```
1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4                       - - -

5   IN RE:  NATIONAL            :

    PRESCRIPTION                :  MDL No. 2804

6   OPIATE LITIGATION           :

    _____ :  Case No.

7                               :  1:17-MD-2804

    THIS DOCUMENT RELATES       :

8   TO ALL CASES                :  Hon. Dan A. Polster

9                       - - -

10          Tuesday, January 22, 2019

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                CONFIDENTIALITY REVIEW

12

                        - - -

13

14      Videotaped deposition of CHRISTOPHER J. FORST,

15  held at the offices of Baker & Hostetler,

16  200 South Civic Drive, Columbus, Ohio  43215,

17  commencing at 9:14 a.m., on the above date, before

18  Carol A. Kirk, Registered Merit Reporter and Notary

19  Public.

20

21                      - - -

22

23          GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

```
 1                 A P P E A R A N C E S:
 2    On behalf of the Plaintiffs:
 3         MCHUGH FULLER LAW GROUP
           BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4              mike@mchughfuller.com
                ALLAN L. ELKINS, ESQUIRE
 5              aj@mchughfuller.com
                AMY J. QUEZON, ESQUIRE
 6              amy@mchughfuller.com
                  (via teleconference)
 7         97 Elias Whiddon Road
           Hattiesburg, Mississippi  39402
 8         601-261-2220
 9
      On behalf of Cardinal Health, Inc.:
10
           WILLIAMS & CONNOLLY LLP
11         BY:  JENNIFER G. WICHT, ESQUIRE
                jwicht@wc.com
12              SUZANNE SALGADO, ESQUIRE
                ssalgado@wc.com
13         725 Twelfth Street, N.W.
           Washington, DC  20005
14         202-434-5000
15
      On behalf of AmerisourceBergen Corporation:
16
           JACKSON KELLY PLLC
17         BY:  GRETCHEN M. CALLAS, ESQUIRE
                gcallas@jacksonkelly.com
18         500 Lee Street East, Suite 1600
           Charleston, West Virginia  25301
19         304-340-1169
20
      On behalf of Walmart:
21
           JONES DAY
22         BY:  CASTEEL BORSAY, ESQUIRE
                cborsay@jonesday.com
23         325 John H. McConnell Boulevard, Suite 600
           Columbus, Ohio  43215-2673
24         614-469-3939
```

```
 1    On behalf of CVS Indiana, LLC and CVS RX Services,
      Inc.:
 2
             ZUCKERMAN SPAEDER LLP
 3           BY:  DANIEL P. MOYLAN, ESQUIRE
                  dmoylan@zuckerman.com
 4           100 East Pratt Street, Suite 2440
             Baltimore, Maryland  21202
 5           410-949-1159
 6
      On behalf of Endo Pharmaceuticals, Inc.,
 7    Endo Health Solutions, Inc., and Par Pharmaceutical
      Companies, Inc. (via video stream and realtime):
 8
             ARNOLD & PORTER KAYE SCHOLER, LLP
 9           BY:  DAVID HIBEY, ESQUIRE
                  david.hibey@arnoldporter.com
10           601 Massachusetts Avenue, NW
             Washington, DC  20001
11           202-942-5041
12
      On behalf of Johnson & Johnson and
13    Janssen Pharmaceuticals:
14           TUCKER ELLIS LLP
             BY:  GIUSEPPE W. PAPPALARDO, ESQUIRE
15                gwp@tuckerellis.com
             950 Main Avenue, Suite 1100
16           Cleveland, Ohio  44113
             216-592-5000
17
18    On behalf of McKesson:
19           COVINGTON & BURLING LLP
             BY:  EMILY L. KVESELIS, ESQUIRE
20                ekveselis@cov.com
             One CityCenter
21           850 Tenth Street, NW
             Washington, DC  20001
22           202-662-5110
23
24
```

```
 1   On behalf of Pernix Therapeutics (via video stream and
     realtime):
 2
         CLARK MICHIE LLP
 3       BY:  BRUCE CLARK, ESQUIRE
              bruce.clark@clarkmichie.com
 4       220 Alexander Street
         Princeton, New Jersey  08540
 5       609-423-2142
 6
     On behalf of Rochester Drug Cooperative (via video
 7   stream and realtime):
 8       ALLEGAERT BERGER & VOGEL, LLP
         BY:  LUCY N. ONYEFORO, ESQUIRE
 9            lonyeforo@abv.com
         111 Broadway, 20th Floor
10       New York, New York  10006
         212-616-7060
11
12   On behalf of the West Virginia Board of Pharmacy
     (via video stream and realtime):
13
         BAILEY & WYANT, PLLC
14       BY:  JUSTIN C. TAYLOR, ESQUIRE
              jtaylor@baileywyant.com
15       500 Virginia Street East
         Charleston, West Virginia  25301
16       304-345-4222
17
     On behalf of Christopher J. Forst:
18
         SYBERT, RHOAD, LACKEY & SWISHER, LLC
19       BY:  ZACHARY M. SWISHER, ESQ.
              zach@law153group.com
20       153 South Liberty Street
         Powell, Ohio  43065
21       614-785-1811
22
23
24
```

```
 1   On behalf of UCB (via teleconference):

 2         HUGHES HUBBARD & REED, LLP

           BY:  DIANE E. LIFTON, ESQUIRE

 3              diane.lifton@hugheshubbard.com

           One Battery Park Plaza

 4         New York, New York  10004

           212-837-6860

 5

 6   On behalf of C&R Pharmacy (via teleconference):

 7         COLLINSON, DAEHNKE, INLOW & GRECO

           BY:  AMANDA E. ROSENTHAL, ESQUIRE

 8              amanda.rosenthal@cdiglaw.com

           2110 East Flamingo Road, Suite 305

 9         Las Vegas, Nevada  89119

           702-979-2132

10

11

12   ALSO PRESENT:

13      Edna Jamison, McHugh Fuller

        Mike Newell, Videographer

14      Gina Veldman, Trial Technician

15

16

17

18

19

20

21

22

23

24
```

```
1     VIDEOTAPED DEPOSITION OF CHRISTOPHER J. FORST

2                    INDEX TO EXAMINATION

3   WITNESS                                        PAGE

4   CHRISTOPHER J. FORST

5       CROSS-EXAMINATION BY MR. FULLER:            13

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    VIDEOTAPED DEPOSITION OF CHRISTOPHER J. FORST
 2                 INDEX TO EXHIBITS
 3    CARDINAL-FORST     DESCRIPTION                 PAGE
 4    Cardinal-Forst 1   Letter to Mr. Forst from     17
                         Mr. Moné, dated February 1,
 5                       2008, with attachments,
                         Bates-stamped CAH_MDL2804_
 6                       03195258 through 3195309
 7    Cardinal-Forst 2   E-mail to Mr. Reardon and    46
                         others from Ms. McPherson,
 8                       dated 1/28/2008, with
                         attachments, Bates-stamped
 9                       CAH_MDL_PRIORPROD_DEA07_008
                         63981 through 863982
10
      Cardinal-Forst 3   Document titled "Process to  63
11                       Establish SOM Threshold
                         Limits," Bates-stamped
12                       CAH_MDL_PRIORPROD_AG_000001
                         7 through 20
13
      Cardinal-Forst 4   Chemical Handler's Manual    101
14
      Cardinal-Forst 5   Document titled "Report to   104
15                       the U.S. Attorney General
                         by the Suspicious Orders
16                       Task Force (Comprehensive
                         Methamphetamine Control Act
17                       of 1996)," Bates-stamped
                         CAH_MDL_PRIORPROD_HOUSE_000
18                       2207 through 2298
19    Cardinal-Forst 6   21 U.S.C.A. 830              109
20    Cardinal-Forst 7   21 C.F.R. 1301.74            127
21    Cardinal-Forst 8   21 U.S.C.A. 801              117
22    Cardinal-Forst 9   Demonstrative prepared by    133
                         Attorney Fuller
23
24
```

```
 1              INDEX TO EXHIBITS (CONT'D)
 2   CARDINAL-FORST     DESCRIPTION                PAGE
 3   Cardinal-Forst 10  Document titled "On-Site   133
                        Investigations," Bates-
 4                      stamped CAH_MDL_PRIORPROD_
                        AG_0000174 through 188
 5
     Cardinal-Forst 11  21 C.F.R. 1310.05          139
 6
     Cardinal-Forst 12  Document titled "Detecting 148
 7                      and Reporting Suspicious
                        Orders and Responding to
 8                      Threshold Events,"
                        Bates-stamped CAH_MDL_
 9                      PRIORPROD_HOUSE_0001004
                        through 1010
10
     Cardinal-Forst 13  Document titled "Daily     166
11                      Threshold Reporting," Issue
                        Date:  1/29/10, Bates-
12                      stamped CAH_MDL_PRIORPROD_
                        AG_0000007 through 12
13
     Cardinal-Forst 14  Demonstrative prepared by  189
14                      Attorney Fuller
15   Cardinal-Forst 15  Corporate Quality          198
                        Regulatory Compliance
16                      Manual," Bates-stamped
                        CAH_MDL_PRIORPROD_DEA07_011
17                      88147 through 1188182
18   Cardinal-Forst 16  Document titled "Compliance 205
                        Group Ingredient Limit
19                      Report," Bates-stamped
                        CAH_MDL_2804_00689780
20                      through 689780
21   Cardinal-Forst 17  Demonstrative prepared by  245
                        Attorney Fuller
22
     Cardinal-Forst 18  Demonstrative prepared by  245
23                      Attorney Fuller
24
```

```
 1            INDEX TO EXHIBITS (CONT'D)

 2   CARDINAL-FORST    DESCRIPTION                 PAGE

 3   Cardinal-Forst 19  E-mail to Mr. Hartman and   248
                        others from Mr. Forst,
 4                      dated 11/6/2009, Bates-
                        stamped CAH_MDL2804_
 5                      00992982 through 992983

 6   Cardinal-Forst 20  E-mail chain ending with an 269
                        e-mail to Ms. Todd from
 7                      Mr. Forst, dated 9/9/2011,
                        Bates-stamped CAH_MDL2804_
 8                      00289420 and 289421

 9   Cardinal-Forst 21  Declaration of Michael A.   294
                        Moné Pursuant to 28 U.S.C.
10                      1746, Bates-stamped
                        CAH_MDL_PRIORPROD_DEA12_000
11                      14053 through 1408

12   Cardinal-Forst 22  E-mail chain ending with an 297
                        e-mail to Ms. Swedyk and
13                      Mr. Forst from Ms. Hug,
                        dated 2/15/10, Bates-
14                      stamped CAH_MDL_PRIORPROD_
                        DEA12_00011836 and 11837
15
     Cardinal-Forst 23  E-mail ending with an       300
16                      e-mail to GMB-QRA-
                        Anti-Diversion from
17                      Mr. Forst, dated 9/30/10,
                        Bates-stamped CAH_MDL_
18                      PRIORPROD_DEA12_00003250
                        and 3251
19
     Cardinal-Forst 24  Document titled "Cardinal   312
20                      Health - Lakeland Threshold
                        Events," Bates-stamped
21                      CAH_MDL_PRIORPROD_DEA12_000
                        04353 through 4355
22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)

 2   CARDINAL-FORST      DESCRIPTION                 PAGE

 3   Cardinal-Forst 25  E-mail to Mr. Quintero from   322
                        Mr. Rausch, dated 10/22/10,
 4                      with attachment, Bates-
                        stamped CAH_MDL2804_
 5                      01103874 through 1103876

 6   Cardinal-Forst 26  Amended Declaration of        336
                        Michael A. Moné Pursuant to
 7                      28 U.S.C. 1746, Bates-
                        stamped CAH_MDL_PRIORPROD_
 8                      DEA12_00014224 through
                        14253
 9
     Cardinal-Forst 27  Cardinal Health, Inc.'s       376
10                      Second Supplemental
                        Objections and Responses to
11                      Plaintiffs' First Combined
                        Discovery Requests
12
     Cardinal-Forst 28  E-mail chain ending with an   369
13                      e-mail to Mr. Reardon and
                        others from Mr. Lawrence,
14                      dated 10/19/2007, Bates-
                        stamped CAH_MDL_PRIORPROD_
15                      DEA07_00883454 through
                        883456
16
17   CERTIFIED QUESTIONS
18   Page 244, line 18
19   Page 342, line 12
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2              P R O C E E D I N G S

 3                      - - -

 4              THE VIDEOGRAPHER:  We are now

 5        on the record.  My name is Michael

 6        Newell.  I am a videographer for

 7        Golkow Litigation Services.

 8              Today's date is January 22,

 9        2018.  The time is 9:14 a.m.

10              This deposition is being held

11        in Columbus, Ohio in the matter of

12        National Prescription Opiate

13        Litigation for the Northern

14        District of Ohio, Eastern Division.

15              The deponent today is Chris

16        Forst.

17              Will counsel please identify

18        themselves.

19              MR. FULLER:  Mike Fuller on

20        behalf of the Plaintiff.

21              MR. ELKINS:  A.J. Elkins on

22        behalf of the Plaintiff.

23              MS. BORSAY:  Casteel Borsay

24        with Jones Day on behalf of
```

```
 1          Walmart.

 2               MR. MOYLAN:  Daniel Moylan,

 3          Zuckerman Spaeder, for the CVS

 4          Defendants.

 5               MR. PAPPALARDO:  Giuseppe

 6          Pappalardo with Tucker Ellis for

 7          Johnson & Johnson and Janssen

 8          Pharmaceuticals.

 9               MS. KVESELIS:  Emily

10          Kveselis, Covington & Burling, for

11          McKesson.

12               MS. CALLAS:  Gretchen Callas

13          of the law firm of Jackson Kelly

14          for AmerisourceBergen.

15               MR. SWISHER:  Zach Swisher on

16          behalf of Mr. Forst.

17               MS. SALGADO:  Suzanne

18          Salgado, Williams & Connolly, on

19          behalf of Cardinal Health and

20          Mr. Forst.

21               MS. WICHT:  I'm Jennifer

22          Wicht from Williams & Connolly on

23          behalf of Cardinal Health and

24          Mr. Forst.
```

```
 1              MR. FULLER:  Anybody on the

 2         phone?

 3              MR. HIBEY:  Hello.  This is

 4         David Hibey of Arnold & Porter on

 5         behalf of Endo Health Solutions,

 6         Endo Pharmaceuticals, Par

 7         Pharmaceutical.

 8              MS. ROSENTHAL:  Amanda

 9         Rosenthal from Collinson, Daehnke,

10         Inlow & Greco for C&R Pharmacy.

11              MS. LIFTON:  Diane Lifton,

12         Hughes Hubbard & Reed, UCB.

13              THE VIDEOGRAPHER:  The court

14         reporter today is Carol Kirk and

15         will now swear in the witness.

16                   - - -

17              CHRISTOPHER J. FORST

18   being by me first duly sworn, as hereinafter

19   certified, deposes and says as follows:

20              CROSS-EXAMINATION

21   BY MR. FULLER:

22         Q.   Sir, please state your name for

23   the record.

24         A.   It's Christopher John Forst.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And, Mr. Forst, where are you
 2    currently working?
 3            A.    I'm actually not working right
 4    now.
 5            Q.    When's the last time you did work?
 6            A.    June 30th of 2017.
 7            Q.    And what position was that?
 8    Where?
 9            A.    At Cardinal Health, quality and
10    regulatory affairs.
11            Q.    And your employment with Cardinal
12    Health goes back to about 2005; is that correct?
13            A.    Correct.
14            Q.    Do you know when in 2005?
15            A.    I think my start date was
16    December 1st.
17            Q.    And what position did you
18    originally hold?
19            A.    I was director of pharmacy at a
20    small suburban hospital in Lancaster, Texas.
21            Q.    Was that pharmacy owned by
22    Cardinal?
23            A.    The pharmacy was managed by
24    Cardinal.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And that lasted till about

 2    February of 2008; is that correct?

 3            A.    Correct.

 4            Q.    And I believe in February 2008,

 5    you moved to Columbus area and took a position

 6    inside the QRA department; is that right?

 7            A.    That's correct.

 8            Q.    And what was your position when

 9    you started in QRA in February of 2008?

10            A.    Director of quality and

11    regulatory, the caveat of anti-diversion.

12                  (Reporter clarification.)

13            A.    Caveat of anti-diversion.  It

14    was -- the title was kind of back and forth.

15                  Do I need to speak up?  Okay.

16            Q.    And did you hold that position

17    until the time you left?  I think you said, in

18    June of 2017.

19            A.    Yes.  I was always the director in

20    quality and regulatory affairs.

21            Q.    So being the director of

22    quality/regulatory affairs, you helped to

23    oversee and to address potential diversion

24    issues with controlled substances, correct?
```

```
 1                    MS. WICHT:  Objection to the

 2            form.

 3                    You can go ahead and answer

 4            the question.  My objection is

 5            preserved for the record.

 6            A.    Okay.  Yes.

 7            Q.    And so you know how it flows

 8    and -- I'm sorry.

 9                    Have you ever been deposed before?

10            A.    No.

11            Q.    Okay.  I'm going to ask most of

12    the questions.

13                    Counsel may object.  Let her get

14    her objection out before you start your answer.

15            A.    Okay.

16            Q.    We'll screw this up, trust me,

17    several times, but we'll work to make sure it's

18    clear and that the record is clear.  Okay?

19            A.    Okay.

20            Q.    All right.

21                    MS. LIFTON:  Can I just let

22            our court reporter know that the

23            questioner's microphone is very

24            muffled.  We can hear the witness
```

Highly Confidential - Subject to Further Confidentiality Review

1          very clearly, but it's very

2          difficult to hear the questioner.

3               Sorry about that.

4               MR. FULLER:  Oh, it's because

5          the phone is over there by the

6          witness and not necessarily by me.

7               MS. LIFTON:  Oh, I'm sorry.

8          There's no microphone.  Okay.

9          Thank you.  We'll do our best.

10              (Discussion off the record.)

11                   - - -

12     (Cardinal-Forst Deposition Exhibit 1 marked.)

13                   - - -

14    BY MR. FULLER:

15          Q.   Let's go to P1.3504.

16              MR. FULLER:  It's only one

17          copy, but there's copies of it on

18          there if you want to pass that down

19          and people want to just download

20          them.

21              MS. WICHT:  Oh, okay.  Sure.

22              MR. FULLER:  Trying to not

23          kill as many trees.

24              MS. WICHT:  Okay.  Oh, so

Highly Confidential - Subject to Further Confidentiality Review

1           this is just one.  Okay.  So I may

2           look on with the witness a little

3           bit.

4    BY MR. FULLER:

5           Q.    Now, Mr. Forst, this has been

6    produced to me.  What you have in front of you

7    is 3504.

8               You should also see it on the

9    screen.  Maybe not.

10              All right.  We'll do the copy you

11   have in front of you.

12              Have you seen this document

13   before, Mr. Forst?

14          A.    Yes.

15          Q.    Okay.  Now, the first letter

16   appears to be your hire letter or at least the

17   date you got hired and transferred into a

18   different position with Cardinal here in

19   Columbus; is that correct?

20          A.    Yes.

21          Q.    Did you have a personnel file

22   before this; meaning for your time frame from

23   '05 until February of '08, did you receive

24   evaluations and have stuff that would be in a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    personnel file, if one existed, or do you know?

 2           A.    I had evaluations.  I don't know

 3    where it was filed.

 4           Q.    Fair enough.

 5                 And if you'll go to page 3.  And

 6    the way this is going to work is I called out

 7    the P1. number, which is the number in the upper

 8    right-hand corner of the document.

 9                 Do you see where it says P1.3504?

10           A.    Yes.

11           Q.    And then the point will give us

12    the page number, so third page is .3.

13                 Fair enough?

14           A.    Mm-hmm.

15           Q.    Okay.  Now, this is, at least

16    appears to be, a year-end performance evaluation

17    for Christopher J. Forst, right?

18           A.    Yes.

19           Q.    And it says the manager is Michael

20    Moné; is that correct?

21           A.    Yes.

22           Q.    Was he your boss at that period of

23    time?

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And it also says a second level

 2   manager is Mark Hartman.  Was that accurate?

 3            A.    Yes, that's correct.

 4            Q.    And explain to the jury who

 5   Mr. Moné is.

 6            A.    Mr. Mone is -- was the vice

 7   president over the anti-diversion group.

 8            Q.    Okay.  And you reported directly

 9   to the vice president, correct?

10            A.    Correct.

11            Q.    And who was Mr. Hartman at this

12   time?

13            A.    Mr. Hartman was either a senior

14   vice president or executive vice president, and

15   he was Michael's boss.

16            Q.    Okay.  And that's your

17   understanding at this point in 2009, in the

18   fiscal year 2009, correct?

19            A.    Correct.

20            Q.    Okay.  Now, let's go back with a

21   caveat.

22                  So now the document is up in front

23   of you.  You should have a screen in front of

24   you that displays what's on the big screen and
```

```
 1   what everybody else down the table and myself

 2   are seeing.

 3            You'll notice as we go along,

 4   Ms. Gina to my right, your left, she'll

 5   highlight the different sections we're talking

 6   about and blow them up because some of the

 7   things may be small and harder to read.  So it

 8   will help us as we go along.  Okay?

 9        A.    Okay.

10        Q.    And you're more than welcome to

11   use the hard copy or refer to the screen, but if

12   you're wondering where I may be reading from, if

13   you look at the screen, Gina should be following

14   right along.

15        A.    Okay.

16        Q.    All right.  So let's look at this.

17   This is --

18            MR. FULLER:  On page 3, Gina.

19   BY MR. FULLER:

20        Q.    This is dated June 30 of 2009,

21   correct?

22        A.    Correct.

23        Q.    And it's -- part 1 is "Review of

24   performance goals, 50 percent of overall
```

Highly Confidential - Subject to Further Confidentiality Review

1    performance rating."

2              Do you see that section?

3         A.    Yes.

4         Q.    And did you normally have

5    performance goals related to your job and your

6    duties?

7         A.    Yes.

8         Q.    And who set those goals; do you

9    know?

10        A.    They were a combination of the

11   employee, which is me, and Michael or Mark.

12        Q.    All right.  So it would be a sort

13   of a collaborative effort between the three of

14   you?

15        A.    Correct.

16        Q.    Okay.  So read the first goal to

17   us, if you don't mind.

18        A.    "Prevent DEA license suspensions

19   at the distribution centers."

20        Q.    Okay.  And this time frame, I'm

21   assuming if it goes back from a year from

22   June 30th of 2009 to June 30th of 2008, do you

23   know if you were successful in that goal during

24   that time frame?

```
 1              A.    I don't know.

 2              Q.    Do you remember that being one of

 3    your goals?

 4              A.    I believe that was the goal of

 5    everyone in the -- on the team.

 6              Q.    Okay.  Fair enough.

 7                    Let's go to goal number 2.  Strike

 8    that.  Let me ask you another question first.

 9                    How were you supposed to prevent

10    the license suspension of the distribution

11    centers?

12              A.    By reviewing orders for customers,

13    making sure they met the parameters of the

14    federal guidelines.

15              Q.    So you had to know in doing your

16    job what the parameters were for the federal

17    guidelines, correct?

18              A.    Yes.

19              Q.    And you needed tools to assist you

20    in doing that job, correct?

21                    MS. WICHT:  Object to the

22              form.

23              A.    Yes.

24              Q.    And mainly those tools would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    include possibly on-site investigations; is that

 2    true?

 3             A.    Yes.

 4             Q.    It would also include having

 5    access to information related to the particular

 6    customer as well, correct?

 7             A.    Yes.

 8             Q.    What type of information would you

 9    have to utilize in doing that or trying to

10    achieve that goal to review these orders and

11    prevent the suspension of licenses from your

12    distribution centers?

13             A.    That would depend on the customer.

14             Q.    Can you give us some examples,

15    though?

16             A.    Where the customer is located,

17    what the business model of the customer was,

18    meaning were they a retail independent, a chain,

19    a hospital, a specialty pharmacy.

20             Q.    So I think I've seen it referred

21    to as the type of customer, correct?

22             A.    Correct.

23             Q.    Okay.  Keep going.  I'm sorry.

24             A.    If available, purchase history for
```

Highly Confidential - Subject to Further Confidentiality Review

1    that customer.  If available, purchase histories

2    of a like customer, preferably in the area.

3              Those are, you know, the basics.

4    I mean, that's not -- that's not just the

5    limited set.  That's just some of the basics.

6         Q.    That's not an exhaustive set, but

7    that's some of the core items, correct?

8         A.    Correct.

9         Q.    You might also want to know the

10   number of scripts that they fill on a -- a daily

11   or monthly basis, right?

12        A.    If that was available, yes.  But

13   that doesn't tell you that much.  I mean, just

14   because it's a number, it's just a number.

15        Q.    Now, you mentioned purchase

16   history.  If they're a Cardinal customer, you

17   would certainly have access to that, correct?

18        A.    Yes.

19             MS. WICHT:  Object to the

20        form.

21        A.    Yes.

22        Q.    Now, I'm assuming that you've seen

23   occasions where a customer has purchased from

24   multiple distributors as well, correct?

```
1           A.    We didn't have access to the other

2    distributors' information unless it was given to

3    us by the customer, and then we -- that was just

4    hearsay by what they said.  We're not sure if

5    that was always correct or not.

6           Q.    Meaning we don't know if the

7    customer is always giving us accurate

8    information, right?

9           A.    Correct.

10          Q.    So the best we can --

11          A.    Or the form that they give us

12   is -- it's not an accurate representation of

13   what it is.

14          Q.    Say that again.  I'm sorry.

15          A.    Well, if the customer doesn't

16   understand exactly what we're asking for, then

17   sometimes they would, you know, not give the

18   correct information or information that was

19   usable.

20                And, again, it was a source from

21   that customer, so ...

22          Q.    Sure.  Now, you guys -- I say "you

23   guys."

24                Depending on the customer,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    certainly, you had the ability to ask for drug

 2    utilization reports, drug usage logs, right?

 3                    MS. WICHT:  Object to the

 4           form.

 5           A.    Yes.

 6           Q.    And can you explain to the jury

 7    what those are?

 8           A.    Drug usage forms?

 9           Q.    Yes, sir.  And you just correct me

10    if I am wrong, but you guys could make requests

11    of the pharmacy to print out what they have

12    dispensed over a certain period of time?

13           A.    Yes.  If the pharmacy was -- had

14    the ability and their software was able to do

15    that, yes.

16           Q.    Sure.  And, actually, in the

17    standard order -- standard operating procedures

18    for Cardinal, that's one of the key documents

19    that you're told to ask for when approving new

20    customers, correct?

21                    MS. WICHT:  Object to the

22           form.

23           A.    Correct.

24           Q.    Okay.  Now --
```

```
1           A.   But I wasn't usually the person

2    that was reviewing new customers.

3           Q.   Fair enough.

4                That doesn't necessarily mean the

5    customer has to give had you that information

6    either, does it?

7           A.   No.

8           Q.   They could refuse?

9           A.   They could refuse.

10          Q.   Now, let me ask you, as a

11   pharmacist that was doing these type of reviews,

12   if they refused to give us information for us to

13   help process their orders and determine whether

14   their order is suspicious, that might be an

15   indication that there's something going on,

16   correct?

17          A.   I can't --

18               MS. WICHT:  Object to the

19          form.

20          A.   I can't answer that question.

21          Q.   Why not?  Let me ask you -- strike

22   that.  Let me ask you a different question.

23               Have you ever had customers where

24   you've had a request made for these reports to
```

1    be printed and ran and they refused?

2         A.    I didn't ask for the reports, so

3    I'm not the individual that would be asking for

4    that question, so ...

5         Q.    Yes.  But you would make requests,

6    would you not, of your investigators to obtain

7    that type of information?

8         A.    Yes.

9         Q.    Okay.  Have they ever came back to

10   you and told you, "Pharmacy says they're not

11   going to give us that information"?

12        A.    There were times that was the

13   correct -- that was correct.

14        Q.    And you wouldn't make an

15   assumption either way as to why they may not be

16   willing to give that information; is that what

17   you're telling the jury?

18            MS. WICHT:  Object to the

19            form.

20        A.    I can't answer that question

21   because I don't know the answer.  I don't know

22   the rationale of why the customer is not giving

23   it to us.  They might -- they might consider

24   proprietary information.  They might not know --

```
 1   might not know how to redact it and make it

 2   HIPAA friendly.

 3              So I can't answer that question.

 4        Q.    So how did you deal with it when

 5   those situations arose -- explain that to the

 6   jury -- where you asked an investigator to

 7   obtain a drug usage form and the investigator

 8   comes back to you and says, "They won't give it

 9   to us"?

10        A.    The investigators didn't report to

11   me, so I would ask the investigator's supervisor

12   if there was anything that we could do about it.

13   And it was usually they won't give us the

14   information.  The inspector did an on-site visit

15   because he was there to get the information.

16        Q.    Sure.

17        A.    And there was nothing that looks

18   suspicious to the investigator.  That was the

19   reason we did investigations.

20              It's not just a number.  It's

21   everything surrounding the pharmacy that we

22   could, as Cardinal Health, see.

23        Q.    I understand that.  But my

24   question is, as these items come through you as
```

```
 1   the director of regulatory, would you make any

 2   assumption when they refused to provide it?

 3                   MS. WICHT:  Object to the

 4           form.

 5           A.    I can't answer that question

 6   because I don't know the rationale as to why

 7   they were not providing the information.

 8           Q.    Well, you've already testified

 9   that there were occasions where they would

10   refuse to give it.

11           A.    Yes.

12           Q.    I want to know back in that time,

13   what assumption, if any, did you make?

14           A.    We would try to --

15                   MS. WICHT:  Object to the

16           form.

17           A.    We would try during the inspection

18   to get the information.  If they did not supply

19   it with us, the investigator was there to assist

20   the situation without the information.

21           Q.    And you would agree with me, would

22   you not, that the investigator can't tell where

23   they're ordering from another distributor just

24   by doing his on-site investigation, correct?
```

```
 1                 MS. WICHT:  Object to the

 2          form.

 3          A.    I can't answer that question.  I'm

 4   not the investigator, so I don't know how they

 5   approached that question.

 6          Q.    Have you ever done an

 7   investigation on a facility?

 8          A.    In the form of an investigator,

 9   the -- the way they do one, no.

10          Q.    How did you do one?

11          A.    We used basic similar parameters.

12   But as a pharmacist, I could ask questions that

13   were more specific to dealing with -- asking the

14   pharmacist questions as opposed to some of the

15   investigators.

16                And I'm sure the investigators

17   learned over time the different ways to

18   investigate.

19          Q.    And what would have caused you to

20   go do an investigation instead of just sending

21   the investigator out?

22          A.    Usually a request by either

23   Michael or Mark Hartman.  My expertise was

24   hospitals, so I did mostly the hospital
```

Highly Confidential - Subject to Further Confidentiality Review

1     investigations.

2            Q.     Did you do any pharmacy

3     investigations?

4            A.     I did a handful of pharmacy

5     investigations, yes.

6            Q.     When you say "handful," do you

7     remember which ones?

8            A.     Maybe nine or ten in Florida.

9            Q.     Were these -- and when we say

10    "investigations," were these where you went in

11    and interviewed people, or were these just

12    surveillance type?

13           A.     They were a combination of both.

14           Q.     I'm sorry.  Say that again.

15           A.     They were a combination of both.

16    So depending on what the pharmacy was, it was a

17    surveillance or it was a direct interaction with

18    the pharmacist or the owner or the pharmacist in

19    charge.

20           Q.     And when you say "depending on

21    what the pharmacy was," do you mean type of

22    customer?

23           A.     I mean type of customer.

24           Q.     So if it was a retail independent,

1    you would go in and talk with them, correct?

2          A.    Correct.

3          Q.    If it was a chain pharmacy, you

4    would not go in and talk to them, correct?

5          A.    Correct.

6          Q.    Let's go to goal number 2.  Goal

7    number 2, the description given is "Learn all

8    relative aspects of the suspicious order

9    monitoring system and associated software

10   applications."

11              And you got a score of a 4 on

12   this, both from yourself and your manager,

13   right?

14         A.    Yes.  According to what's on the

15   document, yes.

16         Q.    And 4 says, "Above target."

17              Tell us, what type of suspicious

18   order monitoring system was Cardinal using when

19   you came in February of 2008?

20         A.    Our system was -- generated a list

21   of customers that exceeded their threshold

22   values that was generated each night.  Each

23   customer was reviewed, looking at different

24   aspects of the customer, where they were

Highly Confidential - Subject to Further Confidentiality Review

```
 1    located, relevant information like their

 2    ordering patterns, et cetera, et cetera, and the

 3    orders were either released or cut or cut and

 4    reported as suspicious, depending on the

 5    circumstance.

 6            Q.    Now, at this point in February of

 7    2008, Cardinal just had several of its

 8    distribution centers' licenses suspended; is

 9    that right?

10            A.    That's correct.

11            Q.    So we know out of those

12    distribution centers, they weren't shipping any

13    controlled substances; is that correct?

14            A.    That is correct.

15            Q.    And what they were doing is they

16    were having their other distribution centers

17    services the customers -- let's do it by

18    example.

19                  So, for example, the Lakeland

20    distribution center had its license suspended

21    down in Florida; is that right?

22            A.    Correct.

23            Q.    And instead of those customers

24    going elsewhere, what Cardinal tried to do is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have those customers serviced by Lakeland

 2    serviced from another distribution center out of

 3    either Mississippi or out of Greensboro,

 4    correct?

 5           A.    I believe that is correct.

 6           Q.    Okay.  And when you came in during

 7    this time frame in February of 2008, I think

 8    what you were describing is a threshold-type

 9    system wasn't fully implemented yet either, was

10    it?

11                 MS. WICHT:  Object to the

12           form.

13           A.    The system had been moved from

14    decentralized to a centralized system.  So prior

15    to, I'm guessing, Michael's employment there,

16    the distribution centers were the ones

17    responsible for looking for suspicious orders

18    and monitoring and reporting them.  And that was

19    before my time, so I don't know how that system

20    worked.

21           Q.    Do you know what the policies and

22    procedures were that were in place when you

23    arrived in February of 2008?

24                 MS. WICHT:  Object to the
```

1          form.

2          A.    I was -- I was instructed on how

3    we were to do the forms.  There were policies

4    and procedures in place, and there were rough

5    drafts of new ways that we were going to be

6    doing things that were in place.

7          Q.    So --

8          A.    So it's a system in transition.

9          Q.    Sure.

10         A.    So the policy would change daily,

11   weekly, monthly, as we focused on what we needed

12   to be looking for.

13         Q.    When you say "focused on what we

14   needed to be looking for" --

15         A.    To make sure we were more accurate

16   in what we were looking for, for diversion, for

17   suspicious orders, for Internet pharmacies.  I

18   believe that at that time, it was a big Internet

19   pharmacy crackdown.

20         Q.    And, again, let's back up just for

21   one second.

22               The thresholds that you were

23   describing, those were not completely implicated

24   or -- or applied yet to chain pharmacies, for

```
 1   example, correct?

 2              MS. WICHT:  Object to the

 3        form.

 4        A.    My understanding is all customers

 5   had thresholds.

 6        Q.    All of them?

 7        A.    My understanding was yes.  Now,

 8   some of the thresholds had not been

 9   individualized for the pharmacy based on some of

10   the data that we had, but that was in process to

11   make sure we weren't missing anything.

12        Q.    So it's your understanding that

13   you put blanket thresholds out, even if they

14   weren't individualized, to cause triggers to

15   make sure Cardinal wouldn't miss anything

16   related to suspicious order monitoring?

17        A.    Correct.

18              MS. WICHT:  Object to the

19        form of the question.

20        Q.    And it's your understanding that

21   that was already in place?

22        A.    That was my understanding.

23              MS. WICHT:  That's okay,

24        Chris.  Just make sure that you let
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              him ask a full question before you

 2              start in on your answer and give me

 3              a quick beat.

 4                   THE WITNESS:  Okay.

 5                   MS. WICHT:  You're doing

 6              fine.

 7                   THE WITNESS:  Sorry.

 8                   MS. WICHT:  No.  You're fine.

 9     BY MR. FULLER:

10          Q.    Like I told you, we'll screw this

11     up a bunch.  And by the time we're done, you'll

12     have it down pat.  Kidding.

13                   MS. WICHT:  And that

14              hopefully won't be a skill you'll

15              need for the rest of your life.

16                   MR. FULLER:  Yeah.  Right?

17     BY MR. FULLER:

18          Q.    All right.  Let's take a look at

19     goal number 3.  You actually got involved in

20     this process.  "Draft and update standard

21     operating practices for the suspicious order

22     monitoring system," correct?

23          A.    Correct.

24                   MS. WICHT:  Object to the
```

```
 1             form.

 2             Q.    And when you were doing that, did

 3     you -- when you were -- let me see if I

 4     understood how you -- strike that.

 5                   Tell us how you approached it.

 6             A.    I approached --

 7                   MS. WICHT:  Go ahead.

 8             A.    I approached it by reviewing the

 9     current policies and procedures that were in

10     place, making sure they were translatable to it

11     now being a centralized system.

12             Q.    These were the policies and

13     procedures that were in place when you arrived

14     back in February of 2008, correct?

15             A.    Correct.  And some of those

16     policies and procedures had been updated when I

17     got there.

18             Q.    And you did additional updating to

19     some of these policies and procedures?

20             A.    I reviewed them to see if there

21     was anything from my perspective that could be

22     added to help.

23             Q.    Okay.  And did you make changes to

24     some of the policies and procedures?
```

```
 1              A.    I don't remember.  That was -- I'm

 2    sure I did, but that was 12 years ago, so --

 3              Q.    Fair enough.

 4                    You don't --

 5              A.    -- I can't answer that.

 6              Q.    You don't recollect whether you --

 7    what changes were made, but you believe that

 8    there probably were changes?

 9              A.    I had input in some of -- I had

10    input into some -- the policies to make certain

11    changes.

12              Q.    Okay.

13              A.    But I don't know -- I can't answer

14    that question.

15              Q.    As to which ones, correct?

16              A.    As to which ones, correct.

17              Q.    No?

18                    Do you know what the policy and

19    procedure was before your arrival in February of

20    '08?

21                    MS. WICHT:  Object to the

22              form.

23              A.    No, I don't.

24              Q.    Do you know about the use of
```

Highly Confidential - Subject to Further Confidentiality Review

1   ingredient limit reports --

2          A.    No.

3          Q.    -- or have you ever seen the --

4          A.    No.

5          Q.    Hold on.  Let me finish.

6          A.    Sorry.  Sorry.

7          Q.    Have you ever seen an ingredient

8   limit report?

9          A.    I don't believe I have, no.

10         Q.    Because they were still being

11  produced or -- or ran, at least up until April

12  of 2008, which would have been the time frame

13  that you're in anti-diversion, correct?

14         A.    It would have been probably a

15  month into the time I was in anti-diversion, but

16  I don't know what those reports are.

17         Q.    You don't recollect seeing them?

18         A.    No.

19         Q.    Now, if I show you one, it might

20  jog your memory, correct?

21         A.    Possibly, but ...

22         Q.    Did you review the older policies

23  and procedures that Cardinal had in place?

24         A.    No.

```
 1                    MS. WICHT:  Object to the

 2            form.

 3            Q.    Why not?

 4            A.    Those were before my time.  I

 5     don't even know if I've even seen them.

 6            Q.    So the -- your job --

 7            A.    I don't what -- I don't know what

 8     the process was as -- as it was decentralized

 9     prior to my coming there.

10            Q.    So being one of the individuals

11     that was strapped with updating the policies and

12     procedures to try to, I'm assuming, ensure

13     compliance, correct?

14                    MS. WICHT:  Object to the

15            form.

16            A.    Correct.

17            Q.    Compliance which had recently

18     failed by the demonstration of four DCs losing

19     their license, right?

20                    MS. WICHT:  Object to the

21            form.

22            A.    I can't answer that question.  I'm

23     not -- I don't know the circumstances of why

24     those --
```

```
 1              Q.    Well, let me ask you.  Did you --

 2    did no one ever inform you as to what the

 3    circumstances of the probably -- the potential

 4    problems were or the allegations by the DEA --

 5              A.    Yes.

 6              Q.    -- that were occurring in four

 7    different distribution centers across the

 8    country when you were trying to create these new

 9    policies and procedures to prevent that from

10    happening again?

11              MS. WICHT:  Object to the

12         form of the question.

13              A.    Yes.  They informed me what the

14    allegations were.

15              Q.    Did you look at any of the

16    allegations?  Did you look at the -- any of the

17    immediate suspension orders that were sent to or

18    delivered to or served upon any of the

19    distribution centers to get an idea of what were

20    these actual problems?

21              A.    I believe --

22              MS. WICHT:  Object to the

23         form of the question.

24              A.    I believe I saw them, but I can't
```

1    recollect what's in those.  That's 12 years ago.

2          Q.    I'm not asking you to recollect

3    necessarily what's in them.  I'm just asking if

4    you were shown them --

5          A.    Yes.

6          Q.    -- because I think it would be

7    significant -- and maybe not just me, maybe for

8    the jury -- to know whether or not the person --

9    one of the persons involved with developing this

10   new system actually looked and seen what may

11   have went wrong in the old system to put them in

12   the situation that you were trying to fix.

13               That seems reasonable, right?

14               MS. WICHT:  Object to the

15          form of the multiple questions.

16         A.    It's reasonable.

17         Q.    Okay.  So you mentioned these

18   thresholds.  Who created the thresholds; do you

19   know?

20         A.    The thresholds, to my

21   understanding, were in place and they were

22   created by the individual that worked with

23   Michael that did analytics.  I'm guessing it

24   would be Nick Rausch.

```
 1              Q.    Mr. Rausch.  Good 'ole Nicholas.

 2                    Let's go to 3823.

 3                    MR. FULLER:  Oh, I'm sorry.

 4              For the record -- where is my

 5              copy? -- 3504 is going to be

 6              Plaintiffs' Exhibit 1.

 7                    This is Plaintiffs' Exhibit

 8              2, 3823.

 9                          - - -

10    (Cardinal-Forst Deposition Exhibit 2 marked.)

11                          - - -

12   BY MR. FULLER:

13          Q.    Mr. Forst, this is an e-mail that

14   has an attachment with it.

15                And do you see it's from a Carolyn

16   McPherson?

17                Do you know who that is?

18          A.    Yes.

19          Q.    And in all fairness to you, this

20   was sent out from Ms. McPherson a few days

21   before you arrived there, correct, January 28th

22   of 2008?

23          A.    It appears so by the document,

24   yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Had you already been in

2    talks with the main office -- I'm assuming that

3    at the date of your actual hire, you had been

4    having some conversations, maybe you visited the

5    main office.

6              Anything like that?  Or do you

7    recollect?

8              MS. WICHT:  Object to the

9         form.

10   A.    I don't recollect because there

11   was a transition period in the month of

12   February.  So one week I was at Cardinal

13   corporate and then one week I was at the

14   hospital cleaning -- or closing down and

15   transferring my duties at the hospital.  The

16   next week I was back at Cardinal.

17   Q.    Sure.  I guess my question is --

18   your acceptance letter is dated February 1st of

19   2008.

20   A.    Correct.

21   Q.    I'm assuming you were in

22   conversations with them and maybe had come out

23   to the corporate office here in Columbus prior

24   to February 1.

```
 1              MS. WICHT:  Object to the

 2         form.  Asked and answered.

 3         A.    No, I did not visit the corporate

 4    office.

 5         Q.    So how did that -- how did that

 6    transition happen?  How did it go that you're

 7    coming from Texas to Columbus, Ohio?  Explain

 8    that to us.

 9         A.    I'd known Michael for a long time,

10    and he was searching for people to add to his

11    team, which was just coming along.  And he, you

12    know, asked me if I would be interested, and I

13    said, "It depends."  And I was looking for a

14    change, so I agreed to the -- the change.

15         Q.    And those talks, I'm assuming, all

16    happened prior to this February 1st date where

17    they confirmed and you accepted, right?

18         A.    Correct.

19         Q.    Okay.  What else did he tell you

20    about what you would be doing?

21         A.    He told -- he told me that he

22    needed a pharmacist on board that understood the

23    regulations of controlled substances.

24         Q.    Which you did, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Which I did, coming from the

 2    hospital.  They're across the board the same for

 3    whether your entity is a hospital or retail

 4    pharmacy or whatever.

 5            Q.    You're still a --

 6            A.    There's different -- yeah, right.

 7    There's different parameters that you look for

 8    depending on your base, but I had those skills.

 9            Q.    And you say you had known Michael.

10    How did you know Michael for a long time,

11    Mr. Moné?

12            A.    I met Mr. Moné when I was -- we

13    were in pharmacy school at different schools

14    together, at a pharmacy meeting.

15            Q.    Oh, okay.  So it goes back quite

16    some time, correct?

17            A.    Quite some time.

18            Q.    Not that I'm commenting on your

19    age; I'm just assuming based on your experience.

20                  All right.  Let's go back to 3823.

21    Now, tell us, Mr. Forst, who is Ms. McPherson,

22    Carolyn?

23            A.    Carolyn was one of the directors

24    that -- I don't exactly know her role process.
```

```
1    I believe she was the one that oversaw the

2    policies and procedures and the regulations and

3    some of the stuff at all the distribution

4    centers.

5            Q.    Okay.

6            A.    But I don't know the parameters of

7    her role.

8            Q.    Fair to say that she was in the

9    QRA department, the department you were moving

10   to, correct?

11           A.    Correct.

12           Q.    Okay.  And she sends this e-mail

13   to Mr. Reardon, Mr. Moné, Mr. Rausch, all

14   individuals we've already talked about, correct?

15               MS. WICHT:  Object to the

16           form.

17           A.    Correct.

18           Q.    And the subject is Threshold List.

19               Do you see that?

20           A.    Yes.

21           Q.    And the attachment is "Deloitte

22   threshold values by type, base, size, combo,

23   report."

24               Did I read that right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    And were you aware that Deloitte

 3    was doing work for Cardinal when you arrived?

 4            A.    Not at the time I arrived, no.

 5            Q.    Did you become aware at some point

 6    after that that Deloitte was doing work for

 7    Cardinal?

 8            A.    Probably in 2012 was the first

 9    time I knew Deloitte was working for Cardinal,

10    and I thought that was a new process.

11            Q.    So the fact that you're involved

12    with thresholds and Deloitte had created -- was

13    paid by Cardinal, hired by Cardinal, to create

14    thresholds, you had no idea?

15            A.    I --

16            MS. WICHT:  Object to the

17            form of the question.

18            A.    I have not -- I have not seen this

19    document to my recollection.

20            Q.    So, again, that's my question.  In

21    2008, when you came in to help with SOPs -- and

22    one of the SOPs you worked on related to

23    thresholds, right?

24            MS. WICHT:  Object.
```

```
 1                    Sorry.  Go ahead.

 2          A.    Yes.

 3          Q.    Okay. -- you were not told by

 4   anyone in QRA that you can recollect that

 5   Cardinal already hired Deloitte to set

 6   thresholds for all of its customer types?

 7          A.    No.

 8                MS. WICHT:  Object to the

 9          form of the question.

10          Q.    Okay.  So if we read the first

11   sentence, it says "Attached is thresholds by

12   customer group list supplied by Deloitte.  I

13   have included to the right of the thresholds

14   list, the drug base code list and the customer

15   grouping list.

16                So -- and, again, I understand you

17   haven't been shown this before, Mr. Forst, but

18   if you go to page 3 of the document, I think

19   you'll see it's -- looks like some sort of

20   spreadsheet.  And it says, "Threshold Value

21   Pivot Table, Crossing Customer Type and DEA Base

22   Number With Size."

23                Do you see that there?

24          A.    Yes.
```

```
 1            Q.    Okay.  Now, let me stop you there
 2   and ask you just a general question.
 3                  When you set thresholds, you did
 4   it by customer type, correct?
 5                  MS. WICHT:  Object to the
 6            form of the question.
 7            A.    Correct.
 8            Q.    You also did it by base code
 9   numbers, so each different base code for
10   whatever the customer is, he would have or she
11   would have a different threshold; is that right?
12                  MS. WICHT:  Object to the
13            form of the question.
14            A.    Correct.
15            Q.    Now, some of the threshold numbers
16   may be the same, but it would be a separate
17   threshold for each base code, just to be clear?
18            A.    Correct.
19                  MS. WICHT:  Object to the
20            form.
21            Q.    Okay.  And then it also says by
22   size.  And if you look at the spreadsheet, there
23   are small, medium and large columns.
24                  Do you see that?
```

```
1           A.     Yes.

2           Q.     And do you know how Cardinal was

3    determining size at this time, the time that you

4    arrived in the anti-diversion department, the

5    QRA department?

6           A.     No, I don't know the parameters

7    used to arrive at small, medium, and large size.

8           Q.     What is your understanding of the

9    different processes to determine size that were

10   utilized by Cardinal at any point in your tenure

11   there?

12              MS. WICHT:  Object to the

13          form.

14          A.     Could you repeat the question,

15   please.

16          Q.     Sure.  You agree that -- and let

17   me back up.  Maybe you didn't.

18              Thresholds -- thresholds were also

19   distinguished by the size of the customers,

20   right?

21          A.     Correct.

22          Q.     What is your understanding as to

23   how the size was determined at Cardinal

24   during -- and if the criteria changed from one
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    point of your tenure to another point of your

 2    tenure, that's fine.  Just give me the different

 3    variables if you recollect.

 4              MS. WICHT:  Object to the

 5         form of the question.

 6         A.   Well, for this form, I don't know

 7    what the --

 8         Q.   And I'm not asking you about this

 9    form.  I'm asking you generally.

10         A.   Okay.  So it would be historical

11    purchases.  It would be where the customer is

12    located.

13         Q.   And just so I'm clear, these are

14    factors that went into assigning a small,

15    medium, or large size?

16         A.   Okay.  So that would be --

17              MS. WICHT:  Let him --

18         A.   Sorry.

19         Q.   No.  Go ahead.

20         A.   No.  Go ahead.

21         Q.   No, that was it.  I just wanted to

22    make sure that's how you were determining the

23    brackets.

24         A.   Well, initially I believe it was
```

Highly Confidential - Subject to Further Confidentiality Review

1    by purchase history.  And that's all I know.

2    I'm sorry.  I don't know any more.

3            Q.    No, no.  That's okay.

4                  And when you say "purchase

5    history," are you talking about the volume of

6    purchases?

7            A.    I don't know if it was based on

8    volume, if it was a formula.

9            Q.    You're not sure, you just --

10           A.    I'm not sure.  I have absolutely

11   no idea how they came up with these first

12   numbers.

13           Q.    And just so you know, I'm not

14   asking you how they came up with these numbers

15   on the spreadsheet.  I'm asking you generally.

16                 And correct me if I am wrong, but

17   even up to the time that you left in 2017 when

18   Cardinal was utilizing thresholds, it

19   differentiated between a small, medium, and

20   large customer type --

21           A.    Right.

22           Q.    -- correct?

23           A.    Correct.

24           Q.    Do you even know -- and this is

 1    going back over a little over a year now.

 2              Do you know, even at that time,

 3    how they determined what was a small, medium,

 4    and large customer?

 5         A.   At the time I left, I wasn't doing

 6    the same thing I was doing when I was hired

 7    there.  So I wouldn't know the new definition of

 8    what small, medium, and large was a year or two

 9    years ago.

10         Q.   Other than the definition that

11    you've already given us, which is based on maybe

12    some sort of formula using volume, are you aware

13    of any other way that they determined small,

14    medium, and large at Cardinal?

15              MS. WICHT:  Object to the

16         form.

17         Q.   Relating to thresholds.

18         A.   I'm not aware of that, no.

19         Q.   All right.

20         A.   I don't know the parameters of

21    that.

22         Q.   Now, if you go to page 10 of this

23    document -- so it would be .10 at the top --

24    you'll see this would be the customer type for

```
 1   retail, correct?

 2           A.    Page 10?  Yes.

 3           Q.    Okay.  And if you look in the

 4   second column, we have the column for DEA base

 5   number.

 6                 Do you see that?

 7           A.    Yes.

 8           Q.    And if you go down to 9143 --

 9   which is what?

10           A.    Page 10?

11           Q.    Yes, sir.  What is 9143 the base

12   code for, Mr. Forst?

13           A.    It's hydrocodone or oxycodone.

14   It's been four or five years since.

15           Q.    I'll help you.  It's oxycodone.

16           A.    It's oxycodone, okay.

17           Q.    9193 is hydrocodone.

18           A.    Correct.  Okay.

19           Q.    So 9143 we have there, and we have

20   the small, medium, and large columns.

21                 Do you see that?

22           A.    Yes.

23           Q.    And then we have 12,000 dosage

24   units, 12,000 dosage units, and 20,000 dosage
```

```
 1   units.

 2               Do you see that there?

 3        A.    Yes.

 4        Q.    Okay.  So at least according to

 5   this sheet, at least from -- and, again, I

 6   understand you haven't seen it before, but the

 7   values for thresholds is 12,000 dosage units --

 8   and you -- you measure thresholds by month,

 9   correct?

10        A.    Correct.

11        Q.    Okay.

12        A.    Purchases per month.

13        Q.    So this would be for a retail

14   pharmacy, 12,000, 12,000, and 20,000 for the

15   small, medium, and large related to oxycodone

16   purchases --

17               MS. WICHT:  Object to the

18          form.

19        Q.    -- correct?

20        A.    According to the document, yes.

21        Q.    Okay.  Now, if we jump down to

22   9193 --

23        A.    Hydrocodone.

24        Q.    -- which -- yes, sir, you're
```

```
 1    absolutely right -- which is hydrocodone, we

 2    again have the small, medium, and large, and the

 3    volume is 10,000 dosage units a month for small,

 4    16,000 for medium, and 27,000 for large.

 5              Do you see that there?

 6        A.    Yes.

 7        Q.    Okay.  Now, because you haven't

 8    seen this document before, I'm assuming that you

 9    have no familiarity with how these thresholds

10    were determined or came to by Deloitte.

11              MS. WICHT:  Object to the

12         form of the question.

13        A.    No, I don't know the parameters --

14        Q.    You don't even know --

15        A.    -- or the analytics of what they

16    looked at to arrive at these.

17        Q.    You don't even have any idea what

18    information Cardinal provided to Deloitte to

19    allow them to come up with these analytics,

20    right?

21              MS. WICHT:  Object to the

22         form of the question.

23        A.    That was before my time, and no.

24        Q.    Well, it was before your time, but
```

 1    it was --

 2            A.    But no, I don't know the -- I

 3    don't know what information was given to

 4    Deloitte.

 5            Q.    Okay.  And, again, you're correct.

 6    This is just before, what, three days before

 7    your start date in this division, and I

 8    understand there was a transition period.  But

 9    when working with thresholds, might this have

10    been helpful information for you to have in

11    dealing with thresholds and trying to come up

12    with a better system at Cardinal?

13            MS. WICHT:  Object to the

14            form of the question.

15            A.    Again, this was the work of

16    Michael, Deloitte, and Nick.  So I can't answer

17    that question.  These thresholds in the system

18    were either in place for those customers by

19    their DEA numbers.  And some of them probably

20    had been in place, maybe -- I don't know this --

21    and possibly adjusted already -- I don't know --

22    based on the customer.

23            Q.    Well, I'm not asking you whether

24    you knew that or not.  I think you even

Highly Confidential - Subject to Further Confidentiality Review

 1    indicated when we were talking about looking at

 2    customers and setting thresholds or evaluating

 3    thresholds, what you try to do is you try to

 4    gather as much information as you can, right?

 5              MS. WICHT:  Object to the

 6         form.

 7         A.    Yes.

 8         Q.    And you're sitting there with the

 9    task of improving on this threshold standard

10    operating procedure.  You'd want to have as much

11    information as you can to do that, right?

12              MS. WICHT:  Object to the

13         form.

14         A.    You would want as much pertinent

15    information as you can because too much

16    information is not always helpful.

17         Q.    Sure.  But if this was never

18    offered to you, you have no way to determine

19    whether it would be pertinent or not or even how

20    Deloitte did it or what they considered at the

21    time, correct?

22              MS. WICHT:  Object to the

23         form.

24         A.    I can't answer that because,

1   again, I wasn't part of that process.  So -- and

2   the thresholds were already loaded in the

3   system.  Those were what I knew as the

4   thresholds for small, medium, and large.  And I

5   probably had a piece of paper that had, "This is

6   a retail customer.  These are small, medium, and

7   large."

8              I'm not saying I haven't seen

9   these numbers.  I just haven't -- I don't know

10  how they arrived at those numbers.

11                   - - -

12   (Cardinal-Forst Deposition Exhibit 3 marked.)

13                   - - -

14        Q.   All right.  Well, let's talk about

15  that some more.  Let's go to 4553.  This is

16  going to be Plaintiffs' Exhibit 3.

17              MR. FULLER:  For the record,

18        it's P1.4553.

19  BY MR. FULLER:

20        Q.   And this is a standard operating

21  procedure by Cardinal, an SOP, correct?

22        A.   That is correct.

23        Q.   And it's actually one that you are

24  the owner of, isn't it, if you look at the last

Highly Confidential -- Subject to Further Confidentiality Review

```
 1   page, page 4?

 2         A.    Correct.

 3         Q.    Now, let me ask you, do you know

 4   if the way that Cardinal used thresholds changed

 5   significantly during your tenure there?

 6               MS. WICHT:  Object to the

 7         form of the question.

 8         A.    Yes.

 9         Q.    When did it change significantly?

10   What were those changes, Mr. Forst?  Tell the

11   jury.

12               MS. WICHT:  Object to the

13         form of the question.

14         A.    Well, the system changed.  The

15   more information that we could gather on

16   customers, the more places that we could use to

17   associate a customer with something that would

18   fit, so what is the -- what's around the

19   customer.  We had more information on that.  We

20   had more information on trends.  We had some

21   clinical information that became available that

22   we would look at more closely.

23               So I can't say one specific item.

24   It was just more -- the more -- the longer you
```

1    do something, the more things you find out that

2    you can apply, put formulas to to see if you can

3    do a better job at getting to the conclusion

4    that you want to draw about a customer.

5         Q.    So I'm not necessarily talking

6    about the information that you might consider in

7    setting a threshold.  What I'm referring to is

8    the system as a whole.

9         A.    The system as a whole changed.

10        Q.    How did the system as a whole

11   change?

12        A.    It matured.

13             MS. WICHT:  Object to the

14        form of the question.

15        A.    It matured.  It was basic at the

16   beginning, and it started incorporating more and

17   more analytics and more and more information,

18   statistical analysis, et cetera, et cetera, that

19   you had a better picture of each customer

20   individually.

21        Q.    So let me ask some pointed

22   questions related to this threshold policy and

23   procedure.

24             In order to utilize the policy and

```
 1    procedure, you have to set a threshold for a

 2    customer, correct?

 3                    MS. WICHT:  Object to the

 4            form of the question.

 5            Q.    I'm just wondering because you've

 6    already testified, Mr. Forst, that all customers

 7    had to have thresholds.

 8            A.    Yes.

 9            Q.    So in order to use this process,

10    you had to have a threshold for the customer,

11    right?

12                    MS. WICHT:  Object to the

13            form of the question.

14            A.    Yes.

15            Q.    You hesitate.  Why do you

16    hesitate?

17            A.    Because I would like to read the

18    whole document, because this is --

19            Q.    We can take a break if you want

20    to --

21            A.    Even though it's -- this is in

22    December of 2008, so I would like to read the

23    whole document before I can answer some of the

24    questions.
```

 1          Q.    Okay.  We can take a break and you

 2    can read the whole document.

 3                MS. WICHT:  We're not going

 4          to take a break for read -- if you

 5          want him to answer questions about

 6          a document, he's entitled to read

 7          it and --

 8                MR. FULLER:  He is not going

 9          to use my time to do it.

10                MS. WICHT:  -- we're not

11          going to go off the record for

12          every time he needs to read a

13          document.

14                MR. FULLER:  If he wants to

15          peruse it --

16                MS. WICHT:  This is not a

17          long document.

18    BY MR. FULLER:

19          Q.    Well, Mr. Forst, you go ahead and

20    you start reading.  And if I think it's using up

21    too much of my time, because I have an allotted

22    amount of time, then I'm going to take a break

23    and let you continue to review, and then we'll

24    come back on when you're finished.

```
 1                        So you just tell me when you're

 2      ready to answer questions, Mr. Forst.  I'm ready

 3      to ask them any time you are.

 4              A.    Okay.

 5              Q.    Have you reviewed the entire

 6      document, Mr. Forst?

 7              A.    Yes.

 8              Q.    Okay.  Are you comfortable to

 9      answer questions about this document?

10              A.    I am comfortable to answer

11      questions about the document, but I think what

12      needs to be established is just because I'm the

13      owner, does not mean the person that authored

14      the document or necessarily uses the document.

15                        This is a document that the

16      analytics team would use, which would be Nick

17      Rausch.

18              Q.    I'm just asking if you reviewed

19      it --

20              A.    Yes.

21              Q.    -- far enough that I can ask you

22      questions about it.

23              A.    Yes.

24              Q.    It lists you as the owner on it,
```

1  doesn't it?

2       A.    Yes.  The system lists me as the

3  owner.

4       Q.    Now, my next question is, when's

5  the last time you've reviewed this document; do

6  you know?

7       A.    I have no idea.

8       Q.    We're talking years ago, right?

9       A.    Right.

10      Q.    Now, this is a standard operating

11  procedure which Cardinal utilized to help

12  prevent the diversion of controlled substances,

13  right?

14            MS. WICHT:  Object to the

15            form of the question.

16      A.    This appears to be how the

17  thresholds were developed and how to apply

18  thresholds to customers.  That's what it appears

19  to be to me --

20      Q.    And the core of --

21      A.    -- in an -- in an analytical form.

22      Q.    And the core of Cardinal's

23  suspicious order monitoring process was the

24  threshold system, correct?

1          MS. WICHT:  Object to the

2      form.

3          A.    Correct.

4          Q.    Okay.  And, again, we're talking

5      about the anti-diversion department, so we're

6      talking about people who want to prevent the

7      diversion of controlled substances, right?

8          A.    Correct.

9          MS. WICHT:  Object to the

10      form of the question.

11          Q.    And you already mentioned the

12      issue with regulatory compliance, both with the

13      Controlled Substances Act, I believe, as well as

14      the Code of Federal Regulations that also apply,

15      right?

16          MS. WICHT:  Object to the

17      form of the question.

18          Mischaracterizes.

19          A.    Yes.

20          Q.    Okay.  Read the Purpose to us, if

21      you will, Mr. Forst.

22          A.    The Purpose, "To outline the

23      conceptual framework and methodology to follow

24      when formulating threshold limits for the

Highly Confidential - Subject to Further Confidentiality Review

1    Suspicious Order Monitoring (SOM) program."

2         Q.    Okay.  So it's the framework, the

3    conceptual framework, for this whole threshold

4    system, right?

5         A.    According to the policy, yes.

6         Q.    Well, not only according to the

7    policy.  You know from working there over a

8    decade in this division that it's the core of

9    the system, isn't it?

10                MS. WICHT:  Object to the

11              form.

12         A.    At this time, according to this

13    policy, yes.

14         Q.    Sir, based on your knowledge and

15    expertise in working in this department, was it

16    the core of the system, or was it not?

17                MS. WICHT:  Object to the

18              form.  Vague.

19         A.    I can't answer that.  I mean --

20         Q.    So, Mr. Forst, during your time

21    with the anti-diversion department, and one of

22    your goals being to prevent the loss of license

23    for other distribution centers, what was the

24    core of the system that you guys implemented to

```
 1   try to prevent diversion?

 2              MS. WICHT:  Object to the

 3         form of the question.

 4         Q.    Tell the jury, please.

 5         A.    Can you define the word "core" for

 6   me.

 7         Q.    The main issue.  What was the

 8   core?  What was the focus of what your

 9   department was doing to try to prevent

10   diversion?

11              MS. WICHT:  Object to the

12         form of the question.

13         A.    Analyzing customer purchases to

14   try to figure out whether diversion was

15   occurring at that customer store or that

16   DEA-licensed store.

17         Q.    Now -- and let's be fair.  Your

18   obligation isn't to determine whether diversion

19   is occurring, is it?  It's suspicion?

20         A.    It's suspicion.

21              MS. WICHT:  Object to the

22         form.

23         Q.    It's suspicion of potential

24   diversion.  Very low standard, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. WICHT:  Object to the

 2         form.

 3         A.    I --

 4              MS. WICHT:  Calls for a legal

 5         conclusion.

 6         A.    I can't answer that question.

 7         Q.    Well, you evaluated threshold

 8    events to determine whether there was potential

 9    diversion, right?

10         A.    Correct.

11         Q.    So before you reported someone to

12    the DEA for a suspicious order, did you have

13    that -- did you require hard proof of diversion,

14    or did you report suspicion?

15         A.    We were --

16              MS. WICHT:  Object to the

17         form of the question.

18         A.    Can we take a break?

19         Q.    No.  There's a question pending.

20              MS. WICHT:  Yeah.  We can't

21         take a break when there's a

22         question pending --

23              THE WITNESS:  Okay.

24              MS. WICHT:  -- unless you
```

1          have an issue about privilege.  So

2          you can do your best and then --

3          A.    Please ask the question again.

4          Q.    So you, evaluating suspicious

5    orders or threshold events, did you report

6    someone to the DEA once you had rock solid proof

7    of diversion, or was your job to report someone,

8    and did you just report them, when they were

9    suspicious orders?

10          MS. WICHT:  Object to the

11          form of the question.

12          A.    We reported them when we thought

13   there was a high potential for diversion

14   occurring at those stores.

15          Q.    Where did you get the basis for a

16   high potential of diversion?  Where did that

17   threshold come from?

18          MS. WICHT:  Object to the

19          form of the question.

20          A.    It's not -- it's not a threshold.

21   It's -- it's a combination of what you look at

22   at the store and the information that you have

23   on the store.

24          Q.    You're supposed to report orders

```
 1   of normal size, pattern, and frequency, correct?

 2                   MS. WICHT:  Object to the

 3            form of the question.

 4            A.    Correct, but that's a very vague

 5   statement.  I mean, what's normal for -- what's

 6   large for one individual might not be large for

 7   another individual.

 8            Q.    Fair enough.

 9                   MR. FULLER:  We can take your

10            break now.

11                   THE VIDEOGRAPHER:  We're

12            going off the record at 10:16.

13                   (Recess taken.)

14                   THE VIDEOGRAPHER:  We're back

15            on the record at 10:32.

16   BY MR. FULLER:

17            Q.    All right, Mr. Forst.  Before the

18   break, we were looking at this standard

19   operating procedure related to threshold limits

20   and establishing them at Cardinal, right?

21            A.    Correct.

22            Q.    The scope of this threshold, it

23   applies to all pharmaceutical operations and

24   customers, QRA, or quality regulatory affairs,
```

```
1    as well as supply chain integrity, doesn't it?

2            A.    Correct.

3            Q.    All right.  Now, the policy.  Read

4    to us the intent of this policy.  Let's do one

5    sentence at a time.  It's right there on .4 or

6    4.0 right there on the first page.

7            A.    Oh, the policy, okay.

8                  "The intent of calculating

9    threshold limits is to establish a baseline

10   purchase pattern for all monitored items."

11           Q.    So this is going to help us

12   calculate the threshold limits for all

13   baseline -- for the baseline for all monitored

14   items, and that would be all of our controlled

15   substances, correct?

16                 MS. WICHT:  Object to the

17           form.

18           A.    Controlled substances and List I

19   chemicals.

20           Q.    Now, help me understand.  What's

21   there -- is there a difference between

22   controlled substances and List I chemicals?

23           A.    Yes.

24           Q.    List I chemicals are separate and
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    distinct from controlled substances; isn't that

 2    true?

 3               MS. WICHT:  Object to the

 4          form of the question.

 5          A.    According to the DEA, yes.

 6          Q.    Well, it's the Controlled

 7    Substances Act, as well as the regulations that

 8    regulate both, correct?

 9          A.    Correct.

10          Q.    Now, do you also have to monitor

11    List I chemicals if they are found in controlled

12    substances?

13          A.    No.  The -- I believe the

14    controlled substance takes precedence.

15          Q.    Fair enough.

16               Read the next sentence of the

17    policy related to these thresholds.

18          A.    "The baseline purchase pattern is

19    then adjusted up by a statistically significant

20    factor or variable to formulate the threshold

21    limit."

22          Q.    So in reality, we determine what

23    an average is, and then we -- it says "adjusted

24    up by a statistically significant factor or
```

Highly Confidential - Subject to Further Confidentiality Review

1    variable."

2              Did you guys at Cardinal adjust up

3    the average for thresholds by a statistically

4    significant factor or variable?

5              MS. WICHT:  Object to the

6         form.  Mischaracterizes.

7         A.    I don't know what their formula

8    was or the analytics behind that.

9         Q.    Okay.  Let's keep going.  Read the

10   next sentence.

11        A.    "The subsequent implementation of

12   threshold limits allows a SOM program to

13   identify customers whose order pattern

14   significantly deviates from the baseline or

15   normalized purchase pattern."

16        Q.    Okay.  So this helps to see

17   deviations from normal patterns, basically,

18   right?

19        A.    Correct.

20        Q.    And that's part of what our

21   requirement is under the regulations, which

22   we'll look at later, is making sure we're not

23   seeing unusual size, pattern, and frequency

24   occurring when we're dealing with controlled

```
 1    substances and our customers, right?

 2              MS. WICHT:  Object to the

 3         form.

 4         A.    Correct.

 5         Q.    Okay.  So let's go down to the

 6    methodology, which is at the bottom of the page,

 7    or at least starts on the bottom of the page.

 8              Do you see that section?

 9         A.    Yes.

10         Q.    It says, "The following

11    methodology outlines the steps to be followed

12    when calculating threshold limits.  Any

13    variation or deviation from the below

14    methodology must -- must -- be approved by

15    corporate QRA."

16              MR. FULLER:  Underline must,

17         please.

18    BY MR. FULLER:

19         Q.    Did I read that accurately?

20         A.    Correct.

21         Q.    Okay.  So if we're going to

22    deviate from this pattern, corporate QRA has to

23    approve; is that correct?

24              MS. WICHT:  Object to the
```

1          form.

2          A.    According to this document,

3    correct.

4          Q.    Is that the way it was operated at

5    Cardinal?

6                MS. WICHT:  Object to the

7          form.

8          Q.    Or do you know?

9          A.    The methodology?

10         Q.    Yeah, how you guys ran --

11         A.    The way the methodology --

12         Q.    How you ran your department

13   related to thresholds.

14                If there was going to be a

15   different deviation from the standard operating

16   procedure that was set out and approved, did

17   that had to -- have to be approved by corporate

18   QRA?

19         A.    As far as I know, it was.

20         Q.    Okay.  Let's go to the next page.

21                So, Mr. Forst, for you and the

22   record, we're on page 2, right?

23         A.    Correct.

24         Q.    All right, 4.2.1 says, "Extract a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    formula list of customers and historical sales

 2    data."

 3              That's the first step in our

 4    process, according to this, right?

 5         A.    Correct.

 6         Q.    And that, again, goes to what you

 7    were talking about earlier, pulling historic

 8    sales information if we have it?  Fair enough?

 9              MS. WICHT:  Just to clarify,

10         it says "extract and format."  I

11         think you read it as "extract a

12         formula," Mike.

13              MR. FULLER:  Sure.  Sorry.

14              MS. WICHT:  It's okay.

15    BY MR. FULLER:

16         Q.    "Extract and format a list of

17    customers and historical sales data.

18              And if you look down at b, I think

19    it asks us to do it for the period of a -- a

20    year, 12 months; is that right, Mr. Forst?

21         A.    According to the document, yes.

22         Q.    Okay.  Is that your recollection

23    as well, or do you remember some other time

24    frame?
```

```
 1            A.    Again, this was the analytics side

 2     under Michael.  So if the document says it's

 3     12 months, it's probably a 12-month period.

 4            Q.    Okay.  You have no reason --

 5            A.    As time changed, it might have

 6     changed, but at this time, it was a 12-month

 7     period, according to this document.

 8            Q.    So at least based on your

 9     recollection, you have no basis to disagree with

10     that, correct?

11            A.    No.

12            Q.    All right.  Let's go to 4.2.2.

13     "Differentiate customers through segmentation."

14     It says, "The segmentation of customers is

15     preferred, but is an optional step."

16                  Do you see that there, Mr. Forst?

17            A.    Yes.

18            Q.    Differentiating customers is what

19     we talked about earlier, the different types --

20            A.    Correct.

21            Q.    -- chains, retail independents,

22     hospitals, so forth and so on, correct?

23            A.    Correct.

24            Q.    Okay.  And it's your understanding
```

 1   that that also was done related to thresholds,

 2   correct?

 3          A.    Correct.

 4          Q.    All right.  4.2.3.

 5                It says, "Evaluate historical

 6   controlled substance sales data per drug family,

 7   per month for each customer segment to establish

 8   appropriate threshold limits."

 9                Did I read that accurately,

10   Mr. Forst?

11          A.    Yes.

12          Q.    And is that part of the process as

13   you understood it at Cardinal?

14          A.    For the methodology, yes.

15          Q.    And if you go down to part b of

16   this section, it says, "Calculate thresholds --

17   threshold limits for each base code for all

18   customers."

19                And then it gives you i through

20   vii on the next page that sets out how to do

21   that; is that right?

22                MS. WICHT:  For all customer

23          segments.

24                MR. FULLER:  Segments.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MS. WICHT:  Yeah.

 2                 MR. FULLER:  I'm sorry.

 3                 MS. WICHT:  No problem.

 4                 MR. FULLER:  Jennifer likes

 5          making fun of the fact I can't read

 6          just because I'm from Mississippi.

 7          A.    That is correct.

 8          Q.    Okay.  And what it basically tells

 9     you to do is it tells you to come up with the

10     average of the different base codes for each

11     segment, correct?  And we can walk through it

12     step by step.  Let's go through it step by step.

13     It won't take us long.

14                 It says, "The thresholds will be

15     calculated using consistent historical sales

16     data.  The intent is to remove the erratic

17     purchase patterns from the data as to not skew

18     the threshold limit values."

19                 Did I read that right?

20          A.    Yes.

21          Q.    And then part -- or ii says,

22     "Determine the total dosage unit quantities

23     purchased per segment per base code over the 12

24     months" -- so what we're doing is we're looking
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   at the total quantities or dosage unit, which is

 2   number of pills; is that correct?

 3          A.    Correct.

 4          Q.    -- "for the 12-month period by

 5   each segment, by each base code."

 6                Is that fair?

 7          A.    Correct.

 8          Q.    Okay.  So now let's go to iii.

 9   "Identify the number of DEA numbers" -- which

10   would be the number of customers presumptively,

11   correct?

12          A.    Correct.  I mean, a DEA number is

13   associated with a -- an entity, yes.

14          Q.    Fair enough.

15                "Identify the number of DEA

16   numbers who purchased each base code over the

17   12 months for each segment."

18                And then we take that number and

19   then we determine the annual quantity per DEA

20   number for the base code for each segment.  So

21   we just divide the total number of dosage units

22   by the number of DEA numbers or customers buying

23   that base code, right?

24          A.    Yes.
```

1    Q.    And then it says -- and that will

2    give us a total per segment per DEA number per

3    base code for the year.

4           Then it says, "Determine the

5    monthly quantity per DEA number."  And we know

6    we've got to divide the annual number by 12

7    because there's 12 months in a year, right?

8    A.    Correct.

9    Q.    Then there -- here's where I want

10   to you a little bit about.

11          Then it says, "Multiply the

12   monthly quantity per DEA number per base code

13   for each segment by a factor of 3, 5, or 8.  The

14   multiplication factor of 3, 5, or 8 is to be

15   implemented in the following manner:  Three:

16   hydrocodone, oxycodone, alprazolam, and

17   phentermine drug families; Five:  All remaining

18   ARCOS-reportable drug families; Eight Factor:

19   All remaining monitored items not multiplied by

20   3" -- "by a factor of 3 or 5."

21          Did I read that correctly?

22   A.    Correct.

23   Q.    So where did Cardinal come up with

24   this 3, 5, and 8?

```
 1              A.    I don't know that answer.

 2              Q.    Well, if we're trying to look for

 3      outliers, does that make sense, to take our

 4      average threshold and then multiply it by -- for

 5      example, for oxycodone three times?

 6              A.    I don't --

 7                    MS. WICHT:  Object to the

 8              form of the question.

 9              A.    I don't know --

10                    MS. WICHT:  Calls for

11              speculation.

12              A.    I don't know what the analytics

13      were behind those numbers.

14              Q.    Well, you've been in -- you've

15      been looking and dealing with anti-diversion

16      issues for a significant period of time, right?

17              A.    Yes.

18                    MS. WICHT:  Object to the

19              form.

20              Q.    Even going back to your time at

21      the hospital in Texas, correct?

22              A.    Correct.

23              Q.    So when you look at thresholds and

24      you come up with an average for a drug family
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   and a segment, does it make sense to then

2   multiply it by 3 --

3               MS. WICHT:  Object to the

4           form of the question.

5       Q.    -- for a threshold?

6               Explain to me from a regulatory

7   perspective --

8       A.    An --

9               MS. WICHT:  Let him finish

10          the question.

11      A.    Okay.

12      Q.    Explain to me from a regulatory

13  perspective, if we're looking for potential

14  suspicious orders, how that makes sense.

15  Explain that to the jury.

16              MS. WICHT:  Object to the

17          form of the question.  Vague.

18          Calls for a legal conclusion.

19      A.    There will be fluctuations in

20  ordering patterns, so if you don't -- if you

21  just take an average, there were people that are

22  going to be above the average or below the

23  average --

24      Q.    Sure.
```

```
 1              A.    -- so you need to adjust for

 2    factors so that they're not continually hitting

 3    thresholds, because the number that you come up

 4    with is just an average.  You're going to have

 5    to also look at other things to adjust.  So you

 6    don't want every order that comes across, just

 7    because it's associated with an average, to hit

 8    the threshold.  You have to have a little bit of

 9    play room in there for fluctuations in number of

10    times they order a month or whatever.

11              So I don't know how they came up

12    with those numbers, but I'm assuming there has

13    to be some factor in there for fluctuations in

14    times you order a month, et cetera, et cetera.

15              Q.    Sure.  And I get that.  And, like

16    you said, it's an average.  So in order to have

17    that as an average, we have to have people above

18    it and people below it, right?

19              A.    Correct.

20              Q.    And that's how you come up with an

21    average, correct?

22              A.    Correct.

23              Q.    Now -- and I understand what

24    you're saying, we need to have some buffer.  But
```

1    why not a 100 percent buffer?  Why not just

2    increase it another 100 percent?

3              You're increasing it 300 percent

4    by multiplying it by 3, right?

5         A.    I --

6              MS. WICHT:  Object to the

7         form.

8         A.    I don't know the analytics behind

9    those numbers.

10        Q.    But you're --

11        A.    I mean, it could be a standard

12   deviation.  I don't know what the analytics is

13   behind those numbers, so I can't answer that

14   question.

15        Q.    So as one evaluating thresholds,

16   the owner, at least according to the document,

17   of this policy and procedure related to

18   thresholds and establishing thresholds, you

19   didn't ask anybody, "Hey, where did we get this

20   3, 5, and 8 multiplying factors"?

21        A.    Okay.

22              MS. WICHT:  Object to the

23        form of the question.

24        A.    The owner of the document in the

```
 1    document system is not the final approval --

 2    approver of the document.  So, yes, I've read

 3    that.  I probably discussed it with Nick, "Is

 4    this the formulas that we are using"?

 5           Q.    I mean, did you ask why?  I mean,

 6    listen, it may not be that you are the final

 7    approver of the document, but you are the owner,

 8    and whatever Cardinal says it means, I guess it

 9    means.  But your name's on it?

10           A.    I understand that.

11           Q.    So do you have any basis for

12    allowing a three-time multiplier to an average

13    to be a threshold for any pharmacy?

14                 MS. WICHT:  Object to the

15           form of the question.  Vague.

16           Asked and answered.

17           A.    I can't answer that, because I

18    don't know the analytics behind this.

19           Q.    So you just --

20           A.    I'm not a statistician, so I don't

21    know where you should put your limits, whether

22    it's one standard deviation, two standard

23    deviations.

24                 Again, a threshold is just
```

1    something that helps you to see what's going on

2    with the customer.

3           Q.    Absolutely.  It's the trigger --

4           A.    You can have a threshold of 1 and

5    everybody hit and you'd review every order.

6    That would not make any sense.

7           Q.    No.  Or you could have a threshold

8    set three times the average so nobody triggers

9    it so you don't have to review anybody, right?

10          A.    But, again, it's an --

11               MS. WICHT:  Object to the

12          form of the question.

13          A.    But, again, it's an average.

14          Q.    But it's -- sir, my question is,

15   or you can multiply the threshold -- the average

16   by some number to make it so large that no one

17   triggers it, correct?

18               MS. WICHT:  Object to the

19          form of the question.  Calls for

20          speculation.  No foundation.

21          A.    Yeah, I could multiply it by

22   10,000, but that's not the purpose of this.

23          Q.    Well, that's what I'm trying to

24   find out, sir, is the purpose, is why Cardinal

```
 1   picked to determine a threshold by finding the

 2   average and then multiplying it by 3.

 3              MS. WICHT:  He's answered

 4          that question.

 5              MR. FULLER:  No, he hasn't

 6          answered the question.

 7              MS. WICHT:  He doesn't know.

 8          He -- you asked him multiple times.

 9          If he --

10              MR. FULLER:  Apparently

11          nobody knows.  And that seems to be

12          the problem in this litigation,

13          because nobody can answer a

14          question and everybody has memory

15          issues.

16              MS. WICHT:  That's --

17   BY MR. FULLER:

18          Q.   So this document --

19              MS. WICHT:  -- a ridiculous

20          statement.

21          Q.   This document went through you, at

22   least according to the document, correct,

23   Mr. Forst?

24          A.   Correct.
```

```
1            Q.    And you have no recollection of

2    questioning anybody why you would be multiplying

3    an average by 3, 5, or 8 --

4            MS. WICHT:  Object to --

5            Q.    -- or do you remember now?

6            MS. WICHT:  Object to the

7        form of the question.

8        Mischaracterizes his testimony.

9            A.    Again, I'm not the statistician.

10           Q.    Sir --

11           A.    The owner of the document does not

12   mean that I have written the document, the --

13   the information in the document necessarily -- I

14   can't think of the word I want to use.

15           The information in the document is

16   based on the analytics.  So I -- like I said,

17   I'm not someone that does the analytics.  I'm

18   not a statistician.  There is a reason for 3, 5,

19   and 8.  My guess is -- and only my guess is --

20   3, 5, and 8 is a number based on the probability

21   of that drug family being diverted.

22           MS. WICHT:  I'd just caution

23       you that -- and I think even

24       Mr. Fuller would agree with this,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          that he doesn't want you to guess

 2          in your answers.

 3               THE WITNESS:  Okay.

 4  BY MR. FULLER:

 5          Q.   As long as you qualify it as a

 6  guess, I don't care if you guess.

 7          A.   Well, I'm not going to guess, but

 8  that's --

 9          Q.   Well, it's a little late for that.

10          A.   That's -- but, again, the

11  analytics behind the 3, 5, and 8, I don't know.

12  But you certainly wouldn't want the hydrocodone

13  multiplied by 8, and the oxycodone, and the

14  alprazolam, because those are -- have a higher

15  incidence of diversion.

16          Q.   Would you want to multiply it by

17  4?

18               MS. WICHT:  Object to the

19          form.  Foundation.  Calls for

20          speculation.

21          A.   I don't know the analytics, so I

22  can't answer that question.

23          Q.   Well, I mean, you just said you

24  didn't want to multiply by 8.  How do you know
```

1    that you don't want to multiply by 8?

2             MS. WICHT:  Object to the

3        form.  This is why we shouldn't

4        guess.

5             He's testified he doesn't

6        know the analytics.  I don't -- I

7        don't think it's a fair question.

8             MR. FULLER:  Let the witness

9        answer this question.

10            MS. WICHT:  Go ahead.  You

11       can answer the question if you're

12       able, Chris.

13       A.    I can't answer that.  But

14   logically, the lesser chance of diversion -- you

15   would not want to be looking for something that

16   has an extremely low chance of diversion when

17   you have hydrocodone, oxycodone, alprazolam, and

18   phentermine as your largest drug families that

19   are diverted according to the DEA.

20            I can't answer the analytics --

21   I've said that three or four times -- about the

22   3, 5 or 8.

23       Q.    Now, not only would you multiply

24   it by 3, 5, or 8, but then you, as you've

Highly Confidential - Subject to Further Confidentiality Review

1    already testified, would go in and ramp up the

2    threshold based on additional factors, correct?

3              MS. WICHT:  Object to the

4         form of the question.

5         Mischaracterizes his testimony.

6              MR. FULLER:  "Object to form"

7         is fine, Counsel.

8         A.    Cardinal looked at each customer

9    individually.  So when you have more information

10   about the customer and you're comfortable that

11   the presence of diversion may be happening, then

12   you should be able to adjust the threshold

13   suitable for that customer's business model and

14   factor.

15        Q.    And it should be consistent with

16   other customers of the same business model and

17   the same size, right?

18             MS. WICHT:  Object to the

19        form.

20        A.    Each individual customer is going

21   to be different.  That's --

22        Q.    Sure it is.  But there's only so

23   many business models out there, right?

24        A.    But the business model is just a

Highly Confidential - Subject to Further Confidentiality Review

1    gauge to get you in the parameter of where you

2    need to be.

3            Q.    Absolutely.  All the factors are

4    just gauges, aren't they?  Whether it's type of

5    business, whether it's number of scripts,

6    whether it's location to a hospital, they're

7    just factors to consider, right?

8            A.    They're factors to consider.

9            Q.    And they're factors that apply to

10   all customers, aren't they?

11           A.    Yes.  If you have that information

12   available to you, yes.

13           Q.    Sure.  So wouldn't you want to

14   make sure that a similarly situated customer

15   isn't ten times more than someone of like size

16   business type and shape and location?

17               MS. WICHT:  Object to the

18           form of the question.

19           A.    But, again, individual customers

20   are all different, just like we're all different

21   sitting around the table.  Different parameters

22   would apply to those individuals.  Unless you

23   know information about that, everybody is just

24   average, and we all know that everybody is

Highly Confidential -- Subject to Further Confidentiality Review

1   different.

2           Q.    We do.  And that's why you

3   segmented them at Cardinal, correct?

4               MS. WICHT:  Object to the

5           form.

6           A.    But segments are only a way to

7   divide up the customers in a logical way that

8   you can at least look at individual customers

9   once you get more focused on what you're looking

10  for.

11          Q.    Sure.  Sure.  So where did

12  Cardinal -- the next step.

13              I'm actually -- go down to 4.2.4.

14  It talks about adjustments can be made to the

15  threshold.

16              Do you see that section?

17          A.    Yes.

18          Q.    Where did Cardinal get the

19  approach?  What scientific studies?  What --

20  where from did Cardinal get the approach that

21  after multiplying a threshold, an average by

22  three, that it still could then go in and adjust

23  the threshold based on customer specifics?

24          A.    I don't know.

```
 1                  MS. WICHT:  Object to the

 2          form of the question.

 3          Q.    Do you know of any study that

 4   suggests that?

 5          A.    I don't know.

 6                  MS. WICHT:  Object to the

 7          form of the question.

 8          A.    I don't know.

 9          Q.    Have you ever seen a study that

10   suggests that?

11          A.    Not to my knowledge.

12                  MS. WICHT:  Object to the

13          form of the question.

14          A.    No.

15          Q.    Okay.  Have you ever been told --

16   strike that.

17                  In all your time at the hospital,

18   did you ever utilize the Chemical Handler's

19   Manual?

20          A.    I'm not sure what that is, or if

21   it had a different name.

22          Q.    Let's go to 3869.

23          A.    It sounds like a distribution

24   manual.
```

```
 1                     - - -

 2    (Cardinal-Forst Deposition Exhibit 4 marked.)

 3                     - - -

 4          Q.    This will be Plaintiffs' Exhibit

 5    Number 4, 3869, Chemical Handler's Manual.

 6                 Have you ever seen that before?

 7    Take a second and look at it.

 8                 Have you ever seen that document

 9    before?

10          A.    No.  Looks like a distributor's

11    document.

12          Q.    And it applies to List I

13    chemicals, correct?

14                 MS. WICHT:  Object to the

15          form.  Calls for speculation.

16          A.    Well, on 3869.7, I see that it

17    does have the word "Listed Chemicals," so a

18    List I chemical, a List II chemical.

19                 MR. FULLER:  Hey, bring up

20          the Reardon clip, please.

21    BY MR. FULLER:

22          Q.    You mentioned Mr. Reardon was your

23    boss, correct, or your boss's boss; is that

24    right?
```

```
 1              A.    Mr. Reardon is --

 2              Q.    Hartman.  Hartman.

 3              A.    Mr. Hartman was my boss' boss.

 4              Q.    Who is Mr. Reardon?

 5              A.    Mr. Reardon was over the

 6     distribution centers.

 7              Q.    And do you know what he held --

 8     what position he held prior to that?

 9              A.    I don't know his history.

10              MR. FULLER:  Go ahead.  Play

11         it.

12              (Video clip played as

13         follows):

14              "Q.  Turn to page 271 of the same

15     document.  And you can look on the big screen or

16     you can try to find that page, either way,

17     Mr. Reardon.  Is that the document you're

18     referring to?

19              "A.  No.

20              "Q.  What other document are you

21     referring to; do you know?

22              "A.  Again, it was a document that

23     the trade association had.

24              "Q.  The HDMA?
```

1                    "A.  Yes, it was NWDA at the time.

2                    "Q.  NWDA.  And how do you know --

3    strike that.  All right.  This is in this manual

4    obviously?

5                    "A.  Yes.

6                    "Q.  It has a suspicious order

7    reporting system of 1998.  Do you see that?

8                    "A.  Yes.

9                    "Q.  Have you seen this document

10   before?

11                   "A.  Yes.

12                   "Q.  Is it your understanding --

13   is that how the limit amounts were created in

14   the audit -- or excuse me -- ingredient limit

15   reports?

16                   "A.  Not the ingredient limits

17   report.

18                   "Q.  What was this used for; do

19   you know?

20                   "A.  I believe this was used for

21   List I chemicals.

22                   "Q.  So this applies only to

23   List I chemicals, is your understanding?

24                   "A.  Yes.

```
 1                 "Q.  And, therefore, not controlled

 2    substances, unless they include List I chemicals,

 3    right?

 4                 "A.  Yes."

 5    BY MR. FULLER:

 6           Q.   Okay.  Had you ever seen that

 7    document before?

 8           A.   The document on the screen?

 9           Q.   Yes, sir.

10           A.   I couldn't see that.

11           Q.   Okay.

12                MR. FULLER:  And this is

13                going to be Plaintiffs' Exhibit

14                Number 5, 4349.

15                       - - -

16      (Cardinal-Forst Deposition Exhibit 5 marked.)

17                       - - -

18    BY MR. FULLER:

19           Q.   And that document is going to be

20    on page 41, Mr. Forst.

21                MS. WICHT:  The document that

22                was shown on the screen in the

23                deposition clip?

24                MR. FULLER:  Yes, ma'am.
```

```
 1    BY MR. FULLER:

 2          Q.    Did you find that document,

 3    Mr. Forst?

 4          A.    Yes.

 5          Q.    It says, "Exhibit II, Suspicious

 6    Order Reporting System of 1998" --

 7          A.    Yes.

 8          Q.    -- "For Use in Automated Tracking

 9    Systems," correct?

10          A.    Yes.

11          Q.    And this appears to be for -- it

12    says, "The Current Calculation Being Used for

13    List I Chemicals and Schedule II through V

14    Controlled Substances."

15                And you can take a minute and look

16    at it.

17                If you go down to the -- right

18    after Number 4, it talks about a multiplier.

19                Do you see that?

20          A.    Yes.

21          Q.    And it has a 3 and an 8 factor,

22    correct?

23          A.    Yes.

24          Q.    It says, "Note:  Factor equals 3
```

```
 1    for controlled -- IIs and IIIs controlled

 2    substances containing List I chemicals."

 3                    Did I read that right?

 4         A.    Yes.

 5         Q.    Now, that, at least according to

 6    that statement, wouldn't apply to OxyContin --

 7    or excuse me -- oxycodone products, would it?

 8                    MS. WICHT:  Object to the

 9             form.  Foundation.  Calls for

10             speculation.

11         A.    Repeat the question, please.

12         Q.    Sure.  It says, "The factor equals

13    3 for C-II through -- and C-III controlled

14    substances containing List I chemicals."

15                    OxyContin -- excuse me --

16    oxycodone products do not contain List I

17    chemicals, do they?

18                    Let me ask a different question.

19    Do you know what the List I chemicals are that

20    you're -- I guess it was during regulatory --

21    supposed to be preventing the diversion of?

22                    MS. WICHT:  Object to the

23             form of the question.

24         A.    The ones that we want were
```

1    pseudoephedrine, ephedrine, and -- I can't --

2    there's -- if it was a List I chemical, it

3    had -- I don't remember.  Those are the two that

4    come to my mind.

5           Q.    Okay.  And that was all based on

6    the meth act that was in the late '90s, correct?

7                 MS. WICHT:  Object to the

8           form.

9           A.    That sounds correct.

10          Q.    It was all -- it was all due to

11   the meth outbreak that the country --

12          A.    Correct.

13          Q.    -- was experiencing back then.

14   You know that, right?

15                MS. WICHT:  Object to the

16          form.

17          A.    Yes.

18          Q.    Okay.  And you know

19   pseudoephedrine is not in any oxycodone products

20   that you're aware of, correct?

21          A.    Not to my knowledge, no.

22          Q.    Okay.  And we'll come back to

23   this, but I wanted to show you that.

24                So we see a 3 factor there, but

1    you would agree with me that based on what we

2    see -- and actually let's, turn to page 5 of

3    that document.

4                 MS. WICHT:  Of Exhibit 5?

5                 MR. FULLER:  Yes, ma'am.

6          4339.

7          Q.    And do you see the title of it?

8    It says, "Report to the U.S. Attorney General by

9    the Suspicious Order Task Force."

10         A.    Yes.

11         Q.    And it says, "The comprehensive

12   Methamphetamine Control Act of 1996," just like

13   you thought, right?

14         A.    Yes.

15                MS. WICHT:  Object to the

16         form.

17         Q.    Okay.  If you go down to the

18   second paragraph, it says, "The charter required

19   to establish a task force to prepare

20   recommendations concerning additional guidelines

21   to be used by the chemical industry in complying

22   with 21 U.S.C. 830(b)(1)(A)."

23                Do you know what that regulation

24   is?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Not off the top of my head, no.

 2                  MR. FULLER:  Gina, can you

 3            pop up the demonstrative A.

 4            Q.    So there's on the screen 2130- --

 5                  MR. FULLER:  And, actually, I

 6            think I have a hard copy.  I need a

 7            sticker, Edna.

 8                  This will be Plaintiffs'

 9            Exhibit Number 6.  It's

10            demonstrative A, and it's part of

11            the 21 U.S.C.A. 830.  There you go.

12                         - - -

13     (Cardinal-Forst Deposition Exhibit 6 marked.)

14                         - - -

15            Q.    And you have that in front of you.

16     It's the 21 U.S.C.A. Section 830, right?

17            A.    Yes.

18            Q.    United States Code.  This is a

19     federal law that was passed by our U.S.

20     Congress.  And it says Reports, (b) -- and if

21     you -- if --

22                  MR. FULLER:  Gina, just leave

23            this up.

24
```

```
 1   BY MR. FULLER:

 2          Q.    If you toggle back and forth,

 3   Mr. Forst, between that and 4339, which is the

 4   document we just pulled out, you can see it

 5   cites 21 U.S.C. 830(b)(1)(A), right?

 6          A.    Yes.

 7          Q.    And if we read (b)(1)(A), it's

 8   Reports to Attorney General, and then (1) is

 9   "Each regulated person shall report to the

10   Attorney General, in such form and manner as the

11   Attorney General shall prescribe by regulation:

12              (A) any regulated transaction

13   involving the extraordinary quantity of a listed

14   chemical, an uncommon method of payment or

15   delivery, or any other circumstances that the

16   regulated person believes may indicate that the

17   listed chemical will be used in violation of

18   this subchapter."

19              Hopefully I read that right,

20   because it's pretty long.

21              Did I get it right, Mr. Forst?

22          A.    Yes.

23          Q.    Okay.  So this code section that

24   the report that we were looking at to Janet Reno
```

1    is referring to is the code section related to

2    List I chemicals, correct?

3         A.    Correct.

4         Q.    Not controlled substances, right?

5              MS. WICHT:  Object to the

6         form of the question.

7         A.    According to the document, yes.

8         Q.    Okay.  Now -- and I think you

9    testified earlier there was two sets of rules

10   that you guys had to follow at Cardinal.  One

11   related to List I chemicals and one related to

12   controlled substances; is that true?

13              MS. WICHT:  Object to the

14        form of the question.

15        A.    Could you repeat the question.

16        Q.    Sure.  There was different

17   statutes that Cardinal had to comply with as a

18   registrant: a set related to List I chemicals,

19   and then the Controlled Substances Act that

20   pertained to controlled substances, correct?

21              MS. WICHT:  Object to the

22        form of the question.

23        A.    Correct.

24        Q.    Okay.  Now, the threshold setting

```
 1    process we read earlier used a multiplier of 3,

 2    5, and 8 in the standard operating procedure set

 3    out by Cardinal, right?

 4          A.    According to the procedure, yes.

 5          Q.    Okay.  And at least the 3 and 8

 6    may be justified by List I chemicals, at least

 7    according to the documents we've seen in the

 8    Chemical Handler's, as well as the Janet Reno

 9    report, right?

10                MS. WICHT:  Object to the

11          form of the question.  Foundation.

12          Calls for speculation.

13          A.    I don't know if those two are

14    related.  I can't -- I can't -- just because one

15    says 3 and 8 and the policy says 3 and 8 -- and

16    I don't know the analytics or where that

17    information came from -- I can't say if those

18    are truly related to each other.  It could be a

19    coincidence they chose those numbers.  I don't

20    know the answer to that.

21          Q.    You don't know if Cardinal based

22    the selection of those numbers off of that

23    report?

24          A.    I do not know that.
```

```
 1            Q.    Okay.  Maybe they did, maybe they

 2      didn't, but you can't testify one way or the

 3      other?

 4            A.    I can't testify one way or the

 5      other.

 6            Q.    Fair enough.

 7                  So back to 4553, which is the SOP,

 8      and page 3 of that document, we talked there

 9      about coming up with the average.  That's just

10      the simple math of coming up with the average,

11      right?

12                  Are you aware of any particular

13      reason that it was done that way?

14            A.    No.

15            Q.    Okay.  Now, we went down to 4.2.4

16      and we talked ever so briefly.  And I'm

17      assuming -- well, let me ask it.

18                  Was the section related to after

19      setting a threshold, then adjusting thresholds

20      based on what you described as customer

21      specifics, was that in this policy and procedure

22      before you made any additions or subtractions to

23      it, or do you recollect?

24                  MS. WICHT:  Object to the
```

```
 1              form.

 2              A.    I don't recollect.

 3              Q.    Do you know what the basis of that

 4       is, what the scientific basis of making those

 5       adjustments would be?

 6                    MS. WICHT:  Object to the

 7              form.  Asked and answered.

 8              A.    I don't know the answer to that.

 9              Q.    Do you know who would?  Do you

10       know who would know what studies out there were

11       done that support this methodology used by

12       Cardinal?

13                    MS. WICHT:  Object to the

14              form of the question.

15              A.    I can't speculate on who it would

16       be.

17              Q.    All right.

18                    So, Mr. Forst, we've talked a

19       little bit about the different regulations and

20       regulatory requirements, right?

21              A.    Yes.

22              Q.    And you said that there were some

23       that apply and some obligations that Cardinal

24       takes on based on them, correct?
```

```
 1              A.     Correct.

 2              Q.     What is your understanding of what

 3    the Controlled Substances Act requires of

 4    Cardinal?  Tell the jury.

 5                    MS. WICHT:  Object to the

 6              form.  Calls for a legal

 7              conclusion.

 8              A.     To monitor DEA customer purchase

 9    orders or acquisitions if -- for some reason,

10    there's not the word "purchase" in there --

11    to --

12                    MS. WICHT:  Mike, I -- you

13              didn't write down what he said.

14                    MR. FULLER:  I'm not

15              transcribing it.

16                    MS. WICHT:  Okay.

17                    MR. FULLER:  So you let me

18              conduct my depo the way I like --

19                    MS. WICHT:  Sure.

20                    MR. FULLER:  -- if you don't

21              mind.

22                    MS. WICHT:  Sure.

23    BY MR. FULLER:

24              Q.     Go ahead.
```

```
 1            A.      -- to look for the possibility of

 2    suspicious orders that may be diverted for a

 3    non-medical purpose.

 4            Q.      Okay.  Any other obligations that

 5    the DEA puts on Cardinal, to your understanding?

 6                    MS. WICHT:  Objection.

 7            Q.      Strike that.

 8                    MS. WICHT:  Sorry.

 9            Q.      Any other regulatory or statutory

10    obligations that Cardinal has to meet related to

11    suspicious order monitoring?

12                    MS. WICHT:  Object to the

13            form and calls for a legal

14            conclusion.

15            A.      I think that's pretty succinct.  I

16    mean, I would include into that the frequency,

17    the quantity, the pattern.  So I think that's a

18    pretty decent definition.

19            Q.      And I'm not saying it's not.  I'm

20    just wanting to give you an opportunity to tell

21    me about anything else that you may believe

22    Cardinal has to do.

23                    Now --

24                            - - -
```

```
 1     (Cardinal-Forst Deposition Exhibit 8 marked.)

 2                        - - -

 3          Q.    All right.  So Plaintiffs' Exhibit

 4     Number 8 --

 5                    MS. WICHT:  7?

 6                    MR. FULLER:  No.  8's first.

 7                    MS. WICHT:  Are we skipping?

 8                    MR. FULLER:  Yeah, we --

 9          I'm -- I'm just taking the wrong

10          one backwards.

11                    MS. WICHT:  Okay.

12     BY MR. FULLER:

13          Q.    This is P.4916.

14                Okay.  Mr. Forst -- and I'm

15     pronouncing that right; it's Forst, right?

16          A.    That's correct.

17          Q.    Okay.  Sorry.

18                You have 4916, which is

19     Plaintiffs' Exhibit Number 8, in front of you?

20          A.    Yes.

21          Q.    And it's also on the screen.

22                It says, "United States Code

23     Annotated, Title 21, Food and Drugs," right?

24          A.    Correct.
```

1     Q.    "Drug Abuse Prevention and

2  Control, Subchapter I, Control and Enforcement,

3  Part A, Introductory Provisions."

4           Do you see that?

5     A.    Yes.

6     Q.    And it talks about the findings

7  and declarations related to controlled

8  substances.

9           Have you ever seen this code

10 before?  Do you ever recall reading the

11 Controlled Substances Act?

12          MS. WICHT:  Yeah.  It's a

13      compilation of different things.

14    Q.    And I'll tell you this is -- yeah,

15 this is sections of it.  I didn't give you the

16 whole act.

17    A.    Okay.

18    Q.    Do you ever recall reading the

19 Controlled Substances Act, Mr. Forst?

20    A.    From cover to cover, no.

21    Q.    But portions of it throughout your

22 career?

23    A.    Yes.

24    Q.    Okay.  So this is the declarations

1    by Congress.  And if you look at number 2, it

2    says, "The illegal importation, manufacture,

3    distribution and possession and improper use of

4    controlled substances have a substantial and

5    detrimental effect on the health and general

6    welfare of the American people."

7              Did I read that correctly?

8         A.   Yes.

9         Q.   And one of the factors that we

10   focus on when we're dealing with Cardinal is the

11   distribution, right?  That's what Cardinal is in

12   the business of is distributing, amongst other

13   things, controlled substances?

14              MS. WICHT:  Object to the

15         form.

16         A.   But "distribution" can also mean

17   distributing to a patient or whatever.  So

18   distribution is a very large -- it -- it's a

19   word that encompasses a lot of things just

20   besides distribution centers or -- in my

21   opinion.

22         Q.   Fair enough.

23              Do you think that that, then,

24   removes the Controlled Substances Act outside

1    the realm of having to be complied with by

2    Cardinal?

3                    MS. WICHT:  Object to the

4            form.

5            Q.    I mean, based on what you were

6    explaining as the definition, does Cardinal

7    still have to comply with the Controlled

8    Substances Act or not?

9            A.    Cardinal has to comply with the

10   Controlled Substances Act in portions that the

11   distribution of controlled substances, the

12   licensing, et cetera, whatever -- whatever

13   part -- whatever Cardinal has that is affiliated

14   in some form or fashion, even if it was

15   manufacture, then they would have to follow the

16   Controlled Substances Act for those -- those

17   processes that they do.

18           Q.    Fair enough.

19                 Are you -- let me ask it

20   differently.

21                 Are you aware of whether Cardinal

22   has to -- I mean, has to provide for the

23   maintenance of effective control against the

24   diversion of particular controlled substances

```
 1   other than -- into other than legitimate

 2   medical, scientific, or industrial channels?

 3                MS. WICHT:  Object to the

 4           form and calls for a legal

 5           conclusion.

 6           A.   Could you repeat the question,

 7   please.

 8           Q.   Sure.  Turn to page 4.  See here

 9   Registration requirements?  It's part of the

10   Controlled Substances Act --

11           A.   Yes.

12           Q.   -- 21 U.S.C. Section --

13           A.   Yes.

14           Q.   -- 823.

15                (b) is one:  Distributors of

16   controlled substances of Schedules I and II.

17   And then one of the requirements is "Maintenance

18   of effective control against the diversion of

19   particular controlled substances into other than

20   legitimate medical, scientific, and industrial

21   channels."

22           A.   Yes.

23                MS. WICHT:  Object to the

24           form.
```

```
 1           Q.    Are you aware whether Cardinal has

 2   to comply with that?

 3                 MS. WICHT:  Object to the

 4           form.

 5           A.    I would say Cardinal does comply

 6   with that.

 7           Q.    And I'm not asking whether they do

 8   or don't right now.

 9           A.    Yes, they have -- they should

10   follow that, yes.

11           Q.    So if we go back to our -- what

12   Cardinal is required to do, can we add maintain

13   effective controls against diversion?

14                 MS. WICHT:  Object to the

15           form.

16           A.    It says "into other than

17   legitimate medical and scientific and industrial

18   channels.

19           Q.    Right.  You want to prevent

20   diversion?

21                 MS. WICHT:  Object to the

22           form of the question.

23           A.    Correct, but is not a DE -- a

24   DEA-licensed facility a legitimate medical,
```

```
1    scientific, or industrial thing if they have a

2    DEA license.

3           Q.    Well, fair enough.

4                 So you always distributed to

5    licensed entities, right?

6           A.    Correct.

7           Q.    Well, explain to the jury why

8    Cardinal got their license suspended, four

9    facilities in 2007 and '08 and then another

10   facility during your time in 2012.

11                MS. WICHT:  Object to the

12          form.

13          Q.    If it only distributed to licensed

14   distributors and that's all you have to do,

15   explain to the jury why Cardinal had five

16   different licenses suspended over a four-year

17   period.

18                MS. WICHT:  Object to the

19          form.

20          Q.    Go ahead.

21                MS. WICHT:  Foundation.

22          Calls for a legal conclusion.

23          A.    I can't --

24          Q.    Because you have to do more than
```

```
 1    just distribute to someone that's licensed to

 2    receive it, don't you?

 3              MS. WICHT:  Object to the

 4         form.

 5         A.    Yes.  You need to make sure that

 6    they are licensed properly, and you also have --

 7    so this one is difficult because you also have

 8    to understand that the entity that's licensed

 9    has also legal obligations.

10              I, as a pharmacist, would not

11    knowingly fill a prescription that would be

12    going out into and used for diversion or abuse.

13    So I have -- as a pharmacist, looking at this, I

14    have to understand there are other professionals

15    out there that have also the responsibility.  So

16    I can't see who they're dispensing to, who their

17    prescriber is, so I'm very limited in that.

18              So effective control is through

19    the whole system.

20         Q.    And Cardinal has to do its part,

21    doesn't it?

22         A.    Cardinal has done its part.

23         Q.    Well --

24         A.    Those were allegations.
```

```
1              Q.    Well, no, because in 2012,

2     Cardinal admitted to its system failing.  There

3     was an admission by -- do you -- are you not

4     aware of that, that Cardinal in its memorandum

5     of agreement -- of understanding with the DEA --

6              A.    I believe there was --

7              Q.    -- and the DOJ -- hold on, let me

8     finish -- actually admitted to failure related

9     to the Controlled Substances Act?

10                   MS. WICHT:  Object to the

11             form of the question.

12             A.    I am not aware of an admission.

13             Q.    No one ever shared that with you

14    before today, right?

15                   MS. WICHT:  Object to the

16             form of the question.

17             A.    I am not aware of an admission.

18             Q.    So, again, my question is, no one

19    ever shared that with you before today, right?

20                   MS. WICHT:  Object to the

21             form of the question.

22             A.    I am not aware of an admission.

23             Q.    Did you ever see the second

24    memorandum of understanding, what the
```

```
 1    allegations were against Lakeland for the second

 2    time?

 3            A.    They were allegations.

 4            Q.    Right.  But Cardinal admitted to

 5    some of them.

 6            A.    I --

 7            Q.    Did anybody share with you --

 8            A.    I do not -- I do not remember

 9    Cardinal admitting.

10            Q.    Fair enough.

11                  So does Cardinal -- from

12    Mr. Forst's perspective, does Cardinal need to

13    maintain effective controls against diversion?

14    Yes or no?

15            A.    In (d)(2)?

16                  MS. WICHT:  Object to form of

17            the question.

18            A.    Sorry.  What was the question

19    again?

20            Q.    Does Cardinal need to maintain

21    effective controls to prevent diversion?

22                  MS. WICHT:  Object to the

23            form of the question.

24            A.    Cardinal does the best to its
```

1    ability to maintain controls to avoid diversion

2    of controlled substances.

3            Q.    All right.

4                  Then let's go to Exhibit Number 7,

5    4915.

6                        - - -

7     (Cardinal-Forst Deposition Exhibit 7 marked.)

8                        - - -

9            Q.    Does Cardinal have an obligation

10   related to suspicious orders that you're aware

11   of, Mr. Forst?

12           A.    I'm sorry.

13           Q.    Does Cardinal have an obligation

14   related to suspicious orders?

15                 MS. WICHT:  Object to the

16           form.

17           A.    Yes.

18           Q.    And what is that obligation, to

19   your understanding?

20           A.    The obligation, to my

21   understanding, is to report orders that are

22   deemed suspicious.

23           Q.    All right.  So make sure I've got

24   this right.

```
 1                    First we talked about they have to

 2    monitor DEA customers looking for possible

 3    suspicious orders that may be diverted for

 4    non-medical purposes, correct?

 5            A.    Correct.

 6                    MS. WICHT:  Object to the

 7            form.

 8            Q.    Second, we talked about they need

 9    to maintain controls against diversion, right?

10            A.    Yes.

11                    MS. WICHT:  Object to the

12            form.

13                    MR. FULLER:  He even paused

14            and sort of glanced your way.

15                    MS. WICHT:  Sorry.  I was

16            slow.

17    BY MR. FULLER:

18            Q.    And lastly, we talked about

19    Cardinal has to, at least according to the

20    regulations, report orders that are deemed

21    suspicious.

22                    MS. WICHT:  Object to the

23            form.

24            Q.    Is that correct, Mr. Forst?
```

```
 1          A.    Yes.

 2          Q.    Okay.  Now, let's bounce back to

 3   thresholds for one second.

 4                Actually, let's finish with this

 5   document, 4915.

 6                Read, if you will, the -- Section

 7   (b) there aloud for the jury, Mr. Forst.

 8          A.    "The registrant shall design and

 9   operate a system to disclose to the registrant

10   suspicious orders of controlled substances.  The

11   registrant shall inform the field office --

12   Field Division Office of the Administration in

13   his area of suspicious orders when discovered by

14   the registrant.  Suspicious orders include

15   orders of unusual size, orders deviating

16   substantially from a normal pattern, and orders

17   of unusual frequency."

18          Q.    So suspicious orders are defined

19   by the DEA as including orders of unusual size,

20   orders deviating substantially from normal

21   pattern, or orders of unusual frequency; is that

22   correct?

23          A.    According to the document, yes.

24          Q.    So Cardinal should be identifying
```

```
 1    and reporting orders of unusual size, deviating

 2    substantially from a normal pattern, and orders

 3    of unusual frequency; is that right?

 4                MS. WICHT:  Object to the

 5          form.

 6          A.    Well --

 7          Q.    Is that how the regulation reads?

 8          A.    It's how the regulation reads, but

 9    the regulation is vague as opposed to what is

10    unusual, what is truly normal, or what is an

11    unusual frequency.

12          Q.    Okay.  Fair enough.

13          A.    That's open to interpretation.

14          Q.    So -- well, all right.  Let's --

15    let's talk about those thresholds just for a

16    moment, though.

17                The thresholds, the process that

18    started in 2008 when you were there, those

19    thresholds -- once somebody reached them, the

20    orders were stopped, weren't they?

21          A.    The orders were held for review.

22          Q.    They wouldn't go out until they

23    were cleared; is that correct?

24          A.    That is correct.
```

1    Q.    And that's been the system since

2    2008 up until the time you left, wasn't it?

3          A.    That is correct.

4          Q.    Now, they can be reviewed and then

5    released, right?

6          A.    That is correct.

7          Q.    But no order is going to go out of

8    Cardinal that's hit a threshold without somebody

9    looking at it, reviewing it, and releasing it,

10   correct?

11         A.    That is correct.

12         Q.    Okay.  And that's, again, from

13   February of '08 all the way to when you left in

14   June of '17 -- I think you said June, right?

15         A.    Correct.

16         Q.    Okay.  Let's talk -- June or July,

17   somewhere around there, isn't that right?

18         A.    Yes.

19         Q.    Okay.

20         A.    Yeah, because we're in '19.

21         Q.    Now, about that same time,

22   Cardinal also started a Know Your Customer

23   policy --

24         A.    And the time you're referring to

```
 1   is?

 2           Q.    Back in 2008.

 3           A.    Okay.

 4           Q.    Right?

 5                 MS. WICHT:  Object to the

 6           form of the question.

 7           A.    As far as I know, that is correct.

 8           Q.    Okay.  Now, it may have been, I

 9   guess, already started when you arrived, but it

10   was there when you got there; is that fair?

11           A.    Yes.

12           Q.    And it's been in place since that

13   time, maybe with some tweaks and adjustments,

14   all the way up till the time you left, again, in

15   middle of 2017, correct?

16           A.    Correct.

17           Q.    Okay.  So those aren't -- those

18   aren't anything new after the 2012 incident?

19   Those have been in place going all the way back

20   to 2008, correct?

21           A.    That --

22                 MS. WICHT:  Object to the

23           form.

24           A.    That sounds correct.
```

```
 1              Q.    Okay.   We're going to mark -- my

 2    handwriting is a -- we'll call it an art --

 3    Exhibit Number 9.

 4                         - - -

 5     (Cardinal-Forst Deposition Exhibit 9 marked.)

 6                         - - -

 7              Q.    Exhibit 9 is a demonstrative --

 8    I'm just going to throw it there in the middle

 9    for now.

10              MS. WICHT:  We can make

11         copies at the break.

12              MR. FULLER:  Sure.  Sure.

13                         - - -

14     (Cardinal-Forst Deposition Exhibit 10 marked.)

15                         - - -

16    BY MR. FULLER:

17              Q.    Let's talk about --

18              MR. FULLER:  Plaintiffs'

19         Exhibit Number 10 is going to be

20         4547.

21    BY MR. FULLER:

22              Q.    Have you ever seen this

23    suspicious -- or excuse me -- standard operating

24    procedure previously?
```

1          And, again, if you look on

2    page 13, I think you're the owner of this

3    document as well, Mr. Forst.

4          A.    And I reiterate, owner does not

5    necessarily mean the person that is the author

6    of the document.

7          Q.    Well, you said that, but Cardinal

8    labeled you as the owner.

9          A.    So this document --

10          MS. WICHT:  What's the

11          question that's open?

12          MR. FULLER:  I'm just asking

13          if he's seen it before.

14          MS. WICHT:  Okay.

15    BY MR. FULLER:

16          Q.    Is it fair to say that you've seen

17    it before, or would they just stick your name on

18    something you've never seen?

19          A.    This document should belong to

20    Steve Morse, because he was the head of

21    investigations.

22          Q.    Now, you worked with Mr. Morse,

23    didn't you?

24          A.    Yes.

```
1            Q.    Okay.

2            A.    And, again, the assignment of

3     these documents --

4            Q.    Look, I can only go by what's on

5     the document.

6            A.    I understand.

7            Q.    I wasn't at Cardinal.  I haven't

8     been in Cardinal.  I don't -- I'm trying to

9     learn, okay?

10                 MS. WICHT:  Well, I think

11            he's trying to explain something --

12                 MR. FULLER:  Well, no.

13                 MS. WICHT:  -- and you jumped

14            in on him.  So --

15                 MR. FULLER:  He's trying to

16            tell me --

17                 MS. WICHT:  -- just let

18            him -- you said you're trying to

19            learn.  He's trying to explain.

20                 MR. FULLER:  He's already

21            explained the owner designation.

22                 MS. WICHT:  Okay.

23     BY MR. FULLER:

24            Q.    All right.  Starting at the first
```

```
 1   page, you see it says "On-Site Investigations"?

 2          A.    Yes.

 3          Q.    Now, it's your position that

 4   Mr. Morse should be the owner of this document,

 5   right?

 6          A.    Correct.

 7          Q.    Not you.  Although the document

 8   says you; is that --

 9          A.    Correct.

10          Q.    Okay.

11          A.    He's the one that would be

12   reviewing the document, recommending to his

13   investigators, and then recommending to him what

14   they should cover.

15          Q.    Well, at least he should be,

16   right?

17          A.    Correct.

18          Q.    You don't know sitting here today

19   whether he did or didn't, do you?

20                MS. WICHT:  Object to the

21          form.

22          A.    I can't answer that question.  I

23   can't evaluate Steve's performance.

24          Q.    I'm not asking you to evaluate his
```

1    perform -- I'm just saying that you don't --

2              A.    I --

3              Q.    -- know sitting here today whether

4    he did or didn't do those things?

5                    MS. WICHT:  Object to the

6              form.

7              Q.    Do you?

8              A.    I would say he did those things.

9              Q.    But you're guessing, right?

10             A.    I'm not guessing.

11             Q.    So you know he did those things?

12             A.    As a professional, yes.  To the

13   best of his ability, yes.

14             Q.    So you're assuming that based on

15   your interactions with him in the past, that he

16   would have taken those steps?

17             A.    Yes.

18             Q.    Fair enough.  Okay.

19                   So it says the purpose.  "The

20   purpose of this policy is to provide guidance to

21   CAH" -- which means Cardinal Health, right?

22             A.    Correct.

23             Q.    -- "CAH employees by outlining the

24   steps involved in the conduct of on-site

```
 1    investigation of Cardinal Health's customers to

 2    obtain information regarding their potential

 3    risk for diversion of regulated drugs."

 4              Did I read that correctly?

 5         A.    Yes.

 6         Q.    All right.  So let's go down a

 7    little bit to 1.2, and then we see 1301.74.

 8              Does that look familiar to you,

 9    Mr. Forst?  I think if you look at one of the

10    last --

11         A.    Yes.

12         Q.    -- exhibits --

13         A.    Yes.

14         Q.    -- it may.

15         A.    Yes.  It's familiar to me.

16         Q.    That's the Code of Federal

17    Regulation related to suspicious orders

18    promulgated by the DEA, right?

19         A.    That is correct.

20         Q.    Let's go down to the next bullet

21    point, which is 310 -- excuse me -- 1310.05.

22    We're going to mark it as a demonstrative, the

23    regulation.

24              MR. FULLER:  There's copies
```

```
 1            for counsel.

 2                      - - -

 3    (Cardinal-Forst Deposition Exhibit 11 marked.)

 4                      - - -

 5            Q.    And at least according to -- we'll

 6    put it up.

 7                  Do you see that on the screen?  Or

 8    maybe it's in front of you.

 9            A.    I have it.

10            Q.    Okay.  It's Code of Federal

11    Regulation, Part 1310, Records and Reports of

12    Listed Chemicals in Certain Machines;

13    Importation and Exportation of Certain Machines,

14    right?

15            A.    Yes.

16            Q.    And then 310 [sic] (a)(1) -- which

17    is what you cite to in your policy and

18    procedure, right, standard operating procedure?

19            A.    Yes.

20            Q.    And it seems to track the same

21    language, doesn't it?

22            A.    Yes, it does.

23            Q.    So read subsection (a) from your

24    standard operating procedure used at Cardinal
```

1    Health during this time.

2            A.    Under 1310.05, Reports; is that

3    correct?

4            Q.    Yes, sir.

5            A.    Okay.  "Each regulated person

6    shall report to the special agent in charge of

7    the DEA divisional office for the area in which

8    the regulated person making the report is

9    located as follows:  Any regulated transaction

10   involving an extraordinary quantity of listed

11   chemical, an uncommon method of payment or

12   delivery and any other circumstance that the

13   regulated person believes may indicate that the

14   listed chemical will be used in violation of

15   this part."

16           Q.    So this is another reporting

17   requirement that Cardinal has, correct?

18           A.    Correct.

19           Q.    That pertains to List I chemicals,

20   doesn't it?

21           A.    Correct.

22           Q.    And is actually set out

23   specifically in Cardinal's own policies and

24   procedures; isn't that right?

1       A.      According to this document, yes.

2       Q.      Okay.  Now, read point -- excuse

3   me -- 1.3 of the standard operating procedure

4   for the jury.

5       A.      "Notwithstanding the requirements

6   of the C.F.R., any memorandum of understanding

7   with the DE -- Drug Enforcement Administration

8   that modifies the requirements of the C.E.R." --

9   "C.F.R. will take precedence."

10      Q.      So that's -- what that's telling

11  us is any agreements as set out in the MOUs will

12  take precedent over the regulations, correct?

13      A.      According to the document, yes.

14      Q.      Okay.  And how many memorandums of

15  understanding are you aware of that Cardinal has

16  with the DEA?

17      A.      Possibly two in my time there.

18      Q.      So let's turn to page 3.  This is

19  the Definitions section.

20              You see we have a definitions

21  section there for suspicious order?

22      A.      Yes.  Suspicious order monitoring.

23  Suspicious order, yes.

24      Q.      Okay.  And we have three bullet

 1    points there, right?

 2         A.    Yes.

 3         Q.    Okay.  Read the first one for the

 4    jury.

 5         A.    "Controlled substance which is of

 6    an unusual size, deviates substantially from a

 7    normal pattern or is ordered with unusual

 8    frequency."

 9         Q.    Okay.  Now, I think you pointed

10    out earlier that that was your definition of the

11    regulation, right?

12         A.    Yes.

13         Q.    You said it was vague, didn't you?

14         A.    It's vague in that unusual --

15    substantial and unusual frequency can be -- what

16    is unusual for one individual or deviates

17    substantially from a normal pattern is going to

18    be different across the board.  It has to be in

19    a certain context to understand that.

20         Q.    Sure.  Now, do you know if

21    Cardinal provided a clearer definition of

22    suspicious order in this regard?

23              MS. WICHT:  Object to the

24         form.

Highly Confidential -- Subject to Further Confidentiality Review

```
 1           A.    I can't -- I can't say if their

 2   definition --

 3           Q.    I'm just asking if you know if

 4   they had any written definition that gives more

 5   clarity to this or not.

 6           A.    That is the definition that we

 7   used.

 8           Q.    That's the -- okay.

 9                 And then read the next bullet

10   point for the jury.

11           A.    "List I or II chemical which is of

12   an extraordinary quantity, involves an uncommon

13   method of payment or delivery, and any other

14   circumstance which may indicate that the listed

15   chemical will be used in violation of the

16   Federal Controlled Substances Act."

17           Q.    Okay.  Now -- so that obviously is

18   suspicious orders relating to List I or II

19   chemicals, correct?

20           A.    Correct.

21           Q.    And it's a different definition

22   for suspicious order than the controlled

23   substance definition, right?

24           A.    According to the document, yes.
```

```
 1              Q.    And it's consistent what we read

 2    in the regulations as well, correct?

 3              MS. WICHT:  Object to the

 4         form.

 5         A.    Correct.

 6              Q.    Now, bullet point 3, take a look

 7    at that real quick.  I'm not going to make you

 8    read it, but it's dealing with drugs required to

 9    be monitored by individual states; is that

10    right?

11         A.    Yes.

12              Q.    Because some states may have had

13    particular statutes that required certain

14    monitoring for other substances --

15         A.    Correct.

16              Q.    -- above and beyond the Controlled

17    Substances Act or the List I Chemicals Act,

18    correct?

19         A.    That is correct.

20              Q.    Okay.  So -- and you can take a

21    moment and look at this, but this is the -- the

22    on-site investigations.  And I think you

23    testified earlier related to chains.

24                   Is there anywhere that you're
```

1    aware of that on-site investigations, the

2    investigative process that Cardinal goes

3    through, is set out in a policy and procedure

4    that is different for retail independents versus

5    chains?

6            MS. WICHT:  Object to the

7        form to the extent it purports to

8        characterize his prior testimony.

9        A.    I'm not aware of a document like

10   that.

11           Q.    Okay.  Now, something that you had

12   to be able to do in your job for you to do your

13   job effectively is to identify what is a

14   suspicious order, correct?

15           A.    My job was to identify orders that

16   may be suspicious.

17           Q.    You reviewed thresholds, correct?

18           A.    Correct.

19           Q.    And you had the authority to

20   release a threshold, right?

21           A.    Correct.  That order was not

22   necessarily suspicious.

23           Q.    Right.  You -- well, let's start

24   with a premise.  You wouldn't want to release

```
 1    one that was suspicious, correct?

 2                    MS. WICHT:  Object to the

 3            form.

 4            A.    I would not want to do that, no.

 5            Q.    Okay.  Your goal was to identify

 6    those that were suspicious and release those

 7    that weren't, right?  That was your job?

 8            A.    Yes.

 9            Q.    Okay.  In order to identify if

10    something is suspicious, you have to know what

11    suspicious is or else you can't do your job; you

12    would agree with that, right?

13            A.    I have to understand what is

14    possibly suspicious.

15            Q.    And those are the ones that get

16    reported, correct?

17            A.    Correct.

18            Q.    Okay.

19            A.    Because I won't know if it's

20    suspicious because what happens to the product

21    once it gets to the pharmacy, I have no control

22    over.

23            Q.    And let me make sure we're on the

24    same page.
```

```
 1                    You said you don't know that it's

 2      suspicious, meaning you don't have to determine

 3      if it's actually being diverted is what you're

 4      saying, right?

 5              A.     Correct.  I can't.

 6              Q.     You can't know where it goes after

 7      you deliver it?

 8              A.     I can't.

 9              Q.     If there's the potential that it

10      could be diverted, Cardinal has a regulatory

11      obligation to report that, correct?

12                    MS. WICHT:  Object to the

13              form.  Foundation.  Calls for a

14              legal conclusion.

15              A.     I can't -- again, once it leaves

16      Cardinal Health, I can -- following the guidance

17      of D -- or the DEA, I can say that this looks

18      suspicious.  Whether it is or not, I don't know.

19      So if I identify it as such, then it would be

20      reported.

21              Q.     That's what I wanted to make sure.

22              A.     But just because it's a threshold

23      does not mean it's necessarily suspicious.

24                            - - -
```

```
 1    (Cardinal-Forst Deposition Exhibit 12 marked.)

 2                        - - -

 3         Q.    Okay.  4226, Plaintiffs' Exhibit

 4    Number 12.

 5              All right.  I'm going to tell you

 6    again, this is one that --

 7         A.    Yeah.

 8         Q.    -- guess what, you are the owner,

 9    Mr. Forst.  That's set out on page 7.

10              Did you see that already?

11         A.    Yep.  Yes, I see that.

12         Q.    All right.  This is another

13    standard operating procedure for the

14    pharmaceutical distribution for Cardinal, isn't

15    it?  It says it in the upper right.  You can say

16    no.

17         A.    Yes, it is.

18         Q.    Okay.

19         A.    I'm trying to get ahead a little

20    bit.

21         Q.    Detecting and reporting suspicious

22    orders and responding to threshold events is

23    exactly what you did, isn't it?

24              MS. WICHT:  Object to the
```

```
 1            form of the question.

 2            Q.    This was your job at Cardinal,

 3    right?

 4            A.    Correct.

 5            Q.    Okay.  This is what you spent --

 6    and this is what you did most of the ten --

 7    well, almost ten years that you were there,

 8    right, almost a decade?

 9                  MS. WICHT:  Object to the

10            form.

11            A.    No.  My role changed.

12            Q.    Okay.  From what time frame did

13    you detect and report suspicious orders at

14    Cardinal?

15            A.    Probably seven of the ten years.

16            Q.    So for seven years, this was your

17    job.

18                  Did you receive any particularized

19    training related to identifying and reporting

20    suspicious orders and evaluating threshold

21    events?

22            A.    The training was based on my

23    knowledge as a pharmacist.

24            Q.    From being a pharmacist --
```

```
 1           A.    From being a pharmacist, from

 2   reading the policies and procedures, reading the

 3   objectives of what Cardinal was trying to do.

 4           Q.    From being aware of the

 5   regulations as well?

 6           A.    Aware of the regulations.

 7           Q.    And you've been a pharmacist -- I

 8   don't mean to pry about age -- how long?

 9           A.    Oh, God.

10           Q.    Just tell me what year you

11   graduated.  That'll help.

12           A.    '81.

13           Q.    Okay.  So you've been a

14   pharmacist --

15           A.    So whatever that is.

16           Q.    Now you'll make me do the math.

17           A.    Mm-hmm.  30-something -- 30 --

18   35-plus years, maybe.

19           Q.    Yes.

20           A.    Yes.

21           Q.    Close to 38 years.

22           A.    Yeah.  Thanks.

23           Q.    You're welcome.  Where did you do

24   your schooling?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Went to Creighton University in

 2    Omaha, Nebraska.

 3            Q.    Now, was that for pharmacy school?

 4            A.    That was for pharmacy school.

 5            Q.    How about undergrad?

 6            A.    I went to the University of

 7    Arkansas, two different branches.

 8            Q.    Go Razorbacks.

 9            A.    Yes.

10            Q.    I went to University of Florida

11    and UCF undergrad, so I'm an SEC fan.  Do you

12    still follow the Razorbacks or --

13            A.    Fortunately, Creighton doesn't

14    have a football team.

15            Q.    And right now Arkansas doesn't

16    have much of one either.

17            A.    Can I object to that?

18            Q.    Yes, you can.  Yes, you can.

19    Look, I had completely written Florida off when

20    they went to the bowl game.  I thought Michigan

21    would have destroyed them.  I was shocked that

22    we beat Michigan.

23                  So let me ask, were you pulling

24    for Alabama?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    I didn't care.  I'm just tired of
2    both of them.
3           Q.    Well, the problem is I don't think
4    that's going to change anytime soon.  Both of
5    them have tremendous teams.
6                 All right.  Sorry I digressed.
7                 So you've been a pharmacist coming
8    up on 40 years --
9           A.    Yes.
10          Q.    -- now, and worked in the industry
11   that entire time?
12          A.    I worked in hospital that entire
13   time, and some -- did -- worked some outpatient
14   in the hospital settings.
15          Q.    When you say "outpatient in the
16   hospital settings" --
17          A.    Just being more like retail.  So
18   I've done both.
19          Q.    Okay.  And then for the past
20   almost ten years of your professional career,
21   you were with Cardinal, right?
22          A.    That is correct.
23          Q.    Part of that was, again, in a
24   hospital setting?
```

1          A.      Correct.

2          Q.      And then in corporate with the

3    anti-diversion group?

4          A.      Correct.

5          Q.      And seven of those ten years, your

6    job was specifically detecting and reporting

7    suspicious orders and responding to threshold

8    events?

9          A.      The job was to, as best we could,

10   detect and report orders that would possibly be

11   suspicious, yes.

12         Q.      And evaluating these threshold

13   events, right?

14         A.      That is correct.

15         Q.      Okay.  So let's talk about your

16   policy and procedure.  It says, "The purpose."

17              "The purpose of the standard

18   operating procedure is to provide guidance to

19   Cardinal Health (CAH) employees in the Quality

20   and Regulatory Affairs (QRA) section on

21   responding, detecting, and reporting suspicious

22   orders."

23              Did I read that correctly?

24         A.      Yes, you did.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    So this is sort of the guidance

 2    provided to you and the others similarly like

 3    you at Cardinal in doing your job, right?

 4            A.    This is the framework, yes.

 5            Q.    Okay.  And it says, "and

 6    processing, documenting, and making judgments

 7    about threshold events, including making

 8    decisions about releasing or cutting orders that

 9    are suspicious or exceed a threshold."

10            Did I read that correctly?

11            A.    You read that correctly.

12            Q.    All right.  And this is the

13    framework for doing that, this document, 4226,

14    right?

15            Now you're going to go through it

16    and look, huh?

17            A.    Yes, this appears correct.

18            Q.    Okay.  And it says, "Purpose 1.2.

19    The purpose of this procedure is also to comply

20    with or exceed the standards for distributors

21    set forth in the Controlled Substances Act" --

22    excuse me -- "Controlled Substances Act,

23    regulations promulgated pursuant to that Act,

24    and extra regulatory guidance to which DEA holds
```

1    distributors responsible."

2              Did I read that accurately?

3         A.    Yes, you did.

4         Q.    Now, the scope.  The Scope under

5    2.0 says, "This procedure applies when an order

6    is triggered by CAH's Anti-Diversion

7    Centralization (or equivalent) system for review

8    by the QRA Pharmacist Group in order for the QRA

9    Pharmacist to evaluate the order so as to meet

10   the purpose of the procedure mentioned in 1.0

11   above."

12        A.    Yes.

13        Q.    Do you agree that that is the

14   scope of this document?

15        A.    According to the document, yes.

16        Q.    Do you have any basis to disagree

17   with that?  And what I'm trying to find out

18   is -- you said "according to the document."  Did

19   things at Cardinal actually operate differently

20   than the document suggests?

21        A.    No.

22              MS. WICHT:  Object to the

23        form.

24        Q.    Okay.

```
 1              MS. WICHT:  And just to

 2        clarify, the time --

 3              MR. FULLER:  Are you going to

 4        tell me I read it wrong again?

 5              MS. WICHT:  No, I'm not going

 6        to tell you you read it wrong.

 7              MR. FULLER:  Okay.

 8              MS. WICHT:  I'm just going to

 9        point out the -- the date on the

10        document, which doesn't cover the

11        full time period that --

12              THE WITNESS:  Correct.

13              MS. WICHT:  -- Mr. Forst was

14        in the role.

15              MR. FULLER:  Sure.

16  BY MR. FULLER:

17        Q.    And so the effective date says at

18  the bottom -- on the first page, effective date,

19  the 2nd -- or excuse me -- the 6th of June 2012,

20  right?

21        A.    That is correct.

22        Q.    Do you know if there are any other

23  versions of this?

24        A.    I'm -- I'm not aware, but I would
```

1    imagine there would be.

2         Q.    Was this or a similar policy and

3    procedure in place the entire time that you were

4    filling this role of detecting and reporting

5    suspicious orders?

6         A.    As far as I know, yes.

7         Q.    Okay.  Do you recall any of the

8    changes or updates that may have been done to it

9    being significant in substance?

10              MS. WICHT:  Object to the

11         form.

12         Q.    And what I'm trying to determine,

13   Mr. Forst, if there was some significant change

14   with this policy and procedure that you

15   specifically recall during your tenure.

16        A.    There were changes --

17              MS. WICHT:  Object to form.

18              Sorry.  Go ahead.

19        A.    I'm sorry.

20              There were changes in some of the

21   ways that we tried to look for suspicious

22   orders, but the goal is still the same as the

23   scope of this document.

24        Q.    Fair enough.

```
 1                     If we go to 4.0 on page 2, do you

 2      see the section there, Responsibilities?

 3              A.    Yes.

 4              Q.    "The responsibilities of the QRA

 5      pharmacist team include ..."

 6                     Now, let me ask you, who else was

 7      on the QRA pharmacist team with you?

 8              A.    At the time -- and this is --

 9              Q.    And we can go through your tenure.

10              A.    -- 2012.

11                     So Steve Morse was there.

12              Q.    Was he a -- is he a pharmacist?

13              A.    He is a pharmacist.

14              Q.    Okay.

15              A.    I'm trying to think of who came

16      in.  We had some analysts, and I can't name all

17      of them because some of them were temporaries.

18      I think we had two or three when I started.

19      Roger McCarter came.  Doug Emma came.  Who am I

20      missing?  Kimberly came later on.

21              Q.    Kimberly who?

22              A.    Kimberly Anna-Soisson.

23              Q.    Okay.

24              A.    William Brady came.  I'm missing
```

```
 1    someone, or I think I'm missing someone.

 2             If I think of it, I'll --

 3        Q.    You just shout it out, okay?

 4        A.    Yeah.

 5        Q.    All right.

 6        A.    So it grew as we evolved into

 7    the -- the central area as opposed to being at

 8    the distribution centers.

 9        Q.    Now, let me ask, when you first

10    started, were there other -- I know Mr. Moné is

11    a pharmacist as well, correct?

12        A.    Correct, and Gary Cacciatore is a

13    pharmacist.

14        Q.    Okay.  Were you -- was he --

15    Mr. Cacciatore was already there when you

16    arrived in '08; is that right?

17        A.    Correct.  I think him and

18    Michael --

19        Q.    Came in together?

20        A.    -- came in together or --

21        Q.    Or around the same time?

22        A.    -- or -- I think he was already

23    there, but he was also involved in this in some

24    form or fashion.  So it became more evolved with
```

1    him, too, at the very beginning.

2         Q.    Okay.  Were there any other

3    pharmacists there in the 2008, '09, '10 time

4    frame?

5         A.    Well, Bob Giacalone, he was there.

6         Q.    Okay.

7         A.    So, yes, there were pharmacists

8    there.

9         Q.    Did the department grow over time?

10        A.    Yes, the department grew over

11   time.

12        Q.    Okay.  Now, it says

13   Responsibilities.  It says, "The

14   responsibilities of the QRA Pharmacist team

15   includes:  A.  Evaluating held orders" -- that

16   was part of your job, right?

17        A.    Yes.

18        Q.    -- "b.  Identifying suspicious

19   orders," correct?

20        A.    Correct.

21        Q.    That's part --

22        A.    Potentially -- potentially

23   suspicious orders, correct.

24        Q.    Okay.  The next, c, is "Reporting

```
 1    the suspicious orders to the DEA," right?

 2            A.    Correct.

 3            Q.    "D.  Performing a review of

 4    suspicious orders."

 5                  Now, this may be a little out of

 6    order.

 7            A.    That's correct.  And, yeah, I

 8    agree.  It's probably out of order.

 9            Q.    But -- that's all right.

10                  Let's go to e, "Releasing

11    suspicious orders when appropriate."

12            A.    Well, I don't like that verbiage,

13    but --

14            Q.    Because you would never release a

15    suspicious order --

16            A.    Correct.

17            Q.    -- right?

18            A.    Correct.

19                  MS. WICHT:  Object to the

20            form.

21            Q.    Cutting suspicious orders when

22    appropriate, that was another job that you would

23    do; is that correct?

24            A.    Correct.
```

1      Q.     When we say "cutting," help the

2   jury understand what you guys mean by "cutting."

3      A.     So the order was held in the

4   system so it wasn't sent to the customer.

5      Q.     So when we say an order is held,

6   it's just sort of in limbo; it's not going

7   out --

8      A.     It's not going out.  The order has

9   been placed.  It's at the distribution center.

10  The system has stopped it so that it can be

11  evaluated based on -- it's stopped because of --

12  it has hit or exceeded the threshold.

13     Q.     And it hasn't been canceled yet,

14  either, right?

15     A.     It has not been canceled.

16     Q.     Okay.  Go ahead.

17     A.     So it's still an active order.

18     Q.     Yes, sir.  So what does the

19  cutting mean?

20     A.     So the cutting means that the

21  order is essentially voided.

22     Q.     So canceled?

23     A.     It is canceled.  It is voided.

24     Q.     So it will no longer exist in the

1    system?

2            A.    It's in the system --

3                  MS. WICHT:  Object to the

4            form.

5            A.    It's in the system.  But it's not

6    an active order, so it can't be shipped.

7            Q.    So maybe a different way of saying

8    it is it's taken out of active status?

9            A.    It's taken out of active status.

10           Q.    So there's no way --

11           A.    It is still -- it is still being

12   documented that it was --

13           Q.    Placed?

14           A.    Placed, correct.

15           Q.    Okay.  But as far as the potential

16   for shipment, that's gone away when an --

17           A.    It's gone.

18           Q.    -- order becomes inactive?

19           A.    It's gone.  Correct.

20           Q.    Okay.  If we go to page 3,

21   "Definitions.  5.0.  Anti-Diversion

22   Centralization (ADC)."

23                 What is your understanding of the

24   ADC system?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Prior to the ADC system, we had

2   lots of information, but it was housed in

3   different areas.  So we would have to go and

4   look in each of the areas separately.

5            The ADC system brought all those

6   together under one -- into one system.  So you

7   could just be in ADC and you could pull up

8   information that you had previously about the

9   customer, possibly in Content Manager.  You

10  could see --

11           Q.    Can you see investigations that

12  may have been done?

13           A.    You could see investigations in

14  Content Manager.  You would go to that.  It

15  would take you to that area.  So it would open

16  up different screens.

17           So it was more centralized, so it

18  was a lot easier to find documents when you were

19  reviewing orders.

20           Q.    So it sort of did what it's named?

21           A.    Exactly.

22           Q.    Anti-diversion centralization?

23           A.    Correct.

24           Q.    Bringing everything together from
```

1    different -- like you said, stored in different

2    areas?

3            A.    Correct.

4            Q.    Now, not that you wouldn't have

5    had access to the --

6            A.    We had access to all those areas

7    previously.  This just tried to simplify it to

8    streamline the process.

9            Q.    What's the -- read the definition

10   for anti-diversion customer profile.

11           A.    "Anti-diversion customer profile.

12   A report generated by QRA containing various

13   background, licensing, and analytical metrics

14   relevant to a customer used to assist in the

15   evaluation of threshold -- threshold events."

16           Q.    Have you utilized these reports

17   before, used them in your --

18           A.    Yes.

19           Q.    You're trying to peek and see what

20   I've got over here.

21           A.    Yeah, I'm trying to see which one

22   it is because they changed.

23           Q.    Yeah, I think you're right.  I

24   think they've changed maybe a couple of times,

```
 1    but I had one that was attached to a daily

 2    threshold reporting policy and procedure.

 3            A.    Okay.

 4            Q.    This is going to be Exhibit 13,

 5    and it's 4301.

 6                     - - -

 7     (Cardinal-Forst Deposition Exhibit 13 marked.)

 8                     - - -

 9            Q.    And I'm not going to really ask

10    you anything other than to turn to page 5 of the

11    document.

12            A.    Okay.  Okay.

13            Q.    Is that what the -- the earlier

14    document, the detecting and reporting suspicious

15    orders, was referring to, is that type of

16    anti-diversion customer profile?

17            A.    This was one of the documents,

18    yes --

19            Q.    Okay.

20            A.    -- which changed over time.

21            Q.    All right.  Okay.  So if you'd

22    turn to the next page.

23                 MS. WICHT:  Which document?

24                 MR. FULLER:  I'm sorry.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              We're going back to 4226.

 2   BY MR. FULLER:

 3         Q.    Actually, stay on the same page,

 4   page 3.  Then we have the procedure and then the

 5   initial review.

 6              Do you see that?

 7         A.    Yes.

 8         Q.    6.11, it says, "The following

 9   orders are held or cut, pending review by QRA

10   under this procedure:  Orders of interest

11   referred by a distribution center" -- right?

12         A.    Yes.

13         Q.    -- "or orders that exceed a

14   threshold set for the customer from the drug

15   family."

16              Correct?

17         A.    That's correct.

18         Q.    And that was two ways that orders

19   could be held and reviewed by your department,

20   right?

21         A.    That is correct.

22         Q.    Then I guess 6.1.2 is sort of a

23   catchall that allows you to look at other stuff,

24   too?
```

```
 1              A.      That is correct.

 2              Q.      And it says -- 6.1.3 says, "Under

 3      this procedure, QRA must first review every --

 4      it's all capped --

 5                      MR. FULLER:  Underline that,

 6              Gina.

 7      BY MR. FULLER:

 8              Q.      -- "every held or cut order under

 9      6.1.1 to determine whether the order is

10      suspicious as the term is used in

11      21 C.F.R. 1301.74(b)."

12                      Right?

13              A.      Correct.

14              Q.      And it says, "Per the regulation,

15      orders are deemed suspicious if they meet one or

16      more of the three criteria."

17                      Is that your understanding of the

18      regulation, Mr. Forst?

19              A.      Yes, it is.

20                      MS. WICHT:  Object to form.

21              Q.      Is that you could have any one of

22      the three criteria for an order to be

23      suspicious, correct?

24              A.      Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.    And then required to be reported

2    to the DEA?

3           A.    If it was deemed as suspicious,

4    yes.

5           Q.    Well, if it fits one of the three

6    criteria, then it fits the definition of

7    suspicious, doesn't it?

8                 MS. WICHT:  Object to the

9           form.

10          A.    Again, we're with the -- some of

11   the vagueness or the unspecificity of unusual --

12          Q.    Okay.  Well, we'll -- we'll get

13   there.

14          A.    Okay.

15          Q.    So (a) is order of unusual size;

16   (b) order of unusual frequency; and (c) order

17   deviates substantially from the normal pattern

18   for the customer.

19                Did I read those correctly?

20          A.    Yes, you did.

21          Q.    As Cardinal has set them out in

22   their own policies and procedures?

23          A.    Yes, you did.

24          Q.    Okay.  Then 6.1.4, "Orders that
```

```
 1    meet one or more of the criteria in 6.1.3

 2    must" -- do you see that word?  We're going to

 3    underline that -- "must be reported to the DEA

 4    as suspicious."

 5              And you agree with that, don't

 6    you, Mr. Forst?

 7              MS. WICHT:  Object to the

 8         form.

 9         A.    I can agree to that --

10         Q.    Okay.

11         A.    -- based on the way that we

12    interpreted unusual and frequency.

13         Q.    All right.  Well, let's keep going

14    then, because next we've got 6.1.5.  Here we

15    have Cardinal's definition of orders of unusual

16    size, don't we?

17         A.    Yes, we do.

18         Q.    And let's underline that and mark

19    it up, because orders of unusual size is one of

20    the three criterias that if we meet it, we are

21    supposed to report it to the DEA, aren't we,

22    Mr. Forst?

23              MS. WICHT:  Object to the

24         form.
```

1          Q.    Correct?

2          A.    If it's deemed suspicious.

3          Q.    All right.  So orders of unusual

4     size can be determined two ways, according to

5     Cardinal's definition, correct?  "Orders of

6     unusual size are significantly larger than --

7     it's still 1 -- orders normally placed by the

8     customer" --

9                Did I read that correctly?

10         A.    Yes.

11         Q.    -- "or" -- right?  It's not "and,"

12    it's "or," isn't it?

13         A.    Yes.

14         Q.    So 2, "or by customers that have

15    a -- "have a size and type of business that is

16    similar to the ordering customer's business."

17                Right?

18         A.    Correct.

19         Q.    So if we look at this, two ways we

20    get suspicious orders per Cardinal Health -- or

21    at least orders of unusual size, right?  These

22    are orders of unusual size only, isn't it?

23         A.    Yes, according to the policy.

24         Q.    -- is that they have to be, when

1    you follow along with me on the regulation -- to

2    make sure I get this right -- or excuse me --

3    the standard operating procedure, they have to

4    be significantly larger than the orders normally

5    placed by 1, being that customer, correct?

6         A.    Correct, the customer himself.

7         Q.    So we have to look at that

8    customer's history, whoever the ordering

9    customer is.  Whether it's a retail -- a

10   hospital, a chain, whoever it is, we need to

11   look at their history as well, correct?

12        A.    We look at their --

13              MS. WICHT:  Object to the

14        form.

15        A.    We look at their patterns that we

16   have the ability to see.

17        Q.    Sure.  And if it's a customer that

18   you've been selling to for a while, you may have

19   a lengthy history, right?

20        A.    Yes.

21        Q.    And you guys actually have

22   computer systems to help look at that history,

23   don't you, through Tableau, through these --

24   what was that thing we just looked at?

```
 1            A.    Oh, the --

 2            Q.    The anti-diversion customer

 3   profile?

 4            A.    Correct.

 5            Q.    It gives you ordering history on

 6   there as well, right?

 7            A.    It gives you -- oh, it's right

 8   here.

 9                  Yes --

10            Q.    Okay.

11            A.    -- it can.

12            Q.    And now, 2, of Cardinal's own

13   policy and procedure is by customers that have a

14   size and type of business similar to the

15   ordering customer, right?

16            A.    Yes.

17            Q.    So in order to be able to

18   determine -- when you get a threshold event, in

19   order to determine whether it meets the criteria

20   of orders of unusual size, you need to be able

21   to look at that customer's history, correct?

22            A.    Correct.

23            Q.    And you look to see if it's

24   unusual based on that customer's purchasing
```

```
 1    history, right?

 2             A.    That is correct.

 3             Q.    And then you also have to be able

 4    to find out what customers of like size and type

 5    have ordered in the past and compare it to those

 6    histories, right?

 7                   MS. WICHT:  Object to the

 8             form.

 9             Q.    That's what the policy says, isn't

10    it?

11                   MS. WICHT:  Object to the

12             form.

13             A.    If that information is available,

14    yes.

15             Q.    So my question is, that's what the

16    policy says, isn't it, Mr. Forst?

17             A.    It was done if the --

18                   MS. WICHT:  Object to the

19             fortunately.

20             A.    -- information is available.

21             Q.    So what was -- so, for example --

22    let's do a hypothetical.  Well, let's use a real

23    life example.  We're going to pretend that

24    everybody in this room is a retail pharmacy,
```

```
 1    okay?

 2            A.    Okay.

 3            Q.    And that would mean that we're all

 4    the same type, correct?

 5            A.    Not necessarily.

 6            Q.    We're all retail pharmacies.  How

 7    did you sub- --

 8            A.    Well, I don't know --

 9            Q.    Let's say retail independent

10    pharmacies.

11            A.    Okay.

12            Q.    Now we're all the same type,

13    right?

14            A.    You're all considered a retail

15    independent pharmacy.  But, sure, each different

16    and unique based on your patient population,

17    based on the number of scripts, et cetera.

18            Q.    Hold on.  Cardinal's policy and

19    procedure says we have to do it by size and by

20    type, right?

21            A.    It says type of business.

22            Q.    Type of business.  And Cardinal

23    subcategorized its customers into types of

24    business.  We've already seen that in the
```

1    threshold system, right?

2            MS. WICHT:  Object to the

3        form.  Mischaracterizes.

4        A.    Yes, but type can be a broad

5    definition.

6        Q.    Sure.  I understand.  You are

7    going to now try to change how type is defined.

8    I get it.  The policy and procedure is there,

9    though.  You cannot get away from it.

10           So it says type of business.  You

11   tell us right now what different types of

12   business Cardinal categorized customers into.

13           MS. WICHT:  Object to the

14       commentary and the form of the

15       question.

16           MR. FULLER:  Actually, strike

17       that question.

18   BY MR. FULLER:

19       Q.    Where in this policy and procedure

20   does it set out the different types of business?

21   Where in this policy?

22           MS. WICHT:  While he's

23       looking for that, Mike, we've been

24       on the record, I think, over an

```
 1          hour and a half now, so whenever

 2          you're at a point to take a break,

 3          that would be good.

 4                  MR. FULLER:  Sure.  I'd like

 5          to finish with this issue.

 6                  MS. WICHT:  Sure.

 7                  MR. FULLER:  And then we can

 8          take a lunch break, probably, too.

 9          I think it's that time.

10          A.    I don't see the definition of type

11   of business, but I just skimmed through it,

12   so ...

13          Q.    Now, you are aware, are you not,

14   that Cardinal classified types of business into

15   different categories, right?

16                  MS. WICHT:  Object to the

17          form.

18          A.    Yes, as a type, but there are also

19   subtypes to that, which I don't think it was

20   categorized as such.  So even though you might

21   be a small retail pharmacy, your customer base

22   would still delineate you to be different

23   than -- you would still be in that type, but

24   your customer base can delineate you to be of a
```

1    different animal than each one of us in the

2    room.

3              Q.    Okay.  I'm just trying to follow

4    the policy and procedures that Cardinal wrote.

5              A.    I understand.

6              Q.    Okay.  So Cardinal delineated

7    customers into types of business, right?

8                    MS. WICHT:  Object to the

9              form.

10             Q.    They had an independent

11   retail-type category, correct?

12                   MS. WICHT:  Object to the

13             form.

14             A.    Yes.

15             Q.    They had retail chains, correct?

16             A.    Yes.

17             Q.    They had hospitals, right?

18             A.    Yes.

19             Q.    Okay.  They also divided customers

20   into size categories, correct?

21             A.    Yes.

22             Q.    And they did small, medium, and

23   large, based on your knowledge, correct?

24             A.    Correct.

```
 1              Q.    So if we're going to apply this

 2    policy and procedure, we need to follow whatever

 3    categorize -- well, strike that.

 4                    Cardinal's system designated each

 5    customer by its customer type, didn't it?

 6                    MS. WICHT:  Object to the

 7              form.

 8              A.    The customer was placed in those

 9    different types.

10              Q.    Types of business, right?

11              A.    By types of business, by the

12    information that we had on the customer --

13              Q.    Right.

14              A.    -- so ...

15              Q.    And they were placed in the

16    different size categories, although you don't

17    necessarily recollect how the size was

18    determined?

19              A.    I don't know how the size was

20    determined, correct.

21              Q.    That's -- you've already testified

22    to that.

23                    But they were separated into size

24    categories?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    And so for a simplistic example,

 3    if everybody in here is a retail independent

 4    pharmacy and everybody in here is ordering

 5    10,000 pills a month of oxycodone and I'm

 6    ordering 100,000 pills per month of oxycodone,

 7    that's significantly -- and maybe my history is

 8    I've ordered 100,000 every month for the past

 9    year.

10                    You would agree with me that

11    that's not abnormal, it's not unusual, for my

12    ordering history, right?

13                    MS. WICHT:  Object to the

14          form.  Hypothetical.

15              A.    I mean, if it's a hypothetical

16    situation, yeah.  I mean, yeah, you -- and that

17    could be -- there could be absolutely no

18    diversion there.

19              Q.    Well, hold on.  We're just talking

20    about my ordering pattern.

21              A.    I know.  So you're staying in your

22    normal realm.

23              Q.    I'm staying in my normal pattern.

24              A.    Right.
```

```
 1            Q.    But compared to everybody else, I

 2     would be unusual; can we agree to that?  I'm ten

 3     times what everybody else is ordering that is

 4     the same --

 5            A.    You would --

 6            Q.    -- type --

 7            A.    You would --

 8            Q.    -- and size of customer?

 9                  MS. WICHT:  Object to the

10            form.  Foundation.  Hypothetical.

11            A.    You would look different.

12            Q.    Now, doesn't necessarily mean for

13     certain that pills are being diverted, does it?

14            A.    No.

15            Q.    Okay.  But it's certainly a red

16     flag that deserves looking into?

17                  MS. WICHT:  Object to the

18            form.

19            A.    And that's when we would find --

20     look for other information about that

21     customer --

22            Q.    Sure.  But --

23            A.    -- to determine.

24            Q.    But it fits the definition of
```

```
 1    unusual size, doesn't it?

 2                 MS. WICHT:  Object to the

 3          form.  Foundation.

 4          A.    I don't --

 5                 MS. WICHT:  Hypothetical.

 6          A.    I can't speak to that because I'm

 7    not sure at what time period.  There is at the

 8    end something that's a lot more definitive where

 9    you can see all the customers grouped.

10          Q.    There is at the end something more

11    definitive?

12          A.    Well, I mean --

13          Q.    Is there a computer system?

14          A.    -- after like -- when Tableau came

15    out, then you could see by dots the different

16    types of customers that fall into.

17                 Prior to that, you had to look and

18    search for those customers.  So the system got

19    more technical and it was a lot easier to look

20    for that information.

21          Q.    So here's what I want to know:

22                 For the particular types and sizes

23    of customers, did Cardinal set out what the

24    average was?  Did they give you a sheet that
```

```
 1   says, "Okay.  For retail independents of medium

 2   size, this is what the average is"?

 3           A.    I don't remember a --

 4                 MS. WICHT:  Object to the

 5           form.

 6                 I'm sorry.  Go ahead.

 7           A.    I don't remember a specific sheet

 8   that says this is the average of a small, a

 9   medium, or a large customer purchasing this

10   certain drug family.

11           Q.    All right.  And while I know you

12   had plenty of things going on when you were

13   trying to do your job, did you go and calculate

14   what the average was -- and I want to figure out

15   over what geographical area.  So if you're

16   looking at a pharmacy that's in Cuyahoga County,

17   Ohio, the Cleveland area, did you compare it

18   just to other pharmacies in Cleveland?  Did you

19   compare it to like pharmacies across the state?

20   Was the comparison across the country?  Or do

21   you know?

22                 MS. WICHT:  Object to the

23           form.  Foundation.  Compound.

24           A.    Each customer was looked at
```

1    individually.  So we would look at what's around

2    them.  We would look at -- it could be the state

3    they're in.  It could be what's around them, if

4    it's a hospital, if it's several other

5    pharmacies, if it's a specialty group of some

6    sort.  So if you're at the Cleveland Clinic,

7    you're probably going to be more of a heart

8    specialist or whatever.

9                So it was an -- it was an

10   independent look at each individual customer.

11   And, yes, we did compare it to size and type of

12   businesses, but, again, they're different and

13   individual.  So each one is going to be -- each

14   one is different.  Even a -- even retail chains

15   that are -- one can be four blocks from the

16   other.  Their customer base could be totally

17   different.

18        Q.    I'm not here to agree or disagree

19   with you.  What I want to know -- and you're

20   saying they look at each customer's

21   individually.

22        A.    Yes.

23        Q.    That's great.  That's the first

24   part of the definition of suspicious --

```
 1            A.    Yes.

 2            Q.    -- or unusual order.

 3            A.    Yes.

 4            Q.    The second part is comparing it to

 5    likes.  And I want to know how Cardinal did

 6    that.  For the seven years that you were there

 7    doing this, I want to know -- not guessing.  I

 8    want to know how Cardinal -- what geographical

 9    area Cardinal looked at.  Was it just within the

10    neighborhood?  Was it within the county?  Was it

11    within the state?  Was it across the country?

12            There are going to be very

13    similarly situated pharmacies like the ones in

14    Ohio in other states.  There just are.  This

15    country isn't that different going from one side

16    to the other.

17            A.    I think it is.

18            Q.    So my point is, how did

19    Cardinal -- what was Cardinal's system for doing

20    that?  Can you answer that question?

21            A.    I can't answer --

22            MS. WICHT:  Object to the

23    form.

24            A.    I can't answer that question.
```

1    Q.    Okay.  So sitting here today, you

2    can't tell us what system Cardinal had in place

3    to compare similarly situated pharmacies, at

4    least according to this policy and procedure,

5    correct?

6             MS. WICHT:  Object to the

7         form of the question.

8         Mischaracterizes his testimony.

9    A.    As I -- as I said previously, each

10   customer was looked at individually.

11   Q.    I --

12   A.    If you could compare them by size

13   and type that made sense, then yes.

14   Q.    Okay.

15   A.    But, otherwise, each customer is

16   individual customer.

17   Q.    So I'm -- all I'm asking,

18   Mr. Forst, is, do you know and can you tell us

19   the system that Cardinal used to make the

20   similarly situated comparison as it relates to

21   orders of unusual size, orders of unusual

22   frequency and pattern during the seven years

23   that you were in this department?

24   A.    I don't know --

```
 1              MS. WICHT:  Object to the

 2         form.

 3         A.    I don't --

 4         Q.    And if you can't, just say "I

 5    can't."  That's fine.

 6              MS. WICHT:  Object to the

 7         form.

 8         A.    I don't know the system that they

 9    used to do that, no.

10         Q.    Okay.  Now, you've testified that

11    it would make sense to do that if they had the

12    information, right?

13              MS. WICHT:  Object to the

14         form.

15         A.    I have testified that we used all

16    the information that we had available to us to

17    make decisions on whether an order had the

18    potential to be suspicious and to be diverted.

19              MR. FULLER:  Okay.  Let's

20         take our lunch break.

21              THE VIDEOGRAPHER:  We're

22         going off the record at 12:28.

23                      - - -

24         Thereupon, at 12:28 p.m. a lunch
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              recess was taken until 1:35 p.m.

 2                       - - -

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                         Tuesday Afternoon Session

                          January 22, 2019

 2                         1:35 p.m.

 3                            - - -

 4              THE VIDEOGRAPHER:  We are

 5         back on the record at 1:35.

 6           CROSS-EXAMINATION (CONT'D.)

 7   BY MR. FULLER:

 8         Q.    All right.  We were finishing with

 9   the policy and procedure when we took a break,

10   Mr. Forst.

11              I want to attach a piece of

12   artwork, Number 14, as another demonstrative

13   exhibit for the record.

14                            - - -

15    (Cardinal-Forst Deposition Exhibit 14 marked.)

16                            - - -

17         Q.    And, Mr. Forst, the -- we were on

18   4226 over on page 4 when we took that break.

19              The definitions for orders of

20   unusual frequency, which is 6.1.6, as well as

21   orders that deviate substantially from the

22   normal ordering pattern, 6.1.7, include the same

23   sort of criteria as orders of unusual size, in

24   that they compare to the customer's history,
```

1   then to history of customers of similar type, as

2   well as size, right?

3                   MS. WICHT:  Object to the

4           form.

5           A.    Correct.

6           Q.    Okay.  And if you'd turn to the

7   next page, page 5.  And if you look at 6.1.8.1,

8   orders cut due to order entry errors and not

9   reported to the DEA.

10                  How do you determine if something

11  is an order entry error versus a suspicious

12  order?

13          A.    Order entry errors are usually the

14  orders that -- say the customer places an order.

15  They call the distribution center and say "This

16  order was placed in error."  And so they're over

17  their threshold, so the distribution center

18  can't do anything with the order until we act on

19  it and they inform us that that order was placed

20  incorrectly.  They can cut the order, but the

21  order will sit there until we act on it.

22          Q.    And you say "they can cut the

23  order."

24          A.    The distribution center can --

1    they can inactivate the order, like we cut

2    orders.

3            Q.    Yes, sir.

4            A.    But we have to respond to it and

5    make a comment on it to clear it through the

6    system.

7            Q.    So the distribution system --

8    center --

9            A.    They can cut it or they can leave

10   it sit there for us if it gets held.

11           Q.    Okay.

12           A.    And then they communicate with us

13   that the order was an entry error or whatever.

14   There are times when there's a -- an order

15   that's a lot larger than what customers normally

16   order.  And at that time, whoever is reviewing

17   the orders can call the customer and says, "This

18   order looks different than normal, what's going

19   on?"  And they would say, "Oh, we didn't mean to

20   order that" or whatever.  So that's how we deal

21   with the order entry errors.

22                And there were -- I don't see

23   those as -- there was very many of those that

24   occurred as a percentage of the orders that we

```
 1    cut.

 2           Q.    That was a very small percentage;

 3    is that what you're saying?

 4           A.    I believe so.  I don't know the

 5    percentage, though.

 6           Q.    It wasn't something that you

 7    encountered all the time?

 8           A.    No.

 9           Q.    Okay.

10           A.    Not that routinely.

11           Q.    Now --

12           A.    Me personally that was doing the

13    orders.

14           Q.    Fair enough.

15                 6.1.8.2, held or cut orders

16    reported to the DEA.  So if it's not an order

17    entry error and it's held and then ultimately

18    cut, it's your understanding that it has to be

19    reported to the DEA, correct?

20                 MS. WICHT:  Object to the

21           form.

22           A.    Not all cut orders were reported.

23    They had to be -- have an air of suspiciousness

24    around them.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So there had to be something in

 2    the patient's profile that would alert us to

 3    say, "This is something that is a suspicious

 4    order for some reason."

 5              MS. WICHT:  Did you mean to

 6         say "patient" in that answer,

 7         Chris?  I'm sorry.  Just to --

 8              THE WITNESS:  I'm sorry?

 9              MS. WICHT:  You said there

10         would be something in the patient's

11         profile.

12         A.   Oh, I'm sorry.  In the --

13              MS. WICHT:  I don't think you

14         meant that.

15         A.   -- in the -- I'm not -- I'm

16    sorry -- in the customer's profile.

17         Q.   Okay.

18              THE WITNESS:  Thank you.

19         Q.   But if it's held or cut, it had to

20    be triggered by something, right?  And this --

21         A.   If it's held, it's triggered by

22    the threshold.

23         Q.   So your testimony to the jury is

24    that you could cut an order that's been
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    triggered by a threshold and not report it to

2    the DEA?

3           A.    Yes.

4                 MS. WICHT:  Object to the

5           form.

6           Q.    Even if it's not just an order

7    entry problem?

8           A.    Yes.  It's -- what is around the

9    order that makes it possibly suspicious.  I

10   mean, another example that might not be an -- an

11   order entry error is ████████████████████
```

```
24          Q.    Uh-huh.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.   ▒▒▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒

▒        ▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒  ▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒▒▒▒  ▒▒▒▒▒▒

▒   ▒▒▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒   ▒▒▒▒▒▒

14          Q.   But does that constitute a cut

15   order?  What's being cut, then, if they --

16          A.   Well, if it -- if it pushes it

17   over threshold, it would be cut.  And then you

18   would have to back it out because of that so

19   that they -- you know, the accrual is

20   appropriate.

21          Q.   Hold on.  So let's just make sure

22   we're on the same page.

23               You're saying they have to

24   re-place the order because someone shipped them

1    the wrong --

2         A.    No.  We didn't ship -- we didn't

3    ship the wrong thing.  ████████████

  ████████████████████████████████████████████

  ████████████████████

6         Q.    Right.

7         A.    --   ████████████████████████

  ███████████████████████████

9              If -- if the -- let's say the tech

10   ordered it and then it was incorrect -- I guess

11   you could call it an order entry error -- and

12   they shipped the ████████████████████████

  ██████████████████████████████████████████

  ██████████████████████████████████████████

  ████████████████████████████████████

  ████████████████████████████████

17        Q.    So -- but in those scenarios,

18   they're returning -- let's just call it the

19   wrong product?

20        A.    Yes.

21        Q.    Okay.  So it's not really a

22   threshold event because some of the --

23        A.    Well, it is if it goes over

24   threshold.  If they're close to that threshold

1    and it bumps them over, it would stop that

2    order.

3            Q.    Right.

4            A.    If I'm reviewing it and I don't

5    know that they're -- they need a ███████████

███  ████████████████████████████████████████████

███  ████████████████████████████████████████

███  ███████  ███████████████████████████████████

9                    And then it would have to be

10   returned.

11                   And it -- you know, if it was

12   ahead of time and it was over and they told us,

13   well, then, it's an order entry error.  But --

14           Q.    When you say "ahead of time," what

15   do you mean?

16           A.    Well, I mean, like I say, you

17   know, if they notice that they ordered the wrong

18   thing or it was going to -- they were going to

19   get shipped the wrong thing, then it would be

20   considered an order entry error.

21           Q.    All right.  Let's go to 4919.

22                      - - -

23    (Cardinal-Forst Deposition Exhibit 15 marked.)

24                      - - -

```
 1                  MR. FULLER:  And this is

 2          going to be -- I'm sorry --

 3          Plaintiffs' Exhibit Number 15, 4919

 4          for the record.

 5  BY MR. FULLER:

 6          Q.    And, Mr. Forst, you see this

 7  apparently is a corporate quality and regulatory

 8  compliance manual.

 9                  Do you see that there?

10          A.    Yes.

11          Q.    And its issue date is June 15th of

12  2006?

13          A.    Yes.

14          Q.    And it's signed off by Stephen

15  Reardon, vice president, quality and regulatory

16  affairs?

17          A.    Yes.

18          Q.    And that's the same Mr. Reardon

19  you mentioned earlier --

20          A.    Correct.

21          Q.    -- correct?

22                  Okay.  Now, this is actually --

23  well, it's not entered before your time at

24  Cardinal because you were actually with
```

1    Cardinal, but you were in Texas at this point in

2    time, correct?

3         A.    Yes.

4         Q.    Okay.  Do you know when this

5    policy went out of effect?

6         A.    No.

7         Q.    Okay.  And we've looked at some of

8    the policies that you were on already today,

9    right?

10        A.    Correct.

11        Q.    I think the earliest one that went

12   into effect was December of 2008.  I believe it

13   was December 22nd, if memory serves.

14               Does that seem right?

15        A.    That sounds correct, yes.

16        Q.    Okay.  So if you will turn to the

17   second page, it says, title, "Required Reports

18   to the DEA."

19               Do you see that?

20        A.    Yes.  I'm sorry.  I was looking --

21        Q.    And the Purpose is "To comply with

22   DEA and Cardinal Health, Inc. requirements to

23   report transactions, thefts, drug destructions

24   and suspicious orders to the DEA and DEA ARCOS

```
1   Unit."

2               Did I read that correctly?

3       A.    Yes, you did.

4       Q.    And then the scope is

5   pharmaceutical distribution facilities.

6               Do you ever recall being shown

7   this policy and procedure?

8       A.    No.

9       Q.    Okay.  Well, if you'll turn to --

10  page 5 is where we get to the order on

11  suspicious -- the section on suspicious orders.

12              Do you see that near the bottom of

13  the page, "Suspicious Orders"?

14      A.    Yes.

15      Q.    Can you read 5a aloud for us,

16  please?

17      A.    "Wholesalers must design and

18  operate a system that will disclose suspicious

19  orders to the wholesaler."

20      Q.    Okay.  And you agree with that,

21  correct?

22      A.    Why am I -- "Wholesalers must

23  design and operate a system that will disclose

24  suspicious orders to the wholesaler."
```

```
 1                   What wholesaler are we doing?

 2          Q.    Wholesale distributors.  Cardinal,

 3   for example.

 4          A.    The sentence doesn't seem to make

 5   sense to me, but -- I mean, we'll disclose

 6   suspicious orders to the wholesaler, so the

 7   wholesaler is reporting them to a wholesaler?

 8          Q.    Well, you have to design and

 9   operate a system to disclose suspicious orders

10   to yourself, right?  It's part of the

11   regulation?

12          A.    That's what it seems to say, yes.

13          Q.    I mean, that's part of the actual

14   regulation isn't it?

15          A.    Okay.  Yeah.  So you'd have to

16   know what's --

17          Q.    You have to have a system to

18   identify suspicious orders.

19          A.    Right.  Okay.

20          Q.    Okay.

21          A.    I agree with that.

22          Q.    And a.i. says -- read that one for

23   us, if you don't mind.

24          A.    "The facility must inform the DEA
```

```
 1    field office in the areas of all suspicious

 2    orders."

 3            Q.    Okay.  You agree with that as

 4    well, correct?

 5            A.    It's --

 6            Q.    So let's go to --

 7            A.    Based on the definition of

 8    suspicious orders, yes.

 9            Q.    Okay.  Let's go to --

10            A.    Again, it's vague.

11            Q.    -- ii.

12                  Read that one for us.

13            A.    "Suspicious orders include orders

14    of unusual size, orders deviating from a normal

15    pattern, and orders of unusual frequency."

16            Q.    Okay.  You agree that's the

17    definition that the regulation gives related to

18    suspicious orders, do you not?

19            A.    Yes.

20            Q.    All right.  Read b for us.

21            A.    "Wholesalers must establish

22    written criteria of what constitutes a

23    suspicious order."

24            Q.    Okay.  Did Cardinal have, to your
```

1    knowledge when you joined them, a written

2    criteria for what constitutes a suspicious

3    order?

4            A.    I believe it was in one of the

5    policies, but I can't say directly.

6            Q.    You don't have any recollection of

7    what that definition would have been or that

8    criteria would have been?

9            A.    The definition would have probably

10   been what the DEA guidelines are.

11           Q.    This asks for a written criteria

12   of what constitutes a suspicious order.

13               Do you have any recollection of

14   seeing that before?

15           A.    No.

16               MS. WICHT:  Object to the

17           form.

18           Q.    If you go down to c -- it's there

19   on page 6 -- it says, "Each facility shall

20   submit to the DEA office on a monthly basis via

21   registered or certified mail, return receipt

22   requested, or via Federal Express or UPS with a

23   tracking number an ingredient limit report."

24               And, again, I think I asked you

```
 1   when we got started about ingredient limit

 2   reports and you don't recollect necessarily

 3   seeing an ingredient limit report, do you?

 4          A.    No.  Excuse me.  No.

 5               MR. FULLER:  3501.

 6               (Discussion off the record.)

 7               MR. FULLER:  Jennifer, this

 8          is one of the documents on that USB

 9          I gave you earlier, too --

10               MS. WICHT:  Oh.

11               MR. FULLER:  -- that who

12          knows where it went?

13               MS. WICHT:  It's down there

14          somewhere.  Okay.

15               MR. FULLER:  This is going to

16          be Exhibit --

17               MS. WICHT:  16.

18               MR. FULLER:  -- 16, 3501.

19                    - - -

20    (Cardinal-Forst Deposition Exhibit 16 marked.)

21                    - - -

22   BY MR. FULLER:

23          Q.    And my understanding from other

24   witnesses is this prints out a little
```

1    differently than the way it may have looked back

2    in the day.  I don't know why, but it's just the

3    way we got it.

4                  This says, "Compliance Group

5    Ingredient Limit Report," and it has a run date

6    there of May 9th of 2008.

7                  This is during your time frame

8    within the regulatory department at Cardinal,

9    correct?

10       A.    Correct.  It's right after I

11   started.

12       Q.    And the Ingredient Limit Report,

13   we see "Ingredient Limit Report Summary,

14   Non-ARCOS Report" there in the first part of the

15   section.

16                  Do you see that?

17       A.    Yes.

18       Q.    Now, to save us some time, I'm

19   going to sort of give you a thumbnail sketch.

20   You're more than happy -- more than welcome to

21   look, but I believe there's non-ARCOS

22   reportables in here.  There's a hospital

23   section.  But we're going to jump forward to

24   page 274.

1              Can you tell me when you've found

2    that.

3         A.    Okay.

4         Q.    Okay.  So the first customer

5    listed on this page -- although we have some of

6    the prior page there -- is Customer 2848,

7    CVS 3360.

8              Do you see that?

9         A.    Yes, I do.

10        Q.    And it provides the address as

11   well as the DEA number and then the ingredient

12   we're measuring, correct?

13             MS. WICHT:  Object to the

14        form.

15        A.    According to the report, yes.

16        Q.    And if we go down a little bit, we

17   have where it looks like there was a page break.

18   And, again, it says month of April '08.  Factor

19   used, it says factor of 4.

20             Do you see that there?

21        A.    Oh, yes, I see it.  Thank you.

22        Q.    Any idea why they would be using a

23   factor of 4 in the ingredient limit report?

24        A.    I don't even --

```
 1              MS. WICHT:  Object to the

 2        form.

 3        A.    I don't even know what that factor

 4   of 4 means.

 5        Q.    Okay.  And we saw earlier with the

 6   thresholds they were using, at least for certain

 7   controls, a factor of 3, correct?

 8              MS. WICHT:  Object to the

 9        form.

10        A.    Correct, but I'm not sure that

11   factor is the same as this factor.

12        Q.    I'm not saying it was.  I just

13   asked if you recalled us looking at the factor

14   of 3 earlier.

15        A.    Yes.

16        Q.    Okay.  And in discovery it's been

17   indicated that it was a DEA-approved factor.

18              Do you have any knowledge of DEA

19   approval to any multiple factor being used by

20   Cardinal?

21        A.    No.

22        Q.    No one from the DEA ever told you

23   to use a multiple factor?

24              MS. WICHT:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         form.

 2         A.    No.

 3         Q.    Did you ever see any letters from

 4  the DEA or from Cardinal to the DEA confirming

 5  conversations where it was suggested to use a

 6  multiple factor related to thresholds?

 7              MS. WICHT:  Object to the

 8         form.

 9         A.    No.

10         Q.    Okay.  Now, let me ask you this:

11              If, in relation to the ingredient

12  limit report, as you saw from the policy and

13  procedure that we were looking at on page 6

14  there, it was sent to the DEA after it's ran --

15  and it clearly was ran after the end of the

16  month because it contains the information for

17  the entire prior month -- in your mind, is that

18  a sufficient and adequate way to monitor the

19  potential diversion of controlled substances

20  simply by sending a report a month after all the

21  substances have been shipped?

22              MS. WICHT:  Object to the

23         form.  No foundation.  Vague.  And

24         calls for a legal conclusion.
```

```
 1              A.    I can't comment on that because

 2     I'm not familiar with this report.

 3              Q.    Well, do you want to take a moment

 4     and familiarize yourself with it?

 5                    MS. WICHT:  Same objections,

 6              even if he spends the whole

 7              afternoon looking at it.

 8              A.    No, I'm not familiar with this

 9     report because this comes from the distribution

10     center.  I wouldn't have seen this report.

11              Q.    What is it that you would have to

12     familiarize yourself with the report about?

13                    So the premise of my question is

14     if the system in place, according to the policy

15     and procedure, is to send a list of orders that

16     exceed some sort of threshold after the month is

17     over and after all the pills have shipped, you

18     would agree that that is not a sufficient policy

19     and procedure to prevent diversion, correct?

20                    MS. WICHT:  Object to the

21              form.  No foundation.  Calls for a

22              legal conclusion.  And vague.

23              A.    Again, I am unfamiliar with this

24     form or that process.
```

```
 1              Q.    I -- well, we have the process in

 2    front of us.  We have the policy and procedure

 3    that Cardinal utilized.

 4              A.    I wasn't at Cardinal at that time,

 5    so I'm not --

 6              Q.    Yes, sir, you were.

 7              A.    Well --

 8              Q.    You were --

 9              A.    -- I was not at Cardinal in the --

10    at a distribution center where this would be --

11              Q.    I get that.  I understand that.

12    You don't have to be for me to ask you this

13    question.

14                    You are one that's been trained by

15    Cardinal, and based on your history and

16    experience, you can testify because you did it

17    for Cardinal, evaluated their systems, improved

18    on their systems.

19                    I'm asking you, is this a

20    sufficient system?

21              A.    I -- my --

22                    MS. WICHT:  Object to the

23              form.  No foundation.  Vague.

24              A.    I --
```

```
 1                MS. WICHT:  And calls for a

 2        legal conclusion.

 3        A.    I -- now I've forgotten what I was

 4   going to say.

 5                MS. WICHT:  Sorry.

 6        A.    I didn't design the systems.  I

 7   reviewed orders held by the systems in place to

 8   determine whether they were possibly suspicious.

 9   And, to the best of my ability, that's what my

10   role was.

11                I didn't design the forms.  I

12   wasn't the IT person.  I wasn't the person at

13   the distribution center when this was set up in

14   2006.  So I can't honestly comment on this form.

15        Q.    You would agree with me that

16   shipping suspicious orders -- shipping

17   suspicious orders is not a valid system based on

18   your understanding of the regulations, correct?

19                MS. WICHT:  Object to the

20        form.  Vague.  Calls for a legal

21        conclusion.

22        A.    I can't -- I don't know what this

23   form --

24        Q.    I'm not --
```

```
 1              A.    -- information the form was

 2       sending, so ...

 3              Q.    Listen to my question.

 4              A.    If it's calling them suspicious

 5       orders --

 6              Q.    Just listen to my question and

 7       answer my question.  I did not ask you about

 8       that form that you keep trying to do -- relate

 9       this to.  I'm just asking you the question.

10                    Earlier you testified that if an

11       order was suspicious, you wouldn't ship it,

12       right?

13              A.    That is correct.

14              Q.    Because that's not compliant with

15       the regulations, correct?

16                    MS. WICHT:  Object to the

17                    form.  No foundation.

18                    Mischaracterizes his testimony.

19              A.    If it was allegedly suspicious or

20       from what it looks to me as being suspicious,

21       no.

22              Q.    So any system -- you would agree

23       that any system that allowed suspicious orders

24       to be shipped is not a sufficient system,
```

```
 1    correct?

 2                   MS. WICHT:  Object to the

 3            form.  No foundation.  Calls for

 4            speculation and a legal conclusion.

 5            A.    I don't know that the system did

 6    not --

 7            Q.    I didn't ask you about the system,

 8    sir.  Just listen to my question, Mr. Forst.

 9                   I am asking you that a system --

10    if someone put in place a system that allowed

11    suspicious orders to be shipped, that that

12    wouldn't be complying with the regulations as

13    you understand them, correct?

14                   MS. WICHT:  Object to the

15            form.  No foundation.  Calls for a

16            legal conclusion.

17            A.    I can't answer that question.

18            Q.    Why can't you answer that

19    question?  You've already told us that it would

20    be against the regulation to ship a suspicious

21    order, right?

22                   MS. WICHT:  Object to the

23            form.  Mischaracterizes his

24            testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FULLER:  Counsel, just
 2         object to form, please.  The
 3         deposition protocol is clear that
 4         these talking objections are
 5         inappropriate.
 6              MS. WICHT:  Well, the
 7         deposition protocol is also clear
 8         that you're not supposed to
 9         mischaracterize his testimony back
10         to him.
11              MR. FULLER:  And I'm not.
12         And, no, the deposition protocol
13         doesn't say that.
14   BY MR. FULLER:
15         Q.   So go ahead and answer -- well,
16   let me ask it again.
17              You agree with me that it would be
18   violative of the regulation to ship a suspicious
19   order, correct?
20              MS. WICHT:  Object to the
21         form.  Calls for a legal
22         conclusion.
23         A.   If it was known to be suspicious.
24         Q.   Potentially suspicious, right?
```

```
 1                 MS. WICHT:  Object to the

 2          form --

 3          A.    Potentially suspicious.

 4                 MS. WICHT:  -- of the

 5          question.

 6          Q.    That would be --

 7          A.    No.  If it was known to be

 8    suspicious, yes.

 9          Q.    Well, what if it was known to be

10    potentially suspicious?  You testified earlier

11    you have an obligation to report suspicious

12    orders.

13                 Potentially suspicious orders,

14    right?

15                 MS. WICHT:  Object to the

16          form.  Compound.  Vague.

17          A.    Mine is not an automated system.

18    Mine is a decision based on my -- the

19    information that's given to me, the information

20    the system sends me.

21          Q.    Yes, sir.  So -- I mean, that

22    didn't answer my question.  Were you done with

23    your answer?

24          A.    Mm-hmm, yes.  I mean --
```

1          Q.    My question, again, is you have an

2    obligation under the regulation not to ship a

3    potentially suspicious order, correct?

4               MS. WICHT:  Object to the

5          form.  Foundation.

6          A.    That is correct.

7               MS. WICHT:  Calls for a legal

8          conclusion.

9          Q.    I apologize.  Your counsel keeps

10   making talking objections.  So you'll have to

11   let her finish.

12         A.    Sorry.

13         Q.    And it's clearly interrupting the

14   flow of the deposition.

15              So you would agree with me that

16   any system that allowed the shipment of

17   potentially suspicious orders would not be a

18   sufficient system to comply with the regulation,

19   right?

20              MS. WICHT:  Object to form.

21         Foundation.  Calls for a legal

22         conclusion.

23         A.    I can't comment on the design of

24   the system.

```
 1              Q.    Well, you know --

 2              A.    If it was designed to do that, it

 3     should be able to fulfill that regulation.

 4     Again, I can't say that -- whether or not this

 5     did it or not.  I was not there.

 6              Q.    I'm not asking you whether this

 7     did it or not.

 8                    I just asked you, "You have an

 9     obligation under the regulation not to ship a

10     potentially suspicious order, correct?"

11                    "Answer:  That is correct."

12                    You still agree with that

13     testimony, right?

14              A.    Yes.

15                    MS. WICHT:  Object to form.

16              Q.    Okay.

17                    MS. WICHT:  Calls for a legal

18              conclusion.

19              Q.    So -- and the reason you can't do

20     that -- well, you said it.  It's under the

21     regulation.  It would be violative of the

22     regulation to ship potentially suspicious

23     orders, correct?

24                    MS. WICHT:  Object to form.
```

```
 1              Calls for a legal conclusion.

 2              A.    Again, I can't answer that because

 3    I'm really not understanding what your question

 4    is because I have this in front of me, a report

 5    I haven't seen.

 6              Q.    Here -- well, let's take a break

 7    and you can move everything out from in front of

 8    you that's confusing you and then we'll come

 9    back.

10                    THE VIDEOGRAPHER:  We're

11              going off the record at 2:03.

12                    (Recess taken.)

13                    THE VIDEOGRAPHER:  We're back

14              on the record at 2:11.

15    BY MR. FULLER:

16              Q.    Mr. Forst, I've written down a

17    question and an answer.  The question was, "My

18    question is again" -- excuse me -- "again is,

19    you have an obligation under the regulation not

20    to ship a potentially suspicious order,

21    correct?"

22                    And your answer was, "That is

23    correct."

24                    Do you stand by that testimony, or
```

```
1    do you wish to change that answer?

2             MS. WICHT:  Objection.  Calls

3         for a legal conclusion.

4         A.    Reading your question as you have

5    it written, I do not believe the word "ship" is

6    in the regulation.  We have a right to report a

7    suspicious order, but it can be shipped.  The

8    reporting of a suspicious order can actually

9    happen after the fact.

10        Q.    So your understanding -- and so

11   your understanding now is that you can ship

12   suspicious orders, right?

13            MS. WICHT:  Object to the

14        form.  Calls for a legal

15        conclusion.

16        Q.    And it's not against the law.

17            MS. WICHT:  Sorry.

18        Q.    That's your testimony to the jury?

19            MS. WICHT:  Object to --

20        Q.    Now --

21            MS. WICHT:  I'm sorry.

22        Object to the form.  Calls for a

23        legal conclusion.

24            MR. FULLER:  Tell him yes.
```

```
 1              That's fine.

 2         A.    Well, if the regulation doesn't

 3    say "ship" in it -- I mean, there are times that

 4    you're going to find that an order might be

 5    suspicious long after it's shipped.  So the

 6    regulation is to report suspicious orders.

 7         Q.    The regulation also requires you

 8    to maintain effective controls against

 9    diversion, doesn't it?

10              MS. WICHT:  Object to --

11         Q.    That's actually the code.

12              MS. WICHT:  Object to the

13         form.

14         Q.    Right?

15         A.    Effective against diversion, yes.

16         Q.    Yes.  So do you believe --

17         A.    Just because an order is --

18         Q.    Hold on.

19         A.    -- suspicious does not mean --

20         Q.    Let me finish my question.

21         A.    -- it's necessarily going to be

22    diverted.

23         Q.    Do you believe shipping suspicious

24    orders is maintaining effective controls against
```

```
 1    diversion?

 2              MS. WICHT:  Object to the

 3         form.  Foundation.  Calls for a

 4         legal conclusion.

 5         A.    No.

 6         Q.    So maintaining effective controls

 7    against diversion would be preventing shipping

 8    suspicious orders, right --

 9              MS. WICHT:  Object to the

10         form.

11         Q.    -- not shipping them?

12              MS. WICHT:  Sorry, Mike.

13              Object to the form.  Calls

14         for a legal conclusion.

15         A.    Could you repeat the question

16    again, please.

17         Q.    Sure.  You understand that -- I

18    mean, the testimony has been since even the

19    early 2000s, this country has been in the middle

20    of an opioid epidemic, right?

21         A.    Yes.

22         Q.    People are dying at obscene

23    numbers in this country mainly due to

24    prescription opioids, not even the illicit
```

```
 1    stuff, right?

 2                 MS. WICHT:  Object to the

 3           form.  Foundation.

 4           A.    I don't know if that information

 5    is totally correct.

 6           Q.    Have you read that?

 7           A.    I haven't read it.  I -- my

 8    understanding --

 9           Q.    Have you seen the news stories?

10           A.    -- is now heroin is.

11           Q.    Have you seen news stories on it,

12    prescription opioids?

13           A.    Yes.

14           Q.    And the abuse and the epidemic

15    this country is facing?  That our kids are

16    dying?

17           A.    I've seen stories.

18           Q.    That kids are dying from

19    prescription opioids?

20           A.    Yes.

21           Q.    So what I'm trying to find out, as

22    one in charge of anti-diversion at Cardinal, one

23    who makes the ultimate decision as to whether an

24    order gets shipped or not, I'm just trying to
```

1    find out what the obligation is under -- that

2    Cardinal believes or you believe -- I just want

3    to know what Mr. Forst believes -- is the

4    obligation under the regulations, can you or can

5    you not ship a suspicious order?  Yes or no?

6                    MS. WICHT:  Object to form.

7            Calls for a legal conclusion.

8            Asked and answered.

9            A.    If I don't know at the time that

10   order is suspicious and it's shipped and I find

11   out later on, I can't unship an order.

12           Q.    Okay.  So if you --

13           A.    My goal is to -- if -- when I see

14   it and it's stopped, if it is potentially

15   suspicious, it will be not shipped.

16           Q.    And that's what the regulation

17   requires, correct?

18                   MS. WICHT:  Object to the

19           form.

20           A.    The regulation --

21                   MS. WICHT:  Calls for a legal

22           conclusion.

23           A.    -- has nothing to say about

24   shipping.  It's reporting potentially suspicious

```
 1   orders.

 2          Q.    And the code section has to deal

 3   with shipping, correct?

 4                MS. WICHT:  Object to the

 5          form.  No foundation.  Calls for a

 6          legal conclusion.

 7          A.    Can I see the code?

 8          Q.    The one we already looked at,

 9   maintaining effective controls against

10   diversion.

11                Here's all I want to find out,

12   Mr. Forst:  According to Mr. Forst, in his

13   almost 40 years of experience, is it legal to

14   ship an order that we know is suspicious?

15          A.    If I know it's suspicious --

16                MS. WICHT:  Object to the

17          form.  Foundation.  Calls for a

18          legal conclusion.

19          A.    You're making me understand that

20   that order is suspicious.  Mine is potentially

21   suspicious.

22          Q.    Okay.  Now --

23          A.    Potentially suspicious is

24   different than suspicious.
```

1      Q.    Okay.  The reg doesn't say

2  potentially suspicious, does it?

3      A.    The reg says suspicious order.

4      Q.    Okay.  And I understand how you

5  want to qualify with potentially suspicious, and

6  I -- I'm not going to quibble with you on that

7  one.  That one I'm fine with.  So let me re-ask

8  the question.

9           Is it Mr. Forst's position and

10 understanding of his obligations that we can

11 ship a potentially suspicious order or not?

12          MS. WICHT:  Object to the

13          form.  Foundation.  Calls for a

14          legal conclusion.

15     A.    Have I reviewed the suspicious

16 order?  Have I reviewed the order, that is,

17 quote, suspicious?

18     Q.    If you -- it's a potentially

19 suspicious order, yes, sir.

20     A.    If I determine it's potentially

21 suspicious, I would not allow that to be shipped

22 under the process of the Cardinal Health policy.

23     Q.    And so we're on the same page, the

24 term "potentially suspicious," that means a

```
 1    chance that it may be diverted, correct?

 2          A.    It has the possibility of being

 3    diverted.

 4          Q.    Okay.  And so then my follow-up

 5    question is, is if we have a system in place --

 6    ignore anything in front of you, okay?

 7                If we have a system in place that

 8    is allowing potentially suspicious orders to be

 9    shipped, that's not an effective system based on

10    the regulations, correct?

11                MS. WICHT:  Object to form.

12          Foundation.

13          A.    I don't know if the system --

14                MS. WICHT:  Calls for a legal

15          conclusion.

16          A.    -- is allowing --

17                THE COURT REPORTER:  I need

18          you to wait until she finishes.

19                THE WITNESS:  I'm sorry.

20                MS. WICHT:  Objection to

21          form.  Foundation.  Calls for a

22          legal conclusion.

23                Thank you.

24          A.    Okay.  Please repeat the question.
```

```
 1              Q.    Sure.  If we have a system in

 2    place that is allowing potential suspicious

 3    orders to be shipped, then we're -- the system

 4    is not in compliance with the regulations,

 5    correct?

 6              MS. WICHT:  Same objections.

 7              A.    When I started at Cardinal Health,

 8    the system in place would not allow orders over

 9    a certain threshold to be shipped.  Those orders

10    were reviewed to see if there was potential --

11    potential -- potentially -- potentially risk of

12    diversion.

13              Q.    Potential suspicious orders,

14    right?

15              A.    Correct.

16              Q.    The way we've framed that today?

17              A.    Correct.

18              Q.    Okay.  I'm not asking what went on

19    at Cardinal.  That's not my question, because

20    I -- so when I premised this question, I said

21    ignore everything in front of you.

22              My question is, if we have a

23    system in place that allows for the shipment of

24    potentially suspicious orders, can we agree that
```

1    that system is not in compliance with the

2    regulations?

3               MS. WICHT:  Object to the

4          form.  Foundation.  Calls for a

5          legal conclusion.

6          A.    I'm not familiar with any system

7    that is totally foolproof.  So I would say what

8    you're saying is correct.

9          Q.    So you agree --

10         A.    That is correct.  I have an issue

11   with the word "ship" because, like I said

12   previously, an order can be shipped and then

13   realized later that it is suspicious and it

14   needs to be reported as such.

15         Q.    But you do agree now that a system

16   that allows us to ship known potential

17   suspicious orders is not a system that complies

18   with the regulation?

19         A.    If it's an --

20              MS. WICHT:  Object to the

21         form.  Foundation.  Calls for a

22         legal conclusion.

23         A.    If it's known to be suspicious,

24   yes.

```
1              Q.    Fair enough.

2                    Now, if you'll -- the policy and

3     procedure now, if you'll put it back in front of

4     you, 4919.  That's the one that was in place

5     when you were there, but -- oh, actually ...

6                    So I think this is the question I

7     asked you:  "A system that allows for the

8     shipment of potentially suspicious orders does

9     not comply with the regulatory requirements,

10    correct?"

11                   Mr. Forst, you tell me what your

12    answer is.

13                   MS. WICHT:  Object to the

14          form.  No foundation.  Vague.  And

15          calls for a legal conclusion.

16             A.    This is a system.  Again, a

17    general system that would do that -- and there's

18    absolutely nothing that prevents it from doing

19    it, there's no thresholds in place, there's

20    nothing in place -- I would say that is correct.

21             Q.    All right.

22                   MS. WICHT:  Just for purposes

23          of the record, the demonstrative

24          that Mr. Fuller has just written
```

```
 1           was not the witness' answer.

 2                MR. FULLER:  Okay.  So I'll

 3           ask him the question again.

 4                MS. WICHT:  The answer is in

 5           the transcript.

 6                MR. FULLER:  I'm sorry.  I

 7           thought this was my noticed

 8           deposition, not yours, Counsel.

 9                MS. WICHT:  Okay.  I'm

10           free -- you're free to ask your

11           questions, Mr. Fuller.  It's no

12           problem.  I'm just --

13                MR. FULLER:  Okay.

14                MS. WICHT:  -- pointing out

15           that the -- what you've written

16           down on the sheet of paper that's

17           going to be marked as an exhibit to

18           this deposition is not what the

19           witness said, as the transcript

20           will reflect.

21   BY MR. FULLER:

22           Q.   So, Mr. Forst, I'm going to ask

23      the question again.

24                A system that allows for the
```

```
 1   shipment of potential -- and look, if we need to

 2   rewrite the question, you help me.  We'll

 3   rewrite it.

 4              How should we rewrite it?

 5      A.   I'm okay with the question.  I

 6   just -- the answer that I gave is not that

 7   answer.

 8      Q.   Well, then I want an answer to

 9   this question, because your answer restructures

10   my question.  So we need to change the question.

11              MS. WICHT:  You just told him

12         he could do that.

13              Go ahead.

14      Q.   And I'm happy to do that.

15      A.   So --

16              MS. WICHT:  Wait.  Hang on.

17      Q.   Go ahead.

18              MS. WICHT:  Is the question

19         pending the one --

20              MR. FULLER:  No, no.

21              MS. WICHT:  -- that's written

22         down?

23              What's the question?

24              MR. FULLER:  No.  The witness
```

```
 1            was fixing to talk and then you cut

 2            him off.  Please --

 3                  MS. WICHT:  Because there --

 4                  MR. FULLER:  -- resist from

 5            doing it.

 6                  MS. WICHT:  -- wasn't a

 7            question pending.

 8                  MR. FULLER:  Yes, there is.

 9                  MS. WICHT:  All right.  Then

10            go ahead and say it.

11   BY MR. FULLER:

12            Q.    Go ahead.

13            A.    So your question to me is, if I'm

14   writing the question, my question would be a

15   system that allows for the shipment of

16   potentially shipped -- suspicious orders does

17   not comply with the regulatory requirements if

18   there are no parameters within the system to

19   stop orders in some fashion, such as a threshold

20   or whatever, if it just blatantly -- the system

21   doesn't exist unless it does something to stop

22   something.

23            Q.    Okay.

24                  MS. WICHT:  That question,
```

1          obviously, was subject to my same

2          objections as when Mr. Fuller asked

3          it the last ten times.

4          Q.    And so if I'm understanding you,

5    if -- even if the system has a threshold, it

6    doesn't stop them, doesn't stop the orders, that

7    is not much of a threshold, right?

8          MS. WICHT:  Object to the

9          form.

10         Q.    You're -- hold on.  Let me follow

11   up on your question.

12         Let's go back to your question,

13   Mr. Forst.

14         I apologize because it keeps going

15   and I got to scroll back.

16         A.    That's all right.

17         Q.    You said if there are no

18   parameters within the system to stop orders in

19   some fashion such as a threshold --

20         A.    To stop them for review --

21         Q.    Right?

22         A.    -- again.

23         Q.    When you say "such as a

24   threshold," you're assuming that the threshold

```
1    actually holds the shipment if it's breached,

2    correct?

3          A.    No.

4                MS. WICHT:  Object to the

5          form.

6          A.    What I'm saying is there should be

7    a parameter in place whether the order is

8    shipped or not because the regulation doesn't

9    say it has to be stopped.

10               I would hope there would be

11   something there.  I don't know.  I'm not that

12   expert.  But there should be something there

13   that reports that these instances, the product

14   doesn't meet whatever the parameter loaded in

15   the system as defined as a suspicious order is.

16         Q.    And -- now -- all right.  So let's

17   address that.  And let me make sure I'm on the

18   same page with you.

19               You're suggesting that the system

20   has to have some sort of mechanism to stop an

21   order from shipping.

22         A.    I did not say --

23         Q.    Hold on.  Let me finish.

24               Well, so then in your mind, as
```

1    long as we have a threshold in place, whatever

2    it is -- say the threshold is 100 pills and we

3    blow through that and we ship 10,000 pills and

4    we know the threshold is 100 and we know that it

5    went past it but we're still shipping, that's

6    okay?

7                    MS. WICHT:  Object to form.

8            Foundation.  Hypothetical.  And

9            calls for a legal conclusion.

10           A.    I can't answer that.

11           Q.    Why can't you answer that?

12           A.    There's way too many things that

13   are all over the place.

14                    Why would you -- number one, if

15   the system is designed to meet the regulation --

16           Q.    Well, that's part of the problem.

17   Let's start there.  A hypothetical --

18           A.    I didn't design the system.

19           Q.    I'm not saying you designed any

20   system.  Well, I mean, the records speak to

21   yourself with what you did in -- in the systems,

22   but let's back up to this question.

23                    What I'm trying to find out from

24   you is a system -- whatever you want to call it,

1    whoever's it is -- if it ships potentially

2    suspicious orders, does it comply with the

3    regulation or not?

4                    MS. WICHT:  Object to form.

5            Foundation.  Calls for a legal

6            conclusion.  Asked and answered.

7            A.    I can't answer that.

8            Q.    Why not?  You've already said you

9    have an obligation that you're not complying

10   with the regulation if you allow a suspicious

11   order to be shipped or potentially suspicious

12   order to be shipped.

13           A.    Potentially suspicious order.

14                   MS. WICHT:  Object to the

15           form.

16           Q.    So if the system allows the same

17   thing, it's violative of the reg just like you

18   would be if you allowed a suspicious order to be

19   shipped, correct?

20                   MS. WICHT:  Object to the

21           form.

22           Q.    What's the difference between a

23   system that allows it and you allowing it?

24           A.    But I don't --

```
 1                    MS. WICHT:  Object to form.

 2            Mischaracterizes his prior

 3            testimony.  And calls for a legal

 4            conclusion.

 5                    MR. FULLER:  Please, let's

 6            just object to form.  One, you're

 7            cutting off the witness when the

 8            witness starts to answer.

 9    BY MR. FULLER:

10            Q.    Go ahead.

11            A.    I have a problem with the word

12    "shipment."

13            Q.    All right.  Well --

14            A.    So --

15            Q.    -- let --

16            A.    -- does the reg say that it should

17    stop a potentially suspicious order, or does it

18    have -- the reg say that there has to be a flag

19    that there's a potentially suspicious order and

20    it is then reported whether before the fact or

21    after the fact?

22            Q.    Well, and that's -- that's what I

23    want to find out, Mr. Forst.  That's what I want

24    to find out.
```

```
 1              Because -- and I've asked you
 2    repeatedly if you believe the reg and the code
 3    section allows for the shipment of suspicious
 4    orders, or potentially suspicious orders, how
 5    we've redefined those today.  And you've told me
 6    that it does not allow for it, that maintaining
 7    effective controls against diversion does not
 8    allow for it.  The record's clear.  You've
 9    answered that question.
10         A.    Right.
11              MS. WICHT:  Object to the --
12         Q.    So if the code -- the United
13    States Code doesn't allow for the shipping of
14    suspicious orders, we can agree on that,
15    potentially suspicious orders, right?
16              MS. WICHT:  Object to the
17              form.  Mischaracterizes his
18              testimony.  And calls for a legal
19              conclusion.
20         A.    I can't.  I can't answer that
21    question.
22         Q.    You already have.  Are you
23    retracting your earlier answer?
24              MS. WICHT:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2          Q.    It's fine if you want to.  You can

3   change your testimony as many times as you want.

4          A.    The question is not -- it can't be

5   as clear and simple as that.

6          Q.    Well, no, it is as clear and

7   simple as that.  When people have tried to muddy

8   it up, that's why we found our -- find ourselves

9   right now sitting in the middle of an opioid

10  epidemic, is because people didn't comply with

11  the regulatory obligations.  That is as clear

12  and simple as that.

13              MS. WICHT:  That's not a

14         question.  That's a speech.  And --

15         Q.    Yeah.  Let's take another break

16  and I'll go back and find your earlier testimony

17  and see if you want to change it.

18              MR. FULLER:  Let's go off the

19         record.

20              THE VIDEOGRAPHER:  We're

21         going off the record at 2:32.

22              (Recess taken.)

23              THE VIDEOGRAPHER:  We're back

24         on the record at 2:47.

```
 1   BY MR. FULLER:

 2        Q.    All right.

 3             MS. WICHT:  Mr. Fuller,

 4        before there's a question pending,

 5        I want to put on the record a

 6        continuing objection to this line

 7        of questioning that I assume you're

 8        about to continue on the basis

 9        of -- on all the bases that I've

10        stated and also on the basis of

11        Special Master Cohen's ruling in

12        September of 2018 in the context of

13        the Walgreens deposition that

14        witnesses are not to be asked about

15        legal conclusions or their

16        agreement or disagreement with

17        regulatory requirements, including

18        shipping or reporting requirements.

19             I think these are improper

20        questions.

21             MR. FULLER:  Special Master

22        Cohen's ruling only applied to

23        30(b)(6) witnesses.  It did not

24        apply to individuals.
```

```
 1                    So if you're done, we can --

 2                    MS. WICHT:  I understand that

 3          you disagree.

 4                    MR. FULLER:  Fair enough.

 5                    MS. WICHT:  I want a

 6          continuing objection.

 7                    MR. FULLER:  Absolutely.  No

 8          problem at all.

 9   BY MR. FULLER:

10          Q.    There you go.

11                So this is the question and answer

12   copied verbatim from page 199 of the -- I guess

13   it's a draft transcript at this point.

14                And it says, "Do you believe

15   shipping suspicious orders is maintaining

16   effective controls against diversion?"  Oh, I

17   forgot to write your answer.

18                You said no.  Now, do you want to

19   change that answer at this point?

20                    MS. WICHT:  Object to the

21          form of the question.

22          A.    Yes.

23          Q.    Okay.  How do you want to change

24   that answer now?
```

```
 1              A.     "Do you believe shipping

 2      suspicious orders is maintaining effective

 3      controls against diversion?"

 4                     Well, if we're looking at the

 5      reg --

 6              Q.     Well, first of all, maintaining

 7      suspicious orders doesn't -- or excuse me --

 8      maintaining effective controls against diversion

 9      doesn't have anything to do with the reg.

10                     But go ahead.  Sorry.

11                     MS. WICHT:  Subject to the

12             same objections.

13              Q.     The U.S. Code says that a

14      distributor such as Cardinal has to maintain

15      effective controls to prevent diversion.  And

16      your testimony is that shipping suspicious

17      orders would not be maintaining effective

18      controls against diversion.  That's the U.S.

19      Code.  That's law passed by Congress.  It's not

20      a regulation.

21                     Regulation on suspicious orders,

22      you're right, doesn't say verbatim anything

23      about shipping.  But explain to this jury how

24      you can maintain effective controls against
```

```
 1    diversion if you're shipping suspicious orders

 2    throughout this country.  Tell the jury that.

 3               MS. WICHT:  Object to the

 4          form of the question.  Foundation.

 5          Calls for a legal conclusion.

 6          Q.   Go ahead.

 7               MS. WICHT:  Hypothetical.

 8          Q.   Tell the jury how this country is

 9    in the middle of an epidemic and Mr. Forst

10    believes it's okay to ship suspicious orders.

11               MS. WICHT:  Object to the

12          form of the question.

13          Mischaracterizes his testimony, in

14          addition to all the other

15          objections.

16          A.   When I was with Cardinal Health,

17    the system that we had set up --

18          Q.   Okay.

19               MS. WICHT:  Let him finish

20          his answer.

21               MR. FULLER:  No, no.  This

22          isn't the answer to the question.

23               MS. WICHT:  You don't -- let

24          him --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. FULLER:  This has --

 2                 MS. WICHT:  -- finish his

 3          answer.

 4                 MR. FULLER:  -- nothing to do

 5          with what was going on at Cardinal

 6          Health.  I didn't ask anything

 7          about Cardinal Health.

 8                 MS. WICHT:  Are you going to

 9          let him answer or not?

10          A.    Again, when I was at Cardinal

11   Health, my job was to review orders that were

12   held by a system that were deemed possibly being

13   suspicious.  Those orders were held using a

14   threshold.  I reviewed those orders.  If there

15   was anything that pertained that they might be

16   potentially suspicious, those orders were cut

17   and not shipped.

18                 MR. FULLER:  So I'm going to

19          certify this whole line of

20          questioning, and we'll file a

21          motion to require the witness to

22          actually answer the questions being

23          asked.

24                 I'll move on.  And I'll
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          attach both of these exhibits.

 2                  I need two exhibit stickers,

 3          please.

 4                  17 is going to be the

 5          document with two questions on it.

 6                          - - -

 7      (Cardinal-Forst Deposition Exhibit 17 marked.)

 8                          - - -

 9                  MR. FULLER:  18 will be the

10          one that we just discussed since

11          being back on the break with one

12          question on it.

13                          - - -

14      (Cardinal-Forst Deposition Exhibit 18 marked.)

15                          - - -

16  BY MR. FULLER:

17          Q.    All right.  So at 4419 -- do you

18      still have that document over there somewhere?

19                  MR. FULLER:  4419.

20                  4919.  My bad.  Sorry

21          everybody.

22                  MS. WICHT:  What is it?

23                  MR. FULLER:  4919.

24          A.    Yes.
```

```
 1                  MR. FULLER:  I apologize.

 2   BY MR. FULLER:

 3         Q.    If you'd turn to page 35 of that

 4   document.

 5                  Have you ever seen this part of

 6   the policies and procedures that were in place

 7   when you arrived at Cardinal?

 8                  MS. WICHT:  Object to the

 9         form of the question.

10         A.    No.

11         Q.    And I don't know if it helps you

12   or not, but if you look -- page 6 refers to this

13   document.  See E down there at the bottom of the

14   page, Dosage Limit Charts?

15         A.    Yes.

16         Q.    "ED04.00 must be posted in the

17   cage vaults."

18                  Were you aware of a system where

19   there was a posting in the cage vaults, the

20   facilities that you were overseeing for

21   anti-diversion purposes to identify excessive

22   purchases related to Schedule IIs and

23   Schedule III drugs?

24         A.    I'm not familiar with that in a
```

1    cage vault.

2         Q.    Okay.  So if you'll turn back to

3    page 35.  Have you ever seen this document

4    before related to excessive purchases for

5    different control II schedules?

6         A.    No.

7         Q.    If you turn to the next page, it

8    should be a similar document of excessive

9    purchases for IIIs, IVs and Vs.

10             Do you see that there?

11        A.    Yes.

12        Q.    And are you -- have you any

13   recollection of seeing these or hearing about

14   this system at Cardinal when you arrived?

15        A.    Not to my recollection.

16        Q.    Okay.  And, again, when you came

17   in -- it was February of 2008 when you came into

18   the regulatory department, correct?

19        A.    That is correct.

20        Q.    And as we saw from your

21   performance evaluation, part of your job was

22   assisting with certain policies and procedures

23   related to regulatory, right?

24        A.    These are from the distribution

```
 1    section.

 2           Q.    Sir, my question was, part of your

 3    job was to help with the policies and procedures

 4    related to regulation, correct?

 5           A.    That is --

 6                 MS. WICHT:  Object to the

 7           form.

 8                 I'm sorry.

 9           A.    That is correct --

10           Q.    Okay.

11           A.    -- under the anti-diversion part

12    that I was assigned when I got there.

13           Q.    So let's go to the -- 3514.

14                 MR. FULLER:  This is -- I'm

15           sorry -- going to be Plaintiffs'

16           Exhibit 19, P1.3514 for the record.

17                        - - -

18      (Cardinal-Forst Deposition Exhibit 19 marked.)

19                        - - -

20    BY MR. FULLER:

21           Q.    Mr. Forst, you actually sent this

22    e-mail, didn't you?

23           A.    Yes.

24           Q.    This was back in November of 2009;
```

```
 1    is that right?

 2          A.     Correct.

 3          Q.     It's "Drug use called epidemic in

 4    Mass" -- meaning Massachusetts -- "OxyContin,

 5    heroin imperil public health commission seeks

 6    help for addicts."

 7                 Do you see that?

 8          A.     Yes.

 9          Q.     Did I read that correctly?  Did I

10    read that --

11          A.     Yes.  I'm sorry.

12          Q.     Okay.  Read the first sentence of

13    the article to us, please.

14          A.     "'Abuse of OxyContin and heroin in

15    Massachusetts has reached epidemic levels and

16    must be attacked with the same fervor now being

17    directed toward controlling the H1N1 flu virus,'

18    a special state commission said yesterday."

19          Q.     And if you go down two paragraphs,

20    read, "The Commonwealth is losing men and

21    women."

22                 Read that for the jury.

23          A.     "'The Commonwealth is losing men

24    and women on its streets at a rate of 42 to 1,
```

1    compared to what the state is losing in two wars

2    overseas,' the panel said in its executive

3    summary."

4          Q.    Why would you circulate this to --

5    and it looks like most of the persons in the

6    anti-diversion group, correct?

7          A.    Correct.

8          Q.    You have Mark Hartman, Mr. Moné,

9    Mr. Morse, Mr. Rausch, Shannon -- how do you

10   pronounce her last name? -- is it Shaffer?

11         A.    Yes.

12         Q.    And who is she?

13         A.    I believe she was one of the

14   technicians -- or the analysts that worked with

15   us.  And I believe she was contract, but I'm not

16   sure.

17         Q.    Okay.  But most of those people

18   are in the anti-diversion group, correct?

19         A.    That's correct.

20         Q.    So why would you forward this to

21   everyone?

22         A.    Because we always stay -- tried to

23   stay current as to what was going on with the

24   epidemic and where it was happening and what

```
 1    drugs we needed to be focusing on and what

 2    states to look at, et cetera.

 3              Q.    And that's --

 4              A.    It was an FYI only document, just

 5    for people to look at and understand what we're

 6    trying to fight.

 7              Q.    But it's important to stay

 8    informed as to what's going on --

 9              A.    Exactly.

10              Q.    -- when you're dealing with these

11    controlled substances and shipping them --

12              A.    Exactly.

13              Q.    -- and shipping them across the

14    country, right?

15                    MS. WICHT:  Object to the

16              form of the question.

17              A.    Yes.

18              Q.    And you even mentioned even

19    particularly with problems in particular states.

20                    Were there particular states that

21    had more of a problem than other states that

22    you're aware of?

23                    MS. WICHT:  Object to the

24              form of the question.
```

```
 1            A.    This looks like a public health

 2     issue across the country.  I'm sure there were

 3     states that had higher issues based on whether

 4     it's the population, whether it's the type of

 5     individuals there.  I mean, that all falls into

 6     it.

 7            Q.    And I completely get that, but my

 8     question to you was, were you aware of any

 9     states that had a more -- a bigger problem than

10     particularly other states --

11                 MS. WICHT:  Object to the

12           form.

13            Q.    -- based on your job?

14            A.    The states that appeared to have

15     large problems were in the Ohio Valley next to

16     West Virginia --

17            Q.    Yes, sir.

18            A.    -- Florida, and possibly the

19     Houston area of Texas.  Those are the ones that

20     stick out in my mind when I first got to

21     Cardinal Health.

22            Q.    So part of Ohio.  Would you

23     include West Virginia as well in that?

24            A.    I would include parts of West
```

1    Virginia in that.

2          Q.    Or when you say the Ohio River

3    Valley, you're talking about all around the

4    river region there?

5          A.    Correct.  And my geography of

6    Ohio, since I have -- I haven't lived here all

7    my life, but, yes, down in the bottom corner,

8    Youngstown and that area.  So, yes.

9          Q.    And then parts of West Virginia.

10          What about parts of Kentucky?

11          A.    The Appalachias in Kentucky.

12          Q.    So sort of the -- and I -- okay.

13          Did you ever become aware that a

14    lot of the Appalachian states were being more

15    heavily hit than other regions of the country?

16              MS. WICHT:  Object to the

17          form.

18          A.    It appeared that they were more

19    heavily hit.

20          Q.    Did Cardinal ever do anything to

21    look into that and see why, what's going on,

22    what's the distribution pattern in some of the

23    Appalachian states to similarly situated other

24    states and why is there a disparity, if there is

```
 1    one at all?

 2                  MS. WICHT:  Object to the

 3            form.

 4            Q.    Do you know if Cardinal did that

 5    comparison?

 6                  MS. WICHT:  Sorry.

 7                  Object to the form.

 8            Compound.

 9            A.    I know the analytics team looked

10    at several different factors, individual states

11    across the country.  And that would probably

12    include Ohio, West Virginia, Florida, states

13    that are very prominent.

14            Q.    And you say probably included.  It

15    would make sense --

16            A.    Oh.

17            Q.    -- that they were included?

18            A.    It would make sense that it would

19    include that, yes.

20                  MS. WICHT:  Object to the

21            form.

22            Q.    You don't know, sitting here

23    today, whether they actually included them or

24    not, nor the results of whatever comparisons
```

1    they did, do you?

2              MS. WICHT:  Object to the

3         form.

4         A.    I don't know how their comparisons

5    were.  I know they looked in states like West

6    Virginia, Ohio, and Florida.

7         Q.    Now, if they made some

8    determinations or some findings or just had

9    additional information, as one -- I'm assuming

10   that you reviewed threshold triggers from all of

11   those states, right?

12        A.    Yes.

13             MS. WICHT:  Object to the

14        form.

15             Was that question just

16        whether he reviewed thresholds from

17        those states?

18             MR. FULLER:  Threshold

19        triggers.

20             MS. WICHT:  Sorry.  There was

21        a lead-in about the analysis.

22             MR. FULLER:  Threshold

23        triggers from all those states.

24             MS. WICHT:  Okay.  Thank you.

1          A.    I reviewed thresholds from those.

2     Or I -- I reviewed orders that reached

3     thresholds from those states.

4          Q.    Okay.  Were you ever provided any

5     information to help you understand why was this

6     disparity between, say, the Ohio River Valley

7     versus -- I don't know -- Iowa?

8                MS. WICHT:  Object to the

9          form.

10         A.    Yes.  I mean --

11         Q.    So what information was provided

12    to you?

13         A.    The information was provided -- we

14    had to look out for pill mills.  We had to look

15    out for people going down the Blue Highway,

16    whatever it was called, and the lingo that --

17    you know, drug dealers, that was the corridor

18    between Florida and West Virginia and Ohio.

19         Q.    What sometimes has been labeled as

20    the Oxy Express?

21         A.    Oxy Express, Blue Corridor.  It

22    has several different names, yes.

23         Q.    Sure.  And what's your

24    understanding of what that was?  What was the

```
 1    Blue Corridor or the Oxy Express, at least as it

 2    was explained to you?

 3          A.    It was where drugs, whether

 4    obtained legally or illegally, were spread down

 5    the coast and disseminated illegally in Florida,

 6    or vice versa.  It could go both ways.

 7          Q.    Because a lot of people went from

 8    the Ohio River Valley area down to Florida.

 9          A.    Mm-hmm.

10          Q.    Is that yes?

11                MS. WICHT:  Object to the

12          form.

13          A.    Yes, that was what I was informed.

14    Yes.

15          Q.    And then they would bring the

16    drugs back home, back to the Ohio River Valley?

17                MS. WICHT:  Object to the

18          form.

19          A.    My understanding was it went both

20    ways.  So you could go both ways.

21          Q.    Yeah.  And -- now, you mentioned

22    something earlier that Cardinal was distributing

23    drugs for -- let me find my reg so I can -- for

24    legitimate medical purposes, right?
```

```
 1            A.     Correct.

 2            Q.     So legitimate medical purposes,

 3    you sort of need to know the medical need in the

 4    areas, correct?

 5            A.     That is correct.

 6            Q.     So explain to the jury what

 7    Cardinal did to determine what the medical need

 8    was in some of these particularly harder-hit

 9    areas.  And let's talk about portions of Ohio,

10    for example.

11                   What did Cardinal do specifically

12    to determine what the medical need was and to

13    develop a system to make sure they weren't

14    exceeding that medical need?

15                   MS. WICHT:  Object to the

16             form of the question.

17            A.     I can't address exceed medical

18    need.  I can say with the system that we used,

19    we did as much due diligence on our customers

20    there that we could.  And, again, some customers

21    were large customers and required more

22    medications than other customers, based on their

23    proximity, based on the proximity of like

24    hospitals around them, based on proximity of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    what type of physician practices were there.

2                 We sent out investigators to check

3    out the ones that were like higher volumes to

4    make sure that there was no signs of diversion

5    going on, according to the list of what you're

6    looking for for signs of diversion.  We went

7    back several times to double check to make sure

8    that if we missed something, that we would catch

9    up on it.  We asked for more information for

10   those customers.  Not that we didn't ask for

11   information across the board --

12        Q.    Right?

13        A.    -- but if it was something in an

14   area that we focused on, we tried to do the best

15   that we could do to evaluate each and every

16   pharmacy that we served.

17        Q.    Well, let's talk about that.  That

18   was a little bit different with chains, correct?

19                 MS. WICHT:  Object to the

20        form.

21        A.    Correct.

22        Q.    On dealing with the chains.  And

23   let's talk about CVS.

24                 Cardinal relied on the chains to
```

1    do their investigative and report back to

2    Cardinal as to what their findings were, if any,

3    right?

4            A.    That's my understanding.

5            MS. WICHT:  Object to the

6        form.

7            A.    That's my understanding, yes.

8            Q.    Now, you've been one that -- about

9    what's in the regulation, right?  There's no

10   shipping -- there's no term "shipping" in the

11   regulation.

12           Do you remember that testimony?

13           A.    Yes.

14           Q.    I want you to show me where --

15   anywhere in the reg or the code where it allows

16   you to rely on the pharmacy or the chain parent

17   to do the due diligence or do the investigation

18   for you.

19           MS. WICHT:  Object to the

20       form.  Foundation.  And calls for a

21       legal conclusion.

22           A.    I don't believe there's anything

23   in the regulation that actually requires you to

24   do that.

```
1              Q.    So you don't believe that you're

2    required to do due diligence?

3                    MS. WICHT:  Object to the

4              form.  Calls for a legal

5              conclusion.

6              Q.    Maintain --

7              A.    Yeah, but due -- but due diligence

8    can also include other forms of gathering

9    information.  You can gather it from the owners

10   of the pharmacy.  You can gather it from your

11   other customers.  Example, CVS --

12             Q.    So --

13             A.    -- who also has a distribution

14   center and a DEA license that -- there, so ...

15             Q.    Do you know how many times DEA --

16   or the -- Cardinal or any of its pharmacies have

17   been fined in this country over the -- say the

18   past eight years, how many tens of hundreds of

19   millions of dollars they've paid in fines for

20   not complying with the Controlled Substances

21   Act?

22                   MS. WICHT:  Cardinal?  Is

23             that what you --

24                   MR. FULLER:  No.  I'm sorry.
```

```
1          CVS.

2                  MR. MOYLAN:  Objection.

3          Form.

4                  MS. WICHT:  Object to the

5          form.

6          A.    I could think of maybe two or

7    three, but I don't know the circumstances behind

8    all of that.

9          Q.    Well, I mean, let's be honest with

10   ourselves.  We're not going to want to rely on

11   CVS to do our due diligence for us if they're

12   being fined repeatedly for not doing a good job

13   in compliance with the Controlled Substances

14   Act, are we?

15                 MR. MOYLAN:  Objection.

16                 MS. WICHT:  Object to the

17         form.  No foundation.  To the

18         extent it calls for a legal

19         conclusion.

20         A.    I can't answer that question.

21         Q.    I figured.

22                 Now, you did go down and do

23   surveillance on a CVS because Mr. Gilberto asked

24   you to in Florida, right?
```

1      A.      A group of us went down and did

2   surveillances on pharmacies in Florida, yes.

3      Q.      Now, your normal course with any

4   other pharmacy that wasn't part of a chain would

5   be to go in and do an on-site investigation,

6   right?

7              MS. WICHT:  Object to the

8          form.

9      A.      That was for retail independents,

10  yes.

11     Q.      But, because of the deal with CVS,

12  you weren't allowed to go in and do an inside --

13  in-store investigation, were you?

14             MS. WICHT:  Object to the

15         form.  No foundation.

16     A.      I am not aware of any deal with

17  CVS.

18     Q.      Well, then why didn't you go in

19  and do the investigation inside?

20     A.      I did go inside.

21     Q.      Then why didn't you go do your

22  investigation?

23             So you talked to the pharmacist,

24  right?

```
 1              A.    I -- no, I didn't talk to the

 2    pharmacist.

 3              Q.    You asked for the drug usage logs

 4    of what they had been shipping out, right?

 5              A.    No, I did not.

 6              Q.    You asked for their highest

 7    prescribers, correct?

 8              A.    No, I did not.

 9              Q.    Well, that's what you would do at

10    any other retail independent pharmacy, isn't it?

11              A.    That's what the investigators

12    would do.

13              Q.    And you said you as a pharmacist,

14    you can even be more pointed in your questions

15    and your investigation when you --

16              A.    Yes.

17              Q.    -- go do it, correct?

18              A.    Yes.  But, again, that was not --

19              Q.    Did you do that when you were --

20              A.    -- my function.

21              Q.    Hold on.  Did you do that when you

22    were at CVS?

23                    MS. WICHT:  You interrupted

24              his answer, Mike, so don't tell him
```

1      to hold on.

2              Q.     Did you do that when you were

3      surveilling the CVS?

4              A.     It wasn't a full investigation.

5      It was a surveillance.

6              Q.     Do you have any idea how many

7      pills or dosage units that CVS was receiving

8      from Cardinal?

9              A.     Based on however many years ago,

10     eight years ago, no.

11             Q.     Was it explained to you why you

12     were going there to do the investigation, or to

13     do the surveillance, as you've put it?

14             A.     My understanding was the DEA asked

15     us to do some -- look at some information in

16     Florida on customers -- oops, I'm sorry --

17                    MS. WICHT:  Sorry.

18             A.     -- on customers.  That was what

19     was told to me.  That's as much as I know.

20             Q.     And who told that to you?

21             A.     That was in a group discussion

22     when -- I believe it was Doug Emma and I and

23     several of the pharmacists went all across

24     Florida and the -- and the investigators.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    So how many different pharmacies

2  did you visit?

3      A.    Maybe seven or eight.  Mostly

4  hospitals.

5      Q.    Now, would that be what all of you

6  all visited, or was that just what you visited

7  when you were down in Florida?  Or do you

8  recall?

9      A.    I don't recall.  It was between

10  seven and ten, and most of mine were hospitals.

11      Q.    How many pharmacies did you do

12  other than the 219 CVS?

13             MS. WICHT:  Object to the

14        form.

15      A.    I don't know.  Nine or ten.  I

16  mean -- oh, you mean total?

17      Q.    No, I mean other pharmacies.  How

18  many --

19      A.    Other like CVS or Walgreens or

20  other --

21      Q.    Or retail independents, pharmacy,

22  drugstore, non-hospital.

23      A.    Probably four retail independents,

24  maybe six hospitals, and two or three

```
 1    surveillance for CVSs.

 2          Q.    Okay.  So that would be two or

 3    three different CVS stores that you sat outside

 4    of?

 5          A.    It was.  They weren't necessarily

 6    on my list.  If they were, I went there.  But if

 7    we drove past a CVS or a Walgreens and if we had

 8    time, we would stop and do a surveillance and

 9    look for, you know, cars in the parking lot with

10    out-of-state plates, see if there was a line at

11    the pharmacy, go in the pharmacy and walk around

12    and see what -- who's at the counter or

13    whatever.

14          Q.    Were you -- did you have any

15    information on the pharmacies that were on your

16    list before --

17          A.    I had information on the

18    pharmacies that were on my list.

19          Q.    And what type of --

20                MS. WICHT:  Be sure to let

21          him finish the question before you

22          start your answer, okay?

23          A.    I'm sorry.

24                MS. WICHT:  That's okay.
```

```
 1              A.    Yes.

 2                    MS. WICHT:  Thank you.

 3              Q.    And what type of information did

 4      you have?

 5              A.    It was -- ranged from very little

 6      to maybe their -- their dispensing information.

 7      There were some that we possibly had a list of

 8      doctors that we had compiled from somewhere that

 9      they were possibly filling prescriptions for and

10      that could have been a source from them, or just

11      notices that we -- in the area from newspaper

12      notices of questionable physicians.

13                    Again, I couldn't look at the

14      prescriptions.  That's a HIPAA violation for me

15      because I'm not in any part of that.  So I would

16      have to ask the pharmacist questions about --

17      and go through the ten things:  Do you do your

18      due diligence?  Are you familiar with your

19      physician's practice?  Do you know what his

20      specialty is?  Do you know of any legal action

21      that may or may not have been taken against him

22      with controlled substances?

23                    So there was that list.  And it

24      was very similar to what the investigators used.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    And that was for the retail

2    independents, right?

3            A.    That is correct.

4            Q.    Okay.

5            A.    And the hospitals also.

6            Q.    Okay.  Fair enough.

7                  Do you know if -- strike that.

8                  When about was this that you made

9    this trip to Florida with some others?

10           A.    I'm thinking it was 2010, but I'm

11   not sure what month.

12                 MR. FULLER:  All right.

13           Let's do -- well, here.  I need

14           3505.

15                 Plaintiffs' Exhibit 20, 3505.

16                         - - -

17    (Cardinal-Forst Deposition Exhibit 20 marked.)

18                         - - -

19   BY MR. FULLER:

20           Q.    All right.  Mr. Forst, this is an

21   e-mail that -- you're the last one on the chain,

22   right?

23                 MR. FULLER:  This is going to

24           be -- didn't I say Plaintiffs'
```

```
 1            Exhibit 20?  Okay.  Great.

 2   BY MR. FULLER:

 3            Q.    And this is another chain

 4   pharmacy, right, K-Mart?

 5            A.    Yes.

 6            Q.    And, to your knowledge, the same

 7   rules that applied to CVS applied to K-Mart,

 8   correct?

 9                  MS. WICHT:  Object to the

10            form.

11            A.    I'm sorry.  Repeat the question.

12            Q.    The same practices that applied to

13   CVS applied to K-Mart, correct?

14                  MS. WICHT:  Object to the

15            form.

16            A.    I -- I believe that is correct.

17            Q.    Now, let me ask.  So there's this

18   designation of chain versus retail independent.

19                  How many pharmacies had to be in

20   a, quote/unquote, chain for it to be categorized

21   as a chain at Cardinal, if you know?

22            A.    I don't know that information.

23            Q.    Who would know?

24            A.    Michael Moné, possibly, and Nick
```

```
 1    Rausch.

 2           Q.    Maybe Nick Rausch would know, too?

 3           A.    Yes.

 4           Q.    Okay.  And so at the bottom of the

 5    page it sort of starts off with Derek e-mailing

 6    Alan and Aaron.

 7                 Do you see that?

 8           A.    Yes.

 9           Q.    And the subject line -- read the

10    subject line for us.

11           A.    "K-Mart 4103 under C-II review

12    again.  SOM event."

13           Q.    All right.  It says, "Alan, Thank

14    you for notifying us that K-Mart 4103 has seen a

15    large increase in shipments for DEA base

16    oxycodone/hydrocodone products over the last

17    several months."

18                 Turn to the next page.  It says,

19    "Based on the information provided by Cardinal

20    and our dispensing history at the store, we have

21    investigated and considered" -- "concluded that

22    there is no suspicious activity.  Please

23    increase the threshold by 15 percent going

24    forward to help eliminate possible holds and
```

 1    allow products to flow without interruption.

 2    Thank you, Derek."

 3              Did I read that right?

 4         A.   Yes.

 5         Q.   Now, generally speaking, Cardinal

 6    doesn't get more feedback from the chains than

 7    that, do they?

 8              MS. WICHT:  Object to the

 9         form.

10         A.   I'm not familiar with all the

11    information that comes from the chains, because

12    some of it could go to Michael and Nick for

13    their analysis.

14         Q.   Well, we know from -- well, let's

15    continue up this chain, then --

16         A.   That's fine.

17         Q.   -- this chain e-mail.

18              All right.  So then Alan forwards

19    it to Debbie Todd and Maranda.

20              And Debbie Todd's in your

21    department, right?

22         A.   Yes.

23         Q.   Okay.  It says, "Maranda, Please

24    see K-Mart's response to the SOM event for store

```
 1   4103.  Alan."

 2               Right?

 3        A.    Mm-hmm.

 4        Q.    Now, do we know at this point

 5   whether the order is being held or whether it

 6   was already shipped that triggered this event?

 7        A.    I don't -- I can't answer that

 8   with the -- I can't answer that by looking at

 9   this document.

10        Q.    Okay.  What would we need to

11   answer that?  If you wanted to find that out,

12   what would you do?

13        A.    Well, I would look at the date.

14   And I'm assuming -- again, assuming -- that

15   there is an attachment or something -- even

16   maybe in a previous e-mail, because I don't see

17   it here -- that's explaining about when and

18   where that incident occurred or that threshold

19   event occurred.  But I don't see it here, so I

20   don't know what the attachment says.

21        Q.    I don't know there was an -- this

22   is what I was given.

23        A.    I don't even know if there was

24   a -- you know, I don't even know.  But, I mean,
```

```
 1   just from this information, there had to be some

 2   discussion somewhere --

 3           Q.    Okay.  Well, let's keep going up

 4   the chain.

 5           A.    -- verbal discussion.

 6                 Yes.

 7           Q.    So Debbie then says it to -- sends

 8   it to you and Shirlene Justus, right?

 9           A.    Correct.

10           Q.    And this is all the same day,

11   correct?

12           A.    Well, it started on August 31st,

13   so --

14           Q.    Well, fair.

15           A.    -- it's been about -- it's been

16   about a week or so, yes.

17           Q.    The e-mail that we started reading

18   from --

19           A.    Correct.

20           Q.    -- is all in the same day?

21           A.    Correct.

22           Q.    That K-Mart has now e-mailed back

23   and let Cardinal know that it's conducted an

24   investigation and it's fine to ship --
```

```
 1          A.    Yes.

 2          Q.    -- and they want to increase their

 3     threshold.

 4                They don't really give a reason

 5     why, do they?

 6                MS. WICHT:  Object to the

 7          form.  Excuse me.  Sorry.

 8          A.    They don't have a reason why here.

 9          Q.    Okay.  And then Ms. Todd forwards

10     it to you --

11          A.    Yes.

12          Q.    -- and says, "See below."

13                And read your response to the

14     jury.

15          A.    My response is, "Please adjust the

16     customer's oxycodone's family threshold by

17     20 percent.  Here is the DEA number and they're

18     serviced out of Knoxville."

19          Q.    "Thank you, Chris," right?

20          A.    Yes.

21          Q.    Now, they only asked -- K-Mart was

22     only asking for a 15 percent increase in their

23     threshold, right?

24          A.    Yes.  That's what they requested.
```

1       Q.    And you gave them an extra

2   5 percent on top of that, didn't you?

3             MS. WICHT:  Object to the

4        form.

5       A.    Again, since it's been --

6       Q.    Well, you gave them an extra

7   5 percent on top of that, right?

8       A.    Yes, because I probably looked at

9   the information that I had in front of me, and

10  that was something that was -- still felt

11  comfortable that there was no obvious signs of

12  diversion going on from the information we had

13  in the file.

14      Q.    So -- and that would be

15  information that's contained within the

16  customer's due diligence file, Know Your

17  Customer type of information, right?

18      A.    Content Manager --

19            MS. WICHT:  Object to the

20       form.

21      A.    -- yes.

22      Q.    Okay.

23      A.    Content Manager.

24      Q.    So we should be able to go back

1    and see what type of information was in there.

2           Now, would you have done any

3    documentation as to why or the basis for your

4    increasing the threshold?

5           MS. WICHT:  Object to the

6        form.

7        A.    Again, it was probably a

8    discussion after I reviewed the stuff.  I

9    reviewed the information that I had in front of

10   me.

11          And, again, I don't even remember

12   this, but it was always review what was in the

13   file, is there any signs of potential diversion,

14   possibly what size store is it, is there

15   rationale for the request, and then you would

16   make a decision on whether you would move the

17   threshold or not.

18       Q.    So let's walk through this

19   process.  So this is a chain, so we may not have

20   all the information we have for the retail

21   independent, correct?

22       A.    Right.

23          MS. WICHT:  Object to the

24       form.

1      Q.    And sitting here today, you don't

know what information you had and didn't have?

2

3      A.    I can't see in Content Manager off

4  of this, no.

5      Q.    And when you say "Content

6  Manager," that's the due diligence?

7      A.    That was the -- that was --

8           MS. WICHT:  Object to the

9      form.

10     Q.    What we talked about earlier,

11  right?

12     A.    That was the information system

13  that we used to place our documents.

14     Q.    Okay.  And all these would have

15  been electronically stored, correct?

16     A.    That is correct.

17     Q.    And at this point in time, 2011,

18  you had the ability to use Tableau as well,

19  right?

20     A.    No.

21     Q.    You didn't have Tableau in 2011?

22     A.    I do not believe so.

23     Q.    Really?  Interesting.

24     A.    If we had the ability to use

1    Tableau, I would -- did not have access to it.

2    So maybe Nick or whoever had started working on

3    it, but I don't remember being able to use

4    Tableau in 2011.

5          Q.    Okay.

6          A.    Because I don't -- I don't -- I

7    can't answer that yes or no, but that date does

8    not sound correct to me.  It's probably in this

9    time frame, but I think it's past 2011 before

10   Tableau was available.

11         Q.    And you could be right, Mr. Forst.

12   You could be right.

13              You had the customer

14   anti-diversion profiles?

15         A.    Yes.

16         Q.    Right?

17         A.    Mm-hmm.

18         Q.    Okay.  That would have been

19   something that you would have looked at?

20         A.    Yes.

21         Q.    For whatever information that you

22   had to plug into that?

23         A.    Correct.

24         Q.    We may not have any site visit

1    investigations because this is a chain?

2           A.    Correct.

3                 MS. WICHT:  Object to the

4           form.

5           Q.    Okay.

6           A.    You may have a surveillance visit,

7    but I don't know that.

8           Q.    And we probably don't have any

9    dosage usage documents because this is a chain?

10                MS. WICHT:  Object to the

11          form.

12          Q.    Right?

13          A.    I don't know that with K-Mart.

14          Q.    Well, if it got treated like CVS,

15   we wouldn't have any, correct?

16          A.    That --

17                MS. WICHT:  Object to the

18          form.

19          A.    That is correct.

20          Q.    Okay.  So then maybe a

21   surveillance, if one was done -- and we can go

22   back and look in the file and see -- and the

23   purchase history --

24          A.    Yes.

```
 1              Q.    -- assuming they were purchasing

 2     from us for a while.

 3                    What else would be in there

 4     related specifically to the customer?  I mean,

 5     certainly you could look at the population,

 6     where it's at --

 7              A.    You could look at that.  You could

 8     see other, possibly, stores around it, where in

 9     the country is this K-Mart.

10              Q.    I guess that goes to comparing it

11     to similarly situated.  We could look and see

12     what others around them were getting or in the

13     county or state or whatever, correct?

14              A.    If we had information around that

15     area, yes, or a pharmacy that we had information

16     on, yes.

17              Q.    Okay.  Sitting here today, you

18     don't recall doing any of that, one way or

19     another, correct?

20              A.    Recall doing any --

21              Q.    Making that type of comparison.

22              A.    Well, that would be in a decision

23     that -- I wouldn't make a decision of 20 percent

24     if I didn't have other things to validate what I
```

```
 1    was -- to give me a comfort zone that there's no

 2    diversion happening or potential diversion at

 3    this pharmacy.

 4            Q.    And then other than this e-mail

 5    when you're increasing it 20 percent, you would

 6    do some documentation to defend your judgment to

 7    make that increase, right?

 8            A.    My documentation --

 9            MS. WICHT:  Object to the

10        form.

11            A.    My documentation would have been

12    in Content Manager.

13            Q.    That's what I mean.  It would be

14    somewhere?

15            A.    Yes.

16            Q.    Okay.

17            MS. WICHT:  Object to the

18        form.

19            Q.    Now, if we're increasing them

20    without a sufficient reason, that's not a

21    justifiable excuse to increase it either, right?

22            MS. WICHT:  Object to the

23        form.  Vague.

24            A.    Again --
```

1          Q.     Strike that.  Let me ask you a

2     different question.  Strike that question.

3                 What type of reasons justified an

4     increase in threshold in Mr. Forst's mind?

5          A.     So has there a pharmacy around

6     them possibly been bought and closed recently

7     and they obtained the files.

8          Q.     You mean bought by them and they

9     took the customers?

10         A.     Well, you can buy the files, but

11    you don't give them a -- I wouldn't put on top

12    of their threshold what the thresholds of that

13    other pharmacy was because -- I would maybe give

14    them ▇▇▇▇▇▇ because most of those customers

15    are going to probably choose to go somewhere

16    else.  They won't necessarily go to that --

17         Q.     Sure.

18         A.     -- store that buys them.

19         Q.     Sure.

20         A.     Are there any new facilities in

21    the area, like a hospital that's expanded in

22    some area?  I mean, you -- the list is --

23         Q.     So I wonder if the DEA shut down a

24    pharmacy next door.

```
1          A.    I don't know that.

2          Q.    Well, I'm not saying you know

3    that.  Is that a legitimate reason to increase

4    thresholds?

5                MS. WICHT:  Object to the

6          form.

7          A.    That wouldn't make any sense to do

8    it, but --

9          Q.    What do you mean, it wouldn't make

10   any sense to do it?

11         A.    Well, I mean, you wouldn't just go

12   do it -- you would have to look to see -- the

13   DEA goes into the store and shuts down that

14   pharmacy --

15         Q.    Yeah.  So you have to keep --

16         A.    -- so -- and K-Mart obtained some

17   of those customers that were possibly at that

18   store.  That doesn't tell me those

19   prescriptions -- all those prescriptions at that

20   store that was shut down were subject to

21   diversion.

22                I mean, you're going to have

23   customers that have medical needs, so -- and the

24   due -- the pharmacist at the K-Mart should also
```

1    be doing their due diligence on any prescription

2    they fill for a customer.

3            Q.    Well, I mean, c'mon.  That goes

4    across the entire country with all pharmacists,

5    right?

6            A.    Yes.

7            Q.    Okay.  So that's nothing special

8    about this K-Mart, correct?

9                  MS. WICHT:  Object to the

10           form.

11           A.    No, but if they're doing their due

12   diligence.

13           Q.    I'm just -- I'm just asking if the

14   DEA closed down a pharmacy nearby, is that a

15   reason to increase the threshold?  Yes or no?

16           A.    It depends.

17           Q.    Okay.  Have you ever heard of the

18   cockroach effect?

19           A.    Vaguely, yes.

20           Q.    Have you ever heard Ms. Howenstein

21   talk about the cockroach effect?

22           A.    Ms. Howenstein?  Oh, Kimberly

23   Howenstein?

24           Q.    I think that's her name,

```
 1    Ms. Howenstein, Kim.

 2             A.    No, not to my knowledge.

 3             Q.    Ask her about the cockroach

 4    effect.

 5                   So I wonder if Cardinal shut off

 6    a -- another customer nearby, would that be a

 7    reason to have increased thresholds for this

 8    pharmacy?

 9             A.    Again, it depends on the

10    information that I have.

11             Q.    So really, increasing thresholds

12    or setting thresholds and evaluating suspicious

13    orders all comes down to information that you

14    have in your possession, right?

15             A.    Yes, and then other information

16    that we can garnish if we can find information.

17             Q.    Sure, sure.  And we're truly

18    trying to look for objective data to make a

19    sound decision when we're talking about

20    increasing thresholds, distributing controlled

21    substances, typically Schedule IIs, which are,

22    in most states, labeled as dangerous drugs,

23    right?

24                   MS. WICHT:  Object to the
```

```
1              form.

2              A.    All the data that we tried to find

3    we hoped -- and was objective.  We tried to make

4    it as objective as possible --

5              Q.    Right.  I mean, that's the goal --

6              A.    -- and use it correctly.

7              Q.    Right.  Right.  So, you know, for

8    example, if someone was trying to get an

9    increase in thresholds and, for example, K-Mart

10   here telling us those are no signs of diversion,

11   if we saw signs of diversion maybe on our

12   surveillance, me may not want to increase the

13   threshold like they're asking, correct?

14             MS. WICHT:  Object to form.

15             Foundation.  Hypothetical.

16             A.    That would be correct and

17   rational.

18             Q.    Okay.

19             A.    If I don't have the information

20   that might be making me not agree to change this

21   to 20 percent, then I don't know what I don't

22   know.

23             Q.    That's a true statement.

24                   So what other legitimate reasons
```

```
 1   are there for increasing thresholds?  Can you

 2   tell the jury?

 3           A.    I believe I --

 4           Q.    Well, you answered some.

 5           A.    Some.

 6           Q.    I'm just asking if there's any --

 7           A.    Some more?

 8           Q.    -- more that you can think of.

 9           A.    I went practice, I went new

10   hospitals in the area, possibly new

11   practitioners in the area, but I'd want to know

12   what their specialty is.

13           Q.    When you -- and you say "new

14   hospitals in the area."  Well, just because a

15   new hospital --

16           A.    Well, it could be a hospital

17   adding more beds.  It could be a hospital adding

18   another service, if I could find out that

19   information.  So ...

20           Q.    Now, what does Cardinal do when

21   they have that situation to determine whether

22   any of those hospital patients are actually

23   filling scripts at that pharmacy?  Because you

24   would agree with me, would you not, if they're
```

```
 1   not -- even if you have a new cancer center move

 2   in --

 3           A.    I can --

 4                 MS. WICHT:  Let him finish

 5           the question.

 6           Q.    -- but they don't -- but that

 7   pharmacy doesn't fill any of their scripts,

 8   there's no reason to increase that pharmacy's

 9   threshold, right?

10                 MS. WICHT:  Object to the

11           form of the question.

12           A.    But, again, that's information

13   I -- I'm not privy to information where somebody

14   goes to get their prescription filled.

15           Q.    Well --

16           A.    Most people usually go when

17   they're treated within either a mile or two of

18   their home if it's convenient or a mile or two

19   of where they've been treated.

20           Q.    Now, is there research on that

21   that suggests that?

22           A.    I don't know if there's any

23   research on that.  But just as an experience

24   from the customers that have -- I've served and
```

```
 1    my colleagues around the country that -- you

 2    know, you ask the question where do you get your

 3    customers from, and most of them say it's

 4    usually someone close by or it's a facility that

 5    has healthcare, like a -- an emergency clinic or

 6    whatever that would give you a prescription for

 7    something.  So you're going to get to the

 8    closest one that you have.

 9            Q.    So can you tell us -- well, strike

10    that.

11                  Is increasing a threshold by

12    20 percent a pretty large or significant

13    increase, generally speaking?

14            A.    It depends on what --

15                  MS. WICHT:  Object to the

16            form.

17            A.    It depends on what the threshold

18    is.

19            Q.    Well, no matter if it's one or --

20    or ten, it's still going to be 20 percent, isn't

21    it?

22            A.    Correct.  But that number -- I

23    mean, 20 percent of ten is what?  So that would

24    make it 12.
```

```
1            Q.    Right.  20 percent of 100 would

2    make it 120.

3            A.    Right.  So I don't know what --

4            Q.    What they were at?

5            A.    I don't know what they were at.

6    If they were at 2,000, that would, what, make it

7    2400.

8            Q.    4,000 dosage units a month, is

9    that a pretty significant increase?

10                 MS. WICHT:  Not 4,000.

11           Q.    400 dosage units?

12           A.    No, that's not a significant

13   increase.

14                 Again, I don't know what the

15   product is and how often -- how many times a day

16   it's given.  It's just oxycodone family.

17           Q.    And sitting here today, you don't

18   know if K-Mart actually provided any additional

19   information to Cardinal or not?

20           A.    I'm not sure at that point in time

21   what information they provided.  I believe it

22   changed over time.

23           Q.    Now, let's talk about CVS 219, the

24   one you did surveillance on.
```

```
 1                    You're aware that they were

 2   getting obscene amounts of controlled

 3   substances, particularly oxycodone, correct?

 4                    MR. MOYLAN:  Objection to

 5          form.

 6                    MS. WICHT:  Object to the

 7          form.

 8          A.    I was aware that their numbers

 9   were larger than --

10          Q.    Were you also aware that from the

11   time you did your investigation, Cardinal

12   continued to increase its thresholds up until

13   the point of the DEA coming in and getting

14   involved with Cardinal in 2012 --

15                    MR. MOYLAN:  Objection.

16                    MS. WICHT:  Object to the --

17          Q.    -- end of 2011?

18                    MS. WICHT:  Object to the

19          form.

20          A.    I did my visit.  And when I was

21   there -- and it's a point in time -- there was

22   no indications of any diversion going on.  There

23   was no cars in the parking lot that were from

24   out of state.  There was no lines.  There was
```

1    none of that.

2                As far as the threshold changes

3    for some of the chains, those were done

4    analytically, and that would have been done

5    through Michael or Nick and his team.  So they

6    had information that we didn't necessarily see

7    and documentation coming in.

8          Q.    When you say those were done

9    analytically, what do you mean?  Some sort of

10   formula?

11         A.    They had some formulary analysis.

12   They had -- their -- they would analyze the data

13   and -- I wish I could find the term, but I

14   can't -- see what was trending, see what looked

15   reasonable.  I don't know exactly what all their

16   parameters were, if it was population changes or

17   anything like that, but ...

18         Q.    Now, Mr. Moné's talked in the past

19   about there being a chain-wide threshold.

20                Are you aware of that?

21         A.    A chain-wide threshold?

22         Q.    Yes, sir.

23         A.    I'm not familiar with what he --

24   what he means by "chain-wide threshold" or if

```
 1    it's something that was implemented or not.

 2            Q.    That may be a good question, too.

 3                  MR. FULLER:  4213.

 4                      - - -

 5     (Cardinal-Forst Deposition Exhibit 21 marked.)

 6                      - - -

 7    BY MR. FULLER:

 8            Q.    Exhibit 21 is 4213.

 9                  Have you ever seen this before?

10            A.    I can't say that I'm familiar with

11    this document.

12            Q.    If you'd turn to page 8,

13    paragraph 17.

14                  Do you see that there?

15            A.    Yes.

16            Q.    Now, this is Mr. Moné's sworn

17    testimony -- or declaration.  It says,

18    "Thresholds for chain pharmacies that open a new

19    pharmacy are set based on the standard threshold

20    for the entire chain because Cardinal Health has

21    determined that chain pharmacy customers

22    generally have a known ordering pattern for a

23    majority of their stores."

24            A.    Okay.
```

1      Q.    So do you have any understanding

2  of what this general standard threshold is for

3  the different chains?

4      A.    No.

5      Q.    So that may be something that's a

6  little different than what we looked at earlier

7  related to setting thresholds; you know, we went

8  through that threshold setting policy and

9  procedure that didn't segregate out chains,

10  right?

11     A.    No.  Well, this says "opens a new

12  pharmacy," so this is a startup.

13     Q.    Right.  But it also says that

14  there is a standard threshold for the entire

15  chain, doesn't it?

16     A.    Yes.

17     Q.    It says, "Pharmacy's" --

18         MS. WICHT:  Object to the

19     form.

20     Q.    -- "threshold is set based on the

21  standard threshold for the entire chain."

22     A.    Yes.  I don't know what that

23  standard threshold --

24     Q.    You don't have any idea what he's

```
 1    talking about?

 2            A.    No.

 3            Q.    Okay.  Now, what about there being

 4    a logistical -- a sophisticated logistic

 5    regression model for pointing out or detecting

 6    at-risk customers?  Are you aware of whether

 7    Cardinal was running some sort of logistical

 8    model?

 9                  MS. WICHT:  Object to the

10            form.

11            A.    That would be Nick Rausch and his

12    group, so I --

13            Q.    You have no idea?

14            A.    -- I probably would not have known

15    what they were doing.  I know that they did

16    statistical analysis all the time.

17            Q.    They did number stuff and you

18    stayed out of number stuff, or their number

19    stuff at least?

20                  MS. WICHT:  Object to the

21            form.

22            A.    Yes.

23            Q.    Okay.

24                        - - -
```

```
 1    (Cardinal-Forst Deposition Exhibit 22 marked.)

 2                        - - -

 3         Q.    Plaintiffs' Exhibit 22, 4323.

 4               Now, certainly, Mr. Forst, you've

 5    seen this e-mail before because you're on it,

 6    right?

 7         A.    Yes.

 8         Q.    And this is back in -- was it

 9    2010, February 2010?  January or February 2010,

10    I guess.

11         A.    Yes.

12         Q.    Right?

13         A.    Yes.

14         Q.    Do you know who Jennifer -- I

15    guess it's Hug.

16         A.    I believe she was a PBC.

17         Q.    That's a salesperson, right?

18         A.    Right.  Probably, I believe, a

19    manager.  Yeah, manager of retail national

20    accounts.

21         Q.    It's a pharmacy business

22    consultant, PBC; is that right?

23         A.    I believe that's the terminology.

24         Q.    And she e-mails Jason.  Who's
```

```
 1    Jason; do you know?  Looks like someone at CVS.

 2         A.    I don't know, unless it would be

 3    the -- it was someone in loss prevention just by

 4    looking at the information.

 5         Q.    Okay.  Well, let's read this.

 6         A.    That was sent to Maranda.

 7         Q.    It says, "Jason, Can you please

 8    have your LP department" -- which I guess is

 9    loss prevention.  Makes sense, right?

10         A.    Yes.

11         Q.    -- "your LP department look into

12    the ordering habits of two stores below.  We

13    have seen a huge jump in oxycodone purchases

14    from both.  Please see the detail for each

15    store."

16               And then it provides some

17    information on the two stores.  It's CVS 850 and

18    CVS 219, correct?

19         A.    Yes.

20         Q.    Okay.  And if you turn over to the

21    next page, it says, "Thank you for your

22    guidance" -- excuse me -- "Thank you for any

23    guidance you can give us on the continued

24    increases we are seeing for the classes of
```

```
 1    drugs" -- or "for this class of drugs."

 2               And then Jason responds back.  He

 3    says, "Jenn, From LP, the store 850 and 219 are

 4    okay.  They're comfortable with the levels."

 5               Do you see that there?

 6         A.    Yes.

 7         Q.    And then it -- apparently Jennifer

 8    sends to Maranda, you, and Mr. Moné -- it says,

 9    "Maranda, I wanted to -- "I wanted to forward

10    you the information from CVS' LP department in

11    reference to the two SOM events attached.

12    Please let me know if you have any additional

13    concerns.  Thank you."

14               Right?

15         A.    Yes.  I don't see any SOM events

16    attached.

17         Q.    Right.  They are not attached.

18               And what does an SOM event look

19    like?

20         A.    It was -- it was what the held

21    orders were called in the suspicious order

22    monitoring system.  So it was a threshold event.

23         Q.    And what type of information did

24    it give?
```

```
 1            A.    The threshold event?

 2            Q.    Yes, sir.

 3            A.    It was the drug product, I think

 4   the amount ordered.  You also had the visibility

 5   of the threshold.

 6                  Again, I don't have that

 7   information in front of me so ...

 8            Q.    Right.  So that's in February.

 9   Then let's fast forward to September.

10                  MR. FULLER:  I need 4948.

11                  This is going to be

12            Plaintiffs' Exhibit 23.

13                        - - -

14     (Cardinal-Forst Deposition Exhibit 23 marked.)

15                        - - -

16   BY MR. FULLER:

17            Q.    So we're what, about seven -- six,

18   seven months later; is that right?

19            A.    Yes.

20            Q.    And you're on this e-mail chain as

21   well, right?  You've read this?  You've seen

22   this?

23            A.    Yes.  It's directing me to do an

24   action for Michael.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And if we start down near the

2   bottom, there's a Paul Farley who sends an

3   e-mail to Mr. Moné and it includes a Brian

4   Jackson.

5            Who is Paul Farley?

6      A.    I'm not familiar with a Paul

7   Farley.

8      Q.    Well, he says, "Michael, I'll

9   continue to try to reach you by phone, but I

10  wanted to recap my conversation with CVS this

11  morning."

12           Do you see that?

13     A.    Yes.

14     Q.    It says -- and this CVS ended up

15  causing a lot of problems for Cardinal, didn't

16  it?

17           MS. WICHT:  Object to the

18       form.

19           MR. MOYLAN:  Object to the

20       form.

21     Q.    CVS 219?

22           MS. WICHT:  Same objection.

23     A.    I'm not always familiar with the

24  CVS store numbers.

```
 1              Q.    CVS 219 was one of the CVS stores

 2     that was the basis of the immediate suspension

 3     order --

 4              A.    Okay.

 5              Q.    -- in February.

 6              A.    Okay.

 7              Q.    You're aware of that right?

 8              A.    Yes.

 9              Q.    So this CVS store caused some

10     problems for Cardinal, correct?

11                   MR. MOYLAN:  Objection to

12           form.

13                   MS. WICHT:  Object to the

14           form.

15              A.    You could call that a problem,

16     yes.

17              Q.    Okay.  Well, let's -- let's read

18     what he -- and I -- by "he," I mean Paul

19     Farley -- relayed from CVS.

20                   It says, "I spoke with Brian

21     Whalen at CVS a couple of times this morning

22     regarding Store 219 and other locations you

23     referenced at NACDS.  I also reviewed your

24     slides with him.  He tells me that he responded
```

```
 1    to Cardinal's last March on inquiries for these

 2    same stores.  At that time, CVS experienced an

 3    increase in sales of oxycodone due to the DEA

 4    closing stores in the area."

 5              Cockroach effect, right?

 6              MS. WICHT:  Object to the

 7         form.

 8         A.   If that's what the definition of

 9    cockroach effect is, yes.

10         Q.   Ask Ms. Howenstein.

11              MS. WICHT:  Well --

12         Q.   Let's go on down a little bit.

13              MS. WICHT:  -- nobody here

14         has defined what it is --

15         A.   Yeah.  Yeah.

16         Q.   Let's go down a little bit.

17              MS. WICHT:  -- so I don't see

18         how he could possibly answer that

19         question.

20         Q.   "None of these stores show

21    significant growth or shrinkage issues."

22              Do you see that?  "None of these

23    stores show significant growth or shrinkage

24    issues."
```

```
 1              A.    Oh, okay.  I need to look at my

 2     monitor.  Yes, I see it.  Thank you.

 3              Q.    Okay.  Now, we know that's not

 4     true, don't we?

 5                    MS. WICHT:  Object to the

 6              form.

 7              A.    I don't know that information.

 8              Q.    We can certainly check it, because

 9     Cardinal can look at its own sales and see if

10     it's selling them or distributing to them

11     significant growth, right?

12                    MS. WICHT:  Object to the

13              form.

14              A.    Again, this is --

15                    MS. WICHT:  Mischaracterizes

16              the document.

17              A.    Again, this is -- started off

18     addressed to Michael.

19              Q.    I understand that.  I'm not asking

20     you who it's addressed to.  I don't care who

21     it's addressed to.  It doesn't matter to me at

22     this point.

23                    CVS is telling Cardinal that there

24     are -- none of these stores are showing
```

```
 1    significant growth or shrinkage issues.

 2              That's what they're saying to

 3    Cardinal, right?

 4         A.    That's what the document says.

 5         Q.    And if Cardinal is distributing

 6    the drugs to them, the controlled substances,

 7    Cardinal can go and check, can't they?

 8              MS. WICHT:  Object to the

 9         form.  Foundation.

10         A.    Cardinal can check --

11         Q.    Yeah, Cardinal can go and pull up

12    on the computer --

13              MS. WICHT:  Let him finish

14         his answer.  He was in the middle

15         of a sentence.

16              MR. FULLER:  No, he wasn't.

17              MS. WICHT:  Let him finish.

18              MR. FULLER:  No, he wasn't.

19         A.    Well, CVS also self warehouses

20    some of their controls.

21         Q.    Control IIIs, not Control IIs,

22    right?

23         A.    V through IIIs, whatever.

24         Q.    Not Control IIs, correct?
```

Highly Confidential – Subject to Further Confidentiality Review

```
1              A.     Not IIs, correct.  So whether we

2      have access to seeing that information, I'm not

3      sure of that.

4              Q.     Let's focus on OxyContin -- or

5      oxycodone.  Sorry.

6              A.     Okay.

7              Q.     And secondly, let's dispel this

8      issue that you've thrown up.

9                     Cardinal doesn't care what IIIs

10     through Vs are going there, because Cardinal

11     doesn't distribute them, right?

12                    MS. WICHT:  Object to the

13             form.

14             A.     I don't know the answer to that

15     question.

16             Q.     Well, you just told me CVS had its

17     own warehouse and was distributing its own IIIs

18     through Vs and Cardinal didn't have access to

19     that information.

20             A.     That doesn't necessarily mean that

21     we didn't care that we didn't have access to

22     that information.

23             Q.     All right.

24             A.     I don't know if there was -- in
```

1    the analysis if that was taken into account,

2    because that was not my area of expertise -- or

3    my area that I did.  I wasn't part of the

4    analytics group.

5        Q.    So CVS says none of these stores

6    show significant growth or shrinkage, correct?

7        A.    That's what this says, yes.

8        Q.    And then it says, "Additionally,

9    CVS has a new attorney working with the DEA.

10   They acknowledge that Florida has been cracking

11   down on pill mills, and that is driving more

12   legitimate traffic to the CVS stores."

13              Right?

14       A.    That's what it says in the

15   document.

16       Q.    It says, "Brian will send your

17   slides over to LP" -- loss prevention -- "for

18   their review and response.  They will not

19   provide -- they will not provide the doctor or

20   patient information you requested unless it is

21   requested by the DEA."

22              They're refusing to provide

23   information that Cardinal asked them for, aren't

24   they?

```
 1              A.    According to the document, yes.

 2              Q.    He was quite adamant about this.

 3      "He does not expect Cardinal to interrupt

 4      service to CVS stores since they have responded

 5      in the manner that we originally agreed upon

 6      when launching the SOM program."

 7                    Did I read that right?

 8              A.    Yes.

 9              Q.    So they're telling you -- they're

10      telling Cardinal, "You better not interrupt our

11      service because we're doing what you asked us to

12      do and we're not going to give you the

13      information that you asked for."

14                    And it says, "Any disruption to

15      service will impact patient care and patient

16      care with pain medication is critical as you are

17      aware.  I ask that you release any pending

18      orders and update Gilberto."

19                    Did I read that correctly?

20              A.    Yes.

21              Q.    So let's see what Cardinal did.

22                    Mr. Moné forwards that to you,

23      correct?

24              A.    Correct.
```

```
 1              Q.     "Okay to release the CVS held

 2      orders for this weekend."

 3                     That's what he tells you to do,

 4      doesn't he?

 5                     MS. WICHT:  Object to the

 6              form.

 7              A.     Yes, but he has information that I

 8      don't see.

 9              Q.     How do you know he has information

10      you don't see?  How do you know he has any

11      additional --

12                     MS. WICHT:  Besides the next

13              sentence in the e-mail that you're

14              not reading?

15              Q.     -- information?

16              A.     "We will be working through

17      another solution.  Please place this e-mail in

18      the repository."

19              Q.     Okay.  You tell me.  What does

20      that -- does that say he has information that

21      you don't see or that you don't have?

22              A.     I don't know what he has.  I don't

23      know what he's looking at.

24              Q.     Well, counsel tried to make a
```

1   cautionary objection that, oh, it's --

2                 MS. WICHT:  Let him finish --

3                 MR. FULLER:  -- in the next

4           sentence.

5                 MS. WICHT:  -- his answer.

6   BY MR. FULLER:

7         Q.    And there is nothing in the next

8   sentence about missing information or additional

9   information he has, is there?

10        A.    Are we talking about "We will be

11  working through another solution.  Please place

12  this in the e-mail" -- is that the sentence

13  that --

14        Q.    That's apparently what -- she said

15  the next sentence, so that would be the next

16  one.

17                MS. WICHT:  What's the

18          question?

19        Q.    So is there anything there that

20  indicates he had additional information?  Where

21  does it say he -- that I --

22        A.    There's nothing there that

23  indicates he has additional information.

24        Q.    Oh, okay.

```
 1          A.    I don't know the context of --

 2          Q.    Because I was being --

 3          A.    -- this down here at the bottom.

 4                MS. WICHT:  Except that he

 5          has another solution.

 6                Go ahead.  Ask your

 7          questions.

 8          Q.    Does it say he has another

 9   solution?

10          A.    "We will be working through

11   another solution."

12          Q.    It doesn't say he has one, does

13   it?  Does it say, "I have another solution"?

14          A.    I'm not privy to this conversation

15   down here.  I'm only privy to the part that I

16   was asked to release the held orders.  That

17   could have been a bottle of 100.  I don't even

18   know what that held order was --

19          Q.    Sure.  Sure.

20          A.    -- and to place this information

21   in the repository.

22          Q.    And I apologize, Mr. Moné, but

23   someone was accusing me of misleading when I

24   weren't, and what they're supposed to do is
```

```
 1    certainly they can cross you on this information

 2    when it's their turn and stop the speaking

 3    objections and -- and I don't even know what

 4    they're called, the statements -- the accusatory

 5    statements on the record.

 6                   MS. WICHT:  Mr. Forst.

 7            Q.    And then you respond that "Please

 8    add to the repository.  Thanks."

 9                   And I'm assuming that you lifted

10    the -- or released the orders as instructed,

11    correct?

12            A.    I would -- I would assume that is

13    correct.

14            Q.    Okay.

15                   MR. FULLER:  Let's go to

16            4663.

17                   This is Plaintiffs' Exhibit

18            24.

19                          - - -

20      (Cardinal-Forst Deposition Exhibit 24 marked.)

21                          - - -

22    BY MR. FULLER:

23            Q.    So we know back in February we had

24    concerns about CVS 219, correct?
```

```
 1                    MS. WICHT:  Object to the

 2          form.

 3          Q.    The first e-mail we looked at was

 4   February --

 5          A.    Apparently, yes.

 6          Q.    -- was February 2010; is that

 7   right?

 8          A.    Yes.

 9          Q.    Then we look in September of 2010

10   and we see there's concerns again because

11   they're again breaching threshold limits; is

12   that right?

13          A.    They are exceeding their

14   threshold, yes.

15          Q.    And if we look at what's been

16   attached as 4663, this document includes the

17   threshold information and actual shipments on a

18   monthly basis for these four pharmacies.  And I

19   say four.  It's CVS 219, Gulf Coast, CVS 5195,

20   and CareMed.

21                Do you have any familiarity with

22   any of those pharmacies, Mr. Forst?

23          A.    I'm familiar with the 219 store.

24   I know information of the Gulf Coast.  I'm not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sure what 5195 is.  And I'm not sure about

 2    CareMed.

 3            Q.    So let's look at 219.

 4                  In September of 2010, CVS tells us

 5    that there has been no significant increase or

 6    shrinkage at the store, right?

 7            A.    My document is turned around.

 8                  On September 30th, I believe,

 9    that's correct.

10            Q.    Okay.  And in the past nine

11    months, at least according to document 4663,

12    their accrual, meaning monthly dosage, of

13    oxycodone has increased from 141,000 to 281,000,

14    and the thresholds went from 118,000 pills per

15    month to 235,000 pills per month, correct?

16            A.    According to the document, yes.

17            Q.    That would seem like some

18    significant growth.  Can we agree on that?

19                  MS. WICHT:  Object to the

20            form.

21            A.    I'm not -- I can't answer that

22    because I'm not sure what significant growth

23    definition is over here, and I also noticed that

24    these orders are all at the end of the month.
```

```
1              Q.     Those are the totals for the

2    month, sir.

3              A.     But this is an order at the end of

4    the month, this date, because that comment says

5    that there was an order there, I believe.  Is

6    this out of the --

7              Q.     So you believe on one day CVS --

8              A.     No, no, no.

9              Q.     -- ordered 281,600 --

10             A.     No, no.

11             Q.     -- dosage units --

12             A.     No.

13             Q.     -- of oxycodone 30-milligram 100s?

14   Is that what you're telling the jury?

15             A.     No.

16             Q.     And that Cardinal delivered them?

17             A.     No, that's not what I'm saying.

18             Q.     Oh, okay.

19             A.     Where is this screenshot from; do

20   you know?

21             Q.     It was information provided by

22   Cardinal to the DEA.

23                    MS. WICHT:  No, it was

24             information that the DEA attached
```

```
1          to a filing.  If you're going to

2          say what the document is and you're

3          incorrect, then I'm going to

4          correct you.

5               MR. FULLER:  No.  You're

6          absolutely wrong.  The

7          information -- DEA didn't make up

8          the threshold.  The information

9          came from Cardinal, Counsel.

10         Unless you're willing to stipulate

11         on the record that the DEA had

12         access to Cardinal's thresholds,

13         then --

14              MS. WICHT:  My point is that

15         the document is a DEA government

16         exhibit.  Whatever this document

17         is, it was created by DEA.

18              MR. FULLER:  Well, I disagree

19         with you.

20              MS. WICHT:  That was the

21         correction.

22              MR. FULLER:  If you want to

23         cross him with it, you can.

24         A.    Okay.  Back to the question.
```

1          Q.    Yes, sir.

2          A.    Please repeat the question.

3          Q.    I don't care what Mr. CVS'

4    definition of significant growth is.  Clearly

5    it's completely different --

6          A.    I'm --

7          Q.    -- than what the person --

8                MS. WICHT:  Wait, wait, wait.

9          He hasn't asked the question yet.

10         A.    Okay.  What's the --

11         Q.    -- what any other person would

12   deem significant growth.

13         A.    Okay.

14         Q.    My question to you was, the

15   growth, at least according to this document,

16   that we see at CVS 219 from January to

17   September, when it doubles in threshold as well

18   as actual dosage units delivered, is

19   significant, correct?

20               MS. WICHT:  Object to the

21         form.

22         A.    Again, I don't know the parameters

23   of the discussion.  I don't know what has

24   changed with this store.  I'm not really sure

```
 1   where the -- what this -- this looks like it was

 2   pulled at the end of each month.  That's just by

 3   looking at the date.  So I can't comment on a

 4   document that I'm not sure what the information

 5   is saying, except for I'm looking at two

 6   numbers.  One's bigger than the threshold, and

 7   it's an accrual.

 8                   I don't know what was shipped.

 9   That's an accrual.  I don't know how much of

10   this was shipped.  The accrual doesn't

11   necessarily mean the product was shipped.

12           Q.    So your testimony is the accrual

13   amount, the amount -- the process through

14   Cardinal doesn't mean it was shipped?

15           A.    That's an accrual.  I don't know

16   what the shipped amount is.

17           Q.    Mr. Forst --

18           A.    Does this accrual --

19           Q.    Hold on.

20                 Go ahead.  I'm sorry.

21           A.    I don't understand what the

22   document -- where it's from and what accrual in

23   a column means.  Does the accrual in this

24   document mean a shipped quantity, or does the
```

```
 1    accrual in this column mean the amount of

 2    product that the customer tried to order and was

 3    or was not necessarily shipped?

 4           Q.    Okay.  So let's back up,

 5    Mr. Forst.

 6                 First you started off this long

 7    answer with I don't know what the situation with

 8    this conversation was referring to, the earlier

 9    document between Mr. CVS and Mr. Moné, correct?

10           A.    Correct.

11           Q.    I told you already I don't care

12    about what their interpretation is of

13    "significant."  I don't care about that.  I'm

14    not asking you about that.

15                 I'm asking you, Mr. Forst, sitting

16    here in Columbus, Ohio reviewing threshold

17    events, if you see an accrual account go from --

18    if shipped product go from 141,000 to 281,000,

19    is that a significant increase?

20                 MS. WICHT:  Object to the

21           form.

22           Q.    Or is it not?  Maybe it's not.

23                 MS. WICHT:  Object to the

24           form.
```

```
 1            A.    I don't know the definition on

 2     this piece of paper of what this accrual number

 3     is.

 4            Q.    I'm asking you to accept as true

 5     it's the number of pills shipped for purposes of

 6     my question, okay?

 7            A.    If it's for the purposes of your

 8     question and this is actually the shipped

 9     quantity, then yes, it shows some growth.

10                 MS. WICHT:  Object to the

11            form of the question.

12            Q.    Just some growth, right?

13                 MS. WICHT:  I didn't want to

14            interrupt the witness.

15            A.    I don't know --

16            Q.    Not significant growth?

17            A.    I don't know the parameters of

18     what has changed in these months at this store.

19            Q.    They're getting a whole lot more

20     pills of OxyContin -- or excuse me -- oxycodone,

21     right?

22                 Let me ask you, assuming for the

23     purposes of my question that the accruals are

24     shipped amounts and that the thresholds are
```

1    accurate as well.  Each time they exceeded that

2    threshold, someone in your department would have

3    had to clear that shipment, correct?

4              MS. WICHT:  Object to the

5         form.

6         A.   Again, accrual on here, in all the

7    terminology that I've ever used at Cardinal,

8    does not mean shipped.  If you're telling me

9    this was shipped -- and I don't see that

10   documented on here that that says that's

11   shipped -- I can't answer the question because I

12   don't know what this accrual column means.

13        Q.   All right.  Well, I actually told

14   you how to interpret it, because I said for the

15   purpose of my question, let's assume it says

16   shipped.

17             Well, hold on.  We can do this a

18   different way.

19             MS. WICHT:  Would this be an

20        okay time for a break while you

21        find the document?

22             MR. FULLER:  Oh, sure.

23        Absolutely.

24             THE VIDEOGRAPHER:  We're

```
 1            going off the record at 4:08.

 2                 (Recess taken.)

 3                 THE VIDEOGRAPHER:  We're back

 4            on the record at 4:30.

 5   BY MR. FULLER:

 6            Q.    All right.  I apologize.  I was

 7   looking for a document and I think it was about

 8   time for a break.  As it was.

 9                 And, Mr. Forst, your concern is

10   whether accrual was actually shipped, right,

11   related to document 4663?

12            A.    That is correct.

13            Q.    All right.  I'm going to pass to

14   you P1.3786, which is Exhibit 25 for the record.

15                        - - -

16    (Cardinal-Forst Deposition Exhibit 25 marked.)

17                        - - -

18            Q.    Do you see this e-mail that

19   Mr. Rausch prepared and sent to Gilberto

20   Quintero?

21            A.    Yes.

22            Q.    And Michael Moné.  It says "CVS

23   Talking Points" is the subject, correct?

24            A.    Yes.
```

```
1            Q.    And then it also says,

2     "Attachments:  CVS Talking Points, October 22,

3     2010," which would be right after this September

4     of '10 e-mail, correct?

5            A.    Yes.  September 30th, yes.

6            Q.    And then Mr. Rausch writes,

7     "Gilberto, Per your request, attached please

8     find talking points specific to CVS store

9     located in Sanford, Florida."

10                 You know where that's at, Sanford,

11    Florida, right?  You've been there?

12           A.    I know where Sanford, Florida is.

13           Q.    Well, let's turn to the next page.

14    It's CVS Pharmacy 219.

15                 Do you see that there?

16           A.    Yes.

17           Q.    Supply chain integrity and

18    anti-diversion.  Now, let's blow up this graph

19    so we can actually see it.

20                 All right.  Do you see that there

21    on the screen?

22           A.    Yes.

23           Q.    It says, "CVS Pharmacy 219," and

24    then it has boxes for the average store as well?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yes.

2            Q.    And let's be fair.  It says, "CVS

3     store average," and the other CVS stores.  So

4     it's comparing 219 to similarly situated other

5     CVS pharmacies, right?

6                  MS. WICHT:  Object to the

7            form.

8            A.    Apparently, yes.

9            Q.    Okay.  So let's -- and my question

10    earlier was related to January of 2010 and up to

11    September of 2010 and how many pills were being

12    shipped and whether there was a significant

13    increase, right?  Remember that conversation we

14    had?

15           A.    That is correct.

16           Q.    All right.

17                 MR. FULLER:  So, Ms. Gina,

18           can you help us draw lines -- oh,

19           there you go.  Lookie there.

20    BY MR. FULLER:

21           Q.    January 2010 and a line on

22    September 2010.

23                 Do you see that now with the

24    lines?
```

1      A.    Yes.

2      Q.    All right.

3            MR. FULLER:  Now, Ms. Gina,

4      if you can draw lines across.  All

5      right.

6  BY MR. FULLER:

7      Q.    So like -- much like what our

8  document says, which you said accruals didn't

9  necessarily mean shipped, it says -- what does

10  it say?  141,000 and some change as far as

11  pills?

12            Now, I'm talking about on --

13      A.    Yeah.  January 10th, yes.

14      Q.    -- 4663.

15      A.    Yeah.

16      Q.    And then September -- and

17  September is -- the accrual on the -- on 4663 is

18  280, and it looks like we're about 280 on the

19  other one as well, right, well above 250?

20      A.    Okay.

21      Q.    And that's in dosage unit

22  quantity.  Do you see that on the side of the --

23      A.    Yes.

24      Q.    -- the graph?

```
 1          A.    Yes.

 2          Q.    Okay.  So from information

 3   Mr. Rausch is giving to Gilberto -- who is

 4   senior to Mr. Rausch and you guys, right?

 5          A.    That is correct.

 6          Q.    Okay.  He's giving his boss

 7   monthly information as far as distribution of

 8   oxycodone, at least according to this chart,

 9   right?

10          A.    That is correct.

11          Q.    Well, let's read and see what

12   other information Mr. Gilberto got.  It says,

13   "High quantity when compared to other CVS

14   stores."

15                Do you see that there?

16          A.    Yes.

17          Q.    It says �â–ˆâ–ˆâ–ˆâ–ˆâ–ˆ more than

18   the average CVS store over the past three

19   months, ▢▢▢▢▢▢▢ dosage

20   units -- pills -- of oxycodone compared to only

21   ▢▢▢ for the average store.

22                Right?

23          A.    Yes, I see that.

24          Q.    Is that a significant difference
```

```
 1    in your mind --

 2                   MS. WICHT:  Object to the

 3           form.

 4           Q.    -- the ████pills compared to

 5    ████ pills?  I'm just trying to figure out

 6    if -- Mr. Forst, if that's a significant

 7    difference.

 8           A.    That's a significant difference.

 9                   MS. WICHT:  Object to the

10           form.

11           Q.    Okay.  Rapid rate of growth.

12                   Well, now we know Mr. CVS said in

13    his e-mail that there was no significant

14    increase or shrinkage, right?  Isn't that what

15    he said?

16           A.    According to the e-mail, correct.

17           Q.    Well, I mean --

18           A.    Or according to the -- this

19    document, yes.

20           Q.    Right.  I mean, we don't think

21    somebody altered his e-mail, do we?

22           A.    No, I'm not saying that.

23           Q.    Okay.

24           A.    I'm just saying according to the
```

```
 1    document I have in front of me, yes.

 2         Q.    That's what it says, right?  Rapid

 3    growth.  "86 percent increase in quantity

 4    purchased (first nine months of 2010 compared to

 5    2009).  See graph to the right for additional

 6    detail."

 7              So do you agree that that is a

 8    rapid rate of growth --

 9              MS. WICHT:  Object to the

10         form.

11         Q.    -- for CVS 219?

12         A.    That is a large rate of growth.

13         Q.    I mean, listen, you can differ --

14    you can disagree with Mr. Rausch.  He's the one

15    that prepared this and said rapid rate of

16    growth.  You can say he's wrong.  Don't feel bad

17    about it.

18              Do you agree or disagree that

19    that's a rapid rate of growth?

20         A.    It appears --

21              MS. WICHT:  Object to the

22         form.

23         A.    -- to be a rapid rate of growth.

24         Q.    Okay.
```

```
 1                    MS. WICHT:  Sorry.

 2          Q.    Unbalanced product mix.  Do you

 3   see that point that he has there?

 4          A.    Yes.

 5          Q.    "58 percent of all purchases are

 6   for oxycodone."

 7                 Now, generally speaking, the only

 8   thing CVS is buying is Control IIs from you

 9   guys, right?

10          A.    Yes, as far as I'm familiar with.

11   And I'm not sure whether we have information on

12   the other products or not.

13          Q.    Apparently we had some information

14   that he was able to compare and figure out that

15   almost 60 percent of their purchases are

16   oxycodone products, right?

17                    MS. WICHT:  Object to the

18           form.  No foundation.

19           Mischaracterizes the document.

20          Q.    I'm sorry.  Did I mischaracterize

21   this, Mr. Forst, or is that what it says?

22          A.    Of the purchases from Cardinal --

23   I don't know, because I don't know the

24   background -- I don't know what other parts are
```

```
 1    in the mix.  I don't know what's behind that.

 2         Q.    Well, what could it be?  Let's ask

 3    you that.  Strike that.  It doesn't really

 4    matter.

 5              It's information that Mr. Rausch

 6    felt significant enough to provide to

 7    Mr. Gilberto, right?

 8              MS. WICHT:  Object to the

 9         form.

10         A.    Yes.  I can -- yes.  Apparently

11    the request was made to him to look at the

12    store, so yes.

13         Q.    And knowing Mr. Rausch, he's not

14    going to give inaccurate or incomplete

15    information to Mr. Gilberto, is he?

16              MS. WICHT:  Object to the

17         form.

18         A.    I can't comment on Mr. Rausch's --

19         Q.    Well, is he a standup guy?  Is he

20    going to give him what he's asked for?

21              MS. WICHT:  Object to the

22         form.

23         Q.    Or do you know?  I mean, you

24    worked with him for a good period of time.
```

```
 1           A.    He's going --

 2                 MS. WICHT:  Object to the

 3           form.

 4           A.    He's going to give him the

 5     information requested.  But I don't know what is

 6     included in this unbalanced product mix, so I

 7     don't know if he has access to the other

 8     controls or not.

 9           Q.    All right.  Having this

10     information now, does it cause you any concern

11     about CVS 219?

12                 MS. WICHT:  Object to the

13           form.

14           A.    Again, the number appears large.

15     I don't know what is happening around the store,

16     but the number does seem like the growth is

17     large.

18           Q.    Would you cut them off if it was

19     you?  If it was your decision, Mr. Forst,

20     knowing what you know -- you've been in the

21     industry almost 40 years, an expert of sorts --

22     based on your training, background, and

23     experience, would you cut this pharmacy off back

24     in 2010?
```

```
 1              MS. WICHT:  Object to the

 2        form.  Calls for speculation.

 3        A.    My position at Cardinal was to

 4   review the orders.  The decision to cut off

 5   customers was above me.  So that would not be in

 6   my purview because, again, I don't know all the

 7   information about all the other CVS stuff.

 8        Q.    Well, hold on.  You say it

 9   wouldn't be in your purview.  Your purview was

10   to --

11        A.    I agree --

12        Q.    I'm sorry.  Go ahead.

13        A.    No.  Finish your question.

14        Q.    Well, your purview was to evaluate

15   threshold events and make a determination of

16   whether you're going to release it or cut the

17   threshold, right?

18              MS. WICHT:  Object to the

19        form.

20        Q.    Whether it was potentially

21   suspicious orders?

22        A.    Release it or cut the order, yes.

23        Q.    And do you have the ability to

24   halt a customer?
```

```
 1            A.    Have the ability to what?  I'm

 2    sorry.

 3            Q.    To stop shipping to a customer?

 4            A.    Yes, I can cut the orders and stop

 5    shipping.

 6            Q.    So would you stop shipping to

 7    CVS 219 back in September of -- when we see this

 8    type of growth, these type of numbers, would

 9    Mr. Forst stop shipments of controlled

10    substances to CVS 219?

11                  MS. WICHT:  Object to form.

12            Calls for speculation.

13            Q.    Now, you were back at this store

14    sometime in 2010.  You've already testified to

15    that.

16            A.    But I didn't see any outward signs

17    of diversion, so ...

18            Q.    Do you always have to see outward

19    signs of diversion?

20                  MS. WICHT:  Object to the

21            form.

22            A.    I would be uncomfortable selling

23    that much to the store.

24            Q.    Do you know if Cardinal cut them
```

```
 1    off in 2010, CVS 219?

 2            A.    I'm not sure when Cardinal cut off

 3    that -- CVS 219.

 4            Q.    Do you know if Cardinal ever cut

 5    them off?

 6            A.    I don't know that answer either.

 7            Q.    Do you know whether -- so sitting

 8    here today, you don't know whether Cardinal ever

 9    cut off CVS 219?

10            A.    Whether it was a Cardinal function

11    or DEA terminating their license, no, I don't.

12    Not this store.

13            Q.    So you know eventually this store

14    got cut off?

15            A.    Yes.

16            Q.    Because both the store and

17    Cardinal lost their ability to distribute and,

18    for the CVS, receive controlled substances,

19    right?

20                  MS. WICHT:  Object to the

21            form.

22            A.    That was a statement.

23            Q.    I'm sorry?

24            A.    Can you repeat your statement
```

```
 1   before right, please.

 2          Q.    Sure.  Eventually both Cardinal

 3   and CVS lost their ability to deal -- at least

 4   CVS 219 -- in controlled substances, correct?

 5                MS. WICHT:  Object to the

 6          form.

 7          A.    When CVS 219 was -- lost their

 8   license by the DEA, yes.

 9          Q.    And Cardinal lost their license

10   partially because of their conduct with CVS 219.

11                MS. WICHT:  Object to the

12          form.

13          Q.    And you know, sitting here today,

14   that Cardinal continued to distribute these huge

15   volume of controlled oxycodones to CVS 219 up

16   until after they were served with an inspection

17   warrant by the DEA?

18                MR. MOYLAN:  Objection.

19                MS. WICHT:  Object to form.

20          No foundation.

21          A.    I'm not familiar with an

22   inspection.

23          Q.    Okay.  Well, let's see.

24                Plaintiffs' 4214, Exhibit 26.
```

```
 1                      - - -

 2    (Cardinal-Forst Deposition Exhibit 26 marked.)

 3                      - - -

 4         Q.    So I will represent to you that

 5   Cardinal got served with its administrative

 6   inspection warrant in October 2011.

 7              Now, look at this document.  This

 8   document is another Michael Moné affidavit or

 9   declaration.

10              Do you see that?

11         A.    Yes.

12         Q.    And it's filed in the matter of

13   Cardinal Health versus Eric Holder.

14              Do you see that as well?

15         A.    Yes.

16         Q.    In the United States District

17   Court for the District of Columbia.

18              Do you see that?

19         A.    Yes.

20         Q.    It says, "My name is Michael Moné.

21   I am the Vice President for Supply Chain

22   Integrity of Cardinal Health.  I have personal

23   knowledge of the facts set forth and believe

24   them to be true, based on my experience in the
```

1   pharmaceutical industry or upon information

2   provided to me by others.  This declaration

3   covers the period since I assumed my current

4   position.  If asked to do so, I could testify

5   truthfully about the matters contained herein."

6              That's what Mr. Moné said, isn't

7   it?

8         A.   Yes.

9         Q.   And let's go to what he says on

10  paragraph 46 on page 25.  And you can tell at

11  the top of this document he -- well, actually,

12  if you go to the last page -- let's see.

13             He signed it on -- or executed it

14  on February 6th of 2012.

15             Do you see that?

16        A.   Yes.

17        Q.   Let's see what he has to say at

18  paragraph 46.

19             Mr. Moné says, "Cardinal Health

20  had already lowered the oxycodone thresholds for

21  these stores months ago.  On December 16, 2011,

22  Cardinal Health lowered the oxycodone threshold

23  for CVS 5195 to 18,000 dosage units.  And on

24  November 10th, 2011, Cardinal Health lowered the

```
 1    monthly oxycodone threshold for CVS 219 to

 2    45,800 dosage units."

 3                    Did I read that right?

 4         A.    Yes, you did.

 5         Q.    So, clearly, Cardinal continued to

 6    ship and do business with store -- CVS store 219

 7    from the time point where you said you'd be

 8    nervous selling that type of volume to them all

 9    the way to the end of 2011.  Did you know this

10    was happening?

11                    MS. WICHT:  Object to the

12         form.

13         A.    Did I know -- clarify.

14         Q.    That you were shipping this type

15    of volume to a single store in Sanford, Florida.

16                    MS. WICHT:  Object to the

17         form.

18         A.    I don't recall that, no.

19         Q.    We saw all the threshold

20    increases.  Who would have had to increase those

21    thresholds for the chain?  Who would that go

22    through?  Would that go through you?

23         A.    No.  My routine role was not

24    usually changing thresholds with the chain
```

```
 1   unless I was directed by someone to do that.

 2          Q.    Someone else would give you

 3   direction to do that, you wouldn't do that

 4   yourself?

 5          A.    Yes, but usually it was done

 6   through the analytics department.

 7          Q.    The numbers guys?

 8          A.    Yes.

 9          Q.    All right.  Well -- but each of

10   these threshold events that we saw numerous

11   threshold breaches, on that earlier document,

12   those would come through you, right, because the

13   shipments would have to stop as soon as they hit

14   or reached that threshold, correct, each time,

15   right?

16          A.    Yes.

17          Q.    And someone would have to review

18   that and then make the affirmative decision to

19   go ahead and ship that type of volume to

20   Sanford, Florida, correct?

21          A.    Someone would make the decision to

22   ship or cut the held order.  So if these are

23   true ships as opposed to accrual -- I mean, I

24   don't know what --
```

```
1          Q.     So is there still a question in

2    your mind after we looked at the information

3    given to Gilberto?

4          A.     No, no, no.  I mean, I'm just

5    referring to the document and the title here.

6          Q.     Sure.  And what my point is, is it

7    wasn't something that happened automatically,

8    meaning they didn't get cleared automatically.

9    Somebody actually had to look at that volume

10   each time and evaluate that volume each time

11   based on the information they had and then

12   decide, "Okay.  It's a good idea to send over

13   200,000 dosage units in one month to one

14   pharmacy in Sanford, Florida."

15              Right?

16              MS. WICHT:  Object to the

17         form.

18         A.     I can't answer that because I'm

19   not sure what the quantities were that were held

20   at each -- each time, even though they are over

21   threshold.

22         Q.     Well, we know what the threshold

23   was, so it had to be at least at the threshold

24   or above to be held based on your automated
```

```
 1    system, correct?  We know they had to reach that

 2    height, hundreds of thousands of pills a month,

 3    before they tripped the threshold?

 4             A.    But, again, going back to the

 5    report, all those dates are at the very end of

 6    the month.

 7             Q.    Okay.  I get that.  I get that.

 8             A.    And I don't know how many days are

 9    in certain months.  I'm not saying that the

10    numbers are small.

11             Q.    Whoa, whoa.  What's this about how

12    many -- well, some days -- some months have 30.

13    Some months have --

14             A.    I understand that.

15             Q.    Hold on.  Let me finish.

16                   Some months have 31, with the

17    exception of February, which is coming up soon.

18    It has 28, but every fourth year it has 29.  So

19    that's how many days are in the month, okay?

20                   So whether it's 30 or 31, that

21    justifies a quarter of a million pills into one

22    pharmacy?

23             A.    No.

24             Q.    Okay.
```

```
 1           A.    What I'm trying to explain is

 2    there are a number of, like, Mondays and

 3    Tuesdays in a month when most pharmacies order.

 4    So, again, the number is large.

 5           Q.    Irrespective of how many Mondays

 6    or Tuesdays in the month, you wouldn't have been

 7    comfortable shipping this type of volume to this

 8    pharmacy, correct?

 9           A.    That number is large.

10                 MS. WICHT:  Object to the

11           form.

12           Q.    No matter how many Mondays or

13    Tuesdays in the month, you would have not been

14    comfortable sending this type of volume to that

15    pharmacy, correct?

16                 MS. WICHT:  Object to the

17           form.

18           A.    The number is large.

19                 MR. FULLER:  All right.  I'll

20           certify the question.

21    BY MR. FULLER:

22           Q.    And let me ask if you know -- and

23    maybe you don't know.  CVS, in and of itself,

24    makes up about 20 percent -- I mean, they're a
```

1    huge chain.  They make up about 20 percent of

2    Cardinal's business, correct?

3          A.    I don't know the exact number.

4          Q.    They make up a significant

5    percentage of Cardinal's business, correct?

6                MS. WICHT:  Object to the

7          form.

8          A.    Yes.

9          Q.    And Cardinal, just shortly prior

10   to this, went through the painful process of

11   losing the Walgreens business to ABC, correct?

12               MS. WICHT:  Object to the

13         form.

14         A.    Walgreens did leave and go to ABC,

15   but I'm not sure of the process.

16         Q.    Chains get treated differently at

17   Cardinal than other customers, don't they?

18               MS. WICHT:  Object to the

19         form of the question.  Vague.

20         A.    I don't know.  The orders don't

21   get treated differently.

22         Q.    Well --

23         A.    The orders that are reviewed

24   anyway.

1          Q.     -- hold on.  Wait a second.

2               The orders that get reviewed don't

3    get treated differently?  So the retail

4    independents, you may actually conduct an

5    on-site investigation.  Chains don't get that.

6    That's reviewing for orders, right?

7               MS. WICHT:  Object to the

8          form.

9          Q.     Right?

10         A.     The -- could you repeat your

11   question, please.

12         Q.     Sure.  You said that orders don't

13   get treated differently.  The process that's

14   gone through to clear orders to set thresholds,

15   the information that's gleaned, because you

16   don't get it from CVS, is clearly different,

17   right?

18              MS. WICHT:  Object to the

19         form.

20         A.     The information is different, yes.

21         Q.     So chains are treated differently

22   than retail independents, correct?

23              MS. WICHT:  Object to the

24         form.

```
 1              A.     Chains are treated in a different

 2     manner.  And I'm not sure all the parameters of

 3     how they are managed on the analytical side --

 4              Q.     I get that.

 5              A.     -- and arrived at that.

 6              Q.     I get that.  My only point is,

 7     chains are treated differently, to the extent

 8     you may not know all the details, right?

 9              A.     That is correct.

10              MS. WICHT:  Object to the

11          form.

12              Q.     Okay.  Did you make a

13     recommendation after your visit -- site visit to

14     219?  If I get their due diligence file, will I

15     see a report in there from your site visit with

16     a recommendation?  Sorry.  From your

17     surveillance visit.

18              A.     A recommendation on?

19              Q.     Recommendation as to whether

20     they're at risk.  My understanding is that most

21     of the investigators, at least according to

22     Mr. Morse, when they would do an investigation

23     of some sorts, would make a recommendation,

24     whether high risk, no risk, moderate risk for
```

1    diversion issues.

2          A.    I believe my report was -- I

3    visited the store and I didn't see any red flags

4    at the store when I was at the time.

5          Q.    Okay.  And that would be a written

6    report that would be in that store's -- on that

7    system you talked about earlier, right, with its

8    due diligence file?

9                MS. WICHT:  Object to the

10               form.

11         A.    There should be some report there.

12         Q.    Would you ever ask the numbers

13   people for any sort of analytics when you were

14   doing reviews?

15         A.    Occasionally.

16         Q.    What type of information would you

17   ask for from the analytics people?

18         A.    Usually it was can you tell me

19   more about the state demographics and

20   information like that or area demographics

21   like --

22         Q.    Population?

23         A.    Not necessarily population, but

24   like the number of hospital facilities in

```
 1    certain areas, et cetera.

 2           Q.    And would you have a certain -- I

 3    want to say scope, but I don't know if that's

 4    the right word.

 5                 So if you're looking at a

 6    pharmacy, say, in Portsmouth, Ohio -- do you

 7    know where Portsmouth is?

 8           A.    Yes.

 9           Q.    -- how big of an area would you

10    ask for?  Just within the county?  Within the

11    town?  Would you ask for the whole southern part

12    of the state?

13           A.    I would usually at least county,

14    if not -- if it was a rural area, you'd ask

15    for -- I would probably try to look at like five

16    or six counties, and it being in the center

17    around it.

18           Q.    The surrounding areas?

19           A.    Yes.

20           Q.    What else?  What other type of

21    analytical information would you ask for?

22           A.    If we had other stores there that

23    we could compare to the store of interest.  And,

24    if not, I mean, is there something as an
```

1    analytics department that you could give me to,

2    you know, give me some relative information to

3    make a decision on that.  A store, if it was a

4    store, or if it was an area or whatever.

5            Q.    Were there regular reports that

6    your analytics people would send to you guys,

7    you pharmacists?  I've been told that there's

8    like a 75 percent of threshold report, that

9    there are red flags and yellow flags for growth

10   in certain -- certain percentage growth over

11   monthly periods.

12           A.    Is this in a document of some --

13           Q.    That's my understanding.  What do

14   you remember?

15           A.    I remember an occasional document,

16   but I don't remember monthly documents like

17   that.

18           Q.    When you say "occasional

19   document," occasional document --

20           A.    Oh, it's like maybe every three or

21   four months you would see a document like that.

22   Now, I don't know if the document was produced

23   every month and it wasn't shared.  But, yes, I

24   know there was some documents like that with

1    different demographic information on them.

2         Q.    And are you referring to the

3    75 percent of thresholds or the flagged one that

4    I mentioned, because I sort of mentioned two.

5    Or let me ask it differently.

6              When you say you recall that type

7    of document, what information would be in the

8    documents that you do recall?

9         A.    It would be like sections of the

10   country.  God, that's been so long ago.  I can't

11   really -- and it would be like states with oxy

12   or hydro as their major purchases.  Again, it's

13   been so long ago, I can't -- I don't -- I

14   can't -- I'm not going to guess to recall what

15   was all in that document.

16        Q.    Were there any documents that you,

17   yourself, particularly liked working with that

18   you would regularly request?

19        A.    I would look at the 75 percent

20   report.  That was a regular document that all

21   the pharmacists had access to, and that was a

22   report to show about where in -- under the

23   threshold the customer was so we could try to do

24   some advanced work.  If they were getting close

```
1    to thresholds, just to make sure that --

2            Q.    You say "advanced work."

3            A.    Well, I mean, like every month as

4    you -- as you purchase, the percentage of your

5    threshold -- the report would say when these

6    customers get to 75 percent.  And then we would

7    look at them at what point in time if they got

8    to 75 percent.  If it was the last part of the

9    week, we would say -- you know, we would look

10   and say, "These thresholds look like they're set

11   correctly for the customers that we have no

12   concerns on."

13            So it was just a guide to see how

14   much work might be coming down the pike at the

15   end of the month.

16            Q.    And you staggered the cycles,

17   right, at some point?  Do you know what I'm

18   referring to?  That was a poor question.

19            A.    Yeah.  They were on different --

20   each distribution center --

21            Q.    Yes, you're right.

22            A.    -- the report was staggered so

23   that the workload was pretty much smoothed out

24   as opposed to --
```

 1          Q.     So not all the cycles ended at the

 2     end of the month, correct?

 3          A.     Correct.  So it wasn't one big

 4     push at the end of the month, which gave us more

 5     time to review the threshold events as opposed

 6     to trying to push them through quickly.

 7          Q.     And going back to your 75 percent

 8     comment.  So if -- say we're only on the 15th of

 9     March and the customer's already reached

10     75 percent.  That might be a concern, right?

11          A.     It might be a concern, but it

12     wasn't necessarily a concern because some

13     customers -- like most hospitals order like once

14     a month.  So if they ordered on whatever the

15     fourth or fifth day of the month was and they

16     were at 75 percent, that wasn't going to be a

17     concern, because if you look at their ordering

18     history, you could see what their pattern

19     normally was.

20          Q.     Sure.  Sure.  And that's fine.

21                 Now, how about retail pharmacies?

22     My understanding is that they try to maintain

23     very low inventories so that they don't

24     necessarily order all their pills at the

1   beginning of the month.  They place repeated

2   orders throughout the month.

3           A.    It depends on how their business

4   model works.  Some people are afraid to run out

5   of stuff because of shortages or things like

6   that, so they'll have a larger shelf amount to

7   get them through.

8                 For a hospital as an example, I

9   had to keep at least three to four weeks of

10  backup stock in case of emergencies.  So it

11  depends on how they run their business unit.

12          Q.    So, say, for example, that it's

13  not a pharmacy that -- or a hospital that orders

14  in one lump at the beginning of the month, it's

15  one that does it sporadically.  If they're

16  hitting 75 percent come mid month, what do you

17  do?  Is that something that would be triggered

18  first of all?

19          A.    No.  It's just a look at that

20  customer.  Some of the pharmacists would take

21  the report and see if they needed to possibly do

22  a site visit.  If that customer, you know,

23  has --

24          Q.    Sort of the --

Highly Confidential -- Subject to Further Confidentiality Review

```
 1              A.    -- you know, threshold amounts

 2     that seem to be a lot higher in -- than, you

 3     know, one or two occasionally or something like

 4     that, they'd look at it.  And if it was a

 5     hospital and Bill was doing it, he would call

 6     the hospital and speak to them to see if there

 7     was a change in their purchasing pattern or if

 8     there is something on the shortage list.

 9              So, I mean, there's several

10     different things that you could look at or try

11     to look at just to see where your customer was

12     falling.  And, you know, certainly look for

13     diversion, but also for customers that you were

14     very sure of that there was no diversion going

15     on so that you're not interfering with the

16     customer at the end of the month or at the end

17     of their cycle.

18              Q.    So let me ask.  So the 75 percent,

19     that was like a type of report you had --

20              A.    Mm-hmm.

21              Q.    -- that would sort of try to give

22     you sort of an overview of what's going on,

23     right?

24              A.    Correct.
```

```
 1              Q.     There's also other triggers out

 2      there that could be potential signs of

 3      diversion, correct?

 4                     MS. WICHT:  Object to the

 5              form.

 6              A.     Other triggers out there?

 7              Q.     Yeah, other things that could be

 8      signs of a potential diversion.  For example, I

 9      think one of the things mentioned in that

10      document Mr. Rausch prepared for Gilberto was

11      the percentage of oxycodone and balanced --

12              A.     Correct.

13              Q.     -- whatever it was.

14              A.     Correct.

15              Q.     And one of the things that my

16      understanding is you guys -- I say "you guys" --

17      Cardinal compared was, for example, controlled

18      with non-controls.  Percentage of cash sales.

19              A.     Yes.  Further along in the process

20      when we had more analytics, yes, we would

21      compare them.

22                     THE COURT REPORTER:  We had?

23                     MR. FULLER:  More analytics.

24                     THE WITNESS:  More analytics.
```

```
 1              Sorry.

 2   BY MR. FULLER:

 3         Q.    And you guys ended up with this

 4   Tableau system in place -- we may disagree or

 5   not be able to --

 6         A.    Correct.

 7         Q.    -- lock down when.

 8         A.    It was in 2012, 2013 when it was

 9   probably introduced.  I'm not exactly familiar.

10         Q.    So my question would be, what

11   other automated type of triggers or -- strike

12   that.  Let me ask it differently.

13              When a threshold happens,

14   threshold -- meaning threshold breaching the

15   threshold, there was an automated system in

16   place that would hold the order, correct?

17         A.    That is correct.

18         Q.    There's an e-mail that went out to

19   certain specific people, correct?

20         A.    Later in the process, yes.

21         Q.    There was also a report that all

22   these pharmacies who had held orders would be

23   put on?

24         A.    I'm not --
```

1       Q.     You can't go into your system in

2  the morning and check and see what all the held

3  orders are?

4       A.     Oh, yes.  That was -- that was the

5  held order report, yes.

6       Q.     Okay.

7       A.     Yes.

8       Q.     There you go.  Held order report.

9  Who would have thunk?

10       A.     I thought you meant like an end of

11  the month report or something.

12       Q.     No, no, just a report that you can

13  access.

14       A.     Right.

15       Q.     And certainly you probably

16  accessed it or somebody accessed it every day

17  because you probably have customers calling

18  somebody to find out why their order was held,

19  right?

20       A.     At the beginning, it was a report

21  that was printed by IT and given to us.  Later

22  on in the system we could generate that from the

23  distribution centers that the pharmacists were

24  covering, so we could do it during the day.

```
 1              Q.    Oh, as they happened?

 2              A.    So as -- yeah, you would check

 3     periodically to see the orders that were being

 4     held.

 5              Q.    So here's my question:  Are

 6     there -- and I would label that as a trigger,

 7     okay?  Meaning that once they hit the threshold,

 8     it triggered some sort of other event.  It

 9     triggered the held order.  It triggered this --

10              A.    Well, the threshold was the held

11     order event that it triggered.

12              Q.    -- breached threshold report or

13     thing that you can look at --

14              A.    Right.

15              Q.    -- right?

16              A.    They're all essentially the same,

17     whether it's on the computer screen, whether

18     it's on the piece of paper or wherever.  It's

19     all essentially the same information.  It's just

20     presented differently.

21              Q.    Sure.  So my question is, with

22     these other potential red flags or indicators of

23     maybe potential diversion, were there other

24     triggers that would go off?
```

1           So, for example, at one point in

2    time, ordering more hydrocodone than

3    oxycodone -- assuming you ordered IIs and IIIs

4    from you guys -- was considered a potential sign

5    of diversion, at least according to Mr. Morse in

6    his testimony.

7           Could there or would there be

8    other triggers -- and I'm not -- I'm just using

9    that as an example -- set up to alert you guys

10   of, "Hey, maybe this is something we want to

11   look at," other than just the thresholds of the

12   75 percent reports?

13        A.    That would have been through the

14   analytics department setting up requests or

15   whatever made by --

16        Q.    But I don't mean just requests.  I

17   mean something that was routinely shot out.

18        A.    Well, that would come from the

19   analytics department.

20        Q.    Right.  But I'm assuming it would

21   have to come to you guys because you guys are

22   the ones that are evaluating the potential

23   suspicious orders, right?

24        A.    As the system grew, there were

```
 1    more and more reports available to the

 2    pharmacist.

 3          Q.    So what other type of reports --

 4          A.    And, again, after 2012, my role

 5    slowly changed away from reviewing the orders

 6    because of Tableau.

 7          Q.    So explain that to me.  How did

 8    Tableau change what you were doing?

 9          A.    They changed the process from more

10    of a qualitative to a quantitative process.  So

11    where the pharmacist was reviewing the orders

12    and looking for all the information, it became

13    more of a looking at the numbers more carefully

14    and still using the qualification around the

15    numbers.

16          Q.    So more of an objective versus

17    subjective standard?

18          A.    It became more and more objective,

19    yes.

20              MR. FULLER:  How much more

21          time we got, Mikey Mike?

22              THE VIDEOGRAPHER:  An hour

23          and ten.

24
```

```
 1   BY MR. FULLER:

 2         Q.    So you mentioned as it progressed,

 3   the pharmacist would get more and more reports.

 4   What type of reports?

 5         A.    Well, the reports -- I can't say

 6   there were more and more reports.  The Tableau

 7   function allowed them to pull up more

 8   information pertinent to either the type of

 9   customer, the drug family.

10               Again, I didn't work with the

11   Tableau reports that much, so -- it could see a

12   scatter plot of all the pharmacies and where

13   they fall in their purchases of that drug

14   family.  And you could generate that on

15   customers, on an individual basis.  So each

16   customer's plot would be different.

17         Q.    Because the Tableau document, you

18   could actually change the dashboard?

19         A.    You could change the parameters of

20   what you were looking for to focus in on what --

21   the information you were looking for, yes.

22         Q.    So -- and I guess that's my

23   question.  Were there more -- let's just say,

24   for example -- I was deposing Mr. Morse.  You
```

```
 1     know Steve, right?

 2            A.    Yes.

 3            Q.    I was deposing him over in Texas,

 4     where you hail from as well, and we looked at a

 5     pharmacy out of Woodstock that he got provided

 6     up in New York.

 7            A.    Okay.

 8            Q.    He got provided the Tableau

 9     document and he says, "Yeah, when I looked at

10     it, it stuck out to me that they were getting

11     significantly more hydro, almost all hydro,

12     compared to the OxyContin" -- "or oxycodone."

13                 I'm like, "Well, that would be a

14     red flag."

15                 He's like, "Yes, it would be

16     during that time frame."

17                 And the only reason he went to

18     look at that was because the DEA requested from

19     Cardinal the hydro and oxycodone purchases by

20     that pharmacy.  So the e-mail reads, "Hey, we

21     need someone to go do a site visit," so

22     Mr. Morse goes and does a site visit.

23                 My point being -- is that being

24     that that's a red flag, was there something in
```

Highly Confidential - Subject to Further Confidentiality Review

1    the system set up to trigger, say, "Hey, look at

2    me.  I have this large number of hydro versus

3    oxycodone.  That might be a red flag somebody

4    wants to look at," because, as Mr. Morse pointed

5    out, he didn't have access to those reports, but

6    had it been brought to his attention, he

7    certainly would have looked into it.  But it

8    didn't get brought to his attention until the

9    DEA made the inquiry.

10                   So what I'm trying to figure out,

11   was Cardinal being proactive in setting flags or

12   alarms like it did with thresholds or 75 percent

13   reports with any of these other factors that you

14   guys looked at when you were looking at

15   potential diversion issues?

16                   MS. WICHT:  Object to the

17           form.

18           A.    As the anti-diversion program

19   evolved, there were more and more things that we

20   were able to look at and see.  So if you're

21   using the hydrocodone and oxycodone ratio as an

22   example, we did know that -- I mean, certain

23   states, depending on the state, the requirements

24   of the state -- for example, Texas required a

1    triplicate prescription.  So you would see a lot

2    more hydrocodone in that state.  States that

3    didn't require triplicate prescriptions, they

4    could be both or a mixture of each.

5              You also had to look at -- or you

6    could look at, like, what are the schools of

7    medicine and the residents.  You look at what

8    the residents are taught while they're doing it,

9    and the -- you know, the distribution of the

10   schools and how those are taught.  I mean, you

11   could see those little patterns.

12             So, yes, you could -- you could

13   ask for those things.  Specifically something

14   would happen across the board.  You would stay

15   with, you know, what's the percentage of oxy in

16   the group or percentage of hydro in the group,

17   or a combination of that.  The top four drugs

18   you would ask that.

19             So we had access to all those.

20        Q.    Well, no.  I understand that you

21   had access to it.  And Mr. Morse made that

22   clear, "If we wanted to look at it, we could."

23   He said, "Even though I didn't have direct

24   access, if I wanted to see it, I could go ask

1    somebody."

2         A.    Right.

3         Q.    But if it's not drawn to our

4    attention -- it's like thresholds.  You guys

5    service, what, 30,000 customers, somewhere in

6    that neighborhood?

7         A.    The number sounds --

8         Q.    Ballpark?

9         A.    -- in the ballparkish, yes.

10        Q.    Okay.  Mr. Forst, sitting at your

11   desk just up the road here in Ohio, you have no

12   idea if a threshold is breached unless the

13   trigger goes off and it's brought to your

14   attention, correct?

15        A.    That's correct.

16        Q.    So the same thing with the other

17   potential triggers -- and I'm just using that

18   term generically -- was there some that

19   automated?  Not that you had to go ask for it,

20   because like Mr. Morse mentioned, he would have

21   never asked about Woodstock, New York and that

22   particular pharmacy and the number of hydro

23   unless the DEA inquired.  Was there some sort of

24   automated thing that would just trigger it?

```
 1              MS. WICHT:  Object to the

 2         form.

 3         A.    Again, as the system evolves,

 4    there are more and more things that you could

 5    look at.  Suggestions from the pharmacists went

 6    to the analytics people about "I would like to

 7    be able to see this."

 8         Q.    Right.

 9         A.    If it was possible, they would

10    certainly try to do that for you as a group and

11    roll it out as a program that you could -- I

12    mean, we also had SQ -- an SQL program so that

13    we could -- if we had the right parameters, we

14    could put in the customer and pull the

15    information for ourselves.

16              So there was tools that we could

17    look for things.  Either they would supply

18    specific information back to us, or if we -- it

19    was a special thing, we had the ability to

20    better access that information on our own.  And

21    if it wasn't accessible by us, we could ask for

22    the information, and they could run reports for

23    us.

24         Q.    Now, let me -- and this may be --
```

```
 1   and don't take this the wrong way, but this may

 2   be above your pay grade.  But it's my

 3   understanding, working with Tableau, that

 4   Tableau has the ability to set triggers.  You

 5   tell the software that if this happens, they'll

 6   give you a notification.  For example, hydro,

 7   excess of oxycodone.  Or another one that I

 8   talked to Mr. Morse about was the hydro 10/325s

 9   being the more abused substance.  We saw on a

10   dashboard how that was like over 80 percent,

11   which, according to some other documents at

12   Cardinal, put it to the 95th percentile, which

13   he agreed would be a red flag.

14              Were there flags like that that

15   would go off -- well, strike that.

16              To your knowledge, there weren't

17   flags like that that were just automatic?  It

18   required someone to ask for it, correct?

19        A.    With the Tableau system that I was

20   familiar with --

21        Q.    Yes, sir.

22        A.    -- those were not in place yet.

23   So they may have been put in place after I moved

24   away from that.  But, again, I'm not a
```

```
 1    programmer, and I'm not familiar with the

 2    dynamics of Tableau.

 3               I'm not saying yes or no, that you

 4    can or cannot do that.

 5         Q.    Right.  You just don't know --

 6    you're not aware of it being in place during

 7    your time frame --

 8         A.    Correct.

 9         Q.    -- looking at these orders?

10         A.    Correct.

11         Q.    Now, we know they had the ability

12    to do the threshold issue, at least back to '08,

13    when those were being put into place, correct?

14               MS. WICHT:  Object to the

15         form.

16         A.    The threshold issue --

17         Q.    Yeah, where the thresholds would

18    trigger and you would get a notification --

19         A.    Oh, yes.

20         Q.    -- of the thresholds --

21         A.    Yes.

22         Q.    -- and it would stop the order.

23    It was an automated process.

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    So we know at least back to '08

 2    they had the ability to put in this automated

 3    process, whether it be you're breaching a

 4    certain number or oxy is greater than hydro, or

 5    your hydro 10s are exceeding 50 percent,

 6    whatever, there was at least the technology out

 7    there to do it, correct?

 8              A.    The technology --

 9              MS. WICHT:  Object to the

10         form.

11              A.    -- for thresholds were -- yeah,

12    2008.  I don't -- I'm not familiar with the

13    technology as it moved through and as it grew,

14    what more and more could be done with the

15    systems that we used.  That would be an IT

16    question.

17              MR. FULLER:  Fair enough.

18         Let's take another quick break.

19              THE VIDEOGRAPHER:  We're

20         going off the record at 5:20.

21              (Recess taken.)

22              THE VIDEOGRAPHER:  We're back

23         on the record at 5:35.

24
```

```
 1              MR. FULLER:  All right.

 2         Let's go to 3708.

 3                   - - -

 4     (Cardinal-Forst Deposition Exhibit 28 marked.)

 5                   - - -

 6              MR. FULLER:  3708 for the

 7         record is going to be Plaintiffs'

 8         Exhibit Number 28, I think.

 9              MS. WICHT:  Was there a 27?

10         I think it's --

11              MR. FULLER:  Oh, never mind.

12         Yeah.  Well, yeah.  I have it --

13              MS. WICHT:  It's stickered

14         28.  Okay.  That's fine.  It's 28.

15              MR. FULLER:  It is.  Sorry.

16              MS. WICHT:  That's okay.

17              MR. FULLER:  For the record,

18         I think we're skipping 27, or if I

19         can peel it off, I'll use it.

20              MS. WICHT:  That's fine.

21     BY MR. FULLER:

22         Q.    Now, this e-mail is October 19th

23     of '07.  Do you see that from a Steve Lawrence?

24     Do you know who Steve Lawrence is?
```

```
1            A.    Yes, I'm familiar with

2    Mr. Lawrence.

3            Q.    It sounds familiar?  Do you not

4    know who he is?

5            A.    Yes, I'm familiar with Steve

6    Lawrence.

7            Q.    Okay.  What was Mr. Lawrence's

8    position; is, was?

9            A.    He was one of the executive

10   officers I believe at the time, or he was over

11   the sales group.

12           Q.    When you say "executive officers,"

13   he's relatively high up, right?

14           A.    He was, yes.  I think he's now the

15   CEO.

16           Q.    Sure.

17           A.    I don't know that for a fact.

18           Q.    I mean, did you just, like, make

19   that up?

20           A.    No.

21           Q.    Heard it somewhere?

22           A.    Yes.

23           Q.    Okay.  So he sends this e-mail --

24   and this is October of '07, October 19th, 2007
```

1  to Mr. Reardon, Mr. Michael -- is that Ambrose?

2  We'll go with it.  A-m-b-r-o-s-e for the record.

3  Michael Bender, Jeff Brannon, Jim Worley, Eric

4  Brantley.

5           You know who Mr. Brantley is,

6  right?

7       A.    Yes, I know Mr. Brantley.

8       Q.    Okay.  He's in anti-diversion,

9  correct?

10      A.    He was in quality and regulatory

11  affairs when I got there.  I'm not sure what

12  his --

13      Q.    QRA?

14      A.    Right -- his title was or where

15  his functionality was.

16      Q.    Okay.  Fair enough.

17           So this is regarding Martinez

18  Pharmacy, Laredo, Texas.  This is Mr. Lawrence

19  writing here at the end.  He says, "My marketing

20  analytics group could help here.  If we new" --

21  and I think he meant k-n-e-w instead of n-e-w --

22  'the triggers' we could develop a report which

23  would only show those stores that hit the

24  triggers.  The data is in SDW and we can get

1    history by location by item going back 33

2    months.  We could build a table to the CINs" --

3    what are CINs; do you know?

4            A.    I believe those are the drug code

5    numbers for the purchases -- like their item

6    numbers, I believe.

7            Q.    Okay.  -- "build a table to the

8    CINs for all these products and monitor the

9    items sales against your defined triggers.  I'd

10   be more than glad to sit down with everyone and

11   see if we can't create something that is less

12   manual and hopefully more accurate."

13           Did I read that right?

14           A.    Yes.

15           Q.    So -- and, again, this is before

16   you got there.  But even Mr. Lawrence, at least

17   at this time frame -- and this is the time frame

18   that things are starting to happen with the DEA,

19   correct?

20           MS. WICHT:  Object to the

21           form.

22           A.    I'm not familiar with that time

23   frame before I came there, when the DEA started

24   actually looking more and more.

1       Q.    Sure.  But you know, at least come

2   the time you got there, they had suspended the

3   licenses --

4       A.    Yes, I did.

5       Q.    -- at four different distribution

6   centers?  Right?

7       A.    Three, and I think we turned in --

8       Q.    Voluntarily turned in one?

9       A.    Yes.

10      Q.    After they issued an

11  administrative warrant, correct?

12      A.    I don't know that process, but --

13      Q.    Okay.  But -- and this is just

14  what we were talking about earlier, right,

15  triggers, and Mr. Lawrence is proposing that his

16  group -- and I think you're right.  SDW -- let's

17  see if it says.  It doesn't say at the bottom of

18  his name.  I think he's in some sort of sales

19  and marketing group.  But he offers to help

20  create these, doesn't he?

21              MS. WICHT:  Object to the

22          form.

23      Q.    To create a system to set off

24  triggers; "you guys just give me the criteria"?

Highly Confidential -- Subject to Further Confidentiality Review

```
 1          A.     Apparently --

 2                 MS. WICHT:  Object to the

 3          form.

 4          A.     -- by this document.

 5                 Apparently that's what this

 6    document says, yes.

 7          Q.     Okay.  Now, would you agree with

 8    me at least that having triggers on these

 9    different risk factors for potential diversion

10    may be a helpful tool?

11                 MS. WICHT:  Object to the

12          form.

13          A.     They may or may not be a helpful

14    tool.  It depends on how the triggers are set up

15    and what he's looking at.

16          Q.     Well -- and that's the thing.

17    Someone with knowledge is going to have to help

18    have input on setting up these triggers,

19    correct?  Just like when they started initially

20    setting up this threshold system and setting

21    triggers for these thresholds, if you don't do

22    it right, it's not going to work right.  It's

23    only as good as the effort and substance that

24    you put into it, correct?
```

```
 1                    MS. WICHT:  Object to the

 2          form.

 3          A.    That is correct.

 4          Q.    So at least according to

 5   Mr. Lawrence, it appears that the technology is

 6   there at Cardinal to be able to monitor for

 7   triggers; can we agree with that?

 8                    MS. WICHT:  Objection to the

 9          form.  Foundation.  Calls for

10          speculation.

11          A.    Again, I wasn't there at this

12   time.  Based on this statement, that's what it

13   appears.

14          Q.    Okay.  And, again, you mentioned

15   you know Mr. Lawrence.  Do you have any reason

16   to doubt his veracity and the statements he

17   makes?

18          A.    I don't know Mr. --

19                    MS. WICHT:  Object to the

20          form.

21          A.    I don't know Mr. Lawrence that

22   well.  I just know that he's one of the higher

23   officers at Cardinal Health.

24          Q.    Fair enough.
```

```
 1          A.    I've never personally met

 2    Mr. Lawrence, to my knowledge.

 3          Q.    Okay.  Was he based out of the

 4    corporate office here?

 5          A.    Yes, I believe that is correct.

 6          Q.    But you still never met him in

 7    person?

 8          A.    I might have seen him in the hall

 9    and knew who he was, but I didn't have a

10    conversation with him or introduce myself to him

11    or anything like that.

12          Q.    No actual interaction that you're

13    aware of?

14          A.    That I'm aware of, no.

15          Q.    Okay.  And you have no idea

16    whether anybody ever took Mr. Lawrence up on his

17    offer set out in this e-mail, do you?

18          A.    Again, before my time, so I don't

19    know.

20                         - - -

21     (Cardinal-Forst Deposition Exhibit 27 marked.)

22                         - - -

23                MR. FULLER:  This doesn't

24          have at P1 number, but it's
```

```
1              Cardinal Health, Inc.'s Second

2              Supplemental Objections and

3              Responses to Plaintiffs' First

4              Combined Discovery Requests filed

5              today.  And it's going to be

6              Plaintiffs' Exhibit 27.  I'm sorry.

7    BY MR. FULLER:

8              Q.    And, Mr. Forst, I want to tell

9    you, I know you ain't seen this document before,

10   because it just got filed a little bit ago.

11             But do you see where it says, "In

12   Re:  National Prescription Opioid Litigation"?

13             A.    Yes.

14             Q.    Yeah.  Unfortunately, I just got

15   the document, so I don't think we're going to

16   have it on the screen.  Oh, we may.  Hold on.

17   There we go.  "In Re:  National Prescription

18   Opioid Litigation," do you see that?

19             A.    Yes, I do.

20             Q.    Okay.  And as I read the title,

21   Cardinal Health, Inc.'s Second Supplemental

22   Objections and Responses to Plaintiffs' First

23   Combined Discovery."

24             Do you see that there?
```

```
 1           A.    Yes, I do.

 2           Q.    And then if you'll turn to page 7.

 3                 MS. WICHT:  Just note for

 4           purposes of the record that the

 5           document is designated "Highly

 6           Confidential Pursuant to the

 7           Protective Order."

 8           Q.    That means you cannot talk about

 9     it outside of this room or a little drone will

10     swoop down -- it's owned by Amazon, by the

11     way -- and scoop you up, Mr. Forst, okay?

12           A.    Amazon doesn't know where I live.

13           Q.    They have drones, though.  They

14     can track you.

15                 MS. WICHT:  You'd be the only

16           person in the country, if that's

17           true.

18                 I'm sorry.  What page?

19                 MR. FULLER:  Page 7.

20                 MS. WICHT:  Thank you.

21     BY MR. FULLER:

22           Q.    And you see there at the top it's

23     Supplemental Response to -- excuse me.

24     Supplemental Response and Objection to Request
```

```
 1    Number 2, January 22, 2019, which I think is

 2    today.

 3            A.    Yes, I see that.

 4            Q.    And if you go down to the second

 5    paragraph, it says, "Ingredient Limit Reports,"

 6    and that's what we talked a little bit about

 7    earlier.

 8                  Do you recollect that?

 9            A.    Yes, I do.

10            Q.    -- "were created on a monthly

11    basis for each of the following customer

12    classifications:  Hospitals/managed care, retail

13    customers, and other."

14                  Then it gives a cite to the

15    record.  And then it says, "For each customer

16    classification Cardinal Health calculated the

17    total grams of each controlled substance in

18    Schedules II through V purchased in the last 12

19    months.  Cardinal Health then calculated the

20    monthly average grams purchased by customers in

21    each classification."

22                  Now, having this information,

23    Mr. Forst, can we figure out, assuming we have

24    sales data, what the average is?
```

```
 1                MS. WICHT:  Object to the

 2          form.

 3          A.    Based on the information that was

 4    just put in front of me, I don't know the answer

 5    to that question.

 6          Q.    Well, let's look at it for a

 7    second.  It says, "For each customer

 8    classification" -- which that has been set out

 9    above as hospital/managed care, retail

10    customers, and other -- "Cardinal Health

11    calculated the total grams of each controlled

12    substances in Schedule II through V purchased in

13    the last 12 months."

14                Now, Cardinal obviously would have

15    the sales data that it sold as far as product

16    for the last 12 months, right?

17          A.    That would seem reasonable, yes.

18          Q.    I'm glad I am finally being

19    reasonable, Mr. Forst.

20                Now, what we don't know -- and

21    they say they use this information to calculate

22    the monthly average, right?  But the problem

23    with this answer is it doesn't tell us for what

24    geographical area, does it?  We don't know if
```

1   it's by county, state, or the entire nation, do

2   we?

3           MS. WICHT:  Object to the

4       form.

5       A.   Again, I don't know what's all in

6   the document, so I can't answer that question.

7       Q.   No.  I'm just asking, those two

8   sentences, it doesn't tell us whether it's the

9   state, county, or the entire country, does it?

10      A.   Those two sentences do not state

11  that.

12      Q.   All right.  Well, let's keep

13  reading because maybe it does.

14          "Cardinal Health then multiplied

15  the resulting averages by a factor approved by

16  the DEA."

17          Again, this mentions something

18  that you and I chatted about earlier.  You know

19  of no DEA approval related to any multiplying

20  factor, do you, Mr. Forst?

21      A.   I'm not aware of one.

22      Q.   You haven't seen anything in

23  writing on it?  You haven't been told about it?

24  Nothing that you recollect related to an

1    approval by the DEA, correct?

2            A.    Unless it was those factors that

3    were at the very beginning of the 3, 8, and

4    whatever that number -- if that's the same

5    factor, the first time I've seen that is when I

6    was in here.

7            Q.    So before that, you haven't --

8    before being in here, you hadn't seen those --

9            A.    I didn't -- if you would have

10   asked me the factor, I would have not known what

11   you were talking about there.

12           Q.    You would have thought I was

13   crazy?

14           A.    Well, I already thought that,

15   but ...

16           Q.    Fair enough.

17           A.    No, I would not know what those

18   were.

19           Q.    Fair enough.

20                 It says, "factors approved by the

21   DEA, which resulted in the maximum amount of

22   those substances that customers could purchase

23   or receive in a month without the orders being

24   included in the Ingredient Limit Report."

1            Do you see that?  Did I get that

2    right?

3        A.    Yes, I see that.

4        Q.    Okay.  The next says, "The factors

5    as they were applied by Cardinal Health were

6    included on the face of the report provided to

7    the DEA."

8            And I think we saw that.  We saw a

9    factor of 4 at some point in that Ingredient

10   Limit Report that I showed you.

11           Do you recall that?

12       A.    I remember a report with -- a

13   report with factor of 4.  Whether it's this

14   report or not, I'm not sure.

15       Q.    Fair enough.  And you don't have

16   any idea where that factor came from, do you?

17       A.    No, I do not.

18       Q.    Okay.  Mr. Forst, what -- again,

19   you came in right during the time of the

20   suspension of -- suspension or surrendering the

21   four different distribution licenses; is that

22   right?

23       A.    Correct.  It was four or five

24   months after that, I believe.

```
 1              Q.    Well, I mean, actually, your start

 2    date was the 1st, and the suspensions and

 3    surrendering occurred between the end of

 4    November and then the first part of January.

 5              A.    So three months about.

 6              Q.    So what type of look-back or

 7    review did Cardinal do, to your knowledge,

 8    related to the allegations made by the DEA to

 9    determine what the problems were?

10                    MS. WICHT:  Object to the

11              form of the question.

12                    And I just would caution you

13              that I don't know whether that's a

14              conversation you discussed with

15              attorneys for Cardinal Health at

16              the time.  But if you did, those

17              conversations would be privileged,

18              and you shouldn't include them.

19                    MR. FULLER:  I disagree on

20              this issue.  If there is any

21              sort --

22                    MS. WICHT:  You're free to

23              disagree --

24                    MR. FULLER:  -- of review
```

```
 1              that was done --

 2                   MS. WICHT:  -- but that's my

 3              instruction to the witness.

 4         A.    I can't remember any discussions

 5    about that.

 6         Q.    What type of review was done of

 7    the prior shipments that made up the actions by

 8    the DEA?

 9         A.    From when I was there --

10                   MS. WICHT:  Object to the

11              form.

12         A.    I'm not aware of the process that

13    occurred before I was there.  All I'm aware of

14    is it was a decentralized process.

15         Q.    Well, I understand that, but I'm

16    asking what type of look-back did Cardinal do to

17    see what the problems were?  Did they relook at

18    the suspicious orders or the potential orders

19    that the DEA was alleging were suspicious?  What

20    type of retrospective review did they do?

21         A.    I'm not familiar --

22                   MS. WICHT:  Object to the

23              form.

24         A.    I'm not familiar with that
```

```
 1    information.

 2            Q.    Do you know who did that review?

 3                  MS. WICHT:  Object to the

 4            form.

 5            A.    I don't know who did that review.

 6            Q.    Okay.  Were you ever provided the

 7    results of that review --

 8                  MS. WICHT:  Object to the

 9            form.

10            Q.    -- so that you could apply them in

11    developing and working on these new systems

12    going forward.

13                  MS. WICHT:  Object to the

14            form.

15            A.    I don't know what that document

16    would look like, so I don't know.

17            Q.    Okay.  Turn to page 27 of this

18    document, if you don't mind.  Down there near

19    the bottom of the page, it says, "QRA

20    Pharmacists."

21                  Do you see that on the right-hand

22    side?

23            A.    Yes.

24            Q.    It says, "QRA Pharmacists received
```

1    daily notification of all threshold events and

2    reviewed each held order and the rationale

3    provided by the customer to determine whether,

4    based on the totality of the information

5    available, the order appeared reasonable and was

6    not likely to be diverted."

7             Now, when it says "QRA

8    Pharmacists," that would be including you,

9    correct?

10        A.   I would imagine that would be,

11   yes, me.

12        Q.   And when it says it reviewed the

13   rationale provided by the customers, did the

14   customers always provide a rationale related to

15   a threshold event?

16        A.   If we had the rationale, that's

17   what we did review.

18        Q.   Okay.

19        A.   And, again, this is early in the

20   process.

21        Q.   And then it reads that "The

22   information available may have included, for

23   example, the customer's profile."

24             Well, if they're a customer, you'd

 1   certainly have that to your availability,

 2   correct?

 3           A.    Yes.

 4           Q.    "The customer's business type" --

 5   and those are the categories that we discussed

 6   earlier.  Independent retail?

 7           A.    Yes.

 8           Q.    Chain, government, hospital,

 9   whatever the case may be, correct?

10           A.    Yes.

11           Q.    This is information about whether

12   Cardinal was the primary or secondary

13   distributor, the drug family that triggered the

14   threshold event, the customer's total number of

15   threshold events in general for a specific drug

16   family -- or excuse me -- in general and for the

17   specific drug family and the customer's monthly

18   drug family limit.

19                Did I read that correctly?

20           A.    Yes.

21           Q.    Now, was it during this time that

22   the -- let me make sure I get it right --

23   anti-diversion customer profiles were being

24   created or utilized?

```
 1                 MS. WICHT:  Object to the

 2           form.

 3                 What time frame are we

 4           talking about?

 5           Q.   Go ahead.  You can answer.

 6           A.   I'm trying to find -- find a time

 7      frame.  I can't answer that because I'm not

 8      really sure of the time frame that that -- one

 9      of the forms came out.  But we did have

10      information that we could evaluate.

11           Q.   So let me also ask you -- I showed

12      you the policy and procedure that was enacted in

13      June of 2006 earlier today.

14                 Do you remember that?

15           A.   Yes, the one from the distribution

16      centers.

17           Q.   That Mr. Reardon signed?

18           A.   Yes.

19           Q.   Do you know when that went out of

20      effect and new policies and procedures were

21      being put in place?  Because I'll tell you, the

22      only thing I can find related to the thresholds

23      and stuff wasn't enacted until December of 2008.

24                 Does that sound right?
```

```
 1                    MR. FULLER:  Object to the

 2           form.

 3           A.    I don't know that -- I don't know

 4    that information.  I don't know when one stopped

 5    and when one started.

 6           Q.    So, for example, if we go back to

 7    4570 -- excuse me.  4547.

 8                    MS. WICHT:  Do you know the

 9           exhibit number?  Sorry.  10?

10                    MR. FULLER:  Exhibit 10.

11                    MS. WICHT:  Thank you.

12    BY MR. FULLER:

13           Q.    If you don't want to keep digging,

14    it's right in front of you on the screen,

15    Mr. Forst.

16           A.    That's fine.

17           Q.    So this is one of those documents

18    that you owned, right?

19           A.    Yes.  According to the system, I

20    was the owner of this document.

21           Q.    And it was new and first enacted

22    when?  When was the issue date?

23           A.    Well, the issue date for this

24    document is 12/22/08.  The previous issue new,
```

Highly Confidential — Subject to Further Confidentiality Review

1   there is a new -- I believe there was a new

2   policies and procedures system that was set up.

3   So any document that was added to this system

4   possibly had the previous issue as new, so ...

5           Q.    Well, that's because there's no

6   older versions, right?

7           A.    Not necessarily.

8                 MS. WICHT:  Object to the

9           form.

10          A.    Not necessarily.

11          Q.    Okay.  So you believe there's an

12  older version of an on-site investigation policy

13  and procedure?

14                Now, here's what I'm trying to

15  lock down:  I'm trying to figure out when the

16  changes occurred in policies and procedures.

17  The Defendants have been ordered to tell us step

18  by step, year by year, when policies and

19  procedures went out, when new ones came in.  And

20  I'm having trouble from this time frame, because

21  as you saw, we have June of '06, right?

22          A.    Yes.

23          Q.    And then I don't see any new ones

24  until December of '08.  Can you tell us when

1    these new ones went into place?

2         A.    No.

3              MS. WICHT:  Object to the

4         form.

5         A.    No, I can't, because, again, I

6    believe this is a new system that houses the

7    forms.  So if this is a new one or if it's one

8    that has just been revised and it's new to the

9    system, new would be the default of the system,

10   that there's nothing here before this.

11             Well, if it's a new system, there

12   wouldn't be anything there before it.

13        Q.    Okay.

14        A.    Because I know these documents in

15   the system are referenced, and if one replaces

16   another, but if they're all just being loaded

17   into the system, my understanding is that means

18   it's new.

19        Q.    Well, that's fine.  I'm just

20   trying --

21        A.    If you needed to clarify it, you

22   would probably need to talk to someone that runs

23   the policies and procedures system that they

24   have that houses this -- all this information.

```
 1           Q.    And who runs that; do you know?

 2   Or any idea who did run it?

 3           A.    Jason Stouffer I think is a

 4   contact.

 5           Q.    Now, is that -- does he run --

 6           A.    And he is totally -- it is all the

 7   policies of Cardinal Health.

 8           Q.    So it's not just the

 9   anti-diversion; it's everybody?

10           A.    Everything is housed in one place

11   as my understanding.

12           Q.    Jason is the keeper of all that?

13           A.    Jason Stouffer either is the

14   keeper, or he could direct you to the keeper if

15   he's still there, so yes.

16           Q.    Okay.  Oh, I've been told that in

17   2012, related to the DEA guidance, that Cardinal

18   created more objective criteria for determining

19   or looking at diversion issues.

20                 Do you know what those new

21   objective criteria were in 2012?

22           A.    I can't recall them off the top of

23   my head.

24           Q.    Can you give me an example of one?
```

```
 1            A.    I don't want to speculate.  I just

 2   can't think of it off the top of my head right

 3   now.

 4            Q.    Well, is it the objective criteria

 5   such as the percentage of controls versus

 6   non-controls or the percentage of cash sales?

 7            A.    Those would sound familiar, so

 8   yes.

 9            Q.    You may not be sure, but you think

10   those are some of them?

11            A.    Yes, yes.

12            Q.    So, again, my question is going to

13   go to triggers.  So if that's an objective

14   criteria, just knowing the percentage, you would

15   agree with me doesn't do anything for us?  We

16   have to have some sort of what's the triggering

17   event if we're making it objective and not

18   subjective?

19                  Does that question make sense?

20            A.    No.  I'm sorry.

21                  MS. WICHT:  Object to the

22            form.

23            Q.    So making something objective

24   means what to you?
```

```
 1              A.    It means that you have more and

 2    more data that you're looking at that's --

 3              Q.    The base?

 4              A.    The base quantifiable data --

 5              Q.    Right.

 6              A.    -- as opposed to being subjective

 7    for -- an individual might look at something and

 8    the -- two different individuals could come to a

 9    different conclusion on --

10              Q.    Right.

11              A.    -- the subject.

12              Q.    So when we're looking at data and

13    these percentages, someone could say, "Well, I

14    don't worry about it being high until after it's

15    50 percent."

16              Somebody else could say, "Well,

17    anything above 25 is high to me."

18              So what I'm trying to figure out

19    is what the threshold level was for concern on

20    these objective criteria.  Because you have to

21    have something to measure it against.  Just

22    having a percentage doesn't do you any good

23    unless you're measuring against a mark, right?

24              A.    Right.
```

```
 1              MS. WICHT:  Object to the

 2         form.

 3         Q.   So do you know what that measuring

 4    mark was for these objective criteria?

 5         A.   I don't know what that measuring

 6    mark was.  That was --

 7         Q.   Did you -- and I know we're taxing

 8    your memory on -- you know, some time ago.

 9              But to your recollection, was

10    there some sort of mark that Cardinal did put in

11    place related to the differing objective

12    criteria?  Or maybe they just said there was an

13    objective criteria and never placed a mark.

14         A.   I don't know that answer.

15              MR. FULLER:  Okay.  Let's

16         take another quick break.  Let me

17         look at my notes.  But I may be

18         done with you, Mr. Forst.

19              THE VIDEOGRAPHER:  We're

20         going off the record at 6:08.

21              (Recess taken.)

22              THE VIDEOGRAPHER:  We're back

23         on the record at 6:17.

24
```

```
 1   BY MR. FULLER:

 2         Q.    Mr. Forst, during your time at

 3   Cardinal, did you have any concerns about the

 4   distribution patterns of the controlled

 5   substances?

 6                MS. WICHT:  Object to the

 7         form.

 8         A.    Could you repeat that.  I'm sorry.

 9         Q.    Sure.  During your time at

10   Cardinal, did you have any concerns about the

11   distribution patterns of the orders that they

12   were filling across the country?

13                MS. WICHT:  Object to the

14         form.

15         A.    Not any orders that I reviewed,

16   no.

17         Q.    Did you have any concern about

18   other orders they were filling?

19         A.    I wouldn't have --

20                MS. WICHT:  Object to the

21         form.

22         A.    I wouldn't have seen all those

23   orders, so I can't --

24         Q.    Would you have seen --
```

```
 1              A.     -- answer that question.

 2              Q.     I'm sorry.  Go ahead.

 3              A.     I can't answer that because I saw

 4      the orders that I saw.  Other orders were

 5      processed by other people.

 6              Q.     Before you went to do the

 7      surveillance on pharmacy 2 -- CVS 219, I believe

 8      it was -- is that right?  219?

 9              A.     I believe -- I believe that's the

10      correct number on it.

11              Q.     Okay.  Would you have been

12      provided with that sales data that you mentioned

13      today made you nervous about distributing to?

14                     MS. WICHT:  Object to the

15              form.

16              A.     I don't remember the information

17      that I was provided with.

18              Q.     So you can't say one way or

19      another whether --

20              A.     No, I cannot.

21              Q.     -- that was provided to you or

22      not?

23              A.     No, I cannot.

24              Q.     Did those numbers cause you
```

```
 1    concern being what I showed you today as to the

 2    sales pattern with at least CVS 219?

 3                    MS. WICHT:  Object to the

 4            form.

 5            A.    As I said previously, those

 6    numbers are high.

 7                    MR. FULLER:  I don't have

 8            anything further.

 9                    MS. WICHT:  We don't have any

10            questions.

11                    THE VIDEOGRAPHER:  We're

12            going off the record at 6:19 p.m.

13                        - - -

14            Thereupon, at 6:19 p.m., on Tuesday, January

15    22, 2019, the deposition was concluded.

16                        - - -

17

18

19

20

21

22

23

24
```

```
 1                       CERTIFICATE

 2    STATE OF OHIO        :

                                  SS:

 3    COUNTY OF FRANKLIN  :

 4

 5            I, CHRISTOPHER J. FORST, do hereby certify

 6    that I have read the foregoing transcript of my

 7    cross-examination given on January 22, 2019; that

 8    together with the correction page attached hereto

 9    noting changes in form or substance, if any, it is

10    true and correct.

11            _____

              CHRISTOPHER J. FORST

12

13            I do hereby certify that the foregoing

14    transcript of the cross-examination of CHRISTOPHER J.

15    FORST was submitted to the witness for reading and

16    signing; that after he had stated to the undersigned

17    Notary Public that he had read and examined his

18    cross-examination, he signed the same in my presence

19    on the _____ day of _____, 2019.

20

              _____

21            NOTARY PUBLIC - STATE OF OHIO

22

23    My Commission Expires:

24    _____, _____.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2   STATE OF OHIO       :
                                 SS:
 3   COUNTY OF FRANKLIN  :
 4           I, Carol A. Kirk, a Registered Merit
     Reporter and Notary Public in and for the State of
 5   Ohio, duly commissioned and qualified, do hereby
     certify that the within-named CHRISTOPHER J. FORST was
 6   by me first duly sworn to testify to the truth, the
     whole truth, and nothing but the truth in the cause
 7   aforesaid; that the deposition then given by him was
     by me reduced to stenotype in the presence of said
 8   witness; that the foregoing is a true and correct
     transcript of the deposition so given by him; that the
 9   deposition was taken at the time and place in the
     caption specified and was completed without
10   adjournment; and that I am in no way related to or
     employed by any attorney or party hereto or
11   financially interested in the action; and I am not,
     nor is the court reporting firm with which I am
12   affiliated, under a contract as defined in Civil Rule
     28(D).
13
             IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office at Columbus, Ohio
     on this 25th day of January 2019.
15
16
17
18                        _____
                          CAROL A. KIRK, RMR
19                        NOTARY PUBLIC - STATE OF OHIO
20   My Commission Expires:  April 9, 2022.
21                    - - -
22
23
24
```

```
1               DEPOSITION ERRATA SHEET

2   I, CHRISTOPHER J. FORST, have read the transcript

    of my deposition taken on the 22nd day of January

3   2019, or the same has been read to me.  I request that

    the following changes be entered upon the record for

4   the reasons so indicated.  I have signed the signature

    page and authorize you to attach the same to the

5   original transcript.

6   Page  Line  Correction or Change and Reason:

7   ____  ____  _____

8   ____  ____  _____

9   ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24  Date _____  Signature _____
```