```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                       -   -   -
 5
     IN RE:  NATIONAL        :   HON. DAN A.
 6   PRESCRIPTION OPIATE     :   POLSTER
     LITIGATION              :
 7                           :
     APPLIES TO ALL CASES    :   NO.
 8                           :   1:17-MD-2804
                             :
 9
             - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       -   -   -
12
                    May 7, 2019
13
                       -   -   -
14
15            Videotaped deposition of
     PERRY FRI, taken pursuant to notice, was
16   held at the offices of Baron & Budd, 600
     New Hampshire Avenue, NW, Washington,
17   D.C., beginning at 10:01 a.m., on the
     above date, before Michelle L. Gray, a
18   Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
19   Realtime Reporter, and Notary Public.
20                       -   -   -
21
             GOLKOW LITIGATION SERVICES
22     877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

 3    BARON & BUDD, P.C.
      BY:  ROLAND TELLIS, ESQ.
      BY:  STERLING CLUFF, ESQ.
 4    Encino Plaza
      15910 Ventura Boulevard
 5    Suite 1600
      Encino, California 91436
 6    (818) 839-2333
      Rtellis@baronbudd.com
 7    Scluff@baronbudd.com
      Representing the Plaintiffs
 8

 9    BRANSTETTER, STRANCH & JENNINGS, PLLC
      BY:  MICHAEL G. STEWART, ESQ.
10    223 Rosa L. Parks Avenue
      Suite 200
11    Nashville, Tennessee 37203
      (615) 254-8801
12    mstewart@bsjfirm.com
      Representing the Tennessee Plaintiffs
13

14    DAVIS POLK & WARDWELL, LLP
      BY:  BRIAN S. WEINSTEIN, ESQ.
15    BY:  CRISTINA M. RINCON, ESQ.
      450 Lexington Avenue
16    New York, New York 10017
      (212) 450-3037
17    brian.weinstein@davispolk.com
      cristina.rincon@davispolk.com
18    Representing HDA and the Witness
19

      DECHERT, LLP
20    BY:  MELANIE MACKAY, ESQ.
      35 West Wacker Drive
21    Suite 3400
      Chicago, Illinois 60601
22    (312) 646-5800
      melanie.mackay@dechert.com
23    Representing the Defendant, Purdue
      Pharmaceuticals
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)
 2

      BARNES & THORNBURG, LLP
 3    BY:  WILLIAM A. HAHN, II, ESQ.
      11 South Meridian Street
 4    Indianapolis, Indiana 46204
      (317) 236-1313
 5    William.hahn@btlaw.com
      Representing the Defendant, H.D. Smith
 6

 7    REED SMITH, LLP
      BY:  ANNE E. ROLLINS, ESQ.
 8    Three Logan Square
      1717 Arch Street, Suite 3100
 9    Philadelphia, Pennsylvania 19103
      (215) 851-8226
10    arollins@reedsmith.com
      Representing the Defendant,
11    AmerisourceBergen Drug Corporation
12

      WILLIAMS & CONNOLLY, LLP
13    BY:  STEVEN M. PYSER, ESQ.
      BY:  KATELYN ADAMS, ESQ.
14    725 12th Street, NW
      Washington, D.C. 20005
15    (202) 434-5148
      spyser@wc.com
16    kadams@wc.com
      Representing the Defendant, Cardinal
17    Health
18

      ZUCKERMAN SPAEDER, LLP
19    BY:  KYLE A. CRAWFORD, ESQ.
      1800 M Street, NW
20    Suite 1000
      Washington, D.C. 20036
21    (202) 778-1825
      kcrawford@zuckerman.com
22    Representing the Defendant, CVS
23
24
```

```
 1    APPEARANCES:   (Cont'd.)

 2

      JONES DAY
 3    BY:  SERGIO A. TOSTADO, ESQ.
      325 John H. McConnell Boulevard
 4    Suite 600
      Columbus, Ohio 43215
 5    (614) 281-3898
      stostado@jonesday.com
 6    Representing the Defendant, Walmart

 7

      COVINGTON & BURLING, LLP
 8    BY:  AMBER M. CHARLES, ESQ.
      850 Tenth Street, NW
 9    Suite 586N
      Washington, D.C. 20001
10    (202) 662-5613
      acharles@cov.com
11    Representing the Defendant, McKesson
      Corporation

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2

      BARON & BUDD, P.C.
 3    BY:  JAY LICHTER, ESQ.
      BY:  JEFFREY LIPINSKI, ESQ.
 4    BY:  ALEX SHERMAN, ESQ.
      Encino Plaza
 5    15910 Ventura Boulevard
      Suite 1600
 6    Encino, California 91436
      (818) 839-2333
 7    jlichter@baronbudd.com
      jlipinski@baronbudd.com
 8    asherman@baronbudd.com
      Representing the Plaintiffs
 9
10    FOLEY & LARDNER, LLP
      BY:  GREGORY N. HEINEN, ESQ.
11    777 East Wisconsin Avenue
      Milwaukee, Wisconsin 53202
12    (414) 297-5913
      Gheinen@foley.com
13    Representing Anda, Inc.
14
15
16

      FOX ROTHSCHILD, LLP
17    BY:  ZACHARY MARTIN, ESQ.
      2700 Kelly Road
18    Suite 300
      Warrington, Pennsylvania 18976
19    (215) 918-3680
      Zmartin@foxrothschild.com
20    Representing the Defendant, Prescription
      Supply Inc.
21
22
23
24
```

```
 1    TELEPHONIC/STREAMING APPEARANCES:
      (Cont'd.)
 2

 3    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  CAITLIN MARTINI MIKA, ESQ.
 4    70 West Madison Street
      Suite 4200
 5    Chicago, Illinois 60602
      (312) 583-2438
 6    caitlin.mika@arnoldporter.com
      Representing the Defendants, Endo
 7    Health Solutions; Endo Pharmaceuticals,
      Inc.; Par Pharmaceutical Companies, Inc.
 8    f/k/a Par Pharmaceutical Holdings, Inc.
 9

      ROPES & GRAY LLP
10    BY:  GREGORY MALLOY, ESQ.
      800 Boylston Street
11    Boston, Massachusetts 02199
      (617) 951-7234
12    Gregory.malloy@ropesgray.com
13          - and -
14    ROPES & GRAY LLP
      BY:  HAYDEN MILLER, ESQ.
15    1211 Avenue of the Americas
      New York, New York 10036
16    (212) 596-9303
      hayden.miller@ropesgray.com
17    Representing the Defendant,
      Mallinckrodt
18

19    DECHERT, LLP
      BY:  DANA MARTIN, ESQ.
20    35 West Wacker Drive
      Suite 3400
21    Chicago, Illinois 60601
      (312) 646-5800
22    dana.martin@dechert.com
      Representing the Defendant, Purdue
23    Pharmaceuticals
24
```

```
 1    TELEPHONIC/STREAMING APPEARANCES:
      (Cont'd.)
 2
 3

      TUCKER ELLIS, LLP
 4    BY:  JEFFREY M. WHITESELL, ESQ.
      950 Main Avenue, Suite 1100
 5    Cleveland, Ohio 44113
      (216) 696-2286
 6    Jeffrey.whitesell@tuckerellis.com
      Representing the Defendant, Janssen and
 7    Johnson & Johnson
 8
      BARTLIT BECK LLP
 9    BY:  BRIAN C. SWANSON, ESQ.
      Courthouse Place
10    54 West Hubbard Street
      Suite 300
11    Chicago, Illinois 60654
      (312) 494-4440
12    Brian.swanson@bartlit-beck.com
      Representing the Defendant, Walgreens
13
14    LOCKE LORD, LLP
      BY:  ANNA K. FINGER, ESQ.
15    2200 Ross Avenue
      Suite 2800
16    Dallas, Texas 75201
      (214) 740-8445
17    Anna.k.finger@lockelord.com
      Representing the Defendant,
18    Henry Schein, Inc.
19
      BAILEY WYANT PLLC
20    BY:  MICHAEL W. TAYLOR, ESQ.
      500 Virginia Street East
21    Suite 600
      Charleston, West Virginia 25301
22    (304) 345-4222
      Mtaylor@baileywyant.com
23    Representing the Defendant, West Virginia
      Board of Pharmacy
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:    (Cont'd.)

 2

 3    ALSO PRESENT:

 4

      Elizabeth A. Gallenagh, Esq.

 5    (HDA)

 6

      VIDEO TECHNICIAN:

 7    Dan Holmstock

 8

      LITIGATION TECHNICIAN:

 9    James Beall

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -
 2                    I N D E X
 3                       -   -   -
 4

     Testimony of:
 5                                        PERRY FRI
 6
             By Mr. Tellis                16
 7
             By Mr. Stewart               127
 8
 9
10

                         -   -   -
11

                    E X H I B I T S
12

                         -   -   -
13
14   NO.              DESCRIPTION              PAGE
15   HDA
     Fri-1            Amended                  25
16                    Notice of Deposition
17
     HDA
18   Fri-2            Vision and Values        38
                      Printout
19                    HDMA
20   HDA
     Fri-3            Missions and             44
21                    Values
                      Printout, HDA
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    HDA
      Fri-4            E-mail Thread            49
 7                     5/1/17
                       Subject, HDA Letters
 8                     Supportive of
                       Opioid Approaches
 9                     in the States
                       HDA_MDL_000214979-82
10
      HDA
11    Fri-5            History, About           54
                       Printout
12                     HDA
13    HDA
      Fri-6            Councils and             70
14                     Committees
                       Printout
15                     HDA
16    HDA
      Fri-7            Native Document          77
17                     List Individuals &
                       Associated Committee
18                     Involvement
19    HDA
      Fri-8            E-mail, 11/19/14         93
20                     Subject, HDMA Industry
                       Relations Council
21                     IRC Roster Mission Statement
                       ML00063167-71
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                      -  -  -
2              E X H I B I T S  (Cont'd.)
3                      -  -  -
4
5    NO.                DESCRIPTION              PAGE
6    HDA
     Fri-9          E-mail, 1/16/14      114
7                   Subject, HDMA Update
                    MCKMDL00651559
8
     HDA
9    Fri-10         E-mail, 7/14/16      116
                    Subject, Reminder:
10                  Coordination Call
                    Tomorrow
11                  HDA_MDL_000089247
12   HDA
     Fri-11         Statement of John    130
13                  M. Gray to Congress
14   HDA
     Fri-12         Prescribing Patterns 148
15                  And the Opioid
                    Epidemic
16   HDA
     Fri-13         Fighting an          154
17                  Epidemic, Combating
                    Prescription Drug Abuse
18                  And Diversion
19   HDA
     Fri-14         Trends in Opioid     158
20                  Use:  History,
                    Background, and Origins
21                  of the Epidemic
                    October 2018
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                          -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     HDA
       Fri-15           The Opioid Abuse         161
 7                      Epidemic
                        Allied Against
 8                      Opioid Abuse
 9     HDA
       Fri-16           HDA, What the            162
10                      Washington Post Won't
                        Say About Distributors
11                      Won't Say
12     HDA
       Fri-17           HDMA, 2014               181
13                      Distribution Management
                        Conference and
14                      Technology Expo
                        MNK-T1_004197986-57
15
       HDA
16     Fri-18           Meeting Notes from       186
                        Buzzeo DEA Conference
17                      Washington DC
                        Topic:  SOM Process
18                      MNK_TNSTA05292267-70
       HDA
19     Fri-19           State of the States      190
                        2014 HDMA Distribution
20                      Management Conference
                        & Technology Expo
21                      3/10/14
                        MNK_TNSTA06628306-46
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2            E X H I B I T S  (Cont'd.)

 3                        -   -   -

 4

 5      NO.             DESCRIPTION            PAGE

 6      HDA

        Fri-20          Conference Notes       193

 7                      HDMA DMC Expo 2011

                        March 7-9, 2011

 8                      MNK_TNSTA08439208-14

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.

10

11    Stipulations

12    PAGE    LINE
      None.

13

      Questions Marked

14

      PAGE    LINE

15    None.

16

17

18

19

20

21

22

23

24
```

```
 1                    -  -  -

 2              THE VIDEOGRAPHER:  We are

 3        now on the record.  My name is

 4        Daniel Holmstock.  I am the

 5        videographer for Golkow Litigation

 6        Services.

 7              Today's date is May 7th,

 8        2019.  The time on the video

 9        screen is 10:01 a.m.

10              This deposition is being

11        held at the law offices of Baron &

12        Budd, 600 New Hampshire Avenue

13        Northwest in Washington, DC, in

14        the matter of In Re National

15        Prescription Opiate Litigation.

16              It's pending before the

17        United States District Court for

18        the Northern District of Ohio,

19        Eastern Division.

20              Our deponent today is Perry

21        Fri, testifying in his personal

22        capacity and also in the 30(b)(6)

23        capacity of Healthcare

24        Distribution Alliance.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Counsel appearances will be
 2         noted on the stenographic record.
 3              Our court reporter is
 4         Michelle Gray who will now
 5         administer the oath to the
 6         witness.
 7                   -  -  -
 8              ... PERRY FRI, having been
 9         first duly sworn, was examined and
10         testified as follows:
11                   -  -  -
12                 EXAMINATION
13                   -  -  -
14    BY MR. TELLIS:
15         Q.    Good morning, Mr. Fri.
16         A.    Good morning.
17              MR. WEINSTEIN: So before we
18         get started, just want to go on
19         the record --
20              MR. TELLIS:  Wait.  Can I
21         visit with him for a minute?
22              MR. WEINSTEIN:  Actually,
23         no.  I want to put on the record
24         what we talked about outside.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. TELLIS:  You will.  Let

2     me introduce myself.

3  BY MR. TELLIS:

4          Q.    Mr. Fri, I'm here to take

5  your deposition.  My name is Roland

6  Tellis.  We met briefly earlier.  I

7  represent the plaintiffs in this case.

8          MR. TELLIS:  Now you can say

9  what you want.

10          MR. WEINSTEIN:  Great.  So

11     as we talked about outside,

12     Mr. Fri is here both in his

13     personal capacity and as a

14     corporate rep.  But he's in his

15     corporate rep capacity only for

16     Topics 1, 2, 12 and 13 and only

17     insofar as it relates to

18     committees that he was responsible

19     for.

20          So if we don't object to

21     scope to particular questions so

22     as to avoid constantly

23     interrupting, we are preserving

24     our objections as to scope for

1    questions that go outside of those

2    topics as just described.

3              MR. TELLIS:  I hear you.  So

4    noted.

5    BY MR. TELLIS:

6         Q.   Mr. Fri, I'm here --

7              MR. PYSER:  One other thing,

8    Counsel, before you go on record,

9    just the other thing that we spoke

10   about.  And this is Steve Pyser

11   from Cardinal Health.  While the

12   orders from the court are clear as

13   to parties, that an objection for

14   one is an objection for all, just

15   to avoid any confusion, the

16   parties -- the plaintiffs and

17   defendants agree that an objection

18   from any party or nonparty such as

19   counsel for the witness will be an

20   objection for all for the record.

21             MR. TELLIS:  Yes.  Agreed.

22   Anyone else?

23   BY MR. TELLIS:

24        Q.   Okay.  Mr. Fri, I'm here to

Highly Confidential - Subject to Further Confidentiality Review

1    take your deposition.  Have you been

2    deposed before?

3            A.    I have not.

4            Q.    You have not.  Okay.  I'm

5    sure your counsel has given you the rules

6    of a deposition.  But let me go over them

7    in case there's anything that you don't

8    understand.

9            A deposition is my

10   opportunity to take your testimony under

11   oath.  Do you understand that?

12           A.    Yes.

13           Q.    The oath that you were

14   administered moments ago is the same oath

15   that you would be administered in a court

16   of law.  Do you understand that?

17           A.    I do.

18           Q.    And therefore, despite the

19   fact that we are in a somewhat informal

20   setting here in a conference room, your

21   testimony would have the same weight as

22   if it were given in a court of law.  Do

23   you understand?

24           A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Everything that is

2   being said here today is being

3   transcribed, and for that reason it's

4   important that we don't talk over one

5   another because we're trying to get an

6   accurate transcript.  Okay?

7         A.    Yes.

8         Q.    It's also important not

9   to --

10        A.    I was waiting for you to

11  stop.

12        Q.    It's also important you give

13  me an audible response.  If you shake

14  your head in one direction or another, it

15  will make for an inaccurate transcript

16  and we don't want an inaccurate

17  transcript.  Okay?

18        A.    Okay.

19        Q.    From time to time your

20  counsel may make objections to questions

21  I ask.  He's doing so to protect the

22  record.  Unless he instructs you not to

23  answer, I'm entitled to an answer to my

24  question.  I'll wait for one.  Okay?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

2        Q.     Okay.  If you don't

3   understand a question I've asked you,

4   please let me know, and I'll do my best

5   to try to help you.

6               The corollary to that is if

7   you answer a question that I've asked

8   you, I'm going to assume that you

9   understood it.  Okay?

10       A.     Yes.

11       Q.     All right.  Any reason that

12  you can't give me your best testimony

13  today?

14       A.     No.

15       Q.     You on any medication that

16  impacts your memory or your ability to

17  testify truthfully today?

18       A.     No.

19       Q.     Okay.  All right.  Who is

20  your employer?

21       A.     Healthcare Distribution

22  Alliance.

23       Q.     I'm going to refer to that

24  entity as the HDA for purposes of the

1   deposition today, okay?

2          A.     Yes.

3          Q.     When I do so, you'll

4   understand who I'm referring to?

5          A.     Yes.

6          Q.     Okay.  What is your current

7   position with the HDA?

8          A.     I'm the executive vice

9   president of industry relations,

10  membership and education, and the COO of

11  the HDA Research Foundation.

12         Q.     All right.  I neglected to

13  tell you, Mr. Fri, that from time to time

14  if I ask you a question, you'll see me

15  looking down at the screen.  I assure you

16  I'm listening to you.  This just gives me

17  a realtime feed of your answers.  And

18  it's easier for me to sometimes follow

19  along if I'm looking down at the screen.

20         A.     No problem.

21         Q.     Okay.  I mean no disrespect

22  by not looking at you when you're talking

23  to me.  All right?

24         A.     That's fine.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All right.  How long have
2    you been the COO of the HDA -- well, I
3    take that back.
4          How long have you been the
5    executive vice president of industry
6    relations, membership and education?
7    A.    Wow.  I started working with
8    HDA in 2006.  My title changed to EVP of
9    industry relations probably four or five
10   years ago.
11   Q.    Four or five years ago, so
12   roughly 2014, '15-ish?
13   A.    Yeah, I started as senior
14   vice president of industry relations and
15   gathered other positions along the way.
16   Q.    All right.  We'll get into
17   that, but right now I'm focused on your
18   present title as EVP.  Sure.  You've held
19   that for approximately five years?
20   A.    I believe so.  I don't know
21   for sure.
22   Q.    Okay.  Generally speaking,
23   what are your job responsibilities as
24   EVP?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I am responsible for the

2  direction of the work that we do in the

3  industry relations department, which is

4  tied to technology, logistics, business

5  processes around the efficiency and

6  supply chain security.  Responsible for

7  our education programming, our membership

8  development, and sponsorship.

9      Q.    And do you have a direct

10  report?

11      A.    I have several direct

12  reports.

13      Q.    Who do you report to?

14      A.    I'm sorry, I directly report

15  to --

16      Q.    Yes.

17      A.    -- John Gray, our CEO.

18      Q.    Anyone else?

19      A.    No.

20      Q.    The HDA as we'll learn later

21  today, has a number of councils, task

22  forces, committees, working groups,

23  right?

24      A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are you personally a member

2    of any of those?

3    A.    I'm not a member of any of

4    those.

5    Q.    Okay.  You understand, sir,

6    that you have been designated by the HDA

7    as the person most qualified to testify

8    on its behalf with -- with respect to

9    certain topics?

10    A.    I do.

11    Q.    I'm going to mark as

12    Exhibit 1 to this deposition, plaintiffs'

13    deposition notice to the HDA.

14         (Document marked for

15         identification as Exhibit

16         HDA-Fri-1.)

17    BY MR. TELLIS:

18    Q.    Mr. Fri, you understand per

19    your counsel's statement earlier that you

20    have been designated by the HDA to

21    testify on its behalf with respect to

22    Topics 1, 2, 12, and 13; is that right?

23    A.    Yes.

24    Q.    Okay.  What did you do to

1    prepare for your testimony with respect

2    to those topics?

3           A.    I had a preparation session

4    with our attorneys.

5           Q.    That's the extent of it?

6           A.    Yes.

7           Q.    Did you meet with anyone --

8           A.    No.

9           Q.    -- at the HDA --

10          A.    No.

11          Q.    -- in preparation for your

12   deposition?

13          A.    No.

14          Q.    Okay.  Did you review the

15   files of any employees --

16          A.    No.

17          Q.    -- in preparation for your

18   deposition?

19                Okay.  Did you review any

20   deposition transcripts that weren't

21   provided to you by counsel?

22          A.    No.

23          Q.    So the extent of your

24   preparation for today was to meet with

1    your lawyers?

2         A.    Correct.

3         Q.    Okay.  And which lawyers did

4    you meet with?

5         A.    I met with Brian and

6    Cristina.

7         Q.    Okay.  And I take it then

8    that you had no conversations with any

9    members of the HDA in preparation for

10   your deposition today or their counsel?

11        A.    I did not.

12        Q.    Other than the lawyers at

13   Davis Polk, were there any other people

14   present during your meetings?

15        A.    Our inside counsel.

16        Q.    Who is that?

17        A.    Elizabeth Gallenagh.

18        Q.    Okay.  Anyone else?

19        A.    No.

20        Q.    When did those meetings take

21   place?

22        A.    Yesterday.

23        Q.    One time?  One meeting?

24        A.    Yes -- no.  One previous

Highly Confidential - Subject to Further Confidentiality Review

1    meeting a couple of weeks ago.  Very

2    brief.

3            Q.    How long did the meeting

4    last yesterday?

5            A.    All told, probably six

6    hours.

7            Q.    Okay.  Mr. Fri, do you think

8    there's an opioid abuse crisis in this

9    country?

10            MR. WEINSTEIN:  Objection to

11        scope.  Objection to form and

12        foundation.

13            THE WITNESS:  I don't know

14        that I am in a position to answer

15        that question.

16   BY MR. TELLIS:

17            Q.    Why not?

18            A.    It's not relative to my job.

19            Q.    You are a human being,

20   right, you pay attention to the news and

21   whatnot?

22            A.    No, that's not --

23            MR. WEINSTEIN:  Objection to

24        form and foundation.  Beyond the

Highly Confidential - Subject to Further Confidentiality Review

```
1              scope.
2    BY MR. TELLIS:
3         Q.    You don't go through life
4    with blinders on, right?
5              Is there a crisis in this
6    country?
7              MR. WEINSTEIN:  Same
8         objections.
9              THE WITNESS:  It depends on
10        how you define it.
11   BY MR. TELLIS:
12        Q.    You have been working with
13   the Healthcare Distribution Alliance for
14   almost 12 years and you don't know what
15   opioid abuse crisis means?
16             MR. WEINSTEIN:  Same
17        objections.
18             THE WITNESS:  Of course I
19        know what an opioid abuse crisis
20        is.
21   BY MR. TELLIS:
22        Q.    Do we have one in this
23   country?
24             MR. WEINSTEIN:  Same
```

1    objections.

2              THE WITNESS:  It's not my

3        position to answer that.

4    BY MR. TELLIS:

5        Q.    You can't answer it today?

6        A.    I can't answer it today.

7        Q.    Has the HDA ever looked into

8    whether there's an opioid abuse crisis in

9    this country?

10             MR. WEINSTEIN:  Objection.

11       Outside the scope.  And objection

12       to form.  Go ahead.

13             THE WITNESS:  That's out --

14       yeah.  Any discussions of that

15       nature would be outside the

16       typical work that I do.

17   BY MR. TELLIS:

18       Q.    All right.  So in your -- in

19   your more than a decade's experience at

20   HDA, you've never come to learn about

21   whether or not the HDA ever looked into

22   whether there was an opioid abuse crisis

23   in this country?

24       A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  You don't know what

2    initiatives the HDA has ever taken to

3    address the opioid abuse crisis in this

4    country?

5    A.    I think that's a different

6    question.  I think our members and our

7    association have taken steps to find

8    solutions across the supply chain to

9    address the opioid crisis.

10    Q.    All right.  So you -- you

11    believe there is one, because the HDA has

12    taken steps to address it.

13    A.    It's not relative to me

14    whether I believe there is one or not,

15    but our members have taken steps to do

16    that.

17    Q.    What does that mean it's not

18    relative to -- to me?

19    A.    I'm not responsible of

20    whether deciding there's an opioid crisis

21    or not.

22    Q.    Do you have a belief?

23    A.    I -- I don't know that I

24    have a belief.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    You don't think that
2    hundreds of thousands of people are dying
3    from opioid addiction?
4                MR. WEINSTEIN:  Just to be
5          clear, the total line of
6          questioning is outside the scope.
7          I won't object to each question.
8          But you can answer.
9                THE WITNESS:  The -- the
10         news reports would appear to
11         support that.
12   BY MR. TELLIS:
13         Q.    You're here being deposed in
14   litigation, right?
15         A.    I'm told, yes.
16         Q.    What is that litigation
17   about?
18         A.    It's about opioid diversion
19   and distribution.
20         Q.    Okay.  That caused what, any
21   harm to people?
22         A.    Apparently it's caused harm
23   to people.
24         Q.    Have you -- apparently?

1    Have you looked at the complaint or any

2    legal documents?

3             A.    I have not actually.

4             Q.    So the extent of what you

5    know about the case you're being deposed

6    here today in is that apparently there's

7    a problem out there that plaintiffs are

8    trying to remedy?

9             A.    I think plaintiffs and

10   defendants are trying to remedy.

11            Q.    Okay.

12            MR. WEINSTEIN:   Object to

13       form.

14   BY MR. TELLIS:

15            Q.    Who are the plaintiffs in

16   this case?

17            A.    I understand them to be

18   state and county and local

19   municipalities.

20            Q.    Okay.  And what are the

21   nature of their claims, do you know?

22            MR. WEINSTEIN:   Objection to

23       form.  Foundation.

24            THE WITNESS:  I -- I am not

Highly Confidential - Subject to Further Confidentiality Review

1          fully aware of all that.  I have

2          not read the exact complaint.

3     BY MR. TELLIS:

4          Q.    Okay.

5          A.    It wouldn't be --

6          Q.    Do you know if they are

7     seeking monetary relief, injunctive

8     relief, other relief?

9                MR. WEINSTEIN:  Objection to

10          form and foundation.

11               THE WITNESS:  My

12          understanding is they are seeking

13          financial relief.

14     BY MR. TELLIS:

15          Q.    For what?

16               MR. WEINSTEIN:  Same

17          objections.

18               THE WITNESS:  Again, I don't

19          know how much I know about the

20          specifics of it.  But my

21          understanding is they're seeking

22          financial relief to help with

23          opioid addiction treatment.

24     BY MR. TELLIS:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  That lawsuit, does

2  it -- did it come as a surprise to you?

3              MR. WEINSTEIN:  Objection to

4         form.  Foundation and scope.  It's

5         a ridiculous question.

6              THE WITNESS:  I don't know

7         how to answer that.

8  BY MR. TELLIS:

9    Q.    How did you learn about this

10  litigation?

11   A.    In the news, I would

12  imagine.  Yeah.

13   Q.    You learned that the lawsuit

14  had been filed by watching the news?

15   A.    Reading the news.

16   Q.    Reading the news, okay.

17         But in connection with your

18  deposition today you've never looked at

19  the complaint that was filed and the

20  action captioned in the complaint on the

21  deposition notice?

22   A.    I've read elements of the

23  deposition notice.  I have not read the

24  specific complaint for the litigation.

1    Q.    Okay.  All right.  Does the

2  HDA maintain a website?

3    A.    Yes.

4    Q.    Who's responsible for the

5  content on that website?

6    A.    Our marketing and

7  communications department.

8    Q.    And do you have any input

9  into the content?

10    A.    Some.

11    Q.    What is your role vis-à-vis

12  the content that goes onto the website?

13    A.    Anything that might have to

14  do with education content or member

15  recruitment or sponsorship programs,

16  things that report up to my departments,

17  I would have ultimate responsibility for.

18    Q.    Okay.  Have you ever gone

19  onto the HDA's website?

20    A.    I have.

21    Q.    Have you looked at various

22  aspects of its pages, for lack of a

23  better word, things like the vision and

24  the mission and values and that sort of

Highly Confidential - Subject to Further Confidentiality Review

1    thing?

2            A.    I have.

3            Q.    Okay.  And there isn't

4    anything in there that you would expect

5    to be misleading, right?

6            A.    Correct.

7            Q.    Okay.  You expect the HDA

8    would have accurate content on its

9    website reflecting accurately what its

10   vision and missions and councils and

11   committees, and that sort of thing,

12   right?

13           A.    Correct.

14           Q.    Okay.  Does the HDA

15   membership play any role in the content

16   of the HDA's website?

17                 MR. WEINSTEIN:  Objection to

18           form.

19                 THE WITNESS:  Not directly.

20   BY MR. TELLIS:

21           Q.    Okay.  The HDA doesn't run

22   the content of its website by its members

23   before publishing it?

24           A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Who is the head of

2    the marketing group that you mentioned

3    who was responsible for the content?

4    A.    John Parker.

5    Q.    Do you know what his title

6    is?

7    A.    John is senior vice

8    president of marketing and

9    communications -- or communications and

10   marketing.  Maybe just communications.

11   Q.    Okay.  Let's look at

12   Exhibit 2.

13   (Document marked for

14   identification as Exhibit

15   HDA-Fri-2.)

16   BY MR. TELLIS:

17   Q.    I want to show you what we

18   were able to download off the internet as

19   an early iteration of the HDA's website

20   under its heading "Vision and Values,"

21   circa 2006-ish when you joined.  Okay?

22   A.    Mm-hmm.

23   Q.    Now --

24   MR. WEINSTEIN:  Is there

1    anything on here that shows that

2    it's 2006?

3              MR. TELLIS:  Well, it says

4    copyright '04 in the bottom

5    right-hand corner but I can tell

6    you that --

7              MR. CLUFF:  In the web

8    address, you can see down at the

9    bottom it says 2006/01/04.  That's

10   the date that we pulled this from

11   the web archives.

12             MR. WEINSTEIN:  Okay.  Thank

13   you.

14   BY MR. TELLIS:

15        Q.   So first of all, it says

16   HDMA in the top left-hand corner,

17   Healthcare Distribution Management

18   Association.  Do you recognize that as

19   the sort of predecessor name to the HDA?

20        A.   I do.

21        Q.   What -- was it known as the

22   HDMA when you joined in 2006?

23        A.   It was.

24        Q.   And what was the reason for

1    the name change?

2          A.    We felt like the word

3    "management" was sort of past its prime.

4    And it was near our -- I think it was

5    near our -- an anniversary -- a big

6    anniversary, so we timed it with a

7    change.

8          Q.    So you went from Healthcare

9    Distribution Management Association to

10   Alliance?

11         A.    Correct.

12         Q.    And the alliance was between

13   whom?

14               MR. WEINSTEIN:  Objection to

15         form.

16               THE WITNESS:  The alliance

17         is among the distributors, but

18         implies our ability to work across

19         the supply chain on various

20         issues.

21   BY MR. TELLIS:

22         Q.    Okay.  Were you involved in

23   the decisionmaking that went into the

24   name change?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I was in some top level

2  discussions as an executive management

3  team.  But that was ultimately driven by

4  our communications department.

5    Q.    Okay.  When you say the word

6  management association was past its

7  prime, what did you mean by that?

8    A.    I said the word "management"

9  is past its prime.

10    Q.    You did.  What does that

11  mean?

12    A.    No one really understood

13  what distribution management was.

14  Actually, I mean, the H -- the HDMA name

15  was what we changed to after NWDA, so if

16  you want to go for a long ride, we can go

17  back there.

18         But that we were -- I'm told

19  that we were trying to be HDA from the

20  beginning, but that was -- there was a

21  minor conflict with another organization

22  called HIDA, H-I-D-A, which represented

23  medical-surgical wholesalers in roughly

24  the same space.  And somehow we ended up

1    at HDMA.

2         Q.    Okay.

3         A.    That was before my time.

4         Q.    So the predecessor name to

5    HDMA was the National Wholesale Druggist

6    Association?

7         A.    Correct.

8         Q.    Okay.  And do you know when

9    that name changed to HDMA?

10        A.    I don't.

11        Q.    Do you know the reason for

12   that change?

13        A.    Again, I think "wholesale

14   druggist" was not a term of art any

15   longer.

16        Q.    Okay.  But essentially the

17   same organization, just name changes?

18        A.    Correct.

19        Q.    Okay.  All right.  So it

20   appears that at least as of 2006 when you

21   joined, that the HDMA had under its

22   website page "Vision and Values," the

23   idea in the first sentence, that it, "Has

24   worked with members to secure a safe,

Highly Confidential - Subject to Further Confidentiality Review

1   efficient, and reliable healthcare

2   distribution system," right?

3           A.      Correct.

4           Q.      And you would agree with me

5   that as of 2006, safety was an important

6   value for the HDA, drug safety?

7           A.      Supply chain safety.

8           Q.      And do you know whether this

9   vision or values changed at all during

10  your tenure at the HDA?

11          A.      I think we've evolved the

12  messaging.  I can't -- or the words

13  maybe.  I can't recall off the top of my

14  head, but I would say that our -- we've

15  remained consistent around safe,

16  efficient, and reliable.

17          Q.      Okay.  And in the second

18  sentence at the top, it says, "HDMA

19  members are responsible for ensuring that

20  billions of units of medication are

21  safely delivered to tens of thousands of

22  retail pharmacies, hospitals, nursing

23  homes, clinics and other provider sites

24  in all 50 states in the most efficient

1  manner possible."

2              Right?

3        A.    Correct.

4        Q.    And that's what the HDA

5  believed as of the time that you joined,

6  right?

7        A.    Correct.

8              (Document marked for

9        identification as Exhibit

10       HDA-Fri-3.)

11 BY MR. TELLIS:

12       Q.    Exhibit 3.  I'm going to

13 show you the most current iteration of

14 this value statement on the HDA's

15 website.  I'm going to show you what is

16 from the missions and values page on the

17 HDA's current website.  Have you ever

18 seen that before today?

19       A.    I have.

20       Q.    Does that reflect an

21 accurate description of the HDA's current

22 mission and value statement?

23       A.    I believe it does.

24       Q.    And so under the bold

Highly Confidential - Subject to Further Confidentiality Review

1  heading, "Mission Statement," the HDA

2  believes that its mission and value is to

3  protect patient safety and access to

4  medicines through the safe and efficient

5  distribution of healthcare products and

6  services, right?

7        A.     Correct.

8              (Brief telephonic

9        interruption.)

10             MR. CLUFF:  Over the phone,

11       can you hear us?

12             MR. MALLOY:  Yeah.

13             (Whereupon, a discussion was

14       held off the record.)

15  BY MR. TELLIS:

16       Q.    So it's safe to say,

17  Mr. Fri, that at least with respect to

18  the public perception of visitors to this

19  website, the HDA is proud of publishing

20  the fact that its mission statement is to

21  protect patient safety through the safe

22  and efficient distribution of healthcare

23  products and services, right?

24       A.     Correct.

1              MR. WEINSTEIN:  Objection to

2        form.

3   BY MR. TELLIS:

4         Q.    Okay.  So now given this

5   commitment to safety that the HDA has

6   articulated, has -- has the HDA supported

7   measures over the years to prevent or

8   curb opioid abuse?

9         A.    Prevent or curb.  I believe

10  so.

11        Q.    You believe so?  Give me an

12  example of what you're talking about.

13             MR. WEINSTEIN:  Obviously

14        this -- all this is outside the

15        scope.

16             THE WITNESS:  Yeah.

17             MR. WEINSTEIN:  So I'm

18        trying not to interrupt question

19        by question.

20             THE WITNESS:  Well, and --

21        and the work that we do in that

22        area is not work that is in my

23        responsibility area.

24  BY MR. TELLIS:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     I understand that.  But you

2  just told me that you believe that the

3  HDA has supported measures over the years

4  to prevent or curb opioid abuse.  So tell

5  me what you're talking about.

6      A.     So we support Allied --

7  Allied Against -- AAOA, Allied Against

8  Opioid Abuse, which helps educate

9  patients about the dangers of opioid

10  addiction and safe disposal of medicines.

11      Q.     And when did that initiative

12  start?

13      A.     It's been in the last -- I

14  don't know specifically, but it's been

15  recently.  The last couple years.

16      Q.     Let's go back from when you

17  started at the HDA, 2006 to -- through,

18  let's say, 2015.  Can you think of an

19  initiative that the HDA supported to

20  prevent or curb opioid abuse?

21           MR. WEINSTEIN:  Objection to

22      scope.

23           THE WITNESS:  Not

24      specifically.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. TELLIS:
 2         Q.    And so what -- what is the
 3    -- what's the basis for the statement
 4    that HDA has as a part of its mission to
 5    protect patient safety?
 6              MR. WEINSTEIN:  Objection to
 7         scope.
 8              THE WITNESS:  HDA, and
 9         particularly in my area, is
10         committed to supply chain safety
11         and security.
12              So we advance technologies
13         and logistics practices and
14         business processes that support
15         the safe distribution of and
16         handling of all medicines that we
17         ship.  We don't specifically call
18         out opioids separately from others
19         in that capacity.
20    BY MR. TELLIS:
21         Q.    I'm going to show you what
22    I'm going to mark as Exhibit 5 (sic).
23              (Document marked for
24         identification as Exhibit
```

```
 1           HDA-Fri-4.)
 2   BY MR. TELLIS:
 3           Q.    Do you know who Matthew
 4   DiLoreto is?
 5           A.    I know who Matthew DiLoreto
 6   is, yes.
 7           Q.    Who is Matthew DiLoreto?
 8           A.    He's a vice president of our
 9   state government affairs department.
10           Q.    And who is Beth Mitchell?
11           A.    I do not know.
12           Q.    Does the HDA and it -- and
13   its employees communicate by e-mail as
14   part of the ordinary course of business?
15           A.    Yes.
16           Q.    Okay.  And HDA.org is the
17   domain that is used?
18           A.    Currently, yes.
19           Q.    Let me show you what I'm
20   marking as Exhibit 5 which is an e-mail
21   to -- excuse me, Exhibit 4, which is an
22   e-mail exchange between Matthew DiLoreto
23   and Beth Mitchell of AmerisourceBergen
24   Bates numbered HDA_MDL_000214979 through
```

Highly Confidential - Subject to Further Confidentiality Review

1    982.

2              Let me know when you've had

3    a chance to review.

4         A.    Sure.  I have -- I have

5    reviewed it largely.

6         Q.    So you recognize this as an

7    e-mail exchange between Beth Mitchell at

8    AmerisourceBergen and Matthew DiLoreto at

9    the HDA regarding opioids?

10             MR. WEINSTEIN:  Objection to

11         form.

12             THE WITNESS:  It's about

13         opiate approaches in the States.

14   BY MR. TELLIS:

15        Q.    And what is --

16             MR. WEINSTEIN:  I object to

17         scope obviously, with respect to

18         this document.

19             But you can go ahead.

20   BY MR. TELLIS:

21        Q.    The e-mail is referring to a

22   memorandum in support that the HDA was

23   authoring with respect to a particular

24   initiative in -- in the -- in the state

Highly Confidential - Subject to Further Confidentiality Review

1    of New York, right, with respect to

2    opioids?

3          A.    That's what it says.

4          Q.    Okay.  And in the top

5    paragraph it says, second sentence,

6    "Between you and I, I totally agree we

7    need to begin openly supporting some

8    measures rather than always opposing

9    them.  We're going to support the

10   governor's opioid abuse package in CT,

11   but it moved before we could even get a

12   letter out.  Bottom line is I talked with

13   both Patrick and Liz and they cannot

14   recall any time that we openly and

15   publicly supported an opioid abuse

16   prevention measure."

17               Do you see that?

18         A.    I do.

19         Q.    Do you know who Patrick and

20   Liz are?

21         A.    I do.

22         Q.    Who is Patrick?

23         A.    Patrick Kelly is our

24   executive vice president of government

Highly Confidential - Subject to Further Confidentiality Review

1   affairs.

2              And I assume your next

3   question would be Liz.  That's Elizabeth

4   Gallenagh, our inside counsel.

5        Q.    Does this sentence come as a

6   surprise to you?

7              MR. WEINSTEIN:  Objection to

8        form.  Objection to scope.

9              THE WITNESS:  This is not

10       even in any area that I work.

11  BY MR. TELLIS:

12       Q.    Okay.  But does it come as a

13  surprise to you that, according to

14  Patrick and Liz, the HDA has never openly

15  and publicly supported an opioid abuse

16  prevention measure?

17             MR. WEINSTEIN:  Objection to

18       form, foundation, and scope.

19             THE WITNESS:  I -- I don't

20       have an opinion.

21  BY MR. TELLIS:

22       Q.    Okay.  Is there a group

23  within the HDA that has, as part of its

24  responsibility, public initiatives like

Highly Confidential - Subject to Further Confidentiality Review

1  this to support legislative measures

2  relating to opioids?

3       A.    If it's related to

4  legislative measures it would take part

5  in our government affairs department.

6       Q.    Okay.  And who is the head

7  of that?

8       A.    Patrick Kelly.

9       Q.    You would agree with me,

10  Mr. Fri, that the part of the HDA's

11  purpose is to help its members maximize

12  their business profits, right?

13           MR. WEINSTEIN:  Objection to

14      form, foundation, and scope.

15           THE WITNESS:  No, I would

16      never have had that discussion

17      with a member.

18  BY MR. TELLIS:

19       Q.    You don't think that falls

20  within the -- the core purpose of the

21  HDA?

22       A.    I don't think it --

23           MR. WEINSTEIN:  Same

24      objections.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Profitability

2      I don't think is an area where we

3      spend a lot of time promoting.

4          (Document marked for

5      identification as Exhibit

6      HDA-Fri-5.)

7  BY MR. TELLIS:

8      Q.    Let's take a look at

9  Exhibit 6 -- Exhibit 5.  Excuse me.

10          It's the portion of the

11  HDA's website entitled "About."  And it's

12  under the heading "History."

13      A.    Mm-hmm.

14      Q.    Have you seen that page

15  before?

16      A.    I have.

17      Q.    What is this supposed to be

18  describing?

19      A.    This is a history better

20  written than the distribution I gave you

21  of the changes in the HDA over time from

22  the NWDA to where we are today.

23      Q.    Okay.  So this document

24  accurately reflects the sort of -- the

1    history and purpose of the various

2    iterations of the name of what's now

3    known as the HDA?

4              MR. WEINSTEIN:  Objection to

5         form.  Foundation.  Scope.

6         Objection to scope more broadly as

7         to the website, but go ahead.

8              THE WITNESS:  This is a

9         history of HDA, presented and

10        prepared for our anniversary.

11   BY MR. TELLIS:

12        Q.   And in that second paragraph

13   it says, "The first" -- "This first

14   industry meeting was called by Agustus

15   Kiefer to 'remedy the existing evils in

16   the wholesale drug business and enable

17   the merchants to carry on business on a

18   more profitable basis.'"  That was the

19   core principles governing this

20   organization, right?

21             MR. WEINSTEIN:  Objection to

22        form.  Mischaracterizes the

23        document.

24             THE WITNESS:  That's taken

1              from old minutes, and that was

2              apparently how he referred to the

3              calling of the first meeting.

4     BY MR. TELLIS:

5              Q.    That's what it says, right?

6              A.    Yeah, that's what it says.

7              Q.    And then the next page at

8     the top, it says, "Throughout the years,

9     NWDA continued to advocate on behalf of

10    the distribution industry and the safety,

11    efficiencies, and cost savings

12    distributors bring to the pharmaceutical

13    supply chain."  Right?

14             A.    Correct.

15             Q.    And that was part of the

16    core advocacy mission that HDA and its

17    predecessors had, right?

18             A.    Correct.

19             Q.    Okay.  I just want to go

20    back to that current day mission and

21    values document, Exhibit 3.  Are you with

22    me?

23             A.    I am.

24             Q.    Page 2.  Under values, there

```
1    are five bullet points, right?

2            A.    Yes.

3            Q.    And those are accurately

4    stated as the core values of the HDA as

5    they exist today?

6            A.    I believe so.

7            Q.    Okay.  First one is a

8    commitment to the members, right?

9            A.    Yes.

10           Q.    Because they're a vital link

11   in healthcare, right?

12           A.    Yes.

13           Q.    The third one is

14   collaborators.  That's what it says,

15   right?

16           A.    Mm-hmm.

17           Q.    We strive to create an

18   environment where knowledge can flow

19   freely and our members can work together

20   to achieve common goals, right?

21           A.    Correct.

22           Q.    And that's a -- so the HDA

23   is a -- is a vehicle for the free flow of

24   information among the distributors; is
```

1    that fair?

2                    MR. WEINSTEIN:  Objection to

3            form.

4                    THE WITNESS:  For the free

5            flow of information that is

6            appropriately discussed under

7            antitrust law and is applicable to

8            the work that we do, yes.

9    BY MR. TELLIS:

10           Q.    Okay.  Allows them to work

11    together to achieve a common goal, right?

12           A.     Correct.

13           Q.     And the members as being

14    referred to here includes more than just

15    the distributors, right?

16                   MR. WEINSTEIN:  Objection to

17           form.

18                   THE WITNESS:  We advocate

19           specifically on behalf of our

20           distributors.  But in the industry

21           relations area, the discussion, we

22           include manufacturers as our

23           members.

24    BY MR. TELLIS:

1    Q.    Well, the statement here

2  that our members can work together to

3  achieve a common goal is referring to all

4  of the HDA's members, right?

5              MR. WEINSTEIN:  Objection to

6        form --

7              THE WITNESS:  Right.

8              MR. WEINSTEIN:  -- and

9        foundation.

10  BY MR. TELLIS:

11    Q.    And that would include, for

12  example, the opioid manufacturers that

13  are members of the HDA?

14              MR. WEINSTEIN:  Same

15        objections, and objection to

16        scope.

17              THE WITNESS:  It would.

18  BY MR. TELLIS:

19    Q.    Okay.  The last bullet point

20  says, "We manage our members' resources

21  as our own."

22              What does members' resources

23  mean in that context?

24              MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          foundation.

2                    THE WITNESS:  Fiscal

3          responsibility.

4     BY MR. TELLIS:

5          Q.    This means we treat our

6     members' money like it is our own?

7                    MR. WEINSTEIN:  Objection to

8          form.  Foundation.  Scope.

9                    THE WITNESS:  It means we

10         pay attention to our budget and

11         what we're focusing our resources

12         on.

13    BY MR. TELLIS:

14         Q.    Okay.  That's because your

15    budget is financed by the members?

16         A.    It is.  In different ways,

17    but yes.

18         Q.    Let's just talk about --

19    help me understand how the HDA is

20    organized.

21                So you have so-called

22    internal employees of HDA, right?

23         A.    Correct.

24         Q.    And how many of those are

Highly Confidential - Subject to Further Confidentiality Review

1    there?

2          A.    32.

3          Q.    Okay.  And then you've

4    got -- are there external folks who

5    provide services for HDA like consultants

6    and the like?

7               MR. WEINSTEIN:  Objection to

8          form.

9               THE WITNESS:  We

10         occasionally hire consultants.

11   BY MR. TELLIS:

12         Q.    Okay.  Is there anyone who's

13   not a member that populates the HDA's

14   committees, councils, task force, working

15   groups, that sort of thing?

16         A.    No.

17         Q.    Okay.  Those are typically

18   populated by its members, not --

19         A.    HDA's members.

20         Q.    HDA's members.  Okay.  And

21   the HDA's employees run the organization?

22         A.    Right.  Staff the

23   committees.

24         Q.    Okay.  And so the HDA

1    currently has a board of directors?

2         A.    Correct.

3         Q.    And it also has an executive

4    committee?

5         A.    Correct.

6         Q.    What is the relationship

7    between those two entities?  Which one

8    reports to whom?

9         A.    The board and the executive

10   committee have slightly different

11   responsibilities, but the executive

12   committee is strategic and fiscally

13   focused and the board is more broadly

14   issue-focused.

15        Q.    And on a hierarchal

16   structure is the board of directors above

17   the executive committee?

18        A.    I would put the executive

19   committee above the board.

20             MR. WEINSTEIN:  Objection to

21        scope as to this line of

22        questions, but go ahead.

23   BY MR. TELLIS:

24        Q.    Has the HDA always had an

Highly Confidential - Subject to Further Confidentiality Review

1    executive committee since you've been

2    there?

3            A.    Since I've been there, yes.

4            Q.    Okay.  Does the -- does the

5    executive committee make recommendations

6    to the board of directors?

7                  MR. WEINSTEIN:  Objection to

8            form.

9                  THE WITNESS:  Occasionally.

10   BY MR. TELLIS:

11           Q.    Are those recommendations

12   always accepted?

13                 MR. WEINSTEIN:  Objection to

14           form.  Foundation.

15                 THE WITNESS:  In my

16           experience, the thinking among the

17           executive committee and board is

18           fairly consistent.

19   BY MR. TELLIS:

20           Q.    Okay.  Does the executive

21   committee make recommendations to

22   councils or committees within the HDA?

23                 MR. WEINSTEIN:  Objection to

24           form.  Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Occasionally.

2      In fact, rarely, actually.

3  BY MR. TELLIS:

4      Q.    Rarely does the executive

5  committee make recommendations to the

6  councils and committees?

7      A.    Correct.

8      Q.    Okay.  Let's look at

9  Exhibit 7 (sic).

10          MR. TELLIS:  I want the

11      document entitled councils and

12      committees.

13  BY MR. TELLIS:

14      Q.    While he's getting that out,

15  how are the board of directors elected

16  within the HDA?

17      A.    You have a relatively few

18  number of members.  And so -- of

19  distributor members.  So all distributor

20  members are invited to have a seat on the

21  board of directors.  Most of them choose

22  to accept that seat, but not all of them.

23      Q.    So how many seats are there

24  on the HDA's board of directors today?

1           MR. WEINSTEIN:  Objection to

2       form.

3           THE WITNESS:  I -- I don't

4       know the specific answer to that.

5    BY MR. TELLIS:

6       Q.    Okay.  But it's -- is it

7    your understanding that at least the big

8    three, McKesson, AmerisourceBergen,

9    Cardinal, hold seats on the HDA's board

10   of directors?

11      A.    Our three publicly held

12   companies do hold seats on the board.

13      Q.    Can you think of the names

14   of other members of the board of

15   directors?

16      A.    The names of people or

17   companies?

18      Q.    Companies.

19      A.    Of course.

20      Q.    Tell me the ones you know.

21      A.    HD Smith, Morris and

22   Dickson, CuraScript, Value Drug, Mutual

23   Drug, Louisiana Wholesale, Prescription

24   Supply, Capital Wholesale.

Highly Confidential - Subject to Further Confidentiality Review

1          I can't -- I can't remember

2     them all.

3          Q.     Okay.  And when you said --

4          A.     They are on our website

5     though.

6          Q.     The distributor members are

7     all invited to have a seat on the board

8     of directors?

9          A.     Correct.

10          Q.     Okay.  How about

11     manufacturers?

12          A.     They are not.

13          Q.     Okay.  How do manufacturers

14     get a seat on the board of directors of

15     the HDA?

16               MR. WEINSTEIN:  Objection to

17          form and foundation.

18               THE WITNESS:  They can't.

19     BY MR. TELLIS:

20          Q.     They can't.  And is there a

21     reason for that?

22               MR. WEINSTEIN:  Objection to

23          form.  Foundation.

24               THE WITNESS:  Yeah, it's

Highly Confidential - Subject to Further Confidentiality Review

1    written into our bylaws.

2  BY MR. TELLIS:

3        Q.    Okay.  What's the -- what's

4  the policy reason behind it or what's

5  the --

6        A.    We are an advocacy

7  organization for government affairs, on

8  the outside house for wholesale

9  distributors.  So they are the only ones

10  that participate in the governance of the

11  organization.

12        Q.    Okay.  And does the board of

13  directors have a say in who populates the

14  council or committee, a task force or

15  working group?

16            MR. WEINSTEIN:  Objection to

17        form.

18            THE WITNESS:  I suppose they

19        could, but they don't typically

20        have a unique say in that.

21  BY MR. TELLIS:

22        Q.    Okay.  Do they provide any

23  direction to any of the councils,

24  committees, or task forces?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. WEINSTEIN:  Objection to

2        form.

3              THE WITNESS:  I don't recall

4        last time they gave specific

5        direction to a --

6   BY MR. TELLIS:

7        Q.    How often do they meet as a

8   board?

9        A.    Twice a year.

10       Q.    Okay.  How many members are

11  there of the HDA's executive committee?

12       A.    Seven.

13       Q.    And who are they?

14       A.    AmerisourceBergen, Cardinal

15  Health, McKesson, Louisiana Wholesale,

16  Morris and Dickson, Value Drug.  Who am I

17  missing?  And Dakota Drug.

18       Q.    And how does a company

19  become a member of the HDA's board of

20  directors?

21             MR. WEINSTEIN:  Objection.

22       You mean executive committee?

23             MR. TELLIS:  I'm sorry.

24       Thank you.

```
 1    BY MR. TELLIS:
 2         Q.    Executive committee?
 3         A.    I caught that.  They are
 4    nominated by the executive committee.  So
 5    they would nominate someone from the
 6    board of directors to be on the executive
 7    committee, I think.
 8         Q.    Okay.  I'm confused.  How
 9    does someone become a member of the
10    executive committee of the HDA?
11              MR. WEINSTEIN:  To be clear,
12         there is an objection to scope to
13         this whole line of questions, but
14         go ahead.
15              THE WITNESS:  Yeah, I mean
16         that's -- that's a responsibility
17         of our CEO and chairman under the
18         governance of our bylaws.  But I
19         believe it is a nomination of our
20         executive committee members.
21         If -- if there's an open space, a
22         nomination that would be put to
23         the board for a vote for a
24         replacement person on the
```

Highly Confidential - Subject to Further Confidentiality Review

1      executive committee.

2  BY MR. TELLIS:

3          Q.    I see.  And are -- is that

4  nomination only available to

5  distributors?

6          A.    Yes.

7          Q.    For the same reasons as the

8  board?

9          A.    Yes.

10         Q.    Okay.  This is the document

11 I was looking for.

12                (Document marked for

13         identification as Exhibit

14         HDA-Fri-6.)

15 BY MR. TELLIS:

16         Q.    I've shown you a section of

17 the HDA's website entitled "Councils and

18 Committees."  Take a second to flip

19 through that.

20                It says in the first

21 paragraph, "HDA has a variety of standing

22 or special councils, committees, and task

23 forces that operate at the direction of

24 its board of directors to help the

1    alliance and its members achieve the

2    goals of the organization."

3              Do you see that?

4         A.    Correct.

5         Q.    So the board of directors

6    direct the work of the standing or

7    special councils, committees, and task

8    forces?

9              MR. WEINSTEIN:  Objection to

10             form.

11             THE WITNESS:  They

12             essentially impanel the ability to

13             put the councils and task forces

14             in place.  But we work with our

15             members and the staff to populate

16             any task forces, working groups,

17             committees or councils.

18   BY MR. TELLIS:

19        Q.    Okay.  And can you -- can

20   you tell me in general terms if you know

21   what the difference between a council and

22   a committee and a task force is?

23        A.    Yeah.

24        Q.    What is -- what is it?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    It's more -- I mean, I guess

2  it's more structural in -- in a way.

3            The council -- in our case

4  we have a public policy council on the

5  government affairs.  We have an industry

6  relations council on the industry side.

7  Those would be sort of -- those that are

8  groups that all the work in those two

9  areas ultimately sort of roll up to.

10            The committee is usually a

11  standing committee, a group that might

12  meet regularly.  A task force or a

13  working group is more devoted to a -- a

14  specific task or project.

15      Q.    And so is it -- is it sort

16  of based on a reporting or hierarchy

17  structure where task forces report to

18  committees and committees report to

19  council?

20      A.    It would be easiest to draw

21  it that way.  And in some cases there are

22  kind of direct communications.  But it's

23  not necessarily that there is a task

24  force that is then required to report to

Highly Confidential - Subject to Further Confidentiality Review

1    a committee that then is required to

2    report to a counsel.

3         Q.    Okay.  Are there

4    restrictions on who can be a member of a

5    council, a committee or a task force?

6         A.    The only restriction is

7    anything on the government affairs side,

8    you can only be a distributor member.

9              On the industry relations

10   side you can be a manufacturer or a

11   distributor member.

12             And then on task forces or

13   working groups, depending on the subject

14   matter, we may include what we call

15   service providers.  And those are

16   consultants or technology company --

17   companies or system vendors or something

18   of that nature.

19        Q.    Okay.  And to your

20   knowledge, do the big three distributors

21   have folks in each of the councils,

22   committees, and task forces?

23        A.    I would say that our large

24   publicly held companies have the most

1    resources of our distributor members and

2    are able to participate most heavily in

3    the bulk of our committees and task

4    forces and councils, and so on.

5          Q.    Okay.  Does this -- does

6    this document accurately reflect the role

7    or description of what each of the

8    councils, committees, and task forces

9    do --

10              MR. WEINSTEIN:  Objection to

11         form and foundation.

12    BY MR. TELLIS:

13         Q.    -- for the HDA?

14              MR. WEINSTEIN:  Objection.

15         Form, foundation, and scope.

16              THE WITNESS:  For the

17         committees and task forces that

18         are under my purview, I believe

19         they do.

20    BY MR. TELLIS:

21         Q.    Which ones are under your

22    purview?

23         A.    Industry relations council;

24    business technology committee, which is

1  not currently active; health, beauty and

2  wellness committee; logistics and

3  operations committee, which is not

4  currently active; bar code task force;

5  E-commerce task force; emergency

6  preparedness is not currently active;

7  returns task force, which is only

8  recently not currently active; the ASN

9  work group is not currently active; and

10  then the contracts and chargebacks work

11  group.

12        Q.    So when I say the word "HDA

13  staff contact," and it has your name next

14  to it, it's a pretty good indication that

15  that's a work group, task force, or

16  council that falls within your

17  jurisdiction?

18        A.    I'd say that's a safe

19  assumption.

20        Q.    Okay.  And who's Anita

21  Ducca?

22        A.    Anita Ducca works in our

23  regulatory affairs department.

24        Q.    And so she has

1    responsibility over the regulatory

2    affairs committee?

3              MR. WEINSTEIN:  Objection to

4         form.

5              THE WITNESS:  That's

6         assigned in government affairs.

7         So if it says that, then that's

8         probably what it is.

9    BY MR. TELLIS:

10        Q.    Okay.  Now, it says here

11   under legal committee, that participation

12   is distributor members, invitation only.

13             Do you see that?

14        A.    I do.

15        Q.    Is there a reason for that?

16        A.    For distributor members, I

17   would imagine it's specific to the

18   advocacy or legal side, which is our

19   distributor members only.  And I can't

20   tell you why it says invitation only.

21        Q.    Okay.  Who makes the

22   invitation to join the legal committee?

23        A.    I don't know.

24             MR. TELLIS:  Let me show him

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit 17 -- sorry, Document 17.

2         MR. CLUFF:  We'll mark it as

3    Exhibit 7.

4         MR. TELLIS:  Yeah.

5         (Document marked for

6    identification as Exhibit

7    HDA-Fri-7.)

8         MR. CLUFF:  For the record,

9    this document was produced

10   natively.  We sorted it by the

11   committee name.  So that it

12   appears in alphanumerical order by

13   that field.

14   BY MR. TELLIS:

15        Q.    Let me show you what we

16   received from the HDA in native format.

17   It's placed before you there.  It appears

18   to be a list of names of individuals and

19   associated committee involvement.

20        A.    If I had a microscope, I

21   could read it.  Whoever is driving this,

22   if they can make it larger, that would be

23   great.  Thank you.

24        Q.    There's some committees on

1    here that aren't reflected in the website

2    document that I just showed you.  I'm

3    wondering if you can shed some light on

4    what it is they do.  We'll go to Page 5,

5    for example.  There's a contracts and

6    chargebacks working group.

7               Do you see that?

8         A.    I do see that.

9         Q.    What do they do?

10        A.    It's listed right here on

11   the last page of the committees.

12        Q.    Is it on there?  I must have

13   missed it.  All right.

14               Then what about the control

15   substances abuse task force?

16        A.    It's not one of my

17   committees, so I would not be clear on

18   their exact mission.

19        Q.    Do you know who -- who is

20   responsible for that?

21        A.    I would assume that's run

22   out of our government affairs department.

23        Q.    Is that Anita Ducca?

24               MR. WEINSTEIN:  Objection to

1          form.

2                    THE WITNESS:  I'm sorry.  If

3          that's a question, I don't know.

4          Patrick assigns those.

5     BY MR. TELLIS:

6          Q.    What about the DEA planning

7     meeting?  Do you see that on Page 7?

8          A.    I see it.

9          Q.    Who's got responsibility for

10    the DEA planning meeting at the HDA?

11         A.    I don't know.  But that's

12    something that probably got -- there was

13    no better way to record it in the

14    database, so they called it a meeting in

15    here.

16         Q.    What does the DEA planning

17    meeting do?

18         A.    That's not -- I don't know.

19    It does not -- did not involve me.

20         Q.    If you wanted to find out

21    who was sort of in charge or involved

22    with these groups at the HDA, is there a

23    directory or who -- at the HDA?  Or who

24    would you ask?

1          MR. WEINSTEIN:  Objection to

2      form.

3          THE WITNESS:  These groups,

4      if I made the assumption they were

5      operating under government

6      affairs, I would ask Patrick.

7  BY MR. TELLIS:

8      Q.    Patrick Kelly?

9      A.    Correct.

10      Q.    You -- you have

11  responsibility over the industry

12  relations group?

13      A.    Correct.

14      Q.    And they are comprised of

15  distributor and manufacturer members?

16      A.    Correct.

17      Q.    And what is their mission or

18  goal?

19      A.    Again, I think that's

20  probably written down here.  But we're

21  talking about issues related to

22  logistics, business practices,

23  technologies.  They provide feedback on

24  our programming and events, as well as

Highly Confidential - Subject to Further Confidentiality Review

1    our professional development programming.

2           Q.     And are there specific task

3    forces that work specifically with the

4    IRC?

5           A.     Not specifically with the

6    IRC.

7           Q.     Okay.  What is the -- what

8    is the -- what causes a task force to be

9    formed within the HDA?

10                 MR. WEINSTEIN:  Objection to

11           form.

12                 THE WITNESS:  Some of these

13           are legacy groups that I wasn't

14           around for.  So business

15           technology committee or logistics

16           committee was there prior.  But

17           they had specific focus on

18           logistics and technology.

19                 The most work we do right

20           now is around traceability

21           implementation, so this is the

22           work we do around serializing and

23           tracing products through the

24           supply chain, and a big chunk of

1           our focus has been work groups

2           specifically devoted to that task.

3    BY MR. TELLIS:

4           Q.    Okay.  Is there a reason why

5    a council can't work on something that

6    they need a task force?  I'm under -- I'm

7    trying to understand what role --

8           A.    It's the responsibility

9    levels, I guess.  So the council people

10   tend to be a little bit higher level with

11   responsibilities for, you know,

12   operations or logistics in their

13   organizations.  But an E-commerce task

14   force is specifically around electronic

15   data interchange and the details of that

16   transaction.  A barcode is -- a barcode

17   task force is specific to the -- the X

18   dimensions of the barcode and what's

19   human readability and what's

20   electronically readable format.  So

21   that's detail-oriented stuff and that

22   requires people that have that

23   understanding.

24          Q.    Is there a task force that

1    focuses on diversion activity or

2    suspicious order monitoring?

3          A.    Not to my knowledge.

4          Q.    How about a working group?

5          A.    Not to my knowledge.

6          Q.    How about a council?

7                MR. WEINSTEIN:  Objection to

8          form.

9                THE WITNESS:  There is not a

10         council.

11   BY MR. TELLIS:

12         Q.    Now, there is also something

13   called strategy meeting groups, right?

14   Is that on that --

15               MR. TELLIS:  What page is it

16         on?

17   BY MR. TELLIS:

18         Q.    See in -- on -- you see on

19   Page 20 of Exhibit 7, this spreadsheet.

20   At the bottom of that page there's

21   something called HDA drug diversion/DEA

22   strategy task force.

23         A.    Okay.

24         Q.    What is a strategy -- DEA

Highly Confidential - Subject to Further Confidentiality Review

1    strategy task force?

2           A.    I don't know.  That would

3    probably take place under government

4    affairs.  I was not involved with it.

5           Q.    And that's Anita Ducca?

6                 MR. WEINSTEIN:  Objection to

7           form.

8                 THE WITNESS:  Patrick Kelly

9           runs government affairs.

10   BY MR. TELLIS:

11          Q.    Anita Ducca is regulatory

12   affairs?

13                MR. WEINSTEIN:  Objection to

14          form.

15                THE WITNESS:  Her title is

16          regulatory affairs.

17   BY MR. TELLIS:

18          Q.    All right.  Do each of these

19   task forces or working groups keep

20   minutes?

21                MR. WEINSTEIN:  Objection to

22          form.  Foundation.

23                THE WITNESS:  I don't know.

24   BY MR. TELLIS:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    How does the HDA executive

2    committee or board of directors know what

3    each of the task force and working groups

4    are doing at any given moment?

5          A.    Anything --

6               MR. WEINSTEIN:  Objection to

7          form.  Foundation.

8               THE WITNESS:  Anything

9          that's relevant to a discussion

10          that the board wants to have, it's

11          reporting from staff, and we try

12          to maintain a list of the issues

13          that we were working on.

14    BY MR. TELLIS:

15          Q.    So an HDA staff member is

16    present for meetings and can report to

17    the executive committee or the board as

18    to what was going on?

19          A.    If it's required.

20          Q.    And is there -- is there

21    periodic reporting of what happens in

22    these meetings or is it only by request?

23               Let me -- let me rephrase

24    that.  Does the staff, does HDA staff

1    provide periodic reporting to the

2    executive committee or the board as to

3    the work of the task forces or the

4    working groups?

5                MR. WEINSTEIN:  Objection to

6           form.

7                THE WITNESS:  In my

8           experience with the committees and

9           task forces that I work with, if

10          it's relevant to the discussion

11          that the board or executive

12          committee wants to have, then yes,

13          I can provide a report on that.

14   BY MR. TELLIS:

15          Q.    But it's by request?

16          A.    It's -- it's by agenda,

17   yeah.

18          Q.    So absent a request like

19   that, what happens in these task forces

20   and working groups isn't typically

21   recorded?

22          A.    It's recorded.

23          Q.    Memorialized in some

24   minutes?

1          MR. WEINSTEIN:  Objection to

2     form.  Foundation.

3          THE WITNESS:  Or -- or a

4     document output.  So for -- an

5     example would be I don't think our

6     board wants to spend a lot of time

7     on X dimensions and human

8     readability formats for barcodes,

9     but yet it's work that we need to

10    do.

11         So we'll produce a guideline

12    that is the result of our work.

13    But it's not something that rises

14    to the level of the board

15    discussion.

16 BY MR. TELLIS:

17    Q.    What about something like

18 the DEA strategy task force, do they

19 report to the board or the executive

20 committee?

21    A.    I don't --

22         MR. WEINSTEIN:  Objection.

23    Foundation.

24         THE WITNESS:  I don't know

Highly Confidential - Subject to Further Confidentiality Review

1    the answer to that.

2    BY MR. TELLIS:

3        Q.    Okay.  Turn to Page 30,

4    please, of this same document.

5        A.    I apologize.  I can't read

6    the document.  My eyes aren't that --

7        Q.    Well, on Page 30 is

8    something referred to as the prescription

9    drug abuse strategy group.

10       A.    Okay.

11       Q.    Do you -- do you know what

12   that group does?

13       A.    I do not.

14       Q.    Do you know who is

15   responsible for that group within the

16   HDA?

17       A.    Presumably comes out of our

18   government affairs department.  So I

19   would say Patrick.

20       Q.    Okay.

21           MR. TELLIS:  All right.

22       We've been going an hour.  Let's

23       take a break.

24           THE VIDEOGRAPHER:  The time

1          is 11:01 a.m.  We are going off

2          the record.

3                  (Short break.)

4                  THE VIDEOGRAPHER:  The time

5          is 11:14 a.m.  We are back on the

6          record.

7    BY MR. TELLIS:

8          Q.    Mr. Fri, task forces

9    typically report to committees which

10   typically report to councils?

11                 MR. WEINSTEIN:  Objection to

12         form.

13                 THE WITNESS:  There is often

14         not a direct reporting structure.

15   BY MR. TELLIS:

16         Q.    Okay.  But so can you tell

17   me -- the -- the so-called HDA drug

18   diversion/DEA strategy task force.  What

19   committee or council does that task force

20   interface with?

21         A.    I don't know.  That's on the

22   government affairs side of the house.

23   That's not part of what I do.

24         Q.    That's Patrick Kelly?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    And the reporting system --

3    reporting system strategy task force,

4    what committee or council do they

5    interface with?

6    A.    I -- I have never heard of

7    that one.

8    Q.    Okay.  So on Page 39 of this

9    chart we have something called the

10   reporting system strategy task force that

11   is populated by AmerisourceBergen,

12   Cardinal Health, McKesson, Miami-Luken,

13   among others.  You don't know what they

14   do?

15   A.    I don't.

16   Q.    Is that in Mr. Kelly's work?

17   A.    That's presumably -- if it's

18   all distributors, it's presumably a

19   government affairs task force and

20   something that Patrick works on.

21   Q.    Okay.  Can you tell me

22   which -- can you tell me all the task

23   forces that have responsibility of

24   interfacing with respect to DEA issues?

1          MR. WEINSTEIN:  Objection to

2     form, foundation, and scope.

3          THE WITNESS:  I wouldn't

4     know all the committees or task

5     forces.

6  BY MR. TELLIS:

7     Q.    Do you know any of them?  Do

8  you?

9     A.    Say it again.  Committees or

10  task forces --

11     Q.    The -- any task force, right

12  now let's just stick to task force --

13     A.    Okay.

14     Q.    -- that has, as part of its

15  responsibility, DEA issues?

16          MR. WEINSTEIN:  Same

17     objections.

18          THE WITNESS:  I wouldn't be

19     able to list them all out there in

20     the government affairs department

21     and I don't work in that.

22  BY MR. TELLIS:

23     Q.    I'm not asking you to list

24  them all out.  I'm asking you for the

Highly Confidential - Subject to Further Confidentiality Review

1    ones you know.

2              We -- we've seen one here

3    called DEA strategy task force, right?

4    Are there others that you know of?

5              MR. WEINSTEIN:  Objection to

6         form, foundation, and scope.

7              THE WITNESS:  I can only

8         assume that a DEA strategy task

9         force has within its purview the

10        discussion on how we relate to

11        DEA.

12   BY MR. TELLIS:

13        Q.    Right.  Very good.  Can you

14   name others?

15        A.    Not off the top of my head.

16   But I can go through the list and guess.

17        Q.    And what would you be

18   looking for, the word DEA?

19        A.    That would be the first

20   clue.

21        Q.    Any others?

22              MR. WEINSTEIN:  Objection to

23        form, foundation, and scope.

24              THE WITNESS:  I don't --

Highly Confidential - Subject to Further Confidentiality Review

1    honestly don't know.  I don't work

2    with those committees.

3  BY MR. TELLIS:

4    Q.    All right.  So industry

5  relations, let's look at Document 10.

6  Which is Exhibit --

7          MR. CLUFF:  8.

8          MR. TELLIS:  8.

9          (Document marked for

10    identification as Exhibit

11    HDA-Fri-8.)

12  BY MR. TELLIS:

13    Q.    That's your world, right?

14    A.    Yes, sir.

15    Q.    Let me show you a document

16  which is an e-mail with attachment from

17  you to Anthony Rattini at Miami-Luken,

18  dated November 19, 2014, Bates numbered

19  ML63167 through 71.

20    A.    Mm-hmm.  Let me take a

21  moment to look that over.

22          Yes.

23    Q.    Do you recognize Exhibit 8

24  as a true and correct copy of an e-mail

Highly Confidential - Subject to Further Confidentiality Review

1    you sent to Mr. Rattini with attachments?

2            A.     Currently do.

3            Q.     You were writing to him

4    asking whether he would like to join the

5    committee, right?

6            A.     Correct.

7            Q.     Okay.  Is that how you

8    typically solicited members, through

9    e-mails like this?

10           A.     At the -- at the time it was

11   potentially driven by a separate

12   conversation.  But if we were recruiting

13   for members of the industry relations

14   council, this might be how we do it.

15           Q.     You've attached the members

16   as of the date of this e-mail, right?

17           A.     Right.

18           Q.     2014.  And its members

19   include both distributors and

20   manufacturers, right?

21           A.     Correct.

22           Q.     And there's also attached

23   the mission statement for this council,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    Among its missions is,

3  second bullet point, "Driving

4  collaborative supply chain improvements."

5          Right?

6    A.    Correct.

7    Q.    Next one, "Enhancing

8  long-term business relations between

9  healthcare supply chain constituents."

10    A.    Correct.

11    Q.    What role do the

12  manufacturers have in those items?

13    A.    Obviously there's a lot --

14  there's a great deal of transactions and

15  a lot of volume of product that flows

16  between manufacturers and distributors.

17          Manufacturers are interested

18  as much as distributors in the most

19  efficient and effective way to handle

20  that, both the physical part of it as

21  well as the electronic part.

22    Q.    So the collaboration on the

23  supply chain would include both input by

24  the manufacturers and distributors?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Correct.

2     Q.     Okay.  You say in your

3  sentence, in the e-mail, attached to

4  this, it says in the second paragraph,

5  "This group" -- last sentence.  "This

6  group," referring to the industry

7  relations council, "helps guide our work

8  around technology, operations, and

9  business practices and helps us direct

10  HDMA's events and membership programs."

11          Do you see that?

12     A.     Correct, yes.

13     Q.     What do you mean by business

14  practices in that context?

15     A.     I think business processes

16  is probably a better word.  But if we are

17  thinking about helping develop

18  information around, as an example, a loss

19  of exclusivity event.  When a

20  manufacturer is going to face a generic

21  competition, how do -- what happens to

22  the returns process to effectively get

23  branded product out when the generic

24  product becomes a competitor.

1    Q.    So a distinction between

2    practices and processes would for example

3    take something like suspicious order

4    monitoring out of your purview?

5    A.    Correct.

6    Q.    So in the mission statement

7    at the end where you talk about providing

8    guidance on legislative, regulatory, and

9    state issues affecting the supply chain,

10   what are you referring to there?

11   A.    Traceability, reverse

12   logistics, things like that, where

13   additional guidances is helpful to how we

14   plan our regulatory or legislative

15   agenda.

16   Q.    That guidance wouldn't be --

17   wouldn't include initiatives to curb

18   opioid abuse?

19   A.    That's not part of the

20   discussion that we have on the industry

21   relations side.

22   Q.    It wouldn't include

23   discussions about distributor due

24   diligence --

Highly Confidential - Subject to Further Confidentiality Review

 1              MR. CRAWFORD:  Object to

 2        form.

 3   BY MR. TELLIS:

 4        Q.    -- suspicious monitoring,

 5   that sort of thing?

 6        A.    We haven't had those

 7   conversations on the industry relations

 8   side.

 9        Q.    Those are on the government

10   affairs side?

11        A.    Correct.

12        Q.    You -- in the bullet point

13   towards the middle, it says, "Identifying

14   initiatives outside the healthcare

15   distribution industry to serve as best

16   practice models."

17              What is that referring to?

18        A.    Well, apparently nothing,

19   because we can't find many.

20              But the idea is to look

21   outside and say, you know, is there

22   something that Walmart does in a consumer

23   products supply chain or something that

24   happens in automotive parts that is

Highly Confidential - Subject to Further Confidentiality Review

1    useful and applicable to learnings in the

2    pharmaceutical supply chain.

3         Q.    Processwise?

4         A.    True.  Technology and

5    processwise.  And my point was we haven't

6    found many good examples.

7         Q.    In other -- in other

8    industries?

9         A.    Correct.

10         Q.    Did you ever have a role on

11    the government affairs side?

12         A.    No, other than what that

13    says in terms of providing guidance

14    around issues that are within the scope

15    of what I do.

16         Q.    Yeah.  So how do you go

17    about doing that?  Do you rely on the

18    government affairs side folks to assist

19    you or --

20              MR. WEINSTEIN:  Objection to

21         form.

22    BY MR. TELLIS:

23         Q.    How do you go about

24    providing guidance on regulatory and

Highly Confidential - Subject to Further Confidentiality Review

1    state issues affecting the supply chain?

2              MR. WEINSTEIN:  Objection to

3         form.

4              THE WITNESS:  So again,

5         traceability is a great example.

6         We have a law that we advocated

7         for that requires traceability in

8         the supply chain with milestones

9         that reach over a ten-year period

10        starting in 2015 and going to

11        2023.

12             The implementation side of

13        that is very focused on -- we've

14        had to do work around bar codes.

15        We've had to do work around EDI

16        transactions.  We've had to do

17        work around the ability to verify

18        serialized saleable returns, and

19        the work we do there informs our

20        regulatory folks as FDA kind of

21        works through the regulations to

22        implement that law.

23   BY MR. TELLIS:

24        Q.    Okay.  Let's talk about HDA

Highly Confidential - Subject to Further Confidentiality Review

1    membership.  Are you familiar with the

2    HDA's membership structure?

3            A.    I am.

4            Q.    So as I understand it,

5    there's a multitiered membership

6    structure.  You have primary members who

7    are the wholesale distributors?

8            A.    Correct.

9            Q.    Yes?  Then you have kind of

10   an associate or affiliate manufacturer

11   member?

12           A.    Correct.

13           Q.    And then are there other

14   tiers?

15           A.    There are.

16           Q.    What are they?

17           A.    We have a service provider

18   membership.

19           Q.    And who's in that tier?

20           A.    Those companies are

21   consultants, IT companies, companies that

22   plan and build warehouse facilities,

23   companies that build vaults and cages.

24   That sort of thing.  So companies that

1   provide services or goods to

2   manufacturers and distributors.

3         Q.    Are there other tiers?

4         A.    We have an international

5   membership.  I believe we have -- I

6   believe we have two international members

7   right now.

8         Q.    Any other tiers?

9         A.    We have -- we have a very

10  small health, beauty, and wellness tier.

11  So for companies that primarily do

12  consumer products but still work through

13  distributors to reach independent

14  pharmacies.  We have a membership that is

15  a lower dues rate.

16              And then we also operate

17  something called the Pharmaceutical Cargo

18  Security Coalition.  And companies can be

19  members of that.

20        Q.    What about data members like

21  IMS?  Are they members?

22        A.    That's a good question.  I

23  don't recall if -- IMS is now called

24  IQVIA.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Right.

2          A.    I don't -- we often work

3    with IQVIA.  But I don't know if they're

4    actually a member.

5          Q.    Is there some restriction on

6    who's entitled to be a member of any of

7    these tiers?  Can -- can my law firm be a

8    member?

9                MR. WEINSTEIN:  Objection to

10          form.

11               THE WITNESS:  Sure.

12   BY MR. TELLIS:

13         Q.    There's no restriction on

14   who can be a member of any one --

15         A.    There's a -- there is a

16   restriction and guidance around criteria

17   for a distributor membership, for

18   manufacturers, and for service providers.

19         Q.    But not within the tiers?

20   In other words -- well, let me take it --

21               Are the primary members

22   limited to distributors?

23         A.    Yes.

24         Q.    The wholesale distributors?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2            MR. CRAWFORD:  Object to

3      form.

4  BY MR. TELLIS:

5      Q.    The big three, McKesson,

6  Cardinal, and Amerisource, are all

7  primary members?

8      A.    Our publicly held companies

9  are, yes, members.

10     Q.    And then the associate or

11 second-tiered members are limited to

12 manufacturers?

13     A.    I don't know if I would call

14 them second tier.  It's another tier.

15 Manufacturers, companies that sell

16 products to distributors in the

17 pharmaceutical supply chain are

18 manufacturer members.

19     Q.    So I'll call them equally

20 culpable members --

21           MR. WEINSTEIN:  Objection to

22     form.

23           MR. CRAWFORD:  Objection to

24     form.

BY MR. TELLIS:

1  Q.    -- on that second tier?  All

2  right.  So -- and they would include

3  Purdue, Janssen, Teva, Allergan,

4  Mallinckrodt to name a few?

5  A.    In most cases, Janssen, not

6  specifically.

7  Q.    Okay.  And then what about

8  generic manufacturers?

9  A.    Well, you just named a

10 couple.  So, yes.

11 Q.    They are members as well?

12 A.    Correct.

13 Q.    And they fall within this --

14 A.    Brand generic and specialty

15 manufacturers.

16 Q.    Okay.  Are -- are the rights

17 that membership -- members get different

18 if you're a distributor or a

19 manufacturer?

20         MR. WEINSTEIN:  Objection to

21         form.

22         THE WITNESS:  Yes.

23 BY MR. TELLIS:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Like, and -- and so the

2     right to participate on a council or a

3     committee or a task force may be

4     different because those are populated by

5     certain types of members?

6          A.    So, again, distributors are

7     the only ones that can participate on the

8     advocacy side.

9          Q.    Right.

10          A.    So anything that has to do

11     with federal, state and regulatory

12     affairs.

13               On the industry side,

14     manufacturers and distributors have the

15     same opportunity to participate in

16     committees, councils, and task forces.

17          Q.    But -- but do the

18     manufacturer members have a right to make

19     suggestions or provide some input to the

20     advocacy side?

21               MR. CRAWFORD:  Object to

22          form.

23               THE WITNESS:  No.

24     BY MR. TELLIS:

1    Q.    Okay.  Do all members have

2    the right to communicate with the board

3    or the executive committee?

4              MR. WEINSTEIN:  Objection to

5         form.

6              THE WITNESS:  Presumably if

7         they know one -- know one another,

8         they can communicate with one

9         another.

10   BY MR. TELLIS:

11   Q.    But I mean, is there -- is

12   there a right to place things on an

13   agenda, for example, to be taken up by

14   the board or the executive committee?

15             MR. WEINSTEIN:  Objection to

16        form.

17             THE WITNESS:  I don't know

18        if there is a right, per se.

19   BY MR. TELLIS:

20   Q.    Is there an HDA staff person

21   or persons with primary responsibility

22   for interfacing between membership and

23   the executive committee?

24   A.    Not specifically.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      How about with the board?

2       A.      Not specifically.

3       Q.      The -- the HDA members are

4    assessed dues --

5       A.      Correct.

6       Q.      -- membership dues.

7               Are they annual?

8       A.      They are.

9       Q.      And are the amount of those

10   fees proportional to the size of the

11   company?

12      A.      Generally.

13      Q.      And it's based on assets,

14   sales, or what's the metric that is used?

15      A.      Sales.

16      Q.      Sales.  And so it's fair to

17   say then that the -- the big three

18   distributors pay the lion's share of

19   those fees?

20              MR. CRAWFORD:  Object to

21       form.

22              MR. WEINSTEIN:  Objection to

23          form.

24              THE WITNESS:  Publicly held

Highly Confidential - Subject to Further Confidentiality Review

1    companies obviously pay a higher

2    rate in dues.

3  BY MR. TELLIS:

4        Q.    They pay the majority of it?

5              MR. WEINSTEIN:  Objection to

6        form.

7              MR. CRAWFORD:  Objection to

8        form.

9              MS. ROLLINS:  Objection.

10             MS. CHARLES:  Objection.

11             THE WITNESS:  I would have

12       to do math on that.

13  BY MR. TELLIS:

14       Q.    It's --

15       A.    If you're talking about all

16  dues, it would be close.

17       Q.    Is it -- is it fair to say

18  that the publicly traded companies are

19  responsible for the majority of the HDA's

20  funding?

21             MR. WEINSTEIN:  Objection to

22       form.

23             MR. CRAWFORD:  Objection to

24       form.

Highly Confidential - Subject to Further Confidentiality Review

 1                    THE WITNESS:  I -- I don't

 2       think so.

 3   BY MR. TELLIS:

 4       Q.    Where does the funding come

 5   from, other than the fees?

 6       A.    Other than the publicly held

 7   company dues?

 8       Q.    Understood --

 9       A.    So we have the other --

10       Q.    No, all dues.  Let's just

11   put all dues.  Does the HDA generate

12   revenue or income from sources other than

13   membership fees or dues?

14       A.    Yes.

15       Q.    From where?

16       A.    We have conference and event

17   registration, and we have sponsorship.

18       Q.    Sponsorship means

19   opportunities to sponsor some --

20       A.    An event.  Education

21   program.  A key card at the hotel.

22       Q.    That meant you display the

23   member's name?

24       A.    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It's like advertising?

2    A.    Yes.

3    Q.    And what proportion to the

4  overall revenue that the HDA earns comes

5  from those two versus fees, sponsorship

6  and --

7    A.    Registration.

8    Q.    -- registration, conference

9  registration versus fees?

10    A.    I -- I don't have the budget

11  in front of me.  I --

12    Q.    More than half of the

13  revenue come from fees?

14            MR. WEINSTEIN:  Objection to

15        form.

16            THE WITNESS:  I -- I don't

17        know the answer to that.

18  BY MR. TELLIS:

19    Q.    And the publicly held

20  distributor members are the big three?

21            MR. CRAWFORD:  Objection to

22        form.

23            MR. WEINSTEIN:  Objection to

24        form.

1    BY MR. TELLIS:

2           Q.    Can you think of others?

3                 MR. WEINSTEIN:  Objection to

4           form.

5                 THE WITNESS:  No, other than

6           publicly held companies.

7                 Actually, that may not be

8           the case.

9                 We have other companies that

10          are divisions of publicly held

11          companies, so...

12   BY MR. TELLIS:

13          Q.    Right.  There might be

14   publicly held divisions of a distributor,

15   so -- is that what you mean, that are

16   members?

17          A.    Of another company.

18                MR. CRAWFORD:  Objection to

19          form.

20   BY MR. TELLIS:

21          Q.    That are members?

22          A.    Yes.

23          Q.    The HDA frequently has

24   meetings or calls that -- that is

1  confined to just the big three

2  distributors, right?

3              MR. WEINSTEIN:  Objection to

4        form.

5              THE WITNESS:  Not to my

6        knowledge.

7  BY MR. TELLIS:

8        Q.    The -- the HDA didn't

9  institute a monthly big three briefing

10 call during your tenure there?

11             MR. CRAWFORD:  Object to

12       form.

13             THE WITNESS:  I think those

14       have typically been executive

15       committee briefing calls.

16 BY MR. TELLIS:

17       Q.    Okay.  So -- and those are

18 limited to the big three?

19       A.    No, sir.  There's seven

20 members of the executive committee.

21             MR. TELLIS:  Show me -- show

22       me that document.  Hold on.

23             (Document marked for

24       identification as Exhibit

```
1              HDA-Fri-9.)

2    BY MR. TELLIS:

3         Q.    Let me show you what I'm

4    going to mark as --

5              MR. CLUFF:  No, it's from

6         the HDA to members of McKesson.

7              MR. TELLIS:  I'm sorry.

8         Right.

9    BY MR. TELLIS:

10        Q.    From Mr. Kelly at the HDA to

11   McKesson, Cardinal Health,

12   AmerisourceBergen, an e-mail dated

13   January 14th -- January of 2014.  Bates

14   numbered MCKMDL00651559.

15             MR. WEINSTEIN:  Take your

16        time to read that.

17             MR. TELLIS:  I'm sorry?

18             MR. WEINSTEIN:  I just told

19        Perry to take his time to read it.

20             I'm going to object to the

21        scope obviously as to questions on

22        this document.

23             THE WITNESS:  Okay.

24   BY MR. TELLIS:
```

1      Q.    You can read it all.  But

2  I'm focused on Paragraph Number 4 at the

3  bottom.  It says, "And finally, I would

4  like to restart a monthly big three

5  briefing call."

6            Do you see that?

7      A.    I do see that.

8      Q.    Do you know what that's

9  referring to?

10     A.    I don't.

11     Q.    You've never taken part in

12 any sort of monthly big three briefing

13 call?

14     A.    I have not.

15     Q.    Do you know who the big

16 three are?

17     A.    They seem to be referring to

18 Amerisource, Cardinal, and McKesson.

19     Q.    Well, that's who the

20 recipients of this e-mail are, right?

21     A.    Correct.

22            MS. CHARLES:  Counsel, I'm

23       going to object.  This is not one

24       of the McKesson documents that you

Highly Confidential - Subject to Further Confidentiality Review

1         provided to me.

2                 MR. CLUFF:  It's authored by

3         the HDA.  We don't need your

4         approval.

5                 MS. CHARLES:  This witness

6         is not on the topic --

7                 MR. CLUFF:  The HDA had the

8         document, and he's testifying in

9         his 30(b)(6) capacity as a member

10        of the HDA.

11                MS. CHARLES:  Not on this

12        topic.

13    BY MR. TELLIS:

14        Q.   So let me show you what

15    we'll mark as Exhibit 12 -- I'm sorry,

16    Exhibit 8 (sic).  It's Document 12.

17                (Document marked for

18        identification as Exhibit

19        HDA-Fri-10.)

20    BY MR. TELLIS:

21        Q.    My apologies.

22                Let me show you what I'm

23    going to mark as Exhibit 10, which is an

24    e-mail from Patrick Kelly to Mary

Highly Confidential - Subject to Further Confidentiality Review

1    Anderson, Bates Number HDA_MDL 0089247.

2                MR. WEINSTEIN:  Object to

3           scope as to this -- questions on

4           this document.

5    BY MR. TELLIS:

6           Q.    Do you know, this e-mail was

7    referring to a coordination call.

8                Do you see that?

9           A.    Let me take a minute to read

10   it first.

11               Yes.

12          Q.    Do you know what a

13   coordination call is?

14               MR. WEINSTEIN:  Objection to

15          form.

16               THE WITNESS:  I think it's a

17          call to address the items on the

18          agenda listed below.

19   BY MR. TELLIS:

20          Q.    And those items include

21   presentation from the DEA, media

22   inquiries on drug abuse, diversion,

23   working group on drug abuse and

24   diversion.

1    Do you see that?

2    A.    Yeah.

3    Q.    And it's inviting only the

4  folks on this e-mail, which are Cardinal

5  Health, AmerisourceBergen, and McKesson,

6  right?

7    A.    Correct.

8    Q.    Do you know why those are

9  the only companies invited by Mr. Kelly

10  to talk about the items that are there?

11    MR. WEINSTEIN:  Objection to

12    form.

13    THE WITNESS:  I do not.

14    MR. WEINSTEIN:  Foundation.

15  BY MR. TELLIS:

16    Q.    Mr. Fri, do your

17  responsibilities involve in any way

18  interacting with an entity called the

19  Pain Care Forum?

20    A.    No.

21    Q.    Do you know who within the

22  HDA does?

23    MR. WEINSTEIN:  Objection to

24    form.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. TELLIS:

2         Q.    I'm talking about staff.

3         A.    I don't, actually.

4         Q.    Do you know what the Pain

5    Care Forum is?

6         A.    I do not.

7         Q.    Never heard of it?

8         A.    I've heard of it.

9         Q.    What is it?  What's your

10   understanding of what it is, if you have

11   one?

12        A.    I don't have a particular

13   understanding.  I would imagine that they

14   have conversations around appropriate use

15   of pain medications.

16        Q.    Is that Mr. Kelly's world?

17        A.    I honestly don't know.

18        Q.    Okay.  If you wanted to find

19   out, who would you ask?

20             MR. WEINSTEIN:  Objection to

21        form.

22   BY MR. TELLIS:

23        Q.    Who would you ask at the HDA

24   staff as to which members of the HDA were

1   involved in interfacing with the Pain

2   Care Forum?

3           MR. WEINSTEIN:  Objection to

4        form.

5           THE WITNESS:  If I was

6        asking about which staff members

7        interface with them?

8   BY MR. TELLIS:

9        Q.    Yes.

10        A.    Patrick would be the first

11   start.

12        Q.    When you joined the HDA in

13   2006, were you familiar with the

14   provisions of the Controlled Substance

15   Act?

16        A.    I was not.

17        Q.    So in your prior life, you

18   had no reason to be involved with that --

19        A.    Correct.

20        Q.    -- Act or as -- or any

21   Schedule II drugs?

22        A.    Correct.

23        Q.    How did you get your job at

24   the HDA?  What is it that caused you to

Highly Confidential - Subject to Further Confidentiality Review

1    be interested in it?

2          A.    I've known our present CEO,

3    Mr. Gray, since '91 or '92.  The person

4    that was previously in the industry

5    relations position left, and I

6    interviewed for the job.

7          Q.    What did you understand the

8    job to be at that time?

9          A.    It was at the time, it was

10   just the industry relations part of my

11   job.

12         Q.    And did you have to have any

13   prior knowledge or understanding of the

14   Controlled Substance Act or schedule --

15         A.    No.

16         Q.    -- the regulation of

17   Schedule II drugs?

18         A.    No.

19         Q.    When is the first time that

20   you learned about a suspicious order

21   monitoring program?

22              MR. WEINSTEIN:  Objection.

23   BY MR. TELLIS:

24         Q.    Let me back up.  Do you know

Highly Confidential - Subject to Further Confidentiality Review

1   what a suspicious order monitoring

2   program is?

3              MR. WEINSTEIN:  Objection to

4         scope as to this line of

5         questions.

6              THE WITNESS:  I -- I

7         generally have a concept of what

8         it's meant to do.

9   BY MR. TELLIS:

10        Q.    What is it meant to do?

11        A.    It is meant to monitor

12  orders for those that might be

13  suspicious.

14        Q.    Okay.  And do you know --

15  when was the first time that you heard

16  that, that phrase?

17        A.    No idea.

18        Q.    Okay.  You came to learn

19  about it, though, after you joined the

20  HDA?

21        A.    Yes.

22        Q.    Okay.  So am I correct that

23  you have never had any discussions with

24  any of the HDA distributor members about

Highly Confidential - Subject to Further Confidentiality Review

```
1    their suspicious order monitoring
2    programs?
3               MR. CRAWFORD:  Object to
4          form.
5               THE WITNESS:  That is
6          correct.
7    BY MR. TELLIS:
8          Q.    Are you generally familiar
9    with the DEA's actions in sending out
10   so-called "Dear Registrant" letters in
11   the 2006, '7 time frame?
12              MR. WEINSTEIN:  Objection.
13   BY MR. TELLIS:
14         Q.    Do you know what I'm talking
15   about?
16              MR. WEINSTEIN:  Objection to
17         form.
18              THE WITNESS:  I don't know
19         the dates.  I've heard the concept
20         of "Dear Registrant" letters.
21   BY MR. TELLIS:
22         Q.    You understand that the DEA,
23   at some point after you joined the HDA,
24   had sent letters to certain folks in the
```

Highly Confidential - Subject to Further Confidentiality Review

1    opioid supply chain concerning their

2    obligations under the Controlled

3    Substance Act?

4              MR. WEINSTEIN:  Objection to

5         form.

6    BY MR. TELLIS:

7         Q.    Are you familiar with that?

8              MR. WEINSTEIN:  Objection to

9         form.

10             THE WITNESS:  I -- I have

11        heard the term "Dear Registrant"

12        letters.

13   BY MR. TELLIS:

14        Q.    Okay.  How did you come to

15   hear of it?

16        A.    I don't know.  If it's that

17   long ago, I don't know how that I'd have

18   come to hear it.

19        Q.    All right.  Have you had any

20   involvement whatsoever in the HDA's

21   activities in response to those

22   letters --

23        A.    No.

24        Q.    -- on behalf of its members?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I have not.

2          Q.     Okay.  If you wanted to know

3     what those activities were within the

4     HDA, who -- who would you ask?

5          A.     I don't know.  That was

6     before Patrick's time.  But it was in the

7     government affairs department if we were

8     having that -- if we were having that

9     conversation it would have been there.

10         Q.     And who was in that

11    department before Patrick?

12         A.     Scott Melville led that

13    before Patrick.

14         Q.     And is Scott Melville still

15    with the HDA?

16         A.     He is not.

17         Q.     Do you know where he is

18    today?

19         A.     I do.

20         Q.     Where is he?

21         A.     He runs a consumer health

22    products association.

23         Q.     Does it have a name?

24         A.     Yes.  The Consumer Health

Highly Confidential - Subject to Further Confidentiality Review

1    Products -- CHPA.

2         Q.    Okay.  You said "A".  Do you

3    mean "the"?  He runs the Consumer Health

4    Products Association?

5         A.    The Consumer Health Products

6    Association.

7         Q.    Okay.  You've had no

8    involvement in the HDA's efforts in

9    developing best practices with respect to

10   suspicious order?

11        A.    No.

12              MR. TELLIS:  Let's take a

13        break.  We're going to be ending

14        soon.

15              MR. WEINSTEIN:  Okay.

16              THE VIDEOGRAPHER:  The time

17        is 11:45 a.m.  We're going off the

18        record.

19              (Short break.)

20              THE VIDEOGRAPHER:  The time

21        is 12:16 p.m.  We are back on the

22        record.

23              MR. TELLIS:  Mr. Fri,

24        thanks.  Those are the questions I

Highly Confidential - Subject to Further Confidentiality Review

1    have for you at this time.

2              THE WITNESS:  Thank you.

3                  -   -   -

4              EXAMINATION

5                  -   -   -

6    BY MR. STEWART:

7         Q.    Mr. Fri, I'm Mike Stewart

8    with the Tennessee plaintiffs in a

9    independent state court -- in independent

10   state court litigation.  And we've been

11   invited to also participate in these

12   depositions through cross notice, which

13   we're doing today.

14             I think your council has a

15   statement he wants to make.

16             MR. WEINSTEIN:  Right.  So,

17        Mike, as we talked about outside,

18        I hadn't received advanced notice

19        that you would be questioning the

20        witness today.  We reserve all our

21        rights in that regard, and have

22        agreed to allow you to question

23        the witness for a maximum of two

24        hours with the understanding that

1        we're not otherwise waiving any

2        rights, with the understanding

3        that in exchange for allowing the

4        witness to testify today, you will

5        not be calling for his testimony

6        or deposition in connection with

7        the Tennessee litigation, either

8        in his personal capacity or as a

9        30(b)(6) witness, and with the

10       further understanding that his

11       30(b)(6) testimony today is

12       limited to the same topics that

13       was discussed earlier, namely

14       Topics 1, 2, 12, and 13 of the MDL

15       plaintiffs' notice.

16           And with respect to those

17       topics, it's limited solely to the

18       committees, councils, and task

19       forces that Mr. Fri was

20       responsible for.

21           And I'll have a standing

22       objection to scope in that regard,

23       rather than object to every

24       question so that I'm not

1    constantly interrupting.  But if

2    we have an agreement as to those

3    terms, then we can proceed.

4         MR. STEWART:  We do.  And I

5    just want to make a couple points.

6    First of all, I, of course, think

7    we did give proper notice.  But

8    it's neither here -- we -- we've

9    reached an arrangement.

10        Of course, and this has been

11   true for all these depositions,

12   we'll be taking time, our time is

13   irrespective of and has nothing to

14   do with the time that you and the

15   MDL have allotted for those

16   depositions, including the

17   30(b)(6) portion or 30.02(6)

18   portion in Tennessee.

19        But we will agree not to --

20   not to redepose this defendant --

21   I mean, or this witness as you

22   described.

23        With that, we'll go forward.

24        MR. PYSER:  For the

1    defendants, many of them are not

2    in the Tennessee case.  We do

3    object to the use of this portion

4    of the deposition that's taken by

5    counsel that's not counsel in the

6    MDL, in the MDL proceedings.

7  BY MR. STEWART:

8        Q.    I'm going to hand you an

9  exhibit, marked Exhibit 11.

10            (Document marked for

11       identification as Exhibit

12       HDA-Fri-11.)

13 BY MR. STEWART:

14       Q.    I'll ask if you recognize

15 it.

16            MR. TELLIS:  Did you -- do

17       you want to start at Exhibit 1 or

18       do you want to start at 11?

19            MR. STEWART:  We've always

20       had consecutive exhibits in this,

21       for simplicity's sake.

22 BY MR. STEWART:

23       Q.    Are you aware that Mr. Gray

24 had made a statement to Congress?

1    A.    Yeah, I don't know the date.

2    Q.    But you did know about the

3    statement?

4    A.    Certainly.

5    Q.    Okay.  Do you remember

6    whether you reviewed the statement before

7    it was made or after it was made?

8    A.    I did not.

9    Q.    Did you ever have

10   discussions with Mr. Gray about his

11   statement before Congress?

12   A.    I did not.

13   Q.    He says in the statement --

14   let me ask, do you know Mr. Gray, do you

15   deal with him in your business affairs?

16   A.    I do.

17   Q.    I presume that if he makes a

18   statement to Congress, he intends it to

19   be truthful and accurate?

20   A.    I would believe he does,

21   yeah.

22   Q.    And let's turn to the third

23   paragraph down the page.  Do you see

24   where Mr. Gray said, "HDA members have

Highly Confidential - Subject to Further Confidentiality Review

1    not only statutory and regulatory

2    responsibilities to detect and prevent

3    diversion and control of prescription

4    drugs, but to undertake such efforts as

5    responsible members of our society."

6              Do you see that?

7         A.    I do see that.

8         Q.    Would you agree that's not a

9    controversial statement, right?

10             MR. WEINSTEIN:  Objection to

11        scope.  Objection to form and

12        foundation.

13             It's not his statement.

14        He's never seen it before.

15   BY MR. STEWART:

16        Q.    Go ahead and answer.

17        A.    I would agree that it's not

18   a controversial statement.

19        Q.    And you've talked about this

20   already.  But can you for the jury remind

21   us, when you're talking about HDMA

22   members, what types of -- of businesses

23   does that include?

24             MR. WEINSTEIN:  Objection to

1          form.

2                    THE WITNESS:  Depends on the

3          context of the conversation.

4          We're talking our -- about our

5          primary distributor members in

6          this case.  So that's who we

7          advocate for.  So that would

8          simply be just distributors and

9          not any of our associate or other

10         types of members.

11    BY MR. STEWART:

12         Q.    When you say just

13    distributors, tell me who you are talking

14    about, specifically with respect to

15    companies.  Give me some examples.

16         A.    Our examples include

17    AmerisourceBergen, McKesson, Cardinal,

18    Smith Drug, Value Drug, Mutual Drug, et

19    cetera, et cetera.

20         Q.    And those are the

21    distributors certainly that have a

22    statutory and regulatory as well as a --

23    a societal responsibility to prevent

24    diversion, fair?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. WEINSTEIN:  Objection to

2     the form.

3          THE WITNESS:  When he's

4     talking about our members, he's

5     talking about our members, yes.

6  BY MR. STEWART:

7     Q.    And can you look to the next

8  paragraph.  There's a statement.  Do you

9  see he says, "To address the issue of

10  prescription drug abuse, distributors

11  have developed complex systems to help

12  prevent diversion of medicines and to

13  comply with the DEA's expanded

14  expectation for suspicious order in

15  monitoring and reporting."

16          Do you see that?

17     A.    I do see that.

18     Q.    Are you familiar with any of

19  the complex systems that distributors

20  have developed to prevent diversion?

21     A.    I'm aware that they have

22  complex systems.  I'm not specifically

23  aware of them or how they operate.

24     Q.    Who in your organization

Highly Confidential - Subject to Further Confidentiality Review

1    would be the best person to tell us about

2    those complex systems?

3                    MR. WEINSTEIN:  Objection to

4           form.  Foundation.

5                    THE WITNESS:  I don't think

6           there's anyone inside our

7           organization that specifically has

8           understanding of these complex

9           systems.

10   BY MR. STEWART:

11        Q.    Well, here someone

12   representing your organization is talking

13   about the complex systems.  Where in your

14   organization would he get that

15   information?

16                    MR. WEINSTEIN:  Objection to

17          form.  Foundation.

18                    THE WITNESS:  Again, it's

19          not my statement.  I didn't

20          develop the statement.  So I'm not

21          sure exactly how the content was

22          developed.

23   BY MR. STEWART:

24        Q.    So if you wanted to know

1  what was meant by complex systems to help

2  prevent diversion of medicines, where

3  would you go in your organization to

4  figure that out?

5         MR. WEINSTEIN:  Objection to

6     form.

7         THE WITNESS:  I understand

8     the concept of complex systems and

9     the intent of -- the intent of

10     preventing diversion.  I don't

11     know who I'd ask because no one

12     would have specific knowledge of

13     those.

14  BY MR. STEWART:

15     Q.    You think nobody within your

16  organization would have specific

17  knowledge of systems used to prevent

18  diversion?

19     A.    Correct.

20         MR. WEINSTEIN:  Objection to

21     form.

22  BY MR. STEWART:

23     Q.    Is preventing diversion not

24  a focus of your organization?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The concept of preventing

2  diversion is in fact an interest of ours.

3    Q.    When we're talking about

4  your organization, we are talking about

5  the Healthcare Distribution Alliance?

6    A.    Yes, sir.

7    Q.    It used to have a different

8  name, right?

9    A.    Correct.

10    Q.    What was that?

11    A.    Healthcare Distribution

12  Management Association.

13    Q.    The point is, if we are

14  talking about Healthcare Distribution

15  Management Association or the Healthcare

16  Distribution Alliance, we're talking

17  about the same group, the same

18  organization, just at different times,

19  fair?

20    A.    Correct.

21    Q.    Okay.  Do you see the next

22  paragraph down in this statement?  He

23  says, "To aid in the development and

24  implementation of these systems in 2008,

Highly Confidential - Subject to Further Confidentiality Review

1   HDMA and its member companies developed

2   the industry compliance guidelines to

3   support the distribution industry

4   practices on the evaluation of customer

5   orders for controlled substances and the

6   reporting of so-called suspicious orders

7   to the DEA.  The ICGs, as we call them,

8   were vetted with the DEA in advance to

9   their publication."

10          Do you see that?

11      A.    Yes, sir.

12      Q.    Are you familiar with

13  industry compliance guidelines developed

14  by the HDMA?

15      A.    I'm aware that we developed

16  industry compliance guidelines, yes.

17      Q.    And what were -- what was

18  the purpose of those guidelines?

19          MR. WEINSTEIN:  Objection to

20      scope as to this line of

21      questioning.

22          THE WITNESS:  I was not

23      involved in the development of

24      these guidelines.

Highly Confidential - Subject to Further Confidentiality Review

BY MR. STEWART:

Q.    Have you ever looked at those guidelines?

A.    I can't say that I have.

Q.    HDMA was the HDA by a different name.  But have the guidelines been enforced -- are they enforced even till today?  Do you know?

MR. WEINSTEIN:  Objection to form.

THE WITNESS:  Any guideline that we produced, including EDI, and bar codes and reverse logistics are not meant to be enforced.  They're merely guidelines.  None of those are ever meant to be standards.

BY MR. STEWART:

Q.    What do you mean they are not meant to be standards?  I mean, you put them out for what purpose?  Why does -- strike that.

Why does the HDA put out guidelines about anything?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. WEINSTEIN:  Objection to

2      form.

3          THE WITNESS:  So in the

4      industry relations side of the

5      house, where I operate, it is to

6      help a very large and complex

7      industry find more efficient ways

8      to do things.

9          So EDI, if you ever want to

10     look at an EDI transactions set, a

11     lot of EDI standards are developed

12     for different industries like

13     automotive.  And so you have to

14     create a guideline on something

15     that is meant for automotive in

16     pharmaceutical.

17         For purchase orders,

18     invoices, purchase order

19     acknowledgments, advance ship

20     notices, that sort of thing.

21  BY MR. STEWART:

22         Q.    You say EDI.  What does EDI

23  mean?

24         A.    Electronic data interchange.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It's a standard format for communication
 2    of business documents.
 3            Q.    So when the HDA puts out a
 4    standard --
 5            A.    They don't put out
 6    standards.
 7            Q.    Let me strike that.  When
 8    the HDA put out something called
 9    guidelines, what does that tell its
10    members?
11                 MR. WEINSTEIN:  Objection to
12            form.  Foundation.
13                 THE WITNESS:  Our intent is
14            to say here is something that we
15            as an industry -- again, on my
16            side with manufacturers and
17            distributors we've kind of worked
18            our way through it and said, this
19            is a good way to do it and in no
20            way obligates anyone to do it that
21            way.
22    BY MR. STEWART:
23            Q.    Just what the guidelines
24    tell people, they guide them as to
```

Highly Confidential - Subject to Further Confidentiality Review

1  practices that the organization believes

2  are a good way to carry out business; is

3  that fair?

4       A.   Yeah.  So a barcode -- a

5  barcode guidelines might have a

6  commentary about how to place a barcode

7  on a case.

8       Q.   And then we'd have to look

9  at your members and determine whether

10 they've adopted the guidelines to know

11 whether the guidelines have become the

12 industry standard; is that fair?

13            MR. WEINSTEIN:  Objection to

14       form.  You can answer.

15            THE WITNESS:  Presumably.

16 BY MR. STEWART:

17       Q.   Look at the next statement

18 here that I'd like to turn your attention

19 to, is the final paragraph on this page

20 of Exhibit 11.  And it says, "These

21 guidelines emphasize the concept of 'know

22 your customer,' that is, obtaining and

23 reviewing thorough background information

24 about a prospective healthcare provider

Highly Confidential - Subject to Further Confidentiality Review

1    prior to doing business with them;

2    therefore, in many cases potential

3    problems can be avoided even before an

4    order is placed."

5              Do you see that?

6         A.    I do see that.

7         Q.    Do you agree with that

8    statement?

9              MR. WEINSTEIN:  Objection to

10         scope.

11             THE WITNESS:  I don't have

12         any reason to disagree with that

13         statement.

14   BY MR. STEWART:

15        Q.    Are you familiar with the

16   know your customer concept as it relates

17   to the distribution of pharmaceuticals?

18        A.    I know that it is a phrase

19   that is used in this -- in any sort of

20   distribution.

21        Q.    What was your -- you say

22   that you know it was a phrase.  But what

23   is it -- are you -- did you ever deal

24   with implementing "know your customer"

1    concepts in the industry?

2         A.    No.

3         Q.    Did you have any involvement

4    yourself with diversion of

5    pharmaceuticals in your work?

6         A.    No.

7              MR. WEINSTEIN:  Objection to

8         form.

9              THE WITNESS:  Sorry.  I was

10        trying to prevent a bad answer.

11        No, I've not.

12   BY MR. STEWART:

13        Q.    Did you ever have meetings

14   to discuss diversion of opioids --

15        A.    No.

16        Q.    -- with your --

17              MR. WEINSTEIN:  Wait until

18        he finishes the question.

19              THE WITNESS:  Sorry.

20   BY MR. STEWART:

21        Q.    Did you ever -- did you ever

22   talk about best practices for dealing

23   with the diversion, you yourself within

24   the organization?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     No.

2        Q.     Are you familiar with any

3    initiatives taken within your

4    organization to combat diversion of

5    opioids or other drugs?

6        A.     I think we've always talked

7    about potential solutions that -- across

8    the industry that could help with

9    diversion or abuse of medicines.

10       Q.     You say we've always talked

11   about.  Where would you talk about that?

12       A.     That would be in any

13   conversation, that would be in our public

14   policy council or our executive

15   committee.

16       Q.     And what was your

17   involvement with your public policy

18   council?

19       A.     I am a listener.

20       Q.     So you were at the meetings?

21       A.     I was at --

22              MR. WEINSTEIN:  Objection to

23       form.

24              THE WITNESS:  -- some of the

Highly Confidential - Subject to Further Confidentiality Review

1      meetings.

2  BY MR. STEWART:

3          Q.    Were you at any meetings

4  that focused on diversion of opioids?

5          A.    I can't say that I was.

6          Q.    Do -- do those meetings have

7  minutes?

8                MR. WEINSTEIN:  Objection to

9          form.

10               THE WITNESS:  I believe our

11         board and executive committee and

12         council meetings all have minutes.

13 BY MR. STEWART:

14         Q.    So we could look at the

15 minutes to figure out whether or not

16 diversion was a subject.  Is that fair?

17         A.    The prevention of diversion,

18 sure.

19         Q.    I'd like to turn your

20 attention to one -- one more paragraph.

21 Turn to Page 106 of this document.

22 That's the stated page number.

23               Do you see that?

24         A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is that the second page of

2    Exhibit 11, it has 106 at the top?

3    A.    Yes.

4    Q.    Just to be clear, if you

5    turn to the front page of Exhibit 11,

6    sir, Page Number 105?

7    A.    Yes.

8    Q.    Okay.  Now, do you see at

9    the top of 106, the first paragraph says,

10   "Because the advanced systems now in

11   place and the industry's proactive

12   efforts, the DEA reported last year that

13   since 2006 and 2011, distributors in this

14   country stopped shipping controlled

15   substances to more than 1,500 customers

16   that could have posed an unreasonable

17   risk of diversion."

18         Do you see that?

19   A.    I do.

20   Q.    Were you aware of that?

21   A.    I -- I can't say when I

22   became aware of it.  I see it written

23   here.  I was probably aware of it.

24   Q.    And within your

Highly Confidential - Subject to Further Confidentiality Review

1    organization, is it just understood that

2    distributors can stop shipping controlled

3    substances to customers if they pose an

4    unreasonable risk of diversion?

5              MR. WEINSTEIN:  Objection to

6         form.

7              THE WITNESS:  I -- I don't

8         know -- I -- it's understood that

9         they can, yes.

10             (Document marked for

11        identification as Exhibit

12        HDA-Fri-12.)

13   BY MR. STEWART:

14        Q.    I'm going to hand you a

15   document marked Exhibit 12.

16             Do you see that you have

17   Exhibit 12 in front of you, and it looks

18   like -- or at the very top of the

19   document it's got the HDA logo?

20        A.    Yes.

21        Q.    Do you see that?

22        A.    Yes.

23        Q.    Then do you see it's

24   entitled, "Prescribing Patterns and the

1    Opioid Epidemic"?

2         A.    Yes.

3         Q.    Have you ever seen this

4    document before?

5         A.    I don't believe I have.

6         Q.    Can you turn down to the

7    very bottom, the last bullet in the

8    document.  Do you see where there's a

9    bullet that states, "Patients of 'high

10   intensity' prescribers are more likely to

11   have long-term reliance on opioids,

12   creating serious risk of misuse or

13   overdose"?

14        A.    I see it, yes.

15        Q.    Okay.  And is that something

16   you're familiar with, is that a concept

17   you're familiar with?

18             MR. WEINSTEIN:  Objection to

19             form.  Objection to scope as to

20             the whole -- this whole line of

21             questioning.

22             THE WITNESS:  Yeah, this is

23             not areas where I work or -- or

24             have specific knowledge.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. STEWART:

2          Q.    Be that as it may, it sounds

3   like you are in a lot of meetings.  And I

4   guess my question would be, while you've

5   been working within the HDA, have you

6   ever heard discussed the fact that

7   patients of high intensity prescribers

8   are more likely to have long-term

9   reliance on opioids, creating a serious

10  risk of misuse and overdose?

11              MR. WEINSTEIN:  Objection to

12         form.

13              THE WITNESS:  I can't

14         remember having a specific

15         discussion about that.

16  BY MR. STEWART:

17         Q.    Who in your organization,

18  the HDA, would probably have the best

19  knowledge of the -- the nature of high

20  intensity prescribers and the risks that

21  they pose?

22              MR. WEINSTEIN:  Objection to

23         form.

24              THE WITNESS:  I don't know

1          that we would.  This appears to be

2          based on secondary research and so

3          it references two other reports,

4          at least.  So I don't know that we

5          have specific information, but

6          we're pointing to data.

7   BY MR. STEWART:

8          Q.    Well, what person would

9   supervise the putting together of the

10  information that is in Exhibit 12 within

11  the HDA?

12              MR. WEINSTEIN:  Objection to

13          form.

14              THE WITNESS:  A document

15          like this would be probably

16          managed by John Parker who runs

17          our communications department.

18  BY MR. STEWART:

19          Q.    Is there a scientific source

20  within the HDA that's responsible for

21  making sure that when the HDA makes

22  statements like the one in Exhibit 12,

23  that they are true and accurate?

24              MR. WEINSTEIN:  Objection to

1          form.

2                    THE WITNESS:  No.

3     BY MR. STEWART:

4          Q.     Is there a process for

5     vetting statements like the one in front

6     of you that's Exhibit 12 to make sure

7     they're fair and accurate?

8                    MR. WEINSTEIN:  Objection to

9          form.

10                   THE WITNESS:  In the work

11         that I do, we have a process for

12         doing that.  I'm not sure how this

13         would have been done.

14    BY MR. STEWART:

15         Q.     What is the process that

16    you're familiar with?

17         A.     We worked directly with

18    secondary research with CDC and IQVIA and

19    others where we directly communicate with

20    them to collect and accurately identify

21    their data.

22         Q.     Fair to say when HDA puts

23    out a paper of the sort that you see in

24    Exhibit 12, it's intended to be accurate?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    It's in -- reports of the

3  sort that are in Exhibit 12 are intended

4  to be reliable, fair?

5      A.    Fair.

6      Q.    Can you look at the actual

7  studies that are cited here below the

8  bullet point talking about high intensity

9  prescribers?

10          Do you see those studies,

11  which are the last two paragraphs at the

12  bottom of the first page of Exhibit 12?

13      A.    I do see that.

14      Q.    Okay.  Are you familiar with

15  either of those studies?

16      A.    I am not.

17      Q.    Who in your organization

18  would be -- who would have the most

19  knowledge about medical studies of the

20  sort that are cited here in this HDA

21  document?

22          MR. WEINSTEIN:  Objection to

23      form.

24          THE WITNESS:  I don't know

Highly Confidential - Subject to Further Confidentiality Review

1          that there -- I don't know that

2          there's anyone in our organization

3          that would have regular knowledge

4          of medical studies.

5     BY MR. STEWART:

6          Q.    So within the HDA, you are

7     not familiar with anybody who has a

8     regular knowledge of medical studies?

9               MR. WEINSTEIN:  Objection.

10              THE WITNESS:  Correct.

11              MR. WEINSTEIN:  Objection to

12         form on that last one.

13              (Document marked for

14         identification as Exhibit

15         HDA-Fri-13.)

16    BY MR. STEWART:

17         Q.    I'll hand you Exhibit 13.

18    Do you see that you've got in front of

19    you Exhibit 13, and it's -- it's entitled

20    a fact sheet?

21         A.    Yes.

22         Q.    Do you see that it's

23    entitled "Fighting an Epidemic:

24    Combatting Prescription Drug Abuse and

1    Diversion"?

2           A.    Yes.

3           Q.    Do you see it's got the HDA

4    logo on it?

5           A.    Yes.

6           Q.    Are you familiar with this

7    document?

8           A.    I can't say that I've seen

9    this specifically.

10          Q.    Are you familiar with this

11   general information being put out by HDA

12   regarding fighting prescription drug

13   abuse and diversion?

14              MR. WEINSTEIN:  Objection to

15         form.

16              THE WITNESS:  Generally,

17         yes.

18   BY MR. STEWART:

19          Q.    Okay.  Do you see at the

20   bottom of the page, last bullet, there's

21   a statement that says, "We take steps to

22   'know our customers,' including actively

23   assessing and reviewing purchases from

24   pharmacies and healthcare providers that

Highly Confidential - Subject to Further Confidentiality Review

1    order controlled substances to monitor

2    and report to the DEA if a customer's

3    controlled substances volume or pattern

4    of ordering might signal inappropriate

5    use of the product.  If inappropriate use

6    is suspected, distributors work

7    proactively with the DEA, local law

8    enforcement, and others to help in the

9    investigation of potential diversion

10   cases."

11              Do you see that?

12        A.    I do.

13        Q.    Who would be responsible

14   within the HDA for making sure that a

15   statement in this document, Exhibit 13,

16   like the one I just read, is truthful,

17   accurate, and reliable?

18              MR. WEINSTEIN:  Objection to

19         form.

20              THE WITNESS:  Again, this is

21         probably managed by our

22         communications department.  And it

23         would receive legal review from

24         inside as well as outside counsel.

Highly Confidential - Subject to Further Confidentiality Review

1          And this presumably is based on

2          elements of what is required under

3          the law.  So it could be -- I

4          don't know who would do it.

5     BY MR. STEWART:

6          Q.    But if you had to identify a

7     human being who would be responsible for

8     making sure that every statement made in

9     Exhibit 13 is true, accurate, and

10    reliable, who would that be?

11              MR. WEINSTEIN:  Objection to

12          form.

13              THE WITNESS:  This is

14          developed by our communications

15          department, so I would presume it

16          would be John Parker.

17    BY MR. STEWART:

18          Q.    And it talks about the

19    statements, bullet points, you see they

20    say "we."  It looks like that "we" is

21    pharmaceutical distributors.  Is that a

22    fair reading of this document?

23              MR. WEINSTEIN:  Objection to

24          form.

1          THE WITNESS:  Based on the

2          way it's worded, I would assume

3          that is correct.

4               (Document marked for

5          identification as Exhibit

6          HDA-Fri-14.)

7     BY MR. STEWART:

8          Q.    I'll hand you Exhibit 14.

9     How many -- do you have in front of you a

10    document entitled -- or identified as

11    Exhibit 14, which is entitled "Trends in

12    Opioid Use:  History, Background, and

13    Origins of the Epidemic"?

14         A.    Yes.

15         Q.    Is this a document that

16    you're familiar with?

17         A.    I am generally familiar with

18    the fact that we did this report.

19         Q.    Okay.  You say "we."  You're

20    talking about the HDA, fair?

21         A.    Avalere did this report.

22    We -- it was, as it says here, conducted

23    on behalf of HDA, but Avalere retained

24    the full editorial control of the

Highly Confidential - Subject to Further Confidentiality Review

1   document.

2        Q.    Avalere is a consulting

3   firm?

4        A.    I believe so.

5        Q.    HDA paid Avalere to produce

6   this report?

7        A.    I believe so.

8        Q.    Okay.  Have you ever

9   reviewed the report?

10       A.    I have not.

11       Q.    I take it HDA has

12  published -- it's a published report now,

13  fair?

14       A.    It was published, yes, by

15  Avalere.

16       Q.    So the fact that HDA

17  retained Avalere and allowed this to be

18  published, it's intended to be an

19  accurate report, fair?

20            MR. WEINSTEIN:  Objection to

21       form.

22            THE WITNESS:  I can't

23       imagine why Avalere independently

24       would create an inaccurate report.

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. STEWART:
2        Q.    Well, you're talking
3   Avalere, but HDA stands behind this
4   report, right?
5             MR. WEINSTEIN:  Objection to
6        form.
7             THE WITNESS:  I believe
8        we -- I believe we funded the
9        report.  But the report was done
10       independently by Avalere.
11  BY MR. STEWART:
12       Q.    If I wanted to question
13  someone at the HDA -- well, put it this
14  way:  Who at the HDA would have been
15  responsible for supervising the creation
16  of this report and the hiring of Avalere?
17            MR. WEINSTEIN:  Objection to
18       form.
19            THE WITNESS:  It would have
20       had something to do with Patrick
21       Kelly or John Parker in our
22       office.
23  BY MR. STEWART:
24       Q.    So John Parker and Patrick
```

1  Kelly, one of the two or both would be

2  the people to talk about this report,

3  fair?

4        A.    Correct.  Or Avalere, who

5  published the report.

6              (Document marked for

7        identification as Exhibit

8        HDA-Fri-15.)

9  BY MR. STEWART:

10       Q.    I'll hand you Exhibit 15.

11 Are you familiar with that document?

12       A.    Not specifically.

13       Q.    You say not specifically.

14 What do you mean by that?

15       A.    I'm familiar with Allied

16 Against Opioid Abuse.  I'm not familiar

17 with this specific document.

18       Q.    What's Allied Against Opioid

19 Abuse?

20       A.    It's -- I think I mentioned

21 earlier, it's an alliance of various

22 groups that have an interest in educating

23 patients on potential for abuse and safe

24 disposal of medicines.

1    Q.    And allied against opioid

2  abuse puts out materials, fair?

3              MR. WEINSTEIN:  Objection to

4        form and objection to scope as to

5        this line of questioning.

6              THE WITNESS:  Yeah because I

7        don't do anything with allied

8        against opioid abuse.

9  BY MR. STEWART:

10    Q.    Okay.  So, all right.  So

11  who would we talk to about Allied Against

12  Opioid Abuse within your organization?

13    A.    John Parker.

14              (Document marked for

15        identification as Exhibit

16        HDA-Fri-16.)

17              MR. WEINSTEIN:  Can I get a

18        copy of that, Mike?

19              MR. STEWART:  Oh, yeah.

20        Pardon.

21  BY MR. STEWART:

22    Q.    I've handed you Exhibit 16.

23  Are you familiar with this document?

24    A.    Generally.

1    Q.    And this is an HDA

2    statement, Exhibit 16, in response to

3    Washington Post article?

4        A.    Presumably.

5            MR. WEINSTEIN:  Objection to

6        scope as to this line of

7        questions.

8    BY MR. STEWART:

9        Q.    Who would have put out this

10   response?

11           MR. WEINSTEIN:  Objection to

12       form.

13           THE WITNESS:  This would

14       have been managed by our

15       communications department.

16   BY MR. STEWART:

17       Q.    Let me ask you something.

18   How much familiarity do you have with the

19   information held by distributors with

20   respect to the distribution of

21   pharmaceuticals to pharmacies and then

22   end users?

23           MR. WEINSTEIN:  Objection to

24       form.

 1            THE WITNESS:  We don't deal

 2       at all with the dispensing of

 3       medicines to end users.

 4            If you generally ask what

 5       knowledge do I have of systems and

 6       processes in the distribution of

 7       medicines, I have a reasonable

 8       amount of knowledge of the supply

 9       chain and how it works.

10  BY MR. STEWART:

11       Q.    Sure.  Could you tell me, I

12  mean, your distributors, right, provide

13  information to drug manufacturers

14  systematically, is that fair?

15            MR. WEINSTEIN:  Objection to

16       form.

17            THE WITNESS:  It depends on

18       their contractual agreements, I

19       believe.

20  BY MR. STEWART:

21       Q.    Okay.  But many have

22  contractual agreements whereby they --

23  they pass on to the manufacturers

24  information about the drugs that are

1  distributed to particular pharmacies, is

2  that fair?

3      A.    They -- not about the drugs.

4  They provide information about inventory

5  levels, fill rates, sales volumes and

6  such.

7      Q.    And that information is

8  typically provided for -- for -- on a

9  national level, is that fair?

10          MR. WEINSTEIN:  Objection to

11      form.

12          THE WITNESS:  No.

13  BY MR. STEWART:

14      Q.    Well, let me put it this

15  way --

16      A.    It's -- it's --

17      Q.    Go ahead.

18      A.    It's distributor specific

19  information.

20      Q.    It's provided typically for

21  example, if you have a distributor, a

22  distributor distributes in a particular

23  region?

24      A.    Yes.

1    Q.   And typically a distributor

2    will provide manufacturers, according to

3    these arrangements, the distribution

4    information related to their region?

5              MR. WEINSTEIN:  Objection to

6         form.

7              MS. CHARLES:  Objection.

8         Foundation.

9              THE WITNESS:  Presumably.  I

10        don't know specifically, but I do

11        know that there are methods for

12        exchanging information.

13   BY MR. STEWART:

14        Q.   Can you tell me what you

15   know about those methods?

16             MR. WEINSTEIN:  Objection to

17        form.

18             THE WITNESS:  They use an

19        EDI transaction site, called an

20        867.  And it provides sale volumes

21        and -- and inventory levels and

22        fill rates.

23   BY MR. STEWART:

24        Q.   So if I'm a manufacturer and

Highly Confidential - Subject to Further Confidentiality Review

1    I'm trying to find out sales volumes for

2    a particular drug in the state of

3    Tennessee, what level of detail do you

4    understand that I can receive?

5         A.    I don't know.

6              MR. WEINSTEIN:  Objection to

7         form and foundation.

8    BY MR. STEWART:

9         Q.    Who in your organization

10   would be the expert on that particular

11   sort of information sharing?

12        A.    Me.

13        Q.    Okay.  So what do you know

14   about it?

15             MR. WEINSTEIN:  Objection to

16        form.

17             THE WITNESS:  I don't know

18        specifically.

19   BY MR. STEWART:

20        Q.    Well, give me -- give me

21   then, if I'm -- what -- what is your

22   understanding of the information about

23   the distribution of --

24        A.    We've -- we've helped create

Highly Confidential - Subject to Further Confidentiality Review

1    a guideline for something called an EDI

2    867 transaction, which provides -- which

3    can provide sales data, inventories, and

4    fill rates back to the manufacturer.

5              I don't know how fully

6    everyone uses them.  I don't know to what

7    level of detail they go to.  I don't know

8    why manufacturers would look at it in a

9    specific way.

10        Q.    So the point is, we could

11   look at your guidelines that the HDA

12   approved, to understand your

13   understanding of -- of the sort of

14   information that is available if

15   manufacturers choose to get it?

16             MR. WEINSTEIN:  Objection to

17        form.

18             THE WITNESS:  If

19        manufacturers and their customer

20        distributors choose to exchange

21        it, yes.

22   BY MR. STEWART:

23        Q.    Is it your understanding

24   that most actors in the industry follow

Highly Confidential - Subject to Further Confidentiality Review

1    your guideline?

2              MR. WEINSTEIN:  Objection to

3         form and foundation.

4              THE WITNESS:  I have no

5         understanding of how many people

6         follow our guidelines.

7    BY MR. STEWART:

8         Q.    So you haven't evaluated

9    that, whether or not your guideline is

10   being used by the members of the HDA or

11   not?

12        A.    Correct.  Again, it's not a

13   standard.  So we don't have a requirement

14   for usage.

15        Q.    Let's look at this document

16   for a moment.

17              Do you see on the second

18   page of the document, which is marked 2

19   of 6?

20        A.    Yes, sir.

21        Q.    There is a statement which

22   is the first sentence of the last

23   paragraph, "Pharmaceutical distributors

24   have no mechanism to increase demand or

1   patient's use of opioids"?

2        A.    I'm sorry, which -- where

3   are you?

4        Q.    Do you see there's a

5   statement, "Pharmaceutical distributors

6   have no mechanism to increase demand or

7   patient's use of opioid."

8        A.    Correct.

9        Q.    But one thing,

10  pharmaceutical distributors, I think

11  you've already testified, certainly have

12  the ability to stop distributing

13  particular drugs to particular pharmacies

14  if they decide those pharmacies are

15  engaged in diversion, fair?

16            MR. PYSER:  Object to form.

17            THE WITNESS:  My

18        understanding is that they can

19        limit shipments for a variety of

20        reasons.

21  BY MR. STEWART:

22        Q.    But I mean, that's one of

23  the reasons, right?

24            MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1           form.

2                      THE WITNESS:  Sure.

3      BY MR. STEWART:

4           Q.    I mean, if -- if a

5      distributor decides that part of the

6      demand for drugs is a particular pharmacy

7      that's not -- that -- that is engaged in

8      diversion, the distributor can cut off a

9      particular drug, such as opioids that may

10     be diverted, fair?

11                     MR. WEINSTEIN:  Objection to

12              form.

13                     THE WITNESS:  I think there

14              are a variety of reasons why they

15              can make any sort of decision.

16              I'm not familiar with their

17              criteria or the construction of

18              their decision tree.

19     BY MR. STEWART:

20          Q.    But certainly if they -- if

21     they find that a pharmacy is engaged in

22     diversion, they have the power to cut

23     that pharmacy off?

24                     MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1              form.

2                      THE WITNESS:  Presumably

3              they are engaged with DEA or other

4              law enforcement officials to

5              research that.

6      BY MR. STEWART:

7              Q.    And the point is, just so we

8      have a clear record.  But the answer is

9      yes, they can cut that pharmacy off,

10     right?

11                     MR. WEINSTEIN:  Same

12             objection.

13                     THE WITNESS:  Presumably.

14             But I don't know their systems or

15             what they do.

16     BY MR. STEWART:

17             Q.    And when you say you don't

18     know their systems, you're saying I don't

19     know the exact systems they use to decide

20     what pharmacies should be cut off and

21     what pharmacies should be allowed to

22     dispense?

23             A.    Correct.

24             Q.    Is that the systems that

1    you're referring to?

2         A.    Yeah, we don't know how

3    their -- their systems operate.

4         Q.    We would have to talk to

5    each distributor about that, to know

6    precisely when they decide to stop giving

7    drugs to a particular pharmacy because of

8    diversion concerns?

9              MR. WEINSTEIN:  Objection to

10        form.

11             THE WITNESS:  Presumably.

12   BY MR. STEWART:

13        Q.    Do you know if within your

14   organization, do you recall being in

15   meetings where you talked about best

16   practices for whereby distributors should

17   cut off pharmacies engaged in diversion?

18             MR. WEINSTEIN:  Objection to

19        form.

20             THE WITNESS:  No.

21             MR. WEINSTEIN:  And scope.

22   BY MR. STEWART:

23        Q.    I'd like to turn to another

24   sentence.  Turn to Page 3 of 6.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see the third

2    paragraph down including the headings,

3    there's a statement, "While distributors

4    must report each controlled substance

5    order that is filled and those that are

6    deemed suspicious to the DEA, a

7    distributor only knows what it ships to a

8    particular dispenser"?

9          A.     Yes.

10         Q.     Okay.  And the point is, I

11   think you already said this, distributors

12   are responsible for reporting orders that

13   are deemed suspicious to the DEA, fair?

14              MR. WEINSTEIN:  Objection to

15         form.  Objection.  Scope.

16              THE WITNESS:  That's my

17         understanding, but in this case,

18         we're talking about all orders of

19         controlled substances.

20   BY MR. STEWART:

21         Q.     But they don't -- okay.

22   Tell me -- tell me what you just meant by

23   that statement.

24         A.     What I meant?  So I

Highly Confidential - Subject to Further Confidentiality Review

1    apologize.  I meant exactly what it says.

2    Distributors must report each controlled

3    substance order that is filled to the DEA

4    as well as those that are deemed

5    suspicious.

6          Q.    Right.  They don't just

7    report wholesale.  Their second

8    obligation, independent or an additional

9    obligation, is to identify within the

10   range of reported transactions which ones

11   are suspicious, fair?

12                MR. WEINSTEIN:  Objection to

13        form.

14                THE WITNESS:  That's --

15        that's what it says.

16   BY MR. STEWART:

17         Q.    And that's correct, right?

18                MR. WEINSTEIN:  Same

19        objection.

20                THE WITNESS:  Presumably.

21   BY MR. STEWART:

22         Q.    Well, you say presumably.

23   It's going to be important for the jury

24   to know.  The point is, a distributor has

1    two obligations.  A distributor is

2    obligated to report each controlled

3    substances order.  But then there's an

4    obligation that a distributor report --

5    and I'm using the exact language in the

6    HDA materials -- those that are deemed

7    suspicious to the DEA, fair?

8              MR. WEINSTEIN:  Objection to

9         form, foundation, and scope.

10             THE WITNESS:  It's what it

11        says.

12   BY MR. STEWART:

13        Q.    And that's correct?  That's

14   your understanding?

15        A.    Sure.

16        Q.    Now look at the --

17             MR. WEINSTEIN:  Same

18        objections to the last question.

19   BY MR. STEWART:

20        Q.    Now look at the last

21   paragraph, and I want you to look at the

22   last sentence at the bottom of the page.

23   Do you see, it says, "Despite many

24   requests for clarity, the DEA too often

Highly Confidential - Subject to Further Confidentiality Review

1    did not help pharmacies, doctors, and

2    distributors understand exactly how the

3    DEA wanted them to operate and what

4    information the DEA wanted them to

5    report."

6              Do you see that sentence?

7         A.    I do see it.

8         Q.    Do you know what -- what

9    your organization is saying about the

10   DEA?  Is the organization blaming the DEA

11   for -- for failures of distributors to

12   control diversion?

13             MR. WEINSTEIN:  Objection to

14        form and to scope.

15             THE WITNESS:  I wasn't

16        involved in developing this

17        document.  A lot of these

18        conversations take place in the

19        government affairs side of our

20        business.  So how we frame or

21        produce any of this, is not really

22        what I do.  So I wouldn't assume

23        how they meant it.

24   BY MR. STEWART:

1    Q.   Have you ever been aware of

2  a time since you've been involved with

3  the pharmaceutical industry that the DEA

4  did not make it clear that distributors

5  had an obligation to limit and prevent

6  diversion?

7              MR. WEINSTEIN:  Objection to

8        form, foundation, and scope.

9              THE WITNESS:  I think there

10       has always been problems with

11       transparency and clarity with the

12       DEA, is my understanding.

13  BY MR. STEWART:

14    Q.   Well, despite all that

15  though, I take it there's never been a

16  challenge such that the industry -- well,

17  strike that.

18             I take it everybody in the

19  industry has always known that the DEA

20  required that participants in the

21  distribution of pharmaceuticals take

22  reasonable steps to prevent diversion,

23  fair?

24             MR. WEINSTEIN:  Objection to

1    form, foundation, and scope.

2            THE WITNESS:  Again, I'm not

3        involved in that side.  I

4        understand that there's a law and

5        regulations associated with it.

6        But I'm not specifically --

7        specifically understanding of what

8        they are.

9    BY MR. STEWART:

10           Q.    But you are understanding --

11   even in your general understanding, you

12   know that distributors of pharmaceuticals

13   have always been required to prevent

14   diversion of drugs, right?

15           MR. WEINSTEIN:  Objection to

16       form.

17           THE WITNESS:  They have

18       responsibilities to ship directly

19       to their dispensing -- to their

20       dispensing customers and whatever

21       reporting requirements they have

22       to DEA.

23   BY MR. STEWART:

24           Q.    Yeah.  I mean, there's never

1    been a time when a distributor could just

2    distribute drugs to a company that

3    they -- to a pharmacy that the

4    distributor knew was participating in

5    diversion, right?

6              MR. WEINSTEIN:  Objection to

7         scope.

8              THE WITNESS:  Correct.  My

9         understanding is correct.

10             MR. PYSER:  Object to form.

11             MR. STEWART:  Let me ask you

12        something.  Has this organization

13        executed -- I'm asking counsel --

14        a protective order in this case?

15             MR. WEINSTEIN:  In the MDL

16        it has.

17             MR. STEWART:  Okay.  And so

18        it's obligated itself not to

19        disclose materials related to this

20        litigation pursuant to the MDL

21        protective order?

22             MR. WEINSTEIN:  That's my

23        understanding.  I mean -- you

24        know, I haven't seen it in a

1    while, but...

2          (Document marked for

3    identification as Exhibit

4    HDA-Fri-17.)

5  BY MR. STEWART:

6          Q.    I'm going to hand you

7  Exhibit 17.  And this is a highly

8  confidential document.

9          MR. WEINSTEIN:  Do you have

10        an extra copy of that?

11        MR. CLUFF:  Yeah.  Sorry.

12        MR. STEWART:  Oh, pardon me.

13        MS. ROLLINS:  What's the

14        Bates number on that?

15        MR. CLUFF:

16        MNK-T1_0004197986 begins the

17        document.

18 BY MR. STEWART:

19        Q.    And here's my only question

20 with respect to the document.  Could you

21 turn to Page MNK-T1_0004198034.

22        Do you see that?

23        A.    I do.

24        Q.    And my question is, do you

1    see there's a reference to IMS controlled

2    substances ratings?

3        A.    I do.

4        Q.    It says, "IMS's controlled

5    substances ratings links pharmacy

6    dispensing with anonymized patients."

7        A.    I see that.

8        Q.    Are you familiar with IMS

9    controlled substance ratings?

10       A.    I'm familiar with IMS, but

11   not their controlled substances ratings.

12       Q.    What's IMS?

13       A.    IMS is now known as IQVIA.

14   It's an industry consulting and analytics

15   firm.

16       Q.    Are you familiar with the

17   information IMS collects on the

18   distribution of opioids in the United

19   States?

20       A.    They collect information on

21   all sorts of medicines, manufacture and

22   sale of medicines, including opioids.

23       Q.    But you're not familiar with

24   their particular controlled substances

Highly Confidential - Subject to Further Confidentiality Review

1    ratings?

2         A.    I am not.

3         Q.    You don't ever remember

4    discussing that?

5         A.    I do not.

6         Q.    Did you have, within your

7    organization, a point of contact with

8    IMS?

9              MR. WEINSTEIN:  Objection to

10        form.

11             THE WITNESS:  Yes.

12   BY MR. STEWART:

13        Q.    Who was that?

14        A.    Me.

15        Q.    Do you see -- turn to the

16   second page of this document.  Do you see

17   it's prepared for HDMA by Doug Long?

18        A.    I do.

19        Q.    Okay.  That's your

20   organization and a previous name, HDMA,

21   right?

22        A.    Correct.

23        Q.    Who is Doug Long?

24        A.    Doug Long is an employee of

1    IQVIA, then IMS Health.

2          Q.    Okay.  So this was a

3    document that was prepared for you?

4          A.    It was a document that was a

5    presentation that was presented at our

6    education conference in 2014.

7          Q.    Now, turn -- and why would

8    Mr. Long have been asked to prepare this

9    presentation at your conference?

10              MR. WEINSTEIN:  Objection to

11         form.  And objection to scope as

12         to this whole line of questioning.

13              THE WITNESS:  Doug is

14         regularly asked to present

15         education to the industry about

16         trends in -- or market trends on

17         pharmaceutical products.

18   BY MR. STEWART:

19         Q.    And turn back to the page

20   that we were looking at, Page 34 of this

21   document.

22         A.    Mm-hmm.

23         Q.    Do you see there's a

24   statement that "the IMS controlled

1   substances ratings identify outlets and

2   prescribers that have higher than normal

3   controlled substance usage and may

4   warrant additional investigation"?

5          A.    I see that.

6          Q.    Okay.  But I take it if Doug

7   Long puts that in materials, you'd assume

8   that that's an accurate description of

9   these controlled substances ratings?

10                MR. WEINSTEIN:  Objection to

11          form, foundation, and scope.

12                THE WITNESS:  I have no idea

13          what their ratings are.

14          Presumably it's a separate service

15          that they offered to distributors

16          or manufacturers.

17   BY MR. STEWART:

18          Q.    Would you think if Doug Long

19   is presenting materials at a conference

20   for your organization, that he intends

21   them to be reliable?

22                MR. WEINSTEIN:  Objection to

23          form, foundation, and scope.

24                THE WITNESS:  I have always

Highly Confidential - Subject to Further Confidentiality Review

1    expected that, yes.

2    BY MR. STEWART:

3        Q.    And you are just not

4    familiar with the details of this

5    particular IMS product --

6        A.    Correct.

7        Q.    -- is that fair?

8        A.    Yeah.

9        Q.    And when I say particular

10   IMS product, I'm talking about the

11   product discussed on Page 34 of this

12   Exhibit 17, the IMS controlled substance

13   ratings?

14       A.    Correct.

15       Q.    I'm going to hand you

16   Exhibit 18.

17            (Document marked for

18            identification as Exhibit

19            HDA-Fri-18.)

20   BY MR. STEWART:

21       Q.    And do you see that there's

22   some meeting notes from a Buzzeo DEA

23   conference, Washington DC, October 27,

24   2008?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.    I can see that.

 2          Q.    Are you familiar with this?

 3          A.    No.

 4          Q.    Okay.  You see it says,

 5   "Topic:  Suspicious Order Monitoring

 6   Process."

 7                Are you familiar with that?

 8          A.    I --

 9                MR. WEINSTEIN:  Objection to

10          form.

11                THE WITNESS:  I can see the

12          topic.

13   BY MR. STEWART:

14          Q.    But are you familiar, is

15   that something you would have been

16   involved in?

17          A.    No.

18          Q.    Okay.  Who in your

19   organization would -- would be the person

20   to ask about this conference?

21                MR. WEINSTEIN:  Objection to

22          form.

23                THE WITNESS:  I don't know

24          that -- I don't know who would

1    have gone to this from an HDA

2    standpoint.

3  BY MR. STEWART:

4         Q.    You may have answered this,

5  but when we are talking suspicious order

6  monitoring, who within your organization

7  would be the expert on that?

8              MR. WEINSTEIN:  Objection.

9  BY MR. STEWART:

10        Q.    Or the person with the most

11 knowledge?

12             MR. WEINSTEIN:  Objection to

13        form.

14             THE WITNESS:  We don't know

15        anything specifically about our

16        suspicious order monitoring

17        programs that -- that our members

18        have.  So I don't know how to

19        answer that.

20 BY MR. STEWART:

21        Q.    Well, within your

22 organization, the organization of

23 distributors of pharmaceuticals, so in

24 the whole United States, who -- who would

1    have the best knowledge of suspicious

2    order monitoring programs?

3                    MR. WEINSTEIN:  Objection to

4            form.

5                    THE WITNESS:  I don't -- so

6            again, what -- under whatever

7            requirements our members have

8            under law and regulation, they

9            develop their own suspicious order

10           monitoring programs and we're not

11           privy to what those programs are.

12   BY MR. STEWART:

13           Q.    I understand that.  But I --

14   I don't think your testimony is that your

15   organization, the HDA, doesn't have

16   anybody that is -- that understands and

17   takes an interest in suspicious order

18   monitorings -- monitoring programs and

19   best industry practices, right?

20                   You must have somebody that

21   pays attention to that and cares about

22   it, fair?

23           A.    As a -- presumably as a

24   general topic that would fall under

Highly Confidential - Subject to Further Confidentiality Review

1  government affairs and that would be

2  Patrick Kelly.

3        Q.    So you think he would be the

4  person that would have the best

5  knowledge?

6        A.    Yeah, I think it would be --

7  maybe minutially better than mine.

8            MS. ROLLINS:  I'm sorry.

9        Can you please read the Bates

10       stamp into the record?

11           MR. CLUFF:  Exhibit 18 was

12       MNK_TNSTA05292267.

13           (Document marked for

14       identification as Exhibit

15       HDA-Fri-19.)

16  BY MR. STEWART:

17       Q.    Handing you Exhibit 19.

18  I'll ask you, are you familiar with the

19  document that's Exhibit 19?

20       A.    I'm not familiar with the

21  specific document.  But we often present

22  a -- an education session at our

23  conference that's called "State of the

24  States."

1    Q.    And what's the purpose of

2    the "State of the States" presentation,

3    typically at your conferences?

4    A.    To provide information to

5    our attendees about the activities of our

6    state affairs department.

7    Q.    What does your state affairs

8    department do in terms of participating

9    in the law making in different states?

10    A.    When there are laws or

11    regulations that impact our industry,

12    then our state affairs team will address

13    them in whatever way our members ask us

14    to, from the advocacy standpoint.

15    Q.    All right.  Did I -- do you

16    go so far at times as to take litigation

17    positions with respect to particular

18    state statutes?

19          MR. WEINSTEIN:  Objection to

20          scope on this whole line of

21          questioning.

22          THE WITNESS:  So again, I'm

23          not involved with our government

24          affairs or legal aspect.  Under --

Highly Confidential - Subject to Further Confidentiality Review

1   my knowledge recently, we've only

2   taken one litigation action in a

3   state.

4   BY MR. STEWART:

5       Q.   Tell me what that was.

6       A.   It had to do with the tax

7   assessment in the state of New York.

8       Q.   I take it among the states

9   that your organization looks at is

10  Tennessee, fair?

11          MR. WEINSTEIN:  Objection to

12      form.

13          THE WITNESS:  I don't -- I'm

14      not involved with our state

15      affairs department.  But

16      presumably Tennessee is part of

17      their purview.

18  BY MR. STEWART:

19      Q.   So we'd have to talk to the

20  state affairs folks to figure out what if

21  anything they've done in Tennessee with

22  respect to for example, the opioid

23  crisis?

24      A.   Sure.  And all of that

1    reports directly to Patrick Kelly.

2              (Document marked for

3         identification as Exhibit

4         HDA-Fri-20.)

5    BY MR. STEWART:

6         Q.    I've handed you Exhibit 20,

7    and I'll ask you if you recognize it.

8              You'll find I've fulfilled

9    my obligation to state the Bates number,

10   and it's Exhibit 20.  Do you see it's

11   Bates Number MNK_TNSTA08439208?

12             Do you see that?

13        A.    I see it.

14        Q.    Okay.  That's on the first

15   page, the same page that's got the

16   exhibit sticker, right?

17        A.    Right.

18        Q.    Okay.  Now, are you familiar

19   with the HDMA DMC Expo 2011?

20        A.    Yeah.  Our distribution

21   management conference.

22        Q.    Did you attend that?

23        A.    I did.

24        Q.    And you -- who would have

1    put together conference notes like this?

2         A.    I honestly don't know.

3         Q.    Is this typical for the

4    organization that after a conference

5    somebody will put together notes and

6    explain what was -- you know, in general

7    terms what happened?

8         A.    Well, these are only for

9    specific sessions, and not all the

10   sessions were presented there.

11            So this clearly was someone

12   with interest of -- on these particular

13   sessions.  So it was probably

14   government -- government affairs of some

15   kind.  And again that reports up to

16   Patrick.

17        Q.    Do you all, do you have

18   attendee lists for all your conferences,

19   HDA conferences?

20        A.    I have no idea who prepared

21   these.  The way it's written, it seems

22   interesting.

23        Q.    You're talking when you say

24   I have no idea who prepared these, you're

Highly Confidential - Subject to Further Confidentiality Review

1   talking about you have no idea who

2   prepared the exhibit that's in front of

3   you?

4          A.    Correct.

5          Q.    Okay.  And what's the number

6   of the exhibit?

7          A.    It's Exhibit 20.

8          Q.    So you just don't know who

9   prepared that?

10              Let's step back to a

11  different question.

12              Do you -- does the HDA keep

13  records of who attends its conferences?

14         A.    We try to.

15         Q.    Who keeps track of those?

16  Who stores those records?

17         A.    It's all stored in our

18  database.

19         Q.    Is that a SharePoint, or

20  what kind of database is it?

21         A.    It's called Net Forum.

22         Q.    Is there a particular person

23  who is responsible for keeping track of

24  that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    We have a specific person

2  who administratively handles the

3  database.

4         Q.    Who is that?

5         A.    Lisa Gallagher who reports

6  to me.

7         Q.    And is it typical when you

8  have conferences for the presentations to

9  be videotaped?

10        A.    We've never done that.

11        Q.    Does somebody maintain the

12  presentations, the PowerPoints, and other

13  presentation materials that speakers

14  get -- put out?

15        A.    They would be in our

16  conference folders, and if they allow us

17  to share them, we share them with the

18  attendees.

19        Q.    And those conference

20  folders, are those physical or are they

21  maintained in a database?

22        A.    They're maintained on a

23  server, yes.

24        Q.    And how far back do you

1    think you've got conference folders for

2    your conferences?

3                MR. WEINSTEIN:  Objection.

4                THE WITNESS:  I have no

5         idea.

6    BY MR. STEWART:

7         Q.    Certainly ten years, right?

8                MR. WEINSTEIN:  Objection.

9                THE WITNESS:  We've had a

10        database conversion, system

11        conversion.  So I don't know if

12        we've gone back that far for

13        conference materials like this.

14   BY MR. STEWART:

15        Q.    We would have to ask

16   Ms. Gallagher, fair?

17        A.    On the -- on -- on the

18   attendee lists?

19        Q.    Yeah.

20        A.    We would have to simply ask

21   a question of our database.  And you guys

22   have presumably already trolled through

23   all our files.  So they're there if they

24   go back that far.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Turn to the second page of

2    this document.  And it's marked with a

3    Bates number that ends in 209.

4                Do you see that?

5          A.    I do.

6          Q.    Do you see there's a bullet

7    point.  It's the third bullet point.

8    It's entitled "Rogue Pain Clinics in

9    Florida."

10         A.    Mm-hmm.

11         Q.    Do you see that?

12         A.    I do.

13         Q.    Do you see it says, "Problem

14   is now migration.  Vast majority of

15   patients are visiting Florida from out of

16   state," and it's got a list of states.

17         A.    Mm-hmm.

18         Q.    Do you see that?

19         A.    I do.

20         Q.    And it's Tennessee.  Do you

21   see that's included?

22         A.    I do see that.

23         Q.    Do you know which particular

24   presentation this is describing?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    It appears to be a statement

2   by Cathy Gallagher of DEA.

3    Q.    So this is what the Drug

4   Enforcement Administration was telling

5   your members at this conference, fair?

6    A.    Yes.

7         MR. WEINSTEIN:  Objection to

8        form.

9   BY MR. STEWART:

10    Q.    Do you see now, if you go

11   down to -- there's a bullet, it's third

12   bullet from the bottom.  The -- and it

13   says, "DEA strongly recommending on-site

14   visits to continue doing business with

15   your customers."

16         Do you see that?

17    A.    I do see it.

18    Q.    Okay.  So this is another

19   statement that Ms. Gallagher made to your

20   conference; is that right?

21         MR. WEINSTEIN:  Objection to

22        form.

23         THE WITNESS:  This is --

24        yeah, I don't know the answer to

1          that.  These are someone else's

2          notes of that conference.  So I

3          have no idea whether she said

4          that.  I'm sorry.  Someone else's

5          notes of that session.

6     BY MR. STEWART:

7          Q.     Fair enough.  Have you ever

8     seen any notes of one of your sessions

9     that described a statement by a DEA

10    official and it turned out that the

11    statement wasn't made?

12              MR. WEINSTEIN:  Objection to

13         form.

14              THE WITNESS:  I've never

15         seen notes like this from any of

16         our sessions.

17    BY MR. STEWART:

18         Q.     Figure a jury should be able

19    to look at this and conclude that the DEA

20    strongly recommended on-site visits to

21    continue doing business with your

22    customers?

23              MR. WEINSTEIN:  Mike, that's

24         a legal question.  That's not an

Highly Confidential - Subject to Further Confidentiality Review

1    appropriate question.

2              MR. PYSER:  Objection to

3         form.

4              MR. STEWART:  I see.  You're

5         saying from an evidentiary

6         standpoint.  I'll withdraw it.

7    BY MR. STEWART:

8         Q.    What we know is that

9    somebody taking notes with respect to

10   this conference concluded that the DEA

11   strongly recommended on-site visits to

12   continue doing business with customers;

13   is that fair?

14             MR. WEINSTEIN:  Objection to

15        form.

16             THE WITNESS:  That's what it

17        appears to what it says on the

18        paper.

19   BY MR. STEWART:

20        Q.    Okay.  And I take it the

21   notes that are taken at your conferences

22   are intended to be reliable, right?

23             MR. WEINSTEIN:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1        THE WITNESS:  I didn't take

2     these notes.  I don't know who

3     take --

4        MR. WEINSTEIN:  We don't

5     even know if these are HDA notes.

6     We don't know anything about these

7     notes.

8  BY MR. STEWART:

9     Q.    Okay.  What's the answer?

10    A.    I have no idea.  We don't

11  have notes taken of our events from our

12  standpoint.  Based on the way this is

13  worded, this is not an HDMA document.

14    Q.    Why do you say that?

15    A.    Because it says, "I found

16  the seminar to be informative,

17  educational, worth the investment of time

18  and expense."  I personally, and nor any

19  of our staff, have the expense of

20  attending this event.

21    Q.    You talked earlier about

22  your own knowledge of the information

23  that your distributors, that the

24  distributors have.  What about within

1  your organization?  Distributors within

2  your organization, I think you've already

3  said, meet at times with manufacture --

4  representatives of manufacturers of

5  pharmaceuticals, fair?

6         A.    We have conferences where

7  networking is possible, yes.

8         Q.    I mean, networking, among

9  the various folks involved in the

10  distribution of -- manufacturing and

11  distribution --

12         A.    Manufacturing and

13  distributors.

14         Q.    -- of pharmaceuticals,

15  right?

16              And I take it at some of

17  these conferences, best practices for

18  tracking and preventing diversion come

19  up, right?

20              MR. WEINSTEIN:  Objection to

21         form.

22              THE WITNESS:  Our

23         distribution management conference

24         is our largest event where we

Highly Confidential - Subject to Further Confidentiality Review

1      invite DEA to present and various

2      consultants who might have

3      interpretations of how DEA

4      enforces their regulations.

5            So presumably they might

6      talk about that in educational

7      sessions there.

8    BY MR. STEWART:

9      Q.     If -- if if --

10           MR. STEWART:  Let's take a

11     five-minute break.  I may have a

12     few more questions.

13           THE VIDEOGRAPHER:  Okay.

14     The time is 1:14 p.m.  We're going

15     off the record.

16           (Short break.)

17           THE VIDEOGRAPHER:  The time

18     is 1:22 p.m.  We are back on the

19     record.

20   BY MR. STEWART:

21     Q.     Do you remember talking

22   about IMS data?

23     A.     I do.

24     Q.     Do you know where IMS gets

Highly Confidential - Subject to Further Confidentiality Review

1    it's data that it then sells and

2    distributes?

3                  MR. WEINSTEIN:  Objection to

4          form.  Foundation.

5                  THE WITNESS:  I don't know

6          specifically.  I believe they

7          source it from distributors and

8          parts of the dispensing community.

9    BY MR. STEWART:

10         Q.    And IMS data is used to

11   identify what drugs are -- are prescribed

12   by particular prescribers in particular

13   regions?

14                 MR. WEINSTEIN:  Objection to

15         form.  Foundation.

16                 THE WITNESS:  I don't know

17         at that level.  The only IQVIA

18         data that I've ever seen as

19         presented in aggregate at a high

20         level.  These are the top ten

21         therapeutic categories, these are

22         the top ten generic drugs, top ten

23         generic manufacturers, that sort

24         of information.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. STEWART:
2         Q.    You haven't seen it broken
3    down by region, state and so forth?
4         A.    I have not.
5         Q.    And of your various members,
6    the members of your organization, who
7    uses IMS data?
8              MR. WEINSTEIN:  Objection to
9         form.  Foundation.
10             THE WITNESS:  I have no idea
11        who has an arrangement with IMS --
12        or IQVIA, excuse me.
13   BY MR. STEWART:
14        Q.    You don't know which, if
15   any, distributors use IMS data?
16             MR. WEINSTEIN:  Same
17        objections.
18             THE WITNESS:  Correct.
19   BY MR. STEWART:
20        Q.    You don't know which, if
21   any, manufacturers use IMS data?
22             MR. WEINSTEIN:  Same
23        objections.
24             THE WITNESS:  Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. STEWART:

2         Q.    Okay.  You talked about a

3    different type of data which was called

4    chargeback data.  Are you familiar with

5    that term?

6         A.    I'm familiar with that term.

7         Q.    Okay.  And is chargeback

8    data the data that you talked about

9    earlier that is acquired by manufacturers

10   from distributors?

11             MS. MACKAY:  Objection.

12        Foundation.

13             THE WITNESS:  First of all,

14        I don't think I specifically

15        discussed chargeback data.  But

16        chargeback data is part of

17        contract administration process.

18        There is an EDI transaction that

19        supports that.  It is information

20        that is shared back with the

21        manufacturers to comply with the

22        contractual relationship.

23   BY MR. STEWART:

24        Q.    And you say comply with
```

Highly Confidential - Subject to Further Confidentiality Review

1    contractual relationship.  The point is,

2    the manufacturers, they essentially pay

3    distributors or compensate them to

4    provide this chargeback data?

5                MR. WEINSTEIN:  Objection to

6          form.  Foundation.

7                THE WITNESS:  I don't

8          know -- I don't know the specifics

9          of that agreement.

10   BY MR. STEWART:

11         Q.    Well, the reason you

12   referred to it as contractual is because

13   part of the contractual arrangements

14   between pharmaceutical manufacturers and

15   pharmaceutical distributors is -- are

16   arrangements whereby the distributors

17   provide chargeback data?

18                MR. WEINSTEIN:  Objection to

19          form.  Foundation.

20                THE WITNESS:  I actually

21          think when we say contracts and

22          chargebacks, it's the -- it's the

23          contracts that manufacturers have

24          with downstream customers that

Highly Confidential - Subject to Further Confidentiality Review

1       facilitate the need for a

2       chargeback.

3   BY MR. STEWART:

4       Q.    Explain what you mean by

5   that.

6       A.    It's contract pricing

7   offered by the manufacturer that may be

8   different than the wholesale price that

9   the -- the distributor buys it.

10      Q.    But at the end of the day,

11  does the distributors provide that

12  information to manufacturers of

13  pharmaceuticals?

14          MR. WEINSTEIN:  Objection to

15      form.  Foundation.

16          THE WITNESS:  In some cases.

17  BY MR. STEWART:

18      Q.    Okay.  And -- and when they

19  do that, they don't do it as a favor.

20  They do it as part of their contractual

21  relationship with manufacturers, right?

22          MR. WEINSTEIN:  Objection to

23      form and foundation.

24  BY MR. STEWART:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    That's your understanding?
 2          MR. WEINSTEIN:  Same
 3      objections.
 4          THE WITNESS:  For
 5      facilitating those -- we are
 6      talking about two different kinds
 7      of contracts.
 8  BY MR. STEWART:
 9          Q.    Okay.  Tell me about that.
10          A.    I just did.  The contract --
11  there is a contract manufacturer has with
12  downstream dispensers.  And that's the
13  contract that needs to be fulfilled using
14  chargeback data.  Then that data is
15  shared between the distributor and
16  manufacturer if it's required to finish
17  off that -- that chargeback
18  administration.
19          Q.    Tell me how practical, like
20  what would the manufacturer need that
21  data for?
22          MR. WEINSTEIN:  Objection to
23      form and foundation.
24  BY MR. STEWART:
```

1      Q.    We are talking about the

2    chargeback data that you just described.

3            MR. WEINSTEIN:  Same

4        objections.

5            THE WITNESS:  It has to do

6        with the -- the contract pricing

7        of that medicine at a dispensing

8        location.

9    BY MR. STEWART:

10     Q.    Okay.  What's a dispensing

11   location, a pharmacy?

12     A.    Generally a hospital or a

13   pharmacy or a clinic or a long-term care

14   facility.

15     Q.    And for the manufacturers

16   that are acquiring chargeback data, what

17   they are getting, right, is they are

18   getting detailed information about what

19   pharmaceuticals are being sold at a

20   particular pharmacy, at what price,

21   right?

22            MR. WEINSTEIN:  Objection.

23   BY MR. STEWART:

24     Q.    Or hospital, or what have

Highly Confidential - Subject to Further Confidentiality Review

1    you?

2              MR. WEINSTEIN:  Objection to

3         form.  Foundation.

4              THE WITNESS:  Presumably.

5    BY MR. STEWART:

6         Q.    And chargeback data is a

7    different set, chargeback data is a

8    different set of information than IMS

9    data, right?

10        A.    Correct.

11        Q.    Okay.  Chargeback data is

12   produced by the distributors or gathered

13   by the distributors, fair?

14             MR. WEINSTEIN:  Objection to

15        form.

16             THE WITNESS:  Chargeback

17        data is provided by the

18        distributors to make themselves

19        whole on the -- on the chargeback

20        administration.

21   BY MR. STEWART:

22        Q.    The point is, the IMS data

23   is -- is collected by this company, IMS?

24        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Now you can say IQ --

2    A.    Which is now called IQVIA.

3    Q.    IQVIA.

4          And so it's two sets of

5    data --

6    A.    That don't match.

7    Q.    You say they don't match.

8    Tell me why.

9    A.    Because the distributors

10   have direct customer relationships and

11   IMS does not have the same direct access

12   to all dispensers.

13   Q.    All right.  To get a full

14   picture of what pills are going to what

15   pharmacy, to what end users, you'd have

16   to use IMS data and chargeback data,

17   right?

18         MR. WEINSTEIN:  Objection to

19         form and foundation.

20         THE WITNESS:  I don't know

21         how manufacturers get that

22         specific information.

23   BY MR. STEWART:

24   Q.    So it's your understanding

1    that the manufacturers that are members

2    of your organization typically will use

3    chargeback data and they'll get IMS data?

4              MR. WEINSTEIN:  Objection to

5         form and foundation.

6              THE WITNESS:  I am not

7         aware.

8    BY MR. STEWART:

9         Q.    Okay.  Is it your

10   understanding that manufacturers do

11   purchase IMS data?

12             MR. WEINSTEIN:  Objection to

13        form and foundation.

14             THE WITNESS:  Some

15        manufacturers do, yes.

16             MR. WEINSTEIN:  If you can

17        wait.

18   BY MR. STEWART:

19        Q.    And I think it's fair to say

20   it's industry practice, right, for

21   manufacturers to get the chargeback data,

22   right?

23             MR. WEINSTEIN:  Objection to

24        form and foundation.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  Yes.

2    BY MR. STEWART:

3         Q.    Do you know if your

4    organization has ever put out a guideline

5    that said, "Manufacturers, when you're

6    trying to prevent diversion, you should

7    look at both chargeback data and IMS

8    data"?

9                    MR. WEINSTEIN:  Objection to

10        form.

11                   MS. MACKAY:  Objection.

12        Foundation.

13   BY MR. STEWART:

14        Q.    Are you familiar with that?

15        A.    No.

16        Q.    Do you know if your

17   organization has ever made any

18   recommendation to any participants in the

19   pharmaceutical industry, whether

20   manufacturers or distributors or what

21   have you, that identified which data

22   streams they should use to limit or

23   prevent diversion?

24                   MR. WEINSTEIN:  Objection to

1    form and to scope.

2            THE WITNESS:  No.

3            MR. WEINSTEIN:  Objection to

4        scope to the whole line of

5        questioning.

6    BY MR. STEWART:

7        Q.    What information, from your

8    knowledge, does the chargeback data have

9    that you can't get from IMS data?  Could

10   you explain that more precisely?

11           MR. WEINSTEIN:  Objection to

12       form.

13           THE WITNESS:  Distributors

14       that provide any sort of data back

15       to the manufacturers that they

16       work with, I believe, are

17       providing data that is relative to

18       their customer base.

19           IMS has a -- has broad

20       access to general sales data, but

21       there are parts of the industry

22       that my understanding is they do

23       not have similar type of access to

24       data.

Highly Confidential - Subject to Further Confidentiality Review

1                    So as an example, the VA.

2           So there's parts of the government

3           perhaps that don't have a

4           relationship with IQVIA, my

5           understanding.  I'm not sure

6           exactly.  But there's parts of the

7           industry that do not provide data

8           back to IQVIA.

9    BY MR. STEWART:

10          Q.    So the chargeback data fills

11   in the gaps for those particular --

12          A.    It could --

13              MR. WEINSTEIN:  Objection to

14          form.

15              THE WITNESS:  -- when

16          there -- when there is a

17          chargeback.

18   BY MR. STEWART:

19          Q.    Okay.  The point is, that's

20   an area where chargeback data might

21   provide information that's not available

22   from IMS?

23              MR. WEINSTEIN:  Objection to

24          form and foundation.

Highly Confidential - Subject to Further Confidentiality Review

 1                      THE WITNESS:  Presumably.  I

 2       don't know.

 3   BY MR. STEWART:

 4            Q.    Okay.  Can you tell me --

 5       remind me what you know about the use of

 6       chargeback data to identify suspicious

 7       orders.

 8                      MR. WEINSTEIN:  Objection.

 9   BY MR. STEWART:

10            Q.    What is your familiarity

11       with that process?

12                      MR. WEINSTEIN:  Objection to

13            form.

14                      THE WITNESS:  I don't know

15            anything specific about that.

16   BY MR. STEWART:

17            Q.    So you don't know what

18       characterizes a specific order within

19       chargeback data?

20                      MR. WEINSTEIN:  Objection to

21            form.

22                      THE WITNESS:  No.

23   BY MR. STEWART:

24            Q.    Okay.  You said that you

Highly Confidential - Subject to Further Confidentiality Review

1   were the organization's -- your

2   organization's, the person most

3   knowledgeable about IMS.  What about IMS

4   data?  What's your familiarity with how

5   one would use IMS data to identify

6   suspicious orders of pharmaceuticals?

7                    MR. WEINSTEIN:  Objection to

8          form.

9                    THE WITNESS:  I have no

10         idea.

11  BY MR. STEWART:

12         Q.    That's not something that

13  you're involved in?

14         A.    I have not been involved

15  with any unique products or services that

16  they offer directly to the industry.

17         Q.    So when you say that, you're

18  not familiar with IMS's products that

19  it's offering to the industry that your

20  organization represents?

21                   MR. WEINSTEIN:  Objection to

22         form.

23  BY MR. STEWART:

24         Q.    How does that work?

Highly Confidential - Subject to Further Confidentiality Review

1                    MR. WEINSTEIN:  Same

2          objection.

3                    THE WITNESS:  I don't

4          understand your question.

5     BY MR. STEWART:

6          Q.    I'm just trying to figure

7     out.  You said that you don't -- you have

8     some limited knowledge of IMS data or of

9     IMS products, but if you're the person in

10    the organization that's most familiar

11    with IMS, why wouldn't you know about

12    IMS's products that it offers to your --

13         A.    No one in our

14    organization --

15                   MR. WEINSTEIN:  Objection to

16         form.

17                   THE WITNESS:  -- would know

18         that.

19    BY MR. STEWART:

20         Q.    Okay.  That wouldn't --

21         A.    We don't -- we don't buy any

22    of the products or services from IMS.

23         Q.    Has your organization itself

24    conducted investigations of diversion of

1  opioids?

2          MR. WEINSTEIN:  Objection to

3       form and to scope.

4          THE WITNESS:  Not to my

5       knowledge.

6  BY MR. STEWART:

7       Q.   Has your organization

8  itself, the HDA, ever funded an analysis

9  of opioid diversion in the United States,

10  where it's occurring, and how it might be

11  addressed?

12          MR. WEINSTEIN:  Objection to

13       scope.

14          THE WITNESS:  Other than

15       presumably the Avalere report,

16       which we showed earlier, not to my

17       knowledge.

18  BY MR. STEWART:

19       Q.   Has your organization itself

20  ever conducted inquiries with your

21  members to determine whether or not they

22  were adhering to best practices with

23  respect to preventing diversion?

24          MR. WEINSTEIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1      form.  Scope.

2             THE WITNESS:  Not to my

3          knowledge.

4  BY MR. STEWART:

5          Q.    Has your organization ever

6  taken any step of any kind to limit or

7  prevent diversion of opioids in the

8  United States?

9             MR. WEINSTEIN:  Objection to

10         form, foundation, and scope.

11            THE WITNESS:  I think I said

12         this earlier.  We've supported

13         AAOA, which is providing education

14         to patients about the dangers of

15         abuse and safe medicine disposal.

16  BY MR. STEWART:

17         Q.    So those are the two things

18  that your organization, representing all

19  the major drug distributors in the

20  country, has done to combat the opioid

21  crisis?

22            MR. WEINSTEIN:  Objection to

23         form, foundation, and scope.

24            THE WITNESS:  Those are two

1    things that I'm familiar with.

2    BY MR. STEWART:

3         Q.    Are you familiar with any

4    other thing?  Now is the time to say.

5              MR. WEINSTEIN:  Same

6         objections.

7              THE WITNESS:  I am not.

8              MR. WEINSTEIN:  Did you

9         finish your answer there?

10              THE WITNESS:  I did.

11    BY MR. STEWART:

12         Q.    Have you ever had a

13    discussion within your organization to

14    determine whether a member had broken the

15    law?

16         A.    No.

17         Q.    Have you ever had a

18    discussion within your organization to

19    evaluate whether a member had not taken

20    required steps to notify the DEA, the

21    U.S. Drug Enforcement Administration, of

22    suspicious orders?

23         A.    No.

24         Q.    Have you ever had a

Highly Confidential - Subject to Further Confidentiality Review

1    discussion within your organization to

2    determine whether or not a particular

3    member was involved in the diversion of

4    drugs into the illegal drug market?

5         A.    No.

6         Q.    Has your organization ever

7    conducted an effort to evaluate the size

8    and scope of the market for diverted

9    drugs in any particular community?

10        A.    No.

11             MR. STEWART:  That's all

12        I've got.  Thank you.

13             THE WITNESS:  Thank you.

14             THE VIDEOGRAPHER:  The time

15        is 1:35 p.m.  We are going off the

16        record.

17             MR. PYSER:  No questions

18        from any of the defendants.

19             MR. WEINSTEIN:  And actually

20        I'd like to just request the

21        transcript be designated

22        confidential, the entire thing.

23             MR. MALLOY:  On behalf of

24        Mallinckrodt, we would like to

```
1              object to the documents that were

2              just used.  We weren't provided

3              any advanced notice that they were

4              going to be used.

5                   MR. TELLIS:  Oh behalf of

6              who?

7                   MR. MALLOY:  Mallinckrodt.

8                   MR. STEWART:  Mallinckrodt.

9              Yeah, this is Mike Stewart for the

10             Tennessee plaintiffs.  Go back and

11             review your materials.  You were

12             provided with notice.  But in any

13             event, duly noted.

14                  (Excused.)

15                  (Deposition concluded at

16             approximately 1:37 p.m.)

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                      CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

            It was requested before
8   completion of the deposition that the
    witness, PERRY FRI, have the opportunity
9   to read and sign the deposition
    transcript.

10

11

12   _____
    MICHELLE L. GRAY,
13   A Registered Professional
    Reporter, Certified Shorthand
14   Reporter, Certified Realtime
    Reporter and Notary Public
15   Dated:  May 8, 2019

16

17

18              (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                 -    -    -    -    -    -

                  E  R  R  A  T  A

2                 -    -    -    -    -    -

3

4     PAGE   LINE   CHANGE

5     _____  _____   _____

6          REASON: _____

7     _____  _____   _____

8          REASON: _____

9     _____  _____   _____

10         REASON: _____

11    _____  _____   _____

12         REASON: _____

13    _____  _____   _____

14         REASON: _____

15    _____  _____   _____

16         REASON: _____

17    _____  _____   _____

18         REASON: _____

19    _____  _____   _____

20         REASON: _____

21    _____  _____   _____

22         REASON: _____

23    _____  _____   _____

24         REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

1

2              ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 230, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16   PERRY FRI                          DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

1

LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____