```
 1              UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

    **************************

 4

    IN RE:  NATIONAL          MDL No. 2804

 5  PRESCRIPTION OPIATE

    LITIGATION                Case No.

 6                            1:17-MD-2804

    **************************

 7

    APPLIES TO ALL CASES      Hon. Dan A. Polster

 8

 9  **************************

10

11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12                CONFIDENTIALITY REVIEW

13         VIDEOTAPED DEPOSITION OF JOSEPH GANLEY

14

15              Friday, July 27th, 2018

16                   9:04 a.m.

17

18       Held At:

19            Liberty Hotel

20            215 Charles Street

21            Boston, Massachusetts

22

23

24  REPORTED BY:

25  Maureen O'Connor Pollard, RMR, CLR, CSR
```

```
 1    APPEARANCES:

 2

      FOR THE PLAINTIFFS:
 3

          JEFF GADDY, ESQUIRE
 4            LEVIN PAPANTONIO THOMAS MITCHELL
              RAFFERTY & PROCTOR, PA
 5            316 S. Baylen Street
              Pensacola, Florida 32502
 6            850-435-7054
              jgaddy@levinlaw.com
 7
                     -and-
 8

          PETER MERRIGAN, ESQUIRE
 9        J. TUCKER MERRIGAN, ESQUIRE
              SWEENEY MERRIGAN LAW LLP
10            268 Summer Street
              Boston, Massachusetts 02210
11            617-391-9001
              peter@sweeneymerrigan.com
12            tucker@sweeneymerrigan.com

13

14    FOR McKESSON CORPORATION and THE WITNESS:

15        AMBER CHARLES, ESQUIRE
          ANDREW STANNER, ESQUIRE
16            COVINGTON & BURLING LLP
              One CityCenter
17            850 Tenth Street, NW
              Washington, DC 20001-4956
18            202-662-5518
              acharles@cov.com
19            astanner@cov.com

20

21    FOR CARDINAL HEALTH, INC.:

22        MATTHEW C. MONAHAN, ESQUIRE
              WILLIAMS & CONNOLLY LLP
23            725 Twelfth Street, N.W.
              Washington, DC 20005
24            202-434-5331
              mmonahan@wc.com

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2    FOR AMERISOURCEBERGEN DRUG CORPORATION:

 3        SHANNON E. McCLURE, ESQUIRE
              REED SMITH LLP
 4            Three Logan Square
              1717 Arch Street, Suite 3100
 5            Philadelphia, Pennsylvania 19103
              215-851-8100
 6            smcclure@reedsmith.com

 7

 8    FOR WALMART:

 9        SARAH G. CONWAY, ESQUIRE
              JONES DAY
10            555 South Flower Street
              Los Angeles, California 90071-2300
11            213-489-3939
              sgconway@jonesday.com

12

13

      FOR PRESCRIPTION SUPPLY, INC.:
14
          PAUL B. RICARD, ESQUIRE
15            PELINI, CAMPBELL & WILLIAMS LLC
              8040 Cleveland Avenue NW, Suite 400
16            North Canton, Ohio 44720
              330-305-6400
17            pbricard@pelini-law.com

18

19    FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.:

20        ANTHONY M. RUIZ, ESQUIRE
              ZUCKERMAN SPAEDER LLP
21            1800 M Street NW, Suite 1000
              Washington, DC 20036-5807
22            202-778-1800
              R. MILES CLARK, ESQ.
23            aruiz@zuckerman.com

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2    FOR MIAMI-LUKEN:
 3        WILLIAM J. AUBEL, ESQUIRE
           (Via teleconference.)
 4            JACKSON KELLY PLLC
               500 Lee Street East, Suite 1600
 5            Charleston, West Virginia 25301
               304-340-1146
 6            william.j.aubel@jacksonkelly.com
 7                   -and-
 8        SCOTT D. LIVINGSTON, ESQUIRE
               MARCUS & SHAPIRA LLP
 9            One Oxford Centre, 35th Floor
               301 Grant Street
10            Pittsburgh, Pennsylvania 15219-6401
               412-338-4690
11            livingston@marcus-shapira.com
12
       FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
13     SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
       INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
14
           CHARLES B. WEINOGRAD, ESQUIRE
15             ARNOLD & PORTER KAYE SCHOLER, LLP
               601 Massachusetts Avenue, NW
16            Washington, DC 20001-3743
               202-942-5000
17            charles.weinograd@arnoldporter.com
18
19     FOR TEVA PHARMACEUTICALS USA, INC., CEPHALON,
       INC., WATSON LABORATORIES, INC., ACTAVIS LLC,
20     ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.:
21        PAMELA C. HOLLY, ESQUIRE
           (Via teleconference)
22            MORGAN, LEWIS & BOCKIUS LLP
               101 Park Avenue
23            New York, New York 10178
               212-309-6864
24            pamela.holly@morganlewis.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2    FOR RITE AID:
 3        JOHN P. LAVELLE, JR., ESQUIRE
          (Via teleconference)
 4            MORGAN, LEWIS & BOCKIUS LLP
              1701 Market Street
 5            Philadelphia, Pennsylvania 19103-2921
              215-963-5000
 6            john.lavelle@morganlewis.com
 7
 8    FOR HENRY SCHEIN, INC., and HENRY SCHEIN MEDICAL
      SYSTEMS, INC.:
 9        BRANDAN MONTMINY, ESQUIRE
          (Via teleconference)
10            LOCKE LORD LLP
              2200 Ross Avenue, Suite 2800
11            Dallas, Texas 75201
              214-740-8445
12            brandan.montminy@lockelord.com

13    FOR MALLINCKRODT, LLC and SPECGX, LLC:
14        WILLIAM T. DAVISON, ESQUIRE
              ROPES & GRAY LLP
15            800 Boylston Street
              Boston, Massachusetts 02199-3600
16            617-951-7000
              william.davison@ropesgray.com
17
      FOR ALLERGAN FINANCE, LLC:
18        KAITLYN L. COVERSTONE, ESQUIRE
19        (Via teleconference.)
20        KIRKLAND & ELLIS, LLP
21        300 North LaSalle Street
22        Chicago, Illinois 60654
23        312-862-2000
24        kaitlyn.coverstone@kirkland.com
25    VIDEOGRAPHER:  Dan Lawlor
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         INDEX
 2    EXAMINATION                              PAGE
 3    JOSEPH GANLEY
 4     BY MR. GADDY                             11
 5
 6
 7                E X H I B I T S
 8    NO.           DESCRIPTION                 PAGE
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1                    P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now on the

 4   record.  My name is Dan Lawlor, I'm a

 5   videographer with Golkow Litigation Services.

 6              Today's date is July 27, 2018, and the

 7   time is 9:04 a.m.

 8              This video deposition is being held in

 9   Boston, Massachusetts in the matter of National

10   Prescription Opiate Litigation, MDL No. 2804.

11              The deponent is Joseph Ganley,

12   McKesson.

13              Counsel, please identify yourselves,

14   starting with the plaintiff.

15              MR. GADDY:  Jeff Gaddy on behalf of

16   the PEC.

17              MS. CHARLES:  Amber Charles for the

18   McKesson Corporation and the witness, Joe

19   Ganley.

20              MR. STANNER:  Andrew Stanner,

21   Covington & Burling, on behalf of McKesson.

22              MR. RUIZ:  Anthony Ruiz of Zuckerman

23   Spaeder on behalf of CVS RX Services, Inc. and

24   CVS Indiana, LLC.

25              MR. WEINOGRAD:  Charles Weinograd on
```

```
 1      behalf of Endo Health Solutions, Endo

 2      Pharmaceuticals, Par Pharmaceuticals.

 3              MR. RICARD:  Paul Ricard on behalf of

 4      Prescription Supply, Inc.

 5              MS. MCCLURE:  Shannon McClure on

 6      behalf of AmerisourceBergen Drug Corporation.

 7              MR. LIVINGSTON:  Scott Livingston,

 8      Marcus & Shapira, on behalf of HBC.

 9              MR. PETER MERRIGAN:  Peter Merrigan on

10      behalf of the plaintiffs, PEC.

11              MR. TUCKER MERRIGAN:  Tucker Merrigan

12      on behalf of the plaintiffs, PEC.

13              MR. MONAHAN:  Matthew Monahan on

14      behalf of Cardinal Health.

15              MR. DAVISON:  William Davison on

16      behalf of Mallinckrodt LLC and Specgx, LLC.

17              MS. CONWAY:  Sarah Conway on behalf of

18      Walmart.

19              THE VIDEOGRAPHER:  Counsel on the

20      phone, please identify yourselves.

21              MR. LAVELLE:  John Lavelle from Morgan

22      Lewis on behalf of Rite Aid.

23              MS. HOLLY:  Pam Holly from Morgan

24      Lewis on behalf of Teva Pharmaceuticals,

25      Cephalon, and certain of the Actavis-acquired
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    entities.
 2              MS. COVERSTONE:  This is Kaitlyn
 3    Coverstone from Kirkland & Ellis on behalf of
 4    Allergen.
 5              MR. AUBEL:  Bill Aubel from Jackson
 6    Kelly on behalf of Miami-Luken, Inc.
 7              THE VIDEOGRAPHER:  The court reporter
 8    today is Maureen Pollard, and will now swear in
 9    the witness.
10
11              JOSEPH GANLEY,
12    having been first duly identified and sworn, was
13    examined and testified as follows:
14                    EXAMINATION
15    BY MR. GADDY:
16         Q.   State your name, please.
17         A.   Joseph Ganley.
18         Q.   And are you employed at McKesson
19    Corporation?
20         A.   I am.
21         Q.   What's your title?
22         A.   Vice president of federal government
23    affairs.
24         Q.   How long have you been in that
25    position?
```

```
 1              A.   Since July, 2014.

 2              Q.   Are you registered as a lobbyist?

 3              A.   I am.

 4              Q.   For how long have you been registered

 5      as a lobbyist?

 6              A.   I'm not sure.  I assume from July,

 7      2014 when I took that role.

 8              Q.   Do you work in any particular division

 9      or department?

10              A.   I work in the corporate public affairs

11      department.

12              Q.   How many other people work in that

13      department for McKesson?

14              A.   I have to think about this now.  12, I

15      believe.

16              Q.   Okay.  Are all 12 of those individuals

17      registered as lobbyists?

18              A.   No.

19              Q.   About how many are?

20              A.   Two are registered as federal

21      lobbyists.  There are state lobbyists as well.

22              Q.   One of those two being you?

23              A.   Yes.

24              Q.   Is there a registration required for

25      state lobbying?
```

```
 1              MS. CHARLES:  I'm going to object that

 2      it's beyond the scope.

 3          A.   It varies by state.  There's various

 4      registration requirements, but it varies by

 5      state.  But yes, many states require

 6      registration.

 7      BY MR. GADDY:

 8          Q.   What are your duties in the position

 9      that you currently have?

10          A.   I represent the company before the

11      federal government, so the Congress and the

12      Administration.  I advocate for the company's

13      public policy positions.  I represent the

14      company on trade association boards and

15      committees and industry organizations.  I'm

16      responsible for our public policy strategy at

17      the federal level.

18          Q.   Okay.  Is one of the goals in your

19      position to influence legislation that might

20      impact McKesson?

21          A.   Yes.

22          Q.   What did you do before that current

23      position?

24          A.   I was a director of state government

25      affairs for the northeast region.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   Also with McKesson?

2          A.   Yes.

3          Q.   How long did you do that?

4          A.   From June of 2011 to July of 2014.

5          Q.   And what were the differences in that

6     position and the position you hold currently?

7          A.   Just the venue.  So I was doing the

8     same work advocating on public policy issues,

9     but at the state government level, in 14

10    northeast states.

11         Q.   Was there any registration required

12    for you to hold that position?

13         A.   There was not.

14         Q.   What states did you cover?

15         A.   I should say -- I should clarify that.

16    There wasn't a -- I was not a registered

17    lobbyist.  We employed outside consultants who

18    were registered lobbyists.  But I personally did

19    not have to register because of the way the

20    rules are written.

21         Q.   Okay.  How many lobbyists did you

22    employ?

23              MS. CHARLES:  Objection.  Beyond the

24    scope.

25         A.   I don't remember exactly.  We had two
```

```
 1    or three.

 2    BY MR. GADDY:

 3         Q.   Okay.  What states did you cover?

 4         A.   I covered Virginia north to all of New

 5    England.

 6         Q.   Okay.  So you did or did not cover

 7    Ohio?

 8         A.   I did not.

 9         Q.   Who did cover Ohio?

10              MS. CHARLES:  Objection.  Beyond the

11    scope.

12         A.   It varied.  There were different

13    people during that time period.  So from 2011 to

14    2014, it would have been Angela Grover who was

15    the state government affairs person for.

16    BY MR. GADDY:

17         Q.   Was that a particular region or

18    department?

19         A.   Yes.  We divide state government

20    affairs into four regions, the Northeast, the

21    Central region, the West region, and the South.

22         Q.   Okay.  So Ohio would be in the Central

23    region?

24         A.   Ohio would be in the Central region,

25    yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.   And Angela Grover was in charge of the

 2        state lobbying for the Central region from 2011

 3        to 2014?

 4              A.   Longer than that, but she, I think,

 5        left the company 2015 maybe, 2016, something

 6        like that.

 7              Q.   Do you know who preceded Ms. Grover?

 8              MS. CHARLES:  Objection.  Beyond the

 9        scope.

10              A.   Nobody specifically, because we

11        restructured the department.  So when we went to

12        four state government -- four regions we hired

13        Angie to cover the Central region.  So prior to

14        that we had only two regions, one East and one

15        West.

16        BY MR. GADDY:

17              Q.   Do you know who would have covered

18        Ohio before Ms. Grover?

19              MS. CHARLES:  Objection.  Beyond the

20        scope.

21              A.   I don't.

22        BY MR. GADDY:

23              Q.   What region is West Virginia in?

24              A.   In the Northeast.

25              Q.   Okay.  So that would have been your
```

```
 1     area?

 2          A.   Correct.

 3          Q.   So you've been at McKesson since 2011?

 4          A.   Yes.

 5          Q.   What field was your employment in

 6     before that?

 7          A.   I worked at a public affairs firm,

 8     Weber Shandwick.

 9          Q.   In any prior employment either with

10     that firm you just mentioned or any other, have

11     you ever done any work in the pharmaceutical

12     industry?

13          MS. CHARLES:  Objection to form.

14          A.   Yes.  I mean, when I was at Weber we

15     represented pharmaceutical companies.

16     BY MR. GADDY:

17          Q.   Okay.  Did you ever represent

18     McKesson?

19          A.   No.

20          Q.   Did you ever represent Cardinal

21     Health?

22          A.   No.

23          Q.   AmerisourceBergen?

24          A.   No.

25          Q.   CVS?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    Walgreens?

 3            A.    No.

 4            Q.    Prior to your work at McKesson, had

 5      you ever had any experience in the drug supply

 6      chain?

 7                  MS. CHARLES:  Objection.  Form.

 8            A.    I'm not sure I know what you mean by

 9      "experience in the drug supply chain."

10      BY MR. GADDY:

11            Q.    Let me ask it this way.

12                  Prior to your employment at McKesson,

13      had you ever had any interaction with or

14      participation in HDA or HDMA?

15            A.    No.

16            Q.    You've been designated by McKesson on

17      two topics today.

18                  I'm going to show you what's been

19      marked as -- we'll call it Ganley 1.

20                  (Whereupon, McKesson-Ganley-001 was

21                  marked for identification.)

22      BY MR. GADDY:

23            Q.    If you don't mind, turn to Page 8,

24      looking at the numbers on the bottom of the

25      page.  You've been designated on topics numbers
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       12 and 13.  Is that your understanding?

 2              A.    Mm-hmm.  Yes.

 3              Q.    And the first topic is your, meaning

 4       McKesson's, participation, relationship or

 5       association with any trade organization,

 6       including, but not limited to, HDA, and its

 7       predecessors, the NACDS and its predecessors,

 8       and also PhRMA.

 9              Do you see that?

10              A.    Yes.

11              MS. CHARLES:  I think you added a

12       predecessors in there.

13              MR. GADDY:  I did, when talking NACDS.

14       Thank you.

15       BY MR. GADDY:

16              Q.    Are you the person at McKesson who is

17       most knowledgeable to testify about that topic?

18              A.    Yes.

19              Q.    What did you do to prepare to testify

20       on that particular topic?

21              A.    I reviewed information with counsel.

22              Q.    Did you review any documents?

23              A.    Yes.

24              Q.    What did you review?

25              A.    A number of documents.  I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        I mean, there was a whole binder full of

 2    documents.

 3         Q.   Any in particular that you recall?

 4         A.   Yeah.  I mean, there were e-mails,

 5    agendas, there were -- I believe there were

 6    documents you all indicated you were going to

 7    ask about.

 8         Q.   So you had the opportunity to review

 9    those?

10         A.   Yes.

11         Q.   Okay.  So that would -- I assume what

12    you're referring to there are documents that

13    were produced by other defendants?

14         A.   I believe they were produced by

15    McKesson and other defendants, yes.

16         Q.   Okay.  And you had the opportunity to

17    review the documents that were produced by other

18    defendants that we had to get permission to use

19    in this deposition?

20         A.   Yes.

21         Q.   Does McKesson belong to or participate

22    in any trade associations or organizations?

23         A.   Yes.

24         Q.   And would one of those be the HDA or

25    HDMA?
```

```
1            A.   Yes.

2            Q.   I've used those terms interchangeably.

3    Are those the same organization?

4            A.   Yes.

5            Q.   What's your understanding of when and

6    how the name changed?

7                 MS. CHARLES:  Objection to form.

8            A.   They rebranded.  They decided that

9    Health Distribution Management Association was

10   unclear, and so they decided to rename

11   themselves a year and a half ago or so, two

12   years ago.

13           Q.   Was there any substantive change

14   within the organization as a result of that

15   rebranding?

16                MS. CHARLES:  Objection.  Beyond the

17   scope.

18           A.   No.

19   BY MR. GADDY:

20           Q.   Did the members that they represent

21   change in any form or fashion from your

22   participation within the organization?

23                MS. CHARLES:  Objection.  Beyond the

24   scope.

25           A.   I don't believe so, but I don't -- you
```

1    know, presumably new members come in

2    occasionally.  I don't know.  So, I mean, the

3    scope of their membership didn't change, but

4    individual members may have come and gone, or

5    merged, or been acquired, or whatever.

6    BY MR. GADDY:

7         Q.   What is that organization?

8              MS. CHARLES:  Objection.  Form, beyond

9    the scope.

10        A.   HDA is a trade association that

11   represents pharmaceutical wholesale

12   distributors.

13   BY MR. GADDY:

14        Q.   Do you know any wholesale distributors

15   that it represents in addition to McKesson?

16        A.   Yes.

17        Q.   Can you tell us?

18        A.   AmerisourceBergen, Cardinal Health,

19   H.D. Smith, Burlington Drug.  I don't -- there's

20   probably other regional distributors, but I

21   couldn't give you all the names.  I don't know

22   all of them.

23        Q.   And those are all companies that

24   perform the same job function, is that correct?

25             MS. CHARLES:  Objection.  Beyond the

1     scope.

2          A.   Generally speaking, yes.

3     BY MR. GADDY:

4          Q.   Those are all companies that have

5     common goals and common purposes?

6               MS. CHARLES:  Objection.  Beyond the

7     scope, form.

8          A.   I couldn't speak to -- I couldn't

9     speak to the goals or purposes of our

10    competitors, but --

11              MS. MCCLURE:  Jeff, just to clarify

12    the record, we have an understanding, correct,

13    that an objection for one serves as an objection

14    for all so we don't need to hear from over here?

15              MR. GADDY:  Of course.

16    BY MR. GADDY:

17         Q.   How long has McKesson been a member of

18    the HDA?

19         A.   Many years.  Many decades.  I don't

20    know exactly when we first became a member.  And

21    HDA was at some point kind of reconstituted, had

22    fallen into kind of -- it was going through some

23    difficult times and it was reconstituted, new

24    leadership was brought in.  But more than

25    20 years certainly.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   From your understanding, or McKesson's

 2    understanding of participation within HDA, is

 3    the same true for the other drug wholesalers

 4    that you mentioned, such at Cardinal Health and

 5    AmerisourceBergen?

 6            MS. CHARLES:  Objection.  Beyond the

 7    scope.

 8            A.   I don't know the answer as to when

 9    they joined.

10    BY MR. GADDY:

11            Q.   Have each of those companies been

12    members as long as you've been with McKesson?

13            MS. CHARLES:  Objection.  Form, beyond

14    the scope.

15            A.   Yes.

16    BY MR. GADDY:

17            Q.   I'm going to show you what I'm going

18    to mark as Ganley 2.

19            (Whereupon, McKesson-Ganley-002 was

20            marked for identification.)

21    BY MR. GADDY:

22            Q.   Have you seen this document before?

23            A.   Yes.

24            Q.   When did you have the opportunity to

25    see this?
```

Highly Confidential - Subject to Further Confidentiality Review



1        A.    When preparing for this deposition.

2        Q.    And do you recognize this to be a

Highly Confidential - Subject to Further Confidentiality Review



13          Q.    Is it safe to assume that, in fact,

14     these individuals who were receiving this

15     correspondence from HDMA, that all of these

16     companies were members of HDMA at the time that

17     this e-mail was sent?

18               MS. CHARLES:  Objection.  Form.

19          A.    Yes.

20     BY MR. GADDY:

21          Q.    You have no reason to dispute that all

22     these companies were members of HDMA going back

23     to 2006 at least?

24          A.    I have no reason to dispute that.

25               MS. MCCLURE:  Objection.

```
 1      BY MR. GADDY:

 2          Q.   Is it your expectation they were

 3      members going back farther than that?

 4               MS. CHARLES:  Objection.  Form, beyond

 5      the scope.

 6          A.   I don't know when the other companies

 7      joined.

 8      BY MR. GADDY:

 9          Q.   Are you familiar with the fact that

10      HDA has a website?

11          A.   Yes.

12          Q.   And have you been to that website

13      before and seen it?

14          A.   Yes.

15          Q.   I'm going to show you what we'll mark

16      as Ganley 3.

17               (Whereupon, McKesson-Ganley-003 was

18               marked for identification.)

19          A.   Thank you.

20      BY MR. GADDY:

21          Q.   Do you recognize this as being a

22      printout from the HDA's website?

23          A.   It appears to be, yes.

24          Q.   And if you look at the bottom of the

25      first page there, you see the web address down
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    at the bottom of the page?

 2         A.   Yes.

 3         Q.   And you recognize that as being the

 4    web address for the HDA's website?

 5         A.   Yes.

 6         Q.   And if you look at the top left-hand

 7    corner of the page, we see the logo of the HDA,

 8    correct?

 9         A.   Yes.

10         Q.   Okay.  And the title of this page

11    looks to be "Distributor."

12              Do you see that?

13         A.   Yes.

14         Q.   Okay.  And down towards the bottom of

15    the page it says that the "HDA has 36

16    distributor members."

17              Do you see that?

18         A.   Yes.

19         Q.   Does that number sound accurate to

20    you?

21              MS. CHARLES:  Objection.  Beyond the

22    scope.

23         A.   Yes.

24              MS. MCCLURE:  Objection.  Form.

25    BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And you see the first member listed

2   there is AmerisourceBergen?

3      A.   Yes.

4      Q.   And the next one listed is Anda?

5      A.   Yes.

6      Q.   And if you turn the page, do you see

7   Cardinal Health is listed as a member of HDA?

8      A.   Yes.

9      Q.   If you go down a few lines, do you see

10   that Henry Schein is listed?

11      A.   Yes.

12      Q.   If you go down a few more, do you see

13   McKesson?

14      A.   Yes.

15      Q.   Below there is Miami-Luken?

16      A.   Yes.

17      Q.   And if you turn the page, four down

18   you'll see that Prescription Supply is also a

19   member of the HDA, correct?

20      A.   Yes.

21      Q.   And the fact that all of those

22   wholesalers are members of HDMA, is that

23   consistent with McKesson's understanding based

24   on its participation within the HDA?

25          MS. CHARLES:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.   Yes.

 2      BY MR. GADDY:

 3           Q.   Does -- would you qualify McKesson as

 4      being active within the HDA?

 5                MS. CHARLES:  Objection.  Form.

 6           A.   Yes.

 7      BY MR. GADDY:

 8           Q.   Does McKesson have members on the

 9      executive committee?

10                MS. CHARLES:  Objection.  Form.

11           A.   We have a member on the executive

12      committee.

13      BY MR. GADDY:

14           Q.   Does McKesson have any members on the

15      board of directors of HDA?

16           A.   Yes.

17           Q.   Does Cardinal Health have any members

18      on the executive committee?

19                MS. CHARLES:  Objection.  Beyond the

20      scope.

21           A.   I don't know the answer to that.

22      BY MR. GADDY:

23           Q.   I'm going to show you what I'll mark

24      as Ganley 4.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Whereupon, McKesson-Ganley-004 was

 2                    marked for identification.)

 3          A.    Thank you.

 4     BY MR. GADDY:

 5          Q.    Do you recognize this, again, as being

 6     a printout from the HDA website?

 7          A.    Yes, I do.

 8          Q.    Again, you see the web address at the

 9     bottom of the page?

10          A.    Yes.

11          Q.    And you see the brand of HDA up in the

12     top left corner?

13          A.    Yes.

14          Q.    Okay.  And you see the title of this

15     page is "Board of Directors"?

16          A.    Yes.

17          Q.    And you see the first individual

18     listed is -- I'm going to mispronounce his last

19     name I'm sure, but Jon Giacomin?

20          A.    Jon Giacomin.

21          Q.    Jon Giacomin.

22                And who does he work for?

23                MS. CHARLES:  Objection.  Beyond the

24     scope.

25          A.    I think Cardinal.
```

```
 1    BY MR. GADDY:

 2         Q.   Okay.  And if you actually turn the

 3    page, you'll see it at the top of the very next

 4    page.

 5         A.   Yes.

 6         Q.   He works for Cardinal Health?

 7         A.   Yep.

 8         Q.   And if you stay on -- I'm sorry, if

 9    you turn to Page 3, at the top left do you see

10    the President/CEO of Miami-Luken?

11              MS. CHARLES:  Objection.  Form.

12         A.   Yes.

13    BY MR. GADDY:

14         Q.   Is he also a member of the board of

15    directors on HDA?

16              MS. CHARLES:  Objection.  Beyond the

17    scope.

18         A.   Yes.

19    BY MR. GADDY:

20         Q.   And next to him, do you see an

21    employee of Henry Schein?

22         A.   Yes.

23         Q.   And if you turn to Page 4, top middle,

24    do you see a McKesson employee who is a member

25    of the board of directors for HDA?
```

```
 1          A.   Yes.

 2          Q.   And if you look at the bottom left of

 3     that page, do you see an employee of

 4     AmerisourceBergen who was on the board of

 5     directors for HDA?

 6          A.   Yes.

 7               MS. CHARLES:  Objection.  Form.

 8     BY MR. GADDY:

 9          Q.   Based on McKesson's participation

10     within the HDA, are these board of directors

11     consistent with McKesson's understanding of who

12     is a participant within the HDA?

13               MS. CHARLES:  Objection.  Form, beyond

14     the scope.

15          A.   Yes.

16     BY MR. GADDY:

17          Q.   Now, in addition to distributors,

18     there are also pharmaceutical manufactures who

19     are members of the HDA, correct?

20               MS. CHARLES:  Objection.  Beyond the

21     scope.

22          A.   I believe that's right.

23     BY MR. GADDY:

24          Q.   Do you know any manufacturers who are

25     members?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. CHARLES:  Objection.  Form, beyond
 2      the scope.
 3            A.   I don't.
 4      BY MR. GADDY:
 5            Q.   I'm going to show you what I'm going
 6      to mark as Ganley 5.
 7                    (Whereupon, McKesson-Ganley-005 was
 8                    marked for identification.)
 9            A.   Thank you.
10      BY MR. GADDY:
11            Q.   Once again, do you recognize this as
12      being a printout from the HDA's website?
13            A.   Yes.
14            Q.   And you recognize the web address at
15      the bottom of the first page?
16            A.   Yes.
17            Q.   And the branding of HDA in the top
18      left-hand corner?
19            A.   Yes.
20            Q.   And if you turn to Page 2, four
21      down -- or first, let me back up just a bit.
22                    On the first page, do you see the
23      title of this page is "Manufacturer"?
24            A.   Yes.
25            Q.   And you see below that it says,
```

```
1        "Manufacturers considering an HDA membership are

2        primarily engaged in developing, manufacturing

3        or labeling healthcare products."

4                Do you see that?

5        A.   Yes.

6        Q.   And then down on the bottom it says,

7        "HDA has 128 manufacturer members."

8                Do you see that?

9        A.   Yes.

10       Q.   And if you turn the page, four down do

11       you see that Allergen is a member of the HDA?

12               MS. CHARLES:  Objection.  Beyond the

13       scope.

14       A.   Yes.

15       BY MR. GADDY:

16       Q.   And if you turn to Page 4, do you see

17       that Endo Pharmaceuticals is also a member of

18       the HDA?

19               MS. CHARLES:  Objection.  Beyond the

20       scope, form.

21       A.   Yes.

22       BY MR. GADDY:

23       Q.   If you go down to the bottom of the

24       page, do you see that Johnson & Johnson is a

25       member of the HDA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. CHARLES:  Same objections.

 2         A.   Yes.

 3    BY MR. GADDY:

 4         Q.   If you go to Page 5, do you see in the

 5    middle of the page that Mallinckrodt is a member

 6    of the HDA?

 7              MS. CHARLES:  Same objections.

 8         A.   Yes.

 9    BY MR. GADDY:

10         Q.   If you go to Page 6, do you see that

11    Par Pharmaceutical is a member of HDA?

12              MS. CHARLES:  Same objections.

13         A.   Yes.

14    BY MR. GADDY:

15         Q.   If you go down, do you see that

16    Patriot Pharmaceuticals, a subsidiary of

17    Janssen, is a member of the HDA?

18              MS. CHARLES:  Same objections.

19         A.   Yes.

20    BY MR. GADDY:

21         Q.   If you go down four up from the

22    bottom, do you see Purdue Pharma is a member of

23    the HDA?

24              MS. CHARLES:  Same objections.

25         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BY MR. GADDY:

 2          Q.   And if you go to the next page, do you

 3      see towards the bottom that Teva Pharmaceuticals

 4      is a member of the HDA?

 5              MS. CHARLES:  Same objections.

 6          A.   Yes.

 7      BY MR. GADDY:

 8          Q.   Based on McKesson's participation

 9      within the HDA, are these manufacturer members

10      consistent with your understanding of HDA

11      membership?

12              MS. CHARLES:  Objection.  Beyond the

13      form -- beyond the scope, form.

14          A.   Yes.

15      BY MR. GADDY:

16          Q.   So there's no doubt the membership of

17      HDA or HDMA includes both distributors and

18      manufacturers, correct?

19              MS. CHARLES:  Objection.  Form, beyond

20      the scope.

21          A.   Correct.

22      BY MR. GADDY:

23          Q.   Now, does HDA have different

24      conferences, committees, and working groups?

25              MS. CHARLES:  Objection.  Beyond the
```

Highly Confidential - Subject to Further Confidentiality Review

1        scope.

2              A.   Yes.

3        BY MR. GADDY:



Highly Confidential - Subject to Further Confidentiality Review



24    BY MR. GADDY:

25        Q.   About how many people actively

Highly Confidential - Subject to Further Confidentiality Review

1       participate in the committee such, as federal

2       government affairs?

3               MS. CHARLES:  Objection.  Form, beyond

4       the scope.

5          A.   Varies from meeting-to-meeting or

6       call-to-call, but a dozen or more.

7       BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20      Q.    I'm going to show you what I'm going

21   to mark as Ganley 6.

22              (Whereupon, McKesson-Ganley-006 was

23              marked for identification.)

24      A.    Thank you.

25   BY MR. GADDY:

```
 1              Q.   Do you, again, recognize this as being

 2       a printout from HDA's website?

 3              A.   Yes.

 4              Q.   Again, you see the web address at the

 5       bottom of the page?

 6              A.   Yes.

 7              Q.   And the title of this page is

 8       "Councils and Committees"?

 9              A.   Yes.

10              Q.   And there on the very first page we

11       see the Public Policy Council that you were

12       speaking about earlier, correct?

13              A.   Yes.

14              Q.   If you turn the page, at the top of

15       Page 2 do you see the Industry Relations

16       Council?

17              A.   Yes.

18              Q.   And it says there that this counsel is

19       "composed of distributor and manufacturer

20       members," is that correct?

21              A.   Yes.

22              Q.   Is that consistent with McKesson's

23       understanding of who participates in the

24       Industry Relations Council?

25              A.   Yes, it is.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   It says that this committee "provides

 2     leadership on pharmaceutical distribution and

 3     supply chain issues."

 4               Do you see that?

 5          A.   Yes.

 6          Q.   And is that consistent with McKesson's

 7     understanding about what those distributor and

 8     manufacturer members do on that council?

 9               MS. CHARLES:  Objection.  Beyond the

10     scope.

11          A.   Yes.

12     BY MR. GADDY:

13          Q.   If you turn to Page 9, you'll see it

14     lists there a Contracts and Chargebacks Working

15     Group.

16               Do you see that?

17          A.   Yes.

18          Q.   Does McKesson participate in that

19     working group?

20          A.   I don't know the answer to that.

21          Q.   Okay.  You see there that it says,

22     "This working group explores how the contract

23     administration process can be streamlined

24     through process improvements or technical

25     efficiencies.  It also creates and exchanges
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      industry knowledge of interest to contract and

 2      chargeback professionals."

 3              Do you see that?

 4      A.   Yes.

 5      Q.   And then below there it indicates that

 6      both manufacturers and distributors participate

 7      in that working group?

 8      A.   Yes.

 9      Q.   Is that consistent with McKesson's

10      understanding based on its participation within

11      the HDA?

12      A.   You know, I have --

13              MS. MCCLURE:  Objection.

14      A.   I have to be honest with you.  I've

15      never heard of this working group, never come

16      across it in my interactions with HDA.

17      BY MR. GADDY:

18      Q.   From McKesson's perspective, is it

19      safe that say that manufacturers and

20      distributors work together under the umbrella of

21      the HDA?

22              MS. MCCLURE:  Objection.

23              MS. CHARLES:  Objection.  Form, and

24      scope.

25      A.   I think -- I did say it depends.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GADDY:

 2         Q.   Well, from McKesson's perspective,

 3    there certainly are issues or circumstances in

 4    which manufacturers and distributors work

 5    together under the umbrella of the HDA.

 6              MS. CHARLES:  Objection.  Form.

 7    BY MR. GADDY:

 8         Q.   Is that true?

 9              MS. CHARLES:  Beyond the scope.

10         A.   Yes, it's true that there are examples

11    where that happens, yes.

12    BY MR. GADDY:

13         Q.   And why would it be --

14         A.   For example, the Public Policy Council

15    doesn't have any manufacturer members.  Our

16    federal government affairs call, there's never a

17    manufacturer on that call.  So in some cases

18    it's distributors and manufacturers, in other

19    cases it's just distributors.

20         Q.   Why would it be beneficial for

21    McKesson to be a member of a trade association

22    where distributors and manufacturers can work

23    together under the same umbrella?

24              MS. CHARLES:  Objection.  Beyond the

25    scope, form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    I don't know.  I'm not sure I know why

2      it would be beneficial.

3      BY MR. GADDY:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6          Q.    Who would be the person for us to --

7    who would be the person within McKesson most

8    knowledgeable to talk about the Industry

9    Relations Council?

10         A.    I mean, I could speak about it, but --

11         Q.    Let me ask it this way.

12         A.    I'm trying to think who --

Highly Confidential - Subject to Further Confidentiality Review



23        Q.    Let me go back to my last question and

24   ask you just as it relates to distributors.

25             From McKesson's perspective, based on

Highly Confidential - Subject to Further Confidentiality Review

1    its participation within HDA, do the wholesale

2    distributor members have common goals when it

3    comes to rules and regulations?

4           MS. CHARLES:  Objection.  Form.

5       A.   Yes.

6    BY MR. GADDY:

7       Q.   From McKesson's perspective, based on

8    their participation within the HDA, do the

9    wholesale distributors have common goals when it

10   comes to DEA enforcement?

11          MS. CHARLES:  Objection.  Form.

12      A.   Yes.

13   BY MR. GADDY:

14      Q.   From the perspective of McKesson,

15   based on its participation within the HDA, do

16   the wholesale distributor members have common

17   goals when it comes to drug annual production

18   quotas?

19          MS. CHARLES:  Objection.  Form.

20      A.   There may be some differing points of

21   view on that.  But I don't know that I could

22   speak to the other companies' perspective on

23   that issue.

24          But I believe HDA has some vaguely

25   worded language that speaks to the need to think

Highly Confidential - Subject to Further Confidentiality Review

```
 1      thoughtfully about production quotas, or

 2      something like that.  I don't know that they

 3      fully endorsed reducing production quotas, but

 4      maybe they have.  I'd have to look.

 5      BY MR. GADDY:

 6          Q.   I want to kind of shift a little bit

 7      and talk about some of the things that HDA does

 8      for its members.

 9          A.   Sure.

10          Q.   Would one of things that HDA would do

11      be send letters to state or federal lawmakers on

12      behalf of its members?

13               MS. CHARLES:  Objection.  Beyond the

14      scope.

15          A.   Yes.

16      BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review



24          Q.   And consensus, when you use that term,

25     means that everybody agrees?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. CHARLES:  Objection.  Form.
 2         A.   Yeah, I'd say it a little differently
 3    than how you just said it.  It means nobody
 4    objects.  Right.
```

20    BY MR. GADDY:
21         Q.   So some of the other things that HDA
22    will do on behalf of its members is take
23    position on legislation, correct?
24              MS. CHARLES:  Objection.  Beyond the
25    scope.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Yes.

 2   BY MR. GADDY:

 3          Q.   And based on McKesson's participation

 4   within the HDA, another thing that HDA will do

 5   on behalf of its members is write letters to the

 6   media representing the position of its members?

 7               MS. CHARLES:  Objection.  Form.

 8          A.   Yeah, rarely.  I mean, engage with the

 9   media, certainly.  Write letters to the media I

10   think is not what they would do.  But yes, press

11   releases and, you know, op eds, things like

12   that, yes.

13   BY MR. GADDY:

14          Q.   And specifically as it relates to this

15   case, one of the things that HDA did was publish

16   what they called Industry Compliance Guidelines?

17               MS. CHARLES:  Objection.  Form.

18          A.   Yes.

19   BY MR. GADDY:

20          Q.   And we talked a little bit just a

21   moment ago about the process that HDA goes

22   through when they want to -- the example we were

23   using there was draft a substantive letter to a

24   lawmaker.  Would --

25          A.   And I'm sorry to interrupt.  The
```

Highly Confidential - Subject to Further Confidentiality Review

1    distinction I'm making is HDA probably does send

2    what I would call non-substantive letters

3    without any real process.  So if it's --

4         Q.   Sure.

5         A.   -- cover letter for annual report or

6    something, that wouldn't be edited and refined.

7    That's the distinction I'm making between

8    substantive and not substantive.

9         Q.   Fair clarification.

10        A.   You know, "congratulations on getting

11   elected" is not a letter that would go through

12   any significant process or something like that.

13        Q.   Understood.

Highly Confidential - Subject to Further Confidentiality Review



23      Q.   What was -- and ultimately, did

24   McKesson approve the publication of the 2008

25   Industry Compliance Guidelines?

Highly Confidential - Subject to Further Confidentiality Review

```
1                 MS. CHARLES:  Objection.  Form.

2        A.   "Approve" is not sort of the word I

3    would use.  I mean, I think the way -- again,

4    the way these things get done is they're sort

5    of -- they're consensus documents, so consented,

6    I mean, I don't know -- I'm not trying to be

7    knit-picky, but "approve" implies there was some

8    vote taken or something like that, and that's

9    not really the way it works.  Sort of, you the

10   document to a good place and everybody agrees

11   that we're going to go ahead and publish it.

12   BY MR. GADDY:
```



```
22   BY MR. GADDY:

23        Q.   Was there any objection made by

24   McKesson to the 2008 Industry Compliance

25   Guidelines being published?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. CHARLES:  Objection.  Form.

 2             A.   No.

 3       BY MR. GADDY:

 4             Q.   I'm going to show you -- I'm on Number

 5       7?  I'm going to show you what we're going to

 6       mark as Ganley 7.

 7                    (Whereupon, McKesson-Ganley-007 was

 8                    marked for identification.)

 9             A.   Thank you.

10                    MR. GADDY:  Shannon, if you don't

11       mind, I was going to use the projector.

12                    MS. MCCLURE:  I'll move.

13       BY MR. GADDY:

14             Q.   Do you recognize this document as

15       being the 2008 Industry Compliance Guidelines

16       that were published by the HDA?

17             A.   Yes.

18             Q.   Why were these guidelines published?

19             A.   I don't know specifically why they

20       were published.  But generally speaking, you

21       know, HDA would publish something like this,

22       HDMA at the time would publish something like

23       this to educate stakeholders about what the

24       industry does and what our procedures are, and

25       to share information among the companies, among
```

Highly Confidential - Subject to Further Confidentiality Review

 1    its membership.

 2         Q.   Was it McKesson's idea to draft and

 3    publish these?

 4         A.   I don't know the answer to that.

 5         Q.   Do you know whether or not these

 6    Industry Compliance Guidelines being published

 7    by HDA had anything to do with the 2008 civil

 8    penalty that McKesson paid?

 9             MS. CHARLES:  Objection.  Form.

10         A.   I don't know the answer to that.

11    BY MR. GADDY:

12         Q.   Were you aware that McKesson paid a

13    civil penalty in 2008?

14             MS. CHARLES:  Objection.  Beyond the

15    scope.

16         A.   I am aware, yes.

17    BY MR. GADDY:

18         Q.   And are you aware that it related to

19    allegations that McKesson had failed to report

20    suspicious orders of opioids?

21             MS. CHARLES:  Objection.  Beyond the

22    scope.

23         A.   Yes.

24    BY MR. GADDY:

25         Q.   And these Industry Compliance

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Guidelines speak exactly to that topic, is that
 2    correct?
 3              MS. CHARLES:  Objection.  Form, beyond
 4    the scope.
 5         A.   And more.  Yes, they speak to
 6    compliance generally, among other things.
 7    BY MR. GADDY:
 8         Q.   If you look in the top of the page, it
 9    says, the "Healthcare Distribution Management
10    Association Industry Compliance Guidelines."
11              Do you see that?
12         A.   Yes.
13         Q.   Goes on to say, "Reporting Suspicious
14    Orders and Preventing Diversion of Controlled
15    Substances."
16         A.   Yes.
17         Q.   Do you see that?
18              And you understand that's the contents
19    of this document?
20         A.   Yes.
21         Q.   In the first paragraph there, second
22    sentence, it says that "Manufacturers,
23    distributors, pharmacies and healthcare
24    practitioners share a mission and responsibility
25    to continuously monitor, protect and enhance the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     safety and security of this system to combat

2     increasingly sophisticated criminals who attempt

3     to breach the security of the legitimate supply

4     chain."

5          Do you see that?

6     A.   Yes.

7     Q.   And it was McKesson's position that

8     that was their role within the supply chain,

9     correct?

10         MS. CHARLES:  Objection.  Form.

11    A.   I'm not sure what you mean by "their."

12    I mean, yes, we would agree with the statement

13    that "Manufacturers, distributors, pharmacies

14    and healthcare practitioners share a mission and

15    responsibility to continuously monitor, protect

16    and enhance the safety and security of this

17    system."  We would agree with that statement.

18    BY MR. GADDY:

19    Q.   Okay.  And if you go down to the

20    second paragraph, starting in the middle of the

21    paragraph it says, "These Industry Compliance

22    Guidelines are consistent with, and further

23    extend, the distributors' track record of

24    supporting and implementing initiatives designed

25    to improve the safety, security and integrity of
```

```
 1     the medicine supply"?

 2          A.   Yes.

 3          Q.   It says, "They have been prepared in

 4     recognition of a growing problem of misuse and

 5     diversion of Controlled Substances."

 6               Do you see that?

 7          A.   Yes.

 8          Q.   And back in 2008, McKesson agreed with

 9     this statement, correct?

10               MS. CHARLES:   Objection.   Form.

11          A.   Yes.

12     BY MR. GADDY:

13          Q.   If you go down to the next paragraph,

14     it says that "distributors are uniquely situated

15     to perform due diligence in order to help

16     support the security of the controlled

17     substances they deliver to their customers."

18               Do you see that?

19          A.   Yes.

20          Q.   And this was a statement that McKesson

21     agreed with back in 2008 when these were

22     published?

23               MS. CHARLES:   Objection.   Form.

24          A.   Yeah, we agreed to the whole document.

25     BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review



11    BY MR. GADDY:

12         Q.   If you turn to Page 2, you'll see

13    there's numbering up in the top right-hand

14    corner.

15         A.   Yes.  Thank you.

16         Q.   Down towards the bottom third of the

17    page, the guidelines cite some of the federal

18    regulations that apply to distributors, correct?

19         A.   Yes.

20         Q.   And in the first sentence of that

21    regulation it says, "The registrant shall design

22    and operate a system to disclose to the

23    registrant suspicious orders of controlled

24    substances."

25              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. CHARLES:  Objection.  Form.

 2           A.   I do.

 3      BY MR. GADDY:

 4           Q.   And the word "suspicious orders" is

 5      underlined, correct?

 6           A.   It is, yes.

 7           Q.   Okay.  And if you look at the bottom

 8      of the paragraph, it says that emphasis was

 9      added by the HDA when they published this,

10      correct?

11           A.   Presumably, yes.  It says "Emphasis

12      added."

13           Q.   Okay.  It says "suspicious orders,"

14      correct?

15           A.   That's what it says.

16           Q.   Not suspicious customers?

17           A.   Right.
```

24      BY MR. GADDY:

25           Q.   If you go down to the next paragraph

Highly Confidential - Subject to Further Confidentiality Review

```
 1      it says, "Although distributors have been

 2      required to identify and report 'suspicious

 3      orders' of controlled substances and listed

 4      chemicals, increasing concerns about the

 5      potential misuse of prescription controlled

 6      substances have elevated awareness within the

 7      supply chain and have led to increased

 8      expectations by DEA."

 9              Do you see that?

10         A.   I do.

11         Q.   And based on McKesson's participation

12      within HDA, this was McKesson's understanding at

13      the time these were published?

14              MS. CHARLES:  Objection.  Form.

15         A.   Sorry, can you ask that again?

16      BY MR. GADDY:

17         Q.   Sure.

18              Based on McKesson's participation

19      within HDA, this sentence right here represents

20      McKesson's understanding at the time these

21      guidelines were published?

22              MS. CHARLES:  Same objection.

23         A.   I'm struggling with McKesson's

24      understanding of what?

25      BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review



16    BY MR. GADDY:

17         Q.   If you go to Page 3, do you see the

18    first full paragraph, it says, "With the strong

19    endorsement and expertise of our members, the

20    HDMA has developed the following Industry

21    Compliance Guidelines for preventing diversion

22    and reporting suspicious orders."

23              Do you see that?

24         A.   Yes.

25         Q.   Is it your understanding that McKesson

```
 1      strongly endorsed these Industry Compliance

 2      Guidelines as the HDMA represents right there?

 3              MS. CHARLES:  Objection.  Form.

 4      A.   I can't speak to the level of our

 5      endorsement.  We would have approved the

 6      document being published.

 7      BY MR. GADDY:

 8      Q.   And you would have approved the

 9      document with that language in there

10      representing that the members, which includes

11      McKesson, strongly endorse the document?

12              MS. CHARLES:  Objection.  Form.

13      A.   Yes.

14      BY MR. GADDY:

15      Q.   Same, at this time we know that

16      Cardinal Health was also a member, correct?

17              MS. CHARLES:  Objection.  Form, beyond

18      the scope.

19      A.   Yes.

20      BY MR. GADDY:

21      Q.   And AmerisourceBergen was also a

22      member, correct?

23              MS. CHARLES:  Same objections.

24      A.   Yes.

25      BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   If you turn to Page 7, do you see in
 2      Section II(a), you see that the guidelines speak
 3      to "Monitoring for Suspicious Orders"?  Just the
 4      title there, II(a).
 5            A.   Yes.  Sorry.  "II.  Monitoring for
 6      Suspicious Orders," yeah.
 7            Q.   And if you go about halfway down the
 8      paragraph, you see that it says that a
 9      distributor must be design and operate a system
10      to disclose to the registrant suspicious orders
11      of controlled substances?
12                 Do you see that?
13            A.   Yes.  It's a citation of the CFR.
14            Q.   And again, do you see that HDA added
15      emphasis to several phrases within that
16      sentence?
17            A.   Yes.
18            Q.   And one of those phrases that they
19      added emphasis to was "suspicious orders,"
20      correct?
21            A.   Yes.
22            Q.   Not suspicious customers, correct?
23                 MS. CHARLES:  Objection.  Form.
24            A.   It says "suspicious orders."
25      BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   If we turn to Page 9, do you see

2    there's a section Roman Numeral III in the

3    middle of the page about suspend or stop an

4    order of interest?

5       A.   Yes.

6       Q.   It says there, "If an order meets or

7    exceeds a distributor's threshold, as defined in

8    the distributor's monitoring system, or is

9    otherwise characterized by the distributor as an

10   order of interest, the distributor should not

11   ship the order to the customer, in fulfillment

12   of that order, any units of the specific drug

13   code product as to which the order met or

14   exceeded a threshold or as to which the order

15   was otherwise characterized as an order of

16   interest."

17           Do you see that?

18      A.   Yes, I do.

19      Q.   And specifically as to the second half

20   of that paragraph that starts "should not ship

21   to the customer," HDA chose to underline that

22   section, correct?

23      A.   Yes, it appears so.

24      Q.   And again, this is language that

25   McKesson had the opportunity to review, comment

1    on, and object to beforehand if they wanted,

2    correct?

3              MS. CHARLES:  Objection to form.

4         A.   Yeah, we had an opportunity to review

5    and comment on the entire document.

6    BY MR. GADDY:

7         Q.   And this is the -- this would be

8    another section that, according to the HDA, its

9    members strongly endorsed?

10             MS. CHARLES:  Objection.  Form.

11        A.   Yeah, I guess so.

12   BY MR. GADDY:

13        Q.   The last section we're going to look

14   at is on Page 12.  Do you see Section V towards

15   the bottom of the page?

16        A.   Yes.

17        Q.   It says, "Immediate DEA Notification."

18             Do you see that?

19        A.   Yes.

20        Q.   It says, "Under 21 CFR 1301.74(b)" --

21   you understand that to be the regulation that

22   requires distributors to report suspicious

23   orders?

24             MS. CHARLES:  Objection.  Form.

25        A.   I do.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. GADDY:

2         Q.   It says under that section, "orders

3    designated as 'suspicious' must be reported to

4    the DEA 'when discovered.'"

5              Do you see that?

6         A.   Yes.

7         Q.   And do you see that that language is

8    in quotations?

9         A.   Yes.

10        Q.   And is it your understanding that that

11   language comes verbatim from the regulation?

12             MS. CHARLES:  Objection.  Form, beyond

13   the scope.

14        A.   I don't know the answer to that.  I

15   would assume so from the plain reading of it,

16   yes.

17   BY MR. GADDY:

18        Q.   And again, this is language that,

19   according to the HDA, McKesson strongly

20   endorsed?

21             MS. CHARLES:  Objection.  Form, beyond

22   the scope.

23        A.   I think HDA said its membership

24   generally endorses it.  I don't think they

25   attributed the endorsement to any individual

Highly Confidential - Subject to Further Confidentiality Review

```
1      company.

2      BY MR. GADDY:

3           Q.   Fair.

4                Let me show you what I'll mark as

5      Ganley 8.

6                (Whereupon, McKesson-Ganley-008 was

7                marked for identification.)

8           A.   Thank you.

9      BY MR. GADDY:

10          Q.   Do you recognize this document?

11          A.   I do.

12          Q.   Have you seen this before?

13          A.   Yes.

14          Q.   When have you seen it?

15          A.   During preparing for this deposition.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MS. CHARLES:  Jeff, we've been going

14   about an hour.  Is this a good time?

15          MR. GADDY:  Sure.

16          THE VIDEOGRAPHER:  We're going off

17   record.  The time is 10:01.

18          (Whereupon, a recess was taken.)

19          THE VIDEOGRAPHER:  Going back on the

20   record beginning at Media File Number 2.  Time

21   is 10:14.

22   BY MR. GADDY:

23      Q.  Mr. Ganley, I'm going to show you

24   what's been marked as Number 9.  Do you

25   recognize this document?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.
2                (Whereupon, McKesson-Ganley-009, was
3                marked for identification.)
4     BY MR. GADDY:
5          Q.    Is this another document that you had
6     to see in preparation for your testimony today?
7          A.    I believe so.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18      BY MR. GADDY:

19           Q.    In 2013, HDMA made a -- added a

20      supplement to those guidelines, is that correct?

21           A.    I don't know that I'd characterize it

22      as supplement.

23           Q.    How would you characterize it?

24           A.    A new header.  I don't know.  I'm not

25      sure what word I would use to describe.  They

```
 1        had a statement that accompanied the guidelines.

 2            Q.   They added a statement to the

 3        guidelines?

 4            A.   Yes.

 5            Q.   Okay.  Other than the addition of a

 6        statement, did anything else about the

 7        guidelines change?

 8                 MS. CHARLES:  Objection.  Beyond the

 9        scope.

10            A.   I don't believe so.

11        BY MR. GADDY:

12            Q.   I'm going to show you what's been

13        marked as Ganley 10.

14                 (Whereupon, McKesson-Ganley-010 was

15                 marked for identification.)

16            A.   Thank you.

17        BY MR. GADDY:

18            Q.   Do you recognize this as being the

19        2013 Industry Compliance Guidelines that HDMA

20        published?

21            A.   Yes.

22            Q.   And would it be fair to say the top

23        three paragraphs are the preamble that was added

24        in 2013 by HDMA?

25            A.   Yes, it says -- yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   As far as adding this preamble to the
2     guidelines, is this the type of substantive
3     document that would have been circulated by HDMA
4     to its members to give them an opportunity to
5     review, comment, and object?
6          A.   Yes.
7          Q.   Do you know specifically if this was
8     circulated to McKesson to review, comment and
9     object upon?
10         A.   I don't know specifically, but I'm
11    sure it was.
```

Highly Confidential - Subject to Further Confidentiality Review



16    BY MR. GADDY:

17         Q.   Based on McKesson's participation

18    within the HDMA, what is your understanding of

19    why this preamble was added to the Industry

20    Compliance Guidelines?

21         A.   My understanding is based on the

22    language of the preamble, and --

23         Q.   Let me ask it differently, then.

24              Do you have any understanding, or does

25    McKesson have any understanding as to why this

Highly Confidential - Subject to Further Confidentiality Review

```
 1    preamble was added, other than what we see

 2    printed in front of us?

 3         A.   Well, I think -- I'm not sure I

 4    understand the question.  An understanding other

 5    than what we see printed in front of us?  I

 6    think they're one in the same.

 7         Q.   Okay.  Well, so I'll just ask my

 8    question again, then.

 9              What is McKesson's understanding for

10    why this preamble was added?

11         A.   It was -- my understanding is that it

12    was added to clarify the purpose of the Industry

13    Compliance Guidelines.

14         Q.   Why did HDMA and its members in 2013,

15    five years after they were originally published,

16    feel the need to clarify?

17              MS. CHARLES:  Objection.  Scope.

18              MS. MCCLURE:  Objection.  Form.

19         A.   Again, based on the reading of what's

20    here, they were clarifying that the Industry

21    Compliance Guidelines are not meant to

22    constitute an industry standard.

23    BY MR. GADDY:

24         Q.   That's not my question.

25              My question is, why did they feel the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      need to clarify?
2              MS. CHARLES:  Objection.  Beyond the
3      scope, form.
4              MS. MCCLURE:  Objection.  Form.
5         A.   I don't know.
6      BY MR. GADDY:
7         Q.   Did it have anything to do with the
8      fact that McKesson was being investigated in
9      2013 by the DEA?
10             MS. CHARLES:  Objection.  Beyond the
11     scope.
12        A.   I don't know.
13     BY MR. GADDY:
14        Q.   In the last sentence of the first
15     paragraph it says that these guidelines -- it
16     says, "It was not intended to be, and should not
17     be understood to constitute, an 'industry
18     standard' or statement of the state-of-the-art
19     with regard to individual companies' practices."
20             Do you see that?
21        A.   I see it.
22        Q.   We already know that -- we've already
23     looked at documents where HDMA has indicated
24     that they expended significant resources to
25     compile these guidelines, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    That's what they said.

14     BY MR. GADDY:

15          Q.    So McKesson has no understanding

16     whatsoever for why HDMA and its members felt the

17     need to clarify the purpose of these guidelines

18     in 2013?

19              MS. CHARLES:   Objection.   Form.

20          A.    I think the decision to include this

21     statement was to be clear that it's not meant --

22     that they were not meant to be an industry

23     standard.

24     BY MR. GADDY:

25          Q.    I understand that that's what they

1    were trying to make clear with this preamble.

2    Why did they feel the need to make that clear?

3    That's my question.

4              MS. CHARLES:  Objection.  Form.

5    BY MR. GADDY:

6         Q.   And if you don't know, you can tell me

7    you don't know.  But do you know, does McKesson

8    know, you as the person who has testified that

9    you're most knowledgeable about this topic, do

10   you know why the HDMA and its members felt the

11   need in 2013 to clarify what these guidelines

12   were and were not supposed to do?

13             MS. CHARLES:  Objection.  Form, beyond

14   the scope.

15        A.   I don't.

16   BY MR. GADDY:

17        Q.   Were you aware that in 2013 McKesson

18   was being investigated by the DEA for failing to

19   report suspicious orders?

20             MS. CHARLES:  Objection.  Beyond the

21   scope.

22        A.   I am aware, yes.

23   BY MR. GADDY:

24        Q.   Are you aware that as a result of

25   that, McKesson paid a significant -- a

Highly Confidential - Subject to Further Confidentiality Review

```
 1      substantial civil penalty?

 2                MS. CHARLES:  Same objection, and

 3      objection to form.

 4           A.   I am.

 5      BY MR. GADDY:

 6           Q.   In the last paragraph, the

 7      second-to-last sentence says, "In light of

 8      passage of time and revised industry practices,

 9      HDMA is considering revision of the ICGs."

10                Do you see that?

11           A.   Yes.

12           Q.   That has not happened, has it?

13           A.   I don't believe so, no.

14           Q.   These have not been -- these Industry

15      Compliance Guidelines have not been revoked,

16      repealed, or replaced by HDMA, correct?

17                MS. CHARLES:  Objection.  Beyond the

18      scope.

19           A.   I wouldn't agree --

20                MS. MCCLURE:  Objection.  Form.

21           A.   I wouldn't agree with the

22      characterization of revoked or repealed.  That's

23      not something HDA would ever do.  Things aren't

24      revoked or repealed.  There's no -- this wasn't

25      enacted.
```

```
 1    BY MR. GADDY:

 2         Q.   Okay.  To McKesson's understanding,

 3    has HDMA ever disavowed these guidelines?

 4              MS. MCCLURE:  Objection.  Form.

 5         A.   I'm not sure I know what you mean by

 6    "disavowed."  But, again, disavowing is not

 7    something HDA does.

 8    BY MR. GADDY:

 9         Q.   As far as McKesson's understanding,

10    these Industry Compliance Guidelines still

11    represent HDMA's position on this issue?

12              MS. CHARLES:  Objection.  Form.

13         A.   I wouldn't say position on the issue,

14    no.  They're guidelines.

15    BY MR. GADDY:

16         Q.   And McKesson's understanding is these

17    remain the guidelines of HDMA?

18         A.   Yes.  These are the HDMA guidelines,

19    yes.
```

Highly Confidential - Subject to Further Confidentiality Review



18          Q.   Now, HDMA also conducts lobbying

19     activity on behalf of its members, correct?

20          A.   Yes.

21          Q.   And we've already covered that its

22     members -- HDA's membership includes

23     manufacturers and distributors, correct?

24               MS. CHARLES:  Objection.  Form.

25          A.   The membership includes manufacturers

Highly Confidential - Subject to Further Confidentiality Review

```
1      and distributors, yes.

2      BY MR. GADDY:

3           Q.   I'm going to show you what we've

4      marked as Ganley 11.

5                (Whereupon, McKesson-Ganley-011 was

6                marked for identification.)

7      BY MR. GADDY:

8           Q.   Do you recognize this document?

9           A.   Yes, I do.

10          Q.   Okay.  Did you have the opportunity to

11     review this in preparation for this deposition

12     today?

13          A.   Yes, I believe so.

14          Q.   And do you see that this is a
```

Highly Confidential - Subject to Further Confidentiality Review

```
6              Do you see that?

7              MS. CHARLES:  Objection.  Form.

8        A.   I do see it.

9   BY MR. GADDY:

10       Q.   And is that consistent with McKesson's

11  understanding that one of the things that HDMA

12  did was advocate for its member company

13  interests?

14       A.   Yes, that's what it says here.

15       Q.   Well, I'm asking, is that consistent

16  with McKesson's understanding of one of the

17  things that HDMA does for its members?

18       A.   Yes.

19       Q.   If you turn to Page 3 of the document,

20  and again the page number is up at the top

21  right, do you see this Summary of the 2014 --

22  tell us what that acronym stands for.

23       A.   The SGAC acronym?

24       Q.   Yes.

25       A.   State Government Affairs Committee.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.   Were you -- did you participate on

2    that committee in 2014?

3           A.   For part of 2014 I did, yes.

4           Q.   Do you know if you attended that

5    summer retreat?

6           A.   I don't know when the retreat was.  I

7    would have stopped participating in the State

8    Government Affairs Committee in July.  I don't

9    know when this meeting was.

10          Q.   Okay.  And one of the things, or one

11   of the primary things that the State Government

12   Affairs Committee does is direct state lobbying

13   efforts, correct?

14          MS. CHARLES:  Objection.  Form.

15          A.   Yes.

16   BY MR. GADDY:
```

23           Do you see that?

24           A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



16          Do you see that?

17          MS. CHARLES:  Objection.  Form.

18      A.   I do see it.

19  BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review



17     BY MR. GADDY:

18          Q.   And that's McKesson's understanding

19     from their participation within the HDMA, and

20     specifically your participation in the State

21     Government Affairs Committee, true?

22               MS. CHARLES:  Objection.  Form.

23          A.   When you say that's my understanding,

24     what's "that"?  I don't --

25     BY MR. GADDY:

```
 1            Q.   McKesson's understanding from your

 2       participation within HDMA, and specifically on

 3       the State Government Affairs Committee, is that

 4       one of McKesson's goals would have been to

 5       prevent onerous legislation from being enacted?

 6            MS. CHARLES:  Objection.  Form.

 7            A.   The goal of the State Government

 8       Affairs Committee -- one of the goals of the

 9       State Government Affairs Committee is to prevent

10       onerous legislation from being enacted.

11       BY MR. GADDY:

12            Q.   I'm going to show you what I'm going

13       to mark as Ganley 12.

14            (Whereupon, McKesson-Ganley-012 was

15            marked for identification.)

16            A.   Thank you.

17       BY MR. GADDY:

18            Q.   Do you recognize this document?

19            A.   Yes.

20            Q.   And is this a document that you

21       specifically reviewed in preparation for this

22       deposition today?

23            A.   I'm not sure.

24            Q.   But it's an e-mail you've seen?

25            A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.   If you look at the top of the page, do
2     you see this is an e-mail from an employee of
3     HDMA?
4              A.   Yes.
5              Q.   And he's writing to the State
6     Government Affairs Committee?
7              A.   It says to SGAC, yes.  I can't say who
8     is actually in the "To" field.
9              Q.   Is that -- I'm glad you mentioned
10    that.  Is that something that's common now; when
11    you receive e-mails from HDMA, do you generally
12    see who all is receiving the e-mail, or is it a
13    blind copy format, or is it a Listserv, or do
14    you know?
15             A.   It all depends.  And I don't know that
16    there's any particular logic to it, to be honest
17    with you.  I think, as I said to you, sometimes
18    these task forces have lots of members, and so I
19    think for ease or convenience when sending to a
20    large group like that, they use the BCC field.
21             Q.   And it looks like that's what was done
22    in this case, because he sent it to himself?
23             A.   I would assume, yes.
24             Q.   And ended up in McKesson's file?
```

Highly Confidential - Subject to Further Confidentiality Review

9        Q.    What are State Drug Abuse Task Forces?

10            MS. CHARLES:  Objection.  Beyond the

11      scope.

12            A.    So I believe that the states had set

13      up various task forces to look at the drug abuse

14      issue, or to tackle the drug abuse issue, many,

15      many states did that.  And what I believe this

16      to be is sort of a document that captures the

17      activity within those task forces.

18      BY MR. GADDY:

19            Q.    Okay.  Would it be fair to say that

20      McKesson's understanding, based on participation

21      within HDA, of the State Drug Abuse Task Forces

22      is that the general goals of these task forces

23      were to prevent or reduce prescription drug

24      abuse?

25            MS. MCCLURE:  Objection.

```
 1                   MS. CHARLES:  Objection.  Form.
 2          A.    Probably all drug abuse, but yes.
 3                   And, you know, I can't speak to the
 4       mission statement of each one of the different
 5       states' Drug Abuse Task Force, but probably
 6       prescription drug abuse, and elicit drug abuse,
 7       and drug abuse generally.
 8       BY MR. GADDY:
 9          Q.    That's fair.
10                   And McKesson and all other HDMA
11       members via HDA were keeping track of what was
12       going on in those different task forces,
13       correct?
14                   MS. CHARLES:  Objection.  Form, beyond
15       the scope.
16          A.    Yes.  Well, let me rephrase.
17                   HDA was on behalf of the industry.
18       BY MR. GADDY:
19          Q.    Correct, on behalf of its members?
20          A.    Right.
21          Q.    Which includes McKesson?
22          A.    Right.
23          Q.    Which includes Cardinal Health?
24          A.    Yes.
25          Q.    Which includes AmerisourceBergen?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. CHARLES:  Objection to form.
 2      BY MR. GADDY:
 3          Q.   Correct?
 4          A.   Yes.
 5          Q.   Which includes Purdue Pharma, correct?
 6              MS. CHARLES:  Objection.  Form.
 7          A.   Yes.
 8      BY MR. GADDY:
 9          Q.   Which includes Endo, Teva, Johnson &
10      Johnson, Janssen, correct?
11              MS. CHARLES:  Objection to form.
12          A.   The membership includes those people?
13      BY MR. GADDY:
14          Q.   Yes.
15          A.   Yes, the membership includes those
16      people.
17          Q.   And if you look just here --
18          A.   Those manufacturers, though, would not
19      have been on this e-mail, so that's the
20      distinction I'm trying to draw.  They don't
21      participate in the SGAC or the FGAC.
22          Q.   But they're all members of HDA?
23          A.   They're members of HDA.
24          Q.   If you just look at the first page
25      here, you see there are several states where
```

Highly Confidential - Subject to Further Confidentiality Review



20      Q.   And they could come up with

21   legislation that could impact your industry as

22   well?

23           MS. CHARLES:  Objection.  Form.

24      A.   Yeah.

25   BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   Turn to Page 5 for me, please.

 2                 Does McKesson agree that a state

 3       having a drug abuse task force is a good thing?

 4                 MS. CHARLES:  Objection.  Beyond the

 5       scope.

 6            A.   Yes.

 7       BY MR. GADDY:

 8            Q.   And you see here on Page 5 there's an

 9       entry for the state of New Jersey, correct?

10            A.   I don't see New Jersey here.  On 5?

11            Q.   I'm sorry, look at the number on the

12       top right-hand.

13            A.   Sorry.

14                 Yes.  That's what it says.
```

22                 Do you see that?

23            A.   I do see that.

24            Q.   Does McKesson agree that bills aimed

25       at preventing prescription drug and opioid abuse

Highly Confidential - Subject to Further Confidentiality Review

```
1      would be a good thing?

2                  MS. CHARLES:  Objection.  Beyond the

3      scope.

4           A.   I wouldn't say -- that's too general

5      to answer.

6      BY MR. GADDY:

7           Q.   Okay.

8           A.   I mean, you could have a bill that was

9      aimed at preventing prescription drug abuse that

10     was not good, that we didn't think would solve

11     the problem, that we would think would be a bad

12     bill and a different solution.  I mean, we are

13     committed to solving the prescription drug abuse

14     problem, but not every bill that has that aim is

15     necessarily -- we would necessarily endorse or

16     agree with.

17          Q.   Understood.

18               McKesson agrees that preventing

19     prescription drug and opioid abuse is a good

20     thing, correct?

21          A.   Yes.  Of course.

22               MS. CHARLES:  Objection.  Beyond the

23     scope.

24     BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review



14    BY MR. GADDY:

15        Q.    And would it also be fair to say that

16    if it is determined that New Jersey wants

17    wholesale distributors to pay for some of these

18    plans, that would be an example of legislation

19    that would be onerous to the wholesale

20    distributors?

21            MS. CHARLES:    Objection.    Form, beyond

22    the scope.

23        A.    Not necessarily.

24    BY MR. GADDY:

25        Q.    But certainly HDMA was going to

Highly Confidential - Subject to Further Confidentiality Review

```
1    continue tracking to see who was going to have

2    to pay for these programs that Governor Christie

3    was suggesting, correct?

4              MS. CHARLES:  Objection.  Form, beyond

5    the scope.




8    BY MR. GADDY:

9         Q.   So yes?

10             MS. CHARLES:  Same objections.

11        A.   That's what it says, yes.

12   BY MR. GADDY:

13        Q.   I'm going to show you what I'm going

14   to mark as Ganley 13.

15             (Whereupon, McKesson-Ganley-013 was

16             marked for identification.)

17        A.   Thank you.

18   BY MR. GADDY:

19        Q.   Do you recognize this document?

20        A.   Yes, I do.

21        Q.   And is this another document that you

22   reviewed in preparation for this deposition?

23        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2         A.    I do.

 3         Q.    And based on McKesson's participation

 4    within the HDMA, and specifically your

 5    participation in the State Government Affairs

 6    Committee, would it be McKesson's understanding

 7    that HDMA had language inserted into that Texas

 8    bill -- I'm sorry, into that Tennessee bill?

 9              MS. CHARLES:  Objection.  Form.

10         A.    It's my understanding that the bill

11    was amended to include language that was

12    recommended by HDMA.

13    BY MR. GADDY:

14         Q.    So HDMA actually had a hand in writing

15    the law that was going to directly apply to the

16    wholesale distributors within the state of

17    Tennessee?

18              MS. CHARLES:  Objection.  Beyond the

19    scope, form.

20         A.    I would not agree with that, no.

21    BY MR. GADDY:

22         Q.    This indicates that HDMA had language

23    included in the bill, correct?

24              MS. CHARLES:  Objection.

25    BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.   Can we agree on that?

2               MS. CHARLES:  Same objections.

3          A.   It was amended to include language

4     that HDMA had recommended, yes.

5     BY MR. GADDY:

6          Q.   Okay.  I show you what's been marked

7     as Ganley 14.

8               (Whereupon, McKesson-Ganley-014 was

9               marked for identification.)

10    BY MR. GADDY:

11         Q.   Do you recognize this document?

12         A.   Yes.

13         Q.   And do you recognize this to be a

14    PowerPoint or presentation from the State

15    Government Affairs Annual Meeting in November of

16    2014?

17         A.   That's what it says, yep.

18         Q.   Would you have attended this meeting?

19         A.   I don't believe so.  I'm not positive.

20    I may have, but it would have been after July

21    when I switched over to federal, but...

22         Q.   Can you turn to Page 5 for me, please?

23         A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

6          Do you see that?

7          MS. CHARLES:  Objection.  Beyond the

8     scope.

9          A.  I see that.

10    BY MR. GADDY:

11         Q.  And is that consistent with your

12    understanding, with McKesson's understanding

13    based on their participation within the HDA?

14         MS. CHARLES:  Objection.  Form.

15         A.  It what consistent, the dollar figure?

16    BY MR. GADDY:

17         Q.  Sure.

18         MS. CHARLES:  Objection.  Form.

19         A.  I wouldn't necessarily have line of

20    sight to what their budget is, but that's what

21    it says.

22    BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review



12          MS. CHARLES:  Objection.  Form, beyond

13     the scope.

14          A.   I wouldn't agree with the

15     characterization "at their disposal."  It's

16     their budget for the State Government Affairs

17     team.

18     BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14      BY MR. GADDY:

15            Q.   If we turn to the next page --

16            A.   This is not accurate as of now,

17      though.

18            Q.   As far as who is covering what

19      section?

20            A.   Three of these people listed are no

21      longer with HDA.

22            Q.   Okay.

23            A.   And I don't know the size of their

24      State Government Affairs team now.  I believe

25      it's smaller, but it might still be four people.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      I'm not sure.

 2           Q.   But it is true --

 3           A.   This is as of 2014.

 4           Q.   Understand.
```

19           Do you see that?

20           A.   Yes.

21           Q.   And would it be consistent with your

22      understanding that that includes both the

23      distributors and the manufacturers who are

24      members of HDMA?

25                MS. CHARLES:  Objection.  Form, beyond

Highly Confidential - Subject to Further Confidentiality Review

```
 1      the scope.

 2          A.   I have no idea where they got that

 3      number.

 4      BY MR. GADDY:

 5          Q.   Well, we saw earlier today there's

 6      only 36 wholesale distributors that are members

 7      of HDMA, correct?

 8          A.   That's correct.

 9          Q.   And then we also saw earlier today

10      that there are approximately 120 manufacturing

11      members who are members of HDMA, correct?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          Do you see that?

19      A.   That's what it says.

20      Q.   That stands for the National

21   Association of Chain Drugstores?

22      A.   Yes.

23      Q.   Is McKesson a member of that?

24      A.   We are.

25      Q.   Is Cardinal Health a member of that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. CHARLES:  Objection.  Beyond the
 2        scope.
 3             A.   I don't know.
 4        BY MR. GADDY:
 5             Q.   Is AmerisourceBergen a member of that?
 6                    MS. CHARLES:  Same objection.
 7             A.   I don't know.
 8        BY MR. GADDY:
 9             Q.   Does NACDS also conduct lobbying
10        activity on behalf of its members?
11                    MS. CHARLES:  Same objection.
12             A.   They do conduct lobbying activity,
13        yes.
14        BY MR. GADDY:
15             Q.   Okay.  And do you see here it
16        indicates they also have directors charged with
17        covering the entire 50 states?
18                    MS. CHARLES:  Objection.  Form.
19             A.   I think so.  That seems to be what
20        this chart indicates.  But they don't have any
21        names here, so I don't...
22        BY MR. GADDY:
23             Q.   Does McKesson pay money to the NACDS?
24             A.   We pay dues, yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5            Do you remember that?

6            MS. CHARLES:  Objection.  Form.

7        A.   It was one of the goals, yes --

8    BY MR. GADDY:

9        Q.   Okay.

10       A.   -- that was listed.  One of many.

11       Q.   And in attempting to meet their goals,

12   would it be fair to say that the HDMA would

13   expect that from time to time there would be

14   particular challenges that they would have to

15   face?

16           MS. CHARLES:  Objection.  Form, beyond

17   the scope.

18       A.   I'm not sure I know what you mean by

19   "challenges."

20   BY MR. GADDY:

21       Q.   Well, let's look at this.  Turn to

22   Page 4 for me, please?

23       A.   Of this document, 14?

Highly Confidential - Subject to Further Confidentiality Review



```
20       BY MR. GADDY:

21            Q.   And "Rx" means prescription, right?

22            A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

2            MS. CHARLES:  Objection.  Form.

3      BY MR. GADDY:

4            Q.   Is that correct?

5            A.   That's what it says, yeah.

6            Q.   And that's McKesson's understanding as

7      it relates to its participation within the HDA,

8      and specifically its participation in the State

9      Government Affairs Committee, correct?

10           A.   What's McKesson's understanding?

11           Q.   That this is one of the challenges

12     that HDA was going to face moving forward?

13           MS. CHARLES:  Objection.  Form.

17     BY MR. GADDY:

18           Q.   It was a challenge for you, correct?

19           MS. CHARLES:  Objection.  Form.

20     BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

2          Q.   Now, HDMA also conducts federal

3     lobbying on behalf of its members, correct?

4          A.   Yes.

5               Well, let me just comment on the form.

6     "On behalf of" has implications in the lobbying

7     laws, so I wouldn't say on behalf of.  I would

8     say HDMA conducts federal lobbying representing

9     the issues affecting the industry.

10         Q.   Understood.

11         A.   HDMA is not a lobbyist for McKesson

12    and registered as such under the laws.  There's

13    nuance there.

14         Q.   There's one in particular, one law

15    that's been passed in particular that has gotten

16    a lot of attention.  Agree with that?

17              MS. CHARLES:  Objection to form.

18    Beyond the scope.

19         A.   I'm not sure what law you're talking

20    about.

21    BY MR. GADDY:

22         Q.   You're really not?

23         A.   Related to opioid abuse?

24         Q.   Yes.

25         A.   S. 483, I assume.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   We talked earlier about the Washington

2     Post article and the CBS 60 Minutes episode, and

3     that was directly related to what you just

4     called S. 483, correct?

5          A.   Yes.

6          Q.   Do you know the name of that bill, or

7     that law?

8               MS. CHARLES:  Objection.  Beyond the

9     scope.

10         A.   The Ensuring Patient Access and

11    Effective Drug Control Act, I think.

12    BY MR. GADDY:

13         Q.   And that's a bill that McKesson

14    actively supported, correct?

15         A.   Yes.

16         Q.   It's a bill that the HDMA actively

17    supported, correct?

18         A.   Yes.

19         Q.   It's a bill that all of HDA members

20    actively supported, correct?

21              MS. MCCLURE:  Objection.

22              MS. CHARLES:  Objection, beyond the

23    scope, form.

24         A.   I don't know the answer to that.

25    BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.   I'm going to show you what's been
2       marked as Ganley 14.
3                   (Whereupon, McKesson-Ganley-015 was
4                   marked for identification.)
5       BY MR. GADDY:
6              Q.   Do you recognize this as being --
7                   MS. CHARLES:  Are we on 14 or 15?  15.
8       BY MR. GADDY:
9              Q.   I'm sorry, 15.
10                  Mr. Ganley, do you mind striking
11      through that 14 at the bottom and making it 15
12      for me, please?  Thank you.
13                  Do you recognize this document as
14      being a statement from John Gray?
15             A.   That's what it says, yes.
16             Q.   And he's the CEO of HDMA, correct?
17             A.   Yes.
18             Q.   If you turn the page to the top of
19      Page 2, do you see where he says, "I am John
20      Gray, President and CEO of HDMA.  Thank you for
21      the opportunity to discuss with the Subcommittee
22      important legislation introduced by
23      Representatives Blackburn and Marino, the
24      Ensuring Patient Access and Effective Drug
25      Enforcement Act"?
```

Highly Confidential - Subject to Further Confidentiality Review

1           Do you see that?

2       A.   Yes.

3       Q.   So president and CEO of HDMA advocated

4    directly to Congress for this bill, correct?

5           MS. CHARLES:  Objection.  Form, beyond

6    the scope.

7       A.   Yes.

8    BY MR. GADDY:

9       Q.   From McKesson's point of view, did you

10    have an understanding of the goal of that bill?

11      A.   Yes.

12      Q.   What was that?

13          MS. CHARLES:  Objection.  Beyond the

14    scope.

15      A.   The goal of the bill was to clarify

16    language in the Controlled Substance Act

17    regarding the definition of imminent danger and

18    a corrective action plan.

19    BY MR. GADDY:

20      Q.   The definition of imminent danger

21    would be entirely new language, correct?

22          MS. CHARLES:  Objection.  Beyond the

23    scope, form.

24      A.   Imminent danger was not defined -- is

25    not defined in the Act.

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. GADDY:

 2         Q.   Correct.

 3              So it would have been new language,

 4     correct?

 5              MS. CHARLES:  Same objections.

 6         A.   Yes.

 7     BY MR. GADDY:

 8         Q.   And the corrective action plan would

 9     be an entirely new clause in the Act, correct?

10              MS. CHARLES:  Same objections.

11         A.   Yeah, there was an amendment to -- the

12     bill was an amendment to the Controlled

13     Substances Act.

14     BY MR. GADDY:

15         Q.   Did you have direct interaction with

16     any member of Congress regarding this bill?

17              MS. CHARLES:  Beyond the scope.

18         A.   Yes.

19     BY MR. GADDY:

20         Q.   Who did you have interaction with?

21              MS. CHARLES:  Same objection.

22         A.   I'm not sure I could list them all.

23     BY MR. GADDY:

24         Q.   Did you have interaction with

25     Congressman Marino?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               MS. CHARLES:  Same objection.

 2        A.   Yes.

 3     BY MR. GADDY:

 4        Q.   Congresswoman Blackburn?

 5               MS. CHARLES:  Same objection.

 6        A.   Yes.

 7     BY MR. GADDY:

 8        Q.   Senator Hatch?

 9               MS. CHARLES:  Same objection.

10        A.   Yes.

11     BY MR. GADDY:

12        Q.   Senator Rubio?

13               MS. CHARLES:  Same objection.

14        A.   Personally, no, not with Senator

15     Rubio.

16     BY MR. GADDY:

17        Q.   From your participation within HDMA,

18     is it your understanding that HDMA also would

19     have had contact with many members of Congress

20     regarding this bill?

21        A.   Yes.

22               MS. CHARLES:  Objection to form.

23     BY MR. GADDY:

24        Q.   I'm going to show you what we're going

25     to mark as Number 16.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                  (Whereupon, McKesson-Ganley-016 was

2                  marked for identification.)

3     BY MR. GADDY:

4          Q.   Do you recognize this document?

5          A.   Yes.
```

17               Do you see that?

18          A.   Yes, I do.

19          Q.   And so no doubt this was a bill that

20     HDMA strongly supported?

21               MS. CHARLES:  Objection.  Form, beyond

22     the scope.

23          A.   HDA, or HDMA and then later HDA

24     supported the bill, yes.

25     BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   If you'd flip to Page 3, do you see an

2  agenda that was attached to this e-mail?

3      A.   Yes, I do.

21      Q.   Is that consistent with your

22  understanding?

23          MS. CHARLES:  Objection.  Form.

24      A.   Yes, it is.

25  BY MR. GADDY:

```
 1           Q.   From McKesson's perspective relative
 2      to its participation with the HDMA, was the
 3      purpose of the adding the definition of imminent
 4      danger and instituting the corrective action
 5      plan, that those items would make it easier or
 6      harder for DEA to investigate wholesale
 7      distributors?
 8                MS. CHARLES:  Objection to form.
 9           A.   Neither.
10      BY MR. GADDY:
11           Q.   From McKesson's perspective, based on
12      its participation within the HDMA, would adding
13      those two provisions to the Controlled Substance
14      Act make it easier or harder for the DEA to
15      issue immediate suspicion orders -- excuse me,
16      immediate suspension orders to wholesale
17      distributors?
18                MS. CHARLES:  Objection to form.
19           A.   I don't know that it would make it
20      easier or harder.  It was adding specific
21      language into the bill where a definite -- where
22      a term was undefined.
23      BY MR. GADDY:
24           Q.   Let's talk about the imminent danger
25      definition.  Correct?
```

```
 1        A.   Right.

 2        Q.   The corrective action plan, that

 3   didn't exist before?

 4        A.   Right.  It was a different regulatory

 5   tool.  It was written into the law for DEA.

 6        Q.   Okay.  And that tool -- tell me if you

 7   agree or disagree, that tool gave any wholesale

 8   distributor who was notified that they may have

 9   been out of compliance with the Controlled

10   Substance Act, it allowed them 30 days to

11   correct their behavior prior to any immediate

12   suspension order being issued.

13            MS. CHARLES:  Objection to form.

14   Beyond the scope.

15        A.   No, I would not agree with that

16   characterization of it.  It created a corrective

17   action plan system where the wholesaler could

18   submit to the DEA a corrective action plan that

19   would be approved or not.

20   BY MR. GADDY:

21        Q.   After they were informed they were out

22   of compliance, they then had an ability to

23   correct their behavior prior to any immediate

24   suspension order being issued, correct?

25            MS. CHARLES:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Beyond the scope.

2         A.   No, that's not correct.

3    BY MR. GADDY:

4         Q.   Do you agree that the bill that HDMA

5    was pushing or advocating for and that McKesson

6    was advocating for was amending a law that had

7    previously been used to penalize McKesson?

8              MS. CHARLES:  Objection.  Form, beyond

9    the scope.

10        A.   It was amending the Controlled

11   Substances Act.

12   BY MR. GADDY:

13        Q.   And McKesson had previously been

14   penalized on two separate occasions for

15   violating the Controlled Substance Act, is that

16   correct?

17             MS. CHARLES:  Objection.  Form, beyond

18   the scope.

19        A.   I'm not sure I know what "penalized."

20   There were settlements related to the Controlled

21   Substances Act, yes.

22   BY MR. GADDY:

23        Q.   Well, McKesson paid a 13 and a half

24   million dollar settlement in 2008, correct?

25             MS. CHARLES:  Objection.  Beyond the
```

```
1     scope.

2          A.   Yes.

3     BY MR. GADDY:

4          Q.   Okay.  And that was for violations of

5     the Controlled Substance Act, correct?

6               MS. CHARLES:  Objection.  Beyond the

7     scope, form.

8          A.   It was a settlement.  I'm not sure --

9     there was an admission of violations.  I don't

10    know the specifics of the settlement.  But it

11    was a settlement arising out of the Controlled

12    Substances Act.

13    BY MR. GADDY:

14         Q.   Are you not aware that McKesson

15    admitted violations of the Controlled Substance

16    Act pursuant to that agreement?

17         A.   I haven't looked at --

18              MS. CHARLES:  Objection.  Form, beyond

19    the scope.

20         A.   I haven't looked at the two

21    settlements.

22    BY MR. GADDY:

23         Q.   As you sit here today, you don't know

24    whether or not McKesson has ever admitted that

25    they violated the Controlled Substances Act
```

```
 1      before?

 2              MS. CHARLES:  Same objections.

 3      A.   I would have to look at the settlement

 4      language.  I'd have to review it, which is not

 5      something I did in preparation for this.

 6      BY MR. GADDY:

 7      Q.   And you're aware that they paid a

 8      $150 million civil penalty in 2016?

 9              MS. CHARLES:  Same objections.

10      A.   Yes.

11              MS. CHARLES:  It's been about another

12      hour, so whenever you have a good time.

13              MR. GADDY:  Now is fine.

14              THE VIDEOGRAPHER:  Going off the

15      record.  The time is 11:10.

16              (Whereupon, a recess was taken.)

17              THE VIDEOGRAPHER:  Going back on the

18      record beginning of Media File Number 3.  Time

19      is 11:21.

20              MR. GADDY:  Are we on Number 16?

21              MS. CHARLES:  We did 16.

22              MR. GADDY:  Thank you.

23              (Whereupon, McKesson-Ganley-017 was

24              marked for identification.)

25      BY MR. GADDY:
```

1          Q.    Mr. Ganley, I'm going to show you

2     what's been marked as Number 17.

3          A.    Thank you.

4          Q.    Do you recognize that document?

5          A.    I do.

6          Q.    And is this a document that you

7     specifically looked at in preparation for this

8     deposition today?

9          A.    It is.

10         Q.    And if you start approximately in the

22         A.    That's correct.

23         Q.    And as we already discussed, that is

24    the law that HDMA advocated for, that McKesson

25    advocated for, that dealt with the definition of

Highly Confidential - Subject to Further Confidentiality Review

1      imminent danger and the institution of a

2      corrective action plan, correct?

3            MS. CHARLES:  Objection to form.

4        A.   That's correct.

5      BY MR. GADDY:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22        Q.   Well, this is not Endo and Purdue's

23   language.  Do you understand that?

24        A.   I'm sorry.

25        Q.   This is language that's been suggested

Highly Confidential - Subject to Further Confidentiality Review

```
1     by HDMA and that they're circulating to

2     McKesson, AmerisourceBergen, and Cardinal Health

3     to see if they want to comment on it.

4              Do you see that?

5        A.   No.

6              MS. CHARLES:  Objection to form.

7     BY MR. GADDY:

8        Q.   Well, look at -- turn to Page 3.  This

9     is the edits that were suggested by Endo and

10    Purdue.

11             Do you see that?

12             MR. WEINOGRAD:  Objection.

13             MS. CHARLES:  Objection to form.

14       A.   I don't see that.

15    BY MR. GADDY:

22       A.   It's difficult from this document to

23    figure out who wrote these suggested edits.

24    It's unclear to me who wrote the suggested

25    edits.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Okay.  Well --

2          A.    I know Endo and Purdue had changes

3    that they wanted to the bill at the last minute,

4    and that they communicated those changes to

5    Hatch's office.  Hatch then went through the

6    process of checking with DEA and DOJ as to

7    whether those changes were acceptable.
```

19   BY MR. GADDY:

20          Q.    I show you what's been marked as

21   Exhibit 18.

22                (Whereupon, McKesson-Ganley-018 was

23                marked for identification.)

24          A.    Thank you.

25   BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.   Do you recognize this as being the law

2      that was ultimately passed?

3           A.   Yes, I believe so.  It says "Public

4      Law," so yes.

5           Q.   If you turn to Page 2, do you see the

6      definition in the middle of the page, there's

7      a -- looks like it's (a)(2), (a)(2), (b)(2)?  Do

8      you see the definition of imminent danger?

9           A.   Yes.

10          Q.   If you look at the last document that

11     you had where we saw the proposed language that

12     was given to McKesson, Cardinal Health, and

13     AmerisourceBergen, does it look like that

14     language made it into the bill?

15          A.   No.

16          Q.   Does it look like the language that

17     made it into the bill that became law is

18     substantially similar to what McKesson,

19     AmerisourceBergen, and Cardinal Health were

20     permitted to comment on?

21               MS. CHARLES:  Objection to form.

22     Beyond the scope.

23          A.   With respect to this definition?

24     BY MR. GADDY:

25          Q.   Sure.
```

```
 1          A.   No.  It's meaningfully different, if
 2     I'm looking at the right thing.
 3              MS. CHARLES:  It might help to clarify
 4     which --
 5          A.   You're talking about this section,
 6     what is listed on Page 3 of Exhibit 12 -- 17
 7     rather.
 8     BY MR. GADDY:
 9          Q.   No, no, no.  I'm sorry.  I'm talking
10     about the language from the prior page.
11          A.   Sorry.
12          Q.   The language -- if you look at the
13     screen, the language that's labeled C.  If you
14     look at the screen.
15          A.   Sorry.
16          Q.   The language labeled C.
17          A.   Yes.
18          Q.   Did that language makes its way into
19     the final bill as far as the definition of
20     imminent danger, this language that McKesson,
21     Cardinal Health, and AmerisourceBergen were
22     asked to comment on?
23              MS. CHARLES:  Objection to form.
24     Beyond the scope.
25          A.   It's similar, yes.
```

```
 1              MS. CONWAY:  Is the record going to

 2       reflect what you mean by the language with a C

 3       mark next to it?

 4              MR. GADDY:  I believe so.  Yes, it's

 5       being recorded.

 6              MS. CHARLES:  I think that we'll see

 7       the video screen.  I think the issue is that his

 8       version doesn't have the C.

 9              Could you just read the language

10       perhaps?

11       BY MR. GADDY:

12          Q.   Sure.  It's the section that we talked

13       ad nauseam about a few minutes ago.  It says,

14       "In this subsection, the phrase 'imminent danger

15       to the public health or safety' means that, due

16       to the failure of the registrant to maintain

17       effective controls against diversion or

18       otherwise comply with the obligations of a

19       registrant under the subchapter, or subchapter 2

20       of this title, there is a substantial likelihood

21       of immediate threat that controlled substances

22       will be diverted for use other than legitimate

23       medical, scientific, or industrial purposes."

24              Are we on the same page, Mr. Ganley?

25          A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.   And I believe your testimony was that

2      that language substantially made it into the

3      bill that was passed as law?

4           MS. CHARLES:  Objection to form.

5           A.   This language is the language that was

6      put forward by Hatch, and it's almost identical

7      to the language that's in the law.

8      BY MR. GADDY:

9           Q.   It is the language that was circulated

10     to McKesson, Cardinal Health, and

11     AmerisourceBergen for them to comment on prior

12     to it becoming law, correct?

13          MS. CHARLES:  Objection to form.

14          A.   It was circulated by HDA.

15     BY MR. GADDY:

16          Q.   Okay.  When you said "Hatch," you're

17     referring to Senator Oren Hatch?

18          A.   Yes.

19          Q.   Now, we touched on this earlier, but

20     after this bill became law, there was criticism

21     of the law by way of media reports in the

22     Washington Post and on CBS 60 Minutes, correct?

23          MS. CHARLES:  Objection.  Beyond the

24     scope.

25          A.   Yes.  There were media reports, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GADDY:
 2         Q.   I'm going to show you what I will mark
 3    as 19.
 4              (Whereupon, McKesson-Ganley-019 was
 5              marked for identification.)
 6    BY MR. GADDY:
 7         Q.   Do you recognize this as being one of
 8    the, I think, two Washington Post articles that
 9    were published on the topic of this law?
10         A.   Yes, I do.
11         Q.   And if you see in the headline there,
12    it says, "The Drug Industry's Triumph Over The
13    DEA."
14              Do you see that?
15         A.   That's what it says.
16         Q.   It says, "Amid a targeted lobbying
17    effort, Congress weakened the DEA's ability to
18    go after drug distributors, even as
19    opioid-related deaths continue to rise."
20              Do you see that?
21         A.   I do.
22         Q.   In the first paragraph of the article
23    it says, "In April 2016, at the height of the
24    deadliest drug epidemic in US history, Congress
25    effectively stripped the DEA of its most potent
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      weapon against large drug companies suspected of

 2      spilling prescription narcotics into the

 3      nation's streets."

 4              Do you see that?

 5      A.   I do see that.

 6      Q.   And is this consistent with some of

 7      the criticism that was publicized in the

 8      Washington Post and the CBS 60 Minutes episode?

 9              MS. CHARLES:  Objection to form.

10      Beyond the scope.

11      A.   Yes, it's consistent with the

12      criticism.

13      BY MR. GADDY:

14      Q.   If you turn to Page 2 and go to the

15      very bottom of the page, it says, "For years,

16      some drug distributors were find for repeatedly

17      ignoring warnings from the DEA to shut down

18      suspicious sales of hundreds of millions of

19      pills, while they racked up billions of dollars

20      in sales."

21              Do you see that?

22      A.   Yes, I see it.

23      Q.   In fact, McKesson was twice fined for

24      ignoring warnings from the DEA, is that correct?

25              MS. CHARLES:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Beyond the scope.

 2         A.   I wouldn't agree with the

 3    characterization of ignoring warnings.

 4    BY MR. GADDY:

 5         Q.   Do you agree that McKesson was twice

 6    fined for violating the Controlled Substance

 7    Act?

 8              MS. CHARLES:  Same objections.

 9         A.   Again, I'd have to look at the

10    settlements, but they were -- we settled two

11    issues with the DEA, yes.

12    BY MR. GADDY:

13         Q.   You say issues.  Those issues were

14    failing to report suspicious orders of opioids,

15    correct?

16              MS. CHARLES:  Same objections.

17         A.   That was the allegation.

18    BY MR. GADDY:

19         Q.   Well, it's the allegation that

20    McKesson admitted.

21              MS. CHARLES:  Same objection.

22         A.   Again, I'd have to look at the

23    settlement.

24    BY MR. GADDY:

25         Q.   What did you say your title was?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Vice president of Federal Government

 2     Affairs.

 3          Q.   As the vice president of Federal

 4     Government Affairs, you're sitting here in 2018,

 5     and you don't know that McKesson has on two

 6     separate occasions admitted to violating the

 7     Controlled Substance Act?

 8               MS. CHARLES:  Objection to form.

 9     Beyond the scope.

10          A.   I don't know specifically what we've

11     admitted.  I haven't reviewed those settlements.

12     BY MR. GADDY:

13          Q.   It goes onto the next page to say,

14     "The new law makes it virtually impossible for

15     the DEA to freeze suspicious narcotic shipments

16     from the companies, according to internal agency

17     and Justice Department documents and an

18     independent assessment."

19               Do you see that?

20          A.   I see it.

21          Q.   Now, we looked earlier at some

22     documents where HDMA was doing some, I guess

23     what I would call offensive lobbying in favor of

24     that particular law, correct?

25               MS. CHARLES:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.   HDA was lobbying in favor of this law,

2       yes.

3       BY MR. GADDY:

4              Q.   Okay.  After these media reports came

5       out, HDMA continued to lobby in support of the

6       bill, and actually defended the bill, correct?

7                   MS. CHARLES:  Objection to form.

8       Beyond the scope.

9              A.   It was a law, so they weren't lobbying

10      on it because it was a law.

11                  HDA aggressively pushed back on these

12      media reports, yes.

13      BY MR. GADDY:

14             Q.   Okay.  From a public policy

15      perspective, I guess.

16             A.   Public relations perspective.

17             Q.   Thank you.  That's more accurate.

18                  I'm going to show you what we'll mark

19      as Exhibit 20.

20                  (Whereupon, McKesson-Ganley-020 was

21                  marked for identification.)

22      BY MR. GADDY:

23             Q.   Did you have the opportunity to review

24      this document before?

25             A.   I don't believe so.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   Okay.  Well, do you see that it's an

15        A.   Yes, I do.

16        MS. CHARLES:  Objection to form.

17  BY MR. GADDY:

18        Q.   And if you look on Page 3, do you see

19  those responses by HDMA somewhat summarized?

20        MS. CHARLES:  Objection to form.

21        A.   Somewhat.  They're not really

22  summarized.  They're linked.

23  BY MR. GADDY:

24        Q.   Sure.  Fair.

25        Based on your participation within

1       HDMA, is this your, McKesson's, understanding of

2       some of the steps that HDA took to, I think as

3       you said, aggressively respond to some of the

4       reporting that was out there by the Washington

5       Post and CBS?

6              MS. CHARLES:  Objection to form.

7              A.   Yes.

8       BY MR. GADDY:

9              Q.   That response included letters to four

10      separate committees, two House committees and

11      two Senate committees?

12             MS. CHARLES:  Objection to form.

13             A.   Yes.

14      BY MR. GADDY:

15             Q.   It included some media updates.  John

16      Gray, the CEO, wrote a letter to the editor of

17      the Washington Post?

18             A.   He did.

19             Q.   He wrote a viewpoint piece in USA

20      Today?

21             A.   He did.  He was invited to.

22             Q.   Okay.  And there was also advertising

23      that was done by HDA, correct?

24             A.   Yes.

25             Q.   And the advertising included ads on



1      the website Politico and website The Hill?

2           A.   Yes.

22     BY MR. GADDY:

23          Q.   Is McKesson also a member of the an

24     organization referred to as PhRMA, P-H-R-M-A?

25          A.   We are not.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Outside of the two we've already

 2    discussed, HDA and NACDS, what other trade

 3    associations does McKesson pay dues to?

 4          A.   I don't think I could give you an

 5    exhaustive list for a couple of reasons.  We're

 6    members of a number of trade associations, and

 7    we publish the larger ones on our website, but

 8    I'd have to look at the list to give you all of

 9    them.

10          But also, there are smaller trade

11    associations that we may belong to where an

12    individual general manager or somebody in the

13    business has the ability to join a trade

14    association without sort of seeking corporate

15    approval.  So, for example, the guy who runs

16    Boston can, you know, pay $1,000 to join the

17    Boston Chamber of Commerce if he wants to

18    without having to -- because of the dollar

19    figures, he doesn't necessarily have to sort of

20    clear that by anybody.  There's some autonomy in

21    that area.

22          So there's probably hundreds of trade

23    associations, quote unquote, that we pay some

24    kind of dues to.

25          Q.   Okay.
```

```
 1              A.   I mean, I could give you the big ones.

 2              Q.   Sure.

 3                   Does McKesson pay dues for its

 4         employees to be members of trade organizations?

 5                   MS. CHARLES:  Objection.  Beyond the

 6         scope.

 7              A.   For its employees, no.

 8         BY MR. GADDY:

 9              Q.   So --

10              A.   If I understand the question

11         correctly.  I mean, the corporate entity would

12         join a trade association, and then individual

13         employees would represent the company working

14         with that trade association.

15              Q.   Okay.  So you gave an example if

16         somebody wanted to be on the Chamber of Commerce

17         in the City of Boston and they had to pay $1,000

18         dollars, that individual would have to pay that

19         out of his pocket -- his or her pocket?

20              A.   No, no.  What I'm saying is if the

21         Chamber of Commerce approached the McKesson

22         business leader for the Boston area and said, we

23         would like McKesson to become a member of the

24         Boston Chamber of Commerce, that business leader

25         would probably not need to get approval to do
```

Highly Confidential - Subject to Further Confidentiality Review

1      that because the dollar figures were such --

2      there's different rules within the business as

3      to what kind of expense needs to be approved.

4      If he has budget for joining trade associations

5      and it's $1,000 for McKesson to be a member, you

6      know, he could probably do that without having

7      to seek any additional corporate approval for

8      that.

9           So that's why I'm saying it's hard to

10     say.  When you said, tell me a list of all the

11     trade associations, I don't know.

12          Q.   Okay.  My question is who is writing

13     that check, the individual employee or McKesson?

14          A.   In the hypothetical I gave you, it

15     would be McKesson joining the trade association.

16          Q.   Let me show you Number 21.

17               (Whereupon, McKesson-Ganley-021 was

18               marked for identification.)

19     BY MR. GADDY:

20          Q.   These are the interrogatory responses

21     that McKesson submitted to us.

22               If you'll turn to Page 13 at the

23     bottom.

24          A.   Going off the page number at the

25     bottom?

```
 1            Q.   Yes.

 2            A.   Okay.

 3            Q.   And do you see in the very bottom

 4      paragraph it indicates that "McKesson has

 5      identified certain industry organizations in

 6      which McKesson employees have been involved,"

 7      and it lists some there.

 8                 Do you see that?

 9            A.   Yes.

10            Q.   Are you familiar with some of those?

11                 (Witness reviewing document.)

12            A.   Yes, there's both trade associations

13      here, and then also standards bodies.

14            Q.   Okay.  And is it your understanding

15      that there are individual employees who are

16      members of these associations, or that it is

17      McKesson as a corporate entity that's a member?

18            A.   It's my understanding that McKesson as

19      a corporate entity is involved in these.

20            Q.   Does McKesson offer any bonuses or

21      incentives for its employees to be members of

22      any trade associations or committees within

23      trade associations?

24                 MS. CHARLES:  Objection.  Beyond the

25      scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.   Sorry, can you ask me that again?

2     BY MR. GADDY:

3          Q.   Sure.

4               So, for example, you serve on the

5     Federal Government Affairs Committee within

6     HDMA.  Do you get any bonus or incentive for

7     participating in that committee?

8               MS. CHARLES:  Same objection.

9          A.   No.  It would be nice, though.

10    BY MR. GADDY:

11         Q.   If you flip to Page 14, there are a

12    list of industry or trade organizations where

13    they indicate McKesson has made total payments

14    exceeding $50,000.

15              Do you see that?

16         A.   I do.

17         Q.   Are you able to tell me the amounts

18    paid by McKesson, outside of the ones we've

19    already talked about, the HDMA, that McKesson

20    has made to any of these different entities?

21         A.   Some, yes; others, no.

22         Q.   Okay.  American College of Health Care

23    Administrators?

24         A.   I don't know.

25         Q.   The Business Roundtable?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't know.

 2          Q.    Health Forum?

 3          A.    I don't know.

 4          Q.    HealthIT Now?

 5  ▮       ▮     ▬▬▬▬▬▬▬▬▬▬   ▬▬▬▬▬▬▬

 6          Q.    And that's paid on an annual basis?

 7          A.    Yes.

 8          Q.    The Health Industry Distributors

 9  Association?

10  ▮       ▮     ▬▬▬▬▬▬▬▬▬▬▬▬

11  ▮       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

12  ▮       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

13  ▮       ▮     ▬▬▬▬   ▬▬▬▬▬▬▬▬

14  ▮       ▮     ▬▬▬

15  ▮       ▮     ▬▬▬▬▬▬▬

16  ▮       ▮     ▬▬▬▬

17          Q.    The Healthcare Leadership Council?

18  ▮       ▮     ▬▬▬▬▬▬▬▬

19  ▮       ▬▬▬

20          Q.    You already told us the HDA.

21                International Federation of

22  Pharmaceutical Distributors?

23          A.    I don't know.

24          Q.    KLAS Enterprises?

25          A.    I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    National Electric Manufacturers

2     Association?

3          A.    I don't know.

4          Q.    Pacific Business Group on Health?

5          A.    I don't know.

6          Q.    Senior Care Pharmacy Coalition?

7          A.    I don't know.

8          Q.    State Privacy and Security Coalition?

9          A.    I don't know.

22              And again, "serves on," I'm not trying

23    to be too nuanced, but "serves on" implies some

24    formality.

25          Q.    What should I say?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Participates in their meetings is the
 2      way I would describe it.
 3              Q.    Okay.
 4              A.    Because if you want the complete list.
 5              Q.    Yes, sorry.
 6                    So if you don't mind, for Federal
 7      Government Affairs, tell me who participates in
 8      those and what their position is in McKesson.
 9              A.    So myself.  Occasionally Pete Sloan,
10      who is the senior vice president of Corporate
11      Public Affairs.  Claire Brandewie, who is a
12      senior manager of Federal Government Affairs and
13      brand new to the company.
14              Q.    Okay.  What about State Government
15      Affairs?
16              A.    It would be the members of our State
17      Government Affairs team.  So it would be -- you
18      want their names?
19              Q.    Yes, please.
20              A.    Chris Vaughan.  It would be Tracy
21      Russell, Matt Ottiger, and Allison Rose.
22              Q.    And there was an individual that you
23      told me her name earlier, Angelica?
24              A.    Angela Grover.
25              Q.    Okay.  Is she with McKesson anymore?
```

```
 1            A.    She is not.

 2            Q.    Okay.  Of the people that you just

 3      mentioned that serve on -- or sorry, that

 4      participate in the State Government Affairs

 5      Committee, which of those people that you named

 6      would have duties that encompassed the state of

 7      Ohio?

 8            A.    It would have been Angela Grover

 9      before she left the company, and now Matt

10      Ottiger.  O-T-T-I-G-E-R.
```

Highly Confidential - Subject to Further Confidentiality Review



13          Q.    Has McKesson ever been a member of the

14    American Pain Foundation?

15          A.    I don't believe so.

16          Q.    What about the American Academy of

17    Pain Medicine?

18          A.    I don't believe so.

19          Q.    What about the Pain Care Forum?

20          A.    I'm not sure.

21          Q.    Who would be the best person to ask

22    about these?

23          A.    The Pain Care Forum, I assume,

24    probably.

25          Q.    You assume that's who we should ask

Highly Confidential - Subject to Further Confidentiality Review

```
 1        about it is what you're saying, is that right?
 2            A.   I mean, we could look it up.  I'm just
 3        not aware of whether we're a member of the Pain
 4        Care Forum or not.
 5            Q.   What about the American Pain Society?
 6            A.   I don't believe so.
 7            Q.   Is there any department or division
 8        within McKesson that's responsible for being --
 9        for McKesson being a part of any association or
10        trade organization?
11                 MS. CHARLES:  Objection.  Beyond the
12        form -- beyond the scope.
13            A.   Generally, no.  They're autonomous
14        decisions that can be made by individual
15        business units or departments.
16        BY MR. GADDY:
17            Q.   I'm going to show you --
18            A.   We don't have a -- there's not an
19        association department or something like that
20        that would centralize all that.
21            Q.   I show you what's been marked as
22        Ganley 22.
23                 (Whereupon, McKesson-Ganley-022 was
24                 marked for identification.)
25        BY MR. GADDY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Do you recognize this document?

 2          A.    I don't.

 3          Q.    Okay.  Do you see it's an e-mail from

 4     HDA?

 5          A.    Yes.

 ▮          ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 9                Do you see that?

10          A.    Yes.

11          Q.    Are you familiar with this?

12          A.    I'm not.

13          Q.    Okay.

14          A.    I'm trying to figure out what it

15     depicts.

16          Q.    Okay.  What is your -- I'm asking you,

17     do you have an understanding of what this means

18     or what this is representing?

 ▮          ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21          Q.    Okay.  What does it indicate for the

22     state of Ohio?

23          A.    It's a little hard to tell.  I can't

24     tell from the colors.

25                Do you have a color version of it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   I don't.


```

```
 4          Q.   Okay.  Well, from your understanding,
 5     does McKesson have a lobbyist in Ohio?
 6               MS. CHARLES:  Objection to form.
 7     Beyond the scope.
 8          A.   I believe we do.
 9     BY MR. GADDY:
10          Q.   And who would that be?
11          A.   I don't know the answer to that.
12          Q.   Does, from your understanding, does
13     HDA have a lobbyist in Ohio?
14               MS. CHARLES:  Objection.  Beyond the
15     scope.
16          A.   I don't know.  If I'm -- depending on
17     the colors, this seems to indicate they do.
18     BY MR. GADDY:
19          Q.   From your understanding, does Cardinal
20     Health have a lobbyist in Ohio?
21               MS. CHARLES:  Objection.  Beyond the
22     scope.
23          A.   Again, I can't tell from the colors on
24     this, but it looks as if they may.
25     BY MR. GADDY:
```

```
 1          Q.   And from your understanding, does
 2     AmerisourceBergen have a lobbyist in Ohio?
 3               MS. CHARLES:  Same objection.
 4               MS. MCCLURE:  Form.
 5          A.   I can't tell.  I don't have any
 6     knowledge one way or the other.
 7               MR. GADDY:  Okay.  Take a quick break.
 8     I might be done.
 9               MS. CHARLES:  Sure.
10               THE VIDEOGRAPHER:  Going off record.
11     The time is 11:50.
12               (Whereupon, a recess was taken.)
13               THE VIDEOGRAPHER:  Go back on the
14     record beginning of Media File 4.  Time is
15     11:58.
16               MR. GADDY:  I'll tender the witness.
17               MS. CHARLES:  No questions.
18               MS. MCCLURE:  Before you go off the
19     record, just a request.  In light of the fact
20     there were highly confidential documents used
21     during this deposition, including deposition
22     exhibits from AmerisourceBergen at least,
23     pursuant to the protective order the parties
24     have a certain number of days to designate
25     portions of the transcript as confidential that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      reference those are highly confidential

 2      exhibits.  So we're just reiterating our request

 3      that in the meantime, of course, the entire

 4      transcripts needs to be treated as highly

 5      confidential pursuant to the protective order.

 6                  Any disagreement regarding that?

 7                  MR. GADDY:  No.

 8                  MS. CHARLES:  We'll reserve read and

 9      sign.

10                  Can you read the full amount that we

11      were on the record?

12                  THE VIDEOGRAPHER:  Total time on the

13      record is two hours and 24 minutes.

14                  MS. CHARLES:  Thank you.

15                  THE VIDEOGRAPHER:  This concludes

16      today's deposition.  We are going off the

17      record.  The time is 11:59.

18                  (Whereupon, the deposition was

19                  concluded.)

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      COMMONWEALTH OF MASSACHUSETTS )

2      SUFFOLK, SS.                  )

3              I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

4      and Notary Public in and for the Commonwealth of

5      Massachusetts, do certify that on the 27th day

6      of July, 2018, at 9:04 o'clock, the person

7      above-named was duly sworn to testify to the

8      truth of their knowledge, and examined, and such

9      examination reduced to typewriting under my

10     direction, and is a true record of the testimony

11     given by the witness.  I further certify that I

12     am neither attorney, related or employed by any

13     of the parties to this action, and that I am not

14     a relative or employee of any attorney employed

15     by the parties hereto, or financially interested

16     in the action.

17              In witness whereof, I have hereunto

18     set my hand this 31st day of July, 2018.

19

20     _____

21     MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

22     Realtime Systems Administrator

23     CSR #149108

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the appropriate

 6    space on the errata sheet for any corrections

 7    that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  It will be attached

10    to your deposition.

11              It is imperative that you return

12    the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt of

14    the deposition transcript by you.  If you fail

15    to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

                    E R R A T A

 2                    - - - - - -

 3     PAGE   LINE   CHANGE

 4     ____   ____   _____

 5          REASON: _____

 6     ____   ____   _____

 7          REASON: _____

 8     ____   ____   _____

 9          REASON: _____

10     ____   ____   _____

11          REASON: _____

12     ____   ____   _____

13          REASON: _____

14     ____   ____   _____

15          REASON: _____

16     ____   ____   _____

17          REASON: _____

18     ____   ____   _____

19          REASON: _____

20     ____   ____   _____

21          REASON: _____

22     ____   ____   _____

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

4                I, _____, do

         Hereby certify that I have read the foregoing

5        pages, and that the same is a correct

         transcription of the answers given by me to the

6        questions therein propounded, except for the

         corrections or changes in form or substance, if

7        any, noted in the attached Errata Sheet.

8

9        _____

         JOSEPH GANLEY                DATE

10

11

12

13

14

15

16       Subscribed and sworn

         To before me this

17       _____ day of _____, 20____.

18       My commission expires: _____

19

         _____

20       Notary Public

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      LAWYER'S NOTES

 2        PAGE  LINE

 3        _____ _____  _____

 4        _____ _____  _____

 5        _____ _____  _____

 6        _____ _____  _____

 7        _____ _____  _____

 8        _____ _____  _____

 9        _____ _____  _____

10        _____ _____  _____

11        _____ _____  _____

12        _____ _____  _____

13        _____ _____  _____

14        _____ _____  _____

15        _____ _____  _____

16        _____ _____  _____

17        _____ _____  _____

18        _____ _____  _____

19        _____ _____  _____

20        _____ _____  _____

21        _____ _____  _____

22        _____ _____  _____

23        _____ _____  _____

24        _____ _____  _____

25
```