Page 1

1                IN THE UNITED STATES COURT

2                NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5              ~~~~~~~~~~~~~~~~~~~~~

6   IN RE:  NATIONAL PRESCRIPTION   MDL NO. 2804

7   OPIATE LITIGATION

8                            Case no. 7-mdl-284

9                            Judge Dan Aaron Polster

10  This document relates to:

11  The County of Summit, Ohio, et al., v. Purdue

12  Pharma L.P., et al.,

13  Case No. 1:18-OP-45090 (N.D. Ohio)

14  Case No. 17-OP-45005

15  Case No. 18-OP-45090

16              ~~~~~~~~~~~~~~~~~~~~~

17             Videotaped deposition of

18                  CHAD GARNER

19               November 14, 2018

20                   8:35 a.m.

21          Taken at:

         Sheraton Columbus Capital Square

            75 East State Street

22             Columbus, Ohio

23           Wendy L. Klauss, RPR

24

25

Page 2

```
 1    APPEARANCES:
 2
            On behalf of the and the Witness:
 3              Ohio Attorney General
                Health and Human Services
 4              JAMES T. WAKLEY, ESQ.
                CHARISSA PAYER, ESQ.
 5              30 E. Broad Street
                26th Floor
 6              Columbus, OH   43215
                (614) 466-6818
 7          James.Wakley@OhioAttorneyGeneral.gov
           Charissa.Payer@OhioAttorneyGeneral.gov
 8                    -AND-
                State of Ohio
 9              Board of Pharmacy
                NICOLE M. DEHNER, ESQ.
10              77 South High Street
                17th Floor
11              Columbus, OH   43215
                (614) 995-7496
12              Nicole.Dehner@pharmacy.ohio.gov
13
            On behalf of the MDL Plaintiffs:
14              Greene Ketchum
                PAUL T. FARRELL, JR., ESQ.
15              419 Eleventh Street
                Huntington, WV   25724-2389
16              (304) 525-9115
                Www.greenketchum.com
17
18          On behalf of Distributor Defendant
            McKesson Corporation:
19              Covington & Burling LLP
                MAUREEN F. BROWNE, ESQ.
20              VINCENT GLYNN, ESQ.
                One City Center
21              850 Tenth Street, NW
                Washington, DC   20001-4956
22              (202) 662-6000
                Mbrowne@cov.com
23              Vglynn@cov.com
24
25
```

```
                                                    Page  3
 1     APPEARANCES, Continued:
 2          On behalf of Cardinal Health, Inc.:
                  Williams & Connolly LLP
 3                J. ANDREW KEYES, ESQ.
                  JOSEPH BUSHUR, ESQ.
 4                725 Twelfth Street, N.W.
                  Washington, DC   20005
 5                (202) 434-5000
                  Akeyes@wc.com
 6                Jbushur@wc.com
 7
            On behalf of Distributor
 8          AmerisourceBergen Drug Corporation:
                  Jackson Kelly PLLC
 9     `          ALVIN L. EMCH, ESQ.
                  500 Lee Street East, Suite 1600
10                Charleston, WV   25301-3202
                  (304) 340-1146
11                Aemch@jacksonkelly.com
12          On behalf of Walmart Inc. F/K/A Wal-Mart
            Stores, Inc.
13                Jones Day
                  BRANDY H. RANJAN, ESQ.
14                325 John H. McConnell Blvd.
                  Suite 600
15                Columbus, OH   43215-2673
                  (614) 469-3939
16                Branjan@jonesday.com
17          On behalf of Purdue Pharma L.P., Purdue
            Pharma, Inc., and The Purdue Frederick
18          Company:
                  Dechert LLP
19                DEBRA O'GORMAN, ESQ.
                  1095 Avenue of the Americas
20                New York, NY   10036
                  (212) 698-3500
21                Debra.ogorman@dechert.com
22          On behalf of the Walgreens Defendants:
                  Bartlit Beck Herman Palenchar &
23                Scott LLP
                  MATTHEW W. BREWER, ESQ.
24                54 West Hubbard Street, Suite 300
                  Chicago, IL   60654
25                (312) 494-4400
                  Matthew.brewer@barlit-beck.com
```

Page 4

```
 1    APPEARANCES, Continued:
 2         On behalf of CVS Rx Services, Inc. and
           CVS Indiana, LLC:
 3              Zuckerman Spaeder LLP
                ANTHONY RUIZ, ESQ.
 4              1800 M Street, NW
                Suite 1000
 5              Washington, DC   20036-5802
                (202) 778-1823
 6              Aruiz@zuckerman.com
 7         On behalf of Johnson & Johnson and
           Janssen Pharmaceuticals, Inc.:
 8              Tucker Ellis, LLP
                RACHEL N. BYRNES, ESQ.
 9              950 Main Avenue, Suite 1100
                Cleveland, OH   44113
10              (216) 592-5000
                Rachel.byrnes@tuckerellis.com
11
           On behalf of HBC Service Company:
12              Marcus & Shapira, LLP
                ERIN ALLEN, ESQ.
13              One Oxford Centre, 35th Floor
                301 Grant Street
14              Pittsburgh, PA   15219-6401
                (412) 471-3490
15              Allen@marcus-Shapira.com
                      ~ ~ ~ ~ ~
16    ALSO PRESENT:
                Joe Van Detta
17                    ~ ~ ~ ~ ~
18
19
20
21
22
23
24
25
```

Page 5

1                    TRANSCRIPT INDEX

2

3     APPEARANCES:...............................    2

4

5     INDEX OF EXHIBITS .......................    6

6

7     EXAMINATION OF CHAD GARNER

8     By Ms. Browne............................    11

9     By Ms. O'Gorman.........................    223

10    By Mr. Emch.............................    227

11

12    REPORTER'S CERTIFICATE...................    248

13

14    EXHIBIT CUSTODY

15    EXHIBITS RETAINED BY COURT REPORTER

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS
2     NUMBER           DESCRIPTION            MARKED
3   Exhibit 1    Notice of Videotape 30(b)(6) .   16
                 Deposition of the State of
4                Ohio Board of Pharmacy
5   Exhibit 2    Subpoena to Testify at a .....   17
                 Deposition in a Civil Action
6
    Exhibit 3    November 21, 2011 Report on .. 100
7                House Bill 93 by William
                 Winsley and Danna Droz
8
    Exhibit 4    Ohio Prescription Drug ....... 139
9                Monitoring Program,
                 Effective 2017
10
    Exhibit 5    A Document From the OARRS .... 146
11               Database, Entitled
                 Instructions For Reporting
12               Wholesale Transactions to
                 OARRS
13
    Exhibit 6    A Copy of Ohio Code .......... 149
14               Provision 4729.78
15  Exhibit 7    A Document From the OARRS .... 170
                 Website, Dated November 24,
16               2015 Entitled Mandatory
                 OARRS Registration and
17               Requests
18  Exhibit 8    PMP AWARxE User Support ...... 174
                 Manual
19
    Exhibit 9    A 2017 Article Entitled ...... 179
20               Opioid Prescriptions By
                 Specialty in Ohio, 2010 to
21               2014
22  Exhibit 10   An Article Entitled .......... 182
                 Prescription Opioids and
23               Labor Market Pains, Dated
                 March 28, 2018
24
    Exhibit 11   A Presentation By Dr. ........ 201
25               Gilson, Entitled Overdose
                 Deaths in Cuyahoga County

Page 7

1                    ...............................

Exhibit 12    A Document Dated August 9, ... 203
2                2017, Entitled Building
                 Dynamic and Functional
3                Interagency Cooperation,
                 Authored by Barbara Sears,
4                Director, Ohio Department of
                 Medicaid
5
    Exhibit 13    A PowerPoint Presentation .... 214
6                Entitled Two Incentives to
                 Engage Providers:
7                Meaningful Use and
                 Individual Prescriber
8                Reports, Beginning with
                 Bates Label Summit 001285650

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          INDEX OF VIDEO OBJECTION

2     OBJECT                                    PAGE

3     objection.............................. 161

4     object.  .............................. 197

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

```
 1              THE VIDEOGRAPHER:  We are now on
 2    the record.  The date is November 14, 2018.
 3    The time is 8:35 a.m.  The caption of this case
 4    is In Re: National Prescription Opiate
 5    Litigation.  The name of the witness is Chad
 6    Garner.
 7              At this time the attorneys present
 8    and those attending remotely will identify
 9    themselves and the parties they represent.
10              MS. BROWNE:  Maureen Browne,
11    Covington & Burling, for McKesson.
12              MR. GLYNN:  Vincent Glynn,
13    Covington & Burling, for McKesson.
14              MR. KEYES:  Andrew Keyes, Williams
15    & Connolly, Cardinal Health.
16              Mr. BUSHUR:  Joseph Bushur,
17    Williams & Connolly, Cardinal Health.
18              MS. RANJAN:  Brandy Ranjan, from
19    Jones Day, on behalf of Walmart.
20              Mr. FARRELL:  Paul Farrell, Jr., on
21    behalf of the MDL plaintiffs.
22              MR. BREWER:  Mat Brewer, from
23    Bartlit Beck, on behalf of Walgreens.
24              MS. O'GORMAN:  Debra O'Gorman, from
25    Dechert LLP, on behalf of Purdue defendants.
```

Page 10

1          MR. EMCH:  Al Emch, Jackson Kelly,

2     on behalf AmerisourceBergen Drug Corporation.

3          MS. PAYER:  Charissa Payer, Ohio

4     Attorney General's office, on behalf of the

5     Ohio Board of Pharmacy.

6          MS. DEHNER:  Nicole Dehner, Ohio

7     Board of Pharmacy.

8          MR. WAKLEY:  James Wakley, Senior

9     Assistant Attorney General, on behalf of the

10    Board of Pharmacy.

11         THE VIDEOGRAPHER:  People on the

12    phone.

13         MS. BYRNES:  Rachel Byrnes, from

14    Tucker Ellis, on behalf of Janssen and Johnson

15    & Johnson.

16         MR. RUIZ:  Anthony Ruiz, with

17    Zuckerman Spaeder, on before of CVS Rx

18    Services, Inc., and CVS Indiana LLC.

19         THE VIDEOGRAPHER:  Will the court

20    reporter please swear in the witness.

21         CHAD GARNER, of lawful age, called

22    for examination, as provided by the Statute,

23    being by me first duly sworn, as hereinafter

24    certified, deposed and said as follows:

25              EXAMINATION OF CHAD GARNER

1   BY MS. BROWNE:

2          Q.    Good morning, Mr. Garner.  We met

3   off the record.  My name is Maureen Browne, and

4   I'm with the law firm of Covington & Burling,

5   and I represent the defendant McKesson in this

6   litigation.

7                Would you please state your name

8   for the record.

9          A.    My name is Chad Garner.

10          Q.    Are you currently employed, Mr.

11   Garner?

12          A.    Yes.

13          Q.    And where is that?

14          A.    The State of Ohio Board of

15   Pharmacy.

16          Q.    What is your role at the Ohio State

17   Board of Pharmacy?

18          A.    The director of the OARRS program.

19          Q.    And what does OARRS stand for?

20          A.    The Ohio Automated Rx Reporting

21   System.

22          Q.    How long have you been the director

23   of the OARRS program?

24          A.    About six years.

25          Q.    Throughout this deposition, if we

```
 1    refer to the Ohio -- or if we use the term
 2    OARRS, you will know what I'm speaking of,
 3    correct?
 4         A.    Yes.
 5         Q.    Prior to -- well, let me ask you
 6    this:  Have you been deposed before?
 7         A.    No.
 8         Q.    So today I'll be asking you a
 9    series of questions for which I request that
10    you give me an oral response.  Wendy is taking
11    down everything that is said in the room, so
12    she cannot take down nods of the head --
13         A.    Correct.
14         Q.    -- is that understood?
15         A.    Yes.
16         Q.    I would also ask that, although you
17    may be able to anticipate my question, you wait
18    for me to finish it before you answer, and
19    again, that's so we have a clean record; is
20    that fair?
21         A.    Sure.
22         Q.    Is there any reason that you would
23    be unable to give your full, complete, and
24    honest testimony?
25         A.    No.
```

1          Q.     Are you under the influence of any

2     medication or alcohol that may impair your

3     ability to give testimony today?

4          A.     No.

5          Q.     If you do not understand a question

6     that I ask, please let me know, and I'll

7     rephrase it.

8          A.     Okay.

9          Q.     Also, Mr. Wakley may impose an

10     objection from time to time to one of my

11     questions.  If he does, and he does not

12     instruct you not to answer, please provide an

13     answer to the question, okay?

14          A.     Okay.

15          Q.     We probably will take a break every

16     hour, but if you need a break at any time, go

17     ahead and ask for it, no problem.  We will just

18     complete whatever question may be pending at

19     that time, and then we can take a break,

20     understood?

21          A.     Okay.

22          Q.     Okay.  What, if anything, did you

23     do to prepare for today's deposition?

24          A.     We had a couple of meetings to

25     discuss what questions we thought might be

Page 14

1    asked.

2         Q.    And who is "we"?

3         A.    Me and the attorneys here.

4         Q.    So that's your attorney Mr. Wakley

5    and then Ms. Dehner?

6         A.    Yes.

7         Q.    And then also Ms. Payer, was she

8    there?

9         A.    Ms. Payer was not there.

10        Q.    Okay.  Other than Mr. Wakley and

11   Mr. Dehner, did you prepare with any other

12   lawyers?

13        A.    No.

14        Q.    Did you have any conversations with

15   any of the lawyers for the plaintiffs in this

16   litigation?

17        A.    No.

18        Q.    Do you understand who the

19   plaintiffs are in this litigation?

20        A.    I believe so.

21        Q.    What is your understanding?

22        A.    My understanding is that it is the

23   state and various counties.

24        Q.    Have you met Mr. Farrell before

25   today?

1          A.    No.

2          Q.    Other than meeting with your

3    attorneys, did you review any documents to

4    prepare for today?

5          A.    I reviewed a subpoena.

6          Q.    Anything else?

7          A.    No.

8          Q.    How long did you meet with your

9    attorneys?

10         A.    A couple hours.

11         Q.    And when was that?

12         A.    A couple weeks ago, as well as last

13   week.

14         Q.    Did you speak with anyone other

15   than attorneys to prepare for the deposition

16   today?

17         A.    No.

18         Q.    You didn't have any conversations

19   with anyone else at the Ohio Board of Pharmacy

20   in order to prepare for today?

21         A.    No.

22         Q.    When were you first told that you

23   would be giving a deposition in this case?

24         A.    Oh, I think it was probably a

25   month, month and a half ago.

1          Q.    And what specifically were you told

2     about the deposition?

3          A.    Very little.  Just that there would

4     be one.

5                        -   -   -   -   -

6                (Thereupon, Deposition Exhibit 1,

7                Notice of Videotape 30(b)(6)

8                Deposition of the State of Ohio

9                Board of Pharmacy, was marked for

10               purposes of identification.)

11                       -   -   -   -   -

12         Q.    We are going to mark as Exhibit 1

13    the notice of videotape deposition.  You can

14    take a minute to look through Exhibit 1, if you

15    would, Mr. Garner.

16               Have you had a chance to review

17    Exhibit 1, Mr. Garner?

18         A.    Yes.

19         Q.    Have you seen Exhibit 1 before?

20         A.    Yes.  It was with the subpoena.

21         Q.    And that's the subpoena for

22    deposition that you understand has compelled

23    your testimony here today?

24         A.    Correct.

25         Q.    Will you turn to page 5 of that

Page 17

1    subpoena, please.  I'm sorry.  Page 7, I

2    apologize.

3             Page 7 identifies topic 16, and it

4    read, "The OARRS database, including why it was

5    created, what purpose it serves, the data it

6    contains, and the evolution of its capabilities

7    utilization from 2006 to the present."  Did I

8    read that correctly?

9         A.    Yes.

10        Q.    Is it your understanding that you

11   are here to testify about topic 16 of Exhibit

12   1?

13        A.    Yes.

14        Q.    Thank you.  You can set that aside.

15                  -  -  -  -  -

16             (Thereupon, Deposition Exhibit 2,

17             Subpoena to Testify at a Deposition

18             in a Civil Action, was marked for

19             purposes of identification.)

20                  -  -  -  -  -

21        Q.    I'm next going to hand you what has

22   been marked as Exhibit 2.  Exhibit 2 is the

23   subpoena for you to testify in your individual

24   capacity today; do you see that?

25        A.    Yes.

1          Q.     Have you seen Exhibit 2 before?

2          A.     Yes.

3          Q.     And do you understand that Exhibit

4     2 compels you to testify today in your

5     individual capacity, in addition to the

6     testimony you will give regarding topic 16?

7          A.     Yes.

8          Q.     You mentioned you have been the

9     director of OARRS for six years; is that right?

10         A.     Yes.

11         Q.     Did you hold any positions with the

12    board of pharmacy prior to becoming the

13    director?

14         A.     Yes.

15         Q.     And what position was that?

16         A.     Immediately prior to becoming the

17    director, I was the chief information officer.

18         Q.     Were you the chief information

19    officer of OARRS prior to becoming the --

20         A.     The board.

21         Q.     Is your employer the board of

22    pharmacy?

23         A.     Yes.

24         Q.     As chief information officer at the

25    board of pharmacy, what were your duties?

1    A.    My duties were to -- I was

2    basically in charge of all technology, so

3    anywhere from computer servers, phone systems.

4    Q.    And as chief information officer at

5    the board of pharmacy, in addition to

6    overseeing the phones and the computers and IT

7    systems, you were responsible for the

8    operations of the OARRS database?

9    A.    No.  There was a different director

10   of OARRS at that point.

11   Q.    In your role as the chief

12   information officer at the board of pharmacy,

13   did you have any connection with the OARRS

14   database?

15   A.    The OARRS database was hosted on

16   the servers that I -- that I ran.

17   Q.    Did you have access to any of the

18   data that resided on the OARRS database in your

19   role as the chief information officer at the

20   board of pharmacy?

21   A.    Yes, I would have had access.

22   Q.    Did you ever access the data on the

23   OARRS database during your tenure as the chief

24   information officer?

25   A.    Not that I can recall.

1      Q.     Prior to becoming the chief

2    information officer at the Ohio Board of

3    Pharmacy, did you have any other roles with the

4    Ohio Board of Pharmacy?

5      A.     Yes.

6      Q.     What was that role?

7      A.     I was the OARRS database

8    administrator.

9      Q.     And for how long did you hold that

10   role?

11     A.     Since late 2005.

12     Q.     For how long a period were you the

13   OARRS database administrator?

14     A.     About four years.

15     Q.     So until about 2009?

16     A.     Yes.

17     Q.     And it was in approximately 2009

18   that you became the chief information officer?

19     A.     Yes.

20     Q.     As the OARRS database

21   administrator, what were your duties?

22     A.     I was in charge of all technology

23   specifically related to OARRS.

24     Q.     And when you say you were -- as the

25   OARRS database administrator, you were

1   responsible for all technology related to

2   OARRS, what do you mean by that, what

3   technology?

4         A.    So the servers that OARRS ran on,

5   the network that it ran on, any software, all

6   of those would have been my responsibility.

7         Q.    To whom did you report when you

8   were the OARRS database administrator?

9         A.    The director of OARRS.

10        Q.    And to whom did you report when you

11  were the chief information officer?

12        A.    The executive director.

13        Q.    The executive director of the board

14  of pharmacy?

15        A.    Yes.

16        Q.    When you say that you were

17  responsible for the servers that OARRS ran on,

18  the network and the software, did you have

19  responsibility for choosing, for example, any

20  software updates?

21        A.    Yes.

22        Q.    And did you choose vendors?

23        A.    Yes.  At that point, I did.

24        Q.    Did you choose the vendor who

25  supplied the OARRS database?

1          A.     No.   That was -- that decision had

2     been made before I started.

3          Q.     Who made the decision as to the

4     vendor to -- who would supply the OARRS

5     database?

6          A.     I don't know.

7          Q.     What if any software changes did

8     you implement while you were the OARRS database

9     administrator?

10          A.     So there are two sides of OARRS.

11     There is the prescription side and the

12     wholesale side.   I wrote the wholesale side.

13     It was not off-the-shelf software.

14               The prescription side, we made

15     various changes to the software, in order to

16     increase capacity.

17          Q.     When you say that you wrote the

18     code for the wholesale side of OARRS --

19          A.     Yes.

20          Q.     -- is the wholesale side -- well,

21     tell me what the wholesale side is?

22          A.     So all wholesalers licensed by the

23     State of Ohio Board of Pharmacy are required to

24     submit certain information about sales of

25     controlled substances to the OARRS program.

Page 23

1    The wholesale side of OARRS is the side that

2    collects that information.

3            Q.    Have you heard of McKesson before?

4            A.    Yes.

5            Q.    Do you know what McKesson does?

6            A.    Yes.

7            Q.    What is it?

8            A.    They are a wholesaler of

9    prescription drugs.

10           Q.    Have you heard of AmerisourceBergen

11   before?

12           A.    Yes.

13           Q.    Do you know what AmerisourceBergen

14   does?

15           A.    Yes.

16           Q.    What is that?

17           A.    They are a wholesaler of

18   prescription drugs.

19           Q.    Have you heard of Cardinal Health

20   before?

21           A.    Yes.

22           Q.    Do you know what Cardinal Health

23   does?

24           A.    Yes.

25           Q.    What is that?

Page 24

1          A.     They are also a wholesaler of

2     prescription drugs.

3          Q.     Do any of McKesson, ABDC -- let me

4     ask you this.  If I refer to AmerisourceBergen

5     as ABDC, will you understand what I mean?

6          A.     Yes.

7          Q.     Thank you.  Does any of McKesson,

8     ABDC or Cardinal Health have access to the

9     wholesale side of the OARRS database, to your

10    knowledge?

11         A.     Do you mean "access," as in can

12    they get data from it?

13         Q.     Well, let me ask.  That's a good

14    question.

15                Can they input data?

16         A.     Yes.

17         Q.     Can they get data from it?

18         A.     No.

19         Q.     Other than writing the code for the

20    wholesale side of the OARRS database, you

21    mentioned that you made changes to the software

22    on the prescriber side to increase capacity,

23    correct?

24         A.     Yes.

25         Q.     And increase capacity how?

Page 25

1          A.     In 2011, there were some changes to

2    law that dramatically increased the usage of

3    the system.  The system at that point was not

4    able to keep up with that type of usage, and so

5    we had to make changes to the software in order

6    to allow it to keep up.

7          Q.     What if any input did you have in

8    recommending any changes to the increased

9    capacity on the prescriber side?

10         A.     I had -- that was entirely me.

11         Q.     That was entirely you?

12         A.     Yes.

13         Q.     When you say it was entirely you,

14   what do you mean by that?

15         A.     I made the decision to make the

16   change, and I actually wrote the code to make

17   the change.

18         Q.     So you wrote the code to increase

19   the capacity on the prescriber side of OARRS in

20   2011?

21         A.     Yes.

22         Q.     And you also wrote the code to

23   create the wholesale side of the OARRS

24   database?

25         A.     Yes.

Page 26

1          Q.    And when was that?

2          A.    2006.

3          Q.    By the time -- you mentioned to me

4    that you were the OARRS database administrator

5    from 2005 to 2009, correct?

6          A.    Yes.

7          Q.    But you wrote the code to increase

8    capacity for the prescriber side in 2011?

9          A.    My dates may be off by a bit, as

10   far as when I was in each position.  They kind

11   of blur together a bit.

12         Q.    But you are sure that you wrote the

13   code to increase the capacity on the prescriber

14   side, correct?

15         A.    Yes.

16         Q.    And you are sure that that was in

17   2011?

18         A.    2010, 2011, that's when the statute

19   passed.

20         Q.    What statute is that?

21         A.    It was then referred to as House

22   Bill 93.

23         Q.    Do you know what it ended up being

24   codified as?

25         A.    It was in --

Page 27

1          Q.    The code section --

2          A.    It was in a lot of code sections.

3          Q.    Okay.  So when you were the OARRS

4     database administrator, we talked about the

5     software updates, or a couple of the software

6     updates.

7                Did you do any other software

8     updates as the database administrator of OARRS,

9     other than increasing the capacity of the

10    software on the prescriber side and

11    implementing the wholesale side of the

12    database?

13         A.    No.  I mean, aside from just the

14    routine updates that come out from various

15    software vendors, no.

16         Q.    So just the pushes, but --

17         A.    Right, just patches and --

18               THE NOTARY:  Wait a minute.  You

19    have to let her finish.

20               "So just the pushes, but" --

21         Q.    -- but not any original code

22    writing?

23         A.    Correct.

24         Q.    You said that you were also

25    responsible for the network, when you were the

Page 28

1    OARRS database administrator.  What did you

2    mean by that?

3         A.    I chose the network hardware, I

4    installed and configured the network hardware,

5    maintained it.

6         Q.    Is OARRS still running the same

7    hardware as it did -- the same network hardware

8    as it did when you were the database

9    administrator?

10        A.    No.

11        Q.    What was the hardware that was

12   running while you were the administrator?

13        A.    There were -- there was a Cisco

14   firewall, Cisco switches.

15        Q.    Anything else?

16        A.    Dell servers.

17        Q.    Anything else on the hardware side,

18   other than the firewall, the switches, and the

19   Dell servers?

20        A.    No.

21        Q.    And you said that today the network

22   is not the same as it was when you were the

23   database administrator?

24        A.    No, it is not.

25        Q.    How many times has it changed,

Page 29

1     since the time that you were the administrator?

2          A.     Twice.

3          Q.     What is it currently, the current

4     hardware configuration?

5          A.     It is currently hosted in the

6     cloud.

7          Q.     When did OARRS become cloud hosted?

8          A.     April 2017.

9          Q.     And prior to cloud hosting, where

10    was -- what hardware supported the OARRS

11    network?

12         A.     It was similar hardware and

13    software, just upgraded versions.

14         Q.     When you say "similar," you mean

15    similar to the Cisco and Dell combination?

16         A.     Correct.  It is still a Cisco and

17    Dell combination, just updated hardware.

18         Q.     You also said that as the

19    network -- I beg your pardon -- the OARRS

20    database administrator, you were responsible

21    for the servers that OARRS ran on; do you

22    recall that?

23         A.     Yes.

24         Q.     You mentioned that currently --

25    well, back up.

1               When you were the database

2      administrator, where were the servers located?

3           A.    At the board of pharmacy office.

4           Q.    And where are the servers located

5      today?

6           A.    They have been split.  The

7      prescription side is hosted on Amazon cloud,

8      the wholesale side is hosted -- it's still

9      hosted at the board of pharmacy.

10          Q.    And the server change took

11     place -- well, did the server change take place

12     at the same time the hardware change was

13     implemented?

14          A.    Did the server --

15          Q.    Strike that.  Let me ask you

16     another question.

17               When did the prescriber side of the

18     OARRS database migrate to the Amazon cloud?

19          A.    That was April of 2017.

20          Q.    But for the life of the wholesale

21     side, that database, the servers have existed

22     at the BOP, correct?

23          A.    Yes.

24          Q.    If I referred to the board of

25     pharmacy as BOP, will you understand what I

Page 31

1    mean?

2         A.    Yes.

3         Q.    Other than your responsibilities

4    for the servers that the OARRS database ran on,

5    the network and the software, in your role as

6    the OARRS database administrator, did you have

7    any other functionality or functions?

8         A.    I don't believe so.

9         Q.    Prior to your role as the OARRS

10   database administrator at the board of

11   pharmacy, did you have any other roles with the

12   board of pharmacy?

13        A.    No.

14        Q.    Do you have an undergraduate

15   degree?

16        A.    Yes.

17        Q.    In what?

18        A.    Computer science.

19        Q.    Do you have any graduate education?

20        A.    Yes.

21        Q.    What is that?

22        A.    I have a Master's of Science in

23   computer information systems.

24        Q.    When did you get that?

25        A.    The master's I received in 2017.

Page 32

1          Q.     From where?

2          A.     Boston University.

3          Q.     And did you go to Boston University

4    to get that, or did you do that --

5          A.     It was on line.

6          Q.     And where is your CS degree from?

7          A.     Mount Union Nazarene University.

8          Q.     And when did you receive that?

9          A.     2004.

10         Q.     Other than your roles at the board

11   of pharmacy, have you worked anywhere else,

12   since your graduation from college?

13         A.     Yes.

14         Q.     Where.

15         A.     Optimum Technology?

16         Q.     Was that right out of college?

17         A.     Yes.

18         Q.     2004 to 2005?

19         A.     Yes.

20         Q.     And what did you do at Optimum

21   Technology?

22         A.     I was their network administrator

23   and a customer support analyst.

24         Q.     Let's talk a little bit about your

25   current role as the director of OARRS.

Page 33

1          A.     Okay.

2          Q.     What are your roles and

3     responsibilities as the director of OARRS?

4          A.     So I manage all aspects of OARRS,

5     vendor relations, as well as managing the OARRS

6     staff.  I also do -- I also do reporting from

7     OARRS.

8          Q.     Anything else in your role as the

9     director of OARRS that you do, other than

10    vendor relations, staff management, and

11    reporting from OARRS?

12         A.     Public speaking, from time to time,

13    attending various meetings, representing the

14    agency at, you know, various meetings and

15    gatherings.

16         Q.     When you say, "Representing the

17    agency at various meetings and gatherings," is

18    that the board of pharmacy or is that OARRS?

19         A.     Well, the agency would be the board

20    of pharmacy, but I am there specifically for

21    OARRS.  If the meetings weren't OARRS related,

22    I wouldn't be the person that was sent.

23         Q.     Other than vendor relations, staff

24    management, reporting from OARRS, some public

25    speaking, attending meetings related to OARRS,

1   and representing the agency where -- on behalf

2   of the BOP, where OARRS is specifically being

3   addressed, are there any other roles and

4   responsibilities that you undertake as the

5   director of OARRS?

6        A.    I would include in reporting, you

7   know, there is a lot of data analysis,

8   statistical types of analysis that goes with

9   that.

10       Q.    So in your role managing vendor

11  relations as the director of OARRS, what do you

12  do?

13       A.    I have weekly meetings with the

14  OARRS software vendor; I also, you know, for

15  other various smaller pieces of software, may

16  occasionally have a meeting or a phone call.

17       Q.    Who is the OARRS software vendor?

18       A.    Appriss.

19       Q.    Can you spell that?

20       A.    A-P-P-R-I-S-S.

21       Q.    Is there one individual with whom

22  you interface at Appriss?

23       A.    There is one main point of contact,

24  but there are a number of others that I may

25  interface with, from time to time.

Page 35

1      Q.    Who is your main point of contact
2  at Appriss?
3      A.    Tonya Vaughn.
4      Q.    Do you know how to spell her last
5  name?
6      A.    V-A-U-G-H-N.
7      Q.    Is Appriss the only OARRS software
8  vendor with whom you interface?
9      A.    Appriss is the prescription
10 monitoring program vendor.  So that is the
11 main -- that is the core OARRS software.
12     Q.    Are you familiar with the term
13 "PDMP"?
14     A.    Yes.
15     Q.    And what does that stand for?
16     A.    Prescription drug monitoring
17 program.
18     Q.    If I use PDMP in this deposition
19 from time to time, will you understand that I'm
20 referring to a prescription drug monitoring
21 program?
22     A.    I will.  If I say PMP though, I
23 mean the same thing.
24     Q.    Fair enough.  You said that you
25 occasionally will have meetings with or calls

Page 36

1    with smaller software vendors in your role as

2    the director of OARRS; is that right?

3         A.   Yes.

4         Q.   And can you identify any of those

5    smaller software vendors for me?

6         A.   It is possible we could have a

7    conversation with Microsoft for something --

8    or most of our software is Microsoft, so that

9    would be the most likely.

10        Q.   What would be the nature -- can you

11   call to mind a specific meeting or call that

12   you have had with Microsoft in the past, in

13   your role as the director of OARRS?

14        A.   Not a specific one, no.

15        Q.   Historically, what would be the

16   nature of any call that you have had with

17   Microsoft about OARRS?

18        A.   It would be either a marketing call

19   or something to do with any type of issue we

20   are dealing with that we can't find resolution

21   to on our own.

22        Q.   When you say it could be a

23   marketing call, what type of -- what do you

24   mean by that?

25        A.   They have a government relations

Page 37

1    staff that call every once in a while to

2    discuss new products that they have that they

3    think might be beneficial to us.

4         Q.    Have you ever followed up on one of

5    those marketing calls to purchase a new product

6    that Microsoft suggested might be beneficial?

7         A.    I'm trying to remember if -- we did

8    eventually upgrade a version of SQL server

9    after a conversation with Microsoft, but I

10   don't remember if it was a marketing call or if

11   I happened to run into somebody somewhere else.

12        Q.    And you said it was the SQL server?

13        A.    Yes.

14        Q.    S-E-Q-U-E-L?

15        A.    S-Q-L.

16        Q.    And what does the SQL server do?

17        A.    It is the -- it's a database

18   software.

19        Q.    A database software for OARRS?

20        A.    For the -- we keep a copy of data

21   for research at the board of pharmacy, and

22   that's what it resides on, but it is also the

23   database software that the wholesale side would

24   also run on.

25        Q.    When you say, "We keep a copy of

Page 38

1    the data for research at the board," what do

2    you mean by that?

3           A.    That would be a copy of the

4    prescription data.  So because the prescription

5    side of OARRS is cloud hosted, we keep a local

6    copy of the data for any kind of analysis and

7    reporting we do.

8           Q.    You mentioned that the wholesale

9    side resides on SQL; did I understand that

10   correctly?

11          A.    Yes.

12          Q.    And what if any wholesale-side data

13   for research is maintained by the board?

14          A.    Well, there is a set -- so there is

15   the production copy, there is a separate

16   research copy.  We don't do -- we don't do the

17   analysis on the production system.

18          Q.    When you say, "We don't do the

19   analysis on the production system," who is the

20   "we"?

21          A.    It would be me and my staff.

22          Q.    And when you say that a copy of the

23   data for research resides on the SQL database,

24   what research do you mean?

25          A.    Any type of analysis that we need

1    to do, if we are assisting compliance with an

2    investigation or doing any other type of

3    statistical reporting.

4         Q.    When you say you would use -- or

5    the research that you and your staff would do,

6    and it is you and your staff that would do the

7    research?

8         A.    Yes.

9         Q.    When you talk about the research

10   that you and your staff would do on compliance

11   with investigations, what type of

12   investigations are you talking about?

13        A.    It could be a number of types of

14   investigations.  It could be an investigation

15   against a prescriber, a pharmacy, anybody that

16   we license, it could also be a criminal case

17   against a patient.

18        Q.    When you are doing research for an

19   investigation against a prescriber, can you

20   call to mind a specific instance of an

21   investigation against a prescriber, where you

22   and your staff did research?

23        A.    Sure.  Yes.

24        Q.    In that case, where did the

25   investigation originate?

1      A.    The specific case originated with

2    OARRS, but they can originate in a number of

3    areas.

4      Q.    In the instance you are recalling

5    where the investigation originated with OARRS,

6    how does an investigation original in OARRS;

7    how does that happen?

8      A.    State law requires -- requires the

9    board to monitor OARRS data for potential

10   violations of drug law, and so as such, there

11   are occasionally such violations, potential

12   violations may be found in the data.

13     Q.    Who is monitoring OARRS to see

14   whether there is cause for an investigation?

15     A.    It would be me and my staff.

16     Q.    How do you do that?

17     A.    Many, many different ways.  We have

18   a number of -- a number of statistical models

19   that we use, as well as, you know, tips from

20   investigators or, you know, if we see something

21   in the news that we can possibly see if anybody

22   else is doing this.  There are many, many

23   different ways.

24     Q.    When you testified that there are

25   statistical models that you and your staff use

1     to monitor the data, are those statistical

2     models built into the OARRS database?

3          A.     No.  They are -- they would be

4     custom code that we write in the office.

5          Q.     Have you written custom code in the

6     office for a statistical model that could be

7     used to monitor the data on OARRS?

8          A.     Yes.

9          Q.     How much -- or how many statistical

10    models -- strike that.

11              How many variations of statistical

12    models do you use to monitor the data from

13    OARRS?

14         A.     I couldn't tell you.  There are too

15    many.

16         Q.     More than a hundred?

17         A.     Likely.

18         Q.     More than a thousand?

19         A.     Maybe not.

20         Q.     More than 500?

21         A.     I'd say somewhere between 100 and

22    500.

23         Q.     So you and your staff use between

24    100 and 500 variations of a statistical model

25    to monitor OARRS, correct?

1          A.     Correct.

2          Q.     And you and your staff wrote the

3     code for all of those 100 to 500 statistical

4     models?

5          A.     Yes.

6          Q.     What if anything determines which

7     statistical model you would run in a particular

8     investigation?

9          A.     It would determine -- I mean, it

10    would be -- I mean, if an investigation was

11    already started, it would be whatever it was

12    that was being found in the investigations, the

13    findings.

14         Q.     You said that investigations could

15    originate through OARRS, but could also

16    originate in a number of other places; do you

17    recall that?

18         A.     Yes.

19         Q.     What other places could an

20    investigation into a prescriber originate?

21         A.     It could come from a complaint from

22    the public, it could be something an agent or

23    an inspector has come across.  I'm sure there

24    is many more.  That's not really my area.

25         Q.     When you say agent or inspector

1    could originate an investigation, is that an

2    agent or inspector of the BOP?

3         A.    Yes.

4         Q.    When you say that a complaint can

5    originate from the public, what do you mean by

6    that?

7         A.    We have a -- on our website, we

8    have a public complaint form.

9         Q.    How many public complaints have you

10   received, during your tenure as the director of

11   OARRS?

12        A.    I wouldn't know.  Those don't come

13   to me.

14        Q.    Who do they go to?

15        A.    The director of compliance.

16        Q.    Who is the director of compliance?

17        A.    Eric Griffin.

18        Q.    How many investigations have you

19   and your staff participated in, while you have

20   been a director of OARRS, that have originated

21   from a public complaint?

22        A.    I don't always know where they

23   originate from, so I don't know.

24        Q.    Do you have in mind any complaints

25   that have originated from the public, that you

Page 44

1    have participated in, during your time as the

2    director of OARRS?

3         A.    I can definitely think of one, yes.

4         Q.    How recently?

5         A.    This particular one would have been

6    three or four years ago.

7         Q.    Other than the one complaint you

8    have in mind from three or four years ago that

9    you know originated from a public complaint,

10   can you think of any other occasions when you

11   and your staff have investigated a complaint

12   that originated from the public?

13        A.    Not that I'm aware of.  Like I

14   said, I don't always know where they start.

15        Q.    Other than public complaints,

16   complaints that may have originated from an

17   agent or inspector from the board of pharmacy

18   or that arise from your own data monitoring,

19   are there any other origination points that

20   would lead to an investigation of OARRS data by

21   you and your staff?

22        A.    I don't know the answer to that.  I

23   wouldn't know the complete list.  That's more

24   of a compliance and enforcement area.

25        Q.    So will you please walk me through

1    how, in the event you are investigating a

2    complaint, as opposed to your data monitoring

3    of OARRS, you get involved in that complaint?

4         A.    Uh-huh.  So typically, either

5    somebody comes to my office or sends an email

6    or calls me and describes what it is that they

7    need, and I either, you know, depending on

8    everybody's, you know, workload at the time,

9    either I decide to do it myself or I assign it

10   to one of my staff.

11        Q.    When you say someone calls you or

12   comes to your office --

13        A.    It would be a -- it would be a

14   member of the compliance staff.

15        Q.    And that's Mr. Griffin's staff?

16        A.    Yes.

17        Q.    Have you ever investigated a

18   complaint that originated from law enforcement?

19        A.    No, not directly to me from law

20   enforcement.  It may have -- it may be

21   something that the compliance department is

22   working with law enforcement on, but anything

23   that we would work would have come from our

24   internal staff.

25        Q.    So if the Cuyahoga Sheriff's

1   Department wanted to investigate a

2   prescriber --

3          A.    Yes.

4          Q.    -- they would not reach out

5   directly to you?

6          A.    They may have -- they may have an

7   account for OARRS, where if they just need a

8   list of prescriptions that a prescriber wrote

9   or prescriptions that a patient has received,

10  they, by law -- they are permitted to have

11  access to that if they have an open case for a

12  drug investigation.  And so they have an

13  account where they could request that report,

14  and the report would be created.

15              All of that happens automatically.

16  It's not something that I would personally be

17  involved with.

18          Q.    When you say that the sheriff may

19  have an account for OARRS and they can access a

20  prescription that is a written or received, but

21  it happens automatically, what do you mean by

22  that?

23          A.    So the -- you know, so the law

24  enforcement officer has a case for a drug crime

25  against a specific patient.  They would have an

Page 47

1    account where they can log in to the web
2    interface for OARRS.  They would enter in the
3    information about the individual that they are
4    investigating, including their case number.
5    They would have to submit that.
6              They have to have a supervisor, who
7    also has an OARRS account, who would approve
8    that.  Then the system would automatically
9    generate the report for them.
10        Q.    How long does that take, do you
11   know?
12        A.    Seconds.
13        Q.    How long does it take you or your
14   staff to run a statistical model on any of
15   the -- on the OARRS data?
16        A.    It depends on the model and the
17   data range that we are looking at.  It could
18   take anywhere from a few seconds to hours.
19        Q.    So we were talking a little bit
20   about prescribers.  Is the process for
21   investigations of pharmacies the same as it is
22   for a prescriber; that is, you monitor -- your
23   office monitors the database, the OARRS
24   database, to discover information about a
25   pharmacy?

Page 48

1          A.    Yes.

2          Q.    And likewise, you and your staff

3    can run statistical models on the OARRS data

4    pertaining to a particular pharmacy?

5          A.    Yes.

6          Q.    Can complaints about a particular

7    pharmacy originate from the public?

8          A.    Yes.

9          Q.    Can complaints about a particular

10   pharmacy originate from a BOP investigator or

11   agent?

12         A.    Yes.

13         Q.    Are there any other ways in which

14   your office would be involved in the complaint

15   about a pharmacy, other than through the

16   monitoring of data by you and your staff, or

17   from a complaint from the public or an

18   investigator?

19         A.    Again, I assume that there are

20   other sources, but I wouldn't know those.

21         Q.    And by "other sources," you mean,

22   perhaps, law enforcement?

23         A.    Quite possible.  Again, that's more

24   the compliance department.

25         Q.    So as with the complaints against

1    prescribers, complaints against pharmacies

2    generally or typically come through the

3    compliance department to you?

4         A.    Yes.

5         Q.    Have you ever investigated a

6    pharmacy, other than in response to a complaint

7    that has come through the compliance

8    department?

9         A.    Ones that we have discovered in

10   OARRS directly.

11        Q.    How many times have you discovered

12   a pharmacy that requires some investigation

13   through your OARRS data monitoring?

14        A.    I don't know that I can put a

15   number on it.  Maybe -- I don't know.  Fewer

16   than a hundred.

17        Q.    Do you know how many you have done

18   this year of a pharmacy, investigations to a

19   pharmacy that arose other than through a

20   complaint that came by the compliance

21   department?

22        A.    Maybe five or six.

23        Q.    You mentioned that OARRS -- you

24   monitor data in the OARRS database for

25   potential violations; is that the right word?

                                          Page 50

1          A.     Uh-huh.

2          Q.     By licensees; do you recall that?

3          A.     Not always by licensees, but it is

4    potential violations of drug law, period.

5          Q.     I believe the term "licensee" was

6    yours, but maybe it wasn't.

7                 There are licensees of the board of

8    pharmacy, correct?

9          A.     Correct.

10         Q.     Are there licensees other than

11   prescribers and pharmacies?

12         A.     Wholesale distributors.

13         Q.     Anybody else?

14         A.     Pharmacists, home medical

15   equipment.  I don't know the entire list.  I

16   know the ones I deal with most frequently.

17         Q.     Are the manufacturers licensees of

18   the board of pharmacy?

19         A.     If they -- if they ship drugs

20   directly into the state, yes.

21         Q.     When I'm talking about

22   manufacturers, I'm talking about manufacturers

23   of opioid medications, okay?

24         A.     Yes.

25         Q.     Does that change your answer at

Page 51

1    all?

2         A.    No.

3         Q.    Have you participated in any

4    investigations of board of pharmacy licensees?

5         A.    Yes.

6         Q.    When?

7         A.    The various times that we have

8    discussed.

9         Q.    Okay.  Thank you.

10             So other than what we have

11   discussed about prescribers and pharmacies, has

12   the board of pharmacy -- strike that.

13             Other than the investigations about

14   prescribers and pharmacies we have discussed,

15   have you and your staff participated in any

16   investigations of wholesale distributors?

17        A.    Yes.

18        Q.    When?

19        A.    Numerous times.

20        Q.    This year have you, in 2018, have

21   you participated in any investigations of

22   wholesale distributors?

23        A.    Yes.

24        Q.    How many?

25        A.    Well, I don't know whether there

Page 52

1    are multiple investigations or if it was all

2    one.  I'd say at least two.

3           Q.    And the two investigations of

4    wholesale distributors that you have in mind,

5    were those originated from you and your staff's

6    monitoring of data?

7           A.    No, they were not.

8           Q.    Were -- did either of them

9    originate from the office of compliance?

10          A.    They both would have.

11          Q.    Other than the approximately two

12   investigations of wholesale distributors that

13   you can call to mind for 2018, how many

14   investigations of wholesale distributors do you

15   recall participating in, in calendar year 2017?

16          A.    I don't recall.

17          Q.    More than five?

18          A.    I really don't remember.

19          Q.    Other than the research that we

20   have just talked about that is done on the

21   wholesale side for the purpose of

22   investigations, what if any research does you

23   and your -- do you and your staff conduct on

24   the OARRS data?

25          A.    Specifically to the wholesale side?

1        Q.    Let's start with that, please.

2        A.     Honestly, we have spent more time

3    on the prescription side than the wholesale

4    side, but typically -- typically on the

5    wholesale side, any of our research is going to

6    be for the purpose of either assisting in an

7    investigation or monitoring for

8    potential -- potential crime.

9        Q.    On the prescription side, so the

10   prescription data, you mentioned that you keep

11   a copy of the data at the BOP for any analysis

12   or reporting; do you recall that?

13       A.    Yes.

14       Q.    What analysis do you do on the

15   prescription-side data?

16       A.    So we do a lot of analysis on the

17   prescription side.  We do -- there is analysis

18   for statistics that get published in our

19   various reports, annual and semiannual reports;

20   statistics that get published to our website.

21   We also do analysis to inform changes in

22   various rules.

23           We, again, do analysis for, you

24   know, for looking for potential crime, as well

25   as -- as well as assisting in investigations.

Page 54

1    We do research to identify individuals who may

2    be at risk, based on the prescriptions that

3    they take.

4              And then we do analysis for -- you

5    know, we have a number of different grants that

6    have different reporting requirements, and so

7    we have to do analysis to produce those

8    reports.

9         Q.    You mentioned that the

10   prescription-side data that is maintained at

11   the BOP is also used for various reporting.  Is

12   there any reporting that you and your staff do

13   with the prescription-side data, other than

14   this list of analyses you perform that you just

15   gave me?

16        A.    There may be something that's not

17   coming to mind, but those are what come to

18   mind.

19        Q.    Before I get through all this, do

20   you want to take a break now?  Are you ready

21   for a break?

22              MS. BROWNE:  How are you doing,

23   Wendy?

24              Okay.  Can we take about a

25   seven-minute break?

1              MR. WAKLEY:  Yeah.

2              THE VIDEOGRAPHER:  Off the record.

3      9:28.

4              (Recess taken.)

5              THE VIDEOGRAPHER:  On the record,

6      9:41.

7         Q.    Welcome back, Mr. Garner.

8              When we went off the record, we

9      were talking about the data analyses that are

10     performed by you and your staff on the

11     prescription side of the OARRS database; do you

12     recall that?

13        A.    Yes.

14        Q.    One of the analyses that you

15     perform are statistics and various

16     reports -- oh, I'm sorry -- annual and

17     semiannual reports; do you recall that?

18        A.    Yes.

19        Q.    When you say, "Annual and

20     semiannual reports," what do you mean?

21        A.    We have various reports, some of

22     them are mandated by our legislature but --

23     that we produce either ever six months or every

24     12 months, and they are posted to our website.

25        Q.    Other than the annual and

Page 56

1    semiannual reports that you post to your

2    website, are there other various reports for

3    which you and your staff perform statistical

4    analysis on the OARRS database?

5              A.    There are, yes.  There are a number

6    of reports.  There are quite a few on our

7    website, but there are also some reports that

8    we have created, several that run automatically

9    on a scheduled basis, as well as others that we

10   may be requested to create ad hoc.

11             Q.    When you say there are reports that

12   are run automatically on a scheduled basis,

13   what do you mean?

14             A.    There are reports that we have

15   written that the server automatically creates

16   and sends to various recipients, by email, on a

17   scheduled basis.  So, say, monthly, typically,

18   monthly or weekly.

19             Q.    I apologize.  What reports are run

20   on a scheduled basis, coming from the

21   prescriber-side data on the OARRS database?

22             A.    There are a couple of -- a couple

23   of investigative reports, that would be a

24   couple of key statistical models that we know

25   are impactful that would go to compliance

1  staff.

2          We have also got some that track

3  progress on a couple of projects we are working

4  on.

5      Q.    When you say there are a couple key

6  statistical models that you know are impactful

7  that go to compliance staff, what do you mean

8  by that?

9      A.    We have one that is -- that

10 identifies doctor shoppers, we have one that

11 identifies -- it's one of the -- one indication

12 of overprescribing.

13     Q.    Other than the investigative

14 reports that identify doctor shoppers and that

15 indicate overprescribing, are there other

16 investigative reports that you and your staff

17 run on the prescriber side of the OARRS

18 database?

19     A.    In an ad hoc manner, yes, but none

20 that are scheduled and run automatically.

21     Q.    For how long has the OARRS database

22 been able to produce reports that identify

23 doctor shoppers?

24     A.    I don't remember when I started

25 that.  That was -- it was probably 2008, 2009.

Page 58

1          Q.     For how long has the OARRS database

2     been able to run reports that indicate

3     overprescribing?

4          A.     That report I would have done -- I

5     want to say it was 2012.

6          Q.     With reference to both the

7     doctor-shopping report and the overprescribing

8     report, you testified, using the pronoun "I."

9     Did you write the code for the doctor-shopping

10    report?

11         A.     Yes.

12         Q.     Did you write the code for the

13    report that can indicate overprescribing?

14         A.     Yes.

15         Q.     How long does it take for a

16    doctor-shopping report to run?

17         A.     You know, since it happens

18    automatically, I'm not sure how long it really

19    takes, but I would imagine it's less than two

20    or three minutes.

21         Q.     How long does it take to run a

22    report that -- to indicate overprescribing?

23         A.     That particular report, it would be

24    very short.

25         Q.     When you say "very short," would it

1    be a matter of minutes?

2         A.    Probably less than a minute.

3         Q.    You had mentioned, when we were

4    talking earlier about, for example, the

5    statistical models that you and your staff run

6    that monitor the data on the OARRS database; do

7    you recall that?

8         A.    Yes.

9         Q.    And we talked about there being

10   perhaps 100 to 500 different statistical models

11   that can be run; do you recall that?

12        A.    Yes.

13        Q.    You also stated that some of those

14   models could be run in seconds; do you recall

15   that?

16        A.    Yes.

17        Q.    How long has the OARRS database had

18   the capability to run these reports in a matter

19   of seconds?

20        A.    I mean, it is a database.  So, I

21   mean, it takes a person to write the code, but,

22   I mean, the software itself, I guess, has been

23   capable all along.  It just took somebody to

24   make it do it.

25        Q.    And the capability for these 100 to

Page 60

1    500, approximately, statistical models to be

2    run, for how long has the database had that,

3    the software to make it capable to do that?

4         A.    All along.  I mean, that is -- I

5    mean, database software holds data and allows

6    you to retrieve data.  So it's just a matter of

7    somebody thinking of the particular model and

8    requesting the data in that manner.

9         Q.    And at what point did OARRS start

10   running, for example, understanding it's been

11   capable, but when did it start running the 100

12   to 500, approximately, reports for which you

13   wrote that code?

14        A.    So, I mean, some of them would have

15   started at the very beginning, and we continue

16   to add to it as time goes on and as we make

17   various discoveries.

18        Q.    And when you say, "At the very

19   beginning," do you mean 2006?

20        A.    Yes.

21        Q.    The writing of, for example, the

22   code that runs the 100 to 500 statistical

23   models we discussed, did that require

24   additional funding?

25        A.    To the extent that I can't do it

Page 61

1  all on my own, and so I have had to hire staff,

2  yes.

3          Q.    Do you recall hiring additional

4  staff in order to write the code that runs the

5  approximately 100 to 500 statistical models

6  that we have discussed today?

7          A.    Yes.

8          Q.    You have hired additional?

9          A.    Yes.

10         Q.    Were the additional people you have

11  in mind that were hired to write the code for

12  the approximately 100 to 500 models

13  contractors?

14         A.    No.

15         Q.    Are they -- were they employees of

16  the BOP?

17         A.    They are now employees of the BOP,

18  yes.

19         Q.    So the individuals who wrote the

20  code for the approximately 100 to 500

21  statistical models we have been discussing

22  today are currently BOP employees?

23         A.    Yes.

24         Q.    Were they hired specifically to

25  write code?

Page 62

```
 1          A.    Yes.
 2          Q.    How many folks is that?
 3          A.    Currently have -- I currently have
 4    one on staff, another getting ready to start.
 5          Q.    At any time did you have on staff
 6    more than one code writer?
 7          A.    Yes.
 8          Q.    When?
 9          A.    It would have been -- I'm so bad at
10    remembering dates.
11          Q.    That's okay.  In the last five
12    years, have you had more than one code writer
13    on staff?
14          A.    Yes.
15          Q.    What is the maximum number of code
16    writers you have had on staff at the -- devoted
17    to OARRS?
18          A.    Two, besides myself.
19          Q.    We had also talked earlier in the
20    context of investigations about a sheriff
21    having an account for OARRS and being able to
22    access information; do you recall that?
23          A.    Yes.
24          Q.    And you testified that they can
25    request a report and -- they, the sheriff's
```

Page 63

1   department, and after a supervisor approves it,

2   a report can be generated within seconds; do

3   you remember that?

4           A.    Yes.

5           Q.    How long has that capability been

6   available in OARRS?

7           A.    It has improved over time, so it

8   originally was not seconds, but all along.

9           Q.    And when you say "all along," you

10  mean since 2006?

11          A.    Yes.

12          Q.    And the sophistication that permits

13  these reports that we are talking about for law

14  enforcement to run within seconds, how long has

15  that capability been available?

16          A.    I believe we got the time down to

17  seconds in -- it would have been with the code

18  changes in 2011.

19          Q.    Did OARRS hire an additional code

20  writer to optimize the system in 2011, such

21  that sheriffs could run reports that we have

22  been discussing in a matter of seconds?

23          A.    No, we did not.  That was me, and

24  it's not just sheriffs.  I mean, that applies

25  to any OARRS user.

1      Q.    When you say any OARRS user can run

2    a report?

3      A.    Yes.

4      Q.    Do you mean prescribers?

5      A.    A prescriber can run a report on

6    their own patient, as can a pharmacist.

7      Q.    Can a wholesaler run a report?

8      A.    No.

9      Q.    Can a manufacturer run a report?

10      A.    No.

11      Q.    Can a member of the public run a

12    report?

13      A.    A member of the public cannot run a

14    report.  A member of the public can receive a

15    copy of their own report, by coming to our

16    office.

17      Q.    Other than law enforcement,

18    prescribers, and pharmacists, are there any

19    other entities that can run reports from OARRS?

20      A.    There are.  I can't remember them

21    all, because it's been changed many times over

22    the years.

23      Q.    Do you know approximately how many

24    entities can run reports from OARRS?

25      A.    I want to say it's getting close to

Page 65

```
 1    20.
 2          Q.    And that includes law enforcement,
 3    correct?
 4          A.    Yes.
 5          Q.    Does it include the medical
 6    examiner?
 7          A.    The coroners?
 8          Q.    Yes.
 9          A.    Yes.
10          Q.    Can the AG's office, the attorney
11    general's office run reports?
12          A.    Only the BCI has access right now,
13    and again, it's only on a -- it's the law
14    enforcement officer's role, so only if they
15    have an open case on an individual.
16          Q.    I'm sorry to interrupt you.  Is BCI
17    the Bureau of Criminal Investigations?
18          A.    Yes.
19          Q.    Can the governor's office access
20    the reports -- run reports -- I beg your
21    pardon.
22                Can the governor's office run
23    reports from OARRS?
24          A.    No.
25          Q.    Does the governor's office have
```

Page 66

1    access to OARRS?

2         A.    No.

3         Q.    Can the department -- the United

4    States Department of Justice access OARRS?

5         A.    Yes.  Various agencies within the

6    justice department, not everybody at the

7    justice department.

8         Q.    Do you know which agencies within

9    the DOJ can access OARRS?

10        A.    Typically the DEA.  I'm sure that

11   there are probably a few other agencies, but I

12   couldn't tell you who they all are, off the top

13   of my head.

14        Q.    Is that written down somewhere,

15   that is the agencies or entities that can

16   access OARRS?

17        A.    So state law is what ultimately

18   determines who can and can't access OARRS.  So

19   that's always the guiding factor.

20        Q.    But does state law actually

21   enumerate by name the entities --

22        A.    No -- I'm sorry.

23        Q.    -- the entities that can access

24   OARRS?

25        A.    No, it does no.

Page 67

1          Q.     So I went off on a tangent there.

2     Let me go back to the reports that you and your

3     office run from OARRS.

4          A.     Uh-huh.

5          Q.     We have talked about the scheduled

6     reports that include reports that identify

7     doctor shopping and that indicate

8     overprescribing.

9               How often are those reports

10    generated?

11         A.     Those two particular reports are

12    generated monthly.

13         Q.     And then, you said, there are

14    reports that are generated on an ad hoc basis,

15    correct?

16         A.     Yes.

17         Q.     Can you give me some examples of ad

18    hoc reports that you have run?

19         A.     So the director of compliance might

20    ask for anybody who has purchased more than a

21    certain number of units of drugs, would be an

22    example.

23         Q.     So to run a report that would

24    identify anyone who has purchased a certain

25    amount of drugs, what would you do?

Page 68

1              A.     So I would make sure that what I

2       have been asked for is clearly defined, and if

3       it is and is appropriate, according to statute,

4       then I would -- I would run such a report.

5              Q.     And when you say you would run a

6       report, can you walk me through that literally,

7       from I log on to the database to the report

8       gets spit out?

9              A.     So I would log in to my computer.

10      I would open SQL Server Management Studio,

11      which is where you write the code.  I would

12      write the code necessary to pull the data, I

13      would typically copy it into the Excel

14      spreadsheet, and either print it or email it

15      to -- typically it is the director of

16      compliance.

17             Q.     So in the case of a report that

18      would indicate anyone who has purchased a

19      certain amount of a drug, you would actually

20      have to write separate code for that report?

21             A.     Yes.

22             Q.     So you can't go in and fill out a

23      field that you want to show up and then run a

24      report that way?

25             A.     No.

Page 69

1        Q.     Is there an interface on OARRS

2    where a user, such as yourself, so you or your

3    staff, could access a screen and, similar to

4    like -- to a Google search, where you write,

5    you know, such a subscriber, within, for

6    opioid, and the report would generate for you?

7        A.     No.

8        Q.     We did talk about reports that are

9    automatically run monthly, such as the doctor

10   shopper or the overprescriber, correct?

11       A.     Yes.

12       Q.     The code has already been written

13   for those, right?

14       A.     Correct.

15       Q.     And there is just a flag in the

16   system that causes it to run monthly, correct?

17       A.     Basically, yes.

18       Q.     A human being doesn't go in and

19   direct, every month, for that report to be

20   generated, correct?

21       A.     Correct.

22       Q.     And the report, for example, the

23   ID, the one that IDs doctor shoppers, that gets

24   automatically delivered by email, you said?

25       A.     Yes.

1      Q.    And the reports that are run by law

2    enforcement, for example, when we were talking

3    about a sheriff wanting to run a report in an

4    investigation, how does the sheriff ask for

5    that report?

6      A.    They have to go into -- they have

7    to go to the OARRS website, log in with their

8    credentials, they type in the name of the

9    individual they are investigating and,

10   depending on whether it is a prescriber or a

11   patient, some other identifying information,

12   they have to include a case number, and they

13   submit it, their supervisor has to log in with

14   their credentials to approve it, and then the

15   system automatically generates that report.

16     Q.    And is the same for pharmacists,

17   for example, a pharmacist wants to see the

18   report on a particular patient, are you with

19   me?

20     A.    Uh-huh.

21     Q.    The pharmacist can log on with his

22   or her login information, correct?

23     A.    Correct.

24     Q.    Enters the patient name, correct?

25     A.    Correct.

Page 71

1      Q.    And then a report is run on that

2  patient?

3      A.    Correct.

4      Q.    So it's not a case where if a

5  pharmacist wants a report done -- run, the

6  pharmacist logs in and contacts OARRS, being

7  you or your staff, who then responds and sends

8  a report, correct?

9      A.    Correct.

10      Q.    Other than the ad hoc

11  reports -- well, let me ask you, are there any

12  other ad hoc reports you can recall, other

13  than, for example, if compliance asks for

14  anyone who has purchased a certain amount of a

15  drug that you recall running?

16      A.    I've looked at what a prescriber or

17  pharmacy purchases, versus what they reported

18  dispensing.

19      Q.    In the case of a report about what

20  a pharmacy purchases versus what it dispenses,

21  can a pharmacy run a report on what it has

22  purchased?

23      A.    No.

24      Q.    Can a pharmacy run a report on what

25  it has dispensed?

Page 72

1         A.     No.

2         Q.     Can law enforcement run a report on

3     what a pharmacy has purchased?

4         A.     No.

5         Q.     Can law enforcement run a report on

6     what a pharmacy has dispensed?

7         A.     Yes.

8         Q.     And in the case of law enforcement

9     running a report on what a pharmacy has

10    dispensed, is it the same process we talked

11    about, where the officer enters -- logs in to

12    his or her account and identifies what it

13    wants, a supervisor approves, and then the

14    system automatically would generate the report

15    on what a pharmacy has dispensed?

16        A.     Yes.

17        Q.     So in that situation, if you at

18    OARRS wanted to run a report on what a pharmacy

19    has dispensed, you would not have to write new

20    code for that report, correct?

21        A.     If that is all that I wanted, was a

22    list of what they have dispensed, that is

23    correct.

24        Q.     It's when you want to compare what

25    has been purchased to what has been dispensed

Page 73

1    that you would then have to write code to

2    generate a report, correct?

3         A.    Correct.

4         Q.    Going back to data analysis that is

5    run on the prescription side of the OARRS

6    database by you and your staff, you mentioned

7    statistics on the website; do you recall that?

8         A.    Yes.

9         Q.    What if any statistics do you and

10   your staff provide on the website that is based

11   on data analysis that is done on the prescriber

12   side of the OARRS database?

13        A.    There are quite a few, actually.

14   There are maps that show, by county, morphine

15   milligram equivalents by per capita, as well as

16   per patient.  Also the number of prescriptions,

17   opioid prescriptions per patient and per

18   capita.

19              There is what we call the county

20   spreadsheet, which is a spreadsheet listing all

21   of the different counties and a number of both

22   bulk measurements of prescriptions dispensed in

23   that county, broken down by major drug classes,

24   sedatives, stimulants, opiates.

25        Q.    The maps and reports that we have

Page 74

1      just discussed, the statistical reports that
2      are available on the website, those are
3      available to the public?
4              A.    Yes.
5              Q.    Are any of those that you have just
6      listed for me available -- not available to the
7      public?
8              A.    No.
9              Q.    Other than the maps that show the
10     MME by county, by capita, per patient, the
11     number of prescriptions per patient and per
12     capita, the county spreadsheets, the bulk
13     measurement of prescriptions dispensed in any
14     county by drug class, are there any other
15     reports that you and your staff routinely
16     generate from prescriber-side data that are
17     available on the website?
18             A.    There may be.  I don't -- I don't
19     recall.
20             Q.    You also mentioned that you and
21     your staff run analyses on the prescriber-side
22     data about changes -- regarding changes in
23     various rules; do you recall that?
24             A.    Yes.
25             Q.    What do you mean by rules?

Page 75

1          A.    Those would be administrative

2     rules, so the Ohio Administrative Code.

3          Q.    Can you give me an example?

4          A.    A year ago, maybe a little more

5     than a year ago, the various prescriber boards

6     were discussing changes to the administrative

7     code, to basically set limits on the amount of

8     an opioid that could be prescribed for acute

9     pain for the initial prescription.

10               We used OARRS data to help -- to

11    help guide that discussion to the specific

12    numbers that they came to.

13         Q.    Who is the "they," in that

14    sentence?

15         A.    Those would be the staffs of the

16    various -- the various boards.

17         Q.    And what various boards do you

18    mean?

19         A.    That would be the medical board,

20    the dental board, and the nursing board.

21         Q.    So when the change to the Ohio code

22    to set limits on the amounts of opioids for

23    initial prescriptions for acute pain were in

24    the process of being codified, the staffs of

25    the medical board, the dental board, the

Page 76

1    nursing board and the board of pharmacy met; is

2    that right?

3            A.    Yes.

4            Q.    Was that at the direction of the

5    legislature?

6            A.    I don't know.  I was simply asked

7    to provide the statistics.  I was not part of

8    the meetings.

9            Q.    To whom did you provide those

10   statistics?

11           A.    The executive director of the

12   pharmacy board.

13           Q.    Can you think of any other occasion

14   where analyses was performed by you and your

15   staff on the prescriber side of the OARRS

16   database for the purpose of a change in any

17   rule?

18           A.    We recently did some analysis as we

19   were -- as we were changing the rule for

20   reporting suspicious orders.

21           Q.    What is a suspicious order?

22           A.    I don't know that I know the entire

23   legal definition of a suspicious order, but it

24   would be an order that is -- that would be

25   unexpected, for one reason or another.

1          Q.    When you say your understanding is
2     that it is an order that is unexpected for one
3     reason or another, expected by whom?
4          A.    It would be expected by -- by the
5     wholesaler, I guess.
6          Q.    And it is an order by whom?
7          A.    By a wholesaler's customers.
8          Q.    And what is the rule change for
9     reporting suspicious orders that -- for which
10    you ran some analysis of prescriber-side data?
11         A.    I don't recall what the final rule
12    ended up being.
13         Q.    When was this?
14         A.    It was earlier this year, late last
15    year.
16         Q.    And for the purpose of running an
17    analysis -- well, let me ask you, who asked for
18    the analysis related to this change in the rule
19    for reporting suspicious orders?
20         A.    It would have been our director of
21    policy and communications, as well as the
22    director of compliance.
23         Q.    Who is the director of policy and
24    communications?
25         A.    Cameron McNamee.

1              MR. FARRELL:  Counsel, I apologize.

2     This is Paul Farrell.  To save time later, I

3     got lost.  Are we talking about prescriber side

4     or wholesaler side?  It seems like we just

5     jumped back and forth, and I got lost.

6              MS. BROWNE:  Yeah.  I asked him

7     about prescriber side, and we're going to get

8     to wholesaler side.

9          A.    I'm sorry.  Then I was answering

10    your question incorrectly, because that would

11    have been on the wholesaler side.

12         Q.    So let me back up.

13             What if any analysis on the

14    prescriber side of the database did you do

15    related to the potential rule change for

16    reporting suspicious orders?

17         A.    There would have been none.

18         Q.    And what if any analysis did you do

19    on the wholesaler side of the OARRS database

20    for the purpose of a rule change related to the

21    reporting of suspicious orders?

22         A.    So we looked at the history of

23    purchases and looked to identify anomalies in

24    the purchase information, so various

25    statistical models, regressions and such, that

1  would show what you should be expecting a

2  customer to purchase, based on their history

3  and, you know, variances from that.

4       Q.  When you say you looked at

5  anomalies in purchasing history, what do you

6  mean by that?

7       A.  It would be where a specific

8  customer is purchasing a drug on a routine

9  basis that -- where a pattern can be

10  identified, yet they make a purchase that is

11  outside of that pattern.

12       Q.  And you said that you ran various

13  regression analyses to determine the

14  expectations of what would be purchased,

15  correct?

16       A.  Yes.

17       Q.  Who wrote the code for the

18  regression analyses?

19       A.  Some would have been written by me,

20  some by my staff.

21       Q.  And this report -- reports related

22  to the suspicious order rule were done, you

23  said, probably late 2017 or early 2018?

24       A.  Yes.

25       Q.  After you ran the reports at the

Page 80

1    request of Cameron McNamee and/or Mr. Griffin,

2    did you hear anything else, after the reports

3    were run, related to the rule change on

4    suspicious orders?

5         A.    No, not directly.

6         Q.    Indirectly?

7         A.    My staff was more involved with it

8    than I was.  So, no, I did not.

9         Q.    Did your staff report to you

10   anything -- anything else related to the rule

11   change for reporting suspicious orders?

12        A.    No.

13        Q.    When you say that not directly you

14   knew more about the rule change for reporting

15   suspicious orders, what did you mean?

16        A.    I mean that I assume my staff had

17   further conversations, but I wasn't involved.

18        Q.    Why do you assume your staff had

19   had further conversations?

20        A.    Because I assigned them to that, to

21   that process.

22        Q.    Do you have meetings with your

23   staff?

24        A.    Occasionally.

25        Q.    Are they scheduled?

1          A.    No.

2          Q.    Does your staff report to you?

3          A.    Yes.

4          Q.    Do they report to anybody else?

5          A.    Sometimes to the executive

6     director.

7          Q.    And has anyone on your staff

8     advised you about anything related to the

9     change in the rule for reporting suspicious

10    orders or work they have done therefor?

11         A.    No.

12         Q.    Do you expect them to?

13         A.    Not necessarily.

14         Q.    Why not?

15         A.    I would expect them to report to me

16    if there was some sort of an issue that they

17    needed me to help resolve.  If no such issues

18    came about, then I would expect them to finish

19    the tasks that were assigned.

20         Q.    You said you additionally run

21    reports on the prescriber side of the OARRS

22    database for the purposes of analysis of a

23    potential crime; do you recall that?

24         A.    Uh-huh.

25         Q.    What did you mean by that?

Page 82

1          A.    I'm sorry.  Which side are we
2    talking about?
3          Q.    This is prescriber side.
4          A.    Prescriber side.  Again, there are
5    a number of different ways that we do this, you
6    know, looking for overprescribing sometimes of
7    specific drugs or combinations of drugs.
8                It could also be, you know,
9    violations by a patient, different things that
10   would indicate overuse or misuse.  Also, you
11   know, dispensing patterns, dispensing
12   combinations of drugs that would be ill
13   advised.  A pharmacy that maybe should have
14   seen something and stopped it that did not,
15   would be another.  There are many, many
16   different things we could look at.
17         Q.    Okay.  So on the prescriber side,
18   you've identified some analyses that you and
19   your staff are able to do on the database that
20   indicate potential crime, such as the
21   overprescription of drugs, the prescription of
22   dangerous combinations of drugs, et cetera,
23   right?
24         A.    Correct.
25         Q.    How long has the OARRS database

Page 83

1    been able to do this type of analysis?

2           A.    Again, the database has always been

3    able to do it.  It was a matter of staff --

4    having the capacity within the staff of doing

5    it.

6           Q.    And at what point did OARRS have

7    the staff capacity to run the types of reports

8    we just discussed that are indicative of

9    potential crime?

10          A.    We've -- we've done, to a certain

11   extent, all along.  It's just it has grown.

12   It's not, you know -- it started small and it

13   has grown over time.

14          Q.    Does OARRS run or perform analyses

15   of the wholesale side of OARRS for the purpose

16   of identifying potential crime?

17          A.    Yes, at times.

18          Q.    And what types of analyses are

19   those that are run on the wholesale side?

20          A.    It could be purchases, especially

21   by prescribers, of more drugs than they are

22   permitted to dispense from their office in a

23   given period of time; purchases that would not

24   make sense for a particular type of prescriber;

25   purchases that are not later reported as being

1    dispensed.  It would be a few.

2          Q.    On purchases by prescribers of more

3    drugs than are permitted -- they are permitted

4    to dispense, how do you, at OARRS, know how

5    much a prescriber is permitted to dispense?

6          A.    It is in the statute.

7          Q.    It is an Ohio statute?

8          A.    Yes.

9          Q.    How frequently have you run or

10   performed the analysis on purchases by a

11   prescribers of more drugs than they are

12   permitted to dispense?

13         A.    It's on an ad hoc basis.  I would

14   say a couple times a year.

15         Q.    And how many times have you run

16   analyses of purchasers -- or purchases that do

17   not make sense for the type of prescriber?

18         A.    A handful of times.

19         Q.    You mentioned that you also run

20   analyses on the prescription side of the OARRS

21   database when assisting with investigations; do

22   you recall that?

23         A.    Yes.

24         Q.    We talked earlier about some

25   reports that are run in the context of

1    investigations, such as the ones that come from

2    the 100 to 500 statistical models; do you

3    recall that?

4           A.    Uh-huh.

5           Q.    When you testified about reports or

6    analyses that are done on the prescription side

7    of the OARRS database related to

8    investigations, were you talking about analyses

9    other than those we have already discussed?

10          A.    No.

11          Q.    So in other words -- because that

12   was a mouthful -- are there analyses that are

13   run by you and your staff on prescriber-side

14   data from OARRS, in the context of an

15   investigation, other than that to which you

16   have already testified?

17          A.    Not that I can think of.

18          Q.    Are there analyses that you run on

19   wholesale-side data to assist in

20   investigations, other than the reports we have

21   already discussed?

22          A.    None that I can think of off the

23   top of my head.  There could be, but...

24          Q.    If you think of any reports related

25   to investigations that you and your staff have

Page 86

1    run on wholesale-side data, other than what we

2    have already discussed, will you just interrupt

3    me at some point and raise it, if you think of

4    it?

5         A.    Absolutely.

6         Q.    Thank you.  You said that you also

7    run reports on prescriber-side data to research

8    and identify individuals at risk based on the

9    prescriptions they take; do you recall that?

10        A.    Yes.

11        Q.    How do you do that?

12        A.    Again, there are a number of

13   different ways that we do that.  Some of them

14   based on morphine milligram equivalents, some

15   of them based on numbers of prescribers and

16   pharmacies, some actually get into an entirely

17   different way of looking at data, using machine

18   learning models, combinations of drugs.

19        Q.    Are there -- is there analysis that

20   is done on the wholesaler side of the database

21   to research and identify individuals who may be

22   at risk, based on prescription they take?

23        A.    No.

24        Q.    So reports that are run based on

25   MME, morphine milligram equivalent, how do you

1   run those reports?

2          A.    Those are, again, ad hoc reports

3   that we would write code for.

4          Q.    And reports that analyze the number

5   of prescriptions and pharmacies from which a

6   particular patient is obtaining medication, are

7   those ad hoc reports?

8          A.    Aside from the one that is

9   scheduled on a monthly basis, we also have ad

10  hoc reports that we would run.

11         Q.    And do you have to write code for

12  that?

13         A.    Yes.

14         Q.    You also mentioned machine learning

15  models that are run?

16         A.    Yes.

17         Q.    Can you tell me a little bit about

18  your machine learning models?

19         A.    Those are, to date, comparing the

20  prescription histories of overdose decedents

21  with living patients, to see which patients are

22  most at risk of overdose.

23         Q.    How did you come to run an analysis

24  of the history of overdose decedents versus

25  live patients, to see those at risk of

Page 88

1   overdose?

2       A.    I'm not sure I understand.  How --

3       Q.    Did someone request that your

4   office run that analysis?

5       A.    No.

6       Q.    Why did you run that analysis?

7       A.    Because ultimately the -- the

8   mission of the board is to protect the public,

9   and protecting them from overdose would

10  certainly fit within that mission.

11      Q.    Did the idea to use machine

12  learning to run the analysis on overdose

13  deaths, versus live patients to determine

14  likelihood of overdose, come from someone

15  within the BOP?

16      A.    The idea of using machine learning

17  would have been my own, and that would have

18  been through my master's program, is where I

19  worked with machine learning.

20      Q.    And does using machine learning cut

21  down on the time it takes to run some of these

22  reports?

23      A.    No, not at all.

24      Q.    So what is the purpose of machine

25  learning?

Page 89

1          A.    It is able to find patterns and

2     compute -- compute so many different

3     possibilities, to find the patterns in a way

4     that, as a human, we would not think of them

5     all.

6          Q.    And is the BOP currently using

7     machine learning with the OARRS database to run

8     reports?

9          A.    So there is a machine

10     learning -- so the patient report that

11     a -- that a pharmacist or a prescriber would

12     get, there is a score on that report that is

13     based on a machine learning model.  That is not

14     any ones that we created in the office.  That

15     was created by the vendor.  But otherwise, no,

16     not currently, based on our models.

17          Q.    Is that the NarxCare score?

18          A.    Yes.

19          Q.    We will talk about that in a

20     minute, but the NarxCare score is -- who can

21     run a NarxCare score, on a particular patient?

22          A.    That would be a healthcare

23     professional, so a pharmacist or physician or

24     their delegates.

25          Q.    Can you or your staff run a

1    NarxCare score, on a particular individual?

2          A.    Yes.

3          Q.    Can any other -- let me back up.

4                We had talked about how state law

5    determines who can access OARRS; do you recall

6    that?

7          A.    Yes.

8          Q.    So could any of the entities who

9    can access OARRS pursuant to state law run the

10   NarxCare score of a particular individual?

11         A.    Currently, only the healthcare

12   professionals.

13         Q.    Is there any machine learning that

14   is used on the wholesaler side of the OARRS

15   database?

16         A.    No, not to date.

17         Q.    You also noted that analyses are

18   run to the prescriber side of the OARRS

19   database by you and your staff for the purpose

20   of reporting requirements under various grants;

21   do you recall that?

22         A.    Yes.

23         Q.    What if any grants were you

24   referring to?

25         A.    We have -- OARRS is primarily grant

Page 91

1    funded.  So we have a number of grants that we

2    receive, particularly through the federal

3    government, the Bureau of Justice Assistance,

4    the CDC or SAMHS, which I'm trying to remember

5    exactly what that stands for, Substance Abuse

6    Mental Health something Administration.

7         Q.    Right.  Do you know how many grants

8    OARRS is currently the beneficiary of?

9         A.    At least three, less than six.

10        Q.    And what are the reports that are

11   required for receipt of the funding under the

12   three to six grants that OARRS currently is the

13   beneficiary of?

14        A.    Each department has a

15   different -- has a different report that they

16   require.  Typically, they are numeric questions

17   for about how many people use the system, how

18   they use the system, as well as, again, some of

19   those key, you know, number of doctor shoppers,

20   by their specific measurement of what is a

21   doctor shopper, and sometimes it is broken into

22   drugs, DEA drug schedules.

23        Q.    Is the data, the reports that are

24   provided to the various granters, anonymized?

25        A.    There is no -- they are aggregated

Page 92

1    at a state level.  So they are just numbers.

2         Q.    And for example, identifying the

3    number of doctor shoppers for, you know, a

4    federal grant, how long does it take to run

5    that report?

6         A.    A few minutes.

7         Q.    So getting back to my original

8    question that got us here, you mentioned that

9    in addition to vendor relations and running

10   reports from OARRS, you are also responsible,

11   in your role as the director of OARRS, for

12   staff management; do you remember that?

13        A.    Yes.

14        Q.    Can you tell me what the

15   responsibilities are that you have related to

16   staff management?

17        A.    So I have currently three employees

18   that report to me, and so I approve their

19   schedules, approve any time off, I assign tasks

20   as necessary, assist them with anything that

21   they need assistance with.  I mean, basic

22   management duties.

23        Q.    And what are the roles of the three

24   employees that report to you?

25        A.    We have a pharmacist who does some

1    customer service, as well as any time -- you

2    know, me not being a pharmacist, any time that

3    I have a question that would be more the

4    practice of pharmacy, that I -- you know, she

5    would help me with that, and she does a number

6    of other things outside of OARRS.

7                    I have an administrative assistant,

8    who does customer support.  She also does

9    administrative tasks for me, booking meetings

10   and so on and so forth.  And then we have a

11   data analyst, who helps me with the various

12   reports and statistics that we have been

13   discussing.

14        Q.    And is the data analyst the

15   individual who assists with writing code?

16        A.    Yes.

17        Q.    And you said you are in the process

18   of hiring another data analyst; is that right?

19        A.    Yes.

20        Q.    Will that increase your staff to

21   four?

22        A.    Yes.

23        Q.    Is the new data analyst position

24   intended to replace somebody else on your

25   staff?

1          A.     No.

2          Q.     You also mentioned, in your role as

3     director of OARRS, that you participate in

4     various public speaking events, correct?

5          A.     Correct.

6          Q.     Is there -- can you give me an

7     example of some of the public speaking you have

8     done, as the director of OARRS?

9          A.     I just gave a presentation at

10    NASCSA, National Alliance of State Controlled

11    Substance Authorities.  I just did that last

12    week -- or two weeks ago.  I have spoken at

13    BJA's grantee meetings.

14         Q.     What does that stand for?

15         A.     Bureau of Justice Assistance.

16         I spoke -- I have spoken before

17    various groups of prescribers and law

18    enforcement around the state.

19         Q.     What was your presentation to the

20    National Alliance of State Controlled

21    Substances Authorities about?

22         A.     It was about a grant project that

23    we currently have -- that we have, about how we

24    do data analysis to identify crime in the OARRS

25    data.

Page 95

1          Q.     Is that presentation publicly

2     available?

3          A.     Yes, it is.

4          Q.     And you also presented to the BJA

5     at a grant meeting; is that correct?

6          A.     Yes.

7          Q.     And what was the topic of that

8     presentation?

9          A.     That was a different project that

10     we've got for a grant that -- where we identify

11     individuals who -- who are, for lack of a

12     better term, doctor shoppers, and we have two

13     agents who then perform interventions to try to

14     get them into treatment.

15          Q.     You said, for "Lack of a better

16     word, doctor shoppers."  Is there another term

17     that is used by the BOP to describe doctor

18     shoppers?

19          A.     That is the term that is used, but

20     doctor shopping is not necessarily the only

21     indication.  You know, that is an indication of

22     drug abuse, but there are others that are also

23     used.

24          Q.     Such as?

25          A.     The amount of drugs that the

Page 96

1    patient is taking, combinations of drugs, you

2    know, historical patterns.

3         Q.    And doctor shopping can be

4    recognized through the use of the OARRS

5    database, correct?

6         A.    Yes.

7         Q.    Can the amount of drugs that a

8    patient is using be revealed through the OARRS

9    database?

10        A.    Yes.

11        Q.    And can the OARRS database reveal

12   combinations of drugs taken by a particular

13   patient?

14        A.    Yes.

15        Q.    Are you responsible for writing the

16   grant proposals?

17        A.    No.

18        Q.    Who does that?

19        A.    Cameron McNamee.

20        Q.    Do you have any input on the grants

21   for which you apply?

22        A.    Yes.

23        Q.    What input do you have into the

24   selection of grants that you will apply for?

25        A.    Typically, I typically have a

Page 97

 1    meeting with Cameron to discuss, you know,
 2    possibilities for projects that could be
 3    funded.
 4         Q.    You mentioned that -- I think you
 5    said most of the funding for OARRS comes from
 6    grants and the federal government; is that
 7    right?
 8         A.    Yes.
 9         Q.    What if any percentage comes from
10    the state, do you know?
11         A.    What would come from the state
12    would come from board of pharmacy licensure
13    fees.  Nothing comes from the general budget.
14         Q.    You mentioned in your role as the
15    director of the board -- I beg your pardon --
16    the director of OARRS that you also attend
17    various meetings, correct?
18         A.    Yes.
19         Q.    What meetings do you attend?
20         A.    More than I could possibly tell
21    you.  So it could be meetings with Medicaid or
22    with the department of mental health and --
23         Q.    That's SAMHS?
24         A.    Well, the state version.  So we
25    call them OMHAS, and I'm trying to remember

1    what that stands for, Mental Health and

2    Addiction Services.  That's it.

3             It could be meetings, you know,

4    internal meetings with board staff, it could be

5    meetings with -- it could be meetings with

6    prescriber groups.  Many different meetings.

7         Q.    When you have met with Medicaid,

8    what do you meet with them about?

9         A.    Typically, it is about what we are

10   both seeing in data.  We do some joint projects

11   at times to -- to see, you know, whether we are

12   seeing the same types of patterns in both

13   systems.

14        Q.    Does Medicaid have -- does the

15   department of Medicaid have access to the OARRS

16   database?

17        A.    They have access only to the

18   patients who receive Medicaid benefits, and

19   only on a patient-by-patient basis.

20        Q.    Are you aware of a movement or

21   proposals by Medicaid to provide private

22   insurers with access to OARRS?

23        A.    If it is an movement by Medicaid,

24   do you mean their -- what do they call those --

25   their managed care organizations, which would

Page 99

1    be public insurers --

2         Q.    Yes.

3         A.    So those specific ones who are

4    contracted by Medicaid --

5         Q.    Contract insurers, correct.

6         A.    They do have access.  They were

7    provided access a number of years ago.

8         Q.    Other than the contract insurers

9    through Medicaid, are there other private

10   insurance companies that can access OARRS?

11        A.    No.  Medicaid or BWC has the same.

12   So their's can as well.

13        Q.    What is PBC?

14        A.    Bureau of Workers' Compensation.

15        Q.    Oh, BWC.  I'm sorry.

16              When you meet with OMHAS, the Ohio

17   Mental Health and Addiction Services, what has

18   that been about?

19        A.    So again, that would be about

20   patterns that they are seeing, that they are

21   hearing about.  They have access to a

22   deidentified set of data that we have provided,

23   so that they can monitor different abuse

24   patterns there as well.

25        Q.    Okay.  And then you said that you

Page 100

1    also will meet with various prescriber groups,

2    correct?

3           A.    Correct.

4           Q.    And what types of meetings do you

5    have with various prescriber groups?

6           A.    That can vary.  It can be anywhere

7    from a training type of session to meetings

8    where they are floating an idea, basically.

9           Q.    When you say "training session," is

10   that a training session on OARRS?

11          A.    Yes.

12          Q.    You mentioned the House Bill 93

13   earlier; do you recall that?

14          A.    Yes.

15                      -   -   -   -   -

16                (Thereupon, Deposition Exhibit 3,

17                November 21, 2011 Report on House

18                Bill 93 by William Winsley and Danna

19                Droz, was marked for purposes of

20                identification.)

21                      -   -   -   -   -

22          Q.    I'm going to show you what we have

23   marked as Exhibit 3.  This is a copy of a

24   November 21, 2011 report on House Bill 93 by

25   William Winsley and Danna Droz.

Page 101

1        A.    Yes.

2        Q.    Have you seen this document before?

3        A.    I am sure that I have.

4        Q.    Who is William Winsley?

5        A.    He's the former executive director

6    of the board of pharmacy.

7        Q.    And who is Danna Droz?

8        A.    She is my predecessor as the

9    director of OARRS.

10        Q.    And you understand that in 2005,

11    Ohio enacted a law that allowed the board of

12    pharmacy to develop its own PMP?

13        A.    Correct.

14        Q.    And that led to the 2006 release of

15    OARRS, correct?

16        A.    Correct.

17        Q.    Do you know why OARRS was

18    established?

19        A.    Because the board of pharmacy,

20    along with the legislature, recognize that

21    there was a prescription drug problem and,

22    ultimately, at that point in time, there was no

23    way of monitoring it.

24        Q.    OARRS monitors outpatient

25    drug -- or outpatient prescriptions, correct?

1          A.     Correct.

2          Q.     So patients who are in the

3     hospital, receiving medication from a hospital,

4     are not included in the database, correct?

5          A.     Correct.

6          Q.     Are hospital pharmacies included in

7     the database?

8          A.     If they dispense outpatient

9     prescriptions.

10         Q.     If they do --

11         A.     And that's on the prescription side

12    of it.

13         Q.     Okay.

14         A.     On the wholesale side of it, we

15    collect what is sold to all pharmacies.  So

16    even if they don't do outpatient prescriptions,

17    we still receive what they purchase.

18         Q.     And do you understand that OARRS

19    was also intended to be an investigative tool

20    for law enforcement?

21         A.     Yes.  I mean, it is a healthcare

22    tool first, a law enforcement tool second, but,

23    yes.

24         Q.     Prior to the creation of OARRS, how

25    did the state monitor patient information?

1          A.     It was very difficult.  An

2     investigation would be opened first, and an

3     investigator would have to go pharmacy to

4     pharmacy and collect prescriptions.

5          Q.     We've talked a little bit about,

6     for example, legislation that identifies the

7     entities that can access OARRS.

8               Are you aware of any legislation,

9     other than the House Bill 93, since 2005 that

10    has updated any OARRS capability?

11         A.     Oh, yes.  There has been a number,

12    a number of times that it has been updated.

13         Q.     Are you aware of legislation that

14    addresses reporting requirements for users?

15         A.     "Reporting requirements for users,"

16    I'm not sure I understand.

17         Q.     Okay.  We'll come back to that.

18               Do you know if other states have

19    systems comparable to OARRS?

20         A.     Yes.

21         Q.     And do they?

22         A.     Yes, they do.

23         Q.     And do you understand that in all

24    50 states, except for Missouri, there are

25    OARRS-type databases?

1          A.     In all 50 states, besides Missouri,

2     there is a statewide system.  Missouri has a

3     system.  It is based in St. Louis County, and

4     other counties are permitted to join it, but it

5     does not have a statewide system.

6          Q.     You mentioned that Appriss is the

7     vendor for OARRS, correct?

8          A.     Correct.

9          Q.     Do you know how many states

10    are -- for whom Appriss is the vendor of their

11    PMP?

12         A.     I don't know the exact number.  I

13    know it is more than 40.

14         Q.     OARRS has the capability to run

15    multistate queries, correct?

16         A.     Correct.

17         Q.     When did it gain that capability?

18         A.     I don't remember the exact date.  I

19    want to say it was 2011.

20         Q.     And the multistate PMP queries that

21    OARRS can run, is that limited to border

22    states?

23         A.     That is not.

24         Q.     Individuals -- strike that.

25                Entities that have access to OARRS,

1    based on the state mandate that we talked about

2    earlier, or the legislation we talked about

3    earlier --

4            A.    Correct.

5            Q.    -- do those entities have

6    multistate access?

7            A.    Not all.  It is typically

8    prescribers and pharmacists, but it is all

9    determined by the laws and the state that owns

10    the data, the state that we are sharing with.

11    We each abide by each other's laws.

12            Q.    We talked a little bit about

13    software updates and changes in the evolution

14    of OARRS related to report running, correct?

15            A.    Correct.

16            Q.    Related to the time it takes for a

17    report to be run, correct?

18            A.    Correct.

19            Q.    Other than the evolution related to

20    specific types of reports and the speed at

21    which those reports can be generated, do you

22    recall any other changes to OARRS that have

23    been implemented over the years?

24            A.    Well, clearly, the ability to

25    access interstate reports would have been one

1    that I forgot about.

2          Q.    Anything else, other than the

3    ability to access interstate reports?

4          A.    Well, I believe when you were

5    questioning me about that, you were talking

6    about my time as database administrator, so

7    those would be those.  However, since I have

8    become director of OARRS, we changed software

9    platforms entirely.

10         Q.    Is there a database administrator

11   for OARRS currently?

12         A.    No.

13         Q.    Does that -- does the

14   responsibility for database administration fall

15   under your jurisdiction now?

16         A.    So the database administrator

17   was -- much of that position was running the

18   servers, and since the majority of that has now

19   been moved to the cloud, it is now the

20   responsibility of our vendor, rather than an

21   individual in our office.

22         Q.    And the vendor, who is the vendor

23   responsible for that running of the cloud?

24         A.    Appriss.

25         Q.    Is OARRS now capable of collecting

Page 107

1    more data than it was in 2006?

2         A.    So the statute has always allowed

3    us to collect controlled substances.  Are we

4    talking about prescription side or wholesale

5    side?

6         Q.    Well, let's start with prescription

7    side.

8         A.    Okay.  The statute has always

9    permitted us to collect controlled substances,

10   and then any drugs of concern, as determined by

11   administrative code, by the board.

12             Originally, there were two drugs

13   that we collected as drugs of concern.  Those

14   were tramadol and carisoprodol.  Those two

15   drugs have since become controlled substances.

16   We recently added gabapentin as a drug of

17   concern.

18        Q.    Why is that, that you added

19   gabapentin?

20        A.    There were a number of reports that

21   we were hearing, both from public sources as

22   well as -- as well as the Department of Mental

23   Health and Addiction Services, that gabapentin

24   was being abused.  We were also hearing from

25   pharmacists, and as time went on, we also then

Page 108

1    started seeing gabapentin show up in coroner's

2    reports from overdosed decedents, and as we

3    gathered all that evidence and took it to the

4    board, they determined it would be appropriate

5    to start collecting that information.

6         Q.    And when was that, that you began

7    collecting the information on gabapentin?

8         A.    I'm so bad with dates.  It was --

9         Q.    Since you have been director of --

10        A.    Yes.  I believe it was the end of

11   2016.

12        Q.    Is the database capable of storing

13   more patient data now than it was in 2006?

14        A.    So as in physical capability?

15        Q.    Correct.

16        A.    Because it is cloud hosted, yes, I

17   would certainly assume it is.

18        Q.    On the wholesale side, is the

19   database more capable -- I'm sorry, capable of

20   collecting more data now than it was when you

21   first instituted the wholesale side, which I

22   believe you said was 2011?

23        A.    No.  The wholesale side was

24   instituted in 2006.

25        Q.    Okay.  So has the wholesale side

Page 109

1    evolved at all since 2006?

2        A.    Yes.  The statute originally

3    required wholesalers to report the sales to

4    prescribers only.  It has since been updated to

5    require the sales to prescribers and what in

6    law is referred to as terminal distributors, so

7    basically pharmacies, clinics and such.

8        Q.    If you could turn to page 9 of

9    Exhibit 3, which is that report on Bill 93 from

10   2011.

11       A.    Uh-huh.

12       Q.    At the bottom of the page, there is

13   a section, Other Accomplishments, and the

14   second sentence says, "For example, OARRS

15   currently processes nearly 7,000 requests for

16   reports daily, and 99.5 percent of these are

17   handled automatically within three seconds";

18   did I read that correctly?

19       A.    Yes.

20       Q.    Do you know how many requests OARRS

21   currently processes?

22       A.    The last number I saw was for July,

23   and it was 599,000.

24       Q.    Per day?

25       A.    Per day.

Page 110

1      Q.    And are those 599,000 requests per

2    day also handled automatically within three

3    seconds?

4      A.    Yes.

5      Q.    We have talked today about the

6    statistical models that you and your staff have

7    created, and we have talked now about the

8    capability for interstate searching on OARRS.

9          We have talked about the increase

10   in speed at which reports can be generated, and

11   we have talked about the increase in types of

12   reports that can be generated, since the

13   inception of OARRS, correct?

14     A.    Correct.

15     Q.    Other than those things, can you

16   recall any other capabilities that have

17   developed in OARRS, since it was started in

18   2006?

19     A.    So shortly after I became director

20   of OARRS, we began adding morphine milligram

21   equivalent information to the patient report.

22          After that, we upgraded to the new

23   software platform, which did not initially

24   provide new capabilities.  It provided more

25   system stability, the ability to grow, and

1    ultimately the ability to add NarxCare, which

2    would be the latest enhancement, and the

3    ability to -- we started also, shortly before

4    moving to AWARxE, we started a project where we

5    were integrating access to OARRS directly into

6    the software of pharmacies and physician

7    systems.  But that really -- the ability to do

8    that really sped up and took off, when we made

9    the platform change.

10           Q.    You mentioned the AWARxE platform,

11   correct?

12           A.    Yes.

13           Q.    That's A-W-A-R-x-E; is that right?

14           A.    Yes.

15           Q.    All caps?

16           A.    Yes.

17           Q.    Except for the X?

18           A.    Yes.

19           Q.    When did you migrate to that

20   platform?

21           A.    That was in April of 2017.

22           Q.    Is there information available

23   through OARRS now publicly that wasn't

24   available when the database originated?

25           A.    I'm sure there is.

1          Q.    Can you think of anything?

2          A.    Any of the reports and such that

3     are on our website were not on the original

4     OARRS website.

5          Q.    Does the website provide searching

6     capability for OARRS for the public?

7          A.    For the public, no.

8          Q.    Why not?

9          A.    So the searching identified

10    information would not be appropriate, nor would

11    it be legal for the public.  Deidentified

12    information, that may -- that may happen some

13    day, but to date, just resources have not

14    allowed.

15          Q.    Okay.

16               MS. BROWNE:  Have we been going for

17    another hour again.  Do you need a break?

18    Okay, we will take a quick break.

19               THE VIDEOGRAPHER:  Off the record

20    at 10:59.

21               (Recess taken.)

22               THE VIDEOGRAPHER:  On the record,

23    11:20.

24          Q.    Mr. Garner, I wanted to just go

25    about -- over some of the things that we talked

1    about in this last session, to get some

2    clarification.

3              You had mentioned that you, at

4    times, will write code to run various reports,

5    correct?

6         A.    Correct.

7         Q.    Is another term for that code you

8    write a query?

9         A.    If the code is a direct -- is

10   directly to the database, yes.

11        Q.    When would you be writing code for

12   a report that isn't directly to the database?

13        A.    I may write code, so for instance,

14   machine learning, that code would not

15   be -- there would be a query in that code, but

16   that code itself would not be a query.

17             Additionally, we use SQL Server

18   Reporting Services, which has, you know, has

19   more of a -- it has, again, the query built

20   into it, but then also allows you to build a

21   graphical, you know, layout and everything that

22   is -- some of it is drag and drop, some of it

23   you can write in other programming languages.

24        Q.    When you write code to query the

25   database to run a report, about how long does

1    it take you to write that piece of code?

2         A.    It depends on the complexity of

3    what we are looking at.  A machine learning

4    model can take days.  A report can take -- a

5    report in SQL Server Reporting Services can

6    sometimes take day.  A query that, you know, we

7    are just pulling data directly and not in one

8    of those tools, you know, minutes to hours.

9         Q.    So if you were running the query to

10   run a report on the number of prescriptions

11   that a certain number of pharmacies was

12   writing, how long would that report -- I beg

13   your pardon -- how long would that query take

14   to write?

15        A.    So if I was to write a query about

16   how many prescriptions a specific pharmacy

17   filled?

18        Q.    Yes.

19        A.    That would take a few seconds, less

20   than a minute.

21        Q.    Also on this code issue, you

22   mentioned that you wrote some -- or performed

23   regression analyses to identify anomalies

24   for -- for example, when we were talking about

25   the rule on the change of suspicious order

1    reporting; do you remember that?

2          A.    Yes.

3          Q.    Who decided what regression

4    analyses would be appropriate?

5          A.    We tried various.  I don't know

6    that anybody made a decision that one or

7    another would be appropriate.  They were --

8    both me and my data analyst were both working

9    on this, and so we ran various analyses in

10   order to see which ones seemed to fit best.

11         Q.    How did you determine which

12   analysis fit best?

13         A.    By reviewing the results and, you

14   know, typically when you have a regression

15   analysis, especially that type of analysis, you

16   can graph it, and so whether the data fit the

17   graph or not is typically a good indication.

18         Q.    And after you and your data analyst

19   determined the regression analysis to use, did

20   you provide the various options to anybody

21   else, or did you just decide amongst yourselves

22   which was the best one to run?

23         A.    There was a group, and this was

24   where I, you know, assigned my data analyst,

25   rather than attending myself, so I don't have a

Page 116

1    lot of detail, but there was a group that was

2    meeting that included my data analyst and a

3    number of others from the compliance department

4    that reviewed the different things we were

5    finding.

6          Q.    Are there data analysts in the

7    compliance department?

8          A.    Not the level of data analyst as

9    what I hired.  There are -- well, no, there is

10   not currently.

11         Q.    When you ran the statistical

12   analysis on the data for the purpose of that

13   new suspicious order rule, you did not run data

14   on, for example, McKesson specifically,

15   correct?

16         A.    Correct.

17         Q.    You didn't run it on ABDC

18   specifically, correct?

19         A.    Correct.

20         Q.    You did not run it specifically on

21   Cardinal Health, correct?

22         A.    Correct.

23         Q.    That's because you have access to

24   aggregate data, correct?

25         A.    Correct.

1      Q.    And the aggregate data is going to

2    provide you with more information than you

3    would have if you just ran it on one

4    distributor, correct?

5      A.    Correct.

6      Q.    And the wholesalers, like McKesson,

7    Cardinal, ABDC, cannot access that aggregate

8    data, correct?

9      A.    Correct.  And I'll correct myself,

10   because we did at times run on individual

11   wholesalers as well.

12     Q.    Why did you run reports on the

13   individual wholesalers?

14     A.    Because of the fact that the

15   wholesalers cannot see each other's

16   information, you know, anything with the rule,

17   we would have to keep that in mind.

18     Q.    Is there any mechanism by which a

19   wholesaler can access the data of another

20   wholesaler?

21     A.    Not that I'm aware of.

22     Q.    Is there a mechanism by which a

23   wholesaler can access its own data?

24     A.    In OARRS?

25     Q.    Yes.

Page 118

1          A.     No.

2          Q.     Have any wholesalers ever been able

3     to access data in OARRS?

4          A.     No.

5          Q.     We also were talking about, a

6     minute ago, the wholesaler database and reports

7     that it can run, reports that can be run on the

8     wholesale side, and you mentioned that there

9     could be a report of sales to prescribers; do

10    you remember saying that?

11         A.     Yes.

12         Q.     Why -- when was it the case that

13    OARRS would run reports of a wholesaler's sale

14    to prescribers?

15         A.     So that typically is -- there is a

16    number of reasons, but one is the fact that

17    state law limits the number of -- the amount of

18    controlled substances that a prescriber can

19    personally furnish from their office, and so

20    one such query would be to see whether or not

21    they were violating that.

22         Q.     And when was it that the reports

23    were being run only as to the prescribers, as

24    opposed to now you said it is terminal

25    distributors and prescribers?

Page 119

1          A.     Okay.  So that is what is reported

2      to us by the wholesalers.  So the House Bill 93

3      legislation changed that.

4          Q.     I see.  Okay.

5          A.     So basically before House Bill 93,

6      we did not have access to what was sold to a

7      pharmacy.

8                  MR. EMCH:  Sorry.  Did you say

9      2011?

10                 THE WITNESS:  It was 2011 when that

11     was passed, yes.

12         Q.     You mentioned that one of the

13     changes that came out over time was the ability

14     for interstate queries, correct?

15         A.     Yes.

16         Q.     And you mentioned that some

17     pharmacies and pharmacists can access some PMPs

18     of other states, correct?

19         A.     Health -- it is typically

20     healthcare professionals, yes, that can access

21     the information in other states.

22         Q.     Are pharmacists considered

23     healthcare professionals?

24         A.     Yes.

25         Q.     Are pharmacies considered

Page 120

1    healthcare professionals?

2         A.    We do not allow access to OARRS as

3    a pharmacy, only as a pharmacist.

4         Q.    How long has it been the case that

5    pharmacists can access or make interstate

6    queries?

7         A.    It would have been 2011-ish, 2011,

8    2012, something like that.

9         Q.    So prior to 2011, 2012, pharmacists

10   and healthcare professionals were unable to

11   access other state's PMP database?

12        A.    There was the possibility that they

13   could register for an account in another state.

14   I know some did that, some have done it in Ohio

15   as well, but there was -- there is no way for

16   me to know how many or which states.

17        Q.    Currently, for a pharmacist to have

18   multistate access, does he or she have that

19   access through their OARRS account?

20        A.    Yes.

21        Q.    But that was not the case prior to

22   2011, 2012?

23        A.    Correct.

24        Q.    We talked about reports that can be

25   run by the pharmacist.  Is the identification

Page 121

1    of the individual who picked up the

2    prescription tracked?

3         A.    No, it is not.

4         Q.    If a prescription is not picked up,

5    so it is filled but not picked up, is that

6    tracked?

7         A.    The pharmacy is supposed to

8    basically retract that information from OARRS,

9    if they have already sent it.  Most pharmacies

10   hold onto the data, until the patient picks it

11   up.

12        Q.    What happens to a prescription, if

13   you know, that doesn't get picked up?

14        A.    I wouldn't know.

15        Q.    Is there some mechanism in OARRS

16   for the pharmacy to report that?

17        A.    The mechanism would be -- so

18   they -- a record that is sent to OARRS

19   basically can be an insert and update or

20   delete.  So basically they would delete that

21   prescription, since it was no longer dispensed.

22        Q.    We talked about law enforcement

23   having accounts and, for example, we talked

24   about a sheriff that wanted to make a query.

25              If, for example, the sheriff of

1    Summit County has an OARRS account, is

2    there -- do you or your staff have a way of

3    monitoring how many times that Summit County

4    Sheriff's account has been used to access

5    OARRS?

6           A.    Yes.

7           Q.    Can you run a report that would

8    show how many times any given OARRS

9    accountholder accessed OARRS?

10          A.    Yes.

11          Q.    On the wholesale side of the

12   database, I think you mentioned that -- we just

13   talked about reports of prescriptions that are

14   purchased.  So the identification of purchasers

15   of prescriptions is reported, correct?

16          A.    Correct.

17          Q.    What else is reported by the

18   wholesaler?

19          A.    The wholesaler reports, first off,

20   who they are, so we know who the wholesaler is;

21   the drug that was sold; how much of the drug

22   was sold; when it was sold; and to whom it was

23   sold; and an invoice number, just to track it.

24          Q.    How long -- and those parameters to

25   whom it was sold, the quantity, where it was

Page 123

1     sold, et cetera, how long has it been mandatory
2     that wholesalers report that information?
3          A.     It's been mandatory since 2006.
4     However, as I mentioned earlier, originally it
5     was only the sales to prescribers.
6          Q.     So all of that information was
7     required, but only as to prescribers who are
8     dispensing from their offices?
9          A.     Correct.
10          Q.     And then it was 2011 when they were
11     required to report it also as to terminal
12     dispensers?
13          A.     Correct.
14          Q.     You said that you can monitor, for
15     example, the number of times an accountholder
16     queries the database, correct?
17          A.     Correct.
18          Q.     Can you monitor the transactions
19     themselves, so what the queries were?
20          A.     Yes.
21          Q.     For how long -- or how far back
22     does that data go?
23          A.     A long time.  I want to say back to
24     about 2014.
25          Q.     Is there data -- the data that goes

```
 1    back to 2014 on transaction history, where does
 2    that reside?
 3            A.    At the board of pharmacy.
 4            Q.    Is there a way to track or monitor
 5    queries that were made by a specific OARRS
 6    accountholder prior to 2014?
 7            A.    I may have it.  It's all in the
 8    same place.  If I do, I don't recall.  At one
 9    point, we were purging that information.  I
10    don't recall when the last time was we did
11    that.
12            Q.    Why were you purging the info?
13            A.    Just as a matter of maintenance, at
14    the time, just the way we did things.
15            Q.    Is there any requirement for the
16    time, length of time for which you have to
17    maintain, for example, transaction information
18    of a particular OARRS accountholder?
19            A.    No.
20            Q.    So who determines, for example,
21    that you have data back to 2014?
22            A.    Currently, it's me.
23            Q.    There are no guidelines for how
24    long one should maintain the data pertaining to
25    the history of a particular OARRS
```

Page 125

1    accountholder?

2         A.    No, there are not.

3         Q.    Is there any other database in the

4    state, other than OARRS, that is accessible to

5    prescribers, that collects the type of data

6    that OARRS collects?

7         A.    No, not that I'm aware of.

8         Q.    Is there any other database in the

9    state that collects the type of data that OARRS

10   collects that is available to dispensers?

11        A.    Not that I'm aware of.

12        Q.    Is OARRS available to hospitals?

13        A.    It would not be to the hospital.

14   It would be to the prescriber in a hospital or

15   pharmacist in a hospital.

16        Q.    So the pharmacist in a

17   hospital-based pharmacy may have an OARRS

18   account?

19        A.    The pharmacist may, yes.

20        Q.    Do you know if there is a PMP for

21   the hospital systems in Ohio?

22        A.    There is not a different PMP, no.

23        Q.    So let's talk a little bit about

24   the specific information that OARRS collects

25   related to outpatient prescriptions.

1        A.     Okay.

2        Q.     So we are talking about the

3    information that a pharmacy or prescriber is

4    required to report.

5        A.     Okay.

6        Q.     Is the prescriber -- so for

7    prescriber information, is the exact drug

8    prescribed required to be reported?

9        A.     They report the NDC code, which,

10   yes, is the exact drug.

11       Q.     Is that the Narcotic Drug Code?

12       A.     National Drug Code.

13       Q.     And are prescribers required to

14   identify the quantity in grams of a

15   prescription prescribed?

16       A.     They report the quantity, based on

17   whatever unit it is.  So if it is a medication

18   that is dispensed as a pill, it would be the

19   number of pills.  If it is a liquid, it is

20   typically the number of milliliters.  I don't

21   know that I have seen powders dispensed

22   directly, but then it would be grams.

23       Q.     What about the MME?

24       A.     The MME is calculated at OARRS.  It

25   is not reported by the pharmacy or prescriber.

```
 1        Q.    Are prescribers required to report
 2   the number of pills per prescription?
 3        A.    Yes.
 4        Q.    Are prescribers required to report
 5   the prescription strength?
 6        A.    That would be derived from the NDC
 7   number.
 8        Q.    Are prescribers required to report
 9   how often a particular drug has been
10   prescribed?
11        A.    Not how often.  It's each
12   prescription.  So that --
13        Q.    Does the prescriber have to report
14   to OARRS the exact date the prescription is
15   written?
16        A.    Yes.
17        Q.    Does the prescriber have to provide
18   its specific name and address?
19        A.    The prescriber or pharmacy,
20   whichever did the dispensing, would report the
21   DEA number of the prescriber.
22        Q.    And then that's prepopulated in the
23   field?
24        A.    Right.
25        Q.    Is the specialty of the prescriber
```

1    reported in the database?

2         A.    It is not.  Any specialty

3    information that we have either comes from the

4    medical board or from the prescriber

5    themselves, on their OARRS account.

6         Q.    Is the specific ailment for which

7    the prescription is directed required to be

8    reported?

9         A.    Yes.  That's a recent change.

10        Q.    When was that change instituted?

11        A.    December of 2017.

12        Q.    The seven or eight requirements we

13   already discussed, have those been in effect

14   since the institution of the database?

15        A.    With the exception of the

16   diagnosis, yes.

17        Q.    So the drug prescription strength,

18   prescriber information, date of prescription,

19   all had to be reported upon the release of

20   OARRS in 2006, correct?

21        A.    Correct.

22        Q.    And the specialty of the

23   prescriber, was that -- I'm sorry, was that

24   also -- had to be reported?

25        A.    It is not reported.  We attempt to

Page 129

1    get that information either from the medical

2    board or from the prescriber themselves, but

3    it's kind of hit or miss.

4         Q.    Is a prescriber required to report

5    the number of refills authorized?

6         A.    Yes.

7         Q.    Has that always been the case?

8         A.    Yes.

9         Q.    And is the prescriber also required

10   to report the dosage of each prescription?

11        A.    They would give the number of unit

12   doses in the prescription.  So the quantity, as

13   we discussed.  They give the number-of-days

14   supply, so the number of days it should last,

15   and that is calculated typically by the

16   dispensary.  If it is dispensed by the office

17   or dispensed by the pharmacy, it is typically

18   calculated there.

19        Q.    And how long has that been the

20   case?

21        A.    Since day one.

22        Q.    Is a copy of the label ever

23   provided to OARRS?

24        A.    No, it is not.

25        Q.    Does a dispenser have to report the

Page 130

1    exact prescriptions it has filled?

2         A.    I'm sorry?

3         Q.    So we talked a minute ago about

4    when prescriptions are filled but not picked

5    up, and you mentioned this ability to delete a

6    prescription.

7              How frequently do dispensers have

8    to complete reports?

9         A.    They report daily.

10        Q.    And in a daily report, if they are

11   going to -- if a prescription is not picked up

12   and they want to delete it, in what period of

13   time does that deletion have to be done?

14        A.    There is no hard-and-fast rule.

15   Each pharmacy typically has its own -- its own

16   rules for how long a prescription will stay in

17   what they call will call.  And so it would be

18   when they remove that from will call and return

19   it to stock, that's when they would also then

20   report it back to OARRS, if they had already

21   reported it.

22             Like I said, a lot of the

23   pharmacies now have the ability to not report

24   that until it is picked up.  So that way they

25   don't have to reverse it.

Page 131

1        Q.    Well, what's the requirement?   In

2    other words, if I'm Mo Browne's pharmacy, do I

3    report -- my daily reporting requirement is to

4    report the prescriptions I've filled or the

5    prescriptions that left my pharmacy?

6        A.    You know, it is not real clear, and

7    so we have accepted either one.  I mean, you

8    know, as a program, we are more interested in

9    what drugs the patient has in their possession

10   than, you know, the drugs that are still

11   sitting on the shelf in the pharmacy.

12            So our advice has been when they

13   can, to report it when it leaves the pharmacy,

14   but not all pharmacies are capable of doing

15   that.

16       Q.    Why would they not be capable of

17   doing that?

18       A.    Traditionally, in pharmacies, there

19   are two separate systems.  There is the

20   dispensing system, which knows all about the

21   prescriptions and, you know, the drugs and all

22   of that.  There is a separate point-of-sale

23   system that is used to charge you for your

24   prescription.

25            And it is that point-of-sale system

1   that knows when it leaves the pharmacy.  The

2   two have not typically -- they don't always

3   talk to each other.  It has changed over time,

4   but in 2006 -- it basically just didn't happen

5   ever, but slowly they are migrating to where

6   they do communicate with each other.

7            Q.    So if today, if I'm a registered

8   pharmacist and I fill a prescription today, and

9   I put it in the system, and as of December 31

10  it hasn't been picked up, I can go back and

11  access my data from November 14 and delete

12  something?

13           A.    Typically, it is seven days or so.

14  I don't know what -- I mean, you would have to

15  talk more to a pharmacist or to compliance to

16  know more about what is happening in the

17  pharmacies, but the practice is not typically

18  that you keep it -- would keep it that long.

19           Q.    Do pharmacies or do dispensers have

20  to report the number of prescriptions they fill

21  per day?

22           A.    No.  We would be able to tell that

23  by how many prescriptions they sent us.

24           Q.    What if any reporting does a

25  dispenser have to give that is different from

1      the list of 11 things we just discussed with

2      respect to the prescriber?

3             A.    They are basically the same.

4             Q.    Do they have to report how the

5      patient paid for the prescription?

6             A.    They do.

7             Q.    And you said they do not have to

8      report the time or date when a prescription is

9      picked up; is that correct?

10            A.    Not when it's -- so they report

11     what they call a date filled.  It is not

12     necessarily the date it is picked up.  I

13     believe you previously asked about who picked

14     it up.  They are not required to report who

15     picked it up.

16            Q.    The patient information that is

17     reported into OARRS, is that the race of the

18     patient?

19            A.    No.

20            Q.    Is the age of the patient reported?

21            A.    The date of birth, so the age can

22     be calculated.

23                  MS. BROWNE:  Can you mute your

24     line, whoever is on the phone, please.

25            Q.    Other than the date of birth, is

Page 134

1     the gender of the patient reported?

2          A.     Yes.

3          Q.     And the date of birth and gender of

4     the patient, the requirement that those be

5     reported, that's always been the case?

6          A.     Yes.

7          Q.     What about the medical history of a

8     patient, is that reported through OARRS?

9          A.     No.

10         Q.     Does the system capture overlapping

11    prescriptions from multiple prescribers?

12         A.     So assuming each prescription is a

13    controlled substance, each prescription would

14    be reported.  So if we looked for it, we would

15    be able to tell whether two prescriptions

16    overlapped.

17         Q.     And that's the same data that you

18    would use to identify, for example, a doctor

19    shopper?

20         A.     Correct.

21         Q.     We talked about data that

22    identifies the transaction history of a

23    particular OARRS accountholder.

24              How long does this information that

25    is reported by prescribers and dispensers, how

Page 135

1    long is that available?

2         A.    That's changed over time.  The law

3    originally allowed us to keep the data for two

4    years.  It was later changed to three years.

5    The current statute says that we shall make

6    five years of information available to

7    the -- to OARRS users, and so we shall keep

8    five years.

9              It allows us, for the purpose of

10   monitoring public health, to keep the data

11   indefinitely though.

12        Q.    So you are required to have the

13   data available to OARRS users as far as back as

14   five years, but in reality, the data exists for

15   a much longer time?

16        A.    We only keep five years available

17   to the endusers.  It is set at five years.

18        Q.    And for OARRS purposes, is it kept

19   longer?

20        A.    It can be kept longer for OARRS

21   purposes.

22        Q.    And is it kept longer?

23        A.    Yes.

24        Q.    How far back does the patient and

25   dispenser and prescriber data we have just been

Page 136

1    discussing exist?

2          A.    So in an identified manner, it goes

3    back to 2014, because that's when the statute

4    changed from three years.

5          Q.    And what do you mean by

6    "identified"?

7          A.    Where we can identify who the

8    patient is.

9          Q.    And does it exist further back,

10   where it is anonymized?

11         A.    Anonymized data exists back to --

12   technical to 2007.  Some of that data is not

13   real clean.

14         Q.    Where does the identified data

15   through 2014 reside?

16         A.    Both in the clouds, in the

17   production system, as well as at the board of

18   pharmacy.

19         Q.    And where does the anonymized data

20   reside?

21         A.    At the board of pharmacy.

22         Q.    And if you wanted to run a search

23   on a particular patient, is it possible that

24   you could run the data back to 2007?

25         A.    Not likely.  There may be ways that

1    we could, on certain patients who have been

2    very consistent since then, there might be some

3    ways we could figure out something, but not

4    likely.

5            Q.    Is there other information that

6    OARRS collects that we haven't just discussed?

7            A.    Not that -- not that we collect

8    from -- by statute or on a regular basis, no.

9            Q.    Right.  So I should be clearer.  Is

10   there other information that OARRS is required

11   to collect that we haven't already discussed?

12           A.    No.

13           Q.    And the reporting requirements that

14   we have just discussed, those are all

15   established by state law?

16           A.    Generally by state law, and more

17   specifically in rule.

18           Q.    Do you know why that is?

19           A.    Why it is?

20           Q.    That the reporting

21   requirements -- that there are reporting

22   requirements?

23           A.    To provide some consistency.

24           Q.    Consistency in what?

25           A.    Well, if they weren't a statute,

Page 138

1  and the board of pharmacy could change them

2  however often they wanted, it wouldn't be very

3  fair.

4       Q.    You mentioned, when we were talking

5  about dispenser information, the concept of

6  diversion.  Do you remember saying that?

7       A.    I may have.

8       Q.    What is your understanding of

9  diversion, in respect to pharmaceuticals?

10       A.    Any use of a drug that -- beyond

11  what it was intended.

12       Q.    And is OARRS capable of running

13  reports that identify diversion?

14       A.    Some types of diversion, not all.

15       Q.    What types of diversion can OARRS

16  run reports about?

17       A.    Well, we have discussed a number of

18  them.  Doctor shopping would be one, just

19  overutilization.

20       Q.    Anything else?

21       A.    No.

22       Q.    And we talked about dispensers

23  having a daily reporting requirement, correct?

24       A.    Correct.

25       Q.    How long has that been the case?

1          A.    That also has changed a number of

2     times.  I don't remember when we went to daily.

3                       -  -  -  -  -

4                (Thereupon, Deposition Exhibit 4,

5                Ohio Prescription Drug Monitoring

6                Program, Effective 2017, was marked

7                for purposes of identification.)

8                       -  -  -  -  -

9          Q.    I'm going to show you what we have

10    marked as Exhibit 4.  This is the Ohio

11    Prescription Drug Monitoring Program, Effective

12    2017; do you see that?

13         A.    Yes.

14         Q.    Are you familiar with this

15    document?

16         A.    Yes.

17         Q.    It came off the -- we got this from

18    your website.

19         A.    Uh-huh.

20         Q.    Can you turn to page five for me.

21         A.    Yes.

22         Q.    And at the top of page 5, under

23    Reporting Requirements, it notes, "Effective

24    March 15, 2017, the Ohio PMP will begin

25    requiring pharmacies and dispensers to report

1    reportable drug dispensations to the SOBP via

2    the PMP clearinghouse"; did I read that

3    correctly?

4         A.   Yes.

5         Q.   It further says, "Dispensations

6    must be reported no later than 24 hours, after

7    dispensing the prescription, although they may

8    be submitted more frequently"; did I read that

9    correctly?

10        A.   Yes.

11        Q.   SOBP is the board of pharmacy,

12   correct?

13        A.   Correct.

14        Q.   What would be an occasion, if you

15   know, where dispensations would be reported

16   more frequently than every 24 hours?

17        A.   There are systems that are in use

18   in other states that require more frequent

19   reporting, and so if such a system, if it is

20   easier for them to report more than once a day,

21   then we would certainly allow it.

22        Q.   So based on this paragraph, at

23   least, it is your understanding, is it not,

24   that as of at least March 2017, there was a

25   daily reporting requirement, correct?

Page 141

1          A.    Yes.

2          Q.    Is it your understanding, based on

3     this paragraph, that prior to 2017, there was

4     not a daily requirement?

5          A.    So prior to 2017, it would have

6     been weekly.

7          Q.    And was it weekly -- was there a

8     different reporting requirement, other than

9     weekly, at any point in time?

10         A.    When OARRS was first created, it

11    was twice a month.

12         Q.    And for how long was it a twice a

13    month reporting requirement?

14         A.    I believe it was through about

15    2011, but I don't know that for sure.

16         Q.    Does OARRS monitor compliance with

17    the reporting requirement?

18         A.    Yes.

19         Q.    What are the consequences for

20    dispensers who fail to report in accordance

21    with the requirement?

22         A.    We have not had a large problem

23    with that.  So initially, we simply contact the

24    pharmacy to find out, you know, why they are

25    out of compliance.  We try to work with the

Page 142

1    pharmacy to get into compliance.

2              Once or twice that hasn't been

3    enough, and we have had to get our compliance,

4    you know, the board of pharmacy's compliance

5    department involved, and every time since then,

6    that has resolved, and we have never really had

7    to take action against them.  Nothing more than

8    a pink sheet.

9         Q.    What is a pink sheet?

10        A.    It's basically a reprimand that

11   requires the pharmacy to follow up with how

12   they are going to comply.

13        Q.    Is there a fine associated with

14   that?

15        A.    Not typically.

16        Q.    How is it determined if a dispenser

17   or prescriber fails to report?

18        A.    It would be determined based on,

19   you know, did we receive a report each day from

20   them, as well as are the prescriptions that we

21   receive each day timely, are they -- you know,

22   if you are reporting prescriptions from a month

23   ago, you know, a month late, then that would

24   obviously not be in compliance.

25        Q.    Are reports that indicate

1    compliance by dispensers and prescribers to

2    OARRS automatically run?

3         A.    They are not.  There is -- in the

4    current system, there is a report that one of

5    my staff goes and manually runs, to look at

6    that.

7         Q.    Every day does your staff run that

8    report?

9         A.    No.  Typically once a week or so.

10        Q.    Do you know if the state conducts

11   any audits of the reporting compliance?

12        A.    There is no -- nothing outside of

13   what we do in OARRS.

14        Q.    So counties can't run reports to

15   monitor compliance with the reporting

16   requirements?

17        A.    No.

18        Q.    And licensing agencies can't run

19   reports to monitor compliance with reporting

20   requirements?

21        A.    No.

22        Q.    Are there instances where a

23   dispenser is investigated for making too many

24   queries into the database?

25        A.    Not investigated, no.  If it is

1    something that I see or one of my staff sees,

2    they may, you know, may raise awareness, and we

3    may seek explanation, but I've never -- I don't

4    recall any actual investigations into that.

5         Q.    So your office does track how

6    frequently pharmacists or pharmacies access

7    OARRS, correct?

8         A.    We do.

9         Q.    Are there occasions in which

10   pharmacies or pharmacists have been

11   investigated for unlawfully accessing OARRS?

12        A.    There have been a number of

13   investigations into individuals who have used

14   OARRS inappropriately, yes.

15        Q.    And do you know how it is

16   determined that an individual is using OARRS

17   inappropriately?

18        A.    Typically, that is initiated by a

19   complaint from the public, and then it is

20   assigned to an investigator to look into.

21        Q.    Have you been involved ever in an

22   investigation of an unlawful access of OARRS?

23        A.    Just to the extent of providing

24   reports of a request history.

25        Q.    So in addition to being able to

Page 145

1    monitor -- well, let me ask you this:

2    Providing reports on a request history, is that

3    the same type of report that you would provide,

4    like we discussed regarding the Summit County

5    Sheriff's Department, so any OARRS

6    accountholder?

7          A.    No.  I mean -- so -- okay.  Were

8    you asking whether we would provide it to the

9    Summit County Sheriff, or on the --

10         Q.    No.  Running a report or being able

11   to identify whether an individual has

12   unlawfully accessed OARRS, how is that

13   determined?

14         A.    It would be any -- it would be any

15   user.  It would not just be a certain type of

16   account.

17         Q.    And you are able to monitor any

18   user's access of OARRS, correct?

19         A.    Correct.

20         Q.    And that includes the specific

21   transactions for which they are accessing

22   OARRS, correct?

23         A.    Correct.

24         Q.    The wholesalers are also required

25   to report, correct?

Page 146

1      A.    Correct.

2      Q.    Is their reporting requirement also

3   daily?

4      A.    No, it's not.

5      Q.    How frequently must the wholesalers

6   report on OARRS?

7      A.    Once a month.

8      Q.    How long has that been the case?

9      A.    Since, I want to say, since about

10   2011.

11                    -  -  -  -  -

12             (Thereupon, Deposition Exhibit 5, A

13             Document From the OARRS Database,

14             Entitled Instructions For Reporting

15             Wholesale Transactions to OARRS, was

16             marked for purposes of

17             identification.)

18                    -  -  -  -  -

19      Q.    Exhibit 5 is a document from the

20   OARRS database, entitled Instructions For

21   Reporting Wholesale Transactions to OARRS.

22             Have you seen this before?

23      A.    Yes.

24      Q.    And what do you understand Exhibit

25   5 to be?

1      A.    So this is the -- these are the

2  instructions we provide to wholesale

3  distributors on how they can report data to us.

4      Q.    And if you turn to page 3 of

5  Exhibit 5, the page is entitled OARRS Data

6  Submission For Wholesale Transactions; do you

7  see that?

8      A.    Yes.

9      Q.    It notes file format ARCOS; do you

10  see that?

11      A.    Yes.

12      Q.    What is ARCOS?

13      A.    ARCOS is a -- ARCOS is a system

14  that the DEA runs that collects certain

15  wholesale transactions from drug wholesalers.

16      Q.    Do you have an understanding as to

17  the interplay, if any, between ARCOS and OARRS?

18      A.    There is none.

19      Q.    Are you, in your capacity as

20  director of OARRS, able to access ARCOS?

21      A.    I am not.

22      Q.    Did you draft this document,

23  Exhibit 5?

24      A.    I drafted the original document.

25  It has changed a few times since then.  I'm not

Page 148

1    necessarily the one who made the changes to

2    this final version.  I don't remember.

3         Q.    Okay.

4         A.    I certainly approved it.

5         Q.    For example, if you look on page 2

6    of Exhibit 5, under Method 2: HTTP method.

7         A.    Yes.

8         Q.    Number three of the directions

9    says, "Click the button to locate the properly

10   formatted ARCOS file"; do you see that?

11        A.    Yes.

12        Q.    What does that mean?

13        A.    It would be a text file that is --

14   that has been created using this ARCOS format

15   that's described on page 3.

16        Q.    And this would be a text file in

17   the possession of the wholesaler?

18        A.    Yes.

19        Q.    And the wholesaler would update

20   this ARCOS file to the OARRS database, if it is

21   complying with the reporting requirements set

22   forth in Exhibit 5?

23        A.    Correct.

24        Q.    If that's the case, then doesn't

25   OARRS have access to wholesalers' ARCOS data?

1      A.    No.   In this case, ARCOS is

2    simply -- simply referring to the way the file

3    is formatted.  It is not ARCOS.  So it is not

4    the data that the DEA houses.

5      Q.    Okay.

6                     -  -  -  -  -

7              (Thereupon, Deposition Exhibit 6, A

8              Copy of Ohio Code Provision 4729.78,

9              was marked for purposes of

10             identification.)

11                    -  -  -  -  -

12     Q.    Exhibit 6 is a copy of Ohio Code

13   Provision 4729.78; do you see that?

14     A.    Yes.

15     Q.    And it notes that it is effective

16   as of September 29, 2017?

17     A.    Yes.

18     Q.    Is this the code provision that

19   covers the reporting by manufacturers and

20   distributors of, in this case, dangerous drugs?

21     A.    Yes.

22     Q.    And is it your understanding that

23   today, manufacturers and wholesale distributors

24   are both required to report purchaser

25   identification, identification of drug sold,

1    quantity of drug sold, date and the license

2    number issued by the board?

3         A.    Yes, if they are selling to the

4    entities that are listed elsewhere.  I don't

5    remember exactly where they are at.

6         Q.    So a manufacturer only has to

7    report this data if it is distributing to a

8    prescriber or terminal dispenser; is that

9    right?

10        A.    Yes.

11        Q.    Otherwise, this -- these

12   requirements set forth in 4729.78 A, 1 through

13   5, pertain to the requirements for wholesalers,

14   correct?

15        A.    Correct.  It also can be a terminal

16   distributor, if they do wholesale transactions,

17   as permitted under their terminal distributor

18   license.

19        Q.    The date of this, as we said, is

20   effective September 29, 2017; do you see that?

21        A.    Yes.

22        Q.    Prior to September 29, 2017, do you

23   have an understanding as to what the

24   requirements were for wholesale reporting?

25        A.    They were very similar, if not the

Page 151

1    same.  You know, it must have just been updated

2    in 2017, or maybe renumbered.  I'm not sure

3    what happened in 2017, that it would be dated

4    2017.

5         Q.    When it notes here in 4729.78 A1,

6    "Purchaser identification," what is your

7    understanding of who the purchaser is?

8         A.    It would be either a prescriber or

9    a terminal distributor.

10        Q.    Is the wholesaler required to

11   report the address to which it ships product?

12        A.    Not necessarily.  They can report

13   the DEA number, which then we would get the

14   address off of the DEA number.

15        Q.    And it is required to report the

16   quantity of the opioids, correct?

17        A.    Correct.

18        Q.    And is it required to report the

19   frequency?

20        A.    Well, it would be each transaction,

21   so we could determine frequency by that.

22        Q.    We talked earlier today about

23   suspicious orders; do you remember that?

24        A.    Yes.

25        Q.    Are wholesalers required to report

Page 152

1    suspicious orders in OARRS?

2         A.    No.

3         Q.    Is OARRS able to run a suspicious

4    order report?

5         A.    We don't have anything in OARRS

6    called a suspicious order report, no.

7         Q.    Is OARRS capable of running a

8    report to identify quantities of opioids that

9    are shipped from a -- beg your pardon, strike

10   that -- the quantity of opioids shipped from a

11   distributor to a dispenser?

12        A.    Yes.

13        Q.    And that's the type of report that

14   has been run, correct?

15        A.    Recently, yes.

16        Q.    And why did you run that report?

17        A.    Because we were -- because we were

18   assisting with the new rule.

19        Q.    Okay.  Do you know why the

20   reporting requirement for distributors differs

21   from the reporting requirements for dispensers

22   and prescribers?

23        A.    In what manner?

24        Q.    Well, for example, you mentioned

25   that the requirement for reporting for

Page 153

1    wholesalers is monthly, as opposed to the daily

2    reporting for dispensers and prescribers?

3         A.    It was determined -- so originally

4    they were the same.  When it was twice a month,

5    both wholesalers and dispensers were required

6    to report twice a month.

7              When we changed the dispensers to

8    weekly, it was determined that the wholesale

9    information was not -- part of the reason for

10   dispensers reporting as frequently as they do

11   is that it is a healthcare tool, and so, as a

12   prescriber, what was dispensed recently is very

13   important.

14             The wholesale program is more for

15   monitoring compliance and more of a compliance

16   and law enforcement type of tool, where you are

17   looking more at patterns over time, and so what

18   was done yesterday may not be as -- quite as

19   important as what happened over the last -- the

20   last few months, years, and so forth.

21        Q.    When you say, "It's a law

22   enforcement tool," what do you mean by that?

23        A.    We use it to ensure that -- that

24   the law is being followed.  It doesn't have

25   patient information in it, so it is a not a

Page 154

1    healthcare tool.

2         Q.    And what part of the law are you

3    watching to make sure it is followed?

4         A.    There is a number of parts.  The

5    original purpose of collecting the wholesale

6    information was to determine -- originally

7    prescribers, what prescribers dispensed from

8    their office was not required to be reported to

9    us.  And so instead, we were looking at what

10   was being purchased, and that's why only

11   prescribers were -- the sales to prescribers

12   was what was being reported.

13            Since then, we have added on what

14   we look for since then, to include, you know,

15   what is being purchased, therefore, what should

16   be reported as dispensed.  The limits on what a

17   prescriber can personally furnish have been put

18   into law, so we can now see whether a

19   prescriber is purchasing more than they are

20   allowed to dispense.  So there has been more

21   utility of it, as time has gone on.

22         Q.    You mentioned that the reporting

23   for wholesalers helps you determine patterns

24   over time?

25         A.    Yes.

Page 155

1          Q.    What types of patterns?

2          A.    So patterns such as, you know, if a

3     drug is being purchased, you know, in a small

4     quantity every -- you know, every other month

5     would be different than large quantities every

6     month.  You know, we can see those types of

7     patterns.

8                It's not what is -- we are not so

9     much looking -- we're not looking at one

10    individual day, as we are a period of time.

11         Q.    Fair to say you are looking for a

12    suspicious pattern?

13         A.    At times, yes.

14         Q.    What are the consequences for a

15    wholesaler who fails to report as required?

16         A.    It would be very similar to a

17    pharmacy.  We would first contact the

18    wholesaler and find out why, and work with the

19    wholesaler to get into compliance.

20                We all understand that there

21    are -- that things happen, and so, you know, we

22    work with people first.

23         Q.    How is it determined that a -- if a

24    wholesaler is failing to meet the reporting

25    requirements?

Page 156

1          A.      If we don't receive a report each
2     month.
3          Q.      Is somebody responsible for
4     tracking the various wholesalers and whether a
5     report has been received each month?
6          A.      It's my staff monitors that.
7          Q.      Does OARRS automatically kick out a
8     report to your staff, on a monthly basis, that
9     identifies the wholesalers who have reported or
10    not reported?
11         A.      No.  There is nothing automated in
12    the wholesale system, with the exception of the
13    actual data collection.
14         Q.      With respect to the wholesale
15    system, is the state, other than the board of
16    pharmacy, able to conduct any audits of
17    reporting by wholesaler?
18         A.      No.
19         Q.      Is any entity, other than the board
20    of pharmacy, able to conduct audits of the
21    information in OARRS related to the
22    wholesalers?
23         A.      No.
24              MS. BROWNE:  Have we been going an
25    hour again?

```
                                        Page 157
 1              THE NOTARY:  Pretty close.
 2              MS. DEHNER:  Do you want to take a
 3    lunch break or --
 4              MS. BROWNE:  Well, let's go off the
 5    record for a second, if we may, and talk about
 6    that.
 7              THE VIDEOGRAPHER:  Off the record
 8    at 12:17.
 9              (Recess taken.)
10              THE VIDEOGRAPHER:  On the record,
11    1:09.
12         Q.   Welcome back, Mr. Garner.
13              Is there a way for the OARRS system
14    to trace an opioid prescription to its specific
15    manufacturer?
16         A.   Yes.  The NDC number does tell you
17    who the manufacturer is.
18         Q.   And by the same token, the OARRS
19    can trace an opioid prescription back to a
20    specific distributor, correct?
21         A.   To an extent.  If a, say, a
22    pharmacy purchases from multiple distributors,
23    I would not necessarily -- if it is the same
24    NDC that they purchase from multiple
25    distributors, I would not be able to say this
```

Page 158

1   bottle came from distributor A and this one

2   from distributor B.

3         Q.    Can OARRS collate data, daily

4   dispensing information for a particular

5   terminal distributor over time to detect

6   spikes?

7         A.    Yes.

8         Q.    Can OARRS collate daily dispensing

9   information over time to determine who

10  prescribed an opioid?

11        A.    Yes.

12        Q.    Can OARRS collate daily dispensing

13  information to determine to whom a prescription

14  was dispensed on a specific day where there was

15  a spike?

16        A.    Yes.

17        Q.    When we were talking about reports,

18  and they are made by prescribers and -- let me

19  back up.

20              Individuals who have access to

21  OARRS, and we talked about the fact that

22  pharmacists have accounts but a pharmacy itself

23  does not, right?

24        A.    Correct.

25        Q.    Can a pharmacy, like a corporate

Page 159

1    entity, have an OARRS account?

2         A.    No.

3         Q.    What if any restrictions are there

4    on the sharing of data from the OARRS database?

5         A.    The restrictions are that it is

6    for -- so there are specific purposes as to why

7    any user can access OARRS, and it is for that

8    use only, and it is not to be -- so then it

9    would not be distributed outside of that.

10        Q.    So pharmacists -- a particular

11   pharmacist is prohibited from sharing OARRS

12   information with its corporate parent, correct?

13        A.    Correct.

14        Q.    And is data or information

15   requested by, for example, the Summit County

16   Sheriff's Department, is that restricted in any

17   way from dissemination?

18        A.    It is to be used in the case that

19   it was -- you know, that it was requested for.

20   So if, you know, if there are others working

21   the case, you know, it is to stay within the

22   case.

23        Q.    So, for example, the Summit County

24   Sheriff's Department could not obtain a report

25   from OARRS and share it with an attorney?

Page 160

1      A.    If it is their attorney that is
2   working on the same case, then, yes,
3   technically they probably could.
4      Q.    If the attorney represented the
5   county in an action against retailers,
6   distributors and manufacturers of opioids,
7   could the Summit County Sheriffs's Department
8   share report information with that lawyer?
9      A.    I'm not sure.  I would have to
10  review the law, and I'm not an attorney, so...
11     Q.    Okay.  Have there ever been
12  occasions when a law enforcement entity has
13  requested a report and OARRS has declined to
14  provide that information?
15     A.    There have been, there have been
16  times, yes.  Typically not through the
17  normal -- the normal course of the way we do
18  things.  I mean, we design OARRS and the web
19  forms such that we get the information that we
20  need and -- you know, and those requests are
21  appropriate.
22          Typically it would be a request
23  that comes, you know, by email or a phone call,
24  or something like that, that we would have to
25  deny, but, yes.

Page 161

1      Q.    Can you think of a specific

2   occasion when a request has been denied?

3          A.    We have had --

4              MR. FARRELL:  Objection.  You are

5   going off the topic here.  Limitations under 16

6   do not entail any of the specific actions taken

7   by the board of pharmacy at the request of law

8   enforcement or directed toward any of the

9   registries.

10         Q.    You can answer.  Did you need me to

11  repeat the question?

12         A.    No.  I'm thinking.

13             We have been requested for, say,

14  top so many prescribers of a specific drug, and

15  that would be one that we would not honor that

16  type of a request.

17         Q.    Do you know if a request for the

18  top prescribers of a specific drug has been

19  made recently?

20         A.    Not that I can recall.  It's been a

21  while.

22         Q.    We talked a little bit before the

23  break about suspicious order reports.  Do you

24  know if OARRS has been used to run suspicious

25  reports?

Page 162

1          A.    I'm not sure how that would make

2     sense.  I mean, only -- suspicious order

3     reports come from, my understanding is,

4     suspicious order reports come from wholesale

5     distributors, and they don't have access to

6     OARRS, so...

7          Q.    Is there a database available to

8     the BOP, other than OARRS, that would -- that

9     provides information about suspicious orders?

10         A.    Not to my knowledge.

11         Q.    You mentioned, when we were talking

12    about how long data had been retained, that

13    there is data back to 2007 that is anonymized?

14         A.    Yes.

15         Q.    Is any of the data back to 2007

16    that is still available pharmacy or wholesaler

17    specific?

18         A.    Only the patient on prescription

19    data has been anonymized.  The prescriber and

20    pharmacy is still available.  Nothing on the

21    wholesale side has been anonymized.  It is

22    available, everything we have received back to

23    2006.

24         Q.    Can you describe for me the process

25    by which the outpatient data is transmitted

Page 163

1   from a dispenser or prescriber to OARRS, and

2   what I mean by that is, what does the screen

3   look like when they get on, how does it work?

4        A.    Much like with the wholesale

5   distributors, there are multiple methods of

6   submitting data.  The most common, much like

7   wholesalers can submit using the ARCOS file

8   format, dispensers can report using the ASAP

9   file format.

10               So this is a rather complex file

11  format that collects all of the fields that are

12  required and typically is done automatically by

13  their software.  It's typically not something

14  that they have to do manually.  Each day it

15  just -- it runs and sends it to us

16  automatically.

17               Some of them do have a slight

18  manual process, that they have to click a

19  button or two, maybe give a date range, but

20  it's not, you know, hand keying in all of that

21  information.

22               For a small pharmacy that dispenses

23  very little or a prescriber who dispenses from

24  their office, there is also a web form that

25  basically looks -- you know, it is just a form

Page 164

1    with boxes for each of the required fields that

2    they can type into for a single prescription

3    and submit.  So that's a secondary option.

4         Q.    So we talked about this a little

5    bit.  There is a difference between a

6    point-of-sale side on the pharmacy, as to

7    whether a prescription is actually picked up,

8    versus when it is filled, correct?

9         A.    Correct.

10        Q.    And if I understand your testimony,

11   the information about prescriptions, as they

12   are being filled, is automatically updated,

13   such that, for example, at the end of the day,

14   a pharmacist just has to press a few buttons,

15   as opposed to manually entering every single

16   prescription from that day?

17        A.    Typically.

18        Q.    And when it is not typical, or the

19   atypical occasion is the very small pharmacy;

20   is that right?

21        A.    Correct.

22        Q.    An independent, a small independent

23   pharmacy?

24        A.    Correct, or maybe not even a

25   full-scale pharmacy.  Maybe ones that, you

Page 165

1    know -- that only does noncontrolled

2    substances.  So the only prescriptions that

3    they are entering are the gabapentin

4    prescriptions, or something like that, but they

5    really don't have a lot to report.

6         Q.   Is it the same for the wholesalers'

7    data report?  In other words, do the

8    wholesalers have to manually enter that

9    information, moving that ARCOS file that we

10   talked about from, I think it was, Exhibit 5?

11        A.   I'm not as familiar with wholesaler

12   software, so I don't know the answer to that.

13        Q.   Who would know the answer to that?

14        A.   The wholesaler distributors.

15        Q.   And while we are talking about user

16   interface, if I'm the sheriff of Summit County

17   and I want to make a request for a report, what

18   does that screen look like when I get on?

19        A.   That particular screen would have a

20   place for you to enter -- well, again, there

21   are two different screens, depending on whether

22   you are asking for a patient or a prescriber.

23             But for a patient, it would have

24   boxes for their name, their date of birth,

25   their address and zip code and phone number,

1    and a date range for the report, and the case

2    number.

3         Q.    So we have talked about the

4    entities that are required to report, and they

5    have specific user account numbers, correct?

6         A.    The entities that are required to

7    report?

8         Q.    Correct.

9         A.    Yes.

10        Q.    And we have talked a little bit, by

11   way of example, of the sheriff of Summit

12   County.  Does the sheriff of Summit County have

13   one user account number?

14        A.    That individual person, yes.  Their

15   office would have one for each individual

16   person who has access to OARRS.

17        Q.    So that could be a detective within

18   the sheriff's department?

19        A.    Yes.

20        Q.    Could it be an administrative

21   assistant in the sheriff's department?

22        A.    Typically, no.  I don't believe

23   I've ever -- I don't even know that I've ever

24   seen a request for an account for an

25   administrative assistant.  I'm fairly certain I

Page 167

1    haven't approved one.

2         Q.    Is there a limit to how many

3    accounts a particular entity can have, or

4    account numbers?

5         A.    No.

6         Q.    Entities such as the various

7    departments of the DOJ, for example, DEA, we

8    talked about, has an OARRS account, correct?

9         A.    Some of their -- some of their

10   investigators have them.

11        Q.    I'm sorry to interrupt you.  Was

12   there something else you wanted to say?

13        A.    No.

14        Q.    Is there a limit to the number of

15   accounts that can be assigned to the DEA?

16        A.    No.

17        Q.    Who makes the decision as to the

18   appropriate number of accounts to be assigned

19   to any entity that can access OARRS?

20        A.    We don't look at it in terms of the

21   numbers of accounts.  I have never even thought

22   of it that way.

23        Q.    How do you look at it?

24        A.    About whether or not an individual

25   should have access to OARRS, based on statute.

Page 168

1        Q.    You are responsible for assigning

2   accounts to users of OARRS; is that right?

3        A.    Yes.

4        Q.    And when you say that you make a

5   determination based on whether or not that

6   individual should have access, what information

7   do you collect about a particular individual,

8   to determine whether or not it is appropriate

9   for the individual to have access?

10        A.    It depends on the type of account.

11   So for law enforcement, we collect the -- we

12   get information about the agency.  We get the

13   agency head to send us a letter, indicating who

14   they approved to be supervisors, and then those

15   supervisors each have to approve the individual

16   investigators that work under them, who they

17   will be responsible for.

18             But we then collect information

19   identifying each individual and, depending on

20   the account type, you know, whatever

21   credentials would be appropriate for that.

22        Q.    So the account is individual

23   specific, correct?

24        A.    Correct.

25        Q.    And if a new detective joins the

Page 169

1    agency, the DEA, and I'm a DEA agent and I have

2    an account number, I can't let the new

3    detective use my account; is that correct?

4           A.    That's correct.

5           Q.    What, if any, penalty is there if I

6    share my account number with another detective

7    in the agency?

8           A.    It is in statute.  I don't recall

9    exactly what it is.

10          Q.    But there is some statute that

11   provides for a penalty?

12          A.    Yes.

13          Q.    We talked about your ability to

14   access, for example, the sheriff of Summit

15   County's transaction history; do you recall

16   that?

17          A.    Yes.

18          Q.    Can you search by a particular

19   user, within the sheriff of Summit County, to

20   find out that individual's transaction history?

21          A.    Yes.

22          Q.    And is that true, for example, of

23   the DEA?

24          A.    Yes.

25          Q.    So you could track the transaction

Page 170

1    history of any individual account number within

2    OARRS?

3            A.    Yes.

4            Q.    We talked just a minute ago, a

5    little bit, about the registration process for

6    an account.  Does it differ, depending on

7    whether you are prescriber or a dispenser or

8    enforcement?

9            A.    Yes.

10           Q.    How does that differ?

11           A.    For a prescriber or dispenser, we

12   don't have the process of approving the agency

13   and the agency head with the supervisors.

14   There is not all of that structure to it.

15                For a prescriber, we collect,

16   again, their personal identifying information,

17   their name, date of birth, their driver's

18   license number, address, all of that kind of

19   information, but also their professional

20   license numbers and DEA numbers, and we verify

21   that information prior to issuing an account.

22                          -   -   -   -   -

23                (Thereupon, Deposition Exhibit 7, A

24                Document From the OARRS Website,

25                Dated November 24, 2015 Entitled

```
                                        Page 171

 1                    Mandatory OARRS Registration and

 2                    Requests, was marked for purposes of

 3                    identification.)

 4                            -   -   -   -   -

 5           Q.    I'm going to show you what we are

 6      marking as Exhibit 7.  This is a document from

 7      the OARRS website, dated November 24, 2015,

 8      entitled Mandatory OARRS Registration and

 9      Requests; do you see that?

10           A.    Yes.

11           Q.    Have you seen this document before?

12           A.    Yes.

13           Q.    And this document is -- well, why

14      don't you tell me, what is this document?

15           A.    This is a document that was created

16      by the board of pharmacy as a -- as a helpful

17      tool for prescribers, because there was some

18      confusion.

19                 You know, the law is broken into

20      many different areas, so it was kind of an

21      educational document that was created.

22           Q.    And Exhibit 7 pertains to

23      prescribers and their delegates and pharmacists

24      and their delegates; do you see that?

25           A.    Yes.
```

1      Q.    This document does not address the

2    registration of wholesalers, does it?

3      A.    It does not.

4      Q.    Is there a separate document that

5    discuss how -- what the process is for

6    wholesalers to register?

7      A.    Wholesalers would not register for

8    it.  So this is for registering for an account

9    on the prescription side of OARRS to access the

10   data.  This is not the same type of information

11   for submitting data.  It is not for that type

12   of account.  Also, it is not at all for the

13   wholesale side of OARRS.

14     Q.    Can a prescriber with an OARRS

15   account access the data of any patient?

16     A.    Legally, they can only access their

17   own patients.

18     Q.    But as a practical matter, they

19   could access any individual's information; is

20   that correct?

21     A.    Technically speaking, there is

22   nothing in the system that actively blocks them

23   from accessing somebody who is not their

24   patient.

25     Q.    Same question with respect to

1    prescribers.  Can prescribers access data for

2    any patient?

3          A.    That was actually the same question

4    you just asked.  Did you mean something

5    different?

6          Q.    I'm sorry.  Thank you for the

7    correction.

8          A.    Dispensers?

9          Q.    Can dispensers access information

10   for any patient?

11         A.    Yes.  It is the same.

12         Q.    Manufacturers cannot register to

13   use OARRS; is that right?

14         A.    That is correct.

15         Q.    We talked a little bit about this,

16   but not specifically.  Is the nature of the

17   access limited by the type of user account?

18         A.    Yes.

19         Q.    Are there names for the specific

20   types of user accounts?

21         A.    There are.  There are also three

22   different systems that you may have an account

23   for.

24         Q.    What do you mean by that, three

25   different systems for which you can have an

1  account?

2       A.     So Exhibit 7 that you gave me,

3  refers to access to the AWARxE platform.   So

4  that is where a prescriber, a dispenser, a law

5  enforcement agent would go to request the data

6  from OARRS.

7              A dispenser may also register for

8  access to a system called Clearinghouse.  That

9  is where they submit prescription data.  A

10 wholesaler distributor can access -- can apply

11 for an account to the wholesale system, to

12 submit data through the wholesale system.

13                    -  -  -  -  -

14             (Thereupon, Deposition Exhibit 8,

15             PMP AWARxE User Support Manual, was

16             marked for purposes of

17             identification.)

18                    -  -  -  -  -

19      Q.     Exhibit 8 is a copy of the PMP

20 AWARxE User Support Manual; do you see that?

21      A.     Yes.

22      Q.     Are you familiar with this

23 document?

24      A.     Yes.

25      Q.     At the top of page 5, under What is

Page 175

1    a Requester, it reads, "A requestor is a PMP

2    AWARxE account type that is typically used to

3    review a patient's prescription history.  A

4    requestor's primary task within the application

5    is to determine if a patient should be given or

6    dispensed a prescription based on their

7    prescription history.  Requesters are the

8    strongest line of defense to prevent

9    prescription drug abuse."  Did I read that

10    correctly?

11           A.    Yes.

12           Q.    And it goes on to note that,

13    "Physicians and pharmacists are the most common

14    type of requester," correct?

15           A.    Correct.

16           Q.    But, "There are myriad of roles

17    that can be classified as a requester,

18    including those of law enforcement," correct?

19           A.    Correct.

20           Q.    So and then it goes on to list

21    these types of entities, and those are all

22    examples of requesters; is that right?

23           A.    That is correct.

24           Q.    And that's includes the Medicaid

25    program, right?

Page 176

1          A.      Yes.

2          Q.      It includes Workers' Compensation?

3          A.      Correct.

4          Q.      Benefit plan managers are

5    requesters in the AWARxE system?

6          A.      So, unfortunately, the system does

7    not allow me to customize the names of roles.

8    There are a number of these that I might

9    change, otherwise.  Benefit plan manager we use

10   for the Medicaid and BWC managed care

11   organizations.

12         Q.      It also notes that corrections and

13   probation, under law enforcement, are

14   requesters; do you see that?

15         A.      That's correct.  All law

16   enforcement accounts -- and again this is one

17   that I would rename and just call it law

18   enforcement, rather than corrections, but

19   corrections is the name that is in the system.

20         Q.      Does the department of corrections

21   have access, as a requester, to the OARRS

22   database?

23         A.      No.

24         Q.      Does the department of corrections

25   have any access to the OARRS database?

Page 177

1          A.     No.

2          Q.     What about the office of parole and

3     probation, or maybe here it's just probation,

4     does the office of probation have any access to

5     the OARRS database?

6          A.     Probation officers, if they oversee

7     drug crime cases, may have access.

8          Q.     And they would have access, as a

9     requester?

10         A.     Yes.

11         Q.     So dispensers have a requester

12    account, but they also -- is the account that

13    is hooked to the Clearinghouse separate from

14    this PMP AWARxE account?

15         A.     Yes.

16         Q.     Are there different account numbers

17    between the two?

18         A.     Yes.

19         Q.     You mentioned that -- it

20    identifies, in this list under healthcare

21    professionals, nurse practitioners/clinical

22    nurse specialists, back on page 5 of Exhibit 8,

23    under What is a Requester; are you with me?

24         A.     Yes.

25         Q.     Can nurse practitioners get

1    requester accounts?

2         A.    If the -- yes.

3         Q.    "If the" what?

4         A.    If they have prescriptive

5    authority, which they all do now.

6         Q.    What about physicians assistants,

7    can they have access?

8         A.    Yes.

9         Q.    Do they have separate account

10   numbers or -- do they have separate account

11   numbers?

12        A.    Yes.

13        Q.    What if any role do you understand

14   a requester to have in preventing any

15   prescription drug abuse?

16        A.    Any prescriber role -- I mean,

17   obviously the prescriber is where a

18   prescription initiates, and so they get to

19   determine whether or not they write a

20   prescription.  So that clearly is a place where

21   the prescription can stop.

22             Same with the dispenser.  A

23   dispenser, you know, is sort of the last line

24   in that process, and so can also stop a

25   prescription from being dispensed.

1            So, clearly, those are key points

2     that play a big role there.  And then the

3     others are more after the fact, that can apply

4     outside influence.

5            Q.    Such as?

6            A.    The law enforcement officer,

7     obviously, can take action against the patient

8     or against the prescriber, if a law is broken.

9                        -  -  -  -  -

10                   (Thereupon, Deposition Exhibit 9, A

11                   2017 Article Entitled Opioid

12                   Prescriptions By Specialty in Ohio,

13                   2010 to 2014, was marked for

14                   purposes of identification.)

15                        -  -  -  -  -

16            Q.    I'm going to show you what has been

17     marked as Exhibit 9.  Exhibit 9 is the copy of

18     a 2017 article, entitled Opioid Prescriptions

19     By Specialty in Ohio, 2010 to 2014, and it was

20     printed in 2017 in the American Academy of Pain

21     Medicine; do you see that?

22            A.    Yes.

23            Q.    You are identified as an author of

24     this article; is that correct?

25            A.    That's correct.

Page 180

1      Q.    What if any contribution did you

2  make to the article that is Exhibit 10?

3      A.    I provided the identified data for

4  research, and I was -- I was a key resource in

5  understanding the data and what certain things

6  might mean or not mean.  I also did a certain

7  amount of editing.

8      Q.    How did you come to be involved in

9  the writing of this article that is Exhibit 10?

10      A.    Dr. Weiner approached me, wanting

11  to do some research, provided a valid research

12  protocol with IRB approval, and signed an MOU

13  with our agency to have access to deidentified

14  information.

15      Q.    And MOU is memorandum of

16  understanding?

17      A.    Yes.

18      Q.    How do you know Dr. Weiner?

19      A.    I've met him at a number of

20  different conferences and meetings.  I'm not

21  sure which one was first.

22      Q.    I would like to direct your

23  attention to the Introduction, which is the

24  bottom of the rightmost column, on page 978 on

25  Exhibit 10, which is the first page of Exhibit

Page 181

1    10.

2          A.     Uh-huh.

3          Q.     You and your co-authors write,

4    "There were multiple causes of increased

5    prescribing, including a heightened focus on

6    assessment and treatment of pain," open paren,

7    "e.g., the Joint Commission's pain initiative,"

8    closed parens, "aggressive and possible

9    fraudulent marketing by pharmaceutical

10   companies, desire for providers and

11   institutions to score highly on patient

12   satisfaction scores, a small number of

13   providers and pharmacies that prescribed and

14   dispensed massive quantities of prescriptions

15   for profit in an unprofessional and sometimes

16   criminal fashion," open parens, "pill mills,"

17   closed parens, "and a cultural shift that

18   fostered unreasonable expectations of pain

19   relief."  Did I read that correctly?

20         A.     Yes.

21         Q.     Do you agree with this statement?

22         A.     I don't have firsthand knowledge of

23   a lot of it, as I'm not a prescriber.  Dr.

24   Weiner is.

25               I have certainly read plenty of

1    news, heard plenty of stories about it from

2    prescribers.  So my assumption is that it's

3    true, but I don't have firsthand knowledge.

4         Q.    In your role as the director of

5    OARRS, is this statement consistent with your

6    experience, the statement I just read into the

7    record from your article?

8         A.    I don't know that these would be

9    things that I would be directly affected by, as

10   the director of OARRS.  Most of these are

11   things that a physician or a pharmacist would

12   be subjected to.

13        Q.    There is no mention of wholesale

14   distributors in this statement that I just read

15   into the record, is there?

16        A.    I don't see it.

17             MS. BROWNE:  I apologize, that was

18   Exhibit 9.  Sorry.

19                  -  -  -  -  -

20             (Thereupon, Deposition Exhibit 10,

21             An Article Entitled Prescription

22             Opioids and Labor Market Pains,

23             Dated March 28, 2018, was marked for

24             purposes of identification.)

25                  -  -  -  -  -

Page 183

1          Q.    I'm going to mark as Exhibit 10 an

2     article that's entitled Prescription Opioids

3     and Labor Market Pains.  This is dated March

4     28, 2018, various authors, and it is out of the

5     University of Tennessee.

6                Have you seen this article before?

7          A.    I don't believe so.

8          Q.    If you turn to page 9 of Exhibit

9     10, at the bottom of the page, under the

10    heading Data; are you with me?

11         A.    Yes.

12         Q.    It reads, "County-level data on

13    opioid prescriptions were acquired directly

14    from ten U.S. states, Arkansas, California,

15    Colorado, Florida, Massachusetts, Michigan,

16    Ohio, Oregon, Tennessee and Texas, by requests

17    through their respective controlled substance

18    monitoring database, CSMB, or PDMP database;"

19    did I read that correctly?

20         A.    Yes.

21         Q.    Do you recall providing access to

22    OARRS to any one of the authors of Exhibit 10?

23         A.    I don't, but if they are looking at

24    the basic numbers of prescription by county,

25    again, as I mentioned earlier in my testimony,

Page 184

1    we do have a spreadsheet on our website that

2    they may have used.

3         Q.    Do you recall ever being contacted

4    by any of the authors of Exhibit 10?

5         A.    None of the names ring a bell to

6    me, so, no.

7         Q.    Is there a requirement that an Ohio

8    prescriber review or access OARRS patient data

9    from time to time?

10         A.    Under certain circumstances, yes.

11         Q.    What are those circumstances?

12         A.    Prior to issuing a prescription for

13    any opioid or benzodiazepine, and every 90 days

14    thereafter, with a certain set of exceptions,

15    and then any time a prescriber continues a

16    course of treatment involving any controlled

17    substance for more than 12 weeks.

18         Q.    And is that codified somewhere?

19         A.    The "prior to an opioid or

20    benzodiazepine, the 90 days thereafter," is

21    codified in each profession's section of the

22    Ohio Revised Code.  The 12 weeks is in each

23    profession's section of the Ohio Administrative

24    Code.

25         Q.    The every 90-days requirement

1    that's in the specific profession's code --

2         A.    Yes.

3         Q.    -- do you know how long that has

4    been in place?

5         A.    That would have been House Bill

6    341, which passed in 15 or 16, I believe.

7         Q.    And the requirement under the Ohio

8    Revised Code about the every 12 weeks, do you

9    know how long that's been in effect?

10        A.    So that was the result of the House

11   Bill 93 that we discussed earlier.  Of course,

12   after the actual bill passed, there was a

13   period of time to write the rules, so sometime

14   after the end of 2011.

15        Q.    Have those requirements been

16   updated at all, so the revised -- the Ohio

17   Revised Code since 2011?

18        A.    That's the Ohio Administrative

19   Code.

20        Q.    I'm sorry.

21        A.    That was 2011.  It was updated at

22   the same time that the new statute Ohio Revised

23   Code was put in place, at least I know the

24   medical board's was, I don't know about the

25   other boards, but they updated it to reflect

Page 186

1    what was in the Ohio Revised Code, as well as

2    continued to keep what was in the Ohio

3    Administrative Code, and to kind of clarify the

4    differences between the two, so it wasn't quite

5    so confusing.

6         Q.    And that was separate from the

7    house bill, the 341?

8         A.    House Bill 341 is what put the

9    requirements into the Ohio Revised Code.

10        Q.    Okay.  And since that -- and that

11   was 2015, 16, correct?

12        A.    I believe so.

13        Q.    And since that time, has it been

14   updated?

15        A.    No.

16        Q.    We talked before the break about a

17   dispenser's ability to delete a prescription

18   that hadn't been picked up; do you remember

19   that?

20        A.    Yes.

21        Q.    Once a distributor or wholesaler

22   submits the information that it is required to

23   submit, can a distributor go back and review

24   any of that information or change it?

25        A.    The only way to change it would be

Page 187

1    to submit a new record with a negative

2    quantity, to basically negate what was

3    previously reported.

4         Q.    Once a distributor submits the

5    required information, who does have access to

6    it?

7         A.    My staff.

8         Q.    Do any of those agencies we talked

9    about that are mandated by state and are

10   permitted to have OARRS account numbers, are

11   any of those agencies or entities permitted

12   access to the wholesaler's side of OARRS?

13        A.    No, they are not.

14        Q.    Can any distributor see what

15   another distributor reported in OARRS?

16        A.    No.

17        Q.    So you and your staff are the only

18   individuals who have access to the wholesale

19   side of the OARRS database?

20        A.    Correct.

21        Q.    But to be clear, a distributor or

22   the general public does have access to the

23   quantity of opioids shipped or sold in a given

24   year in various counties in Ohio?

25        A.    That information all comes from the

```
                                        Page 188
 1    dispensing side, the prescription side.  It

 2    does not come from wholesale.

 3          Q.    But is that public, information

 4    about the quantity of opioids shipped or sold

 5    in a given year?

 6          A.    Not from OARRS, no.

 7          Q.    Is it available publicly otherwise,

 8    that you know of?

 9          A.    The only other source of that

10    information I'm aware of would be the ARCOS

11    system that DEA has.  So they may make some of

12    that public.  I have no idea.

13          Q.    Can a pharmacist -- I think we

14    talked about this, but a pharmacist can search

15    OARRS by patient name, correct?

16          A.    Correct.

17          Q.    Can they search by prescription

18    name?

19          A.    No.

20          Q.    Can a pharmacist search by pharmacy

21    name?

22          A.    No.

23          Q.    Can it search by distributor name?

24          A.    No.

25          Q.    Can it search by a manufacturer
```

Page 189

```
 1   name?

 2        A.    No.

 3        Q.    How frequent, if there is such a

 4   limitation, can a particular pharmacist run

 5   report requests in OARRS?

 6        A.    As frequently as they have a

 7   patient in front of them.

 8        Q.    Can they set up patient alerts?

 9        A.    No.

10        Q.    Will OARRS red flag any -- an order

11   that it sees or -- a prescription that it sees

12   as suspicious, as a dispenser is inputting the

13   information or a prescriber?

14        A.    No.

15        Q.    Is there a reason that there isn't

16   the capability of, I'm going to call it a red

17   flag, to be raised when a specific patient

18   is -- a specific patient name is entered into

19   OARRS, as someone who is being prescribed or

20   dispensed an opioid?

21        A.    So when you are saying a patient

22   name is entered, I was assuming you meant as

23   they were entering a prescription.  If they are

24   making a request, if enough information is

25   provided to them, they see the list of
```

Page 190

1    prescriptions they have, the NarxCare

2    information.

3              It is up to their professional

4    judgment to determine whether or not any of

5    that information deems a different course of

6    action.

7         Q.    And the data on a particular

8    patient that can be accessed by a prescriber or

9    dispenser is the data that is available back to

10   2014?

11        A.    Yes, and the rolling five years,

12   once we get there.

13        Q.    We talked a little bit about this.

14   The medical examiners, or the coroners, have

15   access to OARRS data; is that right?

16        A.    Yes.

17        Q.    And the coroner's have

18   requester-level access to OARRS data?

19        A.    Yes.

20        Q.    Do coroners request reports from

21   you?

22        A.    The coroner would request a report,

23   just like a prescriber or pharmacy would -- I'm

24   sorry, a pharmacist.

25        Q.    Have you received requests for

Page 191

1    information on overdose deaths?

2         A.    What type of --

3         Q.    Sure.  So if the coroner is doing a

4    medical exam of a deceased individual and

5    suspects an overdose, can they request

6    information from OARRS about that

7    patient -- well, about that patient?

8         A.    Yes.  That is what the law permits

9    them to have access to OARRS for.

10        Q.    And they don't need to contact you

11   for that report data, they can pull that up

12   themselves?

13        A.    Right.  Just like a prescriber or a

14   pharmacist would, they have their own

15   credentials to log into the OARRS system to

16   pull that.

17        Q.    So unlike the system with law

18   enforcement, where they make a request and a

19   supervisor approves it and then you make a

20   determination as to whether the law enforcement

21   can get a report, coroner's have direct access;

22   is that right?

23        A.    That is correct.

24        Q.    Can you pull for me from your pile

25   Exhibit 3, please, which was the November 21,

Page 192

1     2011 House Bill 93 report from Dr. Winsley?

2          A.     Yes.

3          Q.     If you turn to page 7 of that

4     report, under Enhanced Drug Utilization Review,

5     it reads, "The question has been raised whether

6     OARRS can evaluate the patient data and" quote,

7     "red flag," end quote, "certain patients so

8     that healthcare providers can be alerted to a

9     potential doctor shopper.  This is not an

10    appropriate use of OARRS for the following

11    reasons;" did I read that correctly?

12         A.     Yes.

13         Q.     The first reason is, "There is no

14    unique identifier for patients."  Is that still

15    the case?

16         A.     It is.

17         Q.     But patient's name and patient date

18    of birth are entered in the system, correct?

19         A.     Correct.

20         Q.     And those are not determined to be

21    unique identifiers?

22         A.     No, they are not.

23         Q.     What would you consider to be a

24    unique identifier?

25         A.     Social Security Number or driver's

Page 193

1    license number.

2         Q.    Does OARRS have the capability to

3    receive unique identifier information?

4         A.    Yes.

5         Q.    The other reason that's noted that

6    OARRS does not evaluate patient data and red

7    flag certain patients is that it does not have

8    sufficient information to make such an

9    evaluation.  Do you have an understanding as to

10   why that is?

11        A.    At the time this was written, there

12   was no diagnosis information in OARRS.

13   Additionally, even today, we would not have all

14   of the history that a healthcare professional

15   would have about their case to know, you know,

16   what other diagnoses the patient may have, what

17   other circumstances there may be.

18              We are really dealing just with a

19   list of prescriptions, which is not the entire

20   picture.

21        Q.    But OARRS, you do run reports on

22   potential doctor shoppers?

23        A.    We do.

24        Q.    The next reason is, "Data entry

25   errors at the pharmacy;" did I read that

 1  correctly?

 2         A.    Yes.

 3         Q.    Is that still a problem in OARRS?

 4         A.    It can be.  This particular section

 5  was dealing with a suggestion that OARRS should

 6  identify these red-flag patients and

 7  automatically send information to a prescriber.

 8             In a system, you know, most

 9  pharmacy systems, a pharmacist selects the

10  prescriber by name.  Clearly, there are

11  prescribers in Ohio that have the same name,

12  and so sometimes they pick the wrong one or

13  pick the one right next to them or a similar

14  name or something, that sometimes the wrong

15  prescriber is on a prescription.

16             The last thing we would want to do

17  is send patient information to somebody who

18  shouldn't have it.

19         Q.    But OARRS, thanks to your code

20  writing now, has the ability to cross-reference

21  the prescriber with the dispenser; doesn't it?

22         A.    So we have always known both the

23  prescriber and the dispenser.

24         Q.    But doesn't that reduce if not

25  eliminate the error of a data entry, if the

Page 195

1    wrong prescriber is listed?

2         A.    No, not at all.

3         Q.    Why not?

4         A.    I don't understand how it would.

5    If the dispenser puts the wrong prescriber on

6    the data, how would knowing who the dispenser

7    is change that?

8         Q.    Don't you have the information from

9    the prescriber side?

10        A.    No.  It is all -- everything comes

11   from the dispenser.  So if the prescriber is

12   the dispenser, then it all came from the

13   prescriber, but everything comes from whoever

14   dispensed the drug.

15        Q.    All right.  The last point is that,

16   "Evaluation of data was never intended to be a

17   function of OARRS."  That's no longer the case,

18   is it?

19        A.    It is not.  Clearly we do a lot

20   more valuation of data than we did then.

21        Q.    On page 8, under Systematic

22   Monitoring For Misuse or Diversion of

23   Controlled Substances, it reads, "Current law

24   requires the board to conduct surveillance on

25   the database to detect potential violations of

1    law and refer suspicions to appropriate law

2    enforcement agencies or health professional

3    licensing boards for investigation."  Did I

4    read that correctly?

5            A.    Yes.

6            Q.    That continues to be a role of you

7    and your staff at OARRS, correct?

8            A.    Correct.

9            Q.    And if you turn to page 10, the

10   last paragraph before Conclusion reads, "OARRS

11   provides quarterly reports to Ohio Department

12   of Alcohol and Drug Abuse Services with

13   county-level data.  Each county's alcohol, drug

14   abuse, and mental health board, or equivalent,

15   receives the same data for that county for the

16   most recent eight quarters, which allows

17   counties to determine some of the trends for

18   patients in their respective county."  Did I

19   read that correctly?

20           A.    Yes.

21           Q.    How long have these quarterly

22   reports been provided?

23           A.    They no longer are.  That is what

24   is now the county data report that is on the

25   public website.  Basically, each county only

1   received their own portion of that, at that

2   time.  We decided that there really was no

3   reason to, basically, hide other counties from

4   each county.  We just went ahead and put it on

5   the website.

6          Q.    Have you ever received requests

7   from a specific county for a specific type of

8   report?

9          A.    We have.

10         Q.    In what circumstances?

11         A.    Counties, you know, that

12  don't -- that don't know the legalities of how

13  OARRS is used often request information that we

14  can't provide.  So, I mean, it's -- there is

15  nothing besides this that we would be able to

16  provide.

17         Q.    When was the last time you received

18  a request from a county for a report?

19         A.    Within the last few months.  I

20  don't know.  I mean, I get them periodically,

21  so...

22         Q.    Do you recall who made the request?

23               MR. FARRELL:  I'm going to object.

24  The scope of this is going beyond the 30(b)(6),

25  and when we start delving --

1          MS. BROWNE:  You can say that you

2     have an objection, but we don't need to hear

3     the speaking.

4          MR. FARRELL:  Well, I think you do.

5     I think this goes directly toward what this

6     witness for -- my speaking objection is that

7     there is a room full of lawyers that have

8     prepared for this deposition on a specific

9     subject matter, and if we are going to go into

10    the other subject matter, I would at least like

11    to reserve the right to come and revisit those,

12    since this is a 30(b)(6) corporate designee.

13         Q.    What county was the one that most

14    recently requested data from you?

15         A.    I don't recall.

16         Q.    And do you recall the nature of the

17    request?

18         A.    No, not specifically.

19         Q.    You mentioned, I think, that

20    licensing boards have access to OARRS; is that

21    right?

22         A.    Their investigators do, yes.

23         Q.    Must an investigation already be

24    underway for a licensing board to have access

25    to data?

1          A.     Yes.

2          Q.     And the investigators request data

3     in the same way that, for example, the

4     sheriff's department requests data, correct?

5          A.     Correct.  We actually treat them

6     just like law enforcement.

7          Q.     Is OARRS able to produce a report

8     as to an individual who should be investigated?

9          A.     The system itself doesn't.  That

10    would be what some of the various analyses that

11    we discussed this morning goes to.

12         Q.     Do you run reports on doctors who

13    have prescribed opioids to a patient who has

14    died by overdose?

15         A.     We have.

16         Q.     Do you do that routinely?

17         A.     I don't know, routinely, who died

18    of an overdose.  I don't have that information

19    until well after the fact.

20         Q.     In what circumstances have you run

21    reports on doctors whose -- to whom they

22    have -- strike that.

23              In what circumstances have you run

24    a report on a doctor who prescribed opioids to

25    a patient who died of an overdose?

1          A.     After all the data has been vetted

2     and finalized, I get a list from the department

3     of health of who, for a given year, has died of

4     an overdose, and so we look at those kind of as

5     a -- en masse, and so we then would look

6     possibly at a prescriber who had multiple

7     patients, typically, die of an overdose.

8          Q.     And then what would you do with

9     that information?

10          A.     Provide it to our compliance

11     department.

12          Q.     To what end; do you know?

13              What does the compliance department

14     do with that information?

15          A.     It depends.

16          Q.     On what?

17          A.     On what they -- on what they

18     determine from the information that we give

19     them.  There would have to be a determination

20     as to what the next step would be.

21          Q.     Ohio drug court programs have

22     access to OARRS; is that right?

23          A.     Correct.

24          Q.     Since when have Ohio drug courts

25     had access to OARRS?

1        A.    That's fairly recent.  I believe it

2    was 2017.

3        Q.    Why do they have access to OARRS?

4        A.    To monitor the individuals who are

5    in their drug court program.

6        Q.    Do drug courts have requester

7    accounts?

8        A.    Yes.

9        Q.    So they are not restricted as to

10   the identity of individuals for whom they can

11   run reports; is that correct?

12       A.    Not in a technical manner, no.

13       Q.    Do you know who Thomas Gilson is?

14       A.    I do.

15       Q.    Who is he?

16       A.    He's the medical examiner for

17   Cuyahoga County.

18                    -  -  -  -  -

19              (Thereupon, Deposition Exhibit 11, A

20              Presentation By Dr. Gilson, Entitled

21              Overdose Deaths in Cuyahoga County,

22              was marked for purposes of

23              identification.)

24                    -  -  -  -  -

25       Q.    We will mark as Exhibit 11 a

1    presentation by Dr. Gilson.  It is entitled

2    Overdose Deaths in Cuyahoga County.

3              Have you seen this document before?

4         A.    I may have.  I saw a presentation

5    that he gave earlier this year.  I don't know

6    if this was the same one or not.

7         Q.    If you turn to the sixth page of

8    this document, Exhibit 11, it says PDR Findings

9    at the top of the page.  Are you with me?

10        A.    Yes.

11        Q.    Do you know what PDR stands for?

12        A.    I do not.

13        Q.    Have you heard of the Poison Death

14   Review Committee?

15        A.    I'm not familiar with it, no.

16        Q.    If you turn to, it's the eighth

17   page of what I have given you, and it is

18   entitled PDR Findings, and it is the one that

19   starts with "73 percent of heroin overdose";

20   are you with me?

21        A.    Yes.

22        Q.    It says, "73 percent of heroin

23   overdose victims had a file with the Ohio Rx

24   Registry System, OARRS"; do you see that?

25        A.    Yes.

1      Q.    Do you know how Dr. Gilson has that

2   information?

3      A.    Well, these were the decedents that

4   he -- that he investigated in his office, and,

5   therefore, he would have been permitted to

6   access OARRS for those individuals, and so I'm

7   sure that he and his staff made these

8   observations.

9      Q.    On the next page of the document,

10  in red, it reads, "A high percentage of fatal

11  overdose victims are receiving legal

12  prescriptions for narcotics in spite of a state

13  drug monitoring program"; did I read that

14  correctly?

15     A.    Yes.

16     Q.    Have you had conversations with Dr.

17  Gilson about expanding the use of the OARRS

18  system?

19     A.    I've had a number of conversations

20  with Dr. Gilson.  I don't recall any of them

21  being about expanding the use of OARRS.

22                    -  -  -  -  -

23              (Thereupon, Deposition Exhibit 12, A

24              Document Dated August 9, 2017,

25              Entitled Building Dynamic and

1              Functional Interagency Cooperation,

2              Authored by Barbara Sears, Director,

3              Ohio Department of Medicaid, was

4              marked for purposes of

5              identification.)

6                    -  -  -  -  -

7         Q.    I'm going to mark as Exhibit 12 a

8    document dated August 9, 2017.  It is entitled

9    Building Dynamic and Functional Interagency

10   Cooperation, authored by Barbara Sears,

11   Director, Ohio Department of Medicaid; do you

12   see that?

13        A.    I do.

14        Q.    Have you seen this document before?

15        A.    I don't believe so.

16        Q.    If you turn to page 5, it is

17   actually the third page of the document so --

18   and the title of this slide is Ohio Automated

19   Rx Reporting System, OARRS, Data, Number of

20   Doctor Shoppers By Year; do you see that?

21        A.    I do.

22        Q.    And we've discussed that the Ohio

23   Department of Medicaid has access to the OARRS

24   database, correct?

25        A.    They have access to make a request

1    of individual patients that are Medicaid

2    recipients.

3         Q.    So as a requester?

4         A.    Yes.

5         Q.    So although they are authorized to

6    search for any patient who is a Medicaid

7    recipient, theoretically, they could search the

8    name of any patient, correct?

9         A.    Technically speaking, yes.

10        Q.    And according to this slide

11   produced by Dr. Sears, the number of doctor

12   shoppers has decreased from 2010 to 2015,

13   according to OARRS data; is that right?

14        A.    Yes.  She got this directly from

15   our website.

16        Q.    And in this chart, or this slide,

17   it notes that, "A doctor shopper is defined as

18   an individual receiving a prescription from

19   five or more prescribers in one calendar

20   month"; did I read that correctly?

21        A.    Correct.

22        Q.    Is that your understanding of what

23   a doctor shopper is as well?

24        A.    That is our definition, yes.

25        Q.    Do you have an understanding that

1    Governor Kasich established a Governor's

2    Cabinet Opiate Action Team in 2011?

3         A.    Yes.

4         Q.    GCOAT, I think?

5         A.    Yes.

6         Q.    Is the BOP a member of that team?

7         A.    Yes.

8         Q.    What do you do -- what does BOP do,

9    as a member of the Governor's Cabinet Opiate

10   Action Team?

11        A.    We have played many roles over the

12   years.  Obviously, a lot of things have

13   happened since 2011.  We have had -- we have

14   provided input, where we have felt our role

15   allowed us to do so.

16        Q.    I'm about to switch topics.  Do you

17   want to take a break or keep going?

18        A.    I don't care.

19             MR. FARRELL:  Please, let's take a

20   break.

21             THE VIDEOGRAPHER:  Off the record,

22   2:12.

23             (Recess taken.)

24             THE VIDEOGRAPHER:  On the record,

25   2:20.

1          Q.    Mr. Garner, can you pull out

2     Exhibit 8 for me, please.  That's the AWARxE

3     User Support Manual.

4          A.    Okay.

5          Q.    And turn to page 45 for me.

6     Section 9 on page 45 reads Introduction to

7     NarxCare; do you see that?

8          A.    Yes.

9          Q.    What is NarxCare?

10         A.    NarxCare is the -- kind of an

11    add-on to the AWARxE platform that provides

12    additional insight into the prescription data.

13         Q.    When did it become available?

14         A.    It was early this year.

15         Q.    Is that when it was first available

16    in the marketplace, or is that when it was

17    first incorporated into OARRS?

18         A.    Ohio was the first state to

19    incorporate it statewide.

20         Q.    Is it a useful add-on?

21         A.    It is specifically for the

22    healthcare users of OARRS, the physicians and

23    the pharmacists, and we've gotten very positive

24    feedback about it.

25         Q.    How so?

Page 208

1           A.    It's sort of an at-a-glance type of
2    tool that gives you a lot of -- a good
3    indication of what you are going to see in the
4    line-by-line prescription data, kind of gives
5    you some risk-type of information right up
6    front, that doesn't require you to do as
7    much -- as much studying of the line-by-line
8    prescription data.
9           Q.    And studying line-by-line
10   prescription data, you mean by prescriber?
11          A.    Yes, by a prescriber or by a
12   pharmacist.
13          Q.    Does NarxCare run reports?
14          A.    NarxCare is simply a software
15   add-on.  It's not -- it is not like a different
16   organization.
17          Q.    And manufacturers can't access
18   NarxCare scores of patients, correct?
19          A.    Correct.
20          Q.    Distributors cannot access NarxCare
21   scores of patients?
22          A.    Correct.
23          Q.    Can any requester or an individual
24   with a requester account access the NarxCare
25   score of a patient?

1          A.    Only the healthcare professional

2     roles, so prescribers and pharmacist, and then,

3     as an administrator, I can.

4          Q.    So the, for example, the director

5     of Medicaid cannot access the NarxCare scores

6     of Medicare recipients?

7          A.    Correct.

8          Q.    And can the coroners access

9     NarxCare scores of decedents?

10         A.    No.

11         Q.    What specifically is the NarxCare

12    score designed to achieve?

13         A.    It is a tool that brings attention

14    to various signs of risk, so various behavioral

15    patterns or items that would indicate risk.

16              It also is a -- it was developed to

17    allow multiple sources of information to be

18    used to basically inform the risk model.  To

19    date, it only uses the prescription data from

20    OARRS, but there is the potential to add other

21    information to it in the future, should it be

22    warranted.

23         Q.    Information such as what?

24         A.    Some states are looking at criminal

25    history information, some states are looking at

1     naloxone distribution or nonfatal overdose type

2     of information.  There is a lot of ideas out

3     there right now.  I don't believe anybody has

4     actually pulled the trigger on any though.

5              Q.    Is Ohio looking into any of these

6     options?

7              A.    We have discussed them, yes.

8              Q.    How far along are those

9     discussions?

10             A.    I'm not sure, at this point.

11             Q.    Is that a decision that you would

12    make?

13             A.    I would certainly be part of that,

14    but whoever owns the information that we would

15    be adding in would clearly have to be on board

16    as well.

17             Q.    You had mentioned earlier that one

18    of the reports that OARRS was capable of

19    running was the identification of at-risk

20    individuals; do you remember that?

21             A.    We have various queries that look

22    at certain factors of risk, certain risk

23    factors.

24             Q.    And what would you do -- what do

25    you do with information about a patient who is

Page 211

1  at risk?  For example, when we were talking

2  earlier, it was somebody who might be on

3  multiple drugs that have a dangerous

4  interaction possibility?

5       A.    So there is -- there is limited

6  things we can do currently, but that's one of

7  the things that we have been working on.

8            So for instance, we do have the

9  project that I mentioned earlier, where we have

10  agents who are doing door-to-door

11  interventions, based off some of this

12  information that we are pulling.

13       Q.    We had also talked -- and I realize

14  I'm skipping around -- about data that when a

15  state or your office started purging files from

16  pre-2014.  When did that purge take place?

17       A.    It took place on a regular basis,

18  up to a certain point in time.

19       Q.    When did it start?

20       A.    Well, it would have started

21  probably in 2008, because originally we only

22  kept two years' worth of any type of

23  information.

24       Q.    And it has continued until this

25  latest regulation that requires the five-year

Page 212

1    looking-back period?

2         A.    Yes.

3         Q.    So was that around 2014?

4         A.    The statute change was more recent

5    than that.  It would have been in 2016.

6         Q.    You mentioned that governor's

7    opioid task force that you are involved in; do

8    you recall that?

9         A.    Yes.

10        Q.    What if any other opioid task

11   forces are you involved in?

12        A.    I'm not.

13        Q.    Is the board of pharmacy involved

14   in any other opioid task forces?

15        A.    I wouldn't know.

16        Q.    The other thing we talked about was

17   grants, that your funding is primarily from

18   grants and federal sources, and then whatever

19   is left over, more or less, is licensing fees;

20   is that right?

21        A.    Correct.

22        Q.    Do you determine the budget for

23   your department on an annual basis?

24        A.    Not entirely.  I have -- I

25   certainly have my requests and my ideas of what

Page 213

1    I would like to accomplish, but ultimately our

2    director of administration is in charge of the

3    entire agency budget.  So it would come down to

4    him and the executive director.

5         Q.    Can OARRS determine how many

6    opioids were lost or stolen or unaccounted for

7    by a particular dispenser?

8         A.    No.

9         Q.    Do you know what a Form 106 is?

10        A.    I've heard of it, not ultimately

11   familiar with it.

12        Q.    You had mentioned that

13   prescribers -- well, let me ask:  Are

14   prescribers required to review an outpatient's

15   prescription history, before writing a

16   prescription?

17        A.    Under the circumstances that I

18   mentioned earlier, so prior to writing any

19   opioid or benzodiazepine, with the

20   exception -- with a number of exceptions, and

21   then for other controlled substances, if

22   treatment is going to last more than 12 weeks.

23        Q.    And can OARRS determine if a

24   prescriber has failed to access the database to

25   get that information?

Page 214

1           A.    Yes, for the most part.

2           Q.    How does it do that?

3           A.    By comparing the prescription data

4    of a prescriber to that prescriber's request

5    information.

6           Q.    And when you say, "Compare the

7    prescription data to the prescriber's request

8    data," the prescription data is what comes from

9    the dispenser, correct?

10          A.    Correct, and the request data would

11   be activity of the -- the activity logs of the

12   prescriber.

13                     -  -  -  -  -

14                (Thereupon, Deposition Exhibit 13, A

15                PowerPoint Presentation Entitled Two

16                Incentives to Engage Providers:

17                Meaningful Use and Individual

18                Prescriber Reports, Beginning with

19                Bates Label Summit 001285650, was

20                marked for purposes of

21                identification.)

22                     -  -  -  -  -

23          Q.    I hand you what has been marked as

24   Exhibit 13.  Exhibit 13 is a PowerPoint

25   presentation entitled Two Incentives to Engage

1    Providers: Meaningful Use and Individual

2    Prescriber Reports, and it bears production

3    numbers on the bottom right of Summit 001285650

4    through 5695; do you see that?

5         A.    Yes.

6         Q.    Are you the Chad Garner, MS, who is

7    listed as one of the presenters?

8         A.    Yes.

9         Q.    Do you recall that presentation?

10        A.    Vaguely, it's been a while.

11        Q.    Do you know when it was presented?

12        A.    It has been at least two years ago,

13   I believe.  I'm trying to even find my portion

14   of this.

15        Q.    Your portion starts on --

16        A.    There we go.

17        Q.    -- the page ending at 682.

18        A.    Apparently, it was in 2017.

19        Q.    Who was the audience for the

20   presentation that is Exhibit 13?

21        A.    So it was primarily other PMP

22   administrators, but anybody at the Prescription

23   Drug Summit could have attended.  So it

24   honestly could have been just about anybody.

25        Q.    If you turn to the page ending 688

1   of Exhibit 13.

2           A.    Yes.

3           Q.    It says -- actually, let's start

4   with the page before it that ends in 687.  It

5   say, "OARRS Practice Insight Report"; do you

6   see that?

7           A.    Yes.

8           Q.    The first sentence, it say, "OARRS

9   Mandator Use Compliance," and it reads,

10  "According to our records, the following

11  patient filled a prescription written by you

12  for a benzodiazepine or an opioid for greater

13  than a seven-day supply.  However, an OARRS

14  patient Rx history report was not accessed;"

15  did I read that correctly?

16          A.    Yes.

17          Q.    Is this the type of report we were

18  talking about a minute ago that would be sent

19  to a prescriber when you compare the

20  prescription -- the prescriber data to the

21  prescription report data?

22          A.    Yes.

23          Q.    What is your expectation as to an

24  action by a prescriber upon receiving a report

25  like this?

Page 217

1        A.    This was actually created in

2   response to -- it was more at the request of

3   the prescriber community.  So the list of --

4   the list of prescribers who failed to check a

5   patient, and as well as who they didn't check

6   with, provided to the appropriate licensing

7   boards, and the prescriber community then, when

8   contacted by their licensing boards, clearly

9   wanted to know who it was that they missed, and

10  so this was the way we responded to that.

11       Q.    And when you say "this," you are

12  talking about the report that is depicted in

13  slide that ends in 5687 of Exhibit 13?

14       A.    Yes.  Correct.

15       Q.    Does the licensing board receive a

16  copy of this report?

17       A.    Not this exact report, no.

18       Q.    But it receives some report about

19  compliance by a prescriber?

20       A.    Yes.

21       Q.    How does the report that the

22  licensing board receives differ from what is

23  depicted on the page ending 5687 of Exhibit 13?

24       A.    The report that the licensing board

25  receives covers all of their licensees, rather

Page 218

1    than just one.

2         Q.    Does any other entity receive a

3    copy of a report such as that depicted in the

4    page ending 5687?

5         A.    No.

6         Q.    If you turn to the page ending in

7    5691, it is the slide entitled Appriss Health's

8    PDMP Prescriber Reports.  The last entry notes

9    that "Each individualized report is created and

10   electronically delivered to prescribers on a

11   quarterly basis;" did I read that correctly?

12        A.    Yes.

13        Q.    Is that delivered by email?

14        A.    It is.

15        Q.    And that's delivered to an inbox

16   that's associated with the user's account

17   number?

18        A.    Yes.

19        Q.    The next slide is the Appriss -- it

20   has the same title, Appriss Health PDMP

21   Prescriber Reports, and it lists a list of

22   metrics that Appriss provides; do you see that?

23        A.    Yes.

24        Q.    Are those same metrics provided by

25   OARRS?

1          A.    So these have -- we do provide

2     these reports.  However, the metrics, I

3     believe, have changed a bit.  The report was

4     still in development, at the time of this

5     presentation.

6          Q.    We talked about 24 hour -- the

7     24-hour reporting cycle for -- I beg your

8     pardon -- for dispensers?

9          A.    Yes.

10         Q.    Does OARRS provide for

11    instantaneous transmission of data?

12         A.    They can, yes.

13         Q.    But it doesn't currently?

14         A.    It does not.  We don't require it.

15    The system is capable.  That's the purpose, I

16    believe, you pointed out earlier, that we said

17    at least daily, but you can report more often.

18    That would be more often.

19         Q.    All right.  And does OARRS provide

20    realtime access to patient reports?

21         A.    Yes.

22         Q.    And based on the NarxCare system,

23    is it true that OARRS now can evaluate patient

24    data and red flag certain patients?

25         A.    It does not red flag certain

1   patients.  It provides risk that is currently

2   determined from the prescription information.

3   There clearly are other factors still that any

4   prescriber or pharmacist needs to consider,

5   besides the information that's on that report.

6          Q.    Do you understand that there are

7   some PDMP systems that have the capability to

8   send a popup alert when the system is accessed

9   for a particular patient?

10         A.    Yes.

11         Q.    Why doesn't Ohio have that?

12         A.    For the reasons that we stated

13  before, because we don't have -- we don't have

14  a patient identifier.  We don't have -- we

15  don't always know that the prescriber on the

16  prescription is correct.  Many of the states

17  have had those sorts of issues, with those

18  types of systems.

19                And ultimately, since we require a

20  prescriber to access OARRS prior to prescribing

21  an opioid or a benzodiazepine, there should not

22  be anything that that popup should be telling

23  them that they shouldn't already be seeing.

24         Q.    Does the database have tools that

25  would permit it to classify information it

Page 221

1    receives?

2         A.    "Classify"?

3         Q.    For example, could it -- can a

4    database itself -- we talked a little about

5    this -- identify patients at risk?

6              Could you run a search and ask it

7    to identify patients at risk?

8         A.    We can -- so the database itself --

9    so the OARRS system, you know, the online,

10   web-based tool does not have anything like that

11   in there.

12             The database that we run

13   internally, we can run queries to look for

14   certain indications of risk that we know of.

15        Q.    And OARRS can identify top

16   prescribers, correct?

17        A.    Correct.

18        Q.    It can identify top dispensers?

19        A.    Yes.

20        Q.    It can identify top patients?

21        A.    Yes.

22        Q.    OARRS can identify the top areas

23   where opioids are being dispensed, correct?

24        A.    Yes.

25        Q.    And OARRS can identify the top

Page 222

1    drugs being dispensed?

2         A.    Yes.

3         Q.    Has the focus of the board of

4    pharmacy changed over time?

5         A.    In what way?

6         Q.    Well, for example, we are talking

7    about opioids right now.  Was there a time when

8    meth was the focus?

9         A.    The board of pharmacy is -- only

10   regulates the distribution of legal drugs, so

11   meth would not be within our purview.  Since I

12   have been at the board, opioids have been the

13   issue.

14        Q.    What about medical marijuana, is

15   that an issue?

16        A.    Medical marijuana is another

17   program that has been enabled by statute.  I

18   don't have a lot of information on that right

19   now.

20        Q.    Does that fall within your purview?

21        A.    No.  Only to the extent that the

22   dispensing will eventually by reported to

23   OARRS, but that hasn't started happening yet.

24             MS. BROWNE:  I just need to review

25   notes.  I don't know, does anybody else have

Page 223

1    questions?

2              MS. O'GORMAN:  Do you want us to

3    start them now?

4              MS. BROWNE:  Is that okay?

5              THE VIDEOGRAPHER:  Could we just

6    take a quick break, because I got to get her a

7    mic.

8              MS. BROWNE:  Yes.  Sure.

9              THE VIDEOGRAPHER:  Off the record

10   at 2:42.

11             (Recess taken.)

12             THE VIDEOGRAPHER:  On the record.

13   2:43.

14             EXAMINATION OF CHAD GARNER

15   BY MS. O'GORMAN:

16        Q.   Good afternoon, Mr. Garner.  My

17   name is Debra O'Gorman, and I'm one of the

18   attorneys for Purdue Pharmaceuticals, one of

19   the defendants named in the lawsuits.

20             Would you please look at Exhibit 9.

21        A.   I got them out of order now.  Let's

22   see.  There it is.  Okay.

23        Q.   Do you recall being asked about the

24   introductory section to this article?

25        A.   Yes.

Page 224

1          Q.    And I believe that you said you
2     have no firsthand knowledge of much of what was
3     included in the section of the introduction
4     that was read to you; is that correct?
5          A.    Correct.
6          Q.    And is one of the things that you
7     have no firsthand knowledge of the marketing by
8     pharmaceutical companies of --
9          A.    Correct.
10         Q.    Okay.  Did you participate in
11    writing this introductory section of the
12    article?
13         A.    The draft of the article was
14    originally -- was written by Dr. Weiner and Dr.
15    Baker, who works with Dr. Weiner, and then the
16    rest of us went through and made our edits and
17    changes as necessary, explained areas that
18    maybe were misunderstood, but I did not
19    actively write that section, no.
20         Q.    Do you recall making any edits or
21    comments on that section?
22         A.    I don't recall, no.
23         Q.    Okay.  And you have no medical
24    background; is that correct?
25         A.    That is correct.

Page 225

1      Q.    Do you have any personal knowledge
2   of marketing practices for opioid drugs in
3   Ohio?
4      A.    No.
5      Q.    Do you have any personal knowledge
6   of aggressive and possibly fraudulent marketing
7   of pharmaceutical drugs -- of opioids in Ohio?
8      A.    No firsthand knowledge, no.
9      Q.    So I take it then you have no
10  knowledge of any specific visits to doctors
11  that you would believe are aggressive or
12  possibly fraudulent, with regard to marketing
13  of opioids?
14     A.    I would have no firsthand knowledge
15  of that, no.
16     Q.    Could you also take a look at
17  Exhibit 11, and that was the PowerPoint
18  presentation.
19     A.    Okay.
20     Q.    Do you recall being asked about the
21  PDR findings --
22     A.    Yes.
23     Q.    -- towards the back of the article?
24     A.    Yes.
25     Q.    And you were asked about overdose

```
 1    victims that, quote, had a file with OARRS; do
 2    you remember that?
 3         A.    Yes.
 4         Q.    What does "have a file with OARRS"
 5    mean?
 6         A.    Having not created the slide, I'm
 7    assuming a bit here, but my assumption would be
 8    that that means that there was no -- if they
 9    had a file, that means that there was some
10    record in OARRS, when the patient was
11    requested.
12         Q.    And could that mean just a single
13    reference to a prescription?
14         A.    I would assume so, but I don't
15    know.  I didn't -- again, this isn't my
16    presentation.
17         Q.    And you had no involvement in
18    preparing this by Dr. Gilson?
19         A.    No.
20         Q.    Do you know for what period of time
21    he was able to access information in preparing
22    the slide, how far back he was able to go?
23         A.    It would have depended on the
24    patients he was -- the deaths he was
25    investigating.  So if he doesn't -- if he
```

Page 227

1    doesn't say, then, no, I don't know.

2        Q.    Does the OARRS system track the

3    history of use of illicit drugs, to your

4    knowledge?

5        A.    It does not.

6        Q.    You were asked earlier in the

7    deposition about access by insurers to the

8    OARRS database, and I think you said that

9    Medicaid insurers and Workers' Comp insurers

10   have access?

11       A.    Correct.

12       Q.    Has any consideration been given to

13   increasing access to any private insurers?

14       A.    We've been -- I believe there is a

15   group looking at it, but it's not something

16   that we have spent much time on, at this point.

17       Q.    And are there any plans for that to

18   happen that you are aware of?

19       A.    Not currently.

20            MS. O'GORMAN:  That's all I have.

21   Thank you.

22            EXAMINATION OF CHAD GARNER

23   BY MR. EMCH:

24       Q.    We will run quickly here, so we can

25   try to get done, if that's all right.  I think

Page 228

1  it is all right with you.

2        A.    Absolutely.

3        Q.    Medicaid and Medicare, we talked

4  about that.

5              THE NOTARY:  Could you introduce

6  yourself, please.

7        Q.    Oh, Al Emch.

8              My understanding is that those were

9  added as requesters in 2015; does that sound

10  right?  You don't have to get it right, but

11  within the past few years they were added?

12        A.    The managed care agencies; is that

13  what you are asking about?

14        Q.    Yes.

15        A.    I believe it has been longer than

16  that.  I want to say it was -- I want to say it

17  was closer to four or five years ago.

18        Q.    Do you know why they were added?

19        A.    The legislature added them.  I'm

20  sure it was at the request of either the

21  Department of Medicaid or those insurers, but I

22  don't know for sure.

23        Q.    In general, are the requesters --

24  is it your understanding that the requesters

25  are those who have some level of control or

1    possible control or insight into potential

2    diversion or misuse or misprescribing?

3            A.    The actual requesters are either

4    the medical director or pharmacy director of

5    those organizations.  Those are the only

6    individuals that are permitted access.

7            Q.    But again, is it your understanding

8    that people who are given access normally are

9    those that have some level of possible control

10   in assisting in combatting diversion?

11           A.    Oh, absolutely, yes.

12           Q.    Does OARRS track who pays?

13           A.    Yes.

14           Q.    Does OARRS track whether Medicare

15   or Medicaid or the Worker's Compensation system

16   pays?

17           A.    Yes.

18           Q.    Do you have, as you sit here today,

19   and we can't hold you to any numbers, but do

20   you have any information or comment you can

21   give us about the percentage of opioid

22   prescriptions written and filled in Ohio that

23   are paid for by Medicaid?

24           A.    I don't know.

25           Q.    Do you have any comment about that

1    at all, is it significant, substantial?

2           A.    I don't know that I have even

3    looked it, to be able to tell.

4           Q.    What about individual insurers, do

5    you have that information, like, oh, just pick

6    one, Medical Mutual, let's say?

7           A.    I do not.

8           Q.    Is that in the OARRS system?

9           A.    It is not.

10          Q.    So Medicare and Medicaid or

11   Worker's Compensation can be tracked or is

12   tracked in the OARRS system, correct?

13          A.    Correct.

14          Q.    Always has been?

15          A.    Yes.

16          Q.    So to the extent that the

17   information is available, one could determine,

18   for any given period of time, how many or what

19   percentage of opioid prescriptions were paid

20   for by those entities?

21          A.    Correct.

22          Q.    Do you know if there has been any

23   decline in those, or anything like that?

24          A.    I don't.  I have not looked at it

25   in that manner.

                                        Page 231

1          Q.    We talked a good bit about

2    suspicious order reports.  You know what that

3    is; is that right?

4          A.    I have got a general idea.  It is

5    not something I deal with directly.

6          Q.    You indicated, I think, in response

7    to an earlier question that certainly OARRS

8    does not contain or track in any way suspicious

9    order reports?

10         A.    Correct.

11         Q.    I think you said you were not aware

12   of any database, at the board of pharmacy, that

13   tracks or somehow has entered into it or

14   utilizes suspicious order reports?

15         A.    Nothing that I'm aware of.

16         Q.    And if there were one, you would be

17   aware of it, correct?

18         A.    Not necessarily.

19         Q.    There are databases that exist at

20   the board of pharmacy that you don't have any

21   involvement in?

22         A.    Yes.

23         Q.    But then back to the same question,

24   you don't know of any database that tracks or

25   keeps account of, or in any way analyzes

Page 232

1    suspicious order reports?

2         A.    None that I'm aware.

3         Q.    Do you have any information about

4    what happens to suspicious order reports?

5         A.    I do not.

6         Q.    There was a time when you indicated

7    that you had provided some data about wholesale

8    distributors' shipments, the data that you get

9    out of the wholesaler portion of OARRS, in

10   connection with a rule or a regulation or

11   statute, I don't remember what --

12        A.    It was a rule.

13        Q.    Is the rule in effect yet?

14        A.    I am not sure about that.

15        Q.    And that is -- there was also some

16   discussion about ARCOS.  You know what ARCOS

17   is?

18        A.    Yes.

19        Q.    Would I be correct that, since the

20   beginning in 2006, as far as the data or the

21   specific items that are required to be reported

22   by wholesale distributors, that really it's the

23   same template, it's the same as the ARCOS data

24   that's input, or very close to the same?

25        A.    My understanding is that there are

Page 233

1    more classes of drugs that we collect, but the

2    information about each individual sale would be

3    the same.

4         Q.    The template was sort of patterned

5    after ARCOS?

6         A.    Correct.

7         Q.    Do you know of other states that

8    actually have, by the way, that get,

9    essentially, the ARCOS data as well as, of

10   course, the dispensing data for their drug

11   monitoring programs?

12        A.    I'm aware of two.

13        Q.    So Ohio is again out in front on

14   that aspect, right?

15        A.    Correct.

16        Q.    You indicated you started getting

17   that data because you needed -- you wanted to

18   know what was coming in to prescribers who also

19   dispensed, because those prescribers are

20   limited in what they can dispense, right?

21        A.    Correct.

22        Q.    So comparing what's coming in with

23   what's going out gives you a good idea of

24   whether or not they are prescribing more than

25   they are supposed to, on one side, right, more

1    than their limit?

2         A.    Whether or not they are dispensing

3    more than they should.

4         Q.    Dispensing more than their limit?

5         A.    Yes.

6         Q.    Now, the same can be true with

7    respect to a pharmacy or a dispenser that's

8    tracked in OARRS?

9         A.    To an extent.  There is not the

10   hard limit on a pharmacy or other type of

11   dispenser.  That is there for a prescriber.

12        Q.    But overall, would you agree that

13   being able to compare what is going into a

14   pharmacy, over a particular period of time,

15   with what is being dispensed by the pharmacy

16   over that same particular period of time, is a

17   very useful piece of information, in trying to

18   cull out or determine possible diversion that

19   is occurring at that pharmacy?

20        A.    Absolutely.

21        Q.    In your experience, would you agree

22   that pharmacies or dispensers don't stockpile

23   controlled substances?

24        A.    I would say that's generally true.

25        Q.    They try to -- they are basically

Page 235

1    keeping their dispensing levels commensurate

2    with what their normal need is; they don't have

3    a lot on hand, right?

4         A.    Correct.

5         Q.    So again, knowing what is coming in

6    for a particular period, comparing it with what

7    is going out, and if there is discrepancy

8    between those two, i.e., more coming in then

9    they are dispensing, would be an indicator of

10   potential diversion at the pharmacy?

11        A.    Correct.  It would be a

12   possibility.

13        Q.    Have you run that kind of

14   comparison?

15        A.    I have.

16        Q.    Has that been something you have

17   done recently?

18        A.    Yeah.

19        Q.    Have you done that kind of

20   comparison historically?  Did you understand my

21   question?  Again, since 2011, when distributors

22   were reporting to you the end information for

23   dispensing?

24        A.    So, I mean, we just started getting

25   that information in toward the end of 2011.  It

Page 236

1    took a while before we really had complete

2    data.  We have looked back at that information,

3    from time to time.  I don't know how to answer

4    your question further than that.

5          Q.    Routinely, have you looked at that

6    kind of information?

7          A.    It's more of an ad hoc.  It's not

8    something that we do on a scheduled basis.

9          Q.    Is that something that you have

10   written a statistical model for or a query, if

11   you will?

12         A.    Yes.

13         Q.    You do have that.  How long does it

14   take you to do that analysis?

15         A.    It depends on exactly how I'm

16   looking at it.  If I'm looking at a specific

17   drug, it -- you know, and a specific pharmacy,

18   it would only take a few minutes, but if I'm

19   trying to look at something on a more global

20   scale, it can take more than 24 hours.

21         Q.    But again, a specific pharmacy

22   could be done very quickly?

23         A.    Yes.

24         Q.    Has anyone ever asked you, from law

25   enforcement or anyplace else, to do that kind

1    of analysis?

2         A.    Only from our internal compliance

3    department.

4         Q.    So again, you don't recall ever

5    having such a request from, for example, a

6    sheriff somewhere?  We have talked about a

7    sheriff a lot here.

8         A.    There is nothing in statute that

9    would permit them to get that type of

10   information.  So I wouldn't be able to provide

11   it, if they did ask.  I don't recall whether I

12   have been asked for that before or not.

13        Q.    Is there something in the statute

14   that would prohibit that information?

15        A.    The statute is specifically written

16   such that if it is not permitted, it is

17   prohibited.

18        Q.    Can a sheriff obtain -- as a

19   requester, can a sheriff obtain information

20   about a pharmacy that's under investigation?

21        A.    They can obtain dispensing

22   information.  That doesn't happen frequently,

23   but it is possible.

24        Q.    So if the sheriff or somebody in

25   law enforcement were suspicious about a

Page 238

1    particular pharmacy on Fifth Avenue, for some

2    reason, and they were investigating that

3    pharmacy, they could go in and look at the

4    dispensing information for that pharmacy?

5         A.    They could.  They would have to

6    have an open case for it.

7         Q.    But if that sheriff called you and

8    said, "You know, I'm looking at this dispensing

9    pharmacy, and I have checked, and I've looked

10   at the last three months of their dispensing

11   history, and I would like to know what they

12   purchased during that time," would you be able

13   to give them the purchase information?

14        A.    No.  There is knowing in statute

15   that would permit that.

16        Q.    Could you see that that would be a

17   very useful piece of information for law

18   enforcement to have?

19        A.    It could be.  Typically, those

20   types of investigators -- or investigations are

21   staff are involved in, but, yes.

22        Q.    The analysis that you did in

23   connection with the change of rule or a new

24   rule with respect to wholesalers --

25        A.    Yes.

1          Q.     -- had you ever done an analysis
2     like that before?
3          A.     Not to that extent, no.
4          Q.     Do you know what a pill mill is?
5          A.     Yes.
6          Q.     Or do you have a definition?
7          A.     I don't know that I've got a clear
8     definition, but I've got the idea.
9          Q.     Which is?
10         A.     It's a place that either lots of
11    pills come from or lots of prescriptions.
12         Q.     Could that be a pain clinic?
13         A.     Typically.
14         Q.     In your experience, are pain
15    clinics regulated in Ohio now?
16         A.     They are.
17         Q.     Since when?
18         A.     Late 2011.
19         Q.     All right.  And you do mine the
20    data?  You know what you mean by that, by the
21    board of pharmacy mines the data in the OARRS
22    program?
23         A.     That's much of what I would have
24    been describing with the various statistical
25    models and such that we were on, yes.

Page 240

1          Q.     So the 100 to 500 models are
2     designed to look at the data and try to
3     identify places where there may be a problem?
4          A.     Correct.
5          Q.     For lack of better terminology.
6               What do you do with the results of
7     that information --
8          A.     I refer --
9          Q.     -- the 100 to 500 models?  I'm
10    sorry.
11         A.     I refer to the board's compliance
12    department.
13         Q.     And do you know what they do with
14    it?
15         A.     I do not.
16         Q.     Do you have any information to
17    indicate that they refer the results of those
18    100 to 500 models that you run to appropriate
19    other agencies?
20               Obviously the board of pharmacy
21    itself would be one of those, but refer things
22    to the board of medicine, to the board of
23    nursing, to the department of health, to other
24    state agencies that -- and/or to law
25    enforcement?

1           A.    I wouldn't have any -- I don't know

2     the interworkings of that department.

3           Q.    We are running past here.

4                 You indicated, in talking about the

5     diversion at one point during your testimony,

6     that you looked for things that might, sort of,

7     indicate diversion.  I think you mentioned

8     doctor shopping and overutilization --

9           A.    Correct.

10          Q.    -- if I remember correctly.

11                Those would both be identification

12    of patients who might be involved in diversion,

13    right?

14          A.    Correct.

15          Q.    But you also can use it to identify

16    overprescribing --

17          A.    Correct.

18          Q.    -- would that be correct?

19          A.    Correct.

20          Q.    Which would mean a doctor.  And

21    would overprescribing include prescribing too

22    many opioids?

23          A.    Yes.

24          Q.    Too much, as far as dosage units

25    are concerned?

Page 242

1           A.    Yes.

2           Q.    Or for too long a time, too many

3    refills over too long a period?

4           A.    Yes, or any combination thereof.

5           Q.    And with the guidelines that are in

6    place now, since 2012 or 2013, the prescribing

7    guidelines, the limitations in the states, have

8    you seen success in combatting overprescribing?

9           A.    There certainly is -- there are

10   certainly indications that prescribing is

11   coming down.  So as I hope, yes.  There

12   certainly are still individual cases.

13          Q.    And again, in your reporting, you

14   have seen and have reported significant

15   declines in doctor shopping?

16          A.    Yes.

17          Q.    And the number of prescriptions

18   written?

19          A.    Yes.

20          Q.    And again, obviously, when there

21   are limitations on seven-day or five-day

22   prescriptions as a maximum, those things have

23   all brought down both the number of

24   prescriptions and the amount and number of

25   dosage units and the quantity, in grams, of

Page 243

1  opioids that have been placed into the stream
2  in Ohio?
3        A.    Yes.
4        Q.    You think OARRS has been a very
5  effective tool --
6        A.    I do.
7        Q.    -- in achieving that?
8        A.    I do.
9        Q.    Am I correct that the board of
10 pharmacy and OARRS does not track the in and
11 the out, as far as hospitals are concerned?
12       A.    We do track what is sold to a
13 hospital.  We do not track what is dispensed in
14 patients.  Now, if the hospital has an
15 outpatient pharmacy, then we would receive what
16 comes out of the outpatient pharmacy.
17       Q.    Is there any place within the board
18 of pharmacy or state government, that you know
19 of, that is capable of making some comparison
20 between what, in the way of opioids, came into
21 a hospital and what went -- was either
22 dispensed within the hospital or outside, if
23 you understand my question?
24       A.    I'm not aware of anybody that could
25 do that, no.

1          Q.    Is there a diversion that occurs in

2     hospitals, to your knowledge?

3          A.    I wouldn't know that.

4          Q.    The first that -- were you involved

5     in the development of the prescribing

6     guidelines that have been promulgated in

7     Ohio --

8          A.    I have.  I was.

9          Q.    -- you know what I'm talking about?

10         A.    Yes, I was.

11         Q.    Emergency room first, chronic pain,

12    acute pain?

13         A.    I don't believe I was involved in

14    the emergency room, but I was involved with the

15    chronic and acute pain guidelines.

16         Q.    And those guidelines are described

17    as just that, if they are not in a statute?

18         A.    Correct.

19         Q.    Guidelines are just guidelines,

20    right?

21         A.    Correct.

22         Q.    Who makes the decision about what

23    is appropriate to be prescribed to a particular

24    patient?

25         A.    The prescriber.

Page 245

1        Q.    And am I correct that the

2   prescriber and the pharmacist or the pharmacy

3   are the two places where a prescription can be

4   killed, for lack of a more appropriate term?

5        A.    Yes.  I mean, I suppose it could be

6   killed in between by the patient, but, yes.

7        Q.    And the board of pharmacy can't

8   make that decision?

9        A.    Correct.

10       Q.    Nobody else is authorized to make

11  that decision?

12       A.    Correct.

13       Q.    Or let's put it the other way,

14  legally required to make the judgment that the

15  prescription -- the prescription is written and

16  is being dispensed for a legitimate medical

17  purpose, in the usual course of professional

18  practices?

19       A.    As far as I'm aware.

20       Q.    The prescribers and pharmacists?

21       A.    Yes.

22            MR. EMCH:  That's all I have.

23            MS. BROWNE:  Can we take two

24  seconds, please?

25            THE VIDEOGRAPHER:  Off the record

Page 246

1    at 3:06.

2                   (Recess taken.)

3                   THE VIDEOGRAPHER:  On the record,

4      3:09.

5                   MS. BROWNE:  Defendants have

6      nothing further, Mr. Garner.  Thank you very

7      much for your time.

8                   THE WITNESS:  Thank you.

9                   THE VIDEOGRAPHER:  Off the record.

10     3:09.

11                  MS. BROWNE:  Do you want him to

12     read and sign, get the deposition transcript

13     and review it?

14                  MR. WAKLEY:  Send the depo to me,

15     I'll provide it to him.  I'm guessing it is

16     going to be too long, but we will look at it,

17     and if we notice anything, we will have him

18     sign off on it.

19                  We will have him sign off on it if

20     it is correct.  If we notice anything, we will

21     bring that up at that point.

22            (Deposition concluded at 3:10 p.m.)

23                          - - - - -

24

25

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                            Page 248

1                    REPORTER'S CERTIFICATE

2     The State of Ohio,    )

3                                        SS:

4     County of Cuyahoga.  )

5

6                I, Wendy L. Klauss, a Notary Public

7     within and for the State of Ohio, duly

8     commissioned and qualified, do hereby certify

9     that the within named witness, CHAD GARNER, was

10    by me first duly sworn to testify the truth,

11    the whole truth and nothing but the truth in

12    the cause aforesaid; that the testimony then

13    given by the above-referenced witness was by me

14    reduced to stenotypy in the presence of said

15    witness; afterwards transcribed, and that the

16    foregoing is a true and correct transcription

17    of the testimony so given by the

18    above-referenced witness.

19                I do further certify that this

20    deposition was taken at the time and place in

21    the foregoing caption specified and was

22    completed without adjournment.

23

24

25

Page 249

1          I do further certify that I am not

2   a relative, counsel or attorney for either

3   party, or otherwise interested in the event of

4   this action.

5          IN WITNESS WHEREOF, I have hereunto

6   set my hand and affixed my seal of office at

7   Cleveland, Ohio, on this 19th day of

8   November, 2018.

9

10

11

12

13                   *Wendy L. Klauss*

14          Wendy L. Klauss, Notary Public

15               within and for the State of Ohio

16

17  My commission expires July 13, 2019.

18

19

20

21

22

23

24

25

```
                                                     Page 250
 1                         Veritext Legal Solutions
                               1100 Superior Ave
 2                                Suite 1820
                             Cleveland, Ohio 44114
 3                           Phone: 216-523-1313
 4
     November 19, 2018
 5
     To: JAMES T. WAKLEY
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3108524
 8
     Witness:  Chad Garner         Deposition Date:  11/14/2018
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 3108524
3   CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 11/14/2018
4   WITNESS' NAME: Chad Garner
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____        _____
9   Date                           Chad Garner
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12

        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15

        I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17

                 _____
18               Notary Public
19               _____
                 Commission Expiration Date
20
21
22
23
24
25

Page 252

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 3108524
 3   CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 11/14/2018
 4   WITNESS' NAME: Chad Garner
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____         _____
     Date                          Chad Garner
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 253

1                    ERRATA SHEET
             VERITEXT LEGAL SOLUTIONS MIDWEST
2                ASSIGNMENT NO: 11/14/2018
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____      _____
20    Date                        Chad Garner
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24

                      _____
25                    Commission Expiration Date

**[& - 2:43]**                                                                    Page 1

| & |
| --- |
| **&**   2:19 3:2,22 4:7 |
| 4:12 9:11,13,15,17 |
| 10:15 11:4 |

| 0 |
| --- |
| **001285650**   7:8 |
| 214:19 215:3 |

| 1 |
| --- |
| **1**   6:3 16:6,12,14,17 |
| 16:19 17:12 |
| 150:12 |
| **10**   6:22 180:2,9,25 |
| 181:1 182:20 |
| 183:1,9,22 184:4 |
| 196:9 |
| **100**   6:6 41:21,24 |
| 42:3 59:10,25 |
| 60:11,22 61:5,12 |
| 61:20 85:2 240:1 |
| 240:9,18 |
| **1000**   4:4 |
| **10036**   3:20 |
| **106**   213:9 |
| **1095**   3:19 |
| **10:59**   112:20 |
| **11**   5:8 6:24 133:1 |
| 201:19,25 202:8 |
| 225:17 |
| **11/14/2018**   250:8 |
| 251:3 252:3 253:2 |
| **1100**   4:9 250:1 |
| **11:20**   112:23 |
| **12**   7:1 55:24 |
| 184:17,22 185:8 |
| 203:23 204:7 |
| 213:22 |
| **12:17**   157:8 |
| **13**   7:5 214:14,24 |
| 214:24 215:20 |
| 216:1 217:13,23 |

249:17
**139**   6:8
**14**   1:19 9:2 132:11
**146**   6:10
**149**   6:13
**15**   139:24 185:6
**15219-6401**   4:14
**16**   6:3 17:3,11
18:6 161:5 185:6
186:11
**1600**   3:9
**161**   8:3
**17**   1:14 6:5
**170**   6:15
**174**   6:18
**179**   6:19
**17th**   2:10
**18**   1:15
**1800**   4:4
**182**   6:22
**1820**   250:2
**19**   250:4
**197**   8:4
**19th**   249:7
**1:09**   157:11
**1:18**   1:13

| 2 |
| --- |
| **2**   5:3 6:5 17:16,22 |
| 17:22 18:1,4 |
| 148:5,6 |
| **20**   65:1 251:16 |
| 252:22 253:22 |
| **20001-4956**   2:21 |
| **20005**   3:4 |
| **20036-5802**   4:5 |
| **2004**   32:9,18 |
| **2005**   20:11 26:5 |
| 32:18 101:10 |
| 103:9 |
| **2006**   17:7 26:2 |
| 60:19 63:10 |

101:14 107:1
108:13,24 109:1
110:18 123:3
128:20 132:4
162:23 232:20
**2007**   136:12,24
162:13,15
**2008**   57:25 211:21
**2009**   20:15,17 26:5
57:25
**201**   6:24
**2010**   6:20 26:18
179:13,19 205:12
**2011**   6:6 25:1,20
26:8,17,18 63:18
63:20 100:17,24
104:19 108:22
109:10 119:9,10
120:7,7,9,22
123:10 141:15
146:10 185:14,17
185:21 192:1
206:2,13 235:21
235:25 239:18
**2012**   58:5 120:8,9
120:22 242:6
**2013**   242:6
**2014**   6:21 123:24
124:1,6,21 136:3
136:15 179:13,19
190:10 211:16
212:3
**2015**   6:16 170:25
171:7 186:11
205:12 228:9
**2016**   108:11 212:5
**2017**   6:9,19 7:2
29:8 30:19 31:25
52:15 79:23
111:21 128:11
139:6,12,24

140:24 141:3,5
149:16 150:20,22
151:2,3,4 179:11
179:18,20 201:2
203:24 204:8
215:18
**2018**   1:19 6:23 9:2
51:20 52:13 79:23
182:23 183:4
249:8 250:4
**2019**   249:17
**202**   2:22 3:5 4:5
**203**   7:1
**21**   6:6 100:17,24
191:25
**212**   3:20
**214**   7:5
**216**   4:10
**216-523-1313**
250:3
**2222**   249:13
**223**   5:9
**227**   5:10
**24**   6:15 140:6,16
170:25 171:7
219:6,7 236:20
**248**   5:12
**25301-3202**   3:10
**25724-2389**   2:15
**26th**   2:5
**28**   6:23 182:23
183:4
**2804**   1:6
**284**   1:8
**29**   149:16 150:20
150:22
**2:12**   206:22
**2:20**   206:25
**2:42**   223:10
**2:43**   223:13

**3**

**3**  6:6 100:16,23
  109:9 147:4
  148:15 191:25
**30**  2:5 6:3 16:7
  197:24 198:12
**300**  3:24
**301**  4:13
**304**  2:16 3:10
**31**  132:9
**3108524**  250:7
  251:2 252:2
**312**  3:25
**325**  3:14
**340-1146**  3:10
**341**  185:6 186:7,8
**35th**  4:13
**3:06**  246:1
**3:09**  246:4,10
**3:10**  246:22

**4**

**4**  6:8 139:4,10
**40**  104:13
**412**  4:14
**419**  2:15
**43215**  2:6,11
**43215-2673**  3:15
**434-5000**  3:5
**44113**  4:9
**44114**  250:2
**45**  207:5,6
**45005**  1:14
**45090**  1:13,15
**466-6818**  2:6
**469-3939**  3:15
**471-3490**  4:14
**4729.78**  6:14 149:8
  149:13 150:12
  151:5

**494-4400**  3:25

**5**

**5**  6:10 16:25
  139:22 146:12,19
  146:25 147:5,23
  148:6,22 150:13
  165:10 174:25
  177:22 204:16
**50**  103:24 104:1
**500**  3:9 41:20,22
  41:24 42:3 59:10
  60:1,12,22 61:5,12
  61:20 85:2 240:1
  240:9,18
**525-9115**  2:16
**54**  3:24
**5687**  217:13,23
  218:4
**5691**  218:7
**5695**  215:4
**592-5000**  4:10
**599,000**  109:23
  110:1

**6**

**6**  5:5 6:3,13 16:7
  149:7,12 197:24
  198:12
**600**  3:14
**60654**  3:24
**614**  2:6,11 3:15
**662-6000**  2:22
**682**  215:17
**687**  216:4
**688**  215:25
**698-3500**  3:20

**7**

**7**  1:8 6:15 17:1,3
  170:23 171:6,22
  174:2 192:3

**7,000**  109:15
**725**  3:4
**73**  202:19,22
**75**  1:21
**77**  2:10
**778-1823**  4:5

**8**

**8**  6:18 174:14,19
  177:22 195:21
  207:2
**850**  2:21
**8:35**  1:19 9:3

**9**

**9**  6:19 7:1 109:8
  179:10,17,17
  182:18 183:8
  203:24 204:8
  207:6 223:20
**90**  184:13,20,25
**93**  6:7 26:22
  100:12,18,24
  103:9 109:9 119:2
  119:5 185:11
  192:1
**950**  4:9
**978**  180:24
**99.5**  109:16
**995-7496**  2:11
**9:28**  55:3
**9:41**  55:6

**a**

**a.m.**  1:19 9:3
**a1**  151:5
**aaron**  1:9
**abdc**  24:3,5,8
  116:17 117:7
**abide**  105:11
**ability**  13:3 105:24
  106:3 110:25
  111:1,3,7 119:13

**130:**5,23 169:13
  186:17 194:20
**able**  12:17 25:4
  57:22 58:2 62:21
  82:19 83:1,3 89:1
  118:2 132:22
  134:15 144:25
  145:10,17 147:20
  152:3 156:16,20
  157:25 197:15
  199:7 226:21,22
  230:3 234:13
  237:10 238:12
**absolutely**  86:5
  228:2 229:11
  234:20
**abuse**  91:5 95:22
  99:23 175:9
  178:15 196:12,14
**abused**  107:24
**academy**  179:20
**accepted**  131:7
**access**  19:17,21,22
  24:8,11 46:11,19
  62:22 65:12,19
  66:1,4,9,16,18,23
  69:3 90:5,9 98:15
  98:17,22 99:6,7,10
  99:21 103:7
  104:25 105:6,25
  106:3 111:5
  116:23 117:7,19
  117:23 118:3
  119:6,17,20 120:2
  120:5,11,18,19
  122:4 132:11
  144:6,22 145:18
  147:20 148:25
  158:20 159:7
  162:5 166:16
  167:19,25 168:6,9

**[access - alert]**                                                                 Page 3

169:14 172:9,15
172:16,19 173:1,9
173:17 174:3,8,10
176:21,25 177:4,7
177:8 178:7
180:13 183:21
184:8 187:5,12,18
187:22 190:15,18
191:9,21 198:20
198:24 200:22,25
201:3 203:6
204:23,25 208:17
208:20,24 209:5,8
213:24 219:20
220:20 226:21
227:7,10,13 229:6
229:8
**accessed** 122:9
145:12 190:8
216:14 220:8
**accessible** 125:4
**accessing** 144:11
145:21 172:23
**accomplish** 213:1
**accomplishments**
109:13
**account** 46:7,13
46:19 47:1,7
62:21 72:12
120:13,19 122:1,4
125:18 128:5
145:16 159:1
166:5,13,24 167:4
167:8 168:10,20
168:22 169:2,3,6
170:1,6,21 172:8
172:12,15 173:17
173:22 174:1,11
175:2 177:12,12
177:14,16 178:9
178:10 187:10

208:24 218:16
231:25
**accountholder**
122:9 123:15
124:6,18 125:1
134:23 145:6
**accounts** 121:23
158:22 167:3,15
167:18,21 168:2
173:20 176:16
178:1 201:7
**achieve** 209:12
**achieving** 243:7
**acknowledge**
251:11 252:16
**acquired** 183:13
**act** 251:14 252:20
**action** 6:5 17:18
142:7 160:5 179:7
190:6 206:2,10
216:24 249:4
**actions** 161:6
**actively** 172:22
224:19
**activity** 214:11,11
**actual** 144:4
156:13 185:12
229:3
**acute** 75:8,23
244:12,15
**ad** 56:10 57:19
67:14,17 71:10,12
84:13 87:2,7,9
236:7
**add** 60:16 111:1
207:11,20 208:15
209:20
**added** 107:16,18
154:13 228:9,11
228:18,19

**addiction** 98:2
99:17 107:23
**adding** 110:20
210:15
**addition** 18:5 19:5
92:9 144:25
**additional** 60:24
61:3,8,10 63:19
207:12
**additionally** 81:20
113:17 193:13
**address** 127:18
151:11,14 165:25
170:18 172:1
250:15
**addressed** 34:3
**addresses** 103:14
**adjournment**
248:22
**administration**
91:6 106:14 213:2
**administrative**
75:1,2,6 93:7,9
107:11 166:20,25
184:23 185:18
186:3
**administrator**
20:8,13,21,25 21:8
22:9 26:4 27:4,8
28:1,9,12,23 29:1
29:20 30:2 31:6
31:10 32:22 106:6
106:10,16 209:3
**administrators**
215:22
**advice** 131:12
**advised** 81:8 82:13
**aemch** 3:11
**affixed** 249:6
251:15 252:21

**aforesaid** 248:12
**afternoon** 223:16
**ag's** 65:10
**age** 10:21 133:20
133:21
**agencies** 66:5,8,11
66:15 143:18
187:8,11 196:2
228:12 240:19,24
**agency** 33:14,17
33:19 34:1 168:12
168:13 169:1,7
170:12,13 180:13
213:3
**agent** 42:22,25
43:2 44:17 48:11
169:1 174:5
**agents** 95:13
211:10
**aggregate** 116:24
117:1,7
**aggregated** 91:25
**aggressive** 181:8
225:6,11
**ago** 15:12,25 44:6
44:8 75:4,5 94:12
99:7 118:6 130:3
142:23 170:4
215:12 216:18
228:17
**agree** 181:21
234:12,21
**ahead** 13:17 197:4
**ailment** 128:6
**akeyes** 3:5
**al** 1:11,12 10:1
228:7
**alcohol** 13:2
196:12,13
**alert** 220:8

**alerted** 192:8
**alerts** 189:8
**allen** 4:12,15
**alliance** 94:10,20
**allow** 25:6 120:2
   140:21 176:7
   209:17
**allowed** 101:11
   107:2 112:14
   135:3 154:20
   206:15
**allows** 60:5 113:20
   135:9 196:16
**alvin** 3:9
**amazon** 30:7,18
**american** 179:20
**americas** 3:19
**amerisourceberg...**
   3:8 10:2 23:10,13
   24:4
**amount** 67:25
   68:19 71:14 75:7
   95:25 96:7 118:17
   180:7 242:24
**amounts** 75:22
**analyses** 54:14
   55:9,14 74:21
   76:14 79:13,18
   82:18 83:14,18
   84:16,20 85:6,8,12
   85:18 90:17
   114:23 115:4,9
   199:10
**analysis** 34:7,8
   38:6,17,19,25
   53:11,14,16,17,21
   53:23 54:4,7 56:4
   73:4,11 76:18
   77:10,17,18 78:13
   78:18 81:22 83:1
   84:10 86:19 87:23

**88**:4,6,12 94:24
   115:12,15,15,19
   116:12 236:14
   237:1 238:22
   239:1
**analyst** 32:23
   93:11,14,18,23
   115:8,18,24 116:2
   116:8
**analysts** 116:6
**analyze** 87:4
**analyzes** 231:25
**andrew** 3:3 9:14
**annual** 53:19
   55:16,19,25
   212:23
**anomalies** 78:23
   79:5 114:23
**anonymized** 91:24
   136:10,11,19
   162:13,19,21
**answer** 12:18
   13:12,13 44:22
   50:25 161:10
   165:12,13 236:3
**answering** 78:9
**anthony** 4:3 10:16
**anticipate** 12:17
**anybody** 39:15
   40:21 50:13 67:20
   81:4 115:6,20
   210:3 215:22,24
   222:25 243:24
**anyplace** 236:25
**apologize** 17:2
   56:19 78:1 182:17
**apparently** 215:18
**appear** 251:11
   252:15
**appearances** 2:1
   3:1 4:1 5:3

**appended** 252:11
   252:18
**applicable** 247:7
**application** 175:4
**applies** 63:24
**apply** 96:21,24
   174:10 179:3
**appriss** 34:18,22
   35:2,7,9 104:6,10
   106:24 218:7,19
   218:20,22
**approached**
   180:10
**appropriate** 68:3
   108:4 112:10
   115:4,7 160:21
   167:18 168:8,21
   192:10 196:1
   217:6 240:18
   244:23 245:4
**approval** 180:12
**approve** 47:7
   70:14 92:18,19
   168:15
**approved** 148:4
   167:1 168:14
**approves** 63:1
   72:13 191:19
**approving** 170:12
**approximately**
   20:17 52:11 60:1
   60:12 61:5,12,20
   64:23
**april** 29:8 30:19
   111:21
**arcos** 147:9,12,13
   147:13,17,20
   148:10,14,20,25
   149:1,3 163:7
   165:9 188:10
   232:16,16,23

**233**:5,9
**area** 42:24 44:24
**areas** 40:3 171:20
   221:22 224:17
**arkansas** 183:14
**arose** 49:19
**article** 6:19,22
   179:11,18,24
   180:2,9 182:7,21
   183:2,6 223:24
   224:12,13 225:23
**aruiz** 4:6
**asap** 163:8
**aside** 17:14 27:13
   87:8
**asked** 14:1 68:2
   76:6 77:17 78:6
   133:13 173:4
   223:23 225:20,25
   227:6 236:24
   237:12
**asking** 12:8 145:8
   165:22 228:13
**asks** 71:13
**aspect** 233:14
**aspects** 33:4
**assessment** 181:6
**assign** 45:9 92:19
**assigned** 80:20
   81:19 115:24
   144:20 167:15,18
**assigning** 168:1
**assignment** 251:2
   252:2 253:2
**assist** 85:19 92:20
**assistance** 91:3
   92:21 94:15
**assistant** 10:9 93:7
   166:21,25
**assistants** 178:6

[assisting - believe]                                                              Page 5

**assisting** 39:1 53:6
  53:25 84:21
  152:18 229:10
**assists** 93:15
**associated** 142:13
  218:16
**assume** 48:19
  80:16,18 108:17
  226:14
**assuming** 134:12
  189:22 226:7
**assumption** 182:2
  226:7
**attached** 252:7
**attempt** 128:25
**attend** 97:16,19
**attended** 215:23
**attending** 9:8
  33:13,25 115:25
**attention** 180:23
  209:13
**attorney** 2:3 10:4
  10:9 14:4 65:10
  159:25 160:1,4,10
  249:2
**attorneys** 9:7 14:3
  15:3,9,15 223:18
**atypical** 164:19
**audience** 215:19
**audits** 143:11
  156:16,20
**august** 7:1 203:24
  204:8
**author** 179:23
**authored** 7:3
  204:2,10
**authorities** 94:11
  94:21
**authority** 178:5
**authorize** 252:11

**authorized** 129:5
  205:5 245:10
**authors** 181:3
  183:4,22 184:4
**automated** 11:20
  156:11 204:18
**automatically**
  46:15,21 47:8
  56:8,12,15 57:20
  58:18 69:9,24
  70:15 72:14
  109:17 110:2
  143:2 156:7
  163:12,16 164:12
  194:7
**available** 63:6,15
  74:2,3,6,6,17 95:2
  111:22,24 125:10
  125:12 135:1,6,13
  135:16 162:7,16
  162:20,22 188:7
  190:9 207:13,15
  230:17
**ave** 250:1
**avenue** 3:19 4:9
  238:1
**aware** 44:13 98:20
  103:8,13 117:21
  125:7,11 188:10
  227:18 231:11,15
  231:17 232:2
  233:12 243:24
  245:19
**awareness** 144:2
**awarxe** 6:18 111:4
  111:10 174:3,15
  174:20 175:2
  176:5 177:14
  207:2,11

**b**

**b** 6:3 16:7 158:2
  197:24 198:12
**back** 29:25 55:7
  67:2 73:4 78:5,12
  90:3 92:7 103:17
  123:21,23 124:1
  124:21 130:20
  132:10 135:13,24
  136:3,9,11,24
  157:12,19 158:19
  162:13,15,22
  177:22 186:23
  190:9 212:1
  225:23 226:22
  231:23 236:2
  250:15
**background**
  224:24
**bad** 62:9 108:8
**baker** 224:15
**barbara** 7:3 204:2
  204:10
**barlit** 3:25
**bartlit** 3:22 9:23
**based** 54:2 73:10
  79:2 86:8,14,15,22
  86:24 89:13,16
  104:3 105:1
  125:17 126:16
  140:22 141:2
  142:18 167:25
  168:5 175:6
  211:11 219:22
  221:10
**basic** 92:21 183:24
**basically** 19:2
  69:17 75:7 100:8
  109:7 119:5 121:8
  121:19,20 132:4
  133:3 142:10

163:25 187:2
  196:25 197:3
  209:18 234:25
**basis** 56:9,12,17
  56:20 67:14 79:9
  84:13 87:9 98:19
  137:8 156:8
  211:17 212:23
  218:11 236:8
**bates** 7:8 214:19
**bci** 65:12,16
**bears** 215:2
**beck** 3:22 9:23
**beck.com** 3:25
**becoming** 18:12
  18:16,19 20:1
**beg** 29:19 65:20
  97:15 114:12
  152:9 219:7
**began** 108:6
  110:20
**beginning** 7:8
  60:15,19 214:18
  232:20
**behalf** 2:2,13,18
  3:2,7,12,17,22 4:2
  4:7,11 9:19,21,23
  9:25 10:2,4,9,14
  34:1
**behavioral** 209:14
**believe** 14:20 31:8
  50:5 63:16 106:4
  108:10,22 133:13
  141:14 166:22
  183:7 185:6
  186:12 201:1
  204:15 210:3
  215:13 219:3,16
  224:1 225:11
  227:14 228:15
  244:13

**bell** 184:5
**beneficial** 37:3,6
**beneficiary** 91:8
91:13
**benefit** 176:4,9
**benefits** 98:18
**benzodiazepine**
184:13,20 213:19
216:12 220:21
**best** 115:10,12,22
**better** 95:12,15
240:5
**beyond** 138:10
197:24
**big** 179:2
**bill** 6:7 26:22
100:12,18,24
103:9 109:9 119:2
119:5 185:5,11,12
186:7,8 192:1
**birth** 133:21,25
134:3 165:24
170:17 192:18
**bit** 26:9,11 32:24
47:19 87:17 103:5
105:12 125:23
161:22 164:5
166:10 170:5
173:15 190:13
219:3 226:7 231:1
**bja** 95:4
**bja's** 94:13
**blocks** 172:22
**blur** 26:11
**blvd** 3:14
**board** 2:9 6:4 10:5
10:7,10 11:14,17
15:19 16:9 18:12
18:20,21,25 19:5
19:12,20 20:2,4
21:13 22:23 30:3

30:9,24 31:10,12
32:10 33:18,19
37:21 38:1,13
40:9 44:17 50:7
50:18 51:4,12
75:19,20,20,25,25
76:1,1,12 88:8
97:12,15 98:4
101:6,11,19
107:11 108:4
124:3 128:4 129:2
136:17,21 138:1
140:11 142:4
150:2 156:15,19
161:7 171:16
195:24 196:14
198:24 210:15
212:13 217:15,22
217:24 222:3,9,12
231:12,20 239:21
240:20,22,22
243:9,17 245:7
**board's** 185:24
240:11
**boards** 75:5,16,17
185:25 196:3
198:20 217:7,8
**booking** 93:9
**bop** 30:22,25 34:2
43:2 48:10 53:11
54:11 61:16,17,22
88:15 89:6 95:17
162:8 206:6,8
**border** 104:21
**boston** 32:2,3
**bottle** 158:1
**bottom** 109:12
180:24 183:9
215:3
**boxes** 164:1
165:24

**brandy** 3:13 9:18
**branjan** 3:16
**break** 13:15,16,19
54:20,21,25
112:17,18 157:3
161:23 186:16
206:17,20 223:6
**brewer** 3:23 9:22
9:22
**bring** 246:21
**brings** 209:13
**broad** 2:5
**broken** 73:23
91:21 171:19
179:8
**brought** 242:23
**browne** 2:19 5:8
9:10,10 11:1,3
54:22 78:6 112:16
133:23 156:24
157:4 182:17
198:1 222:24
223:4,8 245:23
246:5,11
**browne's** 131:2
**budget** 97:13
212:22 213:3
**build** 113:20
**building** 7:2
203:25 204:9
**built** 41:2 113:19
**bulk** 73:22 74:12
**bureau** 65:17 91:3
94:15 99:14
**burling** 2:19 9:11
9:13 11:4
**bushur** 3:3 9:16
9:16
**button** 148:9
163:19

**buttons** 164:14
**bwc** 99:11,15
176:10
**byrnes** 4:8 10:13
10:13

**c**

**ca** 250:25
**cabinet** 206:2,9
**calculated** 126:24
129:15,18 133:22
**calendar** 52:15
205:19
**california** 183:14
**call** 34:16 36:11,11
36:16,18,23 37:1
37:10 39:20 52:13
73:19 97:25 98:24
130:17,17,18
133:11 160:23
176:17 189:16
**called** 10:21 152:6
174:8 238:7
**calls** 35:25 37:5
45:6,11
**cameron** 77:25
80:1 96:19 97:1
**capabilities** 17:6
110:16,24
**capability** 59:18
59:25 63:5,15
103:10 104:14,17
108:14 110:8
112:6 189:16
193:2 220:7
**capable** 59:23
60:3,11 106:25
108:12,19,19
131:14,16 138:12
152:7 210:18
219:15 243:19

**capacity** 17:24
18:5 22:16 24:22
24:25 25:9,19
26:8,13 27:9 83:4
83:7 147:19
**capita** 73:15,18
74:10,12
**capital** 1:21
**caps** 111:15
**caption** 9:3 248:21
**capture** 134:10
**cardinal** 3:2 9:15
9:17 23:19,22
24:8 116:21 117:7
**care** 98:25 176:10
206:18 228:12
**carisoprodol**
107:14
**case** 1:8,13,14,15
9:3 15:23 39:16
39:24 40:1 46:11
46:24 47:4 65:15
68:17 70:12 71:4
71:19 72:8 118:12
120:4,21 129:7,20
134:5 138:25
146:8 148:24
149:1,20 159:18
159:21,22 160:2
166:1 192:15
193:15 195:17
238:6 250:6 251:3
252:3
**cases** 177:7 242:12
**cause** 40:14
248:12
**causes** 69:16 181:4
**cdc** 91:4
**center** 2:20
**centre** 4:13

**certain** 22:24
67:21,24 68:19
71:14 83:10
114:11 137:1
145:15 147:14
166:25 180:5,6
184:10,14 192:7
193:7 210:22,22
211:18 219:24,25
221:14
**certainly** 88:10
108:17 140:21
148:4 181:25
210:13 212:25
231:7 242:9,10,12
**certificate** 5:12
248:1 252:11
**certification** 251:1
252:1
**certified** 10:24
**certify** 248:8,19
249:1
**cetera** 82:22 123:1
**chad** 1:18 5:7 9:5
10:21,25 11:9
215:6 223:14
227:22 248:9
250:8 251:4,9
252:4,13 253:20
**chance** 16:16
**change** 25:16,17
30:10,11,12 50:25
75:21 76:16 77:8
77:18 78:15,20
80:3,11,14 81:9
111:9 114:25
128:9,10 138:1
176:9 186:24,25
195:7 212:4
238:23 250:13,14
252:8 253:3

**changed** 28:25
64:21 106:8 119:3
132:3 135:2,4
136:4 139:1
147:25 153:7
219:3 222:4
**changes** 22:7,15
24:21 25:1,5,8
53:21 63:18 74:22
74:22 75:6 105:13
105:22 119:13
148:1 224:17
250:12 251:7
252:7,9
**changing** 76:19
**charge** 19:2 20:22
131:23 213:2
**charissa** 2:4 10:3
**charissa.payer** 2:7
**charleston** 3:10
**chart** 205:16
**check** 217:4,5
**checked** 238:9
**chicago** 3:24
**chief** 18:17,18,24
19:4,11,19,23 20:1
20:18 21:11
**choose** 21:22,24
**choosing** 21:19
**chose** 28:3
**chronic** 244:11,15
**circumstances**
184:10,11 193:17
197:10 199:20,23
213:17
**cisco** 28:13,14
29:15,16
**city** 2:20
**civil** 6:5 17:18
247:3,7 251:5
252:5

**clarification** 113:2
**clarify** 186:3
**class** 74:14
**classes** 73:23
233:1
**classified** 175:17
**classify** 220:25
221:2
**clean** 12:19 136:13
**clear** 131:6 187:21
239:7
**clearer** 137:9
**clearinghouse**
140:2 174:8
177:13
**clearly** 68:2
105:24 178:20
179:1 194:10
195:19 210:15
217:8 220:3
**cleveland** 4:9
249:7 250:2
**click** 148:9 163:18
**clinic** 239:12
**clinical** 177:21
**clinics** 109:7
239:15
**close** 64:25 157:1
232:24
**closed** 181:8,17
**closer** 228:17
**cloud** 29:6,7,9
30:7,18 38:5
106:19,23 108:16
**clouds** 136:16
**code** 6:13 22:18
24:19 25:16,18,22
26:7,13 27:1,2,21
41:4,5 42:3 58:9
58:12 59:21 60:13
60:22 61:4,11,20

[code - considered]                                                          Page 8

61:25 62:6,12,15
63:17,19 68:11,12
68:20 69:12 72:20
73:1 75:2,7,21
79:17 87:3,11
93:15 107:11
113:4,7,9,11,13,14
113:15,16,24
114:1,21 126:9,11
126:12 149:8,12
149:18 165:25
184:22,24 185:1,8
185:17,19,23
186:1,3,9 194:19
codified   26:24
  75:24 184:18,21
collate   158:3,8,12
collect   102:15
  103:4 107:3,9
  137:7,11 168:7,11
  168:18 170:15
  233:1
collected   107:13
collecting   106:25
  108:5,7,20 154:5
collection   156:13
collects   23:2 125:5
  125:6,9,10,24
  137:6 147:14
  163:11
college   32:12,16
colorado   183:15
columbus   1:21,22
  2:6,11 3:15
column   180:24
combatting
  229:10 242:8
combination
  29:15,17 242:4
combinations   82:7
  82:12,22 86:18

96:1,12
come   27:14 42:21
  42:23 43:12 45:23
  49:2,7 54:17 85:1
  87:23 88:14 97:11
  97:12 103:17
  162:3,4 180:8
  188:2 198:11
  213:3 239:11
comes   45:5,12
  97:5,9,13 128:3
  160:23 187:25
  195:10,13 214:8
  243:16
coming   54:17
  56:20 64:15
  233:18,22 235:5,8
  242:11
commensurate
  235:1
comment   229:20
  229:25
comments   224:21
commission
  249:17 251:19
  252:25 253:25
commission's
  181:7
commissioned
  248:8
committee   202:14
common   163:6
  175:13
communicate
  132:6
communications
  77:21,24
community   217:3
  217:7
comp   227:9

companies   99:10
  181:10 224:8
company   3:18
  4:11
comparable
  103:19
compare   72:24
  214:6 216:19
  234:13
comparing   87:19
  214:3 233:22
  235:6
comparison
  235:14,20 243:19
compelled   16:22
compels   18:4
compensation
  99:14 176:2
  229:15 230:11
complaint   42:21
  43:4,8,21 44:7,9
  44:11 45:2,3,18
  48:14,17 49:6,20
  144:19
complaints   43:9
  43:24 44:15,16
  48:6,9,25 49:1
complete   12:23
  13:18 44:23 130:8
  236:1
completed   248:22
  250:15
complex   163:10
complexity   114:2
compliance   39:1
  39:10 43:15,16
  44:24 45:14,21
  48:24 49:3,7,20
  52:9 56:25 57:7
  67:19 68:16 71:13
  77:22 116:3,7

132:15 141:16,25
  142:1,3,4,24 143:1
  143:11,15,19
  153:15,15 155:19
  200:10,13 216:9
  217:19 237:2
  240:11
comply   142:12
complying   148:21
compute   89:2,2
computer   19:3
  31:18,23 68:9
computers   19:6
concept   138:5
concern   107:10,13
  107:17
concerned   241:25
  243:11
concluded   246:22
conclusion   196:10
conduct   52:23
  156:16,20 195:24
conducts   143:10
conferences
  180:20
configuration   29:4
configured   28:4
confusing   186:5
confusion   171:18
connection   19:13
  232:10 238:23
connolly   3:2 9:15
  9:17
consequences
  141:19 155:14
consider   192:23
  220:4
consideration
  227:12
considered   119:22
  119:25

[consistency - cov.com]  Page 9

consistency
  137:23,24
consistent  137:2
  182:5
contact  34:23 35:1
  141:23 155:17
  191:10
contacted  184:3
  217:8
contacts  71:6
contain  231:8
contains  17:6
context  62:20
  84:25 85:14
continue  60:15
continued  3:1 4:1
  186:2 211:24
continues  184:15
  196:6
contract  99:5,8
contracted  99:4
contractors  61:13
contribution
  180:1
control  228:25
  229:1,9
controlled  22:25
  94:10,20 107:3,9
  107:15 118:18
  134:13 183:17
  184:16 195:23
  213:21 234:23
conversation  36:7
  37:9
conversations
  14:14 15:18 80:17
  80:19 203:16,19
cooperation  7:3
  204:1,10
copy  6:13 37:20
  37:25 38:3,6,15,16

38:22 53:11 64:15
  68:13 100:23
  129:22 149:8,12
  174:19 179:17
  217:16 218:3
core  35:11
coroner  190:22
  191:3
coroner's  108:1
  190:17 191:21
coroners  65:7
  190:14,20 209:8
corporate  158:25
  159:12 198:12
corporation  2:18
  3:8 10:2
correct  12:3,13
  16:24 24:23 26:5
  26:14 27:23 29:16
  30:22 41:25 42:1
  50:8,9 65:3 67:15
  69:10,14,16,20,21
  70:22,23,24,25
  71:3,8,9 72:20,23
  73:2,3 79:15
  82:24 94:4,5 95:5
  96:5 97:17 99:5
  100:2,3 101:13,15
  101:16,25 102:1,4
  102:5 104:7,8,15
  104:16 105:4,14
  105:15,17,18
  108:15 110:13,14
  111:11 113:5,6
  116:15,16,18,19
  116:21,22,24,25
  117:4,5,8,9,9
  119:14,18 120:23
  122:15,16 123:9
  123:13,16,17
  128:20,21 133:9

134:20 138:23,24
  140:12,13,25
  144:7 145:18,19
  145:22,23,25
  146:1 148:23
  150:14,15 151:16
  151:17 152:14
  157:20 158:24
  159:12,13 164:8,9
  164:21,24 166:5,8
  167:8 168:23,24
  169:3,4 172:20
  173:14 175:14,15
  175:18,19,23
  176:3,15 179:24
  179:25 186:11
  187:20 188:15,16
  191:23 192:18,19
  196:7,8 199:4,5
  200:23 201:11
  204:24 205:8,21
  208:18,19,22
  209:7 212:21
  214:9,10 217:14
  220:16 221:16,17
  221:23 224:4,5,9
  224:24,25 227:11
  230:12,13,21
  231:10,17 232:19
  233:6,15,21 235:4
  235:11 240:4
  241:9,14,17,18,19
  243:9 244:18,21
  245:1,9,12 246:20
  248:16
correction  173:7
corrections  176:12
  176:18,19,20,24
  250:12 252:17
correctly  17:8
  38:10 109:18

140:3,9 175:10
  181:19 183:19
  192:11 194:1
  196:4,19 203:14
  205:20 216:15
  218:11 241:10
counsel  78:1 247:1
  247:10 249:2
counties  14:23
  73:21 104:4
  143:14 187:24
  196:17 197:3,11
county  1:11 6:25
  73:14,19,23 74:10
  74:12,14 104:3
  122:1,3 145:4,9
  159:15,23 160:5,7
  165:16 166:12,12
  169:19 183:12,24
  196:13,15,18,24
  196:25 197:4,7,18
  198:13 201:17,21
  202:2 248:4
  251:10 252:15
county's  169:15
  196:13
couple  13:24
  15:10,12 27:5
  56:22,22,24 57:3,5
  84:14
course  160:17
  184:16 185:11
  190:5 233:10
  245:17
court  1:1 5:15
  10:19 200:21
  201:5 251:7
courts  200:24
  201:6
cov.com  2:22,23

**[covers - date]** Page 10

covers 149:19
217:25
covington 2:19
9:11,13 11:4
create 25:23 56:10
created 17:5 46:14
56:8 89:14,15
110:7 141:10
148:14 171:15,21
217:1 218:9 226:6
creates 56:15
creation 102:24
credentials 70:8
70:14 168:21
191:15
crime 46:24 53:8
53:24 81:23 82:20
83:9,16 94:24
177:7
criminal 39:16
65:17 181:16
209:24
cross 194:20
cs 32:6
csmb 183:18
cull 234:18
cultural 181:17
current 29:3 32:25
135:5 143:4
195:23
currently 11:10
29:3,5,24 61:22
62:3,3 89:6,16
90:11 91:8,12
92:17 94:23
106:11 109:15,21
116:10 120:17
124:22 211:6
219:13 220:1
227:19

custody 5:14
custom 41:4,5
customer 32:23
79:2,8 93:1,8
customers 77:7
customize 176:7
cut 88:20
cuyahoga 6:25
45:25 201:17,21
202:2 248:4
cvs 4:2,2 10:17,18
cycle 219:7

**d**

daily 109:16 130:9
130:10 131:3
138:23 139:2
140:25 141:4
146:3 153:1 158:3
158:8,12 219:17
dan 1:9
dangerous 82:22
149:20 211:3
danna 6:7 100:18
100:25 101:7
data 17:5 19:18,22
24:12,15,17 34:7
37:20 38:1,4,6,12
38:23 40:9,12
41:1,7,12 44:18,20
45:2 47:15,17
48:3,16 49:13,24
52:6,24 53:10,11
53:15 54:10,13
55:9 56:21 59:6
60:5,6,8 68:12
73:4,11 74:16,22
75:10 77:10 85:14
85:19 86:1,7,17
91:23 93:11,14,18
93:23 94:24,25
98:10 99:22

105:10 107:1
108:13,20 114:7
115:8,16,18,24
116:2,6,8,12,13,24
117:1,8,19,23
118:3 121:10
123:22,25,25
124:21,24 125:5,9
132:11 134:17,21
135:3,10,13,14,25
136:11,12,14,19
136:24 147:3,5
148:25 149:4
150:7 156:13
158:3 159:4,14
162:12,13,15,19
162:25 163:6
165:7 172:10,11
172:15 173:1
174:5,9,12 180:3,5
183:10,12 184:8
190:7,9,15,18
191:11 192:6
193:6,24 194:25
195:6,16,20
196:13,15,24
198:14,25 199:2,4
200:1 204:19
205:13 207:12
208:4,8,10 209:19
211:14 214:3,7,8,8
214:10 216:20,21
219:11,24 232:7,8
232:20,23 233:9
233:10,17 236:2
239:20,21 240:2
database 6:11
17:4 19:8,14,15,18
19:23 20:7,13,20
20:25 21:8,25
22:5,8 24:9,20

25:24 26:4 27:4,8
27:12 28:1,8,23
29:20 30:1,18,21
31:4,6,10 37:17,19
37:23 38:23 41:2
47:23,24 49:24
55:11 56:4,21
57:18,21 58:1
59:6,17,20 60:2,5
68:7 73:6,12
76:16 78:14,19
81:22 82:19,25
83:2 84:21 85:7
86:20 89:7 90:15
90:19 96:5,9,11
98:16 102:4,7
106:6,10,14,16
108:12,19 111:24
113:10,12,25
118:6 120:11
122:12 123:16
125:3,8 128:1,14
143:24 146:13,20
148:20 159:4
162:7 176:22,25
177:5 183:18,18
187:19 195:25
204:24 213:24
220:24 221:4,8,12
227:8 231:12,24
databases 103:25
231:19
date 9:2 87:19
90:16 104:18
112:13 127:14
128:18 133:8,11
133:12,21,25
134:3 150:1,19
163:19 165:24
166:1 170:17
192:17 209:19

247:11 250:8
251:3,9,19 252:3
252:13,25 253:20
253:25
**dated** 6:15,23 7:1
151:3 170:25
171:7 182:23
183:3 203:24
204:8
**dates** 26:9 62:10
108:8
**day** 3:13 9:19
109:24,25 110:2
112:13 114:6
129:21 132:21
140:20 142:19,21
143:7 155:10
158:14 163:14
164:13,16 216:13
242:21,21 249:7
251:16 252:22
253:22
**days** 114:4 129:13
129:14 132:13
184:13,20,25
250:18
**dc** 2:21 3:4 4:5
**dea** 66:10 91:22
127:21 147:14
149:4 151:13,14
167:7,15 169:1,1
169:23 170:20
188:11
**deal** 50:16 231:5
**dealing** 36:20
193:18 194:5
**dear** 250:10
**death** 202:13
**deaths** 6:25 88:13
191:1 201:21
202:2 226:24

**debra** 3:19 9:24
223:17
**debra.ogorman**
3:21
**deceased** 191:4
**decedents** 87:20
87:24 108:2 203:3
209:9
**december** 128:11
132:9
**dechert** 3:18 9:25
**dechert.com** 3:21
**decide** 45:9 115:21
**decided** 115:3
197:2
**decision** 22:1,3
25:15 115:6
167:17 210:11
244:22 245:8,11
**decline** 230:23
**declined** 160:13
**declines** 242:15
**decreased** 205:12
**deed** 251:14
252:20
**deemed** 250:19
**deems** 190:5
**defendant** 2:18
11:5
**defendants** 3:22
9:25 223:19 246:5
**defense** 175:8
**defined** 68:2
205:17
**definitely** 44:3
**definition** 76:23
205:24 239:6,8
**degree** 31:15 32:6
**dehner** 2:9 10:6,6
14:5,11 157:2

**deidentified** 99:22
112:11 180:13
**delegates** 89:24
171:23,24
**delete** 121:20,20
130:5,12 132:11
186:17
**deletion** 130:13
**delivered** 69:24
218:10,13,15
**delivery** 247:9,11
**dell** 28:16,19
29:15,17
**delving** 197:25
**denied** 161:2
**dental** 75:20,25
**deny** 160:25
**department** 7:4
45:21 46:1 48:24
49:3,8,21 63:1
66:3,4,6,7 91:14
97:22 98:15
107:22 116:3,7
142:5 145:5
159:16,24 160:7
166:18,21 176:20
176:24 196:11
199:4 200:2,11,13
204:3,11,23
212:23 228:21
237:3 240:12,23
241:2 250:22
**departments**
167:7
**depended** 226:23
**depending** 45:7
70:10 165:21
168:19 170:6
**depends** 47:16
114:2 168:10
200:15 236:15

**depicted** 217:12
217:23 218:3
**depo** 246:14
**deposed** 10:24
12:6
**deposition** 1:17
6:3,5 11:25 13:23
15:15,23 16:2,6,8
16:13,22 17:16,17
35:18 100:16
139:4 146:12
149:7 170:23
174:14 179:10
182:20 198:8
201:19 203:23
214:14 227:7
246:12,22 248:20
250:8,11 251:1,3
252:1,3
**derived** 127:6
**describe** 95:17
162:24
**described** 148:15
244:16
**describes** 45:6
**describing** 239:24
**description** 6:2
**design** 160:18
**designed** 209:12
240:2
**designee** 198:12
**desire** 181:10
**detail** 116:1
**detect** 158:5
195:25
**detective** 166:17
168:25 169:3,6
**determination**
168:5 191:20
200:19

**determine** 42:9
79:13 88:13
115:11 151:21
154:6,23 158:9,13
168:8 175:5
178:19 190:4
196:17 200:18
212:22 213:5,23
230:17 234:18
**determined** 105:9
107:10 108:4
115:19 142:16,18
144:16 145:13
153:3,8 155:23
192:20 220:2
**determines** 42:6
66:18 90:5 124:20
**detta** 4:16
**develop** 101:12
**developed** 110:17
209:16
**development**
219:4 244:5
**devoted** 62:16
**diagnoses** 193:16
**diagnosis** 128:16
193:12
**die** 200:7
**died** 199:14,17,25
200:3
**differ** 170:6,10
217:22
**difference** 164:5
**differences** 186:4
**different** 19:9
40:17,23 54:5,6
59:10 73:21 82:5
82:9,16 86:13,17
89:2 91:15,15
95:9 98:6 99:23
116:4 125:22

132:25 141:8
155:5 165:21
171:20 173:5,22
173:25 177:16
180:20 190:5
208:15
**differs** 152:20
**difficult** 103:1
**direct** 69:19 113:9
180:22 191:21
**directed** 128:7
161:8
**direction** 76:4
**directions** 148:8
**directly** 45:19
46:5 49:10 50:20
80:5,13 111:5
113:10,12 114:7
126:22 182:9
183:13 198:5
205:14 231:5
**director** 7:4 11:18
11:22 18:9,13,17
19:9 21:9,12,13
32:25 33:3,9 34:5
34:11 36:2,13
43:10,15,16,20
44:2 67:19 68:15
76:11 77:20,22,23
81:6 92:11 94:3,8
97:15,16 101:5,9
106:8 108:9
110:19 147:20
182:4,10 204:2,11
209:4 213:2,4
229:4,4
**discover** 47:24
**discovered** 49:9
49:11
**discoveries** 60:17

**discrepancy** 235:7
**discuss** 13:25 37:2
97:1 172:5
**discussed** 51:8,11
51:14 60:23 61:6
74:1 83:8 85:9,21
86:2 128:13
129:13 133:1
137:6,11,14
138:17 145:4
185:11 199:11
204:22 210:7
**discussing** 61:21
63:22 75:6 93:13
136:1
**discussion** 75:11
232:16
**discussions** 210:9
**dispensary** 129:16
**dispensations**
140:1,5,15
**dispense** 83:22
84:4,5,12 102:8
154:20 233:20
**dispensed** 71:25
72:6,10,15,19,22
72:25 73:22 74:13
84:1 121:21
126:18,21 129:16
129:17 153:12
154:7,16 158:14
175:6 178:25
181:14 189:20
195:14 221:23
222:1 233:19
234:15 243:13,22
245:16
**dispenser** 129:25
132:25 135:25
138:5 142:16
143:23 150:8

152:11 163:1
170:7,11 174:4,7
178:22,23 189:12
190:9 194:21,23
195:5,6,11,12
213:7 214:9 234:7
234:11
**dispenser's** 186:17
**dispensers** 123:12
125:10 130:7
132:19 134:25
138:22 139:25
141:20 143:1
152:21 153:2,5,7
153:10 163:8
173:8,9 177:11
219:8 221:18
234:22
**dispenses** 71:20
163:22,23
**dispensing** 71:18
82:11,11 123:8
127:20 131:20
140:7 158:4,8,12
188:1 222:22
233:10 234:2,4
235:1,9,23 237:21
238:4,8,10
**dissemination**
159:17
**distributed** 159:9
**distributing** 150:7
**distribution** 210:1
222:10
**distributor** 2:18
3:7 117:4 150:16
150:17 151:9
152:11 157:20
158:1,2,5 174:10
186:21,23 187:4
187:14,15,21

[distributor - enclosed] Page 13

188:23
distributors 50:12
  51:16,22 52:4,12
  52:14 109:6
  118:25 147:3
  149:20,23 152:20
  157:22,25 160:6
  162:5 163:5
  165:14 182:14
  208:20 232:8,22
  235:21
district 1:2
diversion 138:6,9
  138:13,14,15
  195:22 229:2,10
  234:18 235:10
  241:5,7,12 244:1
division 1:3
doctor 57:10,14,23
  58:7,9,16 67:7
  69:9,23 91:19,21
  92:3 95:12,16,17
  95:20 96:3 134:18
  138:18 192:9
  193:22 199:24
  204:20 205:11,17
  205:23 241:8,20
  242:15
doctors 199:12,21
  225:10
document 1:10
  6:10,15 7:1 101:2
  139:15 146:13,19
  147:22,24 170:24
  171:6,11,13,14,15
  171:21 172:1,4
  174:23 202:3,8
  203:9,24 204:8,14
  204:17
documents 15:3

doing 39:2,18
  40:22 54:22 83:4
  131:14,17 191:3
  211:10
doj 66:9 167:7
door 211:10,10
dosage 129:10
  241:24 242:25
doses 129:12
dr 6:24 180:10,18
  181:23 192:1
  201:20 202:1
  203:1,16,20
  205:11 224:14,14
  224:15 226:18
draft 147:22
  224:13
drafted 147:24
drag 113:22
dramatically 25:2
driver's 170:17
  192:25
drop 113:22
droz 6:7 100:19,25
  101:7
drug 3:8 6:8 10:2
  35:16,20 40:10
  46:12,24 50:4
  68:19 71:15 73:23
  74:14 79:8 91:22
  95:22 101:21,25
  107:16 122:21,21
  126:7,10,11,12
  127:9 128:17
  138:10 139:5,11
  140:1 147:15
  149:25 150:1
  155:3 161:14,18
  175:9 177:7
  178:15 192:4
  195:14 196:12,13

200:21,24 201:5,6
  203:13 215:23
  233:10 236:17
drugs 23:9,18 24:2
  50:19 67:21,25
  82:7,7,12,21,22
  83:21 84:3,11
  86:18 91:22 95:25
  96:1,7,12 107:10
  107:12,13,15
  131:9,10,21
  149:20 211:3
  222:1,10 225:2,7
  227:3 233:1
duly 10:23 248:7
  248:10
duties 18:25 19:1
  20:21 92:22
dynamic 7:2
  203:25 204:9

e

e 2:5 37:14,14
  111:13
e.g. 181:7
earlier 59:4 62:19
  77:14 84:24
  100:13 105:2,3
  123:4 151:22
  183:25 185:11
  202:5 210:17
  211:2,9 213:18
  219:16 227:6
  231:7
early 79:23 207:14
easier 140:20
east 1:21 3:9
eastern 1:3
editing 180:7
edits 224:16,20
education 31:19

educational
  171:21
effect 128:13
  185:9 232:13
effective 6:9 139:6
  139:11,23 149:15
  150:20 243:5
eight 128:12
  196:16
eighth 202:16
either 36:18 45:4,7
  45:9 52:8 53:6
  55:23 68:14 128:3
  129:1 131:7 151:8
  228:20 229:3
  239:10 243:21
  249:2
electronically
  218:10
eleventh 2:15
eliminate 194:25
ellis 4:8 10:14
email 45:5 56:16
  68:14 69:24
  160:23 218:13
  250:17
emch 3:9 5:10
  10:1,1 119:8
  227:23 228:7
  245:22
emergency 244:11
  244:14
employed 11:10
employees 61:15
  61:17,22 92:17,24
employer 18:21
en 200:5
enabled 222:17
enacted 101:11
enclosed 250:11

ended   26:23 77:12
ends   216:4 217:13
endusers   135:17
enforcement
  44:24 45:18,20,22
  46:24 48:22 63:14
  64:17 65:2,14
  70:2 72:2,5,8
  94:18 102:20,22
  121:22 153:16,22
  160:12 161:8
  168:11 170:8
  174:5 175:18
  176:13,16,18
  179:6 191:18,20
  196:2 199:6
  236:25 237:25
  238:18 240:25
engage   7:6 214:16
  214:25
enhanced   192:4
enhancement
  111:2
ensure   153:23
entail   161:6
enter   47:2 165:8
  165:20
entered   189:18,22
  192:18 231:13
  252:9
entering   164:15
  165:3 189:23
enters   70:24 72:11
entire   50:15 76:22
  193:19 213:3
  251:5 252:5
entirely   25:10,11
  25:13 86:16 106:9
  212:24
entities   64:19,24
  66:15,21,23 90:8

103:7 104:25
  105:5 150:4 166:4
  166:6 167:6
  175:21 187:11
  230:20
entitled   6:11,16,19
  6:22,25 7:2,6
  146:14,20 147:5
  170:25 171:8
  179:11,18 182:21
  183:2 201:20
  202:1,18 203:25
  204:8 214:15,25
  218:7
entity   156:19
  159:1 160:12
  167:3,19 218:2
entry   193:24
  194:25 218:8
enumerate   66:21
equipment   50:15
equivalent   86:25
  110:21 196:14
equivalents   73:15
  86:14
eric   43:17
erin   4:12
errata   250:13,18
  252:7,10,18 253:1
error   194:25
errors   193:25
especially   83:20
  115:15
esq   2:4,4,9,14,19
  2:20 3:3,3,9,13,19
  3:23 4:3,8,12
essentially   233:9
established   101:18
  137:15 206:1
et   1:11,12 82:22
  123:1

evaluate   192:6
  193:6 219:23
evaluation   193:9
  195:16
event   45:1 249:3
events   94:4
eventually   37:8
  222:22
everybody   66:6
everybody's   45:8
evidence   108:3
evolution   17:6
  105:13,19
evolved   109:1
exact   104:12,18
  126:7,10 127:14
  130:1 217:17
exactly   91:5 150:5
  169:9 236:15
exam   191:4
examination   5:7
  10:22,25 223:14
  227:22
examiner   65:6
  201:16
examiners   190:14
example   21:19
  59:4 60:10,21
  67:22 69:22 70:2
  70:17 71:13 75:3
  92:2 94:7 103:6
  109:14 114:24
  116:14 121:23,25
  123:15 124:17,20
  134:18 148:5
  152:24 159:15,23
  164:13 166:11
  167:7 169:14,22
  199:3 209:4 211:1
  221:3 222:6 237:5

examples   67:17
  175:22
excel   68:13
exception   128:15
  156:12 213:20
exceptions   184:14
  213:20
executed   252:10
execution   251:14
  252:19
executive   21:12,13
  76:11 81:5 101:5
  213:4
exhibit   5:14 6:3,5
  6:6,8,10,13,15,18
  6:19,22,24 7:1,5
  16:6,12,14,17,19
  17:11,16,22,22
  18:1,3 100:16,23
  109:9 139:4,10
  146:12,19,24
  147:5,23 148:6,22
  149:7,12 165:10
  170:23 171:6,22
  174:2,14,19
  177:22 179:10,17
  179:17 180:2,9,25
  180:25 182:18,20
  183:1,8,22 184:4
  191:25 201:19,25
  202:8 203:23
  204:7 207:2
  214:14,24,24
  215:20 216:1
  217:13,23 223:20
  225:17
exhibits   5:5,15 6:1
exist   136:1,9
  231:19
existed   30:21

exists  135:14 136:11
expanding  203:17 203:21
expect  81:12,15,18
expectation  216:23
expectations  79:14 181:18
expected  77:3,4
expecting  79:1
experience  182:6 234:21 239:14
expiration  251:19 252:25 253:25
expires  249:17
explained  224:17
explanation  144:3
extent  60:25 83:11 144:23 157:21 222:21 230:16 234:9 239:3

**f**

f  2:19 3:12
fact  117:14 118:16 158:21 179:3 199:19
factor  66:19
factors  210:22,23 220:3
fail  141:20
failed  213:24 217:4
failing  155:24
fails  142:17 155:15
fair  12:20 35:24 138:3 155:11
fairly  166:25 201:1

fall  106:14 222:20
familiar  35:12 139:14 165:11 174:22 202:15 213:11
far  26:10 123:21 135:13,24 210:8 226:22 232:20 241:24 243:11 245:19
farrell  2:14 9:20 9:20 14:24 78:1,2 161:4 197:23 198:4 206:19
fashion  181:16
fast  130:14
fatal  203:10
federal  91:2 92:4 97:6 212:18
feedback  207:24
fees  97:13 212:19
felt  206:14
fewer  49:15
field  68:23 127:23
fields  163:11 164:1
fifth  238:1
figure  137:3
file  147:9 148:10 148:13,16,20 149:2 163:7,9,10 165:9 202:23 226:1,4,9
files  211:15
fill  68:22 132:8,20
filled  114:17 121:5 130:1,4 131:4 133:11 164:8,12 216:11 229:22
final  77:11 148:2

finalized  200:2
find  36:20 89:1,3 141:24 155:18 169:20 215:13 250:11
finding  116:5
findings  42:13 202:8,18 225:21
fine  142:13
finish  12:18 27:19 81:18
firewall  28:14,18
firm  11:4
first  10:23 15:22 102:22 103:2 108:21 122:19 141:10 155:17,22 180:21,25 192:13 207:15,17,18 216:8 244:4,11 248:10
firsthand  181:22 182:3 224:2,7 225:8,14
fit  88:10 115:10,12 115:16
five  49:22 52:17 62:11 135:6,8,14 135:16,17 139:20 190:11 205:19 211:25 228:17 242:21
flag  69:15 189:10 189:17 192:7 193:7 194:6 219:24,25
floating  100:8
floor  2:5,10 4:13
florida  183:15
focus  181:5 222:3 222:8

folks  62:2
follow  142:11
followed  37:4 153:24 154:3
following  192:10 216:10
follows  10:24
force  212:7
forces  212:11,14
foregoing  248:16 248:21 251:13 252:18
forgot  106:1
form  43:8 163:24 163:25 213:9
format  147:9 148:14 163:8,9,11
formatted  148:10 149:3
former  101:5
forms  160:19
forth  78:5 93:10 148:22 150:12 153:20
forward  250:15
fostered  181:18
found  40:12 42:12
four  20:14 44:6,8 93:21 228:17
fraudulent  181:9 225:6,12
frederick  3:17
free  251:14 252:20
frequency  151:19 151:21
frequent  140:18 189:3
frequently  50:16 84:9 130:7 140:8 140:16 144:6 146:5 153:10

189:6 237:22
**front** 189:7 208:6
233:13
**full** 12:23 164:25
198:7
**function** 195:17
**functional** 7:2
204:1,9
**functionality** 31:7
**functions** 31:7
**funded** 91:1 97:3
**funding** 60:24
91:11 97:5 212:17
**furnish** 118:19
154:17
**further** 80:17,19
136:9 140:5 236:4
246:6 248:19
249:1
**future** 209:21

**g**

**g** 35:6
**gabapentin** 107:16
107:19,23 108:1,7
165:3
**gain** 104:17
**garner** 1:18 5:7
9:6 10:21,25 11:2
11:9,11 16:15,17
55:7 112:24
157:12 207:1
215:6 223:14,16
227:22 246:6
248:9 250:8 251:4
251:9 252:4,13
253:20
**gathered** 108:3
**gatherings** 33:15
33:17
**gcoat** 206:4

**gender** 134:1,3
**general** 2:3 10:9
97:13 187:22
228:23 231:4
**general's** 10:4
65:11
**generally** 49:2
137:16 234:24
**generate** 47:9 69:6
72:14 73:2 74:16
**generated** 63:2
67:10,12,14 69:20
105:21 110:10,12
**generates** 70:15
**getting** 62:4 64:25
92:7 233:16
235:24
**gilson** 6:25 201:13
201:20 202:1
203:1,17,20
226:18
**give** 12:10,23 13:3
18:6 67:17 75:3
94:6 129:11,13
132:25 163:19
200:18 229:21
238:13 247:1,10
**given** 83:23 122:8
175:5 187:23
188:5 200:3
202:17 227:12
229:8 230:18
248:13,17
**gives** 208:2,4
233:23
**giving** 15:23
**glance** 208:1
**global** 236:19
**glynn** 2:20 9:12,12
**go** 13:16 32:3
43:14 56:25 57:7

67:2 68:22 69:18
70:6,7 103:3
112:24 123:22
132:10 157:4
174:5 186:23
198:9 215:16
226:22 238:3
**goes** 34:8 60:16
123:25 136:2
143:5 175:12,20
198:5 199:11
**going** 16:12 17:21
53:5 73:4 78:7
100:22 112:16
117:1 130:11
139:9 142:12
156:24 161:5
171:5 179:16
183:1 189:16
197:23,24 198:9
204:7 206:17
208:3 213:22
233:23 234:13
235:7 246:16
**good** 11:2 24:13
115:17 208:2
223:16 231:1
233:23
**google** 69:4
**gotten** 207:23
**government** 36:25
91:3 97:6 243:18
**governor** 206:1
**governor's** 65:19
65:22,25 206:1,9
212:6
**graduate** 31:19
**graduation** 32:12
**grams** 126:14,22
242:25

**grant** 4:13 90:25
92:4 94:22 95:5
95:10 96:16
**grantee** 94:13
**granters** 91:24
**grants** 54:5 90:20
90:23 91:1,7,12
96:20,24 97:6
212:17,18
**graph** 115:16,17
**graphical** 113:21
**greater** 216:12
**greene** 2:14
**griffin** 43:17 80:1
**griffin's** 45:15
**group** 115:23
116:1 227:15
**groups** 94:17 98:6
100:1,5
**grow** 110:25
**grown** 83:11,13
**guess** 59:22 77:5
**guessing** 246:15
**guide** 75:11
**guidelines** 124:23
242:5,7 244:6,15
244:16,19,19
**guiding** 66:19

**h**

**h** 3:13,14 35:6
**half** 15:25
**hand** 17:21 163:20
214:23 235:3
249:6
**handful** 84:18
**handled** 109:17
110:2
**happen** 40:7
112:12 132:4
155:21 227:18
237:22

**happened** 37:11
151:3 153:19
206:13
**happening** 132:16
222:23
**happens** 46:15,21
58:17 121:12
232:4
**hard** 130:14
234:10
**hardware** 28:3,4,7
28:7,11,17 29:4,10
29:12,17 30:12
**hbc** 4:11
**head** 12:12 66:13
85:23 168:13
170:13
**heading** 183:10
**health** 2:3 3:2 9:15
9:17 23:19,22
24:8 91:6 97:22
98:1 99:17 107:23
116:21 119:19
135:10 196:2,14
200:3 218:20
240:23
**health's** 218:7
**healthcare** 89:22
90:11 102:21
119:20,23 120:1
120:10 153:11
154:1 177:20
192:8 193:14
207:22 209:1
**hear** 80:2 198:2
**heard** 23:3,10,19
182:1 202:13
213:10
**hearing** 99:21
107:21,24

**heightened** 181:5
**help** 75:10,11
81:17 93:5
**helpful** 171:16
**helps** 93:11 154:23
**hereinafter** 10:23
**hereunto** 249:5
**herman** 3:22
**heroin** 202:19,22
**hide** 197:3
**high** 2:10 203:10
**highly** 181:11
**hire** 61:1 63:19
**hired** 61:8,11,24
116:9
**hiring** 61:3 93:18
**historical** 96:2
**historically** 36:15
235:20
**histories** 87:20
**history** 78:22 79:2
79:5 87:24 124:1
124:25 134:7,22
144:24 145:2
169:15,20 170:1
175:3,7 193:14
209:25 213:15
216:14 227:3
238:11
**hit** 129:3
**hoc** 56:10 57:19
67:14,18 71:10,12
84:13 87:2,7,10
236:7
**hold** 18:11 20:9
121:10 229:19
**holds** 60:5
**home** 50:14
**honest** 12:24
**honestly** 53:2
215:24

**honor** 161:15
**hooked** 177:13
**hope** 242:11
**hospital** 102:3,3,6
125:13,14,15,17
125:21 243:13,14
243:21,22
**hospitals** 125:12
243:11 244:2
**hosted** 19:15 29:5
29:7 30:7,8,9 38:5
108:16
**hosting** 29:9
**hour** 13:16 112:17
156:25 219:6,7
**hours** 15:10 47:18
114:8 140:6,16
236:20
**house** 6:7 26:21
100:12,17,24
103:9 119:2,5
185:5,10 186:7,8
192:1
**houses** 149:4
**http** 148:6
**hubbard** 3:24
**huh** 45:4 50:1 67:4
70:20 81:24 85:4
109:11 139:19
181:2
**human** 2:3 69:18
89:4
**hundred** 41:16
49:16
**huntington** 2:15

**i**

**i.e.** 235:8
**idea** 88:11,16
100:8 188:12
231:4 233:23
239:8

**ideas** 210:2 212:25
**identification**
16:10 17:19
100:20 120:25
122:14 139:7
146:17 149:10,25
149:25 151:6
171:3 174:17
179:14 182:24
201:23 204:5
210:19 214:21
241:11
**identified** 79:10
82:18 112:9 136:2
136:6,14 179:23
180:3
**identifier** 192:14
192:24 193:3
220:14
**identifiers** 192:21
**identifies** 17:3
57:10,11 72:12
103:6 134:22
156:9 177:20
**identify** 9:8 36:4
54:1 57:14,22
67:6,24 78:23
86:8,21 94:24
95:10 114:23
126:14 134:18
136:7 138:13
145:11 152:8
194:6 221:5,7,15
221:18,20,22,25
240:3 241:15
**identifying** 70:11
83:16 92:2 168:19
170:16
**identity** 201:10
**ids** 69:23

il  3:24
illicit  227:3
imagine  58:19
immediately  18:16
impactful  56:25
  57:6
impair  13:2
implement  22:8
implemented
  30:13 105:23
implementing
  27:11
important  153:13
  153:19
impose  13:9
improved  63:7
inappropriately
  144:14,17
inbox  218:15
incentives  7:6
  214:16,25
inception  110:13
include  34:6 65:5
  67:6 70:12 154:14
  241:21
included  102:4,6
  116:2 224:3
  250:13
includes  65:2
  145:20 175:24
  176:2
including  17:4
  47:4 175:18 181:5
incorporate
  207:19
incorporated
  207:17 252:12
incorrectly  78:10
increase  22:16
  24:22,25 25:18
  26:7,13 93:20

110:9,11
increased  25:2,8
  181:4
increasing  27:9
  227:13
indefinitely
  135:11
independent
  164:22,22
index  5:1,5 6:1 8:1
indiana  4:2 10:18
indicate  57:15
  58:2,13,22 67:7
  68:18 82:10,20
  142:25 209:15
  240:17 241:7
indicated  231:6
  232:6 233:16
  241:4
indicating  168:13
  250:13
indication  57:11
  95:21,21 115:17
  208:3
indications  221:14
  242:10
indicative  83:8
indicator  235:9
indirectly  80:6
individual  7:7
  17:23 18:5 34:21
  47:3 65:15 70:9
  90:1,10 93:15
  106:21 117:10,13
  121:1 144:16
  145:11 155:10
  166:14,15 167:24
  168:6,7,9,15,19,22
  170:1 191:4 199:8
  205:1,18 208:23
  214:17 215:1

230:4 233:2
  242:12
individual's
  169:20 172:19
individualized
  218:9
individuals  54:1
  61:19 86:8,21
  95:11 104:24
  144:13 158:20
  187:18 201:4,10
  203:6 210:20
  229:6
influence  13:1
  179:4
info  124:12
inform  53:21
  209:18
information  18:17
  18:18,24 19:4,12
  19:19,24 20:2,18
  21:11 22:24 23:2
  31:23 47:3,24
  62:22 70:11,22
  78:24 102:25
  108:5,7 110:21
  111:22 112:10,12
  117:2,16 119:21
  121:8 123:2,6
  124:9,17 125:24
  126:3,7 128:3,18
  129:1 133:16
  134:24 135:6
  137:5,10 138:5
  153:9,25 154:6
  156:21 158:4,9,13
  159:12,14 160:8
  160:14,19 162:9
  163:21 164:11
  165:9 168:6,12,18
  170:16,19,21

172:10,19 173:9
  180:14 186:22,24
  187:5,25 188:3,10
  189:13,24 190:2,5
  191:1,6 193:3,8,12
  194:7,17 195:8
  197:13 199:18
  200:9,14,18 203:2
  208:5 209:17,21
  209:23,25 210:2
  210:14,25 211:12
  211:23 213:25
  214:5 220:2,5,25
  222:18 226:21
  229:20 230:5,17
  232:3 233:2
  234:17 235:22,25
  236:2,6 237:10,14
  237:19,22 238:4
  238:13,17 240:7
  240:16
initial  75:9,23
initially  110:23
  141:23
initiated  144:18
initiates  178:18
initiative  181:7
input  24:15 25:7
  96:20,23 206:14
  232:24
inputting  189:12
insert  121:19
insight  207:12
  216:5 229:1
inspector  42:23,25
  43:2 44:17
installed  28:4
instance  39:20
  40:4 113:13 211:8
instances  143:22

instantaneous
  219:11
instituted  108:21
  108:24 128:10
institution  128:14
institutions  181:11
instruct  13:12
instruction  247:2
  247:10
instructions  6:11
  146:14,20 147:2
insurance  99:10
insurers  98:22
  99:1,5,8 227:7,9,9
  227:13 228:21
  230:4
integrating  111:5
intended  93:24
  102:19 138:11
  195:16
interaction  211:4
interagency  7:3
  204:1,9
interested  131:8
  249:3
interface  34:22,25
  35:8 47:2 69:1
  165:16
internal  45:24
  98:4 237:2
internally  221:13
interplay  147:17
interrupt  65:16
  86:2 167:11
interstate  105:25
  106:3 110:8
  119:14 120:5
interventions
  95:13 211:11
interworkings
  241:2

introduce  228:5
introduction
  180:23 207:6
  224:3
introductory
  223:24 224:11
investigate  46:1
investigated  44:11
  45:17 49:5 143:23
  143:25 144:11
  199:8 203:4
investigating  45:1
  47:4 70:9 226:25
  238:2
investigation  39:2
  39:14,19,21,25
  40:5,6,14 42:8,10
  42:20 43:1 44:20
  46:12 49:12 53:7
  70:4 85:15 103:2
  144:22 196:3
  198:23 237:20
investigations
  39:11,12,14 42:12
  42:14 43:18 47:21
  49:18 51:4,13,16
  51:21 52:1,3,12,14
  52:22 53:25 62:20
  65:17 84:21 85:1
  85:8,20,25 144:4
  144:13 238:20
investigative
  56:23 57:13,16
  102:19
investigator  48:10
  48:18 103:3
  144:20
investigators
  40:20 167:10
  168:16 198:22
  199:2 238:20

invoice  122:23
involved  45:3
  46:17 48:14 80:7
  80:17 142:5
  144:21 180:8
  212:7,11,13
  238:21 241:12
  244:4,13,14
involvement
  226:17 231:21
involving  184:16
irb  180:12
ish  120:7
issue  36:19 81:16
  114:21 222:13,15
issued  150:2
issues  81:17
  220:17
issuing  170:21
  184:12
items  209:15
  232:21

j

j  3:3
jackson  3:8 10:1
jacksonkelly.com
  3:11
james  2:4 10:8
  250:5
james.wakley  2:7
janssen  4:7 10:14
jbushur  3:6
joe  4:16
john  3:14
johnson  4:7,7
  10:14,15
join  104:4
joins  168:25
joint  98:10 181:7
jones  3:13 9:19

jonesday.com
  3:16
joseph  3:3 9:16
jr  2:14 9:20
judge  1:9
judgment  190:4
  245:14
july  109:22 249:17
jumped  78:5
jurisdiction
  106:15
justice  66:4,6,7
  91:3 94:15

k

k  3:12
kasich  206:1
keep  25:4,6 37:20
  37:25 38:5 53:10
  117:17 132:18,18
  135:3,7,10,16
  186:2 206:17
keeping  235:1
keeps  231:25
kelly  3:8 10:1
kept  135:18,20,22
  211:22
ketchum  2:14
key  56:24 57:5
  91:19 179:1 180:4
keyes  3:3 9:14,14
keying  163:20
kick  156:7
killed  245:4,6
kind  26:10 38:6
  129:3 170:18
  171:20 186:3
  200:4 207:10
  208:4 235:13,19
  236:6,25
klauss  1:23 248:6
  249:14

**knew** 80:14
**know** 12:2 13:6
22:6 23:5,13,22
26:23 33:14 34:7
34:14 35:4 40:19
40:20 43:12,22,23
44:9,14,22,23 45:7
45:8 46:23 47:11
48:20 49:14,15,17
50:15,16 51:25
53:24 54:5 56:24
57:6 58:17 64:23
66:8 69:5 76:6,22
76:22 79:3 82:6,8
82:11 83:12 84:4
91:7,19 92:3 93:2
93:4 95:21 96:2
97:1,10 98:3,11
101:17 103:18
104:9,12,13
109:20 113:18,21
114:6,8 115:5,14
115:24 117:16
120:14,16 121:13
121:14 122:20
125:20 126:21
131:6,8,10,21
132:14,16 137:18
140:15 141:15,24
142:4,19,21,23
143:10 144:2,15
151:1 152:19
154:14 155:2,3,4,6
155:21 159:19,20
159:21 160:20,23
161:17,24 163:20
163:25 165:1,12
165:13 166:23
168:20 171:19
178:23 180:18
182:8 185:3,9,23

185:24 188:8
193:15,15 194:8
197:11,12,20
199:17 200:12
201:13 202:5,11
203:1 212:15
213:9 215:11
217:9 220:15
221:9,14 222:25
226:15,20 227:1
228:18,22 229:24
230:2,22 231:2,24
232:16 233:7,18
236:3,17 238:8,11
239:4,7,20 240:13
241:1 243:18
244:3,9
**knowing** 195:6
235:5 238:14
**knowledge** 24:10
162:10 181:22
182:3 224:2,7
225:1,5,8,10,14
227:4 244:2
**known** 194:22
**knows** 131:20
132:1

---

**l**

**l** 1:23 3:9 37:14,15
248:6 249:14
**l.p.** 1:12 3:17
**label** 7:8 129:22
214:19
**labor** 6:23 182:22
183:3
**lack** 95:11,15
240:5 245:4
**languages** 113:23
**large** 141:22 155:5
**late** 20:11 77:14
79:23 142:23

239:18
**latest** 111:2
211:25
**law** 11:4 25:2 40:8
40:10 45:18,19,22
46:10,23 48:22
50:4 63:13 64:17
65:2,13 66:17,20
70:1 72:2,5,8 90:4
90:9 94:17 101:11
102:20,22 109:6
118:17 121:22
135:2 137:15,16
153:16,21,24
154:2,18 160:10
160:12 161:7
168:11 171:19
174:4 175:18
176:13,15,17
179:6,8 191:8,17
191:20 195:23
196:1,1 199:6
236:24 237:25
238:17 240:24
**lawful** 10:21
**laws** 105:9,11
**lawsuits** 223:19
**lawyer** 160:8
**lawyers** 14:12,15
198:7
**layout** 113:21
**lead** 44:20
**learning** 86:18
87:14,18 88:12,16
88:19,20,25 89:7
89:10,13 90:13
113:14 114:3
**leaves** 131:13
132:1
**led** 101:14

**lee** 3:9
**left** 131:5 212:19
**legal** 76:23 112:11
203:11 222:10
250:1 253:1
**legalities** 197:12
**legally** 172:16
245:14
**legislation** 103:6,8
103:13 105:2
119:3
**legislature** 55:22
76:5 101:20
228:19
**legitimate** 245:16
**length** 124:16
**letter** 168:13
250:19
**level** 92:1 116:8
183:12 190:18
196:13 228:25
229:9
**levels** 235:1
**license** 39:16
150:1,18 170:18
170:20 193:1
**licensed** 22:22
**licensee** 50:5
**licensees** 50:2,3,7
50:10,17 51:4
217:25
**licensing** 143:18
196:3 198:20,24
212:19 217:6,8,15
217:22,24
**licensure** 97:12
**life** 30:20
**likelihood** 88:14
**likewise** 48:2
**limit** 167:2,14
234:1,4,10

| | | | |
|---|---|---|---|
| **limitation** 189:4 | **llp** 2:19 3:2,18,23 | 134:14 230:3,24 | **majority** 106:18 |
| **limitations** 161:5 | 4:3,8,12 9:25 | 236:2,5 238:9 | **making** 143:23 |
| 242:7,21 | **local** 38:5 | 241:6 | 189:24 224:20 |
| **limited** 104:21 | **locate** 148:9 | **looking** 47:17 | 243:19 |
| 173:17 211:5 | **located** 30:2,4 | 53:24 82:6 86:17 | **manage** 33:4 |
| 233:20 | **log** 47:1 68:7,9 | 114:3 153:17 | **managed** 98:25 |
| **limits** 75:7,22 | 70:7,13,21 191:15 | 154:9 155:9,9,11 | 176:10 228:12 |
| 118:17 154:16 | **login** 70:22 | 183:23 209:24,25 | **management** |
| **line** 32:5 133:24 | **logs** 71:6 72:11 | 210:5 212:1 | 33:10,24 68:10 |
| 175:8 178:23 | 214:11 | 227:15 236:16,16 | 92:12,16,22 |
| 208:4,4,7,7,9,9 | **long** 11:22 15:8 | 238:8 | **manager** 176:9 |
| 250:13 252:7 | 20:9,12 47:10,13 | **looks** 163:25 | **managers** 176:4 |
| 253:3 | 57:21 58:1,15,18 | **lost** 78:3,5 213:6 | **managing** 33:5 |
| **liquid** 126:19 | 58:21 59:17 60:2 | **lot** 27:2 34:7 53:16 | 34:10 |
| **list** 44:23 46:8 | 63:5,14 82:25 | 116:1 130:22 | **mandate** 105:1 |
| 50:15 54:14 72:22 | 92:4 113:25 | 165:5 181:23 | **mandated** 55:22 |
| 133:1 175:20 | 114:12,13 120:4 | 195:19 206:12 | 187:9 |
| 177:20 189:25 | 122:24 123:1,21 | 208:2 210:2 | **mandator** 216:9 |
| 193:19 200:2 | 123:23 124:24 | 222:18 235:3 | **mandatory** 6:16 |
| 217:3,4 218:21 | 129:19 130:16 | 237:7 | 123:1,3 171:1,8 |
| **listed** 74:6 150:4 | 132:18 134:24 | **lots** 239:10,11 | **manner** 57:19 |
| 195:1 215:7 252:7 | 135:1 138:25 | **louis** 104:3 | 60:8 136:2 152:23 |
| 252:17 | 141:12 146:8 | **lunch** 157:3 | 201:12 230:25 |
| **listing** 73:20 252:7 | 162:12 185:3,9 | **m** | **manual** 6:18 |
| **lists** 218:21 | 196:21 236:13 | | 163:18 174:15,20 |
| **literally** 68:6 | 242:2,3 246:16 | **m** 2:9 4:4 | 207:3 |
| **litigation** 1:7 9:5 | **longer** 121:21 | **machine** 86:17 | **manually** 143:5 |
| 11:6 14:16,19 | 135:15,19,20,22 | 87:14,18 88:11,16 | 163:14 164:15 |
| 250:6 251:3 252:3 | 195:17 196:23 | 88:19,20,24 89:7,9 | 165:8 |
| **little** 16:3 32:24 | 228:15 | 89:13 90:13 | **manufacturer** |
| 47:19 75:4 87:17 | **look** 16:14 82:16 | 113:14 114:3 | 64:9 150:6 157:15 |
| 103:5 105:12 | 143:5 144:20 | **madam** 250:10 | 157:17 188:25 |
| 125:23 161:22 | 148:5 154:14 | **main** 4:9 34:23 | **manufacturers** |
| 163:23 164:4 | 163:3 165:18 | 35:1,11 | 50:17,22,22 |
| 166:10 170:5 | 167:20,23 200:4,5 | **maintain** 124:17 | 149:19,23 160:6 |
| 173:15 190:13 | 210:21 221:13 | 124:24 | 173:12 208:17 |
| 221:4 | 223:20 225:16 | **maintained** 28:5 | **maps** 73:14,25 |
| **live** 87:25 88:13 | 236:19 238:3 | 38:13 54:10 | 74:9 |
| **living** 87:21 | 240:2 246:16 | **maintenance** | **march** 6:23 |
| **llc** 4:2 10:18 | **looked** 71:16 | 124:13 | 139:24 140:24 |
| | 78:22,23 79:4 | **major** 73:23 | 182:23 183:3 |

**marcus** 4:12,15
**marijuana** 222:14
222:16
**mark** 16:12 183:1
201:25 204:7
**marked** 6:2 16:9
17:18,22 100:19
100:23 139:6,10
146:16 149:9
171:2 174:16
179:13,17 182:23
201:22 204:4
214:20,23
**market** 6:23
182:22 183:3
**marketing** 36:18
36:23 37:5,10
181:9 224:7 225:2
225:6,12
**marketplace**
207:16
**marking** 171:6
**mart** 3:12
**massachusetts**
183:15
**masse** 200:5
**massive** 181:14
**master's** 31:22,25
88:18
**mat** 9:22
**matter** 59:1,18
60:6 63:22 83:3
124:13 172:18
198:9,10
**matthew** 3:23
**matthew.brewer**
3:25
**maureen** 2:19
9:10 11:3
**maximum** 62:15
242:22

**mbrowne** 2:22
**mcconnell** 3:14
**mckesson** 2:18
9:11,13 11:5 23:3
23:5 24:3,7
116:14 117:6
**mcnamee** 77:25
80:1 96:19
**mdl** 1:6,8 2:13
9:21
**mean** 21:2 24:5,11
25:14 27:13 28:2
29:14 31:1 35:23
36:24 38:2,24
42:9,10 43:5
46:21 48:21 55:20
56:13 57:7 59:20
59:21,22 60:4,5,14
60:19 63:10,24
64:4 74:25 75:18
79:6 80:15,16
81:25 92:21 98:24
102:21 131:7
132:14 136:5
145:7 148:12
153:22 160:18
162:2 163:2 173:4
173:24 178:16
180:6,6 197:14,20
208:10 226:5,12
235:24 239:20
241:20 245:5
**meaningful** 7:7
214:17 215:1
**means** 226:8,9
**meant** 189:22
**measurement**
74:13 91:20
**measurements**
73:22

**mechanism**
117:18,22 121:15
121:17
**medicaid** 7:4
97:21 98:7,14,15
98:18,21,23 99:4,9
99:11 175:24
176:10 204:3,11
204:23 205:1,6
209:5 227:9 228:3
228:21 229:15,23
230:10
**medical** 50:14
65:5 75:19,25
128:4 129:1 134:7
185:24 190:14
191:4 201:16
222:14,16 224:23
229:4 230:6
245:16
**medicare** 209:6
228:3 229:14
230:10
**medication** 13:2
87:6 102:3 126:17
**medications** 50:23
**medicine** 179:21
240:22
**meet** 15:8 98:8
99:16 100:1
155:24
**meeting** 15:2
34:16 36:11 95:5
97:1 116:2
**meetings** 13:24
33:13,14,17,21,25
34:13 35:25 76:8
80:22 93:9 94:13
97:17,19,21 98:3,4
98:5,5,6 100:4,7
180:20

**member** 45:14
64:11,13,14 206:6
206:9
**memorandum**
180:15
**mental** 91:6 97:22
98:1 99:17 107:22
196:14
**mention** 182:13
**mentioned** 18:8
24:21 26:3 29:24
38:8 49:23 53:10
54:9 59:3 73:6
74:20 84:19 87:14
92:8 94:2 97:4,14
100:12 104:6
111:10 113:3
114:22 118:8
119:12,16 122:12
123:4 130:5 138:4
152:24 154:22
162:11 177:19
183:25 198:19
210:17 211:9
212:6 213:12,18
241:7
**met** 11:2 14:24
76:1 98:7 180:19
**meth** 222:8,11
**method** 148:6,6
**methods** 163:5
**metrics** 218:22,24
219:2
**mic** 223:7
**michigan** 183:15
**microsoft** 36:7,8
36:12,17 37:6,9
**midwest** 250:17
253:1
**migrate** 30:18
111:19

**migrating** 132:5
**mill** 239:4
**milligram** 73:15
  86:14,25 110:20
**milliliters** 126:20
**mills** 181:16
**mind** 36:11 39:20
  43:24 44:8 52:4
  52:13 54:17,18
  61:11 117:17
**mine** 239:19
**mines** 239:21
**minute** 16:14
  27:18 54:25 59:2
  89:20 114:20
  118:6 130:3 170:4
  216:18
**minutes** 58:20
  59:1 92:6 114:8
  236:18
**misprescribing**
  229:2
**missed** 217:9
**mission** 88:8,10
**missouri** 103:24
  104:1,2
**misunderstood**
  224:18
**misuse** 82:10
  195:22 229:2
**mme** 74:10 86:25
  126:23,24
**mo** 131:2
**model** 41:6,24
  42:7 47:14,16
  60:7 89:13 114:4
  209:18 236:10
**models** 40:18,25
  41:2,10,12 42:4
  48:3 56:24 57:6
  59:5,10,14 60:1,23

61:5,12,21 78:25
85:2 86:18 87:15
87:18 89:16 110:6
  239:25 240:1,9,18
**monitor** 40:9 41:1
  41:7,12,25 47:22
  49:24 59:6 99:23
  102:25 123:14,18
  124:4 141:16
  143:15,19 145:1
  145:17 201:4
**monitoring** 6:9
  35:10,16,20 40:13
  44:18 45:2 48:16
  49:13 52:6 53:7
  101:23 122:3
  135:10 139:5,11
  153:15 183:18
  195:22 203:13
  233:11
**monitors** 47:23
  101:24 156:6
**month** 15:25,25
  69:19 141:11,13
  142:22,23 146:7
  153:4,6 155:4,6
  156:2,5 205:20
**monthly** 56:17,18
  67:12 69:9,16
  87:9 153:1 156:8
**months** 55:23,24
  153:20 197:19
  238:10
**morning** 11:2
  199:11
**morphine** 73:14
  86:14,25 110:20
**mou** 180:12,15
**mount** 32:7
**mouthful** 85:12

**moved** 106:19
**movement** 98:20
  98:23
**moving** 111:4
  165:9
**multiple** 52:1
  134:11 157:22,24
  163:5 181:4 200:6
  209:17 211:3
**multistate** 104:15
  104:20 105:6
  120:18
**mute** 133:23
**mutual** 230:6
**myriad** 175:16

### n

**n** 4:8 35:6
**n.d.** 1:13
**n.w.** 3:4
**naloxone** 210:1
**name** 9:5 11:3,7,9
  35:5 66:21 70:8
  70:24 127:18
  165:24 170:17
  176:19 188:15,18
  188:21,23 189:1
  189:18,22 192:17
  194:10,11,14
  205:8 223:17
  250:6 251:3,4,15
  252:3,4,21
**named** 223:19
  248:9
**names** 173:19
  176:7 184:5
**narcotic** 126:11
**narcotics** 203:12
**narxcare** 89:17,20
  89:21 90:1,10
  111:1 190:1 207:7
  207:9,10 208:13

208:14,18,20,24
  209:5,9,11 219:22
**nascsa** 94:10
**national** 1:6 9:4
  94:10,20 126:12
  250:6 251:3 252:3
**nature** 36:10,16
  173:16 198:16
**nazarene** 32:7
**ndc** 126:9 127:6
  157:16,24
**nearly** 109:15
**necessarily** 81:13
  95:20 133:12
  148:1 151:12
  157:23 231:18
**necessary** 68:12
  92:20 224:17
**need** 13:16 38:25
  45:7 46:7 92:21
  112:17 160:20
  161:10 191:10
  198:2 222:24
  235:2
**needed** 81:17
  233:17
**needs** 220:4
**negate** 187:2
**negative** 187:1
**network** 21:5,18
  27:25 28:3,4,7,21
  29:11,19 31:5
  32:22
**never** 142:6 144:3
  167:21 195:16
**new** 3:20 37:2,5
  72:19 93:23
  110:22,24 116:13
  152:18 168:25
  169:2 185:22
  187:1 238:23

| | | | |
|---|---|---|---|
| **news** 40:21 182:1 | 104:12 107:20 | 12:2 17:4 18:9,19 | 102:24 103:7,10 |
| **nicole** 2:9 10:6 | 109:22 114:10,11 | 19:8,10,13,15,18 | 103:19,25 104:7 |
| **nicole.dehner** 2:12 | 116:3 118:16,17 | 19:23 20:7,13,20 | 104:14,21,25 |
| **nods** 12:12 | 122:23 123:15 | 20:23,25 21:2,4,8 | 105:14,22 106:8 |
| **noncontrolled** | 126:19,20 127:2,7 | 21:9,17,25 22:4,8 | 106:11,25 109:14 |
| 165:1 | 127:21 129:5,11 | 22:10,18,25 23:1 | 109:20 110:8,13 |
| **nonfatal** 210:1 | 129:13,14 132:20 | 24:9,20 25:19,23 | 110:17,20 111:5 |
| **normal** 160:17,17 | 138:17 139:1 | 26:4 27:3,8 28:1,6 | 111:23 112:4,6 |
| 235:2 | 144:12 148:8 | 29:7,10,19,21 | 117:24 118:3,13 |
| **normally** 229:8 | 150:2 151:13,14 | 30:18 31:4,6,9 | 120:2,19 121:8,15 |
| **northern** 1:2 | 154:4 157:16 | 32:25 33:3,4,5,7,9 | 121:18 122:1,5,8,9 |
| **notarized** 250:14 | 165:25 166:2,13 | 33:11,18,21,21,24 | 124:5,18,25 125:4 |
| **notary** 27:18 | 167:14,18 169:2,6 | 33:25 34:2,5,11,14 | 125:6,9,12,17,24 |
| 157:1 228:5 248:6 | 170:1,18 176:8 | 34:17 35:7,11 | 126:24 127:14 |
| 249:14 250:25 | 180:19 181:12 | 36:2,13,17 37:19 | 128:5,20 129:23 |
| 251:10,18 252:15 | 192:25 193:1 | 38:5 40:2,5,6,9,13 | 130:20 133:17 |
| 252:23 253:23 | 203:19 204:19 | 41:2,7,13,25 42:15 | 134:8,23 135:7,13 |
| **note** 175:12 | 205:11 213:20 | 43:11,20 44:2,20 | 135:18,20 137:6 |
| 250:12 | 218:17 242:17,23 | 45:3 46:7,19 47:2 | 137:10 138:12,15 |
| **noted** 90:17 193:5 | 242:24 250:7,13 | 47:7,15,23 48:3 | 141:10,16 143:2 |
| **notes** 139:23 147:9 | **numbers** 75:12 | 49:10,13,23,24 | 143:13 144:7,11 |
| 149:15 151:5 | 86:15 92:1 166:5 | 52:24 55:11 56:4 | 144:14,16,22 |
| 176:12 205:17 | 167:4,21 170:20 | 56:21 57:17,21 | 145:5,12,18,22 |
| 218:8 222:25 | 170:20 177:16 | 58:1 59:6,17 60:9 | 146:6,13,15,20,21 |
| **notice** 6:3 16:7,13 | 178:10,11 183:24 | 62:17,21 63:6,19 | 147:5,17,20 |
| 246:17,20 | 187:10 215:3 | 63:25 64:1,19,24 | 148:20,25 152:1,3 |
| **november** 1:19 | 229:19 252:7 | 65:23 66:1,4,9,16 | 152:5,7 156:7,21 |
| 6:6,15 9:2 100:17 | **numeric** 91:16 | 66:18,24 67:3 | 157:13,18 158:3,8 |
| 100:24 132:11 | **numerous** 51:19 | 69:1 70:7 71:6 | 158:12,21 159:1,4 |
| 170:25 171:7 | **nurse** 177:21,22 | 72:18 73:5,12 | 159:7,11,25 |
| 191:25 249:8 | 177:25 | 75:10 76:15 78:19 | 160:13,18 161:24 |
| 250:4 | **nursing** 75:20 | 81:21 82:25 83:6 | 162:6,8 163:1 |
| **number** 6:2 34:24 | 76:1 240:23 | 83:14,15 84:4,20 | 166:16 167:8,19 |
| 39:13 40:2,18,18 | **nw** 2:21 4:4 | 85:7,14 89:7 90:5 | 167:25 168:2 |
| 42:16 47:4 49:15 | **ny** 3:20 | 90:9,14,18,25 91:8 | 170:2,24 171:1,7,8 |
| 54:5 56:5 62:15 | | 91:12 92:10,11 | 172:9,13,14 |
| 67:21 70:12 73:16 | **o** | 93:6 94:3,8,24 | 173:13 174:6 |
| 73:21 74:11 82:5 | **o'gorman** 3:19 5:9 | 96:4,8,11 97:5,16 | 176:21,25 177:5 |
| 86:12 87:4 91:1 | 9:24,24 223:2,15 | 98:15,22 99:10 | 182:5,10 183:22 |
| 91:19 92:3 93:5 | 223:17 227:20 | 100:10 101:9,15 | 184:8 187:10,12 |
| 99:7 103:11,12 | **oarrs** 6:10,12,15 | 101:17,24 102:18 | 187:15,19 188:6 |
| | 6:16 11:18,19,23 | | |

188:15 189:5,10
189:19 190:15,18
191:6,9,15 192:6
192:10 193:2,6,12
193:21 194:3,5,19
195:17 196:7,10
197:13 198:20
199:7 200:22,25
201:3 202:24
203:6,17,21
204:19,23 205:13
207:17,22 209:20
210:18 213:5,23
216:5,8,13 218:25
219:10,19,23
220:20 221:9,15
221:22,25 222:23
226:1,4,10 227:2,8
229:12,14 230:8
230:12 231:7
232:9 234:8
239:21 243:4,10
**object** 8:2,4
197:23
**objection** 8:1,3
13:10 161:4 198:2
198:6
**observations**
203:8
**obtain** 159:24
237:18,19,21
**obtaining** 87:6
**obviously** 142:24
178:17 179:7
206:12 240:20
242:20
**occasion** 76:13
140:14 161:2
164:19
**occasionally** 34:16
35:25 40:11 80:24

**occasions** 44:10
144:9 160:12
**occurring** 234:19
**occurs** 244:1
**office** 10:4 30:3
41:4,6 45:5,12
47:23 48:14 52:9
64:16 65:10,11,19
65:22,25 67:3
83:22 88:4 89:14
106:21 118:19
129:16 144:5
154:8 163:24
166:15 177:2,4
203:4 211:15
249:6
**officer** 18:17,19,24
19:4,12,19,24 20:2
20:18 21:11 46:24
72:11 179:6
**officer's** 65:14
**officers** 177:6
**offices** 123:8
**official** 251:15
252:21
**oh** 2:6,11 3:15 4:9
15:24 55:16 99:15
103:11 228:7
229:11 230:5
**ohio** 1:2,11,13,22
2:3,8 6:4,8,13,20
7:4 10:3,5,6 11:14
11:16,20 12:1
15:19 16:8 20:2,4
22:23 75:2,21
84:7 99:16 101:11
120:14 125:21
139:5,10,24 149:8
149:12 179:12,19
183:16 184:7,22
184:23 185:7,16

185:18,22 186:1,2
186:9 187:24
194:11 196:11
200:21,24 202:23
204:3,11,18,22
207:18 210:5
220:11 225:3,7
229:22 233:13
239:15 243:2
244:7 248:2,7
249:7,15 250:2
**ohioattorneygen...**
2:7,7
**okay** 13:8,13,14
13:21,22 14:10
27:3 33:1 50:23
51:9 54:24 62:11
82:17 99:25
102:13 103:17
107:8 108:25
112:15,18 119:1,4
126:1,5 145:7
148:3 149:5
152:19 160:11
186:10 207:4
223:4,22 224:10
224:23 225:19
**omhas** 97:25
99:16
**once** 37:1 140:20
142:2 143:9 146:7
186:21 187:4
190:12
**ones** 49:9 50:16
85:1 89:14 99:3
115:10 164:25
**online** 221:9
**op** 1:13,14,15
**open** 46:11 65:15
68:10 181:6,16
238:6

**opened** 103:2
**operations** 19:8
**opiate** 1:7 9:4
206:2,9 250:6
251:3 252:3
**opiates** 73:24
**opioid** 6:20 50:23
69:6 73:17 75:8
157:14,19 158:10
179:11,18 183:13
184:13,19 189:20
212:7,10,14
213:19 216:12
220:21 225:2
229:21 230:19
**opioids** 6:22 75:22
151:16 152:8,10
160:6 182:22
183:2 187:23
188:4 199:13,24
213:6 221:23
222:7,12 225:7,13
241:22 243:1,20
**opposed** 45:2
118:24 153:1
164:15
**optimize** 63:20
**optimum** 32:15,20
**option** 164:3
**options** 115:20
210:6
**oral** 12:10
**order** 15:20 22:15
25:5 61:4 76:21
76:23,24 77:2,6
79:22 114:25
115:10 116:13
152:4,6 161:23
162:2,4 189:10
223:21 231:2,9,14
232:1,4

**orders** 76:20 77:9
  77:19 78:16,21
  80:4,11,15 81:10
  151:23 152:1
  162:9
**oregon** 183:16
**organization**
  208:16
**organizations**
  98:25 176:11
  229:5
**original** 27:21
  40:6 92:7 112:3
  147:24 154:5
**originally** 63:8
  107:12 109:2
  123:4 135:3 153:3
  154:6 211:21
  224:14
**originate** 39:25
  40:2 42:15,16,20
  43:1,5,23 48:7,10
  52:9
**originated** 40:1,5
  43:20,25 44:9,12
  44:16 45:18 52:5
  111:24
**origination** 44:19
**outpatient** 101:24
  101:25 102:8,16
  125:25 162:25
  243:15,16
**outpatient's**
  213:14
**outside** 79:11 93:6
  143:12 159:9
  179:4 243:22
**overall** 234:12
**overdose** 6:25
  87:20,22,24 88:1,9
  88:12,14 191:1,5

199:14,18,25
  200:4,7 201:21
  202:2,19,23
  203:11 210:1
  225:25
**overdosed** 108:2
**overlapped** 134:16
**overlapping**
  134:10
**overprescriber**
  69:10
**overprescribing**
  57:12,15 58:3,7,13
  58:22 67:8 82:6
  241:16,21 242:8
**overprescription**
  82:21
**oversee** 177:6
**overseeing** 19:6
**overuse** 82:10
**overutilization**
  138:19 241:8
**owns** 105:9 210:14
**oxford** 4:13

**p**

**p** 34:20,20
**p.m.** 246:22
**pa** 4:14
**page** 8:2 16:25
  17:1,3 109:8,12
  139:20,22 147:4,5
  148:5,15 174:25
  177:22 180:24,25
  183:8,9 192:3
  195:21 196:9
  202:7,9,17 203:9
  204:16,17 207:5,6
  215:17,25 216:4
  217:23 218:4,6
  250:13,15 252:7
  253:3

**paid** 133:5 229:23
  230:19
**pain** 75:9,23
  179:20 181:6,7,18
  239:12,14 244:11
  244:12,15
**pains** 6:23 182:22
  183:3
**palenchar** 3:22
**paragraph** 140:22
  141:3 196:10
**parameters**
  122:24
**pardon** 29:19
  65:21 97:15
  114:13 152:9
  219:8
**paren** 181:6
**parens** 181:8,16
  181:17
**parent** 159:12
**parole** 177:2
**part** 76:7 153:9
  154:2 210:13
  214:1 252:9
**participate** 94:3
  224:10
**participated** 43:19
  44:1 51:3,15,21
**participating**
  52:15
**particular** 42:7
  44:5 48:4,6,9
  58:23 60:7 67:11
  70:18 83:24 87:6
  89:21 90:1,10
  96:12 124:18,25
  127:9 134:23
  136:23 158:4
  159:10 165:19
  167:3 168:7

169:18 189:4
  190:7 194:4 213:7
  220:9 234:14,16
  235:6 238:1
  244:23
**particularly** 91:2
**parties** 9:9
**parts** 154:4
**party** 249:3
**passed** 26:19
  119:11 185:6,12
**patches** 27:17
**patient** 39:17 46:9
  46:25 64:6 70:11
  70:18,24 71:2
  73:16,17 74:10,11
  82:9 87:6 89:10
  89:21 96:1,8,13
  98:19,19 102:25
  108:13 110:21
  121:10 131:9
  133:5,16,18,20
  134:1,4,8 135:24
  136:8,23 153:25
  162:18 165:22,23
  172:15,24 173:2
  173:10 175:5
  179:7 181:11
  184:8 188:15
  189:7,8,17,18,21
  190:8 191:7,7
  192:6,17 193:6,16
  194:17 199:13,25
  205:6,8 208:25
  210:25 216:11,14
  217:5 219:20,23
  220:9,14 226:10
  244:24 245:6
**patient's** 175:3
  192:17

**patients** 87:21,21
87:25 88:13 98:18
102:2 137:1
172:17 192:7,14
193:7 194:6
196:18 200:7
205:1 208:18,21
219:24 220:1
221:5,7,20 226:24
241:12 243:14
**pattern** 79:9,11
155:12
**patterned** 233:4
**patterns** 82:11
89:1,3 96:2 98:12
99:20,24 153:17
154:23 155:1,2,7
209:15
**paul** 2:14 9:20
78:2
**payer** 2:4 10:3,3
14:7,9
**pays** 229:12,16
**pbc** 99:13
**pdmp** 35:13,18
183:18 218:8,20
220:7
**pdr** 202:8,11,18
225:21
**penalty** 169:5,11
**pending** 13:18
**people** 10:11
61:10 91:17
155:22 229:8
**percent** 109:16
202:19,22
**percentage** 97:9
203:10 229:21
230:19
**perform** 54:14
55:15 56:3 83:14

95:13
**performed** 55:10
76:14 84:10
114:22
**period** 20:12 50:4
83:23 130:12
155:10 185:13
212:1 226:20
230:18 234:14,16
235:6 242:3
**periodically**
197:20
**permit** 220:25
237:9 238:15
**permits** 63:12
191:8
**permitted** 46:10
83:22 84:3,3,5,12
104:4 107:9
150:17 187:10,11
203:5 229:6
237:16
**person** 33:22
59:21 166:14,16
**personal** 170:16
225:1,5
**personally** 46:16
118:19 154:17
251:11 252:15
**pertain** 150:13
**pertaining** 48:4
124:24
**pertains** 171:22
**pharma** 1:12 3:17
3:17
**pharmaceutical**
181:9 224:8 225:7
**pharmaceuticals**
4:7 138:9 223:18
**pharmacies** 47:21
49:1 50:11 51:11

51:14 86:16 87:5
102:6,15 109:7
111:6 114:11
119:17,25 121:9
130:23 131:14,18
132:17,19 139:25
144:6,10 181:13
234:22
**pharmacist** 64:6
70:17,21 71:5,6
89:11,23 92:25
93:2 120:3,17,25
125:15,16,19
132:8,15 159:11
164:14 182:11
188:13,14,20
189:4 190:24
191:14 194:9
208:12 209:2
220:4 245:2
**pharmacists** 50:14
64:18 70:16 105:8
107:25 119:17,22
120:5,9 144:6,10
158:22 159:10
171:23 175:13
207:23 245:20
**pharmacy** 2:9 6:4
10:5,7,10 11:15,17
15:19 16:9 18:12
18:22,25 19:5,12
19:20 20:3,4
21:14 22:23 30:3
30:9,25 31:11,12
32:11 33:18,20
37:21 39:15 44:17
47:25 48:4,7,10,15
49:6,12,18,19 50:8
50:18 51:4,12
71:17,20,21,24
72:3,6,9,15,18

76:1,12 82:13
93:4 97:12 101:6
101:12,19 103:3,4
114:16 119:7
120:3 121:7,16
124:3 125:17
126:3,25 127:19
129:17 130:15
131:2,5,11,13
132:1 136:18,21
138:1 140:11
141:24 142:1,11
155:17 156:16,20
157:22 158:22,25
161:7 162:16,20
163:22 164:6,19
164:23,25 171:16
188:20 190:23
193:25 194:9
212:13 222:4,9
229:4 231:12,20
234:7,10,14,15,19
235:10 236:17,21
237:20 238:1,3,4,9
239:21 240:20
243:10,15,16,18
245:2,7
**pharmacy's** 142:4
**pharmacy.ohio.g...**
2:12
**phone** 10:12 19:3
34:16 133:24
160:23 165:25
250:3
**phones** 19:6
**physical** 108:14
**physician** 89:23
111:6 182:11
**physicians** 175:13
178:6 207:22

**pick** 194:12,13
230:5
**picked** 121:1,4,5
121:13 130:4,11
130:24 132:10
133:9,12,13,15
164:7 186:18
**picks** 121:10
**picture** 193:20
**piece** 114:1 234:17
238:17
**pieces** 34:15
**pile** 191:24
**pill** 126:18 181:16
239:4
**pills** 126:19 127:2
239:11
**pink** 142:8,9
**pittsburgh** 4:14
**place** 30:11,11
124:8 165:20
178:20 185:4,23
211:16,17 239:10
242:6 243:17
248:20
**placed** 243:1
**places** 42:16,19
240:3 245:3
**plaintiffs** 2:13
9:21 14:15,19
**plan** 176:4,9
**plans** 227:17
**platform** 110:23
111:9,10,20 174:3
207:11
**platforms** 106:9
**play** 179:2
**played** 206:11
**please** 10:20 11:7
13:6,12 17:1
44:25 53:1 133:24

191:25 206:19
207:2 223:20
228:6 245:24
250:11,11
**plenty** 181:25
182:1
**pllc** 3:8
**pmp** 6:18 35:22
101:12 104:11,20
120:11 125:20,22
139:24 140:2
174:15,19 175:1
177:14 215:21
**pmps** 119:17
**point** 19:10 21:23
25:3 34:23 35:1
60:9 83:6 86:3
101:22 124:9
131:22,25 141:9
164:6 195:15
210:10 211:18
227:16 241:5
246:21
**pointed** 219:16
**points** 44:19 179:1
**poison** 202:13
**policy** 77:21,23
**polster** 1:9
**popup** 220:8,22
**portion** 197:1
215:13,15 232:9
**position** 18:15
26:10 93:23
106:17
**positions** 18:11
**positive** 207:23
**possession** 131:9
148:17
**possibilities** 89:3
97:2

**possibility** 120:12
211:4 235:12
**possible** 36:6
48:23 136:23
181:8 229:1,9
234:18 237:23
**possibly** 40:21
97:20 200:6 225:6
225:12
**post** 56:1
**posted** 55:24
**potential** 40:9,11
49:25 50:4 53:8,8
53:24 78:15 81:23
82:20 83:9,16
192:9 193:22
195:25 209:20
229:1 235:10
**powders** 126:21
**powerpoint** 7:5
214:15,24 225:17
**practical** 172:18
**practice** 93:4
132:17 216:5
**practices** 225:2
245:18
**practitioners**
177:21,25
**pre** 211:16
**predecessor** 101:12
**prepare** 13:23
14:11 15:4,15,20
**prepared** 198:8
**preparing** 226:18
226:21
**prepopulated**
127:22
**prescribed** 75:8
126:8,15 127:10
158:10 181:13
189:19 199:13,24

244:23
**prescriber** 7:7
24:22 25:9,19
26:8,13 27:10
30:17 39:15,19,21
42:20 46:2,8
47:22 56:21 57:17
64:5 70:10 71:16
73:11 74:16,21
75:5 76:15 77:10
78:3,7,14 81:21
82:3,4,17 83:24
84:5,17 85:13
86:7 89:11 90:18
98:6 100:1,5
118:18 125:14
126:3,6,7,25
127:13,17,19,21
127:25 128:4,18
128:23 129:2,4,9
133:2 135:25
142:17 150:8
151:8 153:12
154:17,19 162:19
163:1,23 165:22
170:7,11,15
172:14 174:4
178:16,17 179:8
181:23 184:8,15
189:13 190:8,23
191:13 194:7,10
194:15,21,23
195:1,5,9,11,13
200:6 208:10,11
213:24 214:4,12
214:18 215:2
216:19,20,24
217:3,7,19 218:8
218:21 220:4,15
220:20 234:11
244:25 245:2

**prescriber's** 214:4
  214:7
**prescribers** 47:20
  49:1 50:11 51:11
  51:14 64:4,18
  83:21 84:2,11
  86:15 94:17 105:8
  109:4,5 118:9,14
  118:23,25 123:5,7
  125:5 126:13
  127:1,4,8 134:11
  134:25 143:1
  152:22 153:2
  154:7,7,11,11
  158:18 161:14,18
  171:17,23 173:1,1
  182:2 194:11
  205:19 209:2
  213:13,14 217:4
  218:10 221:16
  233:18,19 245:20
**prescribing** 181:5
  220:20 233:24
  241:21 242:6,10
  244:5
**prescription** 1:6
  6:8,12 9:4 22:11
  22:14 23:9,18
  24:2 30:7 35:9,16
  35:20 38:4,4
  46:20 53:3,9,10,15
  53:17 54:10,13
  55:11 73:5 75:9
  82:21 84:20 85:6
  86:22 87:20
  101:21 102:11
  107:4,6 121:2,4,12
  121:21 126:15
  127:2,5,12,14
  128:7,17,18
  129:10,12 130:6

130:11,16 131:24
  132:8 133:5,8
  134:12,13 139:5
  139:11 140:7
  157:14,19 158:13
  162:18 164:2,7,16
  172:9 174:9 175:3
  175:6,7,9 178:15
  178:18,20,21,25
  182:21 183:2,24
  184:12 186:17
  188:1,17 189:11
  189:23 194:15
  205:18 207:12
  208:4,8,10 209:19
  213:15,16 214:3,7
  214:8 215:22
  216:11,20,21
  220:2,16 226:13
  245:3,15,15 250:6
  251:3 252:3
**prescriptions** 6:20
  46:8,9 54:2 73:16
  73:17,22 74:11,13
  75:23 86:9 87:5
  101:25 102:9,16
  103:4 114:10,16
  122:13,15 125:25
  130:1,4 131:4,5,21
  132:20,23 134:11
  134:15 142:20,22
  164:11 165:2,4
  179:12,18 181:14
  183:13 190:1
  193:19 203:12
  229:22 230:19
  239:11 242:17,22
  242:24
**prescriptive** 178:4
**presence** 248:14

**present** 4:16 9:7
  17:7
**presentation** 6:24
  7:5 94:9,19 95:1,8
  201:20 202:1,4
  214:15,25 215:9
  215:20 219:5
  225:18 226:16
**presented** 95:4
  215:11
**presenters** 215:7
**press** 164:14
**pretty** 157:1
**prevent** 175:8
**preventing** 178:14
**previously** 133:13
  187:3
**primarily** 90:25
  212:17 215:21
**primary** 175:4
**print** 68:14
**printed** 179:20
**prior** 12:5 18:12
  18:16,19 20:1
  29:9 31:9 102:24
  120:9,21 124:6
  141:3,5 150:22
  170:21 184:12,19
  213:18 220:20
**private** 98:21 99:9
  227:13
**probably** 13:15
  15:24 57:25 59:2
  66:11 79:23 160:3
  211:21
**probation** 176:13
  177:3,3,4,6
**problem** 13:17
  101:21 141:22
  194:3 240:3

**procedure** 247:7
  251:5 252:5
**process** 47:20
  72:10 75:24 80:21
  93:17 162:24
  163:18 170:5,12
  172:5 178:24
**processes** 109:15
  109:21
**produce** 54:7
  55:23 57:22 199:7
**produced** 205:11
**product** 37:5
  151:11
**production** 38:15
  38:17,19 136:17
  215:2 250:15,17
  250:22
**products** 37:2
**profession's**
  184:21,23 185:1
**professional** 89:23
  170:19 190:3
  193:14 196:2
  209:1 245:17
**professionals**
  90:12 119:20,23
  120:1,10 177:21
**profit** 181:15
**program** 6:9
  11:18,23 22:25
  35:10,17,21 88:18
  131:8 139:6,11
  153:14 175:25
  201:5 203:13
  222:17 239:22
**programming**
  113:23
**programs** 200:21
  233:11

**progress** 57:3
**prohibit** 237:14
**prohibited** 159:11
　237:17
**project** 94:22 95:9
　111:4 211:9
**projects** 57:3 97:2
　98:10
**promulgated**
　244:6
**pronoun** 58:8
**properly** 148:9
**proposals** 96:16
　98:21
**protect** 88:8
**protecting** 88:9
**protocol** 180:12
**provide** 13:12
　73:10 76:7,9
　98:21 110:24
　112:5 115:20
　117:2 127:17
　137:23 145:3,8
　147:2 160:14
　197:14,16 200:10
　219:1,10,19
　237:10 246:15
**provided** 10:22
　91:24 99:7,22
　110:24 129:23
　180:3,11 189:25
　196:22 206:14
　217:6 218:24
　232:7
**providers** 7:6
　181:10,13 192:8
　214:16 215:1
**provides** 162:9
　169:11 196:11
　207:11 218:22
　220:1

**providing** 144:23
　145:2 183:21
**provision** 6:14
　149:8,13,18
**public** 33:12,24
　42:22 43:5,8,9,21
　43:25 44:9,12,15
　48:7,17 64:11,13
　64:14 74:3,7 88:8
　94:4,7 99:1
　107:21 112:6,7,11
　135:10 144:19
　187:22 188:3,12
　196:25 248:6
　249:14 251:10,18
　252:15,23 253:23
**publicly** 95:1
　111:23 188:7
**published** 53:18
　53:20
**pull** 68:12 191:11
　191:16,24 207:1
**pulled** 210:4
**pulling** 114:7
　211:12
**purchase** 37:5
　78:24 79:2,10
　102:17 157:24
　238:13
**purchased** 67:20
　67:24 68:18 71:14
　71:22 72:3,25
　79:14 122:14
　154:10,15 155:3
　238:12
**purchaser** 149:24
　151:6,7
**purchasers** 84:16
　122:14
**purchases** 71:17
　71:20 78:23 83:20

　83:23,25 84:2,10
　84:16 157:22
**purchasing** 79:5,8
　154:19
**purdue** 1:11 3:17
　3:17,17 9:25
　223:18
**purge** 211:16
**purging** 124:9,12
　211:15
**purpose** 17:5
　52:21 53:6 76:16
　77:16 78:20 83:15
　88:24 90:19
　116:12 135:9
　154:5 219:15
　245:17
**purposes** 16:10
　17:19 81:22
　100:19 135:18,21
　139:7 146:16
　149:9 159:6 171:2
　174:16 179:14
　182:24 201:22
　204:4 214:20
**pursuant** 90:9
　247:3,6
**purview** 222:11,20
**pushes** 27:16,20
**put** 49:14 132:9
　154:17 185:23
　186:8 197:4
　245:13
**puts** 195:5

**q**

**qualified** 248:8
**quantities** 152:8
　155:5 181:14
**quantity** 122:25
　126:14,16 129:12
　150:1 151:16

　152:10 155:4
　187:2,23 188:4
　242:25
**quarterly** 196:11
　196:21 218:11
**quarters** 196:16
**queries** 104:15,20
　119:14 120:6
　123:16,19 124:5
　143:24 210:21
　221:13
**query** 113:8,15,16
　113:19,24 114:6,9
　114:13,15 118:20
　121:24 236:10
**question** 12:17
　13:5,13,18 24:14
　30:16 78:10 92:8
　93:3 161:11
　172:25 173:3
　192:5 231:7,23
　235:21 236:4
　243:23
**questioning** 106:5
**questions** 12:9
　13:11,25 91:16
　223:1
**quick** 112:18
　223:6
**quickly** 227:24
　236:22
**quite** 48:23 56:6
　73:13 153:18
　186:4
**quote** 192:6,7
　226:1

**r**

**r** 34:20 111:13
**race** 133:17
**rachel** 4:8 10:13

rachel.byrnes
  4:10
raise  86:3 144:2
raised  189:17
  192:5
ran  19:16 21:4,5
  21:17 29:21 31:4
  77:10 79:12,25
  115:9 116:11
  117:3
range  47:17
  163:19 166:1
ranjan  3:13 9:18
  9:18
reach  46:4
read  17:4,8 109:18
  140:2,8 175:9
  181:19,25 182:6
  182:14 183:19
  192:11 193:25
  196:4,19 203:13
  205:20 216:15
  218:11 224:4
  246:12 251:5,6,12
  252:5,6,17
reading  250:19
reads  175:1
  183:12 192:5
  195:23 196:10
  203:10 207:6
  216:9
ready  54:20 62:4
real  131:6 136:13
reality  135:14
realize  211:13
really  42:24 52:18
  58:18 111:7,8
  142:6 165:5
  193:18 197:2
  232:22 236:1

realtime  219:20
reason  12:22
  76:25 77:3 153:9
  189:15 192:13
  193:5,24 197:3
  238:2 250:14
  252:8 253:3
reasons  118:16
  192:11 220:12
recall  19:25 29:22
  42:17 50:2 52:15
  52:16 53:12 55:12
  55:17 59:7,11,14
  61:3 62:22 71:12
  71:15 73:7 74:19
  74:23 77:11 81:23
  84:22 85:3 86:9
  90:5,21 100:13
  105:22 110:16
  124:8,10 144:4
  161:20 169:8,15
  183:21 184:3
  197:22 198:15,16
  203:20 212:8
  215:9 223:23
  224:20,22 225:20
  237:4,11
recalling  40:4
receipt  91:11
  250:18
receive  32:8 64:14
  91:2 98:18 102:17
  142:19,21 156:1
  193:3 217:15
  218:2 243:15
received  31:25
  43:10 46:9,20
  156:5 162:22
  190:25 197:1,6,17
receives  196:15
  217:18,22,25

221:1
receiving  102:3
  203:11 205:18
  216:24
recess  55:4 112:21
  157:9 206:23
  223:11 246:2
recipient  205:7
recipients  56:16
  205:2 209:6
recognize  101:20
recognized  96:4
recommending
  25:8
record  9:2 11:3,8
  12:19 55:2,5,8
  112:19,22 121:18
  157:5,7,10 182:7
  182:15 187:1
  206:21,24 223:9
  223:12 226:10
  245:25 246:3,9
  252:9
records  216:10
red  189:10,16
  192:7 193:6 194:6
  203:10 219:24,25
reduce  194:24
reduced  248:14
refer  12:1 24:4
  196:1 240:8,11,17
  240:21
reference  58:6
  194:20 226:13
  250:7 251:2 252:2
referenced  248:13
  248:18 251:11
  252:15
referred  26:21
  30:24 109:6

referring  35:20
  90:24 149:2
refers  174:3
refills  129:5 242:3
reflect  185:25
regard  225:12
regarding  18:6
  74:22 145:4 247:2
  247:11
register  120:13
  172:6,7 173:12
  174:7
registered  132:7
registering  172:8
registration  6:16
  170:5 171:1,8
  172:2
registries  161:9
registry  202:24
regression  79:13
  79:18 114:23
  115:3,14,19
regressions  78:25
regular  137:8
  211:17
regulated  239:15
regulates  222:10
regulation  211:25
  232:10
related  20:23 21:1
  33:21,25 77:18
  78:15,20 79:21
  80:3,10 81:8 85:7
  85:24 92:15
  105:14,16,19
  125:25 156:21
relates  1:10
relations  33:5,10
  33:23 34:11 36:25
  92:9

**relative** 249:2
**release** 101:14
  128:19
**relief** 181:19
**remember** 37:7,10
  52:18 57:24 63:3
  64:20 91:4 92:12
  97:25 104:18
  115:1 118:10
  138:6 139:2 148:2
  150:5 151:23
  186:18 210:20
  226:2 232:11
  241:10
**remembering**
  62:10
**remotely** 9:8
**remove** 130:18
**rename** 176:17
**renumbered** 151:2
**repeat** 161:11
**rephrase** 13:7
**replace** 93:24
**report** 6:6 21:7,10
  46:13,14 47:9
  58:4,7,8,10,13,16
  58:22,23 62:25
  63:2 64:2,5,7,9,12
  64:14,15 67:23
  68:4,6,7,17,20,24
  69:6,19,22 70:3,5
  70:15,18 71:1,5,8
  71:19,21,24 72:2,5
  72:9,14,18,20 73:2
  79:21 80:9 81:2,4
  81:15 89:10,12
  91:15 92:5,18,24
  100:17,24 105:14
  105:17 109:3,9
  110:21 113:12,25
  114:4,5,10,12

118:9 121:16
122:7 123:2,11
126:4,9,16 127:1,4
127:8,13,20 129:4
129:10,25 130:9
130:10,20,23
131:3,4,13 132:20
133:4,8,10,14
139:25 140:20
141:20 142:17,19
143:4,8 145:3,10
145:25 146:6
147:3 149:24
150:7 151:11,12
151:15,18,25
152:4,6,8,13,16
153:6 155:15
156:1,5,8 159:24
160:8,13 163:8
165:5,7,17 166:1,4
166:7 189:5
190:22 191:11,21
192:1,4 196:24
197:8,18 199:7,24
216:5,14,17,21,24
217:12,16,17,18
217:21,24 218:3,9
219:3,17 220:5
**reportable** 140:1
**reported** 71:17
  83:25 119:1
  122:15,17 126:8
  126:25 128:1,8,19
  128:24,25 130:21
  133:17,20 134:1,5
  134:8,14,25 140:6
  140:15 154:8,12
  154:16 156:9,10
  187:3,15 222:22
  232:21 242:14

**reporter** 5:15
  10:20 251:7
**reporter's** 5:12
  248:1
**reporting** 6:11
  11:20 33:6,11,24
  34:6 38:7 39:3
  53:12 54:6,11,12
  76:20 77:9,19
  78:16,21 80:11,14
  81:9 90:20 103:14
  103:15 113:18
  114:5 115:1 131:3
  132:24 137:13,20
  137:21 138:23
  139:23 140:19,25
  141:8,13,17
  142:22 143:11,15
  143:19 146:2,14
  146:21 148:21
  149:19 150:24
  152:20,21,25
  153:2,10 154:22
  155:24 156:17
  204:19 219:7
  235:22 242:13
**reports** 7:8 53:19
  53:19 54:8 55:16
  55:17,20,21 56:1,2
  56:6,7,11,14,19,23
  57:14,16,22 58:2
  59:18 60:12 63:13
  63:21 64:19,24
  65:11,20,20,23
  67:2,6,6,9,11,14
  67:18 69:8 70:1
  71:11,12 73:25
  74:1,15 79:21,25
  80:2 81:21 83:7
  84:25 85:5,20,24
  86:7,24 87:1,2,4,7

87:10 88:22 89:8
  91:10,23 92:10
  93:12 105:20,21
  105:25 106:3
  107:20 108:2
  109:16 110:10,12
  112:2 113:4
  117:12 118:6,7,13
  118:22 120:24
  122:13,19 130:8
  138:13,16 142:25
  143:14,19 144:24
  145:2 158:17
  161:23,25 162:3,4
  190:20 193:21
  196:11,22 199:12
  199:21 201:11
  208:13 210:18
  214:18 215:2
  218:8,21 219:2,20
  231:2,9,14 232:1,4
**represent** 9:9 11:5
**represented** 160:4
**representing**
  33:13,16 34:1
**reprimand** 142:10
**request** 12:9 46:13
  62:25 80:1 88:3
  144:24 145:2
  160:22 161:2,7,16
  161:17 165:17
  166:24 174:5
  189:24 190:20,22
  191:5,18 197:13
  197:18,22 198:17
  199:2 204:25
  214:4,7,10 217:2
  228:20 237:5
  252:9,11
**requested** 56:10
  159:15,19 160:13

161:13 198:14
226:11 247:1,6,10
requester 175:1
175:14,17 176:21
177:9,11,23 178:1
178:14 190:18
201:6 205:3
208:23,24 237:19
requesters 175:7
175:22 176:5,14
228:9,23,24 229:3
requesting 60:8
requestor 175:1
requestor's 175:4
requests 6:17
109:15,20 110:1
160:20 171:2,9
183:16 189:5
190:25 197:6
199:4 212:25
require 60:23
91:16 109:5
140:18 208:6
219:14 220:19
required 22:23
91:11 109:3 123:7
123:11 126:4,8,13
127:1,4,8 128:7
129:4,9 133:14
135:12 137:10
145:24 149:24
151:10,15,18,25
153:5 154:8
155:15 163:12
164:1 166:4,6
186:22 187:5
213:14 232:21
245:14 250:25
requirement
124:15 131:1,3
134:4 138:23

140:25 141:4,8,13
141:17,21 146:2
152:20,25 184:7
184:25 185:7
requirements 54:6
90:20 103:14,15
128:12 137:13,21
137:22 139:23
143:16,20 148:21
150:12,13,24
152:21 155:25
185:15 186:9
requires 40:8,8
49:12 142:11
195:24 211:25
requiring 139:25
research 37:21
38:1,13,16,23,24
39:5,7,9,18,22
52:19,22 53:5
54:1 86:7,21
180:4,11,11
reserve 198:11
reside 124:2
136:15,20
resided 19:18
resides 37:22 38:9
38:23
resolution 36:20
resolve 81:17
resolved 142:6
resource 180:4
resources 112:13
respect 133:2
138:9 156:14
172:25 234:7
238:24
respective 183:17
196:18
responded 217:10

responds 71:7
response 12:10
49:6 217:2 231:6
responsibilities
31:3 33:3 34:4
92:15
responsibility
21:6,19 106:14,20
responsible 19:7
21:1,17 27:25
29:20 92:10 96:15
106:23 156:3
168:1,17
rest 224:16
restricted 159:16
201:9
restrictions 159:3
159:5
result 185:10
results 115:13
240:6,17
retailers 160:5
retained 5:15
162:12
retract 121:8
retrieve 60:6
return 130:18
returned 250:18
reveal 96:11
revealed 96:8
reverse 130:25
review 15:3 16:16
160:10 175:3
184:8 186:23
192:4 202:14
213:14 222:24
246:13 247:2,6
250:12 251:1
252:1
reviewed 15:5
116:4

reviewing 115:13
revised 184:22
185:8,16,17,22
186:1,9
revisit 198:11
right 18:9 27:17
32:16 36:2 49:25
65:12 69:13 76:2
82:23 91:7 93:18
97:7 111:13
127:24 137:9
150:9 158:23
164:20 168:2
173:13 175:22,25
190:15 191:13,22
194:13 195:15
198:11,21 200:22
205:13 208:5
210:3 212:20
215:3 219:19
222:7,18 227:25
228:1,10,10 231:3
233:14,20,25
235:3 239:19
241:13 244:20
rightmost 180:24
ring 184:5
risk 54:2 86:8,22
87:22,25 208:5
209:14,15,18
210:19,22,22
211:1 220:1 221:5
221:7,14
role 11:16 19:11
19:19 20:6,10
31:5,9 32:25 33:8
34:10 36:1,13
65:14 92:11 94:2
97:14 178:13,16
179:2 182:4 196:6
206:14

**roles** 20:3 31:11
32:10 33:2 34:3
92:23 175:16
176:7 206:11
209:2
**rolling** 190:11
**room** 12:11 198:7
244:11,14
**routine** 27:14 79:8
**routinely** 74:15
199:16,17 236:5
**rpr** 1:23
**ruiz** 4:3 10:16,16
**rule** 76:17,19 77:8
77:11,18 78:15,20
79:22 80:3,10,14
81:9 114:25
116:13 117:16
130:14 137:17
152:18 232:10,12
232:13 238:23,24
**rules** 53:22 74:23
74:25 75:2 130:16
185:13 247:3,7
251:5 252:5
**run** 37:11,24 42:7
47:14 48:3 56:8
56:12,19 57:17,20
58:2,16,21 59:5,11
59:14,18 60:2
63:14,21 64:1,5,7
64:9,11,13,19,24
65:11,20,22 67:3
67:18,23 68:4,5,23
69:9,16 70:1,3
71:1,5,21,24 72:2
72:5,18 73:5
74:21 80:3 81:20
83:7,14,19 84:9,15
84:19,25 85:13,18
86:1,7,24 87:1,10

87:15,23 88:4,6,12
88:21 89:7,21,25
90:9,18 92:4
104:14,21 105:17
113:4,25 114:10
115:22 116:13,17
116:20 117:10,12
118:7,7,13,23
120:25 122:7
136:22,24 138:16
143:2,7,14,18
152:3,14,16
161:24 189:4
193:21 199:12,20
199:23 201:11
208:13 221:6,12
221:13 227:24
235:13 240:18
**running** 28:6,12
60:10,11 71:15
72:9 77:16 92:9
105:14 106:17,23
114:9 138:12
145:10 152:7
210:19 241:3
**runs** 60:22 61:4
143:5 147:14
163:15
**rx** 4:2 10:17 11:20
202:23 204:19
216:14

**s**

**s** 34:20,20 37:14
37:15 250:15
252:8,8 253:3
**sale** 118:13 131:22
131:25 164:6
233:2
**sales** 22:24 109:3,5
118:9 123:5
154:11

**samhs** 91:4 97:23
**satisfaction**
181:12
**save** 78:2
**saw** 109:22 202:4
**saying** 118:10
138:6 189:21
**says** 109:14 135:5
140:5 148:9 202:8
202:22 216:3
**scale** 164:25
236:20
**scheduled** 56:9,12
56:17,20 57:20
67:5 80:25 87:9
236:8
**schedules** 91:22
92:19
**science** 31:18,22
**scope** 197:24
**score** 89:12,17,20
89:21 90:1,10
181:11 208:25
209:12
**scores** 181:12
208:18,21 209:5,9
**scott** 3:23
**screen** 69:3 163:2
165:18,19
**screens** 165:21
**seal** 249:6 251:15
252:21
**search** 69:4
136:22 169:18
188:14,17,20,23
188:25 205:6,7
221:6
**searching** 110:8
112:5,9
**sears** 7:3 204:2,10
205:11

**second** 102:22
109:14 157:5
**secondary** 164:3
**seconds** 47:12,18
59:14,19 63:2,8,14
63:17,22 109:17
110:3 114:19
245:24
**section** 27:1
109:13 184:21,23
194:4 207:6
223:24 224:3,11
224:19,21
**sections** 27:2
**security** 192:25
**sedatives** 73:24
**see** 17:24 40:13,20
40:21 70:17 87:21
87:25 98:11
115:10 117:15
118:20 119:4
139:12 144:1
147:7,10 148:10
149:13 150:20
154:18 155:6
171:9,24 174:20
176:14 179:21
182:16 187:14
189:25 202:24
204:12,20 207:7
208:3 215:4 216:6
218:22 223:22
238:16
**seeing** 98:10,12
99:20 108:1
220:23
**seek** 144:3
**seen** 16:19 18:1
82:14 101:2
126:21 146:22
166:24 171:11

183:6 202:3
204:14 242:8,14
**sees** 144:1 189:11
189:11
**selection** 96:24
**selects** 194:9
**selling** 150:3
**semiannual** 53:19
55:17,20 56:1
**send** 168:13 194:7
194:17 220:8
246:14
**sends** 45:5 56:16
71:7 163:15
**senior** 10:8
**sense** 83:24 84:17
162:2
**sent** 33:22 121:9
121:18 132:23
216:18
**sentence** 75:14
109:14 216:8
**separate** 38:15
68:20 131:19,22
172:4 177:13
178:9,10 186:6
**september** 149:16
150:20,22
**series** 12:9
**server** 30:10,11,14
37:8,12,16 56:15
68:10 113:17
114:5
**servers** 19:3,16
21:4,17 28:16,19
29:21 30:2,4,21
31:4 106:18
**serves** 17:5
**service** 4:11 93:1
**services** 2:3 4:2
10:18 98:2 99:17

107:23 113:18
114:5 196:12
**session** 100:7,9,10
113:1
**set** 17:14 38:14
75:7,22 99:22
135:17 148:21
150:12 184:14
189:8 249:6
**seven** 54:25
128:12 132:13
216:13 242:21
**shapira** 4:12
**shapira.com** 4:15
**share** 159:25
160:8 169:6
**sharing** 105:10
159:4,11
**sheet** 142:8,9
250:13 252:7,10
252:18 253:1
**shelf** 22:13 131:11
**sheraton** 1:21
**sheriff** 46:18
62:20 70:3,4
121:24,25 145:9
165:16 166:11,12
169:14,19 237:6,7
237:18,19,24
238:7
**sheriff's** 45:25
62:25 122:4 145:5
159:16,24 166:18
166:21 199:4
**sheriffs** 63:21,24
**sheriffs's** 160:7
**shift** 181:17
**ship** 50:19
**shipments** 232:8
**shipped** 152:9,10
187:23 188:4

**ships** 151:11
**shopper** 69:10
91:21 134:19
192:9 205:17,23
**shoppers** 57:10,14
57:23 69:23 91:19
92:3 95:12,16,18
193:22 204:20
205:12
**shopping** 58:7,9
58:16 67:7 95:20
96:3 138:18 241:8
242:15
**short** 58:24,25
**shortly** 110:19
111:3
**show** 68:23 73:14
74:9 79:1 100:22
108:1 122:8 139:9
171:5 179:16
**shown** 250:16
**side** 22:11,12,12
22:14,18,20,21
23:1,1 24:9,20,22
25:9,19,23 26:8,14
27:10,11 28:17
30:7,8,17,21 37:23
38:5,9,12 52:21,25
53:3,4,5,9,15,17
54:10,13 55:11
56:21 57:17 73:5
73:12 74:16,21
76:15 77:10 78:3
78:4,7,8,11,14,19
81:21 82:1,3,4,17
83:15,19 84:20
85:6,13,19 86:1,7
86:20 90:14,18
102:11,14 107:4,5
107:7 108:18,21
108:23,25 118:8

122:11 162:21
164:6 172:9,13
187:12,19 188:1,1
195:9 233:25
**sides** 22:10
**sign** 246:12,18,19
**signature** 247:5
249:13 250:14
**signed** 180:12
251:13 252:18
**significant** 230:1
242:14
**signing** 250:19
**signs** 209:14
**similar** 29:12,14
29:15 69:3 150:25
155:16 194:13
**simply** 76:6
141:23 149:2,2
208:14
**sincerely** 250:21
**single** 164:2,15
226:12
**sir** 250:10
**sit** 229:18
**sitting** 131:11
**situation** 72:17
**six** 11:24 18:9
49:22 55:23 91:9
91:12
**sixth** 202:7
**skipping** 211:14
**slide** 204:18
205:10,16 217:13
218:7,19 226:6,22
**slight** 163:17
**slowly** 132:5
**small** 83:12 155:3
163:22 164:19,22
181:12

**smaller** 34:15 36:1
  36:5
**sobp** 140:1,11
**social** 192:25
**software** 21:5,18
  21:20 22:7,13,15
  24:21 25:5 27:5,5
  27:7,10,15 29:13
  31:5 34:14,15,17
  35:7,11 36:1,5,8
  37:18,19,23 59:22
  60:3,5 105:13
  106:8 110:23
  111:6 163:13
  165:12 208:14
**sold** 102:15 119:6
  122:21,22,22,23
  122:25 123:1
  149:25 150:1
  187:23 188:4
  243:12
**solutions** 250:1
  253:1
**somebody** 37:11
  45:5 59:23 60:7
  93:24 156:3
  172:23 194:17
  211:2 237:24
**sophistication**
  63:12
**sorry** 17:1 55:16
  65:16 66:22 78:9
  82:1 99:15 108:19
  119:8 128:23
  130:2 167:11
  173:6 182:18
  185:20 190:24
  240:10
**sort** 81:16 178:23
  208:1 233:4 241:6

**sorts** 220:17
**sound** 228:9
**source** 188:9
**sources** 48:20,21
  107:21 209:17
  212:18
**south** 2:10
**spaeder** 4:3 10:17
**speak** 15:14
**speaking** 12:2
  33:12,25 94:4,7
  172:21 198:3,6
  205:9
**specialists** 177:22
**specialty** 6:20
  127:25 128:2,22
  179:12,19
**specific** 36:11,14
  39:20 40:1 46:25
  75:11 79:7 82:7
  91:20 99:3 105:20
  114:16 124:5
  125:24 127:18
  128:6 145:20
  157:14,20 158:14
  159:6 161:1,6,14
  161:18 162:17
  166:5 168:23
  173:19 185:1
  189:17,18 197:7,7
  198:8 225:10
  232:21 236:16,17
  236:21
**specifically** 16:1
  20:23 33:20 34:2
  52:25 61:24
  116:14,18,20
  137:17 173:16
  198:18 207:21
  209:11 237:15

**specified** 248:21
**sped** 111:8
**speed** 105:20
  110:10
**spell** 34:19 35:4
**spent** 53:2 227:16
**spike** 158:15
**spikes** 158:6
**spit** 68:8
**spite** 203:12
**split** 30:6
**spoke** 94:16
**spoken** 94:12,16
**spreadsheet** 68:14
  73:20,20 184:1
**spreadsheets**
  74:12
**sql** 37:8,12,16 38:9
  38:23 68:10
  113:17 114:5
**square** 1:21
**ss** 248:3
**st** 104:3
**stability** 110:25
**staff** 33:6,10,23
  37:1 38:21 39:5,6
  39:10,22 40:15,25
  41:23 42:2 43:19
  44:11,21 45:10,14
  45:15,24 47:14
  48:2,16 51:15
  52:23 54:12 55:10
  56:3 57:1,7,16
  59:5 61:1,4 62:4,5
  62:13,16 69:3
  71:7 73:6,10
  74:15,21 76:15
  79:20 80:7,9,16,18
  80:23 81:2,7
  82:19 83:3,4,7
  85:13,25 89:25

**90:19 92:12,16
  93:20,25 98:4
  110:6 122:2 143:5
  143:7 144:1 156:6
  156:8 187:7,17
  196:7 203:7
  238:21
**staff's** 52:5
**staffs** 75:15,24
**stand** 11:19 35:15
  94:14
**stands** 91:5 98:1
  202:11
**start** 44:14 53:1
  60:9,11 62:4
  107:6 108:5
  197:25 211:19
  216:3 223:3
**started** 22:2 42:11
  57:24 60:15 83:12
  108:1 110:17
  111:3,4 211:15,20
  222:23 233:16
  235:24
**starts** 202:19
  215:15
**state** 1:21 2:8 6:3
  11:7,14,16 14:23
  16:8 22:23 40:8
  50:20 66:17,20
  90:4,9 92:1 94:10
  94:18,20 97:10,11
  97:24 102:25
  105:1,9,10 118:17
  120:13 125:4,9
  137:15,16 143:10
  156:15 187:9
  203:12 207:18
  211:15 240:24
  243:18 248:2,7
  249:15 251:10

252:15
state's 120:11
stated 59:13
220:12
statement 181:21
182:5,6,14 251:13
251:14 252:19,19
states 1:1 66:4
103:18,24 104:1,9
104:22 119:18,21
120:16 140:18
183:14 209:24,25
220:16 233:7
242:7
statewide 104:2,5
207:19
statistical 34:8
39:3 40:18,25
41:1,6,9,11,24
42:3,7 47:14 48:3
56:3,24 57:6 59:5
59:10 60:1,22
61:5,21 74:1
78:25 85:2 110:6
116:11 236:10
239:24
statistics 53:18,20
55:15 73:7,9 76:7
76:10 93:12
statute 10:22
26:18,20 68:3
84:6,7 107:2,8
109:2 135:5 136:3
137:8,25 167:25
169:8,10 185:22
212:4 222:17
232:11 237:8,13
237:15 238:14
244:17
stay 130:16 159:21

stenotypy 248:14
step 200:20
stimulants 73:24
stock 130:19
stockpile 234:22
stolen 213:6
stop 178:21,24
stopped 82:14
stores 3:12
stories 182:1
storing 108:12
stream 243:1
street 1:21 2:5,10
2:15,21 3:4,9,24
4:4,13
strength 127:5
128:17
strike 30:15 41:10
51:12 104:24
152:9 199:22
strongest 175:8
structure 170:14
studio 68:10
studying 208:7,9
subject 198:9,10
subjected 182:12
submission 147:6
submit 22:24 47:5
70:13 163:7 164:3
174:9,12 186:23
187:1
submits 186:22
187:4
submitted 140:8
submitting 163:6
172:11
subpoena 6:5 15:5
16:20,21 17:1,17
17:23
subscribed 251:10
252:14 253:21

subscriber 69:5
substance 91:5
94:11 134:13
183:17 184:17
substances 22:25
94:21 107:3,9,15
118:18 165:2
195:23 213:21
234:23
substantial 230:1
success 242:8
sufficient 193:8
suggested 37:6
suggestion 194:5
suite 3:9,14,24 4:4
4:9 250:2
summit 1:11 7:8
122:1,3 145:4,9
159:15,23 160:7
165:16 166:11,12
169:14,19 214:19
215:3,23
superior 250:1
supervisor 47:6
63:1 70:13 72:13
191:19
supervisors
168:14,15 170:13
supplied 21:25
supply 22:4
129:14 216:13
support 6:18
32:23 93:8 174:15
174:20 207:3
supported 29:10
suppose 245:5
supposed 121:7
233:25
sure 12:21 26:12
26:16 39:23 42:23
58:18 66:10 68:1

88:2 101:3 103:16
111:25 141:15
151:2 154:3 160:9
162:1 180:21
191:3 203:7
210:10 223:8
228:20,22 232:14
surveillance
195:24
suspects 191:5
suspicions 196:1
suspicious 76:20
76:21,23 77:9,19
78:16,21 79:22
80:4,11,15 81:9
114:25 116:13
151:23 152:1,3,6
155:12 161:23,24
162:2,4,9 189:12
231:2,8,14 232:1,4
237:25
swear 10:20
switch 206:16
switches 28:14,18
sworn 10:23
248:10 251:10,13
252:14,18 253:21
system 11:21 25:3
25:3 38:17,19
47:8 63:20 69:16
70:15 72:14 91:17
91:18 104:2,3,5
110:25 131:20,23
131:25 132:9
134:10 136:17
140:19 143:4
147:13 156:12,15
157:13 172:22
174:8,11,12 176:5
176:6,19 188:11
191:15,17 192:18

**[system - time]**                                                    Page 38

194:8 199:9
202:24 203:18
204:19 219:15,22
220:8 221:9 227:2
229:15 230:8,12
**systematic**  195:21
**systems**  19:3,7
31:23 98:13
103:19 111:7
125:21 131:19
140:17 173:22,25
194:9 220:7,18

**t**

**t**  2:4,14 250:5
**take**  12:12 13:15
13:19 16:14 30:11
47:10,13,18 54:3
54:20,24 58:15,21
86:9,22 92:4
112:18 114:1,4,4,6
114:13,19 142:7
157:2 179:7
206:17,19 211:16
223:6 225:9,16
236:14,18,20
245:23
**taken**  1:20 55:4
96:12 112:21
157:9 161:6
206:23 223:11
246:2 248:20
**takes**  58:19 59:21
88:21 105:16
**talk**  32:24 39:9
69:8 89:19 125:23
132:3,15 157:5
**talked**  27:4 52:20
59:9 62:19 67:5
72:10 84:24 90:4
103:5 105:1,2,12
110:5,7,9,11

112:25 120:24
121:22,23 122:13
130:3 134:21
138:22 151:22
158:21 161:22
164:4 165:10
166:3,10 167:8
169:13 170:4
173:15 186:16
187:8 188:14
190:13 211:13
212:16 219:6
221:4 228:3 231:1
237:6
**talking**  39:12
47:19 50:21,22
55:9 59:4 63:13
70:2 78:3 82:2
85:8 106:5 107:4
114:24 118:5
126:2 138:4
158:17 162:11
165:15 211:1
216:18 217:12
222:6 241:4 244:9
**tangent**  67:1
**task**  175:4 212:7
212:10,14
**tasks**  81:19 92:19
93:9
**team**  206:2,6,10
**technical**  136:12
201:12
**technically**  160:3
172:21 205:9
**technology**  19:2
20:22 21:1,3
32:15,21
**tell**  22:21 41:14
66:12 87:17 92:14
97:20 132:22

134:15 157:16
171:14 230:3
**telling**  220:22
**template**  232:23
233:4
**ten**  183:14
**tennessee**  183:5,16
**tenth**  2:21
**tenure**  19:23
43:10
**term**  12:1 35:12
50:5 95:12,16,19
113:7 245:4
**terminal**  109:6
118:24 123:11
150:8,15,17 151:9
158:5
**terminology**  240:5
**terms**  167:20
**testified**  40:24
58:8 62:24 85:5
85:16
**testify**  6:5 17:11
17:17,23 18:4
248:10
**testimony**  12:24
13:3 16:23 18:6
164:10 183:25
241:5 248:12,17
251:6,7 252:6,9,12
**texas**  183:16
**text**  148:13,16
**thank**  17:14 24:7
51:9 86:6 173:6
227:21 246:6,8
**thanks**  194:19
**their's**  99:12
**theoretically**
205:7
**therefor**  81:10

**thereof**  242:4
**thing**  35:23 194:16
212:16
**things**  82:9,16
93:6 110:15
112:25 116:4
124:14 133:1
155:21 160:18
180:5 182:9,11
206:12 211:6,7
224:6 240:21
241:6 242:22
**think**  15:24 37:3
44:3,10 76:13
85:17,22,24 86:3
89:4 97:4 112:1
122:12 161:1
165:10 188:13
198:4,5,19 206:4
227:8,25 231:6,11
241:7 243:4
**thinking**  60:7
161:12
**third**  204:17
**thirty**  250:18
**thomas**  201:13
**thought**  13:25
167:21
**thousand**  41:18
**three**  44:6,8 58:20
91:9,12 92:17,23
109:17 110:2
135:4 136:4 148:8
173:21,24 238:10
**time**  9:3,7 13:10
13:10,16,19 26:3
29:1 30:12 33:12
33:12 34:25,25
35:19,19 44:1
45:8 53:2 60:16
62:5 63:7,16 78:2

83:13,23 88:21
92:19 93:1,2
101:22 105:16
106:6 107:25
119:13 123:23
124:10,14,16,16
130:13 132:3
133:8 135:2,15
141:9 142:5
153:17 154:21,24
155:10 158:5,9
184:9,9,15 185:13
185:22 186:13
193:11 197:2,17
211:18 219:4
222:4,7 226:20
227:16 230:18
232:6 234:14,16
236:3,3 238:12
242:2 246:7
248:20
**timely** 142:21
**times** 28:25 49:11
51:7,19 64:21
83:17 84:14,15,18
98:11 103:12
113:4 117:10
122:3,8 123:15
139:2 147:25
155:13 160:16
**tips** 40:19
**title** 204:18 218:20
**today** 12:8 13:3
14:25 15:4,16,20
16:23 17:24 18:4
28:21 30:5 61:6
61:22 110:5 132:7
132:8 149:23
151:22 193:13
229:18

**today's** 13:23
**token** 157:18
**told** 15:22 16:1
**tonya** 35:3
**tool** 102:19,22,22
153:11,16,22
154:1 171:17
208:2 209:13
221:10 243:5
**tools** 114:8 220:24
**top** 66:12 85:23
139:22 161:14,18
174:25 202:9
221:15,18,20,22
221:25
**topic** 17:3,11 18:6
95:7 161:5
**topics** 206:16
**trace** 157:14,19
**track** 57:2 122:23
124:4 144:5
169:25 227:2
229:12,14 231:8
243:10,12,13
**tracked** 121:2,6
230:11,12 234:8
**tracking** 156:4
**tracks** 231:13,24
**traditionally**
131:18
**training** 100:7,9
100:10
**tramadol** 107:14
**transaction** 124:1
124:17 134:22
151:20 169:15,20
169:25
**transactions** 6:12
123:18 145:21
146:15,21 147:6
147:15 150:16

**transcribed**
248:15 251:7
**transcript** 5:1
246:12 247:3,6,9
247:11 250:11,12
251:5,12 252:5,11
252:17
**transcription**
248:16
**transmission**
219:11
**transmitted**
162:25
**treat** 199:5
**treatment** 95:14
181:6 184:16
213:22
**trends** 196:17
**tried** 115:5
**trigger** 210:4
**true** 169:22 182:3
219:23 234:6,24
248:16
**truth** 248:10,11,11
**try** 95:13 141:25
227:25 234:25
240:2
**trying** 37:7 91:4
97:25 215:13
234:17 236:19
**tucker** 4:8 10:14
**tuckerellis.com**
4:10
**turn** 16:25 109:8
139:20 147:4
183:8 192:3 196:9
202:7,16 204:16
207:5 215:25
218:6
**twelfth** 3:4

**twice** 29:2 141:11
141:12 142:2
153:4,6
**two** 7:6 22:10 52:2
52:3,11 58:19
62:18 67:11 94:12
95:12 107:12,14
131:19 132:2
134:15 135:3
163:19 165:21
177:17 186:4
211:22 214:15,25
215:12 233:12
235:8 245:3,23
**type** 25:4 36:19,23
38:25 39:2,11
70:8 83:1,24
84:17 100:7
103:25 115:15
125:5,9 145:3,15
152:13 153:16
161:16 164:2
168:10,20 172:10
172:11 173:17
175:2,14 191:2
197:7 208:1,5
210:1 211:22
216:17 234:10
237:9
**types** 34:8 39:13
83:7,18 98:12
100:4 105:20
110:11 138:14,15
155:1,6 173:20
175:21 220:18
238:20
**typical** 164:18
**typically** 45:4 49:2
53:4,4 56:17
66:10 68:13,15
91:16 96:25,25

98:9 105:7 115:14
115:17 118:15
119:19 126:20
129:15,17 130:15
132:2,13,17
142:15 143:9
144:18 160:16,22
163:12,13 164:17
166:22 175:2
200:7 238:19
239:13

**u**

**u**  35:6 37:14
**u.s.**  183:14
**uh**  45:4 50:1 67:4
70:20 81:24 85:4
109:11 139:19
181:2
**ultimately**  66:17
88:7 101:22 111:1
213:1,10 220:19
**unable**  12:23
120:10
**unaccounted**
213:6
**undergraduate**
31:14
**understand**  13:5
14:18 16:22 18:3
24:5 30:25 35:19
38:9 88:2 101:10
102:18 103:16,23
146:24 155:20
164:10 178:13
195:4 220:6
235:20 243:23
**understanding**
14:21,22 17:10
60:17 77:1 138:8
140:23 141:2
147:16 149:22

150:23 151:7
162:3 180:5,16
193:9 205:22,25
228:8,24 229:7
232:25
**understood**  12:14
13:20
**undertake**  34:4
**underway**  198:24
**unexpected**  76:25
77:2
**unfortunately**
176:6
**union**  32:7
**unique**  192:14,21
192:24 193:3
**unit**  126:17 129:11
**united**  1:1 66:3
**units**  67:21 241:24
242:25
**university**  32:2,3
32:7 183:5
**unlawful**  144:22
**unlawfully**  144:11
145:12
**unprofessional**
181:15
**unreasonable**
181:18
**update**  121:19
148:19
**updated**  29:17
103:10,12 109:4
151:1 164:12
185:16,21,25
186:14
**updates**  21:20
27:5,6,8,14 105:13
**upgrade**  37:8
**upgraded**  29:13
110:22

**usage**  25:2,4
**use**  7:7 12:1 35:18
39:4 40:19,25
41:12,23 88:11
91:17,18 96:4
113:17 115:19
134:18 138:10
140:17 153:23
159:8 169:3
173:13 176:9
192:10 203:17,21
214:17 215:1
216:9 227:3
241:15
**useful**  207:20
234:17 238:17
**user**  6:18 63:25
64:1 69:2 145:15
159:7 165:15
166:5,13 169:19
173:17,20 174:15
174:20 207:3
**user's**  145:18
218:16
**users**  103:14,15
135:7,13 168:2
207:22
**uses**  209:19
**usual**  245:17
**utility**  154:21
**utilization**  17:7
192:4
**utilizes**  231:14

**v**

**v**  1:11 35:6 250:6
251:3 252:3
**vaguely**  215:10
**valid**  180:11
**valuation**  195:20
**van**  4:16

**variances**  79:3
**variations**  41:11
41:24
**various**  14:23
22:15 27:14 33:13
33:14,17 34:15
51:7 53:19,22
54:11 55:15,21
56:2,16 60:17
66:5 74:23 75:5
75:16,16,17 78:24
79:12 90:20 91:24
93:11 94:4,17
97:17 100:1,5
113:4 115:5,9,20
156:4 167:6 183:4
187:24 199:10
209:14,14 210:21
239:24
**vary**  100:6
**vaughn**  35:3
**vendor**  21:24 22:4
33:5,10,23 34:10
34:14,17 35:8,10
89:15 92:9 104:7
104:10 106:20,22
106:22
**vendors**  21:22
27:15 36:1,5
**verify**  170:20
**veritext**  250:1,7
253:1
**veritext.com.**
250:17
**version**  37:8 97:24
148:2
**versions**  29:13
**versus**  71:17,20
87:24 88:13 164:8
**vetted**  200:1

| | | | |
|---|---|---|---|
| **vglynn** 2:23 | 121:24 136:22 | **week** 15:13 94:12 | 182:13 187:18 |
| **victims** 202:23 | 138:2 167:12 | 143:9 | 188:2 232:7,22 |
| 203:11 226:1 | 217:9 233:17 | **weekly** 34:13 | **wholesaler** 23:8 |
| **video** 8:1 | **wanting** 70:3 | 56:18 141:6,7,9 | 23:17 24:1 64:7 |
| **videographer** 9:1 | 180:10 | 153:8 | 77:5 78:4,8,11,19 |
| 10:11,19 55:2,5 | **wants** 70:17 71:5 | **weeks** 15:12 94:12 | 86:20 90:14 |
| 112:19,22 157:7 | 72:13 | 184:17,22 185:8 | 117:19,20,23 |
| 157:10 206:21,24 | **warranted** 209:22 | 213:22 | 118:6 122:18,19 |
| 223:5,9,12 245:25 | **washington** 2:21 | **weiner** 180:10,18 | 122:20 148:17,19 |
| 246:3,9 | 3:4 4:5 | 181:24 224:14,15 | 151:10 155:15,18 |
| **videotape** 6:3 16:7 | **watching** 154:3 | **welcome** 55:7 | 155:19,24 156:17 |
| 16:13 | **way** 68:24 86:17 | 157:12 | 162:16 165:11,14 |
| **videotaped** 1:17 | 89:3 101:23 | **wendy** 1:23 12:10 | 174:10 186:21 |
| **vincent** 2:20 9:12 | 120:15 122:2 | 54:23 248:6 | 232:9 |
| **violating** 118:21 | 124:4,14 130:24 | 249:14 | **wholesaler's** 77:7 |
| **violations** 40:10 | 149:2 157:13 | **went** 55:8 67:1 | 118:13 187:12 |
| 40:11,12 49:25 | 159:17 160:17 | 107:25 139:2 | **wholesalers** 22:22 |
| 50:4 82:9 195:25 | 166:11 167:22 | 197:4 224:16 | 109:3 117:6,11,13 |
| **visits** 225:10 | 186:25 199:3 | 243:21 | 117:15 118:2 |
| | 217:10 222:5 | **west** 3:24 | 119:2 123:2 |
| **w** | 231:8,25 233:8 | **whereof** 249:5 | 145:24 146:5 |
| | 243:20 245:13 | **whichever** 127:20 | 147:15 148:25 |
| **w** 3:23 111:13 | **ways** 40:17,23 | **wholesale** 6:12 | 150:13 151:25 |
| **wait** 12:17 27:18 | 48:13 82:5 86:13 | 22:12,12,18,20,21 | 153:1,5 154:23 |
| **waived** 250:19 | 136:25 137:3 | 23:1 24:9,20 | 156:4,9,22 163:7 |
| **wakley** 2:4 10:8,8 | **wc.com** 3:5,6 | 25:23 27:11 30:8 | 165:6,8 172:2,6,7 |
| 13:9 14:4,10 55:1 | **we've** 83:10,10 | 30:20 37:23 38:8 | 238:24 |
| 246:14 250:5 | 95:10 103:5 | 38:12 50:12 51:16 | **william** 6:7 100:18 |
| **wal** 3:12 | 204:22 207:23 | 51:22 52:4,12,14 | 100:25 101:4 |
| **walgreens** 3:22 | 227:14 | 52:21,25 53:3,5 | **williams** 3:2 9:14 |
| 9:23 | **web** 47:1 160:18 | 83:15,19 85:19 | 9:17 |
| **walk** 44:25 68:6 | 163:24 221:10 | 86:1 102:14 107:4 | **winsley** 6:7 100:18 |
| **walmart** 3:12 9:19 | **website** 6:15 43:7 | 108:18,21,23,25 | 100:25 101:4 |
| **want** 54:20 58:5 | 53:20 55:24 56:2 | 118:8 122:11 | 192:1 |
| 64:25 68:23 72:24 | 56:7 70:7 73:7,10 | 146:15,21 147:2,6 | **witness** 2:2 9:5 |
| 104:19 123:23 | 74:2,17 112:3,4,5 | 147:15 149:23 | 10:20 119:10 |
| 130:12 146:9 | 139:18 170:24 | 150:16,24 153:8 | 198:6 246:8 248:9 |
| 157:2 165:17 | 171:7 184:1 | 153:14 154:5 | 248:13,15,18 |
| 194:16 206:17 | 196:25 197:5 | 156:12,14 162:4 | 249:5 250:8,11 |
| 223:2 228:16,16 | 205:15 | 162:21 163:4 | 251:1,4,11 252:1,4 |
| 246:11 | | 172:13 174:11,12 | 252:15 |
| **wanted** 46:1 72:18 | | | |
| 72:21 112:24 | | | |

| | | |
|---|---|---|
| witness's  247:2 | 193:11 216:11 | **z** |
| witness'  250:14 | 224:14 229:22 | zip  165:25 |
| word  49:25 95:16 | 236:10 237:15 | zuckerman  4:3 |
| words  85:11 131:2 | 242:18 245:15 | 10:17 |
| 165:7 | wrong  194:12,14 | zuckerman.com |
| work  45:23 81:10 | 195:1,5 | 4:6 |
| 141:25 155:18,22 | wrote  22:12,17 | |
| 163:3 168:16 | 25:16,18,22 26:7 | |
| worked  32:11 | 26:12 42:2 46:8 | |
| 88:19 | 60:13 61:19 79:17 | |
| worker's  229:15 | 114:22 | |
| 230:11 | wv  2:15 3:10 | |
| workers  99:14 | www.greenketc... | |
| 176:2 227:9 | 2:16 | |
| working  45:22 | **x** | |
| 57:3 115:8 159:20 | x  111:13,17 | |
| 160:2 211:7 | **y** | |
| workload  45:8 | yeah  55:1 78:6 | |
| works  224:15 | 235:18 | |
| worth  211:22 | year  49:18 51:20 | |
| write  41:4 58:9,12 | 52:15 75:4,5 | |
| 59:21 61:4,11,25 | 77:14,15 84:14 | |
| 68:11,12,20 69:4 | 187:24 188:5 | |
| 72:19 73:1 87:3 | 200:3 202:5 | |
| 87:11 113:4,8,13 | 204:20 207:14 | |
| 113:23,24 114:1 | 211:25 | |
| 114:14,15 178:19 | years  11:24 18:9 | |
| 181:3 185:13 | 20:14 44:6,8 | |
| 224:19 | 62:12 64:22 99:7 | |
| writer  62:6,12 | 105:23 135:4,4,6,8 | |
| 63:20 | 135:14,16,17 | |
| writers  62:16 | 136:4 153:20 | |
| writing  24:19 | 190:11 206:12 | |
| 27:22 60:21 93:15 | 211:22 215:12 | |
| 96:15 113:11 | 228:11,17 | |
| 114:12 180:9 | yesterday  153:18 | |
| 194:20 213:15,18 | york  3:20 | |
| 224:11 | | |
| written  41:5 46:20 | | |
| 56:15 66:14 69:12 | | |
| 79:19 127:15 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.