Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION

 3

      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____  )   Case No.
                               )   1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES    )   Hon. Dan A.
 7    TO ALL CASES             )   Polster
 8
                 THURSDAY, APRIL 4, 2019
 9

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10               CONFIDENTIALITY REVIEW
11                      - - -
12            Videotaped deposition of Mark
13    Geraci, held at the offices of DECHERT LLP,
14    1095 Sixth Avenue, New York, New York,
15    commencing at 9:10 a.m., on the above date,
16    before Carrie A. Campbell, Registered
17    Diplomate Reporter and Certified Realtime
18    Reporter.
19

20

21                      - - -
22

              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  A P P E A R A N C E S :
 2
 3      SIMMONS HANLY CONROY, LLC
        BY:  JAYNE CONROY
 4           jconroy@simmonsfirm.com
             LAURA FITZPATRICK
 5           lfitzpatrick@simmonsfirm.com
             (VIA REALTIME STREAM)
 6           ELLYN HURD
             ehurd@simmonsfirm.com
 7           SANFORD SMOKLER
             (VIA REALTIME STREAM)
 8      112 Madison Avenue, Seventh Floor
        New York, New York 10016
 9      (212) 784-6400
10
        LANIER LAW FIRM, P.C.
11      BY:  MILDRED CONROY
             mildred.conroy@lanierlawfirm.com
12      126 East 56th Street, Sixth Floor
        New York, New York 10022
13      (212) 421-2800
        Counsel for Plaintiffs
14
15
        DECHERT LLP
16      BY:  NATHAN HOFFMANN
             nathan.hoffman@dechert.com
17           DANA MARTIN
             dana.martin@dechert.com
18      35 West Wacker Drive, Suite 3400
        Chicago, Illinois  60601
19      (312) 646-5800
20      and
21      DECHERT LLP
        BY:  PAUL LAFATA
22           paul.lafata@dechert.com
        1095 Avenue of the Americas
23      New York, New York 10036
        (212) 698-3500
24      Counsel for Purdue Pharma
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        COVINGTON & BURLING LLP
          BY:  SHAILEE DIWANJI SHARMA
 2             ssharma@cov.com
          850 Tenth Street, NW
 3        Washington, DC 20001-4956
          (202) 662-6000
 4        Counsel for McKesson Corporation
 5
 6        JACKSON KELLY PLLC
          BY:  JON L. ANDERSON
 7             jlanderson@jacksonkelly.com
               (VIA TELECONFERENCE)
 8        500 Lee Street East, Suite 1600
          Charleston, WV 25301-3202
 9        (304) 340-1288
          Counsel for AmerisourceBergen
10
11
          VENABLE LLP
12        BY:  JOHN A. McCAULEY
               jamccauley@Venable.com
13             (VIA TELECONFERENCE)
          750 East Pratt Street, Suite 900
14        Baltimore, Maryland  21202
          (410) 244-7400
15        Counsel for Abbott Laboratories
16
17   VIDEOGRAPHER:
             HENRY MARTE,
18         Golkow Litigation Services
19
                        - - -
20
21
22
23
24
25
```

```
 1                    INDEX
 2                                        PAGE
 3    APPEARANCES.................................  2
 4    EXAMINATIONS
 5      BY MS. CONROY.............................  8
 6      BY MR. HOFFMAN........................... 214
 7      BY MS. CONROY............................ 219
 8
 9                  EXHIBITS
10    No.        Description                    Page
11    Purdue     E-mail(s),                      22
      Geraci 1   PPLPC022000763004 -
12               PPLPC022000763005
13    Purdue     "When OMS Started & Updated,"   36
      Geraci 2   PPLP004449246
14
      Purdue     Finance & Accounting Standard   96
15    Geraci 3   Operating Procedures Manual,
                 PPLPC004000119321_001 -
16               PPLPC004000119321_003
17    Purdue     Purdue Order Management System  102
      Geraci 4   SOP-0007,
18               PPLP003430436 - PPLP003430441
19    Purdue     Order Monitoring System (OMS),  121
      Geraci 5   PPLPC019001275418
20
      Purdue     CC-SOP-000017,                  146
21    Geraci 6   PPLP004368538 - PPLP004368543
22    Purdue     CC-SOP-000018,                  146
      Geraci 7   PPLP004393084 - PPLP004393098
23
      Purdue     CC-SOP-000019,                  146
24    Geraci 8   PPLPC023000971890 -
                 PPLPC023000971896
25
```

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Purdue Geraci 9 | E-mail(s), PPLPC00400317960 - PPLPC00400317961 | 161 |
| 2 | | | |
| 3 | Purdue Geraci 10 | Objection to Notice of Deposition | 219 |
| 4 | | | |
| 5 | Purdue Geraci 11 | Notice of Deposition Pursuant to Rules 30(B)(6) and Document Request Pursuant to Rule 30(B)(2) and Rule 34 to Purdue Pharma, L.P., Purdue Pharma, Inc., and the Purdue Frederick Company | 226 |
| 6 | | | |
| 7 | | | |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                VIDEOGRAPHER:  Okay.  We are

 2        now on the record.  My name is Henry

 3        Marte.  I'm a videographer with Golkow

 4        Litigation Services.

 5                Today's date is April 4, 2019,

 6        and the time is 9:10 a.m.

 7                This videotaped deposition is

 8        being held at 1095 Avenue of the

 9        Americas, New York, New York, in the

10        matter of National Prescription Opiate

11        Litigation.

12                The deponent today is Mark

13        Geraci.

14                All appearances please

15        introduce themselves for the record.

16                MS. CONROY:  Jayne Conroy for

17        plaintiffs.

18                MS. HURD:  Ellyn Hurd for

19        plaintiffs.

20                MS. CONROY:  Mildred Conroy,

21        Lanier Law Firm, for the plaintiffs.

22                MR. HOFFMAN:  Nathan Hoffman on

23        behalf of the Purdue defendants and

24        the witness.

25                MR. LAFATA:  Paul LaFata from
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Dechert for the Purdue defendants

 2          also.

 3                  MS. MARTIN:  Dana Martin from

 4          Dechert for the Purdue defendants

 5          also.

 6                  MS. SHARMA:  Shailee Diwanji

 7          Sharma, Covington & Burling, for

 8          McKesson.

 9                  VIDEOGRAPHER:  And those on the

10          phone, please?

11                  MR. ANDERSON:  Jon Anderson,

12          Jackson Kelly, on behalf of

13          AmerisourceBergen.

14                  MR. McCAULEY:  John McCauley

15          for Abbott.

16                  VIDEOGRAPHER:  Anyone else?

17                  Okay.  Will the court reporter

18          please administer the oath to the

19          witness.

20

21                  MARK GERACI,

22    of lawful age, having been first duly sworn

23    to tell the truth, the whole truth and

24    nothing but the truth, deposes and says on

25    behalf of the Plaintiffs, as follows:
```

```
 1              DIRECT EXAMINATION

 2   QUESTIONS BY MS. CONROY:

 3        Q.      Good morning, Mr. Geraci.

 4        A.      Ms. Conroy.

 5        Q.      Have you ever had your

 6   deposition taken before?

 7        A.      No.

 8        Q.      Was that a no?

 9        A.      No.

10        Q.      Okay.  A couple of ground

11   rules.  We have a court reporter, which you

12   saw her magic machine a moment ago, and so

13   she's going to take down what I say; she's

14   going to take down what you say.  It's hard

15   if we talk at the same time, so try to wait

16   for the end of my question, and I'll try not

17   to start a question during your answer.

18              Okay?

19        A.      Fine.

20        Q.      If you want to take a break at

21   any point, just let me know.  I would prefer

22   you not take one between a question and

23   answer; we'll wait until the answer is

24   completed to take a break.  And we'll all try

25   to remind ourselves to remove our microphones
```

Highly Confidential - Subject to Further Confidentiality Review

1    before we break.

2         A.    Okay.

3         Q.    But you're allowed one break

4    without removing it.

5               Where do you live?

6         A.    In New York state.

7         Q.    And did you prepare at all for

8    this deposition today?

9         A.    Yes.

10        Q.    Okay.  Did you meet with your

11   lawyers?

12        A.    Yes.

13        Q.    Okay.  Who did you meet with?

14        A.    Nathan, Paul and Dana.

15        Q.    And for approximately how long?

16        A.    Five to six hours in total.

17        Q.    And did you review any

18   documents in preparation for this deposition?

19        A.    Yes.

20        Q.    And were those documents that

21   you had in your possession, or were they

22   provided to you?

23        A.    They were provided to me.

24        Q.    Okay.  Were any of the

25   documents that you reviewed in your

```
 1      possession?

 2           A.      No.

 3           Q.      And did you review those

 4      documents separately from the meetings that

 5      you had with Nathan, Paul and Dana?

 6                   MR. HOFFMAN:  Object to the

 7              form.

 8                   To the extent counsel provided

 9              it to him, I don't think there's any

10              distinction there, but go ahead.

11      QUESTIONS BY MS. CONROY:

12           Q.      Well, I'm asking about when you

13      reviewed them.

14                   Did you review them during the

15      time you were meeting with your lawyers, or

16      was it a separate period of time that you

17      reviewed the documents?

18           A.      Both.

19           Q.      Okay.  And approximately how

20      much time did you spend reviewing the

21      documents outside the presence of your

22      lawyers?

23           A.      Maybe an hour.

24           Q.      What's your current title at

25      Purdue?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I am vice president and chief

2    security officer.

3        Q.      VP and chief security officer.

4                What are your responsibilities

5    in that role?

6        A.      I am responsible for the

7    protection of the company's people, its

8    facilities, its information.

9                That's in the broadest sense.

10       Q.      And for how long have you held

11   that position?

12       A.      I've been with Purdue for ten

13   years.

14       Q.      And have you been a vice

15   president and chief security officer for the

16   ten years?

17       A.      Yes.

18       Q.      Have you had any promotions or

19   job title changes in the ten years?

20       A.      No.

21       Q.      How about responsibilities,

22   have they changed over the ten years?

23       A.      Yes.

24       Q.      In what way?

25       A.      Currently I'm chairman of the

Highly Confidential - Subject to Further Confidentiality Review

1    executive audit committee.

2         Q.    And what does the executive

3    audit committee do, or what are your

4    responsibilities on that committee?

5         A.    We coordinate the activities of

6    our external auditors and our internal

7    auditors.

8         Q.    Any other responsibilities that

9    have changed over the ten years?

10        A.    Yes.

11              I don't recall when it

12   occurred, but the control substance act group

13   based out of our North Carolina facilities

14   was moved from the legal division into

15   corporate security.

16        Q.    The North Carolina facility,

17   what does that facility do?

18        A.    That's a manufacturing

19   facility.

20        Q.    Okay.  And what did the CSA

21   group do, roughly, generally, at that

22   manufacturing facility?

23        A.    Primary mandate is to be

24   DEA-ready, for inspection by the DEA.

25        Q.    And that group was moved?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2          Q.     Off site?

 3          A.     No.  Moved from where it

 4    reported in to.

 5          Q.     Oh, I see.  I see.

 6                 So they remain in North

 7    Carolina --

 8          A.     Yes.

 9          Q.     -- but they report to you?

10          A.     They did, yes, that's correct.

11          Q.     They did.  Okay.

12                 And is that no longer the case?

13          A.     That is not the case now.

14          Q.     Okay.  And for how long has

15    that not been the case?

16          A.     The change occurred last year.

17          Q.     Do they report to someone else?

18          A.     They report locally, into local

19    operations, with oversight by corporate

20    security.

21          Q.     Any other changes in

22    responsibilities?

23          A.     No.

24          Q.     Did you -- at some point you

25    became a member of the order monitoring
```

```
 1    committee at Purdue?

 2         A.     Yes.

 3         Q.     Okay.  And did that start when

 4    you began at Purdue?

 5         A.     Yes.

 6         Q.     And has that remained the case?

 7         A.     Yes.

 8         Q.     Where were you before Purdue?

 9         A.     I was with Bristol-Myers

10    Squibb, BMS, as you probably -- as I see you

11    writing down here.

12         Q.     And what was -- what were

13    your -- what was generally your title and

14    your responsibilities there?

15         A.     I was the senior director of

16    corporate security with worldwide

17    responsibility.  Same three broad bullets of

18    responsibility.

19         Q.     Okay.  And where were you

20    located?

21         A.     Here in New York City.

22         Q.     And where is your office at

23    Purdue, if you have an office?

24         A.     Stamford, Connecticut.

25         Q.     And is that where you go to
```

```
 1    work every day?

 2         A.     Yes.

 3         Q.     And has that been the case for

 4    the ten years?

 5         A.     Yes.

 6         Q.     For how long were you at BMS?

 7         A.     Over 27 years.

 8         Q.     So I take it your roles changed

 9    and expanded over those 27 years?

10         A.     Yes.

11         Q.     And could you describe for me

12    briefly why you left BMS and went to Purdue

13    ten years ago?

14         A.     It was an opportunity to

15    actually be the leader of the entire group,

16    corporate security.

17         Q.     And you described BMS as a -- I

18    think did you say international --

19         A.     No, I did not.

20         Q.     How did you describe it?

21         A.     I said my responsibilities were

22    global.

23         Q.     Global.  Oh, sorry.

24                What is the range of your

25    responsibilities at Purdue geographically?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     United States.

2        Q.     Is there someone -- is there

3   anyone in Connecticut that is responsible for

4   outside of the United States in a corporate

5   security capacity?

6        A.     No.

7        Q.     And what facilities in the

8   United States do you oversee in your role as

9   VP and corporate security chief?

10       A.     We have our corporate

11  headquarters and our two manufacturing

12  locations in North Carolina.

13       Q.     What about Rhodes in Rhode

14  Island?

15       A.     No direct responsibility for

16  Rhodes.

17       Q.     Do you have any indirect

18  responsibilities for Rhodes?

19       A.     On occasion, providing

20  consultation and advice.

21       Q.     Is there someone in a role

22  comparable to yours at Rhodes?

23       A.     There is a security manager at

24  Rhodes.

25       Q.     Prior to BMS -- long time
```

Highly Confidential - Subject to Further Confidentiality Review

1    ago --

2          A.     Yes.  Yes, it was.

3          Q.     -- where were you?

4          A.     I was a special investigator

5    with the New York State Attorney General's

6    Office.

7          Q.     And what was your concentration

8    there or what did you investigate?

9          A.     Criminal investigations of

10   health care fraud at hospitals, nursing homes

11   and eventually Medicaid, all Medicaid fraud,

12   throughout the state.

13         Q.     And how long were you there?

14         A.     I was there four years.

15         Q.     What sort of fraud did you

16   investigate?  You can give me some examples.

17         A.     Health care fraud.  It was

18   basically white collar crime.

19         Q.     Okay.  Did you investigate

20   doctors?

21         A.     Yes.

22         Q.     Did you investigate

23   pharmaceutical companies?

24         A.     No.

25         Q.     What about distributors or

```
1    anyone in the supply chain of a

2    pharmaceutical --

3         A.    No.

4         Q.    -- company?

5         A.    No.

6              MR. HOFFMAN:  Just wait until

7         she finishes her question.

8    QUESTIONS BY MS. CONROY:

9         Q.    And prior to the New York State

10   Attorney General's Office, where were you?

11        A.    I was at university.

12        Q.    Okay.  And which university?

13        A.    I graduated in -- at Florida

14   Atlantic University.

15        Q.    And what year was that that you

16   graduated?

17        A.    1977.

18        Q.    And what was your degree?

19        A.    Criminal justice.

20        Q.    Do you have any degrees

21   after -- was that a BA or a BS?

22        A.    BA.

23        Q.    Any degrees after the BA?

24        A.    Yes.

25        Q.    And what are they?
```

```
 1           A.      I have a bachelor's degree in

 2    accounting.

 3           Q.      And where did you receive that

 4    degree?

 5           A.      New York -- SUNY Empire State

 6    College.

 7           Q.      And when?

 8           A.      1981.

 9           Q.      Any other degrees?

10           A.      I have an MBA.

11           Q.      And year?  What year did you

12    receive that?

13           A.      1984.

14           Q.      And whereabouts?

15           A.      New York Institute of

16    Technology.

17           Q.      And any other degrees?

18           A.      No.

19           Q.      Do you have any certifications

20    of any sort?

21           A.      Yes.

22           Q.      What are they?

23           A.      I have a CPP, which is

24    designated by ASIS International, which is

25    the largest security association in the
```

Highly Confidential - Subject to Further Confidentiality Review

1    world.

2         Q.    And what is that -- what does

3    that certification suggest to the world?

4         A.    That you're a professional,

5    certified protection professional.

6         Q.    And what is involved in

7    receiving that certification?

8         A.    Examination.

9         Q.    And when did you first take

10   that examination?

11        A.    Oh, gee.

12        Q.    Or if you want to give me like

13   where you were or --

14        A.    I'm thinking it was 1996, '97.

15        Q.    And is that something that you

16   just take once, or do you have to renew it

17   over time?

18        A.    You have to take continuing

19   education.

20        Q.    And have you done that?  Have

21   you kept up with it?

22        A.    Yes.

23        Q.    Any other certifications?

24        A.    I am a certified fraud

25   examiner.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And when did you receive that
 2   certification?
 3          A.     I don't recall.
 4          Q.     Would it have been prior to
 5   your New York State employment?
 6          A.     No.
 7          Q.     And are you current as a
 8   certified fraud examiner?
 9          A.     Yes, I am.
10          Q.     And any other certifications?
11          A.     No.
12          Q.     Do you teach at all?
13          A.     Not currently.
14          Q.     Have you taught in the past?
15          A.     Yes.
16          Q.     What have you taught?
17          A.     What was it?  Corporate
18   security.  Corporate security.
19          Q.     Okay.  And where did you do
20   that?
21          A.     Suffolk County Community
22   College in New York.
23          Q.     Out on Long Island?
24          A.     That is correct.
25          Q.     And for how long did you do
```

Highly Confidential - Subject to Further Confidentiality Review

1    that?

2           A.     I believe two semesters.

3           Q.     And how long ago was that,

4    approximately?

5           A.     Over ten years ago.

6           Q.     So while you were at BMS?

7           A.     That is correct.

8           Q.     Any other teaching engagements?

9           A.     No.

10          Q.     And do you ever participate as

11   an instructor in CLE?

12          A.     No.

13          Q.     Have you ever published any

14   articles or books or book chapters with

15   respect to any of your employment

16   responsibilities?

17          A.     No.

18          Q.     Any in the works?

19          A.     No.

20                 (Purdue-Geraci Exhibit 1 marked

21          for identification.)

22   QUESTIONS BY MS. CONROY:

23          Q.     I'll show you what I've marked

24   as the first exhibit.

25                 Exhibit 1 is an e-mail from you

1    to Carmen Roldan.

2              Do you know who Carmen Roldan

3    is?

4         A.    Yes.

5         Q.    Who is that?

6         A.    She is my administrative

7    assistant.

8         Q.    Okay.  And it's dated

9    September 15th of 2014.

10             And take a look at it.  It is

11   2015 budget, corporate security and

12   Controlled Substances Act compliance.  It

13   looks like a PowerPoint.

14             Do you see that?

15        A.    Yes.

16        Q.    Did you prepare this

17   PowerPoint?

18        A.    No.

19        Q.    Do you know who did?

20        A.    Yes.

21        Q.    Who was it?

22        A.    Our finance department.

23        Q.    Okay.  And did you have any

24   input into the PowerPoint?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Okay.  Can you generally tell
 2   me where you would have provided input?
 3                  And you don't have to show me
 4   the page --
 5          A.      Sure.
 6          Q.      I mean, you can if you want,
 7   but I'm just curious where you would have
 8   provided input, what areas, with respect to
 9   the corporate security and Controlled
10   Substances Act compliance budget.
11          A.      Right.
12                  Nature and purpose of it.
13          Q.      And that is page 3?
14          A.      That is page 3.
15          Q.      Page 3 of the -- of the -- or
16   the third slide, it looks like.
17                  And where would you have --
18   would you have provided all those bullet
19   points?
20          A.      I would have provided the
21   information covered in these bullet points.
22          Q.      Okay.  If you just take a look
23   at the second to the last one it says,
24   "Sustaining the highest level of DEA
25   compliance and readiness."
```

1              That falls within your

2    responsibilities as vice president and chief

3    security officer at Purdue?

4         A.    Yes.

5         Q.    And can you tell me what you

6    mean by "DEA compliance and readiness"?

7         A.    This relates to the work done

8    at our Wilson and Treyburn facilities by

9    the -- at this time and currently the

10   diversion control group, which was the

11   Controlled Substances Act group.  We changed

12   the name to diversion control.  This is their

13   responsibility.

14        Q.    And that's diversion control at

15   the manufacturing plants?

16        A.    That is correct.

17        Q.    And where -- which one of the

18   bullet points would cover your

19   responsibilities with the order monitoring

20   committee?

21             MR. HOFFMAN:  Object to form.

22             THE WITNESS:  I answer this?

23             MR. HOFFMAN:  Yeah.

24             THE WITNESS:  I heard the

25        objection.

1           MR. HOFFMAN:  Unless I tell you

2      not to answer, you can go ahead.

3           THE WITNESS:  None of these

4      cover that.

5  QUESTIONS BY MS. CONROY:

6      Q.    Is the order monitoring

7  committee not a part of a budget for the

8  corporate security and Controlled Substance

9  Act compliance?

10          MR. HOFFMAN:  Object to form.

11          Go ahead.

12          THE WITNESS:  It is not.

13  QUESTIONS BY MS. CONROY:

14     Q.    Where would -- is there a

15  budget for the order monitoring committee?

16     A.    I don't know.

17     Q.    Have you ever looked into that?

18     A.    No.

19     Q.    Have you ever been asked to

20  help prepare a budget for the order

21  monitoring committee?

22     A.    No.

23     Q.    Do you know if the order

24  monitoring committee is not a part of the

25  corporate security and Controlled Substance

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Act compliance budget, do you know who would

 2    be responsible for that budget --

 3                MR. HOFFMAN:  Objection.

 4    QUESTIONS BY MS. CONROY:

 5        Q.    -- if, in fact, there is one?

 6                MR. HOFFMAN:  Go ahead.

 7                THE WITNESS:  Yes.

 8    QUESTIONS BY MS. CONROY:

 9        Q.    Who is that?

10        A.    Originally it would have been

11    in law, and now it's in corporate compliance.

12        Q.    And when you say "it's in

13    corporate compliance," is corporate

14    compliance something separate from your

15    responsibilities?

16        A.    Yes.

17        Q.    Okay.  Who is -- where is

18    corporate compliance located?

19        A.    Stamford, Connecticut.

20        Q.    And is there a vice president

21    of corporate compliance?

22        A.    Yes.

23        Q.    And who is that?

24        A.    Margaret Feltz.

25        Q.    Do you report in any way to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Margaret Feltz?
 2         A.     No.
 3         Q.     Does she report in any way to
 4    you?
 5         A.     No.
 6         Q.     I'm sorry if you already
 7    answered this.
 8                Is she -- does she oversee the
 9    order monitoring committee?
10         A.     Currently.
11         Q.     And for how long has that been
12    the case?
13         A.     I don't know.
14         Q.     Who did -- who was overseeing
15    the order monitoring committee prior to?  Was
16    that legal?
17         A.     Yes.
18         Q.     Is legal the same as the
19    general counsel's office?
20         A.     Yes.
21         Q.     Was it the general counsel's
22    office or legal when you joined Purdue in
23    2009?
24         A.     Yes.
25         Q.     Do you recall whether they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    oversaw it for a very short time or a few
 2    years, or do you have any concept?
 3              I know you don't remember when
 4    the change was.  Would you have a concept of
 5    whether it was a long time or a short time?
 6              MR. HOFFMAN:  Object to form.
 7              THE WITNESS:  I recall it as a
 8        number of years.
 9    QUESTIONS BY MS. CONROY:
10        Q.    So as I look through this
11    budget, this would not in any way concern the
12    order monitoring committee or its
13    responsibilities; is that fair?
14              MR. HOFFMAN:  Object to the
15        form.
16              THE WITNESS:  That is correct
17        from a budget perspective.
18    QUESTIONS BY MS. CONROY:
19        Q.    Okay.  From what perspective
20    would that not be fair?
21        A.    This is at the budget of the
22    corporate security department and the
23    functions that report in to it.
24        Q.    Do any of the functions that
25    report in to the corporate security have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    anything to do with the order monitoring

 2    committee's functions?

 3        A.    Not the functions.

 4        Q.    What do they -- if it's not the

 5    functions, what is it?

 6        A.    Could be an individual.

 7        Q.    Okay.  Do you have anyone in

 8    mind?

 9        A.    Yes.

10        Q.    Who is that?

11        A.    Luis Bauza, that's B-a-u-z-a.

12        Q.    And he has been on the

13    committee, the order monitoring committee,

14    correct?

15        A.    Yes, he has.

16        Q.    Okay.  Is he still on the

17    committee?

18        A.    Yes.

19        Q.    And what are his

20    responsibilities generally, if you know, on

21    the order monitoring committee?

22        A.    His responsibilities have

23    generally been to conduct background

24    inquiries concerning pharmacies that the

25    order monitoring committee was looking at
```

1    that appear to be suspicious.

2          Q.     Has he been on the order

3    monitoring committee since 2009; do you know?

4          A.     I believe so.

5          Q.     Anyone else other than

6    Mr. Bauza that would be a part of the

7    corporate security budget as an individual

8    and have responsibilities in the order

9    monitoring committee?

10         A.     Yes.

11         Q.     And who is that?

12         A.     John Gilbride, G-i-l-b-r-i-d-e.

13         Q.     And what are his

14   responsibilities within corporate security?

15         A.     His responsibilities within

16   corporate security include supply chain

17   security and our law enforcement liaison in

18   education training programs, also known as

19   LELE.

20         Q.     And I saw there were some

21   budget items here for LELE, correct?

22         A.     Yes.

23         Q.     Does LELE have any crossover

24   with the order monitoring committee?

25         A.     No.

```
 1          Q.      Where is -- where does John
 2   Gilbride have an office?
 3          A.      He works remotely.
 4          Q.      And Luis Bauza, is he in
 5   Stamford?
 6          A.      Yes.
 7          Q.      And what is John Gilbride's --
 8   what are his responsibilities with respect to
 9   the order monitoring committee?
10          A.      John is the one that makes the
11   referral of those pharmacies that the
12   committee has deemed to be suspicious to the
13   Drug Enforcement Administration, DEA.
14          Q.      And so he's the one that
15   actually does the physical reporting to the
16   DEA field office?
17          A.      No.
18          Q.      Okay.  Who is that?
19          A.      That's -- it's not to a field
20   office.  It's to headquarters.
21          Q.      Okay.  So he's the one that's
22   responsible for making the actual report to
23   DEA headquarters?
24          A.      He transmits the report
25   generated from the committee to the DEA.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      And for how long has that been

2    the case?

3        A.      A number of years.

4        Q.      Okay.  More than five?

5        A.      No.

6        Q.      Would he have been responsible

7    for that when the -- when legal was -- we'll

8    call it head, but running the order

9    monitoring committee?

10        A.      He may have.

11        Q.      And has he been the person who

12    refers to the DEA since Ms. Feltz has been

13    head of the order monitoring committee?

14        A.      Yes.

15        Q.      Anyone else in corporate

16    compliance that would also have

17    responsibilities in the order monitoring

18    committee, other than Mr. Bauza and John

19    Gilbride and yourself?

20              MR. HOFFMAN:  You said

21        corporate compliance.  Did you mean

22        corporate security?

23              MS. CONROY:  I did.  Corporate

24        security.

25              THE WITNESS:  Not current

Highly Confidential - Subject to Further Confidentiality Review

1          employees.

2     QUESTIONS BY MS. CONROY:

3          Q.     Who are you thinking of that's

4     not a current employee?

5          A.     Rod Benson, B-e-n-s-o-n.

6          Q.     And what were his duties and

7     responsibilities with respect to the order

8     monitoring committee?

9          A.     There was a time where he was

10    making the referrals to the DEA.

11         Q.     And was he a member of

12    corporate security when he was making those

13    referrals?

14         A.     Yes.

15         Q.     Was he making them at the

16    behest of the order monitoring committee?

17         A.     Yes.

18         Q.     And he did that before

19    Mr. Gilbride?

20         A.     Yes.

21         Q.     Did he do it at the same time

22    as Mr. Gilbride as well?

23         A.     No.

24         Q.     Do you know whether he was

25    making those referrals when the order

Highly Confidential - Subject to Further Confidentiality Review

```
 1      monitoring committee was overseen by legal,

 2      or did his time also include Ms. Feltz's

 3      oversight?

 4           A.     Could you repeat the question,

 5      please?

 6           Q.     Sure.

 7                  This is just trying to kind of

 8      pin it in time.

 9                  You said that John Gilbride may

10      have straddled both when legal was overseeing

11      the order monitoring committee as well as

12      when Margaret Feltz was overseeing it.

13           A.     Uh-huh.

14           Q.     And can you put Mr. Benson in

15      that time frame for me?

16           A.     I believe that Mr. Benson was

17      making the referrals when the order

18      monitoring team was reporting into legal.

19           Q.     Okay.  Was he actually a member

20      of the committee?

21           A.     No.

22           Q.     But he was -- he was given the

23      responsibility to make the referrals?

24           A.     Yes.

25           Q.     Do you know if he participated
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in the order monitoring committee meetings,

 2    or was he just given the function of the

 3    reporting of the referrals?

 4         A.    He was given the function of

 5    reporting.

 6         Q.    And Mr. Benson has left the

 7    company?

 8         A.    Yes.

 9         Q.    Anyone else?  Former employees?

10         A.    No.

11               (Purdue-Geraci Exhibit 2 marked

12         for identification.)

13    QUESTIONS BY MS. CONROY:

14         Q.    I'm going to mark as Exhibit 2

15    a PowerPoint, but what I'm going to do, if

16    it's okay with counsel, I'm going to write

17    the -- this is one of those native

18    productions, so I'm going to write the Bates

19    number on it.

20               Okay?

21               MR. HOFFMAN:  And for the

22         record, let me just read it in, Jayne.

23         For the record, the Bates number is

24         PPLP00449246.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. CONROY:

 2         Q.   Mr. Geraci, does this look

 3    familiar to you at all, this PowerPoint that

 4    says on the front "When OMS started and

 5    updated"?

 6              MR. HOFFMAN:  And, Jayne, I'm

 7         sorry, I guess while we're looking at

 8         it, is there a reason why the

 9         PowerPoint starts on page 4 rather

10         than on page 1?

11              Are there any potential pages

12         that are missing?

13              MS. CONROY:  Yeah, I will tell

14         you this -- in Relativity, this

15         PowerPoint appears it's in an Excel

16         format, and so this is printed from an

17         Excel sheet.  And so I don't know why

18         it has -- I don't know why it starts

19         with 4 or 5, but if you go -- for

20         example, when you get past 4 and 5,

21         the chart that begins with CEO --

22              MR. HOFFMAN:  Right.

23              MS. CONROY:  -- is a tab, is an

24         Excel tab.  The algorithm which is the

25         next page is an Excel tab.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. HOFFMAN:  Okay.  I just
 2         wanted to make sure that there weren't
 3         pages that were missing or anything
 4         like that, as far as you know.
 5              MS. CONROY:  As I said, it's in
 6         an unusual format.  I'll go through it
 7         with the witness, and when we take a
 8         break I can show you what it looks
 9         like on the screen, but we did our
10         best to copy it from the Excel format
11         that it was in.
12              MR. HOFFMAN:  Got it.  That's
13         fine.
14              MS. CONROY:  And it may even,
15         in fact, exist elsewhere as a
16         PowerPoint but without the tabs.
17    QUESTIONS BY MS. CONROY:
18         Q.    Mr. Geraci, does this look at
19    all familiar to you?
20         A.    No.
21         Q.    Okay.  Let's look at the first
22    page that says, "When OMS started and
23    updated."
24              It says here on the -- on the
25    far left, "OMS is launched in 2008."
```

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that?

2        A.    Yes.

3        Q.    Does that sound right to you?

4              MR. HOFFMAN:  Object to the

5        form.

6              THE WITNESS:  I don't recall or

7        know when OMS actually started or was

8        launched.

9   QUESTIONS BY MS. CONROY:

10       Q.    Okay.  So that's not something

11  that you looked at in preparation for your

12  deposition, when the order monitoring system

13  was first implemented?

14       A.    That is correct.

15       Q.    Okay.  It says that the SOP --

16  that stands for standard operating procedure,

17  or protocol, correct?

18       A.    Yes.

19       Q.    You're familiar with that term?

20       A.    Yes.  Yes, I am.

21       Q.    It says, "finalized in 2009."

22  Does that sound correct to you?

23              Do you know?

24       A.    That sounds correct.

25       Q.    And then you'll see between

```
 1    2008 and 2009, below the blue line it says
 2    "original algorithm."
 3              Do you see that?
 4       A.    Yes.
 5       Q.    Does that mean anything to you?
 6       A.    No.
 7       Q.    Do you have any understanding
 8    of the algorithms that are used within the
 9    order monitoring system?
10       A.    Yes.
11       Q.    Okay.  And what is your
12    understanding -- can you describe for me
13    generally what the algorithms are for the
14    order monitoring system?
15              MR. HOFFMAN:  Object to form,
16         to time frame, but if you can provide
17         a general response, that's fine.
18              THE WITNESS:  As I understand
19         it generally, the algorithm is --
20         takes data that is received by Purdue
21         from certain wholesalers through a
22         Fee-For-Service agreement, which looks
23         at the distribution by those
24         wholesalers to pharmacies throughout
25         the country.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And then the algorithm will

 2         measure that on a case-by-case basis

 3         looking at periods -- period purchases

 4         versus prior period purchases to try

 5         to determine if there are any

 6         abnormalities or things that appear to

 7         be unusual or possibly suspicious.

 8    QUESTIONS BY MS. CONROY:

 9         Q.    And that function is required

10    under the Controlled Substances Act, correct?

11              MR. HOFFMAN:  Object to the

12         form.

13              THE WITNESS:  I don't know if

14         that's required by the Controlled

15         Substance Act, the regulation, the

16         Controlled Substance Act.

17    QUESTIONS BY MS. CONROY:

18         Q.    You don't know whether or not

19    there is a requirement for Purdue to monitor

20    for suspicious -- suspicious orders with

21    respect to pattern, frequency or size?

22              MR. HOFFMAN:  Object to the

23         form.

24              THE WITNESS:  I don't believe

25         that there is a regulation that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              mandates that to the manufacturers.
 2       QUESTIONS BY MS. CONROY:
 3              Q.      Is there a regulation that
 4       mandates that to someone other than a
 5       manufacturer?
 6              A.      I don't know.
 7                     MR. HOFFMAN:  Object to the
 8              form.  Beyond the scope.
 9       QUESTIONS BY MS. CONROY:
10              Q.      Is it your understanding that
11       there is no governmental regulation that
12       mandates that manufacturers monitor for
13       orders of suspicious size, pattern or
14       frequency?
15                     MR. HOFFMAN:  Object to the
16              form.  Beyond the scope.
17                     THE WITNESS:  You're asking me
18              for a legal interpretation.  I don't
19              know of a regulation that mandates it
20              at the manufacturing level.
21       QUESTIONS BY MS. CONROY:
22              Q.      Well, I'm asking you.  You are
23       the vice president and chief security officer
24       of Purdue, correct?
25              A.      Uh-huh.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     So you must be familiar with

 2    some governmental regulations.

 3          A.     And the question is?

 4          Q.     Are you familiar with some

 5    government regulations?

 6          A.     Yes.

 7          Q.     Okay.  But you're not aware of

 8    any regulation that would require Purdue to

 9    monitor for suspicious orders?

10          A.     That is correct.

11                 MR. HOFFMAN:  Object to the

12          form.  Beyond the scope.

13    QUESTIONS BY MS. CONROY:

14          Q.     Why is there an order

15    monitoring system at Purdue?

16                 MR. HOFFMAN:  Object to the

17          form.

18                 THE WITNESS:  The order

19          monitoring system at Purdue, as I

20          understand it, was created to help

21          support the distributors, wholesalers,

22          in trying to identify those pharmacies

23          whose order patterns may be unusual

24          and possibly suspicious.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MS. CONROY:

 2           Q.     Why do the distributors need

 3      help?

 4                  MR. HOFFMAN:  Object to the

 5           form.  Beyond the scope.

 6                  THE WITNESS:  I can't respond

 7           as to why the distributors needed

 8           help, but Purdue did this to help

 9           support the distributors in their

10           diligence, or due diligence, in

11           reviewing pharmacy orders.

12      QUESTIONS BY MS. CONROY:

13           Q.     Whose due diligence?

14                  MR. HOFFMAN:  Object to the

15           form.  Again, beyond the scope.

16                  THE WITNESS:  Distributors.

17           The review that they would be doing of

18           their pharmacy -- their customers.

19      QUESTIONS BY MS. CONROY:

20           Q.     Do the distributors have a

21      requirement to do due diligence with respect

22      to their pharmacies?

23                  MR. HOFFMAN:  Objection.

24      QUESTIONS BY MS. CONROY:

25           Q.     The pharmacies that they are
```

```
 1      supplying?

 2                     MR. HOFFMAN:  I'm sorry.

 3            Object to the form.  Beyond the scope.

 4                     THE WITNESS:  I can't respond

 5            as to what the responsibilities are of

 6            the distributors.

 7      QUESTIONS BY MS. CONROY:

 8            Q.    But it's your understanding

 9      that Purdue has that understanding?

10                     MR. HOFFMAN:  What

11            understanding?

12      QUESTIONS BY MS. CONROY:

13            Q.    That the distributors have a

14      due diligence requirement with respect to the

15      orders to pharmacies.

16                     MR. HOFFMAN:  Object to the

17            form.  Beyond the scope.

18                     THE WITNESS:  My understanding

19            is Purdue created an order monitoring

20            system to help support the

21            distributors in reviewing pharmacy

22            activity, purchases by them, to look

23            for unusual activity or potentially

24            suspicious orders.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MS. CONROY:
 2          Q.    But you don't know why the
 3     distributors needed that help?
 4               MR. HOFFMAN:  Object to the
 5          form.  Asked and answered.
 6               THE WITNESS:  I believe I
 7          answered that question.
 8     QUESTIONS BY MS. CONROY:
 9          Q.    Well, let me ask it again then.
10          A.    Okay.
11          Q.    Why do they need that help?
12               MR. HOFFMAN:  Same objection
13          and beyond the scope.
14               THE WITNESS:  I can tell you
15          why Purdue did what they did.  I don't
16          know why the distributors created what
17          they did.
18     QUESTIONS BY MS. CONROY:
19          Q.    You told me that Purdue did it
20     to help the distributors.
21          A.    To support.
22          Q.    To support the distributors?
23          A.    That is correct.
24          Q.    But you don't know the
25     rationale behind why Purdue did it to support
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the distributors?
 2              MR. HOFFMAN:  Object to form.
 3         Beyond the scope.
 4              THE WITNESS:  I'm saying that
 5         the distributors -- I know what Purdue
 6         did, and I can comment on what Purdue
 7         did.
 8              I cannot comment as to what the
 9         distributors did or did not do.
10    QUESTIONS BY MS. CONROY:
11         Q.    That's not what I'm asking you.
12         A.    Okay.
13         Q.    I'm asking you what was behind
14    Purdue's reasoning to develop a system to
15    support distributors?
16         A.    The reasoning was created
17    obviously before I joined Purdue in 2009.
18         Q.    So you don't know?
19         A.    I don't know.
20         Q.    What you do know is it has
21    nothing to do with any Controlled Substances
22    Act requirement?
23              MR. HOFFMAN:  Object to the
24         form.  Beyond the scope, and I believe
25         misstates his prior testimony.
```

```
 1                    THE WITNESS:  I know what we
 2          did at Purdue and what I was part of,
 3          and it was to support the distributors
 4          as best we could with the information
 5          that we could garner to help them
 6          identify suspicious or unusual buying
 7          practices at the pharmacy level.
 8   QUESTIONS BY MS. CONROY:
 9          Q.    Okay.  And as far as you know,
10   as vice president and chief security officer
11   at Purdue, that is the entire reason for the
12   creation of the order monitoring system, to
13   support the distributors?
14                    MR. HOFFMAN:  Same objections.
15                    THE WITNESS:  That is a reason.
16   QUESTIONS BY MS. CONROY:
17          Q.    What are the other reasons?
18          A.    Purdue --
19                    MR. HOFFMAN:  Objection.
20          Beyond the scope.
21                    THE WITNESS:  -- wanting to
22          do -- and be a good corporate citizen,
23          did this as a means to support
24          distributors in hopefully reducing any
25          potential diversion of controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            substances, in this case, Purdue

 2            products.

 3     QUESTIONS BY MS. CONROY:

 4            Q.     To reduce diversion --

 5            A.     Potential diversion.

 6            Q.     By the distributors?

 7            A.     No.

 8            Q.     By whom?

 9            A.     At the pharmacy level.

10            MR. HOFFMAN:  Somebody may want

11     to go on mute.  I think we hear a baby

12     crying, which is adorable, but it's a

13     little distracting.

14            THE WITNESS:  Listen, I just

15     know it's one of my grandchildren.

16            MS. CONROY:  It sounds better

17     when they cry when they're a

18     grandchild.

19            THE WITNESS:  It's okay.

20     Ms. Conroy is being nice.

21     QUESTIONS BY MS. CONROY:

22            Q.     If you take a look at that --

23     again, at that first page of Exhibit 2, you

24     see where it says, "DEA meetings," right in

25     the middle, "April, October and December,
```

```
 1    referred 290 pharmacies to DEA"?

 2              Do you see that?

 3       A.    Yes.

 4       Q.    Was that in support of the

 5    distributors, the reporting to the DEA of the

 6    290 pharmacies?

 7              MR. HOFFMAN:  Object to the

 8         form.

 9              THE WITNESS:  I was not part of

10         that meeting, as I recall.

11    QUESTIONS BY MS. CONROY:

12       Q.    Do you know anything about the

13    referral of the 290 pharmacies to the DEA in

14    2011?

15       A.    I recall that there was a

16    meeting with the DEA and that pharmacies were

17    referred to the DEA based on the work

18    conducted by the OMS group.

19       Q.    Do you know whether it was

20    either Mr. Benson or Mr. Gilbride that

21    reported or referred those 290 pharmacies to

22    the DEA?

23              MR. HOFFMAN:  Object to form.

24         Foundation.  I think it calls for

25         speculation.
```

```
 1                    THE WITNESS:  I don't know.

 2    QUESTIONS BY MS. CONROY:

 3        Q.     They were the two individuals

 4    that you identified that were responsible for

 5    referring pharmacies to the DEA, correct?

 6        A.     At a certain period of time.

 7        Q.     Do you think in 2011 there was

 8    someone else responsible for those referrals?

 9                    MR. HOFFMAN:  Object to form.

10        Calls for speculation.

11                    THE WITNESS:  There could have

12        been.

13    QUESTIONS BY MS. CONROY:

14        Q.     You said you were not present

15    at that meeting?  Is that what you said?

16        A.     I don't believe so.

17        Q.     Do you know anything about

18    those referrals?  Were they dis -- for

19    example, were they discussed at the order

20    monitoring committee?

21        A.     I don't have specific

22    recollection of that.

23        Q.     Do you have any recollection of

24    that?

25                    That's a lot of referrals, 290
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    referrals at one meeting.

2              Do you know anything about

3    that?

4              MR. HOFFMAN:  Object to the

5         form.

6              THE WITNESS:  I recall that

7         there was a meeting, and

8         representatives of Purdue met with

9         DEA, made referrals.

10   QUESTIONS BY MS. CONROY:

11        Q.   Do you have any recollection

12   that it had to do with a decline in orders by

13   those 290 pharmacies?

14             MR. HOFFMAN:  Object to the

15        form.

16   QUESTIONS BY MS. CONROY:

17        Q.   Decline in order of Purdue

18   products?

19        A.   I don't recall that.

20        Q.   Do you have any recollection

21   that it was related to a tamper or

22   abuse-resistant formulation of OxyContin?

23             MR. HOFFMAN:  Object to the

24        form.

25             THE WITNESS:  I don't recall
```

Highly Confidential - Subject to Further Confidentiality Review

1              that.

2      QUESTIONS BY MS. CONROY:

3              Q.      Did you look at any documents

4      in your preparation for this deposition with

5      respect to those 290 referrals to the DEA?

6              A.      No, I did not.

7              Q.      Do you know how many referrals

8      have taken place to the DEA during the time

9      that you've been vice president and chief

10     security officer of Purdue?

11             A.      No, I don't.

12                     MR. HOFFMAN:  I'm sorry.  Of

13             pharmacies?  Of distributors?  I mean,

14             is there --

15                     MS. CONROY:  I'll take any.

16                     THE WITNESS:  I don't know how

17             many pharmacies have been referred by

18             Purdue to the DEA.

19     QUESTIONS BY MS. CONROY:

20             Q.      Prior to seeing this

21     PowerPoint, would you have known that there

22     were at least 290, if this PowerPoint is

23     correct?

24             A.      I wouldn't know.

25             Q.      Do you know with respect to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    data that's kept at Purdue, could you figure

 2    that out?

 3              Could you -- if you went back

 4    to Stamford, could you determine how many

 5    times a pharmacy or a distributor or anyone,

 6    a dispenser, has been referred to the DEA

 7    during your tenure at Purdue?

 8              MR. HOFFMAN:  Object to the

 9         form.  It's beyond the scope.

10              THE WITNESS:  I would imagine

11         that it could be pulled together, but

12         I don't know that for a fact.

13    QUESTIONS BY MS. CONROY:

14         Q.    Okay.  If you were to pull it

15    together, what would you ask someone to do?

16    How would they do it?

17              MR. HOFFMAN:  Object to form.

18         Beyond the scope.

19              THE WITNESS:  Query referrals

20         to the DEA.

21    QUESTIONS BY MS. CONROY:

22         Q.    I'm sorry?

23         A.    Query referrals to the DEA.

24         Q.    And what would you be querying?

25              MR. HOFFMAN:  Same objections.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  Any documents
 2          that refer to referrals to the DEA.
 3   QUESTIONS BY MS. CONROY:
 4          Q.    But how would you do -- I mean,
 5   are you asking your assistant to go look for
 6   that, or how -- when you say "query," is it a
 7   query into a database, or what do you -- how
 8   are you doing it?
 9                   MR. HOFFMAN:  I'm sorry.  Same
10          objections.  Beyond the scope.
11                   THE WITNESS:  I can comment as
12          to when corporate security made the
13          referrals.  Those would have been
14          e-mail referrals.  So the retrieval of
15          that information would be an e-mail
16          retrieval.
17   QUESTIONS BY MS. CONROY:
18          Q.    Okay.  So someone would need to
19   search Purdue e-mails from corporate security
20   to determine which of them might have been
21   actual referrals to the DEA of a pharmacy or
22   a distributor?
23                   MR. HOFFMAN:  Same objections.
24          Beyond the scope.
25                   THE WITNESS:  E-mails would
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          have to be reviewed and retrieved

2          showing referrals of pharmacies to the

3          DEA when it was done by corporate

4          security.

5   QUESTIONS BY MS. CONROY:

6          Q.     And then prior to that it might

7   have been done by legal; is that correct?

8          A.     Prior to corporate security

9   reporting, it would have been the

10  responsibility of someone in the legal

11  division.

12         Q.     And do you have any

13  understanding how those could be collected or

14  counted?

15         A.     No.

16         Q.     That would be someone in legal

17  that would potentially know the answer to

18  that?

19                MR. HOFFMAN:  Object to the

20         form.  Beyond the scope.

21                THE WITNESS:  Yes.

22  QUESTIONS BY MS. CONROY:

23         Q.     Or is there an IT group or

24  somebody that would know the answer to that

25  at Purdue, other than legal?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. HOFFMAN:  Same objection.

 2                    THE WITNESS:  I don't know.

 3      QUESTIONS BY MS. CONROY:

 4           Q.     Who would you ask specifically

 5      at corporate security today, if you went back

 6      to your office, to at least determine the

 7      number of referrals that have taken place

 8      while corporate security has been

 9      responsible?

10                    MR. HOFFMAN:  Object to form.

11           Beyond the scope.

12                    THE WITNESS:  There would be no

13           one in corporate security I would go

14           to.

15      QUESTIONS BY MS. CONROY:

16           Q.     Who would you go to?

17                    MR. HOFFMAN:  Same objection.

18                    THE WITNESS:  I would go to IT

19           and ask for an e-mail retrieval.

20      QUESTIONS BY MS. CONROY:

21           Q.     Okay.  And would you be

22      asking -- what does that mean, an e-mail

23      retrieval?

24                    Would you be asking for them to

25      search particular terms or is there -- or to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    look for a file that contained all DEA

 2    referrals, or what would you be asking them

 3    to do?

 4              MR. HOFFMAN:  Same objections,

 5         and asked and answered.

 6              THE WITNESS:  I would be asking

 7         for e-mails from the individuals in my

 8         department, including myself, that

 9         would reflect transmittal of a

10         referral to the DEA of a pharmacy.

11    QUESTIONS BY MS. CONROY:

12         Q.    And as you sit here today,

13    you're not aware of any particular place at

14    Purdue where those referrals have been

15    collected and retained in one place so that

16    you would not have to go and search

17    everyone's e-mails?

18         A.    That's right.

19              MR. HOFFMAN:  Object to form.

20         Beyond the scope.

21    QUESTIONS BY MS. CONROY:

22         Q.    It says here at the bottom of

23    the page, "2008 to 2012:  Began

24    collaborations; focus on major wholesalers."

25              Do you have an understanding of
```

Highly Confidential - Subject to Further Confidentiality Review

1    what that means, to "focus on the major

2    wholesalers"?

3                   MR. HOFFMAN:  Object to the

4          form.  Beyond the scope.

5                   THE WITNESS:  That would have

6          been an effort, as I recall it, and if

7          I'm reading this correctly, to discuss

8          with the wholesalers the OMS process

9          at Purdue and to hopefully share some

10         best practices to make these systems

11         even better in identifying suspicious

12         or unusual pharmacy activity and

13         purchases.

14   QUESTIONS BY MS. CONROY:

15         Q.    To make the systems better at

16   Purdue or at the wholesaler level?

17                   MR. HOFFMAN:  Object to the

18         form.

19                   THE WITNESS:  At both.

20   QUESTIONS BY MS. CONROY:

21         Q.    Who would you consider the

22   major wholesalers from 2008 to 2012?

23         A.    McKesson, Cardinal and ABC, or

24   Amerisource.

25         Q.    And during 2008 to 2012, were

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you in contact yourself with McKesson,

 2    Cardinal and Amerisource with respect to

 3    issues concerning suspicious orders?

 4         A.    No.

 5         Q.    So you had no -- you did not

 6    begin collaborations with the major

 7    wholesalers from 2008 to 2012; is that

 8    correct?

 9              MR. HOFFMAN:  Object to the

10         form.

11              THE WITNESS:  You said me?

12    QUESTIONS BY MS. CONROY:

13         Q.    Right, you.

14         A.    That is correct.

15         Q.    Okay.  Who did on the order

16    monitoring committee?

17         A.    Jack Crowley.

18         Q.    Anyone else?

19         A.    And Robin Abrams.

20         Q.    Jack Crowley was a former DEA

21    agent and was employed by Purdue in -- was he

22    in corporate security?

23         A.    No.

24         Q.    What was -- what division was

25    he in?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     He was in the law department.

 2              Q.     And Robin Abrams is a lawyer in

 3      the law department?

 4              A.     Yes, she was.

 5              Q.     When did she leave Purdue?

 6              A.     I don't recall.

 7              MR. HOFFMAN:  Was he in the law

 8         department or CSA compliance?  Is

 9         there some distinction?

10              THE WITNESS:  I'm sorry, his

11         department was called CSA, who

12         reported into law.

13      QUESTIONS BY MS. CONROY:

14              Q.     What were your responsibilities

15      with respect to the OMS committee from 2008

16      to 2012, or 2009 when you began to 2012?

17              A.     I was a member of the

18      committee.

19              Q.     Okay.  And did that remain

20      true -- does that remain true until today,

21      that you're a member of the committee?

22              A.     Yes.

23              Q.     And can you describe for me

24      your duties or responsibilities as a

25      committee member for the past ten years?
```

```
 1        A.      I had no direct

 2   responsibilities.

 3        Q.      Why were you a member of the

 4   committee?

 5        A.      I believe I was put on the

 6   committee given my background and experience.

 7        Q.      If you didn't have any direct

 8   responsibility, how would you describe your

 9   position on the committee?

10        A.      I'd say oversight role.

11        Q.      And what did you oversee?

12        A.      Along with other members of the

13   committee, including Ms. Abrams, the meetings

14   that we would have where the results of the

15   OMS team, the analysis that was done, would

16   be presented to the committee, and we would

17   review that.

18        Q.      And those would be quarterly or

19   sometimes more often, those meetings?

20        A.      I don't recall the frequency.

21        Q.      They weren't every week,

22   correct?

23        A.      Not to my recollection.

24        Q.      Were they every month; do you

25   think?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I don't recall the frequency.

2      Q.     At all?

3      A.     I don't.

4      Q.     Would there be a record

5   anywhere of order monitoring committee

6   meetings?

7      A.     I believe that there would be

8   reports that were generated, submitted to the

9   committee for review.

10     Q.     Do you know if there were

11  meeting minutes?

12     A.     I believe so.

13     Q.     Do you know if there were

14  minutes taken of every minute -- of every

15  meeting?

16     A.     I don't know.

17     Q.     Were you ever responsible for

18  the minutes?

19     A.     No.

20     Q.     And you would -- in your role

21  with respect to oversight, you would look at

22  reports that were prepared with respect to

23  particular pharmacies that were considered

24  suspicious?

25              MR. HOFFMAN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I would review

 2         those documents.

 3    QUESTIONS BY MS. CONROY:

 4         Q.    Did you ever help to prepare

 5    any of those documents, or was your role to

 6    review those documents?

 7                    MR. HOFFMAN:  Object to the

 8         form.  Overly broad.

 9                    THE WITNESS:  I don't believe I

10         was involved in any preparation of

11         those forms or those documents.

12    QUESTIONS BY MS. CONROY:

13         Q.    So would you, for example, see

14    them for the first time at the order

15    monitoring committee meeting or shortly

16    before the meeting?

17                    MR. HOFFMAN:  Object to the

18         form.

19                    THE WITNESS:  I have some

20         recollection that I would review those

21         documents prior to those meetings.

22    QUESTIONS BY MS. CONROY:

23         Q.    To prepare yourself for the

24    meeting?

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      And where would those meetings
 2      take place?
 3              A.      At Stamford.
 4              Q.      And were they in-person
 5      meetings for the most part or a telephone
 6      conference, or how were they conducted?
 7              A.      I recall that they were
 8      in-person meetings.
 9              Q.      And approximately how many
10      people would attend the meetings?
11                      MR. HOFFMAN:  Object to form.
12              Time frame.
13                      THE WITNESS:  I don't know.
14              The committee members would be there.
15      QUESTIONS BY MS. CONROY:
16              Q.      Okay.  And is that your -- is
17      that your recollection, at least for the past
18      ten years, that there would be meetings; you
19      don't recall how often they would be, but
20      when they did take place, people attended in
21      person in Stamford?
22              A.      I believe so.
23              Q.      Was it in a conference room
24      setup?
25              A.      I believe so.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      When is the last meeting you

 2    attended?

 3          A.      I don't recall.

 4          Q.      A year ago?

 5          A.      I don't recall.

 6          Q.      You have no memory at all?

 7          A.      It's different now.  We're not

 8    meeting the way we did then.

 9          Q.      I see.

10                  When did that change?

11          A.      When the responsibilities moved

12    to corporate ethics and compliance.

13          Q.      Is there still an order

14    monitoring committee?

15          A.      Not as such.

16          Q.      So at some point you had

17    meetings, you received reports, you had, you

18    know, a person-to-person, face-to-face

19    meeting in Stamford.  But at some point that

20    ended and corporate ethics and compliance was

21    involved?

22          A.      Is involved.

23          Q.      Is involved.

24                  Do you know how long ago that

25    was, roughly?
```

Highly Confidential - Subject to Further Confidentiality Review

1           I mean, are we talking a couple

2     years, a couple months?

3           A.      I would say a year or more.

4           Q.      Do you have any involvement

5     with respect to suspicious order monitoring

6     now that corporate ethics and compliance is

7     involved?

8           A.      We are still responsible for

9     the referrals to DEA.

10          Q.      And when you say "we," are you

11    talking about the order monitoring committee

12    is still responsible?

13          A.      No, corporate security

14    reports -- refers -- makes the referral to

15    the DEA.

16          Q.      Oh.

17                  So even under the -- is it fair

18    to say that corporate ethics and compliance

19    oversees the suspicious order monitoring at

20    Purdue?

21          A.      Yes.

22          Q.      And corporate security remains

23    responsible for referrals to the DEA of

24    suspicious pharmacies or whomever?

25          A.      Yes.

1     Q.     But corporate security has no

2    other involvement, is that fair to say, with

3    respect to suspicious order monitoring other

4    than referrals to the DEA?

5              MR. HOFFMAN:  Object to the

6         form.

7              THE WITNESS:  I don't recall

8         specific instances, but I believe that

9         Luis Bauza still will do background

10        checks upon request of certain

11        pharmacies.

12   QUESTIONS BY MS. CONROY:

13        Q.     As far as you are concerned,

14   your responsibilities with respect to

15   suspicious order monitoring now only involve

16   your oversight of Luis Bauza or oversight of

17   whoever is making referrals to the DEA

18   under -- at corporate security?

19        A.     Yes.

20              MR. HOFFMAN:  Object to the

21        form.

22              THE WITNESS:  That is correct.

23   QUESTIONS BY MS. CONROY:

24        Q.     And if you take a look from

25   "2013 to 2015, regular contacts established

Highly Confidential - Subject to Further Confidentiality Review

1    with chains as well as wholesalers."

2                Do you know what is meant by

3    "chains" there?

4        A.    I believe they're referring

5    to -- or this is referring to pharmacy

6    chains.

7        Q.    And can you give me an example

8    of a pharmacy chain?

9        A.    CVS.

10       Q.    Do you recall that occurring

11   while you were on the order monitoring

12   committee, that there -- that contacts began

13   to be established with chains?

14               MR. HOFFMAN:  Objection.

15   QUESTIONS BY MS. CONROY:

16       Q.    With pharmacy chains?

17               MR. HOFFMAN:  Object to the

18        form.  It says "regular contacts."

19               But go ahead.

20               THE WITNESS:  I recall that

21        there were contacts made with pharmacy

22        chains as well as wholesalers.

23   QUESTIONS BY MS. CONROY:

24       Q.    Would you consider when you

25   talked to me earlier about Purdue supporting

```
 1    distributors with respect to their suspicious

 2    order monitoring, would you include chain

 3    pharmacies in with distributors?

 4              MR. HOFFMAN:  Object to the

 5         form.  Beyond the scope.

 6              THE WITNESS:  As reflected

 7         here, it appears that the outreach was

 8         to chains to try to support them as

 9         well as the wholesalers.

10    QUESTIONS BY MS. CONROY:

11         Q.    And do you know if it was

12    done -- if Purdue did that in the same manner

13    it supported wholesalers?

14              MR. HOFFMAN:  Object to the

15         form.

16              THE WITNESS:  Did what?  I'm

17         sorry.

18    QUESTIONS BY MS. CONROY:

19         Q.    Supported their suspicious

20    order monitoring.

21              MR. HOFFMAN:  Object to the

22         form.  It's vague.

23              THE WITNESS:  I don't think

24         that the level of support was at the

25         same level as it was with the
```

```
 1              wholesalers and distributors.

 2      QUESTIONS BY MS. CONROY:

 3          Q.      And why do you think that?

 4                  MR. HOFFMAN:  Object to the

 5          form.

 6                  THE WITNESS:  Because the

 7          wholesalers --

 8                  MR. HOFFMAN:  Sorry.  Beyond

 9          the scope.

10                  Go ahead.  Go ahead.

11                  THE WITNESS:  The wholesalers

12          and the distributors are our

13          customers.

14      QUESTIONS BY MS. CONROY:

15          Q.      And the pharmacies are not your

16      customers; is that what you mean?  Is that

17      the distinction you're drawing?

18          A.      The wholesalers and

19      distributors are our customers.

20          Q.      Right.

21          A.      We sell our products to the

22      wholesalers and distributors.

23          Q.      Okay.  And so your -- you feel

24      you have -- you owe more support to the

25      distributors than you do to the chain
```

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacies because the distributors and the

2    wholesalers are your customers?

3              MR. HOFFMAN:  Object to the

4         form.  Beyond the scope.

5              THE WITNESS:  No.  What I'm

6         saying is the order monitoring system,

7         and with the information -- the

8         information that we acquire --

9              Excuse me, I'm going to sneeze.

10   QUESTIONS BY MS. CONROY:

11        Q.    Bless you.

12        A.    Thank you.

13              -- and the information we

14   receive which we acquire from the wholesalers

15   allows us the insight to -- a certain level

16   of insight, because they're absolutely not

17   perfect -- it allows us to see the movement

18   of product to the chains or to the other

19   pharmacies.

20              The pharmacies are moving

21   product to individuals, to patients, and

22   there's no insight into that type of

23   information.

24        Q.    I see.

25              Have you ever asked, if you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    know, a distributor or wholesaler if they had

 2    insight into the information available to the

 3    pharmacy with respect to patients or

 4    prescribers?

 5              MR. HOFFMAN:  Object to the

 6         form.

 7              THE WITNESS:  No, I don't know.

 8              MS. CONROY:  Good time for a

 9         break.

10              VIDEOGRAPHER:  Okay.

11              THE WITNESS:  Microphones off?

12              VIDEOGRAPHER:  Yes.  The time

13         is 10:17.  Off the record.

14       (Off the record at 10:17 a.m.)

15              VIDEOGRAPHER:  Okay.  We are

16         back on the record.  The time is

17         10:27 a.m.

18    QUESTIONS BY MS. CONROY:

19         Q.    Mr. Geraci, when you were a

20    member of the order monitoring committee, and

21    I'm particularly talking about the time when

22    there were actual meetings that you attended,

23    did the committee vote?

24              MR. HOFFMAN:  Object to form.

25         It's overly broad.
```

1        But go ahead.

2        THE WITNESS:  Yes.

3    QUESTIONS BY MS. CONROY:

4        Q.    And what types of -- for what

5    reason did you vote, or what were you voting

6    about?

7        A.    The voting would involve coming

8    to a conclusion or to a position with regard

9    to certain pharmacies, as we would go through

10   the documents, and the vote would be to

11   either, at that time, to refer a pharmacy to

12   the DEA, to continue to -- the inquiry into

13   the pharmacy's buying practices and other

14   information, or to possibly close out an

15   inquiry for a number of reasons.

16       Q.    And so the committee would --

17   would it be fair to say in general that when

18   you would be looking at a particular pharmacy

19   and you'd have materials with respect to what

20   was known about that pharmacy, that at the

21   end of the discussion about that pharmacy

22   there would be a vote to either refer the

23   pharmacy to the DEA, to continue inquiry into

24   that pharmacy, or to close the inquiry

25   entirely?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     That would be fair to say.

 2            Q.     Approximately how many

 3     pharmacies would be discussed at a board

 4     meeting?

 5                   MR. HOFFMAN:  Object to the

 6            form.

 7                   THE WITNESS:  So first, these

 8            are not board meetings.  It's a

 9            committee --

10     QUESTIONS BY MS. CONROY:

11            Q.     I'm sorry, committee.

12            A.     Committee meeting.

13                   And I -- as I stated before, I

14     don't recall.

15            Q.     How long would the meetings

16     last?

17            A.     I don't recall.

18            Q.     Did they go for more than a

19     day?

20            A.     I don't believe so.

21            Q.     Who would present with respect

22     to a particular pharmacy?

23                   Were there -- were there

24     different people that talked about different

25     pharmacies, or how did it work?
```

1          A.     The starting presentation would

2     be the presentation of the results of the

3     inquiry in the broadest sense up to that time

4     and would be presented by usually one of the

5     members of the OMS committee.  And that

6     was -- that's what would start the

7     discussion.

8          Q.     Did you ever present with

9     respect to a particular pharmacy?

10          A.     I have no recollection that I

11     did.

12          Q.     Do you have any recollection of

13     presentations about a particular prescriber

14     or a particular doctor who was also

15     dispensing Purdue product as opposed to just

16     a pharmacy?

17               MR. HOFFMAN:  Object to the

18          form.

19               THE WITNESS:  I have no

20          recollection of that.

21     QUESTIONS BY MS. CONROY:

22          Q.     So your recollection is the

23     presentations concerned pharmacies?

24               MR. HOFFMAN:  Object to the

25          form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  That would be my
 2      recollection.
 3   QUESTIONS BY MS. CONROY:
 4      Q.      Did you ever have any
 5   discussions at the committee about how those
 6   pharmacies were selected for inquiry or
 7   investigation?
 8      A.      Yes.
 9      Q.      Do you know how they were
10   selected?
11      A.      They would have been selected
12   based on the various data points or
13   information that was available to the
14   individuals of the committee that were doing
15   the actual analytical work prior to these
16   meetings, and that would have included FFS,
17   Fee-For-Service, data purchased by the
18   wholesaler -- from the wholesalers.
19      Q.      Were you ever involved in any
20   discussions at the committee about what data
21   points should be used for that analysis, or
22   was that something that happened outside of
23   the committee?
24      A.      That would happen by a
25   committee member that was actually reviewing
```

1    and analyzing the data that was available.

2        Q.    Did you ever have anything to

3    do with suggesting or reviewing the data

4    points that that committee member was using

5    to analyze the Fee-For-Service data?

6        A.    Yes.

7            MR. HOFFMAN:  Object -- object

8        to the form.

9            THE WITNESS:  Yes.

10   QUESTIONS BY MS. CONROY:

11       Q.    And how did that occur?

12       A.    My suggestion or recommendation

13   at some point was to -- for the committee to

14   consider, along with its other work, review

15   of data, in this case FFS data, in two

16   particular counties in the state of Florida.

17       Q.    And did the committee take your

18   recommendation?

19       A.    Yes.

20       Q.    Is that the only time that you

21   made a recommendation with respect to data

22   points that should be analyzed?

23            MR. HOFFMAN:  Object to the

24       form.

25            THE WITNESS:  I believe so.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. CONROY:
 2         Q.    Do you know any of the nuts and
 3    bolts of how they did that, or was it you
 4    said I think we should look into those two
 5    counties in Florida, and you left it to the
 6    committee member to figure out how exactly
 7    that would be done with the FFS data?
 8         A.    I recall leaving it to a
 9    committee member to pull that information
10    together.
11         Q.    So you weren't -- you weren't
12    the person that would figure out how to write
13    whatever query into whatever database
14    contained the Fee-For-Service data; is that
15    fair?
16         A.    I would not be that person.
17         Q.    Who was the committee member
18    that you're thinking about that would have
19    done that?
20         A.    Steve Seid.
21         Q.    And he was part of the
22    national accounts division or department?
23         A.    Yes.
24         Q.    Did you yourself ever have
25    occasion to go into the OMS database?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Or let me ask you:  Do you
 2     know -- have you ever heard of the OMS
 3     database?
 4          A.     Yes.
 5          Q.     Okay.  And did you ever have
 6     occasion to use the OMS database yourself?
 7          A.     No.
 8          Q.     Do you know if you had access
 9     to it?
10          A.     I don't know.
11          Q.     Okay.  So it's fair to say it's
12     not -- you didn't have it on your monitor
13     somewhere in your office or you weren't
14     working within the database?
15          A.     Yes.
16          Q.     Okay.  Have you ever seen the
17     database?
18          A.     No.
19          Q.     Have you ever seen a
20     Fee-For-Service database or chargeback
21     database or any 867 data on a monitor as part
22     of a database?
23                  MR. HOFFMAN:  Object to the
24          form.
25                  THE WITNESS:  No.
```

```
 1    QUESTIONS BY MS. CONROY:

 2         Q.    Do you work with any databases

 3    as vice president and chief security officer

 4    at Purdue?

 5              MR. HOFFMAN:  Are you asking

 6         him currently or historically?

 7              MS. CONROY:  Well, I'm asking

 8         him just generally and then depending

 9         on the answer.

10              THE WITNESS:  No.

11    QUESTIONS BY MS. CONROY:

12         Q.    When you were sitting on the

13    order monitoring committee and particular

14    pharmacies were selected for review, did you

15    have an understanding, do you know, at the

16    time of what they had triggered to bring them

17    to your attention?

18         A.    Yes, I had an understanding.

19         Q.    And -- strike that.

20              Is that because it would have

21    been explained in the papers that were

22    provided to you about the pharmacy, what had

23    brought it to the attention of the committee?

24         A.    Yes.

25         Q.    If you take a look at -- go in
```

Highly Confidential - Subject to Further Confidentiality Review

1    a few pages and you'll see -- look like this.

2             MR. HOFFMAN:  And, Jayne, I

3        don't know if we've corrected it yet.

4        Should we correct for the record the

5        Bates number?

6             MS. CONROY:  Oh, I'm sorry, we

7        should.  This Exhibit 2, the -- we've

8        corrected it on the exhibit.  The

9        Bates number is PPLP004449246.  We

10        were missing a 4 earlier.  I fixed it

11        on the exhibit, yeah.

12             MR. HOFFMAN:  Okay.

13    QUESTIONS BY MS. CONROY:

14        Q.    It says on the top of that

15    page, "Different algorithms and metrics used

16    throughout the years to identify outlier

17    accounts for review."

18             Do you see that?

19        A.    Yes.

20        Q.    Would it be fair to say that

21    while you appreciated that there was

22    something running in the database to identify

23    particular pharmacies for investigation, you

24    would not be familiar with the actual

25    algorithms?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

2        Q.     If you take a look, it says,

3    "From 2009 to 2010, original algorithm

4    outliers," and then there's a list, "total

5    volume of Purdue product orders, percentage

6    of OxyContin," et cetera.

7               Would you have had anything to

8    do with developing those parameters or data

9    points, or was that done by the committee

10   member that was Steve Seid, responsible for

11   the analysis?

12              MR. HOFFMAN:  Object to the

13       form.

14              If you know.

15              THE WITNESS:  Ms. Conroy, could

16       you repeat the question, please?

17   QUESTIONS BY MS. CONROY:

18       Q.     Sure.

19              Do you see -- do you see the

20   six original algorithm outliers --

21       A.     Yes.

22       Q.     -- there?

23              Would you have had anything to

24   do with the determination of what those six

25   original algorithm outliers should be, or is

1    that something that was left to Stephen Seid

2    to determine?

3              MR. HOFFMAN:  Object to the

4         form.

5              THE WITNESS:  I don't recall

6         that I had anything to do with this.

7    QUESTIONS BY MS. CONROY:

8         Q.    If you look further down, "2009

9    to current, additional sources to identify

10   pharmacies for review," do you see that

11   section?

12        A.    Yes.

13        Q.    And then there are four areas.

14   One reports of concern by sales reps.

15              Do you see that?

16        A.    Yes.

17        Q.    Have you ever heard of a report

18   of concern?

19        A.    Yes.

20        Q.    Would it have been your

21   decision to review reports of concern, or

22   would it have been someone else on the

23   committee that suggested they be reviewed?

24              MR. HOFFMAN:  Object to the

25        form.

```
 1                  THE WITNESS:  I don't recall.

 2    QUESTIONS BY MS. CONROY:

 3         Q.     It says, "Accounts referenced

 4    during calls received by ethics hotline

 5    operators."

 6                  Do you see that?

 7         A.     Yes.

 8         Q.     Do you know whose idea that was

 9    to look at the ethics hotline?

10         A.     No, I don't.

11         Q.     Okay.  Do you have any

12    recollection of ever seeing call notes or

13    messages from the ethics hotline operators?

14         A.     Concerning pharmacies?

15         Q.     Right.  I'm only talking about

16    within the context of the order monitoring

17    committee.

18         A.     I have no recollection of that.

19         Q.     And then if you look "from 2010

20    to 2012, updated algorithm, post-

21    reformulation," do you have an understanding

22    of what that means, "post-reformulation"?

23         A.     Yes.

24         Q.     What does that mean?

25         A.     It means after we reformulated
```

Highly Confidential - Subject to Further Confidentiality Review

1    OxyContin to make -- to have it have the

2    abuse-deterrent technology and properties.

3         Q.    And why were the algorithms

4    updated after the reformulation of OxyContin?

5              MR. HOFFMAN:  Object to the

6         form.  Beyond the scope.

7              THE WITNESS:  I don't recall

8         why.  I don't recall.

9    QUESTIONS BY MS. CONROY:

10        Q.    Do you know anywhere that that

11   decision -- or strike that.

12             Who at the company would know

13   why the algorithm was updated after OxyContin

14   was reformulated, if you don't remember?

15        A.    I just -- I don't recall who

16   would know.  I'm going to guess it would be

17   the chairman of the committee.

18        Q.    Okay.  And whoever the chairman

19   was at that point from 2010 to 2012 when

20   OxyContin was reformulated?

21        A.    I believe that that would be

22   the person that would know.

23        Q.    Okay.  And do you recall who

24   the chairman was at that point?

25        A.    Yes.

```
 1        Q.     And who was it?

 2        A.     Robin Abrams.

 3               MR. HOFFMAN:  I will note for

 4        the record I think Stephen Seid and

 5        Jack Crowley has already testified

 6        about that issue.

 7               MS. CONROY:  About the

 8        algorithm change?

 9               MR. HOFFMAN:  Correct.

10   QUESTIONS BY MS. CONROY:

11        Q.     Do you see the fifth line down,

12   "Evaluate whether geographically located near

13   prescribers of concern"?

14               Do you see that?

15        A.     Yes.

16        Q.     Do you have an understanding of

17   what that means with respect to the data

18   analysis after the OxyContin reformulation?

19        A.     Yes, I have an understanding.

20        Q.     Okay.  And what is your

21   understanding?

22        A.     That this would have been

23   another data point or source of information

24   that would be evaluated by those individuals

25   on the OMS team that were conducting the
```

```
 1    actual inquiries.

 2         Q.     And that would have been a data

 3    point looking for a decrease in oxy -- or a

 4    decline in OxyContin orders?

 5                MR. HOFFMAN:  Object to the

 6         form.

 7                THE WITNESS:  "Evaluated

 8         whether geographically located near

 9         prescribers of concern."

10                Could you repeat your question,

11         please?

12    QUESTIONS BY MS. CONROY:

13         Q.     Well, I'm trying -- I heard

14    what you said --

15         A.     Uh-huh.

16         Q.     -- it would be another data

17    point.  But what would be -- what would be

18    the relevance of a data point concerning

19    whether geographically located near

20    prescribers of concern?  What is the data --

21    what are you looking for?

22         A.     So looking at this statement

23    here, this would be looking at those

24    pharmacies that may be located near

25    prescribers where there's concern about those
```

Highly Confidential - Subject to Further Confidentiality Review

 1    prescribers' dispensing practice -- not

 2    dispensing, I'm sorry, prescription practices

 3    involving our products.

 4         Q.    And so you'd be looking at data

 5    with respect to prescribing practices by

 6    certain prescribers, correct?

 7         A.    Not the OMS team.

 8         Q.    Who would be doing that?

 9         A.    There was a different

10    department that looked at prescribers, or a

11    different group.

12         Q.    So would a data point come from

13    that different group with respect to

14    prescribing practices?

15         A.    Yes.

16         Q.    Do you know what that would be

17    called, or was there a -- was that marketing

18    that did that, marketing and sales?

19         A.    Not to my knowledge.

20         Q.    Where would that data come from

21    with respect to prescribing habits or

22    prescribing data of particular doctors?

23         A.    The data -- to answer your

24    question, the data would come from, as I

25    understand it, IMS data.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.      And so the IMS data would tell
 2     you whether or not prescribers of concern,
 3     doctors that were prescribing Purdue
 4     products, were near pharmacies that you were
 5     looking at that were suspicious?
 6                    MR. HOFFMAN:  Object to the
 7            form.
 8                    THE WITNESS:  I don't believe
 9            that IMS data would show that.
10     QUESTIONS BY MS. CONROY:
11            Q.      No, I understand that, but it
12     looks like there's a connection being made
13     here.
14                    You're evaluating whether the
15     pharmacies are geographically located near
16     prescribers of concern --
17            A.      Right.
18            Q.      -- correct?
19            A.      That's correct.
20            Q.      So the prescribers of concern,
21     those data points come from the IMS data,
22     correct?
23            A.      I believe so.
24            Q.      And the suspicious pharmacies
25     and where they're located geographically,
```

Highly Confidential - Subject to Further Confidentiality Review

1     that's coming from the Fee-For-Service data?

2          A.     I believe so.

3          Q.     So the OMS committee was

4     looking at both of those data points to

5     evaluate whether or not certain pharmacies

6     were geographically situated near prescribers

7     of concern?

8          A.     The OMS committee, or those

9     individuals that were conducting the

10    investigation for the OMS committee, as

11    reflected here, would evaluate -- would have

12    information received from another

13    organization or department within the company

14    that would reflect doctor prescribing

15    practices and would use that information --

16    would receive it and use it as part of the

17    evaluation and inquiry process.

18         Q.     Do you know if that was done

19    only with respect to the updated algorithm

20    post-reformulation of OxyContin?

21         A.     I don't know that.

22         Q.     Do you have any -- other than

23    looking at this page, do you have any

24    independent memory of that taking place?

25         A.     No, I do not.

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.      Right below that it says,

 2   "Adjust threshold, 350,000, to review

 3   significant accounts."

 4              Do you see that?

 5      A.      Yes.

 6      Q.      Do you know if that was a

 7   movement up or down from what had previously

 8   been the threshold?

 9      A.      I don't know.  I don't recall.

10      Q.      If you look on the next page,

11   it says, "2014 to 2015, additional metrics to

12   identify pharmacies for review."

13              Do you see that?

14      A.      Yes, I do.

15      Q.      It says, "The OMS committee

16   requested to concentrate on accounts that met

17   the algorithm in two specific hotspots area,

18   the state of Georgia and Tennessee."

19              Do you see that?

20      A.      Yes.

21      Q.      Would that also have been Steve

22   Seid that would be the individual that would

23   go back and collect the data points for

24   hotspots Georgia and Tennessee?

25              MR. HOFFMAN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Foundation.

 2                   THE WITNESS:  I don't know who

 3         would have done that.

 4    QUESTIONS BY MS. CONROY:

 5         Q.     Are you familiar with the order

 6    monitoring system SOP, standard operating

 7    protocol, or process?

 8         A.     I am familiar with it.

 9         Q.     Did you help to write it?

10         A.     No.

11         Q.     Have you ever assisted in

12    revising it or updating it?

13         A.     I don't recall.

14         Q.     I think you told me you have

15    not been on the OMS database, but let me

16    just -- if you'd continue on in this document

17    to a page that looks like this with a lot of

18    gray.

19                   MR. LAFATA:  Still Exhibit 2?

20                   MS. CONROY:  Yes.

21    QUESTIONS BY MS. CONROY:

22         Q.     Does that -- it looks like to

23    me -- this was a tab on the Excel

24    spreadsheet.  This looks like a screenshot of

25    a database.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Is it familiar to you at all?

2     A.    No.

3     Q.    Then if you turn the page, and

4  there's another what appears to me to be a

5  screenshot.

6          It says "OMS statistics"?

7     A.    Uh-huh.

8     Q.    Does that look familiar to you

9  at all?

10    A.    No.

11    Q.    Would you ever see printed-out

12  spreadsheets or runs of OMS statistics at the

13  board -- at the committee meetings?

14    A.    I don't recall ever seeing

15  anything like that.

16    Q.    And if you go to the final

17  page, which is "OMS measures of

18  effectiveness, MOE," is that familiar to you

19  at all, a measure of effectiveness of the

20  order monitoring system?

21          MR. HOFFMAN:  Object to the

22       form.  Beyond the scope.

23          THE WITNESS:  I've read this

24       now, and your question, Ms. Conroy?

25

```
 1    QUESTIONS BY MS. CONROY:

 2          Q.     Are you familiar with this at

 3    all?  Did you ever discuss measures of

 4    effectiveness of the order monitoring system

 5    or have anything to do with MOE, or measures

 6    of effectiveness?

 7          A.     Well, that's three different

 8    questions, so I'll say this is -- this is

 9    familiar to me.

10          Q.     In what respect is it familiar

11    to you?

12                 From reviewing the papers that

13    would be collected with respect to a

14    particular pharmacy or more generally?

15          A.     This is -- I'm generally

16    familiar with this.

17          Q.     Generally outside of the order

18    monitoring committee, or are you generally

19    familiar with it as part of the order

20    monitoring committee?

21          A.     As part of the order monitoring

22    committee.

23          Q.     And why was a measure of

24    effectiveness used?

25                 MR. HOFFMAN:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1               form.  Beyond the scope.

2                      THE WITNESS:  I don't -- I

3               don't remember specifically why we

4               decided to use a measure of

5               effectiveness.

6       QUESTIONS BY MS. CONROY:

7               Q.    Okay.  Is the numbering system

8       the measure?

9                      So 5 is a referral to the DEA?

10              A.    I don't know that.

11                     MR. HOFFMAN:  Object to the

12              form.  Beyond the scope.

13      QUESTIONS BY MS. CONROY:

14              Q.    You can put that exhibit away.

15                     Are you familiar with any of

16      the SOPs, other than the order monitoring

17      SOP?

18                     MR. HOFFMAN:  Object to the

19              form.  Overly broad.

20                     THE WITNESS:  I don't

21              understand the question.

22                     (Purdue-Geraci Exhibit 3 marked

23              for identification.)

24      QUESTIONS BY MS. CONROY:

25              Q.    Okay.  Let me show you what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     I've marked as Exhibit 3.  Exhibit 3 is a

 2     finance and accounting standard operating

 3     procedures manual with a revision date of

 4     March 12, 2003, and it's SOP number 7.7.

 5                 And the objective is to define

 6     the system for monitoring and disclosing

 7     suspicious orders of controlled substances.

 8                 Mr. Geraci, as a member of the

 9     order monitoring committee, were you familiar

10     with SOP 7.7 at any point during your tenure?

11     A.      I have no recollection of being

12     aware of this specific SOP.

13     Q.      If you look at Section 2, the

14     introduction, it says, "Drug Enforcement

15     Administration, DEA, regulations 21 CFR

16     1301.74, require all DEA registrants that

17     distribute controlled substance products to

18     maintain a system to disclose suspicious

19     orders of controlled substances."

20                 Do you see that?

21     A.      Yes.

22     Q.      Were you familiar with that

23     requirement?

24     A.      Yes.

25     Q.      Yet at the beginning of this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    deposition you told me that there was no

 2    requirement for Purdue to maintain a system

 3    to disclose suspicious orders of controlled

 4    substances; is that correct?

 5              MR. HOFFMAN:  Object to the

 6         form.  I think it misstates his

 7         testimony.

 8              But go ahead and clarify, if

 9         you can.

10              THE WITNESS:  What I believe I

11         said was, I don't recall that there

12         was a specific DEA regulation that

13         mandated the creation of an order

14         monitoring system, all right, by the

15         manufacturers.

16    QUESTIONS BY MS. CONROY:

17         Q.    Does SOP 7.7 have it wrong?

18         A.    I can't give you a legal

19    interpretation or who actually -- who

20    actually wrote this document.

21         Q.    But you weren't -- it's still

22    your testimony that you do not believe a

23    manufacturer has any requirement to maintain

24    a system to disclose suspicious orders of

25    controlled substances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. HOFFMAN:  Object to form.

 2          Beyond the scope.

 3                    THE WITNESS:  To the best of my

 4          knowledge, I am unaware of any

 5          specific regulation that requires the

 6          manufacturers to do such.

 7      QUESTIONS BY MS. CONROY:

 8          Q.    And that has been your

 9      understanding since you joined Purdue?

10                    MR. HOFFMAN:  Object to the

11          form.  Beyond the scope.

12                    THE WITNESS:  That is my

13          understanding.

14      QUESTIONS BY MS. CONROY:

15          Q.    Do you know if Purdue is a DEA

16      registrant?  Do you know one way or the

17      other?

18          A.    Yes.

19          Q.    And are they?

20          A.    Yes.

21          Q.    But as far as you know, you

22      have not seen SOP 7.7 before?

23          A.    I have no recollection of ever

24      seeing this SOP.

25          Q.    You can put that one away.
```

1          Are you familiar at all with

2     the procedures in the national accounts

3     department with respect to the receipt of

4     orders from distributors or wholesalers with

5     respect to triggering a suspicious order

6     because of size, frequency or pattern?

7               MR. HOFFMAN:  Objection.

8     QUESTIONS BY MS. CONROY:

9          Q.    That's before the order is

10    filled.

11              MR. HOFFMAN:  Sorry.

12    QUESTIONS BY MS. CONROY:

13         Q.    Are you familiar with that

14    trigger?

15              MR. HOFFMAN:  Sorry.  Object to

16         form.

17              THE WITNESS:  No.

18    QUESTIONS BY MS. CONROY:

19         Q.    Did you understand what I was

20    talking about?

21         A.    Yes.

22         Q.    And then I take it you have

23    never had any conversations with Stephen Seid

24    or Mr. Berjanski {phonetic} about suspicious

25    order triggers when the order actually comes

Highly Confidential - Subject to Further Confidentiality Review

1    into Purdue before the order is filled?

2        A.    I don't recall having specific

3    discussions with Mr. Seid or Mr. Berjanski

4    about that.

5        Q.    Okay.  Do you recall any

6    conversations with anyone about that?

7        A.    I don't recall any specific

8    conversations.

9        Q.    Do you recall ever generally

10   discussing the concept of there being a

11   trigger with respect to the size, frequency

12   or pattern of an order that is received by

13   Purdue?

14       A.    I recall discussion at

15   committee meetings where this would be

16   discussed.

17       Q.    And what do you recall about

18   that?

19       A.    That this group, national

20   account group, would -- that there was a

21   review that would be conducted of orders at

22   their level looking for large or unusual

23   orders during any given time.

24       Q.    And was there any discussion

25   about what was done with those orders,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    whether they were filled or not?
 2         A.    I don't recall any specific
 3    discussions about that.
 4         Q.    Was there any discussion about
 5    the connection between filling the order to
 6    the distributor and pharmacies of suspicion
 7    that that distributor was supplying?
 8              MR. HOFFMAN:  Object to form.
 9              THE WITNESS:  I don't recall
10         any specific discussions.
11              (Purdue-Geraci Exhibit 4 marked
12         for identification.)
13    QUESTIONS BY MS. CONROY:
14         Q.    I'm going to mark as
15    Exhibit 4 -- I've marked as Exhibit 4 the
16    Purdue SOP 0007, which is the order
17    management system, dated March 23rd of 2009.
18              Are you familiar, have you seen
19    this SOP before?
20         A.    Yes.
21         Q.    If you look at the bottom, the
22    second to last paragraph that starts, "We
23    recognize that pertinent regulations require
24    that registrants inform the local DEA field
25    division office of suspicious orders when
```

Highly Confidential - Subject to Further Confidentiality Review

1   discovered by the registrant."

2            Do you see that?

3       A.    Yes.

4       Q.    I think you told me earlier

5   today that as far as you know reports are

6   made to DEA headquarters, correct?

7       A.    When I was involved with the

8   committee, our reports were to DEA

9   headquarters.

10      Q.    At the OMS committee meetings,

11  was there ever any discussion concerning

12  whether orders that came into Purdue from the

13  distributors that were of a suspicious size,

14  pattern or frequency should be reported to

15  the DEA?

16            MR. HOFFMAN:  Object to the

17       form.

18  QUESTIONS BY MS. CONROY:

19      Q.    And was that ever a subject of

20  conversation at the OMS committee?

21            MR. HOFFMAN:  Object to the

22       form.  Overly broad.

23            THE WITNESS:  I don't recall

24       any specific time when that was

25       discussed.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. CONROY:

 2         Q.    Do you recall any discussion

 3    about that at any point during your time at

 4    Purdue, not necessarily at an order

 5    monitoring committee?

 6              MR. HOFFMAN:  Same objections.

 7              THE WITNESS:  I don't recall

 8         any specific time when that was

 9         discussed.

10    QUESTIONS BY MS. CONROY:

11         Q.    Do you recall any discussion,

12    not necessarily this specific time, about

13    that topic?

14              MR. HOFFMAN:  Same objections.

15         I believe it's beyond the scope.

16              THE WITNESS:  I don't recall

17         any specific discussion concerning it.

18         I don't recall.

19    QUESTIONS BY MS. CONROY:

20         Q.    Take a look on the second page.

21    It says, "The factors considered at present,

22    subject to modification as needed or based

23    upon experience gained through this program,

24    include," and then there's A through E.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.      Yes.

2              Q.      Do you see E, "Percentage of

3      80-milligram strength being purchased"?

4                      Do you see that section?

5              A.      Yes.

6              Q.      And why, if you know, was that

7      factor considered by the order monitoring

8      system?

9                      MR. HOFFMAN:  Object to the

10             form.  Beyond the scope.

11                     THE WITNESS:  I believe that

12             the reason for the 80-milligram

13             strength being on there was because

14             that was our highest dosage, would be

15             the 80-milligram.

16     QUESTIONS BY MS. CONROY:

17             Q.      And so why would the highest

18     dosage be on there?

19                     MR. HOFFMAN:  Same objection.

20                     THE WITNESS:  For the potential

21             of potential diversion and/or abuse.

22             That would be my -- that would be my

23             assumption.

24     QUESTIONS BY MS. CONROY:

25             Q.      Was it your understanding that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the 80-milligram strength was abused or

 2    diverted more often or less often?

 3              MR. HOFFMAN:  Same objections.

 4              THE WITNESS:  I don't recall

 5         looking at or seeing -- I don't recall

 6         seeing data that would suggest that.

 7    QUESTIONS BY MS. CONROY:

 8         Q.    Do you know why it was

 9    considered one of the factors?

10              Did you have anything to do

11    with that, or was it just one of the factors

12    when you arrived?

13         A.    This was one of the factors

14    when I arrived.

15         Q.    If you go to the final page.

16         A.    (Witness complies.)

17         Q.    You were talking to me earlier

18    about the two individuals charged with the

19    actual referrals to the DEA of suspicious

20    pharmacies.

21              Do you recall that testimony?

22         A.    Yes.

23         Q.    And the suspicious order

24    monitoring -- I'm sorry.  The order

25    management system SOP says that -- at the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    very bottom, "CC, Documentation.  All contact

 2    with DEA, either by telephone or in person,

 3    should be documented, and a record of the

 4    contact should be maintained."

 5              Do you see that?

 6         A.    Yes.

 7         Q.    Is it your testimony that the

 8    e-mail from Mr. McBride {sic} or Mr. Benson

 9    or maybe someone else charged with referrals

10    to the DEA is, in fact, that written

11    documentation?

12              MR. HOFFMAN:  Object to the

13         form.  And time frame.

14              THE WITNESS:  So your question

15         is?

16    QUESTIONS BY MS. CONROY:

17         Q.    We talked earlier today about

18    how we would know the number of pharmacies

19    over the years that have been referred to the

20    DEA by Purdue, and you told me that you

21    would -- the way -- you didn't know the

22    answer, but if you needed to find out the

23    answer, there would be a search of e-mails by

24    particular individuals who were charged with

25    referring pharmacies to the DEA.
```

1          Do you recall that?

2     A.     Yes.

3     Q.     Does that sound right to you,

4  the way I just recited it?

5          MR. HOFFMAN:  Object to the

6          form.

7          THE WITNESS:  As of a

8          particular period in time, yes.

9  QUESTIONS BY MS. CONROY:

10     Q.     Okay.  It's not the case right

11  now, correct?  Someone else is in charge?

12     A.     I testified earlier that we

13  still make the referrals to the DEA,

14  corporate security.

15     Q.     Okay.  When you were just

16  making the comment about time, do you mean

17  when it was part of legal it may have been

18  done in a different way?

19     A.     It may have been.

20     Q.     Okay.  But as far as you

21  understand, at least as of the date of March

22  23, 2009, of this SOP, there needed to be

23  some documentation, correct?

24     A.     That's what this SOP reflects.

25     Q.     And is it your understanding

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that the e-mail would be such documentation?

 2                MR. HOFFMAN:  Object to the

 3          form.

 4                THE WITNESS:  My interpretation

 5          would be that the e-mails that I

 6          referenced earlier and now would be

 7          that type of documentation.

 8    QUESTIONS BY MS. CONROY:

 9          Q.    Okay.  Did you yourself ever

10    have any contact with DEA?

11          A.    Yes.

12          Q.    Okay.  And for what purposes?

13          A.    There was and there would be a

14    period of time where some of the referrals

15    were actually sent by me.

16          Q.    And how would they have been

17    sent?

18          A.    Via e-mail.

19          Q.    Did you ever have any telephone

20    or in-person conversations with DEA?

21          A.    The DEA is a big agency.  Can

22    you be more specific?

23          Q.    Well, I take it then your

24    answer is yes?

25          A.    No, I'd like you to be more
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   specific.

 2        Q.    During your time at Purdue,

 3   have you ever had occasion to have an

 4   in-person or telephone conversation with

 5   anyone at DEA?

 6        A.    Yes.

 7        Q.    Have you ever had occasion to

 8   have a conversation in person or by telephone

 9   with DEA concerning suspicious orders?

10        A.    Yes.

11        Q.    On what occasions did that

12   occur?

13        A.    I don't recall.

14        Q.    Were there many?

15        A.    I don't recall.

16        Q.    Do you recall if there was more

17   than one?

18             MR. HOFFMAN:  Are you asking

19        about orders or pharmacies or both,

20        Jayne?  Maybe that will clarify it a

21        little bit.

22             MS. CONROY:  I'm not sure what

23        you mean.  I've asked about if there

24        were any conversations with DEA with

25        respect to suspicious orders.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.

 2    QUESTIONS BY MS. CONROY:

 3         Q.    And -- but you don't recall

 4    when or how many?

 5         A.    I don't recall.

 6         Q.    You don't recall when those

 7    occurred, correct?

 8         A.    Or how many.

 9         Q.    Or how many.

10                Do you recall if there was more

11    than one?

12         A.    I would assume that there would

13    be more than one.

14         Q.    And why would you assume that?

15         A.    I've been with the company for

16    ten years.

17         Q.    So would it have been routine

18    for you to have conversations with DEA?

19         A.    In the -- in the -- in the

20    scope of my law -- my job, I have discussion

21    with agents from various agencies, not only

22    DEA, separate and apart from just order

23    monitoring.

24         Q.    Okay.  But I'm only talking

25    about DEA.
```

```
1         A.      Uh-huh.

2         Q.      And I'm only talking about

3    order monitoring or suspicious orders.

4         A.      Okay.

5         Q.      That area.

6         A.      Correct.

7         Q.      Okay?

8                 And you have no recollection

9    sitting here today of whether or not you had

10   conversations, how many or when?

11        A.      I don't recall how many or

12   when.

13        Q.      Do you have any memory of why

14   you would have had conversations with DEA

15   about suspicious orders or order monitoring?

16        A.      Do I have any idea?  The only

17   idea that I can think of directly related to

18   this area would be when we were first,

19   corporate security, sending the referrals to

20   the DEA to ask, "Is this enough information?

21   Is this what you need?"

22                And then after that, I don't

23   recall any conversations.  As I recall it,

24   the information transmitted in this area was

25   done via e-mail.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Okay.  So just to make sure I

 2    understand what you just said.  Early on in

 3    the process when you were responsible for

 4    referrals to the DEA of suspicious pharmacies

 5    or whomever, you may have had some

 6    conversations with DEA around those

 7    submissions to be sure that it was being

 8    submitted properly or they didn't need more

 9    information or whatever surrounded that

10    referral?

11               MR. HOFFMAN:  Object to the

12          form.

13               THE WITNESS:  Some of that,

14          yes.

15               As I -- you asked me to recall.

16          What I would assume happened would

17          have been in the early stages of us

18          doing this, ensuring that is this the

19          information and the format the way

20          that you want it.

21    QUESTIONS BY MS. CONROY:

22            Q.     Okay.  But it concerned the

23    actual referral -- an actual referral?

24            A.     That is correct.

25            Q.     And early days would be early
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    when you joined Purdue?
 2         A.    No, this would have been when
 3    corporate security assumed the responsibility
 4    of making the actual referrals to the Drug
 5    Enforcement Administration.
 6         Q.    I see.
 7               So after legal, when you
 8    became -- or when your department became
 9    responsible, that's the time frame you're
10    talking about?
11         A.    That's correct.
12         Q.    Did you or do you have a copy
13    of this SOP in your own files in your office?
14         A.    I might.
15         Q.    Would this Exhibit 3 -- or is
16    it --
17               MR. HOFFMAN:   4.
18    QUESTIONS BY MS. CONROY:
19         Q.    Exhibit 4, would it have been
20    something that you would refer to from time
21    to time when you were on the order monitoring
22    committee?
23         A.    No.
24         Q.    Do you have any recollection of
25    being involved in any updates to Exhibit 4 or
```

1    any revisions of the order monitoring

2    protocol?

3         A.    I have no recollection of being

4    involved in the revision of this SOP, but as

5    I stated before, the protocol changed in that

6    one area, which was the responsibility of

7    reporting, which was transferred to -- was

8    assumed by corporate security.

9         Q.    Do you know if there was ever

10   an SOP that was created specifically with

11   respect to reporting when that change

12   occurred?

13        A.    I don't know.  I don't recall.

14        Q.    Take a look at the first page

15   of Exhibit 4.  It says around the middle, "As

16   a DEA registrant, Purdue is charged with

17   maintaining effective controls against

18   diversion of controlled substances into other

19   than legitimate medical, scientific and

20   industrial channels.  This includes

21   reasonable efforts to, quote, 'know our

22   customers,' end quote, as well as aiding in

23   the efforts of our distributors to ensure

24   that they take reasonable steps to, quote,

25   'know their customers,' end quote."

Highly Confidential - Subject to Further Confidentiality Review

```
1                    Do you see that?

2         A.    Yes.

3         Q.    Can you explain to me the

4    reasonable efforts taken to "know our

5    customers"?

6                    And I take it in this context

7    it's talking about wholesalers.

8                    Is that how you read this?

9         A.    That is how I read this.

10        Q.    And what efforts, what

11   reasonable efforts, can you tell me are taken

12   by Purdue to know their customers, the

13   wholesalers?

14               MR. HOFFMAN:  Object to the

15          form.

16               THE WITNESS:  So in connection

17          with this OMS group, we've talked

18          about it before, but the biggest piece

19          is looking at and acquiring the

20          Fee-For-Service data.

21               If there would be a -- as I

22          think you know, there are -- most of

23          our interaction is with the big three:

24          AmerisourceBergen, Cardinal and

25          McKesson.  If there was additional
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              authorized distributors, which there

 2              are, that are not the big three, some

 3              of those reasonable steps against

 4              diversion of controlled substances

 5              would and could have included site

 6              reviews of security at these

 7              distributors where we would make a

 8              recommendation -- or I should say make

 9              an assessment and a recommendation, or

10              recommendations, to improve security

11              to ensure as best -- as best as

12              possible to prevent diversion of

13              controlled substances, in this case

14              Purdue's products.

15       QUESTIONS BY MS. CONROY:

16              Q.     Okay.  And who would -- who

17       would conduct those site reviews?

18              A.     A member of my team.

19              Q.     Did you ever do them yourself?

20              A.     No.

21              Q.     And did you have a protocol or

22       a checklist or anything like that for those

23       site reviews?

24              A.     We have a security

25       vulnerability assessment checklist which we
```

```
 1    would submit to the wholesaler to ask them to

 2    fill out in advance, and then we would audit

 3    against that.

 4         Q.    Okay.  And you said you would

 5    make an assessment and a recommendation, or

 6    recommendations, to improve security to --

 7         A.    If deemed appropriate, if I

 8    may.

 9         Q.    Sure.

10               -- to ensure as best as

11    possible to prevent diversion of controlled

12    substances.  And you were talking about

13    Purdue's products.

14               How would you define diversion

15    in that context?

16               What are you looking -- what

17    are you assessing at that site to prevent

18    diversion?

19               MR. HOFFMAN:  Object to the

20         form.  I think it's beyond the scope.

21               But go ahead.

22               THE WITNESS:  So the diversion

23         I would be referring to there is the

24         possible theft of product at the

25         distributor level.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MS. CONROY:
2         Q.     You would not be looking at
3    anything to do with the size, pattern or
4    frequency of an actual order coming from the
5    wholesaler; is that correct?
6              MR. HOFFMAN:  When you say --
7    QUESTIONS BY MS. CONROY:
8         Q.     That would not be part of your
9    review?
10             MR. HOFFMAN:  When you say
11        "you," you're talking about Mr. Geraci
12        or his department?
13             MS. CONROY:  In his team.
14             MR. HOFFMAN:  Okay.
15             THE WITNESS:  This review of
16        the security vulnerability assessment,
17        the primary role, or I should say the
18        primary objective, is looking at
19        physical security and physical
20        security controls and internal
21        controls, not looking at sales volume.
22   QUESTIONS BY MS. CONROY:
23        Q.     Do you know if there was anyone
24   at Purdue that would look to know the
25   customer, the wholesaler, with respect to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sales volume or frequency of orders or

 2    pattern of orders?

 3         A.      I believe that would have been

 4    in the sales operation group.

 5         Q.      And can you give me a name with

 6    the sales operation group?

 7         A.      Maybe I should have said

 8    national account, but I would think the Steve

 9    Seid of the -- of the world.

10         Q.      Okay.  That's who you mean,

11    Steve Seid?

12         A.      They would be looking at those

13    orders.

14         Q.      Okay.

15         A.      The sales organization.

16                 We would be focusing on

17    security.

18         Q.      Would there be anyplace that

19    that would be documented?

20                 Would there be a file about

21    each customer, for example, with respect to

22    their vulnerability or lack of vulnerability

23    with respect to security, also contain maybe

24    anything that the sales organization knows

25    about the customer?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    Are there any files like that?

2                    MR. HOFFMAN:  Object to the

3          form.  It's beyond the scope.

4                    THE WITNESS:  Yes, we would

5          have our files of the security

6          vulnerability assessments.

7    QUESTIONS BY MS. CONROY:

8          Q.    And do you have those files

9    with respect to each of the authorized

10   distributors for Purdue?

11         A.    We would have to check.  I

12   assume so.

13         Q.    Okay.  And I take it you don't

14   know whether or not national accounts has

15   files with respect to their responsibilities

16   with respect to knowing their customer?

17         A.    I don't know.

18         Q.    You can put that away.

19               (Purdue-Geraci Exhibit 5 marked

20         for identification.)

21   QUESTIONS BY MS. CONROY:

22         Q.    I've marked as Exhibit 5 a

23   document from the Purdue production entitled

24   "Order Monitoring System," PPLPC019001275418.

25               Have you ever seen this
```

```
 1    schematic before?

 2         A.     No.

 3         Q.     Let's take a look at it.

 4                It says, sort of at the first

 5    box, "Factors that Purdue's OMS team analyzes

 6    to determine pharmacy review."

 7                Do you see that?

 8         A.     Yes.

 9         Q.     Would you consider that you

10    were part of the OMS team?

11         A.     Yes.

12         Q.     And then it looks like there

13    are four different areas that are analyzed to

14    determine pharmacy review.

15                And would you agree with me

16    pharmacies are reviewed to determine whether

17    or not they are suspicious?

18                MR. HOFFMAN:  Object to the

19         form.

20                THE WITNESS:  We reviewed

21         pharmacies based on the information

22         that was analyzed that appeared to be

23         suspicious.

24    QUESTIONS BY MS. CONROY:

25         Q.     Right.
```

 1              So the -- so what you -- the

 2     OMS team is reviewing pharmacies that are

 3     selected by national accounts using the FFS

 4     data that -- whatever the data points are

 5     appear to be suspicious?

 6          A.     That's not how I understand it

 7     to be.

 8          Q.     Okay.  How do you understand it

 9     to be?

10          A.     You said it came from national

11     accounts.  OMS members, people that --

12     certain individuals that were actually

13     looking at the FFS data would come to that

14     information, and their analysis could

15     conceivably be completely separate and

16     independent from national sales.  It didn't

17     start with national sales.  It's the buying

18     of the data, analyzing the data.

19              So the way you're describing it

20     I don't believe was the case.

21          Q.     Okay.  So let me make sure I

22     understand.

23              So whoever -- are you making

24     the distinction that the individuals looking

25     at the FFS data may not be from national

Highly Confidential - Subject to Further Confidentiality Review

```
1    accounts; they were from the OMS team?

2         A.    There was a person in national

3    accounts who was a member of the OMS team,

4    but I do not believe he was the one on a

5    regular basis for OMS crunching the data or

6    looking at the data and seeing how it played

7    out in the algorithm.

8         Q.    I see.

9               Who would that have been?

10        A.    Most recently it had been

11   Giselle Issa.  I think it's I-s-s-a.

12              I'm sorry, I should be saying

13   it to you.

14        Q.    And she's part of the legal

15   department?

16        A.    Yes.

17        Q.    Anyone else that you can

18   recall -- these are -- we're talking about

19   who is actually crunching the numbers --

20        A.    Yeah.

21        Q.    -- to come up with the

22   suspicious pharmacies?

23        A.    And most recently Eric

24   Brantley.  I should have said Eric replaced

25   Giselle.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.  And what department is

2   Eric Brantley in?

3      A.      Eric Brantley was in the

4   corporate ethics and compliance department.

5      Q.      And they have -- they have

6   newly taken on these responsibilities in the

7   last two years, I think you told me?

8      A.      What I stated was I believe

9   within the last two years.

10      Q.      Okay.  Who was it prior to

11   Giselle Issa, if you recall, if anyone?

12      A.      If I recall correctly, it was a

13   Betsy Adams, I believe was her last name.

14      Q.      And she was also in legal?

15      A.      I believe so.

16      Q.      So those three individuals --

17   and maybe there were others, but that's who

18   you recall -- they would be the ones that

19   would take the data, crunch the numbers and

20   present the pharmacies of suspicion to the

21   OMS team or committee?

22      A.      Along with other work that

23   would be done between meetings.

24      Q.      Okay.  Is it fair to say that

25   it would start with those pharmacies and then

Highly Confidential - Subject to Further Confidentiality Review

1    additional data would be collected once those

2    suspicious or potentially suspicious

3    pharmacies were identified?

4              MR. HOFFMAN:  Object to the

5         form.

6              THE WITNESS:  I believe it

7         would be fair to say that that was the

8         starting point in probably most

9         instances, which would be the

10        Fee-For-Service data and the analysis

11        of that data by pharmacy.

12   QUESTIONS BY MS. CONROY:

13        Q.    Okay.  And so if we take a look

14   at this first box, "Data complied by

15   wholesalers on sales of Purdue products,"

16   that's Fee-For-Service data, correct?

17        A.    I believe that's what they're

18   referring to there.

19        Q.    And for -- just for the jury,

20   the Fee-For-Service data would be data coming

21   back from each of Purdue's customers that

22   would identify the amount of the -- of an

23   order and where it was shipped and what

24   retail outlet received what product.  Is

25   that --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      That would be the where it was

 2     shipped, right.

 3              Q.      Okay.  So you would know if you

 4     shipped OxyContin to McKesson, the

 5     Fee-For-Service data that would come back to

 6     Purdue would tell you not only what was

 7     shipped to McKesson but where McKesson

 8     distributed the OxyContin to, what retail

 9     outlets or pharmacies received that

10     OxyContin?

11              A.      Well, the retail outlets that

12     received OxyContin, not necessarily that

13     OxyContin.

14                      Understand there's going to

15     be a time.  Okay?

16              Q.      Okay.

17              A.      Okay.  You got to ship it,

18     going in, but they have inventory already.

19     It shows the shipment by the distributors, as

20     I understand it, the wholesalers, of

21     OxyContin to their customers.

22              Q.      Okay.  So you would know, for

23     example, a pharmacy on Main Street in

24     Cleveland, you would be able to tell if

25     McKesson distributed to that pharmacy on Main
```

Highly Confidential - Subject to Further Confidentiality Review

 1    Street in Cleveland.  You would be able to

 2    tell how much OxyContin McKesson distributed

 3    to that pharmacy, correct?

 4                  MR. HOFFMAN:  Object to the

 5         form.

 6                  THE WITNESS:  I believe that's

 7         what the FFS data would reflect.

 8    QUESTIONS BY MS. CONROY:

 9         Q.    Okay.  And then it says below

10    that, "To identify outliers or indicia of

11    potential concern."  And that's what we're

12    talking about, the number-crunching by Betsy

13    Adams, Giselle Issa and Eric Brantley and

14    maybe some others.

15                  They would take the data

16    supplied by the wholesalers on the sales,

17    crunch the numbers, and they would identify

18    for the team outliers or something else that

19    would potentially be of concern to the order

20    monitoring team?

21         A.    That appears to be the case,

22    and that's my recollection and understanding.

23         Q.    Okay.  Then the next box is

24    "Discussions with Wholesalers."

25                  Based on concerning purchase

Highly Confidential - Subject to Further Confidentiality Review

1    trends and other indications, do you -- did

2    you yourself have discussions with

3    wholesalers in your capacity as a member of

4    the order monitoring committee?

5         A.    No.

6         Q.    You would, I take it, as

7    corporate security, or your team, looking at

8    what we just talked about, sight reviews and

9    such, correct?

10        A.    That is correct.

11        Q.    But you did not have

12   discussions with them with respect to

13   suspicious orders, correct?

14        A.    Not -- not as is reflected here

15   in this box.

16        Q.    Okay.  Do you know if others on

17   the committee had discussions with

18   wholesalers?

19        A.    Yes.

20        Q.    And who would those individuals

21   have been?

22        A.    To the best of my recollection,

23   that would have been Jack Crowley's

24   responsibility, and he would have had those

25   discussions.

1     Q.     And then there's a section

2  called reports of concern.  That's ROCs.

3            You're familiar with those,

4  correct?

5     A.     Yes.

6     Q.     And abuse, diversion detection,

7  ADD, program reports indicative of suspicious

8  activity.

9            Are you familiar with the

10 review of those reports as an order

11 monitoring committee member?

12    A.     Yes.

13    Q.     And an ADD report is a report

14 from the sales side.  And by sales I mean

15 sales and marketing, a sales rep or district

16 or regional manager.

17           That would be a report of

18 something that they observed either at a

19 pharmacy or at a physician's office; is that

20 correct?

21    A.     I believe that would be one

22 point of information reviewed and --

23 collected and reviewed by the ADD group

24 concerning physicians.

25    Q.     And would it be fair to say

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that reports of concern or ADD reports would
 2    be collected after suspicious pharmacies were
 3    identified.  Then there'd be a search for
 4    more information that may exist with respect
 5    to that pharmacy?
 6                 MR. HOFFMAN:  Object to the
 7         form.
 8                 THE WITNESS:  It would be
 9         reasonable to state that.  This is
10         another data point.
11    QUESTIONS BY MS. CONROY:
12         Q.    Right.
13                 But it's a data point that
14    would be collected after suspicious
15    pharmacies were identified by the number
16    crunching based on the Fee-For-Service data?
17                 MR. HOFFMAN:  Object to the
18         form.
19                 THE WITNESS:  Okay.  So I don't
20         think -- you're making it very linear.
21         It is possible that the information,
22         the different data points, could come
23         in at different times.
24                 I'm assuming, with no specific
25         recollection, that an ADD report or a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          ROC report conceivably could have
 2          started an investigation, but it's --
 3          I'm not -- I'm not saying that it's
 4          going from one -- it always went one,
 5          two, three, four, five.  It would be
 6          on a case-by-case basis.
 7   QUESTIONS BY MS. CONROY:
 8          Q.     Okay.  Do you have a
 9   recollection of ROC, reports of concern, or
10   ADD reports with respect to a pharmacy?
11          A.     With a specific pharmacy?  No.
12          Q.     Do you have a memory of them
13   relating to prescribers?
14          A.     No specific recollection.
15          Q.     I'm not asking if you remember
16   the pharmacy or the doctor.
17          A.     Oh, okay.  That's what I
18   thought you were referring to.
19          Q.     Okay.  What I'm asking is, do
20   you recall those reports of concern or ADD
21   reports to trigger a discussion at the order
22   monitoring committee about a particular
23   prescriber and that's why -- and then there
24   would be a review of where that prescriber's
25   prescriptions were being filled, or were they
```

```
1    reports about a pharmacy?

2              MR. HOFFMAN:  Object to the

3         form.

4              THE WITNESS:  Yeah, I don't

5         have a specific recollection, but I

6         believe that those types of discussion

7         were had at the OMS committee level.

8    QUESTIONS BY MS. CONROY:

9         Q.    Did you ever have -- well, let

10   me -- did the order monitoring committee ever

11   decide to refer a prescriber to the DEA?

12             MR. HOFFMAN:  Separate and

13        apart from the ADD function?  Is that

14        what you're asking?

15             MS. CONROY:  No, I'm not.

16   QUESTIONS BY MS. CONROY:

17        Q.    What I'm asking is are you --

18   are you aware if the order monitoring

19   committee ever recommended or decided to

20   refer a prescriber to DEA?

21        A.    I don't recall the order

22   monitoring committee recommending or making

23   the actual referral to the DEA about any

24   particular prescriber or prescribers.

25        Q.    Okay.  What you do remember is
```

Highly Confidential - Subject to Further Confidentiality Review

1    that those recommendations were made with

2    respect to pharmacies; is that correct?

3         A.    That is correct.

4         Q.    Do you recall any instance

5    where there was a decision made to refer a

6    distributor to DEA?

7         A.    I don't recall any specific

8    time where that happened.

9         Q.    Do you recall any discussions

10   with respect to whether or not to refer a

11   physician to DEA -- I'm talking about in the

12   order monitoring committee, just discussions

13   about whether to do that.

14        A.    I don't recall discussions

15   being had about referring physicians being

16   conducted during order monitoring committee

17   meetings.

18        Q.    Are you familiar at all with

19   top prescriber lists or region zero lists?

20   Are those familiar terms to you?

21             MR. HOFFMAN:  Object to the

22        form.

23             THE WITNESS:  The region zero

24        lists, or region zero doctors, is a

25        term I am familiar with.

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MS. CONROY:

 2          Q.     And what does that mean?

 3          A.     As I recall and to the best of

 4     my knowledge, doctors that were placed into,

 5     quote, region zero were doctors that the

 6     sales representatives were instructed not to

 7     call on.

 8          Q.     And why is that, if you know?

 9                 MR. HOFFMAN:  Object to the

10          form.  Beyond the scope.

11                 THE WITNESS:  I was not part of

12          the ADD committee.

13     QUESTIONS BY MS. CONROY:

14          Q.     Did the region zero doctors or

15     list, did that in any way impact

16     conversations about suspicious pharmacies in

17     the order monitoring committee?

18                 Was it of any relevance to you?

19          A.     Okay.  So that's two questions.

20                 I don't recall any impact, but

21     it would be a relevant data point, along with

22     many other data points or number of the data

23     points that we had, in order to try to

24     identify pharmacies that their buying

25     practices were unusual or suspicious.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      And can you explain to me why

2      it would be a relevant data point?

3      A.      Well, like as I mentioned

4      earlier, on a case-by-case basis you're

5      looking at a number of different data points.

6                  In this case it could suggest,

7      if there's a doctor or a physician that has

8      been identified as a region zero doctor, it

9      could suggest or point you in a direction to

10     look at the pharmacies where his patients or

11     her patients were actually fulfilling their

12     prescriptions.

13                 But I said "it could."

14     Q.      Right.  I understand.

15     A.      Yeah.

16     Q.      Each investigation is

17     different, correct?

18     A.      And each location is different.

19     Q.      But Purdue would have that data

20     in order to follow down that path, if in fact

21     the investigation warranted it.  To determine

22     if it was a suspicious pharmacy that the

23     order monitoring committee was looking at,

24     you would have available to you data with

25     respect to prescribers in the area that might

Highly Confidential - Subject to Further Confidentiality Review

1    be in region zero or might not be in region

2    zero.  That data would be available to you?

3        A.    Yes, it would be.

4        Q.    And that data would be

5    collected, not by you but some other member

6    of the order monitoring team.  And would that

7    be part of the collection of information you

8    would receive in advance of an order

9    monitoring committee meeting?

10       A.    It could have been, yes.

11       Q.    And if that data existed and

12   had been included, I would see it in the

13   package of materials that would have been

14   sent to you and others.  That's where it

15   would be.  It wouldn't be somewhere else you

16   would go to see it?

17            MR. HOFFMAN:  Object to the

18       form.

19            THE WITNESS:  I believe that

20       that's where you would see it.

21   QUESTIONS BY MS. CONROY:

22       Q.    For example, you yourself, you

23   didn't -- you didn't receive a list of region

24   zero doctors every month or anything like

25   that, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I don't recall ever receiving

2  any list of region zero doctors at any time.

3      Q.      The only time you would hear

4  information about a region zero doctor would

5  be in that package of material?

6      A.      Or during discussion at the

7  order monitoring meeting.

8      Q.      Okay.  And the next one is

9  publicly available legal or regulatory

10  actions, information collected based on

11  public searches of terms to identify actions

12  taken against pharmacists or pharmacies.

13          Does that sound right to you?

14  Do you recall that happening?

15      A.      Yes.

16      Q.      And I take it that's not

17  something -- you would not have been doing

18  those searches, correct?

19      A.      That is correct.

20      Q.      Would information collected

21  from those searches have been either provided

22  to you in the package in advance of the

23  meeting or the topic of those -- of that

24  information discussed at the meeting?

25      A.      Yes, to both.

1    Q.    Do you know who on the team

2    would have been responsible for this

3    information collection?

4    A.    For most of this, the publicly

5    available information would have been

6    collected by a member of my staff, Luis

7    Bauza.  It would be the corporate security

8    review, the due diligence work.

9    Q.    Would you have known in advance

10   of a meeting to ask Mr. Bauza to collect

11   publicly available information about a

12   particular pharmacy, or would the meeting

13   take place and then there would be an

14   assignment to Mr. Bauza to look into anything

15   that might be publicly available after that

16   pharmacy was identified?

17            MR. HOFFMAN:  Object to the

18        form.

19            THE WITNESS:  So it -- the way

20        it would happen or could happen would

21        be two ways.  One, during the course

22        of a meeting a request for inquiry may

23        arise, and Mr. Bauza would accept that

24        responsibility and conduct that

25        inquiry.

```
 1                  The second part would have been

 2           before the meeting, Mr. Bauza would

 3           have received a request from someone

 4           in the order monitoring team to say,

 5           we're looking at a particular pharmacy

 6           or pharmacies.  Can you conduct the

 7           background inquiry in anticipation of

 8           the meeting.

 9     QUESTIONS BY MS. CONROY:

10           Q.    Okay.  And would Mr. Bauza have

11     to go through you to get that request or

12     would it be -- or could it just come from

13     another order monitoring team member directly

14     to Mr. Bauza?

15           A.    I allowed it to go any way he

16     got the request.  It didn't have to be

17     approved by me.

18           Q.    I see.  Okay.

19                 And then all -- all four of

20     these sources of information, I'll call them,

21     would go into the OMS team review.  It says,

22     "OMS team reviews all information collected

23     on accounts that have met any of the criteria

24     above and determines next steps."

25                 Does that sound right to you,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the way it worked?

 2         A.    That seems to be a fair

 3    representation of how it worked.

 4         Q.    And then if you look down,

 5    there are two boxes -- there's one box.

 6    Complete referred.  It says, "OMS team

 7    determined there was sufficient information

 8    regarding the potential suspicious order."

 9             This is talking about

10    determining there was sufficient information

11    to actually refer the matter to DEA, correct?

12         A.    Yes.

13         Q.    The team also could determine

14    to keep looking at the pharmacy or they could

15    close the investigation, correct?

16         A.    Correct.

17         Q.    And you just don't see that box

18    here on this schematic, correct?

19         A.    No.

20         Q.    And then there's a DEA -- and

21    then once the committee decides to refer,

22    there's the actual DEA referral.  "Purdue

23    refers the issue to the local DEA field

24    office division and authorized distributor

25    notified."
```

1            Do you see that?

2       A.    Yes.

3       Q.    The final phrase in that

4   sentence, "the authorized distributor

5   notified," was it your understanding that a

6   distributor would be told if Purdue was going

7   to refer one of its customers to the DEA?

8       A.    It's my understanding that

9   Purdue would tell the distributor that it --

10  Purdue was referring one of the distributor's

11  customers to the DEA.

12      Q.    And why was that done?

13            Why did Purdue tell the

14  distributor?

15            MR. HOFFMAN:  Object to the

16       form.  Beyond the scope.

17            THE WITNESS:  Why did we tell?

18       This is our customer.  My assumption

19       is it was done so that -- because

20       we're working with the customers, as

21       we stated in our SOP, to help support

22       them in developing these systems and

23       identifying suspicious orders and

24       suspicious pharmacies.

25            I think it's just a normal

Highly Confidential - Subject to Further Confidentiality Review

```
 1          practice to say, by the way, we've
 2          done this.  We've been in consultation
 3          with you.  You have either conducted
 4          an investigation or not, and we've
 5          come to the conclusion after a certain
 6          period of time that based on all the
 7          information we have available to us,
 8          the order monitoring team has agreed
 9          that this pharmacy has raised to a
10          level where we believe it requires a
11          referral to the DEA.
12               I think it's just normal and
13          customary that you would do something
14          like this with a customer.
15     QUESTIONS BY MS. CONROY:
16          Q.    Do you know whether that was
17     the practice, to inform the distributor, the
18     customer, at any point when the order
19     monitoring committee decided to refer a
20     pharmacy to DEA?
21          A.    To the best of my recollection
22     and knowledge, if we referred a pharmacy to
23     the DEA, we advised the wholesaler of such.
24          Q.    Was there ever a situation
25     where you made the decision, the order
```

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring committee made the decision, to

2    refer and then asked the distributor to

3    actually make the referral to DEA?

4              MR. HOFFMAN:  Object to the

5         form.  Beyond the scope.

6              THE WITNESS:  I don't recall

7         any time where we would say or ask or

8         request the distributor to make a

9         referral.

10             If we had come to the decision

11        that we were -- that we felt a

12        referral needed to be made, then we

13        were going to make it.  I don't recall

14        that happening.

15   QUESTIONS BY MS. CONROY:

16        Q.    Do you recall any instance

17   where there was a conflict between Purdue and

18   the distributor customer about whether or not

19   one of the pharmacies should be referred to

20   DEA?

21             MR. HOFFMAN:  Object to the

22        form.  Beyond the scope.

23             THE WITNESS:  I don't recall

24        any time where that happened.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. CONROY:

 2         Q.    As you sit here -- well, strike

 3    that.

 4              MR. HOFFMAN:  Jayne, for your

 5         planning purposes, I think we're

 6         having lunch set up at like 12:15.  So

 7         it's in another 20-something minutes.

 8         If that's okay with you guys.

 9              MS. CONROY:  That's great.

10    Thank you.

11              How are you doing?  Do you

12         want --

13              THE WITNESS:  I'm fine.

14              MS. CONROY:  Okay.  We'll

15         keep -- we'll just keep going?

16              MR. HOFFMAN:  Sure.

17              MS. CONROY:  You tell me when

18         lunch is here.  Or tell me when it's

19         12:20.

20    QUESTIONS BY MS. CONROY:

21         Q.    Mr. Geraci, are you familiar

22    with the new order monitoring suspicious

23    order SOPs after 0007?

24         A.    Am I familiar?  No, I'm not.

25         Q.    Okay.  So --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I may have seen them; I just
 2     don't recall.
 3          Q.     Let me mark them, and you can
 4     just tell me --
 5          A.     Sure.
 6          Q.     -- whether you've seen them.
 7               MS. CONROY:  I'll try and do it
 8          in order.  That would actually make
 9          more sense.
10               THE WITNESS:  While you're
11          doing that, may I just step out for a
12          second?  Thank you.
13               MS. CONROY:  We'll go off the
14          record.
15               VIDEOGRAPHER:  The time is
16          11:54 a.m.  Off the record.
17           (Off the record at 11:54 a.m.)
18               VIDEOGRAPHER:  Okay.  We are
19          back on the record.  The time is
20          11:59 a.m.
21               (Purdue-Geraci Exhibits 6, 7
22          and 8 marked for identification.)
23     QUESTIONS BY MS. CONROY:
24          Q.     I'm going to pass you
25     Exhibits 6, 7 and 8, which I'll represent to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you, I believe, are three suspicious order

 2    monitoring protocols.

 3              Exhibit 6 is CC-SOP-000017, and

 4    it says the release date is the 25th of

 5    September, 2017.  "The purpose of this SOP is

 6    to provide guidance on identifying,

 7    reviewing, documenting and reporting

 8    suspicious orders in compliance with the

 9    Controlled Substances Act and 21 CFR 1301.74,

10    subpart B."

11              Have you ever seen this

12    document before?

13         A.    I don't believe so.

14         Q.    Okay.  Do you see it's signed

15    by Eric Brantley?

16              Is he -- it has -- it's on the

17    typed list on the front page --

18         A.    Oh, I see it, yes.

19         Q.    -- and then maybe there's a

20    signature page.  I'm not even -- yeah, there

21    isn't a signature page, but right on the

22    front it says "signed by Eric Brantley."

23              Is he in your department?

24         A.    No.

25         Q.    Okay.  And then also signed by
```

Highly Confidential - Subject to Further Confidentiality Review

1   Alexis Stroud.

2              Do you know what department

3   she's in?

4        A.    Yes.

5        Q.    Which one?

6        A.    Ethics and compliance.

7        Q.    And Eric Brantley is also in

8   ethics and compliance?

9        A.    Yes, he was.

10       Q.    And Danielle Bacco, is she in

11  ethics and compliance, if you know?

12       A.    Yes, she was.

13       Q.    Is this indicative of the

14  switch to ethics and -- the ethics and

15  compliance department taking responsibility

16  for the order monitoring -- or suspicious

17  order monitoring review?

18       A.    It would certainly indicate

19  that.

20       Q.    Does it fit with your memory

21  that around September, the end of September

22  of 2017, that may have been when there ceased

23  to be order monitoring committee meetings

24  that you were attending?

25       A.    That would appear to be the

Highly Confidential - Subject to Further Confidentiality Review

```
1   case.

2        Q.    Okay.  If we look at Exhibit 7,

3   which is CC-SOP-000018, and the document

4   title is "Know Your Customer Due Diligence,"

5   also dated September 25, 2017.  And the

6   description, "This SOP outlines the, quote,

7   'know your customer,' end quote, due

8   diligence process for new and existing

9   customers and applies to all customers

10  purchasing Schedule II through V controlled

11  substances and List I chemicals."

12              Do you see that?

13       A.    Yes.

14       Q.    Do you have any memory of ever

15  seeing or reading this SOP, Exhibit 7?

16       A.    I don't recall ever reading or

17  seeing this SOP.

18       Q.    And I see we have the same

19  three individuals, including Margaret Feltz,

20  who is also on Exhibit 6, part of the ethics

21  and compliance department.

22              Would it be your understanding

23  that this SOP is also part of the ethics and

24  compliance oversight of the suspicious order

25  monitoring department?
```

 1          A.      That would be my understanding.

 2          Q.      Okay.  And then Exhibit 8 is

 3    CC-SOP-000019.  This one is later,

 4    January 25th of 2018.  "This SOP outlines the

 5    know your customers' customers due diligence

 6    process for downstream customers."

 7                  Do you see that?

 8          A.      Yes.

 9          Q.      Have you ever seen this one

10    before, Exhibit 8?

11          A.      I don't recall ever seeing

12    this.

13          Q.      Do you know if that is a new

14    concept, to know your customers' customers

15    with respect to the review of suspicious

16    pharmacies or orders?

17                  MR. HOFFMAN:  Object to the

18          form.  Beyond the scope.

19                  THE WITNESS:  I don't believe

20          it's a new concept.

21    QUESTIONS BY MS. CONROY:

22          Q.      Okay.  Was that anything that

23    was discussed when you were attending order

24    monitoring committee meetings, any know your

25    customers' customers due diligence processes?

Highly Confidential - Subject to Further Confidentiality Review

```
 1             A.      Yes.

 2             Q.      And tell me about that.  What

 3     did that mean, to know your customers'

 4     customers?

 5             A.      This would have been -- you

 6     asked me what I believe it means -- is

 7     knowing the pharmacies.  This is why we would

 8     acquire the Fee-For-Service data, to know our

 9     customers, who is the distributor or

10     wholesaler, their customers.

11             Q.      Right.

12                     And so that's the customers'

13     customer.  The distributor or the wholesaler

14     is Purdue's customer, and then to know their

15     customers' customers, that would be the

16     pharmacies?

17             A.      That is correct.

18             Q.      Do you see at the bottom of

19     Exhibit 8 it says, "Owning departments, STM,

20     corporate compliance"?

21             A.      Uh-huh.

22                     MR. HOFFMAN:  You have to say

23          yes or no.

24                     THE WITNESS:  Yes.  I'm sorry,

25          yes.  I apologize, yes, I see it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. CONROY:

 2         Q.    Have you heard that term before

 3    "owning departments"?

 4         A.    No.

 5         Q.    And what does STM stand for

 6    with corporate compliance, if you know?

 7         A.    I don't know.

 8         Q.    You can put those away.

 9              Do you know if the order

10    monitoring committee has been suspended, or

11    do you know if it ceases to exist?

12              MR. HOFFMAN:  Object to the

13         form.

14              THE WITNESS:  The order

15         monitoring committee continues.

16    QUESTIONS BY MS. CONROY:

17         Q.    Have you had any meetings?

18         A.    I don't know if they've had any

19    meetings.

20         Q.    Okay.  Do you believe you're

21    still on the order monitoring committee?

22         A.    I don't -- there isn't a

23    committee as such as it was before, so to

24    answer your question, I -- I really haven't

25    given thought as to if I'm on the committee
```

Highly Confidential - Subject to Further Confidentiality Review

 1   or not.

 2        Q.    Okay.  Let me ask it this way:

 3   Do you know if there -- do you know if

 4   there's still an order monitoring committee

 5   but it's a different committee and under a

 6   different oversight department, or is it the

 7   same order monitoring committee, you just

 8   don't know if it's active?

 9        A.    I just testified that it still

10   exists.  It is active.  It is within the

11   corporate ethics and compliance group.

12        Q.    Did you say it is within the

13   corporate --

14        A.    It is within.

15        Q.    The corporate ethics and

16   compliance?

17        A.    Yes.

18        Q.    But you have not, to the best

19   of your knowledge, attended any meetings?

20        A.    I have not attended any

21   meetings to the best of my knowledge.

22        Q.    Okay.  Do you receive any

23   packages or agendas or anything like that

24   with respect to the order monitoring

25   committee now that it's part of corporate

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ethics and compliance?

 2         A.     I have not, to the best of my

 3    recollection.

 4         Q.     What about Mr. Bauza, do you

 5    know if he has attended any meetings or if he

 6    receives any materials?

 7         A.     I don't know.

 8         Q.     How do you know it's still

 9    active?

10         A.     In my discussions with Maggie

11    Feltz, and in discussions I've had with Eric

12    Brantley over time.

13         Q.     Do you know who the other

14    committee members are once there was the

15    switch to corporate ethics?

16         A.     The committee members were

17    those individuals listed on the -- I think

18    they call this their SOP, right?

19         Q.     Right.

20         A.     Yes.  Corporate compliance

21    CC-SOP.  It would be those individuals.

22         Q.     Danielle --

23         A.     Eric Brantley, Danielle Bacco,

24    Margaret Feltz, Alexis Stroud.

25         Q.     Do you know if anyone from
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    national accounts is still on the order

2    monitoring committee?

3         A.    I don't know.

4         Q.    Do you know if anyone from

5    marketing or sales, the marketing and sales

6    side of the business, is on the order

7    monitoring committee?

8         A.    I don't know.

9         Q.    Do you know if anyone from the

10   legal department is on the order monitoring

11   committee?

12        A.    I don't know.

13        Q.    Do you know if it's only those

14   four individuals, or do you know one way or

15   the other if there are additional members on

16   the committee?

17        A.    I don't know if there are

18   additional members.

19        Q.    Do you know if you are -- let

20   me ask it this way:  Would you have been

21   familiar with or had in your possession, for

22   example, the SOP with respect to ADD, abuse,

23   diversion and detection?  Would that be

24   something that you would have -- you would

25   have had in your role as a member of the
```

Highly Confidential - Subject to Further Confidentiality Review

1   order monitoring committee?

2          A.     That I would have had what?

3   I'm sorry, Ms. Conroy.

4          Q.     The SOP, for example, the ADD

5   reports.

6          A.     I don't recall ever having the

7   SOP for the ADD or anything related to ADD.

8          Q.     Did you ever even know that

9   there was an SOP for the ADD reporting?

10         A.     Did I ever know?  No, I don't

11   know.

12         Q.     Okay.  Did you ever know one

13   way or the other whether there was an SOP for

14   reports of concern?

15         A.     I don't know or ever recall

16   being aware of an SOP for reports of concern.

17         Q.     So that's not something you

18   would have had in your possession, such an

19   SOP, or if you had it, you didn't know what

20   it was?

21         A.     Well, I'll answer that I don't

22   know that I ever had those in my possession,

23   those SOPs.

24         Q.     What about a Fee-For-Service

25   SOP, is that familiar to you at all?  Would

Highly Confidential - Subject to Further Confidentiality Review

1    you have ever seen one of those?

2        A.    I don't recall ever seeing a

3    Fee-For-Service SOP.

4        Q.    Do you know if you even knew if

5    one existed?

6        A.    I did not know that one

7    existed.

8        Q.    Okay.  Generally at Purdue --

9    or let me ask it this way:  In your role as

10   corporate security, do you work -- do you and

11   the individuals who report to you operate

12   under SOPs or refer to SOPs for their sort of

13   daily functions?

14           MR. HOFFMAN:  Object to the

15           form.

16           THE WITNESS:  Corporate

17           security has certain SOPs that are

18           very specific, but not to your daily

19           function.  Not that I know of to daily

20           function.  Pretty much in the roles

21           and responsibilities.  Physical

22           security, for example.

23   QUESTIONS BY MS. CONROY:

24       Q.    And are you involved in the

25   drafting or review of those SOPs that relate

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to corporate security?

 2         A.     I would have been when those

 3    things -- during my tenure if those things

 4    were up for review or for drafting, I would

 5    have reviewed those and approved those.

 6         Q.     And is there a department at

 7    Purdue that keeps track of SOPs that makes

 8    sure that they are kept up to date and they

 9    keep a record of that sort of thing?

10              MR. HOFFMAN:  Object to the

11         form.  Beyond the scope.

12              THE WITNESS:  Yeah, I don't

13         know if there's a department that has

14         it.  I assume that they reside

15         someplace.

16    QUESTIONS BY MS. CONROY:

17         Q.     When you have a new employee

18    come in to corporate security, are they given

19    the SOPs for that -- for the corporate

20    security department?

21              MR. HOFFMAN:  Object to the

22         form.

23              THE WITNESS:  No.

24              MR. HOFFMAN:  Beyond the scope.

25              THE WITNESS:  Yeah, I haven't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              had a new employee in a long time.  I

 2              don't recall.

 3       QUESTIONS BY MS. CONROY:

 4              Q.    Okay.  Would you, for example,

 5       have copies or know where to puts your hands

 6       on the SOPs that relate to corporate

 7       security?

 8              A.    I would know who to ask to get

 9       those.

10              Q.    Is it part of Purdue as a

11       corporation's culture to have SOPs that sort

12       of guide or explain in general the

13       responsibilities and duties of the different

14       departments?

15                    MR. HOFFMAN:  Object to the

16              form.  Beyond the scope.

17                    THE WITNESS:  To the best of my

18              knowledge, we -- there are a number of

19              SOPs that various departments, if not

20              all departments, have, to the extent

21              of which I don't know.

22       QUESTIONS BY MS. CONROY:

23              Q.    Compared to an SOP, for

24       example, do you have a guidebook or anything

25       like that for corporate security or would it
```

```
 1    be the SOPs?

 2          A.    We do not have a guidebook, per

 3    se.

 4          Q.    Do you have something like a

 5    guidebook?

 6          A.    As I recall, there may be some

 7    references to, quote, security in our

 8    employee handbooks, but it's broad and

 9    general, just for the employee base.

10          Q.    Okay.  With respect to the

11    order monitoring committee, we looked at the

12    SOP that specifically concerned the order

13    monitoring committee, correct?

14          A.    Yes, we did.

15          Q.    Are you familiar with any other

16    guidelines, handbooks, anything else that you

17    would have referred to as a member of the

18    order monitoring committee to define your

19    responsibilities or outline your

20    responsibilities or lay out protocols,

21    anything like that, or would it be the SOP?

22          A.    I'm unaware of any other SOP or

23    guidelines that would have guided our -- how

24    we comported ourselves with regard to the

25    order monitoring.
```

Highly Confidential - Subject to Further Confidentiality Review

1           MS. CONROY:  Okay.  I think we

2      can break for lunch.  We just saved a

3      lot of time.

4           THE WITNESS:  Great.  Good.

5           VIDEOGRAPHER:  Off the record,

6      right?  The time is 12:16 p.m.  Off

7      the record.

8       (Off the record at 12:16 p.m.)

9           VIDEOGRAPHER:  Okay.  We are

10      back on the record.  The time is

11      1:16 p.m.

12           (Purdue-Geraci Exhibit 9 marked

13      for identification.)

14  QUESTIONS BY MS. CONROY:

15      Q.    Mr. Geraci, let me pass what

16  I've marked as Exhibit 9 to you.

17           And the front page,

18  PPLPC004000317960, is an e-mail.  You're the

19  first one listed there.

20           That's you, right, Mark Geraci

21  at pharma.com?

22      A.    Yes.

23      Q.    And the e-mail is dated

24  March 29, 2012, and it's from Giselle Issa,

25  who we talked about earlier, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      And she's in the legal

 3   department?

 4          A.      Yes.

 5          Q.      Although it has her as the

 6   director of OMS and records management.

 7                  Do you see at the bottom her

 8   signature line?

 9          A.      Yes.

10          Q.      Is that a part of legal, if you

11   know?

12          A.      I believe so.

13          Q.      Okay.

14                  MR. HOFFMAN:  Or it was at the

15          time.

16   QUESTIONS BY MS. CONROY:

17          Q.      Okay.  Then if you would turn

18   in a few pages, there is a PowerPoint that

19   says it was a presentation for the HDMA

20   conference in Orlando, Florida, on March 13th

21   of 2012.

22                  Did you find that page?

23          A.      Yes, I did.

24          Q.      And do you know what HDMA

25   stands for?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      That's the Health Distribution

 2   Manufacturers Association, I believe,

 3   currently known as, I think, HDA.

 4          Q.      And do you know if Purdue, in

 5   March of 2012, was a member of HDMA?

 6          A.      I believe so.

 7          Q.      Would you ever attend any HDMA

 8   conferences?

 9          A.      I don't recall ever attending

10   one.

11          Q.      Do you know if there are

12   personal memberships?

13                  Or let me ask:  Do you know if

14   you yourself are a member of HDMA or HDA?

15          A.      No, I'm not.

16          Q.      This e-mail was sent to you.

17                  Do you have any recollection of

18   whether you helped prepare it?

19                  I take it from your earlier

20   answer you would not have been in attendance

21   when it was presented in Orlando, correct?

22          A.      That is correct.

23          Q.      If you turn to the second

24   slide, it says, "The mission of the Purdue

25   OMS program."
```

Highly Confidential - Subject to Further Confidentiality Review

1                    Do you see that?

2        A.      Yes, I do.

3        Q.      And it says, "To ensure

4    compliance with DEA regulations requiring

5    manufacturers and distributors to monitor and

6    report suspicious orders of controlled

7    substances by implementing a detailed

8    process," and then it has three bullet

9    points:  "Ongoing assessment of selected

10   accounts."

11                 We talked about that, correct,

12   the assessment of accounts from the

13   Fee-For-Service data and other areas,

14   correct?

15       A.      That is correct.

16       Q.      "Support for authorized

17   distributors in implementing their own OMS

18   programs and efforts to know their

19   customers."

20                 You agree that was part of the

21   mission of the OMS program?

22                 MR. HOFFMAN:  Object to the

23           form.  Beyond the scope.

24                 THE WITNESS:  It appears to be

25           part of the mission.

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MS. CONROY:
 2          Q.    Do you agree with the sentence
 3     that's at the top of the PowerPoint, that
 4     "The mission of the Purdue OMS program was to
 5     ensure compliance with DEA regulations
 6     requiring manufacturers and distributors to
 7     monitor and report suspicious orders of
 8     controlled substances"?
 9              Do you agree with that?
10              MR. HOFFMAN:  Object to the
11          form.  Beyond the scope.
12              THE WITNESS:  I'm going to say
13          it again.  I don't recall seeing a
14          regulation by the DEA that -- a
15          regulation that mandated that the
16          manufacturers, all right, have to take
17          this next step.  All right?  I don't
18          recall it.
19     QUESTIONS BY MS. CONROY:
20          Q.    So if I got rid of the word
21     "manufacturers" -- the words "manufacturers
22     and" -- so if it just said "to ensure
23     compliance with DEA regulations requiring
24     distributors to monitor and report suspicious
25     orders of controlled substances," would you
```

1    agree with that?

2              MR. HOFFMAN:  Object to the

3         form.  Again, beyond the scope.

4              THE WITNESS:  It would be more

5         to my understanding.

6    QUESTIONS BY MS. CONROY:

7         Q.    And would you agree -- would it

8    be more to your understanding that that

9    was -- removing the word "manufacturers"

10   would also be more to your understanding of

11   the mission of the Purdue OMS program?

12             MR. HOFFMAN:  Object to the

13        form.  Beyond the scope.

14             THE WITNESS:  I think the

15        mission was to support, as we have

16        said repeatedly, I've said repeatedly,

17        to support the distributors here in

18        helping them monitor their customers.

19   QUESTIONS BY MS. CONROY:

20        Q.    Okay.  So you --

21        A.    This was an additional step by

22   Purdue, I mean, as far as I'm concerned.

23        Q.    Okay.

24        A.    And I think to really try to do

25   the right thing, to address any issues that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were there concerning prescription drug

 2    diversion and abuse.

 3         Q.     And to do the right thing by

 4    assisting distributors?

 5         A.     In identifying potentially

 6    suspicious or unusual purchasing patterns by

 7    pharmacies.

 8         Q.     What was -- I'm just not

 9    totally clear.  What was the extent of the

10    right thing that you're talking about, the

11    identification of the orders, or was it

12    something more?

13         A.     Well, the first step would be

14    helping identify those pharmacies whose

15    orders appear to be suspicious or unusual.

16                I will continue by saying, and

17    the right thing then would be, which is what

18    Purdue did, is that where appropriate, when

19    an investigation resulted in the committee

20    voting on a referral to the DEA of these

21    suspicious pharmacies, that that was also the

22    right thing to do.

23         Q.     To refer to the DEA?

24         A.     To refer to the DEA.

25         Q.     Okay.  But you don't recall, as
```

Highly Confidential - Subject to Further Confidentiality Review

1    you sit here, how many referrals to the DEA

2    of pharmacies occurred during the time that

3    you were on the order monitoring committee,

4    at least before the ethics department became

5    involved?

6                    MR. HOFFMAN:  Object to the

7            form.  Asked and answered and beyond

8            the scope.

9                    THE WITNESS:  That is correct.

10   QUESTIONS BY MS. CONROY:

11       Q.    I think the fourth slide is the

12   OMS team members, and would you be the --

13   which one is you?  VP corporate security?

14       A.    That is correct.

15       Q.    Okay.  And I believe we've gone

16   through -- Slide 5 is the OMS information

17   services, and I believe we have talked about

18   those this morning, the Fee-For-Service data,

19   the IMS data and analyses, the reports of

20   concern.

21                 Prescriber program information,

22   what do you believe that is?

23       A.    I actually don't know.

24       Q.    I think what we spoke about

25   earlier today was the top 200 prescriber

Highly Confidential - Subject to Further Confidentiality Review

```
 1    lists and then the region zero lists.
 2              Do you know of any other
 3    information sources with respect to
 4    prescribers that were utilized by the order
 5    monitoring system?
 6              MR. HOFFMAN:  So I don't know
 7         if he testified about the 200
 8         prescriber list, but I know he
 9         testified about region zero.
10              But go ahead.
11              THE WITNESS:  So I did not
12         testify or provide information stating
13         I had knowledge about any list, but
14         did say I was aware of the region zero
15         list.
16    QUESTIONS BY MS. CONROY:
17         Q.    Okay.  Do you know of any other
18    prescriber program information that would be
19    a source to the order monitoring committee
20    other than the region zero list that
21    concerned prescribers?
22         A.    No, I don't.
23         Q.    And just to be -- and you are
24    not familiar with the top prescribing list,
25    that's not a familiar term to you, or top 200
```

```
 1    prescribing list?

 2         A.      I am not.

 3         Q.      And I believe we talked about

 4    local law enforcement, state licensing board

 5    information, that type of thing.  That would

 6    be something Luis Bauza or maybe others would

 7    look into?

 8         A.      That is correct.

 9         Q.      Okay.  With respect to media

10    reports, do you know if there was a clipping

11    service or anything like that that would

12    track reports in the media about Purdue's

13    products or its customers?

14         A.      There was a, your term,

15    clipping service, that corporate

16    communications had that would have

17    information of -- you know, of interest to

18    some, and many times all, concerning our

19    products and other products in this -- in

20    this area.

21         Q.      Do you recall whether or not

22    that service ever became an information

23    source for the order monitoring committee?

24         A.      I don't recall it becoming a

25    source.  I believe the media reports here
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    would be us, meaning corporate security, when

2    we would do our background check review, look

3    at media reports concerning if there were

4    any, concerning individual pharmacies.

5            Q.    Those that -- you typically

6    pick those up --

7            A.    Right.

8            Q.    -- in your analysis?

9            A.    That's correct.

10           Q.    This Slide 7 talks about the

11   OMS process and it says, "Identification of

12   potential problematic outlets, 2009 to 2010."

13                 Do you see that?

14           A.    Yes.

15           Q.    And then it talks about the

16   Fee-For-Service data outliers.  It talks

17   about some of the ways that the data would be

18   analyzed, which are the bullet points, and

19   then it says in yellow at the bottom, "Based

20   on algorithm, 500 to 600 outlets met the

21   criteria."

22                 Do you see that?

23           A.    Yes.

24           Q.    Do you have an understanding of

25   what that means to you as a member of the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    order monitoring committee?

 2         A.    To me, this would have meant

 3    that out of the -- all of the outlets in this

 4    case, the pharmacies that we were looking at

 5    or the committee was looking at or that team

 6    was looking at, 5 or 600 showed some

 7    significant increases or changes in their

 8    buying patterns that would be kicked out by

 9    the algorithm looking at purchases in this

10    case of -- on a month-to-month or

11    three-month-to-three-month or

12    six-month-to-six-month comparison.

13              So it certainly would be a

14    starting point for further inquiry.

15         Q.    Okay.  And I think you told me

16    earlier you didn't utilize the OMS database,

17    but do you know one way or the other whether

18    those 500 or 600 outlets would be identified

19    on a database as kind of showing increases or

20    changes or, in your words, kicked out by the

21    algorithm?

22              Do you know if they'd show up

23    anywhere on a database?

24              MR. HOFFMAN:  Object to the

25         form.

```
 1                   THE WITNESS:  I apologize, I
 2         don't understand the question.
 3                   This came from the FFS data, so
 4         I don't understand your question.
 5    QUESTIONS BY MS. CONROY:
 6         Q.    Okay.  It comes from the
 7    Fee-For-Service data.
 8         A.    Yes.
 9         Q.    500 to 600 are identified as
10    having some indicia of suspicion --
11         A.    Right.
12         Q.    -- correct?
13         A.    Yes.
14         Q.    Do you know whether -- do you
15    know if there's an order monitoring database?
16    Do you know if that exists, apart from fee --
17    the Fee-For-Service database?
18         A.    I don't know that an order
19    monitoring database actually exists the way
20    you're describing it.
21         Q.    Okay.  And so do you know
22    whether or not there was any computerized or
23    electronic list or identification or
24    something of those 500 to 600 outlets that
25    could be reviewed by members of the order
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      monitoring committee or by someone else at

 2      Purdue?

 3              A.      I don't know.  I don't know.

 4              Q.      Do you know one way or the

 5      other whether -- we see here that it says

 6      there were 500 to 600 outlets that met the

 7      criteria.  Do you know if there's a list of

 8      those outlets anywhere, or was there ever a

 9      list of those outlets?

10              A.      I don't know.

11                      MR. HOFFMAN:  Object to the

12              form.  I'm sorry, object to the form.

13                      Go ahead.

14                      THE WITNESS:  I'm sorry, I

15              don't know.

16      QUESTIONS BY MS. CONROY:

17              Q.      Okay.  Is it true that the best

18      you can say is that if one of those 500 or

19      600 outlets were discussed at an order

20      monitoring committee or if you received

21      information in advance of an order monitoring

22      committee about one of those outlets, that's

23      the most you would know?

24                      MR. HOFFMAN:  Object to the

25              form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  What we would

 2         know and I would know would be the

 3         report that was furnished to us, quite

 4         often in advance, that would include

 5         this information, as you're saying,

 6         possibly identifying a pharmacy that

 7         met the criteria.

 8              And depending on the timing of

 9         the issuance of that report and it

10         meeting this criteria, there may or

11         may not have been other investigative

12         work done that would have augmented

13         this in one shape, matter or form.

14    QUESTIONS BY MS. CONROY:

15         Q.    What I'm getting at is that you

16    would receive a packet of information, and

17    that packet may be added to, I understand

18    that, not with respect to 500 or 600 outlets

19    but a discrete number of outlets, to discuss

20    at the order monitoring committee meeting?

21         A.    I have no recollection of ever

22    receiving a list or a report reflecting 5 to

23    600 outlets listed at one time.  I don't

24    recall that.

25         Q.    Okay.  And I know you told me
```

Highly Confidential - Subject to Further Confidentiality Review

1    earlier you didn't recall how many outlets

2    might be discussed at an order monitoring

3    committee, but I think it's fair to say they

4    didn't go for more than a day.  So it didn't

5    dis -- you didn't discuss 500 outlets at a

6    meeting, correct?

7         A.    Not to my recollection.

8         Q.    Would it be -- can you give me

9    a range?  Would it be from 5 to 20 or --

10        A.    That wouldn't be fair, because

11   I don't recall what it would be.  It could

12   vary.

13        Q.    Okay.  Do you know if the OMS

14   committee would have reviewed all 500 to 600

15   outlets that met the criteria, or was there

16   some other selection process that would then

17   funnel certain of those outlets to the

18   committee for discussion?

19        A.    So I don't know if the OMS

20   committee and those conducting the inquiry

21   before the meeting looked at 5 to 600 of the

22   outlets.

23             I assume that there was work

24   done afterwards using other data points that

25   I've referenced before to see if there were

Highly Confidential - Subject to Further Confidentiality Review

```
 1    other indications or indicators that would

 2    reflect unusual activity or required further

 3    investigation.

 4         Q.    So outside of the order

 5    monitoring -- the formal order monitoring

 6    committee --

 7         A.    Right.

 8         Q.    -- there was some winnowing

 9    down of the outlets that met the algorithm or

10    met the criteria?

11              MR. HOFFMAN:  Object to the

12         form.

13              THE WITNESS:  I didn't say

14         that.  I said there could be.

15              You asked me did I know about

16         or at a meeting where 500 and 600 -- 5

17         to 600 outlets presented at a meeting

18         by the order monitoring team, and I

19         said I don't recall that.

20    QUESTIONS BY MS. CONROY:

21         Q.    And then you talked to me about

22    how people would have -- there would have

23    been individuals would have looked at

24    additional information to try to get more

25    information about those, I'll call them,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     suspicious outlets?

 2          A.      Uh-huh.

 3                  MR. HOFFMAN:  You have to say

 4          yes or no.

 5     QUESTIONS BY MS. CONROY:

 6          Q.      Do you know if that was done as

 7     a part of the order monitoring committee or

 8     outside of the committee to then bring the

 9     outlets that were to be discussed at the

10     committee?

11                  MR. HOFFMAN:  Object to the

12          form.

13                  THE WITNESS:  I believe the

14          work was done by committee members

15          looking at criteria such as this and

16          then conducting further inquiry to

17          determine if all 500 or 600 were

18          suspicious or if there is a -- if

19          there's other information that would

20          reduce that amount.

21                  But I have no recollection that

22          there were 5 to 600 presented to us at

23          any particular given time.

24     QUESTIONS BY MS. CONROY:

25          Q.      Okay.  Let me ask it this way:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      The order monitoring committee as a body

 2      would not be reducing -- based on your

 3      testimony would not be reducing the 500 to

 4      600 outlets.  Order monitoring committee

 5      members may do that, but the committee as a

 6      whole would be addressing some number that

 7      had been reduced from the outlets that

 8      initially met the criteria?

 9                  MR. HOFFMAN:  Object to form.

10                  THE WITNESS:  The committee

11            would be reviewing the work of that --

12            of the group itself, the team members

13            that were conducting the inquiry.

14                  Whether the committee received

15            a reduced number or not, I don't

16            recall, but I do not recall any

17            particular meeting where we discussed

18            5 to 600 outlets.

19      QUESTIONS BY MS. CONROY:

20            Q.    As a committee member, would

21      you have known one way or the other whether

22      there were an addition -- an additional ten

23      pharmacies that you never heard about that

24      may, in fact, have met the criteria?

25                  MR. HOFFMAN:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. CONROY:

 2         Q.    Could that occur?

 3              MR. HOFFMAN:  Calls for

 4         speculation.

 5              THE WITNESS:  Yeah, I can't

 6         speculate on that, but I don't recall

 7         us not being -- anything being -- not

 8         being brought to our attention that

 9         the committee -- not the committee,

10         but the people conducting the inquiry

11         had looked at where they were looking

12         for us to either vote on or to ask us

13         to conduct more investigative work.

14    QUESTIONS BY MS. CONROY:

15         Q.    I understand that, and what I'm

16    trying to get at is I hear you saying there

17    were some members of the committee that

18    would, in your words, potentially winnow down

19    the list of -- or the pharmacies that met the

20    criteria, and then that winnowed-down group

21    of pharmacies would be presented to the

22    committee as a whole; is that correct?

23         A.    I said potentially winnowed

24    down, and, yes, that information would be

25    presented to the committee as a whole.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      And so when it was presented to

 2     the committee as a whole, the committee as a

 3     whole would not be aware of what pharmacies

 4     didn't make the cut to be presented to the

 5     committee?

 6                      MR. HOFFMAN:  Object to form.

 7                      THE WITNESS:  Yeah, I don't

 8            recall.  I don't recall how -- if

 9            there was discussion that was had that

10            discussed that we had 500 and we're

11            down to 200.

12     QUESTIONS BY MS. CONROY:

13              Q.      You don't recall --

14              A.      No, I don't.

15              Q.      -- that?

16                      On Slide Number 12, there

17     were -- there's a discussion of order

18     monitoring meetings that were held with

19     authorized distributors and ongoing contacts,

20     and it says, "Between September 2008 and

21     March 2012, Purdue met in person with ten

22     separate wholesalers to discuss OMS programs

23     and procedures and opportunities for better

24     collaboration."

25                      Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      Yes.

2            Q.      Did you, if you recall,

3    participate in any of those in-person

4    meetings with the wholesalers?

5            A.      Yes.

6            Q.      And did you participate, if you

7    know, in all ten meetings?

8            A.      I did not.

9            Q.      Which meetings did you

10   participate in?

11           A.      I recall participating in one

12   meeting.

13           Q.      And who was that?

14           A.      With McKesson.

15           Q.      And why did you attend the

16   McKesson meeting?

17           A.      The McKesson meeting was

18   twofold:  One was to go with the order

19   monitoring team, the representatives from the

20   team; and the second part was I had other

21   business with the head of security, separate

22   and apart from OMS, since it is a major

23   distributor of ours.

24           Q.      And where was that meeting?

25           A.      That was in San Francisco.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is that the only occasion you

2    participated as an OMS committee member with

3    a meeting with one of Purdue's distributor

4    customers?

5    A.    I'd like to correct that.

6    I recall another meeting with a

7    distributor known as Kinray where the team

8    went to -- I believe they were in Queens,

9    Whitestone, Queens, at the time, and we had a

10   meeting there with their team, and I

11   accompanied them there.

12   Q.    And was that strictly an order

13   monitoring committee meeting?

14   A.    Yes.

15   Q.    And do you recall why you went

16   to the Kinray meeting?

17   A.    I don't recall why.

18   Q.    Do you recall anything about

19   that meeting?

20   A.    Nothing in particular.

21   Q.    And was Kinray an authorized

22   distributor for Purdue at the time of the

23   meeting?

24   A.    I believe so.

25   Q.    Do you know if they still are?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I don't think it exists as
 2   Kinray any longer.  I think they were
 3   acquired, and I don't recall who -- by whom.
 4          Q.     The slide on page 12, OMS
 5   reporting committee decision --
 6          A.     You mean Slide 13, right?
 7          Q.     I'm sorry, Slide 13.
 8                 And you see there's -- we've
 9   talked about this before -- the OMS committee
10   decision on each outlet reviewed "pending,"
11   which is there's no decision pending,
12   "complete-closed" and "complete-referred" and
13   "continue to monitor."
14                 Do you see those four different
15   categories?
16          A.     Yes.
17          Q.     Would each of those categories
18   be voted on by the committee?
19          A.     As I recall, yes.
20          Q.     And they would be voted on with
21   respect to the particular pharmacy outlets
22   that were being discussed at that committee
23   meeting?
24          A.     Yes.
25          Q.     And if there was a "continue to
```

1    monitor" vote with respect to a certain

2    pharmacy, in order for that pharmacy to come

3    up again, was there a running list of open

4    investigations that were always discussed at

5    the order monitoring committee, or would

6    it -- or was it something that would be

7    then -- a decision would be made when to

8    bring up that pharmacy again?

9              MR. HOFFMAN:  Object to the

10        form.

11             THE WITNESS:  As I recall,

12        the -- those pharmacies that were

13        pending, which is what you're trying

14        to right now, or continuing to

15        monitor --

16   QUESTIONS BY MS. CONROY:

17        Q.    Is that the same, pending --

18        A.    Well, "no decision pending

19   completion of requested follow-up, continue

20   to monitor suspicious," "warrant close

21   monitoring, not yet to refer," I think

22   there's a distinction there, but both of them

23   are requiring additional work.

24             And as we would have our

25   meeting, these would be the -- this would be

Highly Confidential - Subject to Further Confidentiality Review

1    quite often, I believe, if I recall

2    correctly, the first order of business.  I

3    don't know if they maintained a list of

4    action items from the prior meeting, but I do

5    recall that there was -- it was pretty well

6    done that we would -- this would be follow-up

7    here of pharmacies that we were still looking

8    at, that were still under inquiry.

9        Q.    And would that be typically, if

10   you know, Betsy or Giselle or Eric that would

11   kind of keep that action item list continuing

12   along?

13       A.    Yeah, it would -- to the best

14   of my knowledge, it would have been certainly

15   under Betsy and then Giselle.

16       Q.    Okay.  Now, if you look on

17   Slide 14, it says, "OMS Process:

18   Post-Reformulation."  And we talked about

19   this a bit, the reformulation of OxyContin.

20            And at the bottom of the side

21   it says, "Based on new algorithm, 100 to 200

22   outlets met the criteria."

23            Do you see that?

24       A.    Yes, I do.

25       Q.    Is it your memory that after

Highly Confidential - Subject to Further Confidentiality Review

1    the reformulation of OxyContin, the algorithm

2    identified fewer outlets?

3                MR. HOFFMAN:  Object to the

4         form.  Just as to time frame.  That's

5         my objection, is to time frame.

6    QUESTIONS BY MS. CONROY:

7         Q.    Well, let's take a look at

8    this.  This is the updated algorithm based on

9    the reformulation from 2010 to 2011.

10               Is that the time frame that you

11   recall the reformulation taking place?

12        A.    I recall specifically the

13   reformulation took place -- well, I should

14   say -- when you say "took place" -- was

15   launched, the reformulated product was

16   launched, I believe, in August of 2010.

17        Q.    And do you recall discussions

18   at the order monitoring committee about

19   updating the algorithm?

20        A.    I don't specifically recall

21   that now.

22        Q.    Is it your understanding that

23   the algorithm is what would be used to

24   identify suspicious pharmacies?

25               MR. HOFFMAN:  Object to the

```
 1            form.

 2       QUESTIONS BY MS. CONROY:

 3            Q.      From the Fee-For-Service data?

 4            A.      I've testified to that before,

 5       that, yes, Fee-For-Service data would be a

 6       very important part, certainly a first step,

 7       in identifying potentially suspicious

 8       pharmacies -- or buying patterns of

 9       pharmacies.

10            Q.      And it looks from this slide

11       that there was a new algorithm that was

12       created to apply to the Fee-For-Service data,

13       correct?

14            A.      That appears to be the case.

15            Q.      And would you agree that that

16       new algorithm identified what appeared to be

17       fewer pharmacies or outlets that met the

18       criteria of suspicious?

19            A.      Based on this presentation as I

20       see it now, that would appear to be the case.

21            Q.      Do you have any independent

22       memory of that?

23            A.      No, I don't.

24            Q.      Do you have a memory of there

25       being less of a problem with respect to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    suspicious pharmacies after the reformulation

 2    of OxyContin?

 3              MR. HOFFMAN:  Object to the

 4         form.

 5              THE WITNESS:  My recollection

 6         is based on not only the OMS data but

 7         also what we saw in our RX patrol

 8         system, which, as you probably know,

 9         tracked on a voluntary basis pharmacy

10         robberies and burglaries.

11    QUESTIONS BY MS. CONROY:

12         Q.    So after the reformulation, you

13    saw fewer robberies and burglaries of

14    pharmacies?

15         A.    That's not what I said.

16         Q.    Okay.  Tell me again then.

17         A.    Okay.  What we saw is there

18    would be pharmacy robberies and burglaries.

19    Those numbers, those absolute numbers, did

20    not necessarily decline, but what we did see,

21    as best we could capture this in a voluntary

22    system, that the asking for or taking of

23    OxyContin during those criminal events

24    appeared to be declining.

25         Q.    What would you -- what do you
```

Highly Confidential - Subject to Further Confidentiality Review

1    believe the reason is that the number of

2    outlets that met the suspicious criteria

3    would reduce during this time after the

4    reformulation?

5                    MR. HOFFMAN:  Object to form.

6         Beyond the scope.

7                    THE WITNESS:  You're asking me

8         to speculate?

9    QUESTIONS BY MS. CONROY:

10        Q.     Well, you sat in the meetings;

11   do you know?

12                   MR. HOFFMAN:  Object to form.

13                   THE WITNESS:  As I mentioned

14        before, I don't recall specifically

15        this coming up.

16   QUESTIONS BY MS. CONROY:

17        Q.     And you don't recall any

18   discussion about why there needed to be a new

19   algorithm?

20        A.     I don't recall.

21        Q.     Or why the number of suspicious

22   pharmacies, at least the pharmacies that were

23   being reviewed, reduced?

24        A.     I don't recall that.

25        Q.     On Slide 15, in October of

Highly Confidential - Subject to Further Confidentiality Review

1    2011, 290 outlets were identified to the DEA.

2              Do you see that?

3         A.    Yes, I do.

4         Q.    And I think you told me earlier

5    you don't have any memory of that; is that

6    correct?

7         A.    No, I don't.

8         Q.    Have you ever heard the term

9    "slow pharmacies"?

10        A.    No, I have not.

11        Q.    Do you believe -- or do you

12   have any reason to doubt that the 290 outlets

13   identified to DEA would have been discussed

14   at an order monitoring committee meeting?

15             MR. HOFFMAN:  Object to the

16        form.

17             THE WITNESS:  I had -- to

18        answer your question, I have no reason

19        to doubt that that discussion may have

20        been had.

21   QUESTIONS BY MS. CONROY:

22        Q.    Would there have been a vote --

23   if there were 290 outlets that were referred

24   to DEA, I take it there must have been a vote

25   at the order monitoring committee with

Highly Confidential - Subject to Further Confidentiality Review

1    respect to those 290 outlets.

2              Is that correct?

3              MR. HOFFMAN:  Object to the

4         form.

5              THE WITNESS:  I don't --

6         looking at this presentation, I don't

7         know if this is referring to a

8         one-time referral or if that's a

9         recapitulation of referrals over a

10        number of years.  It's not clear to

11        me.

12   QUESTIONS BY MS. CONROY:

13        Q.    Would it make a difference if

14   it was a one-time referral versus over

15   several years?

16        A.    I can't think of a reason why

17   it would make a difference.

18        Q.    Okay.  There would be a vote

19   one way -- there would be a vote at the order

20   monitoring committee whether it was to refer,

21   you know, more than one pharmacy or just one

22   pharmacy, correct?

23        A.    Or there would have been a

24   number of votes over an extended period of

25   time that when you were to add that up would

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have equaled 290 outlets based on this

 2    presentation.

 3          Q.     And if those 290 outlets were

 4    referred to DEA at a time, whether separately

 5    or together, that you were sitting on the

 6    order monitoring committee, you would have

 7    voted on that?

 8          A.     To the best of my recollection,

 9    we would have voted on that.

10          Q.     Was it a majority vote,

11    generally?  Not just with respect to these

12    290.

13                 With respect to whether or not

14    to refer to DEA, was it a majority vote of

15    the committee?

16          A.     I recall that it would be a

17    majority vote.

18          Q.     And who kept the votes, or who

19    counted them?

20          A.     It would be a vocal vote in the

21    meeting.

22          Q.     And do you know if the minutes

23    would reflect the votes for the -- to either

24    refer or not refer?

25          A.     I believe that in some of the
```

Highly Confidential - Subject to Further Confidentiality Review

1  minutes, if not all, that it would reflect

2  that the committee voted to -- the committee

3  voted and approved the referral of a

4  particular pharmacy or pharmacies to the DEA.

5       Q.    Was there ever a vote taken at

6  the committee with respect to whether or not

7  a distributor should be contacted about a

8  suspicious pharmacy that it was a question

9  about whether to refer that pharmacy to DEA?

10            MR. HOFFMAN:  Object to the

11       form.

12            THE WITNESS:  I don't recall

13       any time voting whether we should make

14       contact with the distributor.

15  QUESTIONS BY MS. CONROY:

16       Q.    The next slide, 16, there's a

17  summary of the OMS program activity.

18            Have you ever seen any sort of

19  compilation of the order monitoring system

20  activity?

21       A.    I don't recall ever seeing this

22  or something like this.

23       Q.    Okay.  You did receive this

24  e-mail, however, correct?

25       A.    The document you produced to me

Highly Confidential - Subject to Further Confidentiality Review

```
 1    shows my name on it, so I'm assuming that I

 2    received this e-mail.

 3         Q.     Would it be your practice to

 4    review something received by Giselle in an

 5    e-mail in 2012?

 6         A.     That would be my practice.

 7              MR. HOFFMAN:  You said

 8         "received by Giselle."  You mean, I

 9         assume, sent by Giselle?

10              MS. CONROY:  Oh, I'm sorry,

11         sent by Giselle.  Sorry.

12    QUESTIONS BY MS. CONROY:

13         Q.     You see there's a breakdown by

14    state of the outlets that were -- it says

15    there were total of 365 outlets that were

16    either reviewed or referred from 2008 to

17    2011.

18              Do you see that?

19         A.     Yes, I do.

20         Q.     And then they're broken down by

21    state in the center of the slide.

22              Do you see that?

23         A.     Yes.

24         Q.     And had you ever seen any kind

25    of compilation or discussed any sort of
```

Highly Confidential - Subject to Further Confidentiality Review

1    compilation by state at the committee?

2         A.    I don't recall if I did.

3         Q.    Can you take a look at

4    Slide 19?

5         A.    Uh-huh.

6         Q.    It says, "Quantities matter:

7    Excessive orders must be evaluated."

8              Do you agree with that?

9              MR. HOFFMAN:  Object to the

10        form.

11             THE WITNESS:  I would agree

12        that excessive orders, which would

13        have to -- you'd have to determine if

14        it was excessive.  In this case, it

15        would be based on the algorithm.  Yes,

16        they must be evaluated.

17   QUESTIONS BY MS. CONROY:

18        Q.    Do you have any understanding

19   what the -- of the algorithm used to evaluate

20   whether or not an order is excessive?

21             Is that anything you ever had

22   anything to do with?

23        A.    I -- well, that's two

24   questions.  Do I understand, yes, I do

25   understand.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.

2      A.      Okay?

3              And as I mentioned before, to

4   the best of my recollection, it was based on

5   period-to-period analysis of purchases by

6   these pharmacies.

7      Q.      Do you know within -- well,

8   strike that.

9              Were you ever part of a

10   conversation with order monitoring committee

11   members or at the committee itself about what

12   kind of numbers would constitute an excessive

13   order?

14              MR. HOFFMAN:  Object to the

15        form.

16              THE WITNESS:  I don't recall

17        ever having that discussion.

18   QUESTIONS BY MS. CONROY:

19      Q.      You can put that exhibit away.

20              Are you familiar with the

21   entities ValuTrack or ValueCentric?

22      A.      I've heard the names.

23      Q.      If I suggested to you they had

24   something to do with the collection of

25   Fee-For-Service data, would that refresh your

Highly Confidential - Subject to Further Confidentiality Review

1    memory at all?

2         A.    It sounds reasonable.

3         Q.    What about the either software,

4    a database or an entity known as Vinyl?  Is

5    that familiar to you at all?

6         A.    Yes.

7         Q.    And what is that?

8         A.    As I recall, it's a software

9    that was used to capture information so --

10   for easier retrieval, whether it be reports

11   of concern -- and I'm not sure if

12   Fee-For-Service data was in there, but that's

13   what I recall.  It was a better way of

14   tracking information and being able to

15   retrieve that information.

16        Q.    Okay.  Is it still in effect?

17   Do you know?

18        A.    I don't know.

19        Q.    Can you put a time frame on it?

20              Would it have been at the time

21   that legal was responsible at the order

22   monitoring committee, or compliance?

23        A.    I don't recall.  I don't

24   recall.

25        Q.    Are you familiar at all with

1    scorecards that are kept by national accounts

2    with respect to particular -- with respect to

3    all of the authorized distributors?

4         A.    No.

5         Q.    You're not familiar with that

6    term "scorecards"?

7         A.    For distributors, no.

8         Q.    Okay.  Are you familiar with it

9    for pharmacies?

10        A.    No.

11        Q.    Have you heard of the entity

12   Edge Dynamics?

13        A.    No, I have not.

14        Q.    I know you hadn't seen the new

15   SOPs 17, 18 and 19.

16             Given that you were -- well,

17   actually, you're still on the order

18   monitoring committee.  Were you surprised

19   that they existed?

20             MR. HOFFMAN:  Object to the

21        form.

22             THE WITNESS:  It doesn't

23        surprise me.

24   QUESTIONS BY MS. CONROY:

25        Q.    Are you surprised that your

1    input was not sought for those three SOPs?

2         A.    No, I'm not surprised.

3         Q.    Why is that?

4         A.    This -- as I consider it, this

5    is a detail, an important detail, but really

6    did not require my input.

7         Q.    Do you know if anyone else on

8    the order monitoring committee, the one that

9    you served on, was asked for their input or

10   had -- do you know if they had anything to do

11   with the new SOPs?

12        A.    I have no knowledge of that.

13        Q.    Do you know if SOP 7.7 is still

14   in effect?

15        A.    I don't know.

16        Q.    Did you ever see any board

17   packages or have any discussions at the -- or

18   not board -- committee packages or have any

19   discussions at the order monitoring committee

20   about any CVS stores?

21        A.    I don't recall any discussions

22   about any particular chains, including CVS.

23        Q.    Do you know why there wouldn't

24   have been any discussion about chains?

25        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      MR. HOFFMAN:  Object to the

 2          form.

 3                      THE WITNESS:  No, I don't.

 4      QUESTIONS BY MS. CONROY:

 5          Q.     Do you know whether the

 6      individual data with respect to the actual

 7      chain pharmacy at a particular street address

 8      was available in the Fee-For-Service data?

 9          A.     I assume that it was.

10          Q.     Did it ever -- did it ever come

11      up as an issue that the chain pharmacies did

12      not appear in conversations at the order

13      monitoring committee?

14                      MR. HOFFMAN:  Object to the

15          form.

16                      THE WITNESS:  I don't recall.

17      QUESTIONS BY MS. CONROY:

18          Q.     But you do recall that -- you

19      don't recall there ever being a discussion

20      about one of the chain pharmacies at an order

21      monitoring committee meeting?

22          A.     I don't recall.

23          Q.     You don't --

24          A.     I don't recall a discussion

25      about a chain pharmacy at an OMS meeting.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.      Okay.  Thank you.

 2            Do you believe that Purdue had

 3    as much data as their authorized distributors

 4    with respect to the outlets or the

 5    pharmacies?

 6                MR. HOFFMAN:  Object to the

 7            form.

 8                THE WITNESS:  I can't judge

 9            that because I don't know what the

10            distributors actually had.

11    QUESTIONS BY MS. CONROY:

12            Q.      Was there anything that you

13    believed Purdue was missing with respect to

14    pharmacy data that it was receiving from the

15    distributors?

16                MR. HOFFMAN:  Object to the

17            form.  Calls for speculation.

18                THE WITNESS:  It never -- I

19            never thought of any particular

20            information that was not forthcoming

21            to us based on what we were requiring

22            from the distributors.

23    QUESTIONS BY MS. CONROY:

24            Q.      So you yourself never

25    identified any gaps or areas where you would
```

Highly Confidential - Subject to Further Confidentiality Review

 1   like more information?

 2         A.     More information from whom?

 3         Q.     From the -- from your customer,

 4   the distributor.

 5         A.     I don't recall that ever coming

 6   up or me thinking there was a gap.

 7         Q.     Right.

 8         A.     I don't recall that happening.

 9         Q.     Okay.  Would you agree that at

10   least as long as you were involved in the

11   order monitoring committee that Purdue has no

12   quantifiable trigger that identifies an order

13   as suspicious and would require a referral to

14   DEA?

15             MR. HOFFMAN:  Object to form.

16         Beyond the scope.

17             THE WITNESS:  Would you

18         rephrase the question, please?

19   QUESTIONS BY MS. CONROY:

20         Q.     Well, I'll tell you what, I'll

21   try or -- I'll reask it.

22             Do you know if Purdue has a

23   quantifiable trigger that would automatically

24   require Purdue to refer to the DEA a

25   suspicious customer?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. HOFFMAN:  Object to form.
2         Time frame and beyond the scope.
3              THE WITNESS:  I do not know if
4         we have an -- a quantifiable automatic
5         trigger, and there's none to the best
6         of my knowledge.
7    QUESTIONS BY MS. CONROY:
8         Q.    And so far as you know, the
9    order monitoring committee must be involved
10   in order to reach a determination to refer a
11   suspicious pharmacy or outlet to the DEA?
12             MR. HOFFMAN:  Object to form.
13             THE WITNESS:  Order monitoring
14        committee or system would be -- has to
15        be involved --
16   QUESTIONS BY MS. CONROY:
17        Q.    Right.
18        A.    -- for pharmacy referrals to
19   the DEA.
20        Q.    Or at least that's how you
21   understand it works.  There would be a
22   determination by the members of the order
23   monitoring committee to refer to DEA?
24        A.    That is correct.
25        Q.    Are you aware of any time
```

Highly Confidential - Subject to Further Confidentiality Review

1    restrictions based on ongoing investigations

2    of suspicious pharmacies or customers at

3    Purdue?

4              MR. HOFFMAN:  Object to the

5         form.

6              THE WITNESS:  I'm not aware of

7         any time restrictions.

8    QUESTIONS BY MS. CONROY:

9         Q.    So for as long as the order

10   monitoring committee decides to investigate a

11   pharmacy, there's no cutoff of that; they can

12   continue to investigate as long as they see

13   fit?

14        A.    I'm unaware of any time

15   restriction.

16        Q.    Is it true that if a

17   distributor's customer was deemed to be

18   suspicious, at least by triggering the

19   algorithm, that a distributor could just --

20   in a conversation with a member of the order

21   monitoring committee could justify that or

22   explain why such an order took place or

23   whatever to dispel the suspicion?

24              MR. HOFFMAN:  Object to form.

25              THE WITNESS:  It's my

Highly Confidential - Subject to Further Confidentiality Review

1          understanding that there -- in that

2          conversation, if it was had and when

3          it was had, that they could provide,

4          the distributor could provide,

5          justification or an explanation that

6          may explain the anomaly in the orders.

7               That information then would be

8          presented to the OMS team for

9          consideration.

10   QUESTIONS BY MS. CONROY:

11        Q.    Do you know if that information

12   needed to be in writing or could it be

13   relayed to one of the -- to the order

14   monitoring committee members and then

15   expressed at the committee meeting, or did it

16   need -- did that justification or explanation

17   need to be in writing from the distributor or

18   from the pharmacy?

19        A.    Yeah, I don't believe it needed

20   to be in writing.

21        Q.    Okay.  I don't know if you know

22   the answer to this, but let me ask it anyway.

23              With respect to any electronic

24   records with respect to the OMS work or lists

25   of suspicious pharmacies or whatever, do you

1    know if someone went in and searched that

2    database if those -- if logs of searches were

3    retained?

4         A.    I have no knowledge of that.

5         Q.    Okay.  And likewise, do you

6    know whether or not it was possible to

7    overwrite electronic notes in the OMS

8    database?  Do you know one way or the other?

9         A.    I don't know.

10        Q.    Do you know one way or the

11   other whether there is any centralized

12   repository for queries that were made into or

13   of the order monitoring database?

14             MR. HOFFMAN:  I'll just object

15        to form.  I think all of these are

16        beyond the scope.

17             But go ahead, if you know.

18             THE WITNESS:  I don't know.

19   QUESTIONS BY MS. CONROY:

20        Q.    Do you believe there's an

21   opioid crisis in this country?

22             MR. HOFFMAN:  Objection.

23        Beyond the scope.

24             THE WITNESS:  Yes, there is

25        an -- I do believe there's an opioid

1      crisis.

2      QUESTIONS BY MS. CONROY:

3           Q.    Do you believe that the order

4      monitoring committee and the role it played

5      was successful?

6                MR. HOFFMAN:  Object to form.

7                THE WITNESS:  I believe that

8           the order monitoring committee, that

9           the good work and the evolution of

10          that committee to do its job better

11          and better and more efficiently, was

12          successful to a certain extent.  It --

13          there were referrals to the DEA, and

14          we considered that a very positive

15          step and a good thing to do.

16               So there's a certain -- certain

17          measure of success there as far as I'm

18          concerned.

19     QUESTIONS BY MS. CONROY:

20          Q.    Okay.  And is that how you

21     measure the success of the order monitoring

22     committee, the referrals to DEA?

23               MR. HOFFMAN:  Object to form.

24          Beyond the scope.

25               THE WITNESS:  I could see that

1          as being a measure of success.

2     QUESTIONS BY MS. CONROY:

3          Q.     Any other measures that you can

4     see?

5               MR. HOFFMAN:  Same objection.

6               THE WITNESS:  I would say over

7          time that the measure of success is

8          how we -- how the committee became

9          more sophisticated, developed and was

10         continuously improving itself.

11    QUESTIONS BY MS. CONROY:

12         Q.     Would you agree that the one

13    reason for the opioid crisis is oversupply of

14    opioids in the United States?

15              MR. HOFFMAN:  Object to form.

16         Beyond the scope.

17              THE WITNESS:  I believe that

18         the opioid crisis -- very complicated,

19         many, many factors there, so -- and I

20         never -- I haven't studied it to say

21         what are those specific factors and if

22         that would be -- went into play.

23    QUESTIONS BY MS. CONROY:

24         Q.     So you don't know if oversupply

25    would be one factor?

```
 1            A.      I can't comment on that.

 2            Q.      Was the order monitoring

 3    committee set up in part to determine whether

 4    or not there was oversupply to a particular

 5    customer?

 6                    MR. HOFFMAN:  Object to the

 7            form.

 8                    THE WITNESS:  I was not with

 9            the company when they set up the order

10            monitoring system.

11    QUESTIONS BY MS. CONROY:

12            Q.      Did you ever understand

13    oversupply to a particular customer to be

14    potentially a suspicious -- an indication of

15    suspicion?

16                    MR. HOFFMAN:  Object to form.

17                    THE WITNESS:  I do recall in

18            one instance, and I forget the name of

19            the distributor, but it was tied to a

20            pharmacy in Las Vegas, and I do recall

21            that there was discussion about not

22            about oversupply but overpurchasing by

23            this particular wholesaler, and it

24            appeared that a lot of the product was

25            going to one particular pharmacy.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. CONROY:

 2         Q.    So overpurchasing by a

 3    distributor that was then ultimately supplied

 4    to an individual pharmacy, would you call

 5    that oversupply?

 6         A.    I would call it a suspicious

 7    order.

 8         Q.    Suspicious because of its size?

 9         A.    Because of its size.

10         Q.    Did the order monitoring

11    committee ever stop any shipments of opioids?

12         A.    I believe that there were

13    certain instances where not the order

14    monitoring team -- committee, but individuals

15    or an individual that is a member of the

16    team, based on a lot of this information,

17    would at times produce orders to certain

18    wholesalers.

19         Q.    Did you ever, as an order

20    monitoring committee member, reduce an order

21    to a wholesaler?

22         A.    No, I did not, because I did

23    not have the authority to do so.

24         Q.    Who did have the authority to

25    do that?
```

```
 1          A.    I -- as I recall, it was done
 2   by Stephen Seid.
 3          Q.    Okay.  And do you believe
 4   Stephen Seid, as a member of the order
 5   monitoring committee, reduced certain orders
 6   to wholesalers?
 7          A.    I recall him doing it -- I
 8   recall there were instances where, in fact,
 9   he had done that.
10          Q.    Okay.  And do you recall why he
11   did that?
12          A.    Because the orders appeared to
13   be suspicious.
14          Q.    Suspicious because of size?
15                MR. HOFFMAN:  Object to the
16          form.
17                THE WITNESS:  Because either of
18          size or because it became -- based on
19          the algorithm, it looked unusual.
20   QUESTIONS BY MS. CONROY:
21          Q.    And he had the authority to do
22   that on his own.  That was not something that
23   the order monitoring committee would vote on?
24          A.    I believe that he -- I don't
25   believe it was the vote of the order
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    monitoring committee, but Steve Seid, whether

 2    he did on it on his own or had to receive

 3    approval from his management, is something

 4    I'm unaware of.

 5         Q.    But that was outside of -- as

 6    far as you know, the order monitoring

 7    committee never stopped any shipments of

 8    opioids?

 9              MR. HOFFMAN:  Object to the

10         form.

11              THE WITNESS:  The order

12         monitoring committee was a monitoring

13         committee, not responsible, or

14         directly responsible, for the movement

15         of product.

16              MS. CONROY:  I think that's all

17         I have.  Thank you.

18              THE WITNESS:  Thank you.

19              MR. LAFATA:  Let's go off the

20         record.

21              VIDEOGRAPHER:  Okay.  The time

22         is 2:12 p.m.  Off the record.

23          (Off the record at 2:12 p.m.)

24              VIDEOGRAPHER:  The time is

25         2:31.  Back on the record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 CROSS-EXAMINATION

 2   QUESTIONS BY MR. HOFFMAN:

 3         Q.     Mr. Geraci, good afternoon.

 4                Again, for the record, my name

 5   is Nathan Hoffman.  I represent Purdue, and

 6   now it's my chance to ask you a few

 7   questions.

 8                Okay?

 9         A.     Okay.

10         Q.     I promise to be brief.  Thank

11   you for your patience.

12                I'd like to go to Exhibit 9, if

13   you have that in front of you.  Just ask you

14   a couple of clarifying questions.

15                And specifically, I'd like for

16   you to turn to Slide Number 5, please.

17         A.     (Witness complies.)

18         Q.     Slide Number 5 is entitled,

19   "OMS Information Sources."  And you will see

20   that the fourth bullet point in the slide

21   describes a prescriber -- it says,

22   "Prescriber program information."

23                Do you see that?

24         A.     Yes, I do.

25         Q.     And you were asked some
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    questions about that earlier, and I just want
 2    to clarify for the record.
 3                What was the prescriber program
 4    at Purdue?
 5                MS. CONROY:  Objection.
 6                THE WITNESS:  In looking at
 7         this, I'm assuming that this is
 8         referring to the ADD program.  I don't
 9         recall ever hearing it described as a
10         prescriber program -- prescriber
11         program information.
12    QUESTIONS BY MR. HOFFMAN:
13         Q.    But as far as any distinction
14    between, for example, order monitoring, the
15    order monitoring system and a prescriber
16    program, is the only prescriber program that
17    you're aware of at Purdue, would that be the
18    ADD program?
19                MS. CONROY:  Objection.
20                THE WITNESS:  That would be
21         correct.
22    QUESTIONS BY MR. HOFFMAN:
23         Q.    Okay.  And you had some
24    discussion about that earlier.
25                Is it true that the ADD program
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     was abuse, diversion and detection program?
 2          A.     Yes.
 3          Q.     And which department or
 4     departments were involved in the ADD program,
 5     if you know?
 6          A.     Legal department.
 7          Q.     So would that be a separate
 8     group analyzing that information as compared
 9     to the OMS committee?
10          A.     That is correct.
11          Q.     Okay.  And then on the second
12     page -- excuse me, not the second page, the
13     next page, which is Slide 6, there is a title
14     at the top of the slide.  It says,
15     "Prescriber versus Dispenser."
16                 Do you see that?
17          A.     Yes, I do.
18          Q.     And does this slide, in fact,
19     make a distinction between the prescriber
20     program on the one hand and the OMS program
21     on the other?
22                 MS. CONROY:  Objection.
23                 THE WITNESS:  Yes, it does.
24     QUESTIONS BY MR. HOFFMAN:
25          Q.     And were you involved at all
```

Highly Confidential - Subject to Further Confidentiality Review

1    directly in the ADD program versus your role

2    in sitting on the OMS committee?

3         A.    I was not directly involved in

4    the ADD program.

5         Q.    You were asked some questions

6    by Ms. Conroy, I believe, to the effect of

7    whether or not the OMS committee had the

8    authority to stop or halt or change the

9    orders that were being sent out to the

10   wholesalers and distributors.

11              Do you recall that?

12        A.    Yes, I do.

13        Q.    Do you recall whether, in fact,

14   the OMS committee at times provided guidance

15   or input to committee members on the halting,

16   changing or the volume of orders that were

17   actually shipped to wholesalers and

18   distributors?

19              MS. CONROY:  Objection.

20              THE WITNESS:  I don't -- I

21         don't recall specifically, but it's

22         reasonable that the committee would

23         have provided guidance or

24         recommendations to certain committee

25         members concerning the distribution of

1          product to the distributors.

2    QUESTIONS BY MR. HOFFMAN:

3          Q.    And would that be generally in

4    the custom and practice of the committee to

5    provide that type of guidance to its members?

6              MS. CONROY:  Objection.

7              THE WITNESS:  When appropriate.

8    QUESTIONS BY MR. HOFFMAN:

9          Q.    And I believe you mentioned

10   Mr. Seid earlier.

11             Is that who typically would be

12   involved in those discussions?

13         A.    He would be in those

14   discussions and would in these -- in this

15   instance would have been the recipient of

16   that guidance and/or recommendation from the

17   committee.

18             MR. HOFFMAN:  Okay.  Thank you.

19         I believe those are all the questions

20         we have at this time.

21             MS. CONROY:  I have a couple of

22         follow-ups.

23             MR. HOFFMAN:  Let me mark that

24         real quick for the record, just before

25         you come back over here.  I forgot to

Highly Confidential - Subject to Further Confidentiality Review

```
 1        do this.
 2             Just for the record, I'd like
 3        to mark as Exhibit 10 -- it's just our
 4        objection to the notice of deposition
 5        regarding the scope of the notice we
 6        received from plaintiff's counsel.  I
 7        simply want to mark it for the record.
 8        I'm not going to ask any questions
 9        about it.
10             (Purdue-Geraci Exhibit 10
11        marked for identification.)
12             REDIRECT EXAMINATION
13   QUESTIONS BY MS. CONROY:
14        Q.    Mr. Geraci -- I'll wait until
15   he get done.  Sorry.
16             With respect to the ADD
17   program, you said that the legal department
18   would be the separate group that would
19   analyze that information developed from the
20   ADD program as opposed to the order
21   monitoring committee?
22        A.    Yes.
23        Q.    But isn't it true that the
24   order monitoring committee did have access to
25   whatever analysis was done by the legal
```

1    committee of the ADD information?

2        A.    I believe I testified to that

3    already and said yes.

4        Q.    Okay.  So even though the

5    analysis was done by the legal department,

6    the order monitoring committee would be able

7    to utilize that abuse, diversion -- abuse,

8    detection and diversion information in its

9    analysis of suspicious pharmacies?

10       A.    Yes, it could.

11       Q.    Your answers with respect to

12   the questions about whether or not it would

13   be -- whether or not you would have

14   conversations among committee members with

15   respect to the halting of product, do you

16   recall that?

17              The question was:  Do you

18   recall whether, in fact, the OMS committee at

19   times provided guidance or input to committee

20   members on the halting, changing or the

21   volume of orders that were actually shipped

22   to wholesalers and distributors?

23              And you said you didn't recall

24   specifically, but it was reasonable that the

25   committee would have provided guidance or

Highly Confidential - Subject to Further Confidentiality Review

1    recommendations to certain committee members

2    concerning the distribution of product.

3                 Do you recall that?

4         A.    Yes.

5         Q.    Do you have a memory of

6    providing guidance, or are you testifying

7    that it would have been reasonable for you to

8    do that but you don't know if it ever

9    happened?

10                MR. HOFFMAN:  Object to the

11            form.

12                THE WITNESS:  I believe I also

13            testified that I did recall an

14            instance, one particular wholesaler,

15            that had come to the attention of the

16            committee and had been -- and that

17            there was guidance provided, I believe

18            it was guidance provided, or sales

19            operations, Steve Seid, cut back

20            orders to that particular wholesaler.

21            I believe I did testify to that, in

22            fact.

23    QUESTIONS BY MS. CONROY:

24         Q.    Okay.  So that was a particular

25    incidence when Stephen Seid came to the

```
 1    committee and talked to you about a

 2    particular order from a distributor, a

 3    particular size order?

 4         A.    What I stated was I don't

 5    recall how it came about, whether Steve Seid

 6    brought it to the committee's attention, or

 7    if this particular wholesaler and, of course,

 8    by extension, the pharmacy or pharmacies

 9    connected to it, had been under scrutiny by

10    the OMS committee.  I don't recall that.

11              But I do recall that there was

12    an instance where orders to a particular

13    wholesaler were, in fact, cut back.

14         Q.    Do you have any particular --

15    do you have any memory at all of discussing

16    with committee members specific size orders

17    that should be suspicious or a particular

18    frequency of orders that should be suspicious

19    or a particular pattern that should be

20    suspicious?

21              MR. HOFFMAN:  Object to the

22         form.

23              THE WITNESS:  I don't recall

24         having that specific discussion.

25
```

```
 1    QUESTIONS BY MS. CONROY:

 2         Q.     Okay.  What you do recall is

 3    when an actual order was described to you, as

 4    a committee member, that you commented on

 5    that particular order.  And it was your

 6    recommendation, or at least the committee's

 7    recommendation, to Mr. Seid that that -- that

 8    order should not be shipped?

 9         A.     What I -- what I believe I

10    stated just before was I don't recall the

11    sequence of how it came to the committee's

12    attention, what came first, but I do recall

13    an instance where orders were cut back to a

14    particular wholesaler.

15         Q.     So if you don't recall the

16    sequence, then you might remember that the

17    committee decided a certain amount in an

18    order should not be shipped, and then it's

19    possible then that Mr. Seid said, "Oh, I have

20    one of those"?

21         A.     No, I don't recall it that way,

22    and I don't recall that it was a particular

23    size.

24              It was -- the one I'm referring

25    to that I recall was -- and again, I don't
```

1    recall the sequence as to how it came about

2    or came to the committee's attention, if it

3    was sales, operation or national account,

4    Mr. Seid seeing the pattern here, or if it

5    was activity, investigative activity, that

6    had been on -- under review by the OMS team.

7    I just don't recall what came first.

8              And then I do recall that there

9    was discussion and that there was a reduction

10   in our sale of our product to this particular

11   wholesaler.

12        Q.    Do you recall the wholesaler?

13        A.    If I recall correctly, I

14   believe it was called Value Drug.  I believe.

15        Q.    And that was a wholesaler?

16        A.    Yes.

17        Q.    Is that a wholesaler that was

18   part of the L.A. investigation?

19        A.    L.A. investigation by whom?

20        Q.    By the L.A. Times or -- there

21   was a very large investigation.  Jack Crowley

22   was quoted in the newspaper.

23              Do you remember that?

24        A.    I remember the L.A. Times

25   articles.  I don't recall specifically if

1    Valley Drug or whatever their name actually

2    is or was mentioned in those articles.  I

3    just don't recall it.

4        Q.    Okay.  But you believe the

5    wholesaler was Valley Drug?

6        A.    I believe so.

7        Q.    And is it your best memory that

8    the order to Valley Drug was reduced?

9        A.    To the best of my recollection,

10   a order, or it could be orders, were in fact

11   reduced.

12       Q.    And what you don't recall is

13   whether Valley Drug was already a subject of

14   review by the order monitoring committee when

15   this issue came up or whether someone brought

16   it to the attention of the order monitoring

17   committee?

18       A.    That is correct.

19       Q.    That's what you mean by

20   sequence; you don't know whether the

21   conversation started?

22       A.    As I've stated repeatedly, yes,

23   that is correct, I don't know what came

24   first.

25       Q.    Do you recall if there was a

Highly Confidential - Subject to Further Confidentiality Review

 1    discussion among the committee members as to

 2    what would constitute size, frequency or

 3    pattern that would require Mr. Seid to reduce

 4    the supply to Valley Drug?

 5                  MR. HOFFMAN:  Object to the

 6          form.

 7                  THE WITNESS:  I don't -- I

 8          don't recall those details.

 9    QUESTIONS BY MS. CONROY:

10          Q.    And that's the only instance

11    you recall?

12          A.    That's the only instance that I

13    recall.

14                  MS. CONROY:  For completeness,

15          let me mark the notice as well since

16          you put the objection in.

17                  We have a copy of the notice,

18          right?

19                  Do we?

20                  MS. HURD:  Oh, I don't know.

21          Yeah, it's here.  Sorry.

22                  MS. CONROY:  That will be

23          Exhibit 11.

24                  (Purdue-Geraci Exhibit 11

25          marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. CONROY:  And I don't have

 2         any further questions.  I just want to

 3         mark the exhibits.

 4              THE WITNESS:  Okay.  Thank you.

 5              MS. CONROY:  Thank you.

 6              VIDEOGRAPHER:  Should we go off

 7         the record?

 8              MR. HOFFMAN:  That's fine.

 9         Yeah, we can mark it off the record.

10              VIDEOGRAPHER:  Okay.  This

11         marks the end of today's deposition.

12         The time is 2:46 p.m.

13         (Deposition concluded at 2:46 p.m.)

14                   - - - - - - -

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATE
 2
 3              I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Mark Geraci was duly
     sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.
 7              I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
                I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
16
            _____
17          CARRIE A. CAMPBELL,
            NCRA Registered Diplomate Reporter
18          Certified Realtime Reporter
            Notary Public
19          Dated:  April 9, 2019
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8            After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13            It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4         I,_____, do

      hereby certify that I have read the foregoing

 5    pages and that the same is a correct

      transcription of the answers given by me to

 6    the questions therein propounded, except for

      the corrections or changes in form or

 7    substance, if any, noted in the attached

      Errata Sheet.

 8

 9

10

11

12    _____

      Mark Geraci              DATE

13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                    - - - - - - -

                          ERRATA

2                    - - - - - - -

3       PAGE    LINE    CHANGE/REASON

4       _____   _____   _____

5       _____   _____   _____

6       _____   _____   _____

7       _____   _____   _____

8       _____   _____   _____

9       _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25

Highly Confidential - Subject to Further Confidentiality Review

1                          - - - - - - -

                        LAWYER'S NOTES

2                          - - - - - - -

3        PAGE    LINE

4        _____   _____   _____

5        _____   _____   _____

6        _____   _____   _____

7        _____   _____   _____

8        _____   _____   _____

9        _____   _____   _____

10       _____   _____   _____

11       _____   _____   _____

12       _____   _____   _____

13       _____   _____   _____

14       _____   _____   _____

15       _____   _____   _____

16       _____   _____   _____

17       _____   _____   _____

18       _____   _____   _____

19       _____   _____   _____

20       _____   _____   _____

21       _____   _____   _____

22       _____   _____   _____

23       _____   _____   _____

24       _____   _____   _____

25