Page 1

1                IN THE UNITED STATES DISTRICT COURT
2                    NORTHERN DISTRICT OF OHIO
3                        EASTERN DIVISION
4

                   ~~~~~~~~~~~~~~~~~~~~~
5

6       IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
        OPIATE LITIGATION
7                                        Case No. 17-md-2804
8                                        Judge Dan Aaron
        This document relates to:       Polster
9

10      County of Cuyahoga v. Purdue
        Pharma L.P., et al.
11

        City of Cleveland, Ohio v. Purdue
12      Pharma L.P., et al.
13      The County of Summit, Ohio, et al.
        v. Purdue Pharma L.P., et al.
14

15      Case No. 1:18-OP-45132
16

                   ~~~~~~~~~~~~~~~~~~~~~
17

                   Videotaped deposition of
18                      BRAD GESSNER
19

                    December 3, 2018
20                      9:12 a.m.
21

22                      Taken at:
                 Brennan, Manna & Diamond
23                75 East Market Street
                     Akron, Ohio
24

25          Renee L. Pellegrino, RPR, CLR

Page 2

```
 1  APPEARANCES:
 2  On behalf of Summit County and City of Akron:
      Motley Rice
 3    KRISTEN M  HERMIZ, ESQ
      FREDERICK C  BAKER, ESQ
 4    28 Bridgeside Boulevard
      Mt  Pleasant, South Carolina  29464
 5    (843) 216-9343
      khermiz@motleyrice.com
 6    fbaker@motleyrice com
 7  On behalf of Walmart, Inc :
      Jones Day
 8    KRISTIN S M  MORRISON, ESQ
      North Point, 901 Lakeside Avenue
 9    Cleveland, Ohio  44114-1190
      (216) 586-3939
10    kmorrison@jonesday com
11  On behalf of Endo Pharmaceuticals, Inc , Endo
    Health Solutions, Inc , Par Pharmaceuticals,
12  Inc  and Par Pharmaceutical Companies, Inc :
      Baker & Hostetler
13    CAROLE S  RENDON, ESQ
      TERA N  COLEMAN, ESQ
14    127 Public Square
      Suite 2000
15    Cleveland, Ohio  44114-1214
      (216) 621-0200
16    crendon@bakerlaw.com
      tcoleman@bakerlaw.com
17
    On behalf of CVS of Indiana, LLC and CVS Rx
18  Services, LLC:
      Zuckerman Spaeder
19    DANIEL P  MOYLAN, ESQ
      100 East Pratt Street
20    Baltimore, Maryland  21202-1031
      (410) 332-1031
21    dmoylan@zuckerman com
22
            ~ ~ ~ ~ ~
23
24
25
```

Page 4

```
 1              TRANSCRIPT INDEX
 2
 3  APPEARANCES ......................................2
 4  INDEX OF EXHIBITS .............................5
 5  INDEX OF OBJECTIONS ...........................7
 6
 7  EXAMINATION OF BRAD GESSNER:
 8  BY MS. WOODS .................................14
 9  BY MS. RENDON ...............................325
10
11  AFTERNOON SESSION ...........................174
12
13  REPORTER'S CERTIFICATE .......................349
14
15  EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES, CONT'D:
 2  On behalf of McKesson Corporation:
      Covington & Burling LLP
 3    RAE WOODS, ESQ
      One CityCentre
 4    850 Tenth Street, NW
      Washington, D C  20001-4956
 5    (202) 662-2000
      rwoods@cov com
 6      - and -
      Covington & Burling LLP
 7    ASEEM P  PADUKONE, ESQ
      One Front Street
 8    San Francisco, California  94111-5356
      (415) 591-7059
 9    apadukone@cov com
10  On behalf of AmerisourceBergen:
      (Via Telephone and Veritext Virtual Stream)
11    Reed Smith
      NICHOLAS R  RODRIGUEZ, ESQ
12    Three Logan Square
      1717 Arch Street
13    Suite 3100
      Philadelphia, Pennsylvania  19103
14    (215) 851-8100
      nrodriguez@reedsmith com
15
    On behalf of Cardinal Health:
16    Porter Wright Morris & Arthur LLP
      JILL G  OKUN, ESQ
17    950 Main Avenue
      Suite 500
18    Cleveland, Ohio  44113
      (216) 443-9000
19    jokun@porterwright com
20  ALSO PRESENT:  Kurt Henschel, Videographer
21
            ~ ~ ~ ~ ~
22
23
24
25
```

Page 5

```
 1              INDEX OF EXHIBITS
 2
 3  Number        Description           Marked
 4
 5  Exhibit 1   County of Summit 2018 Operating  22
                Budget Beginning Bates Number
 6              SUMMIT_000008414
 7  Exhibit 2   County of Summit 2017 Operating  25
                Budget Beginning Bates Number
 8              SUMMIT_000007551
 9  Exhibit 3   County of Summit 2016 Operating  25
                Budget Beginning Bates Number
10              SUMMIT_000006663
11  Exhibit 4   Announcement Titled "The Heroin  38
                Epidemic" Beginning Bates Number
12              SUMMIT_001468949
13  Exhibit 5   Media Release Titled "Heroin     57
                Users Face Potentially Fatal
14              Ingredient" dated January 25,
                2006, Beginning Bates Number
15              SUMMIT_000350711
16  Exhibit 6   Ohio Department of Health News   68
                Release Titled "Illicit Fentanyl
17              Continues to Fuel Increase in
                Drug Overdose Deaths in Ohio"
18              dated August 25, 2016, Beginning
                Bates Number AKRON_000271913
19
    Exhibit 7   "Opiate Overdose Investigations  81
20              & Prosecutions" PowerPoint
                Presentation Slides dated June
21              20, 2018
22  Exhibit 8   Grant Application Beginning      98
                Bates Number SUMMIT_000064898
23
    Exhibit 9   Information Bulletin dated      171
24              January 2001, Bates Numbered
                SUMMIT_2051829
25
```

2 (Pages 2 - 5)

Page 6

INDEX OF EXHIBITS, CONT'D

1
2
3  Exhibit 10  2008 County of Summit Operating  266
        Budget Beginning Bates Number
4        SUMMIT_000015385
5  Exhibit 11  2012 County of Summit Operating  268
        Budget Beginning Bates Number
6        SUMMIT_000002922
7  Exhibit 12  One-Page Spreadsheet - Marked   278
        "Confidential - Subject to
8        Protective Order"
9  Exhibit 13  E-Mail from Brad Gessner to   289
        Margaret Scott, dated May 10,
10       2018, Beginning Bates Number
        SUMMIT_001468944
11
    Exhibit 14  8-22-18 Board Meeting Agenda  296
12       Beginning Bates Number
        SUMMIT_001468844
13
    Exhibit 15  Abbreviated Excel Spreadsheet  322
14
    Exhibit 16  E-Mail String Bates Numbered  328
15       SUMMIT_001506659
16  Exhibit 17  E-Mail String Bates Numbered  330
        SUMMIT_001468903
17
    Exhibit 18  E-Mail from Melanie Hart dated  337
18       July 16, 2018, with Attachment,
        Beginning Bates Number
19       SUMMIT_001011252
20
21
22
23
24
25

Page 8

INDEX OF OBJECTIONS, CONT'D

1
2
3  Objection          78
   Objection          82
4  Objection          85
   Objection          86
5  Objection          86
   Objection          87
6  Objection          87
   Objection          88
7  Objection          88
   Objection          89
8  Objection          94
   Objection          95
9  Objection          96
   Objection          97
10 Objection          97
   Objection         101
11 Objection         102
   Objection         105
12 Objection         106
   Objection         109
13 Objection         110
   Objection         116
14 Objection         117
   Objection         121
15 Objection         122
   Objection         123
16 Objection         124
   Objection         124
17 Objection         125
   Objection         128
18 Objection         129
   Objection         130
19 Objection         131
   Objection         131
20 Objection         132
   Objection         133
21 Objection         133
   Objection         135
22 Objection         136
   Objection         137
23 Objection         137
   Objection         138
24 Objection         138
   Objection         139
25 Objection         140

Page 7

INDEX OF OBJECTIONS

1
2
3  Objection          17
   Objection          17
4  Objection          18
   Objection          20
5  Objection          21
   Objection          22
6  Objection          24
   Objection          26
7  Objection          26
   Objection          28
8  Objection          28
   Objection          29
9  Objection          34
   Objection          34
10 Objection          35
   Objection          36
11 Objection          37
   Objection          38
12 Objection          40
   Objection          40
13 Objection          41
   Objection          41
14 Objection          41
   Objection          42
15 Objection          43
   Objection          47
16 Objection          47
   Objection          51
17 Objection          51
   Objection          55
18 Objection          56
   Objection          56
19 Objection          58
   Objection          59
20 Objection          61
   Objection          63
21 Objection          63
   Objection          64
22 Objection          65
   Objection          66
23 Objection          67
   Objection          67
24 Objection          68
   Objection          70
25 Objection          76

Page 9

INDEX OF OBJECTIONS, CONT'D

1
2
3  Objection         141
   Objection         148
4  Objection         148
   Objection         149
5  Objection         149
   Objection         149
6  Objection         151
   Objection         151
7  Objection         153
   Objection         154
8  Objection         157
   Objection         159
9  Objection         159
   Objection         160
10 Objection         160
   Objection         161
11 Objection         161
   Objection         163
12 Objection         164
   Objection         166
13 Objection         169
   Objection         171
14 Objection         172
   Objection         172
15 Objection         175
   Objection         176
16 Objection         176
   Objection         177
17 Objection         178
   Objection         180
18 Objection         181
   Objection         182
19 Objection         185
   Objection         185
20 Objection         186
   Objection         186
21 Objection         187
   Objection         190
22 Objection         191
   Objection         193
23 Objection         193
   Objection         194
24 Objection         195
   Objection         196
25 Objection         198

3 (Pages 6 - 9)

Page 10

INDEX OF OBJECTIONS, CONT'D

| | |
|---|---|
| Objection | 198 |
| Objection | 200 |
| Objection | 200 |
| Objection | 202 |
| Objection | 202 |
| Objection | 202 |
| Objection | 203 |
| Objection | 205 |
| Objection | 206 |
| Objection | 207 |
| Objection | 210 |
| Objection | 210 |
| Objection | 211 |
| Objection | 213 |
| Objection | 213 |
| Objection | 214 |
| Objection | 214 |
| Objection | 215 |
| Objection | 219 |
| Objection | 220 |
| Objection | 220 |
| Objection | 221 |
| Objection | 222 |
| Objection | 225 |
| Objection | 225 |
| Objection | 226 |
| Objection | 227 |
| Objection | 229 |
| Objection | 229 |
| Objection | 229 |
| Objection | 231 |
| Objection | 231 |
| Objection | 232 |
| Objection | 232 |
| Objection | 233 |
| Objection | 235 |
| Objection | 237 |
| Objection | 239 |
| Objection | 240 |
| Objection | 258 |
| Objection | 259 |
| Objection | 260 |
| Objection | 263 |
| Objection | 263 |
| Objection | 269 |

Page 11

INDEX OF OBJECTIONS, CONT'D

| | |
|---|---|
| Objection | 269 |
| Objection | 272 |
| Objection | 272 |
| Objection | 273 |
| Objection | 274 |
| Objection | 275 |
| Objection | 279 |
| Objection | 279 |
| Objection | 281 |
| Objection | 282 |
| Objection | 283 |
| Objection | 284 |
| Objection | 290 |
| Objection | 292 |
| Objection | 297 |
| Objection | 297 |
| Objection | 300 |
| Objection | 301 |
| Objection | 301 |
| Objection | 304 |
| Objection | 306 |
| Objection | 307 |
| Objection | 308 |
| Objection | 308 |
| Objection | 308 |
| Objection | 310 |
| Objection | 311 |
| Objection | 311 |
| Objection | 311 |
| Objection | 312 |
| Objection | 312 |
| Objection | 312 |
| Objection | 313 |
| Objection | 313 |
| Objection | 313 |
| Objection | 314 |
| Objection | 316 |
| Objection | 317 |
| Objection | 318 |
| Objection | 319 |
| Objection | 320 |
| Objection | 320 |
| Objection | 321 |
| Objection | 321 |
| Objection | 322 |

Page 12

INDEX OF OBJECTIONS, CONT'D

| | |
|---|---|
| Objection | 323 |
| Objection | 325 |
| Objection | 328 |
| Objection | 336 |
| Objection | 336 |
| Objection | 339 |
| Objection | 339 |
| Objection | 341 |
| Objection | 341 |
| Objection | 342 |
| Objection | 343 |

Page 13

1 　　　　THE VIDEOGRAPHER:  We're on the
2 record at 9:12.  Today's date is December 3,
3 2018.  We are here in the matter of the National
4 Prescription Opiate Litigation.  This deposition
5 is taking place in Akron, Ohio.
6 　　　　Would counsel please identify
7 themselves for the record?
8 　　　　MS. HERMIZ:  Kristen Hermiz with
9 Motley Rice, on behalf of the City of Akron, the
10 County of Summit, and the witness, Brad Gessner.
11 　　　　MR. BAKER:  Fred Baker with Motley
12 Rice, same.
13 　　　　MS. RENDON:  Carole Rendon, Baker
14 Hostetler, on behalf of the Endo Defendants.
15 　　　　MS. COLEMAN:  Tera Coleman, Baker
16 Hostetler, on behalf of the Endo Defendants.
17 　　　　MR. MOYLAN:  Daniel Moylan,
18 Zuckerman Spaeder, for CVS.
19 　　　　MS. MORRISON:  Kristin Morrison of
20 Jones Day representing Walmart.
21 　　　　MS. OKUN:  Jill Okun, Porter Wright,
22 on behalf of Cardinal Health.
23 　　　　MR. PADUKONE:  Aseem Padukone,
24 Covington & Burling, on behalf of McKesson.
25 　　　　MS. WOODS:  Rae Woods, Covington &

4 (Pages 10 - 13)

Page 14

1  Burling, on behalf of McKesson.
2         THE VIDEOGRAPHER:  Anyone on the
3  telephone?
4         MS. WOODS:  Is there anyone on the
5  telephone?
6      BRAD GESSNER, of lawful age, called for
7  examination, as provided by the Federal Rules
8  of Civil Procedure, being by me first duly sworn,
9  as hereinafter certified, deposed and said as
10 follows:
11        EXAMINATION OF BRAD GESSNER
12 BY MS. WOODS:
13    Q.   Good morning.
14    A.   Good morning.
15    Q.   As I mentioned before, I'm Rae Woods
16 from the law firm Covington & Burling and I
17 represent McKesson Corporation.
18        Could you please state your name for
19 the record?
20    A.   Brad Gessner.
21    Q.   How do you spell Gessner?
22    A.   G-e-s-s-n-e-r.
23    Q.   Where are you currently employed?
24    A.   Summit County Prosecutor's Office.
25    Q.   What's your job title?

Page 15

1     A.   I am chief counsel.
2     Q.   Have you ever testified in court
3  before?
4     A.   No.
5     Q.   Have you ever been deposed before?
6     A.   No.
7     Q.   Have you ever testified in any form,
8  like a city council meeting or a legislative
9  committee, for example?
10    A.   No.
11    Q.   Have you put witnesses on the stand
12 before?
13    A.   Yes, I have.
14    Q.   You understand you're testifying
15 under oath today?
16    A.   Yes.
17    Q.   I'm going to do my best to ask you
18 questions that are easy to understand, but if
19 you don't understand my question, you can ask me
20 to rephrase it, okay?
21    A.   Okay.
22    Q.   And if you do answer my question,
23 can I take that as a sign that you understood
24 it?
25    A.   Yes.

Page 16

1     Q.   How long have you worked for the
2  Summit County Prosecutor's Office?
3     A.   17 and a half years.
4     Q.   And what do your job
5  responsibilities involve?
6     A.   As chief counsel, I am immediately
7  under the elected county prosecutor, and I
8  supervise all aspects of the office.
9     Q.   Does that include the criminal
10 division?
11    A.   Yes, it does.
12    Q.   And does that include supervision of
13 drug-related crimes?
14    A.   Yes, it does.
15    Q.   During your career as a prosecutor,
16 have you ever known a time when the abuse of
17 drugs was not a problem in Summit County?
18    A.   During my time at Summit County, it
19 has been an abuse -- I mean, it has been a
20 problem.
21    Q.   So since 2001, during your time at
22 the office, you have known drugs, abuse of
23 drugs, to be a problem in Summit County; is that
24 correct?
25        MS. HERMIZ:  Objection to form.

Page 17

1     A.   Drugs in our society are always a
2  problem.
3     Q.   And during your career as a
4  prosecutor at Summit County, drug abuse has
5  always been a problem, correct?
6     A.   We've handled drug cases from my
7  first day working there until the present.
8     Q.   Thank you.
9         As you sit here today, what would
10 you say the most significant drug problem facing
11 Summit County is?
12        MS. HERMIZ:  Objection to form.
13    A.   Could you repeat that or rephrase
14 it?
15    Q.   As we sit here today, what is the
16 most significant drug problem facing the county?
17    A.   The access to drugs, individuals who
18 are addicted to drugs, the sale of drugs, the
19 cost of the drugs, the impact on the community,
20 treatment, incarceration, all of those.  I don't
21 know if you can single out any one of them.
22    Q.   What drug poses the most significant
23 problem?  What type of drug poses the most
24 significant problem to the county currently?
25        MS. HERMIZ:  Objection to form.

5 (Pages 14 - 17)

Page 18

1      A.    Currently, we have an epidemic
2  related to opiates, heroin, fentanyl,
3  carfentanil.  We also have cocaine issues.  We
4  also have issues with meth amphetamines.  We
5  have issues with marijuana.  All forms of drugs,
6  but the drug that is related to more deaths than
7  anything else would be the opiates.
8      Q.    When you say "opioid," what is your
9  definition of an opioid?
10     A.    Opioids are drugs that are from a
11 stem relating to that, heroin again,
12 prescription drugs also included into that.  As
13 far as a list of them, I do not have that.
14     Q.    But you understand opioids to
15 include prescription opioids, correct?
16     A.    Yes.
17     Q.    Do you understand it to include
18 heroin?
19     A.    Yes.
20     Q.    Do you understand opioids to include
21 fentanyl?
22     A.    Yes.
23     Q.    And carfentanil?
24     A.    Yes.
25     Q.    Are there other types of drugs that

Page 19

1  you understand to fall within the category
2  opioid?
3      A.    Yes.  I believe OxyContin,
4  oxycodone, other drugs along those lines.
5  Again, I don't have a list in front of me.
6      Q.    Are you familiar with a drug
7  synthetics opioid called U-47700?
8      A.    Not off the top of my head I'm not.
9      Q.    When we talk about opioids today, is
10 it your understanding that that would include
11 meth amphetamine?
12     A.    I don't know.  You would need to let
13 me know what you are speaking of.
14     Q.    Based on your experience, is meth
15 amphetamine considered an opioid?
16     A.    I don't consider it one.
17     Q.    What about cocaine?  Would you
18 consider cocaine an opioid?
19     A.    No.
20     Q.    And how about marijuana?  Is
21 marijuana an opioid?
22     A.    No.
23     Q.    What is the basis for your knowledge
24 about opioids?
25     A.    Prosecuting for the number of years

Page 20

1  that I have.
2      Q.    You previously stated that a number
3  of drugs currently pose a problem in Summit
4  County, including heroin, fentanyl, carfentanil,
5  meth, cocaine and marijuana.  Are there other
6  drugs that currently pose a significant problem
7  in the county?
8          MS. HERMIZ:  Object to the form.
9      A.    I'm sure there are other drugs.
10     Q.    What are they?
11     A.    Again, off the top of my head, I
12 don't have those, but if you look through the
13 cases we've indicted, each one of those
14 basically has a drug set out.  So I don't have
15 the case-by-case notation of the drugs.
16     Q.    If you had to rank the two most
17 significant type of drugs posing a problem for
18 the county, what would those two drugs be
19 currently?
20     A.    Currently, I think that we would
21 look at, again, opiate-related drugs, and meth
22 amphetamines.
23     Q.    And within the opioid-related drugs,
24 which specific drugs would you rank?
25     A.    I don't think I can rank one over

Page 21

1  the other at this point.
2      Q.    For how long have opioids posed a
3  significant problem to the county?
4      A.    I would think going back probably at
5  least ten years.  Probably more significantly in
6  the last five years would be when we've started
7  to see the number of deaths, again, wholesale
8  loss of life related to those drugs, which was
9  out of the ordinary from what we had been
10 dealing with up until then.
11     Q.    So going back ten years ago, roughly
12 2008, which drugs would you rank as the highest
13 problems for Summit County in 2008?
14         MS. HERMIZ:  Objection to form.
15     A.    I don't know that.
16     Q.    Were you working at the Summit
17 County Prosecutor's Office in 2008?
18     A.    Yes.
19     Q.    But you aren't aware of what drugs
20 caused the biggest problems in the county?
21     A.    I'm not unaware.  I can't rank them.
22 I can tell you, again, heroin, prescription
23 drugs along the lines there, cocaine, meth
24 amphetamines, all of those.  As far as ranking
25 them, I don't have that information.

6 (Pages 18 - 21)

Page 22

1    Q.    Mr. Gessner, are you involved in the
2  budget for your office?
3    A.    Yes, I am.
4    Q.    And what is the nature of your
5  involvement in the budget process?
6    A.    I review the budget.  We discuss
7  what our needs are.  We receive normally a
8  target of what -- from the county's budget
9  office on where they would expect us to be, and
10  we then look at, again, our manpower, look at
11  our needs, and we do proposals to them, and I
12  normally present the budget to county council.
13    Q.    Are you involved in determining the
14  office's priorities?
15          MS. HERMIZ:  Objection to form.
16    A.    I work with the county prosecutor in
17  determining the priorities for the office.
18          - - - - -
19          (Thereupon, Gessner Deposition
20          Exhibit 1, County of Summit 2018
21          Operating Budget Beginning Bates
22          Number SUMMIT_000008414, was marked
23          for purposes of identification.)
24          - - - - -
25    Q.    I'm handing you what's been marked

Page 23

1  as Exhibit 1.  Do you recognize this to be the
2  County of Summit's operating budget for the year
3  2018?
4    A.    I don't believe I've ever seen the
5  entire county's budget.  I've seen our office's
6  budget.
7    Q.    I should be more specific.  This is
8  an excerpt from the operating budget for the
9  prosecutor's office.  Have you seen this before?
10    A.    Let me look through it first.
11          MS. WOODS:  It's Bates number SUMMIT
12  8414.
13    Q.    I'm just going to be asking you
14  about page 322 of the document, which is Bates
15  SUMMIT 7872.  Actually, 324, Bates 8737.
16          I'd like to direct your attention to
17  page 324, the "Program Goals & Objectives"
18  section.  Number 2 states that your office's
19  criminal division goal and objective is to
20  "Focus on most serious offenses," and it lists
21  as examples homicides and sexual assaults,
22  correct?
23    A.    And etc.
24    Q.    Etc.  And it goes on to state,
25  "Continue to prosecute heroin/fentanyl dealers

Page 24

1  in order to try to get these drugs off the
2  street."
3          Did I read that correctly?
4    A.    Yes.
5    Q.    "Continue to collaborate with
6  community partners in seeking end to the
7  heroin/fentanyl epidemic and find ways to
8  eliminate deaths from these drugs."
9          Did I read that correctly?
10    A.    Yes, you did.
11    Q.    So according to the 2018 budget, one
12  of your -- the criminal division's chief
13  objectives is to focus specifically on heroin
14  and fentanyl, correct?
15          MS. HERMIZ:  Objection to form.
16    A.    Yes.
17    Q.    And the budget document refers to
18  the epidemic as "the heroin/fentanyl epidemic,"
19  correct?
20    A.    That is the language we used, yes.
21    Q.    And there's no mention in this
22  section about prescription opioids, right?
23    A.    In those words, no.
24    Q.    And there's no use of the broader
25  term, "opioids," correct?

Page 25

1    A.    That word is not used.
2          - - - - -
3          (Thereupon, Gessner Deposition
4          Exhibit 2, County of Summit 2017
5          Operating Budget Beginning Bates
6          Number SUMMIT_000007551, was marked
7          for purposes of identification.)
8          - - - - -
9          (Thereupon, Gessner Deposition
10          Exhibit 3, County of Summit 2016
11          Operating Budget Beginning Bates
12          Number SUMMIT_000006663, was marked
13          for purposes of identification.)
14          - - - - -
15    Q.    I'd like to hand you what has been
16  marked as Exhibit 3 and Exhibit 2.  Exhibit 2
17  begins SUMMIT 7551.  I'm going to turn your
18  attention to page 322 of that exhibit.  This is
19  the 2017 operating budget for the Summit County
20  Prosecutor, and page 322 lists again program
21  goals and objectives for the criminal division.
22          Do you see that?
23    A.    Yes, I do.
24    Q.    And, once again, the language under
25  program's goals and objectives is identical to

7 (Pages 22 - 25)

Page 26

1 the language that was used in that 2018 budget,
2 correct?
3        MS. HERMIZ:  Objection to form.
4    A.    The language in program goal number
5 2 is the same as in both documents.
6    Q.    Okay.  So, once again, in 2017 your
7 office referred to it as "the heroin/fentanyl
8 epidemic," correct?
9    A.    Yes.  And we also refer to drugs as
10 all different items.  Again, the heroin/fentanyl
11 epidemic did not stop us from prosecuting
12 carfentanil, did not stop us from prosecuting
13 other things.  So we, as prosecutors, at times
14 will name things that may be different than what
15 we're actually doing.
16    Q.    But looking to the actual language
17 used in your budget, you specifically focus your
18 attentions on "heroin/fentanyl dealers in order
19 to try to get these drugs off the street,"
20 correct?
21        MS. HERMIZ:  Objection to form.
22    A.    We specifically use the words
23 "heroin/fentanyl," but whether that was our
24 focus is different.
25    Q.    Okay.  And then, finally, I'm

Page 27

1 handing you what has been marked as Exhibit 3.
2 This is the Summit County Prosecutor budget for
3 2016.  I'm directing your attention to page 320.
4 Once again, we're going to look at that "Program
5 Goals & Objectives" section.
6        And in 2016 we don't see the same
7 language referring to heroin and fentanyl
8 issues, do we?
9    A.    No.  We still see the etc. on the
10 most serious offenses there, but we do not see
11 those specifically listed.
12    Q.    And you're referring to program
13 goals and objectives number 2, correct?
14    A.    Yes.
15    Q.    And it states, "Focus on the most
16 serious offenses, homicides, sexual assaults,
17 etc. to continue to obtain effective results."
18 Is that what it says?
19    A.    Yes.
20    Q.    So there's no specific mention of
21 any type of drug crime here, correct?
22    A.    No specific mention.
23    Q.    Are you aware that throughout the
24 history -- strike that.
25        Are you aware that throughout 2007

Page 28

1 up until 2016 your office did not identify as a
2 program goal and objective specifically any drug
3 crimes?
4    A.    I don't -- off the top of my head
5 without seeing those, I don't recall that.
6    Q.    Would you have any reason to suspect
7 otherwise?
8        MS. HERMIZ:  Objection to form.
9    A.    Again, I don't know.  I have not
10 reviewed those.
11    Q.    Mr. Gessner, tell us why the
12 prosecution of heroin and fentanyl dealers
13 became a priority, according to your budgets, in
14 2017.
15        MS. HERMIZ:  Objection to form.
16    A.    It has been a priority for some
17 time.  Again, based on the number of deaths
18 occurring, based on the number of overdoses
19 occurring, that became very critical for us to
20 do something beyond what -- again, center the
21 focus on that, where it had not been before.
22    Q.    So perhaps you didn't understand my
23 question, and let me rephrase it so it's clear.
24        Why did your office wait until 2017
25 to list a drug crime as one of its program goals

Page 29

1 and objectives in its budget?
2    A.    Again, if you look into each one of
3 those, there was -- there's etc.  Drugs have
4 always been a priority in our office, from the
5 first day I've been there until now.
6    Q.    Was there a particular reason your
7 office waited until 2017 to specifically raise
8 particular drugs in the goals and objectives
9 section of your budgets?
10        MS. HERMIZ:  Objection to form.
11    A.    It again -- the drugs are included
12 in the etc. in every one of those.
13    Q.    Apart from the drugs that you've
14 already mentioned, which other drugs have been a
15 problem in your county?
16    A.    All illegal drugs are a problem in
17 this county.
18    Q.    Have you had issues with bath salts?
19    A.    I've not.
20    Q.    How about ectasy?
21    A.    I have not.
22    Q.    Have you had issues with other
23 prescription drugs that are not opioids?
24    A.    I have not.
25    Q.    And when you say you have not,

Page 30

1 you're referring to yourself, not your office?
2    A.   Yes.
3    Q.   To your knowledge, has your office
4 had issues with other prescription drugs that
5 are not opioids?
6    A.   Yes.  We have prosecuted other
7 prescription drugs that are not opioids.
8    Q.   What type of drugs?
9    A.   Off the top of my head, I can't give
10 you the names of those drugs, but I can tell
11 you, in going through them, I know we've handled
12 those cases.
13    Q.   What other types of drugs has your
14 office prosecuted or investigated apart from the
15 ones we've already discussed?
16    A.   We've -- we've prosecuted -- and I
17 can recall one on birth control, illegal
18 dispensing of those.  So it's any type of drug
19 that is not legally obtained, we are going to
20 prosecute that.
21    Q.   Has your office investigated or
22 prosecuted steroids?
23    A.   I'm sure we have.
24    Q.   Has your office investigated or
25 prosecuted Xanax?

Page 31

1    A.   I'm sure we have.
2    Q.   Has your office investigated or
3 prosecuted weight loss medications, prescription
4 weight loss medications?
5    A.   We may have.
6    Q.   In 2001, when you first joined the
7 office, was the office investigating and
8 prosecuting heroin at that time?
9    A.   The office was not investigating.
10 We were prosecuting cases.  Law enforcement does
11 investigations and then they bring them to the
12 prosecutor.  We don't go out and investigate on
13 our own.
14    Q.   Okay.  Fair enough.
15        So when you joined the office, was
16 your office prosecuting heroin cases?
17    A.   If those cases were brought to us by
18 law enforcement, yes, we were.
19    Q.   And were such cases brought to your
20 office at the time you joined the office?
21    A.   In 2001, I cannot tell you that from
22 my memory.
23    Q.   Okay.  When you joined the office,
24 what was your position?
25    A.   I was a courtroom prosecutor.  I was

Page 32

1 a more -- more experienced in there.  I then
2 became a supervisor.
3    Q.   Okay.  And what types of crimes did
4 you prosecute when you first began at the
5 office?
6    A.   Any crime that was charged that was
7 a felony.
8    Q.   So did you prosecute some drug
9 crimes?
10    A.   Yes, I did.
11    Q.   Did you prosecute some homicide
12 crimes?
13    A.   Yes, I did.
14    Q.   Were you in a particular unit or
15 division of the office?
16    A.   Not when I initially came.
17    Q.   And when you became a supervisor,
18 what types of cases were you supervising?
19    A.   All cases.
20    Q.   Were you overseeing a particular
21 division or department?
22    A.   No; no.  The criminal -- the
23 supervisors are in the criminal division.  They
24 are basically covering the entire docket.
25    Q.   Did you ever use the Grand Jury to

Page 33

1 investigate crimes?
2    A.   I've presented before the Grand
3 Jury, but actually had the Grand Jury go out and
4 investigate on their own, no.
5    Q.   But you've issued Grand Jury
6 subpoenas to further investigations?
7    A.   We have issued subpoenas on cases
8 that we've received.  As far as the Grand Jury
9 conducting their own investigation, I don't
10 believe that's occurred.
11    Q.   When was the first time you
12 prosecuted a heroin case in the Summit County
13 Prosecutor's Office?
14    A.   I can't recall that.
15    Q.   Can you estimate?
16    A.   If I would have had a heroin case in
17 2001, I would have prosecuted it.
18    Q.   Do you believe you prosecuted any
19 heroin cases while you were a line prosecutor
20 before you became a supervisor?
21    A.   I may have.
22    Q.   You don't recall one way or the
23 other?
24    A.   I do not recall.
25    Q.   To your knowledge, was the Summit

9 (Pages 30 - 33)

Page 34

1 County Prosecutor's Office prosecuting heroin
2 cases in the 1990s?
3     MS. HERMIZ: Objection to form.
4     A. I was not in the office at the time.
5     Q. Do you have any knowledge as to
6 whether the office was prosecuting heroin in the
7 1990s?
8     A. I do not.
9     Q. You haven't had any conversations
10 with law enforcement or with colleagues about
11 that issue?
12     A. No, I have not.
13     Q. What types of heroin do you see in
14 the cases prosecuted by the Summit County's
15 Prosecutor's Office?
16     A. I don't normally break it down, but
17 at one point we had what was called black tar
18 heroin. Others, I don't have -- know any
19 particular names given to them.
20     Q. What's your understanding on where
21 the heroin comes from?
22     MS. HERMIZ: Objection to form.
23     A. I don't know where -- as far as
24 where it's manufactured or where it's created,
25 no, I don't have that information.

Page 35

1     Q. Do you have any understanding as to
2 which individuals or groups are the source of
3 the heroin that you've seen in Summit County?
4     MS. HERMIZ: Objection to form.
5     A. The individuals who are the sources
6 of heroin in Summit County are the dealers, and
7 we prosecute them when they are charged.
8     Q. How has the use of heroin in Summit
9 County changed over time?
10     A. What we've seen in our -- in our
11 office is that, historically, we were told that
12 heroin was a more significant problem. It was
13 replaced by cocaine, crack cocaine, that was
14 cheaper to produce. That was then replaced by
15 meth amphetamines, which, in Summit County, were
16 manufactured by individuals in their homes,
17 their garages. And heroin then became cheaper
18 and was replacement to the meth amphetamines.
19     Q. When did you see -- or approximately
20 what time period did you see heroin users shift
21 to crack and cocaine, as you just described?
22     A. I did not see that. When I began
23 prosecuting, cocaine was the main drug.
24     Q. And that was in 2001?
25     A. No. That would have been 1986,

Page 36

1 1987.
2     Q. Okay. So it's your understanding
3 that heroin was more prevalent before 1986,
4 before users switched from heroin to crack and
5 cocaine?
6     A. Yes.
7     Q. And for how long did users focus on
8 crack and cocaine before shifting to meth
9 amphetamine?
10     MS. HERMIZ: Objection to form.
11     A. I don't know the answer to that, but
12 I know that once laws were strengthened
13 regarding cocaine and crack cocaine, we saw drug
14 abusers and drug dealers shift to other drugs.
15     Q. Approximately when did that occur?
16     A. Probably the late '90s.
17     Q. From the late '90s to approximately
18 what time period did you see drug users focus on
19 meth amphetamine as opposed to crack and
20 cocaine?
21     A. In the early part of my time in the
22 Summit County Prosecutor's Office, when meth
23 amphetamine was strong, probably up till about
24 six, seven years ago.
25     Q. So around 2011?

Page 37

1     A. 2011, 2012.
2     Q. And is around 2011 to 2012 the time
3 period when you began to see drug users who had
4 previously used meth amphetamine opting instead
5 to begin using heroin?
6     MS. HERMIZ: Objection to form.
7     A. I do not know if the drug users who
8 were using meth amphetamines are the same drug
9 users who were using heroin.
10     Q. But around 2011 to 2012 you saw a
11 decrease in meth amphetamine and an increase in
12 heroin; is that correct?
13     A. It may be around that time.
14     Q. And you mentioned a reason for that
15 trend from meth amphetamine to heroin is because
16 of the price of heroin, correct?
17     A. That's what law enforcement and our
18 cases showed.
19     Q. What's your understanding about how
20 much heroin cost at that time between 2011 to
21 2012?
22     A. I have no idea on the cost.
23     Q. Do you have any understanding of how
24 the price of heroin on the streets has changed
25 over time?

10 (Pages 34 - 37)

Page 38

1     A.   No, I do not.
2     Q.   Is it your understanding that the
3  heroin of today is more expensive, less
4  expensive or as expensive as the heroin of the
5  1970s?
6     A.   I do not know.
7     Q.   What's your understanding about how
8  the purity level of heroin on the streets has
9  evolved over time?
10        MS. HERMIZ:  Objection to form.
11    A.   I do not know the purity of heroin.
12           -  -  -  -  -
13        (Thereupon, Gessner Deposition
14        Exhibit 4, Announcement Titled "The
15        Heroin Epidemic" Beginning Bates
16        Number SUMMIT_001468949, was marked
17        for purposes of identification.)
18           -  -  -  -  -
19    Q.   I'm marking this as Exhibit 4.  It's
20  Bates SUMMIT 1468949.  Mr. Gessner, this appears
21  to be an announcement from Sherri Bevan Walsh,
22  Summit County Prosecutor, titled "The Heroin
23  Epidemic," correct?
24    A.   Could I finish reading it, please?
25        Okay.  Do you have a question?

Page 39

1     Q.   This appears to be an announcement
2  from Sherri Bevin Walsh, Summit County
3  Prosecutor, titled "The Heroin Epidemic,"
4  correct?
5     A.   I believe it was a newsletter
6  article or an article sent to law enforcement
7  for publication.
8     Q.   Were you involved in the preparation
9  of this document?
10    A.   I may have been.
11    Q.   Do you know on what date this
12  document was created or disseminated?
13    A.   No, I don't.
14    Q.   Who else would have been involved in
15  the creation of this document?
16    A.   Prosecutor Walsh, others in the
17  office who may have done research for her.  I do
18  not know.
19    Q.   You took the time to read the
20  document and you noted, I'm sure, that it
21  contains some statistics?
22    A.   Yes.
23    Q.   Do you know the source of those
24  statistics?
25    A.   Offhand, no.

Page 40

1     Q.   Is there any way you could refresh
2  your recollection as to what the source of these
3  data statistics are?
4        MS. HERMIZ:  Objection to form.
5     A.   Could you repeat your question?
6     Q.   So the report itself does not
7  contain citations to any research or data,
8  correct?
9     A.   That is correct.
10    Q.   Do you know what resources or data
11  back up the statistics --
12        MS. HERMIZ:  Objection to form.
13    Q.   -- in Exhibit 4?
14    A.   Well, if you look to the fourth
15  paragraph, "According to the National Institute
16  on Drug Abuse," that would be one of the
17  sources.
18    Q.   Okay.  So while we're on that
19  paragraph, do you see the statement, "The heroin
20  on the streets today is 80 to 90 percent purer
21  and much cheaper than the heroin of the 1970s"?
22    A.   Yes, I do see that.
23    Q.   And having seen that, is this
24  something that you've reviewed previously?
25    A.   I am sure at some point I reviewed

Page 41

1  this.
2     Q.   And having seen that, does that
3  refresh your recollection as to the purity level
4  of heroin and the cost of heroin?
5        MS. HERMIZ:  Objection to form.
6     A.   The paragraph says that heroin is 80
7  to 90 percent purer and much cheaper than the
8  heroin of the '70s, and I would not disagree
9  with that.
10    Q.   You believe that to be accurate?
11        MS. HERMIZ:  Objection to form.
12    A.   Yes.
13    Q.   Is distribution of heroin a crime?
14    A.   Yes.
15    Q.   And is possession of heroin a crime?
16    A.   In Summit County, yes.
17    Q.   And are those crimes prosecuted by
18  your office?
19    A.   Yes.
20    Q.   I think you mentioned earlier that
21  your office focuses on prosecuting heroin drug
22  dealers, correct?
23        MS. HERMIZ:  Objection to form.
24    A.   Any drug dealers.  We prosecute all
25  drug dealers.

11 (Pages 38 - 41)

Page 42

1    Q.   Do you play any role in
2  investigating international drug traffickers?
3    A.   We do not investigate.
4    Q.   Do you understand that international
5  drug traffickers are the primary source of the
6  heroin in Summit County?
7    A.   The primary source of heroin in
8  Summit County are the dealers in Summit County,
9  so there -- they may receive it from outside the
10 county, but we focus on the county.
11   Q.   You focus on the dealers within the
12 county?
13   A.   Yes.  The transaction -- the
14 possession and use and transactions of those in
15 Summit County is where we're going to focus.
16   Q.   But you do understand that the
17 heroin that those dealers receive is coming from
18 outside the United States?
19       MS. HERMIZ:  Objection to form.
20   A.   Much of it is inside the United
21 States before it gets to Akron, also.
22   Q.   You do understand that the heroin
23 that is manufactured and later sold in Summit
24 County is primarily manufactured outside the
25 United States?  Is that your understanding?

Page 43

1        MS. HERMIZ:  Same objection.
2    A.   We do not focus on where the heroin
3  was manufactured.  We focus on where it was
4  transacted and where it was used and possessed.
5    Q.   And I'm not asking about where your
6  office focuses in terms of who it prosecutes.
7  I'm just asking for your understanding, based on
8  your years as a prosecutor and prosecuting drug
9  crimes, is it your understanding that the
10 primary source of the heroin is Mexico or some
11 country other than the United States?
12   A.   Yes.
13   Q.   Exhibit 4 refers again to "the
14 heroin epidemic," correct, the title of the
15 document itself?
16   A.   Yes.
17   Q.   And in this document there's no
18 mention of prescription opioid drugs, correct?
19   A.   I do not believe there is.
20   Q.   The document doesn't refer to the
21 opioid epidemic, right?
22   A.   Yes, it does.  Well, not epidemic.
23 But it has "Naloxone is administered through the
24 nose and reverses the effects of an opiate
25 overdose caused by heroin or pain-prescribed

Page 44

1  opiates -- or opioids."  So I retract my prior
2  statement that it does not talk about opioids,
3  prescribed opioids.  It does talk about those.
4  And that would be the next -- the last
5  paragraph, the last two sentences.
6    Q.   And the announcement begins with the
7  words "Ohio has a problem.  An epidemic.  It's
8  one which impacts every neighborhood, every
9  person.  Heroin."  Did I read that correctly?
10   A.   Yes, you did.
11   Q.   And do you know who was -- who this
12 announcement was sent to?
13   A.   I think, as I said earlier, it was
14 either sent to law enforcement, journals, or in
15 a newsletter.  It appears something that would
16 be in our monthly newsletter.
17   Q.   And according to Exhibit 4, how have
18 the number of indictments for possession of
19 heroin in Summit County changed between 2010 and
20 2015?
21   A.   The fifth paragraph says, "The
22 number of indictments for possession of heroin
23 in Summit County has more than quadrupled since
24 2010.  In 2014, over 500 defendants were
25 prosecuted for possession of heroin, as opposed

Page 45

1  to 157 in 2010."
2    Q.   Moving down to the next paragraph,
3  it states that heroin trafficking prosecutions
4  also increased from 46 to 152 between 2010 and
5  2014, correct?
6    A.   That's what it states.
7    Q.   And based on your experience in the
8  office, are these statistics accurate?
9    A.   Yes.
10   Q.   What is the basis for these
11 statistics, the ones about the number of
12 indictments and the number of prosecutions?
13   A.   Those would be the cases we handled.
14   Q.   And how are those cases tracked?
15   A.   We at the time had what's called --
16 COPS was our case management system, so to track
17 those, you would have to go through and --
18 basically, go case by case through them and hand
19 count them.
20   Q.   When you say "go case by case
21 through them," what is "them"?
22   A.   Okay.  If you look at the
23 indictments by the Grand Jury, and you count
24 those, all of the cases indicted, we would have
25 had, in 2010, 46 for trafficking in heroin, in

1 2014 you would have counted 152 of those.
2    Q.   Would you have had to count each and
3 every single case -- or, excuse me.  Would you
4 have had to review each and every single
5 indictment that your office had in that
6 particular year to determine which ones were
7 related to heroin?
8    A.   There may have been a code in the
9 COPS system to look at that, but I know we had a
10 lot of difficulty.  COPS was an antiquated
11 system, it began back in the 1990s, and it was
12 just replaced, actually, earlier this year by
13 the Matrix system.  And COPS to the point was
14 when you would pull it up on your computer,
15 instead of being on the full screen, it was
16 almost a postage stamp in the corner, because
17 each operating system of Windows that came out
18 made it more likely to crash, and the ability to
19 search on it was reduced each year it went on.
20 When the COPS people came in to make a proposal
21 for a new case management system, they were
22 shocked that our system was still working.
23    Q.   How did that affect your office's
24 ability to understand criminal trends?
25        MS. HERMIZ:  Objection to form.

1    A.   We don't understand criminal trends
2 by -- by statistics.  When you're working in a
3 courtroom, you understand the criminal trends by
4 what lands on your desk.
5    Q.   So your office wasn't routinely
6 analyzing the proportion of crimes that made up
7 your total docket?
8        MS. HERMIZ:  Objection to form.
9    A.   As to some statistical analysis, no.
10    Q.   To determine that in 2014 over 500
11 defendants were prosecuted for possession of
12 heroin, how many cases would you need to review?
13 In other words, what is the total number of
14 cases that were prosecuted by your office in
15 2014?
16    A.   2014, you would probably be
17 somewhere around 3,700 and some.  You could look
18 on the -- the budget report for each year, and
19 it would have the amount on there for you.
20    Q.   Does the database, the COPS system,
21 allow you to understand the total amount of
22 cases relative to an office on a particular
23 year?
24    A.   No.  We look at the number issued by
25 the clerk of courts and -- for that latest case,

1 to see what number we have.
2    Q.   And the caseloads that are reported
3 in the budget documents, are those all
4 indictments or are they only cases that have
5 been resolved through plea or verdict?
6    A.   Those are new indictments.
7    Q.   What's the name of the new database
8 that replaced the COPS system?
9    A.   Matrix.
10    Q.   And when was Matrix put into effect?
11    A.   I believe it became functional in
12 March of this year.
13    Q.   How does the Matrix system differ
14 from the COPS system with respect to trying to
15 identify what portion of your cases relate to
16 specific types of crimes?
17    A.   A search would have to be made
18 under -- you could search under a particular
19 code section of the Revised Code and it would be
20 able to pull up those cases.
21    Q.   And when it pulls up all the cases
22 related to that code section, does it pull up
23 all cases that have been indicted?
24    A.   It would probably depend on what
25 your parameters were for your search.

1    Q.   What other parameters can you enter
2 apart from the code section?
3    A.   You could look at cases for that
4 year.  You could look at cases resolved that
5 year.  You could look at cases pending that
6 year.
7    Q.   Does the Matrix system contain
8 information about cases that have been declined
9 for prosecution?
10    A.   If it was a case that came to our
11 office, so it went through either our direct
12 indictment program from a city prosecutor's
13 office to our office, where it obtained a case
14 number from the clerk of courts and we declined
15 it at that point, then it would show up in
16 there.  If it did not receive a case number from
17 the clerk of courts, it would not show up in
18 Matrix.
19    Q.   And what determines if it receives a
20 case number from the clerk of courts?
21    A.   Well, if the clerk of courts issues
22 the case number.  So if we review a case from a
23 city prosecutor and we look and say that we're
24 not accepting that case, that would not have --
25 go to a clerk and it would go back to the

13 (Pages 46 - 49)

Page 50

1 municipal prosecutor.
2     Q.    And are records kept of instances
3 when that has occurred?
4     A.    I don't know if the city
5 prosecutor's office keeps those records or if we
6 do.
7     Q.    Who would know?
8     A.    Well, the city prosecutors would
9 know that, and I would be able to check in with
10 my office to see.
11     Q.    Does anyone else in your office
12 know?
13     A.    That's what I would have to check to
14 see.
15     Q.    Okay.  How far back does the data in
16 the Matrix system go?  In other words, does it
17 include cases prior to March 2018?
18     A.    It has some cases back there, but
19 it's not the -- it's not what comes in now.  So
20 when -- I believe there was a transfer of the
21 documents into there, it was more of a dumping,
22 and we don't have the access or ability on all
23 of those.  Basically we have what was in the
24 COPS system, and not even all of that detail in
25 there.  So historically we don't have the

Page 51

1 ability to go back and do things on there that
2 we can do going forward.
3     Q.    Do you still also maintain access to
4 the COPS database?
5     A.    For what it's worth, yes.
6     Q.    When did Summit County first begin
7 prosecuting suppliers of heroin with involuntary
8 manslaughter for overdose deaths?
9         MS. HERMIZ:  Objection to form.
10     A.    Could you repeat that?
11     Q.    When did your office first begin
12 prosecuting suppliers of heroin with involuntary
13 manslaughter for overdose deaths?
14         MS. HERMIZ:  Same objection.
15     A.    I believe the first case we
16 prosecuted was -- it's in the document you gave
17 me there, Danielle Hoover, seventh paragraph
18 down.  2013, "Danielle Hoover was prosecuted and
19 convicted for involuntary manslaughter for the
20 2009 death of Richard Davis."
21     Q.    And the document states that "One of
22 the first cases in Summit County was in 2013."
23 Is it your recollection that 2013 was the first
24 year that your office began prosecuting these
25 types of cases?

Page 52

1     A.    Prosecuting them as involuntary
2 manslaughter, I believe it was around that time.
3     Q.    And until then, you had not
4 prosecuted those cases as involuntary
5 manslaughter, correct?
6     A.    That's correct.
7     Q.    What led to this change?  What led
8 to the decision to begin prosecuting heroin
9 suppliers with involuntary manslaughter when
10 there was an overdose death?
11     A.    The number of deaths, the number of
12 overdoses, law enforcement coming to us saying
13 something needed to be done beyond what -- what
14 was -- that our system wasn't working as it was.
15 Again, with the influx of the drugs, the influx
16 of whatever was being added to these drugs, it
17 wasn't something that was manageable with our
18 system as it was.  At the time we looked to
19 potential charges.  There were discussions of
20 murder charges or discussions of manslaughter.
21 There were discussions of adding new laws to the
22 books in Ohio to deal with this.  But it was
23 something where time was of the essence, so we
24 looked and found that the manslaughter fit and
25 we started charging that.

Page 53

1     Q.    You said that there was an influx of
2 drugs and whatever was being added to these
3 drugs.  Can you specify which drugs in
4 particular attributed to this change in charging
5 policy?
6     A.    I think when we saw the fentanyl,
7 and, then more clearly, when we saw the
8 carfentanil added, you saw spikes in the death
9 rate.
10     Q.    Let's talk about fentanyl for a
11 moment.  First of all, what is fentanyl?
12     A.    Fentanyl is a synthetic opioid.  It
13 is used as a painkiller and it's prescribed by
14 doctors.
15     Q.    And what's your understanding about
16 how potent fentanyl is relative to heroin or
17 other drugs?
18     A.    The first I ever knew of fentanyl
19 was when some of our investigators in the county
20 were talking about an individual who had a time
21 release fentanyl patch and they decided it
22 wasn't working quick enough so they started
23 chewing on it and died as a result of that.
24     Q.    Exhibit 4, in front of you -- I
25 believe it's Exhibit 4 -- the very bottom of

14 (Pages 50 - 53)

Page 54

1 that page, the last paragraph refers to
2 fentanyl, and it states that fentanyl is 80 to
3 100 times more potent than heroin.
4        Do you see that?
5    A.    Yes, I see that.
6    Q.    Is that also your understanding?
7    A.    I don't know the exact 80 to 100,
8 but yes, it's more potent.
9    Q.    And what is carfentanil?
10    A.    What we've been told is it's an
11 elephant tranquilizer.  Akron Police came to us
12 the first time with carfentanil and advised us
13 they had gone to the Akron Zoo to see if they
14 could get a sample of it to take to Ohio BCI Lab
15 to get a standard, and they were told that Akron
16 Zoo did not have any animals large enough to
17 permit them to have carfentanil.  So they went
18 to the Cleveland Zoo.  They obtained carfentanil
19 there.  They were given it by someone in a
20 Hazmat suit, and they were also given an
21 antidote with it based on the seriousness of it.
22    Q.    Is it your understanding that
23 carfentanil is even more potent than fentanyl?
24    A.    Yes.
25    Q.    And you've mentioned both fentanyl

Page 55

1 and carfentanil have been problems in Summit
2 County, correct?
3    A.    We have seen those along with the
4 other drugs they're used with, yes.
5    Q.    Are you aware of instances in which
6 a drug dealer has mixed heroin with fentanyl or
7 carfentanil?
8    A.    Yes.
9    Q.    How many such instances are you
10 aware of?
11        MS. HERMIZ:  Objection to form.
12    A.    Too many.
13    Q.    Can you estimate for us?
14    A.    No, but I can tell you that it was
15 to the point where I believe on one weekend in
16 Akron there were maybe 200 overdoses.  I know it
17 was to the point where the medical examiner had
18 to have a refrigerated trailer brought up
19 because the morgue wasn't big enough to -- or
20 large enough equipped to handle the deaths
21 relating to it.
22    Q.    And it's your understanding those
23 deaths were related to issues where heroin was
24 mixed with fentanyl or carfentanil?
25    A.    Yes.

Page 56

1    Q.    Are you also aware of fentanyl or
2 carfentanil being mixed with cocaine?
3    A.    On some occasions, but much less.
4    Q.    What are the risks of mixing
5 carfentanil with heroin?
6    A.    From what we've --
7        MS. HERMIZ:  Objection to form.
8    A.    I don't know all of the risks, but I
9 can tell you what we've seen is death.
10    Q.    Based on your experience, are drug
11 users always aware that the heroin or the
12 cocaine that they're ingesting is mixed with
13 fentanyl or carfentanil?
14        MS. HERMIZ:  Objection to form.
15    A.    There are times they are.  We don't
16 know if they all are.
17    Q.    When do you recall first seeing
18 fentanyl or carfentanil in Summit County?
19    A.    I don't recall, but I would -- it
20 was not far into when we started charging with
21 the manslaughter.
22    Q.    So based on your recollection, it
23 was around 2013?
24    A.    2013, 2014 or 2015.
25        - - - - -

Page 57

1        (Thereupon, Gessner Deposition
2        Exhibit 5, Media Release Titled
3        "Heroin Users Face Potentially Fatal
4        Ingredient" dated January 25, 2006,
5        Beginning Bates Number
6        SUMMIT_000350711, was marked for
7        purposes of identification.)
8        - - - - -
9    Q.    I've just handed you Exhibit 5,
10 SUMMIT 350711.  This is a media release dated
11 January 25th, 2006, titled "Heroin Users Face
12 Potentially Fatal Ingredient."  It's issued by
13 Sheriff Drew Alexander, the County of Summit.
14        Have you seen Exhibit 5 before?
15    A.    No.
16    Q.    In Exhibit 5 Summit County Sheriff
17 Alexander announces, "That information and
18 intelligence obtained from Summit County Drug
19 Unit indicates that heroin mixed with a
20 synthesized variant of the analgesic fentanyl
21 has been found in northeastern Ohio."
22        And if you go down two paragraphs,
23 Exhibit 5 further states, "During the 1990s,
24 fentanyl was found to be the cause of numerous
25 deaths among heroin users throughout the eastern

15 (Pages 54 - 57)

Page 58

1  United States."
2          MS. HERMIZ:  Objection to form.
3      Q.   Did I read that correctly?
4      A.   Yes, you read what the document
5  says.
6      Q.   Now, you said you hadn't seen this
7  document previously, so this media release was
8  not something you reviewed while you were at the
9  Summit County Prosecutor's Office?
10     A.   No, it was not.  This is the
11 sheriff's department.  They're separate from us.
12     Q.   I understand.
13          You certainly collaborate with the
14 sheriff's department and other law enforcement
15 agencies regarding criminal activities in your
16 jurisdiction, correct?
17     A.   Criminal activities, not media
18 releases.
19     Q.   And this wasn't simply a release to
20 your office about criminal trends; in fact, this
21 was a media release intended for public
22 dissemination, correct?
23     A.   I do not know that.  This is the
24 first I've seen it.
25     Q.   Is this the sort of thing that you

Page 59

1  wish that you had seen at the time in 2006?
2          MS. HERMIZ:  Objection to form.
3      Q.   I'll rephrase.
4          Would knowing this information back
5  in 2006 have been useful to you in your role
6  as -- at the Summit County Prosecutor's Office?
7      A.   May have; may not have been.  I
8  mean, it doesn't really talk about Summit
9  County, other than the last paragraph.  So,
10 again, if it's one case in March of 2005 where
11 someone died as an overdose of fentanyl abuse,
12 that, of course, would have been something that
13 would have been something we would pay attention
14 to.  Other than that, you have to realize, as a
15 prosecutor in the courtroom with the caseloads
16 we have, again, this is not going to stand out
17 to us.
18     Q.   You don't have any reason to dispute
19 that information and intelligence obtained from
20 the Summit County Drug Unit indicated the
21 presence of fentanyl in Summit County as early
22 as 2006, do you?
23     A.   The document doesn't say Summit
24 County.  It says northeast Ohio.
25     Q.   Okay.  You don't have any reason to

Page 60

1  doubt that fentanyl was present in northeastern
2  Ohio, correct?
3      A.   No, I don't.
4      Q.   During your time at the Summit
5  County Prosecutor's Office, how many instances
6  of cases involving fentanyl or carfentanil have
7  you encountered?
8      A.   Numerous.
9      Q.   How many?
10     A.   I can't quantify it.
11     Q.   Is it more than ten?
12     A.   Yes.
13     Q.   Is it more than 50?
14     A.   May have been.
15     Q.   Is it more than a hundred?
16     A.   I don't know.
17     Q.   How would you go about determining
18 the answer to that question?
19     A.   That, I don't know, because you
20 would have to have a time frame.  You would have
21 to have whether the case -- whether there were
22 charges relating to that or not.  If fentanyl or
23 carfentanil was involved but there were no
24 charges relating to it, that would not show up
25 on any of our searches.  So I don't know if I

Page 61

1  can get you that answer.
2      Q.   You could use the COPS or the Matrix
3  databases to look up charge codes related to
4  fentanyl or carfentanil crimes, correct?
5          MS. HERMIZ:  Objection to form.
6      A.   Fentanyl and carfentanil, I don't
7  know if we can search on that or if it's just
8  the criminal charge for the possession or
9  trafficking.
10     Q.   Who would know what search
11 parameters are possible using those databases?
12     A.   I'm sure IT would be able to check
13 that out for you.
14     Q.   Who specifically in IT?
15     A.   Brett Lawrence is our IT person.  He
16 may or may not be the person.  Otherwise, the
17 county IT.
18     Q.   Are you aware of instances in which
19 a drug dealer has disguised fentanyl as
20 prescription opioids?
21     A.   I do not know.
22     Q.   Are you aware of any instances of
23 counterfeit pills containing fentanyl being sold
24 in Summit County?
25     A.   I believe I've heard that.

16 (Pages 58 - 61)

Page 62

1    Q.   Who have you heard that from?
2    A.   Just law enforcement in general.
3    Q.   How did you come to learn about
4 that?
5    A.   It may have been at Summit County
6 Drug Unit meetings.  It may have been just
7 speaking with officers.  I don't know.
8    Q.   How often do you attend meetings
9 with the Summit County Drug Unit?
10    A.   I used to attend monthly.  Maybe a
11 few times a year.
12    Q.   During what period of time do you
13 recall learning that counterfeit pills
14 containing fentanyl were being sold in Summit
15 County?
16    A.   I do not know.
17    Q.   Can you estimate?
18    A.   No.
19    Q.   Was it during the time period in
20 which you were a supervisor at the Summit County
21 Prosecutor's Office?
22    A.   Yes.  That would be between then and
23 now, yes.
24    Q.   And when did you first become a
25 supervisor?

Page 63

1    A.   2003, 2004.
2    Q.   How many conversations or meetings
3 did you attend in which the issue of counterfeit
4 pills containing fentanyl being sold in Summit
5 County was discussed?
6        MS. HERMIZ:  Objection to form.
7    A.   Again, I -- I don't recall if it was
8 at a meeting.
9    Q.   But you're certain that you heard
10 the information, correct?
11    A.   Yes.
12    Q.   Which officers do you speak with on
13 a regular basis about drug issues in Summit
14 County?
15        MS. HERMIZ:  Objection to form.
16    A.   I speak with any officer in the
17 county who would call and ask questions.  I
18 speak with officers who come in to bring files.
19 I speak with officers who come in to testify.  I
20 speak with officers who come in to Grand Jury.
21    Q.   So sometime between 2003 or '04 and
22 the present day, you became aware that
23 counterfeit pills containing fentanyl were being
24 sold in Summit County; is that correct?
25    A.   I believe so.

Page 64

1    Q.   But you cannot recall how many
2 conversations you may have had about that topic?
3    A.   Yes.
4    Q.   And you cannot recall the source of
5 that information?
6    A.   Yes.
7    Q.   Do you know what kinds of pills were
8 being counterfeited?
9    A.   No.
10    Q.   Is it your understanding that a drug
11 user would think they were buying a pill and, in
12 fact, they were getting fentanyl?
13    A.   I don't know what the drug users
14 were thinking.
15    Q.   Law enforcement never shared a
16 theory with you on that issue?
17    A.   Again, what the drug user was
18 thinking, no, I don't know that.
19    Q.   Is it your understanding that the
20 counterfeit pills containing fentanyl sold in
21 Summit County contributed to the overdoses in
22 Summit County?
23        MS. HERMIZ:  Objection to form.
24    A.   They were part of the epidemic that
25 we have.

Page 65

1    Q.   And as being part of the epidemic,
2 is it your understanding they contributed to the
3 overdoses?
4    A.   They may have.
5    Q.   Who, in your experience, sells
6 counterfeit pills?
7        MS. HERMIZ:  Objection to form.
8    A.   Criminals.
9    Q.   So you can't go into Walgreens and
10 purchase them, right?
11    A.   I hope not.
12    Q.   It's illicit drug dealers who are
13 selling them on the street, correct?
14    A.   Unfortunately, I don't think it's
15 just on the street.
16    Q.   Where else do you think this occurs?
17    A.   In schools.
18    Q.   Okay.  How about other than schools
19 and the street; where else?
20    A.   I don't know.
21    Q.   And what is the basis for your
22 belief that counterfeit pills are also being
23 sold in schools?
24    A.   General information while being in
25 the prosecutor's office.

17 (Pages 62 - 65)

1    Q.    Can you be more specific?
2    A.    No.
3    Q.    Is it related to cases that you've
4 actually handled or seen?
5    A.    It may have been cases I've seen,
6 not cases I've handled.
7    Q.    How many such cases are you aware
8 of?
9    A.    I do not know.  I am a supervisor
10 over the juvenile division, but those are --
11 more information they would have.
12    Q.    It's not something that you monitor
13 as a supervisor?
14    A.    No.
15    Q.    Do you consider part of your role as
16 a prosecutor to prevent crime?
17    A.    Yes.
18    Q.    Would you agree that maintaining an
19 awareness of criminal trends in your
20 jurisdiction better equips you to prevent crime
21 as a prosecutor in that jurisdiction?
22         MS. HERMIZ:  Objection to form.
23    A.    Yes.
24    Q.    How difficult is it for law
25 enforcement to detect counterfeit pills at the

1 scene of an overdose?
2         MS. HERMIZ:  Objection to form.
3    A.    You would have to talk to law
4 enforcement on that.
5    Q.    Has anyone that you speak to -- any
6 law enforcement agents that you've spoken to
7 expressed to you anything about the detection of
8 counterfeit pills at the scene of an overdose?
9    A.    I'm sure over the years officers
10 have discussed counterfeit pills with me.
11 Normally our pills that are all sent to BCI,
12 to the Ohio Crime Lab, to have them examined and
13 have them make that determination.
14    Q.    What does BCI stand for?
15    A.    Ohio Bureau of Criminal
16 Investigation.
17    Q.    In your experience, what's the
18 primary source of fentanyl in Summit County?
19         MS. HERMIZ:  Objection to form.
20    A.    Fentanyl is either -- the primary
21 source would be doctors or pharmacies or drug
22 dealers.
23    Q.    You mentioned doctors or pharmacies.
24 Is that because fentanyl is also a prescription
25 medicine?

1    A.    Yes.
2    Q.    Are you aware that the vast majority
3 of fentanyl reports by law enforcement result
4 from illegally produced and trafficked fentanyl,
5 not diverted pharmaceutical fentanyl?
6         MS. HERMIZ:  Objection to form.
7    A.    I am not aware of that information.
8         - - - - -
9         (Thereupon, Gessner Deposition
10         Exhibit 6, Ohio Department of Health
11         News Release Titled "Illicit
12         Fentanyl Continues to Fuel Increase
13         in Drug Overdose Deaths in Ohio"
14         dated August 25, 2016, Beginning
15         Bates Number AKRON_000271913, was
16         marked for purposes of
17         identification.)
18         - - - - -
19    Q.    I'm going to hand you what's been
20 marked for identification as Exhibit 6.  It's
21 AKRON 271913.  I'm going to focus your attention
22 to the first three paragraphs of this document.
23         This is an Ohio Department of Health
24 news release titled "Illicit Fentanyl Continues
25 to Fuel Increase in Drug Overdose Deaths in

1 Ohio."  It was published August 25th of 2016,
2 correct?
3    A.    Hold on.  I'm still reading the
4 third paragraph.
5    Q.    Okay.
6    A.    Okay.  Go ahead.
7    Q.    This is an August 25th, 2016
8 article, correct?
9    A.    That's what it says, yes.
10    Q.    If you look at the fourth paragraph,
11 which begins with the word "Fentanyl," the
12 second sentence states, "The vast majority of
13 fentanyl reports by law enforcement in drug
14 seizures result from illegally produced and
15 trafficked fentanyl, not diverted prescription
16 fentanyl."
17         First, did I read that sentence
18 correctly?
19    A.    Yes, you did.
20    Q.    Okay.  And do you have any reason to
21 disagree with that statement?
22    A.    No.
23    Q.    So it's fair to say that illicit
24 fentanyl contributed to the drug overdose deaths
25 in Ohio?

18 (Pages 66 - 69)

Page 70

1    A.   Legal and illegal drugs, yes.
2    Q.   And the vast majority of fentanyl
3  reports by law enforcement in drug seizures were
4  from that illegally produced fentanyl --
5        MS. HERMIZ:  Objection to form.
6    Q.   -- correct?
7    A.   That's what the Ohio Department of
8  Health said on August 25th of 2016.
9    Q.   Is the sale of illicit fentanyl and
10  carfentanil a crime in Summit County?
11    A.   Yes, it is.
12    Q.   And has your office prosecuted the
13  sale or distribution of illicit fentanyl?
14    A.   If those cases have been brought to
15  us, yes.
16    Q.   How about carfentanil?
17    A.   If those cases have been brought to
18  us, yes.
19    Q.   Now, you said "if."  Is that because
20  you're uncertain as to whether your office has
21  ever prosecuted a distribution case involving
22  fentanyl or carfentanil?
23    A.   As to specific cases, yes.  I know
24  we have handled those cases.  We have handled
25  the cases with deaths relating to those and

Page 71

1  we've prosecuted those.
2    Q.   Do you know how many cases your
3  office has prosecuted since 2006 that involved
4  possession or distribution of fentanyl?
5    A.   Off the top of my head, I cannot
6  give you that number.
7    Q.   Can you give us an estimate?
8    A.   When we look at these -- these
9  cases, we don't break them down into specific --
10  again, as -- for me to just give me an estimate,
11  I can tell you drug-related cases, drug-related
12  deaths, we can do that.  Again, when you're
13  looking at this year, in excess of 4,000 cases,
14  new cases this year, I can't go by and point out
15  each type by the number.
16    Q.   So you might be able to tell us how
17  many of your total caseload are drug cases,
18  right?
19    A.   Um-hum.
20    Q.   But you can't tell us, of those drug
21  cases, how many are fentanyl cases?
22    A.   Right.  I can tell you they're
23  there, but not how many.
24    Q.   Is there a way -- if we needed to
25  determine how many of the drug cases were

Page 72

1  fentanyl cases, is there a way to determine
2  that?
3    A.   Sure.  You can go through those
4  4,000 cases and look through each one.
5    Q.   And what specifically -- what
6  specific documents or information would you have
7  to review in order to separate fentanyl or other
8  drugs from the larger pool of drug cases?
9    A.   The indictment.
10    Q.   Okay.
11    A.   So if you go through each
12  indictment, it will say "trafficking with
13  drugs," and name the drug following that.
14    Q.   So you have to look through each and
15  every indictment to figure out which drugs were
16  at issue --
17    A.   Depending on the drug it is.  If
18  it's something that's not within something that
19  we've found the need to set up a search for,
20  again, due to volume in the past, yes.
21    Q.   For some of your drug cases have you
22  set up a special indicator for them because the
23  volume of those cases is far greater than the
24  volume of other drug cases?
25    A.   I believe with Matrix they did set

Page 73

1  it up for heroin.
2    Q.   Okay.  Other than heroin, do any
3  other drugs have a special indicator that would
4  allow you to quickly cull them from the other
5  drug cases?
6    A.   Cocaine may.  I'm not sure.
7    Q.   What about marijuana?
8    A.   Well, there is a -- I mean, a charge
9  of possession of marijuana, so we can just pull
10  that charge.
11    Q.   Okay.  What about prescription
12  opioids?
13    A.   I -- I think you would have to go
14  through the cases.
15    Q.   To your knowledge, has anyone
16  attempted to do that in your office?
17    A.   Not that I'm aware of.
18    Q.   So sitting here today, you can't
19  tell us how many fentanyl drug cases your office
20  prosecuted between 2006 and the present day?
21    A.   No.
22    Q.   And sitting here, you can't tell us
23  how many carfentanil cases your office
24  prosecuted from 2006 until the present day?
25    A.   No.  I can tell you how many deaths

19 (Pages 70 - 73)

Page 74

1 relating to these crimes we've done, but I can't
2 tell you those specific cases.
3    Q.   Okay.  And is the same true for
4 prescription opioids?  In other words, sitting
5 here today, you can't tell us how many
6 prosecutions for possession or sale of
7 prescription opioids your office has prosecuted
8 from 2006 until the current day?
9    A.   No, I cannot single those out for
10 you.
11    Q.   Okay.  Now, you mentioned you can
12 tell us about the number of deaths tied to
13 specific drugs; is that right?
14    A.   Um-hum.  Well, to the -- to the --
15 again, the manslaughters we've had relating to
16 the heroin, the fentanyl, carfentanil and that,
17 we, I believe, have had since 2013, I believe
18 we've prosecuted somewhere in the neighborhood
19 of 55 of those cases.
20    Q.   What cases specifically are you
21 referring to?
22    A.   Involuntary manslaughter, most of
23 the time with corruption of another with drugs.
24    Q.   And what types of drugs were
25 involved in those approximately 55 cases?

Page 75

1    A.   Heroin, fentanyl, carfentanil,
2 cocaine.
3    Q.   Any other drugs involved in those
4 approximately 55 cases involving involuntary
5 manslaughter?
6    A.   There may have been.
7    Q.   Were prescription opioids involved
8 in any of the approximately 55 cases your office
9 prosecuted involving involuntary manslaughter
10 charges?
11    A.   There was a presence of what could
12 have been prescription opioids in some of those.
13 Again, I don't have specifics on that for you.
14    Q.   You said "in some of those."
15 Approximately how many cases could have involved
16 prescription opioids?
17    A.   I'd have to look at the autopsy
18 reports on those to get you that number.
19    Q.   And within the autopsy reports, are
20 you referring specifically to the toxicology
21 screen?
22    A.   Yes.
23    Q.   And is the reason you would have to
24 look at the autopsy reports because in none of
25 those cases was the individual prosecuted for an

Page 76

1 actual crime relevant to the prescription
2 opioid?
3        MS. HERMIZ:  Objection to form.
4    A.   I would have to check that.
5    Q.   Okay.  And are those autopsy reports
6 maintained in your case files for these
7 involuntary manslaughter cases?
8    A.   They should be.
9    Q.   Now, you said that in some of the
10 cases prescription opioids could have been
11 involved.
12    A.   Um-hum.
13    Q.   What makes you say "could have
14 been"?
15    A.   Well, if you look at the toxicology
16 report, they will list what was found, and what
17 we have to look at, because we have to prove our
18 case beyond a reasonable doubt as to the cause
19 of death, did that particular drug cause the
20 death or was it just in the system or not.
21    Q.   Are you aware of any cases that your
22 office has prosecuted where an individual is
23 being prosecuted for involuntary manslaughter
24 related to an overdose death in which the victim
25 ingested only prescription opioids and no other

Page 77

1 drugs?
2    A.   Not that I'm aware of.
3    Q.   I think you stated earlier you're
4 not aware whether your office prosecuted a
5 synthetic opioid known as U-47700?
6    A.   Yes, I do not recall that specific
7 number.
8    Q.   Do you recall learning about, from
9 media reports or elsewhere, that the governor of
10 Ohio had authorized the State Board of Pharmacy
11 to take emergency action regarding that
12 particular synthetic opioid?
13    A.   Not until you just told me.
14    Q.   I'd like to ask you some more
15 questions about the involuntary manslaughter
16 cases your office has prosecuted.
17        You stated that you began
18 prosecuting those cases in or around 2013,
19 correct?
20    A.   Yes.
21    Q.   And how many such cases has your
22 office indicted?
23    A.   I believe I said 55.
24    Q.   Of those 55 indictments, how many
25 actually have gone to trial?

Page 78

1    A.   Actual trials, I believe three.
2    Q.   And what was the result of those
3 three trials?
4    A.   Guilties, and the others were pleas.
5 I think one or two -- one may have been
6 dismissed for federal prosecution. One was
7 dismissed -- I'm sorry. I can't think of the
8 reason.
9    Q.   How many guilty pleas of the 55?
10   A.   55 minus 3 minus 2 should be about
11 50. Well, I'm sorry. There may be some
12 pending. So absent the ones pending. But it's
13 into the 40s I know.
14   Q.   For guilty pleas?
15   A.   Yes.
16   Q.   So you've had approximately 40 or
17 more guilty pleas in cases involving involuntary
18 manslaughter?
19   A.   Yes.
20   Q.   And how are those cases staffed?
21       MS. HERMIZ: Objection to form.
22   A.   Explain. I don't understand.
23   Q.   How many prosecutors are assigned to
24 work on a particular case involving involuntary
25 manslaughter?

Page 79

1    A.   Our particular assignment in the
2 office is each prosecutor handles their own
3 cases. If there's a case involving a death, we
4 like to have two prosecutors on the case, so
5 those being a death, there would be two
6 prosecutors on it.
7    Q.   Which prosecutors have worked on the
8 involuntary manslaughter cases?
9    A.   It would depend on -- any prosecutor
10 could work on them. It would depend on where
11 it's assigned. Each courtroom -- we have ten
12 courtrooms. Each courtroom has two full-time
13 prosecutors assigned to it, and every two
14 courtrooms has a supervisor, so it would be
15 either the two courtroom prosecutors or the two
16 courtroom prosecutors with their supervisor on
17 these cases.
18   Q.   So you don't have prosecutors that
19 specialize in these cases and only these cases?
20   A.   We'd love to if we had the resources
21 for it.
22   Q.   Is it fair to say that your
23 prosecutors act more as generalists, handling a
24 variety of different types of cases?
25   A.   Based on our budget, that's how we

Page 80

1 have to do it.
2    Q.   Okay. So have all of the
3 prosecutors in the criminal division handled a
4 case involving involuntary manslaughter charges?
5    A.   No.
6    Q.   How many have?
7    A.   Probably the majority.
8    Q.   Okay. And how many total
9 prosecutors do you have?
10   A.   We have in the criminal division 35,
11 I believe.
12   Q.   So approximately how many of those
13 35 prosecutors have handled --
14   A.   I would think 20.
15   Q.   -- cases?
16       Do you recall earlier this year
17 giving a presentation to the Indiana Prosecuting
18 Attorneys Council?
19   A.   Yes, I do.
20   Q.   And during that presentation did you
21 discuss your office's practice of prosecuting
22 heroin suppliers in cases where there are
23 overdose deaths?
24   A.   Yes.
25   Q.   Did you prepare a PowerPoint

Page 81

1 presentation for that speaking engagement?
2    A.   Yes. It's the one you have in front
3 of you.
4    Q.   I'm going to hand you a copy of it,
5 and I'm only going to ask you questions about
6 specific slides. So I'll mark it for the record
7 as Exhibit 7. You can take a look.
8        -  -  -  -  -
9        (Thereupon, Gessner Deposition
10        Exhibit 7, "Opiate Overdose
11        Investigations & Prosecutions"
12        PowerPoint Presentation Slides dated
13        June 20, 2018, was marked for
14        purposes of identification.)
15       -  -  -  -  -
16   Q.   So I've handed you just a few slides
17 from the PowerPoint presentation for the "Opiate
18 Overdose Investigations & Prosecutions"
19 presentation that you delivered on June 20th,
20 2018; is that correct?
21   A.   Yes.
22   Q.   During that presentation did you
23 discuss some of the criticism that your office
24 has encountered because of its decision to begin
25 charging involuntary manslaughter in overdose

21 (Pages 78 - 81)

Page 82

1 deaths?
2    A.    From defense attorneys, yes.
3    Q.    Okay.  So I want to turn your
4 attention to that second page of Exhibit 7.
5 It's the page just prior to the one you're
6 looking at, this one (indicating).
7    A.    Okay.
8    Q.    And in your presentation it looks
9 like you cited to an article that was written by
10 a former heroin addict that criticizes the
11 practice; is that right?
12       MS. HERMIZ:  Objection to form.
13    A.    This article criticized individuals
14 being charged with murder.  It did not criticize
15 the practice we have of charging with
16 involuntary manslaughter.
17    Q.    And what is the difference?
18    A.    Murder in Ohio is a special felony
19 punishable by 15 years to life in prison.
20 Involuntary manslaughter is a first degree
21 felony punishable by anywhere from three, four,
22 five, six, seven, eight, nine, 10 or 11 years in
23 prison.
24    Q.    Okay.  In this article it's noted --
25 did you read the article before you referred to

Page 83

1 it in your presentation?
2    A.    Yes, I did.
3    Q.    Okay.  I'm going to read you a
4 portion of the article.  I'm just going to ask
5 you if you agree with that or not.  "It's likely
6 that these laws even make the crisis worse by
7 unfairly targeting people suffering from
8 addiction, diverting attention toward
9 self-replenishing supply chain and away from
10 harm reduction or recovery and scaring users
11 from reporting overdoses while they are able to
12 be reversed.  Worse, these laws fail to account
13 for the addiction mentality, which drives users
14 to seek the most potent high possible despite
15 known risks."
16       Do you agree with that criticism?
17    A.    No.
18    Q.    Why not?
19    A.    I'm a prosecutor.  We feel that
20 individuals who use drugs, illegal drugs, who
21 sell illegal drugs, are people who society needs
22 to be protected from.
23    Q.    And you believe, as a prosecutor,
24 that individuals who break the law deserve to be
25 held responsible?

Page 84

1    A.    And those who help them break the
2 law also.
3    Q.    Why is that important?
4    A.    Well, if you can get to the source,
5 you're more likely to stop the problem.
6    Q.    You also mentioned that you're aware
7 of some criticism of this policy coming from
8 defense attorneys, correct?
9    A.    That's what you asked me in your
10 question.
11    Q.    So let's turn to the next page.
12 This next page of your presentation relays some
13 criticisms from a defense attorney?
14    A.    And that was actually interesting
15 criticism.
16    Q.    Why was it interesting?
17    A.    Because what the attorney said is --
18 I mean, these are two attorneys who have
19 represented individuals.  They have made
20 comments about there's -- there's proximate
21 cause and that doesn't match up, and these
22 specific attorneys went in and counseled their
23 clients to plead guilty to the charges they said
24 in the paper they didn't think they could prove.
25    Q.    Okay.  So, ultimately, they pled

Page 85

1 guilty to the charges at issue?
2    A.    Yes.
3    Q.    But what was the argument they made
4 about involuntary manslaughter charges in
5 general?
6    A.    Well, I think what you -- you have
7 to put in the proper context first.  These are
8 attorneys who, regardless of what we charge
9 their clients with, whether it's a drug case or
10 not, are going to make criticisms of the
11 charges.  So my -- my opinion is they saw an
12 opportunity to have their name in print.
13    Q.    Okay.  Fair enough.
14       Do you believe that the dealers, the
15 suppliers, the criminals who supply the heroin
16 in overdose cases, are the proximate cause of
17 the overdose?
18       MS. HERMIZ:  Objection to form.
19    A.    If we have no drugs, we have no
20 problems.  I guess you could say that in a
21 perfect world.  So everyone has a part in this.
22 And, again, if it's someone, where did they get
23 their addiction from?  Do we go back there and
24 look?  Is it someone who's supplying them?
25 Again, there are all these different things that

22 (Pages 82 - 85)

Page 86

1 we look at, but the law says to us as
2 prosecutors, here are the charges you can charge
3 with; so if we can meet those elements, we're
4 going to charge them.
5     Q.   To answer my question, do you
6 believe that the supplier of the heroin in an
7 overdose case is the proximate cause of that
8 person's death?
9         MS. HERMIZ:  Objection to form.
10     A.   They're a cause.
11     Q.   Okay.  What percentage of the
12 responsibility for that death would you
13 attribute to the person who supplied the
14 individual with heroin?
15         MS. HERMIZ:  Objection to form.
16     A.   As a prosecutor, if I can file a
17 charge on someone, I guess I can charge multiple
18 people with one hundred percent, so I don't look
19 at those things and that's not something where
20 we've looked at to -- we, again, look at the law
21 and can we prove that law was violated, not what
22 percentage of the law did they break.
23     Q.   Okay.  Would you also consider the
24 individual who used or ingested the drug that
25 ultimately led to the overdose death to have

Page 87

1 committed a crime?
2     A.   Had they lived, yes.
3     Q.   Then do they also in some sense play
4 a role or are they also a factor in causing
5 death?
6     A.   Factor, yes.
7     Q.   Is it difficult in these types of
8 cases to prove causal connection?
9         MS. HERMIZ:  Objection to form.
10     A.   In what manner, causal connection of
11 death?
12     Q.   Is it difficult in these cases to
13 prove that the supplier of the drugs should be
14 held responsible for causing the overdose death?
15         MS. HERMIZ:  Objection to form.
16     A.   If we have charged a supplier, we
17 have an obligation to show the link between
18 their drug they did and the death.  That's why
19 we have the medical examiner that comes in with
20 that toxicology report to say these drugs.  We
21 then -- then look and see -- law enforcement
22 investigates to say those specific drugs came
23 from this person.
24     Q.   Okay.  Would you agree with me that
25 prosecuting individuals for involuntary

Page 88

1 manslaughter related to an overdose death, those
2 are not easy cases, right?
3         MS. HERMIZ:  Objection to form.
4     A.   No cases are easy.
5     Q.   And those, in particular, are not
6 easy cases?
7         MS. HERMIZ:  Same objection.
8     A.   None of our cases are easy.
9     Q.   So do you agree with me that those
10 cases are not easy?
11     A.   I'd agree with you that all cases
12 are not easy.
13     Q.   And one of the reasons those cases
14 are not easy is because you have to prove that
15 causal connection you just talked about, right?
16     A.   We have to prove each and every
17 element.  One does not outweigh any other.  A
18 jury can go through and a judge is going to
19 advise them on the law and says if the
20 prosecutor fails to prove any one of these, then
21 it's a not guilty.  So the fact that the crime
22 occurred in Summit County is as important as
23 this was an illegal drug.
24     Q.   Would you agree with me that another
25 reason those cases are not easy is because you

Page 89

1 have to prove legal culpability of the supplier?
2         MS. HERMIZ:  Objection to form.
3     A.   That does not make it any more
4 difficult than any other case.
5     Q.   Is it true that you highlighted both
6 the causal connection and the legal culpability
7 issues as challenges when you talked at the
8 Indiana Prosecuting Attorneys Council meeting?
9     A.   Yes.  I was talking about their new
10 law and what they would have to do differently
11 than they had been doing and what we do.
12     Q.   And during that presentation, you
13 identified both of those issues as challenges
14 that you have seen in the cases involving
15 involuntary manslaughter?
16     A.   Yes.
17     Q.   Does your office charge involuntary
18 manslaughter in the case of every overdose
19 death?
20     A.   Where there's sufficient evidence,
21 yes.
22     Q.   And how do you make the
23 determination?
24     A.   Initially, what we did is our
25 supervisors -- we have a supervisors meeting

23 (Pages 86 - 89)

Page 90

1 every week, usually Thursday, at 2 p.m., and
2 initially what we did is we had -- it started
3 with Akron Police, actually in the beginning,
4 coming to us with these cases.  There were two
5 officers, Detective Schmidt and Detective
6 Harvey.  They would come meet with us and talk
7 about these cases.
8       We made -- we sat and we basically
9 roundtabled their cases, and determined which
10 one at the time was going to be the first one to
11 be charged.  We made that call.  Again, every
12 supervisors meeting then would have Detective
13 Harvey and Detective Schmidt coming up.  We
14 weren't able to work on other items then.  The
15 sheriff's department then said, Wait.  Can we
16 join in?  Can we come up on ours?  We had some
17 other jurisdictions come in and meet with us on
18 their deaths.
19       So it was then decided well into
20 this, after several charges, and I believe
21 several convictions, that instead of meeting
22 with all the supervisors, that the detectives
23 would meet with two of our supervisors, John
24 Baumoel and Brian LoPrinzi, and then they would
25 present the full case to us at a later time, the

Page 91

1 prosecutors would, rather than law enforcement.
2     Q.   What is the title of those two
3 individuals in your office you just referred to?
4     A.   Assistant county prosecutors.
5     Q.   Who else attended those roundtable
6 supervisors' meetings from your office?
7     A.   All of the criminal supervisors,
8 Margaret Scott at the time -- she's not in the
9 office now -- John Baumoel, Brian LoPrinzi, Greg
10 Peacock, Jenny Shuki, Terry Burnside.  That
11 should be the list.  And myself.
12     Q.   And you mentioned other law
13 enforcement officers would come to those
14 meetings as well to present?
15     A.   Yes.
16     Q.   Where did those meetings take place?
17     A.   In the conference room on the 6th
18 floor in the Summit County Safety Building.
19     Q.   You mentioned they were on a weekly
20 basis.  When did they first begin?
21     A.   Our supervisors' meetings, we
22 probably started those about 2000 -- 2010 I
23 think we started having formal supervisors'
24 meetings.
25     Q.   Was the county prosecutor herself

Page 92

1 present at those meetings?
2     A.   And just clarifying, I'm talking
3 about the supervisors' meetings in general.  Is
4 that what you're talking about?
5     Q.   Yes.
6     A.   Okay.
7       On occasion she is at those
8 meetings.
9     Q.   And are agendas prepared for those
10 meetings?
11     A.   No.
12     Q.   Do you take notes during those
13 meetings?
14     A.   No.
15     Q.   Does anyone else from your office
16 take notes during those meetings?
17     A.   I think recently Angela
18 Walls-Alexander takes notes on them, sends just
19 a brief summary.
20     Q.   Is she with your office?
21     A.   Yes.
22     Q.   What is her title?
23     A.   She's an assistant county
24 prosecutor.  She is not a supervisor, but in a
25 role where -- I believe earlier this year she

Page 93

1 started coming to our supervisors meetings.
2     Q.   When she sends the summaries of
3 those roundtable meetings, how does she do so?
4     A.   E-mail.  However, since she's been
5 doing that, that postdates these cases going
6 to -- coming to all of us.  And if you look at
7 the next document you have, that's John and
8 Brian's form they have.  So this is not a form
9 we had when we would meet and when these would
10 be at supervisors meetings.
11     Q.   So you're referring to the last page
12 of the exhibit titled "Prosecutors," and
13 included on that page is the death-related --
14 excuse me, the drug-related death prosecutor's
15 worksheet, correct?
16     A.   Yes.
17     Q.   And who is it that completes these
18 worksheets?
19     A.   That's an internal form kept by the
20 prosecutors that are reviewing those, so in this
21 case it most likely would be John Baumoel or
22 Brian LoPrinzi.
23     Q.   Who fills out the form?
24     A.   I don't know.
25     Q.   Where does the information come

24 (Pages 90 - 93)

Page 94

1  from?
2      A.    These, either John or Brian would
3  fill this out, or they would have the
4  investigating officer fill it out, so I would
5  assume the information comes from the
6  investigating officer.
7      Q.    Where are these completed forms
8  maintained in your office?
9          MS. HERMIZ:  Objection to form.
10      A.    I do not know if they are in the --
11  I would assume they're in the case file for any
12  case that's charged.
13      Q.    What about the prosecutor's
14  worksheets for cases that are ultimately
15  declined by your office; how are those
16  worksheets maintained?
17      A.    Usually when they come to us on
18  these cases, they're -- most of them are
19  prosecuted.  I don't know if they're declined --
20  now, some of them they decline on the
21  manslaughter charge and charge with the
22  corrupting still, so they would still be in that
23  case file I'm sure, or a trafficking charge if
24  not the corrupting charge.
25      Q.    You mentioned originally decisions

Page 95

1  about whether to file the involuntary
2  manslaughter charges were made during those
3  roundtable meetings?
4      A.    Um-hum.
5      Q.    And that it ultimately changed so
6  that those two individuals, John -- what was his
7  last name?
8      A.    Baumoel.
9      Q.    Baumoel.  And Brian LoPrinzi?
10      A.    B-a-u-m-o-e-l.
11      Q.    Thank you.
12      A.    LoPrinzi, L-o-P-r-i-n-z-i.
13      Q.    Those two individuals filled out the
14  worksheets, correct?
15      A.    I don't know if they did or the
16  officer did.
17      Q.    Okay.  But they ensured that the
18  worksheets were filled out, correct?
19          MS. HERMIZ:  Objection to form.
20      A.    You would have to ask them.
21      Q.    Okay.  When it shifted from the
22  roundtable, how did the -- how was the process
23  done for determining whether to file involuntary
24  manslaughter charges?
25      A.    John and Brian would make that call,

Page 96

1  John and Brian or John or Brian.
2      Q.    When you say make the call, do you
3  mean make a recommendation or make the decision?
4      A.    Make the decision.
5      Q.    And were they required to obtain
6  approval before filing involuntary manslaughter
7  charges?
8      A.    No.  They were the approval.
9      Q.    Okay.  So you did not review, and,
10  to your knowledge, the county prosecutor herself
11  did not review those decisions before they were
12  indicted?
13      A.    No.
14      Q.    Based on your involvement in the
15  process, what factors are considered in
16  screening potential cases for the involuntary
17  manslaughter charges?
18      A.    Do we have the evidence to convict.
19      Q.    What else?
20      A.    That's -- that's our decision.
21      Q.    Do you consider whether the
22  prospective defendant is an addict himself?
23          MS. HERMIZ:  Objection to form.
24      A.    Could you repeat that?
25      Q.    In deciding whether to charge

Page 97

1  involuntary manslaughter --
2      A.    Right.
3      Q.    -- do you consider whether the
4  prospective defendant is an addict himself?
5          MS. HERMIZ:  Same objection.
6      A.    It's discussed if the defendant is
7  an addict.
8      Q.    Okay.  But it doesn't, as you know,
9  factor into the decision on whether to charge
10  that defendant with involuntary manslaughter?
11      A.    In a criminal case everything
12  factors in.
13      Q.    Do you believe it's important to
14  identify the various culpabilities of
15  individuals who are involved in drug overdoses?
16          MS. HERMIZ:  Objection to form.
17      A.    We look at the culpability of the
18  individuals we're charging.
19      Q.    And when you consider who to charge,
20  do you consider whether a prospective defendant
21  was trafficking in drugs for financial reasons
22  versus simply sharing a drug with a fellow
23  addict?  Is that something that your office
24  would consider before deciding to charge?
25      A.    Consider, but it may not affect the

25 (Pages 94 - 97)

Page 98

1 outcome, may not affect whether we charge or
2 not.
3      Q.   Why not?
4      A.   We -- we have charged individuals
5 who were friends who provided the drugs and they
6 were sharing in the drugs, and we've charged
7 those with selling the drugs.  Again, it's --
8 it's all part of the case.  You have to look at
9 each case in the totality.  You can't just look
10 to any specific thing.  Just like I said on our
11 elements, our jury is told if they miss any one
12 of these elements, it's a not guilty.  So,
13 again, we're going to consider everything.  It
14 may make it more challenging of a crime -- or, I
15 mean, of a trial.  It may be something that you
16 think may affect a jury more, but that is,
17 again, something we consider.
18           - - - - -
19           (Thereupon, Gessner Deposition
20           Exhibit 8, Grant Application
21           Beginning Bates Number
22           SUMMIT_000064898, was marked for
23           purposes of identification.)
24           - - - - -
25      Q.   I've marked for identification

Page 99

1 Exhibit 8.  This is a lengthy document.  I'm not
2 going to ask you about all of it.  My first
3 question is, were you involved in drafting this
4 grant application?
5      A.   Other than identifying the
6 individuals in the office who would work on
7 submitting -- creating and submitting this grant
8 proposal, no, I was not.
9      Q.   Okay.  So you didn't draft this
10 document?
11      A.   No.
12      Q.   Who did draft this document?
13      A.   I don't know.
14      Q.   Who did you assign?
15      A.   I believe Kevin Guest and Tom Kroll.
16      Q.   What are their titles?
17      A.   Assistant county prosecutor.
18      Q.   And, to your knowledge, when did
19 those two individuals work on this grant
20 application?
21      A.   Several months ago.
22      Q.   This year?
23      A.   Yes.
24      Q.   And I just want to turn your
25 attention -- there's the project abstract.  You

Page 100

1 can pass forward through that.  And look at page
2 1.  The first paragraph, the second sentence
3 from the end --
4      A.   My pages don't have numbers on them.
5      Q.   The page that's in your hand right
6 now, that very first page there, yes.
7      A.   Okay.
8      Q.   At the very bottom it has the Bates
9 number SUMMIT 64899.
10      A.   Yes.
11      Q.   The first paragraph, second to the
12 last sentence, reads, "The introduction of
13 synthetic opioids like fentanyl and carfentanil
14 has significantly increased the problem,"
15 referring to the unfortunate overdose deaths.
16 Do you agree with that statement, even if you
17 were not the one that drafted it?
18      A.   Yes.
19      Q.   And if you could turn now to page 3.
20 At the top of page 3, the first full sentence at
21 the top of page 3, which is SUMMIT 64901, begins
22 with the words "Charging decisions."
23      A.   Um-hum.
24      Q.   It states, "Charging decisions will
25 consider the respective culpability of drug

Page 101

1 dealers who prey upon a vulnerable drug addicted
2 populous drug users compared to those
3 individuals who share narcotics with friends.
4 This distinction is important as it allows for a
5 multi-faceted approach to the opioid problem by
6 identifying the various culpabilities of
7 individuals involved in drug overdoses.  The
8 Summit County Prosecutor's Office Opiate Unit
9 will identify and separate the criminal
10 population of opiate offenders to ensure that
11 individuals who traffic in opiates for financial
12 reasons are treated differently from opiate
13 addicts who have shared the drug with fellow
14 addicts but were not directly involved in the
15 overdose."
16           Do you agree with that statement,
17 even if you were not the one who drafted it?
18           MS. HERMIZ:  Objection to form.
19      A.   Well, first of all, this is a
20 document that was to -- seeking a grant to
21 create a unit in our office, and I agree that if
22 we received that grant, that's what our unit was
23 going to do.
24      Q.   Okay.  So that would have been the
25 intention of your office had you received the

26 (Pages 98 - 101)

Page 102

1 grant money to fund two prosecutors who could
2 focus on an opiate --
3     A.   I believe the parameters of the
4 opportunities for that grant needed those
5 different things to be met in order to obtain
6 the grant, yes.
7     Q.   Okay.  And do you agree that it
8 makes sense to treat differently those
9 individuals who are trafficking in drugs for
10 financial reasons from addicts who share the
11 drugs with fellow addicts but are not directly
12 involved in the overdose?
13        MS. HERMIZ:  Objection to form.
14     A.   Personally?
15     Q.   Yes.
16     A.   Not always.
17     Q.   Why not?
18     A.   There are times individuals provide
19 drugs to people and use their addictions as an
20 excuse.
21     Q.   Can you say more about that?
22     A.   Ohio has a Good Samaritan law
23 that -- I don't like that either.
24     Q.   Okay.  First of all, tell us about
25 what the Good Samaritan law is.

Page 103

1     A.   If someone has -- has an overdose
2 and you call to get them help, even though you
3 may have supplied them with the drugs, you get a
4 free pass.
5     Q.   And what about that law do you find
6 problematic?
7     A.   The connection between supplying the
8 drugs that caused the death and -- and a pass is
9 what I find troubling.
10     Q.   Are you familiar with the argument
11 that providing immunity to the suppliers of the
12 drugs increases the chances that they will call
13 law enforcement for help when there is an
14 overdose and potentially save a life?  Are you
15 familiar with that argument?
16     A.   I've heard that argument, yes.
17     Q.   What's your response to that
18 argument?
19     A.   If they call for help and get them
20 help, I can't argue with it.
21     Q.   In your opinion, has the Good
22 Samaritan law resulted in a decrease in overdose
23 deaths?
24     A.   No.  I think it just sounded good.
25     Q.   What do you mean by that?

Page 104

1     A.   I think it's something politicians
2 do to try to address problems without going to
3 the source of the problems, so let's make a
4 friendly law here, but again, we've got to look
5 and see why are all of these people having these
6 addictions, where is all this coming from, and
7 that's where we've got to go.
8        THE VIDEOGRAPHER:  Can we go off the
9 record, please?
10        MS. WOODS:  Yes.
11        THE VIDEOGRAPHER:  Off the record at
12 11:11.
13        (Recess had.)
14        THE VIDEOGRAPHER:  We're on the
15 record, 11:28.
16 BY MS. WOODS:
17     Q.   Mr. Gessner, does your office have
18 policies and procedures governing charging
19 decisions?
20     A.   I believe that's within our policy
21 and procedures manual.
22     Q.   Have you produced that manual in
23 this litigation?
24     A.   If it's been requested, it's been
25 produced.

Page 105

1     Q.   How long is the manual?
2     A.   It's digital.
3     Q.   I should first ask, is it electronic
4 --
5     A.   Yes.
6     Q.   -- or hard copy?  Electronic.
7        And is it available to all the
8 prosecutors in your office?
9     A.   Yes.
10     Q.   When was that manual last updated?
11     A.   It's ongoing, depending on what
12 needs to be addressed in that.
13     Q.   Have you produced all prior versions
14 of the manual?
15        MS. HERMIZ:  Objection to form.
16     A.   I have not produced any -- anything.
17 Our IT person would be the person, I think, that
18 has sent those over.
19     Q.   How do you access the manual
20 electronically?  Is it on a website, an
21 intranet?
22     A.   No.  Under office policies.
23 Under -- I believe it's under our O-drive.
24     Q.   Is it a public document?
25     A.   If it's requested, it would be a

27 (Pages 102 - 105)

Page 106

1 public document.
2     Q.   Unfortunately, I don't believe that
3 we've received that manual. Can you summarize
4 for me what the manual says in terms of charging
5 decisions?
6         MS. HERMIZ: Objection to form.
7     A.   I would need -- need in front of
8 me -- other than it primarily -- the most
9 significant portion would be our ethical
10 obligations in it.
11     Q.   And what are those ethical
12 obligations?
13     A.   As prosecutors, we're the only
14 attorneys in the entire legal system that have
15 to do what's right. Prosecutors are the only
16 attorneys under law that have to tell the truth.
17 So it would be following that. I believe it
18 also has, in order to dismiss a case, you need
19 to have my signature on the dismissal. If
20 you're going to reduce a case to a misdemeanor,
21 you need your supervisor's signature on that.
22 So, again, they're all tied in the charging and
23 resolving of cases, I believe.
24     Q.   And does it outline policies that
25 are to be followed in determining whether to

Page 107

1 file charges in a particular case?
2     A.   I don't know if that's in there. We
3 pretty much follow the National Prosecution
4 Standards that the National District Attorneys
5 Association has.
6     Q.   And where are those standards
7 memorialized?
8     A.   The National District Attorneys
9 Association, on their website you can pull those
10 up. It's the National Prosecution Standards.
11     Q.   And what factors are considered in
12 those standards in determining whether to
13 prosecute a case?
14     A.   Just about everything. I think it
15 goes A through, maybe, double X.
16     Q.   Do you rely on any other policies or
17 standards or procedures when deciding whether to
18 prosecute a case?
19     A.   Just our ethical obligations to do
20 what's right.
21     Q.   Are there any specific policies that
22 you're aware of about bringing cases that
23 involve the diversion of prescription medicine?
24     A.   No; however, we did just receive a
25 request from the Ohio Pharmacy Board to enter

Page 108

1 into a diversion program that, I believe, they
2 are using in Franklin County, and we have not
3 opted to participate in that at this point.
4     Q.   Why not?
5     A.   We feel our -- our laws that exist
6 are dealing with that and the diversion program
7 set in the Revised Code covers what we need.
8     Q.   And when you refer to a diversion
9 program, what are you talking about?
10     A.   What I'm talking about with the
11 diversion program is someone who is potentially
12 charged with a crime or charged with a crime,
13 having it diverted to where there are no
14 criminal charges, that we have a system set up
15 with that. That's what I'm speaking of.
16     Q.   And does your office keep records or
17 track the number of cases that are diverted?
18     A.   Yes.
19     Q.   Where are those records kept?
20     A.   Those would actually be kept by the
21 Oriana House. Oriana operates our program for
22 us.
23     Q.   What sorts of cases are diverted
24 from prosecution?
25     A.   A lot of shopliftings.

Page 109

1     Q.   What other types of cases?
2     A.   Minor thefts, individuals who are
3 just over the thousand dollar limit on a theft.
4 A lot of bad checks or fraudulent checks, those
5 are diverted.
6     Q.   Are drug cases diverted?
7     A.   No, because we have our -- the
8 court -- Summit County Court has their Turning
9 Point program. Previously they were diverted in
10 the old drug court system. They are now charged
11 and handled through the courts.
12     Q.   So none of Summit County
13 Prosecutor's diverted drug cases would be
14 diverted to Oriana House?
15     A.   Oriana House.
16     Q.   Is that correct?
17         MS. HERMIZ: Objection to form.
18     A.   Well, you have to clarify. There is
19 the Summit County Prosecutor's diversion
20 program. That program does not have any drug
21 cases in it.
22     Q.   What program does have drug cases
23 that are diverted?
24     A.   If there is any, it would be the
25 Summit County Court of Common Pleas Turning

28 (Pages 106 - 109)

Page 110

1  Point program.
2      Q.   So we'll ask you questions about
3  that later.
4          Going back to the charging
5  decisions, we spoke about the process that is
6  followed with respect to the involuntary
7  manslaughter cases.  What process is followed
8  with respect to the other cases handled by your
9  office?
10         MS. HERMIZ:  Objection to form.
11     A.   Can you rephrase that?
12     Q.   How does your office decide whether
13  to file charges in cases other than those
14  involuntary manslaughter cases we already talked
15  about?
16     A.   All right.
17         Under Ohio law, we only have
18  jurisdiction on felony cases; however, the
19  jurisdiction to initiate a felony charge, absent
20  a secret indictment by the Grand Jury, is
21  maintained by the municipal courts, municipal
22  city prosecutors for the county.  They are --
23  the city prosecutors are not in any way related
24  to our county prosecutor's office.  We have
25  what's called a direct indictment program in

Page 111

1  Summit County that the majority of the county is
2  involved in.  There are some townships and
3  cities in the northern part of the county where
4  they do not participate in that program.
5          So, typically, under the direct
6  indictment program, the municipal prosecutors
7  will approve felony charges.  Those individuals
8  arrested for a felony charge today will be
9  reviewed and screened by our office tomorrow and
10  presented to the Grand Jury within one week of
11  the individual's arrest.  So the initial
12  charging is something that we have no part of --
13     Q.   Understood.
14     A.   -- in those cases.
15         If it's outside of the direct
16  indictment program, it, again, is the city
17  prosecutor's office would handle those or the
18  law director for whatever jurisdiction that may
19  be.  It could go to a preliminary hearing and
20  then be bound over to the Grand Jury, to our
21  office for review at that point, and for
22  presentation to the Grand Jury.
23     Q.   Okay.  For cases that come to you
24  through the direct indictment program, please
25  explain your office's review and screening

Page 112

1  process.
2      A.   Okay.
3          Initially, one of our direct
4  indictment officers -- there are, I believe,
5  seven, five full time, two part time -- they
6  will pick up all of the police reports
7  associated with that charge, bring them back to
8  our office.  I believe they start anywhere from
9  7 to 8:00 in the morning gathering those
10  documents.
11         At about 10:30 that morning, they
12  will have a meeting with whoever the prosecutor
13  is assigned to the Grand Jury presentation a
14  week out from that, at which point they'll
15  review the documents and determine if it is a
16  case to schedule for Grand Jury, which about 98
17  percent of them are, or if it's a case that they
18  feel would be better resolved back in the
19  municipal court, if it's something, again,
20  questionable, something that -- for example,
21  there are individuals who would steal cars and
22  we would find out they were actually renting
23  them in return for giving someone drugs.  So
24  years ago that came up.  So we try to weed those
25  out and send those back to the city.

Page 113

1          So there's -- those individuals,
2  along with our direct indictment officers,
3  screen them, make sure we have the elements of
4  our offenses committed that we believe we can
5  prove, and then the matter is sent over to the
6  clerk of court's office for a case number and
7  scheduled for Grand Jury.
8      Q.   And you said approximately 98
9  percent of the cases that are screened
10  ultimately go on to be charged in your office?
11     A.   Yes.  And I could be a few
12  percentage points off.
13     Q.   How does the prosecutor decide which
14  particular charges to file?
15     A.   Based on their experience.
16     Q.   And what records are kept concerning
17  this review and screening process?
18     A.   Well, it's all, actually,
19  computerized now, the system, on Matrix, where
20  the prosecutors will actually access Matrix
21  right during their screening, put the
22  information in there, so the case management
23  system would have that information on there.
24     Q.   And before the advent of Matrix, how
25  was this review screening process documented?

29 (Pages 110 - 113)

Page 114

1     A.   It was called a green sheet.  It was
2 an 8-and-a-half by 14-inch piece of paper that
3 was green.  That's why they called it a green
4 sheet.  And notes would just be made on it.  The
5 scheduled dates would be on there.
6     Q.   And how were those green sheets
7 maintained?
8     A.   In each case file.  The physical
9 file would have it.
10    Q.   Are those green sheets available in
11 electronic form today or are they still hard
12 copy?
13    A.   I don't know if the clerk of courts
14 has the green sheets or not.  On some cases I
15 believe they did.  So if they took them and
16 scanned them in, they would be electronically;
17 otherwise, it's hard copy in the file.
18    Q.   Where are these case files that
19 contain the green sheets kept?
20    A.   In our office in the Jeter system.
21    Q.   In the what system?
22    A.   Jeter.
23    Q.   What is that?
24    A.   It's a file management system.  It
25 has cranks on it and they move up, space saving.

Page 115

1     Q.   If you needed to go find a
2 particular case file, who would you go to to
3 access it?
4     A.   I would go look myself.
5     Q.   For the case file yourself?
6     A.   Yes.
7     Q.   Is it possible to review these green
8 sheets without going to each individual hard
9 copy case file?
10    A.   If you pulled them up
11 electronically, each individual case, and looked
12 through the clerk of courts to see if it was
13 there, that would be the other way, but there's
14 no system where green sheets are kept by
15 themselves.
16    Q.   And does your office track in any
17 other way data related to the number of cases
18 that have been screened and reviewed and the
19 types of charges that have been filed?
20    A.   I believe over in Grand Jury there
21 is a tracking of the number of cases that are --
22 are brought in, the number of cases that are
23 indicted.  There's a monthly report that goes to
24 the courts.  Actually, not monthly.  Each --
25 each time the Grand Jury reports out, there is a

Page 116

1 partial report that is submitted to the court.
2 And I do not believe those are public records.
3     Q.   Who supports those -- excuse me.
4 Who submits those reports?
5     A.   Our office does.
6     Q.   Who specifically within your office?
7     A.   I would think the secretaries in the
8 Grand Jury division.
9     Q.   What are their names?
10    A.   Just got a brand-new one there.  I
11 believe Julie.  I do not know her last name.
12    Q.   Okay.  Anyone else?
13    A.   No.
14    Q.   Who worked there before Julie?
15    A.   Jennifer Cline, and that was Cline
16 with a C.
17    Q.   What type of documents do you
18 receive from law enforcement agencies concerning
19 potential prosecutions?
20         MS. HERMIZ:  Objection to form.
21    A.   We receive police reports and
22 reports of investigation.
23    Q.   Do you receive any other documents
24 from law enforcement agencies?
25    A.   We are supposed to receive criminal

Page 117

1 histories.  There -- I don't know what other
2 documents you're asking about.
3     Q.   Apart from police reports and
4 criminal history of a prospective defendant, do
5 the law enforcement agencies provide you with
6 any other materials or documents to assist your
7 office in determining how to handle a case?
8     A.   Within the case file you may find
9 records from the crime scene, you might find lab
10 reports, you might find medical reports.  That's
11 all encompassing the report from the police
12 department.  The report of the investigation
13 usually has everything in there.
14    Q.   And are each of the materials you
15 just described contained -- or maintained within
16 your office's case file for that particular
17 case?
18    A.   Yes.
19    Q.   In what circumstances would your
20 office prepare a prosecution memo?
21         MS. HERMIZ:  Objection to form.
22    Q.   First of all, do you know what I'm
23 referring to when I say "prosecution memo"?
24    A.   No.  Explain that to me.
25    Q.   Okay.  In what circumstances would

30 (Pages 114 - 117)

Page 118

1 your office prepare a memo about the case and
2 its evidence and what charges should be filed?
3     A.   We don't normally prepare a memo.
4     Q.   Has your office prepared memos
5 regarding the prosecution of particular cases?
6 Has it ever done so?
7     A.   It may have been done.  It may be
8 done infrequently, but it's not anything
9 required or anything that's normally done.
10     Q.   Have you yourself ever drafted a
11 memo for others to learn about a case you were
12 handling and its evidence?
13     A.   Yes.  And at times I've done -- and
14 I wouldn't call it a memo.  I may have sent an
15 e-mail to -- we have -- in our computer system
16 we have an address system set up called Z Trial.
17 If you're going to go into trial on a case, you
18 normally send out -- and that normally goes to
19 the prosecutor, myself and the supervisors in
20 the criminal division -- a maybe two or
21 three-sentence summary of your case, any
22 strengths or weaknesses, whether there's any
23 attempts to resolve it, again, if it's set for
24 trial, and that's just sent out as a heads up of
25 I'm going to be in trial.

Page 119

1     Q.   And who does the prosecutor send
2 those summaries two?
3     A.   The Z Trial, again, it goes to the
4 county prosecutor, myself and the criminal
5 supervisors.
6     Q.   Is that sent like via e-mail?
7     A.   Yes.
8     Q.   And how are those e-mail summaries
9 of the cases maintained?
10     A.   Well, they're maintained based on
11 our retention record and our retention schedule,
12 which typically what we've had -- what was
13 approved by the -- I believe the Secretary of
14 State and the county, was once an e-mail is no
15 longer of value to the person having it, they
16 are to delete it from their system.  So once my
17 case is over, that Z Trial would be deleted from
18 the system.
19     Q.   And when you say once a case is
20 over, you're referring to the conclusion of --
21     A.   Yes.
22     Q.   -- the case, a verdict or any appeal
23 that might transpire?
24     A.   No, not necessarily any appeal.
25 More just that Z Trial is again -- they know the

Page 120

1 facts of their case, the prosecutor handling it,
2 so they really -- that is not a value to them at
3 any point.  If I look at it, generally I'm going
4 to look at that to see if there are any
5 problems.  If I receive it from a prosecutor, if
6 there are any problems that I think maybe they
7 missed or should be addressed.  And once I've
8 gone through that, I'm going to delete that from
9 my system, again, if there's no need for me to
10 respond to it.
11     What we had is several years ago our
12 system kept slowing down.  The county's
13 resources are not the greatest.  And when you
14 have 4,000 cases in a year, and even though
15 4,000 don't go to trial, those that do go to
16 trial, or are likely to go to trial and you
17 start sending all these things, we had a system
18 that was greatly slowing down, so we went in and
19 created a retention schedule to allow our system
20 to work much more effectively.
21     Q.   Let's talk about that.
22     When did you create that retention
23 schedule?
24     A.   Oh, you'd have to look with the
25 Secretary of State to see when that was filed

Page 121

1 first, but it's been quite a few years.
2     Q.   And you stated you use e-mail in
3 your job.  How long have you used e-mail?
4     I'll rephrase.  Have you used e-mail
5 since joining the Summit County Prosecutor's
6 Office in 2001?
7     A.   Yes.
8     Q.   And how many e-mails a day do you
9 send?
10     MS. HERMIZ:  Objection to form.
11     Q.   Approximately.
12     A.   I may send 20 or 30 e-mails a day.
13 I may receive -- I remember several years ago I
14 broke my wrist and I was off, and the first day
15 off, with trying not to move my wrist, I had 175
16 e-mails that day.
17     Q.   Is that a typical day?
18     A.   Yes.
19     Q.   During your years with the Summit
20 County Prosecutor's Office, have you sent
21 e-mails regarding drug investigations or
22 prosecutions?
23     A.   I may have.
24     Q.   You're not sure?
25     A.   No.  I mean, I -- I'm sure I did.

31 (Pages 118 - 121)

Page 122

1    Q.   How frequently do you delete your
2  e-mails?
3       A.   I try to delete them usually once a
4  week or so.  When you see you have 7 or 800
5  e-mails sitting there, it's nice to get them
6  down to where they can fit on one page.
7       Q.   Has that always been your practice?
8       A.   Yes.  It's an office policy.  Again,
9  you're supposed to delete your e-mails before
10  they build up.
11      Q.   I understand it was a relatively
12  recent office policy.  My question was, has it
13  always been your practice to frequently delete
14  your e-mails?
15          MS. HERMIZ:  Objection to form.
16      A.   First of all, it was not a
17  relatively recent decision.  This has been --
18  for several years our policy has been you delete
19  your e-mails.  I know -- I've been in my
20  position since 2013.  Prior to that, I'm
21  thinking 2007, when I became chief of the
22  criminal division, the policy then was to delete
23  your e-mails.  So this is not a recent change.
24      Q.   And for you, have you always had a
25  practice of deleting on a weekly basis?

Page 123

1       A.   I try to.
2       Q.   Do you still have access to the
3  e-mails you sent back in the early 2000s?
4       A.   No.  I would -- when you delete
5  them, you delete them from your trash bin also
6  so, again, you're not bogging down the system.
7       Q.   What is the oldest e-mail you still
8  have access to?
9       A.   I would think I probably -- I
10  believe I have a couple that might be a year or
11  so old, because they were to some of our judges,
12  and I just haven't deleted those.
13      Q.   Would it surprise you to learn that
14  Summit County only produced 164 documents from
15  your custodial file?
16          MS. HERMIZ:  Objection to form.
17      A.   No, it wouldn't surprise me.
18      Q.   And that the earliest e-mail is from
19  December 19th, 2016?
20      A.   I believe you asked e-mails related
21  to drug-related cases.  I don't believe you
22  asked all of my e-mails.
23      Q.   So it would not surprise you that
24  the earliest e-mail we received is from
25  September 19th of 2016?

Page 124

1          MS. HERMIZ:  Objection to form.
2       A.   That would not surprise me.
3       Q.   Now, you used your work e-mail prior
4  to that date, right?
5       A.   Yes.
6       Q.   And you e-mailed regarding drug
7  issues prior to that date, didn't you?
8       A.   Yes.
9       Q.   Do you still have any of those
10  e-mails?
11      A.   No.  As I told you, our e-mails are
12  based on a retention schedule, and we follow our
13  retention schedule.
14      Q.   If you needed to find an e-mail you
15  had sent back in 2014, how would you go about
16  trying to recover it?
17          MS. HERMIZ:  Objection to form.
18      A.   I don't know.  I have not done that.
19      Q.   How many different work e-mail
20  addresses have you had during your time at
21  Summit County?
22      A.   I've only had this e-mail address.
23      Q.   Do you use any e-mail address other
24  than your official e-mail account for business
25  purposes?

Page 125

1       A.   No.
2       Q.   Do you have a personal e-mail
3  address?
4       A.   Yes, I do.
5       Q.   But you've never used that for work?
6       A.   No.
7       Q.   Are there notifications, reports or
8  other documents that you receive regularly from
9  others related to your work?
10          MS. HERMIZ:  Objection to form.
11      A.   What type of -- clarify the
12  notifications.
13      Q.   You said calendar notifications?
14      A.   No.  What -- what are you asking?
15      Q.   I'm asking what types of documents
16  you might receive regularly from individuals you
17  work with.
18      A.   All types of documents.
19      Q.   Let's walk through them.
20          So what types of documents?
21      A.   For particularly what?  I receive
22  documents for payroll that -- or people's
23  vacation leaves that I have to approve.  Is that
24  what you're --
25      Q.   Let's talk about any and all

32 (Pages 122 - 125)

1 documents you receive related to drugs. We've
2 already mentioned you receive police reports and
3 evidence relating to cases.
4      A.  Um-hum.  I receive a report I think
5 at the end of each month on the pending
6 death-related drug cases. Megan Bogavich,
7 B-o-g-a-v-i-c-h, is our administrative
8 assistant. She prepares that document. And in
9 it I see the names of the prosecutors who are
10 handling the cases, who their second chair is
11 and what the charges are.
12      Q.  When you say "death-related cases,"
13 what are you talking about?
14      A.  The involuntary manslaughter cases.
15      Q.  Okay. What other drug-related
16 documents do you receive from work colleagues?
17      A.  In general, none.
18      Q.  You mentioned you receive or send
19 e-mail summaries of drug-related cases?
20      A.  Of all cases. Any case that is
21 going to go to trial, we send an e-mail out. So
22 it's not something of just drug-related cases.
23      Q.  But you do send and receive e-mail
24 summaries related to drug cases, right?
25      A.  I have not tried a drug case in

1 several years, so I do not send them, I receive
2 them.
3      Q.  Okay. Do you receive calendar
4 invitations to meetings related to drug issues?
5      A.  I believe for the Summit County Drug
6 Unit, we do get calendar notifications for that.
7      Q.  Do you receive agendas or meeting
8 materials related to drug issues?
9      A.  Usually the agenda is passed out at
10 the meeting, the Summit County Drug Unit.
11      Q.  You said "usually." Is it sometimes
12 e-mailed?
13      A.  It may have been. I don't recall.
14      Q.  What other types of documents do you
15 receive in hard copy or electronic format
16 related to drug issues?
17      A.  If an officer doesn't show up for a
18 meeting with one of the prosecutors in
19 preparation for trial, they might send that out.
20 If we're waiting on a lab report from BCI,
21 someone may send out an e-mail saying -- in that
22 Z Trial maybe saying we don't have a BCI report
23 and we may have to call BCI for it.
24      Q.  Do you receive media releases or
25 other announcements from law enforcement agents

1 regarding drug enforcement?
2      A.  I don't receive them. I receive --
3 internally our communications director will send
4 out press releases on cases we have handled, so
5 I'm copied on those. And, again, most of those
6 are things I'm already familiar with.
7      Q.  So you're saying you don't receive
8 any announcements or media releases from law
9 enforcement agents about drugs?
10      A.  No, I'm not saying I don't receive
11 any. You asked me -- we may have received
12 those. I don't typically -- like the sheriff's
13 document you showed me, Exhibit 5, I'm not on
14 the sheriff's media release list.
15      Q.  Why not?
16         MS. HERMIZ:  Objection to form.
17      A.  You would have to ask the sheriff
18 why not. I don't --
19      Q.  Have you ever sought to be?
20      A.  No. I have enough information
21 coming in in a day, with 175 e-mails, that I'm
22 not looking for that. It's something that I'll
23 be made aware of if that's necessary. Our
24 communications director is primarily the person
25 that gets the media releases.

1      Q.  So if it were necessary for you to
2 find out about breaking news regarding a drug in
3 your community, how would you find out about it?
4         MS. HERMIZ:  Objection to form.
5      A.  If it's an issue related to our
6 office, usually I have an officer show up at my
7 office to meet.
8      Q.  So you haven't requested to be part
9 of their e-mail announcement list or anything?
10      A.  As to what?
11      Q.  As to drugs.
12      A.  Again, if an officer has a need to
13 communicate with me, they will communicate with
14 me.
15      Q.  And you would expect them to come to
16 your office in person? Is that what you said?
17      A.  No. I would expect them to come to
18 my office, call me or send me an e-mail.
19      Q.  And have you received e-mails from
20 officers regarding drugs?
21      A.  I'm sure over the years I have.
22      Q.  Have you ever maintained a notebook
23 or diary with notes of your work activities?
24      A.  No.
25      Q.  Do you have a cell phone for work?

33 (Pages 126 - 129)

Page 130

1    A.   Yes.
2    Q.   Do you receive texts on your work
3 cell phone?
4    A.   Yes, I do.
5    Q.   Do those texts sometimes relate to
6 opioid matters?
7    A.   Not that I recall.
8    Q.   Did anybody ever collect your cell
9 phone to download your texts for production in
10 this case?
11    A.   I don't know.
12    Q.   Have you ever given your work cell
13 phone to someone for that purpose?
14    A.   No.
15    Q.   Do your texts sometimes relate to
16 drug matters?
17    A.   I don't believe so.
18    Q.   Do you know that to be certain?
19       MS. HERMIZ:  Objection to form.
20    A.   Yes.
21    Q.   Have you reviewed your text
22 messages?
23    A.   No.
24    Q.   How far back do your text messages
25 go?

Page 131

1    A.   I have no idea.
2    Q.   How frequently do you communicate
3 via text message regarding drug matters?
4    A.   None that -- that I'm aware of.
5    Q.   Who do you communicate via text
6 message with?
7       MS. HERMIZ:  Objection to form.
8    A.   I said I have not as far as I know.
9    Q.   Who do you communicate via text
10 message with on your work phone regarding any
11 matter?
12    A.   I try to not communicate with anyone
13 on it.  If I receive a communication, I'll
14 respond to it.
15    Q.   Sitting here today, you cannot
16 recall whether you have received or sent any
17 text messages regarding drug matters?
18       MS. HERMIZ:  Objection to form.
19    Q.   Would you agree with that?
20    A.   No, I would not agree with that.
21    Q.   You're certain that you have not
22 sent or received any text messages on your work
23 phone regarding drug matters?
24    A.   To the best of my recollection, yes.
25    Q.   And your recollection is based on

Page 132

1 your memory of the texts at the time you sent or
2 received them because you have not gone back and
3 reviewed them; is that right?
4    A.   Yes.
5    Q.   Did you or anybody else collect your
6 computer to search for documents related to this
7 litigation?
8    A.   I believe our IT person did that and
9 county IT also did that.
10    Q.   Do you maintain hard copies of
11 documents in your office?
12    A.   No.
13    Q.   You don't have any hard copies of
14 documents in your office?
15    A.   Not that I maintain.
16    Q.   What hard copies of documents do you
17 have in your office?  What types of documents do
18 you have?
19    A.   I may have cases that I'm reviewing
20 that are going to go back into the case file or
21 be disposed of.
22    Q.   Did anybody collect those hard copy
23 documents from your office to review them?
24       MS. HERMIZ:  Objection to form.
25    A.   Can you narrow down what documents

Page 133

1 or what type of documents you're talking about?
2    Q.   I'm referring to the hard copy
3 documents that you just testified are in your
4 office.  Has anyone gone in to look at those
5 hard copy documents in connection with this
6 litigation?
7       MS. HERMIZ:  Objection to form.
8    A.   In connection with this litigation,
9 meaning drug-related documents?
10    Q.   My question is, has anyone reviewed
11 all the hard copy documents in your office to
12 determine whether any are related to this
13 litigation?
14       MS. HERMIZ:  Objection to form.
15    A.   I have been told to turn over any
16 documents I have, and I've done that.
17    Q.   Have you reviewed all the hard copy
18 documents currently in your office for that
19 purpose?
20    A.   Yes.
21    Q.   Has your offices -- did you receive
22 a hold notice when this litigation was initiated
23 telling you and your staff not to delete any
24 records that may have relevant information?
25    A.   I believe the county executive's

34 (Pages 130 - 133)

Page 134

1 office forwarded an e-mail to us.  I remember a
2 reminder of that coming out a few months ago.
3     Q.    When did you first receive the
4 notice?
5     A.    Which notice?
6     Q.    The original hold notice.
7     A.    I don't recall.
8     Q.    Can you estimate for us when you
9 first received that?
10    A.    It's been a while.
11    Q.    How long?
12    A.    I don't know.
13    Q.    What time of year was it when you
14 first received the hold notice?
15    A.    I have no idea.
16    Q.    Has it been a month or longer?
17    A.    I would say longer than a month.
18    Q.    Has it been a year or longer?
19    A.    I think we just passed that point
20 where I can't recall that part.
21    Q.    So it's been some point between a
22 month and 12 months?
23    A.    It's some point between a month and
24 longer.
25    Q.    But certainly less than a year?

Page 135

1     A.    I don't know.
2     Q.    So it could have been two years ago?
3     A.    I don't know.
4     Q.    What did the litigation hold notice
5 say?
6         MS. HERMIZ:  Objection to form.
7     A.    I don't have a copy of it in front
8 of me.
9     Q.    What was your understanding of what
10 it said?
11    A.    Anything related to the opioid case
12 and the opioid crisis we were to turn over for
13 discovery purposes.
14    Q.    Did you also understand that you
15 were not to delete any records that may have
16 relevant information?
17    A.    Yes.
18    Q.    Did you abide by that notice?
19    A.    As best I could, yes.
20    Q.    And so does that mean that you've
21 suspended the document retention policy so as
22 not to delete any records that may have relevant
23 information in this case?
24    A.    No.  As to this case, yes.  As to
25 everything else, no.

Page 136

1     Q.    Are you still deleting e-mails that
2 may relate to drug cases?
3         MS. HERMIZ:  Objection to form.
4     A.    Well, that's presuming I was
5 deleting them in the first place.  The e-mails
6 -- since we received that notice I am deleting
7 my e-mails that are not related to these cases.
8     Q.    Have you deleted or destroyed any
9 documents or materials related to opioids?
10    A.    Not that I'm aware of.
11    Q.    My question, to be clear, is
12 referring throughout your time at the Summit
13 County Prosecutor's Office.  So prior to
14 receiving the litigation hold notice, did you
15 delete or destroy documents or materials related
16 to opioids?
17    A.    We complied with our retention
18 policy.
19    Q.    And in doing so, did you delete or
20 destroy any documents relating to opioids?
21    A.    I'm sure there were e-mails that
22 were deleted, yes.
23    Q.    Are you aware that case files from
24 your office have been produced in this
25 litigation?

Page 137

1     A.    I would hope so.
2     Q.    Were you involved in any way in
3 determining which case files to produce?
4     A.    I believe we said anything relating
5 to heroin or opiates was to be produced.
6     Q.    Did you produce cases that involved
7 street drugs, like heroin, even if they didn't
8 involve prescription opioids?
9         MS. HERMIZ:  Objection to form.
10    A.    I don't know what was produced.  You
11 would have those records.
12    Q.    Do you know who was involved in
13 deciding which case files to produce?
14    A.    I believe they were advised -- I
15 think -- Merritt Hannah I think is the name of
16 the assistant prosecutor that was handling
17 those.
18    Q.    Who was overseeing that process?
19    A.    I believe Merritt Hannah was the
20 prosecutor assigned to that matter.
21    Q.    Mr. Gessner, what do you consider to
22 be an e-mail related to this case such that you
23 would not delete it today?
24        MS. HERMIZ:  Objection to form.
25    A.    Any e-mail involving heroin or

35 (Pages 134 - 137)

Page 138

opiate-related cases.
Q. Do you consider e-mails related to this case to also apply to e-mails that are not discussing a particular prosecution or a particular case in your office but are discussing the issue more broadly?
MS. HERMIZ: Objection to form.
A. I don't recall specifically what was in the retention letter, but whatever was in the retention letter is what we tried to accommodate.
Q. Do you understand e-mails related to this case to encompass e-mails related to discussions on meth amphetamine?
A. I don't recall if that was in the retention letter.
Q. Do you consider an e-mail related to this case to be an e-mail related to cocaine?
A. If that was in the retention letter.
Q. Have you deleted e-mails regarding meth amphetamine or cocaine?
MS. HERMIZ: Objection to form.
A. Whatever e-mails, if they were deleted, I believe county IT was able to go back and recover those, and I think those were

Page 139

provided.
Q. How do you know that -- is it your understanding that county IT got involved in recovering some of the e-mails you had deleted?
MS. HERMIZ: Objection to form.
A. First of all, you're presuming I deleted something, so if you want to --
Q. Okay. I'm trying to understand. Your answer was that it was your belief that county IT was able to go back and cover those and I think they were provided, so can you explain those?
A. Recover those, not cover those. Recover those. We were advised by the county executive's office, the law department, that they did not feel that there were enough e-mails there, or the e-mails were there, that the IT was going to go -- that the county IT was going to go look and see if there was anything pertinent and those would be provided. I was then at a later time told they were provided. So whether or not those were mine or anyone else's, I do not know.
Q. On what date did the county IT review and prepare to produce relevant e-mails?

Page 140

MS. HERMIZ: Objection to form.
A. I have no idea.
Q. Is it your understanding that that is a continuing process that county IT has engaged in on a daily basis?
A. You would have to ask county IT on that.
Q. Is it your understanding that you're not to delete e-mails related to meth amphetamine due to the litigation hold in this case?
A. Again, I don't have that litigation hold in front of me to tell me if that was in there yet.
Q. Sitting here today, if you were faced with a decision whether or not to delete an e-mail regarding meth amphetamine.
A. If it was a drug-related case, I would not delete it.
Q. You would not delete it?
A. No.
Q. And have you deleted any drug-related e-mails since receiving the litigation hold?
A. Not that I'm aware of.

Page 141

Q. Going back to the decisions to prosecute involuntary manslaughter heroin cases, to your knowledge, how many overdose deaths have occurred in your jurisdiction between 2013 and the present day?
MS. HERMIZ: Objection to form.
A. Way too many. In the hundreds.
Q. And if there are hundreds of overdose deaths, why have you indicted only 55 of the cases?
A. What you have to understand is the first thing is the resources. Again, you look at a particular overdose death where the medical examiner is going to do an autopsy and the toxicology report is going to come back and it's going to have heroin, fentanyl, carfentanil, Percocets, oxycodone, whatever those drugs may be that are listed in there. First of all, was -- were there any witnesses to the death. We're going to look and see are there -- if there are no witnesses, were there any cell phones left that the police could go back and try to trace again where those drugs may have come from, anything there that's going to give us leads, again, anything on social media, on

1 Facebook.  I mean, we've had cases where on
2 Facebook individuals have gone on and
3 acknowledged they provided the drugs that caused
4 someone's death and asking for their friends to
5 send them sympathy.
6     Q.    So you're referring to the quality
7 and the quantity of evidence as a factor in
8 whether or not an overdose death may have been
9 prosecuted?
10    A.    Oh, evidence is the first thing.  If
11 there's no evidence, there can be no
12 prosecution.  Second then is the manpower.
13        So, first of all, if a case, even
14 without investigation, there is enough evidence
15 to link somebody but you don't have the manpower
16 or the resources in law enforcement to
17 investigate it, it doesn't matter how good the
18 evidence is.  So, again, law enforcement -- this
19 is something they've had to play catch-up with
20 because of the volume of the crimes here.  So
21 when they went out then again clearly
22 undermanned in their ability, when, with the
23 crisis we had in the City of Akron, and the
24 police were able to dedicate two officers, two
25 detectives to handle this, and that was all they

1 could do, and that was a stretch, again, we're
2 starting with 50 to a hundred cases for
3 Detective Schmidt and Harvey, and they're able
4 to work on one or two at a time.  So those are
5 going to come in and then we're going to review
6 them, again, waiting for the medical examiner,
7 who has so many bodies sitting in their morgue
8 that they can't do the autopsies.  Again, all
9 those things -- everything in this -- on that
10 number that you asked me about all goes back to
11 the lack of resources that this community has to
12 fight this crime.
13    Q.    How many cases have been referred to
14 your office for potential involuntary
15 manslaughter charges?
16    A.    I would say the majority of what
17 have been referred have been indicted.  Again,
18 there have been some where we've told police
19 there isn't enough evidence here.
20    Q.    So is it fair to say approximately
21 55 cases have been presented to your office?
22    A.    No.  As I said, if -- in most cases
23 we took those cases.  There may be other ones
24 where we said there wasn't sufficient evidence.
25    Q.    And do you know how many cases you

1 would have declined for insufficient evidence?
2    A.    No.
3    Q.    And if you decline them for
4 insufficient evidence for involuntary
5 manslaughter charges, you may have still
6 prosecuted the defendant for other --
7    A.    We may have still been able to
8 prosecute for corrupting, another one, for
9 giving them drugs, for trafficking, for selling
10 them the drugs.  Again, those are other things
11 out there.
12    Q.    Have you indicted for involuntary
13 manslaughter in every case in which you had
14 sufficient evidence?
15    A.    Yes.
16    Q.    Has there been any case that your
17 office has had to turn away due to lack of
18 resources in the prosecutor's office?
19    A.    See, we don't -- we don't turn cases
20 away for lack of resources.  Again, we do -- if
21 you look at those budgets and you see one year
22 3,700 cases, the next year 4,000 cases, you're
23 not really going to see any increase in the
24 budget, and if there is, it's very minimal.  No
25 increase in the number of prosecutors during

1 there.  It's just they're doing more.  So --
2    Q.    And as a former prosecutor myself, I
3 understand prosecutors are salaried, right?
4    A.    Um-hum.
5    Q.    And if there are more cases, they
6 just work harder, longer hours, correct?
7    A.    Yes.
8    Q.    Are your prosecutors paid overtime?
9    A.    No.  They are actually overtime
10 exempt under federal law.
11    Q.    And so there has never been an
12 instance where your office had to say we cannot
13 charge involuntary manslaughter in this case
14 because we don't have enough prosecutors to
15 bring the case to resolution?  There's never
16 been a situation where that's occurred?
17    A.    No.
18    Q.    Why didn't your office begin filing
19 those involuntary manslaughter charges in
20 overdose deaths prior to 2013?
21    A.    Well, first of all, when we saw the
22 swelling of the number of victims in these
23 cases, we looked to see.  In the past there's,
24 again, that link between the cause of death
25 and -- the drug and the cause of death.  A lot

Page 146

1 of times you had law enforcement was not
2 looking.
3        Again -- and, again, going back to
4 Detective Schmidt and Harvey, law enforcement
5 started investigating these things differently
6 in that same time period.  It is, again, where
7 we're able to prosecute.  Again, if they're not
8 knowing to collect those cell phones, they're
9 not knowing to look -- to go on social media,
10 they're not making those connections -- I mean,
11 quite frankly, I think there was a lot of times
12 where it was this is a -- this is a drug abuser
13 and they died.  That's part of the chance of
14 what they're doing.  And, again, seeing again
15 those bodies pile up was no, we have to address
16 this, we have to find a way.
17        So we had EMTs who would go in and
18 trample our crime scenes and destroy evidence.
19 We've had ones where there was a needle sitting
20 there and they threw it in the trash, again, not
21 knowing.
22        So, again, law enforcement, having
23 to change their way of dealing with this, not
24 realizing again, that this wasn't just someone
25 who OD'd, this was someone who was given illegal

Page 147

1 drugs, this was someone who was hooked onto
2 something and someone who something was put in
3 their drugs that caused them to die, it changed
4 the way we looked at these cases.
5        So we were actually, I think, in the
6 lead in the State of Ohio in dealing with these
7 cases and addressing these cases and coming with
8 the manslaughter charges.  We would go to
9 meetings and have other prosecutors from around
10 the state saying, well, no, you can't charge.
11 We need -- some people would say we need a
12 specific law, like Indiana just passed this
13 year, and we're not going to prosecute until we
14 get that law.  And then we have a legislature
15 that, I mean, can't communicate to itself.
16        So we looked and took it upon
17 ourselves, working with law enforcement, to say
18 how can we do something here, how can we make a
19 difference since no one else is.
20    Q.    So it sounds like one of the factors
21 that helped lead to your ability to charge these
22 cases is educating or training law enforcement
23 agents on how to effectively investigate those
24 types of cases and preserve evidence?
25    A.    How to effectively investigate and

Page 148

1 preserve what may not have been historically
2 looked at as a crime, yes.
3    Q.    You've mentioned the legislature a
4 few times and politicians today.  In your
5 opinion, have politicians or bureaucrats stymied
6 law enforcement and your office's ability to
7 tackle the opioid problem in Summit County?
8        MS. HERMIZ:  Objection to form.
9    A.    I think they haven't provided us
10 with the funding to tackle this properly.
11 There's a lack of resources that is the problem.
12    Q.    You mentioned just now a failure to
13 communicate within the legislature.  What did
14 you mean by that?
15    A.    I think that our state legislature
16 is no different than our federal legislature,
17 that I -- they're worried about staying where
18 they are rather than providing the funds and
19 resources for all of us to do our job and make
20 our community safer.
21    Q.    In your opinion, who should they be
22 communicating with more?
23        MS. HERMIZ:  Objection to form.
24    A.    Each other.
25    Q.    In your opinion, has the decision to

Page 149

1 start charging involuntary manslaughter affected
2 the incident of overdose deaths in your county?
3        MS. HERMIZ:  Objection to form.
4    A.    I believe that our efforts, along
5 with local law enforcement, has created some
6 public awareness and has worked to reduce the
7 number of people that are needlessly dying from
8 this epidemic.
9    Q.    And is that because a more severe
10 charge or sentence have a greater deterrence
11 impact on would be drug suppliers?
12        MS. HERMIZ:  Objection to form.
13    A.    Could you repeat that?
14    Q.    Is the reason for that because a
15 more severe penalty may deter someone who would
16 supply drugs?
17        MS. HERMIZ:  Same objection.
18    A.    I think the deterrent here has been
19 the public awareness that our office, the local
20 law enforcement, the Summit County community has
21 gone through -- when you look at Summit County
22 creating an opiate task force to educate the
23 community, working closely with the health
24 department, and that getting information out --
25 I mean, where parents are telling their kids

38 (Pages 146 - 149)

Page 150

1 don't even take a chance here -- I mean, I just
2 saw on Facebook the other day a post someone put
3 on that two 20-year-old college students were --
4 got Percocet pills and the mother went in and
5 found them both there dead, that they had been
6 spiked with fentanyl.
7      Q.   I'm sorry to interrupt.  My question
8 was about the effect that that charging policy
9 may have had on the opioid problem in Summit
10 County.  I know you started talking about the
11 task force and public awareness.  But I want to
12 know, what's your opinion of the effect that the
13 involuntary manslaughter charges have had on the
14 problem in Summit County.
15      A.   I think we're a part of seeing a
16 reduction and an awakening in the community of
17 this, and those charges have permitted this to
18 get to the front page of the paper and open
19 people's eyes to this, this and everything else
20 being done in the county to be proactive on this
21 rather than just sit back and watch people die,
22 is why we're having a reduction in the number of
23 cases.
24      Q.   You mentioned the reduction in the
25 number of cases.  What types of cases have you

Page 151

1 seen reduced?
2      A.   The deaths relating to opiate use.
3      Q.   And do you have specific statistics
4 or data regarding the trend in overdose deaths
5 over time that you can refer to?
6      A.   I believe there was an article in
7 the Beacon Journal just the other day on that.
8 I don't have a copy of it, though.
9      Q.   How do the overdose deaths in Summit
10 County -- how does the trend in that compare to
11 the trend in overdose deaths in other counties
12 that don't charge involuntary manslaughter
13 charges?
14      MS. HERMIZ:  Objection to form.
15      A.   I don't have those numbers.
16      Q.   When we were talking about the
17 involuntary manslaughter charges, you shared
18 that defense attorneys had some criticism, and
19 we discussed that article that had been written
20 by a former heroin addict, also criticizing the
21 practice of those harsh charges.
22      MS. HERMIZ:  Objection to form.
23      Q.   In your view, has Summit County as a
24 whole, not just the prosecutor's office, but has
25 Summit County adequately helped addicts get

Page 152

1 treatment?
2      A.   Within the resources we have had
3 available, I think we've done our best.
4      Q.   What is your basis for reaching that
5 conclusion?
6      A.   Seeing the number of deaths go down.
7      Q.   What pre-indictment screening is
8 done by your office to identify defendants who
9 are at risk of opioid overdose?
10      A.   We don't have any resources to do
11 anything like that.
12      Q.   Are interviews of defendants
13 conducted to determine their risk of opioid
14 overdose?
15      A.   Not by the Summit County
16 Prosecutor's Office.
17      Q.   Do you know if those interviews are
18 done by court employees or probation or pretrial
19 services or anyone else employed by the county?
20      A.   I don't know if those are done,
21 period.
22      Q.   Do you know what percentage of
23 criminal defendants are given the opportunity to
24 be diverted into sobriety and addiction recovery
25 programs?

Page 153

1      A.   No, I do not.
2      Q.   Would you agree that it is common in
3 low level felony drug cases to see situations of
4 criminal defendants overdosing on opioids during
5 the pendency of their case?
6      MS. HERMIZ:  Objection to form.
7      A.   Could you repeat that?
8      Q.   Would you agree -- in your
9 experience at the Summit County Prosecutor's
10 Office, have you seen that it is common in low
11 level felony drug cases to see situations of
12 criminal defendants overdosing on opioids during
13 the pendency of their case?
14      A.   We've had a few, I think, that have,
15 but I don't know -- and I don't think I would
16 use the word "common," but it's happened.
17      Q.   I'd like to direct your attention to
18 that first exhibit that's right in front of you,
19 the one you just pushed to the side.
20      A.   Okay.
21      Q.   If you look at the page that ends
22 64903, again, this is that grant application
23 that was filed by your office?
24      A.   Um-hum.
25      Q.   I know you didn't draft it, but at

39 (Pages 150 - 153)

Page 154

1 the bottom of page SUMMIT 64903, it states, "It
2 has become all too common in low level felony
3 drug cases to see situations of criminal
4 defendants overdosing on opiates during the
5 pendency of their case."
6     A.   Um-hum.
7     Q.   Do you have any basis to disagree
8 with that conclusion?
9         MS. HERMIZ:  Objection to form.
10     A.   I don't know.  As I said, it's
11 happened.  I wouldn't use the word "common" as
12 being frequent, but if it happens even once,
13 that's too many.
14     Q.   And do you have any basis to
15 disagree with the conclusion in this document
16 that it's become all too common?
17         MS. HERMIZ:  Objection to form.
18     A.   Again, I did not draft this
19 document.  I did not do the research.  They did.
20 From my knowledge and my experience, I would say
21 I'm aware it happens, and that, like I said,
22 even once is too many.
23     Q.   How many such cases are you aware
24 of?
25     A.   I know of a couple, and again, I

Page 155

1 can't quantify it.
2     Q.   What are those defendants' names?
3     A.   I cannot give you those names.  I do
4 not have them.
5     Q.   Who would have that information?
6     A.   You would have to go probably --
7 probably the easiest way to get that would be
8 maybe through the court, to determine any cases,
9 because they would be -- if someone died while a
10 case was pending, the court would have the
11 dismissal on that, and, most likely, would have
12 placed on the record the reason for the
13 dismissal.
14     Q.   What if they overdosed but didn't
15 die and the case went forward?  How would we go
16 about determining how many defendants overdosed
17 during the pendency of their criminal case?
18     A.   And that may be where on page 4903
19 they came up with too common of individuals who,
20 I read it as, overdosing and dying.  If it was
21 overdosing and staying -- continuing on --
22 again, that would probably be something that the
23 probation department or pretrial release would
24 have information on.
25     Q.   Okay.  So just so we're clear, are

Page 156

1 you aware of instances in which a criminal
2 defendant has overdosed and died while their
3 criminal case was pending with your office?
4     A.   Yes.
5     Q.   How many such cases?
6     A.   That's when I said one or two maybe.
7     Q.   In addition, are you also aware of
8 cases in which criminal defendants have
9 overdosed but not died during the pendency of
10 their criminal cases?
11     A.   I have heard of that, but I am not
12 aware of any specific cases.
13     Q.   In this grant application, your
14 office is requesting funding, and if you look
15 back at SUMMIT 64903, one of the ways in which
16 your office proposed to use that funding is to
17 conduct, as discussed at the bottom of the page
18 just before the sentence I read earlier, a
19 pre-indictment screening in order to separate
20 the treatment of opiate traffickers from the
21 prosecution of opiate-using offenders.  "It is
22 necessary in the development of such a program
23 to not only focus on opiate dealers but to also
24 identify the population which is made up of
25 criminal defendants who are at risk for opiate

Page 157

1 overdose."
2         To your knowledge, has your office
3 undertaken to conduct that sort of
4 pre-indictment screening?
5     A.   No.  We do not have the resources
6 for that.  I think that's why we asked for it in
7 the grant.
8     Q.   And you did not receive this grant
9 money?
10     A.   No.
11     Q.   Are you aware of other grants that
12 your office has applied for related to opioids?
13     A.   No.
14     Q.   Are you aware of grants related to
15 opioids that your office knew of but did not
16 apply to?
17     A.   No.  I am not aware of any that we
18 could have applied for that we did not.
19     Q.   In your opinion, how effective is
20 the Ohio prison system at rehabilitating
21 offenders?
22         MS. HERMIZ:  Objection to form.
23     Q.   We're done with that exhibit.
24     A.   Years ago there was a judge, Peter
25 Economus, he was a Mahoning County Common Pleas

40 (Pages 154 - 157)

Page 158

1 judge, and he stated -- this would be before I
2 began at Summit County -- that the prison system
3 was for punishment, no longer for
4 rehabilitation.
5     Q.   Do you agree with that?
6     A.   When I prosecute cases, the
7 sentences I ask for are usually for punishment
8 and protection of the community.
9     Q.   So you do not look to the prisons --
10    A.   No.  I think you need -- I think you
11 need community-based corrections programs to
12 rehabilitate people.  Systems set up like Oriana
13 House and that is where you're going to see a
14 benefit.  Again, in connection with the
15 community, if someone is taken away from their
16 problem and put in prison and given all these
17 programs but they come back and then the problem
18 is still existing in their community, their
19 likelihood for success is going to be decreased.
20 You've got to change that in the entire
21 community.  Again, you need all of those
22 resources locally if you want to address the
23 problems.
24    Q.   But you send a good number of drug
25 offenders to prison, right?

Page 159

1         MS. HERMIZ:  Objection to form.
2     Q.   In fact, you send -- the majority of
3 drug defendants who are convicted ultimately go
4 to prison, right?
5     A.   That would depend on what level
6 their felony degree is, because right now under
7 the Ohio law with the T-CAP, felons of fourth
8 and fifth degree are not being sent to prison.
9     Q.   But for the ones who are sent to
10 prison, you advocate for a sentence in prison
11 for punishment reasons, not because you believe
12 it would rehabilitate them?
13        MS. HERMIZ:  Objection to form.
14    A.   We would hope they are
15 rehabilitated, but it's for punishment and
16 protection of the community.
17    Q.   What is the recidivism rate in Ohio?
18    A.   I don't know.
19    Q.   Do you know how the recidivism rate
20 has changed over time?
21    A.   What I've -- from the years that
22 I've worked with community-based correction
23 facilities and programs, those individuals
24 receiving the treatment locally have been much
25 more successful than those individuals who have

Page 160

1 been incarcerated and received treatment.
2     Q.   How effective is the Ohio prison
3 system at providing treatment and counseling to
4 incarcerated individuals who have substance
5 abuse problems?
6         MS. HERMIZ:  Objection to form.
7     A.   I don't know.
8     Q.   Do you have any opinions on that
9 matter?
10        MS. HERMIZ:  Same objection.
11    A.   Again, absent local resources, I --
12 we're not going to address this in a prison.
13 We're going to protect people by putting
14 criminals in prison, but we're not going to
15 address the system without local funding of it.
16    Q.   Do you know how many incarcerated
17 people participate in treatment or counseling
18 programs in Ohio prisons?
19    A.   From going to the patrol board on
20 different cases, pretty much everyone does.  If
21 they want any hope at getting their sentences
22 reduced or shortened, getting opportunities for
23 judicial release, they're going to be
24 participating or at least attempting to
25 participate.

Page 161

1     Q.   Does your office do anything to
2 incentivize their participation in those
3 programs?
4     A.   That would be beyond the authority
5 of a county prosecutor.
6     Q.   Does the prison do anything to
7 incentivize their participation in those
8 treatment programs?
9     A.   You would have to ask them.
10    Q.   Do you believe law enforcement has
11 been effective in enforcing drug laws?
12        MS. HERMIZ:  Objection to form.
13    A.   Do you want to narrow what law
14 enforcement --
15    Q.   How about let's start with the DEA.
16 Do you believe the DEA has been effective in
17 enforcing drug laws?
18        MS. HERMIZ:  Same objection.
19    A.   I think we can only be as effective
20 as -- as the criminals are creative.  Again,
21 without resources, we're not going to be
22 effective.
23    Q.   You mentioned creative criminals, so
24 I'm going to shift gears for a moment and talk
25 with you about opioids and opioid diversion.

41 (Pages 158 - 161)

Page 162

1 Let's start by establishing when you first
2 became aware that prescription opioids were a
3 problem for your county.
4     A.   Probably shortly after coming to
5 Summit County in the prosecutor's office.
6     Q.   And that was around 2001?
7     A.   2001, so I would say it was
8 somewhere between 2001 and 2003 I tried my first
9 case of prescription drug abuse in Summit
10 County.
11    Q.   What were the facts or the nature of
12 that case?
13    A.   A city councilman was charged with
14 selling and possessing OxyContin, oxycodone;
15 with doctor shopping, going to various doctors
16 in Summit County and even one in Portage County;
17 and there was some information that, while he
18 had claimed he had back pain and his defense was
19 his addiction to the drugs, and that he was
20 lawfully prescribed them.  Again, the various
21 doctors were either unaware or were treating him
22 for different symptoms.
23    Q.   Did you charge the doctors as well
24 in that case?
25    A.   No, not in that case, again, because

Page 163

1 it was his -- his lying to the doctors.  The
2 doctors were not aware that he was going to two
3 or three different doctors until the trial, and
4 actually, one of the doctors changed his mind
5 and said that he was aware he was going to
6 another doctor and that he would have prescribed
7 the drugs anyway.
8     Q.   Did that cause any problems for your
9 proof?
10    A.   Yes.  It was a not guilty.
11    Q.   Did you charge any pharmacists in
12 that case?
13    A.   No.  We were being helped by the
14 pharmacist in that case.
15    Q.   How about drug distributors; did you
16 charge any of them?
17        MS. HERMIZ:  Objection to form.
18    A.   From the investigation we had, we
19 did not go back far enough to see if any drug
20 distributors would have been aware of the case.
21    Q.   Okay.  Did you charge any drug
22 manufacturers?
23    A.   Same answer.
24    Q.   Okay.  Have you produced the case
25 file for that case which you prosecuted in

Page 164

1 approximately 2001 to 2003?
2     A.   If it was requested.  John Otterman
3 is the name of the defendant.  He recently was a
4 member of the Akron School Board and found and
5 Narcan'd back to life in the parking lot of the
6 school.
7     Q.   Has he ever been convicted of
8 prescription drug crimes?
9     A.   I do not believe so.  And he was
10 also in between city council and the school
11 board, was a member of the Ohio legislature.
12    Q.   Did you consider prescription
13 opioids to be a problem at the time you
14 prosecuted that case?
15    A.   Yes, when I saw the results of what
16 it could do to him.
17    Q.   When is the first time that someone
18 overdosed on prescription opioids in Summit
19 County?
20        MS. HERMIZ:  Objection to form.
21    Q.   Actually, I should ask, has anyone
22 died of an overdose of prescription opioids in
23 Summit County?
24    A.   I'm sure they have.  You would have
25 to ask the medical examiner that.

Page 165

1     Q.   When was the first time you recall
2 learning that someone had died from an overdose
3 of prescription opioids, if ever?
4     A.   I'm sure in some of the cases we've
5 had from some of the nursing homes and that,
6 that that's come up in them, and I'm sure over
7 the years there are different cases.  But again,
8 if someone is taking prescription opioids and
9 they overdose on those legally prescribed
10 things, there's nobody for us to charge in that
11 situation, so the case is never going to be
12 investigated and never come to us.
13    Q.   Because they were taking a
14 prescription opioid?
15    A.   Because they obtained them legally
16 through the law, whether again, it was unknown
17 doctor shopping or what, but since -- and the
18 nature of it was -- was legal.  There's no
19 reason that law enforcement would be tipped off.
20 So I think that's sort of an iceberg, that if
21 you see one, you know there's a ton underneath
22 it.
23    Q.   So in a situation where someone is
24 taking, let's say, OxyContin, that they had a
25 prescription for from a real doctor, that they

42 (Pages 162 - 165)

Page 166

1  had dispensed to them by a licensed pharmacy, in
2  your opinion as a prosecutor, that would not be
3  the sort of case you would prosecute even if
4  that person ended up overdosing on the medicine?
5      A.  Well, if they overdosed and died,
6  there's no one to charge.  If they -- if they
7  did not die, the hospitals aren't going to
8  report it to us.
9      Q.  Because it's not considered a crime?
10      A.  No.  I think because of privacy
11  laws.
12      Q.  And what about law enforcement?  If
13  law enforcement were involved in a situation
14  like that, would they report it to your office?
15      A.  I'm sure law enforcement would
16  report it to us if they were involved in it.
17      Q.  And how would your office respond in
18  a case such as that one --
19          MS. HERMIZ:  Objection to form.
20      Q.  -- in which an individual used
21  prescription medicine that had been prescribed
22  to them by a doctor?
23      A.  We would have to look at it on a
24  case by case and see what the facts are, see
25  what the evidence is.

Page 167

1      Q.  Okay.  Do you know when OxyContin
2  was first released?
3      A.  No.
4      Q.  Do you know approximately when?
5      A.  No idea.
6      Q.  Now, you mentioned this one case
7  that drew your attention to the problem.  Were
8  you aware of it existing prior to that case
9  involving the city councilman?
10      A.  Of people doctor shopping and that,
11  absolutely.
12      Q.  When did you first become aware of
13  issues related to the diversion of opioids?
14      A.  I don't know.  Just, I mean, in
15  general.
16      Q.  And how did the problem of opioid
17  prescriptions evolve over time in Summit County?
18      A.  Well, what we've seen in pretrial --
19  I mean, in defenses on our cases, in either
20  medical exams or pretrial sentencing reports, or
21  post-sentencing -- or post-trial sentencing
22  reports, individuals talking about how they --
23  they ended up into the heroin, into the fentanyl
24  and everything because of the fact that they
25  couldn't get the prescriptions anymore, again

Page 168

1  because the pharmacy board was, again through
2  OARRS or other systems like that, flagging them.
3  So again, when their legal supplies, whether
4  they were going about getting them legally or
5  illegally on the doctor shopping, but the legal
6  supplies were being made more difficult, then
7  the use of heroin, and ultimately heroin and
8  fentanyl, and -- that came into play.
9          We've seen individuals, I mean, in
10  their 60s and 70s dying from the heroin
11  overdoses.  Again, this is something that
12  isn't -- isn't just in the City of Akron.  I
13  mean, we have them from all walks of life, being
14  young kids, being elderly people, again, and
15  those, the elderly ones are the ones that seem
16  to tie back to starting on the prescription
17  drugs.  Again, we see all of that, and we see it
18  throughout the county.  It's -- it's equal
19  opportunity as a killer in our community.  It's
20  not targeted to one socioeconomic section or
21  not.  So that's what we've seen in the evolution
22  of it.
23      Q.  And in support of those statements,
24  you said you relied on which documents, the pre
25  and post-sentence reports?

Page 169

1      A.  Some of them in actually our police
2  reports, where the families will say, look, they
3  had a problem, they were -- they were -- the
4  doctor was giving them pain medicine.  It just
5  wasn't working anymore.  So we've got that.  We
6  have individuals, again, who are using these for
7  defenses.
8      Q.  Right.  So I'm asking which
9  documents would support the finding that
10  prescription opioids lead to the heroin and the
11  fentanyl use.
12      A.  Police reports, so the reports of
13  investigations.  The probation reports.  So the
14  post-trial sentencing briefs and that that go to
15  the judges.  Any type of reports the defense has
16  brought in in mitigation of sentencing.  Those
17  types of things.  Those have all come into play
18  in these cases.
19      Q.  So you're referring to case-specific
20  materials.  Is it fair to say that your
21  knowledge of this issue relies on anecdotal
22  evidence in these individual different cases?
23          MS. HERMIZ:  Objection to form.
24      A.  As a general matter in these, from
25  handling these cases, from reviewing these cases

43 (Pages 166 - 169)

Page 170

1 and reviewing these cases with law enforcement,
2 there -- we see the connection between the --
3 what originated as the prescription drugs into
4 the illegal drugs.
5      Q.   Sitting here today, can you share
6 with me any statistic or data from a research
7 study that could estimate what percentage of
8 individuals who went through your office had
9 prescription drugs first and then eventually
10 began using heroin or other drugs?
11      A.   No, but I can tell you I've talked
12 to the mothers on the phone who have lost
13 children and they've told us about it, family
14 members who have told us about it.  So no, I
15 don't have statistical numbers for you.
16      Q.   So you're basing that on --
17      A.   Real people.
18      Q.   -- real people and real accounts of
19 what happened to individuals --
20      A.   Yes.
21      Q.   -- that you've encountered?
22      A.   Yes.
23      Q.   Would you agree that OxyContin was
24 identified as a growing threat in Ohio around
25 the same time you joined the Summit County

Page 171

1 Prosecutor's Office?
2          MS. HERMIZ:  Objection to form.
3      A.   I don't -- I don't know when it was
4 identified in -- I mean, I've seen the release
5 you gave me earlier from Sheriff Alexander and
6 I've told you about my experience with John
7 Otterman, but other than that, I don't know the
8 exact dates or times.
9          -  -  -  -  -
10         (Thereupon, Gessner Deposition
11         Exhibit 9, Information Bulletin
12         dated January 2001, Bates Numbered
13         SUMMIT_2051829, was marked for
14         purposes of identification.)
15         -  -  -  -  -
16     Q.   I'm going to hand you what has been
17 marked as Exhibit 10, SUMMIT 2051829.  This is
18 an information bulletin dated January 2001.
19         MS. HERMIZ:  Counsel, what's Exhibit
20 -- did you say this was 10?
21         MS. WOODS:  Yes.
22         MS. HERMIZ:  Did we have a 9?
23         MS. WOODS:  We'll mark that one
24 Exhibit 9, not 10.
25     Q.   And I want to just read a few

Page 172

1 sentences from this report and ask you if you
2 were aware this was the case at the time.
3      So the first sentence is at the very
4 top, the very first sentence of the document.
5 "Diversion and abuse of the prescription pain
6 reliever OxyContin is a major problem,
7 particularly in the eastern United States."
8      The third sentence of that same
9 paragraph, "The pharmacological effects of
10 OxyContin make it a suitable substitute for
11 heroin, therefore, it is attractive to the same
12 abuser population."
13      Two sentences down, "OxyContin
14 abusers who have never used heroin may be
15 attracted to the lower priced heroin when their
16 health insurance no longer pays for OxyContin
17 prescriptions or when they cannot afford the
18 high street-level price of OxyContin."
19         MS. HERMIZ:  Objection to form.
20     Q.   Do you agree with the statements I
21 just read?
22         MS. HERMIZ:  Same objection.
23     A.   I don't have knowledge of what was
24 going on in the eastern part of the United
25 States at the time.

Page 173

1          MS. WOODS:  Let's take a break at
2 this time.
3          MS. HERMIZ:  Would this be a good
4 place to break for lunch?
5          MS. WOODS:  Yes.
6          THE VIDEOGRAPHER:  Off the record at
7 12:51.
8
9          (Luncheon recess taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

44 (Pages 170 - 173)

Page 174

1       THE VIDEOGRAPHER:  On the record,
2  2:04.
3            - - - - -
4       AFTERNOON SESSION
5       CONTINUED EXAMINATION OF BRAD GESSNER
6  BY MS. WOODS:
7    Q.   Before the break, one of the things
8  we discussed was the document retention policy.
9  Have you seen that policy?
10   A.   The document retention policy, yes.
11   Q.   Is it a written policy?
12   A.   Yes.
13   Q.   And where is it located?
14   A.   I believe it's filed with the
15 Secretary of State, and I believe the county
16 would have a copy of it, too, and I believe it
17 was provided through Merritt Hannah, one of our
18 assistant prosecutors in our civil division.
19   Q.   Provided to whom?
20   A.   Whoever requested it.
21   Q.   In this litigation?
22   A.   Yes.
23   Q.   Regarding the e-mails that you
24 stated may have been deleted, to your knowledge,
25 when you delete an e-mail, is there some sort of

Page 175

1  archival backup of that e-mail?
2    A.   I don't know.  You'd have to ask our
3  IT person on that.
4    Q.   You've never had to address that
5  issue personally?
6    A.   No.
7    Q.   In your office, what would you do if
8  there was a claim of a Brady violation, or
9  something of that nature, and you needed to go
10 back and find deleted e-mails?
11   A.   Normally, Brady information wouldn't
12 be related to e-mails, so Brady is usually
13 information that we have regarding files, police
14 reports, documents, so it would be the hard copy
15 of the file would most likely be the best source
16 for that.
17   Q.   So I understand that might be most
18 likely to be the best source, but in the event
19 that there was a claim that information was
20 shared about Brady or other prosecutorial
21 conduct via e-mail, what steps could you do to
22 try to recover any e-mails that might have been
23 deleted by your office?
24       MS. HERMIZ:  Objection to form.
25   A.   We would probably contact the county

Page 176

1  IT department and have them let us know.
2    Q.   And, to your knowledge, has the
3  office ever had to do that in any situation?
4    A.   No.
5    Q.   I asked you earlier what the
6  recidivism rate was in Ohio, and you stated you
7  did not know.  Do you know what the recidivism
8  rate is in Summit County?
9    A.   No, I do not.
10   Q.   Do you know approximately what the
11 rate is?
12       MS. HERMIZ:  Objection to form.
13   A.   No, I do not.
14   Q.   Do you have any awareness of how the
15 recidivism rate in Summit County may have
16 increased or decreased over the last decade?
17   A.   No, I do not.
18   Q.   As a prosecutor whose role it is to
19 try to prevent crime, why have you not gathered
20 information to inform your work about the amount
21 of offenders who release from prison and
22 reoffend in your county?
23       MS. HERMIZ:  Objection to form.
24   A.   When there is a specific issue
25 regarding an individual who has been released

Page 177

1  from prison and reoffends, we address that, but
2  again, we don't have the resources and the
3  manpower to do all these things that -- what
4  you're asking for would be good again in a
5  perfect world with all the resources.  But we're
6  more reactive there.  We go out into the
7  community to try to help make it safe with
8  different programs that we have, but as to
9  recidivism rate, that's something that normally
10 comes up when someone reoffends.
11   Q.   Do you know what type of crimes are
12 correlated with a higher recidivism rate?
13       MS. HERMIZ:  Objection to form.
14   A.   No, but I would think that -- from
15 my experience, that drugs, drug crimes;
16 correlated with the drugs you would have
17 robberies, burglaries, property offenses, where
18 people are stealing or breaking into homes to
19 get money to buy more drugs.
20   Q.   And so based on your experience, are
21 you saying that you you've observed greater
22 recidivism among offenders with drug crimes in
23 their history?
24   A.   No, I did not say that.
25   Q.   What is your understanding, then, of

45 (Pages 174 - 177)

Page 178

1  the correlation between drug offenders
2  recidivating relative to the overall offender
3  population?
4      MS. HERMIZ:  Objection to form.
5      A.  I don't have an opinion about drug
6  offenders and recidivism compared to the overall
7  prison population.
8      Q.  You've mentioned a few times today
9  that you were not able to take certain steps due
10  to a lack of resources.  What have you done to
11  request additional resources for your office?
12      A.  Well, the budget process for Summit
13  County, we have -- going back probably into, I
14  think, 2005 to 2007, we sought additional funds
15  when the county expanded from eight common pleas
16  courts to ten for additional staffing, which
17  included prosecutors, support staff, and I
18  believe one additional supervisor.  That was
19  funded by the county at the time.  Then when the
20  financial crisis hit in about 2009, our budget
21  was cut, cut significantly, to the point where
22  our starting salaries were reduced, I believe,
23  $7,000 per starting individual.
24          Since then, the county has been very
25  cautious in what they're doing, so the county

Page 179

1  budget office will give you the target for your
2  budget.  At one point we did go in and seek a
3  court order to have them impose the budget, and
4  that -- we ended up negotiating that.  But the
5  county made it clear that there were not funds,
6  additional funds.
7          This year our budget is stagnant
8  from last year, except for the fact that we have
9  to incorporate a 3 percent raise effective next
10  April from the same budget that we had last
11  year.
12          So in going to the county, we've not
13  had opportunity there to seek additional funds
14  because they do not have it.  The county did go
15  to the community for a safety tax, I believe, a
16  couple years ago, and that did not pass.  That
17  was to increase the sales tax.
18          We've also sought grants, such as
19  the opiate grant here.  We had a domestic
20  violence grant that we were receiving.  The last
21  time we received it, it was, over a three-year
22  period, $750,000.  That funded three of our
23  prosecutors.
24      Q.  What was the source of funding for
25  that grant?

Page 180

1      A.  I think that was the Violence
2  Against Women Act.
3      Q.  Is that federal dollars?
4      A.  Federal dollars.
5          We -- we have looked to partner,
6  when we can, with -- I -- just, for example, in
7  our civil division we entered into contracts
8  with the county engineer and the health
9  department to offset the cost of a prosecutor
10  assigned to both of those.  So we try to do
11  within the -- the realistic resources within the
12  county what we can.
13      Q.  Have you formally sought additional
14  resources from the county since 2009?
15      MS. HERMIZ:  Objection to form.
16      A.  What do you mean by "formally
17  sought"?
18      Q.  Have you submitted rationales or
19  submitted proposals or made other pleas for
20  additional resources for your office?
21      A.  Yes.  At our annual budget we have
22  gone in at times and requested additional money.
23  We have let them know when we're meeting their
24  budget, but are additional things available, and
25  there have not been the funds to take care of

Page 181

1  those.
2      Q.  How are those requests documented?
3      A.  They would -- may have been in the
4  budget request.  If not, any type of financial
5  request we've made would be something county
6  council would have.  And they have a clerk of
7  council.  They would have copies of any request
8      Q.  Who is that person?
9      A.  Mark Potter.
10      Q.  Does your office maintain copies of
11  its budget proposals or requests?
12      A.  I'm sure we do.
13      Q.  And who within your office maintains
14  those records?
15      A.  Budget requests, Caitlin Croft, both
16  with Cs.
17      Q.  Have those been produced in this
18  litigation?
19      MS. HERMIZ:  Objection to form.
20      A.  If they've been requested, I'm sure
21  they've been provided.
22      Q.  Do you know how many opioid
23  prescriptions were written for Summit County
24  residents last year?
25      A.  No.

46 (Pages 178 - 181)

Page 182

1    Q.   Does your office track that
2 information?
3    A.   I don't think we would be permitted
4 to.
5    Q.   Why not?
6    A.   Privacy laws.
7    Q.   Can you be more specific?
8    A.   No.
9    Q.   Is it because the information may
10 contain medical information that's protected by
11 HIPAA?
12    A.   That could be a reason.
13    Q.   To your knowledge, does anyone
14 within Ohio track information about the number
15 of opioid prescriptions written for a particular
16 county in a particular year?
17    A.   I wouldn't have that information.
18    Q.   I'm not asking if you have the
19 information.  I'm just asking if you're aware of
20 any other efforts to track that information
21 within the county.
22       MS. HERMIZ:  Objection to form.
23    A.   Within the county, no, I'm not.
24    Q.   Have you ever heard of a database
25 called OARRS?

Page 183

1    A.   Yes.  I mentioned that earlier to
2 you.
3    Q.   What does OARRS stand for?
4    A.   Starts with Ohio.  I don't know the
5 rest of it.
6    Q.   What is your understanding of what
7 OARRS is?
8    A.   OARRS is a list that the State
9 Pharmacy Board maintains that has prescribed
10 medications for individuals and the pharmacies
11 that dispense them, and the law enforcement has
12 been able to go through and look and see if --
13 if people are doctor shopping based on those.
14    Q.   Does your office have access to the
15 OARRS data?
16    A.   We have -- our chief investigator
17 had access to that.  He is no longer with the
18 office.  So right now our -- one of our other
19 investigators, Jesse Lee Masters is, I believe,
20 our office's designee with OARRS.
21    Q.   When did those individuals first
22 obtain access to the OARRS database?
23    A.   I do not know when the prior chief
24 investigator obtained access, but Jesse Lee
25 Masters was probably within the last two weeks

Page 184

1 because I signed the document to authorize him
2 for that.
3    Q.   And what was the name of the chief
4 investigator who had access prior to him?
5    A.   Benjamin Bergeron, just like the guy
6 on TV.
7    Q.   How long was he at the office?
8    A.   Ben, I'm thinking ten years.
9    Q.   To your knowledge, did he have
10 access for his entire ten years?
11    A.   I don't know.
12    Q.   Do you know with whom your office
13 coordinates to obtain OARRS database access?
14    A.   State Pharmacy Board, I believe.
15    Q.   And you mentioned that the OARRS
16 data could potentially be helpful to your office
17 because it could show if someone was doctor
18 shopping; is that what you said?
19    A.   If that was contained in an
20 investigation, yes, that could help.
21    Q.   To your knowledge, has OARRS helped
22 your office identify and deter drug abuse in
23 your county?
24    A.   If it has been within investigations
25 that have been brought to us and it was used, it

Page 185

1 would have helped.
2       I believe in the John Otterman case
3 we had OARRS reports, but at that time they came
4 from Detective Patrick Leonard from the Akron
5 Police Department.  We did not have the access
6 to it at the time of that case.
7    Q.   To your knowledge, do pharmaceutical
8 drug distributors like my client, McKesson, have
9 access to the OARRS database?
10    A.   I have no idea.
11    Q.   Are there other types of databases
12 that your office accesses to get data on the
13 number of opioids prescribed in your county?
14       MS. HERMIZ:  Objection to form.
15    A.   I don't know.
16    Q.   According to the complaint, Summit
17 County averaged 36.4 million doses of opioids
18 dispensed per year, with a high of 39.5 million
19 in 2012.  Is that number -- are those numbers
20 problematic from your point of view?
21       MS. HERMIZ:  Objection to form.
22    A.   You would have to know the context
23 of them; otherwise, I don't have enough
24 information to answer that question.
25    Q.   Do you know what percentage of the

47 (Pages 182 - 185)

Page 186

1 opioids prescribed and consumed in Summit County
2 were legitimately prescribed to the patient?
3        MS. HERMIZ:  Objection to form.
4    A.   No.  My knowledge would be case
5 specific.
6    Q.   Do you know how many prescription
7 opioids were consumed in Summit County last
8 year?
9    A.   No.
10   Q.   And apart from the OARRS database,
11 are you aware of any other efforts to track that
12 information?
13       MS. HERMIZ:  Objection to form.
14   A.   You would have to ask law
15 enforcement that.
16   Q.   Who specifically in law enforcement?
17   A.   Akron Police.  Summit County
18 Sheriff's Department.  Any of the jurisdictions
19 there, their investigators.  The State Pharmacy
20 Board.  Pharmacies I'm sure would also have that
21 information.
22   Q.   Are there names of any individuals
23 with whom you coordinate on these types of
24 issues for your office?
25   A.   No.  Again, we don't coordinate on

Page 187

1 that.  We take the investigations when they come
2 in to us.
3    Q.   Have you heard of the term
4 "diversion" used in connection with prescription
5 opioids?
6    A.   From you asking me questions today.
7    Q.   So this is different than a criminal
8 diversion, where you might divert someone from a
9 prosecution in favor of treatment.  What I'm
10 talking about is a prescription pharmaceutical
11 that is diverted from its legitimate medical
12 purposes.
13       Do you understand that?
14   A.   Yes, I do.
15   Q.   Okay.  Are there different ways that
16 pharmaceuticals, prescription opioids, can be
17 diverted?
18       MS. HERMIZ:  Objection to form.
19   A.   I'm sure there are.
20   Q.   And based on your experience
21 prosecuting cases, what types of diversion of
22 prescription drugs can occur?
23   A.   Well, we have seen individuals who
24 steal drugs, steal legal drugs that were
25 prescribed to individuals.  So that would be

Page 188

1 diverted from their intended use.  Steal them,
2 either use them or resell them.  We've seen
3 individuals who legally obtain the drugs to sell
4 them or give them away, either traffic or
5 corrupt others with those drugs.
6        We've seen in nursing homes -- we
7 had a case with a hospice care unit, where one
8 of the nurses was taking drugs that -- pain
9 medication for specific patients, and rather
10 than giving that to those patients who were in
11 terminal states, using those for their own --
12 their own addictions.  We've prosecuted those
13 cases, other cases involving nursing homes
14 and -- that -- with similar type issues.
15   Q.   In your office's experience, when
16 diversion occurs, does the offender typically
17 obtain the drugs for personal use or for resale?
18   A.   Both.
19   Q.   And which is more common in your
20 experience?
21   A.   I don't think you can say which is
22 more common because they're different types of
23 crimes, and so it's -- we see people stealing
24 the drugs, we see people using them for
25 themselves.

Page 189

1    Q.   You see both?
2    A.   Yes.
3    Q.   You see people diverting drugs for
4 their personal use and you see them diverting it
5 to sell?
6    A.   Yes.
7    Q.   And my question is, which of those
8 do you see more often?
9    A.   I've never sat and tried to quantify
10 that.
11   Q.   If an individual is reselling, is it
12 common for the pills that have been diverted to
13 pass through multiple hands before reaching the
14 end user?
15   A.   That would depend on a particular
16 case.
17   Q.   In your experience, based on the
18 cases that you have seen come through the Summit
19 County Prosecutor's Office, is it common for
20 pills that have been diverted to go through
21 multiple hands before they reach the end user?
22   A.   I think that's happened on some
23 occasions, but there have been other occasions
24 where, again, the person who steals it is the
25 person who is selling it or distributing it.

48 (Pages 186 - 189)

Page 190

1    Q.   What kinds of people engage in
2 illicit sales of prescription drugs?
3         MS. HERMIZ:  Objection to form.
4    A.   Addicts, criminals.  In this type
5 of -- opiate related, right here, anyone from
6 any cross-section you want to do in our
7 community can pop up here, again, from high
8 school kids to senior citizens, in wealthier
9 areas, in poorer areas.  It doesn't matter.
10 This has hit the county across the board.
11    Q.   Do you see street gangs involved in
12 the illicit sales of prescription drugs as well?
13    A.   I'm sure there are, and we've
14 charged some of the gangs with drugs, and
15 whether they were specifically prescription -- a
16 lot of times police will make a stop and they'll
17 have prescription drugs without any type of
18 prescription for them.  So, again, those may be
19 found on their person.  Those may be found in
20 the floorboards of the car.  They may just be
21 found in the car.  But that's not an unusual
22 thing to occur.
23    Q.   And prescription drugs without a
24 valid prescription have been found in cases
25 involving, you said, street gangs.  What about

Page 191

1 in other organized crime?
2    A.   Well, any -- individuals being
3 stopped.  Again, as far as other organized
4 crime, you would probably need to explain that,
5 what you mean by that.
6    Q.   Organized kind of criminal
7 enterprises that are acting in Summit County.
8    A.   We did prosecute a criminal
9 enterprise several years ago, where one -- one
10 group was -- were the thieves stealing items
11 from cars, other things like that; the other
12 group were actually meth amphetamine
13 manufacturers, and the head of the enterprise
14 would pay off his thieves with the drugs that
15 were manufactured.  So whether or not there were
16 any prescription drugs in that, I don't
17 specifically recall.
18    Q.   You recall that case was about meth
19 amphetamine?
20    A.   Primarily meth amphetamines, yes.
21    Q.   Based on your experience, would you
22 say there's significant opioid diversion in
23 Summit County?
24         MS. HERMIZ:  Objection to form.
25    A.   I think we frequently see, through

Page 192

1 cases brought to us by law enforcement,
2 individuals with prescriptions that are
3 prescribed drugs that they do not have
4 prescriptions for.
5    Q.   Okay.  Has the incidence of opioid
6 diversion changed over time in Summit County?
7    A.   The access and notoriety of them has
8 clearly increased.  Right now we're going down a
9 little bit again, and I think that's because of
10 our community education and awareness.
11    Q.   Does anyone track how much diversion
12 of prescription opioids has occurred in Summit
13 County by year?
14    A.   You may want to check with the drug
15 unit or the police departments on that.
16    Q.   You're not aware of anyone?
17    A.   No.
18         And the opiate -- the opiate task
19 force for the county may also have that.
20    Q.   I believe you mentioned this
21 earlier.  I just want to make sure I'm clear.
22 If an individual is found in possession of
23 prescription opioids but has a doctor
24 prescription for it, your office would not
25 prosecute that case?

Page 193

1    A.   Not unless there's evidence of a
2 crime.
3    Q.   But that in and of itself is not a
4 crime unless there is evidence of doctor
5 shopping or some other crime?
6    A.   Right.  If you legally possess a
7 prescription for a drug that a doctor has
8 prescribed to you, you're not committing a
9 crime, we're not going to be involved.
10    Q.   What about in a situation where a
11 patient is legally prescribed medicine and
12 misuses the medication?  In that instance, would
13 your office prosecute the individual?
14         MS. HERMIZ:  Objection to form.
15    A.   That would depend on the nature of
16 the misuse and how and when law enforcement
17 became involved in it, and what, if any -- any
18 crime we could find in there that would be
19 something for us to prosecute.
20    Q.   But misuse of your prescription
21 medicine is not in and of itself a crime in
22 Summit County, correct?
23         MS. HERMIZ:  Objection to form.
24    A.   Again, you would have to have the
25 specific facts to determine if that is a crime.

49 (Pages 190 - 193)

Page 194

1    Q.    In your experience, are there some
2 times in which people overdose on prescription
3 drugs that were prescribed to them legitimately?
4    A.    I don't know that.
5    Q.    You're not aware of any cases of
6 accidental overdose from prescription opioids?
7    A.    Not that have come to our office.
8    Q.    If a person has a legitimate
9 prescription for an opioid but sells the
10 prescription opioids to someone else, is that a
11 crime?
12    A.    Yes.
13    Q.    And in that scenario, who should be
14 held responsible for the diversion?
15        MS. HERMIZ:  Objection to form.
16    A.    Well, I'm not going to answer who is
17 going to be responsible for the diversion, but
18 both individuals could be charged with -- with
19 crimes.
20    Q.    And by "both individuals," who are
21 you referring to?
22    A.    The seller and the buyer.
23    Q.    And if someone has a legitimate
24 prescription for an opioid, is it a crime for
25 them to give it away to someone else?

Page 195

1    A.    Yes.
2    Q.    And in that scenario, would you
3 consider that both the person who gave it away
4 and the person who received it to have committed
5 a crime?
6    A.    Yes, and we could look at that,
7 depending on all of the other facts and
8 circumstances.
9    Q.    Is it also a crime to steal opioid
10 pills?
11    A.    Yes.
12    Q.    Is theft of an opioid ever not a
13 crime?
14    A.    If there's justification for it, it
15 may not be a crime.
16    Q.    What sort of justification could
17 there be?
18    A.    I don't know.
19    Q.    Okay.  Is it a crime to obtain an
20 opioid prescription from a pill mill when you
21 don't need it for medical purposes?
22        MS. HERMIZ:  Objection to form.
23    A.    Yes.
24    Q.    What's your understanding of what a
25 pill mill is?

Page 196

1    A.    That would be someone -- a doctor or
2 a clinic that is prescribing pills that are
3 either not needed by that person or we've had
4 some where they do not actually examine the
5 individual, basically just in return for
6 whatever they're paying for that visit are
7 giving them a prescription.  Some, even
8 depending on the nature of the doctor's license,
9 may be dispensing the drugs at the site.
10    Q.    How can you tell the difference
11 between a pill mill and a legitimate pain clinic
12 or other medical office?
13        MS. HERMIZ:  Objection to form.
14    A.    The line around the building.
15    Q.    Long line.
16        Are there any other indicators?
17    A.    There are quite a few other
18 indicators, and those would be case specific and
19 we would look at the investigations there.  I
20 know Detective Leonard had brought us one where,
21 again, the line wrapped around the outside of
22 the building and was like that for several days.
23    Q.    What was the name of that facility?
24    A.    Off the top of my head, I cannot
25 think of that one.  It's probably been in the

Page 197

1 last three or four years.
2    Q.    Are you aware of other pill mills
3 operating within Summit County over the past 20
4 years?
5    A.    Yes.  I've had different discussions
6 over the years with Detective Leonard and Tom
7 Misch -- and I apologize.  I have no idea how to
8 spell his last name.  He was a retired Akron
9 police officer who worked for the Ohio Pharmacy
10 Board.  They would frequently come in with cases
11 for us to review.
12    Q.    How many pill mills are you aware
13 operated within Summit County over the past 20
14 years?
15    A.    I have no idea.  I don't have
16 recollection on the number.
17    Q.    Is it more than five?
18    A.    I'm sure there are more than five,
19 but I, again, don't have recollection of that.
20 You would probably need to talk to Detective
21 Leonard or Mr. Misch.
22    Q.    Can you estimate, over your time
23 period at Summit County, how many pill mills
24 operated?
25    A.    I don't think I can fairly estimate

50 (Pages 194 - 197)

Page 198

1 that, no.
2 Q. Is it less than a hundred?
3 A. I would think so, but I don't know.
4 Q. Is it less than 200?
5 A. I don't know.
6 Q. Okay. How many pill mills did you
7 prosecute?
8 A. A few. I know that.
9 Q. Okay. So you prosecuted a few, but
10 you could have been referred 200?
11 MS. HERMIZ: Objection to form.
12 A. No. That is not what I answered at
13 all. You asked how many pill mills were in
14 Summit County, not how many investigations were
15 presented to us about pill mills in Summit
16 County.
17 Q. I see. So you were aware that these
18 pill mills were operating in your county, but
19 they weren't investigated?
20 MS. HERMIZ: Objection to form.
21 A. I am aware that detectives have said
22 there are other ones going on. As far as --
23 again, remember, the 200 was your number, it was
24 never my number. So there are other
25 investigations that are ongoing that they tell

Page 199

1 us about, and when they're ready, they bring
2 them to us. There are other ones that may --
3 some may go federally, some may be handled by
4 the medical board, some may be handled by the
5 pharmacy board.
6 Q. What are the names of the pill mills
7 that you were informed were operating in Summit
8 County?
9 A. Again, I don't know those. Again,
10 it's the same thing where I don't know the
11 number of them, I don't know the names of them.
12 Q. You don't recall any of the names?
13 A. No. I believe there was one. It
14 was a Dr. Brown.
15 Q. And you cannot estimate in any
16 fashion how many pill mills were operating in
17 Summit County according to the law enforcement
18 officers you worked with?
19 A. No. You would have to talk to them.
20 Q. To the best of your recollection,
21 your office has prosecuted a few pill mills?
22 A. Yes.
23 Q. When you say "a few," how many do
24 you mean?
25 MS. HERMIZ: Objection to form.

Page 200

1 A. A few.
2 Q. Do you mean less than 50?
3 A. Yes.
4 Q. Do you mean less than ten?
5 MS. HERMIZ: Objection to form.
6 A. I would guess less than ten.
7 Q. Were these pill mills well known in
8 the community?
9 A. Probably depend on what part of the
10 community, and I'm sure in some areas of the
11 community they were and in other parts of the
12 community they were not.
13 Q. How did you find out about them?
14 A. Detective Pat Leonard or Tom Misch
15 from the State Pharmacy Board.
16 Q. Were there any other sources apart
17 from those two individuals?
18 A. There may have been other agents
19 from the State Pharmacy Board, but I don't
20 recall any specifics.
21 Q. Do you recall approximately when
22 these pill mills were operating in Summit
23 County?
24 A. No, I don't.
25 Q. Do you know whether any were outside

Page 201

1 Cleveland?
2 A. I don't pay attention to ones in
3 Cleveland.
4 Q. Sorry. I meant Akron.
5 A. Okay.
6 Q. Do you recall if any were outside
7 Akron?
8 A. I believe -- and I don't know for
9 sure, but I'm thinking one of them may have been
10 in Copley or the name of it may have been
11 something in Copley. I don't know.
12 Q. And what was your understanding
13 about who was operating these pill mills?
14 A. Physician or a physicians group.
15 Q. Who has the ability to stop a pill
16 mill from operating in Summit County?
17 A. I would think, under certain
18 circumstances, law enforcement may have that
19 ability. I believe the State Pharmacy Board
20 would have that, the State Medical Board would
21 have that authority.
22 Q. Would your office have the ability
23 to stop a pill mill from operating in Summit
24 County?
25 MS. HERMIZ: Objection to form.

51 (Pages 198 - 201)

Page 202

1     A.   It would depend on the
2  circumstances.
3     Q.   In the prosecutions related to pill
4  mills you spoke of, less than ten of them, how
5  were those cases resolved?
6        MS. HERMIZ:  Objection to form.
7     A.   I believe with a guilty plea.
8     Q.   Do you recall any trials involving
9  prosecution of a pill mill?
10    A.   No.
11    Q.   Do you recall any pill mills that
12  you wanted to prosecute but did not prosecute?
13        MS. HERMIZ:  Objection to form.
14    A.   As to any specific names, no.  As to
15  discussions with Detective Leonard or Tom Misch,
16  I believe there may have been preliminarily some
17  different ones they came in to talk about, and
18  then, for whatever reason, did not return on.
19    Q.   What was your understanding of the
20  State Medical Board's authority to regulate or
21  investigate or prosecute operators of a pill
22  mill?
23    A.   Whatever their authority is granting
24  the doctor their license.
25    Q.   What did you understand the Board of

Page 203

1  Pharmacy's authority to be with respect to pill
2  mills?
3     A.   Again, relating to the doctor's
4  ability to prescribe drugs, again, the type and
5  nature of the drugs, and, again, different
6  certifications and approvals they need.
7     Q.   What did you understand the Drug
8  Enforcement Administration's authority to
9  regulate, investigate or prosecute pill mills?
10    A.   I don't think I talked about that at
11  all.
12    Q.   So I'm asking you to now.  Do you
13  understand that the DEA had any authority to
14  regulate or investigate pill mills?
15        MS. HERMIZ:  Objection to form.
16    A.   I have never had a discussion with
17  the DEA about their authority.
18    Q.   So you don't know one way or the
19  other if they have any authority?
20    A.   That would be something you would
21  need to talk to a federal prosecutor on.
22    Q.   Are there other agencies or entities
23  you're aware of who have the authority to
24  regulate, investigate or prosecute operators of
25  pill mills?

Page 204

1     A.   As to other than what we've already
2  talked about?
3     Q.   Yes.
4     A.   No.
5     Q.   Are you aware of any efforts by
6  county officials to try to get the medical board
7  to revoke or suspend a doctor's license?
8     A.   Firsthand knowledge, no, I don't
9  have any.
10    Q.   Are you aware of any efforts by
11  county officials to try to get the Board of
12  Pharmacy to shut down pill mills?
13    A.   Again, I have no firsthand knowledge
14  of that.
15    Q.   What knowledge do you have?
16    A.   I know there have been issues at
17  times where either county council members or
18  city council members have gone to law
19  enforcement about problems or issues, and those
20  have resulted in meetings with Detective Leonard
21  or the State Pharmacy Board.  As to any
22  specifics of those, I don't have that
23  information.
24    Q.   Is it your understanding that those
25  county officials were seeking action from the

Page 205

1  medical board or the board of pharmacy in those
2  situations?
3        MS. HERMIZ:  Objection to form.
4     A.   I do not know what they were asking
5  for.
6     Q.   Leaving aside whether they're pill
7  mills or not, has your office ever investigated
8  any pain clinics for improper prescriptions?
9     A.   We have worked with law enforcement
10  who have investigated pain clinics for improper
11  prescriptions.
12    Q.   And have you ever prosecuted any
13  pain clinics for improper prescribing?
14    A.   I believe we have.
15    Q.   How many?
16    A.   Again, a few.
17    Q.   Less than ten?
18    A.   As best I can state, yes.
19    Q.   Over what period of time did these
20  prosecutions occur?
21    A.   Somewhere from when I began in the
22  office until the present day.
23    Q.   Do you have an estimate of the
24  number of doses distributed by pill mills to
25  people in your jurisdiction last year?

52 (Pages 202 - 205)

Page 206

1    A.   No.
2    Q.   At some point did the legislature in
3 Ohio enact legislation that helped to deal with
4 the pill mill problem?
5        MS. HERMIZ:  Objection to form.
6    A.   I don't know specifically what
7 legislation.
8    Q.   Is it a crime for a street dealer or
9 anyone else who isn't a DEA-registered pharmacy
10 to sell prescription opioids?
11   A.   I'm sure it is.
12   Q.   Have you prosecuted any such cases?
13   A.   If the cases have been presented to
14 us, we have prosecuted them.
15   Q.   Do you know whether any cases have
16 been presented to you that your office would
17 have prosecuted?
18   A.   We have prosecuted individuals for
19 having legal drugs illegally, yes.
20   Q.   How many cases have you prosecuted
21 in which an individual was unlawfully selling
22 prescription opioids?
23   A.   Personally, I prosecuted one.  I
24 don't know what the rest of the prosecutors in
25 the office would have done.

Page 207

1    Q.   Do you have any knowledge of any
2 prosecutions for the sale of prescription
3 opioids apart from the one prosecution you did?
4 Do you have any knowledge of any other ones in
5 your office?
6    A.   I am not aware of those cases.
7 That's not saying there aren't cases there.
8    Q.   Is it a crime to forge a
9 prescription for a controlled substance?
10   A.   Yes.
11   Q.   In that scenario, who would be
12 responsible for the diversion of the
13 pharmaceutical?
14       MS. HERMIZ:  Objection to form.
15   A.   In what situation?
16   Q.   In a situation in which an
17 individual forged a prescription in order to get
18 a controlled substance.
19   A.   Several people could be responsible.
20   Q.   Who could be responsible?
21   A.   The person who forged the
22 prescription, the person who possessed the
23 prescription.  Again, it -- it would call on the
24 specific facts and circumstances relating to
25 that prescription, the use of it.

Page 208

1    Q.   Is it a crime for a doctor to write
2 a prescription for an opioid knowing that it's
3 not for a legitimate medical purpose?
4    A.   Yes.
5    Q.   Have there been occasions in which
6 your office had reason to believe that certain
7 specific doctors had written prescription --
8 opioid prescriptions without a legitimate
9 medical purpose?
10   A.   I believe we've had discussions with
11 Detective Leonard and the State Pharmacy Board
12 on some of those and I think cases have been
13 referred and prosecuted based upon that.  The
14 specifics of the cases I don't have.
15   Q.   How many cases have been prosecuted
16 against doctors for prescription opioids?
17   A.   A few.  Under ten.
18   Q.   Which specific doctors were
19 investigated by your office -- excuse me, were
20 prosecuted by your office?
21   A.   I do not have that information.
22   Q.   For each case, which specific
23 prescription opioids were involved?
24   A.   Again, I don't have that
25 information.

Page 209

1    Q.   Who would have that information?
2    A.   The case file would have that, the
3 investigators would have that, and the attorneys
4 who defended the individuals would have that.
5    Q.   But how would we know which case
6 file to look at if we don't know the doctor's
7 name, the time frame or anything else?
8    A.   You would need to go case by case
9 through the 4,000 cases we do each year.
10   Q.   For each of the doctor cases that
11 your office prosecuted, were any pharmacies
12 involved?
13   A.   If prescriptions were filled by a
14 pharmacy, a pharmacy would have been involved.
15   Q.   To your knowledge, were any
16 pharmacies charged in those cases?
17   A.   I know we had a case where we were
18 looking at some pharmacist for filling
19 prescriptions that were -- were not legitimate.
20 I mean, I know once that I even -- I drove up to
21 Geneva, Ohio to meet with a pharmacist who had
22 originally been in Akron on a case.  I do not
23 remember the details of it.  So that would be,
24 again, something the State Pharmacy Board would
25 know the details of cases they referred to us

53 (Pages 206 - 209)

Page 210

1 regarding pharmacies or pharmacists.
2     Q.    Who has the ability to stop a doctor
3 who's writing an improper prescription?
4         MS. HERMIZ:  Objection to form.
5     A.   I'm sure a lot of people do.
6     Q.   Who?
7         MS. HERMIZ:  Objection to form.
8     Q.   Or what entity?
9     A.   I think the same ones as I've
10 answered previously.  Again, as to
11 prescriptions, the State Medical Board would
12 have ability there, the State Pharmacy Board
13 would have that.  Again, law enforcement.  If we
14 filed criminal charges, the courts can order the
15 person to stop.  And they could do that of their
16 own free will, too.
17     Q.   Has your office ever investigated a
18 physician or healthcare provider for signing
19 blank prescriptions?
20     A.   Yes. Dr. Johnson.  I believe it was
21 a -- it was birth control pills.  He had offices
22 in Akron and also in Columbus, Ohio.
23     Q.   How many total cases involving
24 physicians or healthcare providers has your
25 office prosecuted for opioid-related wrongdoing

Page 211

1 since you joined the office?
2     A.   I do not know that.
3     Q.   Is that information tracked?
4     A.   No.
5     Q.   How many total physicians has your
6 office investigated since 2005?
7         MS. HERMIZ:  Objection to form.
8     A.   Again, as investigated, you would
9 need to look to the investigators who have
10 brought those files to us.  We do not do the
11 investigations.
12     Q.   In the cases in which you have
13 prosecuted a doctor for overprescribing opioids,
14 does your office typically work or contact the
15 Ohio Medical Board?
16     A.   Presuming we had those cases, we do.
17 We're required on the conviction of any
18 physician to notify the medical board of those
19 convictions.  There is a form within the Ohio
20 Revised Code that's required to be submitted
21 that would be maintained by the State Medical
22 Board.
23     Q.   How long does a typical criminal
24 case of this sort, that is a doctor
25 overprescribing opioids, take from indictment to

Page 212

1 resolution?
2     A.   Again, provided there have been
3 those cases, our caseload, probably on the short
4 end, are anywhere from three months, to the
5 long, two years, in our general cases, so it
6 would fit within that same time frame.
7     Q.   Between three months and two years?
8     A.   Yes.
9     Q.   And during that time frame from
10 between three months up to two years, are there
11 any restrictions on the defendant doctor's
12 ability to continue writing prescription --
13 opioid prescriptions?
14     A.   Presuming there were those cases
15 charged, that normally would not be something
16 that the county prosecutor has the authority to
17 do.  It could be a pretrial order issued by the
18 judge or it could be a pretrial matter decided
19 by the medical board or the pharmacy board.  You
20 would have to ask them.
21     Q.   So even if your office doesn't have
22 the authority to suspend or revoke a doctor's
23 license, you certainly have the authority to
24 request that from the judge, right?
25         MS. HERMIZ:  Objection to form.

Page 213

1     A.   We have the authority to request
2 anything from a judge.  Whether they give it or
3 not is their discretion.
4     Q.   I know we've been speaking in
5 hypotheticals.  Is it your testimony -- I just
6 want to make sure I'm clear.  Is it your
7 testimony that your office has prosecuted at
8 least some doctors for crimes related to
9 prescription opioids?
10     A.   I do not know prescription opioids.
11 Prescription drugs, yes.
12     Q.   Okay.  So you're not certain,
13 sitting here today, if there has even been one
14 prosecution of a doctor for crimes related to
15 prescription opioids specifically?
16     A.   Yes.
17     Q.   Okay.  Thank you.
18         In the cases involving doctors who
19 committed crimes related to prescription drugs
20 generally, has the medical board been a helpful
21 partner to your office?
22         MS. HERMIZ:  Objection to form.
23     A.   You would probably need to speak to
24 the prosecutor -- specifically to the prosecutor
25 that handled those cases.  I have not talked to

54 (Pages 210 - 213)

Page 214

1 the medical board on any case that I have -- I
2 have handled.
3     Q.   Are you aware of discontent among
4 your prosecutors regarding the medical board's
5 partnership on cases that involve doctors?
6        MS. HERMIZ:  Objection to form.
7     A.   No.  But if you want to show me
8 something, I'd be happy to look at it.
9     Q.   I'm just asking if in your role as a
10 supervisor in the office, are you aware of any
11 conversations or other experiences that lead you
12 to believe that Ohio Medical Board is not a
13 helpful partner in the prosecution of doctors?
14        MS. HERMIZ:  Same objection.
15     A.   I know we had a doctor we prosecuted
16 based on sex acts he was performing on his
17 patients and I know the prosecutors were not
18 happy that the State Medical Board did not
19 intervene and they said they were waiting to see
20 the outcome of the case.  That would be the
21 extent of what I know.
22     Q.   And in that case the medical board
23 did not revoke or even suspend that doctor's
24 license until the criminal case was resolved; is
25 that right?

Page 215

1     A.   I believe so.
2     Q.   What was the name of that doctor?
3     A.   Dr. Bressi.
4     Q.   Why was that a concern raised by
5 your prosecutors?
6        MS. HERMIZ:  Objection to form.
7     A.   Well, doctors having sex with their
8 patients when their patients aren't aware of it
9 would -- that should explain it.
10     Q.   Was the concern that this particular
11 doctor was permitted to freely continue to
12 practice medicine despite the evidence of
13 criminal wrongdoing?
14     A.   No.  The concern was he was going to
15 continue his criminal activity on other people.
16     Q.   And that he would be able to
17 continue that criminal activity because he still
18 had the benefit of an active medical license,
19 correct?
20     A.   If that was the case, yes.
21     Q.   Okay.  Are you familiar with a
22 case -- another case involving a doctor,
23 Dr. Mahmud Kara?
24     A.   Dr. Kara, I believe, yes.
25     Q.   And was your --

Page 216

1     A.   Vaguely, yes.
2     Q.   Was your office involved in the
3 prosecution of Dr. Kara?
4     A.   Yes.
5     Q.   And was Dr. Kara prosecuted for
6 prescription drug trafficking?
7     A.   That was a more recent one.  I don't
8 know the details of what he was charged with.  I
9 just remember he was charged and there was an
10 issue that the State Pharmacy Board the day of
11 the Grand Jury presentation sent a press
12 release announcing he was indicted before we
13 even had a vote from our Grand Jury, and we were
14 concerned about that, and we spoke to the State
15 Pharmacy Board about that.  I actually spoke to
16 the person who sent out the press release.
17     Q.   What did you say to that person?
18     A.   That, under Ohio law, you cannot
19 reveal the vote of a Grand Jury prior to the
20 vote being filed with the court.
21     Q.   And after Dr. Kara was indicted, are
22 you aware that his medical license was
23 continued -- excuse me.  What is your
24 understanding of what steps, if any, the medical
25 board took regarding Dr. Kara's license after he

Page 217

1 was indicted?
2     A.   I am not aware of that.
3     Q.   And that case did not involve
4 prescription opioids, right?
5     A.   I don't know.  Again, I don't have
6 the details of what his charges were.  I just
7 know my concern was when it was publicly
8 announced he was indicted prior to the
9 indictment is where I became involved.
10     Q.   And when you're prosecuting a
11 doctor, is it your office's practice to share
12 information or evidence with the medical board?
13     A.   Depending upon what we have, whether
14 it's an ongoing investigation and that, we are
15 very careful in our investigations not to give
16 out information that is not public record.  And,
17 again, there may be some limits, restrictions on
18 what we can give.  You're going to have to look
19 at each case and each -- the facts case
20 specific.
21     Q.   After indictment, when the
22 investigation is no longer ongoing, what efforts
23 does your office make to share information or
24 evidence with the medical board regarding the --
25     A.   It's not after indictment.  It's

55 (Pages 214 - 217)

1  after the case is resolved.
2      Q.   So you don't share any information
3  or evidence prior to case resolution?
4      A.   No.  That's not what I said.
5      Q.   Okay.  Help me understand.
6      A.   What I said is we're going to have
7  to look at each case, each report, going to go
8  fact specific on them on what can and cannot be
9  given at that time.
10     Q.   And you make that determination even
11 after someone has been indicted?
12     A.   Yes.  It's going to be ongoing with
13 that, and we try to have a good working
14 relationship with all agencies that are
15 involved.  So if it's something we can share
16 with them, we will do that.  If it's something
17 we cannot, at the appropriate time we will then
18 share it.
19     Q.   And certainly your office is
20 motivated to share evidence with the medical
21 board in situations where you're aware that a
22 doctor is continuing ongoing criminal activity,
23 correct?
24     A.   Again, within the provisions of the
25 law, that we are permitted to disclose, we are

1  going to do that.  Where we're not, we're going
2  to not give that until we are permitted to.
3      Q.   Have you ever filed a motion for an
4  injunction to suspend a doctor's ability to
5  prescribe medication due to suspected criminal
6  activity?
7      A.   I'm not aware if we have done that
8  or not.
9      Q.   Apart from the doctors that you've
10 decided to prosecute, how many other doctors,
11 based on your conversations with law
12 enforcement, do you suspect of criminal activity
13 in Summit County?
14         MS. HERMIZ:  Objection to form.
15     A.   I don't suspect them of criminal
16 activity in Summit County or we would charge
17 them.
18     Q.   So, in your view, you have
19 charged --
20     A.   Again, we talked earlier on about
21 the National Prosecution Standards.  If we have
22 sufficient evidence to proceed with charges, we
23 would do that.
24     Q.   So my question is different, and I
25 understand in a criminal case you need a certain

1  amount of evidence to meet your criminal burden
2  of proof.  But my question is, short of that,
3  even for those cases where you cannot establish
4  enough evidence to bring a criminal case -- my
5  question is, what other doctors do you suspect,
6  although you cannot charge, of criminal
7  wrongdoing in Summit County?
8          MS. HERMIZ:  Objection to form.
9      A.   I don't know.
10     Q.   Do you recall any instances in which
11 law enforcement has informed you about
12 suspicious activity of a doctor and your office
13 has not prosecuted that doctor?
14     A.   Suspicious activity that they are
15 doing an ongoing investigation on and they would
16 come back at a later date and have not come
17 back, yes, that's happened.  Details of names
18 and doctors I don't have.
19     Q.   Why hasn't your office prosecuted
20 more doctors for improperly prescribing opioids
21 in Summit County?
22         MS. HERMIZ:  Objection to form.
23     A.   I think, as we discussed previously,
24 we do not investigate, so if the investigations
25 are brought to us, again, issues with manpower

1  and resources across the board with our
2  community, with our law enforcement, be that
3  again, local departments, sheriff's departments,
4  again, any other issues there, if it's a case
5  that is not brought to us and we do not have an
6  investigation, we can't proceed with it.  And
7  there are a lot of times, again, you look in
8  opiate-related cases and see individuals who are
9  taking drugs, and you see in another case
10 someone who is out with a deadly weapon,
11 shooting that, police are going to prioritize
12 what they need to do to protect the community,
13 and if they don't have the resources to hit
14 everything, again, the violent crime is going to
15 always come first.
16     Q.   Are you aware of any pharmacist in
17 Summit County who sold opioids to people
18 improperly?
19         MS. HERMIZ:  Objection to form.
20     A.   Off the top of my head, no.
21     Q.   Prior to this litigation did your
22 office ever communicate with the DEA concerning
23 any suspicions of pharmacists or doctors
24 regarding prescription opioids?
25     A.   With the DEA, not that I'm aware of.

56 (Pages 218 - 221)

Page 222

1    Q.    Did your office ever communicate
2  with the Ohio Board of Pharmacy about
3  pharmacists dispensing opioids in ways that you
4  thought were problematic?
5    A.    Based upon investigations they
6  brought to us or law enforcement brought to us,
7  there may have been such communications.
8    Q.    Has the Ohio Board of Pharmacy
9  brought investigations to you of -- involving
10  pharmacists suspected of wrongdoing regarding
11  opioid prescriptions?
12    A.    As to specifics, I don't recall.
13  They may have.
14    Q.    How many pharmacists has your office
15  prosecuted since 2005?
16    A.    I do not know.
17    Q.    Is it possible the number is zero?
18    A.    It's possible.
19    Q.    When your office comes across an
20  addict or an overdose victim who was taking
21  prescription opioids, what steps does it take to
22  warn doctors or pharmacists about that
23  individual?
24        MS. HERMIZ:  Objection to form.
25    A.    Is this someone who has died?

Page 223

1    Q.    No.
2    A.    Again, if it's a case that --
3  someone who has an overdose where it would
4  actually come to us, that is different.  I
5  believe the majority of them don't make it to us
6  if someone just overdoses.
7    Q.    If your office were to come across
8  an individual who had been doctor shopping and
9  illegally taking prescription opioids --
10    A.    I think you're putting the cart
11  before the horse a little bit.  If law
12  enforcement comes to us and says this person is
13  doctor shopping and there's an overdose there,
14  we would then notify -- and police would notify
15  that -- that doctor or that pharmacy.
16    Q.    Would the doctors and pharmacists be
17  notified by police even if that individual had
18  not overdosed?
19    A.    You would have to ask the law
20  enforcement that.
21    Q.    Does your office make efforts to
22  notify doctors or pharmacists when it comes into
23  contact with individuals illegally using or
24  selling prescription opioids?
25    A.    If they are traceable back to that

Page 224

1  doctor, that would have already been done by law
2  enforcement in the investigation, so that doctor
3  would be a witness in our case, so yes, there
4  would be communication with the doctor.
5    Q.    And how about the pharmacists?
6    A.    If that pharmacist would be a
7  witness in the case, yes, there would be
8  communication.
9    Q.    But, otherwise, you wouldn't reach
10  out to them to discuss the individual?
11    A.    Not in the prosecution of that
12  individual for illegally possessing those drugs.
13    Q.    How many cases of prescription
14  forgery has your office prosecuted regarding
15  opioids?
16    A.    I can't give you a number on that.
17  There have been times where individuals have
18  been charged with forgery relating to the
19  prescription forms.  I can tell you that has
20  happened.  But to quantify that, again, I don't
21  have that information.
22    Q.    Would you say it's more than -- more
23  than ten cases?
24    A.    I can't say ten or more or ten or
25  less.  I can just say it's happened.

Page 225

1    Q.    How prevalent has the theft of
2  prescription opioids been in your jurisdiction?
3        MS. HERMIZ:  Objection to form.
4    A.    Again, you would have to look at law
5  enforcement for that number.  Again, the report
6  of theft versus the criminal charging of theft
7  are completely different numbers and we wouldn't
8  have the report of theft.
9    Q.    How many cases have you prosecuted
10  involving the theft of prescription opioids?
11    A.    I do not have that number.  You
12  would have to go through and go case by case
13  through the files to determine that.
14    Q.    Could it be zero?
15    A.    No.
16    Q.    Could it be more than a hundred?
17        MS. HERMIZ:  Objection to form.
18    A.    It could be more.  It could be less.
19    Q.    Has your office prosecuted the sale
20  of counterfeit pills?
21    A.    Yes.
22    Q.    How many such cases?
23    A.    I cannot quantify that, whether it's
24  more or less than a hundred.
25    Q.    Has your office ever prosecuted any

57 (Pages 222 - 225)

Page 226

1 pharmaceutical distributors who deliver
2 prescription medicine to pharmacies?
3     A.   Not that I'm aware of.
4     Q.   Have you ever considered prosecuting
5 those entities?
6     A.   If we're brought the case, the
7 investigation, we will consider that, yes.
8     Q.   Have you ever been brought such a
9 case by law enforcement?
10     A.   Not that I'm aware of.
11     Q.   Have internet sales been a problem
12 for diversion of prescription opioids in Summit
13 County?
14     A.   Not that we've received from law
15 enforcement; however, we are hearing more and
16 more frequently about the access to drugs from
17 China.
18     Q.   What specific drugs are coming from
19 China?
20         MS. HERMIZ:  Objection to form.
21     A.   Basically, any drug, it's my
22 understanding.
23     Q.   Are you aware of reports that
24 fentanyl and carfentanil are coming from
25 China -- coming into Summit County from China?

Page 227

1     A.   As into Summit County, no.  As to
2 into the United States, yes.
3     Q.   Do you believe the opioid abuse
4 problem in Summit County has a single cause or
5 multiple causes?
6     A.   Multiple causes.
7     Q.   What are the causes?
8         MS. HERMIZ:  Objection to form.
9     A.   My opinion initially would be drugs,
10 and the normal drugs, illegal drugs.
11         Individuals, again, as we talked
12 earlier, this is -- unlike our normal criminal
13 trafficking in cocaine or crack cocaine, from
14 going years back, this is something that's gone
15 across the county from all age levels, all
16 economic levels.  This is something where we
17 see, again, people who -- in the article you
18 gave me, people that can't afford their
19 OxyContin anymore, that are forced to buy
20 cheaper heroin and end up getting themselves
21 further hooked.  Those are all things.
22         Again, the ease and access to this,
23 or to the drugs, the doctor shopping to the
24 drugs.  The people putting -- mixing these and
25 cutting these drugs with other illegal

Page 228

1 substances.
2         Again, all of those are factors into
3 this that, again, looking at the root, it looks
4 like the -- we're hearing a lot in all of this
5 that the addiction is the start of it.  And I
6 know the cautions my doctor has -- like when I
7 had shoulder surgery, be careful in how you use
8 this.  Again, those are -- those are all
9 factors.
10     Q.   Are you referring to the warning
11 that you received after -- before you take a
12 prescription drug after shoulder surgery?
13     A.   No.  The face-to-face from my
14 doctor.
15     Q.   And he warned you about the
16 prescription drug before you took it?
17     A.   Yes.
18     Q.   What kind of drug did you have a
19 personal experience taking?
20     A.   Oh, one of the generic names for
21 OxyContin, I believe.
22     Q.   And have your personal experiences
23 with opioids affected your beliefs or your
24 opinions about them?
25         MS. HERMIZ:  Objection to form.

Page 229

1     A.   I think they solidified my opinions
2 about them.
3     Q.   Are you aware that opioids may only
4 be prescribed by a medically licensed doctor?
5     A.   Legally, yes.
6     Q.   And may only be dispensed by a
7 DEA-registered pharmacy?
8     A.   Legally, yes.
9     Q.   Are you aware that opioids carry
10 with them a warning that had been approved by
11 the FDA?
12         MS. HERMIZ:  Objection to form.
13     A.   Those from pharmacies, yes.  Those
14 on the street, no.
15     Q.   And the ones on the street are
16 manufactured by criminals, correct?
17         MS. HERMIZ:  Objection to form.
18     A.   I think the ones on the street we've
19 seen are manufactured by -- some by criminals,
20 some by people overseas, and some by the same
21 people that sell them to my pharmacy.
22     Q.   Would you agree that doctors
23 unlawfully prescribing opiates for no medical
24 purpose is one cause of the opioid abuse problem
25 in Summit County?

58 (Pages 226 - 229)

Page 230

1     A.   I'm sure it could be.
2     Q.   So you said it could be.  But do you
3  agree that it is one of the causes based on what
4  you had seen?
5     A.   From what I've seen, my personal
6  opinion, yes.
7     Q.   Do you believe that pharmacists
8  unlawfully dispensing opiates is one cause of
9  the opioid problem in Summit County?
10    A.   Yes.  As I said, there are many
11 causes.
12    Q.   And are international drug cartels
13 another cause?
14    A.   I don't know about cartels, but
15 whoever is manufacturing it and selling it on
16 the internet would be.
17    Q.   And, of course, the people who
18 obtain prescription opioids and sell them are
19 one cause of the opioid problems you've seen in
20 Summit County, correct?
21    A.   Part of the many causes, yes.
22    Q.   As are the individuals who doctor
23 shop, correct?
24    A.   Yes.
25    Q.   And the individuals who forge

Page 231

1  prescriptions, right?
2     A.   One of many.
3     Q.   And the individuals who commit a
4  crime by giving their opioid prescription to
5  other people or selling it to other people,
6  correct?
7     A.   One of many.
8     Q.   In your opinion, are insurers or
9  Medicaid one cause of the opioid abuse problem
10 in Summit County because they encourage doctors
11 to prescribe opioids over alternative
12 treatments?
13       MS. HERMIZ:  Objection to form.
14    A.   I don't have information to answer
15 that one.
16    Q.   If you were to rate the three most
17 significant causes of the opioid abuse problem
18 in your county, what would you identify?
19       MS. HERMIZ:  Objection to form.
20    A.   The addictions is number one; the
21 access, whether legal or illegal, to the drugs
22 would be two, and the lack of treatment would be
23 three.
24    Q.   If the police arrest someone and
25 find that they have a stash of pills for which

Page 232

1  they don't have a prescription, what, if
2  anything, is done to find out where the person
3  got the pills?
4     A.   Well, police can do all types of
5  things; however, they have to do that within the
6  confines of the constitution and that
7  individual's right against self-incrimination,
8  so it -- that, I guess, is up to your -- your
9  defendant who is illegally possessing the drugs.
10    Q.   Do you encourage law enforcement to
11 seek to gather information regarding the source
12 of the drugs they encounter?
13       MS. HERMIZ:  Objection to form.
14    A.   Yes, and they are very good at doing
15 that.
16    Q.   And if they were able to determine
17 the source of the prescription opioid, do they
18 then try to find out -- scratch that.
19       There are other sources to assist
20 law enforcement in determining the source of
21 drugs apart from the defendant, correct?
22       MS. HERMIZ:  Objection to form.
23    A.   As to who?
24    Q.   In other words, a police officer
25 doesn't need to obtain a confession from the

Page 233

1  defendant in a statement about where the drugs
2  came from in all cases, correct?
3     A.   But if your quest is to look to see
4  where the drugs came from, that is your best
5  opportunity to get that is through the person
6  who is possessing them.
7     Q.   And another opportunity is to
8  investigate the crime scene, correct?
9     A.   Yes.
10    Q.   Because you might find a
11 prescription bottle that lists a particular
12 doctor's name on it, correct?
13    A.   Depends on your crime scene, yes.
14    Q.   Is this something that the law
15 enforcement agents in Summit County attempt to
16 do in each drug case they encounter?
17       MS. HERMIZ:  Objection to form.
18    A.   Yes.  I think our law enforcement
19 are very thorough and very good in finding all
20 the evidence they can in their investigations.
21    Q.   Why is it important to determine the
22 source of the drugs for law enforcement
23 purposes?
24    A.   Again, law enforcement looks up the
25 chain.  We have the person who is using it, so

59 (Pages 230 - 233)

Page 234

1  again, we want to see where did this start from,
2  who is responsible in the beginning for this.
3  So if we can do that again, we're going to try
4  to do that.  Again, the idea is to make the
5  community and keep the community safe.
6      Q.   What incentives can you offer to
7  encourage a drug defendant to cooperate and to
8  inform the government about the source of the
9  drugs at issue?
10     A.   Part of that is -- is the province
11  of the court, not our province.  Our area is --
12  a lot of times is individuals not being charged
13  could be an incentive to them.  Again, it
14  depends on that person.  And there's some people
15  who look in crime and say there's a cost of
16  doing business, so they expect to be arrested so
17  often, and there's nothing you're going to do to
18  get them to move to give you any information.
19  There are other people that are going to look to
20  time in jail or no time in jail, other people
21  that may truly want treatment and will benefit
22  by that.  There -- I mean, that's something that
23  I don't think you can just give a short answer
24  to.  Again, you'd need to know specifics about
25  that person, about their situation, before you

Page 235

1  could come up with an answer for that.
2      Q.   Is your office permitted to dismiss
3  criminal charges or not file criminal charges in
4  exchange for cooperation from the individual?
5      A.   Yes, we have the authority to do
6  that.
7      Q.   Is your office authorized to agree
8  to a more lenient sentencing allocution from
9  your office in exchange for an individual's
10  cooperation?
11     A.   We can do that.
12     Q.   Do you have policies governing when
13  you would take those steps in regards to dealing
14  with defendants who might have information about
15  the source of opioid drugs?
16         MS. HERMIZ:  Objection to form.
17     A.   No written policies as to that.
18     Q.   What are your office's practices
19  regarding that issue?
20     A.   Practices, first is defer to law
21  enforcement and have the consent from law
22  enforcement on it.  Second is there's a smell
23  test that would be passed and it's, again,
24  something where case by case we would have to
25  look to the facts and circumstances.

Page 236

1      Q.   In what percentage of the time are
2  you able to get the person who is using drugs to
3  tell you where they obtained the drugs?
4      A.   I don't have that answer.
5      Q.   Is there any data or statistics
6  you're aware of that would answer that question?
7      A.   No.
8      Q.   Are you aware of any case your
9  office handled in which prescription opioids
10  were traced back to any of the Defendants in
11  this litigation?
12     A.   I don't even, off the top of my
13  head, know the Defendants in this litigation.
14     Q.   Are you aware of any case handled by
15  your office in which prescription opioids were
16  traced back to any pharmacy?
17     A.   Off the top of my head, I do not
18  have an answer for that.
19     Q.   Or traced back to any pharmaceutical
20  distributor?
21     A.   I don't have an answer for that.
22     Q.   Or traced back to any manufacturer?
23     A.   No.
24     Q.   Does your office attempt to develop
25  any kind of statistics on where the opioids you

Page 237

1  encounter are coming from?
2         MS. HERMIZ:  Objection to form.
3      A.   No.  We do not have that luxury with
4  our resources.
5      Q.   How many total employees did your
6  office have in 2017?
7      A.   I believe 209.
8      Q.   Of those, how many are prosecutors?
9      A.   I believe between 55 and 60.
10     Q.   And of those prosecutors, how many
11  handle criminal cases involving drugs?
12     A.   35 in the criminal division and four
13  in the juvenile division.  Actually, you could
14  probably count our child protection unit that
15  works with CSEA on cases, probably another five
16  in there, because they do parents who are
17  involved when children services is going in to
18  take the children out of the home, and there are
19  defenses in those for the parents to keep the
20  childrens that are drug-related cases.  So I'd
21  say you're probably at 46 then, or 45.
22         MS. HERMIZ:  Would this be a good
23  place to stop for a five-minute break?
24         MS. WOODS:  Sure.
25         THE VIDEOGRAPHER:  Off the record at

60 (Pages 234 - 237)

1  3:23.
2         (Recess had.)
3         THE VIDEOGRAPHER:  On the record,
4  3:32.
5  BY MS. WOODS:
6     Q.    Mr. Gessner, before we took our
7  break, you stated that it was your belief that
8  the prescription opioids you see on the street,
9  some portion of them are manufactured by "the
10 same people that sell them to my pharmacy."  My
11 question is, what is the basis for your belief
12 that some of those drugs found on the street
13 were manufactured by the companies that
14 distribute pharmaceuticals through legitimate
15 channels?
16    A.    The basis for that would be your
17 questions about diversion of legal prescription
18 drugs; that if they're being diverted from the
19 pharmacy, as you've been asking, then what we
20 would find on the street would be those same
21 pills from the pharmacy, they've just been
22 diverted.
23    Q.    And do you have any documents or
24 evidence in your possession in your office based
25 on your casework to show that the prescription

1  drugs found on the streets were manufactured by
2  any of the Defendants in this litigation?
3     A.    I think if we looked through the
4  records and that and the different reports we
5  received on each drug, some of them may have the
6  actual pharmaceutical companies or manufacturers
7  stamped on them, so that would be the evidence
8  we would have.
9     Q.    And you said that you think that
10 would be the case.  Is that because, sitting
11 here today, you don't know whether or not any of
12 the prescription drug prosecutions in your
13 office involved prescription drugs that had been
14 manufactured by any of the Defendants in this
15 litigation?
16    A.    No.  I think that's just because it
17 makes sense and I'm trying to answer the
18 questions you're asking me.
19    Q.    Okay.  Just so we're clear, you
20 don't have a firm -- you don't have
21 documentation or evidence to back up that
22 opinion?
23         MS. HERMIZ:  Objection to form.
24    A.    I have a firm belief.  I do not have
25 the evidence in front of me.

1     Q.    Earlier in our conversation you
2  mentioned that your office was engaged in some
3  dispute with the county over your budget?
4         MS. HERMIZ:  Objection to form.
5     A.    Not this year.
6     Q.    What year did that occur?
7     A.    It may have been 2007, 2008 or 2009.
8     Q.    What was the nature of that dispute?
9     A.    We wanted more money to fund more
10 prosecutors.  The county didn't want to give us
11 the money.
12    Q.    What did your office do?
13    A.    We created -- did a proposal, came
14 up with what we needed to, we believe,
15 demonstrate to county council and to judges of
16 the common pleas court of why we would need
17 those additional prosecutors.  We met with the
18 judges, and once the judges agreed that they
19 would back us on that, county council decided to
20 approve our budget.
21    Q.    In the ordinary course of the budget
22 process, does your office routinely meet with
23 the judges to get their support prior to
24 proposing a budget or was that something
25 unusual?

1     A.    That's unusual, and that's an option
2  in the Ohio law for the courts to mandate
3  budgets for various groups that work with the
4  courts, but again, the typical way -- again,
5  Summit County is one of only two counties in the
6  state with a charter form of government, so we
7  have a county council.  Most counties, so 86 of
8  them, have county commissioners.  So that would
9  be a meeting with county council versus a
10 meeting with three commissioners.  So there are
11 other counties, where you have courts routinely
12 set budgets for the courts and prosecutors, and
13 Summit County has been one more for the courts
14 to actually go to county council to get their
15 budget approved even though they can order it to
16 be approved.
17    Q.    So ordinarily your budget is
18 approved and considered by Summit County,
19 correct?
20    A.    Yes.
21    Q.    But in this instance, am I correct
22 that essentially the courts, the judges
23 overruled Summit County and ensured that you got
24 the budget you desired?
25    A.    No.  The judges said they would

Page 242

1 overrule Summit County and then Summit County
2 granted us what we had requested.
3     Q.   I see.  And what documents exist
4 regarding this process?
5     A.   Whatever the county budget would
6 have in it.  Again, you would need to go back
7 and look.  You have the documents from 2018,
8 2017 and 2016 there.  You would want to go back
9 a few more years.
10    Q.   To look at 2007, '08 and '09?
11    A.   Yes.  Whichever one of them was when
12 they expanded the courts to add two more courts.
13 That would be the year you would want.  I don't,
14 off the top of my head, recall that date.
15    Q.   Are there documents apart from the
16 final version of the operating budget that would
17 reflect your office's interaction with the
18 courts?
19    A.   I doubt, with the county retention
20 and our office retention schedule, there would
21 be documents of that, other than the final
22 approved budget.  Like I said, everyone agreed
23 in the end.
24    Q.   And is that because you believe
25 those documents were rightly deleted already?

Page 243

1     A.   I don't know.
2     Q.   What sort of documents, reports,
3 proposals or requests did your office create in
4 furtherance of the request to the courts?
5     A.   I don't know if there was much
6 creation, but I think it was more just a
7 breakdown in the number of cases per court
8 caseload in comparison of caseloads to other
9 counties and similar size counties.  Montgomery
10 County in Dayton and Lucas County, Toledo
11 have -- I believe we're the fourth largest,
12 they're the fifth and sixth largest, and I think
13 it was more comparison to them.  So it was other
14 statistics we just had them look at.
15    Q.   Did representatives from your office
16 meet with the clerk -- excuse me, with the
17 courts regarding this budget?
18    A.   At a judges' meeting we met one
19 afternoon.
20    Q.   Were you at that meeting?
21    A.   Yes.
22    Q.   Who else from your office was there?
23    A.   Mary Ann Kovach and Sherri Bevan
24 Walsh.
25    Q.   To the best of your recollection,

Page 244

1 when did that meeting occur?
2     A.   Either 2007, 2008 or 2009, probably
3 October or November.
4     Q.   What was the purpose of the meeting?
5     A.   Well, it was the judges' regular
6 meeting and we went to talk about our budget.
7     Q.   Who presented to the judges on the
8 budget?
9     A.   I believe Mary Ann Kovach did.
10    Q.   Did you learn of the court's
11 decision during that meeting or subsequent to
12 the meeting?
13    A.   I believe subsequent.  I think we
14 stepped out before they discussed it.
15    Q.   And how did you learn of the court's
16 decision regarding your budget?
17    A.   Probably one of them told us.
18    Q.   And how was that decision
19 communicated to the county?
20    A.   We would -- spoke to the county
21 executive at the time and spoke to county
22 council members.
23    Q.   Has your office attempted to enlist
24 the help of the courts to overrule the county in
25 any other year other than the one you've just

Page 245

1 described during your time at the office?
2     A.   No.  Every other year we've looked
3 to the budget, we've looked to the resources the
4 county has, and we've made sure we've been able
5 to live within that, again, being responsible to
6 the taxpayers in Summit County.
7     Q.   Let's take a look at Exhibit 1
8 again.  This is the 2018 operating budget for
9 Summit County.
10         Turning your attention first to page
11 329 of the exhibit, SUMMIT 8742.
12    A.   Wait a second.
13         Okay.
14    Q.   Does this chart list the full-time
15 employees that were budgeted for the years 2014
16 through 2018?
17    A.   For the general fund -- the general
18 fund I believe -- let's see.  I believe it does
19 for the general fund.
20    Q.   Okay.  And we see listed assistant
21 county prosecutor 1, 2 and 3.
22    A.   Um-hum.
23    Q.   Why are the assistant county
24 prosecutors separated by these numbers?
25    A.   Based on experience and pay scale.

62 (Pages 242 - 245)

Page 246

1    Q.    And who is more experienced or
2  expensive between the different numbers, if you
3  know?
4    A.    I can tell you 2 is in the middle.
5  I believe the -- 3 is the newer hires.  I could
6  be wrong there.  It may be 1.  I don't know.
7    Q.    Who is the chief assistant
8  prosecuting attorney?
9    A.    Chief assistant prosecuting
10  attorney, that would be the chief of the
11  criminal division, the chief of the civil
12  division.
13    Q.    Okay.  So there's one over each of
14  those two divisions; is that right?
15    A.    Yes.
16    Q.    And then chief counsel, that's you?
17    A.    Yes.
18    Q.    And county prosecutor is the
19  elected --
20    A.    Prosecutor Walsh.
21    Q.    Apart from those line items, are any
22  of the other staff listed on this chart
23  attorneys for the office?
24    A.    No.  Those are the attorneys in the
25  general division.

Page 247

1    Q.    Okay.  And if you look to the next
2  page, it continues, and provides at the bottom
3  totals.
4    A.    Um-hum.
5    Q.    So am I correct that in 2014 the
6  prosecutor's office was budgeted 69.49 full-time
7  employees?
8    A.    Yes.
9    Q.    And looking ahead to the current
10  year, 2018, on that same chart, the prosecutor's
11  office was budgeted 63.5 full-time employees; is
12  that right?
13    A.    Yes.
14    Q.    So the number of your office's
15  employees has actually gone down?
16    A.    In the general fund, yes.
17    Q.    Why is your position, chief counsel,
18  listed as .7 instead of 1.0?
19    A.    Because they should pay me more.
20  Kidding.
21      Because part of my position is not
22  on the general fund; it is on the -- if you turn
23  a few pages to the tax division, to -- I also
24  oversee the tax division as chief counsel, so 3
25  percent -- or 30 percent is attributed there.

Page 248

1    Q.    Okay.
2    A.    If you look on that one, which would
3  be page 337, you see chief assistant prosecuting
4  attorney, you see chief counsel under that, you
5  see .3.
6    Q.    That's the remaining portion --
7    A.    Yes.
8    Q.    -- of your position?
9    A.    Yes.
10    Q.    Are there other positions on the
11  general fund list of full-time employees that
12  are shared among other areas, like yourself?
13    A.    Yes.
14      For example, if you look and see
15  chief assistant prosecutor, you see 2.25 on the
16  one.  We actually have whole people.  So if you
17  look, then, on 337, you'll see chief assistant,
18  .8, there again to fill that up.  And then you
19  also want to keep looking all the way back to
20  page 344, and you'll see there, for our child
21  support division, another 118 employees there.
22  So if you add the 118 employees for 2018, plus
23  the 15.27 from the tax division to the 63.5,
24  hopefully you're close to whole people.
25    Q.    Because those three separate

Page 249

1  divisions comprise the total of your office?
2    A.    Yes.
3    Q.    And the only portion of your office
4  that focuses on prosecuting drug crimes is the
5  general fund criminal division, correct?
6    A.    And juvenile.  And we also -- the
7  prosecutors -- I'm not sure the prosecutors
8  under grants, whether or not they are counted on
9  there.  I believe they are in the general fund,
10  but I need to make sure.
11    Q.    Okay.  Turning your attention now to
12  page 331, which ends SUMMIT 8744 --
13    A.    Okay.
14    Q.    -- there is -- there are line item
15  descriptions and there are the actual
16  expenditures for 2015, 2016, 2017 and then the
17  adopted budget for 2018.
18    A.    Um-hum.
19    Q.    My first question is about overtime,
20  the line item for overtime.
21    A.    Yes.
22    Q.    What portion of that expense is
23  provided to prosecutors?
24    A.    Zero.
25    Q.    What portion of that expense is

63 (Pages 246 - 249)

Page 250

1  provided to paralegals or support staff for the
2  criminal division's prosecutions?
3      A.   I think that would be split between
4  the secretaries, the administrative staff in
5  civil, in criminal and in juvenile.
6      Q.   Do you know what portion of the
7  overtime costs are attributed to the criminal
8  division specifically?
9      A.   No.
10     Q.   Is there a way to find that out?
11     A.   Possibly.
12     Q.   How would you go about trying to
13 determine what percentage of the overtime costs
14 for your department are attributable to the
15 criminal division?
16     A.   You would need to pull the
17 secretaries that are assigned to the criminal
18 division and see what overtime they were
19 awarded.
20     Q.   Are there records that would assist
21 in answering that question?
22     A.   Yes.  The county has payroll records
23 for everyone.
24     Q.   And in those records do the
25 secretaries report not just the overtime hours

Page 251

1  worked but what projects they actually were
2  working on?
3      A.   I do not believe they report what
4  they're working on.
5      Q.   So how could you determine what
6  portion of those overtime hours were
7  attributable to the criminal work?
8      A.   If it's a criminal secretary and
9  they're doing work overtime, it would be
10 criminal work.
11     Q.   Okay.  So the secretaries are
12 assigned specifically to either criminal or
13 civil or juvenile?
14     A.   Yes, unless they're floating.
15     Q.   What are the names of the
16 secretaries who are assigned specifically to
17 criminal work, if you know?
18     A.   I don't -- I can go through the
19 whole list.  I don't have them all in front of
20 me.  Let's see.
21     Q.   Let me ask you a different question.
22         If we looked at a secretary who had
23 been assigned to work on criminal work
24 specifically, if we looked at her overtime, how
25 could we go about determining what percentage of

Page 252

1  that overtime was attributable to opioid drug
2  crimes?
3      A.   It would probably be just a general
4  determination as to -- if you look at page 322,
5  where you've got the administrative chart for
6  the office, you can see criminal division
7  support staff over in the left; indictment
8  secretaries, there were four; courtroom
9  secretaries, there were eight; Grand Jury
10 coordinator, there was one.  So those would be
11 all related to criminal cases.  Whether there
12 would be overtime for people staying to work on
13 indictments, overtime for courtrooms, or
14 overtime in the Grand Jury, that would be the
15 individuals who would receive that overtime.
16         To the right you have juvenile
17 division support staff.  You have administrative
18 assistant, legal secretaries and receptionist.
19 Again, you would need to look there.
20     Q.   When you say "look there," where are
21 you referring to?
22     A.   The secretaries who are made up by
23 those numbers.
24     Q.   Right.  So would you have to
25 interview the secretaries themselves?

Page 253

1      A.   No.  You could do that based on the
2  payroll records.  County payroll would have who
3  received overtime.
4      Q.   And to determine what a particular
5  employee was doing, what their -- what type of
6  work they were doing during their overtime,
7  would you be able to refer to some record that
8  is maintained by your office?
9      A.   No.
10     Q.   Moving down the chart that's on --
11     A.   Hold on a minute.  Also, on that
12 same page, you see victim service coordinator,
13 victim advocates listed.  So our victim
14 advocates also can receive overtime.  They're
15 not overtime exempt.  So some of that money
16 could be apportioned to them.
17     Q.   Okay.  Victim advocates.  And are
18 they assigned to --
19     A.   Courtrooms.
20     Q.   Are any assigned specifically to
21 criminal matters?
22     A.   Yes.  They're all criminal matters.
23     Q.   They're all criminal, okay.
24         Moving down the list, what is
25 referred to by fringe benefits?

64 (Pages 250 - 253)

1    A.    Which page are you on?

2    Q.    331.

3    A.    Healthcare primarily.

4    Q.    What is referred to as internal
5  services?

6    A.    Internal services are different
7  expenses that the office has that the county
8  then bills back against our budget.  So, for
9  example, the two floors we use in the safety
10  building, there's internally a charge to the --
11  where the county bills our office for our office
12  space and then that is taken from our budget.
13  Also, if we use the IT department.  So we have
14  the county IT department come in to search for
15  records, say, on opioid cases we prosecuted.
16  They're going to bill our office for that time
17  they've spent, which then comes out of our
18  budget.

19    Q.    There is a description "Other" on
20  this budget near the bottom.

21    A.    Um-hum.

22    Q.    What is your understanding of what
23  types of expenses are comprised by "Other"?

24    A.    One example there would be trial
25  expenses.  So I believe for 2017 there was

1  about approximately $50,000 that was line item
2  for trials.  So that would be one of those
3  others.

4    Q.    What, specifically, type of -- what
5  type of expenses?

6    A.    Expert witness fees, court
7  reporters, typing and transcription fees.

8    Q.    What else other than trial expenses
9  is included in the category "Other"?

10    A.    I don't know if that would -- let's
11  see.  Let's see.  "Other."  I believe, like, our
12  computers.  I don't know if our case management
13  system is -- is within that amount.  We pay a
14  monthly fee for the case management system.  I
15  believe that's $14,000 a month.

16    Q.    I don't want you to guess, so if you
17  don't know, that's okay.

18        With respect to the description
19  "Local grant match" --

20    A.    Um-hum.

21    Q.    -- what is that referring to?

22    A.    For grants such as the VOCA and VAWA
23  grants that we have for our advocates and for
24  our domestic violence unit, there is a match
25  required, a percentage match that, in order for

1  us to get the $250,000 from the violence against
2  women, we had to put up, I believe, a portion of
3  that.

4    Q.    Okay.  So that last line item, it's
5  called "Matching," and that's because you
6  received from the federal government an amount
7  at least equal to the amounts listed under local
8  grant --

9    A.    Some are federal and some are state.

10    Q.    Okay.  And in 2018 what is your
11  total operating budget for the prosecutor
12  general office?

13    A.    5 million 824 dollars.

14    Q.    How has that total budget changed
15  over the years you've been with the office?

16    A.    Well, it -- I think if you look to
17  the -- go back to the second page there -- you
18  have it as 8415 -- it's an introductory letter
19  from the Executive Ilene Shapiro.  She says that
20  in 2008 the county's total budget was 576
21  million.  In the 2018 budget it's 529.2 million.
22  So if you look at our budget historically up
23  through 2008, our budget was significantly
24  higher than it is now.  I believe we may have,
25  in 2008, been at, like, 6.2 or 6.3 million.  And

1  then it's gone down again.  Then when the county
2  has found some better economic times and revenue
3  has increased a bit, you've seen it bump back up
4  some.  The county went several years with no
5  cost of living increases, anything of that sort.
6  And those were reinstituted, I believe, in 2017,
7  and that's when you'll see again the budget
8  increase down there.

9    Q.    And even today, in 2018, your budget
10  has not returned to the level it was at in 2008,
11  correct?

12    A.    Nor has our staffing.

13    Q.    Does the funds for indigent defense
14  come out of the prosecutor's office's budget?

15    A.    No.

16    Q.    Does it come out of the court's
17  budget?

18    A.    It comes out of -- it's a separate
19  item for the court, and in the past several
20  years it has been over budget every year.

21    Q.    Are there any line items in your
22  prosecutor's office budget that relate
23  exclusively to opioids?

24    A.    No.  We don't have that luxury.

25    Q.    Have you ever attempted to figure

Page 258

1 out how much of your office's expenses for a
2 particular year were attributable specifically
3 to opioids?
4    A.  No.  There's no one who has that
5 time to sit down and try to figure that out.
6    Q.  How hard would it be to do that?
7       MS. HERMIZ:  Objection to form.
8    A.  I think extremely hard.  If you want
9 to sit down through 4,000 cases and then
10 calculate the hours put in on each one of those
11 cases -- that would be necessary to do that.  I
12 think you would need an economist for that.
13    Q.  You're not an economist, are you?
14    A.  No.
15    Q.  And as you sit here today, do you
16 know how much of your budget for the past fiscal
17 year was dedicated to drug prosecutions?
18    A.  No.  I can tell you how much was
19 dedicated to prosecutions, but not drug
20 prosecutions.
21    Q.  And how much was dedicated to
22 prosecutions?
23    A.  All of it.
24    Q.  The total -- the total expenditures?
25    A.  Yes.

Page 259

1    Q.  But you're not able to break down
2 for us what percentage of your operating
3 expenses related to prescription opioids, are
4 you?
5    A.  No.
6    Q.  Do you have any sense of how much it
7 cost your department to respond to
8 opioid-related incidents last year?
9       MS. HERMIZ:  Objection to form.
10    A.  I could tell you that we're
11 probably -- when cases come in, I review cases.
12 I will -- if cases go into Grand Jury that are
13 no billed or remanded, if, again, cases are
14 dismissed, other information that comes in as
15 far as the cases are coming in and being
16 assigned in our office, I would say probably
17 about 70 percent of the cases we do in the
18 office are, in one form or another, drug
19 related.
20    Q.  Approximately 70 percent?
21    A.  Yes.
22    Q.  And of the 70 percent of the cases
23 that are drug related, what percentage of those
24 are opioid drug related?
25    A.  I'd say probably there was a

Page 260

1 point -- a point where it was probably 80 to 90
2 percent.  That's probably come down some in the
3 past year.
4    Q.  Okay.  I know you're using the word
5 "probably" a lot.  Is that because you haven't
6 actually reviewed the specific numbers or data
7 on this point?
8    A.  Yes.  That's correct.
9    Q.  And you're testifying based on your
10 experience in the office?
11    A.  Yes.
12    Q.  And based on anecdotal evidence?
13    A.  Yes.
14    Q.  And based on that, it's your belief
15 that approximately 70 percent of your office's
16 work relates to drug crimes, and of those drug
17 crimes, approximately, was it 80 to 90 percent
18 are opioid related?  So of that subcategory,
19 what percentage of those involved prescription
20 opioids?
21       MS. HERMIZ:  Objection to form.
22    A.  I don't know.  I would have to try
23 to sift through those to find that out.
24    Q.  Today does your office have any
25 prosecutors who focus only on drug crimes?

Page 261

1    A.  No.  We'd love to.
2    Q.  Do you know how many prosecutors
3 today have pending cases that involve
4 prescription opioids?
5    A.  No, I do not.
6    Q.  Do your prosecutors -- are they
7 required to keep records of their time and
8 attendance?
9    A.  Yes.  Every prosecutor comes in,
10 signs in, and every prosecutor, when they leave,
11 signs out of the office.  Any time they put in
12 leave, we have a Kronos system that would have
13 their sick or vacation or personal time logged
14 onto that and approved.
15    Q.  And are your prosecutors required to
16 report in any form or fashion what proportion of
17 their working hours were spent on particular
18 types of cases?
19    A.  No.
20    Q.  What is the salary range for an
21 assistant prosecutor in your office?
22    A.  Courtroom prosecutors would range
23 from -- in the felony division, from $50,000 to,
24 I would say, $81,000.
25    Q.  And when you estimated that

66 (Pages 258 - 261)

Page 262

1 approximately 70 percent of your criminal cases
2 are related to drugs --
3      A.  Um-hum.
4      Q.  -- what were you considering to be
5 drug related?
6      A.  Crimes where individuals may be
7 either possessing drugs, trafficking in drugs,
8 committing crimes in order to commit those drug
9 crimes.  Again, that's the majority of what we
10 deal with.
11     Q.  Okay.  So included in that 70
12 percent estimate are cases involving theft or
13 property theft?
14     A.  Yes.  Related to drug trade, yes.
15     Q.  And included in that 70 percent
16 estimate are crimes involving the possession or
17 use of meth amphetamine or cocaine, correct?
18     A.  Yes.
19     Q.  Did you include in that 70 percent
20 estimate crimes of violence that also involved
21 evidence of drug use?
22     A.  Yes.
23     Q.  And to be clear, you included in
24 that 70 percent estimate all drug crimes, not
25 just opioid drugs, correct?

Page 263

1      A.  Yes.
2      Q.  So looking at your budget, if we
3 were to add up the number of prosecutors for
4 each year based on that chart we looked at, on
5 page 329 and 330, that would allow us to
6 understand the total amount of prosecutors
7 working in the criminal division, correct?
8          MS. HERMIZ:  Objection to form.
9      Q.  So let me make that a little bit
10 more clear.
11         If we added up the line item for
12 assistant county prosecutor 1, assistant county
13 prosecutor 2, assistant county prosecutor 3, is
14 that the total number of prosecutors engaged in
15 prosecuting drug crimes in your office?
16         MS. HERMIZ:  Objection to form.
17     A.  No.  We have -- in our office, in
18 the criminal division we have two prosecutors
19 for each of the ten courtrooms, which is 20.
20 The domestic violence courtroom has an
21 additional prosecutor.  That makes that 21.  We
22 have five supervisors.  That makes -- takes that
23 number up to 26.  We have two prosecutors in our
24 appellate division.  That makes it 28.  Two
25 prosecutors assigned to Grand Jury, which makes

Page 264

1 it 30.  And then in our delinquency division we
2 have four prosecutors, and that's juvenile.  And
3 in our dependency and neglect we have six
4 prosecutors.  So that would take that number to
5 40.  And, again, with adding a chief of the
6 criminal division, it's 41.  And a portion of my
7 time would be 41. something.  That would be the
8 criminal and juvenile divisions.  Again, if you
9 take this budget, add those numbers and then
10 add --
11     Q.  Add which numbers, the assistant
12 county prosecutor 1, 2 and 3?
13     A.  1, 2 and 3, plus the chief
14 assistant, plus a portion of chief counsel --
15 and I'm -- and then looking as to what portion
16 out of the -- it should be -- it should be about
17 that -- so let's see.  I don't -- I don't know
18 if there's a different list here for juvenile.
19 I don't see that on here.  But I can tell you
20 that's the numbers we have.
21     Q.  Okay.  And just so we're clear,
22 dependency and neglect proceedings are not
23 criminal prosecutions, right?
24     A.  No, but they are typically related
25 to criminal prosecutions.  Many times when --

Page 265

1 when Children's Services come in and remove
2 children from homes, a lot of those parents are
3 charged with crimes, and so they are -- there is
4 information from those cases that will be then
5 passed on from our dependency and neglect, we
6 call child protection prosecutors, to our
7 criminal division.  So it's sort of like a quasi
8 criminal there, where the juvenile prosecutors
9 in the delinquency are considered criminal.
10     Q.  If we could stay with Exhibit 1 and
11 look back to page 324, referring your attention
12 to the "Performance Measure" of that page.
13     A.  Um-hum.
14     Q.  The first measure is listed as
15 "Caseload, number of cases disposed."  What does
16 it mean to be a case disposed?
17     A.  That means a case is done and over
18 with, so it's been resolved that year.
19     Q.  And by "resolved" do you mean that
20 the case has either been -- led to a conviction
21 or dismissal?
22     A.  Yes.  The case is no longer active.
23     Q.  Okay.  And according to Exhibit 1,
24 the prior year, which would be 2017, the
25 caseload was 3,986?

67 (Pages 262 - 265)

Page 266

1 A. Yes.
2 - - - - -
3 (Thereupon, Gessner Deposition
4 Exhibit 10, 2008 County of Summit
5 Operating Budget Beginning Bates
6 Number SUMMIT_000015385, was marked
7 for purposes of identification.)
8 - - - - -
9 Q. I'm going to hand you what's been
10 marked as Exhibit 10. This is the 2008
11 operating budget.
12 If I could refer your attention to
13 page 287 of Exhibit 10. According to Exhibit
14 10, your office's caseload in 2006 was 5,200; is
15 that correct?
16 A. That's what the document says.
17 Q. And in 2007 it was 5,200; is that
18 correct?
19 A. That's what it says.
20 Q. Do you have any reason to doubt the
21 accuracy of this budget?
22 A. No. But I can tell you why those
23 numbers are there.
24 Q. Why are those numbers there?
25 A. Okay. In 2006 there was an

Page 267

1 initiative -- I believe Pete Elliott, the U.S.
2 Marshal, they went in, they found a lot of --
3 they were very aggressive in going after old and
4 outstanding warrants for individuals, and we
5 also had a Fugitive Safe Surrender program going
6 on in those years that brought in a lot of
7 people on cases that were standing out there and
8 were not active. So we had a spike there for a
9 few-year period.
10 Q. And by "those years," are you
11 referring to 2006, 2007 and 2008?
12 A. Yes.
13 Q. And according to Exhibit 10, the
14 caseload for 2008 was also 5,200; is that right?
15 A. That's what it says.
16 Q. So, in fact, your office's caseload
17 has decreased from 2008 to 2017, which we had
18 just looked at, correct?
19 A. If we compare those two, it was
20 higher in 2008. You'll see, though, shortly
21 after that it went down and then started
22 building back up, crime cyclical also.
23 And if you look, also, there, you'll
24 see the number of homicides. Compare those to
25 the ones today. You'll see there was a clear

Page 268

1 increase in the homicides, too.
2 - - - - -
3 (Thereupon, Gessner Deposition
4 Exhibit 11, 2012 County of Summit
5 Operating Budget Beginning Bates
6 Number SUMMIT_000002922, was marked
7 for purposes of identification.)
8 - - - - -
9 Q. Handing you what's been marked as
10 Exhibit 11, this is the 2012 operating budget.
11 If I could refer your attention to page 347 of
12 this document.
13 According to Exhibit 11, even in
14 2010, several years later, the caseload was
15 still higher than it is today, at 4,243 cases;
16 is that correct?
17 A. That's what it says.
18 Q. And in 2011 your caseload was
19 4,100 --
20 A. Um-hum.
21 Q. -- correct?
22 And that caseload is higher than any
23 year that followed up to the present day,
24 correct?
25 MS. HERMIZ: Objection to form.

Page 269

1 A. I'm sorry. You're going to have to
2 repeat that.
3 Q. The 2011 caseload of 4,100 is a
4 higher caseload than your office experienced in
5 any subsequent year, correct?
6 MS. HERMIZ: Same objection.
7 A. I would have to see those numbers,
8 but I'm not going to disagree with you.
9 Q. Well, Mr. Gessner, the number is
10 right there in front of you. What numbers would
11 you need to see, the intervening years?
12 A. Yes.
13 Q. According to Exhibit 2 -- we just
14 went over this one -- in 2017 your caseload was
15 lower than 4,100, correct?
16 A. Um-hum.
17 Q. And in 2016, which would report on
18 the prior year, which is 2015, your caseload was
19 lower than 4,100, correct?
20 A. Yes.
21 Q. I don't have further years to show
22 you at this time, but it's your testimony that
23 you don't have any reason to doubt the accuracy
24 of the caseloads as reported in the budget
25 documents, correct?

68 (Pages 266 - 269)

Page 270

1    A.   I can tell you, because I've
2 prepared these documents, that these are
3 estimated numbers, again, when you look on them,
4 and our budget is prepared in -- usually we
5 submit the documents in September to October,
6 with a prediction of what we're going to have by
7 the end of the year.  So I would think that this
8 year the 4,040 will be higher than that, and I
9 doubt that -- for example, the one where you had
10 three years of the exact same number, that those
11 were not the actual numbers.
12    Q.   Your office was receiving more
13 funding in 2011, when its caseload is reported
14 as being higher in these budget documents, than
15 your office received last year, correct?  If you
16 look at Exhibit 11, page 350 -- excuse me.  Not
17 page 350.  Exhibit 11, page 341.  According to
18 Exhibit 11, page 341, your office's budget was
19 actually higher in 2009 than it is currently,
20 correct?
21    A.   Yes.
22    Q.   And in 2011 your actual expenditures
23 were approximately 5.09 million; is that
24 correct?
25    A.   Yes.

Page 271

1    Q.   Which is less than your budget for
2 2017, correct?
3    A.   Yes.
4    Q.   Yet your caseload was higher for
5 2011 than it was for 2017?
6    A.   That's what the documents show, yes.
7    Q.   How have the number of prosecutors
8 assigned to work on criminal matters changed
9 between 2006 to the present day?
10    A.   2006 to the present?  When the court
11 expanded, whichever year that was, we added
12 three prosecutors there.  There was a time we
13 had some grants, where we had some additional
14 prosecutors working then.  The number of
15 prosecutors, I believe, has either stayed the
16 same or gone down a little bit.
17         So if you look at 2008 on your
18 budget on page 342 of Exhibit 11, you see in the
19 general fund 87.11 employees, where on the
20 current budget you see 63.5 on page 330 of
21 Exhibit 1.
22    Q.   And are you able to tell us as --
23 for each of the years between 2006 to the
24 present day how many drug cases your office
25 disposed of?

Page 272

1    A.   No.
2    Q.   Are you able to tell us what
3 percentage of the caseloads reflected in the
4 budget were drug cases?
5    A.   Other than telling you it's about 70
6 percent, no.
7    Q.   And has it been 70 percent
8 consistently between 2006 and 2018?
9         MS. HERMIZ:  Objection to form.
10    A.   There are times where the types of
11 cases rise and fall again, so in any given year,
12 you would need to look at that year.
13    Q.   Has your office always prosecuted a
14 large amount of drug crimes?
15    A.   Yes.
16    Q.   Has it always been the case that the
17 majority of crimes prosecuted by the Summit
18 County's Prosecutor's Office are drug crimes?
19    A.   Those are the majority of the cases
20 brought to us by law enforcement.
21    Q.   What percentage increase to your
22 caseloads have you experienced because of the
23 opioid epidemic?
24         MS. HERMIZ:  Objection to form.
25    A.   As to the overall number of cases,

Page 273

1 that is something that, based on the numbers you
2 have, we would not have an increase in the
3 overall number, but within those numbers, the
4 amount of drug cases has -- again, with -- when
5 the fentanyl hit, when the carfentanil hit, it
6 was clearly an increase in those cases.
7    Q.   Okay.  So you're saying between 2006
8 to the present day, your office's caseloads have
9 decreased but the proportion of drug crimes may
10 have increased?  Is that what you're saying?
11    A.   And depending on the type and nature
12 of the drugs, yes.
13    Q.   And specifically, based on your
14 experience, you believe increases were related
15 to fentanyl and carfentanil --
16         MS. HERMIZ:  Objection to form.
17    Q.   -- is that correct?
18    A.   If you look to the -- I believe that
19 presentation I did in Indiana, I think there are
20 some numbers that may be broken down in there.
21    Q.   What sort of numbers?
22    A.   The number of heroin cases or heroin
23 death cases.
24         MS. WOODS:  Could we go off the
25 record and take a short break?

69 (Pages 270 - 273)

Page 274

1    THE VIDEOGRAPHER:  Off the record at
2  4:24.
3        (Recess had.)
4    THE VIDEOGRAPHER:  On the record,
5  4:32.
6  BY MS. WOODS:
7    Q.   Okay.  Before we broke, I'd been
8  asking you some questions about some changes
9  that have occurred in your office between 2006
10  and 2018.
11      Am I correct that the total number
12  of assistant county prosecutors decreased from
13  approximately 48 in 2007 down to approximately
14  35.7 in 2018?
15    MS. HERMIZ:  Object to form.
16    A.   I would disagree based on I don't
17  know if your numbers are -- which divisions
18  they're in, but there was not that great of a
19  decrease in number of employees.
20    Q.   In the criminal division?
21    A.   In the criminal division, yes.
22    Q.   Based on your recollection, what was
23  the decrease in number of assistant county
24  prosecutors in the criminal division?
25    A.   I believe there was a decrease in

Page 275

1  two or three in the criminal division, and then
2  we reduced one in juvenile, which came over to
3  criminal to put criminal back up a little bit.
4    Q.   How many current prosecutors in the
5  criminal division do you have?
6    A.   I think I went through the list with
7  you.
8    Q.   Not including supervisors or the
9  county prosecutor herself.
10    A.   30.
11    Q.   Based on your recollection, has the
12  number of prosecutors in the criminal division
13  remained at 30 over the last decade?
14    MS. HERMIZ:  Objection to form.
15    A.   No.  I believe it was higher before.
16    Q.   How high was it at its highest?
17    A.   At its highest, I do not know that.
18    Q.   But again, if we add up the line
19  items for assistant county prosecutors 1, 2 and
20  3 in the criminal division prosecutor section of
21  your budget, that would tell us the total number
22  of prosecutors for that year?
23    A.   Yes, except the documents you have
24  -- not limited to just the criminal division.
25    Q.   What else is included?

Page 276

1    A.   I -- from that document -- I'm
2  confused by it.  We have our criminal division,
3  our juvenile division, our civil and tax
4  division.  Independent of that budget is the
5  child support division.  That has its own
6  attorneys.  That's not in there.  But those
7  numbers are not all in there and I don't know if
8  you have all of the papers there or not.
9    Q.   Okay.  When you said you were
10  confused by that document, are you referring to
11  the budget documents that you've been looking
12  at, maybe Exhibit 1 as an example?
13    A.   Yes.
14    Q.   Okay.  And if we wanted to determine
15  how many assistant county prosecutors were
16  working on criminal matters in the Summit County
17  Prosecutor's Office on any given year, how could
18  we go about obtaining that information?
19    A.   You would obtain that either from
20  county payroll or from our -- our table of
21  employees.
22    Q.   Where is the table of employees?
23    A.   Part of it is in the beginning of
24  this document.  You can see from -- over the
25  years, from these various documents you gave to

Page 277

1  me, the county requires it in a different format
2  than it previously was, where now there are just
3  numbers listed here where previously there were
4  names listed.  So there is that table of
5  organization that would be available to show who
6  was in each position.
7    Q.   So at least in 2018, you could
8  simply add up the numbers that are contained in
9  the org chart that is part of the budget
10  document; is that correct?
11    A.   I would hope so.
12      And the answer is yes.  If you look
13  at page 323 of Exhibit 1, under criminal
14  division, you see assistant prosecutor
15  supervisors, 5; assistant prosecutors, 23;
16  appellate division, two; assistant prosecutors,
17  two.  You add those together and you would have
18  the 30 number, which is what I gave you.
19    Q.   That's helpful.  Thank you.
20      - - - - -
21      (Thereupon, Gessner Deposition
22      Exhibit 12, One-Page Spreadsheet -
23      Marked "Confidential - Subject to
24      Protective Order," was marked for
25      purposes of identification.)

70 (Pages 274 - 277)

Page 278

1          - - - - -
2      Q.   I'm marking for identification
3  Exhibit 12 and handing that to you.
4          Have you seen this document before?
5      A.   Nope.  And it says, "Subject to a
6  protective order, confidential."
7      Q.   Thank you for noting that.
8          So this is a confidential document
9  that was an exhibit to a recent filing by the
10  Plaintiffs in this action.  There is an
11  exception to the protective order that applies
12  and permits us to show you the document during
13  your deposition.
14          Now, you stated you had not seen
15  this previously?
16      A.   No.  This is the first I've seen it.
17      Q.   At any point were you consulted
18  about the estimated amount of money the
19  prosecutor's office spent on opioid-related
20  matters between 2006 and 2017?
21      A.   I may have been.  I don't recall.
22      Q.   Have you ever been asked to estimate
23  the amount of expenses that your office has
24  expended to handle opioid-related matters in any
25  particular year?

Page 279

1      A.   I think we've had general
2  discussions with the county on that.
3      Q.   And who specifically from the
4  county?  Are you talking about county lawyers or
5  someone else?
6      A.   I don't recall if that was county
7  budget or if that was the county executive's
8  office.
9      Q.   Are you prepared to defend the
10  estimates of damages provided in this chart
11  today?
12          MS. HERMIZ:  Objection to form.
13      A.   No.  I don't know what these numbers
14  even mean.
15      Q.   In that case, I'll retrieve the
16  exhibit.
17          If you were asked, would there be
18  any way for you to estimate the total amount of
19  money spent by your office on issues related to
20  prescription opioids?
21          MS. HERMIZ:  Objection to form.
22      A.   Without sitting down again, looking
23  in, apportioning cases and percentages of cases,
24  I'm sure that that is something that, given
25  time, I could do, but I don't have that

Page 280

1  information and, like I said, I'm not an
2  accountant or an economist.
3      Q.   What process would you undertake to
4  attempt to estimate the amount your office has
5  spent on opioid --
6      A.   Make a determination on the exact
7  number of cases, and then it would be something
8  where you would have to attribute time based on
9  cases that are pleas versus cases that go to
10  trial; again, cases that have multiple pretrials
11  versus cases that have few pretrials.  Again, it
12  would be -- it would be a project.
13      Q.   Before we took a break, you
14  testified that you believed the incidence of
15  drug cases prosecuted by your office have gone
16  up in recent years.
17      A.   Yes.
18          If you look at Exhibit 4, which you
19  provided to me earlier, one, two, three, four --
20  the fifth and sixth paragraphs in there would
21  show the increase from 2010, that the number of
22  indictments for possession of heroin has more
23  than quadrupled since 2010; 2014, over 500
24  defendants were prosecuted for possession of
25  heroin as opposed to 157 in 2010.  The

Page 281

1  possession -- like possession of heroin,
2  indictment, the number of defendants charged
3  with trafficking in heroin has also increased.
4  In 2010 there were 46 cases; 2014, there were
5  152 cases.
6      Q.   And you testified that these
7  statistics that you just read were obtained by
8  actually going through the cases to determine
9  which ones were heroin related, correct?
10          MS. HERMIZ:  Objection to form.
11      A.   Yes.
12      Q.   And do you have any statistics or
13  have any statistics attempted to have been
14  gathered by your office to determine how many
15  cases related to prescription opioids?
16      A.   I do not believe they were broken
17  down from different types of drugs.
18      Q.   Do you know whether crimes related
19  to prescription opioids have increased or
20  decreased or stayed the same over the years?
21      A.   I don't have a definitive answer for
22  that.
23      Q.   Do you know whether other drug
24  crimes, non-opioid drug crimes, have increased,
25  decreased or stayed the same over the years?

71 (Pages 278 - 281)

Page 282

1    A.   Not like those.
2    Q.   When you say "not like those," what
3 do you mean?
4    A.   Not like the heroin-related cases.
5    Q.   You're saying they haven't increased
6 as dramatically as heroin?
7    A.   Right.  And as I told you, we have
8 crimes, again starting years ago, where it was
9 cocaine and crack cocaine, then it went to meth
10 amphetamines, then to heroin and the opiates,
11 and now it's going back to actually meth
12 amphetamines now.  So while you see a decrease
13 in the number of heroin, you're seeing an
14 increase in the meth amphetamines because the
15 public awareness, the public education, the
16 crackdown on the heroin and the opiates has
17 resulted in cheaper meth amphetamines coming in
18 from Mexico and replacing them.
19    Q.   So is it fair to say some portion of
20 the increase in drug crimes that your office has
21 handled is due to the increase in meth
22 amphetamine crimes?
23        MS. HERMIZ:  Objection to form.
24    A.   The current -- the current higher
25 number of cases are -- are related to meth

Page 283

1 amphetamines; however, you also have to look at
2 the prosecutions relating to the deaths, which
3 are solely out there related to the heroin and
4 the opiates, and those cases take significantly
5 more time than a possession and a trafficking.
6    Q.   So you've never prosecuted a case
7 involving a death that involved cocaine or meth?
8    A.   We've prosecuted cases where there
9 were deaths involving cocaine and meth, but I
10 don't believe in the involuntary manslaughters
11 we've had those come up.  Again, the connection
12 with the medical examiner making those calls
13 that it was clearly related and caused by that
14 drug is nowhere near any of those -- what you
15 have when you have someone getting fentanyl and
16 carfentanil mixed into their heroin.  They're
17 not that deadly of drugs.
18    Q.   Has your office experienced a budget
19 surplus in any year since you've worked there?
20        MS. HERMIZ:  Objection to form.
21    A.   No.
22    Q.   Has your office ever requested
23 additional funding from the county on the
24 grounds that it was necessary because of opioid
25 crime?

Page 284

1    A.   We may have had some discussions
2 with either the executive's office or county
3 council members about that, but again, we're
4 mindful of what is there.  We can't ask for
5 money that doesn't exist.
6    Q.   In prior years, and in your budget,
7 your office has mentioned as a challenge a lack
8 of work space for your prosecutors, correct?
9    A.   Yes.
10    Q.   And another challenge that you've
11 highlighted in prior budgets is the low salary
12 paid to your prosecutors, correct?
13    A.   Yes.
14    Q.   But, to your knowledge, you have
15 not, in any of your budgets, mentioned as a
16 challenge prescription opioids?
17        MS. HERMIZ:  Objection to form.
18    A.   I believe the budgets you showed me
19 talk about the heroin/fentanyl, which to us, as
20 prosecutors, that encompasses all of this.  You
21 may refer to it as opiates.  We're looking at it
22 as, again, the heroin/fentanyl.
23    Q.   And the budgets that mention
24 heroin/fentanyl were the 2017 and the 2018
25 budgets, correct?

Page 285

1    A.   Yes.
2    Q.   It was not mentioned in the earlier
3 budgets; is that right?
4    A.   No.  That's not in those documents.
5    Q.   What are your office's sources of
6 funding?
7    A.   The taxpayers of Summit County,
8 grants that we receive.
9    Q.   Do you also receive forfeitures from
10 criminal or civil cases?
11    A.   There are forfeitures from criminal
12 and civil cases, which go into law enforcement
13 trust funds, which, under Ohio Revised Code,
14 have restricted uses.  They cannot be used for
15 salaries or for any compensation of any
16 employees.
17    Q.   Can they be used for any of your
18 office's expenses?
19    A.   They have basically supplemented and
20 taken place of the line items, where years ago
21 we had that would be for the education and
22 training of our prosecutors.
23    Q.   So you can use a portion of that
24 forfeiture money to educate and train your
25 staff; is that correct?

72 (Pages 282 - 285)

Page 286

1     A.   Our prosecutors, yes.
2     Q.   Can you also use a portion of that
3  money to provide education and training to law
4  enforcement agents?
5     A.   Yes.  And we do that, and we can
6  also -- we also are required to, I believe, put
7  20 percent of that into community education,
8  which we also do that.
9     Q.   Okay.  And you use the money that
10  you've obtained -- that law enforcement agents
11  have obtained from forfeiture in order to fund
12  those training programs; is that correct?
13     A.   Yes.
14     Q.   Are they fully funded with the
15  forfeiture money?
16     A.   In most cases they are.
17     Q.   In what cases are they not fully
18  funded with forfeiture money?
19     A.   It would depend, I think.  We've had
20  a seminar where there was a small charge for
21  individuals coming in to offset the lunch or
22  something like that.
23     Q.   Does your office receive
24  reimbursement from Title IV-E funding through an
25  agreement with the Summit County Children's

Page 287

1  Service Board?
2     A.   Yes.  That is for the prosecutors in
3  the dependency or neglect or child protection
4  unit for their time that is spent.  It's
5  billable hours spent on the Children's Services
6  case.
7     Q.   And are those prosecutors required
8  to keep track of the portion of their working
9  hours spent on those type of cases?
10     A.   Yes, they are.  And that is the
11  majority of their cases.  Those prosecutors
12  assigned to that division, that's what they do.
13     Q.   Does your office receive funding
14  from the Summit County Juvenile Court for
15  representation provided by the office for the
16  Crossroads program?
17     A.   Yes.  That is a small amount that
18  comes in there, yes.
19     Q.   The Summit County Drug Unit has a
20  responsibility to identify and destroy illegal
21  channels of drugs into Summit County and arrest
22  violators and seize their illicit financial
23  assets.  Does your office receive any funding or
24  resources from those seizures?
25     A.   It's limited.  If you look into the

Page 288

1  rules of the unit there, it goes into the law
2  enforcement trust fund, that we've already
3  talked about, if it does come in, but there is a
4  minimum balance they need to keep, and that
5  money -- majority of that money is spent on
6  buying equipment and other things to assist law
7  enforcement in their fight against the drugs.
8  And so after all of that is expended, then if it
9  reaches a threshold, then it would be divided up
10  between the members of the drug unit, including
11  the prosecutor, into their law enforcement trust
12  funds.
13     Q.   You mentioned your office also
14  receives grant funds.  From where do those grant
15  funds come?
16     A.   VAWA and VOCA, Victims of Crimes Act
17  and Violence Against Women's Act.
18     Q.   What amount of grant funding do you
19  receive from those sources?
20     A.   I do not have the details of each of
21  those.  I know the last Violence Against Women
22  grant was a three-year grant for $750,000, with
23  restrictions in it on how it could be spent, as
24  is the VOCA.
25     Q.   Are you familiar with the -- a grant

Page 289

1  to provide funding for Comprehensive Opioid
2  Abuse Site-Based Program that was announced in
3  May of this year?
4     A.   Is this an Akron grant or is that a
5  Summit County grant?
6     Q.   The Department of Justice, Bureau of
7  Justice Assistance grant.
8     A.   Okay.  Who was awarded that grant?
9         - - - - -
10         (Thereupon, Gessner Deposition
11         Exhibit 13, E-Mail from Brad Gessner
12         to Margaret Scott, dated May 10,
13         2018, Beginning Bates Number
14         SUMMIT_001468944, was marked for
15         purposes of identification.)
16         - - - - -
17     Q.   Let me mark for identification
18  Exhibit 13, SUMMIT 1468944.  This is an e-mail
19  sent to you May 10th, 2018 regarding the
20  Department of Justice, Bureau of Justice
21  Assistance grant referred to as the
22  Comprehensive Opioid Abuse Site-Based Program.
23     A.   Um-hum.
24     Q.   Do you recall receiving this e-mail?
25     A.   Yes.  And if you see at the top, you

73 (Pages 286 - 289)

Page 290

1  see I forwarded that to Margaret Scott, the
2  chief of the criminal division.
3      Q.   Why did you forward it to Ms. Scott?
4      A.   For her to have the prosecutors
5  assigned to review grants, review and see if we
6  were qualified to apply for that.
7      Q.   Do you know whether your office
8  applied for it?
9      A.   I don't know.  I don't know if that
10  is the grant application you showed me earlier.
11      Q.   And according to the e-mail, the
12  grant -- the available grants ranged from
13  $100,000 to 1.5 million dollars; is that
14  correct?
15      A.   Um-hum.
16      Q.   What other grants has your
17  department applied for, if any?
18          MS. HERMIZ:  Objection to form.
19      A.   I don't have a list in front of me.
20      Q.   Based on your recollection, has your
21  office applied for any other opioid-related
22  grants?
23      A.   Again, I don't know if the document
24  you showed me earlier of the grant we applied
25  for that we were not given is that same grant or

Page 291

1  not.  If it's not, we applied for a different
2  one.  If it's the same one, then we did not.
3      Q.   Okay.  So apart from that one,
4  you're not aware of any other grants --
5      A.   No.  I know there was another grant
6  at one point we were talking with the Cuyahoga
7  County Prosecutor's Office on, and that is
8  something that was previously awarded to them
9  and was not anything open on, so we've been on
10  the lookout for these.
11      Q.   Other than prosecutions, what
12  activities does your office engage in that
13  relate to opioid use and abuse?
14      A.   Community awareness.  Again, our
15  office has presented at the Ohio Prosecuting
16  Attorneys Association on this.  We have provided
17  training to local law enforcement going back
18  several years on, again, how to deal with the
19  crime scenes.  We presented at the National
20  District Attorneys Association up in Cleveland
21  this year, presented at the Indiana Council of
22  Prosecuting Attorneys.  We have been involved in
23  presentations with the Association, I think, of
24  Attorney Generals and -- presentations there.
25  We have gone out to churches throughout the

Page 292

1  community.  We've talked at those.  Again, we've
2  done our newsletter, our senior newsletter that
3  goes out.  We have an anti-crime calendar, which
4  is done by local school children, and that --
5  that has anti-drug messages.  We've taken those,
6  distributed those throughout the community.
7  And, again, we have speakers go out at any time
8  requested.
9      Q.   Do you review legislation or
10  advocate for legislative reform?
11      A.   Yes, we have done that in the past,
12  and that's through Ohio Prosecuting Attorneys
13  Association.  They have a legislative committee.
14  We will a lot of times work with them on
15  different proposals that are out there.
16      Q.   Do you collect, use and share data
17  that may help members of the law enforcement
18  community identify criminal trends?
19          MS. HERMIZ:  Objection to form.
20      A.   Specifically, I -- I can't give you
21  an answer to that one.
22      Q.   Do you engage in any rehabilitation
23  or addiction support services?
24      A.   We have a prosecutor assigned to
25  Turning Point, a court program, and they work in

Page 293

1  that program.  Our -- Doug Avery also goes over
2  and hands out mugs to the graduates of drug
3  court and wishes them well.
4      Q.   What is the Turning Point program?
5      A.   It is Summit County Common Pleas
6  Court's drug court program.
7      Q.   Who participates in it?
8      A.   Individuals who are permitted to --
9  to join the program based upon the judges and
10  the criteria that the court has set up.
11      Q.   Which prosecutor participates in the
12  Turning Point program from your office?
13      A.   I believe we have two prosecutors
14  who do that.  I believe Joe McAleese is one of
15  them and Colleen Sims the other one.
16          The Turning Point program, based on
17  the volume of cases, was originally handled by
18  Judge Tom Teodosio before he went from Common
19  Pleas to the Court of Appeals.  When he came
20  in -- or when he left, I believe Judge Joy
21  Oldfield took over the Turning Point program,
22  and it's since expanded to where she has a
23  program and Judge Christine Croce also has a
24  program.  So we have one prosecutor assigned to
25  each one of those.

74 (Pages 290 - 293)

Page 294

1    Q.   What percentage of their working
2  hours, the prosecutors, is spent on Turning
3  Court {sic} program work?
4    A.   The programs in court are at least,
5  at minimum, half a day one day a week.  So off
6  the top, an easy answer to that would be
7  one-tenth of their workweek is spent in that
8  program if there's something that they're doing on
9  it outside of the court time.
10    Q.   What percentage of the cases handled
11  by the Turning Court {sic} program involve
12  prescription opioids?
13    A.   I don't have an answer for that.
14  You would have to ask the court on that.
15    Q.   In the last decade has your office
16  participated in any drug task forces or
17  committees?
18    A.   We are a member of the Summit County
19  Drug Unit.  We are a member of the Summit County
20  Opiate Task Force.
21    Q.   Who specifically at your office is a
22  member of the Summit County Drug Unit?
23    A.   I attend some of those meetings.
24  Colleen Sims attends the balance of the
25  meetings.

Page 295

1    Q.   Is Colleen Sims an assistant county
2  prosecutor?
3    A.   Yes, she is.
4    Q.   What about the Summit County Opiate
5  Task Force?  Who attends on behalf of your
6  office?
7    A.   Margaret Scott was on that, and I
8  believe Angela Walls-Alexander or Brian LoPrinzi
9  will be taking that position.
10    Q.   How often does the Summit County
11  Drug Unit meet?
12    A.   It meets monthly, but the officers
13  in the drug unit will have different
14  conversations with us as needed.  There may be
15  days -- or weeks where I might get four or five
16  calls from the drug unit.  There might be weeks
17  I don't receive any calls.  Prosecutors handling
18  their specific cases, their active cases, may
19  have daily contact with them.
20    Q.   Is your understanding that the
21  Summit County Drug Unit's work encompasses all
22  drug crimes, not just opiate drug crimes?
23    A.   Yes.
24       - - - - -
25       (Thereupon, Gessner Deposition

Page 296

1    Exhibit 14, 8-22-18 Board Meeting
2    Agenda Beginning Bates Number
3    SUMMIT_001468844, was marked for
4    purposes of identification.)
5       - - - - -
6    Q.   I'm marking for identification
7  Exhibit 14. It's titled "August 22, '18 Board
8  Meeting Agenda."  To your knowledge, is this an
9  agenda for the Summit County Drug Unit meeting?
10    A.   Hold on a minute until I read it.
11    Yes, that appears to be an agenda
12  for the drug unit.
13    Q.   Were you present at the August 22nd
14  board meeting?
15    A.   No, I was not present, but I would
16  have received this agenda.
17    Q.   How did you receive this agenda?
18    A.   I don't know if Colleen Sims would
19  have given it to me or what.
20    Q.   Are these agendas generally e-mailed
21  to the group?
22    A.   Sometimes they e-mail them.
23  Sometimes you just get them at the meeting.
24    Q.   Do you have agendas from prior
25  meetings of this group in hard copy or

Page 297

1  electronic format?
2    A.   No.
3    Q.   Why not?
4       MS. HERMIZ:  Objection to form.
5    A.   I do not keep the agendas from the
6  drug unit meetings.
7    Q.   Have you begun to preserve the
8  agendas from this drug meeting in light of the
9  litigation hold in this case?
10    A.   I believe they are maintained by the
11  Summit County Drug Unit, the sheriff which
12  oversees the drug unit.
13    Q.   My question was, have you begun to
14  preserve your copies of the agenda due to the
15  litigation hold in this case?
16    A.   No.  I have not been attending the
17  meetings of recent and I have not been getting
18  them.
19    Q.   This board meeting agenda refers
20  to -- of -- under "Financial Snapshot" refers to
21  a vote to preserve unused detective overtime
22  money for fiscal year 2018.
23       MS. HERMIZ:  Objection to form.
24    Q.   Do you see that?
25    A.   Yes, I see that.

75 (Pages 294 - 297)

Page 298

1    Q.   And is that because not all of the
2 budgeted money for overtime was used in fiscal
3 year 2018?
4    A.   That's -- it would appear that there
5 was more money allocated for overtime than was
6 spent.
7    Q.   That's because police officers
8 actually worked less overtime than was
9 anticipated, correct?
10    A.   Not necessarily.
11    Q.   Do you know the results of the vote?
12    A.   No, I don't.
13    Q.   Do you know whether this has
14 occurred in prior years, this unused overtime?
15    A.   I do not know.
16    Q.   Has that ever occurred in your
17 office?
18    A.   Has what ever occurred in our
19 office?
20    Q.   In which you had unused overtime.
21    A.   In our office, if there is unused
22 overtime -- again, our prosecutors are all
23 overtime exempt, our investigators are overtime
24 exempt.  If there's unused overtime, it would
25 revert back to the county's general fund.

Page 299

1    Q.   And then if you turn the page, this
2 agenda details drug investigations, and it lists
3 a number of drug investigations discussed at the
4 meeting.  Looking at page 2, do you see it
5 mentions cases involving cocaine, crystal meth,
6 marijuana under "DEA."  Then in the middle of
7 the page it refers to large meth buys, refers to
8 three meth buys.  And at the bottom of the page
9 it also refers to a meth dealer in Akron.  On
10 the second page it refers to marijuana in three
11 cases at the top.  In the middle of the page it
12 refers to a buy bust in which confidential
13 sources purchased meth and heroin.  And do you
14 see an additional five mentions of -- excuse me,
15 four mentions of meth amphetamine on that same
16 page?
17    A.   Yes.
18    Q.   If you turn the page, we see
19 additional mentions of meth amphetamine,
20 marijuana, and one mention -- two mentions of
21 heroin/fentanyl; is that correct?
22    A.   That appears to be correct.
23    Q.   You did not attend this meeting?
24    A.   No, I did not.
25    Q.   Have you ever heard of the phrase

Page 300

1 "ARCOS" before?
2    A.   What?  Excuse me.
3    Q.   ARCOS, A-R-C-O-S.  Have you ever
4 heard of that?
5    A.   I may have.  I don't -- nothing I
6 can place.
7    Q.   If I told you that ARCOS was a
8 database through which distributors and
9 manufacturers report every drug transacted to
10 the DEA, would that help you determine whether
11 you had heard of it before?
12       MS. HERMIZ:  Objection to form.
13    A.   That would help me determine I had
14 not heard it before.
15    Q.   Okay.  So sitting here today, you
16 have no knowledge of the ARCOS database?
17    A.   No, I do not.
18    Q.   Are you familiar with the term
19 "suspicious order reports"?
20    A.   In relation to what?
21    Q.   In relation to prescription opioids.
22    A.   No.
23    Q.   Do you have -- did you ever use the
24 data available through the OARRS database we
25 discussed earlier to see if there were places in

Page 301

1 your jurisdiction that were receiving a
2 disproportionate amount of pills?
3       MS. HERMIZ:  Objection to form.
4    A.   I had reviewed OARRS reports in
5 relation to criminal investigations brought to
6 us by law enforcement to support their
7 investigations in the charges they had brought
8 to us.
9    Q.   Okay.  Have you ever reviewed a
10 suspicious order report relating to a
11 prescription opioid?
12    A.   Unless that's contained in those
13 reports and investigations, provided to our
14 office in investigations, no.
15    Q.   Has the Summit County Prosecutor's
16 Office received criticism from family members or
17 others about its perceived lack of response to
18 the opioid problems in the county?
19       MS. HERMIZ:  Objection to form.
20    A.   Yes.
21    Q.   What types of individuals have
22 expressed criticism of the office?
23    A.   Parents, family members, neighbors,
24 and we receive all kind of phone calls that you
25 return and you try to give people information

76 (Pages 298 - 301)

Page 302

1  permitted by law to give them and make them
2  aware of what's going on.
3       We're an office that has always felt
4  that -- especially victims in crimes.  We
5  look -- in your typical drug case I don't think
6  there's a victim.  In these heroin and
7  opiate-related deaths, you have these families
8  that had no idea what was going on, they didn't
9  expect to find grandma dead.  The family with
10  the 16-year-old, who, I mean, after mom and her
11  girlfriend used drugs that night, that decided
12  to inject themself and die in the hotel, bent
13  over in the chair while they slept it off; the
14  aunt that was raising him, she never expected to
15  be a victim there.  So when she calls up and
16  says, "What's going on in this," we spend the
17  time to explain it to them.  Our victim
18  advocates become involved.  Again, typically in
19  a drug possession or drug trafficking case,
20  victim advocates aren't involved, but in these
21  cases they become involved.
22      Q.    You mentioned your office has
23  received phone calls.  Has your office also
24  received letters relating to this issue?
25      A.    Not normally letters, no.

Page 303

1      Q.    What other mediums are used to
2  express criticism of your office relative to its
3  involvement in the opioid problems?
4      A.    On these, primarily -- and I --
5  either Prosecutor Walsh or I end up getting the
6  complaints.  They've been either in person or
7  they've been on the phone.
8      Q.    Okay.  And how many such complaints
9  or criticisms from individuals do you receive on
10  a -- did you receive last year?
11      A.    I don't keep track of those.  If I
12  kept track of every complaint I received from
13  someone not happy with various aspects of the
14  justice system, I wouldn't have time to do any
15  other work.
16      Q.    So you receive a large amount of --
17      A.    I receive a large amount of
18  complaints.  I can tell you a portion is related
19  to the heroin and opiate --
20      Q.    And what is the nature -- what is
21  the nature of their complaints?
22      A.    That no one is doing anything about
23  it.  And these are typically cases where we've
24  arrested and charged someone.  So it's more of a
25  they're not aware of what's being done.

Page 304

1      Q.    Are there other complaints or
2  criticisms that have been waged against your
3  office related to the opioid abuse problems?
4      A.    I wouldn't say against our office,
5  but to our office, and along the lines of this
6  person is selling drugs, that person is selling
7  drugs, something needs to be done, and we make
8  sure we put them in touch with the appropriate
9  law enforcement agency to address those issues.
10      Q.    Based on your experiences, what
11  weaknesses have you identified in law
12  enforcement's response to the opioid issue?
13          MS. HERMIZ:  Objection to form.
14      A.    If I were to say there is a weakness
15  in law enforcement, it's in lack of resources to
16  combat this.
17      Q.    What specific resources would you
18  seek for your office to combat this issue?
19      A.    Our office, manpower.  Just like in
20  the grant, what we specifically asked for in the
21  grant, if you go through there, and see again,
22  people who can be -- be put into specifically
23  deal with this situation, to specifically
24  address these cases and these deaths, again,
25  that law enforcement can have those as

Page 305

1  resources, victims can have those as resources.
2  The administrative support that we would need in
3  assisting with that.  The victim advocates we
4  would need in doing that.
5      Q.    So when you refer to the grant, just
6  so the record is clear, we're talking about
7  Exhibit 8; is that right?
8      A.    Unless there are other grants that
9  you have.  That's the one you've shown me today.
10      Q.    This is the one we discussed.  And
11  in the grant your office proposed funding to
12  supply "two experienced prosecutors," who would
13  specialize in an opiate unit; is that right?
14      A.    Right.  That was, again, within the
15  parameters of that grant, but if you look
16  outside of that, you see additional -- I mean,
17  additional expenses; that there are times when
18  we need a forensic pathologist and our medical
19  examiner is overbooked on these and we can't do
20  these.
21          It was, I believe, for Dr. Dorothy
22  Dean, who was formerly in our medical examiner's
23  office, to come up and testify from Cincinnati,
24  it's $250 an hour from when she leaves her
25  office until she returns to her office.

77 (Pages 302 - 305)

Page 306

1    Again, resources to pay line item
2  things; again, for expert witnesses if needed in
3  there; for, again, the advocates that can deal
4  with those victims.  Support staff.  The amount
5  it affects our case management system.  So we
6  could have a system set up to basically spit out
7  all of the -- the numbers and details you're
8  asking me about.  If we can have funds for that,
9  that would be a great thing to be able to do.
10    Q.    And I understand you may not be able
11  to do everything, but what is stopping your
12  office from taking two of your assistant county
13  prosecutors right now and assigning them
14  exclusively to work only on opioid issues
15  because your office has decided that that is
16  going to be a top priority?
17        MS. HERMIZ:  Objection to form.
18    A.    Well, first of all, it is a top
19  priority in our office and it's always been, but
20  to go to our ten judges and decide which one of
21  them we're pulling a prosecutor or two
22  prosecutors out of creates the first issue.
23        Looking at the caseloads in our
24  courts, when you have prosecutors that are
25  assigned 60 pending cases each and to say we're

Page 307

1  going to take you out of this courtroom, now you
2  get 120 for you to go work on this -- if we take
3  the problem with just taking two specialized
4  prosecutors out and putting them in there that
5  aren't working in addition to the current
6  prosecutors, then again, those individuals now
7  have to appear, those two people, in ten
8  different courtrooms.  If they take their case,
9  they work their case up and indict it, they can
10  only be in one courtroom at a time.  They can't
11  be in ten.
12        So, again, you can't pull that out
13  of what we already have because our numbers
14  there aren't -- if you, again, compare us to
15  Lucas County, compare us to Montgomery County,
16  and see the number of prosecutors each of those
17  offices have and the number of cases compared to
18  ours, you'll see that we're understaffed as it
19  is.
20    Q.    Are you aware that the DEA sets
21  maximum limits on the amount of opioids that can
22  be manufactured based on the DEA's understanding
23  of the medical needs of the U.S. population?
24        MS. HERMIZ:  Objection to form.
25    A.    No, I'm not aware of that.

Page 308

1    Q.    Are you aware that the DEA
2  consistently increased those manufacture limits
3  over the years?
4        MS. HERMIZ:  Same objection.
5    A.    I am not aware of that.
6    Q.    In your opinion, has the DEA
7  attacked the problem as quickly and as intensely
8  as it should have?
9        MS. HERMIZ:  Objection to form.
10    A.    In the -- in the fight we have been
11  doing against heroin and opiates, the DEA has
12  been a willing partner of our Summit County Drug
13  Unit and has been there to assist us whenever
14  we've requested it.
15    Q.    So, in your opinion, has the DEA
16  attacked the opioid problem as quickly and as
17  intensely as it should have?
18        MS. HERMIZ:  Objection to form.
19    A.    I can only answer for what I know,
20  and what I know is when we've needed them,
21  they've responded to us.
22    Q.    Are there things that you know today
23  about combating prescription drug abuse that you
24  wish you had known ten years ago?
25    A.    There are things I know today that I

Page 309

1  wish I knew a year ago.  I mean, throughout --
2  it's the practice of law.  It's constant
3  learning.  So we always look to try to get
4  better.  So, I mean, absolutely there are things
5  I know now that I wish I would have known then.
6    Q.    About combating prescription drug
7  abuse in particular?
8    A.    About any -- anything, in all areas
9  of the law.
10    Q.    And what do you wish that you had
11  known about prescription drug abuse in Summit
12  County ten years ago?
13    A.    I wish I would have known that we
14  needed to educate people ten years ago on how
15  these prescription drugs are going to hook them
16  and how they're not going to be able to afford
17  to continue using those, and they're going to
18  get addicted to them and they're going to be
19  then looking for heroin out on a street corner
20  and you have a 67-year-old woman found laying on
21  her bed with a syringe next to her, you have a
22  16-year-old boy laying backward over a chair in
23  a hotel room.  Again, I wish we knew enough to
24  educate those people before they ended up
25  killing themselves.

78 (Pages 306 - 309)

Page 310

1  Q.  Other than increasing public
2  awareness, what other things do you wish you had
3  known ten years ago relating to prescription
4  drug abuse?
5  A.  That maybe the people putting these
6  things on the market would have stepped up to
7  stop the problem.
8  Q.  Well, let's talk about that.  In
9  your 2018 budget, we read that one of your goals
10  is to collaborate with community partners
11  regarding the fentanyl and heroin epidemic,
12  correct?
13  A.  That would actually be to continue
14  to collaborate, because with the Summit County
15  Drug Unit and the Summit County Heroin Task
16  Force we've been collaborating.
17  Q.  So what efforts does your office
18  undertake to collaborate with pharmaceutical
19  drug distributors like my client, McKesson?
20  MS. HERMIZ:  Objection to form.
21  A.  I don't know who your client is, as
22  I told you, so maybe had they attempted to
23  collaborate with us, we would have been willing
24  partners.
25  Q.  So you didn't know who McKesson

Page 311

1  Corporation was before this litigation?
2  A.  I didn't know until you just told
3  me.
4  Q.  So are you aware of the role that
5  pharmaceutical distributors play in the
6  healthcare supply chain?
7  MS. HERMIZ:  Objection to form.
8  A.  They supply pharmaceuticals.
9  Q.  McKesson is an 185-year-old American
10  company that employs approximately 78,000 people
11  both in Ohio and across the country, and its job
12  is to make sure that patients get prescription
13  medicine that they need, sometimes for
14  life-threatening illnesses, in a timely
15  fashion --
16  MS. HERMIZ:  Objection to form.
17  Q.  -- even in hard-to-reach places in
18  America.
19  Did you know the nature of
20  McKesson's business prior to this litigation?
21  MS. HERMIZ:  Objection to form.
22  A.  As I said, no.
23  Q.  Are you aware that my client
24  delivers tens of thousands of different types of
25  medicine to more than 40,000 pharmacy customers

Page 312

1  across America and that its sales from opioids
2  is less than 2 percent?
3  MS. HERMIZ:  Objection to form.
4  A.  No, I don't, and I don't even know
5  what that 2 percent would be.
6  Q.  Do you have a personal belief as to
7  whether McKesson is responsible for the opioid
8  abuse that has occurred in Summit County?
9  MS. HERMIZ:  Objection to form.
10  A.  I think anyone who has contributed
11  to the problem is at fault.
12  Q.  And do you have any evidence or
13  basis to conclude that McKesson Corporation, in
14  particular, has contributed to the opioid abuse
15  problem?
16  A.  If you take the opioids they're
17  producing and distributing out of the mix, then
18  you don't have the problem you have with them in
19  the mix.  That would be my opinion.
20  Q.  Do you understand my client doesn't
21  produce opioids?
22  MS. HERMIZ:  Objection to form.
23  A.  They distribute them.
24  Q.  That's right.
25  A.  Yes.  So you take them out of the

Page 313

1  mix, then they're not part of that problem.
2  Q.  Okay.  But you understand that
3  prescription opioids have a lawful -- are
4  lawful, correct, if prescribed -- I'm sorry, if
5  obtained pursuant to a medical prescription?
6  MS. HERMIZ:  Objection to form.
7  A.  Yes.  They may be lawfully possessed
8  and used.
9  Q.  In fact, they're used to treat
10  chronic pain and to comfort people near the end
11  of their life, correct?
12  MS. HERMIZ:  Objection to form.
13  A.  Yes.  As I said, from our hospice
14  case, we saw where they were diverted, to use
15  your word, from the person who needed them for
16  the end of their life and the pain by the
17  addicted nurse.
18  Q.  But you don't disagree that people
19  in pain deserve to have their pain treated,
20  correct?
21  MS. HERMIZ:  Objection to form.
22  A.  They deserve to have their pain
23  treated and they deserve to be taken care of.
24  Q.  Do you agree with me that it would
25  be tragic to keep prescription opioids from

79 (Pages 310 - 313)

Page 314

1 patients who have legitimate medical needs for
2 that medicine?
3        MS. HERMIZ:  Objection to form.
4     A.    The legitimate medical needs,
5 absolutely.  The point that the opiate addicts
6 the individual maybe is where we've failed.
7     Q.    Did your office ever coordinate with
8 any state or federal law enforcement agencies to
9 address any opioid-related issues?
10    A.    We have done the local, again, with
11 the Summit County Heroin Task Force.  State
12 agencies, I'm sure we have had discussions at
13 different times with the Ohio Attorney General's
14 Office.  Federal, the application you have right
15 there for the grant.
16        Those would be, I think, some of our
17 attempts.
18    Q.    To what extent do you coordinate
19 with the medical examiner?
20    A.    To the extent of if there's a dead
21 body in Summit County and it wasn't a natural
22 death and there's someone that led to that
23 person's death, we will consult with the medical
24 examiner, and ultimately if there are charges,
25 use the medical examiner as our witness as to

Page 315

1 the cause of death, the method and manners of
2 the death.
3     Q.    Has your office designated
4 prosecutors to work jointly with the U.S.
5 Attorney's Office on drug trafficking cases?
6     A.    Not jointly with them, but we work
7 with the U.S. Attorney's Office.  We consult
8 with them.  There are cases that we have that
9 have both concurrent jurisdictions, that we
10 will, again, look and see at times where -- in
11 most cases, where they are being -- or able to
12 get tougher sentences than we are, and we
13 will -- once they have the case in process, we
14 will dismiss our case.
15    Q.    Are you aware that Trumbull County
16 has designated prosecutors to work jointly with
17 the U.S. Attorney?
18    A.    Yes, in Trumbull County, and
19 Mr. Watkins there has a little bit more latitude
20 in his staff than we have in ours.  We've
21 actually talked to the U.S. Attorney's Office
22 about that program and said if we had an
23 increase in manpower, we would be interested in
24 doing that.
25    Q.    Has your office participated in the

Page 316

1 heroin summits convened by the U.S. Attorney's
2 Office starting in 2013?
3     A.    I -- there's some courses I think we
4 went to.  I don't know if we've been to all of
5 them.
6     Q.    Has your office been involved in the
7 U.S. Attorney's Heroin and Opiate Task Force
8 that was formed in 2013?
9     A.    I don't think so.
10    Q.    Did your office participate in the
11 Akron Roundtable held by the U.S. Attorney in
12 June of 2014?
13    A.    I don't know.  I'm thinking that
14 Margaret Scott may have been at that.  I don't
15 know.
16    Q.    When you suspect that a doctor or a
17 pharmacist was involved in diversion, to whom do
18 you report it?
19        MS. HERMIZ:  Objection to form.
20    A.    First of all, we don't suspect.  Law
21 enforcement suspects.  They bring cases to us
22 they've investigated.  So -- and if they're
23 looking at the pharmacist and that -- when they
24 bring those cases to us, they've already advised
25 the pharmacy board of that.  They're usually

Page 317

1 working hand in hand with the pharmacy board on
2 that.  So when we take it, we report it to the
3 Grand Jury and usually come out with an
4 indictment, if that's the type of --
5     Q.    So it sounds like you rely on law
6 enforcement to make notices to the board of
7 pharmacies or others, that you do not report
8 criminal wrongdoing of pharmacies or doctors to
9 other entities?
10        MS. HERMIZ:  Objection to form.
11    A.    If there are convictions, we do the
12 state reports.
13    Q.    And who do you do the state reports
14 to?
15    A.    The Pharmacy Board, the State
16 Medical Board.  We also, in some cases, report
17 to the Ohio Department of Education, if it's a
18 teacher involved.
19    Q.    You wait until there's a conviction
20 to make those reports; is that right?
21    A.    That's what we're required to do is
22 report a conviction.
23    Q.    Do you make a report about a doctor
24 or pharmacy engaged in criminal wrongdoing
25 related to opioids to the DEA?

80 (Pages 314 - 317)

Page 318

1    A.   No.
2    Q.   Do you make such a report to the
3  pharmaceutical distributor?
4         MS. HERMIZ:  Objection to form.
5    A.   No.  The state requires that we
6  notify the State Medical Board or the State
7  Board of Pharmacy, again, or the Department of
8  Education if a teacher is involved, the
9  Department of Nursing if a nurse is involved.
10  We have made reports to the state nursing boards
11  on the nurse in the nursing home who was -- the
12  hospice, who was taking the pain medication.
13  That was reported.
14    Q.   But it was not reported to a
15  pharmaceutical distributor, was it, by your
16  office?
17    A.   I don't think in the course of the
18  investigation we were told who the
19  pharmaceutical distributor was, and I've never
20  received a call from a pharmaceutical
21  distributor asking us if there are any cases
22  involving any of their drugs either.
23    Q.   Did you notify any third-party
24  payers or pharmacy benefit managers when you
25  uncovered criminal activity conducted by a

Page 319

1  pharmacist or a doctor?
2         MS. HERMIZ:  Objection to form.
3    A.   No, we have not, but the state -- or
4  the insurance companies, if there's a suspected
5  arson, they will send to our office a
6  notification to us of who we should get in
7  contact with, when we should get in contact, and
8  what information they would need should we get a
9  conviction.  We've never received anything from
10  any of those other providers that you have asked
11  me about, just the insurance companies on the
12  arsons.
13    Q.   Are you familiar with the term
14  "HIDTA"?
15    A.   Yes.
16    Q.   What does that mean?
17    A.   It is the group that funds or helps
18  assist fund the Summit County Drug Unit.
19    Q.   Has your office participated in the
20  Ohio HIDTA?
21    A.   We have participated as to our
22  involvement in the Summit County Drug Unit.
23    Q.   Do you know who funds this effort?
24    A.   I believe the DEA funds that.
25    Q.   Your office is not responsible for

Page 320

1  funding it, is that correct, from its own
2  budget?
3    A.   No.
4    Q.   That is correct?
5    A.   I am not aware that our office funds
6  it.
7    Q.   Prior to this litigation, did your
8  office ever communicate with the DEA concerning
9  any pharmacy improperly supplying prescription
10  opioids to Summit residents?
11         MS. HERMIZ:  Objection to form.
12    A.   Not that I'm aware of.
13    Q.   What about regarding pill mills?
14    A.   Not that I'm aware of.
15    Q.   Did you have any communication on
16  any other subject with the DEA regarding
17  prescription opioids?
18         MS. HERMIZ:  Objection to form.
19    A.   Not that I'm aware of, unless it was
20  in the course of an ongoing investigation or an
21  investigation they were presenting to us.
22    Q.   How many such -- how much such
23  investigations have you discussed with the DEA?
24    A.   I don't know.
25    Q.   Is it possible it's zero?

Page 321

1    A.   It's possible.
2    Q.   Did the DEA ever share any tips with
3  you and alert you to potentially unlawful
4  conduct regarding opioids?
5         MS. HERMIZ:  Objection to form.
6    A.   The DEA would report that to the
7  Summit County Drug Unit, not to our office.
8    Q.   So the DEA never shared any tips
9  directly with your office or alerted your office
10  to --
11    A.   Not directly.
12         MS. WOODS:  Let's take a break and
13  go off the record.
14         THE VIDEOGRAPHER:  Off the record at
15  5:32.
16         (Recess had.)
17         THE VIDEOGRAPHER:  On the record,
18  5:54.
19  BY MS. WOODS:
20    Q.   Mr. Gessner, are you aware of an
21  effort within your office to consolidate all
22  drug cases into an Excel spreadsheet?
23         MS. HERMIZ:  Objection to form.
24    A.   No, I'm not.
25         - - - - -

81 (Pages 318 - 321)

Page 322

1    (Thereupon, Gessner Deposition
2    Exhibit 15, Abbreviated Excel
3    Spreadsheet, was marked for purposes
4    of identification.)
5       - - - - -
6    Q.  I'm handing you what's been marked
7  as Exhibit 15.  It's an abbreviation of an Excel
8  sheet that was produced to us in native format
9  that contained three tabs, the first one being
10  code, which is shown in the first three pages
11  under the tab called "Code," and then the other
12  two tabs were named "One Defendant Per Row" and
13  "One Case Per Row" and contain data similar to
14  the data you see in pages 4, 5 and 6 of Exhibit
15  15.
16    Based on your review of Exhibit 15,
17  are you familiar with a spreadsheet -- with this
18  spreadsheet?
19    A.  No.
20    Q.  Do you have any idea about who may
21  have created Exhibit 15?
22    MS. HERMIZ:  Objection to form.
23    A.  My guess would be Brett Lawrence.
24    Q.  Who is Brett Lawrence?
25    A.  Our IT director.

Page 323

1    Q.  The note on page 1 of Exhibit 15
2  reads, "Highlighted charges are those migrated
3  from COPS where there is no way to determine on
4  their face whether or not they are referencing
5  the targeted opioid-related charges."
6    What do you understand that comment
7  to mean?
8    MS. HERMIZ:  Objection to form.
9    A.  My best guess on that would be when
10  we took or started the Matrix case management
11  system, they tried to import all of the old COPS
12  cases into it, and basically they are just
13  showing up as what they are -- if you look at
14  the back pages there, in the -- none in
15  particular, but you see there CR 2005, CR 2006.
16  Those would be 2005 and 2006 cases.  Again,
17  they're showing possession of cocaine as
18  something -- showing crack, showing meth
19  amphetamine on there, but again, I don't know --
20  some of them are just aggravated trafficking in
21  drugs, aggravated possession of drugs.  So it
22  looks like crack -- and crack and cocaine, at
23  the time it would have made sense for them to
24  both be shown because there were different
25  penalties for them.

Page 324

1    So, again, some of these drugs that
2  had specific penalties you would indict with the
3  name of the offense in the charge; others you
4  would not.  So it just shows on, looks like,
5  whatever is dumped, so there's no way to search
6  a particular drug unless you're looking for, it
7  looks like, the cocaine or the marijuana or the
8  meth on these.
9    Q.  Based on your understanding of
10  Exhibit 15, there would be no way to search to
11  determine which cases involve prescription
12  opioids, for example?
13    A.  That's my guess.  It's not -- not
14  anything else.
15    Q.  And, in fact, some of the crimes --
16  excuse me, some of the charges listed on Exhibit
17  15 refer generally to drugs and do not specify
18  the type of drug?
19    A.  That's correct.
20    MS. WOODS:  Thanks.  Let's take a
21  break so that we can switch places.
22    THE VIDEOGRAPHER:  Off the record.
23    (Short recess had.)
24    THE VIDEOGRAPHER:  On the record,
25  6:00.

Page 325

1    EXAMINATION OF BRAD GESSNER
2  BY MS. RENDON:
3    Q.  Mr. Gessner, as I mentioned this
4  morning, my name is Carole Rendon.  I represent
5  the Endo Defendants in this litigation.  I have
6  just a very small handful of questions for you.
7    So you were just talking about a
8  spreadsheet and whether or not we could use the
9  spreadsheet to identify opioid cases, and it
10  appears that we cannot; is that correct?
11    A.  That's my understanding.  Again,
12  this document I have never seen before.
13    Q.  Did your office at some point in
14  time start a policy of trying to designate cases
15  with an opioid stamp so that you would be better
16  able to determine which cases were opioid cases
17  and which were not?
18    MS. HERMIZ:  Objection to form.
19    A.  I don't believe -- when you say
20  "stamp," I don't believe it's a physical stamp.
21  I think it may be a stamp -- a digital stamp in
22  the Matrix system.  So since we went into the
23  Matrix system, that that now has cases that
24  are -- since I -- well, March of 2018 is when
25  Matrix began, and we've been continuing to tweak

82 (Pages 322 - 325)

Page 326

1 it ever since.  Somewhere between March and the
2 current date we've gone in and added the stamp
3 to the program again, stamp meaning its
4 classification within Matrix, not an ink stamp.
5     Q.   So it's like a digital reference
6 point so that you can identify opioid-related
7 cases?
8     A.   Yes.  I think that was the intent.
9 Whether or not that has been done, I don't --
10 and is working, I don't know that.  That's
11 something Brett Lawrence would be the person to
12 answer.
13     Q.   And are there any other types of
14 cases that have a similar digital signature in
15 the Matrix system?  In other words, do you have
16 a meth amphetamine digital stamp, for example?
17     A.   No.  I believe we have domestic
18 violence.  I believe we have gun-related stamps.
19 I'm not sure of all of those stamps.  Since I'm
20 not working on an active caseload, I don't have
21 that daily connection to it.
22     Q.   What is the purpose of identifying
23 specifically opioid cases versus any other type
24 of drug case in the Matrix system?
25     A.   Basically this lawsuit, so we could

Page 327

1 track them easier, from this point going
2 forward.
3     Q.   And does the stamp in the Matrix
4 system differentiate between cases that involve
5 prescription opioids versus illicit opioids?
6     A.   I do not know that answer.
7     Q.   Who would know that answer?
8     A.   Brett Lawrence.
9     Q.   Who is responsible for designating
10 the documents for adding this digital stamp in
11 the Matrix system?
12     A.   I would believe, if it's working and
13 in effect, the Grand Jury prosecutors, and if
14 for any reason that they failed to do that, the
15 courtroom prosecutor upon receipt.  That's the
16 difference with our COPS system and the Matrix
17 system.  COPS was something that once it was set
18 up, it couldn't be altered or changed.  This
19 system you can adapt.  It keeps track of
20 anything done to it and when it was and by whom
21 it was done, so there are always the ongoing and
22 updated versions in it.
23     Q.   So it's not that it was impossible
24 to keep track of opioid cases versus non-opioid
25 cases, it's just you didn't have a system that

Page 328

1 allowed you to do that easily; is that correct?
2     A.   In the COPS system, there was no way
3 to do that.
4     Q.   But you could have had a system --
5 systems exist like the Matrix system -- where
6 you can identify various types of drugs, you
7 just didn't have that kind of a system; is that
8 correct?
9         MS. HERMIZ:  Objection to form.
10     A.   Right.  We were promised a new case
11 management system by county council in 2007, so
12 in 2018 we received it, so for 11 years we were
13 on life support there.
14         - - - - -
15         (Thereupon, Gessner Deposition
16         Exhibit 16, E-Mail String Bates
17         Numbered SUMMIT_001506659, was
18         marked for purposes of
19         identification.)
20         - - - - -
21     Q.   Let me just very quickly show you
22 what I'm marking as Exhibit 16 for your
23 deposition.  That's an e-mail exchange from
24 Megan Bogavich to you dated May 10th of 2018; is
25 that correct?

Page 329

1     A.   That's what it appears to be.
2     Q.   And she's asking you to make sure
3 the Grand Jury prosecutors are putting the
4 "opioid" stamp on any case indicted for
5 possession, trafficking or corrupting with
6 heroin, carfentanil or fentanyl, correct?
7     A.   Yes.
8     Q.   And there's no reference to
9 prescription opioids in her e-mail, is there?
10     A.   Not in her e-mail or my e-mail,
11 which forwards it on to the Grand Jury
12 prosecutors.  So I was correct that it was
13 something to be added by the Grand Jury
14 prosecutors.
15     Q.   In your e-mail forwarding it on to
16 the Grand Jury prosecutors, what is it you said
17 to them in all capitals?
18     A.   And all capitals were primarily for
19 one of the individuals there.  So "When doing
20 screening or Grand Jury, please add the opioid
21 stamp to any heroin, carfentanil or fentanyl
22 case" and, again, if you see down there, Megan
23 did say that was to make gathering statistics
24 easier.
25     Q.   And that would be statistics with

83 (Pages 326 - 329)

Page 330

1  respect to how many cases you're charging that
2  involve heroin, carfentanil or fentanyl; is that
3  correct?
4      A.    Yes.
5      Q.    You were asked earlier about a
6  roundtable and you said you couldn't recall
7  whether or not your office had attended the
8  roundtable; is that correct?
9      A.    Yes.
10          - - - - -
11          (Thereupon, Gessner Deposition
12          Exhibit 17, E-Mail String Bates
13          Numbered SUMMIT_001468903, was
14          marked for purposes of
15          identification.)
16          - - - - -
17      Q.    I'm going to show you what I'm
18  marking as Exhibit 17 for your deposition, and
19  I'll ask you to take a look at it and tell me if
20  this refreshes your recollection as to whether
21  or not your office attended the roundtable.
22      A.    Okay.  What I was asked was a
23  question of were we -- did we attend a
24  conference or a roundtable organized by the U.S
25  Attorney's Office, I believe was the question.

Page 331

1  This was an -- and I still would not make a
2  connection between this document and the U.S.
3  Attorney's Office.  This was -- the mayor had a
4  committee on youth violence that we were not
5  included on or advised of, on this, and I then
6  contacted, it looks like, Tamiyka Rose in the
7  mayor's office at some point prior to this
8  e-mail, because it has "Hello Brad, per your
9  request, the draft plan is attached."  We read
10  about this in the newspaper.  We had not
11  received any notification on it.  We were not
12  invited.  Tamiyka confirmed to me, yes, you were
13  not invited, is it something you would want to
14  be involved in, and then John Galonski responded
15  to me, saying there was another opioid
16  roundtable that Jerry Craig had and we were not
17  included on.
18      Q.    Were you aware of the opioid
19  roundtable that Jerry Craig hosted before you
20  saw this e-mail from John Galonski?
21      A.    We may have had some discussions
22  from John Galonski after it on what -- I mean,
23  our office is very active in the community, so
24  if something would come up and be in the
25  newspaper or the prosecutor would say who

Page 332

1  attended this on behalf of the office, find out
2  -- so John -- most likely that's what happened,
3  and John looked and said we weren't -- and so
4  this committee that the mayor had that we
5  weren't invited to, and that was to talk about
6  how to deal with youth violence in Akron, so
7  then John responded saying there was an opiate
8  roundtable that we were not included on.
9      Q.    Who is Jerry Craig?
10      A.    I'm at a loss.  He is -- he is --
11  it's not the health department.
12      Q.    Are you familiar with the Summit
13  County ADMs Board?
14      A.    Yes.  ADM Board, yes.
15      Q.    And does that --
16      A.    I believe so.
17      Q.    Do you believe that Jerry Craig is
18  associated with the ADMs Board of Summit County?
19      A.    Yes.
20      Q.    And do you know when he held the
21  opioid roundtable?
22      A.    No, I don't.  The only thing I have
23  about the opioid roundtable is what's in this
24  e-mail.
25      Q.    So you don't know who was there?

Page 333

1      A.    No.
2      Q.    Don't know what the topics of
3  conversation were?
4      A.    No.
5      Q.    Do you know why the Summit County
6  Prosecutor's Office was excluded from an opioid
7  roundtable being hosted by Jerry Craig and the
8  Summit County ADMs Board?
9      A.    No, I do not.
10      Q.    After you received this e-mail, did
11  you reach out to Jerry Craig to find out what
12  the roundtable was?
13      A.    No.  I believe John may have
14  communicated with Jerry Craig.  John is the
15  chief of our civil division and he has a lot of
16  communication with the ADM Board.  I believe he
17  would have done that, if anyone would have.
18      Q.    Did you ever talk to John and ask
19  him to reach out to Jerry Craig?
20      A.    No, not on that, because at that
21  point I was focused on what was in the mayor's
22  committee against -- on youth violence was
23  something that was -- something I was looking
24  into.  So as far as that, John, I believe,
25  talked to Jerry and -- I would guess talked to

84 (Pages 330 - 333)

Page 334

1  Jerry on that.
2      Q.   But you don't know whether or not he
3  talked to Jerry?
4      A.   No.  And I have no idea how long
5  after or when Jerry's meeting was or that.  So,
6  again, with the volume of work we have in the
7  office, you usually don't always have the luxury
8  of going backwards and saying, okay, wait, when
9  was this meeting, why weren't we invited, what
10  was the subject of it.  Again, we're on the
11  Summit County Heroin Task Force.  Margaret Scott
12  was assigned to that.  I believe there are
13  representatives from the ADM Board on that.  So
14  my idea -- other people are dealing with that.
15      Q.   So I'm just trying to ask you a very
16  simple question.  Did you ever have a
17  conversation with John Galonski in which he
18  reported to you having spoken with Jerry Craig
19  and found out anything about the opioid
20  roundtable?
21      A.   No.
22      Q.   So when you say you think John
23  talked to him, that's just pure speculation on
24  your part?
25      A.   Yes.  John talks to everybody.

Page 335

1      Q.   But you have no idea whether or not
2  he talked to Jerry Craig about this subject?
3      A.   No.
4      Q.   Are you familiar with test strips
5  that can be used to test drugs to see whether or
6  not they have fentanyl in them?
7      A.   Test -- preliminary testing?
8      Q.   Yes.
9      A.   Yes, I've heard of them.
10      Q.   So you know that there are these
11  test strips that are available, and one of the
12  ways that they can be used is by drug users to
13  determine whether or not the heroin they're
14  about to use might be laced with fentanyl,
15  correct?
16      A.   Right, and I believe the health
17  department was working on getting those to pass
18  out or distribute those.
19      Q.   And why is that important?
20      A.   We don't want people dying.
21      Q.   And when your drugs that you're
22  buying on the street, which are illegal to begin
23  with, are laced with fentanyl, it increases the
24  likelihood that you're going to overdose and
25  die; is that correct?

Page 336

1      A.   Yes.
2      Q.   And that's true whether the fentanyl
3  is laced in with heroin or laced in with
4  cocaine?
5      A.   Absolutely.
6      Q.   Do you know whether or not these
7  test strips ever came to Summit County?
8          MS. HERMIZ:  Objection to form.
9      A.   Off the top of my head, no, I do
10  not.
11      Q.   But they would be a useful tool for
12  people to use to make sure -- to help prevent
13  overdose deaths; is that correct?
14          MS. HERMIZ:  Objection to form.
15      A.   Provided our drug users are
16  organized enough to have them and use them, yes,
17  they could do that.
18          - - - - -
19          (Thereupon, Gessner Deposition
20          Exhibit 18, E-Mail from Melanie Hart
21          dated July 16, 2018, with
22          Attachment, Beginning Bates Number
23          SUMMIT_001011252, was marked for
24          purposes of identification.)
25          - - - - -

Page 337

1      Q.   I'm going to show you what has been
2  marked as Exhibit 18 for your deposition.
3  Before you spend too much time reading the
4  article, I would like to ask you a preliminary
5  question on page 1, the e-mail.
6      A.   Yes.
7      Q.   Is that an e-mail that you would
8  have received?
9      A.   It's an e-mail I would have had sent
10  out to the office.
11      Q.   Okay.  So then my second question
12  is, having glanced at the article, do you recall
13  this newspaper article?
14      A.   Yes.  I would recall having reviewed
15  this, and our office sends out news clips of
16  issues of interest to -- to the office of what
17  has been in the local media, and we do that, and
18  there for a while there were several sent out
19  under either opiate news or news, opiate crimes.
20      Q.   In the newspaper article that you
21  had sent out to the office -- this is from the
22  Akron Beacon Journal from July 14th of 2018 --
23  there's a discussion with respect to the fact
24  that these test strips, fentanyl test strips,
25  are now available in Summit County; is that

Page 338

1  correct?
2      A.   That's what it says, yes.
3      Q.   And did you view that as a positive
4  development to help avoid unintended overdose
5  deaths?
6      A.   Yes, I did.
7      Q.   Do you have any idea who covered the
8  cost of the fentanyl test strips?
9      A.   I did not see that in the article,
10  so I would not know.
11      Q.   If I could direct your attention to
12  the second page of the article.  It's Bates
13  number, at the bottom, SUMMIT 11254.
14      A.   Okay.
15      Q.   It's the fourth full paragraph from
16  the bottom.  It reads, "The fentanyl test
17  strips, which cost about a dollar each, are
18  being paid for by Summit County Public Health
19  and the ADM Board as part of an evolving plan to
20  help save drug users' lives."
21          Do you see that?
22      A.   Yes.
23      Q.   And do you have any information that
24  would cause you to disagree with the reporter's
25  understanding of the cost of the test strips?

Page 339

1          MS. HERMIZ:  Objection to form.
2      A.   I have no knowledge of this other
3  than what you've just pointed out in this
4  article.
5      Q.   Were these test strips being paid
6  for in any fashion by your budget?
7      A.   Not that I'm aware of.
8      Q.   Have you seen a positive benefit as
9  a result of these test strips being available in
10  terms of the rate of overdose deaths in Summit
11  County?
12          MS. HERMIZ:  Objection to form.
13      A.   I have not received any reports on
14  the success or failure of these programs.
15      Q.   Have you done anything to seek
16  information regarding the success or failure of
17  the test strip program?
18      A.   The prosecutor's office has not done
19  any follow-up on this.
20      Q.   Earlier today you were talking about
21  the production of case files, and I believe that
22  you mentioned that Merritt Hannah in your
23  office --
24      A.   Yes.
25      Q.   -- was collecting case files?

Page 340

1      A.   Well, I don't know if she was
2  collecting case files.  She was designated with
3  the office to coordinate any information that
4  was needed through the request for discovery.
5      Q.   Who designated her?
6      A.   The office designated her.
7      Q.   What human being in the office?
8      A.   Sherri Bevan Walsh.
9      Q.   You indicated a number of times
10  today that the only way to determine whether
11  cases your office prosecuted involved opioids is
12  to actually look at the case file; is that
13  correct?
14      A.   Unless they have the opiate stamp
15  that is added to it now.
16      Q.   And that would apply only to cases
17  in calendar year -- the latter part of calendar
18  year 2018, correct?
19      A.   Yes.
20      Q.   So prior to that, the only way to
21  determine whether or not any case involved an
22  opioid is to actually look at the case file; is
23  that correct?
24      A.   Unless a prosecutor says, here, this
25  is a case, I have it and I'm working on it, or I

Page 341

1  know this case is, yes.
2      Q.   And that would be true, then, even
3  more specifically, if you wanted to find cases
4  that involved prescription opioids, you would
5  have to look at the case files themselves?
6      A.   Yes.
7      Q.   Do you have any idea how many case
8  files have been produced in response to the
9  Defendants' document request to Summit County?
10      A.   No.
11      Q.   Do you have any idea whether or not
12  that production was complete?
13          MS. HERMIZ:  Objection to form.
14      A.   I did not participate in that
15  production.
16      Q.   If I told you that we had only
17  received approximately 55 case files, would that
18  number seem low to you in terms of the number of
19  cases you've prosecuted in the last ten years
20  that involve opioids?
21          MS. HERMIZ:  Objection to form.
22      A.   I don't know the parameters of the
23  search or the request, so I can't give you an
24  opinion on 55 without knowing specifically what
25  was asked.

86 (Pages 338 - 341)

Page 342

1    Q.   Do you think from 2006 to the
2   present your office has prosecuted more than 55
3   cases that involve opioids?
4        MS. HERMIZ:  Objection to form.
5        A.   According to the article we had,
6   there were 500 times where people were charged
7   with heroin.  I don't know the specifics as to
8   any other opiates.
9        Q.   So you believe there are at least
10  500 case files that involved prosecutions for
11  heroin; is that correct?
12       A.   In that one year, that's what our
13  article said.
14       Q.   And you have no reason to think that
15  that's incorrect?
16       A.   No.
17       Q.   Earlier today you made mention of
18  some teenagers who had overdosed.  It was
19  something that you had seen on Facebook.  Do you
20  recall that testimony from earlier this morning?
21       A.   Yes.
22       Q.   Was that an event that happened here
23  in Summit County?
24       A.   No.
25       Q.   Do you know where those teenagers

Page 343

1   were who overdosed?
2        A.   The article did not have where they
3   were, but having a 17-year-old and 19-year-old,
4   when I see something like that, it rings a bell
5   -- I mean, you look at that and you'll pay
6   attention to that, and it's the nature of what
7   happened, not the location of what happened,
8   that was the importance to me.
9        Q.   But you know that that wasn't an
10  event that took place here in Summit County; is
11  that correct?
12       MS. HERMIZ:  Objection to form.
13       A.   Yes, that's correct.
14       Q.   And as I understood your testimony
15  from earlier today, it was your memory from
16  looking at this Facebook article that these
17  teenagers had died from taking Percocet that was
18  laced with fentanyl; is that correct?
19       A.   That's what the article said.
20       Q.   And that's not how Percocet is
21  manufactured; it's not laced with fentanyl when
22  it's manufactured, correct?
23       A.   Depends on where it's manufactured.
24       Q.   The Percocet that you can buy in
25  your pharmacy is not laced with fentanyl, is it,

Page 344

1   sir?
2        A.   I hope not.
3        Q.   Do you remember anything else about
4   the -- that Facebook posting that would allow us
5   to try and identify it and find it?
6        A.   It was probably two to three weeks
7   ago.  It was a photograph with young -- a young
8   man was -- his photo was in it.  He was blond.
9   I can tell you that just in the picture.  The
10  mother said he and another friend from college
11  had these Percocets.  She was not aware of it.
12  The next morning she went to wake them.  They
13  were both dead at the time.
14       Q.   And by "these Percocets," you mean
15  the Percocets that were laced with fentanyl?
16       A.   Yes.
17       Q.   And this was something that appeared
18  on your Facebook feed in some fashion --
19       A.   Yes.
20       Q.   -- or did you go out searching for
21  it?
22       A.   No.  It appeared on my feed.
23       MS. RENDON:  So I have no further
24  questions at the moment.
25       On behalf of both -- on behalf of

Page 345

1   all of the Defendants, I believe, we are going
2   to hold the deposition open.  I think that there
3   are a lot of documents that Mr. Gessner
4   referenced here today that we have not seen,
5   that have not been produced to us, that clearly
6   are relevant, that he would rely on in trying to
7   identify and answer questions.
8        MS. HERMIZ:  Can you identify those
9   documents?
10       MS. RENDON:  Well, just as a
11  starting example, I believe we received 55 case
12  files.
13       MS. HERMIZ:  We have made available
14  to you, I think, at multiple times if you had
15  wanted to inspect the case files yourself,
16  obviously going through from 2006 to 2018.  You
17  know, we put it in letters, formal letters.
18  It's a lot of time and resources.  And so that
19  request is, you know, still available if you'd
20  like to take that.
21       MS. RENDON:  I understand, but I
22  think the obligation is for the Plaintiff, who
23  filed the lawsuit, to produce the documents that
24  are relevant to their claims, and here that
25  would be a claim that the costs associated with

87 (Pages 342 - 345)

Page 346

1 the Summit County Prosecutor's Office have
2 increased, I believe you said, by 4.5 million
3 dollars, which, based on Mr. Gessner's testimony
4 today, must have something to do with case
5 files, and so it would then be your obligation
6 to produce to us the relevant case files. So
7 you and I can agree to disagree on that, but
8 that's just one example.
9      And we will try to, as we have
10 consistently in the past, put together for you a
11 list, a letter, of what we think are documents
12 that were identified as a result of
13 Mr. Gessner's testimony here today that have not
14 been produced, and we can address that.
15      MS. HERMIZ: If it's in writing,
16 we'll take it under advisement. Obviously our
17 position is that Mr. Gessner's custodial file
18 production is complete and we have complied with
19 the request to produce responsive documents
20 within that time period.
21      MS. RENDON: And I understand that,
22 and that, actually, raises another issue, which
23 is, to the extent that the e-mails are archived,
24 and we have reason to believe that they are,
25 that just because Mr. Gessner can't access older

Page 347

1 e-mails, that the IT department can, that there
2 was an obligation to produce those as well, and
3 we don't have any older e-mails from
4 Mr. Gessner. So that would be another example
5 of a concern that we have with respect to the
6 document production.
7      MS. HERMIZ: Okay. And, again,
8 we'll take that under advisement, but I do
9 believe that we had someone go in through the
10 archive database and produce those documents as
11 well. That's my understanding.
12      MS. RENDON: Anybody, anything else?
13      Thank you very much.
14      MS. HERMIZ: Plaintiffs have no
15 further questions.
16      THE VIDEOGRAPHER: Off the record at
17 6:24.
18
19      (Deposition concluded at 6:24 p.m.)
20          - - - - -
21
22
23
24
25

Page 348

1 Whereupon, counsel was requested to give
2 instruction regarding the witness' review of
3 the transcript pursuant to the Civil Rules.
4
5      SIGNATURE:
6 Transcript review was requested pursuant to
7 the applicable Rules of Civil Procedure.
8
9      TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 349

1      REPORTER'S CERTIFICATE
2 The State of Ohio,  )
3                     ) SS:
4 County of Cuyahoga. )
5
6      I, Renee L. Pellegrino, a Notary Public
7 within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, BRAD GESSNER, was by
10 me first duly sworn to testify the truth, the whole
11 truth and nothing but the truth in the cause
12 aforesaid; that the testimony then given by the
13 above referenced witness was by me reduced to
14 stenotypy in the presence of said witness;
15 afterwards transcribed, and that the foregoing is a
16 true and correct transcription of the testimony so
17 given by the above referenced witness.
18      I do further certify that this
19 deposition was taken at the time and place in the
20 foregoing caption specified and was completed
21 without adjournment.
22
23
24
25

88 (Pages 346 - 349)

Page 350

1        I do further certify that I am not a
2 relative, counsel or attorney for either party,
3 or otherwise interested in the event of this
4 action.
5        IN WITNESS WHEREOF, I have hereunto set
6 my hand and affixed my seal of office at
7 Cleveland, Ohio, on this 6th day of December, 2018.
8
9
10
11
12 *Renee L. Pellegrino*
13 Renee L. Pellegrino, Notary Public
14 within and for the State of Ohio
15
16 My commission expires October 12, 2020.
17
18
19
20
21
22
23
24
25

Page 351

1              Veritext Legal Solutions
                 1100 Superior Ave
2                   Suite 1820
                Cleveland, Ohio 44114
3                Phone: 216-523-1313
4
  December 6, 2018
5
  To: Kristen J. Hermiz, Esq
6
  Case Name: In Re: National Prescription Opiate Litigation
7
  Veritext Reference Number: 3128038
8
  Witness:  Brad Gessner    Deposition Date:  12/3/2018
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 352

1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
3  ASSIGNMENT REFERENCE NO: 3128038
   CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 12/3/2018
4  WITNESS' NAME: Brad Gessner
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7     I have made no changes to the testimony
   as transcribed by the court reporter
8
9  Date_____Brad Gessner_____
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed
15
      I have affixed my name and official seal
16
   this _____ day of_____, 20____
17
                 _____
18              Notary Public
19
                 _____
              Commission Expiration Date
20
21
22
23
24
25

Page 353

1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
3  ASSIGNMENT REFERENCE NO: 3128038
   CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 12/3/2018
4  WITNESS' NAME: Brad Gessner
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s)
9     I request that these changes be entered
   as part of the record of my testimony
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein
13
   Date_____Brad Gessner_____
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed
21    I have affixed my name and official seal
22 this _____ day of_____, 20____
23               _____
              Notary Public
24
                 _____
25            Commission Expiration Date

89 (Pages 350 - 353)

```
                                                  Page 354
 1           ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
 2           ASSIGNMENT NO: 12/3/2018
 3   PAGE/LINE(S) /      CHANGE      /REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____    _____
20   Date          Brad Gessner
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
        Notary Public
24
     _____
25      Commission Expiration Date
```

| & |
|---|

**&** 1:22 2:12 3:2,6
  3:16 5:20 13:24
  13:25 14:16 23:17
  27:5 81:11,18

| 0 |
|---|

**000002922** 6:6
  268:6
**000006663** 5:10
  25:12
**000007551** 5:8
  25:6
**000008414** 5:6
  22:22
**000015385** 6:4
  266:6
**000064898** 5:22
  98:22
**000271913** 5:18
  68:15
**000350711** 5:15
  57:6
**001011252** 6:19
  336:23
**001468844** 6:12
  296:3
**001468903** 6:16
  330:13
**001468944** 6:10
  289:14
**001468949** 5:12
  38:16
**001506659** 6:15
  328:17
**04** 63:21
**08** 242:10
**09** 242:10

| 1 |
|---|

**1** 5:5 22:20 23:1
  100:2 245:7,21
  246:6 263:12
  264:12,13 265:10
  265:23 271:21
  275:19 276:12
  277:13 323:1
  337:5
**1.0** 247:18
**1.5** 290:13
**10** 6:3,9 82:22
  171:17,20,24
  266:4,10,13,14
  267:13 289:12
**100** 2:19 54:3,7
**100,000** 290:13
**101** 8:10
**102** 8:11
**105** 8:11
**106** 8:12
**109** 8:12
**10:30** 112:11
**10th** 289:19
  328:24
**11** 6:5 82:22 268:4
  268:10,13 270:16
  270:17,18 271:18
  328:12
**110** 8:13
**1100** 351:1
**11254** 338:13
**116** 8:13
**117** 8:14
**118** 248:21,22
**11:11** 104:12
**11:28** 104:15
**12** 6:7 134:22
  277:22 278:3
  350:16

**12/3/2018** 351:8
  352:3 353:3 354:2
**120** 307:2
**121** 8:14
**122** 8:15
**123** 8:15
**124** 8:16,16
**125** 8:17
**127** 2:14
**128** 8:17
**129** 8:18
**12:51** 173:7
**13** 6:9 289:11,18
**130** 8:18
**131** 8:19,19
**132** 8:20
**133** 8:20,21
**135** 8:21
**136** 8:22
**137** 8:22,23
**138** 8:23,24
**139** 8:24
**14** 4:8 6:11 114:2
  296:1,7
**14,000** 255:15
**140** 8:25
**141** 9:3
**1468944** 289:18
**1468949** 38:20
**148** 9:3,4
**149** 9:4,5,5
**14th** 337:22
**15** 6:13 82:19
  322:2,7,15,16,21
  323:1 324:10,17
**15.27** 248:23
**151** 9:6,6
**152** 45:4 46:1
  281:5
**153** 9:7

**154** 9:7
**157** 9:8 45:1
  280:25
**159** 9:8,9
**16** 6:14,18 302:10
  309:22 328:16,22
  336:21
**160** 9:9,10
**161** 9:10,11
**163** 9:11
**164** 9:12 123:14
**166** 9:12
**169** 9:13
**17** 1:7 6:16 7:3,3
  16:3 330:12,18
  343:3
**171** 5:23 9:13
**1717** 3:12
**172** 9:14,14
**174** 4:11
**175** 9:15 121:15
  128:21
**176** 9:15,16
**177** 9:16
**178** 9:17
**18** 6:17 7:4 296:7
  336:20 337:2
**180** 9:17
**181** 9:18
**182** 9:18
**1820** 351:2
**185** 9:19,19 311:9
**186** 9:20,20
**187** 9:21
**190** 9:21
**191** 9:22
**19103** 3:13
**193** 9:22,23
**194** 9:23
**195** 9:24

| | | | |
|---|---|---|---|
| **196** 9:24 | **2006** 5:14 57:4,11 | 245:15 247:5 | **206** 10:7 |
| **1970s** 38:5 40:21 | 59:1,5,22 71:3 | 280:23 281:4 | **207** 10:7 |
| **198** 9:25 10:3 | 73:20,24 74:8 | 316:12 | **209** 237:7 |
| **1986** 35:25 36:3 | 266:14,25 267:11 | **2015** 44:20 56:24 | **20th** 81:19 |
| **1987** 36:1 | 271:9,10,23 272:8 | 249:16 269:18 | **21** 7:5 263:21 |
| **1990s** 34:2,7 46:11 | 273:7 274:9 | **2016** 5:9,18 25:10 | **210** 10:8,8 |
| 57:23 | 278:20 323:15,16 | 27:3,6 28:1 68:14 | **211** 10:9 |
| **19th** 123:19,25 | 342:1 345:16 | 69:1,7 70:8 | **21202-1031** 2:20 |
| **1:18** 1:15 | **2007** 27:25 122:21 | 123:19,25 242:8 | **213** 10:9,10 |
| **2** | 178:14 240:7 | 249:16 269:17 | **214** 10:10,11 |
| | 242:10 244:2 | **2017** 5:7 25:4,19 | **215** 3:14 10:11 |
| **2** 4:3 5:7 23:18 | 266:17 267:11 | 26:6 28:14,24 | **216** 2:9,15 3:18 |
| 25:4,16,16 26:5 | 274:13 328:11 | 29:7 237:6 242:8 | **216-523-1313** |
| 27:13 78:10 90:1 | **2008** 6:3 21:12,13 | 249:16 254:25 | 351:3 |
| 245:21 246:4 | 21:17 240:7 244:2 | 257:6 265:24 | **216-9343** 2:5 |
| 263:13 264:12,13 | 256:20,23,25 | 267:17 269:14 | **219** 10:12 |
| 269:13 275:19 | 257:10 266:4,10 | 271:2,5 278:20 | **22** 5:5 7:5 296:7 |
| 299:4 312:2,5 | 267:11,14,17,20 | 284:24 | **220** 10:12,13 |
| **2.25** 248:15 | 271:17 | **2018** 1:19 5:5,21 | **221** 10:13 |
| **20** 5:21 7:4 80:14 | **2009** 51:20 178:20 | 6:10,18 13:3 | **222** 10:14 |
| 81:13 121:12 | 180:14 240:7 | 22:20 23:3 24:11 | **2227** 350:12 |
| 150:3 197:3,13 | 244:2 270:19 | 26:1 50:17 81:13 | **225** 10:14,15 |
| 263:19 286:7 | **2010** 44:19,24 45:1 | 81:20 242:7 245:8 | **226** 10:15 |
| 343:3 352:16 | 45:4,25 91:22 | 245:16 247:10 | **227** 10:16 |
| 353:22 354:22 | 268:14 280:21,23 | 248:22 249:17 | **229** 10:16,17,17 |
| **200** 10:3,4 55:16 | 280:25 281:4 | 256:10,21 257:9 | **22nd** 296:13 |
| 198:4,10,23 | **2011** 36:25 37:1,2 | 272:8 274:10,14 | **23** 277:15 |
| **2000** 2:14 91:22 | 37:10,20 268:18 | 277:7 284:24 | **231** 10:18,18 |
| **20001-4956** 3:4 | 269:3 270:13,22 | 289:13,19 297:22 | **232** 10:19,19 |
| **2000s** 123:3 | 271:5 | 298:3 310:9 | **233** 10:20 |
| **2001** 5:24 16:21 | **2012** 6:5 37:1,2,10 | 325:24 328:12,24 | **235** 10:20 |
| 31:6,21 33:17 | 37:21 185:19 | 336:21 337:22 | **237** 10:21 |
| 35:24 121:6 162:6 | 268:4,10 | 340:18 345:16 | **239** 10:21 |
| 162:7,8 164:1 | **2013** 51:18,22,23 | 350:7 351:4 | **24** 7:6 |
| 171:12,18 | 56:23,24 74:17 | **202** 3:5 10:4,5,5 | **240** 10:22 |
| **2003** 63:1,21 162:8 | 77:18 122:20 | **2020** 350:16 | **25** 5:7,9,14,18 57:4 |
| 164:1 | 141:4 145:20 | **203** 10:6 | 68:14 |
| **2004** 63:1 | 316:2,8 | **205** 10:6 | **250** 305:24 |
| **2005** 59:10 178:14 | **2014** 44:24 45:5 | **2051829** 5:24 | **250,000** 256:1 |
| 211:6 222:15 | 46:1 47:10,15,16 | 171:13,17 | **258** 10:22 |
| 323:15,16 | 56:24 124:15 | | |

**[259 - 55]**

| | |
|---|---|
| **259** 10:23 | |
| **25th** 57:11 69:1,7 70:8 | |
| **26** 7:6,7 263:23 | |
| **260** 10:23 | |
| **263** 10:24,24 | |
| **266** 6:3 | |
| **268** 6:5 | |
| **269** 10:25 11:3 | |
| **271913** 68:21 | |
| **272** 11:3,4 | |
| **273** 11:4 | |
| **274** 11:5 | |
| **275** 11:5 | |
| **278** 6:7 | |
| **279** 11:6,6 | |
| **28** 2:4 7:7,8 263:24 | |
| **2804** 1:6,7 | |
| **281** 11:7 | |
| **282** 11:7 | |
| **283** 11:8 | |
| **284** 11:8 | |
| **287** 266:13 | |
| **289** 6:9 | |
| **29** 7:8 | |
| **290** 11:9 | |
| **292** 11:9 | |
| **29464** 2:4 | |
| **296** 6:11 | |
| **297** 11:10,10 | |
| **2:04** 174:2 | |

**3**

**3** 1:19 5:9 13:2 25:10,16 27:1 78:10 100:19,20 100:21 179:9 245:21 246:5 247:24 248:5 263:13 264:12,13 275:20

**3,700** 47:17 144:22
**3,986** 265:25
**30** 121:12 247:25 264:1 275:10,13 277:18
**300** 11:11
**301** 11:11,12
**304** 11:12
**306** 11:13
**307** 11:13
**308** 11:14,14,15
**310** 11:15
**3100** 3:13
**311** 11:16,16,17
**312** 11:17,18,18
**3128038** 351:7 352:2 353:2
**313** 11:19,19,20
**314** 11:20
**316** 11:21
**317** 11:21
**318** 11:22
**319** 11:22
**320** 11:23,23 27:3
**321** 11:24,24
**322** 6:13 11:25 23:14 25:18,20 252:4
**323** 12:3 277:13
**324** 23:15,17 265:11
**325** 4:9 12:3
**328** 6:14 12:4
**329** 245:11 263:5
**330** 6:16 263:5 271:20
**331** 249:12 254:2
**332-1031** 2:20
**336** 12:4,5
**337** 6:17 248:3,17

**339** 12:5,6
**34** 7:9,9
**341** 12:6,7 270:17 270:18
**342** 12:7 271:18
**343** 12:8
**344** 248:20
**347** 268:11
**349** 4:13
**35** 7:10 80:10,13 237:12
**35.7** 274:14
**350** 270:16,17
**350711** 57:10
**36** 7:10
**36.4** 185:17
**37** 7:11
**38** 5:11 7:11
**39.5** 185:18
**3:23** 238:1
**3:32** 238:4

**4**

**4** 5:11 38:14,19 40:13 43:13 44:17 53:24,25 280:18 322:14
**4,000** 71:13 72:4 120:14,15 144:22 209:9 258:9
**4,040** 270:8
**4,100** 268:19 269:3 269:15,19
**4,243** 268:15
**4.5** 346:2
**40** 7:12,12 78:16 264:5
**40,000** 311:25
**40s** 78:13
**41** 7:13,13,14 264:6,7

**410** 2:20
**415** 3:8
**42** 7:14
**43** 7:15
**44113** 3:18
**44114** 351:2
**44114-1190** 2:9
**44114-1214** 2:15
**443-9000** 3:18
**45** 237:21
**45132** 1:15
**46** 45:4,25 237:21 281:4
**47** 7:15,16
**47700** 19:7 77:5
**48** 274:13
**4903** 155:18
**4:24** 274:2
**4:32** 274:5

**5**

**5** 4:4 5:13 57:2,9 57:14,16,23 128:13 256:13 277:15 322:14
**5,200** 266:14,17 267:14
**5.09** 270:23
**50** 60:13 78:11 143:2 200:2
**50,000** 255:1 261:23
**500** 3:17 44:24 47:10 280:23 342:6,10
**51** 7:16,17
**529.2** 256:21
**55** 7:17 74:19,25 75:4,8 77:23,24 78:9,10 141:9 143:21 237:9 341:17,24 342:2

**[55 - accuracy]**

345:11
**56**  7:18,18
**57**  5:13
**576**  256:20
**58**  7:19
**586-3939**  2:9
**59**  7:19
**591-7059**  3:8
**5:32**  321:15
**5:54**  321:18

**6**

**6**  5:16 68:10,20
322:14 351:4
**6.2**  256:25
**6.3**  256:25
**60**  237:9 306:25
**60s**  168:10
**61**  7:20
**621-0200**  2:15
**63**  7:20,21
**63.5**  247:11 248:23
271:20
**64**  7:21
**64899**  100:9
**64901**  100:21
**64903**  153:22
154:1 156:15
**65**  7:22
**66**  7:22
**662-2000**  3:5
**67**  7:23,23 309:20
**68**  5:16 7:24
**69.49**  247:6
**6:00**  324:25
**6:24**  347:17,19
**6th**  91:17 350:7

**7**

**7**  4:5 5:19 81:7,10
82:4 112:9 122:4
247:18

**7,000**  178:23
**70**  7:24 259:17,20
259:22 260:15
262:1,11,15,19,24
272:5,7
**70s**  41:8 168:10
**75**  1:23
**750,000**  179:22
288:22
**7551**  25:17
**76**  7:25
**78**  8:3
**78,000**  311:10
**7872**  23:15

**8**

**8**  5:22 98:20 99:1
114:2 248:18
305:7
**8-22-18**  6:11 296:1
**80**  40:20 41:6 54:2
54:7 260:1,17
**800**  122:4
**81**  5:19
**81,000**  261:24
**82**  8:3
**824**  256:13
**8414**  23:12
**8415**  256:18
**843**  2:5
**85**  8:4
**850**  3:4
**851-8100**  3:14
**86**  8:4,5 241:7
**87**  8:5,6
**87.11**  271:19
**8737**  23:15
**8742**  245:11
**8744**  249:12
**88**  8:6,7
**89**  8:7

**8:00**  112:9

**9**

**9**  5:23 171:11,22
171:24
**90**  40:20 41:7
260:1,17
**901**  2:8
**90s**  36:16,17
**94**  8:8
**94111-5356**  3:8
**95**  8:8
**950**  3:17
**96**  8:9
**97**  8:9,10
**98**  5:22 112:16
113:8
**9:12**  1:20 13:2

**a**

**a.m.**  1:20
**aaron**  1:8
**abbreviated**  6:13
322:2
**abbreviation**
322:7
**abide**  135:18
**ability**  46:18,24
50:22 51:1 142:22
147:21 148:6
201:15,19,22
203:4 210:2,12
212:12 219:4
**able**  48:20 50:9
61:12 71:16 83:11
90:14 138:24
139:10 142:24
143:3 144:7 146:7
178:9 183:12
215:16 232:16
236:2 245:4 253:7
259:1 271:22

272:2 306:9,10
309:16 315:11
325:16
**absent**  78:12
110:19 160:11
**absolutely**  167:11
309:4 314:5 336:5
**abstract**  99:25
**abuse**  16:16,19,22
17:4 40:16 59:11
160:5 162:9 172:5
184:22 227:3
229:24 231:9,17
289:2,22 291:13
304:3 308:23
309:7,11 310:4
312:8,14
**abuser**  146:12
172:12
**abusers**  36:14
172:14
**accepting**  49:24
**access**  17:17 50:22
51:3 105:19
113:20 115:3
123:2,8 183:14,17
183:22,24 184:4
184:10,13 185:5,9
192:7 226:16
227:22 231:21
346:25
**accesses**  185:12
**accidental**  194:6
**accommodate**
138:11
**account**  83:12
124:24
**accountant**  280:2
**accounts**  170:18
**accuracy**  266:21
269:23

accurate   41:10
  45:8
acknowledge
  352:11 353:16
acknowledged
  142:3
act   79:23 180:2
  288:16,17 352:14
  353:20
acting   191:7
action   77:11
  204:25 278:10
  350:4
active   215:18
  265:22 267:8
  295:18 326:20
  331:23
activities   58:15,17
  129:23 291:12
activity   215:15,17
  218:22 219:6,12
  219:16 220:12,14
  318:25
acts   214:16
actual   26:16 76:1
  78:1 239:6 249:15
  270:11,22
adapt   327:19
add   242:12 248:22
  263:3 264:9,10,11
  275:18 277:8,17
  329:20
added   52:16 53:2
  53:8 263:11
  271:11 326:2
  329:13 340:15
addict   82:10 96:22
  97:4,7,23 151:20
  222:20
addicted   17:18
  101:1 309:18

313:17
addiction   83:8,13
  85:23 152:24
  162:19 228:5
  292:23
addictions   102:19
  104:6 188:12
  231:20
addicts   101:13,14
  102:10,11 151:25
  190:4 314:5
adding   52:21
  264:5 327:10
addition   156:7
  307:5
additional   178:11
  178:14,16,18
  179:6,13 180:13
  180:20,22,24
  240:17 263:21
  271:13 283:23
  299:14,19 305:16
  305:17
address   104:2
  118:16 124:22,23
  125:3 146:15
  158:22 160:12,15
  175:4 177:1 304:9
  304:24 314:9
  346:14 351:15
addressed   105:12
  120:7
addresses   124:20
addressing   147:7
adequately   151:25
adjournment
  349:21
adm   332:14
  333:16 334:13
  338:19

administered
  43:23
administration's
  203:8
administrative
  126:7 250:4 252:5
  252:17 305:2
adms   332:13,18
  333:8
adopted   249:17
advent   113:24
advise   88:19
advised   54:12
  137:14 139:14
  316:24 331:5
advisement
  346:16 347:8
advocate   159:10
  292:10
advocates   253:13
  253:14,17 255:23
  302:18,20 305:3
  306:3
affect   46:23 97:25
  98:1,16
affixed   350:6
  352:15 353:21
afford   172:17
  227:18 309:16
aforesaid   349:12
afternoon   4:11
  174:4 243:19
age   14:6 227:15
agencies   58:15
  116:18,24 117:5
  203:22 218:14
  314:8,12
agency   304:9
agenda   6:11 127:9
  296:2,8,9,11,16,17
  297:14,19 299:2

agendas   92:9
  127:7 296:20,24
  297:5,8
agents   67:6 127:25
  128:9 147:23
  200:18 233:15
  286:4,10
aggravated   323:20
  323:21
aggressive   267:3
ago   21:11 36:24
  99:21 112:24
  120:11 121:13
  134:2 135:2
  157:24 179:16
  191:9 282:8
  285:20 308:24
  309:1,12,14 310:3
  344:7
agree   66:18 83:5
  83:16 87:24 88:9
  88:11,24 100:16
  101:16,21 102:7
  131:19,20 153:2,8
  158:5 170:23
  172:20 229:22
  230:3 235:7
  313:24 346:7
agreed   240:18
  242:22
agreement   286:25
ahead   69:6 247:9
akron   1:23 2:2
  5:18 13:5,9 42:21
  54:11,13,15 55:16
  68:15,21 90:3
  142:23 164:4
  168:12 185:4
  186:17 197:8
  201:4,7 209:22
  210:22 289:4

299:9 316:11
332:6 337:22
**al** 1:10,12,13,13
**alert** 321:3
**alerted** 321:9
**alexander** 57:13
57:17 92:18 171:5
295:8
**allocated** 298:5
**allocution** 235:8
**allow** 47:21 73:4
120:19 263:5
344:4
**allowed** 328:1
**allows** 101:4
**altered** 327:18
**alternative** 231:11
**america** 311:18
312:1
**american** 311:9
**amerisourceberg...**
3:10
**amount** 47:19,21
176:20 220:1
255:13 256:6
263:6 272:14
273:4 278:18,23
279:18 280:4
287:17 288:18
301:2 303:16,17
306:4 307:21
**amounts** 256:7
**amphetamine**
19:11,15 36:9,19
36:23 37:4,11,15
138:14,21 140:10
140:17 191:12,19
262:17 282:22
299:15,19 323:19
326:16

**amphetamines**
18:4 20:22 21:24
35:15,18 37:8
191:20 282:10,12
282:14,17 283:1
**analgesic** 57:20
**analysis** 47:9
**analyzing** 47:6
**anecdotal** 169:21
260:12
**angela** 92:17
295:8
**animals** 54:16
**ann** 243:23 244:9
**announced** 217:8
289:2
**announcement**
5:11 38:14,21
39:1 44:6,12
129:9
**announcements**
127:25 128:8
**announces** 57:17
**announcing**
216:12
**annual** 180:21
**answer** 15:22
36:11 60:18 61:1
86:5 139:9 163:23
185:24 194:16
231:14 234:23
235:1 236:4,6,18
236:21 239:17
277:12 281:21
292:21 294:6,13
308:19 326:12
327:6,7 345:7
**answered** 198:12
210:10
**answering** 250:21

**anti** 292:3,5
**anticipated** 298:9
**antidote** 54:21
**antiquated** 46:10
**anybody** 130:8
132:5,22 347:12
**anymore** 167:25
169:5 227:19
**anyway** 163:7
**apadukone** 3:9
**apart** 29:13 30:14
49:2 117:3 186:10
200:16 207:3
219:9 232:21
242:15 246:21
291:3
**apologize** 197:7
**appeal** 119:22,24
**appeals** 293:19
**appear** 298:4
307:7 352:11
353:15
**appearances** 2:1
3:1 4:3
**appeared** 344:17
344:22
**appears** 38:20
39:1 44:15 296:11
299:22 325:10
329:1
**appellate** 263:24
277:16
**appended** 353:11
353:18
**applicable** 348:7
**application** 5:22
98:20 99:4,20
153:22 156:13
290:10 314:14
**applied** 157:12,18
290:8,17,21,24

291:1
**applies** 278:11
**apply** 138:3
157:16 290:6
340:16
**apportioned**
253:16
**apportioning**
279:23
**approach** 101:5
**appropriate**
218:17 304:8
**approval** 96:6,8
**approvals** 203:6
**approve** 111:7
125:23 240:20
**approved** 119:13
229:10 241:15,16
241:18 242:22
261:14
**approximately**
35:19 36:15,17
74:25 75:4,8,15
78:16 80:12 113:8
121:11 143:20
164:1 167:4
176:10 200:21
255:1 259:20
260:15,17 262:1
270:23 274:13,13
311:10 341:17
**april** 179:10
**arch** 3:12
**archival** 175:1
**archive** 347:10
**archived** 346:23
**arcos** 300:1,3,7,16
**area** 234:11
**areas** 190:9,9
200:10 248:12
309:8

argue 103:20
argument 85:3
   103:10,15,16,18
arrest 111:11
   231:24 287:21
arrested 111:8
   234:16 303:24
arson 319:5
arsons 319:12
arthur 3:16
article 39:6,6 69:8
   82:9,13,24,25 83:4
   151:6,19 227:17
   337:4,12,13,20
   338:9,12 339:4
   342:5,13 343:2,16
   343:19
aseem 3:7 13:23
aside 205:6
asked 84:9 123:20
   123:22 128:11
   143:10 157:6
   176:5 198:13
   278:22 279:17
   304:20 319:10
   330:5,22 341:25
asking 23:13 43:5
   43:7 117:2 125:14
   125:15 142:4
   169:8 177:4
   182:18,19 187:6
   203:12 205:4
   214:9 238:19
   239:18 274:8
   306:8 318:21
   329:2
aspects 16:8
   303:13
assaults 23:21
   27:16

assets 287:23
assign 99:14
assigned 78:23
   79:11,13 112:13
   137:20 180:10
   250:17 251:12,16
   251:23 253:18,20
   259:16 263:25
   271:8 287:12
   290:5 292:24
   293:24 306:25
   334:12
assigning 306:13
assignment 79:1
   352:2 353:2 354:2
assist 117:6
   232:19 250:20
   288:6 308:13
   319:18
assistance 289:7
   289:21
assistant 91:4
   92:23 99:17 126:8
   137:16 174:18
   245:20,23 246:7,9
   248:3,15,17
   252:18 261:21
   263:12,12,13
   264:11,14 274:12
   274:23 275:19
   276:15 277:14,15
   277:16 295:1
   306:12
assisting 305:3
associated 112:7
   332:18 345:25
association 107:5
   107:9 291:16,20
   291:23 292:13
assume 94:5,11

attached 331:9
   353:7
attachment 6:18
   336:22
attacked 308:7,16
attempt 233:15
   236:24 280:4
attempted 73:16
   244:23 257:25
   281:13 310:22
attempting 160:24
attempts 118:23
   314:17
attend 62:8,10
   63:3 294:23
   299:23 330:23
attendance 261:8
attended 91:5
   330:7,21 332:1
attending 297:16
attends 294:24
   295:5
attention 23:16
   25:18 27:3 59:13
   68:21 82:4 83:8
   99:25 153:17
   167:7 201:2
   245:10 249:11
   265:11 266:12
   268:11 338:11
   343:6
attentions 26:18
attorney 84:13,17
   246:8,10 248:4
   291:24 314:13
   315:17 316:11
   350:2
attorney's 315:5,7
   315:21 316:1,7
   330:25 331:3

attorneys 80:18
   82:2 84:8,18,22
   85:8 89:8 106:14
   106:16 107:4,8
   151:18 209:3
   246:23,24 276:6
   291:16,20,22
   292:12
attracted 172:15
attractive 172:11
attributable
   250:14 251:7
   252:1 258:2
attribute 86:13
   280:8
attributed 53:4
   247:25 250:7
august 5:18 68:14
   69:1,7 70:8 296:7
   296:13
aunt 302:14
authority 161:4
   201:21 202:20,23
   203:1,8,13,17,19
   203:23 212:16,22
   212:23 213:1
   235:5
authorize 184:1
   353:11
authorized 77:10
   235:7
autopsies 143:8
autopsy 75:17,19
   75:24 76:5 141:14
available 105:7
   114:10 152:3
   180:24 277:5
   290:12 300:24
   335:11 337:25
   339:9 345:13,19

**ave** 351:1
**avenue** 2:8 3:17
**averaged** 185:17
**avery** 293:1
**avoid** 338:4
**awakening** 150:16
**awarded** 250:19
289:8 291:8
**aware** 21:19 27:23
27:25 55:5,10
56:1,11 61:18,22
63:22 66:7 68:2,7
73:17 76:21 77:2
77:4 84:6 107:22
128:23 131:4
136:10,23 140:25
154:21,23 156:1,7
156:12 157:11,14
157:17 162:2
163:2,5,20 167:8
167:12 172:2
182:19 186:11
192:16 194:5
197:2,12 198:17
198:21 203:23
204:5,10 207:6
214:3,10 215:8
216:22 217:2
218:21 219:7
221:16,25 226:3
226:10,23 229:3,9
236:6,8,14 291:4
302:2 303:25
307:20,25 308:1,5
311:4,23 315:15
320:5,12,14,19
321:20 331:18
339:7 344:11
**awareness** 66:19
149:6,19 150:11
176:14 192:10

282:15 291:14
310:2

**b**

**b** 95:10 126:7
**back** 21:4,11
40:11 46:11 49:25
50:15,18 51:1
59:4 85:23 110:4
112:7,18,25 123:3
124:15 130:24
132:2,20 138:24
139:10 141:1,15
141:22 143:10
146:3 150:21
156:15 158:17
162:18 163:19
164:5 168:16
175:10 178:13
220:16,17 223:25
227:14 236:10,16
236:19,22 239:21
240:19 242:6,8
248:19 254:8
256:17 257:3
265:11 267:22
275:3 282:11
291:17 298:25
323:14 351:15
**backup** 175:1
**backward** 309:22
**backwards** 334:8
**bad** 109:4
**baker** 2:3,12 13:11
13:11,13,15
**bakerlaw.com**
2:16,16
**balance** 288:4
294:24
**baltimore** 2:20
**based** 19:14 28:17
28:18 43:7 45:7

54:21 56:10,22
79:25 96:14
113:15 119:10
124:12 131:25
158:11 159:22
177:20 183:13
187:20 189:17
191:21 208:13
214:16 219:11
222:5 230:3
238:24 245:25
253:1 260:9,12,14
263:4 273:1,13
274:16,22 275:11
280:8 289:2,2
290:20 293:9,16
304:10 307:22
322:16 324:9
346:3
**basically** 20:14
32:24 45:18 50:23
90:8 196:5 226:21
285:19 306:6
323:12 326:25
**basing** 170:16
**basis** 19:23 45:10
63:13 65:21 91:20
122:25 140:5
152:4 154:7,14
238:11,16 312:13
**bates** 5:5,7,9,11,14
5:18,22,24 6:3,5
6:10,12,14,16,18
22:21 23:11,14,15
25:5,11 38:15,20
57:5 68:15 98:21
100:8 171:12
266:5 268:5
289:13 296:2
328:16 330:12
336:22 338:12

**bath** 29:18
**baumoel** 90:24
91:9 93:21 95:8,9
**bci** 54:14 67:11,14
127:20,22,23
**beacon** 151:7
337:22
**bed** 309:21
**began** 32:4 35:22
37:3 46:11 51:24
77:17 158:2
170:10 205:21
325:25
**beginning** 5:5,7,9
5:11,14,18,22 6:3
6:5,10,12,18 22:21
25:5,11 38:15
57:5 68:14 90:3
98:21 234:2 266:5
268:5 276:23
289:13 296:2
336:22
**begins** 25:17 44:6
69:11 100:21
**begun** 297:7,13
**behalf** 2:2,7,11,17
3:2,10,15 13:9,14
13:16,22,24 14:1
295:5 332:1
344:25,25
**belief** 65:22 139:9
238:7,11 239:24
260:14 312:6
**beliefs** 228:23
**believe** 19:3 23:4
33:10,18 39:5
41:10 43:19 48:11
50:20 51:15 52:2
53:25 55:15 61:25
63:25 72:25 74:17
74:17 77:23 78:1

80:11 83:23 85:14
86:6 90:20 92:25
97:13 99:15 102:3
104:20 105:23
106:2,17,23 108:1
112:4,8 113:4
114:15 115:20
116:2,11 119:13
123:10,20,21
127:5 130:17
132:8 133:25
137:4,14,19
138:24 149:4
151:6 159:11
161:10,16 164:9
174:14,15,16
178:18,22 179:15
183:19 184:14
185:2 192:20
199:13 201:8,19
202:7,16 205:14
208:6,10 210:20
214:12 215:1,24
223:5 227:3
228:21 230:7
237:7,9 240:14
242:24 243:11
244:9,13 245:18
245:18 246:5
249:9 251:3
254:25 255:11,15
256:2,24 257:6
267:1 271:15
273:14,18 274:25
275:15 281:16
283:10 284:18
286:6 293:13,14
293:20 295:8
297:10 305:21
319:24 325:19,20
326:17,18 327:12

330:25 332:16,17
333:13,16,24
334:12 335:16
339:21 342:9
345:1,11 346:2,24
347:9
**believed** 280:14
**bell** 343:4
**ben** 184:8
**benefit** 158:14
215:18 234:21
318:24 339:8
**benefits** 253:25
**benjamin** 184:5
**bent** 302:12
**bergeron** 184:5
**best** 15:17 131:24
135:19 152:3
175:15,18 199:20
205:18 233:4
243:25 323:9
**better** 66:20
112:18 257:2
309:4 325:15
**bevan** 38:21
243:23 340:8
**bevin** 39:2
**beyond** 28:20
52:13 76:18 161:4
**big** 55:19
**biggest** 21:20
**bill** 254:16
**billable** 287:5
**billed** 259:13
**bills** 254:8,11
**bin** 123:5
**birth** 30:17 210:21
**bit** 192:9 223:11
257:3 263:9
271:16 275:3
315:19

**black** 34:17
**blank** 210:19
**blond** 344:8
**board** 6:11 77:10
107:25 160:19
164:4,11 168:1
183:9 184:14
186:20 190:10
197:10 199:4,5
200:15,19 201:19
201:20 202:25
204:6,11,21 205:1
205:1 208:11
209:24 210:11,12
211:15,18,22
212:19,19 213:20
214:1,12,18,22
216:10,15,25
217:12,24 218:21
221:1 222:2,8
287:1 296:1,7,14
297:19 316:25
317:1,6,15,16
318:6,7 332:13,14
332:18 333:8,16
334:13 338:19
**board's** 202:20
214:4
**boards** 318:10
**bodies** 143:7
146:15
**body** 314:21
**bogavich** 126:6
328:24
**bogging** 123:6
**books** 52:22
**bottle** 233:11
**bottom** 53:25
100:8 154:1
156:17 247:2
254:20 299:8

338:13,16
**boulevard** 2:4
**bound** 111:20
**boy** 309:22
**brad** 1:18 4:7 6:9
13:10 14:6,11,20
174:5 289:11
325:1 331:8 349:9
351:8 352:4,9
353:4,13 354:20
**brady** 175:8,11,12
175:20
**brand** 116:10
**break** 34:16 71:9
83:24 84:1 86:22
173:1,4 174:7
237:23 238:7
259:1 273:25
280:13 321:12
324:21
**breakdown** 243:7
**breaking** 129:2
177:18
**brennan** 1:22
**bressi** 215:3
**brett** 61:15 322:23
322:24 326:11
327:8
**brian** 90:24 91:9
93:22 94:2 95:9
95:25 96:1,1
295:8
**brian's** 93:8
**bridgeside** 2:4
**brief** 92:19
**briefs** 169:14
**bring** 31:11 63:18
112:7 145:15
199:1 220:4
316:21,24

**bringing** 107:22
**broader** 24:24
**broadly** 138:6
**broke** 121:14
274:7
**broken** 273:20
281:16
**brought** 31:17,19
55:18 70:14,17
115:22 169:16
184:25 192:1
196:20 211:10
220:25 221:5
222:6,6,9 226:6,8
267:6 272:20
301:5,7
**brown** 199:14
**budget** 5:5,7,9 6:3
6:5 22:2,5,6,8,12
22:21 23:2,5,6,8
24:11,17 25:5,11
25:19 26:1,17
27:2 29:1 47:18
48:3 79:25 144:24
178:12,20 179:1,2
179:3,7,10 180:21
180:24 181:4,11
181:15 240:3,20
240:21,24 241:15
241:17,24 242:5
242:16,22 243:17
244:6,8,16 245:3,8
249:17 254:8,12
254:18,20 256:11
256:14,20,21,22
256:23 257:7,9,14
257:17,20,22
258:16 263:2
264:9 266:5,11,21
268:5,10 269:24
270:4,14,18 271:1

271:18,20 272:4
275:21 276:4,11
277:9 279:7
283:18 284:6
310:9 320:2 339:6
**budgeted** 245:15
247:6,11 298:2
**budgets** 28:13
29:9 144:21 241:3
241:12 284:11,15
284:18,23,25
285:3
**build** 122:10
**building** 91:18
196:14,22 254:10
267:22
**bulletin** 5:23
171:11,18
**bump** 257:3
**burden** 220:1
**bureau** 67:15
289:6,20
**bureaucrats** 148:5
**burglaries** 177:17
**burling** 3:2,6
13:24 14:1,16
**burnside** 91:10
**business** 124:24
234:16 311:20
**bust** 299:12
**buy** 177:19 227:19
299:12 343:24
**buyer** 194:22
**buying** 64:11
288:6 335:22
**buys** 299:7,8

**c**

**c** 2:3 116:16 126:7
300:3
**ca** 351:25

**caitlin** 181:15
**calculate** 258:10
**calendar** 125:13
127:3,6 292:3
340:17,17
**california** 3:8
**call** 63:17 90:11
95:25 96:2 103:2
103:12,19 118:14
127:23 129:18
207:23 265:6
318:20
**called** 14:6 19:7
34:17 45:15
110:25 114:1,3
118:16 182:25
256:5 322:11
**calls** 283:12
295:16,17 301:24
302:15,23
**cap** 159:7
**capitals** 329:17,18
**caption** 349:20
**car** 190:20,21
**cardinal** 3:15
13:22
**care** 180:25 188:7
313:23
**career** 16:15 17:3
**careful** 217:15
228:7
**carfentanil** 18:3
18:23 20:4 26:12
53:8 54:9,12,17,18
54:23 55:1,7,24
56:2,5,13,18 60:6
60:23 61:4,6
70:10,16,22 73:23
74:16 75:1 100:13
141:16 226:24
273:5,15 283:16

**caitlin** 181:15
**329:6,21 330:2**
**carole** 2:13 13:13
325:4
**carolina** 2:4
**carry** 229:9
**cars** 112:21
191:11
**cart** 223:10
**cartels** 230:12,14
**case** 1:7,15 20:15
20:15 33:12,16
45:16,18,18,20,20
46:3,21 47:25
49:10,13,16,20,22
49:22,24 51:15
59:10 60:21 70:21
76:6,18 78:24
79:3,4 80:4 85:9
86:7 89:4,18
90:25 93:21 94:11
94:12,23 97:11
98:8,9 106:18,20
107:1,13,18
112:16,17 113:6
113:22 114:8,18
115:2,5,9,11 117:7
117:8,16,17 118:1
118:11,17,21
119:17,19,22
120:1 126:20,25
130:10 132:20
135:11,23,24
136:23 137:3,13
137:22 138:3,5,13
138:18 140:11,18
142:13 144:13,16
145:13,15 153:5
153:13 154:5
155:10,15,17
156:3 162:9,12,24
162:25 163:12,14

163:20,24,25
164:14 165:11
166:3,18,24,24
167:6,8 169:19
172:2 185:2,6
186:4 188:7
189:16 191:18
192:25 196:18
208:22 209:2,5,8,8
209:17,22 211:24
214:1,20,22,24
215:20,22,22
217:3,19,19 218:1
218:3,7 219:25
220:4 221:4,9
223:2 224:3,7
225:12,12 226:6,9
233:16 235:24,24
236:8,14 239:10
255:12,14 265:16
265:17,20,22
272:16 279:15
283:6 287:6 297:9
297:15 302:5,19
306:5 307:8,9
313:14 315:13,14
322:13 323:10
326:24 328:10
329:4,22 339:21
339:25 340:2,12
340:21,22,25
341:1,5,7,17
342:10 345:11,15
346:4,6 351:6
352:3 353:3
**caseload** 71:17
212:3 243:8
265:15,25 266:14
267:14,16 268:14
268:18,22 269:3,4
269:14,18 270:13

271:4 326:20
**caseloads** 48:2
59:15 243:8
269:24 272:3,22
273:8 306:23
**cases** 17:6 20:13
30:12 31:10,16,17
31:19 32:18,19
33:7,19 34:2,14
37:18 45:13,14,24
47:12,14,22 48:4
48:15,20,21,23
49:3,4,5,8 50:17
50:18 51:22,25
52:4 60:6 66:3,5,6
66:7 70:14,17,23
70:24,25 71:2,9,11
71:13,14,17,21,21
71:25 72:1,4,8,21
72:23,24 73:5,14
73:19,23 74:2,19
74:20,25 75:4,8,15
75:25 76:7,10,21
77:16,18,21 78:17
78:20 79:3,8,17,19
79:19,24 80:15,22
85:16 87:8,12
88:2,4,6,8,10,11
88:13,25 89:14
90:4,7,9 93:5
94:14,18 96:16
106:23 107:22
108:17,23 109:1,6
109:13,21,22
110:7,8,13,14,18
111:14,23 113:9
114:14 115:17,21
115:22 118:5
119:9 120:14
123:21 126:3,6,10
126:12,14,19,20

126:22,24 128:4
132:19 136:2,7
137:6 138:1 141:2
141:10 142:1
143:2,13,21,22,23
143:25 144:19,22
144:22 145:5,23
147:4,7,7,22,24
150:23,25,25
153:3,11 154:3,23
155:8 156:5,8,10
156:12 158:6
160:20 165:4,7
167:19 169:18,22
169:25,25 170:1
187:21 188:13,13
189:18 190:24
192:1 194:5
197:10 202:5
206:12,13,15,20
207:6,7 208:12,14
208:15 209:9,10
209:16,25 210:23
211:12,16 212:3,5
212:14 213:18,25
214:5 220:3 221:8
224:13,23 225:9
225:22 233:2
237:11,15,20
243:7 252:11
254:15 258:9,11
259:11,11,12,13
259:15,17,22
261:3,18 262:1,12
265:4,15 267:7
268:15 271:24
272:4,11,19,25
273:4,6,22,23
279:23,23 280:7,9
280:9,10,11,15
281:4,5,8,15 282:4

282:25 283:4,8
285:10,12 286:16
286:17 287:9,11
293:17 294:10
295:18,18 299:5
299:11 302:21
303:23 304:24
306:25 307:17
315:5,8,11 316:21
316:24 317:16
318:21 321:22
323:12,16 324:11
325:9,14,16,16,23
326:7,14,23 327:4
327:24,25 330:1
340:11,16 341:3
341:19 342:3
**casework** 238:25
**catch** 142:19
**category** 19:1
255:9
**causal** 87:8,10
88:15 89:6
**cause** 57:24 76:18
76:19 84:21 85:16
86:7,10 145:24,25
163:8 227:4
229:24 230:8,13
230:19 231:9
315:1 338:24
349:11
**caused** 21:20
43:25 103:8 142:3
147:3 283:13
**causes** 227:5,6,7
230:3,11,21
231:17
**causing** 87:4,14
**cautions** 228:6
**cautious** 178:25

cell 129:25 130:3,8
130:12 141:21
146:8
center 28:20
certain 63:9
130:18 131:21
178:9 201:17
208:6 213:12
219:25
certainly 58:13
134:25 212:23
218:19
certificate 4:13
349:11 353:11
certification 352:1
353:1
certifications
203:6
certified 14:9
certify 349:8,18
350:1
chain 83:9 233:25
311:6
chair 126:10
302:13 309:22
challenge 284:7,10
284:16
challenges 89:7,13
challenging 98:14
chance 146:13
150:1
chances 103:12
change 52:7 53:4
122:23 146:23
158:20 351:13,14
353:8 354:3
changed 35:9
37:24 44:19 95:5
147:3 159:20
163:4 192:6
256:14 271:8

327:18
changes 274:8
351:12 352:7
353:7,9
channels 238:15
287:21
charge 61:3,8 73:8
73:10 85:8 86:2,4
86:17,17 89:17
94:21,21,23,24
96:25 97:9,19,24
98:1 110:19 111:8
112:7 145:13
147:10,21 149:10
151:12 162:23
163:11,16,21
165:10 166:6
219:16 220:6
254:10 286:20
324:3
charged 32:6 35:7
82:14 87:16 90:11
94:12 98:4,6
108:12,12 109:10
113:10 162:13
190:14 194:18
209:16 212:15
216:8,9 219:19
224:18 234:12
265:3 281:2
303:24 342:6
charges 52:19,20
60:22,24 75:10
80:4 84:23 85:1,4
85:11 86:2 90:20
95:2,24 96:7,17
107:1 108:14
110:13 111:7
113:14 115:19
118:2 126:11
143:15 144:5

145:19 147:8
150:13,17 151:13
151:17,21 210:14
217:6 219:22
235:3,3 301:7
314:24 323:2,5
324:16
charging 52:25
53:4 56:20 81:25
82:15 97:18
100:22,24 104:18
106:4,22 110:4
111:12 149:1
150:8 225:6 330:1
chart 245:14
246:22 247:10
252:5 253:10
263:4 277:9
279:10
charter 241:6
cheaper 35:14,17
40:21 41:7 227:20
282:17
check 50:9,13
61:12 76:4 192:14
checks 109:4,4
chewing 53:23
chief 15:1 16:6
24:12 122:21
183:16,23 184:3
246:7,9,10,11,16
247:17,24 248:3,4
248:15,17 264:5
264:13,14 290:2
333:15
child 237:14
248:20 265:6
276:5 287:3
children 170:13
237:17,18 265:2
292:4

children's 265:1
286:25 287:5
childrens 237:20
china 226:17,19
226:25,25
christine 293:23
chronic 313:10
churches 291:25
cincinnati 305:23
circumstances
117:19,25 195:8
201:18 202:2
207:24 235:25
citations 40:7
cited 82:9
cities 111:3
citizens 190:8
city 1:11 2:2 13:9
15:8 49:12,23
50:4,8 110:22,23
111:16 112:25
142:23 162:13
164:10 167:9
168:12 204:18
citycentre 3:3
civil 14:8 174:18
180:7 246:11
250:5 251:13
276:3 285:10,12
333:15 348:3,7
352:5 353:5
claim 175:8,19
345:25
claimed 162:18
claims 345:24
clarify 109:18
125:11
clarifying 92:2
classification
326:4

**clear** 28:23 136:11
155:25 179:5
192:21 213:6
239:19 262:23
263:10 264:21
267:25 305:6
**clearly** 53:7
142:21 192:8
273:6 283:13
345:5
**clerk** 47:25 49:14
49:17,20,21,25
113:6 114:13
115:12 181:6
243:16
**cleveland** 1:11 2:9
2:15 3:18 54:18
201:1,3 291:20
350:7 351:2
**client** 185:8
310:19,21 311:23
312:20
**clients** 84:23 85:9
**cline** 116:15,15
**clinic** 196:2,11
**clinics** 205:8,10,13
**clips** 337:15
**close** 248:24
**closely** 149:23
**clr** 1:25
**cocaine** 18:3 19:17
19:18 20:5 21:23
35:13,13,21,23
36:5,8,13,13,20
56:2,12 73:6 75:2
138:18,21 227:13
227:13 262:17
282:9,9 283:7,9
299:5 323:17,22
324:7 336:4

**code** 46:8 48:19,19
48:22 49:2 108:7
211:20 285:13
322:10,11
**codes** 61:3
**coleman** 2:13
13:15,15
**collaborate** 24:5
58:13 310:10,14
310:18,23
**collaborating**
310:16
**colleagues** 34:10
126:16
**collect** 130:8 132:5
132:22 146:8
292:16
**collecting** 339:25
340:2
**colleen** 293:15
294:24 295:1
296:18
**college** 150:3
344:10
**columbus** 210:22
**combat** 304:16,18
**combating** 308:23
309:6
**come** 62:3 63:18
63:19,20 90:6,16
90:17 91:13 93:25
94:17 111:23
129:15,17 141:15
141:24 143:5
158:17 165:6,12
169:17 187:1
189:18 194:7
197:10 220:16,16
221:15 223:4,7
235:1 254:14
257:14,16 259:11

260:2 265:1
283:11 288:3,15
305:23 317:3
331:24
**comes** 34:21 50:19
87:19 94:5 177:10
222:19 223:12,22
254:17 257:18
259:14 261:9
287:18
**comfort** 313:10
**coming** 42:17
52:12 84:7 90:4
90:13 93:1,6
104:6 128:21
134:2 147:7 162:4
226:18,24,25
237:1 259:15
282:17 286:21
**comment** 323:6
**comments** 84:20
**commission**
350:16 352:19
353:25 354:25
**commissioned**
349:8
**commissioners**
241:8,10
**commit** 231:3
262:8
**committed** 87:1
113:4 195:4
213:19
**committee** 15:9
292:13 331:4
332:4 333:22
**committees**
294:17
**committing** 193:8
262:8

**common** 109:25
153:2,10,16 154:2
154:11,16 155:19
157:25 178:15
188:19,22 189:12
189:19 240:16
293:5,18
**communicate**
129:13,13 131:2,5
131:9,12 147:15
148:13 221:22
222:1 320:8
**communicated**
244:19 333:14
**communicating**
148:22
**communication**
131:13 224:4,8
320:15 333:16
**communications**
128:3,24 222:7
**community** 17:19
24:6 129:3 143:11
148:20 149:20,23
150:16 158:8,11
158:15,18,21
159:16,22 168:19
177:7 179:15
190:7 192:10
200:8,10,11,12
221:2,12 234:5,5
286:7 291:14
292:1,6,18 310:10
331:23
**companies** 2:12
238:13 239:6
319:4,11
**company** 311:10
**compare** 151:10
267:19,24 307:14
307:15

compared  101:2
  178:6 307:17
comparison  243:8
  243:13
compensation
  285:15
complaint  185:16
  303:12
complaints  303:6
  303:8,18,21 304:1
complete  341:12
  346:18
completed  94:7
  349:20 351:15
completely  225:7
completes  93:17
complied  136:17
  346:18
comprehensive
  289:1,22
comprise  249:1
comprised  254:23
computer  46:14
  118:15 132:6
computerized
  113:19
computers  255:12
concern  215:4,10
  215:14 217:7
  347:5
concerned  216:14
concerning  113:16
  116:18 221:22
  320:8
conclude  312:13
concluded  347:19
conclusion  119:20
  152:5 154:8,15
concurrent  315:9
conduct  156:17
  157:3 175:21

321:4
conducted  152:13
  318:25
conducting  33:9
conference  91:17
  330:24
confession  232:25
confidential  6:7
  277:23 278:6,8
  299:12
confines  232:6
confirmed  331:12
confused  276:2,10
connection  87:8
  87:10 88:15 89:6
  103:7 133:5,8
  158:14 170:2
  187:4 283:11
  326:21 331:2
connections
  146:10
consent  235:21
consider  19:16,18
  66:15 86:23 96:21
  97:3,19,20,24,25
  98:13,17 100:25
  137:21 138:2,17
  164:12 195:3
  226:7
considered  19:15
  96:15 107:11
  166:9 226:4
  241:18 265:9
considering  262:4
consistently  272:8
  308:2 346:10
consolidate  321:21
constant  309:2
constitution  232:6
consult  314:23
  315:7

consulted  278:17
consumed  186:1,7
cont'd  3:1 6:1 8:1
  9:1 10:1 11:1 12:1
contact  175:25
  211:14 223:23
  295:19 319:7,7
contacted  331:6
contain  40:7 49:7
  114:19 182:10
  322:13
contained  117:15
  184:19 277:8
  301:12 322:9
containing  61:23
  62:14 63:4,23
  64:20
contains  39:21
context  85:7
  185:22
continue  23:25
  24:5 27:17 212:12
  215:11,15,17
  309:17 310:13
continued  174:5
  216:23
continues  5:17
  68:12,24 247:2
continuing  140:4
  155:21 218:22
  325:25
contracts  180:7
contributed  64:21
  65:2 69:24 312:10
  312:14
control  30:17
  210:21
controlled  207:9
  207:18
convened  316:1

conversation
  240:1 333:3
  334:17
conversations
  34:9 63:2 64:2
  214:11 219:11
  295:14
convict  96:18
convicted  51:19
  159:3 164:7
conviction  211:17
  265:20 317:19,22
  319:9
convictions  90:21
  211:19 317:11
cooperate  234:7
cooperation  235:4
  235:10
coordinate  186:23
  186:25 314:7,18
  340:3
coordinates
  184:13
coordinator
  252:10 253:12
copied  128:5
copies  132:10,13
  132:16 181:7,10
  297:14
copley  201:10,11
cops  45:16 46:9,10
  46:13,20 47:20
  48:8,14 50:24
  51:4 61:2 323:3
  323:11 327:16,17
  328:2
copy  81:4 105:6
  114:12,17 115:9
  127:15 132:22
  133:2,5,11,17
  135:7 151:8

[copy - county]

174:16 175:14
296:25
**corner** 46:16
309:19
**corporation** 3:2
14:17 311:1
312:13
**correct** 16:24 17:5
18:15 23:22 24:14
24:19,25 26:2,8,20
27:13,21 37:12,16
38:23 39:4 40:8,9
41:22 43:14,18
45:5 52:5,6 55:2
58:22 60:2 61:4
63:10,24 65:13
69:2,8 70:6 77:19
81:20 84:8 93:15
95:14,18 109:16
145:6 193:22
215:19 218:23
229:16 230:20,23
231:6 232:21
233:2,8,12 241:19
241:21 247:5
249:5 257:11
260:8 262:17,25
263:7 266:15,18
267:18 268:16,21
268:24 269:5,15
269:19,25 270:15
270:20,24 271:2
273:17 274:11
277:10 281:9
284:8,12,25
285:25 286:12
290:14 298:9
299:21,22 310:12
313:4,11,20 320:1
320:4 324:19
325:10 328:1,8,25

329:6,12 330:3,8
335:15,25 336:13
338:1 340:13,18
340:23 342:11
343:11,13,18,22
349:16
**correction** 159:22
**corrections** 158:11
351:12 353:17
**correctly** 24:3,9
44:9 58:3 69:18
**correlated** 177:12
177:16
**correlation** 178:1
**corrupt** 188:5
**corrupting** 94:22
94:24 144:8 329:5
**corruption** 74:23
**cost** 17:19 37:20
37:22 41:4 180:9
234:15 257:5
259:7 338:8,17,25
**costs** 250:7,13
345:25
**council** 15:8 22:12
80:18 89:8 164:10
181:6,7 204:17,18
240:15,19 241:7,9
241:14 244:22
284:3 291:21
328:11
**councilman**
162:13 167:9
**counsel** 13:6 15:1
16:6 171:19
246:16 247:17,24
248:4 264:14
348:1,10 350:2
**counseled** 84:22
**counseling** 160:3
160:17

**count** 45:19,23
46:2 237:14
**counted** 46:1
249:8
**counterfeit** 61:23
62:13 63:3,23
64:20 65:6,22
66:25 67:8,10
225:20
**counterfeited** 64:8
**counties** 151:11
241:5,7,11 243:9,9
**country** 43:11
311:11
**county** 1:10,13 2:2
5:5,7,9 6:3,5
13:10 14:24 16:2
16:7,17,18,23 17:4
17:11,16,24 20:4,7
20:18 21:3,13,17
21:20 22:12,16,20
23:2 25:4,10,19
27:2 29:15,17
33:12 34:1 35:3,6
35:9,15 36:22
38:22 39:2 41:16
42:6,8,8,10,10,12
42:15,24 44:19,23
51:6,22 53:19
55:2 56:18 57:13
57:16,18 58:9
59:6,9,20,21,24
60:5 61:17,24
62:5,9,15,20 63:5
63:14,17,24 64:21
64:22 67:18 70:10
88:22 91:4,18,25
92:23 96:10 99:17
101:8 108:2 109:8
109:12,19,25
110:22,24 111:1,1

111:3 119:4,14
121:5,20 123:14
124:21 127:5,10
132:9 133:25
136:13 138:24
139:3,10,14,18,24
140:4,6 148:7
149:2,20,21
150:10,14,20
151:10,23,25
152:15,19 153:9
157:25 158:2
161:5 162:3,5,10
162:16,16 164:19
164:23 167:17
168:18 170:25
174:15 175:25
176:8,15,22
178:13,15,19,24
178:25 179:5,12
179:14 180:8,12
180:14 181:5,23
182:16,21,23
184:23 185:13,17
186:1,7,17 189:19
190:10 191:7,23
192:6,13,19
193:22 197:3,13
197:23 198:14,16
198:18 199:8,17
200:23 201:16,24
204:6,11,17,25
212:16 219:13,16
220:7,21 221:17
226:13,25 227:1,4
227:15 229:25
230:9,20 231:10
231:18 233:15
240:3,10,15,19
241:5,7,8,9,13,14
241:18,23 242:1,1

242:5,19 243:10
243:10 244:19,20
244:21,24 245:4,6
245:9,21,23
246:18 250:22
253:2 254:7,11,14
257:1,4 263:12,12
263:13 264:12
266:4 268:4
274:12,23 275:9
275:19 276:15,16
276:20 277:1
279:2,4,4,6,7
283:23 284:2
285:7 286:25
287:14,19,21
289:5 291:7 293:5
294:18,19,22
295:1,4,10,21
296:9 297:11
301:15,18 306:12
307:15,15 308:12
309:12 310:14,15
312:8 314:11,21
315:15,18 319:18
319:22 321:7
328:11 332:13,18
333:5,8 334:11
336:7 337:25
338:18 339:11
341:9 342:23
343:10 346:1
349:4 352:10
353:15
**county's**  22:8 23:5
34:14 120:12
256:20 272:18
298:25
**couple**  123:10
154:25 179:16

**course**  59:12
230:17 240:21
318:17 320:20
**courses**  316:3
**court**  1:1 4:15
15:2 109:8,8,10,25
112:19 116:1
152:18 155:8,10
179:3 216:20
234:11 240:16
243:7 255:6
257:19 271:10
287:14 292:25
293:3,6,10,19
294:3,4,9,11,14
352:7
**court's**  113:6
244:10,15 257:16
293:6
**courtroom**  31:25
47:3 59:15 79:11
79:12,15,16 252:8
261:22 263:20
307:1,10 327:15
**courtrooms**  79:12
79:14 252:13
253:19 263:19
307:8
**courts**  47:25 49:14
49:17,20,21
109:11 110:21
114:13 115:12,24
178:16 210:14
241:2,4,11,12,13
241:22 242:12,12
242:18 243:4,17
244:24 306:24
**cov.com**  3:5,9
**cover**  139:10,13
**covered**  338:7

**covering**  32:24
**covers**  108:7
**covington**  3:2,6
13:24,25 14:16
**cr**  323:15,15
**crack**  35:13,21
36:4,8,13,19
227:13 282:9
323:18,22,22
**crackdown**  282:16
**craig**  331:16,19
332:9,17 333:7,11
333:14,19 334:18
335:2
**cranks**  114:25
**crash**  46:18
**create**  101:21
120:22 243:3
**created**  34:24
39:12 120:19
149:5 240:13
322:21
**creates**  306:22
**creating**  99:7
149:22
**creation**  39:15
243:6
**creative**  161:20,23
**crendon**  2:16
**crime**  27:21 28:25
32:6 41:13,15
66:16,20 67:12
70:10 76:1 87:1
88:21 98:14
108:12,12 117:9
143:12 146:18
148:2 166:9
176:19 191:1,4
193:2,4,5,9,18,21
193:25 194:11,24
195:5,9,13,15,19

206:8 207:8 208:1
221:14 231:4
233:8,13 234:15
267:22 283:25
291:19 292:3
**crimes**  16:13 28:3
32:3,9,12 33:1
41:17 43:9 47:6
48:16 61:4 74:1
142:20 164:8
177:11,15,22
188:23 194:19
213:8,14,19 249:4
252:2 260:16,17
260:25 262:6,8,9
262:16,20,24
263:15 265:3
272:14,17,18
273:9 281:18,24
281:24 282:8,20
282:22 288:16
295:22,22 302:4
324:15 337:19
**criminal**  16:9
23:19 24:12 25:21
32:22,23 46:24
47:1,3 58:15,17,20
61:8 66:19 67:15
80:3,10 91:7
97:11 101:9
108:14 116:25
117:4 118:20
119:4 122:22
152:23 153:4,12
154:3 155:17
156:1,3,8,10,25
187:7 191:6,8
210:14 211:23
214:24 215:13,15
215:17 218:22
219:5,12,15,25

220:1,4,6 225:6
227:12 235:3,3
237:11,12 246:11
249:5 250:2,5,7,15
250:17 251:7,8,10
251:12,17,23
252:6,11 253:21
253:22,23 262:1
263:7,18 264:6,8
264:23,25 265:7,8
265:9 271:8
274:20,21,24
275:1,3,3,5,12,20
275:24 276:2,16
277:13 285:10,11
290:2 292:18
301:5 317:8,24
318:25
**criminals** 65:8
85:15 160:14
161:20,23 190:4
229:16,19
**crisis** 83:6 135:12
142:23 178:20
**criteria** 293:10
**critical** 28:19
**criticism** 81:23
83:16 84:7,15
151:18 301:16,22
303:2
**criticisms** 84:13
85:10 303:9 304:2
**criticize** 82:14
**criticized** 82:13
**criticizes** 82:10
**criticizing** 151:20
**croce** 293:23
**croft** 181:15
**cross** 190:6
**crossroads** 287:16

**crystal** 299:5
**cs** 181:16
**csea** 237:15
**cull** 73:4
**culpabilities** 97:14
101:6
**culpability** 89:1,6
97:17 100:25
**current** 74:8 247:9
271:20 275:4
282:24,24 307:5
326:2
**currently** 14:23
17:24 18:1 20:3,6
20:19,20 133:18
270:19
**custodial** 123:15
346:17
**custody** 4:15
**customers** 311:25
**cut** 178:21,21
**cutting** 227:25
**cuyahoga** 1:10
291:6 349:4
**cvs** 2:17,17 13:18
**cyclical** 267:22

**d**

**d.c.** 3:4
**daily** 140:5 295:19
326:21
**damages** 279:10
**dan** 1:8
**daniel** 2:19 13:17
**danielle** 51:17,18
**data** 40:3,7,10
50:15 115:17
151:4 170:6
183:15 184:16
185:12 236:5
260:6 292:16
300:24 322:13,14

**database** 47:20
48:7 51:4 182:24
183:22 184:13
185:9 186:10
300:8,16,24
347:10
**databases** 61:3,11
185:11
**date** 13:2 39:11
124:4,7 139:24
220:16 242:14
326:2 348:11
351:8 352:3,9,19
353:3,13,25
354:20,25
**dated** 5:14,18,20
5:23 6:9,17 57:4
57:10 68:14 81:12
171:12,18 289:12
328:24 336:21
**dates** 114:5 171:8
**davis** 51:20
**day** 2:7 13:20 17:7
29:5 63:22 73:20
73:24 74:8 121:8
121:12,14,16,17
128:21 141:5
150:2 151:7
205:22 216:10
268:23 271:9,24
273:8 294:5,5
350:7 352:16
353:22 354:22
**days** 196:22
295:15 351:18
**dayton** 243:10
**dea** 161:15,16
203:13,17 206:9
221:22,25 229:7
299:6 300:10
307:20 308:1,6,11

308:15 317:25
319:24 320:8,16
320:23 321:2,6,8
**dea's** 307:22
**dead** 150:5 302:9
314:20 344:13
**deadly** 221:10
283:17
**deal** 52:22 206:3
262:10 291:18
304:23 306:3
332:6
**dealer** 55:6 61:19
206:8 299:9
**dealers** 23:25
26:18 28:12 35:6
36:14 41:22,24,25
42:8,11,17 65:12
67:22 85:14 101:1
156:23
**dealing** 21:10
108:6 146:23
147:6 235:13
334:14
**dean** 305:22
**dear** 351:10
**death** 51:20 52:10
53:8 56:9 76:19
76:20,24 79:3,5
86:8,12,25 87:5,11
87:14,18 88:1
89:19 93:13,14
103:8 126:6,12
141:13,19 142:4,8
145:24,25 273:23
283:7 314:22,23
315:1,2
**deaths** 5:17 18:6
21:7 24:8 28:17
51:8,13 52:11
55:20,23 57:25

68:13,25 69:24
70:25 71:12 73:25
74:12 80:23 82:1
90:18 100:15
103:23 141:3,9
145:20 149:2
151:2,4,9,11 152:6
283:2,9 302:7
304:24 336:13
338:5 339:10
**decade** 176:16
275:13 294:15
**december** 1:19
13:2 123:19 350:7
351:4
**decide** 110:12
113:13 306:20
**decided** 53:21
90:19 212:18
219:10 240:19
302:11 306:15
**deciding** 96:25
97:24 107:17
137:13
**decision** 52:8
81:24 96:3,4,20
97:9 122:17
140:16 148:25
244:11,16,18
**decisions** 94:25
96:11 100:22,24
104:19 106:5
110:5 141:1
**decline** 94:20
144:3
**declined** 49:8,14
94:15,19 144:1
**decrease** 37:11
103:22 274:19,23
274:25 282:12

**decreased** 158:19
176:16 267:17
273:9 274:12
281:20,25
**dedicate** 142:24
**dedicated** 258:17
258:19,21
**deed** 352:14
353:20
**deemed** 351:19
**defend** 279:9
**defendant** 96:22
97:4,6,10,20 117:4
144:6 156:2 164:3
212:11 232:9,21
233:1 234:7
322:12
**defendants** 13:14
13:16 44:24 47:11
152:8,12,23 153:4
153:12 154:4
155:2,16 156:8,25
159:3 235:14
236:10,13 239:2
239:14 280:24
281:2 325:5 341:9
345:1
**defended** 209:4
**defense** 82:2 84:8
84:13 151:18
162:18 169:15
257:13
**defenses** 167:19
169:7 237:19
**defer** 235:20
**definition** 18:9
**definitive** 281:21
**degree** 82:20
159:6,8
**delete** 119:16
120:8 122:1,3,9,13

122:18,22 123:4,5
133:23 135:15,22
136:15,19 137:23
140:9,16,19,20
174:25
**deleted** 119:17
123:12 136:8,22
138:20,24 139:4,7
140:22 174:24
175:10,23 242:25
**deleting** 122:25
136:1,5,6
**delinquency** 264:1
265:9
**deliver** 226:1
**delivered** 81:19
**delivers** 311:24
**delivery** 348:9,11
**demonstrate**
240:15
**department** 5:16
32:21 58:11,14
68:10,23 70:7
90:15 117:12
139:15 149:24
155:23 176:1
180:9 185:5
186:18 250:14
254:13,14 259:7
289:6,20 290:17
317:17 318:7,9
332:11 335:17
347:1 351:22
**departments**
192:15 221:3,3
**depend** 48:24 79:2
79:10 159:5
189:15 193:15
200:9 202:1
286:19

**dependency** 264:3
264:22 265:5
287:3
**depending** 72:17
105:11 195:7
196:8 217:13
273:11
**depends** 233:13
234:14 343:23
**deposed** 14:9 15:5
**deposition** 1:17
13:4 22:19 25:3,9
38:13 57:1 68:9
81:9 98:19 171:10
266:3 268:3
277:21 278:13
289:10 295:25
322:1 328:15,23
330:11,18 336:19
337:2 345:2
347:19 349:19
351:8,11 352:1,3
353:1,3
**described** 35:21
117:15 245:1
**description** 5:3
254:19 255:18
**descriptions**
249:15
**deserve** 83:24
313:19,22,23
**designate** 325:14
**designated** 315:3
315:16 340:2,5,6
**designating** 327:9
**designee** 183:20
**desired** 241:24
**desk** 47:4
**despite** 83:14
215:12

**destroy** 136:15,20
  146:18 287:20
**destroyed** 136:8
**detail** 50:24
**details** 209:23,25
  216:8 217:6
  220:17 288:20
  299:2 306:7
**detect** 66:25
**detection** 67:7
**detective** 90:5,5,12
  90:13 143:3 146:4
  185:4 196:20
  197:6,20 200:14
  202:15 204:20
  208:11 297:21
**detectives** 90:22
  142:25 198:21
**deter** 149:15
  184:22
**determination**
  67:13 89:23
  218:10 252:4
  280:6
**determine** 46:6
  47:10 71:25 72:1
  112:15 133:12
  152:13 155:8
  193:25 225:13
  232:16 233:21
  250:13 251:5
  253:4 276:14
  281:8,14 300:10
  300:13 323:3
  324:11 325:16
  335:13 340:10,21
**determined** 90:9
**determines** 49:19
**determining** 22:13
  22:17 60:17 95:23
  106:25 107:12

117:7 137:3
  155:16 232:20
  251:25
**deterrence** 149:10
**deterrent** 149:18
**develop** 236:24
**development**
  156:22 338:4
**diamond** 1:22
**diary** 129:23
**die** 147:3 150:21
  155:15 166:7
  302:12 335:25
**died** 53:23 59:11
  146:13 155:9
  156:2,9 164:22
  165:2 166:5
  222:25 343:17
**differ** 48:13
**difference** 82:17
  147:19 196:10
  327:16
**different** 26:10,14
  26:24 79:24 85:25
  102:5 124:19
  148:16 160:20
  162:22 163:3
  165:7 169:22
  177:8 187:7,15
  188:22 197:5
  202:17 203:5
  219:24 223:4
  225:7 239:4 246:2
  251:21 254:6
  264:18 277:1
  281:17 291:1
  292:15 295:13
  307:8 311:24
  314:13 323:24
**differentiate** 327:4

**differently** 89:10
  101:12 102:8
  146:5
**difficult** 66:24
  87:7,12 89:4
  168:6
**difficulty** 46:10
**digital** 105:2
  325:21 326:5,14
  326:16 327:10
**direct** 23:16 49:11
  110:25 111:5,15
  111:24 112:3
  113:2 153:17
  338:11
**directing** 27:3
**directly** 101:14
  102:11 321:9,11
**director** 111:18
  128:3,24 322:25
**disagree** 41:8
  69:21 154:7,15
  269:8 274:16
  313:18 338:24
  346:7
**disclose** 218:25
**discontent** 214:3
**discovery** 135:13
  340:4
**discretion** 213:3
**discuss** 22:6 80:21
  81:23 224:10
**discussed** 30:15
  63:5 67:10 97:6
  151:19 156:17
  174:8 220:23
  244:14 299:3
  300:25 305:10
  320:23
**discussing** 138:4,6

**discussion** 203:16
  337:23
**discussions** 52:19
  52:20,21 138:14
  197:5 202:15
  208:10 279:2
  284:1 314:12
  331:21
**disguised** 61:19
**dismiss** 106:18
  235:2 315:14
**dismissal** 106:19
  155:11,13 265:21
**dismissed** 78:6,7
  259:14
**dispense** 183:11
**dispensed** 166:1
  185:18 229:6
**dispensing** 30:18
  196:9 222:3 230:8
**disposed** 132:21
  265:15,16 271:25
**disproportionate**
  301:2
**dispute** 59:18
  240:3,8
**disseminated**
  39:12
**dissemination**
  58:22
**distinction** 101:4
**distribute** 238:14
  312:23 335:18
**distributed** 205:24
  292:6
**distributing**
  189:25 312:17
**distribution** 41:13
  70:13,21 71:4
**distributor** 236:20
  318:3,15,19,21

**distributors**
163:15,20 185:8
226:1 300:8
310:19 311:5
**district**  1:1,2
107:4,8 291:20
**diversion**  107:23
108:1,6,8,11
109:19 161:25
167:13 172:5
187:4,8,21 188:16
191:22 192:6,11
194:14,17 207:12
226:12 238:17
316:17
**divert**  187:8
**diverted**  68:5
69:15 108:13,17
108:23 109:5,6,9
109:13,14,23
152:24 187:11,17
188:1 189:12,20
238:18,22 313:14
**diverting**  83:8
189:3,4
**divided**  288:9
**division**  1:3 16:10
23:19 25:21 32:15
32:21,23 66:10
80:3,10 116:8
118:20 122:22
174:18 180:7
237:12,13 246:11
246:12,25 247:23
247:24 248:21,23
249:5 250:8,15,18
252:6,17 261:23
263:7,18,24 264:1
264:6 265:7
274:20,21,24
275:1,5,12,20,24

276:2,3,4,5 277:14
277:16 287:12
290:2 333:15
**division's**  24:12
250:2
**divisions**  246:14
249:1 264:8
274:17
**dmoylan**  2:21
**docket**  32:24 47:7
**doctor**  162:15
163:6 165:17,25
166:22 167:10
168:5 169:4
183:13 184:17
192:23 193:4,7
196:1 202:24
208:1 209:10
210:2 211:13,24
213:14 214:15
215:2,11,22
217:11 218:22
220:12,13 223:8
223:13,15 224:1,2
224:4 227:23
228:6,14 229:4
230:22 316:16
317:23 319:1
**doctor's**  196:8
203:3 204:7 209:6
212:11,22 214:23
219:4 233:12
**doctors**  53:14
67:21,23 162:15
162:21,23 163:1,2
163:3,4 208:7,16
214:5,13 215:7
219:9,10 220:5,18
220:20 221:23
222:22 223:16,22

229:22 231:10
317:8
**document**  1:8
23:14 24:17 39:9
39:12,15,20 43:15
43:17,20 51:16,21
58:4,7 59:23
68:22 93:7 99:1
99:10,12 101:20
105:24 106:1
126:8 128:13
135:21 154:15,19
172:4 174:8,10
184:1 266:16
268:12 276:1,10
276:24 277:10
278:4,8,12 290:23
325:12 331:2
341:9 347:6
**documentation**
239:21
**documented**
113:25 181:2
**documents**  26:5
48:3 50:21 72:6
112:10,15 116:17
116:23 117:2,6
123:14 125:8,15
125:18,20,22
126:1,16 127:14
132:6,11,14,16,17
132:23,25 133:1,3
133:5,9,11,16,18
136:9,15,20
168:24 169:9
175:14 238:23
242:3,7,15,21,25
243:2 269:25
270:2,5,14 271:6
275:23 276:11,25
285:4 327:10

345:3,9,23 346:11
346:19 347:10
**doing**  26:15 89:11
93:5 136:19 145:1
146:14 178:25
220:15 232:14
234:16 251:9
253:5,6 294:8
303:22 305:4
308:11 315:24
329:19
**dollar**  109:3
338:17
**dollars**  180:3,4
256:13 290:13
346:3
**domestic**  179:19
255:24 263:20
326:17
**dorothy**  305:21
**doses**  185:17
205:24
**double**  107:15
**doubt**  60:1 76:18
242:19 266:20
269:23 270:9
**doug**  293:1
**download**  130:9
**dr**  199:14 210:20
215:3,23,24 216:3
216:5,21,25
305:21
**draft**  99:9,12
153:25 154:18
331:9
**drafted**  100:17
101:17 118:10
**drafting**  99:3
**dramatically**
282:6

**drew** 57:13 167:7
**drive** 105:23
**drives** 83:13
**drove** 209:20
**drug** 5:17 16:13
  17:4,6,10,16,22,23
  18:6 19:6 20:14
  27:21 28:2,25
  30:18 32:8 35:23
  36:13,14,18 37:3,7
  37:8 40:16 41:21
  41:24,25 42:2,5
  43:8 55:6 56:10
  57:18 59:20 61:19
  62:6,9 63:13
  64:10,13,17 65:12
  67:21 68:13,25
  69:13,24 70:3
  71:11,11,17,20,25
  72:8,13,17,21,24
  73:5,19 76:19
  85:9 86:24 87:18
  88:23 93:14 97:15
  97:22 100:25
  101:1,2,7,13 109:6
  109:10,13,20,22
  121:21 123:21
  124:6 126:6,15,19
  126:22,24,25
  127:4,5,8,10,16
  128:1 129:2
  130:16 131:3,17
  131:23 133:9
  136:2 140:18,23
  145:25 146:12
  149:11 153:3,11
  154:3 158:24
  159:3 161:11,17
  162:9 163:15,19
  163:21 164:8
  177:15,22 178:1,5

184:22 185:8
192:14 193:7
203:7 216:6
226:21 228:12,16
228:18 230:12
233:16 234:7
237:20 239:5,12
249:4 252:1
258:17,19 259:18
259:23,24 260:16
260:16,25 262:5,8
262:14,21,24
263:15 271:24
272:4,14,18 273:4
273:9 280:15
281:23,24 282:20
283:14 287:19
288:10 292:5
293:2,6 294:16,19
294:22 295:11,13
295:16,21,22,22
296:9,12 297:6,8
297:11,12 299:2,3
300:9 302:5,19,19
308:12,23 309:6
309:11 310:4,15
310:19 315:5
319:18,22 321:7
321:22 324:6,18
326:24 335:12
336:15 338:20
**drugs** 16:17,22,23
  17:1,17,18,18,19
  18:5,10,12,25 19:4
  20:3,6,9,15,17,18
  20:21,23,24 21:8
  21:12,19,23 24:1,8
  26:9,19 29:3,8,11
  29:13,14,16,23
  30:4,7,8,10,13
  36:14 43:18 52:15

52:16 53:2,3,3,17
55:4 70:1 72:8,13
72:15 73:3 74:13
74:23,24 75:3
77:1 83:20,20,21
85:19 87:13,20,22
97:21 98:5,6,7
102:9,11,19 103:3
103:8,12 112:23
126:1 128:9
129:11,20 137:7
141:17,23 142:3
144:9,10 147:1,3
149:16 162:19
163:7 168:17
170:3,4,9,10
177:15,16,19
187:22,24,24
188:3,5,8,17,24
189:3 190:2,12,14
190:17,23 191:14
191:16 192:3
194:3 196:9 203:4
203:5 206:19
213:11,19 221:9
224:12 226:16,18
227:9,10,10,23,24
227:25 231:21
232:9,12,21 233:1
233:4,22 234:9
235:15 236:2,3
237:11 238:12,18
239:1,13 262:2,7,7
262:25 273:12
281:17 283:17
287:21 288:7
302:11 304:6,7
309:15 318:22
323:21,21 324:1
324:17 328:6
335:5,21

**due** 72:20 140:10
  144:17 178:9
  219:5 282:21
  297:14
**duly** 14:8 349:7,10
**dumped** 324:5
**dumping** 50:21
**dying** 149:7
  155:20 168:10
  335:20

## e

**e** 6:9,14,16,17
  14:22,22 93:4
  95:10 118:15
  119:6,8,14 121:2,3
  121:4,8,12,16,21
  122:2,5,9,14,19,23
  123:3,7,18,20,22
  123:24 124:3,6,10
  124:11,14,19,22
  124:23,24 125:2
  126:19,21,23
  127:12,21 128:21
  129:9,18,19 134:1
  136:1,5,7,21
  137:22,25 138:2,3
  138:12,13,17,18
  138:20,23 139:4
  139:16,17,25
  140:9,17,23
  174:23,25 175:1
  175:10,12,21,22
  286:24 289:11,18
  289:24 290:11
  296:20,22 328:16
  328:23 329:9,10
  329:10,15 330:12
  331:8,20 332:24
  333:10 336:20
  337:5,7,9 346:23
  347:1,3

earlier  41:20
44:13 46:12 77:3
80:16 92:25
156:18 171:5
176:5 183:1
192:21 219:20
227:12 240:1
280:19 285:2
290:10,24 300:25
330:5 339:20
342:17,20 343:15
earliest  123:18,24
early  36:21 59:21
123:3
ease  227:22
easier  327:1
329:24
easiest  155:7
easily  328:1
east  1:23 2:19
eastern  1:3 57:25
172:7,24
easy  15:18 88:2,4
88:6,8,10,12,14,25
294:6
economic  227:16
257:2
economist  258:12
258:13 280:2
economus  157:25
ectasy  29:20
educate  149:22
285:24 309:14,24
educating  147:22
education  192:10
282:15 285:21
286:3,7 317:17
318:8
effect  48:10 150:8
150:12 327:13

effective  27:17
157:19 160:2
161:11,16,19,22
179:9
effectively  120:20
147:23,25
effects  43:24 172:9
effort  319:23
321:21
efforts  149:4
182:20 186:11
204:5,10 217:22
223:21 310:17
eight  82:22 178:15
252:9
either  44:14 49:11
67:20 79:15 94:2
102:23 162:21
167:19 188:2,4
196:3 204:17
244:2 251:12
262:7 265:20
271:15 276:19
284:2 303:5,6
318:22 337:19
350:2
elderly  168:14,15
elected  16:7
246:19
electronic  105:3,6
114:11 127:15
297:1
electronically
105:20 114:16
115:11
element  88:17
elements  86:3
98:11,12 113:3
elephant  54:11
eliminate  24:8

elliott  267:1
else's  139:23
email  351:17
emergency  77:11
employed  14:23
152:19
employee  253:5
employees  152:18
237:5 245:15
247:7,11,15
248:11,21,22
271:19 274:19
276:21,22 285:16
employs  311:10
emts  146:17
enact  206:3
enclosed  351:11
encompass  138:13
encompasses
284:20 295:21
encompassing
117:11
encounter  232:12
233:16 237:1
encountered  60:7
81:24 170:21
encourage  231:10
232:10 234:7
ended  166:4
167:23 179:4
309:24
endo  2:11,11
13:14,16 325:5
ends  153:21
249:12
enforcement
31:10,18 34:10
37:17 39:6 44:14
52:12 58:14 62:2
64:15 66:25 67:4
67:6 68:3 69:13

70:3 87:21 91:1
91:13 103:13
116:18,24 117:5
127:25 128:1,9
142:16,18 146:1,4
146:22 147:17,22
148:6 149:5,20
161:10,14 165:19
166:12,13,15
170:1 183:11
186:15,16 192:1
193:16 199:17
201:18 203:8
204:19 205:9
210:13 219:12
220:11 221:2
222:6 223:12,20
224:2 225:5 226:9
226:15 232:10,20
233:15,18,22,24
235:21,22 272:20
285:12 286:4,10
288:2,7,11 291:17
292:17 301:6
304:9,15,25 314:8
316:21 317:6
enforcement's
304:12
enforcing  161:11
161:17
engage  190:1
291:12 292:22
engaged  140:5
240:2 263:14
317:24
engagement  81:1
engineer  180:8
enlist  244:23
ensure  101:10
ensured  95:17
241:23

enter  49:1 107:25
entered  180:7
  353:9
enterprise  191:9
  191:13
enterprises  191:7
entire  23:5 32:24
  106:14 158:20
  184:10 352:5
  353:5
entities  203:22
  226:5 317:9
entity  210:8
epidemic  5:11
  18:1 24:7,18,18
  26:8,11 38:15,23
  39:3 43:14,21,22
  44:7 64:24 65:1
  149:8 272:23
  310:11
equal  168:18
  256:7
equipment  288:6
equipped  55:20
equips  66:20
errata  351:13,18
  353:7,10,18 354:1
especially  302:4
esq  2:3,3,8,13,13
  2:19 3:3,7,11,16
  351:5
essence  52:23
essentially  241:22
establish  220:3
establishing  162:1
estimate  33:15
  55:13 62:17 71:7
  71:10 134:8 170:7
  197:22,25 199:15
  205:23 262:12,16
  262:20,24 278:22

279:18 280:4
estimated  261:25
  270:3 278:18
estimates  279:10
et  1:10,12,13,13
ethical  106:9,11
  107:19
event  175:18
  342:22 343:10
  350:3
eventually  170:9
everybody  334:25
evidence  89:20
  96:18 118:2,12
  126:3 142:7,10,11
  142:14,18 143:19
  143:24 144:1,4,14
  146:18 147:24
  166:25 169:22
  193:1,4 215:12
  217:12,24 218:3
  218:20 219:22
  220:1,4 233:20
  238:24 239:7,21
  239:25 260:12
  262:21 312:12
evolution  168:21
evolve  167:17
evolved  38:9
evolving  338:19
exact  54:7 171:8
  270:10 280:6
examination  4:7
  14:7,11 174:5
  325:1
examine  196:4
examined  67:12
examiner  55:17
  87:19 141:14
  143:6 164:25
  283:12 305:19

314:19,24,25
examiner's  305:22
example  15:9
  112:20 180:6
  248:14 254:9,24
  270:9 276:12
  324:12 326:16
  345:11 346:8
  347:4
examples  23:21
exams  167:20
excel  6:13 321:22
  322:2,7
exception  278:11
excerpt  23:8
excess  71:13
exchange  235:4,9
  328:23
excluded  333:6
exclusively  257:23
  306:14
excuse  46:3 93:14
  102:20 116:3
  208:19 216:23
  243:16 270:16
  299:14 300:2
  324:16
executed  353:10
execution  352:14
  353:19
executive  244:21
  256:19
executive's  133:25
  139:15 279:7
  284:2
exempt  145:10
  253:15 298:23,24
exhibit  4:15 5:5,7
  5:9,11,13,16,19,22
  5:23 6:3,5,7,9,11
  6:13,14,16,17

22:20 23:1 25:4
  25:10,16,16,16,18
  27:1 38:14,19
  40:13 43:13 44:17
  53:24,25 57:2,9,14
  57:16,23 68:10,20
  81:7,10 82:4
  93:12 98:20 99:1
  128:13 153:18
  157:23 171:11,17
  171:19,24 245:7
  245:11 265:10,23
  266:4,10,13,13
  267:13 268:4,10
  268:13 269:13
  270:16,17,18
  271:18,21 276:12
  277:13,22 278:3,9
  279:16 280:18
  289:11,18 296:1,7
  305:7 322:2,7,14
  322:16,21 323:1
  324:10,16 328:16
  328:22 330:12,18
  336:20 337:2
exhibits  4:4 5:1
  6:1
exist  108:5 242:3
  284:5 328:5
existing  158:18
  167:8
expanded  178:15
  242:12 271:11
  293:22
expect  22:9 129:15
  129:17 234:16
  302:9
expected  302:14
expended  278:24
  288:8

**expenditures**
249:16 258:24
270:22
**expense** 249:22,25
**expenses** 254:7,23
254:25 255:5,8
258:1 259:3
278:23 285:18
305:17
**expensive** 38:3,4,4
246:2
**experience** 19:14
45:7 56:10 65:5
67:17 113:15
153:9 154:20
171:6 177:15,20
187:20 188:15,20
189:17 191:21
194:1 228:19
245:25 260:10
273:14
**experienced** 32:1
246:1 269:4
272:22 283:18
305:12
**experiences**
214:11 228:22
304:10
**expert** 255:6 306:2
**expiration** 352:19
353:25 354:25
**expires** 350:16
**explain** 78:22
111:25 117:24
139:12 191:4
215:9 302:17
**express** 303:2
**expressed** 67:7
301:22
**extent** 214:21
314:18,20 346:23

**extremely** 258:8
**eyes** 150:19

**f**

**face** 5:13 57:3,11
228:13,13 323:4
**facebook** 142:1,2
150:2 342:19
343:16 344:4,18
**faced** 140:16
**faceted** 101:5
**facilities** 159:23
**facility** 196:23
**facing** 17:10,16
**fact** 58:20 64:12
88:21 159:2
167:24 179:8
218:8 267:16
313:9 324:15
337:23
**factor** 87:4,6 97:9
142:7
**factors** 96:15
97:12 107:11
147:20 228:2,9
**facts** 120:1 162:11
166:24 193:25
195:7 207:24
217:19 235:25
**fail** 83:12
**failed** 314:6
327:14
**fails** 88:20
**failure** 148:12
339:14,16
**fair** 31:14 69:23
79:22 85:13
143:20 169:20
282:19
**fairly** 197:25
**fall** 19:1 272:11

**familiar** 19:6
103:10,15 128:6
215:21 288:25
300:18 319:13
322:17 332:12
335:4
**families** 169:2
302:7
**family** 170:13
301:16,23 302:9
**far** 18:13 21:24
33:8 34:23 50:15
56:20 72:23
130:24 131:8
163:19 191:3
198:22 259:15
333:24
**fashion** 199:16
261:16 311:15
339:6 344:18
**fatal** 5:13 57:3,12
**fault** 312:11
**favor** 187:9
**fbaker** 2:6
**fda** 229:11
**federal** 14:7 78:6
145:10 148:16
180:3,4 203:21
256:6,9 314:8,14
**federally** 199:3
**fee** 255:14
**feed** 344:18,22
**feel** 83:19 108:5
112:18 139:16
**fees** 255:6,7
**fellow** 97:22
101:13 102:11
**felons** 159:7
**felony** 32:7 82:18
82:21 110:18,19
111:7,8 153:3,11

154:2 159:6
261:23
**felt** 302:3
**fentanyl** 5:16 18:2
18:21 20:4 23:25
24:7,14,18 26:7,10
26:18,23 27:7
28:12 53:6,10,11
53:12,16,18,21
54:2,2,23,25 55:6
55:24 56:1,13,18
57:20,24 59:11,21
60:1,6,22 61:4,6
61:19,23 62:14
63:4,23 64:12,20
67:18,20,24 68:3,4
68:5,12,24 69:11
69:13,15,16,24
70:2,4,9,13,22
71:4,21 72:1,7
73:19 74:16 75:1
100:13 141:16
150:6 167:23
168:8 169:11
226:24 273:5,15
283:15 284:19,22
284:24 299:21
310:11 329:6,21
330:2 335:6,14,23
336:2 337:24
338:8,16 343:18
343:21,25 344:15
**fifth** 44:21 159:8
243:12 280:20
**fight** 143:12 288:7
308:10
**figure** 72:15
257:25 258:5
**file** 86:16 94:11,23
95:1,23 107:1
110:13 113:14

**[file - form]** Page 25

114:8,9,17,24
115:2,5,9 117:8,16
123:15 132:20
163:25 175:15
209:2,6 235:3
340:12,22 346:17
**filed**  115:19 118:2
120:25 153:23
174:14 210:14
216:20 219:3
345:23
**files**  63:18 76:6
114:18 136:23
137:3,13 175:13
211:10 225:13
339:21,25 340:2
341:5,8,17 342:10
345:12,15 346:5,6
**filing**  96:6 145:18
278:9
**fill**  94:3,4 248:18
**filled**  95:13,18
209:13
**filling**  209:18
**fills**  93:23
**final**  242:16,21
**finally**  26:25
**financial**  97:21
101:11 102:10
178:20 181:4
287:22 297:20
**find**  24:7 103:5,9
112:22 115:1
117:8,9,10 124:14
129:2,3 146:16
175:10 193:18
200:13 231:25
232:2,18 233:10
238:20 250:10
260:23 302:9
332:1 333:11

341:3 344:5
351:11
**finding**  169:9
233:19
**finish**  38:24
**firm**  14:16 239:20
239:24
**first**  14:8 17:7
23:10 29:5 31:6
32:4 33:11 51:6
51:11,15,22,23
53:11,18 54:12
56:17 58:24 62:24
68:22 69:17 82:20
85:7 90:10 91:20
99:2 100:2,6,11,20
101:19 102:24
105:3 117:22
121:1,14 122:16
134:3,9,14 136:5
139:6 141:12,18
142:10,13 145:21
153:18 162:1,8
164:17 165:1
167:2,12 170:9
172:3,4 183:21
221:15 235:20
245:10 249:19
265:14 278:16
306:18,22 316:20
322:9,10 349:10
**firsthand**  204:8,13
**fiscal**  258:16
297:22 298:2
**fit**  52:24 122:6
212:6
**five**  21:6 82:22
112:5 197:17,18
237:15,23 263:22
295:15 299:14

**flagging**  168:2
**floating**  251:14
**floor**  91:18
**floorboards**
190:20
**floors**  254:9
**focus**  23:20 24:13
26:17,24 27:15
28:21 36:7,18
42:10,11,15 43:2,3
68:21 102:2
156:23 260:25
**focused**  333:21
**focuses**  41:21 43:6
249:4
**follow**  107:3
124:12 339:19
**followed**  106:25
110:6,7 268:23
**following**  72:13
106:17
**follows**  14:10
**force**  149:22
150:11 192:19
294:20 295:5
310:16 314:11
316:7 334:11
**forced**  227:19
**forces**  294:16
**foregoing**  349:15
349:20 352:13
353:18
**forensic**  305:18
**forfeiture**  285:24
286:11,15,18
**forfeitures**  285:9
285:11
**forge**  207:8 230:25
**forged**  207:17,21
**forgery**  224:14,18

**form**  15:7 16:25
17:12,25 20:8
21:14 22:15 24:15
26:3,21 28:8,15
29:10 34:3,22
35:4 36:10 37:6
38:10 40:4,12
41:5,11,23 42:19
46:25 47:8 51:9
55:11 56:7,14
58:2 59:2 61:5
63:6,15 64:23
65:7 66:22 67:2
67:19 68:6 70:5
76:3 78:21 82:12
85:18 86:9,15
87:9,15 88:3 89:2
93:8,8,19,23 94:9
95:19 96:23 97:16
101:18 102:13
105:15 106:6
109:17 110:10
114:11 116:20
117:21 121:10
122:15 123:16
124:1,17 125:10
128:16 129:4
130:19 131:7,18
132:24 133:7,14
135:6 136:3 137:9
137:24 138:7,22
139:5 140:1 141:6
148:8,23 149:3,12
151:14,22 153:6
154:9,17 157:22
159:1,13 160:6
161:12 163:17
164:20 166:19
169:23 171:2
172:19 175:24
176:12,23 177:13

**[form - general]** Page 26

178:4 180:15
181:19 182:22
185:14,21 186:3
186:13 187:18
190:3 191:24
193:14,23 194:15
195:22 196:13
198:11,20 199:25
200:5 201:25
202:6,13 203:15
205:3 206:5
207:14 210:4,7
211:7,19 212:25
213:22 214:6
215:6 219:14
220:8,22 221:19
222:24 225:3,17
226:20 227:8
228:25 229:12,17
231:13,19 232:13
232:22 233:17
235:16 237:2
239:23 240:4
241:6 258:7 259:9
259:18 260:21
261:16 263:8,16
268:25 272:9,24
273:16 274:15
275:14 279:12,21
281:10 282:23
283:20 284:17
290:18 292:19
297:4,23 300:12
301:3,19 304:13
306:17 307:24
308:9,18 310:20
311:7,16,21 312:3
312:9,22 313:6,12
313:21 314:3
316:19 317:10
318:4 319:2

320:11,18 321:5
321:23 322:22
323:8 325:18
328:9 336:8,14
339:1,12 341:13
341:21 342:4
343:12
**formal** 91:23
345:17
**formally** 180:13
180:16
**format** 127:15
277:1 297:1 322:8
**formed** 316:8
**former** 82:10
145:2 151:20
**formerly** 305:22
**forms** 18:5 94:7
224:19
**forward** 51:2
100:1 155:15
290:3 327:2
351:15
**forwarded** 134:1
290:1
**forwarding**
329:15
**forwards** 329:11
**found** 52:24 57:21
57:24 72:19 76:16
150:5 164:4
190:19,19,21,24
192:22 238:12
239:1 257:2 267:2
309:20 334:19
**four** 82:21 197:1
237:12 252:8
264:2 280:19
295:15 299:15
**fourth** 40:14 69:10
159:7 243:11

338:15
**frame** 60:20 209:7
212:6,9
**francisco** 3:8
**franklin** 108:2
**frankly** 146:11
**fraudulent** 109:4
**fred** 13:11
**frederick** 2:3
**free** 103:4 210:16
352:14 353:20
**freely** 215:11
**frequent** 154:12
**frequently** 122:1
122:13 131:2
191:25 197:10
226:16
**friend** 344:10
**friendly** 104:4
**friends** 98:5 101:3
142:4
**fringe** 253:25
**front** 3:7 19:5
53:24 81:2 106:7
135:7 140:13
150:18 153:18
239:25 251:19
269:10 290:19
**fuel** 5:17 68:12,25
**fugitive** 267:5
**full** 46:15 79:12
90:25 100:20
112:5 245:14
247:6,11 248:11
338:15
**fully** 286:14,17
**functional** 48:11
**fund** 102:1 240:9
245:17,18,19
247:16,22 248:11
249:5,9 271:19

286:11 288:2
298:25 319:18
**funded** 178:19
179:22 286:14,18
**funding** 148:10
156:14,16 160:15
179:24 270:13
283:23 285:6
286:24 287:13,23
288:18 289:1
305:11 320:1
**funds** 148:18
178:14 179:5,6,13
180:25 257:13
285:13 288:12,14
288:15 306:8
319:17,23,24
320:5
**further** 33:6 57:23
227:21 269:21
344:23 347:15
349:18 350:1
**furtherance** 243:4

**g**

**g** 3:16 14:22 126:7
**galonski** 331:14
331:20,22 334:17
**gangs** 190:11,14
190:25
**garages** 35:17
**gather** 232:11
**gathered** 176:19
281:14
**gathering** 112:9
329:23
**gears** 161:24
**general** 62:2 65:24
85:5 92:3 126:17
167:15 169:24
212:5 245:17,17
245:19 246:25

247:16,22 248:11
249:5,9 252:3
256:12 271:19
279:1 298:25
**general's** 314:13
**generalists** 79:23
**generally** 120:3
213:20 296:20
324:17
**generals** 291:24
**generic** 228:20
**geneva** 209:21
**gessner** 1:18 4:7
6:9 13:10 14:6,11
14:20,21 22:1,19
25:3,9 28:11
38:13,20 57:1
68:9 81:9 98:19
104:17 137:21
171:10 174:5
238:6 266:3 268:3
269:9 277:21
289:10,11 295:25
321:20 322:1
325:1,3 328:15
330:11 336:19
345:3 346:25
347:4 349:9 351:8
352:4,9 353:4,13
354:20
**gessner's** 346:3,13
346:17
**getting** 64:12
149:24 160:21,22
168:4 227:20
283:15 297:17
303:5 335:17
**girlfriend** 302:11
**give** 30:9 71:6,7,10
141:24 155:3
179:1 188:4

194:25 213:2
217:15,18 219:2
224:16 234:18,23
240:10 292:20
301:25 302:1
341:23 348:1,10
**given** 34:19 54:19
54:20 130:12
146:25 152:23
158:16 218:9
272:11 276:17
279:24 290:25
296:19 349:12,17
**giving** 80:17
112:23 144:9
169:4 188:10
196:7 231:4
**glanced** 337:12
**go** 31:12 33:3
45:17,18,20 49:25
49:25 50:16 51:1
57:22 60:17 65:9
69:6 71:14 72:3
72:11 73:13 85:23
88:18 104:7,8
111:19 113:10
115:1,2,4 118:17
120:15,15,16
124:15 126:21
130:25 132:20
138:24 139:10,18
139:19 141:22
146:9,17 147:8
152:6 155:6,15
159:3 163:19
169:14 175:9
177:6 179:2,14
183:12 189:20
199:3 209:8 218:7
225:12,12 241:14
242:6,8 250:12

251:18,25 256:17
259:12 273:24
276:18 280:9
285:12 292:7
304:21 306:20
307:2 321:13
344:20 347:9
**goal** 23:19 26:4
28:2
**goals** 23:17 25:21
25:25 27:5,13
28:25 29:8 310:9
**goes** 23:24 107:15
115:23 118:18
119:3 143:10
288:1 292:3 293:1
**going** 15:17 21:4
21:11 23:13 25:17
27:4 30:11,19
42:15 51:2 59:16
68:19,21 81:4,5
83:3,4 85:10 86:4
88:18 90:10 93:5
98:13 99:2 101:23
104:2 106:20
110:4 115:8
118:17,25 120:3,8
126:21 132:20
139:18,18 141:1
141:14,15,16,20
141:24 143:5,5
144:23 146:3
147:13 158:13,19
160:12,13,14,19
160:23 161:21,24
162:15 163:2,5
165:11 166:7
168:4 171:16
172:24 178:13
179:12 192:8
193:9 194:16,17

198:22 215:14
217:18 218:6,7,12
219:1,1 221:11,14
227:14 234:3,17
234:19 237:17
254:16 266:9
267:3,5 269:1,8
270:6 281:8
282:11 291:17
302:2,8,16 306:16
307:1 309:15,16
309:17,18 327:1
330:17 334:8
335:24 337:1
345:1,16
**good** 14:13,14
102:22,25 103:21
103:24 142:17
158:24 173:3
177:4 218:13
232:14 233:19
237:22
**governing** 104:18
235:12
**government** 234:8
241:6 256:6
**governor** 77:9
**graduates** 293:2
**grand** 32:25 33:2
33:3,5,8 45:23
63:20 110:20
111:10,20,22
112:13,16 113:7
115:20,25 116:8
216:11,13,19
252:9,14 259:12
263:25 317:3
327:13 329:3,11
329:13,16,20
**grandma** 302:9

[grant - hermiz]

**grant** 5:22 98:20 99:4,7,19 101:20 101:22 102:1,4,6 153:22 156:13 157:7,8 179:19,20 179:25 255:19 256:8 288:14,14 288:18,22,22,25 289:4,5,7,8,21 290:10,12,24,25 291:5 304:20,21 305:5,11,15 314:15
**granted** 242:2
**granting** 202:23
**grants** 157:11,14 179:18 249:8 255:22,23 271:13 285:8 290:5,12,16 290:22 291:4 305:8
**great** 274:18 306:9
**greater** 72:23 149:10 177:21
**greatest** 120:13
**greatly** 120:18
**green** 114:1,3,3,6 114:10,14,19 115:7,14
**greg** 91:9
**grounds** 283:24
**group** 191:10,12 201:14 296:21,25 319:17
**groups** 35:2 241:3
**growing** 170:24
**guess** 85:20 86:17 200:6 232:8 255:16 322:23 323:9 324:13 333:25

**guest** 99:15
**guilties** 78:4
**guilty** 78:9,14,17 84:23 85:1 88:21 98:12 163:10 202:7
**gun** 326:18
**guy** 184:5

**h**

**h** 126:7
**half** 16:3 114:2 294:5
**hand** 25:15 45:18 68:19 81:4 100:5 171:16 266:9 317:1,1 350:6
**handed** 57:9 81:16
**handful** 325:6
**handing** 22:25 27:1 268:9 278:3 322:6
**handle** 55:20 111:17 117:7 142:25 237:11 278:24
**handled** 17:6 30:11 45:13 66:4 66:6 70:24,24 80:3,13 109:11 110:8 128:4 199:3 199:4 213:25 214:2 236:9,14 282:21 293:17 294:10
**handles** 79:2
**handling** 79:23 118:12 120:1 126:10 137:16 169:25 295:17
**hands** 189:13,21 293:2

**hannah** 137:15,19 174:17 339:22
**happened** 153:16 154:11 170:19 189:22 220:17 224:20,25 332:2 342:22 343:7,7
**happens** 154:12 154:21
**happy** 214:8,18 303:13
**hard** 105:6 114:11 114:17 115:8 127:15 132:10,13 132:16,22 133:2,5 133:11,17 175:14 258:6,8 296:25 311:17
**harder** 145:6
**harm** 83:10
**harsh** 151:21
**hart** 6:17 336:20
**harvey** 90:6,13 143:3 146:4
**hazmat** 54:20
**head** 19:8 20:11 28:4 30:9 71:5 191:13 196:24 221:20 236:13,17 242:14 336:9
**heads** 118:24
**health** 2:11 3:15 5:16 13:22 68:10 68:23 70:8 149:23 172:16 180:8 332:11 335:16 338:18
**healthcare** 210:18 210:24 254:3 311:6

**heard** 61:25 62:1 63:9 103:16 156:11 182:24 187:3 299:25 300:4,11,14 335:9
**hearing** 111:19 226:15 228:4
**held** 83:25 87:14 194:14 316:11 332:20
**hello** 331:8
**help** 84:1 103:2,13 103:19,20 177:7 184:20 218:5 244:24 292:17 300:10,13 336:12 338:4,20
**helped** 147:21 151:25 163:13 184:21 185:1 206:3
**helpful** 184:16 213:20 214:13 277:19
**helps** 319:17
**henschel** 3:20
**hereinafter** 14:9
**hereunto** 350:5
**hermiz** 2:3 13:8,8 16:25 17:12,25 20:8 21:14 22:15 24:15 26:3,21 28:8,15 29:10 34:3,22 35:4 36:10 37:6 38:10 40:4,12 41:5,11,23 42:19 43:1 46:25 47:8 51:9,14 55:11 56:7,14 58:2 59:2 61:5 63:6,15 64:23

65:7 66:22 67:2
67:19 68:6 70:5
76:3 78:21 82:12
85:18 86:9,15
87:9,15 88:3,7
89:2 94:9 95:19
96:23 97:5,16
101:18 102:13
105:15 106:6
109:17 110:10
116:20 117:21
121:10 122:15
123:16 124:1,17
125:10 128:16
129:4 130:19
131:7,18 132:24
133:7,14 135:6
136:3 137:9,24
138:7,22 139:5
140:1 141:6 148:8
148:23 149:3,12
149:17 151:14,22
153:6 154:9,17
157:22 159:1,13
160:6,10 161:12
161:18 163:17
164:20 166:19
169:23 171:2,19
171:22 172:19,22
173:3 175:24
176:12,23 177:13
178:4 180:15
181:19 182:22
185:14,21 186:3
186:13 187:18
190:3 191:24
193:14,23 194:15
195:22 196:13
198:11,20 199:25
200:5 201:25
202:6,13 203:15

205:3 206:5
207:14 210:4,7
211:7 212:25
213:22 214:6,14
215:6 219:14
220:8,22 221:19
222:24 225:3,17
226:20 227:8
228:25 229:12,17
231:13,19 232:13
232:22 233:17
235:16 237:2,22
239:23 240:4
258:7 259:9
260:21 263:8,16
268:25 269:6
272:9,24 273:16
274:15 275:14
279:12,21 281:10
282:23 283:20
284:17 290:18
292:19 297:4,23
300:12 301:3,19
304:13 306:17
307:24 308:4,9,18
310:20 311:7,16
311:21 312:3,9,22
313:6,12,21 314:3
316:19 317:10
318:4 319:2
320:11,18 321:5
321:23 322:22
323:8 325:18
328:9 336:8,14
339:1,12 341:13
341:21 342:4
343:12 345:8,13
346:15 347:7,14
351:5
**heroin**  5:11,13
18:2,11,18 20:4

21:22 23:25 24:7
24:13,18 26:7,10
26:18,23 27:7
28:12 31:8,16
33:12,16,19 34:1,6
34:13,18,21 35:3,6
35:8,12,17,20 36:3
36:4 37:5,9,12,15
37:16,20,24 38:3,4
38:8,11,15,22 39:3
40:19,21 41:4,4,6
41:8,13,15,21 42:6
42:7,17,22 43:2,10
43:14,25 44:9,19
44:22,25 45:3,25
46:7 47:12 51:7
51:12 52:8 53:16
54:3 55:6,23 56:5
56:11 57:3,11,19
57:25 73:1,2
74:16 75:1 80:22
82:10 85:15 86:6
86:14 137:5,7,25
141:2,16 151:20
167:23 168:7,7,10
169:10 170:10
172:11,14,15
227:20 273:22,22
280:22,25 281:1,3
281:9 282:4,6,10
282:13,16 283:3
283:16 284:19,22
284:24 299:13,21
302:6 303:19
308:11 309:19
310:11,15 314:11
316:1,7 329:6,21
330:2 334:11
335:13 336:3
342:7,11

**hidta**  319:14,20
**high**  83:14 172:18
185:18 190:7
275:16
**higher**  177:12
256:24 267:20
268:15,22 269:4
270:8,14,19 271:4
275:15 282:24
**highest**  21:12
275:16,17
**highlighted**  89:5
284:11 323:2
**hipaa**  182:11
**hires**  246:5
**historically**  35:11
50:25 148:1
256:22
**histories**  117:1
**history**  27:24
117:4 177:23
**hit**  178:20 190:10
221:13 273:5,5
**hold**  69:3 133:22
134:6,14 135:4
136:14 140:10,13
140:24 253:11
296:10 297:9,15
345:2
**home**  237:18
318:11
**homes**  35:16 165:5
177:18 188:6,13
265:2
**homicide**  32:11
**homicides**  23:21
27:16 267:24
268:1
**hook**  309:15
**hooked**  147:1
227:21

hoover 51:17,18
hope 65:11 137:1
  159:14 160:21
  277:11 344:2
hopefully 248:24
horse 223:11
hospice 188:7
  313:13 318:12
hospitals 166:7
hosted 331:19
  333:7
hostetler 2:12
  13:14,16
hotel 302:12
  309:23
hour 305:24
hours 145:6
  250:25 251:6
  258:10 261:17
  287:5,9 294:2
house 108:21
  109:14,15 158:13
hum 71:19 74:14
  76:12 95:4 100:23
  126:4 145:4
  153:24 154:6
  245:22 247:4
  249:18 254:21
  255:20 262:3
  265:13 268:20
  269:16 289:23
  290:15
human 340:7
hundred 60:15
  86:18 143:2 198:2
  225:16,24
hundreds 141:7,8
hypotheticals
  213:5

i
iceberg 165:20
idea 37:22 131:1
  134:15 140:2
  167:5 185:10
  197:7,15 234:4
  302:8 322:20
  334:4,14 335:1
  338:7 341:7,11
identical 25:25
identification
  22:23 25:7,13
  38:17 57:7 68:17
  68:20 81:14 98:23
  98:25 171:14
  266:7 268:7
  277:25 278:2
  289:15,17 296:4,6
  322:4 328:19
  330:15 336:24
identified 89:13
  170:24 171:4
  304:11 346:12
identify 13:6 28:1
  48:15 97:14 101:9
  152:8 156:24
  184:22 231:18
  287:20 292:18
  325:9 326:6 328:6
  344:5 345:7,8
identifying 99:5
  101:6 326:22
ilene 256:19
illegal 29:16 30:17
  70:1 83:20,21
  88:23 146:25
  170:4 227:10,25
  231:21 287:20
  335:22
illegally 68:4
  69:14 70:4 168:5

206:19 223:9,23
  224:12 232:9
illicit 5:16 65:12
  68:11,24 69:23
  70:9,13 190:2,12
  287:22 327:5
illnesses 311:14
immediately 16:6
immunity 103:11
impact 17:19
  149:11
impacts 44:8
import 323:11
importance 343:8
important 84:3
  88:22 97:13 101:4
  233:21 335:19
impose 179:3
impossible 327:23
improper 205:8
  205:10,13 210:3
improperly
  220:20 221:18
  320:9
incarcerated
  160:1,4,16
incarceration
  17:20
incentive 234:13
incentives 234:6
incentivize 161:2
  161:7
inch 114:2
incidence 192:5
  280:14
incident 149:2
incidents 259:8
include 16:9,12
  18:15,17,20 19:10
  50:17 262:19

included 18:12
  29:11 93:13
  178:17 255:9
  262:11,15,23
  275:25 331:5,17
  332:8 351:13
including 20:4
  275:8 288:10
incorporate 179:9
incorporated
  353:12
incorrect 342:15
increase 5:17
  37:11 68:12,25
  144:23,25 179:17
  257:8 268:1
  272:21 273:2,6
  280:21 282:14,20
  282:21 315:23
increased 45:4
  100:14 176:16
  192:8 257:3
  273:10 281:3,19
  281:24 282:5
  308:2 346:2
increases 103:12
  257:5 273:14
  335:23
increasing 310:1
incrimination
  232:7
independent 276:4
index 4:1,4,5 5:1
  6:1 7:1 8:1 9:1
  10:1 11:1 12:1
indiana 2:17 80:17
  89:8 147:12
  273:19 291:21
indicated 59:20
  340:9

**indicates** 57:19
**indicating** 82:6
　351:13
**indicator** 72:22
　73:3
**indicators** 196:16
　196:18
**indict** 307:9 324:2
**indicted** 20:13
　45:24 48:23 77:22
　96:12 115:23
　141:9 143:17
　144:12 216:12,21
　217:1,8 218:11
　329:4
**indictment** 46:5
　49:12 72:9,12,15
　110:20,25 111:6
　111:16,24 112:4
　113:2 152:7
　156:19 157:4
　211:25 217:9,21
　217:25 252:7
　281:2 317:4
**indictments** 44:18
　44:22 45:12,23
　48:4,6 77:24
　252:13 280:22
**indigent** 257:13
**individual** 53:20
　75:25 76:22 86:14
　86:24 115:8,11
　166:20 169:22
　176:25 178:23
　189:11 192:22
　193:13 196:5
　206:21 207:17
　222:23 223:8,17
　224:10,12 235:4
　314:6

**individual's**
　111:11 232:7
　235:9
**individuals** 17:17
　35:2,5,16 82:13
　83:20,24 84:19
　87:25 91:3 95:6
　95:13 97:15,18
　98:4 99:6,19
　101:3,7,11 102:9
　102:18 109:2
　111:7 112:21
　113:1 125:16
　142:2 155:19
　159:23,25 160:4
　167:22 168:9
　169:6 170:8,19
　183:10,21 186:22
　187:23,25 188:3
　191:2 192:2
　194:18,20 200:17
　206:18 209:4
　221:8 223:23
　224:17 227:11
　230:22,25 231:3
　234:12 252:15
　262:6 267:4
　286:21 293:8
　301:21 303:9
　307:6 329:19
**influx** 52:15,15
　53:1
**inform** 176:20
　234:8
**information** 5:23
　21:25 34:25 49:8
　57:17 59:4,19
　63:10 64:5 65:24
　66:11 68:7 72:6
　93:25 94:5 113:22
　113:23 128:20

　133:24 135:16,23
　149:24 155:5,24
　162:17 171:11,18
　175:11,13,19
　176:20 182:2,9,10
　182:14,17,19,20
　185:24 186:12,21
　204:23 208:21,25
　209:1 211:3
　217:12,16,23
　218:2 224:21
　231:14 232:11
　234:18 235:14
　259:14 265:4
　276:18 280:1
　301:25 319:8
　338:23 339:16
　340:3
**informed** 199:7
　220:11
**infrequently**
　118:8
**ingested** 76:25
　86:24
**ingesting** 56:12
**ingredient** 5:14
　57:4,12
**initial** 111:11
**initially** 32:16
　89:24 90:2 112:3
　227:9
**initiate** 110:19
**initiated** 133:22
**initiative** 267:1
**inject** 302:12
**injunction** 219:4
**ink** 326:4
**inside** 42:20
**inspect** 345:15
**instance** 145:12
　193:12 241:21

**instances** 50:2
　55:5,9 60:5 61:18
　61:22 156:1
　220:10
**institute** 40:15
**instruction** 348:2
　348:10
**insufficient** 144:1
　144:4
**insurance** 172:16
　319:4,11
**insurers** 231:8
**intelligence** 57:18
　59:19
**intended** 58:21
　188:1
**intensely** 308:7,17
**intent** 326:8
**intention** 101:25
**interaction** 242:17
**interest** 337:16
**interested** 315:23
　350:3
**interesting** 84:14
　84:16
**internal** 93:19
　254:4,6
**internally** 128:3
　254:10
**international** 42:2
　42:4 230:12
**internet** 226:11
　230:16
**interrupt** 150:7
**intervene** 214:19
**intervening**
　269:11
**interview** 252:25
**interviews** 152:12
　152:17

intranet 105:21
introduction
  100:12
introductory
  256:18
investigate 31:12
  33:1,4 42:3
  142:17 147:23,25
  202:21 203:9,14
  203:24 220:24
  233:8
investigated 30:14
  30:21,24 31:2
  165:12 198:19
  205:7,10 208:19
  210:17 211:6,8
  316:22
investigates 87:22
investigating 31:7
  31:9 42:2 94:4,6
  146:5
investigation 33:9
  67:16 116:22
  117:12 142:14
  163:18 184:20
  217:14,22 220:15
  221:6 224:2 226:7
  318:18 320:20,21
investigations
  5:19 31:11 33:6
  81:11,18 121:21
  169:13 184:24
  187:1 196:19
  198:14,25 211:11
  217:15 220:24
  222:5,9 233:20
  299:2,3 301:5,7,13
  301:14 320:23
investigator
  183:16,24 184:4

investigators
  53:19 183:19
  186:19 209:3
  211:9 298:23
invitations 127:4
invited 331:12,13
  332:5 334:9
involuntary 51:7
  51:12,19 52:1,4,9
  74:22 75:4,9 76:7
  76:23 77:15 78:17
  78:24 79:8 80:4
  81:25 82:16,20
  85:4 87:25 89:15
  89:17 95:1,23
  96:6,16 97:1,10
  110:6,14 126:14
  141:2 143:14
  144:4,12 145:13
  145:19 149:1
  150:13 151:12,17
  283:10
involve 16:5
  107:23 137:8
  214:5 217:3 261:3
  294:11 324:11
  327:4 330:2
  341:20 342:3
involved 22:1,13
  39:8,14 60:23
  71:3 74:25 75:3,7
  75:15 76:11 97:15
  99:3 101:7,14
  102:12 111:2
  137:2,6,12 139:3
  166:13,16 190:11
  193:9,17 208:23
  209:12,14 216:2
  217:9 218:15
  237:17 239:13
  260:19 262:20

283:7 291:22
  302:18,20,21
  316:6,17 317:18
  318:8,9 331:14
  340:11,21 341:4
  342:10
involvement 22:5
  96:14 303:3
  319:22
involving 60:6
  70:21 75:4,9
  78:17,24 79:3
  80:4 89:14 137:25
  167:9 188:13
  190:25 202:8
  210:23 213:18
  215:22 222:9
  225:10 237:11
  262:12,16 283:7,9
  299:5 318:22
issue 34:11 63:3
  64:16 72:16 85:1
  129:5 138:6
  169:21 175:5
  176:24 216:10
  234:9 235:19
  302:24 304:12,18
  306:22 346:22
issued 33:5,7
  47:24 57:12
  212:17 216:11
issues 18:3,4,5
  27:8 29:18,22
  30:4 49:21 55:23
  63:13 89:7,13
  124:7 127:4,8,16
  167:13 186:24
  188:14 204:16,19
  220:25 221:4
  279:19 304:9
  306:14 314:9

337:16
item 249:14,20
  255:1 256:4
  257:19 263:11
  306:1
items 26:10 90:14
  191:10 246:21
  257:21 275:19
  285:20
iv 286:24

**j**

jail 234:20,20
january 5:14,24
  57:4,11 171:12,18
jennifer 116:15
jenny 91:10
jerry 331:16,19
  332:9,17 333:7,11
  333:14,19,25
  334:1,3,18 335:2
jerry's 334:5
jesse 183:19,24
jeter 114:20,22
jill 3:16 13:21
job 14:25 16:4
  121:3 148:19
  311:11
joe 293:14
john 90:23 91:9
  93:7,21 94:2 95:6
  95:25 96:1,1
  164:2 171:6 185:2
  331:14,20,22
  332:2,3,7 333:13
  333:14,18,24
  334:17,22,25
johnson 210:20
join 90:16 293:9
joined 31:6,15,20
  31:23 170:25
  211:1

**joining** 121:5
**jointly** 315:4,6,16
**jokun** 3:19
**jones** 2:7 13:20
**jonesday.com**
2:10
**journal** 151:7
337:22
**journals** 44:14
**joy** 293:20
**judge** 1:8 88:18
157:24 158:1
212:18,24 213:2
293:18,20,23
**judges** 123:11
169:15 240:15,18
240:18,23 241:22
241:25 243:18
244:5,7 293:9
306:20
**judicial** 160:23
**julie** 116:11,14
**july** 6:18 336:21
337:22
**june** 5:20 81:13,19
316:12
**jurisdiction** 58:16
66:20,21 110:18
110:19 111:18
141:4 205:25
225:2 301:1
**jurisdictions**
90:17 186:18
315:9
**jury** 32:25 33:3,3
33:5,8 45:23
63:20 88:18 98:11
98:16 110:20
111:10,20,22
112:13,16 113:7
115:20,25 116:8

216:11,13,19
252:9,14 259:12
263:25 317:3
327:13 329:3,11
329:13,16,20
**justice** 289:6,7,20
289:20 303:14
**justification**
195:14,16
**juvenile** 66:10
237:13 249:6
250:5 251:13
252:16 264:2,8,18
265:8 275:2 276:3
287:14

**k**

**kara** 215:23,24
216:3,5,21
**kara's** 216:25
**keep** 108:16 234:5
237:19 248:19
261:7 287:8 288:4
297:5 303:11
313:25 327:24
**keeps** 50:5 327:19
**kept** 50:2 93:19
108:19,20 113:16
114:19 115:14
120:12 303:12
**kevin** 99:15
**khermiz** 2:5
**kidding** 247:20
**kids** 149:25
168:14 190:8
**killer** 168:19
**killing** 309:25
**kind** 191:6 228:18
236:25 301:24
328:7
**kinds** 64:7 190:1

**kmorrison** 2:10
**knew** 53:18
157:15 309:1,23
**know** 17:21 19:12
19:13 21:15 28:9
30:11 34:18,23
36:11,12 37:7
38:6,11 39:11,18
39:23 40:10 44:11
46:9 50:4,7,9,12
54:7 55:16 56:8
56:16 58:23 60:16
60:19,25 61:7,10
61:21 62:7,16
64:7,13,18 65:20
66:9 70:23 71:2
78:13 93:24 94:10
94:19 95:15 97:8
99:13 107:2
114:13 116:11
117:1,22 119:25
122:19 124:18
130:11,18 131:8
134:12 135:1,3
137:10,12 139:2
139:23 143:25
150:10,12 152:17
152:20,22 153:15
153:25 154:10,25
159:18,19 160:7
160:16 165:21
167:1,4,14 171:3,7
175:2 176:1,7,7,10
177:11 180:23
181:22 183:4,23
184:11,12 185:15
185:22,25 186:6
194:4 195:18
196:20 198:3,5,8
199:9,10,11
200:25 201:8,11

203:18 204:16
205:4 206:6,15,24
209:5,6,17,20,25
211:2 213:4,10
214:15,17,21
216:8 217:5,7
220:9 222:16
228:6 230:14
234:24 236:13
239:11 243:1,5
246:3,6 250:6
251:17 255:10,12
255:17 258:16
260:4,22 261:2
264:17 274:17
275:17 276:7
279:13 281:18,23
288:21 290:7,9,9
290:23 291:5
296:18 298:11,13
298:15 308:19,20
308:22,25 309:5
310:21,25 311:2
311:19 312:4
316:4,13,15
319:23 320:24
323:19 326:10
327:6,7 332:20,25
333:2,5 334:2
335:10 336:6
338:10 340:1
341:1,22 342:7,25
343:9 345:17,19
**knowing** 59:4
146:8,9,21 208:2
341:24
**knowledge** 19:23
30:3 33:25 34:5
73:15 96:10 99:18
141:3 154:20
157:2 169:21

**[knowledge - licensed]** Page 34

172:23 174:24
176:2 182:13
184:9,21 185:7
186:4 204:8,13,15
207:1,4 209:15
284:14 296:8
300:16 339:2
**known** 16:16,22
77:5 83:15 200:7
308:24 309:5,11
309:13 310:3
**kovach** 243:23
244:9
**kristen** 2:3 13:8
351:5
**kristin** 2:8 13:19
**kroll** 99:15
**kronos** 261:12
**kurt** 3:20

**l**

**l** 1:25 95:10,12
349:6 350:13
**l.p.** 1:10,12,13
**lab** 54:14 67:12
117:9 127:20
**laced** 335:14,23
336:3,3 343:18,21
343:25 344:15
**lack** 143:11
144:17,20 148:11
178:10 231:22
284:7 301:17
304:15
**lakeside** 2:8
**lands** 47:4
**language** 24:20
25:24 26:1,4,16
27:7
**large** 54:16 55:20
272:14 299:7
303:16,17

**larger** 72:8
**largest** 243:11,12
**late** 36:16,17
**latest** 47:25
**latitude** 315:19
**law** 14:16 31:10
31:18 34:10 37:17
39:6 44:14 52:12
58:14 62:2 64:15
66:24 67:3,6 68:3
69:13 70:3 83:24
84:2 86:1,20,21,22
87:21 88:19 89:10
91:1,12 102:22,25
103:5,13,22 104:4
106:16 110:17
111:18 116:18,24
117:5 127:25
128:8 139:15
142:16,18 145:10
146:1,4,22 147:12
147:14,17,22
148:6 149:5,20
159:7 161:10,13
165:16,19 166:12
166:13,15 170:1
183:11 186:14,16
192:1 193:16
199:17 201:18
204:18 205:9
210:13 216:18
218:25 219:11
220:11 221:2
222:6 223:11,19
224:1 225:4 226:9
226:14 232:10,20
233:14,18,22,24
235:20,21 241:2
272:20 285:12
286:3,10 288:1,6
288:11 291:17

292:17 301:6
302:1 304:9,11,15
304:25 309:2,9
314:8 316:20
317:5
**lawful** 14:6 313:3
313:4
**lawfully** 162:20
313:7
**lawrence** 61:15
322:23,24 326:11
327:8
**laws** 36:12 52:21
83:6,12 108:5
161:11,17 166:11
182:6
**lawsuit** 326:25
345:23
**lawyers** 279:4
**laying** 309:20,22
**lead** 147:6,21
169:10 214:11
**leads** 141:25
**learn** 62:3 118:11
123:13 244:10,15
**learning** 62:13
77:8 165:2 309:3
**leave** 261:10,12
**leaves** 125:23
305:24
**leaving** 205:6
**led** 52:7,7 86:25
265:20 314:22
**lee** 183:19,24
**left** 141:22 252:7
293:20
**legal** 70:1 89:1,6
106:14 165:18
168:3,5 187:24
206:19 231:21
238:17 252:18

351:1 354:1
**legally** 30:19
165:9,15 168:4
188:3 193:6,11
229:5,8
**legislation** 206:3,7
292:9
**legislative** 15:8
292:10,13
**legislature** 147:14
148:3,13,15,16
164:11 206:2
**legitimate** 187:11
194:8,23 196:11
208:3,8 209:19
238:14 314:1,4
**legitimately** 186:2
194:3
**lengthy** 99:1
**lenient** 235:8
**leonard** 185:4
196:20 197:6,21
200:14 202:15
204:20 208:11
**letter** 138:9,10,16
138:19 256:18
346:11 351:19
**letters** 302:24,25
345:17,17
**level** 38:8 41:3
153:3,11 154:2
159:5 172:18
257:10
**levels** 227:15,16
**license** 196:8
202:24 204:7
212:23 214:24
215:18 216:22,25
**licensed** 166:1
229:4

**life** 21:8 82:19
103:14 164:5
168:13 311:14
313:11,16 328:13
**light** 297:8
**likelihood** 158:19
335:24
**limit** 109:3
**limited** 275:24
287:25
**limits** 217:17
307:21 308:2
**line** 33:19 196:14
196:15,21 246:21
249:14,20 255:1
256:4 257:21
263:11 275:18
285:20 306:1
351:13 353:7
354:3
**lines** 19:4 21:23
304:5
**link** 87:17 142:15
145:24
**list** 18:13 19:5
28:25 76:16 91:11
128:14 129:9
183:8 245:14
248:11 251:19
253:24 264:18
275:6 290:19
346:11
**listed** 27:11
141:18 245:20
246:22 247:18
253:13 256:7
265:14 277:3,4
324:16 353:7,17
**listing** 353:7
**lists** 23:20 25:20
233:11 299:2

**litigation** 1:6 13:4
104:23 132:7
133:6,8,13,22
135:4 136:14,25
140:10,12,24
174:21 181:18
221:21 236:11,13
239:2,15 297:9,15
311:1,20 320:7
325:5 351:6 352:3
353:3
**little** 192:9 223:11
263:9 271:16
275:3 315:19
**live** 245:5
**lived** 87:2
**lives** 338:20
**living** 257:5
**llc** 2:17,18
**llp** 3:2,6,16
**local** 149:5,19
160:11,15 221:3
255:19 256:7
291:17 292:4
314:10 337:17
**locally** 158:22
159:24
**located** 174:13
**location** 343:7
**logan** 3:12
**logged** 261:13
**long** 16:1 21:2
36:7 105:1 121:3
134:11 184:7
196:15 211:23
212:5 334:4
**longer** 119:15
134:16,17,18,24
145:6 158:3
172:16 183:17
217:22 265:22

**look** 20:12,21
22:10,10 23:10
27:4 29:2 40:14
45:22 46:9 47:17
47:24 49:3,4,5,23
61:3 69:10 71:8
72:4,14 75:17,24
76:15,17 81:7
85:24 86:1,18,20
87:21 93:6 97:17
98:8,9 100:1
104:4 115:4 120:3
120:4,24 133:4
139:19 141:12,20
144:21 146:9
149:21 153:21
156:14 158:9
166:23 169:2
183:12 195:6
196:19 209:6
211:9 214:8
217:18 218:7
221:7 225:4 233:3
234:15,19 235:25
242:7,10 243:14
245:7 247:1 248:2
248:14,17 252:4
252:19,20 256:16
256:22 265:11
267:23 270:3,16
271:17 272:12
273:18 277:12
280:18 283:1
287:25 302:5
305:15 309:3
315:10 323:13
330:19 340:12,22
341:5 343:5
**looked** 52:18,24
86:20 115:11
145:23 147:4,16

148:2 180:5 239:3
245:2,3 251:22,24
263:4 267:18
332:3
**looking** 26:16
71:13 82:6 128:22
146:2 209:18
228:3 247:9
248:19 263:2
264:15 276:11
279:22 284:21
299:4 306:23
309:19 316:23
324:6 333:23
343:16
**lookout** 291:10
**looks** 82:8 228:3
233:24 323:22
324:4,7 331:6
**loprinzi** 90:24
91:9 93:22 95:9
95:12 295:8
**loss** 21:8 31:3,4
332:10
**lost** 170:12
**lot** 46:10 108:25
109:4 145:25
146:11 164:5
190:16 210:5
221:7 228:4
234:12 260:5
265:2 267:2,6
292:14 333:15
345:3,18
**love** 79:20 261:1
**low** 153:3,10
154:2 284:11
341:18
**lower** 172:15
269:15,19

**lucas** 243:10
307:15
**lunch** 173:4
286:21
**luncheon** 173:9
**luxury** 237:3
257:24 334:7
**lying** 163:1

**m**

**m** 2:3 95:10 351:5
**madam** 351:10
**mahmud** 215:23
**mahoning** 157:25
**mail** 6:9,14,16,17
93:4 118:15 119:6
119:8,14 121:2,3,4
123:7,18,24 124:3
124:14,19,22,23
124:24 125:2
126:19,21,23
127:21 129:9,18
134:1 137:22,25
138:17,18 140:17
174:25 175:1,21
289:11,18,24
290:11 296:22
328:16,23 329:9
329:10,10,15
330:12 331:8,20
332:24 333:10
336:20 337:5,7,9
**mailed** 124:6
127:12 296:20
**mails** 121:8,12,16
121:21 122:2,5,9
122:14,19,23
123:3,20,22
124:10,11 128:21
129:19 136:1,5,7
136:21 138:2,3,12
138:13,20,23

139:4,16,17,25
140:9,23 174:23
175:10,12,22
346:23 347:1,3
**main** 3:17 35:23
**maintain** 51:3
132:10,15 181:10
**maintained** 76:6
94:8,16 110:21
114:7 117:15
119:9,10 129:22
211:21 253:8
297:10
**maintaining** 66:18
**maintains** 181:13
183:9
**major** 172:6
**majority** 68:2
69:12 70:2 80:7
111:1 143:16
159:2 223:5 262:9
272:17,19 287:11
288:5
**making** 146:10
283:12
**man** 344:8
**manageable** 52:17
**management**
45:16 46:21
113:22 114:24
255:12,14 306:5
323:10 328:11
**managers** 318:24
**mandate** 241:2
**manna** 1:22
**manner** 87:10
**manners** 315:1
**manpower** 22:10
142:12,15 177:3
220:25 304:19
315:23

**manslaughter**
51:8,13,19 52:2,5
52:9,20,24 56:21
74:22 75:5,9 76:7
76:23 77:15 78:18
78:25 79:8 80:4
81:25 82:16,20
85:4 88:1 89:15
89:18 94:21 95:2
95:24 96:6,17
97:1,10 110:7,14
126:14 141:2
143:15 144:5,13
145:13,19 147:8
149:1 150:13
151:12,17
**manslaughters**
74:15 283:10
**manual** 104:21,22
105:1,10,14,19
106:3,4
**manufacture**
308:2
**manufactured**
34:24 35:16 42:23
42:24 43:3 191:15
229:16,19 238:9
238:13 239:1,14
307:22 343:21,22
343:23
**manufacturer**
236:22
**manufacturers**
163:22 191:13
239:6 300:9
**manufacturing**
230:15
**march** 48:12
50:17 59:10
325:24 326:1

**margaret** 6:9 91:8
289:12 290:1
295:7 316:14
334:11
**marijuana** 18:5
19:20,21 20:5
73:7,9 299:6,10,20
324:7
**mark** 81:6 171:23
181:9 289:17
**marked** 5:3 6:7
22:22,25 25:6,12
25:16 27:1 38:16
57:6 68:16,20
81:13 98:22,25
171:13,17 266:6
266:10 268:6,9
277:23,24 289:14
296:3 322:3,6
328:18 330:14
336:23 337:2
**market** 1:23 310:6
**marking** 38:19
278:2 296:6
328:22 330:18
**marshal** 267:2
**mary** 243:23
244:9
**maryland** 2:20
**masters** 183:19,25
**match** 84:21
255:19,24,25
**matching** 256:5
**materials** 117:6,14
127:8 136:9,15
169:20
**matrix** 46:13 48:9
48:10,13 49:7,18
50:16 61:2 72:25
113:19,20,24
323:10 325:22,23

325:25 326:4,15
326:24 327:3,11
327:16 328:5
**matter** 13:3 113:5
131:11 137:20
142:17 160:9
169:24 190:9
212:18
**matters** 130:6,16
131:3,17,23
253:21,22 271:8
276:16 278:20,24
**maximum** 307:21
**mayor** 331:3
332:4
**mayor's** 331:7
333:21
**mcaleese** 293:14
**mckesson** 3:2
13:24 14:1,17
185:8 310:19,25
311:9 312:7,13
**mckesson's** 311:20
**md** 1:7
**mdl** 1:6
**mean** 16:19 59:8
73:8 84:18 96:3
98:15 103:25
121:25 135:20
142:1 146:10
147:15 148:14
149:25 150:1
167:14,19 168:9
168:13 171:4
180:16 191:5
199:24 200:2,4
209:20 234:22
265:16,19 279:14
282:3 302:10
305:16 309:1,4
319:16 323:7

331:22 343:5
344:14
**meaning** 133:9
326:3
**means** 265:17
**meant** 201:4
**measure** 265:12
265:14
**media** 5:13 57:2
57:10 58:7,17,21
77:9 127:24 128:8
128:14,25 141:25
146:9 337:17
**medicaid** 231:9
**medical** 55:17
87:19 117:10
141:13 143:6
164:25 167:20
182:10 187:11
195:21 196:12
199:4 201:20
202:20 204:6
205:1 208:3,9
210:11 211:15,18
211:21 212:19
213:20 214:1,4,12
214:18,22 215:18
216:22,24 217:12
217:24 218:20
229:23 283:12
305:18,22 307:23
313:5 314:1,4,19
314:23,25 317:16
318:6
**medically** 229:4
**medication** 188:9
193:12 219:5
318:12
**medications** 31:3
31:4 183:10

**medicine** 67:25
107:23 166:4,21
169:4 193:11,21
215:12 226:2
311:13,25 314:2
**mediums** 303:1
**meet** 86:3 90:6,17
90:23 93:9 129:7
209:21 220:1
240:22 243:16
295:11
**meeting** 6:11 15:8
63:8 89:8,25
90:12,21 112:12
127:7,10,18
180:23 241:9,10
243:18,20 244:1,4
244:6,11,12 296:1
296:8,9,14,23
297:8,19 299:4,23
334:5,9
**meetings** 62:6,8
63:2 91:6,14,16,21
91:24 92:1,3,8,10
92:13,16 93:1,3,10
95:3 127:4 147:9
204:20 294:23,25
296:25 297:6,17
**meets** 295:12
**megan** 126:6
328:24 329:22
**melanie** 6:17
336:20
**member** 164:4,11
294:18,19,22
**members** 170:14
204:17,18 244:22
284:3 288:10
292:17 301:16,23
**memo** 117:20,23
118:1,3,11,14

**memorialized**
107:7
**memory** 31:22
132:1 343:15
**memos** 118:4
**mentality** 83:13
**mention** 24:21
27:20,22 43:18
284:23 299:20
342:17
**mentioned** 14:15
29:14 37:14 41:20
54:25 67:23 74:11
84:6 91:12,19
94:25 126:2,18
148:3,12 150:24
161:23 167:6
178:8 183:1
184:15 192:20
240:2 284:7,15
285:2 288:13
302:22 325:3
339:22
**mentions** 299:5,14
299:15,19,20
**merritt** 137:15,19
174:17 339:22
**message** 131:3,6
131:10
**messages** 130:22
130:24 131:17,22
292:5
**met** 102:5 240:17
243:18
**meth** 18:4 19:11
19:14 20:5,21
21:23 35:15,18
36:8,19,22 37:4,8
37:11,15 138:14
138:21 140:9,17
191:12,18,20

262:17 282:9,11
282:14,17,21,25
283:7,9 299:5,7,8
299:9,13,15,19
323:18 324:8
326:16
**method** 315:1
**mexico** 43:10
282:18
**middle** 246:4
299:6,11
**midwest** 351:17
354:1
**migrated** 323:2
**mill** 195:20,25
196:11 201:16,23
202:9,22 206:4
**million** 185:17,18
256:13,21,21,25
270:23 290:13
346:2
**mills** 197:2,12,23
198:6,13,15,18
199:6,16,21 200:7
200:22 201:13
202:4,11 203:2,9
203:14,25 204:12
205:7,24 320:13
**mind** 163:4
**mindful** 284:4
**mine** 139:22
**minimal** 144:24
**minimum** 288:4
294:5
**minor** 109:2
**minus** 78:10,10
**minute** 237:23
253:11 296:10
**misch** 197:7,21
200:14 202:15

**misdemeanor**
106:20
**missed** 120:7
**misuse** 193:16,20
**misuses** 193:12
**mitigation** 169:16
**mix** 312:17,19
313:1
**mixed** 55:6,24
56:2,12 57:19
283:16
**mixing** 56:4
227:24
**mom** 302:10
**moment** 53:11
161:24 344:24
**money** 102:1
157:9 177:19
180:22 240:9,11
253:15 278:18
279:19 284:5
285:24 286:3,9,15
286:18 288:5,5
297:22 298:2,5
**monitor** 66:12
**montgomery**
243:9 307:15
**month** 126:5
134:16,17,22,23
255:15
**monthly** 44:16
62:10 115:23,24
255:14 295:12
**months** 99:21
134:2,22 212:4,7
212:10
**morgue** 55:19
143:7
**morning** 14:13,14
112:9,11 325:4
342:20 344:12

**morris** 3:16
**morrison** 2:8
13:19,19
**mother** 150:4
344:10
**mothers** 170:12
**motion** 219:3
**motivated** 218:20
**motley** 2:2 13:9,11
**motleyrice.com**
2:5,6
**move** 114:25
121:15 234:18
**moving** 45:2
253:10,24
**moylan** 2:19 13:17
13:17
**mt** 2:4
**mugs** 293:2
**multi** 101:5
**multiple** 86:17
189:13,21 227:5,6
280:10 345:14
**municipal** 50:1
110:21,21 111:6
112:19
**murder** 52:20
82:14,18

**n**

**n** 2:13 14:22 95:12
**naloxone** 43:23
**name** 14:18 26:14
48:7 72:13 85:12
95:7 116:11
137:15 164:3
184:3 196:23
197:8 201:10
209:7 215:2
233:12 324:3
325:4 351:6 352:3
352:4,15 353:3,4

353:21
**named** 322:12
349:9
**names** 30:10 34:19
116:9 126:9 155:2
155:3 186:22
199:6,11,12
202:14 220:12
228:20 251:15
277:4
**narcan'd** 164:5
**narcotics** 101:3
**narrow** 132:25
161:13
**national** 1:6 13:3
40:15 107:3,4,8,10
219:21 291:19
351:6 352:3 353:3
**native** 322:8
**natural** 314:21
**nature** 22:4
162:11 165:18
175:9 193:15
196:8 203:5 240:8
273:11 303:20,21
311:19 343:6
**near** 254:20
283:14 313:10
**necessarily** 119:24
298:10
**necessary** 128:23
129:1 156:22
258:11 283:24
**need** 19:12 47:12
72:19 106:7,7,18
106:21 108:7
120:9 129:12
147:11,11 158:10
158:11,21 191:4
195:21 197:20
203:6,21 209:8

211:9 213:23 219:25 221:12 232:25 234:24 240:16 242:6 249:10 250:16 252:19 258:12 269:11 272:12 288:4 305:2,4,18 311:13 319:8

**needed** 52:13 71:24 102:4 115:1 124:14 175:9 196:3 240:14 295:14 306:2 308:20 309:14 313:15 340:4

**needle** 146:19

**needlessly** 149:7

**needs** 22:7,11 83:21 105:12 304:7 307:23 314:1,4

**neglect** 264:3,22 265:5 287:3

**negotiating** 179:4

**neighborhood** 44:8 74:18

**neighbors** 301:23

**never** 64:15 125:5 145:11,15 165:11 165:12 172:14 175:4 189:9 198:24 203:16 283:6 302:14 318:19 319:9 321:8 325:12

**new** 46:21 48:6,7 52:21 71:14 89:9 116:10 328:10

**newer** 246:5

**news** 5:16 68:11 68:24 129:2 337:15,19,19

**newsletter** 39:5 44:15,16 292:2,2

**newspaper** 331:10 331:25 337:13,20

**nice** 122:5

**nicholas** 3:11

**night** 302:11

**nine** 82:22

**non** 281:24 327:24

**nope** 278:5

**normal** 227:10,12

**normally** 22:7,12 34:16 67:11 118:3 118:9,18,18 175:11 177:9 212:15 302:25

**north** 2:8

**northeast** 59:24

**northeastern** 57:21 60:1

**northern** 1:2 111:3

**nose** 43:24

**notarized** 351:14

**notary** 349:6 350:13 351:25 352:10,18 353:15 353:23 354:23

**notation** 20:15

**note** 323:1 351:12

**notebook** 129:22

**noted** 39:20 82:24

**notes** 92:12,16,18 114:4 129:23

**notice** 133:22 134:4,5,6,14 135:4 135:18 136:6,14

**notices** 317:6

**notification** 319:6 331:11

**notifications** 125:7 125:12,13 127:6

**notified** 223:17

**notify** 211:18 223:14,14,22 318:6,23

**noting** 278:7

**notoriety** 192:7

**november** 244:3

**nrodriguez** 3:14

**number** 5:3,5,7,9 5:11,14,18,22 6:3 6:5,10,12,18 19:25 20:2 21:7 22:22 23:11,18 25:6,12 26:4 27:13 28:17 28:18 38:16 44:18 44:22 45:11,12 47:13,24 48:1 49:14,16,20,22 52:11,11 57:5 68:15 71:6,15 74:12 75:18 77:7 98:21 100:9 108:17 113:6 115:17,21,22 143:10 144:25 145:22 149:7 150:22,25 152:6 158:24 182:14 185:13,19 197:16 198:23,24 199:11 205:24 222:17 224:16 225:5,11 231:20 243:7 247:14 263:3,14 263:23 264:4 265:15 266:6

267:24 268:6 269:9 270:10 271:7,14 272:25 273:3,22 274:11 274:19,23 275:12 275:21 277:18 280:7,21 281:2 282:13,25 289:13 296:2 299:3 307:16,17 336:22 338:13 340:9 341:18,18 351:7 351:13

**numbered** 5:24 6:14,16 171:12 328:17 330:13

**numbers** 100:4 151:15 170:15 185:19 225:7 245:24 246:2 252:23 260:6 264:9,11,20 266:23,24 269:7 269:10 270:3,11 273:1,3,20,21 274:17 276:7 277:3,8 279:13 306:7 307:13 353:7

**numerous** 57:24 60:8

**nurse** 313:17 318:9,11

**nurses** 188:8

**nursing** 165:5 188:6,13 318:9,10 318:11

**nw** 3:4

[o - obtained]

| o | | | |
|---|---|---|---|
| **o**  95:10,12 105:23 | 10:20,20,21,21,22 | 138:7,22 139:5 | 283:20 284:17 |
| 126:7 300:3 | 10:22,23,23,24,24 | 140:1 141:6 148:8 | 290:18 292:19 |
| **oarrs**  168:2 | 10:25 11:3,3,4,4,5 | 148:23 149:3,12 | 297:4,23 300:12 |
| 182:25 183:3,7,8 | 11:5,6,6,7,7,8,8,9 | 149:17 151:14,22 | 301:3,19 304:13 |
| 183:15,20,22 | 11:9,10,10,11,11 | 153:6 154:9,17 | 306:17 307:24 |
| 184:13,15,21 | 11:12,12,13,13,14 | 157:22 159:1,13 | 308:4,9,18 310:20 |
| 185:3,9 186:10 | 11:14,15,15,16,16 | 160:6,10 161:12 | 311:7,16,21 312:3 |
| 300:24 301:4 | 11:17,17,18,18,19 | 161:18 163:17 | 312:9,22 313:6,12 |
| **oath**  15:15 | 11:19,20,20,21,21 | 164:20 166:19 | 313:21 314:3 |
| **object**  20:8 274:15 | 11:22,22,23,23,24 | 169:23 171:2 | 316:19 317:10 |
| **objection**  7:3,3,4,4 | 11:24,25 12:3,3,4 | 172:19,22 175:24 | 318:4 319:2 |
| 7:5,5,6,6,7,7,8,8,9 | 12:4,5,5,6,6,7,7,8 | 176:12,23 177:13 | 320:11,18 321:5 |
| 7:9,10,10,11,11,12 | 16:25 17:12,25 | 178:4 180:15 | 321:23 322:22 |
| 7:12,13,13,14,14 | 21:14 22:15 24:15 | 181:19 182:22 | 323:8 325:18 |
| 7:15,15,16,16,17 | 26:3,21 28:8,15 | 185:14,21 186:3 | 328:9 336:8,14 |
| 7:17,18,18,19,19 | 29:10 34:3,22 | 186:13 187:18 | 339:1,12 341:13 |
| 7:20,20,21,21,22 | 35:4 36:10 37:6 | 190:3 191:24 | 341:21 342:4 |
| 7:22,23,23,24,24 | 38:10 40:4,12 | 193:14,23 194:15 | 343:12 |
| 7:25 8:3,3,4,4,5,5 | 41:5,11,23 42:19 | 195:22 196:13 | **objections**  4:5 7:1 |
| 8:6,6,7,7,8,8,9,9 | 43:1 46:25 47:8 | 198:11,20 199:25 | 8:1 9:1 10:1 11:1 |
| 8:10,10,11,11,12 | 51:9,14 55:11 | 200:5 201:25 | 12:1 |
| 8:12,13,13,14,14 | 56:7,14 58:2 59:2 | 202:6,13 203:15 | **objective**  23:19 |
| 8:15,15,16,16,17 | 61:5 63:6,15 | 205:3 206:5 | 28:2 |
| 8:17,18,18,19,19 | 64:23 65:7 66:22 | 207:14 210:4,7 | **objectives**  23:17 |
| 8:20,20,21,21,22 | 67:2,19 68:6 70:5 | 211:7 212:25 | 24:13 25:21,25 |
| 8:22,23,23,24,24 | 76:3 78:21 82:12 | 213:22 214:6,14 | 27:5,13 29:1,8 |
| 8:25 9:3,3,4,4,5,5 | 85:18 86:9,15 | 215:6 219:14 | **obligation**  87:17 |
| 9:6,6,7,7,8,8,9,9 | 87:9,15 88:3,7 | 220:8,22 221:19 | 345:22 346:5 |
| 9:10,10,11,11,12 | 89:2 94:9 95:19 | 222:24 225:3,17 | 347:2 |
| 9:12,13,13,14,14 | 96:23 97:5,16 | 226:20 227:8 | **obligations**  106:10 |
| 9:15,15,16,16,17 | 101:18 102:13 | 228:25 229:12,17 | 106:12 107:19 |
| 9:17,18,18,19,19 | 105:15 106:6 | 231:13,19 232:13 | **observed**  177:21 |
| 9:20,20,21,21,22 | 109:17 110:10 | 232:22 233:17 | **obtain**  27:17 96:5 |
| 9:22,23,23,24,24 | 116:20 117:21 | 235:16 237:2 | 102:5 183:22 |
| 9:25 10:3,3,4,4,5,5 | 121:10 122:15 | 239:23 240:4 | 184:13 188:3,17 |
| 10:6,6,7,7,8,8,9,9 | 123:16 124:1,17 | 258:7 259:9 | 195:19 230:18 |
| 10:10,10,11,11,12 | 125:10 128:16 | 260:21 263:8,16 | 232:25 276:19 |
| 10:12,13,13,14,14 | 129:4 130:19 | 268:25 269:6 | **obtained**  30:19 |
| 10:15,15,16,16,17 | 131:7,18 132:24 | 272:9,24 273:16 | 49:13 54:18 57:18 |
| 10:17,18,18,19,19 | 133:7,14 135:6 | 275:14 279:12,21 | 59:19 165:15 |
| | 136:3 137:9,24 | 281:10 282:23 | 183:24 236:3 |

281:7 286:10,11
313:5
**obtaining** 276:18
**obviously** 345:16
346:16
**occasion** 92:7
**occasions** 56:3
189:23,23 208:5
**occur** 36:15
187:22 190:22
205:20 240:6
244:1
**occurred** 33:10
50:3 88:22 141:4
145:16 192:12
274:9 298:14,16
298:18 312:8
**occurring** 28:18
28:19
**occurs** 65:16
188:16
**october** 244:3
270:5 350:16
**od'd** 146:25
**offender** 178:2
188:16
**offenders** 101:10
156:21 157:21
158:25 176:21
177:22 178:1,6
**offense** 324:3
**offenses** 23:20
27:10,16 113:4
177:17
**offer** 234:6
**offhand** 39:25
**office** 14:24 16:2,8
16:22 21:17 22:2
22:9,17 23:9 26:7
28:1,24 29:4,7
30:1,3,14,21,24

31:2,7,7,9,15,16
31:20,20,23 32:5
32:15 33:13 34:1
34:4,6,15 35:11
36:22 39:17 41:18
41:21 43:6 45:8
46:5 47:5,14,22
49:11,13,13 50:5
50:10,11 51:11,24
58:9,20 59:6 60:5
62:21 65:25 70:12
70:20 71:3 73:16
73:19,23 74:7
75:8 76:22 77:4
77:16,22 79:2
81:23 89:17 91:3
91:6,9 92:15,20
94:8,15 97:23
99:6 101:8,21,25
104:17 105:8,22
108:16 110:9,12
110:24 111:9,17
111:21 112:8
113:6,10 114:20
115:16 116:5,6
117:7,20 118:1,4
121:6,20 122:8,12
129:6,7,16,18
132:11,14,17,23
133:4,11,18 134:1
136:13,24 138:5
139:15 143:14,21
144:17,18 145:12
145:18 149:19
151:24 152:8,16
153:10,23 156:3
156:14,16 157:2
157:12,15 161:1
162:5 166:14,17
170:8 171:1 175:7
175:23 176:3

178:11 179:1
180:20 181:10,13
182:1 183:14,18
184:7,12,16,22
185:12 186:24
189:19 192:24
193:13 194:7
196:12 199:21
201:22 205:7,22
206:16,25 207:5
208:6,19,20
209:11 210:17,25
211:1,6,14 212:21
213:7,21 214:10
216:2 217:23
218:19 220:12,19
221:22 222:1,14
222:19 223:7,21
224:14 225:19,25
235:2,7,9 236:9,15
236:24 237:6
238:24 239:13
240:2,12,22
242:20 243:3,15
243:22 244:23
245:1 246:23
247:6,11 249:1,3
252:6 253:8 254:7
254:11,11,16
256:12,15 257:22
259:16,18 260:10
260:24 261:11,21
263:15,17 269:4
270:12,15 271:24
272:13,18 274:9
276:17 278:19,23
279:8,19 280:4,15
281:14 282:20
283:18,22 284:2,7
286:23 287:13,15
287:23 288:13

290:7,21 291:7,12
291:15 293:12
294:15,21 295:6
298:17,19,21
301:14,16,22
302:3,22,23 303:2
304:3,4,5,18,19
305:11,23,25,25
306:12,15,19
310:17 314:7,14
315:3,5,7,21,25
316:2,6,10 318:16
319:5,19,25 320:5
320:8 321:7,9,9,21
325:13 330:7,21
330:25 331:3,7,23
332:1 333:6 334:7
337:10,15,16,21
339:18,23 340:3,6
340:7,11 342:2
346:1 350:6
**office's** 22:14 23:5
23:18 46:23 80:21
111:25 117:16
148:6 183:20
188:15 217:11
235:18 242:17
247:14 257:14
258:1 260:15
266:14 267:16
270:18 273:8
285:5,18
**officer** 63:16 94:4
94:6 95:16 127:17
129:6,12 197:9
232:24
**officers** 62:7 63:12
63:18,19,20 67:9
90:5 91:13 112:4
113:2 129:20
142:24 199:18

295:12 298:7
**offices** 133:21
210:21 307:17
**official** 124:24
352:15 353:21
**officials** 204:6,11
204:25
**offset** 180:9
286:21
**oh** 120:24 142:10
228:20
**ohio** 1:2,11,13,23
2:9,15 3:18 5:16
5:17 13:5 44:7
52:22 54:14 57:21
59:24 60:2 67:12
67:15 68:10,13,23
69:1,25 70:7
77:10 82:18
102:22 107:25
110:17 147:6
157:20 159:7,17
160:2,18 164:11
170:24 176:6
182:14 183:4
197:9 206:3
209:21 210:22
211:15,19 214:12
216:18 222:2,8
241:2 285:13
291:15 292:12
311:11 314:13
317:17 319:20
349:2,7 350:7,14
351:2
**okay** 15:20,21
26:6,25 31:14,23
32:3 36:2 38:25
40:18 45:22 50:15
59:25 65:18 69:5
69:6,20 72:10

73:2,11 74:3,11
76:5 80:2,8 82:3,7
82:24 83:3 84:25
85:13 86:11,23
87:24 92:6 95:17
95:21 96:9 97:8
99:9 100:7 101:24
102:7,24 111:23
112:2 116:12
117:25 126:15
127:3 139:8
153:20 155:25
163:21,24 167:1
187:15 192:5
195:19 198:6,9
201:5 213:12,17
215:21 218:5
239:19 245:13,20
246:13 247:1
248:1 249:11,13
251:11 253:17,23
255:17 256:4,10
260:4 262:11
264:21 265:23
266:25 273:7
274:7 276:9,14
286:9 289:8 291:3
300:15 301:9
303:8 313:2
330:22 334:8
337:11 338:14
347:7
**okun** 3:16 13:21
13:21
**old** 109:10 123:11
150:3 267:3
302:10 309:20,22
311:9 323:11
343:3,3
**older** 346:25 347:3

**oldest** 123:7
**oldfield** 293:21
**once** 25:24 26:6
27:4 36:12 119:14
119:16,19 120:7
122:3 154:12,22
209:20 240:18
315:13 327:17
**ones** 30:15 45:11
46:6 78:12 143:23
146:19 159:9
168:15,15 198:22
199:2 201:2
202:17 207:4
210:9 229:15,18
267:25 281:9
**ongoing** 105:11
198:25 217:14,22
218:12,22 220:15
320:20 327:21
**op** 1:15
**open** 150:18 291:9
345:2
**operated** 197:13
197:24
**operates** 108:21
**operating** 5:5,7,9
6:3,5 22:21 23:2,8
25:5,11,19 46:17
197:3 198:18
199:7,16 200:22
201:13,16,23
242:16 245:8
256:11 259:2
266:5,11 268:5,10
**operators** 202:21
203:24
**opiate** 1:6 5:19
13:4 20:21 43:24
81:10,17 101:8,10
101:12 102:2

138:1 149:22
151:2 156:20,21
156:23,25 179:19
190:5 192:18,18
221:8 294:20
295:4,22 302:7
303:19 305:13
314:5 316:7 332:7
337:19,19 340:14
351:6 352:3 353:3
**opiates** 18:2,7 44:1
101:11 137:5
154:4 229:23
230:8 282:10,16
283:4 284:21
308:11 342:8
**opinion** 85:11
103:21 148:5,21
148:25 150:12
157:19 166:2
178:5 227:9 230:6
231:8 239:22
308:6,15 312:19
341:24
**opinions** 160:8
228:24 229:1
**opioid** 18:8,9 19:2
19:7,15,18,21
20:23 43:18,21
53:12 76:2 77:5
77:12 101:5 130:6
135:11,12 148:7
150:9 152:9,13
161:25 165:14
167:16 181:22
182:15 191:22
192:5 194:9,24
195:9,12,20 208:2
208:8 210:25
212:13 222:11
227:3 229:24

230:9,19 231:4,9
231:17 232:17
235:15 252:1
254:15 259:8,24
260:18 262:25
272:23 278:19,24
280:5 281:24
283:24 289:1,22
290:21 291:13
301:11,18 303:3
304:3,12 306:14
308:16 312:7,14
314:9 323:5 325:9
325:15,16 326:6
326:23 327:24,24
329:4,20 331:15
331:18 332:21,23
333:6 334:19
340:22
**opioids** 18:10,14
18:15,20 19:9,24
21:2 24:22,25
29:23 30:5,7 44:1
44:2,3 61:20
73:12 74:4,7 75:7
75:12,16 76:10,25
100:13 136:9,16
136:20 137:8
153:4,12 157:12
157:15 161:25
162:2 164:13,18
164:22 165:3,8
167:13 169:10
185:13,17 186:1,7
187:5,16 192:12
192:23 194:6,10
206:10,22 207:3
208:16,23 211:13
211:25 213:9,10
213:15 217:4
220:20 221:17,24

222:3,21 223:9,24
224:15 225:2,10
226:12 228:23
229:3,9 230:18
231:11 236:9,15
236:25 238:8
257:23 258:3
259:3 260:20
261:4 279:20
281:15,19 284:16
294:12 300:21
307:21 312:1,16
312:21 313:3,25
317:25 320:10,17
321:4 324:12
327:5,5 329:9
340:11 341:4,20
342:3
**opportunities**
102:4 160:22
**opportunity** 85:12
152:23 168:19
179:13 233:5,7
**opposed** 36:19
44:25 280:25
**opted** 108:3
**opting** 37:4
**option** 241:1
**order** 6:8 24:1
26:18 72:7 102:5
106:18 156:19
179:3 207:17
210:14 212:17
241:15 255:25
262:8 277:24
278:6,11 286:11
300:19 301:10
**ordinarily** 241:17
**ordinary** 21:9
240:21

**org** 277:9
**organization**
277:5
**organized** 191:1,3
191:6 330:24
336:16
**oriana** 108:21,21
109:14,15 158:12
**original** 134:6
**originally** 94:25
209:22 293:17
**originated** 170:3
**otterman** 164:2
171:7 185:2
**outcome** 98:1
214:20
**outline** 106:24
**outside** 42:9,18,24
111:15 196:21
200:25 201:6
294:9 305:16
**outstanding** 267:4
**outweigh** 88:17
**overall** 178:2,6
272:25 273:3
**overbooked**
305:19
**overdose** 5:17,19
43:25 51:8,13
52:10 59:11 67:1
67:8 68:13,25
69:24 76:24 80:23
81:10,18,25 85:16
85:17 86:7,25
87:14 88:1 89:18
100:15 101:15
102:12 103:1,14
103:22 141:3,9,13
142:8 145:20
149:2 151:4,9,11
152:9,14 157:1

164:22 165:2,9
194:2,6 222:20
223:3,13 335:24
336:13 338:4
339:10
**overdosed** 155:14
155:16 156:2,9
164:18 166:5
223:18 342:18
343:1
**overdoses** 28:18
52:12 55:16 64:21
65:3 83:11 97:15
101:7 168:11
223:6
**overdosing** 153:4
153:12 154:4
155:20,21 166:4
**overprescribing**
211:13,25
**overrule** 242:1
244:24
**overruled** 241:23
**overseas** 229:20
**oversee** 247:24
**overseeing** 32:20
137:18
**oversees** 297:12
**overtime** 145:8,9
249:19,20 250:7
250:13,18,25
251:6,9,24 252:1
252:12,13,14,15
253:3,6,14,15
297:21 298:2,5,8
298:14,20,22,23
298:23,24
**oxycodone** 19:4
141:17 162:14
**oxycontin** 19:3
162:14 165:24

[oxycontin - people]

167:1 170:23
172:6,10,13,16,18
227:19 228:21

**p**

**p** 2:19 3:7 95:12
**p.m.** 90:1 347:19
**padukone** 3:7
13:23,23
**page** 6:7 23:14,17
25:18,20 27:3
54:1 82:4,5 84:11
84:12 93:11,13
100:1,5,6,19,20,21
122:6 150:18
153:21 154:1
155:18 156:17
245:10 247:2
248:3,20 249:12
252:4 253:12
254:1 256:17
263:5 265:11,12
266:13 268:11
270:16,17,17,18
271:18,20 277:13
277:22 299:1,4,7,8
299:10,11,16,18
323:1 337:5
338:12 351:13,15
353:7 354:3
**pages** 100:4
247:23 322:10,14
323:14
**paid** 145:8 284:12
338:18 339:5
**pain** 43:25 162:18
169:4 172:5 188:8
196:11 205:8,10
205:13 313:10,16
313:19,19,22
318:12

**painkiller** 53:13
**paper** 84:24 114:2
150:18
**papers** 276:8
**par** 2:11,12
**paragraph** 40:15
40:19 41:6 44:5
44:21 45:2 51:17
54:1 59:9 69:4,10
100:2,11 172:9
338:15
**paragraphs** 57:22
68:22 280:20
**paralegals** 250:1
**parameters** 48:25
49:1 61:11 102:3
305:15 341:22
**parents** 149:25
237:16,19 265:2
301:23
**parking** 164:5
**part** 36:21 64:24
65:1 66:15 85:21
98:8 111:3,12
112:5 129:8
134:20 146:13
150:15 172:24
200:9 230:21
234:10 247:21
276:23 277:9
313:1 334:24
338:19 340:17
353:9
**partial** 116:1
**participate** 108:3
111:4 160:17,25
316:10 341:14
**participated**
294:16 315:25
319:19,21

**participates** 293:7
293:11
**participating**
160:24
**participation**
161:2,7
**particular** 29:6,8
32:14,20 34:19
46:6 47:22 48:18
53:4 76:19 77:12
78:24 79:1 88:5
107:1 113:14
115:2 117:16
118:5 138:4,5
141:13 182:15,16
189:15 215:10
233:11 253:4
258:2 261:17
278:25 309:7
312:14 323:15
324:6
**particularly**
125:21 172:7
**partner** 180:5
213:21 214:13
308:12
**partners** 24:6
310:10,24
**partnership** 214:5
**parts** 200:11
**party** 318:23
350:2
**pass** 100:1 103:4,8
179:16 189:13
335:17
**passed** 127:9
134:19 147:12
235:23 265:5
**pat** 200:14
**patch** 53:21

**pathologist** 305:18
**patient** 186:2
193:11
**patients** 188:9,10
214:17 215:8,8
311:12 314:1
**patrick** 185:4
**patrol** 160:19
**pay** 59:13 191:14
201:2 245:25
247:19 255:13
306:1 343:5
**payers** 318:24
**paying** 196:6
**payroll** 125:22
250:22 253:2,2
276:20
**pays** 172:16
**peacock** 91:10
**pellegrino** 1:25
349:6 350:13
**penalties** 323:25
324:2
**penalty** 149:15
**pendency** 153:5
153:13 154:5
155:17 156:9
**pending** 49:5
78:12,12 126:5
155:10 156:3
261:3 306:25
**pennsylvania** 3:13
**people** 46:20 83:7
83:21 86:18
102:19 104:5
147:11 149:7
150:21 158:12
160:13,17 167:10
168:14 170:17,18
177:18 183:13
188:23,24 189:3

190:1 194:2
205:25 207:19
210:5 215:15
221:17 227:17,18
227:24 229:20,21
230:17 231:5,5
234:14,19,20
238:10 248:16,24
252:12 267:7
301:25 304:22
307:7 309:14,24
310:5 311:10
313:10,18 334:14
335:20 336:12
342:6
**people's** 125:22
150:19
**perceived** 301:17
**percent** 40:20 41:7
86:18 112:17
113:9 179:9
247:25,25 259:17
259:20,22 260:2
260:15,17 262:1
262:12,15,19,24
272:6,7 286:7
312:2,5
**percentage** 86:11
86:22 113:12
152:22 170:7
185:25 236:1
250:13 251:25
255:25 259:2,23
260:19 272:3,21
294:1,10
**percentages**
279:23
**percocet** 150:4
343:17,20,24
**percocets** 141:17
344:11,14,15

**perfect** 85:21
177:5
**performance**
265:12
**performing**
214:16
**period** 35:20
36:18 37:3 62:12
62:19 146:6
152:21 179:22
197:23 205:19
267:9 346:20
**permit** 54:17
**permits** 278:12
**permitted** 150:17
182:3 215:11
218:25 219:2
235:2 293:8 302:1
**person** 44:9 61:15
61:16 86:13 87:23
105:17,17 119:15
128:24 129:16
132:8 166:4 175:3
181:8 189:24,25
190:19 194:8
195:3,4 196:3
207:21,22 210:15
216:16,17 223:12
232:2 233:5,25
234:14,25 236:2
303:6 304:6,6
313:15 326:11
**person's** 86:8
314:23
**personal** 125:2
188:17 189:4
228:19,22 230:5
261:13 312:6
**personally** 102:14
175:5 206:23
352:11 353:15

**pertinent** 139:20
**pete** 267:1
**peter** 157:24
**pharma** 1:10,12
1:13
**pharmaceutical**
2:12 68:5 185:7
187:10 207:13
226:1 236:19
239:6 310:18
311:5 318:3,15,19
318:20
**pharmaceuticals**
2:11,11 187:16
238:14 311:8
**pharmacies** 67:21
67:23 183:10
186:20 209:11,16
210:1 226:2
229:13 317:7,8
**pharmacist**
163:14 209:18,21
221:16 224:6
316:17,23 319:1
**pharmacists**
163:11 210:1
221:23 222:3,10
222:14,22 223:16
223:22 224:5
230:7
**pharmacological**
172:9
**pharmacy** 77:10
107:25 166:1
168:1 183:9
184:14 186:19
197:9 199:5
200:15,19 201:19
204:12,21 205:1
206:9 208:11
209:14,14,24

210:12 212:19
216:10,15 222:2,8
223:15 229:7,21
236:16 238:10,19
238:21 311:25
316:25 317:1,15
317:24 318:7,24
320:9 343:25
**pharmacy's** 203:1
**philadelphia** 3:13
**phone** 129:25
130:3,9,13 131:10
131:23 170:12
301:24 302:23
303:7 351:3
**phones** 141:22
146:8
**photo** 344:8
**photograph** 344:7
**phrase** 299:25
**physical** 114:8
325:20
**physician** 201:14
210:18 211:18
**physicians** 201:14
210:24 211:5
**pick** 112:6
**picture** 344:9
**piece** 114:2
**pile** 146:15
**pill** 64:11 195:20
195:25 196:11
197:2,12,23 198:6
198:13,15,18
199:6,16,21 200:7
200:22 201:13,15
201:23 202:3,9,11
202:21 203:1,9,14
203:25 204:12
205:6,24 206:4
320:13

**pills** 61:23 62:13
63:4,23 64:7,20
65:6,22 66:25
67:8,10,11 150:4
189:12,20 195:10
196:2 210:21
225:20 231:25
232:3 238:21
301:2
**place** 13:5 91:16
136:5 173:4
237:23 285:20
300:6 343:10
349:19
**placed** 155:12
**places** 300:25
311:17 324:21
**plaintiff** 345:22
**plaintiffs** 278:10
347:14
**plan** 331:9 338:19
**play** 42:1 87:3
142:19 168:8
169:17 311:5
**plea** 48:5 202:7
**plead** 84:23
**pleas** 78:4,9,14,17
109:25 157:25
178:15 180:19
240:16 280:9
293:5,19
**pleasant** 2:4
**please** 13:6 14:18
38:24 104:9
111:24 329:20
351:11,11
**pled** 84:25
**plus** 248:22
264:13,14
**point** 2:8 21:1
34:17 40:25 46:13

49:15 55:15,17
71:14 108:3 109:9
110:1 111:21
112:14 120:3
134:19,21,23
178:21 179:2
185:20 206:2
260:1,1,7 278:11
291:6 292:25
293:4,12,16,21
314:5 325:13
326:6 327:1 331:7
333:21
**pointed** 339:3
**points** 113:12
**police** 54:11 90:3
112:6 116:21
117:3,11 126:2
141:22 142:24
143:18 169:1,12
175:13 185:5
186:17 190:16
192:15 197:9
221:11 223:14,17
231:24 232:4,24
298:7
**policies** 104:18
105:22 106:24
107:16,21 235:12
235:17
**policy** 53:5 84:7
104:20 122:8,12
122:18,22 135:21
136:18 150:8
174:8,9,10,11
325:14
**politicians** 104:1
148:4,5
**polster** 1:8
**pool** 72:8

**poorer** 190:9
**pop** 190:7
**population** 101:10
156:24 172:12
178:3,7 307:23
**populous** 101:2
**portage** 162:16
**porter** 3:16 13:21
**porterwright.com**
3:19
**portion** 48:15 83:4
106:9 238:9 248:6
249:3,22,25 250:6
251:6 256:2 264:6
264:14,15 282:19
285:23 286:2
287:8 303:18
**pose** 20:3,6
**posed** 21:2
**poses** 17:22,23
**posing** 20:17
**position** 31:24
122:20 247:17,21
248:8 277:6 295:9
346:17
**positions** 248:10
**positive** 338:3
339:8
**possess** 193:6
**possessed** 43:4
207:22 313:7
**possessing** 162:14
224:12 232:9
233:6 262:7
**possession** 41:15
42:14 44:18,22,25
47:11 61:8 71:4
73:9 74:6 192:22
238:24 262:16
280:22,24 281:1,1
283:5 302:19

323:17,21 329:5
**possible** 61:11
83:14 115:7
222:17,18 320:25
321:1
**possibly** 250:11
**post** 150:2 167:21
167:21 168:25
169:14
**postage** 46:16
**postdates** 93:5
**posting** 344:4
**potent** 53:16 54:3
54:8,23 83:14
**potential** 52:19
96:16 116:19
143:14
**potentially** 5:13
57:3,12 103:14
108:11 184:16
321:3
**potter** 181:9
**powerpoint** 5:20
80:25 81:12,17
**practice** 80:21
82:11,15 122:7,13
122:25 151:21
215:12 217:11
309:2
**practices** 235:18
235:20
**pratt** 2:19
**pre** 152:7 156:19
157:4 168:24
**prediction** 270:6
**preliminarily**
202:16
**preliminary**
111:19 335:7
337:4

**preparation** 39:8
127:19
**prepare** 80:25
117:20 118:1,3
139:25
**prepared** 92:9
118:4 270:2,4
279:9
**prepares** 126:8
**prescribe** 203:4
219:5 231:11
**prescribed** 43:25
44:3 53:13 162:20
163:6 165:9
166:21 183:9
185:13 186:1,2
187:25 192:3
193:8,11 194:3
229:4 313:4
**prescribing** 196:2
205:13 220:20
229:23
**prescription** 1:6
13:4 18:12,15
21:22 24:22 29:23
30:4,7 31:3 43:18
61:20 67:24 69:15
73:11 74:4,7 75:7
75:12,16 76:1,10
76:25 107:23
137:8 162:2,9
164:8,12,18,22
165:3,8,14,25
166:21 168:16
169:10 170:3,9
172:5 186:6 187:4
187:10,16,22
190:2,12,15,17,18
190:23,24 191:16
192:12,23,24
193:7,20 194:2,6,9

194:10,24 195:20
196:7 206:10,22
207:2,9,17,22,23
207:25 208:2,7,16
208:23 210:3
212:12 213:9,10
213:11,15,19
216:6 217:4
221:24 222:21
223:9,24 224:13
224:19 225:2,10
226:2,12 228:12
228:16 230:18
231:4 232:1,17
233:11 236:9,15
238:8,17,25
239:12,13 259:3
260:19 261:4
279:20 281:15,19
284:16 294:12
300:21 301:11
308:23 309:6,11
309:15 310:3
311:12 313:3,5,25
320:9,17 324:11
327:5 329:9 341:4
351:6 352:3 353:3
**prescriptions**
167:17,25 172:17
181:23 182:15
192:2,4 205:8,11
208:8 209:13,19
210:11,19 212:13
222:11 231:1
**presence** 59:21
75:11 349:14
**present** 3:20 17:7
22:12 60:1 63:22
73:20,24 90:25
91:14 92:1 141:5
205:22 268:23

271:9,10,24 273:8
296:13,15 342:2
**presentation** 5:20
80:17,20 81:1,12
81:17,19,22 82:8
83:1 84:12 89:12
111:22 112:13
216:11 273:19
**presentations**
291:23,24
**presented** 33:2
111:10 143:21
198:15 206:13,16
244:7 291:15,19
291:21
**presenting** 320:21
**preserve** 147:24
148:1 297:7,14,21
**press** 128:4 216:11
216:16
**presuming** 136:4
139:6 211:16
212:14
**pretrial** 152:18
155:23 167:18,20
212:17,18
**pretrials** 280:10
280:11
**pretty** 107:3
160:20
**prevalent** 36:3
225:1
**prevent** 66:16,20
176:19 336:12
**previously** 20:2
37:4 40:24 58:7
109:9 210:10
220:23 277:2,3
278:15 291:8
**prey** 101:1

**price** 37:16,24
172:18
**priced** 172:15
**primarily** 42:24
106:8 128:24
191:20 254:3
303:4 329:18
**primary** 42:5,7
43:10 67:18,20
**print** 85:12
**prior** 44:1 50:17
82:5 105:13
122:20 124:3,7
136:13 145:20
167:8 183:23
184:4 216:19
217:8 218:3
221:21 240:23
265:24 269:18
284:6,11 296:24
298:14 311:20
320:7 331:7
340:20
**priorities** 22:14,17
**prioritize** 221:11
**priority** 28:13,16
29:4 306:16,19
**prison** 82:19,23
157:20 158:2,16
158:25 159:4,8,10
159:10 160:2,12
160:14 161:6
176:21 177:1
178:7
**prisons** 158:9
160:18
**privacy** 166:10
182:6
**proactive** 150:20
**probably** 21:4,5
36:16,23 47:16

48:24 80:7 91:22
123:9 155:6,7,22
162:4 175:25
178:13 183:25
191:4 196:25
197:20 200:9
212:3 213:23
237:14,15,21
244:2,17 252:3
259:11,16,25
260:1,2,5 344:6
**probation** 152:18
155:23 169:13
**problem** 16:17,20
16:23 17:2,5,10,16
17:23,24 20:3,6,17
21:3 29:15,16
35:12 44:7 84:5
100:14 101:5
148:7,11 150:9,14
158:16,17 162:3
164:13 167:7,16
169:3 172:6 206:4
226:11 227:4
229:24 230:9
231:9,17 307:3
308:7,16 310:7
312:11,15,18
313:1
**problematic** 103:6
185:20 222:4
**problems** 21:13,20
55:1 85:20 104:2
104:3 120:5,6
158:23 160:5
163:8 204:19
230:19 301:18
303:3 304:3
**procedure** 14:8
348:7 352:5 353:5

**procedures** 104:18
104:21 107:17
**proceed** 219:22
221:6
**proceedings**
264:22
**process** 22:5 95:22
96:15 110:5,7
112:1 113:17,25
137:18 140:4
178:12 240:22
242:4 280:3
315:13
**produce** 35:14
137:3,6,13 139:25
312:21 345:23
346:6,19 347:2,10
**produced** 68:4
69:14 70:4 104:22
104:25 105:13,16
123:14 136:24
137:5,10 163:24
181:17 322:8
341:8 345:5
346:14
**producing** 312:17
**production** 130:9
339:21 341:12,15
346:18 347:6
351:15,17,22
**program** 23:17
25:20 26:4 27:4
27:12 28:2,25
49:12 108:1,6,9,11
108:21 109:9,20
109:20,22 110:1
110:25 111:4,6,16
111:24 156:22
267:5 287:16
289:2,22 292:25
293:1,4,6,9,12,16

293:21,23,24
294:3,8,11 315:22
326:3 339:17
**program's** 25:25
**programs** 152:25
158:11,17 159:23
160:18 161:3,8
177:8 286:12
294:4 339:14
**project** 99:25
280:12
**projects** 251:1
**promised** 328:10
**proof** 163:9 220:2
**proper** 85:7
**properly** 148:10
**property** 177:17
262:13
**proportion** 47:6
261:16 273:9
**proposal** 46:20
99:8 240:13
**proposals** 22:11
180:19 181:11
243:3 292:15
**proposed** 156:16
305:11
**proposing** 240:24
**prosecute** 23:25
30:20 32:4,8,11
35:7 41:24 107:13
107:18 141:2
144:8 146:7
147:13 158:6
166:3 191:8
192:25 193:13,19
198:7 202:12,12
202:21 203:9,24
219:10
**prosecuted** 30:6
30:14,16,22,25

31:3 33:12,17,18
34:14 41:17 44:25
47:11,14 51:16,18
52:4 70:12,21
71:1,3 73:20,24
74:7,18 75:9,25
76:22,23 77:4,16
94:19 142:9 144:6
163:25 164:14
188:12 198:9
199:21 205:12
206:12,14,17,18
206:20,23 208:13
208:15,20 209:11
210:25 211:13
213:7 214:15
216:5 220:13,19
222:15 224:14
225:9,19,25
254:15 272:13,17
280:15,24 283:6,8
340:11 341:19
342:2
**prosecutes** 43:6
**prosecuting** 19:25
26:11,12 31:8,10
31:16 34:1,6
35:23 41:21 43:8
51:7,12,24 52:1,8
77:18 80:17,21
87:25 89:8 187:21
217:10 226:4
246:8,9 248:3
249:4 263:15
291:15,22 292:12
**prosecution** 28:12
49:9 78:6 107:3
107:10 108:24
117:20,23 118:5
138:4 142:12
156:21 187:9

202:9 207:3
213:14 214:13
216:3 219:21
224:11
**prosecutions** 5:20
45:3,12 74:6
81:11,18 116:19
121:22 202:3
205:20 207:2
239:12 250:2
258:17,19,20,22
264:23,25 283:2
291:11 342:10
**prosecutor** 16:7
16:15 17:4 22:16
25:20 27:2 31:12
31:25 33:19 38:22
39:3,16 43:8
49:23 50:1 59:15
66:16,21 79:2,9
83:19,23 86:16
88:20 91:25 92:24
96:10 99:17
112:12 113:13
118:19 119:1,4
120:1,5 137:16,20
145:2 161:5 166:2
176:18 180:9
203:21 212:16
213:24,24 245:21
246:18,20 248:15
256:11 261:9,10
261:21 263:12,13
263:13,21 264:12
275:9,20 277:14
288:11 292:24
293:11,24 295:2
303:5 306:21
327:15 331:25
340:24

**prosecutor's** 14:24
16:2 21:17 23:9
33:13 34:1,15
36:22 49:12 50:5
58:9 59:6 60:5
62:21 65:25 93:14
94:13 101:8
109:13,19 110:24
111:17 121:5,20
136:13 144:18
151:24 152:16
153:9 162:5 171:1
189:19 247:6,10
257:14,22 272:18
276:17 278:19
291:7 301:15
333:6 339:18
346:1
**prosecutorial**
175:20
**prosecutors** 26:13
50:8 78:23 79:4,6
79:7,13,15,16,18
79:23 80:3,9,13
86:2 91:1,4 93:12
93:20 102:1 105:8
106:13,15 110:22
110:23 111:6
113:20 126:9
127:18 144:25
145:3,8,14 147:9
174:18 178:17
179:23 206:24
214:4,17 215:5
237:8,10 240:10
240:17 241:12
245:24 249:7,7,23
260:25 261:2,6,15
261:22 263:3,6,14
263:18,23,25
264:2,4 265:6,8

271:7,12,14,15
274:12,24 275:4
275:12,19,22
276:15 277:15,16
284:8,12,20
285:22 286:1
287:2,7,11 290:4
293:13 294:2
295:17 298:22
305:12 306:13,22
306:24 307:4,6,16
315:4,16 327:13
329:3,12,14,16
**prospective** 96:22
97:4,20 117:4
**protect** 160:13
221:12
**protected** 83:22
182:10
**protection** 158:8
159:16 237:14
265:6 287:3
**protective** 6:8
277:24 278:6,11
**prove** 76:17 84:24
86:21 87:8,13
88:14,16,20 89:1
113:5
**provide** 102:18
117:5 286:3 289:1
**provided** 14:7
98:5 139:1,11,20
139:21 142:3
148:9 174:17,19
181:21 212:2
249:23 250:1
279:10 280:19
287:15 291:16
301:13 336:15
**provider** 210:18

**providers** 210:24
319:10
**provides** 247:2
**providing** 103:11
148:18 160:3
**province** 234:10
234:11
**provisions** 218:24
**proximate** 84:20
85:16 86:7
**public** 2:14 58:21
105:24 106:1
116:2 149:6,19
150:11 217:16
282:15,15 310:1
338:18 349:6
350:13 352:10,18
353:15,23 354:23
**publication** 39:7
**publicly** 217:7
**published** 69:1
**pull** 46:14 48:20
48:22 73:9 107:9
250:16 307:12
**pulled** 115:10
**pulling** 306:21
**pulls** 48:21
**punishable** 82:19
82:21
**punishment** 158:3
158:7 159:11,15
**purchase** 65:10
**purchased** 299:13
**purdue** 1:10,11,13
**pure** 334:23
**purer** 40:20 41:7
**purity** 38:8,11
41:3
**purpose** 130:13
133:19 208:3,9
229:24 244:4

326:22
**purposes** 22:23
25:7,13 38:17
57:7 68:16 81:14
98:23 124:25
135:13 171:14
187:12 195:21
233:23 266:7
268:7 277:25
289:15 296:4
322:3 328:18
330:14 336:24
**pursuant** 313:5
348:3,6
**pushed** 153:19
**put** 15:11 48:10
85:7 113:21 147:2
150:2 158:16
256:2 258:10
261:11 275:3
286:6 304:8,22
345:17 346:10
**putting** 160:13
223:10 227:24
307:4 310:5 329:3

**q**

**quadrupled** 44:23
280:23
**qualified** 290:6
349:8
**quality** 142:6
**quantify** 60:10
155:1 189:9
224:20 225:23
**quantity** 142:7
**quasi** 265:7
**quest** 233:3
**question** 15:19,22
28:23 38:25 40:5
60:18 84:10 86:5
99:3 122:12

133:10 136:11
150:7 185:24
189:7 219:24
220:2,5 236:6
238:11 249:19
250:21 251:21
297:13 330:23,25
334:16 337:5,11
**questionable**
112:20
**questions** 15:18
63:17 77:15 81:5
110:2 187:6
238:17 239:18
274:8 325:6
344:24 345:7
347:15
**quick** 53:22
**quickly** 73:4 308:7
308:16 328:21
**quite** 121:1 146:11
196:17

**r**

**r** 3:11 14:22 95:12
300:3
**rae** 3:3 13:25
14:15
**raise** 29:7 179:9
**raised** 215:4
**raises** 346:22
**raising** 302:14
**range** 261:20,22
**ranged** 290:12
**rank** 20:16,24,25
21:12,21
**ranking** 21:24
**rate** 53:9 159:17
159:19 176:6,8,11
176:15 177:9,12
231:16 339:10

**rationales** 180:18
**reach** 189:21
224:9 311:17
333:11,19
**reaches** 288:9
**reaching** 152:4
189:13
**reactive** 177:6
**read** 24:3,9 39:19
44:9 58:3,4 69:17
82:25 83:3 155:20
156:18 171:25
172:21 281:7
296:10 310:9
331:9 352:5,6,12
353:5,6,17
**reading** 38:24
69:3 337:3 351:19
**reads** 100:12
323:2 338:16
**ready** 199:1
**real** 165:25 170:17
170:18,18
**realistic** 180:11
**realize** 59:14
**realizing** 146:24
**really** 59:8 120:2
144:23 195:21
**reason** 28:6 29:6
37:14 59:18,25
69:20 75:23 78:8
88:25 149:14
155:12 165:19
182:12 202:18
208:6 266:20
269:23 327:14
342:14 346:24
351:14 353:8
354:3
**reasonable** 76:18

**reasons** 88:13
97:21 101:12
102:10 159:11
**recall** 28:5 30:17
33:14,22,24 56:17
56:19 62:13 63:7
64:1,4 77:6,8
80:16 127:13
130:7 131:16
134:7,20 138:8,15
165:1 191:17,18
199:12 200:20,21
201:6 202:8,11
220:10 222:12
242:14 278:21
279:6 289:24
330:6 337:12,14
342:20
**receipt** 327:15
351:18
**receive** 22:7 42:9
42:17 49:16
107:24 116:18,21
116:23,25 120:5
121:13 125:8,16
125:21 126:1,2,4
126:16,18,23
127:1,3,7,15,24
128:2,2,7,10 130:2
131:13 133:21
134:3 157:8
252:15 253:14
285:8,9 286:23
287:13,23 288:19
295:17 296:17
301:24 303:9,10
303:16,17
**received** 33:8
101:22,25 106:3
123:24 128:11
129:19 131:16,22

132:2 134:9,14
136:6 160:1
179:21 195:4
226:14 228:11
239:5 253:3 256:6
270:15 296:16
301:16 302:23,24
303:12 318:20
319:9 328:12
331:11 333:10
337:8 339:13
341:17 345:11
**receives**  49:19
288:14
**receiving**  136:14
140:23 159:24
179:20 270:12
289:24 301:1
**receptionist**
252:18
**recess**  104:13
173:9 238:2 274:3
321:16 324:23
**recidivating** 178:2
**recidivism**  159:17
159:19 176:6,7,15
177:9,12,22 178:6
**recognize**  23:1
**recollection**  40:2
41:3 51:23 56:22
131:24,25 197:16
197:19 199:20
243:25 274:22
275:11 290:20
330:20
**recommendation**
96:3
**record**  13:2,7
14:19 81:6 104:9
104:11,15 119:11
155:12 173:6

174:1 217:16
237:25 238:3
253:7 273:25
274:1,4 305:6
321:13,14,17
324:22,24 347:16
353:9
**records**  50:2,5
108:16,19 113:16
116:2 117:9
133:24 135:15,22
137:11 181:14
239:4 250:20,22
250:24 253:2
254:15 261:7
**recover**  124:16
138:25 139:13,14
175:22
**recovering**  139:4
**recovery**  83:10
152:24
**reduce**  106:20
149:6
**reduced**  46:19
151:1 160:22
178:22 275:2
349:13
**reduction**  83:10
150:16,22,24
**reed**  3:11
**reedsmith.com**
3:14
**refer**  26:9 43:20
108:8 151:5 253:7
266:12 268:11
284:21 305:5
324:17
**reference**  326:5
329:8 351:7 352:2
353:2

**referenced**  345:4
349:13,17 352:11
353:15
**referencing**  323:4
**referred**  26:7
82:25 91:3 143:13
143:17 198:10
208:13 209:25
253:25 254:4
289:21
**referring**  27:7,12
30:1 74:21 75:20
93:11 100:15
117:23 119:20
133:2 136:12
142:6 169:19
194:21 228:10
252:21 255:21
265:11 267:11
276:10
**refers**  24:17 43:13
54:1 297:19,20
299:7,7,9,10,12
**reflect**  242:17
**reflected**  272:3
**reform**  292:10
**refresh**  40:1 41:3
**refreshes**  330:20
**refrigerated**  55:18
**regarding**  36:13
58:15 77:11 118:5
121:21 124:6
128:1 129:2,20
131:3,10,17,23
138:20 140:17
151:4 174:23
175:13 176:25
210:1 214:4
216:25 217:24
221:24 222:10
224:14 232:11

235:19 242:4
243:17 244:16
289:19 310:11
320:13,16 321:4
339:16 348:2,11
**regardless**  85:8
**regards**  235:13
**registered**  206:9
229:7
**regular**  63:13
244:5
**regularly**  125:8,16
**regulate**  202:20
203:9,14,24
**rehabilitate**
158:12 159:12
**rehabilitated**
159:15
**rehabilitating**
157:20
**rehabilitation**
158:4 292:22
**reimbursement**
286:24
**reinstituted**  257:6
**relate**  48:15 130:5
130:15 136:2
257:22 291:13
**related**  16:13 18:2
18:6 20:21,23
21:8 46:7 48:22
55:23 61:3 66:3
71:11,11 76:24
88:1 93:13,14
110:23 115:17
123:20,21 125:9
126:1,6,12,15,19
126:22,24 127:4,8
127:16 129:5
132:6 133:9,12
135:11 136:7,9,15

137:22 138:1,2,12
138:13,17,18
140:9,18,23
157:12,14 167:13
175:12 190:5
202:3 210:25
213:8,14,19 221:8
237:20 252:11
259:3,8,19,23,24
260:18 262:2,5,14
264:24 273:14
278:19,24 279:19
281:9,15,18 282:4
282:25 283:3,13
290:21 302:7
303:18 304:3
314:9 317:25
323:5 326:6,18
**relates**  1:8 260:16
**relating**  18:11
55:21 60:22,24
70:25 74:1,15
126:3 136:20
137:4 151:2 203:3
207:24 224:18
283:2 301:10
302:24 310:3
**relation**  300:20,21
301:5
**relationship**
218:14
**relative**  47:22
53:16 178:2 303:2
350:2
**relatively**  122:11
122:17
**relays**  84:12
**release**  5:13,16
53:21 57:2,10
58:7,19,21 68:11
68:24 128:14

155:23 160:23
171:4 176:21
216:12,16
**released**  167:2
176:25
**releases**  58:18
127:24 128:4,8,25
**relevant**  76:1
133:24 135:16,22
139:25 345:6,24
346:6
**relied**  168:24
**relies**  169:21
**reliever**  172:6
**rely**  107:16 317:5
345:6
**remained**  275:13
**remaining**  248:6
**remanded**  259:13
**remember**  121:13
134:1 198:23
209:23 216:9
344:3
**reminder**  134:2
**remove**  265:1
**rendon**  2:13 4:9
13:13,13 325:2,4
344:23 345:10,21
346:21 347:12
**renee**  1:25 349:6
350:13
**renting**  112:22
**reoffend**  176:22
**reoffends**  177:1,10
**repeat**  17:13 40:5
51:10 96:24
149:13 153:7
269:2
**rephrase**  15:20
17:13 28:23 59:3
110:11 121:4

**replaced**  35:13,14
46:12 48:8
**replacement**  35:18
**replacing**  282:18
**replenishing**  83:9
**report**  40:6 47:18
76:16 87:20
115:23 116:1
117:11,12 126:4
127:20,22 141:15
166:8,14,16 172:1
218:7 225:5,8
250:25 251:3
261:16 269:17
300:9 301:10
316:18 317:2,7,16
317:22,23 318:2
321:6
**reported**  48:2
269:24 270:13
318:13,14 334:18
**reporter**  4:15
352:7
**reporter's**  4:13
338:24 349:1
**reporters**  255:7
**reporting**  83:11
**reports**  68:3 69:13
70:3 75:18,19,24
76:5 77:9 112:6
115:25 116:4,21
116:22 117:3,10
117:10 125:7
126:2 167:20,22
168:25 169:2,12
169:12,13,15
175:14 185:3
226:23 239:4
243:2 300:19
301:4,13 317:12
317:13,20 318:10

339:13
**represent**  14:17
325:4
**representation**
287:15
**representatives**
243:15 334:13
**represented**  84:19
**representing**
13:20
**request**  107:25
178:11 181:4,5,7
212:24 213:1
243:4 331:9 340:4
341:9,23 345:19
346:19 353:9,11
**requested**  104:24
105:25 129:8
164:2 174:20
180:22 181:20
242:2 283:22
292:8 308:14
348:1,6,10
**requesting**  156:14
**requests**  181:2,11
181:15 243:3
**required**  96:5
118:9 211:17,20
255:25 261:7,15
286:6 287:7
317:21 351:25
**requires**  277:1
318:5
**resale**  188:17
**research**  39:17
40:7 154:19 170:6
**resell**  188:2
**reselling**  189:11
**residents**  181:24
320:10

**resolution** 145:15
212:1 218:3
**resolve** 118:23
**resolved** 48:5 49:4
112:18 202:5
214:24 218:1
265:18,19
**resolving** 106:23
**resources** 40:10
79:20 120:13
141:12 142:16
143:11 144:18,20
148:11,19 152:2
152:10 157:5
158:22 160:11
161:21 177:2,5
178:10,11 180:11
180:14,20 221:1
221:13 237:4
245:3 287:24
304:15,17 305:1,1
306:1 345:18
**respect** 48:14
110:6,8 203:1
255:18 330:1
337:23 347:5
**respective** 100:25
**respond** 120:10
131:14 166:17
259:7
**responded** 308:21
331:14 332:7
**response** 103:17
301:17 304:12
341:8
**responsibilities**
16:5
**responsibility**
86:12 287:20
**responsible** 83:25
87:14 194:14,17

207:12,19,20
234:2 245:5 312:7
319:25 327:9
**responsive** 346:19
**rest** 183:5 206:24
**restricted** 285:14
**restrictions**
212:11 217:17
288:23
**result** 53:23 68:3
69:14 78:2 339:9
346:12
**resulted** 103:22
204:20 282:17
**results** 27:17
164:15 298:11
**retained** 4:15
**retention** 119:11
119:11 120:19,22
124:12,13 135:21
136:17 138:9,10
138:16,19 174:8
174:10 242:19,20
**retired** 197:8
**retract** 44:1
**retrieve** 279:15
**return** 112:23
196:5 202:18
301:25
**returned** 257:10
351:18
**returns** 305:25
**reveal** 216:19
**revenue** 257:2
**reversed** 83:12
**reverses** 43:24
**revert** 298:25
**review** 22:6 46:4
47:12 49:22 72:7
96:9,11 111:21,25
112:15 113:17,25

115:7 132:23
139:25 143:5
197:11 259:11
290:5,5 292:9
322:16 348:2,6
351:12 352:1
353:1
**reviewed** 28:10
40:24,25 58:8
111:9 115:18
130:21 132:3
133:10,17 260:6
301:4,9 337:14
**reviewing** 93:20
132:19 169:25
170:1
**revised** 48:19
108:7 211:20
285:13
**revoke** 204:7
212:22 214:23
**rice** 2:2 13:9,12
**richard** 51:20
**right** 24:22 43:21
65:10 71:18,22
74:13 82:11 88:2
88:15 97:2 100:5
106:15 107:20
110:16 113:21
124:4 126:24
132:3 145:3
153:18 158:25
159:4,6 169:8
183:18 190:5
192:8 193:6
212:24 214:25
217:4 231:1 232:7
246:14 247:12
252:16,24 264:23
267:14 269:10
282:7 285:3 305:7

305:13,14 306:13
312:24 314:14
317:20 328:10
335:16
**rightly** 242:25
**rings** 343:4
**rise** 272:11
**risk** 152:9,13
156:25
**risks** 56:4,8 83:15
**robberies** 177:17
**rodriguez** 3:11
**role** 42:1 59:5
66:15 87:4 92:25
176:18 214:9
311:4
**room** 91:17
309:23
**root** 228:3
**rose** 331:6
**roughly** 21:11
**roundtable** 91:5
93:3 95:3,22
316:11 330:6,8,21
330:24 331:16,19
332:8,21,23 333:7
333:12 334:20
**roundtabled** 90:9
**routinely** 47:5
240:22 241:11
**row** 322:12,13
**rpr** 1:25
**rules** 14:7 288:1
348:3,7 352:5
353:5
**rwoods** 3:5
**rx** 2:17

**s**

**s** 2:13 14:22,22
300:3 351:15
353:8,8 354:3

**s.m.** 2:8
**safe** 177:7 234:5
  267:5
**safer** 148:20
**safety** 91:18
  179:15 254:9
**salaried** 145:3
**salaries** 178:22
  285:15
**salary** 261:20
  284:11
**sale** 17:18 70:9,13
  74:6 207:2 225:19
**sales** 179:17 190:2
  190:12 226:11
  312:1
**salts** 29:18
**samaritan** 102:22
  102:25 103:22
**sample** 54:14
**san** 3:8
**sat** 90:8 189:9
**save** 103:14
  338:20
**saving** 114:25
**saw** 36:13 37:10
  53:6,7,8 85:11
  145:21 150:2
  164:15 313:14
  331:20
**saying** 52:12
  127:21,22 128:7
  128:10 147:10
  177:21 207:7
  273:7,10 282:5
  331:15 332:7
  334:8
**says** 27:18 41:6
  44:21 58:5 59:24
  69:9 86:1 88:19
  106:4 223:12

256:19 266:16,19
  267:15 268:17
  278:5 302:16
  338:2 340:24
**scale** 245:25
**scanned** 114:16
**scaring** 83:10
**scenario** 194:13
  195:2 207:11
**scene** 67:1,8 117:9
  233:8,13
**scenes** 146:18
  291:19
**schedule** 112:16
  119:11 120:19,23
  124:12,13 242:20
**scheduled** 113:7
  114:5
**schmidt** 90:5,13
  143:3 146:4
**school** 164:4,6,10
  190:8 292:4
**schools** 65:17,18
  65:23
**scott** 6:9 91:8
  289:12 290:1,3
  295:7 316:14
  334:11
**scratch** 232:18
**screen** 46:15 75:21
  113:3
**screened** 111:9
  113:9 115:18
**screening** 96:16
  111:25 113:17,21
  113:25 152:7
  156:19 157:4
  329:20
**seal** 350:6 352:15
  353:21

**search** 46:19
  48:17,18,25 61:7
  61:10 72:19 132:6
  254:14 324:5,10
  341:23
**searches** 60:25
**searching** 344:20
**second** 69:12 82:4
  100:2,11 126:10
  142:12 235:22
  245:12 256:17
  299:10 337:11
  338:12
**secret** 110:20
**secretaries** 116:7
  250:4,17,25
  251:11,16 252:8,9
  252:18,22,25
**secretary** 119:13
  120:25 174:15
  251:8,22
**section** 23:18
  24:22 27:5 29:9
  48:19,22 49:2
  168:20 190:6
  275:20
**see** 21:7 25:22
  27:6,9,10 34:13
  35:19,20,22 36:18
  37:3 40:19,22
  48:1 50:10,14
  54:4,5,13 87:21
  104:5 115:12
  120:4,25 122:4
  126:9 139:19
  141:20 144:19,21
  144:23 145:23
  153:3,11 154:3
  158:13 163:19
  165:21 166:24,24
  168:17,17 170:2

183:12 188:23,24
  189:1,3,4,8 190:11
  191:25 198:17
  214:19 221:8,9
  227:17 233:3
  234:1 238:8 242:3
  245:18,20 248:3,4
  248:5,14,15,17,20
  250:18 251:20
  252:6 253:12
  255:11,11 257:7
  264:17,19 267:20
  267:24,25 269:7
  269:11 271:18,20
  276:24 277:14
  282:12 289:25
  290:1,5 297:24,25
  299:4,14,18
  300:25 304:21
  305:16 307:16,18
  315:10 322:14
  323:15 329:22
  335:5 338:9,21
  343:4
**seeing** 28:5 56:17
  146:14 150:15
  152:6 282:13
**seek** 83:14 179:2
  179:13 232:11
  304:18 339:15
**seeking** 24:6
  101:20 204:25
**seen** 23:4,5,9 35:3
  35:10 40:23 41:2
  55:3 56:9 57:14
  58:6,24 59:1 66:4
  66:5 89:14 151:1
  153:10 167:18
  168:9,21 171:4
  174:9 187:23
  188:2,6 189:18

229:19 230:4,5,19
257:3 278:4,14,16
325:12 339:8
342:19 345:4
**seize** 287:22
**seizures** 69:14
70:3 287:24
**self** 83:9 232:7
**sell** 83:21 188:3
189:5 206:10
229:21 230:18
238:10
**seller** 194:22
**selling** 65:13 98:7
144:9 162:14
189:25 206:21
223:24 230:15
231:5 304:6,6
**sells** 65:5 194:9
**seminar** 286:20
**send** 112:25
118:18 119:1
121:9,12 126:18
126:21,23 127:1
127:19,21 128:3
129:18 142:5
158:24 159:2
319:5
**sending** 120:17
**sends** 92:18 93:2
337:15
**senior** 190:8 292:2
**sense** 87:3 102:8
239:17 259:6
323:23
**sent** 39:6 44:12,14
67:11 105:18
113:5 118:14,24
119:6 121:20
123:3 124:15
131:16,22 132:1

159:8,9 216:16
289:19 337:9,18
337:21
**sentence** 69:12,17
100:2,12,20
118:21 149:10
156:18 159:10
168:25 172:3,4,8
**sentences** 44:5
158:7 160:21
172:1,13 315:12
**sentencing** 167:20
167:21,21 169:14
169:16 235:8
**separate** 58:11
72:7 101:9 156:19
248:25 257:18
**separated** 245:24
**september** 123:25
270:5
**serious** 23:20
27:10,16
**seriousness** 54:21
**service** 253:12
287:1
**services** 2:18
152:19 237:17
254:5,6 265:1
287:5 292:23
**session** 4:11 174:4
**set** 20:14 72:19,22
72:25 108:7,14
118:16,23 158:12
241:12 293:10
306:6 327:17
350:5
**sets** 307:20
**seven** 36:24 82:22
112:5
**seventh** 51:17

**severe** 149:9,15
**sex** 214:16 215:7
**sexual** 23:21 27:16
**shapiro** 256:19
**share** 101:3
102:10 170:5
217:11,23 218:2
218:15,18,20
292:16 321:2
**shared** 64:15
101:13 151:17
175:20 248:12
321:8
**sharing** 97:22 98:6
**sheet** 114:1,4
322:8 351:13
353:7,10,18 354:1
**sheets** 114:6,10,14
114:19 115:8,14
**sheriff** 57:13,16
128:17 171:5
297:11
**sheriff's** 58:11,14
90:15 128:12,14
186:18 221:3
**sherri** 38:21 39:2
243:23 340:8
**shift** 35:20 36:14
161:24
**shifted** 95:21
**shifting** 36:8
**shocked** 46:22
**shooting** 221:11
**shop** 230:23
**shopliftings**
108:25
**shopping** 162:15
165:17 167:10
168:5 183:13
184:18 193:5
223:8,13 227:23

**short** 212:3 220:2
234:23 273:25
324:23
**shortened** 160:22
**shortly** 162:4
267:20
**shoulder** 228:7,12
**show** 49:15,17
60:24 87:17
127:17 129:6
184:17 214:7
238:25 269:21
271:6 277:5
278:12 280:21
328:21 330:17
337:1
**showed** 37:18
128:13 284:18
290:10,24
**showing** 323:13,17
323:18,18
**shown** 305:9
322:10 323:24
351:16
**shows** 324:4
**shuki** 91:10
**shut** 204:12
**sic** 294:3,11
**sick** 261:13
**side** 153:19
**sift** 260:23
**sign** 15:23
**signature** 106:19
106:21 326:14
348:5 350:12
351:14
**signed** 184:1
352:13 353:18
**significant** 17:10
17:16,22,24 20:6
20:17 21:3 35:12

106:9 191:22
231:17
**significantly** 21:5
100:14 178:21
256:23 283:4
**signing** 210:18
351:19
**signs** 261:10,11
**similar** 188:14
243:9 322:13
326:14
**simple** 334:16
**simply** 58:19
97:22 277:8
**sims** 293:15
294:24 295:1
296:18
**sincerely** 351:21
**single** 17:21 46:3,4
74:9 227:4
**sir** 344:1 351:10
**sit** 17:9,15 150:21
258:5,9,15
**site** 196:9 289:2,22
**sitting** 73:18,22
74:4 122:5 131:15
140:15 143:7
146:19 170:5
213:13 239:10
279:22 300:15
**situation** 145:16
165:11,23 166:13
176:3 193:10
207:15,16 234:25
304:23
**situations** 153:3
153:11 154:3
205:2 218:21
**six** 36:24 82:22
264:3

**sixth** 243:12
280:20
**size** 243:9
**slept** 302:13
**slides** 5:20 81:6,12
81:16
**slowing** 120:12,18
**small** 286:20
287:17 325:6
**smell** 235:22
**smith** 3:11
**snapshot** 297:20
**sobriety** 152:24
**social** 141:25
146:9
**society** 17:1 83:21
**socioeconomic**
168:20
**sold** 42:23 61:23
62:14 63:4,24
64:20 65:23
221:17
**solely** 283:3
**solidified** 229:1
**solutions** 2:11
351:1 354:1
**somebody** 142:15
**someone's** 142:4
**sorry** 78:7,11
150:7 201:4 269:1
313:4
**sort** 58:25 157:3
165:20 166:3
174:25 195:16
211:24 243:2
257:5 265:7
273:21
**sorts** 108:23
**sought** 128:19
178:14 179:18
180:13,17

**sounded** 103:24
**sounds** 147:20
317:5
**source** 35:2 39:23
40:2 42:5,7 43:10
64:4 67:18,21
84:4 104:3 175:15
175:18 179:24
232:11,17,20
233:22 234:8
235:15
**sources** 35:5 40:17
200:16 232:19
285:5 288:19
299:13
**south** 2:4
**space** 114:25
254:12 284:8
**spaeder** 2:18
13:18
**speak** 63:12,16,18
63:19,20 67:5
213:23
**speakers** 292:7
**speaking** 19:13
62:7 81:1 108:15
213:4
**special** 72:22 73:3
82:18
**specialize** 79:19
305:13
**specialized** 307:3
**specific** 20:24 23:7
27:20,22 48:16
66:1 70:23 71:9
72:6 74:2,13 77:6
81:6 84:22 87:22
98:10 107:21
147:12 151:3
156:12 169:19
176:24 182:7

186:5 188:9
193:25 196:18
202:14 207:24
208:7,18,22
217:20 218:8
226:18 260:6
295:18 304:17
324:2
**specifically** 24:13
26:17,22 27:11
28:2 29:7 61:14
72:5 74:20 75:20
116:6 138:8
186:16 190:15
191:17 206:6
213:15,24 250:8
251:12,16,24
253:20 255:4
258:2 273:13
279:3 292:20
294:21 304:20,22
304:23 326:23
341:3,24
**specifics** 75:13
200:20 204:22
208:14 222:12
234:24 342:7
**specified** 349:20
**specify** 53:3
324:17
**speculation**
334:23
**spell** 14:21 197:8
**spend** 302:16
337:3
**spent** 254:17
261:17 278:19
279:19 280:5
287:4,5,9 288:5,23
294:2,7 298:6

spike  267:8
spiked  150:6
spikes  53:8
spit  306:6
split  250:3
spoke  110:5 202:4
   216:14,15 244:20
   244:21
spoken  67:6
   334:18
spreadsheet  6:7
   6:13 277:22
   321:22 322:3,17
   322:18 325:8,9
square  2:14 3:12
ss  349:3
staff  133:23
   178:17 246:22
   250:1,4 252:7,17
   285:25 306:4
   315:20
staffed  78:20
staffing  178:16
   257:12
stagnant  179:7
stamp  46:16
   325:15,20,20,21
   325:21 326:2,3,4
   326:16 327:3,10
   329:4,21 340:14
stamped  239:7
stamps  326:18,19
stand  15:11 59:16
   67:14 183:3
standard  54:15
standards  107:4,6
   107:10,12,17
   219:21
standing  267:7
start  112:8 120:17
   149:1 161:15

162:1 228:5 234:1
   325:14
started  21:6 52:25
   53:22 56:20 90:2
   91:22,23 93:1
   146:5 150:10
   267:21 323:10
starting  143:2
   168:16 178:22,23
   282:8 316:2
   345:11
starts  183:4
stash  231:25
state  14:18 23:24
   77:10 119:14
   120:25 147:6,10
   148:15 174:15
   183:8 184:14
   186:19 200:15,19
   201:19,20 202:20
   204:21 205:18
   208:11 209:24
   210:11,12 211:21
   214:18 216:10,14
   241:6 256:9 314:8
   314:11 317:12,13
   317:15 318:5,6,6
   318:10 319:3
   349:2,7 350:14
   352:10 353:15
stated  20:2 77:3
   77:17 121:2 158:1
   174:24 176:6
   238:7 278:14
statement  40:19
   44:2 69:21 100:16
   101:16 233:1
   352:13,14 353:19
   353:19
statements  168:23
   172:20

states  1:1 23:18
   27:15 42:18,21,25
   43:11 45:3,6
   51:21 54:2 57:23
   58:1 69:12 100:24
   154:1 172:7,25
   188:11 227:2
statistic  170:6
statistical  47:9
   170:15
statistics  39:21,24
   40:3,11 45:8,11
   47:2 151:3 236:5
   236:25 243:14
   281:7,12,13
   329:23,25
stay  265:10
stayed  271:15
   281:20,25
staying  148:17
   155:21 252:12
steal  112:21
   187:24,24 188:1
   195:9
stealing  177:18
   188:23 191:10
steals  189:24
stem  18:11
stenotypy  349:14
stepped  244:14
   310:6
steps  175:21 178:9
   216:24 222:21
   235:13
steroids  30:22
stop  26:11,12 84:5
   190:16 201:15,23
   210:2,15 237:23
   310:7
stopped  191:3

stopping  306:11
stream  3:10
street  1:23 2:19
   3:4,7,12 24:2
   26:19 65:13,15,19
   137:7 172:18
   190:11,25 206:8
   229:14,15,18
   238:8,12,20
   309:19 335:22
streets  37:24 38:8
   40:20 239:1
strengthened
   36:12
strengths  118:22
stretch  143:1
strike  27:24
string  6:14,16
   328:16 330:12
strip  339:17
strips  335:4,11
   336:7 337:24,24
   338:8,17,25 339:5
   339:9
strong  36:23
students  150:3
study  170:7
stymied  148:5
subcategory
   260:18
subject  6:7 277:23
   278:5 320:16
   334:10 335:2
submit  270:5
submits  116:4
submitted  116:1
   180:18,19 211:20
submitting  99:7,7
subpoenas  33:6,7
subscribed  352:10
   353:14 354:21

**subsequent** 244:11
244:13 269:5
**substance** 160:4
207:9,18
**substances** 228:1
**substitute** 172:10
**success** 158:19
339:14,16
**successful** 159:25
**suffering** 83:7
**sufficient** 89:20
143:24 144:14
219:22
**suit** 54:20
**suitable** 172:10
**suite** 2:14 3:13,17
351:2
**summaries** 93:2
119:2,8 126:19,24
**summarize** 106:3
**summary** 92:19
118:21
**summit** 1:13 2:2
5:5,6,7,8,9,10,12
5:15,22,24 6:3,4,5
6:6,10,12,15,16,19
13:10 14:24 16:2
16:17,18,23 17:4
17:11 20:3 21:13
21:16 22:20,22
23:11,15 25:4,6,10
25:12,17,19 27:2
33:12,25 34:14
35:3,6,8,15 36:22
38:16,20,22 39:2
41:16 42:6,8,8,15
42:23 44:19,23
51:6,22 55:1
56:18 57:6,10,13
57:16,18 58:9
59:6,8,20,21,23

60:4 61:24 62:5,9
62:14,20 63:4,13
63:24 64:21,22
67:18 70:10 88:22
91:18 98:22 100:9
100:21 101:8
109:8,12,19,25
111:1 121:5,19
123:14 124:21
127:5,10 136:12
148:7 149:20,21
150:9,14 151:9,23
151:25 152:15
153:9 154:1
156:15 158:2
162:5,9,16 164:18
164:23 167:17
170:25 171:13,17
176:8,15 178:12
181:23 185:16
186:1,7,17 189:18
191:7,23 192:6,12
193:22 197:3,13
197:23 198:14,15
199:7,17 200:22
201:16,23 219:13
219:16 220:7,21
221:17 226:12,25
227:1,4 229:25
230:9,20 231:10
233:15 241:5,13
241:18,23 242:1,1
245:6,9,11 249:12
266:4,6 268:4,6
272:17 276:16
285:7 286:25
287:14,19,21
289:5,14,18 293:5
294:18,19,22
295:4,10,21 296:3
296:9 297:11

301:15 308:12
309:11 310:14,15
312:8 314:11,21
319:18,22 320:10
321:7 328:17
330:13 332:12,18
333:5,8 334:11
336:7,23 337:25
338:13,18 339:10
341:9 342:23
343:10 346:1
**summit's** 23:2
**summits** 316:1
**superior** 351:1
**supervise** 16:8
**supervising** 32:18
**supervision** 16:12
**supervisor** 32:2,17
33:20 62:20,25
66:9,13 79:14,16
92:24 178:18
214:10
**supervisor's**
106:21
**supervisors** 32:23
89:25,25 90:12,22
90:23 91:6,7,21,23
92:3 93:1,10
118:19 119:5
263:22 275:8
277:15
**supplemented**
285:19
**supplied** 86:13
103:3
**supplier** 86:6
87:13,16 89:1
**suppliers** 51:7,12
52:9 80:22 85:15
103:11 149:11

**supplies** 168:3,6
**supply** 83:9 85:15
149:16 305:12
311:6,8
**supplying** 85:24
103:7 320:9
**support** 168:23
169:9 178:17
240:23 248:21
250:1 252:7,17
276:5 292:23
301:6 305:2 306:4
328:13
**supports** 116:3
**supposed** 116:25
122:9
**sure** 20:9 30:23
31:1 39:20 40:25
61:12 67:9 72:3
73:6 94:23 113:3
121:24,25 129:21
136:21 164:24
165:4,6 166:15
181:12,20 186:20
187:19 190:13
192:21 197:18
200:10 201:9
206:11 210:5
213:6 230:1
237:24 245:4
249:7,10 279:24
304:8 311:12
314:12 326:19
329:2 336:12
**surgery** 228:7,12
**surplus** 283:19
**surprise** 123:13,17
123:23 124:2
**surrender** 267:5
**suspect** 28:6
219:12,15 220:5

[suspect - testified]

316:16,20
**suspected** 219:5
222:10 319:4
**suspects** 316:21
**suspend** 204:7
212:22 214:23
219:4
**suspended** 135:21
**suspicions** 221:23
**suspicious** 220:12
220:14 300:19
301:10
**swelling** 145:22
**switch** 324:21
**switched** 36:4
**sworn** 14:8 349:10
352:10,13 353:14
353:18 354:21
**sympathy** 142:5
**symptoms** 162:22
**synthesized** 57:20
**synthetic** 53:12
77:5,12 100:13
**synthetics** 19:7
**syringe** 309:21
**system** 45:16 46:9
46:11,13,17,21,22
47:20 48:8,13,14
49:7 50:16,24
52:14,18 76:20
106:14 108:14
109:10 113:19,23
114:20,21,24
115:14 118:15,16
119:16,18 120:9
120:12,17,19
123:6 157:20
158:2 160:3,15
255:13,14 261:12
303:14 306:5,6
323:11 325:22,23

326:15,24 327:4
327:11,16,17,19
327:25 328:2,4,5,7
328:11
**systems** 158:12
168:2 328:5

**t**

**t** 159:7
**tab** 322:11
**table** 276:20,22
277:4
**tabs** 322:9,12
**tackle** 148:7,10
**take** 15:23 54:14
77:11 81:7 91:16
92:12,16 150:1
173:1 178:9
180:25 187:1
211:25 222:21
235:13 237:18
245:7 264:4,9
273:25 283:4
307:1,2,8 312:16
312:25 317:2
321:12 324:20
330:19 345:20
346:16 347:8
**taken** 1:22 158:15
173:9 254:12
285:20 292:5
313:23 349:19
**takes** 92:18 263:22
**talk** 19:9 44:2,3
53:10 59:8 67:3
90:6 120:21
125:25 161:24
197:20 199:19
202:17 203:21
244:6 284:19
310:8 332:5
333:18

**talked** 88:15 89:7
110:14 170:11
203:10 204:2
213:25 219:20
227:11 288:3
292:1 315:21
333:25,25 334:3
334:23 335:2
**talking** 53:20 89:9
92:2,4 108:9,10
126:13 133:1
150:10 151:16
167:22 187:10
279:4 291:6 305:6
325:7 339:20
**talks** 334:25
**tamiyka** 331:6,12
**tar** 34:17
**target** 22:8 179:1
**targeted** 168:20
323:5
**targeting** 83:7
**task** 149:22
150:11 192:18
294:16,20 295:5
310:15 314:11
316:7 334:11
**tax** 179:15,17
247:23,24 248:23
276:3
**taxpayers** 245:6
285:7
**tcoleman** 2:16
**teacher** 317:18
318:8
**teenagers** 342:18
342:25 343:17
**telephone** 3:10
14:3,5
**tell** 21:22 28:11
30:10 31:21 55:14

56:9 71:11,16,20
71:22 73:19,22,25
74:2,5,12 102:24
106:16 140:13
170:11 196:10
198:25 224:19
236:3 246:4
258:18 259:10
264:19 266:22
270:1 271:22
272:2 275:21
303:18 330:19
344:9
**telling** 133:23
149:25 272:5
**ten** 21:5,11 60:11
79:11 178:16
184:8,10 200:4,6
202:4 205:17
208:17 224:23,24
224:24 263:19
306:20 307:7,11
308:24 309:12,14
310:3 341:19
**tens** 311:24
**tenth** 3:4 294:7
**teodosio** 293:18
**tera** 2:13 13:15
**term** 24:25 187:3
300:18 319:13
**terminal** 188:11
**terms** 43:6 106:4
339:10 341:18
**terry** 91:10
**test** 235:23 335:4,5
335:7,11 336:7
337:24,24 338:8
338:16,25 339:5,9
339:17
**testified** 15:2,7
133:3 280:14

281:6
testify 63:19
  305:23 349:10
testifying 15:14
  260:9
testimony 213:5,7
  269:22 342:20
  343:14 346:3,13
  349:12,16 352:6,7
  353:6,9,12
testing 335:7
text 130:21,24
  131:3,5,9,17,22
texts 130:2,5,9,15
  132:1
thank 17:8 95:11
  213:17 277:19
  278:7 347:13
thanks 324:20
theft 109:3 195:12
  225:1,6,6,8,10
  262:12,13
thefts 109:2
themself 302:12
theory 64:16
thieves 191:10,14
thing 58:25 98:10
  141:12 142:10
  190:22 199:10
  306:9 332:22
things 26:13,14
  51:1 85:25 86:19
  102:5 120:17
  128:6 143:9
  144:10 146:5
  165:10 169:17
  174:7 177:3
  180:24 191:11
  227:21 232:5
  288:6 306:2
  308:22,25 309:4

310:2,6
think 20:20,25
  21:4 41:20 44:13
  53:6 64:11 65:14
  65:16 73:13 77:3
  78:5,7 80:14
  84:24 85:6 91:23
  92:17 98:16
  103:24 104:1
  105:17 107:14
  116:7 120:6 123:9
  126:4 134:19
  137:15,15 138:25
  139:11 146:11
  147:5 148:9,15
  149:18 150:15
  152:3 153:14,15
  157:6 158:10,10
  161:19 165:20
  166:10 177:14
  178:14 180:1
  182:3 188:21
  189:22 191:25
  192:9 196:25
  197:25 198:3
  201:17 203:10
  208:12 210:9
  220:23 223:10
  229:1,18 233:18
  234:23 239:3,9,16
  243:6,12 244:13
  250:3 256:16
  258:8,12 270:7
  273:19 275:6
  279:1 286:19
  291:23 302:5
  312:10 314:16
  316:3,9 318:17
  325:21 326:8
  334:22 342:1,14
  345:2,14,22

346:11
thinking 64:14,18
  122:21 184:8
  201:9 316:13
third 69:4 172:8
  318:23
thirty 351:18
thorough 233:19
thought 222:4
thousand 109:3
thousands 311:24
threat 170:24
threatening
  311:14
three 3:12 68:22
  78:1,3 82:21
  118:21 163:3
  179:21,22 197:1
  212:4,7,10 231:16
  231:23 241:10
  248:25 270:10
  271:12 275:1
  280:19 288:22
  299:8,10 322:9,10
  344:6
threshold 288:9
threw 146:20
thursday 90:1
tie 168:16
tied 74:12 106:22
till 36:23
time 16:16,18,21
  28:17 31:8,20
  33:11 34:4 35:9
  35:20 36:18,21
  37:2,13,20,25 38:9
  39:19 45:15 52:2
  52:18,23 53:20
  54:12 59:1 60:4
  60:20 62:12,19
  74:23 79:12 90:10

90:25 91:8 112:5
  112:5 115:25
  124:20 132:1
  134:13 136:12
  139:21 143:4
  146:6 151:5
  159:20 164:13,17
  165:1 167:17
  170:25 172:2,25
  173:2 178:19
  179:21 185:3,6
  192:6 197:22
  205:19 209:7
  212:6,9 218:9,17
  234:20,20 236:1
  244:21 245:1,14
  247:6,11 248:11
  254:16 258:5
  261:7,11,13 264:7
  269:22 271:12
  279:25 280:8
  283:5 287:4 292:7
  294:9 302:17
  303:14 307:10
  323:23 325:14
  337:3 344:13
  345:18 346:20
  349:19
timely 311:14
times 26:13 54:3
  56:15 62:11
  102:18 118:13
  146:1,11 148:4
  171:8 178:8
  180:22 190:16
  194:2 204:17
  221:7 224:17
  234:12 257:2
  264:25 272:10
  292:14 305:17
  314:13 315:10

340:9 342:6
345:14
**tipped**  165:19
**tips**  321:2,8
**title**  14:25 43:14
   91:2 92:22 286:24
**titled**  5:11,13,16
   38:14,22 39:3
   57:2,11 68:11,24
   93:12 296:7
**titles**  99:16
**today**  15:15 17:9
   17:15 19:9 38:3
   40:20 73:18 74:5
   111:8 114:11
   131:15 137:23
   140:15 148:4
   170:5 178:8 187:6
   213:13 239:11
   257:9 258:15
   260:24 261:3
   267:25 268:15
   279:11 300:15
   305:9 308:22,25
   339:20 340:10
   342:17 343:15
   345:4 346:4,13
**today's**  13:2
**told**  35:11 54:10
   54:15 77:13 98:11
   124:11 133:15
   139:21 143:18
   170:13,14 171:6
   244:17 282:7
   300:7 310:22
   311:2 318:18
   341:16
**toledo**  243:10
**tom**  99:15 197:6
   200:14 202:15
   293:18

**tomorrow**  111:9
**ton**  165:21
**tool**  336:11
**top**  19:8 20:11
   28:4 30:9 71:5
   100:20,21 172:4
   196:24 221:20
   236:12,17 242:14
   289:25 294:6
   299:11 306:16,18
   336:9
**topic**  64:2
**topics**  333:2
**total**  47:7,13,21
   71:17 80:8 210:23
   211:5 237:5 249:1
   256:11,14,20
   258:24,24 263:6
   263:14 274:11
   275:21 279:18
**totality**  98:9
**totals**  247:3
**touch**  304:8
**tougher**  315:12
**townships**  111:2
**toxicology**  75:20
   76:15 87:20
   141:15
**trace**  141:23
**traceable**  223:25
**traced**  236:10,16
   236:19,22
**track**  45:16
   108:17 115:16
   182:1,14,20
   186:11 192:11
   287:8 303:11,12
   327:1,19,24
**tracked**  45:14
   211:3

**tracking**  115:21
**trade**  262:14
**traffic**  101:11
   188:4
**trafficked**  68:4
   69:15
**traffickers**  42:2,5
   156:20
**trafficking**  45:3
   45:25 61:9 72:12
   94:23 97:21 102:9
   144:9 216:6
   227:13 262:7
   281:3 283:5
   302:19 315:5
   323:20 329:5
**tragic**  313:25
**trailer**  55:18
**train**  285:24
**training**  147:22
   285:22 286:3,12
   291:17
**trample**  146:18
**tranquilizer**  54:11
**transacted**  43:4
   300:9
**transaction**  42:13
**transactions**  42:14
**transcribed**
   349:15 352:7
**transcript**  4:1
   348:3,6,9,11
   351:11,12 352:5
   352:12 353:5,11
   353:17
**transcription**
   255:7 349:16
**transfer**  50:20
**transpire**  119:23
**trash**  123:5 146:20

**treat**  102:8 313:9
**treated**  101:12
   313:19,23
**treating**  162:21
**treatment**  17:20
   152:1 156:20
   159:24 160:1,3,17
   161:8 187:9
   231:22 234:21
**treatments**  231:12
**trend**  37:15 151:4
   151:10,11
**trends**  46:24 47:1
   47:3 58:20 66:19
   292:18
**trial**  77:25 98:15
   118:16,17,24,25
   119:3,17,25
   120:15,16,16
   126:21 127:19,22
   163:3 167:21
   169:14 254:24
   255:8 280:10
**trials**  78:1,3 202:8
   255:2
**tried**  126:25
   138:10 162:8
   189:9 323:11
**troubling**  103:9
**true**  74:3 89:5
   336:2 341:2
   349:16
**truly**  234:21
**trumbull**  315:15
   315:18
**trust**  285:13 288:2
   288:11
**truth**  106:16
   349:10,11,11
**try**  24:1 26:19
   104:2 112:24

[try - unit]

122:3 123:1
131:12 141:23
175:22 176:19
177:7 180:10
204:6,11 218:13
232:18 234:3
258:5 260:22
301:25 309:3
344:5 346:9
**trying** 48:14
121:15 124:16
139:8 239:17
250:12 325:14
334:15 345:6
**turn** 25:17 82:3
84:11 99:24
100:19 133:15
135:12 144:17,19
247:22 299:1,18
**turning** 109:8,25
245:10 249:11
292:25 293:4,12
293:16,21 294:2
294:11
**tv** 184:6
**tweak** 325:25
**two** 20:16,18 44:5
57:22 78:5 79:4,5
79:12,13,15,15
84:18 90:4,23
91:2 95:6,13
99:19 102:1 112:5
118:20 119:2
135:2 142:24,24
143:4 150:3 156:6
163:2 172:13
183:25 200:17
212:5,7,10 231:22
241:5 242:12
246:14 254:9
263:18,23,24

267:19 275:1
277:16,17 280:19
293:13 299:20
305:12 306:12,21
307:3,7 322:12
344:6
**type** 17:23 20:17
27:21 30:8,18
71:15 116:17
125:11 133:1
169:15 177:11
181:4 188:14
190:4,17 203:4
253:5 255:4,5
273:11 287:9
317:4 324:18
326:23
**types** 18:25 30:13
32:3,18 34:13
48:16 51:25 74:24
79:24 87:7 109:1
115:19 125:15,18
125:20 127:14
132:17 147:24
150:25 169:17
185:11 186:23
187:21 188:22
232:4 254:23
261:18 272:10
281:17 301:21
311:24 326:13
328:6
**typical** 121:17
211:23 241:4
302:5
**typically** 111:5
119:12 128:12
188:16 211:14
264:24 302:18
303:23

**typing** 255:7

**u**

**u** 19:7 77:5 95:10
**u.s.** 267:1 307:23
315:4,7,17,21
316:1,7,11 330:24
331:2
**ultimately** 84:25
86:25 94:14 95:5
113:10 159:3
168:7 314:24
**um** 71:19 74:14
76:12 95:4 100:23
126:4 145:4
153:24 154:6
245:22 247:4
249:18 254:21
255:20 262:3
265:13 268:20
269:16 289:23
290:15
**unaware** 21:21
162:21
**uncertain** 70:20
**uncovered** 318:25
**undermanned**
142:22
**underneath**
165:21
**understaffed**
307:18
**understand** 15:14
15:18,19 18:14,17
18:20 19:1 28:22
42:4,16,22 46:24
47:1,3,21 58:12
78:22 122:11
135:14 138:12
139:8 141:11
145:3 175:17
187:13 202:25

203:7,13 218:5
219:25 263:6
306:10 312:20
313:2 323:6
345:21 346:21
**understanding**
19:10 34:20 35:1
36:2 37:19,23
38:2,7 42:25 43:7
43:9 53:15 54:6
54:22 55:22 64:10
64:19 65:2 135:9
139:3 140:3,8
177:25 183:6
195:24 201:12
202:19 204:24
216:24 226:22
254:22 295:20
307:22 324:9
325:11 338:25
347:11
**understood** 15:23
111:13 343:14
**undertake** 280:3
310:18
**undertaken** 157:3
**unfairly** 83:7
**unfortunate**
100:15
**unfortunately**
65:14 106:2
**unintended** 338:4
**unit** 32:14 57:19
59:20 62:6,9
101:8,21,22 127:6
127:10 188:7
192:15 237:14
255:24 287:4,19
288:1,10 294:19
294:22 295:11,13
295:16 296:9,12

| | | | w |
|---|---|---|---|
| 297:6,11,12 | 64:13 83:10,13 | **victim** 76:24 | |
| 305:13 308:13 | 101:2 335:12 | 222:20 253:12,13 | **waged** 304:2 |
| 310:15 319:18,22 | 336:15 338:20 | 253:13,17 302:6 | **wait** 28:24 90:15 |
| 321:7 | **uses** 285:14 | 302:15,17,20 | 245:12 317:19 |
| **unit's** 295:21 | **usually** 90:1 94:17 | 305:3 | 334:8 |
| **united** 1:1 42:18 | 117:13 122:3 | **victims** 145:22 | **waited** 29:7 |
| 42:20,25 43:11 | 127:9,11 129:6 | 288:16 302:4 | **waiting** 127:20 |
| 58:1 172:7,24 | 158:7 175:12 | 305:1 306:4 | 143:6 214:19 |
| 227:2 | 270:4 316:25 | **videographer** 3:20 | **waived** 351:19 |
| **unknown** 165:16 | 317:3 334:7 | 13:1 14:2 104:8 | **wake** 344:12 |
| **unlawful** 321:3 | | 104:11,14 173:6 | **walgreens** 65:9 |
| **unlawfully** 206:21 | **v** | 174:1 237:25 | **walk** 125:19 |
| 229:23 230:8 | **v** 1:10,11,13 126:7 | 238:3 274:1,4 | **walks** 168:13 |
| **unused** 297:21 | **vacation** 125:23 | 321:14,17 324:22 | **walls** 92:18 295:8 |
| 298:14,20,21,24 | 261:13 | 324:24 347:16 | **walmart** 2:7 13:20 |
| **unusual** 190:21 | **vaguely** 216:1 | **videotaped** 1:17 | **walsh** 38:21 39:2 |
| 240:25 241:1 | **valid** 190:24 | **view** 151:23 | 39:16 243:24 |
| **updated** 105:10 | **value** 119:15 | 185:20 219:18 | 246:20 303:5 |
| 327:22 | 120:2 | 338:3 | 340:8 |
| **use** 24:24 26:22 | **variant** 57:20 | **violated** 86:21 | **want** 82:3 99:24 |
| 32:25 35:8 42:14 | **variety** 79:24 | **violation** 175:8 | 139:7 150:11 |
| 61:2 83:20 102:19 | **various** 97:14 | **violators** 287:22 | 158:22 160:21 |
| 121:2 124:23 | 101:6 162:15,20 | **violence** 179:20 | 161:13 171:25 |
| 151:2 153:16 | 241:3 276:25 | 180:1 255:24 | 190:6 192:14,21 |
| 154:11 156:16 | 303:13 328:6 | 256:1 262:20 | 213:6 214:7 234:1 |
| 168:7 169:11 | **vast** 68:2 69:12 | 263:20 288:17,21 | 234:21 240:10 |
| 188:1,2,17 189:4 | 70:2 | 326:18 331:4 | 242:8,13 248:19 |
| 207:25 228:7 | **vawa** 255:22 | 332:6 333:22 | 255:16 258:8 |
| 254:9,13 262:17 | 288:16 | **violent** 221:14 | 331:13 335:20 |
| 262:21 285:23 | **verdict** 48:5 | **virtual** 3:10 | **wanted** 202:12 |
| 286:2,9 291:13 | 119:22 | **visit** 196:6 | 240:9 276:14 |
| 292:16 300:23 | **veritext** 3:10 | **voca** 255:22 | 341:3 345:15 |
| 313:14 314:25 | 351:1,7 354:1 | 288:16,24 | **warn** 222:22 |
| 325:8 335:14 | **veritext.com.** | **volume** 72:20,23 | **warned** 228:15 |
| 336:12,16 | 351:17 | 72:24 142:20 | **warning** 228:10 |
| **useful** 59:5 336:11 | **version** 242:16 | 293:17 334:6 | 229:10 |
| **user** 64:11,17 | **versions** 105:13 | **vote** 216:13,19,20 | **warrants** 267:4 |
| 189:14,21 | 327:22 | 297:21 298:11 | **washington** 3:4 |
| **users** 5:13 35:20 | **versus** 97:22 225:6 | **vulnerable** 101:1 | **watch** 150:21 |
| 36:4,7,18 37:3,7,9 | 241:9 280:9,11 | | **watkins** 315:19 |
| 56:11 57:3,11,25 | 326:23 327:5,24 | | |

**way** 33:22 40:1
71:24 72:1 110:23
115:13,17 137:2
141:7 146:16,23
147:4 155:7
203:18 241:4
248:19 250:10
279:18 323:3
324:5,10 328:2
340:10,20
**ways** 24:7 156:15
187:15 222:3
335:12
**we've** 17:6 20:13
21:6 30:11,15,16
30:16 33:8 35:10
54:10 56:6,9 71:1
72:19 74:1,15,18
86:20 98:6 104:4
104:7 106:3
119:12 126:1
142:1 143:18
146:19 152:3
153:14 165:4
167:18 168:9,21
169:5 179:12,18
181:5 188:2,6,12
190:13 196:3
204:1 208:10
213:4 226:14
229:18 245:2,3,4,4
279:1 283:8,11
286:19 288:2
291:9 292:1,1,5
303:23 308:14,20
310:16 314:6
315:20 316:4
319:9 325:25
326:2
**weakness** 304:14

**weaknesses**
118:22 304:11
**wealthier** 190:8
**weapon** 221:10
**website** 105:20
107:9
**weed** 112:24
**week** 90:1 111:10
112:14 122:4
294:5
**weekend** 55:15
**weekly** 91:19
122:25
**weeks** 183:25
295:15,16 344:6
**weight** 31:3,4
**went** 46:19 49:11
54:17 84:22
120:18 142:21
150:4 155:15
170:8 244:6 257:4
267:2,21 269:14
275:6 282:9
293:18 316:4
325:22 344:12
**whereof** 350:5
**whichever** 242:11
271:11
**wholesale** 21:7
**willing** 308:12
310:23
**windows** 46:17
**wish** 59:1 308:24
309:1,5,10,13,23
310:2
**wishes** 293:3
**witness** 13:10
224:3,7 255:6
314:25 348:2
349:9,13,14,17
350:5 351:8,11

352:1,4,11 353:1,4
353:15
**witnesses** 15:11
141:19,21 306:2
**witness'** 351:14
**woman** 309:20
**women** 180:2
256:2 288:21
**women's** 288:17
**woods** 3:3 4:8
13:25,25 14:4,12
14:15 23:11
104:10,16 171:21
171:23 173:1,5
174:6 237:24
238:5 273:24
274:6 321:12,19
324:20
**word** 25:1 69:11
153:16 154:11
260:4 313:15
**words** 24:23 26:22
44:7 47:13 50:16
74:4 100:22
232:24 326:15
**work** 22:16 78:24
79:10 90:14 99:6
99:19 120:20
124:3,19 125:5,9
125:17 126:16
129:23,25 130:2
130:12 131:10,22
143:4 145:6
176:20 211:14
241:3 251:7,9,10
251:17,23,23
252:12 253:6
260:16 271:8
284:8 292:14,25
294:3 295:21
303:15 306:14

307:2,9 315:4,6,16
334:6
**worked** 16:1 79:7
116:14 149:6
159:22 197:9
199:18 205:9
251:1 283:19
298:8
**working** 17:7
21:16 46:22 47:2
52:14 53:22
147:17 149:23
169:5 218:13
251:2,4 261:17
263:7 271:14
276:16 287:8
294:1 307:5 317:1
326:10,20 327:12
335:17 340:25
**works** 237:15
**worksheet** 93:15
**worksheets** 93:18
94:14,16 95:14,18
**workweek** 294:7
**world** 85:21 177:5
**worried** 148:17
**worse** 83:6,12
**worth** 51:5
**wrapped** 196:21
**wright** 3:16 13:21
**wrist** 121:14,15
**write** 208:1
**writing** 210:3
212:12 346:15
**written** 82:9
151:19 174:11
181:23 182:15
208:7 235:17
**wrong** 246:6
**wrongdoing**
210:25 215:13

**[wrongdoing - zuckerman.com]**                    Page 65

| | |
|---|---|
| 220:7 222:10 317:8,24 | 120:11 121:1,13 121:19 122:18 127:1 129:21 135:2 157:24 159:21 165:7 179:16 184:8,10 191:9 197:1,4,6,14 212:5,7,10 227:14 242:9 245:15 256:15 257:4,20 267:6,10 268:14 269:11,21 270:10 271:23 276:25 280:16 281:20,25 282:8 284:6 285:20 291:18 298:14 308:3,24 309:12,14 310:3 328:12 341:19 |

**x**

**x**   107:15
**xanax**   30:25

**y**

**year**   23:2 46:6,12
46:19 47:18,23
48:12 49:4,5,6
51:24 62:11 71:13
71:14 80:16 92:25
99:22 120:14
123:10 134:13,18
134:25 144:21,22
147:13 150:3
179:7,8,11,21
181:24 182:16
185:18 186:8
192:13 205:25
209:9 240:5,6
242:13 244:25
245:2 247:10
257:20 258:2,17
259:8 260:3 263:4
265:18,24 267:9
268:23 269:5,18
270:7,8,15 271:11
272:11,12 275:22
276:17 278:25
283:19 288:22
289:3 291:21
297:22 298:3
302:10 303:10
309:1,20,22 311:9
340:17,18 342:12
343:3,3
**years**   16:3 19:25
21:5,6,11 36:24
43:8 67:9 82:19
82:22 112:24

**young**   168:14
344:7,7
**youth**   331:4 332:6
333:22

**z**

**z**   95:12 118:16
119:3,17,25
127:22
**zero**   222:17
225:14 249:24
320:25
**zoo**   54:13,16,18
**zuckerman**   2:18
13:18
**zuckerman.com**
2:21

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.