Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3

        _____
4

        IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
5       OPIATE LITIGATION                Case No. 17-md-2804
6
        This document relates to:        Judge Dan
7                                         Aaron Polster
8       The County of Cuyahoga v. Purdue
        Pharma, L.P., et al.
9       Case No. 17-OP-45005
10      City of Cleveland, Ohio vs. Purdue
        Pharma, L.P., et al.
11      Case No. 18-OP-45132
12      The County of Summit, Ohio,
        et al. v. Purdue Pharma, L.P.,
13      et al.
        Case No. 18-OP-45090
14      _____
15
16
17

          Videotaped Deposition of Thomas Gilson, M.D.
18
                      Cleveland, Ohio
19
                     January 22, 2019
20
                        9:13 a.m.
21
22
23
24      Reported by:  Bonnie L. Russo
25      Job No. 3196188

Page 2

1   Videotaped Deposition of Thomas Gilson held at:

2

3

4

5

6

7

8   Climaco Wilcox Peca Tarantino & Garofoli, LPA

9       55 Public Square

10      Suite 1950

11      Cleveland, Ohio 44113

12

13

14  Pursuant to Notice, when were present on behalf

15  of the respective parties:

16

17

18

19

20

21

22

23

24

25

Page 3

1   APPEARANCES:

2

3   On behalf of Cuyahoga County:
    SALVATORE C  BADALA, ESQ

4   NAPOLI SHKOLNIK, PLLC
    400 Broadhollow Road, Suite 305

5   Melville, New York 11747
    631-224-1133

6   sbadala@napolilaw com
    -and-

7   MARIA FLEMING, ESQ
    NAPOLI SHKOLNIC, PLLC

8   600 Superior Avenue East, Suite 1300
    Cleveland, Ohio 44114

9   212-397-1000
    mfleming@napolilaw com

10   -and-
    HUNTER SHKOLNIK, ESQ

11  (Via Teleconference)
    NAPOLI SHKOLNIK, PLLC

12  270 Munoz Rivera Avenue, Suite 201
    Hato Rey, Puerto Rico 00918

13  212-397-1000
    hunter@napolilaw com

14

    On behalf of Purdue Pharma, L P
15  MARK CHEFFO, ESQ
    DECHERT, LLP

16  Three Bryant Park
    1095 Avenue of the Americas

17  New York, New York 10036
    212-698-3814

18  mark cheffo@dechert com
    -and-

19  LINDSEY COHAN, ESQ
    DECHERT, LLP

20  300 W  6th Street, Suite 2010
    Austin, Texas 78701

21  512-394-3000
    lindsey cohan@dechert com

22

23

24

25

Page 4

1   APPEARANCES (CONTINUED):

2   On behalf of Johnson & Johnson and Janssen
    Pharmaceuticals, Inc

3   ERICA M  JAMES, ESQ
    TUCKER ELLIS, LLP

4   950 Main Avenue
    Suite 1100

5   Cleveland, Ohio 44113
    216-592-5000

6   erica james@tuckerellis com

7   On behalf of Walmart, Inc
    EDWARD M  CARTER, ESQ

8   JONES DAY
    325 John H  McConnell Boulevard

9   Suite 600
    Cleveland, Ohio 43215

10  614-281-3906
    emcarter@jonesday com

11

    On behalf of Endo Pharmaceuticals, Inc , Endo
12  Health Solutions, Inc , Par Pharmaceuticals,
    Inc  and Par Pharmaceutical Companies, Inc :

13  RUTH HARTMAN, ESQ
    BAKER HOSTETLER

14  Key Tower, 127 Public Square
    Cleveland, Ohio 44114

15  216-621-0200
    rhartman@bakerlaw com

16

    On behalf of AmerisourceBergen Drug
17  Corporation:
    STEVEN J  BORANIAN, ESQ

18  LUKE PORTER, ESQ
    (Via Teleconference)

19  REED SMITH, LLP
    101 Second Street, Suite 1800

20  San Francisco, CA 94105
    415-659-5980

21  sboranian@reedsmith com
    -and-

22  SANDRA K  ZERRUSEN, ESQ
    JACKSON KELLY, PLLC

23  50 South Main Street, Suite 201
    Akron, Ohio 44308

24  330-252-9060
    skzerrusen@jacksonkelly com

25

Page 5

1   APPEARANCES (CONTINUED):

2

    On behalf of McKesson Corporation:
3   ANNA Q. HAN, ESQ.
    (Via Teleconference)

4   COVINGTON & BURLING, LLP
    One CityCenter

5   850 Tenth Street, N.W.
    Washington, D.C. 20001

6   202-662-6000
    ahan@cov.com

7

8

9

    Also Present:
10  Daniel Russo, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2 (Pages 2 - 5)

Page 6

C O N T E N T S
1
2   EXAMINATION OF THOMAS GILSON        PAGE
3   BY MR CHEFFO                10
4   BY MR BORANIAN             328
5   BY MR CARTER               373
6   BY MR BADALA               413
7   BY MS HARTMAN              418
8
9
10          EXHIBITS
11  Exhibit 1  Medical Examiner's Office    97
              Heroin Related Deaths
12            in Cuyahoga County
13  Exhibit 2  E-Mail Chain              215
              dated 7-11-13
14            CUYAH_001710246-0247
15  Exhibit 3  Article entitled          253
              "Associations of Nonmedical
16            Pain Reliever Use and
              Initiation of Heroin Use
17            in the United States"
              PPLP004153119-53135
18
    Exhibit 4  E-Mail Chain              269
19            dated 10-9-17
              CUYAH_001670519-0520
20
    Exhibit 5  Spreadsheets              340
21
    Exhibit 6  Medical Examiner's Office    349
22            Heroin/Fentanyl/Cocaine
              Related Deaths in
23            Cuyahoga County
              2018 December Update
24            1-11-18
25  (Exhibits included with transcript )

Page 7

1          P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  Good morning.
4       We are going on the record at 9:13
5   a m. on January 22nd, 2019.
6          Please note that the microphones are
7   sensitive and may pick up whispering, private
8   conversations and cellular interference.
9   Please turn off all cell phones or place them
10  away from the microphones so they can interfere
11  with the deposition audio.  Audio and video
12  recording will continue to take place unless
13  all parties agree to go off the record.
14         This is Media Unit 1 of the video
15  recorded deposition of Dr. Tom -- Thomas
16  Gilson, taken by counsel for the defendant, in
17  the matter of In Re National Prescription
18  Opiate Litigation filed in United States
19  District Court for the Northern Division of
20  Ohio, Eastern Division, case No. 17-MD-2804.
21         This deposition is being held at
22  Climaco Wilcox, Peca, Tarantino & Garofoli,
23  LPA, located at 55 Public Square, Suite 1950,
24  Cleveland, Ohio.
25         My name is Daniel Russo from the

Page 8

1   firm of Veritext Legal Solutions, and I'm your
2   videographer today.  The court reporter is
3   Bonnie Russo from the firm Veritext Legal
4   Solutions.
5          Counsel and all present in the room
6   and everyone attending remotely will now state
7   their appearances and affiliations for the
8   record, please.
9          MR. BADALA:  Salvatore Badala for
10  the Plaintiff Cuyahoga County.
11         MS. FLEMMING:  Maria Flemming for
12  the Plaintiff Cuyahoga County.
13         MS. JAMES:  Erica James, Tucker
14  Ellis, on behalf of Janssen Pharmaceuticals and
15  Johnson & Johnson.
16         MS. HARTMAN:  Ruth Hartman, Baker
17  Hostetler, on behalf of the Endo defendants.
18         MR. CARTER:  Ed Carter for WalMart.
19         MS. ZERRUSEN:  Sandy Zerrusen,
20  Jackson Kelly, on behalf of AmerisourceBergen.
21         MR. BORANIAN:  Steven Boranian from
22  Reed Smith for Defendant AmerisourceBergen.
23         MS. COHAN:  Lindsey Cohan from
24  Dechert, LLP, for the Purdue Defendants.
25         MR. CHEFFO:  And Mark Cheffo, also

Page 9

1   for Dechert, for Purdue.
2          THE VIDEOGRAPHER:  Can the people
3   remotely please state their appearances as
4   well.
5          MS. HAN:  Anna Han from Covington &
6   Burling for McKesson Corporation.
7          MR. PORTER:  Luke Porter with Reed
8   Smith on behalf of AmerisourceBergen.
9          THE VIDEOGRAPHER:  Will the court
10  reporter please swear in the witness.
11
12         THOMAS GILSON,
13  being first duly sworn, to tell the truth, the
14      whole truth and nothing but the truth,
15         testified as follows:
16         THE VIDEOGRAPHER:  You may proceed,
17  Counsel.
18         MR. CHEFFO:  Thank you.
19         MR. BADALA:  Sorry.  Before you
20  begin, we just --
21         MR. CHEFFO:  Sure.
22         MR. BADALA:  -- have a standing
23  objection to Carole Rendon being involved in
24  the litigation as well as the involvement of
25  Baker Hostetler.

3 (Pages 6 - 9)

Page 10

1      MS. HARTMAN:  And in response, the
2  Endo defendants think they would suffer
3  prejudice if they weren't allowed to be in the
4  deposition.
5      EXAMINATION BY COUNSEL FOR DEFENDANT PURDUE
6          PHARMA, L.P.
7      BY MR. CHEFFO:
8      Q.   Okay.  Good morning, Dr. Gilson.
9      A.   Morning, sir.
10     Q.   You understand you're under oath
11  today?
12     A.   Yes, I do.
13     Q.   Is there any reason why you can't
14  testify fully and accurately here today?
15     A.   No.
16     Q.   Can you please state your full name
17  and your -- your professional title.
18     A.   My name is Dr. Thomas Gilson.
19  I am the Cuyahoga County medical examiner and
20  director of the crime laboratory for Cuyahoga
21  County.
22     Q.   And how long have you held those
23  positions?
24     A.   Since 2011.
25     Q.   And have your duties and

Page 11

1  responsibilities been substantially the same
2  since 2011?
3      A.   Yes, they have.
4      Q.   Okay.  And who is your employer?
5      A.   Cuyahoga County.
6      Q.   And who is your supervisor?
7      A.   Brandy Carney is the deputy chief of
8  staff for the safety units, which would include
9  the medical examiner's office.
10     Q.   And that's Ms. Carney?
11     A.   Ms. Carney, yes.
12     Q.   Ms. Carney is -- strike that.
13         How long has Ms. Carney been your
14  supervisor?
15     A.   I don't remember.  She was appointed
16  sometime I believe in 2018.
17     Q.   Who was your supervisor prior to
18  Ms. Carney?
19     A.   Frank Bova, B-O-V-A.
20     Q.   And was he your supervisor from 2011
21  to 2018, or was there someone in between?
22     A.   I think he was the chief of staff
23  when I came for safety.  Oh, Noberta Collogne
24  was the deputy chief of safety for safety
25  before Frank Bova.

Page 12

1      Q.   Is that the -- the typical kind of
2  hierarchy, the dep -- whoever serves as the
3  deputy chief of staff serves as your
4  supervisor?
5      A.   Yes.  There's a deputy chief of
6  staff, then the chief of staff, then the
7  executive.  That's the chain of command over
8  the medical examiner.
9      Q.   And does the deputy chief of staff,
10  whoever sits in that chair, does he or she
11  provide any type of evaluation or performance
12  review for you?
13     A.   They have at different times but not
14  recently.
15     Q.   When was the last time?
16     A.   I don't remember.
17     Q.   Was it in the last two years?
18     A.   I don't believe so.
19     Q.   How many times have you had a
20  performance review?
21     A.   I don't remember the exact number.
22     Q.   Is it more than one?
23     A.   I don't remember.
24     Q.   Well, are they annual reviews?
25     A.   Obviously not, I guess.  So the --

Page 13

1      Q.   Are they supposed to be annual?
2      A.   That's an HR function.  I haven't
3  had an annual review.
4      Q.   Is it less than ten?
5      A.   I have worked here since 2011.  I've
6  had at least one.  So has to be less than ten.
7  I don't remember how many reviews there
8  actually were though.
9      Q.   You don't remember your reviews for
10  the last six or seven years; you only remember
11  one?
12     A.   I remember one very clearly.  But I
13  -- it was right as I came on board.  There may
14  have been another one after that.  But the last
15  couple of years I know we've not had a -- an --
16  a year-end review.
17     Q.   Can you remember more than two?
18     A.   I don't, sir.
19     Q.   So is that your best testimony that
20  you believe you have -- you've had two
21  performance reviews in the last seven or eight
22  years?
23         MR. BADALA:  Objection to form.
24         THE WITNESS:  Well, I get
25  performance reviews by feedback from staff.

4 (Pages 10 - 13)

1  The written annual review that you mention --
2  or if that's what I understand your question to
3  be -- I don't remember the exact number, sir.
4  I know there was at least one, I think two.
5        BY MR. CHEFFO:
6     Q.  And you can't remember any more than
7  two?
8     A.  Not as I sit here today, no.
9     Q.  And -- and with the two that you
10 remember, did you actually get paper -- some
11 type of actual written summary or -- or
12 evaluation that was an adjunct to a formal
13 in-person evaluation?
14    A.  With one of the year-end reviews I
15 did get a piece of paper summarizing that.  And
16 the other informal reviews I don't have any
17 paper with it, and I don't remember if they
18 were annual or if they were just things that
19 were going on in the course of business that I
20 would get feedback from my supervisor.
21    Q.  Have you ever asked for a -- a
22 formal evaluation, other than the one time you
23 got one?
24    A.  No, sir.
25    Q.  Do you review your team on an annual

1  basis?
2     A.  I have.  As I say our HR -- our
3  human resource department hasn't given us the
4  guidance on that recently.  So for the last two
5  years, I believe we have not done that.
6     Q.  Meaning you haven't reviewed any of
7  your people for the last two years?
8     A.  Not in the setting as I understand
9  what you're asking me.  I review all my people
10 pretty much top to bottom very frequently
11 actually.
12    Q.  Yeah.  I'm talking about a formal --
13       MR. BADALA:  You understand --
14       THE WITNESS:  Formal written review?
15       MR. CHEFFO:  Right.
16       THE WITNESS:  No, I have not done
17 that.
18       BY MR. CHEFFO:
19    Q.  And that's because HR didn't tell
20 you that you needed to?
21    A.  They didn't give us a framework to
22 operate in for a review.  So I've done what, as
23 I say, is a more informal review.  And I do
24 those frequently.
25    Q.  And prior to the last two years, did

1  you do them on an annual basis with frequency?
2     A.  Yes, I did.
3     Q.  And did you ever ask HR why they
4  didn't give you the framework so you could
5  review your people formally?
6     A.  I believe I have asked whether we
7  would be doing annual reviews.  And I don't
8  really know what the answer was to that, other
9  than it wasn't going to be done for those two
10 years.
11    Q.  Who'd you ask?
12    A.  I don't remember.
13    Q.  Is there an HR person within your
14 department, or do you rely on an HR person
15 that's outside the department?
16    A.  Both.  We have a liaison to our
17 office.  And then obviously there's HR
18 personnel who are more centrally based in the
19 county.
20    Q.  And who'd you ask?
21    A.  I don't remember, sir.
22    Q.  There's somebody physically in your
23 building who's an HR person?
24    A.  Yes.
25    Q.  Did you ask him or her?

1     A.  I believe I did.  But I -- I -- I
2  want to be certain.  But the person has changed
3  some.  So I originally had a person Radine
4  Brown, who got promoted.  And I would
5  frequently interact with her but still have a
6  different liaison in the building.
7        And my current person is Lynn
8  Ferraro.  And I -- I -- I believe I spoke with
9  her about whether we would be doing reviews
10 through an HR framework.  I may have spoken to
11 Radine though.
12    Q.  Do you think reviews are a good
13 idea?
14       MR. BADALA:  Objection to form.
15       THE WITNESS:  Yes, I do.
16       BY MR. CHEFFO:
17    Q.  And when do you believe you will
18 review the people who work in your department?
19    A.  As I say, I review those people
20 constantly.
21    Q.  I think --
22    A.  The formal review process I think is
23 a good -- good thing too.  But it's not that
24 they're going unreviewed.  I certainly wouldn't
25 say that at all.

5 (Pages 14 - 17)

Page 18

1    Q.   Do you remember my question?
2    A.   I thought I answered your question,
3  sir.
4    Q.   Do you remember what it was?
5    A.   Do you think reviews are a good
6  idea.
7    Q.   No.
8         I said when -- when do you expect to
9  review your people?
10        MR. BADALA:  Objection to form.
11        THE WITNESS:  I don't have a
12  specific time framework for that.  I have four
13  direct reports.  I see them on a weekly basis
14  and provide feedback to them.  I walk the
15  office at least once to twice a week and talk
16  to other employees as well.
17        MR. CHEFFO:  Okay.  Move to strike.
18        BY MR. CHEFFO:
19    Q.   When do you expect issue formal
20  reviews, if ever, of the people who report to
21  you?
22        MR. BADALA:  Objection to form.
23  Asked and answered.
24        THE WITNESS:  I'm not sure what
25  you're meaning by "formal reviews."  I consider

Page 19

1  reviews my interactions with the staff.
2         BY MR. CHEFFO:
3    Q.   Annual performance reviews.
4         MR. BADALA:  Objection to form.
5  It's a different question.
6         THE WITNESS:  Annual performance
7  reviews, I don't have a framework for them this
8  year.  So I -- I don't know if we will receive
9  that guidance to do so.
10        BY MR. CHEFFO:
11    Q.   What did you do to prepare for
12  today's deposition, if anything?
13    A.   I reviewed our web site information
14  primarily, different reports that our agency
15  had generated.  I did speak with counsel for
16  the county in preparation as well.
17    Q.   Okay.  And I don't want you to tell
18  me anything you talked about with your -- with
19  your lawyer.
20        But was it the attorney sitting next
21  to you?
22    A.   He was one, yes.
23    Q.   Anybody else?
24    A.   It was by phone.  Joe Ciaccio I
25  think was the other fellow.

Page 20

1    Q.   Anybody else?
2    A.   Not that I remember.
3    Q.   And how many times did you -- again,
4  with the caveat I don't want you to tell me
5  anything you talked to with them, but how many
6  times did you meet with -- with them or talk
7  with them?
8    A.   We spoke on Friday, and we spoke
9  yesterday.
10    Q.   And how long was each session?
11    A.   I don't remember the Friday.
12  Probably between one to two hours and yesterday
13  was about two and a half hours.
14    Q.   And was anyone present, either in
15  person or on the phone, other than the three --
16  the two lawyers you mentioned and yourself?
17    A.   Not that I remember, no.  I mean I'm
18  -- I was in my office by myself.  So nobody on
19  my end.
20    Q.   Okay.  And -- and the only documents
21  you reviewed were publicly available documents
22  on the web site in connection with your -- your
23  deposition; is that right?
24    A.   Yes.
25    Q.   Do you know what was collected and

Page 21

1  produced from your department in connection
2  with this litigation?
3    A.   In a general way.  I don't know
4  every document that came.
5    Q.   What was -- what generally was
6  collected and produced?
7    A.   I think our public documents and
8  case files around the decedents who died in the
9  opioid epidemic.
10    Q.   Anything else?
11    A.   E-mails I believe were also
12  produced.
13    Q.   Anything else?
14    A.   Not that I remember.  I -- I don't
15  mean to say that there weren't.  I just -- not
16  that I know of --
17    Q.   Okay.
18    A.   -- right now.
19    Q.   How do you refer to your -- your
20  department?
21        MR. BADALA:  Objection to form.
22        BY MR. CHEFFO:
23    Q.   That's why I'm just -- when I stay
24  "the department."
25        What -- what -- is that how you say,

6 (Pages 18 - 21)

Page 22

1  "the department," or do you say the medical
2  examiner's office?
3      What -- how do you --
4      A.   I call it the medical examiner's
5  office.
6      Q.   M -- ME's office?
7      A.   Or the office.
8      Q.   Okay.
9      A.   And crime laboratory.  They're both
10  under me, but they're separate functions.
11     Q.   Okay.  And did you do anything else
12  other than review the documents you've told us
13  about and speak with your lawyers to prepare
14  for the deposition?
15     A.   Maybe read some articles that I had
16  written on the opioid crisis.  I think
17  that's -- that's everything.
18     Q.   Did you speak with anybody else?
19     A.   Not in preparation for today, no.
20     Q.   You've been deposed before; is that
21  right?
22     A.   In this litigation or in general?
23     Q.   In general.
24     A.   Yes, I have.
25     Q.   And in this litigation, you were

Page 23

1  deposed last --
2      A.   Yes.
3      Q.   -- week.
4      A.   And it was also last week --
5      Q.   Right.
6      A.   -- on Monday.
7      Q.   Approximately how many times were --
8  have you been deposed in -- in your career?
9      A.   I don't keep track of it.  I don't
10  honestly know.
11     Q.   Is it over a hundred?
12     A.   No.  No.  It certainly -- the bulk
13  of my testimony's criminal and usually doesn't
14  have a deposition ahead of time.
15     Q.   How many times have you testified at
16  trial?
17     A.   I don't keep track of that either.
18  That, I would say, you know, is over a hundred,
19  I know.
20     Q.   And most of those have been in
21  connection with criminal proceedings is that
22  fair?
23     A.   The majority I would say that's a
24  fair statement.
25     Q.   Did you assist in preparing the

Page 24

1  complaint in this case?
2      A.   No, I did not.
3      Q.   Did you see it before it was filed?
4      A.   No, sir.
5      Q.   Did you -- have you assisted in the
6  preparation of any discovery responses in this
7  case?
8      A.   Not directly.  I mean if our
9  information was used in those responses, I
10  obviously oversee the agency that generates a
11  large amount of data.  But the actual
12  preparation of those documents I would have to
13  say no, I did not.
14     Q.   Okay.  So in other words, no one
15  sent you a copy of an interrogatory response
16  and said, "Hey, Doctor, can you just take a
17  look at this or help fill in the blanks"?
18     A.   No, sir.
19     Q.   Are you aware of anybody on your
20  staff who did that?
21     A.   No, sir.
22     Q.   As is typical, I'm going to try and
23  see if I can start with a few kind of broad
24  concepts and see where you have some knowledge
25  and where you may not.  So I'm going to ask you

Page 25

1  some broad questions and see if you can tell me
2  what -- what you think the responses are.
3      So do you consider yourself to be an
4  expert in opioids?
5      MR. BADALA:  Objection to form.
6      THE WITNESS:  The drugs themselves
7  or...
8      BY MR. CHEFFO:
9      Q.   Yes, sir.
10     A.   I'm familiar with them.  I wouldn't
11  say I'm an expert at them.
12     Q.   So things like pharmacokinetics or
13  pharmacology of opioids, you don't hold
14  yourself as an expert in those, do you?
15     A.   No.  Again, as part of my medical
16  training, I would have received information
17  about them.  But advanced knowledge on them, I
18  wouldn't claim to have that.
19     Q.   And are you an expert in the FDA?
20     MR. BADALA:  Objection to form.
21     THE WITNESS:  I'm familiar with the
22  FDA, but I don't know if anybody's an expert in
23  the FDA.
24     BY MR. CHEFFO:
25     Q.   Okay.  Are you an expert in the FDA?

7 (Pages 22 - 25)

1    A.   No, sir.  I'm not.

2    Q.   Are you an FDA [sic] in -- in

3 labeling of pharmaceutical medicines?

4    A.   I -- I'm sorry.  I missed the

5 beginning of your question.

6    Q.   Are you an expert in the labeling of

7 pharmaceutical medicines?

8    A.   Not something I have expertise in,

9 sir.

10    Q.   And the rules and regulations for

11 pharmaceutical companies that are promulgated

12 by the FDA, are you an expert in that area?

13    A.   No.  I do not have expertise in that

14 area.

15    Q.   Are you an expert in toxicology?

16    A.   As part of my training, I have

17 information in toxicology.  I am not a

18 toxicologist.  I have expertise as a forensic

19 pathologist in interpreting toxicology.

20    Q.   Is there a toxicologist or -- or

21 more than one toxicologist in your office?

22    A.   Our office has a toxicology

23 laboratory.  It's staffed by a chief

24 toxicologist, who is a Ph.D. level.  I have a

25 supervisor who has extensive experience.  I

1 have multiple scientists at different levels.

2         I believe the total number of

3 employees in our toxicology laboratory is nine.

4 I consider all of them, to a greater or lesser

5 extent, to be toxicologists.  But the chief

6 toxicologist would be the Ph.D.-level person,

7 Dr. Apollonio.

8    Q.   Is that a he or she?

9    A.   He.

10    Q.   And what was his first name?

11    A.   Luigino.

12    Q.   Okay.  And are you an expert in

13 epidemiology?

14    A.   Again, I have familiarity with

15 epidemiology.  I do not have formal training in

16 epidemiology though.

17    Q.   So I guess the answer is no, you

18 don't hold yourself out as an expert in

19 epidemiology.

20         Is that fair?

21    A.   I think, as a medical examiner, I

22 have familiarity with public health issues.  In

23 terms of expertise with epidemiology,

24 statistical things, I wouldn't presume to have

25 that.  But I do know things about epidemiology.

1    Q.   Got it.

2         Do you hold ourself out as an expert

3 in epidemiology; yes or no?

4    A.   I -- I don't think I can answer that

5 as a -- I -- I don't -- there's areas of

6 epidemiology with which I am familiar and areas

7 with which I am not.

8    Q.   So tell me --

9    A.   So I would say, if we're talking

10 about the entire field of epidemiology, I don't

11 carry a degree in that field, and I don't have

12 specialized training in it beyond my experience

13 as a medical examiner.

14    Q.   What, if any, areas of epidemiology

15 do you hold yourself out as an expert in?

16         And to the extent that you do,

17 explain the basis of your expertise.

18    A.   I think I am a public health

19 officer.  So I would collect and analyze data

20 as it would relate to different public health

21 issues.

22    Q.   So you're an expert in what with

23 respect to epidemiology?

24         How would you characterize it?

25    A.   Data generation and analysis.

1    Q.   In all fields?

2    A.   All fields of?

3    Q.   Anything.

4    A.   Epidemiology?

5         MR. BADALA:  Objection to form.

6         THE WITNESS:  I'm -- can you say

7 your question.

8         BY MR. CHEFFO:

9    Q.   You say you're an --

10    A.   I don't fully understand.

11    Q.   You said you're an expert in data

12 generation, right, in the context of

13 epidemiology?

14    A.   I think I have advanced knowledge

15 there, yes.

16    Q.   Is that related in all areas of

17 epidemiology or just as it relates to the

18 functions of a -- a medical examiner?

19    A.   As it relates to my duties as a

20 medical examiner and public health officer.

21    Q.   Have you ever published in the field

22 of epidemiology?

23    A.   My publications would be

24 epidemiologic-based, to some extent, in that

25 we're generating data on a population basis.

Page 30

1  So to that extent, I think forensics overlaps
2  with epidemiology.
3      Q.  Are you an expert in the marketing
4  of prescription medicines?
5      A.  No, sir.
6      Q.  Are you an expert in the
7  distribution of pharmaceutical medicines?
8      A.  No, sir.
9      Q.  Are you an expert in -- in
10  pharmacies?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  I'm not sure.  If you
13  can be more specific in your question.
14      BY MR. CHEFFO:
15      Q.  Okay.  Are you an expert in -- in
16  pain management?
17      A.  No, sir.
18      Q.  Are you an expert in addiction?
19      A.  That's not within the scope of what
20  I practice.  So I'd have to say that I don't
21  really carry any formal training in that or
22  expertise.
23      Q.  Are you an expert in the treatment
24  of chronic pain?
25      A.  Again, I have familiarity from my

Page 31

1  medical education, but I wouldn't label that as
2  expertise.  I don't treated those kind of
3  patients.  So I don't have experience with it.
4      And other than my general knowledge
5  as a medical practitioner, I wouldn't say that
6  I have specific, you know, formal training or
7  experience in that.
8      Q.  Are you an expert in the sales
9  practices of pharmaceutical companies?
10      MR. BADALA:  Objection to form.
11      THE WITNESS:  I just have some
12  familiarity with that.  But no, I would not
13  claim expertise in that area.
14      BY MR. CHEFFO:
15      Q.  Are you an expert in connection with
16  the DEA's rules and regulations?
17      MR. BADALA:  Objection to form.
18      THE WITNESS:  Pardon me for a
19  second.
20      No, I am not.
21      BY MR. CHEFFO:
22      Q.  Are you an expert in -- in drug
23  cartels?
24      A.  I know some about them, but I -- I
25  certainly wouldn't profess to be an expert at

Page 32

1  the level of some really high-level law
2  enforcement person on that.
3      Q.  And -- and where -- where did you
4  get your knowledge about drug cartels?
5      A.  Primarily discussions with law
6  enforcement.  My independent reading as well.
7      Q.  And what do you know about them, and
8  how do they intersect with your work as a
9  medical examiner?
10      MR. BADALA:  Objection to form.
11      THE WITNESS:  Well, the drug
12  cartels, you know, are based in different parts
13  of the world, as you know.  And when we were
14  talking back in the heroin phase of the opioid
15  crisis, I became familiar with -- and again,
16  these were discussions with law enforcement --
17  drug cartels that would have been based in
18  Mexico who were considered to be responsible
19  for the large influx of heroin into especially
20  the middle part of the country.
21      There were drug cartels, again,
22  which I was, again, told of in discussions with
23  law enforcement, in Afghanistan and other parts
24  of the world who also distribute opioids.
25      There are drug cartels in South

Page 33

1  America.  The Medayee cartel is one that comes
2  to mind, which was a drug cartel that was very
3  active in the distribution of cocaine.
4      There are I think, you know, bases
5  in the United States, as understand it, with a
6  hierarchy going back to these cartels.  And
7  that's my understanding of them.
8      BY MR. CHEFFO:
9      Q.  And let -- let's -- let's focus for
10  my -- and -- and thank.  You -- you -- you
11  answered my question.  But I have a more
12  specific question.
13      With respect to -- to Cuyahoga
14  County, what is the impact of drug cartels
15  currently in connection with illicit drug use
16  in Cuyahoga County?
17      A.  I -- I couldn't be more specific
18  about it, other than my discussions with law
19  enforcement would indicate that the
20  distribution of drugs in the United States in
21  general comes through large cartels and then
22  will filter down to a place like Cuyahoga
23  County.  And that's probably as specific as I
24  could be.
25      So I think that, as I understand

9 (Pages 30 - 33)

Page 34

1  it -- pardon me -- the cartels have some
2  influence on the distribution of drugs here at
3  a local level.
4      Q.  And when you say the distribution of
5  drugs, am I correct that you're talking about
6  the distribution of illegal or illicit drugs?
7      A.  Again, I don't have the specific
8  knowledge whether they're distributing or
9  redeploying, you know, legitimate
10  pharmaceutical products as well as illegal
11  drugs.  I don't know for sure.
12     Q.  Right.
13         But if a drug cartel even were to
14  get its hands on what would otherwise have been
15  prescription medicines, that would be illicit
16  distribution, wouldn't it?
17     A.  Yes.
18     Q.  I mean they're not -- they're not
19  licensed to sell medicines to people in --
20     A.  No.
21     Q.  -- the county, are they?
22     A.  Of course not.  I think -- sure.
23     Q.  So anything that they would
24  distribute or put into the system that winds up
25  in Cuyahogi [sic] -- Cuyahoga would be, by

Page 35

1  definition, illegal.
2      A.  Right.  It wouldn't be an illicit
3  substance necessarily like heroin, but it would
4  be illegal for them to be distributing it
5  because they're not appropriately the people to
6  be doing that.
7      Q.  And you're aware that they
8  distribute both illicit substances like
9  synthetic fentanyl and carfentanil and -- and
10  heroin as well as could divert what would
11  otherwise have been lawful medicines.
12        MR. BADALA:  Object -- objection to
13  form.
14        THE WITNESS:  In a general way, yes.
15  It's a -- you know, I don't have the specific
16  law enforcement background to say absolute
17  certainty on that.  But I would say, in a
18  general way, the cartels or distributors of
19  illegal substances would have access to both,
20  is my understanding of that.
21        BY MR. CHEFFO:
22     Q.  Correct me if I'm wrong, but I -- I
23  tried to write this down, Doctor.  I think you
24  said "during the heroin phase of the drug
25  crisis."

Page 36

1      Did I get that correct?
2      A.  Yes.
3      Q.  And -- and what did you mean by
4  that?
5      A.  Well, the way I -- I see the
6  writings on the opioid crisis now, and from
7  CDC, which I consider, you know, our premier
8  public health organization, we talk about the
9  opioid crisis in a global way with distinct
10  phases that would include the opioid pain
11  reliever phase, the heroin phase, and the
12  fentanyl and the analogs of fentanyl phase.
13     Q.  Are we in the fentanyl and analog of
14  fentanyl phase right now?
15        MR. BADALA:  Objection to form.
16        THE WITNESS:  I would say that
17  that's a designation.  But I -- I would say,
18  you know, as a caution to that, the number of
19  people who die of heroin overdoses did not drop
20  to zero, nor did the number of people who die
21  of opioid pain reliever.  The prescription pain
22  medications dropped to zero.
23        So I think it's a continuum.  But in
24  terms of what's dominating the picture right
25  now for mortality, we are in the fentanyl

Page 37

1  phase.  Because fentanyl has been responsible
2  for so many more deaths in Cuyahoga County and
3  also nationally.
4        BY MR. CHEFFO:
5      Q.  Well, you told me that there were
6  three phase, as you understood it, right?
7        One was the opioid phase, one was --
8  and I take it you mean by opioid prescription
9  phase?
10     A.  Right.  Yeah.
11     Q.  And then there was the heroin phase,
12  and then there was the fentanyl and fentanyl
13  analog phase.
14        Did I get that right?
15     A.  That's my understanding of what CDC
16  says.  And that's my understanding of the
17  epidemic, yes.
18     Q.  And what -- for what years did those
19  phases exist?
20        MR. BADALA:  Objection to form.
21        THE WITNESS:  I don't know that
22  people would be dogmatic about, you know, there
23  was an overlap in them.  The opioid pain
24  reliever phase I think people would now look
25  back and say, you know, 1990s into maybe about

10 (Pages 34 - 37)

Page 38

1    2010.  Heroin phase would be over about 2010 to
2    2014.  And as I understand, you know, the
3    public health thinking on that, the fentanyl
4    phase would be taking from -- taking off from
5    there.
6            Again, with that caveat that they
7    blend into each other, and they're not
8    necessarily one stopped and another one began
9    so much as another drug starts to take
10   increased prominence.
11           BY MR. CHEFFO:
12   Q.    Did heroin come into being in the --
13   in -- prior to the 1990s?
14   A.    Heroin was first synthesized I think
15   back in 1870-something.
16   Q.    Has there been a problem in Cuyahoga
17   and other municipalities in this state and
18   country with heroin prior to the 1990s?
19           MR. BADALA:  Objection to form.
20           THE WITNESS:  I can't speak to
21   Cuyahoga County with certainty.  Other places
22   that I've worked have had trouble with heroin.
23           BY MR. CHEFFO:
24   Q.    Prior to the 1990s?
25   A.    Prior to the 1990s, yes.

Page 39

1    Q.    And is -- is the same true for
2    illicit fentanyl, that there was a problem with
3    the abuse of illicit fentanyl prior to the
4    1990s?
5    A.    There were -- I -- I don't know
6    that, actually.
7    Q.    Okay.  What about --
8    A.    I'm not familiar with one.
9    Q.    What about methamphetamines; was
10   there a problem with meth prior to the 1990s;
11   do you know?
12           MR. BADALA:  Objection to form.
13           THE WITNESS:  I'm aware of issues
14   with amphetamine that go back into the '50s and
15   '60s.  Methamphetamine, I don't know if that
16   was the specific amphetamine or if it was just
17   the drug amphetamine.  But that class of
18   compounds, there were issues with them prior to
19   1990.
20           BY MR. CHEFFO:
21   Q.    Is there a current problem in
22   Cuyahoga County with the use of
23   methamphetamines?
24   A.    We see it both in the drug chemistry
25   laboratory and in the mortality data.  I

Page 40

1    believe in 2017, which is the last year we have
2    full data for, we had 24 overdoses that were
3    related to methamphetamine, either alone or in
4    combination, but mostly in combination.
5            And in terms of, you know,
6    comparability, it's certainly dwarfed by the
7    opioids.  I don't think anybody likes to see
8    any of these drugs in our community.
9            But it isn't absent completely from
10   our community.  And, in fact, about a year ago
11   we noticed an increase in the number of
12   seizures of methamphetamine in our county.
13   That hasn't really sustained itself over the
14   course of 2018, but it hasn't dropped back down
15   to zero.
16           So it's present here.  I wouldn't
17   say it's at, you know, epidemic proportions.
18   Q.    Has it ever been an epidemic?
19           MR. BADALA:  Objection to form.
20           THE WITNESS:  In Cuyahoga County,
21   not to my knowledge.
22           BY MR. CHEFFO:
23   Q.    Have you looked at the data?
24   A.    I have looked back at different drug
25   overdose data back to 2006 and have not really

Page 41

1    appreciated methamphetamine being a major
2    contributor to drug overdose mortality.
3    Q.    So your -- your knowledge goes back
4    to 2006, your personal knowledge?
5    A.    That's the data I've looked back at.
6    Q.    And methamphetamine is not a -- a
7    lawful product, is it?
8    A.    I don't believe so.  Amphetamine
9    is -- it's a -- it can be used as a diet
10   suppressant or for other things.  But
11   methamphetamine I don't think is anything that
12   can be lawfully prescribed.
13   Q.    Same for heroin, right?
14   A.    Right.  Heroin is a what we call
15   Schedule 1 drug, which means it has no
16   legitimate medical use.
17   Q.    What are the Schedule 1 drugs that
18   are abused in Cuyahoga County?
19           MR. BADALA:  Objection to form.
20           THE WITNESS:  I'd have to say heroin
21   is the one I know best.  I don't know all of
22   the drugs that are Schedule 1.  And I couldn't
23   tell you for certain every drug that has been
24   abused in Cuyahoga County.  So I'd have to say
25   heroin is the one I know best, but --

11 (Pages 38 - 41)

Page 42

1      BY MR. CHEFFO:
2      Q.   Meth is another one, right?
3      A.   Again, if it is Schedule 1, which --
4      Q.   What about cocaine?
5      A.   Cocaine is a drug that has a defined
6   medical use.  It's used as a topical anesthetic
7   in certain types of surgery.  Ear, nose and
8   throat surgery.  It can be used as a topical
9   anesthetic for closing lacerations and wounds.
10  So it has a legitimate medical use, so
11  therefore, not Schedule 1.
12     Q.   Is -- is there a -- a cocaine
13  problem currently in Cuyahoga County?
14     A.   There is an elevation in cocaine
15  deaths in Cuyahoga County.  Our analysis looks
16  at this as really a byproduct largely of the --
17  the -- the rise in cocaine deaths is a
18  byproduct of the opioid crisis.
19     Q.   So is it really your testimony that
20  everybody who has and overdose from cocaine,
21  that's somehow related to opioids?
22     MR. BADALA:  Objection to form.
23     BY MR. CHEFFO:
24     Q.   Is that your testimony?
25     A.   Oh, I'm sorry.  No.  That wouldn't

Page 43

1   be my testimony at all.
2      Q.   Okay.  Cocaine --
3      A.   If I could finish --
4      Q.   No.  I -- I --
5      MR. BADALA:  You can finish your
6   answer.  You can.
7      MR. CHEFFO:  There's no question
8   pending.  But if you --
9      MR. BADALA:  There was a --
10     MR. CHEFFO:  -- want to make a
11  speech.
12     MR. BADALA:  -- pending.  You asked
13  him a question.
14     You can -- you can finish.
15     MR. CHEFFO:  Go ahead.
16     THE WITNESS:  We have a certain
17  baseline of cocaine deaths, again, going
18  back -- you know, my data goes back to 2006,
19  with which I'm most familiar.  And that
20  remained relatively stable until 2016 when it
21  started to pull up.
22     And when we looked at that data, the
23  cocaine deaths without fentanyl being present
24  had remained again where that baseline was.
25  And the elevation that we saw in cocaine deaths

Page 44

1   in 2016 and 2017 is related to mixtures of
2   cocaine with fentanyl.
3      BY MR. CHEFFO:
4      Q.   So you're -- you're saying that
5   there's more deaths based on cocaine use
6   because there's a combination of fentanyl?
7      Is that -- am I understanding that
8   right?
9      A.   No.  What I'm saying is there's a --
10  there are deaths of -- by cocaine without the
11  presence of fentanyl.  But the elevations that
12  we saw in 2016, after at least a decade of
13  stability, those were driven by fentanyl.
14     Q.   Is there a cocaine epidemic in
15  Cuyahoga County today?
16     MR. BADALA:  Objection to form.
17     THE WITNESS:  There are more deaths
18  from cocaine.  But again, I have to see it in a
19  bigger context.
20     BY MR. CHEFFO:
21     Q.   Is there a cocaine crisis in
22  Cuyahoga County?
23     MR. BADALA:  Objection to form.
24     THE WITNESS:  Well, I think, you
25  know, there's concerns about that rise.  But

Page 45

1   they're tied, as I say, back to the fentanyl.
2      BY MR. CHEFFO:
3      Q.   Is there a cocaine crisis in
4   Cuyahoga County?
5      MR. BADALA:  Objection to form.
6      THE WITNESS:  I'd have to say yes
7   and no.
8      BY MR. CHEFFO:
9      Q.   How long has there been a cocaine
10  crisis in Cuyahoga County?
11     MR. BADALA:  Objection to form.
12     THE WITNESS:  The elevation that we
13  saw in cocaine mortality started in 2016.
14     BY MR. CHEFFO:
15     Q.   Was there a cocaine crisis prior to
16  2016 in Cuyahoga County?
17     A.   I wouldn't characterize it as a
18  change over baseline at an epidemic level.
19     Q.   I didn't ask that, Doctor.  I'm not
20  asking whether it changed.
21     Was there a cocaine crisis at any
22  level prior to 2016 in Cuyahoga County?
23     MR. BADALA:  Objection to form.
24     THE WITNESS:  There were certainly a
25  hundred people, on average, dying.

12 (Pages 42 - 45)

Page 46

1    BY MR. CHEFFO:
2    Q.   And is that a crisis; yes or no?
3    A.   I wouldn't like it.  I -- I don't
4  know -- you know, as I understand a crisis, it
5  overwhelms the ability of a county to respond
6  to it.  And those responses, it wasn't
7  worsening over --
8    Q.   So --
9    A.   -- that time frame.  So using that,
10  you know, understanding of the crisis, I'd have
11  to say I -- it's not good.  But I wouldn't say
12  that it acutely worsened into a crisis phase.
13    Q.   Okay.  So there has never -- in your
14  -- in your estimation, there has never been a
15  crisis for cocaine use in Cuyahoga County?
16    MR. BADALA:  Objection to form.
17    BY MR. CHEFFO:
18    Q.   Is that right?
19    A.   No.  That wouldn't be my impression.
20    Q.   Has there ever been a crisis of
21  cocaine use in Cuyahoga County?
22    MR. BADALA:  Objection to form.
23    THE WITNESS:  I don't know.  I mean
24  Ohio had an instance in the 1980s and '90s with
25  crack cocaine that was considered a crisis.

Page 47

1  And I wasn't here, and I don't really have
2  firsthand knowledge of that.
3    But, you know, it was in other
4  jurisdictions that we're seeing cocaine --
5  crack cocaine crisis epidemics.  So it's
6  plausible.
7    BY MR. CHEFFO:
8    Q.   Was --
9    A.   But I don't have first knowledge.
10    Q.   You -- you don't know.
11    A.   I can't testify to that.
12    Q.   Okay.  And was crack cocaine ever
13  marketed by any pharmaceutical company?
14    A.   No, sir.
15    Q.   Was it ever lawfully distributed?
16    A.   No, sir.
17    Q.   And yet there was a crack cocaine
18  crisis back in the '80s in Cuyahoga County; is
19  that right?
20    MR. BADALA:  Objection to form.
21    THE WITNESS:  Again, I have to say I
22  don't know that for certain.
23    BY MR. CHEFFO:
24    Q.   I thought you just testified about
25  that a minute ago.

Page 48

1    MR. BADALA:  Objection to form.
2  Misstates his testimony.
3    THE WITNESS:  No.  That's not what I
4  said, sir.
5    BY MR. CHEFFO:
6    Q.   Was there a crack cocaine crisis in
7  the United States back in the '80s?
8    MR. BADALA:  Objection to form.
9    THE WITNESS:  Yes, there was.
10    BY MR. CHEFFO:
11    Q.   Are you aware of any connection
12  between the crack cocaine crisis and opioids?
13    MR. BADALA:  Objection to form.
14    THE WITNESS:  They're both illicit
15  substances.  I don't know.
16    BY MR. CHEFFO:
17    Q.   Are you aware of any connection
18  between the two?
19    MR. BADALA:  Same objection.
20    THE WITNESS:  I mean I -- I -- I
21  don't know -- I don't know.
22    BY MR. CHEFFO:
23    Q.   Are you an expert in -- well, strike
24  that.
25    Do you know what the OARRS database

Page 49

1  is?
2    A.   Yes, I do.
3    Q.   What's it?
4    A.   It is a prescription drug monitoring
5  program for the State of Ohio.  OARRS is an
6  acronym.  It stands for Ohio Automated Rx or
7  prescription Reporting System.
8    And what it collects is the
9  information from prescribing of controls
10  substances around the state and makes that
11  available to different parties for their use.
12    Q.   So -- and there are certain rules
13  that govern how and when healthcare providers
14  should access and input information to OARRS.
15    Is that fair?
16    A.   I wouldn't profess to know all their
17  rules and regulations.  My understanding is
18  that the pharmacies enter their data into
19  OARRS -- pardon me -- to create the database.
20  And then, if there are controlled substances
21  that are being distributed from a healthcare
22  provider's office, they also have to be entered
23  into OARRS.
24    Q.   Okay.  And beyond that general
25  understanding, do you hold yourself out as an

13 (Pages 46 - 49)

1  expert in the rules and operation and
2  regulations of OARRS?
3     A.  No.  I have familiarity with OARRS.
4  But I didn't write the legislation.  I wouldn't
5  consider myself all-knowing about it either.
6     Q.  Do you assessors from time to time
7  in your professional capacity?
8     A.  Yes.  We do as an office, and I have
9  individually as well.
10     Q.  How frequently do you assessors, and
11  in what circumstances?
12        MR. BADALA:  Objection to form.
13        THE WITNESS:  We -- as an office I
14  would have to say -- and again, I have an
15  account in OARRS and delegates who would use
16  it.  We use that information very frequently.
17        Most recently we've used it to go
18  back and look at the individuals who overdosed
19  in 2016 and early 2017 on fentanyl.  We've used
20  it to look at individuals who've overdosed on
21  heroin as well.
22  BY MR. CHEFFO:
23     Q.  Do you conduct autopsies personally?
24     A.  Yes, I do.
25     Q.  Do you -- in connection with your

1  own personal work as a medical examiner in
2  connection with an autopsy, in what
3  circumstances, if any, do you consult OARRS?
4     A.  We have used the OARRS database to
5  look back on the drug overdose deaths that have
6  come through our county to look for
7  relationships there between prescribed --
8  prescription controlled substances and the
9  illicit overdoses, especially with heroin and
10  fentanyl and some of the analogs of fentanyl.
11        MR. CHEFFO:  Can you read back my
12  question, please.
13        (The record was read as requested.)
14        THE WITNESS:  I -- in doing
15  autopsies on drug overdoses myself and in my
16  capacity as the medical examiner overseeing the
17  agency.  I review the work that comes through
18  the office as well.
19        So it that's my professional
20  capacity, if I understood your question
21  correctly.
22  BY MR. CHEFFO:
23     Q.  No, I don't think you did.
24        Is there -- is there a -- a terminal
25  or way that you can access OARRS from your

1  office, either on computer or some other
2  fashion?
3     A.  Yes.  There's a web site for OARRS.
4  You have a user name and a password, like my
5  other web sites.  I have those.  And I can
6  access that.
7        Or, because of my designation, I can
8  have delegates access that through me.
9     Q.  And I'm just trying to find out,
10  Doctor, your own personal use, if any.
11        So in other words, do you sit at a
12  terminal ever and look at OARRS database and
13  conduct searches or queries; do you ask someone
14  else to do that; or do you never do it in
15  connection with your autopsies?
16        I'm trying to find out when you, Dr.
17  Gilson, do an autopsy, under what
18  circumstances, if any, do you either access
19  OARRS or do you ask someone to access OARRS on
20  your behalf for a specific case?
21        MR. BADALA:  Objection to form.
22        THE WITNESS:  I ask my designees to
23  access it for drug overdose cases, my own and
24  others.  I access it in my own cases if there's
25  some pressing issue that I feel needs a more

1  rapid turnaround time.
2        BY MR. CHEFFO:
3     Q.  Is it accessed by you or on your
4  behalf in connection with every autopsy you do
5  in connection with a drug overdose case?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  That's our ideal.
8  Honestly, with the volume of drug overdose
9  cases we've done, we've fallen behind to some
10  extent on our ability to look at the OARRS
11  database.
12        But our goal is to review all of
13  them on every drug overdose autopsy with the
14  opioids.
15        BY MR. CHEFFO:
16     Q.  How long does it take to actually
17  look at OARRS to find out if somebody who
18  you're doing an autopsy on is in the system?
19     A.  To find out if just they have a file
20  can be relatively quick.
21     Q.  Like two minutes?
22     A.  Maybe even less.  I mean getting on
23  sometimes is more challenging than others.  But
24  pretty much, you know, getting around OARRS --
25  and there have been modifications certainly

Page 54

1   since I was granted access to try to facilitate
2   the use of it, to make it easier to access.
3        But it's not a time consuming
4   process sometimes to find out if somebody has
5   no file there.
6   Q.   Right.
7        And that -- and why -- what are the
8   reasons why you would access OARRS in
9   connection with an autopsy?
10   A.   To document a relationship between
11   somebody who died of a drug overdose and their
12   prescribing history.
13   Q.   What would OARRS tell you or could
14   it tell you?
15   A.   It would tell us whether or not, in
16   their lookback period, that person had received
17   prescriptions for controlled substances.
18   Q.   Anything else?
19   A.   It would give us information about
20   prescriber, would give us information about the
21   pharmacy where they were filled.
22   Q.   Does it tell you whether they had an
23   addiction problem?
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  That's not part of the

Page 55

1   OARRS database.
2        BY MR. CHEFFO:
3   Q.   Does it tell you whether they were
4   ever treated for addiction?
5   A.   We wouldn't glean that information
6   from the OARRS database.  We do look for it
7   through our addiction -- alcohol and drug
8   addiction mental health services.  Or when my
9   scene investigators respond to a death scene,
10   they will specifically see if the person has
11   received treatment.
12        Because the public facilities
13   represent a portion of our treatment capacity,
14   and then there are private facilities which
15   don't have to report.  But we still want to
16   capture that information for public health
17   purposes.
18   Q.   And I'd like to just -- just focus
19   for a minute on OARRS.  Okay.  I'm just going
20   to ask you some specific questions.  We may
21   talk about other things at the office.  I'm
22   sure we will today.  But I want to just have an
23   understanding, based on -- on -- on your
24   understanding of what OARRS does and does not
25   do.

Page 56

1        So OARRS will tell you if someone
2   received a prescription for a scheduled
3   medicine; is that right?
4   A.   Right.  A controlled substance.
5   They have to be entered into OARRS.
6   Q.   And what -- what is a -- what is a
7   definition of a controlled substance that would
8   show up in OARRS?
9   A.   The opioid, benzodiazepines.  Those
10   are the big ones.
11   Q.   Anything else?
12   A.   Amphetamine.
13   Q.   So it's not just opioids, is it?
14   A.   Not just opioids.  That's right.
15   Q.   So it's benzodiazepines,
16   amphetamines, opioids.
17        What else?  Anything else?
18   A.   I don't know everything that's in
19   the database, to be honest.
20   Q.   If they had the topical -- well,
21   strike that.  That's probably used for surgery.
22        Cocaine you mentioned earlier.
23        Would that show up in the -- in the
24   OARRS database?
25   A.   I never have seen it.  I don't know.

Page 57

1   Q.   Anything else you can think of,
2   other than benzodiazepines, amphetamines and
3   opioids?
4   A.   There's other drugs that are like
5   benzodiazepines, like zolpidem, which aren't
6   technically in that family.  They're also in
7   OARRS.
8   Q.   Okay.  So OARRS will tell you if
9   someone received or was prescribed a controlled
10   substance; is that right?
11   A.   Yes.
12   Q.   It won't tell you whether they were
13   addicted to that substance, will it?
14   A.   No.  It can't -- it won't --
15   Q.   It won't --
16   A.   -- capture that information.
17   Q.   It won't tell you if they were
18   ever -- received substance abuse treatment or
19   counseling, will it?
20   A.   No.  It's not in that database.
21   Q.   It won't tell you if they were --
22   had a drug problem prior to receiving the
23   prescription, will it?
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  One of the things

15 (Pages 54 - 57)

Page 58

1    we've used OARRS for is to document doctor
2    shopping.  So I'd have to say that there's --
3    when we see that, it's a concern that
4    something's going on and very suggestive of
5    somebody who has a drug problem.
6         BY MR. CHEFFO:
7         Q.   What is doctor shopping?
8         A.   We use the definition that was
9    provided by one of our treatment individuals
10   when we did our initial review of overdoses.  I
11   believe she took that from the Department of
12   Health for the state, which is accessing five
13   or more prescribers in a 12-month period.
14        Q.   So if someone accesses and has four
15   doctors at the same time getting controlled
16   substances, that's not doctor shopping, under
17   your definition?
18        A.   That's right.
19        Q.   Would you consider that to be doctor
20   shopping?
21             If you were doing an autopsy, and
22   you looked at the OARRS database, and you saw
23   that Mrs. Smith got coordinate prescriptions,
24   let's say even opioids, from four separate
25   doctors at the same time, would that raise a

Page 59

1    concern to you that that's doctor shopping?
2         MR. BADALA:  Objection to form.
3         THE WITNESS:  It doesn't meet the
4    definition of doctor shopping.  It could raise
5    a concern about morphine-equivalent doses that
6    she's receiving, which would be another source
7    of concern to us.
8         BY MR. CHEFFO:
9         Q.   Would you be concerned if you saw
10   that?
11        MR. BADALA:  Objection to form.
12        THE WITNESS:  Sure.
13        BY MR. CHEFFO:
14        Q.   But -- so -- but from a statistics
15   and -- perspective, you would not characterize
16   that as doctor shopping; is that right?
17        A.   It does not meet the definition that
18   we use for doctor shop.
19        Q.   And how long have you used that
20   definition?
21        A.   Since 2013.
22        Q.   So if somebody has five doctors that
23   they're getting the prescriptions from at the
24   same time, that's doctor shopping, right?
25        MR. BADALA:  Objection to form.

Page 60

1         THE WITNESS:  Five prescribers
2    within a 12-month period is our definition of
3    doctor shopping.
4         BY MR. CHEFFO:
5         Q.   Two, three or four is not, under
6    your definition, right?
7         A.   Does not meet the definition for
8    doctor shopping that we -- we adopted.
9         Q.   You mentioned morphine equivalent as
10   being another surrogate or -- or -- or signal.
11            How does morphine equivalent play
12   into the analysis of doctor shopping?
13        A.   It doesn't play into it at all.  The
14   doctor shopping definition is five or more
15   prescribers within a 12-month period.
16        Q.   It doesn't matter what the morphine
17   equivalents are?
18        A.   I'm not saying that.  I just -- it
19   doesn't meet the definition of doctor shopping.
20   Or the definition we use for doctor shopping
21   does not include a reference to
22   morphine-equivalent doses.
23        Q.   So -- so in terms of doctor
24   shopping, the only definition that your -- your
25   office uses if -- is if somebody has seen or

Page 61

1    been prescribed a controlled substances by five
2    or more doctors within a 12-month period; is
3    that right?
4         A.   That's our definition of doctor
5    shopping.
6         Q.   Now, am I correct that -- that you
7    and your colleague are not slavishly adhered to
8    formal definition if things don't make sense to
9    you?
10        MR. BADALA:  Objection to form.
11        THE WITNESS:  I don't think anybody
12   should do that really.
13        BY MR. CHEFFO:
14        Q.   Right.
15            So if you were doing an
16   investigation, and someone received high doses
17   of a controlled substance by four doctors at
18   the same time, would part of your analysis be
19   that you want to explore whether this person
20   was actually was engaging in doctor shopping?
21        A.   What we did was, when we've
22   identified individuals who met the definition
23   for doctor shopping, we would refer them to the
24   Board of Pharmacy for investigation.
25            And there were instances as well

16 (Pages 58 - 61)

1 when we saw people who had high
2 morphine-equivalent doses that we also referred
3 to the Board of Pharmacy for follow-up.
4    Q.   So am I correct that, if -- if -- if
5 somebody had one doctor and you believed that
6 there was a question about the morphine
7 equivalent that was being prescribed, that
8 person could be referred to the Board of
9 Pharmacy?
10   A.   We have done that in some instances,
11 yes.
12   Q.   Have you ever raised concerns about
13 doctor shopping when someone has four doctors
14 prescribing let's say opioid medicines at the
15 same time?
16   A.   I'm sorry if I'm not clear.  By
17 definition, we don't consider that doctor
18 shopping.
19   Q.   And that's not what I'm asking
20 though.
21        You may not consider it under your
22 definition, but have you acted in a practical
23 manner and referred anyone to the Board of
24 Pharmacy when you've seen someone who has two,
25 three or four doctors prescribing medicine at

1 the same time?
2        MR. BADALA:  Objection to form.
3        THE WITNESS:  I can't give you
4 specific names, but we have referred people to
5 Board of Pharmacy where it seemed like there
6 was an excessive dosing of prescription pain
7 medication who did not have five or more
8 prescribers in a 12-month period.
9        And it can be as few as one.  I
10 distinctly remember one of my own case where a
11 woman overdosed.  She was basically described
12 by her husband as, you know, falling asleep
13 right before she died and, you know, had a lot
14 of prescriptions from I think one individual.
15       And we referred her for further
16 investigation.  I don't remember if it was in
17 conjunction with law enforcement, who may have
18 already been aware of this, or if it was in our
19 review -- our referral to the Board of
20 Pharmacy.  I don't remember the details of the
21 follow-up.
22       But we use a specific definition of
23 doctor shopping.  But obviously, if we saw
24 things that didn't meet that definition but
25 were concerning, we would refer that for

1 further investigation as well.
2        BY MR. CHEFFO:
3    Q.   In that one case that you handled,
4 why did you -- well, let me strike that.
5        When you say you referred to the
6 Board of Pharmacy, is -- is that -- am I
7 correct that that's referring the licensed
8 healthcare provider to the Board of Pharmacy?
9        Is that -- is that the -- the person
10 who is subject to the jurisdiction of the Board
11 of Pharmacy?
12   A.   Right.
13       MR. BADALA:  Objection to form.
14       THE WITNESS:  Sorry.
15       The prescriber would be subject to
16 oversight by the Board of Pharmacy.
17       BY MR. CHEFFO:
18   Q.   And why did you refer that -- was it
19 a doctor?  Was it a health -- a nurse
20 practitioner?  Do you remember?
21   A.   I don't remember exactly.
22   Q.   Okay.  So whoever it was, why did
23 you refer that healthcare practitioner, that
24 prescriber, to the Board of Pharmacy?
25   A.   Because this individual had seemed

1 to receive a lot of pain medication based on
2 our OARRS review and also was symptomatic of --
3 I think she was abusing her medications and
4 died of a drug overdose and, you know, left a
5 couple kids behind and a husband.
6    Q.   And --
7    A.   Not that we reported it because of
8 that, but just part of the tragedy.
9    Q.   And -- and did you refer it to the
10 Board of Pharmacy because you believed that
11 there was a question about whether the doctor
12 or healthcare provider had engaged in
13 appropriate medical care of the patient?
14   A.   We were concerned about the role
15 that the medications had played in her death.
16 I don't practice that kind of medicine.  But
17 that's the kind of investigation that we would
18 ask the Board of Pharmacy to conduct.
19   Q.   Did you question whether the doctor
20 did the right thing in prescribing that much or
21 was careless in monitoring the patient?
22       MR. BADALA:  Objection.
23       BY MR. CHEFFO:
24   Q.   Like were those factors in -- in
25 your consideration?

17 (Pages 62 - 65)

Page 66

1        MR. BADALA:  Objection to form.
2        THE WITNESS:  I was concerned about
3    how much pain medicine this individual had
4    received and the nature of her death, that they
5    weren't being used properly.
6        BY MR. CHEFFO:
7        Q.   Do you know happened to the
8    healthcare prescriber, if anything?
9        A.   I do not.
10       Q.   Did you follow up?
11       A.   No, I did not.
12       Q.   Do you know if the -- do you know
13   anything about why the prescriber wrote the
14   prescriptions?
15       MR. BADALA:  Objection to form.
16       THE WITNESS:  I didn't speak
17   personally to the prescriber.
18       BY MR. CHEFFO:
19       Q.   Do you know what condition the
20   decedent was being treated for?
21       A.   I don't remember.  My investigators,
22   when they respond to a death scene, will take a
23   medical history.  I don't remember the details
24   of that.
25       Q.   Do you know if the doctor -- do you

Page 67

1    have any personal knowledge about whether the
2    doctor was influenced by anybody else in his or
3    her prescribing?
4        MR. BADALA:  Objection to form.
5        THE WITNESS:  I didn't speak to the
6    doctor.
7        BY MR. CHEFFO:
8        Q.   Right.
9            Do you have any information at all
10   about why the doctor prescribed the medicine?
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  Again, in reviewing
13   the scene investigation and history take --
14   that was taken, there may have been a medical
15   condition that would have, you know, been
16   treated with opioids by that doctor.  I don't
17   remember that.
18       BY MR. CHEFFO:
19       Q.   Do you remember the name of the
20   person that you referred?
21       A.   No, I don't.
22       Q.   That would be in your files though,
23   wouldn't it?
24       A.   Somewhere, yeah.
25       Q.   Do --

Page 68

1        A.   And it would have been a file we
2    would have released over.
3        Q.   Do you have a place that you keep
4    all of the -- the names of the practitioners
5    who you have referred to boards of pharmacy or
6    any type of law enforcement agency?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  I believe that exists
9    for the agency.  I don't personally have --
10   that's not something I personally do.
11       BY MR. CHEFFO:
12       Q.   If you wanted to find it, who would
13   you ask?
14       A.   Either the Board of Pharmacy
15   themselves or -- the person I most often, you
16   know, ask to make the referrals is Hugh Shannon
17   in my office, my operations chief.
18       Q.   Do you hold yourself out as an
19   expert in ARCOS.
20          Do you know what that is?
21       A.   I know what it is, and I have a
22   general knowledge of it.  But I would not claim
23   to be an expert in that.
24       Q.   Are you an expert in statistics?
25       A.   I know some statistics.  I -- I

Page 69

1    don't hold any degree in statistics.  And I
2    would not say that I would be somebody
3    consulted as an expert in statistics.
4        Q.   Just to follow up on the -- the
5    doctor shopping, what's the -- what is the
6    definition of -- of how your department, your
7    office, defines doctor shopping?
8        A.   Again, we adopted a definition from
9    our addiction medicine specialist on our review
10   panel.  And I believe she was using a
11   definition from Ohio Department of Health,
12   which is five or more prescribers within a
13   12-month period.
14       Q.   Is it 12-month --
15       A.   For the OARRS database.  I should
16   say --
17       Q.   It's --
18       A.   -- not just --
19       Q.   Sorry?
20       A.   -- you know, five or more
21   prescribers, and you're antibiotics or
22   noncontrolled substances.  Five or more
23   prescribers in the OARRS database.
24       Q.   It's -- it's 12, not 13 months?
25       A.   Pardon?

18 (Pages 66 - 69)

Page 70

1      Q.   It's -- your recollection is it's 12
2  months, not 13 months?
3      A.   We use 12 months in our office.
4      Q.   And what was that -- that
5  professional's name that made the
6  recommendation; do you remember?
7      A.   Dr. Christine de los Reyes.
8      Q.   And how many --
9      A.   I'm sorry.  If I could just finish.
10  She was --
11      Q.   Yep.
12      A.   -- the medical director of the
13  alcohol, drug addiction and mental health
14  services for Cuyahoga County at that time.
15  She's since left that position and gone back to
16  her practice of addiction medicine.
17      Q.   How many -- and let me talk first
18  about you personally, and then I'll ask you
19  some questions about the department.
20        But how many cases of doctor
21  shopping have you identified since you have
22  joined the office in Cuyahoga?
23      A.   I don't know.
24      Q.   Is it more than one?
25        Can you recall anyone other than the

Page 71

1  one we've been talking about?
2      A.   Going back through retrospective
3  data, yeah, it's more -- certainly more than
4  one.
5      Q.   I'm talking about you.
6        How many times have you, in an
7  autopsy or something, you know, kind of
8  basically told your people to make a --
9      A.   Yes.  There --
10      Q.   -- report -- let me finish --
11      A.   Sure.
12      Q.   -- to the Board of Pharmacy in
13  connection with a situation where you thought
14  someone was doctor shopping.
15      A.   Frequently.  When -- especially when
16  we were doing our face-to-face reviews and had
17  that information that somebody was doctor
18  shopping.  I reviewed a lot of that data myself
19  initially and then would use a delegate to do
20  the subsequent reviews.
21        So yeah.  I -- I can't give you a
22  number, but it's certainly more than one.
23      Q.   Okay.  And when you believe that
24  there's doctor shopping, is it your practice to
25  report all of the five or more prescribers to

Page 72

1  the Board of Pharmacy?
2      A.   Yes.
3      Q.   And what -- what kind of information
4  do you send them?
5      A.   We send them the patient name -- or
6  the decedent name, actually.  These would be
7  people who had overdosed.  And that, based on
8  our analysis of OARRS, we were seeing more
9  prescribers who fit into the definition of
10  doctor shopping.  And it's -- you know, the
11  database is generated by the Board of Pharmacy.
12  And they can investigate further as they see
13  fit.
14      Q.   Every -- is it fair to say that
15  every case of doctor shopping that you have
16  identified you've referred to the Board of
17  Pharmacy, you or your office?
18        MR. BADALA:  Objection to form.
19        THE WITNESS:  I believe so.
20        BY MR. CHEFFO:
21      Q.   That's the policy?
22      A.   Yes.
23      Q.   So in any situation where someone
24  receives five -- prescriptions from five --
25  control -- strike that.

Page 73

1        In any situation where a decedent
2  received controlled substance prescriptions
3  from five or more healthcare providers over --
4  or within a 12-month period, it's the policy of
5  your office to refer each of those prescribers
6  to the Board of Pharmacy, correct?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  We're not referring
9  the prescribers.  We're referring the decedent
10  who has that profile to the Board of
11  Pharmacy --
12        BY MR. CHEFFO:
13      Q.   Well --
14      A.   -- for further investigation of the
15  prescribing -- his prescription history.
16      Q.   Do you also provide information
17  about the prescribers?
18      A.   The prescribers would be within the
19  OARRS file.  So we refer the decedent.  And the
20  Board of Pharmacy, I have to say they have
21  their own investigative unit.  I don't know
22  their practices.  But they would have access to
23  the OARRS file as to Board of Pharmacy.
24        And how they follow up with the
25  prescribers I don't honestly know.

19 (Pages 70 - 73)

Page 74

1    Q.   Do you do a summary or some -- some
2  type of forming reporting, or you just send
3  kind of a packet of information?
4         MR. BADALA:  Objection to form.
5         THE WITNESS:  I'm not sure I
6  understand your question.
7         BY MR. CHEFFO:
8    Q.   Do you know how -- what the -- the
9  process is in order to make a formal referral
10  or -- or filing with the Board of Pharmacy, or
11  does someone else do that in your office?
12    A.   Somebody else in my office will do
13  that.  We contact the investigative unit.  I'm
14  familiar with the process to some extent.  We
15  contact the investigative unit and refer names
16  of individuals who have five or more
17  prescribers in a 12-month period to them for
18  follow-up.
19    Q.   Do you know if they interview any --
20  you or anyone in your office?
21         "They" meaning the Board of
22  Pharmacy -- do they -- is it their practice to
23  come back and either ask to speak with someone
24  personally or ask for additional documents or
25  information?

Page 75

1         MR. BADALA:  Objection to form.
2         THE WITNESS:  Personally they have
3  not approached me.  I can't speak for the rest
4  of the office.  I don't know for certain.
5         BY MR. CHEFFO:
6    Q.   Are you aware of any situation that
7  you can recall where they asked for additional
8  information, either a verbal interview or
9  subsequent documentation?
10    A.   I don't know.  A lot of our
11  documents, like autopsies records and things,
12  are public.  And I don't know if we've
13  furnished them or not.
14    Q.   Do you know anything about what the
15  Board of Pharmacy does after you make a
16  referral?
17    A.   No.  I haven't pursued that.
18    Q.   Do you know if any doctor that has
19  been referred in connection with a referral to
20  a Board of Pharmacy has lost his or her
21  license?
22    A.   I don't get that follow-up from the
23  Board of Pharmacy.  And I haven't asked about
24  it.  I -- I'm just trying to keep our heads
25  above water with our own part of the crisis.

Page 76

1  So I don't -- I don't know for certain.
2    Q.   Do you know if any of the -- the
3  doctors who have been referred in connection
4  with a -- a decedent referral have been
5  prosecuted?
6    A.   I'd have to say, again, I don't
7  follow up with them.  And I haven't received
8  that feedback from them.  So I don't know.
9         MR. BADALA:  We've been going
10  about over an hour.
11         MR. CHEFFO:  Yeah.
12         MR. BADALA:  Good time to take a
13  break?
14         MR. CHEFFO:  Can I ask one more
15  question, and then we'll --
16         MR. BADALA:  Yeah.  Sure.
17         MR. CHEFFO:  -- do that?
18         MR. BADALA:  Is that okay, Dr.
19  Gilson?
20         THE WITNESS:  Yeah.  It's fine with
21  me.
22         BY MR. CHEFFO:
23    Q.   And am I -- is it correct that --
24  that, even though you make a referral, you
25  would agree that there could -- upon further

Page 77

1  investigation and looking at all the facts,
2  that -- that it could be that various doctors
3  had appropriately and lawfully prescribed
4  various medicines, controlled substances, to a
5  patient, or they may not have, right?
6         MR. BADALA:  Objection to form.
7         THE WITNESS:  Again, it's their
8  investigation.  So I can only say in a general
9  way we're just putting these individuals on
10  their radar.  And how they make those
11  determinations, I don't know.
12         But if you're asking me is it
13  possible they may investigate somebody and say,
14  "Really not anything here," I would think so.
15         MR. CHEFFO:  Okay.  All right.
16  Let's -- let's take a short break.
17         THE VIDEOGRAPHER:  We are going off
18  the record.
19         This is the end of Media Unit No. 1.
20         The time is 10:22.
21         (A short recess was taken.)
22         THE VIDEOGRAPHER:  We're going back
23  on the record.
24         This is the start of Media Unit No.
25  2.

Page 78

1    The time is 10:36.
2    You may proceed, Counsel.
3    MR. CHEFFO:  Thank you.
4    BY MR. CHEFFO:
5    Q.   Dr. Gilson, is there any testimony
6  that you've given that you'd like to modify or
7  amend up until this point?
8    A.   No, sir.
9    Q.   You mentioned referrals, in your
10  professional capacity, to the Board of
11  Pharmacy.
12    Do you recall that?
13    A.   Yes, I do.
14    Q.   What does the Board of Pharmacy do,
15  and what does it have jurisdiction over?
16    MR. BADALA:  Objection to form.
17    THE WITNESS:  I don't know the
18  specific answers to those questions.
19    BY MR. CHEFFO:
20    Q.   Do you know why you've made
21  referrals to that particular organization?
22    A.   As I understand it, there is a state
23  agency that's tasked with the investigation of
24  irregularities in prescribing.
25    Q.   Are you aware of whether there's

Page 79

1  a -- a Board of Medicine in the state?
2    A.   Yes, I am.
3    Q.   And how many times have you
4  personally made referrals to the Board of
5  Medicine in connection with doctor shopping or
6  any prescriptions that you believed were
7  questionable?
8    MR. BADALA:  Objection to form.
9    THE WITNESS:  I don't know.
10    BY MR. CHEFFO:
11    Q.   Ever?
12    A.   I don't know.
13    Q.   You wouldn't --
14    A.   As I say, we've done the referrals
15  to the Board of Pharmacy.  Whether there was a
16  report to the Board of Medicine, I just don't
17  know.
18    Q.   Well, let me -- do -- do you have
19  any recollection, as you sit here today, of
20  ever making a referral to the Board of
21  Medicine?
22    A.   No.  I don't know if we did or not.
23    Q.   Do you have a recollection?
24    A.   I believe I answered your question.
25    Q.   Well, you said you don't know.  And

Page 80

1  I'm asking if --
2    A.   No.
3    Q.   -- you have a recollection.
4    A.   I'm sorry.  I said no, I don't
5  remember.
6    Q.   Okay.  And do you have any
7  recollection of anyone at the Office of the
8  Medical Examiner ever referring anyone to the
9  Board of Medicine?
10    MR. BADALA:  Objection to form.
11    THE WITNESS:  Any referral?  I don't
12  remember.
13    BY MR. CHEFFO:
14    Q.   And do you -- how many times have
15  you made a referral to law enforcement for
16  questions you had about doctor shopping or
17  healthcare providers who have engaged in
18  inappropriate prescribing?
19    MR. BADALA:  Objection to form.
20    THE WITNESS:  Are we considering the
21  investigative unit of Board of Pharmacy, a law
22  enforcement agency or --
23    BY MR. CHEFFO:
24    Q.   No.  Other than the Board of
25  Pharmacy.

Page 81

1    A.   Referrals to law enforcement I -- I
2  don't remember.  Sometimes they've -- have come
3  to us with concerns about a prescriber.  But us
4  going back to them with regard to prescribing,
5  I don't remember any instances.  We would have
6  used to Board of Pharmacy.
7    Q.   Can you remember at all ever doing
8  that or anyone in your office doing that?
9    A.   Doing --
10    Q.   Making a referral to law enforcement
11  for the Board of Pharmacy.
12    MR. BADALA:  Objection to form.
13    THE WITNESS:  Making a referral to
14  the --
15    BY MR. CHEFFO:
16    Q.   Law enforcement.
17    A.   -- law enforcement for Board of
18  Pharmacy?
19    Q.   Or the Board of Pharma -- or -- or
20  the Board Medicine.
21    MR. BADALA:  Objection to form.
22    THE WITNESS:  No.  We used the Board
23  of Pharmacy.  As I say, law enforcement might
24  have contacted us about a concern.  But we
25  weren't reaching back to them for our

21 (Pages 78 - 81)

1  identified decedents.
2      BY MR. CHEFFO:
3      Q.   Where would you look if you wanted
4  to see if there was ever report of any referral
5  to law enforcement in connection with a
6  physician or potentially inappropriate
7  prescribing?
8      MR. BADALA:  Objection to form.
9      THE WITNESS:  There are, you know,
10  50-plus law enforcement agencies in the county.
11  I -- again, I don't know how we would track
12  that.  I just don't know.
13      BY MR. CHEFFO:
14      Q.   Okay.  That's not my question,
15  Doctor.  I'm sorry if it was a bad one.
16      You told us earlier that -- that
17  your department kept track of referrals to the
18  Board of Pharmacy.
19      Remember that?
20      MR. BADALA:  Objection to form.
21      THE WITNESS:  Yes, I do.
22      BY MR. CHEFFO:
23      Q.   And what I'm trying to find out, is
24  there any way that -- anywhere that, to the
25  extent that it occurred, we would find records

1  of referrals from your agency -- from your
2  office to either the Board of Medicine or to a
3  law enforcement agency.
4      A.   I don't know.
5      Q.   Who would you ask if you wanted to
6  find out if that ever occurred?
7      A.   I'm really not sure.  I -- I think,
8  you know, the Board of Medicine, the law
9  enforcement agencies.  My operations chief may
10  track that.  I don't personally.
11      Q.   Well, you're not aware of -- you
12  can't recall it ever happening, right?
13      A.   I don't know if it happened or not.
14      Q.   Right.
15      But in your personal knowledge, you
16  -- you're not aware of any instance; you can't
17  think of any instance when it happened, right?
18      MR. BADALA:  Objection to form.
19      THE WITNESS:  Not as I sit here
20  today, no.
21      BY MR. CHEFFO:
22      Q.   And to the extent that you wanted to
23  know if there were documents reflecting a
24  referral, who would you ask, and where would
25  you go within your own office?

1      A.   My first point of contact would be
2  the operations chief, who does the bulk of
3  reports to Board of Pharmacy to see if there
4  were other referrals that were made.
5      Q.   Has that -- who is that person?
6      A.   Hugh Shannon.
7      Q.   Okay.  How long has Hugh -- Mr.
8  Shannon or Dr. Shannon been in that position?
9      A.   Mr. Shannon.  He --
10      Q.   Mr. Shannon.
11      A.   Yeah.  He'd like to be Dr. Shannon
12  sometimes.
13      He and I came about the same time in
14  2011.  He was there I think about a week or two
15  ahead of me.
16      Q.   In your review of -- in your autopsy
17  work, have you ever raised, in your own mind, a
18  question about whether a prescriber had
19  violated a standard of care in connection with
20  prescription of controlled substances?
21      MR. BADALA:  Objection to form.
22      THE WITNESS:  Raised -- I -- I --
23  sorry if I'm not understanding your question.
24      Raised a concern to whom?
25      BY MR. CHEFFO:

1      Q.   To you.
2      A.   Could I just get the question again.
3  I --
4      Q.   Sure.  Well, let's use an example.
5      You told us earlier that you had a
6  specific example or memory of a case where you
7  believe there was presumably a high level of
8  morphine equivalence being prescribed, and you
9  made a referral.
10      Do you remember that?
11      A.   This is the lady who was falling
12  asleep eating and --
13      Q.   Yes.
14      A.   -- those -- yeah.  Okay.
15      Q.   And -- and I take it one of the
16  reasons why you made that referral is that you
17  questioned the standard of care that was being
18  given by that decedent's healthcare provider.
19      MR. BADALA:  Objection to form.
20      THE WITNESS:  Again, I -- my concern
21  was the -- the symptoms I was seeing suggested
22  overmedication.  And that's why I made the
23  referral --
24      BY MR. CHEFFO:
25      Q.   Is overmedication --

22 (Pages 82 - 85)

Page 86

1    A.   -- after we took a look at the OARRS
2  data on the --
3    Q.   Is overmedication a breach of a
4  standard of care?
5    A.   I don't know.
6    Q.   You're a doctor.
7    Isn't -- isn't it?
8    A.   I don't prescribe.  And I really
9  don't do a lot of that kind of medicine.  So I
10 don't really know what the state's, you know,
11 ruling on standard of care would be there.  But
12 --
13   Q.   Okay.  So you're not an expert on
14 the standard of care for prescribing opioids or
15 other controlled substances, fair?
16       MR. BADALA:  Objection to form.
17       THE WITNESS:  I don't do it.  So I
18 wouldn't have the experience.  I have education
19 about opioids.  But the prescribing of them I
20 haven't done in a very long time.  So I'd have
21 to say I -- I don't know.
22       BY MR. CHEFFO:
23   Q.   And in your personal experience in
24 your capacity in the office since you've been
25 here in 2011, have you ever made a

Page 87

1  determination -- a personal determination that
2  a doctor violated the standard of care in
3  connection with prescribing controlled
4  substances?
5        MR. BADALA:  Objection to form.
6        THE WITNESS:  It's not something our
7  agency would do.  So my answer is no.
8        BY MR. CHEFFO:
9    Q.   Who is authorized or empowered
10 within Cuyahoga County or the state to
11 determine whether a doctor breached the
12 standard of care in connection with
13 prescribing?
14        MR. BADALA:  Objection to form.
15        THE WITNESS:  I don't know for
16 certain.
17        BY MR. CHEFFO:
18   Q.    You're a licensed physician in the
19 state, correct?
20   A.   Yes, I am.
21   Q.    Do you have an understanding of what
22 entity or entities regulates your licensure
23 here?
24   A.   Yes.
25   Q.   Who?

Page 88

1    A.   My license is issued I -- by the
2  Board of Medicine, and I think they regulate
3  it.
4    Q.   Do you believe that they could
5  regulate the standard of care or -- or gross
6  violations of the standard of care?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  I don't know that with
9  certainty.  I don't know who does that function
10 in the state.
11        BY MR. CHEFFO:
12   Q.   We talked a little bit earlier about
13 cocaine use in Cuyahoga County.
14        Do you remember that?
15   A.   Yeah.  Yes, I do.
16   Q.    And correct me if I'm wrong, but
17 I -- I thought I understood you to say, Doctor,
18 that after 2016 there was an increase from the
19 baseline in cocaine overdose deaths.
20   A.    And the absolute number and the
21 increase was related to fentanyl mixtures.  And
22 the baseline of cocaine, in absence of fentanyl
23 and opioids, had remained flat.  It hadn't
24 changed dramatically.
25   Q.   What was the baseline; do you

Page 89

1  remember?
2    A.   Going back again to 2006, we tended
3  to see about a hundred deaths from cocaine in
4  any given year.  It may have fluctuated some on
5  either side of that, but that was about an
6  average.
7    Q.   And in 2016 that changed?
8    A.   Yes, it did.
9    Q.   And in 2016 the number of deaths
10 that were -- strike that.
11        In 2016 the number of overdose
12 deaths where the decedent had cocaine and
13 fentanyl in their system increased; is that
14 right?
15   A.   Yes.  That's true.
16   Q.   And what was the number, in 2016
17 till today, of cocaine deaths?
18   A.   Till today, I -- I don't know.  I
19 remember in 2016 it was over 200.  So it had
20 nearly doubled.  It rose again in 2017.
21        And again, the baseline of cocaine
22 deaths without fentanyl remains somewhere in
23 the area of a hundred.
24   Q.   So the -- you attributed the hundred
25 additional deaths with cocaine and fentanyl to

23 (Pages 86 - 89)

Page 90

1  a combination of fentanyl and cocaine?
2      A.    Those deaths were certified as
3  cocaine and fentanyl or whatever drug, if it
4  was heroin, present.  Obviously cocaine got
5  mentioned on the death certificate, but they
6  were mixed intoxications.
7      Q.    And prior to that, the baseline you
8  attributed to cocaine and not to fentanyl, is
9  that right, or heroin?
10     A.    There may have been mixed
11 intoxications, but they weren't a big player n
12 near that number, that baseline of a hundred or
13 so deaths that we saw from -- I -- at least
14 going back as far as 2006 with cocaine deaths.
15     Q.    Did the baseline increase in 2016 or
16 just the combination of -- of drugs increase?
17     A.    By "baseline" I would mean cocaine
18 in the absence of fentanyl.  And that did not
19 increase in 2016 or '17 substantially.  I don't
20 remember exact numbers, but it stayed around a
21 hundred.  And the increase that we saw was
22 largely being pulled up by fentanyl.  I can't
23 say with certainty that there wasn't a cocaine
24 and heroin death in there.  But the bulk of the
25 mixtures that we were seeing were cocaine and

Page 91

1  fentanyl.
2      Q.    I take it you track and have tracked
3  data for 2018; is that right?
4      A.    We're still finishing cases.  But we
5  track consistently throughout the year, yes.
6      Q.    Where have overdose deaths gone in
7  2018 --
8          MR. BADALA:  Objection to form.
9          BY MR. CHEFFO:
10     Q.    -- in Cuyahoga County?
11     A.    Our preliminary data -- again, I
12 have to say we'll probably not have all of our
13 data in for three or four months, I would say.
14         But our preliminary data indicates
15 that drug overdose deaths in general have
16 declined, fortunately.  Fentanyl deaths have
17 declined.  Heroin deaths have declined.  And
18 cocaine deaths have declined.
19     Q.    What percentages?
20         Can you give us any rough estimates
21 as to the percentage of decline?
22         MR. BADALA:  Objection to form.
23         THE WITNESS:  I don't remember.  And
24 I'd almost be reluctant to say so until we have
25 all the numbers.

Page 92

1          But based on, you know, pending
2  cases, we -- we were able the say with
3  confidence -- and we had a press conference to
4  this effect -- that the numbers are going down.
5          But I don't remember the exact
6  numbers.  And I wouldn't want to offer
7  percentages until we had final data.
8          BY MR. CHEFFO:
9      Q.    Well, what -- what is is -- I -- you --
10 you obviously looked into this before you held
11 a press conference, right?
12     A.    Sure.
13     Q.    And when --
14     A.    Absolutely.
15     Q.    -- when was that?
16     A.    It was a Friday, not this past
17 Friday but the week before that.  January 6th?
18 I don't -- I don't -- whatever that Friday
19 was --
20     Q.    I take it, before you --
21     A.    -- right --
22     Q.    -- would go out and hold a press
23 conference, you wanted to make sure that you
24 had some type of significant decline to report
25 on.

Page 93

1          Isn't that fair?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  We reported the
4  decline based on our projections for the year.
5  And that was a downward trend.
6          BY MR. CHEFFO:
7      Q.    And what was the -- what was the
8  percentage downward trend?
9      A.    For total overdoses, based on our
10 current projection, we thought that that number
11 would come in somewhere around 560 deaths, down
12 from 727.  I can get the calculator out to give
13 you a percentage.
14         But that's our total overdose
15 deaths.  And I do not remember specific numbers
16 for fentanyl, cocaine and heroin other that
17 they were trending downward.
18     Q.    And do you remember roughly what the
19 percentage decline was in 2018 from 725 to 560?
20         I'm not trying to question -- I'm
21 not trying to make you do higher math off
22 the --
23     A.    Can we get a calculator out?
24     Q.    But -- but do you remember, when you
25 were doing a press conference, using that as a

24 (Pages 90 - 93)

Page 94

1  talking point?
2      A.  I don't remember using the
3  percentage.  I remember using the numbers in a
4  general way.
5      (Discussion held off the
6  stenographic record.)
7      MR. CHEFFO:  We'll come -- we'll --
8  we'll look at a calculator, Doctor, and -- and
9  see if we can figure it out.  But...
10     THE WITNESS:  Now, your denominator
11 is 727, not 560, so we agree on terms.  Because
12 it's a decline we're measuring.
13     BY MR. CHEFFO:
14     Q.  The percentage.  That's what I was
15 asking you, what percentage year over year
16 decline.
17     A.  But I want to make sure that what
18 we're calculating is the decline, which would
19 be define as the difference between 2017 and
20 2018 over the rate in 2017, not 2018.
21     Q.  Okay.  Well, I'll ask you a
22 question.  You'll then tell me if you agree
23 with it once we get the information.
24     A.  Well, I can get my phone out and do
25 that calculation.

Page 95

1      MR. BADALA:  We can --
2      THE WITNESS:  I just want to make
3  sure we're on the same page with that.
4      BY MR. CHEFFO:
5      Q.  The -- does -- does 23 percent sound
6  right?
7      Well, I'll you what.  You know, if
8  you're any more comfortable at the break, you
9  can --
10     A.  Yeah.
11     Q.  -- use your calculator, and you can
12 tell me what you think it is.
13     A.  Okay.
14     Q.  Okay?
15     And what -- what factors do you
16 believe led to the decline in overdose deaths
17 from 727 to 560?
18     A.  I'm not sure.  I think, you know,
19 the programs that have been instituted with
20 regard to Naloxone distribution have saved
21 lives.
22     The scheduling of the fentanyl and
23 fentanyl analogs, I am told there were
24 negotiations with China, which was a principal
25 source of fentanyl, to get the -- and

Page 96

1  carfentanil -- to get the influx of those drugs
2  into this country curtailed took place over
3  that time.
4      I think we instituted mandatory
5  checks for OARRS in 2015 so that people
6  prescribing opioids would have to check the
7  database ahead of time before they would
8  prescribe.  It had been -- may have had an
9  impact.
10     There's a -- a tremendous number of
11 programs the county's tried to do.  the drug
12 drop boxes for people to put their old
13 medications back in may have had an impact.
14 Law enforcement and the task forces, the
15 prosecution of these cases potentially may have
16 had an impact.
17     I -- I don't want to pretend to
18 know, you know, all of these.  These are the
19 programs that have been undertaken in
20 response -- some of the programs that have been
21 taken -- undertaken in response to try to
22 address the crisis.
23     And I certainly would like to think
24 they're having some success.
25     Q.  Is it fair to say that there are

Page 97

1  many different factors that impact the overdose
2  rate?
3      MR. BADALA:  Objection to form.
4      THE WITNESS:  I'm not sure I --
5  well, it's kind of a broad question.
6      BY MR. CHEFFO:
7      Q.  Well, you just -- you just listed
8  about ten of them:  drop boxes, changes in
9  OARRS, impact from foreign --
10     A.  Oh, yeah.
11     Q.  -- government shipping.
12     A.  I'm sorry.  Yeah.  Fine.  Yes.
13     Q.  So the answer is "yes," right?
14     A.  Yes.
15     (Deposition Exhibit 1 was marked for
16 identification.)
17     BY MR. CHEFFO:
18     Q.  Doctor, I've marked this as Exhibit
19 1.
20     Have you seen this before?
21     A.  I don't remember.
22     Can I take a look through?
23     Q.  Uh-huh.  Sure.
24     A.  I don't remember it exactly.  But
25 it's a product from our office, so I'm familiar

25 (Pages 94 - 97)

Page 98

1  with it.
2      Q.   And your name's on the front page,
3  right?
4      A.   That's right.
5      Q.   Would you look at the fourth page,
6  please.
7      A.   This -- this one.
8      Q.   Yes.
9      A.   Sure.
10     Q.   It says "Cuyahoga County Overdose
11  Deaths 2006 to 2014."
12         Do you see that?
13     A.   Yes, I do.
14     Q.   And it says "Most Common Drugs,"
15  correct?
16     A.   Yes.
17     Q.   And is that the most common drugs
18  found in individuals who died from overdoses in
19  the years 2006 to 2014?
20     A.   Yes, it is.
21     Q.   And before I ask you specific
22  questions about this, let me just ask you a few
23  questions about how you make that
24  determination.
25         So when someone has an autopsy done

Page 99

1  and there's a toxicology report, do you
2  identify -- try to identify all drugs or just
3  look for certain drugs?
4      A.   We would try to identify all drugs.
5  And, you know, I think one of the challenges
6  is -- isn't necessarily -- they can find
7  everything.  So the assays are directed to
8  certain drugs.
9          But it's a very broad class of drugs
10  that we're looking for.  And once we identify
11  something, we follow through to identify it.
12     Q.   But in fairness, I mean you're not
13  trying to find if somebody took an Aspirin that
14  morning, are you?
15     A.   Yeah.  We are, actually.
16     Q.   Okay.  So is there any threshold?
17     A.   Salicylates or acetaminophen or
18  things like that.
19     Q.   Okay.
20     A.   Caffeine will pick up too.
21     Q.   Is there a threshold though?
22         So will -- will -- if -- if someone
23  had a cup of coffee that morning, will that
24  trigger a threshold for caffeine reporting?
25     A.   Any test would have a limit of

Page 100

1  detection beyond which we would say, if it's
2  under that, we did not detect it.  And
3  that's -- refers to the sensitivity of the
4  instrument and possibility of interference.
5  But caffeine is an example where, if we have a
6  positive at a certain level, we don't
7  quantitate it because it's consistent with
8  somebody drinking a cup of coffee.
9          People have overdosed on caffeine
10  though, and we've quantitated those.
11     Q.   Okay.
12     A.   So some are qualitative, I guess,
13  some of our results; some are quantitative.
14     Q.   So these are the most common, but
15  it's certainly not a exhaustive list of all
16  the -- the -- the drugs that are found in -- in
17  decedents, fair?
18     A.   That would be fair, yes.
19     Q.   And first let me just see if I -- if
20  we're on the same page about this data.  So for
21  illustrative purposes, would you follow me and
22  look at the -- the 2012 data that's on the
23  bottom.  And it says "310 cases."
24         Do you see that?
25     A.   Yes.  Okay.

Page 101

1      Q.   And that -- am I correct that that
2  means that there were 310 overdose deaths in
3  the year 2012?
4      A.   Yes.  That's right.
5      Q.   And then there are various numbers
6  associated with the various drugs that are
7  listed on this chart for each year, correct?
8      A.   Yes.  Okay.
9      Q.   And -- and the -- in 2012 there's
10  161 next to the heroin point on the -- on the
11  graph, right?
12     A.   That's right, yes.
13     Q.   And that -- and heroin is the
14  highest -- or it's the most common drug in --
15  in 2012, right?
16     A.   That's right.
17     Q.   And then the second most common is
18  cocaine; that has 111, right?
19     A.   Yes.
20     Q.   And then below that it says "All
21  Opioids," that's 85, right?
22     A.   That's right.
23     Q.   And that's about half as much as
24  cocaine -- heroin, right?
25     A.   Yes.

26 (Pages 98 - 101)

Page 102

1    Q.   And it says "All Opioids Including
2   oxycodone and fentanyl."
3        Do you see that?
4    A.   Yes, I do.
5    Q.   What else does "all opioids"
6   include?
7    A.   Other drugs that have a similar
8   effect to the opioids or just the ones that act
9   on the mu receptor in the brain.  So opioids
10   would include oxycodone, hydrocodone,
11   oxymorphone, hydromorphone, methadone, any
12   number of drugs.
13    Q.   It would include methadone as well?
14    A.   Yes.
15    Q.   And -- and what is methadone
16   typically used for?
17    A.   It was traditionally used as a drug
18   for people who were tapering off of heroin
19   addiction.  And it also became used more
20   recently as a medication for the treatment of
21   chronic pain.
22    Q.   And if we wanted to know and break
23   out how many of those 85 in the All Opioid
24   category were associated with methadone, I take
25   it you have records that would be able to do

Page 103

1   that; is that right?
2    A.   Yes.  We would be able to do that.
3   We can't do it here as I sit here today, but we
4   would be able to do that.
5    Q.   As a general matter, you know, based
6   on your expertise and experience, what
7   percentage of the All Opioid number is
8   comprised of methadone?
9        MR. BADALA:  Objection to form.
10        THE WITNESS:  We looked at that over
11   this time frame, and there were fluctuations.
12   I couldn't give you a specific number though.
13   I don't know.
14        BY MR. CHEFFO:
15    Q.   Can you give me a ballpark?
16    A.   I wouldn't want to, no.
17    Q.   Is it, you know, 50 percent? 20
18   percent?
19    A.   I don't remember.
20    Q.   Is there any way to determine from
21   this chart whether these are -- at least unto
22   the opioids, whether they are prescription
23   opioids or whether they are associated with
24   illicit opioids?
25    A.   These would be prescription opioids.

Page 104

1   I would be concerned about fentanyl especially
2   in 2014.  Because that's the year that we
3   started to see more illicitly manufactured
4   fentanyl show up in our area.  But the All
5   Opioids would be drugs we would think of as
6   opioid pain relievers, the prescription
7   opioids.
8    Q.   So when it says 85, we're --
9   you're -- you're certain it's your testimony
10   that all of these were prescriptions, and they
11   weren't street drugs?
12    A.   They may have been diverted to the
13   street.  I'd -- if -- but as I understand this
14   number, it's the prescription opioids.
15    Q.   When you do a -- a -- a tox assay or
16   screening and you find fentanyl, can you
17   determine whether it's a prescription fentanyl
18   or an illicit fentanyl that was never
19   manufactured lawfully by a pharma company?
20    A.   We have seen impurities in fentanyl
21   that don't usually show up in the manufacturing
22   process, which suggests a illicit source.  But
23   I can't point to the fentanyl itself, that
24   molecule, and say that's illicit or not.
25    Q.   So then how is it that you can tell

Page 105

1   us with certainty that all 85 of those are from
2   prescription opioids?
3    A.   I'm sorry if I said I -- I just said
4   I don't know.  I'd have to go back and look at
5   the actual data.
6    Q.   No.  I think you told me --
7    A.   But --
8    Q.   -- that they were prescriptions.
9   That's what I was asking you.
10    A.   They would be the prescription
11   narcotics.  They -- that was how we were
12   classifying them, that class of drugs.
13    Q.   Right.
14        But you just told me ten seconds ago
15   that this could include fentanyl that was
16   synthetic that was never a prescription drug.
17    A.   No.  I said that about 2014.  We
18   really didn't see fentanyl as illicitly
19   manufactured fentanyl in our laboratory -- in
20   our drug seize laboratory before 2014.  And
21   that was when the DEA made their report about a
22   rise in seizures of illicitly manufactured
23   fentanyl.
24        So fentanyl in 2012, again, to the
25   best of my knowledge, would be some fentanyl

27 (Pages 102 - 105)

1  patch or fentanyl -- pharmaceutical fentanyl.
2  We didn't see it --
3     Q.  So --
4     A.  -- clearly --
5     Q.  -- your testimony is you're --
6  you're -- you're certain that all 85 are either
7  lawful or diverted prescriptions in the All
8  Opioid?
9     That's your testimony?
10     MR. BADALA:  Objection to form.
11     THE WITNESS:  I -- I -- I'd have to
12  see the data to be more certain.  But that's my
13  understanding of what we were tracking under
14  All Opioids.
15     BY MR. CHEFFO:
16     Q.  What would you need to look at to
17  determine whether you were correct or not?
18     A.  I'd like to look at the case files
19  on this and review before I made a statement
20  with certainty.
21     Q.  And what would you look for in the
22  case files?
23     A.  What drugs were present; was there
24  any indication from scene investigation that
25  there may have been an illicit source.  I

1  think, you know, Thera-Mist for this would be
2  just, you know, beneficial.
3     Q.  Right.
4     A.  A good practice.
5     Q.  So you really couldn't make any
6  statement or testimony with certainty without
7  looking at the case files to determine if, in
8  fact, there were other indicia of illicit drugs
9  or whether someone had a prescription bottle
10  next to them when they expired, right?
11     A.  I can say that these drugs are the
12  ones that we would classify as opioid pain
13  relievers based on what drug is present.
14     Q.  Right.  And that's a different
15  question.
16     What we've been talking about is
17  whether all 85 are either opioids that were
18  prescribed or whether they were diverted
19  medicines from otherwise lawful prescriptions
20  or whether some of them could have been from
21  synthetic fentanyl that came in from China or
22  Mexico.
23     Can you tell that by looking at this
24  chart?
25     A.  I wouldn't want to say that with

1  certainty.
2     Q.  And could you tell that by going
3  back to your files?
4     A.  I think it would bolster my ability
5  to be certain about that, yes.
6     Q.  And you would look for what?
7     If we looked for each -- if we
8  looked at the files for each of these 85
9  people, and we wanted to know whether or not
10  the opioids found in their system were from
11  either lawful or -- or diverted prescriptions,
12  what would you look for?
13     A.  It's a case specific.  I'd -- you
14  know, we'd look for whether there were
15  impurities that we had seen in the synthetic
16  process later with fentanyl.  But -- whether
17  there was anything recovered at the scene in
18  terms of medications or illicit substances and
19  how they were tested.  The OARRS report may be
20  helpful to see if the person had access to
21  these already, as they frequently would have in
22  that time frame.
23     Those would be some things I would
24  at least want to consider before I said with
25  certainty that none of these are anything but

1  the prescriptions, either prescribed or
2  diverted.
3     Q.  So is it your testimony that --
4  well, let's start with today.
5     Can we do a tox study and look at
6  fentanyl and determine whether it was
7  manufactured lawfully by a pharmaceutical
8  company or whether it was created in some
9  warehouse in China?
10     A.  Not that I'm aware of, no.
11     Q.  You told me you'd look for
12  impurities.
13     How would you then -- how would you
14  find those impurities if they wouldn't show up
15  in a tox study?
16     A.  Oh, I'm -- I'm thinking can I tell
17  this fentanyl from that fentanyl.  The
18  impurities are part of the synthetic process,
19  how you make the drug.  And they are usually
20  not present in the pharmaceutical-grade
21  material, but they are present in the illicit
22  manufacture.
23     So one is a chemical called 4-ANPP.
24  And we see that in our seized illicit
25  manufactured fentanyl, but we don't see it in

Page 110

1    pharmaceutical-grade fentanyl.
2        Q.    And you test for that?
3        A.    What's that?
4        Q.    You test for that as part of your
5    tox study?
6        A.    Yeah.  We absolutely do.
7        Q.    When did that start?
8        A.    When fentanyl became a problem, I
9    think we were starting to invest in better
10   instrumentation.  And I think we started to
11   detect that I would say probably in 2016.
12           We may have detected it earlier.  I
13   don't know.  It's not -- I just don't remember
14   that.
15       Q.    Well --
16       A.    But -- but certainly, with better
17   instrumentation, the availability to detected
18   some of these impurities went up.
19       Q.    Well, you said when fentanyl became
20   a problem.
21           It looks to me like there was a --
22   there's a -- there's a high number in -- in --
23   was there a problem in -- in 2011 with
24   fentanyl?
25       A.    It's present, you know, for eight

Page 111

1    overdoses.  I don't think that number was
2    changing much over the previous few years.
3        Q.    Eight overdoses or -- or --
4        A.    I see eight fentanyl overdoses in
5    2011.
6        Q.    Okay.  So -- and that's fentanyl --
7    so -- so let me just see if I understand.
8            So the -- the -- the fentanyl line
9    is then -- those eight or whatever the number
10   is there, that's recounted in the All Opioid
11   line?
12       A.    For this graph, yes, it is.
13       Q.    Okay.
14       A.    Subsequent to this, we generated
15   graphs where fentanyl was not calculated into
16   the opioid line.  But this one it was.
17       Q.    And can you tell who manufactures a
18   particular opioid based on a tox study?
19       A.    No.
20       Q.    So let's go back to the 2012 column,
21   if you will, please.
22           There was 310 cases of overdose
23   deaths in that year in Cuyahoga, correct?
24       A.    Yes.
25       Q.    And there's more -- if we -- if we

Page 112

1    were to add up -- and you free feel to do this.
2            But if there -- there's -- if you
3    add 161, 111, 85, 33, 26 and 10, that adds up
4    to more than 310, correct?
5        A.    That's right, yes.
6        Q.    And why is that?
7        A.    The impact of mixed intoxications.
8    So we looked at this data, actually.  And, as I
9    recall, about a third of our heroin overdoses
10   were only heroin.  And then the other
11   two-thirds were in combination with something
12   else.
13           So we don't count -- we count
14   everything as often as it shows up.  So for the
15   total, we can't do that, obviously.  But the
16   total reflects individual drugs as well as
17   drugs in combination for mortality.
18       Q.    So -- so there's a -- an element of
19   double counting in -- in this chart, right?
20       A.    To reflect the mixtures we would
21   have seen in the drug overdose deaths, yes.
22       Q.    So if -- if you had somebody who had
23   died of an overdose with three substances, for
24   example, let's say cocaine, fentanyl and
25   heroin, that one overdose from a -- would be

Page 113

1    counted three times.
2        A.    In this graph, it would be in the
3    heroin line, in the cocaine line and in the
4    fentanyl line.  That's right.
5        Q.    Is it only in this graph, or do you
6    do that typically when you report other
7    statistics about heroin use or cocaine use?
8            MR. BADALA:  Objection to form.
9            THE WITNESS:  These graphs are
10   generated for each mention of those substances
11   on a death certificate.  So we would count
12   mixtures more than once on these graphs to
13   reflect the usage of the different substances.
14           BY MR. CHEFFO:
15       Q.    Do you make a determination as to
16   how much of each substance was in someone's
17   system?
18       A.    The toxicology laboratory will
19   quantitate these substances where possible,
20   yes.
21       Q.    Well, so let's assume, in my
22   hypothetical, someone had three substances,
23   right?  They had heroin, cocaine and fentanyl.
24           Do you make a determination -- and
25   they're each listed, right, as -- from a

29 (Pages 110 - 113)

Page 114

1 statistics perspective in each of those.
2 Do you make a determination about
3 whether they received a lethal dose of any of
4 those?
5 MR. BADALA: Objection to form.
6 THE WITNESS: Obviously they died,
7 so I would say they received a lethal dose of
8 the combination of them. It's not really
9 possible in forensic practice to start to tease
10 out this is 60 percent, this is 10 percent,
11 this is 20 percent.
12 It's a combined effect. And that's
13 how our death certificates are worded.
14 Combined toxicity, combined effect. You can't
15 really tease out --
16 MR. CHEFFO: Well --
17 THE WITNESS: -- this contribution
18 versus that one.
19 BY MR. CHEFFO:
20 Q. But it's not always combined, is it?
21 Well, let me give you an example,
22 right? I'm sure you could think of a hundred
23 of them.
24 Where someone had a modest dose use
25 of cocaine, and then they had a modest

Page 115

1 nonlethal dose of fentanyl a day or two or
2 however long it might last in their system, and
3 then they had a massive dose of heroin that,
4 irrespective of anything else, would have
5 killed them.
6 In that case, that's not a
7 contribution, is it?
8 MR. BADALA: Objection to form.
9 THE WITNESS: Sure. It is. It
10 certainly is, you know. And that's one of the
11 discussions we've tried to have with, you know,
12 our prosecutor, especially our U.S. Attorney.
13 And we met with Carole Rendon about it.
14 That becomes impossible for a
15 medical examiner to tease out this is the
16 problem, and this isn't. And that becomes very
17 important in the prosecutions because of this
18 idea of but-for causation.
19 So if I can pick up on your example,
20 if you have fentanyl, cocaine, heroin --
21 fentanyl and heroin have similar actions, and
22 they will be expected to potentiate each other.
23 Cocaine has its own stimulant properties, but
24 it's a cardiac irritant.
25 So if I'm becoming more and more

Page 116

1 hypoxic, I don't get as much oxygen because of
2 affects of fentanyl and heroin, it's going to
3 make cocaine more lethal in that soup, if you
4 will, of overdose.
5 So you can't really tease them
6 apart.
7 BY MR. CHEFFO:
8 Q. Do you do any of that analysis?
9 Do you try to quantify any of that?
10 Or do you just do a tox study and
11 say, "This is what's in the system. It's going
12 on the chart"?
13 MR. BADALA: Objection to form.
14 THE WITNESS: We interpret the
15 toxicology with -- you know, in accordance with
16 forensic practice, which would be what I'm
17 describing.
18 BY MR. CHEFFO:
19 Q. Is there any -- is there -- is it
20 fair to say that, if -- if cocaine, for
21 example, or fentanyl show up in any amount on
22 your assay, it's going to be listed as a cause
23 or contributing factor?
24 A. No.
25 Q. So there are times when you've

Page 117

1 recorded it and it doesn't show up as a factor
2 in and overdose death?
3 MR. BADALA: Objection to form.
4 THE WITNESS: That wasn't your
5 question, as I understood it.
6 You know, toxicology is not a
7 substitution for a death investigation. So
8 there's other information that has to be
9 factored into a death ruling. That could be
10 scene information. It could be circumstance
11 information. It could be a lot of other
12 things.
13 And, you know, we may have a
14 positive toxicology that does not fit with the
15 clinical scenario of how a person died, in
16 which case that would not be included in a
17 death certificate.
18 BY MR. CHEFFO:
19 Q. You're talking about like a gunshot
20 wound.
21 But I'm talking about --
22 A. No, no. I --
23 Q. -- let's talk about overdose deaths.
24 A. -- I would talk -- let's say -- I'll
25 give --

30 (Pages 114 - 117)

Page 118

1  MR. BADALA:  Are you done with your
2  answer?
3  THE WITNESS:  No.  Go ahead.  I --
4  BY MR. CHEFFO:
5  Q.  So are there situations where
6  someone has had cocaine in their system in an
7  overdose death, and it's not been listed as a
8  cause or contributing factor?
9  Can you think of any?
10  A.  I can't think of any right now.
11  Q.  Are you aware of any?
12  A.  I -- I don't know.
13  Q.  Are you aware of any situations
14  where someone has had heroin in their system,
15  and it's not been listed as a cause or
16  contribution in and overdose death?
17  A.  Yes.
18  Q.  In what circumstances?
19  A.  Well, if they have an older person
20  who suddenly grabs their chest, says, "Boy, I'm
21  very short of breath, and I'm collapsing," you
22  know, that's not the way people die from and
23  overdose of heroin.
24  They usually go to sleep; they stop
25  breathing; they don't wake up.  And there have

Page 119

1  been instances in my own practice where, you
2  know, I've not included heroin as a cause of
3  death in that and gone with the heart disease.
4  Q.  Yeah.  But -- but I asked you,
5  Doctor, specifically overdose death.  That's
6  what I've talked about.
7  Did -- would you have -- when
8  someone walks in and they're 90 years old and
9  they grab their heart, right, and they fall
10  down, they, say, have a heart attack, you're
11  going to say that's a cardiac event, right?
12  A.  Right.  Even if they saw heroin in
13  their system.
14  Q.  Right.
15  And my question is, in connection --
16  I'm -- I'm -- I'm talking specifically for
17  overdose deaths.  Okay?
18  Is there a situation where you've
19  ever had -- where you've ever seen or aware of
20  any level of an opioid in combination with
21  other drugs where you have not characterized it
22  as causing or contributing to?
23  A.  Not that I remember.
24  Q.  So the fact is, in and overdose
25  death, if there's any measure -- it's the

Page 120

1  policy of your office, any measure, no matter
2  how small or large, of an illicit substance,
3  that's going to automatically be deemed to be
4  causing or contributing; isn't that right?
5  A.  No.
6  Q.  So can you tell me any time where
7  that's not happened?
8  A.  I can't give you a specific
9  instance.  But what you're saying is basically,
10  whatever I see on a toxicology report, I put on
11  a death certificate.  And that's really not
12  good forensic practice.
13  A death investigation is a lot more
14  than an autopsy report.  And I don't think what
15  you said really characterizes the professional
16  judgment of my staff or me.
17  Q.  Can you tell me one situation in --
18  in your practice in Cuyahoga County where you
19  have not determined that an opioid was a cause
20  or contributing factor when it's been detected
21  in a tox assay --
22  A.  I cannot --
23  Q.  -- in an overdose death?
24  A.  I cannot right now.
25  Q.  Okay.  Is there any standard

Page 121

1  operating procedures or guidelines to determine
2  what is a lethal dose of a particular
3  substance, let's say an illicit drug?
4  A.  There are published tables that will
5  talk about therapeutic levels; about, you know,
6  toxic levels; about lethal levels.
7  I would have to caution again that,
8  you know, those tables are reference tables.
9  They do not reflect the -- the practice of
10  forensic medicine, which would include obvious
11  reference to that material but also clinical
12  information.
13  So we may, you know, have lower
14  levels of opiates with a very compelling story
15  and certify that as an opiate death in
16  accordance with, you know, stated forensic
17  practice.
18  Q.  Do you look at the -- do you
19  yourself look at those tables or charts?
20  A.  I have, you know, textbooks and
21  charts that I use, yeah.
22  Q.  Do you know what a therapeutic dose
23  of opioids is and what's a lethal dose?
24  MR. BADALA:  Objection to form.
25  THE WITNESS:  There are studies and

31 (Pages 118 - 121)

Page 122

1  tables that will have ranges there.  They
2  frequently overlap in my experience.  And they
3  would be different for different opioids.
4       BY MR. CHEFFO:
5       Q.   In the All Opioids, does that
6  include morphine?
7       A.   That would be an opioid.  I -- I
8  don't know if -- again, I don't know what
9  specific opioids are here.  But it certainly
10  would be -- if it was present on a death
11  certificate, would have been included in that
12  All Opioid portion of the graph.
13       Q.   And are you aware that, on some
14  or -- or -- or all tox screenings, heroin can
15  show up or -- or often does show up as
16  morphine?
17       A.   Heroin is metabolized to morphine,
18  so it may show up as morphine on a screen.
19  Chemical structure is morphine, and then you
20  put two chemical groups on it, I acetyl, 2
21  acetyl groups.
22       And as heroin is metabolized through
23  the body, what we see is one of the groups
24  comes off, and then we see a chemical called
25  6-monoacetylmorphine.  And then the other one

Page 123

1  comes off, and we may just see morphine.
2       Q.   So in this 85, does that include
3  morphine?
4       MR. BADALA:  Objection to form.
5       THE WITNESS:  It could.  Again, I
6  don't know.
7       BY MR. CHEFFO:
8       Q.   And if it -- if it does include
9  morphine, it could either be morphine, which is
10  a prescribed medicine, or it could be a marker
11  for heroin, correct?
12       A.   The morphine may have come from
13  either source.  One of the things we rely on to
14  distinguish the two is finding that
15  6-monoacetylmorphine.  So that may be a marker.
16  Yes, there's morphine there, but there's also
17  monoacetylmorphine.  So we would certify that
18  as a heroin death.
19       The other thing that we can use is a
20  ratio of morphine to codeine.  Because when
21  heroin is recovered from the poppy plant and
22  processed, the ratio of morphine to codeine is
23  usually substantially higher.  We use, in our
24  laboratory, a ratio of five-to-one
25  concentration morphine to codeine.

Page 124

1       My former chief toxicologist wrote a
2  paper on this topic, and that was the number
3  that we came.  That's in keeping with the
4  position paper from the National Association of
5  Medical Examiners on the certification of
6  opioid deaths.
7       So we try to avoid lumping morphine
8  deaths into here.  Using those guidelines, I
9  think, you know, there may just be morphine
10  there.  If we had a scene investigation, again,
11  with heroin in somebody who was transported to
12  a hospital, and all we were able to recover at
13  that point was morphine, you know, we would
14  probably go on the side of saying that was
15  still heroin.
16       Q.   Is it fair to say that there are
17  processes that you attempt to look for after
18  the initial toxicology finding of morphine to
19  determine whether it's a derivative of heroin,
20  but sometimes that's complicated by various
21  other factors, like body composition and time
22  of death?
23       A.   The opiates as a group are pretty
24  stable after death.  So I wouldn't think they
25  would impact it.

Page 125

1       Q.   So I guess what I'm just trying to
2  find, Doctor, is -- is is --
3       MR. BADALA:  Were you done with your
4  answer?
5       MR. CHEFFO:  Well, I mean --
6       MR. BADALA:  If you're not done, you
7  can -- you can answer his question.  I mean --
8       MR. CHEFFO:  Go ahead.  Go ahead.
9       MR. BADALA:  If you're done, you're
10  done.  But if you're not done, you can still
11  answer your question.
12       THE WITNESS:  Oh.  I just wanted to
13  say that, you know, they remain stable after
14  death.  So, you know, we see that 6-AM, that
15  intermediate between heroin and morphine --
16       MR. CHEFFO:  Okay.
17       THE WITNESS:  -- an people are
18  decomposed.
19       BY MR. CHEFFO:
20       Q.   So 85, does it include morphine that
21  was the result of heroin or not?
22       MR. BADALA:  Objection to form.
23       THE WITNESS:  Using best practices,
24  we have made every effort to avoid including
25  heroin deaths in the morphine deaths.  And I

32 (Pages 122 - 125)

1    cannot say with certainty that those best
2    practices cover everything, but I would expect
3    them to cover most.  That was why they were
4    promulgated.
5        BY MR. CHEFFO:
6        Q.   Okay.  So they -- they may include
7    some heroin usage; you can't say with certainty
8    as you sit here, correct?
9        A.   That's -- again, you know, we've
10   done everything we can to exclude it.  But if
11   you ask me with a hundred percent certainty can
12   I exclude that, I can only follow best
13   practices to exclude it.
14       Q.   Are you using the same practices to
15   determine whether it was heroin today as you
16   were in 2012?
17       A.   Yes.
18       Q.   You mentioned -- we talked about
19   earlier about a -- a healthcare provider that
20   you made a referral to the Board of Pharmacy
21   because of a morphine equivalent dose that you
22   determined or at least questioned.
23       Do you remember that?
24       A.   I remember the case we're talking
25   about.  I don't remember if I said the

1    morphine-equivalent dose or the clinical
2    symptoms.  But we looked at the OARRS report.
3    And I -- I had the concern about
4    overprescribing.
5        Q.   Where are the OARRS report for each
6    case maintained?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  We tend not to print
9    them out.  Because the OARRS database is not a
10   public record.  And the medical examiner's file
11   in the -- in our office is accessible by
12   statute to next of kin, the entire file.  So we
13   don't print them out to keep them.
14       I am not aware of whether there's,
15   you know, a file of OARRS reports in the
16   office.  I don't know that.  But I -- I haven't
17   seen it.
18       BY MR. CHEFFO:
19       Q.   So is it your testimony you've never
20   printed one out?
21       A.   No.
22       Q.   Under what circumstances do you --
23   do you do that, and where do they go when you
24   do?
25       MR. BADALA:  Objection to form.

1        THE WITNESS:  I don't know where
2    they go.
3        BY MR. CHEFFO:
4        Q.   Where do you put them?
5        A.   Most of the OARRS files I've looked
6    at I've looked at electronically.  And I don't
7    know that I've ever printed one myself.
8        Q.   Okay.  I think I just asked you
9    that, did -- if you ever did.
10       Did -- have you ever printed out an
11   OARRS form?
12       A.   I thought you said in -- has the
13   office ever printed out --
14       Q.   Have you ever printed one?
15       A.   Personally, no, I have not.  I don't
16   remember printing one.
17       Have I seen printed copies in the
18   office?  Yes, I have.
19       Q.   And the reason why you don't print
20   them is why?
21       MR. BADALA:  Objection to form.
22       THE WITNESS:  Save trees.  I -- I --
23       BY MR. CHEFFO:
24       Q.   Is that -- that's it?
25       A.   Well, I glean the information I need

1    from the electronic review.  And I try not to
2    print things out if it's just going to be a
3    redundant piece of information.  So -- I mean I
4    --
5        Q.   How -- how big are some of the files
6    in the case?
7        They're pretty voluminous, aren't
8    they?
9        A.   Some of the OARRS files?
10       Q.   No.  Some of the files of decedents,
11   particularly if you have criminal
12   investigations?
13       A.   Varies.  I mean some of them can be
14   very, very large, like the Shepherd case, which
15   still comes up and is a prominent case in this
16   part of the country.  Those files are several
17   folders.
18       Q.   Okay.  So your testimony is you've
19   never presented out an -- an OARRS form, and
20   the reason why you didn't do that is you didn't
21   want to waste paper, fair?
22       MR. BADALA:  Objection to form.
23       THE WITNESS:  You know, I'd
24   appreciate it if that wasn't my answer and you
25   would be fair about what I said, which is

Page 130

1    that --
2        BY MR. CHEFFO:
3    Q.  To save trees.
4        MR. BADALA:  Objection to form.
5        BY MR. CHEFFO:
6    Q.  Didn't you?
7    A.  And because I gleaned the
8    information I needed from the OARRS report
9    before I've decided that I did not need to
10   printed it.
11   Q.  Okay.  And how -- but in order to
12   determine -- let's assume that case became a
13   legal case or there was other -- some other
14   purpose.
15       Wouldn't you want to know and -- and
16   -- and wouldn't -- wouldn't someone -- wouldn't
17   someone want to be able to determine whether
18   there was OARRS information in the file?
19       Isn't that a relevant piece of
20   information?
21       MR. BADALA:  Objection.  Form.
22       THE WITNESS:  They may.
23       BY MR. CHEFFO:
24   Q.  Right.
25       In order -- and then, if you wanted

Page 131

1    to know it, every time, according to you, you'd
2    have to go back and sit at your computer and
3    look at it, right?
4        One way of avoiding that would be to
5    print it out and determine if there was OARRS
6    data, right?
7    A.  But you're misunderstanding our
8    relationship with the Board of Pharmacy.  They
9    do not want that data made public.  That's the
10   way the statute's written.  And the corner
11   statute makes anything in the corner's file a
12   public document, at least to next of kin.
13       So we cannot print them out and
14   maintain that pledge to the Board of Pharmacy
15   that these will not become public documents.
16   So we do not print them, and we do not put them
17   in our file.
18   Q.  So is it your testimony there's no
19   mechanism to segregate that information from
20   the file?
21       MR. BADALA:  Objection to form.
22       THE WITNESS:  I don't know -- I mean
23   it seems to me like there would be, but I don't
24   know that we've done that.
25       BY MR. CHEFFO:

Page 132

1    Q.  Checking OARRS and the information
2    in OARRS is an important part of your
3    determination of cause of death in many cases;
4    isn't that right?
5    A.  Not in many, no.  I wouldn't say
6    that.
7    Q.  In what situations is it important
8    to check the OARRS data?
9    A.  I think the OARRS data was very
10   important to check with our heroin overdose
11   deaths because we were not -- you know, we had
12   no compelling data, other than anecdotal data,
13   to say these people who were abusing heroin
14   potentially got their start back with opioid
15   pain medication.
16       So it was very important I think to
17   go back and see how many of these individuals
18   had an OARRS file, how many that opioid
19   prescribing, to document that, especially for
20   our public health interventions.
21       Because, of the opioid pain reliever
22   phase of the crisis and then the heroin phase,
23   we, you know, wanted to link those back.  And
24   the fentanyl phase as well.
25       So we continue to look at OARRS data

Page 133

1    on our drug overdose deaths.  But in terms of
2    the certification of those deaths, I wouldn't
3    say we look at it that often to make a
4    certification, if at all.
5    Q.  When you go back and look at it, do
6    you print them out, or do you just sit at the
7    computer and -- and memorize that information?
8        MR. BADALA:  Objection to form.
9        THE WITNESS:  I don't memorize it,
10   but I don't print it either.
11       BY MR. CHEFFO:
12   Q.  So you said you -- you went back and
13   did a -- kind of a -- a back look, right, on
14   OARRS data.
15       Did I get that right?
16   A.  The office has, yes.
17   Q.  Okay.  And when they --
18   A.  Me and other designees.
19   Q.  When they -- did they did -- did --
20   when they did that, did they print it out, or
21   did they make records of the OARRS data in
22   order to do that analysis?
23   A.  I can only say what I did, which is
24   I looked at it and generated, you know, reports
25   around that.  But I did not print any of that

34 (Pages 130 - 133)

Page 134

1  out.
2      Q.   So -- so tell me what you did.
3          Like what -- did you look at each
4  case, and then you went back, and you
5  determined if there was an OARRS report?
6      A.   We took the list of decedents --
7  well, let's take 2013.  We would take that list
8  of decedents and send that to the Board of
9  Pharmacy with our information -- identifying
10 information and ask them, "Do you have an OARRS
11 report on this individual?"
12         And they would supply us with a
13 yes-or-no answer and then the OARRS data that
14 we could then go back and analyze for
15 prescribing so that -- did they have an OARRS
16 file, what was prescribed, was there evidence
17 of doctor shopping.
18         And we would not print those out, as
19 I said.  I didn't print them out myself.
20     Q.   Yeah.  Okay, Doctor.
21         So you didn't print them out, but
22 somebody printed them out and sent them to you?
23         Is that what you're telling us?
24     A.   No.  That's not what I'm saying at
25 all.

Page 135

1      Q.   You said you sent a list to the
2  Board of Pharmacy, right?
3      A.   Right.
4      Q.   And you asked them, "Are there" --
5  "Are there any OARRS reports for any of the
6  people on the list," right?
7      A.   Right.
8      Q.   And -- and the list included
9  everybody who had a drug overdose.
10     A.   Right.
11     Q.   And --
12     A.   Well, we were looking at heroin
13 overdoses and fentanyl --
14     Q.   Okay.
15     A.   -- overdoses.
16     Q.   What about cocaine?
17     A.   Not an opioid, so it wasn't as
18 relevant to us to go back and look at the
19 controlled substance data.
20     Q.   Why wasn't looking at control --
21 cocaine relevant to find out if they had an
22 OARRS report?
23     A.   The mechanism of cocaine is
24 fundamentally different than the opioids, be
25 they heroin or the opioid pain relievers.  We

Page 136

1  didn't choose to look at that.
2          And our crisis, as it was evolving,
3  was initially with heroin when we detected it
4  and subsequently fentanyl.
5          Cocaine hadn't really changed over
6  this period of time.  And its relationship to
7  previous prescribing opioid pain relievers
8  wouldn't imply creating an addicted population
9  of narcotics folks, opioid pain relieve or
10 opioid dependent people.  So we didn't look at
11 it.
12     Q.   What about methamphetamine; did you
13 ask for OARRS data about people who overdosed
14 on meth?
15     A.   No.  For the same reason.  It's a
16 stimulant.  So we wouldn't know the relevance
17 of OARRS data for the opioids with that regard.
18         Amphetamine is a controlled
19 substance that we could have gleaned from OARRS
20 data.  But our methamphetamine deaths, as I
21 say, you know, have been somewhere in the 10 to
22 25 range for a long time.  So that isn't, you
23 know, the crisis that was really glaring at us
24 in terms of solving that.
25     Q.   Well, you said fentanyl was a

Page 137

1  crisis, right?
2      A.   Fentanyl became a crisis, yes.
3      Q.   Right.
4          And --
5      A.   Not on this graph that you're
6  showing me.
7      Q.   At the graph I'm looking at, it --
8  it looks like it's the lowest of the -- the
9  five drugs.
10         So when did fentanyl become a
11 crisis?
12     A.   We become aware of fentanyl as a
13 crisis I would say 2015, 2016.  But --
14     Q.   But when was it --
15     A.   -- one of the things --
16     Q.   Sorry.  Go ahead.
17     A.   If I could finish.
18     Q.   Yeah.
19     A.   One of the things, you know, that
20 you have to understand is we're doing
21 retrospective looks.  And this rise to 37 in
22 2014, we really, in retrospect, and I think
23 even at the time, were concerned that's the
24 start of our fentanyl crisis.  It's just it
25 hadn't really overwhelmed us to the same extent

35 (Pages 134 - 137)

Page 138

1 that having 399 deaths in 2016 or 492 deaths in
2 2017 did.
3    Q.   Well, what about -- why wasn't the
4 cocaine a crisis when it was probably in
5 2013 -- I don't know.  What's the number? --you
6 know, 30 times more, 20 time -- 25 times more?
7         Was cocaine a crisis over fentanyl?
8         You had five case of fentanyl in
9 2013; you had 116 cases in -- in -- of cocaine,
10 right.
11        Was cocaine a crisis?
12        MR. BADALA:  Objection to form.
13        THE WITNESS:  Again, cocaine hasn't
14 changed acutely.
15        MR. CHEFFO:  That's not --
16        THE WITNESS:  I think --
17        MR. CHEFFO:  -- my question.
18        THE WITNESS:  -- it's a problem, but
19 I wouldn't necessarily say that the crisis here
20 had overwhelmed our capacity to respond to it.
21        BY MR. CHEFFO:
22    Q.   Did -- did the five cases of
23 fentanyl overwhelm your ability?
24    A.   No.
25    Q.   Did the --

Page 139

1    A.   And I -- I would say, you know, this
2 isn't really where we're looking at the
3 fentanyl phase of the opioid crisis.  So, you
4 know, the graph goes on beyond 2014 and rises
5 dramatically for fentanyl in '15, '16, '17, and
6 remains up in '18.
7    Q.   So '15, '16, '17, that's when the --
8 the fentanyl crisis was?
9    A.   It's evolving over timing.  So as I
10 look back, I say, you know, this 2014 data is
11 probably where, you know, retrospectively I can
12 say that's starting the crisis here.
13        Because the bulk of these 37 deaths
14 were actually in the last two months of that
15 year.  And it rose -- nearly tripled in 2015,
16 nearly tripled again in 2016.
17    Q.   Okay.
18    A.   And that's where our resource get
19 overwhelmed.
20        But, you know, if you're telling me
21 in 2013 five deaths is a fentanyl crisis, I
22 would say that wasn't really our thinking at
23 the time.
24    Q.   And that would be true for any year
25 prior to that, right?

Page 140

1    A.   20 -- 2006 is a -- an unusual year
2 for fentanyl.  Because there was a distribution
3 of pharmaceutical fentanyl around the Great
4 Lakes.  So we had a -- a unusually high number
5 that year.
6    Q.   But it was still less by orders of
7 magnitude than cocaine and heroin, right?
8    A.   Right.  It was just higher at that
9 number.
10    Q.   Okay.  So the crisis you believe was
11 identified and -- and occurred in 2 -- after
12 2015 for fentanyl?
13    A.   Fentanyl I would say the crisis was
14 identified in 2016, 2017.
15    Q.   Okay.  Now, let's go back to your
16 request for OARRS data.
17        You looked at what year when you
18 went to the Board of Pharmacy?
19        Was it a single year?
20    A.   We collect on -- we're in an ongoing
21 collection of OARRS data.  We -- I should say
22 that we started getting data from Board of
23 Pharmacy with regard to OARRS for 2012 year.
24 We continued to have access to OARRS as a
25 coroner medical examiner, access.  And just

Page 141

1 because we've had so many deaths, just --
2    Q.   I'm listening.  Go ahead.
3    A.   Are you?  Okay.
4        Just because we've had so many
5 deaths, we have fallen behind in our ability to
6 look at OARRS data.  But we've made our efforts
7 to stay as current as we can.
8        It's just that personnel-wise we
9 don't have people.  We just hired an
10 epidemiologist into our office to sort -- to
11 sort out some of these look-backs.  Because our
12 existing staff has really just been dedicated
13 to our primary mission.  And our ability to
14 keep up with some of these things just really
15 wasn't --
16    Q.   Okay.
17    A.   -- possible.
18    Q.   I want to ask some very just basic
19 document questions.  Okay?
20        That's where I'm --
21    A.   Okay.
22    Q.   -- I'm going.
23        Am I right that, since 2012, you
24 have sent the Board of Pharmacy a list of all
25 overdose deaths and asked them to provide

36 (Pages 138 - 141)

Page 142

1  information about whether there is or was an
2  OARRS report?
3     A.   Yes.
4     Q.   Did it occur prior to 2012?
5     A.   Or I'm sorry.  You know, I -- I -- I
6  misspoke there.
7           In 2012 we asked about an OARRS file
8  specifically on our heroin overdose deaths.
9  And that would continue to now.
10          And then I don't remember when, but
11  we have access to OARRS, and the intention is
12  to be able to look at our overdose deaths with
13  fentanyl as well as heroin.
14     Q.   Okay.  And I want to talk about
15  documents now, Doc.  Just -- I'm just talking
16  about the documents, what the requests are made
17  and -- and where they are.
18          So from -- when the requests were
19  made for OARRS information from the Board of
20  Pharmacy, and they -- certain information was
21  sent back from the Board of Pharmacy to your
22  office, correct?
23     A.   For a period of time.  I mean now we
24  have our list of decedents; we have access to
25  OARRS; and we can go and do our own searches.

Page 143

1  We don't have to have the intermediate step of
2  having --
3     Q.   Right?
4     A.   -- pharmacy approve.
5          In fact, you know, as I sit here,
6  the only year I really remember us having that
7  need to have pharmacy provide the data us to
8  was 2012.  And we got access in 2013 because
9  there was a lot of back and forth about why we
10  needed access.
11     Q.   Uh-huh.
12     A.   And that was transmitted
13  electronically from pharmacy to us.  It was
14  deidentified in some regards.
15          Beyond that, 2013, we get access to
16  OARRS.  And it's a database; it's a web site.
17  We can go and look up our own cases.
18          So I don't know, as I sit here
19  today, whether they were actually sending
20  electronic files after 2013.  They did for 2012
21  because there was the issue about whether, as
22  an office, the medical examiner, because I
23  don't have a prescription -- pardon me -- a DEA
24  number to prescribe narcotics, whether I was
25  going to get access to OARRS.

Page 144

1           So when that wasn't clear -- I think
2  over time they realized that this was
3  potentially very useful information -- they
4  give us a body of deidentified data
5  electronically for the 2012 overdoses.
6     Q.   Do -- do some people in your office
7  print out OARRS reports as part of their
8  investigation or autopsies?
9     A.   I don't know.
10     Q.   Okay.
11     A.   I -- I've seen printed OARRS
12  reports, I can say.  But whether that's a
13  routine, I don't know.
14     Q.   Do you know the circumstances about
15  whether they are printed?
16     A.   No.
17     Q.   Do you know if they're kept in any
18  uniform way?
19     A.   I'm not aware --
20          MR. BADALA:  Objection to form.
21          THE WITNESS:  -- of any OARRS file
22  that we have on our decedents.
23          BY MR. CHEFFO:
24     Q.   If somebody has only cocaine as part
25  of their toxicological assay, and it's listed

Page 145

1  as the cause of death, is an OARRS report or
2  query done?
3     A.   If it was just a straight overdose
4  with cocaine, we would not do an OARRS check on
5  that.  We started with the heroin overdoses,
6  and then we added the fentanyl overdoses when
7  they became more significant.
8           We do send a list of our
9  prescription opioid deaths where they appear on
10  the death certificate to the Department of
11  Health.  But I don't know, beyond that, what
12  they do in terms of looking into OARRS data or
13  not.
14     Q.   And why is it that you don't do an
15  OARRS report in connection with a -- a cocaine
16  death?
17     A.   For the reasons that I mentioned
18  before.  Our cocaine deaths have been stable
19  over a period of time.  So we're trying to
20  respond to the crisis to design public health
21  interventions to reduce deaths related to
22  initially heroin and then fentanyl.
23           The relationship pharmacologically
24  between opioid pain relievers, heroin and
25  fentanyl, is clear.  They act on the same

37 (Pages 142 - 145)

Page 146

1  receptor in the brain. Cocaine does not.
2      So seeing whether somebody with
3  cocaine had an opioid pain reliever
4  prescription before, I don't know how that
5  would inform a public health initiative in
6  terms of drug drop boxes or trying to get
7  people to have less access to the opioid pain
8  relievers.
9      Q. So, Doctor, putting aside what other
10  uses, there -- OARRS -- in your -- when you're
11  doing an individual autopsy -- let's just talk
12  about you as a forensic doctor doing an
13  autopsy.
14      There is a reason why you do an
15  OARRS query in some cases in order to determine
16  or help you assist in your investigation and
17  preparing your report; is that fair?
18      A. That would be very rare, if -- I
19  can't remember ever doing it to finish a death
20  investigation, which -- by "finish" I would
21  say, you know, write a cause of death, death
22  certificate, issue a final of report. These
23  were more retrospective looks after we had
24  certified deaths.
25      Q. What about as part of the

Page 147

1  investigation?
2      So, for example, let's assume
3  someone had an overdose of fentanyl.
4      Would it be kind of standard
5  practice for -- you were the investigator, and
6  there was no indicia, you know, at the -- the
7  site of death --
8      A. Right.
9      Q. -- to determine whether this person
10  had a prescription for fentanyl or whether
11  there was no prescription so that the
12  assumption might be that it was a synthetic.
13      Is that part of your investigation?
14      MR. BADALA: Objection to form.
15      THE WITNESS: I have to say, you
16  know, when we're on scene at a death, it may
17  look like an overdose. We don't have that
18  degree of specificity what might be involved
19  there. You know, I don't know if it's opioids,
20  cocaine. It may be just powder there.
21      And, you know, checking an OARRS
22  report at that time would be really premature
23  and just -- you know, we're already strained on
24  resources. I -- I think we have to kind of
25  make our best use, which is after

Page 148

1  certification.
2      BY MR. CHEFFO:
3      Q. So is it your testimony that your
4  investigators don't check OARRS reports as a
5  matter of course with respect to fentanyl or
6  heroin or other opioid overdoses?
7      MR. BADALA: Objection.
8      THE WITNESS: My scene
9  investigators?
10      BY MR. CHEFFO:
11      Q. Yeah.
12      Anyone who is involved in the
13  autopsy and the report, is it part of their
14  standard practice and procedures or not?
15      MR. BADALA: Same objection.
16      THE WITNESS: I think you're
17  confusing me.
18      The autopsy is kind of what I do at
19  the autopsy table. The investigation is the
20  sum --
21      MR. CHEFFO: Okay.
22      THE WITNESS: -- of things to get to
23  that point where I write a death certificate.
24      And we are not checking OARRS
25  reports at that time usually. There may be

Page 149

1  exceptions where we do, like the case I
2  mentioned.
3      Most of the checks that we've done
4  on OARRS have been done retrospectively after
5  deaths were certified. And that's just the way
6  our staff is, you know, able to do that.
7      Those checks, you know, are done by
8  delegates. And I believe one of my delegates
9  is a senior investigator. But most the
10  investigators do not do that. And they
11  certainly wouldn't be doing it at the time of a
12  scene investigation.
13      Or, you know, just the work flow in
14  our office, to go from scene investigation,
15  usually autopsy is the next day or within a day
16  or two of that. We wouldn't be checking OARRS
17  in that time frame.
18      BY MR. CHEFFO:
19      Q. So let -- let me see if I
20  understand. I think I do.
21      What you're saying to us is that
22  OARRS reports may be queried, and it's
23  primarily for retrospective public health
24  reasons, but they're typically not queried --
25  or the OARRS database is not queried in

38 (Pages 146 - 149)

1    connection with a death investigation or
2    creation of an autopsy report.
3         Is that fair?
4         A.    It would be the rare instance where
5    we would do that.  It's more retrospective
6    look.  And again, the targeted purpose of that
7    is to design interventions to try to address
8    the number of people who are dying.
9         Q.    So in order to determine, for
10   example -- is checking the OARRS database one
11   way that you would determine whether someone
12   was doctor shopping?
13        A.    Yes.
14        Q.    And -- and that's not typically done
15   at the time of death or when you're doing your
16   investigation or autopsy report; is that right?
17        A.    That's right.
18        Q.    And can you see a benefit of doing
19   it at that time?
20        A.    I mean the sooner you identify it,
21   the better.  But it comes down again to
22   resources in our office.  I don't have -- you
23   know, we're overwhelmed with everything that's
24   going on in a lot of ways.
25        So, you know, asking people to do

1    that at the time of investigation would result
2    in us doing a lot of OARRS checks on people who
3    don't have heroin or fentanyl in their system.
4    We would be guessing, you know, what drug was
5    potentially involved.
6         Q.    Not my question though.
7         So let's -- let's talk about heroin
8    or fentanyl or an overdose involving an opioid.
9    Okay?
10        A.    Sure.
11        Q.    How long does it take to do an -- to
12   -- a -- a check for OARRS?
13        MR. BADALA:  Objection to form.
14        THE WITNESS:  To check the system?
15        MR. CHEFFO:  Uh-huh.  Yes.
16        THE WITNESS:  I haven't done it in a
17   little while.  It usually -- you know, minutes.
18        BY MR. CHEFFO:
19        Q.    And if -- if you determined that --
20   if it was done and you determined that that
21   person had been doctor shopping, would that be
22   important information to have?
23        MR. BADALA:  Objection to form.
24        THE WITNESS:  In the death
25   investigation or just in general?

1         MR. CHEFFO:  Both.
2         THE WITNESS:  In term of
3    certification of death, I -- I don't think it
4    would be very relevant.  In terms of public
5    health interventions, yeah, doctor shopping is
6    something we should be trying to monitor and
7    pick up.
8         BY MR. CHEFFO:
9         Q.    And if you -- if you did an OARRS --
10   someone spent the five minutes or so doing an
11   OARRS check in connection with overdoses
12   involving heroin or fentanyl or other opioids,
13   and you identified doctor shopping, you would
14   presumably refer that to the appropriate
15   authorities?
16        A.    Right.  As I mentioned before, when
17   we identify doctor shopping, we don't refer the
18   prescribers, we refer the decedent to the Board
19   of Pharmacy for further investigation.
20        Q.    You would agree that not every
21   person who has overdosed on heroin has ever
22   taken a -- in Cuyahoga County has taken a
23   prescription medicine, right?
24        A.    I don't know for certain, but I
25   suspect that's true.

1         Q.    If you wanted to -- to know that,
2    you would look at the OARRS database?
3         That would be one way?
4         A.    The ideal way is actually to ask the
5    person, but obviously we can't do that.  So one
6    of the things that we try to do is to go back
7    and look at the OARRS database to see if they
8    had been prescribed.  It's the best data we
9    could get.
10        Family might be another source of
11   information that we may be able to tap into as
12   well.
13        Q.    Do you have any mechanism to look
14   for whether someone was receiving drugs, opioid
15   medicines from a -- a pill mill?
16        MR. BADALA:  Objection to form.
17        THE WITNESS:  Within the Medical
18   Examiner's Office, not directly.  That would be
19   more of a law enforcement function.
20        BY MR. CHEFFO:
21        Q.    Well, wouldn't OARRS tell you?
22        A.    I would have prescriber names.  But
23   whether those individuals were running a pill
24   mill, I wouldn't be able to necessarily tell
25   that from the OARRS data.

39 (Pages 150 - 153)

Page 154

1    Q.   Wouldn't there be anything that
2  would raise a suspicion?
3       MR. BADALA:  Objection to form.
4       THE WITNESS:  Again, the criteria
5  that we used for our reporting I think were
6  things that we identified as potentially
7  suspicious.
8       BY MR. CHEFFO:
9    Q.   Well, if you were to look at OARRS
10  data, and you were to see prescriptions being
11  filled from the same doctor or facility, pill
12  mill, and you saw, you know, every -- every
13  week new prescriptions that appeared to you to
14  be well beyond customary doses or frequency,
15  isn't that how you might identify a pill mill?
16       MR. BADALA:  Objection to form.
17       THE WITNESS:  I don't know.  I...
18       BY MR. CHEFFO:
19    Q.   Do you have any idea how you might
20  identify pill mill activity?
21    A.   As I say, it's more of a law
22  enforcement function, I would think.
23    Q.   So the answer is no, that's not in
24  your expertise?
25    A.   No.  I wouldn't say so.

Page 155

1    Q.   Do you think that detection of
2  illicit fentanyl is -- is undercounted and
3  underreported?
4    A.   I don't know.  It may be.
5    Q.   Are you aware of situations where
6  there have been decedents who purchased or --
7  or used what they believed was cocaine and it
8  was laced with another chemical, like
9  carfentanil or fentanyl?
10       MR. BADALA:  Objection to form.
11       THE WITNESS:  We -- we can only
12  infer that.  But short of asking them what they
13  were intending to use, I can't say that with
14  certainty.
15       BY MR. CHEFFO:
16    Q.   Well, I mean even anecdotally, is
17  that something in your work that -- that's in
18  your conversations with law enforcement and
19  family and investigation reports?
20       You know, someone says, "I talked to
21  Johnny, who was there.  We thought we were
22  using cocaine.  We had no idea we were using
23  fentanyl."
24       Has anything like that come up in
25  Cuyahoga County?

Page 156

1       MR. BADALA:  Objection to form.
2       THE WITNESS:  I -- I believe so.
3  And I think, you know, the entry of fentanyl
4  into the African-American population coincided
5  with seeing more mixtures of fentanyl and
6  cocaine.  And cocaine was a drug that we
7  traditionally saw more in the African-American
8  population.
9       So again, I can't -- can't talk to
10  the guy after they've passed away.  But, you
11  know, that certainly suggested to us that the
12  infiltration of fentanyl into the cocaine
13  market was pushing mortality and may have been
14  something that these folks were not expecting.
15       We did issue an alert to that effect
16  from our office.
17       BY MR. CHEFFO:
18    Q.   And in that situation, if that did
19  occur, that would be listed as both a cocaine
20  and fentanyl death?
21    A.   Again, you know, I'd have to see the
22  sum of the investigation.  But we have
23  certified deaths like that as a combined
24  cocaine and fentanyl overdose.
25    Q.   And -- and if someone takes their

Page 157

1  life and commits suicide by overdose, is --
2  is -- is -- is that counted as a opioid death
3  if it involved, in whole or part, opioids?
4    A.   We would count it as a -- an opioid
5  death.  For this data we tried to I think look
6  at our accidental deaths, as I understand it.
7  We didn't use the suicide designations.
8    Q.   Are you -- are your -- you're aware
9  of how your office counts and treats suicide
10  deaths from -- from overdose, correct?
11    A.   Yes.
12    Q.   Is it consistent with what the --
13  the state Department of -- of Health does, or
14  do you vary in how you count suicides?
15    A.   I don't know what the state
16  Department of Health does.  Our practice is in
17  keeping with, you know, our professional
18  organization and standards, that they are
19  recommendations they make.
20       And I'm not aware of the state
21  promulgating standards about suicide and
22  determination of suicide.
23    Q.   What -- what professional
24  organizations do you follow with respect to how
25  you treat an account for suicides?

40 (Pages 154 - 157)

Page 158

1      A.   There are guidelines from the
2  National Association of Medical Examiners with
3  regard to death certification.  And I think,
4  you know, we're all familiar with those in the
5  office, myself and the other certifiers.
6      Q.   Any other promulgating entities or
7  rules?
8      A.   That's probably the guiding one, I'd
9  say, on a lot of things.  There's papers
10  written about, you know, death certification.
11  And I would say, you know, some of that can be,
12  you know, in the common knowledge.
13          But I think, as a document, the
14  classification of manners of death is probably
15  the one that's most often used.
16      Q.   Do you know in -- whether you
17  account for, from a statistics perspective,
18  overdose deaths by suicide in the same way that
19  Summit County does?
20          MR. BADALA:  Objection to form.
21          THE WITNESS:  I don't know.
22          BY MR. CHEFFO:
23      Q.   Do you know -- do you have any
24  visibility or insight into how Summit, Akron or
25  Cleveland operates their medical examiner

Page 159

1  offices?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  Cleveland does not
4  have a Medical Examiner's Office.  That's
5  Cuyahoga County.  So their practice would be
6  the same as the county.  They don't maintain a
7  separate agency.
8          Summit County, I speak to Dr.
9  Koehler, but I don't know the details of that
10  part of her practice.
11          MR. BADALA:  Mark, if you think it's
12  a good time.  About an hour and a half.  We're
13  a little over noon.  I --
14          MR. CHEFFO:  Yeah.
15          MR. BADALA:  I don't know if lunch
16  is here and we can maybe break for lunch now
17          MR. CHEFFO:  We can do -- I --
18          MR. BADALA:  If that makes sense.
19          MR. CHEFFO:  So yeah.  I'm fine with
20  that.  I actually -- let's go off the record.
21          THE VIDEOGRAPHER:  We -- we are
22  going off the record.
23          This is the end of Media Unit No. 2.
24          The time is 12:03.
25          (A short recess was taken.)

Page 160

1          THE VIDEOGRAPHER:  We are back on
2  the record.
3          This is the beginning of Media Unit
4  No. 3.
5          The time is 12:11.
6          You may proceed, Counsel.
7          BY MR. CHEFFO:
8      Q.   Now, Doctor, earlier you -- you
9  mentioned -- you brought up a person by the
10  name of Carole Rendon.
11          Do you remember that?
12      A.   Yes, I do.
13      Q.   Who is she?
14      A.   She is our U.S. Attorney.  She was
15  the deputy -- or sorry -- the first deputy when
16  I met her.  Then she became U.S. Attorney.
17          And now Justin Hurdman is our
18  attorney.  So I -- I've had three since I got
19  here.
20      Q.   And how many times did you meet with
21  her?
22      A.   Oh, any number of times.  I mean she
23  would be chairing the task force.  I -- yeah.
24  We'd chat with her.
25          MR. PORTER:  Excuse me.  The phone

Page 161

1  are still muted.
2          MR. CHEFFO:  Sorry.  Thank -- thanks
3  for that.  We apologize.
4          BY MR. CHEFFO:
5      Q.   And what about in connection with --
6  did -- did you -- did you testify or indicate
7  that you -- you -- you met with her and -- and
8  other federal prosecutors in connection with
9  strategies for drug prosecutions?
10      A.   We did meet.  Yes, we did.
11      Q.   How many times?
12      A.   With Carole, specifically around
13  that topic, I remember meeting a first time,
14  and we discussed those issues.  We subsequently
15  wrote a paper with another one of the U.S.
16  Attorneys for my professional journal about
17  prosecutions.
18          So we could talk about, you know,
19  the strategy behind what -- it came to kind
20  of -- you know, my understanding changed, you
21  know, as to what their standards were.  And I
22  think their understanding about what the
23  medical examiner could and could not say in a
24  death specification overdose case also changed.
25          So we -- we -- I -- I decided it

41 (Pages 158 - 161)

Page 162

1 would be a good thing to put out for my
2 professional community.  And Carole and -- the
3 other fellow's name was Joe Pinjuh -- were very
4 helpful in --
5    Q.  Okay.
6    A.  -- that part of the process.
7    Q.  Doctor, I'm going to ask that you
8 listen to my questions.
9        I asked you specifically how many
10 times did you meet with Ms. Rendon in
11 connection with the prosecution.  And I think
12 you told me you remembered one, and then there
13 were subsequent --
14    A.  Well, I -- I'm sorry.
15    Q.  No.
16    A.  Finish your question.
17    Q.  Is it one?
18    A.  In answering your question, what I'm
19 saying is we met once, I remember specifically,
20 to discuss --
21    Q.  Okay.
22    A.  -- you know, prosecutions.  We met
23 subsequently to talk about the publication of
24 that article, which is very much related to
25 prosecutions.

Page 163

1        And in terms of other U.S.
2 Attorneys --
3    Q.  That's --
4    A.  -- I've met with a handful of them
5 about drug prosecutions, not Carole at that
6 time.
7    Q.  That -- that -- I mean I'm -- this
8 line of questioning I'm asking you just about
9 Ms. Rendon because I want to try and get
10 that --
11        MR. BADALA:  Just to be clear, Mark,
12 you didn't say that.
13        MR. CHEFFO:  I did.
14        MR. BADALA:  No, you didn't.  You
15 said Carole and other attorneys.
16        MR. CHEFFO:  Okay.
17        MR. BADALA:  You said that.  Just to
18 be clear.
19        BY MR. CHEFFO:
20    Q.  I'm going to ask you questions about
21 Ms. Rendon in any other context in any other
22 way.  But that's what I'm going to focus on so
23 we can kind of get through this and -- and --
24    A.  Sure.
25    Q.  -- to --

Page 164

1    A.  I just -- I heard "other U.S.
2 Attorneys" too.
3    Q.  Where -- when you discussed the
4 prosecutions, were they for specific pending
5 cases, or did you speak in general terms?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  Both.
8        BY MR. CHEFFO:
9    Q.  Okay.  And were they against
10 individuals?
11    A.  I don't remember the details of the
12 case we discussed.  But there was upcoming
13 prosecution.
14    Q.  Were they any of the defendants in
15 this case?
16    A.  No.  No, they were not.  That's my
17 understanding, I should say.  I don't know for
18 certain who we were talking about.  But I
19 didn't have the understanding they were the
20 defendants in this case.
21    Q.  And how many times did you meet with
22 Ms. Rendon and other members of the U.S.
23 Attorney's Office outside of the context of the
24 Heroin and Opioid Task Force?
25    A.  I don't remember.

Page 165

1    Q.  Is it more than one?
2    A.  Yes.
3    Q.  Is it more than five?
4    A.  I don't remember.
5    Q.  What -- what specifically do you
6 remember?
7    A.  I remember our meeting, which was at
8 the Medical Examiner's Office, to talk about
9 the prosecution of opioid deaths.  I remember
10 meeting with U.S. Attorney's Office, including
11 Carole, I believe, to talk about a custody
12 death.  It wasn't related to opioids.  I don't
13 remember other meetings.  I just -- I can't
14 remember them.
15    Q.  Do you remember having a meeting
16 about the Supreme Court's decision in the
17 Burrage versus United States case?
18    A.  Yes.
19    Q.  What was that about, the case?
20    A.  We were talking about the
21 prosecution of opioid-related deaths as they
22 would refer back to a distributor or dealer and
23 the -- the burden of proof that they were
24 required to meet in those kind of prosecution.
25        And from my side, I was talking to

42 (Pages 162 - 165)

Page 166

1  them about the interpretation of toxicology
2  findings that would potentially have an impact
3  on meeting that burden of proof.
4     Q.   And -- and is it your recollection
5  that, during that meeting, the U.S. Attorney's
6  Office and -- and the lawyers there provided
7  your office with information about that case,
8  Burrage versus the United States?
9     A.   They discussed it.  They would have
10  mentioned it.  I don't know that they handed me
11  a -- pardon me -- a decision.  I did
12  subsequently get a copy of that and read it,
13  but I don't remember if it was around that time
14  or not.
15     Q.   I mean it's fair to say you weren't
16  providing them information about a legal case,
17  were you?
18        MR. BADALA:  Objection to form.
19        THE WITNESS:  Boy, that would be
20  scary.  No, it was not.
21        BY MR. CHEFFO:
22     Q.   And -- and have you ever heard of
23  Craig Tame?
24     A.   Yes, I have.
25     Q.   Who is he?

Page 167

1     A.   He is one of the U.S. Attorneys.
2  And I've interacted with him in his capacity on
3  the task force, especially the U.S. Attorney's
4  task force.
5     Q.   And what about Mike Tobin; have you
6  heard of him?
7     A.   Yes, I have.
8     Q.   And who is he?
9     A.   Mike is another one of the U.S.
10  Attorneys.  I know he does a lot of the kind of
11  media outreach and things.  I don't know
12  exactly what his role is in the office.
13        I don't really know what Craig's is
14  either.  Just I know them to be in the U.S.
15  Attorneys office.  But I do know both of them.
16     Q.   And do you know who Joe Pinge --
17  Pinjuh is?
18     A.   Yes, I do.  He was actually the guy
19  I mentioned as the third author on the paper
20  that Carole Rendon and I wrote for my
21  professional journal.
22     Q.   And were Mr. Tame, Mr. Tobin and Mr.
23  Pinjuh present when you met with Ms. Rendon
24  during your discussion of the Burrage case?
25     A.   I don't remember who was present in

Page 168

1  the room.  The discussions I had subsequent
2  with Carole Rendon with regard to our
3  publication, Joe Pinjuh would have been
4  involved in them as a coauthor.  But who was in
5  that room I honestly do not remember.
6     Q.   Was it just her, or do you remember
7  there being other people there?
8     A.   I seem to remember other people were
9  there.  It wasn't just Carole and I sitting
10  there.
11     Q.   Was Mr. Shannon there?
12     A.   I don't remember who was actually
13  there.
14     Q.   And after that meeting, is that when
15  you decided to coauthor an article with Ms.
16  Rendon and Mr. Pinjuh?
17     A.   No.
18     Q.   You had decided to talk -- to write
19  an article about the -- the Burrage decision
20  prior to that?
21     A.   Oh, oh, I'm sorry.  I thought you
22  meant like right after that meeting did we
23  decide to --
24     Q.   Well, at some point after it, right?
25     A.   At some time after that, yes.  It

Page 169

1  wasn't right afterwards though.  I'm sorry.  I
2  misunderstood you.
3     Q.   And it was published in a -- a
4  journal that's available to the public?
5     A.   Yes.
6     Q.   That's the -- the Journal of
7  Forensic Examiners, right?
8     A.   It's the journal called Academic
9  Forensic Pathology.
10     Q.   And -- and it's for forensic
11  examiners though, right?
12     A.   It's for death investigators.
13  It's -- at the time it was the official journal
14  of the National Association of Medical
15  Examiners.
16     Q.   And the purpose of -- of that
17  article was to share to the public the
18  information that the members of the attorneys
19  generals' office had provided to you in
20  connection with the -- the Burrage case; is
21  that right?
22        MR. BADALA:  Objection to form.
23        THE WITNESS:  I -- I think it was to
24  address, you know, what we found was an
25  interesting discussion in that the burden of

43 (Pages 166 - 169)

Page 170

1  proof for a death specification prosecution on
2  the federal level wasn't something I was aware
3  of.
4        And I thought that my colleagues
5  would be interested in knowing that burden of
6  proof and how it would relate to our
7  interactions.
8        Because at this time, you know, our
9  county is becoming, in a lot of ways, a model
10 for a lot of responses to the opioid crisis.
11 And, you know, other U.S. Attorney's offices I
12 think were looking at the prospect of doing
13 these prosecutions.
14       And I felt my colleagues would
15 probably be interacting with them as well, and
16 it would be a useful article to kind of
17 acquaint them with, you know, here's what's
18 kind of driving the strategy behind those
19 prosecutions.
20    Q.  Right.
21       So the sum and substance was there
22 was this Supreme Court case, and the -- the
23 prosecutors came in and -- and shared
24 information to you; you found that interesting
25 and thought that that would be interesting,

Page 171

1  that others in your position might find
2  interesting and useful; and that's why you then
3  decided as a group to coauthor a piece.
4        Isn't that the sum and substance of
5  what happened?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  I think that's a fair
8  statement on my end, that I wanted to kind of
9  bring that message to my colleagues who might
10 not be familiar with it, as I wasn't familiar
11 really before we had discussed strategies, in
12 terms of their needs for prosecution.
13       BY MR. CHEFFO:
14    Q.  And the goal was to publicize this
15 information because you thought it was
16 interesting from a public perspective to have
17 that and useful, right?
18    A.  A potential useful thing for
19 somebody in my shoes in another jurisdiction.
20    Q.  Did you and Mr. Shannon routinely
21 attend meetings of U.S. Attorney's Heroin and
22 Opioid Task Force?
23    A.  He's a better attendee.  By that I
24 mean Hugh Shannon.  I attend as many as I can.
25 He's been very consistent in his attendance,

Page 172

1  and I've been pretty good.
2     Q.  The -- the task included doctors,
3  right?
4     A.  There were some doctors there.
5  Representative of the major hospitals would be
6  there.
7     Q.  Elected officials?
8     A.  Doctors.  I would say, you know,
9  Ph.D.-level people level as well.
10       I've -- are you talking about
11 physicians?
12    Q.  Either way.
13       I mean tell me if this is fair:  The
14 task force included doctors, elected officials,
15 educators, individuals in recovery, and other
16 private citizens.
17       MR. BADALA:  Objection to form.
18       THE WITNESS:  I didn't know that
19 there were specific people present as private
20 citizens.  But obviously we -- the majority of
21 us are citizens within Cuyahoga County.
22       BY MR. CHEFFO:
23    Q.  And did you regularly share
24 information -- you or your office share
25 information with the task force regarding

Page 173

1  opioid abuse issues and statistic?
2     A.  We have a designated time in most of
3  the task force meetings to present data like
4  this kind of graph that I have in front of me
5  and what we're seeing.
6        There may be other information from
7  the crime laboratory that we also oversee that
8  might get presented there as well.
9     Q.  Would that include trends and other
10 information that you were seeing?
11    A.  Sure.  Yes, it would.
12    Q.  And that would be presented to the
13 entire group, right?
14    A.  Yes, it would.
15    Q.  And if you saw things about an
16 advent or an increase in carfentanil or
17 adulterated drugs or things that you were
18 seeing that you thought would be informative
19 for the public and others to know, that would
20 be the type of thing that you would report on,
21 correct?
22    A.  As it impacted mortality data, yes.
23    Q.  Uh-huh.
24       And -- and -- and much of this
25 information was also being shared in press

44 (Pages 170 - 173)

Page 174

1  releases or publications that you were putting
2  out or putting on your -- your web site in
3  terms of statistics and other data; is that
4  light?
5      A.   Yeah.  The press releases I think
6  would usually be used to address things that we
7  had in desire to inform the public about
8  something that was a significant trend.
9          We have a monthly bulletin, if you
10  will, about what we're seeing in the office in
11  trends.  That forms frequently the basis of the
12  presentation at the U.S. attorney's task force.
13  We've discussed it at the Board of Health task
14  force as well.  The data is the data.
15          But I think we put a lot of
16  information out.  And just -- some of it, you
17  know, targeted towards the public; some of it
18  targeted to other audiences.
19      Q.   But -- but -- but this information
20  was largely available in various forms; either
21  you had given testimony or press releases or it
22  was on your web site, right?
23          There was no -- this wasn't super
24  secret information, was it?
25      A.   Not this information, no.

Page 175

1      Q.   The medical examiner's budget,
2  that's, I take it, a public record?
3      A.   Yes.  I believe so.
4      Q.   And -- and as for the Cuyahoga
5  County medical examine -- examiner, do you know
6  whether you were represented by the law
7  department or law director, members of the law
8  department?
9          MR. BADALA:  Objection to form.
10          THE WITNESS:  The law department
11  started under the charter.  And they have
12  represented the office on some issues, which is
13  a more traditional thing.  We've used the
14  county prosecutor as our legal representation
15  as well.
16          And that's -- I say -- by say --
17  when I say "more traditional," that's the more
18  characteristic relationship in the other
19  counties in Ohio which don't have a charter
20  reform.  But in Cuyahoga County, we have been
21  represented by both.
22          BY MR. CHEFFO:
23      Q.   So -- but you are represented by the
24  law director and members of the law department?
25          MR. BADALA:  Objection to form.

Page 176

1          THE WITNESS:  The department has
2  been, yes.
3          BY MR. CHEFFO:
4      Q.   And -- and have you or the
5  department ever retained Ms. Rendon to
6  represent you as a lawyer?
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  I have not.  I don't
9  -- the department has not.
10          BY MR. CHEFFO:
11      Q.   And were there multifaceted efforts
12  to combat the opioid crisis?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  I think, you know, we
15  have a lot of people in the county working to
16  address, you know, what is just a public health
17  emergency.  So multifaceted.  I would look at
18  law enforcement, our medical communities, our
19  medical examiner's office, treatment folks.
20  Yeah.  Yes.
21          BY MR. CHEFFO:
22      Q.   And are they still ongoing?
23      A.   Yes.  Because the crisis is not
24  over.
25      Q.   And when did they begin?

Page 177

1          MR. BADALA:  Objection to form.
2          THE WITNESS:  When did --
3          BY MR. CHEFFO:
4      Q.   The multifaceted efforts to combat
5  the opioid situation, the crisis, is that
6  something that's been ongoing for a long time?
7  a short time?
8          When did start?
9          MR. BADALA:  Objection to form.
10          THE WITNESS:  With my involvement, I
11  would say, you know, we start when we
12  identified the heroin crisis.  And then
13  activities are, you know, added to that.  And,
14  you know, that continues up to this day.
15          BY MR. CHEFFO:
16      Q.   Can you give me a time frame?
17          MR. BADALA:  Objection to form.
18          BY MR. CHEFFO:
19      Q.   Time frame?
20      A.   For?
21      Q.   When it started, these multifaceted
22  activities.
23      A.   Well, they've been ongoing with the
24  different task forces.  So, you know, we could
25  go back to 2013 when we would have the poison

45 (Pages 174 - 177)

Page 178

1  death review committee with lots of different
2  representation.  You know, since then the
3  summits, both of them, with the U.S. Attorney's
4  office.
5        I'd be reluctant to say, you know,
6  this was the absolute date we started to
7  address the heroin crisis or the heroin phase
8  of the opioid crisis.
9        I don't know firsthand, you know, if
10  there were efforts going on beforehand in the
11  county.  But I'm just not familiar with -- I
12  wasn't aware of them particularly.
13        Yeah.  Best I -- best I could deal
14  with that.
15        MR. CHEFFO:  Okay.  Break?
16        MR. BADALA:  Yeah.
17        MR. CHEFFO:  Okay.
18        THE VIDEOGRAPHER:  We are going off
19  the record.
20        The time is 12:28.
21        (A lunch recess was taken.)
22        THE VIDEOGRAPHER:  We are back on
23  the record.
24        The time is 1:14.
25        You may proceed, Counsel.

Page 179

1        BY MR. CHEFFO:
2    Q.   Dr. Gilson, you would agree with me
3  that trying to understand or determine the
4  intent or reasoning or motivations of someone
5  who was using an opioid who overdosed is
6  challenged by the fact that they're -- they've
7  expired, just like you testified earlier with
8  someone who died of a cocaine overdose?
9    A.   I mean they're intending to use
10  drugs, for the most part, if I understand your
11  question.  I wouldn't think that they were --
12  I'm not sure I understand exactly what you're
13  asking.
14    Q.   Understanding the questions about
15  whether they intend to harm themselves, whether
16  they intend to get some type of high, those are
17  questions that are, if not impossible,
18  extremely difficult to determine because they
19  have expired, right?
20        MR. BADALA:  Objection to form.
21        THE WITNESS:  As -- as I would say,
22  you know, I think they are not intending to use
23  drugs, I don't think.  Based on what I've read
24  and people I've talked to, they're intending to
25  harm themselves.  But unfortunately, I think

Page 180

1  that's a risk they are taking.
2        BY MR. CHEFFO:
3    Q.   Is all of the information in your
4  file available to the public?
5        MR. BADALA:  Objection to form.
6        BY MR. CHEFFO:
7    Q.   When you do a -- an autopsy and --
8  report and investigation of a -- of a death?
9    A.   The autopsy report is a public
10  document in Ohio.  There's also a verdict that
11  we generate as a statutory piece.  And the
12  toxicology report is available at my
13  discretion.  We usually release that.
14        The investigative report is not
15  considered a public document.  But the way the
16  statute is written, in Ohio, next of kin can
17  have access to any document in our file.  So
18  what they do with that and if they disseminate
19  that publicly, we can't stop.
20        But the law spells out like
21  journalists can't see everything in our file
22  necessarily.  And -- yeah.  I think -- hope I
23  answered your question.
24    Q.   You did.
25        So as a general matter, let's say a

Page 181

1  journalist was interested in a particular
2  death, and they sent a letter -- either just a
3  cordial letter under some kind of FOIA, Freedom
4  of Information, saying "We'd like all materials
5  in connection with your investigation or review
6  or determination of death for Mr. Smith."
7        What would they -- what would they
8  typically get?
9        What types of information would they
10  get from your office?
11    A.   You know, I've worked in different
12  jurisdictions.  And Ohio is a little bit
13  different in that there's a specific journalist
14  exception.  So they can view a file, as long as
15  it's not like an open homicide investigation.
16  They're not permitted to take notes while
17  they're viewing the file.
18        But it's called the journalist
19  exception.  So they can see nonpublic parts of
20  the file and look at them but not take any
21  notes.  They can take away what they can
22  remember.
23        We usually, in response to media
24  requests, release the public part of the file.
25  And it's kind of the exception where we've had

46 (Pages 178 - 181)

Page 182

1   journalist exception.
2        But that's my understanding of it.
3   They get to see more things, including like my
4   investigator's report, as long as it doesn't
5   impact a criminal investigation.
6      Q.   And that's just what I'm trying to
7   understand.  I mean you're -- you're the expert
8   in this.  And I have a, you know, general
9   understanding of the files, and I've looked
10  through them.
11       But is the only thing that is
12  different, nonpublic, is that the
13  investigator's report in the file and maybe the
14  tox studies or anything else that would be not
15  available to the public but either available to
16  a journalist or next of kin?
17     A.   Again, as I say, everything's
18  available to next of kin.  But things like
19  hospital records, police reports and things
20  like that we usually don't share because it's
21  not our primary work product.
22       We don't share investigative report
23  because it's a preliminary investigative
24  report.  So that's not a public document.
25       You know, some files have other

Page 183

1   things in them that -- I can't be exhaustive on
2   what's public, what's not.
3        But certainly the law is written in
4   Ohio, next of kin, if they want to see what's
5   in the medical examiner or coroner's file, they
6   can see what's in there.
7      Q.   Okay.  Can you turn back to Exhibit
8   1 for a minute.
9        Let me just you ask this:  First of
10  all, is there a -- is there currently a cocaine
11  task force?
12       MR. BADALA:  Objection to form.
13       THE WITNESS:  Not that I'm aware of.
14       BY MR. CHEFFO:
15     Q.   Has there ever been one in Cuyahoga?
16     A.   Not since I've been here.
17     Q.   When was the heroin task force
18  initiated?
19     A.   Well, there's the two.  So the Board
20  of Health I -- I think it's 2011 or 2010.  The
21  U.S. Attorney's task force I believe started
22  after the Summit, which would have been in
23  November 2013.
24     Q.   So 2011, when you say the Board of
25  Health, that's the county Board of Health or

Page 184

1   the state Board of Health?
2      A.   Which --
3      Q.   You -- you mentioned the Board of
4   Health task force -- heroin task force.
5      A.   Right.  That's the Cuyahoga County
6   Board of Health.
7      Q.   Okay.
8      A.   That was through their injury
9   prevention program.
10     Q.   And in 2011 there were 107 instances
11  where someone who overdosed had heroin in their
12  system and 98 where they had cocaine, is that
13  right, based on the --
14     A.   If I can just take a look quickly.
15       Yes.
16     Q.   Now --
17     A.   2011.  I'm sorry.  That was the
18  year?
19     Q.   Right.  That's what I said.
20     A.   I just wanted to make sure.
21     Q.   And if you just look at for a minute
22  the -- the cocaine deaths in Exhibit 1 on -- on
23  Page 4 in the red line.
24       You with me, right?
25     A.   Uh-huh.  Yes, I am.

Page 185

1      Q.   Now, you mention that in I believe
2   2016 there was an increase above baseline in
3   cocaine-related overdose deaths that you
4   attributed to fentanyl.
5        Is that accurate?
6      A.   Yes.
7      Q.   And is it then fair to say that the
8   baseline of cocaine deaths prior to that point
9   were not associated with opioids or fentanyl?
10     A.   I don't think I could say that.
11  Because I know that, the way this graph is
12  generated, if cocaine appears on the death
13  certificate, it would be in that red line.
14  Whether it was mixed with opioid pain
15  relievers, heroin, fentanyl, I wouldn't know --
16     Q.   Okay.
17     A.   -- based on looking at this.  And I
18  don't know that answer either right now.
19     Q.   Well, based on your -- your -- your
20  time at the department, are -- are you -- is it
21  your view that, prior to the 2016 spike in the
22  cocaine deaths, the -- the driver or the
23  baseline of cocaine use and overdose had
24  nothing to do with opioids?
25       MR. BADALA:  Objection to form.

47 (Pages 182 - 185)

1    THE WITNESS:  I don't know that I
2  could say that.
3    BY MR. CHEFFO:
4    Q.   Can you say that it did have
5  anything to do with opioids?
6    A.   No.  I could not say either way.  I
7  haven't really looked at that.  We focused more
8  on it when we saw the rise that we saw in 2016
9  and compared it to the baseline again when we
10  factored out the contribution of the mixtures
11  with fentanyl.  And then the baseline kind of
12  stayed about the same.
13    But whether that baseline -- it
14  certainly wasn't tide in with fentanyl.
15  Whether it was tied in with heroin and been,
16  that I can't say with certainty.
17    Q.   And prior to 2016, there were costs
18  associated to your department for investigating
19  and doing autopsies for cocaine-related deaths;
20  is that right?
21    MR. BADALA:  Objection to form.
22    THE WITNESS:  Costs in terms of just
23  doing investigations.
24    BY MR. CHEFFO:
25    Q.   Right.

1    I mean looking at these numbers, you
2  had -- other than 2011, you had over a hundred
3  deaths a year that were related to -- to
4  cocaine, right?
5    A.   Right.
6    Q.   And there were significant resources
7  expended on investigating those overdose
8  deaths.
9    MR. BADALA:  Objection to form.
10    THE WITNESS:  We would routinely
11  have, you know, a death investigator respond to
12  a scene of an overdose death, be it cocaine or
13  any of the other drugs.
14    We would, unless there had been an
15  interval of survival, conduct an autopsy,
16  which, you know, does factor into cost.  And
17  then the toxicology piece of that would also
18  be, you know, expenses that would be kind of
19  marginally added on top of them.
20    BY MR. CHEFFO:
21    Q.   You mentioned something before our
22  break.  You said, "the heroin phase of the drug
23  crisis."
24    Do you remember that?
25    A.   Yes.

1    Q.   What do you mean by that?
2    A.   In terms of looking at the opioid
3  crisis now from kind of a public health
4  perspective, CDC has written about the phases
5  of the heroin -- or not the heroin -- the
6  opioid crisis.
7    And those phases are kind of in an
8  initial phase with opioid pain relievers, our
9  heroin phase, and a fentanyl and fentanyl
10  analog phase.  And the heroin phase is kind of
11  what I see when I land in Cuyahoga County when
12  I got here in 2011.
13    Q.   So -- I'm sorry.  Tell me that
14  again.
15    It was the first one -- how did you
16  characterize it?
17    A.   Opioid pain relievers.
18    Q.   Okay.  Opioid pain relievers, then
19  heroin, then fentanyl and fentanyl analogs?
20    A.   Right.  That's based on our
21  understanding now as to how the opioid crisis
22  has evolved.
23    Q.   And is it your view that every
24  overdose that -- where someone used heroin is,
25  in whole or part, related to the conduct of the

1  defendants in this lawsuit?
2    MR. BADALA:  Objection to form.
3    THE WITNESS:  Not opioid overdoses.
4  But I think many of them.
5    BY MR. CHEFFO:
6    Q.   What -- what -- what are the
7  differentiation points?
8    A.   Well, if you go back into Cuyahoga
9  County death records, people overdosed on
10  heroin in the 1970s.  There was a heroin crisis
11  in the country.  I don't know Cuyahoga County
12  specifically.
13    And that population could still
14  exist in 2012, 2013, '14, '15, when we're
15  seeing this elevation in deaths.  But what
16  we're able to do is say, "There's an elevation
17  here, and that's related to the conduct of the
18  defendants."
19    But whether, you know, that baseline
20  goes away, I don't think that that would be a
21  very honest thing to say.
22    Q.   What is the baseline?  What
23  percentage?
24    A.   I couldn't say with certainty.
25    Q.   Well, in order to know if there is

Page 190

1  an increased, don't you have to know the
2  baseline?
3      A.  No.  I think, you know, you can look
4  at this data and see there's substantial
5  increase in mortality.  And as we look at this
6  and go back and look at its relationship to
7  opioid practices and prescribing -- pardon
8  me -- opioid prescribing, these folk are
9  overrepresented from the general population in
10 having access to opioid pain relievers.
11      And then, you know, when we finally
12 get 2012 data, we see some part of that
13 picture, but it's incomplete because of the
14 deidentified data.
15      I think, as we get better data in
16 2013 and 2014 to analyze, then I think that's
17 when we start to really have an appreciation of
18 the opioid crisis as an evolutionary thing from
19 opioid pain relievers to heroin and then
20 ultimately to fentanyl.
21     Q.  Let's -- let's -- we can talk some
22 individual just, you know, examples.
23      If somebody was, let's say,
24 unfortunately, 21 years old, never had used an
25 opioid, and in 2012 or '13 overdosed on heroin,

Page 191

1  is that, in whole or part, related to the
2  conduct of the defendants in this lawsuit?
3      MR. BADALA:  Objection to form.
4      THE WITNESS:  Obviously, if they
5  haven't taken an opioid pain reliever, I would
6  say, you know, they can't directly tie it.
7      The prevalence of heroin in this
8  community was created by a demand that came
9  from this opioid-addicted population, who did
10 make transitions into heroin so that heroin
11 coming into this county at a higher rate than
12 it had been seen before is referable back to
13 the actions of the defendants, I think.
14      BY MR. CHEFFO:
15     Q.  But what about -- there -- there's
16 been problems with drugs like crack and -- and
17 -- and cocaine and other drugs, right, and PCP
18 and -- and -- and marijuana.
19      Those are not attributable to
20 opioids, are they?
21      MR. BADALA:  Objection to form.
22      THE WITNESS:  I wouldn't think so.
23 Because the -- again, the action of the opioid
24 pain relievers isn't similar to those drugs
25 like it is to the heroin and to the fentanyl.

Page 192

1      BY MR. CHEFFO:
2      Q.  Is there -- you would agree with me
3  that there's a baseline of people in Cuyahoga
4  County and the county who have addictive
5  personalities and abuse drugs or substances,
6  whether they be alcohol, cocaine, cough syrup,
7  and various other things, including fentanyl,
8  heroin and carfentanil, right?
9      MR. BADALA:  Objection to form.
10      THE WITNESS:  I mean drug addiction
11 didn't start with the actions of the
12 defendants.
13      BY MR. CHEFFO:
14     Q.  Right.
15      So if somebody took illicit fentanyl
16 from a drug cartel and never took an opioid --
17 a prescription opioid, in fact, never saw a
18 doctor for any legitimate pain issue, do the
19 defendants in this case have any responsibility
20 for that?
21      MR. BADALA:  Objection to form.
22      THE WITNESS:  Yes, they do.
23      BY MR. CHEFFO:
24     Q.  How?
25     A.  The drug cartels don't operate in a

Page 193

1  vacuum.  They're responding to an opportunity
2  with an increase in demand for opioids in
3  general.
4      So in the creation of an
5  opioid-addicted population by overprescribing,
6  overdistribution, we create a group of people
7  who are opioid addicted.
8      From there, you know, we evolve into
9  the heroin phase, the fentanyl phase --
10     Q.  I --
11     A.  No, no.  Please let me finish.
12     Q.  Well --
13     A.  Because it's complicated, I think.
14     Q.  You've answered this.
15      MR. BADALA:  But you --
16      MR. CHEFFO:  Go ahead.
17      MR. BADALA:  Finish your --
18      MR. CHEFFO:  Go ahead.
19      THE WITNESS:  And, you know, if we
20 looked at the heroin epidemic in the '70s, for
21 example, there wasn't a large-scale, you know,
22 prescribing of pain medication right before
23 that.  So those individuals largely were
24 recruited by active other users.
25      But that recruitment population that

49 (Pages 190 - 193)

Page 194

1  we see in Cuyahoga County, who may be grabbing
2  that 21-year-old and saying, "This is great.
3  You should try this, even though you haven't
4  had the prescription pain medication," that
5  group, in large measure, was created by the
6  defendants.
7      MR. CHEFFO: Okay.
8      THE WITNESS: And it is referable
9  back to --
10      BY MR. CHEFFO:
11      Q. So --
12      A. -- those actions.
13      Q. So -- so that's your connection?
14      If somebody was -- but even within
15  that group, do you know whether that -- do you
16  have to know whether the person who is the
17  recruiter actually ever took a -- a lawful
18  opioid?
19      So if a 23-year-old person who never
20  took a lawful opioid started using heroin
21  because he was introduced to it through some
22  other street drug and then introduced the
23  21-year-old person, that's -- that's related to
24  the defendant's conduct?
25      A. As I say, you know, there's going to

Page 195

1  be a baseline of addicts before opioid pain
2  relievers. And I would say though that that
3  baseline, that population of addicts, increased
4  substantially in this county in the wake of
5  opioid pain prescribing practices and
6  distribution practices by the defendants.
7      So do I say that guy didn't use, and
8  that guy didn't use, and I can't refer that
9  back? That is possibly true for some of these
10  folks. But I think, in large measure, this
11  crisis is referable back to the actions of the
12  defendants.
13      Q. How much blame do you put on the
14  drug cartels who are actually bringing it into
15  Cuyahoga and selling it and making the money?
16      What percentage of the crisis
17  belongs on -- on their responsibility?
18      MR. BADALA: Objection to form.
19      THE WITNESS: I'd have to say I
20  don't like these people, but the drug cartel is
21  responding to a market where they think they
22  can make money.
23      BY MR. CHEFFO:
24      Q. They're business people?
25      A. And the market -- in some ways I

Page 196

1  think, you know, they're very astute business
2  people.
3      Q. Capitalism?
4      A. Well, I don't know. But I think
5  they see an opportunity in an addicted
6  population to start to infiltrate --
7      Q. Okay.
8      A. Heroin and fentanyl, illicitly
9  manufactured fentanyl. And I do think that
10  gets referable back to the creation of an
11  addicted --
12      Q. Okay.
13      A. -- population.
14      Q. But how much -- and I asked you
15  though something different.
16      What percentage?
17      Tell me what percentage you put on
18  the cartels who are actually making hundreds of
19  millions or billions who ship it here
20  illegally, and a 21-year-old buys a laced
21  fentanyl?
22      In the entire picture -- we
23  understand you've said everything's ultimately
24  related to the defendants in the lawsuit.
25      But tell me what percentage are from

Page 197

1  the cartels.
2      MR. BADALA: Objection to form.
3      THE WITNESS: I don't think I could
4  do that.
5      BY MR. CHEFFO:
6      Q. Is it zero?
7      A. No. It's --
8      MR. BADALA: Objection to form.
9      THE WITNESS: -- definitely not --
10      BY MR. CHEFFO:
11      Q. Definitely not zero, right?
12      A. No.
13      Q. Not a hundred percent though, right?
14      A. I don't think so. Because we have
15  that baseline population who, you know, came
16  from -- you know, came to drug addiction
17  through things before there was a problem with
18  overprescribing and overdistribution.
19      Q. But they're certainly as culpable as
20  the defendants in this lawsuit, right?
21      MR. BADALA: Objection to form.
22      BY MR. CHEFFO:
23      Q. In your view?
24      MR. BADALA: Objection to form.
25      THE WITNESS: Who are we talking

50 (Pages 194 - 197)

Page 198

1 about now that's culpable?
2     BY MR. CHEFFO:
3     Q.   The -- the manufacturers,
4 distributors.
5         I'm saying basically you've told us
6 there's culpability for the actual drug cartels
7 who are, you know, essentially murdering folks,
8 shipping in drugs that are being used on the
9 streets of Cuyahoga, right?
10        There's some culpability.
11        MR. BADALA: Objection to form.
12        THE WITNESS: They bear a
13 responsibility --
14        MR. CHEFFO: Right.
15        THE WITNESS: -- for what --
16        BY MR. CHEFFO:
17    Q.   And -- and --
18    A.   -- they're doing --
19    Q.   -- it's --
20    A.   -- criminal activity.
21    Q.   It's not zero percent, and it's not
22 a hundred percent, right?
23    A.   For the --
24    Q.   The responsibility.
25    A.   -- drug cartel or for the --

Page 199

1     Q.   Yes.
2     A.   -- defendants?
3     Q.   The -- let's talk about the drug
4 cartels.
5     A.   Again, I'd have to go back to why
6 are the drug cartels bringing drugs into
7 Cuyahoga County.  And it's because we have a
8 drug-addicted population.
9     Q.   I understand.
10        But they're not -- they're not --
11 it's not right for them to do this.
12        You would agree with me on that,
13 right?
14        MR. BADALA: Objection to form.
15        THE WITNESS: Sure.  I mean.
16        MR. CHEFFO: Right.
17        THE WITNESS: -- nobody wants to see
18 that.
19        BY MR. CHEFFO:
20    Q.   What -- what --
21    A.   But --
22    Q.   What they're doing is engaging in --
23 I mean we're -- you're really not going to
24 argue with me that -- that a drug cartel from
25 Mexico is not doing something wrong by bringing

Page 200

1 in million or hundred of millions of dollars
2 into this community, and then people are dying,
3 right?
4         We can agree on that.
5         MR. BADALA: Objection to form.
6         BY MR. CHEFFO:
7     Q.   Can we?
8     A.   Everybody reasonable would agree
9 with that I think.
10    Q.   Right.
11        And so what I'm just trying to find
12 out is you've told us in some way -- and in
13 some way it's removed, right -- to conduct and
14 -- and people having addiction and introducing
15 others.
16        And I just want to understand what
17 -- what percentage and how culpable.
18        And -- and if you can't give me
19 percentages, are the drug cartels more culpable
20 than a distributor or manufacturer?
21        MR. BADALA: Objection to form.
22        THE WITNESS: I -- I can't give you
23 percentages.  I feel the crisis, as we looked
24 retrospectively, falls back to the defendants.
25 And the drug cartels are part of the sequence

Page 201

1 of events, if you will.  But the crisis is
2 started with the distributors and --
3         BY MR. CHEFFO:
4     Q.   Would we have a crisis --
5     A.   -- the manufacturers.
6     Q.   -- if we didn't have drug cartels?
7         MR. BADALA: Objection to form.
8         BY MR. CHEFFO:
9     Q.   Where -- where is the illicit heroin
10 and fentanyl coming from, Doctor?
11    A.   This --
12        MR. BADALA:  Which question are you
13 asking?  You just asked two questions.
14        MR. CHEFFO:  That's okay.
15        MR. BADALA:  Okay.  Objection to
16 form.
17        THE WITNESS:  Which one would you
18 like me to answer, sir?
19        BY MR. CHEFFO:
20    Q.   Where is it coming from?
21        MR. BADALA: Objection to form.
22        THE WITNESS:  Based on my
23 discussions with law enforcement, a lot of the
24 heroin that entered the county came from
25 Mexico.  A lot of fentanyl was manufactured in

Page 202

1  China.  It may have passed through drug cartels
2  in other parts of the world, including Mexico,
3  or it may have been directly accessed over the
4  Internet by individuals in Cuyahoga County with
5  no intermediary.
6      BY MR. CHEFFO:
7    Q.  If -- if none of that was -- was
8  sent in from Mexico or China or any other
9  country that may have done it, would we have a
10  fentanyl or heroin crisis today?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  If the drugs aren't
13  here, the people can't overdose on them.
14  But --
15      BY MR. CHEFFO:
16    Q.  Right.
17      Is that --
18    A.  -- I think, you know, that's a very
19  abstract question.  Because the drugs are here,
20  and we lose hundreds of people every year to
21  drug overdoses.
22    Q.  Who -- who's -- who's bringing the
23  drugs in?
24      MR. BADALA:  Objection to form.
25      BY MR. CHEFFO:

Page 203

1    Q.  The cartels, right?
2      MR. BADALA:  Same objection.
3      THE WITNESS:  As I say, you know,
4  cartels are responsible for some.  Internet
5  sales over the dark web and things like that
6  are responsible for others.  I don't know that
7  general --
8      BY MR. CHEFFO:
9    Q.  Are any of the --
10    A.  -- distribution.
11    Q.  -- defendants in this case bringing
12  in illegal drugs into Cuyahoga County?
13      MR. BADALA:  Objection to form.
14      THE WITNESS:  Not that I know of.
15      BY MR. CHEFFO:
16    Q.  And so for all of those people who
17  are engaging in illegal conduct and selling
18  unlawfully dangerous illegal drugs, what
19  percentage of -- of -- of fault do you
20  attribute to them?
21      MR. BADALA:  Objection to form.
22  Asked and answered.
23      THE WITNESS:  Again, I can't give
24  you a specific percentage.
25      BY MR. CHEFFO:

Page 204

1    Q.  Is it more than 1 percent?
2      MR. BADALA:  Objection to form.
3      THE WITNESS:  -- I'm not going to
4  play a game.  I can't give you a number.
5      BY MR. CHEFFO:
6    Q.  Why not?
7    A.  Because I don't know.
8    Q.  Well, I'm asking for your own
9  personal opinion.
10      MR. BADALA:  Same objections.
11      THE WITNESS:  Same answer too.  I
12  mean I don't know what percentage.  I can't
13  give you that.
14      BY MR. CHEFFO:
15    Q.  What percentage are attributable to
16  the defendants in this lawsuit?
17    A.  What's that then?
18    Q.  What percentage are attributable to
19  the defendants in this lawsuit?
20      MR. BADALA:  Objection to form.
21      THE WITNESS:  There's literature
22  that describes what percentage of the
23  heroin-addicted population initiated with
24  opioid pain medication.  As I say --
25      BY MR. CHEFFO:

Page 205

1    Q.  We'll talk about that.
2    A.  Pardon me?
3    Q.  We'll talk about that.
4      But I was asking you a different --
5  I was asking for your opinion.
6      Do you have an opinion as to what
7  percentage of the opioid crisis in Cuyahoga is
8  attributable to the defendants in this
9  litigation?
10    A.  No, I do not.
11    Q.  What percentage are the doctors who
12  were engaging in illegal conduct; are they
13  responsible in any way?
14      MR. BADALA:  Objection to form.
15      THE WITNESS:  I think that, again,
16  they're in the chain.  But ultimately their
17  actions stem from the opioid crisis created by
18  the actions of the defendants.
19      BY MR. CHEFFO:
20    Q.  So then they shouldn't go to jail,
21  right, if they had no culpability?
22    A.  Oh, we didn't say that at all.
23      MR. BADALA:  Objection to form.
24      BY MR. CHEFFO:
25    Q.  So why should they go to jail?

52 (Pages 202 - 205)

1    A.   Because they're conducting illegal
2  activities.  They're a part of the problem.
3    Q.   Okay.
4    A.   But their actions -- again, the pill
5  mill, that person should go to jail.  I don't
6  think any of us would go agree with that.
7         But why does a pill mill exist?
8  Because there's an addicted population who are
9  going to pay cash money to that unscrupulous
10  provider to get medication they are addicted
11  to.
12    Q.   Well, but what if they were selling
13  amphetamines?
14         Does that have anything to do with
15  the opioid crisis?
16    A.   Amphetamines aren't opioids.  So I
17  could say they may, you know, have a business
18  model that they're using to sell whatever
19  somebody comes in and asks for.  And I wouldn't
20  say that the amphetamines are referable back to
21  the practices of the defendants.  But the
22  opioids I would say are.
23    Q.   So let -- let's just see if we can
24  go through them.
25         Cartels have some responsibility,

1  but you can't tell me -- you can't quantify it,
2  fair?
3         MR. BADALA:  Objection to form.
4         THE WITNESS:  Right.  I can't give
5  you a percentage what responsibility.
6         BY MR. CHEFFO:
7    Q.   Doctors who engage in illegal
8  prescribing have some responsibility, but you
9  can't quantify it, fair?
10    A.   Fair.  I mean they're all kind of
11  referable back to the actions of the
12  defendants, as I said.  But, you know,
13  obviously we're not blessing the cartels and
14  saying they're nice people or that people who
15  ran pill mills didn't do their damage.  I just
16  --
17    Q.   Are you suing them?
18    A.   -- think it was referable back to
19  the actions of the defendants creating that
20  drug-addicted population.
21    Q.   How many -- how many cartels are in
22  this lawsuit?
23         MR. BADALA:  Objection to form.
24         THE WITNESS:  It's just the
25  pharmaceutical companies and the distributors,

1  as I understand it.
2         BY MR. CHEFFO:
3    Q.   How many doctors who engage in
4  illegal conduct are in this lawsuit?
5    A.   In this --
6         MR. BADALA:  Objection to form.
7         THE WITNESS:  Pardon me.
8         In this lawsuit I -- I don't see
9  any -- there have been prosecutions of those
10  individuals, both the cartels and the pill mill
11  doctors, in separate criminal proceedings.  But
12  they're --
13         MR. CHEFFO:  Okay.
14         THE WITNESS:  -- not mention in this
15  lawsuit.
16         BY MR. CHEFFO:
17    Q.   How many pill mills are in this
18  lawsuit?
19    A.   What I would consider the pill mill,
20  none.
21    Q.   How many street dealers of drugs are
22  in this lawsuit?
23    A.   I'd say none.
24    Q.   Do any of those four categories you
25  would agree with -- strike that.

1         You would agree with me that, of
2  those four categories, they have some
3  culpability, but you can't quantify it, right?
4         MR. BADALA:  Objection to form.
5         THE WITNESS:  They're a part of this
6  process of an opioid crisis.  But again, you
7  know, overprescribing, overdistributing in this
8  area creates that crisis.  And they are, you
9  know, degrees of separation away from that
10  process.  But ultimately it's that process that
11  I think sets us in to this result.
12         BY MR. CHEFFO:
13    Q.   You -- let me ask you.
14         Has any expert ever told you that
15  that's the case that, there is a kind of -- and
16  everything that happens today with a drug
17  cartel or a street dealer or a criminal doctor
18  somehow is related to something that happened
19  with the defendants in this lawsuit?
20         Have you heard an expert tell you
21  that?
22         MR. BADALA:  Objection to form.
23         THE WITNESS:  I've had discussions
24  with a lot of people.  And I think there's a
25  consensus that, when we talk about the opioid

53 (Pages 206 - 209)

Page 210

1   crisis, the genesis is back with the -- looking
2   retrospectively, is back at the prescribing and
3   distribution practices of the defendants; and
4   that these cartels and things, when I discuss
5   them with law enforcement, you know, is a
6   population again that we're kind of seeing
7   addicted to opioids and changing substances.
8        But if I understood your question
9   correctly, the interpretation would be that the
10  crisis, as we understand it, starts back with
11  prescribing and distribution and evolves into
12  other more criminal activities.
13       BY MR. CHEFFO:
14       Q.  Do -- do -- do pharmaceuticals
15  companies prescribe anything?
16       You said that three times.
17       Do -- do -- are you aware of whether
18  pharmaceutical companies, as a doctor,
19  prescribe medicines; or is that something
20  doctors do?
21       A.  Doctors do.  But there --
22       Q.  Right.
23       A.  -- were influences of the prescribe
24  -- of the manufacturers --
25       Q.  So --

Page 211

1        A.  -- on those prescribing practices.
2        Q.  -- if somebody comes out of medical
3   school and never saw a pharmaceutical rep today
4   and improperly and illegally prescribes
5   opioids, it's your testimony under oath that
6   that somehow is related to the defendant of
7   this -- the defendant's conduct; is that right?
8        MR. BADALA:  Objection to form.
9        THE WITNESS:  No.  I wouldn't say
10  that.
11       BY MR. CHEFFO:
12       Q.  Okay.  So -- so if that person wrote
13  the prescriptions, and they had never had any
14  influence from any pharmaceutical company or
15  any distributor, you would agree with me that
16  none of their conduct or none of those
17  prescriptions have anything to do with the
18  defendants, right?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  I'm trying to follow
21  you.  If someone comes out of medical school --
22       BY MR. CHEFFO:
23       Q.  Uh-huh.  And -- and writes
24  prescriptions --
25       A.  Writes a prescription for --

Page 212

1        Q.  -- illegally for opioids that are
2   then abused or diverted, is there any
3   relationship or any culpability from the
4   defendants?
5        MR. BADALA:  Objection to form.
6        THE WITNESS:  I don't think so.
7        BY MR. CHEFFO:
8        Q.  So you would want to know at least
9   whether the person who was writing the
10  prescriptions had any influence from any of the
11  defendants, right, before you would make a
12  determination that they had some culpability
13  based on defendant's conduct, right?
14       MR. BADALA:  Objection to form.
15       THE WITNESS:  I would want to know
16  the role of the defendants in terms of
17  influencing prescribing practices.
18       BY MR. CHEFFO:
19       Q.  Right.
20       And -- why?
21       A.  Because it's relevant to the
22  overprescribing --
23       Q.  And --
24       A.  -- that we saw.
25       Q.  Okay.  And if -- if there was no

Page 213

1   role -- let's assume a doctor never worked at
2   an institution where there was never any
3   detailing or never any role.
4        That would change your view as to
5   whether the company had any -- or the
6   defendants had any culpability, right?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  There may be other
9   ways that they would influence prescribing
10  practices.
11       BY MR. CHEFFO:
12       Q.  But -- but you'd at least want to
13  understand what -- what the influences and
14  their prescribing practices were before you
15  made a determination that there was
16  culpability, right?
17       So in other words, if there was
18  influencing that you thought was improper from
19  a defendant that influenced a doctor, you would
20  assess some liability or culpability, right?
21       A.  Yes.  I think, in creating that
22  culture of undertreatment of pain, the safety
23  of opioid pain relievers influencing, you know,
24  legislation and practice guidelines, that is
25  referable back to the defendants.

54 (Pages 210 - 213)

1    Q.   And if there was no influence on a
2  prescriber's prescribing based on any conduct
3  of any defendant, then you would not assess
4  culpability, right?
5    A.   You're -- you're -- I'm not
6  following you exactly.  I mean if -- if you
7  influence like the way a medical board says you
8  have to treat pain or you're going to be
9  disciplined, there's not a direct influence
10  again, but there's a very indirect influence
11  that you're going to have do, you know, be
12  cognizant of, that that practice came from, you
13  know, lobbying efforts and things like that
14  before that person wrote that prescription.
15    Q.   You'd want to know though whether
16  the doctor was influenced, right?
17    A.   I mean --
18      MR. BADALA:  Objection.
19      BY MR. CHEFFO:
20    Q.   Right?
21      MR. BADALA:  Objection to form.
22      THE WITNESS:  Well, I don't see how
23  you could say they weren't influenced if these
24  are, you know, the laws they're bound to
25  follow.

1      BY MR. CHEFFO:
2    Q.   Do you think doctors use their
3  independent judgment when they prescribe
4  medicines?
5      MR. BADALA:  Objection to form.
6      THE WITNESS:  I think they're
7  responsible for what they prescribe.
8      MR. CHEFFO:  Okay.  Can we mark
9  this, please.
10      (Deposition Exhibit 2 was marked for
11  identification.)
12      BY MR. CHEFFO:
13    Q.   So you with me, Doctor?
14    A.   Could -- could I just read this,
15  please.
16    Q.   Okay.  Just as a ground rule, I let
17  you read that.  But we're never going to finish
18  this deposition if you read every single
19  document.
20      I need to ask you some preliminary
21  questions.  So some it will be if you've seen
22  it.  And others -- so I just want to give you
23  -- I'm -- I'm fine with you reading that.  But
24  to take five minutes to read every document,
25  we're going to have to, you know, kind of get

1  more time.
2      MR. BADALA:  So, Mark, are you
3  willing to stipulate that your client can't
4  read documents when --
5      MR. CHEFFO:  No.  They can read it,
6  but not -- not -- I first would like to ask
7  some basic questions about whether he's seen
8  it, heard it, refreshed his recollection.  And
9  then we can figure out if he needs --
10      MR. BADALA:  Well --
11      MR. CHEFFO:  -- to read it.
12      MR. BADALA:  -- he's allowed to look
13  at a document.  He didn't spend five minutes.
14  We can go back.
15      MR. CHEFFO:  I think it was pretty
16  close to that.
17      MR. BADALA:  He can look at it.
18  It's a long -- it's a long e-mail.
19      MR. CHEFFO:  He wrote it.
20      MR. BADALA:  Okay?  It's a chain.
21      MR. CHEFFO:  He wrote it.
22      MR. BADALA:  This was -- this was
23  back --
24      MR. CHEFFO:  Okay.  Let's not argue.
25      MR. BADALA:  -- in 2013.

1      MR. CHEFFO:  It's fine.
2      MR. BADALA:  I'm just saying.
3      BY MR. CHEFFO:
4    Q.   Have you seen this --
5      MR. BADALA:  Put that on the record.
6      BY MR. CHEFFO:
7    Q.   -- before today?
8    A.   I don't remember.  But I -- it's
9  from my account, so...
10    Q.   You -- your name's on it, right?
11      You wrote --
12    A.   Right.  I just -- I'm assuming I saw
13  it before, yeah.
14    Q.   Do you also use your personal
15  account sometimes?
16      Do you have a personal e-mail
17  account?
18    A.   I do have a personal e-mail account.
19    Q.   Are those ever used for professional
20  purposes?
21    A.   No.  Not usually.
22    Q.   Is there any reason why you would
23  ever use a personal e-mail address in -- in
24  your professional work?
25    A.   Not that I can think of.

Page 218

1    Q.   So it would surprise you if
2  documents were produced that came from your
3  personal e-mail?
4    A.   I haven't really been consciously
5  using it.  But I -- I don't know.  But I first
6  would say I -- it's my practice not to use it
7  for work-related information.
8    Q.   Okay.  Let's go back to this
9  document.  It's Exhibit 2.  It relates to
10  initials OAR -- the initial OAR -- OARRS
11  analysis you did back in 2013, right?
12    A.   Right.
13    Q.   And this is based on 2012 OARRS
14  data, right?
15    A.   This was the deidentified data that
16  we received from Board of Pharmacy as an
17  aggregate electronic file.
18    Q.   And this e-mail correspondence is
19  from Ed Fitzgerald and Matt Carroll, who were
20  the count exec -- county executive and chief of
21  staff, right?
22    A.   Right.  At that time they were those
23  positions.
24    Q.   And was it routine for you to be
25  communicating with them about this type of

Page 219

1  information?
2      MR. BADALA:  Objection to form.
3      THE WITNESS:  They would be my chain
4  of command.  So I would be communicating with
5  them.
6      BY MR. CHEFFO:
7    Q.   Did you ask you to put this
8  together; do you know?
9    A.   I don't remember what prompted this
10  e-mail.  I had spoken, it says, at cabinet the
11  day before.  And our cabinet meetings would be
12  most all of the department directors.  So it
13  may have been a very short time that I had to
14  speak.
15      I don't know if they specifically
16  asked me to follow up or if I felt a desire to
17  follow up based on kind of providing more
18  information.
19    Q.   And it -- it was deidentified data,
20  right?
21    A.   The information we received from
22  OARRS was deidentified to some extent.
23    Q.   What toes that mean?
24    A.   We had no information in that data,
25  as I recall, about prescribers.  And we got

Page 220

1  files, as I recall, on individuals who had an
2  OARRS file.  We had furnished them the names of
3  our decedents, and I believe they sent files
4  back to us with those names.
5      I don't remember exactly on the --
6  but that's my best recollection.  But we did
7  not know anything about prescribing.
8    Q.   Was it deidentified in the OARRS
9  system or was just what you received
10  deidentified, if you know?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  As I understood it, it
13  was deidentified what was shared with us.
14  Because we did not have access to the OARRS
15  system.
16      But I would have -- based on what I
17  know of the OARRS system, that information
18  would have been available if someone had access
19  to it.
20      BY MR. CHEFFO:
21    Q.   Okay.  And you state that 64 percent
22  of heroin overdose deaths had an OARRS record?
23    A.   Yes.
24    Q.   And in order to have an OARRS
25  record, that means that there's a record

Page 221

1  that -- of a -- of a prescription for a control
2  substance, right?
3      It's not just limited to opioids.
4    A.   That's correct.
5    Q.   It could include opioids, but it's
6  not necessarily one to one, right?
7    A.   Right.  And if you read the
8  parentheses, they had a legal prescription for
9  a controlled substance.  And then they go into
10  the look-back period that we had, which was
11  relatively short, before they died of a heroin
12  overdose.
13    Q.   Right.
14      And then you say that 48 percent had
15  a prescription for benzodiazepines, right?
16    A.   Yes.
17    Q.   And 85 percent had a prescription
18  for an opioid.
19    A.   That's correct, yes.
20    Q.   And -- and what we're talking about
21  is -- is -- and I -- I probably garbled this,
22  so I apologize.
23      It's -- you state that 64 percent of
24  heroin overdose deaths had an OARRS record,
25  correct?

56 (Pages 218 - 221)

Page 222

1    A.   That's right.
2    Q.   And then you basically said that 48
3  percent of those had a prescription for
4  benzodiazepines, right?
5    A.   That's right.
6    Q.   And 85 had a prescription for an
7  opioid, right?
8    A.   That's right.
9    Q.   So what this is saying is, of the 64
10  percent of heroin overdoses with an OARRS
11  record, 85 percent of the 64 percent had an
12  opioid prescription in OARRS.
13    A.   That right.
14    Q.   So it's not 80 or 85 percent of the
15  heroin users had a prescription for opioids;
16  it's 85 of 64.
17    A.   Right.  So more than half but not
18  80 -- not the 85 percent.
19    Q.   Right.
20      In fact, so I did some math, and you
21  can check me on it.
22      But so, of the 160 heroin overdoses
23  in 2012, 87 of them were -- had an OARRS record
24  for an opioid prescription, right?
25    A.   That's right.

Page 223

1    Q.   And that's about 54 percent by my
2  calculations?
3    A.   Sounds right.
4    Q.   And of the heroin overdoses in 2012,
5  54 percent had a record in OARRS of having
6  received some type of opioid prescription,
7  right?
8    A.   That's what you just said before.
9  Yes.  Okay.
10    Q.   And what would that include in terms
11  -- what would be encompassed within opioids?
12      So would that include a prescription
13  for fentanyl?
14    A.   Fentanyl would be one.  Oxycodone,
15  hydrocodone, oxymorphone, hydromorphone, the --
16    Q.   What about morphine?
17    A.   Pardon me?
18    Q.   Morphine?
19    A.   Morphine is an opioid, yes.
20    Q.   What about methadone?
21    A.   Methadone is an opioid, yeah.  Sure.
22    Q.   Any -- anything else?
23    A.   I don't want to say that's the
24  exhaustive list of opioids.  They're certainly
25  the ones that we saw most commonly.  Tramadol I

Page 224

1  think was another one.
2    Q.   Okay.
3    A.   But I mentioned it further down in
4  the paragraph.
5    Q.   And -- and at -- and in -- in
6  determining and looking at those 54 percent of
7  individuals who had a prescription for a lawful
8  opioid of some type, could you tell whether
9  they were using heroin before their opioid
10  prescription?
11    A.   Not on this data, no.
12    Q.   Did you make any judgments or
13  determination about how far in the past they
14  had an opioid prescription prior to their
15  heroin overdose?
16    A.   When we obtained the deidentified
17  data, the OARRS system had a two-year
18  look-back.  And because we didn't get access to
19  the data, we had short look-backs as short as
20  six months and no more than 18 months.
21      So I don't have a full picture of
22  their prescription history.  This is the opioid
23  prescription history for the limited look-back
24  that we had.
25    Q.   So you don't -- if it was for six

Page 225

1  months, if someone had been abusing heroin for
2  five years and then got a lawful opioid
3  prescription, that certainly -- you couldn't
4  differentiate, could you?
5    A.   I couldn't tell how long they had
6  been using heroin, no.
7    Q.   Could you tell whether they were
8  ever addicted or treated for addiction prior to
9  using heroin?
10    A.   Whether they had been in a treatment
11  facility?  That may have come from scene
12  investigation data.  I don't know specifically
13  any one of these 160.  But we may have been
14  aware of some of that.  And we tried to go back
15  and look at that information, looking through
16  our case files.
17      One of the shortcomings of that
18  approach I think is that, whoever is there to
19  provide information at the time of death, you
20  know, it's based on what they knew.  When we
21  convened the formal reviews of poison death
22  reviews in 2013, that was why we wanted the
23  medical director of the alcohol and drug
24  addiction mental health services on the panel.
25  Because she could access that data, and we

57 (Pages 222 - 225)

1 would have better information.
2 We could get the public treatments,
3 and then we could also still have my
4 investigators gleaning information about
5 private treatment facilities.  So get a clearer
6 picture.
7 Q.  Okay.  And you couldn't tell, from
8 any of these prescriptions that showed up on
9 OARRS, whether they were written by a doctor
10 who was engaging in unlawful conduct, could
11 you?
12 A.  I could not, no.
13 Q.  You couldn't tell if it came from a
14 pill mill?
15 A.  No, I don't.
16 Q.  You didn't go back and look, did
17 you?
18 A.  I did not go further than to just
19 analyze the data that you see here.
20 Q.  And you state that the opioid
21 prescriptions in OARRS that you identified, 71
22 percent -- and I think this is a quote -- of
23 the narcotics were prescribed to the victim
24 more than once.
25 Do you see that?

1 A.  Yes.
2 Q.  What does that mean?
3 A.  Let me just refresh myself on that.
4 So when I get the prescription
5 profile, in all there are 169 prescriptions for
6 these individuals who have an OARRS file with
7 the opiates.  And then, of that, 71 percent of
8 that 87, that 85 percent, had been prescribed
9 an opiate more than one time.
10 OARRS is just going to tell me did
11 they ever get one.  But the majority, almost
12 three out of four, were getting multiple
13 prescriptions for opioids, more than one.
14 Q.  Well, could that have been a refill?
15 A.  I don't remember the data to that
16 degree.
17 Q.  Were -- were they different
18 prescriptions for different opioids from
19 different doctors?
20 A.  As it says in the next sentence:  "I
21 don't have the data on whether this involved
22 different doctors or not."  And, you know, I
23 don't -- not able to comment on the doctors.
24 There was a first part to your
25 question I feel I'm missing though.

1 Q.  Yeah.
2 Just -- I think I asked you whether
3 they were different opioids.
4 A.  My anecdotal memory is yes, but I
5 can't give you a percentage as I sit here
6 today.
7 Q.  And did you make any determinations
8 of doctor shopping based on this data?
9 A.  We couldn't.
10 Q.  And at this time, was a doctor
11 required to check OARRS before he or she wrote
12 a prescription?
13 MR. BADALA:  Objection to form.
14 THE WITNESS:  As I understand the
15 OARRS system, the requirement for checking
16 prior to prescribing a narcotic was started in
17 April of 2015.  So this would have preceded
18 that.
19 BY MR. CHEFFO:
20 Q.  But certainly a doctor could have if
21 he or she wanted to; it just wasn't mandatory,
22 right?
23 MR. BADALA:  Objection to form.
24 THE WITNESS:  Wasn't mandatory.  I
25 think, if they had access, they could have

1 checked.
2 BY MR. CHEFFO:
3 Q.  I mean there's no prohibition.
4 Provided a doctor otherwise had -- had access,
5 he or she could have checked the OARRS database
6 prior to 2015.
7 A.  As long as they were prescribing to
8 that patient, yes.
9 Q.  Right.
10 That's what we're talking about is
11 people who are prescribing, right?
12 A.  Right.  Yes.  I mean they can't do
13 searches around --
14 Q.  Oh, sure.  We're talking --
15 A.  -- other prescribers or things like
16 that for the doctor shopping piece.
17 Q.  And you say:  "This confirms that
18 the majority of eventual heroin overdose
19 victims are in the medical system being treated
20 for pain anxiety.  Whether the medical system
21 created their addiction or these numbers
22 reflect addicts trying to get whatever they
23 could to treat their addiction is unclear."
24 Do you see that?
25 A.  Let's see.  On the -- I did see it

58 (Pages 226 - 229)

1  when I read before.  And I don't want to take
2  up more of your time.  Oh, here we are.  Yes.
3      Q.   And so you were saying it's
4  impossible to tell from OARRS whether the
5  decedent's abuse started with prescriptions or
6  before or after, right?
7      A.   That's right.  We could not use this
8  data to try to characterize the overdose -- the
9  heroin overdose population better than to say
10  they have had prescriptions for these drugs.
11  Whether they're interchangeably going in and
12  out of the medical system to obtain them or
13  they started with them and then became addicted
14  and transferred over to heroin, that we could
15  do with --
16      Q.   Well --
17      A.   -- this data.
18      Q.   But also you couldn't -- it could be
19  something else that wouldn't necessarily be the
20  responsibility of -- of the defendants.
21          It could be that someone was using
22  heroin and then was abusing prescription
23  medicines, right?
24          MR. BADALA:  Objection to form.
25          BY MR. CHEFFO:

1      Q.   That's possible, wasn't it?
2      A.   It's possible.  And, you know, this
3  was where we needed to kind of wait for more
4  information to come out from those interviews
5  that were done with actively using heroin
6  addicts.  We couldn't query these people how
7  did you get started on this.
8          So this was kind of our first stab
9  into the data to try to understand the
10  relationship.  But I couldn't clarify, like I
11  say here, oh, all of these people who have a
12  prescription for opioid pain relievers are
13  taking them, getting addicted, and
14  transitioning to heroin.  That doesn't come
15  from this.
16      Q.   And in the second part of your
17  statement you're suggesting, I -- I believe --
18  tell me if you disagree -- that some drug
19  abusers will abuse whatever's available to
20  them?
21      A.   Where are you at, sir?  I'm sorry.
22      Q.   Where you say:  "Whether the medical
23  system created their addiction or these numbers
24  reflect addicts trying to get whatever they
25  could to treat their addiction is unclear."

1      A.   Right.  And then I go on to say
2  anecdotally and this is what we're trying to
3  get better data on.  The addicts were created
4  with the legal pain medicine.
5          But you can't use this data, I
6  think, to say that -- what they're trying to do
7  as they obtain these prescriptions, whether
8  they're taking advantage of whatever they can
9  get their hands on or whether they're, you
10  know, being created by the medical system.
11      Q.   Are you aware of any mandate from
12  the state medical board requiring the
13  prescription of opioids?
14      A.   I am more aware of -- and again, I
15  -- as I don't treat these -- there were
16  guidelines that were put out that talked about
17  the treatment of pain and the undertreatment of
18  pain.
19          I didn't specifically, as I
20  remember, discuss opioids.  So I -- I don't
21  prescribe medications, obviously.  And I don't
22  know that I can characterize it any better than
23  that.
24      Q.   And -- and of the -- the drug
25  dealers, street dealers, are -- are you -- is

1  it your testimony that, because they are
2  opportunistic criminals who are taking
3  advantage of people in need, that they somehow
4  have no culpability to their conduct?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  No.  I think I've
7  answered that before.  You know, there are a
8  cast of unsavory characters here.
9          But I would say that that addicted
10  population is referable back to the defendants.
11  And then there are chains of people.  Some of
12  them are very unsavory.  You know, the street
13  drug dealers, the cartels, et cetera, who have
14  been prosecuted, and I think appropriately so.
15          BY MR. CHEFFO:
16      Q.   Do you think they bear some
17  responsibility for -- if someone were to be a
18  street dealer and sell carfentanil to a opioid
19  naive teenager without any medical need, would
20  they have capability?
21          MR. BADALA:  Objection to form.
22          THE WITNESS:  I think they would be,
23  you know, appropriately entered into the
24  criminal system for their action.
25          BY MR. CHEFFO:

59 (Pages 230 - 233)

Page 234

1    Q.   Do they have culpability for the
2  opioid crisis?
3         MR. BADALA:  Objection to form.
4         THE WITNESS:  They are a part of
5  making the crisis worse.  But I think that the
6  crisis itself is referable back to the
7  defendants, not to these individuals.
8    Q.   They make it worse how?
9    A.   By killing all these people with,
10  you know, heroin and fentanyl and carfentanil,
11  illicit fentanyl.  They're a part of that, you
12  know, chain of events that ultimately is, you
13  know, resulting in the deaths of, you know,
14  thousands of people in this community.
15    Q.   And -- and -- and what -- what
16  percentage of culpability do they have?
17         MR. BADALA:  Objection to form.
18         THE WITNESS:  I -- I can't answer
19  with percentages.  You know, they're a part of
20  the process that has gone on.  But ultimately I
21  think that their existence is referable back to
22  the actions of the defendants.
23         BY MR. CHEFFO:
24    Q.   Do you think they should -- they
25  should pay for drug treatment?

Page 235

1         MR. BADALA:  Objection to form.
2         THE WITNESS:  Honestly, I'd love if
3  anybody who, you know, stepped up to offer drug
4  treatment would pay for it.  Defendants, these
5  folks.
6         You know, it's a terrible crisis.
7  And we've certainly gone through phases where
8  we haven't had enough treatment or treatment's
9  been very difficult to obtain for people
10  because our system was overwhelmed.
11         That my feeling is, you know, if
12  anybody stepped up to pay for treatment, yeah,
13  I -- I would welcome it.
14         BY MR. CHEFFO:
15    Q.   Well, putting aside stepped up.
16         But should -- should -- should the
17  county seek to make the cartels and the drug
18  dealers and the pill mills and the doctors
19  contribute in any way toward the damages that
20  they -- they say that they sustained?
21         MR. BADALA:  Objection to form.
22  Asked and answered.
23         THE WITNESS:  I don't know, you
24  know, how they would do that.  But if there was
25  some mechanism --

Page 236

1         BY MR. CHEFFO:
2    Q.   It's called a lawsuit.
3         How about that?
4         MR. BADALA:  Objection to form.
5         THE WITNESS:  I don't know if you
6  could find the cartel to file the lawsuit,
7  but --
8         BY MR. CHEFFO:
9    Q.   Well, if you could --
10    A.   I don't know those things.
11    Q.   -- would you support that?
12         MR. BADALA:  Objection to form.
13         THE WITNESS:  As I say, I would like
14  to see funding for more treatment.  Because
15  that's something that was overwhelmed in our
16  county.
17         Where those dollars come from, I
18  think the county should just take whatever they
19  can get.
20         BY MR. CHEFFO:
21    Q.   All right.  Would you support a
22  lawsuit against the doctors who potentially
23  made millions of dollars or the pill mills who
24  made lots of money or the cartels or drug
25  dealers in order to pay for some of the costs

Page 237

1  for treatment?
2         Would that be something that you
3  think would be appropriate?
4         MR. BADALA:  Objection to form.
5  Asked and answered.
6         THE WITNESS:  Again, you know,
7  anybody who would, you know, fund this would be
8  a positive development to me.  I think those
9  individuals, you know, are appropriately kind
10  of put in the criminal system for, you know,
11  running a pill mill, an illegal operation like
12  that and I think making the actions of the
13  defendants worse with their actions.
14         MR. BADALA:  Is this a good time for
15  a five-minute break?
16         MR. CHEFFO:  Sure.
17         THE VIDEOGRAPHER:  We are going off
18  the record.
19         This is the end of Media Unit 3.
20         The time is 2:13.
21         (A short recess was taken.)
22         THE VIDEOGRAPHER:  We are going back
23  on the record.
24         This is the start of Media Unit No.
25  4.

60 (Pages 234 - 237)

Page 238

1	The time is 2:30.
2	You may proceed, Counsel.
3	BY MR. CHEFFO:
4	Q.	Doctor, I think I asked you earlier
5	if you were an expert on ARCOS, and I believe
6	you told me that you were not; is that correct?
7	A.	No.  We didn't have access to the
8	data, and I don't know the data.
9	Q.	When you -- when you were deposed
10	last week, I asked you if you had access to the
11	data, and I think you told me you didn't think
12	you did, right?
13	A.	No.  I -- I said we did not.  The
14	county did not.  I did not.
15	Q.	And it's something you would have
16	like to have reviewed if you -- if you had
17	access to it, right?
18	MR. BADALA:  Objection to form.
19	THE WITNESS:  I mean we just didn't
20	have access to it.  It could have been
21	potentially informative.  But we did not get
22	access to the ARCOS data.
23	BY MR. CHEFFO:
24	Q.	And in -- in the last week, did you
25	learn that, in fact, the ARCOS data was

Page 239

1	provided to the county and your lawyers months
2	ago?
3	MR. BADALA:  Objection to form.
4	THE WITNESS:  I became aware that
5	the data was furnished to lawyers.  But it
6	wasn't available to us at the county, is my
7	understanding of that.
8	BY MR. CHEFFO:
9	Q.	So you understood that the lawyers
10	had it, but the county and law enforcement and
11	the other county agencies didn't have any
12	access to it, right?
13	MR. BADALA:  Objection to form.
14	THE WITNESS:  That's my
15	understanding of that.
16	BY MR. CHEFFO:
17	Q.	Does that seem right to you?
18	MR. BADALA:  Objection to form.
19	THE WITNESS:  That's the way they're
20	going to use their data.  I can't tell them how
21	to use it otherwise.
22	BY MR. CHEFFO:
23	Q.	But you think it would be well used
24	if the county had access to it or law
25	enforcement, right?

Page 240

1	MR. BADALA:  Objection to form.
2	THE WITNESS:  I don't know.
3	BY MR. CHEFFO:
4	Q.	Well, why would the county want it,
5	potentially?
6	MR. BADALA:  Objection to form.
7	MR. CHEFFO:  Strike that.  It was a
8	bad question.
9	BY MR. CHEFFO:
10	Q.	Why would the county want it, and --
11	and for what potential uses could it -- it use
12	the ARCOS data?
13	MR. BADALA:  Objection to form.
14	THE WITNESS:  You know, I don't
15	really know that I know enough about the ARCOS
16	data to say.  As I understand it, it's about
17	distribution of drugs into Cuyahoga County and
18	what drugs are coming here.  I know potentially
19	it could be useful for developing public health
20	strategies.
21	But as I say, having never seen the
22	data, I have a very rudimentary knowledge of
23	it.  And, you know, it's through the DEA.  And
24	we have a DEA office here for -- with -- as I
25	understand, it has a diversion unit.

Page 241

1	So yeah.  Not -- not -- not having
2	seen it, I don't know how it could be helpful.
3	But if we knew how much drug was in the county,
4	that may be potentially useful information.
5	BY MR. CHEFFO:
6	Q.	Do you know what -- when I use the
7	term "indication for prescription medicine," do
8	you know what that means?
9	A.	Maybe I can tell you what I think
10	you are saying.  And the indication would be
11	the reason that a prescription was being given.
12	Q.	The approved use, right?
13	Is that -- would you agree with me
14	or -- is that a -- is that a -- is that a
15	definition we can -- we can agree on?
16	A.	I know there are, you know, some
17	medications that have off-label uses.  So the
18	indication I think -- you know, I don't know
19	that it would be something -- necessarily an
20	approved use.
21	Q.	Okay.  We'll -- we'll adopt your --
22	your -- so your definition would be an
23	indication means whatever it's prescribed for
24	by a doctor; yes?
25	A.	The reason for the prescription.

61 (Pages 238 - 241)

Page 242

1   Q.   The reason for it.  Okay.
2        What are the typical indications for
3   opioids?
4        MR. BADALA:  Objection to form.
5        THE WITNESS:  As I say, it's been a
6   very long time since I've prescribed anything.
7   As I remember, they were intended to treat
8   pain.
9        BY MR. CHEFFO:
10  Q.   What kind of pain?
11  A.   I'm not sure I understand your
12  question.
13  Q.   Are you aware of different types of
14  pain, or do you categorize them all under the
15  same rubric?
16  A.   I -- pain.
17  Q.   Okay.  I mean are you aware of
18  whether there's any more -- more clarity or
19  specificity with respect to the approved uses
20  for opioids, or is it just for pain?
21  A.   My basic understanding is they're
22  used to treat pain.  Some of the opiates are
23  used for diarrhea and things like that as well,
24  like paregoric.
25        But I'm not sure what -- I'm not

Page 243

1   sure I understand your question as to what
2   different types of pain.
3   Q.   Okay.  And is it your understanding
4   that they have been -- opioids have been
5   approved by the FDA for the treatment of pain?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  I believe that's what
8   their indication is, yes.
9        BY MR. CHEFFO:
10  Q.   And it's lawful for doctors to
11  prescribe opioids for treating pain?
12  A.   That's my understanding of that.
13  Q.   And it's your understanding that
14  it's -- it's common for doctors treating
15  patients in chronic pain to prescribe opioids,
16  amongst other medicines, to try and help their
17  patients?
18  A.   I don't treat chronic pain.  I'm
19  aware that that's something opioids have
20  been used for.  I don't profess to really know
21  decision making on that, you know, line of
22  treatment.  It's outside of the really scope of
23  practice that I do.
24  Q.   So you wouldn't be the person to
25  talk about whether somebody overprescribed or

Page 244

1   underprescribed or prescribed inconsistent with
2   appropriate standard of care, would you?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  I don't know standards
5   of care with that.  I think there are instances
6   of people who are prescribing opioids that are
7   done in an illegal fashion that I would say I
8   would offer a judgment that that wasn't
9   appropriate prescribing.
10       BY MR. CHEFFO:
11  Q.   What would -- how would you make
12  that determination?
13  A.   I mean the pill mill scenario is
14  what came to mind when you asked your question.
15  You know, not establishing a patient doctor
16  relationship, prescribing opioids at that
17  point; and, you know, not really having a clear
18  reason to be doing that.
19  Q.   Do you believe that some patients
20  can benefit from opioid therapy if it's
21  properly prescribed by their doctor and they're
22  monitored?
23  A.   Yes.
24  Q.   And do you believe it's an
25  appropriate therapy, to the extent a doctor

Page 245

1   determines it's -- it's a -- it's the right
2   medicine, for someone who's suffering from
3   cancer pain?
4   A.   Again, you know, I don't treat
5   people with cancer pain or postoperative pain
6   or chronic pain.  So how appropriate those
7   decisions are I really don't feel qualified to
8   give you an answer on.
9   Q.   Do you -- are you -- are you
10  qualified to make an assessment as to how a
11  doctor should evaluate a patient before
12  prescribing an opioid to his or her patient?
13  A.   I wouldn't say that that's, you
14  know, something I practice in.  And I probably
15  would not feel comfortable making that
16  assessment.
17  Q.   So whether somebody was -- strike
18  that.
19        You're not of the view that opioids
20  should be removed from the market, are you?
21       MR. BADALA:  Objection to form.
22       THE WITNESS:  I mean we've used
23  opioids for a long time for pain.  And I think
24  the -- you know, this is again just, you know,
25  my rudimentary knowledge -- they have a place

62 (Pages 242 - 245)

Page 246

1  in medicine.  I don't know that I would be able
2  to expound at length about what that role is.
3      But I wouldn't say that, you know,
4  they're to be kind of thrown out with the
5  dishwater.  Throw the baby out with the bath
6  water, if you would.
7      BY MR. CHEFFO:
8      Q.  And -- and -- and you would be --
9  you would not support any prohibition on
10  doctors prescribing patients who have a
11  legitimate need for opioids -- preventing those
12  doctors from doing so, would you?
13      MR. BADALA:  Objection to form.
14      THE WITNESS:  I mean a doctor
15  prescribing a legitimate medication
16  appropriately, I -- I don't see how I would
17  object to that.
18      BY MR. CHEFFO:
19      Q.  Have you advocated, either
20  personally or professionally, for any
21  limitations on opioid prescriptions?
22      A.  Not that I -- I -- and I mean our
23  data has been used in a lot of different ways
24  about prescribing.  And I don't know the long
25  ranging impacts.  My direct lobbying for those,

Page 247

1  I don't remember any instances of that.
2      Q.  We'll just have some examples.
3      Have you said a -- you -- a doctor
4  shouldn't be able to prescribe for more than
5  seven days an initial prescription?
6      A.  That's a rule that our governor
7  instituted here.  And through our Opiate Task
8  Forces and things like that data our is used.
9  But I'm not directly influencing that decision.
10      So I would have to say I don't know
11  to what extent, you know, data that we used has
12  influenced any of that.  But I have not
13  personally done so.
14      Q.  Correct me if I'm wrong.  I'm sure
15  you will, which is what you should.  But I -- I
16  think you had referenced ANAMSA --
17      A.  SAMHSA?
18      Q.  -- SAMHSA study last time, maybe
19  earlier today.
20      A.  Both times, yes.
21      Q.  Okay.  And -- and you're familiar
22  with that study?
23      A.  In general, yeah.
24      Q.  Okay.  And what -- tell me what --
25  you know, give me a summary of your

Page 248

1  understanding of the -- the study and the --
2  the takeaway from it.
3      A.  What they were doing in the study
4  was looking at opioids, both narcotics and
5  opioid pain relievers, and trying to establish
6  some, you know, data with regard to their
7  interrelation.
8      And what they did with the heroin
9  users was asked them about, you know, whether
10  they had used or abused opioids for nonmedical
11  purposes, as I recall, within the last year.
12  Or they did a ten-year look-back as well.
13      And adding those two together, they
14  saw that -- I think it was 79.5 percent of the
15  people who were using heroin had a previous
16  history of using opioid pain relievers, and
17  very few of the people who were using the
18  opioid pain relievers or abusing them had
19  initiated with heroin, is the takeaways we took
20  from that.
21      Q.  Okay.  So of the heroin users, they
22  asked them whether they had used an opioid in
23  the last five years?
24      A.  I thought the look-back window they
25  used was ten years.

Page 249

1      Q.  Ten years?
2      A.  And they said, beyond that, they
3  didn't want to rely on recall at that point.
4      Q.  And this was for -- this was for
5  a -- a nonmedical purpose?
6      A.  The opioid pain relievers, yes.
7      Q.  So what does that mean?
8      A.  That it wasn't being used for proper
9  use for a therapeutic intervention.  I don't
10  know how they defined the term in their paper
11  though.
12      Q.  And so --
13      A.  That's kind of what I took from it.
14      Q.  Right.
15      So it was -- there -- they were
16  nonmedical pain prescriptions, so they were not
17  prescribed -- they were not being used in
18  accordance with a proper prescription from a
19  doctor who prescribed it for pain, right?
20      Is that your takeaway?
21      A.  They may have obtained them from a
22  doctor for pain.  But if it was a doctor
23  shopping scenario or something like that, then
24  they were using it in a nonmedical way.
25      Q.  Okay.  So let's -- let's just make

63 (Pages 246 - 249)

Page 250

1 sure --
2    A.   I don't know that they specified,
3 you know, more beyond how they defined the
4 term, as I -- I don't remember that they --
5    Q.   It was people who were using opioids
6 or had used opioids in the -- in ten years
7 before in a way that wasn't legitimately
8 appropriate based on a doctor's prescription or
9 recommendation.
10       Is that your takeaway?
11    A.   They were using them in a
12 nonmedical, nontherapeutic way.
13    Q.   So it could have --
14    A.   That was my takeaway.
15    Q.   -- been someone who bought a handful
16 of pills off the street, right, and used them
17 in the last ten years?
18    A.   That would have been my
19 understanding of, you know, a group -- they
20 group that they would have included in their
21 nonmedical therapeutic use.
22    Q.   Could have been a -- a -- a pill
23 mill, right?
24    A.   Right.  Sure.
25    Q.   It could have been something that

Page 251

1 they got from a drug cartel and -- from a
2 street drug, right?
3    A.   I am not aware of the drug cartels
4 selling the pills that much.  But I don't know,
5 you know, that I could speak more to the
6 source.
7       May have been people -- you know,
8 other examples I can think of that were
9 discussed in different papers would be like
10 taking medications from a medicine cabinet that
11 were intended for somebody else but diverted to
12 somebody.  And that would be an abuse,
13 obviously, that wasn't intended for them.
14       Or, you know, not using your
15 medications appropriately as they were
16 prescribed could also be in that group too.
17       I don't remember how they defined
18 it, to be honest with you.
19    Q.   Would the -- is it fair to say one
20 of the key takeaways, these weren't people that
21 went to their doctors for pain, were prescribed
22 appropriately a pain medication, and then 80
23 percent of the people went on to heroin, right?
24       That's not what the study showed.
25    A.   They're not using their

Page 252

1 medication -- it's a nontherapeutic use of
2 their medication.
3       Your question's a little confusing
4 to me though.
5    Q.   Right.
6       They -- these were not people who
7 were prescribed pain medicines by a doctor,
8 used it as directed and as prescribed, and then
9 went on to use heroin, right?
10       That was not this population or this
11 study.
12    A.   As I understand it, that's not this
13 population.
14    Q.   And of that 80 percent of the heroin
15 users who had used nonmedical prescription pain
16 relievers, about 3.6 percent of those
17 progressed to heroin use, right?
18    A.   I thought the heroin users
19 progressed to -- at -- at that low level, to
20 the nontherapeutic use of medications, the
21 opioid pain relievers.  It was kind of a -- not
22 a initiating drug for the --
23       MR. CHEFFO:  Well, I want to -- when
24 I think -- I'm going to show you the -- the
25 article again.  I -- hopefully -- and I think

Page 253

1 -- you need to -- read the entire thing, but I
2 want you to -- to be clear on this.
3       Can we just mark this.  Because
4 that's not my understanding, but I could be
5 wrong.
6       (Deposition Exhibit 3 was marked for
7 identification.)
8       MR. BADALA:  And just for the
9 record, you're allowed to read the document if
10 you'd like.  You don't have to listen to his
11 instruction.
12       MR. CHEFFO:  I don't think I
13 instructed him to do anything.
14       BY MR. CHEFFO:
15    Q.   I think in the last -- and I'm
16 looking at the abstract, Doc.  I mean, again,
17 you can look at -- but I -- I'd -- I'd ask you
18 to just look at the abstract first on the front
19 page.  And then, if you need to look at more,
20 you can.
21    A.   Not a good way to read medical
22 literature.  But I -- I see what you're saying
23 here.
24    Q.   I -- I understand.  But --
25    A.   I just want to go into --

64 (Pages 250 - 253)

Page 254

1    Q.   -- I -- I -- it's a very specific
2  question.  But again, you -- you --
3    A.   I -- I don't want to take up your
4  time.  I'll -- I'll try to do it with the
5  understanding I can --
6    Q.   And again, I'm not going to stop
7  you, Doctor.  I really want -- but I -- I mean
8  I -- I think -- look at -- look at the -- look at the
9  second-to-last sentence in the abstract.
10    A.   Okay.
11    Q.   It starts with "Only 3.6 percent."
12      Do you see that?
13    A.   Right.
14    Q.   So does that refresh your
15  recollection on this argue -- on this article
16  that only 3.6 percent of nonmedical use pain
17  relief initiates had initiated heroin use
18  within the five-year period following their use
19  of the nonmedical pain reliever use?
20      MR. BADALA:  Objection to form.  I
21  think you read that incorrectly.
22      THE WITNESS:  I'm sorry.  I was
23  looking back to the data part of it, which is
24  on Page 14.
25      Right.  It says here only 3.6

Page 255

1  percent of nonmedical pain reliever initiates
2  had initiated heroin use within five-year
3  period following their first nonmedical pain --
4  pain reliever use.
5      BY MR. CHEFFO:
6    Q.   Right.
7      So what does that mean?
8      MR. BADALA:  Objection to form.
9      THE WITNESS:  That of the people who
10  were initiates with nonmedical pain reliever
11  use, 3.6 of them had initiated heroin use in
12  five years following their first time using the
13  pain relievers in a nonmedical way.
14      Think I confused this with another
15  paper where the number of people who were using
16  prescription pain medication had a very low
17  incidence of having transitioned over from
18  heroin.  So sorry I misinterpreted that.
19      BY MR. CHEFFO:
20    Q.   No.  That's okay.  That's why I
21  showed you.
22      So -- so just tell me then -- so we
23  had a situation where heroin users were asked
24  about their use of nonmedical opioid drugs, and
25  approximately 80 percent said they had done so

Page 256

1  in -- in the prior ten years, right?
2    A.   That's my understanding of the
3  paper, yes.
4    Q.   The paper also says that only 3.6
5  percent of the people who actually used
6  nonmedical opioid or pain relievers went on to
7  use heroin within five years.
8      Is that what that says?
9    A.   Yes.
10    Q.   And that was a significant finding
11  both to you and people in your community,
12  right?
13      MR. BADALA:  Objection to form.
14      THE WITNESS:  Which finding are you
15  talking about, sir?
16      BY MR. CHEFFO:
17    Q.   Those two findings, the -- the 80
18  percent and the 3.6 percent finding.
19    A.   I certainly, you know, quoted this
20  paper and the research paper I wrote and
21  thought it was a well done study.
22    Q.   And it also illustrated that a very
23  small percentage of people who actually
24  even improperly obtained opioids actually went
25  on to use heroin, right?

Page 257

1    A.   This is the 3 percent that they talk
2  about here, 3 and a half percent.
3    Q.   You -- it's a small percentage,
4  wouldn't you agree?
5    A.   But a very large population who are
6  doing that.  But a small percentage of them go
7  on to heroin use, as they mention.
8    Q.   Right.
9      So --
10    A.   And that's really what forms the
11  basis of our population here.
12    Q.   So 96.5 percent don't, according to
13  that study, right?
14    A.   According to that study.
15    Q.   And how do we differentiate the 3.6
16  in that study with the 96.4 percent when we
17  look at the population of Cuyahoga?
18    A.   I don't know how you would --
19      (Telephone interruption.)
20      (Discussion held off the
21  stenographic record.)
22      THE VIDEOGRAPHER:  We are going off
23  the record.
24      The time is 2:54.
25      (A short recess was taken.)

65 (Pages 254 - 257)

Page 258

1	THE VIDEOGRAPHER:  We going back on
2	the record.
3	The time is 2:56.
4	You may proceed, Counsel.
5	MR. CHEFFO:  Thank you.
6	BY MR. CHEFFO:
7	Q.   Just before we finish with this
8	document, I just want to ask you just a -- a
9	question.  Then we'll tie it in, Doctor.
10	So is -- is it your view that some
11	percentage of the people who use heroin in
12	Cuyahoga County today began using
13	nonprescription pain relievers, including
14	opioids, prior to their use of -- of heroin?
15	A.   Yes.  I would say that's true.
16	Q.   And based on this article, would you
17	characterize that at approximately 3.6 percent?
18	A.   I don't know that we've, you know,
19	looked at that.  As I understand, you know, the
20	number of people who are -- if you're asking me
21	who use the prescription opioids in a
22	nonmedical way progressing to heroin abuse --
23	Q.   Uh-huh.
24	A.   -- this is, you know, what they say,
25	a nationally representative study.

Page 259

1	I don't know the data specifically
2	in Cuyahoga County to say what percentage would
3	advance to that.  I don't know.
4	Q.   Well, you -- have you -- have you
5	done anything to either validate or -- or
6	challenge it?
7	A.   I really don't have the capacity
8	with our folks actually to go back to do this
9	kind of a study.
10	Q.   My question is have you?
11	A.   No.  I -- because I don't know how I
12	would do that, I guess is what I'm trying to
13	say.
14	Q.   Are -- are you aware of any reason
15	as to why this information would not apply to
16	Cuyahoga County?
17	A.   It's a national sample.  And
18	Cuyahoga County, in terms of the drug epidemic,
19	has higher prescribing rates than other parts
20	of the county -- part -- pardon me -- other
21	parts of the country.
22	So I can't say for sure is it
23	applicable, is it not applicable.  I don't
24	know.
25	Q.   And this also says that 96.4 percent

Page 260

1	of the people who used nonmedical pain
2	relievers never, within the last five years,
3	went on to -- to use heroin, right?
4	A.   That's their finding, yeah.  And
5	then, when they look at the heroin initiates,
6	that's the ones who they point to the 80
7	percent who did have a nonmedical pain reliever
8	use.
9	Q.   Right.
10	It was 80 percent who used
11	nonmedical within the last ten years, right?
12	A.   That's my understanding.  As I say,
13	I don't want to keep taking up time because I
14	know -- but -- the proportion of M -- N -- MPR
15	initiates who progressed to heroin initiation
16	expressed as a percentage of a hundred percent
17	has remained fairly steady.
18	And that's the numbers.  This is --
19	I'm reading in the middle of page 14.  .71, 71
20	percent, 87 percent, 86 percent.  And I think
21	that's where the number comes 79.5 percent.
22	Q.   And -- and in that study, does it
23	articulate what percentage of people who were
24	prescribed lawful or appropriate opioid therapy
25	went on to use heroin?

Page 261

1	A.   That's not what I think this study
2	is addressing.
3	Q.   Are you aware of a study that looks
4	at that question.
5	Well, let me ask you this:  Are you
6	aware of any data with respect to Cuyahoga
7	County?
8	MR. BADALA:  Objection to form.
9	THE WITNESS:  I think, and
10	understand your question, am I aware of any
11	data of people who have a lawful prescription
12	for opioids who went on to develop a heroin
13	addiction?
14	BY MR. CHEFFO:
15	Q.   Yes.  Within a -- within some period
16	of time.
17	A.   I'm not aware of that data.
18	Q.   Have you ever tried to look at any
19	type of correlation or relationship or
20	percentage of people who were what I'll call
21	lawfully or appropriately prescribed an opioid
22	medicine who later went on to became heroin or
23	fentanyl addicts?
24	A.   We didn't -- I, again, you know,
25	don't have access to all of that prescribing

Page 262

1  data myself.  So I don't know.
2       The other caveat I might say, too,
3  is that, you know, of those people potentially
4  who were kind of stealing out of grandma's
5  medicine cabinet, they could go on to develop a
6  prescription -- or pardon me -- go on to
7  develop an addiction to those substances based
8  on, you know, somebody who lawfully did have
9  that prescription.  So --
10     Q.  Okay.
11     A.  -- little hard to capture all the
12  data --
13     Q.  Well --
14     A.  -- but --
15     Q.  Okay.  I'll be even more precise.  I
16  thought you understand what I was talking
17  about.
18       I was trying to differentiate what
19  this study talks about, right, which is people
20  who are using it for nonmedical purposes,
21  right?
22       And I was trying to ask you someone
23  individually who was prescribed an opioid for a
24  legitimate purpose, and he or she took that
25  medicine --

Page 263

1  A.  Okay.
2  Q.  -- as prescribed by a doctor, if you
3  have looked at or are aware of any data in
4  Cuyahoga County that would tell us what
5  percentage of those people went on to become
6  abusers of heroin or fentanyl.
7       MR. BADALA:  Objection to form.
8       THE WITNESS:  I am not aware of the
9  data --
10  BY MR. CHEFFO:
11  Q.  Are you aware of --
12  A.  -- that it exists.
13  Q.  Are you aware of it nationally?
14  A.  I don't know.
15  Q.  How would you -- how would you
16  determine the answer to that question?
17  A.  What percentage of people who use
18  their drug appropriately --
19  Q.  Yes, sir.
20  A.  -- go on to develop an addiction to
21  heroin.
22       A lot of moving parts on that
23  question.  I don't -- I don't know that I could
24  say.  I mean we could probably go back and
25  identify who got the prescriptions.

Page 264

1       How to identify, you know, the
2  illicit users of drugs, I don't know that we
3  could do that with certainty nationally or in
4  Cuyahoga County.
5       And then, you know, as we talked
6  about, you know, those people who kind of take
7  a -- or you're not asking me that about, you
8  know, people who kind of access legally
9  prescribed, appropriately used medications with
10  their leftovers.
11     Q.  Yeah.
12     A.  That's not a population we're
13  discussing.
14       So to -- to answer your question,
15  I -- I don't know that I could figure out how
16  to get that estimate.
17     Q.  What would be the variables you --
18  you'd want to know if you had -- you know,
19  if -- if you had the resources to answer that
20  question and you have the inclination to answer
21  it?
22     A.  The most obvious one -- and I think
23  it's the one that, you know, would be the
24  easiest to obtain, is who are all these people
25  who've received opioid pain relievers.

Page 265

1  Q.  Can I stop you there.
2       So that -- that would -- isn't that
3  -- couldn't you search OARRS to at least start
4  there?
5  A.  I can't search OARRS like that.  I
6  don't know that's it searchable --
7  Q.  Okay.
8  A.  -- for that.
9  Q.  So first is you'd want to know who
10  received the -- the prescription opioid pain
11  relievers for a medically appropriate purpose,
12  right?
13  A.  That's what we're looking for.
14  Would OARRS capture everything that was
15  medically appropriate.  It may do that and
16  capture some additional things too.  The, you
17  know, medically inappropriate prescribers.
18       And, you know, when I remember
19  talking to the prosecutor about pill mills, he
20  said, yeah, some people who go in there have a
21  very legitimate reason to; be there and are
22  getting, you know, a prescription for that.
23       So even I think going back to
24  prescriber-level data might make that a hard
25  thing to say was this legitimate, even with the

67 (Pages 262 - 265)

Page 266

1  person who is subsequently arrested and, you
2  know, like we say, that that person was
3  running, you know, an illegal pill mill
4  operation.  There may be legitimate people in
5  that data set who, you know, are kind of lumped
6  with the bad practitioner.  So whether they go
7  on and develop addiction, I don't know.
8      And as I say, you know, the end
9  result, these, you know, folks who are addicted
10  to heroin, there are models and, you know,
11  estimates how many people in a community would
12  be, you know, addicted or abusing things.
13      I don't know how they were generated
14  exactly.  So I can't personally kind of go back
15  and tell you what, you know, is the number of
16  addicted people here or how to get a reasonable
17  estimate of that and.
18      Not knowing those individuals, I
19  don't think you could go back and
20  cross-reference OARRS easily on our state
21  level.  Or it would become even more
22  challenging I think on a national level, just
23  given the difference in prescription drug
24  monitoring programs and how efficacious they
25  were.

Page 267

1      And, you know, our OARRS data
2  initially included the pharmacies prescribing
3  narcotics.  But it did not include people who
4  were dispensing narcotic, samples they had,
5  prescribers from their office, until years
6  after OARRS was started.
7      So I don't mean to give a
8  wishy-washy answer.  I don't usually like them.
9  But there's a lot of moving parts to that.  And
10  I -- I -- I wouldn't feel that would be a very
11  easy task to do, if it's even possible.  But
12  not by me, I guess.
13      Q.   So to summarize what I think you're
14  saying is that there -- I think you said
15  there's a lot of moving parts.
16      Is that fair?
17      A.   Yeah.  Direct quote.
18      Q.   And it is something that you can't
19  kind of draw broad conclusions from
20  population-type statistics or data in order to
21  determine whether people were -- ultimately
22  became addicted to heroin or fentanyl or other
23  opioids based on initial prescriptions of
24  lawful opioids without knowing a lot of the
25  different underlying specifics of that

Page 268

1  individual case, right?
2      MR. BADALA:  Objection to form.
3      THE WITNESS:  I don't know think I
4  could do that.  Whether there's expertise like
5  that, that I don't know.  I cannot do it
6  myself.
7      BY MR. CHEFFO:
8      Q.   If it was out there, it'd be helpful
9  to you in your practice in making public health
10  policy, wouldn't it?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  Which -- it would be
13  helpful to know --
14      BY MR. CHEFFO:
15      Q.   If you --
16      A.   -- what percentage of people would
17  go from prescription opioids to the addicted
18  population.
19      Q.   Right.
20      A.   It would be, you know, a piece of
21  information that I -- I think would be, you
22  know, helpful to know I think for our purpose
23  in terms of the opioid crisis kind of -- we had
24  to work backwards from when we identified the
25  crisis, which was the heroin crisis, and then

Page 269

1  try to get to the opioid pain reliever piece of
2  that.  And that's where this study was more
3  helpful to me.
4      But, you know, I firmly believed
5  that all information has some value if it's
6  true.  And that is, you know, information that
7  stays valuable.  As I say, I can't do it.  It's
8  kind of like, if a tree falls on my car, I
9  can't estimate how much damage, but somebody's
10  going to give me money for it.  How they do
11  that, I don't know though.
12      MR. CHEFFO:  Okay.  Mark this,
13  please.
14      (Deposition Exhibit 4 was marked for
15  identification.)
16      THE WITNESS:  I remember the paper.
17  So I'm just going to read the message.
18      BY MR. CHEFFO:
19      Q.   I didn't say anything.  It's a
20  relatively short e-mail.  So I'm happy for you
21  to read it so I can ask you questions about it.
22      A.   Let me just read his results.
23      Okay.  Ready.
24      Q.   Thanks, Doctor.
25      So you wrote this to who?

68 (Pages 266 - 269)

1    A.    The recipients of the message are
2  Vince Caraffi, who is the injury prevention
3  program coordinator at the Cuyahoga County
4  Board of Health.  Jenna Suholdonic is the
5  person at the United States Attorney's Office
6  who coordinates a lot of the information that
7  gets distributed, the minutes and things like
8  that.  And Hugh Shannon is my in-house
9  administrator.  And he's been another person
10  I've worked with very closely with our data
11  generation.
12    Q.    And you -- you say the minutes.
13        Is this in connection with a
14  committee?
15    A.    I was sending this to Vince Caraffi
16  in association with the Cuyahoga County Board
17  of Health task force.  He would be my point of
18  dissemination there.  And I sent it to Jenna
19  Suholdonic -- I boot her name periodically.
20  I'll just say Jenna.
21        I sent it to her because she does
22  the distribution list for the U.S. Attorney's
23  task force.
24    Q.    Okay.  And you expected them to pass
25  it on to the other participants in the task

1  force?
2    A.    Right.  Yeah.  They were going to be
3  points of distribution for me.
4    Q.    And this is dated October 9th, 2017,
5  right?
6    A.    Right.  That's correct.
7    Q.    Could you read just your note for
8  the record.
9    A.    Sure.
10        "Hi all.  Would you please forward
11  this citation to your distribution lists.  I
12  just became aware of it, and it's a critically
13  important piece of information.  What the
14  authors are saying is that" a large segment of
15  the drug-addicted population is -- I'm sorry --
16  "is that there is a large segment of the
17  drug-addicted population who are not getting
18  addicted as a result of overprescribing of pain
19  medications.  This is not to say that the
20  prescribing guidelines are without merit, but
21  it is to say that, if they are our sole or
22  major focus in preventing emergence of new
23  addicts, then we are going to be missing a
24  significance emerging trend.  I believe we
25  suspected that this was the case, but this is

1  our first study I have seen that provides data
2  to back up that belief."
3    Q.    So you -- you thought this was
4  accurate when you sent it, I take it?
5    A.    Yes.
6    Q.    And you still believe it's accurate,
7  right?
8    A.    Yes, I do.
9    Q.    And it says:  "What the authors are
10  saying is that there's a large segment of the
11  drug-addicted population who are not" -- and
12  that's all caps, right?
13    A.    Yes.
14    Q.    -- "getting addicted as a result of
15  the overprescribing of pain medications."
16        What did you mean by that?
17    A.    That they --
18        MR. BADALA:  Objection to form.
19        THE WITNESS:  Oh, pardon me.
20        And I -- I guess I would qualify
21  this with the overprescribing pain medication
22  to them.
23        What Cicero, et al., are saying in
24  this paper is that they've noticed a transition
25  in opioid initiators starting with heroin

1  rising from 2005 to 2015.
2        So there's still the majority who
3  are being introduced to opioid addiction
4  through oxycodone and hydrocodone, but there
5  are drops in those.  And what I would say is
6  that these folk aren't receiving the opioid
7  pain medication.  But this is an entirely
8  unexpected, given that we're prescribing fewer
9  opioid pain medications in Ohio.
10        And what I stressed to the folks
11  when I eventually spoke to them is that, you
12  know, when we look back at these previous, you
13  know, heroin epidemics that we've had, they
14  didn't start with opioid pain relievers.
15        So what we're seeing potentially is
16  a reversion to a model that's more traditional
17  in that we have an opioid-addicted population,
18  again who are, you know, related to the
19  overprescribing of medication, but their
20  initiates, their contacts who subsequently
21  initiate are bypassing that root of having
22  opioid pain relievers prescribed to them.
23        And the public health significance
24  of that is that, especially at this time
25  around, the CDC's guidelines being promulgated,

Page 274

1  what I wanted to say is, you know, it's not the
2  whole story anymore if we're going to
3  intervention efforts with, you know, trying to
4  reduce our fentanyl deaths or our heroin
5  deaths.
6      Because overprescribing still has
7  merit. It's still important because it is a
8  big initiator. But we have to start thinking
9  about interdiction just of illicit substances
10  as well. Because that's potentially what some
11  of these folks are getting started with.
12      BY MR. CHEFFO:
13  Q.  So Cicero said, from 2005 to 2015,
14  there was a significant increase in people who
15  started using heroin who never used opioids,
16  right?
17  A.  Right. The initiates of heroin.
18  Q.  And heroin is not marketed or sold
19  by any drug company, is it?
20  A.  I don't know the overseas. There
21  are some countries like England where heroin is
22  legal.
23  Q.  United States.
24  A.  I don't know --
25  Q.  It's not in the --

Page 275

1  A.  In the --
2  Q.  -- United States, is it?
3  A.  -- United States, no.
4      No. We're not in England.
5  Q.  Okay.
6  A.  No.
7  Q.  And it's not distributed by anybody,
8  right, lawfully?
9  A.  It's not lawfully distributed. It's
10  --
11  Q.  Right.
12  A.  -- distributed by plenty of people,
13  unfortunately.
14  Q.  Are any of them defendants in this
15  lawsuit?
16  A.  Distributors of heroin, no.
17  Q.  And -- and with respect to all of
18  those people that Cicero identified that never
19  used opioids but started on heroin, do you
20  attribute the cause of -- of those initiations
21  of heroin to the conduct of the defendants?
22  A.  At least in large part, yes.
23  Q.  Okay. Why?
24  A.  Because the population, they're not
25  people who wake up one day and say, "I'm going

Page 276

1  to go down and find heroin."
2  Q.  Really?
3      How do you know that?
4  A.  Not my experience talking to people
5  in recovery as to how they get started. In
6  fact, I've never heard anybody say that.
7  Q.  Are you an expert in addiction or --
8  or heroin usage?
9      MR. BADALA: Objection to form.
10      THE WITNESS: No.
11      BY MR. CHEFFO:
12  Q.  Okay. So --
13  A.  I would say that would be a very
14  unusual story, based on my experience talking
15  to people --
16  Q.  You've not --
17  A.  -- who have had this issue.
18  Q.  Right.
19      You -- you've not published this
20  or -- or -- or hold yourself out as an expert
21  on addiction, do you?
22  A.  I know things about addiction. I
23  wouldn't say that, you know, I would hold
24  myself out as an expert.
25  Q.  Right.

Page 277

1      So do the people who actually abuse
2  heroin, do they have any responsibility?
3  A.  Again, you know, I think that they
4  have responsibilities for their behavior.
5  Addiction is, you know, a very hard thing to
6  treat, has high relapse rates and, you know,
7  those things.
8      But the climate that creates the
9  addict I think is again referable back to the
10  defendants. And while I don't necessarily, you
11  know, like the behaviors of the addicts -- I
12  don't feel like, you know, these are people
13  who, you know, promote good behavior in a lot
14  of good communities because of things like
15  property crime that they might do to support
16  their behaviors, I -- I think a lot of the
17  issue with addiction does refer back to the
18  defendants.
19  Q.  So -- so let's assume someone is
20  addicted on heroin, and they go out and break
21  into someone's car and steal something.
22      Is that the defendant's
23  responsibility too?
24      MR. BADALA: Objection to form.
25      THE WITNESS: In an indirect way, I

70 (Pages 274 - 277)

Page 278

1  would say that you've created an addicted
2  population.  They're, you know, conducting
3  illegal activities to support an addiction.
4  And, you know, I can't talk to percentages
5  again, like we mentioned before.  But, you
6  know, that individual has some referral back to
7  the defendants.
8      BY MR. CHEFFO:
9      Q.   So -- and let's -- let's keep going.
10     So they are addicted.  They --
11 this -- this is a person who never took an
12 opioid.  Okay?  Let's give you a hypothetical.
13 Never took an opioid, was -- and never saw a
14 doctor for pain but starts to use heroin.
15     And you've told us that the
16 defendants are substantially responsible for
17 that, right?
18     A.   By degrees of separation in Cuyahoga
19 County.
20     Q.   And then they go and they break into
21 someone's car and steal their radio, and the
22 defendants are responsible for that, too,
23 right?
24     MR. BADALA:  Objection to form.
25     THE WITNESS:  By degrees of

Page 279

1  separation again.
2      BY MR. CHEFFO:
3      Q.   And then they take the radio, and
4  they get into their own car, and they're
5  speeding away from the police, and they hit
6  somebody and injure them.
7      The defendants are responsible for
8  that too?
9      A.   You know, we can track things back,
10 you know, to ridiculous levels.  I think --
11     Q.   Are we doing that?
12     A.   I kind of feel like we are.
13     Q.   I think so too.
14     A.   But I think, you know, if you're
15 telling me is, you know, an addicted population
16 in this county referable back to the
17 defendants, I would say my answer to that is
18 yes.
19     Q.   For heroin?
20     A.   For heroin.
21     Q.   Even if they never were -- had an
22 addiction disorder with any product made by any
23 of the defendants?
24     MR. BADALA:  Objection to form.
25 Asked and answered.

Page 280

1      THE WITNESS:  In some of those
2  instances.  Obviously we had heroin addicts
3  before an opioid pain reliever crisis.  And
4  some of those folks -- you know, I couldn't go
5  back in 1970 and say, you know, "That guy has,
6  you know, an opioid pain reliever problem."
7      But in bulk, a lot of our population
8  who are addicted to heroin have, you know,
9  records of using opioid pain relievers.
10     Q.   Okay.  But you're -- you're
11 changing -- you're changing the -- the story
12 here, Doctor.  This I'm -- you know, that's --
13     A.   I --
14     Q.   Look, this is -- this is -- hold on
15 a second.
16     This is -- this is a lawsuit that
17 the county has brought.  So I'm asking you some
18 questions, right?
19     Seems -- you're -- you're saying
20 that these seem absurd or hypothetical.  And --
21 and, you know, to some extent I would agree
22 with you.
23     But the question is, to the extent
24 that -- and that's why I very carefully said in
25 your -- you were changing it -- if someone

Page 281

1  never saw a doctor and was prescribed opioids,
2  they never took an opioid medicine, they never
3  saw an ad or any information about opioids, but
4  through some channel, whether it's initially
5  starting on heroin or they initially started on
6  illicit fentanyl or methamphetamine or crack
7  cocaine or something, they found their way
8  taking heroin, never having had a prescription
9  or a doctor who said, "You should take an
10 opioid."
11     Okay?  That's -- that's -- that's my
12 population.
13     A.   Okay.
14     Q.   Okay.
15     MR. BADALA:  Objection to form.
16     BY MR. CHEFFO:
17     Q.   Now, my question is do you believe
18 that the defendants are substantially
19 responsible for that person's overdose or
20 addiction?
21     MR. BADALA:  Objection to form.
22     THE WITNESS:  I think they could be;
23 yes.
24     BY MR. CHEFFO:
25     Q.   Are they?

71 (Pages 278 - 281)

Page 282

1    A.  They could be.
2         MR. BADALA:  Objection to form.
3         THE WITNESS:  I can't tell you,
4    again, there was ever heroin abuse before
5    opioid pain relievers.  But the initiation, I
6    don't know to what extent that follows the
7    chain of people back to someone who did get
8    addicted because of opioid pain relievers.
9         The glut of heroin in our area is
10   largely created by the addicted population who
11   are referable back to the defendants.
12        And to me, that isn't a big stretch,
13   like trying to go from a car accident to
14   something.  That has a pretty clear link going
15   back, to my opinion.
16        BY MR. CHEFFO:
17   Q.   But you'd want to know at least what
18   the link was, right?
19        MR. BADALA:  Objection to form.
20        THE WITNESS:  The link being how do
21   we go back to that?
22        BY MR. CHEFFO:
23   Q.   Yeah.
24        How -- how do you --
25   A.   I don't know that you could do that

Page 283

1    on every individual case.  But I'd say, you
2    know, in general, we have, you know, more
3    heroin in this area; we have more addicts in
4    this area; and that's a result of, you know,
5    overprescribing, overdistribution.
6         So it does refer back to the
7    defendants.
8    Q.   So do -- you said you -- you don't
9    think people wake up one day and say, "I want
10   to go use heroin."
11        Is that your testimony?
12        MR. BADALA:  Objection to form.
13        THE WITNESS:  I, you know, have
14   interacted with individuals who were heroin
15   addicts through the task force.  And I have
16   never heard that story.
17        BY MR. CHEFFO:
18   Q.   Have you ever heard someone wake up
19   one day and say, "I've never used opioids, but
20   I want to go and buy carfentanil or fentanyl"?
21   A.   No.
22   Q.   Have you ever heard someone wake up
23   and say, "I've never used or abused any other
24   drugs.  I want to go and use OxyContin"?
25   A.   Not something I'm familiar with, no.

Page 284

1    Q.   So all of those people started -- or
2    many of them started with some other pathway,
3    right?
4         MR. BADALA:  Objection to form.
5         THE WITNESS:  Okay.
6         BY MR. CHEFFO:
7    Q.   Alcohol, right?
8         Marijuana perhaps.  Then maybe
9    cocaine.  Then maybe methamphetamines.
10        MR. BADALA:  Objection.
11        BY MR. CHEFFO:
12   Q.   Some -- some percentage of the
13   population wound up getting there through other
14   addictive behaviors; isn't that fair?
15        MR. BADALA:  Objection to form.
16        THE WITNESS:  I -- I don't know that
17   I could say that.
18        BY MR. CHEFFO:
19   Q.   Well, if you don't know that you can
20   say that, how can you then trace anybody to a
21   prescription opioid?
22        MR. BADALA:  Objection to form.
23        THE WITNESS:  Because people get
24   addicted to prescription opioids when they're
25   prescribed to them.  And if that supply gets

Page 285

1    taken off, then, you know, they may start to
2    transition into things either because they're
3    less expensive, like heroin was, or more
4    available.
5         BY MR. CHEFFO:
6    Q.   But I've asked you a number of
7    times, Doctor.  You can't tell me how -- what
8    percentage of those.
9         I mean are all of the heroin users,
10   are they people who started on prescription
11   opioids?
12        MR. BADALA:  Objection to form.
13        THE WITNESS:  I think I've answered
14   that question multiple times.  And my answer to
15   that is no.
16        MR. CHEFFO:  Right.
17        THE WITNESS:  I mean there were
18   people who were addicted to heroin, came back
19   from Vietnam, and didn't have prescription
20   opioids as their pathway to that.
21        MR. CHEFFO:  Okay.  Let's take a
22   two-minute break, please.
23        THE VIDEOGRAPHER:  We are going off
24   the record.
25        This is the end of Media Unit No. 4.

72 (Pages 282 - 285)

Page 286

1    The time is 3:36.
2    (A short recess was taken.)
3    THE VIDEOGRAPHER:  We are going back
4  on the record.
5    This is the start of Media Unit No.
6  5.
7    The time is 3:35.
8    You may proceed, Counsel.
9    MR. CHEFFO:  Thank you.
10    BY MR. CHEFFO:
11    Q.  Sir, would you look at Exhibit 1,
12  please, and turn to that chart on Page 4.
13    A.  This one, right?
14    Q.  Yes.  Thank you.
15    A.  Okay.  Yes.
16    Q.  I -- I'm not sure if I misheard, but
17  I just want the ask you a question or two about
18  the case numbers on the bottom.
19    Do you see that?
20    They're -- for each year there's a
21  number of cases listed?
22    A.  Oh, like 2006, 250?
23    Q.  Yes, sir.
24    A.  Yes.  Yeah.  Okay.
25    Q.  Do those numbers include suicides?

Page 287

1    A.  I don't think so, but I honestly
2  don't know that for certain.
3    Q.  They shouldn't though, right?
4    A.  I don't think they do.
5    Q.  Okay.  And why would you want to
6  exclude the suicides from that number?
7    MR. BADALA:  Objection to form.
8    THE WITNESS:  Kind of like a
9  different public health issue.  I would say
10  they can sometimes be interrelated because one
11  of the big risk factors for suicide is
12  substance abuse.
13    But in terms of trying to track the
14  overdose, you know, crisis in our county, we
15  wanted to focus more on the accidental
16  overdoses.
17    BY MR. CHEFFO:
18    Q.  And if they were included, that
19  would kind of unnecessarily and improperly
20  inflate the numbers from a apples-to-apples
21  comparison, right?
22    A.  It could.  I think they would be
23  dwarfed by the accidental data, just because
24  the majority of our suicides involve firearms
25  or hangings.  But it would -- say it wouldn't

Page 288

1  be as accurate if we were just wanting to talk
2  about accidental deaths if we had inadvertently
3  caught the suicides in there.
4    Q.  How many -- approximately how many
5  suicides per year are in Cuyahoga related to
6  ingestion of drugs?
7    MR. BADALA:  Objection to form.
8    THE WITNESS:  How many suicides --
9    BY MR. CHEFFO:
10    Q.  How many people kill themselves or
11  commit suicide by ingesting lawful or illegal
12  drugs?
13    A.  I don't know that.  We had 215
14  individuals last year who took their life.  And
15  that was a rise over other years, which would
16  be about 180 or so.  I know firearms account
17  for over half of that.  And hanging would be
18  another percentage.
19    So the drug overdoses, while not
20  zero, I -- I don't know the exact number.  But
21  those are sort of the bigger ones.  And drug
22  overdose I think is third in that list.  But
23  it's substantially behind firearms.
24    Q.  And has the -- has Cuyahoga brought
25  a lawsuit against the manufacturers of

Page 289

1  firearms?
2    MR. BADALA:  Objection to form.
3    THE WITNESS:  Not that I'm aware of.
4    BY MR. CHEFFO:
5    Q.  Have you -- are you aware of any
6  intention to do so?
7    A.  Has not been discussed with me.  So
8  no, I don't know.
9    Q.  Did you learn about opioids when you
10  were in medical school?
11    A.  Yes.  In pharmacology.
12    Q.  And even prior to medical school,
13  had you generally heard about opioids and
14  heroin addiction and abuse of opioids?
15    A.  I remember that heroin situation
16  that was -- I've mentioned a couple times in
17  the 1970s.  And that's probably -- I was a kid
18  back then.  But that's my earliest recollection
19  of opioids in that kind of a setting.
20    Q.  And in that early setting and in
21  your -- your law school days -- excuse me --
22    A.  Medical school.
23    Q.  Medical school.  Pardon me.
24    A.  I didn't make it to law school.
25    Q.  I -- I downgraded you.

73 (Pages 286 - 289)

Page 290

1    A.   Upgrade, I think.
2    Q.   -- did you learn that opioids had
3  the risk of addiction?
4    A.   Back in the 1970s or --
5    Q.   Back in the 1970s and also when you
6  went to medical school.
7    A.   Of, yes.  Sure.
8    Q.   And that was something that was
9  common knowledge amongst you -- you and your --
10  your colleagues and your professors, right?
11        MR. BADALA:  Objection to form.
12        THE WITNESS:  Yes.
13        BY MR. CHEFFO:
14    Q.   Do you remember, as a youth and
15  teenager and young adult, friends and family
16  members, parents perhaps, warning you, saying,
17  "Be careful.  Never get involved with heroin
18  because it can be addictive"?
19        MR. BADALA:  Objection to form.
20        THE WITNESS:  I think there was a
21  lot of messaging I remember as a kid about just
22  like don't use drugs.  Heroin would certainly
23  have been one of those drugs.  But there were
24  other things.  And maybe I just heard more the
25  marijuana and those things.

Page 291

1        But heroin I think would have been
2  in that mix of things, too, that we were
3  advised to stay away from.
4        BY MR. CHEFFO:
5    Q.   And I take it there's -- there's
6  never been a time, either then or in your life,
7  where you came to the view that opioids did not
8  have a risk of addiction, right?
9    A.   No.
10    Q.   It's been a view you've held and had
11  pretty much your whole adult life, right?
12    A.   Yeah.  Even back to being a kid, I
13  think, you know, that was kind of what I was
14  taught.
15    Q.   Have you met any -- any doctors that
16  have said that they don't believe that there's
17  a risk of addiction with opioid medicines?
18    A.   Not that I remember.
19    Q.   Would you think they were quacks if
20  they had that view?
21        MR. BADALA:  Objection to form.
22        THE WITNESS:  I -- I'd wonder about
23  what they were talking about, yeah.
24        BY MR. CHEFFO:
25    Q.   Going back for a minute to the --

Page 292

1  the hypothetical person that it posed, which is
2  the person who never received opioids at all,
3  and determined -- and never received
4  prescription opioids at all, and determined to
5  go out and use heroin or fentanyl and
6  overdosed.  Okay?
7        With respect to that person, could
8  you say, without knowing more, whether it's --
9  it's more likely than not that that person
10  became addicted or overdosed based on the
11  conduct of the defendants, or would you need to
12  know more?
13    A.   I would want to know more.
14    Q.   And what would you want to know more
15  in order to either validate your view one way
16  or the other?
17    A.   You know, where they got their drug
18  from; who they might have associated with; who
19  might have encouraged that use.
20        You know, to refer things back to
21  the defendants, then, you know, how are, you
22  know, those individuals potentially related to
23  opioid pain relievers.  You know, and, yeah,
24  the -- the availability of heroin, I would say,
25  you know, it probably -- time frame when you

Page 293

1  have that hypothetical person.  You know, we've
2  had a -- a big glut of heroin in our community
3  and more recently fentanyl.
4        So I think that those, again, can be
5  referred back, at least in part, to the actions
6  of the defendants.  And -- yeah.  Probably
7  those things.
8    Q.   Are -- are -- are fentanyl abusers
9  and heroin abusers interchangeable?
10    A.   It's a good question.  And I think
11  it's another one that we wanted to answer
12  actually, at least on our data.  So what we've
13  done in my office in terms of characterizing
14  them has been a couple of different things.
15        As I mentioned we've continued to
16  collect that death review data.  And one of the
17  projects that we just completed and will be
18  presenting at the American academy of forensic
19  sciences in -- next month involves kind of a
20  look at our 2016 heroin -- or pardon me --
21  fentanyl overdoses, comparing them back to our
22  2012 heroin overdoses in terms of the
23  demographic data.  So age, race, gender.  And
24  they're very similar.
25        We also looked at things like

74 (Pages 290 - 293)

Page 294

1  whether they received Naloxone, the antidote.
2  And unfortunately that was kind of similar too.
3       And we also looked at the percentage
4  of them who had a file with OARRS.  And that
5  was about 70 percent.  And of that, 90 percent
6  of them were people who had a prescription for
7  opioid pain relievers.
8       Q.   Well --
9       A.   So I think they're similar
10  populations, the 2012.  That's the point of our
11  research is the population of 2016 fentanyl
12  overdoses is a similar population to the heroin
13  overdose population that we saw at the
14  beginning of -- when we recognized first, you
15  know, that things were changing here.
16       And then I kind of have the feeling
17  that we want to be able to go back and look at
18  these populations independently before we make
19  assumptions about, oh, it -- it has to go back
20  to this, it has to go back to that.  I tried to
21  be -- think of -- more of a scientist than just
22  taking anecdotes on that.
23       Q.   You -- you would be wrong to just
24  take anecdotes and draw conclusions, right?
25       A.   You know, decision making I think is

Page 295

1  based on the best information you have.  But if
2  you have access to better information, I would
3  always try to use that.
4       Q.   Anecdotes is not a way to make
5  public policy, is it?
6       MR. BADALA:  Objection to form.
7       THE WITNESS:  Again, I -- I would
8  have to say, you know, when you're making
9  decisions, there are times when the only
10  information you have is largely anecdotal.  And
11  if it's compelling, I could see instances where
12  somebody might make a decision -- a policy
13  decision based on that and maybe revisit it to
14  kind of see does the data support that.
15       But sometimes you have to make the
16  best decision with the information you have in
17  front of you.
18       BY MR. CHEFFO:
19       Q.   Tell me about -- so have you
20  submitted this report for -- or study or --
21  what -- what is it?
22       It is a -- it is a publication, or
23  is it a --
24       A.   It's a --
25       Q.   -- a board?

Page 296

1       A.   -- national meeting in -- in -- in
2  Baltimore.  We submitted an abstract.  My
3  graduate student submitted an abstract.  I
4  don't remember the exact date.
5       Q.   Was it produced in this case?
6       A.   I don't know.
7       Q.   Well, did you give it to any of the
8  lawyers?
9       A.   A lot of the document production was
10  done with my operations officer.  So I don't
11  know if that was provided or not.
12       Q.   And -- and the abstract -- the
13  abstract -- so I want to -- you compared -- I
14  want to come back to this in one second.  I
15  think I had asked you a different question, but
16  I'm happy to -- to ask you some of these.
17       I was actually initially asking you
18  about whether people -- the population of
19  people who abuse heroin are similar to
20  fentanyl.
21       In other words, do people go out on
22  the street, let's say, and if they have a -- an
23  abuse problem, and they -- will they
24  interchangeably use heroin or fentanyl; or do
25  you know?

Page 297

1       A.   I think, you know, the answer to
2  that may be they don't know what they're
3  getting in some instances.  One of the programs
4  that the county's tried to introduce, because
5  of the lethality of fentanyl -- fentanyl is a
6  much more potent drug than heroin -- has been
7  to give to the users fentanyl test strips to
8  see if that drug is present in what they
9  purchased.
10       And I don't have data from Cuyahoga
11  County.  But there's data that says, from a
12  colleague of mine in Rhode Island, that it will
13  the change their behavior if they see fentanyl
14  is present.
15       I don't know if that was -- I got
16  off on a tangent, but --
17       Q.   No, no.
18       So -- so your -- is it your
19  testimony that you believe that often people
20  who use illicit fentanyl don't -- are not aware
21  that it's -- it's fentanyl, and they are
22  seeking heroin, and they wind up with fentanyl,
23  and it's more potent, so it's more dangerous?
24       A.   I can't speak to kind of some of the
25  motivations.  I do think that, you know, based

Page 298

1  on that information and applying it to our
2  community, we are at least, you know,
3  considering that possibility; that if an
4  individual knows something they thought was
5  heroin has fentanyl in it, it may change their
6  behavior.  That's the basis for the program.
7     Q.   And you told -- you just mentioned
8  that you did a -- a -- a look at 2016 data for
9  fentanyl users?
10    A.   Fentanyl -- people who died of
11  fentanyl overdoses, yes.
12    Q.   And you looked at the OARRS
13  database?
14    A.   We went back and looked at the OARRS
15  database for those individuals, yes.
16    Q.   And what were you looking for?
17    A.   Whether they had an OARRS file and
18  whether they had a -- what the file was for and
19  whether there was evidence of doctor shopping.
20    Q.   That was the -- that was the
21  hypothesis?
22    A.   The hypothesis for --
23    Q.   Well, what's -- what was the point
24  of this paper?  What were you trying to convey
25  to the reader?

Page 299

1     A.   The purpose of the research was to
2  take the fentanyl population -- overdose
3  population -- pardon me -- and see whether they
4  were similar or different than the heroin
5  overdose population that we had seen in 2012.
6  We actually used 2013 data for the OARRS
7  comparison because it was not the deidentified
8  data.
9        And, you know, as I say, there are
10 heroin epidemics without opioid pain relievers.
11 We've never really had a fentanyl epidemic --
12 we've never had a drug epidemic like fentanyl.
13       And I thought that it was an
14 important question to answer is the people who
15 overdosed on fentanyl in 2016, at a later phase
16 of the opioid crisis, similar to the people who
17 overdosed in 2012 on heroin?  Because we still
18 have intervention strategies, you know, that
19 are trying to address that --
20    Q.   Right.
21       And what --
22    A.   -- 2012 population.  And again,
23 limited resources, substantial worsening of the
24 crisis.  Want to make sure, yeah, we have the
25 right people.  So it was an important question

Page 300

1  to answer --
2     Q.   What factors were you --
3     A.   -- from my standpoint.
4     Q.   What factors were you looking at to
5  determine if they were similar?
6        Were you looking at who their
7  doctors were?
8     A.   Meaning who --
9     Q.   Who was prescribing it.
10    A.   Who was prescribing opioids or --
11    Q.   Yeah.
12    A.   We looked at the OARRS data, but we
13 didn't specifically look at the physicians who
14 were prescribing --
15    Q.   Did you look at why --
16    A.   -- other than to -- I'm sorry.  If I
17 could finish -- to see if there were people who
18 had five or more prescribers, the doctor
19 shopping folks.
20    Q.   So were you looking for reasons as
21 to why -- well, strike that.
22       Did -- were you -- tell us the
23 factors that you looked at to determine whether
24 there were similarities.
25    A.   We looked at age --

Page 301

1     Q.   Okay.
2     A.   -- race, gender, whether they had a
3  history of substance abuse before, whether they
4  were using intravenous drugs, whether Naloxone
5  had been administered by EMS.
6        We were looking at whether they had
7  had contact with the jail system.  We were
8  looking at whether they had contact with the
9  medical systems, the three major hospitals, in
10 addition to -- or I'm sorry -- the three major
11 hospitals.  And we looked to see whether they
12 had been enrolled in drug court, which was
13 information we could access.
14       I don't remember if -- we -- we saw
15 if EMS had responded to them and the number of
16 times EMS had administered Naloxone.  Because
17 that was relevant for our Project DAWN, the
18 Deaths Avoided With Naloxone.  Because what we
19 saw back in 2012 was that we were seeing a lot
20 of EMS responses, nearly, you know, 90,
21 95 percent, but only 25 percent were deemed
22 salvageable for EMS to administer Naloxone.
23       But an additional 50 percent of
24 those people died in proximity to somebody
25 else.  So they were either using drugs with

76 (Pages 298 - 301)

Page 302

1  somebody else in the minority of cases, or they
2  had an instance where there was somebody -- and
3  we would hear these heartbreaking stories of
4  somebody who would come home intoxicated; they
5  looked high; they went to bed; they were
6  storing like crazy; kept everybody up; and then
7  they stopped snoring; and, you know, they'd
8  find them dead in the morning.
9       And when they stopped snoring, they
10  were dying.  That's when they needed Naloxone.
11  So that was data that was used to support our
12  Naloxone program.  So we looked at that so --
13  as a factor as well.
14    Q.   What -- what did you look at -- I
15  want to -- I want to be very specific on these.
16  So if you could just tell me the specific
17  answer.  I'll go through each one.
18       To determine someone's substance
19  abuse history, what did you do to make that
20  determination in both years?
21    A.   We would rely on -- if there were
22  arrest records, that was one piece.  We would
23  also -- interviews at the scene by my
24  investigator, whether somebody had a history of
25  substance abuse.

Page 303

1    Q.   Anything else?
2    A.   I think those were the big
3  information streams that we used for that
4  determination.
5    Q.   And -- and in many determinate --
6  were you able to determine what -- what -- the
7  rate of uncovering whether they had substance
8  abuse treatment?
9    A.   Treatment we went back and looked at
10  the public data through the ADAMHS -- the
11  Alcohol and Drug Addiction Mental Health
12  Services -- data.  That was furnished us to
13  because it's public.  There were private
14  treatment facilities here.
15       And as these charts would be
16  abstracted, we would look at whether they had
17  the public data and also whether there was
18  anything in our history taking at the scene
19  that suggested, oh, they're not going to show
20  up on the public data because they went to a
21  private treatment facility.
22    Q.   And ADAMHS data is substance abuse
23  data that's public?
24    A.   I don't know.  I mean we had access
25  to it as part of our collaboration and task

Page 304

1  force.
2    Q.   Did -- did you just say --
3    A.   I think that was --
4    Q.   -- it was public?
5    A.   I might have misspoken on that.  We
6  had access to it --
7    Q.   Okay.
8    A.   -- is what I would say.  I would
9  think probably those things would be protected
10  by HIPAA and other things.  You can't tell
11  people who was in drug treatment.
12       We were working, as part of our task
13  force, with those folks.  So we had that
14  access.  But I -- I think you're right that
15  that certainly wouldn't be something that --
16    Q.   So --
17    A.   -- we'd consider public data.
18    Q.   So you --
19    A.   They're public institutions, I would
20  say.
21    Q.   So you looked at data to determine
22  whether somebody was in drug treatment for
23  years, 2013 and 2016, as part of your paper?
24    A.   It's part of our public health
25  intervention.  And then this is the data we're

Page 305

1  going to present.
2    Q.   Okay.  And to determine if they ever
3  were an intervenous drug user, was that largely
4  by visual examination?
5    A.   Again, the two things.  Obviously if
6  we had somebody who had a puncture site on
7  them, we could, you know, rule out whether that
8  was a therapeutic thing from EMS, if we could
9  do that; and if it wasn't, then we would infer
10  from that that they were intravenously using
11  drugs.
12       The scene also could give us
13  indications both whether syringes were present
14  as well as the information of other individuals
15  at the scene.
16    Q.   Okay.
17    A.   So we try to collect as much data
18  from different streams as we can.
19    Q.   What about Naloxone use; how did you
20  determine that?
21    A.   That would be record -- recorded by
22  EMS in their response to these tests.  We get
23  an EMS run sheet for all the deaths where EMS
24  responds.  They come to our office.  And the
25  drug overdoses would be a subset of that.

77 (Pages 302 - 305)

Page 306

1    Q.   And you matched those individually
2  to various people?
3         You got the records, and they said
4  John Smith, Naloxone treatment, and you match
5  it to an overdose death in your office?
6    A.   Maybe I should back up.
7         When we're investigating a death in
8  our office, if there was an EMS response, we
9  would request and obtain the EMS run sheet as
10  part of our practice, drug overdoses or other
11  things.  So in abstracting a chart to kind of
12  pull the data out of it, we would be able to
13  see, you know, an EMS run sheet, did they
14  respond.
15    Q.   I'm -- so you've heard the term
16  "garage in, garage out," right?
17    A.   Yeah.
18    Q.   Right.
19         So you've told me you've done this
20  publication, right?  And you've told me there's
21  varied data points that you're using to try to
22  draw some comparisons.  And we haven't seen
23  this, to my knowledge, paper.  It hasn't been
24  produced.
25         So I'm just trying to under --

Page 307

1    A.   It's not a paper, sir.  I'm sorry.
2  It's an abstract we submitted for presentation.
3    Q.   Well, what -- what's the difference?
4    A.   I think of a paper as, you know,
5  something like we had there.
6    Q.   So what's an ab -- is it like a
7  board at a medical conference?
8    A.   I -- I didn't understand the
9  question.
10    Q.   What is it, like a board at a
11  medical conference; or is it on paper, a
12  written document?
13    A.   It's a abstract.  It's a written
14  document that we submitted to the meeting that
15  we had, and that's our latest data.
16         I don't know, you know, what was
17  supplied to you.  But certainly, you know, I
18  can supply that to our attorneys --
19    Q.   Okay.
20    A.   -- when I get back to the office.
21    Q.   Well, let me just continue asking
22  questions.
23         You said you -- in order to -- what
24  I -- what it sounds like you were trying to do
25  was to draw some comparisons between a

Page 308

1  population in 2013 and something in 2000 --
2  group of people in 2016, and you thought that
3  there was some parallels, right?
4         That's your conclusion?
5    A.   Yes.  The populations are --
6    Q.   Okay.
7    A.   -- very similar.
8    Q.   And then to try to look at them, you
9  -- you -- you identified a number of factors.
10  And that's what I'm just trying to understand
11  as to how you got to those factors, right?
12         We've talked about substance abuse.
13  Talked about intravenous.
14         Now, Naloxone, is it only from the
15  EMS record of -- you know, these are -- these
16  are overdoses -- when someone died; or did you
17  get additional records of prior Naloxone
18  administrations?
19    A.   Oh, you mean from Project DAWN or
20  something, if I'm --
21    Q.   No.
22    A.   -- understanding you right?
23    Q.   If -- if John Smith had previously
24  been -- had overdosed and been revived with
25  Naloxone.

Page 309

1    A.   We would potentially capture that in
2  the contact with the medical systems.  But for
3  the Naloxone, as I'm conveying it to you,
4  that's their terminal event.
5         So did EMS respond?  And if EMS
6  responded, did they administer Naloxone?
7  That's the data set that I'm referring to.
8    Q.   And how did you find out if they had
9  any contact with any jails?
10    A.   One of the original members of our
11  poison death review committee was a
12  representative of our sheriff's office.  And
13  they would basically search their records as
14  the oversight for the jail to see if these
15  folks had been incarcerated.
16         Being in jail is a risk factor for
17  opioid overdose in the abusers because they can
18  lose their tolerance.  That's why we opted to
19  look at that.
20         We also wanted to look at it because
21  they're truly a captive audience.  And we
22  thought that, if we identified them, we could
23  potentially, if it was a significant
24  percentage, do some risk reduction education.
25         So actually everybody who leaves the

78 (Pages 306 - 309)

Page 310

1  justice center over there gets a letter from me
2  about risk reduction strategies around opioids.
3      Q.  Doctor, I'm -- I'm just trying to
4  understand about -- you're -- you're giving a
5  lot of speeches now.  And I know you're looking
6  to the camera, and you're giving a speech.
7          But I'm asking you very specific
8  questions about a report that we haven't seen,
9  and I've limited time.  Okay?  So I'd like you
10  to -- to focus, if you can, on my questions.
11      MR. BADALA:  He's answering your
12  questions.
13      BY MR. CHEFFO:
14      Q.  Now, I asked you how you got the
15  information from the drug court.  You told me
16  somebody who sits on a task force had access.
17          Did that person get a name of all of
18  -- did you give them a list of the names of all
19  the people in 2013 and 2016 and ask them to go
20  and run them in a database?
21          Is that how it worked out?
22      A.  Yes.  We would furnish our list of
23  fentanyl overdoses and run those through a
24  database to see if they matched with people in
25  drug court or in the jail.

Page 311

1      Q.  Who did that?
2      A.  Who did the --
3      Q.  Yeah.  Who was the person who -- who
4  used the criminal justice database to do that
5  and then provided that information to you?
6      A.  It was somebody in the sheriff's
7  office.  I don't have a name to give you.
8      Q.  Well, who's the person who sat on
9  task force with you that authorized that?
10      A.  I think his name was Miguel
11  Caraballo.  But that would have been in 2013.
12  Otherwise, we've been collecting this data not
13  face to face anymore.  2013 we met, we went
14  over the 194 overdoses face-to-face.  And that
15  information was provided by somebody from the
16  sheriff's office.
17          There are minutes of those that I
18  believe were furnished.  And that person would
19  be in the minutes.
20      Q.  Okay.  And did you -- did you
21  disclose to them that you were going to be
22  using this data for an abstract that you were
23  going to be sending outside of Cuyahoga?
24      A.  I don't think so.
25      Q.  And did -- you also access EMS data?

Page 312

1      A.  Right.  The EMS run sheets.
2      Q.  And who -- who's -- who's the person
3  whose -- what -- what organization did you send
4  this abstract to?
5      A.  The abstract representing was sent
6  to the American Academy of Forensic Sciences.
7      Q.  And who's the person there that you
8  deal with?
9      A.  There is a submission abstract.  I
10  don't know who receives that.  Then those are
11  reviewed by different sections.  So my section
12  is pathology, biology.  And it would have been
13  reviewed, and it - it was accepted.
14      Q.  When did you send this abstract in?
15      A.  In the fall, I think.  I don't
16  remember the date specifically.
17      Q.  September, October?
18      A.  I don't remember the date.  I'd have
19  to check.
20      Q.  Did you do any revisions to the
21  abstract?
22      A.  No.  We -- we sent it.  And then,
23  you know, it's their decision after that.  They
24  don't send it back to you and say, "Revised
25  this," or "Add this."

Page 313

1      Q.  Was it peer reviewed?
2      A.  It's not a publication.  So there's
3  a selection committee for these various
4  organizations.  And I don't know the details of
5  what goes into the selection of the papers.
6          I haven't served in my own capacity
7  as a member of AAFS or name in that capacity.
8  So I don't know what went into the selection
9  process.
10      Q.  And how was it presented?
11          Is it presented through a
12  PowerPoint?  Is it a speech?  Is it a board
13  like they do at medical conferences?  Or do you
14  hand people out your abstract?
15      A.  It's an abstract now.  It was
16  accepted to be a poster presentation, but the
17  poster's not been created.
18      Q.  I say "board."
19          That -- so you understood -- you
20  call it a poster?
21      A.  Oh, poster.  Yeah.
22      Q.  Right.
23          You've seen those where they
24  basically put the big -- one big poster up,
25  right, and you stand by it and you talk about

79 (Pages 310 - 313)

1 it?
2     Is that --
3    A.  Right.
4    Q.  -- what we're talking about?
5    A.  That's what we will ultimately be
6 doing in February.  The poster itself though
7 hasn't been created.
8    Q.  Who are the other authors on this
9 poster abstract?
10    A.  My student who collected data and
11 analyzed it was Vaishali -- and that's
12 V-A-I-S-H-A-L-I -- Deo, D-E-O, MD.  And she is
13 a student in the Case Western Reserve School of
14 Public Health.
15    Q.  And in connection with any of these
16 people, did you -- did you talk to any of the
17 doctors who prescribed the opioids?
18    A.  The fentanyl overdose --
19    Q.  Yes.
20      So I understood --
21    A.  That we --
22    Q.  -- one of the things you did was to
23 look at the -- the overdoses and, amongst other
24 factors, you checked the OARRS database to
25 determine if there was a prescription at some

1 point, right?
2    A.  That's right, yes.
3    Q.  And how far back did you go?
4    A.  As far back as the database would
5 let us, which I think changed to three years
6 for this study.
7    Q.  So you looked to see if there was a
8 -- a -- an entry for -- in OARRS for any type
9 of controlled substance, or were you only
10 looking for opioids?
11    A.  Both.  So the 70 percent number that
12 I quoted was for any OARRS file, so any
13 controlled substance.  And the 90 percent of
14 that, so 63 percent of the total, was for
15 prescription opioids.
16    Q.  And you didn't talk to any doctor as
17 to why they were prescribed, right?
18    A.  No.  We didn't do that follow-up.
19    Q.  You didn't look as -- as to the
20 basis for the prescription, did you?
21    A.  No.  It wouldn't have been in the
22 database.
23    Q.  You didn't look at whether it was
24 received from a pill mill, did you?
25    A.  I don't think, you know, we could

1 tell that from the database.
2    Q.  Well, you looked at a lot of
3 different databases.
4      You did -- there's -- in all of your
5 analysis, you didn't -- you didn't check any
6 databases or talk to anyone about why a
7 particular doctor wrote a prescription, did
8 you?
9    A.  No, we did not.
10    Q.  You didn't look at any medical
11 records, check any databases, talk to anyone as
12 to why that prescription was written for a
13 particular patient, did you?
14    A.  There were medical records that we
15 were accessing about treatment.  I don't know
16 that they specifically talked about why opiates
17 would have been prescribed.  We weren't looking
18 at that --
19    Q.  Did you --
20    A.  -- data point.
21    Q.  That wasn't a factor, was it?
22    A.  Huh?
23    Q.  That wasn't a data point, was it?
24    A.  It wasn't a data point we were
25 looking at, no.

1    Q.  You didn't -- and couldn't determine
2 whether the opioids were written after somebody
3 first started using fentanyl, could you?
4    A.  No.  We could just look back and see
5 what percentage of the people who died of a
6 fentanyl overdose had received a prescription
7 for an opioid or a controlled substance through
8 OARRS.
9    Q.  Did you compare how many people were
10 incarcerated prior to receiving the
11 prescription in OARRS?
12    A.  I don't think we went into that
13 level.  We identified the number of people who
14 had been incarcerated, again as an intervention
15 point potentially for public health education.
16 I don't -- we didn't look at their timing of
17 OARRS relative to their incarceration --
18    Q.  Did you look at --
19    A.  -- though --
20    Q.  Sorry.
21    A.  We didn't look at the timing of
22 their incarceration relative to their
23 prescribing, no.
24    Q.  So they could have been in jail well
25 before they received a prescription or not; you

Page 318

1   just don't know.
2       That wasn't a data point, was it?
3       A.   I don't know.
4       Q.   And you didn't determine whether
5   they had actually had an overdose and received
6   Naloxone before they ever received the OARRS
7   prescription, did you?
8       A.   And if I understand your question,
9   whether they'd had an overdose, been revived
10  with Naloxone, and then subsequently received
11  another prescription?
12      Q.   Right.
13      A.   No.  We didn't look at that
14  specifically.
15          I can say, you know, we didn't look
16  at that in 2012 either.  So we wanted to keep
17  the population that we studied in 2012, the
18  data we were getting in 2016, as close to that
19  as we could so we could do comparisons.
20      Q.   Right.
21          If -- if you were looking at whether
22  someone had received addiction treatment, that
23  was one of the things -- treated for substance
24  abuse, right?
25      A.   Right.  Rehabilitation treatment,

Page 319

1   detox, those things.
2       Q.   You didn't look at whether they
3   received detox or substance abuse treatment
4   prior to receiving a prescription for an opioid
5   from a doctor, right?
6       A.   We didn't specifically look at that
7   time line, no.
8       Q.   And you didn't do that because you
9   know it would have shown that a lot of these
10  people actually had long histories of drug
11  abuse prior to ever getting a prescription from
12  a doctor that was listed in OARRS, right?
13      A.   No.  I wouldn't characterize.  We
14  were just trying to collect information.  I'm
15  not trying to find out, you know, what -- as I
16  understood your question, I'm not trying to
17  hide anything there.
18      Q.   But you had information that would
19  have clearly showed that people had had
20  substance abuse treatment prior to ever
21  receiving an opioid that was listed in the last
22  two or three years in the OARRS database,
23  right?
24      A.   We didn't parse it to that level.
25  So it --

Page 320

1       Q.   Did you say that?
2       A.   It's certainly possible.
3       Q.   Did you say that?
4           Did -- I mean -- let me ask you
5   this:  When you looked for drug abuse
6   treatment, did it go back more than two or
7   three years?
8       A.   I don't recall.  We got the data
9   from ADAMHS and -- I don't remember.  It's
10  certainly possible.  Could have gone back
11  further than that.
12      Q.   Right.
13          And did you say, "By the way, it
14  could be misleading if you think that what
15  we're saying to you is someone actually took an
16  opioid and then had treatment, when, in fact,
17  they had treatment five years before they ever
18  got an opioid"?
19          Wouldn't that have been something
20  that you'd want to convey to your -- your- -
21  your consuming public?
22          MR. BADALA:  Objection to form.
23          THE WITNESS:  As I say, all
24  information's valuable.  We didn't look at
25  that.

Page 321

1           BY MR. CHEFFO:
2       Q.   Well, are you going to do that now
3   that you've kind of thought of that issue so
4   that no one is misled?
5           MR. BADALA:  Objection to form.
6           THE WITNESS:  As it stands now, we
7   wanted to compare 2016 data to 2012 data.  And
8   I don't have the staff right now to do that.
9   As I say, it could be a very interesting piece
10  of information to know.  But I -- I can't tell
11  you I'm leaving here and going back to do it
12  because I don't have the resources, given
13  everything else that's going on in our county.
14          BY MR. CHEFFO:
15      Q.   You had the resources to do the
16  poster, right?
17      A.   I mentored a graduate student to do
18  this poster and the research for it.
19      Q.   Do you stand behind it?
20          Is it accurate?
21          MR. BADALA:  Objection to form.
22          THE WITNESS:  Is what accurate?
23          BY MR. CHEFFO:
24      Q.   Did you lend your name and
25  reputation to this board, or is it just

81 (Pages 318 - 321)

1 something that a student did on a frolic and
2 detour?
3     A.    No.  It's a legitimate scientific
4 study.
5     Q.    And you want it to be as accurate as
6 possible, right?
7     A.    Sure.
8     Q.    You don't want it to mislead anyone,
9 do you?
10     A.    No.
11     Q.    And if you thought it would be
12 misleading, you would want to correct it,
13 right?
14     A.    I have to do what I can do.  I
15 wouldn't want to mislead anybody.  And I think,
16 you know, what you talk about -- you know, if I
17 look at addiction as a chronic relapsing
18 illness, maybe people were in treatment, did
19 well, then relapsed later and started to abuse
20 opioid pain relievers.  I don't know that.
21         I'm capturing a data set and sharing
22 it.  I don't, you know, proffer this as the
23 final word on everything.  It's valuable
24 information to move a discussion forward.
25         And I don't think it's my intent to

1 mislead anybody.  I'm certainly not trying to
2 do that.  I'm trying to do my best to
3 characterize two populations of people who
4 overdosed and say that they are similar so the
5 prevention strategies that were formulated back
6 in 2013 when we had this data, 2014, 2015, are
7 still potentially applicable to the population
8 we're dealing with now who overdosed on
9 fentanyl in 2016.
10     Q.    But in order to find out if they're
11 similar, you have to ask the right questions,
12 right?
13         MR. BADALA:  Objection to form.
14         BY MR. CHEFFO:
15     Q.    You can't be result oriented, can
16 you?
17     A.    I -- I didn't hear the beginning
18 of --
19     Q.    In order to --
20     A.    -- your question.
21     Q.    -- to find out if they are, in
22 fact, popular -- similar, you can't be result
23 oriented, right?
24         You have to be fair and neutral and
25 scientific about the comparison, right?

1     A.    And I think we were.
2     Q.    Okay.  And you're going to produce
3 that -- that document and the drafts to your
4 lawyer, right?
5         You -- you can find that?
6         MR. BADALA:  Objection to form.
7         We'll take it under consideration if
8 it hasn't been produced already.
9         MR. CHEFFO:  Okay.
10         MR. BADALA:  You're assuming it
11 hasn't been produced.
12         MR. CHEFFO:  I am assuming that.
13 And it's -- it's -- if it is, then I apologize.
14         MR. BADALA:  According --
15         MR. CHEFFO:  I haven't --
16         MR. BADALA:  Same --
17         MR. CHEFFO:  -- found it.
18         MR. BADALA:  Yeah.
19         BY MR. CHEFFO:
20     Q.    All right.  Let me ask you a few
21 other questions just on resources.
22         Is there a time that you've asked
23 for additional resource from your boss in order
24 to do the function that you think your office
25 needs to do and they have been denied?

1         MR. BADALA:  Objection to form.
2         THE WITNESS:  I think our
3 administration's been supportive.  And they may
4 not have said yes right away.  But I think,
5 when I've asked for additional personnel or
6 staff -- pardon me -- staff or instrumentation,
7 that they were very responsive.  I'm pleased
8 with, you know, how responsive they have been.
9         BY MR. CHEFFO:
10     Q.    And do you think that we're past the
11 peak of the fentanyl issues in Cuyahoga?
12     A.    I think it's too early to say.
13     Q.    Where is the trend going?
14     A.    The trend's going downward.  But in
15 2015 -- or 2014, as you -- 2015 -- I'm sorry --
16 the heroin trend went down, and then we saw a
17 fentanyl trend emerge.
18         And I don't know that the fentanyl
19 trend, I would be willing on one year of data,
20 to say we're out of the woods.  I don't think
21 any of us said that at the press conference
22 either.  We -- a lot of work to do.  But it was
23 encouraging to see it headed in that direction.
24     Q.    Are you going to devote more
25 resources to cocaine?

82 (Pages 322 - 325)

Page 326

1    MR. BADALA: Objection to form.
2    THE WITNESS: What resources are
3 you --
4    BY MR. CHEFFO:
5    Q.   Are -- are -- is your department
6 going to devote more resources in understanding
7 the cocaine epidemic that you have and how to
8 fix it --
9    MR. BADALA: Objection to form.
10    BY MR. CHEFFO:
11    Q.   -- or address it?
12    A.   We continue to monitor the drug
13 supply through our drug chemistry laboratory.
14 We continue to do our autopsy work on any
15 suspected drug overdose.
16    I don't see analogs of cocaine
17 emerging. So I think the resources that we're
18 doing for drug overdose investigations cover
19 the cocaine surge. We've gotten adequately
20 staffed again.
21    I don't know what other resources I
22 would allocate to that, as I think we're
23 sufficiently addressing it now. It's just, you
24 know, it wasn't a good thing to see it rise
25 again.

Page 327

1    Q.   All right. I just have another
2 question or two, and then I'm going to turn it
3 over to my colleagues.
4    Is there a -- is there a person
5 who's in charge of databases and kind of
6 information management in your office?
7    A.   We have a centralized IT department
8 for the county. And we have in-house people
9 who at one time were my employees; but now,
10 when the county charter reform took place, they
11 became centralized. The whole department
12 became centralized.
13    They would maintain our medical
14 examiner database. They would also maintain a
15 separate database for our crime laboratory.
16 It's -- we can't get the two of those in one
17 package, actually.
18    MR. CHEFFO: Okay. Thanks, Doctor.
19    I'm going to pass you over to my
20 colleague.
21    Let's go off the record for a
22 minute.
23    THE VIDEOGRAPHER: We -- we are
24 going off the record.
25    This is the end of Media Unit No. 5.

Page 328

1    The time 14:27.
2    (A short recess was taken.)
3    THE VIDEOGRAPHER: We are going back
4 on the record.
5    This is the start of Media Unit No.
6 6.
7    The time is 4:40.
8    You may proceed, Counsel.
9    EXAMINATION BY COUNSEL FOR DEFENDANT
10    AMERISOURCEBERGEN
11    BY MR. BORANIAN:
12    Q.   Good afternoon, Dr. Gilson.
13    A.   Good afternoon, sir.
14    Q.   You've talked today and before quite
15 a bit about the medical examiner's office's --
16 office's use of the OARRS database. And I just
17 have a couple of follow-up questions on that.
18    The first thing is that are you able
19 to designate delegates to access OARRS data on
20 your behalf?
21    A.   Yes, I am.
22    Q.   And who are those delegates
23 currently?
24    A.   Hugh Shannon, Dr. Deo, and I think
25 our new epidemiologist, Manreet Bhullar,

Page 329

1 B-H-U-L-L-A-R.
2    Q.   And who is Hugh Shannon?
3    A.   Hugh Shannon is my chief of
4 operations administrator. He -- his name --
5 his title's changed. He's my chief of
6 operations though. He oversees the
7 nonlaboratory and nonmedical staff part of the
8 operation.
9    Q.   How long has Mr. Shannon been with
10 you?
11    A.   I arrived in Cuyahoga County in June
12 of 2011. He's been here the whole time with
13 me. It's my understanding he only got there a
14 few weeks before me. I don't remember his
15 exact start date.
16    Q.   Who is Dr. Deo?
17    A.   Dr. Deo is a research assistant to
18 me. She is currently enrolled in the Case
19 Western Reserve University master of public
20 health program. She is an MD from previous
21 schooling, but she was going back for that.
22    Q.   Is she an employee of Cuyahoga
23 County?
24    A.   No, she is not.
25    Q.   And the epidemiologist, is it Dr.

83 (Pages 326 - 329)

Page 330

1  Bhullar?
2     A.  Ms. Bhullar.
3     Q.  Ms. Bhullar.
4     A.  She's also --
5     Q.  And who is she?
6     A.  -- another epidemiologist -- or
7  pardon me -- a master of public health student
8  from Case Western Reserve University.  And she
9  is an employee.  We hired her on a grant.  So
10  she is a Cuyahoga County employee for at least
11  a month or so.
12     Q.  Have you had any other delegates?
13     A.  Erin Worrell, who was one of my
14  investigators -- I don't know if she still has
15  the access or not -- is only the other one I
16  can think of right now.
17     Q.  And Ms. Worrell is an investigator
18  in your office, correct?
19     A.  She's one of my senior
20  investigators, yes.
21     Q.  And also a county employee, correct?
22     A.  Also a county employee, yes.
23     Q.  All right.  Now, again, we've
24  discussed quite a lot the office's use of the
25  OARRS reports.

Page 331

1        And without regard to whether
2  they're printed or downloaded or -- or whatever
3  where -- where is the information that your
4  office gleans from the OARRS reports recorded?
5        And clearly you've done analysis
6  with those data, true?
7     A.  Yes.
8     Q.  So even if the reports are not
9  physically printed aged put in some file in
10  some organized fashion, where is the data
11  gathered once gleaned from the OARRS database?
12     A.  We have a data sheet, a kind of a
13  model form, that we use for our opioid
14  investigations in general.  The OARRS data is
15  recorded as part of that data sheet, data
16  analysis.
17        And I believe we have an electronic
18  database for that now where the OARRS data
19  would be entered for -- you know, whether we
20  have a doctor shopping situation, whether we
21  have -- well, I guess whether we have a file at
22  all, whether there is, you know, opioids
23  prescribed.
24        And I think we're still tracking the
25  benzodiazepines.  And then we also have a track

Page 332

1  for doctor shopping.  I don't think we
2  necessarily keep individualized data for that.
3  I don't -- I don't know at that level.
4     Q.  Who maintains that database?
5     A.  The agency.
6     Q.  The agency.  Okay.
7        Who would know where that database
8  is and how it's maintained?
9     A.  Probably a better question for my
10  operations officer.
11     Q.  Mr. Shannon?
12     A.  Mr. Shannon, yes.
13     Q.  Now, it's your understanding that it
14  became mandatory in 2015 for prescribing
15  physicians to check OARRS when prescribing
16  controlled substances; is that right?
17     A.  Yes.  I think there was a
18  requirement for a check if the prescription was
19  going to be longer than seven days.  Or there
20  was a requirement for the check every 90 days
21  thereafter.  That's my understanding of it.
22        But if somebody was prescribing
23  opioids in the hospital, for example, after
24  surgery, they didn't have to check the OARRS
25  database, is my understanding of it.

Page 333

1     Q.  Did it become mandatory in 2016 for
2  pharmacies to check OARRS when dispensing
3  controlled substances?
4     A.  That's my understanding of that,
5  yes.
6     Q.  And regardless of those
7  requirements, it's mandatory for pharmacies to
8  report the dispensing of controlled substances,
9  right?
10        MR. BADALA:  Objection to form.
11        THE WITNESS:  As I understand how
12  the database was created, that was data that
13  was collected from the pharmacies initially to
14  create the database.  And then at a point
15  subsequent to that, and I want to say a couple
16  years after that, it became mandatory for
17  doctors' offices who were giving out controlled
18  substances from the office also to enter that
19  as a data point as well.
20        BY MR. BORANIAN:
21     Q.  When did it become -- well, strike
22  that.
23        When was it required for pharmacies
24  to report dispensing information to OARRS, if
25  you know.

84 (Pages 330 - 333)

Page 334

1    MR. BADALA:  Objection to form.
2    THE WITNESS:  As I understand it,
3  when it started.  But I -- I don't want to be
4  certain about that.  I thought they had to
5  prescribe -- share that information to create
6  the database.
7    BY MR. BORANIAN:
8    Q.   Let me ask you about death
9  certificates a little bit.
10       The death certificate includes both
11  the cause of death and a manner of death; is
12  that right?
13    A.   That's correct.  Yes.
14    Q.   So is it then part of a medical
15  examiner's job to certify both the cause of
16  death and the manner of death?
17    A.   Yes.  That would be our statutory
18  responsibility to do that.
19    Q.   So if a -- a forensic pathologist or
20  one of your colleagues or if you yourself --
21    A.   They're all forensic pathologists --
22    Q.   Very well?
23    A.   -- in my office who would be doing
24  the certifications.
25    Q.   Okay.  If -- if any one of those

Page 335

1  professionals determines to a reasonable degree
2  of medical certainty that a particular drug or
3  substance was a cause of death, do you then
4  name that particular drug or substance in the
5  cause of death line on the death certificate?
6    A.   Yes, we do.  In fact, that's a good
7  question.  Because one of the things I think
8  that was a problem statewide was people were
9  not doing that.
10       I had one doctor in my office who
11  had come up from Texas who also didn't
12  routinely do that.  And we gave him the nudge
13  that we needed to do that.  Because I think
14  that's important information to track.
15       And I also sit on the board of
16  directors for the State Coroner's Association
17  and made that recommendation through them, too,
18  to the elected coroners throughout our state.
19    Q.   There are cases where there are
20  multiple drugs presents in the tux [sic] -- in
21  the tox reports, correct?
22    A.   Yes.
23    Q.   So the drugs then -- in such a case,
24  the drugs that you list in the cause of death
25  space on the certificate, are those drugs that

Page 336

1  you have determined to be the cause of death?
2    A.   The combined effects of them.
3  That's usually the wording that we'll use.  But
4  they are all contributing to the cause of
5  death.
6    Q.   Now, once you have determined that
7  an opioid death has occurred, how is that --
8  well, you enter it on the death certificate,
9  correct?
10    A.   Right.  Okay.
11    Q.   And how is that recorded or coded
12  otherwise in the department?
13    A.   I'm not sure I understand your
14  question.
15    Q.   Well, is -- you've been -- you've
16  run reports and statistics over the years on
17  overdose deaths and other kinds of deaths.
18       There must be some database from
19  which you draw that information, right?
20    A.   Oh, sure.  Yes.
21    Q.   So then how is -- you know, once
22  you've determined that there's been an
23  opioid-related death, you know, how is that
24  coded and then entered into a database?
25    A.   We have a -- an office data system

Page 337

1  for the medical examiner side called VertiQ.
2  And the cause of death will be entered into
3  that.  And that's, you know, potentially
4  searchable database back through 2006.  And
5  that would be the repository of our cause of
6  death information.
7    Q.   I see.
8       So -- and when did that coding
9  process begin?
10    A.   I think the office has always
11  maintained cause of death information.  That
12  system was implemented I want to say in
13  about -- it was before my time -- 2006, 2007.
14       Prior to that our office has
15  traditionally really put out a statistical
16  report for 75 years.  There were other ways of
17  tabulating cause of death information, but I
18  don't know what they were.
19    Q.   Can a toxicology report distinguish
20  between different kinds of opioids?
21    A.   Oh, pardon me.
22       Yes, it can.
23    Q.   And is that captured in the --
24    A.   Well, the --
25    Q.   -- database that you're --

85 (Pages 334 - 337)

Page 338

1    A.  -- testing can.  I mean the report's
2  reporting the testing.  But yes, it can.
3    Q.  Very well.
4        And is that information then
5  captured and -- and input into the database
6  you're describing?
7    A.  Yes, it is.
8        We also have a separate toxicology
9  database called Pathways, which was an in-house
10  development.  And that tracks toxicology data,
11  all of it, like whatever's positive.
12        The VertiQ system that I mentioned
13  would track the relevant drugs as they impact
14  cause of death but wouldn't necessarily track
15  all of the other drugs that might have been
16  detected, say if there was a car crash or
17  something else.  But we can access that
18  information as well.
19    Q.  When there are multiple factors that
20  contribute to a death, do you determine a sort
21  of principal or leading cause of death?
22    A.  Well, on a death certificate there
23  are two areas that relate to cause of death.
24  So one is called "cause of death," and that
25  would be the injury or disease which would be

Page 339

1  the primary disturbance to the person's, you
2  know, physiology that results in their death.
3        And then we're also asked to make
4  contribution -- if there are other significant
5  contributions.  And these would be other
6  conditions -- they're called "other significant
7  conditions," which in and of themselves don't
8  cause death, but they make death more likely to
9  occur.
10        And the example I give for visiting
11  residents and student is, if you have heart
12  disease, atherosclerosis, that can cause your
13  death.  If you also have diabetes with it,
14  which a lot of people do, it doesn't cause
15  atherosclerosis, but it accelerates the rate
16  that it forms.
17    Q.  And how do you go about determining
18  the -- I think you said principal disturbance?
19        What's the process you go through,
20  the method yo go through to -- to distinguish
21  that from other potential causes of death?
22    A.  The whole death investigation.  And
23  then, you know, our clinical judgment, our
24  medical judgment.  So that we would, you know,
25  take into account scene investigation, autopsy

Page 340

1  findings, microscopy that we might conduct, any
2  of the toxicology information.  Potentially
3  other ancillary studies might be relevant to
4  that as well.
5    Q.  So is it fair to call it a matter of
6  judgment based on the information you had
7  available to you?
8    A.  I -- I think it's ultimately, you
9  know -- a medical death cert -- a death
10  certificate's a medical opinion as to a, you
11  know, cause of death based on the evidence that
12  we've reviewed, yeah.
13    Q.  And coming to that cause of death
14  involves clinical and medical judgment, right?
15    A.  Yes.  I mean all of the forensic
16  pathologists in the office are medical doctors.
17  And they've had training, on top of their
18  medical school education, specifically in death
19  investigation and writing death certificates.
20  We also have a training program in our office
21  as well.
22        MR. BORANIAN:  I'm going to mark
23  this large set of sheets as Exhibit No. 5.
24        I think the stickers are down there.
25        (Deposition Exhibit 5 was marked for

Page 341

1  identification.)
2        BY MR. BORANIAN:
3    Q.  So, Dr. Gilson -- I need my glasses
4  for this one.
5    A.  I'm taking mine off actually.
6    Q.  Okay.  We have opposite problems,
7  you and I.
8        So this is the first ten pages of a
9  voluminous spreadsheet which was produced under
10  the Bates number Cuyahoga 000099975.  And the
11  title of this set of data is 2000 -- I'm
12  sorry -- "CCMEO 2006 to 2017 Overdose Data."
13        And I have the whole spreadsheet on
14  a flash drive.  But I printed the first ten
15  pages because I really have just general
16  questions about these data and what the various
17  columns are and so forth.
18        First of all, can you tell me what
19  these data represent?
20        Do you know what this is?
21    A.  It's a -- a spreadsheet -- and I'm
22  looking at, you know, what's on this, which
23  would be case number.  And our case numbering
24  system at this point on the sheets you're
25  showing me was just sequential.  It was a

Page 342

1 running number. That changed sometime before I
2 got there, a few years before I got there. So
3 this sequential numbering would have been in
4 place in 2006, 2007.
5        It talks about -- some things I --
6 I'm not sure what they are, the coded mode.
7 But I think, if you go over that first solid
8 block with multiple, cause of death would be
9 furnished there.
10       And then we would have
11 information -- as I'm looking at the top -- of,
12 you know, city, state, ZIP code.
13       And we make a distinction between --
14 this is all going to be pulled off of the death
15 certificate -- residence of the decedent and
16 incidence, if there's a injury. So we would
17 actually distinguish those two.
18       And I'm looking just to see if there
19 is a -- I think these data over here in the
20 last column where it sort of looks cut off and
21 says "V City" and "Death County," that might --
22 I -- I -- I -- these are truncated, so I'd have
23 to say it might be the data from the incident.
24       And then there's demographic
25 information here --

Page 343

1    Q.   Okay.
2    A.   -- as well. So race; ethnicity,
3 which is Hispanic, not Hispanic; gender; age;
4 marital status.
5        And we would also look at occupation
6 and other things about the time of death and
7 who the assigned doctor was.
8    Q.   So this was produced to us as a
9 giant spreadsheet.
10       But do you know from -- from where
11 the data came?
12       Was it run from one of your
13 databases?
14   A.   Yes, it was.
15   Q.   And which database was it run from?
16   A.   There was an attempt to enter all of
17 the data into the VertiQ database. And this
18 looks like a sleet sheet I've seen from the
19 VertiQ database. But --
20   Q.   Okay.
21   A.   -- the database -- as I say, I don't
22 remember exactly when it started. It might
23 have been before 2006, and that data may have
24 been entered into the database from some --
25 something separate. I don't know for sure.

Page 344

1    Q.   Do you know when or -- and why this
2 particular set of data was extracted?
3    A.   No.
4    Q.   Do you know who maintains the VertiQ
5 database?
6    A.   We have an IT department who are
7 responsible for the office information
8 technology needs.
9        Data being entered into this is from
10 the general office, which would be clerks in my
11 office who would be entering, you know, time of
12 death, cause of death, et cetera. And that
13 would be pulled out and put into this.
14       So the VertiQ database itself is an
15 IT function. And that's managed by them and
16 maintained by them. But the information that
17 populates this would be more people on my
18 staff.
19   Q.   So the Cause of Death column, which
20 you previously pointed out to me, is that
21 where -- is that where this file would capture
22 opioid-related deaths?
23   A.   Yes.
24   Q.   Is that information recorded
25 anywhere else in this file?

Page 345

1    A.   The clerks do this coding mode, and
2 I -- I don't do that. So I don't know what
3 that is. But I don't see any other place where
4 I would see what drugs would have been included
5 here.
6    Q.   Would --
7    A.   It would be in that cause of
8 death --
9    Q.   Would Mr. Shannon --
10   A.   -- section.
11   Q.   I'm sorry. I thought you were
12 finished, Doctor.
13       Would Mr. Shannon know more about
14 it?
15   A.   I don't know for sure. The clerks
16 are under him, but I don't know to what extent
17 he would know the coding system any better than
18 I.
19   Q.   So which column captures the type of
20 drug that is related to a drug overdose?
21   A.   That would be in the Cause of Death
22 column. Unfortunately, these have been cut
23 off, so a lot of them just say "intoxication by
24 the."
25   Q.   But --

87 (Pages 342 - 345)

Page 346

1    A.   Yes.  That would be the drugs coming
2   after that.
3    Q.   Let me ask you about two of the
4   columns further over to the right.  There's one
5   which is called "RC App Manner."
6    A.   Okay.
7    Q.   Do you know what that means?
8    A.   I know what manner of death means.
9   I know, when cases get called into the office,
10  they'll be given kind of a triage as to what
11  manner they might be.  And I don't know if this
12  is actually extracted from the death
13  certificate database or from at that database.
14       But seeing things here like
15  "unknown" make me think it's from the call-in
16  database.  Because we don't have a checkbox in
17  the death certificate for unknown.  We have an
18  undetermined but not an unknown.
19   Q.   So if I understand correctly, if the
20  -- if -- if these -- if this information were
21  taken from a death certificate, "unknown" would
22  not appear, correct?
23   A.   That would be a very unusual term
24  for death certificate, just because the
25  manner -- if we can't make a decision, there is

Page 347

1   an option.  But it's undetermined, not unknown.
2    Q.   And let's go to the column just to
3   the left of Cc App Manner.  It says "RC NIG,"
4   N-I-G, "Occurred."
5        What does that mean?
6    A.   Whenever you certify a death in
7   other that natural causes, there's a need for
8   an explanation how the injury occurred.  And
9   there are various boxes on a death certificate
10  around that.
11       And they would be, you know, saying
12  things like when did the injury occur, where
13  did it occur.  And one of them would be how did
14  the injury occur.  And that's what you're
15  seeing there.
16   Q.   So I understand, Doctor, that
17  information is keyed into this file or this
18  database from the death certificates.
19       Is all the information from the
20  death certificates keyed into this database?
21   A.   I don't know.
22   Q.   In other words, would we have to
23  actually look at additional copies of death
24  certificates and other paper to get a more
25  complete picture?

Page 348

1    A.   There's a lot of information here.
2   I'm just looking for things that I know are on
3   a death certificate that don't show up here.
4        And one of the ones I know of is
5   veteran status.  So this at least doesn't have
6   that piece of information.
7        But in filling out a death
8   certificate, part of it is filled out by our
9   office, and part of it is filled out by the
10  funeral home.  So there's information the
11  funeral home would collect that maybe doesn't
12  get reflected here, like veteran status.
13   Q.   Okay.  And how about vice versa; is
14  there information here that's not on the death
15  certificate?
16   A.   Again, I -- I -- I don't know if
17  this manner was populated with death
18  certificate data.  And I'm not sure what
19  "unknown" means.
20       The other designations there --
21  natural, suicide, et cetera -- those are
22  legitimate causes of -- or pardon me -- manners
23  of death.  So I don't know if that actually was
24  taken from the death certificate and "unknown"
25  is -- is some default that was used to generate

Page 349

1   the spreadsheet.
2    Q.   If you were to look at a death
3   certificate and -- and look at the cause of
4   death, for example, and look at this file and
5   see a discrepancy, which would you rely on, the
6   death certificate or this file?
7    A.   Death certificate.
8        MR. BORANIAN:  You can put that
9   aside now, Doctor.
10       We'll mark this the next.
11       (Deposition Exhibit 6 was marked for
12  identification.)
13       THE WITNESS:  Thank you.
14       BY MR. BORANIAN:
15   Q.   So, Dr. Gilson, I'll tell you off
16  the bat I think there's an error in this
17  document.  Okay?  It's --
18   A.   Okay.
19   Q.   -- at -- first of all, what is the
20  document I've marked as Exhibit 6?
21   A.   You know, these are monthly reports
22  that we put out for dissemination.  They go
23  primarily through our task force.  And they're
24  summaries of mortality data and, you know,
25  things that we're seeing in the office.

88 (Pages 346 - 349)

Page 350

1    They're -- they change some over
2  time, but there are certain things that show up
3  in all of them and then other thing that are
4  updated on a monthly basis.
5    Q.   So the document is -- is titled
6  "Cuyahoga County Medical Examiner's Office,
7  Heroin/Fentanyl/Cocaine Related Deaths in
8  Cuyahoga County," right?
9    A.   Yes.
10   Q.   And it says "2018 December Update,"
11 correct?
12   A.   Right.  And we would issue it on the
13 11th of January 2018.
14     Oh, 2018 December update, is that
15 that typo?
16   Q.   That's -- that's the error, Doctor.
17   A.   Okay.  Yeah.  We couldn't be issuing
18 the December update on January of 2018.
19   Q.   So I'll represent to you that, when
20 you go on the web site -- and we just did it a
21 few minutes ago -- the link says "January 11,
22 2019."
23   A.   Oh, it does.  Okay.
24   Q.   Yes.
25   A.   So we did fix it.

Page 351

1    Q.   Well, the -- but when you get the
2  document, it still says "2018."
3     Here's the question:  Doctor, what
4  is the correct date for this report?
5    A.   2019.
6    Q.   Very well.
7    A.   Do you want me to fix it on --
8    Q.   And --
9    A.   -- the exhibit or...
10   Q.   No.
11   A.   Okay.
12   Q.   2019 January 11, that's two Fridays
13 ago, right?
14   A.   Yes.
15   Q.   And that's the date of the press
16 conference that you've referred to earlier,
17 true?
18   A.   That's right.  Yes, it was.
19   Q.   So did you present these data at
20 that press conference?
21   A.   We were presenting our data.  And
22 this is a summary of that.  So I -- I'd have to
23 say -- if I could just take a look.
24     I don't know if we presented
25 everything in this document at that press

Page 352

1  conference.  The last column on the first page
2  with the table, that was what we were focusing
3  on primarily at the press conference.  Some of
4  these other things are other things that we
5  traditionally include but I don't think we
6  mentioned at the press conference itself.
7    Q.   Take a look at Page 2 of Exhibit 6.
8    A.   I'm sorry.  Are we looking at this
9  one?
10   Q.   That's right.
11   A.   That one.  Okay.  Yeah.  Sure.
12   Q.   So if you look at the top line,
13 which is "Total Drug Overdose Deaths," 2017 was
14 727; and 2018, at least as you understood on
15 January 11, 2019, was 560, right?
16   A.   That's our projection.  There's an
17 inherent lag in deaths and then being
18 certified.  Have to wait for toxicology
19 testing.
20     So there are standards for our
21 accreditation.  We have to maintain 90 percent
22 of our toxicology testing being completed
23 within 90 days.  So this number may change as
24 more of that comes in.
25     But based on what we had certified

Page 353

1  up until that point -- and I think there's a
2  asterisk that goes through cases we had ruled
3  through September 2018.  We reserve the right
4  the change that.  It may change.
5    Q.   Sure.
6     But those numbers, 727 and 560,
7  those are the same numbers you testified to
8  earlier, right?
9    A.   These were the numbers that we at
10 the --
11   Q.   So this --
12   A.   -- press conference.
13   Q.   Yeah.
14     So this document confirms what you
15 told us earlier, true?
16   A.   I don't remember testifying to that.
17 But that's right.  727 was 2017, and 560 was
18 the number that we mentioned as our projection
19 for 2018 as of that date.
20   Q.   So if you look at the line that's
21 labeled "All Opioids Not Including Fentanyl
22 After 2013" -- see that?
23   A.   Yes.  Yes.
24   Q.   In 2011, it peaks at 113 cases,
25 right?

89 (Pages 350 - 353)

Page 354

1   A.   That's right.
2   Q.   So after 2011, the increases that
3   we're seeing in total deaths is driven
4   principally by heroin, fentanyl and cocaine; is
5   that true?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  I would even back away
8   from the cocaine.  Because, as I mentioned
9   earlier, when we tease out cocaine as an
10  independent contributor, it isn't rising in
11  this time frame, 2016, 2017.  It's being pulled
12  up by fentanyl, as is heroin.
13       Heroin deaths are dropping unless
14  they're associated with fentanyl over that time
15  frame.  They continued their downward trend
16  after 2015 unless fentanyl was present.
17       BY MR. BORANIAN:
18  Q.   And if a drug is detected in
19  connection with a death, let's say both cocaine
20  and fentanyl, that single death is recorded
21  both in the cocaine numbers and in the fentanyl
22  numbers, right?
23  A.   It's kind of a double dip.  You'll
24  see it twice, which is why, if you add all of
25  these numbers together, they exceed the total

Page 355

1   number of --
2   Q.   Right.
3   A.   -- overdoses.
4   Q.   Yep?
5   A.   Because we have a lot of mixtures.
6   In fact, I'd say, the last time we generated
7   data, the majority of our drug overdoses
8   involved mixtures.
9   Q.   And I think you told us that
10  earlier.
11       I just wanted to confirm that,
12  whenever we see this chart, this most common
13  drugs chart, that is true, correct?
14  A.   The data here is true.
15  Q.   The fact that you count multiple
16  drug deaths in multiple times.
17  A.   Oh, oh.  That is true.
18  Q.   That's -- so that's a --
19  A.   Yeah.  I'm sorry.  I didn't
20  understand your -- I thought you said are the
21  numbers true.  And I'm like yeah.
22  Q.   No.  We can get to that --
23  A.   To the best of my knowledge.
24  Q.   -- later.
25       But I'm just confirming that the

Page 356

1   method that you have used to make this chart
2   has not changed, true?
3   A.   No, it has not.
4   Q.   Okay.  Take a look at the fifth page
5   of this same chart.  It looks like this.  This
6   page is entitled "Cuyahoga County
7   Heroin/Fentanyl Related Overdose Deaths 2013 to
8   2018, Projected Death with DAWN Saves As
9   Overdose Deaths."
10       Is that what it says?
11  A.   Yes, it does.
12  Q.   So explain this chart to me, Doctor.
13       What does this represent?
14  A.   This would be a series of data
15  points going back to 2013.  The first graph
16  that we're seeing there is the graph for heroin
17  deaths.  And the -- I think the stripped one
18  with the strips rising up to the left is heroin
19  plus fentanyl.
20       So in 2013 we actually didn't track
21  this.  We -- this was added subsequent to that.
22  So this is one of those things we repeat
23  multiple times.  We started to add heroin and
24  fentanyl as fentanyl became a bigger player in
25  our mortality.

Page 357

1        And then, based on the information
2   that we received from Project DAWN, the deaths
3   avoided with Naloxone, the antidote drug for an
4   opioid overdose, we add those to generate the
5   third column for any given year.
6        So what we say is here is the number
7   of heroin deaths, here is the number of heroin
8   and fentanyl deaths, and then here's the number
9   of opioid deaths we would have had if we didn't
10  have Project DAWN.
11       There was a save with the Project
12  DAWN kit.  And that's data we get from Project
13  DAWN.
14  Q.   Okay.  So the assumption is then
15  that, without the intervention through DAWN,
16  that person would have become an overdose
17  death?
18  A.   Yes.  That's kind of I think what
19  Project DAWN does, is it saves people coming to
20  our office.
21  Q.   So if you look at 2017 column
22  "Without DAWN" --
23  A.   Yes.
24  Q.   -- that total is 1,439, right?
25  A.   That's right.

90 (Pages 354 - 357)

Page 358

1  Q. And that also drops to a projected
2  1,050 in 2018, right?
3  A. Yes, it does.
4  Q. What database is this report run
5  from?
6  A. This report, the page we're --
7  Q. Yeah.
8  A. -- on right now.
9  Q. Well, we can start with that.
10  Where do you get the data?
11  A. The first two columns, the heroin
12  and fentanyl data, would be coming out of the
13  medical examiner's office. The Project DAWN
14  dota [sic] -- data, that we would obtain from
15  Project DAWN. And I don't know what database
16  they use to generate that.
17  Q. What database within the Medical
18  Examiner's Office do you use to access these
19  data?
20  A. Our web site. I -- I'm not sure I
21  understand your question.
22  Q. Well, for example, when you're
23  tabulating 542 fentanyl deaths for 2017,
24  where'd you get that number?
25  A. Oh, from the death -- cause of death

Page 359

1  data that's entered into our office management
2  system, the VertiQ system that I mentioned.
3  Q. Okay. Do you also access data from
4  VertiQ to generate the most common drug chart
5  that we see on the second page?
6  A. Yes. I -- I can say with
7  certainty -- 2011 forward, that's my tenure in
8  the office. That would certainly be true.
9  And as I say, I don't know exactly
10  when we got the VertiQ system running in
11  Cuyahoga County. So I don't want to be as
12  dogmatic about the left side of the curve, when
13  that starts to go into VertiQ. It may; it may
14  not. I just don't know.
15  Q. So for each of these slides, there's
16  a source listed at the bottom.
17  A. Right.
18  Q. So each -- each time that it says
19  the Cuyahoga County Medical Examiner's Office,
20  does that mean that these data are coming from
21  the VertiQ system?
22  A. As I said, I can speak to my tenure
23  more clearly. They would be coming from -- at
24  the time before 2011 it was the coroner's
25  office. So I think that's a kind of academic

Page 360

1  distinction.
2  But the data for these things, 2006,
3  2007, may not come from the VertiQ system. I
4  don't know for certain. But they do come from
5  the coroner's office data --
6  Q. Okay.
7  A. -- that we have.
8  Q. But since then, the VertiQ system is
9  the system in which you keep these data, true?
10  A. Absolutely, yes.
11  Q. So if you took a look at exhibits 5
12  and 6 together, do they have any relation to
13  one another?
14  For example, if we pick a number out
15  of the -- the table in Exhibit 6, could we go
16  through the data reflected in Exhibit 5, the
17  big giant table, and count the number of deaths
18  and sort of cross-reference?
19  A. This data comes from the same system
20  as I believe this was generated from. Again,
21  these data back to '06, '07, I'm not as certain
22  whether they were back entered or not.
23  But I can say confidently 2011 data
24  forward, we would be able to identify a data
25  point here and run it through the VertiQ system

Page 361

1  to provide supporting documentation.
2  And I would say, you know, given
3  what I have seen from the coroner's office,
4  they were pretty thorough in their data
5  acquisition as well. But I don't want to speak
6  to things I don't know about for certain.
7  Q. Do you have any projections
8  regarding future deaths other than what we're
9  seeing here?
10  MR. BADALA: Objection to form.
11  THE WITNESS: We have started to
12  look at 2019. But obviously we haven't
13  finished the first month of the year. So we
14  can't make a projection yet on that.
15  I can say anecdotally that 2019
16  actually has been a bad year so far. Not 560
17  but rising up again.
18  BY MR. BORANIAN:
19  Q. Let me ask you about this lawsuit a
20  little bit.
21  Did you play any role in deciding
22  which defendants would be named in this
23  lawsuit?
24  A. No, sir.
25  Q. Have you ever been asked to quantify

91 (Pages 358 - 361)

Page 362

1  the cost that your department has had to bear
2  as it relates to opioid abuse?
3      A.   We did an analysis of some of the
4  costs. I don't think it was exhaustive. But
5  we were specifically looking at additional
6  personnel and additional instrumentation and
7  those costs. That was prepared. But the
8  entire burden to the office, no, we haven't
9  prepared that.
10     Q.   And the analysis you've just
11 referred to, who prepared that?
12     A.   I believe it was Hugh Shannon.
13     Q.   Now, I'll represent to you that the
14 county has sued, as identified in its
15 complaint, three sets of defendants. We have
16 the manufacturing or marketing defendants; we
17 have the distribution defendants; and we have
18 the retail pharmacy defendants.
19         I want to ask you a few questions
20 about the distributors.
21     A.   Sure.
22     Q.   Do you know which distributors were
23 sued?
24     A.   I don't remember the names. I've
25 seen it, but I don't remember them right now,

Page 363

1  all of them.
2      Q.   Were --
3      A.   McKesson, Cardinal and AmeriBergen
4  [sic] I think was the other. I don't know if
5  that's exhaustive or not. But I think those
6  were the distributors that I'm familiar with.
7      Q.   And before getting involved in this
8  litigation, had you ever heard of McKesson?
9      A.   I don't know.
10     Q.   How about same question for Cardinal
11 Health?
12     A.   I think we drive by Cardinal Health
13 when I go to visit my in-laws. So I think I
14 saw it, you know. But I -- I really don't know
15 much about them other than that.
16     Q.   So no prior knowledge that Cardinal
17 Health was a drug distributor?
18     A.   No.
19     Q.   I should say a prescription drug
20 distributor or a healthcare product --
21     A.   Prescription drug distributor. Yes,
22 sir.
23     Q.   And my client, AmerisourceBergen,
24 have you heard of that -- had you heard of that
25 before getting involved in this litigation?

Page 364

1      A.   I don't remember. If I did, it
2  wasn't really any more than I knew about
3  Cardinal Health or McKesson.
4      Q.   Are you familiar with the
5  regulations imposed on distributors by the Ohio
6  Board of Health?
7      A.   No, I'm not.
8      Q.   Are you aware of regulations imposed
9  on distributors by the Ohio Board of Pharmacy?
10     A.   I'm sorry. I was -- lost your
11 question.
12     Q.   Sure. I'll repeat that.
13         Are you --
14     A.   Oh, thank you.
15     Q.   Are you familiar with any
16 regulations imposed on prescription drug
17 distributors by the Ohio Board of Pharmacy?
18     A.   I thought they were required to use
19 the OARRS system or enter data in the OARRS
20 system. But again, I don't know that for
21 certain either. Beyond that, no.
22     Q.   Are --
23     A.   I'd have to say I don't know
24 anything beyond that.
25     Q.   Are you familiar with any other

Page 365

1  state regulation -- Ohio State regulation of
2  drug distributors?
3      A.   Not myself, no.
4      Q.   How about federal regulations of
5  drug distributors?
6      A.   Again, I -- I have some
7  understanding of DEA requirements about
8  distribution, but they're very rudimentary.
9      Q.   Have you ever had any communications
10 with any representative of a distributor other
11 than myself?
12     A.   No.
13     Q.   Have you ever reached out to any
14 prescription drug distributor for any
15 assistance in any -- the analysis you're doing
16 or any other efforts you've made in connection
17 with opioid abuse?
18     A.   You know, there was a group that
19 came to our office, Leaders Quest, and they
20 represented different people in the
21 pharmaceutical industry. They reached out to
22 us. But I don't remember anything more.
23         It never jelled. They kept wanting
24 to talk to us individually. And we wanted to
25 have our folks meet as a group.

92 (Pages 362 - 365)

Page 366

1    And that's really the extent I think
2  of anything I can think of right now about
3  contact with -- might have been drug
4  manufacturers, drug distributors.  I don't
5  remember.  But it was kind of a consortium, as
6  it was represented to us, of pharmaceutical
7  industry.
8    Q.   Did they reach out to you or you
9  reach out to them?
10    A.    They reached out to Cuyahoga County.
11    Q.   And do you actually recall a drug
12  distributor being among that group?
13    A.   I don't.  You know, there were a lot
14  of people from the pharmaceutical industry I
15  believe represented there.  But I don't
16  remember if it was specific distributor.
17    Q.   Do drug distributors manufacturer
18  prescription drugs?
19    MR. BADALA:  Objection to form.
20    THE WITNESS:  To the best of my
21  knowledge, no.
22    BY MR. BORANIAN:
23    Q.   Do drug distributors ever interact
24  with patients or physicians?
25    A.   I don't know.

Page 367

1    Q.   Do --
2    A.   I would hope they weren't
3  interacting with patients.  But physicians, I
4  don't know if they do or not.
5    Q.   Either way, you don't know, right?
6    A.   I don't know.
7    Q.   Do you know if drug distributors do
8  any marketing of prescription opioids?
9    A.   I'm not aware of it.  I don't know.
10    Q.   Do you know if drug distributors
11  participate at all in preparing the warnings
12  that come in the package insert with
13  prescription drugs?
14    A.   I don't know if they do or not.
15    Q.   Do drug distributors actually ever
16  write or fill prescriptions?
17    A.   Unless they're physicians, I would
18  hope not.  But I don't know if they fill
19  prescriptions if there's distribution at that
20  micro level.  I don't know that.  But writing
21  prescriptions, no.
22    Q.   Do you know if drug distributors
23  contribute to or influence in any way drug
24  formularies in healthcare institutions?
25    A.   I don't have experience with that.

Page 368

1  So I'd have to say I don't know.
2    Q.   And do you know if drug distributors
3  play any role in the DEA's setting of quotas
4  for the manufacture of opioids, of controlled
5  substances?
6    A.   I don't know what goes into that DEA
7  practice.  So I -- I don't know.
8    Q.   Does a drug distributor know how
9  much medication a pharmacy acquires from other
10  drug distributors?
11    MR. BADALA:  Objection to form.
12    Steve, to be clear, when you say
13  "distributors," I know in the complaint we have
14  pharmacies that are distributors.
15    Which one are you talking about now?
16    MR. BORANIAN:  I'm referring to
17  wholesale distributors.
18    MR. BADALA:  Okay.  Just --
19    MR. BORANIAN:  When I say
20  "distributor," I mean wholesale distributor.
21    MR. BADALA:  All right.  Just want
22  to clear the record.
23    MR. BORANIAN:  I appreciate that.
24    THE WITNESS:  I don't know that I
25  understand the distinction.

Page 369

1    BY MR. BORANIAN:
2    Q.   Well, is -- can a wholesale
3  distributor -- does a wholesale distributor
4  have any way of knowing how much medication a
5  pharmacy bought from another wholesale
6  distributor?
7    MR. BADALA:  Objection to form.
8    THE WITNESS:  I know of data that
9  the Ohio Department of Health shared on their
10  web site about sort of number of doses for
11  specific drugs.  I don't know if that's
12  something that, you know, the distributor would
13  need to be aware of.
14    But there's public information on
15  some of that, as to how many solid doses of
16  opiates -- opioids -- I'm thinking of a graph I
17  remember seeing -- in Ohio and that it was
18  rising over a period of time.
19    BY MR. BORANIAN:
20    Q.   And that's aggregated data, right?
21    A.   It's data for the State of Ohio, not
22  specifically Cuyahoga County.
23    Q.   Okay.
24    A.   I don't know if --
25    Q.   But it doesn't disclose who sold

93 (Pages 366 - 369)

Page 370

1 those doses, does it?
2    A.   Oh, no.  To your point, I guess no,
3 it doesn't disclose the individual distributors
4 and how that's broken down by distributor.
5    Q.   Does a dug [sic] -- does a drug
6 distributor know the identity of patients to
7 whom drugs were prescribed?
8        MR. BADALA:  Objection.
9        Again, wholesale distributor?
10       MR. BORANIAN:  Yes.
11       THE WITNESS:  I don't know.
12    BY MR. BORANIAN:
13    Q.   Does a distributor know what a
14 patient's diagnosis is or what the patient
15 actually does with his or her medication?
16    A.   I don't have information on that.
17    Q.   Does a drug distributor have any
18 information about other medications a patient
19 might be taking or a patient's history of
20 addiction?
21    A.   I would not expect that, but I don't
22 know.
23    Q.   In your analysis over the years, Dr.
24 Gilson, have you ever linked a specific order
25 of controlled substances shipped by any of the

Page 371

1 distributor defendants in this case and any
2 individual in the county who overdosed on
3 drugs?
4    A.   I don't remember ever doing that.
5    Q.   Do you know of any instance where --
6 well, strike that.
7        Can you identify any shipment of
8 prescription opioids by any distributor
9 defendant where part of the shipment was
10 diverted outside the closed supply chain?
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  I mean there were
13 diversion of drugs going on, you know, from the
14 pill mills, from the pharmacy shoppers, the
15 data shoppers -- the doctor shoppers, I mean.
16 Diversion of pills out of, you know, medicine
17 cabinets and things like that.
18       I don't know, you know, to what
19 extent they were ever investigated back to the
20 distributor level, but --
21    BY MR. BORANIAN:
22    Q.   Well, in your investigation and in
23 your analysis over the last seven, eight, nine
24 years, have you identified any shipment of
25 prescription opioids, any particular shipment,

Page 372

1 where part of that shipment was diverted?
2    A.   Oh, part of the shipment itself?
3    Q.   Yeah.
4    A.   I'm not aware of that.
5        Again, the distributors, I -- I
6 think some of the pharmacies -- you know, there
7 were robberies of pharmacies.  And those drugs
8 would have obviously been diverted.
9    Q.   Have you --
10    A.   And some of those could be pharmacy
11 distributors.  But I don't know a specific
12 wholesale distributor.  I've never heard of a
13 robbery like that.  I -- I just don't know.
14    Q.   One last question.  If you go back
15 to the -- the very latest most common drugs
16 chart.
17    A.   Yeah.
18    Q.   This -- this confirms what you told
19 us before, that prescription opioid-related
20 deaths plateaued starting at about 2010, right?
21       MR. BADALA:  Look on Exhibit 1 or 6?
22 Because there's two that have the same page.
23       MR. BORANIAN:  We're in Exhibit 6.
24       MR. BADALA:  Thank you.
25       MR. BORANIAN:  The -- the latest

Page 373

1 one.
2        MR. BADALA:  Okay.
3        MR. BORANIAN:  Yeah.
4        THE WITNESS:  We didn't continue to
5 see a rise in a significant way beyond 2011.
6 It seemed to have plateaued beyond that.
7        MR. BORANIAN:  I think that's all I
8 have, Doctor.  Thank you.
9        THE WITNESS:  Thank you.
10       THE VIDEOGRAPHER:  We are going off
11 the record.
12       This is the end of Media Unit No. 6.
13       The time is 5:30.
14       (A short recess was taken.)
15       MR. CARTER:
16       THE VIDEOGRAPHER:  We are going back
17 on the record.
18       This is the beginning of Media Unit
19 No. 7.
20       The time is 5:42.
21       You may proceed, Counsel.
22    EXAMINATION BY COUNSEL FOR DEFENDANT
23       WALMART, INC.
24    BY MR. CARTER:
25    Q.   Good afternoon, Dr. Gilson.

94 (Pages 370 - 373)

Page 374

1    A.   Hi, Mr. Martin.
2    Q.   Mr. Carter.  But that's okay.
3    A.   Carter.
4    Q.   We only met once.  So no problem.
5        I've got some --
6    A.   Thank you.
7    Q.   -- questions for you.
8    A.   Yeah.
9    Q.   Because it's the end of the day, I'm
10   going to kind of jump around, be as efficient
11   as possible.
12   A.   Sure.
13   Q.   If I lose you at any point, will you
14   let me know?
15   A.   Sure.  Sure.
16   Q.   If you don't understand one of my
17   questions, will you let me know?
18   A.   No.  Thank you for that offer.
19   Q.   Are you -- have you ever been a
20   pharmacist?
21   A.   No, I have not.
22   Q.   Ever practiced in that area?
23   A.   No.
24   Q.   Okay.  You were asked some questions
25   about addiction.

Page 375

1        You've never diagnosed addiction in
2    the context of your work as a medical examiner,
3    correct?
4    A.   No, not as a medical examiner.  As I
5    say, it may appear on a medical examiner
6    report, but I am relying on that, as, you know,
7    history of substance abuse, on somebody else
8    making that diagnosis.
9    Q.   So if there is a reference to
10   substance abuse or an addiction or any
11   characterization of a person's medical
12   condition during life, that's something where
13   you've relied on other medical professionals to
14   make those primary diagnoses, correct?
15   A.   Right.  I am familiar, you know,
16   just because my medical training, in a general
17   way with some of those terms.  But I don't make
18   those diagnoses myself --
19   Q.   Okay.
20   A.   -- in the occurs of my work.
21   Q.   And there's no posthumous test for
22   addiction, is there?
23   A.   No, there's not.
24   Q.   And likewise, there's no posthumous
25   test for tolerance, is there?

Page 376

1        MR. BADALA:  Objection to form.
2        THE WITNESS:  I don't know, you
3    know, what research would be done in that.  I'm
4    not aware of any one.
5        BY MR. CARTER:
6    Q.   Okay.  And in the case of a medical
7    diagnosis of addiction, do you agree that that
8    diagnosis is something that you can't assume
9    just from data points in terms of their
10   substance use history, that you can't just see
11   that someone used a substance and assume an
12   addiction or a diagnosis of abuse, correct?
13   A.   From my investigation?
14   Q.   Yes.
15   A.   Again, you know, I think, if we
16   think of an addiction as something where a
17   person continues to use drugs in spite of, you
18   know, consequences, social consequences, it
19   certainly suggests itself if somebody dies of
20   an overdose, and they've been incarcerated for
21   drug charges.
22       But I -- as I say, I don't make the
23   diagnosis.  But it wouldn't say that -- I would
24   consider that person, you know -- I would
25   probably think of that person as having some

Page 377

1    issue around substance abuse.
2    Q.   But based on the data available to
3    you, if there's not a diagnosis of substance
4    abuse or addiction in the file, you do not have
5    enough information at your stage of the
6    investigation where you feel comfortable
7    offering a medical opinion more likely than not
8    medically that an individual was addicted,
9    fair?
10       MR. BADALA:  Objection to form.
11       THE WITNESS:  We do not make that
12   diagnosis.  At the end of every autopsy report,
13   we have a list of diagnoses.  And we don't make
14   the diagnosis of addiction in the absence of a
15   clinical history.
16       BY MR. CARTER:
17   Q.   Okay.  And that clinical history
18   or -- or clinical diagnosis would come from
19   other medical professionals, correct?
20   A.   Right.  A psychiatrist or
21   somebody -- addiction medicine person.
22   Q.   Okay.  Have you ever sat for any
23   boards -- any medical licensure boards that you
24   did not pass the first time?
25   A.   No, sir.

95 (Pages 374 - 377)

Page 378

1    MR. BADALA:  Objection to form.
2    BY MR. CARTER:
3    Q.   In the course of your employment
4  history, have you ever received a performance
5  review that resulted in discipline?
6    MR. BADALA:  Objection to form.
7    THE WITNESS:  Not recently.  And not
8  that I can remember.
9    BY MR. CARTER:
10   Q.   Okay.  What was the subject matter
11 where you were disciplined as a result of a
12 performance review?
13   MR. BADALA:  Objection to form.
14   THE WITNESS:  I'm sorry.  I just
15 said "not recently," which to
16   BY MR. CARTER:
17   Q.   You said "not recently," which to
18 me --
19   A.   I don't remember any --
20   Q.   Oh, okay?
21   A.   -- was the follow-up answer.
22   Q.   Okay.  So you don't reply -- or you
23 don't recall one previously happening where
24 you've lost the details?
25   A.   I don't remember one.  I mean, you

Page 379

1  know, as a kid all kinds of thing happen.
2  But --
3    Q.   And I'm --
4    A.   I'd have to say I don't remember.  I
5  was a pretty good boy.
6    Q.   And I'm not asking about your
7  nonprofessional performance reviews.
8    I'm talking about, on the job as a
9  licensed physician, and have you receive a
10 performance review that resulted in
11 performance?
12   A.   No.
13   MR. BADALA:  Objection to form.
14   BY MR. CARTER:
15   Q.   Has anyone --
16   A.   Never.
17   Q.   -- ever asked for your resignation?
18   A.   No, sir.
19   Q.   Okay.
20   A.   I mean I get calls from the public
21 that aren't always hospitable, and they think I
22 should, you know, pack my bags and leave.  But
23 in terms of a chain of command, no, no one's
24 ever asked me to resign.
25   Q.   All right.  You were asked some

Page 380

1  questions about wholesale distributor
2  defendants.  I want to ask you about retail
3  pharmacies.
4    Do you have an understanding as to
5  the role retail pharmacies played in the
6  distribution network of prescription opioids?
7    A.   I just know that they would be, you
8  know, a point of furnishing prescription
9  opioids.  And I don't know if I understand, you
10 know, the retail pharmacy, just is that the
11 direct-to-person distribution or whether they
12 were doing wholesale things.  I -- I'm a little
13 unclear on that.
14   Q.   Do you who the retail pharmacy
15 defendants are in this case?
16   A.   I don't want to be certain.  I
17 believe Wal-Mart, CVS.  And there may be
18 another.  I just don't remember.
19   Q.   Have you ever initiated contact with
20 Wal-Mart, CVS or any retail pharmacy --
21   MR. BADALA:  Objection to form.
22   BY MR. CARTER:
23   Q.   -- -- related to Cuyahoga County
24 opioid issues?
25   A.   Myself personally, no, I have not.

Page 381

1    Q.   Okay.  Do you know whether any of
2  the retail pharmacies have ever generated a
3  prescription for an opioid medication?
4    A.   I have to think they did, but I
5  don't have that data.
6    Q.   So have they ever written a
7  prescription?
8    A.   Oh, written a prescription.  Only a
9  physician can write that prescription.  So I
10 don't know, you know, if there's any physicians
11 on staff at some of them.  I don't know that
12 for certain.  You know, the -- the minute
13 clinic or those things aren't usually
14 physicians.  So I don't know if they ever wrote
15 prescriptions.
16   Q.   Do you know whether any of the
17 retail pharmacy defendants in this case ever
18 filled a prescription that wasn't written by a
19 DEA-registered physician?
20   A.   I don't know.
21   Q.   Okay.  Sitting here today, have you
22 concluded that any Cuyahoga County -- any
23 specific Cuyahoga County resident's death is
24 attributable to the conduct of a specific
25 defendant?

96 (Pages 378 - 381)

Page 382

1    A.   I think, you know, it's, from my
2  perspective, a look at the aggregate and how we
3  got to a point where there was an oversupply
4  and an overprescribing.
5        If you want me to go back and sort
6  of try to point to one individual and say that
7  links back to this defendant, I'm not prepared
8  to do that.  It might be possible, but I can't
9  do that today.
10   Q.   Sitting here today, you haven't done
11  that analysis, correct?
12   A.   I haven't done that on a specific
13  case basis, no.
14   Q.   Okay.  So in -- in response to the
15  question can you today connect any specific
16  Cuyahoga County resident's death to a specific
17  defendant in this case --
18        MR. BADALA:  Objection.
19        BY MR. CARTER:
20   Q.   -- what's the answer to that?
21        MR. BADALA:  Objection to form.
22  Asked and answered.
23        THE WITNESS:  Again, as I say, in a
24  general way I do think that the actions of the
25  defendants are responsible for lots of deaths

Page 383

1  in our county.
2        The specific, you know, can I point
3  to this person and that defendant, no, I cannot
4  do that.
5        BY MR. CARTER:
6   Q.   Have you -- in the course of
7  exercising your duties in Cuyahoga County, have
8  you ever made a decision, taken any action,
9  instituted any policy based on a public
10  statement from one of the defendants in this
11  case?
12        MR. BADALA:  Objection to form.
13        THE WITNESS:  I'm not aware of
14  public statements that the defendants have made
15  in this case.  So I'd have to say, in that
16  regard, it wasn't -- if I responded to
17  something, it wasn't intentional.
18        BY MR. CARTER:
19   Q.   Okay.  Sitting here today, can you
20  identify any cost that your office has incurred
21  directly as a result of a particular defendant?
22   A.   We incurred the cost as a result of
23  the opioid crisis.  And I would say again that
24  opioid crisis is referable back to the
25  defendants.  And the expenses that my office

Page 384

1  has borne in terms of additional personnel in
2  the medical staff, toxicology staff, drug
3  chemistry staff, instrumentations that we had
4  to purchase in toxicology and drug chemistry
5  and -- and DNA, those are genuine expenses that
6  we had.
7        And I do think they're referable
8  back to the defendants in aggregate, though I
9  wouldn't say I can tell you this was, you know,
10  this part or this was this part.
11        In aggregate, I can say with
12  confidence I think that the actions of the
13  defendants are what prompted us to have to do
14  these things.
15   Q.   Okay.  So you -- have that opinion
16  you just expressed in the aggregate; you don't
17  -- you haven't connected a specific line item
18  expense to a specific defendant, fair?
19   A.   I think that's a fair statement.
20   Q.   Now, in terms of the expenses that
21  you believe you've incurred in the aggregate,
22  of those things that you mentioned with respect
23  to personnel or additional equipment, have any
24  of those expenses been incurred solely as a
25  result of responding to opioid overdose deaths?

Page 385

1   A.   Yes.
2   Q.   Okay.  Which ones?
3   A.   I can't be exhaustive.  You know, we
4  had dramatic rises in case loads.  And that
5  started in 2015 when I think we get data that
6  links the, you know, heroin crisis back to the
7  prescribing.  We have enough data to I think
8  feel comfortable about that.
9        At that point I'm starting to see,
10  you know, accreditation information from my
11  accrediting body that we are starting to have
12  too many case per physician.  At that point I
13  start to lobby for additional staff.
14        And 2016 obviously, with the rise in
15  the number of deaths that we had there, you
16  know, going from 370 up to 666, we were
17  drowning at that point.  And I needed
18  additional staff.  And we added the two
19  doctors.  We added two individuals to our
20  toxicology unit.  We added an additional drug
21  chemist to do testing.  They all cost, you
22  know, what their salary is.
23        In terms of instrumentation costs,
24  you know, as this crisis has evolved -- and
25  again, I think referable back to the

97 (Pages 382 - 385)

Page 386

1  prescription opioids morphing into the heroin
2  phase, morphing into the fentanyl phase and the
3  analogs of fentanyl, it has been incredibly
4  challenging to keep up with the analogs of
5  fentanyl from a testing standpoint.
6         Because these are not drugs that we
7  had encountered before.  So identifying them,
8  we had to purchase a new piece of equipment
9  really to do a better job identifying them.
10        And then, you know, because these
11 drugs like a carfentanil are, you know, a
12 hundred times more potent than fentanyl, to try
13 to find those drugs was just a challenge that
14 required, again, methodology.
15        And I can tell you those instruments
16 were hundreds of thousand of dollars.  They
17 weren't just, you know, like they went to the,
18 you know, warehouse and they picked something
19 up, you know, for a few hundred bucks or
20 something.  They're very sensitive instruments,
21 and they cost a tremendous amount of money.
22        I -- I don't mean to say, you know,
23 this is an exhaustive list.  Those are the
24 things I think that really were the most
25 driving expenses that we had that I'm aware of:

Page 387

1  Personnel, instrumentation.
2     Q.  Sitting here today, is there
3  anything else that you can think of that you
4  would testify your office incurred exclusively
5  as a result of opioid overdoses?
6         MR. BADALA:  Objection to form.
7         THE WITNESS:  We lost, you know,
8  revenue in my office I think starting in about
9  2015 or '16 because we had to turn cases away
10 from my office from adjacent counties.
11        The corner's traditionally Ohio's
12 kind of functionally regional death
13 investigation system.  So a coroner in a Geauga
14 County or Medina County can't afford a system
15 like we have.  And, you know, they needed to be
16 able to send cases to us.
17        And because of, again, accreditation
18 burdens that we were starting to see and high
19 case loads, I had to start tell them, you know,
20 "No.  You -- I can't do your drug overdose
21 cases anymore.  I'm drowning in my own.  I'm
22 trying to add staff to get our accreditation
23 back in order."
24        We were still accredited, but we
25 were basically changed from a full

Page 388

1  accreditation to a partial accreditation in,
2  you know, response to case loads we were
3  seeing.
4         So turning that population away,
5  those drug overdoses from the adjacent counties
6  we contract with, that's, you know, about $1500
7  per case, which we would use for things like
8  the purchase of instrumentation.  It would go
9  into a thing called our laboratory fund and our
10 budget.  And one of the specific purposes of
11 that laboratory fund was to, you know, upgrade
12 instrumentation and things like that.
13    Q.  So --
14    A.  So that's one.  I think, you know,
15 we incurred other expenses in terms of body
16 storage.  You know, we got to a point where we
17 were very concerned we were going to run out of
18 morgue space because so many people were in our
19 office.
20        And I don't know, you know, if you
21 know that in Montgomery County, which is
22 Dayton, or Summit County, they had to get, you
23 know, state resources, refrigerated trucks,
24 because they had an overflow.
25        We didn't get to that point in

Page 389

1  Cuyahoga County.  We got close on Memorial Day
2  2016.  But we're a disaster morgue.  So we're
3  supposed to -- when this, you know, the morgue
4  was designed by my predecessor, Dr. Bolrush, we
5  were supposed to be able to accommodate -- you
6  know, granted if it was the World Trade Center,
7  nobody could accommodate that kind of
8  numbers -- but to accommodate a diaster.
9         And we were at capacity.  And we
10 went out and purchased additional storage for,
11 you know, that possibility that we might be
12 overwhelmed again like that.
13    Q.  So you purchased a mobile unit and
14 never had to utilize it, correct?
15    A.  We haven't had to utilize it for
16 storage.
17    Q.  You mentioned May of 2016.
18        Do you mean 4th of July weekend 2015
19 when carfentanil arrived?
20    A.  No.  This was Memorial Day weekend.
21    Q.  Okay.  So was there an acute issue
22 when carfentanil showed up on the scene?
23    A.  Same thing that, you know, we saw --
24 I think, if you go back to Exhibit 6, you can
25 see that in 2017 carfentanil deaths really went

98 (Pages 386 - 389)

Page 390

1    up dramatically.  But we never got to the point
2    that I described Memorial Day weekend 2016
3    where we were just -- no room at the inn
4    anymore.
5         Carfentanil certainly stressed us
6    again in our resources.  And the number rise
7    is, again, largely driven by that.
8         So what I would say is -- I think
9    what you're talking about, the 4th of July
10   weekend with carfentanil, was 2016.  But that
11   was actually down in Akron where they had a
12   number of overdoses in a very short period.
13   Q.   And you did not have that same
14   experience at that same time?
15   A.   Not at the same time.
16   Q.   Okay.  In terms of revenue from
17   out-of-county autopsy that are referred to
18   Cuyahoga, does the county make a profit on
19   those?
20   A.   I honestly don't think we do.  I
21   feel like we have some responsibility do, you
22   know, support death investigation in the state.
23        I don't know that we've ever
24   calculated out, you know, every expense, direct
25   and indirect, that we would glean from that.

Page 391

1         I mean but my shoot-from-the-hip
2    answer is, if we're making money on it, it's
3    not very much.
4    Q.   And state law regulations actually
5    prohibit making a profit, correct?
6    A.   Making a profit on?
7    Q.   Off autopsies for your office.
8    A.   I'm not aware of that law.  I mean
9    it may be a law.  I just am not aware of it.
10   Q.   In terms of -- you mentioned a
11   couple of times being -- your office being
12   overwhelmed.
13        What was the -- the date or time
14   frame when you were first overwhelmed?
15        MR. BADALA:  Objection to form.
16        THE WITNESS:  Again, I -- I'm not
17   really sure that I could point to a specific
18   date on the calendar, say "We were overwhelmed
19   there."  I can give you instances, you know,
20   like that Memorial Day weekend that I
21   mentioned.
22        You know, have there been instances
23   where we've come into, you know, our autopsy --
24   or into our agency, done triage and had, you
25   know, 22 cases on a Monday -- our offices

Page 392

1    doesn't do autopsy cases on Sunday -- you know,
2    yes.  And we don't do all of them on Monday.
3    So I think we get overwhelmed in that regard.
4         I think the other thing, too, is,
5    you know, we had widenings of turnaround times
6    in our toxicology laboratory, which an
7    indication, you know, we're out of compliance
8    with our accrediting body.  So yes, we're
9    overwhelmed there.
10        Over 325 cases -- you know, autopsy
11   cases per physician is another, you know,
12   accrediting gig that we took.  And that
13   happened in 2016 as well.
14        BY MR. CARTER:
15   Q.   When was the first time that you
16   made a request to the county office for more
17   resources because you weren't able, from your
18   perspective, to carry the load of cases that
19   was before you?
20   A.   I'm always asking the county for
21   more resources.  I think, you know, in response
22   to some of the things I mentioned -- I don't
23   remember exact dates, but certainly when I saw
24   our 2015 numbers and that we were grazing into
25   -- there's two levels of deficiencies in my

Page 393

1    accrediting body.
2         Phase 1 is kind of slap on the
3    wrist.  Phase 2 is you're losing your -- your
4    full accreditation.
5         In 2015 I started to see phase 1
6    deficiencies.  I don't remember if it was at
7    that point that I made the request.  Certainly
8    in 2016, when I saw phase 2 deficiencies
9    showing up, I was making that request and very
10   stridently at that point.  And, you know, we
11   hired two additional medical staff in response
12   to that.
13   Q.   Did you ask for additional --
14   A.   And -- oh, I'm sorry.
15   Q.   I'm sorry.
16   A.   I just want to say, too, that the
17   other thing that we did was to hire contract
18   physicians.  And these were individuals,
19   medical examiners, who we would contract with
20   to provide autopsy service to the county.  But
21   they weren't my employees.  They were just
22   contractors.
23   Q.   Did you ask for additional resources
24   from the county in response to opioid deaths in
25   2011?

99 (Pages 390 - 393)

Page 394

1     MR. BADALA: Objection to form.
2     THE WITNESS: You know, we were just
3  really kind of get aware of the heroin crisis
4  in 2011. So I wouldn't think we had made the
5  request yet.
6     Q.  Did you make such a request in 2012?
7     A.  I don't remember.
8     Q.  Did you make a -- do you remember
9  making any such request prior to 2015 and what
10  you described a moment ago?
11     A.  Can I just look at this? It may
12  help me.
13     The timelines are a little blurry to
14  me, but -- we did add a physician in 2014.
15  That would be Dr. Dolenack.
16     Q.  Was that as a result of opioid
17  overdose deaths?
18     A.  In part, yes.
19     Q.  Was it exclusively?
20     A.  I don't remember exactly. But I
21  think we were very concerned about this rising
22  tide of opiate deaths that we were seeing.
23     And part of what we rely on in our
24  office is we train future medical examiners.
25  We actually have the oldest training program in

Page 395

1  the country for that. And, you know, they can
2  come and do work. They're not a consistent
3  thing.
4     For example, this year we don't have
5  any -- be -- they're fellows. This is what I
6  did when I did my training in New York City.
7  We don't have anybody this year.
8     We, you know, have two the year
9  before. Usually we have one, no more than two.
10  And, you know, they're a great help when
11  they're there.
12     But I remember in 2014, when I was
13  talking about getting another physician, that,
14  you know, I -- I -- I made that clear that, you
15  know, we have an increasing caseload because of
16  the crisis, and this is not something we can
17  consistently rely on as a, you know, help for
18  this because there may be years we don't have
19  anybody, like this year.
20     Q.  Does your office incur costs in
21  terms of money and resources as a result of
22  cocaine overdoses?
23     A.  I mean we're investigating cocaine
24  deaths. So autopsy work there would be a cost.
25  I don't think we go into it thinking this is --

Page 396

1  you know, this is going to be the cocaine one,
2  and this will be the opioid one.
3     We just have to do our best to sort
4  that out afterwards. But, you know, the number
5  of deaths that we have with cocaine is a cost
6  to the office.
7     And I think, as I made -- tried to
8  make clear earlier in my testimony, the number
9  hasn't changed in terms of just cocaine. It
10  was pull up in 2016 and '17 by mixtures with
11  fentanyl, which again I attribute to the opioid
12  crisis, not cocaine changing dramatically.
13     Q.  And we're in the home stretch. So
14  if you could do your best to try to respond to
15  the question. Mine was just do you have costs
16  from cocaine. So I think you've answered that,
17  at least initially.
18     Let me ask this question: Does the
19  cost for inviting overdose deaths in your
20  office vary by substance?
21     A.  I -- I can't give you -- I can give
22  you a "yes" and "no." Then if I can expand a
23  little bit on that.
24     Q.  Well, let me ask it this way. And
25  then, if you still need to expand, you can.

Page 397

1     Sitting here today, can you give me
2  a rank order in terms of heroin versus cocaine
3  versus prescription opioids versus fentanyl in
4  terms of which one is -- in terms of what the
5  actual cost per investigation is for your
6  office?
7     Do you know those precise numbers?
8     A.  I don't --
9     MR. BADALA: Objection to form.
10     THE WITNESS: I don't think we've
11  drilled down to the unit cost per each of those
12  tests. You know, some of these things are
13  going to be panels that we'll do screens on.
14     Where I would really say we bore an
15  additional cost above and beyond kind of
16  routine testing were with the analogs of
17  fentanyl. Because we had a find standards for
18  them, which in many cases weren't even
19  available. We had to upgrade instrumentation.
20  And again, that would be kind of the unit cost
21  I can't provide.
22     But I would say that, you know, it
23  wasn't trivial with the expense of those
24  instruments, that we needed to do a better job
25  analyzing them.

100 (Pages 394 - 397)

Page 398

1      BY MR. CARTER:
2      Q.   I want to follow up on one of the
3   quest -- one of the questions from last week.
4   I asked you about a statement you made before
5   congress in terms of character --
6   characterizing the supply into the County of
7   fentanyl from China and Mexico, that it could
8   essentially be considered an act of terrorism.
9          Do you recall that testimony to
10  congress?
11     A.   I recall the testimony --
12     Q.   Okay.
13     A.   -- to congress.
14     Q.   And you indicated yesterday that
15  that was not -- you wouldn't think it was --
16  or -- I said yesterday.
17          You indicated last week that you
18  didn't think it was fair that the county would
19  adopt that as an official position.  So leave
20  the county out it because this is your
21  individual deposition.
22          Do you stand by that
23  characterization today in your personal view?
24     A.   If I take a definition of
25  "terrorism" as the introduction of an agent

Page 399

1   that is harming the citizens of another
2   country, yes, I stand by that statement.
3      Q.   Okay.  And is that the definition
4   that you were using?
5      A.   That's what I meant to say when I
6   made that statement.
7      Q.   Okay.
8      A.   The drugs that were coming from
9   China, in large measure -- I can't say every
10  fentanyl drug that came here was from China.
11  But we -- you know, based on my discussions
12  with law enforcement, that was a major source.
13          And yes, those drugs were killing a
14  lot of people in our community.  And, you know,
15  it's not a big stretch to me to see that, you
16  know, in the context of flying an airplane into
17  a building and killing citizens here too.
18     Q.   You were asked to testify in an Ohio
19  legislative proceeding relative to the change
20  in OARRS regulation.
21          Do you recall testifying in that
22  capacity?
23     A.   I remember testifying about Naloxone
24  with the joint Ohio House and Senate.  I don't
25  remember OARRS testimony.  I'm not saying it

Page 400

1   didn't happen.  I just don't remember it.
2      Q.   Do you recall testifying that, for
3   the year 2012 to 2013, that a quarter of the
4   overdose deaths that you saw were the result of
5   doctor shopping and that mandatory use of OARRS
6   by physicians prior to any pain medication
7   prescription would eliminate that possibility
8   and that that simple step of making it
9   mandatory could save up to 50 lives a year in
10  Cuyahoga County alone?
11          Do you recall that testimony?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I don't remember the
14  specific testimony.  If I'm in the same time
15  frame, actually, our first data on doctor
16  shopping would have been in 2013.  And that was
17  36 percent, so not 25 percent.  So I'm thinking
18  the testimony must have been later.  It
19  subsequently has gone down to about 20 to 25
20  percent.
21          And -- yeah.  I -- I don't remember
22  the specifics of the testimony.  I did
23  advocate, you know, within our task forces
24  that, you know, mandatory checks on OARRS prior
25  to prescribing would eliminate the potential

Page 401

1   for diversion through the doctor shopping
2   route.
3      BY MR. CARTER:
4      Q.   If you testified in front of the
5   state legislature advocating for the -- the
6   mandatory requirement of physicians checking
7   OARRS before writing a prescription, you would
8   have been accurate and truthful in that
9   context, correct?
10     A.   I would hope to be.  Sure.
11     Q.   Okay.  And what about the view that
12  making mandatory use of OARRS prior to a pain
13  medication prescription on the part of
14  physicians?
15          Do you think that making that
16  mandatory would eliminate the possibility of
17  doctor shopping and could save up to 50 lives
18  per year in Cuyahoga County?
19     A.   I think that the mandatory checks on
20  OARRS would reduce doctor shopping.  You know,
21  where the number came from, I don't remember.
22  If this was testimony in Columbus, I don't even
23  remember going to Columbus.
24          There was a group of legislators who
25  came to -- I believe it was Medina County.  I

101 (Pages 398 - 401)

1  remember talking to them.  But the memory I
2  have of that was that it was more about
3  Naloxone.  I -- I don't remember the specific.
4      But, you know, as I sit here today,
5  I think that, when the prescribers of opioids
6  would be required to check OARRS before
7  prescribing, yeah, that's an excellent idea.
8      I would say, you know, how many
9  lives it could have saved at that time isn't
10  going to be the same necessarily as how many it
11  could save today.  But it would have saved
12  potentially, you know, diversion of drugs into
13  this area.
14      Q.   And so whatever the number was, if
15  you provided a number under oath, you could
16  stand by that in terms of making mandatory
17  checking of OARRS before writing a
18  prescription, that that -- that change alone
19  could prevent deaths in some number?
20      A.   Again, I -- you know, I don't
21  remember testifying, especially under oath to a
22  legislative body.  I remember, you know,
23  talking to a group of House and Senate people
24  from Ohio.  But I don't remember that specific
25  testimony.

1      I would say that the mandatory check
2  of OARRS prior to prescribing, in the face of
3  doctor shopping as we see it, and continue to
4  see it, actually, would, you know, prevent
5  diversion and could save lives.
6      I -- I -- I don't know where I
7  necessarily could have gotten that number.  But
8  it may have been a percentage of individuals
9  who may not have become addicted.  I don't
10  remember what went into the calculation.
11      But if I said a number, I'd have to
12  go back and revisit how I came to that number.
13  But I would tend to stand by, you know, those
14  things.  I don't try to pull them out of the
15  air.
16      Q.   So -- so putting aside the context
17  and the testimony, let me just ask you the
18  question.
19      Do you think the mandatory
20  requirement prior to a prescription by itself
21  would save lives?
22      A.   Yes.
23      MR. BADALA:  Objection to form.
24      THE WITNESS:  I think the state does
25  too.  We enacted that in April of 2015.

1      BY MR. CARTER:
2      Q.   You were asked some questions
3  earlier by Mr. Boranian about certifying the
4  cause and manner of death and what that
5  certification means.
6      I want to follow up in that area.
7  Okay?
8      A.   Sure.
9      Q.   Is it important -- is the function
10  that your office performs in certifying cause
11  and manner of death, do you think that's
12  important to the public?
13      A.   On so many levels, absolutely.  Yes.
14      Q.   And you told Mr. Boranian that those
15  ultimate conclusions that are certified, that's
16  the result of a medical opinion produced from
17  the exercise of medical judgment, correct?
18      A.   That's true for any death
19  certificate, my office included, yes.
20      Q.   Okay.  So in the course of your
21  entire work in Cuyahoga County, have you ever
22  certified as the cause and manner of death, in
23  an overdose case where the person used heroin
24  or illicit fentanyl or cocaine but did not have
25  any toxicology or evidence or OARRS profile of

1  prescription drug use -- so in that type of
2  situation, have you ever certified as a cause
3  or manner of death that their overdose death
4  was due to or referable to or arising out of a
5  prescription opioid epidemic?
6      MR. BADALA:  Objection to form.
7      THE WITNESS:  That one you lost me
8  on.
9      BY MR. CARTER:
10      Q.   Sure.
11      Have you ever certified a cocaine
12  death where there's no prescription opioid use
13  in your investigation -- have you ever
14  certified a case like that and -- and noted on
15  the death certificate that that cocaine
16  overdose was referable to the opioid epidemic?
17      A.   No.
18      Q.   Have you ever certified in such a
19  case that the cocaine overdose was directly
20  linked to the conduct of the defendants in this
21  case?
22      A.   Just so we're clear, we're talking
23  about cocaine in the absence of any opioid, be
24  it --
25      Q.   Correct.

102 (Pages 402 - 405)

Page 406

1  A.   -- prescription opioid, heroin,
2  fentanyl?
3  Q.   So cocaine in the absence of any
4  prescription opioid.
5  So cocaine plus illicit fentanyl,
6  cocaine plus heroin, cocaine by itself, cocaine
7  plus any substance that is not a prescription
8  opioid.
9  In any of those cases, have you ever
10  certified as a cause or manner of death that
11  that overdose death was caused as a result of
12  the conduct of the defendants in this case?
13  A.   That's not really what a death
14  certificate's function is.  There's no place to
15  check that.
16  So the answer, I mean shortly, is
17  no.  We don't put that information on a death
18  certificate.  But that's not the function of a
19  death certificate.
20  So I'm not aware of any jurisdiction
21  that would do something like that.  We
22  certainly don't because I don't think that's a
23  good practice.
24  Q.   So the function of the death
25  certificate is to arrive at the official

Page 407

1  medical opinion as to the cause and manner of
2  death, correct?
3  A.   Right.  We're going to enter a cause
4  and manner of death on a death certificate and
5  then other information, potentially around an
6  injury, if that's an unnatural cause of death.
7  Q.   And so, if you thought that a
8  cocaine overdose, where there's no evidence of
9  prescription opioid use in that person's
10  history, if you nonetheless thought as a
11  medical opinion that that death was
12  attributable to or directly linked to an
13  underlying prescription opioid epidemic, as a
14  medical matter, you would include that on the
15  death certificate, would you not?
16  MR. BADALA: Objection to form.
17  THE WITNESS: No.  Because if the
18  drug isn't present, it's not relevant to the
19  terminal cause of death.  But that doesn't in
20  any way mean that it's not related to the
21  prescription opioid epidemic.
22  If I had somebody who, for example,
23  you know, died of cocaine and heroin overdose,
24  and they were one of those, you know,
25  substantial percentage of people who became

Page 408

1  addicted to heroin after they had developed
2  addiction to opioid pain reliever, I would
3  still link that back to the opioid pain
4  relievers, but I'm not going write "opioid pain
5  reliever" on the death certificate.  Because
6  what my toxicology shows me was terminal event,
7  which is what I am using to certify cause of
8  death, and that would be heroin and cocaine.
9  BY MR. CARTER:
10  Q.   Okay.  If you believed, using your
11  medical, judgment that medically more likely
12  than not one of those deaths was directly
13  caused by the opioid epidemic or the conduct of
14  a defendant in this case, would you not have an
15  obligation, as someone executing your duties
16  under office, to include what you believed to
17  be the -- you know, the actual medical cause
18  and manner of death?
19  MR. BADALA: Objection to form.
20  THE WITNESS: I think you're making
21  a mistake about what a cause of death is.
22  It's -- you know, by definition it's an injury
23  or disease which, in a natural, unbroken
24  sequence, produces death and in whose absence
25  death would not have occurred.

Page 409

1  So we don't go back and say, you
2  know, two weeks ago, you know, something
3  happened here if it's not relevant to the
4  actual terminal event.
5  BY MR. CARTER:
6  Q.   So in terms of your obligations to
7  execute your office, you are required and you,
8  in fact, do certify the cause and manner of
9  death using your best medical judgment for all
10  of the cases before you, correct?
11  MR. BADALA: Objection to form.
12  THE WITNESS: I will certify the
13  cases I'm directly responsible for.  And I
14  review the cases that go through the office.
15  BY MR. CARTER:
16  Q.   Okay.  And --
17  MR. BADALA: And, Counsel, before
18  you start your next question, do we've seven
19  hours there?  I'm sorry.
20  MR. CARTER: No.  I still have two
21  more minutes.
22  THE VIDEOGRAPHER: Two more minutes.
23  MR. BADALA: Two more minutes?
24  MR. CARTER: Yeah.
25  MR. BADALA: Okay.  I just wanted to

103 (Pages 406 - 409)

Page 410

1 double-check.
2        MR. CARTER:  So -- and now I guess
3 I -- I have two more minutes after your
4 discussion.
5        BY MR. CARTER:
6    Q.   So in the course of those -- in
7 executing your duty, have you ever written on
8 any death certificate that the cause or manner
9 of death was an underlying prescription opioid
10 epidemic?
11       MR. BADALA:  Objection to form.
12       BY MR. CARTER:
13   Q.   Have you ever done that when
14 executing your day job?
15   A.   It's, again, not the function of me
16 as a death certifier.  It's a function I would
17 participate in as a public health official.
18 But it's not the way a death certificate would
19 be used in Ohio or any other jurisdiction I
20 worked in.
21   Q.   Prior to this lawsuit, have you ever
22 broken down the number of cocaine overdose
23 deaths and said which ones or what percentage
24 of those were directly attributable or
25 referable to an opioid epidemic?

Page 411

1        Have you ever made such a public
2 comment?
3    A.   I know time's running out.
4        If I understand your question, we're
5 talking about cocaine overdoses, potentially
6 mixtures of cocaine with other drugs?
7    Q.   Cocaine cases where there's no
8 evidence of prescription opioid use.
9        Have you ever -- you said that you
10 -- you have two types of statements.  You have
11 the death certificate certifications, and then
12 you have other things where you make policy
13 statements.  So I'm asking about the policy
14 statements.
15       Have you ever told the public, prior
16 to this lawsuit, that some subset of cocaine
17 cases that did not involve prescription
18 opioids, that some subset was directly
19 relatable to the prescription opioid epidemic?
20       MR. BADALA:  Objection to form.
21       THE WITNESS:  It's the opioid
22 epidemic.  So it would take in those three
23 phases that I mentioned.
24       And yes, we've made statements.  We
25 made statements to the African-American

Page 412

1 community when we saw the infiltration of the
2 cocaine market with fentanyl.  You know, I know
3 in the task forces we've offered, you know, an
4 analysis of the death data to say, "We're
5 seeing this rise in cocaine.  We're seeing this
6 rise in heroin.  But when we drill into the
7 data, that rise is related to fentanyl."
8        And as I said, the drugs that we
9 see, you know, now, the heroin before and the
10 fentanyl, are a continuum of the prescription
11 pain relievers.  And I think, you know, we've
12 generated independent data.  And there's, you
13 know, a consensus, I think, from, you know, CDC
14 about the phases of the opioid crisis.
15       So I -- I wouldn't say, you know,
16 that here's the prescription opioid crisis,
17 here's the heroin.  It's the opioid crisis, and
18 it has different phases.
19       MR. CARTER:  Thank you.
20       I'm out of time.
21       THE WITNESS:  Thanks.
22       THE VIDEOGRAPHER:  We are going off
23 the record at 6:22 p.m.
24       This concludes today's testimony of
25 --

Page 413

1        MR. BADALA:  No, no.  It doesn't
2 conclude.  We're going to have some questions.
3        THE VIDEOGRAPHER:  Oh.  I'm --
4        MR. BADALA:  Yeah.
5        THE VIDEOGRAPHER:  -- sorry,
6 Counsel.
7        MR. BADALA:  Yeah.  I wanted to make
8 sure we --
9        THE WITNESS:  Are we breaking, or
10 not?
11       MR. BADALA:  We could take just a
12 quick two-minute break.
13       THE WITNESS:  Yeah.
14       THE VIDEOGRAPHER:  We are going off
15 the record at 6:22.
16       (A short recess was taken.)
17       THE VIDEOGRAPHER:  We are going back
18 on the record.
19       The time is 6:28.
20       You may proceed, Counsel.
21   EXAMINATION BY COUNSEL FOR PLAINTIFF
22       BY MR. BADALA:
23   Q.   Dr. Gilson, you were asked some
24 questions earlier about Carole Rendon.
25       Do you recall that?

104 (Pages 410 - 413)

Page 414

1    A.  Yes, I do.
2    Q.  Doctor, I want to preface this
3  question by saying I don't want you to disclose
4  any confidences, if there were any.
5       However, at any point in time while
6  Ms. Rendon was at the U.S. Attorney's Office,
7  did you have confidential conversations with
8  Ms. Rendon related to prosecutions and/or
9  strategy?
10      MS. HARTMAN:  Objection.
11      THE WITNESS:  Can I answer?
12      MR. BADALA:  Yes.
13      THE WITNESS:  Yes.  I felt we were
14  sharing things that I wouldn't have shared in a
15  general forum.
16      BY MR. BADALA:
17    Q.  Now, earlier you were asked some
18  questions about the Burrage case.
19       Do you recall that?
20    A.  Yes.
21    Q.  And you were asked some questions
22  about a subsequent article that you copublished
23  with Ms. Rendon?
24    A.  We coauthored, yes.
25    Q.  Was everything that you discussed

Page 415

1  with Ms. Rendon included in that article?
2       MR. CARTER:  Objection to the
3  form.
4       THE WITNESS:  No.
5       BY MR. BADALA:
6    Q.  Do you know if Ms. Rendon is
7  currently representing any defendants in this
8  litigation?
9    A.  Yes, I do.
10    Q.  What was your reaction when you
11  heard that Ms. Rendon was representing a
12  defendant in this litigation?
13      MS. HARTMAN:  Objection.
14      THE REPORTER:  I'm sorry.  Who said
15  that?
16      MS. HARTMAN:  Objection.
17      THE REPORTER:  I just wanted to see
18  who it was.
19      MS. HARTMAN:  Ruth.
20      BY MR. BADALA:
21    Q.  You can answer.
22       Do you want me to repeat the
23  question?
24    A.  If you would, please.  Yeah.
25    Q.  Sure.

Page 416

1       Dr. Gilson, what was your reaction
2  when you heard Ms. Rendon was representing a
3  defendant in this litigation?
4    A.  I like Carole Rendon.  I enjoyed the
5  time we worked together when she was the U.S.
6  Attorney and deputy U.S. Attorney.  And I just
7  have to say I was very disappointed when I saw
8  that.  I -- it was disappointment.
9    Q.  Now, Dr. Gilson, earlier you were
10  asked a series of questions about potentially
11  responsible parties in this litigation.
12       Do you recall that?
13    A.  Yes, I do.
14    Q.  Doctor, do you have any reason to
15  believe that Cuyahoga County failed to name any
16  parties as defendants that you believed to be
17  responsible for the opioid epidemic?
18      MR. CARTER:  Objection to the form.
19      THE WITNESS:  I think Cuyahoga
20  County named the appropriate defendants in this
21  litigation.
22       When we spoke earlier, we talked
23  about drug cartels and pill mills and things
24  like that.  And I would say that, you know,
25  those are criminal operations and certainly

Page 417

1  should be, you know, deplored and punished.
2       But ultimately, it -- it's my belief
3  that the actions of the defendants created a
4  climate in which those individuals took
5  advantage of the county as well.
6       MR. BADALA:  I have no further
7  questions.
8       MR. HARTMAN:  I also have some
9  recross.  So --
10      MR. BADALA:  How much time did we
11  just have on there?
12      MR. CARTER:  Three minutes and two
13  seconds.
14      MR. BADALA:  Okay.
15      MR. HARTMAN:  I want to take a
16  two-minute break and then come back with the
17  recross.
18      MR. BADALA:  You want to go off the
19  record?  Is that what you're saying?
20      MS. HARTMAN:  Yeah.  We'll go off
21  the record.
22      MR. BADALA:  Okay.
23      MS. HARTMAN:  Did you say it was
24  three minutes?
25      MR. BADALA:  Two seconds.

105 (Pages 414 - 417)

Page 418

1      MS. HARTMAN:  Okay.
2      THE VIDEOGRAPHER:  We are going off
3  the record.
4      The time is 6:31.
5      (A short recess was taken.)
6      THE VIDEOGRAPHER:  We are back on
7  the record.
8      The time is 6:43.
9      You may proceed, Counsel.
10     EXAMINATION BY COUNSEL FOR
11     ENDO HEALTH SOLUTIONS, INC, AND
12     ENDO PHARMACEUTICALS, INC,
13     BY MS. HARTMAN:
14  Q.   Good afternoon -- or rather evening,
15  Dr. Gilson.
16  A.   Evening.
17  Q.   My name is Ruth Hartman.  And I am
18  here on behalf of the Endo defendants.
19     I just have a few --
20  A.   Good afternoon -- good evening.
21  Q.   Good evening.
22     I have a few follow-up questions.
23     You just testified that you shared
24  confidential information and strategy related
25  to prosecutions with Ms. Rendon; is that

Page 419

1  correct?
2  A.   Yes, I did.
3  Q.   Did Ms. Rendon compel the sharing of
4  this information that you shared with her?
5      MR. BADALA:  Objection to form.
6      THE WITNESS:  No.  I think we were
7  discussing it in the context of she's the
8  federal prosecution, and I'm the person who
9  potentially was going to serve as an expert
10  witness in some of the death specification
11  cases related to drug overdoses.
12     BY MS. HARTMAN:
13  Q.   Oh, okay.
14     Did you serve as that expert witness
15  related to drug overdoses?
16  A.   We were slated to do a case.  I
17  forget who the U.S. Attorneys were.
18  Q.   Uh-huh.
19  A.   But it pled before it went.
20  Q.   Okay.
21  A.   But I was going to testify in my
22  capacity as the medical examiner who reviewed
23  the data.  I didn't actually do that autopsy.
24     But just, you know, given how much
25  effort I was putting into keeping up and

Page 420

1  tracking these things, I was going to be the
2  person who was going to be called.
3  Q.   Okay.  So -- but -- but this never
4  came to fruition; is that correct?
5      MR. BADALA:  Objection to form.
6      THE WITNESS:  No.  There have been a
7  couple of cases I have had those discussions.
8  But none of them --
9      MS. HARTMAN:  Okay.
10     THE WITNESS:  -- have actually gone
11  to trial.
12     BY MS. HARTMAN:
13  Q.   Okay.  Was the information you
14  shared with Ms. Rendon that you suggested was
15  confidential in the context of the U.S.
16  Attorney Heroin and Opiate Task Force?
17  A.   You mean the task force meetings?
18  Q.   Uh-huh.
19  A.   No.  This would have been more
20  discussion I had with her.
21  Q.   About the expert witness position?
22     MR. BADALA:  Objection to form.
23     THE WITNESS:  I misrecall your
24  question.
25     BY MS. HARTMAN:

Page 421

1  Q.   All right.  So what was the context
2  of this confidential information?
3      MR. BADALA:  I'm just going to
4  instruct you, if it's confidential, not to
5  disclose it.
6      THE WITNESS:  I -- I mean some of it
7  was about strategies for prosecutions.  I don't
8  want to disclose those, actually.
9      BY MS. HARTMAN:
10  Q.   Okay.  So -- well, can you describe
11  exactly the nature of the confidential
12  information you claimed to have shared?
13     MR. BADALA:  Again, objection.
14  Asked and answered.
15     But I'm going to instruct you not to
16  disclose what the confidential information was.
17     THE WITNESS:  I mean and this may
18  bear with future prosecutions.  I don't want to
19  answer that question.
20     BY MS. HARTMAN:
21  Q.   Well, were the prosecutions you
22  discussed against any individuals in this case?
23     MR. BADALA:  Objection to form.
24     Again, I'm going to instruct you not
25  to disclose any confidential information.

106 (Pages 418 - 421)

Page 422

1    BY MS. HARTMAN:
2    Q.   You can answer "yes" or "no" without
3  disclosing any information.
4        MR. BADALA:  Well, that would be
5  disclosing if there was.
6        So I'm going to instruct you not to
7  respond -- not to answer that question.
8    BY MS. HARTMAN:
9    Q.   But you're not aware of any incident
10  when the U.S. Attorney's Office pursued any of
11  the defendants this is this case; is that
12  correct?
13        MR. BADALA:  Objection to form.
14        THE WITNESS:  I don't know of any
15  case that they brought against the
16  pharmaceutical companies or the distributors.
17        MR. BADALA:  And, Counsel --
18        BY MS. HARTMAN:
19    Q.   Or manufacturers?
20        MR. BADALA:  -- before you start
21  your next question, I think we're out of time.
22        MS. FLEMMING:  We are.
23        MR. BADALA:  We are.  Yeah.  You've
24  been on for three minutes.
25        MS. HARTMAN:  Okay.

Page 423

1        THE VIDEOGRAPHER:  We are going off
2  the record at 6:46 p.m.
3        This concludes today's testimony of
4  Dr. Thomas Gilson.
5        The total number of media units was
6  seven and will be retained by Veritext Legal
7  Solutions.
8        (Whereupon, the proceeding was
9  concluded at 6:47 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 424

1        C E R T I F I C A T E
2
3        I, Bonnie L. Russo, Certified Shorthand
4  Reporter, and Notary Public, hereby certify:
5        That THOMAS GILSON was duly sworn by
6  me, an authorized Notary Public, and that this
7  deposition is a true and correct record of the
8  testimony given by such witness to the best of
9  my knowledge and ability.
10        I further certify that I am not related
11  to any of the parties to this action and that I
12  am in no way interested in the outcome of this
13  matter.
14        In witness whereof, I have hereunto set
15  my hand this day, January 25, 2019.
16
17  _Bonnie L. Russo_
18  Bonnie L. Russo
19  Certified Shorthand Reporter
20
21
22
23
24
25

Page 425

1        Veritext Legal Solutions
          1100 Superior Ave
2          Suite 1820
          Cleveland, Ohio 44114
3        Phone: 216-523-1313
4
  January 25, 2019
5
  To: Salvatore C  Badala, Esq
6
  Case Name: In Re: National Prescription Opiate Litigation
7
  Veritext Reference Number: 3196188
8
  Witness:  Thomas Gilson, M D        Deposition Date:  1/22/2019
9
10  Dear Sir/Madam:
11
  Enclosed please find a deposition transcript  Please have the witness
12
  review the transcript and note any changes or corrections on the
13
  included errata sheet, indicating the page, line number, change, and
14
  the reason for the change  Have the witness' signature notarized and
15
  forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext com
18
  If the errata is not returned within thirty days of your receipt of
19
  this letter, the reading and signing will be deemed waived
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

107 (Pages 422 - 425)

Page 426

1      DEPOSITION REVIEW
        CERTIFICATION OF WITNESS

2
     ASSIGNMENT REFERENCE NO: 3196188

3  CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 1/22/2019

4  WITNESS' NAME: Thomas Gilson, M D

5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me
    I have made no changes to the testimony
  as transcribed by the court reporter

8

9  Date       Thomas Gilson, M D

10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,

11  the referenced witness did personally appear
   and acknowledge that:

12
      They have read the transcript;

13     They signed the foregoing Sworn
     Statement; and

14     Their execution of this Statement is of
     their free act and deed

15

16     I have affixed my name and official seal

17  this _____ day of_____, 20____

18     Notary Public

19
     Commission Expiration Date

20

21

22

23

24

25

---

Page 427

1      DEPOSITION REVIEW
        CERTIFICATION OF WITNESS

2
     ASSIGNMENT REFERENCE NO: 3196188

3  CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 1/22/2019

4  WITNESS' NAME: Thomas Gilson, M D

5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me

7    I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as

8  well as the reason(s) for the change(s)

9    I request that these changes be entered
   as part of the record of my testimony

10
     I have executed the Errata Sheet, as well

11  as this Certificate, and request and authorize
   that both be appended to the transcript of my

12  testimony and be incorporated therein

13  Date      Thomas Gilson, M D

14
    Sworn to and subscribed before me, a

15  Notary Public in and for the State and County,
   the referenced witness did personally appear

16  and acknowledge that:

17     They have read the transcript;
     They have listed all of their corrections

18     in the appended Errata Sheet;
     They signed the foregoing Sworn

19     Statement; and
     Their execution of this Statement is of

20     their free act and deed

21     I have affixed my name and official seal

22  this _____ day of_____, 20____

23
     Notary Public

24
     Commission Expiration Date

25

---

Page 428

1      ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST

2     ASSIGNMENT NO: 1/22/2019

3  PAGE/LINE(S) /     CHANGE     /REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19

20  Date      Thomas Gilson, M.D.

21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22  DAY OF _____, 20_____ .

23
     Notary Public

24
     Commission Expiration Date

25

---

108 (Pages 426 - 428)

[& - 2016]                                                                    Page 1

**&**

**&**   2:8 4:2 5:4 7:22
8:15 9:5

**0**

**000099975**  341:10
**001670519-0520**
6:19
**001710246-0247**
6:14
**00918**  3:12
**06**  360:21
**07**  360:21

**1**

**1**  6:11 7:14 41:15
41:17,22 42:3,11
77:19 97:15,19
183:8 184:22
204:1 286:11
372:21 393:2,5
**1,050**  358:2
**1,439**  357:24
**1-11-18**  6:24
**1/22/2019**  425:8
426:3 427:3 428:2
**10**  6:3 112:3
114:10 136:21
**10-9-17**  6:19
**10036**  3:17
**101**  4:19
**107**  184:10
**1095**  3:16
**10:22**  77:20
**10:36**  78:1
**11**  350:21 351:12
352:15
**1100**  4:4 425:1
**111**  101:18 112:3
**113**  353:24
**116**  138:9

**11747**  3:5
**11937**  424:17
**11th**  350:13
**12**  58:13 60:2,15
61:2 63:8 69:13
69:14,24 70:1,3
73:4 74:17
**127**  4:14
**12:03**  159:24
**12:11**  160:5
**12:28**  178:20
**13**  69:24 70:2
190:25
**1300**  3:8
**14**  189:14 254:24
260:19
**14:27**  328:1
**15**  139:5,7 189:14
**1500**  388:6
**16**  139:5,7 387:9
**160**  222:22 225:13
**161**  101:10 112:3
**169**  227:5
**17**  1:5,9 7:20
90:19 139:5,7
396:10
**18**  1:11,13 139:6
224:20
**180**  288:16
**1800**  4:19
**1820**  425:2
**1870**  38:15
**194**  311:14
**1950**  2:10 7:23
**1970**  280:5
**1970s**  189:10
289:17 290:4,5
**1980s**  46:24
**1990**  39:19
**1990s**  37:25 38:13
38:18,24,25 39:4

39:10
**1:14**  178:24

**2**

**2**  6:13 77:25
122:20 140:11
159:23 215:10
218:9 352:7 393:3
393:8
**20**  103:17 114:11
138:6 140:1
400:19 426:16
427:22 428:22
**200**  89:19
**2000**  308:1 341:11
**20001**  5:5
**2005**  273:1 274:13
**2006**  40:25 41:4
43:18 89:2 90:14
98:11,19 140:1
286:22 337:4,13
341:12 342:4
343:23 360:2
**2007**  337:13 342:4
360:3
**201**  3:12 4:23
**2010**  3:20 38:1,1
183:20 372:20
**2011**  10:24 11:2,20
13:5 84:14 86:25
110:23 111:5
183:20,24 184:10
184:17 187:2
188:12 329:12
353:24 354:2
359:7,24 360:23
373:5 393:25
394:4
**2012**  100:22 101:3
101:9,15 105:24
111:20 126:16
140:23 141:23

142:4,7 143:8,20
144:5 189:14
190:12,25 218:13
222:23 223:4
293:22 294:10
299:5,17,22
301:19 318:16,17
321:7 394:6 400:3
**2013**  59:21 134:7
138:5,9 139:21
143:8,15,20
177:25 183:23
189:14 190:16
216:25 218:11
225:22 299:6
304:23 308:1
310:19 311:11,13
323:6 353:22
356:7,15,20 400:3
400:16
**2014**  38:2 98:11,19
104:2 105:17,20
137:22 139:4,10
190:16 323:6
325:15 394:14
395:12
**2015**  96:5 137:13
139:15 140:12
228:17 229:6
273:1 274:13
323:6 325:15,15
332:14 354:16
385:5 387:9
389:18 392:24
393:5 394:9
403:25
**2016**  43:20 44:1,12
45:13,16,22 50:19
88:18 89:7,9,11,16
89:19 90:15,19
110:11 137:13

[2016 - 727]

138:1 139:16
140:14 185:2,21
186:8,17 293:20
294:11 298:8
299:15 304:23
308:2 310:19
318:18 321:7
323:9 333:1
354:11 385:14
389:2,17 390:2,10
392:13 393:8
396:10
**2017** 40:1 44:1
50:19 89:20 94:19
94:20 138:2
140:14 271:4
341:12 352:13
353:17 354:11
357:21 358:23
389:25
**2018** 6:23 11:16,21
40:14 91:3,7
93:19 94:20,20
350:10,13,14,18
351:2 352:14
353:3,19 356:8
358:2
**2019** 1:19 7:5
350:22 351:5,12
352:15 361:12,15
424:15 425:4
**202-662-6000** 5:6
**21** 190:24 194:2,23
196:20
**212-397-1000** 3:9
3:13
**212-698-3814** 3:17
**215** 6:13 288:13
**216-523-1313**
425:3

**216-592-5000** 4:5
**216-621-0200** 4:15
**22** 1:19 391:25
**22nd** 7:5
**23** 95:5 194:19
**24** 40:2
**25** 136:22 138:6
301:21 400:17,19
424:15 425:4
**250** 286:22
**253** 6:15
**26** 112:3
**269** 6:18
**270** 3:12
**2804** 1:4,5 7:20
**2:13** 237:20
**2:30** 238:1
**2:54** 257:24
**2:56** 258:3

**3**

**3** 6:15 160:4
237:19 253:6
257:1,2
**3.6** 252:16 254:11
254:16,25 255:11
256:4,18 257:15
258:17
**30** 138:6
**300** 3:20
**305** 3:4
**310** 100:23 101:2
111:22 112:4
**3196188** 1:25
425:7 426:2 427:2
**325** 4:8 392:10
**328** 6:4
**33** 112:3
**330-252-9060** 4:24
**340** 6:20
**349** 6:21

**36** 400:17
**37** 137:21 139:13
**370** 385:16
**373** 6:5
**399** 138:1
**3:35** 286:7
**3:36** 286:1

**4**

**4** 6:18 109:23
184:23 237:25
269:14 285:25
286:12
**400** 3:4
**413** 6:6
**415-659-5980** 4:20
**418** 6:7
**43215** 4:9
**44113** 2:11 4:5
**44114** 3:8 4:14
425:2
**44308** 4:23
**45005** 1:9
**45090** 1:13
**45132** 1:11
**48** 221:14 222:2
**492** 138:1
**4:40** 328:7
**4th** 389:18 390:9

**5**

**5** 6:20 286:6
327:25 340:23,25
360:11,16
**50** 4:23 82:10
103:17 301:23
400:9 401:17
**50s** 39:14
**512-394-3000** 3:21
**54** 223:1,5 224:6
**542** 358:23

**55** 2:9 7:23
**560** 93:11,19 94:11
95:17 352:15
353:6,17 361:16
**5:30** 373:13
**5:42** 373:20

**6**

**6** 6:21 122:25
123:15 125:14
328:6 349:11,20
352:7 360:12,15
372:21,23 373:12
389:24
**60** 114:10
**600** 3:8 4:9
**60s** 39:15
**614-281-3906** 4:10
**63** 315:14
**631-224-1133** 3:5
**64** 220:21 221:23
222:9,11,16
**666** 385:16
**6:22** 412:23
413:15
**6:28** 413:19
**6:31** 418:4
**6:43** 418:8
**6:46** 423:2
**6:47** 423:9
**6th** 3:20 92:17

**7**

**7** 373:19
**7-11-13** 6:13
**70** 294:5 315:11
**70s** 193:20
**71** 226:21 227:7
260:19,19
**725** 93:19
**727** 93:12 94:11
95:17 352:14

**[727 - acted]** Page 3

353:6,17
**75**   337:16
**78701**   3:20
**79.5**   248:14 260:21

**8**

**80**   222:14,18
251:22 252:14
255:25 256:17
260:6,10
**80s**   47:18 48:7
**85**   101:21 102:23
104:8 105:1 106:6
107:17 108:8
112:3 123:2
125:20 221:17
222:6,11,14,16,18
227:8
**850**   5:5
**86**   260:20
**87**   222:23 227:8
260:20

**9**

**90**   119:8 294:5
301:20 315:13
332:20 352:21,23
**90s**   46:24
**94105**   4:20
**95**   301:21
**950**   4:4
**96.4**   257:16 259:25
**96.5**   257:12
**97**   6:11
**98**   184:12
**9th**   271:4

**a**

**a.m.**   1:20 7:5
**aafs**   313:7
**aaron**   1:7
**ab**   307:6

**ability**   46:5 53:10
108:4 138:23
141:5,13 424:9
**able**   92:2 102:25
103:2,4 124:12
130:17 142:12
149:6 153:11,24
189:16 227:23
246:1 247:4
294:17 303:6
306:12 328:18
360:24 387:16
389:5 392:17
**absence**   88:22
90:18 377:14
405:23 406:3
408:24
**absent**   40:9
**absolute**   35:16
88:20 178:6
**absolutely**   92:14
110:6 360:10
404:13
**abstract**   202:19
253:16,18 254:9
296:2,3,12,13
307:2,13 311:22
312:4,5,9,14,21
313:14,15 314:9
**abstracted**   303:16
**abstracting**
306:11
**absurd**   280:20
**abuse**   39:3 57:18
173:1 192:5 230:5
231:19 251:12
258:22 277:1
282:4 287:12
289:14 296:19,23
301:3 302:19,25
303:8,22 308:12

318:24 319:3,11
319:20 320:5
322:19 362:2
365:17 375:7,10
376:12 377:1,4
**abused**   41:18,24
212:2 248:10
283:23
**abusers**   231:19
263:6 293:8,9
309:17
**abusing**   65:3
132:13 225:1
230:22 248:18
266:12
**academic**   169:8
359:25
**academy**   293:18
312:6
**accelerates**   339:15
**accepted**   312:13
313:16
**access**   35:19 49:14
51:25 52:6,8,18,19
52:23,24 54:1,2,8
73:22 108:20
140:24,25 142:11
142:24 143:8,10
143:15,25 146:7
180:17 190:10
220:14,18 224:18
225:25 228:25
229:4 238:7,10,17
238:20,22 239:12
239:24 261:25
264:8 295:2
301:13 303:24
304:6,14 310:16
311:25 328:19
330:15 338:17
358:18 359:3

**accessed**   53:3
202:3
**accesses**   58:14
**accessible**   127:11
**accessing**   58:12
316:15
**accident**   282:13
**accidental**   157:6
287:15,23 288:2
**accommodate**
389:5,7,8
**account**   50:15
157:25 158:17
217:9,15,17,18
288:16 339:25
**accreditation**
352:21 385:10
387:17,22 388:1,1
393:4
**accredited**   387:24
**accrediting**   385:11
392:8,12 393:1
**accurate**   185:5
272:4,6 288:1
321:20,22 322:5
401:8
**accurately**   10:14
**acetaminophen**
99:17
**acetyl**   122:20,21
**acknowledge**
426:11 427:16
**acquaint**   170:17
**acquires**   368:9
**acquisition**   361:5
**acronym**   49:6
**act**   102:8 145:25
398:8 426:14
427:20
**acted**   62:22

**action** 191:23
233:24 383:8
424:11
**actions** 115:21
191:13 192:11
194:12 195:11
205:17,18 206:4
207:11,19 234:22
237:12,13 293:5
382:24 384:12
417:3
**active** 33:3 193:24
**actively** 231:5
**activities** 177:13
177:22 206:2
210:12 278:3
**activity** 154:20
198:20
**actual** 14:11 24:11
105:5 198:6 397:5
408:17 409:4
**acute** 389:21
**acutely** 46:12
138:14
**ad** 281:3
**adamhs** 303:10,22
320:9
**add** 112:1,3
312:25 354:24
356:23 357:4
387:22 394:14
**added** 145:6
177:13 187:19
356:21 385:18,19
385:20
**addict** 277:9
**addicted** 57:13
136:8 191:9 193:5
193:7 196:5,11
199:8 204:23
206:8,10 207:20

210:7 225:8
230:13 231:13
233:9 266:9,12,16
267:22 268:17
271:15,17,18
272:11,14 273:17
277:20 278:1,10
279:15 280:8
282:8,10 284:24
285:18 292:10
377:8 403:9 408:1
**addiction** 30:18
54:23 55:4,7,8
69:9 70:13,16
102:19 192:10
197:16 200:14
225:8,24 229:21
229:23 231:23,25
261:13 262:7
263:20 266:7
273:3 276:7,21,22
277:5,17 278:3
279:22 281:20
289:14 290:3
291:8,17 303:11
318:22 322:17
370:20 374:25
375:1,10,22 376:7
376:12,16 377:4
377:14,21 408:2
**addictive** 192:4
284:14 290:18
**addicts** 195:1,3
229:22 231:6,24
232:3 261:23
271:23 277:11
280:2 283:3,15
**adding** 248:13
**addition** 301:10
**additional** 74:24
75:7 89:25 265:16

301:23 308:17
324:23 325:5
347:23 362:5,6
384:1,23 385:13
385:18,20 389:10
393:11,13,23
397:15
**address** 96:22
150:7 169:24
174:6 176:16
178:7 217:23
299:19 326:11
425:15
**addressing** 261:2
326:23
**adds** 112:3
**adequately** 326:19
**adhered** 61:7
**adjacent** 387:10
388:5
**adjunct** 14:12
**administer** 301:22
309:6
**administered**
301:5,16
**administration's**
325:3
**administrations**
308:18
**administrator**
270:9 329:4
**adopt** 241:21
398:19
**adopted** 60:8 69:8
**adult** 290:15
291:11
**adulterated**
173:17
**advance** 259:3
**advanced** 25:17
29:14

**advantage** 232:8
233:3 417:5
**advent** 173:16
**advised** 291:3
**advocate** 400:23
**advocated** 246:19
**advocating** 401:5
**affiliations** 8:7
**affixed** 426:15
427:21
**afford** 387:14
**afghanistan** 32:23
**african** 156:4,7
411:25
**afternoon** 328:12
328:13 373:25
418:14,20
**age** 293:23 300:25
343:3
**aged** 331:9
**agencies** 82:10
83:9 239:11
**agency** 19:14
24:10 51:17 68:6
68:9 78:23 80:22
83:1,3 87:7 159:7
332:5,6 391:24
**agent** 398:25
**aggregate** 218:17
382:2 384:8,11,16
384:21
**aggregated** 369:20
**ago** 40:10 47:25
105:14 239:2
350:21 351:13
394:10 409:2
**agree** 7:13 76:25
94:11,22 152:20
179:2 192:2
199:12 200:4,8
206:6 208:25

[agree - approved]

209:1 211:15 241:13,15 257:4 280:21 376:7
**ahan** 5:6
**ahead** 23:14 43:15 84:15 96:7 118:3 125:8,8 137:16 141:2 193:16,18
**air** 403:15
**airplane** 399:16
**akron** 4:23 158:24 390:11
**al** 1:8,10,12,13 272:23
**alcohol** 55:7 70:13 192:6 225:23 284:7 303:11
**alert** 156:15
**allocate** 326:22
**allowed** 10:3 216:12 253:9
**amend** 78:7
**ameribergen** 363:3
**america** 33:1
**american** 156:4,7 293:18 312:6 411:25
**americas** 3:16
**amerisourceberg...** 4:16 8:20,22 9:8 328:10 363:23
**amount** 24:11 116:21 386:21
**amphetamine** 39:14,16,17 41:8 56:12 136:18
**amphetamines** 56:16 57:2 206:13 206:16,20

**analog** 36:13 37:13 188:10
**analogs** 36:12 51:10 95:23 188:19 326:16 386:3,4 397:16
**analysis** 28:25 42:15 60:12 61:18 72:8 116:8 133:22 218:11 316:5 331:5,16 362:3,10 365:15 370:23 371:23 382:11 412:4
**analyze** 28:19 134:14 190:16 226:19
**analyzed** 314:11
**analyzing** 397:25
**anamsa** 247:16
**ancillary** 340:3
**anecdotal** 132:12 228:4 295:10
**anecdotally** 232:2 361:15
**anecdotes** 294:22 294:24 295:4
**anecdotically** 155:16
**anesthetic** 42:6,9
**anna** 5:3 9:5
**annual** 12:24 13:1 13:3 14:1,18,25 16:1,7 19:3,6
**anpp** 109:23
**answer** 16:8 27:17 28:4 43:6 87:7 97:13 118:2 125:4 125:7,11 129:24 134:13 154:23 163:21 185:18

201:18 204:11 234:18 245:8 263:16 264:14,19 264:20 267:8 279:17 285:14 293:11 297:1 299:14 300:1 302:17 378:21 382:20 391:2 406:16 414:11 415:21 421:19 422:2,7
**answered** 18:2,23 33:11 79:24 180:23 193:14 203:22 233:7 235:22 237:5 279:25 285:13 382:22 396:16 421:14
**answering** 162:18 310:11
**answers** 78:18
**antibiotics** 69:21
**antidote** 294:1 357:3
**anxiety** 229:20
**anybody** 19:23 20:1 22:18 24:19 40:7 61:11 67:2 235:3,12 237:7 275:7 276:6 284:20 322:15 323:1 395:7,19
**anybody's** 25:22
**anymore** 274:2 311:13 387:21 390:4
**apart** 116:6
**apollonio** 27:7

**apologize** 161:3 221:22 324:13
**app** 346:5 347:3
**appear** 145:9 346:22 375:5 426:11 427:15
**appearances** 3:1 4:1 5:1 8:7 9:3
**appeared** 154:13
**appears** 185:12
**appended** 427:11 427:18
**apples** 287:20,20
**applicable** 259:23 259:23 323:7
**apply** 259:15
**applying** 298:1
**appointed** 11:15
**appreciate** 129:24 368:23
**appreciated** 41:1
**appreciation** 190:17
**approach** 225:18
**approached** 75:3
**appropriate** 65:13 152:14 237:3 244:2,9,25 245:6 250:8 260:24 265:11,15 416:20
**appropriately** 35:5 77:3 233:14 233:23 237:9 246:16 251:15,22 261:21 263:18 264:9
**approve** 143:4
**approved** 241:12 241:20 242:19 243:5

**approximately**
23:7 255:25
258:17 288:4
**april** 228:17
403:25
**arcos** 68:19 238:5
238:22,25 240:12
240:15
**area** 26:12,14
31:13 89:23 104:4
209:8 282:9 283:3
283:4 374:22
402:13 404:6
**areas** 28:5,6,14
29:16 338:23
**argue** 199:24
216:24 254:15
**arising** 405:4
**arrest** 302:22
**arrested** 266:1
**arrive** 406:25
**arrived** 329:11
389:19
**article** 6:15 162:24
168:15,19 169:17
170:16 252:25
254:15 258:16
414:22 415:1
**articles** 22:15
**articulate** 260:23
**aside** 146:9 235:15
349:9 403:16
**asked** 14:21 16:6
18:23 43:12 75:7
75:23 119:4 128:8
135:4 141:25
142:7 162:9
196:14 201:13
203:22 219:16
228:2 235:22
237:5 238:4,10

244:14 248:9,22
255:23 279:25
285:6 296:15
310:14 324:22
325:5 339:3
361:25 374:24
379:17,24,25
382:22 398:4
399:18 404:2
413:23 414:17,21
416:10 421:14
**asking** 15:9 45:20
62:19 77:12 80:1
94:15 105:9
150:25 155:12
163:8 179:13
201:13 204:8
205:4,5 258:20
264:7 280:17
296:17 307:21
310:7 379:6
392:20 411:13
**asks** 206:19
**asleep** 63:12 85:12
**aspirin** 99:13
**assay** 104:15
116:22 120:21
144:25
**assays** 99:7
**assess** 213:20
214:3
**assessment** 245:10
245:16
**assessors** 50:6,10
**assigned** 343:7
**assignment** 426:2
427:2 428:2
**assist** 23:25
146:16
**assistance** 365:15

**assistant** 329:17
**assisted** 24:5
**associated** 101:6
102:24 103:23
185:9 186:18
292:18 354:14
**association** 124:4
158:2 169:14
270:16 335:16
**associations** 6:15
**assume** 113:21
130:12 147:2
213:1 277:19
376:8,11
**assuming** 217:12
324:10,12
**assumption**
147:12 357:14
**assumptions**
294:19
**asterisk** 353:2
**astute** 196:1
**atherosclerosis**
339:12,15
**attached** 427:7
**attack** 119:10
**attempt** 124:17
343:16
**attend** 171:21,24
**attendance** 171:25
**attendee** 171:23
**attending** 8:6
**attorney** 19:20
115:12 160:14,16
160:18 416:6,6
420:16
**attorney's** 164:23
165:10 166:5
167:3 170:11
171:21 174:12
178:3 183:21

270:5,22 414:6
422:10
**attorneys** 161:16
163:2,15 164:2
167:1,10,15
169:18 307:18
419:17
**attributable**
191:19 204:15,18
205:8 381:24
407:12 410:24
**attribute** 203:20
275:20 396:11
**attributed** 89:24
90:8 185:4
**audience** 309:21
**audiences** 174:18
**audio** 7:11,11
**austin** 3:20
**author** 167:19
**authorities** 152:15
**authorize** 427:11
**authorized** 87:9
311:9 424:6
**authors** 271:14
272:9 314:8
**automated** 49:6
**automatically**
120:3
**autopsies** 50:23
51:15 52:15 75:11
144:8 186:19
391:7
**autopsy** 51:2
52:17 53:4,13,18
54:9 58:21 71:7
84:16 98:25
120:14 146:11,13
148:13,18,19
149:15 150:2,16
180:7,9 187:15

| | | | |
|---|---|---|---|
| 326:14 339:25 | 364:8 367:9 | 265:23 266:14,19 | 40:19 41:19 42:22 |
| 377:12 390:17 | 369:13 372:4 | 272:2 273:12 | 43:5,9,12 44:16,23 |
| 391:23 392:1,10 | 376:4 383:13 | 277:9,17 278:6 | 45:5,11,23 46:16 |
| 393:20 395:24 | 386:25 391:8,9 | 279:9,16 280:5 | 46:22 47:20 48:1 |
| 419:23 | 394:3 406:20 | 282:7,11,15,21 | 48:8,13,19 50:12 |
| **availability** | 422:9 | 283:6 285:18 | 52:21 53:6 54:24 |
| 110:17 292:24 | **b** | 286:3 289:18 | 57:24 59:2,11,25 |
| **available** 20:21 | | 290:4,5 291:12,25 | 61:10 63:2 64:13 |
| 49:11 169:4 | **b** 11:19 329:1 | 292:20 293:5,21 | 65:22 66:1,15 |
| 174:20 180:4,12 | **baby** 246:5 | 294:17,19,20 | 67:4,11 68:7 |
| 182:15,15,18 | **back** 32:14 33:6 | 296:14 298:14 | 72:18 73:7 74:4 |
| 220:18 231:19 | 37:25 38:15 39:14 | 301:19 303:9 | 75:1 76:9,12,16,18 |
| 239:6 285:4 340:7 | 40:14,24,25 41:3,5 | 306:6 307:20 | 77:6 78:16 79:8 |
| 377:2 397:19 | 43:18,18 45:1 | 312:24 315:3,4 | 80:10,19 81:12,21 |
| **ave** 425:1 | 47:18 48:7 50:18 | 317:4 320:6,10 | 82:8,20 83:18 |
| **avenue** 3:8,12,16 | 51:5,11 70:15 | 321:11 323:5 | 84:21 85:19 86:16 |
| 4:4 | 71:2 74:23 77:22 | 328:3 329:21 | 87:5,14 88:7 91:8 |
| **average** 45:25 | 81:4,25 89:2 | 337:4 354:7 | 91:22 93:2 95:1 |
| 89:6 | 90:14 96:13 105:4 | 356:15 360:21,22 | 97:3 103:9 106:10 |
| **avoid** 124:7 | 108:3 111:20 | 371:19 372:14 | 113:8 114:5 115:8 |
| 125:24 | 131:2 132:14,17 | 373:16 382:5,7 | 116:13 117:3 |
| **avoided** 301:18 | 132:23 133:5,12 | 383:24 384:8 | 118:1 121:24 |
| 357:3 | 133:13 134:4,14 | 385:6,25 387:23 | 123:4 125:3,6,9,22 |
| **avoiding** 131:4 | 135:18 139:10 | 389:24 403:12 | 127:7,25 128:21 |
| **aware** 24:19 35:7 | 140:15 142:21 | 408:3 409:1 | 129:22 130:4,21 |
| 39:13 48:11,17 | 143:9 153:6 160:1 | 413:17 417:16 | 131:21 133:8 |
| 63:18 75:6 78:25 | 165:22 177:25 | 418:6 425:15 | 138:12 144:20 |
| 83:11,16 109:10 | 178:22 183:7 | **background** 35:16 | 147:14 148:7,15 |
| 118:11,13 119:19 | 189:8 190:6 | **backs** 141:11 | 151:13,23 153:16 |
| 122:13 127:14 | 191:12 194:9 | 224:19 | 154:3,16 155:10 |
| 137:12 144:19 | 195:9,11 196:10 | **backwards** 268:24 | 156:1 158:20 |
| 155:5 157:8,20 | 199:5 200:24 | **bad** 82:15 240:8 | 159:2,11,15,18 |
| 170:2 178:12 | 206:20 207:11,18 | 266:6 361:16 | 163:11,14,17 |
| 183:13 210:17 | 210:1,2,10 213:25 | **badala** 3:3 6:6 8:9 | 164:6 166:18 |
| 225:14 232:11,14 | 216:14,23 218:8 | 8:9 9:19,22 13:23 | 169:22 171:6 |
| 239:4 242:13,17 | 218:11 220:4 | 15:13 17:14 18:10 | 172:17 175:9,25 |
| 243:19 251:3 | 221:10 224:18,23 | 18:22 19:4 21:21 | 176:7,13 177:1,9 |
| 259:14 261:3,6,10 | 225:14 226:16 | 25:5,20 29:5 | 177:17 178:16 |
| 261:17 263:3,8,11 | 233:10 234:6,21 | 30:11 31:10,17 | 179:20 180:5 |
| 263:13 271:12 | 237:22 248:12,24 | 32:10 35:12 36:15 | 183:12 185:25 |
| 289:3,5 297:20 | 254:23 258:1 | 37:20 38:19 39:12 | 186:21 187:9 |
| | 259:8 263:24 | | |

| | | | |
|---|---|---|---|
| 189:2 191:3,21 | 325:1 326:1,9 | 219:17 220:16 | 323:17 373:18 |
| 192:9,21 193:15 | 333:10 334:1 | 225:20 228:8 | **behalf** 2:14 3:3,14 |
| 193:17 195:18 | 354:6 361:10 | 250:8 258:16 | 4:2,7,11,16 5:2 |
| 197:2,8,21,24 | 366:19 368:11,18 | 262:7 267:23 | 8:14,17,20 9:8 |
| 198:11 199:14 | 368:21 369:7 | 276:14 292:10 | 52:20 53:4 328:20 |
| 200:5,21 201:7,12 | 370:8 371:11 | 295:1,13 297:25 | 418:18 |
| 201:15,21 202:11 | 372:21,24 373:2 | 340:6,11 352:25 | **behavior** 277:4,13 |
| 202:24 203:2,13 | 376:1 377:10 | 357:1 377:2 383:9 | 297:13 298:6 |
| 203:21 204:2,10 | 378:1,6,13 379:13 | 399:11 | **behaviors** 277:11 |
| 204:20 205:14,23 | 380:21 382:18,21 | **baseline** 43:17,24 | 277:16 284:14 |
| 207:3,23 208:6 | 383:12 387:6 | 45:18 88:19,22,25 | **belief** 272:2 417:2 |
| 209:4,22 211:8,19 | 391:15 394:1 | 89:21 90:7,12,15 | **believe** 11:16 |
| 212:5,14 213:7 | 397:9 400:12 | 90:17 185:2,8,23 | 12:18 13:20 15:5 |
| 214:18,21 215:5 | 403:23 405:6 | 186:9,11,13 | 16:6 17:1,8,17 |
| 216:2,10,12,17,20 | 407:16 408:19 | 189:19,22 190:2 | 21:11 27:2 40:1 |
| 216:22,25 217:2,5 | 409:11,17,23,25 | 192:3 195:1,3 | 41:8 58:11 68:8 |
| 219:2 220:11 | 410:11 411:20 | 197:15 | 69:10 71:23 72:19 |
| 228:13,23 230:24 | 413:1,4,7,11,22 | **bases** 33:4 | 79:24 85:7 88:4 |
| 233:5,21 234:3,17 | 414:12,16 415:5 | **basic** 141:18 216:7 | 95:16 140:10 |
| 235:1,21 236:4,12 | 415:20 417:6,10 | 242:21 | 149:8 156:2 |
| 237:4,14 238:18 | 417:14,18,22,25 | **basically** 63:11 | 165:11 175:3 |
| 239:3,13,18 240:1 | 419:5 420:5,22 | 71:8 120:9 198:5 | 183:21 185:1 |
| 240:6,13 242:4 | 421:3,13,23 422:4 | 222:2 309:13 | 220:3 231:17 |
| 243:6 244:3 | 422:13,17,20,23 | 313:24 387:25 | 238:5 243:7 |
| 245:21 246:13 | 425:5 | **basis** 15:1 16:1 | 244:19,24 271:24 |
| 253:8 254:20 | **bags** 379:22 | 18:13 28:17 29:25 | 272:6 281:17 |
| 255:8 256:13 | **baker** 4:13 8:16 | 174:11 257:11 | 291:16 297:19 |
| 261:8 263:7 268:2 | 9:25 | 298:6 315:20 | 311:18 331:17 |
| 268:11 272:18 | **bakerlaw.com** | 350:4 382:13 | 360:20 362:12 |
| 276:9 277:24 | 4:15 | **bat** 349:16 | 366:15 380:17 |
| 278:24 279:24 | **ballpark** 103:15 | **bates** 341:10 | 384:21 401:25 |
| 281:15,21 282:2 | **baltimore** 296:2 | **bath** 246:5 | 416:15 |
| 282:19 283:12 | **based** 16:18 29:24 | **bear** 198:12 | **believed** 62:5 |
| 284:4,10,15,22 | 32:12,17 44:5 | 233:16 362:1 | 65:10 79:6 155:7 |
| 285:12 287:7 | 55:23 65:1 72:7 | 421:18 | 269:4 408:10,16 |
| 288:7 289:2 | 92:1 93:4,9 103:5 | **becoming** 115:25 | 416:16 |
| 290:11,19 291:21 | 107:13 111:18 | 170:9 | **belongs** 195:17 |
| 295:6 310:11 | 179:23 184:13 | **bed** 302:5 | **beneficial** 107:2 |
| 320:22 321:5,21 | 185:17,19 188:20 | **began** 38:8 258:12 | **benefit** 150:18 |
| 323:13 324:6,10 | 201:22 212:13 | **beginning** 26:5 | 244:20 |
| 324:14,16,18 | 214:2 218:13 | 160:3 294:14 | |

**benzodiazepines** 56:9,15 57:2,5 221:15 222:4 331:25

**best** 13:19 41:21 41:25 105:25 125:23 126:1,12 147:25 153:8 178:13,13 220:6 295:1,16 323:2 355:23 366:20 396:3,14 409:9 424:8

**better** 110:9,16 150:21 171:23 190:15 226:1 230:9 232:3,22 295:2 332:9 345:17 386:9 397:24

**beyond** 28:12 49:24 100:1 139:4 143:15 145:11 154:14 249:2 250:3 364:21,24 373:5,6 397:15

**bhullar** 328:25 330:1,2,3

**big** 56:10 90:11 129:5 274:8 282:12 287:11 293:2 303:2 313:24,24 360:17 399:15

**bigger** 44:19 288:21 356:24

**billions** 196:19

**biology** 312:12

**bit** 88:12 181:12 328:15 334:9 361:20 396:23

**blame** 195:13

**blanks** 24:17

**blend** 38:7

**blessing** 207:13

**block** 342:8

**blurry** 394:13

**board** 13:13 61:24 62:3,8,23 63:5,19 64:6,8,10,16,24 65:10,18 68:14 71:12 72:1,11,16 73:6,10,20,23 74:10,21 75:15,20 75:23 78:10,14 79:1,4,15,16,20 80:9,21,24 81:6,11 81:17,19,20,22 82:18 83:2,8 84:3 88:2 126:20 131:8 131:14 134:8 135:2 140:18,22 141:24 142:19,21 152:18 174:13 183:19,24,25 184:1,3,6 214:7 218:16 232:12 270:4,16 295:25 307:7,10 313:12 313:18 321:25 335:15 364:6,9,17

**boards** 68:5 377:23,23

**body** 122:23 124:21 144:4 385:11 388:15 392:8 393:1 402:22

**bolrush** 389:4

**bolster** 108:4

**bonnie** 1:24 8:3 424:3,18

**boot** 270:19

**boranian** 4:17 6:4 8:21,21 328:11 333:20 334:7 340:22 341:2 349:8,14 354:17 361:18 366:22 368:16,19,23 369:1,19 370:10 370:12 371:21 372:23,25 373:3,7 404:3,14

**bore** 397:14

**borne** 384:1

**boss** 324:23

**bottle** 107:9

**bottom** 15:10 100:23 286:18 359:16

**bought** 250:15 369:5

**boulevard** 4:8

**bound** 214:24

**bova** 11:19,25

**boxes** 96:12 97:8 146:6 347:9

**boy** 118:20 166:19 379:5

**brain** 102:9 146:1

**brandy** 11:7

**breach** 86:3

**breached** 87:11

**break** 76:13 77:16 95:8 102:22 159:16 178:15 187:22 237:15 277:20 278:20 285:22 413:12 417:16

**breaking** 413:9

**breath** 118:21

**breathing** 118:25

**bring** 171:9

**bringing** 195:14 199:6,25 202:22 203:11

**broad** 24:23 25:1 97:5 99:9 267:19

**broadhollow** 3:4

**broken** 370:4 410:22

**brought** 160:9 280:17 288:24 422:15

**brown** 17:4

**bryant** 3:16

**bucks** 386:19

**budget** 175:1 388:10

**building** 16:23 17:6 399:17

**bulk** 23:12 84:2 90:24 139:13 280:7

**bulletin** 174:9

**burden** 165:23 166:3 169:25 170:5 362:8

**burdens** 387:18

**burling** 5:4 9:6

**burrage** 165:17 166:8 167:24 168:19 169:20 414:18

**business** 14:19 195:24 196:1 206:17

**buy** 283:20

**buys** 196:20

**bypassing** 273:21

**byproduct** 42:16 42:18

**c**

**c** 3:3 6:1 7:1 424:1 424:1 425:5
**ca** 4:20 425:25
**cabinet** 219:10,11 251:10 262:5
**cabinets** 371:17
**caffeine** 99:20,24 100:5,9
**calculated** 111:15 390:24
**calculating** 94:18
**calculation** 94:25 403:10
**calculations** 223:2
**calculator** 93:12 93:23 94:8 95:11
**calendar** 391:18
**call** 22:4 41:14 261:20 313:20 340:5 346:15
**called** 109:23 122:24 169:8 181:18 236:2 337:1 338:9,24 339:6 346:5,9 388:9 420:2
**calls** 379:20
**camera** 310:6
**cancer** 245:3,5
**capability** 233:20
**capacity** 50:7 51:16,20 55:13 78:10 86:24 138:20 167:2 259:7 313:6,7 389:9 399:22 419:22

**capitalism** 196:3
**caps** 272:12
**captive** 309:21
**capture** 55:16 57:16 262:11 265:14,16 309:1 344:21
**captured** 337:23 338:5
**captures** 345:19
**capturing** 322:21
**car** 269:8 277:21 278:21 279:4 282:13 338:16
**caraballo** 311:11
**caraffi** 270:2,15
**cardiac** 115:24 119:11
**cardinal** 363:3,10 363:12,16 364:3
**care** 65:13 84:19 85:17 86:4,11,14 87:2,12 88:5,6 244:2,5
**career** 23:8
**careful** 290:17
**carefully** 280:24
**careless** 65:21
**carfentanil** 35:9 96:1 155:9 173:16 192:8 233:18 234:10 283:20 386:11 389:19,22 389:25 390:5,10
**carney** 11:7,10,11 11:12,13,18
**carole** 9:23 115:13 160:10 161:12 162:2 163:5,15 165:11 167:20 168:2,9 413:24

416:4
**carroll** 218:19
**carry** 28:11 30:21 392:18
**cartel** 33:1,2 34:13 192:16 195:20 198:25 199:24 209:17 236:6 251:1
**cartels** 31:23 32:4 32:12,17,21,25 33:6,14,21 34:1 35:18 192:25 195:14 196:18 197:1 198:6 199:4 199:6 200:19,25 201:6 202:1 203:1 203:4 206:25 207:13,21 208:10 210:4 233:13 235:17 236:24 251:3 416:23
**carter** 4:7 6:5 8:18 8:18 373:15,24 374:2,3 376:5 377:16 378:2,9,16 379:14 380:22 382:19 383:5,18 392:14 398:1 401:3 404:1 405:9 408:9 409:5,15,20 409:24 410:2,5,12 412:19 415:2 416:18 417:12
**case** 1:5,9,11,13 7:20 21:8 24:1,7 52:20 53:5 63:10 64:3 72:15 85:6 106:18,22 107:7 108:13 115:6 117:16 126:24

127:6 129:6,14,15 130:12,13 134:4 138:8 149:1 161:24 164:12,15 164:20 165:17,19 166:7,16 167:24 169:20 170:22 192:19 203:11 209:15 225:16 268:1 271:25 283:1 286:18 296:5 314:13 329:18 330:8 335:23 341:23,23 371:1 376:6 380:15 381:17 382:13,17 383:11 383:15 385:4,12 387:19 388:2,7 404:23 405:14,19 405:21 406:12 408:14 414:18 419:16 421:22 422:11,15 425:6 426:3 427:3
**caseload** 395:15
**cases** 52:23,24 53:9 70:20 91:4 92:2 96:15 100:23 111:22 132:3 138:9,22 143:17 146:15 164:5 286:21 302:1 335:19 346:9 353:2,24 387:9,16 387:21 391:25 392:1,10,11,18 397:18 406:9 409:10,13,14 411:7,17 419:11 420:7

**cash** 206:9
**cast** 233:8
**categories** 208:24
209:2
**categorize** 242:14
**category** 102:24
**caught** 288:3
**causation** 115:18
**cause** 116:22
118:8,15 119:2
120:19 132:3
145:1 146:21
275:20 334:11,15
335:3,5,24 336:1,4
337:2,5,11,17
338:14,21,23,24
339:8,12,14
340:11,13 342:8
344:12,19 345:7
345:21 349:3
358:25 404:4,10
404:22 405:2
406:10 407:1,3,6
407:19 408:7,17
408:21 409:8
410:8
**caused** 406:11
408:13
**causes** 339:21
347:7 348:22
**causing** 119:22
120:4
**caution** 36:18
121:7
**caveat** 20:4 38:6
262:2
**cc** 347:3
**ccmeo** 341:12
**cdc** 36:7 37:15
188:4 412:13

**cdc's** 273:25
**cell** 7:9
**cellular** 7:8
**center** 310:1 389:6
**centralized** 327:7
327:11,12
**centrally** 16:18
**cert** 340:9
**certain** 17:2 41:23
42:7 43:16 47:22
49:12 75:4 76:1
87:16 99:3,8
100:6 104:9 106:6
106:12 108:5
142:20 152:24
164:18 287:2
334:4 350:2 360:4
360:21 361:6
364:21 380:16
381:12
**certainly** 17:24
23:12 31:25 40:6
45:24 53:25 71:3
71:22 96:23
100:15 110:16
115:10 122:9
149:11 156:11
183:3 186:14
197:19 223:24
225:3 228:20
235:7 256:19
290:22 304:15
307:17 320:2,10
323:1 359:8
376:19 390:5
392:23 393:7
406:22 416:25
**certainty** 35:17
38:21 88:9 90:23
105:1 106:20
107:6 108:1,25

126:1,7,11 155:14
186:16 189:24
264:3 335:2 359:7
**certificate** 90:5
113:11 117:17
120:11 122:11
145:10 146:22
148:23 185:13
334:10 335:5,25
336:8 338:22
342:15 346:13,17
346:21,24 347:9
348:3,8,15,18,24
349:3,6,7 404:19
405:15 406:18,19
406:25 407:4,15
408:5 410:8,18
411:11 427:11
**certificate's**
340:10 406:14
**certificates** 114:13
334:9 340:19
347:18,20,24
**certification** 124:5
133:2,4 148:1
152:3 158:3,10
404:5 426:1 427:1
**certifications**
334:24 411:11
**certified** 90:2
146:24 149:5
156:23 352:18,25
404:15,22 405:2
405:11,14,18
406:10 424:3,19
**certifier** 410:16
**certifiers** 158:5
**certify** 121:15
123:17 334:15
347:6 408:7 409:8
409:12 424:4,10

**certifying** 404:3
404:10
**cetera** 233:13
344:12 348:21
**chain** 6:13,18 12:7
205:16 216:20
219:3 234:12
282:7 371:10
379:23
**chains** 233:11
**chair** 12:10
**chairing** 160:23
**challenge** 259:6
386:13
**challenged** 179:6
**challenges** 99:5
**challenging** 53:23
266:22 386:4
**change** 45:18
213:4 297:13
298:5 350:1
352:23 353:4,4
399:19 402:18
425:13,14 427:8
428:3
**changed** 17:2
45:20 88:24 89:7
136:5 138:14
161:20,24 315:5
329:5 342:1 356:2
387:25 396:9
**changes** 97:8
425:12 426:7
427:7,9
**changing** 111:2
210:7 280:11,11
280:25 294:15
396:12
**channel** 281:4
**character** 398:5

**characteristic**
175:18
**characterization**
375:11 398:23
**characterize** 28:24
45:17 59:15
188:16 230:8
232:22 258:17
319:13 323:3
**characterized**
119:21
**characterizes**
120:15
**characterizing**
293:13 398:6
**characters** 233:8
**charge** 327:5
**charges** 376:21
**chart** 101:7
103:21 107:24
112:19 116:12
286:12 306:11
355:12,13 356:1,5
356:12 359:4
372:16
**charter** 175:11,19
327:10
**charts** 121:19,21
303:15
**chat** 160:24
**check** 96:6 132:8
132:10 145:4
148:4 151:12,14
152:11 222:21
228:11 312:19
316:5,11 332:15
332:18,20,24
333:2 402:6 403:1
406:15 410:1
**checkbox** 346:16

**checked** 229:1,5
314:24
**checking** 132:1
147:21 148:24
149:16 150:10
228:15 401:6
402:17
**checks** 96:5 149:3
149:7 151:2
400:24 401:19
**cheffo** 3:15 6:3
8:25,25 9:18,21
10:7 14:5 15:15
15:18 17:16 18:17
18:18 19:2,10
21:22 25:8,24
29:8 30:14 31:14
31:21 33:8 35:21
37:4 38:11,23
39:20 40:22 42:1
42:23 43:7,10,15
44:3,20 45:2,8,14
46:1,17 47:7,23
48:5,10,16,22
50:22 51:11,22
53:2,15 55:2 58:6
59:8,13 60:4
61:13 64:2,17
65:23 66:6,18
67:7,18 68:11
72:20 73:12 74:7
75:5 76:11,14,17
76:22 77:15 78:3
78:4,19 79:10
80:13,23 81:15
82:2,13,22 83:21
84:25 85:24 86:22
87:8,17 88:11
91:9 92:8 93:6
94:7,13 95:4 97:6
97:17 103:14

106:15 113:14
114:16,19 116:7
116:18 117:18
118:4 122:4 123:7
125:5,8,16,19
126:5 127:18
128:3,23 130:2,5
130:23 131:25
133:11 138:15,17
138:21 144:23
148:2,10,21
149:18 151:15,18
152:1,8 153:20
154:8,18 155:15
156:17 158:22
159:14,17,19
160:7 161:2,4
163:13,16,19
164:8 166:21
171:13 172:22
175:22 176:3,10
176:21 177:3,15
177:18 178:15,17
179:1 180:2,6
183:14 186:3,24
187:20 189:5
191:14 192:1,13
192:23 193:16,18
194:7,10 195:23
197:5,10,22 198:2
198:14,16 199:16
199:19 200:6
201:3,8,14,19
202:6,15,25 203:8
203:15,25 204:5
204:14,25 205:19
205:24 207:6
208:2,13,16
209:12 210:13
211:11,22 212:7
212:18 213:11

214:19 215:1,8,12
216:5,11,15,19,21
216:24 217:1,3,6
219:6 220:20
228:19 229:2
230:25 233:15,25
234:23 235:14
236:1,8,20 237:16
238:3,23 239:8,16
239:22 240:3,7,9
241:5 242:9 243:9
244:10 246:7,18
252:23 253:12,14
255:5,19 256:16
258:5,6 261:14
263:10 268:7,14
269:12,18 274:12
276:11 278:8
279:2 281:16,24
282:16,22 283:17
284:6,11,18 285:5
285:16,21 286:9
286:10 287:17
288:9 289:4
290:13 291:4,24
295:18 310:13
321:1,14,23
323:14 324:9,12
324:15,17,19
325:9 326:4,10
327:18
**chemical** 109:23
122:19,20,24
155:8
**chemist** 385:21
**chemistry** 39:24
326:13 384:3,4
**chest** 118:20
**chief** 11:7,22,24
12:3,5,6,9 26:23
27:5 68:17 83:9

84:2 124:1 218:20
329:3,5
**china** 95:24
107:21 109:9
202:1,8 398:7
399:9,10
**choose** 136:1
**christine** 70:7
**chronic** 30:24
102:21 243:15,18
245:6 322:17
**ciaccio** 19:24
**cicero** 272:23
274:15 275:18
**circumstance**
117:10
**circumstances**
50:11 51:3 52:18
118:18 127:22
144:14
**citation** 271:11
**citizens** 172:16,20
172:21 399:1,17
**city** 1:10 342:12
342:21 395:6
**citycenter** 5:4
**civil** 426:5 427:5
**claim** 25:18 31:13
68:22
**claimed** 421:12
**clarify** 231:10
**clarity** 242:18
**class** 39:17 99:9
105:12
**classification**
158:14
**classify** 107:12
**classifying** 105:12
**clear** 62:16 144:1
145:25 163:11,18
244:17 253:2

282:14 368:12,22
395:14 396:8
405:22
**clearer** 226:5
**clearly** 13:12
106:4 319:19
331:5 359:23
**clerks** 344:10
345:1,15
**cleveland** 1:10,18
2:11 3:8 4:5,9,14
7:24 158:25 159:3
425:2
**client** 216:3
363:23
**climaco** 2:8 7:22
**climate** 277:8
417:4
**clinic** 381:13
**clinical** 117:15
121:11 127:1
339:23 340:14
377:15,17,18
**close** 216:16
318:18 389:1
**closed** 371:10
**closely** 270:10
**closing** 42:9
**coauthor** 168:4,15
171:3
**coauthored**
414:24
**cocaine** 6:22 33:3
42:4,5,12,14,17,20
43:2,17,23,25 44:2
44:5,10,14,18,21
45:3,9,13,15,21
46:15,21,25 47:4,5
47:12,17 48:6,12
56:22 88:13,19,22
89:3,12,17,21,25

90:1,3,4,8,14,17
90:23,25 91:18
93:16 101:18,24
112:24 113:3,7,23
114:25 115:20,23
116:3,20 118:6
135:16,21,23
136:5 138:4,7,9,11
138:13 140:7
144:24 145:4,15
145:18 146:1,3
147:20 155:7,22
156:6,6,12,19,24
179:8 183:10
184:12,22 185:3,8
185:12,22,23
186:19 187:4,12
191:17 192:6
281:7 284:9
325:25 326:7,16
326:19 350:7
354:4,8,9,19,21
395:22,23 396:1,5
396:9,12,16 397:2
404:24 405:11,15
405:19,23 406:3,5
406:6,6,6 407:8,23
408:8 410:22
411:5,6,7,16 412:2
412:5
**code** 342:12
**coded** 336:11,24
342:6
**codeine** 123:20,22
123:25
**coding** 337:8
345:1,17
**coffee** 99:23 100:8
**cognizant** 214:12
**cohan** 3:19 8:23
8:23

**coincided** 156:4
**collaboration**
303:25
**collapsing** 118:21
**colleague** 61:7
297:12 327:20
**colleagues** 170:4
170:14 171:9
290:10 327:3
334:20
**collect** 28:19
140:20 293:16
305:17 319:14
348:11
**collected** 20:25
21:6 314:10
333:13
**collecting** 311:12
**collection** 140:21
**collects** 49:8
**cologne** 11:23
**columbus** 401:22
401:23
**column** 111:20
342:20 344:19
345:19,22 347:2
352:1 357:5,21
**columns** 341:17
346:4 358:11
**combat** 176:12
177:4
**combination** 40:4
40:4 44:6 90:1,16
112:11,17 114:8
119:20
**combined** 114:12
114:14,20
156:23 336:2
**come** 38:12 51:6
74:23 81:2 93:11
94:7 123:12

155:24 225:11
231:4,14 236:17
296:14 302:4
305:24 335:11
360:3,4 367:12
377:18 391:23
395:2 417:16
**comes**  33:1,21
51:17 122:24
123:1 129:15
150:21 206:19
211:2,21 260:21
352:24 360:19
**comfortable**  95:8
245:15 377:6
385:8
**coming**  191:11
201:10,20 240:18
340:13 346:1
357:19 358:12
359:20,23 399:8
**command**  12:7
219:4 379:23
**comment**  227:23
411:2
**commission**
426:19 427:25
428:25
**commit**  288:11
**commits**  157:1
**committee**  178:1
270:14 309:11
313:3
**common**  98:14,17
100:14 101:14,17
158:12 243:14
290:9 355:12
359:4 372:15
**commonly**  223:25
**communicating**
218:25 219:4

**communications**
365:9
**communities**
176:18 277:14
**community**  40:8
40:10 162:2 191:8
200:2 234:14
256:11 266:11
293:2 298:2
399:14 412:1
**companies**  4:12
26:11 31:9 207:25
210:15,18 422:16
**company**  47:13
104:19 109:8
211:14 213:5
274:19
**comparability**
40:6
**compare**  317:9
321:7
**compared**  186:9
296:13
**comparing**  293:21
**comparison**
287:21 299:7
323:25
**comparisons**
306:22 307:25
318:19
**compel**  419:3
**compelling**  121:14
132:12 295:11
**complaint**  24:1
362:15 368:13
**complete**  347:25
**completed**  293:17
352:22 425:15
**completely**  40:9
**compliance**  392:7

**complicated**
124:20 193:13
**composition**
124:21
**compounds**  39:18
**comprised**  103:8
**computer**  52:1
131:2 133:7
**concentration**
123:25
**concepts**  24:24
**concern**  58:3 59:1
59:5,7 81:24
84:24 85:20 127:3
**concerned**  59:9
65:14 66:2 104:1
137:23 388:17
394:21
**concerning**  63:25
**concerns**  44:25
62:12 81:3
**conclude**  413:2
**concluded**  381:22
423:9
**concludes**  412:24
423:3
**conclusion**  308:4
**conclusions**
267:19 294:24
404:15
**condition**  66:19
67:15 375:12
**conditions**  339:6,7
**conduct**  50:23
52:13 65:18
187:15 188:25
189:17 191:2
194:24 200:13
203:17 205:12
208:4 211:7,16
212:13 214:2

226:10 233:4
275:21 292:11
340:1 381:24
405:20 406:12
408:13
**conducting**  206:1
278:2
**conference**  92:3
92:11,23 93:25
307:7,11 325:21
351:16,20 352:1,3
352:6 353:12
**conferences**
313:13
**confidence**  92:3
384:12
**confidences**  414:4
**confidential**  414:7
418:24 420:15
421:2,4,11,16,25
**confidently**
360:23
**confirm**  355:11
**confirming**  355:25
**confirms**  229:17
353:14 372:18
**confused**  255:14
**confusing**  148:17
252:3
**congress**  398:5,10
398:13
**conjunction**  63:17
**connect**  382:15
**connected**  384:17
**connection**  20:22
21:1 23:21 31:15
33:15 48:11,17
50:25 51:2 52:15
53:4,5 54:9 71:13
75:19 76:3 79:5
82:5 84:19 87:3

87:12 119:15
145:15 150:1
152:11 161:5,8
162:11 169:20
181:5 194:13
270:13 314:15
354:19 365:16
**consciously** 218:4
**consensus** 209:25
412:13
**consequences**
376:18,18
**consider** 18:25
25:3 27:4 36:7
50:5 58:19 62:17
62:21 108:24
208:19 304:17
376:24
**consideration**
65:25 324:7
**considered** 32:18
46:25 180:15
398:8
**considering** 80:20
298:3
**consistent** 100:7
157:12 171:25
395:2
**consistently** 91:5
395:17
**consortium** 366:5
**constantly** 17:20
**consult** 51:3
**consulted** 69:3
**consuming** 54:3
320:21
**contact** 74:13,15
84:1 301:7,8
309:2,9 366:3
380:19

**contacted** 81:24
**contacts** 273:20
**context** 29:12
44:19 164:23
375:2 399:16
401:9 403:16
419:7 420:15
421:1
**continue** 7:12
132:25 142:9
307:21 326:12,14
373:4 403:3
**continued** 4:1 5:1
140:24 293:15
354:15
**continues** 177:14
376:17
**continuum** 36:23
412:10
**contract** 388:6
393:17,19
**contractors**
393:22
**contribute** 235:19
338:20 367:23
**contributing**
116:23 118:8
119:22 120:4,20
336:4
**contribution**
114:17 115:7
118:16 186:10
339:4
**contributions**
339:5
**contributor** 41:2
354:10
**control** 72:25
135:20 221:1
**controlled** 49:20
51:8 54:17 56:4,7

57:9 58:15 61:1
61:17 73:2 77:4
84:20 86:15 87:3
135:19 136:18
221:9 315:9,13
317:7 332:16
333:3,8,17 368:4
370:25
**controls** 49:9
**convened** 225:21
**conversations** 7:8
155:18 414:7
**convey** 298:24
320:20
**conveying** 309:3
**coordinate** 58:23
**coordinates** 270:6
**coordinator** 270:3
**copies** 128:17
347:23
**copublished**
414:22
**copy** 24:15 166:12
**cordial** 181:3
**corner** 131:10
**corner's** 131:11
387:11
**coroner** 140:25
387:13
**coroner's** 183:5
335:16 359:24
360:5 361:3
**coroners** 335:18
**corporation** 4:17
5:2 9:6
**correct** 34:5 35:22
36:1 61:6 62:4
64:7 73:6 76:23
87:19 88:16 98:15
101:1,7 106:17
111:23 112:4

123:11 126:8
142:22 157:10
173:21 221:4,19
221:25 238:6
247:14 271:6
322:12 330:18,21
334:13 335:21
336:9 346:22
350:11 351:4
355:13 375:3,14
376:12 377:19
382:11 389:14
391:5 401:9
404:17 405:25
407:2 409:10
419:1 420:4
422:12 424:7
**corrections** 425:12
427:17
**correctly** 51:21
210:9 346:19
**correlation** 261:19
**correspondence**
218:18
**cost** 187:16 362:1
383:20,22 385:21
386:21 395:24
396:5,19 397:5,11
397:15,20
**costs** 186:17,22
236:25 362:4,7
385:23 395:20
396:15
**cough** 192:6
**counsel** 7:16 8:5
9:17 10:5 19:15
78:2 160:6 178:25
238:2 258:4 286:8
328:8,9 373:21,22
409:17 413:6,20
413:21 418:9,10

422:17
counseling 57:19
count 112:13,13
  113:11 157:4,14
  218:20 355:15
  360:17
counted 113:1
  157:2
counties 175:19
  387:10 388:5
counting 112:19
countries 274:21
country 32:20
  38:18 96:2 129:16
  189:11 202:9
  259:21 395:1
  399:2
counts 157:9
county 1:8,12 3:3
  6:12,23 8:10,12
  10:19,21 11:5
  16:19 19:16 33:14
  33:16,23 34:21
  37:2 38:21 39:22
  40:12,20 41:18,24
  42:13,15 44:15,22
  45:4,10,16,22 46:5
  46:15,21 47:18
  51:6 70:14 82:10
  87:10 88:13 91:10
  98:10 120:18
  152:22 155:25
  158:19 159:5,6,8
  170:9 172:21
  175:5,14,20
  176:15 178:11
  183:25 184:5
  188:11 189:9,11
  191:11 192:4,4
  194:1 195:4 199:7
  201:24 202:4

203:12 218:20
235:17 236:16,18
238:14 239:1,6,10
239:11,24 240:4
240:10,17 241:3
258:12 259:2,16
259:18,20 261:7
263:4 264:4 270:3
270:16 278:19
279:16 280:17
287:14 297:11
321:13 327:8,10
329:11,23 330:10
330:21,22 342:21
350:6,8 356:6
359:11,19 362:14
366:10 369:22
371:2 380:23
381:22,23 382:16
383:1,7 387:14,14
388:21,22 389:1
390:17,18 392:16
392:20 393:20,24
398:6,18,20
400:10 401:18,25
404:21 416:15,20
417:5 426:10
427:15
county's 96:11
  297:4
couple 13:15 65:5
  289:16 293:14
  328:17 333:15
  391:11 420:7
course 14:19
  34:22 40:14 148:5
  378:3 383:6
  404:20 410:6
court 1:1 7:19 8:2
  9:9 170:22 301:12
  310:15,25 426:7

court's 165:16
cov.com 5:6
cover 126:2,3
  326:18
covington 5:4 9:5
crack 46:25 47:5
  47:12,17 48:6,12
  191:16 281:6
craig 166:23
craig's 167:13
crash 338:16
crazy 302:6
create 49:19 193:6
  333:14 334:5
created 109:8
  191:8 194:5
  205:17 229:21
  231:23 232:3,10
  278:1 282:10
  313:17 314:7
  333:12 417:3
creates 209:8
  277:8
creating 136:8
  207:19 213:21
creation 150:2
  193:4 196:10
crime 10:20 22:9
  173:7 277:15
  327:15
criminal 23:13,21
  129:11 182:5
  198:20 208:11
  209:17 210:12
  233:24 237:10
  311:4 416:25
criminals 233:2
crisis 22:16 32:15
  35:25 36:6,9
  42:18 44:21 45:3
  45:10,15,21 46:2,4

46:10,12,15,20,25
47:5,18 48:6,12
75:25 96:22
132:22 136:2,23
137:1,2,11,13,24
138:4,7,11,19
139:3,8,12,21
140:10,13 145:20
170:10 176:12,23
177:5,12 178:7,8
187:23 188:3,6,21
189:10 190:18
195:11,16 200:23
201:1,4 202:10
205:7,17 206:15
209:6,8 210:1,10
234:2,5,6 235:6
268:23,25,25
280:3 287:14
299:16,24 383:23
383:24 385:6,24
394:3 395:16
396:12 412:14,16
412:17
criteria 154:4
critically 271:12
cross 266:20
  360:18
culpability 198:6
  198:10 205:21
  209:3 212:3,12
  213:6,16,20 214:4
  233:4 234:1,16
culpable 197:19
  198:1 200:17,19
culture 213:22
cup 99:23 100:8
current 17:7 39:21
  93:10 141:7
currently 33:15
  42:13 183:10

[currently - dated]

328:23 329:18
415:7
**curtailed**  96:2
**curve**  359:12
**custody**  165:11
**customary**  154:14
**cut**  342:20 345:22
**cuyah**  6:14,19
**cuyahoga**  1:8 3:3
6:12,23 8:10,12
10:19,20 11:5
33:13,16,22 34:25
37:2 38:16,21
39:22 40:20 41:18
41:24 42:13,15
44:15,22 45:4,10
45:16,22 46:15,21
47:18 70:14,22
87:10 88:13 91:10
98:10 111:23
120:18 152:22
155:25 159:5
172:21 175:4,20
183:15 184:5
188:11 189:8,11
192:3 194:1
195:15 198:9
199:7 202:4
203:12 205:7
240:17 257:17
258:12 259:2,16
259:18 261:6
263:4 264:4 270:3
270:16 278:18
288:5,24 297:10
311:23 325:11
329:11,22 330:10
341:10 350:6,8
356:6 359:11,19
366:10 369:22
380:23 381:22,23

382:16 383:7
389:1 390:18
400:10 401:18
404:21 416:15,19
**cuyahogi**  34:25
**cvs**  380:17,20

**d**

**d**  7:1 314:12
**d.c.**  5:5
**damage**  207:15
269:9
**damages**  235:19
**dan**  1:6
**dangerous**  203:18
297:23
**daniel**  5:10 7:25
**dark**  203:5
**data**  24:11 28:19
28:25 29:11,25
39:25 40:2,23,25
41:5 43:18,22
49:18 71:3,18
86:2 91:3,11,13,14
92:7 100:20,22
105:5 106:12
112:8 131:6,9
132:8,9,12,12,25
133:14,21 134:13
135:19 136:13,17
136:20 139:10
140:16,21,22
141:6 143:7 144:4
145:12 153:8,25
154:10 157:5
173:3,22 174:3,14
174:14 190:4,12
190:14,15 218:14
218:15 219:19,24
224:11,17,19
225:12,25 226:19
227:15,21 228:8

230:8,17 231:9
232:3,5 238:8,8,11
238:22,25 239:5
239:20 240:12,16
240:22 246:23
247:8,11 248:6
254:23 259:1
261:6,11,17 262:1
262:12 263:3,9
265:24 266:5
267:1,20 270:10
272:1 287:23
293:12,16,23
295:14 297:10,11
298:8 299:6,8
300:12 302:11
303:10,12,17,20
303:22,23 304:17
304:21,25 305:17
306:12,21 307:15
309:7 311:12,22
311:25 314:10
316:20,23,24
318:2,18 320:8
321:7,7 322:21
323:6 325:19
328:19 331:6,10
331:12,14,15,15
331:18 332:2
333:12,19 336:25
338:10 341:11,12
341:16,19 342:19
342:23 343:11,17
343:23 344:2,9
348:18 349:24
351:19,21 355:7
355:14 356:14
357:12 358:10,12
358:14,19 359:1,3
359:20 360:2,5,9
360:16,19,21,23

360:24 361:4
364:19 369:8,20
369:21 371:15
376:9 377:2 381:5
385:5,7 400:15
412:4,7,12 419:23
**database**  48:25
49:19 51:4 52:12
53:11 55:1,6
56:19,24 57:20
58:22 69:15,23
72:11 96:7 127:9
143:16 149:25
150:10 153:2,7
229:5 298:13,15
310:20,24 311:4
314:24 315:4,22
316:1 319:22
327:14,15 328:16
331:11,18 332:4,7
332:25 333:12,14
334:6 336:18,24
337:4,25 338:5,9
343:15,17,19,21
343:24 344:5,14
346:13,13,16
347:18,20 358:4
358:15,17
**databases**  316:3,6
316:11 327:5
343:13
**date**  178:6 296:4
312:16,18 329:15
351:4,15 353:19
391:13,18 425:8
426:3,9,19 427:3
427:13,25 428:20
428:25
**dated**  6:13,19
271:4

**dates** 392:23

**dawn** 301:17
308:19 356:8
357:2,10,12,13,15
357:19,22 358:13
358:15

**day** 4:8 115:1
149:15,15 177:14
219:11 275:25
283:9,19 374:9
389:1,20 390:2
391:20 410:14
424:15 426:16
427:22 428:22

**days** 247:5 289:21
332:19,20 352:23
425:18

**dayton** 388:22

**de** 70:7

**dea** 105:21 143:23
240:23,24 365:7
368:6 381:19

**dea's** 31:16 368:3

**dead** 302:8

**deal** 178:13 312:8

**dealer** 165:22
209:17 233:18

**dealers** 208:21
232:25,25 233:13
235:18 236:25

**dealing** 323:8

**dear** 425:10

**death** 55:9 65:15
66:4,22 90:5,24
113:11 114:13
117:2,7,9,17 118:7
118:16 119:3,5,25
120:11,13,23
121:15 122:10
123:18 124:22,24
125:14 132:3

145:1,10,16
146:19,21,21
147:7,16 148:23
150:1,15 151:24
152:3 156:20
157:2,5 158:3,10
158:14 161:24
165:12 169:12
170:1 178:1 180:8
181:2,6 185:12
187:11,12 189:9
225:19,21 293:16
306:5,7 309:11
334:8,10,11,11,16
334:16 335:3,5,5
335:24 336:1,5,7,8
336:23 337:2,6,11
337:17 338:14,20
338:21,22,23,24
339:2,8,8,13,21,22
340:9,9,11,13,18
340:19 342:8,14
342:21 343:6
344:12,12,19
345:8,21 346:8,12
346:17,21,24
347:6,9,18,20,23
348:3,7,14,17,23
348:24 349:2,4,6,7
354:19,20 356:8
357:17 358:25,25
381:23 382:16
387:12 390:22
404:4,11,18,22
405:3,3,12,15
406:10,11,13,17
406:19,24 407:2,4
407:4,6,11,15,19
408:5,8,18,21,24
408:25 409:9
410:8,9,16,18

411:11 412:4
419:10

**deaths** 6:11,22
37:2 42:15,17
43:17,23,25 44:5
44:10,17 51:5
88:19 89:3,9,12,17
89:22,25 90:2,13
90:14 91:6,15,16
91:17,18 93:11,15
95:16 98:11 101:2
111:23 112:21
117:23 119:17
124:6,8 125:25,25
132:11 133:1,2
136:20 138:1,1
139:13,21 141:1,5
141:25 142:8,12
145:9,18,21
146:24 149:5
156:23 157:6,10
158:18 165:9,21
184:22 185:3,8,22
186:19 187:3,8
189:15 220:22
221:24 234:13
274:4,5 288:2
301:18 305:23
336:17,17 344:22
350:7 352:13,17
354:3,13 355:16
356:7,9,17 357:2,7
357:8,9 358:23
360:17 361:8
372:20 382:25
384:25 385:15
389:25 393:24
394:17,22 395:24
396:5,19 400:4
402:19 408:12
410:23

**decade** 44:12

**decedent** 66:20
72:6 73:1,9,19
76:4 89:12 152:18
342:15

**decedent's** 85:18
230:5

**decedents** 21:8
82:1 100:17
129:10 134:6,8
142:24 144:22
155:6 220:3

**december** 6:23
350:10,14,18

**dechert** 3:15,19
8:24 9:1

**dechert.com** 3:18
3:21

**decide** 168:23

**decided** 130:9
161:25 168:15,18
171:3

**deciding** 361:21

**decision** 165:16
166:11 168:19
243:21 247:9
294:25 295:12,13
295:16 312:23
346:25 383:8

**decisions** 245:7
295:9

**decline** 91:21
92:24 93:4,19
94:12,16,18 95:16

**declined** 91:16,17
91:17,18

**decomposed**
125:18

**dedicated** 141:12

**deed** 426:14
427:20

**deemed** 120:3
301:21 425:19
**default** 348:25
**defendant** 7:16
8:22 10:5 211:6
213:19 214:3
328:9 371:9
373:22 381:25
382:7,17 383:3,21
384:18 408:14
415:12 416:3
**defendant's**
194:24 211:7
212:13 277:22
**defendants** 8:17
8:24 10:2 164:14
164:20 189:1,18
191:2,13 192:12
192:19 194:6
195:6,12 196:24
197:20 199:2
200:24 203:11
204:16,19 205:8
205:18 206:21
207:12,19 209:19
210:3 211:18
212:4,11,16 213:6
213:25 230:20
233:10 234:7,22
235:4 237:13
275:14,21 277:10
277:18 278:7,16
278:22 279:7,17
279:23 281:18
282:11 283:7
292:11,21 293:6
361:22 362:15,16
362:17,18 371:1
380:2,15 381:17
382:25 383:10,14
383:25 384:8,13

405:20 406:12
415:7 416:16,20
417:3 418:18
422:11
**deficiencies**
392:25 393:6,8
**define** 94:19
**defined** 42:5
249:10 250:3
251:17
**defines** 69:7
**definitely** 197:9,11
**definition** 35:1
56:7 58:8,17 59:4
59:17,20 60:2,6,7
60:14,19,20,24
61:4,8,22 62:17,22
63:22,24 69:6,8,11
72:9 241:15,22
398:24 399:3
408:22
**degree** 28:11 69:1
147:18 227:16
335:1
**degrees** 209:9
278:18,25
**deidentified**
143:14 144:4
190:14 218:15
219:19,22 220:8
220:10,13 224:16
299:7
**delegate** 71:19
**delegates** 50:15
52:8 149:8,8
328:19,22 330:12
**demand** 191:8
193:2
**demographic**
293:23 342:24

**denied** 324:25
**denominator**
94:10
**deo** 314:12 328:24
329:16,17
**dep** 12:2
**department** 15:3
16:14,15 17:18
21:1,20,24 22:1
58:11 69:6,11
70:19 82:17
145:10 157:13,16
175:7,8,10,24
176:1,5,9 185:20
186:18 219:12
326:5 327:7,11
336:12 344:6
362:1 369:9
425:22
**dependent** 136:10
**deplored** 417:1
**deposed** 22:20
23:1,8 238:9
**deposition** 1:17
2:1 7:11,15,21
10:4 19:12 20:23
22:14 23:14 97:15
215:10,18 253:6
269:14 340:25
349:11 398:21
424:7 425:8,11
426:1,3 427:1,3
**deputy** 11:7,24
12:3,5,9 160:15,15
416:6
**derivative** 124:19
**describe** 421:10
**described** 63:11
390:2 394:10
**describes** 204:22

**describing** 116:17
338:6
**design** 145:20
150:7
**designate** 328:19
**designated** 173:2
**designation** 36:17
52:7
**designations** 157:7
348:20
**designed** 389:4
**designees** 52:22
133:18
**desire** 174:7
219:16
**detailing** 213:3
**details** 63:20
66:23 159:9
164:11 313:4
378:24
**detect** 100:2
110:11
**detected** 110:12
110:17 120:20
136:3 338:16
354:18
**detection** 100:1
155:1
**determinate** 303:5
**determination**
87:1,1 98:24
113:15,24 114:2
132:3 157:22
181:6 212:12
213:15 224:13
244:12 302:20
303:4
**determinations**
77:11 228:7
**determine** 87:11
103:20 104:17

106:17 107:7
109:6 121:1
124:19 126:15
130:12,17 131:5
146:15 147:9
150:9,11 179:3,18
263:16 267:21
300:5,23 302:18
303:6 304:21
305:2,20 314:25
317:1 318:4
338:20
**determined**
120:19 126:22
134:5 151:19,20
292:3,4 336:1,6,22
**determines** 245:1
335:1
**determining** 224:6
339:17
**detour** 322:2
**detox** 319:1,3
**develop** 261:12
262:5,7 263:20
266:7
**developed** 408:1
**developing** 240:19
**development**
237:8 338:10
**devote** 325:24
326:6
**diabetes** 339:13
**diagnosed** 375:1
**diagnoses** 375:14
375:18 377:13
**diagnosis** 370:14
375:8 376:7,8,12
376:23 377:3,12
377:14,18
**diarrhea** 242:23

**diaster** 389:8
**die** 36:19,20
118:22
**died** 21:8 54:11
63:13 65:4 98:18
112:23 114:6
117:15 179:8
221:11 298:10
301:24 308:16
317:5 407:23
**dies** 376:19
**diet** 41:9
**difference** 94:19
266:23 307:3
**different** 12:13
17:6 19:5,14 27:1
28:20 32:12 40:24
49:11 97:1 107:14
113:13 122:3,3
135:24 177:24
178:1 181:11,13
182:12 196:15
205:4 227:17,18
227:19,22 228:3
242:13 243:2
246:23 251:9
267:25 287:9
293:14 296:15
299:4 305:18
312:11 316:3
337:20 365:20
412:18
**differentiate** 225:4
257:15 262:18
**differentiation**
189:7
**difficult** 179:18
235:9
**dip** 354:23
**direct** 18:13 214:9
246:25 267:17

380:11 390:24
**directed** 99:7
252:8
**direction** 325:23
**directly** 24:8
153:18 191:6
202:3 247:9
383:21 405:19
407:12 408:12
409:13 410:24
411:18
**director** 10:20
70:12 175:7,24
225:23
**directors** 219:12
335:16
**disagree** 231:18
**disappointed**
416:7
**disappointment**
416:8
**disaster** 389:2
**discipline** 378:5
**disciplined** 214:9
378:11
**disclose** 311:21
369:25 370:3
414:3 421:5,8,16
421:25
**disclosing** 422:3,5
**discovery** 24:6
**discrepancy** 349:5
**discretion** 180:13
**discuss** 162:20
210:4 232:20
**discussed** 161:14
164:3,12 166:9
171:11 174:13
251:9 289:7
330:24 414:25
421:22

**discussing** 264:13
419:7
**discussion** 94:5
167:24 169:25
257:20 322:24
410:4 420:20
**discussions** 32:5
32:16,22 33:18
115:11 168:1
201:23 209:23
399:11 420:7
**disease** 119:3
338:25 339:12
408:23
**dishwater** 246:5
**disorder** 279:22
**dispensing** 267:4
333:2,8,24
**disseminate**
180:18
**dissemination**
270:18 349:22
**distinct** 36:9
**distinction** 342:13
360:1 368:25
**distinctly** 63:10
**distinguish** 123:14
337:19 339:20
342:17
**distribute** 32:24
34:24 35:8
**distributed** 47:15
49:21 270:7 275:7
275:9,12
**distributing** 34:8
35:4
**distribution** 30:7
33:3,20 34:2,4,6
34:16 95:20 140:2
195:6 203:10
210:3,11 240:17

270:22 271:3,11
362:17 365:8
367:19 380:6,11
**distributor**  165:22
200:20 211:15
363:17,20,21
365:10,14 366:12
366:16 368:8,20
368:20 369:3,3,6
369:12 370:4,6,9
370:13,17 371:1,8
371:20 372:12
380:1
**distributors**  35:18
198:4 201:2
207:25 275:16
362:20,22 363:6
364:5,9,17 365:2,5
366:4,17,23 367:7
367:10,15,22
368:2,10,13,14,17
370:3 372:5,11
422:16
**district**  1:1,1 7:19
**disturbance**  339:1
339:18
**diversion**  240:25
371:13,16 401:1
402:12 403:5
**divert**  35:10
**diverted**  104:12
106:7 107:18
108:11 109:2
212:2 251:11
371:10 372:1,8
**division**  1:2 7:19
7:20
**dna**  384:5
**doc**  142:15 253:16
**doctor**  24:16
35:23 45:19 52:10

58:1,7,16,19 59:1
59:4,16,18,24 60:3
60:8,12,14,19,20
60:23 61:4,20,23
62:5,13,17 63:23
64:19 65:11,19
66:25 67:2,6,10,16
69:5,7 70:20
71:14,17,24 72:10
72:15 75:18 79:5
80:16 82:15 86:6
87:2,11 88:17
94:8 97:18 119:5
125:2 134:17,20
146:9,12 150:12
151:21 152:5,13
152:17 154:11
160:8 162:7
192:18 201:10
209:17 210:18
213:1,19 214:16
215:13 226:9
228:8,10,20 229:4
229:16 238:4
241:24 244:15,21
244:25 245:11
246:14 247:3
249:19,22,22
252:7 254:7 258:9
263:2 269:24
278:14 280:12
281:1,9 285:7
298:19 300:18
310:3 315:16
316:7 319:5,12
327:18 331:20
332:1 335:10
343:7 345:12
347:16 349:9
350:16 351:3
356:12 371:15

373:8 400:5,15
401:1,17,20 403:3
414:2 416:14
**doctor's**  250:8
**doctors**  58:15,25
59:22 61:2,17
62:13,25 76:3
77:2 172:2,4,8,14
205:11 207:7
208:3,11 210:20
210:21 215:2
227:19,22,23
235:18 236:22
243:10,14 246:10
246:12 251:21
291:15 300:7
314:17 333:17
340:16 385:19
**document**  1:6 21:4
54:10 58:1 131:12
132:19 141:19
158:13 180:10,15
180:17 182:24
215:19,24 216:13
218:9 253:9 258:8
296:9 307:12,14
324:3 349:17,20
350:5 351:2,25
353:14
**documentation**
75:9 361:1
**documents**  20:20
20:21 21:7 22:12
24:12 74:24 75:11
83:23 131:15
142:15,16 216:4
218:2
**dogmatic**  37:22
359:12
**doing**  16:7 17:9
35:6 51:14 53:18

58:21 61:15 71:16
81:7,8,9 93:25
137:20 146:11,12
146:19 149:11
150:15,18 151:2
152:10 170:12
186:19,23 198:18
199:22,25 244:18
246:12 248:3
257:6 279:11
314:6 326:18
334:23 335:9
365:15 371:4
380:12
**dolenack**  394:15
**dollars**  200:1
236:17,23 386:16
**dominating**  36:24
**dose**  114:3,7,24
115:1,3 121:2,22
121:23 126:21
127:1
**doses**  59:5 60:22
61:16 62:2 154:14
369:10,15 370:1
**dosing**  63:6
**dota**  358:14
**double**  112:19
354:23 410:1
**doubled**  89:20
**downgraded**
289:25
**downloaded**  331:2
**downward**  93:5,8
93:17 325:14
354:15
**dr**  7:15 10:8,18
27:7 52:16 70:7
76:18 78:5 84:8
84:11 159:8 179:2
328:12,24 329:16

**[dr - effect]** Page 22

329:17,25 341:3
349:15 370:23
373:25 389:4
394:15 413:23
416:1,9 418:15
423:4
**drafts** 324:3
**dramatic** 385:4
**dramatically**
88:24 139:5 390:1
396:12
**draw** 267:19
294:24 306:22
307:25 336:19
**drill** 412:6
**drilled** 397:11
**drinking** 100:8
**drive** 341:14
363:12
**driven** 44:13
354:3 390:7
**driver** 185:22
**driving** 170:18
386:25
**drop** 36:19 96:12
97:8 146:6
**dropped** 36:22
40:14
**dropping** 354:13
**drops** 273:5 358:1
**drowning** 385:17
387:21
**drug** 4:16 31:22
32:4,11,17,21,25
33:2,14,15 34:13
35:24 38:9 39:17
39:24 40:24 41:2
41:15,23 42:5
49:4 51:5,15
52:23 53:5,8,13
54:11 55:7 57:22

58:5 65:4 70:13
90:3 91:15 96:11
101:14 102:17
105:16,20 107:13
109:19 112:21
121:3 133:1 135:9
146:6 151:4 156:6
161:9 163:5
187:22 192:10,16
192:25 194:22
195:14,20 197:16
198:6,25 199:3,6,8
199:24 200:19,25
201:6 202:1,21
207:20 209:16
225:23 231:18
232:24 233:13
234:25 235:3,17
236:24 241:3
251:1,2,3 252:22
259:18 263:18
266:23 271:15,17
272:11 274:19
288:19,21 292:17
297:6,8 299:12
301:12 303:11
304:11,22 305:3
305:25 306:10
310:15,25 319:10
320:5 326:12,13
326:15,18 335:2,4
345:20,20 352:13
354:18 355:7,16
357:3 359:4
363:17,19,21
364:16 365:2,5,14
366:3,4,11,17,23
367:7,10,15,22,23
368:2,8,10 370:5
370:17 376:21
384:2,4 385:20

387:20 388:5
399:10 405:1
407:18 416:23
419:11,15
**drugs** 25:6 33:20
34:2,5,6,11 40:8
41:17,22 57:4
90:16 96:1 98:14
98:17 99:2,3,4,8,9
100:16 101:6
102:7,12 104:5,11
105:12 106:23
107:8,11 112:16
112:17 119:21
137:9 153:14
173:17 179:10,23
187:13 191:16,17
191:24 192:5
198:8 199:6
202:12,19,23
203:12,18 208:21
230:10 240:17,18
255:24 264:2
283:24 288:6,12
290:22,23 301:4
301:25 305:11
335:20,23,24,25
338:13,15 345:4
346:1 355:13
366:18 367:13
369:11 370:7
371:3,13 372:7,15
376:17 386:6,11
386:13 399:8,13
402:12 411:6
412:8
**due** 405:4
**dug** 370:5
**duly** 9:13 424:5
**duties** 10:25 29:19
383:7 408:15

**duty** 410:7
**dwarfed** 40:6
287:23
**dying** 45:25 150:8
200:2 302:10

e

**e** 6:1,13,18 7:1,1
21:11 216:18
217:16,18,23
218:3,18 219:10
269:20 314:12
424:1,1
**ear** 42:7
**earlier** 56:22
82:16 85:5 88:12
110:12 126:19
160:8 179:7 238:4
247:19 351:16
353:8,15 354:9
355:10 396:8
404:3 413:24
414:17 416:9,22
**earliest** 289:18
**early** 50:19 289:20
325:12
**easier** 54:2
**easiest** 264:24
**easily** 266:20
**east** 3:8
**eastern** 1:2 7:20
**easy** 267:11
**eating** 85:12
**ed** 8:18 218:19
**education** 31:1
86:18 309:24
317:15 340:18
**educators** 172:15
**edward** 4:7
**effect** 92:4 102:8
114:12,14 156:15

effects  336:2
efficacious  266:24
efficient  374:10
effort  125:24
  419:25
efforts  141:6
  176:11 177:4
  178:10 214:13
  274:3 365:16
eight  13:21 110:25
  111:3,4,9 371:23
either  20:14 23:17
  40:3 50:5 52:1,18
  68:14 74:23 75:8
  83:2 89:5 106:6
  107:17 108:11
  109:1 123:9,13
  133:10 167:14
  172:12 174:20
  181:2 182:15
  185:18 186:6
  246:19 259:5
  285:2 291:6
  292:15 301:25
  318:16 325:22
  364:21 367:5
elected  172:7,14
  335:18
electronic  129:1
  143:20 218:17
  331:17
electronically
  128:6 143:13
  144:5
element  112:18
elevation  42:14
  43:25 45:12
  189:15,16
elevations  44:11
eliminate  400:7,25
  401:16

ellis  4:3 8:14
email  425:17
emcarter  4:10
emerge  325:17
emergence  271:22
emergency  176:17
emerging  271:24
  326:17
employee  329:22
  330:9,10,21,22
employees  18:16
  27:3 327:9 393:21
employer  11:4
employment  378:3
empowered  87:9
ems  301:5,15,16
  301:20,22 305:8
  305:22,23,23
  306:8,9,13 308:15
  309:5,5 311:25
  312:1
enacted  403:25
enclosed  425:11
encompassed
  223:11
encountered  386:7
encouraged
  292:19
encouraging
  325:23
endo  4:11,11 8:17
  10:2 418:11,12,18
enforcement  32:2
  32:6,16,23 33:19
  35:16 63:17 68:6
  80:15,22 81:1,10
  81:16,17,23 82:5
  82:10 83:3,9
  96:14 153:19
  154:22 155:18
  176:18 201:23

210:5 239:10,25
  399:12
engage  207:7
  208:3
engaged  65:12
  80:17
engaging  61:20
  199:22 203:17
  205:12 226:10
england  274:21
  275:4
enjoyed  416:4
enrolled  301:12
  329:18
enter  49:18 333:18
  336:8 343:16
  364:19 407:3
entered  49:22 56:5
  201:24 233:23
  331:19 336:24
  337:2 343:24
  344:9 359:1
  360:22 427:9
entering  344:11
entire  28:10
  127:12 173:13
  196:22 253:1
  362:8 404:21
  426:5 427:5
entirely  273:7
entities  87:22
  158:6
entitled  6:15 356:6
entity  87:22
entry  156:3 315:8
epidemic  21:9
  37:17 40:17,18
  44:14 45:18
  193:20 259:18
  299:11,12 326:7
  405:5,16 407:13

407:21 408:13
  410:10,25 411:19
  411:22 416:17
epidemics  47:5
  273:13 299:10
epidemiologic
  29:24
epidemiologist
  141:10 328:25
  329:25 330:6
epidemiology
  27:13,15,16,19,23
  27:25 28:3,6,10,14
  28:23 29:4,13,17
  29:22 30:2
equipment  384:23
  386:8
equivalence  85:8
equivalent  59:5
  60:9,11,22 62:2,7
  126:21 127:1
equivalents  60:17
erica  4:3 8:13
erica.james  4:6
erin  330:13
errata  425:13,18
  427:7,10,18 428:1
error  349:16
  350:16
especially  32:19
  51:9 71:15 104:1
  115:12 132:19
  167:3 273:24
  402:21
esq  3:3,7,10,15,19
  4:3,7,13,17,18,22
  5:3 425:5
essentially  198:7
  398:8
establish  248:5

establishing
  244:15
estimate   264:16
  266:17 269:9
estimates   91:20
  266:11
estimation   46:14
et   1:8,10,12,13
  233:13 272:23
  344:12 348:21
ethnicity   343:2
evaluate   245:11
evaluation   12:11
  14:12,13,22
evening   418:14,16
  418:20,21
event   119:11
  309:4 408:6 409:4
events   201:1
  234:12
eventual   229:18
eventually   273:11
everybody   42:20
  135:9 200:8 302:6
  309:25
everything's
  182:17 196:23
evidence   134:16
  298:19 340:11
  404:25 407:8
  411:8
evolutionary
  190:18
evolve   193:8
evolved   188:22
  385:24
evolves   210:11
evolving   136:2
  139:9
exact   12:21 14:3
  90:20 92:5 288:20

296:4 329:15
  392:23
exactly   64:21
  97:24 167:12
  179:12 214:6
  220:5 266:14
  343:22 359:9
  394:20 421:11
examination   6:2
  10:5 305:4 328:9
  373:22 413:21
  418:10
examine   175:5
examiner   10:19
  12:8 27:21 28:13
  29:18,20 32:9
  51:1,16 80:8
  115:15 140:25
  143:22 158:25
  161:23 175:5
  183:5 327:14
  337:1 375:2,4,5
  419:22
examiner's   6:11
  6:21 11:9 22:2,4
  127:10 153:18
  159:4 165:8 175:1
  176:19 328:15
  334:15 350:6
  358:13,18 359:19
examiners   124:5
  158:2 169:7,11,15
  393:19 394:24
example   85:4,6
  100:5 112:24
  114:21 115:19
  116:21 147:2
  150:10 193:21
  332:23 339:10
  349:4 358:22
  360:14 395:4

407:22
examples   190:22
  247:2 251:8
exceed   354:25
excellent   402:7
exception   181:14
  181:19,25 182:1
exceptions   149:1
excessive   63:6
exclude   126:10,12
  126:13 287:6
exclusively   387:4
  394:19
excuse   160:25
  289:21
exec   218:20
execute   409:7
executed   427:10
executing   408:15
  410:7,14
execution   426:14
  427:19
executive   12:7
  218:20
exercise   404:17
exercising   383:7
exhaustive   100:15
  183:1 223:24
  362:4 363:5 385:3
  386:23
exhibit   6:11,13,15
  6:18,20,21 97:15
  97:18 183:7
  184:22 215:10
  218:9 253:6
  269:14 286:11
  340:23,25 349:11
  349:20 351:9
  352:7 360:15,16
  372:21,23 389:24

exhibits   6:10,25
  360:11
exist   37:19 189:14
  206:7
existence   234:21
existing   141:12
exists   68:8 263:12
expand   396:22,25
expect   18:8,19
  126:2 370:21
expected   115:22
  270:24
expecting   156:14
expended   187:7
expense   384:18
  390:24 397:23
expenses   187:18
  383:25 384:5,20
  384:24 386:25
  388:15
expensive   285:3
experience   26:25
  28:12 31:3,7
  86:18,23 103:6
  122:2 276:4,14
  367:25 390:14
expert   25:4,11,14
  25:19,22,25 26:6
  26:12,15 27:12,18
  28:2,15,22 29:11
  30:3,6,9,15,18,23
  31:8,15,22,25
  48:23 50:1 68:19
  68:23,24 69:3
  86:13 182:7
  209:14,20 238:5
  276:7,20,24 419:9
  419:14 420:21
expertise   26:8,13
  26:18 27:23 28:17
  30:22 31:2,13

103:6 154:24
268:4
**expiration** 426:19
427:25 428:25
**expired** 107:10
179:7,19
**explain** 28:17
356:12
**explanation** 347:8
**explore** 61:19
**expound** 246:2
**expressed** 260:16
384:16
**extensive** 26:25
**extent** 27:5 28:16
29:24 30:1 53:10
74:14 82:25 83:22
137:25 219:22
244:25 247:11
280:21,23 282:6
345:16 366:1
371:19
**extracted** 344:2
346:12
**extremely** 179:18

**f**

**f** 424:1
**face** 71:16,16
311:13,13,14,14
403:2
**facilitate** 54:1
**facilities** 55:12,14
226:5 303:14
**facility** 154:11
225:11 303:21
**fact** 40:10 107:8
119:24 143:5
179:6 192:17
222:20 238:25
276:6 320:16
323:22 335:6

355:6,15 409:8
**factor** 116:23
117:1 118:8
120:20 187:16
302:13 309:16
316:21
**factored** 117:9
186:10
**factors** 65:24
95:15 97:1 124:21
287:11 300:2,4,23
308:9,11 314:24
338:19
**facts** 77:1
**failed** 416:15
**fair** 23:22,24
27:20 49:15 72:14
86:15 93:1 96:25
100:17,18 116:20
124:16 129:21,25
146:17 150:3
166:15 171:7
172:13 185:7
207:2,9,10 251:19
267:16 284:14
323:24 340:5
377:9 384:18,19
398:18
**fairly** 260:17
**fairness** 99:12
**fall** 119:9 312:15
**fallen** 53:9 141:5
**falling** 63:12 85:11
**falls** 200:24 269:8
**familiar** 25:10,21
28:6 32:15 39:8
43:19 74:14 97:25
158:4 171:10,10
178:11 247:21
283:25 363:6
364:4,15,25

375:15
**familiarity** 27:14
27:22 30:25 31:12
50:3
**family** 57:6 153:10
155:19 290:15
**far** 90:14 224:13
315:3,4 361:16
**fashion** 52:2 244:7
331:10
**fault** 203:19
**fda** 25:19,22,23,25
26:2,12 243:5
**february** 314:6
**federal** 161:8
170:2 365:4 419:8
**feedback** 13:25
14:20 18:14 76:8
**feel** 52:25 112:1
200:23 227:25
245:7,15 267:10
277:12 279:12
377:6 385:8
390:21
**feeling** 235:11
294:16
**fellow** 19:25
**fellow's** 162:3
**fellows** 395:5
**felt** 170:14 219:16
414:13
**fentanyl** 6:22 35:9
36:12,12,13,14,25
37:1,12,12 38:3
39:2,3 43:23 44:2
44:6,11,13 45:1
50:19 51:10,10
88:21,22 89:13,22
89:25 90:1,3,8,18
90:22 91:1,16
93:16 95:22,23,25

102:2 104:1,4,16
104:17,18,20,23
105:15,18,19,23
105:24,25 106:1,1
107:21 108:16
109:6,17,17,25
110:1,8,19,24
111:4,6,8,15
112:24 113:4,23
115:1,20,21 116:2
116:21 132:24
135:13 136:4,25
137:2,10,12,24
138:7,8,23 139:3,5
139:8,21 140:2,3
140:12,13 142:13
145:6,22,25 147:3
147:10 148:5
151:3,8 152:12
155:2,9,23 156:3,5
156:12,20,24
185:4,9,15 186:11
186:14 188:9,9,19
188:19 190:20
191:25 192:7,15
193:9 196:8,9,21
201:10,25 202:10
223:13,14 234:10
234:11 261:23
263:6 267:22
274:4 281:6
283:20 292:5
293:3,8,21 294:11
296:20,24 297:5,5
297:7,13,20,21,22
298:5,9,10,11
299:2,11,12,15
310:23 314:18
317:3,6 323:9
325:11,17,18
350:7 353:21

354:4,12,14,16,20
354:21 356:7,19
356:24,24 357:8
358:12,23 386:2,3
386:5,12 396:11
397:3,17 398:7
399:10 404:24
406:2,5 412:2,7,10
**ferraro**  17:8
**fewer**  273:8
**field**  28:10,11
29:21
**fields**  29:1,2
**fifth**  356:4
**figure**  94:9 216:9
264:15
**file**  53:19 54:5
68:1 73:19,23
127:10,12,15
130:18 131:11,17
131:20 132:18
134:16 142:7
144:21 180:4,17
180:21 181:14,17
181:20,24 182:13
183:5 218:17
220:2 227:6 236:6
294:4 298:17,18
315:12 331:9,21
344:21,25 347:17
349:4,6 377:4
**filed**  7:18 24:3
**files**  21:8 67:22
106:18,22 107:7
108:3,8 128:5
129:5,9,10,16
143:20 182:9,25
220:1,3 225:16
**filing**  74:10
**fill**  24:17 367:16
367:18

**filled**  54:21 154:11
348:8,9 381:18
**filling**  348:7
**filter**  33:22
**final**  92:7 146:22
322:23
**finally**  190:11
**find**  52:9,16 53:17
53:19 54:4 68:12
82:23,25 83:6
99:6,13 104:16
109:14 125:2
135:21 171:1
200:11 236:6
276:1 302:8 309:8
319:15 323:10,21
324:5 386:13
397:17 425:11
**finding**  123:14
124:18 256:10,14
256:18 260:4
**findings**  166:2
256:17 340:1
**fine**  76:20 97:12
159:19 215:23
217:1
**finish**  43:3,5,14
70:9 71:10 137:17
146:19,20 162:16
193:11,17 215:17
258:7 300:17
**finished**  345:12
361:13
**finishing**  91:4
**firearms**  287:24
288:16,23 289:1
**firm**  8:1,3
**firmly**  269:4
**first**  9:13 27:10
38:14 47:9 70:17
84:1 100:19

160:15 161:13
183:9 188:15
216:6 218:5
227:24 231:8
253:18 255:3,12
265:9 272:1
294:14 317:3
328:18 341:8,14
341:18 342:7
349:19 352:1
356:15 358:11
361:13 377:24
391:14 392:15
400:15
**firsthand**  47:2
178:9
**fit**  72:9,13 117:14
**fitzgerald**  218:19
**five**  58:12 59:22
60:1,14 61:1 63:7
69:12,20,22 71:25
72:24,24 73:3
74:16 123:24
137:9 138:8,22
139:21 152:10
165:3 215:24
216:13 225:2
237:15 248:23
254:18 255:2,12
256:7 260:2
300:18 320:17
**fix**  326:8 350:25
351:7
**flash**  341:14
**flat**  88:23
**fleming**  3:7
**flemming**  8:11,11
422:22
**flow**  149:13
**fluctuated**  89:4

**fluctuations**
103:11
**flying**  399:16
**focus**  33:9 55:18
163:22 271:22
287:15 310:10
**focused**  186:7
**focusing**  352:2
**foia**  181:3
**folders**  129:17
**folk**  190:8 273:6
**folks**  136:9 156:14
176:19 195:10
198:7 235:5 259:8
266:9 273:10
274:11 280:4
300:19 304:13
309:15 365:25
**follow**  62:3 63:21
66:10 69:4 73:24
74:18 75:22 76:7
99:11 100:21
126:12 157:24
211:20 214:25
219:16,17 315:18
328:17 378:21
398:2 404:6
418:22
**following**  214:6
254:18 255:3,12
**follows**  9:15 282:6
**force**  160:23
164:24 167:3,4
171:22 172:14,25
173:3 174:12,14
183:11,17,21
184:4,4 270:17,23
271:1 283:15
304:1,13 310:16
311:9 349:23
420:16,17

**forces** 96:14
177:24 247:8
400:23 412:3
**foregoing** 426:13
427:18
**foreign** 97:9
**forensic** 26:18
114:9 116:16
120:12 121:10,16
146:12 169:7,9,10
293:18 312:6
334:19,21 340:15
**forensics** 30:1
**forget** 419:17
**form** 13:23 17:14
18:10,22 19:4
21:21 25:5,20
29:5 30:11 31:10
31:17 32:10 35:13
36:15 37:20 38:19
39:12 40:19 41:19
42:22 44:16,23
45:5,11,23 46:16
46:22 47:20 48:1
48:8,13 50:12
52:21 53:6 54:24
57:24 59:2,11,25
61:10 63:2 64:13
66:1,15 67:4,11
68:7 72:18 73:7
74:4 75:1 77:6
78:16 79:8 80:10
80:19 81:12,21
82:8,20 83:18
84:21 85:19 86:16
87:5,14 88:7 91:8
91:22 93:2 97:3
103:9 106:10
113:8 114:5 115:8
116:13 117:3
121:24 123:4

125:22 127:7,25
128:11,21 129:19
129:22 130:4,21
131:21 133:8
138:12 144:20
147:14 151:13,23
153:16 154:3,16
155:10 156:1
158:20 159:2
164:6 166:18
169:22 171:6
172:17 175:9,25
176:7,13 177:1,9
177:17 179:20
180:5 183:12
185:25 186:21
187:9 189:2 191:3
191:21 192:9,21
195:18 197:2,8,21
197:24 198:11
199:14 200:5,21
201:7,16,21
202:11,24 203:13
203:21 204:2,20
205:14,23 207:3
207:23 208:6
209:4,22 211:8,19
212:5,14 213:7
214:21 215:5
219:2 220:11
228:13,23 230:24
233:5,21 234:3,17
235:1,21 236:4,12
237:4 238:18
239:3,13,18 240:1
240:6,13 242:4
243:6 244:3
245:21 246:13
254:20 255:8
256:13 261:8
263:7 268:2,11

272:18 276:9
277:24 278:24
279:24 281:15,21
282:2,19 283:12
284:4,15,22
285:12 287:7
288:7 289:2
290:11,19 291:21
295:6 320:22
321:5,21 323:13
324:6 325:1 326:1
326:9 331:13
333:10 334:1
354:6 361:10
366:19 368:11
369:7 371:11
376:1 377:10
378:1,6,13 379:13
380:21 382:21
383:12 387:6
391:15 394:1
397:9 400:12
403:23 405:6
407:16 408:19
409:11 410:11
411:20 415:3
416:18 419:5
420:5,22 421:23
422:13
**formal** 14:12,22
15:12,14 17:22
18:19,25 27:15
30:21 31:6 61:8
74:9 225:21
**formally** 16:5
**former** 124:1
**forming** 74:2
**forms** 174:11,20
257:10 339:16
**formularies**
367:24

**formulated** 323:5
**forth** 143:9 341:17
**fortunately** 91:16
**forum** 414:15
**forward** 271:10
322:24 359:7
360:24 425:15
**found** 98:18
100:16 108:10
169:24 170:24
281:7 324:17
**four** 18:12 58:14
58:24 60:5 61:17
62:13,25 91:13
208:24 209:2
227:12
**fourth** 98:5
**frame** 46:9 103:11
108:22 149:17
177:16,19 292:25
354:11,15 391:14
400:15
**framework** 15:21
16:4 17:10 18:12
19:7
**francisco** 4:20
**frank** 11:19,25
**free** 112:1 426:14
427:20
**freedom** 181:3
**frequency** 16:1
154:14
**frequently** 15:10
15:24 17:5 50:10
50:16 71:15
108:21 122:2
174:11
**friday** 20:8,11
92:16,17,18
**fridays** 351:12

friends  290:15
frolic  322:1
front  98:2 173:4
  253:18 295:17
  401:4
fruition  420:4
full  10:16 40:2
  224:21 387:25
  393:4
fully  10:14 29:10
function  13:2 88:9
  153:19 154:22
  324:24 344:15
  404:9 406:14,18
  406:24 410:15,16
functionally
  387:12
functions  22:10
  29:18
fund  237:7 388:9
  388:11
fundamentally
  135:24
funding  236:14
funeral  348:10,11
furnish  310:22
furnished  75:13
  220:2 239:5
  303:12 311:18
  342:9
furnishing  380:8
further  63:15 64:1
  72:12 73:14 76:25
  152:19 224:3
  226:18 320:11
  346:4 417:6
  424:10
future  361:8
  394:24 421:18

g

g  7:1 347:4
game  204:4
garage  306:16,16
garbled  221:21
garofoli  2:8 7:22
gathered  331:11
geauga  387:13
gender  293:23
  301:2 343:3
general  21:3 22:22
  22:23 31:4 33:21
  35:14,18 49:24
  68:22 77:8 91:15
  94:4 103:5 151:25
  164:5 180:25
  182:8 190:9 193:3
  203:7 247:23
  283:2 331:14
  341:15 344:10
  375:16 382:24
  414:15
generally  21:5
  289:13
generals  169:19
generate  180:11
  348:25 357:4
  358:16 359:4
generated  19:15
  72:11 111:14
  113:10 133:24
  185:12 266:13
  355:6 360:20
  381:2 412:12
generates  24:10
generating  29:25
generation  28:25
  29:12 270:11
genesis  210:1
genuine  384:5

getting  53:22,24
  58:15 59:23
  140:22 227:12
  231:13 265:22
  271:17 272:14
  274:11 284:13
  297:3 318:18
  319:11 363:7,25
  395:13
giant  343:9 360:17
gig  392:12
gilson  1:17 2:1 6:2
  7:16 9:12 10:8,18
  52:17 76:19 78:5
  179:2 328:12
  341:3 349:15
  370:24 373:25
  413:23 416:1,9
  418:15 423:4
  424:5 425:8 426:4
  426:9 427:4,13
  428:20
give  15:21 16:4
  54:19,20 63:3
  71:21 91:20 93:12
  103:12,15 114:21
  117:25 120:8
  144:4 177:16
  200:18,22 203:23
  204:4,13 207:4
  215:22 228:5
  245:8 247:25
  267:7 269:10
  278:12 296:7
  297:7 305:12
  310:18 311:7
  339:10 391:19
  396:21,21 397:1
given  15:3 78:6
  85:18 89:4 174:21
  241:11 266:23

273:8 321:12
  346:10 357:5
  361:2 419:24
  424:8
giving  310:4,6
  333:17
glaring  136:23
glasses  341:3
glean  55:5 128:25
  390:25
gleaned  130:7
  136:19 331:11
gleaning  226:4
gleans  331:4
global  36:9
glut  282:9 293:2
go  7:13 39:14
  43:15 50:17 83:25
  92:22 105:4
  111:20 118:3,24
  124:14 125:8,8
  127:23 128:2
  131:2 132:17
  133:5 134:14
  135:18 137:16
  140:15 141:2
  142:25 143:17
  149:14 153:6
  159:20 177:25
  189:8 190:6
  193:16,18 199:5
  205:20,25 206:5,6
  206:24 216:14
  218:8 221:9
  225:14 226:16,18
  232:1 253:25
  257:6 259:8 262:5
  262:6 263:20,24
  265:20 266:6,14
  266:19 268:17
  276:1 277:20

278:20 280:4
282:13,21 283:10
283:20,24 292:5
294:17,19,20
296:21 302:17
310:19 315:3
320:6 327:21
339:17,19,20
342:7 347:2
349:22 350:20
359:13 360:15
363:13 372:14
382:5 388:8
389:24 395:25
403:12 409:1,14
417:18,20
**goal** 53:12 171:14
**goes** 41:3 43:18
139:4 189:20
313:5 353:2 368:6
**going** 7:4 14:19
16:9 17:24 24:22
24:25 33:6 43:17
55:19 58:4 71:2
76:9 77:17,22
81:4 89:2 90:14
92:4 108:2 116:2
116:11,22 119:11
120:3 129:2
141:22 143:25
150:24 159:22
162:7 163:20,22
178:10,18 194:25
199:23 204:3
206:9 214:8,11
215:17,25 227:10
230:11 237:17,22
239:20 252:24
254:6 257:22
258:1 265:23
269:10,17 271:2

271:23 274:2
275:25 278:9
282:14 285:23
286:3 291:25
303:19 305:1
311:21,23 321:2
321:11,13 324:2
325:13,14,24
326:6 327:2,19,24
328:3 329:21
332:19 340:22
342:14 356:15
371:13 373:10,16
374:10 385:16
388:17 396:1
397:13 401:23
402:10 407:3
408:4 412:22
413:2,14,17 418:2
419:9,21 420:1,2
421:3,15,24 422:6
423:1
**good** 7:3 10:8
17:12,23,23 18:5
46:11 76:12 107:4
120:12 159:12
162:1 172:1
237:14 253:21
277:13,14 293:10
326:24 328:12,13
335:6 373:25
379:5 406:23
418:14,20,20,21
**gotten** 326:19
403:7
**govern** 49:13
**government** 97:11
**governor** 247:6
**grab** 119:9
**grabbing** 194:1

**grabs** 118:20
**grade** 109:20
110:1
**graduate** 296:3
321:17
**grandma's** 262:4
**grant** 330:9
**granted** 54:1
389:6
**graph** 101:11
111:12 113:2,5
122:12 137:5,7
139:4 173:4
185:11 356:15,16
369:16
**graphs** 111:15
113:9,12
**grazing** 392:24
**great** 140:3 194:2
395:10
**greater** 27:4
**gross** 88:5
**ground** 215:16
**group** 124:23
171:3 173:13
193:6 194:5,15
250:19,20 251:16
308:2 365:18,25
366:12 401:24
402:23
**groups** 122:20,21
122:23
**guess** 12:25 27:17
100:12 125:1
259:12 267:12
272:20 331:21
370:2 410:2
**guessing** 151:4
**guidance** 15:4
19:9

**guidelines** 121:1
124:8 158:1
213:24 232:16
271:20 273:25
**guiding** 158:8
**gunshot** 117:19
**guy** 156:10 167:18
195:7,8 280:5

### h

**h** 4:8 314:12 329:1
**half** 20:13 101:23
159:12 222:17
257:2 288:17
**han** 5:3 9:5,5
**hand** 313:14
424:15
**handed** 166:10
**handful** 163:4
250:15
**handled** 64:3
**hands** 34:14 232:9
**hanging** 288:17
**hangings** 287:25
**happen** 379:1
400:1
**happened** 66:7
83:13,17 120:7
171:5 209:18
392:13 409:3
**happening** 83:12
378:23
**happens** 209:16
**happy** 269:20
296:16
**hard** 262:11
265:24 277:5
**harm** 179:15,25
**harming** 399:1
**hartman** 4:13 6:7
8:16,16 10:1
414:10 415:13,16

415:19 417:8,15
417:20,23 418:1
418:13,17 419:12
420:9,12,25 421:9
421:20 422:1,8,18
422:25
**hato** 3:12
**headed** 325:23
**heads** 75:24
**health** 4:12 27:22
28:18,20 29:20
36:8 38:3 55:8,16
58:12 64:19 69:11
70:13 132:20
145:11,20 146:5
149:23 152:5
157:13,16 174:13
176:16 183:20,25
183:25 184:1,4,6
188:3 225:24
240:19 268:9
270:4,17 273:23
287:9 303:11
304:24 314:14
317:15 329:20
330:7 363:11,12
363:17 364:3,6
369:9 410:17
418:11
**healthcare** 49:13
49:21 64:8,23
65:12 66:8 73:3
80:17 85:18
126:19 363:20
367:24
**hear** 302:3 323:17
**heard** 164:1
166:22 167:6
209:20 216:8
276:6 283:16,18
283:22 289:13

290:24 306:15
363:8,24,24
372:12 415:11
416:2
**heart** 119:3,9,10
339:11
**heartbreaking**
302:3
**held** 2:1 7:21
10:22 92:10 94:5
257:20 291:10
**help** 24:17 146:16
243:16 394:12
395:10,17
**helpful** 108:20
162:4 241:2 268:8
268:13,22 269:3
**hereunto** 424:14
**heroin** 6:11,16,22
32:14,19 35:3,10
35:24 36:11,19
37:11 38:1,12,14
38:18,22 41:13,14
41:20,25 50:21
51:9 90:4,9,24
91:17 93:16
101:10,13,24
102:18 112:9,10
112:25 113:3,7,23
115:3,20,21 116:2
118:14,23 119:2
119:12 122:14,17
122:22 123:11,18
123:21 124:11,15
124:19 125:15,21
125:25 126:7,15
132:10,13,22
135:12,25 136:3
140:7 142:8,13
145:5,22,24 148:6
151:3,7 152:12,21

164:24 171:21
177:12 178:7,7
183:17 184:4,11
185:15 186:15
187:22 188:5,5,9
188:10,19,24
189:10,10 190:19
190:25 191:7,10
191:10,25 192:8
193:9,20 194:20
196:8 201:9,24
202:10 204:23
220:22 221:11,24
222:10,15,22
223:4 224:9,15
225:1,6,9 229:18
230:9,14,22 231:5
231:14 234:10
248:8,15,19,21
251:23 252:9,14
252:17,18 254:17
255:2,11,18,23
256:7,25 257:7
258:11,14,22
260:3,5,15,25
261:12,22 263:6
263:21 266:10
267:22 268:25
272:25 273:13
274:4,15,17,18,21
275:16,19,21
276:1,8 277:2,20
278:14 279:19,20
280:2,8 281:5,8
282:4,9 283:3,10
283:14 285:3,9,18
289:14,15 290:17
290:22 291:1
292:5,24 293:2,9
293:20,22 294:12
296:19,24 297:6

297:22 298:5
299:4,10,17
325:16 350:7
354:4,12,13 356:7
356:16,18,23
357:7,7 358:11
385:6 386:1 394:3
397:2 404:23
406:1,6 407:23
408:1,8 412:6,9,17
420:16
**hey** 24:16
**hi** 271:10 374:1
**hide** 319:17
**hierarchy** 12:2
33:6
**high** 32:1 61:16
62:1 85:7 110:22
140:4 179:16
277:6 302:5
387:18
**higher** 93:21
123:23 140:8
191:11 259:19
**highest** 101:14
**hip** 391:1
**hipaa** 304:10
**hire** 393:17
**hired** 141:9 330:9
393:11
**hispanic** 343:3,3
**histories** 319:10
**history** 54:12
66:23 67:13 73:15
224:22,23 248:16
301:3 302:19,24
303:18 370:19
375:7 376:10
377:15,17 378:4
407:10

**hit**  279:5
**hold**  25:13 27:18
28:2,15 49:25
68:18 69:1 92:22
276:20,23 280:14
**home**  302:4
348:10,11 396:13
**homicide**  181:15
**honest**  56:19
189:21 251:18
**honestly**  23:10
53:8 73:25 168:5
235:2 287:1
390:20
**hope**  180:22 367:2
367:18 401:10
**hopefully**  252:25
**hospitable**  379:21
**hospital**  124:12
182:19 332:23
**hospitals**  172:5
301:9,11
**hostetler**  4:13 8:17
9:25
**hour**  76:10 159:12
**hours**  20:12,13
409:19
**house**  270:8 327:8
338:9 399:24
402:23
**hr**  13:2 15:2,19
16:3,13,14,17,23
17:10
**hugh**  68:16 84:6,7
171:24 270:8
328:24 329:2,3
362:12
**huh**  97:23 143:11
151:15 173:23
184:25 211:23
258:23 316:22

419:18 420:18
**human**  15:3
**hundred**  23:11,18
45:25 89:3,23,24
90:12,21 114:22
126:11 187:2
197:13 198:22
200:1 260:16
386:12,19
**hundreds**  196:18
202:20 386:16
**hunter**  3:10,13
**hurdman**  160:17
**husband**  63:12
65:5
**hydrocodone**
102:10 223:15
273:4
**hydromorphone**
102:11 223:15
**hypothesis**  298:21
298:22
**hypothetical**
113:22 278:12
280:20 292:1
293:1
**hypoxic**  116:1

**i**

**idea**  17:13 18:6
115:18 154:19
155:22 402:7
**ideal**  53:7 153:4
**identification**
97:16 215:11
253:7 269:15
341:1 349:12
**identified**  61:22
70:21 72:16 82:1
140:11,14 152:13
154:6 177:12
226:21 268:24

275:18 308:9
309:22 317:13
362:14 371:24
**identify**  99:2,2,4
99:10,11 150:20
152:17 154:15,20
263:25 264:1
360:24 371:7
383:20
**identifying**  134:9
386:7,9
**identity**  370:6
**illegal**  34:6,10
35:1,4,19 203:12
203:17,18 205:12
206:1 207:7 208:4
237:11 244:7
266:3 278:3
288:11
**illegally**  196:20
211:4 212:1
**illicit**  33:15 34:6
34:15 35:2,8 39:2
39:3 48:14 51:9
103:24 104:18,22
104:24 106:25
107:8 108:18
109:21,24 120:2
121:3 155:2
192:15 201:9
234:11 264:2
274:9 281:6
297:20 404:24
406:5
**illicitly**  104:3
105:18,22 196:8
**illness**  322:18
**illustrated**  256:22
**illustrative**  100:21
**impact**  33:14 96:9
96:13,16 97:1,9

112:7 124:25
166:2 182:5
338:13
**impacted**  173:22
**impacts**  246:25
**implemented**
337:12
**imply**  136:8
**important**  115:17
132:2,7,10,16
151:22 271:13
274:7 299:14,25
335:14 404:9,12
**imposed**  364:5,8
364:16
**impossible**  115:14
179:17 230:4
**impression**  46:19
**improper**  213:18
**improperly**  211:4
256:24 287:19
**impurities**  104:20
108:15 109:12,14
109:18 110:18
**inadvertently**
288:2
**inappropriate**
80:18 82:6 265:17
**incarcerated**
309:15 317:10,14
376:20
**incarceration**
317:17,22
**incidence**  255:17
342:16
**incident**  342:23
422:9
**inclination**  264:20
**include**  11:8 36:10
60:21 102:6,10,13
105:15 121:10

122:6 123:2,8
125:20 126:6
173:9 221:5
223:10,12 267:3
286:25 352:5
407:14 408:16
**included** 6:25
117:16 119:2
122:11 135:8
172:2,14 250:20
267:2 287:18
345:4 404:19
415:1 425:13
**includes** 334:10
**including** 102:1
125:24 165:10
182:3 192:7 202:2
258:13 353:21
**incomplete** 190:13
**inconsistent** 244:1
**incorporated**
427:12
**incorrectly** 254:21
**increase** 40:11
88:18,21 90:15,16
90:19,21 173:16
185:2 190:5 193:2
274:14
**increased** 38:10
89:13 190:1 195:3
**increases** 354:2
**increasing** 395:15
**incredibly** 386:3
**incur** 395:20
**incurred** 383:20
383:22 384:21,24
387:4 388:15
**independent** 32:6
215:3 354:10
412:12

**independently**
294:18
**indicate** 33:19
161:6
**indicated** 398:14
398:17
**indicates** 91:14
**indicating** 425:13
**indication** 106:24
241:7,10,18,23
243:8 392:7
**indications** 242:2
305:13
**indicia** 107:8
147:6
**indirect** 214:10
277:25 390:25
**individual** 63:14
64:25 66:3 112:16
134:11 146:11
190:22 268:1
278:6 283:1 298:4
370:3 371:2 377:8
382:6 398:21
**individualized**
332:2
**individually** 50:9
262:23 306:1
365:24
**individuals** 50:18
50:20 58:9 61:22
74:16 77:9 98:18
132:17 153:23
164:10 172:15
193:23 202:4
208:10 220:1
224:7 227:6 234:7
237:9 266:18
283:14 288:14
292:22 298:15
305:14 385:19

393:18 403:8
417:4 421:22
**industry** 365:21
366:7,14
**infer** 155:12 305:9
**infiltrate** 196:6
**infiltration** 156:12
412:1
**inflate** 287:20
**influence** 34:2
211:14 212:10
213:9 214:1,7,9,10
367:23
**influenced** 67:2
213:19 214:16,23
247:12
**influences** 210:23
213:13
**influencing** 212:17
213:18,23 247:9
**influx** 32:19 96:1
**inform** 146:5
174:7
**informal** 14:16
15:23
**information** 19:13
24:9 25:16 26:17
49:9,14 50:16
54:19,20 55:5,16
57:16 67:9 71:17
72:3 73:16 74:3
74:25 75:8 94:23
117:8,10,11
121:12 128:25
129:3 130:8,18,20
131:19 132:1
133:7 134:9,10
142:1,19,20 144:3
151:22 153:11
166:7,16 169:18
170:24 171:15

172:24,25 173:6
173:10,25 174:16
174:19,24,25
180:3 181:4,9
218:7 219:1,18,21
219:24 220:17
225:15,19 226:1,4
231:4 241:4
259:15 268:21
269:5,6 270:6
271:13 281:3
295:1,2,10,16
298:1 301:13
303:3 305:14
310:15 311:5,15
319:14,18 321:10
322:24 327:6
331:3 333:24
334:5 335:14
336:19 337:6,11
337:17 338:4,18
340:2,6 342:11,25
344:7,16,24
346:20 347:17,19
348:1,6,10,14
357:1 369:14
370:16,18 377:5
385:10 406:17
407:5 418:24
419:4 420:13
421:2,12,16,25
422:3
**information's**
320:24
**informative**
173:18 238:21
**ingesting** 288:11
**ingestion** 288:6
**inherent** 352:17
**initial** 58:10
124:18 188:8

218:10 247:5
267:23
**initially**  71:19
136:3 145:22
267:2 281:4,5
296:17 333:13
396:17
**initials**  218:10
**initiate**  273:21
**initiated**  183:18
204:23 248:19
254:17 255:2,11
380:19
**initiates**  254:17
255:1,10 260:5,15
273:20 274:17
**initiating**  252:22
**initiation**  6:16
260:15 282:5
**initiations**  275:20
**initiative**  146:5
**initiator**  274:8
**initiators**  272:25
**injure**  279:6
**injury**  184:8 270:2
338:25 342:16
347:8,12,14 407:6
408:22
**inn**  390:3
**input**  49:14 338:5
**insert**  367:12
**insight**  158:24
**instance**  46:24
83:16,17 120:9
150:4 302:2 371:5
**instances**  61:25
62:10 81:5 119:1
184:10 244:5
247:1 280:2
295:11 297:3
391:19,22

**instituted**  95:19
96:4 247:7 383:9
**institution**  213:2
**institutions**  304:19
367:24
**instruct**  421:4,15
421:24 422:6
**instructed**  253:13
**instruction**  253:11
**instrument**  100:4
**instrumentation**
110:10,17 325:6
362:6 385:23
387:1 388:8,12
397:19
**instrumentations**
384:3
**instruments**
386:15,20 397:24
**intend**  179:15,16
**intended**  242:7
251:11,13
**intending**  155:13
179:9,22,24
**intent**  179:4
322:25
**intention**  142:11
289:6
**intentional**  383:17
**interact**  17:5
366:23
**interacted**  167:2
283:14
**interacting**  170:15
367:3
**interactions**  19:1
170:7
**interchangeable**
293:9
**interchangeably**
230:11 296:24

**interdiction**  274:9
**interested**  170:5
181:1 424:12
**interesting**  169:25
170:24,25 171:2
171:16 321:9
**interfere**  7:10
**interference**  7:8
100:4
**intermediary**
202:5
**intermediate**
125:15 143:1
**internet**  202:4
203:4
**interpret**  116:14
**interpretation**
166:1 210:9
**interpreting**  26:19
**interrelated**
287:10
**interrelation**
248:7
**interrogatory**
24:15
**interruption**
257:19
**intersect**  32:8
**interval**  187:15
**intervenous**  305:3
**intervention**  249:9
274:3 299:18
304:25 317:14
357:15
**interventions**
132:20 145:21
150:7 152:5
**interview**  74:19
75:8
**interviews**  231:4
302:23

**intoxicated**  302:4
**intoxication**
345:23
**intoxications**  90:6
90:11 112:7
**intravenous**  301:4
308:13
**intravenously**
305:10
**introduce**  297:4
**introduced**  194:21
194:22 273:3
**introducing**
200:14
**introduction**
398:25
**invest**  110:9
**investigate**  72:12
77:13
**investigated**
371:19
**investigating**
186:18 187:7
306:7 395:23
**investigation**
61:16,24 63:16
64:1 65:17 67:13
73:14 77:1,8
78:23 106:24
117:7 120:13
124:10 144:8
146:16,20 147:1
147:13 148:19
149:12,14 150:1
150:16 151:1,25
152:19 155:19
156:22 180:8
181:5,15 182:5
225:12 339:22,25
340:19 371:22
376:13 377:6

387:13 390:22
397:5 405:13
**investigations**
129:12 186:23
326:18 331:14
**investigative**
73:21 74:13,15
80:21 180:14
182:22,23
**investigator** 147:5
149:9 187:11
302:24 330:17
**investigator's**
182:4,13
**investigators** 55:9
66:21 148:4,9
149:10 169:12
226:4 330:14,20
**inviting** 396:19
**involve** 287:24
411:17
**involved** 9:23
147:18 148:12
151:5 157:3 168:4
227:21 290:17
355:8 363:7,25
**involvement** 9:24
177:10
**involves** 293:19
340:14
**involving** 151:8
152:12
**irregularities**
78:24
**irrespective** 115:4
**irritant** 115:24
**island** 297:12
**issue** 18:19 52:25
143:21 146:22
156:15 192:18
276:17 277:17

287:9 321:3
350:12 377:1
389:21
**issued** 88:1
**issues** 27:22 28:21
39:13,18 161:14
173:1 175:12
325:11 380:24
**issuing** 350:17
**it'd** 268:8
**item** 384:17

**j**

**j** 4:17
**jackson** 4:22 8:20
**jacksonkelly.com**
4:24
**jail** 205:20,25
206:5 301:7
309:14,16 310:25
317:24
**jails** 309:9
**james** 4:3 8:13,13
**janssen** 4:2 8:14
**january** 1:19 7:5
92:17 350:13,18
350:21 351:12
352:15 424:15
425:4
**jelled** 365:23
**jenna** 270:4,18,20
**job** 1:25 334:15
379:8 386:9
397:24 410:14
**joe** 19:24 162:3
167:16 168:3
**john** 4:8 306:4
308:23
**johnny** 155:21
**johnson** 4:2,2 8:15
8:15

**joined** 70:22
**joint** 399:24
**jones** 4:8
**jonesday.com**
4:10
**journal** 161:16
167:21 169:4,6,8
169:13
**journalist** 181:1
181:13,18 182:1
182:16
**journalists** 180:21
**judge** 1:6
**judgment** 120:16
215:3 244:8
339:23,24 340:6
340:14 404:17
408:11 409:9
**judgments** 224:12
**july** 389:18 390:9
**jump** 374:10
**june** 329:11
**jurisdiction** 64:10
78:15 171:19
406:20 410:19
**jurisdictions** 47:4
181:12
**justice** 310:1
311:4
**justin** 160:17

**k**

**k** 4:22
**keep** 23:9,17 68:3
75:24 127:13
141:14 260:13
278:9 318:16
332:2 360:9 386:4
**keeping** 124:3
157:17 419:25
**kelly** 4:22 8:20

**kept** 82:17 144:17
302:6 365:23
**key** 4:14 251:20
**keyed** 347:17,20
**kid** 289:17 290:21
291:12 379:1
**kids** 65:5
**kill** 288:10
**killed** 115:5
**killing** 234:9
399:13,17
**kin** 127:12 131:12
180:16 182:16,18
183:4
**kind** 12:1 24:23
31:2 65:16,17
71:7 72:3 74:3
86:9 97:5 133:13
147:4,24 148:18
161:19 163:23
165:24 167:10
170:16,18 171:8
173:4 181:3,25
186:11 187:18
188:3,7,10 207:10
209:15 210:6
215:25 219:17
231:3,8 237:9
242:10 246:4
249:13 252:21
259:9 262:4 264:6
264:8 266:5,14
267:19 268:23
269:8 279:12
287:8,19 289:19
291:13 293:19
294:2,16 295:14
297:24 306:11
321:3 327:5
331:12 346:10
354:23 357:18

**[kind - know]** Page 35

| | | | |
|---|---|---|---|
| 359:25 366:5 | 110:13,25 115:10 | 187:18 189:11,19 | 266:2,3,5,7,8,9,10 |
| 374:10 387:12 | 115:11 116:15 | 189:25 190:1,3,11 | 266:12,13,15 |
| 389:7 393:2 394:3 | 117:6,13 118:12 | 190:22 191:6 | 267:1 268:3,5,13 |
| 397:15,20 | 118:22 119:2 | 193:8,19,21 | 268:20,22,22 |
| **kinds** 336:17 | 121:5,8,13,16,20 | 194:15,16,25 | 269:4,6,11 273:12 |
| 337:20 379:1 | 121:22 122:8,8 | 196:1,4 197:15,16 | 273:13,18 274:1,3 |
| **kit** 357:12 | 123:6 124:9,13 | 198:7 202:18 | 274:20,24 276:3 |
| **knew** 225:20 | 125:13,14 126:9 | 203:3,6,14 204:7 | 276:22,23 277:3,5 |
| 241:3 364:2 | 127:15,16 128:1,7 | 204:12 206:17 | 277:6,11,12,13 |
| **know** 13:15 14:4 | 129:23 130:15 | 207:12 209:7,9 | 278:2,4,6 279:9,10 |
| 16:8 19:8 20:25 | 131:1,22,24 | 210:5 212:8,15 | 279:14,15 280:4,5 |
| 21:3,16 23:10,18 | 132:11,23 133:24 | 213:23 214:11,13 | 280:6,8,12,21 |
| 23:19 25:22 27:25 | 136:16,21,23 | 214:15,24 215:25 | 282:6,17,25 283:2 |
| 31:6,24 32:7,12,13 | 137:19 138:5,6 | 218:5 219:8,15 | 283:2,4,13 284:16 |
| 33:4 34:9,11 | 139:1,4,10,11,20 | 220:7,10,17 | 284:19 285:1 |
| 35:15 36:7,18 | 142:5 143:5,18 | 225:12,20 227:22 | 287:2,14 288:13 |
| 37:21,22,25 38:2 | 144:9,13,14,17 | 231:2 232:10,22 | 288:16,20 289:8 |
| 39:5,11,15 40:5,17 | 145:11 146:4,21 | 233:7,12,23 | 291:13 292:12,13 |
| 41:21,21,25 43:18 | 147:6,16,19,19,21 | 234:10,12,13,13 | 292:14,17,20,21 |
| 44:25 46:4,4,10,23 | 147:23 149:6,7,13 | 234:19 235:3,6,11 | 292:22,23,25 |
| 47:3,10,22 48:15 | 150:23,25 151:4 | 235:23,24 236:5 | 293:1 294:15,25 |
| 48:21,21,25 49:16 | 151:17 152:24 | 236:10 237:6,7,9 | 295:8 296:6,11,25 |
| 53:24 56:18,25 | 153:1 154:12,17 | 237:10 238:8 | 297:1,2,15,25 |
| 63:12,13 65:4 | 155:4,20 156:3,11 | 240:2,14,15,15,18 | 298:2 299:9,18 |
| 66:7,12,12,19,25 | 156:21 157:15,17 | 240:23 241:2,6,8 | 301:20 302:7 |
| 67:15 68:16,20,21 | 158:4,10,11,12,16 | 241:16,16,18,18 | 303:24 305:7 |
| 68:25 69:20 70:23 | 158:21,23 159:9 | 243:20,21 244:4 | 306:13 307:4,16 |
| 71:7 72:10 73:21 | 159:15 161:18,20 | 244:15,17 245:4 | 307:16,17 308:15 |
| 73:25 74:8,19 | 161:21 162:22 | 245:14,24,24 | 310:5 312:10,23 |
| 75:4,10,12,14,18 | 164:17 166:10 | 246:1,3,24 247:10 | 313:4,8 315:25 |
| 76:1,2,8 77:11 | 167:10,11,13,14 | 247:11,25 248:6,9 | 316:15 318:1,3,15 |
| 78:17,20 79:9,12 | 167:15,16 169:24 | 249:10 250:2,3,19 | 319:9,15 321:10 |
| 79:17,22,25 82:9 | 170:8,11,17 172:8 | 251:4,5,7,14 | 322:16,16,20,22 |
| 82:11,12 83:4,8,13 | 172:18 173:19 | 256:19 257:18 | 325:8,18 326:21 |
| 83:23 86:5,10,10 | 174:17 175:5 | 258:18,18,19,24 | 326:24 330:14 |
| 86:21 87:15 88:8 | 176:14,16 177:11 | 259:1,3,11,24 | 331:19,22 332:3,7 |
| 88:9 89:18 92:1 | 177:13,14,24 | 260:14 261:24 | 333:25 336:21,23 |
| 95:7,18 96:18,18 | 178:2,5,9,9 179:22 | 262:1,3,8 263:14 | 337:3,18 339:2,23 |
| 99:5 102:22 103:5 | 181:11 182:8,25 | 263:23 264:1,2,5,6 | 339:24 340:9,11 |
| 103:13,17 105:4 | 185:11,15,18 | 264:8,15,18,18,23 | 341:20,22 342:12 |
| 107:1,2 108:9,14 | 186:1 187:11,16 | 265:6,9,17,18,22 | 343:10,25 344:1,4 |

| | | | |
|---|---|---|---|
| 344:11 345:2,13 | 399:11,14,16 | laced   155:8 196:20 | lawfully   41:12 |
| 345:15,16,17 | 400:23,24 401:20 | lacerations   42:9 | 47:15 77:3 104:19 |
| 346:7,8,9,11 | 402:4,8,12,20,22 | lady   85:11 | 109:7 261:21 |
| 347:11,21 348:2,4 | 403:4,6,13 407:23 | lag   352:17 | 262:8 275:8,9 |
| 348:16,23 349:21 | 407:24 408:17,22 | lakes   140:4 | laws   214:24 |
| 349:24 351:24 | 409:2,2 411:3 | land   188:11 | 363:13 |
| 358:15 359:9,14 | 412:2,2,3,9,11,13 | large   24:11 32:19 | lawsuit   189:1 |
| 360:4 361:2,6 | 412:13,15 415:6 | 33:21 120:2 | 191:2 196:24 |
| 362:22 363:4,9,14 | 416:24 417:1 | 129:14 193:21 | 197:20 204:16,19 |
| 363:14 364:20,23 | 419:24 422:14 | 194:5 195:10 | 207:22 208:4,8,15 |
| 365:18 366:13,25 | knowing   50:5 | 257:5 271:14,16 | 208:18,22 209:19 |
| 367:4,5,6,7,9,10 | 170:5 266:18 | 272:10 275:22 | 236:2,6,22 275:15 |
| 367:14,18,20,22 | 267:24 292:8 | 340:23 399:9 | 280:16 288:25 |
| 368:1,2,6,7,8,13 | 369:4 | largely   42:16 | 361:19,23 410:21 |
| 368:24 369:8,11 | knowledge   24:24 | 90:22 174:20 | 411:16 |
| 369:12,24 370:6 | 25:17 29:14 31:4 | 193:23 282:10 | lawyer   19:19 |
| 370:11,13,22 | 32:4 34:8 40:21 | 295:10 305:3 | 176:6 324:4 |
| 371:5,13,16,18,18 | 41:3,4 47:2,9 67:1 | 390:7 | lawyers   20:16 |
| 372:6,11,13 | 68:22 83:15 | latest   307:15 | 22:13 166:6 239:1 |
| 374:14,17 375:6 | 105:25 158:12 | 372:15,25 | 239:5,9 296:8 |
| 375:15 376:2,3,15 | 240:22 245:25 | law   32:1,5,16,23 | leaders   365:19 |
| 376:18,24 379:1 | 290:9 306:23 | 33:18 35:16 63:17 | leading   338:21 |
| 379:22 380:7,8,9 | 355:23 363:16 | 68:6 80:15,21 | learn   238:25 289:9 |
| 380:10 381:1,10 | 366:21 424:9 | 81:1,10,16,17,23 | 290:2 |
| 381:10,11,12,14 | knows   298:4 | 82:5,10 83:3,8 | leave   379:22 |
| 381:16,20 382:1 | koehler   159:9 | 96:14 153:19 | 398:19 |
| 383:2 384:9 385:3 | | 154:21 155:18 | leaves   309:25 |
| 385:6,10,16,22,24 | **l** | 175:6,7,7,10,24,24 | leaving   321:11 |
| 386:10,11,17,18 | l   1:24 314:12 | 176:18 180:20 | led   95:16 |
| 386:19,22 387:7 | 329:1,1 424:3,18 | 183:3 201:23 | left   65:4 70:15 |
| 387:15,19 388:2,6 | l.p.   1:8,10,12 3:14 | 210:5 239:10,24 | 347:3 356:18 |
| 388:11,14,16,20 | 10:6 | 289:21,24 391:4,8 | 359:12 |
| 388:20,21,23 | label   31:1 241:17 | 391:9 399:12 | leftovers   264:10 |
| 389:3,6,11,23 | labeled   353:21 | lawful   35:11 41:7 | legal   8:1,3 130:13 |
| 390:22,23,24 | labeling   26:3,6 | 106:7 107:19 | 166:16 175:14 |
| 391:19,22,23,25 | laboratory   10:20 | 108:11 194:17,20 | 221:8 232:4 |
| 392:1,5,7,10,11,21 | 22:9 26:23 27:3 | 224:7 225:2 | 274:22 423:6 |
| 393:10 394:2 | 39:25 105:19,20 | 243:10 260:24 | 425:1 428:1 |
| 395:1,8,10,14,15 | 113:18 123:24 | 261:11 267:24 | legally   264:8 |
| 395:17 396:1,4 | 173:7 326:13 | 288:11 | legislation   50:4 |
| 397:7,12,22 | 327:15 388:9,11 | | 213:24 |
| | 392:6 | | |

**legislative** 399:19
402:22
**legislators** 401:24
**legislature** 401:5
**legitimate** 34:9
41:16 42:10
192:18 246:11,15
262:24 265:21,25
266:4 322:3
348:22
**legitimately** 250:7
**lend** 321:24
**length** 246:2
**lesser** 27:4
**lethal** 114:3,7
116:3 121:2,6,23
**lethality** 297:5
**letter** 181:2,3
310:1 425:19
**level** 26:24 27:6
32:1,1 34:3 45:18
45:22 85:7 100:6
119:20 170:2
172:9,9 252:19
265:24 266:21,22
317:13 319:24
332:3 367:20
371:20
**levels** 27:1 121:5,6
121:6,14 279:10
392:25 404:13
**liability** 213:20
**liaison** 16:16 17:6
**license** 75:21 88:1
**licensed** 34:19
64:7 87:18 379:9
**licensure** 87:22
377:23
**life** 157:1 288:14
291:6,11 375:12

**light** 174:4
**likes** 40:7
**likewise** 375:24
**limit** 99:25
**limitations** 246:21
**limited** 221:3
224:23 299:23
310:9
**lindsey** 3:19 8:23
**lindsey.cohan**
3:21
**line** 111:8,11,16
113:3,3,4 163:8
184:23 185:13
243:21 319:7
335:5 352:12
353:20 384:17
425:13 427:7
428:3
**link** 132:23 282:14
282:18,20 350:21
408:3
**linked** 370:24
405:20 407:12
**links** 382:7 385:6
**list** 100:15 134:6,7
135:1,6,8 141:24
142:24 145:8
223:24 270:22
288:22 310:18,22
335:24 377:13
386:23
**listed** 97:7 101:7
113:25 116:22
118:7,15 144:25
156:19 286:21
319:12,21 359:16
427:7,17
**listen** 162:8
253:10

**listening** 141:2
**listing** 427:7
**lists** 271:11
**literature** 204:21
253:22
**litigation** 1:5 7:18
9:24 21:2 22:22
22:25 205:9 363:8
363:25 415:8,12
416:3,11,21 425:6
426:3 427:3
**little** 88:12 151:17
159:13 181:12
252:3 262:11
334:9 361:20
380:12 394:13
396:23
**lives** 95:21 400:9
401:17 402:9
403:5,21
**llp** 3:15,19 4:3,19
5:4 8:24
**load** 392:18
**loads** 385:4 387:19
388:2
**lobby** 385:13
**lobbying** 214:13
246:25
**local** 34:3
**located** 7:23
**long** 10:22 11:13
20:10 45:9 53:16
59:19 84:7 86:20
115:2 136:22
151:11 177:6
181:14 182:4
216:18,18 225:5
229:7 242:6
245:23 246:24
319:10 329:9

**longer** 332:19
**look** 24:17 37:24
50:18,20 51:5,6
52:12 53:10,17
55:6 82:3 86:1
94:8 97:22 98:5
99:3 100:22 105:4
106:16,18,21
108:6,12,14 109:5
109:11 121:18,19
124:17 131:3
132:25 133:3,5,13
134:3 135:18
136:1,10 139:10
141:6,11 142:12
143:17 147:17
150:6 153:2,7,13
154:9 157:5
176:17 181:20
184:14,21 190:3,5
190:6 216:12,17
221:10 224:18,19
224:23 225:15
226:16 248:12,24
253:17,18,19
254:8,8 257:17
260:5 261:18
273:12 280:14
286:11 293:20
294:17 298:8
300:13,15 302:14
303:16 308:8
309:19,20 314:23
315:19,23 316:10
317:4,16,18,21
318:13,15 319:2,6
320:24 322:17
343:5 347:23
349:2,3,4 351:23
352:7,12 353:20
356:4 357:21

360:11 361:12
372:21 382:2
394:11
**lookback** 54:16
**looked** 40:23,24
41:5 43:22 58:22
92:10 103:10
108:7,8 112:8
127:2 128:5,6
133:24 140:17
182:9 186:7
193:20 200:23
258:19 263:3
293:25 294:3
298:12,14 300:12
300:23,25 301:11
302:5,12 303:9
304:21 315:7
316:2 320:5
**looking** 77:1 99:10
107:7,23 135:12
135:20 137:7
139:2 145:12
170:12 185:17
187:1 188:2 210:1
224:6 225:15
248:4 253:16
254:23 265:13
298:16 300:4,6,20
301:6,8 310:5
315:10 316:17,25
318:21 341:22
342:11,18 348:2
352:8 362:5
**looks** 42:15 110:21
137:8,21 146:23
261:3 342:20
343:18 356:5
**los** 70:7
**lose** 202:20 309:18
374:13

**losing** 393:3
**lost** 75:20 364:10
378:24 387:7
405:7
**lot** 63:13 65:1
71:18 75:10 86:9
117:11 120:13
143:9 150:24
151:2 158:9
167:10 170:9,10
174:15 176:15
201:23,25 209:24
246:23 263:22
267:9,15,24 270:6
277:13,16 280:7
290:21 296:9
301:19 310:5
316:2 319:9
325:22 330:24
339:14 345:23
348:1 355:5
366:13 399:14
**lots** 178:1 236:24
382:25
**love** 235:2
**low** 252:19 255:16
**lower** 121:13
**lowest** 137:8
**lpa** 2:8 7:23
**luigino** 27:11
**luke** 4:18 9:7
**lumped** 266:5
**lumping** 124:7
**lunch** 159:15,16
178:21
**lynn** 17:7

**m**

**m** 4:3,7 22:6
260:14
**m.d.** 1:17 425:8
426:4,9 427:4,13

428:20
**madam** 425:10
**magnitude** 140:7
**mail** 6:13,18
216:18 217:16,18
217:23 218:3,18
219:10 269:20
**mails** 21:11
**main** 4:4,23
**maintain** 131:14
159:6 327:13,14
352:21
**maintained** 127:6
332:8 337:11
344:16
**maintains** 332:4
344:4
**major** 41:1 172:5
271:22 301:9,10
399:12
**majority** 23:23
172:20 227:11
229:18 273:2
287:24 355:7
**making** 79:20
81:10,13 195:15
196:18 234:5
237:12 243:21
245:15 268:9
294:25 295:8
375:8 391:2,5,6
393:9 394:9 400:8
401:12,15 402:16
408:20
**managed** 344:15
**management**
30:16 327:6 359:1
**mandate** 232:11
**mandatory** 96:4
228:21,24 332:14
333:1,7,16 400:5,9

400:24 401:6,12
401:16,19 402:16
403:1,19
**manner** 62:23
334:11,16 346:5,8
346:11,25 347:3
348:17 404:4,11
404:22 405:3
406:10 407:1,4
408:18 409:8
410:8
**manners** 158:14
348:22
**manreet** 328:25
**manufacture**
109:22 368:4
**manufactured**
104:3,19 105:19
105:22 109:7,25
196:9 201:25
**manufacturer**
200:20 366:17
**manufacturers**
198:3 201:5
210:24 288:25
366:4 422:19
**manufactures**
111:17
**manufacturing**
104:21 362:16
**marginally** 187:19
**maria** 3:7 8:11
**marijuana** 191:18
284:8 290:25
**marital** 343:4
**mark** 3:15 8:25
159:11 163:11
215:8 216:2 253:3
269:12 340:22
349:10

| | | | |
|---|---|---|---|
| **mark.cheffo** 3:18 | 53:22 90:17 99:12 | **mechanism** | 375:11,13,16 |
| **marked** 97:15,18 | 125:5,7 129:3,13 | 131:19 135:23 | 376:6 377:7,19,23 |
| 215:10 253:6 | 131:22 142:23 | 153:13 235:25 | 384:2 393:11,19 |
| 269:14 340:25 | 150:20 155:16 | **medayee** 33:1 | 394:24 404:16,17 |
| 349:11,20 | 160:22 163:7 | **media** 7:14 77:19 | 407:1,11,14 |
| **marker** 123:10,15 | 166:15 171:24 | 77:24 159:23 | 408:11,17 409:9 |
| **market** 156:13 | 172:13 179:9 | 160:3 167:11 | 419:22 |
| 195:21,25 245:20 | 182:7 187:1 188:1 | 181:23 237:19,24 | **medically** 265:11 |
| 412:2 | 192:10 199:15,23 | 285:25 286:5 | 265:15,17 377:8 |
| **marketed** 47:13 | 204:12 207:10 | 327:25 328:5 | 408:11 |
| 274:18 | 214:6,17 219:23 | 373:12,18 423:5 | **medication** 63:7 |
| **marketing** 30:3 | 227:2 229:3,12 | **medical** 6:11,21 | 65:1 102:20 |
| 362:16 367:8 | 238:19 242:17 | 10:19 11:9 12:8 | 132:15 193:22 |
| **mart** 380:17,20 | 244:13 245:22 | 22:1,4 25:15 | 194:4 204:24 |
| **martin** 374:1 | 246:14,22 249:7 | 27:21 28:13 29:18 | 206:10 246:15 |
| **massive** 115:3 | 253:16 254:7 | 29:20 31:1,5 32:9 | 251:22 252:1,2 |
| **master** 329:19 | 255:7 263:24 | 41:16 42:6,10 | 255:16 272:21 |
| 330:7 | 267:7 272:16 | 51:1,16 65:13 | 273:7,19 368:9 |
| **match** 306:4 | 285:9,17 303:24 | 66:23 67:14 70:12 | 369:4 370:15 |
| **matched** 306:1 | 308:19 320:4 | 80:8 115:15 124:5 | 381:3 400:6 |
| 310:24 | 338:1 340:15 | 127:10 140:25 | 401:13 |
| **material** 109:21 | 347:5 359:20 | 143:22 153:17 | **medications** 36:22 |
| 121:11 | 368:20 371:12,15 | 158:2,25 159:4 | 65:3,15 96:13 |
| **materials** 181:4 | 378:25 379:20 | 161:23 165:8 | 108:18 232:21 |
| **math** 93:21 222:20 | 386:22 389:18 | 169:14 175:1,5 | 241:17 251:10,15 |
| **matt** 218:19 | 391:1,8 395:23 | 176:18,19 183:5 | 252:20 264:9 |
| **matter** 7:17 60:16 | 406:16 407:20 | 211:2,21 214:7 | 271:19 272:15 |
| 103:5 120:1 148:5 | 420:17 421:6,17 | 225:23 229:19,20 | 273:9 370:18 |
| 180:25 340:5 | **meaning** 15:6 | 230:12 231:22 | **medicine** 56:3 |
| 378:10 407:14 | 18:25 74:21 300:8 | 232:10,12 233:19 | 62:25 65:16 66:3 |
| 424:13 | **means** 41:15 101:2 | 253:21 289:10,12 | 67:10 69:9 70:16 |
| **mcconnell** 4:8 | 220:25 241:8,23 | 289:22,23 290:6 | 79:1,5,16,21 80:9 |
| **mckesson** 5:2 9:6 | 346:7,8 348:19 | 301:9 307:7,11 | 81:20 83:2,8 86:9 |
| 363:3,8 364:3 | 404:5 | 309:2 313:13 | 88:2 121:10 |
| **md** 1:5 7:20 | **meant** 168:22 | 316:10,14 327:13 | 123:10 152:23 |
| 314:12 329:20 | 399:5 | 328:15 334:14 | 232:4 241:7 245:2 |
| **mdl** 1:4 | **measure** 119:25 | 335:2 337:1 | 246:1 251:10 |
| **me's** 22:6 | 120:1 194:5 | 339:24 340:9,10 | 261:22 262:5,25 |
| **mean** 20:17 21:15 | 195:10 399:9 | 340:14,16,18 | 281:2 371:16 |
| 24:8 34:18 36:3 | **measuring** 94:12 | 350:6 358:13,17 | 377:21 |
| 37:8 46:23 48:20 | | 359:19 375:2,4,5 | |

**medicines** 26:3,7
  30:4,7 34:15,19
  35:11 62:14 77:4
  107:19 153:15
  210:19 215:4
  230:23 243:16
  252:7 291:17
**medina** 387:14
  401:25
**meet** 20:6 59:3,17
  60:7,19 63:24
  160:20 161:10
  162:10 164:21
  165:24 365:25
**meeting** 161:13
  165:7,10,15 166:3
  166:5 168:14,22
  296:1 307:14
**meetings** 165:13
  171:21 173:3
  219:11 420:17
**melville** 3:5
**member** 313:7
**members** 164:22
  169:18 175:7,24
  290:16 309:10
**memorial** 389:1
  389:20 390:2
  391:20
**memorize** 133:7,9
**memory** 85:6
  228:4 402:1
**mental** 55:8 70:13
  225:24 303:11
**mention** 14:1
  113:10 185:1
  208:14 257:7
**mentioned** 20:16
  56:22 60:9 78:9
  90:5 126:18
  145:17 149:2

152:16 160:9
  166:10 167:19
  184:3 187:21
  224:3 278:5
  289:16 293:15
  298:7 338:12
  352:6 353:18
  354:8 359:2
  384:22 389:17
  391:10,21 392:22
  411:23
**mentored** 321:17
**merit** 271:20
  274:7
**message** 171:9
  269:17 270:1
**messaging** 290:21
**met** 61:22 115:13
  160:16 161:7
  162:19,22 163:4
  167:23 291:15
  311:13 374:4
**metabolized**
  122:17,22
**meth** 39:10 42:2
  136:14
**methadone** 102:11
  102:13,15,24
  103:8 223:20,21
**methamphetamine**
  39:15 40:3,12
  41:1,6,11 136:12
  136:20 281:6
**methamphetami...**
  39:9,23 284:9
**method** 339:20
  356:1
**methodology**
  386:14
**mexico** 32:18
  107:22 199:25

201:25 202:2,8
  398:7
**mfleming** 3:9
**micro** 367:20
**microphones** 7:6
  7:10
**microscopy** 340:1
**middle** 32:20
  260:19
**midwest** 425:17
  428:1
**miguel** 311:10
**mike** 167:5,9
**mill** 153:15,24
  154:12,15,20
  206:5,7 208:10,19
  226:14 237:11
  244:13 250:23
  266:3 315:24
**million** 200:1
**millions** 196:19
  200:1 236:23
**mills** 207:15
  208:17 235:18
  236:23 265:19
  371:14 416:23
**mind** 33:2 84:17
  244:14
**mine** 297:12 341:5
  396:15
**minority** 302:1
**minute** 47:25
  55:19 183:8
  184:21 237:15
  285:22 291:25
  327:22 381:12
  413:12 417:16
**minutes** 53:21
  151:17 152:10
  215:24 216:13
  270:7,12 311:17

311:19 350:21
  409:21,22,23
  410:3 417:12,24
  422:24
**misheard** 286:16
**misinterpreted**
  255:18
**mislead** 322:8,15
  323:1
**misleading** 320:14
  322:12
**misled** 321:4
**misrecall** 420:23
**missed** 26:4
**missing** 227:25
  271:23
**mission** 141:13
**misspoke** 142:6
**misspoken** 304:5
**misstates** 48:2
**mist** 107:1
**mistake** 408:21
**misunderstanding**
  131:7
**misunderstood**
  169:2
**mix** 291:2
**mixed** 90:6,10
  112:7 185:14
**mixtures** 44:1
  88:21 90:25
  112:20 113:12
  156:5 186:10
  355:5,8 396:10
  411:6
**mobile** 389:13
**mode** 342:6 345:1
**model** 170:9
  206:18 273:16
  331:13

| | | | |
|---|---|---|---|
| **models** 266:10 | 122:16,17,18,19 | 301:22 302:10,12 | 264:3 |
| **modest** 114:24,25 | 123:1,3,9,9,12,16 | 305:19 306:4 | **natural** 347:7 |
| **modifications** | 123:20,22,25 | 308:14,17,25 | 348:21 408:23 |
| 53:25 | 124:7,9,13,18 | 309:3,6 318:6,10 | **nature** 66:4 |
| **modify** 78:6 | 125:15,20,25 | 357:3 399:23 | 421:11 |
| **molecule** 104:24 | 126:21 127:1 | 402:3 | **near** 90:12 |
| **moment** 394:10 | 223:16,18,19 | **name** 7:25 10:16 | **nearly** 89:20 |
| **monday** 23:6 | **morphing** 386:1,2 | 10:18 27:10 52:4 | 139:15,16 301:20 |
| 391:25 392:2 | **mortality** 36:25 | 67:19 70:5 72:5,6 | **necessarily** 35:3 |
| **money** 195:15,22 | 39:25 41:2 45:13 | 160:10 162:3 | 38:8 99:6 138:19 |
| 206:9 236:24 | 112:17 156:13 | 270:19 310:17 | 153:24 180:22 |
| 269:10 386:21 | 173:22 190:5 | 311:7,10 313:7 | 221:6 230:19 |
| 391:2 395:21 | 349:24 356:25 | 321:24 329:4 | 241:19 277:10 |
| **monitor** 152:6 | **motivations** 179:4 | 335:4 416:15 | 332:2 338:14 |
| 326:12 | 297:25 | 418:17 425:6 | 402:10 403:7 |
| **monitored** 244:22 | **move** 18:17 | 426:3,4,15 427:3,4 | **need** 106:16 |
| **monitoring** 49:4 | 322:24 | 427:21 | 128:25 130:9 |
| 65:21 266:24 | **moving** 263:22 | **name's** 98:2 | 143:7 163:21 |
| **monoacetylmor...** | 267:9,15 | 217:10 | 215:20 233:3,19 |
| 122:25 123:15,17 | **mpr** 260:14 | **named** 361:22 | 246:11 253:1,19 |
| **montgomery** | **mu** 102:9 | 416:20 | 292:11 341:3 |
| 388:21 | **multifaceted** | **names** 63:4 68:4 | 347:7 369:13 |
| **month** 58:13 60:2 | 176:11,17 177:4 | 74:15 153:22 | 396:25 |
| 60:15 61:2 63:8 | 177:21 | 220:2,4 310:18 | **needed** 15:20 |
| 69:13,14 73:4 | **multiple** 27:1 | 362:24 | 130:8 143:10 |
| 74:17 293:19 | 227:12 285:14 | **napoli** 3:4,7,11 | 231:3 302:10 |
| 330:11 361:13 | 335:20 338:19 | **napolilaw.com** 3:6 | 335:13 385:17 |
| **monthly** 174:9 | 342:8 355:15,16 | 3:9,13 | 387:15 397:24 |
| 349:21 350:4 | 356:23 | **narcotic** 228:16 | **needs** 52:25 |
| **months** 69:24 70:2 | **municipalities** | 267:4 | 171:12 216:9 |
| 70:2,3 91:13 | 38:17 | **narcotics** 105:11 | 324:25 344:8 |
| 139:14 224:20,20 | **munoz** 3:12 | 136:9 143:24 | **negotiations** 95:24 |
| 225:1 239:1 | **murdering** 198:7 | 226:23 248:4 | **network** 380:6 |
| **morgue** 388:18 | **muted** 161:1 | 267:3 | **neutral** 323:24 |
| 389:2,3 | | **national** 1:4 7:17 | **never** 46:13,14 |
| **morning** 7:3 10:8 | **n** | 124:4 158:2 | 52:14 56:25 |
| 10:9 99:14,23 | | 169:14 259:17 | 104:18 105:16 |
| 302:8 | **n** 6:1,1 7:1 90:11 | 266:22 296:1 | 127:19 129:19 |
| **morphine** 59:5 | 260:14 347:4 | 425:6 426:3 427:3 | 190:24 192:16,17 |
| 60:9,11,16,22 62:2 | **n.w.** 5:5 | **nationally** 37:3 | 194:19 211:3,13 |
| 62:6 85:8 122:6 | **naive** 233:19 | 258:25 263:13 | 213:1,2,3 215:17 |
| | **naloxone** 95:20 | | |
| | 294:1 301:4,16,18 | | |

240:21 260:2
274:15 275:18
276:6 278:11,13
278:13 279:21
281:1,2,2,8 283:16
283:19,23 290:17
291:6 292:2,3
299:11,12 365:23
372:12 375:1
379:16 389:14
390:1 420:3
**new**  3:5,17,17
154:13 271:22
328:25 386:8
395:6
**nice**  207:14
**nig**  347:3
**nine**  27:3 371:23
**noberta**  11:23
**noncontrolled**
69:22
**nonlaboratory**
329:7
**nonlethal**  115:1
**nonmedical**  6:15
248:10 249:5,16
249:24 250:12,21
252:15 254:16,19
255:1,3,10,13,24
256:6 258:22
260:1,7,11 262:20
329:7
**nonprescription**
258:13
**nonprofessional**
379:7
**nonpublic**  181:19
182:12
**nontherapeutic**
250:12 252:1,20

**noon**  159:13
**northern**  1:1 7:19
**nose**  42:7
**notarized**  425:14
**notary**  424:4,6
425:25 426:10,18
427:15,23 428:23
**note**  7:6 271:7
425:12
**noted**  405:14
**notes**  181:16,21
**notice**  2:14
**noticed**  40:11
272:24
**november**  183:23
**nudge**  335:12
**number**  12:21
14:3 27:2 36:18
36:20 40:11 71:22
88:20 89:9,11,16
90:12 93:10 96:10
102:12 103:7,12
104:14 110:22
111:1,9 124:2
138:5 140:4,9
143:24 150:8
160:22 204:4
255:15 258:20
260:21 266:15
285:6 286:21
287:6 288:20
301:15 308:9
315:11 317:13
341:10,23 342:1
352:23 353:18
355:1 357:6,7,8
358:24 360:14,17
369:10 385:15
390:6,12 396:4,8
401:21 402:14,15
402:19 403:7,11

403:12 410:22
423:5 425:7,13
**numbering**  341:23
342:3
**numbers**  90:20
91:25 92:4,6
93:15 94:3 101:5
187:1 229:21
231:23 260:18
286:18,25 287:20
353:6,7,9 354:21
354:22,25 355:21
389:8 392:24
397:7 427:7
**nurse**  64:19

**o**

**o**  6:1 7:1 11:19
314:12
**oar**  218:10,10
**oarrs**  48:25 49:5
49:14,19,23 50:2,3
50:15 51:3,4,25
52:3,12,19,19
53:10,17,24 54:8
54:13 55:1,6,19,24
56:1,5,8,24 57:7,8
58:1,22 65:2
69:15,23 72:8
73:19,23 86:1
96:5 97:9 108:19
127:2,5,9,15 128:5
128:11 129:9,19
130:8,18 131:5
132:1,2,8,9,18,25
133:14,21 134:5
134:10,13,15
135:5,22 136:13
136:17,19 140:16
140:21,23,24
141:6 142:2,7,11
142:19,25 143:16

143:25 144:7,11
144:21 145:1,4,12
145:15 146:10,15
147:21 148:4,24
149:4,16,22,25
150:10 151:2,12
152:9,11 153:2,7
153:21,25 154:9
218:10,13 219:22
220:2,8,14,17,22
220:24 221:24
222:10,12,23
223:5 224:17
226:9,21 227:6,10
228:11,15 229:5
230:4 265:3,5,14
266:20 267:1,6
294:4 298:12,14
298:17 299:6
300:12 314:24
315:8,12 317:8,11
317:17 318:6
319:12,22 328:16
328:19 330:25
331:4,11,14,18
332:15,24 333:2
333:24 364:19,19
399:20,25 400:5
400:24 401:7,12
401:20 402:6,17
403:2 404:25
**oath**  10:10 211:5
402:15,21
**object**  35:12
246:17
**objection**  9:23
13:23 17:14 18:10
18:22 19:4 21:21
25:5,20 29:5
30:11 31:10,17
32:10 35:12 36:15

37:20 38:19 39:12
40:19 41:19 42:22
44:16,23 45:5,11
45:23 46:16,22
47:20 48:1,8,13,19
50:12 52:21 53:6
54:24 57:24 59:2
59:11,25 61:10
63:2 64:13 65:22
66:1,15 67:4,11
68:7 72:18 73:7
74:4 75:1 77:6
78:16 79:8 80:10
80:19 81:12,21
82:8,20 83:18
84:21 85:19 86:16
87:5,14 88:7 91:8
91:22 93:2 97:3
103:9 106:10
113:8 114:5 115:8
116:13 117:3
121:24 123:4
125:22 127:7,25
128:21 129:22
130:4,21 131:21
133:8 138:12
144:20 147:14
148:7,15 151:13
151:23 153:16
154:3,16 155:10
156:1 158:20
159:2 164:6
166:18 169:22
171:6 172:17
175:9,25 176:7,13
177:1,9,17 179:20
180:5 183:12
185:25 186:21
187:9 189:2 191:3
191:21 192:9,21
195:18 197:2,8,21

197:24 198:11
199:14 200:5,21
201:7,15,21
202:11,24 203:2
203:13,21 204:2
204:20 205:14,23
207:3,23 208:6
209:4,22 211:8,19
212:5,14 213:7
214:18,21 215:5
219:2 220:11
228:13,23 230:24
233:5,21 234:3,17
235:1,21 236:4,12
237:4 238:18
239:3,13,18 240:1
240:6,13 242:4
243:6 244:3
245:21 246:13
254:20 255:8
256:13 261:8
263:7 268:2,11
272:18 276:9
277:24 278:24
279:24 281:15,21
282:2,19 283:12
284:4,10,15,22
285:12 287:7
288:7 289:2
290:11,19 291:21
295:6 320:22
321:5,21 323:13
324:6 325:1 326:1
326:9 333:10
334:1 354:6
361:10 366:19
368:11 369:7
370:8 371:11
376:1 377:10
378:1,6,13 379:13
380:21 382:18,21

383:12 387:6
391:15 394:1
397:9 400:12
403:23 405:6
407:16 408:19
409:11 410:11
411:20 414:10
415:2,13,16
416:18 419:5
420:5,22 421:13
421:23 422:13
**objections**   204:10
**obligation**   408:15
**obligations**   409:6
**obtain**   230:12
232:7 235:9
264:24 306:9
358:14
**obtained**   224:16
249:21 256:24
**obvious**   121:10
264:22
**obviously**   12:25
16:17 24:10 63:23
90:4 92:10 112:15
114:6 153:5
172:20 191:4
207:13 232:21
251:13 280:2
305:5 361:12
372:8 385:14
**occupation**   343:5
**occur**   142:4
156:19 339:9
347:12,13,14
**occurred**   82:25
83:6 140:11 336:7
347:4,8 408:25
**occurs**   375:20
**october**   271:4
312:17

**offer**   92:6 235:3
244:8 374:18
**offered**   412:3
**offering**   377:7
**office**   6:11,21 11:9
16:17 18:15 20:18
22:2,5,6,7 26:21
26:22 49:22 50:8
50:13 51:18 52:1
55:21 60:25 68:17
69:7 70:3,22
72:17 73:5 74:11
74:12,20 75:4
80:7 81:8 83:2,25
86:24 97:25 120:1
127:11,16 128:13
128:18 133:16
141:10 142:22
143:22 144:6
149:14 150:22
153:18 156:16
157:9 158:5 159:4
164:23 165:8,10
166:6,7 167:12,15
169:19 172:24
174:10 175:12
176:19 178:4
181:10 240:24
267:5 270:5
293:13 305:24
306:5,8 307:20
309:12 311:7,16
324:24 327:6
330:18 331:4
333:18 334:23
335:10 336:25
337:10,14 340:16
340:20 344:7,10
344:11 346:9
348:9 349:25
350:6 357:20

358:13,18 359:1,8
359:19,25 360:5
361:3 362:8
365:19 383:20,25
387:4,8,10 388:19
391:7,11 392:16
394:24 395:20
396:6,20 397:6
404:10,19 408:16
409:7,14 414:6
422:10
**office's** 328:15,16
330:24
**officer** 28:19
29:20 296:10
332:10
**offices** 159:1
170:11 333:17
391:25
**official** 169:13
398:19 406:25
410:17 426:15
427:21
**officials** 172:7,14
**oh** 11:23 42:25
97:10 109:16
125:12 160:22
168:21,21 205:22
229:14 230:2
231:11 272:19
286:22 294:19
303:19 308:19
313:21 336:20
337:21 350:14,23
355:17,17 358:25
364:14 370:2
372:2 378:20
381:8 393:14
413:3 419:13
**ohio** 1:1,10,12,18
2:11 3:8 4:5,9,14

4:23 7:20,24
46:24 49:5,6
69:11 175:19
180:10,16 181:12
183:4 273:9 364:5
364:9,17 365:1
369:9,17,21
399:18,24 402:24
410:19 425:2
**ohio's** 387:11
**okay** 10:8 11:4
18:17 19:17 20:20
21:17 22:8,11
24:14 25:25 27:12
30:15 39:7 43:2
46:13 47:12 49:24
55:19 57:8 64:22
71:23 76:18 77:15
80:6 82:14 84:7
85:14 86:13 94:21
95:13,14 99:16,19
100:11,25 101:8
111:6,13 119:17
120:25 125:16
126:6 128:8
129:18 130:11
133:17 134:20
135:14 139:17
140:10,15 141:3
141:16,19,21
142:14 144:10
148:21 151:9
162:5,21 163:16
164:9 178:15,17
183:7 184:7
185:16 188:18
194:7 196:7,12
201:14,15 206:3
208:13 211:12
212:25 215:8,16
216:20,24 218:8

220:21 223:9
224:2 226:7
241:21 242:1,17
243:3 247:21,24
248:21 249:25
254:10 255:20
262:10,15 263:1
265:7 269:12,23
270:24 275:5,23
276:12 278:12
280:10 281:11,13
281:14 284:5
285:21 286:15,24
287:5 292:6 301:1
304:7 305:2,16
307:19 308:6
310:9 311:20
324:2,9 327:18
332:6 334:25
336:10 341:6
343:1,20 346:6
348:13 349:17,18
350:17,23 351:11
352:11 356:4
357:14 359:3
360:6 368:18
369:23 373:2
374:2,24 375:19
376:6 377:17,22
378:10,20,22
379:19 381:1,21
382:14 383:19
384:15 385:2
389:21 390:16
398:12 399:3,7
401:11 404:7,20
408:10 409:16,25
417:14,22 418:1
419:13,20 420:3,9
420:13 421:10
422:25

**old** 96:12 119:8
190:24 194:2,19
194:23 196:20
**older** 118:19
**oldest** 394:25
**once** 18:15 94:23
99:10 113:12
162:19 226:20
331:11 336:6,21
374:4
**one's** 379:23
**ones** 56:10 102:8
107:12 223:25
260:6 288:21
348:4 385:2
410:23
**ongoing** 140:20
176:22 177:6,23
**op** 1:9,11,13
**open** 181:15
**operate** 15:22
192:25
**operates** 158:25
**operating** 121:1
**operation** 50:1
237:11 266:4
329:8
**operations** 68:17
83:9 84:2 296:10
329:4,6 332:10
416:25
**opiate** 1:5 7:18
121:15 227:9
247:7 394:22
420:16 425:6
426:3 427:3
**opiates** 121:14
124:23 227:7
242:22 316:16
369:16

**opinion** 204:9
205:5,6 282:15
340:10 377:7
384:15 404:16
407:1,11
**opioid** 21:9 22:16
32:14 36:6,9,10,21
37:7,8,23 42:18
56:9 62:14 102:23
103:7 104:6 106:8
107:12 111:10,16
111:18 119:20
120:19 122:7,12
124:6 132:14,18
132:21 135:17,25
136:7,9,10 139:3
145:9,24 146:3,7
148:6 151:8
153:14 157:2,4
164:24 165:9,21
170:10 171:22
173:1 176:12
177:5 178:8 179:5
185:14 188:2,6,8
188:17,18,21
189:3 190:7,8,10
190:18,19,25
191:5,9,23 192:16
192:17 193:5,7
194:18,20 195:1,5
204:24 205:7,17
206:15 209:6,25
213:23 221:18
222:7,12,24 223:6
223:19,21 224:8,9
224:14,22 225:2
226:20 231:12
233:18 234:2
244:20 245:12
246:21 248:5,16
248:18,22 249:6

252:21 255:24
256:6 260:24
261:21 262:23
264:25 265:10
268:23 269:1
272:25 273:3,6,9
273:14,17,22
278:12,13 280:3,6
280:9 281:2,10
282:5,8 284:21
291:17 292:23
294:7 299:10,16
309:17 317:7
319:4,21 320:16
320:18 322:20
331:13 336:7,23
344:22 357:4,9
362:2 365:17
372:19 380:24
381:3 383:23,24
384:25 387:5
393:24 394:16
396:2,11 405:5,12
405:16,23 406:1,4
406:8 407:9,13,21
408:2,3,4,13 410:9
410:25 411:8,19
411:21 412:14,16
412:17 416:17
**opioids** 25:4,13
32:24 40:7 42:21
48:12 53:14 56:13
56:14,16 57:3
58:24 67:16 86:14
86:19 88:23 96:6
101:21 102:1,5,8,9
103:22,23,24,25
104:5,7,14 105:2
106:14 107:17
108:10 121:23
122:3,5,9 135:24

136:17 147:19
152:12 157:3
165:12 185:9,24
186:5 191:20
193:2 206:16,22
210:7 211:5 212:1
221:3,5 222:15
223:11,24 227:13
227:18 228:3
232:13,20 242:3
242:20 243:4,11
243:15,19 244:6
244:16 245:19,23
246:11 248:4,10
250:5,6 256:24
258:14,21 261:12
267:23,24 268:17
274:15 275:19
281:1,3 283:19
284:24 285:11,20
289:9,13,14,19
290:2 291:7 292:2
292:4 300:10
310:2 314:17
315:10,15 317:2
331:22 332:23
337:20 353:21
367:8 368:4
369:16 371:8,25
380:6,9 386:1
397:3 402:5
411:18
**opportunistic**
233:2
**opportunity** 193:1
196:5
**opposite** 341:6
**opted** 309:18
**option** 347:1
**order** 74:9 130:11
130:25 133:22

146:15 150:9
189:25 220:24
236:25 267:20
292:15 307:23
323:10,19 324:23
370:24 387:23
397:2
**orders** 140:6
**organization** 36:8
78:21 157:18
312:3
**organizations**
157:24 313:4
**organized** 331:10
**oriented** 323:15
323:23
**original** 309:10
**originally** 17:3
**ourself** 28:2
**outcome** 424:12
**outreach** 167:11
**outside** 16:15
164:23 243:22
311:23 371:10
**overdistributing**
209:7
**overdistribution**
193:6 197:18
283:5
**overdose** 40:25
41:2 42:20 51:5
52:23 53:5,8,13
54:11 65:4 88:19
89:11 91:6,15
93:14 95:16 97:1
98:10 101:2
111:22 112:21,23
112:25 116:4
117:2,23 118:7,16
118:23 119:5,17
119:24 120:23

132:10 133:1
135:9 141:25
142:8,12 145:3
147:3,17 151:8
156:24 157:1,10
158:18 161:24
179:8 185:3,23
187:7,12 188:24
202:13 220:22
221:12,24 224:15
229:18 230:8,9
281:19 287:14
288:22 294:13
299:2,5 306:5
309:17 314:18
317:6 318:5,9
326:15,18 336:17
341:12 345:20
352:13 356:7,9
357:4,16 376:20
384:25 387:20
394:17 396:19
400:4 404:23
405:3,16,19
406:11 407:8,23
410:22
**overdosed** 50:18
50:20 63:11 72:7
100:9 136:13
152:21 179:5
184:11 189:9
190:25 292:6,10
299:15,17 308:24
323:4,8 371:2
**overdoses** 36:19
40:2 51:9,15
58:10 93:9 98:18
111:1,3,4 112:9
135:13,15 144:5
145:5,6 148:6
152:11 189:3

202:21 222:10,22
223:4 287:16
288:19 293:21,22
294:12 298:11
305:25 306:10
308:16 310:23
311:14 314:23
355:3,7 387:5
388:5 390:12
395:22 411:5
419:11,15
**overflow** 388:24
**overlap** 37:23
122:2
**overlaps** 30:1
**overmedication**
85:22,25 86:3
**overprescribed**
243:25
**overprescribing**
127:4 193:5
197:18 209:7
212:22 271:18
272:15,21 273:19
274:6 283:5 382:4
**overrepresented**
190:9
**overseas** 274:20
**oversee** 24:10
173:7
**overseeing** 51:16
**oversees** 329:6
**oversight** 64:16
309:14
**oversupply** 382:3
**overwhelm** 138:23
**overwhelmed**
137:25 138:20
139:19 150:23
235:10 236:15
389:12 391:12,14

391:18 392:3,9
**overwhelms** 46:5
**oxycodone** 102:2
102:10 223:14
273:4
**oxycontin** 283:24
**oxygen** 116:1
**oxymorphone**
102:11 223:15

**p**

**p** 7:1
**p.m.** 412:23 423:2
423:9
**pack** 379:22
**package** 327:17
367:12
**packet** 74:3
**page** 6:2 95:3 98:2
98:5 100:20
184:23 253:19
254:24 260:19
286:12 352:1,7
356:4,6 358:6
359:5 372:22
425:13,15 427:7
428:3
**pages** 341:8,15
**pain** 6:16 30:16,24
36:10,21,21 37:23
63:6 65:1 66:3
102:21 104:6
107:12 132:15,21
135:25 136:7,9
145:24 146:3,7
185:14 188:8,17
188:18 190:10,19
191:5,24 192:18
193:22 194:4
195:1,5 204:24
213:22,23 214:8
229:20 231:12

232:4,17,18 242:8
242:10,14,16,20
242:22 243:2,5,11
243:15,18 245:3,5
245:5,6,23 248:5
248:16,18 249:6
249:16,19,22
251:21,22 252:7
252:15,21 254:16
254:19 255:1,3,4
255:10,13,16
256:6 258:13
260:1,7 264:25
265:10 269:1
271:18 272:15,21
273:7,9,14,22
278:14 280:3,6,9
282:5,8 292:23
294:7 299:10
322:20 400:6
401:12 408:2,3,4
412:11
**panel** 69:10
225:24
**panels** 397:13
**paper** 14:10,15,17
124:2,4 129:21
161:15 167:19
249:10 255:15
256:3,4,20,20
269:16 272:24
298:24 304:23
306:23 307:1,4,11
347:24
**papers** 158:9
251:9 313:5
**par** 4:12,12
**paragraph** 224:4
**parallels** 308:3
**pardon** 31:18 34:1
49:19 69:25

143:23 166:11
190:7 205:2 208:7
223:17 259:20
262:6 272:19
289:23 293:20
299:3 325:6 330:7
337:21 348:22
**paregoric** 242:24
**parentheses** 221:8
**parents** 290:16
**park** 3:16
**parse** 319:24
**part** 25:15 26:16
32:20 54:25 61:18
65:8 75:25 109:18
110:4 129:16
132:2 144:7,24
146:25 147:13
148:13 157:3
159:10 162:6
179:10 181:24
188:25 190:12
191:1 200:25
206:2 209:5
227:24 231:16
234:4,11,19
254:23 259:20
275:22 293:5
303:25 304:12,23
304:24 306:10
329:7 331:15
334:14 348:8,9
371:9 372:1,2
384:10,10 394:18
394:23 401:13
427:9
**partial** 388:1
**participants**
270:25
**participate** 367:11
410:17

**particular** 78:21
111:18 121:2
181:1 316:7,13
335:2,4 344:2
371:25 383:21
**particularly**
129:11 178:12
**parties** 2:15 7:13
49:11 416:11,16
424:11
**parts** 32:12,23
181:19 202:2
259:19,21 263:22
267:9,15
**pass** 270:24
327:19 377:24
**passed** 156:10
202:1
**password** 52:4
**patch** 106:1
**pathologist** 26:19
334:19
**pathologists**
334:21 340:16
**pathology** 169:9
312:12
**pathway** 284:2
285:20
**pathways** 338:9
**patient** 65:13,21
72:5 77:5 229:8
244:15 245:11,12
316:13 370:14,18
**patient's** 370:14
370:19
**patients** 31:3
243:15,17 244:19
246:10 366:24
367:3 370:6
**pay** 206:9 234:25
235:4,12 236:25

**pcp** 191:17
**peak** 325:11
**peaks** 353:24
**peca** 2:8 7:22
**peer** 313:1
**pending** 43:8,12
92:1 164:4
**people** 9:2 15:7,9
16:5 17:18,19
18:9,20 34:19
35:5 36:19,20
37:22,24 45:25
62:1 63:4 71:8
72:7 96:5,12
100:9 102:18
108:9 118:22
125:17 132:13
135:6 136:10,13
141:9 144:6 146:7
150:8,25 151:2
168:7,8 172:9,19
176:15 179:24
189:9 192:3 193:6
195:20,24 196:2
200:2,14 202:13
202:20 203:16
207:14,14 209:24
229:11 231:6,11
233:3,11 234:9,14
235:9 244:6 245:5
248:15,17 250:5
251:7,20,23 252:6
255:9,15 256:5,11
256:23 258:11,20
260:1,23 261:11
261:20 262:3,19
263:5,17 264:6,8
264:24 265:20
266:4,11,16 267:3
267:21 268:16
274:14 275:12,18

275:25 276:4,15
277:1,12 282:7
283:9 284:1,23
285:10,18 288:10
294:6 296:18,19
296:21 297:19
298:10 299:14,16
299:25 300:17
301:24 304:11
306:2 308:2
310:19,24 313:14
314:16 317:5,9,13
319:10,19 322:18
323:3 327:8 335:8
339:14 344:17
357:19 365:20
366:14 388:18
399:14 402:23
407:25
**percent** 95:5
103:17,18 114:10
114:10,11 126:11
197:13 198:21,22
204:1 220:21
221:14,17,23
222:3,10,11,11,14
222:18 223:1,5
224:6 226:22
227:7,8 248:14
251:23 252:14,16
254:11,16 255:1
255:25 256:5,18
256:18 257:1,2,12
257:16 258:17
259:25 260:7,10
260:16,20,20,20
260:21 294:5,5
301:21,21,23
315:11,13,14
352:21 400:17,17
400:20

**percentage** 91:21
93:8,13,19 94:3,14
94:15 103:7
189:23 195:16
196:16,17,25
200:17 203:19,24
204:12,15,18,22
205:7,11 207:5
228:5 234:16
256:23 257:3,6
258:11 259:2
260:16,23 261:20
263:5,17 268:16
284:12 285:8
288:18 294:3
309:24 317:5
403:8 407:25
410:23
**percentages** 91:19
92:7 200:19,23
234:19 278:4
**performance**
12:11,20 13:21,25
19:3,6 378:4,12
379:7,10,11
**performs** 404:10
**period** 54:16
58:13 60:2,15
61:2 63:8 69:13
73:4 74:17 136:6
142:23 145:19
221:10 254:18
255:3 261:15
369:18 390:12
**periodically**
270:19
**permitted** 181:16
**person** 14:13
16:13,14,23 17:2,3
17:7 20:15 27:6
32:2 54:16 55:10

61:19 62:8 64:9
67:20 68:15 84:5
108:20 117:15
118:19 147:9
151:21 152:21
153:5 160:9
194:16,19,23
206:5 211:12
212:9 214:14
243:24 266:1,2
270:5,9 278:11
292:1,2,7,9 293:1
310:17 311:3,8,18
312:2,7 327:4
357:16 376:17,24
376:25 377:21
380:11 383:3
404:23 419:8
420:2
**person's** 281:19
339:1 375:11
407:9
**personal** 41:4 51:1
52:10 67:1 83:15
86:23 87:1 204:9
217:14,16,18,23
218:3 398:23
**personalities**
192:5
**personally** 50:23
66:17 68:9,10
70:18 74:24 75:2
79:4 83:10 128:15
246:20 247:13
266:14 380:25
426:11 427:15
**personnel** 16:18
141:8 325:5 362:6
384:1,23 387:1
**perspective** 59:15
114:1 158:17

171:16 188:4
382:2 392:18
**ph.d.** 26:24 27:6
172:9
**pharma** 1:8,10,12
3:14 10:6 81:19
104:19
**pharmaceutical**
4:12 26:3,7,11
30:7 31:9 34:10
47:13 106:1 109:7
109:20 110:1
140:3 207:25
210:18 211:3,14
365:21 366:6,14
422:16
**pharmaceuticals**
4:2,11,12 8:14
210:14 418:12
**pharmacies** 30:10
49:18 267:2 333:2
333:7,13,23
368:14 372:6,7
380:3,5 381:2
**pharmacist**
374:20
**pharmacokinetics**
25:12
**pharmacologically**
145:23
**pharmacology**
25:13 289:11
**pharmacy** 54:21
61:24 62:3,9,24
63:5,20 64:6,8,11
64:16,24 65:10,18
68:5,14 71:12
72:1,11,17 73:6,11
73:20,23 74:10,22
75:15,20,23 78:11
78:14 79:15 80:21

80:25 81:6,11,18
81:23 82:18 84:3
126:20 131:8,14
134:9 135:2
140:18,23 141:24
142:20,21 143:4,7
143:13 152:19
218:16 362:18
364:9,17 368:9
369:5 371:14
372:10 380:10,14
380:20 381:17
**phase** 32:14 35:24
36:11,11,12,14
37:1,6,7,9,11,13
37:24 38:1,4
46:12 132:22,22
132:24 139:3
178:7 187:22
188:8,9,10,10
193:9,9 299:15
386:2,2 393:2,3,5
393:8
**phases** 36:10
37:19 188:4,7
235:7 411:23
412:14,18
**phone** 19:24 20:15
94:24 160:25
425:3
**phones** 7:9
**physically** 16:22
331:9
**physician** 82:6
87:18 379:9 381:9
381:19 385:12
392:11 394:14
395:13
**physicians** 172:11
300:13 332:15
366:24 367:3,17

381:10,14 393:18
400:6 401:6,14
**physiology** 339:2
**pick** 7:7 99:20
115:19 152:7
360:14
**picked** 386:18
**picture** 36:24
190:13 196:22
224:21 226:6
347:25
**piece** 14:15 129:3
130:19 171:3
180:11 187:17
229:16 268:20
269:1 271:13
302:22 321:9
348:6 386:8
**pill** 153:15,23
154:11,15,20
206:4,7 207:15
208:10,17,19
226:14 235:18
236:23 237:11
244:13 250:22
265:19 266:3
315:24 371:14
416:23
**pills** 250:16 251:4
371:16
**pinge** 167:16
**pinjuh** 162:3
167:17,23 168:3
168:16
**place** 7:9,12 33:22
68:3 96:2 245:25
327:10 342:4
345:3 406:14
**places** 38:21
**plaintiff** 8:10,12
413:21

**plant** 123:21
**plateaued** 372:20
373:6
**plausible** 47:6
**play** 60:11,13
204:4 361:21
368:3
**played** 65:15
380:5
**player** 90:11
356:24
**please** 7:6,9 8:8
9:3,10 10:16
51:12 98:6 111:21
193:11 215:9,15
269:13 271:10
285:22 286:12
415:24 425:11,11
**pleased** 325:7
**pled** 419:19
**pledge** 131:14
**plenty** 275:12
**pllc** 3:4,7,11 4:22
**plus** 82:10 356:19
406:5,6,7
**point** 78:7 84:1
94:1 101:10
104:23 124:13
148:23 168:24
185:8 244:17
249:3 260:6
270:17 294:10
298:23 315:1
316:20,23,24
317:15 318:2
333:14,19 341:24
353:1 360:25
370:2 374:13
380:8 382:3,6
383:2 385:9,12,17
388:16,25 390:1

391:17 393:7,10
414:5
**pointed** 344:20
**points** 189:7 271:3
306:21 356:15
376:9
**poison** 177:25
225:21 309:11
**police** 182:19
279:5
**policy** 72:21 73:4
120:1 268:10
295:5,12 383:9
411:12,13
**polster** 1:7
**poppy** 123:21
**popular** 323:22
**populated** 348:17
**populates** 344:17
**population** 29:25
136:8 156:4,8
189:13 190:9
191:9 193:5,25
195:3 196:6,13
197:15 199:8
204:23 206:8
207:20 210:6
230:9 233:10
252:10,13 257:5
257:11,17 264:12
267:20 268:18
271:15,17 272:11
273:17 275:24
278:2 279:15
280:7 281:12
282:10 284:13
294:11,12,13
296:18 299:2,3,5
299:22 308:1
318:17 323:7
388:4

**populations**
294:10,18 308:5
323:3
**porter** 4:18 9:7,7
160:25
**portion** 55:13
122:12
**posed** 292:1
**position** 70:15
84:8 124:4 171:1
398:19 420:21
**positions** 10:23
218:23
**positive** 100:6
117:14 237:8
338:11
**possibility** 100:4
298:3 389:11
400:7 401:16
**possible** 77:13
113:19 114:9
141:17 231:1,2
267:11 320:2,10
322:6 374:11
382:8
**possibly** 195:9
**poster** 313:16,20
313:21,24 314:6,9
321:16,18
**poster's** 313:17
**posthumous**
375:21,24
**postoperative**
245:5
**potent** 297:6,23
386:12
**potential** 171:18
240:11 339:21
400:25
**potentially** 82:6
96:15 132:14

144:3 151:5 154:6
166:2 236:22
238:21 240:5,18
241:4 262:3
273:15 274:10
292:22 309:1,23
317:15 323:7
337:3 340:2
402:12 407:5
411:5 416:10
419:9
potentiate 115:22
powder 147:20
powerpoint
313:12
pplp004153119-...
6:17
practical 62:22
practice 30:20
65:16 70:16 71:24
74:22 107:4 114:9
116:16 119:1
120:12,18 121:9
121:17 147:5
148:14 157:16
159:5,10 213:24
214:12 218:6
243:23 245:14
268:9 306:10
368:7 406:23
practiced 374:22
practices 31:9
73:22 125:23
126:2,13,14 190:7
195:5,6 206:21
210:3 211:1
212:17 213:10,14
practitioner 31:5
64:20,23 266:6
practitioners 68:4

preceded 228:17
precise 262:15
397:7
predecessor 389:4
preface 414:2
prejudice 10:3
preliminary 91:11
91:14 182:23
215:20
premature 147:22
premier 36:7
preparation 19:16
22:19 24:6,12
prepare 19:11
22:13
prepared 362:7,9
362:11 382:7
preparing 23:25
146:17 367:11
prescribe 86:8
96:8 143:24
210:15,19,23
215:3,7 232:21
243:11,15 247:4
334:5
prescribed 41:12
51:7 57:9 61:1
62:7 67:10 77:3
85:8 107:18 109:1
123:10 134:16
153:8 226:23
227:8 241:23
242:6 244:1,21
249:17,19 251:16
251:21 252:7,8
260:24 261:21
262:23 263:2
264:9 273:22
281:1 284:25
314:17 315:17
316:17 331:23

370:7
prescriber 54:20
64:15,24 66:8,13
66:17 81:3 84:18
153:22 265:24
prescriber's 214:2
prescribers 58:13
60:1,15 63:8
69:12,21,23 71:25
72:9 73:5,9,17,18
73:25 74:17
152:18 219:25
229:15 265:17
267:5 300:18
402:5
prescribes 211:4
prescribing 49:9
54:12 62:14,25
65:20 67:3 73:15
78:24 80:18 81:4
82:7 86:14,19
87:3,13 96:6
132:19 134:15
136:7 190:7,8
193:22 195:5
207:8 210:2,11
211:1 212:17
213:9,14 214:2
220:7 228:16
229:7,11 244:6,9
244:16 245:12
246:10,15,24
259:19 261:25
267:2 271:20
273:8 300:9,10,14
317:23 332:14,15
332:22 385:7
400:25 402:7
403:2
prescription 1:4
7:17 30:4 34:15

36:21 37:8 49:4,7
51:8 56:2 57:23
63:6 73:15 84:20
103:22,25 104:6
104:14,17 105:2
105:10,16 107:9
143:23 145:9
146:4 147:10,11
152:23 192:17
194:4 211:25
214:14 221:1,8,15
221:17 222:3,6,12
222:15,24 223:6
223:12 224:7,10
224:14,22,23
225:3 227:4
228:12 230:22
231:12 232:13
241:7,11,25 247:5
249:18 250:8
252:15 255:16
258:21 261:11
262:6,9 265:10,22
266:23 268:17
281:8 284:21,24
285:10,19 292:4
294:6 314:25
315:15,20 316:7
316:12 317:6,11
317:25 318:7,11
319:4,11 332:18
363:19,21 364:16
365:14 366:18
367:8,13 371:8,25
372:19 380:6,8
381:3,7,8,9,18
386:1 397:3 400:7
401:7,13 402:18
403:20 405:1,5,12
406:1,4,7 407:9,13
407:21 410:9

411:8,17,19
412:10,16 425:6
426:3 427:3
**prescriptions**
54:17 58:23 59:23
63:14 66:14 72:24
73:2 79:6 104:10
105:8 106:7
107:19 108:11
109:1 154:10,13
211:13,17,24
212:10 226:8,21
227:5,13,18 230:5
230:10 232:7
246:21 249:16
263:25 267:23
367:16,19,21
381:15
**presence** 44:11
**present** 2:14 5:9
8:5 20:14 40:16
43:23 90:4 106:23
107:13 109:20,21
110:25 122:10
167:23,25 172:19
173:3 297:8,14
305:1,13 351:19
354:16 407:18
**presentation**
174:12 307:2
313:16
**presented** 129:19
173:8,12 313:10
313:11 351:24
**presenting** 293:18
351:21
**presents** 335:20
**press** 92:3,11,22
93:25 173:25
174:5,21 325:21
351:15,20,25

**pressing** 52:25
**presumably** 85:7
152:14
**presume** 27:24
**pretend** 96:17
**pretty** 15:10 53:24
124:23 129:7
172:1 216:15
282:14 291:11
361:4 379:5
**prevalence** 191:7
**prevent** 402:19
403:4
**preventing** 246:11
271:22
**prevention** 184:9
270:2 323:5
**previous** 111:2
136:7 248:15
273:12 329:20
**previously** 308:23
344:20 378:23
**primarily** 19:14
32:5 149:23
349:23 352:3
**primary** 141:13
182:21 339:1
375:14
**principal** 95:24
338:21 339:18
**principally** 354:4
**print** 127:8,13
128:19 129:2
131:5,13,16 133:6
133:10,20,25
134:18,19,21
144:7
**printed** 127:20
128:7,10,13,14,17
130:10 134:22

144:11,15 331:2,9
341:14
**printing** 128:16
**prior** 11:17 15:25
38:13,18,24,25
39:3,10,18 45:15
45:22 57:22 90:7
139:25 142:4
168:20 185:8,21
186:17 224:14
225:8 228:16
229:6 256:1
258:14 289:12
308:17 317:10
319:4,11,20
337:14 363:16
394:9 400:6,24
401:12 403:2,20
410:21 411:15
**private** 7:7 55:14
172:16,19 226:5
303:13,21
**probably** 20:12
33:23 56:21 91:12
110:11 124:14
138:4 139:11
158:8,14 170:15
221:21 245:14
263:24 289:17
292:25 293:6
304:9 332:9
376:25
**problem** 38:16
39:2,10,21 42:13
54:23 57:22 58:5
110:8,20,23
115:16 138:18
197:17 206:2
280:6 296:23
335:8 374:4

**problems** 191:16
341:6
**procedure** 426:5
427:5
**procedures** 121:1
148:14
**proceed** 9:16 78:2
160:6 178:25
238:2 258:4 286:8
328:8 373:21
413:20 418:9
**proceeding** 399:19
423:8
**proceedings** 23:21
208:11
**process** 17:22 54:4
74:9,14 104:22
108:16 109:18
162:6 209:6,10,10
234:20 313:9
337:9 339:19
**processed** 123:22
**processes** 124:17
**produce** 324:2
**produced** 21:1,6
21:12 218:2 296:5
306:24 324:8,11
341:9 343:8
404:16
**produces** 408:24
**product** 41:7
97:25 182:21
279:22 363:20
**production** 296:9
425:15,17,22
**products** 34:10
**profess** 31:25
49:16 243:20
**professional** 10:17
50:7 51:19 78:10
120:15 157:17,23

161:16 162:2
167:21 217:19,24
**professional's**
70:5
**professionally**
246:20
**professionals**
335:1 375:13
377:19
**professors** 290:10
**proffer** 322:22
**profile** 73:10
227:5 404:25
**profit** 390:18
391:5,6
**program** 49:5
184:9 270:3 298:6
302:12 329:20
340:20 394:25
**programs** 95:19
96:11,19,20
266:24 297:3
**progressed** 252:17
252:19 260:15
**progressing**
258:22
**prohibit** 391:5
**prohibition** 229:3
246:9
**project** 301:17
308:19 357:2,10
357:11,12,19
358:13,15
**projected** 356:8
358:1
**projection** 93:10
352:16 353:18
361:14
**projections** 93:4
361:7

**projects** 293:17
**prominence** 38:10
**prominent** 129:15
**promote** 277:13
**promoted** 17:4
**prompted** 219:9
384:13
**promulgated**
26:11 126:4
273:25
**promulgating**
157:21 158:6
**proof** 165:23
166:3 170:1,6
**proper** 249:8,18
**properly** 66:5
244:21
**properties** 115:23
**property** 277:15
**proportion** 260:14
**proportions** 40:17
**prosecuted** 76:5
233:14
**prosecution** 96:15
162:11 164:13
165:9,21,24 170:1
171:12 419:8
**prosecutions**
115:17 161:9,17
162:22,25 163:5
164:4 170:13,19
208:9 414:8
418:25 421:7,18
421:21
**prosecutor** 115:12
175:14 265:19
**prosecutors** 161:8
170:23
**prospect** 170:12
**protected** 304:9

**provide** 12:11
18:14 73:16
141:25 143:7
225:19 361:1
393:20 397:21
**provided** 58:9
166:6 169:19
229:4 239:1
296:11 311:5,15
402:15
**provider** 64:8
65:12 85:18
126:19 206:10
**provider's** 49:22
**providers** 49:13
73:3 80:17
**provides** 272:1
**providing** 166:16
219:17
**proximity** 301:24
**psychiatrist**
377:20
**public** 2:9 4:14
7:23 21:7 27:22
28:18,20 29:20
36:8 38:3 55:12
55:16 75:12
127:10 131:9,12
131:15 132:20
145:20 146:5
149:23 152:4
169:4,17 171:16
173:19 174:7,17
175:2 176:16
180:4,9,15 181:24
182:15,24 183:2
188:3 226:2
240:19 268:9
273:23 287:9
295:5 303:10,13
303:17,20,23

304:4,17,19,24
314:14 317:15
320:21 329:19
330:7 369:14
379:20 383:9,14
404:12 410:17
411:1,15 424:4,6
426:10,18 427:15
427:23 428:23
**publication**
162:23 168:3
295:22 306:20
313:2
**publications** 29:23
174:1
**publicize** 171:14
**publicly** 20:21
180:19
**published** 29:21
121:4 169:3
276:19
**puerto** 3:12
**pull** 43:21 306:12
396:10 403:14
**pulled** 90:22
342:14 344:13
354:11
**puncture** 305:6
**punished** 417:1
**purchase** 384:4
386:8 388:8
**purchased** 155:6
297:9 389:10,13
**purdue** 1:8,10,12
3:14 8:24 9:1 10:5
**purpose** 130:14
150:6 169:16
249:5 262:24
265:11 268:22
299:1

[purposes - really]                                                          Page 53

**purposes** 55:17
100:21 217:20
248:11 262:20
388:10
**pursuant** 2:14
**pursued** 75:17
422:10
**pushing** 156:13
**put** 34:24 96:12
120:10 122:20
128:4 131:16
162:1 174:15
195:13 196:17
217:5 219:7
232:16 237:10
313:24 331:9
337:15 344:13
349:8,22 406:17
**putting** 77:9 146:9
174:1,2 235:15
403:16 419:25

**q**

**quacks** 291:19
**qualified** 245:7,10
**qualify** 272:20
**qualitative** 100:12
**quantify** 116:9
207:1,9 209:3
361:25
**quantitate** 100:7
113:19
**quantitated**
100:10
**quantitative**
100:13
**quarter** 400:3
**queried** 149:22,24
149:25
**queries** 52:13
**query** 145:2
146:15 231:6

**quest** 365:19
398:3
**question** 14:2 18:1
18:2 19:5 26:5
29:7 30:13 33:11
33:12 43:7,13
51:12,20 62:6
65:11,19 74:6
76:15 79:24 82:14
84:18,23 85:2
93:20 94:22 97:5
107:15 117:5
119:15 125:7,11
138:17 151:6
162:16,18 179:11
180:23 201:12
202:19 210:8
227:25 240:8
242:12 243:1
244:14 254:2
258:9 259:10
261:4,10 263:16
263:23 264:14,20
280:23 281:17
285:14 286:17
293:10 296:15
299:14,25 307:9
318:8 319:16
323:20 327:2
332:9 335:7
336:14 351:3
358:21 363:10
364:11 372:14
382:15 396:15,18
403:18 409:18
411:4 414:3
415:23 420:24
421:19 422:7,21
**question's** 252:3
**questionable** 79:7

**questioned** 85:17
126:22
**questioning** 163:8
**questions** 25:1
55:20 70:19 78:18
80:16 98:22,23
141:19 162:8
163:20 179:14,17
201:13 215:21
216:7 269:21
280:18 307:22
310:8,10,12
323:11 324:21
328:17 341:16
362:19 374:7,17
374:24 380:1
398:3 404:2 413:2
413:24 414:18,21
416:10 417:7
418:22
**quick** 53:20
413:12
**quickly** 184:14
**quite** 328:14
330:24
**quotas** 368:3
**quote** 226:22
267:17
**quoted** 256:19
315:12

**r**

**r** 7:1 329:1 424:1
**race** 293:23 301:2
343:2
**radar** 77:10
**radine** 17:3,11
**radio** 278:21
279:3
**raise** 58:25 59:4
154:2

**raised** 62:12 84:17
84:22,24
**ran** 207:15
**range** 136:22
**ranges** 122:1
**ranging** 246:25
**rank** 397:2
**rapid** 53:1
**rare** 146:18 150:4
**rate** 94:20 97:2
191:11 303:7
339:15
**rates** 259:19 277:6
**ratio** 123:20,22,24
**rc** 346:5 347:3
**reach** 366:8,9
**reached** 365:13,21
366:10
**reaching** 81:25
**reaction** 415:10
416:1
**read** 22:15 51:11
51:13 166:12
179:23 215:14,17
215:18,24 216:4,5
216:11 221:7
230:1 253:1,9,21
254:21 269:17,21
269:22 271:7
426:5,6,12 427:5,6
427:17
**reader** 298:25
**reading** 32:6
215:23 260:19
425:19
**ready** 269:23
**realized** 144:2
**really** 16:8 30:21
32:1 40:13,25
42:16,19 47:1
61:12 77:14 83:7

86:8,10 105:18
107:5 114:8,15
116:5 120:11,15
136:5,23 137:22
137:25 139:2,22
141:12,14 143:6
147:22 167:13
171:11 186:7
190:17 199:23
218:4 240:15
243:20,22 244:17
245:7 254:7
257:10 259:7
276:2 299:11
337:15 341:15
363:14 364:2
366:1 386:9,24
389:25 391:17
394:3 397:14
406:13
**reason**   10:13
128:19 129:20
136:15 146:14
217:22 241:11,25
242:1 244:18
259:14 265:21
416:14 425:14
427:8 428:3
**reasonable**   200:8
266:16 335:1
**reasoning**   179:4
**reasons**   54:8 85:16
145:17 149:24
300:20
**recall**   70:25 75:7
78:12 83:12 112:9
219:25 220:1
248:11 249:3
320:8 366:11
378:23 398:9,11
399:21 400:2,11

413:25 414:19
416:12
**receipt**   425:18
**receive**   19:8 65:1
379:9
**received**   25:16
54:16 55:11 56:2
57:9,18 61:16
66:4 73:2 76:7
114:3,7 218:16
219:21 220:9
223:6 264:25
265:10 292:2,3
294:1 315:24
317:6,25 318:5,6
318:10,22 319:3
357:2 378:4
**receives**   72:24
312:10
**receiving**   57:22
59:6 153:14 273:6
317:10 319:4,21
**receptor**   102:9
146:1
**recess**   77:21
159:25 178:21
237:21 257:25
286:2 328:2
373:14 413:16
418:5
**recipients**   270:1
**recognized**   294:14
**recollection**   70:1
79:19,23 80:3,7
166:4 216:8 220:6
254:15 289:18
**recommendation**
70:6 250:9 335:17
**recommendations**
157:19

**record**   7:4,13 8:8
51:13 77:18,23
94:6 127:10
159:20,22 160:2
175:2 178:19,23
217:5 220:22,25
220:25 221:24
222:11,23 223:5
237:18,23 253:9
257:21,23 258:2
271:8 285:24
286:4 305:21
308:15 327:21,24
328:4 368:22
373:11,17 412:23
413:15,18 417:19
417:21 418:3,7
423:2 424:7 427:9
**recorded**   7:15
117:1 305:21
331:4,15 336:11
344:24 354:20
**recording**   7:12
**records**   75:11
82:25 102:25
133:21 182:19
189:9 280:9
302:22 306:3
308:17 309:13
316:11,14
**recounted**   111:10
**recover**   124:12
**recovered**   108:17
123:21
**recovery**   172:15
276:5
**recross**   417:9,17
**recruited**   193:24
**recruiter**   194:17
**recruitment**
193:25

**red**   184:23 185:13
**redeploying**   34:9
**reduce**   145:21
274:4 401:20
**reduction**   309:24
310:2
**redundant**   129:3
**reed**   4:19 8:22 9:7
**reedsmith.com**
4:21
**refer**   21:19 61:23
63:25 64:18,23
65:9 73:5,19
74:15 152:14,17
152:18 165:22
195:8 277:17
283:6 292:20
**referable**   191:12
194:8 195:11
196:10 206:20
207:11,18 213:25
233:10 234:6,21
277:9 279:16
282:11 383:24
384:7 385:25
405:4,16 410:25
**reference**   60:21
121:8,11 266:20
360:18 375:9
425:7 426:2 427:2
**referenced**   247:16
426:11 427:15
**referral**   63:19
74:9 75:16,19
76:4,24 79:20
80:11,15 81:10,13
82:4 83:24 85:9
85:16,23 126:20
278:6
**referrals**   68:16
78:9,21 79:4,14

81:1 82:17 83:1
84:4
**referred** 62:2,8,23
63:4,15 64:5
67:20 68:5 72:16
75:19 76:3 293:5
351:16 362:11
390:17
**referring** 64:7
73:8,9 80:8 309:7
368:16
**refers** 100:3
**refill** 227:14
**reflect** 112:20
113:13 121:9
229:22 231:24
**reflected** 348:12
360:16
**reflecting** 83:23
**reflects** 112:16
**reform** 175:20
327:10
**refresh** 227:3
254:14
**refreshed** 216:8
**refrigerated**
388:23
**regard** 81:4 95:20
136:17 140:23
158:3 168:2 248:6
331:1 383:16
392:3
**regarding** 172:25
361:8
**regardless** 333:6
**regards** 143:14
**regional** 387:12
**registered** 381:19
**regularly** 172:23
**regulate** 88:2,5

**regulates** 87:22
**regulation** 365:1,1
399:20
**regulations** 26:10
31:16 49:17 50:2
364:5,8,16 365:4
391:4
**rehabilitation**
318:25
**relapse** 277:6
**relapsed** 322:19
**relapsing** 322:17
**relatable** 411:19
**relate** 28:20 170:6
338:23
**related** 6:11,22
29:16 40:3 42:21
44:1 88:21 145:21
162:24 165:12,21
185:3 186:19
187:3 188:25
189:17 191:1
194:23 196:24
209:18 211:6
218:7 273:18
288:5 292:22
336:23 344:22
345:20 350:7
356:7 372:19
380:23 407:20
412:7 414:8
418:24 419:11,15
424:10
**relates** 1:6 29:17
29:19 218:9 362:2
**relation** 360:12
**relationship** 54:10
131:8 136:6
145:23 175:18
190:6 212:3
231:10 244:16

261:19
**relationships** 51:7
**relative** 317:17,22
399:19
**relatively** 43:20
53:20 221:11
269:20
**release** 180:13
181:24
**released** 68:2
**releases** 174:1,5
174:21
**relevance** 136:16
**relevant** 130:19
135:18,21 152:4
212:21 301:17
338:13 340:3
407:18 409:3
**relied** 375:13
**relief** 254:17
**relieve** 136:9
**reliever** 6:16
36:11,21 37:24
132:21 146:3
191:5 254:19
255:1,4,10 260:7
269:1 280:3,6
408:2,5
**relievers** 104:6
107:13 135:25
136:7 145:24
146:8 185:15
188:8,17,18
190:10,19 191:24
195:2 213:23
231:12 248:5,16
248:18 249:6
252:16,21 255:13
256:6 258:13
260:2 264:25
265:11 273:14,22

280:9 282:5,8
292:23 294:7
299:10 322:20
408:4 412:11
**reluctant** 91:24
178:5
**rely** 16:14 123:13
249:3 302:21
349:5 394:23
395:17
**relying** 375:6
**remain** 125:13
**remained** 43:20
43:24 88:23
260:17
**remains** 89:22
139:6
**remember** 11:15
12:16,21,23 13:7,9
13:10,12,17 14:3,6
14:10,17 16:12,21
18:1,4 20:2,11,17
21:14 63:3,10,16,20
64:20,21 66:21,23
67:17,19 70:6
80:5,12 81:2,5,7
82:19 85:10 88:14
89:1,19 90:20
91:23 92:5 93:15
93:18,24 94:2,3
97:21,24 103:19
110:13 119:23
126:23,24,25
128:16 142:10
143:6 146:19
160:11 161:13
162:19 164:11,25
165:4,6,7,9,13,14
165:15 166:13
167:25 168:5,6,8
168:12 181:22

187:24 217:8
219:9 220:5
227:15 232:20
242:7 247:1 250:4
251:17 265:18
269:16 289:15
290:14,21 291:18
296:4 301:14
312:16,18 320:9
329:14 343:22
353:16 362:24,25
364:1 365:22
366:5,16 369:17
371:4 378:8,15,19
378:25 379:4
380:18 392:23
393:6 394:7,8,20
395:12 399:23,25
400:1,13,21
401:21,23 402:1,3
402:21,22,24
403:10
**remembered**
162:12
**remotely** 8:6 9:3
**removed** 200:13
245:20
**rendon** 9:23
115:13 160:10
162:10 163:9,21
164:22 167:20,23
168:2,16 176:5
413:24 414:6,8,23
415:1,6,11 416:2,4
418:25 419:3
420:14
**rep** 211:3
**repeat** 356:22
364:12 415:22
**reply** 378:22

**report** 18:20 55:15
71:10,25 79:16
82:4 92:24 99:1
105:21 108:19
113:6 120:10,14
127:2,5 130:8
134:5,11 135:22
142:2 145:1,15
146:17,22 147:22
148:13 150:2,16
173:20 180:8,9,12
180:14 182:4,13
182:22,24 295:20
310:8 333:8,24
337:16,19 351:4
358:4,6 375:6
377:12
**report's** 338:1
**reported** 1:24 65:7
93:3
**reporter** 8:2 9:10
415:14,17 424:4
424:19 426:7
**reporting** 49:7
74:2 99:24 154:5
338:2
**reports** 18:13
19:14 84:3 127:15
133:24 135:5
144:7,12 148:4,25
149:22 155:19
182:19 330:25
331:4,8 335:21
336:16 349:21
**repository** 337:5
**represent** 55:13
176:6 341:19
350:19 356:13
362:13
**representation**
175:14 178:2

**representative**
172:5 258:25
309:12 365:10
**represented** 175:6
175:12,21,23
365:20 366:6,15
**representing**
312:5 415:7,11
416:2
**reputation** 321:25
**request** 140:16
306:9 392:16
393:7,9 394:5,6,9
427:9,11
**requested** 51:13
**requests** 142:16
142:18 181:24
**required** 165:24
228:11 333:23
364:18 386:14
402:6 409:7
425:25
**requirement**
228:15 332:18,20
401:6 403:20
**requirements**
333:7 365:7
**requiring** 232:12
**research** 256:20
294:11 299:1
321:18 329:17
376:3
**reserve** 314:13
329:19 330:8
353:3
**residence** 342:15
**resident's** 381:23
382:16
**residents** 339:11
**resign** 379:24

**resignation** 379:17
**resource** 15:3
139:18 324:23
**resources** 147:24
150:22 187:6
264:19 299:23
321:12,15 324:21
325:25 326:2,6,17
326:21 388:23
390:6 392:17,21
393:23 395:21
**respect** 28:23
33:13 148:5
157:24 242:19
261:6 275:17
292:7 384:22
**respective** 2:15
**respond** 46:5 55:9
66:22 138:20
145:20 187:11
306:14 309:5
396:14 422:7
**responded** 301:15
309:6 383:16
**responding** 193:1
195:21 384:25
**responds** 305:24
**response** 10:1
24:15 96:20,21
181:23 305:22
306:8 382:14
388:2 392:21
393:11,24
**responses** 24:6,9
25:2 46:6 170:10
301:20
**responsibilities**
11:1 277:4
**responsibility**
192:19 195:17
198:13,24 206:25

207:5,8 230:20
233:17 277:2,23
334:18 390:21
**responsible**  32:18
37:1 203:4,6
205:13 215:7
278:16,22 279:7
281:19 344:7
382:25 409:13
416:11,17
**responsive**  325:7,8
**rest**  75:3
**result**  125:21
151:1 209:11
266:9 271:18
272:14 283:4
323:15,22 378:11
383:21,22 384:25
387:5 394:16
395:21 400:4
404:16 406:11
**resulted**  378:5
379:10
**resulting**  234:13
**results**  100:13
269:22 339:2
**retail**  362:18
380:2,5,10,14,20
381:2,17
**retained**  176:5
423:6
**retrospect**  137:22
**retrospective**  71:2
137:21 146:23
149:23 150:5
**retrospectively**
139:11 149:4
200:24 210:2
**returned**  425:18
**revenue**  387:8
390:16

**reversion**  273:16
**review**  12:12,20
13:3,16 14:1,25
15:9,14,22,23 16:5
17:18,19,22 18:9
22:12 51:17 53:12
58:10 63:19 65:2
69:9 84:16 106:19
129:1 178:1 181:5
293:16 309:11
378:5,12 379:10
409:14 425:12
426:1 427:1
**reviewed**  15:6
19:13 20:21 71:18
238:16 312:11,13
313:1 340:12
419:22
**reviewing**  67:12
**reviews**  12:24 13:7
13:9,21,25 14:14
14:16 16:7 17:9
17:12 18:5,20,25
19:1,3,7 71:16,20
225:21,22 379:7
**revised**  312:24
**revisions**  312:20
**revisit**  295:13
403:12
**revived**  308:24
318:9
**rey**  3:12
**reyes**  70:7
**rhartman**  4:15
**rhode**  297:12
**rico**  3:12
**ridiculous**  279:10
**right**  13:13 15:15
20:23 21:18 22:21
23:5 29:12 34:12
35:2 36:14,24

37:6,10,14 41:13
41:14 42:2 44:8
46:18 47:19 54:6
56:3,4,14 57:10
58:18 59:16,24
60:6 61:3,14
63:13 64:12 65:20
67:8 77:5,15
83:12,14,17 89:14
90:9 91:3 92:11
92:21 95:6 97:13
98:3,4 101:4,11,12
101:15,16,18,21
101:22,24 103:1
105:13 107:3,10
107:14 112:5,19
113:4,23,25
114:22 118:10
119:9,11,12,14
120:4,24 130:24
131:3,6 132:4
133:13,15 135:2,3
135:6,7,10 137:1,3
138:10 139:25
140:7,8 141:23
143:3 147:8
150:16,17 152:16
152:23 168:22,24
169:1,7,11,21
170:20 171:17
172:3 173:13
174:22 179:19
184:5,13,19,24
185:18 186:20,25
187:4,5 188:20
191:17 192:8,14
193:22 197:11,13
197:20 198:9,14
198:22 199:11,13
199:16 200:3,10
200:13 202:16

203:1 205:21
207:4 209:3
210:22 211:7,18
212:11,13,19
213:6,16,20 214:4
214:16,20 217:10
217:12 218:11,12
218:14,21,22
219:20 221:2,6,7
221:13,15 222:1,4
222:5,7,8,13,17,19
222:24,25 223:3,7
228:22 229:9,11
229:12 230:6,7,23
232:1 236:21
238:12,17 239:12
239:17,25 241:12
245:1 249:14,19
250:16,23,24
251:2,23 252:5,9
252:17 254:13,25
255:6 256:1,12,25
257:8,13 260:3,9
260:11 262:19,21
265:12 268:1,19
271:2,5,6 272:7,12
274:16,17 275:8
275:11 276:18,25
278:17,23 280:18
282:18 284:3,7
285:16 286:13
287:3,21 290:10
291:8,11 294:24
299:20,25 304:14
306:16,18,20
308:3,11,22 312:1
313:22,25 314:3
315:1,2,17 318:12
318:20,24,25
319:5,12,23
320:12 321:8,16

322:6,13 323:11
323:12,23,25
324:4,20 325:4
327:1 330:16,23
332:16 333:9
334:12 336:10,19
340:14 346:4
350:8,12 351:13
351:18 352:10,15
353:3,8,17,25
354:1,22 355:2
357:24,25 358:2,8
359:17 362:25
366:2 367:5
368:21 369:20
372:20 375:15
377:20 379:25
407:3 421:1
**rise** 42:17 44:25
105:22 137:21
186:8 288:15
326:24 373:5
385:14 390:6
412:5,6,7
**rises** 139:4 385:4
**rising** 273:1
354:10 356:18
361:17 369:18
394:21
**risk** 180:1 287:11
290:3 291:8,17
309:16,24 310:2
**rivera** 3:12
**road** 3:4
**robberies** 372:7
**robbery** 372:13
**role** 65:14 167:12
212:16 213:1,3
246:2 361:21
368:3 380:5

**room** 8:5 168:1,5
390:3
**root** 273:21
**rose** 89:20 139:15
**rough** 91:20
**roughly** 93:18
**route** 401:2
**routine** 144:13
218:24 397:16
**routinely** 171:20
187:10 335:12
**rubric** 242:15
**rudimentary**
240:22 245:25
365:8
**rule** 215:16 247:6
305:7
**ruled** 353:2
**rules** 26:10 31:16
49:12,17 50:1
158:7 426:5 427:5
**ruling** 86:11 117:9
**run** 305:23 306:9
306:13 310:20,23
312:1 336:16
343:12,15 358:4
360:25 388:17
**running** 153:23
237:11 266:3
342:1 359:10
411:3
**russo** 1:24 5:10
7:25 8:3 424:3,18
**ruth** 4:13 8:16
415:19 418:17
**rx** 49:6

**s**

**s** 6:1 7:1 314:12
425:15 427:8,8
428:3

**safety** 11:8,23,24
11:24 213:22
**salary** 385:22
**sales** 31:8 203:5
**salicylates** 99:17
**salvageable**
301:22
**salvatore** 3:3 8:9
425:5
**samhsa** 247:17,18
**sample** 259:17
**samples** 267:4
**san** 4:20
**sandra** 4:22
**sandy** 8:19
**sat** 311:8 377:22
**save** 128:22 130:3
357:11 400:9
401:17 402:11
403:5,21
**saved** 95:20 402:9
402:11
**saves** 356:8 357:19
**saw** 43:25 44:12
45:13 58:22 59:9
62:1 63:23 90:13
90:21 119:12
154:12 156:7
173:15 186:8,8
192:17 211:3
212:24 217:12
223:25 248:14
278:13 281:1,3
294:13 301:14,19
325:16 363:14
389:23 392:23
393:8 400:4 412:1
416:7
**saying** 44:4,9
60:18 120:9
124:14 134:24

149:21 162:19
181:4 194:2 198:5
207:14 217:2
222:9 230:3
241:10 253:22
267:14 271:14
272:10,23 280:19
290:16 320:15
347:11 399:25
414:3 417:19
**says** 37:16 98:10
98:14 100:23
101:20 102:1
104:8 118:20
155:20 214:7
219:10 227:20
254:25 256:4,8
259:25 272:9
297:11 342:21
347:3 350:10,21
351:2 356:10
359:18
**sbadala** 3:6
**sboranian** 4:21
**scale** 193:21
**scary** 166:20
**scenario** 117:15
244:13 249:23
**scene** 55:9,9 66:22
67:13 106:24
108:17 117:10
124:10 147:16
148:8 149:12,14
187:12 225:11
302:23 303:18
305:12,15 339:25
389:22
**schedule** 41:15,17
41:22 42:3,11
**scheduled** 56:2

scheduling 95:22
school 211:3,21
  289:10,12,21,22
  289:23,24 290:6
  314:13 340:18
schooling 329:21
sciences 293:19
  312:6
scientific 322:3
  323:25
scientist 294:21
scientists 27:1
scope 30:19
  243:22
screen 122:18
screening 104:16
screenings 122:14
screens 397:13
seal 426:15 427:21
search 265:3,5
  309:13
searchable 265:6
  337:4
searches 52:13
  142:25 229:13
second 4:19 31:19
  101:17 231:16
  254:9 280:15
  296:14 359:5
seconds 105:14
  417:13,25
secret 174:24
section 312:11
  345:10
sections 312:11
see 18:13 24:3,23
  24:24 25:1 36:5
  39:24 40:7 44:18
  55:10 58:3 72:12
  82:4 84:3 89:3
  94:9 98:12 100:19

100:24 102:3
104:3 105:18
106:2,12 108:20
109:24,25 111:4,7
120:10 122:23,24
123:1 125:14
132:17 149:19
150:18 153:7
154:10 156:21
180:21 181:19
182:3 183:4,6
188:11 190:4,12
194:1 196:5
199:17 206:23
208:8 214:22
226:19,25 229:24
229:25,25 236:14
246:16 253:22
254:12 286:19
295:11,14 297:8
297:13 299:3
300:17 301:11
306:13 309:14
310:24 315:7
317:4 325:23
326:16,24 337:7
342:18 345:3,4
349:5 353:22
354:24 355:12
359:5 373:5
376:10 385:9
387:18 389:25
393:5 399:15
403:3,4 412:9
415:17
seeing 47:4 72:8
  85:21 90:25 146:2
  156:5 173:5,10,18
  174:10 189:15
  210:6 273:15
  301:19 346:14

347:15 349:25
354:3 356:16
361:9 369:17
388:3 394:22
412:5,5
seek 235:17
seeking 297:22
seen 56:25 60:25
  62:24 97:20
  104:20 108:15
  112:21 119:19
  127:17 128:17
  144:11 191:12
  215:21 216:7
  217:4 240:21
  241:2 272:1 299:5
  306:22 310:8
  313:23 343:18
  361:3 362:25
segment 271:14,16
  272:10
segregate 131:19
seize 105:20
seized 109:24
seizures 40:12
  105:22
selection 313:3,5,8
sell 34:19 206:18
  233:18
selling 195:15
  203:17 206:12
  251:4
senate 399:24
  402:23
send 72:4,5 74:2
  134:8 145:8 312:3
  312:14,24 387:16
sending 143:19
  270:15 311:23
senior 149:9
  330:19

sense 61:8 159:18
sensitive 7:7
  386:20
sensitivity 100:3
sent 24:15 134:22
  135:1 141:24
  142:21 181:2
  202:8 220:3
  270:18,21 272:4
  312:5,22
sentence 227:20
  254:9
separate 22:10
  58:24 159:7
  208:11 327:15
  338:8 343:25
separation 209:9
  278:18 279:1
september 312:17
  353:3
sequence 200:25
  408:24
sequential 341:25
  342:3
series 356:14
  416:10
serve 419:9,14
served 313:6
serves 12:2,3
service 393:20
services 55:8
  70:14 225:24
  303:12
session 20:10
set 266:5 309:7
  322:21 340:23
  341:11 344:2
  424:14
sets 209:11 362:15
setting 15:8
  289:19,20 368:3

**seven** 13:10,21
  247:5 332:19
  371:23 409:18
  423:6
**shannon** 68:16
  84:6,8,8,9,10,11
  168:11 171:20,24
  270:8 328:24
  329:2,3,9 332:11
  332:12 345:9,13
  362:12
**share** 169:17
  172:23,24 182:20
  182:22 334:5
**shared** 170:23
  173:25 220:13
  369:9 414:14
  418:23 419:4
  420:14 421:12
**sharing** 322:21
  414:14 419:3
**sheet** 305:23 306:9
  306:13 331:12,15
  343:18 425:13
  427:7,10,18 428:1
**sheets** 312:1
  340:23 341:24
**shepherd** 129:14
**sheriff's** 309:12
  311:6,16
**ship** 196:19
**shipment** 371:7,9
  371:24,25 372:1,2
**shipped** 370:25
**shipping** 97:11
  198:8
**shkolnic** 3:7
**shkolnik** 3:4,10,11
**shoes** 171:19
**shoot** 391:1

**shop** 59:18
**shoppers** 371:14
  371:15,15
**shopping** 58:2,7
  58:16,20 59:1,4,16
  59:24 60:3,8,12,14
  60:19,20,24 61:5
  61:20,23 62:13,18
  63:23 69:5,7
  70:21 71:14,18,24
  72:10,15 79:5
  80:16 134:17
  150:12 151:21
  152:5,13,17 228:8
  229:16 249:23
  298:19 300:19
  331:20 332:1
  400:5,16 401:1,17
  401:20 403:3
**short** 77:16,21
  118:21 155:12
  159:25 177:7
  219:13 221:11
  224:19,19 237:21
  257:25 269:20
  286:2 328:2
  373:14 390:12
  413:16 418:5
**shortcomings**
  225:17
**shorthand** 424:3
  424:19
**shortly** 406:16
**show** 56:8,23
  104:4,21 109:14
  116:21 117:1
  122:15,15,18
  252:24 303:19
  348:3 350:2
**showed** 226:8
  251:24 255:21

**319:19 389:22
**showing** 137:6
  341:25 393:9
**shown** 319:9
  425:16
**shows** 112:14
  408:6
**sic** 26:2 34:25
  335:20 358:14
  363:4 370:5
**side** 89:5 124:14
  165:25 337:1
  359:12
**signal** 60:10
**signature** 424:17
  425:14
**signed** 426:13
  427:18
**significance**
  271:24 273:23
**significant** 92:24
  145:7 174:8 187:6
  256:10 274:14
  309:23 339:4,6
  373:5
**signing** 425:19
**similar** 102:7
  115:21 191:24
  293:24 294:2,9,12
  296:19 299:4,16
  300:5 308:7 323:4
  323:11,22
**similarities** 300:24
**simple** 400:8
**sincerely** 425:21
**single** 140:19
  215:18 354:20
**sir** 10:9 13:18 14:3
  14:24 16:21 18:3
  24:4,18,21 25:9
  26:1,9 30:5,8,17

**47:14,16 48:4
  78:8 201:18
  231:21 256:15
  263:19 286:11,23
  307:1 328:13
  361:24 363:22
  377:25 379:18
  425:10
**sit** 14:8 52:11
  79:19 83:19 103:3
  126:8 131:2 133:6
  143:5,18 228:5
  335:15 402:4
**site** 19:13 20:22
  52:3 143:16 147:7
  174:2,22 305:6
  350:20 358:20
  369:10
**sites** 52:5
**sits** 12:10 310:16
**sitting** 19:20 168:9
  381:21 382:10
  383:19 387:2
  397:1
**situation** 71:13
  72:23 73:1 75:6
  119:18 120:17
  156:18 177:5
  255:23 289:15
  331:20 405:2
**situations** 118:5
  118:13 132:7
  155:5
**six** 13:10 224:20
  224:25
**skzerrusen** 4:24
**slap** 393:2
**slated** 419:16
**slavishly** 61:7
**sleep** 118:24

**sleet** 343:18
**slides** 359:15
**small** 120:2
  256:23 257:3,6
**smith** 4:19 8:22
  9:8 58:23 181:6
  306:4 308:23
**snoring** 302:7,9
**social** 376:18
**sold** 274:18 369:25
**sole** 271:21
**solely** 384:24
**solid** 342:7 369:15
**solutions** 4:12 8:1
  8:4 418:11 423:7
  425:1 428:1
**solving** 136:24
**somebody** 16:22
  53:17 54:4,11
  58:5 59:22 60:25
  62:5 69:2 71:17
  74:12 77:13 99:13
  100:8 112:22
  124:11 134:22
  144:24 146:2
  171:19 190:23
  192:15 194:14
  206:19 211:2
  243:25 245:17
  251:11,12 262:8
  279:6 295:12
  301:24 302:1,2,4
  302:24 304:22
  305:6 310:16
  311:6,15 317:2
  332:22 375:7
  376:19 377:21
  407:22
**somebody's** 269:9
**someone's** 113:16
  277:21 278:21

302:18
**something's** 58:4
**sooner** 150:20
**sorry** 9:19 26:4
  42:25 62:16 64:14
  69:19 70:9 80:4
  82:15 84:23 97:12
  105:3 137:16
  142:5 160:15
  161:2 162:14
  168:21 169:1
  184:17 188:13
  231:21 254:22
  255:18 271:15
  300:16 301:10
  307:1 317:20
  325:15 341:12
  345:11 352:8
  355:19 364:10
  378:14 393:14,15
  409:19 413:5
  415:14
**sort** 141:10,11
  288:21 338:20
  342:20 360:18
  369:10 382:5
  396:3
**sound** 95:5
**sounds** 223:3
  307:24
**soup** 116:3
**source** 59:6 95:25
  104:22 106:25
  123:13 153:10
  251:6 359:16
  399:12
**south** 4:23 32:25
**space** 335:25
  388:18
**speak** 19:15 22:13
  22:18 38:20 66:16

67:5 74:23 75:3
  159:8 164:5
  219:14 251:5
  297:24 359:22
  361:5
**specialist** 69:9
**specialized** 28:12
**specific** 18:12
  30:13 31:6 33:12
  33:17,23 34:7
  35:15 39:16 52:20
  55:20 63:4,22
  78:18 85:6 93:15
  98:21 103:12
  108:13 120:8
  122:9 164:4
  172:19 181:13
  203:24 254:1
  302:15,16 310:7
  366:16 369:11
  370:24 372:11
  381:23,24 382:12
  382:15,16 383:2
  384:17,18 388:10
  391:17 400:14
  402:3,24
**specifically** 55:10
  119:5,16 142:8
  161:12 162:9,19
  165:5 189:12
  219:15 225:12
  232:19 259:1
  300:13 312:16
  316:16 318:14
  319:6 340:18
  362:5 369:22
**specification**
  161:24 170:1
  419:10
**specificity** 147:18
  242:19

**specifics** 267:25
  400:22
**specified** 250:2
**speech** 43:11
  310:6 313:12
**speeches** 310:5
**speeding** 279:5
**spells** 180:20
**spend** 216:13
**spent** 152:10
**spike** 185:21
**spite** 376:17
**spoke** 17:8 20:8,8
  273:11 416:22
**spoken** 17:10
  219:10
**spreadsheet** 341:9
  341:13,21 343:9
  349:1
**spreadsheets** 6:20
**square** 2:9 4:14
  7:23
**stab** 231:8
**stability** 44:13
**stable** 43:20
  124:24 125:13
  145:18
**staff** 11:8,22 12:3
  12:6,6,9 13:25
  19:1 24:20 120:16
  141:12 149:6
  218:21 321:8
  325:6,6 329:7
  344:18 381:11
  384:2,2,3 385:13
  385:18 387:22
  393:11
**staffed** 26:23
  326:20
**stage** 377:5

**[stand - strips]**

**stand** 313:25
321:19 398:22
399:2 402:16
403:13
**standard** 84:19
85:17 86:4,11,14
87:2,12 88:5,6
120:25 147:4
148:14 244:2
**standards** 157:18
157:21 161:21
244:4 352:20
397:17
**standing** 9:22
**standpoint** 300:3
386:5
**stands** 49:6 321:6
**start** 24:23 77:24
109:4 110:7 114:9
132:14 137:24
177:8,11 190:17
192:11 196:6
237:24 265:3
273:14 274:8
285:1 286:5 328:5
329:15 358:9
385:13 387:19
409:18 422:20
**started** 43:21
45:13 104:3
110:10 140:22
145:5 175:11
177:21 178:6
183:21 194:20
201:2 228:16
230:5,13 231:7
267:6 274:11,15
275:19 276:5
281:5 284:1,2
285:10 317:3
322:19 334:3

343:22 356:23
361:11 385:5
393:5
**starting** 110:9
139:12 272:25
281:5 372:20
385:9,11 387:8,18
**starts** 38:9 210:10
254:11 278:14
359:13
**state** 8:6 9:3 10:16
38:17 49:5,10
58:12 78:22 79:1
87:10,19 88:10
157:13,15,20
184:1 220:21
221:23 226:20
232:12 266:20
335:16,18 342:12
365:1,1 369:21
388:23 390:22
391:4 401:5
403:24 426:10
427:15
**state's** 86:10
**stated** 121:16
**statement** 23:24
106:19 107:6
171:8 231:17
383:10 384:19
398:4 399:2,6
426:13,14 427:19
427:19
**statements** 383:14
411:10,13,14,24
411:25
**states** 1:1 6:17
7:18 33:5,20 48:7
165:17 166:8
270:5 274:23
275:2,3

**statewide** 335:8
**statistic** 173:1
**statistical** 27:24
337:15
**statistics** 59:14
68:24,25 69:1,3
113:7 114:1
158:17 174:3
267:20 336:16
**status** 343:4 348:5
348:12
**statute** 127:12
131:11 180:16
**statute's** 131:10
**statutory** 180:11
334:17
**stay** 21:23 141:7
291:3
**stayed** 90:20
186:12
**stays** 269:7
**steady** 260:17
**steal** 277:21
278:21
**stealing** 262:4
**stem** 205:17
**stenographic** 94:6
257:21
**step** 143:1 400:8
**stepped** 235:3,12
235:15
**steve** 368:12
**steven** 4:17 8:21
**stickers** 340:24
**stimulant** 115:23
136:16
**stipulate** 216:3
**stop** 118:24
180:19 254:6
265:1

**stopped** 38:8
302:7,9
**storage** 388:16
389:10,16
**stories** 302:3
**storing** 302:6
**story** 121:14 274:2
276:14 280:11
283:16
**straight** 145:3
**strained** 147:23
**strategies** 161:9
171:11 240:20
299:18 310:2
323:5 421:7
**strategy** 161:19
170:18 414:9
418:24
**streams** 303:3
305:18
**street** 3:20 4:19,23
5:5 104:11,13
194:22 208:21
209:17 232:25
233:12,18 250:16
251:2 296:22
**streets** 198:9
**stressed** 273:10
390:5
**stretch** 282:12
396:13 399:15
**stridently** 393:10
**strike** 11:12 18:17
48:23 56:21 64:4
72:25 89:10
208:25 240:7
245:17 300:21
333:21 371:6
**stripped** 356:17
**strips** 297:7
356:18

structure 122:19
student 296:3
   314:10,13 321:17
   322:1 330:7
   339:11
studied 318:17
studies 121:25
   182:14 340:3
study 109:5,15
   110:5 111:18
   116:10 247:18,22
   248:1,3 251:24
   252:11 256:21
   257:13,14,16
   258:25 259:9
   260:22 261:1,3
   262:19 269:2
   272:1 295:20
   315:6 322:4
subject 64:10,15
   378:10
submission 312:9
submitted 295:20
   296:2,3 307:2,14
subscribed 426:10
   427:14 428:21
subsequent 71:20
   75:9 111:14
   162:13 168:1
   333:15 356:21
   414:22
subsequently
   136:4 161:14
   162:23 166:12
   266:1 273:20
   318:10 400:19
subset 305:25
   411:16,18
substance 35:3
   56:4,7 57:10,13,18
   61:17 73:2 113:16

120:2 121:3
135:19 136:19
170:21 171:4
221:2,9 287:12
301:3 302:18,25
303:7,22 308:12
315:9,13 317:7
318:23 319:3,20
335:3,4 375:7,10
376:10,11 377:1,3
396:20 406:7
substances 35:8
   35:19 48:15 49:10
   49:20 51:8 54:17
   58:16 61:1 69:22
   77:4 84:20 86:15
   87:4 108:18
   112:23 113:10,13
   113:19,22 192:5
   210:7 262:7 274:9
   332:16 333:3,8,18
   368:5 370:25
substantial 190:4
   299:23 407:25
substantially 11:1
   90:19 123:23
   195:4 278:16
   281:18 288:23
substitution 117:7
success 96:24
suddenly 118:20
sued 362:14,23
suffer 10:2
suffering 245:2
sufficiently 326:23
suggested 85:21
   156:11 303:19
   420:14
suggesting 231:17
suggestive 58:4

suggests 104:22
   376:19
suholdonic 270:4
   270:19
suicide 157:1,7,9
   157:21,22 158:18
   287:11 288:11
   348:21
suicides 157:14,25
   286:25 287:6,24
   288:3,5,8
suing 207:17
suite 2:10 3:4,8,12
   3:20 4:4,9,19,23
   7:23 425:2
sum 148:20
   156:22 170:21
   171:4
summaries 349:24
summarize 267:13
summarizing
   14:15
summary 14:11
   74:1 247:25
   351:22
summit 1:12
   158:19,24 159:8
   183:22 388:22
summits 178:3
sunday 392:1
super 174:23
superior 3:8 425:1
supervisor 11:6,14
   11:17,20 12:4
   14:20 26:25
supplied 307:17
supply 134:12
   284:25 307:18
   326:13 371:10
   398:6

support 236:11,21
   246:9 277:15
   278:3 295:14
   302:11 390:22
supporting 361:1
supportive 325:3
supposed 13:1
   389:3,5
suppressant 41:10
supreme 165:16
   170:22
sure 9:21 18:24
   30:12 34:11,22
   55:22 59:12 71:11
   74:5 76:16 83:7
   85:4 92:12,23
   94:17 95:3,18
   97:4,23 98:9
   114:22 115:9
   151:10 163:24
   173:11 179:12
   184:20 199:15
   223:21 229:14
   237:16 242:11,25
   243:1 247:14
   250:1,24 259:22
   271:9 286:16
   290:7 299:24
   322:7 336:13,20
   342:6 343:25
   345:15 348:18
   352:11 353:5
   358:20 362:21
   364:12 374:12,15
   374:15 391:17
   401:10 404:8
   405:10 413:8
   415:25
surge 326:19
surgery 42:7,8
   56:21 332:24

surprise  218:1
surrogate  60:10
survival  187:15
suspect  152:25
suspected  271:25
  326:15
suspicion  154:2
suspicious  154:7
sustained  40:13
  235:20
swear  9:10
sworn  9:13 424:5
  426:10,13 427:14
  427:18 428:21
symptomatic  65:2
symptoms  85:21
  127:2
synthesized  38:14
synthetic  35:9
  105:16 107:21
  108:15 109:18
  147:12
syringes  305:13
syrup  192:6
system  34:24 49:7
  53:18 89:13
  108:10 113:17
  115:2 116:11
  118:6,14 119:13
  151:3,14 184:12
  220:9,15,17
  224:17 228:15
  229:19,20 230:12
  231:23 232:10
  233:24 235:10
  237:10 301:7
  336:25 337:12
  338:12 341:24
  345:17 359:2,2,10
  359:21 360:3,8,9
  360:19,25 364:19

364:20 387:13,14
systems  301:9
  309:2

**t**

t  6:1,1 424:1,1
table  148:19 352:2
  360:15,17
tables  121:4,8,8,19
  122:1
tabulating  337:17
  358:23
take  7:12 24:16
  37:8 38:9 53:16
  66:22 67:13 76:12
  77:16 85:15 91:2
  92:20 97:22
  102:24 134:7,7
  151:11 175:2
  181:16,20,21
  184:14 215:24
  230:1 236:18
  254:3 264:6 272:4
  279:3 281:9
  285:21 291:5
  294:24 299:2
  324:7 339:25
  351:23 352:7
  356:4 398:24
  411:22 413:11
  417:15
takeaway  248:2
  249:20 250:10,14
takeaways  248:19
  251:20
taken  7:16 67:14
  77:21 96:21
  152:22,22 159:25
  178:21 191:5
  237:21 257:25
  285:1 286:2 328:2
  346:21 348:24

373:14 383:8
  413:16 418:5
takes  156:25
talk  18:15 20:6
  36:8 55:21 70:17
  117:23,24 121:5
  142:14 146:11
  151:7 156:9
  161:18 162:23
  165:8,11 168:18
  190:21 199:3
  205:1,3 209:25
  243:25 257:1
  278:4 288:1
  313:25 314:16
  315:16 316:6,11
  322:16 365:24
talked  19:18 20:5
  88:12 119:6
  126:18 155:20
  179:24 232:16
  264:5 308:12,13
  316:16 328:14
  416:22
talking  15:12 28:9
  32:14 34:5 71:1,5
  94:1 107:16
  117:19,21 119:16
  126:24 142:15
  164:18 165:20,25
  172:10 197:25
  221:20 229:10,14
  256:15 262:16
  265:19 276:4,14
  291:23 314:4
  368:15 379:8
  390:9 395:13
  402:1,23 405:22
  411:5
talks  262:19 342:5

tame  166:23
  167:22
tangent  297:16
tap  153:11
tapering  102:18
tarantino  2:8 7:22
targeted  150:6
  174:17,18
task  96:14 160:23
  164:24 167:3,4
  171:22 172:2,14
  172:25 173:3
  174:12,13 177:24
  183:11,17,21
  184:4,4 247:7
  267:11 270:17,23
  270:25 283:15
  303:25 304:12
  310:16 311:9
  349:23 400:23
  412:3 420:16,17
tasked  78:23
taught  291:14
team  14:25
tease  114:9,15
  115:15 116:5
  354:9
technically  57:6
technology  344:8
teenager  233:19
  290:15
teleconference
  3:11 4:18 5:3
telephone  257:19
tell  9:13 15:19
  19:17 20:4 25:1
  28:8 41:23 54:13
  54:14,15,22 55:3
  56:1 57:8,12,17,21
  94:22 95:12
  104:25 107:23

| | | | |
|---|---|---|---|
| 108:2 109:16 | 164:5 171:12 | 402:25 403:17 | 63:24 75:11 99:18 |
| 111:17 120:6,17 | 174:3 186:22 | 412:24 423:3 | 108:23 117:12 |
| 134:2 153:21,24 | 188:2 212:16 | 424:8 426:6,7 | 123:13 129:2 |
| 172:13 188:13 | 223:10 259:18 | 427:6,9,12 | 137:15,19 141:14 |
| 196:17,25 207:1 | 268:23 287:13 | **testimony's** 23:13 | 148:22 153:6 |
| 209:20 224:8 | 293:13,22 375:17 | **testing** 338:1,2 | 154:6 158:9 |
| 225:5,7 226:7,13 | 376:9 379:23 | 352:19,22 385:21 | 167:11 173:15,17 |
| 227:10 230:4 | 384:1,20 385:23 | 386:5 397:16 | 174:6 182:3,18,19 |
| 231:18 239:20 | 388:15 390:16 | **tests** 305:22 | 183:1 192:7 |
| 241:9 247:24 | 391:10 395:21 | 397:12 | 197:17 203:5 |
| 255:22 263:4 | 396:9 397:2,4,4 | **texas** 3:20 335:11 | 210:4 214:13 |
| 266:15 282:3 | 398:5 402:16 | **textbooks** 121:20 | 229:15 236:10 |
| 285:7 295:19 | 409:6 | **thank** 9:18 33:10 | 242:23 247:8 |
| 300:22 302:16 | **terrible** 235:6 | 78:3 161:2 258:5 | 265:16 266:12 |
| 304:10 316:1 | **terrorism** 398:8 | 286:9,14 349:13 | 270:7 276:22 |
| 321:10 341:18 | 398:25 | 364:14 372:24 | 277:7,14 279:9 |
| 349:15 384:9 | **test** 99:25 110:2,4 | 373:8,9 374:6,18 | 285:2 290:24,25 |
| 386:15 387:19 | 297:7 375:21,25 | 412:19 | 291:2 292:20 |
| **telling** 134:23 | **tested** 108:19 | **thanks** 161:2 | 293:7,14,25 |
| 139:20 279:15 | **testified** 9:15 | 269:24 327:18 | 294:15 304:9,10 |
| **ten** 13:4,6 97:8 | 23:15 47:24 179:7 | 412:21 | 305:5 306:11 |
| 105:14 248:12,25 | 353:7 401:4 | **thera** 107:1 | 314:22 318:23 |
| 249:1 250:6,17 | 418:23 | **therapeutic** 121:5 | 319:1 335:7 342:5 |
| 256:1 260:11 | **testify** 10:14 47:11 | 121:22 249:9 | 343:6 346:14 |
| 341:8,14 | 161:6 387:4 | 250:21 305:8 | 347:12 348:2 |
| **tend** 127:8 403:13 | 399:18 419:21 | **therapy** 244:20,25 | 349:25 350:2 |
| **tended** 89:2 | **testifying** 353:16 | 260:24 | 352:4,4 356:22 |
| **tenth** 5:5 | 399:21,23 400:2 | **thing** 17:23 65:20 | 360:2 361:6 |
| **tenure** 359:7,22 | 402:21 | 123:19 162:1 | 371:17 380:12 |
| **term** 152:2 241:7 | **testimony** 13:19 | 171:18 173:20 | 381:13 384:14,22 |
| 249:10 250:4 | 42:19,24 43:1 | 175:13 182:11 | 386:24 388:7,12 |
| 306:15 346:23 | 48:2 78:5 104:9 | 189:21 190:18 | 392:22 397:12 |
| **terminal** 51:24 | 106:5,9 107:6 | 253:1 265:25 | 403:14 411:12 |
| 52:12 309:4 | 109:3 127:19 | 277:5 305:8 | 414:14 416:23 |
| 407:19 408:6 | 129:18 131:18 | 326:24 328:18 | 420:1 |
| 409:4 | 148:3 174:21 | 350:3 379:1 388:9 | **think** 10:2 11:22 |
| **terms** 27:23 36:24 | 211:5 233:1 | 389:23 392:4 | 14:4 17:12,21,22 |
| 40:5 60:23 94:11 | 283:11 297:19 | 393:17 395:3 | 18:5 19:25 21:7 |
| 108:18 133:1 | 396:8 398:9,11 | **things** 14:18 25:12 | 22:16 25:2 27:21 |
| 136:24 145:12 | 399:25 400:11,14 | 27:24,25 41:10 | 28:4,18 29:14 |
| 146:6 152:4 163:1 | 400:18,22 401:22 | 55:21 57:25 61:8 | 30:1 33:4,25 |

34:22 35:23 36:23
37:24 38:14 40:7
41:11 44:24 51:23
57:1 61:11 63:14
65:3 77:14 83:7
83:17 84:14 88:2
95:12,18 96:4,23
99:5 104:5 105:6
107:1 108:4 110:9
110:10 111:1
114:22 118:9,10
120:14 124:9,24
128:8 132:9,16
137:22 138:16
144:1 147:24
148:16 149:20
152:3 154:5,22
155:1 156:3 157:5
158:3,13 159:11
161:22 162:11
169:23 170:12
171:7 174:5,15
176:14 179:11,22
179:23,25 180:22
183:20 185:10
189:4,20 190:3,15
190:16 191:13,22
193:13 195:10,21
196:1,4,9 197:3,14
200:9 202:18
205:15 206:6
207:18 209:11,24
212:6 213:21
215:2,6 216:15
217:25 224:1
225:18 226:22
228:2,25 232:6
233:6,14,16,22
234:5,21,24
236:18 237:3,8,12
238:4,11,11

239:23 241:9,18
244:5 245:23
247:16 248:14
251:8 252:24,25
253:12,15 254:8
254:21 255:14
260:20 261:1,9
264:22 265:23
266:19,22 267:13
267:14 268:3,21
268:22 277:3,9,16
279:10,13,14
281:22 283:9
285:13 287:1,4,22
288:22 290:1,20
291:1,13,19 293:4
293:10 294:9,21
294:25 296:15
297:1,25 303:2
304:3,9,14 307:4
311:10,24 312:15
315:5,25 317:12
320:14 322:15,25
324:1,24 325:2,4
325:10,12,20
326:17,22 328:24
330:16 331:24
332:1,17 335:7,13
337:10 339:18
340:8,24 342:7,19
346:15 349:16
352:5 353:1 355:9
356:17 357:18
359:25 362:4
363:4,5,12,13
366:1,2 372:6
373:7 376:15,16
376:25 379:21
381:4 382:1,24
384:7,12,19 385:5
385:7,25 386:24

387:3,8 388:14
389:24 390:8,20
392:3,4,21 394:4
394:21 395:25
396:7,16 397:10
398:15,18 401:15
401:19 402:5
403:19,24 404:11
406:22 408:20
412:11,13 416:19
419:6 422:21
**thinking** 38:3
109:16 139:22
274:8 369:16
395:25 400:17
**third** 112:9 167:19
288:22 357:5
**thirds** 112:11
**thirty** 425:18
**thomas** 1:17 2:1
6:2 7:15 9:12
10:18 423:4 424:5
425:8 426:4,9
427:4,13 428:20
**thorough** 361:4
**thought** 18:2
47:24 71:13 88:17
93:10 128:12
155:21 168:21
170:4,25 171:15
173:18 213:18
248:24 252:18
256:21 262:16
272:3 298:4
299:13 308:2
309:22 321:3
322:11 334:4
345:11 355:20
364:18 407:7,10
**thousand** 386:16

**thousands** 234:14
**three** 3:16 20:15
37:6 60:5 62:25
91:13 112:23
113:1,22 160:18
210:16 227:12
301:9,10 315:5
319:22 320:7
362:15 411:22
417:12,24 422:24
**threshold** 99:16
99:21,24
**throat** 42:8
**throw** 246:5
**thrown** 246:4
**tide** 186:14 394:22
**tie** 191:6 258:9
**tied** 45:1 186:15
**till** 89:17,18
**time** 12:15 14:22
18:12 23:14 46:9
50:6,6 53:1 54:3
58:15,25 59:24
61:18 62:15 63:1
70:14 76:12 77:20
78:1 84:13 86:20
96:3,7 103:11
108:22 120:6
124:21 131:1
136:6,22 137:23
138:6 139:23
142:23 144:2
145:19 147:22
148:25 149:11,17
150:15,19 151:1
159:12,24 160:5
161:13 163:6
166:13 168:25
169:13 170:8
173:2 177:6,7,16
177:19 178:20,24

185:20 216:1
218:22 219:13
225:19 227:9
228:10 230:2
237:14,20 238:1
242:6 245:23
247:18 254:4
255:12 257:24
258:3 260:13
261:16 273:24
286:1,7 291:6
292:25 310:9
319:7 324:22
327:9 328:1,7
329:12 337:13
343:6 344:11
350:2 354:11,14
355:6 359:18,24
369:18 373:13,20
377:24 390:14,15
391:13 392:15
400:14 402:9
412:20 413:19
414:5 416:5
417:10 418:4,8
422:21
**time's**  411:3
**timelines**  394:13
**times**  12:13,19
20:3,6 23:7,15
71:6 79:3 80:14
113:1 116:25
138:6,6 160:20,22
161:11 162:10
164:21 210:16
247:20 285:7,14
289:16 295:9
301:16 355:16
356:23 386:12
391:11 392:5

**timing**  139:9
317:16,21
**title**  10:17 341:11
**title's**  329:5
**titled**  350:5
**tobin**  167:5,22
**today**  8:2 10:11,14
14:8 22:19 44:15
55:22 79:19 83:20
89:17,18 103:3
109:4 126:15
143:19 202:10
209:16 211:3
217:7 228:6
247:19 258:12
328:14 381:21
382:9,10,15
383:19 387:2
397:1 398:23
402:4,11
**today's**  19:12
412:24 423:3
**toes**  219:23
**told**  22:12 32:22
37:5 71:8 82:16
85:5 95:23 105:6
105:14 109:11
162:12 198:5
200:12 209:14
238:6,11 278:15
298:7 306:19,20
310:15 353:15
355:9 372:18
404:14 411:15
**tolerance**  309:18
375:25
**tom**  7:15
**top**  15:10 187:19
340:17 342:11
352:12

**topic**  124:2 161:13
**topical**  42:6,8
56:20
**total**  27:2 93:9,14
112:15,16 315:14
352:13 354:3,25
357:24 423:5
**tower**  4:14
**tox**  104:15 109:5
109:15 110:5
111:18 116:10
120:21 122:14
182:14 335:21
**toxic**  121:6
**toxicity**  114:14
**toxicological**
144:25
**toxicologist**  26:18
26:20,21,24 27:6
124:1
**toxicologists**  27:5
**toxicology**  26:15
26:17,19,22 27:3
99:1 113:18
116:15 117:6,14
120:10 124:18
166:1 180:12
187:17 337:19
338:8,10 340:2
352:18,22 384:2,4
385:20 392:6
404:25 408:6
**trace**  284:20
**track**  23:9,17
82:11,17 83:10
91:2,5 279:9
287:13 331:25
335:14 338:13,14
356:20
**tracked**  91:2

**tracking**  106:13
331:24 420:1
**tracks**  338:10
**trade**  389:6
**traditional**  175:13
175:17 273:16
**traditionally**
102:17 156:7
337:15 352:5
387:11
**tragedy**  65:8
**train**  394:24
**training**  25:16
26:16 27:15 28:12
30:21 31:6 340:17
340:20 375:16
394:25 395:6
**tramadol**  223:25
**transcribed**  426:7
**transcript**  6:25
425:11,12 426:5
426:12 427:5,11
427:17
**transferred**
230:14
**transition**  272:24
285:2
**transitioned**
255:17
**transitioning**
231:14
**transitions**  191:10
**transmitted**
143:12
**transported**
124:11
**treat**  157:25 214:8
229:23 231:25
232:15 242:7,22
243:18 245:4
277:6

**treated**  31:2 55:4
66:20 67:16 225:8
229:19 318:23
**treating**  243:11,14
**treatment**  30:23
55:11,13 57:18
58:9 102:20
176:19 225:10
226:5 232:17
234:25 235:4,8,12
236:14 237:1
243:5,22 303:8,9
303:14,21 304:11
304:22 306:4
316:15 318:22,25
319:3,20 320:6,16
320:17 322:18
**treatment's**  235:8
**treatments**  226:2
**treats**  157:9
**tree**  269:8
**trees**  128:22 130:3
**tremendous**  96:10
386:21
**trend**  93:5,8 174:8
271:24 325:13,16
325:17,19 354:15
**trend's**  325:14
**trending**  93:17
**trends**  173:9
174:11
**triage**  346:10
391:24
**trial**  23:16 420:11
**tried**  35:23 96:11
115:11 157:5
225:14 261:18
294:20 297:4
396:7
**trigger**  99:24

**tripled**  139:15,16
**trivial**  397:23
**trouble**  38:22
**trucks**  388:23
**true**  39:1 89:15
139:24 152:25
195:9 258:15
269:6 331:6
351:17 353:15
354:5 355:13,14
355:17,21 356:2
359:8 360:9
404:18 424:7
**truly**  309:21
**truncated**  342:22
**truth**  9:13,14,14
**truthful**  401:8
**try**  24:22 54:1
96:21 99:2,4
116:9 124:7 129:1
150:7 153:6 163:9
194:3 230:8 231:9
243:16 254:4
269:1 295:3
305:17 306:21
308:8 382:6
386:12 396:14
403:14
**trying**  52:9,16
75:24 82:23 93:20
93:21 99:13 125:1
145:19 146:6
152:6 179:3 182:6
200:11 211:20
229:22 231:24
232:2,6 248:5
259:12 262:18,22
274:3 282:13
287:13 298:24
299:19 306:25
307:24 308:10

310:3 319:14,15
319:16 323:1,2
387:22
**tucker**  4:3 8:13
**tuckerellis.com**
4:6
**turn**  7:9 183:7
286:12 327:2
387:9
**turnaround**  53:1
392:5
**turning**  388:4
**tux**  335:20
**twice**  18:15 354:24
**two**  12:17 13:17
13:20 14:4,7,9
15:4,7,25 16:9
20:12,13,16 48:18
53:21 60:5 62:24
84:14 112:11
115:1 122:20
123:14 139:14
149:16 183:19
201:13 224:17
248:13 256:17
285:22 286:17
305:5 319:22
320:6 323:3 327:2
327:16 338:23
342:17 346:3
351:12 358:11
372:22 385:18,19
392:25 393:11
395:8,9 409:2,20
409:22,23 410:3
411:10 413:12
417:12,16,25
**type**  12:11 14:11
68:6 74:2 92:24
173:20 179:16
218:25 223:6

224:8 261:19
267:20 315:8
345:19 405:1
**types**  42:7 181:9
242:13 243:2
411:10
**typical**  12:1 24:22
242:2
**typically**  102:16
113:6 149:24
150:14 181:8
**typo**  350:15

**u**

**u**  329:1
**u.s.**  115:12 160:14
160:16 161:15
163:1 164:1,22
165:10 166:5
167:1,3,9,14
170:11 171:21
174:12 178:3
183:21 270:22
414:6 416:5,6
419:17 420:15
422:10
**uh**  97:23 143:11
151:15 173:23
184:25 211:23
258:23 419:18
420:18
**ultimate**  404:15
**ultimately**  190:20
196:23 205:16
209:10 234:12,20
267:21 314:5
340:8 417:2
**unbroken**  408:23
**unclear**  229:23
231:25 380:13
**uncovering**  303:7

**undercounted**
　155:2
**underlying** 267:25
　407:13 410:9
**underprescribed**
　244:1
**underreported**
　155:3
**understand** 10:10
　14:2 15:8,13
　29:10 33:5,25
　38:2 46:4 74:6
　78:22 104:13
　111:7 137:20
　149:20 157:6
　179:3,10,12 182:7
　196:23 199:9
　200:16 208:1
　210:10 213:13
　228:14 231:9
　240:16,25 242:11
　243:1 252:12
　253:24 258:19
　261:10 262:16
　307:8 308:10
　310:4 318:8
　333:11 334:2
　336:13 346:19
　347:16 355:20
　358:21 368:25
　374:16 380:9
　411:4
**understanding**
　33:7 35:20 37:15
　37:16 44:7 46:10
　49:17,25 55:23,24
　84:23 87:21
　106:13 161:20,22
　164:17,19 179:14
　182:2,9 188:21
　239:7,15 242:21

243:3,12,13 248:1
　250:19 253:4
　254:5 256:2
　260:12 308:22
　326:6 329:13
　332:13,21,25
　333:4 365:7 380:4
**understood** 37:6
　51:20 88:17 117:5
　210:8 220:12
　239:9 313:19
　314:20 319:16
　352:14
**undertaken** 96:19
　96:21
**undertreatment**
　213:22 232:17
**undetermined**
　346:18 347:1
**unexpected** 273:8
**unfortunately**
　179:25 190:24
　275:13 294:2
　345:22
**uniform** 144:18
**unit** 7:14 73:21
　74:13,15 77:19,24
　80:21 159:23
　160:3 237:19,24
　240:25 285:25
　286:5 327:25
　328:5 373:12,18
　385:20 389:13
　397:11,20
**united** 1:1 6:17
　7:18 33:5,20 48:7
　165:17 166:8
　270:5 274:23
　275:2,3
**units** 11:8 423:5

**university** 329:19
　330:8
**unknown** 346:15
　346:17,18,21
　347:1 348:19,24
**unlawful** 226:10
**unlawfully** 203:18
**unnatural** 407:6
**unnecessarily**
　287:19
**unreviewed** 17:24
**unsavory** 233:8,12
**unscrupulous**
　206:9
**unusual** 140:1
　276:14 346:23
**unusually** 140:4
**upcoming** 164:12
**update** 6:23
　350:10,14,18
**updated** 350:4
**upgrade** 290:1
　388:11 397:19
**usage** 113:13
　126:7 276:8
**use** 6:16,16 33:15
　39:22 41:16 42:6
　42:10 44:5 46:15
　46:21 49:11 50:15
　50:16 52:10 54:2
　58:8 59:18 60:20
　63:22 70:3 71:19
　85:4 88:13 95:11
　113:7,7 114:24
　121:21 123:19,23
　147:25 155:13
　157:7 179:9,22
　185:23 195:7,8
　215:2 217:14,23
　218:6 230:7 232:5
　239:20,21 240:11

241:6,12,20 249:9
　250:21 252:1,9,17
　252:20 254:16,17
　254:18,19 255:2,4
　255:11,11,24
　256:7,25 257:7
　258:11,14,21
　260:3,8,25 263:17
　278:14 283:10,24
　290:22 292:5,19
　295:3 296:24
　297:20 305:19
　328:16 330:24
　331:13 336:3
　358:16,18 364:18
　376:10,17 388:7
　400:5 401:12
　405:1,12 407:9
　411:8
**useful** 144:3
　170:16 171:2,17
　171:18 240:19
　241:4
**user** 52:4 305:3
**users** 193:24
　222:15 248:9,21
　252:15,18 255:23
　264:2 285:9 297:7
　298:9
**uses** 60:25 146:10
　240:11 241:17
　242:19
**usually** 23:13
　104:21 109:19
　118:24 123:23
　148:25 149:15
　151:17 174:6
　180:13 181:23
　182:20 217:21
　267:8 336:3
　381:13 395:9

| | | | |
|---|---|---|---|
| **utilize** 389:14,15 | **victims** 229:19 | **wake** 118:25 195:4 | **wanted** 68:12 82:3 |
| **v** | **video** 7:11,14 | 275:25 283:9,18 | 83:5,22 92:23 |
| **v** 1:8,12 11:19 | **videographer** 5:10 | 283:22 | 102:22 108:9 |
| 314:12 342:21 | 7:3 8:2 9:2,9,16 | **wal** 380:17,20 | 125:12 130:25 |
| **vacuum** 193:1 | 77:17,22 159:21 | **walk** 18:14 | 132:23 153:1 |
| **vaishali** 314:11 | 160:1 178:18,22 | **walks** 119:8 | 171:8 184:20 |
| **validate** 259:5 | 237:17,22 257:22 | **walmart** 4:7 8:18 | 225:22 228:21 |
| 292:15 | 258:1 285:23 | 373:23 | 274:1 287:15 |
| **valuable** 269:7 | 286:3 327:23 | **want** 17:2 19:17 | 293:11 309:20 |
| 320:24 322:23 | 328:3 373:10,16 | 20:4 43:10 55:15 | 318:16 321:7 |
| **value** 269:5 | 409:22 412:22 | 55:22 61:19 92:6 | 355:11 365:24 |
| **variables** 264:17 | 413:3,5,14,17 | 94:17 95:2 96:17 | 409:25 413:7 |
| **varied** 306:21 | 418:2,6 423:1 | 103:16 107:25 | 415:17 |
| **varies** 129:13 | **videotaped** 1:17 | 108:24 129:21 | **wanting** 288:1 |
| **various** 77:2,4 | 2:1 | 130:15,17 131:9 | 365:23 |
| 101:5,6 124:20 | **vietnam** 285:19 | 141:18 142:14 | **wants** 199:17 |
| 174:20 192:7 | **view** 181:14 | 163:9 183:4 | **warehouse** 109:9 |
| 306:2 313:3 | 185:21 188:23 | 200:16 212:8,15 | 386:18 |
| 341:16 347:9 | 197:23 213:4 | 213:12 214:15 | **warning** 290:16 |
| **vary** 157:14 | 245:19 258:10 | 215:22 223:23 | **warnings** 367:11 |
| 396:20 | 291:7,10,20 | 230:1 240:4,10 | **washington** 5:5 |
| **verbal** 75:8 | 292:15 398:23 | 249:3 252:23 | **washy** 267:8 |
| **verdict** 180:10 | 401:11 | 253:2,25 254:3,7 | **waste** 129:21 |
| **veritext** 8:1,3 | **viewing** 181:17 | 258:8 260:13 | **water** 75:25 246:6 |
| 423:6 425:1,7 | **vince** 270:2,15 | 264:18 265:9 | **way** 21:3 35:14,18 |
| 428:1 | **violated** 84:19 | 282:17 283:9,20 | 36:5,9 51:25 77:9 |
| **veritext.com.** | 87:2 | 283:24 286:17 | 82:24 94:4 103:20 |
| 425:17 | **violations** 88:6 | 287:5 292:13,14 | 118:22 131:4,10 |
| **versa** 348:13 | **visibility** 158:24 | 294:17 296:13,14 | 144:18 149:5 |
| **versus** 114:18 | **visit** 363:13 | 299:24 302:15,15 | 150:11 153:3,4 |
| 165:17 166:8 | **visiting** 339:10 | 320:20 322:5,8,12 | 158:18 163:22 |
| 397:2,3,3 | **visual** 305:4 | 322:15 333:15 | 172:12 180:15 |
| **vertiq** 337:1 | **volume** 53:8 | 334:3 337:12 | 185:11 186:6 |
| 338:12 343:17,19 | **voluminous** 129:7 | 351:7 359:11 | 200:12,13 205:13 |
| 344:4,14 359:2,4 | 341:9 | 361:5 362:19 | 214:7 235:19 |
| 359:10,13,21 | **vs** 1:10 | 368:21 380:2,16 | 239:19 249:24 |
| 360:3,8,25 | **w** | 382:5 393:16 | 250:7,12 253:21 |
| **veteran** 348:5,12 | | 398:2 404:6 414:2 | 255:13 258:22 |
| **vice** 348:13 | **w** 3:20 | 414:3 415:22 | 277:25 281:7 |
| **victim** 226:23 | **wait** 231:3 352:18 | 417:15,18 421:8 | 292:15 295:4 |
| | **waived** 425:19 | 421:18 | 320:13 367:5,23 |

369:4 373:5
375:17 382:24
396:24 407:20
410:18 424:12
**ways**  150:24 170:9
195:25 213:9
246:23 337:16
**we've**  13:15 50:17
50:19 53:9,9 58:1
61:21 71:1 75:12
76:9 79:14 100:10
107:16 115:11
126:9 131:24
141:1,4,6 149:3
174:13 175:13
181:25 235:7
245:22 258:18
273:13 293:1,12
293:15 299:11,12
308:12 311:12
326:19 330:23
340:12 390:23
391:23 397:10
409:18 411:24
412:3,11
**web**  19:13 20:22
52:3,5 143:16
174:2,22 203:5
350:20 358:20
369:10
**week**  18:15 23:3,4
84:14 92:17
154:13 238:10,24
398:3,17
**weekend**  389:18
389:20 390:2,10
391:20
**weekly**  18:13
**weeks**  329:14
409:2

**welcome**  235:13
**went**  110:18
133:12 134:4
140:18 251:21,23
252:9 256:6,24
260:3,25 261:12
261:22 263:5
290:6 298:14
302:5 303:9,20
311:13 313:8
317:12 325:16
386:17 389:10,25
403:10 419:19
**western**  314:13
329:19 330:8
**whatever's**  231:19
338:11
**where'd**  358:24
**whereof**  424:14
**whispering**  7:7
**who've**  50:20
264:25
**wholesale**  368:17
368:20 369:2,3,5
370:9 372:12
380:1,12
**widenings**  392:5
**wilcox**  2:8 7:22
**willing**  216:3
325:19
**wind**  297:22
**window**  248:24
**winds**  34:24
**wise**  141:8
**wishy**  267:8
**witness**  9:10 13:24
15:14,16 17:15
18:11,24 19:6
25:6,21 29:6
30:12 31:11,18
32:11 35:14 36:16

37:21 38:20 39:13
40:20 41:20 43:16
44:17,24 45:6,12
45:24 46:23 47:21
48:3,9,14,20 50:13
51:14 52:22 53:7
54:25 57:25 59:3
59:12 60:1 61:11
63:3 64:14 66:2
66:16 67:5,12
68:8 72:19 73:8
74:5 75:2 76:20
77:7 78:17 79:9
80:11,20 81:13,22
82:9,21 83:19
84:22 85:20 86:17
87:6,15 88:8
91:23 93:3 94:10
95:2 97:4 103:10
106:11 113:9
114:6,17 115:9
116:14 117:4
118:3 121:25
123:5 125:12,17
125:23 127:8
128:1,22 129:23
130:22 131:22
133:9 138:13,16
138:18 144:21
147:15 148:8,16
148:22 151:14,16
151:24 152:2
153:17 154:4,17
155:11 156:2
158:21 159:3
164:7 166:19
169:23 171:7
172:18 175:10
176:1,8,14 177:2
177:10 179:21
183:13 186:1,22

187:10 189:3
191:4,22 192:10
192:22 193:19
194:8 195:19
197:3,9,25 198:12
198:15 199:15,17
200:22 201:17,22
202:12 203:3,14
203:23 204:3,11
204:21 205:15
207:4,24 208:7,14
209:5,23 211:9,20
212:6,15 213:8
214:22 215:6
219:3 220:12
228:14,24 233:6
233:22 234:4,18
235:2,23 236:5,13
237:6 238:19
239:4,14,19 240:2
240:14 242:5
243:7 244:4
245:22 246:14
254:22 255:9
256:14 261:9
263:8 268:3,12
269:16 272:19
276:10 277:25
278:25 280:1
281:22 282:3,20
283:13 284:5,16
284:23 285:13,17
287:8 288:8 289:3
290:12,20 291:22
295:7 320:23
321:6,22 325:2
326:2 333:11
334:2 349:13
354:7 361:11
366:20 368:24
369:8 370:11

371:12 373:4,9
376:2 377:11
378:7,14 382:23
383:13 387:7
391:16 394:2
397:10 400:13
403:24 405:7
407:17 408:20
409:12 411:21
412:21 413:9,13
414:11,13 415:4
416:19 419:6,10
419:14 420:6,10
420:21,23 421:6
421:17 422:14
424:8,14 425:8,11
426:1,4,11 427:1,4
427:15
**witness'** 425:14
**woman** 63:11
**wonder** 291:22
**woods** 325:20
**word** 322:23
**worded** 114:13
**wording** 336:3
**words** 24:14 52:11
213:17 296:21
347:22
**work** 17:18 32:8
51:1,17 84:17
149:13 155:17
182:21 217:24
218:7 268:24
325:22 326:14
375:2,20 395:2,24
404:21
**worked** 13:5 38:22
181:11 213:1
270:10 310:21
410:20 416:5

**working** 176:15
304:12
**world** 32:13,24
202:2 389:6
**worrell** 330:13,17
**worse** 234:5,8
237:13
**worsened** 46:12
**worsening** 46:7
299:23
**wound** 117:20
284:13
**wounds** 42:9
**wrist** 393:3
**write** 35:23 50:4
146:21 148:23
168:18 367:16
381:9 408:4
**writes** 211:23,25
**writing** 212:9
340:19 367:20
401:7 402:17
**writings** 36:6
**written** 14:1,11
15:14 22:16
131:10 158:10
180:16 183:3
188:4 226:9
307:12,13 316:12
317:2 381:6,8,18
410:7
**wrong** 35:22 88:16
199:25 247:14
253:5 294:23
**wrote** 66:13 124:1
161:15 167:20
211:12 214:14
216:19,21 217:11
228:11 256:20
269:25 316:7
381:14

**y**

**yeah** 15:12 37:10
67:24 71:3,21
76:11,16,20 84:11
85:14 88:15 95:10
97:10,12 99:15
110:6 119:4
121:21 134:20
137:18 148:11
152:5 159:14,19
160:23 174:5
176:20 178:13,16
180:22 217:13
223:21 228:1
235:12 241:1
247:23 260:4
264:11 265:20
267:17 271:2
282:23 286:24
291:12,23 292:23
293:6 299:24
300:11 306:17
311:3 313:21
324:18 340:12
350:17 352:11
353:13 355:19,21
358:7 372:3,17
373:3 374:8
400:21 402:7
409:24 413:4,7,13
415:24 417:20
422:23
**year** 13:16 14:14
19:8 40:1,10 89:4
91:5 93:4 94:15
94:15 101:3,7
104:2 111:23
139:15,24 140:1,5
140:17,19,23
143:6 184:18
187:3 194:2,19,23

196:20 202:20
224:17 248:11,12
254:18 255:2
286:20 288:5,14
325:19 357:5
361:13,16 395:4,7
395:8,19 400:3,9
401:18
**years** 12:17 13:10
13:15,22 15:5,7,25
16:10 37:18 98:19
111:2 119:8
190:24 225:2
248:23,25 249:1
250:6,17 255:12
256:1,7 260:2,11
267:5 288:15
302:20 304:23
315:5 319:22
320:7,17 333:16
336:16 337:16
342:2 370:23
371:24 395:18
**yep** 70:11 355:4
**yesterday** 20:9,12
398:14,16
**yo** 339:20
**york** 3:5,17,17
395:6
**young** 290:15
**youth** 290:14

**z**

**zero** 36:20,22
40:15 197:6,11
198:21 288:20
**zerrusen** 4:22 8:19
8:19
**zip** 342:12
**zolpidem** 57:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.