Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4

5          ~~~~~~~~~~~~~~~~~~~~~

6

   IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804

7  OPIATE LITIGATION

                            Case No. 17-md-2804

8

                            Judge Dan Aaron

9  This document relates to:      Polster

10 City of Cleveland v. AmerisourceBergen

   Drug Corp., et al.

11

12 Case No. 1:18-OP-45132 (N.D. Ohio)

13

14          ~~~~~~~~~~~~~~~~~~~~~

15        Videotaped deposition of

               MERLE GORDON

16

17             July 19, 2018

                9:15 a.m.

18

19              Taken at:

20        Taft Stettinius & Hollister LLP

21         200 Public Square, Suite 3500

22              Cleveland, Ohio

23

24

25        Renee L. Pellegrino, RPR, CLR

Page 2

```
 1  APPEARANCES:
 2
 3  On behalf of the City of Cleveland, the Witness
    and the Plaintiffs' Executive Committee (MDL):
 4    Baron & Budd, P.C.
      MARK P. PIFKO, ESQ.
 5    THOMAS SIMS, ESQ. (Via Telephone)
      Encino Plaza
 6    15910 Ventura Boulevard, Suite 1600
      Encino, California  91436
 7    (818) 839-2333
      mpifko@baronbudd.com
 8    tsims@baronbudd.com
           - and -
 9    Zarsaur Mujumdar & Debrosse
      DIANDRA "FU" DEBROSSE ZIMMERMANN, ESQ.
10    2332 2nd Avenue North
      Birmingham, Alabama  35203
11    (205) 983-7985
      fuli@zarzaur.com
12
      On behalf of Cuyahoga County:
13    Napoli Shkolnik PLLC
      KEVIN SUSMAN, ESQ.
14    JOSEPH L. CIACCIO, ESQ.
      400 Broadhollow Road
15    Suite 305
      Melville, New York  11747
16    (631) 224-1133
      ksusman@napolilaw.com
17    jciaccio@napolilaw.com
           - and -
18    Plevin & Gallucci
      FRANK L. GALLUCCI, III, ESQ.
19    55 Public Square
      Suite 2222
20    Cleveland, Ohio  44113-1901
      (216) 861-0804
21    fgallucci@pglawyer.com
22
23           ~ ~ ~ ~ ~
24
25
```

Page 3

```
 1  APPEARANCES, CONT'D
 2
 3  City of Cleveland:
      ELENA BOOP, ESQ.
 4    601 Lakeside Avenue, Room 106
      Cleveland, Ohio  44114
 5    (216) 664-3727
      eboop@city.cleveland.oh.us
 6
      On behalf of Summit County and City of Akron:
 7    Motley Rice LLC
      ANNE MCGINNESS KEARSE, ESQ.
 8    28 Bridgeside Boulevard
      Mt. Pleasant, South Carolina  29464
 9    (843) 216-9140
      akearse@motleyrice.com
10
      On behalf of Johnson & Johnson and Janssen
11  Pharmaceuticals, Inc.:
      Tucker Ellis LLP
12    TARIQ M. NAEEM, ESQ.
      MADELINE B. DENNIS, ESQ.
13    950 Main Avenue
      Suite 1100
14    Cleveland, Ohio  44113-7213
      (216) 592-5000
15    tariq.naeem@tuckerellis.com
      madeline.dennis@tucker.com
16
      On behalf of Walmart:
17    Jones Day
      CHRISTOPHER M. McLAUGHLIN, ESQ.
18    North Point
      901 Lakeside Avenue East
19    Cleveland, Ohio  44114-1190
      (216) 586-3939
20    cmmclaughlin@jonesday.com
21
22           ~ ~ ~ ~ ~
23
24
25
```

Page 4

```
 1  APPEARANCES, CONT'D:
 2
      On behalf of Endo Pharmaceuticals, Inc., Endo
 3  Health Solutions, Inc., Par Pharmaceuticals,
    Inc. and Par Pharmaceutical Companies, Inc.:
 4    Arnold & Porter
      CHARLES B. WEINOGRAD, ESQ.
 5    601 Massachusetts Avenue, NW
      Washington, D.C.  20001-3743
 6    (202) 942-5392
      charles.weinograd@arnoldporter.com
 7
      On behalf of AmerisourceBergen:
 8    Reed Smith, LLP
      MICHAEL J. SALIMBENE, ESQ.
 9    Three Logan Square
      1717 Arch Street, Suite 3100
10    Philadelphia, Pennsylvania  19103
      (215) 851-8100
11    msalimbene@reedsmith.com
12  On behalf of Teva Pharmaceutical Industries:
      (Via Telephone)
13    Morgan Lewis & Bockius LLP
      THEODORE DAYNO, ESQ.
14    600 Anton Boulevard
      Suite 1800
15    Costa Mesa, California  92626-7653
      (714) 830-0600
16    tdayno@morganlewis.com
17  On behalf of Allergan:
      (Via Telephone)
18    Kirkland & Ellis LLP
      ZACHARY A. CIULLO, ESQ.
19    300 N. LaSalle Drive
      Chicago, Illinois  60654
20    (312) 862-2000
      zac.ciullo@kirkland.com
21
22           ~ ~ ~ ~ ~
23
24
25
```

Page 5

```
 1  APPEARANCES, CONT'D:
 2
 3  On behalf of McKesson:
      Covington & Burling LLP
 4    ASEEM PADUKONE, ESQ.
      One Front Street, #35
 5    San Francisco, California  94111-5356
      (415) 591-6000
 6    apadukone@cov.com
 7  On behalf of Miami-Luken, Inc.:
      Jackson Kelly PLLC
 8    ERIN R. STANKEWICZ, ESQ.
      1144 Market Street
 9    Suite 400
      Wheeling, West Virginia  26003
10    (304) 233-4000
      erstankewicz@jacksonkelly.com
11
      On behalf of Prescription Supply, Inc.:
12    Pelini Campbell & Williams
      KRISTEN E. CAMPBELL TRAUB, ESQ.
13    Bretton Commons, Suite 400
      8040 Cleveland Avenue NW
14    North Canton, Ohio  44720
      (330) 305-6400
15    kec@pelini-law.com
16  On behalf of Cardinal Health, Inc., co-liaison
      counsel for the Distributor Defendants:
17    Williams & Connolly LLP
      PAUL E. BOEHM, ESQ.
18    725 12th Street NW
      Washington, D.C.  20005
19    (202) 434-5000
      pboehm@wc.com
20
21           ~ ~ ~ ~ ~
22
23
24
25
```

Page 6

1  APPEARANCES, CONT'D:
2
3  On behalf of CVS Indiana, LLC and CVS Rx Services:
   Zuckerman Spaeder
4  ANTHONY M. RUIZ, ESQ.
   1800 M Street NW
5  Suite 1000
   Washington, D.C. 20036-5807
6  (202) 778-1800
   aruiz@zuckerman.com
7
   On behalf of HBC Service Company:
8  Marcus & Shapira
   ROBERT M. BARNES, ESQ.
9  One Oxford Centre, 35th Floor
   301 Grant Street
10 Pittsburgh, Pennsylvania  15219-6401
   (412) 471-3490
11 rbarnes@marcus-shapira.com
12 On behalf of Mallinckrodt Pharmaceuticals:
   (Via Telephone)
13 Ropes & Gray LLP
   JESSICA F. SORICELLI, ESQ.
14 1211 Avenue of the Americas
   New York, New York  10036-8704
15 (212) 596-9000
   jessica.soricelli@ropesgray.com
16
17 ALSO PRESENT:  Jeff Koishor, Videographer
18
19              ~ ~ ~ ~ ~
20
21
22
23
24
25

Page 7

1           TRANSCRIPT INDEX
2
3  APPEARANCES .....................................2
4  INDEX OF EXHIBITS .............................8
5  INDEX OF OBJECTIONS ..........................11
6
7  EXAMINATION OF MERLE GORDON:
8  BY MR. NAEEM ...................................21
9  BY MR. SALIMBENE ............................207
10 BY MR. RUIZ ...................................284
11
12 REPORTER'S CERTIFICATE .......................321
13
14 EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25

Page 8

1              INDEX OF EXHIBITS
2
3  Number        Description        Marked
4
5  Exhibit 1   Letter from Tad Allan to Mark    34
               Pifko, dated July 18, 2018, with
6              Attached Exhibit A
7  Exhibit 1-A  Document Entitled "Heroin and    35
               Opioid Action Plan: Moving
8              Forward, Agenda," with Attached
               Handwritten Notes, Beginning
9              Bates Stamp CLEVE_000298750
10 Exhibit 1-B  E-Mail from Gary Gingell to     36
               Various Recipients dated March
11             6, 2018 Bates-Stamped
               CLEVE_000299033
12
   Exhibit 1-C  Document Entitled "Cuyahoga     38
13             County State of Emergency Action
               Steps," Beginning Bates Stamp
14             CLEVE_000299083
15 Exhibit 2   Ohio Prescription Drug Abuse     85
               Task Force Final Report, Task
16             Force Recommendations, dated
               October 1, 2010
17
   Exhibit 3   CDPH Bi-Weekly Drug Related ER  119
18             Visits Report
19 Exhibit 4   Document Entitled "Opiate       148
               Response Presentation:  Merle
20             Gordon, Director of Public
               Health," Beginning Bates Stamp
21             CLEVE_000187960
22 Exhibit 5   Cleveland City Council Committee 158
               Calendar dated December 1, 2016,
23             with Attachments, Beginning
               Bates Stamp CLEVE_000189292
24
25

Page 9

1           INDEX OF EXHIBITS, CONT'D
2
   Exhibit 6   Cleveland Opioid Response and   189
3              Action Plan (CORAP) Beginning
               Bates Stamp CLEVE-000183257
4
   Exhibit 7   E-Mail from Merle Gordon to     224
5              Merle Gordon Bates-Stamped
               CLEVE-000188104
6
   Exhibit 8   Document Entitled "August 18,   224
7              2016 Notes," Beginning Bates
               Stamp CLEVE_000188105
8
   Exhibit 8   Document Entitled "August 18,   224
9              2016 Notes," Beginning Bates
               Stamp CLEVE_000188105
10
   Exhibit 9   Memo from M. Gordon to Chief    228
11             McGrath and Director Griffin,
               dated September 6, 2016,
12             Beginning Bates Stamp
               CLEVE_000187963
13
   Exhibit 10  E-Mail String Beginning Bates   229
14             Stamp CLEVE_000189085
15 Exhibit 11  Letter from Leana S. Wen, M.D.  239
               to Governor and Vice
16             President-Elect Mike Pence,
               dated November 29, 2016,
17             Beginning Bates Stamp
               CLEVE_000187508
18
   Exhibit 12  Ohio Department of Health 2016  248
19             Ohio Drug Overdose Data:
               General Findings
20
   Exhibit 13  E-Mail from Merle Gordon to Jana 255
21             Rush, dated August 25, 2016,
               Beginning Bates Stamp
22             CLEVE_000191543
23 Exhibit 14  E-Mail from David Gretick to    259
               Merle Gordon, dated July 11,
24             2016, Bates-Stamped
               CLEVE_000188213
25

3 (Pages 6 - 9)

Page 10

INDEX OF EXHIBITS, CONT'D

Exhibit 15  E-Mail String Beginning Bates    271
   Stamp CLEVE_000298635
Exhibit 16  Cuyahoga County Opiate Task    286
   Force Report 2014 Beginning
   Bates Stamp CUYAH_000018534
Exhibit 17  Cuyahoga County Opiate Task    286
   Force Report 2015 Beginning
   Bates Stamp CLEVE_000187871
Exhibit 18  Cuyahoga County Opiate Task    286
   Force Report 2016 Beginning
   Bates Stamp CUYAH_000018265
Exhibit 19  E-Mail String Beginning Bates    295
   Stamp CLEVE_000187408

Exhibit 20  Article Entitled "Cleveland's    315
   New Health Director, Merle
   Gordon, Faces a Daunting Task"

Page 11

INDEX OF OBJECTIONS

Objection .....................23
Objection .....................23
Objection .....................24
Objection .....................25
Objection .....................26
Objection .....................28
Objection .....................29
Objection .....................31
Objection .....................33
Objection .....................36
Objection .....................40
Objection .....................40
Objection .....................41
Objection .....................42
Objection .....................42
Objection .....................43
Objection .....................44
Objection .....................46
Objection .....................47
Objection .....................48
Objection .....................48
Objection .....................49
Objection .....................51
Objection .....................52
Objection .....................53
Objection .....................55
Objection .....................56
Objection .....................56
Objection .....................57
Objection .....................58
Objection .....................59
Objection .....................59
Objection .....................60
Objection .....................60
Objection .....................61
Objection .....................72
Objection .....................73
Objection .....................74
Objection .....................75
Objection .....................78
Objection .....................78
Objection .....................83
Objection .....................88
Objection .....................92

Page 12

INDEX OF OBJECTIONS, CONT'D

Objection .....................93
Objection .....................94
Objection .....................94
Objection .....................94
Objection .....................95
Objection .....................95
Objection .....................96
Objection .....................96
Objection .....................97
Objection .....................100
Objection .....................103
Objection .....................103
Objection .....................103
Objection .....................104
Objection .....................105
Objection .....................107
Objection .....................108
Objection .....................109
Objection .....................112
Objection .....................113
Objection .....................116
Objection .....................117
Objection .....................118
Objection .....................120
Objection .....................120
Objection .....................121
Objection .....................123
Objection .....................124
Objection .....................125
Objection .....................126
Objection .....................126
Objection .....................126
Objection .....................127
Objection .....................128
Objection .....................128
Objection .....................129
Objection .....................129
Objection .....................129
Objection .....................129
Objection .....................130
Objection .....................130
Objection .....................130
Objection .....................130
Objection .....................131
Objection .....................133

Page 13

INDEX OF OBJECTIONS, CONT'D

Objection .....................134
Objection .....................140
Objection .....................141
Objection .....................141
Objection .....................142
Objection .....................143
Objection .....................144
Objection .....................144
Objection .....................145
Objection .....................145
Objection .....................147
Objection .....................149
Objection .....................149
Objection .....................149
Objection .....................150
Objection .....................151
Objection .....................152
Objection .....................152
Objection .....................152
Objection .....................153
Objection .....................153
Objection .....................153
Objection .....................154
Objection .....................154
Objection .....................154
Objection .....................155
Objection .....................155
Objection .....................156
Objection .....................156
Objection .....................157
Objection .....................159
Objection .....................160
Objection .....................160
Objection .....................161
Objection .....................161
Objection .....................162
Objection .....................162
Objection .....................164
Objection .....................166
Objection .....................169
Objection .....................169
Objection .....................170
Objection .....................171
Objection .....................172
Objection .....................173

4 (Pages 10 - 13)

Page 14

1          INDEX OF OBJECTIONS, CONT'D
2
    Objection ....................175
3   Objection ....................179
    Objection ....................182
4   Objection ....................184
    Objection ....................185
5   Objection ....................186
    Objection ....................187
6   Objection ....................189
    Objection ....................191
7   Objection ....................192
    Objection ....................192
8   Objection ....................193
    Objection ....................193
9   Objection ....................194
    Objection ....................196
10  Objection ....................196
    Objection ....................197
11  Objection ....................198
    Objection ....................199
12  Objection ....................200
    Objection ....................200
13  Objection ....................201
    Objection ....................201
14  Objection ....................202
    Objection ....................203
15  Objection ....................205
    Objection ....................207
16  Objection ....................209
    Objection ....................209
17  Objection ....................210
    Objection ....................210
18  Objection ....................211
    Objection ....................212
19  Objection ....................212
    Objection ....................212
20  Objection ....................212
    Objection ....................213
21  Objection ....................219
    Objection ....................220
22  Objection ....................221
    Objection ....................221
23  Objection ....................222
    Objection ....................222
24  Objection ....................222
    Objection ....................223
25  Objection ....................223

Page 16

1          INDEX OF OBJECTIONS, CONT'D
2
    Objection ....................143
3   Objection ....................268
    Objection ....................269
4   Objection ....................271
    Objection ....................272
5   Objection ....................273
    Objection ....................274
6   Objection ....................274
    Objection ....................274
7   Objection ....................274
    Objection ....................275
8   Objection ....................275
    Objection ....................276
9   Objection ....................276
    Objection ....................276
10  Objection ....................277
    Objection ....................277
11  Objection ....................278
    Objection ....................278
12  Objection ....................278
    Objection ....................279
13  Objection ....................280
    Objection ....................280
14  Objection ....................280
    Objection ....................281
15  Objection ....................281
    Objection ....................282
16  Objection ....................282
    Objection ....................283
17  Objection ....................290
    Objection ....................290
18  Objection ....................291
    Objection ....................292
19  Objection ....................293
    Objection ....................293
20  Objection ....................294
    Objection ....................294
21  Objection ....................296
    Objection ....................296
22  Objection ....................296
    Objection ....................296
23  Objection ....................297
    Objection ....................297
24  Objection ....................299
    Objection ....................301
25  Objection ....................301

Page 15

1          INDEX OF OBJECTIONS, CONT'D
2
    Objection ....................226
3   Objection ....................226
    Objection ....................226
4   Objection ....................226
    Objection ....................227
5   Objection ....................231
    Objection ....................231
6   Objection ....................232
    Objection ....................232
7   Objection ....................232
    Objection ....................233
8   Objection ....................233
    Objection ....................233
9   Objection ....................234
    Objection ....................234
10  Objection ....................235
    Objection ....................236
11  Objection ....................237
    Objection ....................238
12  Objection ....................238
    Objection ....................241
13  Objection ....................241
    Objection ....................241
14  Objection ....................242
    Objection ....................243
15  Objection ....................244
    Objection ....................245
16  Objection ....................246
    Objection ....................248
17  Objection ....................249
    Objection ....................250
18  Objection ....................250
    Objection ....................251
19  Objection ....................252
    Objection ....................253
20  Objection ....................253
    Objection ....................253
21  Objection ....................254
    Objection ....................257
22  Objection ....................257
    Objection ....................261
23  Objection ....................262
    Objection ....................263
24  Objection ....................264
    Objection ....................265
25  Objection ....................266

Page 17

1          INDEX OF OBJECTIONS, CONT'D
2
    Objection ....................302
3   Objection ....................302
    Objection ....................302
4   Objection ....................302
    Objection ....................302
5   Objection ....................303
    Objection ....................304
6   Objection ....................304
    Objection ....................305
7   Objection ....................306
    Objection ....................306
8   Objection ....................307
    Objection ....................308
9   Objection ....................308
    Objection ....................309
10  Objection ....................310
    Objection ....................311
11  Objection ....................311
    Objection ....................312
12  Objection ....................312
    Objection ....................312
13  Objection ....................312
    Objection ....................314
14  Objection ....................314
    Objection ....................318
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions

Page 18

1          THE VIDEOGRAPHER:  Good morning.  We
2  are on the record.  The time is 9:15.  The date
3  is July 19th, 2018.  This is media unit 1 of the
4  video recorded deposition of Merle Gordon in the
5  matter of In Re:  National Prescription Opiate
6  Litigation, filed in U.S. District Court,
7  Northern District of Ohio, Case Number
8  17-md-2804.  The deposition is being held at
9  Taft Stettinius & Hollister located in
10  Cleveland, Ohio.
11          My name is Jeff Koishor from
12  Veritext.  I am the videographer.  The court
13  reporter is Renee Pellegrino from Veritext.
14          Counsel all present in the room and
15  everyone attending remotely please state their
16  name and affiliation for the record.
17          MR. PIFKO:  Good morning.  This will
18  probably take 20 minutes.  Mark Pifko from Baron
19  & Budd, on behalf of the City of Cleveland, the
20  witness, and the Plaintiffs' Executive Committee
21  in the MDL.
22          MS. ZIMMERMANN:  Diandra Debrosse
23  Zimmermann, Zarzaur, Mujumdar & Debrosse, same
24  as already stated.
25          MS. KEARSE:  Anne Kearse of Motley

Page 19

1  Rice on behalf of Summit County and the City of
2  Akron.
3          MR. GALLUCCI:  Frank Gallucci with
4  Plevin & Gallucci on behalf of Cuyahoga County.
5          MR. CIACCIO:  Joseph Ciaccio, Napoli
6  Shkolnik, on behalf of Cuyahoga County.
7          MR. SUSMAN:  Kevin Susman, Napoli
8  Shkolnik, on behalf of Cuyahoga County.
9          MS. BOOP:  Elena Boop, City of
10  Cleveland.
11          MS. CAMPBELL:  Kristen Campbell,
12  Pelini, Campbell & Williams, for Prescription
13  Supply, Inc.
14          MR. McLAUGHLIN:  Chris McLaughlin,
15  Jones Day, for Wal-Mart.
16          MR. BARNES:  Robert Barnes, Marcus &
17  Shapira, for HBC Service Company.
18          MS. STANKEWICZ:  Erin Stankewicz,
19  with Jackson Kelly, on behalf of Miami-Luken.
20          MR. PADUKONE:  Aseem Padukone with
21  Covington & Burling on behalf of McKesson
22  Corporation.
23          MR. WEINOGRAD:  Charlie Weinograd
24  with Arnold & Porter on behalf of Endo Health
25  Solutions, Endo Pharmaceuticals and Par

Page 20

1  Pharmaceuticals.
2          MR. BOEHM:  Paul Boehm from Williams
3  & Connolly for Cardinal Health.
4          MR. SALIMBENE:  Mike Salimbene from
5  Reed Smith for AmerisourceBergen.
6          MR. RUIZ:  Anthony Ruiz from
7  Zuckerman Spaeder for CVS Indiana, LLC and CVS
8  Rx Services, Inc.
9          MS. DENNIS:  Madeline Dennis with
10  Tucker Ellis on behalf of Janssen.
11          MR. NAEEM:  Tariq Naeem, also Tucker
12  Ellis, on behalf of Janssen and J&J.
13          THE VIDEOGRAPHER:  And on the phone?
14          MR. CIULLO:  Zachary Ciullo from
15  Kirkland & Ellis of behalf of Allergan.
16          MS. SORICELLI:  Jessica Soricelli
17  with Ropes & Gray on behalf of Mallinckrodt.
18          MR. DAYNO:  Theodore Dayno with
19  Morgan Lewis on behalf of Teva.
20          THE VIDEOGRAPHER:  Will the court
21  reporter please swear in the witness?
22          MR. BOEHM:  Can I just make a note?
23  The deposition protocol entered in this case
24  does require that if there are any attorneys
25  listening in by telephone to this deposition,

Page 21

1  they must identify themselves, so to the extent
2  anybody who is listening in has not yet
3  announced their presence telephonically, they
4  should do so now.
5          MR. SIMS:  This is Thomas Sims with
6  Baron & Budd for the City of Cleveland.
7          THE VIDEOGRAPHER:  Court reporter,
8  please swear in the witness.
9          MERLE GORDON, of lawful age, called for
10  examination, as provided by the Federal Rules of
11  Civil Procedure, being by me first duly sworn,
12  as hereinafter certified, deposed and said as
13  follows:
14          EXAMINATION OF MERLE GORDON
15  BY MR. NAEEM:
16      Q.   Good morning.  Could you please
17  state your full name for the record?
18      A.   My name is Merle Gordon.
19      Q.   Ms. Gordon, we're here to take your
20  deposition in an MDL related to the prescription
21  opioid litigation.  You're aware of that?
22      A.   I am aware.
23      Q.   Before we went on the record, and
24  just to confirm with your counsel, I agreed I
25  wouldn't ask any -- for your personal address as

6 (Pages 18 - 21)

Page 22

1 long as you agreed to accept service for any
2 future proceedings.
3        MR. PIFKO:  Baron & Budd agrees to
4 accept service on behalf of any subpoenas or
5 anything for the witness.
6        MR. NAEEM:  Great.
7    Q.   Ms. Gordon, could you please give us
8 your work address?
9    A.   It's 75 Erieview Plaza, Cleveland,
10 Ohio, 44114.
11   Q.   Thank you.
12        Have you had your testimony taken
13 before in either a deposition or trial?
14   A.   I've been deposed before, yes.
15   Q.   How many times?
16   A.   One time.
17   Q.   And did it relate to a personal
18 matter or to a work matter?
19   A.   A work matter.
20   Q.   Could you give me a very brief
21 discussion or a description of what the issues
22 related to and who the employer was you were
23 with when you testified?
24        MR. PIFKO:  Objection to the extent
25 the question calls for attorney-client

Page 23

1 communication.
2        If you can answer without disclosing
3 conversations you had with counsel in that case,
4 go ahead and do so.
5    Q.   And let me rephrase the question.
6        Who were you employed by at the time
7 that you sat for that deposition?
8    A.   The City of Cleveland.
9    Q.   When was that deposition?
10   A.   It was in the early 2000s.
11   Q.   This was while you were a city
12 council person for the City of Cleveland?
13   A.   Correct.
14   Q.   What general topic matter did it
15 relate to?  Was it a criminal issue?  Was it a
16 civil issue, an employment issue?
17        MR. PIFKO:  Objection.  Vague.
18 Overbroad.
19   A.   It was a matter pertaining to a
20 landfill that was located within the district
21 that I represented.
22   Q.   And did that case end up going to
23 trial?
24   A.   It did not.
25   Q.   Was the City of Cleveland the

Page 24

1 defendant in that case?
2        MR. PIFKO:  Objection to the extent
3 the question calls for a legal conclusion.
4    A.   I believe we were, yes.
5    Q.   Do you know the name of the
6 plaintiff that filed that lawsuit?
7        MR. PIFKO:  Same objection.
8    A.   I don't recall.
9    Q.   Do you know how that case was
10 resolved?  And I may have asked this.  I
11 apologize.  Did you have to testify at trial?
12   A.   Did not.
13   Q.   Since it's been a while since you
14 were deposed, let me just, before we get further
15 in here, give you some ground rules that will
16 help us get through this deposition as
17 efficiently as possible.
18        First, I'm going to need you to
19 verbalize your answers.  Nods and shrugs don't
20 come across in the transcript.  They're
21 difficult for the court reporter to take down.
22 So can we agree that you'll -- to yeses and nos,
23 no ambiguous language like uh-huh and unh-unh?
24   A.   Agree.
25   Q.   To the best we can, and that

Page 25

1 includes counsel in the room, we'll try not to
2 talk over one other.  Again, that's for the
3 court reporter's benefit.  Will you agree to do
4 that?
5    A.   Yes.
6    Q.   If I ask a question and you don't
7 understand it, I'm going to ask that you please
8 ask me to rephrase it.  If you think you know
9 what I meant and still the question doesn't make
10 sense, again, please ask me to rephrase it.
11 We're going to assume that if you answer the
12 question, you understood the question and the
13 answer to the question was what you intended it
14 to be, okay?
15        MR. PIFKO:  Objection.  Vague.
16   Q.   Do you understand what I'm saying?
17   A.   I understand.
18   Q.   And then to the extent you need a
19 break, just let your counsel know at any time.
20 The only thing I'll ask is that if a question is
21 pending when you ask for a break, you have to
22 answer the question, okay?
23        MR. PIFKO:  We don't agree to that.
24 If the witness has a question concerning
25 privilege or something, she's free to take a

7 (Pages 22 - 25)

Page 26

1 break at any time.
2     Q.    If you need a break at any time for
3 any reason, just let us know, okay?
4     A.    Okay.
5     Q.    Ms. Gordon, what did you do to
6 prepare for your deposition today?
7          MR. PIFKO:  Objection to the extent
8 the question calls for attorney-client
9 communication.
10          Aside from communications with
11 counsel, you can answer the question.
12     A.    I met with counsel.
13     Q.    And your counsel sitting next to you
14 defending you?
15     A.    Correct.
16     Q.    Any other counsel in the room?
17     A.    There were other counsel in the
18 room.
19     Q.    How many?
20     A.    About six.
21     Q.    And were any of them internal
22 counsel for the City of Cleveland?
23     A.    Yes.
24     Q.    How many?
25     A.    Two.

Page 27

1     Q.    Can you give me their names?
2     A.    Elena Boop is one and Shirley
3 Tomasello.
4     Q.    And the other four, can you give me
5 their names, please?
6     A.    I don't have their names to memory.
7     Q.    Are any of them in this room here
8 today?
9     A.    Yes, some are in the room today.
10     Q.    Can you identify them, point them
11 out?
12     A.    Yes.
13          The woman sitting next to my
14 counsel, and there were lawyers for the Taft law
15 firm as well and a couple others that were in
16 the room.
17     Q.    Any attorneys from Summit County or
18 Akron that you're aware of?
19     A.    No.
20     Q.    Any attorneys from Cuyahoga County
21 that you're aware of?
22     A.    No.
23     Q.    How many times did you meet with
24 counsel to prepare for your deposition?
25     A.    Five times.

Page 28

1     Q.    When was the first time you met with
2 counsel to prepare for this deposition
3 specifically?
4     A.    Last week.
5     Q.    And so you've met with them five
6 times total since last week?
7     A.    Correct.
8     Q.    All right.  How much time would you
9 estimate you've spent in the preparation for
10 your deposition?
11     A.    We met for a few hours each time.
12     Q.    Did you review documents?
13     A.    Yes.
14     Q.    All right.  Did anything come up
15 during the preparation for your deposition that
16 required your attorneys to collect documents
17 that had not been collected before?
18          MR. PIFKO:  Objection.  Vague.
19 Objection to the extent it calls for
20 attorney-client communications.
21     Q.    Let me back up.
22          When did you first learn that this
23 lawsuit had been filed?
24     A.    Probably a couple months ago.
25     Q.    All right.  So were you consulted

Page 29

1 about any of the details regarding the City of
2 Cleveland's public health department,
3 specifically with it related to opioids, in
4 preparation for preparing and filing the
5 complaint?
6          MR. PIFKO:  Objection to the extent
7 the question calls for attorney-client
8 communications.
9          Director Gordon, if you can answer
10 without revealing any substantive conversations
11 you may have had with counsel, you can answer
12 the question.
13     A.    Can you ask the question again?
14     Q.    Yes.  Let me start a little bit
15 broader.
16          Were you involved in preparing the
17 actual complaint before it was filed?
18          MR. PIFKO:  Instruction not to
19 answer.  That's entirely privileged.
20          MR. NAEEM:  On the basis of?
21          MR. PIFKO:  Attorney-client
22 communications.
23          MR. NAEEM:  If she was --
24          MR. PIFKO:  The question is --
25 you're asking her what she was discussing with

8 (Pages 26 - 29)

1  counsel in connection with preparing the
2  complaint.  I mean, preparing the complaint is a
3  substantive discussion with counsel.  I'm not
4  going to let her answer that.
5      Q.   Did you see a draft of the complaint
6  before it was filed?
7      A.   I did not.
8      Q.   Were you -- I'm sorry.
9          Did you see a draft -- I'm sorry.
10  Did you see the complaint prior to your
11  deposition being scheduled in this case?
12          MR. PIFKO:  I'm going to instruct
13  her not to answer on that to the extent it calls
14  for work product in regard to what counsel
15  showed her in preparing for the deposition.
16      Q.   Absent any communications with
17  counsel by phone, by e-mail or otherwise, had
18  you seen the complaint prior to your
19  deposition --
20          MR. PIFKO:  To be clear, he's
21  asking --
22      Q.   -- being scheduled?
23          MR. PIFKO:  He's only asking outside
24  of communications with counsel.
25      A.   Not outside of communication with

1  counsel.
2      Q.   All right.  After the complaint was
3  filed, did someone come and collect your
4  documents for purposes of production in this
5  litigation?
6          MR. PIFKO:  Objection to the extent
7  it calls for attorney-client communication with
8  the witness.
9          If you had conversations with
10  someone other than counsel about collecting
11  documents or someone who wasn't at the direction
12  of counsel, you can answer the question.
13          MR. NAEEM:  I'm not talking about
14  conversations.  I'm talking about actions.
15      Q.   Do you know whether someone came to
16  your office and collected documents at any point
17  in time for production in this litigation?
18      A.   No one came to my office.
19      Q.   Did you collect the documents
20  yourself for the purposes of production in this
21  litigation, any hard copy documents?  That's all
22  I'm talking about right now.
23      A.   Hard copy documents.  We submitted
24  documents pertaining to our work in this area on
25  behalf of the department.

1      Q.   Okay.  Let me ask that a little
2  differently because I'm not sure we're on the
3  same page.
4          Do you maintain hard copies of
5  documents in your office?
6      A.   I do.
7      Q.   Do you maintain hard copies of
8  documents related to the City of Cleveland's
9  efforts with respect to opioid-related issues in
10  your office?
11      A.   I do.
12      Q.   Did you provide those to anybody for
13  production in this litigation?
14      A.   I did.
15      Q.   When was that?
16      A.   In the last -- the last couple of
17  months.
18      Q.   When was the most recent time you
19  produced hard copy documents -- that you gave
20  your documents to somebody for production in
21  this litigation?
22          MR. PIFKO:  If you understand the
23  question.
24      A.   I had gave some, I believe,
25  yesterday or the day before yesterday.

1      Q.   And do you know why those weren't
2  produced before?
3          MR. PIFKO:  Objection.
4  Argumentative.
5      A.   Over the weekend I was cleaning my
6  office and reorganizing and found a couple
7  additional files and brought them to my
8  attorneys.
9          MR. PIFKO:  And just so you know,
10  too, we're happy to provide copies of anything
11  that you want if you need to make copies of
12  anything to use in the course of the deposition
13  today.
14          MR. NAEEM:  Okay.  Do we want to do
15  this on the record?
16          MR. PIFKO:  If we want to talk about
17  the production, yeah, I would like to do it on
18  the record.
19          MR. NAEEM:  Great.
20          So the defendants collectively
21  object to the late production of documents, you
22  know, late yesterday, understanding the
23  circumstances, and we'll be reserving time from
24  this deposition, and depending on how it goes,
25  asking perhaps to produce the witness again for

9 (Pages 30 - 33)

Page 34

1  deposition.
2         MR. PIFKO:  To be clear, our
3  position is we reject any efforts to call the
4  witness back.  She's a high-level city official.
5  There's a lot of mountains that had to be moved
6  for her to show up today.  You just heard her
7  testimony about when the documents were
8  identified.  There's at least eight people in
9  this room, countless people behind the scenes.
10 It was only 600 pages.  I don't believe there's
11 any prejudice to you all in being able to
12 prepare for the deposition, and like I said,
13 we're happy to make any copies of anything that
14 you want if you tell me.  Just let me know.
15        - - - - -
16        (Thereupon, Deposition Exhibit 1,
17        Letter from Tad Allan to Mark Pifko,
18        dated July 18, 2018, with Attached
19        Exhibit A, was marked for purposes
20        of identification.)
21        - - - - -
22    Q.   I'm just marking that for purposes
23 of getting it on part of the record.  It's our
24 response to the late production of documents.
25        Ms. Gordon, you said you found those

Page 35

1  over the weekend?
2     A.   I did.
3     Q.   And are you aware that they were
4  produced to us last night?
5     A.   I am not aware of that.  I provided
6  them to my counsel two days ago.
7         - - - - -
8         (Thereupon, Deposition Exhibit 1-A,
9         Document Entitled "Heroin and Opioid
10        Action Plan: Moving Forward,
11        Agenda," with Attached Handwritten
12        Notes, Beginning Bates Stamp
13        CLEVE_000298750, was marked for
14        purposes of identification.)
15        - - - - -
16    Q.   Ms. Gordon, I've handed you a
17 document that's been marked by the court
18 reporter as Deposition Exhibit 1-A.  Can you
19 tell me whether this looks familiar to you?
20    A.   This does look familiar to me.
21    Q.   Is this one of the documents you
22 found over the weekend when you were cleaning
23 out your office?
24    A.   Yes.
25    Q.   And you see that there is

Page 36

1  handwriting on page 1 and page 2.  For example,
2  on page 1, the second line, "Prescribing
3  practices are no longer the precursor to OD."
4  Is that your handwriting?
5     A.   This is my handwriting.
6     Q.   And OD refers to overdose?
7     A.   I assume so, yes.
8     Q.   Is this an example of the documents
9  you found when you were cleaning out your
10 office?
11        MR. PIFKO:  Objection.  Vague.
12    Q.   Are there other documents within the
13 documents you found that contain your
14 handwriting and notes regarding those particular
15 documents?
16    A.   There may be.
17        - - - - -
18        (Thereupon, Deposition Exhibit 1-B,
19        E-Mail from Gary Gingell to Various
20        Recipients dated March 6, 2018 Bates
21        Stamped CLEVE_000299033, was marked
22        for purposes of identification.)
23        - - - - -
24    Q.   Ms. Gordon, I've had the court
25 reporter hand you an exhibit that I've had

Page 37

1  marked as Deposition Exhibit 1-B.  Have you seen
2  this document before?
3         MR. PIFKO:  Take your time to review
4  it.
5     A.   Yes, I am familiar with this.
6     Q.   Is this one of the documents that
7  you found over the weekend and produced to your
8  counsel two days ago?
9     A.   I don't recall for sure, but this is
10 a copy of an e-mail that came to me.
11    Q.   And it was sent to you by Gary?
12    A.   Gingell.
13    Q.   Gingell.  Who is he?
14    A.   He is with the Cleveland Department
15 of Police.  He's a commander.
16    Q.   The date of this e-mail is March 6,
17 2018?
18    A.   Correct.
19    Q.   Do you recall receiving it and
20 reading it?
21    A.   I do recall.
22    Q.   And if this is one of the documents
23 you found, I assume that means it's because you
24 printed out your e-mails or some e-mails?
25    A.   It's a common practice.

10 (Pages 34 - 37)

Page 38

1     Q.   Do you sometimes highlight e-mails
2 that you've printed out?
3     A.   Occasionally.
4     Q.   Now, you see there appears to be
5 some highlighting, and that was in the copy
6 provided to us I'll represent, and it says --
7 it's highlighting this phrase, "With the U.S.
8 dropping 6 billion and big pharma about to get
9 whacked for hopefully many billions."  Was that
10 your highlighting in the original document that
11 you printed?
12    A.   I do not recall.
13    Q.   But, to be clear, you do
14 occasionally print documents and highlight them?
15    A.   I do.
16         - - - - -
17         (Thereupon, Deposition Exhibit 1-C,
18         Document Entitled "Cuyahoga County
19         State of Emergency Action Steps,"
20         Beginning Bates Stamp
21         CLEVE_000299083, was marked for
22         purposes of identification.)
23         - - - - -
24    Q.   Ms. Gordon, I've had the court
25 reporter hand you a copy of what's been marked

Page 39

1 as Deposition Exhibit 1-C.  Have you seen this
2 document before?
3         MR. PIFKO:  Please take your time to
4 review it.
5     A.   I am familiar with this document.
6     Q.   Is this one of the documents that
7 you found this weekend and produced to your
8 counsel two days ago?
9     A.   I don't recall.
10    Q.   The handwriting at the top right
11 corner of that document on page 1, is that your
12 handwriting?
13    A.   It looks like my handwriting.
14    Q.   Who is Dr. Papp?
15    A.   Dr. Papp is a physician at Metro
16 Hospital in Cleveland.
17    Q.   Why did you write her name at the
18 top of this document?
19    A.   I believe that she was the one who
20 handed this document out and I put her name on
21 it to know who either the author was or who
22 distributed the document.
23    Q.   Do you remember Dr. Papp handing
24 this document to you?
25    A.   I don't recall for sure.

Page 40

1     Q.   Do you remember the circumstances at
2 which Dr. Papp presented this information,
3 either via this document or through some sort of
4 oral presentation?
5         MR. PIFKO:  Objection.  Vague.
6 Overbroad.
7     A.   Dr. Papp attends a fair amount of
8 meetings that I've also attended and has been
9 instrumental in looking at ways that we can
10 address this significant issue in this community
11 and puts together documents on occasion.
12    Q.   Okay.  I'm asking, do you have a
13 specific recollection of any meeting that took
14 place where either this document was handed out
15 or this information was discussed?
16         MR. PIFKO:  Objection.  Compound.
17    A.   Dr. Papp is very vocal at these
18 meetings and has been a significant contributor
19 to our collective need to respond to this issue
20 in this community.  I recall her talking about a
21 fair amount of the items in this document.  I
22 cannot remember exactly when she produced it or
23 when she handed it out.
24    Q.   Do you recall whether you got this
25 document via e-mail?

Page 41

1     A.   I do not recall.
2     Q.   Do you recall the date you might
3 have received this document?
4     A.   I do not recall.
5     Q.   The little arrows to the side of the
6 lettered sections in the middle of page 1, is
7 that your -- do you believe that's your
8 handwriting?
9     A.   I cannot say for sure.
10    Q.   Bullet point number 3 there says,
11 "Monies seized from drug arrests (trafficking,
12 dealing, etc.) are to be funneled back into
13 treatment programs/prevention/naloxone
14 programs."  Do you see that?
15    A.   Item C?
16    Q.   No.  3.  I'm sorry.
17    A.   3.  Yes, I see it.
18    Q.   Is that something that's currently
19 being done at the City of Cleveland?
20         MR. PIFKO:  Objection.  Foundation.
21 Objection to the extent the question calls for
22 speculation.
23    A.   I do not know that that takes place
24 currently.
25    Q.   All right.  And so to be clear --

11 (Pages 38 - 41)

Page 42

1 we're going to get into this -- the Cleveland
2 Department of Public Health's opioid-related
3 activities.  With respect to this point 3 that
4 we just read, are you telling me you're not
5 aware whether any money seized by the Cleveland
6 Police Department or any other police force in
7 Cuyahoga County is redirected back to the
8 Cleveland Department of Public Health for use in
9 treatment programs?
10        MR. PIFKO:  Objection.  Compound.
11 Calls for speculation.  Foundation.
12     A.   I'm not aware that that happens, no.
13     Q.    And by saying "not aware," are you
14 in the position -- do you believe you would know
15 that if it was happening?
16        MR. PIFKO:  Same objections.
17     A.    I do not know that those monies are
18 directly supporting the general fund, which does
19 support some of our programs in the health
20 department.
21     Q.    We'll come back to this if we need
22 to then.
23        MR. PIFKO:  Can we take a short
24 break?
25        MR. NAEEM:  Sure.

Page 43

1        THE VIDEOGRAPHER:  Going off the
2 record.  The time is 9:43.
3        (Recess had.)
4        THE VIDEOGRAPHER:  Back on the
5 record.  The time is 9:53.
6 BY MR. NAEEM:
7     Q.   Ms. Gordon, before we went off the
8 record, we had been talking about documents that
9 you found this weekend and produced to your
10 counsel a couple days ago.  I do want to go
11 ahead and move on and try to get us further into
12 the depo.  Before I do, can I ask whether you
13 have ever been part of a lawsuit as a plaintiff
14 in which you've sued a pharmaceutical company?
15     A.   I have not.
16     Q.   Do you have any friends or family
17 who have done so?
18        MR. PIFKO:  Objection.  Calls for
19 speculation.
20     A.   I do not.
21     Q.   Have you ever suffered a severe
22 adverse reaction that you attributed to a
23 pharmaceutical product?
24        MR. PIFKO:  Objection to the extent
25 it invades the witness' personal medical

Page 44

1 privacy.  Her medical condition is not at issue
2 in this case.  I'm going to instruct her not to
3 answer.
4        MR. NAEEM:  Well, I believe it goes
5 directly to bias, so I'm going to ask you to
6 reconsider that, and also to keep the deposition
7 protocol in mind with your objections.
8        MR. PIFKO:  Objection stands.
9        MR. NAEEM:  You're instructing the
10 witness not to answer?
11        MR. PIFKO:  Yeah.
12     Q.   Have you ever used prescription
13 opioids?
14        MR. PIFKO:  Same objection.  Invades
15 the witness' personal medical privacy.  She's
16 not here to testify on her individual behalf.
17 She's a city official.  I'm going to instruct
18 her not to answer.
19        MR. NAEEM:  It goes to bias.  Are
20 you still instructing the witness not to answer?
21        MR. PIFKO:  Yes.
22     Q.   Have you ever used heroine?
23        MR. PIFKO:  Same objection.
24        MR. NAEEM:  Goes to bias.
25 Instructing her not to answer?

Page 45

1        MR. PIFKO:  Yes.  Any questions you
2 ask about her medical history, I'm going to
3 object and instruct her not to answer on the
4 medical privilege.
5     Q.   Have any of your friends or family
6 ever used heroine?
7        MR. PIFKO:  Same objection.
8        MR. NAEEM:  I would again state it
9 goes to bias and she has no privilege to protect
10 her friends or family members with respect to
11 their medical history.
12        MR. PIFKO:  They're not here to
13 assert their own concerns about it, and so if
14 you want to go and ask them and -- we can do
15 that, but I'm going to instruct her not to
16 answer until we know what any outside people's
17 position is with respect to their medical
18 privacy.
19        MR. NAEEM:  So, to be clear, what is
20 the privilege you are asserting and instructing
21 her not to answer on?
22        MR. PIFKO:  Confidential medical
23 privilege.
24        MR. NAEEM:  Okay.  Do you represent
25 any of her friends and family?

12 (Pages 42 - 45)

1        MR. PIFKO:  No, but I'm not going to
2 let her disclose a third party's medical
3 condition in this proceeding without their
4 permission.
5        MR. NAEEM:  I haven't asked and I
6 won't ask for any of the names, so I'll ask
7 again.
8    Q.   Do you have any friends or family
9 members who have ever used heroine?
10        MR. PIFKO:  If you want to ask
11 her -- I think that's too specific.  If you want
12 to ask her if she knows anyone, I'll let her
13 answer that question.
14    Q.   Let's go backwards, then, on that
15 basis.
16        Do you know anyone who's ever
17 suffered a severe adverse reaction attributed to
18 a pharmaceutical product?
19        MR. PIFKO:  Objection to the extent
20 the question calls for expert opinion.  Vague.
21 Overbroad.
22        You can answer.
23    A.   Any pharmaceutical product?  I can't
24 say that anybody has not.  I don't know that I
25 would know that.

1    Q.   Well, that's really what the
2 question is.  Do you know anyone who's ever
3 suffered a severe adverse reaction that they
4 attributed to a pharmaceutical product?
5        MR. PIFKO:  Same objection.  Calls
6 for speculation, expert opinion.
7    A.   Perhaps I do.  I don't know that
8 anybody has said to me specifically.  Some
9 people have allergies to some products but I
10 don't necessarily talk about that with friends.
11    Q.   So you do know people who have
12 suffered a severe adverse reaction that they
13 have attributed to pharmaceutical products?
14        MR. PIFKO:  Objection.
15 Mischaracterizes testimony.  Asked and answered.
16    A.   I'm not entirely sure that's what I
17 said.  I may know people.  I can't say that I
18 can answer that question head on.
19    Q.   Do you know anyone who has ever sued
20 a pharmaceutical company?
21    A.   I don't know that I do.
22    Q.   Are you aware of any -- of anyone
23 who's used prescription opioids?
24        MR. PIFKO:  Objection.  Vague.
25 Overbroad.

1    A.   I can't say that I do or I don't.
2    Q.   Do you personally know anyone who
3 has ever used heroine?
4    A.   In the course of my job I've met a
5 number of people who have attended meetings, who
6 have told their story, many addicts who have
7 shared their story and what they have taken and
8 what they've been addicted to, and some have
9 admitted that it has been heroine.
10    Q.   Absent any information you got in
11 your employment, do you know anyone who has ever
12 used heroine?
13        MR. PIFKO:  Objection.  Vague.
14    A.   I can't say that I do or that I
15 don't or that they have admitted that to me.
16    Q.   Are you aware in your personal life,
17 not your employment, of anyone who has used
18 illicit fentanyl?
19    A.   I can't say that I do or that I
20 don't.
21    Q.   So the question was are you aware.
22 So you are not aware of anyone?
23    A.   I am not aware.
24    Q.   Are you aware of anyone in your
25 personal, not your employment life, who has ever

1 suffered from addiction?
2    A.   I do know people, yes, I am aware.
3    Q.   What substances -- without revealing
4 their identity, what substances are you aware of
5 that those people suffered from addiction from?
6        MR. PIFKO:  Objection.  Calls for
7 speculation.  Objection to the extent it calls
8 for expert opinion.
9    A.   I don't have specificity on what
10 they are addicted to or were addicted to.
11    Q.   So you haven't had conversations
12 about what the substance was but you do know in
13 your personal life people who suffer from
14 addiction?
15    A.   I do.
16    Q.   Ms. Gordon, could you briefly run
17 through your undergraduate and post-graduate
18 education?
19    A.   So I have a Bachelor's degree and I
20 have a Master's in public administration.
21    Q.   And your Bachelor's was where?
22    A.   Hampshire College.
23    Q.   And did any of your studies at
24 Hampshire College involve substance abuse
25 courses?

13 (Pages 46 - 49)

Page 50

1     A.   No.
2     Q.   Mental health?
3     A.   No, none that I can recall.
4     Q.   Any medical training?
5     A.   I don't have any medical training.
6     Q.   Any courses or training in
7  epidemiology?
8     A.   I have attended courses on
9  epidemiology.
10    Q.   As part of your undergraduate
11 education?
12    A.   No, not as part of my undergraduate
13 education.
14    Q.   How about as part of your graduate
15 education?
16    A.   No, not specifically.
17    Q.   As part of your employment?
18    A.   As part of my employment -- sorry.
19 The question again is?
20    Q.   Have you taken any courses in
21 epidemiology?
22    A.   I have not taken any specific
23 courses on epidemiology.
24    Q.   Have you received any training on
25 epidemiology?

Page 51

1     A.   I have some, yes.
2     Q.   Could you describe when that was?
3     A.   Specifically, if you're asking for
4  an actual date --
5     Q.   A year is fine.
6     A.   Over the course of the last two
7  years I have spent a fair amount of time with
8  epidemiologists and immersed in that field.
9     Q.   All right.  So one of the things you
10 just said was that you have sat and discussed
11 with epidemiologists in meetings various topics.
12 Was the purpose to train you in the underlying
13 field of epidemiology?
14         MR. PIFKO:  Objection.  Vague.
15 Objection.  Calls for speculation.
16         You can answer.
17    A.   It was -- I'm sorry.  You have to
18 repeat the question.
19    Q.   Sure.
20         You have sat in during the course of
21 your career in meetings with epidemiologists.  I
22 think that's a general statement as to what you
23 told me.  Is that accurate?
24    A.   I have met with many
25 epidemiologists.

Page 52

1     Q.   And what was the purpose of those
2  meetings?
3         MR. PIFKO:  Objection.  Vague.
4     A.   To understand better the work that
5  they do, the data that they -- they analyze, and
6  data that they produce, and what -- what is then
7  done with the data and -- yeah.
8     Q.   Would you consider yourself an
9  epidemiologist?
10    A.   I do not consider myself an
11 epidemiologist.
12    Q.   Does the City of Cleveland have
13 epidemiologists that work with -- in analyzing
14 opioid-related issues?
15    A.   We employ epidemiologists, the
16 Cleveland Department of Public Health, yes.
17    Q.   Okay.  How many?
18    A.   There are three currently in my
19 department.
20    Q.   What are their names?
21    A.   I have three of them.  Wendy Foster,
22 Sheena Fryerson and Katherine Romig.
23    Q.   I've seen a name in the documents,
24 Jana Rush.  Is she employed by the City of
25 Cleveland?

Page 53

1     A.   She's no longer employed by the City
2  of Cleveland.
3     Q.   Was she formerly an epidemiologist
4  in your department?
5     A.   Yes.
6     Q.   When did she leave the City of
7  Cleveland?
8     A.   She left, I believe, in early 2017.
9     Q.   Do you know where she is now?
10    A.   I do not.
11    Q.   Why did she leave?
12         MR. PIFKO:  Objection.  Calls for
13 speculation.  Foundation.
14    Q.   Do you know why she left?
15    A.   I do not know why she left.
16    Q.   Was she fired?
17    A.   She was not fired.
18    Q.   She voluntarily terminated her
19 employment to the best of your knowledge?
20    A.   Correct.
21    Q.   During your education did you take
22 any courses -- and this is either as an
23 undergraduate or graduate -- in pharmacology?
24    A.   I did not.
25    Q.   I don't want to go through your

14 (Pages 50 - 53)

1 entire employment history, but you were a member
2 of Cleveland City Council; is that accurate?
3      A.   That is accurate.
4      Q.   What years was that?
5      A.   1997 to 2005.
6      Q.   And what district did you serve
7 during that time?
8      A.   Then it was ward 15.
9      Q.   What communities does that encompass
10 or what parts of the City of Cleveland does that
11 entail?
12      A.   Generally they were the
13 neighborhoods of Old Brooklyn and Brooklyn
14 Center.
15      Q.   Did you serve on any city council
16 committees while you were a council person?
17      A.   I did.
18      Q.   What committees did you participate
19 in?
20      A.   I chaired the public health
21 committee.  I also -- then in my second term I
22 chaired the community and economic development
23 committee, sat on the finance committee.  I'm
24 not sure if I can remember them all, but
25 aviation transportation committee, employment

1 committee, rules committee.
2      Q.   Is -- and I'm talking about current
3 day.
4      A.   Um-hum.
5      Q.   Is opioid abuse and addiction an
6 issue in the Old Brooklyn neighborhood?
7           MR. PIFKO:  Objection.  Vague.
8 Foundation.
9      Q.   Well, Ms. Gordon, one of the things
10 you do, that your department does currently is
11 try to provide treatment for opioid addicts; is
12 that fair?
13      A.   We try to provide as many programs
14 as we possibly can with the budget we have to
15 address this issue.
16      Q.   And so I would imagine, as the
17 director of that department, you're well aware
18 of what communities in the City of Cleveland are
19 facing opioid abuse and addiction issues; is
20 that fair?
21      A.   That is fair.
22      Q.   Are there some parts of the City of
23 Cleveland that have higher rates of opioid abuse
24 and addiction than others?
25           MR. PIFKO:  Objection.  Vague.

1 Foundation.  Speculation.
2      A.   I'm provided data almost on a daily,
3 if not weekly basis, and along with that data is
4 zip codes, and so we are tracking zip codes and
5 areas of the city that may or may not be
6 impacted more at any given time.
7      Q.   Ms. Gordon, how long have you lived
8 in the City of Cleveland or in this general
9 area?
10      A.   Lived in the general area almost my
11 entire life except for school.
12      Q.   So you're well familiar with the
13 various geographic areas within the City of
14 Cleveland?
15      A.   Yes.
16      Q.   Are there certain neighborhoods that
17 are more impacted by the opioid crisis currently
18 in the City of Cleveland than others?
19           MR. PIFKO:  Objection.  Foundation.
20 Vague.  Overbroad.
21      A.   We get this data on a daily almost
22 or weekly basis and look at zip codes and
23 analyze where the trends are and where there are
24 fatals and non-fatals due to overdoses and look
25 at that based on zip codes and neighborhoods and

1 communities that are impacted.
2      Q.   Okay.  I understand what you look at
3 and so I'm asking you, are there certain areas
4 that, when you look at the trends, are more
5 impacted by the opioid crisis than others?
6           MR. PIFKO:  Objection to the extent
7 the question calls for the witness to speak to
8 data which speaks for itself.  Vague.
9 Ambiguous.
10           MR. NAEEM:  Mr. Pifko, I'm going to
11 remind you again that the deposition protocol is
12 very strict regarding the amount of objections
13 you can raise and your ability to speak on the
14 record, so I would ask again to keep it short
15 and to the objections permitted.
16           MR. PIFKO:  Well, I'm stating my
17 objection to the clarity and specificity and I'm
18 entitled to protect the record and I'm going to
19 continue to do that.  If you have a problem with
20 my articulation of objections, you should try to
21 articulate more specific questions, and if you
22 have further problems, we can address it.  But I
23 don't believe there's anything improper.  I read
24 the protocol and I'm familiar with it.
25           MR. NAEEM:  Okay.  Well, we can

15 (Pages 54 - 57)

Page 58

1 address it as it goes into the deposition. If
2 we have to, we'll bring it up to the special
3 master or the judge.
4      Q.   So the question was, based on your
5 lifelong history as a Clevelander and your
6 employment as the director of public health in
7 the City of Cleveland, are there currently areas
8 of Cleveland or neighborhoods of Cleveland that
9 are more impacted by the opioid crisis than
10 others, that have higher incidents of opioid
11 abuse and addiction than others?
12      MR. PIFKO: Objection. Compound.
13 Vague. Objection to the extent it's asking
14 about data that speaks for itself.
15      A.   All the communities are impacted.
16 We've looked at data. There are -- there are
17 some neighborhoods that have more incidents than
18 others over time, and that can migrate and all
19 depend on what's going on.
20      Q.   At the time you were a city council
21 person in ward 15, was Old Brooklyn one of those
22 communities that had a higher incidence of
23 opioid abuse and addiction than other
24 communities in the neighborhood?
25      MR. PIFKO: Objection. Foundation.

Page 59

1      A.   I can't say that I recall that with
2 specificity.
3      Q.   Did ward 15 -- strike that.
4           Was opioid abuse and addiction an
5 issue in ward 15 during your tenure as a city
6 council person?
7      MR. PIFKO: Objection. Foundation.
8      A.   I have recollection that addiction
9 was -- was an issue throughout the entire city
10 and was impacting that community that I
11 represented, yes.
12      Q.   And when you say "addiction," are
13 you talking about opioid addiction or just
14 addiction generally?
15      A.   I can't say with specificity on
16 whether there was direct opioid addiction at
17 that time. I don't recall with specificity. I
18 don't recall.
19      Q.   How about generally? Do you recall
20 whether opioid abuse and addiction were issues
21 in ward 15 during your tenure as a city council
22 person?
23      A.   As a representative, we looked at
24 all sorts of things that impacted the community.
25 I can't say with absolute certainty that -- that

Page 60

1 that was an issue that we looked at
2 specifically, but I do recall that this was
3 something that was emerging, and data was just
4 anecdotally and in community meetings and we
5 were starting to hear from families and people
6 who were talking about addiction and how that
7 was impacting their families and those
8 communities.
9      Q.   And that emerging data that you just
10 referenced, was that opioid-related data?
11      A.   I can't say with specificity.
12      Q.   How about generally; do you recall
13 any discussions of opioids impacting the City of
14 Cleveland during your tenure as a city council
15 person?
16      MR. PIFKO: Objection. Vague.
17 Overbroad.
18      A.   I don't recall with specificity.
19      Q.   Do you recall generally opioid
20 issues or heroine abuse or fentanyl abuse or
21 prescription drug abuse being an issue in the
22 City of Cleveland between 2007 and -- sorry,
23 1997 and 2005 as a city council person?
24      MR. PIFKO: Objection. Compound.
25      A.   I recall going to a lot of meetings

Page 61

1 and hearing from families and hearing from
2 neighborhoods about the impact of addiction and
3 what was happening within their own families. I
4 remember hearing stories of people's houses
5 getting broken into and people going into the
6 bathrooms and looking for drugs in medicine
7 cabinets. I remember hearing about this
8 countless times. These were painkillers. These
9 were pills people were looking for in people's
10 homes. I went to a lot of meetings and heard a
11 lot of stories of this nature.
12      Q.   So you do have specific recollection
13 while you were at city council of discussions
14 related to opioid abuse and addiction?
15      MR. PIFKO: Objection to the extent
16 the question mischaracterizes her testimony.
17      MR. BOEHM: That's an outrageous
18 objection. I just have to jump in. Read the
19 deposition protocol. It doesn't permit that
20 type of objection.
21      MR. PIFKO: I don't know who you
22 are, but you can't speak, okay? You need to be
23 quiet. There's one person who speaks at a time,
24 so that's the end of it.
25      MR. BOEHM: That's not the end of

16 (Pages 58 - 61)

Page 62

1 it. I'm going to speak if I want to. My name
2 is Paul Boehm. I'm from Williams & Connolly in
3 Washington, D.C.
4        MR. PIFKO: Okay. The protocol is
5 one person speaks at a time, and you will have
6 your turn. You are not allowed to speak right
7 now.
8        MR. BOEHM: I am going to speak to
9 raise this objection. You're not going to stop
10 me from doing that. The objections that you're
11 raising, particularly the last one that you did,
12 was outrageous. It doesn't comport with the
13 deposition protocol.
14        MR. PIFKO: You're characterizing --
15        MR. BOEHM: I'm not done.
16        MR. PIFKO: I don't care if you're
17 done. You're not authorized to speak. Be
18 quiet.
19        MR. BOEHM: I'm here representing my
20 client.
21        MR. PIFKO: You're going to need to
22 leave the room if you can't abide by the rules
23 here.
24        MR. BOEHM: How are you going to get
25 me to leave the room?

Page 63

1        MR. PIFKO: Well, if you can't
2 comply with the deposition protocol, you can't
3 be here.
4        MR. BOEHM: That's acute, coming
5 from you who has not been compliant with their
6 objections from the start.
7        MR. PIFKO: I've read the protocol.
8        MR. BOEHM: I'm going to ask you to
9 rereview it.
10        MR. PIFKO: You can object, you can
11 state your objection with clarity and
12 specificity, and I have done that. There's
13 nothing preventing me from doing that.
14        MR. BOEHM: You're coaching the
15 witness.
16        MR. PIFKO: I'm not coaching the
17 witness at all. The record is very clear.
18        MR. BOEHM: But I will take this to
19 Special Master Cohen, so you need to stop it,
20 and if I need to --
21        MR. PIFKO: Well, there's nothing to
22 take. Go ahead. Take anything --
23        MR. BOEHM: Stop talking over me.
24        MR. PIFKO: I will talk over you.
25 You're not authorized to speak right now.

Page 64

1        MR. BOEHM: I am authorized to
2 speak.
3        MR. PIFKO: No, you're not.
4        MR. BOEHM: I am and I'm going to
5 speak.
6        MR. PIFKO: If you want to speak,
7 then he's going to have to stop speaking.
8        MR. BOEHM: He has stopped speaking.
9 You're the one who won't stop speaking.
10        MR. PIFKO: No. Only one counsel
11 can address the witness at a time --
12        MR. BOEHM: I'm not addressing the
13 witness.
14        MR. PIFKO: And you're addressing my
15 objections concerning the witness.
16        MR. BOEHM: I'm addressing you. You
17 need to get control of the way you're handling
18 it.
19        MR. PIFKO: I've got perfect
20 control, okay. You need to get control. You're
21 sitting halfway down the table and you have no
22 business here, okay.
23        MR. BOEHM: I have no business here?
24        MR. PIFKO: Yeah. You're not the
25 questioner so you need to be quiet.

Page 65

1        MR. BOEHM: I'm not going to be
2 quiet.
3        MR. PIFKO: Okay. I'm going to
4 terminate this deposition if you're going to
5 keep speaking because you're not authorized to
6 speak.
7        MR. BOEHM: I'm going to state my
8 objection for the record.
9        MR. PIFKO: Okay. Then Tariq needs
10 to leave and stop asking questions and you come
11 and sit here if you want to talk.
12        MR. BOEHM: That's not the way --
13        MR. PIFKO: You guys -- as defense
14 counsel, you guys need to decide who is going to
15 speak for you all, okay? It's only going to be
16 one person at a time, and we're not doing this.
17        MR. BOEHM: I'm not speaking for
18 Tariq. I'm speaking for my client.
19        MR. PIFKO: Well, then he's done
20 speaking; apparently you're speaking? We're not
21 doing this.
22        MR. BOEHM: He has paused for me to
23 speak.
24        MR. PIFKO: No. Only one counsel at
25 a time.

17 (Pages 62 - 65)

Page 66

1       MR. BOEHM: I've made a very simple
2  request. One of them is to let me make my
3  record, and then when I'm done, you can say
4  whatever you want.
5       MR. PIFKO: No. You do not have the
6  right to make a record while he's speaking. You
7  do not have that right.
8       MR. BOEHM: I'm asking you to read
9  the deposition protocol again because you've
10  seemed to have forgotten some important
11  components.
12       MR. PIFKO: I don't need your
13  characterization of the deposition protocol.
14  I've read it very carefully and I'm allowed to
15  state my objections with specificity and clarity
16  and I'm going to do that and I'm going to
17  continue to do that and I'm going to protect the
18  record as I deem appropriate. The record is
19  clear that the witness is not being coached, I'm
20  not telling her what to say.
21       MR. BOEHM: If you continue to do it
22  and the way you're doing it, this is going to be
23  in front of Special Master --
24       MR. PIFKO: Well, that's fine. I
25  don't believe anything I'm doing is wrong and

Page 67

1  I'm going to raise the fact that you all can't
2  appear to have selected a person to speak.
3       MR. BOEHM: You raise whatever you
4  want. That's fine.
5       MR. PIFKO: Well, you need to be
6  quiet. If you do that again, I'm going to ask
7  for you to leave the room.
8       MR. BOEHM: You can ask all you
9  want, but that's not going to happen.
10       MR. PIFKO: I think the protocol is
11  clear that only one person is allowed to speak
12  at a time.
13       MR. BOEHM: I'm letting you do that.
14  You should let me do the same.
15       MR. PIFKO: No. You're not -- right
16  now we have one counsel here asking the
17  questions.
18       MR. BOEHM: You have my position.
19  You guys can go ahead.
20       MR. PIFKO: No. You're not allowed
21  to make comments right now. You are not allowed
22  to make comments. If you can't abide by the
23  rules, you need to leave the room.
24       MR. BOEHM: I'm not leaving and I am
25  abiding by the rules.

Page 68

1       MR. PIFKO: No, you're not. You're
2  clearly not. You're clearly not abiding by the
3  rules.
4       MR. BOEHM: Go ahead.
5       MR. PIFKO: You need to keep it
6  quiet, okay?
7       MR. BOEHM: You need to stop trying
8  to speak with me in that kind of disrespectful
9  tone and you're not going to make me leave the
10  room.
11       MR. PIFKO: You're the one who
12  started the disrespectful tone. I'm here doing
13  my job and it's not your business about how I do
14  my job.
15       MR. BOEHM: It's not my business how
16  you do your job.
17       Go ahead. You have my position.
18       MR. PIFKO: You're not authorized to
19  take a position right now.
20       MR. NAEEM: Are you ready?
21       MR. PIFKO: Are you speaking? Are
22  you asking the questions, sir? I believe you
23  are, and I've had fine interactions with you and
24  I don't have any problems with you, but I need
25  to know who is speaking for the defendants in

Page 69

1  this deposition.
2       MR. NAEEM: Mr. Pifko, you're not
3  allowed to ask me questions on the record.
4       MR. PIFKO: Well, I need to know
5  because we apparently have an issue with who is
6  handling this deposition. Are you handling the
7  deposition, sir?
8       MR. NAEEM: I think it's pretty
9  clear, but I think if you look --
10       MR. PIFKO: It's not clear to me.
11       MR. NAEEM: -- at the deposition
12  protocol, you will see that two counsel for each
13  subgroup are permitted to conduct the
14  examination of the witness.
15       MR. PIFKO: Not at one time, okay.
16  Check the case law. You cannot double team a
17  deposition.
18       MR. NAEEM: We're not double
19  teaming. He didn't ask the witness a question
20  at all --
21       MR. PIFKO: He's speaking up. He's
22  getting involved in the questions. Come on.
23       MR. NAEEM: -- so as long as we
24  characterize what's going on accurately, we can
25  move on.

18 (Pages 66 - 69)

Page 70

1        MR. PIFKO:  We have a record.
2  Everything is being heard.  We don't need to
3  characterize anything.  Okay.
4        MR. NAEEM:  You're the one who is
5  addressing me.
6        MR. PIFKO:  Well, I am because I
7  need to know -- defendants -- there are a lot of
8  you here --
9        MR. BOEHM:  If you want to go off
10  the record --
11        MR. PIFKO:  I don't want to have any
12  conversations with you off the record.  No thank
13  you.
14        MR. BOEHM:  I'm saying if you want
15  to stop right now and we can take this up with
16  Special Master Cohen, we can go off the record
17  to do that, if that's what you want to do.  I'm
18  not asking to do that yet.  I'm telling you my
19  position is if the objections continue in the
20  way they have gone so far, I'm going to ask to
21  do that.  That's all I'm saying right now.
22        MR. PIFKO:  Well, I'm saying -- do I
23  have an agreement that only -- when one counsel
24  is asking questions, only one person is going to
25  speak on behalf of defendants?  If I don't have

Page 71

1  that agreement, we're going to go to Cohen now
2  and get that clarity because this is not
3  appropriate.
4        MR. BOEHM:  I'm going to make
5  objections as I see fit.
6        MR. PIFKO:  Okay.  We're going to go
7  off the record and we're going to call him.
8        THE VIDEOGRAPHER:  Off the record.
9  The time is 10:21.
10        (Recess had.)
11        THE VIDEOGRAPHER:  Back on the
12  record.  The time is 10:40.
13  BY MR. NAEEM:
14    Q.  Ms. Gordon, I want to tie off where
15  I believe I think we were before we went off the
16  record.  During your tenure on city council from
17  1997 to 2005 were you aware of citizens in ward
18  15 who had substance abuse issues?
19    A.  Substance abuse issues, yes.
20    Q.  Was that something that city council
21  was involved in assessing?
22    A.  I don't recall.
23    Q.  Let me strike that.
24        Was that an issue -- any issue
25  related to substance abuse that came before city

Page 72

1  council?
2        MR. PIFKO:  Objection.  Vague.
3    A.  I don't recall specifically.
4    Q.  Any legislation passed while you
5  were on city council that was meant to address
6  substance abuse issues?
7    A.  I don't recall specifically.
8    Q.  Any investigations or hearings that
9  you recall that related to substance abuse
10  issues?
11    A.  I don't recall specifically.
12    Q.  And is it fair for me to assume that
13  when you have no recall of specific business of
14  city council on substance abuse issues, that
15  answer includes opioid-related issues, because I
16  could ask the same questions all over again?  So
17  when I say "substance abuse issues," do you
18  understand that to mean opioid-related issues?
19        MR. PIFKO:  I think for clarity
20  maybe you should just ask those questions again.
21        MR. NAEEM:  Sure.
22    Q.  Do you recall while you were on city
23  council that members of ward 15 were suffering
24  from opioid abuse issues?
25        MR. PIFKO:  Objection.  Foundation.

Page 73

1    A.  I have recollection of people who
2  were addicted and hearing firsthand accounts of
3  individuals who were suffering from addiction,
4  families who had a loved one and families who
5  were dealing with this issue.  I have -- I have
6  recollection of that for sure.
7    Q.  So those were hearings that were
8  conducted by city council during your tenure?
9    A.  That was one-on-one interaction with
10  individuals in the community they represented,
11  people who attended community meetings, people
12  that I met with for a variety of reasons.  Part
13  of my job was to meet with families.  I went to
14  community meetings multiple times a week and
15  heard about what was going on on the street, in
16  the community, neighborhoods.
17    Q.  Did city council during your tenure
18  between 1997 and 2005 discuss any legislation
19  directed -- intended to be directed towards
20  addressing these opioid-related issues?
21    A.  I don't recall that specifically.
22    Q.  Did city council during that time
23  frame have any -- conduct any investigations,
24  public hearings of that sort regarding
25  opioid-related issues?

19 (Pages 70 - 73)

Page 74

1    A.    I don't have recollection.
2    Q.    Any discussions at city council
3  between 1997 and 2005 about funding for
4  opioid-related treatment or education?
5    A.    I don't recall.
6    Q.    When did you -- well, strike that.
7  Let me start at the top.
8        What is your current title with the
9  City of Cleveland?
10    A.    I'm the director of the Cleveland
11  Department of Public Health.
12    Q.    When did you take that -- take on
13  that role?
14    A.    I began that on June 13th of 2016.
15    Q.    How did you come to apply for or be
16  approached about taking on the role of director
17  of public health?
18        MR. PIFKO:  Objection.  Calls for a
19  narrative.  Overbroad.
20    A.    I knew that the position had been
21  vacant and that the city was looking to fill
22  that position and so I applied.  I submitted my
23  letter and resume to the city and -- and
24  proceeded through that route.
25    Q.    Do you know why the role was

Page 75

1  available at that time?
2        MR. PIFKO:  Objection.  Calls for
3  speculation.  Foundation.
4    Q.    And the question was do you know why
5  that role was available.
6    A.    There was nobody filling that role.
7    Q.    Do you know why the predecessor had
8  left the Department of Cleveland Health?
9        MR. PIFKO:  Objection.  Calls for
10  speculation.  Foundation.
11    A.    I do not know.
12    Q.    Do you know who that person was, the
13  immediate prior director before you were hired?
14    A.    Who had that position specifically,
15  yes, I do know that person's name.
16    Q.    What was that person's name?
17    A.    Her name is Toinette Parilla.
18    Q.    Can you spell her last name, if you
19  know?
20    A.    I believe it's P-a-r-i-l-l-a.
21    Q.    And do you know how long the
22  position had been vacant prior to you taking on
23  the directorship?
24    A.    About a year.
25    Q.    Do you know why Ms. Parilla left the

Page 76

1  position of director of the Department of Public
2  Health?
3    A.    I do not know.
4    Q.    So you don't know whether she was
5  fired or whether she left voluntarily?
6    A.    I do not know specifically, no.
7    Q.    Once you submitted your resume
8  seeking the position of director, how did the --
9  could you describe how the hiring process went?
10    A.    Sure.
11        I was called in for an interview
12  with a panel of individuals, and after that I
13  was called back shortly thereafter.  I
14  understood that I was one of the finalists.  And
15  the two finalists then had to have an interview
16  with the mayor of the City of Cleveland.  I had
17  that interview, and within a period of time I
18  was called and notified that I was being offered
19  the position.
20    Q.    Do you happen to know who the other
21  final candidate was?  Was that made --
22    A.    I do not know.
23    Q.    Did anyone -- were you the first
24  choice or did the first choice not accept the
25  position?  Do you know that?

Page 77

1    A.    I don't know that.
2    Q.    So you interviewed with a panel.
3  Was that a panel of City of Cleveland employees?
4    A.    Yes.
5    Q.    Do you recall who they were, at
6  least their role within the City of Cleveland,
7  if not their names?
8    A.    Yes.
9    Q.    Can you tell us that, please?
10    A.    Of the four panelists?
11    Q.    Yes.
12    A.    Sure.  Natoya Walker Minor, Tracy
13  Martin Thompson, Martin Flask and Barry Withers.
14    Q.    Okay.  Can you let us know what
15  roles those people had at the time they were
16  interviewing you?
17    A.    Sure.
18        Natoya Walker Minor is the chief of
19  public affairs, Tracy Martin Thompson and Martin
20  Flask are special assistants to the mayor, and
21  Barry Withers also has a key position.  I'm not
22  entirely sure what his title is.
23    Q.    To be clear -- I want to make sure I
24  understood what you said about your awareness of
25  the position.  Did somebody approach you about

20 (Pages 74 - 77)

Page 78

1  this open position before you applied?
2      A.   We were aware that the position had
3  been -- had been vacated and available and that
4  the city was looking for somebody to fill that
5  position.
6      Q.   Okay.  And I wasn't specific enough.
7  I apologize.  Did somebody from the City of
8  Cleveland approach you about seeing whether you
9  were interested in taking the role of director
10  of public health?
11      A.   No.
12      Q.   Was it ultimately Mayor Jackson's
13  decision as to who to hire in that role?
14          MR. PIFKO:  Objection.  Calls for
15  speculation.  Foundation.
16      A.   I believe that's why the interview
17  is with the mayor and then a decision is made.
18      Q.   Do you know whose final decision it
19  was to hire you as the director of Cleveland
20  Public Health?
21      A.   I don't know specifically.
22      Q.   But you believe it was Mayor
23  Jackson's decision?
24          MR. PIFKO:  Objection.  Speculation.
25      A.   I believe.

Page 79

1      Q.   Now, once -- in your role as
2  director, are you free to hire people within the
3  Department of Health without oversight from
4  anyone else in the City of Cleveland?
5      A.   No, not necessarily.
6      Q.   As a general matter, and, for
7  example, I might not pronounce her name
8  correctly, but Persis Sosiak, do you know who
9  she is?
10      A.   I do.
11      Q.   Does she work in your department?
12      A.   She does.
13      Q.   Does she work under you?
14      A.   Yes.
15      Q.   So she reports to you?
16      A.   She does.
17      Q.   Was she hired by the City of
18  Cleveland after you became the director of
19  public health?
20      A.   Yes.
21      Q.   Very briefly -- I don't know the
22  details about her specifically -- were you able
23  to hire her without the oversight of anybody
24  else at the City of Cleveland?
25      A.   No.

Page 80

1      Q.   How did that process work?
2      A.   The commissioner of health position
3  -- and we posted for the position, which is an
4  internal mechanism.  She, along with others,
5  applied for the position.  We reviewed resumes.
6  I had the ability to narrow down some of my
7  recommendations.  She then interviewed with
8  myself and chief of public affairs and Tracy
9  Martin Thompson, who is, again, the special
10  assistant to the mayor, along with the
11  finalists.  The two final recommendations are
12  then brought to the mayor.  The mayor does
13  interview those two top finalists and makes a
14  recommendation of -- of whether or not they
15  support the candidates or whether we should
16  continue the search.
17      Q.   And in that specific situation with
18  Ms. Sersis -- did I get that right?
19      A.   You did not.
20      Q.   No.  Could you say it again, please?
21      A.   Her name is Persis Sosiak.
22      Q.   In that instance did Mayor Jackson
23  give the authority to hire Ms. Sosiak?
24      A.   He did.
25      Q.   When you were interviewing with the

Page 81

1  initial panel or with -- having a discussion
2  with Mayor Jackson prior to being hired as
3  director, was there any discussion about
4  specific public health issues that were being
5  faced by the City of Cleveland?
6      A.   Yes.
7      Q.   Was there any specific discussion
8  about the opioid abuse and addiction issues
9  during that interview process?
10      A.   Yes.
11      Q.   Who did you have that discussion
12  with?
13      A.   That discussion came up in the panel
14  and then as well in the interview I had with the
15  mayor.
16      Q.   And what was -- what was generally
17  described during that process to you?
18      A.   I was asked what I saw as some of
19  the top issues facing the City of Cleveland and
20  I listed that as one of them.
21      Q.   And were you given further
22  information about that issue from any of the
23  panelists or Mayor Jackson during this
24  discussion?
25      A.   What type of information?

21 (Pages 78 - 81)

Page 82

1    Q.   Statistics about the scope of the
2  problem in the City of Cleveland or treatment
3  programs that would be administered through the
4  Department of Public Health.
5    A.   I didn't to my recollection.
6    Q.   So this is something you
7  affirmatively brought to the table during the
8  interview process?  I think that's what you just
9  said.
10    A.   Yes.
11    Q.   And where did you become -- strike
12  that.
13        How did you become available of
14  those issues?  How did you become aware of those
15  issues?
16    A.   I'm a consumer of news and
17  information and engaged in the community.  I've
18  been in this field and there's a lot that's been
19  written on it, and especially here in Ohio
20  around this time the Ohio Attorney General had
21  put out a report.  There was information in the
22  newspaper, local newspaper, and data that was
23  available through organizations that look at
24  issues pertinent to this community.
25    Q.   Were you educating yourself as part

Page 83

1  of the application process or is this
2  information you knew prior to even deciding to
3  apply for this position?
4        MR. PIFKO:  Objection.  Compound.
5  Objection to the extent the question assumes
6  facts not in evidence.
7    A.   I was doing it both, as someone who
8  is concerned about this community and the
9  impacts, issues pertaining to this community as
10  well as work that I do in this area.
11    Q.   Let me ask this a little
12  differently.
13        So you became employed by the City
14  of Cleveland as director of the Department of
15  Public Health on June 13th, 2016?
16    A.   Correct.
17    Q.   When did you apply for the position?
18  Month and year is fine.
19    A.   It was earlier in 2016.  Maybe a
20  couple months prior.
21    Q.   Prior to that couple of months
22  before you applied, were you aware as a consumer
23  of news about some of these opioid-related
24  reports from the Ohio Attorney General or local
25  news reports?

Page 84

1    A.   Yes.
2    Q.   How far back had you been aware of
3  opioids as an issue that the City of Cleveland
4  was facing?
5    A.   I can't say specifically, but I know
6  that over the course of years this has been an
7  issue and something that I had seen and read
8  about and, again, it had been written about in
9  the local newspaper and -- and part of
10  information that I would get just as part of my
11  job and as a concerned citizen.
12    Q.   When you referred to the Ohio
13  Attorney General report when describing the
14  news, as a consumer of news that you were aware
15  of during the application process, what specific
16  report are you referring to?
17    A.   I believe that that came out in
18  2014.  There was a lot of publicity around the
19  release of this report and this information, and
20  in an attempt to try to address what had really
21  become this massive issue here in this
22  community.
23    Q.   Do you recall the title of the
24  report?
25    A.   I don't recall the title of the

Page 85

1  report, but I know it was a report that came out
2  of the Ohio Attorney General's Office.
3    Q.   And what specifically was the
4  subject matter of the report?
5    A.   It was about -- it was about
6  opiates.  It was about prescribing practices.
7  It was about the impact in our community,
8  overdoses, looking at ways that the community
9  could respond to this issue.
10    Q.   Do you think it might have been the
11  Ohio Task Force on opioid abuse?
12    A.   Might have been.  I don't recall for
13  sure the title of it.
14        - - - - -
15        (Thereupon, Deposition Exhibit 2,
16        Ohio Prescription Drug Abuse Task
17        Force Final Report, Task Force
18        Recommendations, dated October 1,
19        2010, was marked for purposes of
20        identification.)
21        - - - - -
22    Q.   I'm handing you what's been marked
23  for the deposition as Exhibit 2.  Do you think
24  this might have been the report you were just
25  referring to?  Well, first of all, have you seen

22 (Pages 82 - 85)

Page 86

1 that report before?
2    A.   I can't say specifically.  This is
3 not the report I was referring to.
4    Q.   Okay.  That's all I need to know for
5 now.  So whatever it was we were just talking
6 about, it's not your recollection that Exhibit 2
7 is the report you were referring to?
8    A.   Correct.
9    Q.   As part of your role with the
10 Cleveland Department of Public Health, do you
11 speak to Mayor Jackson on opioid-related issues?
12    A.   I have presented at cabinet where
13 the mayor is -- holds weekly meetings, and I
14 have presented there, yes.
15    Q.   How often do you present at cabinet
16 where opioid-related issues are discussed?
17    A.   I've done this a few times over the
18 last two plus years that I've been there.
19    Q.   So these are ad hoc as opposed to
20 periodic scheduled updates for Mayor Jackson?
21    A.   The cabinet meets weekly and it's
22 the entire cabinet, about 35 people, who attend,
23 and often I am asked to present or answer
24 questions, but the schedule of who speaks and on
25 what topic is not -- is not scheduled in

Page 87

1 advance.
2    Q.   So you attend the meetings and you
3 might not know before you appear that
4 opioid-related issues come up?
5    A.   That could be possible, correct.
6    Q.   Do you recall ever presenting
7 written materials for one of these cabinet
8 meetings on opioid-related issues?
9    A.   Yes.
10    Q.   When do you recall that that
11 happened?
12    A.   Early on in my tenure, so fall of
13 2016, late summer, early fall I was asked to
14 present on this particular issue.  Public safety
15 and I were asked to come up with a set of
16 recommendations for the mayor pertaining to
17 opiates, opioid-related overdose deaths,
18 fatalities, et cetera.
19    Q.   Did you prepare a PowerPoint
20 presentation?
21    A.   I did not.
22    Q.   What kind of materials did you
23 prepare for that meeting?
24    A.   These are oral presentations, so I
25 just would have had my notes.

Page 88

1    Q.   Handwritten notes?
2    A.   Sometimes they're handwritten notes,
3 but often I'll type them up and bring them just
4 so I can read them.
5    Q.   Do you recall in this instance of
6 the fall of 2016 whether you had handwritten or
7 typed notes for that meeting?
8    A.   Often I would prepare for the
9 meeting in case I was called upon to present
10 information to cabinet, so sometimes I would
11 have that, those notes handwritten, and often I
12 was bringing -- produced notes that I would have
13 typed up.
14    Q.   Do you recall seeing in the
15 production or the materials you found this
16 weekend and turned over to your attorney, seeing
17 any of those kind of written materials when you
18 were cleaning your office, handwritten
19 materials?
20    MR. PIFKO:  Objection.  Vague.
21    A.   No, I did not.
22    Q.   Do you recall what the topic of the
23 conversation was in the fall of 2016 in the
24 presentation you gave specifically?
25    A.   To some degree.  So I was presenting

Page 89

1 information from the medical examiners in terms
2 of a number of overdose deaths, what they
3 pertained to, may have also had information on
4 the number of issuances and doses of Narcan or
5 naloxone and what public safety was using, and
6 going through -- we also would have provided how
7 many patients we had seen who had come into our
8 Project DAWN clinics; also, what other
9 information was at that point available so that
10 I was giving the mayor and cabinet as much
11 information as we possibly could.
12    Q.   And I thought I heard you say that
13 you presented with somebody else from the City
14 of Cleveland this data, maybe a different
15 department.  Did I hear that correctly?
16    A.   Well, often we work in conjunction
17 with other departments, and public safety is one
18 department where I've worked very closely on
19 this particular issue.
20    Q.   And I want to be specific to this
21 meeting, the fall of 2016.  Did you co-present
22 this opioid-related data with somebody from
23 public safety?
24    A.   I don't recall that we co-presented,
25 but it would have been information that would

23 (Pages 86 - 89)

Page 90

1 have been provided from them. We met prior to
2 to make sure that I had information to present
3 at the mayor's cabinet.
4     Q.    And which functions within public
5 safety would have provided this data to you?
6     A.    So there -- this would have been
7 public safety administration, also police and
8 EMS and first responders and fire.
9     Q.    Is the medical examiner's --
10 actually, that's a county position, correct?
11     A.    Medical examiner is a county
12 position, yes.
13     Q.    Would you have gotten data from the
14 Cuyahoga County Medical Examiner's office for
15 this presentation of data to the cabinet in the
16 fall of 2016?
17     A.    Yes.
18     Q.    So do you specifically recall there
19 was discussion, for example, of opioid deaths at
20 that time?
21     A.    Yes.
22     Q.    You mentioned Project DAWN and you
23 said that some of the data would have related to
24 patients to whom kits were dispensed? I may
25 have heard you wrong. What specifically is

Page 91

1 Project DAWN?
2     A.    Sure.
3         Project DAWN is -- DAWN stands for
4 deaths avoided with naloxone. We, the City of
5 Cleveland, in our clinics we're providing
6 Project DAWN kits, and Project DAWN comes
7 from -- it's a program that Dr. Papp was
8 instrumental in creating, so we are one of the
9 distribution points for those kits, and we would
10 give those out to individuals who visited our
11 clinics.
12     Q.    Those clinics do not actually
13 administer Narcan, is that correct, or naloxone?
14     A.    It is part of the kit that is
15 distributed with Project DAWN.
16     Q.    And I understand that, but this
17 clinic doesn't provide -- actually inject Narcan
18 into patients who are suffering overdoses; is
19 that correct?
20     A.    To my knowledge, the clinic has not
21 administered the actual naloxone to a patient,
22 correct. We just provide the kits.
23     Q.    Who provides the funding for Project
24 DAWN currently?
25     A.    It is a program through Metro

Page 92

1 Hospital.
2     Q.    So does any of the funding for
3 Project DAWN clinics in the City of Cleveland
4 actually come from the City of Cleveland?
5         MR. PIFKO: Objection. Foundation.
6     A.    I can speak to the Project DAWN kits
7 that the Cleveland Department of Public Health
8 offers to the community. That is a program
9 specifically through MetroHealth.
10     Q.    Okay. So no City of Cleveland funds
11 are used to purchase the kits that are dispensed
12 by clinics run by the Cleveland Department of
13 Public Health?
14     A.    That is -- to the best of my
15 knowledge, that is correct. We fund the staff
16 who work on this project.
17     Q.    Is that all they do?
18         MR. PIFKO: Hold on. She was still
19 speaking.
20         Are you done with your answer?
21         THE WITNESS: I'm done with my
22 answer.
23     Q.    So the Cleveland Department of
24 Public Health's people who staff these clinics
25 where naloxone kits are dispensed, Narcan, is

Page 93

1 that all they do for the Cleveland Department of
2 Public Health?
3     A.    No. No. It's just part of their
4 work.
5     Q.    How many Cleveland Department of
6 Public Health employees staff those clinics or
7 are authorized to dispense Project DAWN kits?
8         MR. PIFKO: Objection. Compound.
9     A.    At this point we have about 20 staff
10 who are trained.
11     Q.    Was there a time after you were
12 hired where the clinic was -- the clinics were
13 unable to dispense kits because there wasn't
14 anybody trained to do so?
15     A.    There was a time where we had to
16 suspend offering these kits, yes, because we did
17 not have trained staff to be able to provide
18 them.
19     Q.    All right. When was that?
20     A.    I believe that that was fall of 2017
21 into the beginning of 2018. I don't recall
22 exactly the dates.
23     Q.    And prior to fall of 2017, had the
24 Cleveland Department of Public Health been
25 providing Project DAWN kits at its clinics?

24 (Pages 90 - 93)

Page 94

1    A.   Yes.
2    Q.   How long prior to that had it been
3  doing so?
4        MR. PIFKO:  Objection.  Foundation.
5    A.   I don't recall exactly how long, but
6  it had been for a fair amount of time.
7    Q.   Was the Cleveland Department of
8  Public Health issuing those kits prior to you
9  becoming employed as director of the Cleveland
10  Department of Public Health?
11        MR. PIFKO:  Objection.  Foundation.
12    A.   Yes.
13        MR. PIFKO:  Just make sure you give
14  enough time for me to object if I need to say
15  something.
16    Q.   Do you have any data or do you
17  recall any data as you sit here regarding how
18  many kits the City of Cleveland has dispensed in
19  your time with the Cleveland Department of
20  Public Health?
21        MR. PIFKO:  Objection.  Compound.
22    A.   I don't recall.
23    Q.   Is that information that the
24  Cleveland Department of Public Health would have
25  access to?

Page 95

1        MR. PIFKO:  Objection.  Foundation.
2    A.   We would have access to that.
3    Q.   And specifically the Cleveland
4  Department of Public Health, that's what I'm
5  asking about, that data exists somewhere in your
6  department?
7    A.   Most likely, yes.
8    Q.   Who would you ask if you needed to
9  find out that data within the Department of
10  Public Health?
11    A.   I would ask that of Commissioner
12  Persis Sosiak.
13    Q.   Now, going back to this period from
14  fall of 2017 to early 2018, how was it -- how
15  did it occur that there was no one at the
16  Cleveland Department of Public Health remaining
17  to dispense those kits?
18        MR. PIFKO:  Objection to the extent
19  the question calls for speculation.  Foundation.
20    A.   There was one individual who was
21  trained to provide those kits who left the
22  department in the fall of 2017, and when that
23  individual left, we realized we did not have
24  somebody who was trained to be able to provide
25  those kits.

Page 96

1    Q.   What was that person's name?
2    A.   The person's name is David Gretick.
3    Q.   So Mr. Gretick left the Cleveland
4  Department of Public Health in the fall of 2017?
5    A.   Correct.
6    Q.   Did he take a job elsewhere as a
7  City of Cleveland employee to your knowledge?
8        MR. PIFKO:  Objection.  Foundation.
9    A.   I don't know.
10    Q.   Was he fired?
11    A.   He was not fired.
12    Q.   So he voluntarily terminated his
13  employment?
14    A.   Correct.
15    Q.   Do you know why?
16        MR. PIFKO:  Objection.  Speculation.
17  Foundation.
18    A.   I do not know why.
19        MR. NAEEM:  Mr. Pifko, when I ask a
20  question about does she know, I don't believe
21  foundation is an appropriate objection because I
22  am asking her the foundational question.
23        MR. PIFKO:  Understood.
24        MR. NAEEM:  Okay.  I'm really, you
25  know, trying to adjust my questions based on how

Page 97

1  this deposition is going to satisfy you.  I
2  don't seem to be able to do so.
3        MR. PIFKO:  I'm just protecting my
4  record.
5        MR. NAEEM:  Fair enough.
6    Q.   Have you talked to David Gretick
7  since he terminated his employment with the City
8  of Cleveland?
9    A.   I had one interaction with him after
10  he left the department.
11    Q.   And have you received any
12  information from anyone about the circumstances
13  regarding why he terminated his employment?
14    A.   No.
15    Q.   Was he -- would you consider him a
16  disgruntled employee prior to his departure?
17        MR. PIFKO:  Objection.  Vague.
18    A.   I would not.
19    Q.   So to be clear about what we're
20  talking about, prior to the fall of 2017, the
21  Cleveland Department of Health only had one
22  person trained to issue Project DAWN kits?
23    A.   Correct.
24    Q.   Was that the same situation as when
25  you were employed -- became employed in June of

25 (Pages 94 - 97)

1 2016?

2    A.   Correct.

3    Q.   Do you know how long prior to June

4 of 2016 he was the only person trained to

5 provide Project DAWN kits?

6    A.   I do not, no.

7    Q.   Going back generally to the role of

8 director of the Cleveland Department of Public

9 Health, who do you directly report to?  Who is

10 your immediate supervisor?

11    A.   Natoya Walker Minor.  She's the

12 chief of public affairs.

13    Q.   And has that been the same person

14 since you were employed in June of 2016?

15    A.   Yes.

16    Q.   How many direct reports do you have?

17    A.   I have many.

18    Q.   All right.  Let's take a step back

19 and ask or give me a sense -- how is the

20 Cleveland Department of Public Health organized?

21 And I mean are there separate offices or

22 subdepartments within the greater organization.

23    A.   There are divisions.

24    Q.   How many?

25    A.   There are three divisions and also

1 the administrative function.

2    Q.   Does the administration section of

3 the Department of Public Health have any role in

4 opioid-related issues, whether it's providing

5 treatment or collecting statistics, anything at

6 all?

7    A.   In the administrative section?

8    Q.   Um-hum.

9    A.   No.

10    Q.   How many of the three divisions

11 touch on opioid-related issues?

12    A.   Division of Health.

13    Q.   Is that Ms. Sosiak?  Is she the

14 commissioner of that division?

15    A.   Correct.  Yes.

16    Q.   What are the other two divisions?

17    A.   Division of Environment, Division of

18 Air Quality.

19    Q.   How does the budget process work for

20 the Cleveland Department of Public Health?  And

21 to start off, how is it that funds are allocated

22 to the Cleveland Department of Public Health

23 from the Cleveland's general fund?

24    MR. PIFKO:  Sorry.  You asked two

25 questions there.  Are we just going with the

1 most recent one?

2    MR. NAEEM:  Yes.

3    A.   Restate the question, please.

4    Q.   Sure.

5    Starting with the revenue from the

6 City of Cleveland, how is it that funds are

7 allocated from Cleveland to the Department of

8 Public Health?

9    MR. PIFKO:  Objection to the extent

10 the question calls for speculation.

11    You can answer.

12    A.   There's an annual budget process.

13 We are essentially told that we have a certain

14 amount of general revenue fund available to the

15 department, essentially the same amount year

16 over year, if that's what's available to the

17 City overall, and then we also have -- part of

18 our budget is also grant funding and fees

19 generated through licenses and permits.

20    Q.   When you say that you are told how

21 much your annual budget is going to be and it is

22 essentially the same amount, how much is that

23 budget amount currently for this fiscal year?

24    A.   For the general fund?

25    Q.   From the City of Cleveland, yes.

1    A.   It's a little over -- I believe it's

2 a little over 8 million dollars.

3    Q.   And so that's for the 2018 budget

4 year?

5    A.   Correct.

6    Q.   And so you said essentially the same

7 amount.  I need to know from you taking the

8 position in 2016 to the current fiscal year has

9 it changed or did it change.

10    A.   It changed somewhat, yes.

11    Q.   All right.  So what was it prior to

12 this current fiscal year?

13    A.   I don't recall exactly how much it

14 was in 2016 when I -- when I joined.

15    Q.   How about 2017?

16    A.   It changed in 2017 as a result of

17 the increase in income tax after a ballot issue

18 in 2017, more than a million dollar difference

19 that came into the department through 21 new

20 staff under the general revenue fund or paid for

21 under the general revenue.

22    Q.   So we're talking about 2017,

23 correct?

24    A.   Correct.

25    Q.   All right.  What was that number

26 (Pages 98 - 101)

Page 102

1 then?
2     A.   It was over a million dollars.  I
3 don't know specifically how much it was.  I
4 don't recall.
5     Q.   Over a -- a million dollars over
6 what?
7     A.   In additional staff for the
8 Cleveland Department of Public Health.
9     Q.   Okay.  So you're the director of the
10 Cleveland Department of Public Health, correct?
11 We've established that.
12    A.   Yes.
13    Q.   All right.  And is preparing a
14 budget for your department one of the roles and
15 responsibilities you have?
16    A.   Yes, it is.
17    Q.   Is being aware of the amount of
18 funds directed from the City of Cleveland
19 general fund to your department within your
20 roles and responsibilities?
21    A.   It is.
22    Q.   All right.  So what is the top line
23 item for the amount of money allocated from the
24 City of Cleveland general revenue fund to the
25 Cleveland Department of Health in 2017?

Page 103

1         MR. PIFKO:  Objection.  Vague.
2     A.   In 2017 it was a little over 8
3 million dollars.  I don't know exactly how much
4 it is down to the penny.
5     Q.   Is it roughly the same amount as it
6 is this current year, the 8 million dollars?
7     A.   Correct, 2017, 2018.  Correct.
8     Q.   And then if we work back to 2016,
9 you said, I believe, that it was an increase of
10 about a million dollars from the prior year, so
11 2016 would be roughly 7 million dollars?
12    A.   One could surmise, yes.
13    Q.   Would you surmise?
14        MR. PIFKO:  Objection.  Asked and
15 answered.
16    A.   A million plus increase in 2017 from
17 2016, yes.
18    Q.   And what are the things that the
19 Cleveland Department of Public Health uses money
20 allocated from Cleveland's general revenue for
21 in your department?
22        MR. PIFKO:  Objection.  Overbroad.
23 Vague.
24    A.   The majority of those funds are for
25 staffing, for people.

Page 104

1     Q.   So, for example, when the number
2 went up from 2016 to 2017 by about a million
3 dollars, that was to hire the 21 new staff
4 members you talked about?
5     A.   Correct.  Salaries and benefits,
6 yes.
7     Q.   And when 21 new staffers like that
8 come into the Cleveland Department of Public
9 Health, are they assigned to a particular
10 division?
11        MR. PIFKO:  Objection.  Incomplete
12 hypothetical.
13    A.   There were -- yes, they were
14 assigned to specific divisions.
15    Q.   How many of those were assigned to
16 the Division of Health?
17    A.   Seven.
18    Q.   How many of those seven are
19 currently doing -- are currently performing
20 functions related to the opioid abuse and
21 addiction crisis?
22    A.   I -- I don't know specifically the
23 number that are -- I don't know specifically.
24    Q.   Between 2016 and 2017, during the
25 budgeting process, was it the Cleveland

Page 105

1 Department of Public Health that asked the City
2 of Cleveland for more money to hire more staff?
3     A.   Much of this was decided prior to me
4 joining, and decisions made of what positions
5 and where these positions were going to go were
6 predetermined prior to me joining the
7 department.
8     Q.   Well, as the director of public
9 health from June 2016 forward would you have
10 wanted to educate yourself about those
11 initiatives that were undertaken before you took
12 the job?
13        MR. PIFKO:  Objection.
14 Argumentative.
15    A.   I've been educating myself every
16 single day about every issue pertaining to the
17 department.
18    Q.   And when you took the position in
19 June of 2016, did you review the initiatives or
20 the request for additional staffing for the
21 Cleveland Department of Public Health?
22    A.   I did.
23    Q.   And do you have any recollection
24 regarding why the Cleveland Department of Public
25 Health was requesting 21 new staffers?

27 (Pages 102 - 105)

Page 106

1     A.   I did.  Much of it was because the
2  department had seen so many cuts in previous
3  years and was down so many staff in number of
4  program areas.  We're always in need of
5  resources and staffing to address the multiple
6  issues in the community and it had seen a
7  decline in staff and, as such, these were some
8  of the issues that went into deciding where
9  staff was needed in this enhanced budget.
10    Q.   So currently -- strike that.
11         Going back to that point in time
12 when you were reviewing the information related
13 to requests for additional staffing, during the
14 early portion of your employment in June of 2016
15 was there any discussion of the need to hire
16 people due to opioid-related programming or
17 other issues that your department was going to
18 address?
19    A.   I need you to rephrase the question.
20    Q.   Sure.
21         We've been talking about the work
22 you're doing to get yourself up to speed when
23 you took the position in 2016.  Do you recall
24 generally we've been talking about that?
25    A.   Yes.

Page 107

1     Q.   And what we were talking about
2  specifically was the request to increase
3  staffing that had been done prior to you
4  becoming employed in June of 2016.  Do you
5  recall that?
6     A.   Yes.
7     Q.   All right.  Now, what I'm asking is
8  in whatever you reviewed to get yourself up to
9  speed on that particular issue, was there any
10 discussion sent from the Cleveland Department of
11 Public Health to the City of Cleveland
12 indicating that the need for additional staffers
13 was related to the opioid-related -- to
14 opioid-related programming being done by the
15 Cleveland Department of Public Health?
16         MR. PIFKO:  Objection.  Foundation.
17    A.   I don't recall specifically.
18    Q.   And you don't -- as far as the seven
19 new staffers that have been assigned to the
20 Division of Health, you don't know whether --
21 well, strike that.  You don't know how many of
22 them are involved in Cleveland Department of
23 Public Health activities related to the opioid
24 crisis?
25    A.   I can't say specifically, but a fair

Page 108

1  amount of them are working in the area of
2  Healthy Cleveland, which has some programming in
3  this area, epidemiology and HIV, and all of this
4  has broader implications on -- on this issue in
5  the community.
6     Q.   All right.  Are those employees
7  working on anything else that touches on the
8  opioid crisis other than Healthy Cleveland?
9         MR. PIFKO:  Objection.  Foundation.
10    A.   Epidemiology for sure, and the staff
11 in HIV have had to be involved with this issue
12 as well just as we are all focused on -- on all
13 the issues pertaining to the City of Cleveland.
14    Q.   And so when you refer to
15 epidemiology, are you referring back to those
16 three employees that are currently in the
17 epidemiology department and the fact that they
18 were hired since you took the position?  Strike
19 that.  Let me start over again.
20    A.   Thank you.
21    Q.   Of the seven new employees in the
22 Division of Health, were any of those
23 epidemiologists you listed out for me earlier
24 that are currently employed?
25    A.   Yes.

Page 109

1     Q.   How many of them?
2     A.   At least one.
3     Q.   Of the other two that are currently
4  employed, were they employed at the time you
5  took your position in June of 2016?
6     A.   No.
7     Q.   So all three of them have been hired
8  under your directorship?
9     A.   Correct.
10    Q.   And what is the role of your
11 epidemiologists with respect to the opioid
12 crisis?
13         MR. PIFKO:  Objection.  Overbroad.
14         You can answer.
15    A.   Epidemiologists are tasked with
16 reviewing, analyzing data, looking at trends,
17 looking at any kind of reports, any kind of
18 analysis that has been done on issues pertaining
19 to public health and health and, you know,
20 impacts in our community.  They are on task
21 forces.  They attend a lot of meetings.  They
22 bring information to us in terms of things that
23 we need to pay attention to.  They work directly
24 with the Ohio Department of Health, so they're
25 analyzing, reviewing reports that are generated

28 (Pages 106 - 109)

Page 110

1 from them as well.  So their purpose is to make
2 sure that we are aware of what's going on, and
3 to the best of our ability, advocating for what
4 needs to be done in order to address these
5 issues and just making us aware of, again,
6 what's going on in the community.
7        THE WITNESS:  Can I take a break,
8 please?
9        MR. PIFKO:  Yes.
10        THE VIDEOGRAPHER:  Going off the
11 record.  It's 11:32.
12        (Recess had.)
13        THE VIDEOGRAPHER:  Back on the
14 record.  The time is 11:52.
15        MR. PIFKO:  Real quick, it's a
16 little early for lunch, so I thought we would go
17 maybe not like a full hour and we can break for
18 lunch so people don't get too hungry.
19        MR. NAEEM:  Yes.  You let me know.
20 BY MR. NAEEM:
21    Q.   Ms. Gordon, at the time we went off
22 the record, we were talking about the
23 epidemiologists who are employed by the
24 Department of Public Health.  Do you recall
25 generally?

Page 111

1    A.   Generally, yes.
2    Q.   You said one of the things they do
3 is they look for trends.  They are looking for
4 more than just opioid trends with their job at
5 the City of Cleveland, correct?
6    A.   Correct.
7    Q.   So it could be influenza trends?
8    A.   Correct.
9    Q.   They're not specialists on opioid
10 abuse and addiction?
11    A.   These are not, no.
12    Q.   You mentioned that they participate
13 in task forces.  Do you recall saying that?
14    A.   Yes.
15    Q.   And are those task forces devoted to
16 opioid abuse and addiction?
17    A.   They're -- I know that they have
18 been involved with the Cuyahoga County Opiate
19 Addiction Task Force.  I know that they're
20 involved with a number of things throughout the
21 community.
22    Q.   And I just want to get an
23 understanding of when you said task forces --
24 we're here to talk about opioid abuse and
25 addiction.  I want to know which opioid abuse

Page 112

1 and addiction task forces they participate on.
2 You mentioned Cuyahoga County.  Are there any
3 others?
4    A.   Not to my knowledge, and, yeah,
5 they're given information from that committee,
6 yeah, from that task force, yes.
7    Q.   I'm sorry.  They're given
8 information from that task force or they provide
9 information to that task force?
10        MR. PIFKO: Objection.  Compound.
11    A.   I don't know specifically if they're
12 giving information directly to the task force.
13    Q.   So what is your understanding of the
14 role of your epidemiologists in the Cuyahoga
15 County Opioid Task Force?
16    A.   It is my understanding that they
17 have information that is provided from the task
18 force.  I believe that they receive e-mails
19 from -- from that task force.
20    Q.   Do they provide data --
21        MR. PIFKO:  Are you done answering?
22    A.   I don't -- I don't recall if there's
23 any -- what else specifically.
24    Q.   Do you know whether or not they
25 provide Cleveland data regarding abuse -- opioid

Page 113

1 abuse and addiction to the task force?
2    A.   I don't know for sure.
3    Q.   Do you know what sources of data
4 your epidemiologists have to look at trends
5 related to opioid abuse and addiction?
6    A.   I don't know for sure.
7    Q.   Do they have access to medical
8 examiner data from Cuyahoga County?
9    A.   They do have access to some of that
10 information, yes.
11    Q.   And is that -- does that have to be
12 provided to them by a county employee or can
13 they directly access that data?
14        MR. PIFKO: Objection.  Foundation.
15    A.   I don't know the vehicle by which
16 they would receive that.  They -- they also
17 receive information from the Ohio Department of
18 Health.  They seek information.  They have
19 access to -- to databases that I don't know
20 exactly what they are specifically, but I know
21 that they are always actively seeking
22 information to, again, help the department and
23 provide data that helps us collectively around
24 this issue and others.
25    Q.   How often do you discuss opioid

29 (Pages 110 - 113)

Page 114

1 abuse and addiction trends with your
2 epidemiologists?
3     A.   They report directly to the
4 commissioner of health, and those conversations
5 I know take place.
6     Q.   Do they ever get escalated up to
7 you?
8     A.   Oh, sure.
9     Q.   What kind of issues get escalated to
10 you, from epidemiologists to Ms. Sosiak to you?
11     A.   They are provided information often
12 from the Ohio Department of Health when there
13 are cases or instances where there have been a
14 spike in OD deaths, when there's new reports
15 that come out, whether that's national or local
16 or state level, and they give that information
17 to her and she and I meet regularly and discuss
18 this issue.
19     Q.   How often do you meet with
20 Ms. Sosiak to discuss opioid abuse and addiction
21 issues?
22     A.   I can't put an actual number to
23 that.
24     Q.   Do you have a standing meeting to do
25 so, weekly, monthly?

Page 115

1     A.   We talk almost every day.  There are
2 always issues that -- that are germane to the
3 department.  And I'm also given a lot of
4 information that comes in to me as well, whether
5 that's from public safety.  I get a lot of
6 reports.  I get incident reports from public
7 safety, sheer volume of OD deaths, fatals and
8 non-fatals as a result of ODs.  And as I have
9 this information, I often am talking to her
10 about this as well.  We are constantly working
11 on these issues.
12     Q.   Now, opioid abuse and addiction
13 aren't the only issues Ms. Sosiak is dealing
14 with as commissioner of the Division of Health?
15     A.   That's correct.
16     Q.   All right.  So when you have
17 conversations with her about public health
18 issues, it's not always about opioids?
19     A.   That's true.
20     Q.   And when you were talking about, for
21 example, reports that the epidemiologists get
22 from the Department of Health and they might
23 forward to Ms. Sosiak, you said new reports.
24 You're talking about actual physical documents,
25 reports, assessments, those kinds of things, or

Page 116

1 there was a report of a carfentanil death last
2 night?  What kind of reports are you talking
3 about?
4         MR. PIFKO:  Objection.  Overbroad.
5 Compound.
6     A.   Data and information is provided to
7 the health department in a variety of different
8 ways.  Some of these can be actual paper
9 documents.  Oftentimes it's data that might be
10 pulled from databases and sometimes there are
11 actual reports that are generated from the
12 various divisions within the Ohio Department of
13 Health and to others, what they're tracking.
14     Q.   But you, as you sit here today,
15 don't know what databases your epidemiologists
16 have direct access to for opioid-related data?
17     A.   I can't say for sure what they are.
18     Q.   Do you know any databases that they
19 have access to from which you get reports
20 escalated to you?
21     A.   I don't remember the names of them
22 specifically.
23     Q.   Have you heard of EpiCenter?
24     A.   I have heard of EpiCenter.
25     Q.   Is that a database that provides

Page 117

1 information regarding opioid abuse and addiction
2 issues?
3     A.   I believe that it does.
4     Q.   Do you see those reports from
5 EpiCenter?
6         MR. PIFKO:  Objection.  Vague.
7     A.   I don't know if the reports I've
8 seen came directly from EpiCenter.
9     Q.   What is EpiCenter?  Can you describe
10 it?
11     A.   It's a state database of a variety
12 of different data elements that pertain to
13 public health, epidemiology trends, statistics,
14 surveillance data, and that is collected
15 statewide and then it's analyzed also on the
16 state level and provided back to the health
17 departments.  I don't know if it has any other
18 public access, but is available for us to be
19 able to see data essentially in real time to be
20 able to do what we need to do to impact our
21 community.
22     Q.   Does -- do your epidemiologists use
23 that data to prepare local reports on opioid
24 abuse and addiction?
25         MR. PIFKO:  Objection.  Foundation.

30 (Pages 114 - 117)

Page 118

1 Calls for speculation.
2     A.   I believe so.  They are using a
3 variety of different sources of information.
4     Q.   Do you ever review those reports
5 yourself as director of public health?
6     A.   I'm given a lot of information on a
7 daily basis.
8     Q.   Well, do you recall reviewing any of
9 those EpiCenter reports since you took your
10 position in June of 2016?
11     A.   I cannot say for sure.
12     Q.   So if I asked you what kind of data
13 is reported in those reports, you wouldn't be
14 able to answer those questions?
15     A.   I know that there are a number of
16 databases that our staff uses to track and
17 analyze information pertaining to public health
18 of our community.  How that might be put
19 together and from which -- which sources is --
20 is -- I have to trust that my staff is doing
21 what they know best and what we've hired them to
22 do and bringing this information to the
23 commissioner's attention and to my attention.
24     Q.   Okay.  So you don't supervise those
25 epidemiologists directly; is that what you're

Page 119

1 saying?
2     A.   I do not.
3     Q.   Ms. Sosiak, is she the one who
4 directly supervises epidemiologists?
5     A.   She is.
6     Q.   Is she the one who sets their job
7 responsibilities on a day-to-day basis?
8     A.   Yes.
9             - - - - -
10           (Thereupon, Deposition Exhibit 3,
11           CDPH Bi-Weekly Drug Related ER
12           Visits Report, was marked for
13           purposes of identification.)
14             - - - - -
15     Q.   I'm handing you what's been marked
16 as Deposition Exhibit 3.  Do you recognize what
17 this document is?
18     A.   Yes, I've seen this report, these
19 reports, reports that look like this.
20     Q.   How often do you see them?
21     A.   I see them periodically.
22     Q.   So do you go looking for these
23 reports or do you rely on folks to send them up
24 to you when there are issues that need to be
25 addressed?

Page 120

1     MR. PIFKO:  Objection.  Compound.
2     A.   Sorry.  Repeat the question.
3     Q.   Sure.
4       How often do you see these reports?
5     MR. PIFKO:  Objection.  Asked and
6 answered.
7     A.   I see reports that look like this on
8 some regular basis.
9     Q.   Do you ever discuss the data you see
10 in this with Ms. Sosiak?
11     A.   Yes, we have discussed this kind of
12 information.  Yes.
13     Q.   Are you familiar with the type of
14 data that is being reported in these reports?
15     A.   Yes.
16     Q.   Do the data points change over time
17 or do the reports always look the same?
18     A.   What do you mean by data reports?
19     Q.   Data points.
20     A.   Excuse me.  What do you mean by data
21 point?
22     Q.   Well, do you know what is being
23 reported in these reports?
24     A.   Yes.
25     Q.   Okay.  What is it that's being

Page 121

1 reported?
2     A.   Well, as it says here, these are
3 drug-related ER visits, and they are just looked
4 at in different ways, whether it's by zip code
5 and by gender, by age group, just different ways
6 of analyzing data and reporting data.
7     Q.   And at the top do you recognize that
8 logo?
9     A.   I do recognize the logo.
10     Q.   All right.  What is that?
11     A.   That is the old Cleveland Department
12 of Public Health logo.
13     Q.   So this report is something that is
14 prepared by your department?
15     MR. PIFKO:  Objection to the extent
16 the question mischaracterizes the record and
17 assumes facts not in evidence.
18     A.   I can't say for sure, but if our
19 logo was on it, there's a high likelihood that
20 this was produced in the health department.
21     Q.   All right.  And it says,
22 "Drug-Related ER Visits."  Do you know whether
23 that's specific to opioids or is that all drugs?
24     A.   I don't know for sure.
25     Q.   Okay.  So if I wanted to know more

31 (Pages 118 - 121)

Page 122

1 about this, I would perhaps talk to Ms. Sosiak?
2     A.   Yes.
3     Q.   Or perhaps one of the
4 epidemiologists who prepares this report?
5     A.   Yes.
6     Q.   All right.  Do you ever escalate
7 these types of reports up to Ms. Walker or Mayor
8 Jackson?  I'm sorry if I got her name wrong.
9 Where did we have that?  Ms. Walker Minor, do
10 you ever escalate these reports up to her?
11     A.   I have used data from reports like
12 this when I've talked to her about issues that
13 are plaguing our city, this being one of them,
14 yes.
15     Q.   All right.  When is the last time
16 you recall doing that?
17     A.   I've done it at least perhaps a
18 couple times this year so far.
19     Q.   Okay.  When is the last time you did
20 it?
21     A.   I can't recall.
22     Q.   And how do you transmit those to
23 her?
24     A.   It's in one-on-one meetings with
25 her.

Page 123

1     Q.   So you take a version of this and
2 you hand it to her?
3     A.   No, not necessarily.
4     Q.   Do you send them by e-mail?
5     A.   No.  We will just talk about the
6 information.
7     Q.   What's the type of information in
8 this report that you would have spoken to
9 Ms. Walker Minor about?
10     MR. PIFKO:  Objection to the extent
11 the question mischaracterizes the record.
12 Assumes facts not in evidence.
13     A.   I would talk to her about what --
14 what continues to be a huge issue that our city
15 is facing and what is going on in our city
16 related to drugs and addiction that has related
17 to this crisis.
18     Q.   Okay.  So you're continuing to
19 report to her about the ongoing issues with
20 substance abuse that the city is facing; is that
21 a fair characterization of what you just said?
22     A.   You'll have to repeat what you just
23 said.
24     Q.   You are discussing with her the
25 ongoing issues that the city is having with

Page 124

1 substance abuse; is that a fair
2 characterization?
3     A.   We have -- we have a crisis going on
4 and I'm talking to her about the information
5 that is -- is generated, analyzed, looked at
6 from the department, and making sure that she
7 has the information she needs as well because
8 this is -- this is a crisis in our city.
9     Q.   Okay.  And when you refer to "the
10 crisis," just that we're clear and the record is
11 clear, are you referring to something broader
12 than opioid crisis?
13     A.   I believe you mentioned it as an
14 opioid crisis earlier today, so yes, an opioid
15 crisis.
16     Q.   Well, Ms. Gordon, I'm just following
17 up on the question you asked.  You referred to
18 "the crisis."  Is there a meth amphetamine
19 crisis in the City of Cleveland?
20     MR. PIFKO:  Objection.  Foundation.
21     A.   I'm not saying that.
22     Q.   I'm simply trying to understand when
23 you used the phrase "the crisis" in your answer,
24 were you referring to the opioid crisis or
25 something broader than that?

Page 125

1     A.   I'm referring to the crisis that's
2 in our city related to addiction brought upon
3 because of drugs and opioids that have come into
4 the city.
5     Q.   Okay.  Are the drugs you're
6 referring to opioids or are they stimulants,
7 like cocaine?
8     MR. PIFKO:  Objection.  Compound.
9     A.   We have a lot of information.  These
10 are opioids.
11     Q.   So when you used the phrase "the
12 crisis" in your answer, you're not limiting your
13 answer to opioids?
14     A.   I didn't hear a question.
15     Q.   When you referred to the word
16 "crisis" in your answer regarding what
17 information and discussions you have with
18 Ms. Walker Minor, were you referring to all
19 drugs in the City of Cleveland?
20     A.   We're talking about the opioid
21 crisis in the City of Cleveland.
22     Q.   Okay.  Now, when you look at this
23 report, is it limited to just opioids?
24     MR. PIFKO:  Objection.  Foundation.
25 The data speaks for itself.

32 (Pages 122 - 125)

Page 126

1    Q.   Let me ask you a different question.
2  I'll strike that.
3    A.   Okay.
4    Q.   When you look at this and when you
5  report to Ms. Walker Minor, do you know whether
6  it's limited to opioids?
7         MR. PIFKO:  Objection to the extent
8  the question assumes facts not in evidence.
9    A.   I would look at what's on page 2 and
10  the information that's provided and taking this
11  all in context.
12    Q.   Okay.  So the answer is what?  Is it
13  limited to opioids when you review this
14  document?
15         MR. PIFKO:  Objection.  Vague.
16    A.   I can't say that it is or is not.
17    Q.   Well, you just directed me to look
18  at page 2.
19    A.   Um-hum.
20    Q.   So why would I look at page 2 for
21  any other reason?  I'm trying to understand what
22  you said, Ms. Gordon.  I asked whether this data
23  is limited to opioids.  Do you recall me asking
24  that question?  We can start again.
25         MR. PIFKO:  Objection.

Page 127

1  Argumentative.  For the record, there's no
2  question pending.
3    A.   Counsel, the title of this report is
4  "Biweekly Drug-Related ER Visits."
5    Q.   Yes.  You pointed that out to me
6  before, if you'll recall, and I asked is it
7  limited to opioids.
8    A.   I can't say that it is limited to
9  opioids, and --
10    Q.   And then you directed --
11         MR. PIFKO:  Hold on.  She's still
12  talking.
13    A.   Looking at page 2, you have to look
14  at what the data sources are to really
15  understand what is -- what's being provided in
16  the data, and so I look at what the data sources
17  are and what this information is actually trying
18  to convey.
19    Q.   That's what I'm asking you.  Does it
20  convey data regarding strictly opioid ER visits?
21         MR. PIFKO:  Objection.  The document
22  speaks for itself.
23    A.   It is not.  It says here that it is
24  referencing key words and abbreviations used in
25  ER visits.  That is what this is reporting.

Page 128

1    Q.   Okay.  Ms. Gordon, you are the
2  director of Cleveland Public Health, correct?
3    A.   That is true.
4    Q.   Persis Sosiak is the commissioner of
5  health, correct?
6    A.   Correct.
7    Q.   She works for you?
8    A.   Yes.
9    Q.   You testified you've had
10  conversations with Ms. Sosiak about these
11  reports, correct?
12    A.   Correct.
13    Q.   You have had conversations with your
14  supervisor or the person you report up to,
15  Ms. Walker Minor, about this report, correct?
16    A.   Correct.
17         MR. PIFKO:  Objection to the extent
18  the question mischaracterizes the record.
19    Q.   Does it or does it not relate to
20  drug-related ER visits generally?
21         MR. PIFKO:  Objection.  The document
22  speaks for itself.  Foundation.
23    Q.   Let me ask another question.
24         When you look at this report, is
25  there anything in this report that tells you how

Page 129

1  many of these ER visits were related to opioids?
2    A.   No, it does not.
3    Q.   Is there anything in this report
4  that tells you how many of these ER visits were
5  related to prescription opioids?
6         MR. PIFKO:  Objection.  The document
7  speaks for itself.
8    A.   No, it does not.
9    Q.   Is there anything in here that tells
10  you how many of these overdoses were related to
11  heroine?
12         MR. PIFKO:  Same objection.
13    A.   No, it does not.
14    Q.   Anything in here that talks about
15  how many overdoses with illicit fentanyl?
16         MR. PIFKO:  Same objection.
17    A.   No, it does not.
18    Q.   Does it tell you anything regarding
19  how many of those ER visits were alcohol
20  related?
21         MR. PIFKO:  Same objection.
22    A.   Not specifically.
23    Q.   Does it appear that alcohol-related
24  ER visits would be included within this report?
25         MR. PIFKO:  Same objection.

33 (Pages 126 - 129)

Page 130

1     A.    It is included in the report.
2     Q.    And specifically to answer that
3 question, you're looking at the bottom of page 2
4 which describes the data points that are
5 included in the analysis, correct?
6     A.    Correct.
7     Q.    So all of these could be
8 alcohol-related ER visits; would you agree?
9         MR. PIFKO:  Objection.  Calls for
10 speculation.
11     A.    It's highly unlikely.
12     Q.    But they could be?
13         MR. PIFKO:  Same objection.
14     A.    It takes into account a whole number
15 of -- of elements of ER visits.  So it's a
16 collection of information.  It's not specific to
17 any one.
18     Q.    So, again, it could -- any one of
19 these data points for a zip code or a particular
20 week, that week could have all been
21 alcohol-related incidents?
22         MR. PIFKO:  Objection.  Incomplete
23 hypothetical.  Calls for speculation.
24     Q.    We don't know, that's the point,
25 right?  We don't know from looking at this?

Page 131

1     A.    It doesn't go to that level of
2 specificity.
3     Q.    Right.  We don't know from looking
4 at this because this report doesn't tell us how
5 many of those are opioid-related versus other,
6 right?
7         MR. PIFKO:  Objection.  Document
8 speaks for itself.
9     A.    Correct.
10     Q.    Within the context of the functions
11 performed by the Division of Health in the
12 Cleveland Department of Health, you mentioned
13 Healthy Cleveland and the programming they do.
14 You mentioned epidemiologists.  You also
15 mentioned HIV.
16     A.    Yes.
17     Q.    First of all, are there any other
18 functions within the Division of Health that
19 relate to opioids, touch on opioids that we
20 haven't listed --
21     A.    Sure.
22         Well, most importantly, we have an
23 office on mental health and substance abuse.  We
24 are -- we have a registrar that does vital
25 statistics, birth and death certificates.  We

Page 132

1 have emergency preparedness, nursing clinics,
2 STIs, infant mortality.
3     Q.    And, to be clear, those are not all
4 specifically touching the opioid crisis we've
5 been talking about?
6     A.    Pretty much everything within the
7 health department does touch this issue in some
8 way, shape or form, yes.
9     Q.    Do flu vaccines touch on the opioid
10 crisis?
11     A.    We train all of our staff to
12 recognize issues of addiction, talking to
13 patients, and we've needed to prepare people
14 because this has -- again, this has been a big
15 impact in our city and all of our staff has
16 needed to be -- needed to have a level of
17 understanding of the issue and how to talk to
18 the individuals and families who seek our
19 services and make sure that they know how to
20 respond therein.
21     Q.    So give me an example of somebody
22 who would be providing a flu vaccine and how
23 that would touch on the opioid crisis.
24         MR. PIFKO:  Objection.  Incomplete
25 hypothetical.

Page 133

1         You can answer.
2     A.    Have an individual present and --
3 seeking a flu vaccine, and we have staff who
4 talk to them in generalities about what's going
5 on in their lives and in their home situation
6 and if anything else is impacting their life at
7 that time, themselves or their family; and so
8 within that conversation they're trained to
9 understand if they have additional needs,
10 whether it's treatment for addiction for
11 themselves again, for their family, or whatever
12 their situation is.  So yeah, we've had to train
13 all of our staff regarding this.
14     Q.    Okay.  Who is in charge of training
15 your staff, specifically those who provide flu
16 vaccines to members of the public?
17     A.    That would be the responsibility of
18 the Office of Mental Health and Substance Abuse.
19 We've also had additional training for the
20 staff.  There's some things that the
21 commissioner has provided as well.  They have
22 regular staff meetings within each division and
23 talk about this issue and have been bringing
24 this to the attention of the staff for years.
25     Q.    Okay.  Who was in charge of training

34 (Pages 130 - 133)

Page 134

1 the folks that give flu vaccines, a name please
2 within the department currently?
3     A.   I'm sorry.  Your question, who was
4 in charge?
5     Q.   Who trains the people that actually
6 give flu vaccines to members of the public?
7     A.   Sure.  Director of nursing.  Her
8 name is Jeannie Johnson.
9     Q.   And the folks that give flu vaccines
10 to members of the public, are they employees of
11 the Department of Health?
12         MR. PIFKO:  Objection.  Vague.
13     Q.   Strike that.
14         Ms. Gordon, you're the director of
15 public health, correct?
16     A.   That is correct.
17     Q.   And in that role do you take it upon
18 yourself to understand the services provided by
19 the Department of Health?
20     A.   Yes.
21     Q.   Do you take it upon yourself to know
22 what the employees of the Department of Health
23 do?
24     A.   I have over 160 employees and we run
25 over 30 programs, and it is a -- I'm constantly

Page 135

1 trying to interact with -- with my commissioners
2 and with the program managers who oversee all of
3 these programs.  So yes.
4     Q.   Okay.  And is flu vaccines one of
5 the programs that your Department of Health
6 provides?
7     A.   Yes.
8     Q.   Okay.  And we know that the director
9 of nursing, Jeannie Johnson, is somebody who
10 trains the people who give flu vaccines because
11 that's what you told me two minutes ago?
12     A.   Yes.
13     Q.   Now, the people who actually
14 administer those flu vaccines, are they
15 employees?
16     A.   Yes.  Some of them are employees and
17 some of them are contractors.
18     Q.   And the employees you describe, they
19 receive training on opioid-related issues is
20 what you've told me?
21     A.   We have had -- I know that they have
22 had some training in this area of what to
23 observe with patients when they present from
24 individuals who are administering influenza
25 vaccinations, yes.

Page 136

1     Q.   Are there written materials provided
2 that describe that?
3     A.   I don't know if there are specific
4 written materials.  I know that there's -- this
5 is discussed at their monthly -- monthly
6 meetings -- if they're monthly or quarterly I
7 can't recall, but there are -- issues like this
8 does -- it comes up.
9     Q.   Okay.  And we're talking about
10 training?
11     A.   Training.
12     Q.   And the contractors who do flu
13 vaccines, are they given the same training?
14     A.   I believe that they all attend those
15 meetings as well, so yes.
16     Q.   And any initial training that's done
17 when a new employee or a new contractor is
18 brought on to do flu vaccines, is there written
19 materials that are provided that discuss opioids
20 and how to deal with that when giving a flu
21 vaccine?
22     A.   I'm not aware of that level of
23 specificity.
24     Q.   And whatever discussions within that
25 training that are related to opioids, has that

Page 137

1 been going on since before you became the
2 director of the Department of Public Health?
3     A.   Yes.
4     Q.   That's not some program you
5 initiated?
6     A.   No.
7     Q.   And when I say "program," I mean the
8 training of people who give flu vaccines to be
9 aware of opioid-related issues.
10     A.   They are not independent of the
11 other nurses that we -- that we employ to do
12 programming within our clinics and in the
13 community.
14     Q.   So the folks that staff these
15 clinics who provide flu vaccines might provide a
16 range of services?
17     A.   Correct.
18     Q.   Is that what you're telling me?
19     A.   Yes.
20     Q.   Pregnancy testing, is that something
21 the Department of Health does?
22     A.   We do pregnancy testing, yes.
23     Q.   HIV testing --
24     A.   Yes.
25     Q.   -- we talked about that a little

35 (Pages 134 - 137)

Page 138

1 bit?
2  A.  We provide HIV testing.
3  Q.  Lead screenings?
4  A.  Correct.
5  Q.  Immunizations?
6  A.  Correct.
7  Q.  TB testing?
8  A.  We do some TB testing, yes.
9  Q.  Are there any health services
10 provided directly within the clinic to opioid
11 abusers?
12  A.  Yes.
13  Q.  Any services that relate
14 specifically to opioid treatment?
15  A.  Yes.
16  Q.  What are those?
17  A.  In our Office of Mental Health and
18 Substance Abuse we do have some treatment
19 programs.  We do some intensive counseling.  A
20 program with the drug court called CenterPoint,
21 so we provide counseling, intensive counseling
22 and treatment there.  Distribute the Project
23 DAWN kits.  We also work in schools or a school
24 for a prevention program with youth.
25  Q.  Anything else?

Page 139

1  A.  We do a lot of health promotion
2 where we attend as many community events and
3 health fairs in the community and staff tables
4 and staff events.  We have a mobile clinic where
5 we work with -- it's focused on moms -- pregnant
6 women and our efforts around infant mortality.
7 And they, too -- we have community health
8 workers who are trained in identifying, working
9 with individuals who have addiction issues and
10 working with them and directing them to
11 resources.  It's -- a fair amount of the work
12 that we do is making sure that people are
13 matched with -- with available resources if
14 there are.
15      We are desperate for resources in
16 this community for treatment for addressing this
17 issue.  We recognize that.  We are trying to do
18 as much as we possibly can with our limited
19 staff and the limited resources that are
20 available to the -- to our department, and
21 always looking for ways that we can increase our
22 budget to make sure that we are addressing this
23 issue.  This is -- this is huge and it's --
24 we -- we need the resources to be able to deal
25 with this issue.

Page 140

1  Q.  Suing drug companies, that's one way
2 to get additional resources?
3      MR. PIFKO:  Objection.
4 Argumentative.
5  A.  The City of Cleveland has chosen
6 to -- to file this suit because we're seeking
7 damages to help with what has been a huge burden
8 on this community in the past, what's going on
9 right now, and what we know will be in the
10 future with these individuals who are addicted
11 to these pills and addicted to drugs.  Just the
12 types of issues often feels insurmountable as it
13 has impacted our community.
14  Q.  And, Ms. Gordon, do you know what
15 the phrase "pill mill" refers to?
16  A.  I've heard that phrase, yes.
17  Q.  What does it mean?
18  A.  I've heard this phrase used as a
19 term where there are outlets for individuals
20 seeking pain relief or relief -- feed their
21 addiction with additional pills to deal with
22 their pain or deal with their addiction.
23  Q.  Do you believe that these pill mills
24 contributed to the opioid crisis we're talking
25 about today?

Page 141

1      MR. PIFKO:  Objection.  Foundation.
2  A.  I don't think I can respond to that.
3  Q.  Well, I don't know what that means.
4 You can respond with yes, no or I don't know.
5 So do you think pill mills have contributed at
6 all to the opioid crisis we're talking about?
7      MR. PIFKO:  Objection.  Foundation.
8 Objection to the extent the question calls for a
9 legal conclusion or a legal issue in the case.
10      You can answer.
11  A.  I don't know.  Excuse me.  I don't
12 know.
13  Q.  All right.  Again, you're the
14 director of the Department of Public Health in
15 the City of Cleveland?  Yes?
16  A.  Yes.
17  Q.  We just talked about a lot of
18 programs that you described within the
19 department that touch on opioid abuse and
20 addiction issues, services that are provided to
21 the community.  Do you recall?
22  A.  I do.
23  Q.  You talked about suing defendants
24 for responsibility for the opioid crisis?
25      MR. PIFKO:  Objection.

36 (Pages 138 - 141)

Page 142

1 Mischaracterizes.
2    Q.   You brought that up, right?
3    A.   No.  You brought that up.
4    Q.   Fair enough.
5        That's something that's being done
6 right now by the City of Cleveland, you agree,
7 that's why we're here?
8    A.   That's why we're here, yes.
9    Q.   You know what pill mills are?  You
10 described that, right?
11   A.   To some degree.  I know a little bit
12 about what these are.
13   Q.   Well, you're a consumer of news
14 about opioid issues, you've read about pill
15 mills?
16   A.   I've read about a lot of things.
17   Q.   You've read reports at least from
18 the Ohio AG's office.  You told me that, right?
19   A.   Yeah.
20   Q.   Have you read about pill mills in
21 any of those reports or in news sources you
22 referred to as a consumer of news?
23   A.   I have.
24   Q.   And based on anything you've read,
25 do you have a belief, personal belief, as to

Page 143

1 whether pill mills, for example, have
2 contributed to the opioid crisis?
3    A.   May have contributed to the opioid
4 crisis, yes.
5    Q.   What's the City of Cleveland doing
6 to hold them accountable for the opioid crisis?
7        MR. PIFKO:  Objection to the extent
8 the question assumes facts not in evidence,
9 foundation, speculation.  Objection to the
10 extent the question calls for legal conclusions
11 or opinions.
12       You can answer.
13       Oh, and objection to the extent
14 you've had conversations with counsel about that
15 issue.  I'm going to instruct you not to reveal
16 any confidential communications you've had with
17 counsel about that issue.
18       Aside from that, you can answer.
19   Q.   I don't remember what the question
20 is.  Do you?
21   A.   Perhaps you could rephrase the
22 question.
23   Q.   Okay.
24       Has the City of Cleveland sued
25 operators of pill mills as part of this

Page 144

1 complaint seeking damages for the crisis, the
2 opioid crisis we've been discussing?
3        MR. PIFKO:  Objection.  Foundation.
4 Calls for a legal conclusion.
5    A.   I do not know.
6    Q.   Have you seen the complaint?
7    A.   I have seen the complaint.
8    Q.   Have you seen the names of any pill
9 mill operators in the complaint?
10       MR. PIFKO:  Objection.  Foundation.
11       MR. NAEEM:  She just said she saw
12 the complaint.
13   A.   I don't know.
14   Q.   You don't know if you've seen any
15 pill mill operators in the complaint?
16   A.   No.
17       MR. PIFKO:  We talked about taking a
18 break for lunch after 12:30.
19       MR. NAEEM:  If you want to take a
20 break now, it's fine.
21       MR. PIFKO:  All right.
22       THE VIDEOGRAPHER:  Off the record.
23 The time is 12:35.
24
25       (Luncheon recess taken.)

Page 145

1        THE VIDEOGRAPHER:  Back on the
2 record.  The time is 1:32.
3        - - - - -
4        AFTERNOON SESSION
5        CONTINUED EXAMINATION OF MERLE GORDON
6 BY MR. NAEEM:
7    Q.   Ms. Gordon, before we took a break,
8 we had been talking about pill mills.  I wanted
9 to move on and ask, are there substances other
10 than prescription opioids that you believe have
11 contributed to the opioid crisis in the City of
12 Cleveland?
13       MR. PIFKO:  Objection to the extent
14 the question calls for expert opinion, legal
15 opinion.
16       You can answer.
17   A.   I'm sorry.  You're going to have to
18 repeat the question.
19   Q.   Are there substances other than
20 prescription opioids that you believe have
21 contributed to the opioid crisis in the City of
22 Cleveland?
23       MR. PIFKO:  Same objections.
24   A.   I believe that they were the most
25 significant contributing factor to the opioid

37 (Pages 142 - 145)

1 crisis in the City of Cleveland.
2     Q.   Well, that's not what I asked, but
3 can you pull out Exhibit 1-A from the stack of
4 exhibits we've marked?
5     A.   Yes.
6     Q.   You, again, to refresh, have seen
7 this document, correct?
8     A.   Yes.  This is an agenda for the U.S.
9 Attorney's Office opioid addiction task force
10 that I attend.
11    Q.   And what is the date that that
12 meeting was to be scheduled?
13    A.   It says on the document Friday,
14 October 7, 2016.
15    Q.   All right.  And that's roughly four
16 months after you started with the Department of
17 Health?
18    A.   Roughly, yes.
19    Q.   We've established, I believe, and
20 correct me if I'm wrong, but the handwritten
21 notes on this document are yours?
22    A.   They look like mine, yes.
23    Q.   And this is a document that you
24 discovered this weekend and turned over to your
25 counsel a couple of days ago?

1     A.   I believe this was part of the
2 documents, yes.
3     Q.   So your handwritten notes, they are
4 notes of discussions that were ongoing during
5 the meeting?
6     A.   I cannot say for sure, but they
7 appear to be notes that were taken during that
8 meeting.
9     Q.   Okay.  Well, the alternative would
10 be they are your analysis, independent analysis,
11 correct?
12         MR. PIFKO:  Objection to the extent
13 the question assumes facts not in evidence.
14    A.   I suppose that's the alternative,
15 but -- yeah, it looks to be -- looks to be notes
16 taken from that meeting.
17    Q.   Okay.  And on page 1, the first line
18 of your handwritten notes, what does it say?
19    A.   It says, "Fentanyl attracting
20 younger people."
21    Q.   And what does the second line say?
22    A.   The second line on this document,
23 the handwritten note, says, "Prescribing
24 practices are no longer the precursor to OD."
25    Q.   And OD means overdose?

1     A.   I assume so.
2     Q.   And, again, this was October 7,
3 2016, roughly four months after you started with
4 the Department of Health, correct?
5     A.   Correct, and most likely what was
6 said at the meeting just taking notes.
7     Q.   You can put that aside.
8          -  -  -  -  -
9          (Thereupon, Deposition Exhibit 4,
10         Document Entitled "Opiate Response
11         Presentation:  Merle Gordon,
12         Director of Public Health,"
13         Beginning Bates Stamp
14         CLEVE_000187960, was marked for
15         purposes of identification.)
16         -  -  -  -  -
17    Q.   I'm going to hand you what we've
18 marked as Deposition Exhibit 4.  Now, the
19 question I had asked originally of you when we
20 came back on the record, Ms. Gordon, was, do you
21 believe there are substances other than
22 prescription opioids that have contributed to
23 the opioid crisis.  So I'll repeat that
24 question.  Do you believe there are substances
25 other than prescription opioids that have

1 contributed to the opioid crisis?
2          MR. PIFKO:  Objection.  Foundation.
3 Objection to the extent that question calls for
4 a legal opinion, legal conclusion, expert
5 opinion.
6     A.   My answer remains.
7     Q.   Okay.  So Exhibit 4, do you
8 recognize this document?
9     A.   I recognize the document.
10    Q.   Do you recall the date that this
11 document would have been prepared?
12         MR. PIFKO:  Objection.  Foundation.
13    A.   I do not.  Often documents are
14 created, my name is put on them as -- whether in
15 draft form, final form, that are related to work
16 done from the Cleveland Department of Public
17 Health.
18    Q.   But you don't dispute the fact that
19 this document was created at some point while
20 you were director of the Department of Health,
21 do you?
22         MR. PIFKO:  Objection.  Foundation.
23    A.   I don't dispute that.  Apparently
24 so.
25    Q.   And what is the title of the

1 document?
2    A.   "Opiate Response Presentation."
3    Q.   And whose name is listed underneath
4 that?
5    A.   My name is underneath that.
6    Q.   Do you recognize this as potentially
7 a document you used to provide presentations to
8 the cabinet that we discussed earlier?
9    A.   I do not.  The information I would
10 have provided to the cabinet is -- would not
11 have looked like this.
12    Q.   Do you have any specific
13 recollection today of why this was prepared?
14        MR. PIFKO:  Objection.  Foundation.
15    A.   I do not.  Again, there are a lot of
16 documents that are created and background
17 information and other documents such as -- such
18 as this that are created by staff in the
19 department and others around the city pertaining
20 to public health issues, and my name would be
21 associated with it just as the director of the
22 department.
23    Q.   Okay.  So do you see the sentence in
24 the first paragraph that starts with "Today,"
25 the second -- third sentence?

1    A.   I do.
2    Q.   Okay.  Can you read that, please,
3 into the record?
4    A.   The document states, "Today, opiate
5 abuse exists on multiple levels and heroine is
6 far from the only drug of abuse."
7    Q.   Do you agree with that statement?
8        MR. PIFKO:  Objection.  Foundation.
9    A.   I do.
10    Q.   And just to address the foundation
11 objection again, Ms. Gordon, you are the
12 director of the Department of Public Health for
13 the City of Cleveland, correct?
14    A.   That is correct.
15    Q.   And within the Department of Health,
16 as we've discussed, as part of Cleveland's
17 response to the opioid crisis you provide
18 treatment services?
19    A.   We do.
20    Q.   Education and prevention services?
21    A.   We do.
22    Q.   Do you believe you have knowledge
23 regarding the opioid crisis and your
24 department's response to it?
25    A.   I do.

1    Q.   Under "Opioid Use," the first bullet
2 point in Exhibit 4, it says, "No longer just
3 heroine used by injection."  Do you see that?
4    A.   I do.
5    Q.   "Fentanyl and carfentanil are used
6 both in mixes and straight."  Do you see that?
7    A.   I do.
8    Q.   Do you agree with that statement?
9        MR. PIFKO:  Objection.  Foundation.
10    A.   I do agree with that statement.
11    Q.   What is fentanyl?
12    A.   Fentanyl is a synthetic opiate.
13    Q.   Is it manufactured illicitly?
14        MR. PIFKO:  Objection.  Foundation.
15    A.   My understanding, that some is and
16 some is not.
17    Q.   And the fentanyl that is not, where
18 does that come from?
19        MR. PIFKO:  Objection.  Foundation.
20 Calls for speculation.
21    A.   It's my understanding that that is
22 manufactured -- can be manufactured anywhere.
23 It's a synthetic product.
24    Q.   Okay.  And I used illicit.  You said
25 it can be illicit or not illicit.

1    A.   That is my understanding.
2    Q.   Do you believe legal fentanyl can be
3 manufactured by anyone?
4        MR. PIFKO:  Objection.  Foundation.
5 Speculation.
6    A.   You'll have to repeat your original
7 question.
8    Q.   All right.  My original question,
9 fentanyl and carfentanil are used both in mixes
10 and straight.  You agreed with that, I think,
11 right?
12    A.   I do.  Based on information that is
13 provided to me, that is -- that is what I know,
14 yes.
15    Q.   Are you suggesting you don't have
16 personal knowledge regarding the issues that are
17 in document 4?
18        MR. PIFKO:  Objection to the extent
19 the question calls for a legal conclusion.
20    Q.   You're suggesting that information
21 has been provided to you.  Are you just a
22 mouthpiece for the Department of Public Health?
23        MR. PIFKO:  Objection.
24 Argumentative.
25    A.   I'm the director of the Cleveland

1 Department of Public Health, as you've asked me
2 a few times today.
3    Q.   I understand that.  Right.  So I
4 asked, in this particular presentation with your
5 name on it about fentanyl and carfentanil and
6 whether they're illicitly manufactured.
7       MR. PIFKO:  Objection.  Foundation.
8 Assumes facts not in evidence.
9    A.   It's my understanding that -- you've
10 asked about fentanyl, that it is -- there are
11 some that are and are not illicitly made.
12    Q.   Where does the non-illicit fentanyl
13 come from?
14       MR. PIFKO:  Objection.  Calls for
15 speculation.  Foundation.
16    A.   I do not know specifics.
17    Q.   Where does the illicit fentanyl come
18 from?
19       MR. PIFKO:  Objection.  Foundation.
20 Calls for speculation.
21    A.   So for information that has been
22 provided to me regarding some of the sources,
23 not all sources but some of the sources, that
24 they are made overseas and been told that some
25 of them are made in places like Mexico and

1 China.
2    Q.   And under the second bullet point,
3 "Opiate Trafficking," isn't that, in fact, what
4 it says in your presentation, Exhibit 4?
5       MR. PIFKO:  Objection.  Assumes
6 facts not in evidence.
7    A.   I am not saying that this is my
8 presentation.  My name is on this document, as
9 my name is on many documents that are prepared
10 sometimes for me and sometimes with my name on
11 it as the Department of Health and throughout
12 the city.
13    Q.   Okay.  So in the document titled
14 "Opiate Response Presentation:  Merle Gordon,
15 Director of Public Health," does it say in the
16 second bullet point underneath Opiate
17 Trafficking, "Some opiates are sold legally
18 overseas (China) and are purchased online and
19 shipped to the U.S. (illegally)"?
20    A.   It says that in this document, yes.
21    Q.   And do you believe that this --
22 these opiates that are being discussed include
23 fentanyl, as we've been talking about?
24       MR. PIFKO:  Objection.  Foundation.
25    A.   Yes.

1    Q.   Do you believe it includes
2 Carfentanil as well?
3       MR. PIFKO:  Same objection.
4    A.   I'm sorry.  You have to just repeat
5 your question.
6    Q.   Sure.
7       The second bullet point, the
8 statement about opioids being sold legally
9 overseas and purchased illegally in the U.S,
10 does that statement refer also to Carfentanil?
11       MR. PIFKO:  Objection.  Foundation.
12    A.   Again, this is not a document that I
13 wrote.  It does have my name on it, as many
14 documents have my name on it, the letterhead has
15 my name on it, and people use that all the time.
16 So this is in a different bullet point.  I'm
17 not -- I can't draw that conclusion.  It says,
18 "Some opiates."
19    Q.   But you do believe that that
20 statement does refer to fentanyl?
21    A.   It says, "some opiates," and one
22 could draw that conclusion.
23    Q.   Well, that was the answer you just
24 gave me before I asked about carfentanil.  I
25 want to know about your conclusion.  Is fentanyl

1 an opiate that is sold legally overseas and
2 shipped illegally to the United States?
3       MR. PIFKO:  Objection.  Foundation.
4 Calls for speculation.
5    A.   I cannot confirm if it's sold
6 legally, if those are the -- if that is, in
7 fact, what happens in China.  My understanding
8 is that it is shipped and purchased illegally
9 here in the U.S., some -- some opiates are.
10    Q.   Well, I'm not talking about opiates
11 generally; just fentanyl.  That was my question.
12 Is fentanyl shipped into the U.S. illegally?
13    A.   It's my understanding that some of
14 it is, yes.
15    Q.   Now, Carfentanil, do you know
16 whether there is any legal manufacturer of
17 Carfentanil in the United States?
18    A.   I do not know.
19       -  -  -  -  -
20       (Thereupon, Deposition Exhibit 5,
21       Cleveland City Council Committee
22       Calendar dated December 1, 2016,
23       with Attachments Beginning Bates
24       Stamp CLEVE_000189292, was marked
25       for purposes of identification.)

40 (Pages 154 - 157)

Page 158

1          - - - - -
2     Q.   Handing you, Ms. Gordon, what's been
3  marked as Deposition Exhibit 5, have you seen
4  this document before?
5     A.   I am familiar with this document.
6     Q.   Okay.  And what does it refer to?
7     A.   It is an -- the first page is the
8  committee calendar for Cleveland City Council.
9  There's a joint committee with the health and
10 human services committee and safety committee
11 specifically to talk about this epidemic that's
12 killing people in the City of Cleveland.
13    Q.   Okay.  Did you speak at that
14 committee meeting?
15    A.   I did.
16    Q.   Do you recall speaking at that
17 committee meeting?
18    A.   I have recollection of speaking at
19 that meeting, yes.
20    Q.   So you had just stated that this was
21 about the opiates that are killing people in the
22 City of Cleveland?
23    A.   Yes.
24    Q.   What opiates were discussed during
25 the meeting?

Page 159

1     A.   I'm not sure I recall that level of
2  specificity, but we did talk about this issue
3  broadly.  As you have behind page 1, these
4  appear to be my -- my notes and information that
5  was put together for me and some information
6  that talked about jointly with my staff in order
7  for me to be prepared to present at this council
8  meeting.
9     Q.   And there are some opiates
10 specifically listed there in those materials,
11 correct?
12    A.   There are.
13    Q.   Okay.  And the three that are
14 mentioned there are heroine, fentanyl and
15 carfentanil, correct?
16         MR. PIFKO:  Objection to the extent
17 the document -- the question mischaracterizes
18 the document.
19    A.   Those are listed on page 2 of this
20 document.
21    Q.   And, again, right above the notation
22 about heroine, fentanyl and carfentanil, it
23 says, "These drugs are synthetic, so they can be
24 manufactured anywhere and order them over the
25 internet and have them shipped to your door;

Page 160

1  this isn't crack."  Did I read that correctly?
2     A.   That's what is written in this
3  document, yes.
4     Q.   Now, can legal -- well, first of
5  all, heroine is not a legal substance in the
6  United States, is it?
7     A.   It's not.
8     Q.   Do you know whether Carfentanil is?
9         MR. PIFKO:  Objection.  Foundation.
10 Calls for speculation.
11        MR. NAEEM:  Which is why I asked her
12 if she knew.
13    Q.   Do you know if Carfentanil is legal
14 in the United States?
15    A.   For its intended purpose, I believe
16 that it is.
17    Q.   Fentanyl we talked about, can be
18 illicit or legal?
19    A.   Correct, for its intended purpose.
20    Q.   Now, is it legal to order heroine,
21 fentanyl or carfentanil over the internet?
22        MR. PIFKO:  Objection.  Calls for
23 speculation.  Foundation.  Calls for a legal
24 conclusion.  Incomplete hypothetical.
25    A.   If it's not used for its intended

Page 161

1  purpose, I do -- I'm not -- don't know if it
2  is -- I don't believe that it is legal to order
3  it over the internet if it's not for its legal
4  and intended purpose.
5     Q.   Is it legal to order heroine,
6  fentanyl or carfentanil and have it shipped to
7  your door in the United States?
8         MR. PIFKO:  Objection.  Foundation.
9  Calls for a legal conclusion.  Speculation.
10 Incomplete hypothetical.
11    A.   If it's not for its intended purpose
12 and it's an illegal substance -- having an
13 illegal substance sent to your door, dropped off
14 at your door, found somewhere else, purchased
15 somewhere else, if it's an illegal method --
16 it's an illegal substance and illegal to
17 purchase it, if it's not for its intended
18 purpose, having it mailed to your door is not
19 either.
20    Q.   What is heroine's intended purpose?
21        MR. PIFKO:  Objection.  Foundation.
22 Expert opinion.
23    A.   We're talking about people who have
24 become addicted to painkillers and opiates, and
25 how they became addicted to painkillers and

41 (Pages 158 - 161)

Page 162

1 opiates and why they have turned to other
2 illicit and illegal substances and gotten to
3 this point where they would risk their life to
4 take substances such as fentanyl, or even
5 carfentanil, which is a hundred times as potent
6 as fentanyl, is what's so significant about this
7 issue and what -- why people are dying and
8 really why we are here.
9     Q.   So you do know a little bit about
10 Carfentanil?
11     A.   I do know a little bit about
12 Carfentanil.
13     Q.   And so, again, my question, because
14 I appreciate what you said and we're going to
15 get to that in a little bit, but my question is,
16 what's the intended purpose of heroine?
17         MR. PIFKO:  Objection.
18     Q.   You talked about in your answer
19 intended purposes of these medications.  What's
20 the intended purpose of heroine?
21         MR. PIFKO:  Objection.  Foundation.
22 Calls for expert opinion.
23     A.   It is where people have been driven
24 to because they become addicted to pain
25 medications and opiates and are seeking other

Page 163

1 ways of getting to that high and fixing on their
2 addictions, and so they have turned to some of
3 these substances to try to feed their fixation
4 and their addictions.
5     Q.   What is your basis for that
6 statement?
7     A.   You know, I attend a lot of
8 meetings.  I go to a lot of meetings and
9 gatherings of people who are experts in this and
10 listening to their testimony.  Just prior you
11 asked me to look at an agenda for a U.S.
12 Attorney's meeting.  I go to those regularly
13 where we have report-outs and are hearing about
14 this from people who work in this directly.
15 There's -- the CDC has put a lot of information
16 out there, a lot of reputable organizations
17 on -- from -- the White House had an opiate task
18 force.  The Ohio Attorney General put out a
19 report.  So I'm hearing this information from
20 all over.  I have invested a huge amount of my
21 time trying to gather this information,
22 understand this issue as it pertains to people
23 who are in this community, who are dying and are
24 trying to live with this addiction that has just
25 taken over their lives, their family's lives,

Page 164

1 and the impact that this has had in the
2 community.
3     Q.   So let's talk specifically about
4 heroine abusers now, okay.
5         Is it your testimony today that all
6 heroine abusers in the City of Cleveland use
7 heroine because they became addicted to
8 prescription opioids?
9         MR. PIFKO:  Objection.  Foundation.
10 Calls for expert opinion.
11     A.   I don't know that I can isolate it
12 in as narrow of a way as you've just put it.
13 There are pathways to these addictive
14 substances, like heroine and fentanyl, and the
15 pathways are people started in a way of just
16 needing some pain relief and got to a point
17 where they could no longer access these
18 painkillers through -- whether it was their
19 provider or through a pharmacy, and they -- they
20 resorted to other means of trying to, again,
21 address their fix, address their addiction.
22     Q.   Okay.  How many heroine abusers are
23 there in the City of Cleveland currently?
24     A.   I don't have that direct number.
25     Q.   Is there anybody that you would go

Page 165

1 to within the City of Cleveland to find that
2 information?
3     A.   We are always trying to track
4 information, trying to look at all of the data
5 that we have available to us about -- whether
6 that's non-fatals, these are individuals who are
7 seeking treatment.  Always trying to get a sense
8 of proportion of this epidemic in the city.
9     Q.   My question was simply, if you
10 wanted to find out the number of heroine abusers
11 in the City of Cleveland, who would you go to
12 ask for that in the City of Cleveland?
13     A.   I don't believe we have one single
14 person who has that specific piece of
15 information.  We're trying to patch all of this
16 information together from, again, non-fatals.
17 We have data -- I don't have it right here at my
18 fingertips -- of all the people who have died,
19 and toxicology reports, that have these drugs in
20 their system at time of death.  We have a lot of
21 people who work in this area, and, again, we try
22 to track this through our epidemiologists, our
23 Office of Mental Health and Substance Abuse,
24 people who provide information at the U.S.
25 Attorney's Office, the Opiate Task Force,

42 (Pages 162 - 165)

Page 166

1  Cuyahoga County Task Force, with information, as
2  much as they can; within a broader context,
3  sometimes from the Ohio Department of Health,
4  what kind of data is provided to us from the
5  CDC, and, you know, just a variety of sources
6  because we are all trying to address this issue
7  from as many different perspectives as possible.
8      Q.   All right.  So -- again, back to my
9  question -- if you needed to find out the number
10 of heroine abusers in the City of Cleveland, who
11 would you go to to find out?
12      MR. PIFKO:  Objection.  Asked and
13 answered.
14      Q.   Did you give me any names in that
15 long answer you gave me?
16      A.   I don't have one specific name.
17      Q.   Okay.  Do you believe there is
18 anyone in the City of Cleveland that could tell
19 us today in this room how many people abuse
20 heroine in the City of Cleveland?
21      MR. PIFKO:  Objection.  Foundation.
22      A.   On any single day, I don't believe
23 we have somebody who has just specifically that
24 information.
25      Q.   Okay.  And who would be the person

Page 167

1  who would have knowledge regarding whether
2  people start using heroine because they became
3  addicted to prescription opioids?  And I need
4  the number of people --
5      A.   I don't have the number of people
6  for you.
7      Q.   Well, what percentage of heroine
8  abusers became addicted to prescription opioids
9  before they --
10     A.   Well, a lot of that is provided from
11 the CDC.  And, again, this is data that is
12 available -- I don't have that specifically
13 right here in front of me.
14     Q.   Have you seen data regarding the
15 number of people who were legitimately
16 prescribed prescription opioids, became
17 addicted, and then began using heroine?
18     A.   I believe that some of that
19 information has been aggregated and put into a
20 variety of reports that have been produced at a
21 state level, nationally from the Centers for
22 Disease Control and Prevention, the CDC, and
23 some of this is reported out at these drug task
24 forces that I -- meetings that I've attended at
25 the U.S. Attorney's Office, and data that we're

Page 168

1  trying to all collect and analyze and look at
2  trends and look at, you know, fatals and
3  non-fatals that come from the police department
4  and the medical examiner's office.  This is a
5  lot of data.  This is what public health is.  We
6  collect a lot of data from a lot of different
7  sources and really try to put -- wrap our arms
8  around the issue as quickly and as best as we
9  can to figure out where we're targeting
10 resources to help people and help communities in
11 need.  And this addiction issue has just -- it's
12 taken over.  There's a huge amount of impact in
13 this community as a result of it.
14     Q.   So let me start with, do you have
15 personal knowledge regarding the number of
16 heroine abusers who originally were prescribed
17 prescription opioids and became addicted to
18 those opioids before using heroine?
19     A.   I believe some of that information
20 has been tracked for years.
21     Q.   Do you have that information?
22     A.   I'm sure some of that information
23 has been provided to me in my capacity.  The
24 commissioner has aggregated this information.
25 We're all trying to collect information, again,

Page 169

1  to try to figure out how best to address this
2  issue.
3      Q.   So it's your belief that if that --
4  you have that data and it would have been
5  produced during this litigation?
6      MR. PIFKO:  Objection.
7  Mischaracterizes testimony.
8      A.   I'm given a lot of information as
9  the director of the health department.
10     Q.   But to come to your deposition today
11 to discuss the opioid crisis, that's not
12 something you reviewed then, the number of
13 heroine abusers who originally became addicted
14 to prescription opioids?
15     A.   I don't have that information
16 directly in front of me at this moment.
17     Q.   And you can't tell me anybody who
18 would be able to generate that information from
19 the Department of Health?
20     MR. PIFKO:  Objection.  Asked and
21 answered.
22     A.   I don't have that information in
23 front of me.
24     Q.   You don't have the information about
25 who could provide that in front of you?

43 (Pages 166 - 169)

Page 170

1     A.   The health department, it's a part
2  of all of the data that we gather and the
3  information that we gather on a daily basis, so
4  epidemiologists look at this, again, our Office
5  of Mental Health and Substance Abuse.
6     Q.   Okay.  So which one of your
7  epidemiologists would be able to tell us how
8  many of the heroine users in the City of
9  Cleveland originally became addicted to
10  legitimately prescribed opioids?
11         MR. PIFKO:  Objection.
12  Mischaracterizes the record.
13     A.   It's not entirely a fair question
14  that you're asking.  Often we're finding out
15  that someone was a heroine addict anecdotally,
16  after they've died, who was -- people aren't
17  necessarily self selecting that they're a
18  heroine addict and reporting that out, people
19  who are in just search of a high because they're
20  addicted and they're trying to find it in some
21  way, shape or form, and whether it's heroine,
22  whether it's fentanyl, whether it's any other
23  substance that they're trying to find just to
24  address their addiction.
25     Q.   Let's talk about death reports then

Page 171

1  of people who die of heroine.
2         How do you determine from those
3  death reports whether they were ever in their
4  lifetime prescribed prescription opioids?  Do
5  you have that data?
6         MR. PIFKO:  Objection.
7  Mischaracterizes the record.  Assumes facts not
8  in evidence.
9     A.   I do not have that data in front of
10  me.
11     Q.   Does anyone at the Department of
12  Public Health have that data?
13     A.   I don't know.
14     Q.   Does anybody at the County Medical
15  Examiner's office have that information?
16     A.   I do not know.
17     Q.   If you wanted to ask somebody at the
18  County Medical Examiner's office if they do, who
19  would you ask?
20     A.   I would ask the medical examiner or
21  one of their analysts that would attend
22  regularly a lot of these meetings that we talk
23  with quite frequently.
24     Q.   What's the name of the medical
25  examiner?

Page 172

1     A.   Tom Gilson is the medical examiner,
2  Dr. Thomas Gilson.
3     Q.   Who are the analysts who regularly
4  attend these meetings?
5     A.   Hugh Shannon is the one who attends
6  with most frequency, and I've met with him.
7     Q.   Have you ever discussed with Hugh
8  Shannon how many heroine overdose victims
9  became -- originally became addicted to
10  prescription opioids?
11     A.   I'm sorry.  Restate your question.
12     Q.   Sure.
13         Have you ever discussed with Hugh
14  Shannon the number of heroine overdose deaths
15  that his office gets that those patients were
16  originally addicted to prescription opioids?
17     A.   I can't say that we've talked about
18  a specific number as it relates to that pathway,
19  no.
20     Q.   Do you believe every heroine death
21  resulted from a patient who was originally
22  addicted to prescription opioids?
23         MR. PIFKO:  Objection.  Foundation.
24  Calls for an expert opinion.
25     A.   I cannot say that, that people go

Page 173

1  directly to heroine without any other pathway to
2  a drug that has that kind of an impact on
3  people.  I just know from, again, a lot of the
4  information that's presented to me at meetings
5  that I attend with experts and from information
6  that's given to me, that this -- these pathways
7  to heroine, to fentanyl, to these drug
8  cocktails, to these mixes, by and large, for the
9  most part start with prescription drugs and
10  prescription pain killers.
11     Q.   What does by and large mean?  Is
12  that a percentage?
13         MR. PIFKO:  Objection.
14  Mischaracterizes the record.
15     A.   It's a term.
16     Q.   Is it greater than 50 percent?
17     A.   It's a term I just used.
18     Q.   Well, is it a majority?
19     A.   I don't have all that information in
20  front of me, but there have been a fair amount
21  of studying of this and just starting to
22  correlate the number, the significant increase
23  in -- prescriptions of painkillers from the
24  1990s to sort of current day essentially has
25  gone up threefold, if not more, and as we're

Page 174

1 starting to see and track all of these overdoses
2 and overdose deaths as a result of cocktails and
3 toxicology reports, excuse me, and seeing that
4 so many of these are related to these -- the
5 presence of these drugs in these people's blood,
6 of course we're making these correlations.  This
7 is huge.  People are dying.  People are dying
8 every day.  I'm getting these reports, another
9 OD death, another OD death, heroine, heroine,
10 fentanyl.  And this started somewhere and that's
11 what this is -- that's what's been such a huge
12 issue and why we're so desperate for resources
13 to help people and help our communities.
14     Q.   So you've spoken with experts who
15 make the correlation between legitimate
16 prescription opioid use and heroine deaths?
17     A.   Yes.  Many people have talked about
18 this pathway to these illegal and illicit drugs
19 as a result of individuals no longer being able
20 to access prescription drugs for whatever reason
21 and are going to these other drugs.  This is
22 written about extensively.  I'm sure you've read
23 a lot of these reports.  These come out from
24 reputable firms written about in publications,
25 local publications, Plain Dealer and so on,

Page 175

1 newspapers across the country, and, again, CDC
2 reports, the Ohio Department of Health.  The
3 U.S. Attorney's Office has -- I can't say that
4 they put -- the U.S. -- the Ohio Attorney
5 General's Office has put out reports.
6 There's -- a lot of people are looking at this
7 because this has really had such a huge impact
8 here in Ohio.  Ohio has always been one of the
9 sort of top five or ten states in the nation
10 that have been hardest hit by this issue.
11     Q.   All right.  So who are the names of
12 some of those experts, then, that have
13 specifically told you the information regarding
14 heroine deaths and legitimate prescription
15 opioids?
16         MR. PIFKO:  Objection to the extent
17 the question assumes facts not in evidence.
18         You can answer.
19     A.   I'm not recalling every person's
20 name, but again, I've been in so many meetings
21 related to this.  When I first joined, one of
22 the first meetings related to this that I went
23 to was with the U.S. Surgeon General's Office.
24 It was at the Cleveland Clinic.  And there were
25 a number of experts in that room who talked

Page 176

1 specifically about these pathways and how
2 critical this was because we just were dealing
3 with proliferation and this crisis here in this
4 city.
5     Q.   Can you pull out Exhibit 1-A again?
6     A.   Yes.
7     Q.   Can you read into the record again
8 the second sentence in your handwriting on that
9 document?
10     A.   The sentence says, "Prescribing
11 practices are no longer the precursor to OD,"
12 which must have been something that was said at
13 this meeting almost two years ago that I wrote
14 down.
15     Q.   And was your meeting with the
16 Surgeon General around the same time?
17     A.   Meeting with the Surgeon General was
18 earlier than -- than this meeting.
19     Q.   But you had only been at the
20 Department of Public Health for four months, so
21 it was within that four-month period?
22     A.   Well, you have to understand that
23 when you go to a lot of meetings, it's always
24 important to write down what people are saying
25 in the meetings to kind of understand where

Page 177

1 anybody and everybody is coming from, so this
2 obviously was something that was said in -- I
3 can't say it was obviously, but something that
4 must have been said in this meeting that I wrote
5 down on the agenda for the U.S. Attorney's
6 Office Opiate Task Force meeting.
7     Q.   So let me be clear about what the
8 question was.  The meeting with the Surgeon
9 General was between June of 2016 and October 7th
10 of 2016?
11     A.   I believe so.
12     Q.   Okay.  Does your department track
13 any data regarding whether or not -- strike
14 that.
15         Do you have any data that -- at the
16 Cleveland Department of Health that indicates
17 how many people in the City of Cleveland have
18 abused prescription opioids since 2010?
19     A.   Do we track that information?
20     Q.   Do you have it?
21     A.   I cannot say for sure if I have it.
22     Q.   And then the follow-up question, is
23 that something that your department tracks?
24     A.   I do not believe that we track that
25 specifically.

45 (Pages 174 - 177)

Page 178

1    Q.   So your department wouldn't track
2  the number of prescription drug abusers who
3  purchase those drugs illegally?
4    A.   We're a department strapped for
5  resources.  If we have them, I know for sure
6  that we would make sure that we had people who
7  would be tracking all of this information.
8        THE WITNESS:  I'd like to take a
9  break, please.
10       MR. PIFKO:  Okay.
11       THE VIDEOGRAPHER:  Going off the
12 record.  The time is 2:16.
13         (Recess had.)
14       THE VIDEOGRAPHER:  Back on the
15 record, 2:32.
16 BY MR. NAEEM:
17   Q.   Ms. Gordon, I'm going to skip around
18 a bit here to try to clean up some of the things
19 we've talked about or some of the specific items
20 within the Department of Health you listed that
21 I didn't yet follow up on.
22       So earlier in the deposition we were
23 talking about how the Department of Health funds
24 its services, for lack of a better word.  You
25 mentioned and we talked about revenue from the

Page 179

1  City of Cleveland.  You also mentioned grants.
2  And then the third one you mentioned was fees
3  and permits.
4    A.   Fees generated from permits and
5  licenses, yes.
6    Q.   Okay.  Is there any other source of
7  revenue that your department uses to fund its
8  operations?
9    A.   There -- we do bill for some of our
10 services, so we would bill insurance for some of
11 our services, medical services.
12   Q.   Now, as far as grants, how does that
13 process work?  What are the targets for the
14 Cleveland Department of Health in terms of
15 seeking grants?
16       MR. PIFKO:  Objection.  Overbroad.
17   A.   What are -- I'm sorry.  You have to
18 repeat the question.
19   Q.   Targets.  Who do you look for grants
20 from?
21   A.   We look for any kind of revenue
22 possible to -- to fund our programs, so some of
23 them have been from the state, from federal
24 government, from private philanthropy.
25   Q.   And in the 2018 budget for your

Page 180

1  department, how much funding has been received
2  from grants?
3    A.   A little more than 9 million dollars
4  that -- that are received from grants.
5    Q.   And that's 2018 budget year?
6    A.   Yes.
7    Q.   How much of that is attributed to
8  programs related to opioid prevention,
9  treatment, education, opioid-related programs
10 from your department?
11   A.   For the Office of Mental Health and
12 Substance Abuse, there is a rather large SAMHSA,
13 a grant from SAMHSA, which is a federal grant.
14 We also are funded in part from the local ADAMHS
15 board, the alcohol and drug board.  And I
16 believe those are most of them.
17   Q.   Are you able to tell me how much the
18 amount of those grants are within your
19 department's budget combined?
20   A.   One is multi-year, so I believe that
21 it is probably about $800,000, 700 to $800,000
22 from the federal program.  The other is about --
23 less -- let's see.  One is about $90,000, and
24 the other I cannot remember.
25   Q.   Okay.  So within the, roughly, 9

Page 181

1  million dollars received in grants for the 2018
2  budget year, you've given me roughly $900,000 of
3  that that goes toward opioid-related services?
4    A.   Directly.  Again, indirectly our
5  staff is -- I invest in our staff to make sure
6  that they are aware of this issue and are
7  trained to recognize this in the work that they
8  do in the community and our clinics, et cetera,
9  so those are what we would consider indirect
10 funding to the rest of the staff related to this
11 issue.
12   Q.   Do those come out of the grants?
13   A.   It's across the board.  It would be
14 funded from any of the funding sources that were
15 just mentioned.
16   Q.   Okay.  So if you -- can you today
17 for us allocate how much of the budget of your
18 department spent on employee salaries and
19 benefits goes towards opioid-related issues?
20 Are you able to do that today?
21   A.   I know that I couldn't do that
22 calculation.  Some of these are, again, indirect
23 dollars supporting staff and some of the direct
24 programs and programs that we serve in the
25 community.

46 (Pages 178 - 181)

Page 182

1    Q.    So you're not able to do it today?
2    A.    I don't know if I can give you an
3 exact figure, no.
4    Q.    Can you give me an estimate?
5    A.    Well, arguably, almost all of it
6 does in one way, shape or form or another,
7 because this issue has impacted our community so
8 broadly that we are all dealing with it in one
9 way or another.
10    Q.    So if I understand that, are you
11 suggesting that a hundred percent of the budget
12 for your department goes towards opioid-related
13 issues?
14        MR. PIFKO:  Objection.
15 Mischaracterizes testimony.
16    A.    That's not -- that's not what I
17 said.
18    Q.    Okay.  Does your department prepare
19 budget documents?
20    A.    We prepare for the annual budget
21 process, yes.
22    Q.    Where are those documents stored?
23    A.    Those documents are in my department
24 and the Department of Finance.  That's how the
25 process goes between the departments.

Page 183

1    Q.    Is there a particular custodian at
2 the Department of Finance who would have the
3 budget documents related to the Department of
4 Health?
5    A.    Yes.
6    Q.    Who is that person?
7    A.    It would be the finance director,
8 her designee.
9    Q.    Who's the finance director?
10    A.    Her name is Sharon Dumas.
11    Q.    Okay.  And within the Department of
12 Health is there a custodian who would have
13 budget documents created for the department?
14    A.    Yes.  I have a finance director.
15    Q.    Who is that?
16    A.    Her name is Kimberly Davis Sowell.
17    Q.    Is it S-o-w-e-l-l?
18    A.    S-o-w-e-l-l.
19    Q.    Do fees for permits and licenses go
20 towards funding opioid-related programs?
21    A.    The fees generated by the department
22 go back into the general revenue and are then
23 distributed to the department.
24    Q.    The general revenue of the City of
25 Cleveland?

Page 184

1    A.    The general revenue of the City of
2 Cleveland, yes.
3    Q.    All right.  And as far as billing
4 for services, are there means tests for the
5 services that your department provides to
6 Cleveland citizens?
7        MR. PIFKO:  Objection.  Vague.
8    Q.    Income limitations as far as who can
9 get health services from your clinics.
10    A.    No.  We serve anybody who walks in
11 the clinic.
12    Q.    Okay.  Does -- do the Department of
13 Health clinics provide medications that treat
14 opioid addiction or withdrawal?
15    A.    We provide Project DAWN kits.
16    Q.    Other than Project DAWN kits, does
17 the clinic for -- the Department of Health
18 clinics provide or prescribe medications to
19 treat opioid addiction or withdrawal?
20    A.    We do not.
21    Q.    Are you personally a member of the
22 Cuyahoga County Opiate Task Force?
23    A.    I believe in my official capacity I
24 am.
25    Q.    I'm sorry.  In your official

Page 185

1 capacity you are?
2    A.    Um-hum.  Yes.
3    Q.    Can you give me a high-level
4 overview of what your involvement is with that
5 task force?
6        MR. PIFKO:  Objection.  Overbroad.
7 Calls for a narrative.
8    A.    Well, unfortunately, it conflicts
9 with the standing meeting that I have, so my
10 involvement is receiving e-mails of agenda and
11 meeting notes, also have at times been invited
12 to meetings that take place throughout the
13 community that have been hosted by or
14 facilitated by this task force, one rather
15 recently with the representative from the
16 Centers for Disease Control who came to hear
17 about this issue here on -- I guess a listening
18 tour.  And so I try to participate to the extent
19 that I can.  I run a very busy department, and
20 we have a lot of programs and a lot of demands
21 on my time.
22    Q.    With respect to your unofficial
23 involvement, did it precede your appointment to
24 director of the Cleveland Public Health --
25 Cleveland Department of Public Health?

47 (Pages 182 - 185)

Page 186

1      MR. PIFKO:  Objection.
2 Mischaracterizes testimony.
3      MR. NAEEM:  It's a question.
4    A.   What is your question?
5    Q.   The question is, did your
6 involvement with the Cuyahoga County Task Force
7 precede your involvement -- I'm sorry, your
8 appointment as the director of the Department of
9 Public Health?  Did you do anything for the
10 Cuyahoga County Task Force prior to becoming the
11 director?
12    A.   No.
13    Q.   There's one program you mentioned in
14 your description of the services provided by
15 your department to opioid abusers or addicts,
16 and that was CenterPoint.  Do you recall that?
17    A.   Yes.  We have a program called
18 CenterPoint.  Yes.
19    Q.   All right.  Where does the funding
20 for CenterPoint come from?
21    A.   The staff that managed that program
22 was funded by general revenue funds, but the
23 operations of it are funded by the ADAMHS board.
24    Q.   Currently how many spots are
25 available for people in that program?

Page 187

1    A.   I believe the ratio is one counselor
2 to 12 clients, and I believe -- I'm not a
3 hundred percent sure if we have two counselors
4 on that currently.
5    Q.   Has that changed at any point in
6 time while you've been director of the
7 department?
8    A.   It has, as staff has -- has left the
9 department and we've had to hire.
10    Q.   What is the most amount of
11 counselors you've had in that program as
12 director?
13    A.   As director, I don't recall.  I
14 believe two.
15    Q.   Does the Department of Public Health
16 maintain personal information regarding the
17 people that go through that program?
18      MR. PIFKO:  Objection.  Vague.
19    Q.   Let me -- yeah.  And let me ask
20 something more specific to move this along.
21    A.   Please.
22    Q.   Does the Department of Health
23 maintain records regarding the substance that
24 was being abused that led to their entry into
25 the CenterPoint program?

Page 188

1    A.   I believe that these are all
2 referrals from the drug court, and I do not
3 know, don't believe I know that we would have
4 that specific information unless the individual
5 client discloses.
6    Q.   Are the counselors employees of the
7 Department of Public Health?
8    A.   They are.
9    Q.   Okay.  Do those counselors provide
10 services to abusers of substances other than
11 opioids?
12    A.   It is my understanding that it is --
13 these are referrals from the drug court.  I
14 don't know for sure what the requirements are
15 for entry into this -- to these services or what
16 -- what the substance was that brought them to
17 the drug court in the first place.
18    Q.   Okay.  So you can't say one way or
19 another what the substances are that are
20 involved in this program?
21    A.   No, I cannot.
22    Q.   Does your department even choose the
23 people who are eligible for that program?
24    A.   We do not.
25    Q.   So is there anything that limits the

Page 189

1 type of patient that's entered into the program
2 from the Department of Health?
3      MR. PIFKO:  Objection.  Foundation.
4    A.   I don't know.
5    Q.   Do you know what the Cleveland
6 Opioid Response Action Plan is?  Have you heard
7 of that phrase?
8    A.   I would need to see -- I've seen so
9 many response plans, so I'm not a hundred
10 percent sure.
11      - - - - -
12      (Thereupon, Deposition Exhibit 6,
13      Cleveland Opioid Response and Action
14      Plan (CORAP) Beginning Bates Stamp
15      CLEVE-000183257, was marked for
16      purposes of identification.)
17      - - - - -
18    Q.   Handing you what's been marked as
19 Deposition Exhibit 6, have you seen that
20 document before?
21    A.   I have, yes.  Yes.
22    Q.   Do you not recognize that as what I
23 referred to as the Cleveland Opioid Response
24 Action Plan?
25    A.   I've known it as CORAP, so the

48 (Pages 186 - 189)

1 spelling out the acronym is -- now I understand.
2    Q.    So we're talking about the same
3 thing?
4    A.    Yes.
5    Q.    All right.  Is this a plan that is
6 currently in effect at the City of Cleveland?
7    A.    It is not.
8    Q.    When was this plan put together,
9 month and year, if you're aware?
10    A.    So we are always looking for funding
11 opportunities to help us address this epidemic,
12 and this is just one of them.  A number of staff
13 came together looking at opportunities to
14 address this issue, and our epidemiologists, our
15 director of the Office of Mental Health and
16 Substance Abuse and grant writer put this
17 proposal together for funding from the
18 Department of Justice.  I believe this was put
19 together early 2017.
20    Q.    Can I assume by one of your prior
21 answers that the grant was rejected by the
22 Department of Justice?
23    A.    This -- this was not funded.
24    Q.    With respect to any of the
25 initiatives described in this document, has the

1 City of Cleveland moved forward with those
2 initiatives?
3          MR. PIFKO:  Let the record reflect
4 that the witness is reviewing the document.
5    A.    Our need for resources to address
6 this issue from a data perspective to predictive
7 analytics and to do the type of outreach and
8 education necessary to -- to hopefully have an
9 impact on this issue is what we put into this
10 proposal.  We were not funded and, as such,
11 don't have the resources to do this type of
12 work.
13    Q.    Okay.  So at this point in time,
14 that is not -- those initiatives have not
15 been --
16    A.    We have not been able to.  We don't
17 have the resources to do it.  We have a very
18 stretched department to be able to do what we're
19 trying to do now.
20    Q.    Ms. Gordon, who decides when opioids
21 are appropriate for treatment of chronic pain;
22 do you know?
23          MR. PIFKO:  Objection.  Foundation.
24 Calls for expert opinion.
25    A.    I'm sorry.  You would have to ask

1 the question again.
2    Q.    Sure.
3          Who decides when opioids are
4 appropriate for the treatment of chronic pain?
5          MR. PIFKO:  Same objection.
6 Foundation.  Calls for expert opinion.
7    A.    I believe a medical professional.
8    Q.    Can patients legally get opioid
9 products without a prescription?
10          MR. PIFKO:  Objection.  Foundation.
11 Calls for speculation.  Incomplete hypothetical.
12    A.    It's not my understanding that they
13 can, but I don't know for sure.
14    Q.    Do you know the types of medical
15 professionals in the State of Ohio who are
16 permitted to write prescriptions for opioids?
17    A.    I don't know all of them, no.
18    Q.    Well, what are the ones you're aware
19 of?
20    A.    Medical doctors, others who have
21 prescribing authority.
22    Q.    Do you know any other than doctors?
23    A.    I can't say for sure.
24    Q.    Do you agree that the risk of opioid
25 dependence has been known by medical

1 professionals for many years?
2          MR. PIFKO:  Objection.  Calls for
3 speculation.  Foundation.
4    A.    Information that was provided to me,
5 again, at meetings that I attend and discussions
6 that I've had and been involved with, whether
7 it's the U.S. Attorney's Office, whether it's
8 been with professionals in this field or in --
9 around this issue that I've heard this, yes.
10    Q.    How about the risk of addiction from
11 opioids; has that been well known for many
12 years?
13          MR. PIFKO:  Objection.  Calls for
14 speculation.  Foundation.
15    A.    I believe this has been well
16 documented and this is what, again, continues to
17 come up at all of these -- these meetings and
18 things that I attend regarding this issue and
19 broadly in public health, yes.
20    Q.    Have you ever reviewed the -- well,
21 first of all -- strike that.
22          Do you know what a package insert
23 is?  Have you heard that phrase before?
24    A.    I don't believe I have.
25    Q.    Have you ever received prescription

49 (Pages 190 - 193)

Page 194

1 medication that had a leaflet inside it when you
2 opened up the medication?
3     A.   Yes.
4     Q.   Have you ever looked to see what the
5 information on that kind of document was for any
6 prescription opioid?
7     A.   I have not.
8     Q.   Have you done any research to
9 determine what the manufacturers of prescription
10 opioids said about the risk of addiction and
11 abuse in their product information?
12        MR. PIFKO:  Objection to the extent
13 the question calls for attorney-client
14 communications.
15        Aside from communications with your
16 lawyers, you can answer.
17     A.   I'm sorry.  You have to ask it
18 again.
19     Q.   Have you done any research to
20 determine what information the manufacturers of
21 prescription opioids provide in their product
22 information, their package insert, regarding the
23 risk of abuse and addiction?
24        MR. PIFKO:  Aside from
25 communications with lawyers, you can answer.

Page 195

1     A.   I have not.
2     Q.   We have talked a little bit about
3 the -- the treatment services provided by the
4 Department of Health through various outlets for
5 opioid abuse and addiction.  Putting that aside,
6 what we've already talked about, are there any
7 other objectives being pursued by the Department
8 of Health to reduce prescription drug abuse,
9 prescription opioid abuse?
10     A.   Specifically on prescription opioid
11 abuse, not specifically.
12     Q.   Do you know when prescription
13 opioids initially began being marketed and
14 available to patients in the United States?
15     A.   I don't know specifically, no.
16     Q.   Do you know the decade when that
17 might have been?
18     A.   The -- say the question again.
19     Q.   Sure.
20        Even by decade do you know when
21 prescription opioids became available to
22 patients in the United States?
23     A.   I don't know specifically, but I
24 believe that this started in the -- perhaps
25 around the 1990s.

Page 196

1     Q.   Did heroine use and abuse exist
2 prior to the 1990s?
3        MR. PIFKO:  Objection.  Foundation.
4     Q.   In this country.
5        MR. PIFKO:  Speculation.
6     A.   Heroine use has been around for a
7 long time.
8     Q.   Do you have any insight into the
9 formulary process for any of the city's employee
10 benefit plans?
11     A.   I do not.
12     Q.   You told me earlier, I believe, that
13 you have not reviewed the complaint in this
14 case?
15     A.   I have not read the entirety of the
16 complaint.
17     Q.   Okay.  Do you know who the
18 manufacturing defendants are?  Had you heard any
19 of their names prior to reviewing the complaint?
20        MR. PIFKO:  Objection.  Compound.
21 Are we just asking the second question or --
22        MR. NAEEM:  Sure.
23     Q.   Were any of the names -- were you
24 able to identify the manufacturers of opioids
25 from reading the complaint, just the title of

Page 197

1 the complaint?
2     A.   Some of the names were familiar to
3 me.
4     Q.   Do you know what medications each
5 defendant specifically manufactures?
6     A.   I don't know that level of
7 specificity, no.
8     Q.   Do you have any personal knowledge
9 regarding the marketing practices of any of the
10 manufacturing defendants beyond what you read in
11 the complaint?
12     A.   I don't know.
13     Q.   Any personal -- do you have any
14 personal knowledge regarding any statements made
15 by any of the manufacturing defendants to
16 prescribers about their products other than what
17 you've read in the complaint?
18        MR. PIFKO:  Objection to the extent
19 the question calls for attorney-client
20 communications.
21        Other than communications with
22 counsel, you can answer.
23     A.   You'll have to repeat the question.
24     Q.   Sure.
25        Other than what you may have read in

50 (Pages 194 - 197)

Page 198

1 the complaint, do you have any personal
2 knowledge regarding statements made by any of
3 the manufacturing defendants to prescribers
4 regarding their prescription opioid products?
5        MR. PIFKO: Limit your answer to
6 communications outside of your discussions with
7 counsel or information outside of your
8 discussions with counsel.
9    A.   I don't know specifically.
10    Q.   Do you have an understanding of how
11 prescription opioids move from manufacturers
12 through the chain of distribution to patients?
13        MR. PIFKO: Same objection with
14 respect to attorney-client privilege.
15    A.   Very, very broadly but not with a
16 level of specificity.
17    Q.   Okay. What is your broad
18 understanding?
19    A.   Broad sense, manufacturers through
20 distributors to -- to the -- to pharmacies,
21 which is where then the individuals would have
22 access to -- directly to the substances.
23    Q.   Okay. And nothing more specific
24 than that, that's your understanding?
25    A.   That's my understanding.

Page 199

1    Q.   Do you know whether or not
2 manufacturing defendants can legally send opioid
3 prescriptions -- opioid products directly to
4 patients?
5        MR. PIFKO: Objection to the extent
6 the question calls for communications with
7 counsel.
8        Aside from communications with
9 counsel, you can answer.
10    A.   I do not know that that is a legal
11 practice.
12        MR. PIFKO: If you're in a topical
13 pause, do you want to take a short break?
14        MR. NAEEM: Sure.
15        THE VIDEOGRAPHER: Going off the
16 record. The time is 3:05.
17        (Recess had.)
18        THE VIDEOGRAPHER: Back on the
19 record, 3:25.
20 BY MR. NAEEM:
21    Q.   Ms. Gordon, before we took a break,
22 we were talking a little bit about manufacturers
23 of opioids. I just had one last question on
24 that.
25        Do you know what a risk evaluation

Page 200

1 and mitigation strategy is?
2        MR. PIFKO: Objection. Overbroad.
3    A.   As it relates to what?
4    Q.   To prescription drugs.
5    A.   No, I don't.
6    Q.   Have you heard the phrase REMS in
7 the context of prescription drugs?
8    A.   I don't believe that I have, no.
9    Q.   Do you have any knowledge regarding
10 how the number of opioid prescriptions has
11 changed in the City of Cleveland locally -- I'm
12 sorry, since 2010?
13        MR. PIFKO: Aside from
14 communications with your counsel.
15    A.   Ask the question one more time,
16 please.
17    Q.   Sure.
18        Do you have any knowledge regarding
19 how the number of opioid prescriptions has
20 changed in each year since 2010 in the City of
21 Cleveland?
22        MR. PIFKO: Objection to the extent
23 the question calls for attorney-client
24 communication.
25        Aside from communications with

Page 201

1 counsel, you can answer.
2    A.   I don't know that we have that
3 information specific just to the City of
4 Cleveland.
5    Q.   What jurisdiction do you have that
6 information for?
7    A.   I cannot speak specifically to which
8 jurisdiction or what jurisdictions we have that.
9 I believe we have seen information nationally,
10 but I -- I cannot recall if I've seen such local
11 data.
12    Q.   Have you seen State of Ohio data?
13        MR. PIFKO: Again, objection to the
14 extent the question calls for attorney-client
15 communications.
16        You can answer aside from that.
17    A.   I believe that this information is
18 contained in some of the reports that I have
19 looked at as pertains to this issue.
20    Q.   Okay. And has the number of opioid
21 prescriptions in the State of Ohio changed since
22 2010?
23        MR. PIFKO: Objection. Foundation.
24    A.   It is my recollection that there has
25 been a significant increase since 2010.

51 (Pages 198 - 201)

Page 202

1    Q.   Significant increase in the number
2   of prescription opioids provided to people in
3   the State of Ohio since 2010?
4    A.   Yes.
5    Q.   And that's based on data from where
6   that you've seen?
7         MR. PIFKO:  Again, objection to the
8   extent the question calls for attorney-client
9   communication.
10        You can answer it aside from
11  communications with counsel.
12    A.   Information is provided in a number
13  of sources.  I've mentioned before I attend a
14  lot of meetings pertaining to this issue, try to
15  look at reports and other information that is
16  available to -- as we are collectively trying to
17  deal with this epidemic in the city.
18    Q.   Well, is there any particular
19  document that you can point to which shows that
20  the number of prescription opioids provided to
21  citizens in the State of Ohio in each year from
22  2010 to 2017 has increased?
23    A.   It is my recollection, seeing some
24  of this data.  I don't believe that I can recall
25  which document or documents I have that data

Page 203

1   from.
2    Q.   While I'm looking for that, let me
3   ask you about fentanyl overdose deaths in the
4   City of Cleveland or Cuyahoga County.
5         Do you have any knowledge regarding
6   how those deaths have changed over the course of
7   time from 2010 to 2017?
8         MR. PIFKO:  Objection.  Vague.
9   Overbroad.
10    A.   I don't know what the specific time
11  frame is, if the reports that I have seen from
12  the medical examiner goes back to 2010.
13    Q.   Okay.  Well, what is the trend in at
14  least the later years based on your
15  understanding?
16    A.   Of fentanyl deaths, is that your
17  question?
18    Q.   Yes.
19    A.   You know, we see -- we've looked at
20  these reports over the course of time, and
21  this -- these numbers can rise and fall.  One of
22  the things that gets discussed at especially the
23  U.S. Attorney's Office meetings is what that
24  might be contributing -- what the contributing
25  factors are and what they might be related back

Page 204

1   to.
2         The types of experts and individuals
3   at those meetings provide additional information
4   that help us to try to understand what is
5   contributing to these trends because there are
6   times when Fentanyl-related deaths have gone up
7   or down over -- again, over the course of time,
8   but these are part of an entire data set that
9   looks at the toxicology of all the deaths in --
10  that come through the medical examiner's office.
11  And it's all part of this entire crisis.  People
12  are dying, and people are dying related to
13  overdoses, and overdoses that we do not believe
14  started entirely because they got hooked on one
15  of these synthetic opioids, that there was a
16  pathway to them which created the addiction, and
17  thus led to their overdose and, unfortunately,
18  for many of them, their deaths, their demise.
19    Q.   Okay.  I appreciate that,
20  Ms. Gordon, but what my question was, was how
21  has the rate of fentanyl overdoses changed over
22  time.  You didn't know going back to 2010
23  whether you had seen that data from the ME, so I
24  had asked, well, how about the last few years,
25  how has that rate changed.  Do you know how the

Page 205

1   rate has changed?
2    A.   It's my recollection that that rate
3   has gone up as part of -- or in the toxicology
4   reports from individuals, that that may have
5   been in their -- in their blood at time of
6   death, and when they did the -- either an
7   autopsy or tested these individuals.
8    Q.   Okay.  So you believe the rate has
9   gone up?
10    A.   It is my recollection that it has
11  gone up.
12    Q.   Okay.  And do you have an
13  understanding regarding the source of that
14  fentanyl and whether it was fentanyl that was
15  prescribed legally or whether it was illicit
16  fentanyl that was driving the increase in
17  overdose deaths?
18        MR. PIFKO:  Objection to the extent
19  the question mischaracterizes prior testimony.
20  Assumes facts not in evidence.
21    A.   I believe that people who have
22  become addicted to painkillers and opiates have
23  sought pathways to feed their addiction and have
24  resorted to illegal means, which has -- some of
25  which are illegal sources of fentanyl, and that

52 (Pages 202 - 205)

Page 206

1 has been a contributing factor.
2    Q.   Okay.  Well, in any particular year
3 there's a number of fentanyl deaths that the
4 medical examiner reports, and you've seen that
5 data, correct?
6    A.   I have seen many reports from the
7 medical examiner.
8    Q.   Okay.  And some of those reports are
9 fentanyl deaths, correct?
10    A.   They do track fentanyl deaths, yes.
11    Q.   And when you get those reports that
12 track fentanyl deaths, do you get any
13 information from the medical examiner about
14 whether those fentanyl deaths were from
15 prescription fentanyl or illicit fentanyl?
16    A.   No.  They do not recognize the
17 source, no.
18       MR. NAEEM:  Then I don't have
19 anything further at this time, so can we go off
20 the record?
21       THE VIDEOGRAPHER:  Going off the
22 record.  The time is 3:35.
23          (Recess had.)
24       THE VIDEOGRAPHER:  Back on the
25 record.  The time is 3:48.

Page 207

1       EXAMINATION OF MERLE GORDON
2 BY MR. SALIMBENE:
3    Q.   Ms. Gordon, my name is Mike
4 Salimbene.  I'm one of the attorneys who
5 represents a different defendant in the case and
6 I'm going to start asking you some questions now
7 as soon as I strap up with my microphone.
8       Do you know which distributor
9 defendants you sued in this case, Cleveland sued
10 in this case I should say?
11       MR. PIFKO:  Objection to the extent
12 the question calls for legal -- attorney-client
13 communications.
14       You can answer aside from
15 communications with your lawyers.
16       MR. BOEHM:  Can you clarify if he's
17 instructing the witness not to answer that
18 question?
19       MR. PIFKO:  I'm instructing her not
20 to provide attorney-client communications.  If
21 she can answer the question without revealing
22 communications, she can answer the question.
23 That's what I'm telling her.
24    A.   I know that there are a number of
25 firms and organizations listed.  I don't know

Page 208

1 any of them specifically offhand.
2    Q.   Okay.  Fair to say you don't know
3 the companies' names?
4    A.   Not offhand, no.
5    Q.   Do you know the number, how many
6 distributor defendants were named in this
7 lawsuit?
8    A.   Not specifically, no.
9    Q.   Okay.  Have you ever heard the name
10 "AmerisourceBergen" before?
11    A.   Not that I recall.
12    Q.   Or how about the name "Cardinal,"
13 not as it pertains to wildlife but a
14 distribution company?
15    A.   Not necessarily, no.
16    Q.   Okay.  McKesson?
17    A.   McKesson is a name I'm somewhat
18 familiar with.
19    Q.   Do you know what they do, have any
20 knowledge of their business operations?
21    A.   Not necessarily, no.
22    Q.   Do you know what a distributor does
23 in the pharmaceutical supply chain?
24       MR. PIFKO:  Again, aside from
25 communications with your lawyers, you can

Page 209

1 answer.
2    A.   Broadly, part of the supply chain
3 from the manufacturers, distributors and
4 pharmacies, part of the supply chain.  That's to
5 the extent that I know, and --
6    Q.   I didn't mean to cut you off.  I'm
7 sorry.  Within that chain do you have any
8 specifics about the role distributor defendants
9 play?
10    A.   Not specifically, no.
11    Q.   Would you agree that distributors
12 don't manufacture prescription opioids?
13       MR. PIFKO:  Objection.  Foundation.
14    A.   I don't know that for sure, but I'm
15 assuming if it's -- they're distributors, that's
16 what they do, is distribute, not manufacture.
17    Q.   Not manufacture, okay.
18       Do you agree that distributor
19 defendants do not market prescription opioids to
20 prescribing physicians?
21       MR. PIFKO:  Objection.  Foundation.
22 Assumes facts not in evidence.
23    A.   I don't know with any specificity.
24    Q.   Do you agree that distributors do
25 not draft the warnings that accompany

53 (Pages 206 - 209)

1 FDA-approved prescription opioid medications?
2       MR. PIFKO: Objection. Foundation.
3    A.   I do not know that for sure.
4    Q.   Do you know one way or the other
5 whether distributor defendants play a role in
6 determining the quotas for opioid products that
7 are set by the DEA?
8       MR. PIFKO: Objection. Foundation.
9    A.   I do not know that specifically, no.
10    Q.   Do you know one way or the other
11 whether distributors interact with patients in
12 the course of their care for a particular
13 condition?
14    A.   Do not know.
15    Q.   Do you know one way or the other
16 whether distributors interact with doctors or
17 prescribers in the course of prescribing
18 medications to patients?
19    A.   I do not know.
20    Q.   Do you know one way or the other
21 whether distributors fill prescriptions written
22 by physicians?
23    A.   I do not know.
24    Q.   Do you know one way or the other
25 whether distributors counsel patients about

1 proper medication use?
2    A.   I do not know.
3    Q.   As you sit here today, can you
4 recall any statement that was made to you by
5 someone you knew to be working for a distributor
6 defendant in this lawsuit?
7    A.   No.
8    Q.   How about anybody in your
9 department; are you aware of any statements made
10 by a distributor defendant to anybody in the
11 Department of Public Health?
12    A.   No, I'm not aware.
13    Q.   Do you know whether distributors
14 know the identity of an individual who receives
15 one of the opioids that it ships?
16    A.   No, I have no idea.
17    Q.   Do you have any basis to disagree
18 with my contention that distributor defendants
19 do not know the identity of the end user of a
20 particular prescription opioid?
21       MR. PIFKO: Objection to the extent
22 the question assumes facts not in evidence.
23    A.   I would not know that.
24    Q.   Okay.  Do distributors know the
25 reason a medication is prescribed to a

1 particular patient?
2    A.   Sorry.  Rephrase.
3    Q.   Sure.
4       Does a distributor defendant know
5 the reason, diagnosis say, why a doctor writes a
6 prescription for a particular plaintiff --
7 patient?
8       MR. PIFKO: Objection. Foundation.
9    A.   I would not know.
10    Q.   Okay.  Does a distributor know the
11 patient's diagnosis?
12       MR. PIFKO: Objection. Foundation.
13    A.   I would not know.
14    Q.   Does a distributor know whether the
15 patient is suffering from chronic, incurable
16 pain caused by terminal cancer?
17       MR. PIFKO: Objection. Foundation.
18    A.   I would not know.
19    Q.   Does a distributor know whether a
20 patient pays for a prescription using cash or
21 their insurance?
22       MR. PIFKO: Objection. Foundation.
23    A.   I would not know that.
24    Q.   Do you agree that distributors are
25 regulated?

1       MR. PIFKO: Objection. Foundation.
2 Calls for a legal conclusion.
3    A.   No knowledge of that.
4    Q.   Okay.  Do you know whether the State
5 of Ohio has regulations in place that govern the
6 conduct of distributor defendants?
7    A.   Say that again.
8    Q.   Sure.
9       Do you know whether the State of
10 Ohio has regulations in place that govern the
11 conduct of distributor defendants?
12    A.   Distributor defendants, not that I
13 know of.  I don't know.
14    Q.   You don't know one way or the other?
15    A.   I don't know one way or the other.
16    Q.   Okay.  How about the federal
17 government; do you know one way or the other
18 whether there are federal laws and regulations
19 that govern the conduct of pharmaceutical
20 distributors?
21       MR. PIFKO: Aside from
22 communications with counsel, you can answer.
23    A.   Information that's been provided to
24 me by counsel is what I've -- I know, but
25 otherwise, I do not, I have no knowledge of that

54 (Pages 210 - 213)

Page 214

1 specifically.
2    Q.    So prior to the events that gave
3 rise to you meeting with attorneys, you had no
4 knowledge of regulations at the federal level
5 that pertain to pharmaceutical distributors; is
6 that fair to say?
7    A.    What I -- so, as I've said many
8 times here today, a lot of information is shared
9 at meetings that I attend and --
10    Q.    I don't mean to cut you off.  I
11 heard a lot about the meetings.  I don't
12 think -- you can finish --
13        MR. PIFKO:  You cannot do that.
14    Q.    You can finish your answer and then
15 we can see if you answered the question.  You
16 were talking about your meetings.
17    A.    I attend a lot of meetings.  It's my
18 capacity as the director of the Cleveland
19 Department of Public Health.  It's one of the
20 things that I do regularly.  My ability to
21 understand issues to any level of degree that I
22 can, managing a lot of issues in the City of
23 Cleveland, and that --
24        MR. SALIMBENE:  I asked about
25 federal regulations.  I move to strike all this

Page 215

1 as non-responsive.  This is a waste of time.
2 It's filibustering.
3        MR. PIFKO:  No, it's not.  She's
4 answering the question to the best of her
5 ability.
6        MR. SALIMBENE:  No.  No.  No.  I
7 said federal regulations governing the conduct
8 of distributor defendants.
9        MR. PIFKO:  You're cutting her off.
10        MR. SALIMBENE:  We're talking about
11 meetings.  I am cutting her off now because it's
12 been going on for 30 seconds and it's completely
13 non-responsive.
14        MR. PIFKO:  She can answer the
15 question however she pleases.  She can.  If you
16 want to make a motion about it after or do
17 whatever you want to do, you can do it.
18        MR. SALIMBENE:  We'll be leaving the
19 deposition open.
20        MR. PIFKO:  She has the right to
21 give an answer that she wants to do.  If you
22 don't like her answer, you can ask her a
23 follow-up question, you can make a motion, you
24 can do whatever you want, but you cannot cut her
25 off, okay.  If you do that again, I'm going to

Page 216

1 tell the judge that you're cutting her off.
2        MR. SALIMBENE:  Honestly, I'm fine
3 with that.  You know, in this case when I say
4 this is the most --
5        MR. PIFKO:  She's trying to
6 articulate.  You asked her do you have any
7 knowledge.  She's trying to articulate a basis
8 of knowledge and you cut her off.
9        MR. SALIMBENE:  I just asked what
10 the knowledge is.  I didn't ask for the basis.
11 I said what is the knowledge.
12        MR. PIFKO:  She's trying to explain
13 it to you.
14        MR. SALIMBENE:  I disagree
15 completely.
16        MR. PIFKO:  I disagree with you.
17 Obviously you don't like her answer, but that's
18 her answer.
19    Q.    You can continue.
20        MR. BOEHM:  She might need the
21 question reread.
22    Q.    You know what, yes.  I mean, the
23 question was basically, are you aware of any
24 federal regulation that govern the conduct of
25 distributors of pharmaceutical medications?

Page 217

1    A.    Very, very basic understanding based
2 on information that I have gathered in the
3 number of meetings and information that's
4 provided to me in my capacity as the director of
5 the Cleveland Department of Public Health.
6    Q.    What is the information?  What is
7 the information?  Not how did you obtain it.
8 What is the information you are aware of?
9    A.    I know that there are some
10 regulations.  I don't know them verbatim and I
11 don't know them specifically.
12    Q.    Okay.  That's perfect.
13        Are you aware of any DEA regulations
14 that pertain to distributors of pharmaceutical
15 products?
16        MR. PIFKO:  Aside from your
17 communications with counsel, you can answer.
18    A.    I have, again, a very, very basic
19 understanding of some reporting requirements to
20 the DEA.
21    Q.    Okay.  And what is that
22 understanding?  What is that basic
23 understanding?
24        MR. PIFKO:  Again, aside from
25 communications with counsel, you can answer.

55 (Pages 214 - 217)

Page 218

1    A.   A basic understanding of the volume
2 produced and distributed.
3    Q.   Can you explain that?
4    A.   Again, I have a very basic
5 understanding of the -- the numbers of
6 pharmaceuticals that distributors provide to
7 pharmacies in the entire chain.
8    Q.   What about the numbers?  What is the
9 regulation that you're aware of?
10    A.   I don't know the actual regulation.
11    Q.   If a distributor sells a medication
12 to a particular pharmacy, do you know if the
13 distributor knows whether that pharmacy has
14 received orders from other distributors?
15    A.   I would not know that.
16    Q.   Do you know what a -- strike that.
17        Do you know whether distributor
18 defendants are licensed by the DEA?
19    A.   I don't know.
20    Q.   Do you believe, other than, you
21 know, discussions with counsel, that any
22 distributor defendant in this lawsuit was not at
23 all times properly registered with the DEA?
24    A.   I do not know.
25    Q.   Do you know what this lawsuit claims

Page 219

1 distributor defendants either did or failed to
2 do that gave rise or gives rise to their alleged
3 liability in this lawsuit?
4        MR. PIFKO:  Objection to the extent
5 the question calls for a legal conclusion,
6 foundation, and instruction with respect to any
7 attorney-client communications.
8        Aside from communications, you can
9 answer.
10    A.   You have to repeat the question.
11        MR. SALIMBENE:  Can you read it
12 back?  I'm sorry.
13        (Record read.)
14        MR. SALIMBENE:  Thank you.
15    A.   Very, very peripheral knowledge in
16 terms of reporting numbers, but I don't know to
17 any level of specificity.
18    Q.   Okay.  And what is the source of
19 that knowledge that you just described?
20        MR. PIFKO:  Aside from the
21 communications with counsel, you can answer.
22    A.   Knowledge comes from -- from
23 counsel.
24    Q.   Okay.  So no knowledge obtained in
25 your role as the director of public health or at

Page 220

1 any other time aside from communications you've
2 had with counsel; is that fair?
3    A.   It's fair.
4    Q.   Do you have any personal knowledge
5 of something known as suspicious order
6 reporting?
7    A.   No, I do not.
8    Q.   Have you ever discussed suspicious
9 order reporting with anybody in your role as the
10 director of the Department of Public Health?
11    A.   I have no recollection of that, no.
12    Q.   Do you agree that distributors of
13 pharmaceutical medications play an important
14 role in promoting public health in Cleveland?
15        MR. PIFKO:  Foundation.
16        You can answer.
17    Q.   I'm asking you to speak as a top
18 public health official in Cleveland.
19    A.   Do I agree to what?
20    Q.   That distributor defendants,
21 distributors of pharmaceutical medications, play
22 an important role in promoting public health
23 here in Cleveland.
24        MR. PIFKO:  Foundation.  Overbroad.
25 Vague.

Page 221

1    A.   No knowledge of that.
2    Q.   You deal with a number of non-opioid
3 issues, correct?  I think you testified about
4 several of them earlier today, right?
5    A.   I do.
6    Q.   Your residents have things like
7 diabetes, true?
8    A.   Yes.
9    Q.   Cardiovascular disease, true?
10    A.   Yes.
11    Q.   Sexually transmitted infections you
12 mentioned, correct?
13    A.   Yes.
14    Q.   Administering flu vaccines, correct?
15    A.   Yes.
16    Q.   Who do you think distributes the
17 medications that treat those conditions that
18 people in Cleveland suffer from?
19        MR. PIFKO:  Objection.  Calls for
20 speculation.  Foundation.
21    A.   Obviously those come from -- those
22 are pharmaceutical medicines that are provided
23 to individuals.
24    Q.   Do you agree that your citizens here
25 in Cleveland benefit from having access to

56 (Pages 218 - 221)

Page 222

1 prescription medications?
2         MR. PIFKO: Objection. Incomplete
3 hypothetical. Overbroad.
4     A.    Surely there are some that are
5 helpful and beneficial to people.
6     Q.    Can you think of any circumstance
7 where the citizens here in Cleveland would be
8 better off without access to prescription
9 medications? Strike that. Strike that.
10        Do you agree your citizens are
11 better off if they can fill prescriptions for
12 the medications that are prescribed by their
13 doctors, that they can go to a pharmacy, present
14 the script, and they'll get that medication?
15        MR. PIFKO: Objection.
16     A.    You're assuming that --
17        MR. PIFKO: Wait. Wait. Wait.
18 Objection. Incomplete hypothetical.
19 Foundation. Calls for expert opinion.
20        You can answer.
21     Q.    Sorry. Go ahead.
22     A.    You're assuming that everybody can
23 go to a pharmacy and get their prescription
24 filled or even have access to medical
25 professionals. This is one of the things that

Page 223

1 we realize in the City of Cleveland that is a
2 big issue for us in terms of access, so in terms
3 of the totality of public health, that we try to
4 make sure that we are addressing all of those
5 issues for -- for individuals and families in
6 the city.
7     Q.    Access is a good thing, true, access
8 to healthcare, correct?
9         MR. PIFKO: Overbroad. Vague.
10 Incomplete hypothetical.
11     A.    Access to healthcare is a good
12 thing.
13     Q.    So access, including to prescription
14 medications, is a good thing in terms of
15 promoting public health, fair?
16        MR. PIFKO: Objection. Incomplete
17 hypothetical. Overbroad. Vague.
18     A.    That is part of public health, yes.
19     Q.    We're going to start looking at a
20 few documents now. So I'm going to mark these
21 as 7 and 8, and these are Bates ending -- it's
22 Cleveland and ending 188104 and 188105
23 respectively.
24        - - - - -
25        (Thereupon, Deposition Exhibit 7,

Page 224

1         E-Mail from Merle Gordon to Merle
2         Gordon Bates-Stamped
3         CLEVE-000188104, was marked for
4         purposes of identification.)
5         - - - - -
6         - - - - -
7         (Thereupon, Deposition Exhibit 8,
8         Document Entitled "August 18, 2016
9         Notes," Beginning Bates Stamp
10        CLEVE_000188105, was marked for
11        purposes of identification.)
12        - - - - -
13     Q.    And I believe what I marked here,
14 the first document is from you and also to you
15 and the subject is opioid notes. Do you see
16 where I've read that?
17     A.    I do.
18        - - - - -
19        (Thereupon, Deposition Exhibit 8,
20        Document Entitled "August 18, 2016
21        Notes," Beginning Bates Stamp
22        CLEVE_000188105, was marked for
23        purposes of identification.)
24        - - - - -
25     Q.    And then I'll represent to you that

Page 225

1 the next exhibit, Exhibit 8, is what was
2 produced to us as the attachment to that e-mail.
3         So fair to say here you were
4 e-mailing yourself some notes you took about, it
5 looks like, a meeting. And there's individuals
6 listed at the top of Exhibit 8. Do you see
7 where I am?
8     A.    I do.
9     Q.    Okay. Now, August 2016, fair to say
10 that's soon after you started the job as the
11 director of public health?
12     A.    Yes.
13     Q.    Okay. And do you recall what the
14 purpose of this meeting was?
15     A.    To some degree, yes.
16     Q.    And what was that?
17     A.    We were asked by the mayor's -- from
18 the mayor to come up with a set of
19 recommendations of how to deal with this crisis
20 in the City of Cleveland.
21     Q.    Okay. And these are your notes from
22 that meeting, correct?
23     A.    My name is not on this document.
24     Q.    Okay. So these are at least, at a
25 minimum, notes from the meeting, whether you

57 (Pages 222 - 225)

Page 226

1 took them or somebody else recorded them?
2       MR. PIFKO: Objection.
3    Q.   You don't recall that today?
4       MR. PIFKO: Objection. Foundation.
5    Q.   What is Exhibit 8?  What does that
6 document show?
7       MR. PIFKO: Objection. Overbroad.
8    A.   The document has a date at the top
9 and it says "Notes" and indicates individuals
10 that were most likely at this meeting. My name
11 is not on this document.
12    Q.   So do you recall attending this
13 meeting or no?  I thought before you testified
14 you may have, but --
15    A.   I believe I attended this meeting,
16 yes.
17    Q.   So is it fair to say that since your
18 name is not listed and you attended, it's likely
19 that you did, in fact, take these notes and
20 didn't record your own name as being present?
21       MR. PIFKO: Objection.
22 Argumentative. Assumes facts not in evidence.
23    Q.   I'm just asking if that's a
24 reasonable explanation for what --
25    A.   It's reasonable.

Page 227

1    Q.   Okay.  Is it fair to say, as you
2 look at this document and all the
3 recommendations from various folks, that there's
4 nothing in this document that speaks to the
5 conduct of any distributor of prescription
6 opioids?
7       MR. PIFKO: Objection.  The document
8 speaks for itself.  Mine is double-sided.
9       MR. SALIMBENE: I'm ever conscious
10 of the environment, so I printed one
11 single-sided and the other copies double-sided.
12 I don't know what the deposition protocol says
13 about that, I got to say.
14       MR. PIFKO: I'm okay with this
15 document --
16       MR. SALIMBENE: Okay.
17       MR. PIFKO: -- with respect to its
18 double-sidedness.
19       MR. SALIMBENE: Limited to that, of
20 course.
21    A.   I do not see distributors identified
22 in this document.
23       - - - - -
24       (Thereupon, Deposition Exhibit 9,
25       Memo from M. Gordon to Chief McGrath

Page 228

1       and Director Griffin, dated
2       September 6, 2016, Beginning Bates
3       Stamp CLEVE_000187963, was marked
4       for purposes of identification.)
5       - - - - -
6    Q.   Okay.  And then -- so you mentioned
7 this meeting with the mayor, and I'm going to
8 mark now what I think is a document -- it's
9 Bates number CLEVE 187963 and the subject line
10 of this is "Re: Recommendations for the City of
11 Cleveland Mayor Frank Jackson to address the
12 opioid addiction epidemic in Cleveland."  Do you
13 see where I've read that?
14       MR. PIFKO: Hold on.  She just got
15 the document.
16       MR. SALIMBENE: Sure.
17       MR. PIFKO: Take your time to review
18 the document.
19    A.   Yes, I see that.
20    Q.   And this document is from you, true?
21    A.   That is what it says, yes.
22    Q.   Do you agree that you are the top
23 public health official in Cleveland?
24    A.   I am the director of the Cleveland
25 Department of Public Health.

Page 229

1    Q.   Would you characterize yourself as
2 in Cleveland I am the top health official?
3    A.   Often that is what the director is
4 referred to as, yes.
5    Q.   I'm asking you would you refer to
6 yourself as the top health official in
7 Cleveland?
8    A.   Often that is what I am referred to
9 as, yes.
10       - - - - -
11       (Thereupon, Deposition Exhibit 10,
12       E-Mail String Beginning Bates Stamp
13       CLEVE_000189085, was marked for
14       purposes of identification.)
15       - - - - -
16    Q.   So this is 10, and right there --
17 it's an e-mail --
18       MR. PIFKO: Hold on.
19    Q.   Okay.  Sure.  It's an e-mail from
20 you.  The Bates is 189085, also CLEVE.  It says,
21 Hello, Melanie.  And then number 2 says, "In
22 Cleveland I am the top health official."  Do you
23 see where I've read that?
24       MR. PIFKO: Take your time to review
25 the document.

Page 230

1    Q.   That's the only question I have is
2 number 2 says "In Cleveland I am the top health
3 official." Did I read that correctly?
4    A.   Yes.
5    Q.   And that's an e-mail you sent, true?
6    A.   Yes.
7    Q.   Okay. We can go back to the other
8 document, the mayor's report.
9        Now, what was the purpose of this
10 mayor's report? I mean, I believe you testified
11 about this earlier, but just because we're here
12 again, if you could describe why you guys put
13 together these recommendations.
14    A.   Sure.
15        So the mayor asked, as he regularly
16 does, to put together a set of recommendations
17 for the city to address any particular issue,
18 and I would report out with some regularity at
19 cabinet issues that were happening in the city.
20 And so he had asked me and the director of
21 public safety to put together a set of
22 recommendations to address the opiate crisis in
23 the City of Cleveland.
24    Q.   Okay. Under "Rehabilitation" --
25 it's a bit down the first page there -- it's

Page 231

1 underlined, "Rehabilitation," and it says, last
2 paragraph -- excuse me, last sentence of the
3 first paragraph, "According to the county
4 medical examiner, 15 percent of addicts actually
5 want out of the addiction; of that, 10 percent
6 actually make it clean one year later." Do you
7 see where I read that?
8    A.   I do.
9    Q.   Does that mean that 85 percent of
10 people using -- excuse me, of addicts don't want
11 out of the addiction? Is that the flip side?
12        MR. PIFKO: Objection. Foundation.
13 Calls for speculation.
14    A.   That is not what is stated here in
15 this document.
16    Q.   But what is stated is that only 15
17 percent do, in fact, want out of addiction,
18 true?
19        MR. PIFKO: Same objections.
20    A.   I am stating what -- we got
21 information from the county medical examiner's
22 office and just repeating what they had given to
23 me as information.
24    Q.   Do you agree that there are some
25 individuals that don't want to stop using drugs?

Page 232

1        MR. PIFKO: Objection. Calls for
2 speculation. Foundation.
3    A.   As we've heard from people that
4 there are some people who are just so addicted,
5 they have lost their ability to rationalize and
6 their addiction has taken over and consumed
7 their life.
8    Q.   But there are people who don't mind
9 using drugs; is that fair to say?
10        MR. PIFKO: Objection. Calls for
11 speculation. Foundation. Asked and answered.
12    A.   I can't imagine that there's
13 somebody who has a desire to not be addicted to
14 a substance that they -- that is illegal for
15 them to consume.
16    Q.   Can you explain then why only 15
17 percent of addicts actually want out of the
18 addiction according to your county's medical
19 examiner?
20        MR. PIFKO: Objection. Asked and
21 answered. Foundation. Speculation.
22        MR. SALIMBENE: I definitely didn't
23 ask this one.
24        MR. PIFKO: She answered it already.
25    A.   I am simply stating on this document

Page 233

1 that according to the county medical examiner --
2 I'll repeat it back to you, I'll read what is
3 written here -- "15 percent of addicts actually
4 want out of the addiction, and of that, 10
5 percent actually make it clean one year later."
6    Q.   Okay. So you have no idea why or
7 how the other 85 percent of addicts feel?
8        MR. PIFKO: Objection. Asked and
9 answered.
10    A.   How they feel? No, I don't know
11 that I know how they feel specifically.
12    Q.   Do you agree that there's an element
13 of personal responsibility in addiction?
14        MR. PIFKO: Objection. Foundation.
15 Calls for speculation. Incomplete hypothetical.
16 Calls for expert opinion.
17    A.   In what type of addiction?
18    Q.   Opioid addiction.
19        MR. PIFKO: Same objections.
20    A.   From what we have gathered from a
21 lot of information and meetings and data and
22 discussions around this issue, there are
23 pathways into addiction that have caused people
24 to go to extremes to feed their addiction.
25    Q.   And my question was, do you believe

59 (Pages 230 - 233)

Page 234

1 that, based on your experience, there's an
2 element of personal responsibility in that cycle
3 of addiction?
4    MR. PIFKO: Objection. Foundation.
5 Calls for speculation. Incomplete hypothetical.
6 Calls for expert opinion.
7    A.  I believe that in some -- to a large
8 degree, they don't have the capacity to -- to be
9 rational about this once they're addicted.
10    Q.  Is that a no then? Is no the answer
11 to my question?
12    MR. PIFKO: Objection. Asked and
13 answered. You're harassing her. She gave an
14 answer.
15    A.  I answered your question.
16    Q.  I don't think you did. I said, is
17 there an element of personal responsibility in
18 addiction? And it could be yes and explain or a
19 no and explain.
20    MR. PIFKO: No. She can answer
21 however she wants.
22    MR. SALIMBENE: I move to strike her
23 answer as non-responsive.
24    A.  I believe that once people are
25 addicted, they are, to a large degree, incapable

Page 235

1 of making that rational --
2    Q.  How --
3    A.  -- decision.
4    MR. PIFKO: Stop cutting her off.
5    MR. SALIMBENE: I didn't mean to cut
6 her off.
7    Q.  How about the decision to use an
8 addictive substance, an illegal, addictive
9 substance? Strike that.
10    How about the decision to use an
11 illegal opioid in the first instance; do you
12 believe that there is an element of personal
13 responsibility with that?
14    MR. PIFKO: Objection. Foundation.
15 Incomplete hypothetical. Speculation. Calls
16 for expert opinion.
17    You can answer.
18    A.  I believe that there's a pathway to
19 that, and --
20    Q.  I didn't ask about a pathway.
21    A.  -- leading up to the point where
22 they are seeking these -- these drugs to satiate
23 their addiction.
24    Q.  I didn't ask about a pathway, so I
25 move to strike that as non-responsive, and we'll

Page 236

1 move on in the sake of time. We'll probably be
2 back here.
3    Now -- okay. So you're the top
4 public health official in Cleveland, true? We
5 established that?
6    A.  Sure.
7    Q.  Okay. And you come up -- you're
8 presenting these recommendations to the mayor,
9 right, so you have, on page 2 of this document
10 ending Bates 964, a list of recommendations. Do
11 you see where I am?
12    A.  I do.
13    Q.  And it's fair to say you could have
14 put anything in this list of recommendations
15 that you thought made sense? Is that fair?
16    A.  Say your question again.
17    Q.  Sure.
18    You could have put anything in this
19 list of recommendations that you thought made
20 sense in terms of, you know, improving the
21 public's health?
22    MR. PIFKO: Objection to the extent
23 the question assumes facts not in evidence.
24    A.  This is to the chief of public
25 safety and to the director of community

Page 237

1 relations, a set of recommendations to present
2 to the mayor regarding this epidemic in this
3 city.
4    Q.  I move to strike that as completely
5 non-responsive. My question was, you could have
6 put in this list of recommendations anything you
7 wanted that you thought made sense in, you know,
8 serving the purpose of what you were trying to
9 do here, true?
10    MR. PIFKO: Hold on. Calls for
11 speculation. Assumes facts not in evidence.
12    Q.  Your answer was?
13    A.  I could have.
14    Q.  Okay. Number 3 here is "Part of the
15 money seized from drug arrests could support
16 treatment programs, prevention education or
17 noloxone programs." Do you see where I read
18 that?
19    A.  Yes.
20    Q.  Did that happen?
21    A.  That has not happened, no.
22    Q.  Okay. Is there anything in this
23 list of nine items here that addresses anything
24 to do with the conduct of the companies who
25 distribute opioid medications, pharmaceutical

60 (Pages 234 - 237)

1 opioid medications?

2　　　　MR. PIFKO: Objection. The document
3 speaks for itself. Objection to the extent that
4 the question calls for a legal conclusion.

5　　A.　The distributors are not named
6 specifically in this set of recommendations.

7　　Q.　Okay. Is there anything -- excuse
8 me. Strike that.

9　　　　There is nothing in this set of
10 recommendations that speaks to in any way
11 suspicious order reporting; is that correct?

12　　　　MR. PIFKO: Again, the document
13 speaks for itself and objection to the extent
14 the question calls for a legal opinion.

15　　Q.　You can answer.

16　　A.　That is not mentioned specifically
17 in this list of recommendations.

18　　Q.　Do you recall -- you can put that
19 aside.

20　　　　Do you recall signing onto a letter
21 to the presidential transition team, yes or no?

22　　A.　I do recall signing onto a couple
23 letters to the transition team, yes.

24　　Q.　So I'll mark this as Exhibit 11.

25　　　　　-　-　-　-　-

1　　　　(Thereupon, Deposition Exhibit 11,
2　　　　Letter from Leana S. Wen, M.D. to
3　　　　Governor and Vice President-Elect
4　　　　Mike Pence, dated November 29, 2016,
5　　　　Beginning Bates Stamp
6　　　　CLEVE_000187508, was marked for
7　　　　purposes of identification.)

8　　　　　-　-　-　-　-

9　　　　MR. PIFKO: Hold on.

10　　Q.　It's Cleveland 187508, and it's a
11 letter dated November 29th, 2016 to Governor and
12 Vice-President Elect Mike Pence, and if you look
13 at the page ending Bates 514, it says,
14 sincere -- well, the page before it says,
15 "Sincerely," and then it says, "On behalf of the
16 following health commissioners representing 31
17 million American citizens in 11 cities and
18 counties," and there's a colon, and one of the
19 names listed there on the left column, second
20 from the bottom, is your name, true?

21　　A.　True.

22　　Q.　Okay. What was the purpose of this
23 letter?

24　　　　MR. PIFKO: Take your time to review
25 the letter.

1　　A.　So a big part of my work involves
2 advocacy and I am part of a coalition of big
3 cities. It's called The Big City Health
4 Coalition. These individuals are and these
5 individual departments are -- I believe all of
6 them are members of the Big City Health
7 Coalition. And this issue is so significant to
8 us and to the cities where we work that we
9 thought it very important to make sure that we
10 submitted a letter to the transition team, and
11 here it's addressed to Governor and
12 Vice-President Elect Mike Pence, regarding this
13 issue, and there's a number of -- number of
14 issues contained therein.

15　　Q.　Right. And one of the issues is, on
16 page Bates ending 509, opioid addiction and
17 overdose, correct?

18　　A.　Yes, that is one of the
19 subcategories. Yes.

20　　Q.　And towards the bottom of that page
21 there's a sentence that says, "We propose that
22 the new administration," colon, and then there's
23 a bulleted list of five items, true?

24　　A.　On this page, yes.

25　　Q.　Right. So this is a list that you

1 put together for proposals that the new
2 administration consider, fair?

3　　　　MR. PIFKO: Objection. Assumes
4 facts not in evidence. Mischaracterizes the
5 document and the record.

6　　A.　I did not write this document.

7　　Q.　You signed onto the document,
8 correct?

9　　A.　Signed onto it.

10　　Q.　What was your understanding of what
11 this section was designed to do?

12　　　　MR. PIFKO: Objection. Foundation.

13　　A.　Again, a big part of my job is
14 advocacy and bringing resources to issues in our
15 community. One way we do that is we advocate to
16 policy makers on a federal level, and this is
17 one example of that.

18　　Q.　Okay. Is it correct that there is
19 nothing in these five bullets that relates to
20 the conduct by distributor defendants who have
21 been sued by the City of Cleveland in this case?

22　　　　MR. PIFKO: Objection. The document
23 speaks for itself and objection to the extent
24 the question calls for a legal opinion.

25　　A.　Distributors are not mentioned in

61 (Pages 238 - 241)

Page 242

1 this set of proposals on page 2.
2     Q.   Are you aware of any criminal act
3 related to drug diversion that were committed by
4 the distributor defendants who have been sued by
5 the City of Cleveland in this case?
6         MR. PIFKO:  Aside from your
7 communications with counsel, you can answer.
8     A.   I am not aware.
9     Q.   How about criminal acts related to
10 improper use of prescription opioids by other
11 individuals, such as street drug dealers; are
12 you aware of criminal activities like that?
13         MR. PIFKO:  Again, aside from your
14 communications with counsel, you can answer.
15     A.   Repeat your question.
16     Q.   Sure.
17         Are you aware that there are people
18 breaking the law with respect to prescription
19 opioids, such as street dealers who are selling
20 prescription-only pills to individuals who have
21 no valid legal prescription?
22         MR. PIFKO:  Objection to the extent
23 the question assumes facts not in evidence.
24     A.   I -- I know that we've heard
25 anecdotally that there are -- there is some sale

Page 243

1 of prescription pills illegally, and this is
2 based on, again, hearing testimony at meetings
3 and individuals that we've talked about in terms
4 of -- came up in a lot of different discussions
5 around breaking and entering and how bathrooms
6 and medicine cabinets had been pilfered and
7 pills had been taken and then sold on the -- on
8 the streets, all just what has come up again in
9 the many meetings and many conversations that
10 I've had about this issue.
11     Q.   You've had conversations with law
12 enforcement, true?
13     A.   Law enforcement, sure.
14     Q.   You've had conversations where law
15 enforcement tells you that they've been
16 arresting people for selling drugs, true?
17     A.   Correct.
18     Q.   Okay.  And is it also true that you
19 have not sued anybody that participates in that
20 sort of conduct in this lawsuit?
21         MR. PIFKO:  Objection to the extent
22 the question mischaracterizes the record and
23 calls for a legal conclusion, legal opinion.
24 The lawsuit speaks for itself.
25         You can answer.  Oh, and

Page 244

1 attorney-client privilege.  Aside from
2 communications with counsel, you can answer.
3         MR. SALIMBENE:  When your objections
4 are longer than my question, it's probably
5 inappropriate, just as a rule of thumb, but --
6         MR. PIFKO:  Well, when you ask bad
7 questions, I'm going to have plenty of
8 objections to make.
9         MR. SALIMBENE:  You have all day.
10     Q.   You can answer.
11     A.   You'll have to repeat the question.
12         MR. SALIMBENE:  Can you read it
13 back?
14         (Record read.)
15     Q.   And "that sort of conduct" was
16 criminal sale of drugs?
17         MR. PIFKO:  Again, objection to the
18 extent the question calls for a legal
19 conclusion, legal opinions.
20         MR. SALIMBENE:  You have the same
21 objection.
22     Q.   You can answer.
23         MR. PIFKO:  Well, no.  You added to
24 the question.
25     Q.   You can answer.

Page 245

1     A.   I do not believe that those
2 individuals are included in this case.
3     Q.   As you sit here today, are you able
4 to link any expense you allege that your
5 department incurred to the conduct of anybody,
6 any company who distributed lawfully
7 prescription opioid medications?
8         MR. PIFKO:  Objection.  Foundation.
9 Calls for expert opinion.  Calls for a legal
10 conclusion, legal opinion.  You can answer.
11 Speculation.
12     Q.   You can answer.
13     A.   I cannot draw that conclusion
14 myself.
15     Q.   I'm sorry.  What was the answer?
16     A.   I cannot -- I cannot make -- I
17 cannot answer that question.
18     Q.   Why not?
19     A.   I cannot answer that question.
20     Q.   Have you ever attempted to make that
21 determination prior to today?
22     A.   Make what determination?
23     Q.   What amount or what proportion of
24 the damages that you say -- you claim in this
25 lawsuit your department suffered are due to the

62 (Pages 242 - 245)

1 conduct of the distributor defendants in this
2 lawsuit.
3        MR. PIFKO:  Hold on.  What's your
4 question?
5        MR. SALIMBENE:  I just asked it.
6    A.   I don't understand your question.
7        MR. PIFKO:  Well, if you literally
8 read the transcript here, it's just a statement
9 from you.  It's not a question.
10        MR. SALIMBENE:  What is it?
11        MR. PIFKO:  It says, "What amount or
12 proportion of the damages that you say claim
13 in this lawsuit your department suffered are due
14 to the conduct of distributors in this lawsuit."
15    Q.   That's a question.  What proportion
16 of the --
17        MR. PIFKO:  She just answered that
18 question.
19    Q.   Do you know the answer to that
20 question?
21        MR. PIFKO:  Objection.  Prior
22 objections.  Calls for expert opinion, legal
23 conclusion, foundation.
24    Q.   Do you know the answer to that
25 question?

1    A.   My department and the city has had
2 to respond to this issue and we are way
3 under-resourced to do that, and we -- we are
4 dealing with a crisis in this community of
5 addicts and the impact of all of that, and I
6 can't put a dollar figure on it and I can't be
7 that specific to an actual amount.
8    Q.   I move to strike everything before
9 "I can't put a dollar figure on it."
10        Do you agree that since you took
11 over the Department of Public Health in 2016,
12 that illegal drugs have been a bigger problem in
13 Cleveland when you compare them to prescription
14 opioids?
15        MR. PIFKO:  Hold on a second.
16        You can answer the question.  You
17 are speaking fast.
18        MR. SALIMBENE:  I speak fast; that I
19 will agree to.  Sorry.
20    A.   I believe that illegal drugs are a
21 problem because pathways towards them have
22 contributed to this issue in this community.
23    Q.   Do you believe that in 2016,
24 starting the year you took over, more deaths
25 have been caused by illegal opioids than have

1 been caused by prescription opioids?
2        MR. PIFKO:  Objection.  Foundation.
3    A.   I don't know that I can answer that
4 question.
5    Q.   Why not?
6    A.   I don't have the data in front of
7 me.
8        MR. SALIMBENE:  Let's mark this.  I
9 had them make copies.  There's two black and
10 white copies and one color copy that you can
11 look at.  There's some color coding.  Sorry.  I
12 didn't mark that.
13            - - - - -
14        (Thereupon, Deposition Exhibit 12,
15        Ohio Department of Health 2016 Ohio
16        Drug Overdose Data:  General
17        Findings, was marked for purposes of
18        identification.)
19            - - - - -
20    Q.   What I marked as Exhibit 12 is a
21 2016 Ohio drug overdose data general findings
22 document, and it has the Ohio Department of
23 Health at the top.  Do you see that document?
24    A.   I do.
25    Q.   Have you ever seen this document

1 before?
2    A.   I see a lot of documents.
3    Q.   Do you know one way or the other?
4    A.   I can't say.
5    Q.   That's okay.
6        I believe earlier you testified,
7 when you were being questioned by counsel for
8 the manufacturer defendants, that the number of
9 pills coming into the county -- excuse me, into
10 your city had gone up.  Do you remember that
11 testimony?
12        MR. PIFKO:  Objection.
13 Mischaracterizes the record.  Assumes facts not
14 in evidence.
15    Q.   Do you remember that testimony?
16    A.   It's been a long day.
17    Q.   Well, I'm going to give you a chance
18 to answer it again.  Do you believe, as you sit
19 here right now, that the number of opioid
20 prescription pills that have been distributed
21 into Cleveland has increased since 2011?
22    A.   I know that there has -- based on
23 information, has been an increase.  I don't know
24 for sure the actual date that we have that
25 information back from --

63 (Pages 246 - 249)

Page 250

1    Q.   How about with respect to the State
2 of Ohio; has the number of opioid -- excuse me,
3 prescription opioids gone up or down since 2011?
4        MR. PIFKO:  Objection.  Foundation.
5 Calls for speculation.
6    Q.   Do you know?
7    A.   It is my recollection that it has
8 been on the rise.
9    Q.   Okay.  Can you look at page 4 of the
10 document, figure 6, "Opioid solid doses
11 dispensed to Ohio patients by year."  Do you see
12 that chart?  In 2011 the Y axis is the number of
13 solid doses in millions, and in 2011 it says
14 782.  Do you see where I read that?
15    A.   I do.
16    Q.   And in 2016 it says 631.  Do you see
17 where I read that?
18    A.   Yes.
19    Q.   The number goes down, true?
20        MR. PIFKO:  Objection.  The document
21 speaks for itself.  Calls for foundation.
22    Q.   Is 631 lower than 782?
23    A.   I am not a pharmacist so I don't
24 know what a solid dose is.
25    Q.   Is 631 lower than 782?

Page 251

1        MR. PIFKO:  Objection.
2 Argumentative.  Harassing.
3    A.   I'm not a pharmacist and I don't
4 know what a solid dose is.
5    Q.   Is 631 lower than 732?
6        MR. PIFKO:  You're harassing her.
7 You're trying to trick her.  She's answered the
8 question about this chart that you're asking
9 her --
10        MR. SALIMBENE:  No.
11        MR. PIFKO:  If you just want to
12 know --
13        MR. SALIMBENE:  I don't want to know
14 anything from you.  I just don't.
15        MR. PIFKO:  I want to be clear about
16 the record here.  Are you just asking her a
17 simple question is the number 631 lower than 732
18 or are you asking about this document?
19        MR. SALIMBENE:  Sir, I'm asking her
20 exactly what I asked her.  That's what I'm
21 asking her, exactly what I said.
22        MR. PIFKO:  He's asking you a simple
23 number question.  You don't need the document to
24 answer his question.
25    Q.   Is 631 lower than 782?

Page 252

1    A.   Strictly as a number, sure.
2    Q.   If you look at the figure 6 on page
3 4 of this document, is it your testimony, as the
4 top public health official in Cleveland, you are
5 unable to interpret the trend of opioid solid
6 doses over time dispensed to Ohio patients?
7        MR. PIFKO:  Objection.
8 Argumentative.
9    A.   As I've said before, I'm not a
10 pharmacist so I don't know what a solid dose is
11 and I don't know if this is the totality of all
12 opiates being dispensed in the state.
13    Q.   So you don't know how to interpret
14 that chart; is that fair to say?
15    A.   As I said before, I'm not a
16 pharmacist so I don't know what a solid dose is.
17    Q.   How about you look at page 2,
18 please?  And this is -- figure 2 is percentage
19 of unintentional drug overdose deaths involving
20 selected drugs by year 2010 to 2016.  Do you see
21 where I am?
22    A.   Up at the top, yes.
23    Q.   What has happened to the percentage
24 of deaths attributable to prescription opioids
25 since 2011?

Page 253

1        MR. PIFKO:  Objection.  The document
2 speaks for itself.  Foundation.  Calls for
3 speculation.
4    A.   I'm sorry.  Ask your question again.
5    Q.   Sure.  I'll ask it a different way.
6        The percentage of overall -- excuse
7 me, the percentage of all overdose deaths
8 attributable to prescription opioids according
9 to this chart has declined every year since
10 2011, true?
11        MR. PIFKO:  Objection.  Foundation.
12 Document speaks for itself.
13    A.   This is what's purported on this
14 report.
15    Q.   Do you have any basis to dispute the
16 accuracy of this report?
17        MR. PIFKO:  Objection.  Foundation.
18 Speculation.  Expert opinion.
19    A.   There's just one source indicated
20 here, so it is data reported just on -- from one
21 source, and based on just this report from this
22 one source, while not entirely true, it does
23 look -- it does appear that there is a
24 reduction, yes.
25        MR. PIFKO:  We are taking a break

64 (Pages 250 - 253)

Page 254

1 right now.
2        MR. SALIMBENE:  Okay.
3        THE VIDEOGRAPHER:  Going off the
4 record.  The time is 4:37.
5        (Recess had.)
6        THE VIDEOGRAPHER:  Back on the
7 record.  The time is 4:58.
8 BY MR. SALIMBENE:
9    Q.   Director Gordon, one more question
10 about Exhibit 12, which I think is in that pile
11 right there.
12        Again, on page 2, if you look at
13 figure 2, which indicates the percentage of
14 unintentional drug overdose deaths involved with
15 selected drugs by year, if you look at for 2016
16 the orange column to the far right, if you
17 compare cocaine to prescription opioids, would
18 you agree that the percentage of unintentional
19 drug overdose deaths involving cocaine is higher
20 than the percentage involving prescription
21 opioids?
22        MR. PIFKO:  Objection.  The document
23 speaks for itself.  Foundation.
24        You can answer.
25    A.   Well, again, considering the source

Page 255

1 and the -- based on the actual -- the time of
2 death, that is what this specific report does
3 reflect in the orange column.
4    Q.   Are you aware of any data that
5 suggests what's represented there in figure 2,
6 which I just asked you to describe, is not
7 accurate?
8    A.   I don't -- I don't have -- I don't
9 know.
10        -  -  -  -  -
11        (Thereupon, Deposition Exhibit 13,
12        E-Mail from Merle Gordon to Jana
13        Rush, dated August 25, 2016,
14        Beginning Bates Stamp
15        CLEVE_000191543, was marked for
16        purposes of identification.)
17        -  -  -  -  -
18    Q.   Okay.  Can you look at what I'm
19 handing you that has been marked as Exhibit 13?
20 And that is a document -- it's an e-mail from
21 you and a Bates ending CLEVE 191543.  At the
22 beginning of this document it is an e-mail,
23 correct, from you to Jana Rush?  Do you see
24 where I am?
25    A.   I do.

Page 256

1    Q.   Who is Ms. Rush?
2    A.   Jana Rush was an employee of the
3 Cleveland Department of Public Health.
4    Q.   And you wanted her to distribute
5 this to her team, true?
6    A.   That is what I say here in this
7 e-mail.
8    Q.   Would you ask her to distribute
9 information to her team that you did not think
10 was accurate?
11    A.   I would ask her to distribute to her
12 team information that comes to me from the Ohio
13 Department of Health.  I'm still new at this
14 point so I'm forwarding information.  I don't
15 know if they are receiving it or not.
16    Q.   Okay.  So is it your testimony,
17 then, this information might be accurate, it
18 might not be accurate, and you're asking her to
19 forward it out to her team?
20    A.   It is information directly from the
21 Ohio Department of Health.  It is one of the
22 many listservs that I am on, and I am forwarding
23 it to -- to the staff person and asking her to
24 distribute it to her team.
25    Q.   Okay.  On page 2 of this document

Page 257

1 Bates ending 544, there's a quote in that first
2 paragraph towards the bottom.  It says, "Also,
3 the percentage of prescription opioid-related
4 deaths compared to all unintentional overdose
5 deaths declined in Ohio for the fourth straight
6 year and the number of these deaths are leveling
7 off."  Do you see where I read that?
8    A.   I do.
9    Q.   Do you have any basis to disagree
10 with the conclusions stated there?
11        MR. PIFKO:  Objection.  Foundation.
12 Calls for speculation.
13    A.   It's a quote in this e-mail from the
14 Ohio Department of Health.
15    Q.   That's correct.
16        Do you have any basis to dispute or
17 do you disagree with in any way what is stated
18 in that quote?
19        MR. PIFKO:  Objection.  Foundation.
20 Calls for speculation.
21    A.   I have no basis one way or the
22 other.
23    Q.   Okay.  If you look at the first page
24 of this document, Bates ending 543, it says --
25 there's -- it says, "Mark Hurst, medical

65 (Pages 254 - 257)

Page 258

1 director of the Ohio Department of Mental Health
2 and Addiction Services." Do you know Dr. Hurst
3 personally -- professionally? Sorry.
4    A.   I do not.
5    Q.   No.
6        Well, let me ask you this: Before
7 you asked Jana to forward this, do you recall
8 whether you would have read this and reviewed it
9 first yourself?
10    A.   I receive a lot of e-mails. I can't
11 tell you whether or not I read the entirety of
12 this e-mail or not. This is August of 2016,
13 almost two years ago.
14    Q.   That's fair.
15        Was it your standard practice to
16 read newsletters from the Ohio Department of
17 Health before you asked team members to forward
18 them?
19    A.   Not necessarily. I was forwarding
20 them, again, as part of these listservs and
21 wanting to make sure my staff had information as
22 it was coming out of the Ohio Department of
23 Health. That is regular practice.
24        MR. SALIMBENE: Can we hop off the
25 record for one second?

Page 259

1        THE VIDEOGRAPHER: Off the record,
2 5:04.
3        (Short recess had.)
4        THE VIDEOGRAPHER: Back on the
5 record, 5:04.
6 BY MR. SALIMBENE:
7    Q.   Director Gordon, are you familiar
8 with the OARRS database, O-A-R-R-S?
9    A.   I have some familiarity with the
10 database, yes.
11    Q.   And can you describe for me what
12 your familiarity consists of, what your
13 understanding of that database is?
14        Oh, sorry. I didn't mark that.
15        - - - - -
16        (Thereupon, Deposition Exhibit 14,
17        E-Mail from David Gretick to Merle
18        Gordon, dated July 11, 2016,
19        Bates-Stamped CLEVE_000188213, was
20        marked for purposes of
21        identification.)
22        - - - - -
23    Q.   I've marked as Exhibit 14 an e-mail
24 from David Gretick to you, Director Gordon,
25 Kathie Rosen -- Rothenberg, excuse me, Jana Rush

Page 260

1 and Brent Styer, and the Bates is Cleveland
2 188213. Do you see where I am?
3    A.   I do.
4    Q.   And who is Mr. Gretick?
5    A.   It says on here David Gretick was
6 the program director for the Office of Mental
7 Health and Substance Abuse for the Cleveland
8 Department of Public Health.
9    Q.   Do you know how long he has been
10 with Cleveland in that role?
11    A.   I don't know exactly how long he's
12 been with Cleveland, no.
13    Q.   And he says, "Hello again. As
14 Dr. Murthy's discussion to the audience at grand
15 rounds will include appropriate opioid
16 prescribing practices, I'm also attaching
17 information on the Ohio Automated Rx Reporting
18 System (OARRS)." Do you see where I read that?
19    A.   Yes.
20    Q.   Is Dr. Murthy -- is that the same
21 Dr. Murthy who was the former Surgeon General;
22 do you know?
23    A.   I cannot say for sure.
24    Q.   Okay. You did testify earlier you
25 attended a presentation with that Dr. Murthy,

Page 261

1 true?
2    A.   I did go to a meeting when he was
3 here in town, yes.
4    Q.   But you don't recall if this is the
5 same thing; is that fair?
6    A.   I can't say for sure. It's an old
7 e-mail.
8    Q.   Sure.
9        Do you recall -- well, let me ask it
10 this way: Did you attend the grand rounds that
11 Dr. Murthy gave on that topic? Do you recall
12 whether you were there?
13        MR. PIFKO: Objection. Vague.
14    A.   I cannot recall if I attended that
15 grand rounds. I attended a pre-meeting with a
16 group of stakeholders and experts and
17 individuals with the Surgeon General.
18    Q.   Had you heard of OARRS prior to the
19 time you received this e-mail from Mr. Gretick?
20    A.   I don't believe so.
21    Q.   Okay. Did you review this e-mail
22 from Mr. Gretick when you received it; do you
23 recall?
24    A.   I do not recall.
25    Q.   Do you know whether the city,

66 (Pages 258 - 261)

Page 262

1 Cleveland's Department of Public Health, was
2 utilizing information obtained from the OARRS
3 database at the time you took over in your role
4 as director in 2016?
5    A.   I do not recall.
6    Q.   Does the department currently
7 utilize data obtained from the OARRS database
8 for any purpose as we sit here today?
9    A.   I do not know.
10    Q.   Can you say one way or the other
11 whether the Department of Public Health has ever
12 used or attempted to leverage or review data
13 contained in the OARRS database?
14       MR. PIFKO:  Objection.  Vague.
15    A.   I do recall that this was a part of
16 the application from -- for grant funding from
17 the Department of Justice for a program that we
18 discussed earlier today, the CORAP application.
19 There was an anticipation that if we were
20 funded, that we would be able to access this
21 information.
22    Q.   Have you ever made -- let me ask it
23 this way:  You testified that you're not, in
24 fact, using this OARRS information in any way
25 today, true?

Page 263

1    A.   I don't know that we are.
2    Q.   Okay.  Have you ever asked anybody
3 at OARRS to gain access to their information,
4 independent of that grant you just mentioned?
5    A.   Independent of that grant?
6    Q.   Yes.
7    A.   I have no recollection.
8    Q.   You testified earlier that you look
9 at a number of databases and I believe you said
10 we like to look at all the data available to us.
11 Do you recall giving testimony like that?
12    A.   As the director of the Cleveland
13 Department of Public Health, we look at as much
14 data as we can to assess and understand the
15 issues facing our city.
16    Q.   Including prescription drug abuse,
17 true?
18       MR. PIFKO:  Objection.  Vague.
19    A.   If we can.
20    Q.   In that first -- second paragraph,
21 after the introduction there's quotes, blocked,
22 it's indented, it says, "To address the growing
23 misuse and diversion of prescription drugs, the
24 State of Ohio Board of Pharmacy created Ohio's
25 Prescription Drug Monitoring Program, PDMP in

Page 264

1 parens, known as the Ohio Automated Rx Reporting
2 System (OARRS).  Established in 2006, OARRS
3 collects information on all outpatient
4 prescriptions for controlled substances
5 dispensed by Ohio licensed pharmacies and
6 personally furnished by licensed prescribers in
7 Ohio.  Drug wholesalers are also required to
8 submit information on all controlled substances
9 sold to an Ohio licensed pharmacy or a
10 prescriber.  The data is reported every 24 hours
11 and is maintained in a secure database."  Did I
12 read that correctly?
13    A.   You did.
14    Q.   And that is information that is
15 available in Ohio, true?
16       MR. PIFKO:  Objection.  Foundation.
17 Calls for speculation.
18    A.   Well, just above it, it says, "The
19 following description is copied verbatim from
20 the OARRS website," so I believe that what you
21 just read is what was copied verbatim from the
22 OARRS website.
23    Q.   OARRS is a database available to
24 you, true, as the Department of Health director,
25 that you could review and it would provide you

Page 265

1 information about the amount of prescription
2 opioids being used in Ohio; isn't that fair?
3       MR. PIFKO:  Objection.  Assumes
4 facts not in evidence.  Mischaracterizes the
5 record.  Calls for speculation.  Foundation.
6    A.   I do not know if this is available
7 to us.  There are a number of databases that
8 require certain licenses of individuals to
9 access, and sometimes there's costs associated
10 to them and sometimes there are other
11 requirements.  I don't know where this falls.
12    Q.   Okay.  With respect to OARRS, have
13 you made an inquiry as to where it falls in that
14 spectrum you just described with cost and access
15 issues?  Have you ever reached out to somebody
16 and said, hey, how can we get our hands on this
17 OARRS data?
18    A.   I don't have recollection that I did
19 that specifically.
20    Q.   Okay.  It says, second paragraph,
21 "OARRS is a tool that can be used to address
22 prescription drug diversion and abuse."  Do you
23 see where I read that?
24    A.   Yes.
25    Q.   And then it goes on to say, "It

67 (Pages 262 - 265)

Page 266

1 serves multiple functions including: Patient
2 care tool, drug epidemic early warning system."
3 Do you see where I read that?
4     A.   Yes.
5     Q.   It's true that that's what your
6 department does as well, that -- what I should
7 say is, is it correct that the Public Health
8 Department in Ohio is designed in part to
9 prevent epidemics?
10     A.   That is what we strive to do with
11 the limited resources we have and the staff
12 available to do it.
13     Q.   Right.  And there was this program
14 in Ohio that was designed to do the same thing,
15 correct, serve as a drug epidemic early warning
16 system, true?
17         MR. PIFKO: Objection.  Foundation.
18 Calls for speculation.  Assumes facts not in
19 evidence.
20         You can answer.
21     A.   This is copied from the OARRS
22 website and it is describing apparently what it
23 does and the information that it has.
24     Q.   And it's fair to say that the
25 information it has lines up almost verbatim with

Page 267

1 one of the goals of your department, which is to
2 prevent epidemics, true?
3         MR. PIFKO: Objection.  Foundation.
4 Speculation.  Assumes facts not in evidence.
5 You can answer.
6     A.   There are a number of databases that
7 are available nationwide and here in Ohio.
8 Again, I can't say whether or not we would have
9 had access to it either with the credentials
10 that we had on staff or -- I don't know if this
11 is a service that is -- has a fee associated
12 with it.  There are a lot of databases that --
13 some we have access to and some we do not.
14         MR. SALIMBENE: I move to strike
15 that as non-responsive.
16         Can you read back my question?  I'm
17 asking about this specific database, OARRS.
18         (Record read.)
19         MR. PIFKO: Even the court reporter
20 has trouble understanding your questions.
21         MR. SALIMBENE: I think she just
22 took down a word incorrectly, but thank you.
23     A.   I don't understand your question.
24     Q.   What I'm saying is, one of the
25 stated uses of OARRS according to the OARRS

Page 268

1 website is it is a drug epidemic early warning
2 system, correct?
3         MR. PIFKO: Objection.  Foundation.
4 Speculation.
5     A.   If this is copied verbatim as stated
6 in this e-mail, then those are the words that
7 are here.
8     Q.   And one of the stated objectives for
9 your Department of Public Health is to prevent
10 epidemics, true?
11     A.   We also seek to stop all HIV cases.
12 We try to work on that as well as --
13     Q.   I move to strike as non-responsive.
14     A.   -- STIs and avoid all infant
15 mortality cases.
16     Q.   Are you having trouble understanding
17 my questions?
18         MR. PIFKO: She is, and she's trying
19 to answer your question and you're interrupting
20 her, so continue as much as you need to to
21 answer his question.  I think her point is
22 clear.  It's clear to me.
23     Q.   My question was, is it true that one
24 of your stated goals, the Department of Public
25 Health that is, is to prevent epidemics?  Is

Page 269

1 that a stated goal for the Department of Public
2 Health?
3     A.   It is a goal, yes.
4     Q.   Okay.  Thank you.
5         And you asked to use this OARRS data
6 in a recent grant, correct?
7     A.   It was included in the -- some part
8 of it was included in the application to the
9 Department of Justice for that CORAP grant, yes.
10     Q.   Would you have asked to access OARRS
11 data if you didn't think the data would be
12 useful to you?
13         MR. PIFKO: Objection.  Speculation.
14 Foundation.  Assumes facts not in evidence.
15     A.   I don't understand your question.
16     Q.   You asked for access --
17     A.   Please don't point at me.
18     Q.   I'm not.  I'm sorry.  This is just
19 the way I talk.  Let the record reflect I have
20 my fingers pinched like I'm holding a pencil.
21         MR. PIFKO: You are pointing at her.
22     Q.   Director Gordon, my question is --
23         MR. PIFKO: She's the director of
24 the public health department of the city.  You
25 could give her a little bit more respect.

Page 270

1     MR. SALIMBENE:  I said to her --
2     MR. PIFKO:  No.  It's your tone.
3     MR. BOEHM:  The tone has been
4 perfectly fine.  Nobody was pointing.
5     MR. PIFKO:  He is pointing.  How
6 many people in this room, if you're going to say
7 that -- he is pointing at her.  He is pointing.
8 Does anyone else -- you said he's not pointing
9 so I want to be clear here.
10     MR. NAEEM:  Is this an anti-pointing
11 room?
12     MR. PIFKO:  No, but it's attacking
13 the witness and it's inappropriate.
14     THE COURT REPORTER:  I cannot take
15 down everyone talking at the same time.
16     MR. BOEHM:  You guys are playing
17 games.  Let's keep going.  And I pinched my
18 finger together.
19     MR. PIFKO:  We're not playing games.
20 I don't have an issue with you pointing at me.
21 You can point at me all day long.
22     Q.   Is it true that you requested access
23 to OARRS data because you thought that data
24 could be useful to you as the director of public
25 health?

Page 271

1     MR. PIFKO:  Objection.  Assumes
2 facts not in evidence.
3     A.   I recall it being part of the
4 application for the CORAP grant and for all of
5 our -- for the proposal that was submitted to
6 the Department of Justice.
7          - - - - -
8          (Thereupon, Deposition Exhibit 15,
9          E-Mail String Beginning Bates Stamp
10         CLEVE_000298635, was marked for
11         purposes of identification.)
12         - - - - -
13    Q.   I'm marking as Exhibit 15 one of the
14 many documents produced to us yesterday, the day
15 before this deposition, of course, that I did
16 not get a chance to review until I landed here
17 in Cleveland at about midnight.  It's marked as
18 Exhibit 15.  This is Cleveland 298635.  It is an
19 e-mail from you, Ms. Gordon, to Jana Rush and
20 David Gretick, correct?
21    A.   Yes.
22    Q.   It says in the third line down --
23 or, excuse me, backing up -- it says, "All,
24 please note I spoke with leadership at OARRS and
25 with Cameron McNamee."  Who is Cameron McNamee?

Page 272

1     A.   I don't recall who exactly Cameron
2 McNamee is.
3     Q.   Okay.  It says, "They are applying
4 for category 5, the Prescription Monitoring and
5 Implementation Program.  So this should not
6 conflict.  They would be happy to write a letter
7 of support but want to know what kind of data we
8 would need from OARRS.  Apparently past grants
9 expected to receive data from OARRS but they
10 were not notified nor asked to write letters of
11 support, and on occasion, were unable to meet
12 the expectations of the grant."  Do you see
13 where I read that?
14    A.   I do.
15    Q.   Does that indicate to you that in
16 the past your department wanted to receive data
17 from OARRS but OARRS was never notified or asked
18 to write letters of support?
19         MR. PIFKO:  Objection.  Calls for
20 speculation.  Foundation.
21    A.   It does not say that it was my
22 department specifically that they had a concern
23 about, because if you read the next sentence, it
24 says he just gave this as a general statement,
25 not that it pertained to CDPH.  CDPH is an

Page 273

1 acronym for the Cleveland Department of Public
2 Health.
3     Q.   Okay, but do you know -- you wrote
4 this e-mail -- who it was that expected to
5 receive data from OARRS but did not follow up
6 with writing a letter?
7     A.   No, I do not.
8     Q.   You don't know.  Was it the City of
9 Cleveland in any way?  Was it Cuyahoga County?
10 Do you know?
11    A.   I do not know.
12    Q.   Okay.  You wrote this e-mail --
13 never mind.
14         Do you agree that some patients
15 benefit from taking prescription opioids?
16         MR. PIFKO:  Objection.  Asked and
17 answered.  Foundation.  Calls for expert
18 opinion.  Incomplete hypothetical.
19         You can answer.
20    A.   For its intended use, I would
21 believe so.
22    Q.   Do you agree that the only way a
23 person can lawfully obtain a prescription opioid
24 is with a valid prescription from a licensed
25 physician?

69 (Pages 270 - 273)

Page 274

1          MR. PIFKO: Objection. Calls for a
2  legal conclusion. Speculation.
3      A.    I don't know with specificity.
4      Q.    Do you agree that prescription
5  opioids to this day remain approved as safe and
6  effective by the FDA?
7          MR. PIFKO: Objection. Foundation.
8      A.    Sorry. You're going so fast.
9      Q.    Sorry. Let me read it slower. I
10 apologize. You've been here -- it's a long day.
11 Do you agree that prescription opioids are
12 approved as safe and effective by the FDA even
13 to this day?
14         MR. PIFKO: Objection. Foundation.
15     A.    I don't know that statement for a
16 fact.
17     Q.    Do you agree that the majority of
18 people who take a prescription opioid do not
19 become addicted?
20         MR. PIFKO: Objection. Foundation.
21     A.    Sorry. You have to repeat the
22 question again.
23     Q.    Sure.
24         Do you agree that the majority of
25 people who take prescription opioids do not

Page 275

1  become addicted to opioids?
2          MR. PIFKO: Objection. Foundation.
3  Calls for expert opinion.
4      A.    I'm sorry. One more time. Do I
5  know for a fact what?
6      Q.    No. No. No. I didn't say for a
7  fact. Do you agree that the majority of people
8  who take prescription opioids do not become
9  addicted to prescription opioids?
10         MR. PIFKO: Same objections.
11     A.    I cannot agree to that. I don't
12 know one way or the other.
13     Q.    Did you ever investigate what
14 percentage of prescription opioid users become
15 addicted to opioids?
16     A.    I review a lot of information.
17 Again, this is an issue we've been dealing with
18 for a number of years and there are a number of
19 factors that -- that contribute to it all. That
20 particular statement, I don't know that I can
21 comment on that one.
22     Q.    Do you know if you ever conducted
23 personally an investigation into what percentage
24 of people who use a prescription opioid end up
25 becoming addicted to opioids?

Page 276

1      A.    I did not conduct my own
2  investigation, no.
3      Q.    Do you agree that the majority of
4  prescription opioid users never go on to try an
5  illegal substance like heroine, fentanyl or
6  carfentanil?
7          MR. PIFKO: Objection. Foundation.
8  Speculation. Assumes facts not in evidence.
9      A.    I don't know.
10     Q.    Do you agree that many residents
11 here in Cleveland live with chronic pain?
12     A.    I don't know.
13     Q.    Do you agree that many residents
14 here in Cleveland suffer from temporary pain,
15 for example, postoperative pain when they leave
16 the Cleveland Clinic?
17         MR. PIFKO: Objection. Foundation.
18     A.    I don't -- I don't know.
19     Q.    Do you agree that all patients in
20 pain deserve to have their pain treated?
21         MR. PIFKO: Objection. Incomplete
22 hypothetical. Foundation.
23     A.    It's a very hypothetical question.
24     Q.    Well, let me ask you this way: Do
25 you believe patients in pain should not be

Page 277

1  treated for that pain?
2          MR. PIFKO: Objection. Vague. Same
3  objections as to the prior question.
4          You can answer.
5      A.    I'm sorry. You have to ask it
6  again.
7      Q.    Okay. I'll ask it the way I asked
8  it the first time. Do you agree that all
9  patients who are suffering from pain deserve to
10 have their pain treated?
11         MR. PIFKO: Same objections.
12     A.    People who may have health needs and
13 need -- if they have medical conditions or
14 health needs, then they should have access to
15 healthcare and -- they should have access to
16 healthcare.
17     Q.    Including patients who are suffering
18 from pain?
19     A.    Sure.
20     Q.    Do you agree that doctors are in the
21 best position to evaluate whether a medication's
22 benefits outweigh its risks for a particular
23 patient?
24         MR. PIFKO: Objection. Incomplete
25 hypothetical. Foundation.

70 (Pages 274 - 277)

Page 278

1      A.    Doctors who have the certifications
2   to be able to practice medicine and -- yeah.
3   Sure.
4      Q.    Do you agree that some of the
5   medications distributed by the distributor
6   defendants who you've sued in this case help
7   save lives of residents here in Cleveland?
8          MR. PIFKO: Objection. Assumes
9   facts not in evidence.
10     A.    I don't know.
11     Q.    Do you agree that there are
12  individuals living with high cholesterol, for
13  example, who would suffer a heart attack if they
14  didn't have access to their cholesterol meds?
15         MR. PIFKO: Objection. Calls for
16  speculation. Incomplete hypothetical.
17     Q.    You can answer.
18     A.    I'm sorry. What was your question?
19         MR. SALIMBENE: Can you read it
20  back, please?
21         (Record read.)
22     A.    I am not a doctor to be able to
23  confirm that statement.
24     Q.    What are the potential consequences
25  to residents here in Cleveland if the Department

Page 279

1   of Public Health fails to fulfill its duties?
2          MR. PIFKO: Objection. Vague.
3   Overbroad. Incomplete hypothetical.
4      A.    You're speaking so quickly. I'm
5   trying to understand your question.
6      Q.    I'll slow it down. I'm sorry. I'll
7   slow it down.
8          What are the potential consequences
9   to Cleveland residents if the Department of
10  Public Health fails to fulfill its duties?
11         MR. PIFKO: Objection. Vague.
12  Overbroad. Incomplete hypothetical.
13     A.    We offer a lot of programs in the
14  area of prevention, and prevention is so
15  critical to -- to disease intervention and
16  stopping the spread of disease. A lot of our
17  work in inspections and licensing are so
18  important to food safety and to the environment
19  and to communicable diseases, et cetera, and --
20  this is incredibly critical work that we do.
21  There's a common phrase in public health, public
22  health saved your life today, you just don't
23  know it. And this is part of what we do
24  collectively as a department of about 160 that
25  is really resource strapped and trying to do our

Page 280

1   best with all of the issues that are -- that are
2   impacting our community.
3      Q.    So is it fair to say if you fail to
4   fulfill your duty as the Department of Public
5   Health, the health of the citizens of Cleveland
6   could suffer?
7          MR. PIFKO: Objection. Vague.
8   Overbroad.
9      A.    I think that there would be a
10  dramatic impact on the city, yes.
11     Q.    Do you agree that a patient's
12  insurance company has access to patient-specific
13  data?
14         MR. PIFKO: Objection. Calls for
15  speculation. Foundation.
16     A.    If a patient's insurance company has
17  access to --
18     Q.    That patient's patient-specific
19  data, yes.
20     A.    What kind of data?
21     Q.    Data about what medications they're
22  using, for example.
23         Let me back up. You worked for an
24  insurance company, true?
25     A.    I did.

Page 281

1      Q.    What was the name of the insurance
2   company?
3      A.    Kaiser Permanente of Ohio.
4      Q.    Okay. So, for example, did Kaiser
5   Permanente -- if one of your members went into a
6   pharmacy, filled a prescription that was
7   reimbursed by Kaiser, did Kaiser have a record
8   of that transaction?
9          MR. PIFKO: Objection. Foundation.
10  Speculation.
11     A.    They would have had a record of that
12  transaction if it was put on their insurance
13  card, sure.
14     Q.    And that's true for prescription
15  opioid medications, correct?
16         MR. PIFKO: Objection. Incomplete
17  hypothetical.
18     A.    If it's put on their insurance card,
19  I would assume so, yes.
20     Q.    All right. And is it also true that
21  they would have information about which medical
22  doctor was writing the prescription that was
23  filled, assuming it was processed through the
24  insurance coverage?
25         MR. PIFKO: Objection. Foundation.

71 (Pages 278 - 281)

Page 282

1 Speculation.
2     A.   I would assume so, yes.
3     Q.   And, also, it would have data about
4 where it is that patients are filling the
5 prescriptions of course so long as the patients
6 use their insurance to process that -- excuse
7 me, to pay for that prescription?
8         MR. PIFKO:  Foundation.
9 Speculation.
10     A.   Only from my experience at Kaiser,
11 because they had their own pharmacies and so
12 they would know that from filling the
13 prescription specifically.
14     Q.   What were the years you were at
15 Kaiser?  Remind me.
16     A.   I was community benefit manager at
17 Kaiser, so I did not work in the insurance side.
18 I worked there -- I don't remember the dates --
19 approximately 2000 -- perhaps '09 to 2016.
20     Q.   Okay.  Did you have a formulary --
21 excuse me.  Not did you.  Sorry.
22         Did Kaiser have a formulary for
23 which medications it would cover and which would
24 be excluded throughout the time you were at
25 Kaiser?

Page 283

1         MR. PIFKO:  Objection.  Foundation.
2 Speculation.
3     A.   That is my general understanding.
4     Q.   Had you ever reviewed that
5 formulary?
6     A.   I did not have a purpose to review
7 that formulary.
8     Q.   Did you ever express to anybody at
9 Kaiser that prescription opioids should not be
10 included in the formulary?
11     A.   I would have -- that's not part of
12 my responsibility.  I didn't have any part of
13 that work.
14     Q.   Fair to say, then, you never made
15 the recommendation to anybody at Kaiser that the
16 company should not include in its formulary
17 prescription opioids?
18     A.   No recollection that I -- I have no
19 recollection.
20         MR. SALIMBENE:  Okay.  Thank you.  I
21 think I'm going to -- oh, you know what,
22 actually, just before I go, I do want to
23 reiterate the objection that was raised earlier
24 today about the late production of documents,
25 and we're going to leave, I think, some time

Page 284

1 today in our seven hours to come back and ask
2 questions about the 150-ish documents that were
3 handed to us -- delivered to us last night.  Or
4 600.  Whatever.
5         THE VIDEOGRAPHER:  Off the record.
6 The time is 5:33.
7         (Recess had.)
8         THE VIDEOGRAPHER:  Back on the
9 record.  The time is 5:46.
10         EXAMINATION OF MERLE GORDON
11 BY MR. RUIZ:
12     Q.   Good afternoon, Director Gordon.
13     A.   Good afternoon.
14     Q.   My name is Anthony Ruiz and I
15 represent CVS Indiana, LLC and CVS Rx Services,
16 Inc.  I'm going to be asking you a couple of
17 questions.
18         So, first, I know you talked a
19 little bit earlier about your knowledge of
20 regulation of controlled substances.  I wanted
21 to ask you first, have you heard of the
22 Controlled Substances Act?
23     A.   I have heard of it, yes.
24     Q.   Do you know what it does?
25     A.   I really don't.

Page 285

1     Q.   Do you know that drugs are placed on
2 schedules?
3     A.   I don't know what that means, no.
4     Q.   Okay.  So you don't know how drugs
5 are classified at the federal level?
6     A.   I do not.
7     Q.   Okay.  Have you ever heard the term
8 "ARCOS"?
9         MR. PIFKO:  Aside from
10 communications with counsel, you can answer.
11     A.   Aside from communications with
12 counsel, no, I have not.
13     Q.   It stands for Automated Reports and
14 Consolidated Ordering System.  Does that change
15 your answer at all?
16     A.   No, it does not.
17     Q.   Okay.  Are you familiar with the
18 Ohio Board of Pharmacy?
19     A.   I am aware that there is a board of
20 pharmacy in Ohio.
21     Q.   Do you interact with them at all?
22     A.   I do not.
23         MR. RUIZ:  I think we're at 16.  Is
24 that right?
25         MR. PIFKO:  The exhibits, yes.

72 (Pages 282 - 285)

Page 286

1       MR. RUIZ:  I'm going to mark Exhibit
2  16, 17 and 18.
3       - - - - -
4       (Thereupon, Deposition Exhibit 16,
5       Cuyahoga County Opiate Task Force
6       Report 2014 Beginning Bates Stamp
7       CUYAH_000018534, was marked for
8       purposes of identification.)
9       - - - - -
10      (Thereupon, Deposition Exhibit 17,
11      Cuyahoga County Opiate Task Force
12      Report 2015 Beginning Bates Stamp
13      CLEVE_000187871, was marked for
14      purposes of identification.)
15      - - - - -
16      (Thereupon, Deposition Exhibit 18,
17      Cuyahoga County Opiate Task Force
18      Report 2016 Beginning Bates Stamp
19      CUYAH_000018265, was marked for
20      purposes of identification.)
21      - - - - -
22   Q.   So I've handed you three documents.
23  The first, which is Exhibit 16, is the 2014
24  Cuyahoga County Opiate Task Force Report, and
25  that is Bates number CUYAH 18534.  The second

Page 287

1  document is the 2015 version of that report with
2  Bates number CLEVE 187871.  And then the third
3  document, which is Exhibit 18, is the 2016
4  version of that report, which is CUYAH 18265.
5  I'll give you a second to finish looking through
6  them.
7   A.   Thank you.  Okay.
8   Q.   Are you familiar with these three
9  reports?
10   A.   I have some familiarity with these
11  reports, yes.
12   Q.   And I believe you said earlier that
13  you are a member of the Cuyahoga Opiate Task
14  Force; is that right?
15   A.   I am on the distribution of
16  information for this particular task force.
17   Q.   And your department is a member; is
18  that correct?
19   A.   I don't know if member is the exact
20  term, but yes, they are part of this task force.
21   Q.   Okay.  And would you have received
22  these reports as part of your activities as
23  director?
24   A.   I would.  These, along with so many
25  other reports that I receive on a regular basis,

Page 288

1  yes.
2   Q.   And would you review them?
3   A.   When I have time to review them, I
4  do.  I've looked through them when they arrived.
5   Q.   Okay.  And I think you said earlier
6  that when you were getting ready to interview
7  for this job that you currently have as
8  director, that you reviewed what I believe you
9  said is a 2014 attorney general report; is that
10  right?
11   A.   There is information that came out
12  from the Ohio Attorney General that was -- came
13  out, I believe, in 2014 that part of which I did
14  review, along with a number of other pieces of
15  information, just to familiarize myself with the
16  other issues related to the City of Cleveland.
17   Q.   Right.
18       So reviewing documents like this is
19  part of how you educate yourself or familiarize
20  yourself with opioid issues in your county, in
21  your city?
22   A.   It's one of many ways.
23   Q.   Okay.  And if you could look back in
24  that pile to Exhibit 2, and that is the 2010
25  Ohio Prescription Drug Abuse Task Force report.

Page 289

1   A.   Um-hum.  Yes.
2   Q.   Do you have any memory of reviewing
3  that or reading it when it came out?
4   A.   I do not.
5   Q.   Is it something that you think you
6  might have come across?
7   A.   I have no recollection of coming
8  across this particular document.
9   Q.   But is it something that you expect
10  you might have?
11   A.   I cannot say for sure.  This is a
12  2010 document, and in my capacity as the health
13  director I don't know that I would have this --
14  this information going back this far.
15   Q.   Okay.  Around the time that this
16  came out in 2010 you would have been working at
17  Kaiser Permanente, right?
18   A.   Yes.
19   Q.   Okay.  And you've worked in the
20  public health field for a decade, longer?
21   A.   Much of my career.
22   Q.   And you said that you are a consumer
23  of news and like to keep on top of issues that
24  are important to your community?
25   A.   To the extent that I can, yes.

73 (Pages 286 - 289)

Page 290

1    Q.    Now, given that you reviewed -- that
2  these Cuyahoga County Task Force reports came
3  across your desk and are something that you
4  would have reviewed -- is that what you said?
5    A.    I cannot say that they are all of
6  them.  I have -- I know that they look familiar
7  to me and I know that I have looked through at
8  least the 2016 one.
9    Q.    But it's the kind of document that
10  you would expect a director of public health to
11  have seen and read?
12    A.    To have seen, yes.
13    Q.    Okay.  Would you have expected the
14  director at the time in 2010 to have read the
15  2010 report?
16         MR. PIFKO:  Objection.  Calls for
17  speculation.
18    A.    I can't speak to that.
19    Q.    Do you think if you were the
20  director at the time you would have been aware
21  of it?
22         MR. PIFKO:  Objection.  Calls for
23  speculation.  Incomplete hypothetical.
24    A.    There are a number of reports that
25  come out on a regular basis that I receive, and

Page 291

1  I would imagine that my predecessors had
2  received as well.
3    Q.    So is that a yes, that you expect
4  that they would have seen it?
5    A.    I can't speak to that.
6    Q.    Would you expect, if you were the
7  director, that you would have seen it?
8         MR. PIFKO:  Objection.  Incomplete
9  hypothetical.  Speculation.
10    A.    Honestly, I don't know how it was
11  distributed.  I don't know what the involvement
12  of the director at the time was with whether or
13  not a task force was formed or whether or not
14  they were on the receiving end of this document
15  or would have had knowledge of it.
16    Q.    Well, let's look at the -- let's
17  look at the 2016 report.  If you could turn
18  to -- these don't have page numbers on them, but
19  they do have the Bates numbers at the bottom
20  right-hand corner.
21    A.    Okay.
22    Q.    And it ends in 268.  Do you see
23  that?
24    A.    I do.
25    Q.    And if you look on the left-hand

Page 292

1  column, it says, "The Cuyahoga County Opiate
2  Task Force was formed in 2010 to find solutions
3  to the increasing number of accidental
4  drug-related deaths."
5    A.    Okay.
6    Q.    Did I read that right?
7    A.    You read what was on the document.
8    Q.    Does that suggest to you that in
9  2010 Cuyahoga knew that opioids were a problem
10  in the county?
11         MR. PIFKO:  Objection.  Speculation.
12  Foundation.
13    A.    Based --
14         MR. PIFKO:  Incomplete hypothetical.
15    A.    Based on what's written here, trying
16  to find solutions to the increasing number of
17  accidental drug-related deaths, and that's what
18  the task force -- why the task force was formed.
19    Q.    Right.  So the task force was formed
20  in 2010?
21    A.    In 2010.
22    Q.    To solve a problem related to
23  opioids?
24         MR. PIFKO:  Objection.  Foundation.
25  Speculation.

Page 293

1    A.    Well, it says here to find
2  solutions, yes.
3    Q.    And that suggests that they thought
4  there was a problem in 2010, right?
5         MR. PIFKO:  Objection.  Speculation.
6  Foundation.
7    A.    Well, they're responding to deaths,
8  and yeah, public health is -- part of it is
9  working around issues related to why people are
10  dying, yes.
11    Q.    And if you turn to the 2014
12  report -- I'm sorry.  I mean the 2015 report.
13  Apologies.
14    A.    2015?
15    Q.    Yes.
16    A.    Um-hum.
17    Q.    And if you look on the bottom
18  left-hand corner, there are page numbers.  If
19  you go to page 4 of that report.
20    A.    Okay.
21    Q.    And there it says at the top, first
22  paragraph, "Cuyahoga County was recognized in
23  2010 as one of the top five areas in Ohio being
24  impacted by prescription drug abuse."  Do you
25  see that?

74 (Pages 290 - 293)

Page 294

1    A.  I do.
2    Q.    And does that suggest to you that
3 they knew this was a problem in 2010?
4        MR. PIFKO:  Objection.  Speculation.
5 Foundation.
6    A.    It would suggest to me that it
7 was -- they were one of the top five areas in
8 Ohio being impacted by prescription drug abuse,
9 just as it states here in the document that I
10 had nothing to do with writing.
11    Q.    And would you expect them to know
12 that they -- that they were one of the top five
13 areas in Ohio being impacted?
14        MR. PIFKO:  Objection.  Speculation.
15 Foundation.
16    A.    I can only assume that the reason
17 why they would write it in a publication that
18 was widely distributed or was distributed -- I
19 can't say if it was widely distributed -- that
20 they would put an assertion like this in based
21 on something.
22    Q.    And the Cleveland Department of
23 Public Health was a part of this task force
24 since at least 2010, right?
25    A.    I do not know that.  I do not know

Page 295

1 when the Cleveland Department of Public Health
2 was part of -- invited to be part of the
3 Cuyahoga County Opiate Task Force.
4        - - - - -
5        (Thereupon, Deposition Exhibit 19,
6        E-Mail String Beginning Bates Stamp
7        CLEVE_000187408, was marked for
8        purposes of identification.)
9        - - - - -
10    Q.    Well, let's look at what I've marked
11 as Exhibit 19, which is an e-mail from David
12 Gretick to you, and it is CLEVE 187408.
13    A.    Okay.
14    Q.    And if you look at the second e-mail
15 in the chain, which is also from David Gretick
16 to you, in the second paragraph, the second
17 sentence, he writes, "My current affiliations
18 and activities related to the opiate issue
19 include the Cuyahoga County Opiate Task Force.
20 (I represented CDPH as one of the founding
21 members when it was known as 'Prescription for
22 Prevention' in 2010, and continue to attend
23 bi-monthly meetings)."  Does that mean that the
24 Department of Public Health was a part of the
25 task force since at least 2010?

Page 296

1        MR. PIFKO:  Objection.  Foundation.
2 Speculation.
3    A.    Well, in an e-mail that I received
4 back in 2016, this individual did put this in
5 this e-mail, so I suspect we could draw that
6 conclusion.
7    Q.    Do you have any reason to doubt what
8 he wrote to you?
9        MR. PIFKO:  Objection.  Foundation.
10 Speculation.
11    A.    I do not.
12    Q.    Is it fair to say that Cleveland --
13 the City of Cleveland knew there was an opioid
14 problem in their city since at least 2010?
15        MR. PIFKO:  Objection.  Vague.
16 Overbroad.  Speculation.  Foundation.
17    A.    Repeat your question, please.
18    Q.    Is it fair to say that the City of
19 Cleveland knew that there was an opioid problem
20 in the city in -- at least as early as 2010?
21        MR. PIFKO:  Same objections.
22    A.    I don't know when they first --
23 first recognized it.  What is stated in here is
24 that David Gretick, who was the program director
25 for the Office of Mental Health and Substance

Page 297

1 Abuse, stated that he was one of the founding
2 members of the task force.
3    Q.    Well, let's break it down a little
4 bit.
5        So we know in 2010 Ohio issued a
6 report on opioid abuse, prescription abuse,
7 prescription drug abuse in the State of Ohio; is
8 that right?
9        MR. PIFKO:  Objection.  Foundation.
10    A.    Are you referring to this report
11 here?
12    Q.    Yes.
13        MR. BOEHM:  Can you just say what
14 you're referring to on the record?
15        MR. PIFKO:  She's looking at Exhibit
16 2.
17    A.    Again, your question?
18    Q.    So we know that the State of Ohio
19 issued that report in 2010, right?
20        MR. PIFKO:  Objection.  Foundation.
21    A.    That's the date on the report, yes.
22    Q.    And we looked at a document, one of
23 the Ohio task reports, that said that the
24 Cuyahoga County Task Force was set up in 2010 as
25 well, right?

75 (Pages 294 - 297)

1    A.   Right.  You're asking me a lot of
2 questions about dates that precede my time at
3 the Cleveland Department of Public Health and I
4 can't speak to how any decisions were made or
5 what our engagement was prior to that.
6    Q.   Well, let's just back up.  I'm not
7 asking you that.  I'm just asking, in 2010 Ohio
8 issued the final report that is Exhibit 2,
9 right?
10    A.   That is the date on the document,
11 yes.
12    Q.   And then we also looked at one of
13 the Cuyahoga County Task Force reports that said
14 that the Cuyahoga County Task Force was set up
15 in 2010?
16    A.   Right.
17    Q.   And we also just looked at an e-mail
18 where someone who works for the Department of
19 Public Health said that the department has been
20 part of the Cuyahoga County Task Force since
21 2010?
22    A.   Right.
23    Q.   Is it fair to say that the City of
24 Cleveland by 2010 knew there was an opioid
25 problem in the city?

1       MR. PIFKO:  Objection.  Foundation.
2 Speculation.
3    A.   By 2010?
4    Q.   At least.
5    A.   By 2010, yeah, you could make that
6 assumption.
7    Q.   Okay.  Now I'm going to transition
8 to something different.
9       Do you know what a hydrocodone
10 combination product is?
11    A.   I do not.
12    Q.   Have you ever heard the term?
13    A.   I can't say that I have or have not.
14 I've heard a lot of terms pertaining to this
15 issue.  That specifically I can't speak to.
16    Q.   So you can't name any examples of a
17 hydrocodone combination product?
18    A.   I'm not a pharmacist.
19    Q.   You don't know how they are
20 scheduled by the DEA?
21    A.   I do not.
22    Q.   So I'm guessing that you don't know
23 that in 2008 the U.S. Department of Health and
24 Human Services and the Food and Drug
25 Administration issued a memo where they found

1 that hydrocodone combination products have a
2 lower risk for abuse than other -- than schedule
3 II drugs?
4    A.   I am not aware of a memo of that
5 nature, no.
6    Q.   And you don't know anything about
7 the analysis they did of abuse data; is that
8 right?
9    A.   I'm not aware of that, no.
10    Q.   And you're not aware that they found
11 that hydrocodone products -- hydrocodone
12 combination products are abused at rates more
13 similar to other schedule III drugs rather than
14 schedule II drugs?
15    A.   This is an area that I am not
16 familiar so I cannot answer that question.  I
17 don't know.
18    Q.   And so you don't know how many
19 people in the City of Cleveland overdose from
20 hydrocodone combination products?
21    A.   I don't know, no.
22    Q.   You haven't done anything to trace
23 the deaths in your city to hydrocodone
24 combination products?
25    A.   No, I have not.

1    Q.   To trace opioid addiction to
2 hydrocodone combination products?
3    A.   Not that I'm aware of, to anything
4 specific like that, no.
5    Q.   Okay.  Part of what this lawsuit is
6 about is to -- the City of Cleveland is trying
7 to collect -- is alleging damages based on the
8 cost to the city from the opioid -- from opioid
9 use in the city; is that correct?
10       MR. PIFKO:  Objection.  Calls for a
11 legal opinion, legal conclusion.
12       Aside from conversations with
13 counsel, you can answer.
14    A.   That's basically what I've come to
15 understand, yes.
16    Q.   Okay.  Can you connect any costs
17 from opioid use in your city to any drug
18 distributed by a CVS company?
19       MR. PIFKO:  Objection.  Foundation.
20 Objection to the extent the question calls for
21 an expert opinion.
22       You can answer.
23    A.   That's not in my purview.
24    Q.   Okay.  Can you do that for any drug
25 distributed by Wal-Mart?

76 (Pages 298 - 301)

Page 302

1    MR. PIFKO: Same objections.
2    A.   That's not in my purview.
3    Q.   Can you do that for any drug
4  distributed by Walgreens?
5    MR. PIFKO: Same objections.
6    A.   It's not in my purview.
7    Q.   Can you do that for any drug
8  distributed by Rite-Aid?
9    MR. PIFKO: Same objections.
10    A.   It's not in my purview.
11    Q.   Can you identify a single medication
12  that was inappropriately prescribed by a doctor?
13    MR. PIFKO: Objection. Foundation.
14    A.   I'm sorry. I don't understand your
15  question.
16    Q.   Can you identify any medication, any
17  instance in which a medication was prescribed by
18  a doctor that was done inappropriately?
19    MR. PIFKO: Objection. Foundation.
20    A.   I don't know of one instance
21  specifically, no.
22    Q.   Okay. Can you identify any instance
23  in which a pharmacy dispensed an opioid
24  inappropriately?
25    MR. PIFKO: Objection. Foundation.

Page 303

1    A.   I do not know.
2    Q.   I want to talk about what the
3  Department of Public Health has done to
4  investigate the cause of the opioid problem in
5  your city.
6    Can you tell me what they've done --
7  so I know that there -- we've talked a lot
8  already about what the department does in terms
9  of education in schools, what they do with
10  Project DAWN and treatment and with CenterPoint.
11  I'm not talking about that. All I want to know
12  is, what has the department done, if anything,
13  to investigate the causes of the opioid problem
14  in your city?
15    A.   You know, I really wish I had the
16  resources and the staffing available to do that
17  kind of research and to provide that kind of
18  data so we can really target interventions and
19  programs and apply for additional resources to
20  be able to bring these programs to the
21  community.
22    Q.   Did you ever reach out to CVS for
23  help?
24    A.   I did not.
25    Q.   Has your department ever?

Page 304

1    A.   I have no knowledge of that.
2    Q.   Have you ever reached out to
3  Rite-Aid?
4    A.   I did not.
5    Q.   To Walgreens?
6    A.   I did not.
7    Q.   To Wal-Mart?
8    A.   I did not.
9    Q.   Do you know if your department has
10  ever done that?
11    A.   I do not have knowledge of that
12  specifically, no.
13    Q.   Why not?
14    MR. PIFKO: Objection.
15    A.   I don't understand your question.
16    Q.   Well, CVS and Rite-Aid and
17  Walgreens -- I'll just leave it to CVS. There
18  are a lot of CVS pharmacies in the City of
19  Cleveland, right?
20    MR. PIFKO: Objection. Foundation.
21  Vague.
22    A.   There are some to my knowledge.
23    Q.   Okay. Why wouldn't you -- if you
24  have a problem and you believe that that problem
25  is related to prescription drugs, and you say

Page 305

1  that you don't have the resources to deal with
2  the problem, why wouldn't you go to these
3  corporations who are in your neighborhood, who
4  are involved with dispensing drugs, prescription
5  drugs, and ask for their help in fighting
6  whatever opioid problem there is in the city?
7    MR. PIFKO: Objection. Compound.
8  Assumes facts not in evidence.
9    A.   The stores are in the neighborhood.
10  The corporation -- if I had the resources and
11  the staffing available to -- to do that, and --
12  we're battling this on the front line. We're
13  battling addiction. We're battling all these
14  other public health issues on the front line. I
15  often don't have the luxury of time to -- to do
16  that kind of thing specifically. We're dealing
17  real time with real issues.
18    Q.   And so you couldn't pick up the
19  phone and try to place a call to one of these
20  corporations and ask, Hey, look, we're really
21  strapped for resources here and we could really
22  use your help in making sure that this opioid
23  problem doesn't get worse, that it gets better.
24  Couldn't you have done that?
25    MR. PIFKO: Objection. Foundation.

77 (Pages 302 - 305)

Page 306

1    A.   I didn't realize there was a
2 telephone number to call for that kind of --
3 that kind of -- those kinds of resources.
4 Again, we are -- we are trying our best to
5 address all the public health issues in this
6 city and have staff trying to develop ways that
7 we can with the resources we have to battle
8 these -- these issues.  These are huge issues in
9 our community.  Trying to find resources to
10 address them is -- it's a huge part of our work.
11    Q.   Okay.  Well, let's look at the 2014
12 Cuyahoga Task Force report again, which is Bates
13 number CUYAH 18534.  And that's Exhibit 16.
14        If you go to page 4, at about the
15 middle of the page, the last paragraph before
16 the next section, it says, "We have also
17 partnered with Discount Drug Mart and Marc's to
18 provide outreach to their pharmacy customers."
19 So the task force that your department is a part
20 of has partnered with some pharmacies, right?
21        MR. PIFKO:  Objection.  Foundation.
22    A.   Well, if you read the top of this,
23 it's CCBH.  It's the Cuyahoga County Board of
24 Health had partnered with several members of the
25 task force to fulfill the goals of this grant.

Page 307

1 I can't say for sure that the Cleveland
2 Department of Public Health was affiliated with
3 this particular issue.  It doesn't state so in
4 the document.
5    Q.   So -- okay.  But you could have
6 called someone at -- and I'm sorry.  What does
7 that stand for, the Cuyahoga County Board of
8 Health?
9    A.   Correct.
10   Q.   You could have called someone at the
11 Cuyahoga County Board of Health and asked, Hey,
12 you guys have partnered with these pharmacies,
13 we think that's a really great idea, could you
14 tell me how you did that?
15       MR. PIFKO:  Objection.  Speculation.
16 Foundation.
17   A.   I suppose I could have found one
18 sentence in a report that was dated prior to my
19 joining the Cleveland Department of Public
20 Health, but -- I'm sorry.  You have to rephrase
21 your question or state your question again,
22 please.
23   Q.   Sure.
24       You could have called someone at the
25 Cuyahoga County Board of Health and said, Look,

Page 308

1 this is really interesting that you guys are
2 partnering with pharmacies to help provide
3 outreach, how can we do something like that?
4        MR. PIFKO:  Objection.  Foundation.
5    A.   I suppose we could have.  I just
6 know that I have staff who are -- limited staff
7 at that, who are out there working on this
8 issue.  Any one particular method of
9 intervention or programs specific to addressing
10 this mammoth issue -- I suppose we could have
11 done that.
12   Q.   And, in fact, that would maybe have
13 helped your ability to combat the problem
14 because it would -- you would have another
15 partner helping you in the city, right?
16       MR. PIFKO:  Objection.  Speculation.
17 Assumes facts not in evidence.  Incomplete
18 hypothetical.
19   A.   With the number of people who have
20 died, the number of non-fatal overdoses that
21 were occurring in the city, just the enormity of
22 the issue, the amount of resources necessary to
23 combat this issue -- I'm not entirely sure --
24 connecting with two local organizations perhaps
25 would have been a drop in the bucket.

Page 309

1    Q.   So you don't think that this
2 partnership is useful?
3    A.   I did not say that.
4    Q.   Well, you think it's a drop in the
5 bucket?
6    A.   I did not -- I used those terms.  I
7 think you're mischaracterizing what I'm saying
8 here, but this is one -- one intervention in a
9 document that, again, precedes me, and I cannot
10 say for sure that, again, the Cleveland
11 Department of Public Health partnered
12 specifically on -- on this particular
13 intervention.  This document doesn't state it
14 and I do not have that knowledge.
15   Q.   I want to ask you about -- earlier
16 today you said that pill mills may have
17 contributed to the opioid problem in your city;
18 is that right?
19       MR. PIFKO:  Objection to the extent
20 the question mischaracterizes the record.
21   Q.   Well, let me just ask it again, if
22 that's okay.
23       Do you believe that pill mills may
24 have contributed to the opioid problem in your
25 city?

78 (Pages 306 - 309)

Page 310

1        MR. PIFKO:  Objection.  Foundation.
2  Objection to the extent the question calls for
3  expert opinion.
4        You can answer.
5     A.   I don't have that expert opinion.  I
6  don't -- it's been a long day, so how I answered
7  one question in this long day -- a lot of
8  contributing factors to -- to this issue.
9     Q.    Okay.  Do you know what diversion of
10  drugs is?  Do you know what that means, to
11  divert drugs?
12     A.   I -- I don't know that I do.
13     Q.    Okay.  Do you know what doctor
14  shopping is?
15     A.   I don't know if that's a technical
16  term.  I don't -- I don't have familiarity with
17  that.
18     Q.    Have you ever heard of an internet
19  pharmacy?
20     A.   An internet pharmacy?
21     Q.    Of internet pharmacies generally.
22     A.   Very, very, very generally.
23     Q.    Okay.  Do you think they had any
24  impact on the opioid issue in your city?
25        MR. PIFKO:  Objection.  Calls for

Page 311

1  speculation.  Foundation.  Expert opinion.
2  Legal conclusion.
3     A.   I do not know.
4     Q.    Okay.  I think earlier you said that
5  when you were on the city council, you would
6  hear stories of people breaking into homes
7  looking for pills; is that right?
8     A.   Yes.  Yeah.  We've heard lots of
9  stories from people, yes.
10     Q.    Is theft of prescription drugs a
11  contributing factor to the opioid problem?
12        MR. PIFKO:  Objection.  Calls for
13  expert opinion.  Legal conclusion.  Speculation.
14  Foundation.
15        You can answer.
16     A.   I think hearing firsthand stories
17  from individuals and how desperate people became
18  because of their addiction by resorting to
19  breaking into people's homes and medicine
20  cabinets to try to find painkillers and other --
21  other opiates and other drugs is part of the
22  narrative of how significant and pervasive this
23  issue is in our community.
24     Q.    My question was, do you think it
25  contributed to the opioid problem in your city?

Page 312

1        MR. PIFKO:  Same objection.
2  Speculation.  Expert opinion.  Legal conclusion.
3  Foundation.
4     A.   Again, it's part of the narrative of
5  the addiction crisis that is happening in this
6  community.
7     Q.    Okay.  What about counterfeit drugs;
8  is that part of the problem?
9        MR. PIFKO:  Objection.  Foundation.
10     A.   I don't know what the legal
11  description of counterfeit drug is.
12     Q.    Okay.  What about patients faking
13  injuries to get drugs; is that part of the
14  problem?
15        MR. PIFKO:  Objection to the extent
16  the question assumes facts not in evidence.
17  Speculation.  Foundation.
18     A.   I don't have any direct knowledge on
19  that.
20     Q.    What about illegal drugs?
21        MR. PIFKO:  Same objections.
22     A.   Illegal drugs, broadly.  We have a
23  lot of data here that indicates how people have
24  in that -- the pipeline, and the issue of them
25  becoming addicted to painkillers and opiates,

Page 313

1  that they had to resort to illegal drugs to get
2  their fix and, unfortunately, lead to ODs, both
3  fatal and non-fatal, and the addiction crisis
4  we're in.
5     Q.    Now I want to ask you -- I'm not
6  going to ask you about anything -- specifically
7  to read anything in the Cuyahoga Task Force
8  reports that we've looked at already, but I just
9  want to ask -- so we looked at an Ohio report in
10  2010; is that right?  Exhibit 2 is a 2010
11  report?
12     A.   Correct.
13     Q.    And the last one that we looked at
14  is a 2016 Cuyahoga Task Force report; is that
15  right?
16     A.   It's one of the exhibits you handed
17  me.
18     Q.    It's the one right there on top,
19  Exhibit 18.
20     A.   Um-hum.
21     Q.    So for at least six years the County
22  of Cuyahoga and the City of Cleveland, as part
23  of that task force, has been studying the opioid
24  problem in Ohio, in Cuyahoga County, in the City
25  of Cleveland?

79 (Pages 310 - 313)

Page 314

1        MR. PIFKO: Objection. Foundation.
2    A.    At least, yes.
3    Q.    Okay.  Would you be surprised to
4  know that none of those reports identify the
5  failure to detect suspicious orders as a cause
6  of the opioid problem?
7        MR. PIFKO: Objection. Speculation.
8  Foundation. Argumentative.
9    A.    Am I surprised?  Not necessarily.
10   Q.    Okay.
11       MR. PIFKO: Can we take a break so
12  we can figure out this air conditioning issue?
13       MR. BOEHM:  Just before we do that,
14  I think the air conditioning issue, my sense is
15  was largely because the windows were not
16  covered.
17       MR. RUIZ: Can we go off the record?
18       THE VIDEOGRAPHER:  Off the record.
19         (Recess had.)
20       THE VIDEOGRAPHER:  Back on the
21  record, 6:37.
22  BY MR. RUIZ:
23   Q.    Director Gordon, I want to show you
24  a -- an article from the Plain Dealer.  It does
25  not have any Bates stamps, but it is -- was

Page 315

1  posted on June 15th, 2016.  The title is
2  "Cleveland's New Health Director, Merle Gordon,
3  Faces a Daunting Task," and it's Exhibit 19.
4        MR. PIFKO: I think it should be 20.
5        MR. RUIZ: It's 20.  I'm sorry.
6  That's Exhibit 20.
7        - - - - -
8        (Thereupon, Deposition Exhibit 20,
9        Article Entitled "Cleveland's New
10       Health Director, Merle Gordon, Faces
11       a Daunting Task," was marked for
12       purposes of identification.)
13       - - - - -
14   A.    I don't recall reading it when it
15  came out, but I knew it came out, so I'll read
16  it now.
17   Q.    I've only got two or three questions
18  about it.
19   A.    Okay.
20       Okay.
21   Q.    If you could turn -- these aren't
22  numbered, but if you could turn to what's page
23  7.  It's the third to last page.
24   A.    What's at the top?
25   Q.    At the top it says, "Rigorous

Page 316

1  compliance standards."
2        MR. PIFKO: On my version there's
3  actually blank of 11 pages.
4        MR. RUIZ: You're right.  It's 8 of
5  11.  Thank you.
6    Q.    So, first, this article came out
7  around the time that you started as director, is
8  that right, in June 2016?
9    A.    Yes.  It's dated -- yeah, June of
10  2016.  Yes.
11   Q.    And if you -- if you actually look
12  at the bottom of page 7, going onto page 8, it
13  quotes you as saying that you hope to, quote,
14  reestablish a high level of service credibility
15  and integrity back to the, bracket, health
16  department, closed bracket, and to, quote,
17  institute rigorous compliance standards, closed
18  quote, in a department that has, quote,
19  struggled to be more preventive, proactive and
20  prospective.  Did I read that right?
21   A.    You read what is stated here in this
22  document, yes.
23   Q.    Do you have any reason to disagree
24  with that quote that you gave in 2016?
25   A.    I don't recall what I said exactly

Page 317

1  at my swearing in on that day, but it sounds
2  about right.
3    Q.    And if you look on page 3, I think
4  you mentioned earlier today that prior to you
5  becoming the director, that position had been
6  vacant for about a year; is that right?
7    A.    I believe it was about a year, yeah.
8    Q.    Okay.  And then if you see right
9  there, about a third of the way down in the
10  article, it says, "Gordon's two predecessors had
11  relatively short tenures and little to no public
12  health or medical training."  Is that your
13  impression or understanding of what the
14  situation was like before you joined?
15   A.    I know that the previous director
16  had a short tenure.  At this precise moment I
17  don't remember who preceded her, but it states
18  here that my immediate predecessor lasted only
19  18 months in the position here in this document.
20   Q.    Okay.  You can put that document to
21  the side.  I just want to ask you -- I want to
22  go back to when we were talking about damages
23  and the costs to the city, and when I asked if
24  you could trace any of the costs to, for
25  instance, CVS, you said that's not in my

80 (Pages 314 - 317)

Page 318

1 purview.  What do you mean by that?
2      A.   It's not in my purview.  I don't --
3 I don't -- I don't know that it does or doesn't.
4 It's not something that I know.
5      Q.   Okay.  And it's not something you've
6 tried to figure out?
7      A.   No.
8          MR. RUIZ:  Then I would like to just
9 join the other questioners earlier today who
10 said that we object to the late production of
11 documents, which I did not receive until after I
12 got off the plane yesterday, and I'd like to
13 reserve the opportunity to recall you.  But
14 other than that, I am -- I have no further
15 questions.
16          MR. PIFKO:  Does anyone -- before we
17 go off the record, does anyone else have
18 questions?
19          All right.  We're going to go off
20 the record.  I don't think we have any
21 questions, but I just want to talk to my
22 colleagues real quick.
23          THE VIDEOGRAPHER:  Off the record,
24 6:45.
25          (Recess had.)

Page 319

1          THE VIDEOGRAPHER:  Back on the
2 record.  The time is 6:49.
3          MR. PIFKO:  We don't have any
4 questions for the reasons we stated at the
5 beginning of the record.  Among other things, we
6 believe there's no further basis to recall the
7 witness.  So that concludes the deposition.  And
8 we reserve the right to review and sign the
9 transcript.
10          THE VIDEOGRAPHER:  We're off the
11 record.  The time is 6:50.
12
13          (Deposition concluded at 6:50 p.m.)
14              - - - - -
15
16
17
18
19
20
21
22
23
24
25

Page 320

1
2 Whereupon, counsel was requested to give instruction
3 regarding the witness' review of the transcript
4 pursuant to the Civil Rules.
5
6          SIGNATURE:
7 Transcript review was requested pursuant to the
8 applicable Rules of Civil Procedure.
9
10          TRANSCRIPT DELIVERY:
11 Counsel was requested to give instruction regarding
12 delivery date of transcript.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 321

1          REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3                      ) SS:
4 County of Cuyahoga.  )
5
6      I, Renee L. Pellegrino, a Notary Public
7 within and for the State of Ohio, duly commissioned
8 and qualified, do hereby certify that the within
9 named witness, MERLE GORDON, was by me first duly
10 sworn to testify the truth, the whole truth and
11 nothing but the truth in the cause aforesaid; that
12 the testimony then given by the above referenced
13 witness was by me reduced to stenotypy in the
14 presence of said witness; afterwards transcribed,
15 and that the foregoing is a true and correct
16 transcription of the testimony so given by the above
17 referenced witness.
18      I do further certify that this deposition
19 was taken at the time and place in the foregoing
20 caption specified and was completed without
21 adjournment.
22
23
24
25

81 (Pages 318 - 321)

Page 322

1      I do further certify that I am not a
2   relative, counsel or attorney for either party, or
3   otherwise interested in the event of this action.
4        IN WITNESS WHEREOF, I have hereunto set my
5   hand and affixed my seal of office at Cleveland,
6   Ohio, on this 24th day of July, 2018.
7
8
9
10
11  *Renee L. Pellegrino*
12  Renee L. Pellegrino, Notary Public
13  within and for the State of Ohio
14
15  My commission expires October 12, 2020.
16
17
18
19
20
21
22
23
24
25

---

Page 324

1        DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 2959486
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 7/19/2018
4   WITNESS' NAME: Merle Gordon
5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have made no changes to the testimony
    as transcribed by the court reporter.
8
9   Date          Merle Gordon
10     Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
16     I have affixed my name and official seal
17  this _____ day of _____, 20____.
18     _____
       Notary Public
19     _____
       Commission Expiration Date
20
21
22
23
24
25

---

Page 323

1        Veritext Legal Solutions
           1100 Superior Ave
2             Suite 1820
           Cleveland, Ohio 44114
3           Phone: 216-523-1313
4
    July 24, 2018
5
    To: Mark Pifko, Esq.
6
    Case Name: In Re: National Prescription Opiate Litigation v.
7
    Veritext Reference Number: 2959486
8
    Witness:  Merle Gordon     Deposition Date:  7/19/2018
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

---

Page 325

1        DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 2959486
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 7/19/2018
4   WITNESS' NAME: Merle Gordon
5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9      I request that these changes be entered
    as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
    Date          Merle Gordon
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18     in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20     their free act and deed.
21     I have affixed my name and official seal
22  this _____ day of _____, 20____.
23     _____
       Notary Public
24
       _____
25     Commission Expiration Date

---

82 (Pages 322 - 325)

```
                                            Page 326
1           ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 7/19/2018
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date           Merle Gordon
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
          Notary Public
24
    _____
25        Commission Expiration Date
```

**[& - 18265]**

| & | | |
|---|---|---|
| **&** 1:20 2:4,9,18 3:10 4:4,13,18 5:3 5:12,17 6:8,13 18:9,19,23 19:4,12 19:16,21,24 20:3 20:15,17 21:6 22:3 62:2 | | |

**0**

**000018265** 10:9 286:19
**000018534** 10:5 286:7
**000183257** 9:3 189:15
**000187408** 10:10 295:7
**000187508** 9:17 239:6
**000187871** 10:7 286:13
**000187960** 8:21 148:14
**000187963** 9:12 228:3
**000188104** 9:5 224:3
**000188105** 9:7,9 224:10,22
**000188213** 9:24 259:19
**000189085** 9:14 229:13
**000189292** 8:23 157:24
**000191543** 9:22 255:15
**000298635** 10:3 271:10

**000298750** 8:9 35:13
**000299033** 8:11 36:21
**000299083** 8:14 38:21
**09** 282:19

**1**

**1** 8:5,7,10,12,16,22 18:3 34:16 35:8 35:18 36:1,2,18 37:1 38:17 39:1 39:11 41:6 85:18 146:3 147:17 157:22 159:3 176:5
**10** 9:13 229:11,16 231:5 233:4
**100** 12:7
**1000** 6:5
**10036-8704** 6:14
**103** 12:7,8,8
**104** 12:9
**105** 12:9
**106** 3:4
**107** 12:10
**108** 12:10
**109** 12:11
**10:21** 71:9
**10:40** 71:12
**11** 7:5 9:15,23 238:24 239:1,17 259:18 316:3,5
**1100** 3:13 323:1
**112** 12:11
**113** 12:12
**1144** 5:8
**116** 12:12
**117** 12:13
**11747** 2:15

**118** 12:13
**119** 8:17
**11:32** 110:11
**11:52** 110:14
**12** 9:18 187:2 248:14,20 254:10 322:15
**120** 12:14,14
**121** 12:15
**1211** 6:14
**123** 12:15
**124** 12:16
**125** 12:16
**126** 12:17,17,18
**127** 12:18,19
**128** 12:19,20
**129** 12:20,21,21,22
**12:30** 144:18
**12:35** 144:23
**12th** 5:18
**13** 9:20 255:11,19
**130** 12:22,23,23,24
**131** 12:24
**133** 12:25
**134** 13:2
**13th** 74:14 83:15
**14** 9:23 259:16,23
**140** 13:3
**141** 13:3,4
**142** 13:4
**143** 13:5 16:2
**144** 13:5,6
**145** 13:6,7
**147** 13:7
**148** 8:19
**149** 13:8,8,9
**15** 10:2 54:8 58:21 59:3,5,21 71:18 72:23 231:4,16 232:16 233:3 271:8,13,18

**150** 13:9 284:2
**151** 13:10
**152** 13:10,11,11
**15219-6401** 6:10
**153** 13:12,12,13
**154** 13:13,14,14
**155** 13:15,15
**156** 13:16,16
**157** 13:17
**158** 8:22
**159** 13:17
**15910** 2:6
**15th** 315:1
**16** 10:4 285:23 286:2,4,23 306:13
**160** 13:18,18 134:24 279:24
**1600** 2:6
**161** 13:19,19
**162** 13:20,20
**164** 13:21
**166** 13:21,22
**169** 13:22,23
**17** 1:7 10:6 18:8 286:2,10
**170** 13:23
**171** 13:24
**1717** 4:9
**172** 13:24
**173** 13:25
**175** 14:2
**179** 14:3
**18** 8:5 9:6,8 10:8 34:18 224:8,20 286:2,16 287:3 313:19 317:19
**1800** 4:14 6:4
**182** 14:3
**1820** 323:2
**18265** 287:4

**184** 14:4
**185** 14:4
**18534** 286:25
306:13
**186** 14:5
**187** 14:5
**187408** 295:12
**187508** 239:10
**187871** 287:2
**187963** 228:9
**188104** 223:22
**188105** 223:22
**188213** 260:2
**189** 9:2 14:6
**189085** 229:20
**19** 1:17 10:10
295:5,11 315:3
**191** 14:6
**19103** 4:10
**191543** 255:21
**192** 14:7,7
**193** 14:8,8
**194** 14:9
**196** 14:9,10
**197** 14:10
**198** 14:11
**199** 14:11
**1990s** 173:24
195:25 196:2
**1997** 54:5 60:23
71:17 73:18 74:3
**19th** 18:3
**1:18** 1:12
**1:32** 145:2

**2**

**2** 7:3 8:15 36:1
85:15,23 86:6
126:9,18,20
127:13 130:3
159:19 229:21
230:2 236:9 242:1

**252**:17,18 254:12
254:13 255:5
256:25 288:24
297:16 298:8
313:10
**20** 10:11 18:18
93:9 315:4,5,6,8
324:16 325:22
326:22
**200** 1:21 14:12,12
**2000** 282:19
**20001-3743** 4:5
**20005** 5:18
**2000s** 23:10
**20036-5807** 6:5
**2005** 54:5 60:23
71:17 73:18 74:3
**2006** 264:2
**2007** 60:22
**2008** 299:23
**201** 14:13,13
**2010** 8:16 85:19
177:18 200:12,20
201:22,25 202:3
202:22 203:7,12
204:22 252:20
288:24 289:12,16
290:14,15 292:2,9
292:20,21 293:4
293:23 294:3,24
295:22,25 296:14
296:20 297:5,19
297:24 298:7,15
298:21,24 299:3,5
313:10,10
**2011** 249:21 250:3
250:12,13 252:25
253:10
**2014** 10:4 84:18
286:6,23 288:9,13
293:11 306:11

**2015** 10:6 286:12
287:1 293:12,14
**2016** 8:22 9:7,9,11
9:16,18,21,24 10:8
74:14 83:15,19
87:13 88:6,23
89:21 90:16 98:1
98:4,14 101:8,14
103:8,11,17 104:2
104:24 105:9,19
106:14,23 107:4
109:5 118:10
146:14 148:3
157:22 177:9,10
224:8,20 225:9
228:2 239:4,11
247:11,23 248:15
248:21 250:16
252:20 254:15
255:13 258:12
259:18 262:4
282:19 286:18
287:3 290:8
291:17 296:4
313:14 315:1
316:8,10,24
**2017** 53:8 93:20,23
95:14,22 96:4
97:20 101:15,16
101:18,22 102:25
103:2,7,16 104:2
104:24 190:19
202:22 203:7
**2018** 1:17 8:5,11
18:3 34:18 36:20
37:17 93:21 95:14
101:3 103:7
179:25 180:5
181:1 322:6 323:4
**202** 4:6 5:19 6:6
14:14

**2020** 322:15
**203** 14:14
**205** 2:11 14:15
**207** 7:9 14:15
**209** 14:16,16
**21** 7:8 101:19
104:3,7 105:25
**210** 14:17,17
**211** 14:18
**212** 6:15 14:18,19
14:19,20
**213** 14:20
**215** 4:10
**216** 2:20 3:5,14,19
**216-523-1313**
323:3
**216-9140** 3:9
**219** 14:21
**220** 14:21
**221** 14:22,22
**222** 14:23,23,24
**2222** 2:19
**223** 14:24,25
**224** 9:4,6,8
**224-1133** 2:16
**226** 15:2,3,3,4
**227** 15:4
**228** 9:10
**229** 9:13
**23** 11:2,3
**231** 15:5,5
**232** 15:6,6,7
**233** 15:7,8,8
**233-4000** 5:10
**2332** 2:10
**234** 15:9,9
**235** 15:10
**236** 15:10
**237** 15:11
**238** 15:11,12

**239**   9:15
**24**   11:3 264:10
    323:4
**241**   15:12,13,13
**242**   15:14
**243**   15:14
**244**   15:15
**245**   15:15
**246**   15:16
**248**   9:18 15:16
**249**   15:17
**24th**   322:6
**25**   9:21 11:4
    255:13
**250**   15:17,18
**251**   15:18
**252**   15:19
**253**   15:19,20,20
**254**   15:21
**255**   9:20
**257**   15:21,22
**259**   9:23
**26**   11:4
**26003**   5:9
**261**   15:22
**262**   15:23
**263**   15:23
**264**   15:24
**265**   15:24
**266**   15:25
**268**   16:3 291:22
**269**   16:3
**271**   10:2 16:4
**272**   16:4
**273**   16:5
**274**   16:5,6,6,7
**275**   16:7,8
**276**   16:8,9,9
**277**   16:10,10
**278**   16:11,11,12

**279**   16:12,13
**28**   3:8 11:5
**280**   16:13,14
**2804**   1:6,7 18:8
**281**   16:14,15
**282**   16:15,16
**283**   16:16
**284**   7:10
**286**   10:4,6,8
**29**   9:16 11:5 239:4
**290**   16:17,17
**291**   16:18
**292**   16:18
**293**   16:19,19
**294**   16:20,20
**29464**   3:8
**295**   10:10
**2959486**   323:7
    324:2 325:2
**296**   16:21,21,22,22
**297**   16:23,23
**298635**   271:18
**299**   16:24
**29th**   239:11
**2:16**   178:12
**2:32**   178:15
**2nd**   2:10

**3**

**3**   8:17 41:10,16,17
    42:3 119:10,16
    237:14 317:3
**30**   134:25 215:12
**300**   4:19
**301**   6:9 16:24,25
**302**   17:2,3,3,4,4
**303**   17:5
**304**   5:10 17:5,6
**305**   2:15 17:6
**305-6400**   5:14
**306**   17:7,7

**307**   17:8
**308**   17:8,9
**309**   17:9
**31**   11:6 239:16
**310**   17:10
**3100**   4:9
**311**   17:10,11
**312**   4:20 17:11,12
    17:12,13
**314**   17:13,14
**315**   10:11
**318**   17:14
**321**   7:12
**33**   11:6
**330**   5:14
**34**   8:5
**35**   5:4 8:7 86:22
**3500**   1:21
**35203**   2:10
**35th**   6:9
**36**   8:10 11:7
**38**   8:12
**3:05**   199:16
**3:25**   199:19
**3:35**   206:22
**3:48**   206:25

**4**

**4**   8:19 148:9,18
    149:7 152:2
    153:17 155:4
    250:9 252:3
    293:19 306:14
**40**   11:7,8
**400**   2:14 5:9,13
**41**   11:8
**412**   6:10
**415**   5:5
**42**   11:9,9
**43**   11:10
**434-5000**   5:19

**44**   11:10
**44113-1901**   2:20
**44113-7213**   3:14
**44114**   3:4 22:10
    323:2
**44114-1190**   3:19
**44720**   5:14
**45132**   1:12
**46**   11:11
**47**   11:11
**471-3490**   6:10
**48**   11:12,12
**49**   11:13
**4:37**   254:4
**4:58**   254:7

**5**

**5**   8:22 157:20
    158:3 272:4
**50**   173:16
**509**   240:16
**51**   11:13
**514**   239:13
**52**   11:14
**53**   11:14
**543**   257:24
**544**   257:1
**55**   2:19 11:15
**56**   11:15,16
**57**   11:16
**58**   11:17
**586-3939**   3:19
**59**   11:17,18
**591-6000**   5:5
**592-5000**   3:14
**596-9000**   6:15
**5:04**   259:2,5
**5:33**   284:6
**5:46**   284:9

| 6 |
| --- |
| **6**  8:11 9:2,11 |
| 36:20 37:16 38:8 |
| 189:12,19 228:2 |
| 250:10 252:2 |
| **60**  11:18,19 |
| **600**  4:14 34:10 |
| 284:4 |
| **601**  3:4 4:5 |
| **60654**  4:19 |
| **61**  11:19 |
| **631**  2:16 250:16,22 |
| 250:25 251:5,17 |
| 251:25 |
| **664-3727**  3:5 |
| **6:37**  314:21 |
| **6:45**  318:24 |
| **6:49**  319:2 |
| **6:50**  319:11,13 |

| 7 |
| --- |
| **7**  9:4 103:11 |
| 146:14 148:2 |
| 223:21,25 315:23 |
| 316:12 |
| **7/19/2018**  323:8 |
| 324:3 325:3 326:2 |
| **700**  180:21 |
| **714**  4:15 |
| **72**  11:20 |
| **725**  5:18 |
| **73**  11:20 |
| **732**  251:5,17 |
| **74**  11:21 |
| **75**  11:21,22 22:9 |
| **778-1800**  6:6 |
| **78**  11:22,23 |
| **782**  250:14,22,25 |
| 251:25 |
| **7th**  177:9 |

| 8 |
| --- |
| **8**  7:4 9:6,8 101:2 |
| 103:2,6 223:21 |
| 224:7,19 225:1,6 |
| 226:5 316:4,12 |
| **800,000**  180:21,21 |
| **8040**  5:13 |
| **818**  2:7 |
| **83**  11:23 |
| **830-0600**  4:15 |
| **839-2333**  2:7 |
| **843**  3:9 |
| **85**  8:15 231:9 |
| 233:7 |
| **851-8100**  4:10 |
| **861-0804**  2:20 |
| **862-2000**  4:20 |
| **88**  11:24 |

| 9 |
| --- |
| **9**  9:10 180:3,25 |
| 227:24 |
| **90,000**  180:23 |
| **900,000**  181:2 |
| **901**  3:18 |
| **91436**  2:6 |
| **92**  11:24 |
| **92626-7653**  4:15 |
| **93**  12:2 |
| **94**  12:3,3,4 |
| **94111-5356**  5:5 |
| **942-5392**  4:6 |
| **95**  12:4,5 |
| **950**  3:13 |
| **96**  12:5,6 |
| **964**  236:10 |
| **97**  12:6 |
| **983-7985**  2:11 |
| **9:15**  1:17 18:2 |
| **9:43**  43:2 |
| **9:53**  43:5 |

| a |
| --- |
| **a.m.**  1:17 |
| **aaron**  1:8 |
| **abbreviations** |
| 127:24 |
| **abide**  62:22 67:22 |
| **abiding**  67:25 68:2 |
| **ability**  57:13 80:6 |
| 110:3 214:20 |
| 215:5 232:5 |
| 308:13 |
| **able**  34:11 79:22 |
| 93:17 95:24 97:2 |
| 117:19,20 118:14 |
| 139:24 169:18 |
| 170:7 174:19 |
| 180:17 181:20 |
| 182:1 191:16,18 |
| 196:24 245:3 |
| 262:20 278:2,22 |
| 303:20 |
| **absent**  30:16 |
| 48:10 |
| **absolute**  59:25 |
| **abuse**  8:15 49:24 |
| 55:5,19,23 58:11 |
| 58:23 59:4,20 |
| 60:20,20,21 61:14 |
| 71:18,19,25 72:6,9 |
| 72:14,17,24 81:8 |
| 85:11,16 104:20 |
| 111:10,16,24,25 |
| 112:25 113:1,5 |
| 114:1,20 115:12 |
| 117:1,24 123:20 |
| 124:1 131:23 |
| 133:18 138:18 |
| 141:19 151:5,6 |
| 165:23 166:19 |
| 170:5 180:12 |
| 190:16 194:11,23 |
| 195:5,8,9,11 196:1 |
| 260:7 263:16 |
| 265:22 288:25 |
| 293:24 294:8 |
| 297:1,6,6,7 300:2 |
| 300:7 |
| **abused**  177:18 |
| 187:24 300:12 |
| **abusers**  138:11 |
| 164:4,6,22 165:10 |
| 166:10 167:8 |
| 168:16 169:13 |
| 178:2 186:15 |
| 188:10 |
| **accept**  22:1,4 |
| 76:24 |
| **access**  94:25 95:2 |
| 113:7,9,13,19 |
| 116:16,19 117:18 |
| 164:17 174:20 |
| 198:22 221:25 |
| 222:8,24 223:2,7,7 |
| 223:11,13 262:20 |
| 263:3 265:9,14 |
| 267:9,13 269:10 |
| 269:16 270:22 |
| 277:14,15 278:14 |
| 280:12,17 |
| **accidental**  292:3 |
| 292:17 |
| **accompany** |
| 209:25 |
| **account**  130:14 |
| **accountable**  143:6 |
| **accounts**  73:2 |
| **accuracy**  253:16 |
| **accurate**  51:23 |
| 54:2,3 255:7 |
| 256:10,17,18 |

**accurately** 69:24
**acknowledge**
324:11 325:16
**acronym** 190:1
273:1
**act** 242:2 284:22
324:14 325:20
**action** 8:7,13 9:3
35:10 38:19 189:6
189:13,24 322:3
**actions** 31:14
**actively** 113:21
**activities** 42:3
107:23 242:12
287:22 295:18
**acts** 242:9
**actual** 29:17 51:4
91:21 114:22
115:24 116:8,11
218:10 247:7
249:24 255:1
**acute** 63:4
**ad** 86:19
**adamhs** 180:14
186:23
**added** 244:23
**addict** 170:15,18
**addicted** 48:8
49:10,10 73:2
140:10,11 161:24
161:25 162:24
164:7 167:3,8,17
168:17 169:13
170:9,20 172:9,16
172:22 205:22
232:4,13 234:9,25
274:19 275:1,9,15
275:25 312:25
**addiction** 49:1,5
49:14 55:5,19,24
58:11,23 59:4,8,12

59:13,14,16,20
60:6 61:2,14 73:3
81:8 104:21
111:10,16,19,25
112:1 113:1,5
114:1,20 115:12
117:1,24 123:16
125:2 132:12
133:10 139:9
140:21,22 141:20
146:9 163:24
164:21 168:11
170:24 184:14,19
193:10 194:10,23
195:5 204:16
205:23 228:12
231:5,11,17 232:6
232:18 233:4,13
233:17,18,23,24
234:3,18 235:23
240:16 258:2
301:1 305:13
311:18 312:5
313:3
**addictions** 163:2,4
**addictive** 164:13
235:8,8
**addicts** 48:6 55:11
186:15 231:4,10
232:17 233:3,7
247:5
**additional** 33:7
102:7 105:20
106:13 107:12
133:9,19 140:2,21
204:3 303:19
**address** 21:25
22:8 40:10 55:15
57:22 58:1 64:11
72:5 84:20 106:5
106:18 110:4

151:10 164:21,21
166:6 169:1
170:24 190:11,14
191:5 228:11
230:17,22 263:22
265:21 306:5,10
323:15
**addressed** 119:25
240:11
**addresses** 237:23
**addressing** 64:12
64:14,16 70:5
73:20 139:16,22
223:4 308:9
**adjournment**
321:21
**adjust** 96:25
**administer** 91:13
135:14
**administered** 82:3
91:21
**administering**
135:24 221:14
**administration**
49:20 90:7 99:2
240:22 241:2
299:25
**administrative**
99:1,7
**admitted** 48:9,15
**advance** 87:1
**adverse** 43:22
46:17 47:3,12
**advocacy** 240:2
241:14
**advocate** 241:15
**advocating** 110:3
**affairs** 77:19 80:8
98:12
**affiliated** 307:2

**affiliation** 18:16
**affiliations** 295:17
**affirmatively** 82:7
**affixed** 322:5
324:15 325:21
**aforesaid** 321:11
**afternoon** 145:4
284:12,13
**ag's** 142:18
**age** 21:9 121:5
**agenda** 8:8 35:11
146:8 163:11
177:5 185:10
**aggregated** 167:19
168:24
**ago** 28:24 35:6
37:8 39:8 43:10
135:11 146:25
176:13 258:13
**agree** 24:22,24
25:3,23 130:8
142:6 151:7 152:8
152:10 192:24
209:11,18,24
212:24 220:12,19
221:24 222:10
228:22 231:24
233:12 247:10,19
254:18 273:14,22
274:4,11,17,24
275:7,11 276:3,10
276:13,19 277:8
277:20 278:4,11
280:11
**agreed** 21:24 22:1
153:10
**agreement** 70:23
71:1
**agrees** 22:3
**ahead** 23:4 43:11
63:22 67:19 68:4

68:17 222:21
**aid**  302:8 304:3,16
**air**  99:18 314:12
  314:14
**akearse**  3:9
**akron**  3:6 19:2
  27:18
**al**  1:10
**alabama**  2:10
**alcohol**  129:19,23
  130:8,21 180:15
**allan**  8:5 34:17
**allege**  245:4
**alleged**  219:2
**alleging**  301:7
**allergan**  4:17
  20:15
**allergies**  47:9
**allocate**  181:17
**allocated**  99:21
  100:7 102:23
  103:20
**allowed**  62:6
  66:14 67:11,20,21
  69:3
**alternative**  147:9
  147:14
**ambiguous**  24:23
  57:9
**american**  239:17
**americas**  6:14
**amerisourceberg...**
  1:10 4:7 20:5
  208:10
**amount**  40:7,21
  51:7 57:12 94:6
  100:14,15,22,23
  101:7 102:17,23
  103:5 108:1
  139:11 163:20
  168:12 173:20

180:18 187:10
  245:23 246:11
  247:7 265:1
  308:22
**amphetamine**
  124:18
**analysis**  109:18
  130:5 147:10,10
  300:7
**analysts**  171:21
  172:3
**analytics**  191:7
**analyze**  52:5 56:23
  118:17 168:1
**analyzed**  117:15
  124:5
**analyzing**  52:13
  109:16,25 121:6
**anecdotally**  60:4
  170:15 242:25
**anne**  3:7 18:25
**announced**  21:3
**annual**  100:12,21
  182:20
**answer**  23:2 25:11
  25:13,22 26:11
  29:9,11,19 30:4,13
  31:12 44:3,10,18
  44:20,25 45:3,16
  45:21 46:13,22
  47:18 51:16 72:15
  86:23 92:20,22
  100:11 109:14
  118:14 124:23
  125:12,13,16
  126:12 130:2
  133:1 141:10
  143:12,18 145:16
  149:6 156:23
  162:18 166:15
  175:18 194:16,25

197:22 198:5
  199:9 201:1,16
  202:10 207:14,17
  207:21,22 209:1
  213:22 214:14
  215:14,21,22
  216:17,18 217:17
  217:25 219:9,21
  220:16 222:20
  234:10,14,20,23
  235:17 237:12
  238:15 242:7,14
  243:25 244:2,10
  244:22,25 245:10
  245:12,15,17,19
  246:19,24 247:16
  248:3 249:18
  251:24 254:24
  266:20 267:5
  268:19,21 273:19
  277:4 278:17
  285:10,15 300:16
  301:13,22 310:4
  311:15
**answered**  47:15
  103:15 120:6
  166:13 169:21
  214:15 232:11,21
  232:24 233:9
  234:13,15 246:17
  251:7 273:17
  310:6
**answering**  112:21
  215:4
**answers**  24:19
  190:21
**anthony**  6:4 20:6
  284:14
**anti**  270:10
**anticipation**
  262:19

**anton**  4:14
**anybody**  21:2
  32:12 46:24 47:8
  79:23 93:14
  164:25 169:17
  171:14 177:1
  184:10 211:8,10
  220:9 243:19
  245:5 263:2 283:8
  283:15
**apadukone**  5:6
**apologies**  293:13
**apologize**  24:11
  78:7 274:10
**apparently**  65:20
  69:5 149:23
  266:22 272:8
**appear**  67:2 87:3
  129:23 147:7
  159:4 253:23
  324:11 325:15
**appearances**  2:1
  3:1 4:1 5:1 6:1 7:3
**appears**  38:4
**appended**  325:11
  325:18
**applicable**  320:8
**application**  83:1
  84:15 262:16,18
  269:8 271:4
**applied**  74:22 78:1
  80:5 83:22
**apply**  74:15 83:3
  83:17 303:19
**applying**  272:3
**appointment**
  185:23 186:8
**appreciate**  162:14
  204:19
**approach**  77:25
  78:8

**approached**  74:16
**appropriate**  66:18
  71:3 96:21 191:21
  192:4 260:15
**approved**  210:1
  274:5,12
**approximately**
  282:19
**arch**  4:9
**arcos**  285:8
**area**  31:24 56:9,10
  83:10 108:1,3
  135:22 165:21
  279:14 300:15
**areas**  56:5,13 57:3
  58:7 106:4 293:23
  294:7,13
**arguably**  182:5
**argumentative**
  33:4 105:14 127:1
  140:4 153:24
  226:22 251:2
  252:8 314:8
**arms**  168:7
**arnold**  4:4 19:24
**arnoldporter.com**
  4:6
**arresting**  243:16
**arrests**  41:11
  237:15
**arrived**  288:4
**arrows**  41:5
**article**  10:11
  314:24 315:9
  316:6 317:10
**articulate**  57:21
  216:6,7
**articulation**  57:20
**aruiz**  6:6
**aseem**  5:4 19:20

**aside**  26:10 143:18
  148:7 194:15,24
  195:5 199:8
  200:13,25 201:16
  202:10 207:14
  208:24 213:21
  217:16,24 219:8
  219:20 220:1
  238:19 242:6,13
  244:1 285:9,11
  301:12
**asked**  24:10 46:5
  47:15 81:18 86:23
  87:13,15 99:24
  103:14 105:1
  118:12 120:5
  124:17 126:22
  127:6 146:2
  148:19 154:1,4,10
  156:24 160:11
  163:11 166:12
  169:20 204:24
  214:24 216:6,9
  225:17 230:15,20
  232:11,20 233:8
  234:12 246:5
  251:20 255:6
  258:7,17 263:2
  269:5,10,16
  272:10,17 273:16
  277:7 307:11
  317:23
**asking**  29:25
  30:21,23 33:25
  40:12 51:3 57:3
  58:13 65:10 66:8
  67:16 68:22 70:18
  70:24 95:5 96:22
  107:7 126:23
  127:19 170:14
  196:21 207:6

220:17 226:23
  229:5 251:8,16,18
  251:19,21,22
  256:18,23 267:17
  284:16 298:1,7,7
**assert**  45:13
**asserting**  45:20
**assertion**  294:20
**assess**  263:14
**assessing**  71:21
**assessments**
  115:25
**assigned**  104:9,14
  104:15 107:19
**assignment**  324:2
  325:2 326:2
**assistant**  80:10
**assistants**  77:20
**associated**  150:21
  265:9 267:11
**assume**  25:11 36:7
  37:23 72:12 148:1
  190:20 281:19
  282:2 294:16
**assumes**  83:5
  121:17 123:12
  126:8 143:8
  147:13 154:8
  155:5 171:7
  175:17 205:20
  209:22 211:22
  226:22 236:23
  237:11 241:3
  242:23 249:13
  265:3 266:18
  267:4 269:14
  271:1 276:8 278:8
  305:8 308:17
  312:16
**assuming**  209:15
  222:16,22 281:23

**assumption**  299:6
**attached**  8:6,8
  34:18 35:11 325:7
**attaching**  260:16
**attachment**  225:2
**attachments**  8:23
  157:23
**attack**  278:13
**attacking**  270:12
**attempt**  84:20
**attempted**  245:20
  262:12
**attend**  86:22 87:2
  109:21 136:14
  139:2 146:10
  163:7 171:21
  172:4 173:5 193:5
  193:18 202:13
  214:9,17 261:10
  295:22
**attended**  40:8 48:5
  50:8 73:11 167:24
  226:15,18 260:25
  261:14,15
**attending**  18:15
  226:12
**attends**  40:7 172:5
**attention**  109:23
  118:23,23 133:24
**attorney**  22:25
  26:8 28:20 29:7
  29:21 31:7 82:20
  83:24 84:13 85:2
  88:16 163:18
  175:4 194:13
  197:19 198:14
  200:23 201:14
  202:8 207:12,20
  219:7 244:1 288:9
  288:12 322:2

**attorney's** 146:9 163:12 165:25 167:25 175:3 177:5 193:7 203:23

**attorneys** 20:24 27:17,20 28:16 33:8 207:4 214:3

**attracting** 147:19

**attributable** 252:24 253:8

**attributed** 43:22 46:17 47:4,13 180:7

**audience** 260:14

**august** 9:6,8,21 224:8,20 225:9 255:13 258:12

**author** 39:21

**authority** 80:23 192:21

**authorize** 325:11

**authorized** 62:17 63:25 64:1 65:5 68:18 93:7

**automated** 260:17 264:1 285:13

**autopsy** 205:7

**available** 75:1,5 78:3 82:13,23 89:9 100:14,16 117:18 139:13,20 165:5 167:12 186:25 195:14,21 202:16 263:10 264:15,23 265:6 266:12 267:7 303:16 305:11

**ave** 323:1

**avenue** 2:10 3:4,13 3:18 4:5 5:13 6:14

**aviation** 54:25

**avoid** 268:14

**avoided** 91:4

**aware** 21:21,22 27:18,21 35:3,5 42:5,12,13 47:22 48:16,21,22,23,24 49:2,4 55:17 71:17 78:2 82:14 83:22 84:2,14 102:17 110:2,5 136:22 137:9 181:6 190:9 192:18 211:9,12 216:23 217:8,13 218:9 242:2,8,12 242:17 255:4 285:19 290:20 300:4,9,10 301:3

**awareness** 77:24

**axis** 250:12

**b**

**b** 3:12 4:4 8:10 36:18 37:1

**bachelor's** 49:19 49:21

**back** 28:21 34:4 41:12 42:7,21 43:4 71:11 76:13 84:2 95:13 98:7 98:18 103:8 106:11 108:15 110:13 117:16 145:1 148:20 166:8 178:14 183:22 199:18 203:12,25 204:22 206:24 219:12 230:7 233:2 236:2 244:13 249:25 254:6 259:4

267:16 278:20 280:23 284:1,8 288:23 289:14 296:4 298:6 314:20 316:15 317:22 319:1 323:15

**background** 150:16

**backing** 271:23

**backwards** 46:14

**bad** 244:6

**ballot** 101:17

**barnes** 6:8 19:16 19:16

**baron** 2:4 18:18 21:6 22:3

**baronbudd.com** 2:7,8

**barry** 77:13,21

**based** 56:25 58:4 96:25 142:24 153:12 202:5 203:14 217:1 234:1 243:2 249:22 253:21 255:1 292:13,15 294:20 301:7

**basic** 217:1,18,22 218:1,4

**basically** 216:23 301:14

**basis** 29:20 46:15 56:3,22 118:7 119:7 120:8 163:5 170:3 211:17 216:7,10 253:15 257:9,16,21 287:25 290:25 319:6

**bates** 8:9,11,13,20 8:23 9:3,5,7,9,12 9:13,17,21,24 10:2 10:5,7,9,10 35:12 36:20 38:20 148:13 157:23 189:14 223:21 224:2,9,21 228:2,9 229:12,20 236:10 239:5,13 240:16 255:14,21 257:1 257:24 259:19 260:1 271:9 286:6 286:12,18,25 287:2 291:19 295:6 306:12 314:25

**bathrooms** 61:6 243:5

**battle** 306:7

**battling** 305:12,13 305:13

**becoming** 94:9 107:4 186:10 275:25 312:25 317:5

**began** 74:14 167:17 195:13

**beginning** 8:8,13 8:20,23 9:3,7,9,12 9:13,17,21 10:2,4 10:6,8,10 35:12 38:20 93:21 148:13 157:23 189:14 224:9,21 228:2 229:12 239:5 255:14,22 271:9 286:6,12,18 295:6 319:5

**behalf** 2:3,12 3:6 3:10,16 4:2,7,12

4:17 5:3,7,11,16
6:3,7,12 18:19
19:1,4,6,8,19,21
19:24 20:10,12,15
20:17,19 22:4
31:25 44:16 70:25
239:15
**belief**  142:25,25
169:3
**believe**  24:4 32:24
34:10 39:19 41:7
42:14 44:4 53:8
57:23 66:25 68:22
71:15 75:20 78:16
78:22,25 84:17
93:20 96:20 101:1
103:9 112:18
117:3 118:2
124:13 136:14
140:23 145:10,20
145:24 146:19
147:1 148:21,24
151:22 153:2
155:21 156:1,19
160:15 161:2
165:13 166:17,22
167:18 168:19
172:20 177:11,24
180:16,20 184:23
187:1,2,14 188:1,3
190:18 192:7
193:15,24 195:24
196:12 200:8
201:9,17 202:24
204:13 205:8,21
218:20 224:13
226:15 230:10
233:25 234:7,24
235:12,18 240:5
245:1 247:20,23
249:6,18 261:20

263:9 264:20
273:21 276:25
287:12 288:8,13
304:24 309:23
317:7 319:6
**beneficial**  222:5
**benefit**  25:3
196:10 221:25
273:15 282:16
**benefits**  104:5
181:19 277:22
**best**  24:25 53:19
92:14 110:3
118:21 168:8
169:1 215:4
277:21 280:1
306:4
**better**  52:4 178:24
222:8,11 305:23
**beyond**  197:10
**bi**  8:17 119:11
295:23
**bias**  44:5,19,24
45:9
**big**  38:8 132:14
223:2 240:1,2,3,6
241:13
**bigger**  247:12
**bill**  179:9,10
**billing**  184:3
**billion**  38:8
**billions**  38:9
**birmingham**  2:10
**birth**  131:25
**bit**  29:14 138:1
142:11 162:9,11
162:15 178:18
195:2 199:22
230:25 269:25
284:19 297:4

**biweekly**  127:4
**black**  248:9
**blank**  316:3
**blocked**  263:21
**blood**  174:5 205:5
**board**  180:15,15
181:13 186:23
263:24 285:18,19
306:23 307:7,11
307:25
**bockius**  4:13
**boehm**  5:17 20:2,2
20:22 61:17,25
62:2,8,15,19,24
63:4,8,14,18,23
64:1,4,8,12,16,23
65:1,7,12,17,22
66:1,8,21 67:3,8
67:13,18,24 68:4,7
68:15 70:9,14
71:4 207:16
216:20 270:3,16
297:13 314:13
**boop**  3:3 19:9,9
27:2
**bottom**  130:3
239:20 240:20
257:2 291:19
293:17 316:12
**boulevard**  2:6 3:8
4:14
**bracket**  316:15,16
**break**  25:19,21
26:1,2 42:24
110:7,17 144:18
144:20 145:7
178:9 199:13,21
253:25 297:3
314:11
**breaking**  242:18
243:5 311:6,19

**brent**  260:1
**bretton**  5:13
**bridgeside**  3:8
**brief**  22:20
**briefly**  49:16
79:21
**bring**  58:2 88:3
109:22 303:20
**bringing**  88:12
118:22 133:23
241:14
**broad**  198:17,19
**broader**  29:15
108:4 124:11,25
166:2
**broadhollow**  2:14
**broadly**  159:3
182:8 193:19
198:15 209:2
312:22
**broken**  61:5
**brooklyn**  54:13,13
55:6 58:21
**brought**  33:7
80:12 82:7 125:2
136:18 142:2,3
188:16
**bucket**  308:25
309:5
**budd**  2:4 18:19
21:6 22:3
**budget**  55:14
99:19 100:12,18
100:21,23 101:3
102:14 106:9
139:22 179:25
180:5,19 181:2,17
182:11,19,20
183:3,13
**budgeting**  104:25

[bullet - changed]

Page 10

**bullet** 41:10 152:1
155:2,16 156:7,16
**bulleted** 240:23
**bullets** 241:19
**burden** 140:7
**burling** 5:3 19:21
**business** 64:22,23
68:13,15 72:13
208:20
**busy** 185:19

**c**

**c** 8:12 38:17 39:1
41:15
**ca** 323:25
**cabinet** 86:12,15
86:21,22 87:7
88:10 89:10 90:3
90:15 150:8,10
230:19
**cabinets** 61:7
243:6 311:20
**calculation** 181:22
**calendar** 8:22
157:22 158:8
**california** 2:6 4:15
5:5
**call** 34:3 71:7
305:19 306:2
**called** 21:9 76:11
76:13,18 88:9
138:20 186:17
240:3 307:6,10,24
**calls** 22:25 24:3
26:8 28:19 29:7
30:13 31:7 41:21
42:11 43:18 46:20
47:5 49:6,7 51:15
53:12 57:7 74:18
75:2,9 78:14
95:19 100:10
118:1 130:9,23

141:8 143:10
144:4 145:14
149:3 152:20
153:19 154:14,20
157:4 160:10,22
160:23 161:9
162:22 164:10
172:24 185:7
191:24 192:6,11
193:2,13 194:13
197:19 199:6
200:23 201:14
202:8 207:12
213:2 219:5
221:19 222:19
231:13 232:1,10
233:15,16 234:5,6
235:15 237:10
238:4,14 241:24
243:23 244:18
245:9,9 246:22
250:5,21 253:2
257:12,20 264:17
265:5 266:18
272:19 273:17
274:1 275:3
278:15 280:14
290:16,22 301:10
301:20 310:2,25
311:12
**cameron** 271:25
271:25 272:1
**campbell** 5:12,12
19:11,11,12
**cancer** 212:16
**candidate** 76:21
**candidates** 80:15
**canton** 5:14
**capacity** 168:23
184:23 185:1
214:18 217:4

234:8 289:12
**caption** 321:20
**card** 281:13,18
**cardinal** 5:16 20:3
208:12
**cardiovascular**
221:9
**care** 62:16 210:12
266:2
**career** 51:21
289:21
**carefully** 66:14
**carfentanil** 116:1
152:5 153:9 154:5
156:2,10,24
157:15,17 159:15
159:22 160:8,13
160:21 161:6
162:5,10,12 276:6
**carolina** 3:8
**case** 1:7,12 18:7
20:23 23:3,22
24:1,9 30:11 44:2
69:16 88:9 141:9
196:14 207:5,9,10
216:3 241:21
242:5 245:2 278:6
323:6 324:3 325:3
**cases** 114:13
268:11,15
**cash** 212:20
**category** 272:4
**cause** 303:4 314:5
321:11
**caused** 212:16
233:23 247:25
248:1
**causes** 303:13
**ccbh** 306:23
**cdc** 163:15 166:5
167:11,22 175:1

**cdph** 8:17 119:11
272:25,25 295:20
**center** 54:14
**centerpoint**
138:20 186:16,18
186:20 187:25
303:10
**centers** 167:21
185:16
**centre** 6:9
**certain** 56:16 57:3
100:13 265:8
**certainty** 59:25
**certificate** 7:12
321:1 325:11
**certificates** 131:25
**certification** 324:1
325:1
**certifications**
278:1
**certified** 21:12
**certify** 321:8,18
322:1
**cetera** 87:18 181:8
279:19
**chain** 198:12
208:23 209:2,4,7
218:7 295:15
**chaired** 54:20,22
**chance** 249:17
271:16
**change** 101:9
120:16 285:14
323:13,14 325:8
326:3
**changed** 101:9,10
101:16 187:5
200:11,20 201:21
203:6 204:21,25
205:1

changes 323:12 324:7 325:7,9
characterization 66:13 123:21 124:2
characterize 69:24 70:3 229:1
characterizing 62:14
charge 133:14,25 134:4
charles 4:4
charles.weinograd 4:6
charlie 19:23
chart 250:12 251:8 252:14 253:9
check 69:16
chicago 4:19
chief 9:10 77:18 80:8 98:12 227:25 236:24
china 155:1,18 157:7
choice 76:24,24
cholesterol 278:12 278:14
choose 188:22
chosen 140:5
chris 19:14
christopher 3:17
chronic 191:21 192:4 212:15 276:11
ciaccio 2:14 19:5,5
circumstance 222:6
circumstances 33:23 40:1 97:12

cities 239:17 240:3 240:8
citizen 84:11
citizens 71:17 184:6 202:21 221:24 222:7,10 239:17 280:5
city 1:10 2:3 3:3,6 8:22 18:19 19:1,9 21:6 23:8,11,12,25 26:22 29:1 32:8 34:4 41:19 44:17 52:12,24 53:1,6 54:2,10,15 55:18 55:22 56:5,8,13,18 58:7,20 59:5,9,21 60:13,14,22,23 61:13 71:16,20,25 72:5,14,22 73:8,17 73:22 74:2,9,21,23 76:16 77:3,6 78:4 78:7 79:4,17,24 81:5,19 82:2 83:13 84:3 89:13 91:4 92:3,4,10 94:18 96:7 97:7 100:6,17,25 102:18,24 105:1 107:11 108:13 111:5 122:13 123:14,15,20,25 124:8,19 125:2,4 125:19,21 132:15 140:5 141:15 142:6 143:5,24 145:11,21 146:1 150:19 151:13 155:12 157:21 158:8,12,22 164:6 164:23 165:1,8,11 165:12 166:10,18

166:20 170:8 176:4 177:17 179:1 183:24 184:1 190:6 191:1 200:11,20 201:3 202:17 203:4 214:22 223:1,6 225:20 228:10 230:17,19,23 237:3 240:3,6 241:21 242:5 247:1 249:10 261:25 263:15 269:24 273:8 280:10 288:16,21 296:13,14,18,20 298:23,25 300:19 300:23 301:6,8,9 301:17 303:5,14 304:18 305:6 306:6 308:15,21 309:17,25 310:24 311:5,25 313:22 313:24 317:23
city's 196:9
city.cleveland.o... 3:5
ciullo 4:18 20:14 20:14
civil 21:11 23:16 320:4,8 324:5 325:5
claim 245:24 246:12
claims 218:25
clarify 207:16
clarity 57:17 63:11 66:15 71:2 72:19
classified 285:5

clean 178:18 231:6 233:5
cleaning 33:5 35:22 36:9 88:18
clear 30:20 34:2 38:13 41:25 45:19 63:17 66:19 67:11 69:9,10 77:23 97:19 124:10,11 132:3 177:7 251:15 268:22,22 270:9
clearly 68:2,2
cleve 8:9,11,14,21 8:23 9:3,5,7,9,12 9:14,17,22,24 10:3 10:7,10 35:13 36:21 38:21 148:14 157:24 189:15 224:3,10 224:22 228:3,9 229:13,20 239:6 255:15,21 259:19 271:10 286:13 287:2 295:7,12
cleveland 1:10,22 2:3,20 3:3,4,14,19 5:13 8:22 9:2 18:10,19 19:10 21:6 22:9 23:8,12 23:25 26:22 37:14 39:16 41:19 42:1 42:5,8 52:12,16,25 53:2,7 54:2,10 55:18,23 56:8,14 56:18 58:7,8,8 60:14,22 74:9,10 75:8 76:16 77:3,6 78:8,19 79:4,18,24 81:5,19 82:2 83:14 84:3 86:10

89:14 91:5 92:3,4
92:7,10,12,23 93:1
93:5,24 94:7,9,18
94:19,24 95:3,16
96:3,7 97:8,21
98:8,20 99:20,22
100:6,7,25 102:8
102:10,18,24,25
103:19 104:8,25
105:2,21,24
107:10,11,15,22
108:2,8,13 111:5
112:25 121:11
124:19 125:19,21
128:2 131:12,13
140:5 141:15
142:6 143:5,24
145:12,22 146:1
149:16 151:13
153:25 157:21
158:8,12,22 164:6
164:23 165:1,11
165:12 166:10,18
166:20 170:9
175:24 177:16,17
179:1,14 183:25
184:2,6 185:24,25
189:5,13,23 190:6
191:1 200:11,21
201:4 203:4 207:9
214:18,23 217:5
220:14,18,23
221:18,25 222:7
223:1,22 225:20
228:11,12,23,24
229:2,7,22 230:2
230:23 236:4
239:10 241:21
242:5 247:13
249:21 252:4
256:3 260:1,7,10

260:12 263:12
271:17,18 273:1,9
276:11,14,16
278:7,25 279:9
280:5 288:16
294:22 295:1
296:12,13,19
298:3,24 300:19
301:6 304:19
307:1,19 309:10
313:22,25 322:5
323:2
**cleveland's** 10:11
29:2 32:8 99:23
103:20 151:16
262:1 315:2,9
**clevelander** 58:5
**client** 22:25 26:8
28:20 29:7,21
31:7 62:20 65:18
188:5 194:13
197:19 198:14
200:23 201:14
202:8 207:12,20
219:7 244:1
**clients** 187:2
**clinic** 91:17,20
93:12 138:10
139:4 175:24
184:11,17 276:16
**clinics** 89:8 91:5
91:11,12 92:3,12
92:24 93:6,12,25
132:1 137:12,15
181:8 184:9,13,18
**closed** 316:16,17
**closely** 89:18
**clr** 1:25
**cmmclaughlin**
3:20

**coached** 66:19
**coaching** 63:14,16
**coalition** 240:2,4,7
**cocaine** 125:7
254:17,19
**cocktails** 173:8
174:2
**code** 121:4 130:19
**codes** 56:4,4,22,25
**coding** 248:11
**cohen** 63:19 70:16
71:1
**colleagues** 318:22
**collect** 28:16 31:3
31:19 168:1,6,25
301:7
**collected** 28:17
31:16 117:14
**collecting** 31:10
99:5
**collection** 130:16
**collective** 40:19
**collectively** 33:20
113:23 202:16
279:24
**collects** 264:3
**college** 49:22,24
**colon** 239:18
240:22
**color** 248:10,11
**column** 239:19
254:16 255:3
292:1
**combat** 308:13,23
**combination**
299:10,17 300:1
300:12,20,24
301:2
**combined** 180:19
**come** 24:20 28:14
31:3 42:21 65:10

69:22 74:15 87:4
87:15 89:7 92:4
104:8 114:15
125:3 152:18
154:13,17 168:3
169:10 174:23
181:12 186:20
193:17 204:10
221:21 225:18
236:7 243:8 284:1
289:6 290:25
301:14
**comes** 91:6 115:4
136:8 219:22
256:12
**coming** 63:4 177:1
249:9 258:22
289:7
**commander** 37:15
**comment** 275:21
**comments** 67:21
67:22
**commission**
322:15 324:19
325:25 326:25
**commissioned**
321:7
**commissioner**
80:2 95:11 99:14
114:4 115:14
128:4 133:21
168:24
**commissioner's**
118:23
**commissioners**
135:1 239:16
**committed** 242:3
**committee** 2:3
8:22 18:20 54:21
54:23,23,25 55:1,1
112:5 157:21

[committee - continue]

158:8,9,10,10,14
158:17
**committees**  54:16
54:18
**common**  37:25
279:21
**commons**  5:13
**communicable**
279:19
**communication**
23:1 26:9 30:25
31:7 200:24 202:9
**communications**
26:10 28:20 29:8
29:22 30:16,24
143:16 194:14,15
194:25 197:20,21
198:6 199:6,8
200:14,25 201:15
202:11 207:13,15
207:20,22 208:25
213:22 217:17,25
219:7,8,21 220:1
242:7,14 244:2
285:10,11
**communities**  54:9
55:18 57:1 58:15
58:22,24 60:8
168:10 174:13
**community**  40:10
40:20 54:22 59:10
59:24 60:4 73:10
73:11,14,16 82:17
82:24 83:8,9
84:22 85:7,8 92:8
106:6 108:5
109:20 110:6
111:21 117:21
118:18 137:13
139:2,3,7,16 140:8
140:13 141:21

163:23 164:2
168:13 181:8,25
182:7 185:13
236:25 241:15
247:4,22 280:2
282:16 289:24
303:21 306:9
311:23 312:6
**companies**  4:3
140:1 208:3
237:24
**company**  6:7
19:17 43:14 47:20
208:14 245:6
280:12,16,24
281:2 283:16
301:18
**compare**  247:13
254:17
**compared**  257:4
**complaint**  29:5,17
30:2,2,5,10,18
31:2 144:1,6,7,9
144:12,15 196:13
196:16,19,25
197:1,11,17 198:1
**completed**  321:20
323:15
**completely**  215:12
216:15 237:4
**compliance**  316:1
316:17
**compliant**  63:5
**comply**  63:2
**components**  66:11
**comport**  62:12
**compound**  40:16
42:10 58:12 60:24
83:4 93:8 94:21
112:10 116:5
120:1 125:8

196:20 305:7
**concern**  272:22
**concerned**  83:8
84:11
**concerning**  25:24
64:15
**concerns**  45:13
**concluded**  319:13
**concludes**  319:7
**conclusion**  24:3
141:9 144:4 149:4
153:19 156:17,22
156:25 160:24
161:9 213:2 219:5
238:4 243:23
244:19 245:10,13
246:23 274:2
296:6 301:11
311:2,13 312:2
**conclusions**
143:10 257:10
**condition**  44:1
46:3 210:13
**conditioning**
314:12,14
**conditions**  221:17
277:13
**conduct**  69:13
73:23 213:6,11,19
215:7 216:24
227:5 237:24
241:20 243:20
244:15 245:5
246:1,14 276:1
**conducted**  73:8
275:22
**confidential**  45:22
143:16
**confirm**  21:24
157:5 278:23

**conflict**  272:6
**conflicts**  185:8
**conjunction**  89:16
**connect**  301:16
**connecting**  308:24
**connection**  30:1
**connolly**  5:17 20:3
62:2
**conscious**  227:9
**consequences**
278:24 279:8
**consider**  52:8,10
97:15 181:9 241:2
**considering**
254:25
**consists**  259:12
**consolidated**
285:14
**constantly**  115:10
134:25
**consulted**  28:25
**consume**  232:15
**consumed**  232:6
**consumer**  82:16
83:22 84:14
142:13,22 289:22
**cont'd**  3:1 4:1 5:1
6:1 9:1 10:1 12:1
13:1 14:1 15:1
16:1 17:1
**contain**  36:13
**contained**  201:18
240:14 262:13
**contention**  211:18
**context**  126:11
131:10 166:2
200:7
**continue**  57:19
66:17,21 70:19
80:16 216:19
268:20 295:22

[continued - course]                                                    Page 14

continued 145:5
continues 123:14
  193:16
continuing 123:18
contractor 136:17
contractors
  135:17 136:12
contribute 275:19
contributed
  140:24 141:5
  143:2,3 145:11,21
  148:22 149:1
  247:22 309:17,24
  311:25
contributing
  145:25 203:24,24
  204:5 206:1 310:8
  311:11
contributor 40:18
control 64:17,20
  64:20 167:22
  185:16
controlled 264:4,8
  284:20,22
conversation
  88:23 133:8
conversations
  23:3 29:10 31:9
  31:14 49:11 70:12
  114:4 115:17
  128:10,13 143:14
  243:9,11,14
  301:12
convey 127:18,20
copied 264:19,21
  266:21 268:5
copies 32:4,7
  33:10,11 34:13
  227:11 248:9,10
copy 31:21,23
  32:19 37:10 38:5

38:25 248:10
corap 9:3 189:14
  189:25 262:18
  269:9 271:4
corner 39:11
  291:20 293:18
corp 1:10
corporation 19:22
  305:10
corporations
  305:3,20
correct 23:13
  26:15 28:7 37:18
  53:20 83:16 86:8
  87:5 90:10 91:13
  91:19,22 92:15
  96:5,14 97:23
  98:2 99:15 101:5
  101:23,24 102:10
  103:7,7 104:5
  109:9 111:5,6,8
  115:15 128:2,5,6
  128:11,12,15,16
  130:5,6 131:9
  134:15,16 137:17
  138:4,6 146:7,20
  147:11 148:4,5
  151:13,14 159:11
  159:15 160:19
  206:5,9 221:3,12
  221:14 223:8
  225:22 238:11
  240:17 241:8,18
  243:17 255:23
  257:15 266:7,15
  268:2 269:6
  271:20 281:15
  287:18 301:9
  307:9 313:12
  321:15

corrections 323:12
  325:17
correctly 79:8
  89:15 160:1 230:3
  264:12
correlate 173:22
correlation 174:15
correlations 174:6
cost 265:14 301:8
costa 4:15
costs 265:9 301:16
  317:23,24
council 8:22 23:12
  54:2,15,16 58:20
  59:6,21 60:14,23
  61:13 71:16,20
  72:1,5,14,23 73:8
  73:17,22 74:2
  157:21 158:8
  159:7 311:5
counsel 5:16 18:14
  21:24 23:3 25:1
  25:19 26:11,12,13
  26:16,17,22 27:14
  27:24 28:2 29:11
  30:1,3,14,17,24
  31:1,10,12 35:6
  37:8 39:8 43:10
  64:10 65:14,24
  67:16 69:12 70:23
  127:3 143:14,17
  146:25 197:22
  198:7,8 199:7,9
  200:14 201:1
  202:11 210:25
  213:22,24 217:17
  217:25 218:21
  219:21,23 220:2
  242:7,14 244:2
  249:7 285:10,12
  301:13 320:2,11

322:2
counseling 138:19
  138:21,21
counselor 187:1
counselors 187:3
  187:11 188:6,9
counterfeit 312:7
  312:11
counties 239:18
countless 34:9
  61:8
country 175:1
  196:4
county 2:12 3:6
  8:13 10:4,6,8 19:1
  19:4,6,8 27:17,20
  38:18 42:7 90:10
  90:11,14 111:18
  112:2,15 113:8,12
  166:1 171:14,18
  184:22 186:6,10
  203:4 231:3,21
  233:1 249:9 273:9
  286:5,11,17,24
  288:20 290:2
  292:1,10 293:22
  295:3,19 297:24
  298:13,14,20
  306:23 307:7,11
  307:25 313:21,24
  321:4 324:10
  325:15
county's 232:18
couple 27:15
  28:24 32:16 33:6
  43:10 83:20,21
  122:18 146:25
  238:22 284:16
course 33:12 48:4
  51:6,20 84:6
  174:6 203:6,20

[course - daunting]                                                    Page 15

204:7 210:12,17
227:20 271:15
282:5
**courses** 49:25 50:6
50:8,20,23 53:22
**court** 1:1 7:14
18:6,12 20:20
21:7 24:21 25:3
35:17 36:24 38:24
138:20 188:2,13
188:17 267:19
270:14 324:7
**cov.com** 5:6
**cover** 282:23
**coverage** 281:24
**covered** 314:16
**covington** 5:3
19:21
**crack** 160:1
**created** 149:14,19
150:16,18 183:13
204:16 263:24
**creating** 91:8
**credentials** 267:9
**credibility** 316:14
**criminal** 23:15
242:2,9,12 244:16
**crisis** 56:17 57:5
58:9 104:21
107:24 108:8
109:12 123:17
124:3,8,10,12,14
124:15,18,19,23
124:24 125:1,12
125:16,21 132:4
132:10,23 140:24
141:6,24 143:2,4,6
144:1,2 145:11,21
146:1 148:23
149:1 151:17,23
169:11 176:3

204:11 225:19
230:22 247:4
312:5 313:3
**critical** 176:2
279:15,20
**current** 55:2 74:8
101:8,12 103:6
173:24 295:17
**currently** 41:18,24
52:18 55:10 56:17
58:7 91:24 100:23
104:19,19 106:10
108:16,24 109:3
134:2 164:23
186:24 187:4
190:6 262:6 288:7
**custodian** 183:1
183:12
**custody** 7:14
**customers** 306:18
**cut** 209:6 214:10
215:24 216:8
235:5
**cuts** 106:2
**cutting** 215:9,11
216:1 235:4
**cuyah** 10:5,9
286:7,19,25 287:4
306:13
**cuyahoga** 2:12
8:12 10:4,6,8 19:4
19:6,8 27:20
38:18 42:7 90:14
111:18 112:2,14
113:8 166:1
184:22 186:6,10
203:4 273:9 286:5
286:11,17,24
287:13 290:2
292:1,9 293:22
295:3,19 297:24

298:13,14,20
306:12,23 307:7
307:11,25 313:7
313:14,22,24
321:4
**cvs** 6:3,3 20:7,7
284:15,15 301:18
303:22 304:16,17
304:18 317:25
**cycle** 234:2

**d**

**d.c.** 4:5 5:18 6:5
62:3
**daily** 56:2,21
118:7 170:3
**damages** 140:7
144:1 245:24
246:12 301:7
317:22
**dan** 1:8
**data** 9:19 52:5,6,7
56:2,3,21 57:8
58:14,16 60:3,9,10
82:22 89:14,22
90:5,13,15,23
94:16,17 95:5,9
109:16 112:20,25
113:3,8,13,23
116:6,9,16 117:12
117:14,19,23
118:12 120:9,14
120:16,18,19,20
121:6,6 122:11
125:25 126:22
127:14,16,16,20
130:4,19 165:4,17
166:4 167:11,14
167:25 168:5,6
169:4 170:2 171:5
171:9,12 177:13
177:15 191:6

201:11,12 202:5
202:24,25 204:8
204:23 206:5
233:21 248:6,16
248:21 253:20
255:4 262:7,12
263:10,14 264:10
265:17 269:5,11
269:11 270:23,23
272:7,9,16 273:5
280:13,19,20,21
282:3 300:7
303:18 312:23
**database** 116:25
117:11 259:8,10
259:13 262:3,7,13
264:11,23 267:17
**databases** 113:19
116:10,15,18
118:16 263:9
265:7 267:6,12
**date** 18:2 37:16
41:2 51:4 146:11
149:10 226:8
249:24 297:21
298:10 320:12
323:8 324:3,9,19
325:3,13,25
326:20,25
**dated** 8:5,10,16,22
9:11,16,21,23
34:18 36:20 85:18
157:22 228:1
239:4,11 255:13
259:18 307:18
316:9
**dates** 93:22 282:18
298:2
**daunting** 10:12
315:3,11

**david** 9:23 96:2
97:6 259:17,24
260:5 271:20
295:11,15 296:24
**davis** 183:16
**dawn** 89:8 90:22
91:1,3,3,6,6,15,24
92:3,6 93:7,25
97:22 98:5 138:23
184:15,16 303:10
**day** 3:17 19:15
32:25 55:3 105:16
115:1 119:7,7
166:22 173:24
174:8 244:9
249:16 270:21
271:14 274:5,10
274:13 310:6,7
317:1 322:6
324:16 325:22
326:22
**dayno** 4:13 20:18
20:18
**days** 35:6 37:8
39:8 43:10 146:25
323:18
**dea** 210:7 217:13
217:20 218:18,23
299:20
**deal** 136:20
139:24 140:21,22
202:17 221:2
225:19 305:1
**dealer** 174:25
314:24
**dealers** 242:11,19
**dealing** 41:12 73:5
115:13 176:2
182:8 247:4
275:17 305:16

**dear** 323:10
**death** 116:1
131:25 165:20
170:25 171:3
172:20 174:9,9
205:6 255:2
**deaths** 87:17 89:2
90:19 91:4 114:14
115:7 172:14
174:2,16 175:14
203:3,6,16 204:6,9
204:18 205:17
206:3,9,10,12,14
247:24 252:19,24
253:7 254:14,19
257:4,5,6 292:4,17
293:7 300:23
**debrosse** 2:9,9
18:22,23
**decade** 195:16,20
289:20
**december** 8:22
157:22
**decide** 65:14
**decided** 105:3
**decides** 191:20
192:3
**deciding** 83:2
106:8
**decision** 78:13,17
78:18,23 235:3,7
235:10
**decisions** 105:4
298:4
**decline** 106:7
**declined** 253:9
257:5
**deed** 324:14
325:20
**deem** 66:18

**deemed** 323:19
**defendant** 24:1
197:5 207:5 211:6
211:10 212:4
218:22
**defendants** 5:16
33:20 68:25 70:7
70:25 141:23
196:18 197:10,15
198:3 199:2 207:9
208:6 209:8,19
210:5 211:18
213:6,11,12 215:8
218:18 219:1
220:20 241:20
242:4 246:1 249:8
278:6
**defending** 26:14
**defense** 65:13
**definitely** 232:22
**degree** 49:19
88:25 142:11
214:21 225:15
234:8,25
**delivered** 284:3
**delivery** 320:10,12
**demands** 185:20
**demise** 204:18
**dennis** 3:12 20:9,9
**department** 9:18
29:2 31:25 37:14
42:2,6,8,20 52:16
52:19 53:4 55:10
55:17 74:11 75:8
76:1 79:3,11 82:4
83:14 86:10 89:15
89:18 92:7,12,23
93:1,5,24 94:7,10
94:19,24 95:4,6,9
95:16,22 96:4
97:10,21 98:8,20

99:3,20,22 100:7
100:15 101:19
102:8,10,14,19,25
103:19,21 104:8
105:1,7,17,21,24
106:2,17 107:10
107:15,22 108:17
109:24 110:24
113:17,22 114:12
115:3,22 116:7,12
121:11,14,20
124:6 131:12
132:7 134:2,11,19
134:22 135:5
137:2,21 139:20
141:14,19 146:16
148:4 149:16,20
150:19,22 151:12
151:15 153:22
154:1 155:11
166:3 168:3 169:9
169:19 170:1
171:11 175:2
176:20 177:12,16
177:23 178:1,4,20
178:23 179:7,14
180:1,10 181:18
182:12,18,23,24
183:2,3,11,13,21
183:23 184:5,12
184:17 185:19,25
186:8,15 187:7,9
187:15,22 188:7
188:22 189:2
190:18,22 191:18
195:4,7 211:9,11
214:19 217:5
220:10 228:25
245:5,25 246:13
247:1,11 248:15
248:22 256:3,13

256:21 257:14
258:1,16,22 260:8
262:1,6,11,17
263:13 264:24
266:6,8 267:1
268:9,24 269:1,9
269:24 271:6
272:16,22 273:1
278:25 279:9,24
280:4 287:17
294:22 295:1,24
298:3,18,19
299:23 303:3,8,12
303:25 304:9
306:19 307:2,19
309:11 316:16,18
323:22
**department's**
151:24 180:19
**departments**
89:17 117:17
182:25 240:5
**departure** 97:16
**depend** 58:19
**dependence**
192:25
**depending** 33:24
**depo** 43:12
**deposed** 21:12
22:14 24:14
**deposition** 1:15
18:4,8 20:23,25
21:20 22:13 23:7
23:9 24:16 26:6
27:24 28:2,10,15
30:11,15,19 33:12
33:24 34:1,12,16
35:8,18 36:18
37:1 38:17 39:1
44:6 57:11 58:1
61:19 62:13 63:2

65:4 66:9,13 69:1
69:6,7,11,17 85:15
85:23 97:1 119:10
119:16 148:9,18
157:20 158:3
169:10 178:22
189:12,19 215:19
223:25 224:7,19
227:12,24 229:11
239:1 248:14
255:11 259:16
271:8,15 286:4,10
286:16 295:5
315:8 319:7,13
321:18 323:8,11
324:1,3 325:1,3
**describe** 51:2 76:9
117:9 135:18
136:2 230:12
255:6 259:11
**described** 81:17
141:18 142:10
190:25 219:19
265:14
**describes** 130:4
**describing** 84:13
266:22
**description** 8:3
22:21 186:14
264:19 312:11
**deserve** 276:20
277:9
**designed** 241:11
266:8,14
**designee** 183:8
**desire** 232:13
**desk** 290:3
**desperate** 139:15
174:12 311:17
**details** 29:1 79:22

**detect** 314:5
**determination**
245:21,22
**determine** 171:2
194:9,20
**determining** 210:6
**develop** 306:6
**development**
54:22
**devoted** 111:15
**diabetes** 221:7
**diagnosis** 212:5,11
**diandra** 2:9 18:22
**die** 171:1
**died** 165:18
170:16 308:20
**difference** 101:18
**different** 89:14
116:7 117:12
118:3 121:4,5
126:1 156:16
166:7 168:6 207:5
243:4 253:5 299:8
**differently** 32:2
83:12
**difficult** 24:21
**direct** 59:16 98:16
116:16 164:24
181:23 312:18
**directed** 73:19,19
102:18 126:17
127:10
**directing** 139:10
**direction** 31:11
**directly** 42:18
44:5 98:9 109:23
112:12 113:13
114:3 117:8
118:25 119:4
138:10 163:14
169:16 173:1

181:4 198:22
199:3 256:20
**director** 8:20 9:11
10:12 29:9 55:17
58:6 74:10,16
75:13 76:1,8 78:9
78:19 79:2,18
81:3 83:14 94:9
98:8 102:9 105:8
118:5 128:2 134:7
134:14 135:8
137:2 141:14
148:12 149:20
150:21 151:12
153:25 155:15
169:9 183:7,9,14
185:24 186:8,11
187:6,12,13
190:15 214:18
217:4 219:25
220:10 225:11
228:1,24 229:3
230:20 236:25
254:9 258:1 259:7
259:24 260:6
262:4 263:12
264:24 269:22,23
270:24 284:12
287:23 288:8
289:13 290:10,14
290:20 291:7,12
296:24 314:23
315:2,10 316:7
317:5,15
**directorship** 75:23
109:8
**disagree** 211:17
216:14,16 257:9
257:17 316:23
**disclose** 46:2

**[discloses - doing]** Page 18

discloses 188:5
disclosing 23:2
discount 306:17
discovered 146:24
discuss 73:18
  113:25 114:17,20
  120:9 136:19
  169:11
discussed 40:15
  51:10 86:16
  120:11 136:5
  150:8 151:16
  155:22 158:24
  172:7,13 203:22
  220:8 262:18
discussing 29:25
  123:24 144:2
discussion 22:21
  30:3 81:1,3,7,11
  81:13,24 90:19
  106:15 107:10
  260:14
discussions 60:13
  61:13 74:2 125:17
  136:24 147:4
  193:5 198:6,8
  218:21 233:22
  243:4
disease 167:22
  185:16 221:9
  279:15,16
diseases 279:19
disgruntled 97:16
dispense 93:7,13
  95:17
dispensed 90:24
  92:11,25 94:18
  250:11 252:6,12
  264:5 302:23
dispensing 305:4

dispute 149:18,23
  253:15 257:16
disrespectful 68:8
  68:12
distribute 138:22
  209:16 237:25
  256:4,8,11,24
distributed 39:22
  91:15 183:23
  218:2 245:6
  249:20 278:5
  291:11 294:18,18
  294:19 301:18,25
  302:4,8
distributes 221:16
distribution 91:9
  198:12 208:14
  287:15
distributor 5:16
  207:8 208:6,22
  209:8,18 210:5
  211:5,10,18 212:4
  212:10,14,19
  213:6,11,12 215:8
  218:11,13,17,22
  219:1 220:20
  227:5 241:20
  242:4 246:1 278:5
distributors
  198:20 209:3,11
  209:15,24 210:11
  210:16,21,25
  211:13,24 212:24
  213:20 214:5
  216:25 217:14
  218:6,14 220:12
  220:21 227:21
  238:5 241:25
  246:14
district 1:1,2 18:6
  18:7 23:20 54:6

diversion 242:3
  263:23 265:22
  310:9
divert 310:11
division 1:3 99:12
  99:14,17,17
  104:10,16 107:20
  108:22 115:14
  131:11,18 133:22
divisions 98:23,25
  99:10,16 104:14
  116:12
doctor 212:5
  278:22 281:22
  302:12,18 310:13
doctors 192:20,22
  210:16 222:13
  277:20 278:1
document 1:9 8:7
  8:12,19 9:6,8 35:9
  35:17 37:2 38:10
  38:18 39:2,5,11,18
  39:20,22,24 40:3
  40:14,21,25 41:3
  119:17 126:14
  127:21 128:21
  129:6 131:7 146:7
  146:13,21,23
  147:22 148:10
  149:8,9,11,19
  150:1,7 151:4
  153:17 155:8,13
  155:20 156:12
  158:4,5 159:17,18
  159:20 160:3
  176:9 189:20
  190:25 191:4
  194:5 202:19,25
  224:8,14,20
  225:23 226:6,8,11
  227:2,4,7,15,22

228:8,15,18,20
  229:25 230:8
  231:15 232:25
  236:9 238:2,12
  241:5,6,7,22
  248:22,23,25
  250:10,20 251:18
  251:23 252:3
  253:1,12 254:22
  255:20,22 256:25
  257:24 287:1,3
  289:8,12 290:9
  291:14 292:7
  294:9 297:22
  298:10 307:4
  309:9,13 316:22
  317:19,20
documented
  193:16
documents 28:12
  28:16 31:4,11,16
  31:19,21,23,24
  32:5,8,19,20 33:21
  34:7,24 35:21
  36:8,12,13,15 37:6
  37:22 38:14 39:6
  40:11 43:8 52:23
  115:24 116:9
  147:2 149:13
  150:16,17 155:9
  156:14 182:19,22
  182:23 183:3,13
  202:25 223:20
  249:2 271:14
  283:24 284:2
  286:22 288:18
  318:11
doing 62:10 63:13
  65:16,21 66:22,25
  68:12 83:7 94:3
  104:19 106:22

118:20 122:16
143:5
**dollar** 101:18
247:6,9
**dollars** 101:2
102:2,5 103:3,6,10
103:11 104:3
180:3 181:1,23
**door** 159:25 161:7
161:13,14,18
**dose** 250:24 251:4
252:10,16
**doses** 89:4 250:10
250:13 252:6
**double** 69:16,18
227:8,11,18
**doubt** 296:7
**dr** 39:14,15,23
40:2,7,17 91:7
172:2 258:2
260:14,20,21,25
261:11
**draft** 30:5,9
149:15 209:25
**dramatic** 280:10
**draw** 156:17,22
245:13 296:5
**drive** 4:19
**driven** 162:23
**driving** 205:16
**drop** 308:25 309:4
**dropped** 161:13
**dropping** 38:8
**drug** 1:10 8:15,17
9:19 41:11 60:21
85:16 119:11
121:3,22 127:4
128:20 138:20
140:1 151:6
167:23 173:2,7
178:2 180:15

188:2,13,17 195:8
237:15 242:3,11
248:16,21 252:19
254:14,19 263:16
263:25 264:7
265:22 266:2,15
268:1 288:25
292:4,17 293:24
294:8 297:7
299:24 301:17,24
302:3,7 306:17
312:11
**drugs** 61:6 121:23
123:16 125:3,5,19
140:11 159:23
165:19 173:9
174:5,18,20,21
178:3 200:4,7
231:25 232:9
235:22 243:16
244:16 247:12,20
252:20 254:15
263:23 285:1,4
300:3,13,14
304:25 305:4,5
310:10,11 311:10
311:21 312:7,13
312:20,22 313:1
**due** 56:24 106:16
245:25 246:13
**duly** 21:11 321:7,9
**dumas** 183:10
**duties** 279:1,10
**duty** 280:4
**dying** 162:7
163:23 174:7,7
204:12,12 293:10

---

**e**

**e** 5:12,17 8:10 9:4
9:13,20,23 10:2,10
30:17 36:19 37:10

37:16,24,24 38:1
40:25 112:18
123:4 183:17,18
185:10 224:1
225:2,4 229:12,17
229:19 230:5
255:12,20,22
256:7 257:13
258:10,12 259:17
259:23 261:7,19
261:21 268:6
271:9,19 273:4,12
295:6,11,14 296:3
296:5 298:17
**earlier** 83:19
108:23 124:14
150:8 176:18
178:22 196:12
221:4 230:11
249:6 260:24
262:18 263:8
283:23 284:19
287:12 288:5
309:15 311:4
317:4 318:9
**early** 23:10 53:8
87:12,13 95:14
106:14 110:16
190:19 266:2,15
268:1 296:20
**east** 3:18
**eastern** 1:3
**eboop** 3:5
**economic** 54:22
**educate** 105:10
288:19
**educating** 82:25
105:15
**education** 49:18
50:11,13,15 53:21
74:4 151:20 180:9

191:8 237:16
303:9
**effect** 190:6
**effective** 274:6,12
**efficiently** 24:17
**efforts** 32:9 34:3
139:6
**eight** 34:8
**either** 22:13 39:21
40:3,14 53:22
161:19 205:6
219:1 267:9 322:2
**elect** 9:16 239:3,12
240:12
**element** 233:12
234:2,17 235:12
**elements** 117:12
130:15
**elena** 3:3 19:9 27:2
**eligible** 188:23
**ellis** 3:11 4:18
20:10,12,15
**email** 323:17
**emergency** 8:13
38:19 132:1
**emerging** 60:3,9
**employ** 52:15
137:11
**employed** 23:6
52:24 53:1 83:13
94:9 97:25,25
98:14 107:4
108:24 109:4,4
110:23
**employee** 96:7
97:16 113:12
136:17 181:18
196:9 256:2
**employees** 77:3
93:6 108:6,16,21
134:10,22,24

135:15,16,18
188:6
**employer** 22:22
**employment** 23:16
48:11,17,25 50:17
50:18 53:19 54:1
54:25 58:6 96:13
97:7,13 106:14
**ems** 90:8
**encino** 2:5,6
**enclosed** 323:11
**encompass** 54:9
**endo** 4:2,2 19:24
19:25
**ends** 291:22
**enforcement**
243:12,13,15
**engaged** 82:17
**engagement** 298:5
**enhanced** 106:9
**enormity** 308:21
**entail** 54:11
**entered** 20:23
189:1 325:9
**entering** 243:5
**entire** 54:1 56:11
59:9 86:22 204:8
204:11 218:7
324:5 325:5
**entirely** 29:19
47:16 77:22
170:13 204:14
253:22 308:23
**entirety** 196:15
258:11
**entitled** 8:7,12,19
9:6,8 10:11 35:9
38:18 57:18
148:10 224:8,20
315:9

**entry** 187:24
188:15
**environment**
99:17 227:10
279:18
**epicenter** 116:23
116:24 117:5,8,9
118:9
**epidemic** 158:11
165:8 190:11
202:17 228:12
237:2 266:2,15
268:1
**epidemics** 266:9
267:2 268:10,25
**epidemiologist**
52:9,11 53:3
**epidemiologists**
51:8,11,21,25
52:13,15 108:23
109:11,15 110:23
112:14 113:4
114:2,10 115:21
116:15 117:22
118:25 119:4
122:4 131:14
165:22 170:4,7
190:14
**epidemiology** 50:7
50:9,21,23,25
51:13 108:3,10,15
108:17 117:13
**er** 8:17 119:11
121:3,22 127:4,20
127:25 128:20
129:1,4,19,24
130:8,15
**erieview** 22:9
**erin** 5:8 19:18
**errata** 323:13,18
325:7,10,18 326:1

**erstankewicz** 5:10
**escalate** 122:6,10
**escalated** 114:6,9
116:20
**especially** 82:19
203:22
**esq** 2:4,5,9,13,14
2:18 3:3,7,12,12
3:17 4:4,8,13,18
5:4,8,12,17 6:4,8
6:13 323:5
**essentially** 100:13
100:15,22 101:6
117:19 173:24
**established** 102:11
146:19 236:5
264:2
**estimate** 28:9
182:4
**et** 1:10 87:18
181:8 279:19
**evaluate** 277:21
**evaluation** 199:25
**event** 322:3
**events** 139:2,4
214:2
**everybody** 177:1
222:22
**evidence** 83:6
121:17 123:12
126:8 143:8
147:13 154:8
155:6 171:8
175:17 205:20
209:22 211:22
226:22 236:23
237:11 241:4
242:23 249:14
265:4 266:19
267:4 269:14
271:2 276:8 278:9

305:8 308:17
312:16
**exact** 182:3 287:19
**exactly** 40:22
93:22 94:5 101:13
103:3 113:20
251:20,21 260:11
272:1 316:25
**examination** 7:7
21:10,14 69:14
145:5 207:1
284:10
**examiner** 90:11
113:8 171:20,25
172:1 203:12
206:4,7,13 231:4
232:19 233:1
**examiner's** 90:9
90:14 168:4
171:15,18 204:10
231:21
**examiners** 89:1
**example** 36:1,8
79:7 90:19 104:1
115:21 132:21
143:1 241:17
276:15 278:13
280:22 281:4
**examples** 299:16
**excluded** 282:24
**excuse** 120:20
141:11 174:3
231:2,10 238:7
249:9 250:2 253:6
259:25 271:23
282:6,21
**executed** 325:10
**execution** 324:14
325:19
**executive** 2:3
18:20

**exhibit** 7:14 8:5,6
8:7,10,12,15,17,19
8:22 9:2,4,6,8,10
9:13,15,18,20,23
10:2,4,6,8,10,11
34:16,19 35:8,18
36:18,25 37:1
38:17 39:1 85:15
85:23 86:6 119:10
119:16 146:3
148:9,18 149:7
152:2 155:4
157:20 158:3
176:5 189:12,19
223:25 224:7,19
225:1,1,6 226:5
227:24 229:11
238:24 239:1
248:14,20 254:10
255:11,19 259:16
259:23 271:8,13
271:18 286:1,4,10
286:16,23 287:3
288:24 295:5,11
297:15 298:8
306:13 313:10,19
315:3,6,8
**exhibits** 7:4 8:1
9:1 10:1 146:4
285:25 313:16
**exist** 196:1
**exists** 95:5 151:5
**expect** 289:9
290:10 291:3,6
294:11
**expectations**
272:12
**expected** 272:9
273:4 290:13
**expense** 245:4

**experience** 234:1
282:10
**expert** 46:20 47:6
49:8 145:14 149:4
161:22 162:22
164:10 172:24
191:24 192:6
222:19 233:16
234:6 235:16
245:9 246:22
253:18 273:17
275:3 301:21
310:3,5 311:1,13
312:2
**experts** 163:9
173:5 174:14
175:12,25 204:2
261:16
**expiration** 324:19
325:25 326:25
**expires** 322:15
**explain** 216:12
218:3 232:16
234:18,19
**explanation**
226:24
**express** 283:8
**extensively** 174:22
**extent** 21:1 22:24
24:2 25:18 26:7
28:19 29:6 30:13
31:6 41:21 43:24
46:19 49:7 57:6
58:13 61:15 83:5
95:18 100:9
121:15 123:10
126:7 128:17
141:8 143:7,10,13
145:13 147:12
149:3 153:18
159:16 175:16

185:18 194:12
197:18 199:5
200:22 201:14
202:8 205:18
207:11 209:5
211:21 219:4
236:22 238:3,13
241:23 242:22
243:21 244:18
289:25 301:20
309:19 310:2
312:15
**extremes** 233:24

## f

**f** 6:13
**faced** 81:5
**faces** 10:12 315:3
315:10
**facilitated** 185:14
**facing** 55:19 81:19
84:4 123:15,20
263:15
**fact** 67:1 108:17
149:18 155:3
157:7 226:19
231:17 262:24
274:16 275:5,7
308:12
**factor** 145:25
206:1 311:11
**factors** 203:25
275:19 310:8
**facts** 83:6 121:17
123:12 126:8
143:8 147:13
154:8 155:6 171:7
175:17 205:20
209:22 211:22
226:22 236:23
237:11 241:4
242:23 249:13

265:4 266:18
267:4 269:14
271:2 276:8 278:9
305:8 308:17
312:16
**fail** 280:3
**failed** 219:1
**fails** 279:1,10
**failure** 314:5
**fair** 40:7,21 51:7
55:12,20,21 72:12
94:6 97:5 107:25
123:21 124:1
139:11 142:4
170:13 173:20
208:2 214:6 220:2
220:3 223:15
225:3,9 226:17
227:1 232:9
236:13,15 241:2
252:14 258:14
261:5 265:2
266:24 280:3
283:14 296:12,18
298:23
**fairs** 139:3
**faking** 312:12
**fall** 87:12,13 88:6
88:23 89:21 90:16
93:20,23 95:14,22
96:4 97:20 203:21
**falls** 265:11,13
**familiar** 35:19,20
37:5 39:5 56:12
57:24 120:13
158:5 197:2
208:18 259:7
285:17 287:8
290:6 300:16
**familiarity** 259:9
259:12 287:10

**[familiarity - force]** Page 22

310:16
**familiarize** 288:15
  288:19
**families** 60:5,7
  61:1,3 73:4,4,13
  132:18 223:5
**family** 43:16 45:5
  45:10,25 46:8
  133:7,11
**family's** 163:25
**far** 70:20 84:2
  107:18 122:18
  151:6 179:12
  184:3,8 254:16
  289:14
**fast** 247:17,18
  274:8
**fatal** 308:20 313:3
  313:3
**fatalities** 87:18
**fatals** 56:24,24
  115:7,8 165:6,16
  168:2,3
**fda** 210:1 274:6,12
**federal** 21:10
  179:23 180:13,22
  213:16,18 214:4
  214:25 215:7
  216:24 241:16
  285:5
**fee** 267:11
**feed** 140:20 163:3
  205:23 233:24
**feel** 233:7,10,11
**feels** 140:12
**fees** 100:18 179:2
  179:4 183:19,21
**fentanyl** 48:18
  60:20 129:15
  147:19 152:5,11
  152:12,17 153:2,9

154:5,10,12,17
155:23 156:20,25
157:11,12 159:14
159:22 160:17,21
161:6 162:4,6
164:14 170:22
173:7 174:10
203:3,16 204:6,21
205:14,14,16,25
206:3,9,10,12,14
206:15,15 276:5
**fgallucci** 2:21
**field** 51:8,13 82:18
  193:8 289:20
**fighting** 305:5
**figure** 168:9 169:1
  182:3 247:6,9
  250:10 252:2,18
  254:13 255:5
  314:12 318:6
**file** 140:6
**filed** 18:6 24:6
  28:23 29:17 30:6
  31:3
**files** 33:7
**filibustering** 215:2
**filing** 29:4
**fill** 74:21 78:4
  210:21 222:11
**filled** 222:24 281:6
  281:23
**filling** 75:6 282:4
  282:12
**final** 8:15 76:21
  78:18 80:11 85:17
  149:15 298:8
**finalists** 76:14,15
  80:11,13
**finance** 54:23
  182:24 183:2,7,9
  183:14

**find** 95:9 165:1,10
  166:9,11 170:20
  170:23 292:2,16
  293:1 306:9
  311:20 323:11
**finding** 170:14
**findings** 9:19
  248:17,21
**fine** 51:5 66:24
  67:4 68:23 83:18
  144:20 216:2
  270:4
**finger** 270:18
**fingers** 269:20
**fingertips** 165:18
**finish** 214:12,14
  287:5
**fire** 90:8
**fired** 53:16,17
  76:5 96:10,11
**firm** 27:15
**firms** 174:24
  207:25
**first** 21:11 24:18
  28:1,22 76:23,24
  85:25 90:8 131:17
  147:17 150:24
  152:1 158:7 160:4
  175:21,22 188:17
  193:21 224:14
  230:25 231:3
  235:11 257:1,23
  258:9 263:20
  277:8 284:18,21
  286:23 293:21
  296:22,23 316:6
  321:9
**firsthand** 73:2
  311:16
**fiscal** 100:23 101:8
  101:12

**fit** 71:5
**five** 27:25 28:5
  175:9 240:23
  241:19 293:23
  294:7,12
**fix** 164:21 313:2
**fixation** 163:3
**fixing** 163:1
**flask** 77:13,20
**flip** 231:11
**floor** 6:9
**flu** 132:9,22 133:3
  133:15 134:1,6,9
  135:4,10,14
  136:12,18,20
  137:8,15 221:14
**focused** 108:12
  139:5
**folks** 119:23 134:1
  134:9 137:14
  227:3
**follow** 177:22
  178:21 215:23
  273:5
**following** 124:16
  239:16 264:19
**follows** 21:13
**food** 279:18
  299:24
**force** 8:15,16 10:4
  10:6,8 42:6 85:11
  85:17,17 111:19
  112:6,8,9,12,15,18
  112:19 113:1
  146:9 163:18
  165:25 166:1
  177:6 184:22
  185:5,14 186:6,10
  286:5,11,17,24
  287:14,16,20
  288:25 290:2

291:13 292:2,18
292:18,19 294:23
295:3,19,25 297:2
297:24 298:13,14
298:20 306:12,19
306:25 313:7,14
313:23
**forces** 109:21
111:13,15,23
112:1 167:24
**foregoing** 321:15
321:19 324:13
325:18
**forgotten** 66:10
**form** 132:8 149:15
149:15 170:21
182:6
**formed** 291:13
292:2,18,19
**former** 260:21
**formerly** 53:3
**formulary** 196:9
282:20,22 283:5,7
283:10,16
**forward** 8:8 35:10
105:9 115:23
191:1 256:19
258:7,17 323:15
**forwarding**
256:14,22 258:19
**foster** 52:21
**found** 33:6 34:25
35:22 36:9,13
37:7,23 39:7 43:9
88:15 161:14
299:25 300:10
307:17
**foundation** 41:20
42:11 53:13 55:8
56:1,19 58:25
59:7 72:25 75:3

75:10 78:15 92:5
94:4,11 95:1,19
96:8,17,21 107:16
108:9 113:14
117:25 124:20
125:24 128:22
141:1,7 143:9
144:3,10 149:2,12
149:22 150:14
151:8,10 152:9,14
152:19 153:4
154:7,15,19
155:24 156:11
157:3 160:9,23
161:8,21 162:21
164:9 166:21
172:23 189:3
191:23 192:6,10
193:3,14 196:3
201:23 209:13,21
210:2,8 212:8,12
212:17,22 213:1
219:6 220:15,24
221:20 222:19
226:4 231:12
232:2,11,21
233:14 234:4
235:14 241:12
245:8 246:23
248:2 250:4,21
253:2,11,17
254:23 257:11,19
264:16 265:5
266:17 267:3
268:3 269:14
272:20 273:17
274:7,14,20 275:2
276:7,17,22
277:25 280:15
281:9,25 282:8
283:1 292:12,24

293:6 294:5,15
296:1,9,16 297:9
297:20 299:1
301:19 302:13,19
302:25 304:20
305:25 306:21
307:16 308:4
310:1 311:1,14
312:3,9,17 314:1,8
**foundational**
96:22
**founding** 295:20
297:1
**four** 27:4 77:10
146:15 148:3
176:20,21
**fourth** 257:5
**frame** 73:23
203:11
**francisco** 5:5
**frank** 2:18 19:3
228:11
**free** 25:25 79:2
324:14 325:20
**frequency** 172:6
**frequently** 171:23
**friday** 146:13
**friends** 43:16 45:5
45:10,25 46:8
47:10
**front** 5:4 66:23
167:13 169:16,23
169:25 171:9
173:20 248:6
305:12,14
**fryerson** 52:22
**fu** 2:9
**fulfill** 279:1,10
280:4 306:25
**fuli** 2:11

**full** 21:17 110:17
**function** 99:1
**functions** 90:4
104:20 131:10,18
266:1
**fund** 42:18 92:15
99:23 100:14,24
101:20 102:19,24
179:7,22
**funded** 180:14
181:14 186:22,23
190:23 191:10
262:20
**funding** 74:3
91:23 92:2 100:18
180:1 181:10,14
183:20 186:19
190:10,17 262:16
**funds** 92:10 99:21
100:6 102:18
103:24 178:23
186:22
**funneled** 41:12
**furnished** 264:6
**further** 24:14
43:11 57:22 81:21
206:19 318:14
319:6 321:18
322:1
**future** 22:2 140:10

### g

**gain** 263:3
**gallucci** 2:18,18
19:3,3,4
**games** 270:17,19
**gary** 8:10 36:19
37:11
**gather** 163:21
170:2,3
**gathered** 217:2
233:20

gatherings 163:9
gender 121:5
general 9:19 23:14
  42:18 51:22 56:8
  56:10 79:6 82:20
  83:24 84:13 99:23
  100:14,24 101:20
  101:21 102:19,24
  103:20 163:18
  176:16,17 177:9
  183:22,24 184:1
  186:22 248:16,21
  260:21 261:17
  272:24 283:3
  288:9,12
general's 85:2
  175:5,23
generalities 133:4
generally 54:12
  59:14,19 60:12,19
  81:16 98:7 106:24
  110:25 111:1
  128:20 157:11
  310:21,22
generate 169:18
generated 100:19
  109:25 116:11
  124:5 179:4
  183:21
geographic 56:13
germane 115:2
getting 34:23 61:5
  69:22 163:1 174:8
  288:6
gilson 172:1,2
gingell 8:10 36:19
  37:12,13
give 22:7,20 24:15
  27:1,4 80:23
  91:10 94:13 98:19
  114:16 132:21

134:1,6,9 135:10
137:8 166:14
182:2,4 185:3
215:21 249:17
269:25 287:5
320:2,11
given 56:6 81:21
  112:5,7 115:3
  118:6 136:13
  169:8 173:6 181:2
  231:22 290:1
  321:12,16
gives 219:2
giving 89:10
  112:12 136:20
  263:11
go 23:4 43:10
  45:14 46:14 53:25
  63:22 67:19 68:4
  68:17 70:9,16
  71:1,6 105:5
  110:16 119:22
  131:1 163:8,12
  164:25 165:11
  166:11 172:25
  176:23 183:19,22
  187:17 206:19
  222:13,21,23
  230:7 233:24
  261:2 276:4
  283:22 293:19
  305:2 306:14
  314:17 317:22
  318:17,19
goal 269:1,3
goals 267:1 268:24
  306:25
goes 33:24 44:4,19
  44:24 45:9 58:1
  181:3,19 182:12
  182:25 203:12

250:19 265:25
going 23:22 24:18
  25:7,11 30:4,12
  42:1 43:1 44:2,5
  44:17 45:2,15
  46:1 57:10,18
  58:19 60:25 61:5
  62:1,8,9,21,24
  63:8 64:4,7 65:1,3
  65:4,7,14,15 66:16
  66:16,17,22 67:1,6
  67:9 68:9 69:24
  70:20,24 71:1,4,6
  71:7 73:15 89:6
  95:13 97:1 98:7
  99:25 100:21
  105:5 106:11,17
  110:2,6,10 123:15
  124:3 133:4 137:1
  140:8 143:15
  145:17 148:17
  162:14 174:21
  178:11,17 199:15
  204:22 206:21
  207:6 215:12,25
  223:19,20 228:7
  244:7 249:17
  254:3 270:6,17
  274:8 283:21,25
  284:16 286:1
  289:14 299:7
  313:6 316:12
  318:19
good 18:1,17
  21:16 223:7,11,14
  284:12,13
gordon 1:15 7:7
  8:20 9:4,5,10,20
  9:23 10:12 18:4
  21:9,14,18,19 22:7
  26:5 29:9 34:25

35:16 36:24 38:24
43:7 49:16 55:9
56:7 71:14 110:21
124:16 126:22
128:1 134:14
140:14 145:5,7
148:11,20 151:11
155:14 158:2
178:17 191:20
199:21 204:20
207:1,3 224:1,2
227:25 254:9
255:12 259:7,18
259:24 269:22
271:19 284:10,12
314:23 315:2,10
321:9 323:8 324:4
324:9 325:4,13
326:20
gordon's 317:10
gotten 90:13 162:2
govern 213:5,10
213:19 216:24
governing 215:7
government
179:24 213:17
governor 9:15
239:3,11 240:11
graduate 49:17
50:14 53:23
grand 260:14
261:10,15
grant 6:9 100:18
180:13,13 190:16
190:21 262:16
263:4,5 269:6,9
271:4 272:12
306:25
grants 179:1,12,15
179:19 180:2,4,18
181:1,12 272:8

**gray** 6:13 20:17
**great** 22:6 33:19
 307:13
**greater** 98:22
 173:16
**gretick** 9:23 96:2,3
 97:6 259:17,24
 260:4,5 261:19,22
 271:20 295:12,15
 296:24
**griffin** 9:11 228:1
**ground** 24:15
**group** 121:5
 261:16
**growing** 263:22
**guess** 185:17
**guessing** 299:22
**guys** 65:13,14
 67:19 230:12
 270:16 307:12
 308:1

**h**

**halfway** 64:21
**hampshire** 49:22
 49:24
**hand** 36:25 38:25
 123:2 148:17
 291:20,25 293:18
 322:5
**handed** 35:16
 39:20 40:14,23
 284:3 286:22
 313:16
**handing** 39:23
 85:22 119:15
 158:2 189:18
 255:19
**handling** 64:17
 69:6,6
**hands** 265:16

**handwriting** 36:1
 36:4,5,14 39:10,12
 39:13 41:8 176:8
**handwritten** 8:8
 35:11 88:1,2,6,11
 88:18 146:20
 147:3,18,23
**happen** 67:9 76:20
 237:20
**happened** 87:11
 237:21 252:23
**happening** 42:15
 61:3 230:19 312:5
**happens** 42:12
 157:7
**happy** 33:10 34:13
 272:6
**harassing** 234:13
 251:2,6
**hard** 31:21,23
 32:4,7,19
**hardest** 175:10
**hbc** 6:7 19:17
**head** 47:18
**health** 4:3 5:16
 8:20 9:18 10:12
 19:24 20:3 29:2
 42:8,19 50:2
 52:16 54:20 58:6
 74:11,17 75:8
 76:2 78:10,20
 79:3,19 80:2 81:4
 82:4 83:15 86:10
 92:7,13 93:2,6,24
 94:8,10,20,24 95:4
 95:10,16 96:4
 97:21 98:9,20
 99:3,12,20,22
 100:8 102:8,10,25
 103:19 104:9,16
 105:1,9,21,25

107:11,15,20,23
108:22 109:19,19
109:24 110:24
113:18 114:4,12
115:14,17,22
116:7,13 117:13
117:16 118:5,17
121:12,20 128:2,5
131:11,12,18,23
132:7 133:18
134:11,15,19,22
135:5 137:2,21
138:9,17 139:1,3,7
141:14 146:17
148:4,12 149:17
149:20 150:20
151:12,15 153:22
154:1 155:11,15
158:9 165:23
166:3 168:5 169:9
169:19 170:1,5
171:12 175:2
176:20 177:16
178:20,23 179:14
180:11 183:4,12
184:9,13,17
185:24,25 186:9
187:15,22 188:7
189:2 190:15
193:19 195:4,8
211:11 214:19
217:5 219:25
220:10,14,18,22
223:3,15,18
225:11 228:23,25
229:2,6,22 230:2
236:4,21 239:16
240:3,6 247:11
248:15,23 252:4
256:3,13,21
257:14 258:1,17

258:23 260:7,8
262:1,11 263:13
264:24 266:7
268:9,25 269:2,24
270:25 273:2
277:12,14 279:1
279:10,21,22
280:5,5 289:12,20
290:10 293:8
294:23 295:1,24
296:25 298:3,19
299:23 303:3
305:14 306:5,24
307:2,8,11,20,25
309:11 315:2,10
316:15 317:12
**health's** 42:2
 92:24
**healthcare** 223:8
 223:11 277:15,16
**healthy** 108:2,8
 131:13
**hear** 60:5 89:15
 125:14 185:16
 311:6
**heard** 34:6 61:10
 70:2 73:15 89:12
 90:25 116:23,24
 140:16,18 189:6
 193:9,23 196:18
 200:6 208:9
 214:11 232:3
 242:24 261:18
 284:21,23 285:7
 299:12,14 310:18
 311:8
**hearing** 61:1,1,4,7
 73:2 163:13,19
 243:2 311:16
**hearings** 72:8 73:7
 73:24

**heart** 278:13
**held** 18:8
**hello** 229:21
 260:13
**help** 24:16 113:22
 140:7 168:10,10
 174:13,13 190:11
 204:4 278:6
 303:23 305:5,22
 308:2
**helped** 308:13
**helpful** 222:5
**helping** 308:15
**helps** 113:23
**hereinafter** 21:12
**hereunto** 322:4
**heroin** 8:7 35:9
**heroine** 44:22 45:6
 46:9 48:3,9,12
 60:20 129:11
 151:5 152:3
 159:14,22 160:5
 160:20 161:5
 162:16,20 164:4,6
 164:7,14,22
 165:10 166:10,20
 167:2,7,17 168:16
 168:18 169:13
 170:8,15,18,21
 171:1 172:8,14,20
 173:1,7 174:9,9,16
 175:14 196:1,6
 276:5
**heroine's** 161:20
**hey** 265:16 305:20
 307:11
**high** 34:4 121:19
 163:1 170:19
 185:3 278:12
 316:14

**higher** 55:23
 58:10,22 254:19
**highlight** 38:1,14
**highlighting** 38:5
 38:7,10
**highly** 130:11
**hire** 78:13,19 79:2
 79:23 80:23 104:3
 105:2 106:15
 187:9
**hired** 75:13 79:17
 81:2 93:12 108:18
 109:7 118:21
**hiring** 76:9
**history** 45:2,11
 54:1 58:5
**hit** 175:10
**hiv** 108:3,11
 131:15 137:23
 138:2 268:11
**hoc** 86:19
**hold** 92:18 127:11
 143:6 228:14
 229:18 237:10
 239:9 246:3
 247:15
**holding** 269:20
**holds** 86:13
**hollister** 1:20 18:9
**home** 133:5
**homes** 61:10 311:6
 311:19
**honestly** 216:2
 291:10
**hooked** 204:14
**hop** 258:24
**hope** 316:13
**hopefully** 38:9
 191:8
**hospital** 39:16
 92:1

**hosted** 185:13
**hour** 110:17
**hours** 28:11
 264:10 284:1
**house** 163:17
**houses** 61:4
**huge** 123:14
 139:23 140:7
 163:20 168:12
 174:7,11 175:7
 306:8,10
**hugh** 172:5,7,13
**huh** 24:23
**hum** 55:4 99:8
 126:19 185:2
 289:1 293:16
 313:20
**human** 158:10
 299:24
**hundred** 162:5
 182:11 187:3
 189:9
**hungry** 110:18
**hurst** 257:25
 258:2
**hydrocodone**
 299:9,17 300:1,11
 300:11,20,23
 301:2
**hypothetical**
 104:12 130:23
 132:25 160:24
 161:10 192:11
 222:3,18 223:10
 223:17 233:15
 234:5 235:15
 273:18 276:22,23
 277:25 278:16
 279:3,12 281:17
 290:23 291:9
 292:14 308:18

**i**

**idea** 211:16 233:6
 307:13
**identification**
 34:20 35:14 36:22
 38:22 85:20
 119:13 148:15
 157:25 189:16
 224:4,11,23 228:4
 229:14 239:7
 248:18 255:16
 259:21 271:11
 286:8,14,20 295:8
 315:12
**identified** 34:8
 227:21
**identify** 21:1
 27:10 196:24
 302:11,16,22
 314:4
**identifying** 139:8
**identity** 49:4
 211:14,19
**ii** 300:3,14
**iii** 2:18 300:13
**illegal** 161:12,13
 161:15,16,16
 162:2 174:18
 205:24,25 232:14
 235:8,11 247:12
 247:20,25 276:5
 312:20,22 313:1
**illegally** 155:19
 156:9 157:2,8,12
 178:3 243:1
**illicit** 48:18 129:15
 152:24,25,25
 154:12,17 160:18
 162:2 174:18
 205:15 206:15

**illicitly** 152:13
154:6,11
**illinois** 4:19
**imagine** 55:16
232:12 291:1
**immediate** 75:13
98:10 317:18
**immersed** 51:8
**immunizations**
138:5
**impact** 61:2 85:7
117:20 132:15
164:1 168:12
173:2 175:7 191:9
247:5 280:10
310:24
**impacted** 56:6,17
57:1,5 58:9,15
59:24 140:13
182:7 293:24
294:8,13
**impacting** 59:10
60:7,13 133:6
280:2
**impacts** 83:9
109:20
**implementation**
272:5
**implications** 108:4
**important** 66:10
176:24 220:13,22
240:9 279:18
289:24
**importantly**
131:22
**impression** 317:13
**improper** 57:23
242:10
**improving** 236:20
**inappropriate**
244:5 270:13

**inappropriately**
302:12,18,24
**incapable** 234:25
**incidence** 58:22
**incident** 115:6
**incidents** 58:10,17
130:21
**include** 155:22
260:15 283:16
295:19
**included** 129:24
130:1,5 245:2
269:7,8 283:10
323:13
**includes** 25:1
72:15 156:1
**including** 223:13
263:16 266:1
277:17
**income** 101:17
184:8
**incomplete** 104:11
130:22 132:24
160:24 161:10
192:11 222:2,18
223:10,16 233:15
234:5 235:15
273:18 276:21
277:24 278:16
279:3,12 281:16
290:23 291:8
292:14 308:17
**incorporated**
325:12
**incorrectly** 267:22
**increase** 101:17
103:9,16 107:2
139:21 173:22
201:25 202:1
205:16 249:23

**increased** 202:22
249:21
**increasing** 292:3
292:16
**incredibly** 279:20
**incurable** 212:15
**incurred** 245:5
**indented** 263:22
**independent**
137:10 147:10
263:4,5
**index** 7:1,4,5 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1
**indiana** 6:3 20:7
284:15
**indicate** 272:15
**indicated** 253:19
**indicates** 177:16
226:9 254:13
312:23
**indicating** 107:12
323:13
**indirect** 181:9,22
**indirectly** 181:4
**individual** 44:16
95:20,23 133:2
188:4 211:14
240:5 296:4
**individuals** 73:3
73:10 76:12 91:10
132:18 135:24
139:9 140:10,19
165:6 174:19
198:21 204:2
205:4,7 221:23
223:5 225:5 226:9
231:25 240:4
242:11,20 243:3
245:2 261:17

265:8 278:12
311:17
**industries** 4:12
**infant** 132:2 139:6
268:14
**infections** 221:11
**influenza** 111:7
135:24
**information** 40:2
40:15 48:10 81:22
81:25 82:17,21
83:2 84:10,19
88:10 89:1,3,9,11
89:25 90:2 94:23
97:12 106:12
109:22 112:5,8,9
112:12,17 113:10
113:17,18,22
114:11,16 115:4,9
116:6 117:1 118:3
118:6,17,22
120:12 123:6,7
124:4,7 125:9,17
126:10 127:17
130:16 150:9,17
153:12,20 154:21
159:4,5 163:15,19
163:21 165:2,4,15
165:16,24 166:1
166:24 167:19
168:19,21,22,24
168:25 169:8,15
169:18,22,24
170:3 171:15
173:4,5,19 175:13
177:19 178:7
187:16 188:4
193:4 194:5,11,20
194:22 198:7
201:3,6,9,17
202:12,15 204:3

206:13 213:23
214:8 217:2,3,6,7
217:8 231:21,23
233:21 249:23,25
256:9,12,14,17,20
258:21 260:17
262:2,21,24 263:3
264:3,8,14 265:1
266:23,25 275:16
281:21 287:16
288:11,15 289:14
**initial** 81:1 136:16
**initially** 195:13
**initiated** 137:5
**initiatives** 105:11
105:19 190:25
191:2,14
**inject** 91:17
**injection** 152:3
**injuries** 312:13
**inquiry** 265:13
**insert** 193:22
194:22
**inside** 194:1
**insight** 196:8
**inspections** 279:17
**instance** 80:22
88:5 235:11
302:17,20,22
317:25
**instances** 114:13
**institute** 316:17
**instruct** 30:12
44:2,17 45:3,15
143:15
**instructing** 44:9
44:20,25 45:20
207:17,19
**instruction** 29:18
219:6 320:2,11

**instrumental** 40:9
91:8
**insurance** 179:10
212:21 280:12,16
280:24 281:1,12
281:18,24 282:6
282:17
**insurmountable**
140:12
**integrity** 316:15
**intended** 25:13
73:19 160:15,19
160:25 161:4,11
161:17,20 162:16
162:19,20 273:20
**intensive** 138:19
138:21
**interact** 135:1
210:11,16 285:21
**interaction** 73:9
97:9
**interactions** 68:23
**interested** 78:9
322:3
**interesting** 308:1
**internal** 26:21
80:4
**internet** 159:25
160:21 161:3
310:18,20,21
**interpret** 252:5,13
**interrupting**
268:19
**intervention**
279:15 308:9
309:8,13
**interventions**
303:18
**interview** 76:11,15
76:17 78:16 80:13
81:9,14 82:8

288:6
**interviewed** 77:2
80:7
**interviewing**
77:16 80:25
**introduction**
263:21
**invades** 43:25
44:14
**invest** 181:5
**invested** 163:20
**investigate** 275:13
303:4,13
**investigation**
275:23 276:2
**investigations**
72:8 73:23
**invited** 185:11
295:2
**involve** 49:24
**involved** 29:16
69:22 71:21
107:22 108:11
111:18,20 188:20
193:6 254:14
305:4
**involvement** 185:4
185:10,23 186:6,7
291:11
**involves** 240:1
**involving** 252:19
254:19,20
**ish** 284:2
**isolate** 164:11
**issuances** 89:4
**issue** 23:15,16,16
40:10,19 44:1
55:6,15 59:5,9
60:1,21 69:5
71:24,24 73:5
81:22 84:3,7,21

85:9 87:14 89:19
97:22 101:17
105:16 107:9
108:4,11 113:24
114:18 123:14
132:7,17 133:23
139:17,23,25
141:9 143:15,17
159:2 162:7
163:22 166:6
168:8,11 169:2
174:12 175:10
181:6,11 182:7
185:17 190:14
191:6,9 193:9,18
201:19 202:14
223:2 230:17
233:22 240:7,13
243:10 247:2,22
270:20 275:17
295:18 299:15
307:3 308:8,10,22
308:23 310:8,24
311:23 312:24
314:12,14
**issued** 297:5,19
298:8 299:25
**issues** 22:21 32:9
52:14 55:19 59:20
60:20 71:18,19
72:6,10,14,15,17
72:18,24 73:20,25
81:4,8,19 82:14,15
82:24 83:9 86:11
86:16 87:4,8 99:4
99:11 106:6,8,17
108:13 109:18
110:5 114:9,21
115:2,11,13,18
117:2 119:24
122:12 123:19,25

132:12 135:19
136:7 137:9 139:9
140:12 141:20
142:14 150:20
153:16 181:19
182:13 214:21,22
221:3 223:5
230:19 240:14,15
241:14 263:15
265:15 280:1
288:16,20 289:23
293:9 305:14,17
306:5,8,8
**issuing** 94:8
**item** 41:15 102:23
**items** 40:21
178:19 237:23
240:23

**j**

**j** 4:8
**j&j** 20:12
**jackson** 5:7 19:19
80:22 81:2,23
86:11,20 122:8
228:11
**jackson's** 78:12,23
**jacksonkelly.com**
5:10
**jana** 9:20 52:24
255:12,23 256:2
258:7 259:25
271:19
**janssen** 3:10 20:10
20:12
**jciaccio** 2:17
**jeannie** 134:8
135:9
**jeff** 6:17 18:11
**jessica** 6:13 20:16
**jessica.soricelli**
6:15

**job** 48:4 68:13,14
68:16 73:13 84:11
96:6 105:12 111:4
119:6 225:10
241:13 288:7
**johnson** 3:10,10
134:8 135:9
**join** 318:9
**joined** 101:14
175:21 317:14
**joining** 105:4,6
307:19
**joint** 158:9
**jointly** 159:6
**jones** 3:17 19:15
**jonesday.com**
3:20
**joseph** 2:14 19:5
**judge** 1:8 58:3
216:1
**july** 1:17 8:5 9:23
18:3 34:18 259:18
322:6 323:4
**jump** 61:18
**june** 74:14 83:15
97:25 98:3,14
105:9,19 106:14
107:4 109:5
118:10 177:9
315:1 316:8,9
**jurisdiction** 201:5
201:8
**jurisdictions**
201:8
**justice** 190:18,22
262:17 269:9
271:6

**k**

**kaiser** 281:3,4,7,7
282:10,15,17,22
282:25 283:9,15

289:17
**katherine** 52:22
**kathie** 259:25
**kearse** 3:7 18:25
18:25
**kec** 5:15
**keep** 44:6 57:14
65:5 68:5 270:17
289:23
**kelly** 5:7 19:19
**kevin** 2:13 19:7
**key** 77:21 127:24
**killers** 173:10
**killing** 158:12,21
**kimberly** 183:16
**kind** 68:8 87:22
88:17 109:17,17
114:9 116:2
118:12 120:11
166:4 173:2
176:25 179:21
194:5 272:7
280:20 290:9
303:17,17 305:16
306:2,3
**kinds** 115:25
306:3
**kirkland** 4:18
20:15
**kirkland.com** 4:20
**kit** 91:14
**kits** 90:24 91:6,9
91:22 92:6,11,25
93:7,13,16,25 94:8
94:18 95:17,21,25
97:22 98:5 138:23
184:15,16
**knew** 74:20 83:2
160:12 211:5
292:9 294:3
296:13,19 298:24

315:15
**know** 24:5,9 25:8
25:19 26:3 31:15
33:1,9,22 34:14
39:21 41:23 42:14
42:17 45:16 46:16
46:24,25 47:2,7,11
47:17,19,21 48:2
48:11 49:2,12
53:9,14,15 61:21
68:25 69:4 70:7
74:25 75:4,7,11,12
75:15,19,21,25
76:3,4,6,20,22,25
77:1,14 78:18,21
79:8,21 84:5 85:1
86:4 87:3 96:9,15
96:18,20,25 98:3
101:7 102:3 103:3
104:22,23 107:20
107:21 109:19
110:19 111:17,19
111:25 112:11,24
113:2,3,6,15,19,20
114:5 116:15,18
117:7,17 118:15
118:21 120:22
121:22,24,25
126:5 130:24,25
131:3 132:19
134:21 135:8,21
136:3,4 140:9,14
141:3,4,11,12
142:9,11 144:5,13
144:14 153:13
154:16 156:25
157:15,18 160:8
160:13 161:1
162:9,11 163:7
164:11 166:5
168:2 171:13,16

173:3 178:5
181:21 182:2
188:3,3,14 189:4,5
191:22 192:13,14
192:17,22 193:22
195:12,15,16,20
195:23 196:17
197:4,6,12 198:9
199:1,10,25 201:2
203:10,19 204:22
204:25 207:8,24
207:25 208:2,5,19
208:22 209:5,14
209:23 210:3,4,9
210:10,14,15,19
210:20,23,24
211:2,13,14,19,23
211:24 212:4,9,10
212:13,14,18,19
212:23 213:4,9,13
213:13,14,15,17
213:24 216:3,22
217:9,10,11
218:10,12,15,16
218:17,19,21,24
218:25 219:16
227:12 233:10,11
236:20 237:7
242:24 246:19,24
248:3 249:3,22,23
250:6,24 251:4,12
251:13 252:10,11
252:13,16 255:9
256:15 258:2
260:9,11,22
261:25 262:9
263:1 265:6,11
267:10 272:7
273:3,8,10,11
274:3,15 275:5,12
275:20,22 276:9

276:12,18 278:10
279:23 282:12
283:21 284:18,24
285:1,3,4 287:19
289:13 290:6,7
291:10,11 294:11
294:25,25 296:22
297:5,18 299:9,19
299:22 300:6,17
300:18,21 302:20
303:1,7,11,15
304:9 308:6 310:9
310:10,12,13,15
311:3 312:10
314:4 317:15
318:3,4
**knowledge** 53:19
91:20 92:15 96:7
112:4 151:22
153:16 167:1
168:15 197:8,14
198:2 200:9,18
203:5 208:20
213:3,25 214:4
216:7,8,10,11
219:15,19,22,24
220:4 221:1
284:19 291:15
304:1,11,22
309:14 312:18
**known** 189:25
192:25 193:11
220:5 264:1
295:21
**knows** 46:12
218:13
**koishor** 6:17 18:11
**kristen** 5:12 19:11
**ksusman** 2:16

**l**

**l** 1:25 2:14,18
75:20,20 183:17
183:17,18,18
321:6 322:12
**lack** 178:24
**lakeside** 3:4,18
**landed** 271:16
**landfill** 23:20
**language** 24:23
**large** 173:8,11
180:12 234:7,25
**largely** 314:15
**lasalle** 4:19
**lasted** 317:18
**late** 33:21,22
34:24 87:13
283:24 318:10
**law** 27:14 69:16
242:18 243:11,13
243:14
**law.com** 5:15
**lawful** 21:9
**lawfully** 245:6
273:23
**laws** 213:18
**lawsuit** 24:6 28:23
43:13 208:7 211:6
218:22,25 219:3
243:20,24 245:25
246:2,13,14 301:5
**lawyers** 27:14
194:16,25 207:15
208:25
**lead** 138:3 313:2
**leadership** 271:24
**leading** 235:21
**leaflet** 194:1
**leana** 9:15 239:2
**learn** 28:22

**leave** 53:6,11
62:22,25 65:10
67:7,23 68:9
276:15 283:25
304:17
**leaving** 67:24
215:18
**led** 187:24 204:17
**left** 53:8,14,15
75:8,25 76:5
95:21,23 96:3
97:10 187:8
239:19 291:25
293:18
**legal** 24:3 141:9,9
143:10 144:4
145:14 149:4,4
153:2,19 157:16
160:4,5,13,18,20
160:23 161:2,3,5,9
199:10 207:12
213:2 219:5 238:4
238:14 241:24
242:21 243:23,23
244:18,19 245:9
245:10 246:22
274:2 301:11,11
311:2,13 312:2,10
323:1 326:1
**legally** 155:17
156:8 157:1,6
192:8 199:2
205:15
**legislation** 72:4
73:18
**legitimate** 174:15
175:14
**legitimately**
167:15 170:10
**letter** 8:5 9:15
34:17 74:23

238:20 239:2,11
239:23,25 240:10
272:6 273:6
323:19
**lettered**  41:6
**letterhead**  156:14
**letters**  238:23
272:10,18
**letting**  67:13
**level**  34:4 114:16
117:16 131:1
132:16 136:22
159:1 167:21
185:3 197:6
198:16 214:4,21
219:17 241:16
285:5 316:14
**leveling**  257:6
**levels**  151:5
**leverage**  262:12
**lewis**  4:13 20:19
**liability**  219:3
**liaison**  5:16
**licensed**  218:18
264:5,6,9 273:24
**licenses**  100:19
179:5 183:19
265:8
**licensing**  279:17
**life**  48:16,25 49:13
56:11 133:6 162:3
232:7 279:22
**lifelong**  58:5
**lifetime**  171:4
**likelihood**  121:19
**limit**  198:5
**limitations**  184:8
**limited**  125:23
126:6,13,23 127:7
127:8 139:18,19
227:19 266:11

308:6
**limiting**  125:12
**limits**  188:25
**line**  36:2 102:22
147:17,21,22
228:9 271:22
305:12,14 323:13
325:7 326:3
**lines**  266:25
**link**  245:4
**list**  236:10,14,19
237:6,23 238:17
240:23,25
**listed**  81:20
108:23 131:20
150:3 159:10,19
178:20 207:25
225:6 226:18
239:19 325:7,17
**listening**  20:25
21:2 163:10
185:17
**listing**  325:7
**listservs**  256:22
258:20
**literally**  246:7
**litigation**  1:7 18:6
21:21 31:5,17,21
32:13,21 169:5
323:6 324:3 325:3
**little**  29:14 32:1
41:5 83:11 101:1
101:2 103:2
110:16 137:25
142:11 162:9,11
162:15 180:3
195:2 199:22
269:25 284:19
297:3 317:11
**live**  163:24 276:11

**lived**  56:7,10
**lives**  133:5 163:25
163:25 278:7
**living**  278:12
**llc**  3:7 6:3 20:7
284:15
**llp**  1:20 3:11 4:8
4:13,18 5:3,17
6:13
**local**  82:22 83:24
84:9 114:15
117:23 174:25
180:14 201:10
308:24
**locally**  200:11
**located**  18:9 23:20
**logan**  4:9
**logo**  121:8,9,12,19
**long**  22:1 56:7
69:23 75:21 94:2
94:5 98:3 166:15
196:7 249:16
260:9,11 270:21
274:10 282:5
310:6,7
**longer**  36:3 53:1
147:24 152:2
164:17 174:19
176:11 244:4
289:20
**look**  35:20 56:22
56:24 57:2,4 69:9
82:23 111:3 113:4
119:19 120:7,17
125:22 126:4,9,17
126:20 127:13,16
128:24 146:22
163:11 165:4
168:1,2 170:4
179:19,21 202:15
227:2 239:12

248:11 250:9
252:2,17 253:23
254:12,15 255:18
257:23 263:8,10
263:13 288:23
290:6 291:16,17
291:25 293:17
295:10,14 305:20
306:11 307:25
316:11 317:3
**looked**  58:16
59:23 60:1 121:3
124:5 150:11
194:4 201:19
203:19 288:4
290:7 297:22
298:12,17 313:8,9
313:13
**looking**  40:9 61:6
61:9 74:21 78:4
85:8 109:16,17
111:3 119:22
127:13 130:3,25
131:3 139:21
175:6 190:10,13
203:2 223:19
287:5 297:15
311:7
**looks**  35:19 39:13
147:15,15 204:9
225:5
**lost**  232:5
**lot**  34:5 60:25
61:10,11 70:7
82:18 84:18
109:21 115:3,5
118:6 125:9 139:1
141:17 142:16
150:15 163:7,8,15
163:16 165:20
167:10 168:5,6,6

**[lot - mean]**
Page 32

169:8 171:22
173:3 174:23
175:6 176:23
185:20,20 202:14
214:8,11,17,22
233:21 243:4
249:2 258:10
267:12 275:16
279:13,16 298:1
299:14 303:7
304:18 310:7
312:23
**lots** 311:8
**loved** 73:4
**lower** 250:22,25
251:5,17,25 300:2
**luken** 5:7 19:19
**lunch** 110:16,18
144:18
**luncheon** 144:25
**luxury** 305:15

**m**

**m** 3:12,17 6:4,4,8
9:10 227:25
**m.d.** 9:15 239:2
**madam** 323:10
**madeline** 3:12
20:9
**madeline.dennis**
3:15
**mail** 8:10 9:4,13
9:20,23 10:2,10
30:17 36:19 37:10
37:16 40:25 123:4
224:1 225:2
229:12,17,19
230:5 255:12,20
255:22 256:7
257:13 258:12
259:17,23 261:7
261:19,21 268:6

271:9,19 273:4,12
295:6,11,14 296:3
296:5 298:17
**mailed** 161:18
**mailing** 225:4
**mails** 37:24,24
38:1 112:18
185:10 258:10
**main** 3:13
**maintain** 32:4,7
187:16,23
**maintained**
264:11
**majority** 103:24
173:18 274:17,24
275:7 276:3
**makers** 241:16
**making** 110:5
124:6 139:12
174:6 235:1
305:22
**mallinckrodt** 6:12
20:17
**mammoth** 308:10
**managed** 186:21
**manager** 282:16
**managers** 135:2
**managing** 214:22
**manufacture**
209:12,16,17
**manufactured**
152:13,22,22
153:3 154:6
159:24
**manufacturer**
157:16 249:8
**manufacturers**
194:9,20 196:24
198:11,19 199:22
209:3

**manufactures**
197:5
**manufacturing**
196:18 197:10,15
198:3 199:2
**marc's** 306:17
**march** 8:10 36:20
37:16
**marcus** 6:8,11
19:16
**mark** 2:4 8:5
18:18 34:17
223:20 228:8
238:24 248:8,12
257:25 259:14
286:1 323:5
**marked** 8:3 34:19
35:13,17 36:21
37:1 38:21,25
85:19,22 119:12
119:15 146:4
148:14,18 157:24
158:3 189:15,18
224:3,10,13,22
228:3 229:13
239:6 248:17,20
255:15,19 259:20
259:23 271:10,17
286:7,13,19 295:7
295:10 315:11
**market** 5:8 209:19
**marketed** 195:13
**marketing** 197:9
**marking** 34:22
271:13
**mart** 19:15 301:25
304:7 306:17
**martin** 77:13,13
77:19,19 80:9
**massachusetts** 4:5

**massive** 84:21
**master** 58:3 63:19
66:23 70:16
**master's** 49:20
**matched** 139:13
**materials** 87:7,22
88:15,17,19 136:1
136:4,19 159:10
**matter** 18:5 22:18
22:18,19 23:14,19
79:6 85:4
**mayor** 76:16
77:20 78:12,17,22
80:10,12,12,22
81:2,15,23 86:11
86:13,20 87:16
89:10 122:7
225:18 228:7,11
230:15 236:8
237:2
**mayor's** 90:3
225:17 230:8,10
**mcginness** 3:7
**mcgrath** 9:11
227:25
**mckesson** 5:3
19:21 208:16,17
**mclaughlin** 3:17
19:14,14
**mcnamee** 271:25
271:25 272:2
**md** 1:7 18:8
**mdl** 1:6 2:3 18:21
21:20
**mean** 30:2 72:18
98:21 120:18,20
137:7 140:17
173:11 209:6
214:10 216:22
230:10 231:9
235:5 293:12

295:23 318:1

means  37:23 141:3
  147:25 164:20
  184:4 205:24
  285:3 310:10
meant  25:9 72:5
mechanism  80:4
media  18:3
medical  43:25
  44:1,15 45:2,4,11
  45:17,22 46:2
  50:4,5 89:1 90:9
  90:11,14 113:7
  168:4 171:14,18
  171:20,24 172:1
  179:11 192:7,14
  192:20,25 203:12
  204:10 206:4,7,13
  222:24 231:4,21
  232:18 233:1
  257:25 277:13
  281:21 317:12
medication  194:1
  194:2 211:1,25
  218:11 222:14
  302:11,16,17
medication's
  277:21
medications
  162:19,25 184:13
  184:18 197:4
  210:1,18 216:25
  220:13,21 221:17
  222:1,9,12 223:14
  237:25 238:1
  245:7 278:5
  280:21 281:15
  282:23
medicine  61:6
  243:6 278:2
  311:19

medicines  221:22
meds  278:14
meet  27:23 73:13
  114:17,19 272:11
meeting  40:13
  87:23 88:7,9
  89:21 114:24
  146:12 147:5,8,16
  148:6 158:14,17
  158:19,25 159:8
  163:12 176:13,15
  176:17,18 177:4,6
  177:8 185:9,11
  214:3 225:5,14,22
  225:25 226:10,13
  226:15 228:7
  261:2,15
meetings  40:8,18
  48:5 51:11,21
  52:2 60:4,25
  61:10 73:11,14
  86:13 87:2,8
  109:21 122:24
  133:22 136:6,15
  163:8,8 167:24
  171:22 172:4
  173:4 175:20,22
  176:23,25 185:12
  193:5,17 202:14
  203:23 204:3
  214:9,11,16,17
  215:11 217:3
  233:21 243:2,9
  295:23
meets  86:21
melanie  229:21
melville  2:15
member  54:1
  184:21 287:13,17
  287:19

members  45:10
  46:9 72:23 104:4
  133:16 134:6,10
  240:6 258:17
  281:5 295:21
  297:2 306:24
memo  9:10 227:25
  299:25 300:4
memory  27:6
  289:2
mental  50:2
  131:23 133:18
  138:17 165:23
  170:5 180:11
  190:15 258:1
  260:6 296:25
mentioned  90:22
  111:12 112:2
  124:13 131:12,14
  131:15 159:14
  178:25 179:1,2
  181:15 186:13
  202:13 221:12
  228:6 238:16
  241:25 263:4
  317:4
merle  1:15 7:7
  8:19 9:4,5,20,23
  10:12 18:4 21:9
  21:14,18 145:5
  148:11 155:14
  207:1 224:1,1
  255:12 259:17
  284:10 315:2,10
  321:9 323:8 324:4
  324:9 325:4,13
  326:20
mesa  4:15
met  26:12 28:1,5
  28:11 48:4 51:24
  73:12 90:1 172:6

meth  124:18
method  161:15
  308:8
metro  39:15 91:25
metrohealth  92:9
mexico  154:25
miami  5:7 19:19
michael  4:8
microphone  207:7
middle  41:6
  306:15
midnight  271:17
midwest  323:17
  326:1
migrate  58:18
mike  9:16 20:4
  207:3 239:4,12
  240:12
mill  140:15 144:9
  144:15
million  101:2,18
  102:2,5 103:3,6,10
  103:11,16 104:2
  180:3 181:1
  239:17
millions  250:13
mills  140:23 141:5
  142:9,15,20 143:1
  143:25 145:8
  309:16,23
mind  44:7 232:8
  273:13
mine  146:22 227:8
minimum  225:25
minor  77:12,18
  98:11 122:9 123:9
  125:18 126:5
  128:15
minutes  18:18
  135:11

**[mischaracterizes - need]** Page 34

**mischaracterizes**
47:15 61:16
121:16 123:11
128:18 142:1
159:17 169:7
170:12 171:7
173:14 182:15
186:2 205:19
241:4 243:22
249:13 265:4
309:20
**mischaracterizing**
309:7
**misuse** 263:23
**mitigation** 200:1
**mixes** 152:6 153:9
173:8
**mobile** 139:4
**moment** 169:16
317:16
**moms** 139:5
**money** 42:5
102:23 103:19
105:2 237:15
**monies** 41:11
42:17
**monitoring** 263:25
272:4
**month** 83:18
176:21 190:9
**monthly** 114:25
136:5,5,6 295:23
**months** 28:24
32:17 83:20,21
146:16 148:3
176:20 317:19
**morgan** 4:13
20:19
**morganlewis.com**
4:16

**morning** 18:1,17
21:16
**mortality** 132:2
139:6 268:15
**motion** 215:16,23
**motley** 3:7 18:25
**motleyrice.com**
3:9
**mountains** 34:5
**mouthpiece**
153:22
**move** 43:11 69:25
145:9 187:20
198:11 214:25
234:22 235:25
236:1 237:4 247:8
267:14 268:13
**moved** 34:5 191:1
**moving** 8:7 35:10
**mpifko** 2:7
**msalimbene** 4:11
**mt** 3:8
**mujumdar** 2:9
18:23
**multi** 180:20
**multiple** 73:14
106:5 151:5 266:1
**murthy** 260:20,21
260:25 261:11
**murthy's** 260:14

**n**

**n** 4:19
**n.d.** 1:12
**naeem** 3:12 7:8
20:11,11 21:15
22:6 29:20,23
31:13 33:14,19
42:25 43:6 44:4,9
44:19,24 45:8,19
45:24 46:5 57:10
57:25 68:20 69:2

69:8,11,18,23 70:4
71:13 72:21 96:19
96:24 97:5 100:2
110:19,20 144:11
144:19 145:6
160:11 178:16
186:3 196:22
199:14,20 206:18
270:10
**naloxone** 41:13
89:5 91:4,13,21
92:25
**name** 18:11,16
21:17,18 24:5
39:17,20 52:23
62:1 75:15,16,17
75:18 79:7 80:21
96:1,2 122:8
134:1,8 149:14
150:3,5,20 154:5
155:8,9,10 156:13
156:14,15 166:16
171:24 175:20
183:10,16 207:3
208:9,12,17
225:23 226:10,18
226:20 239:20
281:1 284:14
299:16 323:6
324:3,4,15 325:3,4
325:21
**named** 208:6
238:5 321:9
**names** 27:1,5,6
46:6 52:20 77:7
116:21 144:8
166:14 175:11
196:19,23 197:2
208:3 239:19
**napoli** 2:13 19:5,7

**napolilaw.com**
2:16,17
**narcan** 89:4 91:13
91:17 92:25
**narrative** 74:19
185:7 311:22
312:4
**narrow** 80:6
164:12
**nation** 175:9
**national** 1:6 18:5
114:15 323:6
324:3 325:3
**nationally** 167:21
201:9
**nationwide** 267:7
**natoya** 77:12,18
98:11
**nature** 61:11
300:5
**necessarily** 47:10
79:5 123:3 170:17
208:15,21 258:19
314:9
**necessary** 191:8
308:22
**need** 24:18 25:18
26:2 33:11 40:19
42:21 61:22 62:21
63:19,20 64:17,20
64:25 65:14 66:12
67:5,23 68:5,7,24
69:4 70:2,7 86:4
94:14 101:7 106:4
106:15,19 107:12
109:23 117:20
119:24 139:24
167:3 168:11
189:8 191:5
216:20 251:23
268:20 272:8

277:13
**needed**  95:8 106:9
  132:13,16,16
  166:9
**needing**  164:16
**needs**  65:9 110:4
  124:7 133:9
  277:12,14
**neighborhood**
  55:6 58:24 305:3
  305:9
**neighborhoods**
  54:13 56:16,25
  58:8,17 61:2
  73:16
**never**  272:17
  273:13 276:4
  283:14
**new**  2:15 6:14,14
  10:12 101:19
  104:3,7 105:25
  107:19 108:21
  114:14 115:23
  136:17,17 240:22
  241:1 256:13
  315:2,9
**news**  82:16 83:23
  83:25 84:14,14
  142:13,21,22
  289:23
**newsletters**
  258:16
**newspaper**  82:22
  82:22 84:9
**newspapers**  175:1
**night**  35:4 116:2
  284:3
**nine**  237:23
**nods**  24:19
**noloxone**  237:17

**non**  56:24 115:8
  154:12 165:6,16
  168:3 215:1,13
  221:2 234:23
  235:25 237:5
  267:15 268:13
  308:20 313:3
**north**  2:10 3:18
  5:14
**northern**  1:2 18:7
**nos**  24:22
**notarized**  323:14
**notary**  321:6
  322:12 323:25
  324:10,18 325:15
  325:23 326:23
**notation**  159:21
**note**  20:22 147:23
  271:24 323:12
**notes**  8:8 9:7,9
  35:12 36:14 87:25
  88:1,2,7,11,12
  146:21 147:3,4,7
  147:15,18 148:6
  159:4 185:11
  224:9,15,21 225:4
  225:21,25 226:9
  226:19
**notified**  76:18
  272:10,17
**november**  9:16
  239:4,11
**number**  8:3 18:7
  41:10 48:5 89:2,4
  101:25 104:1,23
  106:3 111:20
  114:22 118:15
  130:14 164:24
  165:10 166:9
  167:4,5,15 168:15
  169:12 172:14,18

173:22 175:25
  178:2 190:12
  200:10,19 201:20
  202:1,12,20 206:3
  207:24 208:5
  217:3 221:2 228:9
  229:21 230:2
  237:14 240:13,13
  249:8,19 250:2,12
  250:19 251:17,23
  252:1 257:6 263:9
  265:7 267:6
  275:18,18 286:25
  287:2 288:14
  290:24 292:3,16
  306:2,13 308:19
  308:20 323:7,13
**numbered**  315:22
**numbers**  203:21
  218:5,8 219:16
  291:18,19 293:18
  325:7
**nurses**  137:11
**nursing**  132:1
  134:7 135:9
**nw**  4:5 5:13,18 6:4

**o**

**o**  183:17,18 259:8
**oarrs**  259:8
  260:18 261:18
  262:2,7,13,24
  263:3 264:2,2,20
  264:22,23 265:12
  265:17,21 266:21
  267:17,25,25
  269:5,10 270:23
  271:24 272:8,9,17
  272:17 273:5
**object**  33:21 45:3
  63:10 94:14
  318:10

**objection**  11:2,3,3
  11:4,4,5,5,6,6,7,7
  11:8,8,9,9,10,10
  11:11,11,12,12,13
  11:13,14,14,15,15
  11:16,16,17,17,18
  11:18,19,19,20,20
  11:21,21,22,22,23
  11:23,24,24 12:2,3
  12:3,4,4,5,5,6,6,7
  12:7,8,8,9,9,10,10
  12:11,11,12,12,13
  12:13,14,14,15,15
  12:16,16,17,17,18
  12:18,19,19,20,20
  12:21,21,22,22,23
  12:23,24,24,25
  13:2,3,3,4,4,5,5,6
  13:6,7,7,8,8,9,9,10
  13:10,11,11,12,12
  13:13,13,14,14,15
  13:15,16,16,17,17
  13:18,18,19,19,20
  13:20,21,21,22,22
  13:23,23,24,24,25
  14:2,3,3,4,4,5,5,6
  14:6,7,7,8,8,9,9,10
  14:10,11,11,12,12
  14:13,13,14,14,15
  14:15,16,16,17,17
  14:18,18,19,19,20
  14:20,21,21,22,22
  14:23,23,24,24,25
  15:2,3,3,4,4,5,5,6
  15:6,7,7,8,8,9,9,10
  15:10,11,11,12,12
  15:13,13,14,14,15
  15:15,16,16,17,17
  15:18,18,19,19,20
  15:20,21,21,22,22
  15:23,23,24,24,25

| | | | |
|---|---|---|---|
| 16:2,3,3,4,4,5,5,6 | 126:7,15,25 | 234:4,12 235:14 | 231:19 233:19 |
| 16:6,7,7,8,8,9,9,10 | 127:21 128:17,21 | 236:22 238:2,3,13 | 244:3,8 246:22 |
| 16:10,11,11,12,12 | 129:6,12,16,21,25 | 241:3,12,22,23 | 275:10 277:3,11 |
| 16:13,13,14,14,15 | 130:9,13,22 131:7 | 242:22 243:21 | 296:21 302:1,5,9 |
| 16:15,16,16,17,17 | 132:24 134:12 | 244:17,21 245:8 | 312:21 |
| 16:18,18,19,19,20 | 140:3 141:1,7,8,25 | 246:21 248:2 | **objectives** 195:7 |
| 16:20,21,21,22,22 | 143:7,9,13 144:3 | 249:12 250:4,20 | 268:8 |
| 16:23,23,24,24,25 | 144:10 145:13 | 251:1 252:7 253:1 | **observe** 135:23 |
| 17:2,3,3,4,4,5,5,6 | 147:12 149:2,3,12 | 253:11,17 254:22 | **obtain** 217:7 |
| 17:6,7,7,8,8,9,9,10 | 149:22 150:14 | 257:11,19 261:13 | 273:23 |
| 17:10,11,11,12,12 | 151:8,11 152:9,14 | 262:14 263:18 | **obtained** 219:24 |
| 17:13,13,14,14 | 152:19 153:4,18 | 264:16 265:3 | 262:2,7 |
| 22:24 23:17 24:2 | 153:23 154:7,14 | 266:17 267:3 | **obviously** 177:2,3 |
| 24:7 25:15 26:7 | 154:19 155:5,24 | 268:3 269:13 | 216:17 221:21 |
| 28:18,19 29:6 | 156:3,11 157:3 | 271:1 272:19 | **occasion** 40:11 |
| 31:6 33:3 36:11 | 159:16 160:9,22 | 273:16 274:1,7,14 | 272:11 |
| 40:5,16 41:20,21 | 161:8,21 162:17 | 274:20 275:2 | **occasionally** 38:3 |
| 42:10 43:18,24 | 162:21 164:9 | 276:7,17,21 277:2 | 38:14 |
| 44:8,14,23 45:7 | 166:12,21 169:6 | 277:24 278:8,15 | **occur** 95:15 |
| 46:19 47:5,14,24 | 169:20 170:11 | 279:2,11 280:7,14 | **occurring** 308:21 |
| 48:13 49:6,7 | 171:6 172:23 | 281:9,16,25 283:1 | **october** 8:16 85:18 |
| 51:14,15 52:3 | 173:13 175:16 | 283:23 290:16,22 | 146:14 148:2 |
| 53:12 55:7,25 | 179:16 182:14 | 291:8 292:11,24 | 177:9 322:15 |
| 56:19 57:6,17 | 184:7 185:6 186:1 | 293:5 294:4,14 | **od** 36:3,6 114:14 |
| 58:12,13,25 59:7 | 187:18 189:3 | 296:1,9,15 297:9 | 115:7 147:24,25 |
| 60:16,24 61:15,18 | 191:23 192:5,10 | 297:20 299:1 | 174:9,9 176:11 |
| 61:20 62:9 63:11 | 193:2,13 194:12 | 301:10,19,20 | **ods** 115:8 313:2 |
| 65:8 72:2,25 | 196:3,20 197:18 | 302:13,19,25 | **offer** 279:13 |
| 74:18 75:2,9 | 198:13 199:5 | 304:14,20 305:7 | **offered** 76:18 |
| 78:14,24 83:4,5 | 200:2,22 201:13 | 305:25 306:21 | **offering** 93:16 |
| 88:20 92:5 93:8 | 201:23 202:7 | 307:15 308:4,16 | **offers** 92:8 |
| 94:4,11,21 95:1,18 | 203:8 205:18 | 309:19 310:1,2,25 | **offhand** 208:1,4 |
| 96:8,16,21 97:17 | 207:11 209:13,21 | 311:12 312:1,9,15 | **office** 31:16,18 |
| 100:9 103:1,14,22 | 210:2,8 211:21 | 314:1,7 | 32:5,10 33:6 |
| 104:11 105:13 | 212:8,12,17,22 | **objections** 7:5 | 35:23 36:10 85:2 |
| 107:16 108:9 | 213:1 219:4 | 11:1 12:1 13:1 | 88:18 90:14 |
| 109:13 112:10 | 221:19 222:2,15 | 14:1 15:1 16:1 | 131:23 133:18 |
| 113:14 116:4 | 222:18 223:16 | 17:1 42:16 44:7 | 138:17 142:18 |
| 117:6,25 120:1,5 | 226:2,4,7,21 227:7 | 57:12,15,20 62:10 | 146:9 165:23,25 |
| 121:15 123:10 | 231:12 232:1,10 | 63:6 64:15 66:15 | 167:25 168:4 |
| 124:20 125:8,24 | 232:20 233:8,14 | 70:19 71:5 145:23 | 170:4 171:15,18 |

172:15 175:3,5,23
177:6 180:11
190:15 193:7
203:23 204:10
231:22 260:6
296:25 322:5
**offices** 98:21
**official** 34:4 44:17
184:23,25 220:18
228:23 229:2,6,22
230:3 236:4 252:4
324:15 325:21
**oftentimes** 116:9
**oh** 114:8 143:13
243:25 259:14
283:21
**ohio** 1:2,12,22
2:20 3:4,14,19
5:14 8:15 9:18,19
18:7,10 22:10
82:19,20 83:24
84:12 85:2,11,16
109:24 113:17
114:12 116:12
142:18 163:18
166:3 175:2,4,8,8
192:15 201:12,21
202:3,21 213:5,10
248:15,15,21,22
250:2,11 252:6
256:12,21 257:5
257:14 258:1,16
258:22 260:17
263:24 264:1,5,7,9
264:15 265:2
266:8,14 267:7
281:3 285:18,20
288:12,25 293:23
294:8,13 297:5,7
297:18,23 298:7
313:9,24 321:2,7

322:6,13 323:2
**ohio's** 263:24
**okay** 25:14,22
26:3,4 32:1 33:14
40:12 45:24 52:17
57:2,25 61:22
62:4 64:20,22
65:3,9,15 68:6
69:15 70:3 71:6
77:14 78:6 86:4
92:10 96:24 102:9
118:24 120:25
121:25 122:19
123:18 124:9
125:5,22 126:3,12
128:1 133:14,25
135:4,8 136:9
143:23 147:9,17
149:7 150:23
151:2 152:24
155:13 158:6,13
159:13 164:4,22
166:17,25 170:6
177:12 178:10
179:6 180:25
181:16 182:18
183:11 184:12
188:9,18 191:13
196:17 198:17,23
201:20 203:13
204:19 205:8,12
206:2,8 208:2,9,16
209:17 211:24
212:10 213:4,16
215:25 217:12,21
219:18,24 225:9
225:13,21,24
227:1,14,16 228:6
229:19 230:7,24
233:6 236:3,7
237:14,22 238:7

239:22 241:18
243:18 249:5
250:9 254:2
255:18 256:16,25
257:23 260:24
261:21 263:2
265:12,20 269:4
272:3 273:3,12
277:7 281:4
282:20 283:20
285:4,7,17 287:7
287:21 288:5,23
289:15,19 290:13
291:21 292:5
293:20 295:13
299:7 301:5,16,24
302:22 304:23
306:11 307:5
309:22 310:9,13
310:23 311:4
312:7,12 314:3,10
315:19,20 317:8
317:20 318:5
**old** 54:13 55:6
58:21 121:11
261:6
**once** 76:7 79:1
234:9,24
**ones** 192:18
**ongoing** 123:19,25
147:4
**online** 155:18
**op** 1:12
**open** 78:1 215:19
**opened** 194:2
**operations** 179:8
186:23 208:20
**operators** 143:25
144:9,15
**opiate** 1:7 8:19
10:4,6,8 18:5

111:18 148:10
150:2 151:4
152:12 155:3,14
155:16 157:1
163:17 165:25
177:6 184:22
230:22 286:5,11
286:17,24 287:13
292:1 295:3,18,19
323:6 324:3 325:3
**opiates** 85:6 87:17
155:17,22 156:18
156:21 157:9,10
158:21,24 159:9
161:24 162:1,25
205:22 252:12
311:21 312:25
**opinion** 46:20 47:6
49:8 145:14,15
149:4,5 161:22
162:22 164:10
172:24 191:24
192:6 222:19
233:16 234:6
235:16 238:14
241:24 243:23
245:9,10 246:22
253:18 273:18
275:3 301:11,21
310:3,5 311:1,13
312:2
**opinions** 143:11
244:19
**opioid** 8:7 9:2
21:21 32:9 35:9
42:2 52:14 55:5
55:11,19,23 56:17
57:5 58:9,10,23
59:4,13,16,20
60:10,19 61:14
72:15,18,24 73:20

[opioid - page]

73:25 74:4 81:8
83:23 85:11 86:11
86:16 87:4,8,17
89:22 90:19 99:4
99:11 104:20
106:16 107:13,14
107:23 108:8
109:11 111:4,9,16
111:24,25 112:15
112:25 113:5,25
114:20 115:12
116:16 117:1,23
124:12,14,14,24
125:20 127:20
131:5 132:4,9,23
135:19 137:9
138:10,14 140:24
141:6,19,24
142:14 143:2,3,6
144:2 145:11,21
145:25 146:9
148:23 149:1
151:17,23 152:1
169:11 174:16
180:8,9 181:3,19
182:12 183:20
184:14,19 186:15
189:6,13,23 192:8
192:24 194:6
195:5,9,10 198:4
199:2,3 200:10,19
201:20 210:1,6
211:20 221:2
224:15 228:12
233:18 235:11
237:25 238:1
240:16 245:7
249:19 250:2,10
252:5 257:3
260:15 273:23
274:18 275:14,24

276:4 281:15
288:20 296:13,19
297:6 298:24
301:1,8,8,17
302:23 303:4,13
305:6,22 309:17
309:24 310:24
311:11,25 313:23
314:6
**opioids** 29:3 44:13
47:23 60:13 84:3
115:18 121:23
125:3,6,10,13,23
126:6,13,23 127:7
127:9 129:1,5
131:19,19 136:19
136:25 145:10,20
148:22,25 156:8
164:8 167:3,8,16
168:17,18 169:14
170:10 171:4
172:10,16,22
175:15 177:18
188:11 191:20
192:3,16 193:11
194:10,21 195:13
195:21 196:24
198:11 199:23
202:2,20 204:15
209:12,19 211:15
227:6 242:10,19
247:14,25 248:1
250:3 252:24
253:8 254:17,21
265:2 273:15
274:5,11,25 275:1
275:8,9,15,25
283:9,17 292:9,23
**opportunities**
190:11,13

**opportunity**
318:13
**opposed** 86:19
**oral** 40:4 87:24
**orange** 254:16
255:3
**order** 110:4 159:6
159:24 160:20
161:2,5 220:5,9
238:11
**ordering** 285:14
**orders** 218:14
314:5
**organization**
98:22
**organizations**
82:23 163:16
207:25 308:24
**organized** 98:20
**original** 38:10
153:6,8
**originally** 148:19
168:16 169:13
170:9 172:9,16,21
**outlets** 140:19
195:4
**outpatient** 264:3
**outrageous** 61:17
62:12
**outreach** 191:7
306:18 308:3
**outs** 163:13
**outside** 30:23,25
45:16 198:6,7
**outweigh** 277:22
**overall** 100:17
253:6
**overbroad** 23:18
40:6 46:21 47:25
56:20 60:17 74:19
103:22 109:13

116:4 179:16
185:6 200:2 203:9
220:24 222:3
223:9,17 226:7
279:3,12 280:8
296:16
**overdose** 9:19
36:6 87:17 89:2
147:25 172:8,14
174:2 203:3
204:17 205:17
240:17 248:16,21
252:19 253:7
254:14,19 257:4
300:19
**overdoses** 56:24
85:8 91:18 129:10
129:15 174:1
204:13,13,21
308:20
**overseas** 154:24
155:18 156:9
157:1
**oversee** 135:2
**oversight** 79:3,23
**overview** 185:4
**oxford** 6:9

**p**

**p** 2:4 75:20
**p.c.** 2:4
**p.m.** 319:13
**package** 193:22
194:22
**padukone** 5:4
19:20,20
**page** 32:3 36:1,1,2
39:11 41:6 126:9
126:18,20 127:13
130:3 147:17
158:7 159:3,19
230:25 236:9

[page - people]                                                                    Page 39

239:13,14 240:16
240:20,24 242:1
250:9 252:2,17
254:12 256:25
257:23 291:18
293:18,19 306:14
306:15 315:22,23
316:12,12 317:3
323:13,15 325:7
326:3
**pages** 34:10 316:3
**paid** 101:20
**pain** 140:20,22
162:24 164:16
173:10 191:21
192:4 212:16
276:11,14,15,20
276:20,25 277:1,9
277:10,18
**painkillers** 61:8
161:24,25 164:18
173:23 205:22
311:20 312:25
**panel** 76:12 77:2,3
81:1,13
**panelists** 77:10
81:23
**paper** 116:8
**papp** 39:14,15,23
40:2,7,17 91:7
**par** 4:3,3 19:25
**paragraph** 150:24
231:2,3 257:2
263:20 265:20
293:22 295:16
306:15
**parens** 264:1
**parilla** 75:17,25
**part** 34:23 43:13
50:10,12,14,17,18
73:12 82:25 84:9

84:10 86:9 91:14
93:3 100:17
143:25 147:1
151:16 170:1
173:9 180:14
204:8,11 205:3
209:2,4 223:18
237:14 240:1,2
241:13 258:20
262:15 266:8
269:7 271:3
279:23 283:11,12
287:20,22 288:13
288:19 293:8
294:23 295:2,2,24
298:20 301:5
306:10,19 311:21
312:4,8,13 313:22
325:9
**participate** 54:18
111:12 112:1
185:18
**participates**
243:19
**particular** 36:14
87:14 89:19 104:9
107:9 130:19
154:4 183:1
202:18 206:2
210:12 211:20
212:1,6 218:12
230:17 275:20
277:22 287:16
289:8 307:3 308:8
309:12
**particularly** 62:11
**partner** 308:15
**partnered** 306:17
306:20,24 307:12
309:11

**partnering** 308:2
**partnership** 309:2
**parts** 54:10 55:22
**party** 322:2
**party's** 46:2
**passed** 72:4
**patch** 165:15
**pathway** 172:18
173:1 174:18
204:16 235:18,20
235:24
**pathways** 164:13
164:15 173:6
176:1 205:23
233:23 247:21
**patient** 91:21
172:21 189:1
212:1,7,15,20
266:1 277:23
280:12,18
**patient's** 212:11
280:11,16,18
**patients** 89:7
90:24 91:18
132:13 135:23
172:15 192:8
195:14,22 198:12
199:4 210:11,18
210:25 250:11
252:6 273:14
276:19,25 277:9
277:17 282:4,5
312:12
**paul** 5:17 20:2
62:2
**pause** 199:13
**paused** 65:22
**pay** 109:23 282:7
**pays** 212:20
**pboehm** 5:19

**pdmp** 263:25
**pelini** 5:12,15
19:12
**pellegrino** 1:25
18:13 321:6
322:12
**pence** 9:16 239:4
239:12 240:12
**pencil** 269:20
**pending** 25:21
127:2
**pennsylvania** 4:10
6:10
**penny** 103:4
**people** 34:8,9 47:9
47:11,17 48:5
49:2,5,13 60:5
61:5,9 73:1,11,11
77:15 79:2 86:22
92:24 103:25
106:16 110:18
132:13 134:5
135:10,13 137:8
139:12 147:20
156:15 158:12,21
161:23 162:7,23
163:9,14,22
164:15 165:18,21
165:24 166:19
167:2,4,5,15
168:10 170:16,18
171:1 172:25
173:3 174:7,7,13
174:17 175:6
176:24 177:17
178:6 186:25
187:17 188:23
202:2 204:11,12
205:21 221:18
222:5 231:10
232:3,4,8 233:23

234:24 242:17
243:16 270:6
274:18,25 275:7
275:24 277:12
293:9 300:19
308:19 311:6,9,17
312:23
**people's** 45:16
61:4,9 174:5
311:19
**percent** 173:16
182:11 187:3
189:10 231:4,5,9
231:17 232:17
233:3,5,7
**percentage** 167:7
173:12 252:18,23
253:6,7 254:13,18
254:20 257:3
275:14,23
**perfect** 64:19
217:12
**perfectly** 270:4
**performed** 131:11
**performing**
104:19
**period** 76:17
95:13 176:21
**periodic** 86:20
**periodically**
119:21
**peripheral** 219:15
**permanente** 281:3
281:5 289:17
**permission** 46:4
**permit** 61:19
**permits** 100:19
179:3,4 183:19
**permitted** 57:15
69:13 192:16

**persis** 79:8 80:21
95:12 128:4
**person** 23:12
54:16 58:21 59:6
59:22 60:15,23
61:23 62:5 65:16
67:2,11 70:24
75:12 97:22 98:4
98:13 128:14
165:14 166:25
183:6 256:23
273:23
**person's** 75:15,16
96:1,2 175:19
**personal** 21:25
22:17 43:25 44:15
48:16,25 49:13
142:25 153:16
168:15 187:16
197:8,13,14 198:1
220:4 233:13
234:2,17 235:12
**personally** 48:2
184:21 258:3
264:6 275:23
324:11 325:15
**perspective** 191:6
**perspectives** 166:7
**pertain** 117:12
214:5 217:14
**pertained** 89:3
272:25
**pertaining** 23:19
31:24 83:9 87:16
105:16 108:13
109:18 118:17
150:19 202:14
299:14
**pertains** 163:22
201:19 208:13

**pertinent** 82:24
**pervasive** 311:22
**pglawyer.com**
2:21
**pharma** 38:8
**pharmaceutical**
4:3,12 43:14,23
46:18,23 47:4,13
47:20 208:23
213:19 214:5
216:25 217:14
220:13,21 221:22
237:25
**pharmaceuticals**
3:11 4:2,3 6:12
19:25 20:1 218:6
**pharmacies**
198:20 209:4
218:7 264:5
282:11 304:18
306:20 307:12
308:2 310:21
**pharmacist**
250:23 251:3
252:10,16 299:18
**pharmacology**
53:23
**pharmacy** 164:19
218:12,13 222:13
222:23 263:24
264:9 281:6
285:18,20 302:23
306:18 310:19,20
**philadelphia** 4:10
**philanthropy**
179:24
**phone** 20:13 30:17
305:19 323:3
**phrase** 38:7
124:23 125:11
140:15,16,18

189:7 193:23
200:6 279:21
**physical** 115:24
**physician** 39:15
273:25
**physicians** 209:20
210:22
**pick** 305:18
**piece** 165:14
**pieces** 288:14
**pifko** 2:4 8:5 18:17
18:18 22:3,24
23:17 24:2,7
25:15,23 26:7
28:18 29:6,18,21
29:24 30:12,20,23
31:6 32:22 33:3,9
33:16 34:2,17
36:11 37:3 39:3
40:5,16 41:20
42:10,16,23 43:18
43:24 44:8,11,14
44:21,23 45:1,7,12
45:22 46:1,10,19
47:5,14,24 48:13
49:6 51:14 52:3
53:12 55:7,25
56:19 57:6,10,16
58:12,25 59:7
60:16,24 61:15,21
62:4,14,16,21 63:1
63:7,10,16,21,24
64:3,6,10,14,19,24
65:3,9,13,19,24
66:5,12,24 67:5,10
67:15,20 68:1,5,11
68:18,21 69:2,4,10
69:15,21 70:1,6,11
70:22 71:6 72:2
72:19,25 74:18
75:2,9 78:14,24

| | | | |
|---|---|---|---|
| 83:4 88:20 92:5 | 193:2,13 194:12 | 269:21,23 270:2,5 | **place** 40:14 41:23 |
| 92:18 93:8 94:4 | 194:24 196:3,5,20 | 270:12,19 271:1 | 114:5 185:12 |
| 94:11,13,21 95:1 | 197:18 198:5,13 | 272:19 273:16 | 188:17 213:5,10 |
| 95:18 96:8,16,19 | 199:5,12 200:2,13 | 274:1,7,14,20 | 305:19 321:19 |
| 96:23 97:3,17 | 200:22 201:13,23 | 275:2,10 276:7,17 | **placed** 285:1 |
| 99:24 100:9 103:1 | 202:7 203:8 | 276:21 277:2,11 | **places** 154:25 |
| 103:14,22 104:11 | 205:18 207:11,19 | 277:24 278:8,15 | **plaguing** 122:13 |
| 105:13 107:16 | 208:24 209:13,21 | 279:2,11 280:7,14 | **plain** 174:25 |
| 108:9 109:13 | 210:2,8 211:21 | 281:9,16,25 282:8 | 314:24 |
| 110:9,15 112:10 | 212:8,12,17,22 | 283:1 285:9,25 | **plaintiff** 24:6 |
| 112:21 113:14 | 213:1,21 214:13 | 290:16,22 291:8 | 43:13 212:6 |
| 116:4 117:6,25 | 215:3,9,14,20 | 292:11,14,24 | **plaintiffs** 2:3 |
| 120:1,5 121:15 | 216:5,12,16 | 293:5 294:4,14 | 18:20 |
| 123:10 124:20 | 217:16,24 219:4 | 296:1,9,15,21 | **plan** 8:7 9:3 35:10 |
| 125:8,24 126:7,15 | 219:20 220:15,24 | 297:9,15,20 299:1 | 189:6,14,24 190:5 |
| 126:25 127:11,21 | 221:19 222:2,15 | 301:10,19 302:1,5 | 190:8 |
| 128:17,21 129:6 | 222:17 223:9,16 | 302:9,13,19,25 | **plane** 318:12 |
| 129:12,16,21,25 | 226:2,4,7,21 227:7 | 304:14,20 305:7 | **plans** 189:9 |
| 130:9,13,22 131:7 | 227:14,17 228:14 | 305:25 306:21 | 196:10 |
| 132:24 134:12 | 228:17 229:18,24 | 307:15 308:4,16 | **play** 209:9 210:5 |
| 140:3 141:1,7,25 | 231:12,19 232:1 | 309:19 310:1,25 | 220:13,21 |
| 143:7 144:3,10,17 | 232:10,20,24 | 311:12 312:1,9,15 | **playing** 270:16,19 |
| 144:21 145:13,23 | 233:8,14,19 234:4 | 312:21 314:1,7,11 | **plaza** 2:5 22:9 |
| 147:12 149:2,12 | 234:12,20 235:4 | 315:4 316:2 | **pleasant** 3:8 |
| 149:22 150:14 | 235:14 236:22 | 318:16 319:3 | **please** 18:15 20:21 |
| 151:8 152:9,14,19 | 237:10 238:2,12 | 323:5 | 21:8,16 22:7 25:7 |
| 153:4,18,23 154:7 | 239:9,24 241:3,12 | **pile** 254:10 288:24 | 25:10 27:5 39:3 |
| 154:14,19 155:5 | 241:22 242:6,13 | **pilfered** 243:6 | 77:9 80:20 100:3 |
| 155:24 156:3,11 | 242:22 243:21 | **pill** 140:15,23 | 110:8 134:1 151:2 |
| 157:3 159:16 | 244:6,17,23 245:8 | 141:5 142:9,14,20 | 178:9 187:21 |
| 160:9,22 161:8,21 | 246:3,7,11,17,21 | 143:1,25 144:8,15 | 200:16 252:18 |
| 162:17,21 164:9 | 247:15 248:2 | 145:8 309:16,23 | 269:17 271:24 |
| 166:12,21 169:6 | 249:12 250:4,20 | **pills** 61:9 140:11 | 278:20 296:17 |
| 169:20 170:11 | 251:1,6,11,15,22 | 140:21 242:20 | 307:22 323:11,11 |
| 171:6 172:23 | 252:7 253:1,11,17 | 243:1,7 249:9,20 | **pleases** 215:15 |
| 173:13 175:16 | 253:25 254:22 | 311:7 | **plenty** 244:7 |
| 178:10 179:16 | 257:11,19 261:13 | **pinched** 269:20 | **plevin** 2:18 19:4 |
| 182:14 184:7 | 262:14 263:18 | 270:17 | **pllc** 2:13 5:7 |
| 185:6 186:1 | 264:16 265:3 | **pipeline** 312:24 | **plus** 86:18 103:16 |
| 187:18 189:3 | 266:17 267:3,19 | **pittsburgh** 6:10 | **point** 3:18 27:10 |
| 191:3,23 192:5,10 | 268:3,18 269:13 | | 31:16 41:10 42:3 |

89:9 93:9 106:11
120:21 130:24
149:19 152:2
155:2,16 156:7,16
162:3 164:16
187:5 191:13
202:19 235:21
256:14 268:21
269:17 270:21
**pointed** 127:5
**pointing** 269:21
270:4,5,7,7,8,10
270:20
**points** 91:9 120:16
120:19 130:4,19
**police** 37:15 42:6,6
90:7 168:3
**policy** 241:16
**polster** 1:9
**porter** 4:4 19:24
**portion** 106:14
**position** 34:3
42:14 45:17 67:18
68:17,19 70:19
74:20,22 75:14,22
76:1,8,19,25 77:21
77:25 78:1,2,5
80:2,3,5 83:3,17
90:10,12 101:8
105:18 106:23
108:18 109:5
118:10 277:21
317:5,19
**positions** 105:4,5
**possible** 24:17
87:5 166:7 179:22
**possibly** 55:14
89:11 139:18
**post** 49:17
**posted** 80:3 315:1

**postoperative**
276:15
**potent** 162:5
**potential** 278:24
279:8
**potentially** 150:6
**powerpoint** 87:19
**practice** 37:25
199:11 258:15,23
278:2
**practices** 36:3
85:6 147:24
176:11 197:9
260:16
**pre** 261:15
**precede** 185:23
186:7 298:2
**preceded** 317:17
**precedes** 309:9
**precise** 317:16
**precursor** 36:3
147:24 176:11
**predecessor** 75:7
317:18
**predecessors**
291:1 317:10
**predetermined**
105:6
**predictive** 191:6
**pregnancy** 137:20
137:22
**pregnant** 139:5
**prejudice** 34:11
**preparation** 28:9
28:15 29:4
**prepare** 26:6
27:24 28:2 34:12
87:19,23 88:8
117:23 132:13
182:18,20

**prepared** 121:14
149:11 150:13
155:9 159:7
**preparedness**
132:1
**prepares** 122:4
**preparing** 29:4,16
30:1,2,15 102:13
**prescribe** 184:18
**prescribed** 167:16
168:16 170:10
171:4 205:15
211:25 222:12
302:12,17
**prescriber** 264:10
**prescribers**
197:16 198:3
210:17 264:6
**prescribing** 36:2
85:6 147:23
176:10 192:21
209:20 210:17
260:16
**prescription** 1:6
5:11 8:15 18:5
19:12 21:20 44:12
47:23 60:21 85:16
129:5 145:10,20
148:22,25 164:8
167:3,8,16 168:17
169:14 171:4
172:10,16,22
173:9,10 174:16
174:20 175:14
177:18 178:2
192:9 193:25
194:6,9,21 195:8,9
195:10,12,21
198:4,11 200:4,7
202:2,20 206:15
209:12,19 210:1

211:20 212:6,20
222:1,8,23 223:13
227:5 242:10,18
242:20,21 243:1
245:7 247:13
248:1 249:20
250:3 252:24
253:8 254:17,20
257:3 263:16,23
263:25 265:1,22
272:4 273:15,23
273:24 274:4,11
274:18,25 275:8,9
275:14,24 276:4
281:6,14,22 282:7
282:13 283:9,17
288:25 293:24
294:8 295:21
297:6,7 304:25
305:4 311:10
323:6 324:3 325:3
**prescriptions**
173:23 192:21
199:3 200:10,19
201:21 210:21
222:11 264:4
282:5
**presence** 21:3
174:5 321:14
**present** 6:17 18:14
86:15,23 87:14
88:9 89:21 90:2
133:2 135:23
159:7 222:13
226:20 237:1
**presentation** 8:19
40:4 87:20 88:24
90:15 148:11
150:2 154:4 155:4
155:8,14 260:25

**presentations**
87:24 150:7
**presented**  40:2
86:12,14 89:13,24
173:4
**presenting**  87:6
88:25 236:8
**president**  9:16
239:3,12 240:12
**presidential**
238:21
**pretty**  69:8 132:6
**prevent**  266:9
267:2 268:9,25
**preventing**  63:13
**prevention**  41:13
138:24 151:20
167:22 180:8
237:16 279:14,14
295:22
**preventive**  316:19
**previous**  106:2
317:15
**print**  38:14
**printed**  37:24 38:2
38:11 227:10
**prior**  30:10,18
75:13,22 81:2
83:2,20,21 90:1
93:23 94:2,8
97:16,20 98:3
101:11 103:10
105:3,6 107:3
163:10 186:10
190:20 196:2,19
205:19 214:2
245:21 246:21
261:18 277:3
298:5 307:18
317:4

**privacy**  44:1,15
45:18
**private**  179:24
**privilege**  25:25
45:4,9,20,23
198:14 244:1
**privileged**  29:19
**proactive**  316:19
**probably**  18:18
28:24 180:21
236:1 244:4
**problem**  57:19
82:2 247:12,21
292:9,22 293:4
294:3 296:14,19
298:25 303:4,13
304:24,24 305:2,6
305:23 308:13
309:17,24 311:11
311:25 312:8,14
313:24 314:6
**problems**  57:22
68:24
**procedure**  21:11
320:8 324:5 325:5
**proceeded**  74:24
**proceeding**  46:3
**proceedings**  22:2
**process**  76:9 80:1
81:9,17 82:8 83:1
84:15 99:19
100:12 104:25
179:13 182:21,25
196:9 282:6
**processed**  281:23
**produce**  33:25
52:6
**produced**  32:19
33:2 35:4 37:7
39:7 40:22 43:9
88:12 121:20

167:20 169:5
218:2 225:2
271:14
**product**  30:14
43:23 46:18,23
47:4 152:23
194:11,21 299:10
299:17
**production**  31:4
31:17,20 32:13,20
33:17,21 34:24
88:15 283:24
318:10 323:15,17
323:22
**products**  47:9,13
192:9 197:16
198:4 199:3 210:6
217:15 300:1,11
300:12,20,24
301:2
**professional**  192:7
**professionally**
258:3
**professionals**
192:15 193:1,8
222:25
**program**  91:7,25
92:8 106:4 135:2
137:4,7 138:20,24
180:22 186:13,17
186:21,25 187:11
187:17,25 188:20
188:23 189:1
260:6 262:17
263:25 266:13
272:5 296:24
**programming**
106:16 107:14
108:2 131:13
137:12

**programs**  41:13
41:14 42:9,19
55:13 82:3 134:25
135:3,5 138:19
141:18 179:22
180:8,9 181:24,24
183:20 185:20
237:16,17 279:13
303:19,20 308:9
**project**  89:8 90:22
91:1,3,6,6,15,23
92:3,6,16 93:7,25
97:22 98:5 138:22
184:15,16 303:10
**proliferation**
176:3
**promoting**  220:14
220:22 223:15
**promotion**  139:1
**pronounce**  79:7
**proper**  211:1
**properly**  218:23
**proportion**  165:8
245:23 246:12,15
**proposal**  190:17
191:10 271:5
**proposals**  241:1
242:1
**propose**  240:21
**prospective**
316:20
**protect**  45:9 57:18
66:17
**protecting**  97:3
**protocol**  20:23
44:7 57:11,24
61:19 62:4,13
63:2,7 66:9,13
67:10 69:12
227:12

[provide - question]

**provide** 32:12
33:10 55:11,13
91:17,22 93:17
95:21,24 98:5
112:8,20,25
113:23 133:15
137:15,15 138:2
138:21 150:7
151:17 165:24
169:25 184:13,15
184:18 188:9
194:21 204:3
207:20 218:6
264:25 303:17
306:18 308:2
**provided** 21:10
35:5 38:6 56:2
89:6 90:1,5
112:17 113:12
114:11 116:6
117:16 126:10
127:15 133:21
134:18 136:1,19
138:10 141:20
150:10 153:13,21
154:22 166:4
167:10 168:23
186:14 193:4
195:3 202:2,12,20
213:23 217:4
221:22
**provider** 164:19
**provides** 91:23
116:25 135:6
184:5
**providing** 91:5
93:25 99:4 132:22
**public** 1:21 2:19
8:20 29:2 42:2,8
49:20 52:16 54:20
58:6 73:24 74:11

74:17 76:1 77:19
78:10,20 79:19
80:8 81:4 82:4
83:15 86:10 87:14
89:5,17,23 90:4,7
92:7,13,24 93:2,6
93:24 94:8,10,20
94:24 95:4,10,16
96:4 98:8,12,20
99:3,20,22 100:8
102:8,10 103:19
104:8 105:1,8,21
105:24 107:11,15
107:23 109:19
110:24 115:5,6,17
117:13,18 118:5
118:17 121:12
128:2 133:16
134:6,10,15 137:2
141:14 148:12
149:16 150:20
151:12 153:22
154:1 155:15
168:5 171:12
176:20 185:24,25
186:9 187:15
188:7 193:19
211:11 214:19
217:5 219:25
220:10,14,18,22
223:3,15,18
225:11 228:23,25
230:21 236:4,24
247:11 252:4
256:3 260:8 262:1
262:11 263:13
266:7 268:9,24
269:1,24 270:24
273:1 279:1,10,21
279:21 280:4
289:20 290:10

293:8 294:23
295:1,24 298:3,19
303:3 305:14
306:5 307:2,19
309:11 317:11
321:6 322:12
324:10,18 325:15
325:23 326:23
**public's** 236:21
**publication**
294:17
**publications**
174:24,25
**publicity** 84:18
**pull** 146:3 176:5
**pulled** 116:10
**purchase** 92:11
161:17 178:3
**purchased** 155:18
156:9 157:8
161:14
**purported** 253:13
**purpose** 51:12
52:1 110:1 160:15
160:19 161:1,4,11
161:18,20 162:16
162:20 225:14
230:9 237:8
239:22 262:8
283:6
**purposes** 31:4,20
34:19,22 35:14
36:22 38:22 85:19
119:13 148:15
157:25 162:19
189:16 224:4,11
224:23 228:4
229:14 239:7
248:17 255:16
259:20 271:11
286:8,14,20 295:8

315:12
**pursuant** 320:4,7
**pursued** 195:7
**purview** 301:23
302:2,6,10 318:1,2
**put** 39:20 82:21
114:22 118:18
148:7 149:14
159:5 163:15,18
164:12 167:19
168:7 175:4,5
190:8,16,18 191:9
230:12,16,21
236:14,18 237:6
238:18 241:1
247:6,9 281:12,18
294:20 296:4
317:20
**puts** 40:11
**putting** 195:5

**q**

**qualified** 321:8
**quality** 99:18
**quarterly** 136:6
**question** 22:25
23:5 24:3 25:6,9
25:12,12,13,20,22
25:24 26:8,11
29:7,12,13,24
31:12 32:23 41:21
46:13,20 47:2,18
48:21 50:19 51:18
57:7 58:4 61:16
69:19 75:4 83:5
95:19 96:20,22
100:3,10 106:19
120:2 121:16
123:11 124:17
125:14 126:1,8,24
127:2 128:18,23
130:3 134:3 141:8

143:8,10,19,22
145:14,18 147:13
148:19,24 149:3
153:7,8,19 156:5
157:11 159:17
162:13,15 165:9
166:9 170:13
172:11 175:17
177:8,22 179:18
186:3,4,5 192:1
194:13 195:18
196:21 197:19,23
199:6,23 200:15
200:23 201:14
202:8 203:17
204:20 205:19
207:12,18,21,22
211:22 214:15
215:4,15,23
216:21,23 219:5
219:10 230:1
233:25 234:11,15
236:16,23 237:5
238:4,14 241:24
242:15,23 243:22
244:4,11,18,24
245:17,19 246:4,6
246:9,15,18,20,25
247:16 248:4
251:8,17,23,24
253:4 254:9
267:16,23 268:19
268:21,23 269:15
269:22 274:22
276:23 277:3
278:18 279:5
296:17 297:17
300:16 301:20
302:15 304:15
307:21,21 309:20
310:2,7 311:24

312:16
**questioned** 249:7
**questioner** 64:25
**questioners** 318:9
**questions** 45:1
57:21 65:10 67:17
68:22 69:3,22
70:24 72:16,20
86:24 96:25 99:25
118:14 207:6
244:7 267:20
268:17 284:2,17
298:2 315:17
318:15,18,21
319:4
**quick** 110:15
318:22
**quickly** 168:8
279:4
**quiet** 61:23 62:18
64:25 65:2 67:6
68:6
**quite** 171:23
**quotas** 210:6
**quote** 257:1,13,18
316:13,16,18,18
316:24
**quotes** 263:21
316:13

**r**

**r** 5:8 75:20 259:8,8
**raise** 57:13 62:9
67:1,3
**raised** 283:23
**raising** 62:11
**range** 137:16
**rate** 204:21,25
205:1,2,8
**rates** 55:23 300:12
**ratio** 187:1

**rational** 234:9
235:1
**rationalize** 232:5
**rbarnes** 6:11
**reach** 303:22
**reached** 265:15
304:2
**reaction** 43:22
46:17 47:3,12
**read** 42:4 57:23
61:18 63:7 66:8
66:14 84:7 88:4
142:14,16,17,20
142:24 151:2
160:1 174:22
176:7 196:15
197:10,17,25
219:11,13 224:16
228:13 229:23
230:3 231:7 233:2
237:17 244:12,14
246:8 250:14,17
257:7 258:8,11,16
260:18 264:12,21
265:23 266:3
267:16,18 272:13
272:23 274:9
278:19,21 290:11
290:14 292:6,7
306:22 313:7
315:15 316:20,21
324:5,6,12 325:5,6
325:17
**reading** 37:20
196:25 289:3
315:14 323:19
**ready** 68:20 288:6
**real** 110:15 117:19
305:17,17 318:22
**realize** 223:1
306:1

**realized** 95:23
**really** 47:1 84:20
96:24 127:14
162:8 168:7 175:7
279:25 284:25
303:15,18 305:20
305:21 307:13
308:1
**reason** 26:3
126:21 174:20
211:25 212:5
294:16 296:7
316:23 323:14
325:8 326:3
**reasonable** 226:24
226:25
**reasons** 73:12
319:4
**recall** 24:8 37:9,19
37:21 38:12 39:9
39:25 40:20,24
41:1,2,4 50:3 59:1
59:17,18,19 60:2
60:12,18,19,25
71:22 72:3,7,9,11
72:13,22 73:21
74:5 77:5 84:23
84:25 85:12 87:6
87:10 88:5,14,22
89:24 90:18 93:21
94:5,17,22 101:13
102:4 106:23
107:5,17 110:24
111:13 112:22
118:8 122:16,21
126:23 127:6
136:7 141:21
149:10 158:16
159:1 186:16
187:13 201:10
202:24 208:11

211:4 225:13
226:3,12 238:18
238:20,22 258:7
261:4,9,11,14,23
261:24 262:5,15
263:11 271:3
272:1 315:14
316:25 318:13
319:6
**recalling** 175:19
**receipt** 323:18
**receive** 112:18
113:16,17 135:19
258:10 272:9,16
273:5 287:25
290:25 318:11
**received** 41:3
50:24 97:11 180:1
180:4 181:1
193:25 218:14
261:19,22 287:21
291:2 296:3
**receives** 211:14
**receiving** 37:19
185:10 256:15
291:14
**recess** 43:3 71:10
110:12 144:25
178:13 199:17
206:23 254:5
259:3 284:7
314:19 318:25
**recipients** 8:10
36:20
**recognize** 119:16
121:7,9 132:12
139:17 149:8,9
150:6 181:7
189:22 206:16
**recognized** 293:22
296:23

**recollection** 40:13
59:8 61:12 73:1,6
74:1 82:5 86:6
105:23 150:13
158:18 201:24
202:23 205:2,10
220:11 250:7
263:7 265:18
283:18,19 289:7
**recommendation**
80:14 283:15
**recommendations**
8:16 80:7,11
85:18 87:16
225:19 227:3
228:10 230:13,16
230:22 236:8,10
236:14,19 237:1,6
238:6,10,17
**reconsider** 44:6
**record** 18:2,16
21:17,23 33:15,18
34:23 43:2,5,8
57:14,18 63:17
65:8 66:3,6,18,18
69:3 70:1,10,12,16
71:7,8,12,16 97:4
110:11,14,22
121:16 123:11
124:10 127:1
128:18 144:22
145:2 148:20
151:3 170:12
171:7 173:14
176:7 178:12,15
191:3 199:16,19
206:20,22,25
219:13 226:20
241:5 243:22
244:14 249:13
251:16 254:4,7

258:25 259:1,5
265:5 267:18
269:19 278:21
281:7,11 284:5,9
297:14 309:20
314:17,18,21
318:17,20,23
319:2,5,11 325:9
**recorded** 18:4
226:1
**records** 187:23
**redirected** 42:7
**reduce** 195:8
**reduced** 321:13
**reduction** 253:24
**reed** 4:8 20:5
**reedsmith.com**
4:11
**reestablish** 316:14
**refer** 108:14 124:9
156:10,20 158:6
229:5
**reference** 323:7
324:2 325:2
**referenced** 60:10
321:12,17 324:11
325:15
**referencing**
127:24
**referrals** 188:2,13
**referred** 84:12
124:17 125:15
142:22 189:23
229:4,8
**referring** 84:16
85:25 86:3,7
108:15 124:11,24
125:1,6,18 297:10
297:14
**refers** 36:6 140:15

**reflect** 191:3 255:3
269:19
**refresh** 146:6
**regard** 30:14
**regarding** 29:1
36:14 57:12 73:24
94:17 97:13
105:24 112:25
117:1 125:16
127:20 129:18
133:13 151:23
153:16 154:22
167:1,14 168:15
175:13 177:13
187:16,23 193:18
194:22 197:9,14
198:2,4 200:9,18
203:5 205:13
237:2 240:12
320:3,11
**registered** 218:23
**registrar** 131:24
**regular** 120:8
133:22 258:23
287:25 290:25
**regularity** 230:18
**regularly** 114:17
163:12 171:22
172:3 214:20
230:15
**regulated** 212:25
**regulation** 216:24
218:9,10 284:20
**regulations** 213:5
213:10,18 214:4
214:25 215:7
217:10,13
**rehabilitation**
230:24 231:1
**reimbursed** 281:7

reiterate 283:23
reject 34:3
rejected 190:21
relate 22:17 23:15
 128:19 131:19
 138:13
related 8:17 21:20
 22:22 29:3 32:8,9
 42:2 52:14 60:10
 61:14 71:25 72:9
 72:15,18 73:20,25
 74:4 83:23 86:11
 86:16 87:4,8,17
 89:22 90:23 99:4
 99:11 104:20
 106:12,16 107:13
 107:13,14,23
 113:5 116:16
 119:11 121:3,22
 123:16,16 125:2
 127:4 128:20
 129:1,5,10,20,23
 130:8,21 131:5
 135:19 136:25
 137:9 149:15
 174:4 175:21,22
 180:8,9 181:3,10
 181:19 182:12
 183:3,20 203:25
 204:6,12 242:3,9
 257:3 288:16
 292:4,17,22 293:9
 295:18 304:25
relates 1:9 172:18
 200:3 241:19
relations 237:1
relative 322:2
relatively 317:11
release 84:19
relief 140:20,20
 164:16

rely 119:23
remain 274:5
remaining 95:16
remains 149:6
remember 39:23
 40:1,22 54:24
 61:4,7 116:21
 143:19 180:24
 249:10,15 282:18
 317:17
remind 57:11
 282:15
remotely 18:15
rems 200:6
renee 1:25 18:13
 321:6 322:12
reorganizing 33:6
repeat 51:18 120:2
 123:22 145:18
 148:23 153:6
 156:4 179:18
 197:23 219:10
 233:2 242:15
 244:11 274:21
 296:17
repeating 231:22
rephrase 23:5
 25:8,10 106:19
 143:21 212:2
 307:20
report 8:15,18
 10:4,6,8 82:21
 84:13,16,19,24
 85:1,1,4,17,24
 86:1,3,7 98:9
 114:3 116:1
 119:12,18 121:13
 122:4 123:8,19
 125:23 126:5
 127:3 128:14,15
 128:24,25 129:3

129:24 130:1
131:4 163:13,19
230:8,10,18
253:14,16,21
255:2 286:6,12,18
286:24 287:1,4
288:9,25 290:15
291:17 293:12,12
293:19 297:6,10
297:19,21 298:8
306:12 307:18
313:9,11,14
reported 118:13
 120:14,23 121:1
 167:23 253:20
 264:10
reporter 7:14
 18:13 20:21 21:7
 24:21 35:18 36:25
 38:25 267:19
 270:14 324:7
reporter's 7:12
 25:3 321:1
reporting 121:6
 127:25 170:18
 217:19 219:16
 220:6,9 238:11
 260:17 264:1
reports 79:15
 83:24,25 98:16
 109:17,25 114:14
 115:6,6,21,23,25
 116:2,11,19 117:4
 117:7,23 118:4,9
 118:13 119:19,19
 119:23 120:4,7,14
 120:17,18,23
 122:7,10,11
 128:11 142:17,21
 165:19 167:20
 170:25 171:3

174:3,8,23 175:2,5
201:18 202:15
203:11,20 205:4
206:4,6,8,11
285:13 287:9,11
287:22,25 290:2
290:24 297:23
298:13 313:8
314:4
represent 38:6
 45:24 224:25
 284:15
representative
 59:23 185:15
represented 23:21
 59:11 73:10 255:5
 295:20
representing
 62:19 239:16
represents 207:5
reputable 163:16
 174:24
request 66:2
 105:20 107:2
 325:9,11
requested 270:22
 320:2,7,11
requesting 105:25
requests 106:13
require 20:24
 265:8
required 28:16
 264:7 323:25
requirements
 188:14 217:19
 265:11
reread 216:21
rereview 63:9
research 194:8,19
 303:17

**reserve** 318:13
319:8
**reserving** 33:23
**residents** 221:6
276:10,13 278:7
278:25 279:9
**resolved** 24:10
**resort** 313:1
**resorted** 164:20
205:24
**resorting** 311:18
**resource** 279:25
**resourced** 247:3
**resources** 106:5
139:11,13,15,19
139:24 140:2
168:10 174:12
178:5 191:5,11,17
241:14 266:11
303:16,19 305:1
305:10,21 306:3,7
306:9 308:22
**respect** 32:9 42:3
45:10,17 109:11
185:22 190:24
198:14 219:6
227:17 242:18
250:1 265:12
269:25
**respectively**
223:23
**respond** 40:19
85:9 132:20 141:2
141:4 247:2
**responders** 90:8
**responding** 293:7
**response** 8:19 9:2
34:24 148:10
150:2 151:17,24
155:14 189:6,9,13
189:23

**responsibilities**
102:15,20 119:7
**responsibility**
133:17 141:24
233:13 234:2,17
235:13 283:12
**responsive** 215:1
215:13 234:23
235:25 237:5
267:15 268:13
**rest** 181:10
**restate** 100:3
172:11
**result** 101:16
115:8 168:13
174:2,19
**resulted** 172:21
**resume** 74:23 76:7
**resumes** 80:5
**retained** 7:14
**returned** 323:18
**reveal** 143:15
**revealing** 29:10
49:3 207:21
**revenue** 100:5,14
101:20,21 102:24
103:20 178:25
179:7,21 183:22
183:24 184:1
186:22
**review** 28:12 37:3
39:4 105:19 118:4
126:13 228:17
229:24 239:24
261:21 262:12
264:25 271:16
275:16 283:6
288:2,3,14 319:8
320:3,7 323:12
324:1 325:1

**reviewed** 80:5
107:8 169:12
193:20 196:13
258:8 283:4 288:8
290:1,4
**reviewing** 106:12
109:16,25 118:8
191:4 196:19
288:18 289:2
**rice** 3:7 19:1
**right** 28:8,14,25
31:2,22 39:10
41:25 51:9 62:6
63:25 66:6,7
67:15,21 68:19
70:15,21 80:18
93:19 98:18
101:11,25 102:13
102:22 107:7
108:6 115:16
121:10,21 122:6
122:15 130:25
131:3,6 140:9
141:13 142:2,6,10
142:18 144:21
146:15 153:8,11
154:3 159:21
165:17 166:8
167:13 175:11
184:3 186:19
190:5 215:20
221:4 229:16
236:9 240:15,25
249:19 254:1,11
254:16 266:13
281:20 285:24
287:14 288:10,17
289:17 291:20
292:6,19 293:4
294:24 297:8,19
297:25 298:1,9,16

298:22 300:8
304:19 306:20
308:15 309:18
311:7 313:10,15
313:18 316:4,8,20
317:2,6,8 318:19
319:8
**rigorous** 315:25
316:17
**rise** 203:21 214:3
219:2,2 250:8
**risk** 162:3 192:24
193:10 194:10,23
199:25 300:2
**risks** 277:22
**rite** 302:8 304:3,16
**road** 2:14
**robert** 6:8 19:16
**role** 74:13,16,25
75:5,6 77:6 78:9
78:13 79:1 86:9
98:7 99:3 109:10
112:14 134:17
209:8 210:5
219:25 220:9,14
220:22 260:10
262:3
**roles** 77:15 102:14
102:20
**romig** 52:22
**room** 3:4 18:14
25:1 26:16,18
27:7,9,16 34:9
62:22,25 67:7,23
68:10 166:19
175:25 270:6,11
**ropes** 6:13 20:17
**ropesgray.com**
6:15
**rosen** 259:25

rothenberg 259:25
roughly 103:5,11
  146:15,18 148:3
  180:25 181:2
rounds 260:15
  261:10,15
route 74:24
rpr 1:25
ruiz 6:4 7:10 20:6
  20:6 284:11,14
  285:23 286:1
  314:17,22 315:5
  316:4 318:8
rule 244:5
rules 21:10 24:15
  55:1 62:22 67:23
  67:25 68:3 320:4
  320:8 324:5 325:5
run 49:16 92:12
  134:24 185:19
rush 9:21 52:24
  255:13,23 256:1,2
  259:25 271:19
rx 6:3 20:8 260:17
  264:1 284:15

**s**

s 9:15 183:17,18
  239:2 259:8
  323:15 325:8,8
  326:3
safe 274:5,12
safety 87:14 89:5
  89:17,23 90:5,7
  115:5,7 158:10
  230:21 236:25
  279:18
sake 236:1
salaries 104:5
  181:18
sale 242:25 244:16

salimbern 4:8 7:9
  20:4,4 207:2,4
  214:24 215:6,10
  215:18 216:2,9,14
  219:11,14 227:9
  227:16,19 228:16
  232:22 234:22
  235:5 244:3,9,12
  244:20 246:5,10
  247:18 248:8
  251:10,13,19
  254:2,8 258:24
  259:6 267:14,21
  270:1 278:19
  283:20
samhsa 180:12,13
san 5:5
sat 23:7 51:10,20
  54:23
satiate 235:22
satisfy 97:1
save 278:7
saved 279:22
saw 81:18 144:11
saying 25:16 42:13
  70:14,21,22
  111:13 119:1
  124:21 155:7
  176:24 267:24
  309:7 316:13
says 38:6 41:10
  121:2,21 127:23
  146:13 147:19,23
  152:2 155:4,20
  156:17,21 159:23
  176:10 226:9
  227:12 228:21
  229:20,21 230:2
  231:1 239:13,14
  239:15 240:21
  246:11 250:13,16

257:2,24,25 260:5
  260:13 263:22
  264:18 265:20
  271:22,23 272:3
  272:24 292:1
  293:1,21 306:16
  315:25 317:10
scenes 34:9
schedule 86:24
  300:2,13,14
scheduled 30:11
  30:22 86:20,25
  146:12 299:20
schedules 285:2
school 56:11
  138:23
schools 138:23
  303:9
scope 82:1
screenings 138:3
script 222:14
seal 322:5 324:15
  325:21
search 80:16
  170:19
second 36:2 54:21
  147:21,22 150:25
  155:2,16 156:7
  176:8 196:21
  239:19 247:15
  258:25 263:20
  265:20 286:25
  287:5 295:14,16
  295:16
seconds 215:12
section 99:2,7
  241:11 306:16
sections 41:6
secure 264:11
see 30:5,9,10
  35:25 38:4 41:14

41:17 69:12 71:5
  117:4,19 119:20
  119:21 120:4,7,9
  150:23 152:3,6
  174:1 180:23
  189:8 194:4
  203:19 214:15
  224:15 225:6
  227:21 228:13,19
  229:23 231:7
  236:11 237:17
  248:23 249:2
  250:11,14,16
  252:20 255:23
  257:7 260:2,18
  265:23 266:3
  272:12 291:22
  293:25 317:8
seeing 78:8 88:14
  88:16 174:3
  202:23
seek 113:18
  132:18 268:11
seeking 76:8
  113:21 133:3
  140:6,20 144:1
  162:25 165:7
  179:15 235:22
seen 30:18 37:1
  39:1 52:23 84:7
  85:25 89:7 106:2
  106:6 117:8
  119:18 144:6,7,8
  144:14 146:6
  158:3 167:14
  189:8,19 201:9,10
  201:12 202:6
  203:11 204:23
  206:4,6 248:25
  290:11,12 291:4,7

**[seized - sorry]**                                                Page 50

seized  41:11 42:5
  237:15
selected  67:2
  252:20 254:15
selecting  170:17
self  170:17
selling  242:19
  243:16
sells  218:11
send  119:23 123:4
  199:2
sense  25:10 98:19
  165:7 198:19
  236:15,20 237:7
  314:14
sent  37:11 107:10
  161:13 230:5
sentence  150:23
  150:25 176:8,10
  231:2 240:21
  272:23 295:17
  307:18
separate  98:21
september  9:11
  228:2
sersis  80:18
serve  54:6,15
  181:24 184:10
  266:15
serves  266:1
service  6:7 19:17
  22:1,4 267:11
  316:14
services  6:3 20:8
  132:19 134:18
  137:16 138:9,13
  141:20 151:18,20
  158:10 178:24
  179:10,11,11
  181:3 184:4,5,9
  186:14 188:10,15

195:3 258:2
  284:15 299:24
serving  237:8
session  145:4
set  87:15 204:8
  210:7 225:18
  230:16,21 237:1
  238:6,9 242:1
  297:24 298:14
  322:4
sets  119:6
seven  104:17,18
  107:18 108:21
  284:1
severe  43:21 46:17
  47:3,12
sexually  221:11
shannon  172:5,8
  172:14
shape  132:8
  170:21 182:6
shapira  6:8 19:17
shapira.com  6:11
shared  48:7 214:8
sharon  183:10
sheena  52:22
sheer  115:7
sheet  323:13 325:7
  325:10,18 326:1
shipped  155:19
  157:2,8,12 159:25
  161:6
ships  211:15
shirley  27:2
shkolnik  2:13 19:6
  19:8
shopping  310:14
short  42:23 57:14
  199:13 259:3
  317:11,16

shortly  76:13
show  34:6 226:6
  314:23
showed  30:15
shown  323:16
shows  202:19
shrugs  24:19
side  41:5 231:11
  282:17 317:21
sided  227:8,11,11
sidedness  227:18
sign  319:8
signature  320:6
  322:11 323:14
signed  241:7,9
  324:13 325:18
significant  40:10
  40:18 145:25
  162:6 173:22
  201:25 202:1
  240:7 311:22
signing  238:20,22
  323:19
similar  300:13
simple  66:1
  251:17,22
simply  124:22
  165:9 232:25
sims  2:5 21:5,5
sincere  239:14
sincerely  239:15
  323:21
single  105:16
  165:13 166:22
  227:11 302:11
sir  68:22 69:7
  251:19 323:10
sit  65:11 94:17
  116:14 211:3
  245:3 249:18
  262:8

sitting  26:13 27:13
  64:21
situation  80:17
  97:24 133:5,12
  317:14
six  26:20 313:21
skip  178:17
slow  279:6,7
slower  274:9
smith  4:8 20:5
sold  155:17 156:8
  157:1,5 243:7
  264:9
solid  250:10,13,24
  251:4 252:5,10,16
solutions  4:3
  19:25 292:2,16
  293:2 323:1 326:1
solve  292:22
somebody  32:20
  77:25 78:4,7
  89:13,22 95:24
  132:21 135:9
  166:23 171:17
  226:1 232:13
  265:15
somewhat  101:10
  208:17
soon  207:7 225:10
soricelli  6:13
  20:16,16
sorry  30:8,9 41:16
  50:18 51:17 60:22
  99:24 112:7 120:2
  122:8 134:3
  145:17 156:4
  172:11 179:17
  184:25 186:7
  191:25 194:17
  200:12 209:7
  212:2 219:12

222:21 245:15
247:19 248:11
253:4 258:3
259:14 269:18
274:8,9,21 275:4
277:5 278:18
279:6 282:21
293:12 302:14
307:6,20 315:5
**sort** 40:3 73:24
173:24 175:9
243:20 244:15
**sorts** 59:24
**sosiak** 79:8 80:21
80:23 95:12 99:13
114:10,20 115:13
115:23 119:3
120:10 122:1
128:4,10
**sought** 205:23
**sounds** 317:1
**source** 179:6
205:13 206:17
219:18 253:19,21
253:22 254:25
**sources** 113:3
118:3,19 127:14
127:16 142:21
154:22,23,23
166:5 168:7
181:14 202:13
205:25
**south** 3:8
**sowell** 183:16
**spaeder** 6:3 20:7
**speak** 57:7,13
61:22 62:1,6,8,17
63:25 64:2,5,6
65:6,15,23 67:2,11
68:8 70:25 86:11
92:6 158:13 201:7

220:17 247:18
290:18 291:5
298:4 299:15
**speaking** 64:7,8,9
65:5,17,18,20,20
66:6 68:21,25
69:21 92:19
158:16,18 247:17
279:4
**speaks** 57:8 58:14
61:23 62:5 86:24
125:25 127:22
128:22 129:7
131:8 227:4,8
238:3,10,13
241:23 243:24
250:21 253:2,12
254:23
**special** 58:2 63:19
66:23 70:16 77:20
80:9
**specialists** 111:9
**specific** 40:13
46:11 50:22 57:21
61:12 72:13 78:6
80:17 81:4,7
84:15 89:20
104:14 121:23
130:16 136:3
150:12 165:14
166:16 172:18
178:19 187:20
188:4 198:23
201:3 203:10
247:7 255:2
267:17 280:12,18
301:4 308:9
**specifically** 28:3
29:3 47:8 50:16
51:3 60:2 72:3,7
72:11 73:21 75:14

76:6 78:21 79:22
84:5 85:3 86:2
88:24 90:18,25
92:9 95:3 102:3
104:22,23 107:2
107:17,25 112:11
112:23 113:20
116:22 119:22
130:2 132:4
133:15 138:14
158:11 159:10
164:3 166:23
167:12 175:13
176:1 177:25
195:10,11,15,23
197:5 198:9 201:7
208:1,8 209:10
210:9 214:1
217:11 233:11
238:6,16 265:19
272:22 282:13
299:15 302:21
304:12 305:16
309:12 313:6
**specificity** 49:9
57:17 59:2,15,17
60:11,18 63:12
66:15 131:2
136:23 159:2
197:7 198:16
209:23 219:17
274:3
**specifics** 154:16
209:8
**specified** 321:20
**spectrum** 265:14
**speculation** 41:22
42:11 43:19 47:6
49:7 51:15 53:13
56:1 75:3,10
78:15,24 95:19

96:16 100:10
118:1 130:10,23
143:9 152:20
153:5 154:15,20
157:4 160:10,23
161:9 192:11
193:3,14 196:5
221:20 231:13
232:2,11,21
233:15 234:5
235:15 237:11
245:11 250:5
253:3,18 257:12
257:20 264:17
265:5 266:18
267:4 268:4
269:13 272:20
274:2 276:8
278:16 280:15
281:10 282:1,9
283:2 290:17,23
291:9 292:11,25
293:5 294:4,14
296:2,10,16 299:2
307:15 308:16
311:1,13 312:2,17
314:7
**speed** 106:22
107:9
**spell** 75:18
**spelling** 190:1
**spent** 28:9 51:7
181:18
**spike** 114:14
**spoke** 271:24
**spoken** 123:8
174:14
**spots** 186:24
**spread** 279:16
**square** 1:21 2:19
4:9

**[ss - submitted]**

| | | | |
|---|---|---|---|
| **ss** 321:3 | **standard** 258:15 | **statement** 51:22 | **strap** 207:7 |
| **stack** 146:3 | **standards** 316:1 | 151:7 152:8,10 | **strapped** 178:4 |
| **staff** 92:15,24 93:6 | 316:17 | 156:8,10,20 163:6 | 279:25 305:21 |
| 93:9,17 101:20 | **standing** 114:24 | 211:4 246:8 | **strategy** 200:1 |
| 102:7 104:3 105:2 | 185:9 | 272:24 274:15 | **street** 4:9 5:4,8,18 |
| 106:3,7,9 108:10 | **stands** 44:8 91:3 | 275:20 278:23 | 6:4,9 73:15 |
| 118:16,20 132:11 | 285:13 | 324:13,14 325:19 | 242:11,19 |
| 132:15 133:3,13 | **stankewicz** 5:8 | 325:19 | **streets** 243:8 |
| 133:15,20,22,24 | 19:18,18 | **statements** 197:14 | **stretched** 191:18 |
| 137:14 139:3,4,19 | **start** 29:14 63:6 | 198:2 211:9 | **strict** 57:12 |
| 150:18 159:6 | 74:7 99:21 108:19 | **states** 1:1 151:4 | **strictly** 127:20 |
| 181:5,5,10,23 | 126:24 167:2 | 157:2,17 160:6,14 | 252:1 |
| 186:21 187:8 | 168:14 173:9 | 161:7 175:9 | **strike** 59:3 71:23 |
| 190:12 256:23 | 207:6 223:19 | 195:14,22 294:9 | 74:6 82:11 106:10 |
| 267:10 306:6 | **started** 68:12 | 317:17 | 107:21 108:18 |
| 308:6,6 | 146:16 148:3 | **statewide** 117:15 | 126:2 134:13 |
| **staffers** 104:7 | 164:15 174:10 | **stating** 57:16 | 177:13 193:21 |
| 105:25 107:12,19 | 195:24 204:14 | 231:20 232:25 | 214:25 218:16 |
| **staffing** 103:25 | 225:10 316:7 | **statistics** 82:1 99:5 | 222:9,9 234:22 |
| 105:20 106:5,13 | **starting** 60:5 | 117:13 131:25 | 235:9,25 237:4 |
| 107:3 303:16 | 100:5 173:21 | **stenotypy** 321:13 | 238:8 247:8 |
| 305:11 | 174:1 247:24 | **step** 98:18 | 267:14 268:13 |
| **stakeholders** | **starts** 150:24 | **steps** 8:13 38:19 | **string** 9:13 10:2,10 |
| 261:16 | **state** 8:13 18:15 | **stettinius** 1:20 | 229:12 271:9 |
| **stamp** 8:9,13,20 | 21:17 38:19 45:8 | 18:9 | 295:6 |
| 8:23 9:3,7,9,12,14 | 63:11 65:7 66:15 | **stimulants** 125:6 | **strive** 266:10 |
| 9:17,21 10:3,5,7,9 | 114:16 117:11,16 | **stis** 132:2 268:14 | **struggled** 316:19 |
| 10:10 35:12 38:20 | 167:21 179:23 | **stop** 62:9 63:19,23 | **studies** 49:23 |
| 148:13 157:24 | 192:15 201:12,21 | 64:7,9 65:10 68:7 | **studying** 173:21 |
| 189:14 224:9,21 | 202:3,21 213:4,9 | 70:15 231:25 | 313:23 |
| 228:3 229:12 | 250:1 252:12 | 235:4 268:11 | **styer** 260:1 |
| 239:5 255:14 | 263:24 297:7,18 | **stopped** 64:8 | **subcategories** |
| 271:9 286:6,12,18 | 307:3,21 309:13 | **stopping** 279:16 | 240:19 |
| 295:6 | 321:2,7 322:13 | **stored** 182:22 | **subdepartments** |
| **stamped** 8:11 9:5 | 324:10 325:15 | **stores** 305:9 | 98:22 |
| 9:24 36:21 224:2 | **stated** 18:24 | **stories** 61:4,11 | **subgroup** 69:13 |
| 259:19 | 158:20 231:14,16 | 311:6,9,16 | **subject** 85:4 |
| **stamps** 314:25 | 257:10,17 267:25 | **story** 48:6,7 | 224:15 228:9 |
| **stand** 307:7 | 268:5,8,24 269:1 | **straight** 152:6 | **submit** 264:8 |
| | 296:23 297:1 | 153:10 257:5 | **submitted** 31:23 |
| | 316:21 319:4 | | 74:22 76:7 240:10 |

[submitted - talk]                                                                         Page 53

271:5
**subpoenas**  22:4
**subscribed**  324:10
325:14 326:21
**substance**  49:12
49:24 71:18,19,25
72:6,9,14,17
123:20 124:1
131:23 133:18
138:18 160:5
161:12,13,16
165:23 170:5,23
180:12 187:23
188:16 190:16
232:14 235:8,9
260:7 276:5
296:25
**substances**  49:3,4
145:9,19 148:21
148:24 162:2,4
163:3 164:14
188:10,19 198:22
264:4,8 284:20,22
**substantive**  29:10
30:3
**sued**  43:14 47:19
143:24 207:9,9
241:21 242:4
243:19 278:6
**suffer**  49:13
221:18 276:14
278:13 280:6
**suffered**  43:21
46:17 47:3,12
49:1,5 245:25
246:13
**suffering**  72:23
73:3 91:18 212:15
277:9,17
**suggest**  292:8
294:2,6

**suggesting**  153:15
153:20 182:11
**suggests**  255:5
293:3
**suing**  140:1
141:23
**suit**  140:6
**suite**  1:21 2:6,15
2:19 3:13 4:9,14
5:9,13 6:5 323:2
**summer**  87:13
**summit**  3:6 19:1
27:17
**superior**  323:1
**supervise**  118:24
**supervises**  119:4
**supervisor**  98:10
128:14
**supply**  5:11 19:13
208:23 209:2,4
**support**  42:19
80:15 237:15
272:7,11,18
**supporting**  42:18
181:23
**suppose**  147:14
307:17 308:5,10
**sure**  32:2 37:9
39:25 41:9 42:25
47:16 51:19 54:24
72:21 73:6 76:10
77:12,17,22,23
85:13 90:2 91:2
94:13 100:4
106:20 108:10
110:2 113:2,6
114:8 116:17
118:11 120:3
121:18,24 124:6
131:21 132:19
134:7 139:12,22

147:6 156:6 159:1
168:22 172:12
174:22 177:21
178:5,6 181:5
187:3 188:14
189:10 192:2,13
192:23 195:19
196:22 197:24
199:14 200:17
209:14 210:3
212:3 213:8 223:4
228:16 229:19
230:14 236:6,17
240:9 242:16
243:13 249:24
252:1 253:5
258:21 260:23
261:6,8 274:23
277:19 278:3
281:13 289:11
305:22 307:1,23
308:23 309:10
**surely**  222:4
**surgeon**  175:23
176:16,17 177:8
260:21 261:17
**surmise**  103:12,13
**surprised**  314:3,9
**surveillance**
117:14
**susman**  2:13 19:7
19:7
**suspect**  296:5
**suspend**  93:16
**suspicious**  220:5,8
238:11 314:5
**swear**  20:21 21:8
**swearing**  317:1
**sworn**  21:11
321:10 324:10,13
325:14,18 326:21

**synthetic**  152:12
152:23 159:23
204:15
**system**  165:20
260:18 264:2
266:2,16 268:2
285:14

**t**

**table**  64:21 82:7
**tables**  139:3
**tad**  8:5 34:17
**taft**  1:20 18:9
27:14
**take**  18:18 21:19
24:21 25:25 37:3
39:3 42:23 53:21
63:18,22,22 68:19
70:15 74:12,12
96:6 98:18 110:7
114:5 123:1
134:17,21 144:19
162:4 178:8
185:12 199:13
226:19 228:17
229:24 239:24
270:14 274:18,25
275:8 314:11
**taken**  1:19 22:12
48:7 50:20,22
144:25 147:7,16
163:25 168:12
232:6 243:7
321:19
**takes**  41:23 130:14
**talk**  25:2 33:16
47:10 63:24 65:11
111:24 115:1
122:1 123:5,13
132:17 133:4,23
158:11 159:2
164:3 170:25

171:22 269:19
303:2 318:21
**talked** 97:6 104:4
122:12 137:25
141:17,23 144:17
159:6 160:17
162:18 172:17
174:17 175:25
178:19,25 195:2,6
243:3 284:18
303:7
**talking** 31:13,14
31:22 40:20 43:8
55:2 59:3 60:6
63:23 86:5 97:20
101:22 106:21,24
107:1 110:22
115:9,20,24 116:2
124:4 125:20
127:12 132:5,12
136:9 140:24
141:6 145:8
155:23 157:10
161:23 178:23
190:2 199:22
214:16 215:10
270:15 303:11
317:22
**talks** 129:14
**target** 303:18
**targeting** 168:9
**targets** 179:13,19
**tariq** 3:12 20:11
65:9,18
**tariq.naeem** 3:15
**task** 8:15,15 10:4
10:6,8,12 85:11,16
85:17 109:20
111:13,15,19,23
112:1,6,8,9,12,15
112:17,19 113:1

146:9 163:17
165:25 166:1
167:23 177:6
184:22 185:5,14
186:6,10 286:5,11
286:17,24 287:13
287:16,20 288:25
290:2 291:13
292:2,18,18,19
294:23 295:3,19
295:25 297:2,23
297:24 298:13,14
298:20 306:12,19
306:25 313:7,14
313:23 315:3,11
**tasked** 109:15
**tax** 101:17
**tb** 138:7,8
**tdayno** 4:16
**team** 69:16 238:21
238:23 240:10
256:5,9,12,19,24
258:17
**teaming** 69:19
**technical** 310:15
**telephone** 2:5 4:12
4:17 6:12 20:25
306:2
**telephonically**
21:3
**tell** 34:14 35:19
77:9 129:18 131:4
166:18 169:17
170:7 180:17
216:1 258:11
303:6 307:14
**telling** 42:4 66:20
70:18 137:18
207:23
**tells** 128:25 129:4
129:9 243:15

**temporary** 276:14
**ten** 175:9
**tenure** 59:5,21
60:14 71:16 73:8
73:17 87:12
317:16
**tenures** 317:11
**term** 54:21 140:19
173:15,17 285:7
287:20 299:12
310:16
**terminal** 212:16
**terminate** 65:4
**terminated** 53:18
96:12 97:7,13
**terms** 89:1 109:22
179:14 219:16
223:2,2,14 236:20
243:3 299:14
303:8 309:6
**tested** 205:7
**testified** 22:23
128:9 221:3
226:13 230:10
249:6 262:23
263:8
**testify** 24:11 44:16
260:24 321:10
**testimony** 22:12
34:7 47:15 61:16
163:10 164:5
169:7 182:15
186:2 205:19
243:2 249:11,15
252:3 256:16
263:11 321:12,16
324:6,7 325:6,9,12
**testing** 137:20,22
137:23 138:2,7,8
**tests** 184:4

**teva** 4:12 20:19
**thank** 22:11 70:12
108:20 219:14
267:22 269:4
283:20 287:7
316:5
**theft** 311:10
**theodore** 4:13
20:18
**thing** 25:20 190:3
223:7,12,14 261:5
266:14 305:16
**things** 51:9 55:9
59:24 103:18
109:22 111:2,20
115:25 133:20
142:16 178:18
193:18 203:22
214:20 221:6
222:25 319:5
**think** 25:8 46:11
51:22 67:10 69:8
69:9 71:15 72:19
82:8 85:10,23
141:2,5 153:10
214:12 221:3,16
222:6 228:8
234:16 254:10
256:9 267:21
268:21 269:11
280:9 283:21,25
285:23 288:5
289:5 290:19
307:13 309:1,4,7
310:23 311:4,16
311:24 314:14
315:4 317:3
318:20
**third** 46:2 150:25
179:2 271:22
287:2 315:23

317:9
**thirty** 323:18
**thomas** 2:5 21:5
  172:2
**thompson** 77:13
  77:19 80:9
**thought** 89:12
  110:16 226:13
  236:15,19 237:7
  240:9 270:23
  293:3
**three** 4:9 52:18,21
  98:25 99:10
  108:16 109:7
  159:13 286:22
  287:8 315:17
**threefold** 173:25
**thumb** 244:5
**tie** 71:14
**time** 18:2 22:16
  23:6 25:19 26:1,2
  28:1,8,11 31:17
  32:18 33:23 37:3
  39:3 43:2,5 51:7
  54:7 56:6 58:18
  58:20 59:17 61:23
  62:5 64:11 65:16
  65:25 67:12 69:15
  71:9,12 73:22
  75:1 76:17 77:15
  82:20 90:20 93:11
  93:15 94:6,14,19
  106:11 109:4
  110:14,21 117:19
  120:16 122:15,19
  133:7 144:23
  145:2 156:15
  163:21 165:20
  176:16 178:12
  185:21 187:6
  191:13 196:7

199:16 200:15
203:7,10,20 204:7
204:22 205:5
206:19,22,25
215:1 220:1
228:17 229:24
236:1 239:24
252:6 254:4,7
255:1 261:19
262:3 270:15
275:4 277:8
282:24 283:25
284:6,9 288:3
289:15 290:14,20
291:12 298:2
305:15,17 316:7
319:2,11 321:19
**times** 22:15 27:23
  27:25 28:6 61:8
  73:14 86:17
  122:18 154:2
  162:5 185:11
  204:6 214:8
  218:23
**title** 74:8 77:22
  84:23,25 85:13
  127:3 149:25
  196:25 315:1
**titled** 155:13
**today** 26:6 27:8,9
  33:13 34:6 116:14
  124:14 140:25
  150:13,24 151:4
  154:2 164:5
  166:19 169:10
  181:16,20 182:1
  211:3 214:8 221:4
  226:3 245:3,21
  262:8,18,25
  279:22 283:24
  284:1 309:16

317:4 318:9
**toinette** 75:17
**told** 48:6 51:23
  100:13,20 135:11
  135:20 142:18
  154:24 175:13
  196:12
**tom** 172:1
**tomasello** 27:3
**tone** 68:9,12 270:2
  270:3
**tool** 265:21 266:2
**top** 39:10,18 74:7
  80:13 81:19
  102:22 121:7
  175:9 220:17
  225:6 226:8
  228:22 229:2,6,22
  230:2 236:3
  248:23 252:4,22
  289:23 293:21,23
  294:7,12 306:22
  313:18 315:24,25
**topic** 23:14 86:25
  88:22 261:11
**topical** 199:12
**topics** 51:11
**total** 28:6
**totality** 223:3
  252:11
**touch** 99:11
  131:19 132:7,9,23
  141:19
**touches** 108:7
**touching** 132:4
**tour** 185:18
**town** 261:3
**toxicology** 165:19
  174:3 204:9 205:3
**trace** 300:22 301:1
  317:24

**track** 118:16
  165:3,22 174:1
  177:12,19,24
  178:1 206:10,12
**tracked** 168:20
**tracking** 56:4
  116:13 178:7
**tracks** 177:23
**tracy** 77:12,19
  80:8
**trafficking** 41:11
  155:3,17
**train** 51:12 132:11
  133:12
**trained** 93:10,14
  93:17 95:21,24
  97:22 98:4 133:8
  139:8 181:7
**training** 50:4,5,6
  50:24 133:14,19
  133:25 135:19,22
  136:10,11,13,16
  136:25 137:8
  317:12
**trains** 134:5
  135:10
**transaction** 281:8
  281:12
**transcribed**
  321:14 324:7
**transcript** 7:1
  24:20 246:8 319:9
  320:3,7,10,12
  323:11,12 324:5
  324:12 325:5,11
  325:17
**transcription**
  321:16
**transition** 238:21
  238:23 240:10
  299:7

transmit  122:22
transmitted
  221:11
transportation
  54:25
traub  5:12
treat  184:13,19
  221:17
treated  276:20
  277:1,10
treatment  41:13
  42:9 55:11 74:4
  82:2 99:5 133:10
  138:14,18,22
  139:16 151:18
  165:7 180:9
  191:21 192:4
  195:3 237:16
  303:10
trend  203:13
  252:5
trends  56:23 57:4
  109:16 111:3,4,7
  113:4 114:1
  117:13 168:2
  204:5
trial  22:13 23:23
  24:11
trick  251:7
tried  318:6
trouble  267:20
  268:16
true  115:19 128:3
  221:7,9 223:7
  228:20 230:5
  231:18 236:4
  237:9 239:20,21
  240:23 243:12,16
  243:18 250:19
  253:10,22 256:5
  261:1 262:25

263:17 264:15,24
  266:5,16 267:2
  268:10,23 270:22
  280:24 281:14,20
  321:15
trust  118:20
truth  321:10,10,11
try  25:1 43:11
  55:11,13 57:20
  84:20 163:3
  165:21 168:7
  169:1 178:18
  185:18 202:14
  204:4 223:3
  268:12 276:4
  305:19 311:20
trying  68:7 96:25
  124:22 126:21
  127:17 135:1
  139:17 163:21,24
  164:20 165:3,4,7
  165:15 166:6
  168:1,25 170:20
  170:23 191:19
  202:16 216:5,7,12
  237:8 251:7
  268:18 279:5,25
  292:15 301:6
  306:4,6,9
tsims  2:8
tucker  3:11 20:10
  20:11
tucker.com  3:15
tuckerellis.com
  3:15
turn  62:6 291:17
  293:11 315:21,22
turned  88:16
  146:24 162:1
  163:2

two  26:25 35:6
  37:8 39:8 51:6
  69:12 76:15 80:11
  80:13 86:18 99:16
  99:24 109:3
  135:11 176:13
  187:3,14 248:9
  258:13 308:24
  315:17 317:10
type  61:20 81:25
  88:3 120:13 123:7
  189:1 191:7,11
  233:17
typed  88:7,13
types  122:7 140:12
  192:14 204:2

**u**

u.s  156:9
u.s.  18:6 38:7
  146:8 155:19
  157:9,12 163:11
  165:24 167:25
  175:3,4,23 177:5
  193:7 203:23
  299:23
uh  24:23
ultimately  78:12
um  55:4 99:8
  126:19 185:2
  289:1 293:16
  313:20
unable  93:13
  252:5 272:11
undergraduate
  49:17 50:10,12
  53:23
underlined  231:1
underlying  51:12
underneath  150:3
  150:5 155:16

understand  25:7
  25:16,17 32:22
  52:4 57:2 72:18
  91:16 124:22
  126:21 127:15
  133:9 134:18
  154:3 163:22
  176:22,25 182:10
  190:1 204:4
  214:21 246:6
  263:14 267:23
  269:15 279:5
  301:15 302:14
  304:15
understanding
  33:22 111:23
  112:13,16 132:17
  152:15,21 153:1
  154:9 157:7,13
  188:12 192:12
  198:10,18,24,25
  203:15 205:13
  217:1,19,22,23
  218:1,5 241:10
  259:13 267:20
  268:16 283:3
  317:13
understood  25:12
  76:14 77:24 96:23
undertaken
  105:11
unfortunately
  185:8 204:17
  313:2
unh  24:23,23
unintentional
  252:19 254:14,18
  257:4
unit  18:3
united  1:1 157:2
  157:17 160:6,14

161:7 195:14,22
**unofficial** 185:22
**updates** 86:20
**use** 33:12 42:8
  117:22 152:1
  156:15 164:6
  174:16 196:1,6
  211:1 235:7,10
  242:10 269:5
  273:20 275:24
  282:6 301:9,17
  305:22
**useful** 269:12
  270:24 309:2
**user** 211:19
**users** 170:8 275:14
  276:4
**uses** 103:19
  118:16 179:7
  267:25
**utilize** 262:7
**utilizing** 262:2

**v**

**v** 1:10 323:6
**vacant** 74:21
  75:22 317:6
**vacated** 78:3
**vaccinations**
  135:25
**vaccine** 132:22
  133:3 136:21
**vaccines** 132:9
  133:16 134:1,6,9
  135:4,10,14
  136:13,18 137:8
  137:15 221:14
**vague** 23:17 25:15
  28:18 36:11 40:5
  46:20 47:24 48:13
  51:14 52:3 55:7
  55:25 56:20 57:8

58:13 60:16 72:2
  88:20 97:17 103:1
  103:23 117:6
  126:15 134:12
  184:7 187:18
  203:8 220:25
  223:9,17 261:13
  262:14 263:18
  277:2 279:2,11
  280:7 296:15
  304:21
**valid** 242:21
  273:24
**variety** 73:12
  116:7 117:11
  118:3 166:5
  167:20
**various** 8:10 36:19
  51:11 56:13
  116:12 195:4
  227:3
**vehicle** 113:15
**ventura** 2:6
**verbalize** 24:19
**verbatim** 217:10
  264:19,21 266:25
  268:5
**veritext** 18:12,13
  323:1,7 326:1
**veritext.com**
  323:17
**version** 123:1
  287:1,4 316:2
**versus** 131:5
**vice** 9:15 239:3,12
  240:12
**victims** 172:8
**video** 18:4
**videographer** 6:17
  18:1,12 20:13,20
  21:7 43:1,4 71:8

71:11 110:10,13
  144:22 145:1
  178:11,14 199:15
  199:18 206:21,24
  254:3,6 259:1,4
  284:5,8 314:18,20
  318:23 319:1,10
**videotaped** 1:15
**virginia** 5:9
**visited** 91:10
**visits** 8:18 119:12
  121:3,22 127:4,20
  127:25 128:20
  129:1,4,19,24
  130:8,15
**vital** 131:24
**vocal** 40:17
**volume** 115:7
  218:1
**voluntarily** 53:18
  76:5 96:12

**w**

**w** 183:17,18
**wait** 222:17,17,17
**waived** 323:19
**wal** 19:15 301:25
  304:7
**walgreens** 302:4
  304:5,17
**walker** 77:12,18
  98:11 122:7,9
  123:9 125:18
  126:5 128:15
**walks** 184:10
**walmart** 3:16
**want** 33:11,14,16
  34:14 43:10 45:14
  46:10,11 53:25
  62:1 64:6 65:11
  66:4 67:4,9 70:9
  70:11,14,17 71:14

77:23 89:20
  111:22,25 144:19
  156:25 199:13
  215:16,17,24
  231:5,10,17,25
  232:17 233:4
  251:11,13,15
  270:9 272:7
  283:22 303:2,11
  309:15 313:5,9
  314:23 317:21,21
  318:21
**wanted** 105:10
  121:25 145:8
  165:10 171:17
  237:7 256:4
  272:16 284:20
**wanting** 258:21
**wants** 215:21
  234:21
**ward** 54:8 58:21
  59:3,5,21 71:17
  72:23
**warning** 266:2,15
  268:1
**warnings** 209:25
**washington** 4:5
  5:18 6:5 62:3
**waste** 215:1
**way** 64:17 65:12
  66:22 70:20 132:8
  140:1 164:12,15
  170:21 182:6,9
  188:18 210:4,10
  210:15,20,24
  213:14,15,17
  238:10 241:15
  247:2 249:3 253:5
  257:17,21 261:10
  262:10,23,24
  269:19 273:9,22

275:12 276:24
277:7 317:9
**ways**  40:9 85:8
116:8 121:4,5
139:21 163:1
288:22 306:6
**wc.com**  5:19
**we've**  58:16
102:11 106:21,24
118:21 132:4,13
133:12,19 144:2
146:4,19 148:17
151:16 155:23
172:17 178:19
187:9 195:6
203:19 232:3
242:24 243:3
275:17 303:7
311:8 313:8
**website**  264:20,22
266:22 268:1
**week**  28:4,6 73:14
130:20,20
**weekend**  33:5 35:1
35:22 37:7 39:7
43:9 88:16 146:24
**weekly**  8:17 56:3
56:22 86:13,21
114:25 119:11
**weinograd**  4:4
19:23,23
**wen**  9:15 239:2
**wendy**  52:21
**went**  21:23 43:7
61:10 71:15 73:13
76:9 104:2 106:8
110:21 175:22
281:5
**west**  5:9
**whacked**  38:9

**wheeling**  5:9
**whereof**  322:4
**white**  163:17
248:10
**wholesalers**  264:7
**widely**  294:18,19
**wildlife**  208:13
**williams**  5:12,17
19:12 20:2 62:2
**windows**  314:15
**wish**  303:15
**withdrawal**
184:14,19
**withers**  77:13,21
**witness**  2:3 18:20
20:21 21:8 22:5
25:24 31:8 33:25
34:4 43:25 44:10
44:15,20 57:7
63:15,17 64:11,13
64:15 66:19 69:14
69:19 92:21 110:7
178:8 191:4
207:17 270:13
319:7 320:3 321:9
321:13,14,17
322:4 323:8,11
324:1,4,11 325:1,4
325:15
**witness'**  323:14
**woman**  27:13
**women**  139:6
**word**  125:15
178:24 267:22
**words**  127:24
268:6
**work**  22:8,18,19
30:14 31:24 52:4
52:13 79:11,13
80:1 83:10 89:16
92:16 93:4 99:19

103:8 106:21
109:23 138:23
139:5,11 149:15
163:14 165:21
179:13 181:7
191:12 240:1,8
268:12 279:17,20
282:17 283:13
306:10
**worked**  89:18
280:23 282:18
289:19
**workers**  139:8
**working**  108:1,7
115:10 139:8,10
211:5 289:16
293:9 308:7
**works**  128:7
298:18
**worse**  305:23
**wrap**  168:7
**write**  39:17 176:24
192:16 241:6
272:6,10,18
294:17
**writer**  190:16
**writes**  212:5
295:17
**writing**  273:6
281:22 294:10
**written**  82:19 84:8
87:7 88:17 136:1
136:4,18 160:2
174:22,24 210:21
233:3 292:15
**wrong**  66:25 90:25
122:8 146:20
**wrote**  156:13
176:13 177:4
273:3,12 296:8

### y

**y**  250:12
**yeah**  33:17 44:11
52:7 64:24 112:4
112:6 133:12
142:19 147:15
187:19 278:2
293:8 299:5 311:8
316:9 317:7
**year**  51:5 75:24
83:18 100:15,16
100:23 101:4,8,12
103:6,10 122:18
180:5,20 181:2
190:9 200:20
202:21 206:2
231:6 233:5
247:24 250:11
252:20 253:9
254:15 257:6
317:6,7
**years**  51:7 54:4
84:6 86:18 106:3
133:24 168:20
176:13 193:1,12
203:14 204:24
258:13 275:18
282:14 313:21
**yeses**  24:22
**yesterday**  32:25
32:25 33:22
271:14 318:12
**york**  2:15 6:14,14
**younger**  147:20
**youth**  138:24

### z

**zac.ciullo**  4:20
**zachary**  4:18
20:14

**zarsaur**  2:9
**zarzaur**  18:23
**zarzaur.com**  2:11
**zimmermann**  2:9
  18:22,23
**zip**  56:4,4,22,25
  121:4 130:19
**zuckerman**  6:3
  20:7
**zuckerman.com**
  6:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.