1              UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

2                   EASTERN DIVISION

3                      - - -

4    IN RE:  NATIONAL        )

     PRESCRIPTION OPIATE     )  MDL No. 2804

5    LITIGATION              )

     _____)  Case No. 1:17-MD-2804

6                            )

     THIS DOCUMENT RELATES   )

7    TO ALL CASES            )  Hon. Dan A. Polster

8

9

10                     - - -

11             Thursday, June 6, 2019

12           - HIGHLY CONFIDENTIAL -

13      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14                     - - -

15

16        Videotaped deposition of Henry Grabowski,

17   Ph.D., held at Alston & Bird, 555 Fayetteville

18   Street, Raleigh, North Carolina, 27601, commencing at

19   9:34 a.m., on the above date, before Karen Kidwell,

20   Registered Merit Reporter, Certified Realtime

21   Reporter.

22                     - - -

23

24           GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

25                deps@golkow.com

```
 1                  A P P E A R A N C E S:
 2
 3     On behalf of the Plaintiffs:
 4          ROBINS KAPLAN LLP
            BY:   TARA D. SUTTON, ESQUIRE
 5                tsutton@robinskaplan.com
                  GARY L. WILSON, ESQUIRE
 6                gwilson@robinskaplan.com
            800 LaSalle Avenue
 7          Suite 2800
            Minneapolis, MN  55402
 8          612.349.8500
 9
10     On behalf of Endo Pharmaceuticals, Inc., and
       Endo Health Solutions Inc. and Par:
11
            ARNOLD & PORTER KAYE SCHOLER LLP
12          BY:   SEAN MORRIS, ESQUIRE
                  sean.morris@arnoldporter.com
13          777 South Figuero Street
            44th Floor
14          Los Angeles, CA  90017
            213.243.4222
15
16
17     On behalf of Johnson & Johnson and
         Janssen Pharmaceuticals:
18
            O'MELVENY & MYERS LLP
19          BY:   ANNE T. MARCHITELLO, ESQUIRE
                  amarchitello@omm.com
20               (Via Videoconference)
            1625 Eye Street NW
21          Washington, DC  20006
            202.383.5329
22
23
24
25
```

```
 1    APPEARANCES CONTINUED:
 2    On behalf of the Cardinal Health, Inc.:
 3          WILLIAMS & CONNOLLY LLP
              BY:  MICHAEL R. FISHMAN, ESQUIRE
 4                mfishman@wc.com
                  (Via Videoconference)
 5          725 Twelfth Street, NW
            Washington, DC  20005
 6          202.434.5702
 7
 8    On behalf of Purdue Pharma:
 9          DECHERT LLP
              BY:  WILL SACHSE, ESQUIRE
10                will.sachse@dechert.com
                  (Via Videoconference)
11          2929 Arch Street
            Philadelphia, PA  19104
12          215.994.2496
13
14    On behalf of Walgreens:
15          BARTLIT BECK LLP
              BY:  KASPAR STOFFELMAYR, ESQUIRE
16                kaspar.stoffelmayr@bartlit-beck.com
                  (Via Videoconference)
17          54 West Hubbard Street
            Suite 300
18          Chicago, IL  60654
            312.494.4434
19
20
21    ALSO PRESENT:   Trae Howerton, Videographer
22
23
24
25
```

```
 1                    I N D E X

 2   WITNESS/EXAMINATION                        Page

 3   HENRY GRABOWSKI, Ph.D.

 4     By Ms. Sutton                             6

 5

 6

 7                 E X H I B I T S

 8     Number          Description          Page

 9   Exhibit 1   Plaintiffs' Notice of oral .........7

                 Videotaped Expert Deposition

10               of Henry Grabowski

11   Exhibit 2   Expert Report of Henry ............7

                 Grabowski, Ph.D., May 10,

12               2019, Confidential

13   Exhibit 3   Supplemental Expert Report of ......7

                 Henry Grabowski, Ph. D., June

14               4, 2019, Confidential

15   Exhibit 4   Invoices of Henry Grabowski to ....96

                 Samuel Lonergan, Arnold &

16               Porter, Re: National

                 Prescription Opiate

17               Litigation, 4 pages

18   Exhibit 5   Invoices, In re National ........105

                 Prescription Opiate

19               Litigation, beginning August

                 2018, from Cornerstone

20               Research, Confidential

21   Exhibit 6   Analysis Group page of Henry .....109

                 G. Grabowski experience and

22               education, 1 page

23   Exhibit 7   Declaration of Henry G. ..........119

                 Grabowski, Ph.D., March 28,

24               2013

25
```

```
 1              E X H I B I T S (Cont'd)
 2     Number         Description              Page
 3   Exhibit 8    Tufts Center for the Study of ....129
                  Drug Development, Tufts
 4                University, Corporate
                  Sponsorship, July 8-9, 2019
 5
     Exhibit 9    Financial Disclosure of Tufts ....130
 6                Center for the Study of Drug
                  Development
 7
     Exhibit 10   Journal of Health Economics ......132
 8                article, Innovation in the
                  pharmaceutical industry: New
 9                estimates of R&D costs
10   Exhibit 11   Henry George Grabowski, Vita, ....147
                  filed 2/15/08
11
     Exhibit 12   2010 Curr. Vitae LEXIS 13752, ....155
12                Henry George Grabowski,
                  Durham, N.C.
13
     Exhibit 13   Reply Declaration of Henry G. ....163
14                Grabowski, Ph.D.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1      THURSDAY, JUNE 6, 2019, RALEIGH, NORTH CAROLINA

 2                    P R O C E E D I N G S

 3                         -oOo-

 4           VIDEOGRAPHER:  Good morning.  We're now on

 5      the record.  My name is Trae Howerton.  I'm the

 6      videographer representing Golkow Litigation

 7      Services.  Today's date is June 6th, 2019.  The

 8      time is 9:34 a.m.

 9           This deposition is being held in Raleigh,

10      North Carolina, In Re National Prescription

11      Opiate Litigation.  This is filed in the United

12      States District Court for the Northern District

13      of Ohio, Eastern Division.  The deponent is

14      Henry Grabowski.

15           All counsel will be noted on the

16      stenographic record.  Our court reporter this

17      morning is Karen Kidwell.  She will now swear in

18      the witness.

19                   HENRY GRABOWSKI, Ph.D.

20  being first duly sworn, testified as follows:

21                       EXAMINATION

22  BY MS. SUTTON:

23      Q.   Good morning, Professor Grabowski.  We

24  talked just briefly before the deposition started.

25  Thank you for being here today.
```

1            I understand, having looked through your

2    background, you've testified quite a few times, so I

3    don't think it's probably necessary to cover the

4    deposition ground rules.  You probably know those

5    better than me.

6            So what I want to do is just get started

7    with the first three exhibits which I have marked.

8    Exhibit 1 is the notice of your deposition, and

9    Exhibit 2 is the expert report that we received from

10   you on May 10th, 2019, and it includes the appendices

11   and the exhibits that were served with it.  And then

12   Exhibit 3 is a supplemental expert report we received

13   just about 48 hours ago, on June 4th, which I think

14   also has an exhibit.  So those are the first

15   documents we're going to talk about.

16           And we'll probably want to keep your

17   expert report out through most of the deposition,

18   because we'll be coming back to that.

19       (Exhibit 1 was marked for identification.)

20       (Exhibit 2 was marked for identification.)

21       (Exhibit 3 was marked for identification.)

22   BY MS. SUTTON:

23       Q.   With respect to Exhibit 1, the deposition

24   notice, have you seen this document before?

25       A.   No, I have not.

1      Q.   Okay.  If you can turn to the third page,

2  there's an Exhibit A.  And we had served this on your

3  counsel, requesting that you bring certain types of

4  documents prior to or at the deposition, to the

5  extent they existed.  So maybe if we can just go

6  through those.

7           Category 1 asks you to bring any documents

8  or materials that you have reviewed since the date of

9  your report that are not specifically identified in

10  your report in preparation for your testimony.  So

11  are there any additional documents beyond those that

12  are disclosed in your report and your supplemental

13  report that you have reviewed to prepare for this

14  deposition?

15      A.   I don't believe so.

16      Q.   Okay.  So you don't have any other

17  documents that you haven't already described to

18  provide to me today?

19      A.   Yes, I'm not sure when Rosenthal's errata

20  was produced.  I think it was before the -- my

21  report.

22      Q.   Yes, I think you disclosed the Rosenthal

23  errata in your report.  I saw that.

24           Now, Number 2 was asking for basically

25  the -- the invoices that you had provided for your

1    work in this case.  And we received those, I think,

2    at 3:30 in the morning from your counsel, and we'll

3    go through those a bit later.  And we have invoices

4    from -- from yourself and also from Cornerstone.

5             Did anybody besides Cornerstone help you

6    in -- in your work on this report?

7        A.   No.

8        Q.   Setting aside counsel?

9        A.   No.

10       Q.   Okay.  Your expert report that was served

11   to us on May 10th included your curriculum vitae,

12   your CV.  Is that your most recent and current CV, or

13   do you have a more recent one since -- since that one

14   was provided to us on May 10?

15       A.   That's my current one.

16       Q.   Okay.  I would ask that if you have any

17   changes to your CV prior to the trial that's

18   scheduled in October, we would really appreciate if

19   you could provide us with an updated copy of your CV.

20   Would you be willing to do that?

21            MR. MORRIS:  Objection.  And we'll take

22        that under consideration.

23            MS. SUTTON:  Okay.

24            MR. MORRIS:  I suspect that won't be a

25        problem.

1          MS. SUTTON:  All right.

2    BY MS. SUTTON

3          Q.   So we can look at Exhibit 2, which is your

4    report and all the materials that were served with

5    it.  I want to direct your attention to the first

6    appendix, Appendix 1, which is your CV.

7               So just a few questions.  Did you prepare

8    this CV?

9          A.   Yes.

10         Q.   Do you have a different CV that you use

11    for your nontestifying work?

12         A.   No, this is the CV I used in academic

13    settings or any type of consulting.

14         Q.   Okay.  Does this CV list all the

15    professional organizations that you belong to?

16         A.   You know, I'm a member of the American

17    Economic Association and the -- some other

18    professional associations, but they -- I'm not an

19    officer or editor, any official position.  That's

20    just a member.

21         Q.   Okay.  So you said "the American Economics

22    Association and some other organizations."  Do you

23    remember, can you recall what those are?

24         A.   I think the American Society of Health

25    Economics -- Health Economists.

1        Q.   Okay.  Anything else?

2        A.   Those were the ones I think I'm currently

3    affiliated with.

4        Q.   Okay.  So looking at Exhibit 2, which is

5    your -- your expert report and materials along with

6    the supplemental report, Exhibit 3, as you sit here

7    today, are these complete and accurate, to the best

8    of your knowledge?

9        A.   Yes.

10       Q.   Do you have any corrections that you would

11   like to make to either Exhibit 2 or 3?

12       A.   I think they were listed, some typos were

13   listed in the supplement, Exhibit 3.

14       Q.   Okay.  So there's no -- you haven't

15   identified any other corrections you want to make

16   besides what's set forth in Exhibit 3?

17       A.   That's correct.

18       Q.   Okay.  Do Exhibit 2 and 3 contain all the

19   opinions you intend to express in this case?

20            MR. MORRIS:  Objection.  Form.

21            THE WITNESS:  Yes, unless I'm asked to do

22       something further.

23   BY MS. SUTTON:

24       Q.   Have you been asked to do anything in

25   addition to what's -- what you were requested to do

 1   in these reports?

 2        A.   No.

 3        Q.   Did you rely on anything else beyond what

 4   is mentioned or cited in your report and in the

 5   attachments to your reports?

 6        A.   No.

 7        Q.   Okay.  When did you finish the

 8   supplemental expert report?

 9        A.   I finished it I think two days ago.

10        Q.   Okay.  Now, looking at Exhibit 2, I wanted

11   to kind of walk through the appendices and make sure

12   that I understand them.

13             So Appendix 1 is your CV.  Appendix 1 is

14   your CV, right?

15        A.   Yes.

16        Q.   Okay.  And Appendix 2, that's the -- your

17   list of testimony in the four prior years, correct?

18        A.   Yes.

19        Q.   And then Exhibit -- or Appendix 3 is a

20   listing of the materials that you considered?

21        A.   Yes.

22        Q.   And then you have Appendix 4A through 4C.

23   And this seems to be a schedule of opioids that were

24   sold by Endo; is that -- is that correct?

25        A.   Yes.

1     Q.   Okay.  Did you prepare these charts?

2     A.   It was prepared under my direction at

3  Cornerstone and at a request of the attorneys.

4     Q.   So did the attorneys request that this

5  book be put together?

6     A.   They requested that I do some market share

7  analysis to -- in the report, and I instructed

8  Cornerstone to do so.

9     Q.   Okay.  What -- what did you do to verify

10 that this information was correct, that's set forth

11 in these schedules?

12    A.   I looked at some of the -- the

13 IQVA Xponent data.  I looked at it in detail.  And I

14 did some summary checks.

15    Q.   So then if we turn to the -- the exhibits

16 that are attached to your report, Exhibit -- Depo

17 Exhibit Number 2.  You have Exhibit 1, 2A, and 2B.

18 And these are adjustments to some of Dr. Rosenthal's

19 calculations, correct?

20    A.   Yes.

21    Q.   And who prepared these?

22    A.   Well, I -- they were done under my

23 direction at Cornerstone.  And these are the

24 conclusions, and I checked some of the inputs to see

25 that I was satisfied that Cornerstone had executed my

1  directions.

2      Q.  Did the attorneys ask you to perform these

3  adjustments?

4      A.  No.

5      Q.  So it was your idea to do this?

6      A.  Yes.

7      Q.  Okay.  And then just briefly looking at

8  your supplemental report that we received on

9  June 4th, it also has exhibits attached to it,

10  Exhibits 1, 2A, and 2B, and these also seem to be

11  adjustments to Dr. Rosenthal's calculations; is that

12  correct?

13      A.  Yes.

14      Q.  And why did you do these?

15      A.  Well, they were part of my report.

16  It's -- you know, I -- I found various problems and

17  limitations with Dr. Rosenthal's model, so I -- the

18  first line is -- is her preferred model, and then the

19  subsequent lines are various changes in terms of the

20  depreciation rate, demand side variable, different

21  treatment of time trend.  So those were all

22  adjustments to show that her model was not very

23  robust, or reasonable adjustments.  And this -- the

24  one in here is based on the code that she submitted

25  with her errata.

1      Q.   And you asked -- did you perform these

2  analyses?  Or again, did Cornerstone do them?

3      A.   Cornerstone did them under my direction.

4  They did the number crunching, but I proposed what

5  was to be done, and then I checked it.

6      Q.   Okay.  Let's talk a little bit about your

7  educational background and -- and work history, and

8  it might be helpful to have your CV in front of you,

9  but I'm sure you remember all of this well.

10          You received your Ph.D. in economics in

11  1967 from Princeton University?

12      A.   Yes.

13      Q.   Okay.  So that was 52 years ago.  I know

14  that, because I was born in '67.  Then you went on to

15  teach at Yale from 1967 to 1971, correct?

16      A.   Yes.

17      Q.   And then you were a research associate at

18  the National Bureau of Economic Research.  Can you

19  tell me a little bit about what you did there?

20      A.   Well, I was a member of the -- visiting

21  scholar research associate physician, and I actually

22  worked on some advertising issues, a project

23  involving -- that resulted in two subsequent

24  publications, the interindustry distribution of

25  advertising and the intraindustry impact of

1  advertising.

2         So this was mainly consumer -- advertising

3  to consumers in major media, and I was looking at

4  some hypotheses that had been put forth by Professor

5  Galbraith and others.

6      Q.  Were you focusing on the impact of

7  advertising on any particular industry?

8      A.  Well, the first publication looked at

9  several industries, you know, industries like

10  consumer goods, toiletries, tires, various -- you

11  know, I -- I looked at industries that had

12  significant major media advertising and -- and looked

13  at the impact there.  And then in the intraindustry,

14  I looked at five industries that did a lot of major

15  media advertising, including alcohol and cigarettes.

16      Q.  Okay.  And then you joined Duke University

17  in 1972?

18      A.  Yes.

19      Q.  And -- and you've been employed there ever

20  since?

21      A.  Yes.

22      Q.  Okay.  And it looks like from your résumé

23  that you were a professor until 2009, when you became

24  a professor emeritus; is that correct?

25      A.  Yes.  That meant I no longer had teaching

 1    responsibilities, but I continued as a director of a

 2    program.

 3        Q.   Okay.  So since 2009, you have -- you have

 4    no longer -- you no longer teach classes at

 5    Duke University?

 6        A.   That's correct.

 7        Q.   Okay.  And prior to 2009, did you teach

 8    undergraduates?

 9        A.   I taught undergraduates and graduates.

10        Q.   Okay.  Is it -- I know it's kind of a wide

11    span of time, but can you just give me an overview of

12    the types of classes that you -- you taught from 1972

13    to 2009?

14        A.   Okay.  So when I first came to Duke, I

15    taught both undergraduates in -- in microeconomics

16    and econometrics, and I taught graduate courses in

17    what we called industrial organization, which is the

18    study of competition and factors that influence

19    competition in particular industries.

20             And then, as time evolved, I did some

21    teaching of health economics, innovation.  I did some

22    senior seminars for honor students over time.  And I

23    continue to do graduate classes in industrial

24    organization.

25        Q.   So you mentioned that since 2009 you no

 1   longer teach classes, and that your work I think

 2   centers on the program in pharmaceutical and health

 3   economics.  Were you the director?  Is that correct?

 4        A.   Yes.

 5        Q.   Okay.  So is it possible for you to just

 6   like tell me how many hours a month you devote to

 7   your work at Duke as professor emeritus?

 8        A.   I would say maybe 20 hours a -- a week.

 9   You know, the -- it's like a -- more like a

10   half-time.

11        Q.   So 24 hours a week every week since 2009,

12   on average?

13             MR. WILSON:  20.

14             THE WITNESS:  20 hours.

15   BY MS. SUTTON:

16        Q.   20 hours.  I'm sorry.

17        A.   Yes.  I would say that's a -- you know, a

18   rough average.  Sometimes it's a lot more; sometimes

19   it may be less.

20        Q.   Okay.  So let's take like last month, for

21   example.  How much time did you spend in your role as

22   professor emeritus at Duke?

23        A.   Well, we're doing a major paper with --

24   I'm doing it with Joe DiMasi on R&D cost and returns

25   of oncology drugs.  And so related to that and

 1   conferences and -- that were related to the program

 2   in pharmaceutical and economics, we're talking about

 3   last month, the month of May, I would say, you know,

 4   maybe 75 hours.

 5        Q.   A week, or a month --

 6        A.   For the month.

 7        Q.   -- for the entire month?

 8        A.   Yeah.

 9        Q.   And is that more than -- more hours than

10   you would typically spend, because of all the -- all

11   the things that are going on that you described?

12        A.   As I said, it -- it averages -- there may

13   be some months when I'm not doing much at Duke, and

14   then others where I'm doing full 40 hours, or -- you

15   know, I'm still invited to give lectures, and I still

16   get together with colleagues to discuss potential

17   projects for the program.

18        Q.   And so in some of those hours when you're

19   not doing as much at Duke, is that sometimes because

20   you're busy acting as an expert witness?

21        A.   That's one of the factors.  But it's more

22   like I've gone on vacation or something like that.

23        Q.   But you oftentimes act as an expert?

24        A.   Yes.

25        Q.   So you've been the director of the program

 1   in pharmaceuticals and health economics since 1983?

 2        A.   Right.  So there -- there was -- the

 3   program really evolved before that, but it was not an

 4   official program of Duke until 1983.

 5        Q.   Can you tell me a little bit about its

 6   structure and how it works within Duke?  Is it part

 7   of the department of economics, or . . .

 8        A.   Yes.  It's administered through the

 9   economics department and through the School of Arts

10   and Sciences.  I'm the director, and it's -- you

11   know, it's a mechanism for supporting graduate

12   students, for supporting summer research on projects

13   that relate to pharmaceuticals and health economics.

14   It can pay for travels to present results at

15   professional conferences.  That's kind of mainly what

16   the functions are.

17        Q.   What's the -- the annual budget for the

18   program?

19        A.   Right now it's less than it was at one

20   point in time, but I would say right now the annual

21   budget is maybe 60,000 a year.

22        Q.   And so has it -- has the annual budget

23   been higher than that in other years?

24        A.   Way back when, in the '80s, it was higher,

25   yes.

1        Q.   Can you tell me how much higher it was?

2        A.   It might have been as much as 100,000.

3        Q.   Okay.  And where did the -- where did the

4    funds come from that support this program?

5        A.   Over the years, they've come from various

6    sources.  They came from the National Science

7    Foundation, from organizations like the General

8    Accounting Office and the Institute of Medicine.

9    They came from foundations, and they came from

10   corporate grants.

11       Q.   And do those corporate grants include

12   grants from pharmaceutical companies?

13       A.   Yes.

14       Q.   Do they include grants from biotech or

15   medical device companies?

16       A.   Yes.

17       Q.   Are you -- is it possible for you to

18   characterize over time what percentage of the funding

19   has come from pharmaceutical companies?

20       A.   That would be hard to do.  I think it --

21   it varied over different periods.  At some points it

22   was mainly government; other times it was foundation

23   or corporate grants.

24       Q.   But certainly included money from drug

25   companies?

1   A. Yes.

2   Q. Okay.

3   A. But to Duke University.

4   Q. Yeah.  And -- okay.  So it goes to

5 Duke University, but then is it earmarked for -- for

6 the program in pharmaceuticals and health economics?

7   A. Yes.

8   Q. Okay.  Is there -- is there anywhere I

9 could go to look to see who -- what companies have

10 provided grants to the program in pharmaceutical and

11 health economics?

12   A. No, I never -- you know, I never had a

13 website.  It predates websites, and --

14   Q. Right.

15   A. -- I never put that together here.

16   In -- in recent years, it is -- I should

17 have also mentioned, there's an endowment, and the

18 endowment is mainly what sustains the program now.

19   Q. And the -- is the endowment the money that

20 was built up over time through the various grants and

21 donations that were received, or . . .

22   A. No.

23   Q. Okay.  How was the -- how was the

24 endowment created?

25   A. The endowment was created from

1    GlaxoWellcome Company in a grant to Duke University

2    to -- for this program and -- and for minority

3    scholarships.

4        Q.   Do you know the size of the endowment from

5    GlaxoSmithKline?

6        A.   You know, initially it was maybe 100,000,

7    but it's grown through investments.

8        Q.   Do you know, how large is the current

9    endowment?

10       A.   What I know is how much income it

11   generates each year that can be used by the program.

12   And that's -- let's see.  It's on the order of -- I

13   think it's on the order of $30,000 income.

14       Q.   Okay.  Do you know if your -- the program

15   in pharmaceutical and health economics has ever

16   received any funding from Purdue Pharma?

17       A.   It has not.

18       Q.   Okay.  Were you involved in reaching out

19   to the pharmaceutical companies in order to get

20   grants or funding for -- for your program in

21   pharmaceutical and health economics at Duke?

22       A.   That was mainly done by the development

23   group at Duke.  The endowment came through a reaching

24   out by the Duke development office to GlaxoWellcome

25   to support activities at Duke.  And as I indicated,

 1  at the time I got my endowment they also funded

 2  minority scholarships and other things at Duke, but

 3  this is one of the things that was funded through the

 4  development office.

 5           What I did is to anybody that provided

 6  funds, I provided them with some -- an annual update

 7  on the kind of work we were doing.

 8      Q.   Okay.  Do you get a salary from the --

 9  from this program in pharmaceutical and health

10  economics?

11      A.   I currently do, yes, because I'm emeritus,

12  and this is one of the sources of my current research

13  in the program along with, you know, grants made

14  directly to me.

15      Q.   Right.  So what -- what is your current

16  salary from the program in pharmaceuticals and health

17  economics?

18      A.   It's $5,000 a month.

19      Q.   Okay.  And then do you have a separate --

20  another salary that you get from Duke as your role of

21  professor emeritus?

22      A.   Not except for pension funds.

23      Q.   Okay.  And has that been the case since

24  you became a professor emeritus in 2009?

25      A.   Yes.

1      Q.   So your money that you get paid from Duke

2   comes through this program in pharmaceuticals and

3   health economics?

4      A.   Yes.

5      Q.   Okay.  And then you mentioned, I think, in

6   one of your last answers, that there were -- you

7   receive money from grants that are made directly to

8   you?

9      A.   Well, I should clarify that.  Not directly

10   to me, but to some researcher that -- you know, we

11   got a grant to study neglected diseases that came, I

12   think, through the public policy department that I

13   was part of.  We've had grants from other government

14   sources that come to me -- that I'm one of the

15   principal investigators.

16      Q.   Right.  But the -- the grant money, does

17   it go to Duke to be used on the project, or does it

18   come like to you?  I'm just trying to understand how

19   the money flows.

20      A.   Flows through Duke or through Tufts or

21   through some generally academic institution.

22      Q.   Okay.  So if you look at your -- I was

23   going to do this a little later, but can we look at

24   your CV?  I see you have a list -- I think it's on

25   page 16.  There's a list of research grants and

1    government projects.

2           Is this -- does this contain all -- a

3    description of all the grants that have -- have come

4    through you to Duke University?  Or are there some

5    missing?

6           MR. MORRIS:  Objection to form.

7           THE WITNESS:  I think it would include all

8       the grants to Duke or through Duke, yes.

9    BY MS. SUTTON:

10      Q.   Okay.  It would -- this would not include

11   the grants, though, that went through Tufts, that you

12   mentioned earlier?

13      A.   Well, I may have misspoke.  I used Tufts

14   as an example.  I don't recall specifically a grant

15   from Tufts.  I work collaboratively with Tufts.

16      Q.   Yeah, you -- you work collaboratively with

17   Joe DiMasi, right?

18      A.   Yes.

19      Q.   And he's at Tufts, correct?

20      A.   Right.

21      Q.   And then so he probably receives grants

22   from Tufts for his work where you collaborate?  Am I

23   characterizing that correct?

24      A.   Yes.

25      Q.   Okay.  So just looking at these research

 1   grants, I see that you have dollar amounts for the

 2   grants listed at the first grant, second, third, and

 3   then skip down to the sixth.  And those seem to be

 4   grants that you received from the National Science

 5   Foundation, correct?

 6          MR. MORRIS:  Objection to form.

 7          THE WITNESS:  They were grants from the

 8      National Foundation to Duke University for

 9      various projects.

10   BY MS. SUTTON:

11      Q.   Is there a reason you don't put dollar

12   amounts for the -- for the size of the grants for

13   the -- the remainder that are listed here?

14      A.   I think those were the -- what I would

15   call the major grants, particularly the ones starting

16   the second through the fourth, and most of the others

17   would be much smaller amounts.

18      Q.   Okay.  So I just want to turn briefly

19   to -- to another topic.  In your expert report, I

20   think at paragraph 6, it says that you were retained

21   on behalf -- you were retained for this case on

22   behalf of Endo Pharmaceuticals, Endo Health

23   Solutions, as well as Par Pharmaceutical companies,

24   correct?

25      A.   Yes.

 1      Q.   Okay.  So are you working for any other of

 2  the defendants in the opioid litigation in this case?

 3      A.   No.

 4      Q.   Okay.  Who first contacted you about

 5  becoming an expert in this case?

 6      A.   I think first I had a conversation with

 7  Cornerstone saying there was interest in exploring

 8  whether I was open -- you know, available, and

 9  interested in being an expert in the case.  And that

10  was Greg Eastman and some colleagues at Cornerstone.

11  And I said I would be interested in discussing it.

12          And then subsequent to that, I had a

13  conversation with Steve Lonergan from Arnold & Porter

14  about the case and about a potential -- my potential

15  role.

16      Q.   Was it your understanding that Steve

17  Lonergan had reached out to Cornerstone about getting

18  an -- getting an expert involved in this case on

19  behalf of Endo and Par?

20      A.   I don't know for sure.  It may be the

21  case.

22      Q.   I'm just trying to understand if you know

23  how -- why Cornerstone reached out to you.  What

24  prompted them to do that?

25      A.   I have worked with Cornerstone on many

 1   pharmaceutically related projects.  Many of the list

 2   of testimony were done in -- with Cornerstone doing

 3   support.  So it's possible that they recommended me

 4   to Arnold & Porter, or suggested that I had a strong

 5   knowledge of the pharmaceutical industry, lots of

 6   publications related to pharmaceuticals, and I had

 7   some experience in doing litigation.

 8        Q.   So -- and Cornerstone lists on its website

 9   a number of clients that are -- that include law

10   firms, right?

11        A.   I haven't looked at their website, but

12   I'll take your word for it.

13        Q.   But it's your understanding that law firms

14   come to Cornerstone to help them find experts for

15   cases, correct?

16             MR. MORRIS:  Objection to form.

17             THE WITNESS:  Among other things, that

18        they may have, you know, relationships with law

19        firms, yes.

20   BY MS. SUTTON:

21        Q.   And had you -- had you worked with Steve

22   Lonergan in prior matters before this case?

23        A.   No.

24        Q.   Had you worked with the law firm Arnold &

25   Porter in prior litigation?

1          A.   I think I may have, but I don't recall

2    specifically if I have.

3          Q.   Do you recall whether you worked with

4    Arnold & Porter more than once?

5          A.   I think if I did -- I would have to go

6    back and look at my records -- I -- you know, I

7    served on a board with an Arnold & Porter member,

8    and -- who is former general counsel at Arnold &

9    Porter.  But I don't recall any specific litigation.

10   I -- I remember being on a board with him.

11         Q.   Well, maybe a little later we'll go

12   through some of the cases, and it might spark your

13   memory if you had worked with Arnold & Porter in the

14   past.

15              So you said that Cornerstone reached out

16   to you first.  Do you remember when that contact

17   occurred?

18         A.   It was kind of last summer, I think, the

19   summer of 2018.

20         Q.   Okay.  What was your understanding of

21   the -- of the assignment that you had been given to

22   look into in this case?

23         A.   Well, it was initially a consulting

24   assignment that -- there was litigation, as -- as I

25   indicated here, that related to Cuyahoga and Summit

1    County against manufacturers, distributors, and

2    pharmacies, and that there was an allegation that

3    massive false marketing had drastically expanded the

4    market, and that there was, you know, likely to be

5    expert reports by economists from plaintiffs that I

6    might rebut, depending on their nature, as well as,

7    given my research in the pharmaceutical industry, I

8    could explain the complexities and the dynamic nature

9    of the pharmaceutical industry as it relates to this

10   litigation.

11        Q.   So at the time you were retained, in the

12   summer of 2018, you had not seen any expert reports

13   had been provided by the Plaintiffs yet?

14        A.   That's correct.

15        Q.   Were you given any assumptions from which

16   you were to write your report?

17        A.   No.

18        Q.   Okay.  You mentioned the Summit and

19   Cuyahoga County cases; and is it your understanding

20   that those are the first cases that are slotted to go

21   to trial in the multidistrict litigation?

22        A.   Yes.

23        Q.   Okay.  Have you been retained as an expert

24   in -- in any of the other cases that are filed in the

25   MDL?

1          A.    No.

2          Q.    Have you been retained as an expert in any

3     other opioid case falling outside the multidistrict

4     litigation?

5          A.    No.

6          Q.    Okay.  So it's your understanding that

7     you're only providing testimony in the Cuyahoga and

8     Summit County case?

9               MR. MORRIS:  Objection to form.

10              THE WITNESS:  Yes, related to my

11         assignment here that I have provided testimony

12         today related to that, yes.

13    BY MS. SUTTON:

14         Q.    Okay.  Have you met with or had any

15    discussions or e-mail exchanges with any individuals

16    that have been designated as expert witnesses in this

17    case?

18         A.    No.

19         Q.    Okay.  Do you know Minnie Baylor-Henry?

20         A.    No.

21         Q.    Never had any meetings or e-mails with her

22    about this case?

23         A.    Not to my memory, no.

24         Q.    Okay.  Do you know Jon Fryzek?

25         A.    No.

1        Q.   So you've never had any discussions or

2    e-mails with him?

3        A.   That's correct.

4        Q.   Okay.  Richard La Magna?

5        A.   No.

6        Q.   Okay.  Same questions with respect to

7    Justin McCrary.

8        A.   No, I've not had any e-mails or

9    discussions.

10        Q.   Do you know him?  He's at Columbia

11    University.

12        A.   No, I do not know him.  I've heard of him,

13    but I don't know him personally.

14        Q.   Okay.  Sean Patterson?

15        A.   No.

16        Q.   Have you heard of him?

17        A.   No.

18        Q.   Okay.  Have you had any discussions or

19    e-mails about this case with Robert Young, Dr. Robert

20    Young?

21        A.   No.

22        Q.   Do you know of him?

23        A.   No.

24        Q.   Have you had any meetings, discussions, or

25    e-mails with Mark Murtha?

1       A.   No.

2       Q.   Do you know Mark Murtha?

3       A.   No.

4       Q.   Okay.  Have you had any e-mails, meetings

5  or discussions with Dr. Doug Tucker?

6       A.   No.

7       Q.   Do you know Dr. Doug Tucker?

8       A.   No.

9       Q.   Have you had any e-mails, discussions, or

10 meetings with a Dr. Robert Lyerla at Western Michigan

11 University?

12      A.   No.

13      Q.   Do you know -- do you know him?

14      A.   No.

15      Q.   Have you had any e-mails, meetings, or

16 discussions with a Dr. Bruce Michael Bagley at the

17 University of Miami?

18      A.   No.

19      Q.   Okay.  Do you know him?

20      A.   No.

21      Q.   All right.  Thank you.

22           Do you plan to testify at the Summit and

23 Cuyahoga trial in October?

24      A.   If I'm asked to testify, I will.  You

25 know.

1      Q.   Have you been -- have you been asked?

2      A.   Not to this point, no.

3      Q.   Do you have it blocked out on your

4  calendar?

5      A.   I have it blocked out, yes.

6      Q.   Okay.  Besides the attorneys at Arnold &

7  Porter, have you been in touch with any other lawyers

8  about your expert work in this case?

9      A.   No.

10      Q.   Do -- if -- if you testify at trial, do

11  you plan to use any demonstratives?

12           MR. MORRIS:  Objection to form.

13           THE WITNESS:  Quite possibly, yes.

14  BY MS. SUTTON:

15      Q.   Okay.  Have those demonstratives been

16  made?

17      A.   No.

18      Q.   Would you make them, or would someone else

19  do it?

20      A.   They would be made under my direction by

21  someone who does software.

22      Q.   Okay.  Would -- would those folks be at

23  Cornerstone?

24      A.   Cornerstone or another related

25  technological company.

 1      Q.   So turning back to your expert report, I

 2   wanted to turn to Appendix 3, which you have titled

 3   "Materials Considered."

 4           Did you put together Appendix 3, or did

 5   someone else do that for you?

 6      A.   It was put together under my direction.  I

 7   didn't type it out, but I -- this is -- I indicated

 8   to Cornerstone to put down all of the material that

 9   we had considered in the report, including all of the

10   references.

11      Q.   Okay.  So this Appendix 3 was created by

12   Cornerstone?

13           MR. MORRIS:  Objection to form.

14           THE WITNESS:  Well, I wouldn't

15       characterize it that way.  I -- I created it.

16       They did the actual typing of it, but it was

17       created under my direction.

18   BY MS. SUTTON:

19      Q.   Did Cornerstone keep track of, along the

20   way, all the materials that you were considering for

21   your expert report?

22      A.   They -- you know.  Yes, I would say they

23   kept track of materials, but I initiated much of

24   the -- the documents to look at.

25      Q.   Okay.  So -- so is this Appendix 3, is

1    this a full and complete listing of every document

2    you have reviewed and considered in preparing your

3    report?

4              MR. MORRIS:  Objection.  Form.

5              THE WITNESS:  It looks to be a complete

6         documentation of materials considered.  Of

7         course, I rely also on my 50-years-plus of doing

8         research in economics of the pharmaceutical

9         industry.

10   BY MS. SUTTON

11        Q.   Is there anything you would want to add as

12   you sit here today?

13        A.   No.

14        Q.   Let's take a look at first -- the first

15   section of materials considered, which are the

16   academic articles.

17             I counted this up, and it looked like that

18   there were 38 articles.  You would agree that there

19   are more than 38 academic articles on the

20   relationship between the promotion and sale of

21   pharmaceuticals, wouldn't you?

22        A.   Yes.

23        Q.   So how did you go about selecting -- well,

24   first, did Cornerstone find any of these 38 articles

25   for you?

1    A.   A few, you know.  I -- I gave them the

2  articles that I thought were most relevant from my

3  experience, and then I asked them to see if there

4  were any other references that were in the literature

5  that seemed relevant to the report at hand.

6    Q.   Can you identify the articles that you

7  provided to Cornerstone?

8    A.   Not off -- most of these were ones that I

9  mentioned, but I -- you know, I -- I don't have a

10  memory of which ones they followed up on or suggested

11  I look at.

12    Q.   So what kind of instructions did you give

13  Cornerstone with respect to adding to this list of

14  academic articles beyond what you provided them?

15    A.   I said there is a -- a literature here on

16  the effects of promotion.  And particularly, you

17  know, I -- I have done work in this area, so I know

18  the literature well.  But for instance, Dr. Rosenthal

19  has found a negative depreciation rate, which I said

20  I never have seen this in my professional experience.

21  And she claims it's due to -- it can be explained by

22  the fact that opioids are addictive, but there are

23  other work on addictive substances, marketing of

24  addictive substances, like cigarettes and alcohol,

25  that has been undertaken, some by me and some by

1    others.  And I want you to see if I'm right, that

2    there -- that you can find anything in the literature

3    that has a negative depreciation rate.

4              And in the context of that, they looked at

5    stuff -- some more articles.  They searched the

6    literature diligently, but they could not find

7    anything.

8         Q.   And when you say "they," you're referring

9    to Cornerstone?

10        A.   Yes, the team at Cornerstone.

11        Q.   Did you conduct any of your own searches

12   of the medical literature?

13        A.   Of this literature, yes.

14        Q.   Oh.  And when did you do that?

15        A.   Started when -- back in -- when I was

16   first retained, and it continued through when I

17   submitted my report.

18        Q.   So you did searches, and you also asked

19   Cornerstone to do searches?

20        A.   Yes.  They're another set of eyes.

21        Q.   And so this list of academic articles

22   reflects both articles you found and articles that

23   Cornerstone found?

24        A.   Yes.  Primarily that I found or knew

25   about, and a few that they added to, had me look at.

1        Q.   Now, you're aware that Dr. Rosenthal has

2   published in the area of promotion and the sale of

3   pharmaceutical products, correct?

4        A.   Yes.

5        Q.   And in fact you have cited to her in some

6   of your academic research, correct?

7        A.   Yes.

8        Q.   Okay.  So when you would receive

9   materials -- oh, one other question.  With respect to

10   these academic articles, or actually any of the other

11   things that are listed in Appendix 3, were -- were

12   any of these items provided to you by the attorneys?

13        A.   No.

14        Q.   Okay.  So when you would receive materials

15   from Cornerstone, how would they send it to you?

16   Electronic or hard copy?

17        A.   Electronic, usually.

18        Q.   Like a PDF?

19        A.   Yes.

20        Q.   Okay.  Do you keep a file for this case in

21   your office, or in your home?

22             MR. MORRIS:  Objection to form.

23             THE WITNESS:  No, not really.

24   BY MS. SUTTON:

25        Q.   Okay.  How do you organize the materials

 1    that you considered for your report?

 2         A.   You know, they're all available pretty

 3    much online, so I looked online at a lot of them.  So

 4    a lot of them were not literally a PDF.  There may

 5    have been a few like that, that I wanted us -- them

 6    to produce, but I -- I have access to Medline through

 7    Duke University, so I can pull up an article and look

 8    at it.

 9         Q.   Okay.  Now, in this case, you're

10    testifying on behalf of Endo or Par, correct?

11         A.   Yes.

12         Q.   All right.  And how many Endo and Par --

13    strike that.

14              Endo and Par produced documents in this

15    litigation as part of the discovery process; are you

16    aware of that?

17         A.   Yes.

18         Q.   And I -- looking at your "Materials

19    Considered" list, under "Produced Documents," it

20    looks like you looked at three documents that were

21    produced by Endo.  Is that correct?

22         A.   Yes.

23         Q.   Did you -- did you review any more than

24    the three documents that are described here?

25         A.   No.

1      Q.   Were you given access to the Endo and Par

2  document productions that were made in the opioid

3  litigation?

4      A.   Yes.

5      Q.   And how were you given access?

6      A.   In the sense that we went through a

7  process where -- you know, initially I wasn't --

8  initially the scope of my participation was to

9  characterize the pharmaceutical industry and its

10  complexities, which I've done in the report, and to

11  await what would be produced by the economist on the

12  plaintiffs' side that I would -- could be asked to

13  rebut.

14          And so I asked Cornerstone to look at what

15  data was available that might be used either by the

16  plaintiffs or by us, and what documents internally

17  might be useful in this task.  So they screened some

18  documents, but then we received Rosenthal's report,

19  which was focused on statistical analysis between

20  marketing and opioid utilization, and that one became

21  my focus after receiving Rosenthal's report.

22          So I had all the documents I needed to do

23  my two main tasks, which were to characterize the

24  industry complexity and dynamic nature, and second,

25  to focus on the limitations of Rosenthal's analysis.

1        Q.   Okay.  So if I understand -- that was kind

2   of a long answer.  If I understand it correctly, when

3   I had asked you, did you -- were you given access to

4   the millions of documents that Endo and Par produced

5   in discovery, and if I heard you right, I think you

6   were saying Cornerstone had that access?

7        A.   Cornerstone and myself.  But I -- I

8   delegated to Cornerstone to look through this

9   material to see if it was anything that was useful in

10  supporting my analysis of, you know, the way the

11  industry works.  But I primarily relied on my own

12  experience and knowledge.  And second of all,

13  depending on what we were going to be asked to do in

14  terms of a rebuttal, was there useful information.

15        So yes, they -- they were screening a lot

16  of the documents, looking through them, and I relied

17  on them to call to my attention anything that would

18  be supportive of my main assignment.

19        Q.   So do you know how many of Endo and Par's

20  internal documents that Cornerstone would have looked

21  at?

22        A.   No.

23        Q.   And do you know how many Endo and Par

24  discovery documents you looked at?  Is it just the

25  three that are listed here?

1        A.    It's just the three here.

2        Q.    Okay.  Did you ever perform any searches

3   of -- on any database that contained Endo and Par

4   internal documents?

5        A.    No.

6        Q.    Do you know if Cornerstone did?

7        A.    I think they made -- I think they may have

8   looked at what documents -- what data might -- data

9   exists, both externally and internally, that might

10  support a statistical analysis by the plaintiffs or

11  in rebuttal to the plaintiffs economics analysis.

12       Q.    Did you ever ask them what Cornerstone

13  found when they looked at the Endo and Par documents?

14       A.    We had some discussions of that, yes.

15       Q.    And how would those discussions occur?

16       A.    Well, I would ask, is there claims data

17  available?  Is there data about potentially marketing

18  contacts in Cuyahoga and Summit County?  Is there

19  data on prescriptions in those counties?  What

20  information, either external or internal, is

21  available that would -- could shed light on issues of

22  marketing and sales in a -- at a county level?

23       Q.    So would you have those discussions via

24  e-mail, or over the phone?  Can you just tell me

25  how -- what format they took?

 1          A.    Over the phone.

 2          Q.    Okay.  And did -- did Cornerstone point

 3    you to any internal documents that spoke to the

 4    subject you just described?

 5          A.    No, I think basically they said there's

 6    not any information that would provide a basis for a

 7    statistical analysis.

 8          Q.    Did you have -- did you review any

 9    documents that were produced by the Plaintiffs,

10    Cuyahoga and Summit County, in this case?

11          A.    I don't recall doing so.

12          Q.    Do you know if you had access to the

13    documents that were produced by the plaintiffs in

14    this case?

15          A.    What I did is I reviewed any references

16    that I felt were important to review in Rosenthal.  I

17    don't know that she cited any government documents.

18          Q.    And when you say "government documents,"

19    documents produced by Cuyahoga and Summit County?

20          A.    That's what I understood your query, yes.

21          Q.    Just wanted to make sure we were using the

22    same terminology.

23                Did you review any internal documents

24    produced in discovery by any of the other defendants

25    in this case?

 1          A.   Not to my knowledge, no.

 2          Q.   Do you know if Cornerstone reviewed any

 3     documents produced by other defendants in this

 4     litigation?

 5          A.   I don't believe they did.

 6          Q.   Do you know if Cornerstone is working with

 7     any other experts in this case?

 8          A.   I understand they are, but they're not --

 9     there's not an interchange of information.

10          Q.   What do you mean by "there's not an

11     interchange of information"?

12          A.   Well, my understanding is there are

13     separate teams working for separate defendants, and

14     those teams have not shared information prior to the

15     expert reports that came from the different

16     defendants.  I think there was no communication of --

17     as I understand it, about analysis or data or

18     anything prior to the reports that came out.

19          Q.   Okay.  And what other -- do you know what

20     other experts in this litigation that Cornerstone is

21     working with, who they are?

22          A.   My understanding is they include Sean

23     Nicholson and Ian Coburn.  Those are the only two I

24     know about.

25          Q.   And those experts were retained by other

 1   defendants in this litigation?

 2        A.   That's my understanding.

 3        Q.   And have you now had an opportunity to

 4   review the results of Sean Nicholson and Ian Coburn's

 5   work?

 6        A.   No.

 7        Q.   Appendix 3 also said that you reviewed the

 8   depositions of two plaintiffs' experts, Dr. Rosenthal

 9   and Dr. McGuire.  Why did you choose to review the

10   depositions of those two experts?

11        A.   Well, Dr. Rosenthal was --

12        Q.   Or -- excuse me.  I'll ask that

13   differently.  Strike that.  We know why you did it,

14   so I'll simplify that.

15             Why did you chose to review the deposition

16   of Thomas McGuire and not any other plaintiffs'

17   experts besides McGuire and Rosenthal?

18        A.   There was a reference in Dr. McGuire's

19   deposition to formularies.  He was asked some

20   questions on formularies, and he said that

21   formularies do affect which drugs are selected to use

22   for patients.  And it was a useful thing to quote in

23   my report.

24        Q.   But you did not review the depositions of

25   any other plaintiffs' experts beyond Rosenthal and

 1  McGuire, correct?

 2       A.   Yes.

 3       Q.   And you didn't review the depositions of

 4  any of the defense witnesses that were taken in this

 5  case, did you?

 6       A.   That's correct.

 7       Q.   And you didn't review the depositions of

 8  any of the plaintiff witnesses that were taken in

 9  this case, correct?

10       A.   Yes.

11       Q.   Did you review the exhibits to

12  Dr. Rosenthal's deposition?

13       A.   Yes, I did.

14       Q.   And did you review the exhibits to the

15  deposition of Dr. McGuire?

16       A.   Oh, to the deposition.  I was initially

17  thinking about his report -- her report.

18            I don't know that I saw the exhibits.  I

19  don't think they were provided in the document that I

20  reviewed.

21       Q.   Okay.  Are you aware of whether any of the

22  manufacturing defendants conducted any internal

23  studies or possess any data on the effects of

24  promotion on sales?

25            MR. MORRIS:  Objection to form.  I'll

1           instruct the witness not to answer, to the

2           extent that any information you may have comes

3           from counsel.

4                THE WITNESS:  Other than what's

5           confidential, I -- I don't have any knowledge.

6    BY MS. SUTTON:

7           Q.   When you say "confidential," you're

8    referring to communications with counsel?

9           A.   Yes, although -- could I hear the question

10   again?

11          Q.   Well, maybe I can rephrase it.

12               Did you ever ask whether or not any of the

13   manufacturing defendants had -- had any internal

14   studies or any data on the effects of promotion on

15   sales?

16          A.   No, I never asked that question.

17          Q.   Okay.  Have you ever heard of something

18   called "call notes"?

19          A.   Yes.

20          Q.   And isn't it true that call notes describe

21   interactions between pharmaceutical drug sales

22   representatives and prescribers?

23          A.   Yes, they're like contacts, but they often

24   can be very brief in their notation.

25          Q.   Right.  But they do document to some

1  extent the interactions that the sales reps have with

2  prescribing physicians, correct?

3      A.   Yes, some firms have them historically.

4  Some firms don't have -- they're very limited in what

5  they have.

6      Q.   Okay.  And did you review any call notes

7  in this case?

8      A.   No.

9      Q.   Did you ask to see any of the call notes

10  that have been produced in this case?

11     A.   No.

12     Q.   I was going to go to another topic.  I

13  don't know if you want to take a break or keep going.

14         MR. MORRIS:  I guess we can take a quick

15     break, just to stretch the legs and . . .

16         THE WITNESS:  Yeah.  We can use the

17     restroom.  Thank you.

18         VIDEOGRAPHER:  Going off the record.  The

19     time is 10:34 a.m.

20         (A recess transpired from 10:34 a.m. until

21         10:43 a.m.)

22         VIDEOGRAPHER:  Going back on the record.

23     The time is 10:43 a.m.

24  BY MS. SUTTON:

25     Q.   Professor Grabowski, I just wanted to

1   change topics and -- and talk about some -- some of

2   your areas of academic interest.  I've read a lot of

3   your -- your papers and a lot of your expert reports,

4   so I feel like I'm starting to get kind of a better

5   handle on -- on what some of your views on topics

6   are.  But I just wanted to ask you a few questions.

7           Is it -- is it your opinion that branded

8   pharmaceutical companies need more patent protection

9   in order to award innovation?

10          MR. MORRIS:  Objection to form.

11          THE WITNESS:  I'm not sure what you mean

12      by "more."  The amount of protection varies.

13      And it can be very short, or it can be longer.

14      We found on average it's 12 years.

15  BY MS. SUTTON:

16      Q.   Do you think 12 years is an adequate

17  amount of time for patent protection in order to

18  reward innovation?

19      A.   Well, that also can vary, but as an

20  average, it's -- you know, some of the seminal work

21  by Nordhaus, who won the Nobel Prize in economics,

22  but some of his seminal work was on exclusivity, and

23  found that it could be longer to get -- promote

24  social welfare for innovation.  But in

25  pharmaceuticals, I think a very short exclusivity

 1    period, like the five years, would generally -- a

 2    five years' exclusivity under Hatch-Waxman would be

 3    insufficient for many important innovations.  Twelve

 4    years is generally sufficient in most cases.

 5         Q.   Okay.  But five years, in your view, is

 6    too short to reward innovation?

 7         A.   For most innovations, yes.

 8         Q.   Okay.

 9         A.   In pharmaceuticals.

10         Q.   And I know you've testified in both

11    Congress and -- and court proceedings in patent --

12    about the patent laws in -- in patent cases.  Do you

13    have any disagreement with the patent laws as they

14    are now written?

15              MR. MORRIS:  Objection to form.

16              THE WITNESS:  Well, laws can always be

17         improved, but I haven't specifically advocated

18         any particular reforms.

19    BY MS. SUTTON

20         Q.   Okay.  So there is nothing, as you sit

21    here today, that you would advocate should be changed

22    about the patent system?

23         A.   Well, I think it could be harmonized.  I

24    think I've indicated harmonization globally, and, you

25    know, the -- the Hatch-Waxman exclusivity is

 1   different from biologics and new chemical entities,

 2   and that could be harmonized.  I think otherwise you

 3   create more incentives for one type of innovation

 4   compared to another.

 5        Q.   And you have -- you've been involved in a

 6   lot of litigation involving branded pharmaceutical

 7   companies versus generic drug manufacturers, correct?

 8        A.   That's correct.

 9        Q.   And in those cases, is it fair to say that

10   you've generally testified on behalf of the branded

11   drug company?

12        A.   Generally, yes.

13        Q.   Have you ever testified in one of those

14   cases on behalf of a generic?

15        A.   Yes, I've testified on behalf of a patent

16   challenger.

17        Q.   Okay.  But that was just one time that you

18   recall?

19        A.   One time testifying.  Other times I've

20   been retained and the cases have been settled.

21        Q.   Do you have a view on whether or not

22   generic drugs undermine branded pharmaceutical

23   company revenue?

24             MR. MORRIS:  Objection to form.

25             THE WITNESS:  Well, I wouldn't phrase it

 1          that way.  I think both branded and generic

 2          serve very useful social welfare functions.

 3          Branded companies provide discovery of new

 4          products, and generics provide intensive price

 5          competition after patents and exclusivities

 6          expire.  And they're both very important social

 7          welfare functions.

 8    BY MS. SUTTON:

 9          Q.    But after exclusivity has expired and the

10    generic product launches on the market, you would

11    agree that that has a negative impact on the branded

12    pharmaceutical company's profits?

13          A.    Generally that's the case, yes.  And

14    sometimes the product has eroded for other reasons;

15    you know, competition from other brands, et cetera.

16          Q.    But profits can also be eroded by the

17    introduction of the generic, correct?

18          A.    Sure.

19          Q.    Are you named on any patents?

20          A.    No.

21          Q.    Okay.  Have you ever -- well, let's talk

22    about the past.  Have you ever owned stock in a

23    pharmaceutical company?

24          A.    Mainly through mutual funds.  But I have

25    owned some stock in pharmaceutical companies.

1          Q.   Yes.  So setting aside your mutual funds,

2     what companies have you owned stock in,

3     pharmaceutical companies -- strike that.  I'll start

4     over.

5               Setting aside your mutual funds, what

6     pharmaceutical companies have you owned stock in in

7     the past?

8          A.   Well, I have some small amounts in Merck

9     and J&J that I inherited from my mother.  I guess

10    those are stocks for widows and orphans.  And so I

11    still retain, you know, a few hundred shares of

12    those, not an appreciable amount.

13               I have owned some stock in some of the

14    younger companies, like Regeneron Pharmaceuticals.  I

15    was a -- on the board of Triangle Pharmaceuticals, a

16    local company here that developed AIDS products, and

17    so I had stock in Triangle Pharmaceutical, which was

18    acquired by Gilead, and so for a while I had stock

19    options at Gilead.  But I donated much of that to

20    Duke University.

21         Q.   You mentioned Regeneron.  Do you still

22    hold ownership in Regeneron shares?

23         A.   Small amounts, yes.

24         Q.   Do you know how many shares you own?

25         A.   I think I own 25 shares, or -- no, it's

1  250 shares, I think.

2     Q.  Okay.  I think I've seen in prior

3  testimony that you have owned stock in Pfizer?

4     A.  Yes, in the past.

5     Q.  In the past.  Do you -- do you remember

6  how many shares of Pfizer stock you owned?

7     A.  Not an appreciable amount, for terms of

8  anyone's portfolio, you know.  Maybe several hundred

9  shares.

10     Q.  Any other stock holdings in pharmaceutical

11  companies that you can recall besides the ones you've

12  mentioned?

13     A.  I've owned shares in Mylan Corporation.

14        Those are the ones I think I would

15  remember.

16     Q.  Okay.  So do you remember -- do you

17  currently hold stock ownership in Mylan?

18     A.  Yes.

19     Q.  And how many shares do you own?

20     A.  Maybe a couple hundred.

21     Q.  And you mentioned Gilead stock options.

22  Did you receive those stock options as part of the --

23  Triangle being acquired by Gilead?

24     A.  Yes.

25     Q.  And you said --

 1          A.   Well, I had the options, and they rolled

 2   over to Gilead.

 3          Q.   Okay.  All right.  So you had stock

 4   options in Triangle that rolled over into Gilead upon

 5   the purchase of Triangle?

 6          A.   Yes.

 7          Q.   Okay.  Do you know what the value of those

 8   stock options was?

 9          A.   Well, at the time I donated the Gilead

10   shares to Duke University, they were over $100,000.

11          Q.   Did you -- prior to donating them to Duke,

12   did you exercise any of those stock options?

13          A.   No, I didn't exercise them.  I -- you

14   know, I took the -- I rolled them over completely to

15   Gilead because I thought it was a good company to

16   invest in.

17          Q.   And then after they rolled over to Gilead,

18   did you exercise on your own behalf any of the stock

19   options?

20          A.   Yes, at some point I exercised them, and

21   then I donated them.

22          Q.   Okay.  So after you exercised them, you

23   donated all the proceeds to Duke?

24          A.   Yes.

25          Q.   Okay.  Later on we're going to talk about

1    the cases where you've testified as an expert on

2    behalf of a pharmaceutical company.  But have you

3    ever consulted for a pharmaceutical company where --

4    outside of your expert work?

5         A.   Yes.

6         Q.   And how many times have -- have you

7    engaged in such consulting with a pharmaceutical

8    company?

9         A.   Over, you know, 50 years, maybe ten or

10   twelve times.

11        Q.   And do you recall which pharmaceutical

12   companies you've consulted with?

13        A.   To some degree, yes.

14        Q.   If you could list as many as you recall,

15   that would be great.

16             MR. MORRIS:  Are you asking about

17        consulting where he's been revealed as a

18        consultant, so like he's done something, even if

19        it's not litigation?  Or are you talking about

20        consulting where it's for potential litigation,

21        but not disclosed?

22             I just want to know because I will have an

23        objection.

24   BY MS. SUTTON:

25        Q.   Right.  Let's talk about consulting

 1   outside the context of litigation.

 2        A.   Right.  But some of those would be

 3   confidential in nature.

 4        Q.   Okay.  So let's just start over, with the

 5   caveat, my questions now are going to be about how

 6   many -- the consulting that you have done with

 7   pharmaceutical companies outside of your expert work

 8   or outside of litigation.

 9             So you have acted as a consultant to the

10   pharmaceutical industry in the past, outside of your

11   work in litigation or as an expert?

12        A.   Yes.

13        Q.   Okay.  And you mentioned earlier, 10 or

14   12 times.  Is that how many times you would

15   approximate that has occurred?

16        A.   Yes, over a -- a really long time span.

17        Q.   And you mentioned that some of these

18   projects were confidential.  Are there any names of

19   the pharmaceutical companies you were consulting with

20   that you could tell us today that aren't

21   confidential?

22        A.   You know, I think in some publications I

23   have enumerated a consulting relationship, in that it

24   I think would include Pfizer.  Where -- where it's

25   led to a publication, I would generally indicate that

1   funds were provided by a particular company.

2        Q.   So sometimes you would consult, like for

3   instance Pfizer, on a project that then would turn

4   into a publication?

5        A.   Yes.

6        Q.   And then in -- in that publication you

7   would disclose that you received funds from Pfizer?

8        A.   Right.  And I would do that if -- if

9   Pfizer made a grant to Duke for a contract, and I

10  would reveal that as well.

11       Q.   Okay.  And can you name any other

12  companies besides Pfizer that you consulted with?

13       A.   In terms of leading to a publication?  I

14  think Genentech.

15       Q.   Anyone else?

16       A.   Those are the ones I could recall right

17  now.

18       Q.   Do you -- have you ever consulted with a

19  pharmaceutical company on a project that didn't

20  result in a published paper, setting aside

21  litigation?

22            MR. MORRIS:  Yeah.

23            THE WITNESS:  Yes.  I mean, sometimes it

24       is a strategic -- it's a consultant consulting

25       about things like strategies for research

 1      allocation or strategies involving competitive

 2      issues.

 3   BY MS. SUTTON:

 4      Q.   In that type of work, what is your hourly

 5   rate that you generally charge?

 6      A.   It can be less.  It can be similar.  I

 7   mean, often those projects are on a dollar contract,

 8   like there is a budget of so many -- so much money

 9   involved.

10      Q.   So when you said it can be less or more,

11   less or more than your $800 hourly rate?

12      A.   You know, I -- it's not negotiated as an

13   hourly rate, usually.  Sometimes it is.  But, you

14   know, more often it's -- you know, there is a budget

15   of $10,000 that I've agreed to do this project.

16          Another company is -- that I did work on

17   blood products was Grifols, and it -- it had a

18   similar kind of a budget of that kind.

19      Q.   A budget of $10,000?

20      A.   No, a budget -- I don't know what the

21   budget was, but it would be a fixed budget or --

22   Grifols, I think I may have gotten my hourly rate up

23   to some cap, so I got $800 an hour to -- to work on

24   an interdisciplinary project that resulted in a few

25   publications on -- Grifols does blood products.  They

1    extract proteins from blood, and there were issues

2    surrounding, you know, the ethics and economics of

3    paying for donors.  Some countries allow that, like

4    the U.S. and Germany.  Some don't.

5          So we had a project team of ethicists, of

6    economists, of medical doctors.  And we worked -- I

7    think I agreed to work for $800 an hour, subject to

8    an outer cap.  But I don't -- I don't think I ever

9    reached the outer cap.

10         Q.   Do you recall how much with this project

11   you ultimately were paid?

12         A.   No, I don't.  I'd have to review my

13   invoices.

14         Q.   Okay.  Is it possible for you to

15   approximate how much you've been paid working as a

16   consultant for the pharmaceutical industry outside of

17   the litigation work you've done?

18         A.   Not without looking at records, but I

19   would say it's not a huge amount.

20         Q.   And what do you mean by "not a huge

21   amount"?

22         A.   It's not hundreds of thousands of dollars.

23         Q.   Is it $100,000?

24         A.   It might be, over 40 years, yes.

25         Q.   Okay.  You'd have to go back and look at

1   your records to figure -- figure that out?

2        A.   Yes.

3        Q.   Okay.  I've also seen in some of your

4   testimony a reference to you being an advisor on

5   strategic issues for drug companies.  Do you recall

6   giving testimony where you said that you were an

7   advisor on strategic issues?

8        A.   Yes, that was what I was just enumerating.

9        Q.   Okay.

10       A.   Like research allocation, or issues of

11  competition.

12       Q.   Okay.  Did you give strategic advice to

13  Merck?

14       A.   I gave a talk to Merck about work.  I

15  think Merck supported some work that we did many,

16  many years ago.  Maybe more than 20 years ago.

17       Q.   So you gave a speech, or . . .

18       A.   Well, I had a -- some project funds from

19  Merck.  I think they went through the program.  And

20  then I was asked to just present it.  I wasn't paid

21  for the speech.

22       Q.   Okay.  So how did the -- how were the

23  funds that Merck provided, how were they used for

24  this particular strategic issue that you consulted

25  on, if they weren't paid to you?

 1        A.   Well, I -- I think I'm confusing.  There

 2    was -- you know, I did a project through the program

 3    which was -- resulted in one of my publications, my

 4    initial work on returns to R&D and the distribution

 5    of returns to R&D.  And then I also may have done

 6    some strategic, you know, as a sidebar, some

 7    strategic work for Merck of a minor nature.

 8        Q.   Okay.  So you've done -- sounds like

 9    several projects, then, for Merck?

10             MR. MORRIS:  Objection to form.

11             THE WITNESS:  I wouldn't say "several."

12        I've done a few projects many, many years ago.

13        I haven't had any support from Merck in, I would

14        say, more than 20 years.

15    BY MS. SUTTON

16        Q.   Do you know how much Merck paid to support

17    the few projects you described?

18        A.   Not offhand, no.

19        Q.   Okay.  Did -- were you an advisor on

20    strategic issues for Pfizer?

21        A.   Yes.

22        Q.   And can you describe that, please.

23        A.   That would be confidential in nature, but

24    it involved some sort of general competitive issues.

25        Q.   Do you recall how much you were paid by

 1    Pfizer for that work?

 2        A.    Maybe $10,000.

 3        Q.    Any other work as an advisor on strategic

 4    issues for Pfizer that you can recall?

 5        A.    No.

 6        Q.    Have you been an advisor on strategic

 7    issues for Sandoz?

 8        A.    Yes.

 9        Q.    Can you describe that for me?

10        A.    They had an advisory committee.  I -- I

11    have worked on biosimilars.  They're a major

12    biosimilar company, and they had a -- what I'd call

13    an advisory board that met a few times to help them

14    advise about strategies in the biosimilar space.  And

15    I think I was paid like $1,000 a day twice, something

16    like that, to be on this advisory board.

17        Q.    Are you on that advisory board any longer?

18        A.    It -- I think it's defunct.  At least I

19    haven't been contacted in several years.

20        Q.    Okay.  Have you been an advisor on

21    strategic issues for Allergan?

22        A.    Yes.

23        Q.    Okay.  Again, can you describe that,

24    please.

25        A.    That was --

1          MR. MORRIS:  Objection.  I'll just caution

2     the witness to the extent that -- confidential

3     information, not to reveal that.

4          MS. SUTTON:  We have a protective order,

5     Counsel.

6          MR. MORRIS:  Well --

7          MS. SUTTON:  I don't want him to violate

8     any confidentiality --

9          MR. MORRIS:  Correct.  He's got different

10     obligations, potentially.

11          THE WITNESS:  I think it was confidential,

12     but in general, it was related to biosimilars

13     again.  It was in the nature of biosimilar --

14     evolution of biosimilars which I had written on.

15  BY MS. SUTTON:

16     Q.   And do you recall how much you were paid

17  by Allergan for being an advisor on that strategic

18  issue for them?

19     A.   I think it was something like $5,000.

20     Q.   Okay.  Any other times that you've been an

21  advisor on strategic issues to drug companies that we

22  haven't covered?

23     A.   I think, similar to the biosimilars, I was

24  an advisor to Amgen.

25     Q.   Do you recall what you received in

1    compensation from Amgen for that work?

2         A.   Could have been about 10,000 for, you

3    know, various meetings and analysis.

4         Q.   Okay.  Any other companies that you can

5    recall where you've been an advisor on strategic

6    issues?

7         A.   No.

8         Q.   Okay.  Have you ever been hired, either in

9    your own individual capacity or through a third

10   party, to conduct a study on behalf of a

11   pharmaceutical company?

12             MR. MORRIS:  Objection to form.  Are we

13        still outside of the context of retained, but

14        not disclosed or testifying experts, for

15        litigation?

16             MS. SUTTON:  Well, he can answer yes or no

17        without it running afoul.

18             THE WITNESS:  Well, if I understand the

19        question, I have been retained as part of an

20        academic group of colleagues to investigate

21        particular issues.  But I had, you know, a -- it

22        was a -- in the form of being retained to look

23        at a particular issue, to research an issue, to

24        publish on it, and the outside third party had

25        no impact on it other than to say, you know,

1    "Please analyze" -- you know, I'll give an

2    example:  "Please analyze the average

3    exclusivity of innovative drugs."

4         And that was commissioned by a

5    pharmaceutical research association.

6    Q.   Was that PhRMA --

7    A.   Yes.

8    Q.   -- that commissioned that?

9    A.   Yes.

10   Q.   Okay.  Have any other pharmaceutical

11   companies come to you to commission a study on their

12   behalf?

13   A.   Well, I mentioned that if I did a study

14   like that, I would acknowledge it in my -- my

15   publications, so we could look through that.

16        You know, I think I have -- you know, I

17   have the acknowledged support from Pfizer at some

18   point.

19   Q.   So there's another study that you

20   conducted on behalf of Pfizer?

21   A.   I would have to look through -- you know,

22   it's in the distant past, but I -- but I think there

23   is some support from Pfizer to do economic analysis

24   that -- although I think that it really then threw

25   our program.

1          Q.   Okay.  And this earlier study that you

2     mentioned that went through the trade organization,

3     PhRMA, that they sponsor, is that one that you did in

4     conjunction with Tufts?

5          A.   Tufts, Joe DiMasi was involved.  And I

6     think Genia Long was involved.

7          Q.   Okay.  Maybe we'll look at that a little

8     later.

9               Have you, either directly or through a

10    third party, submitted a proposal to a pharmaceutical

11    company to conduct a study regarding the economic

12    impact of abuse-deterrent opioids?

13         A.   No.

14         Q.   Do you know if any third party ever

15    offered your services to Purdue to work on a study

16    related to the economic impact of abuse-deterrent

17    formulations of -- of prescription opioids?

18         A.   I have no knowledge of that.

19         Q.   Okay.  Have you ever made any study

20    proposal to Purdue Pharma?

21         A.   No.

22         Q.   Have you ever been a key opinion leader

23    for any pharmaceutical company?

24              MR. MORRIS:  Objection to form.

25              THE WITNESS:  I don't think I could be

1          characterized that way.  That's usually a

2          medical doctor.

3     BY MS. SUTTON:

4          Q.   Right.  Just asking.

5               So you've never been a -- what's

6     considered a key opinion leader for Purdue Pharma?

7          A.   No.

8          Q.   Okay.  Have you ever considered the opioid

9     effect on hospital utilization, medical costs, worker

10    compensation costs, disability costs, absenteeism

11    costs, caregiver burdens, or criminal justice costs?

12         A.   No.

13         Q.   Turning to something -- I think it's on

14    your résumé -- the American Enterprise Institute.

15    You're familiar with that group, correct?

16         A.   Yes.

17         Q.   Okay.  What would you call them?  I always

18    think of them as like a conservative think tank; is

19    that you would -- how you would characterize them?

20         A.   No.  I -- I think they've been

21    characterized that way, but I think they're basically

22    a market-oriented group that deals with various

23    issues, sort of sponsors conferences and sponsors

24    publications.

25         Q.   What's your association with the American

 1   Enterprise Institute?

 2        A.   Over the years, they -- they were

 3   interested in the economics of pharmaceuticals, so

 4   they asked me to present at conferences that then

 5   resulted in publications.  I was on their advisory

 6   board, but that is more of an honorary position than

 7   anything active.

 8        Q.   Okay.  So you -- you have given -- have

 9   you given speeches at the American Enterprise

10   Institute?

11        A.   I've -- I've talked about my research

12   there, yes.  Similar to what I gave to Congress.

13        Q.   Have they sponsored any of your research?

14        A.   Not -- I wouldn't say they sponsored a

15   research project.  They have sponsored a -- you know,

16   "Please write up a layman's understanding of your

17   research or a review of the literature on a

18   particular topic, and we will publish it."  More

19   oriented to policymakers than the journals that you

20   normally publish.

21        Q.   Right, right.  So do they pay you for that

22   work?

23        A.   I think they would like give you a $2,000

24   honorarium, which means you're working at less than

25   minimum wage.

1          Q.   Does the American Enterprise Institute

2     have like meetings that you would attend?

3          A.   Yes, they -- you know, I think in my CV

4     I've indicated presentations at the American

5     Enterprise Institute.  They would -- back when Bob

6     Helms was their economic director for health

7     economics and related issues, he would sponsor some

8     conferences where academics would present their

9     latest results, and there would be discussions and

10    critics, and they would publish this, and there are

11    three or four publications that reflect that.

12         Q.   So a lot of the work at the American

13    Enterprise Institute is aimed at policymakers and

14    lawmakers?

15         A.   Yeah, and the general public, and -- not

16    so much academics.

17         Q.   Correct.  Do you know how the American

18    Enterprise Institute obtains its funding?

19         A.   I think they get it -- they have

20    endowments.  They get it from different

21    organizations.

22         Q.   Do you know if the American Enterprise

23    Institute receives funding from the pharmaceutical

24    industry?

25         A.   I would assume so, from among other

 1   sources.

 2        Q.   Are you aware of whether or not any

 3   pharmaceutical company or pharmaceutical trade

 4   organization has used your research or your academic

 5   work to defend the price of drugs?

 6        A.   I'm not aware of it, no.

 7        Q.   Do you know whether or not any

 8   pharmaceutical company or pharmaceutical trade

 9   organization has used your academic work to prolong

10   patent protection for branded drugs?  To argue for

11   prolonging patent protection for branded drugs?

12        A.   I'm not specifically aware of that, no.

13        Q.   Okay.  Manhattan Institute, are you

14   familiar with them?

15        A.   Yes.

16        Q.   Do you have an association or affiliation

17   with the Manhattan Institute?

18        A.   No.

19        Q.   Okay.  Were you ever on anything called

20   the Project FDA Committee?

21        A.   It sounds vaguely familiar, but I don't

22   remember doing anything on such a committee.  I may

23   have been approached about it, or they asked me to

24   review a few papers, but other than reviewing some

25   papers and not being paid for it, I don't think there

 1   was any involvement.

 2        Q.   Okay.  So you -- you remember reviewing a

 3   few papers for the Manhattan institute?

 4        A.   Yeah, I remember being very critical of

 5   these papers.

 6        Q.   Okay.  Was it like -- it's not like peer

 7   review?  It was just papers that were sponsored by

 8   the Manhattan Institute?

 9        A.   It was like peer review, but I think they

10   sponsored the work.

11        Q.   Okay.  All right.  So do you have an

12   understanding what kind of organization Manhattan

13   Institute is?

14        A.   Once again, they're very market,

15   libertarian kind of organization.

16        Q.   Okay.  I don't think you've disclosed that

17   on your CV.  Is that because you don't have an

18   official position with them, or . . .

19        A.   That's right.  I have no official

20   position.

21        Q.   Okay.  But you -- you've done some work.

22   Did they pay you for the reviews of the papers that

23   you did?

24        A.   No.

25        Q.   Okay.  Your expert report discloses that

1  you've been an advisor and a consultant to the

2  National Science Foundation.  That's on your --

3  that's actually -- I'm sorry.  It's in your expert

4  report, paragraph 4.  I just want to talk a little

5  bit about what that work was.

6        A.   Oh, the National Academy of Sciences?

7        Q.   Yes, I'm sorry.  National Academy of

8  Sciences Institute of Medicine.  Is that -- is that

9  something that's different than the National Science

10 Foundation?

11       A.   Yes.  They're both branches of the

12 government, but the National Academy of Science

13 Institute is sort of like a branch of, you know, the

14 NIH.

15       Q.   Okay.  Are you aware of whether or not

16 Purdue Pharma or the Sackler family have given money

17 to the National Academy of Sciences Institute?

18       A.   I have no knowledge one way or the other.

19       Q.   Okay.  What kind of topics have you

20 advised and consulted the National Academy of

21 Sciences Institute of Medicine on?

22       A.   There's been a few projects here of --

23       Q.   Are they listed in your résumé?

24       A.   I think there is some . . .

25            So back on page 16?  The first one

1    involved a National Academy of Science study of the

2    impact of government regulation on innovation, and

3    that occurred in the late 1970s.  There was a concern

4    in the country that government regulation had

5    affected innovation, and the Carter administration,

6    through the NSF and through the National Academy,

7    asked them to examine this issue.

8            They put forth a committee of, you know,

9    former government officials and others, and I was

10   what was called a study rapporteur, which was to

11   investigate the academic literature and write a

12   report for this committee that I said was a sort of

13   blue ribbon committee, involved former high officials

14   like the Secretary of State, and other groups.

15       Q.   So if I wanted to find out the topics

16   where you had acted as an advisor and consultant to

17   the National Academy of Science, I would be able to

18   find them by looking in your CV, correct?

19       A.   Yes.

20       Q.   Okay.

21       A.   There's a second one, you know, the -- on

22   vaccine innovation, on the next page.

23       Q.   All right.  Your CV also says, in

24   paragraph 3, that you've testified several times

25   before U.S. Congress on pharmaceutical industry

 1   issues, correct?

 2        A.   Yes.

 3        Q.   And when you say "several times," do you

 4   know how many times you've testified?

 5        A.   I think it's six times, when I counted

 6   last.

 7        Q.   Okay.  And each -- in any of the six times

 8   that you testified, were you testifying on behalf of

 9   any organization or company?

10        A.   No.  I was testifying on my research.

11        Q.   Okay.  Were you representing Duke as part

12   of that, or were you just representing your own

13   research?

14        A.   I would say, you know, they were

15   interested -- I had worked on issues related to

16   legislation, and I was -- a staff member called me

17   up.  I wouldn't say I was representing Duke.  I was

18   reporting on my research to Congress.

19        Q.   Okay.  So in each of the six times that

20   you were -- and maybe we'll have to go one by one,

21   but each of the six times you were called to testify,

22   how were you contacted?  How did it come about that

23   you testified?

24        A.   By a staff member for the relevant

25   committee saying "We're having hearings on a

 1   particular topic, like the Hatch-Waxman Act, or

 2   litigation about patent life prior to the

 3   Hatch-Waxman Act, and I understand you've worked on

 4   this issue, and we would like you to be on the

 5   academic panel, which would other include other

 6   economists."

 7        Q.   So you never testified on behalf of a

 8   pharmaceutical company before Congress?

 9        A.   No.

10        Q.   Okay.  When you testified before Congress,

11   you're doing that work voluntarily?  There's no --

12   you're not getting paid, correct?

13        A.   In the early days, they paid for your

14   expenses; but recently I've had to pay for my own, or

15   like Duke will pay for them.

16        Q.   Right.  It would -- before, they would pay

17   for your hotel or airfare?

18        A.   Yes.

19        Q.   No more, huh?

20        A.   That's correct.  That's government

21   constraints.

22        Q.   Okay.  So have you ever -- have you heard

23   of an organization called contract research

24   organizations?

25        A.   CROs?

1      Q.   Yes.

2      A.   Yes.

3      Q.   Yeah.  Have you ever been retained on

4   behalf of a CRO?

5      A.   No, I don't think so.

6      Q.   Has a CRO ever came to you with a -- with

7   a paper or a study that they wanted you to publish?

8      A.   No.

9      Q.   Okay.  We've talked a little bit about

10  Triangle Pharmaceuticals, a local -- a local company.

11  Was it -- would you call it a startup, or -- from

12  here?

13     A.   Yes, it was a startup.

14     Q.   Okay.  And when did you first get involved

15  with Triangle Pharmaceuticals?

16     A.   Dr. Dave Barry, who was -- who was at

17  Wellcome, who was one of the signature researchers

18  that invented the first AIDS drug, and he left

19  Wellcome -- Wellcome was a pioneer in AIDS research

20  and drugs -- and he formed Triangle.  And I knew him

21  from his days at Wellcome.  And when he founded

22  Triangle, at least not initially, but after a -- a

23  few years, he asked me to be on the board.

24     Q.   Do you recall when that was?

25     A.   It was the end of the '90s.

1    Q.   Okay.  So you served on the board of

2  directors?

3    A.   Yes.

4    Q.   Was it a publicly held company?

5    A.   Initially it was privately, but I think

6  when I was elected or on the board, it was public.

7    Q.   Okay.  And did Triangle Pharmaceuticals

8  have any commercialized products?

9    A.   No.

10    Q.   Okay.  The AIDS drug that you had talked

11  about that he was working on at Wellcome, is that a

12  project that continued at Gilead, or did it stay at

13  Wellcome?

14    A.   Gilead acquired Triangle because we had a

15  drug that could be put in a double and triple therapy

16  with their drugs.  And it was close to approval by

17  the FDA, and they made an offer, and this was --

18  unfortunately, David had passed away, and I was still

19  on the board.  And there was a determination to let

20  Triangle be acquired by Gilead, by the board and by

21  the shareholders.  And they continued the research

22  here in the Triangle to get approval of that drug,

23  and they put it in Truvada and the other triple

24  therapies, and it became the most successful AIDS

25  drug on the market.

1        Q.   So did Triangle have any other types of

2   drugs, like a molecule to treat hepatitis B?

3        A.   Yes, they did.  They had some hepatitis

4   drugs in development.

5        Q.   In development.  Including hepatitis C?

6        A.   I think it was B, but I'd have to -- I'm

7   not certain about that.

8        Q.   And Gilead purchased that drug development

9   as well, correct?

10       A.   Yes.

11       Q.   Okay.  So you were on the board from the

12   end of the 1990s until Gilead acquired Triangle,

13   which I believe was in 2003?

14       A.   Yes.

15       Q.   Do you recall what the purchase price was?

16       A.   You know, in retrospect, it was too low, I

17   think.  But I don't remember the exact amount.  I

18   mean, they made billions on that triple therapy

19   which -- you know, we had talked -- before David

20   passed away, we had talked about more of an alliance

21   rather than a purchase.  And, you know, I think they

22   made a very good purchase.

23       Q.   So -- and Gilead continues today to sell

24   products to treat hepatitis and HIV, correct?

25       A.   Yes.

1          Q.   Okay.  And you would agree that as a

2    consequence of the opioid crisis, there's been an

3    increase, unfortunately, increase in incidence of

4    hepatitis B and C and HIV?

5               MR. MORRIS:  Objection to form.

6               THE WITNESS:  That's a medical question.

7         I don't have an opinion on that.

8    BY MS. SUTTON:

9          Q.   So you don't know one way or the other?

10         A.   Yes.

11         Q.   Okay.  So you were on the board for a

12    number of years.  Did -- were you paid -- did you

13    receive payment to be on the board?

14         A.   What I received was stock options.  I

15    never received any salary.

16         Q.   Okay.  Did you get any money at the time

17    of the sale of Triangle to Gilead?

18         A.   No.

19         Q.   Okay.  But your stock options rolled over

20    into Gilead?

21         A.   Yes, they vested there.

22         Q.   Okay.  They vested at Gilead, and then I

23    think you previously testified that you exercised the

24    options and donated the funds to Duke?

25         A.   Yeah, although I may have misspoke there.

1   I think I donated my Amgen stock to Duke, rather than

2   my Gilead stock.  But I'd have to go back and check

3   for sure.

4       Q.   Okay.  Do you remember the value of the

5   stock options that you exercised with Gilead?

6       A.   No, not exactly, no.  You know, they may

7   have been on the order of a little less than 100,000.

8       Q.   Okay.  And so the -- the stock that you

9   think you donated to Duke you now recall as being

10  Amgen stock?

11      A.   Yes.

12      Q.   Okay.  And do you know what the value of

13  that Amgen stock was?

14      A.   It was over 100,000.

15      Q.   Was it less than 200?

16      A.   Yes.

17      Q.   Okay.  Who were other members on the board

18  of Triangle Pharmaceuticals with you?  Do you

19  remember?

20      A.   Well, of course David Barry was the

21  founder, CEO, chairman.  So he was the -- on the

22  board.  There -- you know, I don't remember a lot of

23  the names, but as a startup, they -- they received

24  money from Venrock, which is a -- you know, a company

25  that funded startups, associated with the Rockefeller

 1    Foundation.  There was a person from the startup out

 2    in California.  There was the vice president of the

 3    company was on the board.

 4          So I think there were three venture

 5    capitalist types.  There were company officials, and

 6    then there was the founder and CEO of a -- of a CRO.

 7          Q.   A contract research organization?

 8          A.   Yes.

 9          Q.   Do you recall which one?

10          A.   That's the one in the Triangle here.  Went

11    private -- I'd have to think about the exact name,

12    but . . .

13          Q.   Okay.  Is your understanding that contract

14    research organizations oftentimes work with

15    pharmaceutical companies?

16          A.   Yeah, I think it -- the person was

17    Gillings, and he founded a local company.

18          Q.   Okay.

19          A.   And -- yeah, they did some work for us at

20    Triangle, because we were a smaller company, and we

21    outsourced some of the development tasks to CROs,

22    including the one that was headed by this individual.

23          Q.   Okay.  I think earlier I had asked you

24    what the purchase price, and I think you said you

25    didn't remember the exact amount, and then went on to

1  say that Gilead made billions of dollars off the

2  product.  Do you have -- can you have an

3  approximation of -- of what the purchase price was?

4  Was it around 400 million?

5      A.   That sounds about right.  I think they

6  paid $6 a share, but the company went public at $12 a

7  share.  And so the early shareholders publicly took a

8  beating.

9           And the reason for that was this drug was

10  being tested abroad, in the U.S. as well as in South

11  Africa.  It ran into some issues of -- regulatory

12  issues in South Africa that wasn't -- they were doing

13  testing in triple therapies, and some adverse events

14  occurred that weren't associated with our drug.  Our

15  stock dropped because we were a small company.  And

16  that's when Gilead came in and took us over.

17      Q.   Swooped it up?

18      A.   Yes.

19      Q.   Okay.  So I was going to go into a topic

20  that's going to take a while.  I know -- I don't know

21  if you want to do a break now or wait.

22      A.   Yeah, I like to break every hour, just for

23  my back.

24      Q.   Yeah, I get it.  Thank you.

25           VIDEOGRAPHER:  Going off the record.  The

1          time is 11:31 a.m.

2               (A recess transpired from 11:31 a.m.

3               until 11:43 a.m.)

4               VIDEOGRAPHER:  Going back on the record.

5          The time is 11:43 a.m.

6     BY MS. SUTTON:

7          Q.   So we touched on this briefly before, but

8     your expert report said that you were assisted in

9     this case by the staff of Cornerstone Research.

10    That's correct, right?

11         A.   Yes.

12         Q.   Okay.  How would you describe Cornerstone

13    Research?

14         A.   Cornerstone Research does consulting

15    services relative to litigation, as well as related

16    to other matters.  They provide support for experts

17    in litigation.  They initially started as more

18    strategic analysis in the energy business and were

19    asked to help with some litigation.  And then I think

20    over time they've evolved more into litigation

21    support, and so they have many Ph.D.s in economics

22    and related fields, MBAs.  And some of them are

23    distinguished experts in their own right.

24         Q.   Do you know how many people are employed

25    at Cornerstone Research?

 1          A.   No.  I know they have offices in four or

 2     five cities, but I don't know their total employment.

 3          Q.   Do you know how many people at Cornerstone

 4     Research assisted you in your report in this matter?

 5          A.   Well, I mainly dealt with three

 6     individuals.  Greg Eastman.  Ceren -- have to look up

 7     her last name; I call her Ceren -- and Ross.  Ceren

 8     and Ross were the main individuals that I -- along

 9     with Greg.  And then they had a team that did some of

10     the technical analysis that sometimes were on phone

11     calls.

12          Q.   Do you know how big that team was?

13          A.   Could be three or four more individuals.

14          Q.   Now, what -- how would you describe your

15     relationship with Cornerstone?

16          A.   Over the years, I've used them on

17     litigation support.  I've also used other firms, like

18     Analysis Group.  But Cornerstone, I think, is one of

19     the top economics consulting firms.  And I think they

20     do high-level support work.

21          Q.   When did you first start working with

22     Cornerstone Research?

23          A.   I would say between 10 and 15 years ago.

24          Q.   Okay.  Did you go to them, or did they

25     come to you?  Do you recall?

1        A.    Initially they contacted me about a case

2    that had some I think North Carolina connections to

3    it.  I don't remember exactly what the case was, but

4    they -- they asked me if I was interested in serving

5    as an expert.  I don't think it ever went to -- it

6    was more of an advisory kind of role, so I don't

7    think it ever went into litigation.

8        Q.    And then from there, you just continued to

9    get more contacts from Cornerstone about additional

10   expert work?

11       A.    Yeah, or I contacted them sometimes

12   when -- a lot of times law firms would contact me

13   directly, and I'd say, "Well, I'd like to have

14   support on this, because I'm a full-time faculty

15   member, initially, and to help me with this and

16   provide some, you know, data-crunching under my

17   direction," whatever.

18            And, you know, oftentimes the law firm

19   would agree, or they might say, "Well, we normally

20   work with this company; would you work with them?"

21       Q.    But in this case, in the opioid

22   litigation, Cornerstone Research came to you to see

23   if you would be interested in working as an expert?

24       A.    Initially, yes.

25       Q.    Okay.  Now, you're not an employee of

 1   Cornerstone Research, are you?

 2       A.   No.

 3       Q.   So you don't receive a W-2?

 4       A.   No.

 5       Q.   But do you receive a 1099?

 6       A.   Yes.

 7       Q.   Okay.  And would those 1099s reflect how

 8   much Cornerstone has paid to you directly for your

 9   work on -- with them?

10       A.   Yes.

11       Q.   Okay.  Do you have any idea of how much,

12   over the years, Cornerstone has paid you for your

13   expert work?

14       A.   No.  It varies with how much involvement I

15   have with them on cases, and also how much activity

16   they do on those cases supporting me.  And -- and

17   other functions, like I sometimes do continuing ed

18   for them, or . . .

19       Q.   Okay.  So like on a particular litigation

20   project, do you get paid a portion of what -- do you

21   get paid from Cornerstone services?  Just trying to

22   understand how the -- the money works with -- when

23   you do expert work for Cornerstone in general.

24       A.   I get a check a few times a year, and it

25   says "Thank you for your, you know, involvement, and

1  here's a check relating to our support of projects

2  that we jointly pursued."

3          And I think it is -- it has some basis in

4  percentage relationship, as well as it could involve,

5  you know, payment for some of the other things I do

6  for Cornerstone occasionally, like presentations at

7  breakfasts, continuing education, that kind of thing.

8          Q.   Setting aside the breakfasts or the

9  continuing education, just talking about a litigation

10  matter where you're the expert and they're providing

11  support to you for your expert report, do you receive

12  a percentage of their billings?

13          A.   I think that's the way they determine it,

14  but it also may vary over time.  I don't know if the

15  percentage is fixed, or varies, or what.

16          Q.   Okay.  Do you have a -- is your

17  arrangement -- do you have any arrangements with

18  Cornerstone in writing?

19          A.   No.

20          Q.   Do you ever enter into a writing with

21  respect to what your -- the percentage is going to be

22  for a particular case?

23          A.   No.

24          Q.   And then how is that percentage

25  determined?

1       A.   They determine it internally, and, you

2   know, they -- as I said, I get a check semi-annually

3   about -- relating to my work with them, but I don't

4   know exactly what the percentages is -- are or

5   what -- how it varies over time.

6       Q.   So how big have the -- some of those

7   checks been for a particular project, if you don't

8   know what the percentage is?

9       A.   It's not -- it's not for one project.  So

10  I do four or five cases over the year, and I get two

11  checks.  And, you know, I think the most recent check

12  was about $20,000.  Checks have been in that range.

13  Sometimes they are larger if there's a very intensive

14  workload on a case that goes to trial.

15      Q.   So the checks don't come based on a

16  project.  They just -- you get a certain number of

17  checks in a year?

18      A.   Yes.

19      Q.   Okay.  And how -- how often do you get

20  checks from Cornerstone Research?

21      A.   Semi-annually.

22      Q.   Okay.  And those checks are based on all

23  the projects and works that you -- work that you've

24  done with them over the -- during that six-month

25  period?

1    A.   Yes.

2    Q.   Okay.  I'm just trying to understand how

3  that check gets calculated.

4    A.   I think -- as I said, I think it's a

5  percentage basis, but it can vary.  You know, there's

6  very -- they have various rules, or allocation rules,

7  and I've never inquired and said, "Well, you know,

8  how much am I getting related to this or that?"

9         I mean, they -- I trust them.  There's an

10  attribution and -- based on work that they support me

11  on, and, you know, I never inquired about what the

12  exact percentage is.  I think it -- it can vary,

13  depending on, you know, whether I brought work to

14  them or they contacted me.  There can be other

15  variables.

16    Q.   Okay.  Do you know what the financial

17  arrangements are with Cornerstone for this case and

18  how Cornerstone is going to pay you for your work in

19  this case?

20    A.   No.  I think there will probably be a

21  percentage, some percentage.  But it's -- you know,

22  as I say, the checks are not that large that I'm

23  getting a huge amount of their bills.

24    Q.   Okay.  So -- so you have no idea, then, as

25  you sit here, what the financial relationship with

1    Cornerstone is going to be on your work in the opioid

2    case?

3         A.   That's correct.

4         Q.   Okay.  Did you get a check at the end of

5    2018?

6         A.   I got a check in March, I think, of this

7    year.

8         Q.   Okay.  And was that for the prior six

9    months, or . . .

10        A.   You know, I don't know.  You know, I think

11   there's some lags in the process, so it could have

12   been for the last six months of last year, or . . .

13        Q.   Okay.  And Cornerstone started working and

14   supporting you on this case last -- in the summer of

15   last year, correct?

16        A.   Yes, although I think the work really

17   started towards the end of the year.

18        Q.   Okay.  How much was the check that you

19   received in March?

20        A.   I think it was like 20,000.

21        Q.   Okay.  And did that include -- for -- for

22   that time period, did it include work on this case?

23        A.   Possibly, yes.  Probably, yes.

24        Q.   Okay.  Did it include work on any other

25   cases?

1        A.   Well, let me look at my workload here.

2             It might have included work on some other

3    cases.  But it looks like the deposition and trial

4    testimony for Galderma at the end of -- in October

5    and December of last year.  Cornerstone wasn't

6    involved in that.

7        Q.   Okay.

8        A.   Couple of the other cases where I

9    testified earlier in the year, Cornerstone was

10   involved, but -- so I don't know the lag involved

11   there.

12       Q.   Okay.  So when you get a check from

13   Cornerstone, does it come with any paperwork, or is

14   it just a check?

15       A.   It's a check with a "thank you" letter.

16       Q.   And does the "thank you" letter have any

17   more than just "Thank you"?  Does it have any

18   substance to it?

19       A.   It has no -- if you're talking about

20   accounting, no, there's no accounting of -- you know,

21   "This is the amount associated with this project."

22   But it is a check saying, "This is attribution to you

23   for work that we jointly did.  We continue to have a

24   good relationship, and" -- you know, that kind of

25   letter.  It's a two-paragraph letter.

1      Q.   Okay.  But it doesn't have any accounting

2   or division of, you know, where the money -- why

3   certain funds are being paid for what projects?  It

4   doesn't include that kind of information?

5      A.   That's correct.

6      Q.   Okay.  How many projects do you think

7   you've worked on with Cornerstone over the years?

8   Litigation projects?

9           That's only four years.

10      A.   Right.  No, and I've only worked with

11   Cornerstone maybe ten years, and I started not doing

12   a lot with them, and then as I gained confidence that

13   they were a really excellent team to work with, I --

14   I did more work with them.

15      Q.   Okay.

16      A.   Maybe there's a dozen here over the last

17   four and a half years, and then maybe another dozen

18   going back in time.

19      Q.   Okay.  We're going to go through some of

20   those lists, and maybe we can -- maybe you can

21   identify them when we get to those, which ones were

22   Cornerstone projects and which ones weren't.

23           So I'm going to show you what's been

24   marked as Exhibit 4.  And I think you have this.

25   These are the invoices that were provided to us early

 1   this morning by your counsel.

 2        (Exhibit 4 was marked for identification.)

 3             MR. MORRIS:  Just so I know which, is it

 4        the full set, or the ones that are --

 5             MS. SUTTON:  No, just the Grabowski.

 6             MR. MORRIS:  Got it.

 7   BY MS. SUTTON

 8        Q.   So do you recognize these four invoices?

 9        A.   Yes.

10        Q.   And these are invoices that you prepared,

11   correct?

12        A.   Yes.

13        Q.   And you submit them to Arnold & Porter for

14   payment?

15        A.   Yes.

16        Q.   And then Arnold & Porter writes a check to

17   you, not to Cornerstone, correct?

18        A.   Yes.

19        Q.   They pay you directly.  All right.

20             And these seem to be -- appear -- these

21   invoices seem to be appear -- appear -- strike that.

22             These invoices appear to be current

23   through May 31st of 2019; is that correct?

24        A.   Yes.

25        Q.   And I assume you've had some additional

1    work in June?

2         A.   Yes.

3         Q.   Do you have any idea how many hours?

4         A.   So today's the 6th.  We've had some prep

5    sessions.  I've done some review.  Maybe another

6    20 hours.

7         Q.   Okay.  So I took the liberty of adding up

8    the hours that are set forth in these exhibits, and I

9    came to a total of 182 hours.  Does that sound about

10   right?

11        A.   Yes.

12        Q.   And then plus an additional 20.  And if

13   you're using your hourly rate in the totals that you

14   said were due, I came up with a total of $145,600.

15   Does that sound about right?

16        A.   So --

17        Q.   I think my math is right.

18        A.   I was just looking at this.  So you're

19   saying it's how much?  164?

20        Q.   $145,600.

21        A.   Well, if it was 200 times 8 -- yeah, I

22   guess that's right.

23        Q.   Okay.  And have you been paid -- are all

24   these -- have these statements all been paid?

25        A.   My understanding is they've been approved

 1   by the company, but I don't know that they've -- I

 2   don't believe they've actually -- I haven't checked

 3   recently, but I don't -- they -- you know, they do

 4   a -- they do a transfer into my bank account.

 5        Q.   Okay.  And you -- you have a -- it's

 6   transferred into Grabowski Associates, Inc.  Is that

 7   like an LLC that you've set up?

 8        A.   It's a C corp, yes.

 9        Q.   C corp.  And this is a C corp for your

10   expert work?

11        A.   Primarily, yes.

12        Q.   Okay.  Just a few questions about these

13   bills.  I haven't had a lot of time to study them,

14   but I see -- I was trying to identify the amount of

15   time that's indicated here that you spent reviewing

16   academic and economic studies, and it looks like on

17   June 15th, 2018, you spent 5 hours reviewing studies.

18   And then on the next statement, on March 29th, 2019,

19   you spent another 5 hours reviewing academic and

20   economic studies.

21             I didn't see any other references to you

22   working on the review of the literature, other than

23   those two references.  So is it fair, then, to say

24   that you spent about 10 hours reviewing the academic

25   and economic literature?

1       A.   I would think it's more, that -- you know,

2   those were the days where that was the primary task,

3   but I have a lot of items like work on draft reports,

4   which could be searching literature for a particular

5   reference.

6       Q.   So do you -- can you estimate how much

7   more time beyond the 10 hours that are described you

8   may have spent reviewing economic or economic studies

9   -- academic or economic studies?

10      A.   Well, it -- it would also be in

11  conjunction with like Rosenthal referenced something,

12  and I looked at that.  And similar with Cutler,

13  Gruber, and McGuire.  So, you know, probably a

14  multiple of those -- those 10 hours.  Maybe a

15  multiple of 5 or something.

16      Q.   So could be up to 50 hours --

17      A.   Yeah.

18      Q.   -- you're thinking?  Okay.  Of your

19  approximately 200 hours you've spent on this case.

20  Okay.

21           Then I wanted to ask you about an entry on

22  the second invoice, the April invoice.  The entry is

23  for March 13th, 2019; it indicates 5 and a half hours

24  for report draft and agenda.  Do you see that?

25      A.   What date is that?

1          Q.    March 13, 2019.  Says "Report draft and

2     agenda."

3          A.    Okay.  These are a little out of order.

4          Q.    I'm sorry.

5          A.    Yes.

6          Q.    Okay.  I'm just trying to understand what

7     this entry is.  Is this when you received a draft of

8     the report, and you're reviewing it?

9          A.    No, I think the way I usually work is to

10    prepare an outline of, you know, what I think the

11    report will look like, what -- what agenda I have to

12    pursue to kind of fill in the placeholders.  And so I

13    think this is a draft outline more than a report

14    draft.

15         Q.    Okay.  I just didn't see the word

16    "outline," because -- like on the next invoice, on

17    March 15th, which is approximately a month later,

18    there is an indication of a draft report outline.

19         A.    Yeah, so there's an evolutionary process.

20    And at this point we didn't have a draft, I'm pretty

21    sure, in March.  We had an outline.

22         Q.    Yeah.  And you mentioned placeholders,

23    that you put placeholders in your -- in your outline?

24         A.    Yeah, that's part of an agenda saying,

25    "Here's an outline of the likeliest report, which

 1   changes over time as we get into it, but -- and

 2   here's some of the things we need to do to implement

 3   this report."

 4        Q.   Right.  And are these outlines then shared

 5   with Cornerstone?

 6        A.   They're discussed with them, yes.

 7        Q.   Yeah.  You've been saying "we."  Is that

 8   that -- you're referring to working with Cornerstone?

 9        A.   Yes.

10        Q.   Does the "we" include attorneys, or . . .

11        A.   Not at this stage, no.

12        Q.   Okay.  So when you would indicate that

13   there are placeholders in the outline, sometimes

14   would you have Cornerstone fill in those placeholders

15   or draft those placeholders for you?

16        A.   I think they would do some literature

17   search under my direction, or various tasks under my

18   direction, yes.

19        Q.   Would they provide language to you?

20        A.   In some cases they might, but I would

21   always edit it in my -- you know, it was always my

22   report, so if they drafted anything like a discussion

23   in Table 1, then I would edit it or redraft it.

24        Q.   So in your expert report, did they draft

25   any -- or propose any drafts of any of the language

 1    in the actual body of the report?

 2        A.    I wouldn't characterize it that way.  I

 3    think -- you know, it started with my outline, my

 4    words, and sometimes I would delegate a particular

 5    section related to literature or a search or

 6    something, and they might put words down, and then I

 7    would edit it so that it reflected my opinion.

 8        Q.    Do you still have a copy of the -- of the

 9    outline, finished outline you did for this report?

10        A.    I don't think so.

11        Q.    Okay.  So sometimes they would, then,

12    provide you with language for certain sections of the

13    report that you would then review and edit?

14        A.    Yes.

15        Q.    Okay.  Would they ever -- did you share

16    drafts with them of your report as it was being put

17    together?

18        A.    Yes.

19        Q.    And then would they provide edits or

20    markups to you?

21        A.    They -- they could -- they could provide

22    suggestions, yes.

23        Q.    Okay.  And how would they typically do

24    that?

25        A.    We would go over a section of the report,

1    and they might suggest doing further, you know,

2    citations or something.

3          Q.   Okay.  Would you have those conversations

4    on the phone, or would they do like markups, like a

5    redline markup on the actual document?  How would

6    that happen?  Or would it happen both ways?

7          A.   We would have a Zoom -- you know, the

8    draft evolved over time, and we would do it generally

9    on Zoom, and we would look at it, and, you know, it

10   would go through another iteration.  We would look at

11   it again.

12         Q.   Okay.  When you were on Zoom and you were

13   looking at it together sometimes, would you then send

14   them off to do certain things on your report before

15   you would have the next meeting?

16         A.   Yes.

17         Q.   Okay.  And how many meetings do you think

18   you had with Cornerstone about your report?

19         A.   Once we got into March, where we were kind

20   of more intensively involved in the report and

21   responding to Rosenthal, I think we agreed to have a

22   discussion every Thursday.  But sometimes that, you

23   know, would shift to Wednesday or Friday.  But it was

24   at least weekly, beginning in March.

25         Q.   Okay.  And then I see references to

1    conference calls in your invoices.  Would that be --

2    is that referring to those conference calls with

3    Cornerstone?

4         A.   Primarily, yes.

5         Q.   Would you have conference calls with other

6    people that might be indicated in these invoices

7    besides Cornerstone?

8         A.   I think once or twice the attorneys, we

9    had a call with the attorneys to give us some update

10   on the case.

11        Q.   Okay.  Would the attorneys be present on

12   the conference calls with Cornerstone?

13        A.   Sometimes.

14        Q.   How -- could you say how often that would

15   happen?

16        A.   A few times.

17        Q.   Was it more often that you would have

18   conference calls with Cornerstone where attorneys

19   weren't present?

20        A.   Yes.

21        Q.   Okay.  So you would -- during the Zoom

22   meetings, would you be sharing the document on a

23   screen that you were -- everyone was looking at?

24        A.   Yes.

25        Q.   Okay.  Do those -- did those documents as

 1   they -- are they still in existence as they were up

 2   on the screen with Cornerstone when there were no

 3   lawyers present?

 4        A.   No, I don't think so, because the

 5   documents --

 6        Q.   You wrote it over?

 7        A.   Yes.

 8        Q.   Okay.  So then the Rosenthal report came

 9   in -- I think you received it March 25th.  Did -- and

10   I assume you communicated with Cornerstone about what

11   the Rosenthal report said, right?

12        A.   Yes.

13        Q.   Okay.  Did they -- did Cornerstone provide

14   any written critique or analysis of the Rosenthal

15   report to you?

16        A.   No, I provided the critique and shared it

17   with them.

18        Q.   Okay.  So I'm going to show you something,

19   what's been marked as Exhibit 5.  And this was

20   provided to us early this morning from your counsel,

21   and it purports to be the -- the bills that

22   Cornerstone has -- the invoices Cornerstone has

23   created for their work with you in this case.

24        (Exhibit 5 was marked for identification.)

25

 1    BY MS. SUTTON:

 2         Q.   I'm not sure.  Do you -- have you ever

 3    seen that before?

 4         A.   I saw it briefly yesterday in my prep

 5    session with Sean Morris.

 6         Q.   Do you generally see Cornerstone's bills

 7    for the projects you work on?

 8         A.   No, I've never seen them prior to this

 9    case.

10         Q.   Okay.  And is your understanding that

11    Cornerstone would have sent this bill to Arnold &

12    Porter for payment?

13         A.   Yes.

14         Q.   Okay.  What -- what time yesterday did you

15    see those invoices?  Do you recall?

16         A.   Yesterday afternoon.

17         Q.   Okay.  So I'm not going to ask you a lot

18    about those.  Have you looked at those very

19    carefully?

20         A.   No.

21         Q.   Okay.  Have you -- have you reviewed them

22    at all?

23         A.   More for who are these people, you know.

24         Q.   Right.

25         A.   And you know these people.  And I do know

1    several of them.  Some of them I -- several of them

2    were on calls, the primary person, people that I knew

3    was -- or recognize as James Eastman, Robby Letson,

4    certainly Ceren Aruoba, and Ross was on the call, or

5    several calls.  And, you know, some of the other

6    individuals selectively on the team, that the

7    technical or --

8         Q.   So are there names on there that you don't

9    recognize?

10        A.   Yes, there are a few names that were on

11   the technical team doing, you know, some of the data

12   crunching that didn't come onto the call, I think.

13        Q.   All right.  So some of the names were new

14   to you when you were flipping through that?

15        A.   Yes.

16        Q.   Okay.  So I think we had talked about how

17   you had spent 182 hours in billings in these invoices

18   that make up Exhibit 4, and -- and you said you've

19   testified that you worked an additional 20 hours.

20             So we took a look at these invoices from

21   Cornerstone, and they reflect 1,239.6 hours on the

22   project supporting you through April 2019.  And

23   adding up the amount that they have billed, it's

24   $478,600.

25             So is it your understanding that these

1    bills are provided to Arnold & Porter for payment?

2         A.   Yes.

3         Q.   And --

4         A.   Well, ultimately Endo, I guess, but . . .

5         Q.   So do you have any understanding of the --

6    through April, of the $478,600 that they're going

7    to -- that they have billed or will bill to Arnold &

8    Porter, what percentage you're going to receive or

9    how much you will receive of that?

10        A.   So maybe 5 percent.  I don't know.  It's a

11   guess, but . . .

12        Q.   Have you had any discussions with Greg

13   Eastman or Ceren or any folks at Cornerstone about

14   how much you're going to receive from Cornerstone

15   that they've billed to Arnold & Porter?

16        A.   No, but, you know, in some -- in some

17   contractual relationships that I have with, you know,

18   other firms, they -- they spell out, you know, "We're

19   going to give you 5 percent for work that we bring to

20   you, and we're going to give you 7 and a half percent

21   if you bring the work to us."

22             So that's a kind of typical industry norm,

23   if you want.  I don't know if Cornerstone adheres to

24   that or not.

25        Q.   Okay.  And you're not going to make any

1    demand on them on what the percentage is going to be?

2    You're just going to let them decide?

3        A.    Yes.

4        Q.    Okay.  But you think it will probably be

5    around 5 percent?

6        A.    Something like that, yes.

7        Q.    Okay.  All right.  Let's move to

8    another -- sorry; too much paper -- expert witness

9    organization I think you've worked with.  Have you

10   worked with a group called the Analysis Group?

11       A.    Yes.

12       Q.    Okay.  And what's your understanding of

13   the Analysis Group?  What do they do?

14       A.    They are -- do similar things to

15   Cornerstone.  They provide expert support.  They

16   do -- they have their own set of experts on cases.

17   They do academic work.  I've done some publications

18   with individuals at Analysis Group.  So they -- their

19   work, you know, they do cost-effectiveness analysis

20   for the industry or for -- or health entities.

21            MS. SUTTON:  Okay.  So I'm just going to

22       have you mark -- I think we're up to 6.

23       (Exhibit 6 was marked for identification.)

24   BY MS. SUTTON:

25       Q.    So 6 is -- comes from the Analysis Group

 1   website, and it's -- it's a listing of you and

 2   your -- your experience and background.  Do you see

 3   that?

 4          A.   Yes.

 5          Q.   Okay.  And I think you also appear on the

 6   Cornerstone website as well, correct?

 7          A.   I haven't looked at it, but I would

 8   presume so, if they list their experts.

 9          Q.   Right.  And it has a summary of your

10   experience.  And you would agree that that explains

11   your relevant experience in the field, right?

12          A.   Yes.

13          Q.   Okay.  So it sounds like you do different

14   types of work with the Analysis Group.  So you've

15   authored some articles through the Analysis Group?

16          A.   Yes.

17          Q.   Okay.  Do you know how many?

18          A.   I can recall at least three.

19          Q.   Are they for the actual peer-reviewed

20   literature, or are they for more -- different types

21   of literature?

22          A.   Peer reviewed.

23          Q.   Peer reviewed.  Okay.

24               And how -- how does it come about that you

25   end up working with Analysis Group on peer-reviewed

1    literature?

2         A.   It either could be at my initiation or

3    their initiation.  So the particular articles that we

4    did on the -- the average exclusivity period between

5    when a brand enters the market and when a generic

6    first enters the market, we've done a series of

7    papers on that, and it builds on some work I had gone

8    with Margaret Kyle, who was at Duke and now is at a

9    university in Paris.

10        And the -- PhRMA approached us to kind of

11   follow up on that work, and they suggested -- they

12   had worked with Analysis Group, and they suggested

13   that I -- we go ahead, and Analysis Group would be a

14   collaborator and do some of the number-crunching, and

15   I would supervise it and essentially write the

16   article.

17        Q.   Right.

18        A.   And that's the way that -- those three

19   articles evolved.

20        Q.   Right.  And so then they -- they're

21   providing support to you in writing the article; is

22   that a fair way to describe it?

23        A.   More they're colleagues, and that when

24   it's a publication, they provide support, but they

25   also, you know, help structure the project, you know,

 1   that -- these are Ph.D. individuals that are

 2   respected and do publications.

 3            You know, I also have used Analysis Group

 4   in litigation support.

 5        Q.   Right.

 6        A.   Some of -- people there.  But --

 7        Q.   With respect to authors, then, the people

 8   that you collaborate with from Analysis Group, do

 9   they appear as listed authors on the article?

10        A.   Yes.

11        Q.   Okay.  And the articles that you were

12   talking about, you mentioned PhRMA, which is -- would

13   PhRMA have provided funding for the article?

14        A.   Yes, although in some cases I was unpaid.

15        Q.   Okay.

16        A.   Because I -- I felt a conflict of

17   interest, at least -- at least in one of them.

18        Q.   And why -- why was that?

19        A.   Well, that I was involved in some other --

20   you know, other matters involving generic competition

21   and exclusivity, and I just felt -- I would be -- I

22   could be an academic, but I didn't want to take a

23   paid physician for the article.

24        Q.   Okay.  So the -- the funding would go to

25   maybe the folks in Analysis Group then?  Or . . .

1      A.   Yes.

2      Q.   Okay.  Do you know how much funding PhRMA

3  provided to -- to you or the Analysis Group for these

4  projects that you worked on?

5      A.   I'd have to go back in my records.  On a

6  few where I was paid, it was, you know, a lot less

7  than what I get in litigation.

8      Q.   Yeah.  So let's talk about -- you

9  mentioned that you worked with Analysis Group on

10  litigation.  Is it in a kind of a similar capacity

11  with what you describe with Cornerstone?

12      A.   Yes.

13      Q.   How many projects, legal projects, do you

14  think you've worked on with the Analysis Group?

15      A.   At least a half-dozen.

16      Q.   Okay.  And how long have you been working

17  with them?

18      A.   You know, it goes back a lot of years.  I

19  would say at least ten years.

20      Q.   Okay.  Now, how does that -- just to

21  understand how it works, if it works like it does

22  with Cornerstone, do you get a -- a share of -- of

23  the billings of the Analysis Group in projects

24  where they're -- litigation projects where they're

25  supporting you?

1      A.   Yes.

2      Q.   Okay.  And is that a set percentage?

3      A.   Yes.

4      Q.   And what is the percentage?

5      A.   It varies from 5 to 7 and a half.

6      Q.   Okay.  And do you get paid by project, or

7  do you get paid on a -- on a monthly or annual basis?

8      A.   Analysis Group gives you very detailed

9  accounting by month.

10     Q.   Okay.  So you would see the sorts of

11  invoices that I just previously showed you for

12  Cornerstone, you would see that type of information

13  from Analysis Group?

14     A.   No.

15     Q.   It would be less detailed?

16     A.   Yeah.  Very less detailed.

17     Q.   But you would -- you would get information

18  about what they had billed and collected on the

19  projects that you worked on with them?

20     A.   Yes.

21     Q.   Okay.  Do you know if Analysis Group is

22  involved in this litigation?

23     A.   I do not know.

24     Q.   Do not know.  Okay.

25          Maybe we'll do one more, and then take --

 1  this will be short, and then do you guys want to have

 2  lunch?

 3          MR. MORRIS:  Sure.  I think it's in the

 4      next room, so . . .

 5          MS. SUTTON:  Yeah.  It's 12:30.

 6  BY MS. SUTTON

 7      Q.   So -- okay.

 8          The Brattle Group, have you heard of an

 9  organization called "the Brattle Group"?

10      A.   Yes.

11      Q.   And are they a similar type organization

12  to Cornerstone and -- and Analysis Group?

13      A.   Yes.

14      Q.   Okay.  So -- and again, I think you're

15  listed on their website, does that make --

16      A.   Yes, I am.

17      Q.   Okay.  How long have you been associated

18  with the Brattle Group?

19      A.   Well, the Brattle Group bought out a

20  company that I worked with many -- my first real

21  litigation was back in the '80s.  I worked on a

22  so-called DES long-tail liability with a company -- I

23  forget the exact name -- that Brattle eventually

24  acquired.  And so I would say that I worked with --

25  since the '80s with the Brattle, or their previous

 1   version of the Brattle.

 2         Q.   So you're listed as an academic advisor on

 3   their website.  What does that mean?  Do you know?

 4         A.   Well, a lot of work I've done with Brattle

 5   have been more consulting, nonlitigation.

 6         Q.   And consulting with whom?

 7         A.   Consulting like -- one case, give you at

 8   least a flavor of the case, is a company -- the IRS

 9   wants to get a company to pay more, based on

10   international relationships or affiliates, and, you

11   know, I was brought in to sort of analyze it and give

12   them some advice.

13         Q.   Was the company in -- in question a

14   pharmaceutical company?

15         A.   Yes.

16         Q.   Okay.  Can you tell us which one?

17         A.   No.

18         Q.   Okay.  Can you tell us how much you were

19   paid to do that?

20         A.   Maybe 20,000.  It wasn't a big job, in

21   terms of hours.

22         Q.   Have you had similar projects like that

23   with the Brattle Group?

24         A.   Yes.  We're talking about the Brattle

25   Group?

1          Q.   Right.

2          A.   You mean other projects?

3          Q.   Yeah, other projects, like consulting

4     projects with the Brattle Group besides the one

5     you've discussed.

6          A.   Not that I can recall.

7          Q.   Okay.  So just the one?

8          A.   Yes.

9          Q.   All right.  Now, have you also

10    been working with the Brattle Group in litigation?

11         A.   Yes.

12         Q.   Have they provided support services to you

13    in your role as an expert witness?

14         A.   Yes.

15         Q.   Do you know on how many cases?

16         A.   Well, there was this one, one that went on

17    many years, complex litigation in California and then

18    New York.  Long-tail liability.  And so that was a

19    major case.  But then I didn't do much work with

20    them, maybe two or three more cases since then.

21         Q.   Okay.  Does it work similarly to the other

22    two expert research groups, where you get a

23    percentage of Brattle Group's billings?

24         A.   Not in the 1980s.  I think that was

25    something that came about more recently, after 2000,

 1    this attribution fee to experts.

 2        Q.   Okay.  And then do you have a set

 3    percentage agreement with Brattle Group?

 4        A.   I think it could be similar to Analysis

 5    Group, the 5 or 7 and a half percent range.

 6        Q.   Okay.  And that started in the 2000s when

 7    you were working with the Brattle Group?

 8        A.   Yes.

 9        Q.   Okay.  And how did that come about?  Did

10    you raise the idea with them that you would get an

11    attribution percentage, or did they bring that idea

12    to you?  Do you recall?

13        A.   I don't recall specifically with Brattle

14    Group, but one of the groups raised the -- or said

15    they were going to pay attribution fees to -- to

16    economists or experts.  And then, you know, it became

17    more widespread.

18        Q.   Okay.  So we've talked about Cornerstone.

19    We've talked about Brattle.  We talked about the

20    Analysis Group.  Are there any other expert witness

21    service organizations you work with that I've missed?

22        A.   I worked once, many years ago, with

23    Charles Rivers, which is in Boston.

24        Q.   Right.  Did you have an attribution fee

25    arrangement with them?

```
 1          A.   I don't believe so.
 2          Q.   Okay.  Are there any other expert witness
 3   organizations that you work with?
 4          A.   I think it's those four.
 5          Q.   All right.  Okay.  Thank you.  Good time
 6   for lunch?
 7               MR. MORRIS:  Sure.
 8               MS. SUTTON:  Okay.
 9               VIDEOGRAPHER:  Going off the record.  The
10          time is 12:28 p.m.
11               (A luncheon recess transpired
12                from 12:28 p.m. until 1:13 p.m.)
13               VIDEOGRAPHER:  Going back on the record.
14          The time is 1:13 p.m.
15               MR. MORRIS:  So before you ask your first
16          question, Professor Grabowski has some
17          information about his attribution percentage you
18          were asking him about before.
19               MS. SUTTON:  Sure.
20               THE WITNESS:  Yeah, so I talked to
21          Cornerstone Ceren Aruoba, and she confirmed that
22          it's 7 and a half percent in this case.
23          (Exhibit 7 was marked for identification.)
24   BY MS. SUTTON
25          Q.   Thank you.  I appreciate that.
```

 1          I'm going to -- moving on to a different

 2   topic, I wanted to show you what's been marked as

 3   Exhibit 7, which is a declaration by you, dated

 4   March 28th, 2013.  My understanding is that this

 5   declaration --

 6          MR. MORRIS:  Do you have one of those?

 7   BY MS. SUTTON:

 8      Q.   -- was submitted on behalf of Purdue

 9   Pharma in a patent case involving the potential

10   approval of generic oxycodone.  Is that your

11   recollection?

12      A.   No.  I -- I think I submitted it on behalf

13   of Endo in a patent case.  But maybe -- maybe this

14   is . . .

15      Q.   If you look at paragraph 6 on page 2?

16   Does that -- does that refresh your recollection that

17   you were hired by Purdue Pharma in this matter?

18      A.   Oh, okay.  I had another case where I was

19   opposed to Pharma but -- or to Purdue, thinking in my

20   mind.

21          But yes, this was in conjunction with

22   their reformulated OxyContin, that -- I don't believe

23   I testified in this case, but . . .

24      Q.   You provided a declaration, though,

25   correct?

 1      A.   Yes.

 2      Q.   And was the declaration sworn?

 3      A.   Yes, I think so.

 4      Q.   Okay.  So you said "reformulated

 5   OxyContin."  What's your understanding of what that

 6   means?

 7      A.   That was their crusher-proof --

 8   crusher-resistant OxyContin.

 9      Q.   And do you know why they made it

10   crusher-resistant?

11      A.   Because OxyContin was subject to, you

12   know, abuse, and they wanted to have a version that

13   was less subject to abuse.

14      Q.   Okay.  And do you recall what -- what

15   opinion you gave in this case?

16      A.   I think it was that generics should not

17   enter -- or the FDA should not approve generics that

18   were nontamper resistant ---

19      Q.   And did you give a reason why?

20      A.   Well, that -- you know, I'd have to look

21   at it.  It's been a while since this occurred.

22           So I think I was dealing -- analyzing

23   substitution rates here, and that the

24   nontamper-resistant generic oxycodone might have a

25   large share of oxycodone, and whereas the FDA I think

1    was receptive to -- or and approved a non -- or a

2    tamper-resistant.

3            And so I was trying to analyze the

4    economics, if you have both a nontamper-resistant

5    generic and a reformulated crush-resistant OxyContin,

6    what would that mean for market shares.

7        Q.   And you determined that -- that the

8    nontamper-resistant generic oxycodone might have a

9    larger share of the oxycodone market?

10       A.   Yes.

11       Q.   Yeah.  And in part, you do talk about in

12   here the fact that people might be driven to the

13   nontamper-resistant because of the abuse potential,

14   correct?

15       A.   Yes.

16       Q.   Okay.  So do you recall which law firm had

17   hired you in this case?

18       A.   No.  I think I worked with Analysis Group

19   on the case, but --

20       Q.   But you don't remember which law firm?

21       A.   That's correct.

22       Q.   Okay.  So was this your -- had you

23   represented Endo prior to -- to this case?

24       A.   Yes.

25       Q.   Okay.  So this wasn't the -- your first

1    representation of a company that sold opioids?

2         A.   Right.

3         Q.   Okay.  The work that you just mentioned

4    you did for Endo, was that related to opioids?

5         A.   It was related to -- Endo was a generic at

6    the time, and they were trying to enter the market

7    for OxyContin, and they were challenging the patents.

8    And I was representing Endo in that matter.

9         Q.   And that was against Purdue?

10        A.   Yes.

11        Q.   And that was -- was it before or after

12   this?

13        A.   It was before this.

14        Q.   Okay.  So did you ever disclose the work

15   you did on behalf of Purdue here to Endo as part of

16   your working with them in this case?

17        A.   I don't think so.  It's -- you know, I --

18   it's a declaration.  And it had slipped my mind even

19   that I did a declaration to the FDA.

20        Q.   Do you have any idea how many hours you

21   would have devoted to preparing this declaration?

22   It's 25 pages, with some analysis.

23        A.   Maybe 80 hours.

24        Q.   Okay.  And the declaration states at this

25   time you were charging $800 an hour, which is what

1   you charge now, right?

2       A.   Yes.

3       Q.   Okay.  You can set that aside.

4            The Duke University has a school of

5   medicine, correct?

6       A.   Yes.  Very distinguished.

7       Q.   I was going to say that.  Very acclaimed

8   school of medicine.  Have you taught any courses

9   there?

10      A.   No.

11      Q.   Okay.  Are you aware of their policy for

12  industry relations?

13      A.   Generally, yes.

14      Q.   Are you aware of whether Duke Hospital

15  places any restrictions on detailing by

16  pharmaceutical drug representatives?

17      A.   I think some years back, I don't know how

18  many years, they decided -- I know they decided to

19  stop accepting samples.  I don't know about

20  detailing.

21      Q.   Okay.  So you don't know if -- if Duke

22  restricts pharmaceutical representatives from

23  detailing the doctors at the school of medicine, or

24  the students?

25      A.   No, I don't know that.

1     Q.   Okay.  This came up briefly earlier, the

2  Tufts Center for Study of Drug Development.  Is it

3  okay if we call it "CSDD"?  Do you -- is that what

4  you call it?

5     A.   At times, yes.

6     Q.   It is a shorter acronym.

7          And you testified earlier that you've done

8  work with Dr. DiMasi.  Do you consider him a

9  colleague?

10    A.   Yes.  Not a Duke colleague, but a

11 colleague in economics, yes.

12    Q.   And you have coauthored a number of papers

13 with him, correct?

14    A.   Yes.

15    Q.   And your relationship with him goes back

16 decades, right?

17    A.   Yeah, maybe 20 years.

18    Q.   Okay.  And when I was looking at your CV,

19 it looked to me like you've coauthored maybe a dozen

20 articles with him.  Does that sound about right?

21    A.   It could be a dozen, but some of them are

22 just comments to -- you know, so we write a short

23 comment in the literature.

24    Q.   Are you -- I think you mentioned earlier

25 that you are working with him on a study right now.

```
 1    Is it an update to your drug development cost study?

 2         A.   It's related, of sorts, but it's not a --

 3    a full update.

 4         Q.   Okay.  You're not going to be calculating

 5    a new number for the development of a drug from

 6    its -- from its infancy to commercialization?

 7         A.   That's correct.

 8         Q.   You're not.  Okay.

 9         A.   No, we're going to focus in on a

10    therapeutic group.

11         Q.   Oh.  What therapeutic group?

12         A.   Oncology.

13         Q.   Okay.  So cancer drugs?

14         A.   Yes.

15         Q.   Okay.  Did anybody ask you to do that?

16         A.   Yes.

17         Q.   Who?

18         A.   We have a grant from Pfizer.

19         Q.   How much is the grant?

20         A.   I think with everything, including travel,

21    research assistants, everything, it's about 120K.

22         Q.   So when do you expect that to be ready for

23    publication?

24         A.   Hopefully by the end of the summer.

25         Q.   Okay.  So pretty far along, then?
```

1        A.   It's -- you know, we have preliminary

2    results, but we're doing further analysis.

3        Q.   So I think in the -- the study that you

4    did, it was published in 2016, and we can get it out

5    if you don't recall, but it seems like that the

6    average private sector cost to develop a new drug was

7    just under 2.6 billion in the study that you

8    published; does that sound right?

9        A.   Yes.

10        Q.   Okay.  So do you have even a preliminary

11   calculation with respect to the cancer medications?

12   Are they going to be above that or below it?

13        A.   They're going to be commensurate with it.

14        Q.   Commensurate with it, okay.  So in the

15   ballpark?

16        A.   Yes.

17        Q.   Okay.  So Dr. DiMasi, my understanding is

18   he's a -- a director at CSDD.  He's director of

19   economic analysis.  Does that sound right?

20        A.   Yes.

21        Q.   Okay.  And I think he's also a research

22   associate professor at the Tufts Department of Public

23   Health; are you aware of that?

24        A.   Yes.

25        Q.   So it's like a dual position?

     1          A.   Yes.  All of the faculty at -- CSDD is

     2     part of public health now, and they're all faculty

     3     positions.

     4          Q.   Okay.  So have you ever talked to

     5     Dr. DiMasi about Tufts' relationship with the Sackler

     6     family?

     7          A.   No.

     8          Q.   Okay.  And are you aware that Tufts has

     9     hired an independent investigator to look into the

    10     financial contributions that the Sackler family has

    11     provided over the years to Tufts University?

    12          A.   I'm not aware of that, no.

    13          Q.   Okay.  Just asking -- wondering if maybe

    14     you talked to Dr. DiMasi about that.

    15               So have you ever been on the board of

    16     CSDD?

    17          A.   Yes.

    18          Q.   Are you on the board now?

    19          A.   No.

    20          Q.   Okay.  When were you on the board?

    21          A.   You know, I -- it spanned a period maybe

    22     from the late '90s through sometime in the 2000s.

    23          Q.   Okay.  So you went off the board sometime

    24     in the 2000s?

    25          A.   Yeah, the board, as it was constituted,

1  there was a new director, and I think he didn't think

2  they needed a board, so I don't think there is a

3  board anymore.

4      Q.   Right.  I looked at the website, and I

5  couldn't find a board, so -- right.

6           When you were on the board, were there any

7  board members from the pharmaceutical industry?

8      A.   No.

9      Q.   Okay.  So is it your understanding that

10 CSDD does not receive any funds from Tufts

11 University?

12     A.   I don't know one way or the other.

13     (Exhibit 8 was marked for identification.)

14 BY MS. SUTTON:

15     Q.   Okay.  So this comes from the CSDD

16 website.  And if you turn to the second page, it

17 talks about who sponsors Tufts.

18           It says that "Tufts CSDD relies on the

19 support of its corporate sponsors to help cover

20 operating expenses and support nonsponsored research

21 studies, such as our highly cited series of papers on

22 the cost of pharmaceutical R&D.  Note that Tufts CSDD

23 receives no financial support from Tufts University

24 and is required to be self-supporting.  That is why

25 corporate support is vital."  You see that?

1          A.    Yes.

2          Q.    Okay.  So I read this to mean that CSDD

3     gets their support from corporate sponsors.

4          A.    Not exclusively.  This is a -- the mission

5     for corporate money, but they -- I know for a fact

6     they have received government grants, that they have

7     received foundation grants.

8          Q.    Right.  And we can look at that.

9          (Exhibit 9 was marked for identification.)

10    BY MS. SUTTON:

11         Q.    Exhibit 9 is a financial disclosure from

12    their website, and then it says that -- in the second

13    sentence, it says they receive unrestricted grants

14    from pharmaceutical and biotechnology firms as well

15    as companies that provide related services to the

16    research base industry, contract research consulting

17    and technology firms, and that those grants represent

18    25 percent of the operating expenses.

19              And then it goes on to say that they --

20    their additional funding comes from government and

21    foundation support.  Is that consistent with your

22    understanding of how CSDD is funded?

23         A.    Right.  And the cost studies are not

24    funded by any directed money from any pharmaceutical

25    firm.

1      Q.   Okay.  But pharmaceutical money is used

2   for the cost studies?

3      A.   Not necessarily.  I mean, it's -- it's

4   work we do, but it's not like a dedicated amount of

5   money is focused on these projects.

6      Q.   Okay.  I probably misspoke, then.  My

7   understanding is that the drug development cost

8   studies are funded by the Tufts Center for the Study

9   of Drug Development.

10      A.   Yes, in the sense that they pay Joe

11   DiMasi's salary.

12      Q.   Right.  And the Tufts Center for Study of

13   Drug Development does receive money from the

14   pharmaceutical industry?

15      A.   Right.  And I have never received any

16   money for any of the cost studies.

17      Q.   Okay.  So you -- you don't receive any

18   money for the cost studies from Tufts Center for

19   Study of Drug Development, correct?

20      A.   That's correct.

21      Q.   Okay.  Do you receive any money for the

22   work that you do on those studies, or is it just what

23   you get paid at Duke?

24      A.   It's what I get paid at Duke.

25      Q.   Okay.  So I think you mentioned that

 1  the -- the current update you're doing to the Tufts

 2  Drug Development Cost Study was suggested by Pfizer

 3  and is being -- is being funded by Pfizer, correct?

 4       A.   Yes, but independently.

 5       Q.   Independently.  Yeah.  You're

 6  independently running the study?

 7       A.   Right.  Pfizer has not made any comments

 8  or . . .

 9       (Exhibit 10 was marked for identification.)

10  BY MS. SUTTON:

11       Q.   Okay.  Exhibit 10 is one of your cost

12  studies that was published in 2016.  I think that's

13  the one where you estimate that the cost of drug

14  development -- the cost of developing a new drug was

15  just under 2.6 billion.  I think that's published in

16  this study?

17       A.   Yes.

18       Q.   Okay.  Did -- did any -- who -- who

19  suggested that you do this study?

20       A.   Tufts director Ken Kaitin felt that we

21  should update it, because it had been ten years since

22  the last study, and that we would reach out and get

23  participation from, you know, firms, and do a

24  representative sample of projects at various stages

25  of development.

1        So it was essentially the Tufts group

2    decided we -- we should do an update of our prior

3    studies using similar methodology.

4        Q.    So the prior study that you referenced,

5    the one that you had done ten years earlier, was that

6    study suggested to you by any pharmaceutical company?

7        A.    I don't believe so.

8        Q.    Do you know who suggested that you do that

9    earlier study?

10       A.    Well, there was a line of research going

11   way back in time on the cost of new drug development.

12   And the first study was actually -- in this series

13   was done at Rochester by Ronald Hansen.  And there

14   was, you know, I think Lou Lasagna, who was a

15   prominent epidemiologist who headed the center before

16   it was -- the CSDD, in modified form, was at

17   Rochester.

18            And Hansen was commissioned to do -- by

19   the CSDD to do a more rigorous study than what --

20   there were numbers floating around in the literature

21   that were based very loosely on, you know, limited

22   data and other studies.  And I think Lasagna felt

23   that it would be a major -- some major contribution

24   to really do a more rigorous study, and Hansen was

25   the professor at Rochester who was asked to perform

1    this.

2             And then Hansen came out with a study that

3    was much more rigorous and comprehensive than any

4    research to date.  And then the center got lots of

5    citations for this.  I mean, we are -- our -- Journal

6    of Health Economics is the most respected health

7    economics journal peer-reviewed, and I think we have

8    more citations than any other single article.

9         Q.   On this topic?

10        A.   Yes.

11        Q.   Okay.  So that -- the earlier study that

12   you were referencing by Hansen, were you a coauthor

13   on that as well?

14        A.   No, that was just Hansen by himself.

15        Q.   Okay.  But it was -- it was a study that

16   was funded by CSDD?  Or . . .

17        A.   I don't know that for sure.  It could have

18   been Hansen just -- he was a professor at Rochester.

19   He may have just used his own money to do it.

20        Q.   And then is there a cost study that you

21   were an author on that's dated before Exhibit 10?

22        A.   Yes.

23        Q.   Okay.  And was that a study that was

24   commissioned by the CS -- CDSS?

25        A.   Yes, it was performed by CSDD, and I think

 1  DiMasi did it as part of his regular faculty position

 2  at Tufts.

 3      Q.   Okay.  And you -- and you were coauthor,

 4  along with Professor Hansen?

 5      A.   Yes.

 6      Q.   Okay.  And was that -- did that study come

 7  out in published form when you were on the board of

 8  CSDD?

 9      A.   Let me see when it came out.

10           It came out in 2007, but I think by that

11  time the board was no longer.

12      Q.   Okay.  All right.  So in this study in

13  Exhibit 10, there's a starred paragraph under the

14  "Introduction" paragraph.  Do you see that?  Where

15  you thank the survey firms for providing data?

16           I'm sorry.  On the first page.

17      A.   Yes.

18      Q.   So my understanding of this study is that

19  pharmaceutical companies provided data to you.

20      A.   Yes, although we selected the -- the

21  products, so we would get a representative sample.

22  And we also gave them a format, and we checked it,

23  and, you know, so there -- and we check -- in this

24  article, there are various checks from -- of the

25  internal data that we received with external data.

 1          Q.   And you surveyed I think ten different

 2     pharmaceutical companies?

 3          A.   Yes.

 4          Q.   And you -- they provided data on 106

 5     different drug molecules?

 6          A.   Yes.

 7          Q.   Okay.  And the paper -- I think you said

 8     that that information is proprietary, so did you not

 9     disclose the -- the drug molecules that you studied?

10          A.   That's correct.

11          Q.   Okay.  Did you disclose them by

12     therapeutic class?

13          A.   Yes.

14          Q.   Okay.  And you didn't disclose the -- the

15     pharmaceutical companies that provided the data?

16          A.   That's right, although we characterized,

17     you know, what percentage of the industry sales and

18     R&D and -- so we -- we characterized the sample and

19     tested that it would be representative, but we didn't

20     disclose the companies that provided the information.

21          Q.   Were any of the drug molecules that you

22     studied opioid medications?

23          A.   I don't know the answer.  I would rather

24     doubt it, but -- because it's not -- it was not a

25     major class that we investigated, but -- only Joe

1  DiMasi knows the exact molecules.

2      Q.   Okay.  And there's never been any

3  publication that describes the molecules that you

4  studied or the pharmaceutical companies from which

5  you got the data, correct?

6      A.   Only by therapeutic class.

7      Q.   Okay.  All right.  Okay.  You can set that

8  aside.

9           I tried to shorten up over lunchtime,

10  because we talked about some of the topics already.

11  But I think you acknowledged before lunch that --

12  that you have published articles in the academic

13  literature that have received funding from

14  pharmaceutical companies, correct?

15      A.   Yes.

16      Q.   Okay.  And the Duke program in

17  pharmaceutical and health economics that you're the

18  director of, you have received support from PhRMA,

19  the organization called PhRMA, correct?

20      A.   I think so, but it -- I think it was not a

21  primary source of revenue.

22      Q.   Right.  But they have funded some of

23  the -- the studies that have come out of the Duke

24  program in pharmaceutical and health economics,

25  correct?

1         A.   Yes.

2         Q.   Okay.  Do they ever --

3         A.   These have always -- let me add --

4         Q.   Yes.

5         A.   -- been peer-reviewed.

6         Q.   Oh, true.  Sorry.  Thank you for that

7    clarification.

8              So when PhRMA has supported your work

9    through grants, do they -- have they ever done more

10   than just provide money?  Do they provide you other

11   types of support beyond financial support?

12        A.   I don't --

13             MR. MORRIS:  Objection to form.

14             THE WITNESS:  I'm not sure what you're

15        referring to.

16   BY MS. SUTTON:

17        Q.   I can rephrase it.

18             Has PhRMA provided you data for use in the

19   studies that are -- that come out of the Duke program

20   in pharmaceutical and health economics?

21        A.   They've provided data or allowed us --

22   part of the funds were used to purchase data from

23   IQVA and IMS and -- and all, but they've never

24   provided internal data.

25        Q.   Okay.  Do they ever provide you with any

1    staff to assist you in your studies?

2         A.    No.

3         Q.    Okay.  Do they ever -- does PhRMA ever

4    review drafts of your papers before they're

5    published?

6         A.    At the very end, we sometimes -- not

7    always, but sometimes we'll say "This is ready for

8    publication.  Do you want to read it over and see if

9    we have made any errors that you could see?"

10             And sometimes they make suggestions and we

11   take them under advisement.  Most of the time we

12   don't make any changes.

13        Q.    Okay.  Do they ever assist with your

14   collection of data?

15        A.    Only from publicly available sources, like

16   IMS.

17        Q.    Okay.  All right.  So moving into -- I'll

18   talk a bit about your past testimony as an expert.

19             How did you decide you wanted to become an

20   expert in litigation?  Expert witness?

21        A.    Well, I was a professor working on the

22   economics of pharmaceuticals, and companies asked me

23   if I could provide testimony on particular issues,

24   and I said, "Well, if it relates to my research, I --

25   and I have the time to do it, I -- I will consider

1   it."

2         Q.   And when did you first testify as an

3   expert in litigation?

4         A.   I think that -- those were the 1980's DES

5   cases involving long-tail liability of daughters that

6   had a problem with mothers who took DES.

7         Q.   And who hired you there?

8         A.   Bristol-Myers Squibb.

9         Q.   Okay.  And do you remember the law firm?

10        A.   It was a couple law firms, but one was out

11  of Boston, and one was out of California.  A smaller

12  law firm.

13        Q.   Okay.  And you don't recall the names?

14        A.   You know, maybe by the end of the

15  testimony I might recall it.

16        Q.   Okay.  Do you have any estimate of how

17  many hours you would have put into that expert work

18  in the 1980s?

19        A.   Well, I was only charging a few hundred

20  dollars an hour in those days.  And these cases

21  spanned three phases, five years, multiple

22  defendants, multiple plaintiffs, the -- you know,

23  certainly at least a few hundred hours.  Maybe more.

24        Q.   Okay.  And then did you -- did you just

25  give deposition testimony, or did you do trial

 1   testimony?

 2        A.   I gave deposition and trial.

 3        Q.   Okay.  Where was the trial, in California?

 4        A.   San Francisco, yes.

 5        Q.   Okay.  Any other testimony in the '80s

 6   that you can recall?

 7        A.   I testified for Genentech in a case

 8   involving a human growth hormone and a company -- it

 9   was a patent litigation, I think.

10        Q.   Okay.  And you were hired by Genentech?

11        A.   Yes.

12        Q.   Okay.  And was the defendant a

13   pharmaceutical company as well?

14        A.   Yes.

15        Q.   Okay.  Do you have any idea how much time

16   you would have spent on that case?

17        A.   Maybe 100 hours.

18        Q.   Okay.  And do you remember which law firm

19   hired you?

20        A.   Yes.  Fish & Richardson.

21        Q.   Okay.  Yeah, I know them.  I used to be a

22   patent lawyer, back in the day.

23             So anything else from the '80s that you

24   remember with respect to expert testimony?

25        A.   No.

1      Q.   Okay.  Now, moving into the '90s, I -- I

2  think you've testified -- well, did the human growth

3  hormone ITC litigation go into the '90s?

4      A.   Yes.

5      Q.   Okay.  So we've talked about that.  Do you

6  remember any other cases in the 1990s?

7      A.   Not off the top of my head.

8      Q.   Okay.  So how many times in your career do

9  you think you've been hired as an expert witness?

10      A.   You know, over -- let's see.  The '80s are

11  what, 30 years ago?

12      Q.   Mm-hmm.

13      A.   And so it's been more than 35 years.  And

14  I've testified between -- early days, maybe two times

15  a year, and then it -- when I became emeritus, it's

16  more.  Maybe four or five times a year.

17          And so -- you know, I don't know.  Do a

18  rough thing:  Maybe I've testified 50 times over

19  35 years, something like that.  At least 50 times,

20  maybe.

21      Q.   Yeah.  I've been trying to add it up, and

22  it looks to me like you've been an expert witness at

23  least 70 times.  Does that sound like that could be

24  possible?

25      A.   Yes.

1      Q.   Okay.  And that's something you probably

2  could go back and look up if you had to.  You could

3  figure it out, right?  Maybe?

4      A.   I could look at the records since maybe

5  2000.  I don't think I saved anything from the '90s.

6      Q.   Okay.  So is it fair to say that your

7  expert testimony is generally always on behalf of a

8  pharmaceutical company?

9          MR. MORRIS:  Objection to form.

10          MS. SUTTON:  I can strike that.  I'll do a

11      better question.

12  BY MS. SUTTON

13      Q.   Is it fair to say that your expert

14  testimony is generally on behalf of pharmaceutical

15  companies?

16      A.   Generally, but not exclusively.

17      Q.   Who else have you testified besides

18  pharmaceutical companies?

19      A.   Well, I testified for plaintiffs in a

20  limited funds case in Cincinnati, where, you know,

21  the biotech firm that invented fen-phen was a

22  relatively small startup, and they licensed this to a

23  bigger pharm, and they started -- the fen-phen

24  litigation started to be so costly that they were

25  going bankrupt.

1    So they petitioned the court to, you know,

2  instead of -- this company could get out of the

3  litigation by giving a lot of their assets to the

4  plaintiffs or rights to the plaintiffs.  And I was

5  assigned to try to evaluate, you know, what their

6  drugs that were in different stages of development

7  were worth.

8    Q.    Right.  Other than that case, have you

9  acted as an expert witness for companies other than

10  pharmaceutical companies?

11    A.    For chemical companies once.

12    Q.    Once.  Okay.  Is it fair to say that the

13  vast percentage of your expert work has been on

14  behalf of pharmaceutical companies?

15    A.    But generally companies versus other

16  companies.

17    Q.    Against other pharmaceutical companies?

18    A.    Yes.

19    Q.    Right.  So would it be fair to say that

20  more than 95 percent of the cases where you've acted

21  as an expert, you've -- you've been hired by a

22  pharmaceutical company?

23    A.    I don't know if 95 percent, but . . .

24    Q.    Over 90?

25    A.    Maybe.

1        Q.    Okay.  Can you identify -- you mentioned a

2    chemical company case, this fen-phen matter.  Are

3    there any other cases that come to mind where you

4    weren't an expert on behalf of a pharmaceutical

5    company?

6        A.    I was hired by the Department of Justice

7    in a case, and -- it was an antitrust case.

8        Q.    Was it involving the pharmaceutical

9    industry?

10        A.    No.

11        Q.    Okay.  Something else.  Okay.

12              Anything else?

13        A.    You know, I'm sure there are other cases.

14    I'd have to go back and think about them.

15        Q.    Okay.  We're going to look at some lists

16    of cases, too, to the extent I was able to find lists

17    of cases where you had testified.

18              So over the course of your professional

19    career, how many hours do you think you've dedicated

20    to your expert work?

21        A.    Over 35 years?

22        Q.    Yeah, I know -- big question.  But do you

23    have a way to approximate it?

24        A.    Not really.  Not -- it would be

25    speculative, I think.

1      Q.   Would it -- would it be in the thousands

2  of hours?

3      A.   It could be in the thousands, yes.

4      Q.   Could it be in the tens of thousands?

5      A.   I don't think so.

6      Q.   Okay.  We talked earlier about, that you

7  went emeritus status at Duke, I think in 2009, and

8  now your salary is 5,000 a month from the -- the

9  center that you run, correct?

10     A.   Yes.

11     Q.   Okay.  Prior to 2009, you were a professor

12 teaching courses at Duke, correct?

13     A.   Right.

14     Q.   And what was your salary when you were

15 acting professor, or a professor teaching classes,

16 before you went emeritus?

17     A.   About 125,000.

18     Q.   Okay.  And I think you -- your report says

19 that your hourly rate in this case is $800 per hour.

20 And how long have you been charging $800 an hour?  Do

21 you recall?

22     A.   I don't know.  Half-dozen years.

23     Q.   Okay.  Sometimes experts have different

24 rates that they charge for trial versus deposition

25 testimony.  Do you have a -- different rate scales?

 1          A.    No.

 2          Q.    Okay.  Do you have any idea how much

 3    you've made over your career serving as an expert

 4    witness?

 5          A.    No.

 6          Q.    Okay.  Do you -- could you estimate that

 7    you've -- you've made millions of dollars?

 8          A.    I don't think so.

 9          Q.    Do you think you made over a million?

10          A.    Yeah, over 35 years, I probably made a

11    million.

12          Q.    Okay.  Now, I want to show you . . .

13          (Exhibit 11 was marked for identification.)

14    BY MS. SUTTON:

15          Q.    So this is a -- a copy of a CV that I --

16              MR. WILSON:  John, I can trade you with

17          one that's clipped.

18              MR. MORRIS:  Yeah.  Because I got a

19          Post-it Note, too.  I wrote the exhibit number

20          on there.

21    BY MS. SUTTON:

22          Q.    This is a copy of a CV that I found, filed

23    in the -- in the docket of the case matter.  And you

24    can see at the top it says "Case 2:05-CV-05727."  Do

25    you see that?

1       A.   Yes.

2       Q.   And I'll just -- can just show you, that

3   case number relates to Eisai Company versus Teva.  Do

4   you recall that case?

5       A.   Yes.

6       Q.   Here.  I can give that to you to confirm.

7            MR. WILSON:  That's not been marked.  Do

8       you need to mark it?

9            MS. SUTTON:  I was just showing it to

10       refresh his recollection that that's -- the case

11       file on the CV relates to this matter.

12            THE WITNESS:  Oh.  So I'm not sure -- I've

13       done a few cases for Eisai.  I don't know

14       exactly which one this is.

15   BY MS. SUTTON

16       Q.   Right.  Well, the reason I was showing you

17   is the -- the docket number on this case is the same

18   docket number that appears on top of your CV.

19       A.   Okay.

20       Q.   Okay.  So it was just to refresh your

21   recollection that this CV was submitted in the Eisai

22   versus Teva case.

23            And so if you look -- the CV was submitted

24   on February 2008.  And if you go to the very back

25   page, Appendix 2.  Do you see that?

1    A.   Yes.

2    Q.   There is a listing of cases where you had

3    testified since 2003.  So it begins in December of

4    2003, and it goes through August 2007.  Do you see

5    that?

6    A.   Yes.

7    Q.   Do you have any reason to believe that

8    this isn't an accurate list of your testimony during

9    this time period?

10    A.   It looks accurate.

11    Q.   Okay.  And I counted up that there are

12    13 cases listed here where you acted as an expert

13    witness from December 2003 to August 2007.  Does that

14    look correct?

15    A.   Yeah, although some of these cases are the

16    same product, with multiple generics, and so the --

17    Q.   Right.

18    A.   -- the follow-on cases involved much less

19    work than the original.

20    Q.   Right.  But they're all separate cases,

21    though, correct?

22    A.   Yes.

23    Q.   Okay.  And it appears when I'm looking at

24    this list that a pharmaceutical company was involved

25    in each of the cases, correct?

1        A.   Yeah, although I'm not sure -- New River

2   Pharma versus D -- you know, I think those were

3   suppliers rather than manufacturers.

4        Q.   Okay.  Do you -- rather than going through

5   each one of these, did you -- can you tell me, were

6   you generally on the side of the plaintiff or the

7   defendant in these cases?  Or do we need to go one by

8   one?

9        A.   For the plaintiff.

10       Q.   Okay.  And did these cases involve -- did

11  all these cases on this list involve patent disputes?

12       A.   New River I think was a contractual

13  dispute.  Elan Pharm king, was definitely a

14  contractual dispute.  State of Colorado versus Warner

15  Chilcott was some kind of antitrust, I think.

16       Q.   And who did you testify on behalf of in

17  that case?

18       A.   Warner Chilcott.

19       Q.   Okay.  And then the last case, do you

20  think that was an antitrust case as well?

21       A.   Yes.

22       Q.   Okay.  And there you were also testifying

23  on behalf of Warner Chilcott, right?

24       A.   Right.

25       Q.   And they're in the pharmaceutical

 1   industry, correct?

 2        A.   Yes.

 3        Q.   Okay.  So do you recall, for any of these

 4   cases, which law firms may have hired you?

 5        A.   Well, we saw on this one, Bruce Wexler

 6   hired me -- you showed me something, but Bruce was

 7   with --

 8        Q.   Eisai?

 9        A.   The Eisai case.  He was with -- let's

10   see -- Paul Hastings.  You know, I did cases with

11   Paul Hastings.

12        Q.   Mm-hmm.

13        A.   I did some cases with Finnegan.  And you

14   know, they're, as you're aware, patent specialists.

15   And -- Fish & Richardson.

16             There was another one in D.C. that -- I

17   did work with Williams & Connolly.

18        Q.   Right.  I know you're aware that Williams

19   & Connolly represents a defendant in this case?

20        A.   No.

21        Q.   They represent Cardinal Health, one of the

22   distributors.

23        A.   Okay.

24        Q.   So in the patent cases, is there a way to

25   generalize the opinion?  Because you said a lot of

1    these cases were -- were follow-on.  Is there a way

2    to generalize the type of opinion you would give in

3    these patent cases?

4         A.   Yeah, they were --

5              MR. MORRIS:  Objection to form.

6              THE WITNESS:  Either the general -- you

7         know, one of the issues is nonobviousness, and

8         one of the metrics to look at nonobviousness is

9         commercial success.  And that's what I was

10        generally hired to be, a net analyst of

11        commercial success, and the links to the patent.

12             So that's many of these.  Sometimes there

13        would also be a petition for a preliminary

14        injunction, and then it would be irreparable

15        harm.

16   BY MS. SUTTON

17        Q.   Okay.  Do you have any idea for this

18   four-year -- basically this time period that's set up

19   on December 2003 to August 2007, how much time you

20   would have spent on this expert work?

21        A.   Well, I was teaching, so, you know, I

22   limited my time.

23             Most of these cases were settled.  I see

24   only one that went to trial.  Some of them were

25   arbitration, which took less work than some of the

 1    other cases.  I always had assistants from either

 2    Brattle, Analysis Group, or Cornerstone in virtually

 3    all these cases, or sometimes a -- a person that was,

 4    you know, a one-man band, so to speak, actually in

 5    Minneapolis.  He assisted me -- but I always had

 6    support to do number-crunching and different things,

 7    so . . .

 8         Q.   What was the guy's name -- did you mention

 9    someone in Minneapolis?

10         A.   Oh, Frank Lehrman.

11         Q.   Oh, okay.

12         A.   He's in Minneapolis now because his wife

13    works for a Minneapolis firm.  He was one for Brattle

14    I think.

15         Q.   So looking at, for example, Pfizer versus

16    Teva cases, where you gave trial testimony:  Do you

17    have any idea how much time you would have devoted to

18    that matter?

19         A.   Not off the top of my head.  You know,

20    over this whole period, I would say my time -- my

21    billings were much more limited in hours as well as

22    what I was charging.

23         Q.   Is that in part because you were a

24    professor teaching courses at Duke --

25         A.   Yes.

1      Q.   -- during this time period?

2      A.   Yes.

3      Q.   But beginning in 2009, when you went

4  emeritus status, you had more time to devote to your

5  expert work?

6      A.   Yes.

7      Q.   Okay.  So do you remember if any of

8  these -- I'm sorry.  Going back to that -- if in any

9  of the cases listed on this exhibit whether or not

10 your opinion or any part of your opinion was excluded

11 by the courts?

12     A.   I don't think my opinion's ever been

13 excluded.

14     Q.   Okay.  So you don't believe that your

15 expert opinion has ever been excluded in any case

16 where you've served as an expert?

17     A.   That's correct.

18     Q.   Okay.  So this list just started in

19 December of 2003, and we talked a little bit about

20 the '90s.  Are there any other cases that you

21 could -- that prior to 2003 that aren't listed here,

22 that we -- that we haven't discussed?

23     A.   So, you know, I think there would be

24 fairly -- relatively few in the '90s, because after

25 this major case, the DES cases took a lot of time.

 1  At that time I was director of graduate studies, so I

 2  had a major administrative job.  The case went on for

 3  five years and had three different phases, so I

 4  wanted a break from testifying.

 5          The case got brought up again in New York,

 6  and in both cases, my market share analysis was

 7  accepted by the judge as the basis for allocating

 8  funds to plaintiffs And so that New York case was

 9  probably in the '90s.

10          Off the top of my head, I can't think of

11  others, but there may have been a few.

12      Q.  Okay.  All right.  Let me show you

13  another.

14      (Exhibit 12 was marked for identification.)

15  BY MS. SUTTON:

16      Q.  I'm going to show you a document that's

17  been marked as Exhibit 12.  This is a CV from 2010

18  that we obtained off Lexis.

19          And does this appear to be a CV of yours?

20      A.  Yes.

21      Q.  Okay.  Then if you go to page 12 of 13,

22  which is at the back, Appendix 2, you'll see that

23  there's a list of testimony, beginning December 2003,

24  running through January of 2009.  Do you see that?

25      A.  Yes.

1    Q.   Okay.  So I think -- we don't have to go

2  through all these, because some of these overlap with

3  the last one that we looked at.  The last testimony

4  that was disclosed on Exhibit 11 was the Meijer

5  versus Warner Chilcott.  Do you see that, on the --

6  on page 13?

7    A.   Yes.

8    Q.   Okay.  So just -- just focusing, then, on

9  everything below the Warner Chilcott case, starting

10 with Roche Palo Alto.  So this discloses deposition,

11 trial testimony in March and December of 2008.  And

12 then the list runs through January of 2009.  So it's

13 basically a listing of less than a year time period.

14 Correct?

15   A.   In terms of actual deposition, yes.

16   Q.   Right.  So if we look here, there are --

17 let's see; one, two, three, four, five, six -- seven

18 cases that you did between March 2008 and

19 January 2009, correct?

20   A.   Yes.

21   Q.   And again, it looks like all the cases

22 here involve pharmaceutical companies.

23   A.   Yes.

24   Q.   Okay.  And is it fair to say that in each

25 of these cases, you've been retained as an expert by

 1    a pharmaceutical company?

 2         A.   Yes.

 3         Q.   Okay.  Do you recall any of the law firms

 4    that had hired you?

 5         A.   I think some of these would be the same

 6    ones I had mentioned earlier.

 7         Q.   Okay.  Do you recall in the Wyeth versus

 8    Lupin Limited case, you were hired by Arnold &

 9    Porter?

10         A.   I don't recall that, but it -- it could be

11    true.

12         Q.   Okay.  Were these -- were the cases that

13    are listed here, starting with the Roche Palo Alto

14    down to the Wyeth v. Apotex, were they mostly patent

15    cases?

16         A.   Yes.

17         Q.   And again, the opinion -- opinions that

18    you were giving, were they similar to the opinions

19    you gave in other patent cases, or where they -- is

20    your opinion different in these cases, many of which

21    are involving generics?

22         A.   Are they generally similar?  I mean, I try

23    to develop metrics of commercial success, and then I

24    tend to look at whether there's a link to the patent.

25         Q.   Okay.  So can you just -- without having

1  an extended discussion, what were some of the metrics

2  for commercial success that you would spell out in

3  your expert opinion?

4          MR. MORRIS:  Objection to form.

5          THE WITNESS:  You know, generally we would

6      look at -- and I would look at new and refilled

7      prescriptions to total prescriptions.  I would

8      look at units, maybe extended units in some

9      cases.  I might look at patient days.  I would

10     look at market share in units and -- and

11     dollars.  And where the data permitted, I would

12     look at return on R&D investment.

13  BY MS. SUTTON

14     Q.   Did you ever conclude in any of these

15  cases that the branded pharmaceutical product was not

16  a commercial success?

17     A.   Not in these cases.  But I've had -- you

18  know, I've concluded that in other cases.  And the --

19  you know, a lot of times I've been called and said,

20  "Could you serve as an expert," and they explained

21  it -- the company, the brand, sometimes the patent as

22  well, and I said "I don't think I can give you an

23  affirmative opinion."  And then I wasn't hired.

24     Q.   Okay.  And so in most of these cases that

25  we went through on here, you've been hired by the

1    branded pharmaceutical company, correct?

2         A.    Yes.  And most of the products would be,

3    you know, very large commercial products.

4         Q.    Right.  So do you have any estimate from

5    this time period, beginning in March 2008 through

6    January 2009, how much time you would have spent

7    serving as an expert witness in these seven cases?

8         A.    Maybe 50 hours a case.  Some would be

9    more, some less.

10        Q.    Okay.  And during this time period, do you

11   know what your hourly rate was?

12        A.    Maybe 500 an hour.

13        Q.    Okay.  And you -- your rate of 800, you

14   said it's been around for a half-dozen years?

15        A.    That would be my estimate.

16        Q.    Your estimate.  Okay.

17              So -- just want to ask you about a few

18   other cases and see if you recall serving as an

19   expert.  We already talked about the Eisai versus

20   Teva case, and you served as an expert in that case,

21   correct?

22        A.    Yes.

23        Q.    And you were an expert for Eisai?

24        A.    Yes.

25        Q.    Were you also an expert in -- in a case in

 1   2006, Wyeth versus Impax Laboratories?

 2        A.   If it's on there, I -- I would guess -- if

 3   it's on some of my list of expert testimony, then --

 4   I don't recall the case, but . . .

 5        Q.   Have you served as an expert for Wyeth?

 6        A.   Yes.

 7        Q.   Okay.  Have you -- did you serve as an

 8   expert in a case called Harden Manufacturing versus

 9   Pfizer, in 2008?  And it was venued in Massachusetts.

10        A.   I don't remember the name "Harden" at all.

11        Q.   You have served as an expert for Pfizer,

12   though, correct?

13        A.   Yes.

14        Q.   And have you worked with -- in your

15   capacity as representing Pfizer as an expert, have

16   you been hired by Mark Cheffo at Skadden Arps?

17        A.   I've done work for Skadden Arps, but I

18   don't recall that case, or testifying.

19        Q.   Okay.  And so you don't recall

20   testifying -- providing an expert report in Harden

21   Manufacturing versus Pfizer, then?

22        A.   That's correct.

23        Q.   Okay.  Do you recall providing a

24   declaration in 2009 in a case, Hoffmann-La Roche

25   versus Apotex?

```
 1          A.   I recall doing some cases for

 2   Hoffmann-La Roche, but I don't recall the details.

 3          Q.   But you do recall being an expert for

 4   Hoffmann-La Roche?

 5          A.   Yes.

 6          Q.   Okay.  Do you recall a case in Indiana,

 7   from 2009, where you provided a declaration

 8   entitled -- the case was captioned Eli Lilly versus

 9   Teva?

10          A.   I recall doing a case for Lilly

11   involving -- I think it was a -- one of their

12   commercially successful drugs.

13          Q.   So you do recall being a -- serving as an

14   expert for Eli Lilly?

15          A.   Yes.

16          Q.   Okay.  Do you recall serving an expert

17   report in a case between Novartis versus Teva in New

18   Jersey in 2009?

19          A.   No.

20          Q.   Do you recall ever serving as an expert

21   for Novartis?

22          A.   Yes.

23          Q.   Okay.  And you do recall being in

24   litigation where Teva was on the other side, I

25   believe, correct?
```

```
 1          A.   Yes.

 2          Q.   Okay.  Do you recall submitting an expert

 3   declaration in the case Sanofi-Aventis versus Sandoz,

 4   in 2009, in New Jersey?

 5          A.   No.

 6          Q.   Okay.  Have you served as an expert for

 7   Sanofi-Aventis?

 8          A.   Yes.

 9          Q.   Okay.  Do you recall serving an expert

10   report in a case entitled Bayer Schering Pharma

11   versus Teva Pharmaceuticals, in 2009, in the District

12   of Delaware?

13          A.   No.

14          Q.   Have you served as an expert or been

15   retained by -- to be an expert by Bayer?

16          A.   Yes.

17          Q.   Okay.  And have you been hired by

18   Williams & Connolly to serve as an expert?

19          A.   Yes.

20          Q.   Okay.  And you don't recall Williams &

21   Connolly being involved in the Bayer Schering versus

22   Teva case?

23          A.   Did it go to trial, or . . .

24          Q.   Expert report --

25          A.   No.
```

 1          Q.    -- is all I'm aware of.  Okay.

 2                Sorry, it's a memory test.

 3                MS. SUTTON:  Okay.  If you can mark this.

 4          (Exhibit 13 was marked for identification.)

 5    BY MS. SUTTON

 6          Q.    Exhibit 13 is a reply declaration Henry

 7    Grabowski, Ph.D., submitted in the Janssen Biotech

 8    and NYU versus Celltrion Healthcare matter, in 2015.

 9    Do you recognize this document?

10          A.    Yes.

11          Q.    And do you know which side you were hired

12    by?

13          A.    Yes.  Janssen.

14          Q.    Okay.  If you turn to Exhibit B, which is

15    very near the end.

16                MR. MORRIS:  While he's going there, this

17          one is marked "Highly confidential, filed under

18          seal," but there are redactions.  Is this the

19          non-under-seal version?

20                MS. SUTTON:  Yes.

21                MR. MORRIS:  I just need to know whether

22          or not I need to do something about this.

23                MS. SUTTON:  No.  It was --

24                MR. MORRIS:  Okay.

25                MS. SUTTON:  It's publicly available.

1          MR. MORRIS:  Okay.  Thank you.

2          MS. SUTTON:  You're welcome.  I was not

3     involved in this case.  I know that.

4          MR. MORRIS:  Okay.

5          MS. SUTTON:  No access to anything under

6     seal.

7  BY MS. SUTTON:

8     Q.   Do you see Appendix B?

9     A.   Yes.

10    Q.   Okay.  So that -- this appears to provide

11 a list of cases where you've acted as an expert for

12 four years prior to the date of the expert report.

13 And if you see the expert report on page 16 is dated

14 May 20th, 2015?

15    A.   Yes.

16    Q.   So -- okay.  So this is -- this would

17 appear to be, then, a list of cases where you had

18 served as an expert between the time period of

19 May 20th, 2011, to May 20th, 2015.  Does that seem

20 correct?

21    A.   Yes.

22    Q.   Okay.  So at this time now you're a

23 professor emeritus at -- at Duke, correct?

24    A.   Yes.

25    Q.   It appears -- I counted these.  It appears

 1    that there are 20 cases listed here where you -- on

 2    these two pages -- where you acted as an expert.

 3         A.   Yes, with the same caveat, that many of

 4    them are really the same report, just updated a

 5    little to a new generic challenger.

 6         Q.   And it looks like a number of these cases

 7    involved not only deposition, but at-trial testimony?

 8              I think there are six -- six of the

 9    20 cases, you gave not only a deposition but at-trial

 10   testimony.

 11        A.   Yes.

 12        Q.   Okay.  Generally, when you would testify

 13   at these trials, how much time would go into the

 14   preparation, being at trial and testifying at trial?

 15   Is there a way to generalize?

 16        A.   It varies.  Some cases it was like -- you

 17   go to Delaware, most of them are in Delaware, some in

 18   New York, and two days before the trial, and you go

 19   on -- I'm often the last witness, because the

 20   commercial success comes at the end.

 21             And other cases you might be there a

 22   little longer.  You generally have, you know, a

 23   web-based trial prep before you went to Delaware.

 24   So, you know, it could be three or four full days,

 25   30 hours of --

 1          Q.   Right.  And then you also would have

 2    additional time getting ready for your deposition and

 3    sitting for your deposition, correct?

 4          A.   Yes.

 5          Q.   And then in most of these cases, there

 6    would also have been an expert report that would have

 7    been provided?

 8          A.   Yes.

 9          Q.   And there would be time spent on putting

10    the expert report together as well, correct?

11          A.   Yes.

12          Q.   And -- and during this time period, would

13    your hourly rate be in the 750-to-800-dollar range?

14          A.   I think so.

15          Q.   Okay.  And most of these cases -- or --

16    strike that.

17               Are all of these cases that are listed in

18    Appendix B patent cases?

19          A.   No.

20          Q.   Okay.  Which ones are not?

21          A.   So the arbitration hearing, which has

22    three dates --

23          Q.   Mm-hmm.

24          A.   -- is a contractual dispute.  I think the

25    rest would be patent disputes.

1          Let me clarify.  Like in regard --

2   Gabapentin, it's patent litigation, but it's entry at

3   risk rather than commercial success.

4          Q.   So in that type of case, what generally

5   would your expert opinion be?

6          A.   This was a jury trial.  Teva I think

7   entered at risk.  And on appeal, the patent was

8   upheld.  And so I was sort of telling the jury what

9   it normally would take to produce a new drug, and how

10  much innovators spend in related -- related issues to

11  the innovation process.

12         Q.   So kind of similar to some of the academic

13  work we looked at earlier, where you studied the --

14  the cost of drug development?

15         A.   Right.  But I also looked at the specifics

16  of this the drug.

17         Q.   Correct.  Okay.

18              So this is -- in these 20 matters, over

19  this time period from September 2010 to January 2015,

20  is there a way for you to estimate -- or can you

21  estimate how many hours you would have spent on this

22  expert work?

23         A.   Not really.

24         Q.   Other than the information you provided

25  before about generally how much time you would spend

 1    at a trial where you testified?

 2         A.    Right.

 3         Q.    Okay.  All right.  So -- and do you have

 4    any recollection of the law firms that would have

 5    hired you in these cases listed in Appendix B?

 6         A.    I mean, I think it's some of the same law

 7    firms.  I did several cases with Williams & Connolly,

 8    but I couldn't say which ones here.  I did work with

 9    Paul Hastings.  I did work with Finnegan.

10         Those are the ones I could think of off

11    the top of my head.

12         Q.    Okay.  Thank you.

13         Do you recall -- we're done with that.

14    You can put that aside.

15         Do you recall testifying as an expert in a

16    matter called Smith v. Pfizer in 2010, where you had

17    been hired by Skadden Arps?

18         A.    No.

19         Q.    Okay.  So you don't recall anything about

20    that matter?

21         A.    No.

22         Q.    But you have served as an expert to Pfizer

23    in the past, correct?

24         A.    Yes.

25         Q.    Okay.  Do you recall giving trial

 1   testimony in October 2010 in a case in the Eastern

 2   District of Texas between Pozen Inc. and Par

 3   Pharmaceutical?

 4        A.   Yes.

 5        Q.   Okay.  And what -- do you know what type

 6   of case that was?

 7        A.   That was a patent dispute.

 8        Q.   That's the rocket docket, Eastern District

 9   of Texas?

10        A.   That's right.  That's my first time down

11   there.

12        Q.   Okay.  And were you -- which party did you

13   testify on behalf of?

14        A.   Pozen.

15        Q.   Okay.  And what kind of company is Pozen?

16        A.   Pozen was a small company, and I don't

17   think they exist anymore, but they were headquartered

18   in Chapel Hill, and they did combination drugs.

19        Q.   Okay.  Do you -- do you work -- have you

20   ever worked on behalf of Par Pharmaceutical -- well,

21   you work on behalf of Par Pharmaceutical in this

22   case, correct?

23        A.   Yes.

24        Q.   Okay.  But on that case, you were opposed

25   to them?

```
 1        A.    Right.

 2        Q.    Okay.  Do you recall giving trial

 3   testimony in Eli Lilly versus Teva in Delaware in

 4   2010?

 5        A.    There was -- I'm not sure it's this case,

 6   but I remember doing a Lilly case in front of Judge

 7   Sleet, where he ruled from the bench in favor of

 8   Lilly.  So that could be this case.

 9        Q.    Okay.  Do you think that was the case

10   where Williams & Connolly were your attorneys?

11        A.    Yes.

12        Q.    Okay.  All right.

13              Now, if we can go back in your stack to

14   your expert report, which I think is Exhibit

15   Number 2, it should be in there.  It's Depo

16   Exhibit 2, and we're going to look at Appendix 2.

17              MR. MORRIS:  Counsel, when you get to a

18        stopping point --

19              MS. SUTTON:  Yeah.

20              MR. MORRIS:  -- could we take a restroom

21        break, when you get a chance?

22              MS. SUTTON:  Yeah.  If you want to take

23        one now, we can, and then I could just -- I'm

24        getting close to being done, and I -- we can go

25        off the record.
```

```
 1              VIDEOGRAPHER:  Going off the record.  The
 2       time is 2:26 p.m.
 3              (A recess transpired from 2:26 p.m.
 4              until 2:44 p.m.)
 5              VIDEOGRAPHER:  Going back on the record.
 6       The time is 2:44 p.m.
 7  BY MS. SUTTON:
 8       Q.   Professor Grabowski, before we left for
 9  the break, I had asked you to pull out your
10  Appendix 2 from your expert report --
11       A.   Yes.
12       Q.   -- served in this case.
13            Do you have that in front of you?
14       A.   Yes.
15       Q.   Okay.  And then -- I don't know if you
16  still have Exhibit 13 before you, the last exhibit.
17  I was just going to use it as a placeholder to show
18  you where we left off.
19            If you can go to the second page of
20  Appendix B.
21       A.   Okay.
22       Q.   The last case that's listed in Exhibit 13,
23  of cases where you provided expert testimony is the
24  Alcon Research versus Mylan Pharmaceuticals case, in
25  January 2015.  Do you see that?
```

 1          A.   Yes.

 2          Q.   And then if you turn back to your expert

 3     report, Appendix 2, you can see that that -- that

 4     that case is listed on the second line in your

 5     current expert report.  So what I want to do is just

 6     focus on the cases below that case, below Alcon

 7     Research and Mylan Pharmaceuticals, because these are

 8     cases we haven't talked about yet.  Correct?

 9          A.   Yes.

10          Q.   Okay.  So Appendix 2 covers the four years

11     prior to when you served your expert report, which is

12     on May 10th, 2019.  So this list goes back from

13     May 2019 to May 2014.  But I just want to look at the

14     cases starting with the Sanofi-Aventis versus Eli

15     Lilly in June 2015 forward, because we haven't spoke

16     about that.

17               And if you -- I counted them up; it looks

18     like you have, since that case in June of 2015, you

19     have served as an expert witness in 18 cases total.

20     Does that sound right?

21          A.   Yes.

22          Q.   And again, is it fair to say that in all

23     of these cases -- all of these cases involved

24     pharmaceutical companies?

25          A.   Yes.

```
 1          Q.   And in each of these cases, 18 cases, did

 2    you provide expert testimony on behalf of a

 3    pharmaceutical company?

 4          A.   Yes, either a brand or a generic.

 5          Q.   Okay.  Were all of these cases patent

 6    disputes?

 7          A.   No.

 8          Q.   Okay.  Which ones weren't?

 9          A.   State of Wisconsin versus Pfizer was not a

10    patent dispute.  And Akorn versus Fresenius Kabi was

11    not a patent dispute.

12          Q.   So the -- the State of Wisconsin case, did

13    you testify on behalf of Pfizer?

14          A.   Yes.

15          Q.   And what kind of case was that?

16          A.   It was what's so-called AWP cases, where

17    the states used a discount off of AWP as a mechanism

18    of reimbursement, and they thought, you know, that

19    that was not the appropriate -- the AWP was not an

20    appropriate measure of wholesale prices.

21          Q.   And what expert opinion did you give in

22    that case?

23          A.   Well, Pfizer did not propulgate an AWP,

24    for one thing.  They -- they gave a WAC price, which

25    was their wholesale acquisition cost.  It was a
```

1   journal that figured out AWP mechanically, and -- and

2   I gave other opinions, but essentially contested the

3   State of Wisconsin's allegations and damage experts'

4   estimates.

5       Q.   Are you still working on that matter?

6       A.   No, it was settled, and Pfizer was happy

7   with the settlement.

8       Q.   Okay.  Then you also, I believe, mentioned

9   that the Akorn versus Fresenius was not -- or excuse

10  me.  I had that wrong.  There was another case you

11  listed that didn't involve a patent?

12      A.   Yes.  It was the Akorn case.

13      Q.   Okay.  Versus Fresenius?

14      A.   Yes.

15      Q.   And what type of case was that?

16      A.   That was in front of a chancery judge in

17  Delaware.  Basically Fresenius had made an offer to

18  take over Akorn subject to certain constraints or

19  contingencies.  And at some point Akorn's stock fell,

20  and they wanted to get out of the merger or the

21  acquisition, and it went to court, in chancery court.

22      Q.   Okay.  And which party did you represent

23  in this matter?

24      A.   Akorn.

25      Q.   Okay.  And Akorn is a pharmaceutical

 1    company?

 2         A.   Yeah.  I mean, these were two generics.

 3         Q.   Right.  Do you recall, from this list of

 4    18 cases, any of the law firms that retained you?

 5         A.   I think in the Santofi-Lilly case, I think

 6    that was Gibson Dunn.

 7         Q.   Mm-hmm?

 8         A.   Eisai versus Novartis, that could have

 9    been Paul Hastings.

10         Q.   Right.

11         A.   There were two Teva cases where I

12    testified for them, in Houston and -- that was a

13    Boston firm that was often on the other side, but --

14    you know, their name slips my mind right now.

15         Q.   It was a Boston firm that hired you?

16         A.   No, that -- yes, that hired me, yes, in

17    those cases.

18         Q.   In the Pfizer versus Fresenius case, were

19    you hired by Williams & Connolly?

20         A.   Possibly.

21         Q.   You just don't recall?

22         A.   Right.

23         Q.   Okay.  And then the Bayer versus Mylan

24    case, which is on the second page, were you

25    representing Bayer there?

1         A.    Yes.

2         Q.    And were you again hired -- or excuse

3    me -- were you hired by Williams & Connolly?

4         A.    I believe so.

5         Q.    Okay.  And then on this list, second from

6    the bottom, there's Alcon Research versus Watson

7    Labs.  Do you see that?

8         A.    Yes.

9         Q.    And who were you hired by?

10        A.    I think that was Williams & Connolly.

11        Q.    And on behalf of whom?

12        A.    Alcon.

13        Q.    Okay.  All right.  So I'm just focusing on

14   the cases where you testified in 2018.  So I think it

15   would start with the Galderma case versus Amneal.

16             It looks like you gave a trial testimony

17   in February of 2018.  Correct?

18        A.    Yes.

19        Q.    And then in the next case, the Sanofi

20   versus Merck case, you gave a deposition in

21   April 2018 and trial testimony in May of 2018,

22   correct?

23        A.    Yes.

24        Q.    And then in the Akorn case, you gave a

25   deposition in June of 2018, correct?

```
 1          A.   Yes.

 2          Q.   And then in the Alcon Research versus

 3   Watson Lab case, you gave a deposition in July of

 4   2018.  Do you see that?

 5          A.   Yes.

 6          Q.   And then in the Galderma case versus Sun

 7   Pharmaceuticals, you gave a deposition in October of

 8   2018 and trial testimony in December of 2018?

 9          A.   Right.

10          Q.   So if you just add that up, it looks like

11   you gave, in 2018, three depositions, and you

12   testified at trial three times.  Does that make

13   sense?

14          A.   Yes.

15          Q.   So -- and in some of these cases you may

16   also have been -- had time spent preparing expert

17   reports?

18          A.   Right, although two of the cases are

19   redos, so to speak.  Sanofi versus Merck Sharp &

20   Dohme was a case similar to Sanofi in a case

21   previously -- I don't know if it's on this list,

22   but -- yeah, versus Eli Lilly.  They were both

23   challenging Lantus, a very prominent diabetes insulin

24   product.  So the report was just updating the

25   metrics.
```

1      Q.   Okay.  But you did have to give

2  deposition -- three depositions and three trial

3  testimonies, correct?

4      A.   Right.  And Galderma was also a redo of an

5  earlier case.

6      Q.   Okay.  So -- and you also testified

7  earlier that you had just started to work in this

8  matter as well, correct?

9      A.   Yes.

10     Q.   And are there other cases that -- that you

11 are currently working on, in addition to the ones

12 that are listed here?

13     A.   Yes, although I haven't been named in

14 them, there's two other cases.  One of them's been

15 fairly dormant.

16     Q.   Okay.  So since 2018's pretty recent, can

17 you estimate how much income you received in your

18 capacity as an expert witness in 2018?

19     A.   For these cases?  Maybe 400 hours.

20     Q.   Okay.  And at your rate of $800?

21     A.   Yes.

22     Q.   Okay.  And that would have been

23 information -- your income from your -- your

24 testifying in 2018, you'd be able to figure that out

25 from looking at your income taxes, wouldn't you?

1        A.   Yes, although they haven't been filed yet.

2   We took an extension.

3        Q.   Ah.  Okay.  But you would have information

4   where you could put that number together for us,

5   couldn't you?

6        A.   Yes.

7        Q.   Okay.  Thank you.

8             If you think it's about 400 hours at $800,

9   that would be 320,000, correct?

10       A.   Yes.

11            MS. SUTTON:  Okay.  I don't think I have

12       anything other -- or anything right now, unless

13       your counsel has a redirect; I might have a few

14       additional questions.  But I want to thank you

15       so much for all your time and cooperation today.

16       I know this can be tedious, but I appreciate it.

17            MR. MORRIS:  So I -- I don't have

18       anything, but I know that counsel for Janssen

19       wanted to say something before we went off the

20       record.

21            MS. MARCHITELLO:  Yes.  On behalf of

22       Janssen, I want to put on the record regarding

23       Exhibit 13, and the testimony thereon, that

24       Janssen reserves all rights to enforce all

25       applicable confidentiality agreements and the

1          protective orders that apply to that matter.

2                MS. SUTTON:  And I have confirmed that

3          Exhibit 13 was obtained from Pacer Docket and is

4          publicly available, so there's nothing in the --

5          in Exhibit 13 that can't be obtained by anyone

6          who has a Pacer password.

7                MR. MORRIS:  Okay.  Again, I don't have

8          anything.

9                VIDEOGRAPHER:  This is the end of the

10         video deposition.  Time going off the record is

11         2:56 p.m.

12               (The deposition was concluded

13                at 2:56 p.m.)

14               (Signature reserved.)

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF NORTH CAROLINA

    COUNTY OF MECKLENBURG

2

3           I, Karen K. Kidwell, RMR, CRR, in and for

4   the State of North Carolina, do hereby certify that

5   there came before me on Thursday, June 6, 2019, the

6   person hereinbefore named, who was by me duly sworn to

7   testify to the truth and nothing but the truth of his

8   knowledge concerning the matters in controversy in this

9   cause; that the witness was thereupon examined under

10  oath, the examination reduced to typewriting under my

11  direction, and the deposition is a true record of the

12  testimony given by the witness.

13          I further certify that I am neither attorney

14  or counsel for, nor related to or employed by, any

15  attorney or counsel employed by the parties hereto or

16  financially interested in the action.

17          This the 6th day of June, 2019.

18

19

20          *Karen K. Kidwell*
            _____

            Karen K. Kidwell, RMR, CRR

21          Notary Public #19971050142

22

23

24

25

1                ACKNOWLEDGMENT OF DEPONENT

2

3          I, HENRY GRABOWSKI, Ph.D., do hereby

4     certify that I have read the foregoing pages and that

5     the same is a correct transcription of the answers

6     given by me to the questions therein propounded,

7     except for the corrections or changes in form or

8     substance, if any, noted in the attached Errata

9     Sheets.

10

11

12     _____

            HENRY GRABOWSKI, Ph.D.     Date

13

14

15

16     Subscribed and sworn to before me this _____ day

17     of_____, 20_____.

18

19

            _____

20            Notary Public

21     My Commission Expires:

22

23

24

25

1                    E R R A T A

2        VIDEOTAPED DEPOSITION OF HENRY GRABOWSKI, Ph.D.

3      PAGE     LINE        CHANGE

4      _____    _____       _____

5      REASON:  _____

6      _____    _____       _____

7      REASON:  _____

8      _____    _____       _____

9      REASON:  _____

10     _____    _____       _____

11     REASON:  _____

12     _____    _____       _____

13     REASON:  _____

14     _____    _____       _____

15     REASON:  _____

16     _____    _____       _____

17     REASON:  _____

18     _____    _____       _____

19     REASON:  _____

20     _____    _____       _____

21     REASON:  _____

22     _____    _____       _____

23     REASON:  _____

24     _____

25     (DATE)                          (SIGNATURE)

```
 1                        _ _ _ _ _ _ _

 2                        LAWYER'S NOTES

 3                        _ _ _ _ _ _ _

 4       PAGE    LINE    _____

 5       _____   _____   _____

 6       _____   _____   _____

 7       _____   _____   _____

 8       _____   _____   _____

 9       _____   _____   _____

10       _____   _____   _____

11       _____   _____   _____

12       _____   _____   _____

13       _____   _____   _____

14       _____   _____   _____

15       _____   _____   _____

16       _____   _____   _____

17       _____   _____   _____

18       _____   _____   _____

19       _____   _____   _____

20       _____   _____   _____

21       _____   _____   _____

22       _____   _____   _____

23       _____   _____   _____

24       _____   _____   _____

25       _____   _____   _____
```