Page 1

1            UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4                      *   *   *

5

6    IN RE:

7    NATIONAL PRESCRIPTION        MDL 2804

8    OPIATE LITIGATION            Case No. 1:17-md-2804

9

10                     *   *   *

11          Deposition of ERIC A. GRIFFIN,

12   Witness herein, called by the Defendants for

13   cross-examination pursuant to the Rules of Civil

14   Procedure, taken before me, Christine Gallagher,

15   a Notary Public and Registered Professional

16   Reporter in and for the State of Ohio, at the

17   Sheraton Columbus at Capitol Square, 75 East

18   State Street, Judicial Board Room, Columbus,

19   Ohio, on Wednesday, the 23rd day of January,

20   2019, at 8:48 a.m.

21                     *   *   *

22

23

24

25

Page 2

1          EXAMINATIONS CONDUCTED          PAGE

2     BY MS. BROWNE..........................   9

3     BY MR. MORIARTY........................ 220

4     BY MS. MCNAMARA........................ 242

5     BY MR. EMCH............................ 243

6     BY MS. RANJAN.......................... 280

7     BY MR. RUIZ............................ 296

8     BY MR. WAKLEY.......................... 300

9

10          EXHIBITS MARKED

11    (Thereupon, Defendants' Exhibit          21

12    Number 1, Notice of Videotape 30(b)(6)

13    Deposition of the State of Ohio Board

14    of Pharmacy, was marked for purposes

15    of identification.)

16    (Thereupon, Defendants' Exhibit          24

17    Number 2, Subpoena to testify at a

18    Deposition in a Civil Action, was

19    marked for purposes of identification.)

20    (Thereupon, Defendants' Exhibit          44

21    Number 3, Letter Dated September 27,

22    2006 from the U.S. Department of

23    Justice Drug Enforcement

24    Administration, was marked for

25    purposes of identification.)

Page 3

1    (Thereupon, Defendants' Exhibit        91

2    Number 4, State of Ohio Board of

3    Pharmacy Complaint Form, was marked

4    for purposes of identification.)

5    (Thereupon, Defendants' Exhibit        115

6    Number 5, Document: Ohio Governor's

7    Office Force Pharmacy Firing, was

8    marked for purposes of identification.)

9    (Thereupon, Defendants' Exhibit        140

10   Number 6, Ohio Prescription Drug Abuse

11   Task Force Initial Report Dated May

12   17, 2010, was marked for purposes of

13   identification.)

14   (Thereupon, Defendants' Exhibit        154

15   Number 7, Settlement Agreement with

16   the State Board of Pharmacy, Docket

17   No. D-990726-009, was marked for

18   purposes of identification.)

19   (Thereupon, Defendants' Exhibit        158

20   Number 8, Order of the State Board of

21   Pharmacy vs. Charles A. Gilford,

22   Docket No. 6-65-2, was marked for

23   purposes of identification.)

24

25

Page 4

1     (Thereupon, Defendants' Exhibit          161
2     Number 9, Order of the State Board of
3     Pharmacy vs. Henry E. Agin, R.Ph.,
4     Docket No. 6-88-1, was marked for
5     purposes of identification.)
6     (Thereupon, Defendants' Exhibit          167
7     Number 10, Minutes of the June 9-10,
8     2014 Meeting of the Ohio State Board
9     of Pharmacy, was marked for purposes
10    of identification.)
11    (Thereupon, Defendants' Exhibit          174
12    Number 11, Minutes of the September
13    13-15, 2010 Meeting of the Ohio State
14    Board of Pharmacy, was marked for
15    purposes of identification.)
16    (Thereupon, Defendants' Exhibit          177
17    Number 12, Minutes of the December
18    1-3, 2014 Meeting of the Ohio State
19    Board of Pharmacy, was marked for
20    purposes of identification.)
21    (Thereupon, Defendants' Exhibit          183
22    Number 13, Fax Dated April 21, 2016
23    with attached Suspicious Order Report,
24    was marked for purposes of
25    identification.)

Page 5

1    (Thereupon, Defendants' Exhibit          187
2    Number 14, State of Ohio Board of
3    Pharmacy 3rd Quarter 2017 - Rule
4    Update, was marked for purposes of
5    identification.)
6    (Thereupon, Defendants' Exhibit          192
7    Number 15, Minutes of the December
8    8-9, 2008 Meeting of the Ohio State
9    Board of Pharmacy, was marked for
10   purposes of identification.)
11   (Thereupon, Defendants' Exhibit          203
12   Number 16, Ohio State Board of
13   Pharmacy Newsletter Dated November
14   2014, was marked for purposes of
15   identification.)
16   (Thereupon, Defendants' Exhibit          224
17   Number 17, Ohio State Board of
18   Pharmacy Newsletter Dated May 2010,
19   was marked for purposes of
20   identification.)
21   (Thereupon, Defendants' Exhibit          228
22   Number 18, Ohio State Board of
23   Pharmacy Newsletter Dated May 2011,
24   was marked for purposes of
25   identification.)

Page 6

1     (Thereupon, Defendants' Exhibit              242

2     Number 19, Settlement Agreement with

3     the State Board of Pharmacy in the

4     matter of Cardinal Health 110, Inc.,

5     was marked for purposes of

6     identification.)

7     (Thereupon, Defendants' Exhibit              264

8     Number 20, Ohio Automated Rx Reporting

9     System 2017 Annual Report, was marked

10    for purposes of identification.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:
 2       On behalf of the Defendant McKesson
         Corporation:
 3
             Covington & Burling, LLP
 4
         By:  Maureen F. Browne
 5            Attorney at Law
              850 Tenth Street, N.W.
 6            One CityCenter
              Washington, D.C.  20001
 7            202-662-6000
              mbrowne@cov.com
 8
         On behalf of the Defendant Janssen
 9       Pharmaceuticals, Inc.
10            Tucker Ellis, LLP
11       By:  Matthew P. Moriarty
              Attorney at Law
12            950 Main Avenue, Suite 1100
              Cleveland, Ohio  44113
13            216-696-2276
              matthew.moriarty@tuckerellis.com
14
         On behalf of the Defendant AmerisourceBergen
15       Drug Corporation:
16            Jackson Kelly, PLLC
17       By:  A.L. Emch
              Attorney at Law
18            500 Lee Street East, Suite 1600
              Charleston, West Virginia  25301
19            304-340-1000
              aemch@jacksonkelly.com
20
         On behalf of the Defendant Cardinal Health:
21
              Williams & Connolly, LLP
22
         By:  Colleen McNamara
23            Attorney at Law
              725 Twelfth Street, N.W.
24            Washington, D.C.  20005
              202-434-5000
25            cmcnamara@wc.com
```

```
 1      On behalf of the Defendant CVS Indiana,
        LLC and CVS Rx Services, Inc.:
 2
             Zuckerman Spaeder, LLP
 3
        By:  Anthony M. Ruiz
 4            Attorney at Law
              1800 M Street, N.W., Suite 1000
 5            Washington, D.C.  20036
              202-778-1800
 6            aruiz@zuckerman.com
 7      On behalf of the Defendant Wal-Mart:
 8           Jones Day
 9      By:  Brandy H. Ranjan
              Attorney at Law
10            325 John H. McConnell Boulevard
              Suite 600
11            Columbus, Ohio  43215
              614-469-3939
12            branjan@jonesday.com
13      On behalf of the Ohio Board of Pharmacy
        and the Deponent:
14
             Ohio Attorney General's Office
15
        By:  James T. Wakley
16            Assistant Attorney General
              30 East Broad Street, 26th Floor
17            Columbus, Ohio  43215
              614-466-6818
18            james.wakley@ohioattorneygeneral.gov
19            State of Ohio Board of Pharmacy
20      By:  Nicole M. Dehner
              Chief Legal Counsel
21            77 South High Street, 17th Floor
              Columbus, Ohio  43215
22            614-995-7496
              nicole.dehner@pharmacy.ohio.gov
23
        ALSO PRESENT:
24
             Vincent Glynn, Covington & Burling
25           Robert L. Miller, Videographer
```

1    THE VIDEOGRAPHER:  We're on the

2    record.

3    THE NOTARY:  If you'll raise your

4    right hand, please, to be sworn.

5    ERIC A. GRIFFIN

6    of lawful age, Witness herein, having been first

7    duly cautioned and sworn, as hereinafter

8    certified, was examined and said as follows:

9    CROSS-EXAMINATION

10   BY MS. BROWNE:

11   Q.    Good morning, Mr. Griffin.  As we

12   met before the deposition, my name is Maureen

13   Browne, and I represent McKesson Corporation in

14   this litigation.

15   Could you state your name for the

16   record, please?

17   A.    Eric A. Griffin.

18   Q.    Spell your last name, please.

19   A.    G-R-I-F-F-I-N.

20   Q.    Are you currently employed,

21   Mr. Griffin?

22   A.    I am.

23   Q.    And where is at?

24   A.    At the Ohio State Board of

25   Pharmacy.

1          Q.    Have you been deposed before?

2          A.    No.

3          Q.    So let's go over a few ground

4    rules so we're operating from the same play

5    book.  I'll be asking you a series of questions

6    today which will require you to provide an oral

7    response.

8          A.    Okay.

9          Q.    If at any time you don't

10   understand a question I've asked, please ask me

11   to repeat it.

12         A.    Okay.

13         Q.    If at any time you need a break,

14   you can ask for one.  We generally will take a

15   break every hour, but you are -- if you need a

16   break before that, certainly be free to ask.

17         A.    Okay.

18         Q.    I would just mention that if you

19   do need a break and there's a question pending,

20   we complete that question before we go off the

21   record.

22         A.    Okay.

23         Q.    Is there any reason that you are

24   unable today to give your full, complete and

25   honest testimony?

Page 11

1          A.    No, ma'am.

2          Q.    You're not under the influence of

3     any drugs or alcohol?

4          A.    No, ma'am.

5          Q.    Also, because of the way the

6     record works, even if you can anticipate what

7     I'm asking, you'll need to wait for me to

8     finish my question before you start to speak,

9     and I'll do my best to wait until you complete

10    your answer before I begin the next question.

11    Fair?

12         A.    Absolutely.

13         Q.    What, if anything, did you do to

14    prepare for the deposition today?

15         A.    I prepped with in-house counsel, I

16    prepped with our Assistant Attorney General, I

17    also spoke to other members of our staff.

18         Q.    How many times did you -- well,

19    let me ask you this:  When you say you prepped

20    with in-house counsel, is that Ms. Dehner?

21         A.    Yes.

22         Q.    Anybody else?

23         A.    Also in-house counsel Joe Koltak.

24         Q.    How many times did you meet with

25    in-house counsel?

1          A.    Two for those, but then also, in

2     talking to other staff members, two additional

3     times.

4          Q.    Who were the other staff members

5     with whom you met?

6          A.    Cameron McNamee and Steve

7     Schierholt.

8          Q.    What is Mr. McNamee's --

9                Mr.?

10         A.    Yes, ma'am.

11         Q.    -- Mr. McNamee's position?

12         A.    Director of communication.

13         Q.    And what is Mr. Schierholt's

14    position?

15         A.    Executive director.

16         Q.    Did you meet with them at the same

17    time or separately?

18         A.    Separately.

19         Q.    What did you discuss with

20    Mr. McNamara (sic)?

21         A.    Some of the questions that may be

22    asked and reviewed some of the subpoena

23    information, the types of questions that were

24    in the subpoena.

25         Q.    What did you discuss with

1  Mr. Schierholt?

2          A.    The same, questions that were

3  related to the subpoena and questions that I

4  could anticipate would be asked today.

5          Q.    How long did you meet with

6  Mr. McNamara (sic)?

7          A.    It's McNamee.

8          Q.    I'm sorry.

9          A.    That's okay.

10         Q.    I beg your pardon.  I've got my

11  colleague down at the end of the table on my

12  mind.

13         A.    No problem.  Once.

14         Q.    For about how long?

15         A.    Maybe an hour.

16         Q.    What about your meeting with

17  Mr. Schierholt, how many times did you meet

18  with him?

19         A.    One time.

20         Q.    For how long?

21         A.    Maybe an hour or less.

22         Q.    You mentioned that you met with

23  Ms. Dehner and Mr. Koltak --

24         A.    Yes.

25         Q.    -- twice?

1          A.    Yes, ma'am.

2          Q.    For how long?

3          A.    Total for both meetings or each

4     meeting?

5          Q.    Total is fine.

6          A.    Maybe two to three hours.

7          Q.    You mentioned that you also met

8     with an individual from the Attorney General's

9     office, correct?

10          A.    Yes, ma'am.

11          Q.    Is that Mr. Wakley?

12          A.    Yes.

13          Q.    How long did you meet with

14     Mr. Wakley?

15          A.    I met with him also at the same

16     time that I met with in-house counsel Dehner

17     and Koltak, so two to three hours.

18          Q.    Other than the meetings with

19     in-house counsel, the Attorney General's office

20     and Mr. McNamee and Mr. Schierholt, did you do

21     anything else to prepare for the deposition?

22          A.    Just reviewed the questions, some

23     of our rules, our laws, guidance documents,

24     some different policies and procedures.

25          Q.    When you say guidance documents,

Page 15

1    what do you mean?

2           A.    Guidance documents that we publish

3    on our website for our licensees.

4           Q.    Other than rules, laws, guidance

5    documents, policies and procedures, did you

6    review any other documentation in preparation

7    for the deposition?

8           A.    The Ohio Administrative Code and

9    Ohio Revised Code.  In addition, correspondence

10   from McKesson reference our latest rule

11   proposal.

12          Q.    Other than the meetings with

13   counsel, the review of the documents we've just

14   discussed, did you do anything else to prepare

15   for the deposition?

16          A.    I did review some case statistics,

17   some suspicious order statistics, prior

18   convictions.  That would be it.

19          Q.    Where did the case statistics come

20   from that you reviewed?

21          A.    That would come from our matrix

22   system, which is our records management system.

23          Q.    Are any of those records public?

24          A.    No.

25          Q.    You mentioned that you also

1  reviewed suspicious order statistics; is that
2  right?
3       A.   Yes.
4       Q.   How did you access suspicious
5  order statistics?
6       A.   They're in an Excel spreadsheet.
7       Q.   Did you have to create that Excel
8  spreadsheet or does it exist in Excel's format?
9       A.   It exists in Excel format.
10       Q.   What was the time period that you
11  reviewed for suspicious order statistics?
12       A.   Last three years.
13       Q.   2015 to 2018?
14       A.   Yes.
15       Q.   The --
16       A.   I take that back, '17.  '17 and
17  '18 and '19.
18       Q.   So 2017 through the present of
19  '19?
20       A.   To present, yep.
21       Q.   Okay.  The case statistics that
22  you reviewed, what was the date range for that
23  -- those documents?
24       A.   The last five years.
25       Q.   So that's 2014 to present, or

1    2013?

2              A.    2014 to the present.

3              MR. EMCH:  Might I ask the witness

4    to speak a little louder?

5              THE WITNESS:  Sure, absolutely.

6    BY MS. BROWNE:

7              Q.    You also mentioned that you

8    reviewed prior conviction information, correct?

9              A.    Correct.

10             Q.    Where does that information

11   reside?

12             A.    It would also be in matrix where

13   all of our case information is kept.

14             Q.    And for what period of time did

15   you review the convictions?

16             A.    Same period of time, five years.

17             Q.    So about 2014 to the present?

18             A.    Yes, ma'am.

19             Q.    The conviction information is

20   public, right?

21             A.    Correct.

22             Q.    And how would a member of the

23   public access that information?

24             A.    Through the county clerk's office,

25   Clerk of Courts office in the jurisdiction in

1    which a conviction took place.

2             Q.    The conviction information that

3    you reviewed is not available through a

4    website?

5             A.    It is.

6             Q.    Is it available through the Board

7    of Pharmacy website?

8             A.    No, no, it would be through the

9    independent county Clerk of Courts or whatever

10   jurisdiction that the conviction had taken

11   place in.

12            Q.    What is the nature of the

13   information that the Board of Pharmacy

14   maintains regarding convictions?  In other

15   words, how is that different than what one

16   could access through, you know, the clerk's

17   office of the jurisdiction where the conviction

18   took place?

19            A.    What I was looking for

20   specifically was those -- the judgment entries,

21   the final disposition on a case or an

22   investigation.

23            Q.    So the Board of Pharmacy maintains

24   actual investigation files related to those

25   convictions?

Page 19

1           A.    Yes, ma'am.

2           Q.    And those investigation files are

3    not public?

4           A.    Correct.

5           Q.    Did you review investigation files

6    or just statistical information about

7    convictions?

8           A.    No, specific case files I looked

9    at.

10          Q.    About how many?

11          A.    A couple dozen, I would say.

12          Q.    Does the couple dozen conviction

13   investigation files that you reviewed represent

14   the total number of convictions during that

15   period of time?

16          A.    No, ma'am.

17          Q.    How did you choose which

18   investigative files to review?

19          A.    I was looking for investigative

20   files related to Cuyahoga and Summit County.

21          Q.    And the approximately two dozen

22   files that you looked through related to prior

23   convictions, do those represent the entirety of

24   the convictions in Cuyahoga and Summit for that

25   period, 2014 to the present?

Page 20

1           A.    No, ma'am.

2           Q.    What specifically about those --

3  well, do you know how many --

4                 (Brief interruption.)

5                 THE VIDEOGRAPHER:  I'm sorry,

6  they're controlling it.

7  BY MS. BROWNE:

8           Q.    Do you know how many investigative

9  files for Cuyahoga and Summit -- strike that.

10                Do you know how many

11 investigations --

12                MS. BROWNE:  Can we go off the

13 record for one second, please?

14                (Thereupon, an off-the-record

15 discussion was had.)

16                MS. BROWNE:  We can go back on.

17 Thank you.

18 BY MS. BROWNE:

19          Q.    Do you know how many

20 investigations the Board of Pharmacy conducted

21 in Cuyahoga and Summit Counties in the period

22 2014 to the present?

23          A.    I do.

24          Q.    How many?

25          A.    Cuyahoga County, approximately

Page 21

1  over 700 complaints were investigated in a

2  five-year period.

3        Q.    And for Summit County?

4        A.    Just over 200.  I believe it was

5  231 cases.

6        Q.    Other than meeting with the

7  lawyers, reviewing documents, taking a look at

8  the case statistics, suspicious order

9  statistics and some prior conviction

10  investigation files, what, if anything else,

11  did you do to prepare for the deposition?

12        A.    That was it.  Reviewed my past

13  work history, the laws, the rules, especially

14  as they changed over time.

15              (Thereupon, Defendants' Exhibit

16  Number 1, Notice of Videotape 30(b)(6)

17  Deposition of the State of Ohio Board of

18  Pharmacy, was marked for purposes of

19  identification.)

20  BY MS. BROWNE:

21        Q.    I'm going to show you what has

22  been marked as Exhibit 1.  Exhibit 1 is the

23  Notice of Videotape 30(b)(6) Deposition of the

24  State of Ohio Board of Pharmacy.

25              Have you seen that document

Page 22

1    before?

2              A.    If this is the one that was sent

3    to us, yes.

4              Q.    Do you have an understanding of

5    the topics for which you have been designated

6    as the representative for the Board of Pharmacy

7    today?

8              A.    I do.

9              Q.    Do you have them memorized, the

10   numbers?  You don't have the numbers of the

11   topics memorized, do you?

12             A.    I do not.

13             Q.    Okay.  So if you follow along with

14   me, do you agree you're here for 1 -- the

15   topics themselves start on page 5.

16             A.    Yep, yes, ma'am.

17             Q.    Topics 1, 2, 4 through 15?

18             A.    Hold on.

19             Q.    Yep.

20             A.    I am aware.

21             Q.    Also topic 21?

22             A.    Yes, ma'am.

23             Q.    Topic 23?

24             A.    Yes, ma'am.

25             Q.    Topic 24?

```
 1          A.   Yes, ma'am.
 2          Q.   27?
 3          A.   Yes, ma'am.
 4          Q.   28?
 5          A.   Yes, ma'am.
 6          Q.   And 31?
 7          A.   Yes, ma'am.
 8          Q.   You are also here in, I think, a
 9   more limited capacity for topics 19 and 20 and
10   22; is that right?
11          A.   Okay.
12          MR. WAKLEY:  I did not designate
13   him for 19, 20 and 22.  Here's my letter.
14          MS. BROWNE:  I was just looking
15   for that.  Thanks.
16          So if you look --
17          MR. WAKLEY:  I know, I
18   specifically --
19          MS. BROWNE:  He would be prepared
20   to discuss discipline that the board has
21   imposed or other public actions of the board
22   based on actions the board previously provided,
23   so that's why I said subject to certain
24   limitations.
25          MR. WAKLEY:  Okay.
```

1           MS. BROWNE:  So that's on number

2    20.  I'm sorry, that's on 19 and 20.

3           And then the only other one is 27,

4    which is not mentioned at all in this letter,

5    and 27 is just the board's involvement with the

6    Governor's Cabinet Opiate Action Team.

7           Is there an objection as --

8           MR. WAKLEY:  No, he can speak

9    about --

10          MS. BROWNE:  Okay.

11          MR. WAKLEY:  -- involvement in

12   GCOAT.

13          MS. BROWNE:  So we're good, right?

14          MR. WAKLEY:  Uh-huh.

15          MS. BROWNE:  Thank you.

16          MR. WAKLEY:  Subject to the

17   limitations set forth in my letter.

18          MS. BROWNE:  Fair enough.

19   BY MS. BROWNE:

20       Q.  So with that understanding, you

21   agree with the topics we just talked about and

22   your ability to testify to them today?

23       A.  Yes, ma'am.

24       Q.  You can set that aside.

25          (Thereupon, Defendants' Exhibit

Page 25

1    Number 2, Subpoena to testify at a Deposition

2    in a Civil Action, was marked for purposes of

3    identification.)

4    BY MS. BROWNE:

5           Q.   Exhibit 2 is a copy of the

6    subpoena to you for testimony in your

7    individual capacity today.  Do you see that?

8           A.   Yes, ma'am.

9           Q.   And if you turn to --

10          A.   Should I have two?

11          Q.   Not unless you want two.

12          A.   Okay.

13          Q.   If you turn to the second page,

14   there is a proof of service that notes that you

15   were served on January 11th, 2019.  Do you see

16   that?

17          A.   I do.

18          Q.   And do you understand that in

19   addition to your testimony on behalf of the

20   board, you're here in your individual capacity?

21          A.   I am.

22          Q.   You can set that aside.

23               What is your current title at --

24          A.   Director of compliance and

25   enforcement.

1          Q.    Okay.  And that's with the Ohio --
2          A.    With the Ohio State Board of
3    Pharmacy.
4          Q.    And what are your duties as the
5    director of compliance and enforcement?
6          A.    I oversee daily operations for our
7    field staff, which includes the hiring of
8    individuals, it includes conducting meetings,
9    setting priorities, managing issues as they
10   arise throughout investigations.  We also work
11   in -- within the Pharmacy Practice Act of
12   helping develop rules and changes to rules.  As
13   technology and as industry advances, we have a
14   role in that.  We also have a proactive
15   inspection program where we inspect licensees.
16   We conduct both administrative and criminal
17   investigations.  In addition, we do a lot of
18   educational outreach.
19         Q.    Anything else?
20         A.    Oversee all complaints coming into
21   the board from the general public, from law
22   enforcement, from other agencies.  We hold
23   meetings with stakeholders and other partners,
24   regulatory and law enforcement partners.
25         Q.    Anything else?

1          A.    Not that I can recall at this

2    time.

3          Q.    Is the department of compliance --

4    or the compliance enforcement division

5    responsible for continuing pharmaceutical

6    education?

7          A.    It is not responsible for that.

8    That is a licensing function that ensures

9    continuing education for the pharmacist;

10   however, if there's a violation it would be

11   referred to us to investigate.  Of a licensee,

12   obviously.

13         Q.    Do you share these

14   responsibilities with anybody else?

15         A.    I do.  I have a chief of

16   investigations.

17         Q.    Who is that?

18         A.    Tom Pyles.  I also have a chief

19   pharmacist, Jenni Wai.  We also have an

20   administrative supervisor, Yolanda Freeman,

21   five regional supervisors and two agent

22   supervisors.

23               Would you like the names of the

24   regional supervisors?

25         Q.    Yes, please.

Page 28

1          A.    Lisa Dietche.

2          Q.    What region is she in?

3          A.    She is Northeast Ohio.  Kevin

4    Flaharty is Southeast Ohio, Michael Poe is

5    Southwest region, Mark Keeley is Northwest

6    region, and Jesse Wimberly is medical

7    marijuana.

8                And then the two agent

9    supervisors, there's one assigned to Northeast

10   Ohio, which would be John West -- I'm sorry,

11   John Bonish is in Northeast Ohio, John West is

12   in Southeast Ohio.

13         Q.    Do you have regular meetings with

14   -- let me ask you this:  The individuals we

15   just talked about from Mr. Pyles through

16   Mr. West, those individuals all report to you?

17         A.    The chain of command is that Chief

18   Pyles -- the regional supervisors report to

19   Chief Pyles, the people that report to me are

20   Chief Pyles, Chief Jenni Wai, and Yolanda

21   Freeman.

22         Q.    What is the role of the regional

23   supervisors?

24         A.    They are to manage everything in

25   that region with their team.  Each region, we

1  restructured the region -- or the field staff

2  workforce a couple years ago, and each regional

3  supervisor is responsible for managing their

4  field staff in each region; and depending on

5  the number of licensees and the number of

6  cases, depends on the amount of field staff

7  allocated to the various regions.

8          Q.    Is Summit County Northeast Ohio?

9          A.    It is, yes, ma'am.

10         Q.    And is Cuyahoga Northwest?

11         A.    Cuyahoga is Northeast.

12         Q.    It's also Northeast, okay.

13               Do you know how many individuals

14  are on the field staff in Northeast Ohio?

15         A.    If you give me one second, I can

16  tell you.

17         Q.    Okay.

18         A.    Ten field staff, approximately.

19         Q.    Were you writing down the names to

20  try to remember?

21         A.    I was, yes.

22         Q.    Okay.  To whom do you report?

23         A.    The executive director, Steve

24  Schierholt.

25         Q.    Do you have regular meetings with

Page 30

1  your chiefs and Ms. Freeman?

2          A.   I have regular meetings with the

3  chiefs and the regional supervisors on a weekly

4  basis.

5          Q.   Are minutes kept of those

6  meetings?

7          A.   Not so-called minutes, but an

8  agenda.  We have a very specific agenda.

9          Q.   And does anyone maintain those

10  agendas?

11          A.   Yes.

12          Q.   Who is that?

13          A.   Yolanda Freeman.

14          Q.   Are notes or follow-up action

15  items generated from those meetings?

16          A.   Yes, ma'am.

17          Q.   And are those circulated?

18          A.   Yes, ma'am.

19          Q.   To whom?

20          A.   To the regional -- the agenda,

21  which those notes would be kept, are -- the

22  action items are on the agendas.

23          Q.   And are they circulated

24  electronically to the meeting participants?

25          A.   Yes, ma'am.

1          Q.    How often do you meet with
2     Mr. Schierholt?
3          A.    Scheduled, probably weekly, but
4     probably more often than that.
5          Q.    And are agendas generated for the
6     weekly meetings with Mr. Schierholt?
7          A.    No, ma'am.
8          Q.    Are notes or action items
9     generated as a result of the meetings with
10    Mr. Schierholt?
11         A.    Yes, but nothing formal.
12         Q.    Do you meet with him -- and the
13    weekly meetings, are those one-on-one or are
14    those with other of his reports?
15         A.    Both.
16         Q.    Okay.  When others are part of the
17    meetings, who are the others?
18         A.    It would be all the department
19    heads.  And there is an agenda for that
20    meeting, I apologize.  So it would be all the
21    department heads.
22         Q.    How many department heads are
23    there?
24         A.    You have licensing, compliance and
25    enforcement, administration, legal, and OARRS

Page 32

1   or informational systems.

2          Q.    An agenda is circulated for the

3   meetings that involve licensing, compliance,

4   admin, legal and OARRS?

5          A.    Yes, ma'am.

6          Q.    Are minutes or action items

7   generated through those meetings?

8          A.    On the agenda there is, yes.

9          Q.    And are those circulated after the

10  meeting?

11         A.    Yes, normally.

12         Q.    Who circulates them?

13         A.    Steve Schierholt's assistant,

14  Brenda Cooper.

15         Q.    Are those agendas with action

16  items circulated only to the meeting

17  participants?

18         A.    Yes, ma'am.

19         Q.    Is there a system in place to

20  track the completion of the action items?

21         A.    Only when we have discussions

22  about them, they're removed from the list.

23         Q.    Other than your weekly meeting

24  with your chiefs and the regional supervisors,

25  do you have any other regularly scheduled

1    meetings with the individuals in the compliance

2    and enforcement department?

3           A.    Yes, we have a quarterly meeting

4    and an annual meeting.

5           Q.    What is the purpose of the

6    quarterly meeting?

7           A.    To establish our priorities for

8    the next quarter, address issues that we may be

9    having, whether it's from personnel to case

10   types.  They're normally a day long.  And then

11   we set priorities or goals for the next

12   quarter.

13          Q.    Is there any writing coming out of

14   the quarterly meeting, an agenda, action items,

15   what have you?

16          A.    Yes, ma'am.

17          Q.    And how would you describe the

18   written product?

19          A.    Again, action items are on the

20   agenda that's carried over from the weekly

21   meetings to the quarterly meetings.  At the end

22   of the quarterly meeting, additionally, we have

23   our goals and objectives that we call Rocks to

24   get done.

25          Q.    And is there a system in place to

1    monitor whether the goals and objectives have

2    been met?

3            A.    At each quarter we review them for

4    completion and there's ongoing conversation at

5    the weekly meetings in reference to the Rocks

6    being completed.  It's a business management

7    system.

8            Q.    And the annual meetings, what is

9    the purpose of the annual meetings?

10           A.    Again, to review -- to review the

11   prior quarter's goals, to set new goals, to

12   discuss issues, challenges, anything -- any

13   topics that may have came up during that

14   quarter or any problems, discuss personnel,

15   staffing, regular business functions.

16           Q.    You mentioned that the quarterly

17   meeting is approximately a day long.  How long

18   is the annual meeting?

19           A.    Two days.

20           Q.    Is that on-site?

21           A.    Most of the time, no, it's at a

22   state park, like a lodge for the state parks.

23           Q.    Are there Rocks generated through

24   this annual meeting?

25           A.    Yes, ma'am.  It takes the place of

Page 35

1    the fourth quarter meeting.

2            Q.    I see.  How long have you been a

3    director of compliance and enforcement?

4            A.    Since 2016.

5            Q.    Were you with the -- so let me

6    just -- I should have said this earlier.  If I

7    refer to the Board of Pharmacy as the board or

8    the BOP, will you understand that I'm referring

9    to the Ohio State Board of Pharmacy?

10           A.    Yes, ma'am.

11           Q.    Thank you.

12                 Did you have any roles with the

13   board prior to 2016?

14           A.    Yes, I've had various roles since

15   2008.  I started out as a compliance agent.

16           Q.    What was your role as a compliance

17   agent?

18           A.    I inspected facilities that

19   stored, distributed, sold, manufactured

20   dangerous drugs, investigated drug law

21   violations of Ohio Revised Code, Ohio

22   Administrative Code and the federal CFR.

23           Q.    Did you have any particular

24   training to become a compliance agent?

25           A.    Prior to joining the board I was

1    with Delaware County sheriff's office, so I

2    have -- I'm OPOTA certified, Ohio Peace Officer

3    certified, and almost 15 -- well, over 15 years

4    prior law enforcement experience in

5    investigations prior to coming to the board.

6            Q.    How long were you with the

7    Delaware County sheriff's office?

8            A.    From 2000 -- or, I'm sorry, from

9    1995 to 2008.

10           Q.    And why did you take the position

11   with the board?

12           A.    Change of pace, less hours, it was

13   an intriguing opportunity.

14           Q.    How long were you a compliance

15   agent?

16           A.    Until 2010.

17           Q.    What was your next position?

18           A.    I was a compliance supervisor.

19           Q.    How did your role change from

20   being a compliance agent to a compliance

21   supervisor?

22           A.    As a compliance supervisor, at the

23   time the structure -- there was two regional

24   supervisors and then the field staff, and it

25   was a daily operations position, again managing

Page 37

1    it.  However, we had a smaller staff size at

2    that point in time, so it was more manageable.

3    And I reported to the assistant executive

4    director who was in charge of compliance and

5    enforcement.

6            Q.   Who was the assistant executive

7    director in charge of compliance and

8    enforcement at the time that you were the -- a

9    compliance supervisor?

10           A.   John Whittington.

11           Q.   What was your next position with

12   the board?

13           A.   2014 I was the interim assistant

14   executive director for a time period due to an

15   illness, a lengthy time off of our current

16   assistant executive director at that time.

17           Q.   So you were a compliance

18   supervisor from 2010 to 2014?

19           A.   Yes, ma'am.

20           Q.   And then in 2014 you became the

21   interim assistant executive director?

22           A.   Yes, ma'am.

23           Q.   Of compliance or of the entire

24   board?

25           A.   At the time our -- the title was

Page 38

```
 1   assistant executive director; however, the
 2   responsibilities of the assistant executive
 3   director was over compliance and enforcement.
 4          Q.   Was there -- if you were the
 5   assistant executive director, was there an
 6   executive director in place?
 7          A.   Yes, ma'am.
 8          Q.   Who was that?
 9          A.   Kyle Parker.
10          Q.   How long were you the interim
11   assistant executive director?
12          A.   Less than a year, and then I was
13   appointed to interim executive director for
14   approximately two months.
15          Q.   And then from there you became the
16   director of compliance and enforcement?
17          A.   No, ma'am.
18          Q.   Okay.  What was next?
19          A.   I went back to compliance and
20   enforcement supervisor until 2000 -- yeah,
21   until 2016.  And also in 2016 I did a short
22   stint as the interim executive director of the
23   Ohio Embalmers and Funeral Board of Directors.
24          Q.   What prepared you for that
25   position?
```

Page 39

1         A.   I would say my work experiences
2    with the Board of Pharmacy had been and I had
3    been in various leadership roles prior to
4    coming to the board.
5         Q.   And for what period of time were
6    you the interim director of the Embalmers and
7    Funeral --
8         A.   Very short period, less than two
9    months.
10        Q.   Okay.  Backing up, you were a
11   Delaware County -- you were in the Delaware
12   County sheriff's office from '95 to 2008,
13   correct?
14        A.   Yes, ma'am.
15        Q.   What did you do prior to that?
16        A.   I worked at New Albany police
17   department as a police officer.
18        Q.   For what period of time?
19        A.   '94 to '95.
20        Q.   What did you do prior to 1994?
21        A.   I worked for my family's stucco
22   company as a manual laborer and had some
23   odd-and-end jobs through high school.
24        Q.   Do you have any formal education
25   since high school?

1          A.   Yes, ma'am, I've had various

2     trainings.  Obviously I'm OPOTA certified, I've

3     had some college classes.  I've also taken

4     numerous trainings, educational leadership

5     types of trainings throughout the years.

6          Q.   And you said OPOTA certified?

7          A.   Yes, ma'am.

8          Q.   That's the Peace Officer?

9          A.   Ohio Peace Officer.

10          Q.   What is the exact -- what are the

11     letters, is it O-P-A-T-A or O-P --

12          A.   O-P -- O-P-O-T-A, OPOTA.

13          Q.   All right.  Have you heard the

14     term opioid crisis?

15          A.   Yes, ma'am.

16          Q.   Have you ever used that term?

17          A.   I'm sure I have.

18          Q.   What is your understanding of the

19     opioid crisis as it relates to the State of

20     Ohio?

21          A.   As it relates to the State of

22     Ohio?

23          Q.   Yes.

24          A.   Obviously we have an issue with

25     diverted pharmaceuticals, in addition to

Page 41

1  illicit drugs that are all opiate derivatives,

2  and in 2008 our overdose deaths exceeded those

3  of deaths in motor vehicle accidents.  So

4  obviously it is a big issue for the State of

5  Ohio.

6          Q.   Is your understanding of the

7  opiate crisis as it relates to the State of

8  Ohio different from how it may relate to Summit

9  or Cuyahoga Counties?

10         A.   No, ma'am.

11         Q.   Do you have an understanding that

12  there is an opioid crisis in Cuyahoga County?

13         A.   I am sure they are in the same

14  boat with the rest of Ohio.  I don't know any

15  of their statistics or anything like that, but

16  globally for the State of Ohio there's an

17  issue.

18         Q.   Do you have an understanding as to

19  whether there is an opioid crisis specific to

20  Summit County?

21         A.   I would believe so.

22         Q.   And why do you say that?

23         A.   From case investigations, from

24  information from the Ohio Department of Health

25  on overdose deaths, attending drug task force

Page 42

1    commanders association meetings and hearing the
2    different challenges that the task forces have.
3            Q.    Do you have an understanding that
4    the opioid crisis may be worse in Summit County
5    than in Cuyahoga County?
6            A.    I do not have that understanding.
7            Q.    You do not know one way or the
8    other?
9            A.    I don't know, yeah.
10           Q.    At what point in time did the
11   board come to realize that there was an opioid
12   crisis?
13           A.    I think that before I got to the
14   board we were investigating individuals that
15   were diverting pharmaceutical drugs prior to me
16   getting there.
17           Q.    And you joined in 2008?
18           A.    Yes, ma'am.
19           Q.    So it's your understanding that
20   prior to 2008 the board was aware of an opioid
21   crisis?
22           A.    I can tell you that we had had a
23   focus on investigating those who were diverting
24   and we were seeing various drug trends that
25   would make you believe that.

Page 43

1           Q.   When you say you were seeing
2    various drug trends that would make you believe
3    that, what do you mean?
4           A.   Sure.  So an example of it would
5    be at the time we were seeing a massive amount
6    of Florida prescriptions coming to the State of
7    Ohio from what was labeled as pill mills down
8    in the Florida, Broward County area, and
9    massive amounts of prescriptions.
10          Q.   Do you know the types of
11   prescriptions that were coming in from Florida?
12          A.   Most of the time they were for
13   hydrocodone, oxycodone, Soma, alprazolam.
14          Q.   And do you have an understanding
15   that hydrocodone, oxycodone are opioids?
16          A.   Yes, ma'am.
17          Q.   And alprazolam is a benzodiazapine?
18          A.   Yes, ma'am.
19          Q.   What is Soma?
20          A.   A muscle relaxer or a mild -- it
21   can also be used as a mild pain reliever.
22          Q.   Have you ever used the term
23   diversion in your work at the board?
24          A.   Yes, ma'am.
25          Q.   What is your understanding of the

1  term diversion?

2          A.   My understanding of diversion is

3  when a pharmaceutical prescription is in any

4  way redirected from its legitimate medical use

5  to an illicit use, whether that's to an

6  individual or being sold or being stolen, when

7  it's essentially taken out of the legitimate --

8  the legitimate medical use system to be used

9  illicitly.

10         Q.   So do you agree that the transfer

11  from a DEA registered and Ohio licensed entity

12  to another DEA registered and Ohio licensed

13  entity is not diversion?

14         A.   Correct, it would be a normal

15  course of business.

16         Q.   And do you agree that transfer

17  from a DEA registered and Ohio licensed

18  dispenser to an outpatient who presents a legal

19  prescription written by a licensed prescriber

20  is not diversion?

21         A.   As long as it's a legal

22  prescription, yes, ma'am.

23              MS. BROWNE:  Can I get AA, please?

24              (Thereupon, Defendants' Exhibit

25  Number 3, Letter Dated September 27, 2006 from

Page 45

1    the U.S. Department of Justice Drug Enforcement

2    Administration, was marked for purposes of

3    identification.)

4    BY MS. BROWNE:

5         Q.   I'm going to hand you what we've

6    marked as Exhibit 3.  This is a September 27th,

7    2006 letter from the Drug Enforcement

8    Administration.  It bears production BOP_ MDL

9    2nd Production 012217 through 012220.

10             MR. MORIARTY:  I'm sorry, Mo, what

11   exhibit number did you assign that?

12             MS. BROWNE:  Number 3, Exhibit 3.

13             MR. MORIARTY:  Okay.  Thank you.

14   BY MS. BROWNE:

15        Q.   Have you seen this document

16   before, Mr. Griffin?

17        A.   Can you give me a minute to review

18   it?

19        Q.   You bet you.

20             (Pause in proceedings.)

21             THE WITNESS:  I don't know if I've

22   seen this particular document; however,

23   probably versions of it, or at least I'm

24   familiar with most of the language in here.  I

25   can't recall this specific document, though.

Page 46

1   BY MS. BROWNE:

2          Q.    Okay.   This was produced by the

3   BOP.   Are documents of this type -- let me ask

4   this:   You said that you may have seen versions

5   of a letter like this, if not this version.

6   Does the DEA provide the BOP with copies of

7   these types of letters?

8          A.    In some incidences I believe they

9   do; however, this one is dated 2006.

10         Q.    So before your time?

11         A.    Before I was here.

12         Q.    Okay.   Take a look for me at the

13  second paragraph.   The first sentence reads, as

14  each of you is undoubtedly aware, the abuse,

15  open parens, non-medical use, closed parens, of

16  controlled prescription drugs is a serious and

17  growing health problem in this country.

18              Did I read that correctly?

19         A.    Yes, ma'am.

20         Q.    And there's a footnote to a

21  National Institute on Drug Abuse Research

22  Report from 2005.   Do you see that?

23         A.    Yes, ma'am.

24         Q.    Are you familiar with that report?

25         A.    I am not.

1          Q.    Okay.  On page 2 of Exhibit 3, the

2     second paragraph reads, DEA recognizes that the

3     overwhelming majority of registered

4     distributors act lawfully and take appropriate

5     measures to prevent diversion.

6               Did I read that correctly?

7          A.    Yes, ma'am.

8          Q.    Has that been your experience in

9     your time at the board, that the overwhelming

10    majority of registered distributors act

11    lawfully?

12         A.    Yes, ma'am.

13         Q.    On the third page of this document

14    under the heading circumstances that might be

15    indicative of diversion, under number 1 is

16    ordering excessive quantities of a limited

17    variety of controlled substances, open parens,

18    e.g. ordering only phentermine, hydrocodone and

19    alprazolam, closed parens, while ordering few,

20    if any, other drugs.

21              Did I read that correctly?

22         A.    Yes, ma'am.

23         Q.    When we were talking about the

24    drugs coming from Florida, you mentioned

25    hydrocodone and alprazolam, correct?

Page 48

1            A.    Yes, ma'am.

2            Q.    And those are drugs that, from

3    your understanding, were coming from pill

4    mills, among other places, into the State of

5    Ohio?

6            A.    Not the pills, the prescriptions,

7    the actual paper prescriptions.

8            Q.    Okay.  So you can set that aside.

9            When you testified about what was

10   coming up from Ohio (sic), it wasn't the drugs,

11   it was the paper prescriptions that were coming

12   up to Ohio from Florida?

13           A.    Yeah, coming from Florida to Ohio.

14   At the time when I joined the board, it seemed

15   like this was a growing trend and it wasn't the

16   -- I'm sure the pills were, however, but what

17   we were seeing is a lot of paper prescriptions

18   coming in from Florida.

19           Q.    Okay.  So other than paper

20   prescriptions coming in from Florida, what, if

21   any, other ways do you understand that

22   prescription opioids have been diverted?

23           A.    Okay.  There's numerous ways.

24   Let's start with your very basic drug theft.

25   That could be a theft at a wholesale

Page 49

1   distributor, that could be a theft at a
2   pharmacy, a retail pharmacy, there could be a
3   theft in a hospital.  It could also include
4   doctors' offices, clinics, veterinarian
5   facilities, dentists' offices.  Really anywhere
6   controlled substances are stored you run the
7   risk of theft diversion of controlled
8   substances and/or dangerous drugs.
9           The second means of diversion
10  would be illegal processing of drug documents,
11  producing false prescriptions, changing
12  quantity amounts on a legitimate prescription
13  that was written for legitimate means, but
14  changing the quantity numbers on those types of
15  prescriptions, forging any type of document,
16  whether it's an order form, any type of drug
17  document to secure a controlled substance.
18          Number three, obviously, you have
19  doctor shoppers, those that are deceiving
20  physicians and going to multiple physicians to
21  get a similar or like medication where you have
22  overlapping drug therapy, and then filling them
23  at, most of the time, different pharmacies.  So
24  you have doctor shoppers that also create
25  diversion.

Page 50

1              Additionally to that you have drug
2     trafficking.  You have physicians that are
3     operating essentially pill mills, if you will,
4     where they're taking cash payments for
5     prescriptions that would not be for legitimate
6     medical use.
7              And we sort of saw -- we saw all
8     of those types of diversions when I came to the
9     board in 2008.
10          Q.   When you came to the board in
11    2008, had these types of diversion been
12    ongoing?
13          A.   I'm sure they had been.  The board
14    had conducted, from what I heard, what I had
15    learned when I got here, numerous
16    investigations years prior to me being there;
17    and being assigned as a drug task force
18    commander, I was well aware of the different
19    types of diversions that were out there.
20          Q.   When you were with the Delaware
21    County sheriff's office, did you -- were you
22    working at all in drug-related offenses?
23          A.   Yes, ma'am.
24          Q.   What, if any -- did you ever --
25    did you ever participate in investigations or,

Page 51

1   I guess -- well, let's say investigations

2   directed toward criminal activity that related

3   to opioids?

4           A.   Yes, ma'am.

5           Q.   How frequently did that occur?

6           A.   I was a drug task force commander,

7   we did that on a daily basis.  We had long-term

8   investigations and street-level investigations

9   that range from hand-to-hand buys to long-term

10  drug investigations.

11          Q.   Did there come a time while you

12  were with the Delaware County sheriff's office

13  that you noticed an uptake -- an uptick in

14  opioid-related crimes?

15          A.   It wasn't until I got to the drug

16  task force that I realized that the

17  relationship between violent crimes and

18  property crimes were so closely related to

19  illegal drug activity.  During my time as a

20  detective prior to being assigned to the drug

21  task force, every suspect you interviewed most

22  of the time was a drug-related incident.  I

23  never -- all of them said the reason that they

24  were stealing was to get money for drugs.

25          Q.   And when you -- when did you

1   become the commander of the drug task force?

2          A.   '02.

3          Q.   And it was after '02 that you

4   started noticing more of these crimes related

5   specifically to opioids?

6          A.   No, I would say when I was

7   assigned to the detective bureau in 2000.  I

8   started out as a general detective, then I

9   moved into major crimes which covered rape,

10  robbery, homicide.

11         Q.   And so it was at that time when

12  you noticed the --

13         A.   The correlation between drug

14  crimes, property crimes and violent crimes, or

15  the uptick in drug-related crimes.

16         Q.   I'm talking here specifically

17  about opioids versus like meth.

18         A.   Okay.  I think we always --

19  because you wouldn't -- you would have anybody

20  from selling their own prescription to people

21  stealing drugs.  It was -- I can't tell you how

22  many burglaries or reported thefts that we had

23  of prescription medications.  It was a lot.

24              MS. BROWNE:  We've been going

25  about an hour.  Do you want to take a break?

1           MR. WAKLEY:  Yeah.

2           THE VIDEOGRAPHER:  We're off the

3    record.

4           (Recess taken.)

5           THE VIDEOGRAPHER:  We're on the

6    record.

7    BY MS. BROWNE:

8        Q.   So, Mr. Griffin, we were talking a

9    little bit about diversion and what you saw

10   when you were the commander of the drug task

11   force in the Delaware County sheriff's

12   department?

13       A.   Correct.

14       Q.   I know that there is a sheriff's

15   department in Summit and there's a sheriff's

16   department in Cuyahoga.  Do you have an

17   understanding about the jurisdictional

18   responsibilities of, for example, Delaware

19   County versus a place like Summit or Cuyahoga?

20   Not a good question, okay.

21          Delaware County is a smaller

22   county than Cuyahoga County, correct?

23       A.   Yes, ma'am.

24       Q.   Does Delaware County have a police

25   force in addition to the sheriff's office?

Page 54

1           A.    Yes, ma'am, or Delaware City does.

2           Q.    What are the roles -- when you

3     were with the Delaware County sheriff's

4     department, how did the role of the sheriff's

5     department differ from the role of the police

6     department?

7           A.    The police department is in charge

8     of the incorporated area or provides law

9     enforcement services to an incorporated area.

10    So a city, a small municipality or townships

11    could have their own police departments; a

12    sheriff had -- a sheriff's office has original

13    jurisdiction over the entire county, also

14    provides the jail -- also is in charge of the

15    jail, also provides court security, and also

16    provides administrative services for subpoenas

17    and different legal papers.

18          Q.    And do you know if that is the

19    case in all Ohio counties; for example, in

20    Summit County does the Summit County sheriff's

21    department have original jurisdiction the same

22    way that you described Delaware County did, and

23    then the police -- the police departments have

24    separate roles?

25          A.    I believe so.  I do know that

Page 55

```
 1   Cuyahoga operates a little differently.  I
 2   don't know if they have like a patrol division
 3   and different things like that.  I know
 4   Cuyahoga's main function is the jail.
 5           Q.   When you were with Delaware County
 6   did the police department of Delaware City
 7   report to the sheriff's department?
 8           A.   No, ma'am.  They are a separate
 9   entity, so each agency within their
10   jurisdiction is their own separate entity, they
11   don't report to anybody.  However, the drug
12   task force that I was in charge of was a
13   multi-agency jurisdiction, and so agencies
14   would assign people to our task force and we
15   would work cases jointly within everyone's
16   jurisdiction.
17           Q.   When you said it was multi-agency,
18   the task force that you were commander of in
19   Delaware County, what agencies are you talking
20   about?
21           A.   So obviously Delaware County
22   sheriff's office, Delaware City police
23   department, Genoa Township police department,
24   Sunbury police department, Powell police
25   department, and the Delaware County
```

Page 56

1    prosecutor's office.

2         Q.    Who --

3         A.    Oh, I'm sorry, and Westerville

4    City police department and Worthington City

5    police department.

6         Q.    Who started the task force, the

7    drug task force?

8         A.    I'm assuming the sheriff's office

9    way before I got there.

10         Q.    So the drug task force was in

11   place prior to your joining the Delaware County

12   sheriff's department?

13         A.    Yes, ma'am.

14         Q.    Did the -- did the type of drug --

15   let me ask you this:  Did the focus of the drug

16   task force change at all depending on an influx

17   of a certain drug in the community?

18         A.    Sure, yeah, absolutely.  We -- you

19   could -- pricing and availability were impacted

20   by what was going on nationally.

21         Q.    So when you took over in 2002 as

22   the commander of the drug task force, what was

23   the drug of focus, if you will, in 2002?

24         A.    I don't know if there was a

25   specific focus because we -- it was anything,

Page 57

```
 1   any type of illegal substance that we would
 2   investigate.  However, predominantly I would
 3   say the daily ones were crack cocaine,
 4   marijuana, cocaine, and then prescription
 5   pills.
 6            Q.   How long were you the drug force
 7   commander?
 8            A.   Probably until 2000 and -- 2005,
 9   2006, and then I was promoted to administrative
10   lieutenant in charge of all of our
11   investigation sections, which also included the
12   drug task force.  So they were still -- I still
13   had management responsibilities for the drug
14   task force.
15            Q.   So from 2002 through the period
16   when you served as the administrator in charge
17   of all the sections, did you notice one drug
18   sort of waning and another taking more
19   prominence in the crimes that you investigated?
20            A.   I think the biggest swing that I
21   would say that you could have -- that we would
22   have seen in there was to heroin.
23            Q.   And about what time did you see
24   the swing towards heroin?
25            A.   Maybe thereabouts 2000 -- end of
```

Page 58

1   2004, 2005 it became much more readily

2   available and extremely cheap.

3           Q.   You had mentioned that during the

4   2002 to 2005 time frame that some of the drugs

5   that the task force routinely saw were crack,

6   marijuana, cocaine and prescription pills,

7   correct?

8           A.   Uh-huh.

9           Q.   At any time did you see an

10  increase in prescription pills being the

11  predominant drug issue in the community?

12          A.   I can't say we ever saw a

13  significant increase like we did with heroin.

14  They were always just -- they always seemed to

15  be available.

16          Q.   So you mentioned for -- earlier

17  for types of diversion that you've seen, drug

18  theft, and you mentioned from retail

19  pharmacies, hospitals, any place there's a

20  controlled substance stored, illegal processing

21  of --

22          A.   Drug documents.

23          Q.   -- drug documents, doctor shopping

24  and drug trafficking.

25               Are these types of diversions

Page 59

1   diversions that the BOP has oversight of?

2          A.   We do conduct those types of

3   investigations.  As far as complete oversight,

4   no, there are plenty of other agencies that

5   also investigate these types of drug-related

6   crimes.

7          Q.   Does the board investigate --

8   well, let me ask you this:  If a child steals

9   his parent's hydrocodone prescription from the

10  medicine cabinet, is that diversion?

11         A.   Yes.

12         Q.   Does the Board of Pharmacy

13  investigate that?

14         A.   We would not.  We would refer that

15  to local law enforcement.

16         Q.   How would the Board of Pharmacy

17  know when a kid is stealing his parent's opioid

18  medication?

19         A.   We wouldn't unless the parent or

20  somebody reported it.

21         Q.   Have you ever in your experience

22  at the Board of Pharmacy participated in an

23  investigation of an individual who had been

24  stealing medication from a -- from a family

25  member?

Page 60

1              A.    I don't believe so.

2              Q.    Do you know of any in the history

3      of the Board of Pharmacy where the Board of

4      Pharmacy has investigated an individual who had

5      been stealing a relative's opioid prescription?

6              A.    I'm not sure.  I don't know.  The

7      only type of scenario I could think of would be

8      a relative from an elderly family member.

9              Q.    And you think you may have

10     investigated -- you, being the board, have

11     investigated a situation where a relative stole

12     a medication from an elderly family member?

13             A.    I can't recall.

14             Q.    So other than those four types of

15     diversion we talked about and potentially when

16     a relative steals an opioid medication from a

17     family member, those are the types of diversion

18     over which the board has some investigative

19     capacity?

20             A.    Yes, ma'am, and I would also

21     include in there that those can take different

22     forms.  Prescription -- illegal processing of

23     drug documents can come anywhere from an

24     individual printing their own prescriptions,

25     to, again, changing quantity amounts, to -- the

1    diversion schemes can come in various different

2    forms, in different ways.

3              Q.    Have you heard of McKesson

4    Corporation?

5              A.    I have.

6              Q.    What is McKesson?

7              A.    They're a drug wholesaler.

8              Q.    What about Cardinal Health, have

9    you heard of Cardinal Health?

10             A.    Yes, ma'am.

11             Q.    Do you know what they do?

12             A.    They are also a wholesaler.

13             Q.    What about AmerisourceBergen, have

14   you heard of them?

15             A.    Yes, ma'am.

16             Q.    And do you know what they do?

17             A.    They are also a wholesaler.

18             Q.    Do you know approximately how many

19   wholesale pharmaceutical distributors do

20   business in Ohio?

21             A.    I do not, no, off the top of my

22   head.

23             Q.    Would you be surprised to learn

24   it's more than 500?

25             A.    I would be surprised if it was

Page 62

1    over 500, but I'm sure there's plenty of

2    out-of-state distributors that ship to the

3    State of Ohio.

4              Q.    Distributors who do business --

5              A.    Actually, can I correct that

6    answer?

7              Q.    Yes, you may.

8              A.    No, I would not be surprised if

9    it's over 500.

10             Q.    And why is that?

11             A.    Because there's plenty of places

12   that are shipping controlled substances and

13   dangerous drugs into the State of Ohio that we

14   license outside of the State of Ohio.

15             Q.    Wholesale pharmaceutical

16   distributors who do business in Ohio have to be

17   licensed to operate in Ohio, correct?

18             A.    Correct.

19             Q.    And the BOP is the agency

20   responsible for licensing wholesale drug

21   distributors in Ohio?

22             A.    Yes, ma'am.

23             Q.    Information about whether an

24   entity is licensed -- a wholesale entity is

25   licensed in the State of Ohio is publicly

Page 63

1    available?

2           A.    Yes, ma'am.

3           Q.    And can one access that through

4    the BOP website?

5           A.    Yes, ma'am.

6           Q.    The public information identifies

7    when a license was issued to a wholesaler,

8    correct?

9           A.    I believe so.

10          Q.    Does it --

11          A.    We recently changed licensing

12   systems.

13          Q.    Does it identify the expiration

14   date of a wholesale license?

15          A.    I believe so.

16          Q.    Does the public information about

17   a wholesaler indicate whether the wholesaler

18   has ever had any discipline?

19          A.    It does.

20          Q.    Has that type of information, the

21   licensee period and whether action has been

22   ever taken against a licensee, always been

23   publicly available?

24          A.    To my knowledge it's been -- since

25   2008 when I started, it was publicly available.

1        Q.    And you don't know whether prior
2   to 2008 that information was publicly
3   available?
4        A.    I would assume that it was, but I
5   do not know.
6        Q.    If an individual today wanted to
7   see who was licensed in 2004, would that
8   individual be able to access that information
9   on the BOP website?
10       A.    I would think that it would -- you
11  could and it would show an inactive status.
12       Q.    Wholesale distributors in the
13  State of Ohio also have to be registered with
14  the DEA; is that right?
15       A.    If they're selling controlled
16  substances.
17       Q.    Are you aware of any wholesale
18  distributor -- well, strike that.
19            What, if any, understanding do you
20  have of the role of a dispenser in preventing
21  diversion?
22       A.    Of a dispenser?
23       Q.    Yes, sir.
24       A.    So if we're using it as the term
25  of a pharmacy, that the prescription or order

Page 65

1    is for a legitimate medical purpose prior to

2    dispensing.

3            Q.    Physicians can be dispensers also,

4    right?

5            A.    They can.  They can provide up to

6    a 72-hour supply of a controlled substance.

7            Q.    What, if any, role does a

8    wholesale manufacturer have in preventing

9    diversion?

10           A.    They should know their clients,

11   they should know the rules and the laws around

12   what an individual prescriber can personally

13   furnish.  They should also be mindful of any

14   type of suspicious orders.  They should take

15   steps to ensure security and control of drug

16   stock, whether it's at their facility or

17   whether it is in transit to a retail

18   distributor or a prescriber or a DEA

19   registrant.

20           Q.    Does a wholesale distributor have

21   any role in preventing diversion?

22           A.    Absolutely.

23           Q.    What is that?

24           A.    Again, security and control of the

25   drug stock as it is -- whether it's stored at

Page 66

1    their facility, whether it's in transit at

2    their facility, and to ensure that -- that they

3    are selling to a licensed entity that is doing

4    business appropriately.

5            Q.    Do individual pharmacists have a

6    role in preventing diversion?

7            A.    Absolutely.

8            Q.    What is that?

9            A.    To ensure that the prescription or

10   the dispensing -- or order is for a legitimate

11   medical purpose prior to dispensing of a

12   controlled substance and/or dangerous drug.

13           Q.    The board requires -- we talked a

14   little bit about this.  The board requires CPE

15   or continuing pharmaceutical education for

16   registered pharmacists; is that correct?

17           A.    Yes, ma'am.

18           Q.    Does the board -- what, if any,

19   role does the board have in recommending areas

20   for CPE credit?

21           A.    That's actually up to -- sometimes

22   the board will make some CE requirements

23   depending on industry change, depending on

24   maybe issues that are seen, whether it may be

25   patient safety related to errors in dispensing.

Page 67

1    In addition, we do -- we've done hundreds of

2    presentations on law updates for CE.  We also

3    provide a CPE quiz on our website, a yearly

4    one.  So I think there's numerous ways the

5    board is involved in monitoring the CPE.

6            Q.   The board identifies CPE

7    opportunities in its newsletters, correct?

8            A.   Yes, ma'am.

9            Q.   Does the board work with preferred

10   CPE providers?

11           A.   I don't know if we would call them

12   preferred CPE providers.  We don't -- to my

13   knowledge, we don't endorse one CPE provider

14   over another.

15           Q.   You said when there are changes to

16   rules, and I'm paraphrasing, then the board can

17   suggest certain areas of continuing education;

18   is that right?

19           A.   I don't know if it's dictated

20   around the rules specifically, but we have

21   required different types of CE depending on

22   changes in the industry.

23           Q.   For example, for lawyers where

24   there's a continuing education requirement

25   there will be a requirement of, say, four hours

1  of ethics and then your other ten hours can be

2  anything else.  So does the pharmacy board have

3  something where you've got to have X hours of a

4  certain kind of continuing education versus any

5  other general type of --

6          A.    We do.  There's a requirement for

7  jurisprudence hours.  I don't know the exact

8  hours, but there is a requirement for law.

9          Q.    What is the board's role, if any,

10  in preventing abuse of heroin?

11          A.    None.  We don't investigate

12  illicit drugs, being Schedule 1's.

13          Q.    What about fentanyl?

14          A.    There's two different types of

15  fentanyl.  There's clandestine illicit fentanyl

16  and there's pharmaceutical grade fentanyl that

17  is in the closed loop of distribution that we

18  would investigate crimes or violations of.

19          Q.    So the board has no role in

20  preventing the use or abuse of heroin or

21  illicit fentanyl, correct?

22          A.    No, ma'am.

23          Q.    You had mentioned that you saw at

24  the Delaware County sheriff's department an

25  uptick in heroin-related crimes around the

Page 69

1    2004, 2005 period, correct?

2          A.    Yes, ma'am.

3          Q.    In your role at the Board of

4    Pharmacy, do you keep track of or have any

5    insight into the particular drugs that are at

6    play in the opioid crisis that we talked about

7    earlier?

8          A.    Can you re-ask that question?

9          Q.    Sure.

10         A.    Sorry.

11         Q.    No problem.

12               Earlier this morning we talked

13   about that term opioid crisis and you

14   acknowledged that you're aware of an opioid

15   crisis in the State of Ohio generally, correct?

16         A.    Yes, ma'am.

17         Q.    Do you have any understanding as

18   to the role that heroin and illicit fentanyl

19   play in the opioid crisis as opposed to

20   prescription pharmaceuticals?

21         A.    I do.

22         Q.    What is that understanding?

23         A.    It's very prevalent.  From the

24   information that I've received from people that

25   I've talked to, from the drug task force

1   commanders that we've spoken to, to other

2   agencies that we work with on a collective

3   basis, we have that understanding.

4           Q.    When you say it's very prevalent,

5   do you mean heroin and other illicit opioids?

6           A.    Yes, that was the question.

7           Q.    So you do agree the board has a

8   role in preventing prescription drug abuse,

9   correct?

10          A.    Yes, ma'am.

11          Q.    And the board has a role in

12  preventing prescription drug diversion?

13          A.    Yes, ma'am.

14          Q.    Does the board have a role in

15  preventing opioid abuse generally?

16          A.    When it comes to prescription

17  drugs, yes.

18          Q.    How does the board work to fulfill

19  its role in preventing prescription drug abuse?

20          A.    I think this falls into four types

21  of areas.  I think the first area would be

22  regulatory and administrative.  To start with,

23  as an administrative piece we've, you know,

24  expanded our scope and authority by changing

25  rules or requesting rule changes and law

 1   changes to help combat what we were seeing.

 2                     In addition to that regulatory

 3   administrative function, we do proactive

 4   inspections at licensed locations.  Those are

 5   also unannounced inspections and also, I

 6   believe, education opportunities during the

 7   regulatory piece of it.

 8                     We also do background

 9   investigations on licensees that prevent --

10   or ensure that people are properly getting

11   licensed.  In addition to that, we have an

12   enforcement component that is our

13   administrative and criminal enforcement part of

14   that, that I believe helps suppress drug abuse;

15   and most of the time our criminal

16   investigations will parallel an administrative

17   investigation.  We've investigated and

18   convicted hundreds over the past years for

19   different diversion schemes.

20                     In addition, I think education

21   plays a huge role in our prevention efforts.

22   We have a monthly newsletter, we do email

23   blasts, we've redesigned our website twice.  In

24   addition, we do RP round tables for responsible

25   persons for licensees.  We do CE round tables,

1 events with stakeholders. We do loss

2 prevention round tables. We travel around to

3 the boards of pharmacies to give presentations.

4          We also -- we also reorganized --

5 when we reorganized our field staff, I think

6 we're one of the few agencies that you can call

7 and talk to a pharmacist and ask a question.

8 You get a live pharmacist when you call to ask

9 a question at our agency. So I think education

10 and being available for questions is very

11 important to us.

12          In addition to other efforts we've

13 made, I would say, surround the OARRS program,

14 and I think over the past several years it's

15 made leaps and bounds enhancements.

16 Integration of OARRS into work flow, I think,

17 was a significant change to put the OARRS

18 information at the fingertips of a prescriber

19 or a dispensing pharmacist. Integrating it

20 into the workflow has been huge. Connecting

21 OARRS to PMPs across the country and

22 surrounding states, I think, was a huge effort.

23 That way our prescribers and our pharmacists

24 have that information available to them.

25          In addition, to adding MED scores

Page 73

1   to the OARRS reports, doing proactive

2   prescriber reports for physicians and clinics,

3   the -- also the most recent additions of the

4   NARx care and providing an overdose risk score

5   analysis on the report. It's all information

6   that is, I feel, key to the healthcare

7   professional.

8          Q.   You've given me a whole list of

9   things that the board does in its role in

10  preventing prescription drug abuse. Does that

11  role and the -- the items you just identified

12  for me differ at all with regard to preventing

13  diversion?

14         A.   I would say that we take -- I

15  wouldn't say they would differ much; however,

16  with our regulatory inspections we do have an

17  emphasis on security and control. And whether

18  that security and control is at a hospital,

19  whether that security and control is at a

20  veterinarian's office or an EMS unit, we put a

21  very high emphasis on security and control

22  during our inspection process, just with the

23  amount of drug theft that we've experienced or

24  that the board experiences and the types of

25  investigations.

Page 74

1          Additionally, we put in a rule --
2    we are one of six states that did not license
3    technicians and we started -- excuse me,
4    register technicians.  We don't license them,
5    they are registered with us.  And prior to the
6    rule going into effect, a pharmacy technician,
7    we could be investigating one for a felony drug
8    crime and they could get a job -- during our
9    investigation they could get fired from one
10   pharmacy and get a job at a pharmacy down the
11   street.  So that's allowed us to prevent those
12   types of activities from happening.
13          Q.   So you've spoken a bit and
14   mentioned that there are administrative and
15   criminal investigations that the board
16   undertakes; is that right?
17          A.   Yes, ma'am.
18          Q.   Is there a difference between a
19   criminal investigation as opposed to an
20   administrative investigation in terms of the
21   process?
22          A.   Oh, yeah, the process is much
23   different.
24          Q.   Okay.
25          A.   In an administrative investigation

Page 75

1   we conduct the investigation, prepare documents

2   and reports, basically are finders-of-fact, and

3   then we submit it to site review process; at

4   which point in time the site review committee

5   will determine if it's appropriate to issue a

6   citation against a licensee.

7              The criminal investigations are

8   mostly different in the fact that the -- the

9   case or the final investigation is submitted to

10  a local prosecutor.  Most of the time the

11  county prosecutor of that jurisdiction, or in

12  some cases the U.S. attorney's office, being

13  either in the Northern District or the Southern

14  District of Ohio.

15             On an administrative investigation

16  the end conclusion can be from obviously a

17  finding of not guilty, to a fine, a CE

18  requirement, probation, all the way up to

19  license revocation; and on a criminal

20  investigation, if a person is found guilty,

21  they can serve a prison term.

22        Q.   In a criminal investigation the

23  board will still prepare documents and reports

24  through factfinding, correct?

25        A.   Yes, ma'am.

Page 76

1          Q.    The difference is that once --

2     between the administrative and the criminal, is

3     that once the board prepares the documents and

4     reports and does its factfinding that, rather

5     than going to the state review, that

6     information is submitted to a local prosecutor;

7     is that right?

8          A.    Correct.  Can I add something to

9     that?

10         Q.    Yeah, you bet.

11         A.    In some cases they -- they may go

12    down simultaneous tracks.  They may have an

13    administrative investigation and a criminal

14    investigation simultaneously because they're a

15    licensee that we hold.  And if it's a licensee

16    of another board, we would notify them of the

17    possible violations, another regulatory board,

18    such as med, nursing, dental, veterinarian.

19         Q.    In the course of gathering

20    information for either an administrative or a

21    criminal investigation, does the board collect

22    patient-specific information?

23         A.    Yes, ma'am.

24         Q.    What type of patient-specific

25    information would the board collect during the

Page 77

1   process of an investigation?

2          A.    Prescription drug records, whether

3   it be dispensings, orders, profiles, and at

4   some point in time on criminal investigations

5   we would get the entire patient file to be

6   reviewed by an expert on some criminal cases.

7          Q.    What is a profile?  What do you

8   mean by that?

9          A.    A patient profile, a list of their

10  -- the drugs that they may be on or be

11  receiving from a specific pharmacy.

12         Q.    And how do you obtain a patient

13  profile?

14         A.    Depending on where it's from, like

15  a pharmacy has a printout that they give us or

16  that they would give us about the patient's

17  medications.

18         Q.    Is that information available on

19  OARRS?

20         A.    A patient profile?

21         Q.    Yes.

22         A.    No, not all of it.  Some of it

23  could be because a patient profile is going to

24  list every drug that they're on and OARRS only

25  captures controlled substances and gabapentin.

1      Q.    And when you say in a criminal

2   investigation the board could get the entire

3   patient file to be reviewed by an expert,

4   that's a patient's medical file?

5           A.    Medical file.

6           Q.    And to be reviewed by an expert,

7   is this -- would this be an expert that is on

8   the BOP staff?

9           A.    Not an expert on the BOP staff.

10  It would be an outside expert that's hired or

11  contracted.

12          Q.    For what purpose?

13          A.    To provide an expert opinion on

14  medical scope and practice.

15          Q.    Does the board collect information

16  to permit it -- during the course of an

17  investigation, does the board collect

18  information to permit to identify doctor

19  shoppers?

20          A.    I don't think I understand your

21  question.

22          Q.    Sure.  I think you mentioned that

23  - yeah, you did - one of the methods of

24  diversion that the board -- or that the board

25  is aware of is doctor shopping.

Page 79

1          A.    Yes, ma'am.

2          Q.    Right?

3          A.    Uh-huh.

4          Q.    So does the board conduct

5    investigations to identify doctor shoppers?

6          A.    Yes, ma'am.

7          Q.    And in order to do that, it needs

8    to collect a certain type of information,

9    right?

10          A.    Yeah.  So most of the time it

11    starts with an OARRS report and then we would

12    collect the original prescriptions or orders,

13    in addition to interviewing the physician or

14    the prescriber.

15          Q.    Does the Board of Pharmacy ever on

16    its own -- or has it ever on its own instigated

17    an investigation into a doctor shopper?

18          A.    Yes.

19          Q.    Under what circumstance?

20          A.    We get a monthly report of doctor

21    shoppers that's generated from OARRS.

22          Q.    When you say we get this report,

23    who gets it?

24          A.    Compliance and enforcement.

25          Q.    How long has compliance and

Page 80

1    enforcement received a monthly report of doctor

2    shoppers from OARRS?

3            A.    I can't recall.  At least for the

4    last -- I believe for the last three years that

5    it was an automated type of feature, as an

6    automated report.

7            Q.    But prior -- so three years ago,

8    2016, prior to 2016 was it possible for OARRS

9    to generate a report of doctor shoppers?

10           A.    Yes, ma'am.  I'm just not sure how

11   or the frequency of the reports.

12           Q.    Prior to 2016 had you seen a

13   doctor shopper report?

14           A.    Yes.

15           Q.    How frequently; do you recall?

16           A.    I don't recall.

17           Q.    The board also can identify pill

18   traffickers; is that right?  I think drug

19   traffickers.  You said one of the means of

20   diversion was drug trafficking by doctors who

21   operate pill mills, take cash for prescriptions

22   that are not for a legitimate medical use.

23              Do you recall telling me that?

24           A.    I do.

25           Q.    And does the board have the

1    ability to identify drug traffickers?

2              A.    I would not say -- OARRS is a tool

3    that we utilize in analyzing the information

4    for prescribers that would appear to be

5    outliers; however, that's not the -- that's

6    just one component of the investigation.

7              Q.    If I said OARRS, I meant the board

8    generally.  Is the board able to or does it

9    investigate pill traffickers or drug

10   traffickers?

11             A.    We investigate prescribers that --

12   that write prescriptions for non-legitimate

13   medical use, and so which is drug trafficking.

14             Q.    And how does the board identify

15   prescribers who write for non-legitimate

16   medical use?

17             A.    So that's an investigative process

18   and we get the information from various means.

19   I think if I go much further it would be

20   confidential information.

21             Q.    Does the board investigate

22   individuals who forge prescriptions?

23             A.    We have.

24             Q.    And how does the board do that?

25             A.    So I think that's sort of a tough

Page 82

1    question because it's in various ways that we

2    learn about the information, whether it's a

3    complaint, whether it's a phone call from a

4    pharmacy, whatever it may be.

5                    In addition, some of them have

6    expanded if you -- it's sort of like pulling

7    the string, when you pull the string and you

8    look at one or two, that you find them.  We

9    start to look and we start to find other ones

10   that are on that same pattern or that same

11   geographic area, and so we've identified

12   fraudulent prescriptions in that means also.

13          Q.   In the course of conducting an

14   investigation, does the board -- other than

15   looking at patient-specific information, does

16   it look -- we talked a little bit about this,

17   prescriber-specific information.  For example,

18   you mentioned that there's an OARRS report, a

19   monthly report of doctor shoppers from OARRS.

20                   Is there some type of monthly

21   report about frequent prescribers, if you will?

22          A.   Sure.  One we have is called a 640

23   list and it's for physicians that are seeing

24   more than 640 patients or issue 640 new

25   prescriptions.

Page 83

1          Q.    And what is the magic of 640?

2          A.    It's a calculation that our OARRS

3    director came up with on number of days, number

4    of patients.  I'm not sure all the different

5    things he takes into consideration to determine

6    640 patients.

7          Q.    Does the prescriber information

8    that the board reviews identify improper

9    combinations of drugs that have been

10   prescribed?

11         A.    Improper.  I don't know if

12   improper would be the same, but cookie-cutter

13   drug therapy.  If every patient gets the same

14   types of drugs, the same quantities, we have

15   identified or OARRS has identified those types

16   of behaviors.

17         Q.    The 640 list, that's doctors who

18   have seen more than 640 patients or issued 640

19   new prescriptions in what period of time?

20         A.    I believe that's one month.

21         Q.    Does the board investigate

22   prescribers who continue to work without a

23   valid license?

24         A.    The medical board would do an

25   administrative investigation; however, we have

1  had incidents, and I can't recall specifics,

2  where a prescriber's DEA number -- or, I'm

3  sorry, his medical board license wasn't renewed

4  on time or was suspended and they wrote

5  prescriptions where they shouldn't have.  And

6  we also refer those to the local jurisdiction,

7  county prosecutor.

8          Q.    But the Board of Pharmacy doesn't

9  get involved in the investigation of physicians

10  or prescribers who are prescribing opioids

11  without a license, be it because the license

12  lapsed or for whatever reason?

13          A.    We would.

14          Q.    You would?

15          A.    Uh-huh.

16          Q.    And that is in conjunction with

17  the medical board or is it a separate

18  investigation?

19          A.    I think that's hard to say.  We

20  would provide them the information.  So I would

21  say in conjunction; however, we would submit

22  the case and the facts to the county prosecutor

23  for ultimate decision.

24          Q.    Okay.  So in a case where a

25  physician is prescribing without a valid

Page 85

1    license, the administrative punishment, if you

2    will, would come from the medical board and the

3    Board of Pharmacy would refer it for criminal

4    prosecution?

5           A.   Yeah, ultimately for the county

6    prosecutor to make the decision whether they

7    want to go forward for an indictment.

8           Q.   So the Board of Pharmacy wouldn't

9    be issuing its own administrative sanction, if

10   you will, to a prescriber who has prescribed

11   without a valid license?

12          A.   The only sanction we would, would

13   be is if the facility was also licensed, we

14   would take an administrative action on that

15   facility.

16          Q.   Got it.

17               Does the board collect

18   dispenser-specific information?  So individual

19   pharmacists have to be licensed, correct?

20          A.   Correct.

21          Q.   Is the board able to identify

22   dispensers who are stealing from their --

23   stealing drugs from their employer?

24          A.   Identify people that are stealing

25   drugs, we have no way of identifying that.  The

Page 86

 1    normal course is that it is reported, normally
 2    via DEA 106 with theft or loss; however, I do
 3    know that administrative or regulatory
 4    inspections have led to drug theft
 5    investigations where recordkeeping was not
 6    appropriate or tampered with and uncovered or
 7    identified theft.
 8            Q.    When you say administrative or
 9    regulatory inspection, would that have been a
10    board administrative or regulatory inspection
11    that led to the identification of drug theft
12    because of recordkeeping abnormalities?
13            A.    Yes, ma'am.
14            Q.    And in an occasion where a
15    specific dispenser is stealing drugs from their
16    employer, that's -- that's diversion, right?
17            A.    Correct.
18            Q.    Is the board able to -- or does it
19    collect -- strike that.
20                  Is the board able to identify
21    dispensers who dispense without a valid
22    prescription?
23            A.    I'm not sure I understand your
24    question, but I don't -- so a dispenser that is
25    dispensing without a valid prescription.

Page 87

1          Q.    So a pharmacist who is -- so not

2    stealing the drugs for him or herself, a

3    pharmacist who is --

4          A.    Not without investigating.

5          Q.    -- taking drugs.

6          A.    We have no means to look at a

7    dispensing record and say, hey, this one is --

8          Q.    So the board can't tell from --

9    does the board have access to dispensing

10   records from pharmacies?

11         A.    In OARRS?

12         Q.    Yes.

13         A.    Yes.  All pharmacies report their

14   controlled substances and gabapentin to OARRS,

15   so we can look at that piece of it.

16         Q.    But just looking at the dispensing

17   records, the board would be unable to determine

18   whether the prescription -- or whether the

19   medication was dispensed pursuant to a valid

20   prescription?

21         A.    We wouldn't know until we

22   investigated.

23         Q.    And that's an example of

24   diversion, correct?

25         A.    Somebody stealing from a

Page 88

1    dispenser, yes, or, I'm sorry --

2              Q.    A dispenser issuing a medication

3    without a valid prescription.

4              A.    Yes, ma'am, it could be.

5              Q.    Does the board or is the board

6    able to identify individual dispensers who

7    forge prescriptions?

8              A.    No, ma'am.

9              Q.    Does the board collect information

10   on the most commonly diverted prescriptions?

11             A.    We collect all -- so the drugs

12   that are most commonly diverted, I'm trying to

13   think of a way that we collect that

14   information.  We sort of have a good idea

15   through investigations what the most common

16   diverted drugs are.  I would say yes, on DEA

17   106s.  We collect DEA 106s that shows the

18   amount of theft and loss of various types of

19   drugs.

20             Q.    Does the board have access to any

21   manufacturer-specific information; for example,

22   who is making the drugs that are diverted?

23             A.    I'm sure we could find out, but we

24   don't collect like data from a manufacturer.

25             Q.    For example, could you trace --

Page 89

1    you've done an investigation, somebody has

2    illegal hydrocodone; is the board able to --

3    meaning it was obtained illegally.  Is the

4    board able to trace the manufacturer of a

5    specific medication that's landed in the hands

6    of somebody improperly?

7         A.   Sure.  If it came from a stock

8    bottle at a pharmacy, you would know the

9    manufacturer by the bottle, the NDC number, lot

10   number, all that other good stuff.

11        Q.   Does the board have access to

12   ARCOS data?

13        A.   We can request it through DEA.

14        Q.   Under what circumstances has the

15   board requested ARCOS data?

16        A.   I can't recall any specific off

17   the top of my head.  Our staff work with DEA

18   diversion and enforcement agents on a regular

19   basis, they share information, but I can't

20   recall any case-specific times where we've

21   requested it and --

22        Q.   Is the board able to identify

23   wholesale distributors that fail to report

24   suspicious orders?

25        A.   Not without investigating.

Page 90

1          Q.    Is the board able to identify the
2    wholesale distributors that supply the most
3    prescription opioids in a particular county?
4          A.    Can you ask that again?
5          Q.    Sure.  Is the board able to
6    identify the wholesale -- the particular
7    wholesale distributors that supply the most
8    prescription opioids in a given county?
9          A.    I would believe so.  I think
10   there's some publicly available data.  Well, it
11   wouldn't show by which distributor, but I
12   believe that OARRS could tell you that
13   information.
14         Q.    You mentioned that there are
15   individuals at the board who work with DEA
16   agents every day or on a regular basis; is that
17   right?
18         A.    Yes, ma'am.
19         Q.    And you had mentioned that the
20   board can request ARCOS data.  Is OARRS data
21   provided to the DEA?
22         A.    They can request OARRS data, yes,
23   for criminal investigations.
24         Q.    DEA agents have OARRS accounts,
25   don't they?

Page 91

1          A.    Yes, ma'am.

2          Q.    Does anyone at the board have an

3    ARCOS account?

4          A.    Not that I know of.

5                MS. BROWNE:  All right.  Why don't

6    we go off right now.  We need to change the

7    DVD.

8                THE VIDEOGRAPHER:  We're off the

9    record.

10               (Recess taken.)

11               THE VIDEOGRAPHER:  We're on the

12   record.

13               (Thereupon, Defendants' Exhibit

14   Number 4, State of Ohio Board of Pharmacy

15   Complaint Form, was marked for purposes of

16   identification.)

17   BY MS. BROWNE:

18         Q.    Mr. Griffin, I've handed you what

19   has been marked Exhibit 4.  We printed this

20   from the BOP website.  It's the State of Ohio

21   Board of Pharmacy Complaint Form.

22               Have you seen this before?

23         A.    Yes, ma'am.

24         Q.    What is the purpose of Exhibit 4?

25         A.    For anybody to file a complaint in

Page 92

1   regards to one of our licensees or a complaint

2   with the Board of Pharmacy concerning any type

3   of prescription drug problem; however, we get

4   all kinds of complaints through here.

5           Q.   Like what, like other than -- do

6   you mean other than pharmacy-related

7   complaints?

8           A.   Sure, yeah.  We get them from

9   other states, we get them from anywhere --

10  anything and everything.

11          Q.   In your role as the director of

12  compliance and enforcement, do you review

13  complaint forms?

14          A.   I do.  Me or one of the two chiefs

15  do, two supervisors do.

16          Q.   Do you know how many complaints

17  you've received, public complaints you've

18  received during your tenure as the director of

19  compliance and enforcement?

20          A.   In total I can't tell you.  What I

21  can tell you is in the last five years -- I

22  think we had over 1,000 five years ago and

23  we're probably thereabouts around 2,000,

24  different types of complaints.  Maybe just shy

25  of 2,000 as of 2018.

Page 93

1         Q.   Do you just get a notification

2    that a complaint has been filed or does the

3    filled-out complaint actually come to your in

4    box when it's filed?

5         A.   It doesn't come to my in box.  It

6    comes to a support person, who then collects

7    additional information if it's regards to a

8    licensee that they would put with the

9    complaint, and then we have a process that we

10   call intake review that happens pretty much on

11   a weekly basis where we review any of the

12   complaints that come in.

13             However, we do have a few items

14   that if they were to come in -- this is

15   monitored on an hourly basis, that if a certain

16   type of complaint comes in we would have an

17   immediate response to, such as an act of

18   diversion.

19        Q.   Other than an act of diversion,

20   what other types of complaints get an immediate

21   response?

22        A.   Risk to public health and/or an

23   impairment issue.

24        Q.   What do you mean by an impairment

25   issue?

1          A.    A pharmacist that shows up
2    intoxicated or impaired by either drugs or
3    alcohol or appears to be impaired.
4          Q.    What is a risk of public health
5    issue?
6          A.    It could be a compounding issue.
7    We've been notified by CDC about potential
8    compounding issues where we had to have
9    immediate response to investigate a possible
10   contamination of a compounded drug.
11         Q.    And you said the -- in the first
12   instance a complaint goes to a support person?
13         A.    Yes, ma'am.
14         Q.    Is that an IT person, is it a
15   member of your staff?
16         A.    It's a member of our staff,
17   compliance and enforcement.
18         Q.    Is it a particular member of the
19   staff?
20         A.    We have two people that can
21   receive the complaints and then we have a
22   back-up third.
23         Q.    Who are they?
24         A.    Susan King and Tracy Simmons would
25   be the two primary, both are administrative

Page 95

1   professionals; and the third being Yolanda

2   Freeman, who is a supervisor.

3           Q.   If the complaint is not one that

4   requires immediate attention, does it ever make

5   its way to you?

6           A.   So again, we have an intake review

7   process.

8           Q.   Right.

9           A.   So all of these complaints are

10  either reviewed by me and one of the chiefs, or

11  the two chiefs, simultaneously.  There's always

12  two supervisors on the weekly intake review

13  process that review all the complaints.

14          Q.   Is that an assignment, so this

15  week I'm on intake review kind of thing?

16          A.   Yeah, it's sort of a rotational

17  basis, but depending on people's schedules we

18  flip all the -- I mean, trade all the time.

19  Chief Pyles is the one that normally schedules

20  all the intake reviews.

21          Q.   Is there an intake review meeting

22  once a week?

23          A.   Yeah, an intake review, yeah.

24  It's not so much -- yeah, literally we sit

25  down, we review every complaint, any associated

Page 96

1   information that could be pulled in about if

2   it's a licensee, we review that on a weekly

3   basis; and it is in person at a conference

4   table, so yes, a meeting.

5           Q.   Is that procedure written down

6   somewhere?

7           A.   I'm sure it is memorialized.

8           Q.   What about in the case of either

9   diversion or risk of public health or an

10  impairment issue, you mentioned that those

11  types of complaints get immediate attention,

12  correct?

13          A.   Yes.

14          Q.   And what does that mean, immediate

15  attention?  What is the process?

16          A.   So it would be somebody actually

17  going to the facility and starting the

18  investigation.  If it's going to be a public

19  health issue, that's going to dictate a

20  pharmacist and probably an agent.  If it's a

21  diversion from a retail pharmacy, that's just

22  going to be an agent's response.  It sort of

23  depends on the level of what we depend --

24  determine to be expertise in a certain topic or

25  area of pharmacy.

Page 97

1           Q.   So if it's a -- if it's a
2    diversion issue, Susan or Tracy brings the
3    complaint to you or --
4           A.   Or to one of the chiefs and it
5    would immediately get assigned.
6           Q.   Okay.  And when it gets assigned
7    to an agent, that's one that's -- one of the
8    folks who is in the field staff?
9           A.   Correct.
10          Q.   So you would -- so you or Chief
11   Pyles would contact the supervisor, who would
12   then contact a member of the field staff?
13          A.   No, we would send it straight to
14   the agent or the specialist.
15          Q.   There's a notation -- or one of
16   the questions on page 2 of the complaint is
17   have you made a complaint to any other
18   government agency, professional association, et
19   cetera, about this matter.
20               Did I read that correctly?  It's
21   the final question before that box on the
22   second page.
23          A.   Yes.
24          Q.   Why is that important?
25          A.   Duplicate of services.  If it's

Page 98

1    been notified to the nursing board, we want to

2    make sure that everybody is on the same page.

3    If they're investigating a nurse for diversion,

4    we would coordinate with them as our

5    investigation proceeds, as they're going to

6    have an administrative action along with our

7    criminal action.  And that's just an example,

8    but it could be any -- you know, whether it's

9    DEA, nursing board, vet board, dental board,

10   med board.  It could be any of them.

11              Or some of them are complaints

12   about insurance, you know, the cost of their

13   co-pay went up, or whatever it may be.

14         Q.   Does the board track how many --

15   let me back up.

16              This complaint form is a complaint

17   form for members of the public?

18         A.   It can be public or another

19   agency.

20         Q.   How frequently do you receive

21   complaints with this format or through this

22   form from other agencies?

23         A.   Occasionally they'll submit them.

24   I wouldn't say it's extremely frequently, but

25   occasionally another agency would submit via

1    the online complaint form.

2              Q.   In the middle of the -- of page 2,

3    does your complaint involve an OARRS report, do

4    you see that?

5              A.   Yep.

6              Q.   What does that mean?

7              A.   Does it involve an OARRS related

8    complaint, an OARRS report.  Doctor writes an

9    OARRS report, doesn't see a script that he

10   wrote or sees -- pulls an OARRS report and

11   there's a script under his name that isn't his.

12   Or a prescriber, I shouldn't just say a doctor.

13   It could be a multitude of issues.

14             Q.   But members of the public don't

15   have access to OARRS, do they?

16             A.   They do not.  An individual can

17   come in and request their OARRS report at our

18   office providing proper identification and we

19   will provide them a copy of their OARRS report.

20             Q.   So how many times has the board

21   received a complaint where it involved an OARRS

22   report?

23             A.   I couldn't tell you.  I have no

24   idea.

25             Q.   Do you recall the last time that

1   you investigated -- or that you received a

2   complaint where it involved an OARRS report?

3          A.   I can't recall the exact

4   incidence, but it happens.

5          Q.   Does the board track whether

6   complaints that it receives have also been made

7   to other agencies?

8          A.   We don't track that.  That's not

9   -- it's not something that -- it's noted within

10  the complaint, and if the other agency is a

11  partner in the investigation it would be listed

12  in that complaint.

13         Q.   Other than through this online

14  portal, if you will, what other ways do board

15  licensees -- or what other ways are

16  investigations of board licensees instigated?

17         A.   Sure.  So we get complaints via

18  email, we get complaints via phone call, not

19  only to our office in Columbus, but field staff

20  also get emails, phone calls on a regular basis

21  where complaints are generated.  The complaints

22  are also generated from in the office because

23  of a DEA 106.  There's multiple ways a

24  complaint can be generated.  But again, most of

25  the time it's either the online complaint, a

Page 101

1    phone call or an email.

2           Q.    What's the DEA 106?

3           A.    It's a commonly referred to form,

4    but it is the reporting of theft and loss.

5           Q.    How frequently are DEA 106s

6    reviewed at the board?

7           A.    They're reviewed right when they

8    come in; however, every agent or specialist

9    gets a copy of any DEA 106 that is sent to the

10   board for their particular territory or their

11   area of responsibility.

12          Q.    So let's say you receive an email.

13   From whom do you receive complaints that

14   generate investigations?

15          A.    From who?

16          Q.    From whom, yeah.  You've told me

17   that you guys get emails, phone calls, you

18   check a DEA 106.

19          A.    General public.

20          Q.    Okay.

21          A.    Other regulatory boards, other law

22   enforcement agencies.  Additionally, loss

23   prevention for industry, district managers from

24   industry, pharmacists themselves, interns,

25   pharmacy technicians.  It can be any -- it

1    could be anybody that we receive complaints

2    from literally.

3             Q.    Okay.   Is there one type of entity

4    that makes complaints more frequently than

5    another?

6             A.    I would say general public is

7    probably the most predominant, followed up by

8    loss prevention and industry, within the

9    industry.

10            Q.    Can you give me an example of a

11   contact -- or complaint from loss prevention

12   within the industry that --

13            A.    Sure.   They normally give us

14   initial notification if they suspect a theft or

15   loss, and at which point we start an

16   investigation.

17            Q.    Is that theft or loss from a

18   pharmacy, from a -- from a warehouse?

19            A.    Dentist's office, doctor's office,

20   hospital.   Really anywhere.   EMS.   Anywhere

21   controlled substances or dangerous drugs are

22   stored.   But predominantly I would say

23   pharmacies.

24            Q.    And how is it that a pharmacy --

25   if you can call to mind a complaint that

1  generated that way, how is it that a pharmacy

2  would have been able to tell that there was a

3  theft or loss?

4        A.   Normally they have some type of

5  system in place that monitors their inventory,

6  and when that doesn't match or they have

7  reporting errors that they monitor they notify

8  us.

9        Q.   And that's because a pharmacy has

10  records of how much they ordered that came into

11  the pharmacy, correct?

12        A.   Uh-huh.

13        Q.   And they also have records of how

14  much went out through their prescription

15  records, right?

16        A.   Yes, ma'am.

17        Q.   And is that type of information

18  also available to the board?

19        A.   If we request it, yes.

20        Q.   If you request it from whom?

21        A.   The pharmacy.

22        Q.   The board could routinely compare

23  records of what came into a pharmacy to what

24  goes out?

25        A.   We could; however, the question

1   was about a theft or how they determine it.  We

2   don't -- I don't think we could tell from our

3   wholesale records and our dispensing records if

4   a theft was occurring.

5          Q.   You could tell that there is a --

6   if there's a discrepancy, correct?

7          A.   No, because you're missing one

8   piece of the pie, you're missing their on-hand

9   quantity.  You're always going to have -- like

10  when we do audits, you have to have the on-hand

11  amount to know if there's a discrepancy.  We

12  would know -- we would know how much the

13  on-hand account should be or reported at that

14  point in time; however, they don't line up

15  exactly.

16         Q.   When a licensee is being

17  investigated, does that entity receive notice?

18         A.   Not necessarily.

19         Q.   When the board is conducting an

20  investigation, who does receive notice of an

21  investigation, if anyone?

22         A.   Nobody -- not the licensee.

23         Q.   If the board is investigating for

24  criminal purposes, does the board notify the

25  prosecutor that the investigation is being

Page 105

1   undertaken?

2           A.   Sometimes, but not always.

3           Q.   In what situations would the

4   prosecutor be notified before the investigation

5   is complete?

6           A.   I think it would depend on the

7   totality of the investigation.  You know, your

8   average drug theft from a retail pharmacy, they

9   wouldn't be notified; however, if it was a

10  longer-term drug trafficking investigation or

11  something that was more complex, we would want

12  to get the prosecutor involved.

13          Q.   Compliance and enforcement is

14  responsible for investigations of licensees,

15  right?

16          A.   Yes, ma'am.

17          Q.   In the case of diversion that

18  involves trafficking --

19          A.   Yes, ma'am.

20          Q.   -- is that an investigation that

21  also falls within the ambit of compliance and

22  enforcement?

23          A.   If a -- so if a prescriber is drug

24  trafficking, does that fall within our purview?

25          Q.   Correct.

Page 106

1          A.    Yes, ma'am.

2          Q.    You mentioned earlier that you

3    have taken a look at the number of

4    investigative files for Cuyahoga and Summit

5    Counties.  Do you recall that?

6          A.    Yes, ma'am.

7          Q.    You said they were about -- you

8    looked at approximately 700 complaints for

9    Cuyahoga and approximately 231 for Summit

10   County.  Do you remember that?

11         A.    I did, but that's not what I said.

12   I said that I know the total number of

13   complaints.  I did not look at all 700

14   complaints or 231 complaints.

15         Q.    Thank you.

16              And that total number of

17   complaints -- so just for the record, you

18   looked at complaints and you were able to tell

19   me, though, that you are aware of approximately

20   700 complaints in Cuyahoga County and

21   approximately 231 complaints in Summit County,

22   correct?

23         A.    Yes, ma'am.

24         Q.    And that was for the period 2017

25   to the present?

Page 107

1          A.   No, that was a five-year lookback.

2          Q.   Do you know how many complaints

3    there have been in 2019?

4          A.   I do not.

5          Q.   Do you know how many have been in

6    2018?

7          A.   I don't know the specific by year

8    for those counties.

9          Q.   When a complaint comes in and it's

10   determined that you will undertake an

11   investigation, are there specific documents or

12   rules about documentation that has to be

13   completed in order to -- you know, as part of

14   the investigation?

15         A.   So there's reports generated on an

16   investigator's findings.

17         Q.   So an investigator doesn't just go

18   out with a notebook and just start writing

19   stuff down versus there's specific forms that

20   one has to complete for an investigative file

21   to be complete?

22         A.   I don't know if there's so much

23   forms.  It would depend on what the case would

24   dictate on it.  You know, most of the time it's

25   actually reports that they are generating, a

Page 108

1    written follow-up of --

2         Q.   Sorry, I was going to sneeze.

3         A.   It would be a follow-up on the

4    investigation, it would be what they've done to

5    either collect additional information,

6    collaborate -- corroborate the complaint and

7    what they're doing within their investigative

8    activity.  So we don't have a specific form for

9    different things.

10              Now, we do have, you know, forms

11   within that for an error in dispensing.  Let's

12   say they get -- we get a complaint involving an

13   error in dispensing, we have an error in

14   dispensing report that would be completed.  So

15   there are some specific forms, but as for an

16   investigative in whole, most of the time it's

17   going to be more of a narrative form.

18        Q.   What, if any, role does the board

19   have in the DEA setting of quotas for

20   prescription opioids?

21        A.   None.

22        Q.   Does the board stay abreast of

23   changes to quotas the DEA makes?

24        A.   Not to my knowledge.

25        Q.   The board does have available to

1   it the volume of prescription opioids that have

2   been dispensed in the state, correct?

3           A.   Yes, in OARRS.

4           Q.   And it can separate that out by

5   county, correct?

6           A.   Yes, ma'am.

7           Q.   Other than OARRS, is there any

8   other way that the board tracks the volume of

9   prescription opioids that are dispensed in the

10  state?

11          A.   Can you give me an example of --

12          Q.   Sure.

13          A.   -- what other -- what you mean by

14  dispensed?

15          Q.   Opioids that are transferred from

16  a licensed dispenser of controlled substances

17  to an individual.

18          A.   Okay.  So what would be that

19  example outside of a pharmacy?

20          Q.   Is there self-reporting as opposed

21  to -- the OARRS data is -- and you can correct

22  me if I'm wrong.  The pharmacist inputs the

23  data into a computer; it's automatically

24  uploaded into OARRS, correct?

25          A.   Correct.  A pharmacy, the support

Page 110

1    staff, enter the prescription data into their

2    dispensing software, it's automatically pushed

3    to us on a daily basis.  If you're asking if

4    there's other -- any other dispensings out

5    there other than what a pharmacy does --

6            Q.    Right.

7            A.    -- it would be a prescriber.  They

8    are also required to record any dispensings of

9    controlled substances and/or gabapentin.  I

10   can't think of another issue where an actual

11   dispensing is going on.

12           Q.    If a vet gives 72 hours of some

13   opioid medication for someone's dog, there's no

14   -- they don't have to give -- there's no

15   prescription, right?

16           A.    Well, that's an actual dispensing,

17   so that would be an order because the doctor is

18   doing it right there in their office, and they

19   do not have to report that to OARRS.

20           Q.    So any licensed dispenser who is

21   dispensing less than 72 hours' worth of an

22   opioid medication doesn't have to report that

23   to OARRS?

24           A.    No, a physician still needs to

25   report, but a veterinarian would not.

Page 111

1          Q.   Okay.  What about a dentist?  So

2    I'm getting a tooth pulled and the doctor gives

3    me 72 hours of hydrocodone, does he have to put

4    that in?

5          A.   I believe they are required to

6    report also.

7          Q.   But you don't know for sure?

8          A.   I don't.

9          Q.   In the case of an actual

10   physician, if she gives 72 hours' worth of some

11   drug for an in-and-out surgical procedure, does

12   she have to put that into OARRS?

13         A.   They're required to report.

14         Q.   But vets don't and we don't know

15   about dentists?

16         A.   I believe dentists do.

17         Q.   The OARRS data that's available to

18   the board also identifies the locations and

19   identities of specific dispensers, correct?

20         A.   Yes.

21         Q.   What does the board do with this

22   specific information, information that -- it's

23   got information about volume, dispenser,

24   location, and it's available at any given time,

25   is the board -- through OARRS.

1            Is the board routinely reviewing

2    that information?

3            A.    That would be -- I'm not sure what

4    reports and what OARRS is doing with it.  Ours

5    would be a request.  If we were to review it in

6    compliance and enforcement, we would request a

7    certain type of report.  Again, the proactive

8    reports that you discussed earlier, doctor

9    shopper, 640 list, those would be ones that are

10   automated.  At some points in times if we would

11   identify an issue, a trend, what have you, we

12   may ask for them to do a different type of

13   report.

14            We've looked and compared overdose

15   death data in OARRS, how many of those

16   decedents had actual OARRS histories, different

17   things like that, so we have done some

18   different analysis.  We've also looked at

19   different types of analysis with the data when

20   it comes to certain drugs that are prescribed

21   in addition to a secondary drug, or a certain

22   drug combination that would not be normal.

23            So, I mean, there's been numerous

24   different types that we've tried to look at the

25   data or we have looked at the data; I just

1  can't recall every type that we've done now.

2        Q.   So the two proactive reports are

3  the 640 and the doctor shopper report, correct?

4        A.   Correct.

5        Q.   And those are the only two that

6  are -- as you put it, they're proactive

7  currently?

8        A.   They're routinely sent to us in

9  compliance and enforcement, yes.

10       Q.   You mentioned that you've looked

11 at overdose deaths -- overdose death data to

12 see who has an OARRS history, correct?

13       A.   Uh-huh.

14       Q.   How long ago did you do that?

15       A.   We've compared that for the last

16 couple of years since we started getting the

17 information from the Health Department.  We

18 didn't always have it readily available.

19       Q.   And when did you start getting the

20 overdose death information?

21       A.   Within the last couple years.  Two

22 to three.

23       Q.   And what, if anything, have you

24 noticed in comparing overdose death data with

25 who has an OARRS history?

1           A.    The majority of them do have a

2    history in OARRS, which means they were

3    prescribed a controlled substance.  I would say

4    the percentages are somewhere between 70 and 80

5    percent.

6           Q.    And do you have available to you

7    the particular mechanism for overdose in that

8    data?

9           A.    To tell what exactly the tox

10   screen said?

11          Q.    Correct.

12          A.    It's not going to be detailed

13   information.  I do believe that OARRS has it to

14   some degree, but it's not as detailed as

15   actually getting the autopsy report.

16          Q.    Do you get the autopsy report?

17          A.    We do if we launch an

18   investigation.

19          Q.    So as a regular -- in the regular

20   course, you're unable to tell from overdose --

21   comparing overdose data to an OARRS report

22   whether the prescription that --

23          A.    That is in their history?

24          Q.    Correct.  Is the mechanism for the

25   overdose, correct?

1          A.    No, you cannot tell that.

2          Q.    So all you know is that 70 percent

3    of people whose overdose data you reviewed at

4    one point in time -- and it could be just one

5    point in time, had a prescription for a

6    controlled substance?

7          A.    That is correct.

8          Q.    Why did you do that comparison?

9          A.    Because our overdose rates were

10   going up and we were trying to identify trends

11   and outliers in that prescriber community.

12               (Thereupon, Defendants' Exhibit

13   Number 5, Document:  Ohio Governor's Office

14   Force Pharmacy Firing, was marked for purposes

15   of identification.)

16   BY MS. BROWNE:

17          Q.    I'm going to hand you what has

18   been marked as Exhibit 5.  This is -- Exhibit 5

19   is a September 16, 2014 AP article entitled

20   Ohio Governor's Office Forced Pharmacy Firing.

21   Do you see that?

22          A.    I do.

23          Q.    Have you seen this document

24   before, this -- in another form even, this

25   article?

1          A.   I'm sure I have.  I don't know if

2     it's this specific one.  Let me read it real

3     quick.

4          Q.   Sure.

5               (Pause in proceedings.)

6               MR. MORIARTY:  And, I'm sorry, you

7     made this 5?

8               MS. BROWNE:  Yes, I did.

9               THE WITNESS:  Okay.

10    BY MS. BROWNE:

11         Q.   Have you read this article or

12    articles like it?

13         A.   I have.

14         Q.   And this Exhibit 5 references the

15    parting of ways between Kyle Parker and the

16    Board of Pharmacy, correct?

17         A.   Yes, ma'am.

18         Q.   You were the director of

19    compliance and enforcement in 2014, September

20    1, 2014 when Mr. Parker stepped down, correct?

21         A.   At the time when Kyle stepped down

22    I was the interim -- yes, I was the interim

23    executive director in charge of compliance and

24    enforcement.

25         Q.   The article notes in the

Page 117

1  penultimate paragraph, Ohio is in an all-out

2  war with opiates and pill mills, and the

3  executive director was sitting on his hands,

4  Nichols said.  It was either indifference or

5  tone deafness, or he was being an

6  obstructionist, but either way, we wanted to

7  move the board in a new direction.

8             Did I read that correctly?

9        A.   You did.

10        Q.   What, if anything, was taking

11  place in 2014, from your perspective, that

12  indicated that Mr. Parker was not doing enough

13  to combat pill mills?

14        A.   I'm not really sure of his

15  conversations with the Governor's office at

16  that point in time.

17        Q.   Did you have an understanding that

18  Mr. Parker was pushed out?

19        A.   I knew they wanted a change.  I

20  don't -- I know the Governor's office wanted a

21  change and also the board had supported that

22  change.

23        Q.   Who replaced Mr. Parker?

24        A.   Mr. Steven Schierholt.

25        Q.   Was there an interim before

1    Mr. Schierholt was appointed?

2              A.    That was me.

3              Q.    So was that from September through

4    December that you were the interim?

5              A.    It may have been a two-month

6    period.

7              Q.    A minute ago we were talking about

8    the comparison of overdose death data with

9    OARRS data and you mentioned that the majority

10   of those folks had some type of OARRS history

11   of the deaths that you reviewed; is that right?

12             A.    Correct.

13             Q.    Is the report comparing the death

14   rates to the OARRS history public?

15             A.    I don't know.

16             Q.    In what form did you review it?

17             A.    It was reviewed and an analysis

18   summary was done by OARRS, either Chad or his

19   staff.

20             Q.    How did you receive it?

21             A.    I can't remember if it was via

22   email or not.  Probably via email.  But also

23   out of that report what we were looking for is

24   identifying the outlying prescribers.

25             Q.    Was the purpose of this analysis

Page 119

1   to identify the percentage of individuals who

2   had an OARRS history or to identify prescribing

3   outliers?

4         A.   I think they're -- I think it was

5   more to look for the outliers; however, what we

6   realized when we first did the analysis was the

7   percentages.

8         Q.   Who received this analysis?

9         A.   Our board staff, our executive

10  director was aware of it, our chief of

11  compliance.

12        Q.   Anybody else?

13        A.   We've also worked with the medical

14  board and made referrals to them on some of the

15  physicians that were identified.

16        Q.   So that report and analysis may

17  have been given to somebody on the medical

18  board?

19        A.   I'm not sure if the entire

20  analysis was or just the parts for their

21  investigative purposes.

22        Q.   The board has all of the

23  information it needs to discern possible

24  diversion, right?

25        A.   No.

Page 120

1          Q.   What does it not have that it
2     needs in order to identify diversion?
3          A.   Well, let's first identify what
4     setting we're talking in.
5          Q.   Well --
6          A.   Because every setting is
7     different.
8          Q.   -- one of the -- one of the roles
9     of OARRS -- or, I beg your pardon, one of the
10    roles of the board is to identify diversion,
11    correct?
12         A.   Absolutely.
13         Q.   Okay.  And, for example, the board
14    has OARRS available to it, right?
15         A.   Uh-huh, yes.
16         Q.   And the board, if it so chooses,
17    has ARCOS available to it, correct?
18         A.   Yeah, but that would be more on a
19    case-specific basis.
20         Q.   What, if anything else, does the
21    board need that it does not have in order to
22    fulfill its role in combatting diversion?
23         A.   Well, I think that when you're
24    talking about -- when you're talking about at a
25    retail pharmacy, you don't have the on-hand

1    amounts within the system or any information

2    available to us on what their on-hand amounts

3    are.  We would not have the on-hand amounts on

4    a hospital pharmacy.  We would not be able to

5    identify a nurse theft occurring from a

6    specific patient or from a Pyxis machine with

7    any information that we have.  We would not be

8    able to identify a theft at any type of EMS

9    location because there's nothing that they give

10   us a -- or provide us any type of inventories

11   on their drug boxes or on their drug

12   utilization.

13            We don't require an inventory be

14   submitted to the board.  We require one be

15   taken and have it on hand, but we don't have

16   that piece of the puzzle.

17            Q.   Has the board -- you mentioned

18   that one of the roles of the board is

19   development of rules and regulations, correct?

20            A.   Yes, ma'am.

21            Q.   Has there been any effort by the

22   board to develop some rule or regulation that

23   would provide it access to on-hand amounts at

24   pharmacies or hospital pharmacies?

25            A.   You know, we did change the rate,

1    the inventory requirements in our rules.  DEA

2    requires a two-year inventory, we moved it to a

3    one-year inventory.  But again, it wasn't

4    reported to us, nor do I think that we would

5    have the -- it would be a technically

6    challenging undertaking.

7            Q.   How so?

8            A.   You would have to develop a new

9    system to catalog it, reporting it, everything

10   like that, and inventories change in a health

11   care setting by the minute.  It would never be

12   accurate.

13           Q.   So the board -- the board can't

14   accurately monitor for diversion in a hospital

15   pharmacy setting; is that right?

16           A.   Via OARRS we could not.

17           Q.   Is there any other way you can?

18           A.   Inspection, proactive inspection.

19           Q.   Do you believe -- does the board

20   believe that the proactive inspections that it

21   currently undertakes adequately addresses

22   potential diversion in the hospital setting?

23           A.   I believe that the inspections do

24   address the recordkeeping and the security and

25   control.  During a regulatory inspection,

Page 123

1    they're addressed.  If there's deficits in

2    those systems, the facilities are required to

3    give corrective actions to -- excuse me, to

4    those deficits and follow-up inspections are

5    scheduled and conducted.

6         Q.   Is it your belief that those

7    proactive inspections are adequate to address

8    any potential diversion in the hospital

9    pharmacy setting?

10        A.   Within the regulatory inspection

11   scope, yes.

12        Q.   Is there some other scope?

13        A.   There's only so much you can look

14   at when you're at an inspection, and again it's

15   a snapshot in time.  So things can change when

16   you walk out the door.

17        Q.   So a better way to adequately

18   monitor diversion in the hospital pharmacy

19   setting would be through access to on-hand

20   inventory amounts, correct?

21        A.   No.

22        Q.   Okay.

23        A.   Again, your on-hand inventory is

24   going to change every time that a patient is

25   administered an injection, a pill, anything.

Page 124

1    That on-hand inventory is a constant moving

2    number.

3            Q.    And because the on-hand inventory

4    number is constantly moving, you cannot say

5    with certainty that the board is adequately

6    monitoring or preventing diversion in the

7    hospital pharmacy setting based solely on the

8    proactive inspections, correct?

9            A.    Correct.

10            Q.    How frequently are those proactive

11    inspections?

12            A.    It depends.  They're on a risk

13    schedule, so depending on -- the public risk or

14    the complexity of the pharmacy practice going

15    on at the facility depends on how frequent they

16    are inspected.  Sterile compounders are a high

17    risk, they are on a yearly inspection - again,

18    these are unannounced, so they could be any

19    time - all the way down to a retail pharmacy is

20    at five years.  I believe a hospital pharmacy

21    is at three years.

22            Q.    And it's the board's belief that

23    it can adequately prevent diversion in a

24    hospital pharmacy setting based on a -- an

25    inspection that take place every three years?

Page 125

1          A.    You keep using the word

2    adequately.   That's not my word.

3          Q.    Okay.

4          A.    What we do is we proactively

5    inspect to help prevent diversion.   I don't

6    think there is an ultimate cure for diversion.

7    There's not going to be one thing that's going

8    to prevent all diversion because there's so

9    many different types and means in there.   I

10   think it's one tool that we utilize to prevent

11   diversion, along with education of responsible

12   persons, along with investigations, along with

13   holding health care professionals responsible

14   for diversion.   Those are all means of

15   prevention of diversion.   There's no one magic

16   bullet.

17         Q.    Exhibit 5 mentioned that one of

18   the reasons that Mr. Parker was pushed out was

19   an issue with pill mills, correct?

20         A.    Yes.

21         Q.    Were pill mills an issue in Ohio

22   prior to 2014?

23         A.    Yes.

24         Q.    Do you know when pill mills became

25   an issue -- I know we talked about the Florida,

                                          Page 126

1    but other than the prescriptions coming up

2    through Florida, were there other pill mill

3    issues in Ohio prior to 2014?

4            A.   I believe so, and I think prior to

5    me there was pill mill issues.  Prior to my

6    employment with the board I believe that there

7    was issues.

8            Q.   So prior to 2008?

9            A.   Yes, ma'am.

10           Q.   Was Mr. Parker the executive

11   director when you joined --

12           A.   No, ma'am.

13           Q.   -- the BOP?

14                Who was the executive director

15   when you joined?

16           A.   William Winsley.

17           Q.   And he had the medical issue; is

18   that what you said?

19           A.   No, no, the assistant executive

20   director at the time had a medical issue and

21   was on extended leave.

22           Q.   Do you know why Mr. Winsley left?

23           A.   I do not.

24           Q.   Are you able to generally describe

25   the board's efforts from -- let's say from the

Page 127

1    time you joined, so 2008 to the present, to

2    address opioid diversion?

3              A.    Sure, yeah.  So again, I think

4    that's a multi-bucket approach.  Since I've

5    joined I'll just start with criminal, because

6    that's the majority of what I handled when I

7    first started, but we conducted numerous

8    investigations on those responsible for

9    diversion; and again, whether that's a doctor

10   shopper or whether that's a drug theft, whether

11   that's illegal processing, whether that's

12   trafficking in drugs, all the way to, you know,

13   the administrative investigations where

14   somebody potentially had -- was summarily

15   suspended, permanently revoked their license.

16   So I believe that us addressing the opiate

17   issue from a proactive law enforcement

18   standpoint was just one angle of how we

19   addressed prescription drug abuse.

20              We worked multiple investigations

21   collaboratively with state and local agencies,

22   FBI, IRS, DEA, HHS, OIG, local regulatory

23   boards or state regulatory boards, BWC,

24   Medicaid Fraud Control Unit.

25              Q.    What is BWC?

Page 128

1          A.    Bureau of Workers' Compensation.

2          Q.    Thank you.  Go on, sir.

3          A.    No problem.  So from the criminal

4    and administrative investigative angle, we are

5    very proactive in our efforts.

6               I think, additionally, changing

7    the rules and essentially making legislative

8    requests for rule changes and law changes

9    helped strengthen our regulatory authority and

10   hold those more accountable, such as House Bill

11   93 2011, which essentially gave the board

12   authority to license pain management clinics.

13   It also set forth some rules that they had to

14   be physician-owned, that the prescriber could

15   only personally furnish 72 hours, and that the

16   -- and at that time it required the wholesalers

17   to now report all wholesale transactions to the

18   board.

19               And again, with other legislative

20   fixes that came after that, mandatory checking

21   of OARRS, the registration of technicians, to

22   the -- I'm trying to think of other rules that

23   went into place.  Security and control rules,

24   we had some adjustments to those.  All of these

25   types of rules, changes, I felt, helped us

Page 129

1    combat the prescription drug issues that we

2    were seeing.

3              In addition to that, just the

4    massive amount of education we were trying to

5    get out there to our licensees, through our

6    newsletter, through our -- you can sign up for

7    board alerts on our website, all the way to

8    we've done -- I know we've done some webinars

9    in the past, and we do routine -- we've done

10   hundreds, literally, and continue to this day

11   of RP round tables, CE provided on law updates

12   and rule updates.  We travel around to all the

13   pharmacy schools on a yearly basis and have

14   educational discussions with them and CE

15   programs with them.  In addition, again, I

16   still think it's a bonus that you can call in

17   and talk to a live pharmacist at our agency and

18   ask questions.

19              On top of that, the enhancements

20   to OARRS.  You know, one of the big drawbacks

21   was it takes too much time to log into the

22   system, and the integration has just changed

23   the whole scope of that.  Putting it in the

24   workflow of a physician at their practice,

25   putting it into the front-line pharmacist that

Page 130

1    is in that line making the dispensing, I think,

2    is key; in addition to the hospital systems

3    that it started in, you know, the integration

4    there, a patient hitting the ER and immediately

5    be able to have that OARRS report readily

6    available.  I think it's drastically improved

7    as a clinical tool.

8              Adding the MED scores, changing

9    the NARx care to the NARx care platform for

10   prescribers, providing prescriber insight

11   reports.  It's just -- it has evolved into a

12   very good tool for healthcare professionals.

13   And connecting the PMP with other PMPs, I

14   think, was another major accomplishment as

15   patients are very transient.

16             Q.   You mentioned the rule and law

17   changes.  Does the board have a lobbyist?

18             A.   Cameron McNamee is our director of

19   communication.  I believe he's registered as a

20   lobbyist.  He helps draft the rules, along with

21   our chief pharmacist and input from the

22   compliance staff.  And obviously the board has

23   insight and input into those also.

24             MS. BROWNE:  Maybe we can take a

25   lunch break now because I'm going to get into

Page 131

1   all the regs, which is kind of boring, so it's

2   perfect for right after lunch.

3               THE VIDEOGRAPHER:  We're off the

4   record.

5               (Lunch recess taken.)

6               THE VIDEOGRAPHER:  We're on the

7   record.

8   BY MS. BROWNE:

9        Q.    Good afternoon, Mr. Griffin.

10       A.    Good afternoon.

11       Q.    I just wanted to clear up, before

12  we move on to the next topic, some of the stuff

13  that we talked about this morning.

14              We were discussing those

15  investigations in Cuyahoga and Summit and you

16  said during the five-year period or the

17  five-year lookback there were approximately 700

18  in Cuyahoga and approximately 231 from Summit.

19              Those were investigations that

20  were not confined just to opioids, right?

21       A.    Correct, those were total

22  complaints.

23       Q.    And the approximately two dozen

24  that you reviewed, were those opioid-specific?

25       A.    Yes, but the two dozen I reviewed

Page 132

1  were not specific in those counties.  I was

2  looking for examples of opioid cases to those

3  two counties.  So I was looking -- of the dozen

4  or so that I looked at, or two dozen I looked

5  at, I was looking for ones that specifically

6  had opiate-related in Cuyahoga and Summit

7  Counties.  So all two dozen of those were not

8  from Cuyahoga or Summit.

9          Q.    Understood.  Thank you.

10             We also were talking a bit about

11  the inspections, some are annual, some are

12  every three years, some are every five years --

13          A.    Yes, ma'am.

14          Q.    -- and who does those inspections?

15          A.    Our field staff complete those

16  inspections, so it's a combination of

17  compliance specialists, agents and inspectors.

18          Q.    Is there a difference in level of

19  training between or among the compliance

20  specialists, the agents and the inspectors?

21          A.    Yes, ma'am.

22          Q.    What's --

23          A.    Specialists are required to be

24  pharmacists, so they are licensed pharmacists

25  in the State of Ohio, and obviously have had

Page 133

1   the training.  They also have additional

2   training in sterile compounding and most come

3   with a diverse background between hospital and

4   retail experience.

5            Our agents are all -- come from a

6   law enforcement background or an investigative

7   background and our inspectors all come from an

8   industry background, such as technicians,

9   pharmacy technicians.

10           Q.   And do the specialists, agents and

11  inspectors all receive any particular training

12  before they are deputized, if you will, to go

13  out and be Board of Pharmacy inspectors?

14           A.   Yes, we have a 16-week orientation

15  program that all three go through where it --

16  it sort of diverges, if you will.  At some

17  point during the 16 weeks it's additional

18  training where the specialists are with

19  specialists, the agents are with agents, and

20  the inspectors are with inspectors, and we call

21  that our field training program.

22           Q.   The entire 16-week program is the

23  field training program?

24           A.   Yeah.  Or, I'm sorry, orientation

25  program.

1          Q.    Is it always the same inspector
2     who visits a facility?
3          A.    Not always.  It can be, but not
4     always.
5          Q.    What, if anything, determines who
6     will conduct the inspection at any given
7     facility?
8          A.    They're all assigned geographic
9     regions and responsibilities for certain
10    license types; however, sometimes just with
11    overlap or a complaint, inspections may be
12    assigned to one inspector or agent or
13    specialist and another one ends up doing an
14    inspection in their territory or in their
15    region.
16         Q.    So is it more frequently the case
17    that it's the same inspector visiting the same
18    facility?
19         A.    Yes.
20         Q.    And you mentioned it's by
21    geographic region and we talked a little bit
22    about your -- your regional supervisors, and
23    there's a Northeast Ohio, a Southeast Ohio, a
24    Southwest region and a Northwest region.
25         A.    Yes, ma'am.

Page 135

1          Q.    Is there a specific map that you

2    guys -- that you at the board maintain that

3    shows which jurisdictions fall within each

4    region?

5          A.    By county, yes.  It's a State of

6    Ohio map that's divided into four quadrants.

7    So you can see the counties, but it doesn't

8    list like cities or townships.  It just shows

9    the county for each region.

10         Q.    Okay.  Because we're in Columbus

11   in the middle of the state, right?

12         A.    Uh-huh.

13         Q.    So what region does that fall in?

14         A.    Southeast Ohio.  And the regions

15   are divided up -- the north and the south is

16   based upon the federal jurisdiction lines, the

17   Northern and Southern District U.S. courts.

18         Q.    When we broke we were talking

19   about the efforts that the board has taken to

20   combat the opioid abuse and diversion issues

21   that we've been talking about today.  Do you

22   remember that?

23         A.    Yes, ma'am.

24         Q.    And you talked about -- or you

25   mentioned that you work on formulating or

1  making requests for certain rule changes or

2  regulations, correct?

3        A.   We work with our director of

4  communication for the drafting of the rules,

5  our chief pharmacist has input on all of the

6  rules, and also the compliance specialists are

7  sort of on an ad hoc type of group.

8        Q.   Do you work with other local

9  agencies to create new legislation or rules or

10  regulations?

11        A.   I would believe that Cameron has

12  conversations with other state agencies as to

13  our rules, especially the other regulatory

14  boards, just because so much of our rules and

15  licenses overlap with other prescriber boards.

16        Q.   We had talked a little bit -

17  changing topics for a second here - about a 640

18  report; and volume alone isn't a determinative

19  factor in whether diversion is taking place,

20  right?

21        A.   Correct.

22        Q.   So you need to know -- you need to

23  know more than just there's 640 prescriptions

24  being written a month by a prescriber before

25  you can determine whether there's a diversion

Page 137

1    issue, correct?

2              A.    Correct.  And it's not 640

3    prescriptions, it's 640 unique patients.

4              Q.    I thought it was both.

5              A.    Well, it would be, but you can't

6    just say prescriptions because one patient

7    could have three scripts and that would only be

8    one.

9              Q.    Okay.  So it's 640 prescriptions

10   or --

11             A.    Not an or.  640 patients receiving

12   a new prescription.

13             Q.    In a month?

14             A.    In one month.

15             Q.    What else do you need to know

16   other than volume to determine whether

17   diversion is taking place?

18             A.    Volume of a prescriber?

19             Q.    Yeah.

20             A.    Well, that would -- you would have

21   to look at -- several other factors that you

22   would look at.  You would look at any other red

23   flags, where is the patient population coming

24   from, how far are the patients traveling to see

25   the physician, what type of specialty they may

1  have.  One of the red flags is whether they're
2  cash paying or accepting insurance.  So there's
3  numerous different red flags that you would
4  have to look into other than just the volume
5  alone itself.
6        Q.   You mentioned education as one of
7  the ways that the board works towards
8  prevention of abuse and diversion, correct?
9        A.   Yes, ma'am.
10        Q.   And part of that education effort
11  includes participation on various task forces?
12        A.   I don't know if I said task force
13  as part of education.  We do a lot of round
14  table events.
15        Q.   But the board does participate in,
16  for example, the Governor's task force,
17  correct?
18        A.   The opiate -- the GCOAT?
19        Q.   Yes.
20        A.   Yes, ma'am.
21        Q.   And what is the purpose of that?
22        A.   To provide guidance, give
23  information, update information on what's going
24  on with the pharmacy rule.  Me personally, I
25  was on the LE work group.

Page 139

1          Q.    What is the LE work group?

2          A.    Law enforcement work group.

3          Q.    And what was the role of the law

4     enforcement work group?

5          A.    Share information and talk about

6     different strategies and how different agencies

7     were dealing with different crises in their

8     community.

9          Q.    So when you were talking about

10    education as one of the ways that the board

11    combats opioid abuse and diversion, you were

12    speaking about education of its licensees?

13         A.    Yes.  Well, no, not just our

14    licensees.  We do OARRS for law enforcement

15    training, we have also done education with loss

16    prevention.  So primarily our licensees, but

17    some other stakeholder education also.

18         Q.    But not the general public?

19         A.    I don't think we've offered

20    anything for the general public.

21         Q.    Other than the GCOAT, is there --

22    are there any other task forces on which the

23    board participates directed towards opioid

24    abuse?

25         A.    I would say we work with -- we

Page 140

1   work with task forces, such as different DEA
2   tactical diversion squads, different drug task
3   forces across the State of Ohio.  I'm not aware
4   of any task forces.  I know that our executive
5   director sat on a working group with NABP, I've
6   sat on a working group with NABP in the past,
7   but no specific task forces.
8               MS. BROWNE:  We'll mark as Exhibit
9   6 a copy of the Initial Report, Progress and
10  Recommendations, May 17th, 2010, Ohio
11  Prescription Drug Abuse Task Force.
12              (Thereupon, Defendants' Exhibit
13  Number 6, Ohio Prescription Drug Abuse Task
14  Force Initial Report Dated May 17, 2010, was
15  marked for purposes of identification.)
16  BY MS. BROWNE:
17          Q.   Have you seen this document
18  before?
19          A.   I have not.
20          Q.   If you look on page 3 there's a
21  listing of task force members, and in the first
22  column, six down, it's William T. Winsley,
23  executive director, Ohio Pharmacy Board.  Do
24  you see that?
25          A.   Yes, ma'am.

Page 141

1          Q.    And we talked about Mr. Winsley

2     earlier today.  He was the executive director

3     of the Board of Pharmacy back in 2010; is that

4     correct?

5          A.    Yes, ma'am.

6          Q.    The Ohio Prescription Drug Abuse

7     Task Force isn't GCOAT, right?

8          A.    No, I don't believe so.

9          Q.    If you turn to page 4 for me, this

10     -- of Exhibit 5 (sic), it's entitled the

11     problem - prescription drug abuse, and down at

12     the bottom one of the subtitles is reasons for

13     the increase.

14                Are you with me?

15          A.    Yep.

16          Q.    And the second sentence of that

17     section reads, while some of the legal reasons

18     include growth in overall prescription drug

19     use, direct marketing to consumers and general

20     over-prescribing, the most common illegal

21     reason is diversion.

22                Did I read that correctly?

23          A.    You did.

24          Q.    And you agree that, at least as of

25     2010, diversion was the greatest problem

1    regarding prescription drug abuse?

2            A.    I'm not sure I understand the

3    problem.  I think any type of drug abuse is a

4    problem.  So your question is, is illegal

5    diversion the main problem?

6            Q.    Well, the main reason, yes, for

7    the increase in prescription drug abuse.

8            A.    I would say it has to be in

9    combination with over-prescribing.

10           Q.    You can set that aside.  Thank

11   you.

12                 Do you happen to know who the

13   intended audience is of Exhibit 6?

14           A.    I do not.

15           Q.    Has GCOAT issued a report that you

16   know of?

17           A.    I don't know.

18           Q.    Do you participate on GCOAT?

19           A.    I do not.

20           Q.    But the board does?

21           A.    Yes.

22           Q.    Who from the board is the

23   participant?

24           A.    I believe in the past it has been

25   Kyle Parker.  I believe that Dr. John

Page 143

1    Whittington, the assistant executive director,

2    participated, and I believe our current

3    executive director participates.

4            Q.    And do you know if GCOAT has

5    issued any type of report at any point during

6    it's ten-year existence?

7            A.    I don't know off the top of my

8    head.

9            Q.    Do you know what the mission of

10   GCOAT is?

11           A.    To help collaboratively find

12   solutions to help curb the opioid epidemic and

13   reduce unintentional overdose deaths.

14           Q.    Going back to the ways in which

15   the board has worked towards combatting the

16   opioid epidemic, you mentioned that the board

17   works with -- with other regulatory -- is it

18   regulatory and -- well, let me back up.

19                 It's state and local agencies, the

20   FBI, the IRS, OIG, HHS and DEA.  Do you recall

21   that?

22           A.    Yes, ma'am.

23           Q.    And we talked a minute ago about

24   some work that Mr. McNamee does with other

25   regulatory boards, such as the medical board,

Page 144

1    on legislation, right?

2              A.   Yes, ma'am.

3              Q.   Are there other efforts or

4    collaborations in which the board participates

5    with other state and local agencies?

6              A.   Outside of investigations?

7              Q.   Well, okay.  So the investigations

8    which we talked about earlier today.

9              A.   Right.

10             Q.   We just talked about rule making

11   issues.  Is there anything else?

12             A.   Yeah, the prescription integrity

13   group with the Medicare -- excuse me, Medicaid

14   Fraud Control Unit, we collaborate with.  Also,

15   that same unit hosts a quarterly meeting for

16   investigative units.  Additionally, we've

17   hosted quarterly regulatory board meetings.

18             Q.   What is the purpose of the

19   quarterly regulatory board meetings?

20             A.   Discuss rule changes, law changes

21   with our different prospective licensee

22   population, discuss investigations.

23             Q.   Who attends the quarterly

24   regulatory board meetings?

25             A.   Nursing board, medical board,

Page 145

1    pharmacy board, Medicare, Medicaid Fraud

2    Control Unit and dental board.

3           Q.    But not licensees?

4           A.    No.

5           Q.    And the prescription integrity

6    group with Medicaid fraud, how often does that

7    --

8           A.    I believe that's also quarterly.

9           Q.    And who participates in those

10   meetings?

11          A.    What agencies or what -- who from

12   our agency?

13          Q.    First who from your agency.

14          A.    A representative from OARRS and

15   Chief Pyles.

16          Q.    And who from the other agencies?

17   What other agencies participate?

18          A.    I know Medicaid is also present, I

19   know that the Attorney General's Medicaid Fraud

20   Control Unit is also there.  I'm trying to

21   think who -- I'm not sure of the rest of the

22   agencies that participate in that one.

23          Q.    And what is the purpose of the

24   meetings with the Medicaid Fraud Control Unit?

25          A.    They're looking at trends in past

1    cases that they've -- that they've conducted

2    under investigation, similarities, and talking

3    about looking for information, I believe, in

4    the billing systems that is utilized.

5    Discussions center around those types of

6    things.

7            Q.   Medicaid fraud -- the Medicaid

8    fraud unit has access to OARRS, doesn't it?

9            A.   They can.

10           Q.   You mentioned earlier that the

11   board also coordinates with the Bureau of

12   Workers' Compensation?

13           A.   Yes, ma'am.

14           Q.   What kind of coordination is that?

15           A.   Criminal investigations mostly.

16           Q.   Of patients?

17           A.   Most times it's a prescriber.

18           Q.   And you mentioned coordination

19   with the FBI, the IRS, OIG, HHS, DEA.  We

20   talked a little bit this morning about

21   coordination with DEA.

22               Other than those -- the context of

23   criminal investigations, are there other

24   incidents -- or occasions when the board

25   coordinates with DEA?

1           A.    Other than the investigation --

2           Q.    Investigations.

3           A.    Yeah.  I mean, we've had

4    discussions about their rule changes over

5    times.  We have an open dialogue, I would say,

6    with them on questions that they may have or we

7    may have of our prospective licensees.

8           Q.    What coordination or collaboration

9    does the board have with HHS?

10          A.    HHS/OIG is all in criminal

11   investigations.

12          Q.    Is there anything about criminal

13   investigations involving the HHS/OIG that is

14   different from what we discussed this morning

15   about criminal investigations?

16          A.    I'm not sure I understand the

17   question.

18          Q.    Sure.  So you said that the reason

19   that the board collaborates with HHS -- the OIG

20   of HHS is in criminal investigations, correct?

21          A.    Correct, uh-huh.

22          Q.    Earlier this morning we talked

23   about investigations that the board undertakes

24   with administrative and criminal, and that when

25   it conducts criminal investigations it does

1   factfinding and sort of the same type of

2   investigation and reporting that it would do

3   for an administrative proceeding, but that once

4   the factfinding is completed it gets referred

5   to a local prosecutor.

6          A.   Or a U.S. prosecutor, yes.

7          Q.   Or a U.S. prosecutor.

8          A.   Yep.

9          Q.   At what point does the OIG get

10  involved?

11         A.   They may be at ground level.  It

12  may be start to end, or if we find during our

13  investigation that there could potentially be a

14  Medicare fraud, we would contact them and they

15  would participate or have the option to

16  participate.

17         Q.   In what manner is there

18  collaboration between the board and IRS?

19         A.   Sure.  So sometimes in drug

20  trafficking cases there's large amounts of

21  money that are not reported properly, taxes

22  paid on, and that there's violations of federal

23  IRS statutes, so we would coordinate with IRS

24  if we have anything like that; or vice-versa,

25  if they would have a pharmacy-related thing

Page 149

1    they may call us.

2           Q.    And lastly, you mentioned

3    coordination with the FBI.  How does the board

4    coordinate with the FBI?

5           A.    Sort of in the same manner with

6    DEA.  FBI has a healthcare division, and so we

7    coordinate efforts with them so we're not

8    duplicating resources and investigative

9    efforts.

10          Q.    Can you think of a recent time

11   when there was coordination with the FBI?

12          A.    Yes, ma'am.

13          Q.    When was that?

14          A.    Within the last couple months;

15   however, the investigation is confidential.

16          Q.    Understood.  Can you tell me if

17   the investigation involves an individual as

18   opposed to a larger entity?

19          A.    Both.

20          Q.    You mentioned the coordination

21   with the regulatory boards.  Does the board

22   ever coordinate with the department of alcohol

23   and abuse services?

24          A.    We have on occasion.  We have a --

25   recently we have a grant-funded position where

Page 150

1    -- it's sort of an intervention where when we

2    run into those that are in need of treatment

3    and trying to hook them up with services or

4    trying to get them to services for counseling

5    or addiction.

6            Q.    Is there any coordination with the

7    Department of Health?

8            A.    Yes, ma'am.

9            Q.    When?

10           A.    Different types of investigation

11   where health has a regulatory authority, we

12   will notify them and coordinate with them.  For

13   an example would be a contaminated drug product

14   at a hospital, we may coordinate our

15   investigative efforts, or something to that

16   effect.

17           Q.    So the board would be involved in

18   the investigation of a contaminated drug

19   product?

20           A.    Yes, ma'am.

21           Q.    Why is that not a CDC function?

22           A.    Because it comes from one of our

23   licensees at a sterile compounder.  CDC would

24   also be involved, though, and potentially FDA

25   now.

1          Q.    Are there any county level local

2    agencies with which the board will collaborate

3    or has collaborated?

4          A.    We've -- you know, we've assisted

5    in collaboration with the Montgomery County

6    Drug Coalition and different sort of groups of

7    that effect around the state.  The Ross County

8    also has a drug coalition that we participate

9    in.  And so there's -- I think there's several

10   of those different types of smaller local level

11   involvement that the board has.

12         Q.    You mentioned the collaboration,

13   particularly in the investigation context

14   between the DEA and the board --

15         A.    Yes.

16         Q.    -- and the sharing of information?

17         A.    Yes, ma'am.

18         Q.    There is information sharing with

19   FBI, IRS, HHS, during the -- during any of

20   these investigations, correct?

21         A.    Yes, ma'am.

22         Q.    And during the context of --

23   during an investigation, can a federal agency,

24   such as the FBI or the IRS, obtain the records

25   and documentation from the board?

Page 152

1          A.    Records and documentation of what?

2          Q.    Of the investigation.

3          A.    Do we exchange reports or give

4    them a report?

5          Q.    Yeah.

6          A.    Yes.

7          Q.    Do you give them all of the

8    information?  You know, for example, I'm not

9    saying do you just type up a report and give it

10   to the FBI.  Are you under any obligation or do

11   you routinely give all of your information to

12   the FBI for them to sift through?

13         A.    If we are conducting a joint

14   investigation, absolutely.

15         Q.    I know that DEA and the FBI have

16   access to OARRS.  What about the IRS?

17         A.    If they're investigating a drug

18   crime, they could have access to it.

19         Q.    And what about HHS?

20         A.    Again, if they're investigating a

21   drug crime.

22         Q.    How do you know when they access

23   OARRS or request access for OARRS that it's for

24   the investigation of a drug crime?

25         A.    It's part of the -- my

Page 153

1  understanding is it's part of the user

2  agreement and they have to put a unique case

3  number next to any inquiry that they make.

4          Q.   You had mentioned that one of the

5  bills that you worked on that was -- when I say

6  you, I mean the board, that you guys -- that

7  the board was proud of is the 2011 House Bill

8  93, right?

9          A.   We did have input on that and that

10  was some legislative requests by the board.  I

11  don't know if I would use the word proud of,

12  but definitely it took significant moves to

13  give us more regulatory authority.

14          Q.   And that gave you the authority to

15  license the pain -- to license pain management

16  clinics, correct?

17          A.   Yes, ma'am, and it also added some

18  additional requirements of the pain management

19  clinics themselves.

20          Q.   Including that they can only

21  dispense 72 hours' worth of controlled

22  substance?

23          A.   Yes, ma'am.

24          Q.   Were pain management clinics a

25  problem in Ohio in 2011?

Page 154

1          A.    I believe so.

2          Q.    So what was the -- was that the

3  impetus for looking to pass that bill?  What

4  brought that on?

5          A.    I think that was one of the

6  reasons, through what we had learned through

7  investigations and different information that

8  we obtained, that we were seeing sort of the

9  mimic of the Florida pill mills, of cash-paying

10  physicians, cookie-cutter prescriptions, lines

11  out the door, different things like that in

12  clinics that were not owned by physicians or

13  ran by physicians.

14          Q.    And selling prescription opioids

15  to individuals without a legitimate medical

16  purpose is a form of diversion, right?

17          A.    Correct.

18               (Thereupon, Defendants' Exhibit

19  Number 7, Settlement Agreement with the State

20  Board of Pharmacy, Docket No. D-990726-009, was

21  marked for purposes of identification.)

22  BY MS. BROWNE:

23          Q.    I'm going to mark as Exhibit 7 a

24  document bearing Summit_002052981 through

25  Summit_002052992.  The heading is Imogene

Page 155

1  Carole Maynard, R.Ph. (SA 04-03-2000) and it's

2  a Settlement Agreement with the State Board of

3  Pharmacy, docket number D-990726-009.  Do you

4  see that?

5          A.   I do.

6          Q.   1999 was before your time at the

7  board, correct?

8          A.   Yes, ma'am.

9          Q.   If you take a look at this

10  settlement agreement, Exhibit 7 --

11          A.   Yes.

12          Q.   -- it notes on page 1 through page

13  -- through page 11 of 12 -- well, no, I take

14  that back, through page 10 of 12, there's an

15  identification of -- there's 37 paragraphs'

16  worth of allegations or facts against

17  Ms. Maynard pertaining to failing to review

18  original prescriptions and/or refill

19  information, for over-utilization, incorrect

20  drug dosage and duration of drug treatment and

21  misuse.

22              For example, paragraph 5, sold

23  controlled substances to patient 1 without a

24  legitimate medical purpose and it lists

25  hydrocodone and Hydromet syrup.  Paragraph 8,

1    she sold the following controlled substances to

2    patient 2 without a legitimate medical purpose

3    and it's Roxicet.  Paragraph 9, she sold the

4    following controlled substances to paragraph 2

5    -- to patient 2 without a legitimate medical

6    purpose and it's hydrocodone.  Do you see that?

7            A.    I do.

8            Q.    And then in paragraph 37 on page

9    10 of 12 it notes that Ms. Maynard pled guilty

10   --

11           Are you with me?  I'm sorry.

12           A.    Okay.

13           Q.    Ms. Maynard pled guilty to two

14   counts of attempted illegal processing of drug

15   documents in violation of Section 2923.02 of

16   the ORC, misdemeanors in the first degree.  Do

17   you see that?

18           A.    Yes, ma'am.

19           Q.    On page 11 of 12, paragraph (C) --

20   well, you can start with paragraph (B)

21   actually.  Paragraph (B) notes that she must --

22   Ms. Maynard must successfully complete

23   jurisprudence examination offered by the board

24   prior to reinstatement, and if Ms. Maynard has

25   not successfully completed the jurisprudence

1    examination prior to one year from the

2    effective date of the agreement her license

3    will remain suspended until the condition has

4    been achieved.  Do you see that?

5            A.   I do.

6            Q.   And then in paragraph (C) it notes

7    her license, upon the completion of the terms

8    of suspension and after having passed the

9    jurisprudence exam, will be issued

10    automatically upon renewal which may require

11    submission of continuing pharmacy education as

12    set forth in the OAC.  Do you see that?

13            A.   I do.

14            Q.   So Ms. Maynard's license after a

15    year was to be reinstated, correct?

16            A.    I would have to read through the

17    entire thing, but it -- from what you've read,

18    it sounds like after she completed her

19    jurisprudence -- if you come back up to (A), it

20    says that her license would be suspended for a

21    year.

22            Q.   These offenses, if you tab through

23    this document, all took place between 1996 and

24    1997, correct?

25            A.   I would have to read the document

1   to confirm that, but from the paragraphs that

2   you read they were, it looks like, dated all of

3   '96.  I do see a couple paragraphs that

4   indicate a date -- a dispensing date of '97.

5          Q.    OARRS was not available in 1996

6   and 1997, was it?

7          A.    No, ma'am.

8          Q.    But the board was able to conduct

9   an investigation to make these determinations,

10  correct?

11         A.    I'm assuming they did.

12               (Thereupon, Defendants' Exhibit

13  Number 8, Order of the State Board of Pharmacy

14  vs. Charles A. Gilford, Docket No. 6-65-2, was

15  marked for purposes of identification.)

16  BY MS. BROWNE:

17         Q.    I'm going to mark as Exhibit 8 a

18  document -- I'm sorry, this document does not

19  have any production numbers.  I believe we

20  accessed this from the board website.  And it's

21  the State Board of Pharmacy versus Charles A.

22  Gilford.

23               If you take a look at the first

24  paragraph, it notes that the State Board of

25  Pharmacy finds that Charles A. Gilford did sell

Page 159

1   on more than one occasion between March 29,

2   1978 and December 13, 1979, without a valid

3   prescription, 26,600 tablets of Dilaudid 4

4   milligrams and 2,010 tablets of Quaalude 300

5   milligrams, of which both are Schedule II

6   controlled substances.  Do you see that?

7            A.   I do.

8            Q.   Paragraph (2) notes the State

9   Board of Pharmacy finds that Charles A. Gilford

10  did sell biphetamine, Dilaudid and Percodan on

11  more than one occasion between July 21, 1978

12  and July 22, 1979 without a valid prescription.

13  Do you see that?

14           A.   I do.

15           Q.   And then the third paragraph,

16  Mr. Gilford did sell without a valid

17  prescription on more than one occasion between

18  July 10, 1978 and November 8, 1978 Desoxyn,

19  Parest, Tuinal and Seconal in amounts less than

20  the minimal bulk amount.  Do you see that?

21           A.   I do.

22           Q.   And, finally, in paragraph (4), it

23  says the Board of Pharmacy finds that without a

24  written or oral prescription given by a

25  practitioner between May 16, 1978 and December

Page 160

1   17, 1979, approximately 400 capsules of Tuinal

2   200 milligrams, approximately 430 capsules of

3   biphetamine 12 and approximately 10 capsules of

4   Eskatrol, all of which are Schedule II

5   controlled substances, correct?

6           A.   Except for it's not 10 capsules,

7   it's 100.

8           Q.   I stand corrected.

9                And on page 4 of this document the

10  board has determined to revoke Mr. Gilford's

11  pharmacist identification card, correct, in

12  paragraph (A)?

13          A.   Yes, ma'am, that's what paragraph

14  (A) says.

15          Q.   And paragraph (C), the board

16  denies Charles Gilford's application for a

17  Terminal Distributor of Dangerous Drugs

18  license, right?

19          A.   Yes, ma'am.

20          Q.   Do you have any knowledge as to

21  how the board was able to monitor prescription

22  and dispensing habits in the state?

23          A.   When, now?

24          Q.   In the 1970s.

25          A.   No, ma'am.

Page 161

1        Q.   They didn't do it with OARRS,

2   though, right?

3        A.   They did not do it with OARRS.

4             (Thereupon, Defendants' Exhibit

5   Number 9, Order of the State Board of Pharmacy

6   vs. Henry E. Agin, R.Ph., Docket No. 6-88-1,

7   was marked for purposes of identification.)

8   BY MS. BROWNE:

9        Q.   We are going to mark as Exhibit

10  9 -- this is another printout from the Board of

11  Pharmacy website, State Board of Pharmacy

12  versus Henry E. Agin, registered pharmacist,

13  and there's an identification of findings of

14  fact.

15            Paragraph (1), on one or more

16  occasions between October 1st, 1982, Mr. Agin

17  did dispense without a valid prescription

18  approximately 1,508 tablets of Dilaudid 4

19  milligrams, correct?

20        A.   Yes, ma'am.

21        Q.   In paragraph (2) it notes that the

22  Board of Pharmacy finds that Mr. Agin, between

23  March 23, 1981 and February 25th, 1983, did

24  distribute by dispensing controlled substances

25  when he knew, or had reasonable cause to

Page 162

1    believe, such drugs were intended for sale or

2    resale by another person and were not

3    prescribed for legitimate medical purposes by a

4    practitioner in the course of his professional

5    practice, to wit:  approximately 360 tablets of

6    Percodan and approximately 300 capsules of

7    biphetamine 20 milligrams, both of which are

8    Schedule II controlled substances, and

9    approximately 200 tablets of Parabenzamine 43,

10   correct?

11          A.   Yes, ma'am.

12          Q.   Paragraph (3), between March 23,

13   1981 and February 25th, 1983, Mr. Agin

14   dispensed without a valid prescription

15   approximately 360 tablets of Percodan and

16   approximately 300 capsules of biphetamine,

17   correct?

18          A.   Yes, ma'am.

19          Q.   And it goes on, there's a couple

20   of things again in this 1983 period.  Do you

21   see that?

22          A.   I do.

23          Q.   In paragraph (A) on the last page,

24   it notes that the Board of Pharmacy takes the

25   following actions:  It suspended the registered

Page 163

1   pharmacist's ID card of Mr. Agin for 24 months,
2   correct?
3           A.   Yes, ma'am.
4           Q.   There's then the two 24-month
5   suspensions shall run concurrently and they
6   will suspend 18 months of each 24-month
7   suspension on the condition that he takes and
8   successfully completes a jurisprudence exam
9   offered in January 1985, does not violate any
10  drug laws of the State of Ohio, any other state
11  or the federal government, and abides by the
12  Board of Pharmacy -- rules of the Board of
13  Pharmacy, correct?
14          A.   Yes, ma'am.
15          Q.   Every licensee of the Board of
16  Pharmacy has to not violate drug laws of the
17  State of Ohio, correct?
18          A.   Correct.
19          Q.   And every licensee of the state --
20  from the State Board of Pharmacy has to agree
21  to abide by the rules of the Board of Pharmacy,
22  right?
23          A.   Yes, ma'am.
24          Q.   Do all licensees have to take a
25  jurisprudence exam?

Page 164

1          A.    I believe that there is some law
2    component today of their CE requirement.  I
3    don't know in 1985 what the requirement was.
4          Q.    But what Exhibit 9 does
5    demonstrate is that, even in the 1980s, the
6    board was monitoring and disciplining
7    individuals who diverted prescriptions, right?
8          A.    Yes, ma'am.
9          Q.    And you would agree with me that
10   the conduct that is set forth in Exhibit 9 by
11   Mr. Agin is an example of diversion?
12         A.    Yes, ma'am.
13         Q.    And the conduct that we discussed
14   in Exhibit 8 with Mr. Gilford from the 1970s,
15   that's also diversion, correct?
16         A.    Yes, ma'am.
17         Q.    And even -- so even in the 1970s
18   the board was requiring its licensees to
19   recognize a legitimate medical purpose to --
20   prior to dispensing a medication, correct?
21         A.    Yes, ma'am.
22         Q.    Bear with me for a second.
23               You joined the board in 2008?
24         A.    Yes, ma'am.
25         Q.    Since you've been at the board, do

1   you know if any wholesale distributors have

2   been sanctioned?

3          A.   Yes, ma'am.

4          Q.   You do?

5          A.   I do.

6          Q.   Do you know if any of the

7   distributor defendants have been sanctioned?

8          A.   I believe so.

9          Q.   Do you know when?

10         A.   I don't know when.  And let me

11  correct my answer.  Yes, I do know one of the

12  defendants has been sanctioned.

13         Q.   How does the board determine

14  whether to accept an applicant's registration

15  as a Terminal Distributor of Dangerous Drugs?

16         A.    It first goes through the

17  licensing process and they're required to

18  provide documentation, complete the application

19  process, and then seeing if there was no

20  issues; and depending on what type of license,

21  then it would be issued.  Certain types of

22  licenses have to have a pre-inspection.

23         Q.   What types of licenses have a

24  pre-inspection?

25         A.   Pharmacy license, pain management

Page 166

1  license, OBOT license.

2        Q.   I'm sorry, what?

3        A.   OBOT, office-based opioid

4  treatment facility.

5        Q.   What is the difference between

6  that and a pain management clinic?

7        A.   They treat two different types of

8  disease states.  One treats pain and the other

9  one treats addiction.

10        Q.   Any other different types of

11  licenses for TDDs?

12        A.   Yes, high-risk sterile

13  compounders, and these are in-state TDDs, and

14  outsourcers.

15        Q.   What is an outsourcer?

16        A.   An outsourcer is essentially --

17  it's sort of tough to describe.  So that's a

18  facility that complies with good manufacturing

19  practices set forth by the FDA, but is not a

20  full-blown manufacturing facility.  They

21  normally produce smaller volumes and they may

22  do 503A or 503B, either wholesale sales or

23  patient-specific prescriptions.

24        Q.   How is a patient-specific

25  prescription, the production of

1  patient-specific different from a compounding
2  pharmacy?
3          A.   It's similar.  They may have two
4  separate categories in their licenses.
5              (Thereupon, Defendants' Exhibit
6  Number 10, Minutes of the June 9-10, 2014
7  Meeting of the Ohio State Board of Pharmacy,
8  was marked for purposes of identification.)
9  BY MS. BROWNE:
10          Q.   I'm going to mark as Exhibit 10
11  the Minutes of the June 9 to 10, 2014 Meeting
12  of the Ohio State Board of Pharmacy.  It's
13  marked with production identification
14  OhioPharmMins_000106.  And if you would turn
15  for me to the page - the top right are the page
16  numbers - to page 247.
17              Are you with me?
18          A.   Yes, ma'am.
19          Q.   The entry is R-2014-231 and it's a
20  settlement agreement with the State Board of
21  Pharmacy, case number 2012-1918, Pharmacy
22  Creations, care of Scott Karolychyk, in
23  Randolph, New Jersey.  Do you see that?
24          A.   Yes, ma'am.
25          Q.   And on page 248 in paragraph

Page 168

1    number (2), it notes, to wit:  the applicant

2    did, on or before October 10th, 2012, illegally

3    compound and sell dangerous drugs to Valley

4    Surgical Center in Ohio without being licensed

5    as a Terminal Distributor of Dangerous Drugs.

6                 Did I read that correctly?

7         A.    Yes, ma'am.

8         Q.    And page 248 also notes at the top

9    in the first whereas clause that the State

10   Board of Pharmacy is empowered to suspend,

11   revoke, refuse to renew any license issued to a

12   Terminal Distributor of Dangerous Drugs

13   pursuant to Section 4729.54 of the Revised

14   Code, or may impose a monetary penalty on the

15   license holder, correct?

16        A.    Yes, ma'am.

17        Q.    And paragraph (3) notes that

18   specifically the applicant did, on or before

19   October 10th, 2012, sell compounded drugs to

20   Valley Surgery Center in a quantity exceeding a

21   72-hour supply, correct?

22        A.    Yes, ma'am.

23        Q.    It looks like these were

24   vancomycin and other antibiotics, correct?

25        A.    That's what it appears.  I would

Page 169

1   have to look up each of the drug chemicals that
2   they have listed.
3           Q.    And as a penalty, if you turn to
4   page 249 of this, it notes that the pharmacy
5   had to pay $2,000, that it is granted its
6   license as a TDDD, but is on probation for a
7   year, correct?
8           A.    Yes, ma'am.
9           Q.    And the terms of the probation are
10  that the pharmacy must not violate the drug
11  laws of the State of Ohio or any other state or
12  the federal government, correct?
13          A.    Yes, ma'am.
14          Q.    The pharmacy must abide by the
15  rules of the State of Ohio Board of Pharmacy,
16  correct?
17          A.    Correct.
18          Q.    And it must comply with the terms
19  of this agreement, correct?
20          A.    Yes, ma'am.
21          Q.    And as we discussed, any licensee
22  has to agree not to violate the drug laws of
23  the State of Ohio, any other state or the
24  federal government in the normal course of
25  things, correct?

Page 170

1          A.    You would expect so, yes.

2          Q.    And any licensee of the State

3     Board of Pharmacy also must agree to abide by

4     the rules, correct?

5          A.    Yes.

6          Q.    Is there a standard by which the

7     board determines whether to revoke or suspend a

8     TDDD's license?

9          A.    I don't know of a standard.  The

10    board is a tribunal essentially that hears the

11    facts of the case and makes a decision and a

12    recommendation and a ruling.

13         Q.    Are all licensees that may be

14    subject to revocation or suspension entitled to

15    a formal hearing?

16         A.    Yes.

17         Q.    Do you know how often a TDDD's

18    license has been suspended in 2019?

19         A.    In the last month, I'm not sure

20    we've had any suspended in the last month.

21         Q.    What about 2018, any suspended in

22    2018?

23         A.    I'm sure we have.  I don't know

24    them off the top of my head, but I'm sure we

25    have.

Page 171

1      Q.   Do you recall if any have been

2  revoked, any licenses have been revoked in

3  2018?

4      A.   Again, I don't know off the top of

5  my head.  I would assume that we have.

6           MS. BROWNE:  We need to take a

7  break so you can change the DVD.

8           THE VIDEOGRAPHER:  We're off the

9  record.

10          (Recess taken.)

11          THE VIDEOGRAPHER:  We're on the

12 record.

13 BY MS. BROWNE:

14      Q.   Mr. Griffin, we -- can you pull

15 out Exhibit 7 for me again?  That's the Imogene

16 Carole Maynard settlement agreement.

17      A.   Yes, ma'am.

18      Q.   At the bottom of the first page of

19 Exhibit 7, that paragraph (2) --

20      A.   I'm sorry.

21      Q.   Sure.

22      A.   Paragraph (2).

23      Q.   Paragraph (2), numbered (2) at the

24 bottom of the page, there's this reference to

25 failing to review the original prescriptions

1   and/or refill information for over-utilization.

2            Do you have an understanding of

3   what the term over-utilization means?

4        A.   I do.

5        Q.   What is that?

6        A.   Overlapping therapies or a drug

7   therapy that would be contraindicated by a

8   disease state or by manufacturer guidelines.

9        Q.   Is over-utilization also another

10  word for over-prescribing?

11       A.   It could be, but not one and the

12  same.

13       Q.   So is over-utilization a type of

14  over-prescribing?

15       A.   No, I wouldn't categorize that.  I

16  would say that over-utilization could be -- if

17  a disease state called for a certain regimen or

18  a certain length of duration that you would

19  take a specific drug and the pharmacist

20  dispensed way over that amount, I would say

21  that would be an over-utilization, but not

22  maybe an over-prescribing.

23       Q.   But they both involve giving too

24  much medication for --

25       A.   They do, yes.

Page 173

1          Q.   Okay, so let me start over.  They

2    both involve giving too much medication for a

3    particular disease state, but you don't equate

4    the two?  Is it because over-utilization is

5    broader than over-prescribing?

6          A.   I believe so.

7          Q.   Okay.  So over-prescribing may be

8    an example of over-utilization?

9          A.   Could be.

10          Q.   You can put that aside.

11               So we've seen a couple of these

12    settlement agreements where a fine has been

13    levied or a license has been suspended.

14               What other types of discipline are

15    available to the board?

16          A.   There can be additional CE

17    requirements.  I know you saw jurisprudence in

18    there; however, there could be other different

19    types of CE requirements.  They can be on

20    probation and have to appear before a

21    probationary committee.  Other than their

22    suspension, there's permanent revocation.

23               Additionally, with impairment

24    cases they may be required to enter into an

25    agreement with a monitoring agency or a type of

1    company or association to monitor their

2    compliance with a drug treatment plan.  They

3    may also have to report -- submit quarterly

4    reports or different types of reports deemed

5    necessary by the board.

6            Q.    What kind of quarterly reports?

7    What would that entail?

8            A.    Whether it's their drug screens,

9    whether it would be inventories.  We've had

10   incidences where they've had to have consultant

11   pharmacists review different policies and

12   procedures.

13           Q.    You mentioned earlier that in 2018

14   one of the defendant wholesalers -- I beg your

15   pardon, distributors had been sanctioned.

16   Which distributor was that?

17           A.    I didn't know if it was that

18   specific year, but Cardinal had been sanctioned

19   by the board.  I don't recall that I said 2018.

20           Q.    You're right.  It was since you

21   joined, so since 2008?

22           A.    In 2008 Cardinal was disciplined

23   by the board and we've had a couple others

24   since then.

25                 (Thereupon, Defendants' Exhibit

Page 175

1   Number 11, Minutes of the September 13-15, 2010

2   Meeting of the Ohio State Board of Pharmacy,

3   was marked for purposes of identification.)

4   BY MS. BROWNE:

5          Q.   I'm handing you what has been

6   marked as Exhibit 11.  Exhibit 11 is the

7   minutes of the June 9 to 10 --

8               Do I have that right?

9          A.   This looks like September.

10         Q.   You're right, I'm looking at the

11  wrong one.  I beg your pardon.  This is the

12  meeting -- you're right, the meeting minutes

13  from September 13 to 15, 2010 of the Ohio State

14  Board of Pharmacy.  Do you see that?

15         A.   Yes, ma'am.

16         Q.   It bears a production at the

17  bottom OhioPharmMins_00044?

18         A.   Yes, ma'am.

19         Q.   If you could please turn to the --

20  it's the fourth page that starts at the top

21  R-2011-057, settlement agreement with the State

22  Board of Pharmacy, docket number D-100617-131

23  in the matter of Marc's, M-A-R-C, apostrophe S,

24  Pharmacy, number 46.  Do you see that?

25         A.   Yes, ma'am.

Page 176

1      Q.   And it notes in paragraph (1) down

2   towards the bottom of the page that Marc's

3   Pharmacy is licensed as a Terminal Distributor

4   of Dangerous Drugs, correct?

5      A.   Yes.

6      Q.   And then in paragraph (2) it notes

7   that Marc's Pharmacy, on or about November

8   11th, 2009, did not have adequate safeguards,

9   and notes specifically procedures were not in

10  place, and/or procedures were not followed, so

11  as to prevent drugs that had been dispensed

12  from being sold, slash, delivered to persons

13  other than the correct patient.  Rx 158371,

14  written for metoprolol 25 milligrams, and Rx

15  162105, written for Seroquel 50 milligrams,

16  were prescribed and dispensed for patient X,

17  but was given to patient Y, who had actually

18  been prescribed Rx 464562, written for

19  Synthroid 100 micrograms.  Patient Y ingested

20  the incorrect medication and was harmed.

21          Did I read that correctly?

22      A.   Yes.

23      Q.   Are the facts that I just read an

24  example of diversion?

25      A.   It could be; however, this would

1   be more indicative of an error in dispensing.

2        Q.   Noted in paragraph (A), it says

3   Marc's Pharmacy agrees to the imposition of a

4   monetary penalty of $500, correct?

5        A.   Yes, ma'am.

6        Q.   Is $500 a typical amount for an

7   error in dispensing?

8        A.   I'm not exactly sure.  It sounds

9   like it could be.

10       Q.   Is there some matrix or

11  identification of -- within the board as to

12  amounts that certain violations would require

13  as an appropriate form of punishment or

14  discipline?

15       A.   I know that we've worked on

16  something to that effect; however, I don't know

17  if it's been implemented.

18       Q.   But at least as -- as of 2010, to

19  your knowledge there was no matrix or standard

20  amount of penalty that corresponded to a

21  specific violation?

22       A.   No, ma'am.

23            (Thereupon, Defendants' Exhibit

24  Number 12, Minutes of the December 1-3, 2014

25  Meeting of the Ohio State Board of Pharmacy,

Page 178

1  was marked for purposes of identification.)

2  BY MS. BROWNE:

3          Q.   We've marked as Exhibit 12 the

4  Minutes of the December 1st through 3rd, 2014

5  Meeting of the Ohio State Board of Pharmacy.

6  You were present, right, if you look at that

7  third paragraph, Eric Griffin, compliance and

8  enforcement supervisor?

9          A.   Yes, ma'am.

10          Q.   If you turn, again, there's page

11  numbers on the top right, to page 201 of

12  Exhibit 12.  At the bottom of the page is a

13  settlement agreement with the State Board of

14  Pharmacy, case number 2013-1696, Heritage

15  Healthcare, dba Heritage Pharmaceutical &

16  Medical Supplies, care of John L. Hunter,

17  registered pharmacist.  Do you see that?

18          A.   I do.

19          Q.   Have you seen these minutes

20  before?

21          A.   I don't approve the minutes.  I

22  don't know if I've seen these particular

23  minutes in the past.

24          Q.   If you turn to page 202, at the

25  bottom of the page is paragraph (2), and it

1    notes that, specifically, Heritage had no

2    system in place to verify the signature of Life

3    Ambulance's responsible person Dr. Wayne

4    Wheeler.  This lack of security and control

5    over the process of dangerous drug orders

6    allowed Life Ambulance employee, Brian Buckle,

7    an individual with a known history of drug

8    abuse, to sign DEA 222 forms for controlled

9    substances on behalf of Life Ambulance as

10   evidenced by the DEA 222 forms dated June 14,

11   2013 and July 5, 2013, with attached packing

12   slip invoices.

13            Did I read that correctly?

14        A.    You did.

15        Q.    And paragraph (3) notes that on or

16   about November 12th, 2012 through September

17   2013, Heritage failed to detect the fraudulent

18   orders for controlled substances and other

19   dangerous drugs that were being placed by Life

20   Ambulance employee, Brian Buckle, for his own

21   self-administration.

22            Did I read that correctly?

23        A.    You did.

24        Q.    Is this an example of diversion?

25        A.    It is.

1      Q.   And in this case Heritage had

2   failed to detect fraudulent orders for

3   controlled substances that were being placed by

4   this ambulance employee, correct?

5      A.   Yes, ma'am.

6      Q.   We talked a little bit earlier

7   about the pharmacy's -- I beg your pardon, the

8   board's having imperfect control over

9   ambulances because of the constant changing of

10  the inventory in order to prevent diversion?

11     A.   I think it's not just EMS, but I

12  would say most licensed sites where they're

13  administering on a continual basis, yes, ma'am.

14     Q.   And in this case Heritage paid

15  $5,000.  Do you see that, paragraph (A)?

16     A.   I do.

17     Q.   As of 2015, do you have an

18  understanding as to whether a diversion

19  violation such as this -- whether -- strike

20  that.  Whether a $5,000 fine was typical for a

21  diversion violation such as this?

22     A.   I don't have knowledge of that.  I

23  don't know if that would be typical or not.

24     Q.   Okay.  You can set that aside.

25          Does the board have in place

Page 181

1   policies or procedures for responding to

2   suspicious order reports that are submitted by

3   distributors?

4           A.   We do not have a written policy or

5   procedure; however, they are reviewed

6   periodically by a supervisor, and the most

7   recent system set up will review them at the

8   weekly intake meetings where we also review the

9   complaints.

10          Q.   Does a suspicious order report

11  automatically trigger an investigation?

12          A.   No, ma'am.

13          Q.   In what circumstances would there

14  not be an investigation?

15          A.   Well, to give you an example, the

16  majority of our suspicious order reports are

17  for package sizes less than a quantity of four.

18  I think roughly 75 percent are for a package

19  size less than four and you need additional

20  information from the wholesalers.  We've

21  requested additional information in the past

22  and we've also opened an investigation based

23  upon some suspicious orders in the past.

24          Q.   So what does trigger an

25  investigation?

1          A.    It would have to be after

2    gathering information where the order has

3    additional information other than just a

4    suspicious order report, why does the

5    wholesaler or the drug distributor feel that it

6    is a suspicious order; such as, you know, it

7    deviates from regular buying power -- or

8    regular buying pattern, sorry, not power, and

9    that -- essentially why it was suspicious.  The

10   majority of our suspicious orders are one and

11   two bottles to normal pharmacies that don't

12   raise a red flag.

13          Q.    What do you mean by a normal

14   pharmacy?

15          A.    A chain pharmacy.

16          Q.    And chain pharmacies don't

17   regularly raise a red flag?

18          A.    No, they absolutely can, but they

19   also do the highest volume in the state.

20          Q.    So they tend to be more trusted?

21          A.    I would not say that.  I would

22   just say that we know that they dispense a lot

23   more medication than other pharmacies do.

24          Q.    So you mentioned if there is a

25   deviation in a regular buying pattern, that

Page 183

1   might trigger an investigation, right?

2          A.   However, we would need that

3   information from the wholesaler.

4          Q.   What if you see repeated reports?

5          A.   We would contact the wholesaler

6   and ask them for additional information;

7   however, if the wholesaler -- the first

8   question is if you're seeing repeated reports,

9   why is the wholesaler continuing to sell to

10  them, so we would probably ask that question

11  and we would ask for additional information.

12             Some of the -- from the policies

13  and procedures that we've learned, some of the

14  suspicious order reports are solely based upon

15  a number verse an actual knowing the customer's

16  business model, and so they could go two

17  tablets over and it would generate a suspicious

18  order report.

19             (Thereupon, Defendants' Exhibit

20  Number 13, Fax Dated April 21, 2016 with

21  attached Suspicious Order Report, was marked

22  for purposes of identification.)

23  BY MS. BROWNE:

24         Q.   We're going to mark as Exhibit 13

25  a document parked BOP_MDL 2nd production 00105

1   to 106.  This is a two-page fax.  The date at

2   the top is April 21st, 2016 and the title is

3   Suspicious Order Report.  Do you see that?

4           A.   I do.

5           Q.   On the second page of Exhibit 13

6   it's a Cardinal Health Memo to the Board of

7   Pharmacy, South High Street, Columbus, Ohio.

8   That's your Board of Pharmacy, correct?

9           A.   Yes, ma'am.

10          Q.   And this is a suspicious order

11  report for the Ritzman Pharmacy in Akron,

12  correct?

13          A.   Yes, ma'am.

14          Q.   Do you recall how, if at all, the

15  board responded to this suspicious order

16  report?

17          A.   I don't recall.

18          Q.   Do you know if the board has

19  received other suspicious order reports from

20  Ritzman Pharmacy?

21          A.   I can't recall off the top of my

22  head.

23          Q.   You mentioned that if there were a

24  number of suspicious order reports over a given

25  time you would wonder why the wholesaler was

1    still sending medication to that pharmacy,

2    right?

3          A.    Correct.

4          Q.    But pharmacies obtain

5    pharmaceuticals from multiple wholesalers,

6    don't they?

7          A.    They can.

8          Q.    So you could have multiple

9    suspicious order reports about, for example,

10   the Ritzman Pharmacy, from more than just

11   Cardinal, correct?

12         A.    You could.

13         Q.    And what point, if at all, would

14   you elevate that to an investigation?

15         A.    We would have to glean more

16   information from either of the wholesalers to

17   find out why.  It is not uncommon for any

18   pharmacy to have multiple wholesalers.  They

19   normally have a primary and a secondary

20   wholesaler.

21         Q.    And if that pharmacy received

22   multiple suspicious order reports or you

23   received multiple suspicious order reports

24   regarding one pharmacy, that does not

25   automatically trigger an investigation?

Page 186

1          A.   It would not because you don't --
2     we don't know why the wholesaler is triggering
3     it.  You would have to find out from them what
4     their suspicious order report policy and
5     procedure is.  We've had discussions with
6     Cardinal in the past, you know, and sometimes
7     with different wholesalers, and the fact that,
8     again, it could just be a number that they've
9     generated and the system automatically
10    calculates or sends a suspicious order report,
11    when in theory it's legitimate use.
12         Q.   So, for example, Cardinal has a
13    suspicious monitoring -- let's take Cardinal
14    out of it.  A wholesaler has a suspicious
15    monitoring software that, based on numbers,
16    will automatically generate a suspicious order
17    report?
18         A.   Right.
19         Q.   But it's not numbers alone.  What
20    you're saying is that just because there's a
21    suspicious order report doesn't necessarily
22    mean it really is a suspicious order?
23         A.   Correct.
24         Q.   Because you can't tell just based
25    on the numbers --

1          A.   We can't tell just by this
2    document that this is a suspicious order.
3          Q.   Are the requirements for
4    investigating a suspicious order codified
5    anywhere?
6          A.   No, ma'am.
7          Q.   We've talked a little bit about
8    new rules and regulations and the board's role
9    in proposing or passing various rules,
10   regulations and legislation, correct?
11         A.   Yes, ma'am.
12              (Thereupon, Defendants' Exhibit
13   Number 14, State of Ohio Board of Pharmacy 3rd
14   Quarter 2017 - Rule Update, was marked for
15   purposes of identification.)
16   BY MS. BROWNE:
17         Q.   We'll mark as Exhibit 15 -- I beg
18   your pardon, Exhibit 14 a printout from the BOP
19   website.  It's entitled 3rd Quarter 2017 - Rule
20   Update.
21         A.   Yes, ma'am.
22         Q.   And it notes some of the rules
23   effective this quarter are organized into these
24   new divisions; for the rules that are
25   rescinded, please refer to the last column to

1  see if the rule has been moved to a new

2  division, correct?

3          A.   Yes, ma'am.

4          Q.   Are you able to tell me by just

5  paging through this document which, if any, of

6  these rules may have been enacted in response

7  to the opioid crisis?

8          A.   I can't tell you specifically

9  which ones; however, on some of the amendments

10  what I can tell you is that manner of issuance

11  could have an amendment to help strengthen the

12  rules, definitions of impairment --

13          Q.   Let me stop you right there.  I'm

14  sorry.  So manner of issuance is Rule

15  4729-5-30?

16          A.   Yes, ma'am.

17          Q.   Go on.  Sorry.

18          A.   So the amendment to that rule

19  could have had some impact or response to the

20  opiate.  The definitions of impairment and

21  summary suspension, I think we had added

22  language in that section.  I think we also had

23  added some security requirements, which was

24  47-9-05.  I'm not sure about the electronic

25  format required for transmission of dispensing

1  data.  I think that may have been the change

2  that also went along with manner of issuance

3  for possibly requiring ICD-10 codes.

4          Q.    And what reg number or rule number

5  was that?

6          A.    4729-37-05.

7          Q.    Anything else?

8          A.    Not that I see at this time.  This

9  is more of an update because we were moving the

10  sections.

11          Q.    Is this the most recent update to

12  the rules and regulations from the board?

13          A.    No, ma'am.

14          Q.    When was the most recent update?

15          A.    We have some going into effect

16  April 15th of this year.

17          Q.    And are any of the rules that are

18  going into effect on April 15th of 2019

19  directed to combatting the opioid crisis?

20          A.    I don't think any one single rule

21  is the combatting opioid rule.  I think they

22  collectively together help strengthen our

23  ability to hold licensees accountable, and I

24  would say yes with that rule.

25          Q.    Are the rules that are going into

1    effect or under consideration by the board at

2    this time primarily concerned with medical

3    marijuana?

4           A.    No.

5           Q.    You mentioned that when you

6    receive a suspicious order report similar to

7    what we looked at in Exhibit 13, they can be

8    reviewed at weekly status -- or weekly intake

9    meetings.

10              Are suspicious order reports ever

11   discussed with any federal, state or local

12   entity?

13          A.    They could be as part of an

14   investigation.

15          Q.    So the only -- but the only time

16   that you would discuss, you, the board, would

17   discuss a suspicious order report with another

18   agency would be if it is elevated to an

19   investigation?

20          A.    Yes, ma'am.

21          Q.    And the entities or the agencies

22   with whom you would interface on the

23   investigation are the ones we've already talked

24   about, perhaps other regulatory boards, like

25   medical or veterinarian or dental or the

Page 191

1    federal law enforcement agencies?

2            A.   Or state -- or local law

3    enforcement agencies.

4            Q.   Has the board issued any guidance

5    to wholesale drug distributors regarding the

6    reporting of suspicious orders?

7            A.   Not that I can recall.  You're

8    specifically talking about wholesale?

9            Q.   I'm going to get to others, but I

10   need to do it one at a time.

11           A.   Okay, sorry.  Wholesale, not that

12   I can recall, any specific guidance for the

13   wholesalers.

14           Q.   To other distributors has the

15   board issued any guidance as to the reporting

16   of suspicious orders?

17           A.   Can you ask that question again?

18           Q.   I'm sorry, that was a bad

19   question.

20               So to TDDDs, have there been any

21   guidance given -- has there been any guidance

22   given with respect to suspicious order

23   monitoring?

24           A.   No, ma'am.

25           Q.   OAC 4729-9-16 is the code

Page 192

1   provision that pertains to the reporting of

2   suspicious orders, correct?

3           A.    Okay.

4           Q.    Is that right?  Do you know that?

5           A.    I don't know it off the top of my

6   head.

7           Q.    Fair enough.

8           A.    If you had a copy of it --

9           Q.    I'll see if I have a copy of it.

10          A.    -- I could verify it.

11          Q.    Okay.

12          A.    I believe it is.

13          Q.    Okay.  Let's take a look at

14  Exhibit E, please.  Pardon me, tab U.  I beg

15  your pardon.

16                (Thereupon, Defendants' Exhibit

17  Number 15, Minutes of the December 8-9, 2008

18  Meeting of the Ohio State Board of Pharmacy,

19  was marked for purposes of identification.)

20  BY MS. BROWNE:

21          Q.    Exhibit 16 (sic) is the Minutes of

22  the December 8th through 9th, 2008 Ohio State

23  Board of Pharmacy Meeting.  Do you see that?

24          A.    Yes, ma'am.

25          Q.    If you -- it's bearing production

Page 193

1  OhioPharmMins_16, and there are no page

2  numbers, so about ten pages in -- I think you

3  just passed it.  Ten pages in is the -- sets

4  out 4729-9-16, minimum requirements for

5  wholesalers.  Do you see that?

6          A.   Yes, ma'am.

7          Q.   And this reg is a number of pages,

8  but just generally is it your understanding

9  that this code provision includes the

10  requirements for wholesalers to report

11  suspicious orders?

12               And I'll give you a hint,

13  paragraph H(1)(e) applies to suspicious orders.

14          A.   Yes, ma'am.

15          Q.   These regs are reported in the

16  2008 minutes of the Board of Pharmacy.  Do you

17  know if this provision has been updated since

18  2008?

19          A.   I don't know.  I know it's -- a

20  new provision will be effective April 15th of

21  these rules.

22          Q.   So a new provision of 4729-9-16 is

23  going to become effective as of April 15th,

24  2019?

25          A.   Yes, ma'am.

1        Q.   Do you know if the provision

2   related to suspicious orders specifically, so

3   in this reg it's paragraph H(1)(e), is going to

4   change at all?

5        A.   Yes, ma'am.

6        Q.   Do you know how?

7        A.   Yeah.  So there will be a

8   requirement for the wholesalers to report if

9   they cut off a company, they must do due

10  diligence on knowing the customer and the fact

11  of not so much their specific business model,

12  but knowing, you know, are they a cash entity

13  business, different types of indicators or due

14  diligent requirement for the wholesalers.

15       Q.   If you turn to page 1 of Exhibit

16  14 (sic), it notes that these rules that we are

17  looking at were made effective as of January

18  1st, 2009.  Do you see that?  It's at the very

19  bottom of the page, R-2009-124, Mrs. Gregg

20  moved that the rules be approved?

21       A.   Okay.  Yes, ma'am.

22       Q.   Since January 1, 2009, do you know

23  if there has been any guidance given to

24  wholesale drug distributors about this

25  provision 4729-9-16 by the board?

1          A.    I don't know.

2          Q.    You don't know one way or the

3     other?

4          A.    I don't.

5          Q.    Who would know that?

6          A.    Since 2009, it could be

7     Mr. Winsley, it could be Mr. Parker, or

8     Mr. Keeley as he was the one that was -- it

9     looks like presented the rules.

10         Q.    Would Mr. McNamee know?

11         A.    I don't know.  He was -- I don't

12    know when he started with the board, but he

13    hasn't been here that long.

14         Q.    You can set that aside.

15              So we've just talked a little bit

16    about requirements of wholesale distributors,

17    at least with respect to suspicious ordering.

18              Do you have an understanding as to

19    the professional obligations of pharmacists who

20    are authorized by the board to dispense

21    prescription opioid medications?

22         A.    I do.

23         Q.    And what are those?

24         A.    They have to perform the

25    prospective drug utilization that's spelled

1  out, which includes ensuring that there is not

2  over-utilization, the prescription is issued

3  for a legitimate medical purpose.  They must do

4  a DUR on that, making sure there's no drug

5  interactions.  In some incidences they would be

6  required to check OARRS.  And then there has to

7  be -- obviously under the manner of issuance,

8  the label has to be correct, right drug, right

9  quantity, right directions have to be on it

10  before it is dispensed to the patient.

11          Q.   And what does DUR stand for?

12          A.   Drug Utilization Review.

13          Q.   If we turn back to Exhibit 14,

14  this one is easier, it's about the -- there it

15  is (indicating).

16          A.   Sorry.

17          Q.   Nope.  Was that 14?  It's the one

18  I just --

19          A.   16.

20          Q.   I'm sorry, 16.

21              MS. BROWNE:  Is that right, that

22  was 16?

23              MR. WAKLEY:  15.

24              MS. BROWNE:  No, it wasn't.  It

25  should have been --

Page 197

1                MR. WAKLEY:  The '09 -- or the '08

2      minutes?

3                MS. BROWNE:  The '08 minutes.

4                MR. WAKLEY:  Those are 15 by my

5      count.

6                THE WITNESS:  I have it as 16 on

7      mine.

8                MR. RUIZ:  It's 15.

9                MS. BROWNE:  Just so the record is

10     clear, the minutes of the December --

11               Is that what you have as the next

12     -- Christy, as the next exhibit?  Do you have

13     that?  I think it is 15.

14               So the minutes of the December 8th

15     to 9th, 2008 Board of Pharmacy meeting bearing

16     OhioPharmMins_0016 is Exhibit 15 and we were

17     talking about that when we were talking about

18     the code provision 4729-9-16 that pertains to

19     wholesalers.

20     BY MS. BROWNE:

21          Q.   If you look back at that Exhibit

22     15 on the third page, the top of the page is

23     4729-5-10, prescription pick-up station.

24          A.   Okay.

25          Q.   Are you with me?

1        A.    Yes, ma'am.

2        Q.    No pharmacist shall accept
3  prescriptions obtained from a place which
4  offers in any manner its services as a pick-up
5  station or intermediary for the purpose of
6  having prescriptions filled unless such place
7  is a pharmacy.

8              What is a pick-up station?  What
9  is that?

10       A.    Why is this a rule?

11       Q.    Yeah.

12       A.    Okay.  I believe that this rule
13  has since been changed, but in some incidences
14  when a doctor is going to prescribe a
15  medication for an injection there was rules
16  that the prescription had to go straight to the
17  patient.  In some incidences they wanted to be
18  able to have the prescription, instead of going
19  to a patient's residence where then the patient
20  would carry it into a procedure and it wouldn't
21  be stored properly and everything like that, an
22  ability for a compounded medication or a
23  prescription to be sent to a facility, such as
24  a doctor's office, and it could be held for
25  that patient.

```
 1              Does that make sense?
 2         Q.    It does.
 3         A.    Okay.
 4         Q.    So I was just -- I was trying to
 5    figure out what this was meant to address, but
 6    this isn't necessarily an opioid-related thing;
 7    this is --
 8         A.    No, this is white bagging, brown
 9    bagging.
10         Q.    In general, how are rules -- how
11    are the Board of Pharmacy rules enforced?  I
12    mean, for example, this pick-up station rule,
13    how would that have been enforced?
14         A.    During an inspection it could have
15    been noticed that, hey, there's patient-specific
16    drugs here at this location, where is your
17    pick-up -- you know, are you complying with the
18    pick-up station rule.
19         Q.    And the prior page, 4729-3-02,
20    registration as a pharmacy intern, how is that
21    enforced, this rule?
22         A.    02, the registration?
23         Q.    Yes, sir.
24         A.    So if you're in pharmacy school
25    they require you to do intern hours, and before
```

Page 200

1    you can work into a pharmacy you would have to

2    be registered as a registered pharmacy intern

3    with us and it's a licensure process.

4           Q.   I know that you mentioned that the

5    wholesaler rule is one of the rules that's

6    changing as of April 15th of this year and you

7    also said the pick-up station rule that we've

8    just looked at that was in effect as of January

9    1st, 2009 is no longer in the same form?

10          A.   Yeah, there's been changes to it.

11          Q.   Are there other rules directed

12   toward pharmacists specifically that are going

13   to be changed as of April 15th, 2019?

14          A.   I'm not sure of the exact rule

15   effective dates that are going into effect, but

16   I'm sure there are.

17          Q.   So the rule as to the wholesalers,

18   that's just -- that's one rule that's being

19   effective as of April 15th, but it's not that

20   there is a wholesale rule change going into

21   effect on April 15th, 2019?

22          A.   I don't understand your question.

23          Q.   Is there more than one rule that's

24   being changed as of April 15th, 2019?

25          A.   I don't know what other rules are

1   going into effect on that day.  There could be

2   other ones.  We're continually updating our

3   rules on a regular basis.

4         Q.    Okay.  But you do know that the

5   provision as to the wholesalers is being

6   changed?

7         A.    Yes, ma'am.

8         Q.    And we've looked at some changes

9   in Exhibit 14 about rule updates, correct?

10        A.    Yes, ma'am.

11        Q.    Other than the rule updates that

12  we looked at from 2017, and I know we didn't go

13  through all of them, but what's set forth as of

14  January 1st, 2009 in Exhibit 15, have there

15  been other updates to rules or regulations that

16  cover pharmacists?

17        A.    Yes, ma'am.

18        Q.    When?

19        A.    I couldn't -- again, we are tasked

20  to review all of our rules over a certain time

21  period.  Again, there's been consistent change

22  of our rules over the last several -- since

23  I've been at the board.

24        Q.    There isn't a given period when

25  rule making changes are made; for example, we

Page 202

1  review rules annually and so annually a rule is

2  changed?

3         A.    Sometimes there is more activity,

4  but some of them are also legislatively

5  dictated, it's not just rules.  Some of it is

6  legislatively dictated where changes are

7  requested to be made, or there's different

8  legislative changes that dictate us to

9  promulgate rules for a certain thing or change

10 rules for a certain thing.

11         So it's not just they're changed

12 on an annual basis or anything like that.

13 Sometimes there's other extenuating

14 circumstances.

15         Q.    Can you give me an example of a

16 legislatively dictated rule change?

17         A.    House Bill 93 2011 dictated that

18 we license PMCs and we set -- promulgate rules

19 for that also.

20         Q.    Other than the rule and regulation

21 promulgation that is done with the board

22 itself, I think you answered this, but does the

23 board ever assist the medical or the dental or

24 the nursing boards with the promulgation of

25 their rules?

1          A.    They may have some consultation.

2     We try not to make sure that they conflict

3     (sic).  We also have external stakeholders that

4     assist in the rulemaking process.

5               MS. BROWNE:  Want to take a break?

6               THE VIDEOGRAPHER:  We're off the

7     record.

8               (Recess taken.)

9               THE VIDEOGRAPHER:  We're on the

10    record.

11    BY MS. BROWNE:

12          Q.    Welcome back, Mr. Griffin.

13          A.    Thank you.

14              (Thereupon, Defendants' Exhibit

15    Number 16, Ohio State Board of Pharmacy

16    Newsletter Dated November 2014, was marked for

17    purposes of identification.)

18    BY MS. BROWNE:

19          Q.    I'm showing you what has been

20    marked as Exhibit 16.  This is November 2014

21    Ohio State Board of Pharmacy Newsletter.  I

22    pulled this off your website.

23              Have you seen this document

24    before?

25          A.    I have seen the newsletters.  I

Page 204

1    can't recall if I've seen this specific one.

2          Q.   Who is the audience of these

3    newsletters?

4          A.   The licensees.

5          Q.   How often are they issued?

6          A.   I believe they're monthly.

7          Q.   Who is responsible for issuing

8    them?

9          A.   We use a service through NABP;

10   however, Mr. McNamee creates some content with

11   the executive director's input.

12         Q.   And NABP is the National

13   Association of Boards of Pharmacy, correct?

14         A.   Yes, ma'am.

15         Q.   If you turn to the second page --

16   second to third page of the newsletter, the

17   newsletter bears the seals of the CPSC, the

18   FDA, the DEA and the NABP.  Do you see that?

19         A.   Yes.

20         Q.   Is the newsletter cleared with

21   these agencies before it's issued?

22         A.   I don't believe it's cleared with

23   them.  I think -- I don't know how it works

24   exactly.  I know that we submit them

25   information that we would like included and

Page 205

1    then it is sent out from there.

2           Q.   When you say them and it is sent

3    out from there, are you talking about the NABP?

4           A.   Yeah, NABP has a service for the

5    Boards of Pharmacies.

6           Q.   What role, if any, does the

7    Consumer Product Safety Commission have in the

8    issuance of the Board of Pharmacy newsletter?

9           A.   I don't know.

10          Q.   What about the FDA, what role do

11   they have?

12          A.   I don't know, other than the NABP

13   is putting updated information from those

14   organizations in the newsletter.

15          Q.   What would you -- what is the

16   purpose of these newsletters?

17          A.   Information, education.

18          Q.   If you look back at page 1 of this

19   document in the second column, the second full

20   paragraph starts, another new law enacted by

21   the General Assembly, HB 341, requires a

22   prescriber prior to issuing a prescription for

23   an opioid analgesic or benzodiazapine to query

24   the OARRS database.  It also requires all

25   pharmacists to register with OARRS by September

1  15th, 2015.

2           Did I read that correctly?

3      A.   Yes, ma'am.

4      Q.   It goes on to note the

5  circumstances under which a check of OARRS is

6  required.  Do you see that?

7      A.   Yes, ma'am.

8      Q.   There are five of them, receiving

9  reported drugs from multiple prescribers,

10  receiving reported drugs for more than twelve

11  consecutive weeks, abusing or misusing reported

12  drugs, requesting the dispensing of reported

13  drugs from a prescription issued by a

14  prescriber with whom the pharmacist is

15  unfamiliar, presenting a prescription for

16  reported drugs when the patient resides outside

17  the usual pharmacy geographic population.

18           Did I read that correctly?

19      A.   Yes, ma'am.

20      Q.   And are those all instances or

21  examples of diversion?

22           MS. RANJAN:  Object to form.

23           THE WITNESS:  Do what?

24  BY MS. BROWNE:

25      Q.   You can answer.  She's objecting

1  for the record.

2          A.   I wouldn't say that these are all

3  instances of diversion; however, these would be

4  requirements on the prescriber to -- I think

5  they're red flags for the prescriber; however,

6  receiving reported drugs from multiple

7  prescribers could be diversion, abusing or

8  misusing obviously could be diversion.  Again,

9  these are more red flags than they are examples

10  of diversion.

11          Q.   And this goes on to note that, in

12  conclusion, it's the pharmacist and not the

13  employer or supervisor or fellow employee who

14  is held accountable for making an independent

15  judgment to ensure that a prescription

16  presented at the pharmacy is legitimate?

17          A.   Correct.

18          Q.   And the reason that this is

19  directed towards physicians and individual

20  pharmacists is that those individuals are the

21  ones who could immediately see if a patient is

22  doctor shopping, right?

23          A.   They could, but it also is

24  directed at them because they are the first

25  line and OARRS is a clinical tool where they

1  could see some of these different types of red

2  flags.

3          Q.   Well, nobody else can see OARRS

4  except for a doctor, a pharmacist -- or have

5  access to OARRS except a doctor or pharmacist

6  or the board, correct?

7          A.   That's incorrect.  Their delegates

8  can have access, so a physician can have a

9  delegate run an OARRS report, a pharmacist can

10 now have a delegate that can run an OARRS

11 report for them.

12         Q.   But the delegate is inside the

13 pharmacy, right?

14         A.   Correct, yes.

15         Q.   It's not a corporate

16 representative?

17         A.   Correct.

18         Q.   So in addition to this -- I'm

19 sorry, the legislation, the report or the

20 newsletter also provides information about

21 changes in DEA or changes from DEA, correct;

22 for example, on page 2, DEA reschedules

23 hydrocodone combination products as Schedule

24 II?

25         A.   Yes, ma'am.

Page 209

1          Q.   And then it also includes
2    information about changes that are coming out
3    of FDA, correct; for example, on page 3, FDA
4    lowers recommended starting dose for Lunesta
5    due to risk of morning impairment?
6          A.   Yes, ma'am.
7          Q.   Back to page 1, the sub (1) reads
8    receiving reported drugs from multiple
9    prescribers.  The board is the only entity that
10   can see whether an individual is receiving
11   reported drugs from multiple prescribers,
12   right?
13         A.   Well, a pharmacist and a patient
14   profile could see that without utilizing OARRS.
15         Q.   Without utilizing OARRS, how?
16         A.   Because if you go there as a
17   patient and you go to a dentist one week and
18   you go to your general practitioner one week
19   and they give you two prescriptions, it's going
20   to be on file with the pharmacy.
21         Q.   What if you don't go to the same
22   pharmacy?
23         A.   Well, then it would not be, but a
24   pharmacist receiving twelve weeks, if you are a
25   regular patient, you may have varying

```
 1   prescribers.
 2         Q.   Sure, but I was talking about
 3   number (1), receiving reported drugs from
 4   multiple prescribers.
 5         A.   Uh-huh, the pharmacist.
 6         Q.   So if I have multiple -- just bear
 7   with me for one second.
 8         A.   Okay.
 9         Q.   If I have three prescriptions for
10   hydrocodone, I got one from an orthopedic
11   surgeon, one from a neurologist and one from my
12   primary care, and I went to three different
13   pharmacies to get them filled --
14         A.   Right.
15         Q.   -- the board is going to know
16   that, but the pharmacy -- the pharmacist at
17   pharmacy A, pharmacy B and pharmacy C won't
18   know that I've gone to three different
19   pharmacies with the same prescription, will
20   they?
21         A.   In that scenario that would be
22   correct, unless they are all with the same
23   chain.
24         Q.   Well, I'm smarter than that.
25         A.   Okay.
```

Page 211

1          Q.   So if I'm going to Joe's pharmacy

2    with one hydrocodone prescription, Ed's

3    pharmacy with the second prescription and Mary

4    Jane's pharmacy with prescription three,

5    they're all independent pharmacies, the only

6    entity that knows that I've got three

7    prescriptions for hydrocodone at the exact same

8    time is the board, right?

9          A.   Yes.  However, I would also say

10   the insurance provider, if insurance was

11   utilized.

12         Q.   Is there any way to -- looking

13   back, I'm sorry, at Exhibit 16, is there any

14   way for the board to monitor compliance with

15   that regulation other than by using OARRS?

16         A.   Compliance with this regulation?

17         Q.   Yeah, with 4729-5-20.

18         A.   I wouldn't see how.

19         Q.   If the board determines that a

20   pharmacist has failed to abide by this code

21   provision --

22              Well, let me ask you this:  How is

23   it determined that a pharmacist has failed to

24   abide by this code provision?

25         A.   We would have to do an

1    investigation and review the OARRS request

2    verse the dispensing request and then go to the

3    pharmacy and look at the original records, such

4    as the prescription, dispensing logs, patient

5    profiles.

6         Q.    But in the first instance how

7    would you know?  How would you know that a

8    violation occurred?

9         A.    We wouldn't.  A violation of

10   4729-5-20, we wouldn't know a violation

11   occurred other than potentially a patient that

12   is getting a new prescription wasn't ran at

13   all, but to -- the issue is that the OARRS

14   requests are done specifically by the

15   pharmacist, the dispensing is specifically to

16   the pharmacy.

17        Q.    So, for example, if a pharmacist

18   is filling or dispensing prescriptions from

19   multiple prescribers for the same opioid to one

20   customer/patient, is a report automatically

21   generated to flag that for the board?

22        A.    There's no way for us to know.

23   OARRS doesn't -- again, they're not linked.

24        Q.    So if a customer is going to the

25   pharmacy and receiving multiple prescriptions

1    from multiple prescribers for an opioid

2    medication, the only way the board would become

3    aware of that is if somebody happened to look

4    at it in OARRS or it received a complaint?

5            A.   So I think you're asking two

6    separate questions.

7            Q.   Okay.

8            A.   Your first one was specific to a

9    pharmacist, where OARRS is not linked to the

10   pharmacist.  It is linked -- OARRS dispensing

11   is not linked to the specific pharmacist.

12   OARRS checks our link to the specific

13   pharmacist, but not the specific pharmacy.

14           Q.   But it's the pharmacist with -- or

15   his or her delegate who has the --

16           A.   Right.  So the second question is

17   if they come to -- if they come to the pharmacy

18   and they're receiving multiple prescriptions

19   from different doctors, the pharmacist would

20   have to check OARRS.  If you go with the same

21   scenario where they're all independent

22   pharmacies, how would the pharmacist know, they

23   would have to check OARRS.

24           Q.   I'm not talking about the

25   pharmacist, I'm talking about the board.  You

1    guys could see it.

2           A.    Okay.  So how would we see it,

3    yes.

4           Q.    So you would see it if you just

5    happened to be -- so that's what I'm asking, is

6    there an automatic flag?

7           A.    Absolutely.  That was the doctor

8    shopper report --

9           Q.    Okay.

10          A.    -- that comes up on a monthly

11   basis.

12          Q.    All right.

13          A.    And with doctor shoppers we've

14   dramatically reduced the numbers from the

15   thousands to a couple hundred.

16          Q.    We talked about the board

17   conducting hearings and reaching settlement

18   agreements, but after -- if the board conducts

19   a hearing and decides or determines to suspend

20   or revoke a license, is there an appeal

21   process?

22          A.    There is.

23          Q.    What is it?

24          A.    It would have to go to the county

25   court.

1            Q.    And who participates in appeals?

2            A.    I'm assuming the respondent, their

3    attorney, our Attorney General that represents

4    the board.

5            Q.    Is the appeal -- the issuance of a

6    suspension or a revocation of a license is

7    public, correct?

8            A.    Yes, ma'am.

9            Q.    Is the appeal public?

10           A.    I would assume so.

11           Q.    What is a pink sheet?

12           A.    Well, a pink sheet is a term from

13   when we used to do handwritten inspection forms

14   and I believe it was -- sheet number three was

15   actually pink in color and that was the one

16   that was left with the terminal distributor.

17   And if you received a pink sheet, that also

18   indicated that you had to provide a written

19   response or a corrective response to

20   deficiencies that were found in the pharmacy.

21           Q.    And does the board still issue

22   pink sheets?

23           A.    They have been renamed, due to

24   technology, to written warnings.

25           Q.    So the board does still issue

Page 216

1   written warnings, but they don't refer to them
2   as pink sheets?
3            A.    Yeah, we don't refer to them as
4   pink sheets.  We went -- in 2015 we developed a
5   digital web-based system for inspections, and
6   so hence the name change from a pink sheet to a
7   written warning.
8            Q.    Failure to report required
9   prescription data to OARRS is an offense that
10  would warrant a written warning?
11           A.    It depends under what
12  circumstances.  If it was an ongoing, it would
13  -- it would probably get -- or any failure to
14  report would get a written warning; however,
15  some of those would also get escalated up to a
16  citation review committee.
17           Q.    And how do you monitor for a
18  failure to report a required -- failure to
19  report prescription data to OARRS?  How do you
20  know that?
21           A.    That would be an OARRS question.
22  I don't know.
23           Q.    Do you know what a dangerous drug
24  inspection report is?
25           A.    Yes, ma'am.

1          Q.    What is it?

2          A.    That's our inspection report that

3    I've been referring to through the course of my

4    testimony.

5          Q.    We talked about the public

6    complaint earlier and that some of -- you've

7    even received complaints about my co-pay went

8    up, all sorts of things.  Have you received

9    complaints about specific hospitals or clinics

10   through that public complaint process?

11         A.    I'm sure we have.

12         Q.    Have you received complaints about

13   out-of-state facilities through that public

14   complaint forum?

15         A.    Yes, ma'am.

16         Q.    You've mentioned the National

17   Association of Boards of Pharmacy a couple

18   times today, one in which we talked about them

19   being part of the issuance of Exhibit 16, the

20   Board of Pharmacy newsletter.  And I think you

21   mentioned that you're also -- you, through the

22   board, participate on a task force with NABP;

23   is that correct?

24         A.    It was a working group for the

25   national sterile compounding inspection

Page 218

1    blueprint.

2           Q.    What is that?

3           A.    It was efforts by all the states

4    in NABP to standardize compounding inspections

5    of facilities in all the -- across the United

6    States; that way you had some comfort in

7    licensing out-of-state compounders.

8           Q.    Other than the work on the

9    newsletter and this compounding inspection

10   blueprint, have there been other times when the

11   board has collaborated with the NABP?

12          A.    I think we've collaborated with

13   NABP on a multiple of things.  I think we have

14   ongoing conversations with NABP, whether it's

15   model practice; however, formally being on a

16   committee or a task force or a work group, the

17   only other one that comes to mind is our

18   executive director was asked to chair a work

19   group on suspicious orders where other states'

20   representatives were among those.

21               They had also met with industry,

22   including the HDA, Healthcare Distribution

23   Alliance, in consultation, and made

24   recommendations to changes to the Model

25   Practice Act that NABP offers or utilizes.

Page 219

1        Q.   Do you know what changes to the

2   Model Practice Act were made?

3        A.   I don't know all of them.  I know

4   some of the highlights, again, were reporting

5   customers that were cut off, doing additional

6   due diligence on the customers of the

7   wholesalers and providing information in a

8   standard format.  I know I'm missing a couple

9   other ones.  Oh, and timely reporting.

10       Q.   Does the board have any role in

11  the enforcement of the Ohio Controlled

12  Substances Act?

13       A.   Yes, ma'am.

14       Q.   What is that?

15       A.   It's the same as our investigative

16  authority, investigating complaints involving

17  controlled substance, whether that's a theft,

18  whether it's illegal processing.

19            MS. BROWNE:  I may be done.  I

20  need to review my notes.  I don't know if any

21  of my colleagues have questions that they want

22  to ask while I take a look.

23            MR. MORIARTY:  I have some.

24            MS. BROWNE:  All right.  Want to

25  trade places here, Matt, or do you want me to

                                                        Page 220

1   try to throw you down a microphone?

2                  MR. MORIARTY:  Well, there's a

3   microphone here.  Is this for me or is this for

4   the telephone?

5                  THE VIDEOGRAPHER:  Yes, sir.  Go

6   ahead.

7                        *   *   *

8                  CROSS-EXAMINATION

9   BY MR. MORIARTY:

10          Q.   Ready?

11          A.   Yes, sir.

12          Q.   The disadvantage of going second

13   is that your notes are all over the place,

14   okay.

15                  So let me ask you, there have been

16   some meeting minutes already marked as

17   exhibits, and in order to try and avoid marking

18   more, let me just ask you a couple of general

19   questions.  At these board meetings are you

20   there at most of them, where these minutes are

21   kept and where they come from?

22          A.   No.  I will make an appearance at

23   the board meeting to give a report --

24          Q.   Okay.

25          A.   -- but I am not there for the

Page 221

1  entire board meeting.

2          Q.    Do you ever look at the minutes?

3          A.    Occasionally.

4          Q.    Are you aware that there, from

5  time to time, are people who make what are

6  called the legislative report to the board?

7          A.    I am aware of that.

8          Q.    And do you know if that has been

9  true for many years, going back into, say, the

10  1990s?

11          A.    I don't know that.

12          Q.    And the legislative report, I

13  assume, is somebody talking about what the Ohio

14  legislature may be considering talking about or

15  that they may, in fact, be voting upon in the

16  near future, correct?

17          A.    I believe so.

18          Q.    And then also the board in these

19  minutes, as Ms. Browne quizzed you about, has a

20  role in rulemaking; in other words, writing

21  parts of the Ohio Administrative Code?

22          A.    Yes, sir.

23          Q.    Has that been true for many years,

24  that the board has rulemaking or rule writing

25  authority?

1          A.   Ever since I've been employed at

2     the board, I believe so.

3          Q.   Do you know if that practice was

4     in place back in the '90s?

5          A.   I don't know.  I would assume so.

6          Q.   So if Ohio legislature in the

7     1990s passed some piece of legislation that

8     directly or indirectly impacted on the universe

9     that you at the board supervise, the board

10    could have some rule writing role --

11         A.   Yes, sir.

12         Q.   -- that goes into the Ohio

13    Administrative Code?

14         A.   Yes, sir.

15         Q.   I see from time to time in these

16    minutes that there are discussions of Mrs. Droz

17    presenting the Ohio Automated Prescription

18    Reporting System update?

19         A.   Yes, sir.

20         Q.   Is that somebody talking about

21    what's going on with OARRS?

22         A.   Yes, she was the OARRS

23    administrator prior to Mr. Garner.

24         Q.   And from time to time I see in the

25    minutes that there are references to a

1    particular provider of continuing education

2    applying to be -- I don't know whether you call

3    it a certified provider or a preferred

4    provider.  Have you seen that in the past?

5            A.   Yes.  I don't know if they're

6    certified or preferred either.  I think it's

7    just being recognized as a provider of CE.

8            Q.   But they have to apply, they're

9    not just -- they don't just automatically get

10   to set up shop and have pharmacists or other

11   licensees get the credit from them?

12           A.   Yes, sir.

13           Q.   You want to make sure that they

14   have some quality to them, correct?

15           A.   Correct.

16           Q.   Now, you have been asked about

17   some newsletters, and unfortunately a couple of

18   those I do want to mark.

19                MR. MORIARTY:  Can I have some

20   exhibit stickers?

21                MS. BROWNE:  That's 17.

22   BY MR. MORIARTY:

23           Q.   Would you agree with me that, so I

24   don't have to mark all of these, the newsletter

25   to some degree is involved in addressing the

Page 224

1    licensees and their continuing education

2    requirements, true?

3            A.   I believe so.

4            Q.   And the newsletters also discuss

5    as they do at the meetings and in their

6    minutes, changes in rules and updates from the

7    Ohio legislature?

8            A.   Yes, sir.

9                 (Thereupon, Defendants' Exhibit

10   Number 17, Ohio State Board of Pharmacy

11   Newsletter Dated May 2010, was marked for

12   purposes of identification.)

13   BY MR. MORIARTY:

14           Q.   Let me hand you what I've had

15   marked as Exhibit 17.  I'll put this up in the

16   right-hand corner because there's more room.

17                MR. MORIARTY:  One for the

18   witness, one for you, a couple more.  I don't

19   think I have enough for everybody.

20   BY MR. MORIARTY:

21           Q.   Is that an Ohio State Board of

22   Pharmacy newsletter from May of 2010?

23           A.   Yes, sir.

24           Q.   And you were working there at the

25   time?

Page 225

1          A.   Yes, sir.

2          Q.   In your role in enforcement did

3    you have anything to do with the drafting of

4    these newsletters?

5          A.   No, sir.

6          Q.   And tell me again, I think I

7    missed it, is it the national association that

8    has the primary role in drafting these?

9          A.   Yes.  The board of -- or the NABP,

10   the National Board of Pharmacy Association,

11   assists with drafting these.

12         Q.   And who would -- who from the Ohio

13   board would be providing the national

14   association with the Ohio-specific data?

15         A.   I believe that would be the

16   director of communication or legislative

17   affairs or the executive director.

18         Q.   All right.  Now, if you go to the

19   last page of this, there's a section called

20   corresponding responsibility is needed more

21   than ever.  Do you see that?

22         A.   Yes, sir.

23         Q.   And corresponding responsibility

24   has to do with the fact that there are several

25   different people or entities involved in making

1  sure the prescriptions are handled properly,

2  correct?

3          A.   Yes, sir.

4          Q.   And this indicates, as many of you

5  know, we are having a tremendous problem in

6  Ohio with so-called pain clinics who are doing

7  nothing but providing large amounts of

8  controlled substances, particularly oxycodone

9  and hydrocodone, to people who have no

10  legitimate medical need for them.  Do you see

11  that?

12          A.   Yes, sir.

13          Q.   And then it goes down to talk

14  about in several areas of Ohio the abuse and

15  misuse of these drugs has reached epidemic

16  proportions, and then it goes on.

17              Did I read that correctly, by the

18  way?

19          A.   Hold on.  I'm looking for where

20  you were.

21          Q.   I just went down maybe four lines

22  from the first part I read.  In several areas

23  of Ohio.

24          A.   Yes.  Okay.  Yes, sir.

25          Q.   I read that correctly?

Page 227

1          A.   Yes, sir.

2          Q.   So even back in 2010 they were

3    referring this to -- to this as an epidemic?

4          A.   Yes, sir.

5          Q.   And were they referring -- they,

6    or you in your job there from 2008 to 2010,

7    referring to it as an epidemic?

8          A.   I'm sure I was.

9          Q.   Before 2008 in your role -- in

10   your various other roles, were you referring to

11   it as an epidemic, even from what you knew as a

12   sheriff's deputy?

13         A.   I would not have known the level

14   of detail of abuse of prescription drugs.  I

15   would not say that I would at that point in

16   time have the knowledge that I did once I

17   joined the board.

18         Q.   You saw it locally in Delaware

19   County, and then when you got to the board you

20   realized this is going on all over the place?

21         A.   Correct.

22         Q.   And this is the point at which

23   Governor Strickland was issuing an executive

24   order creating the drug task force, correct?

25         A.   According to this, yes, sir.

1          Q.    All right.  You can put that one

2     aside, and let me just mark this one as Exhibit

3     18.

4                 (Thereupon, Defendants' Exhibit

5     Number 18, Ohio State Board of Pharmacy

6     Newsletter Dated May 2011, was marked for

7     purposes of identification.)

8     BY MR. MORIARTY:

9          Q.    This is the following year in May.

10    Do you have that Number 18 in front of you?

11         A.    Yes, sir.

12         Q.    On the first page of this one,

13    does it say corresponding responsibility is

14    needed more than ever?

15         A.    Yes, sir.

16         Q.    Then it refers to last May's

17    newsletter, the one I just marked as Exhibit

18    17, correct?

19         A.    Yes.

20         Q.    And then it goes through a

21    discussion very similar to what was in the May

22    2000 -- I'm sorry, the 2010 version, correct?

23    If you follow the article --

24         A.    Yeah, I've got to switch to page

25    4.

Page 229

1           Q.    Right?

2           A.    Yes, sir.

3           Q.    Okay.  And it's talking about the

4    board has had calls from pharmacies as far away

5    as Virginia and South Carolina asking about the

6    legitimacy of prescriptions, right?

7           A.    Yes, sir.

8           Q.    And then House Bill 93 was sort of

9    imminent at that point, correct?

10          A.    Yes.

11          Q.    That's all I want to ask you about

12    that one.

13                Now, as I understand it,

14    compounding pharmacies have traditionally in

15    the United States been inspected and regulated

16    by state boards of pharmacy; is that true?

17          A.    Yes, for the most part.

18          Q.    But manufacturers of

19    pharmaceuticals are traditionally regulated by

20    the FDA, correct?

21          A.    Correct.

22          Q.    Have you as a member of the Board

23    of -- or an employee of the Board of Pharmacy

24    ever had communication directly with

25    pharmaceutical manufacturers?

Page 230

1          A.    If I had communication with a
2   manufacturer, it would have been -- I don't
3   recall any of the big manufacturers.  It would
4   probably be a virtual manufacturer or a smaller
5   manufacturer.
6          Q.    Okay.  Have you ever sought to
7   investigate what you consider one of the big
8   manufacturers?
9          A.    Not to my knowledge.
10         Q.    Let me just flip through my notes.
11         A.    No problem.
12         Q.    I don't have that much more.
13               When you said that you were one of
14   the drug task force commanders --
15         A.    Yes, sir.
16         Q.    -- plural --
17         A.    No, no, just one.
18         Q.    Okay.
19         A.    There's only one.
20         Q.    Were you collaborating with the
21   task force commanders in other counties?
22         A.    Oh, yes, on a regular basis.  I
23   apologize.  There's an association for the Ohio
24   Task Force -- Drug Task Force Commanders
25   Association, so all of the drug task forces

Page 231

1  across the state, their commanders had an

2  association and we collaborated together.

3          Q.   So remind me in what years you

4  were involved in that.  Was that 2000, 2002,

5  back that far?

6          A.   It would have been 2002 -- 2002,

7  2003 to 2005, 6.  And then I still oversaw the

8  drug task force even as a lieutenant; however,

9  there was an operations commander in charge.

10         Q.   How many of our 88 counties back

11 then had drug task forces with which you

12 collaborated?

13         A.   It varied between, I think, the

14 numbers of 24 and 28 --

15         Q.   Were -- go ahead.

16         A.   -- that were sort of local task

17 forces that operated across the state.  That

18 doesn't include some of the federal task forces

19 that went on.

20         Q.   Was Cuyahoga County one with which

21 you collaborated?

22         A.   I think they had a couple

23 different task forces within Cuyahoga County.

24 The Caribbean/Gang Task Force was based out of

25 Cuyahoga County and also the Seal Drug Task

Page 232

1   Force was based out of Cuyahoga County.  Those

2   are the two that I can remember off the top of

3   my head.

4           Q.    That you collaborated with?

5           A.    Yes.

6           Q.    Did Summit County have a task

7   force that you collaborated with?

8           A.    They did.

9           Q.    You and Ms. Browne were talking

10  about these reports that have been run in the

11  last few years that compared overdose deaths

12  with OARRS reports.

13          A.    Yes, sir.

14          Q.    I have a couple of questions about

15  that.

16          A.    Okay.

17          Q.    When she asked you, you didn't

18  know if those reports had ever been made

19  public.  Have you checked into that or thought

20  more about it since she asked you about that

21  hours ago?

22          A.    I have not checked into it or

23  thought any more about it.

24          Q.    Do you know anything about the

25  methodology by which those statistics were run

Page 233

1   or compared?

2            A.    I do not know.

3            Q.    You were just given raw data,

4   that's it, or the end product?

5            A.    Yes, sir.

6            Q.    Who at the Board of Pharmacy would

7   know the most about how those reports were run,

8   compiled and analyzed?

9            A.    Chad Garner.

10           Q.    Ms. Browne asked you about Exhibit

11  5, which is this news article about the

12  pressure from the Governor's office for a

13  director of the Board of Pharmacy to resign.

14  Do you remember that?

15           A.    Yes, sir.

16           Q.    Okay.  Are you aware of any

17  correspondence from the Governor's office which

18  indicated that their office was unhappy with

19  either the board, the employees of the board,

20  or the executive director?

21           A.    Am I aware of any correspondence?

22           Q.    Yes.  For example, did you

23  personally see a memo or a letter or a

24  directive indicating that the Governor's office

25  was unhappy with the board or someone in the

1  board's office?

2        A.   I never directly saw a memo or any

3  type of correspondence or directives.

4        Q.   Well, did you ever see one

5  indirectly?

6        A.   Or indirectly, no, I did not.  I

7  did not see any correspondence.

8        Q.   Was that ever discussed as a

9  meeting -- at a meeting?

10        A.   Not specific correspondence;

11  however, we had got the information from the

12  executive director at the time, which would

13  have been Kyle Parker.

14        Q.   Okay.  So the gentleman who was

15  being pressured is the one who gave you the

16  information?

17        A.   Correct.

18        Q.   Okay.  What current employee at

19  the Board of Pharmacy would know the most about

20  that incident?

21        A.   I don't know if we have one.

22        Q.   Okay.  Let me ask it a different

23  way.  I think the allegation in the article,

24  without reading it again, was that the director

25  was sitting on his hands regarding the opioid

Page 235

1    crisis.

2              What current employee would know

3    the most about whether the then-director was or

4    was not sitting on his hands in some way

5    regarding the opioid crisis?

6         A.   I think I could answer that.

7         Q.   Okay.  So was the then-director

8    sitting on his hands in some way?

9         A.   I didn't feel like he was.  I

10   think we were utilizing all of our resources

11   for a small agency to do as much as we possibly

12   can.  I think that -- I don't know if at his

13   level there was the same type of cooperation

14   between the different regulatory boards.  And

15   we definitely had a change in -- some change in

16   directives after Kyle left; however, I don't

17   know that he was sitting on his hands.  We

18   weren't ordered not to investigate anything or

19   not to do anything like that.  I just think the

20   Governor's office wanted things done faster.

21        Q.   Okay.  Now, you referred to some

22   external stakeholders who helped in the

23   rulemaking process.

24        A.   Yes, sir.

25        Q.   Name some categories of people or

Page 236

1   entities who would be external stakeholders in

2   that process.

3          A.   Sure.  So they have a rules review

4   committee that pharmacists and associations can

5   apply, so they do sort of a pre-draft of the

6   rules.  They preview it to the committee; for

7   an example, hospital pharmacist, if it's going

8   to affect institutional pharmacy they're going

9   to want to get experts from the institutional

10  world, associations, Ohio Pharmacist

11  Association, OSHP, the Ohio Hospital Pharmacist

12  Association.  I think there's an American

13  Pharmacist -- Hospital Pharmacy Association,

14  the HDA, the Healthcare Distributor

15  Association.  There's several, several --

16          Q.   Okay.

17          A.   And they provide feedback and we

18  make changes to those feedbacks.  We have open

19  discussions about it.  Sometimes they'll put it

20  in writing, sometimes it's just verbal in a

21  meeting.

22          Q.   Okay.  And you're not getting

23  feedback from pharmaceutical manufacturers?

24          A.   I don't -- I couldn't tell you if

25  there was or wasn't anybody from pharmaceutical

1  manufacturers in any of those meetings.

2          Q.   Now, I thought I understood OARRS

3  and then I got confused when you two were

4  talking about going to Jane's pharmacy and all

5  those, so let me ask you a pretty simple

6  question.

7               In Mrs. Browne's example where one

8  person goes to three different pharmacies to

9  fill a prescription of a scheduled drug, OARRS

10 would detect that if the pharmacist or the

11 doctor checked OARRS, correct?

12         A.   They could.

13         Q.   Okay.

14         A.   You're asking if OARRS can

15 determine that a pharmacist or a physician

16 checked OARRS?

17         Q.   No.  They would -- a pharmacist or

18 physician checking OARRS would know that the

19 patient in front of them had been to several

20 different pharmacies to get prescriptions

21 filled?

22         A.   Yes, sir.

23         Q.   Okay.  So the three people who

24 would know that if they check OARRS are the

25 board, the pharmacist, and the doctor?

Page 238

1           A.    Correct.

2           Q.    And even if it happened in

3    relatively short period of time, that data

4    should be entered and available promptly,

5    correct?

6           A.    Yes, we -- I can't remember the

7    year that we went to daily reporting, but it

8    wasn't -- OARRS wasn't always a daily reporting

9    program.  I can't remember the time period

10   prior to it, but sometimes there was a delay

11   early on when OARRS first --

12          Q.    Got it.  And you said that the

13   doctor shoppers report had reduced the number

14   from the thousands to the hundreds.

15          A.    Yes, sir.

16          Q.    The number of doctor shoppers?

17          A.    On the list.  However, the list is

18   only as good as the data entry, so you have to

19   verify all of that information, and sometimes

20   there are errors in it because a human is

21   typing that information in.

22          Q.    Sure.

23          A.    So sometimes what comes on the

24   doctor shopper list may be wrong.

25          Q.    And some new ones can come on?

Page 239

1          A.    Oh, absolutely.

2          Q.    Okay.  But when you said the

3    number, you were talking about the number of

4    human beings who were being categorized as

5    doctor shoppers?

6          A.    Yes, sir.

7          Q.    You talked about over-utilization

8    and over-prescribing.  If the board finds out

9    through some complaint process or its own

10   checking of statistics that there is somebody

11   who is over-prescribing, does the board

12   investigate that?

13         A.    Yes.

14         Q.    That's the type of thing that the

15   board can investigate?

16         A.    Yes, sir.

17         Q.    Is over-prescribing itself

18   something that someone can be disciplined for?

19         A.    We would investigate it solely as

20   a criminal matter to see if it was not for a

21   legitimate medical purpose and we would

22   investigate it in that manner.  If it did not

23   reach that scope or that threshold, we would

24   refer it to the medical board for

25   administrative action, and most likely from the

Page 240

1  beginning of it the medical board would have

2  been involved.

3          Q.   Okay.  So when Ms. Browne asked

4  you about this task force report, Exhibit 6 --

5          A.   Yes, sir.

6          Q.   -- she asked you based on page --

7  the bottom of page 4 about the causes, and you

8  said two things; you said diversion and

9  over-prescribing.  That's what you said.  Okay?

10          A.   Okay.

11          Q.   Do you remember that?

12          A.   Yes, sir.

13          Q.   So diversion is clearly illegal,

14  correct?

15          A.   Yes.

16          Q.   And over-prescribing, if properly

17  investigated and proven, is also unlawful,

18  correct?

19          A.   Yes, it can be illegal.

20          Q.   All right.  And the report on the

21  next page, 5, doesn't get into

22  over-prescribing; it just talks about three

23  forms of diversion, being doctor shop -- I'm

24  sorry, two forms, doctor shopping and pill

25  mills, correct?

1          A.   Yes.

2          Q.   Based on what you know and what is

3    in this task force report, it's clear that the

4    epidemic or crisis, whatever term you want to

5    put on it, was multi-factorial, correct?

6          A.   Yes.

7          Q.   I would assume that neither -- you

8    never assigned any percentage as to what of the

9    many factors contributed to it, correct?

10         A.   I did not.

11         Q.   Do you think it would be

12   impossible to do that?

13         A.   Yeah, yes.

14         Q.   Based on what you've told me,

15   diversion would be a large percentage, correct?

16         A.   Diversion and over-prescribing.

17         Q.   Those would be the majority,

18   correct?

19         A.   Yes, sir.

20              MR. MORIARTY:  Thanks.  That's all

21   I have.

22              MS. MCNAMARA:  I just have a

23   couple of questions.

24                     *   *   *

25                   CROSS-EXAMINATION

Page 242

1   BY MS. MCNAMARA:

2          Q.   Mr. Griffin, my name is Colleen

3   McNamara.  I represent Cardinal Health.  I just

4   have a couple of questions for you.

5                  (Thereupon, Defendants' Exhibit

6   Number 19, Settlement Agreement with the State

7   Board of Pharmacy in the matter of Cardinal

8   Health 110, Inc., was marked for purposes of

9   identification.)

10  BY MS. MCNAMARA:

11         Q.   I'm passing you down the long

12  table what I've marked as Exhibit 19, and this

13  is a document that's Bates labeled BOP_MDL 1st

14  Production_0110318.  It's a settlement

15  agreement with the State Board of Pharmacy in

16  the matter of Cardinal Health 110,

17  Incorporated.  Do you see that?

18         A.   Yes, ma'am.

19         Q.   Have you seen this document

20  before?

21         A.   Yes.

22         Q.   And do you recall earlier in the

23  day you testified that Cardinal Health had been

24  disciplined by the Board of Pharmacy back in

25  2008?

Page 243

1          A.    Yes, ma'am.

2          Q.    And is the settlement agreement

3    that I've handed to you the matter that you

4    were referring to earlier today?

5          A.    If you don't mind me reading over

6    it.

7          Q.    Go for it, and I apologize for the

8    toner issue.

9          A.    Yes, ma'am.

10         Q.    Thank you.

11               And could you just read into the

12   record the third paragraph up from the bottom

13   beginning with Cardinal Health 110, Inc.

14   neither?

15         A.    Neither admits nor denies the

16   allegations pending in the board's

17   investigation; however, the board has initiated

18   and conducted an investigation pursuant to the

19   mandate of Section 3719-18 and 4729-25 of the

20   Ohio Revised Code.

21               MS. MCNAMARA:  Thank you.  That's

22   all I have.

23                         *   *   *

24                    CROSS-EXAMINATION

25   BY MR. EMCH:

Page 244

1          Q.   Doing okay?

2          A.   Doing good.

3          Q.   The Exhibit 19 that you just

4    looked at --

5          A.   Yes, sir.

6          Q.   -- I believe you testified before,

7    am I correct, that this represents the only

8    time of which you are aware as you sit here

9    today that any wholesale drug distributor

10   defendant was sanctioned in any way by the

11   board?

12         A.   No, we've had others.

13              MS. MCNAMARA:  Objection.  Form.

14   BY MR. EMCH:

15         Q.   Are you aware of all of the

16   defendants in the case?

17         A.   All the defendants in this case?

18         Q.   Yes, that's my question.

19         A.   I know the big ones.  I don't know

20   all of them.

21         Q.   All right.  We went through them a

22   little bit before.  AmerisourceBergen Drug

23   Corporation, you've heard of them?

24         A.   Yes, sir.

25         Q.   Any sanctions against them?

Page 245

1          A.    Not that I can recall.

2          Q.    Now I'll just give you the names.

3    We've already talked about Cardinal?

4          A.    Yep.

5          Q.    And you just say yes or no, okay?

6          A.    Okay.

7          Q.    McKesson?

8          A.    No.

9          Q.    Anda?

10         A.    I cannot recall Anda.

11         Q.    Preservation Supply -- or

12   Prescription Supply, I'm sorry.  Prescription

13   Supply - I can't read my own writing - Inc.?

14         A.    I do not know.

15         Q.    Don't recall any?

16         A.    I don't recall.

17         Q.    HBC Service Company?

18         A.    I don't recall.

19         Q.    H.D. Smith?

20         A.    Yes, I believe we've had previous

21   discipline with H.D. Smith.

22         Q.    Do you remember the number, when,

23   any kind of detail at all?

24         A.    I don't.

25         Q.    Should that appear in the records

Page 246

1   that have been produced by the Board of

2   Pharmacy?

3            A.   Yeah, I believe we've turned over

4   all of our disciplinary actions.

5            Q.   And I'm not sure if we're done

6   with that production or not.  I know we didn't

7   get through all of it before today.

8                 MR. WAKLEY:  Disciplinary actions,

9   yes, you should have the complete record that

10  the board has found.

11  BY MR. EMCH:

12           Q.   So if there were any kind of

13  sanction, it would be in the records --

14           A.   Yes, sir.

15           Q.   -- that we should have?

16                Okay.  Questions about pill mills

17  early on, remember?

18           A.   Yes, sir.

19           Q.   And you described pill mills, and

20  am I correct that what you were describing as

21  pill mills are what we've also talked about

22  from that vintage as pain clinics?

23           A.    I think there's legitimate pain

24  clinics and then there's pill mills.  That's

25  what they were originally labeled by everybody,

Page 247

1    I guess; however, I do think there's a

2    distinction between a pain management clinic

3    and a pill mill.

4              Q.    But the pill mills of which you

5    are aware were masquerading as pain clinics,

6    would that be a way to say it?

7              A.    Initially, yes, sir.

8              Q.    And did you become aware of these

9    pill mills during the time you were in law

10   enforcement?

11             A.    No.

12             Q.    You became aware of them once you

13   came to the Board of Pharmacy?

14             A.    Yes, sir.

15             Q.    But didn't run into them when you

16   were with the sheriff's department or any of

17   those?

18             A.    No, we did some prescription drug

19   cases, but no pill mills.

20             Q.    To your knowledge were pain

21   clinics regulated in the State of Ohio prior to

22   the passage of what we call the pill mill

23   legislation in May of 2011?

24             A.    The only regulation was from the

25   medical board for the licensed prescriber, so

Page 248

1    other than that, that was the only regulation

2    that I know of.

3          Q.   So as a pain clinic or what we

4    would call legitimate or illegitimate pain

5    clinics, they weren't regulated prior to May of

6    2011?

7          A.   The facilities themselves were not

8    licensed.

9          Q.   Now, pill mill pain clinics, as we

10   would describe them that existed in, say, 2011

11   when the act was passed, do they still exist?

12         A.   Nearly not like they do today and

13   nor -- some drug trends have shown that they've

14   moved away from traditional pain management

15   drugs of oxycodone and hydrocodone to other

16   types of drugs.

17         Q.   You're talking about the

18   legitimate pain clinics now?

19         A.   No, I believe that there's other

20   pill mills that exist today that -- and I can't

21   get into too much because it's confidential

22   information, but they are not like they were in

23   2011 with lines out the doors and people coming

24   from all over the state and out of state, cash

25   paying doctors.  They're not like they used to

1  be.

2          Q.    So the legislation has served its

3  function?

4          A.    I believe so.

5          Q.    Let me ask you to go back to

6  suspicious order reporting, and you've got two

7  exhibits that I want you to look at, Numbers 13

8  and 15.

9          A.    Yes, sir.

10          Q.    And 15 has the suspicious order

11  regulation in it, and I'm sorry, I don't have

12  the page number, but it's pretty far into it

13  and it's H(1)(e).

14          A.    Yes, sir.

15          Q.    And 13, Exhibit 13 is an example

16  of a suspicious order report, right?

17          A.    Correct.

18          Q.    Looking at -- again, at H(1)(e)(1)

19  -- or (i) and (ii), were those already in

20  effect in January of 2009, if you know?

21          A.    I believe they were.

22          Q.    They had been in effect for a long

23  time --

24          A.    Yes, sir.

25          Q.    -- right?

```
                                               Page 250

 1              So they weren't amended or changed
 2    in January of 2009, they were already in
 3    existence?
 4         A.    I don't believe so.  They were
 5    already in effect.
 6         Q.    And so the board had been
 7    receiving suspicious order reports for a long
 8    time prior to January of 2009?
 9         A.    I believe so.
10         Q.    Exhibit -- well, let me stick with
11    Exhibit 15 for now.  Do you agree that H(1)(e)
12    is a reporting requirement?
13         A.    Yes, sir.
14         Q.    And H(1)(e)(i) -- well,
15    H(1)(e)(ii) names the things that are to be
16    included in the report.  Do you see that, the
17    last sentence?
18         A.    Yes.
19         Q.    And the example that we have in
20    Exhibit Number 13 does list all of those things
21    that are required to be in the report, doesn't
22    it?
23         A.    Yes, sir.
24         Q.    And what is required to be in the
25    report, (e)(ii), doesn't include any kind of
```

Page 251

1   further explanation or comments about reasoning

2   or things like that?

3           A.   No, sir.

4           Q.   Now, the board does inspections of

5   wholesale drug distributors --

6           A.   Yes, sir.

7           Q.   -- also, doesn't it?

8           A.   Yes, sir.

9           Q.   You'll go to a distribution

10  center?

11          A.   One of our staff will, yes.

12          Q.   And you look at documents and

13  things when you do that?

14          A.   Yes, sir.

15          Q.   And one of the documents you may

16  look at is the order monitoring program of the

17  distributor?

18          A.   Yes, sir.

19          Q.   And you do that?

20          A.   That may be one of the things

21  that's checked during an inspection.

22          Q.   Now, in your tenure as a

23  compliance officer, do you know of any time

24  when the Board of Pharmacy has criticized or

25  suggested that changes be made or that

Page 252

1   structures of order monitoring programs of

2   wholesale drug distributors be altered?

3            A.   I think our discussions were not

4   around them to be altered, but help -- well, I

5   guess help us provide more context to them,

6   because a thousand pills solely to Ritzman's

7   Pharmacy doesn't mean a whole lot to us.  We

8   need more context to why is it suspicious.

9            Q.   Okay.  Turning to Exhibit 13, my

10  understanding of your testimony was that --

11  what you just said basically, that, you know,

12  numbers alone don't really mean much, you need

13  more information --

14           A.   Correct.

15           Q.   -- in order to determine if an

16  order is really suspicious?

17           A.   Yes, sir.

18           Q.   Now, I would like to get a little

19  bit more detail about how suspicious order

20  reports have been handled at the Board of

21  Pharmacy.

22           A.   Okay.

23           Q.   So let's say -- take the date off

24  of Exhibit 13, and let's say we're sitting in

25  the Board of Pharmacy today and this report

```
                                        Page 253
 1   comes in, and let's say it's 2008, because I
 2   want to understand how this worked over time
 3   and whether or not it's changed.  And so, you
 4   know, 2008 to today, is it different today or,
 5   you know, last month or last year than it was
 6   in 2008, okay.
 7              So we'll kind of start with it
 8   comes into the -- well, let me back up.  Has it
 9   changed?  Is it different now than it was back
10   then?
11        A.   I believe so.
12        Q.   All right.  Has it gotten more
13   detailed or --
14        A.   Yes.
15        Q.   -- receive more attention now than
16   it did?
17        A.   I can't recall prior to being
18   promoted to compliance and enforcement
19   supervisor receiving suspicious orders in the
20   field, so --
21        Q.   That would have been what date?
22        A.   2008 to 2012.  However, once I was
23   promoted and I was working in the office,
24   suspicious orders were handled by an
25   administrative supervisor and were basically at
```

Page 254

1    that point in time catalogued in binders by

2    year.

3          Q.   All right.  So after you came and

4    up until 2012, you did not become aware

5    yourself in your duties of suspicious order

6    reports; they weren't shared with you, you

7    didn't have to look at them, you didn't do

8    anything with them?

9          A.   It wasn't part of my regular

10   duties to look at them, nor receive them, nor

11   was I ever assigned a case at that point in

12   time to investigate a suspicious order.

13         Q.   All right.  So again, in your

14   preparation for this deposition in talking

15   about suspicious order reports and how they

16   were handled, would it be correct to say that

17   the board had no policy or procedure that

18   required any kind of utilization of suspicious

19   order reports, up until 2012 at least?

20         A.   I don't know that.

21         Q.   Did you find out anything in

22   connection with your investigation to get ready

23   for the deposition to indicate that suspicious

24   order reports were utilized in any way by the

25   board prior to 2012?

Page 255

1              A.    I have no knowledge of it.

2              Q.    So help me again.  2012, you

3     became aware of suspicious order reports and my

4     understanding is you're saying that they were

5     -- you say catalogued by year?

6              A.    Yes.

7              Q.    All right.

8              A.    And kept in whatever -- it was a

9     paper format because we were getting them in

10    various faxes, emails, Excel spreadsheets, Word

11    documents.  You name it, we were getting them

12    in various forms.

13             Q.    All right.  And this -- what you

14    just described that you became aware of in

15    2012, how long did that procedure exist?

16             A.    I'm not sure when we changed it,

17    but we changed it to -- from the administrative

18    supervisor receiving them to an analyst

19    receiving them and reviewing them.

20             Q.    Can you give me an estimated date

21    or time when that happened?

22             A.    13/14.

23             Q.    Would it be correct to say that

24    the -- when the administrative person was

25    getting them and putting them in the binder,

Page 256

1  are you aware of anything else that was done
2  other than receiving them and putting them in
3  the binder prior to 2012?
4          A.   I'm sure they were reviewed, but I
5  don't -- I don't have direct knowledge.
6          Q.   All right.  I'm sorry, prior to
7  2013 or '14 when they started going to the
8  analyst.  I mis-asked the question.
9          Same question, I'm just saying up
10  until that time, to your knowledge sitting here
11  today, the only thing that happened to
12  suspicious order reports when they came to the
13  board was the administrative person catalogued
14  them and put them in a notebook by year?
15          A.   I think that they were reviewing
16  them, but I don't -- I don't have a direct
17  policy or procedure on how that was done.
18          Q.   And you don't know of any action
19  that was taken based upon the review that they
20  may have done?
21          A.   No, sir.
22          Q.   Now, after 2013/14 when the
23  analysts starting getting them, what changed?
24          A.   They were monitoring them for the
25  time being that we had an analyst, and then in

Page 257

1    '15 and '16, somewhere between 15/16 we started

2    to take all of the format and put them into a

3    digital format, taking all of those paper

4    documents and entering them into an Excel.

5    That way we could search them and look more

6    easily at the data that we had.

7              And after that I believe we

8    maintained three years' worth of records at

9    that time once we got the preservation order.

10   We keep them indefinitely now.

11         Q.   All right.  Now, during this time

12   where you were getting them and they were

13   reviewing them as you just described and

14   putting them into digital format, my

15   understanding from your earlier testimony was

16   that -- I mean, the report form hasn't changed,

17   right?  You haven't added any requirements

18   beyond what we just read?

19         A.   No.

20         Q.   The report is the same.  So it

21   still doesn't contain any of this context that

22   you talked about?

23         A.   Correct.

24         Q.   So is your standard procedure --

25   other than what you just described and putting

1  them into digital format so they could be

2  searched, have you changed the procedure

3  whereby you contact the wholesale drug

4  distributor and ask questions every time?

5          A.   Not every time.  We have in the

6  past if it -- if it looks suspicious or if it

7  isn't -- you know, if it raises some type of

8  red flag myself or another supervisor may ask

9  for additional follow-up.  And, additionally,

10  we've also had some investigations that have

11  started because of them.

12          Q.   All right.  First one, you said

13  additional follow-up.  By additional

14  follow-up -- well, I hadn't heard anything

15  about an initial follow-up other than the

16  possibility of calling the wholesale drug

17  distributor.

18          A.   Yeah, an initial follow-up of why

19  it's suspicious.

20          Q.   All right.  And that would be

21  before you would initiate any kind of

22  investigation based upon one or more suspicious

23  order reports?

24          A.   Yes, sir.

25          Q.   All right.  What would be the

Page 259

1    questions that would be asked if you called a

2    wholesale drug distributor?

3            A.    Why is it suspicious, did you cut

4    off the -- did you cut off the pharmacy, are

5    you still selling to them, why do you feel --

6    did it deviate from their normal purchasing,

7    was it a large quantity, what made this order

8    suspicious in your system.

9            Q.    Have you, yourself, had any such

10   conversations with wholesale drug distributors?

11           A.    I believe I have.

12           Q.    And this follow-up that you just

13   described, was this beginning to occur in the

14   2014/2016 time frame we were describing where

15   you were doing more with them and putting them

16   into digital form and all of that?

17           A.    I think it would have been more --

18   it would have probably been 14/15-ish.

19           Q.    Do I understand your testimony

20   correctly that there has not been an instance

21   where an investigation was triggered by a

22   suspicious order report alone, just the number

23   report that came in, you always did follow-up?

24           A.    Yeah, not without an initial

25   contact.  We're going to call and find out.

Page 260

1          Q.    Okay.  As you sit here today, can

2    you tell me of any investigation that was

3    actually initiated based upon a suspicious

4    order report or reports and the follow-up that

5    you did?

6          A.    That's confidential.

7          Q.    Well, are there any investigations

8    that you did -- well, strike that.

9                I mean, we've tried to go through

10   the documents that have been produced and there

11   are many documents that do talk about the

12   results of investigations that have been made

13   public because something has happened --

14         A.    Right.

15         Q.    -- there's been some kind of an

16   action taken --

17         A.    Yep.

18         Q.    -- and have not been able to find

19   any where suspicious orders were mentioned in

20   these reports.

21               So I'll ask the question:  Have

22   you done any investigations that resulted from

23   suspicious order reports and their follow-up

24   that resulted in some kind of a public

25   suspension or revocation or a fine or

                                        Page 261

1    something?

2           A.    The investigations themselves are

3    confidential; however, there are current

4    investigations that are going on that have not

5    went through the whole administrative process

6    at this point in time or are still being

7    investigated.

8           Q.    And these would be investigations

9    of dispensers?

10          A.    Of dispensers and/or wholesalers.

11          Q.    When you talk about investigations

12   that were triggered by a suspicious order

13   report follow-up, as you sit here today would

14   those all be post the 2014, '15, '16 time

15   frame?

16          A.    I believe the majority would be.

17          Q.    And to talk a little bit about,

18   you know, your comment about the numbers, based

19   upon your knowledge gained through your work

20   with the Board of Pharmacy, is it correct that

21   the ordering that is done by dispensers in Ohio

22   as far as the quantity is concerned varies a

23   lot, to use a technical term?

24          A.    It really depends on their

25   business model.  I mean, a dispenser -- you

Page 262

1    could have an outpatient pharmacy at Cleveland
2    Clinic verse a mom-and-pop, you know,
3    independent pharmacy, so it varies all over, to
4    independent physicians.
5              Q.    So a pharmacy, for example, your
6    mom-and-pop, if one of the patients that
7    customarily came there got cancer or was put in
8    hospice and was getting those medications, that
9    could make a significant change in the amount
10   of opioids that they would be ordering?
11             A.    It could be, absolutely.
12             Q.    So depending -- and would I be
13   correct that the ordering pattern of a
14   particular pharmacy or dispenser is going to
15   depend on the prescribing -- the prescribers,
16   whoever they are, and the patients, and what's
17   going on with those prescribers and patients at
18   any given time?
19             A.    Yes, sir.
20             Q.    And it's going to go up and down
21   and change?
22             A.    (Witness nodded head up and down.)
23             Q.    You have to speak.
24             A.    Yes, sir.  Sorry.
25             Q.    You don't have to say sir, but you

Page 263

1   need to speak.

2              Am I correct that the regulation

3   again I mentioned or asked you, it's a

4   reporting requirement?

5        A.   Yes, sir.

6        Q.   Does the Board of Pharmacy expect

7   or anticipate that suspicious orders that are

8   reported will not be shipped to the pharmacy?

9        A.   No, our expectation is that they

10  do their due diligence.  If a computer spits

11  out a number and says, hey, this is a

12  suspicious order, the hope is that they're

13  going to follow up with that, do their due

14  diligence, check with the customer, try to find

15  out, such as the recently -- like you

16  explained, new prescriber in the area or a new

17  practice in the area, whatever it may be, but

18  to do their due diligence on them, on those

19  particular customers; and if they feel that it

20  is not legitimate, that they don't ship it.

21        Q.   If a wholesale drug distributor

22  called you up and did some follow-up, said,

23  hey, Board of Pharmacy, we're looking at

24  dispenser X in Akron, Ohio and we sent you a

25  suspicious order report a couple months ago

Page 264

1    about them, would you give us an OARRS report

2    on that dispenser so we can see what their

3    dispensing pattern is for the last two or three

4    months, would you do that?

5              A.   No, but we could based upon --

6              Q.   We --

7              A.   We, the Board of Pharmacy, could

8    based upon your phone call and your

9    information.

10             Q.   But wholesale drug distributors

11   wouldn't have access to any of that

12   information?

13             A.   Not the OARRS.

14                  THE VIDEOGRAPHER:  I need to stop.

15                  MR. EMCH:  Oh, okay.

16                  THE VIDEOGRAPHER:  We're off the

17   record.

18                  (Recess taken.)

19                  THE VIDEOGRAPHER:  We're on the

20   record.

21                  (Thereupon, Defendants' Exhibit

22   Number 20, Ohio Automated Rx Reporting System

23   2017 Annual Report, was marked for purposes of

24   identification.)

25   BY MR. EMCH:

Page 265

1          Q.    You've got in front of you Exhibit
2     Number 20, which is, I believe, the 2017 OARRS
3     report?
4          A.    Yes, sir.
5          Q.    And the Board of Pharmacy's fiscal
6     year runs from the middle of -- from July to
7     July; is that right?
8          A.    Yes, sir.
9          Q.    And I've seen both OARRS reports
10    and the annual reports for the board through
11    2017 or what they call the 2017 fiscal year.
12                Is there a 2018 report yet; do you
13    know?  I didn't look at your website.
14         A.    I don't know.
15         Q.    But the OARRS report and the
16    annual report are normally entered at the same
17    time or prepared and issued at the same time,
18    if you know?
19         A.    I believe so.
20         Q.    This Exhibit Number 20, have you
21    seen that?
22         A.    I've glanced over it just off of
23    our website.
24         Q.    Are you able, do you think, to
25    answer some questions about it?

1          A.    I can try.

2          Q.    Okay.  Go to -- I'm skipping a

3    lot.  Go to Section 1.  Title is Section 1,

4    opioids dispensed to Ohio patients, right?

5          A.    Yes, sir.

6          Q.    Okay.  And I'll ask -- some of

7    these questions will probably be silly, but,

8    you know, that goes with the territory

9    occasionally.  Opioids dispensed to Ohio

10   patients, so that means opioids not that were

11   stolen or had something else, some other way

12   they got into somebody's hands; they mean

13   through the OARRS program what you have tracked

14   and has been recorded as being dispensed by

15   registered, licensed dispensers in the State of

16   Ohio?

17         A.    Yes, sir.

18         Q.    And prescribed by registered

19   licensed prescribers in Ohio?

20         A.    Yes, sir.

21         Q.    Now, you talked a little bit

22   earlier about this, but just to be clear, the

23   only entities who have a legal and professional

24   obligation to prescribe and dispense

25   prescriptions only for legitimate medical

Page 267

1    purpose in the usual course of professional

2    practice are prescribers, mostly doctors, and

3    pharmacists; is that right?

4            A.    I believe so.

5            Q.    Is it also true that it is only

6    those -- those two entities, the prescriber who

7    is treating the patient and the pharmacist who

8    is asked to fill the prescription, who can make

9    and are legally obligated to make a

10   determination that the prescription is for a

11   legitimate medical purpose?

12           A.    Yes, sir.

13           Q.    And there isn't anybody else in

14   the system that can prospectively make that

15   decision; it's made on the spot by the doctor

16   prescriber and by the dispenser, the

17   pharmacist, correct?

18           A.    Yes, sir.

19           Q.    Now, to go to the Section 1 that

20   we were looking at, this chart, number 1 that's

21   there, goes back to 2011, and would I be

22   correct that if we move backwards in a previous

23   OARRS report, a similar chart exists in those

24   reports for 2010, 2009?

25           A.    I would assume so.

1          Q.    So this one goes from 2011 to 2017

2     and the top chart number 1 is showing solid

3     doses dispensed to Ohio patients by year, and

4     these would be opioid solid doses defined as

5     tablets, capsules and patches.  That's at the

6     bottom of the page under your finger.

7          A.    Yes, sir.

8          Q.    Now, all opioids are included in

9     these numbers --

10         A.    Okay.

11         Q.    -- correct?

12         A.    Yes.

13         Q.    Do you have a place that breaks

14    them down by particular opioids?

15         A.    I'm sure that OARRS does.  I don't

16    have it personally.

17         Q.    Do you know how many different

18    opioids are tracked in OARRS?

19         A.    All of them.

20         Q.    But do you know how many of them

21    there are?

22         A.    Oh, I do not.

23         Q.    Can you give me an estimate?

24         A.    I cannot.

25         Q.    More than three or four?

```
 1          A.   Yes.
 2          Q.   A lot more than three or four?
 3          A.   Yes.
 4          Q.   But these charts don't break it
 5   down, the statistics don't break it down to
 6   that level; it's everything included?
 7          A.   Yeah, in Section 1.
 8          Q.   And these are dosage units,
 9   correct?
10          A.   Yes.
11          Q.   So these charts don't tell you
12   anything about the actual amount in milligrams
13   or MEDs, this chart doesn't --
14          A.   It does not.
15          Q.   -- that are involved in any of the
16   dosage units?
17          A.   It does not talk about MED at all.
18          Q.   So they could be 5 milligram with
19   500 acetaminophen or 10 milligram or whatever
20   the largest pill or dosage is, correct?
21          A.   Yes, sir.
22          Q.   Now, chart number 2 is
23   prescriptions dispensed to Ohio patients in
24   each year in millions, correct?
25          A.   Yes, opioid prescriptions.
```

1          Q.    Opioid prescriptions?

2          A.    Yes, sir.

3          Q.    Do you know what the population of

4    Ohio was in 2010 or is today?

5          A.    I don't know.  It's in the

6    millions.

7          Q.    Okay.  And chart number 1 shows

8    that the total number of dosage units and the

9    total number of prescriptions peaked in 2012,

10   agreed?

11         A.    Yes, sir.

12         Q.    And, generally speaking, the two

13   lines, the solid doses dispensed in Ohio and

14   the prescription numbers, I'll say correlate,

15   if not correspond; more prescriptions, more

16   doses?

17         A.    Yes, sir.

18         Q.    You're aware of Ohio's enactment

19   of prescribing guidelines?  You know what I

20   mean by that?

21         A.    Yes, sir.

22         Q.    And Ohio has done that, I think,

23   three times now; am I right?

24         A.    Yes, there's emergency room

25   guidelines, there's acute pain, yes.

Page 271

1          Q.    And the emergency room was in

2     2012?

3          A.    I believe so.

4          Q.    And the guidelines for chronic

5     pain were in 2013 and the guidelines for acute

6     pain in 2016?

7          A.    Yes, sir.

8          Q.    And then further restrictions

9     placed upon prescribing in 2017?

10         A.    Okay.

11         Q.    And I'll represent to you that

12    those are right.  They sound right to you?

13         A.    They sound correct to me.

14         Q.    And these charts that we're

15    looking at have been decreasing since 2012,

16    right?

17         A.    Yes, sir.

18         Q.    Do you think the prescribing

19    guidelines have had an impact on that?

20         A.    I do.

21         Q.    Were there, to your knowledge,

22    prescribing guidelines for the prescribing of

23    opioids in Ohio prior to May of 2012?

24         A.    Not to my knowledge.

25         Q.    Now, if you go to the next page,

1    it has table 1, opioids dispensed by Ohio

2    patients -- or to Ohio patients by year, and

3    that runs 2010 to 2017.  Do you see that?

4             A.   Yes, sir.

5             Q.   Table number 1.

6                  Now, back to a question that two

7    of my colleagues were asking you or you were

8    testifying about earlier, which is the reports

9    that were generated about opioid deaths --

10   well, overdose deaths, not opioid deaths,

11   overdose deaths in Ohio and the lookback at

12   OARRS reports --

13            A.   Yes, sir.

14            Q.   -- for those persons who are

15   deceased, was that -- was that done for all of

16   the overdose deaths in Ohio?

17            A.   It was all the opioid-related

18   overdose deaths, unintentional overdose deaths.

19            Q.   I'm sorry, I misstated after I

20   clarified myself.  Was the OARRS check done for

21   all drug overdose deaths in Ohio?

22            A.   I believe it was done for all

23   opioid overdose deaths in Ohio.

24            Q.   Did you do it on your own

25   initiative or were you asked by somebody to do

Page 273

1  it?

2          A.    I can't recall.  I think it was

3  more of a collaborative effort with us and the

4  Health Department.

5          Q.    But it was for all of Ohio?

6          A.    Yes, sir.

7          Q.    What year or years did you cover?

8          A.    We only recently in the last three

9  or four years started getting the data and from

10 health is where we were getting the overdose --

11 unintentional overdose death data.  And their

12 data is behind several months, so I think we've

13 only done it for three years now where we've

14 compared the information.

15         Q.    And I believe you indicated that

16 -- and you clarified that what you were looking

17 at were opioid-related deaths; is that your

18 description?

19         A.    Yes.

20         Q.    Opioid-related deaths, overdose

21 deaths?  Opioid-related overdose deaths?

22         A.    Let's throw unintentional overdose

23 deaths in there.

24         Q.    So you excluded suicides?

25         A.    I didn't personally exclude them,

Page 274

1    but that would be one that would be -- I would
2    assume was excluded from there.
3           Q.   And as I understand what you
4    looked for and what your data reflects is when
5    we went -- when we looked at any given
6    unintentional opioid-related death, we checked
7    the OARRS records back for how long?
8           A.   As far as the OARRS record went
9    back.
10          Q.   So you didn't limit it to like
11   eighteen months or two years, you went back as
12   far as you could go back?
13          A.   I believe that that's what they
14   did.
15          Q.   All right.  And then you simply
16   recorded whether or not there was one or more
17   prescription opioid on that record?
18          A.   Yes.
19          Q.   And when you said 70 or 80
20   percent, that means literally that, that there
21   was one or more opioid prescription on that
22   several years of record that you look for --
23   looked at for these unintentional
24   opioid-related deaths?
25          A.   Yes, sir.

Page 275

1          Q.   Do you know -- and you said 70 or
2     80 percent of that particular population that
3     you were looking at.  Do you know how many --
4     what percent -- do you know what percentage of
5     the adult population in Ohio has an opioid
6     prescription in their OARRS history?
7          A.   I do not know.
8          Q.   If we look at table 1, and the
9     number of patients that are indicated in that
10    number of patients column.  Do you see that?
11         A.   Yes, sir.
12         Q.   Does that indicate -- like for
13    2010 it says 2,733,066 patients and then the
14    next year it's 2,761,707 patients.  Do you know
15    if those are the same patients or were there
16    new and different patients in each of those
17    years?
18         A.   I don't know.  I'm assuming there
19    would be new patients.
20         Q.   So if we took, say, a two-year
21    time or a three-year time and those numbers
22    that are in there and we just looked at those
23    -- say we looked at 2015, '16 and '17, 2.6,
24    2.3, 1.9 million, and we pulled out all of the
25    different patients, we would come up with a

Page 276

1   higher number than any of those three numbers,
2   right?
3           A.   So you want to combine all three
4   of them and pull out --
5           Q.   I just want to look through them
6   and pull out how many different patients are
7   represented in those three years.  How many
8   different patients got opioid prescriptions on
9   their OARRS record for those three years?
10          MR. WAKLEY:  I'm going to object
11  to this.  Mr. Griffin has not been designated
12  as any kind of representative as to OARRS data.
13  This is an OARRS report.  Chad Garner was the
14  individual who would have participated in this.
15  This is not the correct witness to ask those
16  questions.
17          THE WITNESS:  Do I still need to
18  answer it?
19  BY MR. EMCH:
20          Q.   Well, you can try.
21          A.   I would assume, but I don't --
22  don't know for sure.
23          Q.   Okay.  But in the event you
24  haven't done -- or you don't know of any
25  studies that have been done or any reports that

Page 277

1    have been run by the Board of Pharmacy to try

2    to compare different populations with the

3    population of unintentional opioid-related

4    overdose deaths?

5           A.   I don't quite understand your

6    question.

7           Q.   What percentage of the entire

8    adult population of Ohio -- as I asked you

9    before, for comparison purposes, what

10   percentage of them have an opioid prescription?

11          A.   I don't know.

12          Q.   You're not aware of any --

13          A.   I'm not aware of any.

14          Q.   Do you see on table 1 again where

15   it says average daily MED per prescription and

16   average quantity per prescription?  Do you see

17   those two columns?

18          A.   I do.

19          Q.   Do you, yourself, have any

20   information about -- well, strike that.

21               I notice that those numbers, even

22   though the number of prescriptions written and

23   the number of patients, to some degree, has

24   diminished in general over time, the average

25   quantity per prescription and the average MED

Page 278

1   per prescription has stayed fairly close.

2             Do you see that?  It hasn't

3   changed all that much?

4        A.   Yes, sir.

5        Q.   Do you agree with me that that

6   would indicate that the mix of prescriptions,

7   the mix of dosages, high dosages, a lot of MEDs

8   per day, has stayed relatively constant even

9   though the number of prescriptions overall and

10  the number of patients, to a lesser degree,

11  have diminished?

12            Do you understand my question?

13            MR. WAKLEY:  Again, I object.

14            THE WITNESS:  I don't.

15            MR. WAKLEY:  This is outside this

16  witness' scope of knowledge.

17  BY MR. EMCH:

18       Q.   Do you have any idea yourself or

19  any knowledge yourself, based upon your

20  familiarity with OARRS and dispensers and the

21  board, what kind of average daily MED per

22  prescription or per day would be utilized by an

23  end-of-life patient or a cancer patient or a

24  hospice patient?

25            MR. WAKLEY:  Again, it's outside

1    this witness' scope of knowledge.

2    BY MR. EMCH:

3         Q.    You were asked some questions

4    about -- or a question about the DEA's quota

5    program?

6         A.    Yes, sir.

7         Q.    And you know what that is?

8         A.    I do.

9         Q.    But the Board of Pharmacy has

10   never been involved in that program?

11        A.    Not to my knowledge.

12        Q.    Has the Ohio Board of Pharmacy

13   ever, to your knowledge, considered

14   implementing some kind of quota program itself?

15        A.    Not to my knowledge.

16        Q.    Has the Ohio Board of Pharmacy

17   ever considered setting forth some kind of a

18   restriction on the number of dosage units that

19   could be dispensed in a particular geographic

20   area based on the population of that area?

21        A.    Not to my knowledge.

22        Q.    Have you ever heard that subject

23   brought up?  Do you understand what my question

24   is?  Saying that there are a certain number of

25   dosage units that are coming into a particular

1    area --

2            A.    Right.

3            Q.    -- like Columbus.  It's X number.

4    We think that might be a lot, too much, so why

5    don't we limit it, why don't we say

6    prospectively, while the population of Columbus

7    is 600,000, and so you can only dispense, pick

8    your number, based on that population?

9            A.    I have not engaged in any

10   conversations, nor do I recall any types of

11   conversations like that.

12           Q.    You couldn't do that, could you?

13   You couldn't make a prospective limit based on

14   population?

15           A.    I don't see how you could.

16           MR. EMCH:  I'm going to pass, with

17   the understanding that I am going to look

18   through my notes, too, just because we want to

19   stick with the schedule here.  So I might come

20   back briefly.

21                   *   *   *

22                 CROSS-EXAMINATION

23   BY MS. RANJAN:

24           Q.    Good afternoon, Mr. Griffin.

25           A.    Hello.

Page 281

1          Q.    My name is Brandy Ranjan.    I
2    represent Wal-Mart here today.    Hopefully I can
3    keep this brief because I know we're running
4    close to time and it's been a long day, so --
5          A.    Thank you.
6          Q.    Sure.
7                Earlier during Ms. Browne's
8    questioning you were asked about the variety of
9    ways in which complaints might reach the board
10   and become investigated.    Do you recall that
11   testimony?
12         A.    Yes, ma'am.
13         Q.    And I think that you testified to
14   a number of sources.    I think you said that the
15   top two sources for those complaints were the
16   public, that was the first?
17         A.    Yes, ma'am.
18         Q.    And the second was, you said, loss
19   prevention within the industry?
20         A.    Yes, ma'am.
21         Q.    Can you explain to me what you
22   mean by that?
23         A.    Sure.    We get and we work with
24   regularly loss prevention on employees from CV
25   -- different pharmacy chains and corporations

Page 282

1   that report to us potential theft and loss on a

2   regular basis.  The majority of these

3   diversions are small quantities that are

4   swiped.  It may not just be loss prevention

5   from a retail chain, it may be a security

6   person or a compliance person at a hospital or

7   at a clinic type of setting where they're

8   calling us to report small doses of theft and

9   loss that we investigate, and again, most of

10  them are small quantities.

11         Q.   Okay.  So just to make sure I

12  understand, so it could be a pharmacy or a

13  hospital or a doctor's office that's reporting

14  to you that they've either lost a small amount

15  of some controlled substance; is that right?

16         A.   They believe they've lost.  I

17  mean, we do initial notification immediately

18  and then we start the investigation from there.

19         Q.   I see.  But it could be as a

20  result of either a loss or a theft of the drug?

21         A.   Yes, ma'am.

22         Q.   And that's an example of the

23  industry cooperating with the board to try to

24  address potential illegal activity; is that

25  right?

1          A.    Yes, ma'am.

2          Q.    And in your experience is that
3    kind of cooperation and collaboration within
4    the industry fairly common?

5          A.    I believe it is here in the State
6    of Ohio.  We've had round tables strictly with
7    loss prevention folks and invited them in for
8    discussions and different things like that, so
9    I would say yes.

10          Q.    And one of the sources of the
11    complaints that you mentioned was that
12    complaints might come in from other law
13    enforcement agencies; is that right?

14          A.    Yes, ma'am.

15          Q.    And that, I assume, would include
16    county sheriff's offices, correct?

17          A.    Yes, ma'am.

18          Q.    And I think that we talked about
19    some numbers of complaints that you received
20    for Cuyahoga and Summit County.  I believe you
21    said you received 700 complaints for Cuyahoga
22    County over the last five years, right?

23          A.    It's just over 700.

24          Q.    Okay.  And that's the total number
25    of complaints within that jurisdiction that you

Page 284

1    received from all sources?

2              A.    Correct.

3              Q.    Do you have any idea how many of

4    those would have been referrals from the

5    Cuyahoga County sheriff's office?

6              A.    I have no idea.

7              Q.    Or the Akron -- I'm sorry, the

8    Cleveland police department?

9              A.    We've worked in conjunction with

10   Cleveland police department, so there may be

11   some from them.

12             Q.    Do you have a general sense?  Is

13   it, you know, 10 percent, half?

14             A.    I couldn't -- I would say it's a

15   low percentage, but I couldn't put a number on

16   it.

17             Q.    Okay.  Probably less than 25

18   percent?

19             A.    Yes.

20             Q.    Probably less than 15 percent?

21             A.    Yes.

22             Q.    Probably less than 10 percent?

23             A.    I don't know there.

24             Q.    Okay.  That's fair.  I'm just

25   trying to get a general sense.

1          And then the same question for the
2    123 complaints that you received for the Summit
3    County jurisdiction, that was from all sources
4    over the last five years?
5          A.   It was a little over -- I think it
6    was 231 complaints.
7          Q.   I'm sorry, I had the number wrong.
8    231 complaints.  That was from all sources over
9    the last five years?
10          A.   Yes, ma'am.
11          Q.   And would the breakdown there in
12    terms of complaints that you were receiving
13    from Summit County sheriff's office and the
14    Akron police department be roughly the same as
15    in Cuyahoga County?
16          A.   Maybe a little less, just because
17    Cuyahoga County has more population, we've had
18    more cases there.  Probably less.
19          Q.   Okay.  So there could you say less
20    than 15 percent?  That was sort of the gauge we
21    were going by before.
22          A.   Yeah, less than 15.
23          Q.   Less than 10 percent?
24          A.   Most likely.
25          Q.   Changing gears, Mr. Griffin, you

1   would agree with me that pharmacists and

2   pharmacies don't practice medicine, right?

3           A.    They do not practice medicine.

4   They practice pharmacy.

5           Q.    Pharmacists are not trained as

6   physicians?

7           A.    They are not.

8           Q.    And they cannot diagnose patients?

9           A.    I think it gets into a scope

10  question between pharmacists and physicians.

11  There are collaborative agreements that

12  physicians can enter with pharmacists to help

13  change med dosing and different things like

14  that, but typically they are not diagnosing

15  disease states.

16          Q.    In the typical exchange that we

17  think of where a patient walks into a pharmacy

18  and presents a prescription and has that

19  prescription filled, the pharmacist is not

20  making a diagnosis of that patient; is that

21  right?

22          A.    Correct.

23          Q.    And in Ohio pharmacists are also

24  not licensed to prescribe medications?

25          A.    They're not licensed to prescribe

Page 287

1    medications; however, again, with some consult

2    agreements under certain disease states I

3    believe that they can add medications to a

4    formulary for a patient for certain disease

5    states such as diabetes.

6              Q.   Okay.  And those would be sort of

7    the edge case type of situations, right?

8              A.   What do you --

9              Q.   So that would be an unusual

10   circumstance, something that doesn't happen in

11   your everyday exchange, again where the patient

12   is walking in and having their --

13             A.   Right.

14             Q.   -- prescription filled at a

15   pharmacy, right?

16             A.   Right.

17             Q.   And again, speaking of that

18   typical exchange between a pharmacist and a

19   patient where a patient walks into a pharmacist

20   -- pharmacy and presents a prescription, the

21   pharmacist doesn't have access to the patient's

22   medical records in that situation, do they?

23             A.   The majority of the time, no.

24   However, there are pharmacies that are within

25   institutions where a pharmacist may have access

Page 288

1    to -- where a retail pharmacy has access to the

2    patient files.

3            Q.    Like that would happen in a

4    hospital, for instance?

5            A.    A hospital, large clinic, oncology

6    clinics that have their own pharmacies in them,

7    medical facilities, some of them, they use the

8    same, or would have access to that -- the

9    medical records.

10           Q.    To your knowledge do pharmacists

11   at national retail chains like Wal-Mart, CVS,

12   Rite Aid, do they typically have access to a

13   patient's medical records when they're

14   dispensing medication?

15           A.    No, ma'am.

16           Q.    Pharmacists do have access to

17   OARRS now in Ohio, right?

18           A.    Yes, ma'am.

19           Q.    But even OARRS also has a limited

20   set of information; would you agree with that?

21           A.    Yes, ma'am.

22           Q.    For instance, up until -- until

23   recently, OARRS didn't include a patient's

24   diagnosis?

25           A.    Correct.

1          Q.    When was that added?
2          A.    Recently.  I think it was first
3    discussed -- I'm trying to think if it went
4    into effect in '17 or '18, but recently we just
5    started collecting the diagnosis codes on
6    prescriptions.
7          Q.    And OARRS doesn't describe a
8    physician's treatment plan?
9          A.    It doesn't describe their
10   treatment plan?
11         Q.    Correct.
12         A.    No.
13         Q.    And it doesn't have the
14   physician's reasoning for prescribing a drug?
15         A.    No.
16         Q.    It doesn't disclose what
17   conversations the physician may have had with a
18   patient about a particular course of treatment?
19         A.    No.
20         Q.    In other words, it doesn't paint
21   the whole picture of the patient's medical
22   condition, correct?
23         A.    Correct.
24         Q.    Would you agree with me,
25   Mr. Griffin, that there may be valid reasons

1   why a patient would have multiple -- would have

2   prescriptions from multiple doctors?

3           A.   Yes, ma'am.

4           Q.   And would you agree with me that

5   there may be valid reasons for having

6   prescriptions filled in multiple locations?

7           A.   There could be, yes.

8           Q.   For instance, it could just be a

9   matter of convenience, right?

10          A.   Yes, ma'am.

11          Q.   Or possibly insurance coverage?

12          A.   Yes, ma'am.

13          Q.   There are some insurers that

14  require patients to have certain medications

15  filled by certain dispensers?

16          A.   Yes, ma'am.

17          Q.   And that circumstance in and of

18  itself, having a prescription filled in

19  multiple locations, does not necessarily

20  indicate diversion or illegal activity, right?

21          A.   It does not.

22          Q.   And having prescriptions from

23  multiple doctors does not necessarily indicate

24  diversion or illegal activity?

25          A.   It does not.

Page 291

1           Q.    Ohio law requires pharmacists to

2    exercise professional judgment when dispensing

3    medications, right?

4           A.    Yes, ma'am.

5           Q.    And do you agree with me that the

6    exercise of that professional judgment is a

7    subjective exercise?

8           A.    It can be; however, there are some

9    requirements that a pharmacist must do before

10   dispensing medication.

11          Q.    We talked about some of those

12   earlier, right?

13          A.    Yes, ma'am.

14          Q.    The pharmacist has to do a

15   prospective Drug Utilization Review; is that

16   right?

17          A.    Yes, ma'am.

18          Q.    And there are some circumstances

19   in which a pharmacist must check OARRS?

20          A.    Yes, ma'am.

21          Q.    And then after evaluating all of

22   that information that's available to the

23   pharmacist, the pharmacist exercises his or her

24   judgment about whether or not the medication

25   should be dispensed, right?

Page 292

```
 1              A.   Yes, ma'am, or within consultation
 2    with the prescriber who wrote the prescription.
 3              Q.   Right.   That's one step that a
 4    pharmacist might take to resolve a potential
 5    red flag that the pharmacist sees, right?
 6              A.   Yes, ma'am.
 7              Q.   The pharmacist could consult with
 8    the doctor?
 9              A.   Yes, ma'am.
10              Q.   So you agree with me that
11    pharmacists can take steps to resolve any red
12    flags that a particular prescription might
13    present?
14              A.   Yes.
15              Q.   And ultimately the duty to
16    evaluate whether or not a prescription should
17    be dispensed rests with the pharmacist,
18    correct?
19              A.   Yes, ma'am.
20              Q.   Not the pharmacy?
21              A.   Correct.
22              Q.   And not the pharmacist's employer?
23              A.   Correct.
24              Q.   Each patient's circumstances are
25    unique and have to be evaluated independently,
```

1    right?

2         A.    Yes, ma'am.

3         Q.    Do you have Exhibit 16 in front of

4    you still?  It was one of the Ohio State Board

5    of Pharmacy newsletters from November 2014.

6         A.    Yep.  November of 2014?

7         Q.    Yes.

8         A.    Yes, ma'am.

9         Q.    It should be labeled Exhibit 16.

10        A.    Yes, ma'am.

11        Q.    I would like to look at the

12   paragraph that was reviewed earlier on the

13   first page.  It's the big huge paragraph in the

14   bottom right-hand corner with the numbered

15   bullets.  Do you see that?

16        A.    Yes, ma'am.

17        Q.    When we looked at this earlier we

18   discussed how this newsletter was -- was

19   informing recipients of the newsletter about

20   some new regulations that have been put in

21   place; is that right?

22        A.    Yes, ma'am.

23        Q.    And those regulations were the

24   ones that required prescribers to begin

25   checking OARRS in certain circumstances?

Page 294

1              A.    Yes, ma'am.

2              Q.    And I would like to read the

3    sentence that is towards the middle of that

4    paragraph above the bullet point list.  It

5    begins while there are new mandatory

6    requirements.  Do you see that?

7              A.    Yes, ma'am.

8              Q.    It says while there are new

9    mandatory requirements for prescribers to check

10   OARRS, pharmacists should also be aware that

11   they have a corresponding responsibility to

12   check the system, and it cites a portion of the

13   administrative code.  Do you see that?

14             A.    Yes, ma'am.

15             Q.    And it says that that section of

16   the administrative code, which is 4729-5-20,

17   requires a check of OARRS in any of the

18   following instances.

19                   Did I read that properly?

20             A.    Yes, ma'am.

21             Q.    And it lists a number of

22   circumstances in which a pharmacist has a

23   corresponding duty to check OARRS; is that

24   right?

25             A.    Yes, ma'am.

Page 295

1          Q.   And if I understand your testimony

2    from earlier, I think that you would agree with

3    me that just because one of these circumstances

4    is present, doesn't necessarily indicate that

5    diversion is happening; is that correct?

6          A.   Yes, ma'am.

7          Q.   So, for instance, the first bullet

8    point there, receiving reported drugs from

9    multiple prescribers, we talked earlier that

10   doesn't necessarily indicate that there would

11   be diversion happening, right?

12         A.   Yes, ma'am.

13         Q.   This is just a list of the

14   circumstances in which a pharmacist should

15   consider checking OARRS, correct?

16         A.   Yes, ma'am.

17         Q.   And then again, at the bottom it

18   says, in conclusion, the pharmacist, not an

19   employer, supervisor or fellow employee, is the

20   one held accountable for making an independent

21   judgment to ensure the prescription - and then

22   it continues on the back, the very last page -

23   presented at the pharmacy is legitimate.

24              Did I read that properly?

25         A.   Yes, ma'am.

Page 296

1          Q.    And that's what we talked about

2     earlier, about how it's the pharmacist, and not

3     their employer, who has the duty to make that

4     judgment about whether a medication should be

5     dispensed, right?

6          A.    Yes, ma'am.

7                MS. RANJAN:  I, like the others,

8     have very disorganized notes at this point, so

9     I will reserve the right to ask a couple of

10    follow-ups, but I think I may be done, so --

11                        *   *   *

12                CROSS-EXAMINATION

13    BY MR. RUIZ:

14          Q.    Hi, Mr. Griffin.

15          A.    Hello.

16          Q.    Thank you for your time today.

17                My name is Anthony Ruiz and I

18    represent CVS Indiana, LLC and CVS Rx Services,

19    Inc.  Do you recognize those two entities as

20    wholesale drug distributors?

21          A.    They are -- CVS is a corporation.

22    I believe they have their own in-house

23    wholesale where they distribute to their

24    pharmacies, but their pharmacies are drug --

25    are licensed as terminal drug distributors.

1        Q.    Right, and I'm not asking about

2    the terminal drug distributors that are the

3    pharmacies, but do you recognize the two

4    entities that I represent, CVS Indiana, LLC and

5    CVS Rx Services, Inc., as not terminal drug

6    distributors, but actually wholesale -- they

7    have wholesale drug distributor licenses?

8        A.    I would believe so, if that's what

9    you're telling me.  I know that CVS has its own

10   internal wholesale.  I don't know the names of

11   them specifically by Inc. and LLCs.

12       Q.    Okay.  Earlier today, in

13   connection with some discussions about

14   suspicious order reports, you mentioned an

15   expectation that distributors conduct due

16   diligence in connection with those reports.

17   Do you recall that?

18       A.    Yes, ma'am -- or yes, sir, sorry.

19       Q.    And you recall that we looked at

20   -- I believe it was Exhibit 15 which has the

21   suspicious order standard --

22       A.    Yes.

23       Q.    -- that's under H(1)(e).  Do you

24   recall that?

25       A.    Yes.

1          Q.    The text of that rule doesn't say

2     anything about due diligence; is that right?

3          A.    It does not.

4          Q.    Is that expectation related to due

5     diligence, is that a requirement?

6          A.    It's not required by the rule;

7     however, it would be an expectation to ensure

8     drug security and control.

9          Q.    And has that expectation been

10    codified in any way in the laws or the rules by

11    BOP?

12         A.    No, sir.

13         Q.    Has it been -- strike that.

14               If we could look at Exhibit 17 --

15         A.    Yes, sir.

16         Q.    -- and that's the May 2010 BOP

17    newsletter.

18         A.    Yes, sir.

19         Q.    If you look at the last page.

20               Do you remember you were asked

21    some questions about this second to last

22    heading that reads corresponding

23    responsibilities needed more than ever?

24         A.    Yes, sir.

25         Q.    If you look at the last paragraph

Page 299

1    in that section, the first sentence, it says,

2    having said that, please remember that there

3    are legitimate pain specialists and legitimate

4    pain patients out there.  Legitimate patients

5    should have their prescriptions filled in a

6    timely fashion and without harassment.

7              Do you agree with that statement?

8         A.   I would, but hold on.  Can you

9    point that out again?

10         Q.   I'm sorry.  So that's the last

11   paragraph of that section.

12         A.   Okay.

13         Q.   So, first of all, go ahead and

14   read it to yourself --

15         A.   Thank you.

16         Q.   -- and let me know if I read any

17   of that incorrectly.

18         A.   I would agree with that statement.

19         Q.   You agree that it's important for

20   people in pain to have access to the medication

21   that a doctor has prescribed for them, right?

22         A.   Yes, sir.

23         Q.   Are you aware of BOP revoking any

24   CVS wholesale distributor license?

25         A.   No.

1          Q.    Are you aware of BOP suspending

2     any CVS wholesale distributor license?

3          A.    No.

4               MR. RUIZ:  That's all I have.

5               Anybody else?

6               MS. BROWNE:  I don't have

7     anything.

8               MR. WAKLEY:  If you're all done, I

9     have a few clean-up questions I just want to go

10    over with him.

11              MS. BROWNE:  Do you need a break

12    first or --

13              MR. WAKLEY:  No, I'm good.  Let's

14    get this done.

15                   DIRECT EXAMINATION

16    BY MR. WAKLEY:

17         Q.    Good evening, Mr. Griffin.

18         A.    Good evening.

19         Q.    In your experience as both a

20    compliance agent up through to your current

21    job, what is the most common type of diversion

22    that you've seen while working at the Board of

23    Pharmacy?

24         A.    Small quantity thefts.

25         Q.    What percentage of diversion cases

                                        Page 301

1    overall would you say do not require access to

2    the OARRS database at all?

3          A.    A majority of them don't.  If we

4    have a -- a theft at a hospital, retail

5    location or a doctor's office, there may never

6    be a need to access OARRS at all.

7          Q.    In your experience can the board

8    take action against a licensee solely based on

9    an OARRS check?

10         A.    No.

11         Q.    Why not?

12         A.    Because the information has to be

13   verified and the original documentation

14   collected as evidence.

15         Q.    When you say the original

16   documentation, what do you mean, the original

17   documentation?

18         A.    Such as the original prescription.

19   Obviously, as I spoke earlier, OARRS can have

20   incorrect data and -- because it is entered via

21   humans and there could be errors and mistakes.

22   And so you want to verify the information that

23   is in OARRS, so you would collect the original

24   documentation or copies of the original

25   documentation.

Page 302

1           Q.   Have you been involved in any

2    disciplinary cases taken by the board against

3    any licensee?

4           A.   Yes.

5           Q.   In your experience, or are you

6    aware, are OARRS reports allowed to be used in

7    those contexts?

8           A.   We do not use OARRS --

9               MR. RUIZ:  Objection.  Form.

10              THE WITNESS:  Sorry.  We do not

11   use OARRS reports in those contexts.

12   BY MR. WAKLEY:

13          Q.   Why not?

14          A.   Because the information is not --

15   it's not as reliable as the original document.

16          Q.   Are you aware of any legal

17   requirements that keep OARRS reports or

18   information confidential?

19          A.   Yes, there's statutes of laws that

20   protect the OARRS information.

21              MR. WAKLEY:  I have no further

22   questions.  Thank you.

23              MS. BROWNE:  Okay.  I think we're

24   done.

25              THE WITNESS:  Are we sure?

1                THE VIDEOGRAPHER:  We're off the

2   record.

3                (Thereupon, signature was not

4   waived.)

5                (Thereupon, the deposition

6   concluded at 5:21 p.m.)

7                          *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

304

```
 1  STATE OF OHIO            )
                                      Page 304
 2  COUNTY OF MONTGOMERY  )   SS: CERTIFICATE

 3              I, Christine Gallagher, a Notary

 4  Public within and for the State of Ohio, duly

 5  commissioned and qualified,

 6              DO HEREBY CERTIFY that the

 7  above-named ERIC A. GRIFFIN, was by me first duly

 8  sworn to testify the truth, the whole truth and

 9  nothing but the truth.

10              Said testimony was reduced to

11  writing by me stenographically in the presence

12  of the witness and thereafter reduced to

13  typewriting.

14              I FURTHER CERTIFY that I am not a

15  relative or Attorney of either party, in any

16  manner interested in the event of this action,

17  nor am I, or the court reporting firm with which

18  I am affiliated, under a contract as defined in

19  Civil Rule 28(D).

20

21

22

23

24

25
```

1          IN WITNESS WHEREOF, I have hereunto set my
2    hand and seal of office at Dayton, Ohio, on this

3    28th day of January, 2019.

4

5

6

7

8    CHRISTINE GALLAGHER
     NOTARY PUBLIC, STATE OF OHIO
9    My Commission expires 8-28-2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                  Page 306
 1                     Veritext Legal Solutions
                           1100 Superior Ave
 2                            Suite 1820
                        Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4

      January 28, 2019
 5

      To: James T. Wakley
 6

      Case Name: In Re: National Prescription Opiate Litigation v.
 7

      Veritext Reference Number: 3194811
 8

      Witness:  Eric A. Griffin       Deposition Date:  1/23/2019
 9

10    Dear Sir/Madam:
11

      Enclosed please find a deposition transcript.  Please have the witness
12

      review the transcript and note any changes or corrections on the
13

      included errata sheet, indicating the page, line number, change, and
14

      the reason for the change.  Have the witness' signature notarized and
15

      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18

      If the errata is not returned within thirty days of your receipt of
19

      this letter, the reading and signing will be deemed waived.
20

21    Sincerely,
22    Production Department
23

24
25    NO NOTARY REQUIRED IN CA
```

```
1                   DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2

     ASSIGNMENT REFERENCE NO: 3194811
3    CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 1/23/2019
4    WITNESS' NAME: Eric A. Griffin
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have made no changes to the testimony
     as transcribed by the court reporter.
8

     _____          _____
9    Date                            Eric A. Griffin
10         Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17

                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2

     ASSIGNMENT REFERENCE NO: 3194811
 3   CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 1/23/2019
 4   WITNESS' NAME: Eric A. Griffin
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Eric A. Griffin
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 309

1                     ERRATA SHEET
               VERITEXT LEGAL SOLUTIONS MIDWEST
2                  ASSIGNMENT NO: 1/23/2019
3      PAGE/LINE(S) /       CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____        _____
20     Date                          Eric A. Griffin
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
25                   _____
                     Commission Expiration Date

**[& - 2]**

**&**

**&** 7:3,21 8:24
178:15

**0**

**000106** 167:14
**00044** 175:17
**00105** 183:25
**0016** 197:16
**002052981** 154:24
**002052992** 154:25
**0110318** 242:14
**012217** 45:9
**012220** 45:9
**02** 52:2,3 199:22
**04-03-2000** 155:1
**08** 197:1,3
**09** 197:1

**1**

**1** 2:12 21:16,22,22
22:14,17 47:15
116:20 155:12,23
161:15 176:1
193:13 194:3,15
194:22 205:18
209:7,7 210:3
249:13,18,18
250:11,14,15
266:3,3 267:19,20
268:2 269:7 270:7
272:1,5 275:8
277:14 297:23
**1's** 68:12
**1,000** 92:22
**1,508** 161:18
**1-3** 4:18 177:24
**1.9** 275:24
**1/23/2019** 306:8
307:3 308:3 309:2
**10** 4:7 155:14
156:9 159:18

160:3,6 167:6,10
167:11 175:7
189:3 269:19
284:13,22 285:23
**100** 160:7 176:19
**1000** 8:4
**100617-131**
175:22
**106** 86:2 100:23
101:2,9,18 184:1
**106s** 88:17,17
101:5
**10th** 168:2,19
**11** 4:12 155:13
156:19 175:1,6,6
**110** 6:4 242:8,16
243:13
**1100** 7:12 306:1
**115** 3:5
**11th** 25:15 176:8
**12** 4:17 155:13,14
156:9,19 160:3
177:24 178:3,12
**123** 285:2
**12th** 179:16
**13** 4:22 159:2
175:13 183:20,24
184:5 190:7 249:7
249:15,15 250:20
252:9,24
**13-15** 4:13 175:1
**13/14** 255:22
**14** 5:2 179:10
187:13,18 194:16
196:13,17 201:9
256:7
**14/15** 259:18
**140** 3:9
**15** 5:7 22:17 36:3
36:3 175:13
187:17 192:17

196:23 197:4,8,13
197:16,22 201:14
249:8,10 250:11
257:1 261:14
284:20 285:20,22
297:20
**15/16** 257:1
**154** 3:14
**158** 3:19
**158371** 176:13
**15th** 189:16,18
193:20,23 200:6
200:13,19,21,24
206:1
**16** 5:12 115:19
133:14,17,22
159:25 192:21
193:1 196:19,20
196:22 197:6
203:15,20 211:13
217:19 257:1
261:14 275:23
293:3,9
**1600** 7:18
**161** 4:1
**162105** 176:15
**167** 4:6
**17** 3:12 5:17 16:16
16:16 140:14
160:1 223:21
224:10,15 228:18
275:23 289:4
298:14
**174** 4:11
**177** 4:16
**17th** 8:21 140:10
**18** 5:22 16:17
163:6 228:3,5,10
289:4
**1800** 8:4

**1820** 306:2
**183** 4:21
**187** 5:1
**19** 6:2 16:17,19
23:9,13 24:2
242:6,12 244:3
**192** 5:6
**1970s** 160:24
164:14,17
**1978** 159:2,11,18
159:18,25
**1979** 159:2,12
160:1
**1980s** 164:5
**1981** 161:23
162:13
**1982** 161:16
**1983** 161:23
162:13,20
**1985** 163:9 164:3
**1990s** 221:10
222:7
**1994** 39:20
**1995** 36:9
**1996** 157:23 158:5
**1997** 157:24 158:6
**1999** 155:6
**1:17** 1:8
**1st** 161:16 178:4
194:18 200:9
201:14 242:13

**2**

**2** 2:17 22:17 25:1
25:5 47:1 97:16
99:2 156:2,4,5
159:8 161:21
168:1 171:19,22
171:23,23 176:6
178:25 208:22
269:22

**[2,000 - 30]**                                                        Page 2

**2,000**  92:23,25
169:5
**2,010**  159:4
**2,733,066**  275:13
**2,761,707**  275:14
**2.3**  275:24
**2.6**  275:23
**20**  6:8 23:9,13
24:2,2 162:7
264:22 265:2,20
307:16 308:22
309:22
**200**  21:4 160:2
162:9
**2000**  36:8 38:20
52:7 57:8,25
228:22 231:4
**20001**  7:6
**20005**  7:24
**2002**  56:21,23
57:15 58:4 231:4
231:6,6
**2003**  231:7
**20036**  8:5
**2004**  58:1 64:7
69:1
**2005**  46:22 57:8
58:1,4 69:1 231:7
**2006**  2:22 44:25
45:7 46:9 57:9
**2008**  5:8 35:15
36:9 39:12 41:2
42:17,20 50:9,11
63:25 64:2 126:8
127:1 164:23
174:21,22 192:17
192:22 193:16,18
197:15 227:6,9
242:25 253:1,4,6
253:22

**2009**  176:8 194:18
194:22 195:6
200:9 201:14
249:20 250:2,8
267:24
**2009-124**  194:19
**201**  178:11
**2010**  3:12 4:13
5:18 36:16 37:18
140:10,14 141:3
141:25 175:1,13
177:18 224:11,22
227:2,6 228:22
267:24 270:4
272:3 275:13
298:16
**2011**  5:23 128:11
153:7,25 202:17
228:6 247:23
248:6,10,23
267:21 268:1
**2011-057**  175:21
**2012**  168:2,19
179:16 253:22
254:4,19,25 255:2
255:15 256:3
270:9 271:2,15,23
**2012-1918**  167:21
**2013**  17:1 179:11
179:11,17 256:7
271:5
**2013-1696**  178:14
**2013/14**  256:22
**2014**  4:8,18 5:14
16:25 17:2,17
19:25 20:22 37:13
37:18,20 115:19
116:19,20 117:11
125:22 126:3
167:6,11 177:24
178:4 203:16,20

261:14 293:5,6
**2014-231**  167:19
**2014/2016**  259:14
**2015**  16:13 180:17
206:1 216:4
275:23
**2016**  4:22 35:4,13
38:21,21 80:8,8,12
183:20 184:2
271:6
**2017**  5:3 6:9 16:18
106:24 187:14,19
201:12 264:23
265:2,11,11 268:1
271:9 272:3
**2018**  16:13 92:25
107:6 170:21,22
171:3 174:13,19
265:12
**2019**  1:20 25:15
107:3 170:18
189:18 193:24
200:13,21,24
305:3 306:4
**202**  178:24
**202-434-5000**  7:24
**202-662-6000**  7:7
**202-778-1800**  8:5
**203**  5:11
**21**  2:11 4:22 22:21
159:11 183:20
**216-523-1313**
306:3
**216-696-2276**  7:13
**21st**  184:2
**22**  23:10,13 159:12
**220**  2:3
**222**  179:8,10
**224**  5:16
**228**  5:21

**23**  22:23 161:23
162:12
**231**  21:5 106:9,14
106:21 131:18
285:6,8
**23rd**  1:19
**24**  2:16 22:25
163:1,4,6 231:14
**242**  2:4 6:1
**243**  2:5
**247**  167:16
**248**  167:25 168:8
**249**  169:4
**25**  176:14 284:17
**25301**  7:18
**25th**  161:23
162:13
**26,600**  159:3
**264**  6:7
**26th**  8:16
**27**  2:21 23:2 24:3
24:5 44:25
**27th**  45:6
**28**  23:4 231:14
304:19 306:4
**280**  2:6
**2804**  1:7,8
**28th**  305:3
**29**  159:1
**2923.02**  156:15
**296**  2:7
**2nd**  45:9 183:25

**3**

**3**  2:21 44:25 45:6
45:12,12 47:1
140:20 162:12
168:17 179:15
209:3
**30**  2:12 8:16 21:16
21:23

**[300 - access]**

**300**   2:8 159:4
   162:6,16
**304-340-1000**   7:19
**31**   23:6
**3194811**   306:7
   307:2 308:2
**325**   8:10
**341**   205:21
**360**   162:5,15
**37**   155:15 156:8
**3719-18**   243:19
**3rd**   5:3 178:4
   187:13,19

**4**

**4**   3:2 22:17 91:14
   91:19,24 141:9
   159:3,22 160:9
   161:18 228:25
   240:7
**400**   160:1
**43**   162:9
**430**   160:2
**43215**   8:11,17,21
**44**   2:20
**44113**   7:12
**44114**   306:2
**46**   175:24
**464562**   176:18
**47-9-05**   188:24
**4729-25**   243:19
**4729-3-02**   199:19
**4729-37-05**   189:6
**4729-5-10**   197:23
**4729-5-20**   211:17
   212:10 294:16
**4729-5-30**   188:15
**4729-9-16**   191:25
   193:4,22 194:25
   197:18
**4729.54**   168:13

**5**

**5**   3:6 22:15 115:13
   115:18,18 116:7
   116:14 125:17
   141:10 155:22
   179:11 233:11
   240:21 269:18
**5,000**   180:15,20
**50**   176:15
**500**   7:18 61:24
   62:1,9 177:4,6
   269:19
**503a**   166:22
**503b**   166:22
**5:21**   303:6

**6**

**6**   2:12 3:10 21:16
   21:23 140:9,13
   142:13 231:7
   240:4
**6-65-2**   3:22 158:14
**6-88-1**   4:4 161:6
**600**   8:10
**600,000**   280:7
**614-466-6818**   8:17
**614-469-3939**   8:11
**614-995-7496**   8:22
**640**   82:22,24,24
   83:1,6,17,18,18
   112:9 113:3
   136:17,23 137:2,3
   137:9,11

**7**

**7**   3:15 154:19,23
   155:10 171:15,19
**70**   114:4 115:2
   274:19 275:1
**700**   21:1 106:8,13
   106:20 131:17
   283:21,23

**72**   65:6 110:12,21
   111:3,10 128:15
   153:21 168:21
**725**   7:23
**75**   1:17 181:18
**77**   8:21

**8**

**8**   3:20 155:25
   158:13,17 159:18
   164:14
**8-28-2023**   305:9
**8-9**   5:8 192:17
**80**   114:4 274:19
   275:2
**850**   7:5
**88**   231:10
**8:48**   1:20
**8th**   192:22 197:14

**9**

**9**   2:2 4:2 156:3
   161:5,10 164:4,10
   167:11 175:7
**9-10**   4:7 167:6
**90s**   222:4
**91**   3:1
**93**   128:11 153:8
   202:17 229:8
**94**   39:19
**95**   39:12,19
**950**   7:12
**96**   158:3
**97**   158:4
**990726-009**   3:17
   154:20 155:3
**9th**   192:22 197:15

**a**

**a.l.**   7:17
**a.m.**   1:20
**aa**   44:23

**abide**   163:21
   169:14 170:3
   211:20,24
**abides**   163:11
**ability**   24:22 81:1
   189:23 198:22
**able**   64:8 81:8
   85:21 86:18,20
   88:6 89:2,4,22
   90:1,5 103:2
   106:18 121:4,8
   126:24 130:5
   158:8 160:21
   188:4 198:18
   260:18 265:24
**abnormalities**
   86:12
**abreast**   108:22
**absolutely**   11:12
   17:5 56:18 65:22
   66:7 120:12
   152:14 182:18
   214:7 239:1
   262:11
**abuse**   3:10 46:14
   46:21 68:10,20
   70:8,15,19 71:14
   73:10 127:19
   135:20 138:8
   139:11,24 140:11
   140:13 141:6,11
   142:1,3,7 149:23
   179:8 226:14
   227:14
**abusing**   206:11
   207:7
**accept**   165:14
   198:2
**accepting**   138:2
**access**   16:4 17:23
   18:16 63:3 64:8

87:9 88:20 89:11
99:15 121:23
123:19 146:8
152:16,18,22,23
208:5,8 264:11
287:21,25 288:1,8
288:12,16 299:20
301:1,6
**accessed** 158:20
**accidents** 41:3
**accomplishment**
130:14
**account** 91:3
104:13
**accountable**
128:10 189:23
207:14 295:20
**accounts** 90:24
**accurate** 122:12
**accurately** 122:14
**acetaminophen**
269:19
**achieved** 157:4
**acknowledge**
307:11 308:16
**acknowledged**
69:14
**act** 26:11 47:4,10
93:17,19 218:25
219:2,12 248:11
307:14 308:20
**action** 2:18 24:6
25:2 30:14,22
31:8 32:6,15,20
33:14,19 63:21
85:14 98:6,7
239:25 256:18
260:16 301:8
304:16
**actions** 23:21,22
123:3 162:25

246:4,8
**activities** 74:12
**activity** 51:2,19
108:8 202:3
282:24 290:20,24
**actual** 18:24 48:7
110:10,16 111:9
112:16 183:15
269:12
**acute** 270:25
271:5
**ad** 136:7
**add** 76:8 287:3
**added** 153:17
188:21,23 257:17
289:1
**addiction** 150:5
166:9
**adding** 72:25
130:8
**addition** 15:9
25:19 26:17 40:25
53:25 67:1 71:2
71:11,20,24 72:12
72:25 79:13 82:5
112:21 129:3,15
130:2 208:18
**additional** 12:2
93:7 108:5 133:1
133:17 153:18
173:16 181:19,21
182:3 183:6,11
219:5 258:9,13,13
**additionally** 33:22
50:1 74:1 101:22
128:6 144:16
173:23 258:9
**additions** 73:3
**address** 33:8
122:24 123:7
127:2 199:5

282:24 306:15
**addressed** 123:1
127:19
**addresses** 122:21
**addressing** 127:16
223:25
**adequate** 123:7
176:8
**adequately** 122:21
123:17 124:5,23
125:2
**adjustments**
128:24
**admin** 32:4
**administered**
123:25
**administering**
180:13
**administration**
2:24 31:25 45:2,8
179:21
**administrative**
15:8 26:16 27:20
35:22 54:16 57:9
70:22,23 71:3,13
71:16 74:14,20,25
75:15 76:2,13,20
83:25 85:1,9,14
86:3,8,10 94:25
98:6 127:13 128:4
147:24 148:3
221:21 222:13
239:25 253:25
255:17,24 256:13
261:5 294:13,16
**administrator**
57:16 222:23
**admits** 243:15
**adult** 275:5 277:8
**advances** 26:13

**aemch** 7:19
**affairs** 225:17
**affect** 236:8
**affiliated** 304:18
**affixed** 307:15
308:21
**afternoon** 131:9
131:10 280:24
**age** 9:6
**agencies** 26:22
55:13,19 59:4
70:2 72:6 98:22
100:7 101:22
127:21 136:9,12
139:6 143:19
144:5 145:11,16
145:17,22 151:2
190:21 191:1,3
204:21 283:13
**agency** 55:9,13,17
62:19 72:9 97:18
98:19,25 100:10
129:17 145:12,13
151:23 173:25
190:18 235:11
**agenda** 30:8,8,20
31:19 32:2,8
33:14,20
**agendas** 30:10,22
31:5 32:15
**agent** 27:21 28:8
35:15,17,24 36:15
36:20 96:20 97:7
97:14 101:8
134:12 300:20
**agent's** 96:22
**agents** 89:18 90:16
90:24 132:17,20
133:5,10,19,19
**agin** 4:3 161:6,12
161:16,22 162:13

163:1 164:11
ago  29:2 80:7
  92:22 113:14
  118:7 143:23
  232:21 263:25
agree  22:14 24:21
  44:10,16 70:7
  141:24 163:20
  164:9 169:22
  170:3 223:23
  250:11 278:5
  286:1 288:20
  289:24 290:4
  291:5 292:10
  295:2 299:7,18,19
agreed  270:10
agreement  3:15
  6:2 153:2 154:19
  155:2,10 157:2
  167:20 169:19
  171:16 173:25
  175:21 178:13
  242:6,15 243:2
agreements
  173:12 214:18
  286:11 287:2
agrees  177:3
ahead  220:6
  231:15 299:13
aid  288:12
akron  184:11
  263:24 284:7
  285:14
albany  39:16
alcohol  11:3 94:3
  149:22
alerts  129:7
allegation  234:23
allegations  155:16
  243:16

alliance  218:23
allocated  29:7
allowed  74:11
  179:6 302:6
alprazolam  43:13
  43:17 47:19,25
altered  252:2,4
ambit  105:21
ambulance  179:6
  179:9,20 180:4
ambulance's
  179:3
ambulances  180:9
amended  250:1
amendment
  188:11,18
amendments
  188:9
american  236:12
amerisourceberg...
  7:14 61:13 244:22
amount  29:6 43:5
  73:23 88:18
  104:11 129:4
  159:20 172:20
  177:6,20 262:9
  269:12 282:14
amounts  43:9
  49:12 60:25 121:1
  121:2,3,23 123:20
  148:20 159:19
  177:12 226:7
analgesic  205:23
analysis  73:5
  112:18,19 118:17
  118:25 119:6,8,16
  119:20
analyst  255:18
  256:8,25
analysts  256:23

analyzed  233:8
analyzing  81:3
anda  245:9,10
angle  127:18
  128:4
annual  6:9 33:4
  34:8,9,18,24
  132:11 202:12
  264:23 265:10,16
annually  202:1,1
answer  11:10 62:6
  165:11 206:25
  235:6 265:25
  276:18
answered  202:22
anthony  8:3
  296:17
antibiotics  168:24
anticipate  11:6
  13:4 263:7
anybody  11:22
  27:14 52:19 55:11
  91:25 102:1
  119:12 236:25
  267:13 300:5
ap  115:19
apologize  31:20
  230:23 243:7
apostrophe  175:23
appeal  214:20
  215:5,9
appeals  215:1
appear  81:4
  173:20 245:25
  307:11 308:15
appearance
  220:22
appearances  7:1
appears  94:3
  168:25

appended  308:11
  308:18
applicant  168:1,18
applicant's  165:14
application  160:16
  165:18
applies  193:13
apply  223:8 236:5
applying  223:2
appointed  38:13
  118:1
approach  127:4
appropriate  47:4
  75:5 86:6 177:13
appropriately
  66:4
approve  178:21
approved  194:20
approximately
  19:21 20:25 29:18
  34:17 38:14 61:18
  106:8,9,19,21
  131:17,18,23
  160:1,2,3 161:18
  162:5,6,9,15,16
april  4:22 183:20
  184:2 189:16,18
  193:20,23 200:6
  200:13,19,21,24
arcos  89:12,15
  90:20 91:3 120:17
area  43:8 54:8,9
  70:21 82:11 96:25
  101:11 263:16,17
  279:20,20 280:1
areas  66:19 67:17
  70:21 226:14,22
article  115:19,25
  116:11,25 228:23
  233:11 234:23

articles 116:12
aruiz 8:6
aside 24:24 25:22
  48:8 142:10
  173:10 180:24
  195:14 228:2
asked 10:10 12:22
  13:4 218:18
  223:16 232:17,20
  233:10 240:3,6
  256:8 259:1 263:3
  267:8 272:25
  277:8 279:3 281:8
  298:20
asking 10:5 11:7
  110:3 213:5 214:5
  229:5 237:14
  272:7 297:1
assembly 205:21
assign 45:11 55:14
assigned 28:9
  50:17 51:20 52:7
  97:5,6 134:8,12
  241:8 254:11
assignment 95:14
  307:2 308:2 309:2
assist 202:23
  203:4
assistant 8:16
  11:16 32:13 37:3
  37:6,13,16,21 38:1
  38:2,5,11 126:19
  143:1
assisted 151:4
assists 225:11
associated 95:25
association 42:1
  97:18 174:1
  204:13 217:17
  225:7,10,14
  230:23,25 231:2

236:11,12,13,15
associations 236:4
  236:10
assume 64:4 171:5
  215:10 221:13
  222:5 241:7
  267:25 274:2
  276:21 283:15
assuming 56:8
  158:11 215:2
  275:18
attached 4:23
  179:11 183:21
  308:7
attempted 156:14
attending 41:25
attends 144:23
attention 95:4
  96:11,15 253:15
attorney 7:5,11,17
  7:23 8:4,9,14,16
  11:16 14:8,19
  145:19 215:3,3
  304:15
attorney's 75:12
audience 142:13
  204:2
audits 104:10
authority 70:24
  128:9,12 150:11
  153:13,14 219:16
  221:25
authorize 308:11
authorized 195:20
automated 6:8
  80:5,6 112:10
  222:17 264:22
automatic 214:6
automatically
  109:23 110:2
  157:10 181:11

185:25 186:9,16
  212:20 223:9
autopsy 114:15,16
availability 56:19
available 18:3,6
  58:2,15 63:1,23,25
  64:3 72:10,24
  77:18 90:10
  103:18 108:25
  111:17,24 113:18
  114:6 120:14,17
  121:2 130:6 158:5
  173:15 238:4
  291:22
ave 306:1
avenue 7:12
average 105:8
  277:15,16,24,25
  278:21
avoid 220:17
aware 22:20 42:20
  46:14 50:18 64:17
  69:14 78:25
  106:19 119:10
  140:3 213:3 221:4
  221:7 233:16,21
  244:8,15 247:5,8
  247:12 254:4
  255:3,14 256:1
  270:18 277:12,13
  294:10 299:23
  300:1 302:6,16

**b**

b 2:12 21:16,23
  156:20,21 210:17
back 16:16 20:16
  38:19 94:22 98:15
  141:3 143:14,18
  155:14 157:19
  196:13 197:21
  203:12 205:18

209:7 211:13
  221:9 222:4 227:2
  231:5,10 242:24
  249:5 253:8,9
  267:21 272:6
  274:7,9,11,12
  280:20 295:22
  306:15
background 71:4
  133:3,6,7,8
backing 39:10
backwards 267:22
bad 191:18
bagging 199:8,9
based 23:22 124:7
  124:24 135:16
  166:3 181:22
  183:14 186:15,24
  216:5 231:24
  232:1 240:6 241:2
  241:14 256:19
  258:22 260:3
  261:18 264:5,8
  278:19 279:20
  280:8,13 301:8
basic 48:24
basically 75:2
  252:11 253:25
basis 30:4 51:7
  70:3 89:19 90:16
  93:11,15 95:17
  96:3 100:20 110:3
  120:19 129:13
  180:13 201:3
  202:12 214:11
  230:22 282:2
bates 242:13
bear 164:22 210:6
bearing 154:24
  192:25 197:15

**bears** 45:8 175:16
204:17
**beg** 13:10 120:9
174:14 175:11
180:7 187:17
192:14
**beginning** 240:1
243:13 259:13
**begins** 294:5
**behalf** 7:2,8,14,20
8:1,7,13 25:19
179:9
**behaviors** 83:16
**beings** 239:4
**belief** 123:6
124:22
**believe** 21:4 41:21
42:25 43:2 46:8
54:25 60:1 63:9
63:15 71:6,14
80:4 83:20 90:9
90:12 111:5,16
114:13 122:19,20
122:23 124:20
126:4,6 127:16
130:19 136:11
141:8 142:24,25
143:2 145:8 146:3
154:1 158:19
162:1 164:1 165:8
173:6 192:12
198:12 204:6,22
215:14 221:17
222:2 224:3
225:15 244:6
245:20 246:3
248:19 249:4,21
250:4,9 253:11
257:7 259:11
261:16 265:2,19
267:4 271:3

272:22 273:15
274:13 282:16
283:5,20 287:3
296:22 297:8,20
**benzodiazapine**
43:17 205:23
**best** 11:9
**bet** 45:19 76:10
**better** 123:17
**beyond** 257:18
**big** 41:4 129:20
230:3,7 244:19
293:13
**biggest** 57:20
**bill** 128:10 153:7
154:3 202:17
229:8
**billing** 146:4
**bills** 153:5
**binder** 255:25
256:3
**binders** 254:1
**biphetamine**
159:10 160:3
162:7,16
**bit** 53:9 66:14
74:13 82:16
132:10 134:21
136:16 146:20
180:6 187:7
195:15 244:22
252:19 261:17
266:21
**blasts** 71:23
**blown** 166:20
**blueprint** 218:1,10
**board** 1:18 2:13
3:2,16,20 4:2,8,14
4:19 5:2,9,12,17
5:22 6:3 8:13,19
9:24 18:6,13,23

20:20 21:17,24
22:6 23:20,21,22
25:20 26:2,21
35:7,7,9,13,25
36:5,11 37:12,24
38:23 39:2,4
42:11,14,20 43:23
47:9 48:14 50:9
50:10,13 59:7,12
59:16,22 60:3,3,10
60:18 66:13,14,18
66:19,22 67:5,6,9
67:16 68:2,19
69:3 70:7,11,14,18
73:9,24 74:15
75:23 76:3,16,17
76:21,25 78:2,15
78:17,24,24 79:4
79:15 80:17,25
81:7,8,14,21,24
82:14 83:8,21,24
84:3,8,17 85:2,3,8
85:17,21 86:10,18
86:20 87:8,9,17
88:5,5,9,20 89:2,4
89:11,15,22 90:1,5
90:15,20 91:2,14
91:21 92:2 98:1,9
98:9,9,10,14 99:20
100:5,14,16 101:6
101:10 103:18,22
104:19,23,24
108:18,22,25
109:8 111:18,21
111:25 112:1
116:16 117:7,21
119:9,14,18,22
120:10,13,16,21
121:14,17,18,22
122:13,13,19
124:5 126:6

128:11,18 129:7
130:17,22 133:13
135:2,19 138:7,15
139:10,23 140:23
141:3 142:20,22
143:15,16,25
144:4,17,19,24,25
144:25 145:1,2
146:11,24 147:9
147:19,23 148:18
149:3,21 150:17
151:2,11,14,25
153:6,7,10 154:20
155:2,7 156:23
158:8,13,20,21,24
159:9,23 160:10
160:15,21 161:5
161:10,11,22
162:24 163:12,12
163:15,20,21
164:6,18,23,25
165:13 167:7,12
167:20 168:10
169:15 170:3,7,10
173:15 174:5,19
174:23 175:2,14
175:22 177:11,25
178:5,13 180:25
184:6,8,15,18
187:13 189:12
190:1,16 191:4,15
192:18,23 193:16
194:25 195:12,20
197:15 199:11
201:23 202:21,23
203:15,21 205:8
208:6 209:9
210:15 211:8,14
211:19 212:21
213:2,25 214:16
214:18 215:4,21

215:25 217:20,22
218:11 219:10
220:19,23 221:1,6
221:18,24 222:2,9
222:9 224:10,21
225:9,10,13
227:17,19 228:5
229:4,22,23 233:6
233:13,19,19,25
234:19 237:25
239:8,11,15,24
240:1 242:7,15,24
243:17 244:11
246:1,10 247:13
247:25 250:6
251:4,24 252:20
252:25 254:17,25
256:13 261:20
263:6,23 264:7
265:5,10 277:1
278:21 279:9,12
279:16 281:9
282:23 293:4
300:22 301:7
302:2
**board's**  24:5 68:9
124:22 126:25
180:8 187:8 234:1
243:16
**boards**  72:3
101:21 127:23,23
136:14,15 143:25
149:21 190:24
202:24 204:13
205:5 217:17
229:16 235:14
**boat**  41:14
**bonish**  28:11
**bonus**  129:16
**book**  10:5

**bop**  35:8 45:8 46:3
46:6 59:1 62:19
63:4 64:9 78:8,9
91:20 126:13
183:25 187:18
242:13 298:11,16
299:23 300:1
**boring**  131:1
**bottle**  89:8,9
**bottles**  182:11
**bottom**  141:12
171:18,24 175:17
176:2 178:12,25
194:19 240:7
243:12 268:6
293:14 295:17
**boulevard**  8:10
**bounds**  72:15
**box**  93:4,5 97:21
**boxes**  121:11
**brandy**  8:9 281:1
**branjan**  8:12
**break**  10:13,15,16
10:19 52:25
130:25 171:7
203:5 269:4,5
300:11
**breakdown**
285:11
**breaks**  268:13
**brenda**  32:14
**brian**  179:6,20
**brief**  20:4 281:3
**briefly**  280:20
**brings**  97:2
**broad**  8:16
**broader**  173:5
**broke**  135:18
**brought**  154:4
279:23

**broward**  43:8
**brown**  199:8
**browne**  2:2 7:4
9:10,13 17:6 20:7
20:12,16,18 21:20
23:14,19 24:1,10
24:13,15,18,19
25:4 44:23 45:4
45:12,14 46:1
52:24 53:7 91:5
91:17 115:16
116:8,10 130:24
131:8 140:8,16
154:22 158:16
161:8 167:9 171:6
171:13 175:4
178:2 183:23
187:16 192:20
196:21,24 197:3,9
197:20 203:5,11
203:18 206:24
219:19,24 221:19
223:21 232:9
233:10 240:3
300:6,11 302:23
**browne's**  237:7
281:7
**bucket**  127:4
**buckle**  179:6,20
**bulk**  159:20
**bullet**  125:16
294:4 295:7
**bullets**  293:15
**bureau**  52:7 128:1
146:11
**burglaries**  52:22
**burling**  7:3 8:24
**business**  34:6,15
44:15 61:20 62:4
62:16 66:4 183:16
194:11,13 261:25

**buying**  182:7,8,25
**buys**  51:9
**bwc**  127:23,25

**c**

**c**  156:19 157:6
160:15 175:23
210:17
**ca**  306:25
**cabinet**  24:6 59:10
**calculates**  186:10
**calculation**  83:2
**call**  33:23 67:11
72:6,8 82:3 93:10
100:18 101:1
102:25 129:16
133:20 149:1
223:2 247:22
248:4 259:25
264:8 265:11
**called**  1:12 30:7
82:22 172:17
221:6 225:19
226:6 259:1
263:22
**calling**  258:16
282:8
**calls**  100:20
101:17 229:4
**cameron**  12:6
130:18 136:11
**cancer**  262:7
278:23
**capacity**  23:9 25:7
25:20 60:19
**capitol**  1:17
**capsules**  160:1,2,3
160:6 162:6,16
268:5
**captures**  77:25
**card**  160:11 163:1

**cardinal** 6:4 7:20
61:8,9 174:18,22
184:6 185:11
186:6,12,13 242:3
242:7,16,23
243:13 245:3
**care** 73:4 122:11
125:13 130:9,9
167:22 178:16
210:12
**caribbean** 231:24
**carole** 155:1
171:16
**carolina** 229:5
**carried** 33:20
**carry** 198:20
**case** 1:8 15:16,19
16:21 17:13 18:21
19:8 21:8 33:9
41:23 54:19 75:9
84:22,24 89:20
96:8 105:17
107:23 111:9
120:19 134:16
153:2 167:21
170:11 178:14
180:1,14 244:16
244:17 254:11
287:7 306:6 307:3
308:3
**cases** 21:5 29:6
55:15 75:12 76:11
77:6 132:2 146:1
148:20 173:24
247:19 285:18
300:25 302:2
**cash** 50:4 80:21
138:2 154:9
194:12 248:24
**catalog** 122:9

**catalogued** 254:1
255:5 256:13
**categories** 167:4
235:25
**categorize** 172:15
**categorized** 239:4
**cause** 161:25
**causes** 240:7
**cautioned** 9:7
**cdc** 94:7 150:21,23
**ce** 66:22 67:2,21
71:25 75:17
129:11,14 164:2
173:16,19 223:7
**center** 146:5 168:4
168:20 251:10
**certain** 23:23
56:17 67:17 68:4
79:8 93:15 96:24
112:7,20,21 134:9
136:1 165:21
172:17,18 177:12
201:20 202:9,10
279:24 287:2,4
290:14,15 293:25
**certainly** 10:16
**certainty** 124:5
**certificate** 304:2
308:11
**certification** 307:1
308:1
**certified** 9:8 36:2
36:3 40:2,6 223:3
223:6
**certify** 304:6,14
**cetera** 97:19
**cfr** 35:22
**chad** 118:18 233:9
276:13
**chain** 28:17
182:15,16 210:23

282:5
**chains** 281:25
288:11
**chair** 218:18
**challenges** 34:12
42:2
**challenging** 122:6
**change** 36:12,19
56:16 66:23 72:17
91:6 117:19,21,22
121:25 122:10
123:15,24 171:7
189:1 194:4
200:20 201:21
202:9,16 216:6
235:15,15 262:9
262:21 286:13
306:13,14 308:8
309:3
**changed** 21:14
63:11 129:22
198:13 200:13,24
201:6 202:2,11
250:1 253:3,9
255:16,17 256:23
257:16 258:2
278:3
**changes** 26:12
67:15,22 70:25
71:1 108:23 128:8
128:8,25 130:17
136:1 144:20,20
147:4 200:10
201:8,25 202:6,8
208:21,21 209:2
218:24 219:1
224:6 236:18
251:25 306:12
307:7 308:7,9
**changing** 49:11,14
60:25 70:24 128:6

130:8 136:17
180:9 200:6
285:25
**charge** 37:4,7 54:7
54:14 55:12 57:10
57:16 116:23
231:9
**charles** 3:21
158:14,21,25
159:9 160:16
**charleston** 7:18
**chart** 267:20,23
268:2 269:13,22
270:7
**charts** 269:4,11
271:14
**cheap** 58:2
**check** 101:18
196:6 206:5
213:20,23 237:24
263:14 272:20
291:19 294:9,12
294:17,23 301:9
**checked** 232:19,22
237:11,16 251:21
274:6
**checking** 128:20
237:18 239:10
293:25 295:15
**checks** 213:12
**chemicals** 169:1
**chief** 8:20 27:15
27:18 28:17,19,20
28:20 95:19 97:10
119:10 130:21
136:5 145:15
**chiefs** 30:1,3 32:24
92:14 95:10,11
97:4
**child** 59:8

**[choose - comment]**                                                                    Page 10

**choose**  19:17
**chooses**  120:16
**christine**  1:14
  304:3 305:8
**christy**  197:12
**chronic**  271:4
**circulated**  30:17
  30:23 32:2,9,16
**circulates**  32:12
**circumstance**
  79:19 287:10
  290:17
**circumstances**
  47:14 89:14
  181:13 202:14
  206:5 216:12
  291:18 292:24
  293:25 294:22
  295:3,14
**citation**  75:6
  216:16
**cites**  294:12
**cities**  135:8
**city**  54:1,10 55:6
  55:22 56:4,4
**citycenter**  7:6
**civil**  1:13 2:18
  25:2 304:19 307:5
  308:5
**clandestine**  68:15
**clarified**  272:20
  273:16
**classes**  40:3
**clause**  168:9
**clean**  300:9
**clear**  131:11
  197:10 241:3
  266:22
**cleared**  204:20,22
**clearly**  240:13

**clerk**  17:25 18:9
**clerk's**  17:24
  18:16
**cleveland**  7:12
  262:1 284:8,10
  306:2
**clients**  65:10
**clinic**  166:6 247:2
  248:3 262:2 282:7
  288:5
**clinical**  130:7
  207:25
**clinics**  49:4 73:2
  128:12 153:16,19
  153:24 154:12
  217:9 226:6
  246:22,24 247:5
  247:21 248:5,9,18
  288:6
**close**  278:1 281:4
**closed**  46:15 47:19
  68:17
**closely**  51:18
**cmcnamara**  7:25
**coalition**  151:6,8
**cocaine**  57:3,4
  58:6
**code**  15:8,9 35:21
  35:22 168:14
  191:25 193:9
  197:18 211:20,24
  221:21 222:13
  243:20 294:13,16
**codes**  189:3 289:5
**codified**  187:4
  298:10
**collaborate**  108:6
  144:14 151:2
**collaborated**
  151:3 218:11,12
  231:2,12,21 232:4

232:7
**collaborates**
  147:19
**collaborating**
  230:20
**collaboration**
  147:8 148:18
  151:5,12 283:3
**collaborations**
  144:4
**collaborative**
  273:3 286:11
**collaboratively**
  127:21 143:11
**colleague**  13:11
**colleagues**  219:21
  272:7
**collect**  76:21,25
  78:15,17 79:8,12
  85:17 86:19 88:9
  88:11,13,17,24
  108:5 301:23
**collected**  301:14
**collecting**  289:5
**collective**  70:2
**collectively**  189:22
**collects**  93:6
**colleen**  7:22 242:2
**college**  40:3
**color**  215:15
**columbus**  1:17,18
  8:11,17,21 100:19
  135:10 184:7
  280:3,6
**column**  140:22
  187:25 205:19
  275:10
**columns**  277:17
**combat**  71:1
  117:13 129:1
  135:20

**combats**  139:11
**combatting**
  120:22 143:15
  189:19,21
**combination**
  112:22 132:16
  142:9 208:23
**combinations**  83:9
**combine**  276:3
**come**  15:19,21
  42:11 51:11 60:23
  61:1 85:2 93:3,5
  93:12,14 99:17
  101:8 133:2,5,7
  157:19 213:17,17
  220:21 238:25
  275:25 280:19
  283:12
**comes**  70:16 93:6
  93:16 107:9
  112:20 150:22
  214:10 218:17
  238:23 253:1,8
**comfort**  218:6
**coming**  26:20
  33:13 36:5 39:4
  43:6,11 47:24
  48:3,10,11,13,18
  48:20 126:1
  137:23 209:2
  248:23 279:25
**command**  28:17
**commander**  50:18
  51:6 52:1 53:10
  55:18 56:22 57:7
  231:9
**commanders**  42:1
  70:1 230:14,21,24
  231:1
**comment**  261:18

comments 251:1
commission 205:7
  305:9 307:19
  308:25 309:25
commissioned
  304:5
committee 75:4
  173:21 216:16
  218:16 236:4,6
common 88:15
  141:20 283:4
  300:21
commonly 88:10
  88:12 101:3
communication
  12:12 130:19
  136:4 225:16
  229:24 230:1
community 56:17
  58:11 115:11
  139:8
company 39:22
  174:1 194:9
  245:17
compare 103:22
  277:2
compared 112:14
  113:15 232:11
  233:1 273:14
comparing 113:24
  114:21 118:13
comparison 115:8
  118:8 277:9
compensation
  128:1 146:12
compiled 233:8
complaint 3:3
  82:3 91:15,21,25
  92:1,13 93:2,3,9
  93:16 94:12 95:3
  95:25 97:3,16,17

98:16,16 99:1,3,8
99:21 100:2,10,12
100:24,25 102:11
102:25 107:9
108:6,12 134:11
213:4 217:6,10,14
239:9
complaints 21:1
26:20 92:4,7,16,17
92:24 93:12,20
94:21 95:9,13
96:11 98:11,21
100:6,17,18,21,21
101:13 102:1,4
106:8,13,14,14,17
106:18,20,21
107:2 131:22
181:9 217:7,9,12
219:16 281:9,15
283:11,12,19,21
283:25 285:2,6,8
285:12
complete 10:20,24
11:9 59:3 105:5
107:20,21 132:15
156:22 165:18
246:9
completed 34:6
107:13 108:14
148:4 156:25
157:18 306:15
completes 163:8
completion 32:20
34:4 157:7
complex 105:11
complexity 124:14
compliance 25:24
26:5 27:3,4 31:24
32:3 33:1 35:3,15
35:16,24 36:14,18
36:20,20,22 37:4,7

37:9,17,23 38:3,16
38:19 79:24,25
92:12,19 94:17
105:13,21 112:6
113:9 116:19,23
119:11 130:22
132:17,19 136:6
174:2 178:7
211:14,16 251:23
253:18 282:6
300:20
complies 166:18
comply 169:18
complying 199:17
component 71:12
81:6 164:2
compound 168:3
compounded
94:10 168:19
198:22
compounder
150:23
compounders
124:16 166:13
218:7
compounding
94:6,8 133:2
167:1 217:25
218:4,9 229:14
computer 109:23
263:10
concerned 190:2
261:22
concerning 92:2
concluded 303:6
conclusion 75:16
207:12 295:18
concurrently
163:5
condition 157:3
163:7 289:22

conduct 26:16
59:2 75:1 79:4
134:6 158:8
164:10,13 297:15
conducted 2:1
20:20 50:14 123:5
127:7 146:1
243:18
conducting 26:8
82:13 104:19
152:13 214:17
conducts 147:25
214:18
conference 96:3
confidential 81:20
149:15 248:21
260:6 261:3
302:18
confined 131:20
confirm 158:1
conflict 203:2
confused 237:3
conjunction 84:16
84:21 284:9
connecting 72:20
130:13
connection 254:22
297:13,16
connolly 7:21
consecutive
206:11
consider 230:7
295:15
consideration 83:5
190:1
considered 279:13
279:17
considering
221:14
consistent 201:21

constant 124:1
180:9 278:8
constantly 124:4
consult 287:1
292:7
consultant 174:10
consultation 203:1
218:23 292:1
consumer 205:7
consumers 141:19
contact 97:11,12
102:11 148:14
183:5 258:3
259:25
contain 257:21
contaminated
150:13,18
contamination
94:10
content 204:10
context 146:22
151:13,22 252:5,8
257:21
contexts 302:7,11
continual 180:13
continually 201:2
continue 83:22
129:10
continues 295:22
continuing 27:5,9
66:15 67:17,24
68:4 157:11 183:9
223:1 224:1
contract 304:18
contracted 78:11
contraindicated
172:7
contributed 241:9
control 65:15,24
73:17,18,19,21
122:25 127:24

128:23 144:14
145:2,20,24 179:4
180:8 298:8
controlled 46:16
47:17 49:6,7,17
58:20 62:12 64:15
65:6 66:12 77:25
87:14 102:21
109:16 110:9
114:3 115:6
153:21 155:23
156:1,4 159:6
160:5 161:24
162:8 179:8,18
180:3 219:11,17
226:8 282:15
controlling 20:6
convenience 290:9
conversation 34:4
conversations
117:15 136:12
218:14 259:10
280:10,11 289:17
convicted 71:18
conviction 17:8,19
18:1,2,10,17 19:12
21:9
convictions 15:18
17:15 18:14,25
19:7,14,23,24
cookie 83:12
154:10
cooper 32:14
cooperating
282:23
cooperation
235:13 283:3
coordinate 98:4
148:23 149:4,7,22
150:12,14

coordinates
146:11,25
coordination
146:14,18,21
147:8 149:3,11,20
150:6
copies 46:6 301:24
copy 25:5 99:19
101:9 140:9 192:8
192:9
corner 224:16
293:14
corporate 208:15
corporation 7:2
7:15 9:13 61:4
244:23 296:21
corporations
281:25
correct 14:9 17:8
17:9,21 19:4
39:13 44:14 47:25
53:13,22 58:7
62:5,17,18 63:8
66:16 67:7 68:21
69:1,15 70:9
75:24 76:8 85:19
85:20 86:17 87:24
96:12 97:9 103:11
104:6 105:25
106:22 109:2,5,21
109:24,25 111:19
113:3,4,12 114:11
114:24,25 115:7
116:16,20 118:12
120:11,17 121:19
123:20 124:8,9
125:19 131:21
136:2,21 137:1,2
138:8,17 141:4
147:20,21 151:20
153:16 154:17

155:7 157:15,24
158:10 160:5,11
161:19 162:10,17
163:2,13,17,18
164:15,20 165:11
168:15,21,24
169:7,12,16,17,19
169:25 170:4
176:4,13 177:4
180:4 184:8,12
185:3,11 186:23
187:10 188:2
192:2 196:8 201:9
204:13 207:17
208:6,14,17,21
209:3 210:22
215:7 217:23
221:16 223:14,15
226:2 227:21,24
228:18,22 229:9
229:20,21 234:17
237:11 238:1,5
240:14,18,25
241:5,9,15,18
244:7 246:20
249:17 252:14
254:16 255:23
257:23 261:20
262:13 263:2
267:17,22 268:11
269:9,20,24
271:13 276:15
283:16 284:2
286:22 288:25
289:11,22,23
292:18,21,23
295:5,15
corrected 160:8
corrections 306:12
308:17

corrective 123:3
215:19
correctly 46:18
47:6,21 97:20
117:8 141:22
168:6 176:21
179:13,22 206:2
206:18 226:17,25
259:20
correlate 270:14
correlation 52:13
correspond
270:15
corresponded
177:20
correspondence
15:9 233:17,21
234:3,7,10
corresponding
225:20,23 228:13
294:11,23 298:22
corroborate 108:6
cost 98:12
counsel 8:20 11:15
11:20,23,25 14:16
14:19 15:13
counseling 150:4
count 197:5
counties 20:21
41:9 54:19 106:5
107:8 132:1,3,7
135:7 230:21
231:10
country 46:17
72:21
counts 156:14
county 17:24 18:9
19:20 20:25 21:3
29:8 36:1,7 39:11
39:12 41:12,20
42:4,5 43:8 50:21

51:12 53:11,19,21
53:22,22,24 54:3
54:13,20,20,22
55:5,19,21,25
56:11 68:24 75:11
84:7,22 85:5 90:3
90:8 106:10,20,21
109:5 135:5,9
151:1,5,7 214:24
227:19 231:20,23
231:25 232:1,6
283:16,20,22
284:5 285:3,13,15
285:17 304:2
307:10 308:15
couple 19:11,12
29:2 113:16,21
149:14 158:3
162:19 173:11
174:23 214:15
217:17 219:8
220:18 223:17
224:18 231:22
232:14 241:23
242:4 263:25
296:9
course 44:15
76:19 78:16 82:13
86:1 114:20 162:4
169:24 217:3
267:1 289:18
court 1:1 54:15
214:25 304:17
307:7
courts 17:25 18:9
135:17
cov.com 7:7
cover 201:16
273:7
coverage 290:11

covered 52:9
covington 7:3 8:24
cpe 66:14,20 67:3
67:5,6,10,12,13
cpsc 204:17
crack 57:3 58:5
create 16:7 49:24
136:9
creates 204:10
creating 227:24
creations 167:22
credit 66:20
223:11
crime 74:8 152:18
152:21,24
crimes 51:14,17
51:18 52:4,9,14,14
52:14,15 57:19
59:6 68:18,25
criminal 26:16
51:2 71:13,15
74:15,19 75:7,19
75:22 76:2,13,21
77:4,6 78:1 85:3
90:23 98:7 104:24
127:5 128:3
146:15,23 147:10
147:12,15,20,24
147:25 239:20
crises 139:7
crisis 40:14,19
41:7,12,19 42:4,12
42:21 69:6,13,15
69:19 188:7
189:19 235:1,5
241:4
criticized 251:24
cross 1:13 9:9
220:8 241:25
243:24 280:22
296:12

curb 143:12
cure 125:6
current 25:23
37:15 143:2
234:18 235:2
261:3 300:20
currently 9:20
113:7 122:21
customarily 262:7
customer 194:10
212:20,24 263:14
customer's 183:15
customers 219:5,6
263:19
cut 194:9 219:5
259:3,4
cutter 83:12
154:10
cuyahoga 19:20
19:24 20:9,21,25
29:10,11 41:9,12
42:5 53:16,19,22
55:1 106:4,9,20
131:15,18 132:6,8
231:20,23,25
232:1 283:20,21
284:5 285:15,17
cuyahoga's 55:4
cv 281:24
cvs 8:1,1 288:11
296:18,18,21
297:4,5,9 299:24
300:2

**d**

d 3:17 154:20
155:3 175:22
304:19
d.c. 7:6,24 8:5
daily 26:6 36:25
51:7 57:3 110:3
238:7,8 277:15

[daily - departments]

278:21
**dangerous** 35:20
  49:8 62:13 66:12
  102:21 160:17
  165:15 168:3,5,12
  176:4 179:5,19
  216:23
**data** 88:24 89:12
  89:15 90:10,20,20
  90:22 109:21,23
  110:1 111:17
  112:15,19,25,25
  113:11,24 114:8
  114:21 115:3
  118:8,9 189:1
  216:9,19 225:14
  233:3 238:3,18
  257:6 273:9,11,12
  274:4 276:12
  301:20
**database** 205:24
  301:2
**date** 16:22 63:14
  157:2 158:4,4
  184:1 252:23
  253:21 255:20
  306:8 307:3,9,19
  308:3,13,25
  309:20,25
**dated** 2:21 3:11
  4:22 5:13,18,23
  44:25 46:9 140:14
  158:2 179:10
  183:20 203:16
  224:11 228:6
**dates** 200:15
**day** 1:19 8:8 33:10
  34:17 90:16
  129:10 201:1
  242:23 278:8,22
  281:4 305:3

307:16 308:22
  309:22
**days** 34:19 83:3
  306:18
**dayton** 305:2
**dba** 178:15
**dea** 44:11,12,17
  46:6 47:2 64:14
  65:18 84:2 86:2
  88:16,17 89:13,17
  90:15,21,24 98:9
  100:23 101:2,5,9
  101:18 108:19,23
  122:1 127:22
  140:1 143:20
  146:19,21,25
  149:6 151:14
  152:15 179:8,10
  204:18 208:21,21
  208:22
**dea's** 279:4
**deafness** 117:5
**dealing** 139:7
**dear** 306:10
**death** 112:15
  113:11,20,24
  118:8,13 273:11
  274:6
**deaths** 41:2,3,25
  113:11 118:11
  143:13 232:11
  272:9,10,10,11,16
  272:18,18,21,23
  273:17,20,21,21
  273:23 274:24
  277:4
**deceased** 272:15
**decedents** 112:16
**deceiving** 49:19
**december** 4:17 5:7
  118:4 159:2,25

177:24 178:4
  192:17,22 197:10
  197:14
**decides** 214:19
**decision** 84:23
  85:6 170:11
  267:15
**decreasing** 271:15
**deed** 307:14
  308:20
**deemed** 174:4
  306:19
**defendant** 7:2,8,14
  7:20 8:1,7 174:14
  244:10
**defendants** 1:12
  2:11,16,20 3:1,5,9
  3:14,19 4:1,6,11
  4:16,21 5:1,6,11
  5:16,21 6:1,7
  21:15 24:25 44:24
  91:13 115:12
  140:12 154:18
  158:12 161:4
  165:7,12 167:5
  174:25 177:23
  183:19 187:12
  192:16 203:14
  224:9 228:4 242:5
  244:16,17 264:21
**deficiencies**
  215:20
**deficits** 123:1,4
**defined** 268:4
  304:18
**definitely** 153:12
  235:15
**definitions** 188:12
  188:20
**degree** 114:14
  156:16 223:25

277:23 278:10
**dehner** 8:20 11:20
  13:23 14:16
**delaware** 36:1,7
  39:11,11 50:20
  51:12 53:11,18,21
  53:24 54:1,3,22
  55:5,6,19,21,22,25
  56:11 68:24
  227:18
**delay** 238:10
**delegate** 208:9,10
  208:12 213:15
**delegates** 208:7
**delivered** 176:12
**demonstrate**
  164:5
**denies** 160:16
  243:15
**dental** 76:18 98:9
  145:2 190:25
  202:23
**dentist** 111:1
  209:17
**dentist's** 102:19
**dentists** 49:5
  111:15,16
**department** 2:22
  27:3 31:18,21,22
  33:2 39:17 41:24
  45:1 53:12,15,16
  54:4,5,6,7,21 55:6
  55:7,23,23,24,25
  56:4,5,12 68:24
  113:17 149:22
  150:7 247:16
  273:4 284:8,10
  285:14 306:22
**departments**
  54:11,23

[depend - disciplined]                                                                     Page 15

**depend** 96:23
  105:6 107:23
  262:15
**depending** 29:4
  56:16 66:23,23
  67:21 77:14 95:17
  124:13 165:20
  262:12
**depends** 29:6
  96:23 124:12,15
  216:11 261:24
**deponent** 8:13
**deposed** 10:1
**deposition** 1:11
  2:13,18 9:12
  11:14 14:21 15:7
  15:15 21:11,17,23
  25:1 254:14,23
  303:5 306:8,11
  307:1,3 308:1,3
**deputized** 133:12
**deputy** 227:12
**derivatives** 41:1
**describe** 33:17
  126:24 166:17
  248:10 289:7,9
**described** 54:22
  246:19 255:14
  257:13,25 259:13
**describing** 246:20
  259:14
**description** 273:18
**designate** 23:12
**designated** 22:5
  276:11
**desoxyn** 159:18
**detail** 227:14
  245:23 252:19
**detailed** 114:12,14
  253:13

**detect** 179:17
  180:2 237:10
**detective** 51:20
  52:7,8
**determination**
  267:10
**determinations**
  158:9
**determinative**
  136:18
**determine** 75:5
  83:5 87:17 96:24
  104:1 136:25
  137:16 165:13
  237:15 252:15
**determined**
  107:10 160:10
  211:23
**determines** 134:5
  170:7 211:19
  214:19
**develop** 26:12
  121:22 122:8
**developed** 216:4
**development**
  121:19
**deviate** 259:6
**deviates** 182:7
**deviation** 182:25
**diabetes** 287:5
**diagnose** 286:8
**diagnosing** 286:14
**diagnosis** 286:20
  288:24 289:5
**dialogue** 147:5
**dictate** 96:19
  107:24 202:8
**dictated** 67:19
  202:5,6,16,17
**dietche** 28:1

**differ** 54:5 73:12
  73:15
**difference** 74:18
  76:1 132:18 166:5
**different** 14:24
  18:15 41:8 42:2
  49:23 50:18 54:17
  55:3 60:21 61:1,2
  67:21 68:14 71:19
  74:23 75:8 83:4
  92:24 108:9
  112:12,16,18,19
  112:24 120:7
  125:9 138:3 139:6
  139:6,7 140:1,2
  144:21 147:14
  150:10 151:6,10
  154:7,11 166:7,10
  167:1 173:18
  174:4,11 186:7
  194:13 202:7
  208:1 210:12,18
  213:19 225:25
  231:23 234:22
  235:14 237:8,20
  253:4,9 268:17
  275:16,25 276:6,8
  277:2 281:25
  283:8 286:13
**differently** 55:1
**digital** 216:5 257:3
  257:14 258:1
  259:16
**dilaudid** 159:3,10
  161:18
**diligence** 194:10
  219:6 263:10,14
  263:18 297:16
  298:2,5
**diligent** 194:14

**diminished** 277:24
  278:11
**direct** 141:19
  256:5,16 300:15
**directed** 51:2
  139:23 189:19
  200:11 207:19,24
**direction** 117:7
**directions** 196:9
**directive** 233:24
**directives** 234:3
  235:16
**directly** 222:8
  229:24 234:2
**director** 12:12,15
  25:24 26:5 29:23
  35:3 37:4,7,14,16
  37:21 38:1,3,5,6
  38:11,13,16,22
  39:6 83:3 92:11
  92:18 116:18,23
  117:3 119:10
  126:11,14,20
  130:18 136:3
  140:5,23 141:2
  143:1,3 218:18
  225:16,17 233:13
  233:20 234:12,24
  235:3,7
**director's** 204:11
**directors** 38:23
**disadvantage**
  220:12
**discern** 119:23
**disciplinary** 246:4
  246:8 302:2
**discipline** 23:20
  63:18 173:14
  177:14 245:21
**disciplined** 174:22
  239:18 242:24

**disciplining** 164:6
**disclose** 289:16
**discrepancy** 104:6
104:11
**discuss** 12:19,25
23:20 34:12,14
144:20,22 190:16
190:17 224:4
**discussed** 15:14
112:8 147:14
164:13 169:21
190:11 234:8
289:3 293:18
**discussing** 131:14
**discussion** 20:15
228:21
**discussions** 32:21
129:14 146:5
147:4 186:5
222:16 236:19
252:3 283:8
297:13
**disease** 166:8
172:8,17 173:3
286:15 287:2,4
**disorganized**
296:8
**dispense** 86:21
153:21 161:17
182:22 195:20
266:24 280:7
**dispensed** 87:19
109:2,9,14 162:14
172:20 176:11,16
196:10 266:4,9,14
268:3 269:23
270:13 272:1
279:19 291:25
292:17 296:5
**dispenser** 44:18
64:20,22 85:18

86:15,24 88:1,2
109:16 110:20
111:23 261:25
262:14 263:24
264:2 267:16
**dispensers** 65:3
85:22 86:21 88:6
111:19 261:9,10
261:21 266:15
278:20 290:15
**dispensing** 65:2
66:10,11,25 72:19
86:25 87:7,9,16
104:3 108:11,13
108:14 110:2,11
110:16,21 130:1
158:4 160:22
161:24 164:20
177:1,7 188:25
206:12 212:2,4,15
212:18 213:10
264:3 288:14
291:2,10
**dispensings** 77:3
110:4,8
**disposition** 18:21
**distinction** 247:2
**distribute** 161:24
296:23
**distributed** 35:19
**distribution** 68:17
218:22 251:9
**distributor** 49:1
64:18 65:18,20
90:11 160:17
165:7,15 168:5,12
174:16 176:3
182:5 215:16
236:14 244:9
251:17 258:4,17
259:2 263:21

297:7 299:24
300:2
**distributors** 47:4
47:10 61:19 62:2
62:4,16,21 64:12
89:23 90:2,7
165:1 174:15
181:3 191:5,14
194:24 195:16
251:5 252:2
259:10 264:10
296:20,25 297:2,6
297:15
**district** 1:1,2
75:13,14 101:23
135:17
**diverges** 133:16
**diverse** 133:3
**diversion** 43:23
44:1,2,13,20 47:5
47:15 49:7,9,25
50:11 53:9 58:17
59:10 60:15,17
61:1 64:21 65:9
65:21 66:6 70:12
71:19 73:13 78:24
80:20 86:16 87:24
89:18 93:18,19
96:9,21 97:2 98:3
105:17 119:24
120:2,10,22
122:14,22 123:8
123:18 124:6,23
125:5,6,8,11,14,15
127:2,9 135:20
136:19,25 137:17
138:8 139:11
140:2 141:21,25
142:5 154:16
164:11,15 176:24
179:24 180:10,18

180:21 206:21
207:3,7,8,10 240:8
240:13,23 241:15
241:16 290:20,24
295:5,11 300:21
300:25
**diversions** 50:8,19
58:25 59:1 282:3
**diverted** 40:25
48:22 88:10,12,16
88:22 164:7
**diverting** 42:15,23
**divided** 135:6,15
**division** 1:3 27:4
55:2 149:6 188:2
**divisions** 187:24
**docket** 3:16,22 4:4
154:20 155:3
158:14 161:6
175:22
**doctor** 49:19,24
58:23 78:18,25
79:5,17,20 80:1,9
80:13 82:19 99:8
99:12 110:17
111:2 112:8 113:3
127:9 198:14
207:22 208:4,5
214:7,13 237:11
237:25 238:13,16
238:24 239:5
240:23,24 267:15
292:8 299:21
**doctor's** 102:19
198:24 282:13
301:5
**doctors** 49:4 80:20
83:17 213:19
248:25 267:2
290:2,23

[document - east]                                                                                                          Page 17

**document** 3:6
  21:25 45:15,22,25
  47:13 49:15,17
  115:13,23 140:17
  154:24 157:23,25
  158:18,18 160:9
  183:25 187:2
  188:5 203:23
  205:19 242:13,19
  302:15
**documentation**
  15:6 107:12
  151:25 152:1
  165:18 301:13,16
  301:17,24,25
**documents** 14:23
  14:25 15:2,5,13
  16:23 21:7 46:3
  49:10 58:22,23
  60:23 75:1,23
  76:3 107:11
  156:15 251:12,15
  255:11 257:4
  260:10,11
**dog** 110:13
**doing** 66:3 73:1
  108:7 110:18
  112:4 117:12
  134:13 219:5
  226:6 244:1,2
  259:15
**door** 123:16
  154:11
**doors** 248:23
**dosage** 155:20
  269:8,16,20 270:8
  279:18,25
**dosages** 278:7,7
**dose** 209:4
**doses** 268:3,4
  270:13,16 282:8

**dosing** 286:13
**dozen** 19:11,12,21
  131:23,25 132:3,4
  132:7
**dr** 142:25 179:3
**draft** 130:20 236:5
**drafting** 136:4
  225:3,8,11
**dramatically**
  214:14
**drastically** 130:6
**drawbacks** 129:20
**droz** 222:16
**drug** 2:23 3:10
  7:15 35:20 41:25
  42:24 43:2 45:1,7
  46:21 48:24 49:10
  49:16,22 50:1,17
  50:22 51:6,10,15
  51:19,20,22 52:1
  52:13,15 53:10
  55:11 56:7,10,14
  56:15,17,22,23
  57:6,12,13,17
  58:11,17,22,23,24
  59:5 60:23 61:7
  62:20 65:15,25
  66:12 69:25 70:8
  70:12,19 71:14
  73:10,23 74:7
  77:2,24 80:18,20
  81:1,9,13 83:13
  86:4,11 92:3
  94:10 105:8,10,23
  111:11 112:21,22
  121:11,11 127:10
  127:19 129:1
  140:2,11,13 141:6
  141:11,18 142:1,3
  142:7 148:19
  150:13,18 151:6,8

  152:17,21,24
  155:20,20 156:14
  163:10,16 169:1
  169:10,22 172:6
  172:19 174:2,8
  179:5,7 182:5
  191:5 194:24
  195:25 196:4,8,12
  216:23 227:24
  230:14,24,25
  231:8,11,25 237:9
  244:9,22 247:18
  248:13 251:5
  252:2 258:3,16
  259:2,10 263:21
  264:10 272:21
  282:20 289:14
  291:15 296:20,24
  296:25 297:2,5,7
  298:8
**drugs** 11:3 35:20
  41:1 42:15 46:16
  47:20,24 48:2,10
  49:8 51:24 52:21
  58:4 62:13 68:12
  69:5 70:17 77:10
  83:9,14 85:23,25
  86:15 87:2,5
  88:11,16,19,22
  94:2 102:21
  112:20 127:12
  160:17 162:1
  165:15 168:3,5,12
  168:19 176:4,11
  179:19 199:16
  206:9,10,12,13,16
  207:6 209:8,11
  210:3 226:15
  227:14 248:15,16
  295:8

**due** 37:14 194:9
  194:13 209:5
  215:23 219:6
  263:10,13,18
  297:15 298:2,4
**duly** 9:7 304:4,7
**duplicate** 97:25
**duplicating** 149:8
**dur** 196:4,11
**duration** 155:20
  172:18
**duties** 26:4 254:5
  254:10
**duty** 292:15
  294:23 296:3
**dvd** 91:7 171:7

---
e
---

**e** 4:3 161:6,12
  192:14 193:13
  194:3 249:13,18
  250:11,14,15,25
  297:23
**e.g.** 47:18
**earlier** 35:6 58:16
  69:7,12 106:2
  112:8 141:2 144:8
  146:10 147:22
  174:13 180:6
  217:6 242:22
  243:4 257:15
  266:22 272:8
  281:7 291:12
  293:12,17 295:2,9
  296:2 297:12
  301:19
**early** 238:11
  246:17
**easier** 196:14
**easily** 257:6
**east** 1:17 7:18 8:16

eastern  1:3
ed's  211:2
edge  287:7
education  27:6,9
  39:24 66:15 67:17
  67:24 68:4 71:6
  71:20 72:9 125:11
  129:4 138:6,10,13
  139:10,12,15,17
  157:11 205:17
  223:1 224:1
educational  26:18
  40:4 129:14
effect  74:6 150:16
  151:7 177:16
  189:15,18 190:1
  200:8,15,21 201:1
  249:20,22 250:5
  289:4
effective  157:2
  187:23 193:20,23
  194:17 200:15,19
effort  72:22
  121:21 138:10
  273:3
efforts  71:21
  72:12 126:25
  128:5 135:19
  144:3 149:7,9
  150:15 218:3
eighteen  274:11
either  75:13 76:20
  94:2 95:10 96:8
  100:25 108:5
  117:4,6 118:18
  166:22 185:16
  223:6 233:19
  282:14,20 304:15
elderly  60:8,12
electronic  188:24

electronically
  30:24
elevate  185:14
elevated  190:18
ellis  7:10
email  71:22
  100:18 101:1,12
  118:22,22 306:17
emails  100:20
  101:17 255:10
embalmers  38:23
  39:6
emch  2:5 7:17
  17:3 243:25
  244:14 246:11
  264:15,25 276:19
  278:17 279:2
  280:16
emergency  270:24
  271:1
emphasis  73:17,21
employed  9:20
  222:1
employee  179:6,20
  180:4 207:13
  229:23 234:18
  235:2 295:19
employees  233:19
  281:24
employer  85:23
  86:16 207:13
  292:22 295:19
  296:3
employment  126:6
empowered
  168:10
ems  73:20 102:20
  121:8 180:11
enacted  188:6
  205:20

enactment  270:18
enclosed  306:11
endorse  67:13
ends  134:13
enforced  199:11
  199:13,21
enforcement  2:23
  25:25 26:5,22,24
  27:4 31:25 33:2
  35:3 36:4 37:5,8
  38:3,16,20 45:1,7
  54:9 59:15 71:12
  71:13 79:24 80:1
  89:18 92:12,19
  94:17 101:22
  105:13,22 112:6
  113:9 116:19,24
  127:17 133:6
  139:2,4,14 178:8
  191:1,3 219:11
  225:2 247:10
  253:18 283:13
engaged  280:9
enhancements
  72:15 129:19
ensure  65:15 66:2
  66:9 71:10 207:15
  295:21 298:7
ensures  27:8
ensuring  196:1
entail  174:7
enter  110:1 173:24
  286:12
entered  238:4
  265:16 301:20
  308:9
entering  257:4
entire  37:23 54:13
  77:5 78:2 119:19
  133:22 157:17
  221:1 277:7 307:5

308:5
entirety  19:23
entities  190:21
  225:25 236:1
  266:23 267:6
  296:19 297:4
entitled  115:19
  141:10 170:14
  187:19
entity  44:11,13
  55:9,10 62:24,24
  66:3 102:3 104:17
  149:18 190:12
  194:12 209:9
  211:6
entries  18:20
entry  167:19
  238:18
epidemic  143:12
  143:16 226:15
  227:3,7,11 241:4
equate  173:3
er  130:4
eric  1:11 9:5,17
  178:7 304:7 306:8
  307:4,9 308:4,13
  309:20
errata  306:13,18
  308:7,10,18 309:1
error  108:11,13,13
  177:1,7
errors  66:25 103:7
  238:20 301:21
escalated  216:15
eskatrol  160:4
especially  21:13
  136:13
essentially  44:7
  50:3 128:7,11
  166:16 170:10
  182:9

establish 33:7
estimate 268:23
estimated 255:20
et 97:18
ethics 68:1
evaluate 292:16
evaluated 292:25
evaluating 291:21
evening 300:17,18
event 276:23
 304:16
events 72:1 138:14
everybody 98:2
 224:19 246:25
everyday 287:11
everyone's 55:15
evidence 301:14
evidenced 179:10
evolved 130:11
exact 40:10 68:7
 100:3 200:14
 211:7
exactly 104:15
 114:9 177:8
 204:24
exam 157:9 163:8
 163:25
examination 1:13
 9:9 156:23 157:1
 220:8 241:25
 243:24 280:22
 296:12 300:15
examinations 2:1
examined 9:8
example 43:4
 53:18 54:19 67:23
 82:17 87:23 88:21
 88:25 98:7 102:10
 109:11,19 120:13
 138:16 150:13
 152:8 155:22

164:11 173:8
176:24 179:24
181:15 185:9
186:12 199:12
201:25 202:15
208:22 209:3
212:17 233:22
236:7 237:7
249:15 250:19
262:5 282:22
examples 132:2
 206:21 207:9
exceeded 41:2
exceeding 168:20
excel 16:6,7,9
 255:10 257:4
excel's 16:8
excessive 47:16
exchange 152:3
 286:16 287:11,18
exclude 273:25
excluded 273:24
 274:2
excuse 74:3 123:3
 144:13
executed 308:10
execution 307:14
 308:19
executive 12:15
 29:23 37:3,6,14,16
 37:21 38:1,2,5,6
 38:11,13,22
 116:23 117:3
 119:9 126:10,14
 126:19 140:4,23
 141:2 143:1,3
 204:11 218:18
 225:17 227:23
 233:20 234:12
exercise 291:2,6,7

exercises 291:23
exhibit 2:11,16,20
 3:1,5,9,14,19 4:1,6
 4:11,16,21 5:1,6
 5:11,16,21 6:1,7
 21:15,22,22 24:25
 25:5 44:24 45:6
 45:11,12 47:1
 91:13,19,24
 115:12,18,18
 116:14 125:17
 140:8,12 141:10
 142:13 154:18,23
 155:10 158:12,17
 161:4,9 164:4,10
 164:14 167:5,10
 171:15,19 174:25
 175:6,6 177:23
 178:3,12 183:19
 183:24 184:5
 187:12,17,18
 190:7 192:14,16
 192:21 194:15
 196:13 197:12,16
 197:21 201:9,14
 203:14,20 211:13
 217:19 223:20
 224:9,15 228:2,4
 228:17 233:10
 240:4 242:5,12
 244:3 249:15
 250:10,11,20
 252:9,24 264:21
 265:1,20 293:3,9
 297:20 298:14
exhibits 2:10
 220:17 249:7
exist 16:8 248:11
 248:20 255:15
existed 248:10

existence 143:6
 250:3
exists 16:9 267:23
expanded 70:24
 82:6
expect 170:1 263:6
expectation 263:9
 297:15 298:4,7,9
experience 36:4
 47:8 59:21 133:4
 283:2 300:19
 301:7 302:5
experienced 73:23
experiences 39:1
 73:24
expert 77:6 78:3,6
 78:7,9,10,13
expertise 96:24
experts 236:9
expiration 63:13
 307:19 308:25
 309:25
expires 305:9
explain 281:21
explained 263:16
explanation 251:1
extended 126:21
extenuating
 202:13
external 203:3
 235:22 236:1
extremely 58:2
 98:24

f

f 7:4 9:19,19
facilities 35:18
 49:5 123:2 217:13
 218:5 248:7 288:7
facility 65:16 66:1
 66:2 85:13,15
 96:17 124:15

134:2,7,18 166:4
166:18,20 198:23
**fact** 75:2,8 161:14
186:7 194:10
221:15 225:24
**factfinding** 75:24
76:4 148:1,4
**factor** 136:19
**factorial** 241:5
**factors** 137:21
241:9
**facts** 84:22 155:16
170:11 176:23
**fail** 89:23
**failed** 179:17
180:2 211:20,23
**failing** 155:17
171:25
**failure** 216:8,13
216:18,18
**fair** 11:11 24:18
192:7 284:24
**fairly** 278:1 283:4
**fall** 105:24 135:3
135:13
**falls** 70:20 105:21
**false** 49:11
**familiar** 45:24
46:24
**familiarity** 278:20
**family** 59:24 60:8
60:12,17
**family's** 39:21
**far** 59:3 137:24
229:4 231:5
249:12 261:22
274:8,12
**fashion** 299:6
**faster** 235:20
**fax** 4:22 183:20
184:1

**faxes** 255:10
**fbi** 127:22 143:20
146:19 149:3,4,6
149:11 151:19,24
152:10,12,15
**fda** 150:24 166:19
204:18 205:10
209:3,3 229:20
**feature** 80:5
**february** 161:23
162:13
**federal** 35:22
135:16 148:22
151:23 163:11
169:12,24 190:11
191:1 231:18
**feedback** 236:17
236:23
**feedbacks** 236:18
**feel** 73:6 182:5
235:9 259:5
263:19
**fellow** 207:13
295:19
**felony** 74:7
**felt** 128:25
**fentanyl** 68:13,15
68:15,16,21 69:18
**field** 26:7 29:1,4,6
29:14,18 36:24
72:5 97:8,12
100:19 132:15
133:21,23 253:20
**figure** 199:5
**file** 77:5 78:3,4,5
91:25 107:20
209:20
**filed** 93:2,4
**files** 18:24 19:2,5,8
19:13,18,20,22
20:9 21:10 106:4

288:2
**fill** 237:9 267:8
**filled** 93:3 198:6
210:13 237:21
286:19 287:14
290:6,15,18 299:5
**filling** 49:22
212:18
**final** 18:21 75:9
97:21
**finally** 159:22
**find** 82:8,9 88:23
143:11 148:12
185:17 186:3
254:21 259:25
260:18 263:14
306:11
**finders** 75:2
**finding** 75:17
**findings** 107:16
161:13
**finds** 158:25 159:9
159:23 161:22
239:8
**fine** 14:5 75:17
173:12 180:20
260:25
**finger** 268:6
**fingertips** 72:18
**finish** 11:8
**fired** 74:9
**firing** 3:7 115:14
115:20
**firm** 304:17
**first** 9:6 46:13
70:21 94:11 119:6
120:3 127:7
140:21 145:13
156:16 158:23
165:16 168:9
171:18 183:7

207:24 212:6
213:8 226:22
228:12 238:11
258:12 281:16
289:2 293:13
295:7 299:1,13
300:12 304:7
**fiscal** 265:5,11
**five** 16:24 17:16
21:2 27:21 92:21
92:22 107:1
124:20 131:16,17
132:12 206:8
283:22 285:4,9
**fixes** 128:20
**flag** 182:12,17
212:21 214:6
258:8 292:5
**flags** 137:23 138:1
138:3 207:5,9
208:2 292:12
**flaharty** 28:4
**flip** 95:18 230:10
**floor** 8:16,21
**florida** 43:6,8,11
47:24 48:12,13,18
48:20 125:25
126:2 154:9
**flow** 72:16
**focus** 42:23 56:15
56:23,25
**folks** 97:8 118:10
283:7
**follow** 22:13 30:14
108:1,3 123:4
228:23 258:9,13
258:14,15,18
259:12,23 260:4
260:23 261:13
263:13,22 296:10

followed 102:7
176:10
following 156:1,4
162:25 228:9
294:18
follows 9:8
footnote 46:20
force 3:7,11 41:25
50:17 51:6,16,21
52:1 53:11,25
55:12,14,18 56:6,7
56:10,16,22 57:6
57:12,14 58:5
69:25 115:14
138:12,16 140:11
140:14,21 141:7
217:22 218:16
227:24 230:14,21
230:24,24 231:8
231:24 232:1,7
240:4 241:3
forced 115:20
forces 42:2 138:11
139:22 140:1,3,4,7
230:25 231:11,17
231:18,23
foregoing 307:13
308:18
forge 81:22 88:7
forging 49:15
form 3:3 49:16
91:15,21 98:16,17
98:22 99:1 101:3
108:8,17 115:24
118:16 154:16
177:13 200:9
206:22 244:13
257:16 259:16
302:9
formal 31:11
39:24 170:15

formally 218:15
format 16:8,9
98:21 188:25
219:8 255:9 257:2
257:3,14 258:1
forms 60:22 61:2
92:13 107:19,23
108:10,15 179:8
179:10 215:13
240:23,24 255:12
formulary 287:4
formulating
135:25
forth 24:17 128:13
157:12 164:10
166:19 201:13
279:17
forum 217:14
forward 85:7
306:15
found 75:20
215:20 246:10
four 60:14 67:25
70:20 135:6
181:17,19 226:21
268:25 269:2
273:9
fourth 35:1 175:20
frame 58:4 259:14
261:15
fraud 127:24
144:14 145:1,6,9
145:24 146:7,8
148:14
fraudulent 82:12
179:17 180:2
free 10:16 307:14
308:20
freeman 27:20
28:21 30:1,13
95:2

frequency 80:11
frequent 82:21
124:15
frequently 51:5
80:15 98:20,24
101:5 102:4
124:10 134:16
front 129:25
228:10 237:19
265:1 293:3
fulfill 70:18
120:22
full 10:24 166:20
205:19
function 27:8 55:4
71:3 150:21 249:3
functions 34:15
funded 149:25
funeral 38:23 39:7
furnish 65:13
128:15
further 81:19
251:1 271:8
302:21 304:14
future 221:16

**g**

g 9:19
gabapentin 77:25
87:14 110:9
gained 261:19
gallagher 1:14
304:3 305:8
gang 231:24
garner 222:23
233:9 276:13
gathering 76:19
182:2
gauge 285:20
gcoat 24:12
138:18 139:21
141:7 142:15,18

143:4,10
gears 285:25
general 8:16 11:16
26:21 52:8 68:5
101:19 102:6
139:18,20 141:19
199:10 205:21
209:18 215:3
220:18 277:24
284:12,25
general's 8:14
14:8,19 145:19
generally 10:14
69:15 70:15 81:8
126:24 193:8
270:12
generate 80:9
101:14 183:17
186:16
generated 30:15
31:5,9 32:7 34:23
79:21 100:21,22
100:24 103:1
107:15 186:9
212:21 272:9
generating 107:25
genoa 55:23
gentleman 234:14
geographic 82:11
134:8,21 206:17
279:19
getting 42:16
71:10 111:2
113:16,19 114:15
212:12 236:22
255:9,11,25
256:23 257:12
262:8 273:9,10
gilford 3:21
158:14,22,25
159:9,16 164:14

[gilford's - happen]

**gilford's** 160:10
160:16
**give** 10:24 29:15
45:17 72:3 77:15
77:16 102:10,13
109:11 110:14
121:9 123:3
138:22 152:3,7,9
152:11 153:13
181:15 193:12
202:15 209:19
220:23 245:2
255:20 264:1
268:23
**given** 73:8 90:8
111:24 119:17
134:6 159:24
176:17 184:24
191:21,22 194:23
201:24 233:3
262:18 274:5
**gives** 110:12 111:2
111:10
**giving** 172:23
173:2
**glanced** 265:22
**glean** 185:15
**globally** 41:16
**glynn** 8:24
**go** 10:3,20 20:12
20:16 76:11 81:19
85:7 91:6 107:17
128:2 133:12,15
183:16 188:17
198:16 201:12
209:16,17,18,21
212:2 213:20
214:24 220:5
225:18 231:15
243:7 249:5 251:9
260:9 262:20

266:2,3 267:19
271:25 274:12
299:13 300:9
**goals** 33:11,23
34:1,11,11
**goes** 94:12 103:24
162:19 165:16
206:4 207:11
222:12 226:13,16
228:20 237:8
266:8 267:21
268:1
**going** 21:21 45:5
49:20 52:24 56:20
74:6 76:5 77:23
96:17,18,19,22
98:5 104:9 108:2
108:17 110:11
114:12 115:10,17
123:24 124:14
125:7,7 130:25
138:23 143:14
154:23 158:17
161:9 167:10
183:24 189:15,18
189:25 191:9
193:23 194:3
198:14,18 200:12
200:15,20 201:1
209:19 210:15
211:1 212:24
220:12 221:9
222:21 227:20
236:7,8 237:4
256:7 259:25
261:4 262:14,17
262:20 263:13
276:10 280:16,17
285:21
**good** 9:11 24:13
53:20 88:14 89:10

130:12 131:9,10
166:18 238:18
244:2 280:24
300:13,17,18
**gotten** 253:12
**government** 97:18
163:11 169:12,24
**governor** 227:23
**governor's** 3:6
24:6 115:13,20
117:15,20 138:16
233:12,17,24
235:20
**grade** 68:16
**grant** 149:25
**granted** 169:5
**greatest** 141:25
**gregg** 194:19
**griffin** 1:11 9:5,11
9:17,21 45:16
53:8 91:18 131:9
171:14 178:7
203:12 242:2
276:11 280:24
285:25 289:25
296:14 300:17
304:7 306:8 307:4
307:9 308:4,13
309:20
**ground** 10:3
148:11
**group** 136:7
138:25 139:1,2,4
140:5,6 144:13
145:6 217:24
218:16,19
**groups** 151:6
**growing** 46:17
48:15
**growth** 141:18

**guess** 51:1 247:1
252:5
**guidance** 14:23,25
15:2,4 138:22
191:4,12,15,21,21
194:23
**guidelines** 172:8
270:19,25 271:4,5
271:19,22
**guilty** 75:17,20
156:9,13
**guys** 101:17 135:2
153:6 214:1

**h**

**h** 8:9,10 193:13
194:3 249:13,18
250:11,14,15
297:23
**h.d.** 245:19,21
**habits** 160:22
**half** 284:13
**hand** 9:4 45:5 51:9
51:9 104:8,10,13
115:17 120:25
121:2,3,15,23
123:19,23 124:1,3
224:14,16 293:14
305:2
**handed** 91:18
243:3
**handing** 175:5
**handled** 127:6
226:1 252:20
253:24 254:16
**hands** 89:5 117:3
234:25 235:4,8,17
266:12
**handwritten**
215:13
**happen** 142:12
287:10 288:3

**happened** 213:3 214:5 238:2 255:21 256:11 260:13
**happening** 74:12 295:5,11
**happens** 93:10 100:4
**harassment** 299:6
**hard** 84:19
**harmed** 176:20
**hb** 205:21
**hbc** 245:17
**hda** 218:22 236:14
**head** 61:22 89:17 143:8 170:24 171:5 184:22 192:6 232:3 262:22
**heading** 47:14 154:25 298:22
**heads** 31:19,21,22
**health** 6:4 7:20 41:24 46:17 61:8 61:9 93:22 94:4 96:9,19 113:17 122:10 125:13 150:7,11 184:6 242:3,8,16,23 243:13 273:4,10
**healthcare** 73:6 130:12 149:6 178:15 218:22 236:14
**heard** 40:13 50:14 61:3,9,14 244:23 258:14 279:22
**hearing** 42:1 170:15 214:19
**hearings** 214:17

**hears** 170:10
**held** 198:24 207:14 295:20
**hello** 280:25 296:15
**help** 71:1 125:5 143:11,12 188:11 189:22 252:4,5 255:2 286:12
**helped** 128:9,25 235:22
**helping** 26:12
**helps** 71:14 130:20
**henry** 4:3 161:6 161:12
**hereinafter** 9:7
**hereunto** 305:1
**heritage** 178:14,15 179:1,17 180:1,14
**heroin** 57:22,24 58:13 68:10,20,25 69:18 70:5
**hey** 87:7 199:15 263:11,23
**hhs** 127:22 143:20 146:19 147:9,10 147:13,19,20 151:19 152:19
**hi** 296:14
**high** 8:21 39:23,25 73:21 124:16 166:12 184:7 278:7
**higher** 276:1
**highest** 182:19
**highlights** 219:4
**hint** 193:12
**hired** 78:10
**hiring** 26:7
**histories** 112:16

**history** 21:13 60:2 113:12,25 114:2 114:23 118:10,14 119:2 179:7 275:6
**hitting** 130:4
**hoc** 136:7
**hold** 22:18 26:22 76:15 128:10 189:23 226:19 299:8
**holder** 168:15
**holding** 125:13
**homicide** 52:10
**honest** 10:25
**hook** 150:3
**hope** 263:12
**hopefully** 281:2
**hospice** 262:8 278:24
**hospital** 49:3 73:18 102:20 121:4,24 122:14 122:22 123:8,18 124:7,20,24 130:2 133:3 150:14 236:7,11,13 282:6 282:13 288:4,5 301:4
**hospitals** 58:19 217:9
**hosted** 144:17
**hosts** 144:15
**hour** 10:15 13:15 13:21 52:25 65:6 168:21
**hourly** 93:15
**hours** 14:6,17 36:12 67:25 68:1 68:3,7,8 110:12,21 111:3,10 128:15 153:21 199:25

232:21
**house** 11:15,20,23 11:25 14:16,19 128:10 153:7 202:17 229:8 296:22
**huge** 71:21 72:20 72:22 293:13
**huh** 24:14 58:8 79:3 84:15 103:12 113:13 120:15 135:12 147:21 210:5
**human** 238:20 239:4
**humans** 301:21
**hundred** 214:15
**hundreds** 67:1 71:18 129:10 238:14
**hunter** 178:16
**hydrocodone** 43:13,15 47:18,25 59:9 89:2 111:3 155:25 156:6 208:23 210:10 211:2,7 226:9 248:15
**hydromet** 155:25

**i**

**icd** 189:3
**idea** 88:14 99:24 278:18 284:3,6
**identification** 2:15 2:19,25 3:4,8,13 3:18,23 4:5,10,15 4:20,25 5:5,10,15 5:20,25 6:6,10 21:19 25:3 45:3 86:11 91:16 99:18 115:15 140:15

154:21 155:15
158:15 160:11
161:7,13 167:8,13
175:3 177:11
178:1 183:22
187:15 192:19
203:17 224:12
228:7 242:9
264:24
**identified** 73:11
82:11 83:15,15
86:7 119:15
**identifies** 63:6
67:6 111:18
**identify** 63:13
78:18 79:5 80:17
81:1,14 83:8
85:21,24 86:20
88:6 89:22 90:1,6
112:11 115:10
119:1,2 120:2,3,10
121:5,8
**identifying** 85:25
118:24
**identities** 111:19
**ii** 159:5 160:4
162:8 208:24
249:19 250:15,25
**illegal** 49:10 51:19
57:1 58:20 60:22
89:2 127:11
141:20 142:4
156:14 219:18
240:13,19 282:24
290:20,24
**illegally** 89:3
168:2
**illegitimate** 248:4
**illicit** 41:1 44:5
68:12,15,21 69:18
70:5

**illicitly** 44:9
**illness** 37:15
**immediate** 93:17
93:20 94:9 95:4
96:11,14
**immediately** 97:5
130:4 207:21
282:17
**imminent** 229:9
**imogene** 154:25
171:15
**impact** 188:19
271:19
**impacted** 56:19
222:8
**impaired** 94:2,3
**impairment** 93:23
93:24 96:10
173:23 188:12,20
209:5
**imperfect** 180:8
**impetus** 154:3
**implemented**
177:17
**implementing**
279:14
**important** 72:11
97:24 299:19
**impose** 168:14
**imposed** 23:21
**imposition** 177:3
**impossible** 241:12
**improper** 83:8,11
83:12
**improperly** 89:6
**improved** 130:6
**inactive** 64:11
**incidence** 100:4
**incidences** 46:8
174:10 196:5
198:13,17

**incident** 51:22
234:20
**incidents** 84:1
146:24
**include** 49:3 60:21
141:18 231:18
250:25 283:15
288:23
**included** 57:11
204:25 250:16
268:8 269:6
306:13
**includes** 26:7,8
138:11 193:9
196:1 209:1
**including** 153:20
218:22
**incorporated** 54:8
54:9 242:17
308:12
**incorrect** 155:19
176:20 208:7
301:20
**incorrectly** 299:17
**increase** 58:10,13
141:13 142:7
**indefinitely**
257:10
**independent** 18:9
207:14 211:5
213:21 262:3,4
295:20
**independently**
292:25
**indiana** 8:1 296:18
297:4
**indicate** 63:17
158:4 254:23
275:12 278:6
290:20,23 295:4
295:10

**indicated** 117:12
215:18 233:18
273:15 275:9
**indicates** 226:4
**indicating** 196:15
233:24 306:13
**indicative** 47:15
177:1
**indicators** 194:13
**indictment** 85:7
**indifference** 117:4
**indirectly** 222:8
234:5,6
**individual** 14:8
25:7,20 44:6
59:23 60:4,24
64:6,8 65:12 66:5
85:18 88:6 99:16
109:17 149:17
179:7 207:19
209:10 276:14
**individuals** 26:8
28:14,16 29:13
33:1 42:14 81:22
90:15 119:1
154:15 164:7
207:20
**industry** 26:13
66:23 67:22
101:23,24 102:8,9
102:12 133:8
218:21 281:19
282:23 283:4
**influence** 11:2
**influx** 56:16
**information** 12:23
17:8,10,13,19,23
18:2,13 19:6
41:24 62:23 63:6
63:16,20 64:2,8
69:24 72:18,24

73:5 76:6,20,22,25
77:18 78:15,18
79:8 81:3,18,20
82:2,15,17 83:7
84:20 85:18 88:9
88:14,21 89:19
90:13 93:7 96:1
103:17 108:5
111:22,22,23
112:2 113:17,20
114:13 119:23
121:1,7 138:23,23
139:5 146:3
151:11,16 152:8
152:11 154:7
155:19 172:1
181:20,21 182:2,3
183:3,6,11 185:16
204:25 205:13,17
208:20 209:2
219:7 234:11,16
238:19,21 248:22
252:13 264:9,12
273:14 277:20
288:20 291:22
301:12,22 302:14
302:18,20
**informational**
32:1
**informing** 293:19
**ingested** 176:19
**initial** 3:11 102:14
140:9,14 258:15
258:18 259:24
282:17
**initially** 247:7
**initiate** 258:21
**initiated** 243:17
260:3
**initiative** 272:25

**injection** 123:25
198:15
**input** 130:21,23
136:5 153:9
204:11
**inputs** 109:22
**inquiry** 153:3
**inside** 208:12
**insight** 69:5
130:10,23
**inspect** 26:15
125:5
**inspected** 35:18
124:16 229:15
**inspection** 26:15
73:22 86:9,10
122:18,18,25
123:10,14 124:17
124:25 134:6,14
165:22,24 199:14
215:13 216:24
217:2,25 218:9
251:21
**inspections** 71:4,5
73:16 86:4 122:20
122:23 123:4,7
124:8,11 132:11
132:14,16 134:11
216:5 218:4 251:4
**inspector** 134:1,12
134:17
**inspectors** 132:17
132:20 133:7,11
133:13,20,20
**instance** 94:12
212:6 259:20
288:4,22 290:8
295:7
**instances** 206:20
207:3 294:18

**instigated** 79:16
100:16
**institute** 46:21
**institutional** 236:8
236:9
**institutions** 287:25
**insurance** 98:12
138:2 211:10,10
290:11
**insurers** 290:13
**intake** 93:10 95:6
95:12,15,20,21,23
181:8 190:8
**integrating** 72:19
**integration** 72:16
129:22 130:3
**integrity** 144:12
145:5
**intended** 142:13
162:1
**interactions** 196:5
**interested** 304:16
**interface** 190:22
**interim** 37:13,21
38:10,13,22 39:6
116:22,22 117:25
118:4
**intermediary**
198:5
**intern** 199:20,25
200:2
**internal** 297:10
**interns** 101:24
**interruption** 20:4
**intervention** 150:1
**interviewed** 51:21
**interviewing**
79:13
**intoxicated** 94:2
**intriguing** 36:13

**inventories** 121:10
122:10 174:9
**inventory** 103:5
121:13 122:1,2,3
123:20,23 124:1,3
180:10
**investigate** 27:11
57:2 59:5,7,13
68:11,18 81:9,11
81:21 83:21 94:9
230:7 235:18
239:12,15,19,22
254:12 282:9
**investigated** 21:1
35:20 57:19 60:4
60:10,11 71:17
87:22 100:1
104:17 240:17
261:7 281:10
**investigating**
42:14,23 74:7
87:4 89:25 98:3
104:23 152:17,20
187:4 219:16
**investigation**
18:22,24 19:2,5,13
21:10 57:11 59:23
71:17 74:9,19,20
74:25 75:1,9,15,20
75:22 76:13,14,21
77:1 78:2,17
79:17 81:6 82:14
83:25 84:9,18
89:1 96:18 98:5
100:11 102:16
104:20,21,25
105:4,7,10,20
107:11,14 108:4
114:18 146:2
147:1 148:2,13
149:15,17 150:10

150:18 151:13,23
152:2,14,24 158:9
181:11,14,22,25
183:1 185:14,25
190:14,19,23
212:1 243:17,18
254:22 258:22
259:21 260:2
282:18
**investigations**
20:11,20 26:10,17
27:16 36:5 41:23
50:16,25 51:1,8,8
51:10 59:3 71:9
71:16 73:25 74:15
75:7 77:4 79:5
86:5 88:15 90:23
100:16 101:14
105:14 125:12
127:8,13,20
131:15,19 144:6,7
144:22 146:15,23
147:2,11,13,15,20
147:23,25 151:20
154:7 258:10
260:7,12,22 261:2
261:4,8,11
**investigative**
19:18,19 20:8
60:18 81:17 106:4
107:20 108:7,16
119:21 128:4
133:6 144:16
149:8 150:15
219:15
**investigator**
107:17
**investigator's**
107:16
**invited** 283:7

**invoices** 179:12
**involve** 32:3 99:3
99:7 172:23 173:2
**involved** 67:5 84:9
99:21 100:2
105:12 148:10
150:17,24 223:25
225:25 231:4
240:2 269:15
279:10 302:1
**involvement** 24:5
24:11 151:11
**involves** 105:18
149:17
**involving** 108:12
147:13 219:16
**irs** 127:22 143:20
146:19 148:18,23
148:23 151:19,24
152:16
**ish** 259:18
**issuance** 188:10
188:14 189:2
196:7 205:8 215:5
217:19
**issue** 40:24 41:4
41:17 58:11 75:5
82:24 93:23,25
94:5,6 96:10,19
97:2 110:10
112:11 125:19,21
125:25 126:17,20
127:17 137:1
212:13 215:21,25
243:8
**issued** 63:7 83:18
142:15 143:5
157:9 165:21
168:11 191:4,15
196:2 204:5,21
206:13 265:17

**issues** 26:9 33:8
34:12 66:24 94:8
99:13 126:3,5,7
129:1 135:20
144:11 165:20
**issuing** 85:9 88:2
204:7 205:22
227:23
**items** 30:15,22
31:8 32:6,16,20
33:14,19 73:11
93:13

### j

**jackson** 7:16
**jacksonkelly.com**
7:19
**jail** 54:14,15 55:4
**james** 8:15 306:5
**james.wakley** 8:18
**jane's** 211:4 237:4
**janssen** 7:8
**january** 1:19
25:15 163:9
194:17,22 200:8
201:14 249:20
250:2,8 305:3
306:4
**jenni** 27:19 28:20
**jersey** 167:23
**jesse** 28:6
**job** 74:8,10 227:6
300:21
**jobs** 39:23
**joe** 11:23
**joe's** 211:1
**john** 8:10 28:10,11
28:11 37:10
142:25 178:16
**joined** 42:17 48:14
126:11,15 127:1,5
164:23 174:21

227:17
**joining** 35:25
56:11
**joint** 152:13
**jointly** 55:15
**jones** 8:8
**jonesday.com**
8:12
**judgment** 18:20
207:15 291:2,6,24
295:21 296:4
**judicial** 1:18
**july** 159:11,12,18
179:11 265:6,7
**june** 4:7 167:6,11
175:7 179:10
**jurisdiction** 17:25
18:10,17 54:13,21
55:10,13,16 75:11
84:6 135:16
283:25 285:3
**jurisdictional**
53:17
**jurisdictions**
135:3
**jurisprudence**
68:7 156:23,25
157:9,19 163:8,25
173:17
**justice** 2:23 45:1

### k

**karolychyk**
167:22
**keeley** 28:5 195:8
**keep** 69:4 125:1
257:10 281:3
302:17
**kelly** 7:16
**kept** 17:13 30:5,21
220:21 255:8

kevin 28:3
key 73:6 130:2
kid 59:17
kind 68:4 95:15
131:1 146:14
174:6 245:23
246:12 250:25
253:7 254:18
258:21 260:15,24
276:12 278:21
279:14,17 283:3
kinds 92:4
king 94:24
knew 117:19
161:25 227:11
know 18:16 20:3,8
20:10,19 23:17
29:13 41:14 42:7
42:9 43:10 45:21
53:14 54:18,25
55:2,3 56:24
59:17 60:2,6
61:11,16,18 64:1,5
65:10,11 67:11,19
68:7 70:23 83:11
86:3 87:21 89:8
91:4 92:16 98:8
98:12 104:11,12
104:12 105:7
106:12 107:2,5,7
107:13,22,24
108:10 111:7,14
115:2 116:1
117:20 118:15
121:25 125:24,25
126:22 127:12
129:8,20 130:3
136:22,23 137:15
138:12 140:4
142:12,16,17
143:4,7,9 145:18

145:19 151:4
152:8,15,22
153:11 164:3
165:1,6,9,10,11
170:9,17,23 171:4
173:17 174:17
177:15,16 178:22
180:23 182:6,22
184:18 186:2,6
192:4,5 193:17,19
193:19 194:1,6,12
194:22 195:1,2,5
195:10,11,12
199:17 200:4,25
201:4,12 204:23
204:24 205:9,12
210:15,18 212:7,7
212:10,22 213:22
216:20,22,23
219:1,3,3,8,20
221:8,11 222:3,5
223:2,5 226:5
232:18,24 233:2,7
234:19,21 235:2
235:12,17 237:18
237:24 241:2
244:19,19 245:14
246:6 248:2
249:20 251:23
252:11 253:4,5
254:20 256:18
258:7 261:18
262:2 265:13,14
265:18 266:8
268:17,20 270:3,5
270:19 275:1,3,4,7
275:14,18 276:22
276:24 277:11
279:7 281:3
284:13,23 297:9
297:10 299:16

knowing 183:15
194:10,12
knowledge 63:24
67:13 108:24
160:20 177:19
180:22 227:16
230:9 247:20
255:1 256:5,10
261:19 271:21,24
278:16,19 279:1
279:11,13,15,21
288:10
known 179:7
227:13
knows 211:6
koltak 11:23 13:23
14:17
kyle 38:9 116:15
116:21 142:25
234:13 235:16

**l**

l 8:25 178:16
label 196:8
labeled 43:7
242:13 246:25
293:9
laborer 39:22
lack 179:4
landed 89:5
language 45:24
188:22
lapsed 84:12
large 148:20 226:7
241:15 259:7
288:5
larger 149:18
largest 269:20
lastly 149:2
latest 15:10
launch 114:17

law 7:5,11,17,23
8:4,9 26:21,24
35:20 36:4 54:8
59:15 67:2 68:8
70:25 101:21
127:17 128:8
129:11 130:16
133:6 139:2,3,14
144:20 164:1
191:1,2 205:20
247:9 283:12
291:1
lawful 9:6
lawfully 47:4,11
laws 14:23 15:4
21:13 65:11
163:10,16 169:11
169:22 298:10
302:19
lawyers 21:7
67:23
le 138:25 139:1
leadership 39:3
40:4
leaps 72:15
learn 61:23 82:2
learned 50:15
154:6 183:13
leave 126:21
led 86:4,11
lee 7:18
left 126:22 215:16
235:16
legal 8:20 31:25
32:4 44:18,21
54:17 141:17
266:23 302:16
306:1 309:1
legally 267:9
legislation 136:9
144:1 187:10

208:19 222:7
247:23 249:2
**legislative** 128:7
128:19 153:10
202:8 221:6,12
225:16
**legislatively** 202:4
202:6,16
**legislature** 221:14
222:6 224:7
**legitimacy** 229:6
**legitimate** 44:4,7,8
49:12,13 50:5
65:1 66:10 80:22
81:12,15 154:15
155:24 156:2,5
162:3 164:19
186:11 196:3
207:16 226:10
239:21 246:23
248:4,18 263:20
266:25 267:11
295:23 299:3,3,4
**length** 172:18
**lengthy** 37:15
**lesser** 278:10
**letter** 2:21 23:13
24:4,17 44:25
45:7 46:5 233:23
306:19
**letters** 40:11 46:7
**level** 51:8 96:23
132:18 148:11
151:1,10 227:13
235:13 269:6
**levied** 173:13
**license** 62:14 63:7
63:14 74:2,4
75:19 83:23 84:3
84:11,11 85:1,11
127:15 128:12

134:10 153:15,15
157:2,7,14,20
160:18 165:20,25
166:1,1 168:11,15
169:6 170:8,18
173:13 202:18
214:20 215:6
299:24 300:2
**licensed** 44:11,12
44:17,19 62:17,24
62:25 64:7 66:3
71:4,11 85:13,19
109:16 110:20
132:24 168:4
176:3 180:12
247:25 248:8
266:15,19 286:24
286:25 296:25
**licensee** 27:11
63:21,22 75:6
76:15,15 93:8
96:2 104:16,22
144:21 163:15,19
169:21 170:2
301:8 302:3
**licensees** 15:3
26:15 29:5 71:9
71:25 92:1 100:15
100:16 105:14
129:5 139:12,14
139:16 145:3
147:7 150:23
163:24 164:18
170:13 189:23
204:4 223:11
224:1
**licenses** 136:15
165:22,23 166:11
167:4 171:2 297:7
**licensing** 27:8
31:24 32:3 62:20

63:11 165:17
218:7
**licensure** 200:3
**lieutenant** 57:10
231:8
**life** 179:2,6,9,19
278:23
**limit** 274:10 280:5
280:13
**limitations** 23:24
24:17
**limited** 23:9 47:16
288:19
**line** 104:14 129:25
130:1 207:25
306:13 308:7
309:3
**lines** 135:16
154:10 226:21
248:23 270:13
**link** 213:12
**linked** 212:23
213:9,10,11
**lisa** 28:1
**list** 32:22 73:8
77:9,24 82:23
83:17 112:9 135:8
238:17,17,24
250:20 294:4
295:13
**listed** 100:11
169:2 308:7,17
**listing** 140:21
308:7
**lists** 155:24 294:21
**literally** 95:24
102:2 129:10
274:20
**litigation** 1:8 9:14
306:6 307:3 308:3

**little** 17:4 53:9
55:1 66:14 82:16
134:21 136:16
146:20 180:6
187:7 195:15
244:22 252:18
261:17 266:21
285:5,16
**live** 72:8 129:17
**llc** 8:1 296:18
297:4
**llcs** 297:11
**llp** 7:3,10,21 8:2
**lobbyist** 130:17,20
**local** 59:15 75:10
76:6 84:6 127:21
127:22 136:8
143:19 144:5
148:5 151:1,10
190:11 191:2
231:16
**locally** 227:18
**location** 111:24
121:9 199:16
301:5
**locations** 71:4
111:18 290:6,19
**lodge** 34:22
**log** 129:21
**logs** 212:4
**long** 13:5,14,20
14:2,13 33:10
34:17,17 35:2
36:6,14 38:10
44:21 51:7,9 57:6
79:25 113:14
195:13 242:11
249:22 250:7
255:15 274:7
281:4

| | | | |
|---|---|---|---|
| **longer** 105:10 | **looks** 158:2 168:23 | 63:2,5 66:17 67:8 | 242:18 243:1,9 |
| 200:9 | 175:9 195:9 258:6 | 68:22 69:2,16 | 281:12,17,20 |
| **look** 21:7 23:16 | **loop** 68:17 | 70:10,13 74:17 | 282:21 283:1,14 |
| 46:12 82:8,9,16 | **loss** 72:1 86:2 | 75:25 76:23 79:1 | 283:17 285:10 |
| 87:6,15 106:3,13 | 88:18 101:4,22 | 79:6 80:10 86:13 | 288:15,18,21 |
| 112:24 119:5 | 102:8,11,15,17 | 88:4,8 90:18 91:1 | 290:3,10,12,16 |
| 123:13 137:21,22 | 103:3 139:15 | 91:23 94:13 | 291:4,13,17,20 |
| 137:22 138:4 | 281:18,24 282:1,4 | 103:16 105:16,19 | 292:1,6,9,19 293:2 |
| 140:20 155:9 | 282:9,20 283:7 | 106:1,6,23 109:6 | 293:8,10,16,22 |
| 158:23 169:1 | **lost** 282:14,16 | 116:17 121:20 | 294:1,7,14,20,25 |
| 178:6 192:13 | **lot** 26:17 48:17 | 126:9,12 132:13 | 295:6,12,16,25 |
| 197:21 205:18 | 52:23 89:9 138:13 | 132:21 134:25 | 296:6 297:18 |
| 212:3 213:3 | 182:22 252:7 | 135:23 138:9,20 | **machine** 121:6 |
| 219:22 221:2 | 261:23 266:3 | 140:25 141:5 | **madam** 306:10 |
| 249:7 251:12,16 | 269:2 278:7 280:4 | 143:22 144:2 | **magic** 83:1 125:15 |
| 254:7,10 257:5 | **louder** 17:4 | 146:13 149:12 | **main** 7:12 55:4 |
| 265:13 274:22 | **low** 284:15 | 150:8,20 151:17 | 142:5,6 |
| 275:8 276:5 | **lowers** 209:4 | 151:21 153:17,23 | **maintain** 30:9 |
| 280:17 293:11 | **lunch** 130:25 | 155:8 156:18 | 135:2 |
| 298:14,19,25 | 131:2,5 | 158:7 160:13,19 | **maintained** 257:8 |
| **lookback** 107:1 | **lunesta** 209:4 | 160:25 161:20 | **maintains** 18:14 |
| 131:17 272:11 | **m** | 162:11,18 163:3 | 18:23 |
| **looked** 19:8,22 | | 163:14,23 164:8 | **major** 52:9 130:14 |
| 106:8,18 112:14 | **m** 8:3,4,20 175:23 | 164:12,16,21,24 | **majority** 47:3,10 |
| 112:18,25 113:10 | **ma'am** 11:1,4 | 165:3 167:18,24 | 114:1 118:9 127:6 |
| 132:4,4 190:7 | 12:10 14:1,10 | 168:7,16,22 169:8 | 181:16 182:10 |
| 200:8 201:8,12 | 17:18 19:1,16 | 169:13,20 171:17 | 241:17 261:16 |
| 244:4 274:4,5,23 | 20:1 22:16,22,24 | 175:15,18,25 | 282:2 287:23 |
| 275:22,23 293:17 | 23:1,3,5,7 24:23 | 177:5,22 178:9 | 301:3 |
| 297:19 | 25:8 29:9 30:16 | 180:5,13 181:12 | **making** 88:22 |
| **looking** 18:19 | 30:18,25 31:7 | 184:9,13 187:6,11 | 128:7 130:1 136:1 |
| 19:19 23:14 82:15 | 32:5,18 33:16 | 187:21 188:3,16 | 144:10 196:4 |
| 87:16 118:23 | 34:25 35:10 37:19 | 189:13 190:20 | 201:25 207:14 |
| 132:2,3,5 145:25 | 37:22 38:7,17 | 191:24 192:24 | 225:25 286:20 |
| 146:3 154:3 | 39:14 40:1,7,15 | 193:6,14,25 194:5 | 295:20 |
| 175:10 194:17 | 41:10 42:18 43:16 | 194:21 198:1 | **manage** 28:24 |
| 211:12 226:19 | 43:18,24 44:22 | 201:7,10,17 | **manageable** 37:2 |
| 249:18 263:23 | 46:19,23 47:7,12 | 204:14 206:3,7,19 | **management** |
| 267:20 271:15 | 47:22 48:1 50:23 | 208:25 209:6 | 15:22 34:6 57:13 |
| 273:16 275:3 | 51:4 53:23 54:1 | 215:8 216:25 | 128:12 153:15,18 |
| | 55:8 56:13 60:20 | 217:15 219:13 | 153:24 165:25 |
| | 61:10,15 62:22 | | |

166:6 247:2
248:14
**managers** 101:23
**managing** 26:9
29:3 36:25
**mandate** 243:19
**mandatory** 128:20
294:5,9
**manner** 148:17
149:5 188:10,14
189:2 196:7 198:4
239:22 304:16
**manual** 39:22
**manufactured**
35:19
**manufacturer**
65:8 88:21,24
89:4,9 172:8
230:2,4,5
**manufacturers**
229:18,25 230:3,8
236:23 237:1
**manufacturing**
166:18,20
**map** 135:1,6
**marc's** 175:23
176:2,7 177:3
**march** 159:1
161:23 162:12
**marijuana** 28:7
57:4 58:6 190:3
**mark** 28:5 140:8
154:23 158:17
161:9 167:10
183:24 187:17
223:18,24 228:2
**marked** 2:10,14
2:19,24 3:3,8,12
3:17,22 4:4,9,14
4:19,24 5:4,9,14
5:19,24 6:5,9

21:18,22 25:2
45:2,6 91:15,19
115:14,18 140:15
154:21 158:15
161:7 167:8,13
175:3,6 178:1,3
183:21 187:14
192:19 203:16,20
220:16 224:11,15
228:6,17 242:8,12
264:23
**marketing** 141:19
**marking** 220:17
**mart** 8:7 281:2
288:11
**mary** 211:3
**masquerading**
247:5
**massive** 43:5,9
129:4
**match** 103:6
**matrix** 15:21
17:12 177:10,19
**matt** 219:25
**matter** 6:4 97:19
175:23 239:20
242:7,16 243:3
290:9
**matthew** 7:11
**matthew.moriarty**
7:13
**maureen** 7:4 9:12
**may's** 228:16
**maynard** 155:1,17
156:9,13,22,24
171:16
**maynard's** 157:14
**mbrowne** 7:7
**mcconnell** 8:10
**mckesson** 7:2 9:13
15:10 61:3,6

245:7
**mcnamara** 2:4
7:22 12:20 13:6
241:22 242:1,3,10
243:21 244:13
**mcnamee** 12:6
13:7 14:20 130:18
143:24 195:10
204:10
**mcnamee's** 12:8
12:11
**md** 1:8
**mdl** 1:7 45:8
183:25 242:13
**mean** 15:1 43:3
70:5 77:8 92:6
93:24 95:18 96:14
99:6 109:13
112:23 147:3
153:6 182:13
186:22 199:12
252:7,12 257:16
260:9 261:25
266:12 270:20
281:22 282:17
301:16
**meaning** 89:3
**means** 49:9,13
80:19 81:18 82:12
87:6 114:2 125:9
125:14 172:3
266:10 274:20
**meant** 81:7 199:5
**measures** 47:5
**mechanism** 114:7
114:24
**med** 72:25 76:18
98:10 130:8
269:17 277:15,25
278:21 286:13

**medicaid** 127:24
144:13 145:1,6,18
145:19,24 146:7,7
**medical** 28:6 44:4
44:8 46:15 50:6
65:1 66:11 78:4,5
78:14 80:22 81:13
81:16 83:24 84:3
84:17 85:2 119:13
119:17 126:17,20
143:25 144:25
154:15 155:24
156:2,5 162:3
164:19 178:16
190:2,25 196:3
202:23 226:10
239:21,24 240:1
247:25 266:25
267:11 287:22
288:7,9,13 289:21
**medicare** 144:13
145:1 148:14
**medication** 49:21
59:18,24 60:12,16
87:19 88:2 89:5
110:13,22 164:20
172:24 173:2
176:20 182:23
185:1 198:15,22
213:2 288:14
291:10,24 296:4
299:20
**medications** 52:23
77:17 195:21
262:8 286:24
287:1,3 290:14
291:3
**medicine** 59:10
286:2,3
**meds** 269:13 278:7

[meet - monthly]                                                                Page 31

**meet** 11:24 12:16
  13:5,17 14:13
  31:1,12
**meeting** 4:8,13,18
  5:8 13:16 14:4
  21:6 30:24 31:20
  32:10,16,23 33:3,4
  33:6,14,22 34:17
  34:18,24 35:1
  95:21 96:4 144:15
  167:7,11 175:2,12
  175:12 177:25
  178:5 192:18,23
  197:15 220:16,23
  221:1 234:9,9
  236:21
**meetings** 14:3,18
  15:12 26:8,23
  28:13 29:25 30:2
  30:6,15 31:6,9,13
  31:17 32:3,7 33:1
  33:21,21 34:5,8,9
  42:1 144:17,19,24
  145:10,24 181:8
  190:9 220:19
  224:5 237:1
**member** 17:22
  59:25 60:8,12,17
  94:15,16,18 97:12
  229:22
**members** 11:17
  12:2,4 98:17
  99:14 140:21
**memo** 184:6
  233:23 234:2
**memorialized**
  96:7
**memorized** 22:9
  22:11
**mention** 10:18

**mentioned** 13:22
  14:7 15:25 17:7
  24:4 34:16 47:24
  58:3,16,18 68:23
  74:14 78:22 82:18
  90:14,19 96:10
  106:2 113:10
  118:9 121:17
  125:17 130:16
  134:20 135:25
  138:6 143:16
  146:10,18 149:2
  149:20 151:12
  153:4 174:13
  182:24 184:23
  190:5 200:4
  217:16,21 260:19
  263:3 283:11
  297:14
**met** 9:12 12:5
  13:22 14:7,15,16
  34:2 218:21
**meth** 52:17
**methodology**
  232:25
**methods** 78:23
**metoprolol** 176:14
**michael** 28:4
**micrograms**
  176:19
**microphone** 220:1
  220:3
**middle** 99:2
  135:11 265:6
  294:3
**midwest** 306:17
  309:1
**mild** 43:20,21
**mill** 126:2,5 247:3
  247:22 248:9

**miller** 8:25
**milligram** 269:18
  269:19
**milligrams** 159:4
  159:5 160:2
  161:19 162:7
  176:14,15 269:12
**million** 275:24
**millions** 269:24
  270:6
**mills** 43:7 48:4
  50:3 80:21 117:2
  117:13 125:19,21
  125:24 154:9
  240:25 246:16,19
  246:21,24 247:4,9
  247:19 248:20
**mimic** 154:9
**mind** 13:12 102:25
  218:17 243:5
**mindful** 65:13
**mine** 197:7
**minimal** 159:20
**minimum** 193:4
**minute** 45:17
  118:7 122:11
  143:23
**minutes** 4:7,12,17
  5:7 30:5,7 32:6
  167:6,11 175:1,7
  175:12 177:24
  178:4,19,21,23
  192:17,21 193:16
  197:2,3,10,14
  220:16,20 221:2
  221:19 222:16,25
  224:6
**mis** 256:8
**misdemeanors**
  156:16

**missed** 225:7
**missing** 104:7,8
  219:8
**mission** 143:9
**misstated** 272:19
**mistakes** 301:21
**misuse** 155:21
  226:15
**misusing** 206:11
  207:8
**mix** 278:6,7
**mo** 45:10
**model** 183:16
  194:11 218:15,24
  219:2 261:25
**mom** 262:2,6
**monetary** 168:14
  177:4
**money** 51:24
  148:21
**monitor** 34:1
  103:7 122:14
  123:18 160:21
  174:1 211:14
  216:17
**monitored** 93:15
**monitoring** 67:5
  124:6 164:6
  173:25 186:13,15
  191:23 251:16
  252:1 256:24
**monitors** 103:5
**montgomery**
  151:5 304:2
**month** 83:20
  118:5 136:24
  137:13,14 163:4,6
  170:19,20 253:5
**monthly** 71:22
  79:20 80:1 82:19
  82:20 204:6

**[monthly - notes]**

Page 32

214:10

**months** 38:14 39:9
149:14 163:1,6
263:25 264:4
273:12 274:11
**moriarty** 2:3 7:11
45:10,13 116:6
219:23 220:2,9
223:19,22 224:13
224:17,20 228:8
241:20
**morning** 9:11
69:12 131:13
146:20 147:14,22
209:5
**motor** 41:3
**move** 117:7
131:12 267:22
**moved** 52:9 122:2
188:1 194:20
248:14
**moves** 153:12
**moving** 124:1,4
189:9
**multi** 55:13,17
127:4 241:5
**multiple** 49:20
100:23 127:20
185:5,8,18,22,23
206:9 207:6 209:8
209:11 210:4,6
212:19,25 213:1
213:18 218:13
290:1,2,6,19,23
295:9
**multitude** 99:13
**municipality**
54:10
**muscle** 43:20

**n**

**n** 9:19
**n.w.** 7:5,23 8:4
**nabp** 140:5,6
204:9,12,18 205:3
205:4,12 217:22
218:4,11,13,14,25
225:9
**name** 9:12,15,18
99:11 216:6
235:25 242:2
255:11 281:1
296:17 306:6
307:3,4,15 308:3,4
308:21
**named** 304:7
**names** 27:23 29:19
245:2 250:15
297:10
**narrative** 108:17
**narx** 73:4 130:9,9
**national** 1:7 46:21
204:12 217:16,25
225:7,10,13
288:11 306:6
307:3 308:3
**nationally** 56:20
**nature** 18:12
**ndc** 89:9
**near** 221:16
**nearly** 248:12
**necessarily** 104:18
186:21 199:6
290:19,23 295:4
295:10
**necessary** 174:5
**need** 10:13,15,19
11:7 91:6 120:21
136:22,22 137:15
150:2 171:6
181:19 183:2

191:10 219:20
226:10 252:8,12
263:1 264:14
276:17 300:11
301:6
**needed** 225:20
228:14 298:23
**needs** 79:7 110:24
119:23 120:2
**neither** 241:7
243:14,15
**neurologist** 210:11
**never** 51:23
122:11 234:2
241:8 279:10
301:5
**new** 34:11 39:16
82:24 83:19 117:7
122:8 136:9
137:12 167:23
187:8,24 188:1
193:20,22 205:20
212:12 238:25
263:16,16 275:16
275:19 293:20
294:5,8
**news** 233:11
**newsletter** 5:13,18
5:23 71:22 129:6
203:16,21 204:16
204:17,20 205:8
205:14 208:20
217:20 218:9
223:24 224:11,22
228:6,17 293:18
293:19 298:17
**newsletters** 67:7
203:25 204:3
205:16 223:17
224:4 225:4 293:5

**nichols** 117:4
**nicole** 8:20
**nicole.dehner** 8:22
**nodded** 262:22
**non** 46:15 81:12
81:15
**nope** 196:17
**normal** 44:14 86:1
112:22 169:24
182:11,13 259:6
**normally** 32:11
33:10 86:1 95:19
102:13 103:4
166:21 185:19
265:16
**north** 135:15
**northeast** 28:3,9
28:11 29:8,11,12
29:14 134:23
**northern** 1:2
75:13 135:17
**northwest** 28:5
29:10 134:24
**notarized** 306:14
**notary** 1:15 9:3
304:3 305:8
306:25 307:10,18
308:15,23 309:23
**notation** 97:15
**note** 206:4 207:11
306:12
**notebook** 107:18
256:14
**noted** 100:9 177:2
**notes** 25:14 30:14
30:21 31:8 116:25
155:12 156:9,21
157:6 158:24
159:8 161:21
162:24 168:1,8,17
169:4 176:1,6,9

[notes - occurred]

179:1,15 187:22
194:16 219:20
220:13 230:10
280:18 296:8
**notice**  2:12 21:16
21:23 57:17
104:17,20 277:21
**noticed**  51:13
52:12 113:24
199:15
**noticing**  52:4
**notification**  93:1
102:14 282:17
**notified**  94:7 98:1
105:4,9
**notify**  76:16 103:7
104:24 150:12
**november**  5:13
159:18 176:7
179:16 203:16,20
293:5,6
**number**  2:12,17
2:21 3:2,6,10,15
3:20 4:2,7,12,17
4:22 5:2,7,12,17
5:22 6:2,8 19:14
21:16 24:1 25:1
29:5,5 44:25
45:11,12 47:15
49:18 83:3,3 84:2
89:9,10 91:14
106:3,12,16
115:13 124:2,4
140:13 153:3
154:19 155:3
158:13 161:5
167:6,21 168:1
175:1,22,24
177:24 178:14
183:15,20 184:24
186:8 187:13

189:4,4 192:17
193:7 203:15
210:3 215:14
224:10 228:5,10
238:13,16 239:3,3
242:6 245:22
249:12 250:20
259:22 263:11
264:22 265:2,20
267:20 268:2
269:22 270:7,8,9
272:5 275:9,10
276:1 277:22,23
278:9,10 279:18
279:24 280:3,8
281:14 283:24
284:15 285:7
294:21 306:7,13
**numbered**  171:23
293:14
**numbers**  22:10,10
49:14 158:19
167:16 178:11
186:15,19,25
193:2 214:14
231:14 249:7
252:12 261:18
268:9 270:14
275:21 276:1
277:21 283:19
308:7
**numerous**  40:4
48:23 50:15 67:4
112:23 127:7
138:3
**nurse**  98:3 121:5
**nursing**  76:18
98:1,9 144:25
202:24

**o**

**o**  40:11,11,12,12
40:12
**oac**  157:12 191:25
**oarrs**  31:25 32:4
72:13,16,17,21
73:1 77:19,24
79:11,21 80:2,8
81:2,7 82:18,19
83:2,15 87:11,14
90:12,20,22,24
99:3,7,8,9,10,15
99:17,19,21 100:2
109:3,7,21,24
110:19,23 111:12
111:17,25 112:4
112:15,16 113:12
113:25 114:2,13
114:21 118:9,10
118:14,18 119:2
120:9,14 122:16
128:21 129:20
130:5 139:14
145:14 146:8
152:16,23,23
158:5 161:1,3
196:6 205:24,25
206:5 207:25
208:3,5,9,10
209:14,15 211:15
212:1,13,23 213:4
213:9,10,12,20,23
216:9,19,21
222:21,22 232:12
237:2,9,11,14,16
237:18,24 238:8
238:11 264:1,13
265:2,9,15 266:13
267:23 268:15,18
272:12,20 274:7,8
275:6 276:9,12,13

278:20 288:17,19
288:23 289:7
291:19 293:25
294:10,17,23
295:15 301:2,6,9
301:19,23 302:6,8
302:11,17,20
**object**  206:22
276:10 278:13
**objecting**  206:25
**objection**  24:7
244:13 302:9
**objectives**  33:23
34:1
**obligated**  267:9
**obligation**  152:10
266:24
**obligations**  195:19
**obot**  166:1,3
**obstructionist**
117:6
**obtain**  77:12
151:24 185:4
**obtained**  89:3
154:8 198:3
**obviously**  27:12
40:2,24 41:4
49:18 55:21 75:16
130:22 132:25
196:7 207:8
301:19
**occasion**  86:14
149:24 159:1,11
159:17
**occasionally**  98:23
98:25 221:3 266:9
**occasions**  146:24
161:16
**occur**  51:5 259:13
**occurred**  212:8,11

| | | | |
|---|---|---|---|
| **occurring** 104:4 | 4:13,18 5:2,8,12 | 272:23 273:5 | 234:22 235:7,21 |
| 121:5 | 5:17,22 6:8 7:12 | 275:5 277:8 | 236:16,22 237:13 |
| **october** 161:16 | 8:11,13,14,17,19 | 279:12,16 283:6 | 237:23 239:2 |
| 168:2,19 | 8:21 9:24 15:8,9 | 286:23 288:17 | 240:3,9,10 244:1 |
| **odd** 39:23 | 21:17,24 26:1,2 | 291:1 293:4 304:1 | 245:5,6 246:16 |
| **offense** 216:9 | 28:3,4,10,11,12 | 304:4 305:2,8 | 252:9,22 253:6 |
| **offenses** 50:22 | 29:8,14 35:9,21,21 | 306:2 | 260:1 264:15 |
| 157:22 | 36:2 38:23 40:9 | **ohio's** 270:18 | 266:2,6 268:10 |
| **offered** 139:19 | 40:20,22 41:5,8,14 | **ohioattorneygen...** | 270:7 271:10 |
| 156:23 163:9 | 41:16,24 43:7 | 8:18 | 276:23 282:11 |
| **offers** 198:4 | 44:11,12,17 48:5 | **ohiopharmmins** | 283:24 284:17,24 |
| 218:25 | 48:10,12,13 54:19 | 167:14 175:17 | 285:19 287:6 |
| **office** 3:7 8:14 | 61:20 62:3,13,14 | 193:1 197:16 | 297:12 299:12 |
| 14:9,19 17:24,25 | 62:16,17,21,25 | **oig** 127:22 143:20 | 302:23 |
| 18:17 36:1,7 | 64:13 69:15 75:14 | 146:19 147:10,13 | **once** 13:13 76:1,3 |
| 39:12 50:21 51:12 | 91:14,20 115:13 | 147:19 148:9 | 95:22 148:3 |
| 53:25 54:12 55:22 | 115:20 117:1 | **okay** 10:8,12,17 | 227:16 247:12 |
| 56:1,8 73:20 | 125:21 126:3 | 10:22 13:9 16:21 | 253:22 257:9 |
| 75:12 99:18 | 132:25 134:23,23 | 22:13 23:11,25 | **oncology** 288:5 |
| 100:19,22 102:19 | 135:6,14 140:3,10 | 24:10 25:12 26:1 | **ones** 57:3 82:9 |
| 102:19 110:18 | 140:13,23 141:6 | 29:12,17,22 31:16 | 112:9 132:5 188:9 |
| 115:13,20 117:15 | 153:25 163:10,17 | 38:18 39:10 45:13 | 190:23 201:2 |
| 117:20 166:3 | 167:7,12 168:4 | 46:2,12 47:1 48:8 | 207:21 219:9 |
| 198:24 233:12,17 | 169:11,15,23 | 48:19,23 52:18 | 238:25 244:19 |
| 233:18,24 234:1 | 175:2,13 177:25 | 53:20 74:24 84:24 | 293:24 |
| 235:20 253:23 | 178:5 184:7 | 97:6 101:20 102:3 | **ongoing** 34:4 |
| 282:13 284:5 | 187:13 192:18,22 | 109:18 111:1 | 50:12 216:12 |
| 285:13 301:5 | 203:15,21 219:11 | 116:9 120:13 | 218:14 |
| 305:2 | 221:13,21 222:6 | 123:22 125:3 | **online** 99:1 100:13 |
| **officer** 36:2 39:17 | 222:12,17 224:7 | 135:10 137:9 | 100:25 |
| 40:8,9 251:23 | 224:10,21 225:12 | 144:7 156:12 | **open** 46:15 47:17 |
| **offices** 49:4,5 | 225:14 226:6,14 | 173:1,7 180:24 | 147:5 236:18 |
| 283:16 | 226:23 228:5 | 191:11 192:3,11 | **opened** 181:22 |
| **official** 307:15 | 230:23 236:10,11 | 192:13 194:21 | **operate** 62:17 |
| 308:21 | 243:20 247:21 | 197:24 198:12 | 80:21 |
| **oh** 56:3 74:22 | 261:21 263:24 | 199:3 201:4 210:8 | **operated** 231:17 |
| 219:9 230:22 | 264:22 266:4,9,16 | 210:25 213:7 | **operates** 55:1 |
| 239:1 264:15 | 266:19 268:3 | 214:2,9 220:14,24 | **operating** 10:4 |
| 268:22 | 269:23 270:4,13 | 226:24 229:3 | 50:3 |
| **ohio** 1:2,16,19 | 270:22 271:23 | 230:6,18 232:16 | **operations** 26:6 |
| 2:13 3:2,6,10 4:8 | 272:1,2,11,16,21 | 233:16 234:14,18 | 36:25 231:9 |

opiate  1:8 24:6
  41:1,7 127:16
  132:6 138:18
  188:20 306:6
  307:3 308:3
opiates  117:2
opinion  78:13
opioid  40:14,19
  41:12,19 42:4,11
  42:20 51:14 59:17
  60:5,16 69:6,13,14
  69:19 70:15
  110:13,22 127:2
  131:24 132:2
  135:20 139:11,23
  143:12,16 166:3
  188:7 189:19,21
  195:21 199:6
  205:23 212:19
  213:1 234:25
  235:5 268:4
  269:25 270:1
  272:9,10,17,23
  273:17,20,21
  274:6,17,21,24
  275:5 276:8 277:3
  277:10
opioids  43:15
  48:22 51:3 52:5
  52:17 70:5 84:10
  90:3,8 108:20
  109:1,9,15 131:20
  154:14 262:10
  266:4,9,10 268:8
  268:14,18 271:23
  272:1
opota  36:2 40:2,6
  40:12
opportunities  67:7
  71:6

opportunity  36:13
opposed  69:19
  74:19 109:20
  149:18
option  148:15
oral  10:6 159:24
orc  156:16
order  3:20 4:2,23
  15:17 16:1,5,11
  21:8 49:16 64:25
  66:10 79:7 107:13
  110:17 120:2,21
  158:13 161:5
  180:10 181:2,10
  181:16 182:2,4,6
  183:14,18,21
  184:3,10,15,19,24
  185:9,22,23 186:4
  186:10,16,21,22
  187:2,4 190:6,10
  190:17 191:22
  220:17 227:24
  249:6,10,16 250:7
  251:16 252:1,15
  252:16,19 254:5
  254:12,15,19,24
  255:3 256:12
  257:9 258:23
  259:7,22 260:4,23
  261:12 263:12,25
  297:14,21
ordered  103:10
  235:18
ordering  47:16,18
  47:19 195:17
  261:21 262:10,13
orders  65:14 77:3
  79:12 89:24 179:5
  179:18 180:2
  181:23 182:10
  191:6,16 192:2

193:11,13 194:2
  218:19 253:19,24
  260:19 263:7
organizations
  205:14
organized  187:23
orientation  133:14
  133:24
original  54:12,21
  79:12 155:18
  171:25 212:3
  301:13,15,16,18
  301:23,24 302:15
originally  246:25
orthopedic  210:10
oshp  236:11
outliers  81:5
  115:11 119:3,5
outlying  118:24
outpatient  44:18
  262:1
outreach  26:18
outside  62:14
  78:10 109:19
  144:6 206:16
  278:15,25
outsourcer  166:15
  166:16
outsourcers
  166:14
overall  141:18
  278:9 301:1
overdose  41:2,25
  73:4 112:14
  113:11,11,20,24
  114:7,20,21,25
  115:3,9 118:8
  143:13 232:11
  272:10,11,16,18
  272:18,21,23
  273:10,11,20,21

273:22 277:4
overlap  134:11
  136:15
overlapping  49:22
  172:6
oversaw  231:7
oversee  26:6,20
oversight  59:1,3
overwhelming
  47:3,9
owned  128:14
  154:12
oxycodone  43:13
  43:15 226:8
  248:15

                p

p  7:11 40:11,11,12
  40:12
p.m.  303:6
pace  36:12
package  181:17,18
packing  179:11
page  2:1 22:15
  25:13 47:1,13
  97:16,22 98:2
  99:2 140:20 141:9
  155:12,12,13,14
  156:8,19 160:9
  162:23 167:15,15
  167:16,25 168:8
  169:4 171:18,24
  175:20 176:2
  178:10,11,12,24
  178:25 184:1,5
  193:1 194:15,19
  197:22,22 199:19
  204:15,16 205:18
  208:22 209:3,7
  225:19 228:12,24
  240:6,7,21 249:12
  268:6 271:25

[page - people]                                                     Page 36

293:13 295:22
298:19 306:13,15
308:7 309:3
**pages** 193:2,3,7
**paging** 188:5
**paid** 148:22
180:14
**pain** 43:21 128:12
153:15,15,18,24
165:25 166:6,8
226:6 246:22,23
247:2,5,20 248:3,4
248:9,14,18
270:25 271:5,6
299:3,4,20
**paint** 289:20
**paper** 48:7,11,17
48:19 255:9 257:3
**papers** 54:17
**parabenzamine**
162:9
**paragraph** 46:13
47:2 117:1 155:22
155:25 156:3,4,8
156:19,20,21
157:6 158:24
159:8,15,22
160:12,13,15
161:15,21 162:12
162:23 167:25
168:17 171:19,22
171:23 176:1,6
177:2 178:7,25
179:15 180:15
193:13 194:3
205:20 243:12
293:12,13 294:4
298:25 299:11
**paragraphs**
155:15 158:1,3

**parallel** 71:16
**paraphrasing**
67:16
**pardon** 13:10
120:9 174:15
175:11 180:7
187:18 192:14,15
**parens** 46:15,15
47:17,19
**parent** 59:19
**parent's** 59:9,17
**parest** 159:19
**park** 34:22
**parked** 183:25
**parker** 38:9
116:15,20 117:12
117:18,23 125:18
126:10 142:25
195:7 234:13
**parks** 34:22
**part** 31:16 71:13
107:13 138:10,13
152:25 153:1
190:13 217:19
226:22 229:17
254:9 308:9
**participant** 142:23
**participants** 30:24
32:17
**participate** 50:25
138:15 142:18
145:17,22 148:15
148:16 151:8
217:22
**participated** 59:22
143:2 276:14
**participates**
139:23 143:3
144:4 145:9 215:1
**participation**
138:11

**particular** 35:23
45:22 69:5 90:3,6
94:18 101:10
114:7 133:11
173:3 178:22
223:1 262:14
263:19 268:14
275:2 279:19,25
289:18 292:12
**particularly**
151:13 226:8
**parting** 116:15
**partner** 100:11
**partners** 26:23,24
**parts** 119:20
221:21
**party** 304:15
**pass** 154:3 280:16
**passage** 247:22
**passed** 157:8
193:3 222:7
248:11
**passing** 187:9
242:11
**patches** 268:5
**patient** 66:25
76:22,24 77:5,9,12
77:20,23 78:3
82:15 83:13 121:6
123:24 130:4
137:6,23 155:23
156:2,5 166:23,24
167:1 176:13,16
176:17,19 196:10
198:17,19,25
199:15 206:16
207:21 209:13,17
209:25 212:4,11
212:20 237:19
267:7 278:23,23
278:24 286:17,20

287:4,11,19,19
288:2 289:18
290:1
**patient's** 77:16
78:4 198:19
287:21 288:13,23
289:21 292:24
**patients** 82:24
83:4,6,18 130:15
137:3,11,24
146:16 262:6,16
262:17 266:4,10
268:3 269:23
272:2,2 275:9,10
275:13,14,15,16
275:19,25 276:6,8
277:23 278:10
286:8 290:14
299:4,4
**patrol** 55:2
**pattern** 82:10
182:8,25 262:13
264:3
**pause** 45:20 116:5
**pay** 98:13 169:5
217:7
**paying** 138:2
154:9 248:25
**payments** 50:4
**peace** 36:2 40:8,9
**peaked** 270:9
**penalty** 168:14
169:3 177:4,20
**pending** 10:19
243:16
**penultimate** 117:1
**people** 28:19
52:20 55:14 69:24
71:10 85:24 94:20
115:3 221:5
225:25 226:9

235:25 237:23
248:23 299:20
**people's** 95:17
**percent** 114:5
115:2 181:18
274:20 275:2,4
284:13,18,20,22
285:20,23
**percentage** 119:1
241:8,15 275:4
277:7,10 284:15
300:25
**percentages** 114:4
119:7
**percodan** 159:10
162:6,15
**perfect** 131:2
**perform** 195:24
**period** 16:10
17:14,16 19:15,25
20:21 21:2 37:14
39:5,8,18 57:15
63:21 69:1 83:19
106:24 118:6
131:16 162:20
201:21,24 238:3,9
**periodically** 181:6
**permanent** 173:22
**permanently**
127:15
**permit** 78:16,18
**person** 75:20 93:6
94:12,14 96:3
162:2 179:3 237:8
255:24 256:13
282:6,6
**personally** 65:12
128:15 138:24
233:23 268:16
273:25 307:11
308:15

**personnel** 33:9
34:14
**persons** 71:25
125:12 176:12
272:14
**perspective**
117:11
**pertaining** 155:17
**pertains** 192:1
197:18
**pharmaceutical**
27:5 42:15 44:3
61:19 62:15 66:15
68:16 178:15
229:25 236:23,25
**pharmaceuticals**
7:9 40:25 69:20
185:5 229:19
**pharmacies** 49:23
58:19 72:3 87:10
87:13 102:23
121:24,24 182:11
182:16,23 185:4
205:5 210:13,19
211:5 213:22
229:4,14 237:8,20
286:2 287:24
288:6 296:24,24
297:3
**pharmacist** 27:9
27:19 72:7,8,19
87:1,3 94:1 96:20
109:22 129:17,25
130:21 136:5
160:11 161:12
172:19 178:17
198:2 206:14
207:12 208:4,5,9
209:13,24 210:5
210:16 211:20,23
212:15,17 213:9

213:10,11,13,14
213:19,22,25
236:7,10,11,13
237:10,15,17,25
267:7,17 286:19
287:18,19,21,25
291:9,14,19,23,23
292:4,5,7,17
294:22 295:14,18
296:2
**pharmacist's**
163:1 292:22
**pharmacists** 66:5
66:16 72:23 85:19
101:24 132:24,24
174:11 195:19
200:12 201:16
205:25 207:20
223:10 236:4
267:3 286:1,5,10
286:12,23 288:10
288:16 291:1
292:11 294:10
**pharmacy** 2:14
3:3,7,16,21 4:3,9
4:14,19 5:3,9,13
5:18,23 6:3 8:13
8:19 9:25 18:7,13
18:23 20:20 21:18
21:24 22:6 26:3
26:11 35:7,9 39:2
49:2,2 59:12,16,22
60:3,4 64:25 68:2
69:4 74:6,10,10
77:11,15 79:15
82:4 84:8 85:3,8
89:8 91:14,21
92:2,6 96:21,25
101:25 102:18,24
103:1,9,11,21,23
105:8 109:19,25

110:5 115:14,20
116:16 120:25
121:4 122:15
123:9,18 124:7,14
124:19,20,24
129:13 133:9,13
138:24 140:23
141:3 145:1
148:25 154:20
155:3 157:11
158:13,21,25
159:9,23 161:5,11
161:11,22 162:24
163:12,13,16,20
163:21 165:25
167:2,7,12,21,21
168:10 169:4,10
169:14,15 170:3
175:2,14,22,24
176:3,7 177:3,25
178:5,14 182:14
182:15 184:7,8,11
184:20 185:1,10
185:18,21,24
187:13 192:18,23
193:16 197:15
198:7 199:11,20
199:24 200:1,2
203:15,21 204:13
205:8 206:17
207:16 208:13
209:20,22 210:16
210:17,17,17
211:1,3,4 212:3,16
212:25 213:13,17
215:20 217:17,20
224:10,22 225:10
228:5 229:16,23
233:6,13 234:19
236:8,13 237:4
242:7,15,24 246:2

247:13 251:24
252:7,21,25 259:4
261:20 262:1,3,5
262:14 263:6,8,23
264:7 277:1 279:9
279:12,16 281:25
282:12 286:4,17
287:15,20 288:1
292:20 293:5
295:23 300:23
**pharmacy's** 180:7
265:5
**pharmacy.ohio.g...**
8:22
**phentermine**
47:18
**phone** 82:3 100:18
100:20 101:1,17
264:8 306:3
**physician** 79:13
84:25 110:24
111:10 128:14
129:24 137:25
208:8 237:15,18
289:17
**physician's** 289:8
289:14
**physicians** 49:20
49:20 50:2 65:3
73:2 82:23 84:9
119:15 154:10,12
154:13 207:19
262:4 286:6,10,12
**pick** 197:23 198:4
198:8 199:12,17
199:18 200:7
280:7
**picture** 289:21
**pie** 104:8
**piece** 70:23 71:7
87:15 104:8

121:16 222:7
**pill** 43:7 48:3 50:3
80:17,21 81:9
117:2,13 123:25
125:19,21,24
126:2,5 154:9
240:24 246:16,19
246:21,24 247:3,4
247:9,19,22 248:9
248:20 269:20
**pills** 48:6,16 57:5
58:6,10 252:6
**pink** 215:11,12,15
215:17,22 216:2,4
216:6
**place** 18:1,11,18
32:19 33:25 34:25
38:6 53:19 56:11
58:19 103:5
117:11 124:25
128:23 136:19
137:17 157:23
176:10 179:2
180:25 198:3,6
220:13 222:4
227:20 268:13
293:21
**placed** 179:19
180:3 271:9
**places** 48:4 62:11
219:25
**plan** 174:2 289:8
289:10
**platform** 130:9
**play** 10:4 69:6,19
**plays** 71:21
**please** 9:4,16,18
10:10 20:13 27:25
44:23 175:19
187:25 192:14
299:2 306:11,11

**pled** 156:9,13
**plenty** 59:4 62:1
62:11
**pllc** 7:16
**plural** 230:16
**pmcs** 202:18
**pmp** 130:13
**pmps** 72:21
130:13
**poe** 28:4
**point** 37:2 42:10
75:4 77:4 102:15
104:14 115:4,5
117:16 133:17
143:5 148:9
185:13 227:15,22
229:9 254:1,11
261:6 294:4 295:8
296:8 299:9
**points** 112:10
**police** 39:16,17
53:24 54:5,7,11,23
54:23 55:6,22,23
55:24,24 56:4,5
284:8,10 285:14
**policies** 14:24 15:5
174:11 181:1
183:12
**policy** 181:4 186:4
254:17 256:17
**pop** 262:2,6
**population** 137:23
144:22 206:17
270:3 275:2,5
277:3,8 279:20
280:6,8,14 285:17
**populations** 277:2
**portal** 100:14
**portion** 294:12
**position** 12:11,14
36:10,17,25 37:11

38:25 149:25
**possibility** 258:16
**possible** 76:17
80:8 94:9 119:23
**possibly** 189:3
235:11 290:11
**post** 261:14
**potential** 94:7
122:22 123:8
282:1,24 292:4
**potentially** 60:15
127:14 148:13
150:24 212:11
**powell** 55:24
**power** 182:7,8
**practice** 26:11
78:14 124:14
129:24 162:5
218:15,25 219:2
222:3 263:17
267:2 286:2,3,4
**practices** 166:19
**practitioner**
159:25 162:4
209:18
**pre** 165:22,24
236:5
**predominant**
58:11 102:7
**predominantly**
57:2 102:22
**preferred** 67:9,12
223:3,6
**preparation** 15:6
254:14
**prepare** 11:14
14:21 15:14 21:11
75:1,23
**prepared** 23:19
38:24 265:17

**prepares** 76:3
**prepped** 11:15,16
  11:19
**prescribe** 198:14
  266:24 286:24,25
**prescribed** 83:10
  85:10 112:20
  114:3 162:3
  176:16,18 266:18
  299:21
**prescriber** 44:19
  65:12,18 72:18
  73:2 79:14 82:17
  83:7 85:10 99:12
  105:23 110:7
  115:11 128:14
  130:10 136:15,24
  137:18 146:17
  205:22 206:14
  207:4,5 247:25
  263:16 267:6,16
  292:2
**prescriber's** 84:2
**prescribers** 72:23
  81:4,11,15 82:21
  83:22 84:10
  118:24 130:10
  206:9 207:7 209:9
  209:11 210:1,4
  212:19 213:1
  262:15,17 266:19
  267:2 293:24
  294:9 295:9
**prescribing** 84:10
  84:25 119:2
  141:20 142:9
  172:10,14,22
  173:5,7 239:8,11
  239:17 240:9,16
  240:22 241:16
  262:15 270:19

271:9,18,22,22
  289:14
**prescription** 1:7
  3:10 44:3,19,22
  46:16 48:22 49:12
  52:20,23 57:4
  58:6,10 59:9 60:5
  60:22 64:25 66:9
  69:20 70:8,12,16
  70:19 73:10 77:2
  86:22,25 87:18,20
  88:3 90:3,8 92:3
  103:14 108:20
  109:1,9 110:1,15
  114:22 115:5
  127:19 129:1
  137:12 140:11,13
  141:6,11,18 142:1
  142:7 144:12
  145:5 154:14
  159:3,12,17,24
  160:21 161:17
  162:14 166:25
  195:21 196:2
  197:23 198:16,18
  198:23 205:22
  206:13,15 207:15
  210:19 211:2,3,4
  212:4,12 216:9,19
  222:17 227:14
  237:9 245:12,12
  247:18 267:8,10
  270:14 274:17,21
  275:6 277:10,15
  277:16,25 278:1
  278:22 286:18,19
  287:14,20 290:18
  292:2,12,16
  295:21 301:18
  306:6 307:3 308:3

**prescriptions** 43:6
  43:9,11 48:6,7,11
  48:17,20 49:11,15
  50:5 60:24 79:12
  80:21 81:12,22
  82:12,25 83:19
  84:5 88:7,10
  126:1 136:23
  137:3,6,9 154:10
  155:18 164:7
  166:23 171:25
  198:3,6 209:19
  210:9 211:7
  212:18,25 213:18
  226:1 229:6
  237:20 266:25
  269:23,25 270:1,9
  270:15 276:8
  277:22 278:6,9
  289:6 290:2,6,22
  299:5
**presence** 304:11
**present** 8:23 16:18
  16:20,25 17:2,17
  19:25 20:22
  106:25 127:1
  145:18 178:6
  292:13 295:4
**presentations** 67:2
  72:3
**presented** 195:9
  207:16 295:23
**presenting** 206:15
  222:17
**presents** 44:18
  286:18 287:20
**preservation**
  245:11 257:9
**pressure** 233:12
**pressured** 234:15

**pretty** 93:10 237:5
  249:12
**prevalent** 69:23
  70:4
**prevent** 47:5 71:9
  74:11 124:23
  125:5,8,10 176:11
  180:10
**preventing** 64:20
  65:8,21 66:6
  68:10,20 70:8,12
  70:15,19 73:10,12
  124:6
**prevention** 71:21
  72:2 101:23 102:8
  102:11 125:15
  138:8 139:16
  281:19,24 282:4
  283:7
**preview** 236:6
**previous** 245:20
  267:22
**previously** 23:22
**pricing** 56:19
**primarily** 139:16
  190:2
**primary** 94:25
  185:19 210:12
  225:8
**printed** 91:19
**printing** 60:24
**printout** 77:15
  161:10 187:18
**prior** 15:17 17:8
  19:22 21:9 34:11
  35:13,25 36:4,5
  39:3,15,20 42:15
  42:20 50:16 51:20
  56:11 64:1 65:1
  66:11 74:5 80:7,8
  80:12 125:22

126:3,4,5,8 156:24
157:1 164:20
199:19 205:22
222:23 238:10
247:21 248:5
250:8 253:17
254:25 256:3,6
271:23
**priorities**  26:9
33:7,11
**prison**  75:21
**proactive**  26:14
71:3 73:1 112:7
113:2,6 122:18,20
123:7 124:8,10
127:17 128:5
**proactively**  125:4
**probably**  31:3,4
45:23 57:8 92:23
96:20 102:7
118:22 183:10
216:13 230:4
259:18 266:7
284:17,20,22
285:18
**probation**  75:18
169:6,9 173:20
**probationary**
173:21
**problem**  13:13
46:17 69:11 92:3
128:3 141:11,25
142:3,4,5 153:25
226:5 230:11
**problems**  34:14
**procedure**  1:14
96:5 111:11 181:5
186:5 198:20
254:17 255:15
256:17 257:24
258:2 307:5 308:5

**procedures**  14:24
15:5 174:12 176:9
176:10 181:1
183:13
**proceeding**  148:3
**proceedings**  45:20
116:5
**proceeds**  98:5
**process**  73:22
74:21,22 75:3
77:1 81:17 93:9
95:7,13 96:15
165:17,19 179:5
200:3 203:4
214:21 217:10
235:23 236:2
239:9 261:5
**processing**  49:10
58:20 60:22
127:11 156:14
219:18
**produce**  166:21
**produced**  46:2
246:1 260:10
**producing**  49:11
**product**  33:18
150:13,19 205:7
233:4
**production**  45:8,9
158:19 166:25
167:13 175:16
183:25 192:25
242:14 246:6
306:15,17,22
**products**  208:23
**professional**  1:15
73:7 97:18 162:4
195:19 266:23
267:1 291:2,6
**professionals**  95:1
125:13 130:12

**profile**  77:7,9,13
77:20,23 209:14
**profiles**  77:3 212:5
**program**  26:15
72:13 133:15,21
133:22,23,25
238:9 251:16
266:13 279:5,10
279:14
**programs**  129:15
252:1
**progress**  140:9
**prominence**  57:19
**promoted**  57:9
253:18,23
**promptly**  238:4
**promulgate**  202:9
202:18
**promulgation**
202:21,24
**proof**  25:14
**proper**  99:18
**properly**  71:10
148:21 198:21
226:1 240:16
294:19 295:24
**property**  51:18
52:14
**proportions**
226:16
**proposal**  15:11
**proposing**  187:9
**prosecution**  85:4
**prosecutor**  75:10
75:11 76:6 84:7
84:22 85:6 104:25
105:4,12 148:5,6,7
**prosecutor's**  56:1
**prospective**
144:21 147:7
195:25 280:13

291:15
**prospectively**
267:14 280:6
**protect**  302:20
**proud**  153:7,11
**proven**  240:17
**provide**  10:6 46:6
65:5 67:3 78:13
84:20 99:19
121:10,23 138:22
165:18 215:18
236:17 252:5
**provided**  23:22
90:21 129:11
**provider**  67:13
211:10 223:1,3,4,7
**providers**  67:10
67:12
**provides**  54:8,14
54:15,16 208:20
**providing**  73:4
99:18 130:10
219:7 225:13
226:7
**provision**  192:1
193:9,17,20,22
194:1,25 197:18
201:5 211:21,24
**public**  1:15 15:23
17:20,23 19:3
23:21 26:21 63:6
63:16 92:17 93:22
94:4 96:9,18
98:17,18 99:14
101:19 102:6
118:14 124:13
139:18,20 215:7,9
217:5,10,13
232:19 260:13,24
281:16 304:4
305:8 307:10,18

308:15,23 309:23
**publicly** 62:25
63:23,25 64:2
90:10
**publish** 15:2
**pull** 82:7 171:14
276:4,6
**pulled** 96:1 111:2
203:22 275:24
**pulling** 82:6
**pulls** 99:10
**punishment** 85:1
177:13
**purchasing** 259:6
**purpose** 33:5 34:9
65:1 66:11 78:12
91:24 118:25
138:21 144:18
145:23 154:16
155:24 156:2,6
164:19 196:3
198:5 205:16
239:21 267:1,11
**purposes** 2:14,19
2:25 3:4,8,12,18
3:23 4:5,9,15,20
4:24 5:4,10,14,19
5:24 6:5,10 21:18
25:2 45:2 91:15
104:24 115:14
119:21 140:15
154:21 158:15
161:7 162:3 167:8
175:3 178:1
183:22 187:15
192:19 203:17
224:12 228:7
242:8 264:23
277:9
**pursuant** 1:13
87:19 168:13

243:18
**purview** 105:24
**pushed** 110:2
117:18 125:18
**put** 72:17 73:20
74:1 93:8 111:3
111:12 113:6
153:2 173:10
224:15 228:1
236:19 241:5
256:14 257:2
262:7 284:15
293:20
**putting** 129:23,25
205:13 255:25
256:2 257:14,25
259:15
**puzzle** 121:16
**pyles** 27:18 28:15
28:18,19,20 95:19
97:11 145:15
**pyxis** 121:6

**q**

**quaalude** 159:4
**quadrants** 135:6
**qualified** 304:5
**quality** 223:14
**quantities** 47:16
83:14 282:3,10
**quantity** 49:12,14
60:25 104:9
168:20 181:17
196:9 259:7
261:22 277:16,25
300:24
**quarter** 5:3 33:8
33:12 34:3,14
35:1 187:14,19,23
**quarter's** 34:11
**quarterly** 33:3,6
33:14,21,22 34:16

144:15,17,19,23
145:8 174:3,6
**query** 205:23
**question** 10:10,19
10:20 11:8,10
53:20 69:8 70:6
72:7,9 78:21 82:1
86:24 97:21
103:25 142:4
147:17 183:8,10
191:17,19 200:22
213:16 216:21
237:6 244:18
256:8,9 260:21
272:6 277:6
278:12 279:4,23
285:1 286:10
**questioning** 281:8
**questions** 10:5
12:21,23 13:2,3
14:22 72:10 97:16
129:18 147:6
213:6 219:21
220:19 232:14
241:23 242:4
246:16 258:4
259:1 265:25
266:7 276:16
279:3 298:21
300:9 302:22
**quick** 116:3
**quite** 277:5
**quiz** 67:3
**quizzed** 221:19
**quota** 279:4,14
**quotas** 108:19,23

**r**

**r** 9:19 167:19
175:21,23 194:19
**r.ph.** 4:3 155:1
161:6

**raise** 9:3 182:12
182:17
**raises** 258:7
**ran** 154:13 212:12
**randolph** 167:23
**range** 16:22 51:9
**ranjan** 2:6 8:9
206:22 280:23
281:1 296:7
**rape** 52:9
**rate** 121:25
**rates** 115:9 118:14
**raw** 233:3
**reach** 239:23
281:9
**reached** 226:15
**reaching** 214:17
**read** 46:18 47:6,21
97:20 116:2,11
117:8 141:22
157:16,17,25
158:2 168:6
176:21,23 179:13
179:22 206:2,18
226:17,22,25
243:11 245:13
257:18 294:2,19
295:24 299:14,16
307:5,6,12 308:5,6
308:17
**readily** 58:1
113:18 130:5
**reading** 234:24
243:5 306:19
**reads** 46:13 47:2
141:17 209:7
298:22
**ready** 220:10
254:22
**real** 116:2

realize 42:11
realized 51:16
  119:6 227:20
really 49:5 102:20
  117:14 186:22
  252:12,16 261:24
reason 10:23
  51:23 84:12
  141:21 142:6
  147:18 207:18
  306:14 308:8
  309:3
reasonable 161:25
reasoning 251:1
  289:14
reasons 125:18
  141:12,17 154:6
  289:25 290:5
recall 27:1 45:25
  60:13 80:3,15,16
  80:23 84:1 89:16
  89:20 99:25 100:3
  106:5 113:1
  143:20 171:1
  174:19 184:14,17
  184:21 191:7,12
  204:1 230:3
  242:22 245:1,10
  245:15,16,18
  253:17 273:2
  280:10 281:10
  297:17,19,24
receipt 306:18
receive 94:21
  98:20 101:12,13
  102:1 104:17,20
  118:20 133:11
  190:6 253:15
  254:10
received 69:24
  80:1 92:17,18

99:21 100:1 119:8
  184:19 185:21,23
  213:4 215:17
  217:7,8,12 283:19
  283:21 284:1
  285:2
receives 100:6
receiving 77:11
  137:11 206:8,10
  207:6 209:8,10,24
  210:3 212:25
  213:18 250:7
  253:19 255:18,19
  256:2 285:12
  295:8
recess 53:4 91:10
  131:5 171:10
  203:8 264:18
recipients 293:19
recognize 164:19
  296:19 297:3
recognized 223:7
recognizes 47:2
recommendation
  170:12
recommendations
  140:10 218:24
recommended
  209:4
recommending
  66:19
record 9:2,16
  10:21 11:6 20:13
  20:14 53:3,6 87:7
  91:9,12 106:17
  110:8 131:4,7
  171:9,12 197:9
  203:7,10 207:1
  243:12 246:9
  264:17,20 274:8
  274:17,22 276:9

303:2 308:9
recorded 266:14
  274:16
recordkeeping
  86:5,12 122:24
records 15:22,23
  77:2 87:10,17
  103:10,13,15,23
  104:3,3 151:24
  152:1 212:3
  245:25 246:13
  257:8 274:7
  287:22 288:9,13
red 137:22 138:1,3
  182:12,17 207:5,9
  208:1 258:8 292:5
  292:11
redesigned 71:23
redirected 44:4
reduce 143:13
reduced 214:14
  238:13 304:10,12
refer 35:7 59:14
  84:6 85:3 187:25
  216:1,3 239:24
reference 15:10
  34:5 171:24 306:7
  307:2 308:2
referenced 307:11
  308:15
references 116:14
  222:25
referrals 119:14
  284:4
referred 27:11
  101:3 148:4
  235:21
referring 35:8
  217:3 227:3,5,7,10
  243:4

refers 228:16
refill 155:18 172:1
reflects 274:4
refuse 168:11
reg 189:4 193:7
  194:3
regard 73:12
regarding 18:14
  142:1 185:24
  191:5 234:25
  235:5
regards 92:1 93:7
regimen 172:17
region 28:2,5,6,25
  28:25 29:1,4
  134:15,21,24,24
  135:4,9,13
regional 27:21,24
  28:18,22 29:2
  30:3,20 32:24
  36:23 134:22
regions 29:7 134:9
  135:14
register 74:4
  205:25
registered 1:15
  44:11,12,17 47:3
  47:10 64:13 66:16
  74:5 130:19
  161:12 162:25
  178:17 200:2,2
  266:15,18
registrant 65:19
registration
  128:21 165:14
  199:20,22
regs 131:1 193:15
regular 28:13
  29:25 30:2 34:15
  89:18 90:16
  100:20 114:19,19

182:7,8,25 201:3
209:25 230:22
254:9 282:2
**regularly** 32:25
182:17 281:24
**regulated** 229:15
229:19 247:21
248:5
**regulation** 121:22
202:20 211:15,16
247:24 248:1
249:11 263:2
**regulations** 121:19
136:2,10 187:8,10
189:12 201:15
293:20,23
**regulatory** 26:24
70:22 71:2,7
73:16 76:17 86:3
86:9,10 101:21
122:25 123:10
127:22,23 128:9
136:13 143:17,18
143:25 144:17,19
144:24 149:21
150:11 153:13
190:24 235:14
**reinstated** 157:15
**reinstatement**
156:24
**relate** 41:8
**related** 13:3 18:24
19:20,22 50:22
51:2,14,18,22 52:4
52:15 59:5 66:25
68:25 92:6 99:7
132:6 148:25
194:2 199:6
272:17 273:17,20
273:21 274:6,24
277:3 298:4

**relates** 40:19,21
41:7
**relationship** 51:17
**relative** 60:8,11,16
304:15
**relative's** 60:5
**relatively** 238:3
278:8
**relaxer** 43:20
**reliable** 302:15
**reliever** 43:21
**remain** 157:3
**remember** 29:20
106:10 118:21
135:22 232:2
233:14 238:6,9
240:11 245:22
246:17 298:20
299:2
**remind** 231:3
**removed** 32:22
**renamed** 215:23
**renew** 168:11
**renewal** 157:10
**renewed** 84:3
**reorganized** 72:4
72:5
**repeat** 10:11
**repeated** 183:4,8
**replaced** 117:23
**report** 3:11 4:23
6:9 28:16,18,19
29:22 46:22,24
55:7,11 73:5
79:11,20,22 80:1,6
80:9,13 82:18,19
82:21 87:13 89:23
99:3,8,9,10,17,19
99:22 100:2
108:14 110:19,22
110:25 111:6,13

112:7,13 113:3
114:15,16,21
118:13,23 119:16
128:17 130:5
136:18 140:9,14
142:15 143:5
152:4,9 174:3
181:10 182:4
183:18,21 184:3
184:11,16 186:4
186:10,17,21
190:6,17 193:10
194:8 208:9,11,19
212:20 214:8
216:8,14,18,19,24
217:2 220:23
221:6,12 238:13
240:4,20 241:3
249:16 250:16,21
250:25 252:25
257:16,20 259:22
259:23 260:4
261:13 263:25
264:1,23 265:3,12
265:15,16 267:23
276:13 282:1,8
**reported** 37:3
52:22 59:20 86:1
104:13 122:4
148:21 193:15
206:9,10,11,12,16
207:6 209:8,11
210:3 263:8 295:8
**reporter** 1:16
307:7
**reporting** 6:8
101:4 103:7
109:20 122:9
148:2 191:6,15
192:1 219:4,9
222:18 238:7,8

249:6 250:12
263:4 264:22
282:13 304:17
**reports** 31:14 73:1
73:2 75:2,23 76:4
80:11 107:15,25
112:4,8 113:2
130:11 152:3
174:4,4,6 181:2,16
183:4,8,14 184:19
184:24 185:9,22
185:23 190:10
232:10,12,18
233:7 250:7
252:20 254:6,15
254:19,24 255:3
256:12 258:23
260:4,20,23 265:9
265:10 267:24
272:8,12 276:25
297:14,16 302:6
302:11,17
**represent** 9:13
19:13,23 242:3
271:11 281:2
296:18 297:4
**representative**
22:6 145:14
208:16 276:12
**representatives**
218:20
**represented** 276:7
**represents** 215:3
244:7
**request** 89:13
90:20,22 99:17
103:19,20 112:5,6
152:23 212:1,2
308:9,11
**requested** 89:15
89:21 181:21

202:7
**requesting**  70:25
206:12
**requests**  128:8
136:1 153:10
212:14
**require**  10:6
121:13,14 157:10
177:12 199:25
290:14 301:1
**required**  67:21
110:8 111:5,13
123:2 128:16
132:23 165:17
173:24 188:25
196:6 206:6 216:8
216:18 250:21,24
254:18 293:24
298:6 306:25
**requirement**
67:24,25 68:6,8
75:18 164:2,3
194:8,14 250:12
263:4 298:5
**requirements**
66:22 122:1
153:18 173:17,19
187:3 188:23
193:4,10 195:16
207:4 224:2
257:17 291:9
294:6,9 302:17
**requires**  66:13,14
95:4 122:2 205:21
205:24 291:1
294:17
**requiring**  164:18
189:3
**resale**  162:2
**reschedules**
208:22

**rescinded**  187:25
**research**  46:21
**reserve**  296:9
**reside**  17:11
**residence**  198:19
**resides**  206:16
**resign**  233:13
**resolve**  292:4,11
**resources**  149:8
235:10
**respect**  191:22
195:17
**responded**  184:15
**respondent**  215:2
**responding**  181:1
**response**  10:7
93:17,21 94:9
96:22 188:6,19
215:19,19
**responsibilities**
27:14 38:2 53:18
57:13 134:9
298:23
**responsibility**
101:11 225:20,23
228:13 294:11
**responsible**  27:5,7
29:3 62:20 71:24
105:14 125:11,13
127:8 179:3 204:7
**rest**  41:14 145:21
**restriction**  279:18
**restrictions**  271:8
**restructured**  29:1
**rests**  292:17
**result**  31:9 282:20
**resulted**  260:22,24
**results**  260:12
**retail**  49:2 58:18
65:17 96:21 105:8
120:25 124:19

133:4 282:5 288:1
288:11 301:4
**returned**  306:18
**review**  15:6,13,16
17:15 19:5,18
34:3,10,10 45:17
75:3,4 76:5 92:12
93:10,11 95:6,12
95:13,15,21,23,25
96:2 112:5 118:16
155:17 171:25
174:11 181:7,8
196:12 201:20
202:1 212:1
216:16 219:20
236:3 256:19
291:15 306:12
307:1 308:1
**reviewed**  12:22
14:22 15:20 16:1
16:11,22 17:8
18:3 19:13 21:12
77:6 78:3,6 95:10
101:6,7 115:3
118:11,17 131:24
131:25 181:5
190:8 256:4
293:12
**reviewing**  21:7
112:1 255:19
256:15 257:13
**reviews**  83:8 95:20
**revised**  15:9 35:21
168:13 243:20
**revocated**  127:15
**revocation**  75:19
170:14 173:22
215:6 260:25
**revoke**  160:10
168:11 170:7
214:20

**revoked**  171:2,2
**revoking**  299:23
**right**  9:4 16:2
17:20 23:10 24:13
40:13 64:14 65:4
67:18 74:16 76:7
79:2,9 80:18
86:16 90:17 91:5
91:6 95:8 101:7
103:15 105:15
110:6,15,18
118:11 119:24
120:14 122:15
131:2,20 135:11
136:20 141:7
144:1,9 153:8
154:16 160:18
161:2 163:22
164:7 167:15
174:20 175:8,10
175:12 178:6,11
183:1 185:2
186:18 188:13
192:4 196:8,8,9,21
207:22 208:13
209:12 210:14
211:8 213:16
214:12 219:24
224:16 225:18
228:1 229:1,6
240:20 244:21
249:16,25 253:12
254:3,13 255:7,13
256:6 257:11,17
258:12,20,25
260:14 265:7
266:4 267:3
270:23 271:12,12
271:16 274:15
276:2 280:2
282:15,25 283:13

283:22 286:2,21
287:7,13,15,16
288:17 290:9,20
291:3,12,16,25
292:3,5 293:1,14
293:21 294:24
295:11 296:5,9
297:1 298:2
299:21
**risk** 49:7 73:4
93:22 94:4 96:9
124:12,13,17
166:12 209:5
**rite** 288:12
**ritzman** 184:11,20
185:10
**ritzman's** 252:6
**robbery** 52:10
**robert** 8:25
**rocks** 33:23 34:5
34:23
**role** 26:14 28:22
35:16 36:19 54:4
54:5 64:20 65:7
65:21 66:6,19
68:9,19 69:3,18
70:8,11,14,19
71:21 73:9,11
92:11 108:18
120:22 139:3
187:8 205:6,10
219:10 221:20
222:10 225:2,8
227:9
**roles** 35:12,14
39:3 54:2,24
120:8,10 121:18
227:10
**room** 1:18 224:16
270:24 271:1

**ross** 151:7
**rotational** 95:16
**roughly** 181:18
285:14
**round** 71:24,25
72:2 129:11
138:13 283:6
**routine** 129:9
**routinely** 58:5
103:22 112:1
113:8 152:11
**roxicet** 156:3
**rp** 71:24 129:11
**ruiz** 2:7 8:3 197:8
296:13,17 300:4
302:9
**rule** 5:3 15:10
70:25 74:1,6
121:22 128:8
129:12 130:16
136:1 138:24
144:10,20 147:4
187:14,19 188:1
188:14,18 189:4
189:20,21,24
198:10,12 199:12
199:18,21 200:5,7
200:14,17,18,20
200:23 201:9,11
201:25 202:1,16
202:20 221:24
222:10 298:1,6
304:19
**rulemaking** 203:4
221:20,24 235:23
**rules** 1:13 10:4
14:23 15:4 21:13
26:12,12 65:11
67:16,20 70:25
107:12 121:19
122:1 128:7,13,22

128:23,25 130:20
136:4,6,9,13,14
163:12,21 169:15
170:4 187:8,9,22
187:24 188:6,12
189:12,17,25
193:21 194:16,20
195:9 198:15
199:10,11 200:5
200:11,25 201:3
201:15,20,22
202:1,5,9,10,18,25
224:6 236:3,6
298:10 307:5
308:5
**ruling** 170:12
**run** 49:6 150:2
163:5 208:9,10
232:10,25 233:7
247:15 277:1
**running** 281:3
**runs** 265:6 272:3
**rx** 6:8 8:1 176:13
176:14,18 264:22
296:18 297:5

**s**

**s** 175:23 306:15
308:8,8 309:3
**sa** 155:1
**safeguards** 176:8
**safety** 66:25 205:7
**sale** 162:1
**sales** 166:22
**sanction** 85:9,12
246:13
**sanctioned** 165:2
165:7,12 174:15
174:18 244:10
**sanctions** 244:25
**sat** 140:5,6

**saw** 50:7,7 53:9
58:5,12 68:23
173:17 227:18
234:2
**saying** 152:9
186:20 255:4
256:9 279:24
**says** 157:20
159:23 160:14
177:2 263:11
275:13 277:15
294:8,15 295:18
299:1
**scenario** 60:7
210:21 213:21
**schedule** 68:12
124:13 159:5
160:4 162:8
208:23 280:19
**scheduled** 31:3
32:25 123:5 237:9
**schedules** 95:17
95:19
**schemes** 61:1
71:19
**schierholt** 12:7
13:1,17 14:20
29:24 31:2,6,10
117:24 118:1
**schierholt's** 12:13
32:13
**school** 39:23,25
199:24
**schools** 129:13
**scope** 70:24 78:14
123:11,12 129:23
239:23 278:16
279:1 286:9
**score** 73:4
**scores** 72:25 130:8

scott  167:22
screen  114:10
screens  174:8
script  99:9,11
scripts  137:7
seal  231:25 305:2
   307:15 308:21
seals  204:17
search  257:5
searched  258:2
seconal  159:19
second  20:13
   25:13 29:15 46:13
   47:2 49:9 97:22
   136:17 141:16
   164:22 184:5
   204:15,16 205:19
   205:19 210:7
   211:3 213:16
   220:12 281:18
   298:21
secondary  112:21
   185:19
section  141:17
   156:15 168:13
   188:22 225:19
   243:19 266:3,3
   267:19 269:7
   294:15 299:1,11
sections  57:11,17
   189:10
secure  49:17
security  54:15
   65:15,24 73:17,18
   73:19,21 122:24
   128:23 179:4
   188:23 282:5
   298:8
see  25:7,15 35:2
   46:22 57:23 58:9
   64:7 99:4,9

113:12 115:21
135:7 137:24
140:24 155:4
156:6,17 157:4,12
158:3 159:6,13,20
162:21 167:23
175:14,24 178:17
180:15 183:4
184:3 188:1 189:8
192:9,23 193:5
194:18 204:18
206:6 207:21
208:1,3 209:10,14
211:18 214:1,2,4
222:15,24 225:21
226:10 233:23
234:4,7 239:20
242:17 250:16
264:2 272:3
275:10 277:14,16
278:2 280:15
282:19 293:15
294:6,13
seeing  42:24 43:1
   43:5 48:17 71:1
   82:23 129:2 154:8
   165:19 183:8
seen  21:25 45:15
   45:22 46:4 57:22
   58:17 66:24 80:12
   83:18 91:22
   115:23 140:17
   173:11 178:19,22
   203:23,25 204:1
   223:4 242:19
   265:9,21 300:22
sees  99:10 292:5
self  109:20 179:21
sell  158:25 159:10
   159:16 168:3,19
   183:9

selling  52:20 64:15
   66:3 154:14 259:5
send  97:13
sending  185:1
sends  186:10
sense  199:1 284:12
   284:25
sent  22:2 101:9
   113:8 198:23
   205:1,2 263:24
sentence  46:13
   141:16 250:17
   294:3 299:1
separate  54:24
   55:8,10 84:17
   109:4 167:4 213:6
separately  12:17
   12:18
september  2:21
   4:12 44:25 45:6
   115:19 116:19
   118:3 175:1,9,13
   179:16 205:25
series  10:5
serious  46:16
seroquel  176:15
serve  75:21
served  25:15
   57:16 249:2
service  25:14
   204:9 205:4
   245:17
services  8:1 54:9
   54:16 97:25
   149:23 150:3,4
   198:4 296:18
   297:5
set  24:17,24 25:22
   33:11 34:11 48:8
   128:13 142:10
   157:12 164:10

166:19 180:24
   181:7 195:14
   201:13 202:18
   223:10 288:20
   305:1
sets  193:3
setting  26:9
   108:19 120:4,6
   122:11,15,22
   123:9,19 124:7,24
   279:17 282:7
settlement  3:15
   6:2 154:19 155:2
   155:10 167:20
   171:16 173:12
   175:21 178:13
   214:17 242:6,14
   243:2
share  27:13 89:19
   139:5
shared  254:6
sharing  151:16,18
sheet  215:11,12,14
   215:17 216:6
   306:13 308:7,10
   308:18 309:1
sheets  215:22
   216:2,4
sheraton  1:17
sheriff  54:12
sheriff's  36:1,7
   39:12 50:21 51:12
   53:11,14,15,25
   54:3,4,12,20 55:7
   55:22 56:8,12
   68:24 227:12
   247:16 283:16
   284:5 285:13
ship  62:2 263:20
shipped  263:8

shipping 62:12
shop 223:10
  240:23
shopper 79:17
  80:13 112:9 113:3
  127:10 214:8
  238:24
shoppers 49:19,24
  78:19 79:5,21
  80:2,9 82:19
  214:13 238:13,16
  239:5
shopping 58:23
  78:25 207:22
  240:24
short 38:21 39:8
  238:3
show 21:21 64:11
  90:11
showing 203:19
  268:2
shown 248:13
  306:16
shows 88:17 94:1
  135:3,8 270:7
shy 92:24
sic 12:20 13:6
  48:10 141:10
  192:21 194:16
  203:3
sift 152:12
sign 129:6 179:8
signature 179:2
  303:3 306:14
signed 307:13
  308:18
significant 58:13
  72:17 153:12
  262:9
signing 306:19

silly 266:7
similar 49:21
  167:3 190:6
  228:21 267:23
similarities 146:2
simmons 94:24
simple 237:5
simply 274:15
simultaneous
  76:12
simultaneously
  76:14 95:11
sincerely 306:21
single 189:20
sir 64:23 128:2
  199:23 220:5,11
  221:22 222:11,14
  222:19 223:12
  224:8,23 225:1,5
  225:22 226:3,12
  226:24 227:1,4,25
  228:11,15 229:2,7
  230:15 232:13
  233:5,15 235:24
  237:22 238:15
  239:6,16 240:5,12
  241:19 244:5,24
  246:14,18 247:7
  247:14 249:9,14
  249:24 250:13,23
  251:3,6,8,14,18
  252:17 256:21
  258:24 262:19,24
  262:25 263:5
  265:4,8 266:5,17
  266:20 267:12,18
  268:7 269:21
  270:2,11,17,21
  271:7,17 272:4,13
  273:6 274:25
  275:11 278:4

279:6 297:18
  298:12,15,18,24
  299:22 306:10
sit 95:24 244:8
  260:1 261:13
site 34:20 75:3,4
sites 180:12
sitting 117:3
  234:25 235:4,8,17
  252:24 256:10
situation 60:11
  287:22
situations 105:3
  287:7
six 74:2 140:22
size 37:1 181:19
sizes 181:17
skipping 266:2
slash 176:12
slip 179:12
small 54:10
  235:11 282:3,8,10
  282:14 300:24
smaller 37:1 53:21
  151:10 166:21
  230:4
smarter 210:24
smith 245:19,21
snapshot 123:15
sneeze 108:2
software 110:2
  186:15
sold 35:19 44:6
  155:22 156:1,3
  176:12
solely 124:7
  183:14 239:19
  252:6 301:8
solid 268:2,4
  270:13

solutions 143:12
  306:1 309:1
soma 43:13,19
somebody 59:20
  87:25 89:1,6
  96:16 119:17
  127:14 213:3
  221:13 222:20
  239:10 272:25
somebody's
  266:12
someone's 110:13
sorry 13:8 20:5
  24:2 28:10 36:8
  45:10 56:3 69:10
  84:3 88:1 108:2
  116:6 133:24
  156:11 158:18
  166:2 171:20
  182:8 188:14,17
  191:11,18 196:16
  196:20 208:19
  211:13 228:22
  240:24 245:12
  249:11 256:6
  262:24 272:19
  284:7 285:7
  297:18 299:10
  302:10
sort 50:7 57:18
  81:25 82:6 88:14
  95:16 96:22
  133:16 136:7
  148:1 149:5 150:1
  151:6 154:8
  166:17 229:8
  231:16 236:5
  285:20 287:6
sorts 217:8
sought 230:6

**sound** 271:12,13
**sounds** 157:18
  177:8
**sources** 281:14,15
  283:10 284:1
  285:3,8
**south** 8:21 135:15
  184:7 229:5
**southeast** 28:4,12
  134:23 135:14
**southern** 75:13
  135:17
**southwest** 28:5
  134:24
**spaeder** 8:2
**speak** 11:8 17:4
  24:8 262:23 263:1
**speaking** 139:12
  270:12 287:17
**specialist** 97:14
  101:8 134:13
**specialists** 132:17
  132:20,23 133:10
  133:18,19 136:6
  299:3
**specialty** 137:25
**specific** 19:8 30:8
  41:19 45:25 56:25
  76:22,24 77:11
  82:15,17 85:18
  86:15 88:21 89:5
  89:16,20 107:7,11
  107:19 108:8,15
  111:19,22 116:2
  120:19 121:6
  131:24 132:1
  135:1 140:7
  166:23,24 167:1
  172:19 174:18
  177:21 191:12
  194:11 199:15

204:1 213:8,11,12
  213:13 217:9
  225:14 234:10
**specifically** 18:20
  20:2 23:18 52:5
  52:16 67:20 132:5
  168:18 176:9
  179:1 188:8 191:8
  194:2 200:12
  212:14,15 297:11
**specifics** 84:1
**spell** 9:18
**spelled** 195:25
**spits** 263:10
**spoke** 11:17
  301:19
**spoken** 70:1 74:13
**spot** 267:15
**spreadsheet** 16:6
  16:8
**spreadsheets**
  255:10
**squads** 140:2
**square** 1:17
**ss** 304:2
**staff** 11:17 12:2,4
  26:7 29:1,4,6,14
  29:18 36:24 37:1
  72:5 78:8,9 89:17
  94:15,16,19 97:8
  97:12 100:19
  110:1 118:19
  119:9 130:22
  132:15 251:11
**staffing** 34:15
**stakeholder**
  139:17
**stakeholders**
  26:23 72:1 203:3
  235:22 236:1

**stand** 160:8
  196:11
**standard** 170:6,9
  177:19 219:8
  257:24 297:21
**standardize** 218:4
**standpoint** 127:18
**start** 11:8 22:15
  48:24 70:22 82:9
  82:9 102:15
  107:18 113:19
  127:5 148:12
  156:20 173:1
  253:7 282:18
**started** 35:15 52:4
  52:8 56:6 63:25
  74:3 113:16 127:7
  130:3 195:12
  256:7 257:1
  258:11 273:9
  289:5
**starting** 96:17
  209:4 256:23
**starts** 79:11
  175:20 205:20
**state** 1:16,18 2:13
  3:2,16,20 4:2,8,13
  4:18 5:2,8,12,17
  5:22 6:3 8:19 9:15
  9:24 21:17,24
  26:2 34:22,22
  35:9 40:19,21
  41:4,7,16 43:6
  48:4 62:2,3,13,14
  62:25 64:13 69:15
  76:5 91:14,20
  109:2,10 127:21
  127:23 132:25
  135:5,11 136:12
  140:3 143:19
  144:5 151:7

154:19 155:2
  158:13,21,24
  159:8 160:22
  161:5,11 163:10
  163:10,17,19,20
  166:13 167:7,12
  167:20 168:9
  169:11,11,15,23
  169:23 170:2
  172:8,17 173:3
  175:2,13,21
  177:25 178:5,13
  182:19 187:13
  190:11 191:2
  192:18,22 203:15
  203:21 217:13
  218:7 224:10,21
  228:5 229:16
  231:1,17 242:6,15
  247:21 248:24,24
  266:15 283:5
  293:4 304:1,4
  305:8 307:10
  308:15
**statement** 299:7
  299:18 307:13,14
  308:19,19
**states** 1:1 72:22
  74:2 92:9 166:8
  218:3,6,19 229:15
  286:15 287:2,5
**station** 197:23
  198:5,8 199:12,18
  200:7
**statistical** 19:6
**statistics** 15:16,17
  15:19 16:1,5,11,21
  21:8,9 41:15
  232:25 239:10
  269:5

**status** 64:11 190:8
**statutes** 148:23
  302:19
**stay** 108:22
**stayed** 278:1,8
**stealing** 51:24
  52:21 59:17,24
  60:5 85:22,23,24
  86:15 87:2,25
**steals** 59:8 60:16
**stenographically**
  304:11
**step** 292:3
**stepped** 116:20,21
**steps** 65:15 292:11
**sterile** 124:16
  133:2 150:23
  166:12 217:25
**steve** 12:6 29:23
  32:13
**steven** 117:24
**stick** 250:10
  280:19
**stickers** 223:20
**stint** 38:22
**stock** 65:16,25
  89:7
**stole** 60:11
**stolen** 44:6 266:11
**stop** 188:13
  264:14
**stored** 35:19 49:6
  58:20 65:25
  102:22 198:21
**straight** 97:13
  198:16
**strategies** 139:6
**street** 1:18 7:5,18
  7:23 8:4,16,21
  51:8 74:11 184:7

**strengthen** 128:9
  188:11 189:22
**strickland** 227:23
**strictly** 283:6
**strike** 20:9 64:18
  86:19 180:19
  260:8 277:20
  298:13
**string** 82:7,7
**structure** 36:23
**structures** 252:1
**stucco** 39:21
**studies** 276:25
**stuff** 89:10 107:19
  131:12
**sub** 209:7
**subject** 23:23
  24:16 170:14
  279:22
**subjective** 291:7
**submission** 157:11
**submit** 75:3 84:21
  98:23,25 174:3
  204:24
**submitted** 75:9
  76:6 121:14 181:2
**subpoena** 2:17
  12:22,24 13:3
  25:1,6
**subpoenas** 54:16
**subscribed** 307:10
  308:14 309:21
**substance** 49:17
  57:1 58:20 65:6
  66:12 114:3 115:6
  153:22 219:17
  282:15
**substances** 47:17
  49:6,8 62:12
  64:16 77:25 87:14
  102:21 109:16

  110:9 155:23
  156:1,4 159:6
  160:5 161:24
  162:8 179:9,18
  180:3 219:12
  226:8
**subtitles** 141:12
**successfully**
  156:22,25 163:8
**suggest** 67:17
**suggested** 251:25
**suicides** 273:24
**suite** 7:12,18 8:4
  8:10 306:2
**summarily** 127:14
**summary** 118:18
  188:21
**summit** 19:20,24
  20:9,21 21:3 29:8
  41:8,20 42:4
  53:15,19 54:20,20
  106:4,9,21 131:15
  131:18 132:6,8
  154:24,25 232:6
  283:20 285:2,13
**sunbury** 55:24
**superior** 306:1
**supervise** 222:9
**supervisor** 27:20
  29:3 36:18,21,22
  37:9,18 38:20
  95:2 97:11 178:8
  181:6 207:13
  253:19,25 255:18
  258:8 295:19
**supervisors** 27:21
  27:22,24 28:9,18
  28:23 30:3 32:24
  36:24 92:15 95:12
  134:22

**supplies** 178:16
**supply** 65:6 90:2,7
  168:21 245:11,12
  245:13
**support** 93:6
  94:12 109:25
**supported** 117:21
**suppress** 71:14
**sure** 17:5 40:17
  41:13 43:4 48:16
  50:13 56:18 60:6
  62:1 69:9 78:22
  80:10 82:22 83:4
  86:23 88:23 89:7
  90:5 92:8 96:7
  98:2 100:17
  102:13 109:12
  111:7 112:3 116:1
  116:4 117:14
  119:19 127:3
  142:2 145:21
  147:16,18 148:19
  170:19,23,24
  171:21 177:8
  188:24 196:4
  200:14,16 203:2
  210:2 217:11
  223:13 226:1
  227:8 236:3
  238:22 246:5
  255:16 256:4
  268:15 276:22
  281:6,23 282:11
  302:25
**surgeon** 210:11
**surgery** 168:20
**surgical** 111:11
  168:4
**surprised** 61:23
  61:25 62:8

**surround** 72:13
**surrounding**
  72:22
**susan** 94:24 97:2
**suspect** 51:21
  102:14
**suspend** 163:6
  168:10 170:7
  214:19
**suspended** 84:4
  127:15 157:3,20
  162:25 170:18,20
  170:21 173:13
**suspending** 300:1
**suspension** 157:8
  163:7 170:14
  173:22 188:21
  215:6 260:25
**suspensions** 163:5
**suspicious** 4:23
  15:17 16:1,4,11
  21:8 65:14 89:24
  181:2,10,16,23
  182:4,6,9,10
  183:14,17,21
  184:3,10,15,19,24
  185:9,22,23 186:4
  186:10,13,14,16
  186:21,22 187:2,4
  190:6,10,17 191:6
  191:16,22 192:2
  193:11,13 194:2
  195:17 218:19
  249:6,10,16 250:7
  252:8,16,19
  253:19,24 254:5
  254:12,15,18,23
  255:3 256:12
  258:6,19,22 259:3
  259:8,22 260:3,19
  260:23 261:12

263:7,12,25
  297:14,21
**swing** 57:20,24
**swiped** 282:4
**switch** 228:24
**sworn** 9:4,7 304:8
  307:10,13 308:14
  308:18 309:21
**synthroid** 176:19
**syrup** 155:25
**system** 6:9 15:22
  15:22 32:19 33:25
  34:7 44:8 103:5
  121:1 122:9
  129:22 179:2
  181:7 186:9 216:5
  222:18 259:8
  264:22 267:14
  294:12
**systems** 32:1
  63:12 123:2 130:2
  146:4

**t**

**t** 8:15 40:11,12
  140:22 306:5
**tab** 157:22 192:14
**table** 13:11 96:4
  138:14 242:12
  272:1,5 275:8
  277:14
**tables** 71:24,25
  72:2 129:11 283:6
**tablets** 159:3,4
  161:18 162:5,9,15
  183:17 268:5
**tactical** 140:2
**take** 10:14 16:16
  36:10 46:12 47:4
  52:25 60:21 65:14
  73:14 80:21 85:14
  124:25 130:24

155:9,13 158:23
  163:24 171:6
  172:19 186:13
  192:13 203:5
  219:22 252:23
  257:2 292:4,11
  301:8
**taken** 1:14 18:10
  40:3 44:7 53:4
  63:22 91:10 106:3
  121:15 131:5
  135:19 171:10
  203:8 256:19
  260:16 264:18
  302:2
**takes** 34:25 83:5
  129:21 162:24
  163:7
**talk** 72:7 129:17
  139:5 226:13
  260:11 261:11,17
  269:17
**talked** 24:21 28:15
  60:15 66:13 69:6
  69:12,25 82:16
  125:25 131:13
  134:21 135:24
  136:16 141:1
  143:23 144:8,10
  146:20 147:22
  180:6 187:7
  190:23 195:15
  214:16 217:5,18
  239:7 245:3
  246:21 257:22
  266:21 283:18
  291:11 295:9
  296:1
**talking** 12:2 47:23
  52:16 53:8 55:19
  118:7 120:4,24,24

132:10 135:18,21
  139:9 146:2 191:8
  197:17,17 205:3
  210:2 213:24,25
  221:13,14 222:20
  229:3 232:9 237:4
  239:3 248:17
  254:14
**talks** 240:22
**tampered** 86:6
**task** 3:11 41:25
  42:2 50:17 51:6
  51:16,21 52:1
  53:10 55:12,14,18
  56:6,7,10,16,22
  57:12,14 58:5
  69:25 138:11,12
  138:16 139:22
  140:1,2,4,7,11,13
  140:21 141:7
  217:22 218:16
  227:24 230:14,21
  230:24,24,25
  231:8,11,16,18,23
  231:24,25 232:6
  240:4 241:3
**tasked** 201:19
**taxes** 148:21
**tddd** 169:6
**tddd's** 170:8,17
**tddds** 191:20
**tdds** 166:11,13
**team** 24:6 28:25
**technical** 261:23
**technically** 122:5
**technician** 74:6
**technicians** 74:3,4
  101:25 128:21
  133:8,9
**technology** 26:13
  215:24

[telephone - time]                                                                                   Page 51

| | | | |
|---|---|---|---|
| **telephone** 220:4 | 259:19 281:11 | 251:2,13,20 283:8 | 197:22 204:16 |
| **tell** 29:16 42:22 | 295:1 304:10 | 286:13 | 243:12 |
| 52:21 87:8 90:12 | 307:6,7 308:6,9,12 | **think** 23:8 42:13 | **thirty** 306:18 |
| 92:20,21 99:23 | **text** 298:1 | 52:18 57:20 60:7 | **thought** 137:4 |
| 103:2 104:2,5 | **thank** 20:17 24:15 | 60:9 64:10 67:4 | 232:19,23 237:2 |
| 106:18 114:9,20 | 35:11 45:13 | 70:20,21 71:20 | **thousand** 252:6 |
| 115:1 149:16 | 106:15 128:2 | 72:5,9,14,16,22 | **thousands** 214:15 |
| 186:24 187:1 | 132:9 142:10 | 78:20,22 80:18 | 238:14 |
| 188:4,8,10 225:6 | 203:13 243:10,21 | 81:19,25 84:19 | **three** 14:6,17 |
| 236:24 260:2 | 281:5 296:16 | 88:13 90:9 92:22 | 16:12 49:18 80:4 |
| 269:11 | 299:15 302:22 | 104:2 105:6 | 80:7 113:22 |
| **telling** 80:23 297:9 | **thanks** 23:15 | 110:10 119:4,4 | 124:21,25 132:12 |
| **ten** 29:18 68:1 | 241:20 | 120:23 122:4 | 133:15 137:7 |
| 143:6 193:2,3 | **theft** 48:24,25 49:1 | 125:6,10 126:4 | 210:9,12,18 211:4 |
| **tend** 182:20 | 49:3,7 58:18 | 127:3 128:6,22 | 211:6 215:14 |
| **tenth** 7:5 | 73:23 86:2,4,7,11 | 129:16 130:1,6,14 | 237:8,23 240:22 |
| **tenure** 92:18 | 88:18 101:4 | 139:19 142:3 | 257:8 264:3 |
| 251:22 | 102:14,17 103:3 | 145:21 149:10 | 268:25 269:2 |
| **term** 40:14,16 | 104:1,4 105:8 | 151:9 154:5 | 270:23 273:8,13 |
| 43:22 44:1 51:7,9 | 121:5,8 127:10 | 180:11 181:18 | 275:21 276:1,3,7,9 |
| 64:24 69:13 75:21 | 219:17 282:1,8,20 | 188:21,22 189:1 | **threshold** 239:23 |
| 105:10 172:3 | 301:4 | 189:20,21 193:2 | **throw** 220:1 |
| 215:12 241:4 | **thefts** 52:22 | 197:13 202:22 | 273:22 |
| 261:23 | 300:24 | 204:23 207:4 | **time** 10:9,13 12:17 |
| **terminal** 160:17 | **theory** 186:11 | 213:5 217:20 | 13:19 14:16 16:10 |
| 165:15 168:5,12 | **therapies** 172:6 | 218:12,13 223:6 | 17:14,16 19:15 |
| 176:3 215:16 | **therapy** 49:22 | 224:19 225:6 | 21:14 27:2 34:21 |
| 296:25 297:2,5 | 83:13 172:7 | 231:13,22 234:23 | 36:23 37:2,8,14,15 |
| **terms** 74:20 157:7 | **thereabouts** 57:25 | 235:6,10,12,19 | 37:16,25 39:5,18 |
| 169:9,18 285:12 | 92:23 | 236:12 241:11 | 42:10 43:5,12 |
| **territory** 101:10 | **thing** 95:15 125:7 | 246:23 247:1 | 46:10 47:9 48:14 |
| 134:14 266:8 | 148:25 157:17 | 252:3 256:15 | 49:23 51:11,19,22 |
| **testified** 48:9 | 199:6 202:9,10 | 259:17 265:24 | 52:11 57:23 58:4 |
| 242:23 244:6 | 239:14 256:11 | 270:22 271:18 | 58:9 71:15 75:4 |
| 281:13 | **things** 55:3 73:9 | 273:2,12 280:4 | 75:10 77:4 79:10 |
| **testify** 2:17 24:22 | 83:5 108:9 112:17 | 281:13,14 283:18 | 83:19 84:4 95:18 |
| 25:1 304:8 | 123:15 146:6 | 285:5 286:9,17 | 99:25 100:25 |
| **testifying** 272:8 | 154:11 162:20 | 289:2,3 295:2 | 104:14 107:24 |
| **testimony** 10:25 | 169:25 217:8 | 296:10 302:23 | 108:16 111:24 |
| 25:6,19 217:4 | 218:13 235:20 | **third** 47:13 94:22 | 115:4,5 116:21 |
| 252:10 257:15 | 240:8 250:15,20 | 95:1 159:15 178:7 | 117:16 123:15,24 |

124:19 126:20
127:1 128:16
129:21 149:10
155:6 184:25
189:8 190:2,15
191:10 201:20
211:8 221:5,5
222:15,15,24,24
224:25 227:16
234:12 238:3,9
244:8 247:9
249:23 250:8
251:23 253:2
254:1,12 255:21
256:10,25 257:9
257:11 258:4,5
259:14 261:6,14
262:18 265:17,17
275:21,21 277:24
281:4 287:23
296:16
**timely** 219:9 299:6
**times** 11:18,24
12:3 13:17 89:20
99:20 112:10
146:17 147:5
217:18 218:10
270:23
**title** 25:23 37:25
184:2 266:3
**today** 10:6,24
11:14 13:4 22:7
24:22 25:7 64:6
135:21 141:2
144:8 164:2
217:18 243:4
244:9 246:7
248:12,20 252:25
253:4,4 256:11
260:1 261:13
270:4 281:2

296:16 297:12
**told** 101:16 241:14
**tom** 27:18
**tone** 117:5
**toner** 243:8
**tool** 81:2 125:10
130:7,12 207:25
**tooth** 111:2
**top** 61:21 89:17
129:19 143:7
167:15 168:8
170:24 171:4
175:20 178:11
184:2,21 192:5
197:22 232:2
268:2 281:15
**topic** 22:21,23,25
96:24 131:12
**topics** 22:5,11,15
22:17 23:9 24:21
34:13 136:17
**total** 14:3,5 19:14
92:20 106:12,16
131:21 270:8,9
283:24
**totality** 105:7
**tough** 81:25
166:17
**township** 55:23
**townships** 54:10
135:8
**tox** 114:9
**trace** 88:25 89:4
**track** 32:20 69:4
98:14 100:5,8
**tracked** 266:13
268:18
**tracks** 76:12 109:8
**tracy** 94:24 97:2
**trade** 95:18
219:25

**traditional** 248:14
**traditionally**
229:14,19
**traffickers** 80:18
80:19 81:1,9,10
**trafficking** 50:2
58:24 80:20 81:13
105:10,18,24
127:12 148:20
**trained** 286:5
**training** 35:24
132:19 133:1,2,11
133:18,21,23
139:15
**trainings** 40:2,4,5
**transactions**
128:17
**transcribed** 307:7
**transcript** 306:11
306:12 307:5,12
308:5,11,17
**transfer** 44:10,16
**transferred**
109:15
**transient** 130:15
**transit** 65:17 66:1
**transmission**
188:25
**travel** 72:2 129:12
**traveling** 137:24
**treat** 166:7
**treating** 267:7
**treatment** 150:2
155:20 166:4
174:2 289:8,10,18
**treats** 166:8,9
**tremendous** 226:5
**trend** 48:15
112:11
**trends** 42:24 43:2
115:10 145:25

248:13
**tribunal** 170:10
**tried** 112:24 260:9
**trigger** 181:11,24
183:1 185:25
**triggered** 259:21
261:12
**triggering** 186:2
**true** 221:9,23
224:2 229:16
267:5
**trusted** 182:20
**truth** 304:8,8,9
**try** 29:20 203:2
220:1,17 263:14
266:1 276:20
277:1 282:23
**trying** 88:12
115:10 128:22
129:4 145:20
150:3,4 199:4
284:25 289:3
**tucker** 7:10
**tuckerellis.com**
7:13
**tuinal** 159:19
160:1
**turn** 25:9,13 141:9
167:14 169:3
175:19 178:10,24
194:15 196:13
204:15
**turned** 246:3
**turning** 252:9
**twelfth** 7:23
**twelve** 206:10
209:24
**twice** 13:25 71:23
**two** 12:1,2 14:6,17
19:21 25:10,11
27:21 28:8 34:19

**[two - utilized]** Page 53

36:23 38:14 39:8
68:14 82:8 92:14
92:15 94:20,25
95:11,12 113:2,5
113:21 118:5
122:2 131:23,25
132:3,4,7 156:13
163:4 166:7 167:3
173:4 182:11
183:16 184:1
209:19 213:5
232:2 237:3 240:8
240:24 249:6
264:3 267:6
270:12 272:6
274:11 275:20
277:17 281:15
296:19 297:3
**type**  46:3 49:15,16
56:14 57:1 60:7
63:20 65:14 68:5
76:24 79:8 80:5
82:20 92:2 93:16
102:3 103:4,17
112:7,12 113:1
118:10 121:8,10
136:7 137:25
142:3 143:5 148:1
152:9 165:20
172:13 173:25
234:3 235:13
239:14 258:7
282:7 287:7
300:21
**types**  12:23 33:10
40:5 43:10 46:7
49:14 50:8,11,19
58:17,25 59:2,5
60:14,17 67:21
68:14 70:20 73:24
74:12 83:14,15

88:18 92:24 93:20
96:11 112:19,24
125:9 128:25
134:10 146:5
150:10 151:10
165:21,23 166:7
166:10 173:14,19
174:4 194:13
208:1 248:16
280:10
**typewriting**
304:13
**typical**  177:6
180:20,23 286:16
287:18
**typically**  286:14
288:12
**typing**  238:21

**u**

**u**  192:14
**u.s.**  2:22 45:1
75:12 135:17
148:6,7
**uh**  24:14 58:8 79:3
84:15 103:12
113:13 120:15
135:12 147:21
210:5
**ultimate**  84:23
125:6
**ultimately**  85:5
292:15
**unable**  10:24
87:17 114:20
**unannounced**  71:5
124:18
**uncommon**  185:17
**uncovered**  86:6
**understand**  10:10
25:18 35:8 48:21
78:20 86:23 142:2

147:16 200:22
229:13 253:2
259:19 274:3
277:5 278:12
279:23 282:12
295:1
**understanding**
22:4 24:20 40:18
41:6,11,18 42:3,6
42:19 43:14,25
44:2 48:3 53:17
64:19 69:17,22
70:3 117:17 153:1
172:2 180:18
193:8 195:18
252:10 255:4
257:15 280:17
**understood**  132:9
149:16 237:2
**undertake**  107:10
**undertaken**  105:1
**undertakes**  74:16
122:21 147:23
**undertaking**  122:6
**undoubtedly**
46:14
**unfamiliar**  206:15
**unfortunately**
223:17
**unhappy**  233:18
233:25
**unintentional**
143:13 272:18
273:11,22 274:6
274:23 277:3
**unique**  137:3
153:2 292:25
**unit**  73:20 127:24
144:14,15 145:2
145:20,24 146:8

**united**  1:1 218:5
229:15
**units**  144:16 269:8
269:16 270:8
279:18,25
**universe**  222:8
**unlawful**  240:17
**unusual**  287:9
**update**  5:4 138:23
187:14,20 189:9
189:11,14 222:18
**updated**  193:17
205:13
**updates**  67:2
129:11,12 201:9
201:11,15 224:6
**updating**  201:2
**uploaded**  109:24
**ups**  296:10
**uptake**  51:13
**uptick**  51:13 52:15
68:25
**use**  44:4,5,8 46:15
50:6 68:20 80:22
81:13,16 141:19
153:11 186:11
204:9 261:23
288:7 302:8,11
**user**  153:1
**usual**  206:17
267:1
**utilization**  121:12
155:19 172:1,3,9
172:13,16,21
173:4,8 195:25
196:2,12 239:7
254:18 291:15
**utilize**  81:3 125:10
**utilized**  146:4
211:11 254:24
278:22

**utilizes** 218:25
**utilizing** 209:14,15
  235:10

**v**

**v** 306:6 307:3
  308:3
**valid** 83:23 84:25
  85:11 86:21,25
  87:19 88:3 159:2
  159:12,16 161:17
  162:14 289:25
  290:5
**valley** 168:3,20
**vancomycin**
  168:24
**varied** 231:13
**varies** 261:22
  262:3
**variety** 47:17
  281:8
**various** 29:7 35:14
  39:3 40:1 42:24
  43:2 61:1 81:18
  82:1 88:18 138:11
  187:9 227:10
  255:10,12
**varying** 209:25
**vehicle** 41:3
**verbal** 236:20
**verified** 301:13
**verify** 179:2
  192:10 238:19
  301:22
**veritext** 306:1,7
  309:1
**veritext.com.**
  306:17
**versa** 148:24
**verse** 183:15 212:2
  262:2

**version** 46:5
  228:22
**versions** 45:23
  46:4
**versus** 52:17 53:19
  68:4 107:19
  158:21 161:12
**vet** 98:9 110:12
**veterinarian** 49:4
  76:18 110:25
  190:25
**veterinarian's**
  73:20
**vets** 111:14
**vice** 148:24
**videographer** 8:25
  9:1 20:5 53:2,5
  91:8,11 131:3,6
  171:8,11 203:6,9
  220:5 264:14,16
  264:19 303:1
**videotape** 2:12
  21:16,23
**vincent** 8:24
**vintage** 246:22
**violate** 163:9,16
  169:10,22
**violation** 27:10
  156:15 177:21
  180:19,21 212:8,9
  212:10
**violations** 35:21
  68:18 76:17
  148:22 177:12
**violent** 51:17
  52:14
**virginia** 7:18
  229:5
**virtual** 230:4
**visiting** 134:17

**visits** 134:2
**volume** 109:1,8
  111:23 136:18
  137:16,18 138:4
  182:19
**volumes** 166:21
**voting** 221:15
**vs** 3:21 4:3 158:14
  161:6

**w**

**wai** 27:19 28:20
**wait** 11:7,9
**waived** 303:4
  306:19
**wakley** 2:8 8:15
  14:11,14 23:12,17
  23:25 24:8,11,14
  24:16 53:1 196:23
  197:1,4 246:8
  276:10 278:13,15
  278:25 300:8,13
  300:16 302:12,21
  306:5
**wal** 8:7 281:2
  288:11
**walk** 123:16
**walking** 287:12
**walks** 286:17
  287:19
**waning** 57:18
**want** 25:11 52:25
  85:7 98:1 105:11
  203:5 219:21,24
  219:25 223:13,18
  229:11 236:9
  241:4 249:7 253:2
  276:3,5 280:18
  300:9 301:22
**wanted** 64:6 117:6
  117:19,20 131:11
  198:17 235:20

**war** 117:2
**warehouse** 102:18
**warning** 216:7,10
  216:14
**warnings** 215:24
  216:1
**warrant** 216:10
**washington** 7:6,24
  8:5
**way** 11:5 42:7
  44:4 54:22 56:9
  72:23 75:18 85:25
  88:13 95:5 103:1
  109:8 117:6
  122:17 123:17
  124:19 127:12
  129:7 172:20
  195:2 211:12,14
  212:22 213:2
  218:6 226:18
  234:23 235:4,8
  244:10 247:6
  254:24 257:5
  266:11 298:10
**wayne** 179:3
**ways** 48:21,23
  61:2 67:4 82:1
  100:14,15,23
  116:15 138:7
  139:10 143:14
  281:9
**wc.com** 7:25
**we've** 15:13 45:5
  52:24 67:1 70:1
  70:23 71:17,23
  72:12 73:23 82:11
  89:20 94:7 112:14
  112:18,24 113:1
  113:15 119:13
  129:8,8,9 135:21
  139:19 144:16

147:3 151:4,4
170:20 173:11
174:9,23 177:15
178:3 181:20,22
183:13 186:5
187:7 190:23
195:15 200:7
201:8 214:13
218:12 244:12
245:3,20 246:3,21
258:10 260:9
273:12,13 283:6
284:9 285:17
**web** 216:5
**webinars** 129:8
**website** 15:3 18:4
18:7 63:4 64:9
67:3 71:23 91:20
129:7 158:20
161:11 187:19
203:22 265:13,23
**wednesday** 1:19
**week** 95:15,22
133:14,22 209:17
209:18
**weekly** 30:3 31:3,6
31:13 32:23 33:20
34:5 93:11 95:12
96:2 181:8 190:8
190:8
**weeks** 133:17
206:11 209:24
**welcome** 203:12
**went** 38:19 98:13
103:14 128:23
189:2 210:12
216:4 217:7
226:21 231:19
238:7 244:21
261:5 274:5,8,11
289:3

**west** 7:18 28:10,11
28:16
**westerville** 56:3
**wheeler** 179:4
**whereof** 305:1
**white** 199:8
**whittington** 37:10
143:1
**wholesale** 48:25
61:19 62:15,20,24
63:14 64:12,17
65:8,20 89:23
90:2,6,7 104:3
128:17 165:1
166:22 191:5,8,11
194:24 195:16
200:20 244:9
251:5 252:2 258:3
258:16 259:2,10
263:21 264:10
296:20,23 297:6,7
297:10 299:24
300:2
**wholesaler** 61:7
61:12,17 63:7,17
63:17 182:5 183:3
183:5,7,9 184:25
185:20 186:2,14
200:5
**wholesalers**
128:16 174:14
181:20 185:5,16
185:18 186:7
191:13 193:5,10
194:8,14 197:19
200:17 201:5
219:7 261:10
**william** 126:16
140:22
**williams** 7:21

**wimberly** 28:6
**winsley** 126:16,22
140:22 141:1
195:7
**wit** 162:5 168:1
**witness** 1:12 9:6
17:3,5 45:21
116:9 197:6
206:23 224:18
262:22 276:15,17
278:14,16 279:1
302:10,25 304:12
305:1 306:8,11
307:1,4,11 308:1,4
308:15
**witness'** 306:14
**wonder** 184:25
**word** 125:1,2
153:11 172:10
255:10
**words** 18:15
221:20 289:20
**work** 21:13 26:10
39:1 43:23 55:15
67:9 70:2,18
72:16 83:22 89:17
90:15 135:25
136:3,8 138:25
139:1,2,4,25 140:1
143:24 200:1
218:8,16,18
261:19 281:23
**worked** 39:16,21
119:13 127:20
143:15 153:5
177:15 253:2
284:9
**workers** 128:1
146:12
**workflow** 72:20
129:24

**workforce** 29:2
**working** 50:22
140:5,6 217:24
224:24 253:23
300:22
**works** 11:6 138:7
143:17 204:23
**world** 236:10
**worse** 42:4
**worth** 110:21
111:10 153:21
155:16 257:8
**worthington** 56:4
**write** 81:12,15
**writes** 99:8
**writing** 29:19
33:13 107:18
221:20,24 222:10
236:20 245:13
304:11
**written** 33:18
44:19 49:13 96:5
108:1 136:24
159:24 176:14,15
176:18 181:4
215:18,24 216:1,7
216:10,14 277:22
**wrong** 109:22
175:11 238:24
285:7
**wrote** 84:4 99:10
292:2

| x |
|---|
**x** 68:3 176:16
263:24 280:3

| y |
|---|
**y** 176:17,19
**yeah** 38:20 42:9
48:13 53:1 56:18
74:22 76:10 78:23

79:10 85:5 92:8
95:16,23,23,24
101:16 120:18
127:3 133:24
137:19 144:12
147:3 152:5 194:7
198:11 200:10
205:4 211:17
216:3 228:24
241:13 246:3
258:18 259:24
269:7 285:22
**year**   21:2 38:12
107:1,7 122:2,3
131:16,17 143:6
157:1,15,21 169:7
174:18 189:16
200:6 228:9 238:7
253:5 254:2 255:5
256:14 265:6,11
268:3 269:24
272:2 273:7
275:14,20,21
**yearly**   67:3 124:17
129:13
**years**   16:12,24
17:16 29:2 36:3
40:5 50:16 71:18
72:14 80:4,7
92:21,22 113:16
113:21 124:20,21
124:25 132:12,12
221:9,23 231:3
232:11 257:8
273:7,9,13 274:11
274:22 275:17
276:7,9 283:22
285:4,9
**yep**   16:20 22:16
22:19 99:5 141:15
148:8 245:4

260:17 293:6
**yolanda**   27:20
28:20 30:13 95:1

**z**

**zuckerman**   8:2
**zuckerman.com**
8:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.