```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                   -   -   -
 5   IN RE:  NATIONAL         :   HON. DAN A.
     PRESCRIPTION OPIATE      :   POLSTER
 6   LITIGATION               :
                              :
 7   This document relates to: :  NO.
                              :   1:17-MD-2804
 8   County of Cuyahoga, et    :
     al. v. Purdue Pharma L.P.,:
 9   et al., Case No. 17-OP-   :
     45004 (N.D. Ohio)         :
10                             :
     County of Summit, Ohio et :
11   al. v. Purdue Pharma L.P.,:
     et al., Case No. 18-OP-   :
12   45090 (N.D. Ohio)         :
                   -   -   -
13

          - HIGHLY CONFIDENTIAL -
14   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
15               April 25, 2019
16               Videotaped deposition of
     JONATHAN GRUBER, Ph.D., taken pursuant to
17   notice, was held at the law offices of
     Robins Kaplan, 800 Boylston Street,
18   Boston, Massachusetts, beginning at 10:06
     a.m., on the above date, before Michelle
19   L. Gray, a Registered Professional
     Reporter, Certified Shorthand Reporter,
20   Certified Realtime Reporter, and Notary
     Public.
21
                   -   -   -
22

          GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2

 3    KELLER ROHRBACK, L.L.P.
      BY:  DAVID J. KO, ESQ.
 4    1201 Third Avenue, Suite 3200
      Seattle, Washington 98101
 5    (206) 623-1900
      Dko@kellerrohrback.com
 6
              - and -
 7

      ROBINS KAPLAN, LLP
 8    BY:  TARA D. SUTTON, ESQ.
      800 LaSalle Avenue
 9    Suite 2800
      Minneapolis, Minnesota 55402
10    (612) 349-8577
      Tsutton@robinskaplan.com
11
              - and -
12

      NAPOLI SHKOLNIK, PLLC
13    BY:  JOSEPH L. CIACCIO, ESQ.
      400 Broadhollow Road, Suite 305
14    Melville, New York 11747
      (631) 224-1133
15    Jciaccio@napolilaw.com
      Representing the Plaintiffs
16

17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES:   (Cont'd.)
 2
      JONES DAY
 3    BY:  STEVEN N. GEISE, ESQ.
      4655 Executive Drive, Suite 1500
 4    San Diego, California 92121
      (858) 314-1200
 5    Sngeis@jonesday.com
 6           - and -
 7    JONES DAY
      BY:  CLAIRE E. CASTLES, ESQ.
 8    555 South Flower Street
      Fiftieth Floor
 9    Los Angeles, California 90071
      (213) 489-3939
10    Ccastles@jonesday.com
      Representing the Defendant, Walmart
11
12    COVINGTON & BURLING, LLP
      BY:  DAVID W. HALLER, ESQ.
13    MEGAN L. HARE, ESQ.
      620 Eighth Avenue
14    New York, New York 10018
      (202) 841-1000
15    dhaller@cov.com
      mhare@cov.com
16    Representing the Defendant, McKesson
      Corporation
17
18    MARCUS & SHAPIRA, LLP
      BY:  RICHARD I. HALPERN, ESQ.
19    One Oxford Centre, 35th Floor
      Pittsburgh, Pennsylvania 15219
20    (412) 338-3990
      Halpern@marcus-shapira.com
21    Representing the Defendant, HBC
      Service Company
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)
 2
      BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
 3    BY:  MATTHEW BREWER, ESQ.
      Courthouse Place
 4    54 West Hubbard Street, Suite 300
      Chicago, Illinois 60654
 5    (312) 494-4440
      Matthew.brewer@bartlit-beck.com
 6    Representing the Defendant, Walgreens
 7
      REED SMITH, LLP
 8    BY:  ANNE E. ROLLINS, ESQ.
      Three Logan Square
 9    1717 Arch Street, Suite 3100
      Philadelphia, Pennsylvania 19103
10    (215) 851-8226
      arollins@reedsmith.com
11    Representing the Defendant,
      AmerisourceBergen Drug Corporation
12
13    KIRKLAND & ELLIS, LLP
      BY:  MARTIN L. ROTH, ESQ.
14    300 North LaSalle Street
      Chicago, Illinois 60654
15    (312) 862-7184
      martin.roth@kirkland.com
16    Representing the Defendant, Allergan
      Finance
17
18    ZUCKERMAN SPAEDER, LLP
      BY:  DANIEL P. MOYLAN, ESQ.
19    100 East Pratt Street, Suite 2440
      Baltimore, Maryland 21202
20    (410) 949-1159
      dmoylan@zuckerman.com
21    Representing the Defendant, CVS
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)
 2

      DECHERT LLP
 3    BY:  KATHERINE UNGER DAVIS, ESQ.
      Cira Centre
 4    2929 Arch Street
      Philadelphia, Pennsylvania 19104
 5    (215) 994-4000
      katherine.ungerdavis@dechert.com
 6    Representing the Defendant, Purdue
      Pharmaceuticals
 7
 8    ARNOLD & PORTER KAYE SCHOLER LLP
      BY:  ALLISON B. RUMSEY, ESQ.
 9    601 Massachusetts Avenue, NW
      Washington, D.C. 20001
10    (202) 942-5095
      allison.rumsey@arnoldporter.com
11    Representing the Defendants, Endo Health
      Solutions Endo Pharmaceuticals, Inc.; Par
12    Pharmaceutical Companies, Inc. f/k/a Par
      Pharmaceutical Holdings, Inc.
13
14    O'MELVENY & MYERS LLP
      BY:  MATTHEW KAISER, ESQ.
15    400 South Hope Street, 18th Floor
      Los Angeles, California 90071
16    (213) 430-6665
      mkaiser@omm.com
17    Representing the Defendants, Janssen and
      Johnson & Johnson
18
19    ROPES & GRAY LLP
      BY:  JENNIFER PANTINA, ESQ.
20    800 Boylston Street
      Boston, Massachusetts 02199
21    (617) 951-7234
      Jennifer.pantina@ropesgray.com
22    Representing the Defendant, Mallinckrodt
      and Spec GX
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2    MORGAN, LEWIS & BOCKIUS, LLP
      BY:  JOHN M. MALOY, ESQ.
 3    101 Park Avenue
      New York, New York 10178
 4    (212) 309-6692
      John.maloy@morganlewis.com
 5    Representing the Defendant,
      Rite Aid of Maryland
 6
 7    MORGAN, LEWIS & BOCKIUS LLP
      BY:  VALERIE M. TOTH, ESQ.
 8    200 S. Biscayne Boulevard
      Suite 5300
 9    Miami, Florida 33131-2339
      (305) 415-3413
10    Valerie.toth@morganlewis.com
      Representing the Defendants, Teva
11    Pharmaceuticals, Inc. Cephalon Inc,
      Watson Laboratories, Actavis LLC, Actavis
12    Pharma, Inc.
13
      LOCKE LORD, LLP
14    BY:  BRANDON MONTMINY, ESQ.
      2200 Ross Avenue
15    Suite 2800
      Dallas, Texas 75201
16    (214) 740-8445
      Brandon.montminy@lockelord.com
17    Representing the Defendant,
      Henry Schein, Inc.
18
19
      ALSO PRESENT:
20
21    Evan McKay
      (Via stream)
22
      VIDEO TECHNICIAN:
23    Robert Martignetti
24
```

```
 1                      -   -   -
 2                  I N D E X
 3                      -   -   -
 4

    Testimony of:   JONATHAN GRUBER, Ph.D.
 5

 6

    By Mr. Geise                              15
 7

    By Mr. Haller                    390, 486
 8

    By Ms. Rumsey                         459
 9

    By Ms. Unger Davis                    444
10

    By Mr. Ko                             470
11

12

13                      -   -   -
14                  E X H I B I T S
15                      -   -   -
16

17   NO.             DESCRIPTION            PAGE
18   Gruber-1        Expert Report of       19
                     Professor Jonathan
19                   Gruber, 3/25/19
20   Gruber-2        Pain Management        92
                     And Opioid Epidemic
21                   Balancing societal
                     And Individual
22                   Benefits and Risks of
                     Prescription Opioid Use
23

24
```

```
 1                         -   -   -
 2              E  X  H  I  B  I  T  S   (Cont'd.)
 3                         -   -   -
 4
 5    NO.              DESCRIPTION                 PAGE
 6    Gruber-3         Public Finance             100
                       And Public Policy
 7                     Fifth Edition
 8    Gruber-4         How Increasing             214
                       Medical Access to
 9                     Opioids Contributes
                       To the Opioid Epidemic
10                     (Powell)
11    Gruber-5         Relationship Between  252
                       Nonmedical Prescription
12                     Opioid Use and Heroin
                       Use
13                     (Compton)
14    Gruber-6         HHS Public Access          269
                       US Regional and
15                     Demographic
                       Differences in
16                     Prescription Opioid
                       And Heroin-Related
17                     Overdose Hospitalizations
                       (Unick)
18
      Gruber-7         Increased Use              272
19                     Of Heroin as an
                       Initiating Opioid
20                     Of Abuse
                       (Cicero)
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2              E X H I B I T S   (Cont'd.)
 3                      -   -   -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Gruber-8         Nonmedical              283
                      Prescription Opioids
 7                    And Pathways of Drug
                      Involvement in the
 8                    US Generational
                      Differences
 9                    (Wall)
10   Gruber-9         Heroin Use and          293
                      Heroin Use Risk
11                    Behaviors Among
                      Nonmedical Users of
12                    Prescription Period
                      Pain Relievers
13                    (Jones)
14   Gruber-10        Associations of         299
                      Nonmedical Pain
15                    Relievers Use and
                      Initiation of Heroin
16                    Use in the United States
                      (Muhuri)
17
     Gruber-11        The Changing Face       308
18                    of Heroin Use in the
                      United States:
19                    A Retrospective
                      Analysis of the Past
20                    50 Years
                      (Cicero)
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5    NO.             DESCRIPTION             PAGE
 6    Gruber-12       Injection and           318
                      Sexual HIV/HCV Risk
 7                    Behaviors Associated
                      With Nonmedical Use
 8                    Of Prescription Opioids
                      (Mateu-Gelabert)
 9
      Gruber-13       Abuse-Deterrent         324
10                    Formulations and the
                      Prescription Opioid
11                    Abuse Epidemic in the
                      US:  Lessons Learned
12                    From OxyContin
                      (Cicero)
13
      Gruber-14       How the                 346
14                    Reformulation of
                      OxyContin Ignited
15                    The Heroin Epidemic
                      (Evans)
16
      Gruber-15       Supply-Side Drug        372
17                    Policy in the
                      Presence of Substitutes
18                    Evidence from the
                      Introduction of
19                    Abuse-Deterrent Opioids
                      (Alpert)
20
      Gruber-16       A Transitioning         382
21                    Epidemic:  How the
                      Opioid Crisis is
22                    Driving The Rise
                      In Hepatitis C
23                    (Powell)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                        -   -   -

2            E  X  H  I  B  I  T  S   (Cont'd.)

3                        -   -   -

4

5    NO.              DESCRIPTION              PAGE

6    Gruber-17        Letter, 12/16/13         455
                      To Dr. Hamburg
7

     Gruber-18        Changing Dynamics        460
8                     of the Drug Overdose
                      Epidemic in the
9                     United States from 1979
                      Through 2016
10                    (Jalal)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     None.

 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.

10

11   Stipulations

12   PAGE    LINE
     None.

13

14   Questions Marked

15   PAGE    LINE
     None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1      THE VIDEOGRAPHER:  We are

2    now on the record.  My name is

3    Robert Martignetti.  I'm a

4    videographer for Golkow Litigation

5    Services.

6      Today's date is April 25,

7    2019, and the time is 10:06 a.m.

8      This video deposition is

9    being held in Boston,

10   Massachusetts, In Re National

11   Prescription Opiate Litigation.

12     The deponent is Jonathan

13   Gruber.

14     Counsel in the room, please

15   identify yourselves.

16     MR. GEISE:  Steve Geise on

17   behalf of Walmart.

18     MS. CASTLES:  Claire Castles

19   on behalf of Walmart.

20     MR. HALLER:  David Haller

21   and Megan Hare from Covington &

22   Burling for McKesson.

23     MR. HALPERN:  Richard

24   Halpern for HBC Services, Inc.

Highly Confidential - Subject to Further Confidentiality Review

1      MR. ROTH:  Martin Roth for

2   Allergan Finance, LLC.

3      MR. BREWER.  Matt Brewer,

4   Bartlit Beck for Walgreens.

5      MS. UNGER DAVIS:  Kate Unger

6   Davis from Dechert LLP, for the

7   Purdue defendants.

8      MR. KAISER:  Matthew Kaiser

9   for the Janssen defendants.

10      MR. MOYLAN:  Daniel Moylan

11   from Zuckerman Spaeder for the CVS

12   defendants.

13      MS. ROLLINS:  Anne Rollins,

14   Reed Smith, for AmerisourceBergen

15   Corporation.

16      MS. PANTINA:  Jennifer

17   Patina, from Ropes & Gray for

18   Mallinckrodt, LLC and Spec GX.

19      MS. RUMSEY:  Allison Rumsey,

20   from Arnold & Porter for Endo and

21   Par.

22      MR. CIACCIO:  Joseph Ciaccio

23   from Napoli Shkolnik for Cuyahoga

24   County.

Highly Confidential - Subject to Further Confidentiality Review

1          MS. SUTTON:  Tara Sutton,

2     Robins Kaplan on behalf of

3     Plaintiffs.

4          MR. KO:  David Ko, Keller

5     Rohrback, on behalf of the

6     plaintiffs, and also on behalf of

7     the witness.

8          THE VIDEOGRAPHER:  The court

9     reporter is Michelle Gray and will

10    now swear in the witness.

11              -  -  -

12         ... JONATHAN GRUBER, Ph.D.,

13    having been first duly sworn, was

14    examined and testified as follows:

15              -  -  -

16          EXAMINATION

17              -  -  -

18  BY MR. GEISE:

19    Q.    Good morning, sir.

20    A.    Good morning.

21    Q.    I had a chance to introduce

22  myself before we went on the record.  My

23  name is Steve Geise.  I'm an attorney

24  representing Walmart in this case.  And

1    I'm going to start off today by asking

2    you a series of questions.  Is that okay?

3              A.    Sure.

4              Q.    Now, your name is Jonathan

5    Gruber.  Do you have what you prefer to

6    be called, Professor Gruber, Mr. Gruber,

7    what's your preference?

8              A.    I don't care.  Whatever is

9    easier for you.

10             Q.    Okay.  I'll stick with

11   professor.  How's that?

12             A.    Sounds good.

13             Q.    You do understand that

14   you're appearing here today to give

15   testimony for the plaintiffs, Cuyahoga

16   County and Summit County, in this

17   litigation, correct?

18             A.    Yes, I do.

19             Q.    You understand that you're

20   testifying under oath?

21             A.    Yes, I do.

22             Q.    You understand that your

23   testimony here today will have the same

24   effect and import as if you were

1   testifying in front of a judge and jury

2   in a courtroom, correct?

3           A.    Yes.

4           Q.    I know you've given a

5   handful of depositions in your career; is

6   that correct?

7           A.    Yes.

8           Q.    Go over a couple quick

9   ground rules.  One thing to make it

10  easier for Michelle today, if I could ask

11  you to wait until I complete a question,

12  even if you know where my question is

13  going before you answer.  It will make it

14  easier on her.  Is that okay?

15          A.    Yes.

16          Q.    Similarly, I will try to

17  wait until you finish an answer before I

18  ask another question.  Okay?

19          A.    Yes.

20          Q.    Throughout the day there may

21  be questions that I ask that draw an

22  objection from the plaintiffs' attorneys.

23  If that happens, we will deal with that.

24  But most of the time that's just to

Highly Confidential - Subject to Further Confidentiality Review

1    preserve some legal argument.  Unless

2    you're instructed to answer, do you

3    understand you'll still answer the

4    question?

5        A.    Yes.

6        Q.    If any questions I ask today

7    are unclear or you don't understand the

8    terminology that I use, would you please

9    let me know, and I can rephrase the

10   question?

11       A.    Sure.

12       Q.    If you don't ask me to do

13   that, I will assume that you've

14   understood the question I've asked and

15   answered that question.  Is that fair?

16       A.    Yes.

17       Q.    We'll be at this for quite a

18   few hours today, but it's not an

19   endurance session.  If you need to take a

20   break at any time, please ask me, and I'm

21   sure we can accommodate that.

22       A.    Okay.

23       Q.    Are there any reasons why

24   you're not able to give full, fair and

Highly Confidential - Subject to Further Confidentiality Review

1    complete testimony today about the

2    opinions you formed in this case?

3         A.    No.

4         Q.    Professor Gruber, I'll hand

5    you what's marked as Exhibit 1 to your

6    deposition, which is a copy of your

7    expert report, including the appendices.

8              (Document marked for

9         identification as Exhibit

10        Gruber-1.)

11   BY MR. GEISE:

12        Q.    Do you see that?

13        A.    Yes, I do.

14        Q.    Professor Gruber, did you

15   write this report on your own?

16        A.    I wrote the report -- I --

17   all the words are mine.  I wrote the

18   report.  I was assisted in creating the

19   report by a number of parties.  But the

20   report is my words and my responsibility.

21        Q.    Can you identify the parties

22   who assisted you in writing your report?

23        A.    Sure.  I received support

24   for the analysis from Compass Lexecon, a

1    litigation consulting firm.

2            I received comments on the

3    draft from both the lawyers I worked with

4    and from some of my fellow experts.

5        Q.    And I don't want to ask you

6    about the comments you may have received

7    from the lawyers at this point, but I do

8    want to ask you, who are the individuals

9    at Compass Lexecon who assisted you in

10   preparing your report?

11       A.    I don't know everyone who

12   assisted.  I know the people I dealt with

13   most consistently in my report were Hal

14   Sider and Evan McKay.

15       Q.    In addition to Hal Sider and

16   Evan McKay, is it your understanding that

17   there were other individuals at Compass

18   Lexecon who provided assistance for your

19   materials for your report?

20       A.    I'm not certain.

21       Q.    You said that you weren't

22   sure of everybody at Compass Lexecon who

23   assisted.  Is it your understanding that

24   there are other individuals in addition

1    to Mr. Sider and Mr. McKay who did

2    assist?

3           A.    It's my understanding there

4    were other individuals who were working

5    on this general matter for the

6    plaintiffs.  I don't know for sure who

7    assisted with my report in particular.

8           Q.    You also identified that you

9    discussed your report with a number of

10   fellow experts in the case; is that

11   correct?

12          A.    That is correct.

13          Q.    Can you identify the other

14   experts with whom you spoke about your

15   report?

16          A.    With David Cutler and Tom

17   McGuire.

18          Q.    Did you speak with any other

19   experts for purposes of preparing your

20   report?

21          A.    No.

22          Q.    Can you describe the

23   involvement that experts Cutler and

24   McGuire had on your preparation of your

1    report?

2        A.    We -- they read it,

3    commented on it.  We had a number of

4    conversations about the structure of the

5    report and how it fit into the whole set

6    of reports that are being produced.

7        Q.    Throughout your report, you

8    identify and refer to reports by Cutler,

9    McGuire and other experts.  Did you have

10   their reports with you at the time you

11   were preparing your report?

12       A.    I saw drafts of their -- the

13   drafts were being prepared

14   simultaneously.  So, yes, I saw drafts of

15   their reports.

16       Q.    Did you have any joint

17   meetings with Cutler and McGuire, where

18   the three of you would talk about what

19   you were going to cover in your

20   individual reports?

21           MR. KO:  At this point, I

22       just instruct the witness to make

23       sure that, to the extent that any

24       of these meetings happened with

Highly Confidential - Subject to Further Confidentiality Review

1    counsel, not to disclose any of

2    the contents or the substance of

3    the conversations, but certainly

4    you're free to respond as to the

5    topic and the identity.

6          THE WITNESS:  Yes.  We did

7    have joint meetings.

8  BY MR. GEISE:

9    Q.    How many?

10   A.    I don't know.

11   Q.    Were these in person?

12   A.    By the -- typically not.

13 They were typically over the phone.  But

14 there may have been a small number in

15 person.

16   Q.    When you say a small number,

17 how many would that be?

18   A.    About the reports, per se,

19 it would have been less than five.

20   Q.    In addition to in-person

21 meetings with Professors Cutler and

22 McGuire about the report, per se, did you

23 have other in-person meetings with them

24 about other topics related to this

1    litigation?

2        A.    We had a series of meetings

3    over the last year, developing our

4    thinking that would go into this set of

5    reports.

6        Q.    How many did you have in

7    that series?

8        A.    I don't recall exactly.

9        Q.    In addition to these

10   in-person meetings, did you also have

11   telephone conferences?

12       A.    Yes, we did.

13       Q.    How many telephone

14   conferences did you have with Professors

15   Cutler and McGuire to discuss the

16   preparation of your report?

17       A.    I don't recall the number.

18       Q.    Did the three of you also

19   exchange e-mail communication about the

20   preparation of your reports?

21       A.    We -- anything involving the

22   reports we essentially would indirectly

23   communicate, which is we'd communicate

24   through the lawyers.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did you provide input with

2  Professors Cutler and McGuire on what was

3  going to be in their reports?

4          MR. KO:  Again, that -- the

5          same instruction that I gave

6          earlier to you -- to you,

7          Dr. Gruber.

8          To the extent the input

9          includes any kind of substance or

10         content to which the attorneys

11         were involved, I'd advise you not

12         to answer.

13         To the extent that there's

14         anything about the identity of the

15         topic, you are free to disclose

16         that to -- to Steve.

17         THE WITNESS:  So could you

18         repeat the question?

19  BY MR. GEISE:

20    Q.    Sure.  Did you provide input

21  with Professors Cutler and McGuire on

22  what was going to be in their reports?

23    A.    Yes, I did.

24    Q.    Can you describe that input?

1      A.    It was in the nature of both

2   before the reports were written,

3   discussing what the structures would be.

4   And in the nature of commenting on drafts

5   of the report as it was being written.

6      Q.    Would it be accurate to

7   describe you and Cutler and McGuire as

8   working collaboratively in the

9   preparation of each of your reports?

10           MR. KO:  Object to the form.

11           THE WITNESS:  I think it

12        was -- we certainly worked

13        collaboratively in deciding what

14        would go in what report.

15           I think in terms of the

16        reports themselves, I would

17        describe it more as commenting on

18        each other's drafts.

19   BY MR. GEISE:

20      Q.    Direct your attention back

21   to Exhibit 1, which is your expert

22   report.  And also attached to that is the

23   appendix that contains a CV and prior

24   testimony.

1          And, Professor Gruber, is --

2    is the appendix that contains those

3    materials complete and accurate to the

4    best of your knowledge?

5          A.    Yes.

6          Q.    Is there anything that isn't

7    included in your appendix about either

8    your education, your experience or your

9    publications that would be relevant to

10   your opinions in this matter?

11         A.    No.

12         Q.    If I can ask you to look at

13   Page 2 of your expert report, and in

14   particular, Paragraph 5.

15         At the beginning of that

16   paragraph, you write, "My work in health

17   economics also includes extensive work on

18   addictive behavior, including significant

19   academic work, federal policy experience,

20   and expert testimony experience in the

21   economics of smoking.

22         "I've written more than a

23   dozen academic papers on the economics

24   of, and government policy towards,

Highly Confidential - Subject to Further Confidentiality Review

1    smoking."

2              Do you see that?

3         A.    Yes, I do.

4         Q.    And your CV that's contained

5    in Exhibit 1 contains a list of your

6    publications that have appeared in

7    journals; is that correct?

8         A.    Yes.

9         Q.    Included in that list are

10   the academic papers that you have written

11   on the economics of, and government

12   policy towards smoking, correct?

13        A.    Correct.

14        Q.    From a review of your

15   publications, is it correct that you have

16   not written any academic papers in

17   peer-reviewed journals involving

18   prescription opioids?

19        A.    That is correct.

20        Q.    As part of your CV, you

21   identified experience testifying in

22   matters involving cigarette smoking, and

23   in particular, an evaluation you did of

24   the costs and benefits of cigarette

Highly Confidential - Subject to Further Confidentiality Review

1  warning labels.  Do you recall that?

2       A.    Yes.

3       Q.    But you have not performed

4  an evaluation of the cost and benefits of

5  warning labels on prescription opioids;

6  is that correct?

7            MR. KO:  Object to the form.

8            THE WITNESS:  That's

9       correct.

10  BY MR. GEISE:

11       Q.    Similarly, you have not

12  performed an evaluation in the costs and

13  benefits of any written communications

14  about prescription opioids; is that

15  correct?

16            MR. KO:  Objection.

17            THE WITNESS:  Yes.

18  BY MR. GEISE:

19       Q.    Your CV identifies a number

20  of articles about the impact of

21  regulations on the tobacco industry,

22  correct?

23       A.    Yes.

24       Q.    But you have not written any

1    academic paper in a peer reviewed journal

2    on the impact of regulations on

3    prescription opioids; is that correct?

4          A.    Yes.

5          Q.    Nor have you authored any

6    peer-reviewed paper on the impact of

7    prescription opioid shipments on opioid

8    dependence, correct?

9          A.    That's correct.

10         Q.    Nor have you authored any

11   peer-reviewed paper on the impact on

12   heroin mortality attributed to shipments

13   of prescription opioids, correct?

14         A.    That's correct.

15         Q.    In Appendix 1-B to your

16   expert report, you have a list of

17   materials that you considered for

18   purposes of forming your opinions in this

19   case; is that correct?

20         A.    Yes, that's correct.

21         Q.    Are there any materials that

22   are not disclosed in Appendix 1-B that

23   you considered for your opinions in this

24   case?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Not intentionally.  This is

2    to -- as far as I know, the complete

3    list.

4         Q.    From looking at your

5    appendix, you don't identify specifically

6    expert reports from other experts in this

7    case?

8         A.    I don't specifically.  But

9    if you look at the end of the appendix on

10   Page 5, I say, "and all of the documents

11   cited in this report, the tables and the

12   appendices," and I cite a number of

13   expert -- or other expert reports.

14        Q.    And -- and I wasn't trying

15   to -- to catch you in a gotcha moment

16   there.

17        A.    Right.

18        Q.    That was going to be my next

19   question.  That the bottom line of your

20   materials considered list refers back to

21   your report and wraps in anything you

22   might have referred to in your report; is

23   that correct?

24        A.    That's correct.

1                MR. KO:  Object to form.

2    BY MR. GEISE:

3        Q.    If I can direct your

4    attention to that same page of your

5    Appendix 1-B where you list a number of

6    data sources that you consulted for

7    purposes of forming your opinions.

8                Do you see that?

9        A.    Yes.

10        Q.    I want to ask you about a

11    few of these data sources.  The first one

12    is the ARCOS data.

13                Do you see that?

14        A.    Yes.

15        Q.    How did you get the ARCOS

16    data in this matter?

17        A.    I never personally had my

18    hands on the ARCOS data.  The ARCOS data

19    was obtained and used by Compass Lexecon

20    under my direction.

21        Q.    When you say you never had

22    access to the ARCOS data, I take it it

23    means you never received the underlying

24    data yourself?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    But you did receive analyses

3  or summaries of the data performed by

4  Compass Lexecon?

5    A.    Yes.

6    Q.    Professor Gruber, do you

7  recall if you signed a protective order

8  in this case to obtain the ARCOS data?

9    A.    I don't recall.

10    Q.    Do you know if the people

11  that you will worked with at Compass

12  Lexecon signed a protective order in

13  order to obtain the ARCOS data?

14    A.    I don't know.

15    Q.    Were you aware that there

16  was a protective order procedure in place

17  in the litigation for folks having access

18  to the ARCOS data?

19        MR. KO:  I just want to

20      be -- sorry to interrupt.  But I

21      just want to be clear on -- are

22      you asking about private or public

23      ARCOS data?  Because both are

24      referenced in the report, so there

Highly Confidential - Subject to Further Confidentiality Review

1          might be some confusion in the

2          questioning.

3                    MR. GEISE:  That's fine.  I

4          can -- I can clarify that.

5    BY MR. GEISE:

6          Q.    Do you know if you signed a

7    protective order at all regarding ARCOS

8    data?

9          A.    I don't recall.

10         Q.    Do you know if you had

11   access to public or private ARCOS data?

12         A.    I did not directly -- did

13   not directly use either public or private

14   ARCOS data in my analysis.

15         Q.    I understand you say that

16   you did not directly use it.

17         A.    Right.

18         Q.    But do you know if the

19   materials that you were provided by

20   Compass Lexecon involved either private

21   or public ARCOS data?

22         A.    I know the materials I

23   received from Compass Lexecon involved

24   ARCOS data.  I'm not sure about the

Highly Confidential - Subject to Further Confidentiality Review

1    private or public nature of it.

2         Q.    So you didn't do anything to

3    verify if they were providing you

4    information based on public or private

5    ARCOS data?

6              MR. KO:  Object to the form.

7              THE WITNESS:  No, I do not.

8    BY MR. GEISE:

9         Q.    I'm going to jump down a

10   couple spots on your list of data

11   sources.  You have the FBI UCR data,

12   which is the Uniform Crime Reporting

13   data, correct?

14        A.    Yes.

15        Q.    Did you access that data

16   yourself?

17        A.    No, I did not.

18        Q.    Is that something that

19   Compass Lexecon did?

20        A.    Yes.

21        Q.    Do you -- did you sign any

22   data use agreement or other agreement

23   with regard to the FBI UCR data?

24        A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know if Compass

2  Lexecon did?

3    A.    No, I do not.

4    Q.    Jump down a couple spots

5  below.  You have NCHS Multiple Causes of

6  Death data.

7         Do you see that?

8    A.    Yes, I do.

9    Q.    Did you access the NCHS

10  Multiple Causes of Death data yourself?

11    A.    No, I did not.

12    Q.    Did you, again, rely on

13  Compass Lexecon for that material?

14    A.    Yes, I did.

15    Q.    And did Compass Lexecon

16  provide you an analysis and summary of

17  that data?

18         MR. KO:  Object to the form.

19         THE WITNESS:  They provided

20    me various analyses and summaries

21    of that data.

22  BY MR. GEISE:

23    Q.    Professor Gruber, did you

24  sign a data use agreement with respect to

Highly Confidential - Subject to Further Confidentiality Review

1    the NCHS Multiple Causes of Death data?

2         A.    I don't recall.

3         Q.    Do you know if the people

4    you worked with at Compass Lexecon signed

5    a data use agreement with regard to the

6    NCHS Multiple Causes of Death data?

7         A.    No, I don't.

8         Q.    From your prior academic

9    research, are you aware that certain NCHS

10   Multiple Causes of Death data is

11   considered restricted access data?

12        A.    Yes, I am.

13        Q.    Do you know if Compass

14   Lexecon used any restricted access data

15   for purposes of providing you the

16   materials they did as you prepared your

17   report?

18        A.    I know that Compass Lexecon

19   used some non-public data.  I'm not sure

20   of the technical definition of restricted

21   access.

22        Q.    Okay.

23        A.    But they used some

24   non-public NCHS mortality death.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    When you use the "non-public
2  data," is that meant to refer to the fact
3  that you would need to sign a data use
4  agreement to have access to that data?
5         MR. KO:  Object to the form.
6         THE WITNESS:  That refers to
7       the fact that it's not data that,
8       for instance, I, myself, as an
9       academic researcher, could simply
10      go on the web and download, but
11      rather involves some interaction
12      with the folks who control that
13      data.  I don't know the nature of
14      those interactions or what had to
15      be signed.
16  BY MR. GEISE:
17    Q.    It's your understanding
18  though from your other academic research
19  that there's some procedure you would
20  have to go through to get access to that
21  restricted access data?
22    A.    Typically, in my academic
23  experience, yes.
24    Q.    And in your academic

1    experience, have you signed data use

2    agreements to receive access to

3    restricted access data in the past?

4         A.    Yes, I have.

5         Q.    Do you understand that it

6    would be improper to use restricted

7    access data without a data use agreement

8    for that underlying data?

9              MR. KO:  Object to the form.

10             THE WITNESS:  I don't know

11        what is true in every context.  I

12        know in some contexts that's

13        absolutely true.

14   BY MR. GEISE:

15        Q.    Have you in the past ever

16   executed a data use agreement to get the

17   non-public data from the NCHS multiple

18   causes of death data?

19        A.    Not that I can recall.

20        Q.    You're familiar with other

21   data use agreements though for restricted

22   access data?

23        A.    Yes, I am.

24        Q.    Did you do anything to

1    verify -- well, let me start that over.

2               You mentioned that you're

3    aware that Compass Lexecon used

4    non-public data, correct?

5         A.    Correct.

6         Q.    Did you do anything to

7    verify if Compass Lexecon secured a data

8    use agreement to have access to that

9    non-public data?

10        A.    No, I did not.

11        Q.    Do you know from the

12   material that you relied on from Compass

13   Lexecon, what part of that material is

14   non-public and what part of that material

15   is public?

16        A.    No.

17        Q.    Did you do anything to

18   ensure that Compass Lexecon had secured

19   the proper approval to use the non-public

20   data from the NCHS multiple causes of

21   death data?

22               MR. KO:  Object to form.

23               THE WITNESS:  No, I did not.

24   BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And I take it that you don't

2  know if Compass Lexecon executed a data

3  use agreement for access to the

4  non-public data?

5            MR. KO:  Objection.  Asked

6        and answered.

7            THE WITNESS:  I don't know.

8  BY MR. GEISE:

9    Q.    In your experience of using

10 non-public data in your academic

11 pursuits, are you familiar with

12 limitations on the use of that data, so

13 that it cannot be used for commercial

14 purposes?

15           MR. KO:  Object to the form.

16           THE WITNESS:  Yes, I am.

17 BY MR. GEISE:

18    Q.    And what are the

19 consequences of using non-public data in

20 a commercial purpose?

21    A.    I actually don't recall.

22    Q.    Did you have any concerns in

23 this matter about using non-public data

24 for purposes of your report and opinions?

1    A.    No, I did not.

2    Q.    Did you raise any concerns

3 with Compass Lexecon about using

4 non-public data for purposes of your

5 report and opinions?

6    A.    I honestly don't recall.

7    Q.    Let me jump down to the

8 bottom of your list of data sources, and

9 you identify the National Historical

10 Geographic Information System.

11    Do you see that?

12    A.    Yes, I do.

13    Q.    First of all, what is that?

14    A.    That's essentially data

15 which summarizes information from

16 nationally representative surveys in

17 geographic units.

18    Q.    How did you access that

19 data?

20    A.    Once again, I did not access

21 that data.

22    Q.    Professor Gruber, in looking

23 at all of your data sources listed on

24 Page 5 in your appendix, is there any

1   data that you personally accessed for

2   purposes of forming your opinion?

3              MR. KO:  Object to the form.

4              THE WITNESS:  No.

5   BY MR. GEISE:

6        Q.    So all of the access to the

7   data sources listed in your appendix was

8   done through Compass Lexecon?

9        A.    Yes.

10       Q.    Were there any other

11  organizations that were involved in

12  collecting data that you ultimately

13  relied on for purposes of your opinions,

14  leaving out counsel?

15       A.    I don't believe so.

16       Q.    Have you ever heard of an

17  organization that goes by the acronym

18  PIRE, P-I-R-E?

19       A.    It sounds vaguely familiar.

20       Q.    I think it stands for the

21  Pacific Institute For Research

22  Evaluation?

23       A.    Once again it sounds vaguely

24  familiar.

1    Q.    If it's vaguely familiar,

2  did you have any involvement with PIRE

3  for purposes of forming your opinions in

4  this case?

5    A.    Not -- not directly.

6    Q.    Well, when you say not

7  directly, that causes me to ask the

8  follow-up.

9         Did you have any indirect

10  contact with PIRE for purposes of forming

11  your opinions in this case?

12    A.    I don't mean not directly.

13  The difficult -- I just mean that people

14  I had contact with may have had contact

15  with them that I don't know of.  But I

16  don't recall having a direct -- any

17  contact with them.

18    Q.    And that's a good

19  clarification.  To your knowledge, did

20  anyone you were working with have any

21  communication with PIRE for purposes of

22  the -- the data and materials you relied

23  on in this case?

24    A.    Not that I recall.

1        Q.      Your appendix on Page 4 also

2   lists nine interviews that were

3   conducted.

4               Do you see that?

5        A.      Yes.

6        Q.      And did you, Professor

7   Gruber, conduct these interviews

8   yourself?

9        A.      I was present for interviews

10  with these individuals.

11       Q.      And from the dates

12  identified, all of these interviews took

13  place on the same date, July 11, 2018,

14  correct?

15       A.      That's correct.

16       Q.      You said you were present

17  for those interviews.  Who else was

18  present?

19       A.      I don't recall the full

20  list, but it was myself and Tom McGuire

21  was present for -- there were two

22  interviews.  One with the set of

23  individuals -- I don't recall the exact

24  split.  But one with fire and EMS and

1    police, and one with human services.

2              Professor McGuire was

3    present for the first.  I don't think he

4    was present for the second, but I don't

5    recall for sure.  And then staff from

6    Compass Lexecon, but I don't exactly

7    recall who, were present at both

8    meetings.  And at least one legal counsel

9    was present at both meetings.

10        Q.    When you say staff from

11   Compass Lexecon, are you referring to

12   Mr. Sider and Mr. McKay?

13        A.    I know it was not either

14   Mr. Sider or Mr. McKay.  But I don't

15   recall which staff it was.

16        Q.    How many staff members from

17   Compass Lexecon attended those

18   interviews?

19        A.    I believe one.

20        Q.    Who determined what

21   individuals would be interviewed if you

22   know?

23              MR. KO:  Again I'm going to

24        instruct you not to answer or not

Highly Confidential - Subject to Further Confidentiality Review

1      to disclose the contents of the

2      communication or any rationale or

3      substance behind that

4      determination.

5           But again you're free to

6      disclose the identity and -- and

7      topics that were potentially

8      discussed.

9           MR. GEISE:  I can rephrase,

10      Professor Gruber.

11  BY MR. GEISE:

12      Q.    Did you determine what

13  individuals would be interviewed?

14      A.    No, I did not.

15      Q.    Did you make a request to

16  interview specific individuals for

17  purposes of forming your opinions in this

18  case?

19      A.    No, I did not.

20      Q.    Do you rely on these

21  interviews for anything in your report?

22      A.    No, I do not.

23      Q.    Did you take any notes from

24  these interviews?

1    A.    I don't believe so.

2    Q.    Of the nine interviewees

3    listed, I believe they're all associated

4    with either a Cuyahoga County division or

5    a Cleveland division; is that correct?

6          And it's -- it's inartfully

7    phrased because I don't know how to

8    summarize all of those different

9    entities, but...

10   A.    Yes, that's correct.

11   Q.    Did you interview anyone

12   from Summit County?

13   A.    No, I did not.

14   Q.    Professor Gruber, have you

15   reviewed any documents that have been

16   produced by Cuyahoga County or Summit

17   County in this litigation?

18   A.    I don't recall.

19   Q.    Looking at Page 2 of your

20   CV, which is attached as Appendix 1-A to

21   your report.  You list a handful of past

22   expert testimony; is that correct?

23   A.    Yes.

24   Q.    Is that a complete and

Highly Confidential - Subject to Further Confidentiality Review

1    accurate list of your past expert

2    testimony in either deposition or trial?

3            A.    As far as I'm -- no, it --

4    it's an attempt to be as complete, to be

5    complete.

6            Q.    Did any of your prior

7    testimony relate to addiction or

8    dependence to opioids?

9            A.    No, it did not.

10           Q.    Did any of your prior

11   testimony relate to the shipment of

12   prescription opioids?

13           A.    No, it did not.

14           Q.    And while you refer in your

15   report at different times to addictive

16   behaviors, you don't consider yourself an

17   expert in addictive behaviors, do you?

18                MR. KO:  Object to form.

19                THE WITNESS:  I consider

20           myself an expert in the economic

21           issues and policy around addictive

22           behaviors.

23   BY MR. GEISE:

24           Q.    In terms of making a

1    diagnosis of somebody with having an

2    addiction or a use disorder, that's not

3    something you would do?

4              MR. KO:  Object to the form.

5              THE WITNESS:  No, that's not

6         something I would do.

7    BY MR. GEISE:

8         Q.    Professor Gruber, I want to

9    turn to Paragraph 11 of your report and

10   specifically ask you.  You write, "Two

11   economic questions arise in connection

12   with these allegations.  First, is it

13   possible to evaluate from an economic

14   perspective the extent to which the

15   actions of the defendants contributed to

16   this epidemic?  Second, is it possible to

17   estimate the damages to the bellwether

18   government entities resulting from the

19   defendants' actions using principles of

20   applied economics?"

21             Do you see that?

22        A.    Yes, I do.

23        Q.    In this paragraph and

24   throughout your expert report, you use

1    the term "defendants."  Can you define

2    how you use that term?

3            A.    I use that term in my

4    understanding to refer to the set of

5    entities that are being -- that are

6    defendants in this litigation.

7            Q.    Can you identify the set of

8    entities that are being sued in this

9    litigation?

10           A.    Not completely, no.

11           Q.    How many of the entities

12   that have been sued in this litigation

13   can you name?

14           A.    It depends how long you want

15   to give me.  But I can certainly name a

16   number of them.

17           Q.    Now, your recitation of the

18   two economic questions that arose, that

19   you address in your report, it does not

20   include an evaluation to the extent which

21   the actions of a specific entity who has

22   been sued in this case contribute to what

23   you call an epidemic, correct?

24                 MR. KO:  Object to the form.

1          THE WITNESS:  That's

2     correct.

3  BY MR. GEISE:

4          Q.    Similarly, your recitation

5  doesn't include an estimate of damages

6  that result from a specific entity's

7  actions, correct?

8          A.    The report includes the

9  damages that result from the collective

10  set of actions of the defendants.

11         Q.    And when you speak of the

12  collective set of actions, you have not

13  done anything to parcel out damages

14  attributable to a specific defendant,

15  correct?

16         A.    Correct.

17         Q.    Neither as a contributor to

18  the epidemic as you call it, correct?

19         MR. KO:  Object to the form.

20         THE WITNESS:  Correct.

21  BY MR. GEISE:

22         Q.    And -- and not as to the

23  question of damages, correct?

24         A.    Correct.

1   Q.    Is it accurate to say that

2   you do not intend to offer an opinion in

3   this case regarding a specific defendant?

4   A.    Yes, that's accurate.

5   Q.    Turning to Page 8 of your

6   report in Paragraph 15.  You set out what

7   you've been asked by counsel for the

8   bellwether plaintiffs to specifically

9   address.

10   Do you see that?

11   A.    Yes, I do.

12   Q.    First it says you've been

13   asked to provide, from the perspective of

14   accepted principles of economics, an

15   overview of the nation's opioid crisis.

16   Do you see that?

17   A.    Yes, I do.

18   Q.    Does that reflect your

19   understanding of that part of your

20   assignment?

21   A.    Yes, it does.

22   Q.    In connection with that

23   section of your report are you providing

24   those opinions to a reasonable degree of

1    certainty in the field of economics?

2        A.    That -- yes.  I'm an

3    economist.  So that's what I'm doing.

4        Q.    Look at the second part of

5    Paragraph 15.  You write, "Second, I have

6    been asked whether, to a reasonable

7    degree of certainty in the field of

8    economics, the defendants' shipments of

9    prescription opioids contributed in whole

10    or part to the growth in the misuse of

11    opioids and the increases in licit and

12    illicit opioid-related mortality over the

13    past 20 years and to explain the bases

14    for my opinion."

15            Do you see that?

16        A.    Yes.

17        Q.    And does that accurately

18    reflect your understanding of that part

19    of your assignment?

20        A.    Yes, it does.

21        Q.    Professor Gruber, was

22    your -- were you requested to form an

23    opinion regarding shipments to Cuyahoga

24    County and Summit County in particular?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I don't quite understand the

2  question.

3      Q.    Sure.  So you indicate that

4  you were asked whether shipments of

5  prescription opioids contributed to the

6  growth and the misuse of opioids and

7  increases in licit and illicit

8  opioid-related mortality, right?

9      A.    Right.

10      Q.    Were you asked to focus

11  specifically on Cuyahoga and Summit

12  County for purposes of that question?

13      A.    I was asked to focus

14  specifically on them in terms of

15  documenting the, as you'll see in the

16  report, the underlying change in both

17  shipments in harms in Cuyahoga and Summit

18  as well as nationally.

19      Q.    When you say as well as

20  nationally, are Cuyahoga and Summit part

21  of the national picture?

22      A.    Yes.

23      Q.    And as part of your

24  analysis, did you look at the national

1    picture and then apply that to Cuyahoga

2    and Summit?

3              MR. KO:  Object to the form.

4              THE WITNESS:  I looked at

5         the national picture and

6         separately the Cuyahoga and Summit

7         situation.

8    BY MR. GEISE:

9         Q.    Have you made any effort to

10   determine the specific shipments of

11   prescription opioids from any particular

12   defendant in this case?

13             MR. KO:  Object to the form.

14             THE WITNESS:  No, I have

15        not.

16   BY MR. GEISE:

17        Q.    Have you made any effort to

18   determine a specific defendants'

19   shipments of opioids to Cuyahoga or

20   Summit County?

21             MR. KO:  Object to the form.

22             THE WITNESS:  No, I have

23        not.

24   BY MR. GEISE:

1      Q.    As you mentioned before,

2    does your analysis only consider the

3    impact of aggregate opioid shipments?

4                MR. KO:  Objection.

5                THE WITNESS:  As laid out in

6          the report, we define both

7          aggregate opioid shipments, and in

8          some places we parse out different

9          types of opioids.  So -- but

10         that's the finest detail we go

11         into.

12   BY MR. GEISE:

13         Q.    You don't go into a detail

14   with respect to a particular defendants'

15   shipment of opioids, correct?

16         A.    Correct.

17         Q.    And if I wanted to ask you

18   today about if you had any opinions about

19   any specific defendant with regard to

20   their shipments, you're not prepared to

21   address that?

22         A.    I'm not, no.

23         Q.    You agree that prescription

24   opioids come in many different forms,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2          A.    Yes.

3          Q.    And you agree that different

4    pharmaceutical manufacturers make

5    different prescription opioids?

6          A.    Yes.

7          Q.    Your analysis did not

8    differentiate between different

9    pharmaceutical manufacturers, correct?

10               MR. KO:  Objection.

11               THE WITNESS:  That's

12         correct.

13    BY MR. GEISE:

14         Q.    And you didn't -- did you do

15    anything to limit your analysis to

16    shipments by pharmaceutical manufacturers

17    who are defendants in this lawsuit?

18         A.    I'll just need one minute to

19    check the appendix.

20               No, I didn't.

21         Q.    Similarly, did you do

22    anything to limit your analysis to

23    shipments by distributors who are

24    defendants in this lawsuit?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    No, I didn't.

2          Q.    With respect to the entities

3    who are defendants in this lawsuit,

4    you're not saying that each defendant is

5    jointly and severally liable for the

6    damages to the bellwether government

7    entities, are you?

8               MR. KO:  Object to the form.

9               THE WITNESS:  I'm not really

10         speaking to that issue.

11   BY MR. GEISE:

12         Q.    You don't have an opinion on

13   that, correct?

14              MR. KO:  Same objection.

15              THE WITNESS:  I'm an

16         economist.  That's a legal

17         question.

18   BY MR. GEISE:

19         Q.    If I can turn your attention

20   to Paragraph 16 of your report that spans

21   from Page 8 to Page 10.  Look at the

22   first bullet point on Paragraph 16.  You

23   write, "There is a direct causal

24   relationship between defendants'

Highly Confidential - Subject to Further Confidentiality Review

1    shipments of prescription opioids and the

2    misuse and mortality from prescription

3    opioids with geographic areas that

4    received higher volumes of per capita

5    shipments of prescription opioids

6    experiencing significantly higher rates

7    of opioid-related misuse and mortality,

8    including the bellwether jurisdictions."

9              Do you see that?

10        A.    Yes, I do.

11        Q.    As stated in this paragraph,

12   does prescription opioids include

13   prescription opioids that are used both

14   for medical purposes and those that are

15   not used for medical purposes?

16             MR. KO:  Object to the form.

17             THE WITNESS:  This uses data

18        from ARCOS shipments, which I do

19        not believe distinguishes the

20        purpose of the prescription

21        opioid.

22   BY MR. GEISE:

23        Q.    If you look at the next

24   bullet point on the top of Page 9, you

Highly Confidential - Subject to Further Confidentiality Review

1    write, "There is a direct causal

2    relationship between defendants'

3    shipments of prescription opioids and the

4    misuse of and mortality from illicit

5    opioids, including heroin and fentanyl,

6    which accelerated rapidly after 2010."

7              Do you see that?

8         A.    Yes, I do.

9         Q.    When you used the term

10   "illicit opioids" here, are you excluding

11   the nonmedical use of prescription

12   opioids in that definition?

13             MR. KO:  Object to the form.

14             THE WITNESS:  Yes, I am.

15   BY MR. GEISE:

16        Q.    And again, with respect to

17   both of these bullet points in Paragraph

18   16 of your report, you've done nothing to

19   establish a direct causal relationship

20   between a specific defendant's shipment

21   of prescription opioids and the harm that

22   you say follows, correct?

23        A.    That's correct.

24        Q.    Look at the next sentence in

1   that top bullet point on Paragraph 9 of

2   your expert report.  You write, "As has

3   been widely recognized in the economic

4   literature, the growth in the dependence

5   on prescription opioids from the early

6   1990s to 2010, coupled with a variety of

7   factors starting in and around 2010,

8   created an increased demand for illicit

9   opioids, including heroin and later

10  fentanyl.

11          "These factors included the

12  release of an abuse-deterrent formulation

13  of OxyContin, the increase in state level

14  prescription drug monitoring programs,

15  caps on opioid prescribing, and law

16  enforcement investigation and

17  prosecutions against pill mills

18  throughout the country."

19          Do you see that?

20      A.    Yes, I do.

21      Q.    Professor Gruber, is it your

22  opinion that the release of an

23  abuse-deterrent formulation of OxyContin

24  caused an increased demand for illicit

1  opioids, including heroin and fentanyl?

2                    MR. KO:  Object to the form.

3                    THE WITNESS:  Yes, it is.

4  BY MR. GEISE:

5        Q.    Is it your opinion that the

6  increase in state level prescription drug

7  monitoring programs caused an increased

8  demand for illicit opioids including

9  heroin and fentanyl?

10                   MR. KO:  Same objection.

11                   THE WITNESS:  Yes, it is.

12  BY MR. GEISE:

13       Q.    Is it your opinion that caps

14  on opioid prescribing cause an increased

15  demand for illicit opioids, including

16  heroin and fentanyl?

17                   MR. KO:  Same objection.

18                   THE WITNESS:  Yes, it is.

19  BY MR. GEISE:

20       Q.    And is it your opinion that

21  law enforcement investigations and

22  prosecutions caused an increased demand

23  for illicit opioids, including heroin and

24  fentanyl?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. KO:  Same objection.

2          THE WITNESS:  Yes, it is.

3    BY MR. GEISE:

4          Q.     Professor Gruber, have you

5    apportioned how each of those causal

6    factors contributed to illicit opioid

7    use?

8          A.     No, I have not.

9          Q.     And the list that you

10   provide of factors in that second bullet

11   point on paragraph -- in Paragraph 16 of

12   your report, that's not an exhaustive

13   list of factors that contribute to an

14   increased demand for illicit opioids, is

15   it?

16         A.     No.

17         Q.     Other factors could include

18   the ease of accessibility to illicit

19   opioids, correct?

20         MR. KO:  Object to the form.

21         THE WITNESS:  That's

22   correct.

23   BY MR. GEISE:

24         Q.     Internet availability for

1    illicit opioids, correct?

2          A.    Correct.

3          Q.    It could also include the

4    affordability of illicit opioids,

5    correct?

6          A.    That's correct.

7          Q.    On Page 11 of your expert

8    report, in Paragraph 19, you spell out

9    kind of a table of contents or

10   organization to your report, correct?

11         A.    Yes.

12         Q.    I want to ask you about

13   Section 6 where you say, "It establishes

14   that shipments of prescription opioids

15   are also associated with higher crime."

16               Do you see that?

17         A.    Yes, I do.

18         Q.    Now, when we looked at

19   Paragraph 15 of your report where you

20   identified what you were requested to do,

21   I don't believe there was a request there

22   to look at any relationship between

23   shipment of prescription opioids and an

24   association with higher crime; is that

Highly Confidential - Subject to Further Confidentiality Review

1  correct?

2      A.    That's correct.   That

3  sentence doesn't say that.

4           The -- the request was to

5  consider more broadly the growth and

6  misuse in opioids and increase in harms

7  caused by opioids.  I refer to mortality

8  there, but we also use crimes and other

9  evidence of the harms that were caused by

10 opioids.

11     Q.    Were you asked to look at

12 crime for part of your research in this

13 case or was that something you decided to

14 do?

15     A.    I was asked to.

16     Q.    As you mentioned earlier,

17 you discussed the preparation of your

18 report with a number of other experts,

19 correct?

20     A.    Yes, that's correct.

21     Q.    And in your report, you

22 refer to a number of other expert

23 reports, correct?

24     A.    Yes, I do.

1    Q.    If I could ask you to look

2  at Page 7, Paragraph 13 of your report.

3  That paragraph refers to --

4            MR. KO:  Give him a second

5       to get there.

6            MR. GEISE:  Oh sure, I'm

7       sorry.

8  BY MR. GEISE:

9    Q.    Are you there, Professor

10 Gruber?

11   A.    Yes, I am.

12   Q.    In paragraph 13 you indicate

13 that "other economists will also be

14 submitting expert reports addressing" --

15 "addressing certain aspects of the

16 questions that you were answering,"

17 correct?

18   A.    Yes.

19   Q.    And you identify in that

20 paragraph Professor Meredith Rosenthal,

21 Professor David Cutler, and Professor

22 Thomas McGuire, correct?

23   A.    Correct.

24   Q.    Now, earlier in the

Highly Confidential - Subject to Further Confidentiality Review

1    deposition when you identified experts

2    that you talked to during the preparation

3    of your report, you identified Professors

4    Cutler and McGuire, but you did not

5    identify Professor Rosenthal?

6         A.    That's correct.

7         Q.    Did you have any calls or

8    meetings with Professor Rosenthal during

9    the preparation of your report?

10        A.    During the preparation of

11   this written report, about this report, I

12   did not.  I had a number of calls and

13   meetings with Professor Rosenthal

14   throughout the process of this litigation

15   that led to -- that led to the

16   construction of the set of reports

17   including her own.  But in terms of the

18   construction of this report, I did not --

19   I don't recall receiving specific

20   comments or assistance from her on this

21   report.

22        Q.    Earlier you testified that

23   for a series of time you and Professor

24   Cutler and Professor McGuire discussed

1    the overview of what -- the issues that

2    you would cover.  Do you recall that

3    testimony?

4              MR. KO:  Object to the form.

5              THE WITNESS:  Yes, I do.

6    BY MR. GEISE:

7         Q.    Was Professor Rosenthal also

8    involved in some of those initial

9    discussions?

10        A.    Yes, she was.

11        Q.    Did you have in-person

12   meetings where Professor Rosenthal joined

13   you and Professors Cutler and McGuire?

14        A.    Yes.

15        Q.    Do you recall how many?

16        A.    No.

17        Q.    Now, in Paragraph 13 you

18   broadly identify the subject matter of

19   the other experts' individual reports, is

20   that fair?

21        A.    That's what I try to do,

22   yes.

23        Q.    Are you deferring to each of

24   those experts as to the subject matter in

1    his or her report?

2              MR. KO:  Object to the form.

3              THE WITNESS:  I guess I

4        don't understand what that means.

5    BY MR. GEISE:

6         Q.    Sure.  Where you -- you have

7    their reports, you know what they address

8    in their reports, do you intend to

9    address the same topics that they address

10   in their reports or are you deferring to

11   them on that point?

12             MR. KO:  Same objection.

13             THE WITNESS:  They are --

14        there is a significant overlap in

15        the topics I address with

16        Professor Cutler's report,

17        although the reports are distinct

18        and do separate things.

19   BY MR. GEISE:

20        Q.    Did you do anything on your

21   own to validate the opinions offered in

22   Professor Rosenthal's report?

23             MR. KO:  Object to the form.

24             THE WITNESS:  I don't

1    understand the question.

2  BY MR. GEISE:

3        Q.    You are familiar with the

4  opinions that Professor Rosenthal draws

5  in her report?

6        A.    Yes, I am.

7        Q.    Did you do anything to check

8  her opinions?

9             MR. KO:  Object to the form.

10            THE WITNESS:  I read at

11       least one draft of her report.

12  BY MR. GEISE:

13       Q.    Professor Rosenthal has a

14  number of mathematical computations in

15  her report, correct?

16       A.    Yes.

17       Q.    Did you do anything to check

18  her math on those computations?

19       A.    While Professor Rosenthal --

20  I think it's important to distinguish the

21  report from the long process that led to

22  the report.

23       Q.    Sure.

24       A.    During that long process we

1    discussed at length the methodologies she

2    was using in her report.  In the draft of

3    the report, I didn't comment on the

4    specific mathematical underlying aspects

5    of her report.

6         Q.    Is that true with regard to

7    Professor Cutler's report and Professor

8    McGuire's report as well?

9         A.    No.  For Professor Cutler

10   and McGuire's report, I had more detailed

11   interactions where I commented on

12   specific aspects of their analysis.

13        Q.    Do you recall what detailed

14   comments you had with regard to Professor

15   Cutler's analysis?

16             MR. KO:  And again, same

17             instruction I gave previously.  To

18             the extent that these comments

19             happened in the context of

20             communications involving counsel,

21             I'd instruct you not to disclose

22             the substance or the content of

23             those communications.

24             THE WITNESS:  Broadly we

1  discussed the whole set of issues

2  around the empirical strategy used

3  in their reports.  Both, you know,

4  over the -- over the long run sort

5  of getting to their reports, and

6  specifically what they do in their

7  reports.

8  BY MR. GEISE:

9       Q.    Can you recall anything

10  specifically that you discussed?

11            MR. KO:  Same instructions

12       as previously given a moment ago.

13            THE WITNESS:  I guess I

14       don't understand the question.

15  BY MR. GEISE:

16       Q.    Well, you used the term that

17  you discussed the whole set of issues

18  around the empirical strategy used in

19  their reports.  What did you discuss

20  about the empirical strategy used in

21  Professor Cutler's report?

22            MR. KO:  Same instruction.

23            THE WITNESS:  So we

24       discussed, you know, everything

Highly Confidential - Subject to Further Confidentiality Review

1          ranging from the functional forms

2          that he used in his regressions to

3          what variables would be included,

4          things of that nature.

5     BY MR. GEISE:

6          Q.    Did you discuss with

7     professor Cutler the reliance on national

8     data as opposed to data specific to

9     Summit and Cuyahoga County?

10              MR. KO:  Object to the form.

11              THE WITNESS:  I believe I

12         did, but I don't recall those

13         conversations.

14    BY MR. GEISE:

15         Q.    Did you have similar

16    discussions with Professor McGuire around

17    the empirical strategy used in his

18    report?

19         A.    Yes, I did.

20         Q.    Do you recall anything

21    specific about the discussion about the

22    empirical strategy in Professor McGuire's

23    report?

24              MR. KO:  Same instruction as

1    I gave previously.

2         THE WITNESS:  Once again, we

3    had a lot of conversations about

4    many aspects of his report, you

5    know, ranging from, you know, how

6    to think about which costs to

7    include for each department, to

8    other topics of that nature.

9    BY MR. GEISE:

10        Q.    And as part of these

11   discussions with Professor Cutler and

12   Professor McGuire, did you ever prepare

13   any written comments to them or

14   suggestions with regard to the empirical

15   strategy that they used?

16        A.    Yes.

17        Q.    And did you share that with

18   Professor Cutler and Professor McGuire?

19        A.    I was shared the comments

20   with attorneys.  And I believe attorneys

21   then shared them with the other experts.

22        Q.    Do you recall if Professor

23   Cutler made any changes to his empirical

24   strategy after receiving comments from

1    you?

2              MR. KO:  Same instruction as

3         previously given.

4              THE WITNESS:  I don't recall

5         specific instances.

6    BY MR. GEISE:

7         Q.    Do you recall if Professor

8    McGuire made any changes to his empirical

9    strategy after receiving comments from

10   you?

11             MR. KO:  Same instruction.

12             THE WITNESS:  I don't recall

13        specific instances.

14   BY MR. GEISE:

15        Q.    Now, on Page 7 of your

16   report in Footnote 15, you state, "I

17   understand a separate report will present

18   an estimate of the share of shipments

19   that distributor defendants could

20   reasonably have been expected to identify

21   as excessive and/or potentially

22   suspicious, but that this report does not

23   need to be disclosed until April 15,

24   2019."

Highly Confidential - Subject to Further Confidentiality Review

1            Do you see that?

2       A.    Yes, I do.

3       Q.    Do you know if that report

4  has now been disclosed?

5       A.    No, I don't.

6       Q.    Do you know who was

7  preparing that report?

8       A.    No, I don't.

9       Q.    Do you know if it was any

10  particular expert?

11       A.    No, I don't.

12       Q.    And if you haven't seen that

13  report and you don't know who prepared

14  it, is it accurate to say that you don't

15  know what that estimate of the share of

16  shipments that a distributor defendant

17  could reasonably have been expected to

18  identify as excessive and/or potentially

19  suspicious was?

20            MR. KO:  Object to the form.

21            THE WITNESS:  That's a long

22       question.  I don't --

23  BY MR. GEISE:

24       Q.    It is.  I can try -- let me

Highly Confidential - Subject to Further Confidentiality Review

1  try to break it up.

2          You don't know if such a

3  report exists, correct?

4       A.    Correct.

5       Q.    So you don't know what's in

6  that report, correct?

7       A.    Correct.

8       Q.    So you don't know what that

9  report would say about an estimate of the

10  share of shipments that distributor

11  defendants could reasonably have been

12  expected to identify as excessive and/or

13  potentially suspicious, correct?

14          MR. KO:  Object to the form.

15          THE WITNESS:  Correct.

16  BY MR. GEISE:

17       Q.    Professor Gruber, what was

18  your purpose of including this footnote

19  in your report if you don't know who

20  wrote the report and you haven't seen the

21  report?

22       A.    The purpose was that I was

23  documenting the other expert reports to

24  be included.  And so for completeness,

1  since I was told that this report would

2  be included, I thought I'd include the

3  footnote to note it.

4          Q.    Did you have any discussion

5  with Professors Cutler, McGuire or

6  Rosenthal with regard to that forthcoming

7  separate report?

8              MR. KO:  On this question.

9          The same instruction that I gave

10         you before.  To the extent that

11         these communications involve

12         counsel, I ask that you not --

13         instruct you not to disclose the

14         contents of such communications.

15             THE WITNESS:  We discussed

16         the general issue of how one would

17         think about this problem.  So we

18         had sort of a broad conversation

19         about that.  But we weren't -- it

20         wasn't specific to a given report.

21 BY MR. GEISE:

22         Q.    Professor Gruber, is it

23 correct that you do not intend to offer

24 an opinion on the allocation of

1    responsibility for shipment volumes

2    between any of the defendants in this

3    case?

4              MR. KO:  Object to the form.

5              THE WITNESS:  That's

6         correct.

7    BY MR. GEISE:

8         Q.    You don't have the

9    underlying data or information to even

10   form that opinion, do you?

11             MR. KO:  Object to the form.

12             THE WITNESS:  I haven't

13        looked at it.  I don't -- you

14        know, no, I have not used any data

15        of that nature.

16   BY MR. GEISE:

17        Q.    Looking at Paragraph 14 of

18   your report, you write -- let's go down,

19   I think, to the second sentence.

20   "Analyses presented below established

21   that per capita shipments of prescription

22   opioids varied widely across geographic

23   areas that are otherwise comparable in

24   terms of population demographics.  This

1   pattern indicates that many such

2   shipments of prescription opioids were

3   potentially suspicious and that such

4   shipments were not identified and

5   prevented by CSA registrants.

6          "This in turn suggest that a

7   potentially substantial share of harms

8   associated with shipments of opioids due

9   to manufacturers' misconduct could have

10   been avoided if CSA registrants,

11   including distributors, had met their

12   obligation to monitor and prevent

13   excessive shipments."

14          Do you see that?

15     A.   Yes, I do.

16     Q.   If a potentially substantial

17   share of harms could have been avoided,

18   do you agree that some percentage of

19   harms could not have been avoided?

20         MR. KO:  Object to the form.

21         THE WITNESS:  I don't -- I

22      don't know.  Substantial share

23      could include 100 percent, so I

24      don't know for sure.  I don't try

Highly Confidential - Subject to Further Confidentiality Review

1         to apportion that.

2    BY MR. GEISE:

3         Q.    Okay.  In addition to not

4    trying to apportion it, do you have an

5    opinion whether it's 100 percent or a

6    number somewhat below that?

7         A.    I don't have an opinion on

8    that.

9         Q.    Professor Gruber, do you

10   intend to offer an opinion as to a

11   specific share of such shipments?

12        A.    No, I do not.

13        Q.    And in particular, you don't

14   offer any opinion with regard to a

15   specific defendant in this case and their

16   obligation to monitor and prevent

17   excessive shipments, correct?

18             MR. KO:  Object to the form.

19             THE WITNESS:  Correct.

20   BY MR. GEISE:

21        Q.    I could go through a list of

22   all of the defendants in the case, and

23   your answer would be the same, correct?

24        A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    When you write that harms

2    could have been avoided if CSA

3    registrants had met their obligation to

4    monitor and prevent excessive shipments,

5    do you include all CSA registrants?

6    A.    I am speaking generally

7    about CSA registrants.  I don't know

8    that -- I don't use the sentence to claim

9    that I know for sure that every single

10   CSA registrant -- how every single CSA

11   registrant behaved.

12   Q.    Do you know how any CSA

13   registrant behaved with regard to

14   identifying and preventing the shipment

15   of potentially suspicious shipments?

16   A.    Not individually, no.

17   Q.    Do you include physicians or

18   prescribers with DEA registrations within

19   the definition of CSA registrants?

20   A.    I'm not sure if they are

21   included in the definition.  This

22   sentence as I wrote it was meant to refer

23   primarily to distributors.  I was writing

24   it to include other registrants that

1    might potentially be involved, but my

2    focus in this sentence was on

3    distributors.

4         Q.    You agree that physicians

5    and prescribers with DEA registrations to

6    write prescriptions for controlled

7    substances also qualify as CSA

8    registrants, correct?

9         A.    I don't know for sure.

10        Q.    Do you agree that a

11   potentially substantial share of harms

12   associated with shipments of opioids

13   could have been avoided if prescribers

14   met their obligations with respect to

15   writing prescriptions of controlled

16   substances?

17             MR. KO:  Object -- object to

18        the form.

19             THE WITNESS:  That's not

20        really something I've studied.

21   BY MR. GEISE:

22        Q.    So you don't know how the

23   potential share of harms attributable to

24   a prescriber compares to a potentially

Highly Confidential - Subject to Further Confidentiality Review

1  substantial share of harms associated

2  with distributors, correct?

3           MR. KO:  Same -- same

4      objection.  And objection to

5      scope.

6           THE WITNESS:  No, I don't.

7  BY MR. GEISE:

8      Q.    Did you conduct any analysis

9  to determine the share of harms that

10  could have been avoided based on the

11  actions of prescribers?

12           MR. KO:  Same two prior

13      objections as previously stated.

14           THE WITNESS:  I did not, no.

15  BY MR. GEISE:

16      Q.    Professor Gruber, are you

17  aware that the Drug Enforcement

18  Administration and other law enforcement

19  agencies are charged with enforcing laws

20  to prevent the distribution and use of

21  illicit drugs in the United States?

22      A.    Yes, I am.

23      Q.    Are you aware that the DEA

24  has a mission to enforce the controlled

Highly Confidential - Subject to Further Confidentiality Review

1    substance laws and regulations in the

2    United States?

3          A.    Yes, I am.

4          Q.    And you agree that mission

5    includes reducing the availability of

6    illicit controlled substances on the

7    domestic and international market,

8    correct?

9          A.    I don't know specifically if

10   that's in the mission statement, but

11   certainly that would seem to be part of

12   the scope of what they should be doing.

13         Q.    Part of the scope of what

14   the DEA should be doing also involves

15   enforcing the provisions of the

16   Controlled Substances Act as they pertain

17   to the manufacture, distribution, and

18   dispensing of legally produced controlled

19   substances, correct?

20         A.    I do not know.

21         Q.    One of the harms that you

22   identify in your report associated with

23   the shipment of prescription opioids is

24   mortality from illicit drugs, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    Do you agree that a

3  potentially substantial share of harms

4  associated with shipment of opioids could

5  have been avoided if the DEA reduced the

6  availability of illicit controlled

7  substances on the domestic market?

8          MR. KO:  Object to the form.

9    Objection as to scope.

10         THE WITNESS:  I -- I

11   don't -- no, I don't necessarily

12   agree.

13 BY MR. GEISE:

14   Q.    So in your report where you

15 say that a potentially substantial share

16 of harms associated with shipments of

17 opioids due to manufacturers' misconduct

18 could have been avoided if CSA

19 registrants, including distributors, had

20 met their obligation to monitor and

21 prevent excessive shipments.  And with

22 respect to that, I think you told me you

23 don't have a specific percentage in mind,

24 correct?

1                MR. KO:  Are -- are you --

2         where are we at?

3                MR. GEISE:  Paragraph 14 of

4         his report.

5                MR. KO:  Okay.  Sorry.

6                THE WITNESS:  Yes, I don't

7         have a specific percentage in

8         mind.

9    BY MR. GEISE:

10         Q.    And as part of your

11    analysis, did you do anything to

12    determine a particular percentage of harm

13    that could have been avoided depending on

14    the actions or inactions of the DEA?

15                MR. KO:  Objection.

16                THE WITNESS:  No, I did not.

17    BY MR. GEISE:

18         Q.    And you also did not perform

19    any analysis to see what percentage of

20    harm could have been avoided based on

21    actions or inactions of prescribers,

22    correct?

23                MR. KO:  Same objections.

24                THE WITNESS:  That's

1      correct.

2   BY MR. GEISE:

3      Q.    Professor Gruber, in

4   Paragraph 20 of your report, you start

5   the paragraph by saying, "Opioids have

6   long been used to treat pain in the U.S.

7   and around the world, as well as having

8   long been abused leading to addiction and

9   death."

10          Do you see that?

11     A.    Yes, I do.

12     Q.    And according to the

13  analysis in Paragraph 20 of your report,

14  you indicate that that knowledge goes

15  back into the 19th century, correct?

16     A.    That's correct.

17     Q.    The knowledge that opioids

18  have long been abused leading to

19  addiction and death has been known to

20  doctors for decades and centuries,

21  correct?

22          MR. KO:  Object to the form.

23          THE WITNESS:  I -- that

24      sentence has two parts.  It refers

1         to the fact they've long been used

2         to treat pain, as well as long

3         being abused.

4              I guess I don't know for

5         sure how -- how -- I know the

6         treatment of pain by opioids

7         definitely goes back centuries.

8         The knowledge that it can be

9         abused, I'm not sure how far that

10        goes back.

11   BY MR. GEISE:

12        Q.    Well, you agree that the

13   addictive potential for opioids is long

14   established in the medical literature,

15   correct?

16        A.    Correct.

17        Q.    Okay.  And the knowledge of

18   that goes back a number of decades,

19   correct?

20        A.    Certainly a number of

21   decades.

22        Q.    And that would be knowledge

23   available to physicians?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    The FDA?

2    A.    Sure.

3    Q.    The DEA?

4    A.    Yes.

5    Q.    The State of Ohio?

6    A.    Yes.

7    Q.    And the counties of Cuyahoga

8  and Summit in Ohio, correct?

9    A.    That's correct.

10   Q.    Professor Gruber, are you

11  familiar with the concept of diversion

12  with regard to controlled substances?

13   A.    Yes.

14   Q.    Do you have a definition

15  that you use of diversion?

16   A.    I might.  Somewhere in the

17  report I could spend a few minutes

18  looking through, or I could tell you --

19  you know, but I certainly have a view of

20  what it is.  I'm not sure where, if I

21  specifically defined it in the report.

22   Q.    Are you aware of what the

23  National Academy's of Science definition

24  of the term "diversion" is?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    I'm sure I read it at some

2  point, but I don't recall what it is.

3     Q.    Does it -- and I can show it

4  to you.  Does it sound familiar that the

5  definition used by NAS is diverted before

6  being dispensed, i.e., diverted from

7  lawful channels of commercial

8  distribution such as wholesalers and

9  pharmacies?

10          MR. KO:  Objection.  If you

11     want to show them to him, I mean.

12     I thought you said this wasn't a

13     memory test.

14          MR. GEISE:  Yeah, we can.

15  BY MR. GEISE:

16     Q.    Have you heard of that

17  definition before, Professor Gruber?

18     A.    I don't recall honestly.

19     Q.    Okay.

20          (Document marked for

21     identification as Exhibit

22     Gruber-2.)

23  BY MR. GEISE:

24     Q.    Professor Gruber, I'm

Highly Confidential - Subject to Further Confidentiality Review

1    handing you what's marked as Exhibit 2 to

2    your deposition.  And this is entitled on

3    the front, "Pain Management and the

4    Opioid Epidemic:  Balancing Societal and

5    Individual Benefits and Risk of

6    Prescription Opioid Use."

7              Do you see that?

8         A.    Yes, I do.

9         Q.    And are you familiar with

10   this document?

11        A.    Yes, I am.

12        Q.    If I can ask you to turn to

13   Page 226 of Exhibit 2.

14              MR. KO:  And just so the

15         record is clear, it appears that

16         Exhibit 2 is just portions of this

17         study.

18              MR. GEISE:  You're correct,

19         Counsel.

20   BY MR. GEISE:

21        Q.    It's just segments of the

22   report.  It's not the entire publication.

23        A.    Okay.

24        Q.    If you look at Page 226, do

1    you see there's a section entitled

2    "Summary and Recommendation"?

3         A.    Yes.

4         Q.    And if you look, beginning

5    at the second sentence in that paragraph

6    it reads, "The products they supply

7    include opioids prescribed, dispensed,

8    and used by patients as medically

9    intended; those prepared as a

10   prescription, but not used as intended,

11   including opioids dispensed and misused;

12   as well as those that are diverted before

13   being dispensed, i.e., diverted from

14   lawful channels of commercial

15   distribution, such as wholesalers and

16   pharmacies; and those provided by drug

17   trafficking organizations, mostly from

18   international sources."

19              Do you see that?

20        A.    Yes, I do.

21        Q.    Does that refresh your

22   recollection in terms of the definition

23   that the National Academy of Science uses

24   for diversion?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. KO:  Same.  Object to

2     the form.

3          THE WITNESS:  I don't know

4     that they declared a formal

5     definition.  But certainly that's

6     the definition that they seem to

7     use in this report.

8  BY MR. GEISE:

9     Q.    Is that definition that they

10 use in that report one that is commonly

11 used in academic papers that discuss the

12 diversion of controlled substances?

13         MR. KO:  If you know.

14 BY MR. GEISE:

15    Q.    If you know.

16    A.    I guess I don't -- yeah,

17 certainly -- yeah, I don't know for sure.

18    Q.    Using the word "diversion"

19 as it's defined in Exhibit 2 by NAS, are

20 you offering an opinion about whether any

21 of the defendants in this case failed to

22 maintain effective controls against

23 diversion?

24    A.    No, I'm not.

1    Q.    If I can turn your attention

2    to Paragraphs 23 and 24 of your report.

3              In Paragraph 23 and 24 you

4    discuss changes in physicians' approaches

5    to pain management over time and cite to

6    another expert, Dr. Courtright's, report,

7    correct?

8    A.    That's correct.

9    Q.    Did you have meetings with

10   Dr. Courtright while you were preparing

11   your report?

12   A.    No, I did not.

13   Q.    Without asking you if you

14   learned of the contents of

15   Dr. Courtright's report from counsel, did

16   you see any draft of Dr. Courtright's

17   report while you were preparing your

18   report?

19   A.    No, I did not.

20   Q.    Have you ever talked with

21   Dr. Courtright about his report and his

22   opinions?

23   A.    No, I have not.

24   Q.    Do you intend to offer an

Highly Confidential - Subject to Further Confidentiality Review

1    independent opinion on the subject matter

2    in Dr. Courtright's report, being changes

3    in physicians' approaches?

4              MR. KO:  Object to the form.

5              THE WITNESS:  No, I don't.

6    BY MR. GEISE:

7         Q.    If you look at Paragraph 25,

8    you refer to another expert, Matthew

9    Perri.

10             Do you see that?

11        A.    Yes, I do.

12        Q.    Did you have any discussions

13   with Matthew Perri while you were forming

14   your report?

15        A.    No, I did not.

16        Q.    Is your exposure to what his

17   opinions were going to be similar to your

18   exposure to Dr. Courtright's, in that you

19   had a draft of his report or were told

20   about it?

21        A.    I don't understand the

22   question.

23        Q.    It's a terrible question.

24   I'm glad you don't understand it.

Highly Confidential - Subject to Further Confidentiality Review

1              Let me ask you, did you see

2    a draft of Matthew Perri's report while

3    you were preparing your report?

4         A.    No, I didn't.

5         Q.    It was information that was

6    conveyed to you about what his report

7    would cover?

8         A.    Yes.

9         Q.    And do you intend to offer

10   an independent opinion on the subject

11   matter in Perri's report about the

12   marketing of opioids for pain management?

13              MR. KO:  Object to the form.

14              THE WITNESS:  No, I don't.

15   BY MR. GEISE:

16        Q.    If you look at Paragraph 26

17   of your report, in it you discuss changes

18   in medical policies to encourage more

19   active pain management, and specifically

20   you mentioned the Veterans Administration

21   mandate to assess pain as the fifth vital

22   sign.

23              Do you see that?

24        A.    Yes.

1      MR. KO:  There is a lot more

2      to that paragraph.

3  BY MR. GEISE:

4      Q.    There is a lot more to it.

5  Do you agree that it's included in the

6  paragraph?

7      A.    Yes, I do.

8      Q.    In the last sentence of

9  Paragraph 26, you write, "This followed

10  the Veterans Administration's

11  implementation of a mandate to assess

12  pain as the fifth vital sign in 2000,

13  including the use of 0 to 10-point

14  numerical rating scale."

15      Do you see that?

16      A.    Yes, I do.

17      Q.    And we talked in Paragraph

18  20 and 22 of your report about the length

19  of time that the addictive potential for

20  opioids has been established in the

21  medical literature and the length of time

22  that opioids have been used to treat

23  pain.  Do you recall that?

24      A.    Yes, I do.

1    Q.   Okay.   The Veterans

2  Administration implemented their mandate

3  in 2000 with knowledge that opioids had

4  long been used to treat pain and had long

5  been abused, leading to addiction and

6  death, correct?

7           MR. KO:  Object to the form.

8           THE WITNESS:  I don't know

9      what knowledge they had.

10           MR. GEISE:  We've been going

11      a little over an hour.  Why don't

12      we take a quick break.

13           THE WITNESS:  Yeah, sure.

14           THE VIDEOGRAPHER:  The time

15      is 11:16 a.m.  We are off the

16      record.

17           (Short break.)

18           THE VIDEOGRAPHER:  The time

19      is 11:31 a.m., and we're on the

20      record.

21           (Document marked for

22      identification as Exhibit

23      Gruber-3.)

24  BY MR. GEISE:

1          Q.     Professor Gruber, I'm

2     handing you an excerpt from the book

3     Public Finance and Public Policy that you

4     might recognize since you wrote it.

5               Do you see that?

6          A.     Yes, I do.

7          Q.     And this is not the entire

8     book.  This is just an excerpt.  I want

9     to ask you about some specific passages

10    in your book.  First, if I can turn your

11    attention to Page 66.

12               MR. KO:  This is Exhibit 3?

13               MR. GEISE:  It is Exhibit 3.

14        Yes.

15               THE WITNESS:  Okay.

16    BY MR. GEISE:

17         Q.     At the top of Page 66, you

18    write, "In this chapter, we review these

19    empirical methods and encounter the

20    fundamental issue faced by those doing

21    empirical work in economics,

22    disentangling causality from

23    correlation."

24               Do you see that?

1   A.   Yes, I do.

2   Q.   And is it your opinion that

3   this is a fundamental issue faced by

4   those doing empirical work in economics?

5   A.   Yes, it is.

6   Q.   That paragraph continues,

7   "We say that two economic variables are

8   correlated if they move together, but

9   this relationship is causal only if one

10  of the variables causes the movement in

11  the other."

12        Do you see that?

13  A.   Yes, I do.

14  Q.   You continue, "If instead

15  there is a third factor that causes both

16  to move together, the correlation is not

17  causal."

18        Do you see that?

19  A.   Yes, I do.

20  Q.   Do you agree that there is a

21  difference between correlation and

22  causation?

23  A.   Yes, I do.  That's what we

24  just covered.

1    Q.    You agree that correlation

2    does not equal causation, correct?

3    A.    That's -- once again, that's

4    what we just -- yeah, that's what's in

5    the paragraph.

6    Q.    And next to the paragraph in

7    the margin you have two highlighted

8    terms.  First you have "correlated" and

9    you write, "Two economic values are

10   correlated if they move together."

11   And causal, "Two economic

12   variables are causally related if the

13   movement of one causes movement of the

14   other."

15   Do you see that?

16   A.    Yes, I do.

17   Q.    And that basically repeats

18   what you have in the substance of the

19   paragraph, correct?

20   A.    That's correct.

21   Q.    And you agree that the

22   distinction between correlation and

23   causality is an important distinction,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, I do.

2    Q.    In fact, that's the title of

3  Section 3.1 of your book, "The important

4  distinction between correlation and

5  causality," right?

6    A.    Yes.

7    Q.    I want to also draw your

8  attention to a cartoon that is included

9  on Page 66 of your book in the lower

10  left-hand corner.

11         Do you see that?

12    A.    Yes, I do.

13    Q.    Professor Gruber, did you

14  select this cartoon to be included in

15  your book?

16    A.    Yes, I did.

17    Q.    And the cartoon depicts a

18  man sitting at a desk and another man

19  standing next to the desk, and the

20  caption is, "That'S the gist of what I

21  want to say, now get me some statistics

22  to base it on."

23         Do you see that?

24    A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Why did you include this

2    cartoon in your book?

3    A.    I'm trying to -- in my

4    textbook, I'm trying to find ways to get

5    students to understand and remember

6    important empirical concepts.  The

7    cartoons are not to be definitional or

8    dispositive.  But rather to get them to

9    sort of have some graphical associations

10   with thinking about the important issues

11   in the book.

12   Q.    What association do you want

13   the students to take away from this

14   particular cartoon?

15   A.    From this cartoon I want

16   them to take away the distinction that

17   just having data about something does not

18   imply causation.

19   Q.    And similarly, correlation

20   does not equal causation, correct?

21        MR. KO:  Objection.  Asked

22        and answered.

23        THE WITNESS:  That's

24        correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. GEISE:
 2         Q.    I want to direct your
 3    attention to the next page of your book.
 4    You see there's a heading, "The Problem"?
 5         A.    Yes, I do.
 6         Q.    You write in the first
 7    sentence, "In all of these examples, the
 8    analysis suffered from a common problem:
 9    The attempt to interpret a correlation as
10    a causal relationship without sufficient
11    thought to the underlying process
12    generating the data."
13              Do you see that?
14         A.    Yes, I do.
15         Q.    And do you agree that
16    correlation should not be interpreted as
17    a causal relationship without analysis of
18    the underlying process generating the
19    data?
20         A.    Yes, I do.
21         Q.    If you look at the last
22    sentence of that paragraph on Page 67,
23    you write, "Once the data are available
24    on any two measures, it is easy to see
```

Highly Confidential - Subject to Further Confidentiality Review

1   whether or not they move together, a

2   characteristic we call being correlated."

3              Do you see that?

4        A.    Yes, I do.

5        Q.    You continue, "What is

6   harder to assess is whether the movements

7   in one measure are causing the movements

8   in the other."

9              Do you see that?

10       A.    Yes, I do.

11       Q.    And then you continue, "For

12  any correlation between two variables, A

13  and B, there are three possible

14  explanations, one or more of which could

15  result in the correlation:  A causes B, B

16  causes A, some third factor causes both."

17             Do you agree with that?

18       A.    Yes, that's what I wrote.

19       Q.    And on the next page you

20  also wrote in the first sentence of the

21  last paragraph, in Section 3.1, "The

22  general problem that empirical economists

23  face in trying to use existing data to

24  assess the causal influence of one factor

Highly Confidential - Subject to Further Confidentiality Review

1   on another, is that one cannot

2   immediately go from correlation to

3   causation.  This is a problem for policy

4   purposes because what matters most is

5   causation.  Policymakers typically want

6   to use the results of empirical studies

7   as a basis for predicting how government

8   interventions will affect behaviors.

9   Knowing that two factors are correlated

10  provides no predictive power; prediction

11  requires understanding the causal links

12  between the factors."

13          Do you see that?

14      A.    Yes, I do.

15      Q.    Now, in the context of your

16  book, are you using the term "factors" to

17  mean the same as a variable?

18      A.    That would be another word

19  for typically what's used in economic

20  studies.

21      Q.    You are familiar with the

22  term "dependent variable"?

23      A.    Yes, I am.

24      Q.    How would you define that

Highly Confidential - Subject to Further Confidentiality Review

1  term?

2      A.    In a statistical analysis,

3  generally you're trying to use certain

4  factors or variables to explain a

5  phenomenon.  The phenomenon you're trying

6  to explain is the dependent variable.

7      Q.    And a dependent variable is

8  one that is explained by other variables.

9  Is that accurate?

10     A.    The -- the dependent

11 variable is dependent on a set of what we

12 typically call independent variables

13 that -- that explain in part or in whole

14 the movement of the dependent variable.

15     Q.    And a definition then of an

16 independent variable would be one that

17 explains in part or in whole the movement

18 of the dependent variable?

19         MR. KO:  Object to the form.

20         THE WITNESS:  The -- the

21         definition of an independent

22         variable would be one that can be

23         hypothesized to explain in part or

24         in whole the movement of the

1     dependent variable.

2  BY MR. GEISE:

3     Q.    You can have more than one

4  independent variable that influences a

5  dependent variable, correct?

6     A.    That's correct.

7     Q.    Are there statistical tools

8  that can help an economist identify

9  whether the correlation between two or

10  more variables represents a causal

11  relationship?

12     A.    Yes, there are.

13     Q.    Is regression analysis one

14  of those statistical tools?

15     A.    Yes, it is.

16     Q.    What is regression analysis?

17     A.    Regression analysis

18  generally forms the statistical

19  methodology of trying to establish a

20  core -- a relationship between a set of

21  independent variables and a dependent

22  variable.

23     Q.    Are regressions then used to

24  quantify the relationship between the

1    variables?

2         A.     Typically in economics, we

3    are using a regression framework to try

4    to quantify relationship between some

5    independent variables.  Sometimes we're

6    using it to simply establish the sign of

7    that relationship.  Sometimes

8    quantification is not as important as

9    establishing the sign.  Sometimes it's to

10   quantify it.

11        Q.     As part of that

12   quantification, do regressions also allow

13   you to identify how close and well

14   determined the relationship between the

15   variables is?

16              MR. KO:  Object to the form.

17              THE WITNESS:  The goal of

18         regression analysis typically is

19         to try to understand the nature of

20         that relationship.  Close is not

21         really the term we'd use.  But

22         it's the -- to try to understand

23         the nature of the relationship

24         between a set of independent

Highly Confidential - Subject to Further Confidentiality Review

 1             variables and dependent variable.

 2    BY MR. GEISE:

 3        Q.    When you say the nature of

 4    the relationship, are you also looking to

 5    determine the strength of that

 6    relationship?

 7             MR. KO:  Object to the form.

 8             THE WITNESS:  That is

 9         generally the goal of a regression

10         analysis, yes.

11    BY MR. GEISE:

12        Q.    Professor Gruber, are you

13    familiar with the term "omitted variable

14    bias"?

15        A.    Yes, I am.

16        Q.    How do you understand that

17    term to be defined?

18        A.    You think of the three

19    separate words.  Omitted means it's --

20    there's a factor that's not included in

21    the model.  The factor -- or variable.

22    Omitted variable is something which is

23    not included in the model.  The bias

24    arises because if that omitted fact

Highly Confidential - Subject to Further Confidentiality Review

1   variable is not included in the model,

2   both is correlated with the dependent

3   variable and correlated with the

4   independent variables that are the focus

5   of your study.  It can cause the

6   relationship that you estimate between

7   the dependent and independent variables,

8   to be not -- to be a bias that is not the

9   best predictor of the effect of that

10  independent variable on the dependent

11  variable.

12          Q.    If an analysis suffers from

13  omitted variable bias either in the

14  correlation with the dependent variable

15  or -- and/or the correlation with the

16  independent variable, does it cause the

17  conclusion from that analysis to be less

18  reliable?

19          MR. KO:  Object to the form.

20          THE WITNESS:  "Reliable" is

21      not a term that I understand.

22  BY MR. GEISE:

23          Q.    Okay.  Does it cause the

24  analysis to be less proven?

1          MR. KO:  Object to the form.

2          THE WITNESS:  Once again, I

3     don't really know how to think

4     about that term.

5 BY MR. GEISE:

6     Q.    Well, do you characterize

7 the strength of a relationship when you

8 perform the regression analysis?

9          MR. KO:  Object to the form.

10          THE WITNESS:  You're using

11     terms that I really wouldn't use

12     in studies.  I don't know how to

13     quite interpret them.

14 BY MR. GEISE:

15     Q.    Well, if the omitted

16 variable causes a bias in the analysis,

17 would that cause the resulting regression

18 coefficients to be biased as well?

19     A.    Let me go back to the

20 definition of omitted variable bias.  If

21 there is a variable that is excluded from

22 the model that's correlated with the

23 dependent variable, and it's also

24 correlated with one or more of the

Highly Confidential - Subject to Further Confidentiality Review

1  independent variables in the model, then

2  that will cause those coefficients of

3  those independent variables to deviate

4  from the best linear predictor, which is

5  what regression is trying to get you.

6        Q.    And that would be a weakness

7  of that analysis, correct?

8             MR. KO:  Object to the form.

9             THE WITNESS:  Once again,

10       you have to say relative to what.

11 BY MR. GEISE:

12       Q.    Well, obviously if you

13 included the variable instead of omitted

14 the variable, it would be a stronger

15 analysis, because you would take account

16 of that variable that has an impact on

17 both the dependent and independent

18 variables?

19             MR. KO:  Object to the form.

20             THE WITNESS:  Not

21       necessarily.

22 BY MR. GEISE:

23       Q.    Okay.  Do you agree that

24 omitted variable bias can cause a

Highly Confidential - Subject to Further Confidentiality Review

1    misattribution of the effect of the

2    variables?

3                 MR. KO:  Object to the form.

4                 THE WITNESS:  Omitted

5          variable bias -- I'd like to stick

6          with the technical definition.

7          Omitted variable bias can, under

8          certain conditions, cause the

9          coefficients that you estimate in

10         other variables to deviate from

11         their best -- their best linear

12         prediction of the dependent

13         variable.

14   BY MR. GEISE:

15         Q.    I want to ask you to look at

16   Page 58 of your report, and in particular

17   Footnote 97.  For purposes of your

18   report, looking at the third line of

19   Footnote 97, you said, "As noted, I used

20   shipments of prescription opioids as a

21   proxy for consumption in an area."

22                Do you see that?

23         A.    Yes, I do.

24         Q.    Is it accurate to say that

1    you did not use actual consumption for

2    your analysis in this case?

3            MR. KO:  Object to the form.

4            THE WITNESS:  That is

5        accurate.

6    BY MR. GEISE:

7        Q.    And you did not use

8    prescriptions for purposes of your

9    analysis in this case?

10           MR. KO:  Object to the form.

11           THE WITNESS:  I, at various

12       points -- I can't -- I can't

13       recall whether prescriptions was

14       used in the analysis at some

15       point.  But in this case I'm

16       talking about using shipments.

17   BY MR. GEISE:

18       Q.    And throughout your report,

19   you use shipments as a proxy for

20   consumption, correct?

21       A.    Yes.

22       Q.    Did you attempt to use

23   consumption for part of your analysis?

24           MR. KO:  Object to the form.

1         THE WITNESS:  I don't recall

2     the entire process.

3   BY MR. GEISE:

4         Q.    Did you want to use

5   consumption for purposes of your

6   analysis?

7         MR. KO:  Same objection.

8         THE WITNESS:  What we would

9     ideally like to use is the best

10     measure of use/misuse of

11     opioids -- use and misuse of

12     opioids in a specific location.

13         Whether we'd want to use

14     consumption would depend on how

15     precisely consumption was measured

16     relative to shipments.

17   BY MR. GEISE:

18         Q.    When you write that you use

19   shipments as a proxy for consumption,

20   that leads me to understand that you

21   wanted to use consumption but weren't

22   able to, and then you used shipments as a

23   proxy; is that incorrect?

24         MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  The -- we

2          would like to use a measure of

3          prescription opioid use in a

4          county.

5              Consumption would mean

6          broadly, meaning prescription

7          opioid use.  That is not measured

8          well in many contexts.  So we use

9          prescriptions -- we use shipments

10         as a proxy.

11    BY MR. GEISE:

12         Q.    If you had it available,

13    would you have preferred to use

14    consumption as opposed to shipments as a

15    proxy for consumption?

16             MR. KO:  Object to the form.

17             THE WITNESS:  It would

18         depend how it was measured, how

19         well it was measured, things like

20         that.

21    BY MR. GEISE:

22         Q.    When you and Professor

23    Cutler and Professor McGuire initially

24    sat down to look at the landscape of

Highly Confidential - Subject to Further Confidentiality Review

1    where your analysis would go, was there a

2    suggestion at the beginning to use

3    consumption numbers for purposes of your

4    analysis?

5            MR. KO:  I'd give you the

6         same instruction that I gave

7         previously.  To the extent that

8         these discussions were with

9         counsel, I'd advise you actually

10        not to answer regarding any of the

11        substance or the contents of those

12        communications.

13            THE WITNESS:  We discussed a

14        large variety of issues about how

15        to set up the analysis.  And

16        certainly one of the things -- the

17        issue was how we'd measure the

18        opioid use.

19    BY MR. GEISE:

20        Q.    Did the three of you discuss

21    whether consumption data was available

22    for purposes of your analysis?

23            MR. KO:  Object to the form.

24        And also the same instruction that

1    I gave previously.

2         THE WITNESS:  I once again

3    would just say broadly we

4    discussed how we were going to

5    measure these things.

6  BY MR. GEISE:

7    Q.    Were you requested for

8  purposes of your analysis to use

9  shipments as a proxy for consumption?

10   A.    No.

11   Q.    I'm going to ask you to turn

12 to Paragraph 72 in your expert report.

13 You see this is the first paragraph in

14 Roman Numeral IV, entitled "Impact of

15 Shipments on Opioid Dependence."

16        Do you see that?

17   A.    Yes, I do.

18   Q.    And directing your attention

19 to the first sentence in that paragraph,

20 you write, "In this section and the next,

21 I show that the increases in shipments of

22 prescription opioids was a direct and

23 substantial cause of the rapid growth in

24 mortality for both licit and illicit

1    opioid-related mortality in the past

2    20 years."

3              Do you see that?

4         A.    Yes, I do.

5         Q.    Now, for purposes of your

6    analysis, are shipments your independent

7    variable?

8         A.    Yes.  Okay.  Well, let me

9    clarify that answer.  Shipments are one

10   of the set of independent variables that

11   we look at.

12        Q.    What other independent

13   variables did you look at for part of

14   your analysis?

15        A.    Well, as you can see later

16   in the report, I looked at measures of

17   demographics in the county, measures of

18   economic activity, and measures of

19   non-opioid mortality.

20        Q.    We'll talk about those other

21   variables in a moment.  But are there any

22   other variables in addition to the

23   demographics, economics activity, and

24   non-opioid mortality that you looked at?

1    A.    I don't think so.

2    Q.    Specifically with respect to

3 your opinion in Paragraph 72 that there

4 is a direct and substantial -- that

5 shipments of prescription opioids was a

6 direct and substantial cause of the rapid

7 growth in mortality for both licit and

8 illicit opioid-related mortality, are you

9 attributing responsibility for increases

10 in shipments to conduct by any of the

11 individual entities in this lawsuit?

12         MR. KO:  Object to the form.

13         THE WITNESS:  I'm

14     attributing this to the

15     consequence of the behavior of a

16     variety of entities who are

17     defendants in this lawsuit.

18 BY MR. GEISE:

19    Q.    But you have not attributed

20 responsibility to a specific defendant in

21 this lawsuit, correct?

22    A.    That is correct.

23         MR. KO:  Object -- object to

24     the form.  Objection, asked and

1     answered.

2   BY MR. GEISE:

3          Q.     Your opinion in Paragraph 72

4   is based on shipments in the aggregate;

5   is that correct?

6                MR. KO:  Objection.  Asked

7          and answered.

8                THE WITNESS:  That is

9          correct.

10               MR. KO:  Actually I

11         apologize to you.  I didn't see

12         that you asked about Paragraph 72.

13  BY MR. GEISE:

14         Q.     Professor Gruber, if a

15  defendant in this case was dismissed,

16  would your opinion set forth in

17  Paragraph 72 change at all?

18         A.     I haven't really focused on

19  that.  I don't know.

20         Q.     So the removal of a

21  defendant or a group of defendants from

22  this case would not impact your opinion

23  in Paragraph 72; is that correct?

24               MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  I didn't say

2          that.  I said I don't know.

3   BY MR. GEISE:

4          Q.    Well, can you tell me if you

5   have an opinion with respect to a

6   specific defendant as it relates to your

7   opinion in Paragraph 72?

8          A.    As we discussed, my opinion

9   in Paragraph 72 is about the relationship

10  between aggregate shipments and outcomes.

11                    I've not formed any

12  opinions -- opinions with respect to a

13  specific defendant.

14         Q.    So, I think we established

15  before that you don't know if there are

16  other entities who contributed to

17  shipments that aren't part of this

18  lawsuit, correct?

19                    MR. KO:  Object to the form.

20                    THE WITNESS:  I -- can

21         you -- can you ask again?  I don't

22         quite understand.

23  BY MR. GEISE:

24         Q.    Sure.  You don't -- you're

Highly Confidential - Subject to Further Confidentiality Review

1    looking at shipments in the aggregate,

2    correct?

3         A.    That's correct.

4         Q.    You do not know if the

5    defendants in this lawsuit are

6    responsible for that full aggregate of

7    shipments, correct?

8         A.    That's correct.

9         Q.    So if a defendant were not

10   in the case, current defendant is

11   dismissed, say, would that change the

12   opinion, or is your opinion still based

13   on the aggregate regardless of the

14   underlying individual defendants?

15             MR. KO:  Object to the form.

16             THE WITNESS:  I just, I

17        haven't really worked that out.  I

18        don't know.

19   BY MR. GEISE:

20        Q.    And if you haven't worked it

21   out, you couldn't answer questions about

22   that today, correct?

23             MR. KO:  Object to the form.

24             THE WITNESS:  That's

1    correct.

2  BY MR. GEISE:

3         Q.    Continuing in Paragraph 72,

4  you write, "The relationship between the

5  rapid rise in prescription opioid

6  shipments and the increase in

7  opioid-related mortality since the mid

8  1990s is readily apparent when comparing

9  differences across geographic areas and

10 opioid shipments received between 1997 to

11 2010 and the growth of opioid dependence

12 and mortality."

13             Do you see that?

14        A.    Yes, I do.

15        Q.    And then you continue by

16 saying your discussion here identifies

17 and illustrates these major trends,

18 right?

19        A.    That's what it says, yes.

20        Q.    Now, according to the layout

21 in your textbook that we looked at

22 earlier, a correlation between increasing

23 opioid shipments and increasing opioid

24 mortality could have three possible

1    explanations, correct?

2              MR. KO:  Object to the form.

3              THE WITNESS:  In general, in

4         theory there are three possible

5         relationships.

6              In this, A could cause B, B

7         could cause A, or there could be a

8         third variable causing both.  It's

9         hard in this context to think

10        about how mortality would be

11        causing increased shipments.  So

12        I'm not sure all three conditions

13        apply in this context.

14   BY MR. GEISE:

15        Q.    So the -- A causing B here

16   would be increases in opioid shipments

17   caused the increase in opioid mortality,

18   correct?

19        A.    That's correct.

20        Q.    B here would be an increase

21   in opioid mortality caused an increase in

22   opioid shipments?

23        A.    That would be with the

24   parallel.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And then the third option is

2   that some other variable caused both the

3   increase in opioid shipments and the

4   increase in opioid mortality, correct?

5        A.    Correct.

6        Q.    Now, in your report, you

7   spend most of your time discussing that

8   first variable, that opioid shipments

9   cause the increase in opioid mortality,

10  correct?

11            MR. KO:  Object to the form.

12            THE WITNESS:  Your question,

13        I -- it's not a first variable.  I

14        spend most of the time discussing

15        that first explanation.

16  BY MR. GEISE:

17        Q.    Okay.  Did you perform any

18  analysis with regard to the second two

19  options?

20            MR. KO:  Object to the form.

21            THE WITNESS:  I did not

22        perform analysis with regards to

23        higher mortality causing higher

24        prescriptions.  That's

Highly Confidential - Subject to Further Confidentiality Review

1    implausible.

2         I did perform a number of

3    analyses and considerations

4    regarding to the third possibility

5    that there's an omitted factor

6    causing both.

7    BY MR. GEISE:

8         Q.    And those factors or

9    variables that you considered are the

10   ones you identified with the

11   demographics, the economic activity, and

12   non-opioid mortality?

13        A.    The -- those are the three

14   things I considered.  They are -- they

15   can represent, not only those three

16   things but they can represent testing

17   larger hypotheses as well.  But those are

18   the three factors I considered.

19        Q.    Let me direct your attention

20   to Paragraph 74 of your report.

21             In the first sentence you

22   write, "The extreme variation in per

23   capita shipments across areas suggest

24   that prescription activity which drives

Highly Confidential - Subject to Further Confidentiality Review

1    shipments to an area bears little

2    relationship to medical need."

3              Do you see that?

4         A.    Yes, I do.

5         Q.    First of all, Professor

6    Gruber, what do you mean by the term

7    "prescription activity"?

8         A.    I mean prescriptions of

9    opioids.

10        Q.    Those would be prescriptions

11   issued by physicians and other

12   prescribers for opioids?

13        A.    What I mean -- I think that

14   was inartfully expressed.  What I mean to

15   say suggests that use of opioids -- yeah,

16   I agree with your question.

17        Q.    And did you conduct any

18   research in this case of prescription

19   activity?

20        A.    No, I did not.

21        Q.    And I take it by that

22   answer, you didn't conduct any research

23   of prescription activity in Cuyahoga

24   County or Summit County?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     No, I did not.

2     Q.     Do you agree that

3  prescription activity can vary across

4  different areas?

5     A.     Certainly.

6     Q.     Do you agree that medical

7  need can vary across different areas?

8          MR. KO:  Object to the form.

9          THE WITNESS:  Yes, I agree

10       medical need can vary across

11       areas.

12  BY MR. GEISE:

13     Q.     Do you have any opinion that

14  any of the individual defendants in this

15  case are responsible for prescription

16  activity in Cuyahoga or Summit County?

17          MR. KO:  Object to the form.

18          THE WITNESS:  That's not

19       something which I have an opinion.

20  BY MR. GEISE:

21     Q.     In Paragraph 74, you

22  indicate that prescription activity,

23  which drives shipments to an area, bears

24  little relationship to medical need.

Highly Confidential - Subject to Further Confidentiality Review

1           Do you see that?

2           A.    I think it's important to

3    read the whole sentence.  What I say,

4    that the data suggests that prescription

5    activity would drive shipments to the

6    area bears little relationship to medical

7    need.

8           Q.    What do you mean by "little

9    relationship"?

10          A.    What I mean is that it is

11   hard to conceive of there being so much

12   variation in the actual need for proper

13   use of opioids that would vary to such a

14   large degree across geographic areas.

15          Q.    Where you say it is hard to

16   conceive, it is the case though that you

17   did not do any research into the

18   prescription activity in these areas,

19   correct?

20               MR. KO:  Object to the form.

21               THE WITNESS:  We used, as

22           you said repeatedly, shipments as

23           a proxy for opioid use in the

24           areas.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. GEISE:

2           Q.    Understand.  In Paragraph 74

3    of your report though, you state that the

4    variation in per capita shipments

5    suggests that prescription activity,

6    which drives shipments to an area, bears

7    little relationship to medical need.

8                Do you see that?

9           A.    That's correct.

10          Q.    And my question is, you did

11   not perform any analysis of that

12   prescription activity, correct?

13          A.    That's correct.

14          Q.    Similarly, you didn't

15   perform any analysis of medical need in

16   any particular area; is that correct?

17                MR. KO:  Object to the form.

18                THE WITNESS:  No, that's not

19         correct.

20   BY MR. GEISE:

21          Q.    It's not?  What did you do

22   to perform an analysis of medical need?

23          A.    As we described in the

24   paper, we said that medical need is

1   primarily proxy by demographic factors.

2   And so for example, as I said here, for

3   example, a county with an older

4   population would be expected to have

5   greater demand for prescription pain

6   medications.  Therefore, we -- I assessed

7   whether variation in demographic factors,

8   which we correlate with medical need, is

9   responsible for this wide variation we

10  see.

11          Q.    Is it your opinion that

12  there is no correlation between medical

13  need and prescription activity?

14          MR. KO:  Object to the form.

15          THE WITNESS:  No.  That's

16      not my opinion.

17  BY MR. GEISE:

18          Q.    So you agree there is a

19  correlation between medical need and

20  prescription activity?

21          MR. KO:  Same objection.

22          THE WITNESS:  I have not

23      conducted a study of the

24      relationship between -- between

Highly Confidential - Subject to Further Confidentiality Review

1    medical need and prescription

2    activity.

3  BY MR. GEISE:

4        Q.    So in paragraph 74 of your

5  report, you say that you have -- you say

6  the prescription activity bears little

7  relationship to medical need.  But you

8  haven't conducted a study of the

9  relationship between medical need and

10  prescription activity; is that correct?

11            MR. KO:  Object to the form.

12            THE WITNESS:  As I've said,

13        we use, as a proxy for medical

14        need, demographic characteristics,

15        and ask how much of this extreme

16        variation in shipments that we see

17        can be explained by this proxy for

18        medical need.  And the answer is

19        very, very little.

20  BY MR. GEISE:

21        Q.    So have you conducted a

22  study of the relationship between medical

23  need and prescription activity?

24            MR. KO:  Objection.  Asked

Highly Confidential - Subject to Further Confidentiality Review

1        and answered.

2             THE WITNESS:  Once again, we

3        have done -- medical need is a

4        term of -- it's not -- that's not

5        a strictly scientific definition

6        of medical need.

7             We've done -- as I said, we

8        have a proxy, which we think

9        should be closely associated with

10       medical need.  And if it is true

11       that medical need drove this

12       extreme variation across counties,

13       then it would be true that when we

14       included this proxy, you would

15       typically expect that to explain a

16       significant part of the variation

17       across counties where in fact it

18       explains almost none.

19   BY MR. GEISE:

20       Q.   Do you agree that medical

21   need in individual cases is determined by

22   physicians and prescribers with input

23   from their patients?

24             MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1        Objection.  Foundation.

2              THE WITNESS:  I'm not in the

3        head of prescription provide --

4        no -- doctors.  I don't know.

5  BY MR. GEISE:

6        Q.    In terms of who makes the

7  individual decision as to medical need on

8  a patient, that would be the doctor,

9  correct?

10             MR. KO:  Object to the form.

11        Objection.  Foundation.

12             THE WITNESS:  You know, once

13        again, I don't really know.  I --

14        it's going to be some combination

15        of people, the doctor, and some

16        combination of some variety of

17        people ranging from the patient to

18        the set of people that doctor

19        interacts with.  So I can't say

20        for sure.

21  BY MR. GEISE:

22        Q.    How did you factor in

23  medical decisionmaking as part of your

24  proxy for determining medical need?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. KO:  What do you mean?

2     Object to the form.

3          THE WITNESS:  Yeah, I don't

4     really -- I'm just confused.

5  BY MR. GEISE:

6     Q.    Well, in terms of who makes

7  the individual decision as to medical

8  need, you just told me that it was going

9  to be some combination of people, the

10  doctor and some variety of people ranging

11  from the patient and the people the

12  doctor interacts with.  Do you recall

13  that testimony?

14     A.    Yes, I do.

15     Q.    Okay.  So my question is,

16  how did you factor that environment as

17  part of your proxy for determining

18  medical need?

19          MR. KO:  Object to the form.

20          THE WITNESS:  Once again, I

21     don't claim to completely explain

22     the medical need for opioids

23     across counties.  The argument

24     here is that a strong proxy for

Highly Confidential - Subject to Further Confidentiality Review

1        medical need would be these

2        demographic factors.  And common

3        arguments made in economics,

4        that's used in economic research,

5        is if you don't have an entire

6        variable, if you don't have the

7        variable you want but you have a

8        strong proxy for it, you'd like to

9        see if that proxy is correlated

10       with the dependent variable of

11       interest.

12   BY MR. GEISE:

13       Q.    Is there an accepted

14   definition of the term "medical need" for

15   purposes of economic research?

16       A.    No, there's not.

17       Q.    Is that why you use the

18   proxy that you did, because there's no

19   defined term of "medical need"?

20       A.    I used the proxy because

21   that was the best available data that I

22   thought would be representative of the

23   variation of medical need across areas.

24       Q.    When we talk about the

Highly Confidential - Subject to Further Confidentiality Review

1  process of the doctor making a

2  prescription decision for a patient, do

3  you agree that a prescription results

4  from the doctor either addressing the

5  perceived medical need, or a doctor

6  proceeding despite knows there is no

7  medical need?

8          MR. KO:  Object to form.

9      Objection.  Foundation.

10          THE WITNESS:  I don't

11      understand the question.

12  BY MR. GEISE:

13      Q.  Well, do you have a view as

14  to what percentage of prescriptions fall

15  into the category of addressing a medical

16  need of a patient?

17          MR. KO:  Same two prior

18      objections.

19          THE WITNESS:  No, I don't

20      have a view of that.

21  BY MR. GEISE:

22      Q.  And similarly, you don't

23  know -- you don't have a view as to what

24  percentage of prescriptions do not

Highly Confidential - Subject to Further Confidentiality Review

1    address a medical need of a patient?

2              MR. KO:  Same two prior

3         objections.

4              THE WITNESS:  It's the same

5         question.  No, I don't.

6    BY MR. GEISE:

7         Q.    In Paragraph 75 of your

8    report, you write in the first sentence,

9    "To evaluate the extent to which

10   variation and per capita shipments can be

11   explained by such factors, I use

12   regression analysis to evaluate the

13   relationship between the demographic and

14   economic characteristics of counties and

15   county-level shipments per capita in

16   2010.  The analysis is based on a large

17   county sample."

18             Do you see that?

19        A.    Yes, I do.

20        Q.    Okay.  And I believe you

21   mentioned the demographic and economic

22   characteristics are two of the

23   independent variables that you looked at

24   for performing your analysis, correct?

1    A.    Well, there's more than two.
2 There's a series of variables that fall
3 into that category.

4    Q.    I'm saying they are two of
5 the variables.

6    A.    Well, no, there's -- there
7 are -- they're two of the categories of
8 variables.  There's a variety of
9 variables within each category.

10    Q.    Fair.  And we'll look at
11 some of those.

12         You say your analysis is
13 based on the large county sample, right?
14 What do you mean by that?

15    A.    So if we look at -- let me
16 get back to the section.  Sorry, one
17 minute.  I defined the large county
18 sample, I'm just trying to find the spot
19 where I do.

20         Yes, so I defined the large
21 county sample in Paragraph 36, which is
22 the 404 counties identified in the MCOD
23 data that have consistently available
24 data over the period from 1993 to 2016,

1  which includes the bellwether counties.

2  These are counties with roughly more than

3  100,000 in population.

4        Q.    Now, do you know if the

5  large county data that you relied on

6  included private data?

7              MR. KO:  Object to the form.

8              THE WITNESS:  I don't know

9        for sure.

10 BY MR. GEISE:

11       Q.    And when you use that data,

12 I think you told us before that you

13 didn't actually have any of the data

14 yourself to look at; is that correct?

15             MR. KO:  Objection to form.

16             THE WITNESS:  That's --

17       that's correct.

18 BY MR. GEISE:

19       Q.    So your description where

20 you just identified in Paragraph 36 of

21 the -- the counties and the data that was

22 looked at, that was something that

23 Compass Lexecon did, not you

24 specifically, correct?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. KO:  Object to the form.

2           THE WITNESS:  I worked with

3      Compass Lexecon to guide their

4      analysis of the data.  But I never

5      used the actual raw data.  They

6      combined it into these counties.

7  BY MR. GEISE:

8      Q.    Now, do you agree that there

9  could be other factors that affect both

10 medical need and shipments that you did

11 not take into account in your regression?

12     A.    That's why I said that these

13 things were a proxy for medical need.

14     Q.    If there are other factors

15 that affect both medical need and

16 shipments that you did not consider in

17 your regression, do you agree that your

18 regression would misrepresent the degree

19 to which variation in shipments can be

20 explained by medical need?

21          MR. KO:  Object to the form.

22          THE WITNESS:  It's certainly

23     possible.  It's not certain.

24 BY MR. GEISE:

1    Q.    If I could ask you to look

2  at Appendix 1-D to your report.

3           MR. KO:  I'm sorry, Steve,

4       you said 1?

5           MR. GEISE:  1-D.

6  BY MR. GEISE:

7    Q.    And this is -- the

8  Appendix 1-D is "Regression Estimates of

9  Demographic Variables."

10          Do you see that?

11   A.    Yes, I do.

12   Q.    And you used regression

13 analysis to evaluate the relationship

14 between the demographic and economic

15 characteristics of counties and shipments

16 in 2010, correct?

17   A.    That's correct.

18   Q.    Your regression analysis

19 only considered 2010, correct?

20   A.    Yes.  For this case, I just

21 used 2010.

22   Q.    Did you run the same

23 analysis for other years to compare the

24 results to the results in 2010?

1          A.     At various points in the

2   analysis we have run regressions like

3   this for very -- for different years.

4          Q.     Why didn't you include that

5   in your appendix?

6          A.     The appendix does not

7   include a conference of reporting of

8   every analysis that was done over the

9   last year.  It includes what's relevant

10  to the report.

11         Q.     And along the left-hand

12  column of Appendix 1-D you have a list of

13  different variables, correct?

14         A.     Yes, that's correct.

15         Q.     And is this what you were

16  referring to before, when I was -- I was

17  grouping the demographic and economic

18  activity as a variable that you had parts

19  underlying that specifically, correct?

20             MR. KO:  Object to the form.

21             THE WITNESS:  I don't know

22         what "parts" means.

23  BY MR. GEISE:

24         Q.     Well, when I use the term

1    "demographic variable," you indicated

2    that there's more to it than just that.

3    And the more to it than just that are the

4    variables identified on Appendix 1-D,

5    correct?

6                    MR. KO:  Object to the form.

7                    THE WITNESS:  What I said is

8            this is not demographic variables,

9            it's a series of demographic

10           variables, and those are what's

11           included in -- in that -- in that

12           regression.

13   BY MR. GEISE:

14           Q.    Correct.  And the series of

15   demographic variables are those listed

16   along the left-hand column of

17   Appendix 1-D, right?

18           A.    1-D include -- lists a

19   series of demographic and economic

20   variables that are included in the

21   regression.

22           Q.    So for instance, MMEs per

23   capita per day.  Percent male in 2010.

24   Percent under 15 in 2010.  So on and so

Highly Confidential - Subject to Further Confidentiality Review

1  forth, correct?

2          A.    No, that's not correct.

3          Q.    You don't use those

4  variables?

5          A.    No.  But MMEs per capita per

6  day is the dependent variable.

7          Q.    Okay.  And then below that

8  are the independent variables that you

9  were testing, correct?

10          A.    Yes.

11          Q.    Okay.  Now, you list a

12  number of -- of variables that you

13  tested.  But there are a number that you

14  did not account for, correct?

15              MR. KO:  Object to the form.

16              THE WITNESS:  I don't

17          understand.

18  BY MR. GEISE:

19          Q.    Well, did you account or

20  control for marital status?

21          A.    No, that's not included.

22          Q.    Did you account for number

23  of children?

24          A.    No, it's not included.

1    Q.    Did you account for single

2    parents?

3    A.    We didn't include that

4    variable.  A lot of the variables listing

5    will be highly correlated with other

6    variables that we did include.  But that

7    specific variable wasn't included.

8    Q.    You include the variable of

9    employment ratio, but you did not include

10   a variable for underemployment, correct?

11   A.    I don't know what

12   underemployment means.

13   Q.    Did you include a variable

14   for veterans?

15   A.    No, we did not.

16   Q.    Did you include a variable

17   for the number of doctors?

18           MR. KO:  Object to the form.

19           THE WITNESS:  No, that's --

20   that's not included.

21   BY MR. GEISE:

22   Q.    Did you include a variable

23   for eligibility for Medicare Part D?

24   A.    We included a variable about

1    the age distribution which would be

2    pretty highly correlated with eligibility

3    for Medicare Part D.

4         Q.    But you didn't include

5    eligibility for Medicare Part D

6    specifically, correct?

7              MR. KO:  Objection, asked

8         and answered.

9              THE WITNESS:  Once again,

10        eligibility for Medicare Part D

11        will be very highly correlated for

12        the percent of the population

13        that's over 65 which is included.

14   BY MR. GEISE:

15        Q.    But eligibility and --

16   and -- I'll move on.

17             Did you include eligibility

18   for employer-sponsored health insurance?

19        A.    Once again, that would be

20   correlated with some of the variables we

21   included but we did not include that

22   variable specifically.

23        Q.    You didn't include the

24   variable incidence of cancer, correct?

1      A.    That is not included, no.

2      Q.    Or mental health?

3      A.    There's not a variable.  I

4  don't know what mental health means.

5      Q.    Well, did you include

6  anything for diagnoses of mental health

7  disorders?

8      A.    No, we did not.

9      Q.    Did you include access to

10  treatment for opioid use disorder?

11      A.    No, we did not.

12      Q.    Did you include life

13  expectancy?

14      A.    Once again we included a

15  variety of demographic factors which

16  would be highly correlated with life

17  expectancy, but we did -- we did not

18  include that.

19      Q.    Do you agree that these

20  variables could affect both medical need

21  for opioids and shipments of opioids?

22          MR. KO:  Object to the form.

23          THE WITNESS:  It's possible,

24      sure.

Highly Confidential - Subject to Further Confidentiality Review

1    Once again, the main goal

2    here, as I said, we used these as

3    a proxy for medical need.  The

4    goal here is to not develop a

5    comprehensive model of medical

6    need.

7    The goal here was to show

8    that including a variety of very

9    explanatory variables that have a

10    lot of power to explain medical

11    need doesn't really move the

12    needle in terms of explaining this

13    enormous variation across

14    counties.

15    BY MR. GEISE:

16    Q.    So you agree that your goal

17    was not to develop a comprehensive

18    model -- model of medical need?

19    MR. KO:  Object to the form.

20    Mischaracterizes testimony and the

21    report.

22    THE WITNESS:  The goal of

23    our analysis was to develop a

24    model that, with the available

Highly Confidential - Subject to Further Confidentiality Review

1          variables, could show clearly that

2          when a set of variables that are

3          correlated with medical need are

4          included, they do not explain

5          much, if anything, of this

6          enormous variation across the

7          counties in shipments.

8     BY MR. GEISE:

9          Q.    When you speak in terms of

10    available variables, do you agree that

11    the list that we just walked through are

12    also variables that would have been

13    available for you?

14               MR. KO:  Object to the form.

15               THE WITNESS:  I don't know

16          for sure.

17    BY MR. GEISE:

18          Q.    Certainly some of them would

19    be available, correct?

20               MR. KO:  Object to the form.

21               THE WITNESS:  That's true.

22    BY MR. GEISE:

23          Q.    Professor Gruber, if you can

24    look at Paragraph 77 in your report.  You

1    state, "In some, the wide variation in

2    daily per capita MMEs across counties

3    after controlling for differences in

4    demographic and economic characteristics,

5    indicates that many shipments were

6    excessive and unnecessary."

7                 Do you see that?

8          A.    Yes, I do.

9          Q.    Does this opinion apply

10   across all of the counties that were

11   included in the large county study?

12         A.    An analysis such as the one

13   we did here is an aggregate analysis.

14   Aggregate analyses explain the central

15   tendency in the sample.  And that's what

16   I'm explaining.  I'm explaining across --

17   this sample.  This is the relationship

18   that we observed.

19         Q.    And did you do anything to

20   observe the relationship specifically in

21   Cuyahoga and Summit compared to the other

22   counties?

23               MR. KO:  Object to the form.

24               THE WITNESS:  The analysis

```
 1              here is to show there's wide
 2              variation.  You need multiple
 3              observations to show wide
 4              variation.  It wouldn't really
 5              make sense to use one or two
 6              counties to illustrate this point.
 7    BY MR. GEISE:
 8         Q.    Well, whether it would make
 9    sense or not, did you do anything to try
10    to observe the relationship specifically
11    in Cuyahoga and Summit Counties?
12              MR. KO:  Object to the form.
13         Asked and answered.
14              THE WITNESS:  Cuyahoga and
15         Summit Counties are included in
16         the analysis.  The goal of this
17         analysis is to use the breadth of
18         the data for the large counties to
19         show that it is implausible -- it
20         is very unlikely based on the
21         observation, based on the data,
22         based on this regression, that
23         medical need could be explaining
24         the enormous variation that we're
```

Highly Confidential - Subject to Further Confidentiality Review

1           seeing across counties.

2                   To do analysis like that,

3           you need multiple counties.

4           That's the definition of how you

5           do an analysis like that.

6     BY MR. GEISE:

7           Q.    And your analysis and your

8     conclusion would be exactly the same for

9     all of the counties contained within the

10    studies; is that accurate?

11                  MR. KO:  Object to the form.

12                  THE WITNESS:  That's not

13          what I'm saying.

14    BY MR. GEISE:

15          Q.    Okay.

16          A.    What I'm saying is the goal

17    of an analysis like this is to explain a

18    central tendency in the data, to

19    illustrate a general point.

20                  You cannot -- the statement

21    that I'm making here is that there's an

22    enormous variability across the counties

23    that cannot be explained by medical need.

24    That is not a statement that applies to

Highly Confidential - Subject to Further Confidentiality Review

1  one unit of observation, like a county.

2  It's a statement that applies to central

3  tendency in the data.

4      Q.    So your statement applies to

5  all of those counties, not just an

6  individual one; is that fair?

7      A.    My statement applies to

8  that -- the central tendency in the set

9  of data.

10     Q.    Okay.  What do you mean when

11 you use the term that many shipments were

12 excessive and unnecessary?

13     A.    What I mean by that is

14 that -- that essentially if the -- what I

15 mean by that in this context is that, if

16 the shipments were to address medical

17 needs, then they would -- we would see a

18 large share of that huge variation being

19 explained by the variables included in

20 the model, and we don't.

21     Q.    So is your definition of

22 excessive and unnecessary dependent on

23 medical need?

24          MR. KO:  Object to the form.

1          THE WITNESS:  Yeah, I don't

2     quite understand.

3  BY MR. GEISE:

4     Q.    Well, you're saying that if

5  the shipments were to address medical

6  needs, you would see a large share of

7  that huge variation being explained by

8  the variables that you included in the

9  model, and you don't.

10          So I guess my question is,

11  is the definition you use for excessive

12  and unnecessary, that it means that it's

13  more than and not necessary to medical

14  need?

15          MR. KO:  Object to the form.

16          THE WITNESS:  It means --

17     what I mean -- what I'm saying

18     here is that there are

19     shipments -- the enormous

20     variation of shipments across

21     counties goes beyond what would be

22     explained by medical need.

23  BY MR. GEISE:

24     Q.    If we accept that

1    conclusion, does that also imply that

2    prescription activity went -- was

3    excessive and unnecessary compared to

4    medical need?

5              MR. KO:  Object to the form.

6              THE WITNESS:  What I'm

7         saying here is that use of

8         prescription opioids was excessive

9         and unnecessary relative to

10        medical need.  There are different

11        terms that you can use to proxy

12        for that.  But that writ large is

13        what I'm talking about here.

14   BY MR. GEISE:

15        Q.    I think you said before that

16   you didn't conduct any analysis of

17   prescription activity in Cuyahoga or

18   Summit County, correct?

19        A.    I did not.  That's correct.

20        Q.    So do you have an opinion

21   whether prescription activity in Cuyahoga

22   and Summit Counties was excessive and

23   unnecessary?

24              MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I do not.

2    BY MR. GEISE:

3          Q.    When your analysis

4    establishes, as you term it, an enormous

5    variability, that doesn't show that

6    shipments exceeded medical need for

7    Cuyahoga and Summit County though,

8    correct?

9              MR. KO:  Object to the form.

10             THE WITNESS:  As I've said,

11        what I'm trying to do is show you

12        that that's enormous variability

13        that can't be explained by medical

14        need as proxied by these

15        demographic and economic

16        variables.

17   BY MR. GEISE:

18         Q.    Did you perform any analysis

19   to see if certain counties received fewer

20   shipments than medical need would

21   suggest?

22             MR. KO:  Object to the form.

23             THE WITNESS:  No, I did not.

24   BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Looking at Paragraph 78 of

2    your report, in your first sentence, you

3    wrote, "As these data imply, there are

4    wide differences across counties and the

5    growth of per capita shipments over time.

6    This is demonstrated further in Figure

7    1.16 below which compares high shipment

8    to low shipment areas."

9         Do you see that?

10   A.    Yes, I do.

11   Q.    And you used the comparison

12   for high shipment to low shipment

13   counties for several of your graphs and

14   analysis in your report, correct?

15   A.    That's correct.

16   Q.    Is it true that Cuyahoga

17   County is not in the group of counties in

18   the top 25 percent of shipments?

19   A.    I believe that's true, yes.

20   Q.    And is it also true that

21   Summit County is not in the group of

22   counties in the top 25 percent of

23   shipments, correct?

24   A.    I believe that's true, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And is it true that Cuyahoga

2    County is not in the bottom 25 percent of

3    counties?

4        A.    That's correct.

5        Q.    And same for Summit County?

6        A.    That's correct.

7            MR. KO:  Just so the record

8        is clear, Steve, I assume that the

9        top 25 and bottom 25 percent that

10       you're referring to is as

11       Dr. Gruber describes it in his

12       report.

13           MR. GEISE:  Correct.  His

14       chart for bottom 25 percent of

15       shipments and top 25 percent of

16       shipments.

17   BY MR. GEISE:

18       Q.    So you agree that in your

19   charts and figures that use the

20   demarcation of top 25 percent and bottom

21   25 percent that Cuyahoga and Summit

22   County actually are not part of those

23   families of the top and bottom quartile?

24           MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  The -- the

2         data that's included here, the --

3         so if we look at Figure 1.16, the

4         orange and blue lines do not

5         include Cuyahoga and Summit.

6              The reason that the -- these

7         figures are constructed is to

8         demonstrate for the -- as a

9         general tendency in the data, the

10        relationship -- the -- the fact

11        that shipments grew much faster in

12        some areas of the country than in

13        others.

14   BY MR. GEISE:

15        Q.    Did you perform the analysis

16   and create a chart for the second

17   quartile of counties that are in that

18   second 25 percent of shipments?

19        A.    No, I did not.

20             MR. KO:  Object to the form.

21   BY MR. GEISE:

22        Q.    Did you perform the analysis

23   for the counties in the third quartile?

24        A.    As I describe in the report,

Highly Confidential - Subject to Further Confidentiality Review

1    there -- since shipments is, as they

2    described, only a proxy for opioid use,

3    we decided the clearest way to make the

4    comparison was to show the very high

5    shipment and the very low shipment

6    places.

7              If you want to look at a --

8    at an analysis that's county by county,

9    that's what Professor Cutler's regression

10   analysis does.  This is to show clearly

11   and transparently the relationship

12   between places that were high shipment

13   and low shipment places and the resulting

14   outcomes.

15        Q.    Do you agree that your

16   depiction of the difference between high

17   shipment and low shipment outcomes does

18   not specifically apply to Cuyahoga and

19   Summit Counties?

20              MR. KO:  Object to the form.

21        Mischaracterizes.

22              THE WITNESS:  No, I don't

23        agree with that.

24   BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  Do you agree that

2  Cuyahoga and Summit Counties would not be

3  included in the red line on Figure 1.16

4  for the top 25 percent shipments?

5      A.     Yes, I agree.

6      Q.     And you agree that they

7  would not be included in the blue line at

8  Figure 1.16 for the bottom 25 percent of

9  shipments?

10      A.     Yes, I agree.

11      Q.     Their category is not

12  depicted in this figure, correct?

13      A.     That's correct.

14      Q.     If I could ask you to look

15  at Section B of your report that begins

16  on Page 55 and covers Paragraphs 79, 80

17  and 81, and direct your attention to the

18  last sentence in Paragraph 79 where you

19  write, "Nonetheless, data are available

20  that can be used to compare OUD" -- which

21  is opioid use disorder?

22      A.     Correct.

23      Q.     -- "as measured from NSDUH

24  data in states with higher and lower

Highly Confidential - Subject to Further Confidentiality Review

1    levels of prescription opioid shipments."

2            Do you see that?

3        A.    Yes.

4        Q.    And NSDUH is the National

5    Survey on Drug Use and Health, correct?

6        A.    I don't recall the exact

7    title of the survey.  I've used the

8    acronym so many times.  I don't

9    believe it's -- I don't know if it's

10   health or households.  I know what -- I

11   don't know what the last H stands for.

12       Q.    Okay.  Let me ask you.

13            In Section B of your report

14   that begins on Page 55, are you analyzing

15   any relationship between shipments as the

16   independent variable and opioid use

17   disorder as the dependent variable?

18       A.    Ask the question again, I'm

19   sorry.

20       Q.    Yeah.  In Section B, it's --

21   it's titled, "Self-Reported OUD is higher

22   in areas with greater shipments."

23            Do you see that heading?

24       A.    Yeah.

1        Q.    But I'm asking, did you

2   analyze any relationship between

3   shipments as the independent variable and

4   opioid use disorder as the dependent

5   variable?

6              MR. KO:  In this report as a

7        whole or in this specific

8        paragraph?

9              MR. GEISE:  In the report as

10       a whole.

11             THE WITNESS:  In this report

12       as a whole, once again what we're

13       doing here is, this is

14       illustrating in a clear and

15       transparent way that when you

16       divide the independent variable

17       into high and low shipment areas,

18       that there is a significant

19       difference in the value of the

20       dependent variable.  And that's

21       what I'm trying to illustrate in

22       this Figure 1.17.

23   BY MR. GEISE:

24       Q.    What you're illustrating in

1  Figure 1.17, is that more accurately

2  described as a correlation as opposed to

3  causation?

4          MR. KO:  Object to the form.

5          THE WITNESS:  This is

6      described as an illustration of a

7      relationship that is -- this is an

8      illustration of a relationship

9      that is consistent with hypothesis

10     I lay out in the data, in the

11     report.

12  BY MR. GEISE:

13     Q.    And while it's consistent

14  with your hypothesis, contained within

15  your report or the appendix, is not a

16  data analysis to prove a relationship

17  between the two, correct?

18          MR. KO:  Object to the form.

19          THE WITNESS:  That is

20     correct.

21  BY MR. GEISE:

22     Q.    Looking again at

23  Paragraph 79 of your report.  In the --

24  the second sentence, you say, "As

Highly Confidential - Subject to Further Confidentiality Review

```
1    discussed above, others have noted that
2    these data substantially understate the
3    use of opioids and other drugs and that
4    changes in definitions complicate
5    historical comparison using these data."
6              Do you see that?
7         A.   Yes, I do.
8         Q.   And does that refer to the
9    NSDUH survey data on the self-reported
10   use of opioids?
11        A.   Yes, that's correct.
12        Q.   Do you believe that this is
13   a possible data limitation based on that
14   reporting?
15        A.   As I've said, as I lay out
16   very clearly earlier in the report, the
17   reason that we focus this report mostly
18   on mortality as an outcome is because we
19   think there are limitations with the
20   NSDUH measure of -- of opioid use
21   disorder.
22        Q.   Do you also think that NSDUH
23   has understated the use of heroin
24   throughout the years?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.    I haven't looked at the

2   NSDUH over time.  There were changes in

3   definition.  But at a point in time for

4   the reasons that we lay out, that NSDUH

5   understates the use of prescription

6   opioids, it -- those same reasons, many

7   of them would apply to understating the

8   use of heroin and other illicit

9   substances.

10      Q.    Well, doesn't the literature

11  also talk about there's a greater

12  likelihood of -- of understating the use

13  of illicit substances compared to the use

14  of licit substances?

15          MR. KO:  Object to the form.

16          THE WITNESS:  I have --

17          in -- in the studies I've looked

18          at, that tends to be the general

19          tendency, although I don't know

20          the extent to which it applies to

21          a particular drug by drug.  But

22          that certainly is the general

23          tendency in the studies I've

24          looked at.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. GEISE:

2         Q.    Similar to Figure 1.16 on

3    Page 55 of your report, figure 1.17 on

4    Page 56, again looks at those counties

5    that have the top 25 percent and the

6    bottom 25 percent of shipments, correct?

7         A.    That's correct.

8         Q.    And just as it was true with

9    Figure 1.16, Cuyahoga and Summit County

10   do not fall within either of these two

11   categories depicted in Figure 1.17,

12   correct?

13        A.    That's correct.

14        Q.    Now, with regard to

15   Figure 1.17 and the percentage, we have

16   the average NSDUH 2015-2016 opioid use

17   disorder rate.  Is that percentage based

18   on -- is it per capita, do you know?

19             MR. KO:  Object to the form.

20             THE WITNESS:  In the

21        appendix, Appendix 1-C, I've

22        carefully gone through with --

23        carefully -- I've tried to as

24        carefully as possible go through

Highly Confidential - Subject to Further Confidentiality Review

1           and lay out exactly what's in each

2           figure.  And if you look at the

3           appendix Figure 1.17, we say, "The

4           OUD rate is the percent of NSDUH

5           survey respondents age 12 or over

6           who report having experienced OUD

7           in the past 12 months."

8    BY MR. GEISE:

9           Q.    So the percentage are based

10   on the percentage who have used -- is it

11   based on the percentage that have used

12   prescription opioids in the last

13   12 months or those who have reported

14   experiencing opioid use disorder in the

15   past 12 months?

16          A.    The NSDUH, based on expert

17   analyses, has a definition of opioid use

18   disorder which includes answers to a

19   number of questions that are included in

20   the survey.  They aggregate those

21   questions to have an indicator of whether

22   you have opioid use disorder.

23               And this is saying that this

24   is the percent of survey respondents age

Highly Confidential - Subject to Further Confidentiality Review

1  12 who meet those criteria for having

2  opioid use disorder.

3      Q.    Do you know what the results

4  are for Cuyahoga and Summit County for

5  that question?

6      A.    The NSDUH unfortunately does

7  not report county-level estimates.

8      Q.    And, again --

9      A.    Actually -- so, yeah, can I

10  clarify an earlier question?  Am I

11  allowed to do that?

12      Q.    Sure.

13      A.    You asked me in Figure 1.17,

14  does that include Cuyahoga and Summit.

15  My -- my answer was incorrect because if

16  you look at Figure 1.17, it's a

17  state-level figure not a county-level

18  figure.  And I believe, I don't know for

19  sure, but I believe Ohio would be in the

20  top 25 of states.

21      Q.    Okay.  That was going to be

22  a question.  So do you think Ohio is in

23  the top 25 percent of shipments per

24  state?

1       A.     I don't know for sure.

2       Q.     Okay.  Do you know how the

3  shipments to Cuyahoga and Summit County

4  compare to shipments to other counties in

5  Ohio?

6       A.     I do not.

7       Q.     In particular, do you know

8  how the shipments to Cuyahoga and Summit

9  County compare to shipments to Montgomery

10  County, Ohio?

11      A.     No, I do not.

12      Q.     Paragraph 81 of your report,

13  you write, "Nevertheless, a concern with

14  a simple cross-sectional comparison of

15  this type is that high shipment states

16  may differ from low shipment states in

17  ways that are unobserved, but are

18  nonetheless correlated with the rate of

19  OUD, resulting in potentially misleading

20  estimates of the relationship between

21  shipments and opioid misuse.

22           Do you see that?

23      A.     Yes, I do.

24      Q.     What do you mean by "ways

1  that are unobserved but nonetheless

2  correlated"?

3       A.   What I mean is that there

4  may be omitted variables that represent

5  fundamental differences between states

6  that may impact both the level of

7  shipments and the level of OUD.

8       Q.   So this is an example of

9  what we discussed in the abstract before

10  of an omitted variable bias, where

11  something could be impacting both here,

12  correct?

13            MR. KO:  Object to the form.

14            THE WITNESS:  Something

15       could be.  It's not -- it's not --

16       I'm not stating it is true, and

17       I'm not stating it significantly

18       biases this estimate, because it's

19       not a regression estimate.  This

20       is an illustrative estimate of two

21       grouped categories.  So it's not

22       saying the estimate is wrong.

23       It's saying that I want to confirm

24       it by -- with data that could try

Highly Confidential - Subject to Further Confidentiality Review

1    and get around these problems.

2  BY MR. GEISE:

3    Q.    What are some of the other

4  factors that may explain the variation in

5  opioid use disorder rates between

6  high-shipment states and low-shipment

7  states?

8    A.    Once again, a variety of

9  demographic differences, economic

10  differences, and other -- other

11  differences.

12    Q.    For purposes of the opioid

13  use disorder rates, did you run a

14  regression to try to control or account

15  for those other factors?

16    A.    I don't recall if we did

17  that at some point.

18    Q.    You used the word

19  "estimates" in your paragraph to describe

20  the relationship between shipment and

21  misuse.  Why did you pick that particular

22  term?

23    A.    Can you show me where you're

24  talk -- referring to?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yes.  In the last clause of

2    Paragraph 81, you say resulting in

3    potentially misleading estimates of the

4    relationship between shipments and opioid

5    misuse.

6    A.    Yeah, that is probably not

7    the appropriate term to use there.  I

8    really -- a potentially misleading -- I

9    really mean a potentially misleading

10   conclusion about the relationship between

11   them, because as you know, I'm not

12   providing the estimate here.

13   Q.    So you agree, then, that the

14   unobserved variables could mean that the

15   relationship identified here is

16   misleading?

17   A.    It may.

18         MR. KO:  Object to the form.

19         THE WITNESS:  It may; it may

20   not.

21   BY MR. GEISE:

22   Q.    And again, you haven't done

23   the regression analysis on those

24   variables to determine if it is or it

1    isn't?

2         A.    No, I've not.

3         Q.    If we turn to Page 57 of

4    your report in Section C, it is entitled

5    "Opioid-Related Mortality Grew Faster in

6    Areas That Received More Shipments."

7              Do you see that?

8         A.    Yes, I do.

9         Q.    In the last sentence of

10   Paragraph 82, you provide, "In

11   particular, I ask whether areas that

12   received more shipments of prescription

13   opioids have higher rates of growth of

14   opioid mortality."

15             Do you see that?

16        A.    Yes.

17        Q.    So here the independent

18   variables are shipments; is that right?

19   Is that one of them?

20        A.    I'm not estimating

21   regression model here.

22        Q.    Okay.  All right.  So with

23   regard to your analysis of a potential

24   relationship between shipments and opioid

Highly Confidential - Subject to Further Confidentiality Review

1    mortality, did you perform a regression

2    analysis to explore that?

3         A.    In this report, I did not.

4    This uses the kind of illustrative graphs

5    and regression analysis as contained in

6    Professor Cutler's report.

7         Q.    Do you rely on the

8    information contained in Professor

9    Cutler -- Professor Cutler's report for

10   your analysis and conclusions in this

11   section of your report?

12        A.    I do not rely on that, no.

13        Q.    You don't rely on Professor

14   Cutler?

15        A.    In -- I've used Professor

16   Cutler's report in -- I understand

17   Professor Cutler's report.  It influenced

18   in the construction of my report.  But in

19   the conclusions I draw here, I do not

20   rely on his regression estimates.

21        Q.    Why not?

22        A.    Because he has the report.

23   So this -- we decided, as a team, to use

24   my report, this introductory report, to

Highly Confidential - Subject to Further Confidentiality Review

1    clearly and transparently illustrate the

2    causal relationship at hand.  But not to

3    delve into the magnitudes that come out

4    of -- that Professor Cutler produces that

5    then feed into Professor McGuire's

6    report.

7         Q.    And as you've used the term

8    a couple times in answers, through your

9    figures in that, is that what you refer

10   to illustrating the causal relationship?

11            MR. KO:  Object to the form.

12            THE WITNESS:  I, as I've

13            talked -- as you mentioned, in my

14            textbook, I think graphic

15            illustration is a very transparent

16            and clear way to illustrate a

17            relationship.  And that's what I'm

18            doing here.

19   BY MR. GEISE:

20        Q.    But graphic illustrations

21   may also just be demonstrating

22   correlation, not causation, correct?

23        A.    That's possible, yes.

24            MR. GEISE:  I see it's about

Highly Confidential - Subject to Further Confidentiality Review

1    quarter to 1:00.  We've been going

2    for about another hour.  Why don't

3    we take our break for lunch now.

4            THE WITNESS:  Sure.

5            MR. KO:  Okay.

6            THE VIDEOGRAPHER:  The time

7    is 12:44 p.m., and we're off the

8    record.

9                -   -   -

10            (Lunch break.)

11                -   -   -

12            THE VIDEOGRAPHER:  The time

13    is 1:30 p.m.  We are on the

14    record.

15    BY MR. GEISE:

16        Q.    Professor Gruber, throughout

17    your report, when you talk about

18    shipments, what is your definition of a

19    shipment?

20        A.    It's what it says.  It's --

21    it's -- the ARCOS collects data on the

22    amount of each prescription drug.  In

23    this case, prescription opioids, that are

24    shipped to -- shipped to distribution

Highly Confidential - Subject to Further Confidentiality Review

1   points in a given county or they measure

2   a final level, we aggregate it up to

3   county.

4        Q.    When you say distribution

5   points, how do you define that?

6        A.    I don't know the precise

7   definition, but it's the places that, to

8   which individuals can go to get their

9   opioids.  So pharmacies and things of

10  that nature.

11       Q.    It would be dispensing

12  locations?

13       A.    Dispensing locations would

14  be a better way to put it.

15       Q.    And did you conduct analysis

16  of that ARCOS data yourself to determine

17  the shipment numbers or did you rely on

18  Compass?

19       A.    As I said before, as is my

20  usual practice in this kind of analysis,

21  when I have very talented research

22  assistants, they handle the data and

23  handle my requests for that information.

24       Q.    The ARCOS data that you

Highly Confidential - Subject to Further Confidentiality Review

1  relied on for the definition of

2  shipments, is that again aggregate for

3  that area, for -- for a county?

4              MR. KO:  Object to the form.

5              THE WITNESS:  Yeah.  Can you

6      try -- try that one again.

7  BY MR. GEISE:

8      Q.    Well, sure.  It sounds to me

9  like you looked at the ARCOS data for

10 particular opioids and not necessarily

11 opioids from a particular source.  Is

12 that fair?

13             MR. KO:  Object to the form.

14             THE WITNESS:  I don't know

15     what you mean by source.

16 BY MR. GEISE:

17     Q.    Okay.  You didn't look for

18 the amount of shipments associated with a

19 particular manufacturer.

20     A.    That was not the point or

21 purpose of the analysis, no.

22     Q.    Nor did you look for the

23 particular amount of shipments from a

24 distributor?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Once again, we're looking

2    at -- at more aggregated levels of

3    shipments.

4        Q.      And -- and that's fine.  But

5    by looking at the aggregate level, you

6    didn't look at a particular shipment from

7    a particular manufacturer or distributor?

8        A.      I wasn't asked to do that,

9    no.

10       Q.      Looking at Paragraph 83 of

11   your report, you write -- and I'll just

12   read the -- the first sentence -- "While

13   this approach identifies substantial

14   differences in opioid mortality rates in

15   areas that received higher and lower

16   levels of shipments, it comes with an

17   important challenge:  Comparing shipments

18   across areas does not account for the

19   critical transshipment problem that marks

20   the distribution of prescription opioids

21   in the 2000s."

22               Do you see that?

23       A.      Yes.

24       Q.      Can you please tell me your

Highly Confidential - Subject to Further Confidentiality Review

1    definition of transshipment?

2        A.    Transshipment would mean

3    opioids that were prescribed to

4    individuals at a given -- in a given

5    location or dispensed into this given

6    location, but were not used by those

7    individuals, instead were transported to

8    be used by individuals in other

9    locations.

10       Q.    So consumption of the opioid

11   could take place in a location different

12   than the shipment of the opioid?

13       A.    That is correct.

14       Q.    So where you used shipments

15   as a proxy for consumption, that proxy

16   would not work in the situation of a

17   transshipment?

18           MR. KO:  Object to the form.

19           THE WITNESS:  I don't know

20       why it would not work.

21   BY MR. GEISE:

22       Q.    Well, if you're using

23   shipments as a proxy for consumption, are

24   you doing that in a particular area or a

Highly Confidential - Subject to Further Confidentiality Review

1    particular county?

2           A.    Well, as I described, within

3    each county we are proxying for use of

4    opioids with the shipments to that

5    county.

6           Q.    And if the consumption of an

7    opioid, say, in Cuyahoga County is

8    actually an opioid that was shipped to a

9    different county, then shipments would

10   not be a proxy for consumption in that

11   situation, correct?

12          A.    No, that's not correct.

13          Q.    Why?

14          A.    Because the word proxy --

15   shipments would not be a perfect --

16   perfect non-error -- yes, the word proxy

17   means a proxy.  It is our -- it is

18   basically our attempt to measure, using

19   available data as well as possible the

20   amount of opioids in the county.

21          Q.    So that is a -- a situation

22   where shipments cannot be a perfect match

23   for consumption in a particular county?

24                MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1        THE WITNESS:  They may or

2     may not be.

3   BY MR. GEISE:

4        Q.    You would agree that in a

5   situation of transshipment, that the

6   consumption does not occur in the same

7   county as the shipment?

8        A.    That's the definition of

9   what we mean by transshipment.

10        Q.    How did you account for

11   transshipments in determining shipments

12   in a particular county?

13        A.    So, in determining shipments

14   to a particular county, we simply

15   measured shipments to that county.

16   Transshipments was accounted -- is

17   clearly a factor that happens,

18   particularly from -- from Florida to

19   places like Cuyahoga and Summit.  And

20   that is a reason why it's useful to do

21   the kind of more aggregated analysis that

22   I do in this report to compare very high

23   shipment to very low shipment areas as a

24   factor.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    In Paragraph 83 of your

2    report, in the last two sentences, you

3    write, with respect to transshipment,

4    "This will induce some measurement error

5    into my comparisons, reducing the power

6    of shipments to distinguish high versus

7    low use areas.  To some extent, I address

8    this measurement error by comparing only

9    the highest and lowest shipment areas in

10   the large county sample discussed above."

11            Do you see that?

12   A.    Yes, I do.

13   Q.    How does comparing only the

14   highest and lowest shipment areas correct

15   for the measurement error that is

16   introduced by the transshipment problem?

17   A.    It corrects it because we

18   think that as long as places that have

19   more shipment have more consumption,

20   which then basically -- let me -- let me

21   restart.

22            If there is measurement

23   error in a variable, then comparing two

24   values that are very close to each other

Highly Confidential - Subject to Further Confidentiality Review

1   may be harder to distinguish than two

2   variables that are much farther apart

3   from each other.  So two variables that

4   are very farther apart from each other,

5   we clearly think there's a distinction

6   that places that have high shipments,

7   then at the highest shipments clearly

8   have the highest consumption and places

9   with lower shipments clearly have lowest

10  consumption.  Whether two places that

11  have shipments which are one different

12  from each other have different

13  consumption, is unclear.

14          Q.    When you account for this by

15  comparing only the highest and lowest

16  shipment areas, do you agree that that

17  analysis then doesn't necessarily apply

18  to the two areas in the middle, the

19  middle two quartiles?

20              MR. KO:  Object to the form.

21              THE WITNESS:  The analysis

22          here is our best attempt to

23          represent the central tendency in

24          the data.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. GEISE:

2         Q.    But what you're comparing is

3    only the highest and lowest shipment

4    areas, correct?

5         A.    And as -- as I'm -- as I'm

6    doing, as I explained, the reason I'm

7    doing that is to try to create a format

8    which can illustrate clearly the causal

9    relationship between shipments and harms.

10   And that we think is the best way to do

11   it.

12        Q.    What results would you find

13   if you compared the second and third

14   quartiles as opposed to the highest and

15   lowest shipment areas with regard to

16   addressing the measurement error?

17        A.    I don't know for sure.  But

18   the -- once again, as I described with

19   measurement error, if there's some

20   measurement error, then obviously the

21   more you really distinguish clear groups,

22   like the top and the bottom, the -- the

23   stronger your conclusions can be.

24        Q.    A moment ago in one of your

1    answers, you said that there is -- there

2    is higher consumption in areas with

3    higher shipments.  Did I hear that

4    correctly?

5          A.    Yes, yes.

6          Q.    Is that a causal

7    relationship?

8                MR. KO:  Object to the form.

9                THE WITNESS:  I mean they

10         are basically shipments -- yes,

11         it's a causal relationship, yeah,

12         that's right.

13   BY MR. GEISE:

14         Q.    You said that you used

15   shipments as a proxy for consumption.

16   But by that answer you're telling me that

17   consumption is caused by the shipments.

18         A.    That's a good point.

19                MR. KO:  Is there a

20         question?

21                MR. GEISE:  Yes.

22                THE WITNESS:  I guess in

23         this -- the way -- the reason I'm

24         using shipments is as a proxy for

Highly Confidential - Subject to Further Confidentiality Review

1      consumption.

2              I'm not using them because

3          of a particular causal

4          relationship.  I'm using them

5          because they are the best

6          available proxy we have for

7          consumption at the county level,

8          and we wanted to carry out this

9          analysis at the county level.

10   BY MR. GEISE:

11          Q.    Did you have any discussions

12   with Compass Lexecon to see if there were

13   other ways to measure consumption at a

14   county level?

15          A.    Yes.

16          Q.    What ways did you consider?

17          A.    I don't recall.

18          Q.    Did Compass Lexecon report

19   to you about different potential ways to

20   measure consumption at a county level?

21          A.    All I recall is we discussed

22   it at various times.

23          Q.    So sitting here today, you

24   recall a discussion about other ways to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   mention -- measure consumption, but you

 2   don't recall what any of those

 3   discussions were?

 4        A.    No, I do not.

 5             MR. KO:  Objection.  Asked

 6        and answered.

 7   BY MR. GEISE:

 8        Q.    Footnote 97 that accompanies

 9   the last sentence in Paragraph 83, in it,

10   you report that your analysis excludes

11   data from four counties that are outliers

12   with respect to the level of per capita

13   shipments.

14             Do you see that?

15        A.    Yes, I do.

16        Q.    Can you explain what you

17   mean by outliers with respect to the

18   level of per capita shipments?

19        A.    What I mean is there were

20   several counties which had shipments per

21   capita which were so implausibly high

22   that clearly they did not -- they were

23   not meaningful proxies for the actual

24   consumption that took place -- the actual
```

1    use of prescription opioids that took

2    place in that county.

3              We were worried.  The idea

4    of an outlier in an empirical analysis is

5    the idea that there could be data which

6    is measured inappropriately and which has

7    an undue influence on the analysis.

8              So a typical thing in

9    economics, typical practice in economics,

10   if you have outlying observations, is to

11   assess the sensitivity to exclude those

12   outlying observations, which is what we

13   did here.

14        Q.    Do you recall those -- what

15   four counties were excluded?

16        A.    I do not recall.  No.

17        Q.    Do you recall if they were

18   in Ohio?

19        A.    I don't recall.

20        Q.    Do you know who among your

21   group of Professor McGuire, Professor

22   Cutler, Professor Rosenthal, might know

23   which counties were excluded?

24        A.    I don't know.

1    Q.    Do you think any of them

2    know?

3    A.    Well, I -- we all -- well, I

4    can't speak for them.  I do know --

5    I've -- since this is analysis I'm

6    directing, obviously when there's a

7    decision like this, it's a decision that

8    I take part in.  And I know -- and I've

9    seen at some point seen that list.  I

10   just don't recall -- I can't recall what

11   the lists.

12           The most important -- the

13   most important thing, if you -- if you

14   continue to read in the footnote, the

15   most important thing is that it doesn't

16   materially change the conclusions if we

17   include them or not.  We are just

18   excluding them out of caution here.

19   Q.    Turning your attention to

20   Paragraph 84, and in particular Figure

21   1.18.

22           And again, this is a figure

23   that compares the top 25 counties in

24   terms -- top 25 percent of counties in

Highly Confidential - Subject to Further Confidentiality Review

1  terms of shipments to the bottom

2  25 percent, correct?

3          A.     That's correct.

4          Q.     And Figure 1.18 looks at

5  prescription overdose mortality rates by

6  those county categories, correct?

7          A.     That's correct.

8          Q.     Do you know what the

9  prescription overdose mortality rate was

10  in any of these years for Cuyahoga

11  County?

12          A.     I don't recall offhand.  I

13  have seen it.  And there is

14  Cuyahoga-specific data referred to later.

15  Actually, we can look at that.  If you

16  look at -- let's see.  Okay.  If we go

17  to -- later we discuss Cuyahoga and

18  Summit more particularly.

19                Yes.  So if you look at --

20  if you look at Figure 1.23, this is all

21  opioid, not just prescription opioids.

22  So it's not quite comparable.  But we

23  have the data for prescription opioids

24  only for -- for Cuyahoga and Summit.  I

1  just don't have it in this report.

2      Q.    Okay.  Do you have any

3  opinions today about the prescription

4  overdose mortality rate in Cuyahoga and

5  Summit Counties?

6      A.    I believe that if you look

7  at these graphs -- and as I discuss in

8  the history of the opioid crisis -- most

9  of the mortality associated with opioids

10  through the late 2000s was through

11  prescription opioids.  And the trends

12  here, at least, look very comparable to

13  the trends nationally.  So if you

14  figure -- compare Figure 1.23 to Figure

15  1.18, you know, you see this sort of

16  gradual upward trend in both figures.

17          The magnitudes, it looks

18  like, if I compare the magnitude,

19  obviously the scales are different, so

20  it's a little bit hard to compare.  But

21  it looks like the magnitudes are, you

22  know, comparable.

23      Q.    And in looking at the, I

24  guess, the data on Figure 1.18 in your

1    chart, did you make any attempt to

2    control for any factors, or is it simply

3    reporting the prescription overdose

4    mortality rate by those county

5    categories?

6                    MR. KO:  Object to the form.

7                    THE WITNESS:  So the key

8              thing with this analysis, before

9              we discuss the NSDUH analysis and

10             how that was just comparing one

11             state to another, the key thing

12             with this analysis, additionally

13             at the county level, is we're

14             looking at the changes over time

15             in mortality rates.

16                  So by definition we've

17             already sort of controlled for

18             fundamental differences between

19             the two groups of counties.

20             They're represented by the

21             starting points.

22                  So the idea of this analysis

23             is anything which is sort of fixed

24             over time, the difference between

Highly Confidential - Subject to Further Confidentiality Review

1          those counties, is already

2          captured in this graph.  That's

3          why we like -- that's why most of

4          this report relies on the

5          mortality data where we can look

6          over time and say in the places

7          that got a lot of shipments after

8          the late 1990s, compared to the

9          places that got few, they look

10         comparable before those shipments

11         began and after those shipments

12         began is when they really

13         diverged.

14    BY MR. GEISE:

15         Q.   Let's talk a little bit

16    about illicit opioid use.  And in

17    particular, let's turn to page -- or to

18    Paragraph 85 of your report.  And you

19    start the paragraph by saying, "As

20    discussed above, rising illicit opioid

21    use coincided with declining shipments of

22    prescription opioids and related events

23    around 2010."

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Do you acknowledge that

3 there is a negative correlation between

4 shipments and illicit opioid use starting

5 around 2010?

6             MR. KO:  Object to the form.

7             THE WITNESS:  When you ask

8        about a negative correlation,

9        you've got to tell me more

10        about -- at what level?

11 BY MR. GEISE:

12        Q.    Okay.  Well, do you agree

13 that shipments are declining at the same

14 time that illicit opioid use is

15 increasing?

16        A.    Yes.  I agree with that.

17        Q.    Do you also agree that after

18 2010, as shipments are declining, opioid

19 mortality rates are increasing?

20        A.    Yes, that's true.

21        Q.    And in particular, illicit

22 opioid mortality rates?

23        A.    Yes.  As I describe in the

24 report, their shipments are declining

Highly Confidential - Subject to Further Confidentiality Review

1    because of these various factors,

2    crackdown on the prescription opioid

3    market, which cause people to shift to

4    illicit opioids.  So naturally you're

5    going to see shipments declining while

6    the harms of illicit opioids go up.

7         Q.    So in the period of time

8    before 2010, the correlation you find is

9    an increase in shipments and an increase

10   in opioid mortality, correct?

11            MR. KO:  Object to the form.

12            THE WITNESS:  Once again, as

13        I already in the report, we

14        established a causal relationship

15        here, not just a correlation.  And

16        we're doing that is by -- is by

17        splitting these two types of

18        counties, which were once again

19        similar in the mortality rates

20        before 2000 and yet diverged.

21            So I believe we're showing

22        that there was a causal

23        relationship that before 2010, the

24        rise -- the places that saw the

Highly Confidential - Subject to Further Confidentiality Review

1          big growths in shipments, were

2          also the places that saw the big

3          increase in prescription

4          overdose -- prescription opioid

5          overdose mortality.

6     BY MR. GEISE:

7          Q.     Then after 2010 when the

8     prescription opioid shipments decrease,

9     there continues to be an increase in

10    opioid mortality in those counties?

11         A.     In -- in those counties as I

12    illustrate later in the -- in the later

13    figures, there continues to be an

14    increase because those counties had

15    people who were already addicted to

16    opioids and they moved onto illicit

17    opioids.

18         Q.     Well, we'll talk about the

19    moving on point later.  But from

20    statistical examination of it, when the

21    shipments go down, the mortality rate is

22    going up?

23         A.     When the shipments of

24    prescription opioids are falling, in --

Highly Confidential - Subject to Further Confidentiality Review

1   they are falling due to series of actions

2   I described in the report which induce

3   individuals to switch to illicit opioids,

4   so illicit opioid mortality rises.

5          Q.    Looking at Figure 1.19 on

6   Page 60 of your report.  You have

7   mortality rates involving heroin or

8   fentanyl by county shipment category from

9   large counties, correct?

10         A.    Yes.

11         Q.    And the mortality involving

12  heroin or fentanyl per 100,000 was higher

13  in the top quartile than it was in the

14  bottom quartile going back to 1999 when

15  this graph starts, correct?

16         A.    Right.  That's why it's very

17  useful to do a graph like this where you

18  show the evolution over time.  Clearly

19  these two sets of counties have some

20  long-run differences in them.  The key

21  observation in this graph is that after

22  2010 when there was a move to illicit

23  opioids, the places that had more

24  shipments of prescription opioids were

Highly Confidential - Subject to Further Confidentiality Review

1  the ones where illicit mortality grew the

2  most.

3      Q.    And you say it's important

4  to look at this -- this graph showing the

5  evolution over time, correct?

6      A.    Yes.

7      Q.    Was there ever a time prior

8  to 1999 when the mortality rate involving

9  heroin or fentanyl was the same in these

10 two quartiles?

11     A.    This graph goes back as far

12 as we have the data for large counties.

13     Q.    Did you look for -- did you

14 look for data before 1999?

15     A.    Actually can I strike that

16 answer?  No, large county data are

17 available earlier.  We looked to data

18 back to 1990 -- to 1997 at some points,

19 but I don't recall if we looked before

20 1997.

21     Q.    And do you know if there was

22 ever a time when the mortality rate

23 involving heroin and fentanyl was the

24 same in these two quartiles?

1          MR. KO:  Object to the form.

2          THE WITNESS:  No.

3    BY MR. GEISE:

4          Q.    Do you know if you or

5    Compass Lexecon or people working with

6    you looked for that information going

7    back to that period of time?

8          A.    I am not sure we did.

9    Because once again if you look at this

10   graph, there's a decade where it's clear

11   that these two counties are -- are

12   trending in exactly parallel fashion.

13   And that is enough in my view to

14   establish causally that these two

15   counties were in very similar positions

16   in terms of any changes in use of illicit

17   opioids.  And it was only after 2010 the

18   two counties started to deviate.  So

19   whether they were the same in 1990 is

20   sort of irrelevant, I think, to this

21   conversation.

22          Q.    Well, do you know how the

23   shipment of prescription opioids into

24   these counties compared if and when the

Highly Confidential - Subject to Further Confidentiality Review

1    mortality rates were equal?

2            MR. KO:  Object to the form.

3            THE WITNESS:  I don't

4       understand the question.

5    BY MR. GEISE:

6       Q.    Sure.  So here you have --

7    you split between the top quartile and

8    the bottom quartile in terms of

9    shipments, correct?

10      A.    Correct.

11      Q.    And even at the beginning of

12   1999, the mortality rate is higher in the

13   counties with the top 25 shipments

14   compared with the bottom 25, correct?

15      A.    Correct.

16      Q.    What I'm saying is do you

17   know -- and I think you said you don't

18   know if there was ever a time when the

19   mortality rate was the same in those two

20   quartiles, correct?

21      A.    And as I said before, I

22   don't know.  But the reason I really feel

23   that I need to know is because the

24   evidence is clear from the time period we

Highly Confidential - Subject to Further Confidentiality Review

1  present to make the causal case that in

2  those counties with high shipments,

3  that's where the illicit deaths went up

4  the most.

5       Q.    Wouldn't it be relevant to

6  your analysis if the shipment into those

7  counties -- how that shipment into those

8  counties compared if their mortality

9  rates were equal?

10            MR. KO:  Object to the form.

11            THE WITNESS:  No, it

12       wouldn't, because the key causal

13       change this report establishes is

14       that the increase in use in harm

15       from illicit opioids arose after,

16       primarily, after the crackdown

17       through abuse deterrent

18       formulations, PDMPs, pill mills,

19       et cetera, in prescription

20       opioids.

21            So in showing the decade

22       before that and showing that these

23       two places are on parallel

24       trends -- they are different.  I

1          agree.  You've mentioned that, but

2          that's why we show it over time.

3              We show that there are

4          parallel trends.  Suddenly what

5          happens after 2010 is when they

6          deviate.  Exactly when the --

7          these factors, the abuse deterrent

8          formulation, PDMPs, and pill mill

9          crackdowns and others, happened.

10  BY MR. GEISE:

11      Q.   If the mortality rates were

12  equal at a period of time for these

13  counties, and the shipments were still

14  different, wouldn't that indicate that

15  there are additional variables that

16  impact the mortality rate from heroin or

17  fentanyl?

18          MR. KO:  Object to the form.

19          THE WITNESS:  No.

20  BY MR. GEISE:

21      Q.   In Paragraph 87 of your

22  report, first sentence, referring to the

23  figures in Figure 1.20.  "As these

24  figures indicate, the growth in opioid

1    mortality including that from

2    prescription and illicit opioids has a

3    strong relationship with per capita

4    shipments of prescription opioids between

5    1997 to 2010 with counties that received

6    more shipments experiencing higher

7    mortality rates."

8                 Do you see that?

9         A.    Yes.

10        Q.    Do you know if there is a

11   relationship between a higher number of

12   shipments of prescription opioids and the

13   number of individual opioid users in a

14   county?

15        A.    I would strongly assume that

16   it's very positive, but I don't know the

17   magnitude and I haven't done that

18   analysis.

19        Q.    On Footnote 99 of that same

20   page, you cite to a study by David Powell

21   that looked at the impact of improved

22   access to opioids under Medicare Part D,

23   on nonmedical abuse of opioids; is that

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That's correct.

2    Q.    And on the third line of

3  your footnote you say, "Recognizing that

4  states differ with respect to the share

5  of the population eligible for Part D,

6  the study established that states with

7  greater eligibility experienced greater

8  increases in opioid supply and greater

9  opportunities for diversion of shipments

10  by recipients or pharmacies in these

11  states."

12          Do you see that?

13    A.    Yes.

14    Q.    So do you agree that states

15  with populations with greater Part D

16  eligibility experience greater increases

17  in the opioid supply?

18    A.    I believe that that is

19  established by this article, yes.

20    Q.    And do you agree that

21  shipments to a state are partially driven

22  by greater Part D eligibility?

23    A.    Yes, I believe that's once

24  again established by this study.

1    Q.    And when we looked at your

2  appendix before of the regression

3  analysis you ran, it -- on second look it

4  doesn't seem like you used as a variable

5  those 65 or over.

6    A.    Actually I do.  If you go to

7  the regression.  The way regressions work

8  is you can't put in a set of variables

9  that add up to one.  So in other words,

10  if you want to control for age, you don't

11  put in percent below 65, percent above

12  65.  You just put percent below 65.  The

13  percent above 65 is implicitly

14  incorporated by the constant term.

15          So when you include these

16  categorical variables, like you'll see

17  white, black, Hispanic, there's another

18  race variable that's not included, those

19  add up to one.  So we are essentially

20  controlling for the share over 65 in this

21  regression.

22    Q.    Now, do you agree that the

23  defendants in this case do not have any

24  responsibility for how a state handles

1    Medicare Part D eligibility?

2              MR. KO:  Object to the form.

3              THE WITNESS:  Just not

4         really something I've thought

5         about or have any expertise in.

6    BY MR. GEISE:

7         Q.    Well, as you point out in

8    your footnote, populations with greater

9    Part D eligibility experience greater

10   increase in opioid supply, correct?

11        A.    That's what the study

12   establishes, yes.

13        Q.    Okay.  So in terms of why --

14   the relationship to shipments, greater

15   Part D eligibility has an impact on

16   shipments, correct?

17        A.    Greater Part D

18   eligibility -- yes.

19        Q.    But in this case, do you

20   know if any of the defendants have any

21   responsibility for how a state handles

22   Part D eligibility?

23              MR. KO:  Objection.  Asked

24         and answered.

 1                    THE WITNESS:  I don't know.

 2    BY MR. GEISE:

 3         Q.    So to the extent that Part D

 4    eligibility impacts shipments to a

 5    particular county, that's something that

 6    the defendants in this case would not

 7    have any involvement in, correct?

 8                    MR. KO:  Objection.  Asked

 9         and answered.

10                    THE WITNESS:  I just said I

11         don't know.

12                    (Document marked for

13         identification as Exhibit

14         Gruber-4.)

15    BY MR. GEISE:

16         Q.    Mr. Gruber, I'm handing you

17    what's marked as Exhibit 4 to your

18    deposition.  And this is entitled "How

19    Increasing Medical Access to Opioids

20    Contributes to the Opioid Epidemic:

21    Evidence From Medicare Part D."  And it's

22    written by David Powell, Rosalie Liccardo

23    Pacula, and Erin Taylor from April of

24    2017.

1          Do you see that?

2          A.    I do.

3          Q.    And is this the study that

4    you're referring to in Footnote 99 of

5    your report?

6          A.    Yes, it is.

7          Q.    I want to ask you about a

8    couple of statements in this study.  If

9    you could look to Page 2 of Exhibit 4.

10          In the second paragraph, you

11   see where it begins, "Unlike many drugs

12   associated with overdose, deaths, and

13   other harms, opioids remain an important

14   medical tool which in certain cases are

15   even believed to be underprescribed."

16          Do you see that?

17          A.    Yes, I do.

18          Q.    Are you aware that the

19   economic literature reports that opioids

20   are under -- some believe opioids to be

21   underprescribed?

22          MR. KO:  Object to the form.

23          THE WITNESS:  I'm -- I'm

24          aware and have read a number of

Highly Confidential - Subject to Further Confidentiality Review

```
 1              articles, which suggest that in
 2              certain instances opioids were not
 3              appropriately used to manage
 4              pain -- were not used enough to
 5              manage pain in certain instances.
 6      BY MR. GEISE:
 7              Q.    Continuing further down in
 8      that same paragraph, there's a sentence
 9      that reads, "Despite clear concurrent
10      national trends in overdoses and medical
11      distribution of opioids since 1999, as
12      well as geospacial correlations, there is
13      little empirical evidence of the causal
14      relationship between the increasing
15      supply of medically intended opioids and
16      spillovers to the nonmedical market."
17              Do you see that?
18              A.    Yes.
19              Q.    Do you interpret the phrase
20      "the increasing supply of medically
21      intended opioids" as equating to
22      prescription activity for prescription
23      opioids?
24              MR. KO:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

1               THE WITNESS:  I'm not sure

2         what they mean by that.

3    BY MR. GEISE:

4         Q.    What do you think they could

5    mean by that?

6         A.    I think -- I don't want to

7    speak for them.  I would interpret it as

8    prescription opioids.  That's how I read

9    that sentence.

10        Q.    How do you interpret the

11   phrase "spillovers to the nonmedical

12   market" in that sentence?

13        A.    I interpret that as use for,

14   you know, use of opioids for which they

15   were not prescribed.

16        Q.    If you look on Page 3 of

17   Exhibit 4, the bottom paragraph in the

18   second sentence, the authors write,

19   "However, access to opioids has increased

20   at levels proportional to the rise in

21   overdoses, and there is evidence of a

22   positive correlation between opioid

23   prescribing and opioid abuse."

24               Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      Do you agree that opioid

3  prescribing would be a relevant

4  independent variable to an analysis of

5  the factors driving opioid misuse?

6               MR. KO:  Object to the form.

7               THE WITNESS:  I believe that

8          there's a number of ways that you

9          can proxy misuse.  I think that in

10         my analysis, I think the most --

11         you know, the most empirically

12         relevant for my analysis is

13         shipments.  But there's a number

14         of different proxies for the

15         amount of misuse.

16             Not all -- not all opioids

17         that are used are prescribed,

18         because, as you mentioned,

19         diversion earlier.  So that would

20         not be a perfect measure, just

21         like shipments is not a perfect

22         measure.

23  BY MR. GEISE:

24      Q.      Do any of the comparisons

1    that you conducted in your report control

2    for opioid prescribing?

3           A.    Once again, we -- it's all

4    just a question of how you best proxy for

5    the variable you care about, which is the

6    actual opioid use, and opioid prescribing

7    is one proxy.  Shipments is another

8    proxy.  So we focused on shipments as --

9    because -- because shipments was the data

10   available over time at the county level,

11   which allowed us to do our empirical

12   analysis.

13          Q.    Opioids prescribing is -- is

14   a proxy you could have used, but you did

15   not use here?

16          A.    Opioid prescribing, I don't

17   believe it's as good a proxy for

18   various -- for various reasons.  But

19   certainly the number of prescriptions of

20   opioids is another proxy one could use.

21          Q.    You say it's not as good of

22   a proxy.  Did you do anything to compare

23   opioid prescribing as a proxy compared to

24   shipments as a proxy?

1      A.    What I meant by that

2   statement is it's not as useful for our

3   empirical analysis because we don't have

4   data at the county level over time on

5   prescribing.

6      Q.    We'll look at Paragraph 88

7   of your report.  And in the first two

8   sentences, you write, "The overview of

9   the opioid crisis in Section 3 above

10  explains how declining shipments of

11  prescription opioids after 2010 transform

12  the opioid crisis from one centered on

13  prescription opioids to one involving

14  both prescription and, to an even greater

15  degree, illicit opioids, first to heroin

16  and later fentanyl.  As shown in Figure

17  1.4 above, there was no material trend in

18  heroin mortality nationally from 1999

19  through 2010, but mortality involving

20  heroin accelerated sharply following the

21  end of the dramatic 20-year increase in

22  shipments of prescription opioids."

23           Do you see that?

24      A.    Yes, I do.

1    Q.    Professor Gruber, do you

2  agree that the sharp increase in heroin

3  mortality after 2010 was due at least in

4  part to fentanyl?

5    A.    The sharp increase -- I

6  don't really understand the question, I

7  guess.

8    Q.    Well, according to your

9  figures you show an increase in the trend

10  in heroin mortality following 2010,

11  correct?

12    A.    Yes.  That's in Figure 1.4.

13    Q.    Correct.  And do you have an

14  opinion whether the increase in heroin

15  mortality following 2010 was due at least

16  in part to fentanyl?

17         MR. KO:  Object to the form.

18    Asked and answered.

19         THE WITNESS:  I guess I

20    don't understand what you mean,

21    due to -- caused by fentanyl.  I

22    don't understand the statement

23    that you're making.  Sorry.

24  BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  That's okay.  When

2    you look at your mortality rates in your

3    report, specifically Figure 1.19 --

4    A.    Okay.

5    Q.    -- where it's mortality

6    involving heroin or fentanyl by county

7    shipment category and large counties.

8         Do you see that?

9    A.    What page is that on?

10   Q.    Page 60.

11   A.    Yes.

12   Q.    So that looks at mortality

13   involving heroin or fentanyl, correct?

14   A.    That's correct.

15   Q.    All right.  And does that

16   mortality rate -- obviously it takes into

17   account fentanyl, correct?

18   A.    Yes.  This is mortality of

19   heroin or fentanyl.

20   Q.    Right.  And did the relative

21   risk of dying from heroin use increase

22   during the time period after 2010?

23   A.    It increased -- yes, after

24   2010 it increased.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And what was -- what

2  led to the increase in the relative risk

3  of dying from heroin use after 2010?

4    A.    What -- let me go back and

5  clarify your question.  When you say

6  relative risk, relative to what?

7    Q.    Well, on a per capita basis

8  of heroin users, did the mortality rate

9  increase after 2010?

10    A.    Okay.  So I'm sorry, I have

11  to strike my other answer.  That's not

12  what I thought you meant.

13         When you say -- you're

14  saying among heroin -- just to clarify,

15  you're asking among heroin users --

16    Q.    Yes.

17    A.    -- did the risk of death

18  increase after 2010.  I don't recall.

19  That's not in my report.  I don't recall

20  whether that's the case.

21    Q.    Do you know if -- you cite

22  to the Evans article from 2019 in your

23  report, correct?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know if the Evans

2    article talked about fentanyl having a

3    large impact on heroin mortality after

4    2013?

5    A.    I don't recall.

6    Q.    Did you conduct any analysis

7    to determine to what extent the increase

8    in heroin mortality after 2010 was due to

9    fentanyl?

10   MR. KO:  Object to the form.

11   THE WITNESS:  What I did --

12   no, I did not conduct that

13   analysis.  At least not in the

14   report.  We may have looked at

15   that at some point during the year

16   working on this case, but it's not

17   in the report.

18   BY MR. GEISE:

19   Q.    Did you conduct any analysis

20   to determine to what extent the increase

21   in heroin mortality was due to

22   carfentanil?

23   A.    The same answer that I just

24   gave.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Same answer?

2            Is there any reason for

3   purposes of forming your opinions when

4   you're going to talk about mortality

5   involving heroin or fentanyl as depicted

6   in Figure 1.19, why you didn't perform

7   any analysis to see what -- what -- I

8   guess the extent that fentanyl played in

9   that increase in mortality?

10           MR. KO:  Object to the form.

11           THE WITNESS:  Well, we -- we

12       do show the breakout earlier

13       between -- I believe that's a

14       figure -- I guess I can't recall

15       for sure -- that shows the growth

16       of heroin mortality and fentanyl

17       mortality separately.

18           Certainly we do that for

19       Cuyahoga and Summit.  I know those

20       figures exist.  I showed you those

21       before, where we show separately

22       for Cuyahoga and Summit, the

23       trends in mortality, so we look

24       at -- no, I'm sorry, that's not

Highly Confidential - Subject to Further Confidentiality Review

1    right.  That's opioid and

2    non-opioid.

3         Hold on.  Let me just look

4    for one minute at the list of

5    figures.

6         Yeah, I guess we don't show

7    that here that I recall.  Actually

8    Figure 1 -- one second.

9         Yeah, Figure 1.8, on

10   Page 38, we show mortality for

11   prescription opioids, heroin

12   excluding fentanyl and -- and

13   fentanyl.

14   BY MR. GEISE:

15        Q.    Correct.  And if you look at

16   the lines there, heroin mortality

17   excluding fentanyl goes up in 2010 and

18   then about 2'13 it plateaus through 2'16,

19   correct?

20        A.    I don't know exact -- I

21   would say it sort of plateaus in 2014 --

22        MR. KO:  200 -- I'm sorry?

23        THE WITNESS:  2014.

24        MR. GEISE:  Two thousand --

1        Sorry.

2               THE WITNESS:  2014.  I'd say

3        it plateaus around then.  But yes,

4        that's absolutely right.  It --

5  BY MR. GEISE:

6        Q.    And is there -- I'm sorry.

7  Go ahead.

8        A.    There's another spike in

9  heroin mortality after 2010 that sort of

10  plateaus around 2014.

11        Q.    And in fact, it -- after

12  2014 it plateaus and decreases, correct?

13        A.    At the end of the sample it

14  decreases, yes.

15        Q.    On the other hand, mortality

16  involving fentanyl after 2010 to about

17  2013, there's a dramatic increase in

18  mortality involving fentanyl, correct?

19               MR. KO:  Object to the form.

20               THE WITNESS:  Once again,

21        after 2013 it is a dramatic

22        increase.  And I describe in the

23        report essentially the evolution

24        of the sort of increasing

Highly Confidential - Subject to Further Confidentiality Review

1      inclusion of fentanyl products in

2      opioid distribution.  Fentanyl is

3      exceedingly -- is much more

4      dangerous than is heroin.  And as

5      a result, as fentanyl gets

6      included, it's causing a much more

7      larger rise in mortality.

8  BY MR. GEISE:

9      Q.    Were there any other factors

10  that led to the increase in heroin

11  mortality after 2010 that you considered?

12      A.    In -- yes, we considered

13  whether that was due to changes in

14  economic conditions, and we also used --

15  looked at changes in non-opioid mortality

16  as a proxy for other general changes and

17  conditions that might have increased use

18  of any opioids including heroin.

19      Q.    You -- you picked 2010 as

20  kind of a sharp demarcation in time.  Is

21  that fair?

22          MR. KO:  Object to the form.

23          THE WITNESS:  In -- in the

24      report, that seems to be clear in

Highly Confidential - Subject to Further Confidentiality Review

1          the data.

2     BY MR. GEISE:

3          Q.    And some of the things you

4     talked about earlier in your deposition

5     that occurred around that time were

6     anti-abuse formulations, prescription

7     drug monitoring programs, and increased

8     law enforcement, do you recall that?

9          A.    Those were three of the

10    factors I listed, yes.

11         Q.    Now, those factors didn't

12    come online exactly in 2010, correct?

13         A.    It's different timing for

14    different factors.  There -- but there

15    was not on one date in which all three of

16    those came online.

17         Q.    Did you conduct any research

18    into the development and evolution of

19    Ohio's prescription drug monitoring

20    program?

21         A.    No, I did not.

22         Q.    Do you know when Ohio first

23    had a prescription drug monitoring

24    program?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I knew at some point, but I
2    don't recall.
3          Q.    Do you know the name of
4    Ohio's prescription drug monitoring
5    program?
6          A.    Once again I knew at one
7    point, but I don't recall.
8          Q.    Did you conduct any analysis
9    about the implementation of Ohio's
10   prescription drug monitoring program in
11   Cuyahoga or Summit County?
12         A.    Once again, the analyses in
13   my report are trying to use multiple
14   observations to draw correlational
15   conclusions.  Within one state, by just
16   using data on one state, it's impossible
17   to draw a causal conclusion.  Well,
18   it's -- more difficult.  I'm sorry, I
19   shouldn't say impossible.
20              It is more difficult to draw
21   a causal conclusion about the effect of
22   that state's policy on just that state,
23   without doing a multistate comparison.
24   And therefore, it's very hard to

1   determine the effect on a particular

2   county within the state.

3           Q.    So is the answer to my

4   question that you did not do an analysis

5   about the implementation of Ohio's PDMP

6   in Cuyahoga or Summit County?

7           A.    Once again I'm saying it

8   would be hard to look at the effect of

9   Ohio's PDMP on -- to take that -- to take

10  that one observation and explain it.

11  That's why when we do these analyses in

12  both my report and Professor Cutler's

13  report, we use large groups of data to

14  look for the -- to look for the causal

15  relationships in the data.

16          Q.    And I'm just asking, did you

17  look to see what took place in Cuyahoga

18  and Summit County with the development

19  and evolution of the prescription drug

20  monitoring program to see how it lines up

21  in time with your other opinions?

22              MR. KO:  Object to the form.

23          Objection.  Asked and answered.

24              THE WITNESS:  Once again, we

1          don't know how much we can learn

2          from just lining those up over

3          time, because lots of things are

4          changing over time.

5    BY MR. GEISE:

6          Q.   Do you agree that the

7    adoption of prescription drug monitoring

8    programs had an important effect on the

9    market for opioids and heroin?

10               MR. KO:  Object to the form.

11               THE WITNESS:  I believe it

12          had an effect.  The evidence on

13          the magnitude of that effect is,

14          as I discussed in my report, it's

15          mixed.

16   BY MR. GEISE:

17          Q.   Who are the entities

18   responsible for adopting prescription

19   drug monitoring programs?

20               MR. KO:  Objection.

21          Foundation.

22               THE WITNESS:  I actually

23          don't know.

24   BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you have any

2    understanding that the manufacturers and

3    distributors who are defendants in this

4    case are responsible for adopting a

5    prescription drug monitoring program?

6              MR. KO:  Same objection.

7              THE WITNESS:  I don't know.

8    BY MR. GEISE:

9    Q.    Do you have an opinion as to

10   whether traffickers of illicit drugs from

11   Mexico were a factor in the increase in

12   heroin mortality after 2010?

13   A.    Yes.  I believe that that

14   was a factor in the increase in mortality

15   after 2010.

16   Q.    Did you do anything to

17   assess how much of a factor traffickers

18   from Mexico were in the increasing in

19   heroin mortality deaths after 2010?

20   A.    We, once again in our

21   analysis looked at the changes in opioid

22   mortality on the east and west of the

23   Mississippi, which were very different

24   kinds of heroin, to try to look at that.

1    But we did not specifically conduct an

2    empirical analysis of the effect of

3    Mexican trafficking.

4         Q.    Did you conduct any analysis

5    as to whether a reduced social stigma in

6    connection with the use of heroin was a

7    factor in the increase in heroin

8    mortality after 2010?

9              MR. KO:  Object to the form.

10            Objection.  Foundation.

11            THE WITNESS:  So let me be

12            clear on what we did.  We did, in

13            this report, several things.

14                 First, we show a very

15            striking change in heroin

16            mortality at exactly the point

17            when these -- when these changes

18            were coming online.

19                 We also then, as following

20            standard empirical practice, said,

21            well, let's make sure -- so we

22            did -- we did three things.

23                 We looked at -- we saw the

24            striking time series change.  We

Highly Confidential - Subject to Further Confidentiality Review

1    show heroin and fentanyl mortality

2    go up most in the places that had

3    the more shipments.  And we then,

4    as is standard empirical practice,

5    tried to rule out other factors

6    that could explain that.

7         The primary hypotheses of

8    what could explain that are

9    changes in economic conditions and

10   changes in stigma or other

11   attitudes.

12        And the proxies for that is

13   to ask, well, did non-opioid

14   mortality change?  If other things

15   were changing which caused people

16   to, say, be less averse to using

17   drugs and that led to more death,

18   you'd see or more deaths from

19   non-opioids, and you don't.  Or

20   you don't see that differential

21   emerging across these counties.

22   BY MR. GEISE:

23        Q.   Well, did you conduct any

24   analysis as to how many post-2010 deaths

Highly Confidential - Subject to Further Confidentiality Review

```
 1   resulted from fentanyl-laced non-opioids?

 2        A.    Fentanyl -- we at some point

 3   we looked separately at all -- trends

 4   are -- are -- fentanyl-laced non-opioids?

 5   Well, let's be clear.  When we're

 6   defining an opioid death here, it's

 7   described in the report, it's a death

 8   that involves opioid.  So there's no such

 9   thing as a fentanyl-laced non -- there

10   are fentanyl-laced, for example,

11   methamphetamine deaths.  But that is an

12   opioid death.  And so we included that in

13   our count of fentanyl-related deaths.

14        Q.    Do you know the percentage

15   of fentanyl-related deaths that involved

16   fentanyl-laced non-opioids?

17             MR. KO:  Object to the form.

18        Mischaracterizes the previous

19        answer.

20             THE WITNESS:  I do not

21        recall offhand, no.  But once

22        again, we are -- the key thing we

23        do here is to look at -- is to

24        establish that this is driven by
```

Highly Confidential - Subject to Further Confidentiality Review

1          opioids is to look at the

2          non-opioid mortality.

3    BY MR. GEISE:

4          Q.    Did you conduct any analysis

5    as to how many heroin deaths post 2010

6    resulted in individuals who had never

7    consumed prescription opioids?

8          A.    There's not an analysis that

9    I'm aware of that's done that.  To be

10   clear, I don't know how you'd possibly do

11   that.

12         Q.    Now, one of the opinions

13   that you set forth in your report is that

14   the reduction in prescription -- in

15   shipment of prescription opioids

16   beginning in 2010 led to an increase in

17   opioid mortality rates, correct?

18         A.    That's correct.

19         Q.    Is it your opinion that

20   opioid-related mortality rates would be

21   lower if there had not been a reduction

22   in the shipment of prescription opioids?

23              MR. KO:  Object to the form.

24              THE WITNESS:  I don't know.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. GEISE:

 2         Q.    Is that something that you

 3    examined?

 4         A.    Well, you'd have to --

 5    before the reformulation, if you look

 6    at -- as you can see in Figure 1.8 that

 7    we were just looking at, prescription

 8    deaths were rising.  Now, it's true after

 9    2010 opioid deaths rose more rapidly.

10    But we can't say for sure what -- absent

11    the reformulation or absent other policy

12    changes, what would have happened to

13    prescription mortality.  It might have

14    started rising itself.  We don't know.

15         Q.    In Paragraph 51 of your

16    report, you state that, "However, the

17    substitution of illicit opioids for

18    prescription opioids expanded

19    dramatically starting around 2010,

20    closely coinciding with the declines in

21    shipments associated with increased legal

22    enforcement, increased awareness of the

23    potential for abuse, and the launch of

24    abuse-deterrent formulations."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2          A.    Yes.

3          Q.    Now, in other parts of your

4    report, you have footnotes that you cite

5    for statements contained within the

6    separate paragraphs.  There's not a

7    footnote contained for that statement.

8    Is there a cite for your first sentence?

9          A.    The first sentence repeats a

10   point that's made multiple times in the

11   report in footnoted ways.  I felt it was

12   clear enough -- that I footnoted it clear

13   enough in other contexts that I could

14   sort of summarize here without having to

15   footnote that.

16         Q.    Let's look at some of those

17   other contexts that you're talking about.

18   If you can turn your attention to Page 62

19   of your report.  You have a heading,

20   "Epidemiological Evidence Establishes the

21   Impact of Prescription Opioids on Heroin

22   Use."

23              Do you see that?

24         A.    Yes.

1    Q.    And Professor Gruber, do you

2    consider yourself to be an

3    epidemiologist?

4    A.    I'm not trained as an

5    epidemiologist, but I am a consumer

6    and -- of the epidemiological literature

7    throughout my career.

8    Q.    You don't have a degree in

9    epidemiology?

10    A.    No, I do not.

11    Q.    You don't teach courses in

12    epidemiology?

13    A.    In my both graduate and

14    undergraduate teaching, I do a lot of

15    teaching that involves covering and

16    summarizing epidemiological articles.

17    Q.    Okay.  But that's different

18    than teaching epidemiology, though,

19    right?

20    A.    I do not teach a course

21    entitled "Epidemiology."

22    Q.    In looking at Page 67 on

23    your report.  You have Table 1.1 that is

24    a summary of epidemiological studies

1   establishing the link between

2   prescription opioids and heroin use.

3              Do you see that?

4        A.    Yes.  And I apologize for

5   the small font.

6        Q.    That's okay.  And you list

7   five studies on Table 1.1, correct?

8        A.    Yes.

9        Q.    And does this table list the

10  studies upon which you relied for your

11  opinions contained in -- I guess it's

12  Subsection 5 of your report, in

13  particular 5A?

14       A.    Yes.

15       Q.    Are these five studies the

16  only studies of the epidemiological

17  evidence that you considered for

18  portion -- for this portion of your

19  report?

20       A.    I don't recall how broadly I

21  looked at articles.  But these are the

22  five I relied on primarily.

23       Q.    Do you recall looking at

24  other studies or articles and determining

1  not to use them in your report?

2        A.    I don't recall.

3        Q.    Did you find these five

4  studies yourself or did people within the

5  team working with you identify them for

6  you?

7        A.    The people working with the

8  team under my direction, for what kind of

9  studies we're looking for, did a

10  literature review, which is typically

11  done when I do write a -- do a

12  research -- a team carries out a

13  literature review, and they identified

14  these as the key articles.

15        Q.    So you -- did you instruct

16  the team to find you literature on

17  epidemiological evidence that established

18  the impact of prescription opioids on

19  heroin use?

20        A.    No.  I asked them to find

21  studies which studied the link between --

22  you know, when you collect the

23  literature, you need to collect the

24  literature on a question, not a

1    conclusion.

2           So I asked them to find

3    studies that studied the link.  After

4    reviewing that literature it became very

5    clear, the conclusion of the literature

6    was very clear that it did establish this

7    link and so those were the studies that

8    focused on this report.

9           Q.    When you say the conclusions

10   of the literature, are you referring to

11   the conclusions in these five studies or

12   epidemiological literature in total?

13          A.    We did --

14                MR. KO:  Object to the form.

15                THE WITNESS:  We did not

16          find any studies that we deemed

17          significant that drew a conclusion

18          to the opposite of these.  So

19          rather than summarizing an entire

20          literature, we picked the ones --

21          we picked a sample of studies that

22          clearly show this relationship,

23          and I'm not aware of any studies

24          in the epidemiological literature

Highly Confidential - Subject to Further Confidentiality Review

1    which offer contrary evidence to

2    these -- to this conclusion.

3  BY MR. GEISE:

4        Q.    So do you recall if there

5  were any studies in addition to these

6  five that were brought to you for review

7  on this topic?

8        A.    I don't recall, but I do

9  recall that there were no studies brought

10  to me that offered a -- a conclusion that

11  differed in a significant way from the

12  conclusion that we just summarized in the

13  report and -- and discuss here.

14            In a number of places in

15  this report, as you pointed out yourself,

16  if things are a little bit vague or

17  uncertain, I call attention to them.

18  This is a -- this we feel is a fair

19  representation of the conclusion from the

20  epidemiological literature.

21        Q.    And I think I -- I

22  understand your question, but -- or your

23  answer.  But you don't know if you looked

24  at anything in addition to these five

Highly Confidential - Subject to Further Confidentiality Review

1    studies, correct?

2              MR. KO:  Objection.  Asked

3         and answered.

4              THE WITNESS:  Once again I

5         know I looked at a broader set of

6         studies.  I don't recall which

7         ones.  But the -- I know that the

8         conclusion did not -- I -- I never

9         saw a study which drew a different

10        conclusion than the -- than the

11        results I'm summarizing here.

12   BY MR. GEISE:

13        Q.    So I'm going to ask you

14   about some studies, but I just want to

15   clarify that on the record.  It -- it's

16   your testimony that you never saw an

17   epidemiological study which drew a

18   different conclusion than the result you

19   summarize in this section of your report?

20        A.    I did not.

21        Q.    Now, with regard to the link

22   between prescription opioid use and

23   heroin use, have you heard that referred

24   to as a gateway hypothesis?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    What is your understanding

3 of the gateway hypothesis?

4    A.    Well, it's -- gateway

5 hypothesis generally is the notion that

6 there are certain drugs through which

7 their use that leads you to move onto

8 another drugs.

9    Q.    Have you also heard of a

10 theory called the common liability to

11 addiction theory?

12    A.    No, I've not.

13    Q.    You've not come across that

14 in any of your review of the literature?

15    A.    I mean I may have, but I

16 don't recall the -- I don't recall that

17 term.

18    Q.    Since you don't recall that

19 term, am I safe to assume that you didn't

20 consider that theory as part of your

21 analysis in this case?

22    A.    Yes.

23    Q.    Professor Gruber, have you

24 ever written an academic paper on the --

Highly Confidential - Subject to Further Confidentiality Review

1    the gateway hypothesis?

2           A.    I believe I've discussed --

3    I may have discussed -- I may have

4    discussed it in some of my work, but I

5    don't recall.  I certainly never wrote an

6    article where that was the sole focus.

7           Q.    Do you agree that there are

8    a number of paths an individual can take

9    to becoming a heroin user?

10               MR. KO:  Object to the form.

11               THE WITNESS:  I don't -- I

12          guess that's a really broad

13          question.  I don't quite

14          understand what you mean.

15   BY MR. GEISE:

16          Q.    Well, based on your report,

17   it appears one of the views you take

18   is -- is that prescription opioids is one

19   path somebody can take to becoming a

20   heroin user, correct?

21          A.    Yes.

22               MR. KO:  Object to the form.

23   BY MR. GEISE:

24          Q.    But you don't think that's

Highly Confidential - Subject to Further Confidentiality Review

1    the only path somebody could take to

2    becoming a heroin user, correct?

3           A.    That's correct.

4           Q.    Somebody can initiate heroin

5    use without ever using any other drug or

6    substance before that, correct?

7           A.    That is correct.

8           Q.    People can progress from

9    using cocaine to then using heroin

10   following using cocaine, correct?

11          A.    I'm not an expert in this

12   area, so you're now sort of extending

13   beyond what I know about drug pathways.

14          Q.    Well, let me ask you.  If

15   you're not an expert in this area, how do

16   you feel comfortable providing an opinion

17   about people transitioning from

18   prescription opioids to heroin?

19          A.    What I mean by that is I'm

20   not an expert in all the various pathways

21   by which people become addicted to

22   heroin.  I also, before reviewing

23   literature, would not have considered

24   myself an expert on the particular

1   pathway.  I -- I was aware of -- of the

2   view that there was that pathway.  But

3   it's not something I'd studied in my

4   academic research.  That's why I do a

5   literature review.  And I did the

6   literature review and it clearly

7   established that pathway.  I have not

8   reviewed the literature on all pathways

9   to heroin.  That's why I said I don't

10  consider myself an expert on all the

11  possible pathways one could lead to

12  heroin use.  I viewed the literature on

13  this pathway, and I do -- do consider

14  myself an expert on that.

15          Q.    So you consider yourself an

16  expert on the pathway of prescription

17  opioid use to heroin use on the basis of

18  your review of these five epidemiological

19  studies?

20              MR. KO:  Object to the form.

21              THE WITNESS:  I believe,

22          based on my -- based on the data

23          I've looked at, these

24          epidemiological studies, the

Highly Confidential - Subject to Further Confidentiality Review

1    economic studies I'm sure we'll

2    discuss soon, I believe based on

3    that literature that I've

4    developed an expertise on that

5    question, yes.

6  BY MR. GEISE:

7         Q.    But you agree with me that

8  you're not an expert in the pathways of

9  becoming a user of heroin?

10        A.    I am not an expert in all

11 the possible pathways of becoming a user

12 of heroin, no.

13        Q.    When you qualify it by

14 saying you're not an expert in all the

15 possible pathways of becoming a user of

16 heroin, is it accurate to say that the

17 only pathway you believe you're an expert

18 in is prescription opioids and the use of

19 heroin?

20             MR. KO:  Object to the form.

21             THE WITNESS:  That's the one

22        that I focused on, yes.

23 BY MR. GEISE:

24        Q.    Not only have you only

Highly Confidential - Subject to Further Confidentiality Review

1  focused on that one, but you haven't

2  compared that pathway to any other

3  pathway of becoming a heroin user?

4      A.    I have not studied that, no.

5      Q.    In your review of any

6  literature, have you seen it described

7  that another pathway of becoming a heroin

8  user is -- is through binge drinking?

9      A.    I have not seen that, no.

10     Q.    Have you seen any literature

11  that discusses marijuana as a pathway to

12  becoming a heroin user?

13     A.    Once again I'm sure there

14  are literatures out there on a number of

15  different pathways.  That's not really --

16  what I'm studying here is establishing --

17  this is part of a suite of evidence that

18  I establish in this report.  In this

19  report I'm using this epidemiological

20  evidence to support the conclusion of

21  both the economic evidence and the data I

22  show that this pathway is functional and

23  important.  I'm not offering to rule out

24  all possible pathways for that -- for

Highly Confidential - Subject to Further Confidentiality Review

1    the -- for developing the use of heroin.

2            Q.    And you don't have an

3    opinion as to how this particular

4    potential pathway compares to other

5    potential pathways, correct?

6                    MR. KO:  Object to the form.

7                    THE WITNESS:  I do not have

8            an opinion on that, no.

9                    (Document marked for

10           identification as Exhibit

11           Gruber-5.)

12   BY MR. GEISE:

13           Q.    Professor Gruber, I'm

14   handing you what's marked as Exhibit 5 to

15   your deposition.  This is an article

16   entitled "Relationship Between Nonmedical

17   Prescription Opioid Use and Heroin Use."

18                    Do you see that?

19           A.    Yes, I do.

20           Q.    And this is an article that

21   appeared in The New England Journal of

22   Medicine in 2016, correct?

23           A.    Yes.

24           Q.    And the -- the lead author

1    identified is Wilson M. Compton, M.D.

2              Do you see that?

3         A.    Yes.

4         Q.    Now, one of the things I

5    wanted to ask you, when you looked at the

6    five studies that are listed in Table 1.1

7    of your report, those are -- the dates of

8    those studies are 2013, '14, and '15,

9    correct?

10        A.    Yes, correct.

11        Q.    Did you look at any

12   epidemiological studies from after 2015

13   for purpose of forming your opinion in

14   this case -- on this topic?

15        A.    In this case at all?

16        Q.    On this topic.

17        A.    On this topic.  I don't

18   recall.

19        Q.    Now, the study identified --

20   this New England Journal of Medicine

21   article from 2016 is not one that you

22   list in your Table 1.1, correct?

23        A.    That's correct.

24        Q.    Do you recall from looking

Highly Confidential - Subject to Further Confidentiality Review

1  at the title if this was one that you saw

2  during your research in this case?

3       A.    I do not recall.  Sorry.

4       Q.    Well, I want to just ask you

5  about a couple passages in here.  And I

6  understand that you haven't had the

7  opportunity to read it yet because you

8  didn't look at it for purposes of forming

9  your opinion.  But I want to get your

10  reaction to some of the statements from

11  the authors.  If you look at Page 155

12  second paragraph.

13            It begins, "Some persons

14  certainly use heroin when they are unable

15  to obtain their preferred prescription

16  opioid; however, whether the increases in

17  heroin trends in the overall population

18  are driven by changes in policies and

19  practices regarding prescription opioids,

20  it's much less clear."

21            Do you see that?

22       A.    Yes, I do.

23       Q.    Do you agree that that

24  statement would -- would be contrary to

1    the conclusions you draw in this section

2    of your report?

3         A.    You know, once again, I

4    haven't read this report.  Certainly that

5    statement looks that way, but it's not

6    footnoted.  I'm not sure what evidence

7    it's based on.  I'm not -- so I don't

8    really know what to make of that

9    sentence.

10        Q.    You told me in reviewing the

11   epidemiological literature that you had,

12   for purposes of your report, that you

13   didn't see anything that questioned the

14   conclusion that you came to; is that

15   correct?

16        A.    No.  I said I saw nothing

17   that significantly differed --

18        Q.    Okay.

19        A.    -- from the conclusion that

20   I came to.

21        Q.    So would you consider this

22   passage to significantly differ --

23        A.    No.

24        Q.    -- from the conclusion that

Highly Confidential - Subject to Further Confidentiality Review

1    you came to?

2         A.    No.

3         Q.    Okay.  If you look at Page

4    156 of Exhibit 5.  In particular, there

5    is a bar in the middle of the first

6    column.  And after that, the authors

7    write, "Studies that address the patterns

8    of heroin use in nonmedical users of

9    prescription opioids are mostly

10   observational and descriptive, i.e.,

11   non-experimental; thus, conclusions about

12   cause and effect are uncertain."

13              Do you see that?

14        A.    Yes, I do.

15        Q.    Would that statement

16   significantly differ from the conclusions

17   that you drew in this portion of your

18   report?

19              MR. KO:  Object to the form.

20              THE WITNESS:  No it

21        wouldn't.  The conclusions that I

22        drew in this table show, using

23        typical epidemiological methods, a

24        correlation.

1          I don't -- I don't believe I

2     used the word "causal" in

3     discussion of the epidemiological

4     literature.  As I've said before,

5     this report, like good economic

6     studies tries to use multiple

7     dimensions of evidence to make

8     it's case.  The epidemiological

9     evidence is consistent, I believe

10    always consistent with the case

11    I'm making.

12          I did not claim that

13    these -- that these were

14    establishing causal relationships

15    as opposed to consistent bodies of

16    evidence.

17  BY MR. GEISE:

18          Q.    Would you agree that the

19  study that refers to a conclusion about

20  cause and effect between prescription

21  opioid use and heroin use as uncertain,

22  is inconsistent with the statement in

23  your report that the link between

24  prescription opioids and heroin use is

1     established?

2          MR. KO:  Object to the form.

3          Also object to the extent it

4          mischaracterizes this review

5          article, which actually doesn't

6          appear to be a study to the extent

7          that you are describing it, Steve.

8          I'm not clear on how you're

9          describing a study.  But it's

10         actually a review article.

11    BY MR. GEISE:

12         Q.    You can answer.

13         A.    Can you show me to where

14    you're referring?

15         Q.    Well, the heading on your

16    Table 1.1 says "Summary of

17    Epidemiological Studies Establishing the

18    Link Between Prescription Opioids and

19    Heroin Use."

20         Do you see that?

21         A.    Yes.

22         Q.    And would you agree that the

23    statements I've pointed to you in

24    Exhibit 5 tend to question that link?

```
 1              MR. KO:  Object to the form.

 2              THE WITNESS:  So can you

 3         point me to specific statements

 4         again.  Sorry.

 5   BY MR. GEISE:

 6         Q.    Sure.  On Page 155, where it

 7   says, "Some persons certainly use heroin

 8   when they are unable to obtain their

 9   preferred prescription opioid; however,

10   whether the increases in heroin trends in

11   the overall population are driven by

12   changes in policies and practices

13   regarding prescription opioids is much

14   less clear."  And on Page 156, where it

15   says, "Studies that address the patterns

16   of heroin use in nonmedical users of

17   prescription opioids are mostly

18   observational and descriptive, i.e.,

19   non-experimental; thus, conclusions about

20   cause and effect are uncertain."

21         A.    And what's the question?

22         Q.    Do you believe that

23   statements like that in this article is

24   inconsistent with the conclusion that
```

Highly Confidential - Subject to Further Confidentiality Review

1    epidemiological studies have established

2    a link between prescription opioids and

3    heroin use?

4              MR. KO:  Object to the form.

5              THE WITNESS:  I believe that

6         clearly the person whose these

7         sort of non-footnoted opinions are

8         expressed, clearly would not agree

9         with the title of that table.

10   BY MR. GEISE:

11        Q.   I'm going to ask you to look

12   at Page 157 of this article.  And the

13   second -- at the bottom of the left-hand

14   column, you see, "As seen in Table 1, in

15   addition to the 138.9 percent increase in

16   heroin use among nonmedical users of

17   prescription opioids between the period

18   of 2002 to 2004, and the period of 2011

19   to 2013, heroin use increased

20   97.5 percent among nonmedical users of

21   other prescription drugs (stimulants,

22   tranquilizers and sedatives),

23   87.3 percent among users of cocaine,

24   57.3 percent among people who binge

Highly Confidential - Subject to Further Confidentiality Review

1    drink, and 45.4 percent among marijuana

2    users."

3              Do you see that?

4         A.    Yes.

5         Q.    And I think you told me

6    before that studying other pathways to

7    heroin use isn't something that you did

8    in this case, correct?

9         A.    That's correct.  I think the

10   key point to remember is there are

11   multiple pathways.  I'm not claiming in

12   Table 1.1 or in my report that this is

13   the only pathway.  I'm just claiming that

14   there is a pathway.

15        Q.    So by admitting that you're

16   not claiming that it's the only pathway,

17   you're just saying it is a pathway, by no

18   means do you suggest that the total

19   increase in heroin use is attributable to

20   prescription opioids?

21              MR. KO:  Object to the form.

22              THE WITNESS:  I didn't say

23        that.

24   BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you know what
2    percentage of the increase in heroin use
3    is attributable to prescription opioids?
4    A.    I do not know.  I believe
5    Professor Cutler has some analysis that
6    speaks to that, and he finds the vast
7    majority is due to prescription opioids.
8    Q.    You're citing to an opinion
9    from Professor Cutler.  You haven't
10   formed that opinion yourself?
11   A.    I respect what Professor
12   Cutler has done, and I've seen it in his
13   report.
14   Q.    Do you respect what
15   Dr. Compton and the other authors in this
16   New England Journal of Medicine article
17   have done?
18   A.    I haven't read the article,
19   and I don't know who they are.  So I
20   don't have a strong opinion.
21   Q.    If I can ask you to look at
22   Page 160 of Exhibit 5.  On the second
23   column under conclusions, midway through
24   that first paragraph, do you see the

Highly Confidential - Subject to Further Confidentiality Review

1    clause that says, "Heroin use among

2    people who use prescription opioids for

3    nonmedical reasons is rare and the

4    transition to heroin use appears to occur

5    at a low rate."

6              Do you see that?

7         A.    Yes.

8         Q.    Is that consistent with the

9    studies you reviewed?

10        A.    Sure.

11        Q.    If you look at the bottom

12   paragraph on Page 160 of Exhibit 5, in

13   the middle of the paragraph there's a

14   sentence that begins with alternatively.

15   And it reads, "Alternatively, heroin

16   market forces, including increased

17   accessibility, reduced price, and high

18   purity of heroin, appear to be major

19   drivers of the recent increases in rates

20   of heroin use."

21              Do you see that?

22        A.    Yes.

23        Q.    And you notice that there

24   are also citations to that statement?

Highly Confidential - Subject to Further Confidentiality Review

1   A.   Yes, I do.

2   Q.   Professor Gruber, are you

3   aware of data showing an increased supply

4   of heroin was a major driver of increases

5   in rates of heroin use?

6   A.   I -- I think -- I'm not

7   aware of the data.  I'm aware that that

8   is -- that that's been discussed, yes.

9   Q.   Did any of the studies you

10  cited in Table 1.1 control for the

11  increased supply of heroin?

12  A.   Two responses to that.

13  First of all, once again, the -- the goal

14  of the report was to establish this

15  causal relationship between prescription

16  opioids and outcomes, including heroin

17  use.  That's why we show in the report

18  that heroin use and fentanyl use, if you

19  go to -- we discuss this in

20  Figure 1.18 -- 1.18, that's what we show

21  in figure -- no.  Figure 1.19, that while

22  it's true heroin use rose nationally, it

23  rose more in the places which had more

24  opioid shipments, which is both

1    consistent with the epidemiological

2    evidence we reviewed and also consistent

3    with the economic evidence reviewed in

4    this study.

5           Q.    Professor Gruber, were you

6    aware of data showing that increased

7    accessibility was a major driver of

8    increases in rates of heroin use?

9                MR. KO:  Object to the form.

10               THE WITNESS:  I am not aware

11          of that data, but I think there's

12          one other important point to

13          remember here which is, even if

14          it's increased supply and

15          increased accessibility, people

16          have written, I don't remember the

17          exact citations, that essentially

18          prescription opioids can play a

19          role through increased supply and

20          increased accessibility, as well,

21          by creating what we call sort of a

22          thick market for heroin use, that

23          by creating a body of supply can

24          arise to meet demand, that by

1          creating a body of individuals who

2          are addicted to opioids and

3          looking to meet that addiction,

4          that can lead to a concomitant

5          increase in the supply of illicit

6          opioids as well.

7    BY MR. GEISE:

8          Q.    Professor Gruber, are you

9    aware of data showing that reduced prices

10   were a major driver of increases in the

11   rates of heroin use?

12              MR. KO:  Object to the form.

13              THE WITNESS:  I am not, no.

14   BY MR. GEISE:

15         Q.    Are you aware of data

16   showing that high purity was a major

17   driver of increases in rates of heroin

18   use?

19              MR. KO:  Object to the form.

20              THE WITNESS:  It's not

21         something I've studied, no.

22   BY MR. GEISE:

23         Q.    So you did -- those last two

24   concepts are not something you studied

Highly Confidential - Subject to Further Confidentiality Review

1    for purposes of your opinions in this

2    case?

3            A.    Once again, the purpose of

4    my opinion was to show conclusively that

5    there is a causal relationship between

6    shipments of prescription opioids and the

7    increase in both licit and illicit opioid

8    use.  And that's what I do in the report.

9            Q.    Professor Gruber, if you can

10   look at the second paragraph in the

11   conclusion section on Page 160 of

12   Exhibit 5, the -- the last sentence

13   reads, "Although some authors suggest

14   that there is an association between

15   policy driven reductions in the

16   availability of prescription opioids and

17   increases in the" --

18           A.    I'm sorry, one second.  I --

19   I haven't found where you are.

20           Q.    I'm sorry.

21           A.    Want to state it again?

22           Q.    Page 160 --

23           A.    Oh, I see.  Got it.  Go

24   ahead.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Second paragraph under

2   conclusions.

3      A.    Yep, got it.

4      Q.    Middle of that paragraph

5   reads, "Although some authors suggest

6   that there is an association between

7   policy driven reductions in the

8   availability of prescription opioids and

9   increases in the rates of heroin use, the

10  timing of these shifts, many of which

11  began before policies were robustly

12  implemented, makes a causal link

13  unlikely."

14            Do you see that?

15     A.    Yes, I do.

16     Q.    Is -- is that statement from

17  these authors inconsistent with your

18  conclusions in your report?

19     A.    Yes, it is.

20     Q.    And this was not a study

21  that was brought to your attention when

22  you were forming your report?

23     A.    Once again I'm not sure.

24  But it is a study which is at odds with

1    both -- and once again, this is an

2    opinion.  The opinion expressed in this

3    report are at odds with both the

4    epidemiological studies I reviewed, the

5    economic evidence and the data that I

6    showed you.

7            Q.    When you asked your team to

8    bring you articles, you didn't tell them

9    to only bring you articles that would

10   support the position you were going to

11   give, correct?

12           A.    No.  As I stated earlier, I

13   asked for a review of the literature.

14           Q.    And -- and this wasn't a

15   piece of literature you were provided?

16           A.    Once again I don't know --

17   as I said, I don't recall whether I saw

18   this article or not.

19                 MR. KO:  Steve, whenever --

20           whenever is convenient --

21                 MR. GEISE:  Let me -- let me

22           get through one more article.  It

23           shouldn't take as long as the last

24           one.

Highly Confidential - Subject to Further Confidentiality Review

1                (Document marked for

2         identification as Exhibit

3         Gruber-6.)

4    BY MR. GEISE:

5         Q.    Professor Gruber, I'm

6    handing you another article.  It's marked

7    Exhibit 6 to your deposition.  This is

8    entitled "U.S. Regional and Demographic

9    Differences in Prescription Opioid and

10   Heroin Related Overdose

11   Hospitalizations."

12             Do you see that?

13        A.    Yes.

14        Q.    And the authors here are

15   George Unick and Daniel Ciccarone?

16        A.    Yes.

17        Q.    And you see that this was

18   published in a final edited form in the

19   International Journal of Drug Policy,

20   correct?

21        A.    That's what it indicates,

22   yes.

23        Q.    And I just want to -- we'll

24   do this quickly.  If you turn to Page 3

Highly Confidential - Subject to Further Confidentiality Review

1    of Exhibit 6.  In -- in the first full

2    paragraph, the authors write, "However,

3    there are reasons to view the causal

4    relationship between PO" -- which is

5    prescription opioid -- "availability and

6    use of heroin use as only a partial

7    explanation for the recent increase in

8    heroin use and subsequent harms.

9              "First, drug use gateway

10   arguments in general have been widely

11   discredited and should be viewed with

12   caution."

13             Do you see that?

14        A.    Yes.

15        Q.    And are you aware of the

16   literature that cautions that gateway

17   arguments have been discredited?

18        A.    I do not agree with

19   discredited.  I'm aware of the literature

20   that's questioned gateway arguments which

21   are largely based on correlations, not

22   causal inferences.

23             MR. GEISE:  Why don't we

24        take a break now.

1        THE VIDEOGRAPHER:  The time

2    is 2:50 p.m.  We are off the

3    record.

4            (Short break.)

5            THE VIDEOGRAPHER:  The time

6    is 3:07 p.m.  We are on the

7    record.

8            (Document marked for

9    identification as Exhibit

10    Gruber-7.)

11   BY MR. GEISE:

12        Q.    Professor Gruber, I'm

13   handing you a publication that's marked

14   as Exhibit 7 to your deposition.  This is

15   entitled "Increased Use of Heroin As an

16   Initiating Opioid of Abuse."

17            Do you see that?

18        A.    Mm-hmm.

19        Q.    And the lead author listed

20   on this communication is Theodore J.

21   Cicero.

22            Do you see that?

23        A.    Yes.

24        Q.    And do you recognize that

1   author?

2          A.    Yes, I do.

3          Q.    In fact, of the five

4   epidemiological studies that you list on

5   Table 1.1, two of them were written by

6   Cicero, correct?

7          A.    That's correct.

8          Q.    Let me ask you, this is from

9   2017 and appeared in the journal

10  "addictive behaviors".

11         Do you see that?

12         A.    Yes.

13         Q.    Have you seen this document

14  before?

15         A.    This one, I've not.

16         Q.    Okay.  When you sent your

17  team out to research literature in this

18  field, did you ask them to pull all the

19  materials from Cicero?

20         A.    No.  I asked them to pull

21  the literature on the relationship

22  between prescription opioid use and

23  illicit opioids.

24         Q.    I'm going to ask you about a

1    couple of passages from this article from

2    Cicero in 2017.

3              If you look at the

4    right-hand column on Page 64, under

5    results, do you see where it says "first

6    opioid"?

7         A.    Yes.

8         Q.    And the second sentence

9    reads, "Only 8.7 percent of opioid

10   initiates who began regular use in 2005

11   started with heroin.  But its use sharply

12   increased thereafter to the point where

13   in 2015, heroin as an initiating opioid

14   was at its highest point, 33.3 percent,

15   with no evidence of stabilization."

16              Do you see that?

17        A.    Yes.

18        Q.    In your analysis in your

19   report, did you account for the increase

20   in heroin initiation?

21        A.    Yes.

22        Q.    Okay.  And did your analysis

23   account for the trend of the increase in

24   people who had their first initiation of

Highly Confidential - Subject to Further Confidentiality Review

1    an opioid with heroin?

2         A.    That was not explicitly a

3    factor, but if you look -- if you review

4    the discussion in my -- in my report, as

5    I say there was a clear sort of chain of

6    events, if you will, where people first

7    became dependent on prescription opioids.

8    When those became more difficult to

9    obtain a more expensive after 2010, they

10   switched to heroin, and then as fentanyl

11   came in, it became a more profitable and

12   cheaper substitute, individuals then

13   transitioned -- much of the harm, if you

14   will, transitioned from heroin to

15   fentanyl.

16         So I'm not surprised by

17   their conclusions in this report.

18         Q.    Now, with respect to your

19   direction to your team, did you ask them

20   to find studies that showed a

21   relationship between prescription opioid

22   use and heroin use, or did you ask for

23   studies that discussed whether there was

24   a relationship?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The latter.  And if I

2  misspoke, I'm sorry.

3    Q.    I'm not hearing things

4  clearly, so I'm not going put the blame

5  on you.

6    A.    No, no, I may have misspoke.

7    Q.    If you can look at the last

8  sentence -- or the first sentence under

9  the last section called "discussion" on

10  Page 64.

11          Do you see that?

12    A.    Yes.

13    Q.    And it says, "The rapid

14  fourfold increase in the use of heroin by

15  new initiates to opioid use from 2005 to

16  2015 is a striking finding with

17  significant public health implications."

18          Do you see that?

19    A.    Yes.

20    Q.    Okay.  According to this

21  paper from Cicero, the number of

22  individuals who initiate opioid use with

23  heroin was increasing, correct?

24    A.    I have not read the article.

Highly Confidential - Subject to Further Confidentiality Review

1   That is certainly what follows from both

2   the graph I looked at and what -- the

3   sentences you read.

4           Q.    And from 2005 to 2015, the

5   percentage of opioid initiates who

6   began with -- started with heroin, went

7   from 8.7 percent to 33.3 percent,

8   correct?

9           A.    That's what the article

10  says.

11          Q.    Okay.  And in the analysis

12  by Cicero here, he also speculates that

13  opioid novices may be dying at a higher

14  rate because they are initiating with

15  heroin.  Are you familiar with that

16  discussion?

17              MR. KO:  Object to the form.

18              THE WITNESS:  I don't

19          know --

20  BY MR. GEISE:

21          Q.    And in your review of the

22  other studies, did you see it discussed

23  where the increase in initiation with

24  heroin was a cause of higher death rates

Highly Confidential - Subject to Further Confidentiality Review

1    because of the relative risk of mortality

2    from heroin?

3            A.    I think, once again, it's

4    important to remember the sequence of

5    events here.  The studies I focused on

6    were talking about the initiation -- the

7    gateway, as the term you used, from

8    prescription opioids to heroin, around

9    the era when prescription opioids were

10   expanding.

11            After 2010 when prescription

12   opioids were falling off, it's not

13   surprising that an increase in use of

14   illicit opioids was by people who started

15   with opioids, because prescription

16   opioids were harder to get to fill that

17   high.

18            Moreover, as I -- as I said,

19   it's not studying the report.  But as

20   I -- as I -- has been discussed by a

21   number of experts on the opioid crisis,

22   the -- there was an expansion in the

23   opioid market that essentially created --

24   this thick market for heroin was created

Highly Confidential - Subject to Further Confidentiality Review

1    by the expansion of prescription opioids.

2              So the story that I make

3    clear, the explanation that I make clear

4    in my report, is one of expanding of

5    prescription opioids during the 2000s,

6    1990s to 2000.  When they fell off,

7    people turned to heroin.  Heroin was more

8    readily available because people had

9    become addicted to opioids.  And thus,

10   it's not surprising that the new people

11   who are starting these drugs after 2010

12   would start with heroin.  After all,

13   prescription opioids were much harder to

14   get.

15        Q.    People have initiated opioid

16   use with heroin for decades, correct?

17        A.    I presume so.

18        Q.    People -- back in the 1960s,

19   people would initiate opioid use with

20   heroin?

21        A.    That's true.

22        Q.    And it's no different now,

23   and you can see in 2015 in this paper,

24   people are initiating opioid use with

Highly Confidential - Subject to Further Confidentiality Review

1  heroin?

2       A.    It's very difficult.  In

3  1960, as I say in my report, if you look

4  at -- I guess I don't -- the number of

5  individuals who were dying from heroin, I

6  guess I don't have those numbers here.

7            I believe the number of

8  individuals dying from heroin was at a

9  much, much lower rate, so I don't

10  think -- in the late 1960s than it was

11  post 2010.  So I don't think you can

12  really compare the two eras and draw

13  conclusions from one to the other.

14       Q.    Right.  And what was the

15  percentage of heroin users in the 1960s

16  that also had fentanyl either with their

17  heroin or available to them?

18       A.    I believe it's zero.  I

19  don't believe fentanyl was around.

20       Q.    That's a major difference

21  between the 1960s and 2010s, correct?

22       A.    That's one of a number of

23  differences.  It's also true that there

24  wasn't an expansion in prescription

Highly Confidential - Subject to Further Confidentiality Review

1    opioids to which they became addicted.

2         Q.    Additional things that we've

3    already talked about that are different

4    in the 2010 period are the increased

5    accessibility to heroin, correct?

6         A.    Once again, my understanding

7    is there was an increase in accessibility

8    to heroin.  And my understanding is that

9    that was at least in part, if not wholly,

10   due to the increased profitability of

11   setting up markets in heroin because

12   there was a large population now of

13   opioid users.

14        Q.    Well, drug dealers have been

15   setting up markets for ages, correct?

16        A.    They haven't been setting up

17   markets in heroin in many of the places

18   where heroin really expanded in the

19   2000s.

20        Q.    Did you study that?

21        A.    Certainly, if you look at

22   where heroin expanded, if you look at

23   the -- it's not in my report, but I've

24   seen the data, which -- and this is -- so

1  I'm now going on my recollection of the

2  data.  I don't have a specific citation.

3  My recollection of the data is there were

4  both groups which were non-traditional

5  heroin users in area -- areas where

6  heroin is not a traditional drug of

7  choice, was a large expansion of heroin

8  use in the -- around -- in the sort of

9  post-2010 period.

10       Q.   Do you recall the source for

11  that data?

12       A.   I don't.

13       Q.   Do you recall if it's

14  contained on any of the data sources

15  listed in your appendix?

16       A.   I don't.

17       Q.   Do you recall if that was a

18  discussion that you had as part of your

19  discussions with Professors Cutler and

20  McGuire?

21       A.   Yes, it was part of our

22  broad discussions.  We -- it certainly --

23  and once again, I don't claim it raises

24  to the level of evidence in this report.

Highly Confidential - Subject to Further Confidentiality Review

1  It's not -- I haven't studied it and put

2  data to it.  It is what -- it's sort

3  of -- for want of -- it's in the

4  narrative discussions of the opioid

5  crisis.  It's discussed in a number of

6  epidemiological and economic articles,

7  but I can't point you to a specific

8  reference.

9            (Document marked for

10           identification as Exhibit

11           Gruber-8.)

12  BY MR. GEISE:

13       Q.    Professor Gruber, I'm

14  handing you what's been marked as

15  Exhibit 8 to your deposition.  This is

16  another article entitled "Nonmedical

17  Prescription Opioid and Pathways of Drug

18  Involvement in the U.S.:  Generational

19  Differences."

20            Do you see that?

21       A.    Yes, I do.

22       Q.    And this is from -- it was

23  published online in 2017 and then

24  published in print, final edited form, in

Highly Confidential - Subject to Further Confidentiality Review

1    2018 in the Journal of Drug and Alcohol

2    Dependency, correct?

3         A.    Drug and Alcohol Dependence,

4    yes.

5         Q.    I'm sorry.

6               Are you familiar with this

7    article?

8         A.    I don't recall if I reviewed

9    this article before.

10        Q.    Are you familiar with that

11   journal?

12        A.    Yes.

13        Q.    Now, the title here,

14   "Nonmedical Prescription Opioids and

15   Pathways of Drug Involvement in the

16   U.S.," that title alone would be

17   responsive to the question you posed to

18   your research team in terms of articles

19   to search for, correct?

20               MR. KO:  Object to the form.

21               THE WITNESS:  That would

22          certainly seem to fall within the

23          set of questions I was interested

24          in learning about.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. GEISE:

2         Q.    And do you recall if your

3    research team brought this article to you

4    when they brought you to the other five

5    epidemiological studies you looked at?

6         A.    Once again I do not recall.

7         Q.    If I can turn your attention

8    to what's marked as -- as Page 14 at the

9    top of the pages.

10        A.    Page 14 at the top.

11             MR. KO:  Page 14 of this?

12             THE WITNESS:  I don't have

13        that.

14    BY MR. GEISE:

15        Q.    Let me find it.

16        A.    Yeah, no problem.

17        Q.    See what happened is they

18    gave me one version of the article and

19    printed off the other one.

20             (Whereupon a discussion was

21        held off the record.)

22    BY MR. GEISE:

23        Q.    Okay.  Turn your attention

24    to Page 107 of Exhibit 8.  Do you see

Highly Confidential - Subject to Further Confidentiality Review

1   there's a paragraph that begins, the

2   increasingly higher risk?

3          A.    Yes.  The second column.

4          Q.    Okay.  Yes.  And if you look

5   at the bottom of that paragraph, do you

6   see where it says, "However for all

7   generations, the progression from

8   prescription opioids to heroin needs to

9   take cocaine into account, since

10  cocaine" --

11         A.    Hold on, I'm not

12  following -- finding this.

13         Q.    Okay.

14         A.    How far down in the

15  paragraph is it?

16         Q.    It's the last sentence of

17  the paragraph.

18         A.    Last sentence.  I'm sorry,

19  go ahead.

20         Q.    It says, "However, for all

21  generations, the progression from

22  prescription opioids to heroin needs to

23  take cocaine into account, since cocaine

24  is an integral part of the progression

1  from NMPO, nonprescription medical

2  opioids, to heroin."

3          Do you see that?

4      A.    Yes, I do.

5      Q.    Okay.  And I think from your

6  earlier answers, you did not take cocaine

7  into account for purposes of your

8  opinions in this section of your report?

9      A.    For the -- once again, the

10 goal of the section of the report was in

11 collaboration with the other sections of

12 the report, to show, based on various --

13 various bodies of evidence, that there is

14 a relationship from prescription opioids

15 to illicit opioids.  It was not to

16 establish that that was the only

17 relationship.

18     Q.    And according to this

19 article from Melanie Wall and others,

20 it -- it indicates that there is a need

21 to take cocaine into account when looking

22 at the prescription -- progression from

23 prescription opioids to heroin, correct?

24     A.    That's what they say.  I

1  don't know what that means.

2       Q.    And --

3       A.    I don't know what need --

4  you know, I'm not sure what that means

5  statistically, but that's certainly what

6  the sentence says.

7       Q.    Well, whether you need to do

8  it statistically or not, you didn't do

9  it, correct?

10      A.    We -- in this -- in our --

11  once again, in our analysis, we, what we

12  did do to try to address any concerns

13  about other drugs playing a role here was

14  show that in the high prescription opioid

15  counties, high prescription -- high

16  shipment counties, where there was an

17  explosion of illicit opioid deaths or to

18  low shipment counties, there was no

19  change, relative change, in non-opioid

20  drug deaths.  So that's the way in which

21  we accounted for other drugs in our

22  analysis.

23      Q.    Did you look at, among those

24  with opioid mortalities, whether they had

1    prior use of cocaine?

2           A.    You cannot know that from a

3    mortality record.  That's not knowable,

4    lifetime history of drug use.

5           Q.    Did you look in the NSDUH

6    data to see what percentage of heroin

7    users had prior use of cocaine?

8           A.    No, I did not.

9           Q.    If you can look further

10   below in that -- I guess it's just above

11   the -- the sentence I read you in that

12   paragraph on Page 107 of Exhibit 8.  Do

13   you see the sentence that reads, "The

14   increase in the progression from

15   prescription opioids to heroin among

16   millennials compared to older generations

17   may be due not only to increases in high

18   intensity prescription opioid use, but

19   also to the greater availability and

20   affordability of heroin."

21              Do you see that?

22        A.    Yes, I do.

23        Q.    Do you agree that heroin

24   availability is -- is a variable in

1   increased heroin use?

2        A.   Yes.  And as I stated

3   before, I believe heroin availability

4   rose because of the thick markets for

5   opioids created by an increase in

6   prescription opioids.

7        Q.   Do you agree that heroin

8   affordability is also a variable?

9        A.   Yes.

10            MR. KO:  Objection.  Asked

11       and answered.

12  BY MR. GEISE:

13       Q.   Professor Gruber, I want to

14  now talk to you about some of the

15  epidemiological studies that you listed

16  in your report.  And in particular, those

17  on Table 1.1.

18            Direct your attention to

19  Paragraph 93 of your report where you

20  write, "Additional small sample

21  epidemiological studies confirm these

22  findings," and you cite a Mateu-Gelabert

23  article there; is that correct?

24       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.    What does it mean when you

2  say it's a small sample epidemiological

3  study?

4  A.    Well, small sample is not

5  a -- is -- is not a statistically defined

6  term.  I'm just meaning that typically

7  our studies are more reliable the larger

8  sample you bring to bear on the problem.

9  And typically, as an economist, these

10 studies with something like with 46

11 observations as a small sample for a

12 statistical analysis.

13 Q.    And the Mateu-Gelabert

14 article involved a sample of 46 people

15 and only considered those in New York

16 City, correct?

17 A.    Yes.

18 Q.    You also refer to a 2015

19 study by Cicero & Ellis.  And their

20 sample was also small and looked at just

21 153 individuals, correct?

22 A.    That's correct.

23 Q.    So of the five studies you

24 looked at, two of them were small sample

Highly Confidential - Subject to Further Confidentiality Review

1    studies; is that correct?

2         A.    Of the five studies I

3    reference in this table, two are small

4    sample studies.

5         Q.    Well, and you can't recall

6    any other studies you looked at, so I'm

7    assuming that means you can't recall the

8    sample size in any study that you don't

9    remember; is that correct?

10              MR. KO:  Object to -- object

11         to the form.

12              THE WITNESS:  That's

13         correct.

14   BY MR. GEISE:

15        Q.    Now, you would agree that

16   none of the five studies you looked at

17   collected data from either Cuyahoga

18   County or Summit County?

19        A.    So if you look at my table,

20   the Jones and Muhuri data, I'm

21   familiar -- and that's a national sample,

22   so presumably there could be some

23   observations in there from Cuyahoga and

24   Summit County.  I'm not as familiar with

1    the sampling frame for the skip data.  So

2    I'm not sure if they might include

3    individuals from Cuyahoga or Summit

4    County.

5                (Document marked for

6           identification as Exhibit

7           Gruber-9.)

8    BY MR. GEISE:

9           Q.    Professor Gruber, I'm

10   handing you what's been marked Exhibit 9

11   to your deposition.  And this is a 2013

12   article from Christopher Jones entitled

13   "Heroin Use and Heroin Use Risk Behaviors

14   Among Nonmedical Users of Prescription

15   Opioid Pain Relievers:  United States

16   2002 to 2004 and 2008 to 2010."

17                Do you see that?

18          A.    Yeah.

19          Q.    And this is one of the five

20   studies that you looked at for purposes

21   of your report, correct?

22          A.    That's correct.

23          Q.    If I can direct your

24   attention to Page 99 of the study, the

Highly Confidential - Subject to Further Confidentiality Review

```
1    first full paragraph.  Do you see

2    where -- I'm sorry.  I got ahead of you.

3              The first full paragraph on

4    the right-hand column of Page 99.

5              MR. KO:  Steve, we're on

6         Exhibit 9, right?

7              MR. GEISE:  Yes.

8              THE WITNESS:  Yes, I see it.

9    BY MR. GEISE:

10        Q.    Do you see where the --

11   Jones writes, "This study has several

12   limitations.  First" --

13        A.    One second.  Hold on.

14        Q.    Yep.

15        A.    The first full paragraph on

16   Page 99?

17        Q.    On the right-hand column.

18        A.    On the right-hand column.

19   I'm sorry.  Yes, go ahead.

20        Q.    "This study has several

21   limitations.  First, NSDUH data are

22   self-reported and their value depends on

23   the truthfulness and accuracy of

24   individual respondents; under or
```

Highly Confidential - Subject to Further Confidentiality Review

1    overreporting may occur."

2              Do you see that?

3         A.    Yes.

4         Q.    You agree with that?

5         A.    As I point out in my report,

6    that's a concern many people have raised

7    with NSDUH, and that's why I don't rely

8    on it extensively in my analysis.

9         Q.    Jones continues by saying,

10   "Second, the survey is cross-sectional;

11   therefore, assessing causality is not

12   possible."

13             Do you see that?

14        A.    Yes.  And as we discussed

15   before, that's why I move on from that

16   NSDUH graph, which just compares high and

17   low shipment states, to look at what

18   happened over time in those states.

19        Q.    Would you agree that in his

20   own study, Christopher Jones reports that

21   assessing causality is not possible from

22   it, correct?

23             MR. KO:  Object to the form.

24             THE WITNESS:  I see that

Highly Confidential - Subject to Further Confidentiality Review

1    what he -- I don't necessarily

2    agree.  I don't agree that you

3    cannot assess causality in

4    cross-sectional data.  He states

5    that, but I don't agree with that

6    conclusion.

7    BY MR. GEISE:

8        Q.   Do you also see further down

9    in that same paragraph, there's a

10   sentence that starts with "therefore,"

11   and again referring to NSDUH, Jones

12   writes, "Therefore, the drug use

13   estimates in this study may not

14   generalize to the total U.S. population.

15   This may be particularly true for

16   estimates of rarely used drugs like

17   heroin."

18        Do you agree with that

19   assessment?

20       A.   As I discuss in my report,

21   we know that the NSDUH does not survey

22   particular populations, and that's a

23   limitation.  That's why it's critical in

24   my report that I can come at this

Highly Confidential - Subject to Further Confidentiality Review

1    question from a variety of angles, and I

2    appreciate the honesty of the author in

3    pointing out the limitations in this

4    study.  And that's why I wouldn't want to

5    rely in my analysis solely on this study.

6          Q.    And despite the fact that

7    the author, in assessing his own study

8    says that assessing causality from it is

9    not possible, you disagree and think that

10   it is possible?

11          MR. KO:  Objection.

12          Mischaracterizes the conclusions

13          reached in the report.

14          THE WITNESS:  That's not

15          what I said.

16   BY MR. GEISE:

17          Q.    Do you think that assessing

18   causality is possible from Jones' study

19   or is not?

20          A.    From -- from Jones' study,

21   per se, the study he carries out, I do

22   not believe you can assess causality.  My

23   point was that's not a generally true

24   statement about cross-sectional data.

Highly Confidential - Subject to Further Confidentiality Review

1    But I agree in the study he

2    carries out, this is really establishing

3    a correlational link as we've discussed

4    with this reference to Table 1.1.

5         Q.    So with regard to Table 1.1

6    and the Jones study, you agree that all

7    it establishes is correlation and not

8    causation?

9              MR. KO:  Object to the form.

10             THE WITNESS:  I -- I'm

11         sorry.  I missed what you said.

12             MR. KO:  I just objected to

13         the form.  Go ahead.

14             THE WITNESS:  I agree that

15         the Jones study does not establish

16         causality to the standards that I

17         would like.

18   BY MR. GEISE:

19        Q.    In the heading to Table 1.1

20   in your report, you use the term

21   "establishing the link."

22             When you say "establishing

23   the link," does that mean establishing

24   correlation or establishing causation?

1          A.     I -- when I say establishing

2     the link, what I'm trying to mean is I

3     mean that temporally to show that these

4     studies show that there is a link from --

5     you know, there is a link from the use of

6     prescription opioids to the use of other

7     illicit opioids.  I don't mean that to

8     say that these studies are -- are causal

9     evidence of that link.

10               But that -- once again, that

11    doesn't mean that they're useless.  That

12    means that one wants to use them in a

13    portfolio of considerations.

14               If -- it is always useful in

15    economic studies, or it's often useful in

16    studies of health economics, to

17    supplement the statistical analysis with

18    understanding of what's going on behind

19    the data that epidemiological studies can

20    provide.

21               (Document marked for

22          identification as Exhibit

23          Gruber-10.)

24    BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Professor Gruber, I'm

2   handing you what's been marked Exhibit 10

3   to your deposition.  This is a 2013

4   article from Pradip Muhuri and others

5   that is, I think, the second study listed

6   on Table 1.1 in your report; is that

7   correct?

8        A.    Let me just double-check.

9   Yes.

10        Q.    And I believe you cite to

11   and discuss certain findings in this

12   study in Paragraph 91 of your report; is

13   that correct?

14        A.    Yes.

15        Q.    As you report in Paragraph

16   91 at the last sentence beginning on the

17   bottom of Page 63, you say, "The authors

18   note that there are many plausible

19   explanations for this finding, including

20   the gateway theory of drug use that

21   posits that the use of some drugs may

22   expose individuals to a répétiteur of

23   biological and behavioral factors that

24   could influence their future use of other

1    drugs."

2              Do you see that?

3         A.    Yes.

4         Q.    What are the other plausible

5    explanation noted by Muhuri in their

6    study?

7         A.    I don't recall exactly.

8         Q.    If I can point your

9    attention to the discussion section of

10   the Muhuri article, which I think would

11   be on the 14th page.

12        A.    Yes.

13        Q.    Have you found that?

14        A.    Yep.

15        Q.    If you look in the middle of

16   that first paragraph, you see the

17   sentence that you quoted in Paragraph 91

18   of your report, correct?

19        A.    Yes.

20        Q.    If you look two sentences

21   after that, do you see where Muhuri

22   writes, "Although the findings indicated

23   that NMPR use is a common step on the

24   pathway to heroin initiation, most NMPR

Highly Confidential - Subject to Further Confidentiality Review

1    users do not progress to heroin use."

2              Do you see that?

3         A.    Yes.

4         Q.    Do you agree with that?

5         A.    I do not know for sure the

6    statistics on that.  It seems very likely

7    to me that most would not progress use to

8    heroin use.  Heroin use is a much, much

9    lower rate than nonmedical prescription.

10        Q.    Do you know what percentage

11   of nonmedical prescription opioid users

12   progress to heroin?

13        A.    No, I do not.

14        Q.    Muhuri continues, "Second,

15   heroin use appears to be neither a

16   sufficient nor a necessary condition for

17   the subsequent onset of NMPR use."

18             Do you see that?

19        A.    Yes.

20        Q.    Do you agree with that

21   assessment?

22        A.    I don't quite understand the

23   sentence.  I mean, I don't quite

24   understand.  Because they are talking

Highly Confidential - Subject to Further Confidentiality Review

1    about the progression to heroin.  Now

2    suddenly they are talking about the

3    progression from heroin.  And I'd have to

4    read the article more to understand where

5    that fits in.  I don't quite understand

6    how that sentence fits their -- fits the

7    article.

8         Q.    And then the next sentence

9    says, "Put differently, it appears that

10   there are many unique pathways leading to

11   NMPR use, and many of those do not

12   involve heroin as a developmental

13   precursor or milestone on the career

14   trajectory of an illicit drug user."

15             Do you see that?

16        A.    Yes.

17        Q.    And I think you told us

18   earlier that -- that you didn't look at

19   any other pathways other than

20   prescription opioid use and heroin,

21   correct?

22        A.    That is a pathway that --

23   that is the focus of my review of the

24   epidemiological literature.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    If you look in the next

2  paragraph in Muhuri's article, about six

3  lines down there's a sentence that reads,

4  "Besides the relationship between

5  prior" --

6    A.    One second, sorry.

7    Q.    I'm sorry.  It begin --

8    A.    Six lines down, the second

9  paragraph?

10    Q.    It's actually the -- the

11  fifth line down at the very end of that

12  line.  It begins --

13    A.    Yes, got it.

14    Q.    Muhuri writes, "Besides the

15  relationship between prior NMPR use and

16  subsequent heroin use may have been

17  partially accounted for by factors such

18  as availability of pain relievers or

19  heroin supply which we could not examine

20  here."

21        Do you see that?

22    A.    Yes.

23    Q.    Do you recognize that

24  availability of pain relievers and heroin

Highly Confidential - Subject to Further Confidentiality Review

1  supply can be other factors in people

2  initiating the use of heroin?

3         A.    Once again, two responses to

4  that.  One is, the goal of my report is

5  not to comparably explain all the reasons

6  why people use heroin.  It's to causally

7  establish that the expansion of

8  prescription drug availability led to use

9  of heroin.

10             Point 1 and Point 2 I'll

11  make again is that even if the use of --

12  even if one of those pathways is through

13  expanded supply, that pathway itself is

14  impacted by the availability of

15  prescription drugs.

16         Q.    You agree that Muhuri did

17  not, in their study, did not examine the

18  importance of factors such as the

19  availability of pain relievers or the

20  heroin supply in their study, correct?

21             MR. KO:  Object to the form.

22             THE WITNESS:  I don't recall

23        the article well enough.  But they

24        certainly seem to imply that in

1    that sentence.

2  BY MR. GEISE:

3    Q.    Do you agree that these two

4  factors would be omitted variables?

5    A.    Well, they are not doing a

6  regression analysis here as far as I

7  know.  There -- and so, there's a

8  reason -- there's sort of a wrinkle to

9  the invariable bias discussion we were

10  having before, which is, the way you

11  described an invariable bias before, it

12  would imply you should always include

13  every variable which might be omitted.

14  That's not always true.

15    Like sometimes the variables

16  you might include might actually

17  themselves be caused by the dependent

18  variable.  So if the availability of

19  heroin, if the price of heroin for

20  example, or the supply of heroin is

21  caused by shipments of prescription

22  drugs, you wouldn't want to include that

23  in the regression.  Even though it's

24  omitted, including it would bias your

Highly Confidential - Subject to Further Confidentiality Review

1    regression.  You can actually make your

2    regression worse, by including the

3    variable itself is caused by the

4    dependent variable.  So I think that's --

5    that's some of the difficulty this speaks

6    to.  So whether it's omitted, it is not

7    included in their analysis.  Whether

8    that's a mistake, that's harder to say.

9    Because if that itself was caused by the

10   availability of prescription drugs, you

11   wouldn't want to include it.

12          Q.    If you look at the first

13   page of Muhuri's article, the second

14   paragraph of the introduction.  She

15   writes, "This progression may result

16   simply because heroin may be cheaper or

17   easier for them to get in some

18   locations."

19          Do you see that?

20          A.    Yes.

21          Q.    So, do you know if -- how

22   the ease of availability or the price of

23   heroin compared in Cuyahoga and Summit

24   Counties to other counties in Ohio?

1       A.    No, I don't.

2       Q.    Do you know how the price of

3   heroin or the ease to get heroin compared

4   in Cuyahoga and Summit County to any

5   counties throughout the nation?

6       A.    That's not something I

7   studied, no.

8           (Document marked for

9           identification as Exhibit

10          Gruber-11.)

11  BY MR. GEISE:

12      Q.    Professor Gruber, I'm

13  handing you what's marked as Exhibit 11

14  to your deposition.  And this is the

15  second of the two Cicero articles that

16  you cite in Table 1.1, correct?

17      A.    This is the first of the two

18  I believe that I cite.

19      Q.    Okay.  That's my bad.

20  You're right.  We talked about Jones

21  before.  This is the first, this is the

22  2014 Cicero article.

23      A.    Yes.

24      Q.    We talked about the 2015

1    one.  You are correct.

2                   I want to talk about some of

3    the findings in Cicero's article in 2014.

4    If you look under -- on the first page

5    under results?

6         A.    Oh, the first page.

7         Q.    Yes.

8         A.    Okay.

9         Q.    And the last sentence Cicero

10   writes, "Although the high produced by

11   heroin was described as a significant

12   factor in its selection, it was often

13   used because it was more readily

14   accessible and much less expensive than

15   prescription opioids."

16                  Do you see that?

17        A.    Yes.

18        Q.    And that's similar to what

19   we were discussing in the Muhuri article

20   where they speculated that -- that price

21   and availability are factors in heroin

22   use, correct?

23        A.    I believe price and

24   availability are factors in the use of

1  many goods, heroin among them.

2      Q.    Do you agree that the high

3  from heroin is a factor in why people

4  choose to use heroin?

5      A.    I -- as I -- as I described

6  in my report, I believe the high from

7  opioids is a reason that people choose

8  opioids.  Heroin is, especially now that

9  prescription opioids have gotten more

10  difficult to get, a cheaper way to get

11  that high.

12      Q.    Do you know how the high

13  from heroin compares to the high from

14  prescription opioids?

15      A.    No, I do not, I'm not an

16  expert on that.  But I am -- I have

17  reviewed the literature and rely on a

18  number of other experts in this case

19  which -- who discuss the essential

20  substitution, the substitutability of

21  heroin as a means of getting that high of

22  prescription opioids.  And indeed, one of

23  the most striking piece of evidence I

24  think is that in the places where heroin

1   is most similar to prescription opioids,

2   that is east of the Mississippi, the

3   white heroin east of the Mississippi, as

4   opposed to the black tar heroin west of

5   the Mississippi is where we saw the

6   largest rise of heroin use and deaths.

7          Q.    Tell me what you know about

8   the heroin consumption in Cuyahoga

9   County.  What's the most predominant form

10  of heroin in Cuyahoga County?

11         A.    The most predominant form of

12  heroin I believe is -- is white heroin.

13         Q.    Have you studied that?

14         A.    I have not studied that in

15  Cuyahoga County in particular.

16         Q.    Have you studied that in

17  Summit County?

18         A.    Not in particular, no.

19         Q.    Now, Cicero's study, the

20  2014 study, it looked at those 18 years

21  or older who met the DSM-IV criteria for

22  substance abuse with a primary drug that

23  was an opioid, correct?

24         A.    Can you point me to where --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sure.  If you look under the

2  methods section on the second page.

3  Midway down the first paragraph it says,

4  "Participants must be 18 years of age or

5  older and must meet DSM-IV criteria for

6  substance abuse with a primary drug that

7  is an opioid prescription drug or

8  heroin."

9         Do you see that?

10    A.    Yes, I do.

11    Q.    Do you know what percentage

12  of users in any given year meet the

13  DSM-IV criteria for substance abuse for

14  both prescription opioids and heroin?

15    A.    No, I don't.

16    Q.    Do you know what percentage

17  of users of prescription opioids met the

18  DSM-IV criteria for substance abuse

19  before using heroin for the first time?

20    A.    No, I don't.

21    Q.    If you can turn your

22  attention to the fourth page of

23  Exhibit 11.  The bottom paragraph that

24  begins, "As shown in Figure 2."

Highly Confidential - Subject to Further Confidentiality Review

1            Do you see that?

2       A.    Yes.

3       Q.    The second sentence in that

4  paragraph says, "The ethnicity of heroin

5  users seeking treatment also showed a

6  marked shift from nearly equal white to

7  non-white ratios in the 1960s to a

8  dominance of white users (90.3 percent)

9  by 2010."

10           Do you see that?

11      A.    Yes.

12      Q.    Do you know the ethnic

13  composition of Cuyahoga County?

14      A.    I do not know that

15  particularly.

16      Q.    Do you know the ethnic

17  composition of Summit County?

18      A.    No, not particularly.

19      Q.    Do you know the ethnic

20  breakdown among users of prescription

21  opioids in either county?

22      A.    No, I don't.

23      Q.    Do you know the ethnic

24  breakdown of those who had an

Highly Confidential - Subject to Further Confidentiality Review

1    opioid-related mortality in either of

2    those counties?

3           A.    Not offhand, no, I don't.

4           Q.    If you turn to the seventh

5    page of Exhibit 11.  In the paragraph

6    above the heading "conclusions."

7                 Do you see where I'm

8    referring?

9           A.    Yes.

10          Q.    The paragraph starts, "There

11   are important limitations to our studies.

12   In terms of our treatment base sample,

13   one could speculate whether or not this

14   population is representative of those

15   using opioids recreationally,

16   particularly those who had access to the

17   internet in order to participate in our

18   web-based follow-up."

19                Do you see that?

20          A.    Yes.

21          Q.    Do you agree that Cicero, in

22   their study, questioned if the population

23   in their study could be extrapolated to

24   the population at large, including those

Highly Confidential - Subject to Further Confidentiality Review

1    who use opioids recreationally?

2              MR. KO:  Object to the form.

3              THE WITNESS:  That seems --

4         that's the way I would interpret

5         the second sentence.

6    BY MR. GEISE:

7         Q.    Do you agree that the

8    shipment data that you've been using as a

9    proxy for consumption would include those

10   who use opioids recreationally?

11        A.    Yes, certainly it does.

12        Q.    In Paragraph 51 of your

13   report that I think we talked about

14   earlier today.  This is where you were

15   talking about the substitution of illicit

16   opioids for prescription opioids?

17        A.    Yes.

18        Q.    In this paragraph, you talk

19   about individuals who had become addicted

20   to prescription opioids and then turned

21   to substitute products, correct?

22        A.    Yes, at the bottom of the

23   paragraph.

24        Q.    So do you agree that this

1  opinion would not apply to users of

2  prescription opioids who, instead of

3  being addicted, are recreational users?

4          MR. KO:  Object to the form.

5          THE WITNESS:  I don't

6      understand the question.

7  BY MR. GEISE:

8      Q.    If this paragraph applies to

9  those who are addicted to prescription

10 opioids, would you agree it doesn't apply

11 to those who are not addicted?

12     A.    No, I can't agree to that.

13     Q.    If a reason that you point

14 out in Paragraph 51 that somebody would

15 switch from a prescription opioid to

16 heroin is because of an addiction -- am

17 I -- do you follow me so far?

18     A.    That's one reason, yes.

19     Q.    Okay.  You would agree that

20 if somebody is not addicted, then

21 addiction obviously cannot be a reason

22 for making a switch between prescription

23 opioids to heroin?

24         MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  I mean, that's

2       a really hard question to answer.

3       You know, it could be --

4  BY MR. GEISE:

5       Q.    Is it?

6       A.    Yes, it is.  So it could be

7  the addiction of a family member, which

8  causes them to switch from being a

9  recreational user to addicted to opioids.

10 So let's say addiction doesn't play a

11 role --

12      Q.    Well, I didn't -- I don't

13 think I said addiction doesn't play a

14 role.  Let me ask it this way.

15            Do you agree an individual

16 who is not addicted to prescription

17 opioids would not switch to heroin

18 because of their own addiction --

19            MR. KO:  Object to the form.

20 BY MR. GEISE:

21      Q.    -- to prescription opioids?

22            MR. KO:  Object to the form.

23            THE WITNESS:  If they're not

24      addicted, then yes, I don't see

Highly Confidential - Subject to Further Confidentiality Review

1      them switching due to addiction

2      because they're not addicted.

3  BY MR. GEISE:

4      Q.    Have you done any analysis

5  to determine what percentage of

6  prescription opioid users meet the DSM-IV

7  criteria for opioid use disorder?

8          MR. KO:  Objection.  Asked

9      and answered.

10          THE WITNESS:  No, I've not.

11          (Document marked for

12      identification as Exhibit

13      Gruber-12.)

14  BY MR. GEISE:

15      Q.    Professor Gruber, I'm

16  handing you what's been marked as

17  Exhibit 12 to your deposition.  This is

18  an article entitled "Injection and Sexual

19  HIV/HCV Risk Behaviors Associated With

20  Nonmedical Use of Prescription Opioids

21  Among Young Adults in New York City."

22          Do you see that?

23      A.    Yes.

24      Q.    The lead author on this

1    paper is Pedro Mateu-Gelabert?

2            A.    Yes.

3            Q.    And apologies to Pedro if I

4    butchered his last name.  But this is

5    also one of the studies that you

6    identified on Table 1.1 of your report,

7    correct?

8            A.    Yes.

9            Q.    I want you to turn your

10   attention to Page 15 of Exhibit 12, the

11   bottom paragraph.  The authors write,

12   "These results should be interpreted with

13   caution in light of several limitations."

14            Do you see that?

15           A.    Yes.

16           Q.    Did you interpret their

17   results with caution?

18           A.    Yes.

19           Q.    Okay.  The next sentence

20   reads, "Because this is a qualitative

21   study based on interviews conducted with

22   a relatively small number of participants

23   who were sampled via non-problalistic

24   methods, the results are not intended to

1    be generalizable to all young adult

2    nonmedical PO users."

3                Do you see that?

4        A.    Yes.

5        Q.    If we go two sentences down,

6    they write, "We used quantitative data to

7    precisely characterize our data, not to

8    make statistical inferences about a

9    larger population."

10               Do you see that?

11       A.    Yes.

12       Q.    Is that an indication from

13   these authors that they did not think

14   that their data should be used to make

15   inferences about a larger population?

16               MR. KO:  Object to the form.

17               THE WITNESS:  I'm not --

18       that's -- they may or may not

19       think that.

20   BY MR. GEISE:

21       Q.    Well, they wrote that,

22   correct?

23       A.    No.  They wrote -- precisely

24   categorize...is not to make statistical

Highly Confidential - Subject to Further Confidentiality Review

1    inference about a larger population.

2              I believe your question was

3    did the authors believe those inferences

4    should not be drawn.  They don't state,

5    whether they believe that or not.

6              Q.    Okay.  Now, you see the last

7    sentence of this section says, "Our

8    qualitative research provides insight

9    into the social context in which

10   nonmedical PO use occurs and will

11   hopefully provide" --

12             A.    Hold on.  I'm lost.  Sorry.

13   My mind is baked.

14             Q.    That's okay.  If you go down

15   to that --

16             A.    Page 15.

17             Q.    It'd be Page 16 now.

18             A.    Oh, Page 16 now.  I see.

19   That's what I missed.

20             Q.    The last paragraph.

21             A.    Okay, gotcha.

22             Q.    Okay.  And it says -- well,

23   let's just do the whole thing.  "This

24   study demonstrates the importance of

1   understanding nonmedical PO use among

2   young adults in its role as a pathway to

3   heroin use, injection drug use, and

4   increased vulnerability to HIV and HCV."

5            Do you see that?

6       A.    Yes.

7       Q.    And then it says, "Our

8   qualitative research provides insights

9   into the social context in which

10  nonmedical PO use occurs and will

11  hopefully provide a useful platform upon

12  which future quantitative studies and

13  intervention efforts can build."

14           Do you see that?

15      A.    Yeah.

16      Q.    Now, you are using this

17  small study as part of forming a basis

18  for an opinion in a case about two

19  studies in Ohio, correct?

20           MR. KO:  Objection.

21      Mischaracterizes the study.  I

22      believe Professor Gruber described

23      this is a small statistical sample

24      that he drew from, not a small

1      study.

2              MR. GEISE:  Okay.  I'll

3      rephrase it.

4  BY MR. GEISE:

5      Q.    You are using this, this

6  study that you've described as a small

7  statistical sample in New York for

8  purposes of a case involving two counties

9  in Ohio, correct?

10      A.    I'm using it as part of a

11  suite of evidence that I'm developing.

12  It's one of five studies in one of three

13  different parts of the argument.  So yes,

14  it is used in that context.

15      Q.    And when you sat down with

16  Professors Cutler and McGuire to look at

17  what materials you were going to gather

18  to support your opinions in this case,

19  did you suggest doing a statistically

20  small sample in Cuyahoga or Summit

21  County, testing similar things that

22  Mateu-Gelabert did in this study?

23              MR. KO:  Object to the form.

24              Also I'll give you the same

1    instruction that I gave earlier

2    today.  To the extent that counsel

3    were involved in these discussions

4    with you, Professor Cutler and

5    Professor McGuire, I instruct you

6    not to answer.

7           THE WITNESS:  Yeah, so I

8    think I can't get into that

9    detail.

10   BY MR. GEISE:

11        Q.   Did you ever suggest doing a

12   small statistical sample in Cuyahoga or

13   Summit County?

14           MR. KO:  To whom?

15   BY MR. GEISE:

16        Q.   To Cutler or McGuire.

17           MR. KO:  Same instruction.

18           THE WITNESS:  And same

19   answer.

20   BY MR. GEISE:

21        Q.   Are you aware of a

22   statistical sample being conducted in

23   Cuyahoga or Summit County along the lines

24   of that performed by Mateu-Gelabert?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     No, I'm not aware of that.

2                 (Document marked for

3          identification as Exhibit

4          Gruber-13.)

5    BY MR. GEISE:

6          Q.     Professor Gruber, I'm

7    handing you Exhibit 13 to your

8    deposition.  And I believe this is the

9    last of the five studies that you

10   identify in Table 1.1; is that correct?

11                This should be Cicero 2015.

12         A.     Yes.

13         Q.     And like the Mateu-Gelabert

14   study I believe you also referred to --

15         A.     No, I'm -- I'm sorry.

16         Q.     I'm sorry?

17         A.     This is not.  This is 2014.

18   It says '15 here, but this is the -- this

19   is the -- this uses the skip data.

20                I'm not sure if this is --

21   this may be another version, 2014.  This

22   definitely isn't the last -- I'm not sure

23   what this is.  2014.

24                So this is Cicero -- this is

1    Cicero & Ellis.

2         Q.    Correct.

3         A.    We -- we have two Cicero --

4    I refer to two Cicero et al. studies.

5         Q.    We looked at the Cicero 2014

6    before.  That was Exhibit 11, correct?

7         A.    Yeah.  And this is not --

8         Q.    Well, if you look at your --

9         A.    Hold on.  Hold on one

10   second.

11        Q.    I'm sorry.

12        A.    Yeah, one second.  I'm

13   sorry.  I just have to clarify.  There's

14   a lot of studies here, so give me a

15   moment.

16             Yes, I'm sorry, that is,

17   that is the right study.

18             But, I think it's -- I --

19   the reason I'm concerned, is it's perhaps

20   a typo in my report, but the -- the

21   abstract talks about an N of 244.  And my

22   report talks about an N of 153.  And so

23   that -- that concerns me.  This looks

24   like the right study, but I'm a little

Highly Confidential - Subject to Further Confidentiality Review

1    bit concerned that those numbers are off.

2    And it -- it may be a typo in my report,

3    I'm not entirely sure.

4         Q.    I will tell you if there's

5    another Cicero 2015 study we didn't find

6    it.

7         A.    Okay.

8         Q.    So I believe this is it

9    but this talks --

10        A.    This looks like -- this

11   looks like the right study, but let me

12   just note for the record that I'm -- I'm

13   a little concerned with this

14   misalignment.  But I'll presume it's just

15   a typo in my report and we'll move ahead.

16        Q.    And we'll still -- we'll

17   talk about the -- the study and we won't

18   worry too much about the -- the size of

19   the N in the data source.

20             Okay?

21        A.    Okay.

22        Q.    If you look at -- well,

23   first of all, this is entitled "Abuse

24   Deterrent Formulations and the

Highly Confidential - Subject to Further Confidentiality Review

1    Prescription Opioid Abuse Epidemic in the

2    United States:  Lessons learned from

3    OxyContin," correct?

4         A.    Hold on.  There is an easy

5    way to do this, which is let's look at

6    the bibliography.

7              MR. KO:  Or --

8              THE WITNESS:  It's this one?

9              MR. KO:  -- to try and

10         clarify, it's also -- rather than

11         looking at the table and the

12         bullets to your narrative prior to

13         the table, it's listed.

14              But you can look at the

15         bibliography too.

16              THE WITNESS:  Yes, this is

17         the right study.

18              Okay.  I'm sorry, go ahead.

19   BY MR. GEISE:

20         Q.    So I -- first of all, what

21   do you understand abuse deterrent

22   formulation to mean?

23         A.    My understanding of abuse

24   deterrent formulation of OxyContin, I --

Highly Confidential - Subject to Further Confidentiality Review

```
1    you're saying the general term "abuse

2    deterrent formulation"?

3         Q.    Yeah.

4         A.    That it's a reformulation of

5    a drug, although I guess it could be of

6    other types of substances as well, to try

7    to still deliver the same medical

8    efficacy while reducing the odds of

9    abuse.

10        Q.    Direct your attention to the

11   second page of the exhibit, the first

12   page of the study, you see -- oh, you had

13   it, I'm sorry.  I -- I crossed you up.

14   First page.

15        A.    First page?

16        Q.    Yes.  You see where it says

17   objective?

18        A.    Yes.

19        Q.    Okay.  Next to objector --

20   objective the authors state, "To examine

21   the factors that led to the initial steep

22   decline in OxyContin abuse and the

23   substantial levels of residual abuse that

24   have remained relatively stable since
```

1    2002."

2              Do you see that?

3         A.    2012.

4         Q.    2012.  I'm sorry.

5              MR. KO:  2012.

6    BY MR. GEISE:

7         Q.    Do you see that?

8         A.    I see that.

9         Q.    If you look at Table 1.1,

10   your chart that accompanies this study,

11   under questions studied, you describe it

12   as "effect of introduction of the abuse

13   deterrent formulation of OxyContin on

14   heroin use."

15             Do you see that?

16        A.    Yes.

17        Q.    Now, the authors provide a

18   different objective to what their study

19   was designed to address, correct?

20        A.    Yes.  They state -- they

21   state it differently than it's stated in

22   the table.

23             But what's in the table is

24   part of what they find.  So that's sort

Highly Confidential - Subject to Further Confidentiality Review

1    of the -- the part of the report we're

2    focusing on here.

3           Q.    Professor Gruber, I want to

4    turn your attention to Paragraph 89 of

5    your report.  And you state, "Several

6    epidemiological studies establish a link

7    between prescription opioids and heroin

8    use."  And then you say, "These studies

9    establish that prescription opioids have

10   become the predominant gateway to heroin

11   use, a pattern not observed in earlier

12   decades."

13                Do you see that?

14          A.    Yes.

15          Q.    And you continue by saying,

16   "Unless the illicit opioid crisis is a

17   direct result of defendants' misconduct."

18                Do you see that?

19          A.    Yes.

20          Q.    Now, do any of the five

21   studies upon which you rely mention

22   anything about the defendants' conduct or

23   misconduct?

24          A.    Not that I recall, no.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Do any of the five studies

2  address manufacturers' shipments of

3  prescription opioids?

4      A.    I don't know what you mean

5  by address.  Can you maybe be clearer of

6  what you're asking?  I don't understand.

7      Q.    Mention, discuss?

8      A.    I don't recall if they do.

9      Q.    Do any of the five studies

10  mention or discuss the distributors'

11  shipments of prescription opioids?

12      A.    I don't recall.

13      Q.    Do you agree that the

14  studies upon which you rely do not

15  examine the causal effect of any conduct

16  by the defendants?

17            MR. KO:  Object to the form.

18            THE WITNESS:  Once again,

19        the -- the -- there's two elements

20        wrapped up in that statement.

21        There's the question of causal and

22        the question of defendants.

23            As we said, these are not

24        causal studies, the standards of

Highly Confidential - Subject to Further Confidentiality Review

1        the economics literature.  They

2        are part of a suite of evidence

3        I'm developing that show

4        epidemiologically why a link makes

5        sense of the type that I'm sort of

6        showing statistically the

7        economics analysis.

8            The second question is

9        defendants.  I don't believe they

10       focus specifically on the

11       defendants, but the defendants do

12       represent the majority of opioid

13       manufacture and shipment.  And

14       they do in at least some studies,

15       like the one we just looked at,

16       talk about a drug produced

17       primarily by the defendants, if

18       not exclusively, in OxyContin.

19   BY MR. GEISE:

20       Q.    You said that the studies

21   you look at show that the link makes

22   sense.  Do you recall using that term?

23       A.    Yes.

24       Q.    Okay.  Would you agree that

1   even if the studies show that the link

2   makes sense, these studies themselves do

3   not prove a causal relationship?

4       A.   These studies do not prove a

5   causal relationship to the standards that

6   we use in economics literature.

7       Q.   So looking specifically at

8   this sentence and Paragraph 89 of your

9   report, Professor Gruber, isn't it

10   incorrect to say that these studies

11   establish that prescription opioids have

12   become the predominate gateway to heroin

13   use, a pattern not observed in earlier

14   decades, and thus that the illicit opioid

15   crisis is a direct result of defendants'

16   misconduct?

17          MR. KO:  Object to the form.

18          THE WITNESS:  I don't think

19   so.

20  BY MR. GEISE:

21       Q.   Would you agree that these

22   studies, the five studies that you looked

23   at, do not discuss the defendants'

24   misconduct or alleged misconduct at all?

1          MR. KO:  Objection.  Asked

2     and answered.

3          THE WITNESS:  Once again, I

4     don't recall if they discussed the

5     defendants.  They do focus on the

6     role of prescription opioids which

7     are primarily manufactured and

8     distributed by defendants.

9  BY MR. GEISE:

10     Q.    Would you agree that these

11  studies cannot be used to establish that

12  the illicit opioid crisis is a direct

13  result of defendants' misconduct?

14          MR. KO:  Object to the form.

15     Asked and answered.  Also to

16     clarify, "these studies," we're

17     talking about the studies -- the

18     five studies, correct?

19          MR. GEISE:  Correct.

20          THE WITNESS:  Once again,

21     what these studies do is show the

22     mechanism through which the use of

23     prescription opioids, which the

24     defendants are the primary

1  manufacturer and distributors, was

2  a pathway to the use of illicit

3  opioids.

4  BY MR. GEISE:

5  Q.   But that doesn't -- those

6  studies don't talk at all about -- they

7  don't label the defendants' activities as

8  misconduct at all, correct?

9  MR. KO:  Objection.  Asked

10  and answered.

11  THE WITNESS:  I don't

12  recall.

13  BY MR. GEISE:

14  Q.   Do you agree that this

15  sentence in Paragraph 89 of your report

16  overstates what those five studies

17  establish regarding the defendants'

18  conduct?

19  MR. KO:  Object to the form.

20  THE WITNESS:  Read -- read

21  individually, it seems an

22  overstatement.  But I think if you

23  put it in the context of the

24  report, I -- as I said, I rely on

1    Professor Rosenthal's report to

2    talk about the link from

3    misconduct to the shipments of

4    opioid.  This is part of a body of

5    evidence that shows the link

6    between shipments of opioids and

7    illicit opioid use.  And,

8    therefore, you put those two

9    together, and that is the basis

10    for that sentence.

11   BY MR. GEISE:

12        Q.    Where that sentence is

13   contained within your report in Paragraph

14   89, your answer just referred to more

15   than just those five studies, correct?

16        A.    Yes, it did.

17        Q.    And you would agree that you

18   don't refer to Professor Rosenthal's

19   report in your Table 1.1 when you talk

20   about the five studies that you looked

21   at?

22        A.    That's right.

23        Q.    And the five studies that

24   you looked at only examined one possible

Highly Confidential - Subject to Further Confidentiality Review

1    pathway to heroin use, correct?

2                    MR. KO:  Object to the form.

3                    THE WITNESS:  No.  I mean,

4            as you, yourself, have pointed

5            out, they discuss -- they discuss

6            and study -- I believe if we look

7            back at the studies, there's

8            reference to multiple pathways.  I

9            don't recall how explicitly those

10            other pathways were studied.

11    BY MR. GEISE:

12            Q.    And even if there is a

13    reference in those other studies about

14    other potential pathways, I think you

15    told us before that you did not study

16    those other potential pathways to be able

17    to offer an expert opinion about them,

18    correct?

19            A.    I did not.

20                    MR. KO:  Object to the form.

21                    MR. GEISE:  We've been going

22            about an hour.  I think we might

23            be switching up here.  Let's take

24            a break.

Highly Confidential - Subject to Further Confidentiality Review

1           THE VIDEOGRAPHER:  The time

2      is 4:09 p.m.  We are off the

3      record.

4           (Short break.)

5           THE VIDEOGRAPHER:  The time

6      is 4:23 p.m.  We are on the

7      record.

8  BY MR. GEISE:

9      Q.    Professor Gruber, I had a

10  chance to go back and look at an answer

11  that you gave to a recent question before

12  we took a break.  And I just want to

13  clarify something.

14           I think you said that you

15  rely on Professor Rosenthal's report to

16  talk about the link of misconduct to the

17  shipment of opioids.  Was that accurate?

18      A.    Well, that's what I rely on

19  for that -- for that part of the

20  conclusion.  The truth is the Professor

21  Rosenthal's -- of course, her report uses

22  different data than mine.  It doesn't use

23  the ARCOS data.  It uses data from

24  marketing to a different measure of

1    prescription that comes from IQVIA data.

2              Once again, as we discussed

3    before, these are different proxies for

4    the same thing that we're trying to get

5    at, which is opioid use.

6         Q.   As I understand your

7    opinions today, you discuss about

8    shipments as a proxy for -- for

9    consumption, and the association with

10   harms.  Is that -- it's very broad, but

11   is that accurate?

12        A.   That's accurate.

13             THE WITNESS:  Go ahead.

14             MR. KO:  Object to the form.

15   BY MR. GEISE:

16        Q.   And I think from the answer

17   referring to Professor Rosenthal's

18   report, do you then leave the misconduct

19   judgment to Professor Rosenthal, how that

20   relates to shipment?

21        A.   I don't discuss misconduct.

22   I only reference her report here.

23        Q.   And that may be the better

24   way of me phrasing that question.  You

Highly Confidential - Subject to Further Confidentiality Review

1  don't discuss defendants' alleged

2  misconduct in your report, correct?

3          MR. KO:  Objection.  Asked

4      and answered.

5          THE WITNESS:  My report

6      draws on Professor Rosenthal's

7      discussion.

8  BY MR. GEISE:

9      Q.    You yourself didn't form an

10  opinion about whether the defendants

11  engaged in misconduct?

12      A.    I don't express an opinion

13  in this report on that topic.

14      Q.    I want to turn to Page 68 of

15  your report and Heading B that says the

16  economic literature recognizes that the

17  increase in heroin mortality after 2010

18  is attributable to shipments of

19  prescription opioids.

20          Do you see that?

21      A.    Yes.

22      Q.    Now, that heading is a

23  pretty -- pretty broad and global

24  statement, "the economic literature."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2          A.     Yes.

3          Q.     Would it be more accurate to

4    say that some economic literature

5    recognizes that?

6               MR. KO:  Object to the form.

7               THE WITNESS:  I would say

8          maybe a more accurate -- the

9          relevant economic literature

10         recognizes that.

11   BY MR. GEISE:

12         Q.     Now, in this section of your

13   report, I believe you cite to three

14   different studies, an Evans study, an

15   Alpert study, and then the last one is a

16   Powell study; is that correct?

17         A.     Yes.

18         Q.     In looking at these studies,

19   they do not necessarily discuss shipments

20   of prescription opioids; is that correct?

21         A.     I don't think that's

22   correct.

23         Q.     Okay.  We'll look at them

24   individually then.

1          Turning your attention to

2    Paragraph 95 of your report.  In the

3    first sentence, you say, "As demonstrated

4    above, the rapid growth of mortality from

5    illicit opioids nationally coincided with

6    the reduction in aggregate sales of

7    prescription opioids after 2010."

8          Do you see that?

9    A.    Yes.

10   Q.    Now, when you use the term

11   "coincided" here, do you mean coincided

12   in time?

13   A.    Yes.

14   Q.    As shipments went down,

15   mortality went up?

16   A.    Nationally as shipments --

17   post 2010, shipments were going down, as

18   mortality from illicit opioids was going

19   up, because individuals, as I've

20   discussed before, individuals substituted

21   from their prescription opioids to

22   illicit opioids after 2010.

23   Q.    As we discussed before, I

24   think we referred to this as a negative

Highly Confidential - Subject to Further Confidentiality Review

1    correlation after 2010, that shipments

2    went down and mortality went up?

3              MR. KO:  Object to the form.

4              THE WITNESS:  That's right.

5    BY MR. GEISE:

6         Q.    The second sentence of

7    Paragraph 95 provides, "A variety of

8    economic studies have previously

9    established the causal relationship

10   between the increase in heroin-related

11   mortality between 2010 and either 2012 or

12   2013, and defendants earlier shipments of

13   prescription opioids, as well as the

14   reduction in sales after 2010."

15             Do you see that?

16        A.    Yes.

17        Q.    And to clarify, are you

18   asserting that the studies establish that

19   heroin mortality, for a period starting

20   in 2010, was related to two factors,

21   prescription shipments before 2010 and a

22   reduction in sales after 2010?

23             MR. KO:  Object to the form.

24             THE WITNESS:  No.  To

Highly Confidential - Subject to Further Confidentiality Review

1  clarify what I'm saying is that

2  it's related to prescription

3  shipments through 2010 and a

4  series of actions that led to a

5  reduction in sales after 2010.

6  BY MR. GEISE:

7  Q.    Now, in Paragraph 95, you

8  make mention of a variety of studies.

9  Are there other studies that purportedly

10  establish this causal relationship in

11  addition to the three that you discuss in

12  Subsection B that begins on Page 68?

13  MR. KO:  Object to the form.

14  THE WITNESS:  Not that I'm

15  aware of, but this is --

16  economists have sort of come to

17  this literature somewhat later

18  than epidemiologists.  You see the

19  articles are recent.  It is a

20  growing literature.  There may be

21  recent articles of which I'm not

22  yet aware.

23  BY MR. GEISE:

24  Q.    So in terms of, when you use

Highly Confidential - Subject to Further Confidentiality Review

1  the heading "the economic literature,"

2  you're really referring to these three

3  articles?

4        A.    The -- how will you say, the

5  extant relevant economic literature.

6        Q.    Okay.  We can say that.

7              And the extant relevant

8  economic literature consists of three

9  articles?

10        A.    That's absolutely right.

11        Q.    Let's look first at the

12  Evans article.  I'm handing it to you,

13  Professor Gruber.

14              (Document marked for

15              identification as Exhibit

16              Gruber-14.)

17  BY MR. GEISE:

18        Q.    It's marked as Exhibit 14 to

19  your deposition.

20              And you discuss the findings

21  from this article in Paragraph 96 of your

22  report, correct?

23        A.    Yes.

24        Q.    And just for the record, the

Highly Confidential - Subject to Further Confidentiality Review

1    title of this is "How the Reformulation

2    of OxyContin Ignited the Heroin

3    Epidemic."

4            And it's from March of 2019,

5    and it's written by William Evans, Ethan

6    Lieber, and Patrick Power, correct?

7        A.    This draft is from March of

8    2018.  It's going to be published in

9    2019.  I believe I referenced the -- I

10   sort of future referenced it.  I

11   referenced it as 2019 because that's the

12   date in which it -- it's been accepted to

13   be published.

14           Let me go look at the

15   references.  It may have actually -- I

16   worked from the version you showed me.

17       Q.    Okay.

18       A.    It has subsequently been

19   published.

20       Q.    It has.

21       A.    But it's fine to refer to

22   this version.

23       Q.    And I have both of them.

24   And there's not a substantive difference.

1    So let -- we'll work off the -- the

2    version I gave you as Exhibit 14.

3                Professor Gruber, this study

4    doesn't seek to attribute heroin

5    mortality to shipments of prescription

6    opioids, correct?

7         A.    Well, it -- I -- I believe

8    the study talks about shipments as, if

9    you will, a mediating factor in the chain

10   of causation that they discuss.  Which

11   is, as discussed in this study, areas

12   with higher shipments saw the largest

13   growth in heroin use after OxyContin was

14   reformulated.  So the study does involve

15   using shipments data.

16        Q.    If you look at the first

17   sentence of the abstract, the authors

18   write, "We attribute the recent

19   quadrupling of heroin death rates to the

20   August 2010 reformulation of an

21   oft-abused prescription opioid,

22   OxyContin," correct?

23        A.    Yes.

24        Q.    And if you look to the

Highly Confidential - Subject to Further Confidentiality Review

1    second page of Exhibit 14 which is

2    Page Number 1 at the bottom.  It's the

3    second page in the exhibit.

4            A.    Mm-hmm.

5            Q.    At the bottom, bottom

6    paragraph, do you see where the authors

7    write, "In this paper we argue that the

8    rapid rise in the heroin death rate since

9    2010 is largely due to the reformulation

10   of OxyContin, an opioid introduced in

11   1996"?

12           A.    Yes, I do.

13           Q.    So this paper by Evans

14   considered the impact of the

15   reformulation of a single opioid,

16   OxyContin, correct?

17           A.    That's correct.

18           Q.    You agree that the study did

19   not attempt to establish a relationship

20   between global opioid shipments other

21   than OxyContin and heroin mortality,

22   correct?

23                 MR. KO:  Object to the form.

24                 THE WITNESS:  One -- one

1      moment.  Yes, that's correct.

2  BY MR. GEISE:

3      Q.    If I could direct your

4  attention to Page 4 of Exhibit 14.  The

5  first complete sentence at the top of the

6  page says, "The Food and Drug

7  Administration has promoted the

8  development of abuse deterrent opioids to

9  pharmaceutical companies and worked with

10 manufacturers to bring these products to

11 market as quickly as possible."

12          Do you see that?

13     A.    Yes.

14     Q.    And were you aware that the

15 FDA promoted the development of abuse

16 deterrent opioids?

17     A.    Yes, I was.

18     Q.    Continuing, Evans writes,

19 "Recently the FDA listed the development

20 of ADFs a national policy priority.  Five

21 states have adopted laws requiring

22 insurance companies to cover ADFs and

23 similar laws have been proposed in 15

24 other states."

1      Do you see that?

2      A.    Yes.

3      Q.    Are you aware that the FDA

4  has listed the development of ADFs as a

5  national policy priority?

6      A.    I -- I am -- I don't know

7  about that particular title.  I'm aware

8  the FDA promoted the idea of ADFs.

9      Q.    Do you have an opinion that

10  the FDA bears any responsibility for

11  negative consequences that flow from

12  ADFs?

13      MR. KO:  Object to the form.

14      THE WITNESS:  No, I don't.

15  BY MR. GEISE:

16      Q.    You don't think the FDA

17  bears any responsibility?

18      MR. KO:  Object to the form.

19      THE WITNESS:  No.

20  BY MR. GEISE:

21      Q.    Do states requiring

22  insurance companies to cover ADFs bear

23  any responsibility for negative

24  consequences flowing from them?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. KO:  Object to the form.

2           THE WITNESS:  No, I don't --

3      no, they don't.

4  BY MR. GEISE:

5      Q.    If you look at the next

6  paragraph of Evans study, they write, "We

7  also present evidence that a number of

8  alternative explanations do not appear

9  capable of generating the patterns found

10  in the data.  The adoption of

11  prescription drug monitoring programs and

12  the rise of the potent synthetic opioid

13  fentanyl likely have important effects on

14  the markets for opioids and heroin, but

15  do not seem to be the driving force

16  behind the abrupt growth in heroin death

17  rates starting in 2010."

18           Do you see that?

19      A.    Yes.

20      Q.    And I think we talked before

21  about the adoption of prescription drug

22  monitoring programs, correct?

23      A.    Correct.

24      Q.    If we can turn to Page 5.

Highly Confidential - Subject to Further Confidentiality Review

1    Actually turn to Page 9.

2                 And you see at the top of

3    Page 9, beginning on Page 8, the authors

4    summarize some of the available

5    literature that looks at people switching

6    to heroin.

7                 Do you see that?

8         A.    Yes.

9         Q.    Okay.  Now, you were aware

10   of, obviously, the Evans study, correct?

11        A.    Yes.

12        Q.    Because you cited it, right?

13        A.    Yes.

14        Q.    And if you see at the end of

15   the bottom of Page 8 where they list a

16   number of studies that look at heroin

17   use, one of them that they cite is the

18   Compton paper from 2016 that we looked at

19   as Exhibit 5.

20                 Do you recall that?

21        A.    Yes.

22        Q.    Now, when you read -- did

23   you read the Evans paper in its entirety?

24        A.    Yes, I did.

1    Q.    When you read it and saw

2    these sites, did you ask your team of

3    researchers to get the underlying cites

4    that Evans cited?

5    A.    I did not make a separate

6    request separate from my asking them to

7    do the literature review.

8    Q.    So the Compton article that

9    we looked at as Exhibit 5 was actually

10   mentioned in the Evans study you have,

11   correct?

12   A.    Correct.

13   Q.    But you don't have any

14   recollection of actually looking at that

15   Compton article?

16   A.    No, I don't.

17   Q.    If we look midway through

18   the paragraph on the top of Page 9, you

19   see where the authors write, "In the

20   population of people that use pain

21   medicine recreationally, few eventually

22   moved to heroin."

23         Do you see that?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It continues, "Looking at

2  data from the third quarter of 2010

3  through the end of 2014 in the annual

4  NSDUH, among respondents that have used

5  pain medicine recreationally over the

6  past year, less than 1 percent said they

7  ever used heroin."

8         Do you see that?

9    A.    Yes.

10    Q.    Do you agree with that data?

11    A.    As we've talked about the

12  limitations of the NSDUH, but I think

13  it's -- it's the best data nationally for

14  that, as well as for the next fact that's

15  cited about the fact that most of the

16  people that use heroin report a younger

17  use age of initiation for pain medicine

18  use than for heroin.

19    Q.    And the next sentence says,

20  "However, over the same period 79 percent

21  of people that used heroin in the past

22  30 days report a younger age of

23  initiation for recreational pain medicine

24  use than their initiation age for

Highly Confidential - Subject to Further Confidentiality Review

1    heroin."  Is that correct?

2           A.    Yes.

3           Q.    And again, you haven't

4    studied other potential substances that

5    people had earlier ages of initiation for

6    before their initiation age for heroin,

7    correct?  Is that a mouthful?

8           A.    Yeah, that's a mouthful.

9           Q.    Okay.  You pointed out this

10   sentence that talks about 79 percent of

11   people that used heroin in the past

12   30 days report a younger age of

13   initiation for recreational pain

14   medicine, correct?

15          A.    Yes.

16          Q.    Do you know what percentage

17   of those people that used heroin in the

18   past 30 days report a younger age of

19   initiation for cocaine?

20          A.    No, I don't.

21          Q.    Do you know the answer for

22   marijuana?

23          A.    No, I don't.

24          Q.    Do you know the answer for

```
 1    binge drinking?

 2         A.    No, I do not.

 3         Q.    Now, Evans in this article

 4    talks about the reformulation of

 5    OxyContin, correct?

 6         A.    That's correct.

 7         Q.    Do you agree that the

 8    distributors defendants in this case had

 9    no involvement in the reformulation of

10    OxyContin?

11              MR. KO:  Object to the form.

12         Foundation.

13              THE WITNESS:  I don't -- can

14         you repeat the question.

15    BY MR. GEISE:

16         Q.    Yeah.  Do you agree that the

17    distributor defendants in this lawsuit

18    had no involvement in the reformulation

19    of OxyContin?

20              MR. KO:  Object to the form.

21         Object as to foundation.

22              THE WITNESS:  I -- clearly

23         the reformulation of OxyContin was

24         done by the manufacturers.  I
```

```
1          don't know if the distributors had
2          no role.  I don't -- I don't know
3          that the underlying mechanics of
4          the process well enough in the
5          history of how it happened.
6   BY MR. GEISE:
7          Q.   Are you aware of whether the
8   distributors had any role in the
9   reformulation of OxyContin?
10              MR. KO:  Same objections.
11              THE WITNESS:  I'm not.
12  BY MR. GEISE:
13         Q.   Are you aware of whether the
14  pharmacy defendants in this lawsuit had
15  any involvement in the reformulation of
16  OxyContin?
17              MR. KO:  Same objections.
18              THE WITNESS:  No, I'm not.
19  BY MR. GEISE:
20         Q.   Is it accurate to say that
21  the FDA had a role in the reformulation
22  of OxyContin?
23         A.   The FDA, as we said, made it
24  a national priority to reformulate
```

1  OxyContin.

2      Q.   Now, the Evans study

3  acknowledged that any shock associated

4  with oxycodone was not seen with the

5  prescription opioid market generally,

6  correct?

7      A.   Where are you looking?

8      Q.   Let me find it here.  If you

9  look at the middle of Page 11 on

10 Exhibit 14, the last sentence says,

11 "These results for other drugs suggest

12 that there was not a change to the opioid

13 market more generally, but that the shock

14 was specific to oxycodone and heroin."

15          Do you see that?

16     A.   I see that, yes.

17          MR. KO:  I'm sorry.  Where

18     are -- the witness was reading,

19     but where was that?

20          MR. GEISE:  Page 11.

21          MR. KO:  Okay.  Thank you.

22 BY MR. GEISE:

23     Q.   Now, the Evans study also

24 recognized that whatever impact the

Highly Confidential - Subject to Further Confidentiality Review

1   substitution of heroin for opioids had

2   was dependent on a particular geographic

3   area, correct?

4           MR. KO:  Object to the form.

5           THE WITNESS:  Try that one

6       more time.

7   BY MR. GEISE:

8       Q.    Sure.  The Evans study

9   recognized that whatever impact the

10  substitution of heroin for opioids --

11  opioids had was dependent on the

12  particular area?

13          MR. KO:  Object to the form.

14          THE WITNESS:  He does -- the

15      core of the study is using

16      differences across areas in

17      understanding what happened after

18      2010.

19  BY MR. GEISE:

20      Q.    Why don't we look at the

21  next section on Page 11 under Roman

22  Numeral IV, where Evans writes, "The

23  substitution of heroin for opioids is not

24  likely to be the same in all areas.

Highly Confidential - Subject to Further Confidentiality Review

1    Areas where heroin is more easily

2    available or where there is pervasive

3    abuse of oxycodone will probably see

4    larger shifts from opioids to heroin."

5              Do you see that?

6         A.    Yes.

7         Q.    Now, the Evans study did not

8    look specifically at Cuyahoga and Summit

9    Counties, correct?

10        A.    The Evans study used

11   national data, so it would include those

12   counties.

13        Q.    But they didn't look

14   specifically at them to see where

15   Cuyahoga and Summit fall with respect to

16   the ease of availability of heroin or the

17   abuse of oxycodone, correct?

18        A.    No.   There's no reason they

19   would have.   This is a national

20   representative academic study.

21        Q.    After you read this national

22   academic study, did you convene any

23   research to see about the ease of

24   availability of heroin or the pervasive

Highly Confidential - Subject to Further Confidentiality Review

1    abuse of oxycodone in Summit or Cuyahoga

2    Counties?

3                    MR. KO:  Object to the form.

4                    THE WITNESS:  We have data

5           on both heroin and we have data on

6           shipments of prescription opioids

7           of OxyContin in particular.  And

8           we have data on deaths from heroin

9           from those counties that we use in

10          our analysis.

11   BY MR. GEISE:

12          Q.    Well, did you perform any

13   research or analysis into the

14   pre-reformulation heroin death rates in

15   Cuyahoga and Summit counties?

16          A.    We have data on the

17   preformulation death rates that's part of

18   the analysis.

19          Q.    Did you perform any research

20   or analysis into the level of oxycodone

21   use in Cuyahoga and Summit counties

22   before the reformulation?

23          A.    That's been part of our

24   analysis, yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     And respectfully, Professor
2    Gruber, when I read your report, I don't
3    see any summary of that analysis with
4    regard to pre-reformulation and heroin
5    deaths in Cuyahoga and Summit Counties.
6        A.     Yes, that's not included in
7    the report.  You're right.  I just -- I
8    use a more summary -- if you look at
9    Figure 1.23, that's more summary of
10   mortality analysis than oxycodone
11   specific.
12       Q.     The Evans study recognized
13   that abuse deterrent form, formations,
14   formulations can result in lower
15   mortality, correct?
16       A.     You have to show me where
17   you're looking.
18       Q.     Okay.  If you go to Page 20,
19   Exhibit 14.  The bottom paragraph.  Evans
20   writes, "An important caveat is that we
21   are only able to examine short run
22   impacts of the reformulation.  If the
23   stock of opioid abusers is significantly
24   reduced in the long run because of the

¹ introduction of ADFs, then it is likely

² that the stock of heroin users will also

³ be reduced in the long run.  As a

⁴ consequence, even though there does not

⁵ appear to be a reduction in total opioid

⁶ and heroin deaths due to the

⁷ reformulation of OxyContin in the first

⁸ five years after reform, there could be a

⁹ reduction in these death rates in the

¹⁰ long run."

¹¹          Do you see that?

¹²     A.    Yes.

¹³     Q.    Now, on Page 31 of your

¹⁴ report, I think it's at Paragraph 52, you

¹⁵ also quoted from Evans there to report

¹⁶ that "there appears to be a one-for-one

¹⁷ substitution of heroin deaths for opioid

¹⁸ deaths."

¹⁹          Do you recall that passage

²⁰ in your report?

²¹     A.    One moment.  That's a direct

²² quote from the Evans report, yes.

²³     Q.    So in your report at

²⁴ Paragraph 52 you write, "For example,

1   Evans et al. 2019 notes that 'when we

2   combined heroin and opioid deaths

3   together, we find no evidence that total

4   heroin and opioid deaths fell at all

5   after the reformulation' - there appears

6   to have been one-for-one substitution of

7   heroin deaths for opioid deaths."

8          Did I read that correctly?

9      A.    You did.

10     Q.    If you look at Page 21 of

11  Exhibit 14.  Evans also stated in their

12  report, "Although we cannot reject

13  one-for-one substitution of heroin deaths

14  for opioid deaths in the aggregate,

15  combined heroin or opioid death rates did

16  fall after the reformulation in states

17  that had high levels of pre-reformulation

18  oxycodone use and relatively little

19  heroin availability."

20          Do you see that?

21     A.    Yes.

22     Q.    So do you agree that Evans

23  found a negative correlation between

24  OxyContin reformulation and

Highly Confidential - Subject to Further Confidentiality Review

1    opioid-related death rates in certain

2    states?

3              MR. KO:  Object to the form.

4         Also I believe it mischaracterizes

5         that statement.  But you can

6         answer.

7              THE WITNESS:  I guess I

8         wouldn't -- I wouldn't quite put

9         it that way.  Let's be clear about

10        what he found, and maybe this is

11        what you mean, maybe it's not.

12             What he clearly found is

13        there was a subset of states in

14        which the reformulation led to a

15        total decline in mortality.

16   BY MR. GEISE:

17        Q.    So if there is a total

18   decline in mortality, there could not be

19   a one-for-one substitution of heroin

20   deaths for opioid deaths, correct?

21             MR. KO:  Object to the form.

22             THE WITNESS:  In that subset

23        of states, in that quadrant, there

24        would not be.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. GEISE:

2         Q.    And you agree that other

3    studies have refuted the idea that there

4    is a one-for-one substitution of heroin

5    deaths for opioid deaths, correct?

6         A.    I don't recall other studies

7    showing that same estimate.

8         Q.    Did you look for studies

9    that discussed that estimate?

10        A.    That one-for-one estimate

11   was not central to my analysis, so I

12   didn't focus on other studies.  I didn't

13   focus on a literature search around that

14   particular point.

15        Q.    Well, even if it might not

16   be central to your analysis, you

17   certainly mentioned it in your report,

18   correct?

19        A.    Yes.

20        Q.    If I can have you look back

21   at Exhibit 5 to your deposition.  This is

22   that Compton article from 2016, correct?

23        A.    Mm-hmm.  Yeah.

24        Q.    And this is the article that

1  Evans actually cites in the report you --

2  his study that you rely on, correct?

3         A.    He did cite this study, yes

4  among others.

5         Q.    And again you're not sure --

6         A.    Among others.

7         Q.    Among others.

8               And you are not sure if you

9  read this one, correct?

10        A.    That's correct.

11        Q.    If I can ask you to turn to

12  Page 160 of Exhibit 5 and look at the

13  left-hand column on Page 160.  Compton is

14  reporting on -- on studies that have

15  looked at -- at death rates following

16  2010.

17               And in the first full

18  paragraph on that left-hand column, he

19  writes, "The third study examined deaths

20  from overdose in Florida through 2012.

21  Florida had a well-documented

22  prescription opioid problem.  Between

23  2010 and 2011 Florida instituted a series

24  of major policy changes that were

Highly Confidential - Subject to Further Confidentiality Review

1   designed to reduce the inappropriate

2   supply of prescription opioids.  After

3   these policies were implemented,

4   prescriptions were curtailed and the rate

5   of death from prescription opioid

6   overdose declined 27 percent between 2010

7   and 2012.

8               "Moreover, these significant

9   declines in prescription opioid mortality

10  were accompanied by an increase of only

11  60 deaths related to heroin, with the

12  overall number of total deaths from

13  overdose declining by 535 between 2010

14  and 2012."

15              Do you see that?

16      A.    Yes.

17      Q.    So that reports a study

18  there that after these changes in Florida

19  in 2010, that there was not a one-for-one

20  correlation of -- between opioid deaths

21  and heroin deaths?

22      A.    Exactly what Evans says.

23      Q.    And then if you look at the

24  next paragraph --

Highly Confidential - Subject to Further Confidentiality Review

1           A.    Let's be clear.  I want to

2    clarify my answer.  They don't find that,

3    which exactly what Evans said they should

4    fine that.  Because Florida is a high

5    oxycodone/low heroin state, and as Evans

6    says, there isn't a one-for-one

7    substitution of the OxyContin --

8    oxycodone/low heroin states.  So it's

9    not -- these are consistent with each

10   other.

11          Q.    Right.  But it's also an

12   example of a state that did not see a

13   one-for-one replacement, correct?

14          A.    That's correct, yeah.

15          MR. KO:  Objection.  Asked

16       and answered.

17   BY MR. GEISE:

18          Q.    If you look at the next

19   paragraph it cites to a New York study.

20   It says, "The fourth study which examined

21   opioid overdoses in New York showed a

22   29 percent reduction in the rate of death

23   from prescription opioid overdose coupled

24   with declines in the rates of overall and

1    high dose opioid prescribing in Staten

2    Island, New York, in 2013 after the

3    implementation of targeted and general

4    public health initiatives, including a

5    heavy focus on prescribing behaviors.

6    Importantly, these decreases were not

7    offset by increases in mortality from

8    heroin-involved overdose during the same

9    time period."

10              Do you see that?

11        A.    Yes.

12        Q.    So this is again another

13   example of there not being a one-for-one

14   replacement of a heroin death for an

15   opioid death, correct?

16        A.    That's correct.  I have not

17   reviewed the studies they are citing.  As

18   I said I've reviewed the Evans study.

19   It's a very high quality empirical study.

20   I don't -- so I can't speak to the

21   quality of these studies relative to the

22   Evans study.

23              But what you've read to me

24   is certainly consistent with what we

Highly Confidential - Subject to Further Confidentiality Review

1    discussed about certain states seeing a

2    fall in total mortality.

3          Q.    Professor Gruber, I'm going

4    to jump out of order for a second.  I

5    can't find a couple extra copies of the

6    next exhibit I want to use.

7                MS. SUTTON:  Do you need

8          copies made?

9                MR. GEISE:  We may, but the

10         copy I have is marked up, so I'm

11         just trying to find a clean one.

12         But that's all right.  We can keep

13         progressing.

14   BY MR. GEISE:

15         Q.    Back to our regularly

16   scheduled programming.

17                (Document marked for

18         identification as Exhibit

19         Gruber-15.)

20   BY MR. GEISE:

21         Q.    Professor Gruber, I'm

22   handing you what's marked as Exhibit 15

23   to your deposition.

24                And do you recognize this as

1    the 2018 publication from Alpert, Powell,

2    and Pacula entitled "Supply-Side Drug

3    Policy in the Presence of Substitutes:

4    Evidence from the Introduction of Abuse

5    Deterrent Opioids"?

6         A.    Yes, I do.

7         Q.    And this is -- you refer to

8    this in your report as one of those three

9    economic studies, correct?

10        A.    Yes, I do.

11             MR. KO:  Do you have any

12        extra copies of those?

13             MS. CASTLES:  Trying.

14             MR. GEISE:  Do you want to

15        wait and make copies?  We can.

16             MR. KO:  Why don't we -- why

17        don't we keep going, and then to

18        the extent that I need a copy

19        right away, I'll let you know.

20        But go ahead.  You can share your

21        version as well.

22             MR. GEISE:  He's got --

23             MR. KO:  The one that's

24        marked up?

1          MR. GEISE:  No.

2          MR. KO:  That's what I

3     meant.

4          MR. GEISE:  No, no.  He's

5     got a clean one.

6  BY MR. GEISE:

7     Q.    Professor Gruber, if you

8  look on Page 1 the first sentence they

9  write, "Overdose deaths between" -- "from

10  prescription opioid pain relievers nearly

11  quadrupled between 1999 and 2010.  We

12  studied the consequences of one of the

13  largest supply disruptions to date to

14  abusable opioids, the introduction of an

15  abuse-deterrent version of OxyContin in

16  2010."

17          Do you see that?

18     A.    Yes.

19     Q.    So like the Evans study,

20  these authors also focused on the

21  reformulation of OxyContin, correct?

22     A.    Correct.

23     Q.    And they did not study the

24  impact of opioid shipments generally,

Highly Confidential - Subject to Further Confidentiality Review

1  correct?

2          A.     In this study, they -- I

3  don't believe they used opioid shipments

4  data.

5          Q.     If you look at the last

6  sentence of that abstract paragraph on

7  Page 1.  The authors write, "Our results

8  imply that the recent heroin epidemic is

9  largely due to the reformulation of

10  OxyContin," correct?

11          A.     That's what it says, yes.

12          Q.     Now, if we look at the

13  conclusions section which is on Page 31

14  of Exhibit 15, do you agree that in the

15  entire conclusions section, shipments of

16  prescription opioids are not mentioned?

17          A.     I have to take a minute to

18  read it.

19                 They don't mention the word

20  "shipments."  They use -- once again, as

21  we discussed repeatedly, shipments is one

22  of the proxies people have used for the

23  supply of prescription opioids and the

24  consumption of prescription opioids.

1    They use other terms here. They use

2    other terms in their description.

3         Q.    What other terms do you

4    think they use in their description that

5    is equivalent to the term that you've

6    used for shipment of prescription

7    opioids?

8         A.    "Prevalence of OxyContin

9    misuse" is one term they use. And then

10    later they use the term -- they later

11    talk about the supply of opioids, but

12    that's more indirect. I think really the

13    main one they use is the first one.

14         Q.    Okay. So you agree that the

15    main focus of this paper was to look at

16    the prevalence -- the impact of the

17    reformulation of OxyContin, correct?

18         A.    Yes.

19         Q.    An in the conclusion

20    section, when they talk about that, they

21    talk about the prevalence of OxyContin

22    misuse, correct?

23         A.    Correct.

24         Q.    This is not a study that

Highly Confidential - Subject to Further Confidentiality Review

1    looked at the impact of opioid shipments

2    as a whole?

3            MR. KO:  Object to the form.

4            THE WITNESS:  This study is

5        similar in spirit to the Evans

6        study.  Both are asking the

7        question -- both are saying, look,

8        there's a sharp change in 2010

9        with the reformulation.  We want

10       to look at how that affected

11       different places differently.

12           Evans divide the area up --

13       divides his areas up based on

14       shipment data.  They divide their

15       areas up based on misuse data as

16       measured in the NSDUH.  Both --

17       they're just using two different

18       proxies to try to get at the same

19       question.

20   BY MR. GEISE:

21       Q.    But their proxy to get at

22   the question here is the use and misuse

23   of OxyContin, correct?

24       A.    As reported in the NSDUH.

1     Q.    Right.  Their use of a proxy

2  here is not earlier shipments of

3  prescription opioids, is it?

4     A.    I don't -- one second.  What

5  they say on Page 12, if you look at Page

6  12 at the top.  They say, "Using ARCOS we

7  also show there's a strong correlation

8  with OxyContin misuse in the per capita

9  legal supply of oxycodone."  So they rely

10  on the NSDUH data as their primary

11  measure, but they sort of look to

12  shipments as a validation for what

13  they're doing.

14     Q.    But not shipments of

15  prescription opioids, just shipments of

16  OxyContin and oxycodone, correct?

17     A.    Those are the two that they

18  focus on, yes.

19     Q.    If you look back at your

20  report in Paragraph 97 where you're

21  discussing this Alpert article which is

22  Exhibit 15 to your deposition.  We -- see

23  that Paragraph 97?

24     A.    Yes.

1    Q.    At the end of the paragraph

2  before the block quote that cites to the

3  Alpert article, you wrote, "Alpert, et

4  al., conclude that the increase in heroin

5  mortality after 2010 is directly related

6  to earlier shipments of prescription

7  opioids and the 2010 reformulation of

8  OxyContin."

9              Do you see that?

10    A.    Yeah.

11    Q.    And then you have a block

12  quote that you pull from the Alpert

13  article, correct?

14    A.    Correct.

15    Q.    Would you agree with me

16  though, that Alpert does not conclude

17  that the increase in heroin mortality

18  after 2010 is directly related to earlier

19  shipments of prescription opioids?

20              MR. KO:  Object to the form.

21              THE WITNESS:  They don't use

22        that measure.  But their theory

23        underlying it is the same as the

24        theory underlying the Evans as

Highly Confidential - Subject to Further Confidentiality Review

1          well as the theory that I refer to

2          in this article, which is that

3          it's about the use of prescription

4          opioids.  They used a different

5          measure, but it's the same idea.

6   BY MR. GEISE:

7          Q.    It may be the same idea.

8   But as you've used shipments of

9   prescription opioids throughout your

10  report, it means -- it means general

11  aggregate shipments of prescription

12  opioids, correct?

13             MR. KO:  Object to the form.

14             THE WITNESS:  That's

15         correct.

16  BY MR. GEISE:

17         Q.    Okay.  When you use that

18  term in Paragraph 97, shipments of

19  prescription opioids does not mean that

20  in relation to the Alpert article,

21  correct?

22         A.    That's a good point.

23         Q.    If I can turn your attention

24  to Page 15 of Exhibit 15.  I think this

1   is consistent with something we discussed

2   earlier.  But there's a section on

3   results.

4           Do you see that?

5       A.    Yes.

6       Q.    If you go down to the end of

7   the second paragraph under the Roman

8   numeral, do you see the sentence that

9   reads, "In states with the highest

10  initial OxyContin misuse, the rate of

11  OxyContin misuse declined by nearly

12  50 percent after the reformulation, while

13  OxyContin misuse actually increased

14  slightly in states with the lowest rates

15  of initial OxyContin misuse."

16          Do you see that?

17      A.    Yes.

18      Q.    Do you know where the state

19  of Ohio falls among states as either the

20  highest or lowest initial OxyContin

21  misuse?

22      A.    No, I don't.

23      Q.    Do you know where the

24  counties of Cuyahoga and Summit fall

Highly Confidential - Subject to Further Confidentiality Review

1    within rates of highest or lowest initial

2    OxyContin misuse?

3         A.    No, I don't.

4         Q.    In looking at the focus of

5    Alpert's study into OxyContin in

6    particular, would you agree that his

7    study makes no comment on the

8    responsibility of distributors for

9    opioid-related deaths?

10              MR. KO:  Object to the form.

11              THE WITNESS:  Just

12         correction.  It's her study.

13   BY MR. GEISE:

14         Q.    Sorry.

15         A.    The co-authors.  And they

16   discuss the general phenomenon how the

17   introduction of abuse-deterrent opioids

18   led to more mortality.  They don't

19   discuss specifically the roles of

20   individual parties in that.

21              (Document marked for

22         identification as Exhibit

23         Gruber-16.)

24   BY MR. GEISE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Professor Gruber, let me

2  hand you what's been marked as Exhibit 16

3  to your deposition.  You recognize this

4  as -- it's entitled "A Transitioning

5  Epidemic:  How the Opioid Crisis is

6  Driving the Rise in Hepatitis C."

7         Do you see that?

8    A.    Yes, I do.

9    Q.    And it's written by David

10 Powell, Abby Alpert, and Rosalie Pacula?

11   A.    Yes.

12   Q.    And this is the third

13 economic -- piece of economic literature

14 that you cite in this section of your

15 report that begins on Page 68, correct?

16   A.    Correct.

17   Q.    Upfront, do you agree that

18 this study did not examine any

19 correlation between prescription opioid

20 shipments and hepatitis C infections?

21   A.    Once again, this is in the

22 spirit of the Evans study and my report

23 in trying to establish a relationship

24 between places that had a lot of use of

1    prescription opioids and a rise in

2    illicit opioids after 2010.

3              As in the previous study by

4    the same authors, they just flipped the

5    order of the first two authors, but the

6    same authors, their measure is the NSDUH

7    measure of OxyContin misuse.

8         Q.    So if we look at the heading

9    on Page 68 of your report where you

10   write, "The economic literature

11   recognizes that the increase in heroin

12   mortality after 2010 is attributable to

13   shipments of prescription opioids."

14             Do you see that header?

15        A.    Yes.

16        Q.    All three of these articles,

17   Evans, Alpert, and this one by Powell,

18   they relate to OxyContin use and misuse

19   specifically, correct?

20        A.    Yes, they do.

21        Q.    So throughout your report

22   where you talk about shipments of

23   prescription opioids in the aggregate, it

24   would be misleading in this heading to

Highly Confidential - Subject to Further Confidentiality Review

1    say that this economic literature

2    recognizes the increase in heroin

3    mortality after 2010 is attributable to

4    shipments of prescription opioids in the

5    aggregate, correct?

6                MR. KO:  Object -- object to

7           the form.  Also mischaracterizes

8           the report.

9                THE WITNESS:  It wouldn't be

10          misleading in the sense that this

11          is -- OxyContin shipments are a,

12          if not the major contributor to

13          aggregate shipments.

14   BY MR. GEISE:

15          Q.    But, I think you told us

16   before today that you did not form any

17   opinion particular to any particular

18   defendant in this case, correct?

19          A.    That's correct.

20          Q.    And where you speak in your

21   report about shipments to prescription

22   opioids, you've defined it before, that

23   that includes all shipments, correct?

24          A.    That is correct.

1    Q.    And you --

2    A.    All shipments that are

3    included in the ARCOS data.

4    Q.    And you would agree with me

5    that these three pieces of literature

6    from the economic literature do not look

7    at shipments of prescription opioids in

8    the aggregate, they look specifically at

9    OxyContin?

10    A.    Yes.

11    Q.    If I can just turn your

12    attention to Page 293 of Exhibit 16.  On

13    the left-hand column, the first full

14    paragraph, the authors write, "Our

15    findings do not rule out the possibility

16    that other factors, such as changes in

17    the availability of prescription opioids

18    or increased availability of inexpensive

19    heroin from Mexico may have also

20    independently contributed to the national

21    rise in the hepatitis C infection rates."

22    Do you see that?

23    A.    Yes.

24    Q.    And again, in looking at the

1  economic literature that is available,

2  have you conducted an analysis of

3  literature that examines the impact of

4  availability of inexpensive heroin from

5  Mexico on hepatitis C infection rates?

6          A.    If you read the rest of this

7  paragraph I think you are sort of talking

8  a lot about the kind of literature

9  economists use in articles where we try

10  to be cautious.  But if you read the rest

11  of this paragraph, they are saying we

12  can't rule it out, but we've done a

13  number of tests to show that it does not

14  seem to be driving our results.

15              I just want to clarify that.

16  They -- they are not claiming this is a

17  major causal role.  They are just being

18  cautious in -- in highlighting that they

19  can't rule it out.

20              But to answer your question

21  directly, I've not directly studied

22  hepatitis C infection rates.

23          Q.    And they also said those

24  other factors would not be correlated

Highly Confidential - Subject to Further Confidentiality Review

1    specifically with the state's initial

2    rate of OxyContin misuse, correct?

3           A.    Correct.

4           Q.    In -- in your earlier answer

5    you said that economists in articles try

6    to be cautious.

7           A.    Not always, but typically,

8    that's what we're trained to do.

9           Q.    Did you approach writing

10   your report as you would approach writing

11   an article as an economist?

12          A.    In some ways, yes.  In some

13   ways, no.

14          Q.    In what ways didn't you?

15          A.    It is more -- the style of

16   writing is not the style I'd use for an

17   economic article.

18                It -- the -- the arguments

19   and the way I place the arguments would

20   be more equipped to an article that's

21   like a review of a literature, rather

22   than an article that is trying to

23   establish a new scientific finding.

24          Q.    With respect to being

Highly Confidential - Subject to Further Confidentiality Review

1    cautious and looking in particular at the

2    heading on Page 68 of your report, do you

3    think that's an example of being cautious

4    about writing in -- in literature or not?

5            A.    I believe that's an example

6    of trying to make a point using the

7    language that the fact that it's triple

8    the shipments of prescription opioids, of

9    which OxyContin is a major opioid.

10            MR. GEISE:  Professor

11        Gruber, I think we're going to

12        take a break now.  I think you may

13        be done answering questions from

14        me --

15            THE WITNESS:  Okay.

16            MR. GEISE:  -- which is

17        probably good for you.  But I

18        thank you for your -- your time

19        and your patience with me today.

20            THE WITNESS:  Thanks.

21            THE VIDEOGRAPHER:  The time

22        is 5:12 p.m.  We are off the

23        record.

24            (Short break.)

```
1              THE VIDEOGRAPHER:  The time

2         is 5:22 p.m.  We are on the

3         record.

4                   -  -  -

5              EXAMINATION

6                   -  -  -

7    BY MR. HALLER:

8         Q.    Well, Professor Gruber, my

9    name is, excuse me, David Haller.  I'm

10   with the law firm of Covington and

11   Burling.

12             And my questioning might be

13   a little more disjointed than Mr. Geise's

14   in part because, probably naturally so,

15   but also because I'm trying to fill in

16   little gaps here or there.

17             MR. KO:  Give yourself some

18        more credit.

19             MR. HALLER:  Okay.  Well,

20        we'll see.  I like to set low

21        expectations.

22   BY MR. HALLER:

23        Q.    Now, with regard to your

24   100-county analysis, you included four
```

1    counties from that that you believe to be

2    outliers; is that right?

3           A.    I believe so.

4                 Do you remember where --

5    where that footnote is?  Footnote 97,

6    right?

7           Q.    Correct.  Reflected on

8    Page 58.

9                 MR. KO:  And did you say 100

10          counties?

11                MR. HALLER:  Yeah.

12                THE WITNESS:  I believe

13          that -- what happened?  My

14          goodness, my pages got out of

15          order.

16                But the -- the -- the four

17          excluded from the entire

18          404-county sample.

19   BY MR. HALLER:

20          Q.    Okay.  And were those the

21   four counties that -- that had the

22   highly level of per capita shipments?

23          A.    Per -- they were the highest

24   level of per capita MME.

Highly Confidential - Subject to Further Confidentiality Review

1    As we describe in the

2  report, we take the shipments by type of

3  drug and then multiply by a factor which

4  shows the potency of the drug as measured

5  by morphine equivalence.  And so our key

6  valuable is not the number of shipments,

7  but the MME, the morphine equivalence of

8  shipments, and those had the highest --

9  the four really outlying values of MME

10  per capita per day.

11      Q.   But those MME per capita

12  were MME per capita that were shipped; is

13  that right?

14      A.    Those are shipments of MME

15  per capita per day to those four

16  counties.

17      Q.   Okay.  And did those four

18  counties also have the highest level of

19  opioid mortality within the 404-county

20  sample?

21      A.   I don't know.

22      Q.   Would I be able to find in

23  your data anywhere the mortality for

24  those four counties, and how they compare

Highly Confidential - Subject to Further Confidentiality Review

1    to the mortality of the not excluded

2    counties?

3         A.    It's not in the report.  I

4    mean it's -- I don't know what data is

5    being produced to you.

6              But I think the key point is

7    that as I described before, when there's

8    outliers in the data it's standard

9    practice in economics to worry about

10   whether they are going to have an undue

11   influence on the results.  And typically

12   to test -- sort of pressure test the

13   results, both with and without those

14   observations, which is what we do here,

15   we were concerned enough that they

16   didn't reflect -- they were concerned

17   enough that they would have an undue

18   influence that excluded them, but we've

19   also ran the results with them included

20   and it doesn't change the results

21   materially.

22        Q.    And in which directions did

23   they change the results if they had been

24   included, even if not materially?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't remember.

2    Q.    Do you know what four

3  counties those were?

4    A.    I've seen the list, but I

5  can't recall it offhand.

6    Q.    Do you know what state they

7  were in?

8    A.    I don't recall.

9    Q.    Do you know either from your

10  own work or from any study, the

11  percentage of people who received a

12  prescription for a medically necessary

13  condition for prescription opioid and

14  later became addicted to heroin?

15         MR. KO:  Object to the form.

16         THE WITNESS:  That was a

17    long question.  Can you either say

18    it again or break it down?

19  BY MR. HALLER:

20    Q.    Do you know either from your

21  own work or from any study the percentage

22  of people who had a prescription opioid

23  for a legitimate medical need and later

24  became addicted to heroin?

1          MR. KO:  Object to the form.

2          THE WITNESS:  I don't know

3      that number offhand, although

4      studies we've looked at during

5      today have made reference to

6      computations like that, of that

7      nature, which suggest that a very

8      small minority of people who get

9      prescriptions then transition onto

10      heroin.

11  BY MR. HALLER:

12      Q.    But you don't know what that

13  percentage is?  Do you believe it to be a

14  single-digit percentage?

15      A.    I don't recall the way that

16  you phrased it.  One of the studies -- we

17  can look back at it, in a particular way

18  they phrased it, they had a number of 1

19  percent.  But I don't recall what that

20  was 1 percent of.

21      Q.    To talk a little bit about

22  your Gateway hypothesis, do you know the

23  demographic that's most likely to be

24  prescribed a prescription opioid?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.  I knew once, and now I

2  don't recall.  I'm sorry.

3    Q.    Would that refresh your

4  memory if those were older women?

5    A.    I recalled that it was older

6  people.  I didn't recall men or women.

7  But that would not surprise me.

8    Q.    Okay.  And do you know that

9  the demographic most likely to be

10  addicted to heroin are younger men?

11    A.    Once again, I don't know.  I

12  mean, I knew, but I don't recall.

13    Q.    And that doesn't refresh

14  your memory?

15    A.    That one, I don't recall as

16  well.

17    Q.    If you assume for the moment

18  that the demographic most likely to be

19  prescribed a prescription opioid is older

20  women, and the demographic most likely to

21  become addicted to heroin are younger

22  men, how do you square those facts with

23  your gateway hypothesis?  I take it that

24  you don't assume that older women pass

Highly Confidential - Subject to Further Confidentiality Review

1  through the gateway and become younger

2  men, right?

3           MR. KO:  Object to the form.

4       Which question -- there's two

5       questions?  Which one do you want

6       him to answer?

7  BY MR. HALLER:

8       Q.    You can answer.

9       A.    I'll ignore the second

10  question you asked.

11      Q.    Right.

12      A.    And focus on the first.

13           When you take a set of data,

14  which are showing a relationship, that

15  does not mean that every element of the

16  data perfectly conforms with that

17  relationship.  You've pointed out two

18  pieces of data which don't conform with

19  the notion of prescription opioids, a

20  gateway to heroin.  That does not mean in

21  any way, shape, or form prescription

22  opioids aren't a gateway to heroin.  It's

23  just about an observation of two elements

24  of the data.

1      Q.    At least for the older women

2   demographic, would you agree that

3   those -- that demographic is not passing

4   through the gateway?

5              MR. KO:  Object to the form.

6              THE WITNESS:  I do not -- I

7      do not know.

8   BY MR. HALLER:

9      Q.    Do you have any opinion as

10  to whether all of the people who are

11  addicted to -- were addicted to heroin in

12  2018 were addicted to prescription

13  opioids in 2010 or earlier?

14     A.    My opinion would be that --

15  I haven't studied this, but you asked my

16  opinion.  I would say that not that -- it

17  is not true that every single person

18  addicted to heroin in 2018 was issued a

19  prescription of opioids before 2010.

20     Q.    And so you agree that a

21  significant number of the people who were

22  addicted to heroin in 2018 became

23  addicted to heroin at some point after

24  2010?

1           MR. KO:  Object to the form.

2           THE WITNESS:  I don't know

3      what a significant number is.  But

4      certainly some did.

5  BY MR. HALLER:

6      Q.    Now, you're familiar with

7  the fact that Professor Cutler determined

8  that there was a break in his model in

9  December 2010, such that he did a direct

10 regression between shipments and opioid

11 mortality only up through December 2010;

12 is that right?

13     A.    That's my recollection, yes.

14     Q.    And he did not do any

15 regression -- any direct regression

16 between shipments and opioid mortality

17 for the period after December 2010; is

18 that right?

19     A.    That's correct.

20     Q.    Now, in the analyses that

21 you did purporting to show a relationship

22 between shipments and opioid mortality,

23 you used 2010 shipment data; is that

24 right?

Highly Confidential - Subject to Further Confidentiality Review

1      MR. KO:  Object to the form.

2      THE WITNESS:  I used

3   shipment -- I used -- I have

4   different analyses in the report.

5   So I think you'll have to talk

6   about which particular figure

7   you're referring to or analysis.

8  BY MR. HALLER:

9      Q.   Let's -- I want to refer you

10  to Page 59 of your report.

11      A.   Okay.

12      Q.   With regard to and figure

13  1.18, what shipment data are you using?

14      A.   There we are splitting into

15  counties by whether they have a high or

16  low level of shipments of prescription

17  opioids over the 1999 to 2010 period on

18  average.

19      Q.   Is there a name for the

20  analysis that you're doing here that's

21  reflected in this figure where you

22  have -- you're comparing the highest

23  quartile shipments with the lowest

24  quartile shipments?  What do you call

1    that analysis?

2         A.    I would call it a way to use

3    the data to sort of transparently

4    illustrate the causal relationship

5    between shipments and mortality.

6         Q.    Let me -- for the work that

7    Professor Cutler did, I know that's

8    called a multivariate regression

9    analysis.  And I can go into lots and

10   lots of textbooks, and they can talk to

11   me about that, right.

12              But if I want to look for a

13   textbook that discusses -- that discusses

14   the analysis that you're doing on this

15   page, this type of analysis, what do I

16   look for in the index?  What's this

17   called?

18              MR. KO:  Object to the form.

19              THE WITNESS:  I would not

20        say this has a particular

21        methodological name.  You would

22        see, if you looked at many, I

23        might say most, modern empirical

24        economic analyses, they will

1      typically include, in addition to

2      multivariate regression analysis,

3      increasingly they're including

4      graphical illustrations of the

5      data so that the reader can -- the

6      reader who is not -- the reader

7      can transparently understand

8      what's going on in the data,

9      rather than to rely on the

10     statistical interpretation.

11          So we typically, you know,

12     so we encourage our students today

13     when they're writing a paper to

14     include both figures that

15     transparently illustrate the story

16     they are trying to tell, as well

17     as using underlying statistical

18     analysis to make that more

19     concrete.

20  BY MR. HALLER:

21     Q.    And I'm not focused so much

22  on the graphic itself as the analysis

23  that underlines -- underlies the graphic,

24  where you've divided -- you take the

1    lowest quartile and the highest quartile,

2    and you've shown a difference in terms of

3    mortality, growth between those two

4    quartiles.  What's the name of that

5    analysis so I can find it in a textbook?

6                    MR. KO:  Objection.  Asked

7            and answered.

8                    THE WITNESS:  I don't know

9            that there's a common name for

10           this analysis that you find in a

11           textbook.  I think the right way

12           to think about this is if you look

13           at a, once again, increasingly

14           with modern empirical analysis,

15           this would be a typical way to

16           make an argument and to -- and to

17           illustrate how you've convincingly

18           tested your hypothesis, would be

19           to combine the kind of graphical

20           analysis I have here with the kind

21           of multivariate regression

22           analysis that Professor Cutler

23           does in his report.

24    BY MR. HALLER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But what you're showing

2  graphically here is not Professor

3  Cutler's regression, it's something else,

4  right?

5              MR. KO:  Objection.  Asked

6         and answered.

7              THE WITNESS:  This is --

8         this is using the same data

9         Professor Cutler does, the exact

10         same dataset, to show clearly for

11         the reader who wants to go beyond

12         the statistical analysis to

13         actually visualize the data and

14         say, is there a clear indication

15         in the data of what's happening.

16              This is -- I would say this

17         is a compliment using the same

18         data that Professor Cutler does,

19         it's identical dataset.

20  BY MR. HALLER:

21         Q.    If we were -- if we were

22  graphing Professor Cutler's work, we'd

23  have some sort of a line running through

24  400 different dots, right, showing them

Highly Confidential - Subject to Further Confidentiality Review

1    on -- what those regression points were

2    for him, correct?

3          A.    That would be one way to

4    illustrate his specific results.

5          Q.    Whether in a textbook or

6    some other source, can you point me to

7    any source that would describe for me the

8    type of, you know, high quartile --

9    highest quartile-lowest quartile analysis

10   that you're doing here and would state

11   that that's an appropriate means to show

12   causation?

13               MR. KO:  Object to the form.

14               THE WITNESS:  Sure.  The

15          Evans study that we -- Evans,

16          Lieber and Powell study does

17          exactly this kind of analysis,

18          where they divide the country into

19          high -- they divide the country

20          into -- they -- they don't use

21          quartiles, per se, but divide the

22          country to essentially high --

23          high heroin, high oxy, low --

24          they -- they divide the -- they

Highly Confidential - Subject to Further Confidentiality Review

1          divide the country by -- by two

2          dimensions:  Heroin use and -- and

3          oxy use pre 2010, and then they

4          analyze separately the effect in

5          those four groups.

6                  That's just sort of a

7          two-dimensional version of what

8          I'm doing here.

9     BY MR. HALLER:

10         Q.    And in addition to the Evans

11    study, can you point me to any other

12    study which uses this type of analysis to

13    prove causation?

14         A.    Not offhand, no.

15         Q.    And the Evans study doesn't

16    purport to show causation, does it?

17         A.    Yes, it does.

18         Q.    Does it?

19         A.    Yeah.

20         Q.    Now, if I can refer you back

21    to Page 56 of your report where you --

22    it's another quart -- high -- highest

23    quartile-lowest quartile analysis.  But

24    it relates to opioid use disorder rates,

1    correct?

2         A.    Yes.  That's right.

3         Q.    Okay.  And did we establish

4    earlier that Summit and Cuyahoga are

5    neither in the top 25 percent quartile,

6    nor in the bottom 25 percent quartile?

7         A.    Yes.  That's correct.

8              MR. KO:  And to be clear,

9         this is a graph depicting states.

10        I think the question was asked

11        about counties.

12             THE WITNESS:  Okay.  Oh yes,

13        you're right.  Once again, I --

14        thank you, David.  I clarified

15        that earlier.

16   BY MR. HALLER:

17        Q.    Yes.

18        A.    There's a lot of different

19   graphs here.

20             This is a state graph, I

21   don't recall whether Ohio is in the top

22   or bottom 25 percent.

23        Q.    Now, I assume, tell me if

24   I'm right, that there are exceptions

1  with -- within the states.  In other

2  words, are there any states that are in

3  the bottom 25 percent of shipments but

4  are not -- or above the bottom 25 percent

5  in terms of opioid use disorder rates?

6          MR. KO:  Object to the form.

7          THE WITNESS:  Whenever we do

8      analysis type in economics, be it

9      through regression analysis or

10     through this kind of graphical

11     representation of the data, we're

12     looking for central tendencies in

13     the data.

14         We don't claim that every

15     single observation lines up with

16     what's shown in those central

17     tendencies, but that's not the

18     purpose.  The purpose is to draw

19     ultimately causal conclusion, and

20     the causal conclusion will be

21     based on the central tendency in

22     the data, not the behavior of any

23     single observation.

24  BY MR. HALLER:

1       Q.    Well, I understand your

2   goal.  But my question is, in fact, in

3   connection with this particular analysis,

4   were there any states that were within

5   the bottom 25 percent of shipments but

6   were above the bottom 25 percent in terms

7   of OUD rates?

8               MR. KO:  Object to the form.

9               THE WITNESS:  I didn't look

10          at that.

11  BY MR. HALLER:

12      Q.    Do you assume -- do you

13  assume that it's likely there's at least

14  one such state?

15              MR. KO:  Object to the form.

16              THE WITNESS:  Since this is

17          the average, unless all the states

18          are identical, by definition there

19          must be at least one state that is

20          above the average and at least one

21          state that's below the average,

22          otherwise this would not be the

23          average.

24  BY MR. HALLER:

1    Q.    And likewise with regard to

2  the top 25 percent of shipments.  Was

3  there any state that was in the top

4  25 percent of shipments but was below the

5  top 25 percent in terms of opioid use

6  disorder rates?

7    A.    Once again, I didn't study

8  that.

9    Q.    But once again, you assumed

10  there's at least one such state, maybe

11  more, correct?

12    A.    I assume that's true, yes.

13    Q.    Now, the difference

14  between -- the difference in the OUD

15  rates between the bottom quartile and the

16  top quartile is in the range of about

17  40 percent, right?  The top quartile OUD

18  rate is about 40 percent greater than the

19  bottom quartile rate, correct?

20        MR. KO:  Object to the form.

21        THE WITNESS:  Once again,

22      it's hard to tell with

23      percentages.  It depends.  As a

24      percent of the bottom it more

1    looks like more it's 50 percent

2    higher.  You could say the top

3    25 percent is 50 percent higher

4    than the bottom, or you could say

5    the bottom is 60 percent as high

6    as the top.

7  BY MR. HALLER:

8        Q.    Okay.  Well, I won't

9  quibble.  It looked like 40 percent to

10  me, but I'll take 50 percent.  But the --

11  the top is about 50 percent higher,

12  right?

13        A.    Right.

14            MR. KO:  Object to the form.

15        Also mischaracterizes the

16        witness's response to your

17        previous question.

18  BY MR. HALLER:

19        Q.    Well, if we can compare that

20  difference to the difference on Page 59

21  in your Figure 1.18 which compares the

22  bottom quartile in shipments with the top

23  quartile in shipments.

24            The difference in mortality

Highly Confidential - Subject to Further Confidentiality Review

1    between those two quartiles is much

2    greater than 40 or 50 percent, correct?

3          A.    It depends on the year in

4    which you look.

5          Q.    It points in the middle of

6    the graph, right, in the meat of the

7    graph, the differences range between

8    200 percent, 300 percent, 400 percent, in

9    that range, right?

10              MR. KO:  Object to the form.

11              THE WITNESS:  That's

12         correct.

13   BY MR. HALLER:

14         Q.    Do you have an opinion as to

15   why, given the same differences in

16   shipments, the difference in mortality is

17   so much greater than the difference in

18   opioid use disorder?

19         A.    I have some hypotheses.

20         Q.    What -- what are those?

21         A.    One that I focus on in the

22   paper is that the NSDUH data used in

23   Figure 1.17 to look at OUD rates is --

24   has a number sources of mismeasurement

Highly Confidential - Subject to Further Confidentiality Review

1  which I cite from the literature.  In

2  particular, it doesn't include

3  populations that are particularly likely

4  to use opioids such as incarcerated

5  populations, or homeless populations.

6      There's also the fact we

7  cite in the report that people have

8  been -- a number of studies have shown

9  that people underreport their use of

10  these drugs.  So for that reason it's

11  underreported.  So there's a number of

12  reasons why the NSDUH OUD rates would be

13  underreported, whereas the mortality rate

14  is more appropriate administrative data.

15  So that could be one reason that they're

16  different.

17      You know, that would be my

18  first pass.

19    Q. Is another reason, another

20  hypothesis that, given what you referred

21  to earlier as the increased lethality,

22  the radical lethality of fentanyl, that

23  that drives mortality higher than it

24  drives opioid use disorder?

Highly Confidential - Subject to Further Confidentiality Review

1  A.    That could be true, but it's

2  not actually supported by the data in the

3  sense that if you look at -- you were

4  looking at the difference between the two

5  bars in Figure 1.17 versus the two lines

6  in Figure 1.18.

7  Q.    Right.

8  A.    You see that difference

9  actually peaks before fentanyl was really

10  a factor.  So I don't know that we can

11  say that fentanyl explains -- the

12  lethality of fentanyl explains that.

13  It's possible, but the graph doesn't look

14  consistent with that.

15  Q.    I believe in the 2012, 2014

16  and 2016 time periods, there's still a

17  300 percent difference between the lines,

18  right?

19  A.    That's correct.

20  Q.    In any of your analyses,

21  what -- did you ever include a fentanyl

22  factor to, you know, test whether that's

23  affecting your conclusions at all?

24  A.    I don't know what that

1    means.

2          Q.    Is there any analysis in

3    your report, any regression, any of these

4    quartile analyses, that takes into

5    account the lethality of fentanyl?

6          A.    Well, I -- that's

7    incorporated in my discussion.  And we

8    show repeatedly the data including

9    fentanyl.  So if you look at Figure 1.19,

10   we show mortality including heroin or

11   fentanyl.  If you look at Figure 1.9, we

12   show the fentanyl mortality rate east and

13   west of the Mississippi River.  If you

14   look at Figure 1.8, we know the opioid

15   mortality rate by type of opioid in large

16   counties.  So in a variety of places --

17   oh, and then finally in Figure 1.6, we

18   show the relative strength of 1 milligram

19   prescription opioids.

20          So a number of places we

21   discuss the role of fentanyl in various

22   ways in the analysis.

23          Q.    In your regression where

24   you're looking at the variation in

1   shipments -- strike that.  Sorry.

2              It's your opinion that at

3   some point in 2010 or thereabouts, the

4   price of heroin became relatively lower

5   than the price of prescription opioids;

6   is that right?

7         A.    It's my opinion that around

8   2010, the price of heroin, relative to

9   the price of opioids, fell.  I don't

10  know -- you made a comparison about the

11  level, that one was lower than the other.

12  I know the ratio fell.  I don't know what

13  it did to -- what it did to the level,

14  whether one got cheaper than the other

15  per unit.  I'm not sure about that.  But

16  I know that it got relatively cheap

17  compared to opioids after 2010.

18        Q.    What data do you have

19  concerning the street prices of heroin,

20  either nationally or in the relevant

21  counties?

22        A.    I don't use that data in

23  this report.

24        Q.    Do you know where you can

Highly Confidential - Subject to Further Confidentiality Review

1    find that?

2         A.    In my discussion, in my

3    answer to you I'm referring to really

4    sort of observational, you know,

5    discussions of the opioid crisis that

6    I've read, which have described that.

7    But I have not analyzed the data.

8         Q.    And what about the

9    availability of fentanyl?  Have you -- do

10   you have any data that shows the

11   availability of fentanyl over time of

12   nationally and the affected counties?

13        A.    Yes.  If you look at Figure

14   1.7.  So this is data from the DEA's

15   national forensic laboratory information

16   system which reports the identification

17   results of drug samples confiscated by

18   law enforcement that were submitted to

19   and analyzed by participating federal,

20   state, and local forensic laboratories.

21             And what it shows is that

22   the share of drug confiscations by law

23   enforcement that involve fentanyl

24   increased from .1 percent in 2013 to 5.2

1    percent in 2017.

2          Q.    Do you have any data

3    concerning the price of fentanyl during

4    any period of time?

5          A.    No, I don't.

6          Q.    Do you have any data

7    concerning the street price of

8    prescription opioids?

9          A.    No, I don't.

10          Q.    So can you point me

11    specifically to any source -- you

12    referred that you've read, you know, some

13    literature.  But can you point me to any

14    source where it's specifically stated,

15    you know, what the street prices of

16    prescription opioids were compared to the

17    street prices of heroin, compared to the

18    street prices of fentanyl over time?

19              MR. KO:  Object to the form.

20              THE WITNESS:  I -- I cannot

21          point you to a particular source,

22          no.

23    BY MR. HALLER:

24          Q.    Now, you understand, and I

Highly Confidential - Subject to Further Confidentiality Review

1    think reflected in your report, right,

2    that Ohio appears to have, amongst all of

3    the 50 states, the highest -- the very

4    highest level of fentanyl; is that right?

5           A.    So if we look at -- the bar

6    chart with all the counties --

7           Q.    Page 46?

8           A.    Page 46.  Thank you.

9           Q.    On Page 45.

10          A.    48.  I'm sorry.  48.  Page

11   48, I have a figure which talks about

12   opioid mortality rates in the 100 large

13   counties with the highest rates.  And I

14   break out Ohio and adjacent states.  I

15   don't do Ohio, per se.  And this is not

16   fentanyl, per se.

17              This is -- so it speaks

18   somewhat to what you're discussing, but

19   it's not fentanyl, per se, and it's not

20   Ohio, per se.  It's opioid mortality, and

21   it's Ohio and adjacent states.

22          Q.    If I refer you to Page 45 of

23   your report, the last line you say that

24   Ohio has the highest rate of fentanyl

Highly Confidential - Subject to Further Confidentiality Review

1    seizures per capita in the U.S.?

2            A.    I did not remember that I

3    said that.  Yes, I do say that.

4            Q.    Now you remember that?

5            A.    Yes.

6            Q.    Do you have an opinion as to

7    whether that fact could affect or does

8    affect mortality rates in Ohio separate

9    and apart from shipments?

10           A.    Well, I know that obviously

11   the access and use of fentanyl in Ohio is

12   going to contribute to mortality.  But it

13   is not separate from shipments.  As I

14   said before, it was the increase in

15   shipments that established the demand for

16   opioids, a demand that after 2010 was

17   increasingly met first by heroin and then

18   by fentanyl.

19           Q.    So it's your opinion that in

20   the vicinity of 2010, there were these

21   changes, the abuse-deterrent OxyContin

22   and PDMPs and the like, and that that

23   forced a shift of people through gateway

24   from prescription opioid addiction to

Highly Confidential - Subject to Further Confidentiality Review

1    heroin addiction, right?

2              MR. KO:  Object to the form.

3              THE WITNESS:  I -- I'm not

4         sure I would use the word

5         "forced."  But it induced the

6         shift in -- from -- from

7         prescription opioids to illicit

8         opioids.

9    BY MR. HALLER:

10        Q.    So that occurs in your

11   opinion in 2010 or thereabouts.  And then

12   fentanyl-driven mortality increases

13   radically several years after that,

14   correct?

15             MR. KO:  Object to the form.

16             THE WITNESS:  That's

17        correct.

18   BY MR. HALLER:

19        Q.    And what drives that

20   increase?  It's not the same 2010 shift,

21   is it?

22        A.    I believe it is.  In fact, I

23   discussed that in the report.  I discuss

24   the fact that essentially what happened

Highly Confidential - Subject to Further Confidentiality Review

1  was because people become addicted to

2  opioids in run up to 2010, when

3  prescription opioids became harder to

4  get, they moved to the heroin.

5           And then when fentanyl

6  became available, it became a much more

7  profitable way for drug dealers to meet

8  that ongoing demand.  So drug dealers --

9  it was not an individual demand for

10 fentanyl.  Indeed, as I discuss in my

11 reports, individuals don't appear to want

12 fentanyl.  They even -- there's even a

13 demand for test strips for fentanyl in

14 their drug supply.

15          But suppliers recognize that

16 this ongoing opioid demand, beginning

17 with prescription opioids, passing

18 through heroin, could be met more cheaply

19 and profitably by starting to introduce

20 fentanyl into the opiate mix.

21      Q.    So it's your testimony that

22 the same factors that you claim happened

23 in or around 2010 drove heroin addiction

24 and then had a delayed effect and later

1  drove fentanyl --

2         MR. KO:  Object.

3  BY MR. HALLER:

4      Q.    -- overdoses; is that

5  correct?

6         MR. KO:  Object to the form.

7         THE WITNESS:  I think what I

8      would say, I would put it slightly

9      differently.  What I would say is

10      it drove heroin addiction and a

11      new, if you will, technology of

12      meeting more cheaply those

13      addicts' needs emerged with

14      fentanyl, especially, available

15      from China.

16         And so there was a shift in

17      the sort of technology of meeting

18      the addicts' needs to a more

19      profitable means for the dealers,

20      which was to introduce fentanyl.

21  BY MR. HALLER:

22      Q.    When did prescription opioid

23  overdose deaths peak nationally?

24      A.    We can look at Figure 1.8,

1    on Page 38.  And it shows the peak at

2    about 2011.

3           Q.    And heroin mortality peaked

4    in 2014 or 2015; is that right?

5           A.    Yeah, it looks from the

6    graph like about 2015.

7           Q.    Do you understand that total

8    opioid-related overdose deaths including

9    for fentanyl and heroin and prescription

10   opioids, have declined in Ohio in 2018

11   over 2017?

12               MR. KO:  Object to the form.

13          Objection.  Foundation.

14               THE WITNESS:  I don't recall

15          whether that's the case.

16   BY MR. HALLER:

17          Q.    Do you know whether that's

18   the case in Maine?

19               MR. KO:  Same two

20          objections.

21               THE WITNESS:  I don't

22          recall.

23   BY MR. HALLER:

24          Q.    Do you know if that's the

Highly Confidential - Subject to Further Confidentiality Review

1   case in any other states?

2              MR. KO:  Same two

3        objections.

4              THE WITNESS:  No, I don't.

5   BY MR. HALLER:

6        Q.   Now, when you use the term

7   "shipments," you're using that as a

8   shorthand, I assume, right?

9              I mean, it's not -- it's not

10  your testimony that, you know, if a drug

11  distributor has a van and drives

12  pharmaceutical supplies including

13  prescription opioids to a pharmacy and

14  unloads it and it goes into a locked room

15  and never leaves that room, that that

16  shipment is somehow driving mortality, or

17  opioid use disorder or anything else,

18  right?

19             MR. KO:  Object to the form.

20             THE WITNESS:  I don't know

21        about your particular

22        hypothetical, but I will say, as

23        I've described before, we are

24        using shipments as a proxy for

1    opioid use in the county.

2    BY MR. HALLER:

3         Q.    Right.  It's not the

4    shipment, per se, in and of itself that's

5    driving either opioid use disorder or

6    opioid mortality.  It's the combination

7    of, I assume, and tell me if I'm wrong,

8    the shipment then being dispensed by a

9    pharmacist to a patient and that -- it

10   then being consumed in the public, right?

11              MR. KO:  Object to the form.

12              THE WITNESS:  There are --

13         as we discussed earlier today

14         there's a variety of different

15         modes including diversion and --

16         and other things that can lead to

17         this sort of if you will

18         translation from the production of

19         the opioid to ultimate use by the

20         consumer.

21              I think the proper way to

22         think about it is just to say that

23         we want to measure -- in this

24         analysis, we want to measure

1          opioid use at the county level.

2          Shipments is the best data

3          available at the county level that

4          allows us to proxy for opioid use.

5     BY MR. HALLER:

6          Q.    Well, then maybe -- maybe

7     you're viewing this as being overly

8     simplistic on my part.  But it's used in

9     the county only if there's something more

10    than the shipment, right?

11              The shipment has to get to

12    the county and then it's -- it's

13    dispensed to patients in the county,

14    correct?

15              MR. KO:  Object to the form.

16              THE WITNESS:  Once again,

17          the -- the shipment is part of the

18          chain.  That chain cannot break in

19          multiple ways.  I don't -- can't

20          think offhand where a shipment

21          could directly cause a death

22          without other elements of the

23          chain.  But I don't claim to be

24          another expert in all the possible

1          mechanisms that that couldn't

2          happen.

3               But certainly we, I think,

4          typically, you do the shipment as

5          part of a chain of events that

6          leads to the harms that are due to

7          opioids.

8     BY MR. HALLER:

9          Q.    Do you have an opinion as to

10    whether some people are more susceptible

11    than others, either because of their

12    brain chemistry or history to addiction?

13         A.    I believe that is true, yes.

14         Q.    And I take it you don't

15    think that shipments cause that

16    susceptibility, correct?

17              MR. KO:  Object to the form.

18              THE WITNESS:  I don't think

19         that shipments cause genetic

20         variations across individuals, no.

21    BY MR. HALLER:

22         Q.    If you turn to the back of

23    your report where you discuss crime.

24         A.    Okay.

1    Q.    And I -- I have a similar

2    question to the one I had before.

3                With regard to the analyses

4    that are reflected graphically on

5    Page 79, but also in the underlying

6    analyses themselves, what do you call

7    that, the analysis that you're doing

8    there?

9    A.    I'd give the same answer I

10   did before.  It's a -- it's a transparent

11   illustration of the causal relationship

12   between shipments and crime.  That is a

13   natural compliment to the kind of

14   progression analysis that Dr. Cutler does

15   in his report.

16   Q.    And as before, I -- I won't

17   find this analysis, this type of analysis

18   referred to in any textbook, correct?

19               MR. KO:  Object to the form.

20         Mischaracterizes --

21               THE WITNESS:  Incorrect.

22               MR. KO:  -- the witness's

23         previous answer.

24   BY MR. HALLER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So could you point me

2    to that textbook that would describe this

3    type of an analysis?

4    A.    I can't.

5    Q.    And is there, apart from a

6    textbook, is there a source that you can

7    point me to where this type of analysis

8    has previously been done to prove

9    causation leading to crime?

10    A.    Causation leading to crime?

11    Q.    Right.

12    A.    No, I cannot point to a

13    source.  I can -- as I said I can point

14    to the Evans article, and with time,

15    could find other sources that uses kind

16    of graphical comparison.  But I don't

17    recall of a source that does this to

18    establish a relationship between

19    prescription opioids and crime.

20    Q.    Or between anything and

21    crime?

22    MR. KO:  Object to the form.

23    THE WITNESS:  Not to my --

24    not to my recollection.

1    BY MR. HALLER:

2         Q.    Can I refer you to Page 43

3    please, in your report.

4         A.    Okay.

5         Q.    So that page includes

6    Figure 1.10, which reflects, does it not,

7    that for the most part, shipments into

8    Summit were above the national average

9    for this time period, whereas shipments

10   into Cuyahoga were below the national

11   average; is that right?

12        A.    Yes, that's correct.

13        Q.    Did you do any investigation

14   into why shipments were, per capita, were

15   significantly lower in Cuyahoga than they

16   were in Summit?

17             MR. KO:  Object to the form.

18             THE WITNESS:  Not that I can

19        recall.

20   BY MR. HALLER:

21        Q.    If we turn the page to

22   Figure 1.11, we can see opioid mortality

23   rates in Summit and Cuyahoga in relation

24   to the national average.  And at least

Highly Confidential - Subject to Further Confidentiality Review

1    through 2010 or 2011, the mortality rates

2    in both counties stayed pretty close to

3    the national average; is that right?

4           A.    That's correct.

5           Q.    Now, if -- if shipments, in

6    your view, drive opioid mortality, how is

7    it that the two counties end up with

8    about the same opioid mortality but there

9    are significantly big differences in the

10   shipments to those two counties?

11               MR. KO:  Object to the form.

12               THE WITNESS:  Can you

13          express that in terms of the

14          graphs?  I don't quite understand

15          what -- what conclusion you're

16          drawing.

17   BY MR. HALLER:

18          Q.    Well, on page -- on Page 43,

19   in Figure 1.10 we can see that the

20   shipments into Summit were much higher

21   than the shipments into Cuyahoga, right?

22          A.    Yes.

23          Q.    But the mortality, as

24   reflected on Figure 1.11, is roughly the

Highly Confidential - Subject to Further Confidentiality Review

1  same as between the two counties.  And I

2  would have thought if shipments, in fact,

3  are driving mortality, that the higher

4  shipments in Summit would have led to

5  higher mortality, but instead, the higher

6  shipments resulted in about the same

7  mortality.  So I'm -- I'm asking if you

8  can square that for me.

9           MR. KO:  Object to the form.

10          THE WITNESS:  Sure.  So two

11      answers.  One is about the same

12      until 2014 when -- when Summit

13      does get higher.

14          And the second answer is, as

15      I said before, we're trying to use

16      these data to explain the central

17      tendencies that both, as I say, if

18      you do a sort of transparent

19      graphical analysis or regression

20      analysis, there's a clear

21      relationship between shipments in

22      2010 and opioid mortality.

23          That does not mean that that

24      relationship -- that does not mean

Highly Confidential - Subject to Further Confidentiality Review

1   you cannot find an observation of

2   data or two for which that

3   relationship doesn't appear to

4   hold.  You can take any empirical

5   analysis and find a pair of

6   observations where the

7   relationship estimated for the

8   central tendency of the data

9   doesn't hold for that pair of

10  observations.

11  BY MR. HALLER:

12       Q.    And here the pair of

13  observations is Cuyahoga and Summit,

14  right?

15       A.    That's correct.

16       Q.    Now, you've testified -- and

17  I think your report reflects this view,

18  that these various factors that you say

19  happened in or around 2010, in reality

20  those factors didn't all occur in 2010 at

21  a particular point in time; is that

22  right?

23            MR. KO:  Object to the form.

24            THE WITNESS:  That's

1       correct.

2   BY MR. HALLER:

3       Q.    PDMP programs, for example,

4   were instituted by some states many years

5   ago and other states more recently and in

6   some states still don't exist, correct?

7       A.    That is correct.  Let me

8   clarify.  I'm not sure if they don't

9   exist in some states.  But the first two

10  parts of your statement are definitely

11  correct.

12      Q.    When Mr. Geise was asking

13  you questions, you didn't know when

14  Ohio's PDMP came into effect, correct?

15          MR. KO:  Objection.  Asked

16      and answered.

17          THE WITNESS:  That's

18      correct.

19  BY MR. HALLER:

20      Q.    So how is it that these

21  various changes, which were happening

22  over a multi-year period in your view all

23  caused an inflection point precisely in

24  2010?

1        A.    My view of this -- of the

2   big picture here is that these changes

3   were happening over time.  I -- and my

4   reading on the literature on PDMPs is

5   that the initial ones were relatively

6   weak and the stronger ones came in later

7   towards the 2010 period, that the pill

8   mill crackdown happened after the 2010

9   period.

10             So the way I would view this

11  as the reformulation causing the

12  inflection, but the strength of the

13  inflection and the subsequent strength of

14  the response being driven by the

15  combination of factors that I list in

16  this report.

17        Q.    Now, on Page 34 of your

18  report you state that illicit opioid

19  mortality accelerated again after 2013 as

20  drug traffickers started to incorporate

21  fentanyl as a lower cost alternative to

22  heroin.

23             What source do you have for

24  the date of 2013 as the date or the year

Highly Confidential - Subject to Further Confidentiality Review

1   when drug traffickers started to

2   incorporate fentanyl?

3           A.    That's -- that's a reference

4   to my reading of the literature or, quite

5   frankly, this is referring to the

6   literature I didn't specifically read,

7   but that Compass Lexecon read and

8   summarized for me, was the gist, that

9   2013 was the sort of rough timing when

10  fentanyl started really coming in as a

11  substitute for heroin.

12          Q.    And is the source for that

13  what's stated here in Footnote 75 or is

14  it something else or you don't know?

15          A.    That is one source.  I

16  believe it's shown in multiple locations.

17  But that source, as far as I understand,

18  is the source of that, although I did not

19  read that particular article.

20          Q.    If I can refer you to Page

21  43.  We were there not too long ago.

22  This is maybe similar to one of the

23  questions that I asked, but different.

24                At the bottom of that page,

Highly Confidential - Subject to Further Confidentiality Review

1    you state that the mortality rate in

2    Cuyahoga County increased by 280 percent,

3    and that in Summit County it increased by

4    362 percent.  So I have a similar

5    question, which is, what effort, if any,

6    did you undertake to determine why

7    mortality increased in Summit to a

8    greater extent than it did in Cuyahoga in

9    the very most recent years?

10            MR. KO:  Object to the form.

11            THE WITNESS:  I did not do a

12        specific analysis of that

13        phenomenon.

14   BY MR. HALLER:

15        Q.    If I can refer you to Pages

16   52 and 53 of your report, this is where

17   you examined variability in shipments and

18   determine whether any of that -- you

19   know, the degree to which that

20   variability is explained by certain

21   economic factors, right?

22        A.    Economic and demographic

23   factors, yes.

24        Q.    And you show that the --

1    that the variation narrows once you

2    control for those factors, but it doesn't

3    narrow by a lot in your opinion, correct?

4         A.    That's correct.

5         Q.    Okay.  And that's reflected

6    in this Figure 1.15, right?

7         A.    That's correct.

8         Q.    Again, sort of going back to

9    sort of variation on a theme, but where

10   in any textbook can I find this type of

11   an analysis that looks at variation,

12   regresses it against economic and

13   demographic factors, to determine, you

14   know -- at one point in time, right, so

15   this is not over time type of analysis --

16   that that is an accepted methodology?

17              MR. KO:  Object to the form.

18              THE WITNESS:  That would be

19         a common methodology used in

20         articles.  I don't know if it's

21         included or explained in a

22         textbook.  Certainly econometric

23         textbooks talk about what we

24         call -- this is a sort of

1           residualized analysis, where

2           you're controlling for other

3           factors and then looking at the

4           behavior of the residual after

5           controlling for those other

6           factors.

7                So this would be -- that

8           would be the general principle.  I

9           don't know if the textbooks would

10          express it in this way, but that

11          would be the principle they're

12          looking at here.

13     BY MR. HALLER:

14          Q.   And with regard to a

15     residualized analysis, is there any

16     modifier that would describe this type of

17     analysis based on the fact that it's a

18     snapshot at one point in time?

19                MR. KO:  Object to the form.

20                THE WITNESS:  I guess it

21          would probably be called a

22          cross-sectional residual analysis.

23          Residual, residualized, I'm not

24          sure which term the textbook would

Highly Confidential - Subject to Further Confidentiality Review

1    use.

2         MR. HALLER:  Bless you.

3    BY MR. HALLER:

4         Q.    It's your opinion that

5    prescription activity drives shipments to

6    an area, correct?

7         A.    It's my opinion that

8    prescription activity, shipments to the

9    area, as we discussed before, are two

10   different proxies for the availability

11   and use of opioids in an area.

12        Q.    Look on Page 52 of your

13   report.  You say that prescription

14   activity drives shipments to an area,

15   right?

16        A.    Where is that?

17        Q.    At the top.

18        A.    Yes, I do say that.

19        Q.    If prescriptions drive

20   shipments, what causes differences in

21   prescription levels?

22        A.    Well, differences in

23   prescription levels can be caused by a

24   wide variety of factors, ranging -- first

1  there would be the underlying medical

2  need.  Second, there would be different

3  preferences of doctors.  Third, there

4  would be the marketing of those -- of the

5  drugs to the doctors, which will affect

6  their use of them.  Fourth could be

7  attitudes towards -- towards using those

8  drugs.  Fifth could be things like the

9  police environment and the risk of

10  getting caught using these drugs

11  illegally.

12           There's a whole list of

13  factors that would all actually interact.

14  These would not operate separately.

15  Attitudes could be shaped by police --

16  policing patterns and things like that.

17  They would come together to drive

18  shipments to an area.

19           And it's all going to be

20  influenced by -- I'm sorry, to drive

21  prescription activity.  And that will all

22  be influenced by the underlying push or

23  marketing towards using these

24  prescriptions that's going to be sort of

1    an underlying factor.  It's going to

2    underlie all of that.

3         Q.    Well, as between Summit and

4    Cuyahoga, did you do any investigation as

5    to why it's the case that Summit has a

6    higher prescription level of activity

7    than Cuyahoga?

8         A.    No, I did not.

9              MR. HALLER:  Why don't we

10         take a break, and we'll regroup

11         with our team and see what else

12         needs to be done.

13              THE VIDEOGRAPHER:  The

14         time is --

15              MR. KO:  Hold on a second.

16         So is there more questioning?

17              MR. HALLER:  Yes, I think

18         we're going to regroup --

19              MS. CASTLES:  Let's go off

20         the record.

21              MR. HALLER:  Yeah, we'll go

22         off the record.

23              THE VIDEOGRAPHER:  The time

24         is now 6:17 p.m.  We are going off

Highly Confidential - Subject to Further Confidentiality Review

1    the record.

2              (Short break.)

3              THE VIDEOGRAPHER:  The time

4       is 6:20 p.m.  We are on the

5       record.

6                    -  -  -

7              EXAMINATION

8                    -  -  -

9    BY MS. UNGER DAVIS:

10        Q.    Good afternoon.  I'm Kate

11   Unger Davis.  We just met off the record.

12   And I represent the Purdue defendants in

13   this matter.

14              I have just a few questions

15   for you.  I'm going to try and make it

16   quick, because I realize we've been here

17   going over this.

18              So your measure of shipments

19   includes all opioids, correct?

20        A.    It includes all opioids that

21   are recorded in the ARCOS data --

22        Q.    Okay.

23        A.    -- that -- yes.

24        Q.    So does that include

1    immediate release and extended-release

2    opioids?

3          A.    I believe that includes both

4    of those.

5          Q.    And branded and generic

6    opioids?

7          A.    I believe so.

8          Q.    And you said earlier that

9    you didn't look at any particular

10   defendant or any particular opioid; is

11   that correct?

12              MR. KO:  Objection.  Asked

13         and answered.

14              THE WITNESS:  This report

15         does not focus on any particular

16         defendant or opioid.

17   BY MS. UNGER DAVIS:

18         Q.    And rather, you were looking

19   at shipments of prescription opioid

20   medications in the -- in the aggregate?

21         A.    Yes.

22         Q.    And you said also that you

23   did not personally look at the ARCOS

24   data; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. KO:  Object to the form.

2          THE WITNESS:  I did not

3     personally look at the ARCOS data,

4     no.

5 BY MS. UNGER DAVIS:

6          Q.    You also said that OxyContin

7 is a major contributor to shipments of

8 opioid shipments.  Is that an opinion

9 you're offering here today?

10          A.    It's obviously badly worded

11 by me.  But the opinion I'd offer is that

12 OxyContin is one of the largest

13 prescription -- has -- has a large market

14 share of -- in the prescription opioid

15 market.  So therefore, if shipments are

16 rising, OxyContin would be a major

17 contributor to that.

18          Q.    And how did you arrive at

19 that opinion?

20          A.    I -- well, if you look at --

21 let's see.  If you look at Figure 1.2 on

22 17, I don't break out OxyContin, per se,

23 but I do show oxycodone.  And I know that

24 OxyContin has a large market share in

1   that space and that is the largest

2   contributor of the increasing shipments

3   of prescription opioids.

4          Q.     And what page are you on?

5   I'm sorry?

6          A.     I'm on Page 17.

7          Q.     And can you name other forms

8   of oxycodone?

9          A.     Not offhand, no.

10          Q.     Okay.  And this chart that

11   you are citing to here, do you know, the

12   oxycodone, does that include generic and

13   branded?

14          A.     I believe it does.

15          Q.     Okay.  And do you know if

16   that include -- includes immediate

17   release and extended-release?

18          A.     I believe it does.

19          Q.     Okay.  And do you know if

20   OxyContin is an immediate release or an

21   extended-release medication?

22          A.     I -- I believe that

23   OxyContin is an extended-release

24   medication.

1       Q.    And do you know what

2    percentage of this oxycodone graph is

3    actually OxyContin?

4                MR. KO:  Object to the form.

5                THE WITNESS:  No, I do not.

6    BY MS. UNGER DAVIS:

7       Q.    Okay.  And did you undertake

8    to look at that?

9       A.    Not as part of my analysis,

10   no.

11      Q.    Okay.  So when you say that

12   OxyContin is a large part of oxycodone

13   and oxycodone is a large part of total

14   opioid prescriptions, you can't quantify

15   what percentage is actually OxyContin; is

16   that correct?

17      A.    I don't in this report, no.

18      Q.    Okay.  And have you done

19   that work outside of this report?

20      A.    I have not.

21      Q.    Okay.  Have you asked anyone

22   to do that?

23      A.    I believe that in the

24   context of other reports that's been

1    looked at, I believe in particular

2    Dr. Rosenthal's report, they've looked at

3    the share of different particular

4    manufacturers.

5         Q.    Okay.  And are you relying

6    on Dr. Rosenthal's report?

7         A.    Not for that particular

8    question.

9         Q.    Okay.  And we are talking

10   here, we're talking about MME per capita

11   per day; is that correct?

12        A.    That's correct.

13        Q.    Okay.  Do you know how the

14   MME per cap -- or per day -- excuse me.

15             How the MME compares between

16   oxycodone, hydrocodone, fentanyl,

17   morphine, et cetera?

18        A.    How the -- I know how the

19   relative weights, the relative MME for a

20   given unit compare.  That's shown in --

21   that's using data that's put together by

22   the government.  And that is shown in the

23   figure here, Figure 1.6 on Page 35, shows

24   the relative strength in terms of MME of

1    different types of prescription opioids.

2         Q.    And have you considered what

3    part of the market share OxyContin has by

4    any other sort of measurement?

5         A.    I have not, no.

6         Q.    Okay.  So you don't know the

7    number of pills that these shipments are,

8    what -- what percentage of those pills

9    are OxyContin pills?

10            MR. KO:  Object to the form.

11            THE WITNESS:  No, I don't.

12   BY MS. UNGER DAVIS:

13        Q.    Okay.  And you don't know

14   that on the national level or the state

15   level or the county level?

16        A.    No, I don't.

17        Q.    Okay.  And have you

18   undertaken to look what percentage of the

19   shipments to the bellwether jurisdictions

20   was OxyContin as compared to any other

21   opioid?

22        A.    No, I've not.

23        Q.    Now, turning to the abuse

24   deterrent formulations, would you agree

1  that studies show that the reformulation

2  of OxyContin was effective in reducing

3  the misuse and abuse of OxyContin?

4            MR. KO:  Object to the form.

5            THE WITNESS:  That is my

6       understanding of those studies,

7       yes.

8  BY MS. UNGER DAVIS:

9       Q.    And would you agree that

10 Evans 2019 which you rely on, shows that

11 as well?

12      A.    Yes.

13      Q.    And Cicero 2015, which you

14 also rely on, supports that point as

15 well?

16      A.    That one I don't recall as

17 well.  So give me a moment.

18      Q.    Sure.

19      A.    We can take the time, I can

20 look at it.

21      Q.    If you want to.  It's

22 Exhibit 13.

23      A.    Exhibit 13.

24      Q.    If you prefer I can read to

Highly Confidential - Subject to Further Confidentiality Review

1   you.

2           A.      Yeah, that would be great.

3           Q.      Okay.

4           A.      Or you could -- I could

5   look -- if you have a copy I could look

6   at.

7                   MR. KO:  Find the article,

8           John.

9                   THE WITNESS:  What?

10  BY MS. UNGER DAVIS:

11          Q.      That's fine.  So the result

12  says, "Reformulated OxyContin was

13  associated with a significant reduction

14  of past month abuse after its

15  introduction."

16          A.      I'm sorry, I need to look at

17  it and I can't find my copy.  Is there

18  another copy that I can look at?

19          Q.      You can look at Cicero 2015.

20          A.      You said it's Number 13?

21          Q.      That's -- I believe that's

22  correct.  Exhibit 13.

23          A.      I'm not trying to be

24  difficult.  I'm just having a hard time

1    finding it.

2              I'm sorry.  To which page

3    are you referring?

4         Q.    So the results section it

5    says, the first sentence, "Reformulated

6    OxyContin was associated with a

7    significant reduction of past month abuse

8    after its introduction."

9         A.    Yes, I see that.

10        Q.    Okay.  Do you say -- do you

11   see under objective where it says, "To

12   examine the factors that led to the

13   initial steep decline in OxyContin

14   abuse"?

15        A.    Yes, I do.

16        Q.    Okay.  And then Alpert 2018

17   also noted, "Evidence suggests that

18   OxyContin reformulation reduced

19   nonmedical OxyContin use by as much as

20   40 percent."

21              Did you consider that?

22        A.    Where is that in the

23   article?

24        Q.    Sure.  If you turn to the

Highly Confidential - Subject to Further Confidentiality Review

1    second page, the second full paragraph

2    down, the last sentence says, "Indeed,

3    time series evidence suggest that the

4    OxyContin reformulation reduced

5    nonmedical OxyContin use by as much as

6    40 percent."

7         A.    Yes, I see that.

8         Q.    And as your report notes,

9    Purdue was the first to manufacture an

10   abuse-deterrent formulation of a

11   prescription opioid medication, correct?

12        A.    That's correct.

13        Q.    And I believe you've already

14   testified that you're aware that the FDA

15   encouraged the development of

16   abuse-deterrent formulations?

17        A.    Yes.

18             MR. KO:  Objection.  Asked

19        and answered.

20   BY MS. UNGER DAVIS:

21        Q.    And are you aware that Ohio

22   Attorney General Mike DeWine has also

23   supported abuse deterrent formulations?

24             MR. KO:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

 1          Foundation.

 2                   THE WITNESS:  No, I'm not.

 3                   MS. UNGER DAVIS:  Mark this.

 4          What are we on?

 5                   (Document marked for

 6          identification as Exhibit

 7          Gruber-17.)

 8   BY MS. UNGER DAVIS:

 9          Q.    Here you'll see a

10   December 16, 2013, letter to the

11   commissioner of the Food and Drug

12   Administration.

13                   Do you see that?

14          A.    Yes.

15          Q.    And if you turn to the third

16   page.

17          A.    Okay.

18          Q.    You'll see about halfway

19   down on the left-hand column is the

20   signature of Mike DeWine, Ohio Attorney

21   General?

22          A.    Yes, I see that.

23          Q.    And the second paragraph

24   says, "The State's Attorney General wants

1    to thank you" -- meaning the commissioner

2    of the FDA -- "for your recent efforts to

3    ensure branded opioid drugs have

4    abuse-deterrent formulations."

5             Did I read that correctly?

6        A.    Yes.

7        Q.    It goes on to say,

8    "Abuse-deterrent properties is a

9    common-sense improvement that provides

10   yet another important tool in the fight

11   against our nation's prescription drug

12   epidemic."

13            Did I read that correctly?

14       A.    Yes.

15       Q.    Did you consider this?

16       A.    This letter?

17       Q.    Mm-hmm.

18       A.    No, I did not.

19       Q.    And do you believe that Ohio

20   Attorney General Mike DeWine bears some

21   responsibility for the harms you

22   attribute to abuse-deterrent formulations

23   of prescription opioid medications?

24            MR. KO:  Object to the form.

1          Objection.  Foundation.

2                THE WITNESS:  I don't

3          actually attribute harms to

4          abuse-deterrent formulation.  I

5          attribute harms to the shift that

6          followed the introduction of

7          abuse-deterrent formulations.

8    BY MS. UNGER DAVIS:

9          Q.    So do you support the

10   adoption of abuse-deterrent formulations?

11               MR. KO:  Objection.

12               THE WITNESS:  I don't

13         really -- I haven't really thought

14         about conjecturing.  At the time,

15         I wasn't really aware of that

16         policy, so I don't -- didn't

17         really think about it.

18   BY MS. UNGER DAVIS:

19         Q.    Okay.  So you don't have an

20   opinion on whether or not abuse-deterrent

21   formulations are a good thing?

22               MR. KO:  Object to the form.

23               THE WITNESS:  I think that

24         the articles that we've discussed

Highly Confidential - Subject to Further Confidentiality Review

1    today show that the analysis of

2    abuse-deterrent formulations means

3    it's complicated about whether

4    they were a net -- a good thing or

5    a bad thing.

6  BY MS. UNGER DAVIS:

7    Q.    Did you evaluate in your

8  model the State Attorney General's

9  position?

10    MR. KO:  Object to the form.

11    Position as to what?

12    THE WITNESS:  I don't

13    understand what that means.

14  BY MS. UNGER DAVIS:

15    Q.    The State Attorney General's

16  support for abuse-deterrent formulations,

17  did you take that into account in your

18  model?

19    A.    No, I did not.

20    Q.    So do you support the

21  efforts of the industry to prevent misuse

22  or abuse of prescription opioid

23  medications?

24    MR. KO:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  That's too

2     broad a question.

3  BY MS. UNGER DAVIS:

4     Q.    It's not a yes or no?

5     A.    No.

6          MR. KO:  Same objection.

7          MS. UNGER DAVIS:  All right.

8     Shall we re-regroup?

9          MS. CASTLES:  Can we go off

10    the record?

11         THE VIDEOGRAPHER:  The time

12    is 6:33 p.m.  We're off the

13    record.

14         (Short break.)

15         THE VIDEOGRAPHER:  The time

16    is 6:43 p.m.  We are on the

17    record.

18              -  -  -

19              EXAMINATION

20              -  -  -

21  BY MS. RUMSEY:

22     Q.    Hello, I'm Allison Rumsey.

23  I represent the Endo parties.  I'll

24  speak -- or I'll start again.

1    I'm Allison Rumsey, and I

2    represent Endo.  So I know that I'm all

3    that's between you and the door, so I'm

4    going to ask a couple of questions at the

5    end here.

6    Are you familiar in your

7    research -- did you read the Jalal

8    article that came out in September 2018

9    about the opioid epidemic?  Are you

10   familiar with that article?

11        A.    I don't recall.

12              (Document marked for

13        identification as Exhibit

14        Gruber-18.)

15   BY MS. RUMSEY:

16        Q.    Okay.  Why don't we

17   introduce this.  It's Gruber-18.  Is it

18   18?

19              MR. KO:  Thank you.

20   BY MS. RUMSEY:

21        Q.    So the -- just to jump at

22   the end, the -- in this article, the

23   group of professors -- it's a group from

24   the University of Pittsburgh, and they

Highly Confidential - Subject to Further Confidentiality Review

1    actually looked at the opioid epidemic

2    from 19 -- or at the epidemics in the

3    United States from 1979 through to the

4    current day.

5              And they concluded here on

6    the first page, if you look under

7    conclusion, "The U.S. drug overdose

8    epidemic has inexorably tracking along an

9    exponential growth curve since at least

10   1979."

11             Have -- in your analysis,

12   did you look back as far as 1979?

13        A.   No, we did not.

14        Q.   Did you consider other kinds

15   of epidemics?

16        A.   We did look -- I do refer in

17   my report, I talk about deaths from a

18   crack epidemic.  And at one point, I

19   refer to heroin or OUD rates during this

20   current period to past periods.

21        Q.   And what did you conclude

22   about -- where in your article?

23        A.   So I looked --

24        Q.   Your report.

1    A.    -- at -- if you look at

2  Paragraph 8, I says, "The size of other

3  drug crises in U.S. history pale in scope

4  compared to the current opioid crisis.

5  In contrast, the 47,600 opioid-related

6  deaths in 2017, fewer 3,000 individuals

7  died of crack cocaine overdoses at the

8  height of that epidemic.  While

9  methamphetamine deaths could indeed rise

10  in the U.S., there are only 5,130 deaths

11  involving methamphetamines in 2017."

12       If you look at Paragraph 21,

13  analysts from RAND estimate that as of

14  2010, roughly 1.5 million people

15  regularly used heroin.  In contrast,

16  available studies indicate there were

17  roughly 110,000 opioid addicts in 1967.

18  So it's a historical pattern.

19    Q.    Heroin -- heroin addiction

20  is not an entirely new problem in the

21  United States?

22    A.    No, it's not, but the

23  magnitude seems much larger.

24    Q.    And if you look at the

Highly Confidential - Subject to Further Confidentiality Review

1   individual drugs in the lines in -- I

2   guess it's still Page 1 of 6.  I think

3   I -- if you turn it over.

4           A.    Mm-hmm.

5           Q.    Diagram 8, you'll see that,

6   in fact, a number of these drugs are

7   increasing over time from 1999.  And

8   just, do you see here where the yellow

9   line is an unspecified drug?  You see

10  heroin is going up.  But also meth is

11  going up exponentially?

12              Does -- do you have an

13  account -- do you have an explanation for

14  why all of those drugs are increasing

15  exponentially in a similar pattern to

16  heroin?

17              MR. KO:  Object to the form.

18              THE WITNESS:  I have not

19          reviewed this study.  A critical

20          component analysis of mortality is

21          what you do in cases where there's

22          overlapping drugs.  Where you have

23          meth plus fentanyl for example.

24              I don't know how they handle

Highly Confidential - Subject to Further Confidentiality Review

1       those cases here.  Obviously

2       the -- it turns out the weight of

3       those cases can matter.  I don't

4       know how they handle them here.

5            So, yeah, so it's hard for

6       me to draw a conclusion because I

7       don't know how -- how these are

8       data that are relative to what we

9       did in our work.

10  BY MS. RUMSEY:

11       Q.    If somebody -- if -- if

12  somebody took fentanyl, meth with

13  fentanyl and they died, would that be an

14  opioid death or would that be some other

15  death?

16       A.    That's a good question.  So

17  what we did to try to analyze that is to

18  say -- to think about the fact that

19  you've got deaths from opioids plus other

20  drugs.  You've got deaths from opioids

21  alone, and deaths from other drugs alone.

22  And if you look at deaths -- if you look

23  at the first two categories, they are

24  going up enormously.  Both deaths from

1  opioids alone and deaths from opioids in

2  combination with other drugs.  Whereas

3  nonopioid deaths, that is the other drugs

4  without opioids, are pretty flat.

5            So that leads us to believe

6  that that is not a -- it's a judgment

7  call.  But our judgment, my judgment of

8  the data is given that when you look at

9  other drugs without opioids, it's pretty

10  flat, that it's really opioids that drive

11  them in these combination deaths.

12            Q.    So the -- the Jalal article,

13  if you go to Page 5 of 8, they concluded

14  that the epidemic of drug overdoses in

15  the U.S., it's the same sentence, has

16  been inexorably tracking along an

17  exponential growth curve since at least

18  1979, well before the surge in opioid

19  prescribing in the mid 1990s.

20            And it goes on to say

21  basically that the opioid epidemic is

22  just actually part of a larger epidemic

23  that was heroin in the 1970s, crack in

24  the 1980s, meth in the '90s, prescription

Highly Confidential - Subject to Further Confidentiality Review

1  drugs -- meth and prescription drug in

2  the '90s, heroin, fentanyl, and they go

3  onto say, in fact, whatever is going to

4  be causing this in the future is -- is

5  probably not even known yet.  But the

6  synthetic drugs are now the main source

7  of -- of deaths.

8        A.    Yes.

9              MR. KO:  Hold on.  I don't

10       know if there is a question there.

11       So I will object, first of all,

12       object --

13  BY MS. RUMSEY:

14       Q.    So you --

15             MR. KO:  Hold on.  Let me

16  just -- I appreciate the soliloquy and I

17  appreciate your attempt to summarize the

18  article, but I object to the form.

19             I also object to the extent

20  that you're trying to characterize an

21  article that Mr. Gruber hasn't read.

22  BY MS. RUMSEY:

23       Q.    Do you -- do you have a view

24  on how the prescription -- the use of

Highly Confidential - Subject to Further Confidentiality Review

1    prescription drugs in the '90s fits into

2    the larger drug epidemic that we see in

3    this country?

4        A.    I have a view that it is an

5    exception.  And that the reason that they

6    draw the conclusion they do is because --

7    now that I've looked at this article, I

8    remember think -- reviewing this article

9    and discussing it.  They treat -- they

10   take an exponential form of mortality

11   growth which is not what's done typically

12   in the literature.  We look at mortality

13   rates, not log mortality rates, which is

14   what they do.  So while it's true

15   exponentially, they are sort of saying

16   that if -- if you go from 10 people dying

17   of heroin to 20 people, that is just the

18   same as going to a million to two

19   million.  That is not a proper way to

20   analyze -- in my view, that's not a

21   proper way to analyze the effect of

22   opioids on deaths, and so I don't think

23   this is really a very relevant analysis

24   to the kind of analysis we do in our

Highly Confidential - Subject to Further Confidentiality Review

1    reports.

2         I also -- I don't know if

3    it's -- if it's true that opioid deaths

4    have fallen off in 2018.  But if that's

5    true, that would also be inconsistent

6    with their conclusions.

7         Q.    Well -- well, actually you

8    can re-read the article.  But I think

9    their conclusions would say that opioids

10   will drop off and something else will

11   replace it.

12        One last question.  So just

13   so that we're clear, you consulted -- in

14   preparation for this, you spoke with

15   Cutler, McGuire, and also with Rosenthal?

16        A.    I spoke with Rosenthal

17   throughout -- throughout the development

18   of the project.  But at the end when

19   we're working on our reports, I was

20   not -- I was not discussing with

21   Rosenthal.

22        Q.    Okay.  But were you

23   discussing your report then with McGuire

24   and Cutler?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. KO:  I would just give

2     you the same instruction,

3     Dr. Gruber, as I've given before,

4     as to not disclose the contents of

5     any communications that you had

6     with these other experts when

7     counsel was present.

8          THE WITNESS:  Yes.  I

9     discussed it with Cutler and

10    McGuire.

11 BY MS. RUMSEY:

12    Q.    Okay.  And did you discuss

13 your report with any other -- any other

14 individuals, other than counsel?

15    A.    I also discussed my report

16 with the team from Compass Lexecon that

17 supported me in writing the report.

18    Q.    And did you rely on anybody

19 else's reports or work that you haven't

20 mentioned yet here today?

21    A.    No, I did not.

22         MS. RUMSEY:  Okay.  Then I

23    think we're done.

24         MR. KO:  Okay.  I have a few

1        follow-up questions.

2                MS. RUMSEY:  Okay.

3                   -  -  -

4                EXAMINATION

5                   -  -  -

6   BY MR. KO:

7        Q.    Dr. Gruber, we're almost

8   done, but like I said, just a few more

9   questions.

10               Earlier today, or just a

11  moment ago, Mr. Haller was asking you

12  some questions about Figures 1.17 and

13  1.18 of your report.  Do you recall that?

14       A.    Yes, I do.

15       Q.    And go ahead and turn to

16  that section.  I believe it's on Page 56

17  of your report.  It's Figure 17 and

18  Figure 18, 1.18 to be clear, is on

19  Page 59 of your report.

20               Now, Mr. Haller was -- well,

21  first of all, Figure 1.17, to be clear,

22  depicts data from NSDUH and ARCOS,

23  correct?

24       A.    Yes, it -- it uses data from

Highly Confidential - Subject to Further Confidentiality Review

1    NSDUH and ARCOS.

2         Q.    Okay.  And -- and the NSDUH

3    data as we have discussed before talks

4    about the, among other things, the opioid

5    use disorder rates, correct?

6         A.    The NSDUH is used to measure

7    opioid disorder -- opioid use disorder

8    rates.

9         Q.    And the -- the table or the

10   Figure 1.18, what are the datasets that

11   are used to show the -- the graph there?

12        A.    Well, in -- in both figures,

13   the -- the two samples are divided based

14   on the shipments data.

15             The key difference, and I --

16   I keep forgetting this during the

17   deposition, I'm sorry about that, is that

18   for the NSDUH data, that's only available

19   at the state level.

20             As a result, whereas the

21   mortality data which is depicted in

22   Figure 1.18 is developed at the county

23   level.  So the underlying prescription

24   data that's used to divide the samples is

1  the same.  But in Figure 1.17 it's

2  dividing them by the top and bottom

3  states.  And in Figure 1.18 is divided by

4  the top and bottom counties.

5       Q.    Okay.  So if -- Mr. Haller,

6  I think, was trying to make some

7  comparisons as to the percentage

8  differences, and in particular he was

9  making some comparisons about a 40 to

10  50 percent range shown in Figure 1.17 and

11  a 300 percent range for the same time

12  period in Figure 1.18.  Do you recall

13  that?

14       A.    Yes, I do.

15       Q.    And is that range that he

16  was attempting to show the discrepancy

17  in, is it an apples-to-apples comparison

18  when you're using different underlying

19  data, and in particular, NSDUH data and

20  NCHS mortality data?

21            MR. HALLER:  Objection to

22       form.

23            THE WITNESS:  No, it's not

24       an apples-to-apples comparison.

1          And in particular, the

2     variation is larger across

3     counties than across states.

4     States are larger units, so by

5     definition it's going to be a

6     smaller variation from the most

7     intensive -- the states with the

8     most prescriptions to the least

9     prescriptions relative to the

10    counties with the most and the

11    counties with the least.

12  BY MR. KO:

13         Q.    Okay.  Now, Mr. Haller also

14  asked you questions with respect to

15  Figure 1.8 of your report.  Do you recall

16  that?

17         A.    Hold on.  Yes.

18         Q.    And I believe that's on

19  Page 38, to be clear.

20         And he had talked about how

21  prescription opioid mortality rates in

22  particular had peaked in 2010.  Do you

23  recall that question and answer?

24         A.    Yes, I do.

1          MS. RUMSEY:  Object to form.

2    BY MR. KO:

3          Q.    Now, I want to make sure

4    that the record is clear as to what is

5    being depicted in this graph.

6                First of all, what is the

7    time period that is measured in this

8    graph?

9          MS. RUMSEY:  Object to form.

10          THE WITNESS:  From 1999 to

11          2016.

12    BY MR. KO:

13          Q.    And during that time period,

14    let's take prescription mortality rates,

15    what is the general trend regarding

16    prescription mortality rates in this

17    graph?

18          MS. RUMSEY:  Object to form.

19          THE WITNESS:  Prescription

20          mortality rates trended upwards in

21          2010, then begin to trend

22          downwards, but ended at a point

23          well above where they started.

24    BY MR. KO:

1      Q.    Okay.  And if my math is

2    correct, I believe there's at least a

3    200 percent increase from the end of this

4    graph relative to the beginning of this

5    graph for prescription mortality rates,

6    correct?

7                MR. HALLER:  Object to form.

8                MS. CASTLES:  Object to

9          form.

10               MS. UNGER DAVIS:  Object to

11         form.

12               MS. RUMSEY:  Object to form.

13               THE WITNESS:  I can't do the

14         math in my head.  It's

15         certainly -- it's certainly well

16         over 100 percent.  I don't know if

17         it's 200 percent.

18   BY MR. KO:

19     Q.    Okay.  Now, earlier this

20   afternoon, Mr. Geise spent some time

21   discussing the epidemiological studies

22   and economic literature you cited in your

23   report, and in particular in Section 5 of

24   your report.

1        Do you recall that

2   testimony?

3        A.    Yes, I do.

4        Q.    And I just want to

5   understand the context in which you have

6   cited these articles.  First of all, with

7   regard to the epi studies, I believe

8   that's in Subsection A of Section 5 of

9   your report; is that correct?

10        A.    That's correct.

11        Q.    And so is it accurate to say

12   that you are using these epi studies to,

13   in the words of your report, to show,

14   "addition evidence that the illicit

15   opioid crisis was the consequence of

16   shipments of prescription opioids"?

17            MR. HALLER:  Object to form.

18            MS. CASTLES:  Object to

19        form.

20            MS. UNGER DAVIS:  Object to

21        form.

22            MS. RUMSEY:  Object to form.

23            THE WITNESS:  Yes, as I

24        tried to ineloquently describe

1          before when we were discussing it,

2          there -- what you like to do in

3          economic article is to try to make

4          the argument in multiple ways.

5          This was one of the ways in which

6          I was using to show that this

7          channel -- that I was arguing is

8          the channel from prescription

9          opioids to illicit opioids was

10         plausible, and there was a channel

11         supported by the epidemiological

12         literature.

13    BY MR. KO:

14         Q.    So the epi studies are used

15    to support your premises that you list in

16    Section 5 of your report, correct?

17              MR. HALLER:  Object to form.

18              MS. CASTLES:  Object to

19         form.

20              MS. UNGER DAVIS:  Object to

21         form.

22              MS. RUMSEY:  Object to form.

23              THE WITNESS:  Correct.

24    BY MR. KO:

1          Q.    And same with respect to the

2   economic literature that you were

3   questioned about in Subsection B.

4   That --

5                MS. RUMSEY:  Object to form.

6                MR. KO:  Can I finish my

7        question?

8                MS. RUMSEY:  I thought you

9        had.

10  BY MR. KO:

11         Q.    So the same question I have

12  with respect to Subsection B of your

13  report, and the question is as follows:

14               You cite economic literature

15  to support your point in Section 5 that

16  there is additional evidence that the

17  illicit opioid crisis was the consequence

18  of shipments of prescription opioid,

19  correct?

20               MR. HALLER:  Object to form.

21               MS. CASTLES:  Object to

22        form.

23               MS. UNGER DAVIS:  Object to

24        form.

1          MS. RUMSEY:  Object to form.

2          THE WITNESS:  Correct.  You

3     know, the typical thing we do in

4     running economic analysis, is you

5     make your argument, and then you

6     try to bring additional evidence

7     to bear to support it.  And this

8     is a set of -- as the section

9     title indicates, a set of

10    additional evidence to support my

11    conclusion.

12 BY MR. KO:

13    Q.    And, now, are there other

14 reasons or evidence that you cite to in

15 your report other than the epi studies

16 and the economic literature that you list

17 here?

18    A.    Yes.  I also talk about

19 the -- in substance the counterfactual

20 arguments that I made in Section C saying

21 that the trends that I document in

22 Section 4 cannot be explained by factors

23 like economic opportunity or things

24 related to non-opioid mortality.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  And these are all

2     reasons or evidence that you cite to in

3     your report that support your primary

4     analysis and opinion regarding the impact

5     of shipments on -- on harms.  And in

6     particular, that there is a direct causal

7     link between shipments that occurred

8     before 2010 and the illicit harms that

9     resulted post 2010?

10               MR. HALLER:  Object to form.

11               MS. CASTLES:  Object to

12          form.

13               MS. UNGER DAVIS:  Object to

14          form.

15               MS. RUMSEY:  Object to form.

16               THE WITNESS:  My conclusion,

17          as you stated, was that there is a

18          causal link between shipments and

19          mortality, and this Section 5, the

20          epi study, economic studies, and

21          these other factors are done in

22          support of that causal conclusion.

23     BY MR. KO:

24          Q.    And that causal conclusion,

Highly Confidential - Subject to Further Confidentiality Review

1    is set forth in Section 4 of your report,

2    correct?

3              A.      That's correct.

4              Q.      Okay.  So is it fair to say

5    that the reasons that you provide in

6    Section 5 of your report are qualitative

7    reasons that support the primary

8    quantitative economic analysis that you

9    performed in Section 4?

10                   MR. HALLER:  Object to form.

11                   MS. CASTLES:  Object to

12              form.

13                   MS. UNGER DAVIS:  Object to

14              form.

15                   MS. RUMSEY:  Object to form.

16                   THE WITNESS:  I would say

17              that's true about Section 5A.

18              Section 5B and 5C are also --

19              they're -- well, let me back up.

20              I wouldn't say they're essentially

21              qualitative or quantitative.  What

22              I would say is they are Section 4

23              and Section 5C are primary

24              analysis by myself.  Sections 5A

Highly Confidential - Subject to Further Confidentiality Review

1          and B are reviewing other

2          literatures to support those

3          conclusions.

4     BY MR. KO:

5          Q.    Just a couple more

6     questions.  There have been some

7     questions by various counsel regarding

8     the underlying data that you have

9     reviewed in particular -- or the

10    underlying data that you have relied on,

11    and in particular ARCOS data.  Do you

12    recall that questioning?

13         A.    Yes.

14              MS. RUMSEY:  Object to form.

15    BY MR. KO:

16         Q.    Now, is it common for you,

17    in the academic setting or in any of your

18    previous work, to rely on the work of

19    either consultants or research analysts

20    to examine and review the underlying data

21    before it's given to you?

22              MS. RUMSEY:  Object to form.

23              THE WITNESS:  Yes, that's

24         typically how I'd write an

Highly Confidential - Subject to Further Confidentiality Review

1    article, especially as I've gotten

2    more senior in the field.

3         Typically I would not

4    actually handle the data.  It

5    would be -- someone would handle

6    it under my direction.  I'd

7    constantly check in through the

8    process to make sure it's being

9    done correctly, and then an

10   analyst would produce for me the

11   key datasets and summary

12   statistics that I need to use to

13   draw my conclusions.

14   BY MR. KO:

15        Q.   And do you know whether or

16   not -- and I appreciate the answer that

17   you've given that it's common to you.  Do

18   you know whether or not this is a common

19   practice in the field of --

20             MR. HALLER:  Object to form.

21             MS. CASTLES:  Object to

22        form.

23             MS. UNGER DAVIS:  Object to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. RUMSEY:  Object to form.
 2      BY MR. KO:
 3           Q.     -- health economics?
 4           A.     This is pretty much how any
 5      senior health economist would write a
 6      paper.
 7           Q.     Okay.  Final question.
 8      There were some questions earlier -- or
 9      final area of questioning.  There were
10      some questions regarding Appendix 1-D of
11      your report earlier today.  Do you recall
12      that?
13           A.     Yes, I do.
14           Q.     And I believe Mr. Geise had
15      questioned you on -- on a variety of --
16      of metrics or variables that you did not
17      consider.  Do you recall that line of
18      questioning?
19           A.     Yes, I do.
20                  MR. HALLER:  Object to form.
21                  MS. CASTLES:  Object to
22           form.
23                  MS. RUMSEY:  Object to form.
24      BY MR. KO:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And why didn't you consider

2    the variables that Mr. Geise had set

3    forth for you?

4    A.    Essentially the goal, if you

5    recall the purpose of this analysis it

6    was to try to ask, can factors relate to

7    medical need explain this enormous

8    variation across counties in -- in

9    shipments.

10           So what we did was start

11   with a sensible list of factors that

12   capture medical need, capture the major

13   determinance of it, and what we found was

14   even with a fairly broad list, it was

15   such a small effect that we deemed it

16   unlikely that adding additional variables

17   of the type that Mr. Geise listed would

18   much affect our conclusions.

19   Q.    And did you feel that it was

20   ultimately reasonable to rely on the

21   factors that you did set forth in

22   Appendix 1-D to reach the conclusions set

23   forth in your report?

24           MS. CASTLES:  Object to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    MS. RUMSEY:  Object to form.

3                    THE WITNESS:  Yes, I did.

4          Whenever you run a regression,

5          there's a choice about what to

6          include and what to exclude.  And

7          we felt that this was a

8          comprehensive set of variables

9          which would indicate to us whether

10         underlying variation of medical

11         need was driving the variation in

12         shipments.

13                   MR. KO:  Okay.  That's all I

14         have.  Thank you.

15                   MR. HALLER:  I have a few

16         questions.

17                   MR. KO:  He's going to ask

18         you some questions, because I

19         asked you some questions.

20                   THE WITNESS:  Sure.

21                        -  -  -

22                   EXAMINATION

23                        -  -  -

24    BY MR. HALLER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Professor Gruber, Mr. Ko

2  brought you back to your Figures 1.17 and

3  1.18.  And in the course of those

4  questions, you reminded yourself and us

5  that the groupings in Figure 1.18 are

6  counties and the groupings in Figure 1.17

7  are states, right?

8    A.    That's correct.

9    Q.    And I think at the end of

10  your -- one of your responses, you said

11  something about you would expect greater

12  variation as between two counties than as

13  you would between two states, correct?

14    A.    That's correct.

15    Q.    But in Figure 1.18, you are

16  not comparing one county to another,

17  right, it's the top 25 percent of the

18  counties in the country versus the lowest

19  25 percent of the counties in the

20  country.  Those are very huge groupings,

21  correct?

22        MR. KO:  Object to the form.

23        THE WITNESS:  Those are

24      large groupings.  But not as large

Highly Confidential - Subject to Further Confidentiality Review

```
 1              as the groupings in figure --
 2              well, they are large in terms of
 3              population, but there's also large
 4              groupings in Figure 1.17.
 5    BY MR. HALLER:
 6         Q.    Right.  And do you have any
 7    reason to think in terms of the
 8    population covered that the groupings of
 9    25 percent of the counties is greater or
10    less are than the grouping of 25 percent
11    of the states?
12              MR. KO:  Object to the form.
13              THE WITNESS:  I don't
14              understand the question.
15    BY MR. HALLER:
16         Q.    Well, you -- I think you
17    were suggesting that you would expect
18    more variation between counties.  And my
19    question is, that might be true, the
20    smallest county to the largest county.
21    But we are talking about the 25 percent
22    of the counties in Figure 1.18.  And we
23    are talking about 25 percent of the
24    states in Figure 1.17, right?
```

1          In terms of the population

2    covered by 25 percent of the states

3    versus 25 percent of the counties, do you

4    have any reason to think one is greater

5    or lesser with the others?

6               MR. KO:  Object to the form.

7               THE WITNESS:  Yes.  I would

8          think, since there's more

9          dispersion across counties, then

10         there's dispersion across states.

11         If you take the top 25 percent and

12         the bottom 25 percent of a more

13         dispersed distribution, those two

14         means would be more dispersed and

15         the top 25 percent and bottom

16         25 percent are less dispersed

17         distribution.

18              So what I missed in my

19         earlier answer, and I apologize

20         for this, is that by definition,

21         by comparing state categories to

22         county categories, you are by

23         definition going to get a bigger

24         variation between the most, the

1          counties with the most shipments

2          and the least shipments.  Not just

3          a county.  But the counties with

4          the most shipments and least

5          shipments will be more in the

6          tails, because that is a more

7          dispersed distribution than is the

8          distribution across states.

9   BY MR. HALLER:

10          Q.    In terms of -- you are

11   talking about in terms of shipments, and

12   I'm talking about in terms of the

13   endpoints you're looking at.

14          You are looking at mortality

15   in Figure 1.18, right?

16          A.    Mm-hmm.

17          Q.    Number of people, right, who

18   suffered an overdose death?

19          A.    Right.

20          Q.    Those are real people?

21          A.    Right.

22          Q.    And in Figure 1.17 we are

23   talking about people living in the states

24   who have opioid use disorder --

1       A.    Right.

2       Q.    -- right?

3             And so my question is, do

4   you -- is it your opinion that the bottom

5   25 percent of the states in terms of

6   people, the 25 percent of the states

7   cover fewer or greater people than

8   25 percent of the counties?

9       A.    No, they cover the same

10  number of people.

11            MR. HALLER:  Anybody else?

12      So we can conclude.

13            THE VIDEOGRAPHER:  The time

14      is 7:08 p.m.  This deposition has

15      concluded and we are off the

16      record.

17            (Excused.)

18            (Deposition concluded at

19      approximately 7:08 p.m.)

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                        CERTIFICATE

3

4

5            I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.

7

             It was requested before
8    completion of the deposition that the
     witness, JONATHAN GRUBER, Ph.D., have
9    the opportunity to read and sign the
     deposition transcript.

10

11

12    _Michelle L. Gray_____
      MICHELLE L. GRAY,
13    A Registered Professional
      Reporter, Certified Shorthand
14    Reporter, Certified Realtime
      Reporter and Notary Public
15    Dated:  April 30, 2019

16

17

18            (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4      over carefully and make any necessary

 5      corrections.  You should state the reason

 6      in the appropriate space on the errata

 7      sheet for any corrections that are made.

 8              After doing so, please sign

 9      the errata sheet and date it.

10              You are signing same subject

11      to the changes you have noted on the

12      errata sheet, which will be attached to

13      your deposition.

14              It is imperative that you

15      return the original errata sheet to the

16      deposing attorney within thirty (30) days

17      of receipt of the deposition transcript

18      by you.  If you fail to do so, the

19      deposition transcript may be deemed to be

20      accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 -   -   -   -   -   -

                     E R R A T A

 2                 -   -   -   -   -   -

 3

 4      PAGE   LINE    CHANGE

 5      _____  _____   _____

 6        REASON:      _____

 7      _____  _____   _____

 8        REASON:      _____

 9      _____  _____   _____

10        REASON:      _____

11      _____  _____   _____

12        REASON:      _____

13      _____  _____   _____

14        REASON:      _____

15      _____  _____   _____

16        REASON:      _____

17      _____  _____   _____

18        REASON:      _____

19      _____  _____   _____

20        REASON:      _____

21      _____  _____   _____

22        REASON:      _____

23      _____  _____   _____

24        REASON:      _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4          I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 496, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    JONATHAN GRUBER, Ph.D.            DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

1

LAWYER'S NOTES

2 PAGE   LINE

3 _____   _____   _____

4 _____   _____   _____

5 _____   _____   _____

6 _____   _____   _____

7 _____   _____   _____

8 _____   _____   _____

9 _____   _____   _____

10 _____   _____   _____

11 _____   _____   _____

12 _____   _____   _____

13 _____   _____   _____

14 _____   _____   _____

15 _____   _____   _____

16 _____   _____   _____

17 _____   _____   _____

18 _____   _____   _____

19 _____   _____   _____

20 _____   _____   _____

21 _____   _____   _____

22 _____   _____   _____

23 _____   _____   _____

24 _____   _____   _____