Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

                   ~~~~~~~~~~~~~~~~~~~~

5

6    IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
     OPIATE LITIGATION

7                                    Case No. 17-md-2804

8                                    Judge Dan Aaron
     This document relates to:      Polster

9

10   The County of Cuyahoga v. Purdue
     Pharma L.P., et al.

11
     Case No. 18-OP-45004

12

13                 ~~~~~~~~~~~~~~~~~~~~

14

                   Videotaped deposition of

15                 JAMES A. GUTIERREZ, ESQ.

16

                   January 31, 2019

17                      9:48 a.m.

18

19                    Taken at:

20                 Kelley & Ferraro

21              950 Main Avenue, Suite 1300

22                  Cleveland, Ohio

23

24

25           Renee L. Pellegrino, RPR, CLR

Page 2

1  APPEARANCES:
2  On behalf of Cuyahoga County:
   Thasher, Dinsmore & Dolan
3  LEO M  SPELLACY, JR , ESQ
   1111 Superior Avenue
4  Suite 412
   Cleveland, Ohio  44114
5  (216) 255-5434
   lspellacy@tddlaw com
6   - and -
   (Via Telephone)
7  Napoli Shkolnik PLLC
   SALVATORE BADALA, ESQ
8  JOSEPH L  CIACCIO, ESQ
   360 Lexington Avenue
9  New York, New York  10017
   (844) 230-7676
10  sbadala@napolilaw com
   jciaccio@napolilaw com
11
   On behalf of Walmart, Inc :
12  (Via Telephone)
   Jones Day
13  LISA GATES, ESQ
   901 Lakeside Avenue East
14  Cleveland, Ohio  44114
   (216) 586-3939
15  lgates@jonesday com
16  On behalf of CVS Indiana, LLC and CVS Rx Services,
   LLC:
17  Zuckerman Spaeder LLP
   R  MILES CLARK, ESQ
18  1800 M Street NW
   Suite 1000
19  Washington, D C   20036-5807
   (202) 778-1800
20  mclark@zuckerman com
21
          ~ ~ ~ ~ ~
22
23
24
25

Page 3

1  APPEARANCES, CONT'D:
2  On behalf of AmerisourceBergen Drug Corporation:
   Jackson Kelly PLLC
3  SANDRA K  ZERRUSEN, ESQ
   50 South Main Street
4  Suite 201
   Akron, Ohio  44308
5  (330) 252-9060
   skzerussen@jacksonkelly com
6
   On behalf of Endo Pharmaceuticals, Inc , Endo
7  Health Solutions, Inc , Par Pharmaceuticals,
   Inc  and Par Pharmaceutical Companies, Inc :
8  Baker & Hostetler
   DOUGLAS L  SHIVELY, ESQ
9  127 Public Square, Suite 2000
   Cleveland, Ohio  44114-1214
10  (216) 621-0200
   dshively@bakerlaw com
11
   On behalf of Johnson & Johnson and Janssen
12  Pharmaceuticals, Inc :
   Tucker Ellis LLP
13  JEFFREY M  WHITESELL, ESQ
   950 Main Avenue, Suite 1100
14  Cleveland, Ohio  44113-7213
   (216) 592-5000
15  jeffrey whitesell@tuckerellis com
16
          ~ ~ ~ ~ ~
17
18
19
20
21
22
23
24
25

Page 4

1  APPEARANCES, CONT'D:
2  On behalf of McKesson Corporation:
   Covington & Burling
3  RAE WOODS, ESQ.
   One CityCenter
4  850 Tenth Street, NW
   Washington, D.C.  20001-4956
5  (202) 662-6000
   rwoods@cov.com
6   - and -
   Covington & Burling LLP
7  ASEEM PADUKONE, ESQ.
   One Front Street
8  San Francisco, California  94111-5356
   (415) 591-6000
9  apadukone@cov.com
10
   ALSO PRESENT:  Joe VanDetta, Videographer
11
          ~ ~ ~ ~ ~
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1            TRANSCRIPT INDEX
2
3  APPEARANCES .....................................2
4  INDEX OF EXHIBITS .............................6
5  INDEX OF OBJECTIONS ...........................9
6
7  EXAMINATION OF JAMES A. GUTIERREZ, ESQ.:
8  BY MS. WOODS ..................................15
9
10  AFTERNOON SESSION ............................135
11
12  REPORTER'S CERTIFICATE .......................321
13
14  EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

**Page 6**

```
 1           INDEX OF EXHIBITS
 2
 3    Number      Description        Marked
 4
 5    Exhibit 1  Melvin Edwards Indictment, Bates  81
              Numbered CUYAH_000020887 -
 6            Marked Confidential
 7    Exhibit 2  Multi-Page Document Entitled   83
              "2015 Ohio Drug Overdose Data
 8            General Findings," Beginning
              Bates Number CUYAH_011231985 -
 9            Marked Confidential
10    Exhibit 3  Article Entitled "Doctor Accused 111
              of Operating 'Pill Mill' Tells
11            His Story"
12    Exhibit 4  Article Entitled "Clinic Doctor  131
              In Drug Probe Takes Own Life;
13            Urology Resident Investigated
              for Narcotics Prescriptions,"
14            Dated April 8, 1993
15    Exhibit 5  Article Entitled "Doctor Accused 138
              of Giving Drugs For Sex Pleads
16            Guilty 31 Times To End His
              Trial," Dated September 28, 1999
17
      Exhibit 6  Article Entitled "Prescription  140
18            For Prison:  Doctor's Pill
              Practice Paid For Yacht, Seven
19            Mistresses," Dated October 12,
              1999
20
      Exhibit 7  Article Entitled "Former Doctor 167
21            Pleads Guilty:  He Was Charged
              With Manslaughter In Drug
22            Overdose," dated May 17, 1997
23
24
25
```

**Page 7**

```
 1         INDEX OF EXHIBITS, CONT'D
 2
 3    Exhibit 8  Cuyahoga County's Supplemental  184
              Response and Objections to
 4            Distributor Defendants'
              Interrogatory Number 3 As
 5            Rewritten By Special Master
              David Cohen
 6
 7
 8
      Exhibit 9  News Article Titled "For A    198
 9            Certain Kind Of Drug Trafficker,
              Blank Prescription Pads Are The
10            Way To Get Pain Pills, With A
              Little Help From Their Friends,
11            Who They Use To Get Them
              Filled," Beginning Bates Number
12            CLEVE-001485599
13    Exhibit 10 Cuyahoga County Office of the   248
              Prosecutor 2015 Report to the
14            Public, Beginning Bates Number
              CUYAH_012970490 - Marked
15            Confidential
16    Exhibit 11 Cuyahoga County Office of the   248
              Prosecutor 2016 Report to the
17            Public, Beginning Bates Number
              CUYAH_001368881 - Marked
18            Confidential
19    Exhibit 12 Plaintiffs The County of     259
              Cuyahoga, Ohio and the State of
20            Ohio Ex Rel  Prosecuting
              Attorney of Cuyahoga County,
21            Michael C  O'Malley's Second
              Supplemental Responses and
22            Objections to Distributor
              Defendants' Interrogatory No  18
23            Pursuant to the Court's November
              21, 2018 Order
24
      Exhibit 13 Kenneth V  Mills Indictment   310
25
```

**Page 8**

```
 1       INDEX OF EXHIBITS, CONT'D
 2
 3    Exhibit 14   News Article Entitled "Former   312
              Cuyahoga County Jail Director,
 4            Indicted In Corruption Probe,
              Received $16,700 Payout When He
 5            Resigned"
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 9**

```
 1           INDEX OF OBJECTIONS
 2
 3    Objection                    23
      Objection                    24
 4    Objection                    25
      Objection                    25
 5    Objection                    26
      Objection                    27
 6    Objection                    28
      Objection                    28
 7    Objection                    30
      Objection                    31
 8    Objection                    31
      Objection                    33
 9    Objection                    33
      Objection                    33
10    Objection                    33
      Objection                    35
11    Objection                    36
      Objection                    37
12    Objection                    37
      Objection                    37
13    Objection                    38
      Objection                    38
14    Objection                    40
      Objection                    40
15    Objection                    41
      Objection                    42
16    Objection                    42
      Objection                    43
17    Objection                    44
      Objection                    44
18    Objection                    44
      Objection                    45
19    Objection                    45
      Objection                    45
20    Objection                    45
      Objection                    46
21    Objection                    46
      Objection                    47
22    Objection                    47
      Objection                    47
23    Objection                    47
      Objection                    49
24    Objection                    49
25
```

3 (Pages 6 - 9)

**Page 10**

1     INDEX OF OBJECTIONS, CONT'D
2
3 Objection    50
   Objection    50
4 Objection    51
   Objection    51
5 Objection    51
   Objection    52
6 Objection    52
   Objection    52
7 Objection    53
   Objection    54
8 Objection    54
   Objection    56
9 Objection    58
   Objection    58
10 Objection    58
   Objection    58
11 Objection    59
   Objection    59
12 Objection    60
   Objection    60
13 Objection    61
   Objection    61
14 Objection    62
   Objection    63
15 Objection    66
   Objection    67
16 Objection    68
   Objection    68
17 Objection    69
   Objection    70
18 Objection    70
   Objection    71
19 Objection    73
   Objection    73
20 Objection    74
   Objection    74
21 Objection    74
   Objection    76
22 Objection    77
   Objection    78
23 Objection    79
   Objection    79
24 Objection    80
25

**Page 11**

1     INDEX OF OBJECTIONS, CONT'D
2
3 Objection    80
   Objection    80
4 Objection    81
   Objection    82
5 Objection    83
   Objection    83
6 Objection    83
   Objection    85
7 Objection    85
   Objection    86
8 Objection    86
   Objection    87
9 Objection    88
   Objection    90
10 Objection    90
   Objection    90
11 Objection    91
   Objection    91
12 Objection    91
   Objection    92
13 Objection    93
   Objection    97
14 Objection    97
   Objection    99
15 Objection    99
   Objection    100
16 Objection    102
   Objection    104
17 Objection    106
   Objection    107
18 Objection    107
   Objection    108
19 Objection    108
   Objection    110
20 Objection    112
   Objection    113
21 Objection    113
   Objection    113
22 Objection    114
   Objection    117
23 Objection    119
   Objection    120
24 Objection    120
25

**Page 12**

1     INDEX OF OBJECTIONS, CONT'D
2
3 Objection    121
   Objection    122
4 Objection    122
   Objection    125
5 Objection    125
   Objection    126
6 Objection    128
   Objection    134
7 Objection    139
   Objection    139
8 Objection    148
   Objection    153
9 Objection    156
   Objection    159
10 Objection    163
   Objection    165
11 Objection    167
   Objection    172
12 Objection    173
   Objection    174
13 Objection    174
   Objection    176
14 Objection    176
   Objection    177
15 Objection    178
   Objection    179
16 Objection    180
   Objection    180
17 Objection    181
   Objection    181
18 Objection    181
   Objection    181
19 Objection    182
   Objection    182
20 Objection    182
   Objection    182
21 Objection    183
   Objection    183
22 Objection    185
   Objection    188
23 Objection    188
   Objection    190
24 Objection    191
25

**Page 13**

1     INDEX OF OBJECTIONS, CONT'D
2
3 Objection    191
   Objection    191
4 Objection    191
   Objection    193
5 Objection    194
   Objection    195
6 Objection    196
   Objection    199
7 Objection    201
   Objection    202
8 Objection    203
   Objection    203
9 Objection    203
   Objection    204
10 Objection    204
   Objection    205
11 Objection    205
   Objection    206
12 Objection    206
   Objection    206
13 Objection    207
   Objection    207
14 Objection    208
   Objection    210
15 Objection    213
   Objection    213
16 Objection    213
   Objection    213
17 Objection    214
   Objection    215
18 Objection    224
   Objection    230
19 Objection    230
   Objection    232
20 Objection    233
   Objection    237
21 Objection    238
   Objection    244
22 Objection    245
   Objection    247
23 Objection    252
   Objection    257
24 Objection    258
25

Veritext Legal Solutions
www.veritext.com      888-391-3376

Page 14

INDEX OF OBJECTIONS, CONT'D

| Objection | 261 |
| Objection | 265 |
| Objection | 271 |
| Objection | 274 |
| Objection | 275 |
| Objection | 284 |
| Objection | 286 |
| Objection | 287 |
| Objection | 287 |
| Objection | 288 |
| Objection | 291 |
| Objection | 293 |
| Objection | 295 |
| Objection | 296 |
| Objection | 296 |
| Objection | 299 |
| Objection | 299 |
| Objection | 300 |
| Objection | 301 |
| Objection | 302 |
| Objection | 304 |
| Objection | 305 |
| Objection | 306 |
| Objection | 307 |
| Objection | 308 |
| Objection | 310 |
| Objection | 312 |
| Objection | 313 |
| Objection | 313 |
| Objection | 313 |
| Objection | 314 |
| Objection | 314 |
| Objection | 314 |
| Objection | 314 |
| Objection | 315 |
| Objection | 315 |
| Objection | 315 |
| Objection | 316 |

Page 15

1    THE VIDEOGRAPHER:  On the record,
2  9:48.
3    JAMES A. GUTIERREZ, ESQ., of lawful age,
4  called for examination, as provided by the
5  Federal Rules of Civil Procedure, being
6  previously duly sworn, as hereinafter
7  certified, deposed and said as follows:
8    EXAMINATION OF JAMES A. GUTIERREZ, ESQ.
9  BY MS. WOODS:
10    Q.   I want to ask you some questions
11  about your education and employment background.
12    A.   Okay.
13    Q.   Where did you attend college?
14    A.   Kent State University.
15    Q.   When did you graduate?
16    A.   1980.
17    Q.   Where did you attend law school?
18    A.   University of Akron.
19    Q.   And when did you graduate law
20  school?
21    A.   '84.
22    Q.   Other than your law degree, do you
23  have any other advanced degrees or academic
24  training?
25    A.   No.

Page 16

1    Q.   Have you received specialized
2  training in law enforcement activity relating to
3  drugs?
4    A.   Do you consider seminars training?
5    Q.   Yes.
6    A.   I've gone to various seminars over
7  my years regarding these issues we're talking
8  about today.
9    Q.   And did those training seminars
10  focus on drugs?
11    A.   Yes.
12    Q.   Did they focus on prescription
13  opioids in particular?
14    A.   Yes.
15    Q.   How many seminars have you attended
16  that focused on prescription opioids in
17  particular?
18    A.   In my career?
19    Q.   Yes.
20    A.   I'd say about 20, 20 to 30,
21  somewhere in there.
22    Q.   And over what period of time did you
23  receive those trainings?
24    A.   Through my career.
25    Q.   When was the first time you recall

Page 17

1  attending a seminar focused on prescription
2  opioids?
3    A.   Early '90s.
4    Q.   And who sponsored those seminars you
5  attended related to prescription opioids?
6    A.   I couldn't tell you who back then,
7  but I can tell you that there's a national
8  organization called the National Organization of
9  Drug Diversion Investigators.  They have -- I
10  think they operate today and still do that
11  called NADDI.  I went to a lot of their
12  seminars.  I spoke at a few of those.
13    Q.   You spoke on the topic of
14  prescription opioids?
15    A.   Absolutely.
16    Q.   At how many different seminars?
17    A.   I'd probably say 10, 15.
18    Q.   So I'll come back to that and ask
19  you some questions about that later on.
20    Do you have any specialized training
21  in law enforcement activity -- excuse me, any
22  specialized training in medicine?
23    A.   No.
24    Q.   Do you have any in pharmacy?
25    A.   No.

5 (Pages 14 - 17)

Page 18

1    Q.    Addiction services?
2    A.    No.
3    Q.    And prior to your employment with
4 the Cuyahoga County Prosecutor's Office, where
5 did you work?
6    A.    I worked at two small firms for the
7 year.  I got my law license in '85, and I
8 started at the prosecutor's office in '86, so
9 that one year I worked in the private sector for
10 two small firms.
11   Q.    And in either of those jobs at the
12 firms did you have -- did your work involve
13 prescription opioids?
14   A.    No.
15   Q.    Did it involve drugs?
16   A.    No.
17   Q.    How did you come to join the
18 Cuyahoga County Prosecutor's Office?
19   A.    It's what I always wanted to do.
20   Q.    And which unit did you work in
21 originally?
22   A.    Well, you were -- you had a
23 three-month rotation with general felony,
24 juvenile and child support for the first year,
25 and then when you prove yourself, then you go

Page 19

1 into general felony.
2    Q.    And for how long were you in general
3 felony?
4    A.    Approximately three years, two and a
5 half years.
6    Q.    Where did you go after general
7 felony?
8    A.    What they call special
9 investigations, which was a precursor to the
10 economic crime unit.
11   Q.    And for how long were you in special
12 investigations?
13   A.    From '89 to '94.  Actually, middle
14 of '88, so what, four and a half, five and a
15 half years.
16   Q.    And from 1994 on you've been in the
17 economic crimes unit?
18   A.    Yes, ma'am.
19   Q.    In which of those different units
20 did your work involve prescription opioids?
21   A.    Well, the economic crime unit.  See,
22 the economic crime unit is kind of a misnomer in
23 a sense that we do all -- besides traditional
24 white collar crime, we do all licensed
25 professionals, public corruptions, people of

Page 20

1 status, kind of the cases that don't fit into
2 the units that we have in the office.
3    Q.    Okay.  So you didn't work on
4 prescription opioid cases when you were in
5 general felony or in special investigations?
6    A.    I couldn't tell you for sure or not,
7 but -- I don't remember back then, but the usual
8 cases of people stealing drugs, doctor shoppers
9 would come through the general felony unit.  So
10 I couldn't tell you specifically.
11   Q.    Okay.  In the course of your job,
12 who do you communicate with on a regular basis
13 on issues that relate, either directly or
14 indirectly, to opioids?
15   A.    The investigative agencies that I
16 work with.
17   Q.    And which investigative agencies do
18 you work with?
19   A.    The main one would be the pharmacy
20 board.
21   Q.    What other agencies?
22   A.    The local agencies.  Any other local
23 agency.  There's, like, WEB, Westshore
24 Enforcement Bureau.  There's a similar -- God,
25 what's the name of it on the east side?  There's

Page 21

1 a similar one on the east side.  And these
2 are -- what they are are different detectives
3 from different jurisdictions all basically work
4 with one unit.  Like the Westshore Enforcement
5 Bureau are detectives from different cities.
6 There's one on the east side.  And then all
7 local jurisdictions in Cuyahoga County, all the
8 police departments, if they have an issue in a
9 particular incident there, they'll call us.
10   Q.    Do you work with the Drug
11 Enforcement Administration?
12   A.    Yes.
13   Q.    Would you say that you communicate
14 on a regular basis with the DEA?
15   A.    I used to, but not recently.
16   Q.    During what period of time were you
17 communicating regularly with the DEA?
18   A.    Well, I -- to answer your question
19 candidly, it depends who is sitting in that
20 chair with the DEA locally, and that
21 relationship.  So over the years we would have
22 better relationships with some of the diversion
23 directors than other ones, and so -- and the DEA
24 has their own policies, whether they want to
25 come to us with certain cases.  Sometimes they

6 (Pages 18 - 21)

Page 22

1 did. Sometimes they didn't. So over the years
2 it's been kind of hit and miss.
3     Q.   Okay. Are there particular years
4 where you recall having more routine
5 communication relative to the other years?
6     A.   I would say from middle '90s to the
7 middle 2000s, maybe 2005.
8     Q.   And are there years when you recall
9 having less communication with the DEA relative
10 to the other years?
11    A.   Again, I would say it was hit and
12 miss. It would depend on the case and things of
13 that nature.
14    Q.   I believe you stated that currently
15 you don't have regular communication?
16    A.   Well, I do. I mean, I do. I don't
17 know what you mean by "regular." Do we -- do I
18 talk to them over a period of a year? Yes. We
19 have certain individuals that are in a task
20 force that are local CPD officers that work with
21 the DEA. They have a task force. So if you
22 want to -- if you want to say that, yeah, then I
23 have a regular communication with them.
24    Q.   But over the years you had the most
25 communication with your DEA counterparts between

Page 23

1 the mid-1990s to 2005?
2     A.   I would say, yes, worked more
3 closely with them, yes.
4     Q.   Does your office have any manuals or
5 anything similar relating to opioid
6 investigations or prosecutions?
7     A.   No.
8     Q.   As part of your work do you draft
9 regular written reports?
10    A.   No.
11    Q.   Are you aware of any regular reports
12 relating to opioids coming out of your office?
13    A.   Not that I am aware of.
14    Q.   How about reports related to
15 potential or actual drug prosecutions?
16    A.   No.
17    Q.   Do you receive any regular reports
18 from anyone relating to opioids --
19         MR. SPELLACY:  Objection.
20    Q.   -- such as the medical examiner's
21 office, for example?
22    A.   No.
23    Q.   Do you receive any reports from the
24 County Board of Health related to drug-related
25 ER visits or other drug-related matters?

Page 24

1     A.   No.
2     Q.   Do you receive any reports from Ohio
3 Hospital Association?
4     A.   No.
5     Q.   And, to your knowledge, does anyone
6 else in your office receive any of these
7 reports?
8     A.   To my knowledge, they don't.
9     Q.   Do you receive regular reports from
10 the DEA relating to opioids?
11    A.   No.
12    Q.   Do you receive regular reports from
13 other federal, state or local agencies related
14 to opioids?
15    A.   No, not regular reports; no.
16    Q.   To what extent during your career
17 with the office have you been involved in policy
18 setting?
19    A.   What do you mean?
20    Q.   To what extent have you been
21 involved in amending or modifying the policies
22 or the practices of the prosecution in your
23 office?
24         MR. SPELLACY:  Objection.
25    A.   I really don't understand that

Page 25

1 question, to be honest with you, okay.
2     Q.   Do you have any authority or any
3 involvement in changing the way that prosecutors
4 carry out their responsibility in your office?
5         MR. SPELLACY:  Objection.
6     A.   No, I do not.
7     Q.   Do you have any authority or
8 involvement in changing the policies or
9 practices of the prosecutors with respect to
10 drug enforcement?
11         MR. SPELLACY:  Objection.
12    A.   No, I do not have any authority to
13 do that.
14    Q.   Do you set priorities for your
15 office in terms of what kinds of cases it will
16 prosecute?
17    A.   For my office?
18    Q.   Yes.
19    A.   Not for the office, no.
20    Q.   And who does that?
21    A.   I would assume the -- the county
22 elected prosecutor sets all the policies.
23    Q.   To what extent have you been
24 involved in budget issues for your office?
25    A.   None.

7 (Pages 22 - 25)

Page 26

1    Q.   Who is involved in budget issues for
2  your office?
3    A.   Again, the elected county prosecutor
4  would deal with budget issues.
5    Q.   Do you know how the budget is
6  prepared, what the budget process is?
7        MR. SPELLACY:  Objection.
8    A.   No, I don't.
9    Q.   Have you ever been asked to provide
10  quantitative or qualitative information in
11  support of a budget request?
12   A.   No.
13   Q.   To what extent do you exercise your
14  discretion over whether to bring a case?
15   A.   I have complete discretion whether
16  to -- to bring a case or not.
17   Q.   And are there any policies or
18  practices to help guide a prosecutor's
19  discretion?
20   A.   The law.
21   Q.   And when you say "the law," what are
22  you referring to specifically?
23   A.   Referring to if a case is brought to
24  me, I will evaluate it to whether it's proper to
25  bring charges or not, so I rely on the law

Page 27

1  whether we have the evidence to bring charges.
2    Q.   Okay.  So you look at the law to
3  determine whether the evidence is going to be
4  sufficient to prove a crime, correct?
5    A.   Correct.
6    Q.   What other factors do you consider?
7    A.   There are no other factors.  If the
8  evidence is sufficient enough to bring charges,
9  then we do it.
10   Q.   Are there any written policies or
11  practices regarding -- to provide guidance in
12  how to exercise your discretion or to provide a
13  list of factors that should be considered?
14   A.   Are you talking written policies?
15   Q.   Yes.
16   A.   Not that I'm aware of.
17   Q.   To what extent have you been
18  responsible for speaking publicly on behalf of
19  your office over the years?
20       MR. SPELLACY:  Objection.
21       Go ahead.
22   A.   Like I said, when I would talk at
23  certain seminars and things of that nature, my
24  office was aware of the fact that I was doing
25  that.

Page 28

1    Q.   Well, in what other circumstances
2  have you spoke publicly on behalf of the office?
3        MR. SPELLACY:  Objection.
4    A.   I would assume the only other
5  instance would be if I was interviewed by the
6  media as a result of a case.
7    Q.   Okay.  And of course here today in
8  your deposition, correct?
9        MR. SPELLACY:  Objection.
10   A.   That's correct.
11   Q.   Okay.  Apart from seminars, media
12  interviews and today's deposition, have there
13  been other occasions in which you have been
14  responsible for speaking publicly on behalf of
15  your office?
16       MR. SPELLACY:  Just to clarify, in
17  this part of the deposition he's here in his
18  individual capacity.  He had the 30(b)(6)
19  already.  So I just want to clarify your
20  question there.
21       Go ahead.  You can answer.
22   A.   Besides seminars and -- I'm trying
23  to think besides seminars if I spoke on behalf
24  of the office.  I can't think of anything right
25  now.

Page 29

1    Q.   Okay.
2    A.   And I want to make sure that we
3  understand each other.  Seminars also include
4  training.  You know, when I would speak in front
5  of, let's say, investigators in training
6  situations, I would consider that a seminar.
7    Q.   Okay.  During your career have you
8  personally served on any task forces related to
9  drugs?
10   A.   No, not officially.
11   Q.   Have you served on task forces
12  informally that relate to drugs?
13   A.   No.
14   Q.   What makes you say "not officially"?
15   A.   Because I worked with drug task
16  forces but I wasn't on the drug task force.
17   Q.   And which drug task forces did you
18  work with?
19   A.   I can't -- can't remember.  Over the
20  years there have been numerous types of task
21  forces that would get together for a while and
22  then break up.
23   Q.   And what was the nature of the work
24  that you did with those task forces?
25   A.   It would be the prosecution of drug

8 (Pages 26 - 29)

Page 30

1 offenses.
2    Q.    And during what period of time did
3 you provide assistance to task forces related to
4 drugs?
5    A.    Whenever they were formed.  I can't
6 give you a number.
7    Q.    You don't recall?
8    A.    No.  Like right now, like I said,
9 you know, CPD has a diversion police officer
10 that now is on the DEA.  They call them a task
11 force.  I mean, so I work with them.  That's
12 happened over the years.  I can't tell how many
13 times.
14    Q.    Has anyone in your office served on
15 a task force related to drugs?
16    A.    I don't know the answer to that
17 question.
18    Q.    Is the prosecutor's office part of a
19 larger department of Cuyahoga County's
20 government?
21        MR. SPELLACY:  Objection.
22    A.    I don't know what you mean by that.
23    Q.    Does the prosecutor's office work
24 under Cuyahoga County?
25    A.    They're a separate and distinct

Page 31

1 entity within Cuyahoga County.
2    Q.    How many full-time employees work
3 for the prosecutor's office?
4        MR. SPELLACY:  Objection.
5    A.    I could approximate around -- are
6 you just talking about attorneys or support
7 staff or everybody?
8    Q.    First I'm asking you how many
9 full-time employees, including support staff.
10    A.    I'd say between 250 and 300.
11    Q.    And do you know how many attorneys
12 work for the prosecutor's office?
13    A.    I would say between 150 and a little
14 over 200.
15    Q.    How have those staffing numbers
16 changed over time?
17    A.    I don't know the answer to that
18 question.
19    Q.    Earlier today during your 30(b)(6)
20 deposition you gave us your understanding of
21 what an opioid is.  When you and others in your
22 office talk about opioids, what drugs does that
23 category include?
24        MR. SPELLACY:  Objection.
25    A.    You want me to specifically name the

Page 32

1 drugs?
2    Q.    Yes.
3    A.    Vicodin, Percocet, OxyContin, any
4 derivative of oxycodone, whatever that may be,
5 Endocet, Norco, all type of those type of drugs,
6 yes.  Schedule 3, 2s.
7    Q.    And those would all be considered
8 prescription opioids?
9    A.    Correct.
10    Q.    And when we're speaking more
11 generally about opioids, what is your
12 understanding about what the term "opioids"
13 encompasses?
14    A.    Ma'am, my view of opioids, what that
15 means, is what we just talked about.
16    Q.    Okay.  So it includes the
17 prescription pills?
18    A.    Correct.
19    Q.    Does it also include heroin?
20    A.    Those are street drugs, which I do
21 not do.  Now, I should say that's unless they
22 get caught up in a case that I do.  For example,
23 people will trade prescription drugs for heroin.
24 So in a case that I have, heroin might come up
25 in those circumstances.

Page 33

1    Q.    I see.
2        To your knowledge, is heroin
3 considered an opioid?
4    A.    I'm not -- I'm not a doctor.  I'm
5 not a pharmacologist.
6    Q.    So you don't know?
7    A.    Generally speaking, I would say
8 heroin fits into the opioid classification.
9    Q.    Okay.  Does methamphetamine fit into
10 the classification opioid?
11        MR. SPELLACY:  Objection.
12    A.    I don't know that.  I don't think
13 so.  I don't know that.
14    Q.    Does fentanyl?
15        MR. SPELLACY:  Objection.
16    A.    I would say fentanyl does.
17    Q.    How about carfentanil?
18        MR. SPELLACY:  Objection.
19    A.    Same.  And, again, I'm not a
20 pharmacist, so I don't know.
21    Q.    Is cocaine considered an opioid?
22        MR. SPELLACY:  Objection.
23    A.    Again, I'm not a pharmacist, but I
24 would not consider cocaine to be an opioid.
25    Q.    And how about marijuana?  When we're

9 (Pages 30 - 33)

Page 34

1  talking about opioids, would you consider
2  marijuana included?
3      A.   No.
4      Q.   Does your office provide any
5  training programs related to opioids?
6      A.   I don't know that.  I don't -- I
7  don't know.
8      Q.   You mentioned earlier that you had
9  attended a number of different training seminars
10 related to drugs and even to prescription
11 opioids specifically.
12     A.   Correct.
13     Q.   Were any of those training seminars
14 funded by your office?
15     A.   No.
16     Q.   Were any of them funded by Cuyahoga
17 County generally?
18     A.   Not that I know of.
19     Q.   To your knowledge, does your office
20 provide any training relating specifically to
21 prescription opioids?
22     A.   Only within our unit.
23     Q.   And what training is available
24 within the economic crimes unit?
25     A.   It's just that when I get a case, I

Page 35

1  will train a younger prosecutor how to do these
2  cases.
3      Q.   Okay.  So would you characterize
4  that as informal on-the-job training?
5      A.   Yes.
6      Q.   Which opioids have you had personal
7  experience with in your work as a prosecutor?
8           MR. SPELLACY:  Objection.
9      A.   Geez.  All the oxycodone
10 derivatives, hydromorphone.  Is that Dilaudid?
11 Oh, God.  What else?  Those are the ones that
12 come to mind right now.
13     Q.   And you've referred specifically to
14 prescription opioids.  Have you had any personal
15 experience in your work as a prosecutor with
16 heroin?
17     A.   Just, like I said, if it's a -- if
18 it comes up in a prescription case.
19     Q.   Okay.
20     A.   But we have a specific unit that
21 does all the street drugs.
22     Q.   And you don't deal -- you don't
23 prosecute those crimes that involve just heroin?
24     A.   Unless it comes up within my case.
25     Q.   Which would also be a case that

Page 36

1  involves prescription opioids?
2      A.   Yes.
3      Q.   And what about fentanyl or
4  carfentanil?
5      A.   Same thing.
6      Q.   They would be handled by the
7  separate unit unless the case also involves
8  prescriptions?
9      A.   Yes, unless there's an over --
10     Q.   Are there any prescription opioids
11 that you've heard of but have not encountered in
12 your work?
13     A.   I've never had a case with
14 carfentanil yet.
15     Q.   With carfentanil you said?
16     A.   Yes.
17     Q.   Based on your knowledge as a
18 prosecutor, are there some opioids that are
19 never lawful to possess?
20          MR. SPELLACY:  Objection.
21     A.   Prescription drugs you're allowed to
22 possess in the right circumstances.
23     Q.   And are there some opioids, like
24 heroin, that are never lawful to possess?
25     A.   Yes.

Page 37

1      Q.   Are there some kinds of opioids that
2  people in the community legitimately possess and
3  use --
4           MR. SPELLACY:  Objection.
5      Q.   -- by prescription?
6      A.   By prescription, yes.
7      Q.   Are there circumstances under which
8  possession of Vicodin or oxycodone would not be
9  treated as a crime?
10          MR. SPELLACY:  Objection.
11     A.   Ask that question again.
12     Q.   Are there circumstances in which
13 someone is possessing, let's say, Vicodin --
14     A.   Okay.
15     Q.   -- and it would not be treated as a
16 crime?
17     A.   Yes.
18     Q.   There are many such instances,
19 right?
20     A.   Yes.
21     Q.   And that's because the Food and Drug
22 Administration and the DEA has allowed Vicodin
23 to exist due to its medical benefit?
24          MR. SPELLACY:  Objection.
25     A.   Yes.  It's a scheduled drug.

10 (Pages 34 - 37)

Page 38

1     Q.   Do you know what medically
2  appropriate uses for prescription opioids are?
3          MR. SPELLACY:  Objection.
4     A.   Ask me that question again.
5     Q.   Based on your experience prosecuting
6  cases that involve prescription opioids --
7     A.   Yes.
8     Q.   -- what is your understanding of
9  some medically appropriate and legitimate uses
10  for prescription opioids?
11     A.   Cancer, palliative care.  In certain
12  situations, chronic, benign pain, in very rare
13  circumstances.
14     Q.   And you don't disagree that people
15  who are experiencing extreme pain deserve to
16  have that pain treated, do you?
17     A.   Oh, no.  They should treat it, yes.
18     Q.   In fact, it would be tragic to keep
19  someone who was terminally ill, in the final
20  days of their life, from accessing medicine,
21  right?
22          MR. SPELLACY:  Objection.
23     A.   That would be horrific.
24     Q.   Now, there are circumstances in your
25  work where you would treat the possession of a

Page 39

1  prescription opioid as a crime, correct?
2     A.   Correct.
3     Q.   In your role as a prosecutor, how do
4  you distinguish between the lawful possession
5  and use of a prescription opioid?
6     A.   It's contextual.
7     Q.   Tell us more about that.
8     A.   Well, you're only allowed to have a
9  prescription for a legitimate medical purpose
10  with a bona fide doctor/patient relationship, so
11  you have to be able to get a prescription
12  lawfully, and that lawfully is defined in
13  federal codes and state codes.  So I go by what
14  the law says and put it into particular context
15  to determine whether it's lawful or not.
16     Q.   Okay.  So patients can only legally
17  obtain prescription opioids if they have a valid
18  prescription from a licensed doctor, right?
19     A.   It has to be lawful.  Just can't get
20  a prescription from a doctor because it could
21  be -- because the statute says lawful
22  prescription.
23     Q.   So the licensed doctor can only
24  prescribe it for a legitimate medical need,
25  right?

Page 40

1     A.   That's correct.
2     Q.   Okay.  In the investigations that
3  you've conducted involving prescription opioids,
4  have you found it difficult to determine whether
5  or not a doctor has written an opioid
6  prescription for a legitimate medical purpose?
7          MR. SPELLACY:  Objection.
8     A.   Is it difficult for me to determine
9  that?  Not really.
10     Q.   Okay.  Do you encounter any
11  challenges in those types of cases?
12          MR. SPELLACY:  Objection.
13     A.   Of course it's always a challenge,
14  okay.  But again, it's all contextual, ma'am.
15  We're talking generally speaking.  All I can
16  give you is general answers.
17     Q.   Okay.  Is one of the challenges that
18  the doctor/patient medical information is
19  confidential information?
20     A.   No, because we can get to the
21  medical records in the State of Ohio.
22     Q.   And what process do you have to
23  undertake to obtain private medical records?
24     A.   A search warrant.
25     Q.   So you need a search warrant.  And

Page 41

1  what do you need to establish to obtain a search
2  warrant?
3     A.   Probable cause.
4     Q.   So you have to establish probable
5  cause and effectuate a search warrant before you
6  can get your hands on those confidential
7  documents?
8     A.   Absolutely, unless the patient gives
9  us consent to go get the medical record.
10     Q.   In addition to having to undertake
11  that process to obtain the records, you can't
12  easily know what a doctor saw or didn't see that
13  would have led him to write a prescription?
14     A.   That is correct.
15     Q.   And even if you do know, it can be
16  challenging in a court of law to try to
17  second-guess a doctor's medical opinion, right?
18          MR. SPELLACY:  Objection.
19     A.   No, not really.
20     Q.   You don't think it's challenging?
21     A.   No, because in those circumstances,
22  it's pretty obvious what a doctor is doing based
23  upon all the circumstantial evidence that we
24  have developed.
25     Q.   Okay.  You have to enlist the help

11 (Pages 38 - 41)

Page 42

1 of an expert to testify as to the medical
2 decisions, correct?
3     A.   That's correct.  We engage experts,
4 you are right.
5     Q.   Are there situations in which people
6 engage in perfectly lawful use of opioids that
7 still cause problems for your office --
8     A.   No.
9     Q.   -- such as addiction or overdoses?
10         MR. SPELLACY:  Objection.
11     A.   Well, see, you just switched the
12 question there.  You asked me something
13 different than what you just followed up on.
14     Q.   So I'll rephrase my question --
15     A.   Okay.
16     Q.   -- so that you're clear because I
17 want to make sure I'm clear.
18     A.   Please.
19     Q.   Are there situations in which people
20 may engage in perfectly lawful uses of opioids
21 but still cause problems because they
22 accidentally overdose, for example?
23         MR. SPELLACY:  Objection.
24     A.   Yeah, that could happen.
25     Q.   And when that happens, does it cause

Page 43

1 any additional work or problems for your office?
2         MR. SPELLACY:  Objection.
3     A.   That's a difficult question to
4 answer.  Somebody overdoses, does that cause a
5 problem to our office?  Well, if there's
6 something illegal surrounding that, then yeah,
7 that would cause problems; otherwise,
8 unfortunately, that would be the medical
9 examiner's problem, having to look at a dead
10 body.
11     Q.   Does your department do any
12 information collection focused on the question
13 of what portion of its work or duties relate to
14 improper uses of lawfully prescribed opioids?
15     A.   I have no idea what you just asked
16 me, okay.  If you could explain that.
17     Q.   Does your office attempt to track
18 how much of its work relates to conduct that
19 happened from improper use of a lawfully
20 prescribed opioid?
21     A.   Not that I know of.
22     Q.   Have you had any personal
23 experiences in your life that affect your
24 feelings or your beliefs about prescription
25 opioids?

Page 44

1         MR. SPELLACY:  Objection.
2     A.   Well, that's a loaded question.
3 What do you mean by that?
4     Q.   So I'm asking if you've had any
5 personal experiences in life that affect the way
6 that you think about prescription opioids.
7         MR. SPELLACY:  Objection.
8     Q.   The way that you approach your --
9 your work.
10         MR. SPELLACY:  Objection.
11     A.   I really don't know how to answer
12 that question because we're all basically a sum
13 of all of our experiences.  We can't sit there
14 and forget about things that happened to us.
15 But how does it affect my work?  I wouldn't say
16 any of my personal experiences affected my work.
17 I've had personal experiences in this area that
18 -- how should I say -- that saddened me, okay,
19 but it hasn't affected the way I approach my
20 job.
21     Q.   Fair enough.
22         During your career as a prosecutor
23 in Cuyahoga County, have you ever known a time
24 when abuse of drugs was not a significant
25 problem for the county?

Page 45

1         MR. SPELLACY:  Objection.
2     A.   Was not a significant problem, no.
3     Q.   Drugs have always been a significant
4 problem for the county?
5         MR. SPELLACY:  Objection.
6     A.   I would assume for the whole
7 country.
8     Q.   And as you sit here today, what is
9 the most significant drug problem facing
10 Cuyahoga County?
11         MR. SPELLACY:  Objection.
12     A.   Look.  You know, I'm an individual
13 looking at this through only one lens.  I don't
14 have the big lens.  So I can't really answer
15 that question because I'm just looking at the
16 prescription side of it, the practitioner side
17 of it.
18     Q.   Based on your experience in the
19 prosecutor's office, are you aware of which type
20 of drug poses the most significant problem to
21 the county here today in 2019?
22         MR. SPELLACY:  Objection.
23     A.   I could tell you what the
24 significant prescription drugs are, but I
25 couldn't tell you the street drugs because I

12 (Pages 42 - 45)

Page 46

1 don't do those, and I can't tell you if the
2 prescription drugs are -- never mind.
3     Q.  Do you know which drugs have been
4 most prevalent in the county in the last two
5 years?
6         MR. SPELLACY:  Objection.
7     A.  You just mean all drugs?
8     Q.  Yes.
9     A.  I couldn't -- I couldn't give you an
10 answer on that.
11    Q.  You don't know?
12    A.  No.  I could speculate, but I don't
13 have the numbers in front of me and can say so
14 many heroin, so many fentanyl, so many
15 OxyContin, so many -- I don't have that
16 information.
17    Q.  You don't know.
18        Would it surprise you to learn that
19 crack is the leading drug of choice in Cuyahoga
20 County currently?
21        MR. SPELLACY:  Objection.
22    A.  I don't have personal knowledge of
23 that.
24    Q.  But that does not defer with your
25 personal experience working in the office?

Page 47

1         MR. SPELLACY:  Objection.
2     A.  There's always been that issue of
3 drugs in our office.
4     Q.  Do you know how long cocaine has
5 been a problem for Cuyahoga County?
6         MR. SPELLACY:  Objection.
7     A.  Again, I can't sit here and -- I
8 don't have those specific numbers.  You want me
9 to speculate and assume.  I don't want to do
10 that.
11    Q.  Well, here's a question.  So you've
12 been with the county for more than three decades
13 now.
14    A.  Correct.
15    Q.  In your time with the county, has
16 cocaine always been a problem?
17        MR. SPELLACY:  Objection.
18    A.  I would agree.
19    Q.  And in your time with the county,
20 when has methamphetamine been a problem?
21        MR. SPELLACY:  Objection.
22    A.  I don't know.  I really haven't
23 dealt with methamphetamine.
24    Q.  Do you have any knowledge or any
25 statistical information that would allow you to

Page 48

1 determine how many Cuyahoga residents died each
2 week due to a drug overdose?
3     A.  I don't have that, no.  I know it
4 increased in the last few years.
5     Q.  Over what years did it increase?
6     A.  I would say starting about '14, '15
7 is when I started to notice more dead bodies
8 than usual.
9     Q.  And is this based on your review of
10 statistics and data or your experience in
11 individual cases?
12    A.  Just looking at the media and
13 talking to people in my office.
14    Q.  Okay.  And based on those
15 conversations and the media reports, what's your
16 understanding of how -- which drug or drugs were
17 responsible for the increase that you believe
18 occurred in 2014?
19    A.  My understanding is that there's
20 certain laws and regulations been passed in the
21 last few years to decrease the number of opioid
22 prescriptions and opioids on the street, and as
23 a result, people are starting to turn to heroin
24 and fentanyl and that's what's killing them.
25 But that's my understanding of what's going on

Page 49

1 on the streets right now.  There's been laws,
2 like I said, passed that have reduced the number
3 of scrips that can be written, and people are
4 getting addicted to the opioids, and then they
5 go to the street drugs when they can't get the
6 opioids, prescription opioids I should say.
7     Q.  And, again, is that understanding
8 based on any statistical analysis or research?
9     A.  No.  That is talking to my -- my
10 officers on the street.
11    Q.  Do you know which drugs were the
12 major focus of your office over the last 15
13 years?
14        MR. SPELLACY:  Objection.
15    A.  Again, I'm only a little compartment
16 here with prescription drugs, so I couldn't give
17 you the answer to that question.
18    Q.  Do you know if the top priority for
19 your office is targeting criminal drug dealers
20 who are illegally selling heroin and fentanyl?
21        MR. SPELLACY:  Objection.
22    A.  I would assume that's one of our
23 tasks that we prioritize.
24    Q.  But you don't know if it's the top
25 priority for your office?

13 (Pages 46 - 49)

Page 50

1    A.   Exactly.  I don't know if it's the
2  top one.
3    Q.   And no one in your office has
4  communicated to you the top drug priorities?
5         MR. SPELLACY:  Objection.
6    A.   No.
7    Q.   At any point during your tenure at
8  the office?
9    A.   No.
10        MR. SPELLACY:  Someone on the phone
11  is making some noise, so if you could mute your
12  phone, please.  Thank you.
13    Q.   As far as you know, when was the
14  first time that someone overdosed on opioids in
15  Cuyahoga County?
16    A.   I don't know the answer to that
17  question.
18    Q.   Do you know the first time when
19  someone overdosed on prescription opioids
20  specifically?
21        MR. SPELLACY:  Objection.
22    A.   I don't know the answer to that
23  question.
24    Q.   When was the first time your office
25  considered filing charges in an opiate-related

Page 51

1  prosecution?
2         MR. SPELLACY:  Objection.
3    A.   I don't know the answer to that
4  question.  I don't know anybody who would.
5    Q.   And when was the first time your
6  office considered filing charges in a
7  prescription opioid case?
8         MR. SPELLACY:  Objection.
9    A.   Again, all I can tell you is what I
10  have -- what my experience was since basically
11  1989, when I started doing practitioners.
12    Q.   When was the first time you filed a
13  prosecution related to prescription opioids?
14    A.   Early '90s.
15    Q.   Were prescription opioids a problem
16  in the early '90s?
17        MR. SPELLACY:  Objection.
18    A.   Absolutely.
19    Q.   And what kind of problem were they
20  posing in the 1990s in Cuyahoga County?
21    A.   When OxyContin came out, it was --
22  it was like a jailbreak.  It just exploded.
23    Q.   And when did that occur?
24    A.   The late '90s, when OxyContin first
25  went on the market.  It was unbelievable what

Page 52

1  was happening out in the streets.
2    Q.   Can you describe in more detail what
3  was happening on the streets in the late '90s?
4         MR. SPELLACY:  Objection.
5    A.   Oh, OxyContin was just -- forget
6  about heroin and fentanyl.  Well, fentanyl
7  wasn't even around.  But that was the drug to
8  get, especially, I believe, with the 80
9  milligram.  It was going for a dollar a
10  milligram.  So one pill was going for 80 bucks,
11  and that was causing all sorts of issues.
12    Q.   And how do you know this?  What's
13  the basis?
14        MR. SPELLACY:  Objection.
15    A.   From my personal experience from
16  prosecuting those cases.
17    Q.   Would you say that OxyContin then
18  was the drug of choice in the late 1990s in
19  Cuyahoga County?
20    A.   Absolutely.
21        MR. SPELLACY:  Objection.
22    A.   And you got to understand something.
23  There is a subset of individuals out there that
24  just want the prescription drugs.  So yes, that
25  was the choice of drug for that subsection of

Page 53

1  addicts who want prescription drugs.  That was
2  it.
3    Q.   And when you're describing the
4  subsection of addicts, are you talking about
5  people who are -- who have an addictive
6  personality?
7    A.   I'm talking about people whose drugs
8  of choice, because they're addicts, are
9  prescriptions.  I've talked to many of these
10  individuals, and they like to have prescription
11  drugs because they know the quality of the drug
12  and what they're getting as opposed to out on
13  the street sometimes you don't know what you're
14  getting, but there is a subsection of addicts
15  that just do prescription drugs.
16    Q.   In your experience, that posed a
17  significant problem to the county in the late
18  1990s?
19    A.   And moving forward.
20        MR. SPELLACY:  Objection.
21    Q.   How many such cases did you
22  encounter in the late 1990s involving
23  prescription opioid abuse?
24    A.   Well, you have to be specific.
25  Again, I go after the doctors, okay, so there

14 (Pages 50 - 53)

Page 54

1 are a number of doctors I prosecuted in the '90s
2 for opioid prescription abuse.
3          MR. SPELLACY:  At your next line of
4 questioning, when you change, can we take a
5 break, whenever you change?
6          MS. WOODS:  Sure.  We can take a
7 break now.  Let's go off the record.
8          THE VIDEOGRAPHER:  Off the record at
9 10:27.
10          (Recess had.)
11          THE VIDEOGRAPHER:  On the record,
12 10:35.
13 BY MS. WOODS:
14      Q.    So before we broke you were
15 discussing the noticeable surge in prescription
16 opioid abuse in the late 1990s.
17      A.    Um-hum.
18          MR. SPELLACY:  Objection.
19      Q.    Did the number of prescription
20 opioid prosecutions or investigations start to
21 increase at that time?
22          MR. SPELLACY:  Objection.
23      A.    I can't really say if they did or
24 not because it's all a matter of resources.
25      Q.    So, to your knowledge -- and I

Page 55

1 understand you were in the economic crime unit
2 from the mid-1990s onward, correct?
3      A.    Um-hum.  Yes, ma'am.
4      Q.    So you were in the unit that
5 prosecuted prescription drug crimes, right?
6      A.    I was the one that did the doctors,
7 not just prescriptions but just the doctors.
8      Q.    Okay.  So how many people are in
9 that unit, how many prosecutors?
10      A.    Now?
11      Q.    Yes.
12      A.    Six.
13      Q.    And of those six prosecutors, how
14 many focus on prescription opioid crimes?
15      A.    I'm the one that does the
16 practitioners.
17      Q.    Okay.  So you focus on
18 practitioners.  Do any of the other prosecutors
19 focus on prescription opioid prosecutions?
20      A.    There's a prosecutor that does just
21 the nurses.
22      Q.    And what is that prosecutor's name?
23      A.    Right now it's -- I think it's Paul
24 Soucie.  I did nurses for years until I handed
25 it off.

Page 56

1      Q.    Do other prosecutors within the
2 economic crime unit focus on prescription opioid
3 prosecutions?
4      A.    I'm sure now and then they'll do a
5 nurse or something like that, but I'm the guy
6 that does the practitioners.
7      Q.    Okay.
8      A.    Let me qualify that answer by saying
9 there could be a point in time where one of the
10 people in the unit will do a prescription ring,
11 or something like that, with my guidance.
12      Q.    Okay.  And then talking about the
13 broader office, the entire prosecutor's office,
14 within that office how many prosecutors work on
15 cases involving prescription opioid crime?
16          MR. SPELLACY:  Objection.
17      A.    Again, you're talking about a broad
18 question, and, again, I couldn't tell you
19 because a lot of the cases go into general
20 felony.  If they don't rise to a certain level
21 of complexity, our unit does not do that.
22      Q.    And how many prosecutors make up the
23 general felony unit?
24      A.    I couldn't tell you.  I don't know
25 the number.  It would have to be over a hundred.

Page 57

1      Q.    And of those hundred prosecutors, do
2 you know how many focus on crimes related to
3 prescription opioids?
4      A.    You say "focus," ma'am.  That's
5 disingenuous because they take all cases that go
6 into certain courtrooms.  Now, some of the cases
7 could be -- have prescriptions, but nobody
8 focuses just on that particular area, okay.
9      Q.    Okay.  I'm asking you questions.
10 I'm not intending to communicate statements or
11 be disingenuous, so my question was whether or
12 not they focus on it, and if they don't focus,
13 you can go ahead and tell me that.
14      A.    And I'm telling you the word that
15 you used, "focus," is inappropriate as far as
16 the question you're asking me, because nobody
17 focuses just on prescription drugs in general
18 felony, okay.  It's part of their job.
19      Q.    I will rephrase my question.
20      A.    Okay.
21      Q.    Of the hundred plus prosecutors in
22 the general felony unit, how many focus, not
23 necessarily exclusively, on crimes related to
24 prescription opioids?
25      A.    I don't know.

15 (Pages 54 - 57)

1          MR. SPELLACY:  Objection.
2     Q.    How does the number of prescription
3 opioid crimes prosecuted by your office in the
4 late 1990s compare to the early 1990s?
5          MR. SPELLACY:  Objection.
6     A.    I couldn't quantify that for you.
7     Q.    Am I correct that you noticed a
8 surge in prescription drug crime in the late
9 1990s?
10          MR. SPELLACY:  Objection.
11     A.    I noticed a surge in the -- in
12 the -- what's the word I'm looking for -- in the
13 wanting of a certain drug, which was OxyContin.
14     Q.    And what sources of data informed
15 you of that?
16     A.    Again, just my experience of talking
17 to the officers on the streets.
18     Q.    Which specific officers did you
19 speak to?
20     A.    Back in the '90s?
21     Q.    Yes.
22          MR. SPELLACY:  Objection.
23     A.    There were individuals that are
24 retired now.  I could give you some names of
25 people that worked back in the '90s.  Bob Cole,

1 who was a diversion supervisor of the pharmacy
2 board, Jim Rye, Lynn Mudra.  Those are the names
3 that come to my mind.
4     Q.    And who did Jim Rye work with?
5     A.    All pharmacy board investigators.
6     Q.    Apart from those three individuals,
7 were there any other sources that you recall
8 speaking with?
9     A.    Yeah, but I don't know their names.
10 Local law enforcement people.
11     Q.    How many such people --
12          MR. SPELLACY:  Objection.
13     Q.    -- approximately?
14     A.    I'd say a handful.
15     Q.    And what steps did your office take
16 to deploy resources toward prescription drug
17 work in the late 1990s?
18          MR. SPELLACY:  Objection.
19     A.    The only thing I can tell you is if
20 we were doing a practitioner and we needed to
21 hire an expert, then we got money to hire an
22 expert.
23     Q.    Are you aware of any other resources
24 that were deployed in reaction to the surge in
25 prescription drug crime?

1     A.    Not to my knowledge.
2     Q.    Did your office increase the number
3 of prosecutors to address the increase?
4     A.    Not to my knowledge.
5     Q.    And in the years that followed, in
6 the early 2000s, are you aware of whether the
7 number of prosecutors intended to work on
8 prescription drug crimes increased?
9          MR. SPELLACY:  Objection.
10     A.    Not to my knowledge.
11     Q.    Are you aware of any other steps
12 your office took at that time to deploy
13 resources toward prescription opioid work?
14          MR. SPELLACY:  Objection.
15     A.    Not that I know of.
16     Q.    When you first learned about the
17 issues with OxyContin and other prescription
18 drugs, with whom did you discuss your concerns
19 within your office?
20     A.    It would be my immediate supervisor.
21     Q.    And who was that at the time?
22     A.    Paul Soucie.
23     Q.    Did you discuss your concerns
24 outside your office?
25     A.    Just with the investigators that I

1 worked with.
2     Q.    And what were their names?
3     A.    Again, ma'am, I could tell you right
4 now I'm very bad with names, so the three that I
5 mentioned to you are the ones that stand out,
6 but I'm sure there's a handful of other
7 individuals that I worked with during that
8 period of time.  I can't remember their names.
9     Q.    Understood.
10          What would you say your office's
11 first efforts were in response to the
12 prescription drug crime?
13          MR. SPELLACY:  Objection.
14     A.    What period of time?
15     Q.    When your office first noticed the
16 prescription drug issue.
17          MR. SPELLACY:  Objection.
18     A.    Well, you're framing it -- your
19 question is framing -- you're assuming certain
20 things, okay.  There has always been an issue
21 with drugs.  There's always been an issue with
22 prescription drugs.
23     Q.    I see.
24     A.    There's always been an issue with
25 bad doctors, okay.

16 (Pages 58 - 61)

Page 62

1    Q.   Even before the late 1990s?
2    A.   I would assume that.
3         MR. SPELLACY:  Objection.
4    A.   I don't know.  But I can tell you
5 from this, from right now, all the way back,
6 there's always been an issue, and the issue has
7 been -- how should I say -- aggravated in the
8 last three or four years because of all the dead
9 bodies that are showing up.
10    Q.   And I want to make sure I'm
11 understanding what you're saying.  So when
12 you're talking about the issue and it, what are
13 you talking about?
14    A.   I'm talking about the issue became
15 more of a crisis in the last three or four years
16 because of the number of people that are dying.
17 We didn't have these number of people dying in
18 the late '90s and early 2000s, but from like
19 2014, '15, all the sudden we're getting a ton of
20 dead bodies, and we didn't have those dead
21 bodies before.
22    Q.   Okay.  When did you recall first
23 bringing a prosecution against a doctor for
24 unlawfully prescribing a prescription opioid to
25 a patient who didn't need it?

Page 63

1    A.   I would say in the early '90s.
2    Q.   Do you recall a specific case?
3    A.   No, I don't, because I -- I've done
4 so many doctors, I only can remember a couple.
5    Q.   When did you first bring a
6 prosecution against an individual who forged a
7 prescription opioid, if you have ever done so?
8    A.   Yeah, I've done that.  I would say,
9 again, in the early '90s.
10    Q.   And do any defendant names come to
11 mind?
12    A.   No.
13    Q.   When did you first bring a
14 prosecution against an individual in possession
15 of prescription opioids without a valid medical
16 prescription --
17         MR. SPELLACY:  Objection.
18    Q.   -- if ever?
19    A.   You just -- could you repeat the
20 question?
21    Q.   When, if ever, did you first bring a
22 prosecution against an individual who was in
23 possession of a prescription opioid who didn't
24 actually have a valid prescription for that
25 drug?

Page 64

1    A.   For that opioid, okay.  Again, in
2 the early '90s.
3    Q.   And do you recall the defendant's
4 name?
5    A.   No, I don't, ma'am.
6    Q.   When did you first bring a
7 prosecution against an individual who stole a
8 prescription opioid?
9    A.   Stole the prescription or the
10 opioid?
11    Q.   Stole the prescription opioid drug.
12    A.   So somebody who stole an opioid
13 drug?
14    Q.   Yes.
15    A.   He didn't get the drug and buy a
16 prescription but he just got the opioid itself
17 without the prescription?
18    Q.   Precisely.
19    A.   I would say in the early '90s, too.
20    Q.   When was the first time you brought
21 a prosecution against an individual who
22 illegally sold a prescription opioid?
23    A.   Again, in the early '90s.
24    Q.   And when was the first time you
25 brought a prosecution against an individual who

Page 65

1 stole a prescription pad?
2    A.   I would say sometime in early '90s
3 again.
4    Q.   When did -- do you recall the
5 defendant's name --
6    A.   No, I don't.
7    Q.   -- in any of these?
8    A.   No, I don't, ma'am.
9    Q.   When did you first bring a
10 prosecution against a pharmacy for illegally
11 operating a pill mill?
12    A.   I've never prosecuted a pharmacy for
13 operating a pill mill.
14    Q.   Okay.  And what do you understand a
15 pill mill to mean?
16    A.   My understanding of a pill mill is a
17 doctor that writes prescriptions unlawfully on a
18 regular and routine basis.
19    Q.   When did you first bring a
20 prosecution, if ever, against a pharmacist for
21 unlawfully dispensing prescription opioids?
22    A.   I've never prosecuted a pharmacist
23 for opioids; for amphetamines but not opioids.
24    Q.   When did you first bring a
25 prosecution, if ever, against a licensed

17 (Pages 62 - 65)

Page 66

1 distributor of prescription drugs?
2     A.   Never have.
3     Q.   You mentioned that, as prescription
4 drug crime increased, your office deployed
5 resources enabling you to hire expert witnesses.
6     A.   In certain particular cases, yes.
7     Q.   Okay.  What does your office
8 otherwise do to respond to the prescription drug
9 abuse in the county?
10    A.   We are --
11        MR. SPELLACY:  Objection.
12    A.   We are reactive.  We're not
13 proactive.  So when we get complaints regarding
14 certain, mostly, doctors, or maybe a scrip ring
15 who stole prescriptions, then we react, then we
16 deploy resources to investigate and prosecute
17 that case.
18    Q.   And, generally speaking, from whom
19 do those complaints come?
20    A.   We have complaints that come from
21 citizens, investigative agencies, specifically
22 pharmacy board and local -- local diversion
23 investigators in the Cleveland Police Department
24 and/or suburban police when we get complaints.
25    Q.   Sitting here today, can you think of

Page 67

1 any proactive steps your office has taken in
2 response to the prescription drug crime in the
3 county?
4        MR. SPELLACY:  Objection.
5     A.   Could you get more specific?  I
6 mean, I really -- that's a very broad question.
7     Q.   So I intend it to be broad because I
8 do want to try to know throughout your
9 experience if you recall any proactive measures
10 your office took.
11    A.   Besides going out and teaching
12 investigators how to do these cases, I can't
13 think of anything.
14    Q.   In your experience, are you aware
15 whether retail pharmacies have ever lodged
16 complaints that --
17    A.   Yes.
18    Q.   To your office?
19    A.   Yes.  We would get complaints from
20 retail pharmacists about what they would think
21 would be suspicious prescriptions, yes.
22    Q.   Approximately on how many such
23 occasions?
24    A.   I couldn't quantitate that, but
25 that's part of the reporting to us, pharmacists.

Page 68

1 In fact, that's their duty actually, obligation
2 under the law.
3     Q.   And what is their duty under the
4 law?
5     A.   They have to report to the pharmacy
6 board any time they think there's a suspicious
7 prescription, or law enforcement.
8     Q.   So we talked about a number of drugs
9 today.  Apart from the ones we've already
10 discussed, cocaine, heroin, prescription
11 opioids, what other drugs have been a problem in
12 Cuyahoga County?
13        MR. SPELLACY:  Objection.
14    A.   Again, this is all from my personal
15 perspective.  I can't think of any.
16    Q.   Okay.  I forgot we mentioned
17 methamphetamine.  Has that been a problem for
18 the county?
19        MR. SPELLACY:  Objection.
20    A.   I would assume.
21    Q.   You don't know that to be the case?
22    A.   I don't do the street drugs, but I
23 would assume that drug issues of that nature is
24 always a problem for any urban setting.
25    Q.   Okay.  Has marijuana been a problem

Page 69

1 for the county in your experience?
2     A.   Again, I don't do the street drugs
3 so I can't answer these questions, but just
4 general knowledge, people would think there's a
5 drug problem out there.
6     Q.   How about a drug called U-47700; are
7 you familiar with that drug?
8     A.   No.
9     Q.   What other prescription drugs that
10 are not opioids have posed a problem in Cuyahoga
11 County?
12        MR. SPELLACY:  Objection.
13    A.   Well, the only thing I can tell you
14 is what I've prosecuted, and I've prosecuted
15 doctors for illegal prescriptions of
16 phentermine.
17    Q.   What is phentermine?
18    A.   It's a stimulant that's used in
19 weight loss, okay, and back in late 1989, when I
20 did my first practitioner, that was amphetamines
21 for weight loss, but that's not an issue now
22 because you're not allowed to prescribe
23 amphetamines for weight loss.
24    Q.   Have there been issues with
25 prescription drug crimes related to Xanax?

18 (Pages 66 - 69)

Page 70

1    A.    Yes.
2    Q.    Related to steroids?
3    A.    Yes.
4    Q.    Have you prosecuted any such cases?
5    A.    Yes.
6    Q.    What percentage of your caseload
7 relates to prescription drugs as opposed to
8 other economic-related crimes?
9         MR. SPELLACY:  Objection.
10    A.    I would say 15 to 20 percent of my
11 caseload.
12    Q.    Currently, correct?
13    A.    Yes.
14    Q.    And of those prescription drug
15 crimes, what percentage relate to prescription
16 opioids as opposed to these other prescription
17 medicines?
18         MR. SPELLACY:  Objection.
19    A.    I would say 95 percent.  I can give
20 you an example, okay.  I haven't prosecuted
21 phentermine cases or diet cases until two years
22 ago, so from '89 until 2015, '16 there were no
23 cases that I saw regarding phentermines.  It was
24 all opioids.  So that's probably 99 -- 97
25 percent.

Page 71

1    Q.    Was your office prosecuting heroin
2 cases when you joined it 31 years ago?
3    A.    33, but yes.
4    Q.    33.  I'm sorry.  I don't want to
5 short-change you.
6    A.    That's right.  I'm an old guy.
7    Q.    But it was prosecuting heroin cases?
8    A.    I would assume, yes.
9    Q.    Was it prosecuting heroin cases
10 prior to OxyContin's release in the late '90s?
11         MR. SPELLACY:  Objection.
12    A.    I didn't understand that question.
13    Q.    Did your office continue to
14 prosecute heroin into the '90s?
15    A.    Yes.
16    Q.    And is your office continuing to
17 prosecute heroin crimes today?
18    A.    I would assume, yes.
19    Q.    Heroin has been around a long time,
20 correct?
21    A.    Yes.
22    Q.    Do you know how the use of heroin
23 has changed in your county over time?
24    A.    It's become cheaper and more readily
25 accessible.

Page 72

1    Q.    How do you know that?
2    A.    Dead bodies.
3    Q.    Please elaborate.
4    A.    Again, my understanding of what's
5 going on in the street in the last few years is
6 that because the opioids have been reduced on
7 the street, after people get addicted to the
8 opioids, they go to heroin, which is cheaper.
9    Q.    And you mentioned that that
10 understanding is based on conversations that
11 you've had?
12    A.    With the people on the front lines
13 that are out on the streets.
14    Q.    And what type of people are you
15 talking about?  Are you talking about police
16 officers?
17    A.    And diversion investigators, yes.
18    Q.    And with how many such individuals
19 have you discussed this topic?
20    A.    A dozen, people that I work with
21 over the years.
22    Q.    What types of heroin do you see on
23 the streets in Cuyahoga County?
24    A.    I can't answer that question.  I
25 don't do that.

Page 73

1    Q.    Do you know where the heroin -- what
2 is the source of the heroin on the streets in
3 Cuyahoga County?
4         MR. SPELLACY:  Objection.
5    A.    The only knowledge I have of that is
6 what I read in the paper.
7    Q.    Do you have any knowledge, based on
8 your experience and your conversations with
9 colleagues, on how the potency of heroin on the
10 streets today compares to the potency of heroin
11 in the 1970s?
12         MR. SPELLACY:  Objection.
13    A.    No personal knowledge of that.
14    Q.    Do you have any knowledge derived
15 from other conversations?
16    A.    Yes.
17    Q.    And what is your understanding?
18    A.    That it's more powerful and cheaper.
19    Q.    And how do you know that to be the
20 case?
21    A.    Again, from media and talking to my
22 investigators.
23    Q.    And in those conversations did you
24 also learn that international drug traffickers
25 are the primary source of the heroin problem in

19 (Pages 70 - 73)

Page 74

1 Cuyahoga County?
2         MR. SPELLACY:  Objection.
3     A.   Again, just from what I read in the
4 papers and see on TV.
5     Q.   Is that your understanding?
6     A.   That is my understanding.
7     Q.   Are you familiar with the "Let's
8 Face Heroin" campaign?
9     A.   No.
10    Q.   Have you heard of it?
11    A.   No.  First time I've heard of it.
12    Q.   Are you aware that between 2007 and
13 2013 deaths caused by heroin rose by nearly 400
14 percent according to your office?
15        MR. SPELLACY:  Objection.
16    A.   I just know that dead bodies started
17 to stack up in the last few years.
18    Q.   Do you know how the "Let's Face It
19 -- "Let's Face Heroin" campaign is funded?
20        MR. SPELLACY:  Objection.
21    A.   No.
22    Q.   Do you know -- you've never heard of
23 it so I won't go down this path.
24        In the event that it is not clear,
25 is the distribution of heroin a crime?

Page 75

1     A.   Yes, it is.
2     Q.   Is the possession of heroin a crime?
3     A.   Yes, it is.
4     Q.   Do you know what the penalty range
5 is for someone convicted of distributing heroin?
6 And I'm sure it depends on the amount.
7     A.   It depends on the amount.
8     Q.   But not depending on the amount,
9 what is the general --
10    A.   Well, you have five degrees of
11 felonies, okay, in the State of Ohio, so if you
12 have a low amount of heroin under a bulk amount,
13 it's a felony 5.  As you go -- have more, I
14 assume it would go all the way up to a felony 1
15 for Schedule 2 because that is a Schedule 2
16 drug.
17    Q.   And that's for distribution?
18    A.   Yes.
19    Q.   How about for possession of heroin?
20 How would the sentencing --
21    A.   It's the same way.  It's all based
22 on weight.
23    Q.   Do you know how many heroin-related
24 cases your office prosecuted in 2017?
25    A.   No.

Page 76

1     Q.   What percentage of the prescription
2 opioid cases you work on also involve heroin?
3     A.   What percentage?  That's hard to
4 answer -- it really is -- because within cases
5 people trade prescriptions itself or the
6 prescription drugs itself for heroin.  I've had
7 a few of those cases.  So I can't -- I can't
8 really put a percentage on it.
9     Q.   Would you be able to approximate how
10 many of your prescription drug prosecutions
11 involve only prescription drugs and not some
12 other drug like heroin?
13    A.   I would say 80 percent.
14    Q.   And you stated earlier you focus
15 primarily on the medical professionals, like the
16 doctors, and not on the individuals who might be
17 selling these drugs on the street?
18    A.   Unless it's an organized
19 prescription ring.
20    Q.   When did Cuyahoga County first begin
21 prosecuting suppliers of heroin with involuntary
22 manslaughter for overdose deaths?
23        MR. SPELLACY:  Objection.
24    A.   I don't know.
25    Q.   Do you know whether Cuyahoga County

Page 77

1 has ever prosecuted an individual -- a supplier
2 of heroin with manslaughter for an overdose
3 death?
4     A.   I have no personal knowledge of
5 that.
6     Q.   You have never prosecuted someone
7 for manslaughter?
8     A.   Yes, I have.
9     Q.   Related to overdose of prescription
10 opioids?
11    A.   Yes, I have.
12    Q.   In what case?
13    A.   That was the Dr. Dunifer case.
14    Q.   And when was that case?
15    A.   Geez, I don't know.
16        Either late '90s or early 2000s.
17    Q.   Are you able to approximate how many
18 cases you consider but decline to prosecute that
19 involve prescription opioids?
20        MR. SPELLACY:  Objection.
21    A.   In my particular context, going
22 after doctors, I can remember there have been
23 two cases that we did not -- declined to
24 prosecute after investigation.
25    Q.   Two cases total during your entire

20 (Pages 74 - 77)

Page 78

1  career with the office?
2      A.   Yes.
3      Q.   And why did you decline to prosecute
4  those two cases?
5          MR. SPELLACY:  Objection.
6      A.   Because the evidence was not there.
7      Q.   Has your office ever -- have you
8  ever declined to prosecute a crime involving
9  prescription opioids due to resource issues?
10     A.   No.
11     Q.   Does your office issue a declination
12 letter or any other record when it declines a
13 case?
14     A.   Sometimes we do, depending if we
15 talk -- if we have conversations with the
16 attorney pre-indictment.  If they want something
17 in writing, we'll put it in.
18     Q.   Okay.  And how are those letters or
19 records maintained?
20     A.   They're in the Justice Matters
21 system.  Everything should be scanned in under
22 that case.
23     Q.   And what about for cases prior to
24 2009; how would those records or letters
25 involving declinations be maintained?

Page 79

1      A.   I couldn't tell you.  I would put
2  things in the file, and whatever happened to the
3  file happened to the file.
4      Q.   So in your practice, you would
5  include any record of a declination inside the
6  physical case file?
7      A.   Right, but I can tell you that
8  rarely ever happened.
9      Q.   What's your understanding of what
10 fentanyl is?
11         MR. SPELLACY:  Objection.
12     A.   I don't really have a biological
13 understanding what the drug is; that it's just a
14 drug that is used to cut heroin and it's really
15 bad.
16     Q.   What's your understanding of what
17 carfentanil is?
18     A.   That's even worse.
19     Q.   And by "worse," do you mean more
20 potent?
21     A.   Yes.
22     Q.   And what's your understanding about
23 the potency of fentanyl relative to heroin?
24         MR. SPELLACY:  Objection.
25     Q.   Is it more, less or the same?

Page 80

1      A.   All I know is -- again, I'm not a
2  pharmacist.  I couldn't give you the -- all I
3  know from general information is that when they
4  cut heroin with fentanyl, it's a toxic mix.
5      Q.   Would you consider fentanyl and
6  carfentanil to be a significant problem in the
7  county?
8          MR. SPELLACY:  Objection.
9      A.   Again, you're asking me questions I
10 can't really give an answer on because I don't
11 do the street drugs.
12     Q.   So you don't have an opinion on the
13 matter?
14     A.   I have an opinion, but, you know --
15     Q.   In your opinion, are fentanyl and
16 carfentanil a significant problem for your
17 county?
18         MR. SPELLACY:  Objection.
19     A.   Like all drugs, I think it is, yes.
20     Q.   When did you first recognize
21 fentanyl to be a problem in your county?
22         MR. SPELLACY:  Objection.
23     A.   I don't know.
24     Q.   Are you familiar with a case from
25 2006 involving a defendant Melvin Edwards?

Page 81

1      A.   No.  It doesn't ring a bell.
2      Q.   To your knowledge, that's not a case
3  you worked on?
4          MR. SPELLACY:  Objection.
5      A.   I don't know.  I could have,
6  couldn't have.  I don't know.  I'd have to look
7  at the file.
8      Q.   Would reviewing the indictment
9  refresh your memory?
10     A.   It could.
11         - - - - -
12         (Thereupon, Gutierrez Deposition
13         Exhibit 1, Melvin Edwards
14         Indictment, Bates Numbered
15         CUYAH_000020887 - Marked
16         Confidential, was marked for
17         purposes of identification.)
18         - - - - -
19     Q.   I'm marking this as Exhibit 1.  This
20 appears to be the indictment of Melvin Edwards,
21 correct?
22     A.   Yes.
23     Q.   And does this Exhibit 1 refresh your
24 memory as to whether you personally worked on
25 this case?

21 (Pages 78 - 81)

Page 82

1     A.   I don't -- I don't know.  Does that
2  refresh my recollection -- and I don't believe I
3  did, but I can't be for sure.
4     Q.   Okay.  But this does appear to be an
5  indictment of a case brought by your office
6  against a defendant for illegal fentanyl
7  distribution, correct?
8     A.   Yes.
9     Q.   And it's dated October 5th, 2006?
10     A.   That is correct.
11     Q.   That's all I have for that document.
12          To your knowledge, has fentanyl use
13  in your county changed over time?
14          MR. SPELLACY:  Objection.
15     A.   I don't know that.
16     Q.   Are you familiar with something
17  called Ohio Drug Overdose Data Findings Report?
18     A.   No.
19          - - - - -
20          (Thereupon, Gutierrez Deposition
21          Exhibit 2, Multi-Page Document
22          Entitled "2015 Ohio Drug Overdose
23          Data General Findings," Beginning
24          Bates Number CUYAH_011231985 -
25          Marked Confidential, was marked for

Page 83

1          purposes of identification.)
2          - - - - -
3     Q.   Handing you what has been marked as
4  Exhibit 2 -- that's a report I just referenced
5  -- you don't receive these types of reports in
6  the regular course of your business?
7          MR. SPELLACY:  Objection.
8     A.   No, I do not.
9     Q.   This is a report dated 2015, and on
10  that first page it notes a significant rise in
11  fentanyl-related overdose deaths.
12     A.   Yes, I see that.
13          MR. SPELLACY:  Objection.
14     Q.   And if I could just direct your
15  attention to that first bullet point there in
16  the center of the page.  It reads,
17  "Fentanyl-related unintentional drug overdose
18  deaths in Ohio more than doubled from 503 in
19  2014 to 1,155 in 2015."
20          Did I read that correctly?
21          MR. SPELLACY:  Objection.
22     A.   Where you at?
23     Q.   The bullet point in the center of
24  the page, the very first bullet point.
25          MR. SPELLACY:  Have you read the

Page 84

1  statement correctly in a document he's never
2  seen before?
3          You can answer the question.
4     A.   So you're in the first bullet point?
5     Q.   Yes.
6     A.   Yes, I see that sentence.
7     Q.   Okay.  And based on your experience,
8  do you have any reason to disagree with the
9  finding in that report regarding the fentanyl --
10     A.   I don't have any personal knowledge
11  of this, so I -- so I can't -- how do you want
12  me to answer that?  Do you want me to agree to
13  something I don't know about?
14     Q.   I'm just trying to understand
15  whether or not you have a basis to agree or
16  disagree with that statement.
17     A.   I do not have a basis one way or the
18  other.
19     Q.   Okay.  In your experience as a
20  prosecutor -- and I'm not referring to the
21  document now.
22     A.   Okay.
23     Q.   -- are you aware of instances in
24  which a drug dealer has mixed heroin with
25  carfentanil or fentanyl?

Page 85

1     A.   I have never worked on a case like
2  that, but I know there are cases out there.
3     Q.   Are you aware of fentanyl or
4  carfentanil also being mixed with cocaine?
5     A.   Yes.
6     Q.   You've heard of that happening?
7     A.   Yes.
8     Q.   Are you aware that there was a spike
9  in the mix of cocaine and fentanyl in 2016 in
10  your county?
11          MR. SPELLACY:  Objection.
12     A.   I don't know that.
13     Q.   Are you aware that in 2016 roughly
14  half of cocaine overdose deaths contained
15  fentanyl?
16          MR. SPELLACY:  Objection.
17     A.   I don't know that.
18     Q.   What do you understand, based on
19  your conversations and in your work experience,
20  are the risks of mixing carfentanil with another
21  drug?
22     A.   Well, carfentanil, you can have just
23  a little speck and that will kill you, so
24  carfentanil is extremely potent.  Mixed with
25  anything it could be deadly.

22 (Pages 82 - 85)

Page 86

1    Q.    And in your experience and based on
2 what you've learned from colleagues, are there
3 situations where drug users are unaware that
4 carfentanil is actually included in the drug
5 they're ingesting?
6         MR. SPELLACY:  Objection.
7    A.    I don't know that.
8    Q.    You haven't heard of that happening?
9    A.    No.
10   Q.    Are you aware of instances in which
11 a drug dealer has disguised fentanyl as a
12 prescription opioid?
13        MR. SPELLACY:  Objection.
14   A.    No.
15   Q.    You haven't heard of that?
16   A.    Never heard of that one.
17   Q.    Are you aware of counterfeit pills
18 containing fentanyl being sold in Cuyahoga
19 County?
20   A.    No.
21   Q.    Are you aware of counterfeit
22 prescription drug pills being sold in Cuyahoga
23 County?
24   A.    Previously I have, yes.
25   Q.    And that's a crime, right?

Page 87

1    A.    Absolutely.
2    Q.    How difficult is it for law
3 enforcement to detect counterfeit pills at the
4 scene of an overdose?
5         MR. SPELLACY:  Objection.
6    A.    I'm not a police officer.  I
7 couldn't answer that.
8    Q.    Based on your conversations with
9 your colleagues and with police officers, do you
10 have any appreciation of the difficulty in
11 attempting to detect a counterfeit pill?
12   A.    In my experience, my investigators
13 are very experienced, so they can detect a
14 counterfeit drug pretty easily, a pill.
15   Q.    And who are those investigators?
16   A.    Again, the individuals that I work
17 with.
18   Q.    The three individuals you previously
19 named who work with the Board of Pharmacy?
20   A.    Yes, and the people now that I work
21 with, Board of Pharmacy and the local police
22 that I work with.
23   Q.    And they told you they had an easy
24 time identifying counterfeit pills?
25   A.    No.  Again, you're trying -- to me

Page 88

1 you're asking these broad questions, and in
2 specific instances I know previously in some
3 cases that I've had the police officer didn't
4 indicate to me they had any problems detecting
5 that pill is not a real OxyContin pill, for
6 example.
7    Q.    Are you aware that the majority of
8 fentanyl death reports result from illegally
9 produced and trafficked fentanyl, not from
10 diverted pharmaceutical fentanyl?
11        MR. SPELLACY:  Objection.
12   A.    I don't know that for a fact.
13   Q.    Is the sale of fentanyl and
14 carfentanil a crime?
15   A.    Yes.
16   Q.    Has your office prosecuted the sale
17 of fentanyl or carfentanil?
18   A.    Again, that's a different division.
19 I would assume that they have.
20   Q.    Do you know which prosecutor or
21 prosecutors have prosecuted cases involving
22 fentanyl or carfentanil?
23   A.    We have a major drug unit.  They do
24 those cases.
25   Q.    Can you think of any specific

Page 89

1 prosecutors who you know have handled those
2 types of cases?
3    A.    Well, the people in the major drug
4 unit, Mark Boler and Pat -- I've only worked
5 with the guy for 30 years.  I forget his last
6 name.  He's going to kill me.
7    Q.    That's okay.
8         Do you know the total number of
9 prosecutions your office has conducted that
10 involve fentanyl or carfentanil?
11   A.    No, I don't.
12   Q.    Do you know what the penalties are
13 for crimes involving fentanyl or carfentanil?
14   A.    I would generally speaking.
15   Q.    Generally --
16   A.    What the drug statutes are, what the
17 penalties are for drugs, and based on weight.
18   Q.    And what are those?
19   A.    Again, felony 5 through felony 1,
20 depending on the bulk amount.
21   Q.    Do you know what amounts might lead
22 to a particular sentencing range?
23   A.    Yes, bulk amounts.  Legislature has
24 determined a certain amount of a drug is a bulk
25 amount.  Once you get over a bulk amount, then

23 (Pages 86 - 89)

Page 90

1 the penalties increase.
2    Q.   And do you know the bulk amounts for
3 fentanyl?
4    A.   No, I don't.
5    Q.   Are you aware of any deaths linked
6 to carfentanil?
7        MR. SPELLACY:  Objection.
8    A.   I -- no, I'm not aware of it.
9    Q.   How about fentanyl?
10       MR. SPELLACY:  Objection.
11   A.   Same answer.
12   Q.   I asked you earlier if you were
13 familiar with a drug called U-47700.
14   A.   Correct.
15   Q.   And you said no.
16   A.   Correct.
17   Q.   Do you know whether it's a crime to
18 possess or distribute U-47700 in Ohio?
19       MR. SPELLACY:  Objection.
20   A.   I have no knowledge of that, what
21 that is, so I can't answer any questions on
22 that.
23   Q.   Do you recall around May of 2016 the
24 governor of the state taking action to ban a
25 dangerous synthetic opioid called U-47700?  Does

Page 91

1 that refresh your memory?
2        MR. SPELLACY:  Objection.
3    A.   No.
4    Q.   Do you know how many opioid
5 prescriptions were written for Cuyahoga County
6 residents in 2018?
7        MR. SPELLACY:  Objection.
8    A.   No.
9    Q.   How about in any additional year?
10       MR. SPELLACY:  Objection.
11   A.   I did get some numbers a year or two
12 ago from the DEA -- or was it the pharmacy
13 board -- no -- the pharmacy board -- about the
14 number of prescriptions in Cuyahoga County.
15   Q.   So, to your knowledge, does the
16 Board of Pharmacy have a way of tracking the
17 total number of prescription opioid
18 prescriptions in the county?
19   A.   Yes.
20   Q.   Do you know how they track that?
21   A.   You know, I don't know if it's the
22 Board of Pharmacy or DEA that I got those
23 numbers from.
24   Q.   And what numbers were you provided?
25   A.   Just the number of prescriptions

Page 92

1 that were coming into Cuyahoga County for a
2 couple of years.
3    Q.   And do you recall what the total
4 number or what years it covered?
5    A.   No, I don't.  I have those at my
6 office somewhere.
7    Q.   If you wanted to know what total
8 number of prescription drugs were coming into
9 the county, who would you ask at the Board of
10 Pharmacy?
11       MR. SPELLACY:  Objection.
12   A.   The compliance supervisor.
13   Q.   What is that person's name?
14   A.   Mark Griffin.
15   Q.   Are you familiar with something
16 called OARRS?
17   A.   Yes.
18   Q.   What is OARRS?
19   A.   That is a data system that was, I
20 think, started in about 2010 in the State of
21 Ohio that tracks the prescriptions that are
22 written by doctors and prescriptions that are
23 gotten by individual patients.
24   Q.   Who has access to OARRS?
25       MR. SPELLACY:  Objection.

Page 93

1    A.   Any -- what's the word I'm looking
2 for -- authorized law enforcement agency.
3    Q.   Who else has access to OARRS?
4    A.   You have to be an authorized law
5 enforcement agency to look at OARRS.
6    Q.   Do doctors have access to OARRS?
7    A.   Yes.
8    Q.   Do pharmacies or pharmacists have
9 access to OARRS?
10   A.   I don't know that, but I would
11 assume they do.
12   Q.   Do drug distributors have access to
13 OARRS?
14   A.   I don't know the answer to that
15 question.
16   Q.   Do drug manufacturers have access to
17 OARRS?
18   A.   I don't know the answer to that
19 question.
20   Q.   Have you -- are you familiar with
21 OARRS data?  Have you seen it?
22   A.   Yes.
23   Q.   And what sort of data is contained
24 in the OARRS database?
25   A.   The only data that I've seen from

24 (Pages 90 - 93)

Page 94

1 OARRS are the prescription history of certain
2 patients, of doctors that we're looking at.
3     Q.    Does OARRS tell you the patient
4 names?
5     A.    Yes.
6     Q.    And does it tell you the drugs that
7 those patients were prescribed?
8     A.    Yes.
9     Q.    And the quantities?
10    A.    The prescription drugs, scheduled
11 drugs, yes.
12    Q.    Does OARRS tell you where those
13 patients filled their prescriptions?
14    A.    You know, I don't know the answer to
15 that question.
16    Q.    Okay.  On how many different
17 occasions have you had reason to gather OARRS
18 data in furtherance of your work?
19    A.    Every time we look at a
20 practitioner, that's the first place we go.
21    Q.    So more than a hundred times during
22 your investigations or less?
23    A.    No.  I would say under 20 in the
24 last five years.
25    Q.    And is OARRS a database that you

Page 95

1 might use proactively to decide who to
2 investigate or something that you use
3 reactively?
4     A.    I know the pharmacy board does that.
5 They will look at OARRS and they will determine
6 whether a doctor is writing a large amount of
7 prescriptions.  They have, I guess, a program to
8 do that.
9     Q.    Does your office use it proactively
10 in that action?
11    A.    Well, no.  We get that report from
12 the investigators.
13    Q.    Have you used OARRS data to support
14 criminal cases against doctors?
15    A.    Yes.
16    Q.    Apart from OARRS, what other types
17 of database has your office accessed to
18 determine the number of prescription opioids
19 prescribed and dispensed?
20    A.    That's the only database that I
21 know.
22    Q.    Are you familiar with a database
23 called ARCOS?
24    A.    Yes.
25    Q.    What is ARCOS?

Page 96

1     A.    That is a database that is -- that
2 is maintained and done by the DEA to track, I
3 believe, the number of drugs, prescription
4 drugs, that are in a certain jurisdiction.
5     Q.    Do you rely on ARCOS data in
6 furtherance of your work?
7     A.    No.
8     Q.    Have you had occasion to request
9 access to ARCOS or data subsets of ARCOS data?
10    A.    I think only in one instance did the
11 feds share that with me.
12    Q.    Do you know who has access to ARCOS
13 data?
14    A.    The DEA.
15    Q.    Does anyone else have access to
16 ARCOS data?
17    A.    I don't know the regs on the ARCOS.
18    Q.    According to the complaint in this
19 action, according to ARCOS data, 700 --
20 approximately 792 million opioid doses were
21 dispensed in Cuyahoga County.
22    A.    What time frame?
23    Q.    That is a good question.
24    A.    Gotcha, huh?
25    Q.    I was thinking the same thing.

Page 97

1 We'll come back to that question.
2         To your knowledge, over the years
3 has anyone in your office or in the law
4 enforcement agencies with which you work tried
5 to figure out what percentage of the opioids,
6 prescription opioids, consumed in your county
7 were legitimately prescribed by a doctor for a
8 legitimate medical purpose?
9         MR. SPELLACY:  Objection.
10    A.    Not that I know of.
11    Q.    And in cases involving death
12 overdoses, do you believe the county has any way
13 to determine whether the overdoses resulted from
14 legitimate versus illegitimate consumption of
15 prescription opioids?
16        MR. SPELLACY:  Objection.
17    A.    I believe that would be a contextual
18 thing based upon the facts of a particular case.
19    Q.    During your 30(b)(6) deposition we
20 talked about some various forms of drug
21 diversion?
22    A.    Um-hum.
23    Q.    Including theft?
24    A.    Um-hum.
25    Q.    You mentioned doctor shopping?

25 (Pages 94 - 97)

Page 98

1    A.   Um-hum.
2    Q.   What is doctor shopping?
3    A.   It's an individual who goes to
4  different doctors to get drugs and -- unlawfully
5  to get drugs.
6    Q.   What are some other ways in which
7  the diversion of prescription opioids might
8  occur?
9    A.   Stealing of the prescription pads.
10   Q.   Okay.  What else?
11   A.   And distributing those prescription
12  pads.
13   Q.   What else?
14   A.   A doctor who's prescribing
15  illegally.
16       I can't think of any more off the
17  top of my head.
18   Q.   What about forged prescriptions?
19   A.   That goes in with the prescription
20  ring, yes.
21   Q.   What about pill sharing, sharing
22  your medicine with a friend or a relative?
23   A.   I really don't have any cases like
24  that.  Technically, that's trafficking, but I
25  don't really have that many -- experience with

Page 99

1  those type of cases.
2    Q.   What about internet sales?
3    A.   I did, but not on opioids.  That was
4  on steroids, internet sales.
5    Q.   In your office's experience, when
6  diversion occurs, does the offender receiving
7  the prescription drug typically intend to use
8  them personally or to sell them for profit?
9       MR. SPELLACY:  Objection.
10   A.   Both.  Depends on the context.
11   Q.   Do you see one scenario more often
12  than the other?
13       MR. SPELLACY:  Objection.
14   A.   I -- as opposed to somebody
15  self-medicating as opposed to them trafficking
16  it?
17   Q.   Um-hum.
18   A.   More than the other; is that what
19  you're asking?
20   Q.   Yes.  Which is more common?
21   A.   It's more common -- I can't really
22  answer that because it happens a lot, in both
23  instances, where I get people that self-medicate
24  and people get the drugs to sell them.
25   Q.   For those who get the drugs to sell

Page 100

1  them --
2    A.   Um-hum.
3    Q.   -- is it common for pills to pass
4  through multiple hands before reaching the end
5  user?
6    A.   Not usually.  Usually it's a retail
7  sale, as I call it.
8    Q.   What is a retail sale?
9    A.   I'm selling to you and you're buying
10  it to consume as opposed to me selling it to him
11  and then him selling it to you.  He'll be the
12  wholesaler.
13   Q.   In your experience, what type of
14  people engage in the illicit sale of illicit
15  drugs?
16       MR. SPELLACY:  Objection.
17   A.   What do you mean, what type of
18  people?
19   Q.   Do you see street gangs involved in
20  this type of crime?
21   A.   No.
22   Q.   Do you see other organized crime
23  involved in this type of crime?
24   A.   No.  Any organized crime, I mean,
25  you have individuals that are organized together

Page 101

1  in a ring to do these things.  If you mean that,
2  yes.  If you mean some type of cartel
3  involvement, no.
4    Q.   Have you worked cases in which
5  individuals were organized in a ring like you
6  described?
7    A.   Yes.
8    Q.   How many such cases have you worked?
9    A.   Dozens.
10   Q.   And, generally, what is the nature
11  of that drug ring?  How does it usually work?
12   A.   You usually have somebody inside a
13  medical office or a medical facility who has
14  access to blank prescriptions, and they will
15  then -- they will then steal the prescriptions.
16  And then you have to have the ability to be able
17  to fill those out correctly.  And then you have
18  to have the ability to then have people what we
19  call bust those, cash those scrips in.  So you
20  have individuals who organize each individual's
21  role in doing that.
22   Q.   Okay.  So the person who stole the
23  prescription pad committed a crime, right?
24   A.   Yes.
25   Q.   And then the person who forged the

Page 102

1 prescriptions committed a crime?
2    A.   Correct.
3    Q.   And then the individuals that they
4 enlist to go about to different pharmacies to
5 fill the prescriptions commit crimes?
6    A.   Correct.
7    Q.   And then the recipients of the
8 prescriptions, who give them or sell them to
9 other individuals, also committed a crime?
10   A.   Yes.
11   Q.   So in that situation, you would have
12 kind of layers of criminal activity by
13 multiple --
14   A.   That's why we use the RICO statute
15 in those situations.
16   Q.   You do use the RICO statute?
17   A.   Yes, we do.
18   Q.   How many such cases have you
19 prosecuted involving RICO?
20        MR. SPELLACY:  Objection.
21   A.   Quite a few.
22   Q.   More than two?
23   A.   Oh, yeah.
24   Q.   More than ten?
25   A.   Yes.

Page 103

1    Q.   And these are cases involving
2 prescription opioids?
3    A.   Yes.
4    Q.   Do you recall the names of any of
5 the defendants in those cases?
6    A.   Not -- I just did a few recently,
7 the last year or two.  I can't remember the
8 names.
9    Q.   Generally speaking, when you're
10 prosecuting a ring, is there going to be a
11 doctor or a medical professional involved in the
12 ring?
13   A.   Most of the time in that type of
14 situation the doctor is the victim of the crime
15 because the prescription pads are being stolen
16 from him.  We have to eliminate that right away
17 to make sure that the doctor is not involved in
18 doing those things.
19   Q.   And although, I believe you said,
20 you generally focus on doctors and medical
21 professionals, you would still nonetheless
22 prosecute these more complex RICO cases?
23   A.   Yes, exactly.
24   Q.   Is there significant opioid
25 diversion in Cuyahoga County?

Page 104

1        MR. SPELLACY:  Objection.
2    A.   When you put these words out like
3 "significant," I would say yes, that's an issue.
4    Q.   And how has it changed over time, if
5 you know?
6    A.   In my view, it's gotten worse,
7 especially in the last few years.
8    Q.   When did you notice it getting
9 worse, what year?
10   A.   '15; '14, '15, somewhere in there.
11   Q.   And what is the basis for your
12 observations on this point?
13   A.   Because people are dying.
14   Q.   Have you reviewed death statistics?
15   A.   I've had cases where we've had
16 overdose deaths because of prescription drugs.
17   Q.   Okay.  And I'm asking these
18 questions to try to understand if your answers
19 -- and it's perfectly fine -- if your answers
20 are related to your personal experience working
21 individual cases or if the basis of your
22 knowledge is from research or statistics or some
23 other data.
24   A.   My working on my cases.
25   Q.   Okay.

Page 105

1        I want to ask you about some of the
2 specific cases that you prosecuted over the
3 years, your office I should say, so let's start
4 with pill mills.
5    A.   Okay.
6    Q.   How can you tell the difference
7 between a pill mill and a legitimate pain clinic
8 or medical office?  What are the indicators?
9    A.   Well, first of all, you mentioned
10 something.  You have to get the context of what
11 the medical provider is doing.  Is he a general
12 practitioner?  Is he a pain management doctor?
13 So that's the first thing.
14        The second thing is then we go to
15 OARRS and we look at the prescription pattern,
16 the type of prescriptions, the combination of
17 prescriptions, because you have to have a
18 pattern to be able to prosecute practitioners.
19 It's very difficult to prosecute a practitioner
20 in a singular situation.
21   Q.   Okay.  Are you aware of pill mills
22 that operated in Cuyahoga County within the last
23 20 years?
24   A.   Yes.
25   Q.   How many approximately?

27 (Pages 102 - 105)

1        MR. SPELLACY:  Objection.
2     A.   20, 25.
3     Q.   And can you identify them by name
4  for us?
5     A.   No.  The only one I can tell you is
6  the last one I did was Dr. Lalli.
7     Q.   Dr. -- how do you spell his name?
8     A.   I think L-a-l-l -- it's either I or
9  Y.  I'm not sure.
10       MR. SPELLACY:  I think it's I.
11    Q.   Do you know the name of Dr. Lalli's
12 clinic?
13    A.   No.
14    Q.   Do you recall any other names of the
15 pill mills that you've prosecuted in the past
16 for your office?
17    A.   How many years back?
18    Q.   Past 20 years.
19    A.   Well, there's the big ones, because
20 there's little ones and big ones.  So, I mean,
21 Dr. Smirnoff was one of them.  I can't remember
22 the names.  I'm sorry.  I just can't remember
23 names.  I have very bad short-term memory.
24    Q.   In your experience, when these pill
25 mills were detected and prosecuted, were they

1  well known in the community?
2        MR. SPELLACY:  Objection.
3     A.   I don't know what you mean by that.
4  Were they well known within the people that are
5  seeking drugs out in the street?  Yes, everybody
6  knows who the high writers are; yes.
7     Q.   And were they known to law
8  enforcement as conducting suspicious business
9  practices even before you determined that they
10 were, in fact, breaking the law with respect to
11 prescription opioids?
12       MR. SPELLACY:  Objection.
13    A.   I don't know.  I mean, that's a --
14 again, you're asking all these general
15 questions.  When we find out about things, then
16 we act on them.
17    Q.   How did you generally find out about
18 pill mills operating?
19    A.   Complaints.  Pharmacists, citizens
20 basically that will come to law enforcement and
21 then law enforcement comes to me.
22    Q.   And I know it's difficult because
23 you've been with the office so long and I'm
24 asking you about the past 20 years, and there
25 have been a number -- you said about 20 -- pill

1  mills.  Can you estimate for me approximately
2  when those different pill mills were in
3  operation in the county?
4        MR. SPELLACY:  Objection.
5     Q.   And what I'm trying to get at, is
6  there a trend or a time period in which you saw
7  more pill mills in operation than at other times
8  during that 20-year window?
9        MR. SPELLACY:  Objection.
10    A.   That's a hard question to answer
11 because to me the issue has always been
12 significant.  It's just a matter of, again,
13 we're always reactive instead of proactive.  As
14 we speak right now, there are doctors out in the
15 county that are high writers.
16    Q.   So you can't kind of put into a time
17 context any sort of, like, surge in pill mills
18 or --
19    A.   There's been a surge in the last, I
20 would say, three or four years in the
21 prescription rings that I have done.  I've seen
22 that.
23    Q.   In the last three or four years you
24 said?
25    A.   Yes.

1     Q.   Are you aware of any pill mills that
2  operated outside the county that catered to the
3  county's residents?
4     A.   No.
5     Q.   And in your experience prosecuting
6  these cases, who was it that generally operated
7  the pill mills?  Were they generally operated by
8  a doctor?
9     A.   Yes.  It's usually a sole
10 practitioner.
11    Q.   Who has the authority to stop a pill
12 mill from operating in Cuyahoga County?
13    A.   I don't know what you mean by that.
14    Q.   Who can shut down a pill mill?
15    A.   Law enforcement.
16    Q.   And what specific law enforcement
17 agencies have that authority?
18    A.   Everyone.  Every law enforcement
19 agency in the State of Ohio is tasked with
20 enforcing the drug laws.
21    Q.   Can the Board of Pharmacy shut down
22 a pill mill?
23    A.   They need local law enforcement help
24 to do that.
25    Q.   And what about the medical board;

28 (Pages 106 - 109)

1 can they shut down a pill mill?
2    A.   I don't know what you mean by that.
3 They have certain administrative things that
4 they can do.
5    Q.   Can they revoke or suspend the
6 doctor's license?
7        MR. SPELLACY:  Objection.
8    A.   That's in their purview, yes, but
9 they have to establish wrongdoing first.
10    Q.   I want to ask you some questions
11 about Ronald Celeste.
12    A.   Yeah.  That's right.  There you go.
13 There was one.  I think he's still in jail.
14    Q.   Who is Dr. Celeste?
15    A.   Was a doctor on the west side of
16 Cleveland.
17    Q.   And is he a doctor that you
18 prosecuted?
19    A.   Yes, I did.
20    Q.   Was he convicted?
21    A.   Yes.  He -- he pled guilty.
22    Q.   And was he a doctor that was accused
23 of operating one of these pill mills we've been
24 discussing?
25    A.   That is correct.

1    Q.   What were the general allegations
2 against Dr. Celeste?
3    A.   He was indiscriminately prescribing
4 opiate drugs to his patients.
5    Q.   What was he charged with?
6    A.   Trafficking, and a number of other
7 things, I would assume.  I'd have to look at the
8 indictment, but basically trafficking.
9    Q.   Do you recall how many prescriptions
10 he wrote?
11    A.   I'd have to go back to the case
12 file, but it was a lot.
13    Q.   Does it sound right that he would
14 have been indicted December 19th, 2013?
15    A.   If you showed me the document, I
16 could tell you.
17    - - - - -
18        (Thereupon, Gutierrez Deposition
19        Exhibit 3, Article Entitled "Doctor
20        Accused of Operating 'Pill Mill'
21        Tells His Story," was marked for
22        purposes of identification.)
23    - - - - -
24    Q.   Fortunately, we were not produced a
25 copy of the indictment of this matter, but I'm

1 going to hand you Exhibit 3 --
2    A.   Okay.
3    Q.   -- which is a news article about the
4 case.
5    A.   Right.  Yeah, I've seen this before.
6    Q.   Okay.  You've seen this document
7 before?
8    A.   Um-hum.
9    Q.   So according to the news article, in
10 the middle of the page, "Celeste was indicted
11 September 19th, 2013, on 226 counts of drug
12 trafficking and illegal processing of drug
13 documents in Cuyahoga County Common Pleas
14 Court"; is that correct?
15        MR. SPELLACY:  Objection.
16    A.   Sounds about right.
17    Q.   And the article goes on to state
18 that, "According to the Cuyahoga County
19 Prosecutor's Office" -- that's your office?
20    A.   Um-hum.
21    Q.   -- "Celeste wrote more than 33,000
22 prescriptions for controlled substances from
23 2009 through 2011."
24    A.   Um-hum.
25    Q.   In your opinion, did Dr. Celeste

1 contribute to the prescription opioid problem
2 that your county is facing?
3        MR. SPELLACY:  Objection.
4    A.   Yes.
5    Q.   In fact, would you agree that he
6 endangered not only his patients but also the
7 citizens of Cuyahoga County?
8        MR. SPELLACY:  Objection.
9    A.   Yes.
10    Q.   And he played a significant role in
11 contributing to the prescription opioid
12 problems?
13        MR. SPELLACY:  Objection.
14    A.   He was one of many individuals out
15 there that were doing this.
16    Q.   Okay.  Now, doctors who, like
17 Celeste, over-prescribe, other doctors like him
18 also are significant causes of the prescription
19 opioid problems, right?
20    A.   Yeah.  Put them all together and
21 they make up the problem, yes.
22    Q.   Now, in this article, at the very
23 bottom of that second page, going into the third
24 page, Dr. Celeste -- you can go to the top of
25 the third -- states that, "The real danger, I

29 (Pages 110 - 113)

Page 114

1 feel, lies in the people who deceive the doctors
2 who are only trying to help their symptoms.
3 Those people are the parasites of society."
4       Do you agree with Dr. Celeste that
5 the patients are the real danger?
6       MR. SPELLACY:  Objection.
7    A.   No.
8    Q.   Why not?
9    A.   I believe that the people that you
10 are representing are the source of this problem.
11    Q.   And by who do you mean when you
12 refer to the people we're representing?
13    A.   The drug manufacturers and
14 distributors.
15    Q.   Okay.  And why do you say that?
16    A.   Why?  Because they have made
17 millions, if not billions of dollars of blood
18 money by ruining our community by putting all
19 these drugs available for doctors to prescribe.
20 They're the source of this problem.
21    Q.   Let's shift gears for a moment here.
22       What do you know about this lawsuit?
23    A.   When it first came out, I perused
24 it, and I knew some of the facts anyway about
25 it.

Page 115

1    Q.   So what do you know about it?
2    A.   I know how the marketing -- the
3 marketing -- specifically so, that you guys
4 marketed these drugs and convinced everybody
5 somehow that drugs were good for long-term
6 therapy for pain.  With all the medicine, all
7 the scientific research out there before that,
8 everybody knew that was not correct, but for
9 some reason you guys did the full court press
10 and had this nice marketing campaign, you wined
11 and dined doctors and you tried to convince the
12 medical community that all this was good stuff
13 to do.
14    Q.   Have you read the complaint in
15 total?
16    A.   No.  Just perused it.
17    Q.   Have you spoken to anyone about this
18 case other than counsel?
19    A.   No.  But these issues that I told
20 you about were discussed in a couple seminars
21 that I went to.
22    Q.   Okay.  So you just shared a general
23 understanding about the case.
24    A.   Well, I knew that --
25    Q.   I want to understand better what

Page 116

1 actual facts you know.  As a former prosecutor,
2 facts matter.
3       So prior to this case, had you had
4 any involvement with my client, McKesson
5 Corporation?
6    A.   Directly, no.
7    Q.   Had you heard of McKesson
8 Corporation?
9    A.   Oh, yeah.
10    Q.   You had?
11    A.   Oh, yeah.
12    Q.   And what had you heard about
13 McKesson before?
14    A.   I saw the nice 60 Minutes thing, how
15 McKesson was able to flex their muscle to defang
16 the DEA so they could weasel out of a criminal
17 investigation that was going on in another part
18 of the country.
19    Q.   Okay.  So you watched the 60
20 Minutes --
21    A.   Yes.
22    Q.   And it formulated some views for
23 you?
24    A.   Well, and then I -- go ahead.
25       MR. SPELLACY:  Objection.

Page 117

1    Q.   Are you aware that McKesson is an
2 185-year American company that employs 78,000
3 employees across the country?
4    A.   Oh, they're a very rich and powerful
5 corporation, absolutely.
6    Q.   Do you understand McKesson does not
7 manufacture any drugs?
8    A.   I know they distribute them.
9    Q.   Do you know they simply deliver
10 drugs from manufacturers to pharmacies pursuant
11 to prescriptions?
12    A.   They don't simply do that.
13    Q.   Do you understand it is McKesson's
14 job to make sure patients get prescription
15 medicine quickly, sometimes to treat
16 life-threatening illnesses, even if they live in
17 rural or hard-to-reach areas?  Do you understand
18 that's the nature of McKesson's business?
19    A.   I know the nature of McKesson's
20 business, like Cardinal and all these other
21 people, are to distribute the pharmaceutical
22 drugs that are manufactured.
23    Q.   And you know that prescription
24 opioids make up less than 2 percent of
25 McKesson's sales?

30 (Pages 114 - 117)

Page 118

1    A.   I don't know that.
2    Q.   You don't know that?
3    A.   No, I don't.
4    Q.   Are you aware that my client
5  delivers tens of thousands of different
6  medicines to more than 40,000 pharmacy customers
7  across the country?
8    A.   I'm not going to sit here and debate
9  that McKesson has some legitimate purposes,
10  okay, there's no doubt about that, and they
11  provide a valuable service to our country, but
12  --
13    Q.   You shared a personal belief that
14  McKesson, my client -- I believe -- I believe
15  you were referring to McKesson when you said
16  "you guys" is responsible for the opioid abuse
17  that's occurred in Cuyahoga County.
18    A.   They contributed to it; yes, they
19  did.
20    Q.   And as the basis for that belief,
21  you mentioned the 60 Minutes special?
22    A.   Um-hum.
23    Q.   What else is the basis for that
24  belief?
25    A.   The few seminars that I went to,

Page 119

1  that was laid out specifically.  In fact, the
2  allegations in the lawsuit that have been filed
3  were specifically talked about in the seminar
4  that I went to.
5    Q.   Okay.  And based on your knowledge,
6  what specifically did McKesson do wrong?
7    A.   All the particular drug distributors
8  did something wrong in my view.  They ignored
9  obvious things, suspicious drug orders, and they
10  shouldn't have shipped the drugs when things --
11  I'll give an example.  The example back to the
12  60 Minutes, where you have a small community in
13  West Virginia who -- you know, who have what,
14  5,000 people, and they get a million dosage
15  units given to them.  That kind of stuff.  Do I
16  know specifically how much McKesson did?  No.  I
17  just know they're one of the big drug
18  distributors.
19    Q.   Have you ever investigated or
20  prosecuted a drug distributor?
21    MR. SPELLACY:  Objection.
22    A.   No, but I'd love to.
23    Q.   You would love to?
24    A.   Oh, it would be fun, but can't --
25  can't do it, though.

Page 120

1    Q.   Why not?
2    A.   Because the evidence isn't there.
3    Q.   What evidence is missing?
4    MR. SPELLACY:  Objection.
5    A.   I'd have to -- I'd have to think
6  about that, but a civil action is probably more
7  appropriate because of the standard of proof and
8  things of that nature.
9    Q.   In your opinion, Dr. Celeste
10  committed a crime, correct?
11    A.   Absolutely.
12    Q.   And he shouldn't be excused from the
13  crimes that he committed --
14    A.   No.
15    MR. SPELLACY:  Objection.
16    Q.   -- correct?
17    A.   No.
18    Q.   And it was not -- Dr. Celeste's
19  conduct began in 2009, correct?
20    A.   Yes.
21    Q.   Yet your office didn't charge him
22  until December 19th of 2013, correct?
23    A.   Correct.
24    Q.   And his office was raided in
25  September of 2012?

Page 121

1    A.   Correct.
2    Q.   But he was permitted to continue
3  practicing medicine and prescribing opioids
4  until July of 2013, wasn't he?
5    MR. SPELLACY:  Objection.
6    A.   But he's presumed innocent until
7  found guilty.
8    Q.   What efforts did your office make to
9  have his license suspended in light of the
10  evidence you collected?
11    A.   That is not our role.  That is an
12  administrative action to either suspend or
13  retain a license.  Sometimes in the process of
14  plea negotiations, that will be part of a plea
15  negotiation, but the medical board is the one
16  that makes the final decision on that, unless
17  it's part of a plea.
18    Q.   So you did not take action to
19  attempt to have his license suspended?
20    A.   I don't know.  I think -- I'd have
21  to look whether giving up his license was part
22  of the plea, and I think it was, but I'm not
23  sure.
24    Q.   But I'm talking about the
25  intervening time in which he practiced while

31 (Pages 118 - 121)

Page 122

1  your office and law enforcement authorities
2  conducted its two-year investigation.
3      A.    It takes a long time to prosecute a
4  doctor.
5      Q.    And during that time he continued to
6  write prescriptions for opioids?
7      A.    That's something you would have to
8  talk to the medical board about.  I can't do
9  anything about that until I convict him.
10      Q.    What efforts did your office
11  undertake to warn or to contact Dr. Celeste's
12  patients during your investigation?
13          MR. SPELLACY:  Objection.
14      A.    Can't do that.  We wouldn't do that
15  anyway.  That would compromise the
16  investigation.
17      Q.    So, to your knowledge, his patients
18  did not receive any warnings or contact from
19  your office?
20      A.    No.
21          MR. SPELLACY:  Objection.
22      Q.    And in December of 2013, when he was
23  ultimately convicted after pleading guilty, what
24  efforts were taken by your office or law
25  enforcement to recover the prescription opioids

Page 123

1  you believe were prescribed pursuant to his
2  criminal activities?
3      A.    All the opioids were distributed and
4  used.  We couldn't recover any of the opioids.
5      Q.    Did you try?
6      A.    That's silly.  That's just a silly
7  question.
8      Q.    Did you try?
9      A.    No, because it's impractical and
10  silly.
11      Q.    Apart from the Dr. Celeste case, are
12  you aware of other efforts by county officials
13  to try to get the medical board to suspend or
14  revoke doctors' licenses?
15      A.    Could you repeat that question
16  again?
17      Q.    Are you aware of efforts by county
18  officials, including those at your office, to
19  try to get the medical board to suspend or
20  revoke doctor licenses?
21      A.    I can't answer that question.  I can
22  only answer what I specifically know about my
23  particular cases.
24      Q.    So you're not aware of any efforts?
25      A.    Correct.

Page 124

1      Q.    Are you aware of any efforts by
2  anyone in your office to get the Board of
3  Pharmacy to shut down a pill mill or a pharmacy?
4      A.    When we do investigation on the
5  practitioners, yes, as part of -- the ultimate
6  goal is to shut it down.
7      Q.    And in the case of Dr. Celeste, did
8  your office work with the DEA in an attempt to
9  suspend or revoke Dr. Celeste's DEA
10  registration?
11      A.    I'd have to go look back at the
12  file.  I can't -- it could be or couldn't be.
13  I'd have to go look at the file.
14      Q.    That's not something you do in every
15  case involving a doctor?
16      A.    I notify the DEA and then they'll do
17  whatever administrative action they do.  I'm not
18  part of it usually.  Sometimes that is part of
19  the -- sometimes that is part of the plea, to
20  give up their DEA registration.  And I remember
21  not recently, but back a while ago, when the guy
22  was out on bond, the doctor was out on bond,
23  that was part -- part of the thing, bond
24  condition, that he would have to give up his DEA
25  registration.

Page 125

1      Q.    When your office comes across a
2  defendant or a witness who is clearly addicted
3  to prescription opioids or has overdosed on
4  prescription opioids, do you try to figure out
5  who their doctor is so that you can warn the
6  doctor?
7          MR. SPELLACY:  Objection.
8      A.    Do we try to warn the doctor when we
9  know somebody is addicted on opioids,
10  prescription opioids?
11      Q.    That's right.
12      A.    I never have.
13      Q.    Does your office have any policy
14  you're aware of about informing doctors in those
15  situations?
16      A.    I'm not aware of any.
17      Q.    Can you estimate the number of
18  prescription opioid doses that have been
19  distributed by pill mills to people in your
20  jurisdiction?
21          MR. SPELLACY:  Objection.
22      A.    For what period of time?
23      Q.    Over the last 20 years.
24      A.    Oh, my God.  I couldn't even
25  estimate.

32 (Pages 122 - 125)

Page 126

1    Q.    Could you estimate how --
2    A.    It would be a lot.
3    Q.    Could you estimate for last year?
4    A.    I couldn't. It would be a lot. I
5  can't -- I don't have those numbers.
6    Q.    It would be thousands and thousands,
7  correct?
8        MR. SPELLACY: Objection.
9    A.    Yes.
10    Q.    I mean, Dr. Celeste himself wrote
11 more than 33 prescriptions, and he's not the
12 only doctor involved in a pill mill that you
13 prosecuted, right?
14    A.    Correct.
15    Q.    Does anyone track that information;
16 that is, the number of doses distributed by pill
17 mills in your jurisdiction?
18    A.    Maybe the DEA would. Our office
19 doesn't. Locally, no. We don't have the
20 resources for all that stuff.
21    Q.    At some point did the legislature in
22 Ohio enact legislation that helped to deal with
23 the pill mill problem?
24    A.    Yes.
25    Q.    And what was that legislation?

Page 127

1    A.    They -- I'm not sure. The last
2  couple years they passed laws regarding how much
3  opioids can be distributed by one doctor in a
4  month, how much a doctor can give a patient -- I
5  think it's in 72 hours -- himself. And there's
6  a few other regulations that I'm not aware of,
7  but those -- and the suspicious drug orders,
8  that -- that distributors are supposed to flag
9  suspicious drugs and tell the pharmacy board.
10 Besides those --
11    Q.    What effect did that legislation
12 have on the pill mill problem in your county?
13    A.    I think it reduced the number of
14 prescription opioid pills on the street, which
15 then led to, like I said before, them going to
16 heroin and fentanyl, which has caused, in my
17 opinion, the deaths in Cuyahoga County.
18    Q.    And when you use phrases as a
19 prosecutor like prescription pills on the
20 street, are you talking about diverted pills?
21    Q.    Not pills that might be on the
22    Q.    Not pills that might be on the
23 street because you have a valid prescription?
24    A.    No. I'm talking about people who
25 get pills in a scrip mill and either sell them

Page 128

1  or take them themselves.
2    Q.    Okay. So, in your opinion, you've
3  found that piece of legislation to have a
4  positive effect on actually reducing the number
5  --
6    A.    Yes.
7    Q.    -- of drug diversion?
8    A.    But then it had the negative effect
9  of people using heroin and overdosing.
10    Q.    Okay. When was that legislation
11 passed?
12    A.    I'm not sure. Within the last four
13 years, I believe.
14    Q.    And could the same thing have been
15 accomplished earlier if the legislature had
16 passed that law sooner?
17        MR. SPELLACY: Objection.
18    A.    Boy, I can't speculate on that. I
19 mean, we can all sit here and think about laws
20 that should be passed that would help. But I
21 can't speculate on that. All I know is it did
22 have an effect.
23    Q.    Do you believe it's important that
24 doctors are educated about prescribing opioids
25 responsibly?

Page 129

1    A.    Absolutely.
2    Q.    And why is that important?
3    A.    Because it will help the situation.
4  I've talked to doctor groups about this.
5    Q.    You have?
6    A.    Yes.
7    Q.    And what sorts of advice have you
8  given them?
9    A.    To be a doctor.
10    Q.    What does that mean?
11    A.    To do what doctors do. Doctors
12 have -- you know, there's this innate hostility
13 between, I believe, lawyers and doctors.
14 Doctors think that the government was trying to
15 legislate the way that they practice their
16 medicine. And my message to them was no. If
17 you do what you're supposed to be doing, acting
18 like a doctor and recording everything that you
19 do, and acting properly, you don't have an
20 issue. And opiates are appropriate in the
21 appropriate contexts. We want to treat pain.
22 We don't want people going around unnecessarily
23 having pain, but treating chronic pain with
24 opioids is a dead end. And they'll only be
25 prosecuted if they -- because you have to

33 (Pages 126 - 129)

Page 130

1 understand, when you prosecute doctors, the ones
2 that we go after are the ones that are way in
3 left field. They're so far above the pale
4 that -- and so I try to show these doctors,
5 look, this is who we go after.
6    Q.   They're clearly criminals?
7    A.   Exactly, because it's kind of like
8 Dr. Celeste, who writes 13,000 prescriptions a
9 year for opioids.
10    Q.   So let me show you another -- ask
11 you some questions about another case.
12       MR. SPELLACY: Counsel, we're going
13 to break for lunch at some point? What time are
14 you thinking?
15       MS. WOODS: If I could just ask a
16 few questions about this case.
17       MR. SPELLACY: Yeah. That's great.
18    Q.   So do you recall investigating a
19 case back in 1993 involving a urology resident
20 at the Cleveland Clinic named Sean Carey, who
21 ultimately ended up committing suicide before
22 the case?
23    A.   Yes. I remember that case. It was
24 tragic. It was very tragic. He went up in
25 Pennsylvania in his cabin and blew his brains

Page 131

1 out after we searched his office.
2    Q.   And he was another doctor who was
3 prescribing opioids illegally, correct?
4    A.   Um-hum. That's amazing they dug
5 that case up. I forgot the guy's name.
6    Q.   In this case do you recall that he
7 was writing prescriptions in his wife's name
8 over a two-year period, approximately 26,000
9 prescriptions?
10    A.   I don't know the specific facts now.
11 I'd have to go back to the file and look at it.
12       - - - - -
13       (Thereupon, Gutierrez Deposition
14       Exhibit 4, Article Entitled "Clinic
15       Doctor In Drug Probe Takes Own Life;
16       Urology Resident Investigated for
17       Narcotics Prescriptions," Dated
18       April 8, 1993, was marked for
19       purposes of identification.)
20       - - - - -
21    Q.   Okay. I'm handing you what's been
22 marked as Exhibit 4. This is a Plain Dealer
23 news article on the case.
24    A.   Right. This was on the front page
25 of the Plain Dealer. He went to Pennsylvania.

Page 132

1 Yeah, I was right.
2    Q.   The first full paragraph states, "A
3 source knowledgeable about the probe said it
4 involved allegations that Carey had written
5 prescriptions for 26,000 dosage units of
6 Percocet, Vicodin and Tylenol-4, all narcotics,
7 in his wife's name during a two-year period."
8    A.   Um-hum.
9    Q.   Does that sound correct to you?
10    A.   Yes. I mean, again, I will rely on
11 this to answer your questions, but I would have
12 to go back to the file.
13    Q.   And in this situation it appeared as
14 though the individuals took great lengths to
15 evade law enforcement; namely, by having the
16 prescriptions filled at 62 different pharmacies
17 across three different counties?
18    A.   Um-hum.
19    Q.   Does that sound correct?
20    A.   Yes.
21    Q.   And, in your experience, when
22 individuals are attempting to divert
23 prescription opioids, do you sometimes see them
24 take evasive measures such as this?
25    A.   Oh, absolutely.

Page 133

1    Q.   By using multiple different
2 pharmacies, for example?
3    A.   Absolutely, and out-of-state
4 pharmacies.
5    Q.   And out-of-state pharmacies?
6    A.   Oh, yeah.
7    Q.   Or certainly out-of-county
8 pharmacies?
9    A.   Oh, absolutely.
10    Q.   What other evasive tactics do you
11 see individuals use when they're attempting to
12 divert prescription opioids?
13    A.   Well, back then it was a lot easier
14 to do that because whoever is representing CVS
15 here now, if you go to CVS, CVS is going to know
16 if you filled a prescription out in Lake County
17 as opposed to Cuyahoga County. But that's --
18 that's about it. They go to different
19 pharmacies so they don't get tracked. They go
20 to pharmacies -- certain pharmacies that will
21 fill the prescriptions more readily than others
22 at certain periods of the day, mostly at night,
23 so they can't call the doctor's office, for
24 example. Things of that nature, yes. So that's
25 your basic modus operandi of going to different

34 (Pages 130 - 133)

Page 134

1 pharmacies.
2      Q.   And in this case there were, they
3 said, 26,000 dosage units diverted.  And am I
4 correct that those pills were never recovered?
5      A.   That is correct.
6      Q.   In fact, Sheriff's Detective Veres
7 said, "At this point we don't know what happened
8 to the pills"?
9      A.   Correct.
10      Q.   And this was back in 1993?
11      A.   Correct.
12      Q.   Would you agree prescription opioids
13 were a problem way back then --
14           MR. SPELLACY:  Objection.
15      Q.   -- in 1993?
16      A.   Yes, they were a problem; yes.
17           MS. WOODS:  We can take a break now
18 for lunch.
19           THE VIDEOGRAPHER:  Off the record,
20 11:58.
21
22           (Luncheon recess had.)
23
24
25

Page 135

1           THE VIDEOGRAPHER:  On the record,
2 12:39.
3           - - - - -
4           AFTERNOON SESSION
5           CONTINUED EXAMINATION OF
6           JAMES A. GUTIERREZ, ESQ.
7 BY MS. WOODS:
8      Q.   Okay.  I want to pick up where we
9 left off, discussing some of the cases you
10 handled.
11           So earlier today you mentioned a
12 particular doctor you had prosecuted, Dr. George
13 Smirnoff.  Do you recall prosecuting him?
14      A.   Oh, yes.
15      Q.   What do you recall about that case?
16      A.   How brazen he was about doing what
17 he was doing.  For example, it got to the point
18 where none of the pharmacies would fill his
19 prescriptions, so he started to distribute them
20 from his office himself.  His office was in a
21 building on 12th Street where a local TV station
22 was, so actually on the 6 o'clock news you had
23 people walking out of his office with baggies
24 full of Percocet and Vicodin, I mean bags.  It
25 was that brazen and blatant.

Page 136

1           And the DEA had kind of screwed up a
2 case with him a few years back, so he decided to
3 name his boat "Injection."  So he was a very
4 arrogant individual.
5      Q.   He owned a yacht?
6      A.   No.  It was a boat.
7      Q.   A boat that he named "Injection"?
8      A.   Injection.  And the jury liked to
9 see that, too.
10      Q.   I can imagine that had some serious
11 jury appeal.
12      A.   Um-hum.
13      Q.   What was wrong with the case or the
14 investigation that the DEA had pursued against
15 Dr. Smirnoff earlier?
16      A.   I'm not sure, but the DEA came to me
17 in the middle '90s and said they had worked the
18 case up and the U.S. Attorney's Office did not
19 like it for whatever reason, and they wanted to
20 know if I would do that case.  And I said I
21 would if we started from scratch, and we started
22 from scratch.
23      Q.   Which U.S. Attorney's Office was
24 that that had declined the case?
25      A.   Here.  I couldn't tell you the

Page 137

1 specific reasons why.  I don't know.
2      Q.   So you agreed to start from scratch
3 an investigation into Dr. Smirnoff?
4      A.   Um-hum.
5      Q.   And who were the investigating
6 agencies that worked on the case?
7      A.   DEA and the pharmacy board.  And I'm
8 not sure if CPD did or not.  I'm not sure if
9 there was a local on there.  I'm not sure.  I
10 know DEA and the pharmacy board.
11      Q.   And was the Cleveland Police
12 Department also involved?
13      A.   I'm not sure.  They could have been.
14      Q.   And based on your recollection, did
15 the investigation take approximately three years
16 and conclude in September of 1999?
17      A.   That is when he pled guilty, but I
18 think the investigation concluded earlier than
19 that, and then there was some litigation time.
20 I'm not sure, but it did take over a year to
21 investigate the case.
22           - - - - -
23           (Thereupon, Gutierrez Deposition
24           Exhibit 5, Article Entitled "Doctor
25           Accused of Giving Drugs For Sex

35 (Pages 134 - 137)

Page 138

1      Pleads Guilty 31 Times To End His
2      Trial," Dated September 28, 1999,
3      was marked for purposes of
4      identification.)
5              - - - - -
6      Q.    So I'm going to hand you what has
7  been marked for identification as Exhibit 5.
8  This is a news article about Dr. Smirnoff's
9  case.
10     A.    You guys got on Google, didn't you?
11     Q.    This article is from the Plain
12  Dealer in Cleveland, Ohio.  It's dated September
13  28th, 1999.  And according to this article,
14  Dr. Smirnoff pleaded guilty to 31 counts of drug
15  trafficking, one count for each of the
16  plaintiffs prosecutors said became addicts.  Is
17  that correct?
18     A.    That's correct.
19     Q.    And he was originally charged with
20  212 counts in the indictment that had been
21  handed down in February of 1998.  Does that
22  sound correct?
23     A.    It sounds about right.
24     Q.    This article notes that "Witnesses
25  said that more than 100 patients a day passed

Page 139

1  through Dr. Smirnoff's office, some getting up
2  to 50 times the legal dosage of drugs in a
3  single prescription."
4     A.    Um-hum.
5     Q.    Does that accord with your memory of
6  the evidence against Dr. Smirnoff?
7     A.    Yes.  It was pretty outrageous.
8     Q.    And, in fact, according to the
9  evidence, Dr. Smirnoff helped turn more than 30
10  people into addicts; is that correct?
11          MR. SPELLACY:  Objection.
12     A.    At least, yes.
13     Q.    And you found that some of his
14  patients actually died from overdoses?
15     A.    Yes.
16     Q.    In fact, is it fair to call
17  Dr. Smirnoff one of the biggest drug dealers in
18  Cuyahoga County?
19          MR. SPELLACY:  Objection.
20     A.    He was one of the larger pill mills
21  in this county, yes.
22     Q.    And, in fact, according to this
23  article, Cuyahoga County Prosecutor William D.
24  Mason, at the top of the second page, referred
25  to him, stating "Today one of the biggest drug

Page 140

1  dealers in Cuyahoga County has been taken off
2  the streets."
3          Do you see that quote?
4     A.    I would agree with that.
5              - - - - -
6          (Thereupon, Gutierrez Deposition
7          Exhibit 6, Article Entitled
8          "Prescription For Prison:  Doctor's
9          Pill Practice Paid For Yacht, Seven
10         Mistresses," Dated October 12, 1999,
11         was marked for purposes of
12         identification.)
13             - - - - -
14     Q.    Okay.  I'm also going to show you
15  what has been marked for identification as
16  Exhibit 6.  Exhibit 6 is another article about
17  the Dr. Smirnoff case.  This is an article dated
18  October 12th, 1999 published in the Plain
19  Dealer.
20     A.    Okay.
21     Q.    Do you recall seeing this news story
22  around that time?
23     A.    I would have to read it.
24     Q.    Okay.
25     A.    I know there were numerous articles.

Page 141

1  This was a very high profile case in the papers.
2     Q.    According to this article, it does
3  mention that he owned that boat called
4  "Injection."  That's on page 1 near the bottom.
5          And if you looked to page 2 of the
6  article, it cites some facts regarding the
7  evidence against Dr. Smirnoff, and it says,
8  "During the abbreviated trial, prosecutors
9  claimed that about 80 percent of his 3,000
10  patients were pill addicts who came to him
11  because he was easy."
12          Does that accord with your memory of
13  the evidence that was offered against
14  Dr. Smirnoff?
15     A.    Generally speaking, yes.
16     Q.    And that he kept at least 31
17  patients addicted to painkillers by prescribing
18  far more pills than legally allowable.
19          Does that also accord with what you
20  recall the evidence being?
21     A.    Yes, ma'am.
22     Q.    Additionally, according to this
23  article, prosecutors also said, but were
24  prohibited from alleging in court, that nine of
25  Smirnoff's patients died from overdoses of

36 (Pages 138 - 141)

Page 142

1 prescription drugs.
2       Do you remember that?
3     A.   Yes.
4     Q.   And why were you prohibited from
5 alleging that nine of his patients died from
6 these overdoses?
7     A.   Because I don't know if you realize
8 how hard it is to prove manslaughter on a
9 doctor.
10    Q.   So tell me --
11    A.   It's very difficult to do that.
12    Q.   Why is it so difficult?
13    A.   Because of the proximate cause
14 factor, okay.  So if the doctor gives you, for
15 example, a vial full of Percocet and you're
16 supposed to take them one a day and you take
17 them all at once, is that the doctor's fault?
18 Depending on the circumstances.
19       I've only prosecuted one doctor case
20 for manslaughter, and that was because the
21 doctor had prior notice of an overdose of this
22 patient and kept giving the drugs to the
23 patient.
24       Plus, if I remember the facts of
25 this case, some of the patients were also taking

Page 143

1 some street drugs in combination with the
2 opioids, so that also causes a proximate cause
3 issue.
4     Q.   It complicates matters by suggesting
5 that a different factor contributed to the
6 death?
7     A.   Exactly.  So really all the stars
8 have to align perfectly for you to be able to
9 convict a doctor for manslaughter for
10 over-prescribing of drugs.
11    Q.   Okay.  And just to make sure I
12 understand, that's because if you have to show
13 that doctor is responsible for the death, it
14 becomes more complicating if you have other
15 factors that could have contributed to the
16 death?
17    A.   That's correct.  That's why it's
18 very rare for you to ever see anything like
19 that.  Do your research throughout the whole
20 country.  It's very rare that that happens.
21    Q.   Okay.  But nonetheless, nine of his
22 patients did die during that time period from --
23    A.   Yes, they did.
24    Q.   -- overdoses of prescription drugs?
25    A.   Absolutely.

Page 144

1     Q.   In addition, when he was arrested,
2 25 patients had to go to the emergency room or
3 detox clinics because they had withdrawal
4 symptoms and weren't able to obtain prescription
5 drugs from other --
6     A.   That's not unusual when we take a
7 pill mill out.
8     Q.   And is that what happened in the
9 Dr. Smirnoff case?
10    A.   From general memory, yes.
11    Q.   And does that behavior indicate to
12 you that the patients were likely addicted to
13 the drugs that they were receiving?
14    A.   Yes.  There's no doubt about it that
15 they were getting -- that they were addicted.
16    Q.   Dr. Smirnov was a doctor who was
17 ingenious at covering his tracks, would you say?
18    A.   He thought he was and he really
19 wasn't.
20    Q.   Eventually you got him?
21    A.   He was a man that -- you got to
22 understand.  When you prosecute doctors, you go
23 to the medical records.  The medical record is
24 going to tell you the story.  Either you're
25 going to have a medical record that's hardly

Page 145

1 documented, which shows he's not doing what he's
2 supposed to, or you have something like
3 Smirnoff, who writes up a ton of stuff on the
4 medical record, thinks he's covering himself,
5 but at the end of the day every patient still
6 walked out with the drug.  So no.  A pill mill
7 that size, there's no way around it because the
8 numbers are always going to get you.
9     Q.   Okay.  According to that Exhibit 6
10 that I gave you, at the bottom of page 2 it
11 states that the investigation took three years
12 and three agencies, the Drug Enforcement
13 Administration, the Ohio Pharmacy Board and the
14 Cleveland Police Department.
15    A.   There you go.  So CPD was on that
16 then.  Okay.
17    Q.   And during those three years in
18 which you were investigating Dr. Smirnoff, am I
19 correct that he continued to practice medicine
20 and prescribe prescription opioids?
21    A.   Yeah, which gets to the point that
22 -- why we're here.  How come he was allowed to
23 get all those drugs from the distributors,
24 because the pharmacies wouldn't give him the
25 drugs.  He was actually ordering the drugs from

37 (Pages 142 - 145)

Page 146

1 the pharmacies when we cut him off.  When we
2 searched his office, all the pharmacies cut him
3 off, so he started getting the drugs right from
4 -- I don't know who, whatever, but whatever
5 distributor.
6     Q.    Directly?
7     A.    Right.
8     Q.    He got them directly?
9     A.    Um-hum.
10    Q.    And that's because he was registered
11 himself --
12    A.    Yes.
13    Q.    -- as a DEA --
14    A.    No.  He had the DEA license, but he
15 had to have a specific license from the pharmacy
16 board to be able to distribute from his office.
17 And 99 percent of the time doctors aren't going
18 to do that because you have to go through a
19 number of different administrative rules to do
20 that, proper labeling, proper pill vial, the
21 documentation, where it's at, and on top of
22 that, you don't want to be robbed.
23    Q.    But he had completed that entire
24 process, correct?
25    A.    Yes, he did.

Page 147

1     Q.    And so he was operating under a
2 license of the Board of Pharmacy so that he
3 could be a direct supplier --
4     A.    That's correct.
5     Q.    -- of prescription drugs?
6     A.    That's correct.
7     Q.    And the Board of Pharmacy did not
8 suspend or revoke his ability to be that direct
9 supplier during the period of your
10 investigation, correct?
11    A.    No, they didn't.
12    Q.    It wasn't until after he was
13 convicted?
14    A.    That's correct.
15    Q.    At the time that your investigation
16 was proceeding, he was seeing approximately
17 3,000 patients?
18    A.    That was his patient population,
19 yes.  And, again, I'm just going from memory --
20 actually, from reading this stuff, so let's
21 preface all my answers saying I -- assuming all
22 of this information is correct.
23    Q.    Okay.  I want to direct your
24 attention to page 3 of Exhibit 6, in which you
25 are quoted a few times about the case, and I

Page 148

1 want to direct your attention about two-thirds
2 of the way down to the paragraph that begins
3 with your last name.
4     A.    Um-hum.
5     Q.    "Gutierrez said it took a long time,
6 maybe too long, for law enforcement to commit
7 the time and money needed to document that the
8 doctor was doing something illegal, not just
9 medically unconventional."
10          Was it your opinion that the
11 investigation of Dr. Smirnoff went too slowly?
12          MR. SPELLACY:  Objection.
13    A.    I can't make that determination now.
14 The only thing I can tell you is that it takes a
15 lot of time and effort and resources to
16 prosecute a doctor.  And Smirnoff was one of
17 these doctors that was one of the larger ones,
18 so it took us a long time.  Would everybody like
19 things to go quicker, sure.  But that's the
20 common problem that I have had in my years as a
21 prosecutor.
22    Q.    Understood.
23          The article also notes, "But as
24 years passed, more and more patients and
25 relatives filed complaints against him with the

Page 149

1 Ohio Pharmacy Board and the Ohio Medical Board."
2     A.    Um-hum.
3     Q.    Were you aware of those complaints?
4     A.    Only when we started getting into --
5 into the case.
6     Q.    And, to your knowledge, did the
7 pharmacy board and the medical board have
8 authority to act irrespective of your criminal
9 investigation?
10    A.    No.  They can't.  They can't do
11 anything until I'm done.  They're not going to
12 do anything administratively because, A,
13 evidence sharing would be -- could compromise my
14 investigation; and, B, he's got a 5th Amendment
15 right, so doing anything administratively until
16 the criminal case is over is like spitting into
17 the wind, you just don't do it that way.  So
18 they have to wait until I'm done and then they
19 have the authority to go administratively and do
20 what they need to do.
21    Q.    Is that something that you've been
22 told by others or is that something that the
23 pharmacy board and the medical board have been
24 informed --
25    A.    No.  They ask me, and we agree or

38 (Pages 146 - 149)

Page 150

1 disagree most of the time whether they should
2 proceed administratively, and we have agreed in
3 most of the cases not to proceed
4 administratively.
5        Now, there's some that have, because
6 I don't care if the evidence is out and it's not
7 going to compromise the investigation. It's all
8 about the investigation, whether it's going to
9 compromise it or not.
10     Q.    Okay. So in this case do you recall
11 whether you specifically asked the pharmacy
12 board or the medical board not to act because it
13 would compromise your criminal investigation?
14     A.    I don't recall specifically.
15     Q.    Do you recall whether you, in this
16 case or in any other case involving a doctor,
17 have ever filed a motion for an injunction to
18 try to suspend their license prior to the actual
19 conviction?
20     A.    I don't think that's a viable
21 procedure in the criminal context in the State
22 of Ohio.
23     Q.    Okay. So it's something that you've
24 never done?
25     A.    No.

Page 151

1     Q.    Okay. What efforts, if any --
2 strike that.
3        You said when you spoke to the media
4 about this unfortunate case that this man ruined
5 lives and this man killed people; this man did
6 so much damage to the community, I can't even
7 put it into words?
8     A.    That's correct.
9     Q.    Do you stand by what you said there?
10     A.    Oh, absolutely. This guy was a bad
11 guy.
12     Q.    And doctors, like him, who are
13 over-prescribing, are killing people?
14     A.    Yeah. But you know what, let's back
15 this up a little bit. They couldn't kill
16 anybody unless they got the drugs from the
17 distributors, okay. And that's why -- you know,
18 the doctors are responsible for what they do and
19 we hold them responsible. Who's holding you
20 guys responsible?
21     Q.    Do you understand that distributors
22 may not distribute medication except to licensed
23 pharmacies who are filling legitimate
24 prescriptions pursuant to a prescription written
25 by a licensed medical professional?

Page 152

1     A.    And do you realize that before you
2 do that, you got to make sure they're not
3 suspicious orders?
4     Q.    Is that your understanding, Mr.
5 Gutierrez? I'm the one today that's asking
6 questions.
7     A.    I understand that.
8     Q.    You're the one that is answering the
9 questions.
10     A.    That's correct.
11     Q.    So you understand that distributors
12 cannot distribute medicine if it is not pursuant
13 to a prescription written by a medical
14 professional like a doctor?
15     A.    Repeat that.
16     Q.    Distributors distribute prescription
17 opioids only pursuant to actual prescriptions
18 written by a licensed medical professional?
19     A.    You're talking about when a doctor
20 orders it from the distributors; is that what
21 you're saying?
22     Q.    Distributors do not simply send
23 medication out unless it is pursuant to an
24 actual prescription, correct?
25     A.    My understanding is there's an

Page 153

1 order, that the doctor actually orders drugs
2 from a distributor. Whether that has to be by
3 prescription or not, I don't know.
4     Q.    Would you agree with me that doctors
5 who over-prescribe, like Dr. Smirnoff, for
6 example, can kill people?
7     A.    Absolutely.
8     Q.    And, in fact, in his case nine
9 people died?
10        MR. SPELLACY: Objection.
11     A.    Under his care nine people died,
12 yes.
13     Q.    And this does real damage to the
14 community, like you said?
15     A.    Absolutely.
16     Q.    And Dr. Smirnoff is not the only
17 doctor in the county who was over-prescribing
18 prescription opioids --
19     A.    Nope.
20     Q.    -- right?
21        In this case you enlisted the help
22 of an expert witness, correct?
23     A.    Correct.
24     Q.    And that was because you needed a
25 medical authority to counter Dr. Smirnoff's

39 (Pages 150 - 153)

Page 154

1 defense?
2     A.   I need a medical opinion based upon
3 that statute I mentioned, what I have to prove.
4     Q.   Yes.
5     A.   Okay.
6     Q.   And do you recall that that expert
7 witness found in the review of the patient
8 records that some of the patients' toxicology
9 screens actually showed the patients weren't
10 ingesting the medication they were receiving?
11     A.   I'm not -- I don't recall that fact.
12     Q.   Okay.  Is that something that you
13 have seen in other cases involving doctors --
14     A.   That the --
15     Q.   -- that they indicate diversion?
16     A.   That indicate that they are not
17 taking the pills?
18     Q.   Right.
19     A.   And they're selling them, yes.
20     Q.   Do you recall in this --
21 Dr. Smirnoff case that the expert also concluded
22 some of the patients were doctor shopping?
23     A.   Yes, I remember that.
24     Q.   How many of Dr. Smirnoff's
25 approximately 3,000 patients were investigated

Page 155

1 and prosecuted by your office for drug
2 diversion?
3     A.   I believe we -- I'm not sure.  There
4 was a handful of patients that we utilized as
5 far as undercover to go back in, but generally
6 speaking, if -- a patient that is getting drugs
7 from a doctor and we think that that patient is
8 getting it for illegal purposes, we will work
9 with that individual to get into the doctor to
10 see us.  If he cooperates, we will.  If he
11 doesn't cooperate, then we'll prosecute him.
12 But most of the time the patients cooperate with
13 us, because we don't really want to go after the
14 patients, we want to go after the doctor and the
15 people responsible for all this stuff.
16     Q.   Why don't you want to go after the
17 patients?  Can you explain that further?
18     A.   Yeah.  Because we see them as
19 addiction is a disease.
20     Q.   So what about the patient I just
21 described, who is actually receiving these
22 prescription opioid prescriptions, but according
23 to toxicology screens --
24     A.   That's different.  Then he's
25 trafficking.  Then we'll go after them.  We're

Page 156

1 talking about addicts who go there to
2 self-medicate.
3     Q.   Okay.
4     A.   We're not talking about people going
5 there to grab the drugs to sell.
6     Q.   And of Dr. Smirnoff's approximately
7 3,000 patients, how many were investigated or
8 prosecuted for drug trafficking?
9         MR. SPELLACY:  Objection.
10     A.   I can't remember.  I can't recall.
11     Q.   Do you recall whether your office
12 took any efforts to investigate the patients
13 whose toxicology screens indicated they may be
14 diverting the drugs?
15     A.   You're asking me questions for
16 something that happened 20 years ago.  Unless I
17 look at the file and start reading it all back,
18 I can't answer specifically these type of
19 questions.
20     Q.   So you don't recall?
21     A.   No, I do not recall.  That would be
22 the answer.
23     Q.   Do you recall whether any
24 cooperation agreements were reached with respect
25 to Dr. Smirnoff's patients in which they

Page 157

1 received some benefit --
2     A.   Absolutely.
3     Q.   -- for not being charged in exchange
4 for testimony?  Let me finish my question.
5     A.   I know.
6     Q.   Sometimes they're long questions --
7     A.   I know and I'm sorry.
8     Q.   -- and she needs time to type before
9 you answer.
10     A.   I'm sorry.
11     Q.   And I'm sure your counsel wants the
12 opportunity to object as well.
13         So I will repeat my question.  Do
14 you recall entering into any cooperation
15 agreements with Dr. Smirnoff's patients in which
16 they received a benefit, such as not being
17 prosecuted, in exchange for testifying or
18 participating in your investigation?
19     A.   Yes.
20     Q.   How many such agreements do you
21 recall?
22     A.   I can just remember two
23 specifically, but I'm sure there were more.
24     Q.   Do you remember the names --
25     A.   Actually, there were a couple names.

40 (Pages 154 - 157)

Page 158

1 No, I don't.  No.  I can remember, I think,
2 four, but I know there probably were more.
3     Q.    In the Dr. Smirnoff case
4 specifically?
5     A.    Specifically, yeah.
6     Q.    Do you remember the patients' names?
7     A.    No, I don't.
8     Q.    And I said patients.  Were each of
9 these cooperators patients?
10     A.    Yes.
11     Q.    And is this tactic, using patients
12 and entering into cooperation agreements in
13 furtherance of your investigation, a common
14 tactic you might use --
15     A.    Yes.
16     Q.    -- in the prosecution of a doctor?
17     A.    Yes.
18     Q.    And were those two to four patients
19 that entered into the cooperation agreement drug
20 traffickers?
21     A.    I don't think so, and -- I don't
22 recall.  How's that?  That's probably a better
23 answer.
24     Q.    In Dr. Smirnoff's case were you able
25 to determine how many dosages of prescription

Page 159

1 drugs he dispensed to citizens of your county
2 over the years he practiced?
3     A.    I'm sure we have that number
4 somewhere.  I don't recall.  It is a lot.
5     Q.    Do you know how many of those doses
6 were recovered by law enforcement agents?
7     A.    The only -- the only things that we
8 covered is the drugs that we got in his -- in
9 his office when we searched it, but we never got
10 any drugs from the patients.
11     Q.    Were any pharmacists prosecuted in
12 the Dr. Smirnoff investigation?
13     A.    That's a good question.  I don't
14 know.  I don't recall.  That's a good question.
15     Q.    Were any distributors prosecuted in
16 this investigation?
17     A.    No.
18     Q.    Were any manufacturers prosecuted?
19     A.    No.
20     Q.    Why not?
21         MR. SPELLACY:    Objection.
22     A.    Because -- that's a loaded question.
23 It really, really is.  I don't know how to
24 answer that.
25     Q.    Did you have any evidence that would

Page 160

1 have supported a criminal action --
2     A.    No.
3     Q.    -- against drug distributors or drug
4 manufacturers?
5     A.    No.  If I had, I would have.
6     Q.    So you have shared with us some of
7 the challenges inherent in investigating a
8 doctor.  In those cases, what are your best
9 sources of evidence?
10     A.    Well, you have to define that, best
11 sources of evidence.
12         The first thing we do is look at the
13 amount of drugs that are coming out of that, and
14 then to be able to crack that, we need to be
15 able to go inside, so we need to get a CI, a
16 cooperating witness or a cop, to get into the
17 office to see what's going on.
18     Q.    Could you prosecute a doctor simply
19 because they are prescribing and/or dispensing a
20 high volume of prescription opioids?  Is the
21 number enough to justify a prosecution?
22     A.    That in and of itself, no.
23     Q.    Okay.  What other evidence would you
24 need?
25     A.    Well, you need a medical expert to

Page 161

1 indicate whether the drugs given were for
2 legitimate medical therapeutic purposes.
3     Q.    And that expert would need to review
4 the actual patient records?
5     A.    Correct.
6     Q.    And those records are the ones that
7 we discussed previously, which are confidential
8 under HIPAA, correct?
9     A.    Correct.
10     Q.    What other evidence would you gather
11 to make a strong case against a doctor?
12     A.    We talked about the pattern, the
13 amount of drugs, kind of drugs, combination of
14 drugs.  And you look at, like, family members,
15 like the whole family get the same drugs, that
16 kind of stuff.  You get a CI in to see if the
17 medical treatment is actually real instead of
18 being superficial.  And then you need a medical
19 expert to tell me whether the treatment is
20 within the bounds of -- within the standards of
21 medicine.  And I'm talking generally.
22     Q.    Have you referred to the standard
23 that you must prove in these types of cases as
24 medical malpractice, quote, with an attitude?
25     A.    Yes.

41 (Pages 158 - 161)

Page 162

1    Q.    And what do you mean by that phrase?
2    A.    4731 is the statute that we
3 mentioned before.  That statute is what doctors
4 are disciplined for for malpractice.  For
5 example, they don't use care and discrimination
6 and use of their modalities.  Okay.  I have to
7 prove three of those things in 4731 and I think
8 it's 22, okay.  That is malpractice.  But the
9 State of Ohio in State vs. McCarthy back in the
10 early '90s indicated that I go one step further
11 and I have to prove bad faith.  So that's why I
12 say it's medical malpractice with an attitude,
13 because I have to prove bad faith, and usually
14 that bad faith is greed or sex.
15    Q.    And in Dr. Smirnoff's case it was
16 both?
17    A.    I had both, yes.  That was a very
18 salacious case, as you probably read.
19    Q.    Yes.
20        So based on that standard, you need
21 to go -- you need to dig into the actual records
22 and the actual patient-by-patient specific
23 information --
24    A.    Yes.
25    Q.    -- in order to conclude that the

Page 163

1 doctor is acting unlawfully?
2    A.    And that's how I frame my
3 indictment, by patient.  So if you're going to
4 Dr. Smirnoff, I would indict on your
5 prescription history.
6    Q.    So if Dr. Smirnoff had been indicted
7 for, say, 200 counts, is that because -- is that
8 relative to 200 separate patients?
9    A.    I don't know how many patients, but
10 every time you get a prescription that's
11 unlawful, you are receiving the drug, so you
12 have possession of the drug, and it's an illegal
13 processing charge, too.  So there's different
14 charges from every singular transaction.  And,
15 by the way, I aggregate the drugs, too.
16    Q.    Was there any effort by your office
17 to compare the number of drugs prescribed and
18 dispensed by Dr. Smirnoff against the number
19 that you believe were illegally prescribed and
20 dispensed?  In other words, do you have a sense
21 of how -- what percentage of his dispensing was
22 legitimate versus illegitimate?
23        MR. SPELLACY:  Objection.
24    A.    Again, you're asking me on a case
25 from 20 years ago.  I would say Smirnoff was one

Page 164

1 of the most egregious cases, so I would say
2 probably upwards -- because you're always going
3 to have legitimate patients commingled with
4 illegitimate patients in a pill mill.  There's
5 always some patients that go there that are
6 actually -- there's -- nothing is being done
7 wrong, so -- but to answer your question, I
8 would say anywhere upwards between 70 and 80
9 percent of Smirnoff's patients were
10 illegitimate.
11    Q.    Okay.  Now, Smirnoff, as you said,
12 is one of the more egregious cases, and you
13 charged him with conduct related to a number of
14 different patients.  Have you ever prosecuted a
15 doctor for conduct with respect to a single
16 patient, a single case?
17    A.    No.
18    Q.    I gather that that type of case
19 would be more difficult because you cannot
20 establish a pattern; is that --
21    A.    That is correct.
22    Q.    -- correct?
23    A.    That is correct.
24    Q.    Generally speaking, in your work,
25 how many separate patients or separate instances

Page 165

1 do you like to see before you believe it reaches
2 to the level where you could successfully
3 prosecute a doctor?
4        MR. SPELLACY:  Objection.
5    A.    Again, we look at the overall
6 pattern, okay, and we try to identify, let's
7 say, 50 or 60 patients from OARRS, for example,
8 that's getting what we would consider off -- you
9 know, that's illegal.  And from those 50 or 60
10 patients, I usually narrow it down to anywhere
11 between 10 and 20, 25 patients, that I will
12 actually indict on, and those are the patients
13 that we actually go out and talk to and ask to
14 join team Ohio.
15    Q.    And what do you do to incentivize
16 them to, as you said, join team Ohio?
17    A.    We don't prosecute them.
18    Q.    So it sounds, from what you said,
19 that you generally try to make sure you have at
20 least a critical mass of patients --
21    A.    Yes.
22    Q.    -- in which you can show the doctor
23 has a pattern of improper prescribing; is that
24 fair?
25    A.    That would be -- yeah, you can say

42 (Pages 162 - 165)

1 it that way.
2      Q.   I want to talk with you now about
3 Dr. Charles Dunifer.  We're going to go back to
4 1997 --
5      A.   Here we go.
6      Q.   -- when he pled guilty to
7 involuntary manslaughter for the death of a
8 patient who overdosed.
9           Do you remember this case?
10      A.   Oh, yes.
11      Q.   And am I correct that this was the
12 first time that Ohio charged a doctor with
13 manslaughter for improperly prescribing
14 prescription opioids?
15      A.   I'm not sure about that, but I think
16 so.  I could not find anybody else in Ohio that
17 had done that at that time.  There could be.
18           -  -  -  -  -
19           (Thereupon, Gutierrez Deposition
20           Exhibit 7, Article Entitled "Former
21           Doctor Pleads Guilty:  He Was
22           Charged With Manslaughter In Drug
23           Overdose," dated May 17, 1997, was
24           marked for purposes of
25           identification.)

1           -  -  -  -  -
2      Q.   Handing you what has been marked for
3 identification as Exhibit 7, again, we are
4 looking at a Plain Dealer news article dated May
5 1997.  And this article, in the first sentence,
6 confirms that this doctor is believed to be the
7 first one charged with manslaughter with respect
8 to prescriptions.
9      A.   Yes.
10      Q.   Is this doctor the only doctor your
11 office has prosecuted for -- for manslaughter
12 related to the patient overdosing?
13           MR. SPELLACY:  Objection.
14      A.   To the best of my knowledge.
15      Q.   And you stated earlier that one of
16 the challenges in these manslaughter cases is
17 proving that the doctor is the proximate cause.
18 In this case, in Dr. Dunifer's case, you were
19 able to prove that he was the proximate cause of
20 his patient's death; is that correct?
21      A.   That is correct.
22      Q.   It was a particularly strong case,
23 wasn't it?
24      A.   Yes, it was.
25      Q.   Now, when Dr. Dunifer was indicted,

1 he was charged with, according to page 2 of the
2 article at the top, 74 counts, including
3 involuntary manslaughter, racketeering, and 42
4 counts of drug trafficking?
5      A.   Um-hum.
6           MR. SPELLACY:  Yes or nos.  Try to
7 do yes or no.
8           THE WITNESS:  I'm sorry.
9           MR. SPELLACY:  You're mumbling.
10           THE WITNESS:  It's usually my nap
11 time at this time, so --
12      Q.   In that indictment was he charged
13 with drug trafficking related to prescriptions
14 for patients other than the patient who
15 ultimately died?
16      A.   Yes.
17      Q.   And because he was charged with 72
18 counts of drug trafficking, can we presume that
19 that involved 72 individual patients?
20      A.   No.
21      Q.   We'd have to look at the indictment?
22      A.   Yeah.  And I could tell you it's
23 multiple patients.
24      Q.   Okay.  Do you know how many
25 individuals total received illegally prescribed

1 opioids from Dr. Dunifer?
2      A.   How many individuals?  I can't
3 recall that.
4      Q.   Dr. Dunifer was, in your words, one
5 of the biggest drug dealers in Cuyahoga County.
6 Do you agree with that?
7      A.   I say that a lot, don't I?
8      Q.   Well, on page 1, near the bottom,
9 "Gutierrez characterized Dunifer as one of the
10 biggest drug dealers in Cuyahoga County."
11      A.   Um-hum.
12      Q.   And you stated, "The whole practice
13 was geared to drug dealing."
14      A.   Yes.
15      Q.   Okay.  Ultimately Dr. Dunifer ended
16 up pleading guilty?
17      A.   Correct.
18      Q.   And your office dropped many of the
19 charges against him in exchange for that guilty
20 plea to manslaughter, correct?
21      A.   Correct.
22      Q.   What factors went into that
23 determination?
24      A.   As far as what goes?  You mean the
25 plea?

Page 170

1     Q.    Yes, the plea offer.
2     A.    Like anything else, we determined
3  the charges he's going to plea to and a
4  sentence, and then, you know, that saves us time
5  and resources and we don't have to write an
6  appeal and all sorts of other stuff, but if
7  we -- just like any plea agreement, there's
8  always a compromise, and that was the
9  compromise.
10     Q.    Do you recall what sentence
11  Dr. Dunifer received?
12     A.    According to this, he got three to
13  15.
14     Q.    And do you know where within that
15  range, what his sentence was?
16     A.    That would be it.  He has got to
17  stay a minimum of three.  In Ohio there used to
18  be a lot of what we call tails on the sentence,
19  whereas now -- well, they just redid the law
20  again in March.  They're going to put some tails
21  on first and second degrees, but now they have
22  more definite sentencing.  I don't know exactly
23  what he did, but he got a three to 15.  He's got
24  to do a minimum of three, a maximum of 15.  It
25  depends on the department of corrections at that

Page 171

1  point if he's going to do the whole 15.
2     Q.    In your opinion, was that an
3  appropriate sentence?
4     A.    Absolutely, because that's the most
5  I could have got on any of the charges.  In
6  fact, the reality of that one was the drug
7  trafficking charges carried more time than the
8  involuntary manslaughter.
9     Q.    Why was that?
10     A.    Just the nature of the sentencing,
11  and that's still the same today.
12     Q.    What efforts, if any, did your
13  office or your investigative partners take to
14  try to recover the illegal prescription medicine
15  from Dr. Dunifer's patients or others?
16     A.    I want to -- maybe we can put this
17  to rest, okay.  When doctors give out pain
18  medication, opiate pain medications, they
19  usually take them or sell them, so it's
20  impossible to try to recover any of the drugs.
21  So you keep asking me that same question and I
22  think I said in the morning that's just a silly
23  question, because you never recover the drugs
24  that have been given out by the doctor and
25  filled at pharmacies.  They're gone.  The drugs

Page 172

1  are gone.
2     Q.    So, to answer my question, you did
3  not attempt to recover the prescription medicine
4  from his individual patients?
5        MR. SPELLACY:  Objection.
6     Q.    You believed that the medicine was
7  already gone?
8     A.    Yes.
9     Q.    Do you recall how many of
10  Dr. Dunifer's patients you decided to charge, if
11  any?
12     A.    I can't recall.  I can't recall.  I
13  know we did have some cooperating patients on
14  that case.
15     Q.    Now, in the Dunifer case, the
16  patient died in 1994, three years before the
17  doctor ultimately pled guilty?
18     A.    Correct.
19     Q.    According to this news article,
20  investigators became aware of Dunifer's
21  practices through complaints that dated back to
22  1990.
23     A.    Okay.
24     Q.    Were you aware of those complaints?
25        MR. SPELLACY:  Objection.

Page 173

1     A.    I don't recall that without looking
2  at the file.
3     Q.    And you mentioned at the very last
4  paragraph of page 1 that "Dunifer had been on a
5  list of doctors" -- the bottom of page 1,
6  "Dunifer had been on a list of doctors who wrote
7  many more prescriptions than most of their
8  colleagues."  What list are you referring to?
9     A.    There is a -- how should I say -- a
10  hit list that the investigators have through
11  being out in the street of doctors that are
12  known to be high writers.
13     Q.    Which investigators create or
14  maintain this hit list?
15     A.    It -- I don't know if anybody
16  actually maintains a list, but there's just a
17  number of doctors that keep coming up in
18  conversations in this area.  There's really no
19  official list that anybody keeps.  It's just
20  that my investigator would come in and say, Hey,
21  you know, Dr. Joe and Dr. George, we're hearing
22  about these guys.
23     Q.    Well, in the news article you said
24  that he had been on a list of doctors who wrote
25  many more prescriptions than most of their

Page 174

1 colleagues.  Were you not referring to a
2 specific list?
3      A.   I wasn't being --
4           MR. SPELLACY:  Objection.
5      A.   I wasn't being literal.  Like right
6 now I can tell you there's a bunch of high
7 writers in Cuyahoga County that the
8 investigators are aware of, okay.  So, I mean,
9 there's high writers, and the good ones we can
10 never get to.
11      Q.   Why not?
12      A.   Because they're smart enough to
13 cover their tracks.
14      Q.   When you say a high writer, you're
15 talking about a doctor who prescribes --
16      A.   Prescribes a lot of prescriptions,
17 yes.
18      Q.   How many high writers are you aware
19 of, a handful or a hundred?
20           MR. SPELLACY:  Objection.
21      A.   No.  Just a handful.
22      Q.   And is one of the reasons you can't
23 get to these high writers because you haven't
24 been able yet to establish probable cause in
25 order to get a search warrant to see the medical

Page 175

1 records?
2      A.   As I indicated before, it takes a
3 lot of time and effort and resources to zero in
4 on a doctor.
5      Q.   I believe you.
6      A.   So I have to have political will by
7 the outside agencies to do this, and it's very
8 difficult to do these cases, and so a lot of
9 investigators, and especially like local
10 suburban police departments, are not equipped to
11 do this, and they don't want to get into it, so
12 -- and if the pharmacy board, who is overtaxed
13 and overwhelmed right now, can't get their
14 people to do it, and if somebody like WEB can't
15 do it, then it doesn't get done because we don't
16 have the resources.  So what we try to do is go
17 after the most egregious ones, the ones that we
18 know we can knock off.
19      Q.   And what sources are used to try to
20 determine who the high writers are?
21      A.   OARRS now.
22      Q.   OARRS.  And which law enforcement
23 agency monitors OARRS and comes up with a list,
24 whether it be a physical list or a metaphorical
25 list?

Page 176

1      A.   Pharmacy board.
2      Q.   The pharmacy board?
3      A.   Yes.
4      Q.   So sitting here today, you are aware
5 of some high writers?
6      A.   A couple, yes.
7      Q.   Who seem suspicious for that reason?
8      A.   Um-hum.
9      Q.   But for whom you do not yet have
10 sufficient evidence to launch a criminal
11 investigation?
12           MR. SPELLACY:  Objection.
13      A.   We have some preliminary evidence of
14 that but we have not undergone a full-blown
15 investigation.
16      Q.   Similarly, do you, sitting here
17 today, have particular pharmacies that have
18 raised suspicions as high dispensing
19 establishments?
20           MR. SPELLACY:  Objection.
21      A.   Yes and no.  We know there are some
22 pharmacies that the doctor shoppers and the
23 prescription rings like to go to.  Okay.  Mostly
24 they're inner city ones.
25      Q.   How about individual patients?

Page 177

1 Based on the OARRS data, has law enforcement
2 identified particular patients that have raised
3 a red flag for you?
4           MR. SPELLACY:  Objection.
5      A.   Within the context of a doctor,
6 Because we just don't go looking on OARRS for
7 individuals that are getting drugs?  That's not
8 how it works.
9      Q.   So OARRS is used to determine
10 whether someone is doctor shopping, for example?
11      A.   Yes, exactly.
12      Q.   And so does law enforcement
13 proactively attempt to use OARRS to determine
14 which patients are using multiple doctors to
15 obtain --
16      A.   Yes.
17      Q.   -- high quantities of prescription
18 opioids?
19      A.   Yes.
20      Q.   And are you aware of some
21 individuals that meet that category?
22      A.   Not presently, but in the past, yes.
23      Q.   And when you've become aware of such
24 individuals, what actions, if any, has your
25 office taken?

45 (Pages 174 - 177)

Page 178

1    A.    Well, our office doesn't take any
2  action.  It's the investigative agencies that
3  take the action to develop the evidence.  We
4  only take action once the evidence is presented
5  to me.  So they go out and investigate, and what
6  that means is they go to the various doctors and
7  say, you know, George is coming to get scrips
8  from you.  Yeah.  Do you know he's getting
9  scrips from Dr. Joe down the road?  No.  That's
10 how that works.
11    Q.    To what extent is your office
12 involved in an ongoing investigation?
13         MR. SPELLACY:  Objection.
14    A.    Regarding a doctor, a practitioner,
15 I manage and coordinate the investigation
16 usually from the beginning.
17    Q.    So is it fair to say that perhaps
18 for more complex investigations, your office
19 would be involved --
20    A.    Yes.
21    Q.    -- as a partner with the
22 investigating agency?
23    A.    I think that's a good way to say it,
24 complex investigations, yes.
25    Q.    The Dr. Dunifer investigation took

Page 179

1  18 months, correct?
2    A.    Um-hum.  Yes.
3    Q.    And between -- in the interim, from
4  the time the patient died until you convicted
5  the doctor, the patient's family actually sued
6  him in civil court and settled, correct?
7    A.    I'm not aware of that, but could
8  have been.  I don't recall.
9    Q.    And I have the same questions for
10 Dr. Dunifer as I had for the other doctors, and
11 that is did he continue to treat patients and
12 prescribe medication while the 18-month
13 investigation was ongoing?
14    A.    I believe so.  He was still
15 practicing, yes.
16    Q.    And, again, your office didn't take
17 steps to attempt to suspend his medical --
18    A.    We can't.
19    Q.    -- license?
20    A.    We can't.  You keep asking me the
21 same question.  We can't.  If we could, we
22 would.
23         MR. SPELLACY:  Objection.
24    Q.    During that time period, the 18
25 months in which he was being investigated, do

Page 180

1  you know how many prescription opioids he
2  dispensed and prescribed to patients?
3    A.    I don't recall that.
4    Q.    Do you have any estimate?
5    A.    No.  I'd have to get to the file,
6  look at the file to answer that question, but a
7  lot.
8    Q.    With respect to the Dr. Dunifer
9  case, would you agree that cases that try to
10 challenge a doctor's medical judgment are
11 difficult?
12    A.    Yes.
13    Q.    And that's because doctors can claim
14 that a person's death was an unintentional
15 result of legitimate therapy?
16         MR. SPELLACY:  Objection.
17    A.    You're talking about death now?
18    Q.    Yes.
19    A.    So you're talking the manslaughter
20 context?
21    Q.    Yes.
22         MR. SPELLACY:  Objection.
23    A.    Repeat the question because I
24 thought you were talking a different context.
25    Q.    Any case, including the manslaughter

Page 181

1  case, that tries to challenge a doctor's medical
2  judgment is going to be a difficult case
3  relative to your run of the mill --
4         MR. SPELLACY:  Objection.
5    A.    Absolutely.
6    Q.    And one of the reasons for that is
7  in manslaughter cases doctors can claim that a
8  person's death was an unintentional result of
9  legitimate medical treatment or therapy?
10         MR. SPELLACY:  Objection.
11    A.    Yeah, they could claim that.
12    Q.    Also, if that patient misuses the
13 drugs, like you described earlier, it's
14 difficult to then hold the physician
15 responsible?
16         MR. SPELLACY:  Objection.
17    A.    That is correct.
18    Q.    And if the patient has ingested
19 other drugs, it's difficult to hold the
20 physician responsible?
21         MR. SPELLACY:  Objection.
22    A.    Yes.
23    Q.    Do you believe that the Board of
24 Medicine has done enough to regulate the
25 prescribing practices of physicians in your

46 (Pages 178 - 181)

Page 182

1 county?
2        MR. SPELLACY:  Objection.
3    A.    The medical board?
4    Q.    Yes.
5    A.    The Ohio State Medical Board has
6 done enough to regulate?
7    Q.    To regulate the prescribing
8 practices of the physicians in your county.
9        MR. SPELLACY:  Objection.
10    A.    I can't really answer that.
11    Q.    Do you view the Board of Medicine as
12 an effective oversight for physicians?
13        MR. SPELLACY:  Objection.
14    A.    Administratively.
15    Q.    If your office identifies a
16 physician that it believes is suspicious, does
17 it provide that physician's name to the medical
18 board?
19        MR. SPELLACY:  Objection.
20    A.    By that time the medical board knows
21 about it.  If they don't, I will inform the
22 medical board that we're looking at a doctor,
23 and I ask them for any information, to be honest
24 with you.
25    Q.    In your experience, how long does it

Page 183

1 typically take for the medical board to prevent
2 a doctor from continuing to practice?
3        MR. SPELLACY:  Objection.
4    A.    I couldn't answer that.  That's
5 contextual.
6    Q.    Moving on to pharmacists now, are
7 you aware of any pharmacists in Cuyahoga County
8 that sold prescription opioids to people
9 improperly?
10        MR. SPELLACY:  Objection.
11    A.    I can't recall.
12    Q.    I'm going to show you Plaintiffs'
13 response to an interrogatory --
14    A.    Okay.
15    Q.    -- which I understand will be marked
16 as Exhibit 8.
17        -  -  -  -  -
18        (Thereupon, Gutierrez Deposition
19        Exhibit 8, Cuyahoga County's
20        Supplemental Response and Objections
21        to Distributor Defendants'
22        Interrogatory Number 3 As Rewritten
23        By Special Master David Cohen, was
24        marked for purposes of
25        identification.)

Page 184

1        -  -  -  -  -
2    Q.    And you can turn to page 5.
3 Plaintiffs were asked at the top of page 5 to
4 "Identify those pharmacies within your
5 geographic boundaries that you investigated for
6 or learned were being investigated for or
7 learned were engaged in possible diversion or
8 wrongful prescription of prescription opioids
9 during the time frame."
10        If you look to the bottom of page 5,
11 you see the response --
12    A.    Um-hum.
13    Q.    -- that "According to the records of
14 the State of Ohio Board of Pharmacy, the
15 following pharmacies or pharmacists were
16 investigated within Cuyahoga County," and it
17 provides a chart of pharmacists, page 5 through
18 page 8.  In total, it lists 19 pharmacies that
19 have been involved in investigations since
20 October 1996 all the way until the most recent,
21 January 2019.
22    A.    Not to be argumentative, but you're
23 saying pharmacies, and all these have to deal
24 with particular pharmacists.
25    Q.    Then I will use the word

Page 185

1 "pharmacist."
2    A.    Because that's a big difference.
3    Q.    Yes.
4    A.    Because there are a lot of
5 pharmacists that we have prosecuted over the
6 years, mostly for them dipping their hands in
7 the till.
8    Q.    So this chart is intended to list
9 all the pharmacists --
10    A.    Right.
11    Q.    -- and pharmacies that have been
12 investigated?
13        To your knowledge, what role did
14 your office play in disciplining or prosecuting
15 these pharmacies and pharmacists?
16        MR. SPELLACY:  Objection.
17    A.    I can't be specific with the
18 information you've given me here, but I can tell
19 you over the years pharmacists have been
20 prosecuted for, usually, stealing the drugs
21 themselves.
22    Q.    And can you tell me which of these
23 19 individual entries were prosecuted by your
24 office?
25    A.    I -- I couldn't tell you.  I don't

47 (Pages 182 - 185)

Page 186

1 know that answer.
2     Q.    Could you tell me which ones have
3 been investigated by your office?
4     A.    I couldn't tell you that either.
5     Q.    Have you personally worked on any
6 cases involving the entities listed in this
7 chart?
8     A.    Well, again, they're listing
9 pharmacists here, okay, that they're going
10 after, okay.  I have prosecuted pharmacists over
11 the course of my career.  I can't tell you if
12 any of these pharmacists are on this list.
13     Q.    Just looking at the names that are
14 listed, none of these stand out to you as a case
15 you might have -- you recall investigating or
16 prosecuting?
17     A.    Chesterfield Pharmacy rings a bell.
18 And that is a pharmacy.  And I don't know if
19 that pharmacy was involved in the Smirnoff case
20 -- I think it was involved in the Smirnoff
21 case -- or another case.  I'm not sure.  But let
22 me look at the other names --
23     Q.    Sure.
24     A.    -- and see if anything else stands
25 out to me.

Page 187

1         None of the other names stand out to
2 me.
3     Q.    Okay.  And among the four entries
4 for Chesterfield Pharmacy, do any of the
5 individual pharmacists who are listed refresh
6 your memory?
7     A.    Okay.  Where are the four for the
8 Chesterfield Pharmacy?
9     Q.    Page 6 in the center of the page.
10     A.    Okay.
11     Q.    Row 2, 3, 4 and 5.  And you see that
12 that corresponds --
13     A.    Right.  I see that, yeah.  Those
14 names do not ring a bell.
15     Q.    Okay.  So you believe you worked on
16 investigation or prosecution involving
17 Chesterfield Pharmacy but you cannot recall
18 specifics?
19     A.    Yeah.  That was in connection with
20 either the Smirnoff case or another case.  It
21 wasn't standing of itself.
22     Q.    To your knowledge, has your office
23 prosecuted or disciplined any pharmacies or
24 pharmacists other than those that appear on this
25 list?

Page 188

1     A.    I can't answer that question.  I
2 don't have that knowledge.
3     Q.    Based on the knowledge you do have,
4 and your review of this list, are any pharmacies
5 or pharmacists missing?
6         MR. SPELLACY:  Objection.
7     A.    I couldn't answer that question.  I
8 don't know.
9     Q.    Have you prosecuted -- has your
10 office prosecuted more than 19 pharmacists or
11 pharmacies?
12     A.    I don't know.
13     Q.    We're done with that exhibit.
14     A.    And I just want to qualify that
15 answer in the sense that sometimes when
16 pharmacists do come into our office, if it's a
17 simple thing of a pharmacist stealing drugs, it
18 will go through general felony.
19     Q.    Prior to this litigation did your
20 office ever communicate with the DEA concerning
21 any pharmacists improperly supplying
22 prescription opioids?
23         MR. SPELLACY:  Objection.
24     A.    I'm sure during the course of some
25 of these doctor investigations, yes.

Page 189

1     Q.    Did you yourself make those
2 communications with the DEA?
3     A.    I don't recall.
4     Q.    Do you recall any communications
5 you've had with the DEA regarding pill mills
6 operating in your county?
7     A.    Yes.
8     Q.    How many such conversations?
9     A.    Over the course of my three decades
10 of doing this, numerous times.
11     Q.    So how long have you been
12 prosecuting prescription opioids?
13     A.    Since 1989, practitioners.
14     Q.    Since 1989?
15     A.    Yes.
16     Q.    Did you ever communicate with the
17 Ohio Board of Pharmacy about pharmacists
18 dispensing opioids illegally?
19     A.    Yes.  Usually as a result of them
20 telling me.
21     Q.    Sitting here today, can you tell us
22 how many pharmacists your office has
23 investigated or prosecuted since 2005?
24     A.    I don't have that --
25         MR. SPELLACY:  Objection.

48 (Pages 186 - 189)

Page 190

1    A.   I don't have that information.
2    Q.   When you set out to investigate a
3 pharmacist, what are the typical steps in your
4 investigative plan?
5    A.   Well, it's -- depends what the
6 pharmacist is doing, okay.  If the pharmacist
7 himself is just stealing medication and
8 self-medicating, that we would call a low end
9 case, where usually my unit is not going to take
10 that, okay.
11    Q.   Which unit would take that?
12    A.   General felony, okay, because it's a
13 simple case.  It's just a theft case.
14        Now, sometimes there have been
15 pharmacy techs that are involved in a scrip
16 ring, okay, which is different, okay, and -- but
17 generally speaking, pharmacists that I have
18 dealt with, which are very few -- I only can
19 remember maybe, like I said, Chesterfield
20 Pharmacy, so there's not really any -- how
21 should I say -- a protocol that we have with
22 pharmacists as we do with doctors, is what I'm
23 trying to say.  It's contextual, what they're
24 doing.
25    Q.   Do you know how many pharmacists or

Page 191

1 pharmacies have been investigated but not
2 charged by your office?
3        MR. SPELLACY:  Objection.
4    A.   I don't know.
5    Q.   Are any records kept relating to
6 that question?
7        MR. SPELLACY:  Objection.
8    A.   I don't know about that either.
9    Q.   Do you know who might know?
10        MR. SPELLACY:  Objection.
11    A.   No, I don't.
12    Q.   Has your office been involved in any
13 cases in which pharmacists or pharmacies have
14 lost their licenses even if you didn't
15 ultimately pursue criminal action against them?
16        MR. SPELLACY:  Objection.
17    A.   Yes.
18    Q.   Tell me about those cases.
19    A.   I can remember a case of an older
20 guy -- I'm talking like 78, 79 -- that was
21 stealing a bunch of Viagra so he could have sex
22 with his stripper girlfriend, and because he was
23 so old and everything, that we didn't -- and it
24 was Viagra and the pharmacy board just -- we
25 didn't prosecute.  And I think the guy had one

Page 192

1 foot in the grave anyway, so we didn't -- I just
2 remember that one because, you know, it kind of
3 sticks out.
4    Q.   So he lost his license but he wasn't
5 prosecuted?
6    A.   Yes, because it was only Viagra.
7    Q.   Do you have any other examples of
8 cases --
9    A.   No.  That's the one that stands out
10 to me.
11    Q.   I can see why.
12        Did you or your office ever receive
13 reports that pharmacists had placed suspicious
14 orders of prescription opioids?
15    A.   No.
16    Q.   Did you receive any reports similar
17 to that from the DEA?
18    A.   They never shared it with me.
19    Q.   How about from the Ohio Board of
20 Pharmacy; did they ever share reports of
21 suspicious orders by pharmacists?
22    A.   No, not that I recall.
23    Q.   Have you ever seen something called
24 a suspicious order report?
25    A.   Yes.

Page 193

1    Q.   Under what circumstances did you see
2 one?
3    A.   I can't really tell you that.  It's
4 under investigation right now.
5    Q.   Okay.  So it relates to a case
6 that's currently being investigated?
7    A.   Yes.
8    Q.   And is that the only case in which
9 you've reviewed a suspicious report?
10        MR. SPELLACY:  Objection.
11    A.   I think so.
12    Q.   And who did that suspicious order
13 report?  Who generated that particular report?
14    A.   I can't really tell you.  This is an
15 ongoing criminal investigation.  I can't tell
16 you anything.
17    Q.   Trust me, I understand, and I'm not
18 asking you to identify by name, but could you
19 identify by type?  Was it a distributor who
20 created that suspicious order report you're
21 reviewing?
22    A.   No, it wasn't a distributor.
23    Q.   Okay.  Was it a pharmacy --
24    A.   That --
25    Q.   -- that created the suspicious order

49 (Pages 190 - 193)

Page 194

1 report you're referring to?
2     A.  I can't really tell you any facts
3 and circumstances about that case, ma'am.
4     Q.  Has your office investigated
5 instances of prescription forgery --
6     A.  Yes.
7     Q.  -- for prescription opioids?
8     A.  Yes, ma'am.
9     Q.  And how often -- scratch that.
10        How many such cases has your office
11 prosecuted over the past 20 years?
12        MR. SPELLACY:  Objection.
13     A.  Forging prescriptions?
14     Q.  Yes.
15     A.  Numerous times.
16     Q.  More than 50?
17     A.  Yes.
18     Q.  More than 200?
19     A.  Yes.  Over 20 years, sure.
20     Q.  More than a thousand?
21     A.  I would say over a thousand, and
22 counting.
23     Q.  And can you provide in those cases
24 an example of like a typical case, how that
25 might transpire?

Page 195

1        MR. SPELLACY:  Objection.
2     A.  Well, there's a difference between a
3 forged prescription and a counterfeit
4 prescription.
5     Q.  What's the difference?
6     A.  A forged prescription is that I get
7 a prescription and put the doctor's --
8        (Interruption.)
9     Q.  Okay.  What's the difference?
10     A.  Okay.  The forged prescription is
11 where somebody gets a blank prescription and
12 fills it out.  Counterfeit prescription is where
13 somebody actually creates the prescription
14 itself and then fills it out.
15     Q.  And you see both types of cases?
16     A.  Yes, counterfeit and forged.
17     Q.  Is one type more common than others?
18     A.  The forged.  It's easier to steal
19 than to create.
20     Q.  Do you think your hard working law
21 enforcement agents in the county succeed in
22 detecting each and every instance in which
23 prescriptions are forged?
24     A.  No.
25     Q.  So there are certainly some cases

Page 196

1 that go undetected?
2     A.  Absolutely.
3     Q.  Do you have any estimate or basis to
4 conclude as to what percentage you believe go
5 undetected?
6        MR. SPELLACY:  Objection.
7     A.  I can't really give you an answer to
8 that.  Only to the extent that it is very
9 prevalent out there, forged prescriptions.  I've
10 seen the spike in the last four years with scrip
11 rings.
12     Q.  When you say "scrip rings," what are
13 you referring to?
14     A.  I'm talking about somebody who
15 steals scrips, and like I said, the organized
16 ring.
17     Q.  In those cases do you sometimes see
18 individuals who take low level jobs at hospitals
19 or in medical buildings in order to obtain
20 access to prescription pads?
21     A.  I don't know if they get employment
22 to do that, but that's one way of how sometimes
23 they get it.  They will pay somebody who's like
24 the -- you know, who's cleaning the offices.
25     Q.  Do you recall a case involving a

Page 197

1 defendant named Destiny Ramos?  It was a 2012
2 case out of your office.
3     A.  Oh, yeah.
4     Q.  And did the defendant, Destiny
5 Ramos, and her boyfriend, Donte Jones, engage in
6 a scrip ring?
7     A.  I believe so, yes.
8     Q.  Did you personally prosecute that
9 case?
10     A.  Yes, with another prosecutor; yes.
11     Q.  And tell us about the allegations in
12 that case.
13     A.  I know the name.  I know it was a
14 scrip ring.  I'm not sure about the facts or
15 not, if this is the one from the Cleveland
16 Clinic or not.  I'm not sure.
17        - - - - -
18        (Thereupon, Gutierrez Deposition
19        Exhibit 9, News Article Titled "For
20        A Certain Kind Of Drug Trafficker,
21        Blank Prescription Pads Are The Way
22        To Get Pain Pills, With A Little
23        Help From Their Friends, Who They
24        Use To Get Them Filled," Beginning
25        Bates Number CLEVE-001485599, was

50 (Pages 194 - 197)

Page 198

1      marked for purposes of
2      identification.)
3           - - - - -
4      Q.  I'm going to give you Exhibit 9,
5  which is a news article.
6      A.  I should have brought my readers.
7      Q.  This particular article highlights
8  two cases, one involving the Ramos case out of
9  your office --
10      A.  Um-hum.
11      Q.  -- and one involving a case out of
12  the Ohio Attorney General's Office involving
13  defendant Angela Hicks.  Both are scrip ring
14  cases.  I'll give you a moment to review the
15  article.
16      A.  We did both of these cases.  The
17  Attorney General's Office did not do Hicks.
18      Q.  Okay.  So you said that your office
19  is the one that prosecuted --
20      A.  Yes.  Both those cases were my
21  cases.
22      Q.  And Angela Hicks was a pediatric
23  medical assistant at University Hospital,
24  correct?
25      A.  Yes.

Page 199

1      Q.  And she stole about 640 prescription
2  sheets?
3      A.  Pad, yeah.  Pad.
4      Q.  Each sheet on that prescription pad
5  is worth between $50 and $100 on the street,
6  correct?
7      A.  That's correct.
8      Q.  And this is, by the way, a --
9      A.  2012, I think.
10      Q.  -- 2014 case.  So at this point, in
11  2019, would a sheet for prescriptions be worth
12  more --
13          MR. SPELLACY:  Objection.
14      Q.  -- or the same?
15      A.  I think around the same.  Not much
16  more.
17      Q.  Given how many sheets Ms. Hicks
18  stole, she could have obtained a possible 30 to
19  $60,000, correct?
20      A.  Yes, if you add that up.
21      Q.  And according to the evidence in
22  this case, Angela and Joshua Hicks recruited
23  their friends to go out and fill the
24  prescriptions, correct?
25      A.  Again, I don't have the facts of the

Page 200

1  case except this news article, but I'll agree
2  with you.
3      Q.  Does that accord with your memory of
4  the facts?
5      A.  Basically, generally, yes.
6      Q.  Okay.  And do you recall that in
7  this case the individuals who were attempting to
8  fill these invalid prescriptions took measures
9  to evade authorities by going to several
10  different pharmacies?
11      A.  Yes.
12      Q.  In fact, according to this news
13  article, they went to 17 different pharmacies,
14  correct?
15      A.  Again, that's a common factor in
16  these type of cases, yes.
17      Q.  And that's to make it more difficult
18  for pharmacists and pharmacies to detect the
19  behavior?
20      A.  That's correct.
21      Q.  With respect to the Destiny Ramos
22  case, she was training at Southwest General
23  Hospital, correct?
24      A.  Yes.
25      Q.  And she and her boyfriend recruited

Page 201

1  18 people to participate in the scrip ring,
2  correct?
3      A.  Sounds about right.  Again, I want
4  to preface all these answers by saying I don't
5  have the file in front of me.
6      Q.  But to the best of your
7  recollection --
8      A.  Yes.
9      Q.  -- that sounds correct?
10      A.  Yes.
11      Q.  Do you consider prescription pad
12  theft to be an ongoing challenge for the county?
13      A.  Yes.
14      Q.  And for hospitals and physician
15  offices?
16      A.  Yes, I do.
17      Q.  In your personal experience, have
18  you seen prescription pads left out in plain
19  sight in medical offices?
20          MR. SPELLACY:  Objection.
21      A.  Yes.
22      Q.  And in your opinion, you don't
23  believe that medical facilities always carefully
24  guard those prescription pads?
25          MR. SPELLACY:  Objection.

Page 202

1    A.   Yes.
2    Q.   With respect to the Ramos case, you
3  said to the media, "There's always going to be a
4  vacuum for getting drugs illegally, and that
5  vacuum will be filled by people getting the
6  prescriptions their own way."
7         Do you still agree with that
8  statement?
9    A.   Yes.
10   Q.   And just as you've testified here
11 today, you explained to the media, "There's
12 always been a subsection of addicts that want
13 prescription drugs and not street drugs."
14        Do you still agree with that
15 statement?
16   A.   I think I said that this morning.
17   Q.   You did.
18        And, in your experience, addicts and
19 criminals, like Ramos and Hicks, are willing to
20 steal and lie and break the law in order to
21 obtain prescription drugs, correct?
22   A.   Yes.
23   Q.   And certainly as a prosecutor, you
24 would agree with me that individuals who do
25 break the law in order to obtain prescription

Page 203

1  drugs deserve to be held accountable?
2    A.   Yes, and so do other people.
3    Q.   Do you know how many cases involving
4  doctor shopping your office has prosecuted over
5  the years?
6         MR. SPELLACY:  Objection.
7    A.   No.
8    Q.   Are you aware of any efforts your
9  office has undertaken to prevent citizens from
10 attempting to doctor shop?
11        MR. SPELLACY:  Objection.
12   A.   Not my office.
13        MR. SPELLACY:  Can we break when
14 it's convenient for you?
15        MS. WOODS:  Yes.
16   Q.   Has your office prosecuted cases
17 involving counterfeit pills sold as prescription
18 opioids that were actually something else?
19        MR. SPELLACY:  Objection.
20   A.   Personally, I've maybe done one of
21 those cases.  I can't remember.
22   Q.   Do you recall how long ago?
23   A.   No, I don't.
24   Q.   Or the defendant's name?
25   A.   No.  It's very unusual, at least in

Page 204

1  my experience, for me to do that.
2    Q.   Do you recall anything about the
3  type of defendant you prosecuted in that case?
4    A.   No.
5    Q.   And have you ever seen counterfeit
6  pills sold by legitimate pharmacies?
7    A.   No.
8    Q.   Have you ever seen counterfeit pills
9  distributed by legitimate distributors?
10   A.   No.
11   Q.   Have internet sales of prescription
12 opioids ever been a problem in Cuyahoga County?
13        MR. SPELLACY:  Objection.
14   A.   It was initially in the early 2000s
15 when the internet started to come on, but
16 federal regulations cut that off.
17   Q.   Are you aware of opioids that have
18 entered your county from abroad?  And when I say
19 "opioids," I'm referring broadly to heroin as
20 well as prescription opioids.
21        MR. SPELLACY:  Objection.
22   A.   I have no knowledge of that but for
23 what I read in the papers.
24   Q.   Based on conversations with
25 colleagues and law enforcement agents, have you

Page 205

1  learned of any instances in which opioids made
2  their way into the county from foreign
3  countries?
4    A.   From conversations with -- over the
5  years with NDO prosecutors, yeah.
6    Q.   Did those conversations make you
7  aware that Mexican drug organizations are
8  responsible for much of the heroin in the
9  county?
10        MR. SPELLACY:  Objection.
11   A.   I don't recall that.  I recall
12 hearing about China.
13   Q.   And what did you hear about China?
14   A.   That they're a source of illegal
15 drugs that come into the United States.
16   Q.   And specifically did you learn that
17 China drug cartels are responsible for much of
18 the fentanyl and carfentanil?
19   A.   I know that.
20        MR. SPELLACY:  Objection.
21   Q.   You did or did not?
22   A.   I do from going to those seminars
23 that I told you about.
24   Q.   In fact, did you learn at those
25 seminars that the illicit manufacture and

52 (Pages 202 - 205)

Page 206

1 illegal importation of fentanyl comes almost
2 exclusively from China?
3          MR. SPELLACY: Objection.
4     A.   I just remember that China was a big
5 player in that area.
6     Q.   Are you able to approximate what
7 percent of the opioid problems in your county
8 can be traced to international drug
9 organizations?
10         MR. SPELLACY: Objection.
11    A.   I can't answer that.
12    Q.   Do you know whether opioids,
13 including prescription opioids, come into your
14 county from other states and other cities --
15         MR. SPELLACY: Objection.
16    Q.   -- outside your jurisdiction?
17    A.   Yes.
18    Q.   What do you know about that?
19    A.   There has been some cases where we
20 know that the opioids are coming from Detroit.
21    Q.   And how do you know that to be the
22 case?
23    A.   Investigations.
24    Q.   What specific evidence in the
25 investigation has led you to conclude that the

Page 207

1 opioid came from Detroit?
2     A.   Just from individuals that we have
3 talked to in the course of some investigations.
4     Q.   And what specific type of opioids
5 have been coming from Detroit?
6     A.   What were they?  They were either
7 Percocet or OxyContins, one of the two, some
8 oxycodone derivative.  So an oxycodone
9 derivative.  It could be OxyContin.  It could be
10 Percocet.  So I'm just giving you a general.
11 I'm not sure.
12    Q.   Do you know the total number of
13 opioids that came into your county from Detroit
14 or from other locations outside your
15 jurisdiction?
16         MR. SPELLACY: Objection.
17    A.   No.
18    Q.   Can you approximate?
19         MR. SPELLACY: Objection.
20    A.   No.
21    Q.   Has your office -- does your office
22 take any steps to prevent the entry of illicit
23 drugs from outside your jurisdiction?
24    A.   Again, we are a reactive
25 organization, so we react to complaints and to

Page 208

1 situations.  I am not aware of any of that.
2          MS. WOODS: This is a good time for
3 a break.
4          THE VIDEOGRAPHER: Off the record,
5 1:54.
6          (Recess had.)
7          THE VIDEOGRAPHER: On the record,
8 2:10.
9 BY MS. WOODS:
10    Q.   So we've been talking today about
11 prescription opioid abuse problems in Cuyahoga
12 County.
13         Do you believe that the county's
14 problem has one cause or multiple causes?
15         MR. SPELLACY: Objection.
16    A.   Well, that's a complex -- that's a
17 complex question to -- for a simple answer.  I
18 can tell you this.  I believe that the
19 distributors and the manufacturers are a major
20 part of the problem.
21    Q.   What else is a part of the problem?
22    A.   Socioeconomics.
23    Q.   Are doctors unlawfully prescribing
24 opioids for no medical purpose part of the
25 problem?

Page 209

1     A.   Look, you know, you've given me
2 examples like cartels, you know, from China and
3 Mexico who bring the stuff in --
4     Q.   Did you understand the question I
5 asked?
6     A.   Yes.
7     Q.   In your opinion, are doctors who
8 unlawfully prescribe opioids for no medical
9 purpose part of the problem?
10         MR. SPELLACY: Counsel, don't
11 interrupt the witness when he's talking.  He
12 hasn't interrupted you all day.  Don't interrupt
13 him, please.
14    A.   Yes, they are, and they have been
15 prosecuted and held responsible for their
16 actions, whereas now you guys are.
17    Q.   Are pharmacists who unlawfully
18 dispense prescription opioids also part of the
19 problem?
20    A.   I'm going to answer the question
21 because you're going to keep going down this
22 line.  From you guys distributing, to giving the
23 drugs, to the doctors illegally prescribing it,
24 to the pharmacists filling it, to the patients
25 taking it, it's all a part of the chain.

53 (Pages 206 - 209)

Page 210

1    Q.    So pharmacists are a contributing
2 factor?
3    A.    Yes, ma'am.  The ones that act
4 illegally.
5    Q.    You mentioned international drug
6 cartels.  Do they play some role in the problem?
7        MR. SPELLACY:  Objection.
8    A.    What problem?  Opioid problem?
9    Q.    The opioid abuse problem in Cuyahoga
10 County.
11    A.    Okay.  Are you talking about street
12 drugs as well as prescription drugs?
13    Q.    I'm talking about opioids, the
14 opioid abuse problem that is occurring in
15 Cuyahoga County.
16    A.    I can't answer that question unless
17 you're going to be more specific with the
18 question, okay.
19    Q.    I'll rephrase the question.
20    A.    Thank you.
21    Q.    In your opinion, are international
22 drug cartels a contributing cause to the opioid
23 abuse problem in Cuyahoga County?
24    A.    When it relates to street drugs, I
25 would say yes.

Page 211

1    Q.    And by street drugs do you mean
2 heroin?
3    A.    I mean all drugs that you can't get
4 with a prescription.
5    Q.    Including counterfeit prescription
6 drugs, for example?
7    A.    If that's the case.
8    Q.    In your opinion, is the Federal Drug
9 Administration a cause of the opioid abuse
10 problem in Cuyahoga County because it concluded
11 that prescription opioids were less addictive
12 than they are?
13    A.    Well, wait a minute.  Let's break
14 down that question because I don't really
15 understand it.
16        You're telling me the FDA said that
17 what?
18    Q.    The FDA -- my question is, is it
19 your opinion that the FDA contributed to the
20 opioid abuse problem because they concluded that
21 prescription opioids were, in fact, less
22 addictive than they truly are?
23    A.    I have no knowledge of that
24 statement by the FDA so I cannot answer that
25 question.

Page 212

1    Q.    Do you have any opinion as to
2 whether the Drug Enforcement Administration
3 contributed to the problem by registering
4 pharmacists and doctors to dispense controlled
5 substances and continuing to allow them to do so
6 even as they were unlawfully prescribing and
7 dispensing them?
8    A.    I don't really understand that
9 question.  You're asking me if the DEA was part
10 of the problem because they licensed physicians
11 and gave prescription authority for these
12 physicians?
13    Q.    That's correct.  That is my
14 question.
15    A.    No.  The Drug Enforcement
16 Administration is not the problem because they
17 licensed lawful individuals to do lawful things.
18    Q.    Despite the fact that some of those
19 doctors that the DEA licensed did unlawful
20 things, correct?
21    A.    I can't answer that.
22    Q.    You would not hold the DEA
23 responsible simply because one of its
24 registrants broke the law?
25        MR. SPELLACY:  Objection.

Page 213

1    A.    No.
2    Q.    Are patients who improperly use
3 prescription opioids that were properly
4 prescribed to them a contributing factor in
5 Cuyahoga County's abuse problem?
6        MR. SPELLACY:  Objection.
7    A.    If prescriptions were properly
8 prescribed and legally prescribed, that's not a
9 problem.  The problem is when they're illegally
10 prescribed and illegally got.
11    Q.    So you don't consider it to be a
12 problem if a patient improperly uses the
13 prescription opioids that have been properly
14 prescribed?
15    A.    Define problem.
16        MR. SPELLACY:  Objection.
17    A.    What do you mean by "problem"?
18    Q.    You don't believe it is a
19 contributing factor in creating opioid abuse
20 problems here in your county?
21        MR. SPELLACY:  Objection.
22    A.    The patients, no.
23    Q.    In your opinion, are insurers and/or
24 Medicaid a cause of the opioid abuse problem in
25 Cuyahoga County because they encourage doctors

54 (Pages 210 - 213)

Page 214

1 to prescribe opioids over alternative treatment
2 by making opioids cheaper than alternative forms
3 of therapy?
4      MR. SPELLACY:  Objection.
5      A.   In my business we call that assuming
6 facts in evidence.  I don't know any of those
7 facts that are contained within that question so
8 I cannot answer that.
9      Q.   You have no opinion on that matter?
10     A.   I cannot answer it.  It's not that I
11 don't have an opinion.  I cannot answer it.  I
12 don't know the fundamental background facts that
13 you're -- that you're telling me.
14     Q.   Are you aware that the Drug
15 Enforcement Administration sets maximum
16 production quotas for manufacturers of
17 prescription opioids?
18     A.   I do not know that.
19     Q.   So you're not aware that the DEA
20 routinely raised those quotas over the years?
21     A.   I have no knowledge of that.
22     Q.   Certainly criminals who sell
23 prescription opioids on the street are a part of
24 the cause of the opioid abuse problem in
25 Cuyahoga County, correct?

Page 215

1      A.   Because they can get the drugs,
2 because you supply them, yes.
3      Q.   In your cases involving doctors, you
4 previously made statements publicly that those
5 doctors had victimized not just their patients
6 but the county as a whole.  Do you stand by
7 those statements?
8      A.   Yes, ma'am.
9      Q.   And do you believe that dealers of
10 illegal substances victimize Cuyahoga County and
11 the State of Ohio?
12     MR. SPELLACY:  Objection.
13     A.   You mean dealers of scrips, opioid
14 scrips --
15     Q.   Yes.
16     A.   -- because I want to be specific
17 what we're talking about, okay.  If you're
18 talking about dealers who get prescription
19 opioids illegally and sell them -- is that what
20 you're saying?
21     Q.   My question was about illegal
22 substances broadly --
23     A.   Okay.
24     Q.   -- and individuals who deal in
25 illegal substances.

Page 216

1      A.   Are those illegal substances
2 opioids?
3      Q.   That falls under illegal substances
4 certainly, but other drugs also fall under
5 illegal substances.
6      A.   Right.
7      Q.   In those situations, would you agree
8 with me that those drug dealers victimize the
9 county and the state?
10     A.   Of course they do.
11     Q.   With whom have you discussed the
12 causes of the opioid abuse problem?
13     A.   My boss, Michael O'Malley.  My
14 supervisor, Paul Soucie.  Members of my unit.  A
15 couple speakers at seminars I went to.  I can't
16 -- don't remember their names.
17     Q.   You testified earlier that you
18 attended a seminar in which you learned about
19 the allegations in this litigation.
20          Do you remember that?
21     A.   Oh, yeah.
22     Q.   When did you attend that particular
23 seminar?
24     A.   Probably the summer of 2016.
25     Q.   And who sponsored the seminar?

Page 217

1      A.   I think the DEA did.  I'm not sure.
2 I think the DEA did.
3      Q.   Who attended the seminar?
4      A.   What do you mean, who attended?  I
5 did.
6      Q.   Who were the participants other than
7 you?
8      A.   There were people from all over the
9 country there, prosecutors, investigators.
10     Q.   And what was the topic of this
11 seminar?
12     A.   One of the topics was -- is how --
13 and I say you guys -- I mean distributors and
14 manufacturers -- how you created this whole
15 market and marketed all this stuff so you could
16 make a ton of money on the backs and the blood
17 of people at least in our county.
18     Q.   That was one of the topics of this
19 seminar?
20     A.   One of the topics was how you guys
21 had your marketing campaign and how you guys
22 marketed all these drugs, tried to downplay how
23 they were dangerous, tried to tell everybody
24 they weren't addictive, things of --
25     Q.   Do you know that --

55 (Pages 214 - 217)

Page 218

1     MR. SPELLACY:  Counsel, I'll caution
2 you not to interrupt him.
3     A.   I'm just saying when I say "you
4 guys," I mean distributors and manufacturers.
5     Q.   Okay.  Who presented on this topic?
6     A.   It was a -- it was a prosecutor, a
7 county prosecutor from Minnesota, who, by the
8 way, I think is suing.
9     Q.   What was the person's name?
10    A.   I don't have it with me.  I have his
11 card at my office.
12    Q.   How many people attended this
13 particular topic discussion?
14    A.   I would say about 50 or 60.
15    Q.   Where was this located?
16    A.   In downtown Cleveland.
17    Q.   Did you take notes during the
18 presentation?
19    A.   No.  I don't have any -- I don't
20 have any -- I don't have any materials from
21 that, except I think I have the guy's business
22 card that presented that part of it.
23    Q.   And did that particular individual
24 use a PowerPoint presentation or some other
25 means?

Page 219

1     A.   Oh, yeah.
2     Q.   Did you obtain a copy of the
3 PowerPoint presentation or any --
4     A.   No.
5     Q.   -- other materials?
6     A.   No.  I'm sure I had some materials
7 that you get with a seminar.  More than likely I
8 threw them out.
9     Q.   And had that particular prosecutor
10 investigated or prosecuted any of the entities
11 or individuals about whom he was presenting?
12    A.   He didn't criminally prosecute, but
13 I think that they were suing them civilly.
14    Q.   When police in your county arrest an
15 individual and find that they have a stash of
16 prescription pills for which they don't have a
17 valid prescription, what steps, if any, are
18 taken to find out where the person got the
19 pills?
20    A.   So you're giving me a fact pattern
21 where police arrest an individual with, you say,
22 stash, but a number of pills that he doesn't
23 have a prescription for?
24    Q.   Um-hum.
25    A.   Well, it depends what container the

Page 220

1 pills are in, okay.  We try to backtrack to
2 where the source of those pills are.  If they're
3 in a baggie or some type of thing that doesn't
4 have any way to track it, unless he tells us
5 where he gets the pills, we're not going to
6 know.
7     Q.   Okay.  So you would look to the
8 container to see if that would provide a lead to
9 who obtained the prescription?
10    A.   Exactly.
11    Q.   Who is it was written for?
12    A.   Right.
13    Q.   If that didn't work, you would
14 attempt to interview the subject?
15    A.   Correct.
16    Q.   If you found out where that person
17 got the pills, would you then take steps to
18 figure out where that other person got the pills
19 from?  In other words, would you follow the
20 chain --
21    A.   Yes.
22    Q.   -- up to the original source, if
23 possible?
24    A.   Yes.  And if we -- let's say we
25 found a pill bottle that had a doctor on it.  We

Page 221

1 would then start looking at the doctor.
2     Q.   Okay.  And how do you -- as you
3 follow that chain, how do you decide when to
4 stop?
5     A.   Based upon the evidence, where the
6 evidence takes us.
7     Q.   And if the evidence took you all the
8 way to the individual patient that was
9 prescribed the medication by a particular
10 doctor, would that end your inquiry as to the
11 source of the pills?
12    A.   Let me make sure I understand you.
13 I have the pills and we trace the pills to you,
14 who got it from a prescription.
15    Q.   Yes.
16    A.   Well, we would talk to you.
17    Q.   Okay.
18    A.   And if you told us to go pound salt,
19 then we would start looking at the doctor.  We
20 would start getting intel out there to see if,
21 in fact, this doctor was giving other
22 individuals -- as I indicated to you before, we
23 have high writers, so we kind of know if the
24 doctor is on our radar, so to speak.
25    Q.   Okay.  Do you attempt to trace the

56 (Pages 218 - 221)

Page 222

1  pill all the way up the chain to the
2  manufacturer?
3     A.   No.
4     Q.   In your --
5     A.   Now, let me qualify that.  If we
6  have a situation where the individual doctor is
7  dispensing from his office, we will look at the
8  orders he has from the distributors.  But that's
9  very rare, to be honest with you, like I told
10  you.
11     Q.   Okay.  And why, in your opinion, is
12  it important for law enforcement purposes to try
13  to determine the source, the patient who
14  obtained -- who was supposed to obtain those
15  prescription pills that you've recovered from
16  someone else?
17     A.   Because we don't want the diversion
18  of the drugs out on the streets.
19     Q.   Are there policies used by law
20  enforcement in your county on tracing where the
21  pills come from as part of any investigation
22  involving prescription opioids?
23     A.   You know, again, you ask general
24  questions, and trying to give a specific answer
25  to those general questions is very hard to do.

Page 223

1  Based upon the context, if we find individuals
2  that have prescription pills without the
3  appropriate prescription to back it up, then we
4  will investigate them.
5     Q.   So my question was, are there
6  policies, written or otherwise, you're aware of
7  that are implemented by law enforcement in your
8  county relating to the tracing of pills?
9     A.   I don't know if there's policies,
10  but I know there's protocols and processes that
11  investigators use as a routine basis in how they
12  investigate these cases.
13     Q.   What are those protocols and
14  processes?
15     A.   I explained to you, we try to
16  backtrack where these drugs came from, okay.
17  And, again, it's a matter of degree.  If I get
18  30 Percocet and decide to give you ten, and the
19  doctor is a good doctor and the prescription was
20  legitimate and we just have a little context
21  there, then the investigation is not going to go
22  any further than that.
23     Q.   That's because in your estimation
24  the doctor didn't do anything wrong?
25     A.   Correct.

Page 224

1     Q.   And the pharmacy didn't do anything
2  wrong?
3     A.   Correct.
4     Q.   And the distributor didn't do
5  anything wrong?
6     A.   Well, I would assume if it's for a
7  lawful prescription, correct.
8     Q.   What percentage of the time is law
9  enforcement able to determine the source of
10  prescription drugs?
11     A.   I don't understand your question.
12     Q.   In what percentage of the time are
13  you successful in determining the original
14  source of prescription drugs found on another
15  individual?
16        MR. SPELLACY:  Objection.
17     A.   I don't think I can answer that
18  question.  It's all contextual.
19     Q.   Are there -- is there any data or
20  statistics kept on that question?
21     A.   Not that I know of.
22     Q.   If I wanted to try to determine the
23  answer to that question, can you think of any
24  records I could review that might answer the
25  question?

Page 225

1     A.   No, because you would have to go
2  into individual files of all the police
3  departments investigating this to determine
4  that.
5     Q.   What incentives can your office
6  offer to encourage cooperation of the individual
7  who was in possession of those pills that you're
8  trying to trace?
9     A.   For them to cooperate with us you
10  mean?  Everybody wants to make a deal, so it
11  depends how much we get them for and things of
12  that nature.  I mean, you were a prosecutor.
13  You know what I'm talking about.
14     Q.   I do know, but we need the record to
15  be established, so let's be a little bit clearer
16  about this.
17        So some incentives that you could
18  give a person to encourage their cooperation
19  might be an agreement not to prosecute?
20     A.   Or a lesser offense, right.  That's
21  the only leverage we have.
22     Q.   Does your office have any policies,
23  either written or otherwise, governing the
24  instances in which you can offer cooperators
25  those incentives?

57 (Pages 222 - 225)

Page 226

1    A.   Usually you have to talk to your
2 supervisor about, as we say in the business,
3 rolling somebody, so before I roll somebody, I
4 have to go to my boss and say, here's what I
5 want to do and this is why I want to do it.
6 There's nothing written down.  That's just --
7 how should I say -- established, not policy but
8 established -- what's the word I'm looking
9 for -- behavior.
10   Q.   Practice?
11   A.   Practice.  Thank you.
12   Q.   So have there been occasions in
13 which your supervisor has overruled your attempt
14 to cooperate with a particular individual?
15   A.   No.
16   Q.   How many times have you entered into
17 cooperation agreements in cases involving
18 prescription opioids?
19   A.   With the patients?
20   Q.   With any individuals, whether it be
21 a patient or a doctor or a pharmacist.
22   A.   I think in every case that I've done
23 that we've done that.
24   Q.   So would you say you've probably
25 entered into hundreds of cooperation agreements?

Page 227

1    A.   Yes.
2    Q.   And, in your experience, did that
3 assist you in successfully identifying suppliers
4 of the prescription drugs?
5    A.   Yes.
6    Q.   Are you aware of any case you've
7 prosecuted in which prescription opioids were
8 traced back to one of the Distributor Defendants
9 in this case?  That would be like a McKesson
10 Corporation or Cardinal.
11   A.   I want to say yes, but I can't
12 remember.
13   Q.   Does your department attempt to
14 develop any kind of statistics on where the
15 opioids you encounter are coming from?
16   A.   No.
17   Q.   Does your department separately
18 track arrests associated with different types of
19 opioids, for example, prescription pills versus
20 heroin versus fentanyl?
21   A.   Not that I know of.
22   Q.   Do you know if anyone tracks this
23 information?
24   A.   I don't know.
25   Q.   You spoke about needing your

Page 228

1 supervisor's approval for entering into a
2 cooperation agreement.  Do you also need your
3 supervisor's approval to indict a case?
4    A.   Technically, yes.
5    Q.   And how does your office go about
6 deciding which cases to investigate or indict?
7    A.   Well, typically if I get information
8 from one of my investigative agencies, I will
9 inform my supervisor we have this case and that
10 it looks good so let's work it up.
11   Q.   And I think you stated earlier your
12 office doesn't have like a written
13 policy/procedures manual regarding the charging
14 decisions?
15   A.   Correct.
16   Q.   Do you have any policies regarding
17 violations of Ohio Controlled Substances Act
18 prosecutions or investigations?
19   A.   What do you mean by that?
20   Q.   Do you have any written policies
21 regarding your office's prosecution under the
22 Ohio Controlled Substances Act?
23   A.   Not that I know of.
24   Q.   What type of documents do you
25 receive from your law enforcement agencies

Page 229

1 concerning potential investigations or
2 prosecutions?
3    A.   Well, they will give me their field
4 reports.
5    Q.   Do they fill out any sort of
6 referral one-pager or other document to first
7 introduce you to a new investigation?
8    A.   Not that I know of.
9    Q.   And when you say "field report,"
10 what are you referring to?
11   A.   Meaning an investigator will come in
12 and say, Hey, we think this doctor is bad.  I
13 go, Okay.  What do you got?  And they'll tell me
14 what they've done and then they'll give me their
15 reports to that point, and then we'll sit down
16 and figure out a game plan on how we're going to
17 crack that nut.
18   Q.   And are those field -- how are those
19 field reports maintained by your office?
20   A.   They're in the case files, which
21 then end up on -- should end up in Justice
22 Matters, will end up.  At least in my cases they
23 do.
24   Q.   So I know not every case is complex
25 enough to justify preparation of a prosecution

58 (Pages 226 - 229)

Page 230

1 memo, but in your experience have you ever
2 prepared a prosecution memo summarizing your
3 case?
4    A.   We're not the feds.  We don't have
5 to do that.  Verbally is what we -- we sit down
6 and verbalize.
7    Q.   What about a declination memo; have
8 you ever prepared a memo detailing why a
9 particular case was declined?
10    A.   I can't recall if I did one or not.
11    Q.   To your knowledge, has your office
12 ever declined a case involving opioids because
13 it lacked sufficient resources to prosecute the
14 case?
15       MR. SPELLACY:  Objection.
16    A.   Not that I'm aware of.
17    Q.   To what extent does your office
18 consider the views of government officials,
19 victims or interested parties in deciding
20 whether to prosecute a particular case?
21       MR. SPELLACY:  Objection.
22    A.   I don't think any of those people
23 have any influence on our charging decisions.
24    Q.   They don't affect your decisions --
25    A.   No.

Page 231

1    Q.   -- about how to proceed?
2    A.   The evidence does.
3    Q.   If you were to receive input from
4 any of those parties, would you keep records of
5 those communications in the case file?
6    A.   I find that question just silly
7 again, because we don't do that.  So if I don't
8 do something, why would I keep any documentation
9 about doing that?
10    Q.   Okay.  So maybe you misunderstood my
11 question.
12    A.   Okay.
13    Q.   Let me rephrase it.
14    A.   Okay.
15    Q.   If a victim, let's say --
16    A.   Okay.
17    Q.   -- writes a letter to the Cuyahoga
18 County Prosecutor's Office advocating for a
19 particular action with respect to a particular
20 case and you receive that letter --
21    A.   Okay.
22    Q.   -- even if it does not influence
23 your decisions with regard to that case, would
24 you maintain that communication from that victim
25 somewhere in the case file?

Page 232

1    A.   Yes.
2    Q.   Okay.  And would that sort of
3 information be included in the Justice
4 Matters --
5    A.   Yes, it would be in the Justice
6 Matters.
7    Q.   Or prior to 2009, it would be in
8 hard copy?
9    A.   Hard file.
10    Q.   To what extent does your office
11 share responsibilities or coordinate with other
12 law enforcement departments on opioid-related
13 activities?
14       MR. SPELLACY:  Objection.
15    A.   We try to work together with all
16 sorts of law enforcement agencies, both state,
17 federal and local, to tackle this issue that --
18 problem, crisis, however you want to call it,
19 and do this.
20    Q.   Are there any memoranda of
21 understanding or similar agreements on this
22 subject?
23    A.   Not that I'm aware of.
24    Q.   Do you know if there are any cost
25 reimbursement or cost sharing agreements?

Page 233

1    A.   There is nothing in writing, but,
2 for example, if we do a case with the pharmacy
3 board, we will split costs sometimes on the
4 expert, and if we get a forfeiture on it, for
5 example, we will then split the proceeds of the
6 forfeiture, too.
7    Q.   To your knowledge, does your office
8 receive any grants from government agencies?
9    A.   I don't know that.  I'm not the guy
10 to ask on that one.
11    Q.   Does your office interact with state
12 or federal government, such as the Ohio Attorney
13 General's Office?
14    A.   Yes.  We -- yes, we do.
15    Q.   And do you personally interact with
16 state or federal government officials?
17    A.   Yeah.
18    Q.   Is it true that in Ohio the AG's
19 offices has limited jurisdiction and has to be
20 invited into a county to assist or to prosecute
21 a case?
22       MR. SPELLACY:  Objection.
23    A.   I believe -- I believe so.  I'm not
24 sure on that, though.
25    Q.   Have you ever had occasion to call

59 (Pages 230 - 233)

Page 234

1  in a special prosecutor from the Ohio Attorney
2  General's Office to assist you in any of your
3  cases?
4      A.    In my cases, no, but I know in other
5  cases, yes.
6      Q.    How many other cases are you aware
7  of?
8      A.    What, that we bring in -- the AG's
9  office or --
10     Q.    Yes.
11     A.    Because sometimes we have another
12  prosecutor from the county when they're
13  conflicted.  When there's a conflict, we have
14  either another county prosecutor come in to do
15  it or the AG's office.  They do have a
16  specialized unit that does litigation for
17  conflicted cases.
18     Q.    And, to your knowledge, have any of
19  those special prosecutors that have come in
20  assisted with prosecutions related to opioids?
21     A.    Not that I know of.
22     Q.    What geographic territory does your
23  office cover?
24     A.    Just Cuyahoga County.
25     Q.    Do you know how many residents fall

Page 235

1  under your jurisdiction?
2      A.    What is it, 1.2, 1.3 million in this
3  county?  I'm not sure.  Over a million.
4      Q.    What is your relationship between
5  the county and municipal law departments with
6  respect to your jurisdiction?
7      A.    Not much.  They make the initial
8  charging decisions, and if they're felonies,
9  then they go through the process.
10     Q.    Okay.  Does the Cuyahoga County
11  Prosecutor's Office handle all cases involving
12  drugs and narcotic offenses that take place
13  within your county?
14     A.    No.  The feds will do their thing.
15     Q.    Other than the feds, can a defendant
16  move through the judicial process with respect
17  to a drug or narcotic charge without someone
18  from your office handling the case?
19     A.    Not if it's local, no.  We're the
20  people to do it.
21     Q.    How does your office track its
22  caseload?
23     A.    I have no idea how they count the
24  numbers.
25     Q.    Do you have some sense of what the

Page 236

1  caseload has been in recent years?
2      A.    I know our indictments have
3  decreased.
4      Q.    Do you know if your office tracks
5  prosecutions related to opioids specifically?
6      A.    I do not know that.
7      Q.    Do you know whether cases related to
8  opioids are tracked with a specific offense code
9  in any of your databases?
10     A.    I do not know that.
11     Q.    Does your county office track the
12  recidivism rate of individuals it convicts?
13     A.    That, I don't know.
14     Q.    And then I think I know the answer
15  to this question but I have to ask it anyway.
16  Does the county track the recidivism rate of
17  convicted prescription opioid diverters?
18     A.    That, I don't know.
19     Q.    With respect to the use of the OARRS
20  data we discussed earlier --
21     A.    Okay.
22     Q.    -- does the county monitor
23  prescribers in Cuyahoga County for compliance
24  with the requirement that they consult OARRS
25  prior to prescribing a prescription opioid?

Page 237

1          MR. SPELLACY:  Objection.
2      A.    That particular function is by the
3  pharmacy board.
4      Q.    Okay.  So it's not something that
5  your office does?
6      A.    No.  The pharmacy board does that.
7      Q.    To your knowledge, has your office
8  ever prosecuted a doctor for failing to consult
9  OARRS prior to prescribing a prescription
10  opioid?
11     A.    To my knowledge, no.
12     Q.    Do you know if the Board of Pharmacy
13  or the Board of Medicine has ever disciplined a
14  doctor for failing to consult OARRS prior to
15  prescribing a prescription opioid?
16     A.    Let's go back to that other
17  question.
18          I don't think that failure is a
19  criminal offense, I think it might be an
20  administrative offense, so that would be the
21  pharmacy board again.
22          I'm sorry.  Your second question
23  was?
24     Q.    So then my question was, are you
25  aware of any instances in which the pharmacy

60 (Pages 234 - 237)

Page 238

1 board has disciplined a doctor for not checking
2 OARRS prior to prescribing prescription opioids?
3        MR. SPELLACY:  Objection.
4     A.   I know in some of my cases the
5 doctors have not done that.  I don't know what
6 the administrative action is after that, but I
7 know that that has been part of some of my
8 cases.
9     Q.   Okay.  When you've uncovered that in
10 your cases, is that the sort of evidence or
11 information that you would forward on to the
12 Board of Pharmacy to make sure that they were
13 aware of that conduct?
14     A.   If they were not part of the case,
15 yes.
16     Q.   And when you forward such
17 information to the Board of Pharmacy, do you
18 keep records of that communication?
19     A.   Well, let's put things in context.
20 Most -- 99.9 percent of the time it's the Board
21 of Pharmacy that are bringing me the doctor
22 cases, so they already know the information.
23 So, to answer the question, I don't believe so.
24 I don't know of no -- no tracking of that
25 communication.

Page 239

1     Q.   Okay.  Do you know if the county has
2 ever obtained the identities of the top
3 physician prescribers of prescription opioids
4 practicing in Cuyahoga County?
5     A.   The county hasn't, but I know the
6 DEA and the pharmacy board and the local
7 diversion investigators have.
8     Q.   And that's that list that we talked
9 about earlier?
10    A.   Yes, which is fluid and changes.
11    Q.   And how often do you receive updated
12 lists or information?
13    A.   I don't receive a list.  It's all
14 verbal.
15    Q.   How often do you receive updated
16 information?
17    A.   Well, again, just they will call and
18 say, Hey, Dr. Joe is -- looks like he's, you
19 know, being a bad boy.
20    Q.   And what sort of follow-up are you
21 able to do at that time?
22    A.   Well, at that point in time it's
23 like do we have a case.  If you think it's worth
24 it, let's start working it.
25    Q.   When did the county start using the

Page 240

1 OARRS database to aid its prosecutions?
2     A.   When OARRS first came out in 2010 --
3 and, again, you have to understand the function
4 and the ability of OARRS has changed over the
5 years.  There's more information, more
6 requirements and things of that nature.  I am
7 not up on all of that.  All I do is use that as
8 an investigative tool to look at patterns.  And
9 that's what my investigators do.  They will look
10 at the OARRS and bring it to me and say, Look
11 what we got.
12    Q.   And, in your experience, has OARRS
13 been a helpful tool?
14    A.   Oh, absolutely.
15    Q.   And, in your experience, when did
16 you first recall hearing that OARRS data was
17 being used to support or --
18    A.   When it first came out.
19    Q.   2010?
20    A.   Yes.  Because the -- when the
21 pharmacy -- they're the ones that got it going.
22 They're the ones that maintain it.  And over the
23 years they're the ones that have evolved it.
24    Q.   How is your office's budget created?
25    A.   No idea.

Page 241

1     Q.   Do you know who is primarily
2 responsible for creating the budget?
3     A.   I would assume the elected county
4 prosecutor.
5     Q.   Do you know the methodology behind
6 the budget process?
7     A.   No, ma'am.  The only thing I know is
8 we're underpaid.
9     Q.   So you don't know what steps must be
10 taken for the budget to be approved?
11    A.   It has to go in front of county
12 council.
13    Q.   And do you know what supporting
14 documents are prepared or reviewed during the
15 budget process?
16    A.   No, I don't, ma'am.
17    Q.   Do you know what quantitative and
18 qualitative factors are considered during the
19 budget process?
20    A.   No, ma'am.
21    Q.   Do you know if your office has its
22 own accounting system?
23    A.   I don't know that.  I would assume
24 they do.  I don't know.
25    Q.   Do you know your office's total

61 (Pages 238 - 241)

Page 242

1 operating budget for this year approximately?
2    A.   No, I don't.  I really don't.  I
3 know it's over a million.
4    Q.   Do you know how it's changed, if at
5 all, over the past five years?
6    A.   No, I don't, ma'am.
7    Q.   Do you know if your office has any
8 particular budget line items that relate
9 exclusively to opioids?
10    A.   I don't know that.
11    Q.   Do you know what portion of your
12 office's budget for the past fiscal year was
13 dedicated to drug investigations and
14 prosecutions?
15    A.   I don't know that answer.
16    Q.   Remind me how many prosecutors your
17 office currently has.
18    A.   I'd say over 200.
19    Q.   And do you -- do you know whether
20 that number has changed in any significant way
21 over the last ten years?
22    A.   I couldn't answer that.  I do not
23 know.
24    Q.   Currently how many prosecutors work
25 on prescription opioid cases in your office?

Page 243

1    A.   I don't -- again, that's hard to
2 tell because a lot of cases go through general
3 felony.
4    Q.   And let's just talk about within
5 your unit, the economic crimes unit.  Within
6 that unit how many of its six prosecutors work
7 on cases involving prescription opioids?
8    A.   Three.
9    Q.   And you're one of them?
10    A.   Correct.
11    Q.   What percentage of your work is on
12 cases involving prescription drug crimes?
13    A.   Again, regarding practitioners, 10
14 to 20 percent.
15    Q.   And then with respect to the other
16 two prosecutors in your unit who you know work
17 on some prescription drug crimes --
18    A.   Yes.
19    Q.   -- if you were to estimate,
20 approximately what percentage of their --
21    A.   I couldn't answer that question.
22    Q.   To your knowledge, do they work on
23 prescription drug crime cases more, less or
24 approximately the same as you?
25       MR. SPELLACY:  Objection.

Page 244

1    A.   We have one prosecutor in our unit
2 that does the nurses, and then all the other
3 prescription cases come through me and I'll
4 determine whether I'm going to take them.  If
5 not, then I will give them to the other
6 prosecutor, that then does take them.
7    Q.   But you don't have a sense of what
8 percentage --
9    A.   No, because I don't -- I mean, I
10 would have to look at their caseload and look at
11 it.
12    Q.   Are you familiar with the
13 restructuring that took place in your office in
14 February of 2009 when it shifted to the
15 community-based prosecution model?
16    A.   I know that we created regions.
17    Q.   How, if at all, did it change your
18 office's approach to prosecutions in your
19 experience?
20    A.   I don't believe it changed anything.
21    Q.   And how, in your experience, did it
22 change the approach for drug crimes, if at all?
23    A.   I don't believe it changed anything.
24    Q.   Sitting here today, you don't know
25 how many prosecutors in your office have active

Page 245

1 cases involving diversion of prescription drugs?
2    A.   No.  I don't know.
3    Q.   Do you know if your office has ever
4 requested funding for additional prosecutors to
5 work on prescription opioid cases?
6    A.   I don't know.
7    Q.   Do you know if your office has ever
8 requested funding for additional prosecutors to
9 work on opioid cases more generally?
10    A.   I don't know.
11    Q.   What's the salary range for an
12 assistant prosecutor in your office?
13       MR. SPELLACY:  Objection.
14    A.   Well, first they make us take a vow
15 of poverty.  I believe the starting salary is
16 $60,000.
17    Q.   Okay.  And that's for someone with
18 the minimal amount of experience?
19    A.   Yes.  That's when you first come in,
20 yes.
21    Q.   And as you progress through the
22 ranks of seniority and -- what is the high range
23 of the salary for someone in your office?
24    A.   I don't think -- I don't believe
25 there's more than a handful of individuals in

62 (Pages 242 - 245)

Page 246

1 our office that make over a hundred thousand
2 dollars a year that are not a supervisor, so the
3 majority of people in our office make less than
4 $90,000. We're like school teachers, underpaid
5 and underappreciated.
6     Q.   Do you know if your office has
7 experienced a budget surplus in any of the
8 years?
9     A.   I've never heard of that. And it's
10 the county. Remember, the county gives us the
11 money.
12    Q.   Yes.
13        Apart from the county, what are your
14 office's other sources of funding?
15    A.   I -- I don't know. I couldn't tell
16 you. I'm not part of that. I know we get
17 grants for certain things, but I couldn't tell
18 you.
19    Q.   Do you know if they're federal or
20 state grants?
21    A.   I don't know that. I assume they're
22 federal, but I don't know.
23    Q.   You mentioned earlier today that you
24 receive some funding from forfeitures; is that
25 correct?

Page 247

1     A.   On a particular case, yes.
2     Q.   Okay. And is that in both criminal
3 and civil cases?
4     A.   I know criminal.
5     Q.   Okay. Do you have a sense of the
6 amount that your office has received in criminal
7 forfeitures?
8         MR. SPELLACY: Objection.
9     A.   I know we just take 20 percent of --
10 so if we get a $100,000 forfeiture, we take 20
11 grand.
12    Q.   Do you know where the rest of the
13 forfeiture goes?
14    A.   To the investigative agency or
15 agencies. They will split it if it's multiple
16 agencies, or one agency will get it.
17    Q.   And how is that forfeiture money
18 spent by your office?
19    A.   We have a law enforcement trust fund
20 that that -- so when somebody wants to go on a
21 seminar -- I know by law you can't put it into
22 salaries, so it's all for support. All the
23 seminars, any type of equipment, things of that
24 nature, is where that money goes.
25        MS. WOODS: Let's go ahead and take

Page 248

1 a break right now.
2         MR. SPELLACY: Great.
3         THE VIDEOGRAPHER: Off the record,
4 2:54.
5         (Recess had.)
6         THE VIDEOGRAPHER: On the record,
7 3:10.
8         - - - - -
9         (Thereupon, Gutierrez Deposition
10        Exhibit 10, Cuyahoga County Office
11        of the Prosecutor 2015 Report to the
12        Public, Beginning Bates Number
13        CUYAH_012970490 - Marked
14        Confidential, was marked for
15        purposes of identification.)
16        - - - - -
17        (Thereupon, Gutierrez Deposition
18        Exhibit 11, Cuyahoga County Office
19        of the Prosecutor 2016 Report to the
20        Public, Beginning Bates Number
21        CUYAH_001368881 - Marked
22        Confidential, was marked for
23        purposes of identification.)
24        - - - - -
25 BY MS. WOODS:

Page 249

1     Q.   I've just handed you what's been
2 marked as Exhibit 10 and 11. These are two
3 Cuyahoga County Office of the Prosecutor reports
4 to the public.
5     A.   Um-hum.
6     Q.   Do you know how frequently the
7 prosecutor's office publishes an annual report
8 like this one?
9     A.   No, I don't. I didn't even know
10 that we did these two.
11    Q.   So you haven't seen these reports
12 before?
13    A.   No.
14        I'm in the picture in Exhibit 10.
15    Q.   Do you know whether these reports
16 were published for prior years, years prior to
17 2015?
18    A.   I do not.
19    Q.   Or for the years 2017 onward?
20    A.   We have a different prosecutor, so I
21 don't know.
22    Q.   I want to ask you some questions
23 about your office's caseload --
24    A.   Okay.
25    Q.   -- over the years.

63 (Pages 246 - 249)

Page 250

1     A.    Okay.
2     Q.    Are you aware that there was an 18
3 and a half percent decrease in the total crimes
4 charged by your office between 2010 and 2014?
5     A.    It doesn't surprise me.
6     Q.    If you would turn to page 10.
7     A.    On Exhibit 10?
8     Q.    On Exhibit 10.  That's the 2015
9 report to the public.
10     A.    Um-hum.
11     Q.    In the top left corner of page 10 --
12     A.    Okay.
13     Q.    -- you see some charts, some graphs
14 regarding crime trends.
15     A.    Um-hum.
16     Q.    And there's a statistic to the right
17 of those that says, "18 and a half percent
18 decrease in total crimes charged between 2010
19 and 2014"?
20     A.    Correct.  I see that.
21     Q.    Does that accord with your
22 experience in the office?
23     A.    Yes.
24     Q.    This document also states that you
25 have a 97 percent rate of cases being resolved

Page 251

1 at the pretrial stage, and that means that they
2 did not need to be taken to trial; is that
3 right?
4     A.    Seems about right.
5     Q.    Do you know what accounts for the
6 substantial decrease in total crimes charged by
7 your office between 2010 and 2014?
8     A.    Yes.
9     Q.    What is that?
10     A.    Some factors involved.
11          Well, we started to take a more
12 macro view of things, at least from the drug
13 situation, and we got a drug court going on.
14 We're trying to get more diversion type of low
15 end felonies out.
16          Also, there was a change in
17 prosecutor, okay, and so a change in policy.
18 And there was -- I know there was criticism of
19 our office from when Mr. Mason was in office
20 that he charged too many people with too many
21 things.  So I think the prosecutor coming in,
22 Mr. McGinty, took a view to try not to indict
23 everything that came in, and so there's other
24 alternative resolutions that we did to try to
25 alleviate taking everything to -- to indictment,

Page 252

1 more pre-indictment type of programs.
2     Q.    Did you agree with those changes?
3          MR. SPELLACY:  Objection.
4     A.    Generally speaking, yeah.  I mean,
5 I'll give you an example.  For nurses -- I don't
6 know if I indicated to you this morning -- we
7 try to -- and most people, licensed
8 professionals -- it's available to everybody,
9 but specifically in nurses in my experience, we
10 give them treatment in lieu of conviction, which
11 means they plead guilty to the charge, but it's
12 held in abeyance and they're put on a one-year
13 probation; and if they complete the program,
14 then their case is dismissed and the case is
15 sealed and then they're able to be productive
16 again, straighten them out.  Because if we lay a
17 felony on everybody, that doesn't do anybody any
18 good.  So we're trying to take a more -- how
19 should I say -- learned view of things.  At
20 least from my perspective, that was it.
21     Q.    So it sounds like your office put
22 more of an emphasis on addiction treatment
23 versus prosecution than it had in prior years?
24     A.    I think that would be a fair
25 statement.

Page 253

1     Q.    And, in your opinion, this was a
2 positive move?
3     A.    Yes, because the individual people
4 are addicts.  That's a disease.  And I've seen
5 it destroy families in our community.  So let's
6 try to get them straight and productive.
7     Q.    Do you know what treatment programs
8 are available in prisons for prisoners with
9 addiction issues?
10     A.    No, I don't.  I would assume there
11 are.
12     Q.    If you look again at the same
13 exhibit, page 11, one page backwards from the
14 same page we were on previously, on the left
15 side in the middle there is a chart.  It's
16 called the office snapshot.
17     A.    Yes.
18     Q.    A pie chart?
19     A.    Right.
20     Q.    And it says that your 2014 operating
21 budget was 31.2 million dollars?
22     A.    Holy mackerel.
23     Q.    Does that sound accurate to you?
24     A.    I just --
25     Q.    You don't know?

64 (Pages 250 - 253)

Page 254

1    A.   No.  It's a lot of money.
2    Q.   If you look at the pie chart, you
3 see that 62 percent of the budget was for
4 salaries and 22 percent was for benefits.
5    A.   Um-hum.
6    Q.   So combined, 84 percent of the
7 budget in 2014 was for salary and benefits,
8 correct?
9    A.   Correct.
10    Q.   And do you know at this time -- this
11 is the 2015 report -- do you know whether your
12 office had taken steps to hire anyone additional
13 to work on opioid-related matters?
14    A.   I don't know.
15    Q.   Do you know whether your office
16 incurred any additional expenses around this
17 time related to opioid abuse problems?
18    A.   I would assume, because we started
19 having dead bodies and these problems turned
20 into a crisis, it accelerated, so I would assume
21 that it cost the county more money to -- you
22 know, the county coroner's office was being
23 flooded with dead bodies and other expenses like
24 that.
25    Q.   But referring your attention

Page 255

1 specifically to the prosecutor's office, do you
2 know if the prosecutor's office incurred
3 additional line item expenses because of the
4 opioid --
5    A.   I would have no knowledge of that,
6 whether it is true or not.
7    Q.   Okay.  These -- this public report
8 highlights some headline cases of your office.
9 Would it surprise you to learn that none of the
10 headline cases involved prescription opioids?
11    A.   That doesn't mean anything.  It
12 doesn't mean anything.  That's the headline
13 cases that are here.  I agree with you.  None of
14 the cases listed on page 12 have to do with
15 opioid.
16    Q.   Okay.  Turning your attention to the
17 other exhibit -- that's Exhibit?
18    A.   11.
19    Q.   11.  Thank you.  Exhibit 11 is the
20 2016 report.
21    A.   Um-hum.
22    Q.   And if I could turn your attention
23 to page 6 of this report.  It's a little bigger
24 than the last one.
25    A.   All right.

Page 256

1    Q.   And we're going to look again at
2 that chart at the top left corner.
3    A.   Salaries went down.
4       MR. SPELLACY:  Where are we at?  I'm
5 sorry.  What page?
6       MS. WOODS:  Page 6.
7       MR. SPELLACY:  Okay.
8    Q.   So the chart at the top left corner
9 indicates that 10,779 adult cases were completed
10 in 2015.
11       Do you see that?
12    A.   Yes.
13    Q.   Do you know how that compares to the
14 previous year?
15    A.   I'd have to open up the piece -- I
16 mean the report and look at it.
17    Q.   Okay.  We're going to make it a
18 little easier for you.  If you simply turn the
19 page to page 7 of that same exhibit --
20    A.   Okay.  Got it.
21    Q.   -- do you see in Section 1, the last
22 couple sentences in Section 1 there in italics
23 that begin with the words, "The impact of this
24 practice is significant"?  Do you see that
25 section?

Page 257

1    A.   Yes.
2    Q.   And that states, "In 2015 the office
3 indicted 21 percent fewer defendants than in
4 2011."
5    A.   Okay.
6    Q.   "A reduction of nearly 3,000 cases
7 per year"?
8    A.   Okay.
9    Q.   "And low level indictments are down
10 even more, 25 percent, since 2011."
11       Does that statement accord with your
12 experience?  In other words, do you have any
13 reason to doubt that that is an accurate
14 statement?
15    A.   No.
16    Q.   And here again, just as in the prior
17 year, we see your office's caseload continue to
18 decrease over time, correct?
19       MR. SPELLACY:  I object.  It's not
20 true.
21    Q.   Do you understand my question?
22    A.   No.  I'm sorry.
23    Q.   So here again, just as in the prior
24 year, we see it noted that your office's number
25 of defendants are decreasing --

Page 258

1     MR. SPELLACY:  Objection.
2     Q.   -- over time?
3     A.   That's what these documents you put
4  in front of me say.
5     Q.   And Section 2 of page 7 I think
6  refers to what you were speaking about earlier.
7  In that section there's a quote, a bold quote,
8  that says, "We want to send dealers to prison
9  and addicts to treatment."
10        Do you see that?
11     A.   Yes.
12     Q.   And is that in alignment with what
13  you understood your office's policy to be at
14  this time when Prosecutor McGinty was in charge?
15     A.   I would, yes.  Based upon our
16  limited resources, yeah.
17        -  -  -  -  -
18     (Thereupon, Gutierrez Deposition
19     Exhibit 12, Plaintiffs The County of
20     Cuyahoga, Ohio and the State of Ohio
21     Ex Rel. Prosecuting Attorney of
22     Cuyahoga County, Michael C.
23     O'Malley's Second Supplemental
24     Responses and Objections to
25     Distributor Defendants'

Page 259

1     Interrogatory No. 18 Pursuant to the
2     Court's November 21, 2018 Order, was
3     marked for purposes of
4     identification.)
5        -  -  -  -  -
6     Q.   Handing you what's been marked as
7  Exhibit 12, this is another response from the
8  Plaintiffs to an interrogatory --
9     A.   Okay.
10     Q.   -- regarding damages.
11     A.   Okay.
12     Q.   Have you seen this document before?
13     A.   No, ma'am.
14     Q.   Okay.  Let's move to page 8.  Sorry
15  about that.  Let's go to page 9.  Okay.  There
16  are two categories here I want to draw your
17  attention to in the center of page 9.
18        The first is "Expansion and
19  improvement of opioid-related law enforcement
20  interventions," and the second category is
21  "Expansion and improvement of opioid-related
22  drug disposal programs."
23     A.   Okay.
24     Q.   Do you have any knowledge about what
25  damages your office incurred related to the

Page 260

1  expansion and improvement of opioid-related law
2  enforcement interventions?
3     A.   Could you repeat that question
4  again?  Do I know what they are?
5     Q.   Yes.
6     A.   I would have no knowledge of that,
7  no.
8     Q.   Okay.  If you turn now to page --
9  the very end.  It's the second to last page of
10  the document.  You'll see an Excel spreadsheet.
11  Second to the last page.
12     A.   Okay.
13     Q.   The prosecutor is the third row from
14  the top.
15     A.   Um-hum.
16     Q.   And it lists damages from year 2006
17  to 2017.
18     A.   Okay.
19     Q.   Totaling 50 million dollars.
20     A.   Okay.
21     Q.   Do you know how these damage
22  calculations were generated?
23     A.   No.
24     Q.   Have you seen this document before?
25     A.   No.

Page 261

1     Q.   Do you have any basis from which to
2  conclude that your office had 50 million dollars
3  in damages as a result of opioid abuse?
4     MR. SPELLACY:  Objection.
5     A.   No.  I can't answer that question.
6     Q.   Do you know what future costs your
7  office expects to incur as a result of the
8  opioid abuse?
9     A.   I can't answer that question.
10     Q.   Sitting here today, are you aware of
11  any specifics regarding additional costs your
12  office has incurred as a result of opioid abuse?
13     A.   All I can tell you is what I know in
14  the last few years, how things have increased as
15  far as the addiction problem in our county based
16  upon prescription opioids.  All I can tell you
17  is the dead bodies we keep finding and all the
18  prescription rings that keep popping up.  It
19  just seems things really accelerated in the last
20  three or four years in our county regarding this
21  specific issue.  And I can't put a number on
22  that.
23     Q.   Nor do you dispute that your county
24  has experienced a substantial decline in number
25  of cases?

66 (Pages 258 - 261)

Page 262

1     A.   Yes, because -- but for different
2 reasons than this.  You're trying to separate
3 two things and make a conclusion out of them and
4 that's -- that's not what's happening here.
5     Q.   Okay.  But you certainly do agree
6 that your office had -- its caseload has
7 decreased substantially during this time?
8     A.   Our caseload has decreased but the
9 opioid crisis has increased.
10     Q.   Okay.  You mentioned that your
11 office took on a renewed focus to get addicts
12 treatment.  Are you familiar with a drug court
13 program?
14     A.   I'm familiar with it, yes.  I mean,
15 I know about it, yes.
16     Q.   Do you know what the criteria are
17 for a defendant to be routed into the drug court
18 program?
19     A.   No, I don't, actually.  Just that he
20 has to have a drug problem and be assessed by
21 the psych clinic and be requested to be put in
22 that particular courtroom.  Besides those
23 fundamental things, I don't know.
24     Q.   To your understanding, it's
25 voluntary?

Page 263

1     A.   Yeah.
2     Q.   What role does a prosecutor play in
3 drug court, if any?
4     A.   We have a drug court prosecutor.
5 You'd have to ask him.  All I know is that's to
6 try to get -- that's an alternative type of way
7 of dealing with this problem that we're having.
8     Q.   Do you know if your office has
9 incurred any costs associated with drug court?
10     A.   I don't know.  I would just assume
11 they did.  I don't know.
12     Q.   Do you know roughly what percentage
13 of drug offenders participate in drug court
14 programs?
15     A.   I don't have that, no, don't have
16 that figure.
17     Q.   Do you know if there's a limit on
18 how many people can participate in a drug court
19 at a given time?
20     A.   I don't know that answer either.
21     Q.   Do you know how the drug court is
22 funded?
23     A.   I don't know that either.  See, I
24 don't want my defendants to go to drug court.
25     Q.   Why not?

Page 264

1     A.   Because I want them to pay for what
2 they did.
3     Q.   Because, in general, you prosecute
4 the more serious offenders?
5     A.   Exactly.  The people that are in
6 drug court are usually the addicts, i.e., the
7 patients too, not the dealers.
8     Q.   Do you know which two judges preside
9 over the drug court?
10     A.   Judge Matia.  I know Judge Jackson
11 was the other one, but he retired.  So I don't
12 know who the other drug court judge is.  They
13 had to just appoint one in the last month, this
14 month actually.
15     Q.   And you've never worked in the drug
16 court?
17     A.   No.
18     Q.   Do you know what portion of your
19 budget is allocated toward drug prosecutions?
20     A.   I do not know that.
21     Q.   Do you have any knowledge about why
22 your budget may have increased or decreased at
23 particular times?
24     A.   No.
25     Q.   Do you have any knowledge in how the

Page 265

1 overall staffing numbers of your office has
2 changed in the last 15 years?
3     A.   No.  I can say generally, when the
4 economy is going well, people leave, and when
5 the economy is not going well, people stay.
6     Q.   Do you have any basis for believing
7 that your office's spending has increased,
8 decreased or stayed the same over the last 15
9 years?
10     A.   I don't have those numbers.
11     Q.   Other than prosecutions, what
12 activities does your office engage in that
13 relate to opioid abuse and use, if any?
14          MR. SPELLACY:  Objection.
15     A.   I don't know what programs they have
16 or don't have.
17     Q.   Your office participates in the drug
18 court?
19     A.   Correct.
20     Q.   And certainly in criminal
21 investigations and prosecutions, right?
22     A.   Correct.
23     Q.   Does your office also participate in
24 rehabilitation and addiction support services?
25     A.   Does our office provide those

67 (Pages 262 - 265)

Page 266

particular services? I don't think they do.
Q. Do you know if your office engages in emergency response related to opioids?
A. What do you mean by that? What's emergency response? I don't understand what that is.
Q. Would your prosecutors ever be involved in or have they ever been involved in emergency response efforts related to opioids, such as going to the scene of an overdose, for example?
A. I think as a matter of course our major trial division prosecutors go out to scenes of potential homicides.
Q. Do you know whether any of those --
A. That's potential homicides.
Q. -- have involved opioids?
A. Could be.
Q. You just don't know one way or the other?
A. Yeah. But I'm just saying your standard overdose, I don't think we go out on that.
Q. Okay. Is your office involved in death investigations?

Page 267

A. Yes. We investigate homicides.
Q. Good point.
Does your office also engage in the collection and use of data related to the opioid abuse problems in the county?
A. Not that I know of.
Q. You mentioned earlier that you provided some training and that some of the participants were law enforcement?
A. Correct.
Q. Does your office also engage in other types of training for law enforcement related to opioids?
A. Not that I know of. Not that I'm aware of.
Q. Do you know of any other prosecutors in your office who have led training programs for law enforcement related to opioids?
A. Not that I can remember.
Q. What public education or outreach efforts does your office engage in related to opioids, if any?
A. I don't know.
Q. Does your office engage in any outreach to industries, like distributors,

Page 268

pharmacists or doctors, related to opioids?
A. I have no knowledge.
Q. What activities does your office engage in with respect to review of legislation and advocacy efforts?
A. Regarding the opioid crisis?
Q. Yes.
A. I don't know about that. I'm sure they do. I don't know. I'm not involved in that whole type of activities.
Q. Were you involved in efforts to change the law in the area of the admissibility of medical records?
A. Yeah. That was me, and I did.
Q. When was that?
A. '99, 2000, when the law finally got passed.
Q. And what did the law change?
A. That permitted prosecutors in the State of Ohio to utilize medical records in the prosecution of practitioners, because before that -- how should I say -- creative defense counsels would make an argument to the court that we did not have the right to look at medical records.

Page 269

Q. Under HIPAA?
A. That was one of the arguments, yes. And that was taken care of. I mean, it took me about five years to get that statute passed.
Q. Why was it important that you were able to use medical records?
A. So I could prosecute practitioners without not having my vital piece of evidence, which was the medical record.
Q. And you would consider those medical records vital --
A. Essential.
Q. -- to proving a case against the doctor?
A. Yes. But we have to redact the personal information of the individuals, so you get a medical record up there with no identifying of individuals.
Q. What specifically did you do to help push through that legislative reform?
A. I worked with the medical board and the pharmacy board. I was about to go to Columbus and testify, but somebody else did for the pharmacy board.
And I also had a case and I was --

Page 270

1  I've been a special prosecutor in numerous
2  counties over the years, and I was a special
3  prosecutor in Logan County, and I prosecuted the
4  coroner down there for giving out amphetamines,
5  which I just was thinking -- I told you I didn't
6  do an amphetamine case from '89 to recently.
7  That was the one in the middle that I did,
8  Dr. McGriff, and that issue came up down there,
9  and the third district down there ruled for me
10  and then the legislature then followed suit
11  after that case.
12      Q.   How were you able to prosecute
13  Dr. Smirnoff and others in court before the law
14  was changed allowing the use of these medical
15  records?
16      A.   Because the judges ruled in my favor
17  on that one.
18      Q.   I see.
19      A.   That was an issue of first
20  impression, and some judges would rule -- most
21  of the judges could see the sense of that
22  because the doctor would get up and assert the
23  privilege and say I have the privilege of that
24  and --
25      Q.   Have you assisted in the passage of

Page 271

1  any other legislation related to prosecution of
2  medical professionals or opioids?
3      A.   No.
4      Q.   To your knowledge, have any of the
5  other employees in your office participated in
6  the review of legislation or advocacy efforts?
7      A.   I don't have no knowledge of that.
8      Q.   Are you familiar with the Oriana
9  House?
10      A.   Oriana House.
11      Q.   Oriana House.  Thank you.
12      A.   Yes.
13      Q.   What is it?
14      A.   It's a halfway house.
15      Q.   Do you or does anyone in your office
16  have any work or activities related to its work?
17      A.   Not me --
18          MR. SPELLACY: Objection.
19      A.   -- personally.  I don't know if
20  anybody in my office does.
21      Q.   Are you familiar with the opiate
22  task force?
23      A.   No, I'm not.  That's street drugs.
24      Q.   To your knowledge, was your office
25  involved in the passage of what was called House

Page 272

1  Bill Number 110 titled "Naloxone Hit/Skip Drug
2  Overdose Immunity"?
3      A.   No.  I don't know.
4      Q.   Are you familiar with that law?
5      A.   No.
6      Q.   Are you familiar with a law that
7  provides immunity from arrest or prosecution or
8  permits the court to consider drug treatment for
9  a minor drug possession in situations where a
10  person seeks medical assistance for themselves
11  or for someone else experiencing a drug
12  overdose?
13      A.   I'm not familiar with that law.
14      Q.   Are you familiar with any special
15  programs in your office relating to opioids?
16      A.   Just the treatment in lieu.
17      Q.   The what?
18      A.   The treatment in lieu statute that
19  we use.
20      Q.   Can you explain that in greater
21  detail?
22      A.   Yes.
23          An individual who has committed a
24  crime based upon the fact that they are addicted
25  to drugs get an opportunity to straighten

Page 273

1  themselves out.  So they get evaluated by a
2  psychologist or psychiatric people to determine,
3  in fact, the person was addicted during the time
4  that they were committing the crime.  If, in
5  fact, we agree to that, and the court -- well,
6  actually, it's the court's ultimate decision,
7  but the court weighs heavily on whether the
8  state agrees to that -- they plead guilty to the
9  charge, and as you know, being a prosecutor, a
10  guilty plea is not effectuated until there is a
11  guilty finding.  So a judge holds a guilty
12  finding in abeyance for a year to two years
13  while that individual is put in a program and on
14  intensive probation, to straighten him or
15  herself out; and if that person then does, in
16  fact, successfully complete that, the charges
17  are dropped and the case is sealed and hopefully
18  they go on their merry way to be a productive
19  member of society.  If they fail, then the
20  guilty plea is then enforced, they are found
21  guilty and are subject to the criminal
22  sanctions.
23      Q.   For how long has your office
24  embraced this treatment in lieu policy?
25      A.   Well, it's not a policy.  It's a

69 (Pages 270 - 273)

Page 274

1 statute that is utilized in the appropriate
2 context.  And for as long as I've been a
3 prosecutor.
4      Q.    And who funds the expenses
5 associated with the psych evaluation?
6      A.    I believe that's the county is the
7 one that pays for that unit, for those doctors.
8      Q.    Does it come out of your office's
9 budget?
10      A.    I don't know if our office pays some
11 of that or if it's just completely funded by the
12 county.  I don't know that.
13      Q.    Has your office designated any
14 prosecutors to work jointly with the U.S.
15 Attorney's Office on drug trafficking cases?
16      A.    Not to my knowledge, but I -- I know
17 we have cross-designated some of our people to
18 go over there on some cases and that could have
19 dealt with some street drugs.
20      Q.    Has your office participated in the
21 heroin summits convened by the U.S. Attorney's
22 Offices starting in 2013?
23          MR. SPELLACY:  Objection.
24      A.    I don't know.  Could be.  Again,
25 that's not my purview.

Page 275

1      Q.    Has your office been involved in the
2 U.S. Attorney's heroin and opiate task force
3 formed in 2013?
4          MR. SPELLACY:  Objection.
5      A.    I don't know about that either and,
6 again, usually when you're talking about task
7 forces, you're talking about street drugs, not
8 prescription drugs.
9      Q.    In the course of your
10 investigations, when you substantiate criminal
11 conduct by a doctor or a pharmacist, do you make
12 notifications to a third-party payer or a
13 pharmacy benefit manager?
14      A.    No.
15      Q.    Why not?
16      A.    Why should I?  What's that got to do
17 with what I'm doing?  I don't see why I
18 should -- a third-party payer, an insurance
19 company?  Unless somehow insurance fraud is
20 involved, then they would be contacted as a
21 matter of course as being a victim.
22      Q.    Are you familiar with the term
23 "HIDTA"?
24      A.    Yes.
25      Q.    Do you know what it means?

Page 276

1      A.    High Intensity Drug Enforcement Area
2 or whatever.
3      Q.    Do you know if your office has
4 participated in the Ohio HIDTA?
5      A.    Yes.  I'm sure we have.  I've been
6 to their offices, yeah.
7      Q.    You've participated yourself?
8      A.    In seminars that they have, yes.
9      Q.    And these are training seminars?
10      A.    I guess you would call them training
11 seminars.
12      Q.    Approximately how much time have you
13 spent participating in Ohio HIDTA activities?
14      A.    Over the years, I can't -- now and
15 then go out there.
16      Q.    Is it a couple times a year?
17      A.    No.  No.  Maybe a couple times every
18 five years.
19      Q.    Okay.  Do you know who funds that
20 effort?
21      A.    No idea.
22      Q.    Prior to this litigation did your
23 office ever communicate with the DEA concerning
24 a retailer improperly supplying prescription
25 opioids to your county's residents?

Page 277

1      A.    What do you mean by retailer?
2      Q.    A pharmacy, for example.
3      A.    That did what?
4      Q.    That improperly supplied
5 prescription opioids to your residents.
6      A.    Repeat that question again because
7 I'm getting tired.
8      Q.    Yeah.  I'll rephrase it.
9          Has your office communicated with
10 the DEA concerning bad acting pharmacies, such
11 as pill mills, for example?
12      A.    Okay.  Over the years I have worked
13 with the DEA on pill mills, yes.
14      Q.    Over the years in your
15 investigations, when you have uncovered criminal
16 conduct by doctors or pharmacists --
17      A.    Um-hum.
18      Q.    -- do you routinely refer those
19 individuals or companies to the DEA?
20      A.    Usually not.  If we -- if the state
21 locals develop that case, then it stays in the
22 state courts.  I will call the DEA regarding the
23 administrative action on the registration
24 number.
25      Q.    Has the DEA ever shared with you or

70 (Pages 274 - 277)

Page 278

1  your office any tips or advice on how to detect
2  potentially unlawful conduct related to
3  prescription opioids?
4      A.   That's a very broad question.  I
5  don't know how to answer that.  I've worked with
6  the DEA over the years.  They tell me their
7  tips.  I don't know.  They do the investigation.
8  I do the prosecution.  So I don't know how to
9  answer that question.
10     Q.   We'll break it down.
11          Have you ever received any documents
12  or materials from the DEA providing you advice
13  on how to investigate and prosecute prescription
14  opioid cases?
15     A.   Not that I can recall.
16     Q.   And in your conversations with the
17  DEA, have any of the DEA employees ever
18  communicated to you advice or tips on how to
19  effectively investigate and prosecute
20  prescription drug crimes?
21     A.   It's usually the other way around.
22     Q.   Where --
23     A.   I'm telling them what to do.
24     Q.   And what sorts of things do you tell
25  the DEA?

Page 279

1      A.   It's contextual depending on the
2  case.  I mean, I'm the one that manages in court
3  these cases.
4      Q.   I cannot recall if you said you have
5  access to ARCOS or not.
6      A.   No, I don't.
7      Q.   You do not.
8          Did you ever reach out to the DEA
9  and try to get access to ARCOS?
10     A.   Not access but numbers.
11     Q.   You stated earlier that you believed
12  you had a report that would tell you the total
13  number of opioids coming into your county over a
14  particular period of time, right?
15     A.   Yes.
16     Q.   Where might that report be?
17     A.   I don't know where I have that.  I
18  got a sheet, a spreadsheet, with numbers on it,
19  and I don't know whether I got it from the
20  pharmacy board or the DEA.  And that would have
21  been in the last two years.  I don't know where
22  that is.
23     Q.   Is there a particular reason why you
24  didn't request the ARCOS data from the DEA
25  earlier?

Page 280

1      A.   Can I have a second?
2      Q.   Do you want to take a break?
3      A.   Just one second, talk to him for a
4  second.
5          MS. WOODS:  Let's take a break.
6          THE VIDEOGRAPHER:  Off the record,
7  3:47.
8          (Recess had.)
9          THE VIDEOGRAPHER:  On the record,
10  3:49.
11  BY MS. WOODS:
12     Q.   Okay.  So would you like me to
13  repeat the question?
14     A.   Sure.
15     Q.   Why didn't you routinely request
16  ARCOS data from the DEA?
17     A.   Why I didn't routinely request ARCOS
18  data?  Because, first of all, DEA doesn't give
19  that stuff out just willy nilly.  That's the
20  first thing.  Okay.  And I did not think it was
21  relevant until just recently to get those
22  numbers because of the increase, as I keep
23  saying, of the dead bodies, and, it is my view,
24  the opioid crisis getting completely out of hand
25  in the last three or four years.  And when I say

Page 281

1  "opioid crisis," I want to make sure I'm talking
2  about prescription drugs, okay, from my little
3  box that I work in.
4      Q.   So the first thing you said was that
5  the DEA doesn't just give it out.
6      A.   No.  No, they don't.
7      Q.   What does the DEA require from you
8  in order for them to give you the ARCOS data
9  you're requesting?
10     A.   I don't know.  And, again, when I
11  requested this information, I believe, about a
12  year and a half, two years ago, I can't remember
13  whether I got that information from -- if I got
14  ARCOS from the DEA or I got it from the pharmacy
15  board and their tracking of prescriptions being
16  filled in Cuyahoga County for certain years.
17     Q.   Okay.  But in your experience, even
18  as a law enforcement professional, it is
19  challenging to get your hands on the ARCOS data;
20  is that a fair characterization of your
21  testimony?
22     A.   I don't know.  I don't know if -- I
23  wouldn't characterize it like that.  All I know
24  is maybe in the right circumstances that I would
25  be able to get that information from the DEA if

71 (Pages 278 - 281)

Page 282

1 I needed it, if we were on a joint investigation
2 on something and it was appropriate and
3 relevant.  So I don't know about challenging,
4 but just to say, Hey, can I have these numbers,
5 I think, yeah, that would be challenging.
6     Q.   Okay.  Have you attempted to get
7 ARCOS data from the DEA and had your request
8 denied?
9     A.   See, I can't remember whether I got
10 it from the DEA or the pharmacy board.  I'm
11 sorry.  I don't remember --
12     Q.   So you don't recall?
13     A.   -- whether I got it from one of
14 those two.
15     Q.   Have you ever tried to proactively
16 use either ARCOS data or OARRS data to determine
17 if there were pockets within your jurisdiction
18 who were getting a disproportionate number of
19 prescription opioids?
20     A.   The short answer to that question is
21 no.
22     Q.   Why not?
23     A.   Because we don't need to look for
24 work.  Work will come to us, okay.  We are
25 overwhelmed at our office all the time.  I feel

Page 283

1 like I'm putting my finger in a dike.  That's
2 all I feel I'm doing in the last 30 years,
3 especially in the last four years.
4     Q.   What do you have to do to receive
5 the OARRS data?  Do you have to go through the
6 board?
7     A.   No.  We actually have -- there's a
8 certain certification that the pharmacy board
9 gives to law enforcement agencies to be able to
10 access that data, and we do have an OARRS
11 officer within our office, but to be honest with
12 you, I've never used that, because when I work
13 with the pharmacy board, they just have that
14 stuff, so I don't have to request it.  But we do
15 have an OARRS officer, I believe, in our office.
16     Q.   Okay.  Are you familiar with the
17 opioid prescribing guidelines that were issued
18 in 2011 by the governor's cabinet opiate action
19 team?
20     A.   No.
21     Q.   Are you familiar with the
22 prescribing guidelines for management of chronic
23 pain that were issued in 2013?
24     A.   Not that specific document, but
25 generally I do.

Page 284

1     Q.   And what is your general
2 understanding?
3     A.   Are you talking about a pain
4 management situation?  Is that what you're
5 talking about?
6     Q.   The guidelines for management of
7 chronic pain that were issued.
8        MR. SPELLACY:  Objection.
9     A.   Generally speaking, there's
10 certain -- how should I say -- regulations
11 before you can even open up a pain management
12 clinic.  Okay.  I don't know if that was the law
13 that changed that you had to be a doctor to
14 actually open one.  It used to be that people
15 would open them and get some shady doctors and
16 just start writing prescriptions.  Especially in
17 southern Ohio that was a big, big issue.
18     Q.   When was that occurring, over what
19 time period approximately?
20     A.   Last five, six years that we've had
21 those issues, but generally speaking, there has
22 to be a certain -- pain management is a
23 multi-disciplinary approach.  You have to do
24 certain things before you put patients on
25 long-term narcotic therapy, okay.  There is a

Page 285

1 very small subset in the United States that,
2 based upon my -- my experience, that there is an
3 appropriate situation where people are on
4 long-term narcotic therapy, but that subset of
5 people is very, very, very, very low, and so you
6 have to go through all these procedures and -- I
7 mean protocols before I'm going to put you on
8 Vicodin for the rest of your life.
9     Q.   And is that according to these
10 guidelines that were issued by the governor's
11 cabinet?
12     A.   I don't know.  All I know is this is
13 what evolved and developed since the middle '90s
14 regarding pain management in the State of Ohio.
15 The medical board puts out these -- what do they
16 call them -- these guidelines, these papers,
17 this is what you need to do.  They're not
18 statutes, but they're recommendations that this
19 is what you need to do, and they've tightened
20 that up regarding pain management over the
21 years.  So I don't know specifically that, but I
22 know the evolution of what's going on with pain
23 management.
24     Q.   Okay.  So over the years these
25 guidelines, these best practices, if you will,

72 (Pages 282 - 285)

Page 286

1 have evolved to become more strict and more
2 careful --
3     A.  I would agree with that.
4     Q.  -- regarding prescription opioids?
5     A.  I would agree with that.
6     Q.  Are you familiar with the
7 prescribing guidelines for outpatient management
8 of acute pain that were issued in 2016?
9         MR. SPELLACY:  Objection.
10     A.  No.
11     Q.  Do you know what role, if any, your
12 office played in creating these guidelines?
13     A.  I would have no knowledge of that.
14     Q.  Based on what you know about the
15 evolution over time, in your opinion, would the
16 opioid abuse problem have been lessened in some
17 respect had those guidelines been more strict
18 sooner?
19     A.  That's -- I'm not going to speculate
20 on that.  I can't answer that question.  I can't
21 answer that question because clearly if they
22 would have had any effect, we wouldn't be where
23 we're sitting here right now.
24     Q.  Do you think since they've been
25 issued, they've had a positive or a negative or

Page 287

1 no effect?
2     A.  Again, as I explained before, what I
3 see going on is that the availability of these
4 prescription opioids have been taken back by
5 legislation and practices, and what has happened
6 is people who get addicted to OxyContin,
7 Percocet, then go to heroin, and that is why we
8 have the dead bodies right now.
9     Q.  But in response to my question, do
10 you believe these guidelines have had a positive
11 impact, a negative impact or no impact on the
12 opioid abuse?
13         MR. SPELLACY:  Objection.
14     A.  Well, first of all, that wasn't the
15 question you first asked me, but I don't know.
16     Q.  The question was, do you think since
17 they've been issued they've had a positive or a
18 negative or no effect --
19         MR. SPELLACY:  Objection.
20     Q.  -- and your answer is you don't
21 know?
22     A.  My answer is I can't speculate on
23 something like that.  And my other answer was if
24 they did have such a positive effect, we
25 wouldn't be here right now.

Page 288

1     Q.  As someone in law enforcement, do
2 you agree with the decision to issue guidelines
3 related to opioid prescriptions?
4         MR. SPELLACY:  Objection.
5     A.  Well, I don't know the guidelines,
6 but I would assume that -- that they would be
7 something that would help our community.
8     Q.  Do you think it's a wise idea to
9 encourage doctors to access OARRS to obtain data
10 about a patient's other prescriptions?
11     A.  Absolutely.
12     Q.  And in the training programs in
13 which you've presented, have you encouraged
14 colleagues and others to use OARRS as a helpful
15 tool in their prosecutions?
16     A.  Well, when I was doing all the -- I
17 haven't talked in a seminar about this for a
18 long time, at least ten years, so when I talked,
19 OARRS wasn't even available.
20     Q.  I see.
21     A.  But if I did talk, I would tell them
22 that.
23     Q.  Do you wish that OARRS had been
24 available sooner?
25     A.  Absolutely.

Page 289

1     Q.  Why?
2     A.  It's a great investigative tool.
3         Just to give you an example, if we
4 would prosecute a doctor, for example, we would
5 have to gather 30 or 40 agents of the pharmacy
6 board and spread out through Cuyahoga County in
7 a few days and grab all the prescriptions
8 literally from the pharmacies, and we would just
9 go to every pharmacy and see if they had -- if
10 prescriptions of that doctor was in there.  Now
11 we know that we don't have to do that.
12     Q.  Just by looking at the database?
13     A.  Exactly.  We didn't have a database
14 before, so we had to go out and actually grab
15 them physically, and it was a very arduous
16 process.
17     Q.  Okay.  The OARRS database is also
18 sensitive because it contains private medical
19 information about individuals, right?
20     A.  The only OARRS that I've ever seen
21 has been a drug, basically, profile of
22 individuals and doctors.
23     Q.  So it does contain medical
24 information about patients, right?
25     A.  Well, in the State of Ohio a

73 (Pages 286 - 289)

Page 290

1 prescription is not -- is not confidential
2 because the pharmacy board has the
3 administrative powers to go in at any point in
4 time at any pharmacy and look at the
5 prescription.
6     Q.    The pharmacy board does, but other
7 actors, like my client, cannot gain access?
8     A.    Of course, because you're not law
9 enforcement, but, I mean, HIPAA does bar that
10 stuff in certain situations, so the fact that
11 you got a prescription for a certain drug on a
12 certain date, I guess that could be debatable
13 whether that's under HIPAA or not.  I could
14 guess it would be contextual.
15     Q.    But certainly prosecutors, police
16 and doctors all have access to OARRS data?
17     A.    To OARRS, yes.
18     Q.    OARRS.  Excuse me.
19     A.    It's okay.  You're getting ARCOS and
20 OARRS all mixed up.  That's okay.  You're
21 getting tired, too.
22     Q.    Are you aware that the Ohio governor
23 in 2015 announced a project to integrate OARRS
24 directly into electronic medical records and
25 pharmacy dispensing systems across the state?

Page 291

1     A.    No.
2     Q.    In your opinion, would that be
3 helpful?
4     A.    He wants to do what now?
5     Q.    Integrate OARRS directly into the
6 electronic medical records and pharmacy
7 dispensing systems throughout the state.
8     A.    I don't know what that means.  I
9 have no idea what that means.
10     Q.    So we've talked a little bit about
11 what governors have done or what the legislature
12 has done, what the prosecutors have done.  In
13 some circumstances do you think that government
14 bureaucracy has stymied the county's ability to
15 combat its opioid abuse problem?
16         MR. SPELLACY:  Objection.
17     A.    I don't know.  I don't know.
18     Q.    Based on your experiences, have you
19 identified any weaknesses in law enforcement's
20 response to the opioid abuse problem?
21     A.    Have I identified any weaknesses in
22 law enforcement's response to the opioid crisis?
23     Q.    Yes.
24     A.    I think the fact that the system is
25 overwhelmed by it because we only have limited

Page 292

1 resources and we're completely overwhelmed by
2 this.
3     Q.    If additional resources were
4 available, what would you like to see your
5 office do with additional funding to combat the
6 opioid abuse problem?
7     A.    If I had a wish list, hire
8 investigators and we'd do our own investigation
9 of these type of cases besides the pharmacy
10 board and local law enforcement, because they're
11 overwhelmed with everything that they do.
12     Q.    So you would want your office to
13 hire its own investigators?
14     A.    Investigators and have a whole
15 diversion unit to combat this.
16     Q.    Is there a blueprint for how that is
17 done?  Has that ever been done in your office
18 before?
19     A.    No.  But to give you an example, the
20 Cuyahoga County Sheriff's Department used to
21 have a diversion unit.  Now they don't.  So it's
22 funding the entities and their priorities.
23     Q.    Anything else that you would like to
24 see your office do?
25     A.    I mean, that's a loaded question.  I

Page 293

1 would have to think about it.  I'm sure there
2 would be things, but right now talking to you, I
3 can only speculate.  Maybe doing some talks to
4 the doctors around town, you know, get out to
5 the pharmacists, try to have these medical
6 professionals understand the problem, what to
7 look for, how to combat it, how to integrate
8 that interface with us, with the prosecutor's
9 office, law enforcement, things of that nature,
10 yes.
11     Q.    What obstacles or frustration -- I'm
12 sure there are some -- have you encountered in
13 prosecuting prescription drug crimes?
14         MR. SPELLACY:  Objection.
15     Q.    I mean, one example we talked about
16 was the inability to reliably use those medical
17 records in court, and that one was handled with
18 new legislation.
19     A.    Right.
20     Q.    Have there been other examples of
21 challenges or obstacles that you faced in your
22 prosecutions?
23     A.    Like I said, it's a matter of
24 resources.  We are so overwhelmed with other
25 things, what's going on here, that I don't think

74 (Pages 290 - 293)

Page 294

1 we have enough resources to be able to
2 effectively deal with this problem.
3    Q.    And just speaking from your own kind
4 of personal caseload -- we looked at your
5 office's caseload trajectory, but when you just
6 look at what you're working on, I believe you
7 stated that 10 to 20 percent of your caseload
8 relates to prescription opioids, correct?
9    A.    Yes.  And it ebbs and flows.
10    Q.    How has that changed over the last
11 ten years?
12    A.    It hasn't.  It's been consistent.
13 Like I said --
14    Q.    Excuse me.  What about over the last
15 20 years?
16    A.    Over the last ten years, like I told
17 you, there's been an increase of scrip rings,
18 and, like I said, I keep going back to the last
19 four or five years how things have just exploded
20 as far as the opioid -- and when I say opioid
21 crisis, I'm talking about prescriptions.  It
22 just seems like -- it appears to be out there
23 that there is just a lot of people trying to get
24 prescriptions, trying to get the medication, and
25 because doctors are now starting to clean up

Page 295

1 their act a little bit, that's why I think we
2 have more scrip rings going on out there.  But I
3 can tell you this, all of us, the police, the
4 prosecutor's office, everybody, has done the
5 best they possibly could under the circumstances
6 with what has been given to us to work with.
7 I mean, I, for example, have done 80
8 percent of the doctor cases in our office in the
9 last 30 years.  I've trained a few people, but
10 they have left.  So, I mean, I shouldn't be the
11 one doing all this all the time.  There should
12 be other individuals.
13    Q.    So putting aside what law
14 enforcement and prosecutors have done, have
15 there been other government officials, like
16 elected representatives in Ohio, that, in your
17 opinion, did not attack the opioid abuse problem
18 as quickly and as effectively as they should
19 have?
20    A.    I can't think of any.
21    MR. SPELLACY:  Objection.
22    Q.    Do you think your own office
23 attacked the problem as quickly and intensely as
24 it should have?
25    A.    Absolutely.  With what we had and

Page 296

1 what we had to work for -- with, yes, the best
2 we possibly could.
3    Q.    Are there things today that you know
4 about combating prescription drug crime that you
5 wish you had known about ten years ago?
6    MR. SPELLACY:  Objection.
7    A.    You always think you're going to be
8 wiser, but the question is I wish I would have
9 done what again?
10    Q.    Just if you've learned some lessons
11 and today you sit here knowing some things about
12 prescription drug crime prosecution that you
13 wish you had known ten years ago.
14    MR. SPELLACY:  Objection.
15    A.    To the extent what you guys did, I
16 never really realized the marketing and the
17 plans that the distributors and manufacturers of
18 these drugs and what they did starting with in
19 the late '90s with OxyContin and just went pedal
20 to the metal.  That -- I was taken aback when I
21 really started to learn about really what was
22 going on and why the questions in my mind, why
23 all the time that there were so many drugs
24 available to these doctors.  I could never
25 understand who was tracking the drugs, who was

Page 297

1 -- who was counting all the pills.  And you guys
2 are the ones who had all that information.  You
3 knew where you were sending drugs, how much you
4 were sending the drugs to everybody.  I didn't.
5 You did.
6    Q.    Let's --
7    MR. SPELLACY:  You got to stop
8 interrupting the witness.  Every time you don't
9 like an answer, you interrupt him.  Stop.
10    Q.    What is the source of statements you
11 made?  What are you relying on?  You mentioned a
12 60 Minutes episode.
13    A.    Yes.  And then the seminar that I
14 went to and things I started reading about
15 really what was going on.  I mean, I'm blown
16 away that -- how you guys marketed these
17 dangerous drugs and told everybody that they
18 were fine when they weren't.
19    Q.    Are you aware that McKesson does not
20 market --
21    A.    I don't know what McKesson does.
22 All I know is McKesson is a very powerful
23 corporation that has a lot of political clout
24 that screwed the DEA.  Look, you guys all
25 represent to me -- to me you guys all

75 (Pages 294 - 297)

Page 298

1 represent -- you guys are the evil empire, okay.
2 You've destroyed our community out there. You
3 may not think so, but you did.
4    Q.   We've talked a lot today about
5 doctors who have illegally prescribed medicine
6 to people that did not need it, and as a result,
7 real people died because of this doctor.
8    A.   Absolutely.
9    Q.   We've talked about a number of cases
10 in which these doctors broke the law and it
11 resulted in death and harm to Cuyahoga County.
12    A.   Correct.
13    Q.   Despite the fact that we have talked
14 about a number of different cases involving
15 different doctors --
16    A.   Correct.
17    Q.   -- would it surprise you to learn
18 that Cuyahoga County only produced 12 documents
19 from your custodial file?
20    A.   What do you mean?  What custodial
21 file?  What is that?
22    Q.   So that would be all the documents,
23 electronic and hard copy, in your possession
24 that relate to this litigation.  Does that
25 number sound accurate to you?

Page 299

1       MR. SPELLACY:  Objection.
2    A.   I don't know what you mean by
3 custodial file, if you mean my e-mails, if you
4 mean my case files.
5    Q.   Yes, all of it.
6    A.   My case files are my case files.
7 They're there.  And I'm not an e-mail guy, so
8 you wouldn't find very many e-mails.
9    Q.   Do you use e-mail in your job?
10    A.   Yes.
11    Q.   How long have you used e-mail?
12    A.   Ever since it came out.
13    Q.   About how many e-mails a day do you
14 send?
15       MR. SPELLACY:  Objection.
16    A.   Do I send?
17    Q.   Yes.
18    A.   I would probably say two or three a
19 week.
20    Q.   And about how many e-mails do you
21 receive a week?
22    A.   I receive a lot more.  I don't know.
23 A week?  20.  I don't know.
24    Q.   During the years have you sent
25 e-mails about your drug investigations and

Page 300

1 prosecutions?
2    A.   No.  I didn't put anything
3 confidential in my e-mail.
4    Q.   I wasn't asking about anything
5 confidential.  I asked -- and I'll repeat my
6 question.  During the years did you send e-mails
7 regarding drug investigations or prosecutions?
8       MR. SPELLACY:  Objection.
9    A.   I don't know.  I don't know.
10    Q.   Sitting here today, you cannot
11 recall if you have ever sent an e-mail regarding
12 a drug investigation or prosecution?
13    A.   Of course.  Of course I -- I have an
14 individual -- my investigator wants to meet.
15 We'll, yeah, e-mail each other where we're going
16 to meet.
17    Q.   So you have sent such e-mails?
18    A.   Yeah, but nothing substantive about
19 the case, something maybe procedural.
20    Q.   You have never sent a substantive
21 e-mail regarding a drug investigation or
22 prosecution?
23    A.   No; not what I would consider
24 substantive by talking about the facts and
25 circumstances of a case in detail, no.

Page 301

1    Q.   But you have sent e-mails about the
2 drug investigations --
3    A.   Yes.
4    Q.   -- and prosecutions?
5    A.   Yes.
6    Q.   How frequently do you delete your
7 e-mails?
8    A.   I've never deleted my e-mails.
9    Q.   What is the oldest e-mail you still
10 have access to?
11    A.   I have no idea.  You can look at my
12 inbox now.  It's got like 1200 e-mails.  I never
13 -- I never delete anything.
14    Q.   Would it surprise you to find out
15 that the earliest e-mail we were provided is
16 dated March 21st, 2013?
17       MR. SPELLACY:  Objection.
18    A.   I don't know what was produced to
19 you.  All I know is they were supposed to give
20 you all my e-mails.  I said, "Go ahead."  So I
21 don't know.
22    Q.   You did use e-mail prior to March
23 21st of 2013, correct?
24    A.   If e-mail was available prior to
25 March 13th of 2013, yes, I would have used

76 (Pages 298 - 301)

Page 302

1 e-mails.
2     Q.    Was e-mail available in your office?
3     A.    I assume it was.  I don't know.  How
4 long have we had e-mails?  When did we get the
5 internet?  The late '90s, early 2000s.  I would
6 assume.
7     Q.    You've used your work e-mail
8 throughout --
9     A.    The time that --
10     Q.    -- the last 15 or 20 years?
11     A.    Whenever it was available.
12     Q.    Okay.  And am I correct that you
13 sent and received e-mails regarding opioids and
14 prescription opioids?
15         MR. SPELLACY:  Objection.
16     A.    Again, you're asking me very general
17 questions.  Get specific.
18     Q.    I'm intending for them to be
19 general.
20     A.    Well, I can't answer the general
21 questions.  All I can tell you is as a matter of
22 course I use my e-mails.  Do I talk about
23 specifics of a case in my e-mails?  No.  If
24 somebody wants to meet on a case?  Yes.  Could
25 there be a mention of we're going to talk about

Page 303

1 Dr. Joe and his patient?  Yes, something like
2 that.  But I can't remember.  And if it's there,
3 it's there; if it isn't, it isn't.
4     Q.    Do you still have the e-mails that
5 you've written and received over the years?
6     A.    No.  Do you?  Do you have e-mails
7 back from 2010?
8     Q.    I'm not here today to answer your
9 questions.
10     A.    That's what I'm saying.  It's a
11 silly question, okay.  Whatever e-mails are on
12 my e-mail, that's what it is.
13     Q.    And what e-mails have you preserved?
14     A.    I haven't preserved any.
15     Q.    You've stated you do not delete your
16 e-mails.
17     A.    I don't delete my e-mails, so --
18     Q.    If you wanted to find an e-mail from
19 2010, how would you do that?
20     A.    I couldn't.  I don't know how.
21     Q.    What about e-mails from 2015?  How
22 would you find those e-mails?
23     A.    I don't know.
24     Q.    What about the seminars you've
25 attended?  Did you receive any e-mails about the

Page 304

1 seminars you've attended?
2     A.    I'm sure I have.
3     Q.    Did you delete those e-mails?
4     A.    I haven't deleted a thing.
5     Q.    Do you use any e-mail addresses
6 other than your official e-mail account from the
7 Cuyahoga County -- Cuyahoga County Prosecutor's
8 Office?
9     A.    For my professional business, no.
10 That's the only e-mail I use for county
11 business.
12     Q.    Do you have a personal e-mail
13 address as well?
14     A.    Yes, I do.
15     Q.    You've never used that for business?
16     A.    I don't believe I have.  Could I
17 have been once maybe -- no, I don't think so.  I
18 don't think so.
19     Q.    Are there other electronic
20 notifications, reports or other documents you
21 receive from others related to opioids?
22         MR. SPELLACY:  Objection.
23     A.    Like I said, in my normal course of
24 my business, e-mails I receive from pharmacy
25 board agents, local law enforcement about these

Page 305

1 cases, that's all I do.  That's all I receive.
2     Q.    Have you ever maintained a notebook
3 or diary with notes of your work activities?
4     A.    No.
5     Q.    Do you have a cell phone for work?
6     A.    No.  I use my personal cell phone
7 for work.
8     Q.    Do you receive or send texts on your
9 personal cell that relate to your work?
10     A.    No.  Talk on the phone about it.
11     Q.    Did you or anybody else collect your
12 computer to search for documents related to this
13 litigation?
14         MR. SPELLACY:  Objection.
15     A.    All I know is my IT guy says they
16 were going to get all my e-mails and give them
17 to you.  I said, "Go ahead."
18     Q.    Do you currently have in possession
19 more than 13?
20     A.    E-mails?
21     Q.    E-mails.
22     A.    On my computer right now?
23     Q.    Yes.
24     A.    I am sure.  I assume -- and I was
25 going to say this but you cut me off, is that at

77 (Pages 302 - 305)

Page 306

1 a certain point in time e-mails just drop off,
2 that the system itself just drops it off.
3     Q.    Do you maintain hard copies of
4 documents in your office?
5     A.    Yes.  On my case files, yeah.
6     Q.    Where do you keep them?
7     A.    In my file cabinet.
8     Q.    And did you or anybody collect those
9 hard copy documents to review them for this
10 litigation?
11          MR. SPELLACY:  Objection.
12     A.    Last week Mr. Gallucci asked me if I
13 had any hard copies, and I told him I had my
14 seminar papers and things of that nature, and
15 that's what I gave to him and he was supposed to
16 give them to you guys.
17     Q.    Does your office have document
18 retention policies?
19     A.    I'm sure they do, but I'm not aware
20 of them.  When a file is done, I give the file
21 to the file room and they supposedly scan the
22 files on the computer and then they discard the
23 hard copies.  That's my understanding of how we
24 keep files.
25     Q.    For how long does your office

Page 307

1 archive e-mails?
2     A.    I don't know.
3     Q.    Did you receive a hold notice when
4 this litigation was initiated, telling you and
5 your staff not to delete any records that might
6 have relevant information?
7     A.    I was told not to delete any e-mails
8 that might have something to do with this case.
9     Q.    When did you receive that notice?
10     A.    I'm not sure who told me that,
11 whether it was Pete Sagetti or Dave Lambert.
12     Q.    When did you receive that notice?
13          MR. SPELLACY:  Objection.
14     A.    I don't know.  When I first found
15 out you guys wanted to depose me.  When was
16 that, August?
17     Q.    August of 2018?
18     A.    Yes.
19     Q.    Have you deleted or destroyed any
20 documents or materials related to opioids?
21     A.    No.
22     Q.    Are you aware that certain case
23 files from your office have been produced in
24 this litigation?
25     A.    I was told that a hundred cases were

Page 308

1 given to you.
2     Q.    Were you involved in any way in
3 determining which case files to produce?
4          MR. SPELLACY:  Objection.
5     A.    I want to answer something regarding
6 my e-mails.  I have deleted e-mails before, but
7 not very many.  I'll get an e-mail, for example,
8 from an individual -- I used to coach
9 baseball -- about baseball tournaments.  I'll
10 delete that, things of that nature.  So I just
11 want to make sure we're all clear on that one.
12          MR. SPELLACY:  Take a break while
13 you're looking through --
14          MS. WOODS:  Yes, let's take a break.
15          THE VIDEOGRAPHER:  Off the record at
16 4:19.
17          (Recess had.)
18          THE VIDEOGRAPHER:  On the record,
19 4:30.
20     A.    I'd like to say something about this
21 hold and stuff, okay, to clarify things.
22     Q.    There's no question pending.
23     A.    I don't care if there's a question
24 pending.  I want to make sure the record is
25 clear on my answers on this.

Page 309

1     Q.    So you need to correct your prior
2 answer regarding the document hold?
3     A.    You want to say correct or explain
4 or whatever.  The only thing I can tell you is
5 that in my memory -- we're talking about two
6 things, when I was informed I was going to be a
7 witness and when I was informed about some -- I
8 never was told about some litigation hold or
9 whatever.  All I was told was that you guys are
10 entitled to all my e-mails, and I said, "Fine."
11 My understanding is that I got -- that I
12 remember in my head that sometime in August that
13 I was going to be deposed.  Now, you have to
14 understand, I actually technically retired for
15 two months in July and August of this year and
16 then got rehired, so I can't remember whether I
17 was told before I had my two months hiatus, but
18 I know that in August my deposition -- in my
19 mind it's two different things.  So this
20 litigation hold with e-mails, I can't even tell
21 you if somebody told me that.  All that was told
22 to me was that all of my e-mails were going to
23 be mined for anything to do with opiate.  I
24 said, "Be my guest.  Take them all.  I have
25 nothing to hide."

78 (Pages 306 - 309)

Page 310

1    Q.    To your knowledge, have you deleted
2  any e-mails or documents related to opioids in
3  the last two years?
4    A.    No.
5              - - - - -
6         (Thereupon, Gutierrez Deposition
7         Exhibit 13, Kenneth V. Mills
8         Indictment, was marked for purposes
9         of identification.)
10             - - - - -
11   Q.    I want to hand you what has been
12  marked as Exhibit 13.
13        And sorry.  Was that a sufficient
14  opportunity to explain your prior testimony?
15   A.    Yes.  I just wanted to make sure
16  that you understood that to me there were two
17  things going on and I was mentioning them
18  together.
19   Q.    Are you familiar with the
20  prosecution of Ken Mills, the former director of
21  corrections for Cuyahoga County?
22   A.    Yes, I am.
23        MR. SPELLACY:  Object to this line
24  of questioning.
25        Go ahead.

Page 311

1    Q.    And is he being prosecuted by your
2  office?
3    A.    Yes, he is.
4    Q.    What has Mr. Mills been charged
5  with, according to Exhibit 13?
6    A.    Basically he's charged with lying to
7  county council and lying to us and the FBI.
8    Q.    And specifically in Exhibit 13,
9  charges -- looks like counts 18 through 25 are
10  charges against Mr. Mills, correct?
11   A.    Yes.
12   Q.    Are you personally involved in the
13  prosecution of Mr. Mills?
14   A.    Yes.
15   Q.    Do the charges against Mr. Mills
16  relate in any way to the issues raised in this
17  lawsuit?
18   A.    I don't know because I don't know
19  all the issues in this lawsuit.
20   Q.    Are you aware that Mr. Mills had no
21  prior experience running or working in jails?
22   A.    Yes.
23   Q.    Do you have any knowledge as to how
24  he got the job?
25        MR. SPELLACY:  Objection.

Page 312

1    A.    I can't tell you about an ongoing
2  criminal investigation.  I can't tell you facts
3  and circumstances that are the basis of these
4  indictments.
5              - - - - -
6         (Thereupon, Gutierrez Deposition
7         Exhibit 14, News Article Entitled
8         "Former Cuyahoga County Jail
9         Director, Indicted In Corruption
10        Probe, Received $16,700 Payout When
11        He Resigned," was marked for
12        purposes of identification.)
13             - - - - -
14   Q.    Turning your attention to Exhibit
15  14 --
16   A.    Did you give it to me?
17   Q.    -- it is a news article dated
18  January 25th, 2019 --
19   A.    Yes.
20   Q.    -- entitled "Former Cuyahoga County
21  Jail Director Indicted in Corruption Probe
22  received $16,700 payout when he resigned."
23   A.    Yes.
24   Q.    Have you read this particular news
25  article about the Mills case?

Page 313

1    A.    Yes, I did.
2    Q.    And according to this article,
3  Mr. Mills allegedly lied about his role in
4  blocking the hiring of necessary nursing staff
5  for jail facilities.
6         MR. SPELLACY:  Objection.
7    A.    Yes.  That's in the article or was
8  in articles.  I don't know if it's in this one.
9    Q.    Is it fair to say that failing to
10  have adequate medical staffing at a jail could
11  harm the inmate's health and well-being?
12        MR. SPELLACY:  Objection.
13   A.    I think that's kind of common
14  sensical, yes.
15   Q.    And, in fact, in 2008 seven inmates
16  died under Mr. Mills' watch, correct?
17        MR. SPELLACY:  Objection.
18   A.    What year?
19   Q.    2018.
20   A.    Okay.  Yes.
21   Q.    Excuse me if I --
22   A.    Yeah.  I think you said 2008.
23   Q.    And, in fact, an eighth inmate died
24  in December shortly after Mr. Mills left?
25        MR. SPELLACY:  Objection.

79 (Pages 310 - 313)

Page 314

1    A.   That is correct.
2    Q.   From a financial perspective, these
3 types of health incidents could be costly to the
4 corrections department, right?
5        MR. SPELLACY:  Objection.
6    A.   To the county, yes.
7    Q.   That's because it would result in
8 increased spending in medical treatments?
9        MR. SPELLACY:  Objection.
10   A.   No.  Mine was when lawyers start
11 filing wrongful death suits, it's going to cost
12 the county a lot of money.
13   Q.   So lawsuits can follow an inmate's
14 death?
15   A.   Yes.  In fact, there are lawsuits
16 filed already on these deaths.
17   Q.   How many such lawsuits have been
18 filed; do you know?
19   A.   I don't know.  You'd have to ask
20 Mr. Lambert that.
21   Q.   And do you know what sort of damages
22 have been requested in those lawsuits?
23       MR. SPELLACY:  Objection.
24   A.   I don't know but they're wrongful
25 death suits, so if somebody died, that means

Page 315

1 money.
2    Q.   What other costs would the county
3 incur in situations like this one?
4    A.   What do you mean?
5        MR. SPELLACY:  Objection.
6    Q.   In the case of multiple inmate
7 deaths.
8    A.   I don't understand the question,
9 what you mean.  I'm sorry.
10   Q.   Speaking for your office, does your
11 office need to expend resources in order to
12 prosecute the Mills case?
13       MR. SPELLACY:  Objection.  He's not
14 here speaking for his office on the Mills case.
15   A.   All I can tell you is that our
16 offices was the lead -- lead prosecutorial
17 office that did this case.
18   Q.   Okay.  And you yourself are actually
19 working on the case?
20   A.   I'm part of that team, yes.
21   Q.   And so part of your time is now
22 being spent on the Mills prosecution as opposed
23 to other prosecutions?
24       MR. SPELLACY:  Objection.
25   A.   Correct.  I do a wide variety of

Page 316

1 things, ma'am.
2    Q.   Are you aware that Mr. Mills
3 received this $16,700 payout when he resigned?
4    A.   This is a misnomer, because when
5 you're a county employee or a public employee,
6 you accrue vacation time.  When you quit or
7 resign, you get whatever vacation time that you
8 have earned.  So this $16,700 is just his
9 vacation time that he accrued over the years of
10 working for the county.  This is nothing
11 unusual.
12   Q.   So you're aware that he did receive
13 that money?
14   A.   Yeah, but it's a lot to do about
15 nothing.  He earned that vacation time.
16   Q.   What is the current status of the
17 Mills case?
18       MR. SPELLACY:  Objection.
19       Don't answer that.
20   Q.   Like what is the procedural posture
21 of the Mills case currently?
22   A.   He's been indicted.
23   Q.   He's been indicted.  Have there been
24 any hearings in the Mills case, any public
25 hearings?

Page 317

1    A.   No.
2    Q.   Have there been any bond hearings,
3 for example?
4    A.   Arraignment is next week.
5    Q.   Is he being held currently?
6    A.   No.  What happens is, at least in
7 this county, when you get indicted, if we don't
8 arrest you, you get a notice in the mail to show
9 up for arraignment.
10   Q.   So he's being expected to
11 essentially self-report?
12   A.   Show up for arraignment.  If he
13 doesn't show up for arraignment, then a capias
14 is issued for his arrest.
15   Q.   And in what cases did you say that
16 that process is followed?
17   A.   Unless somebody is not arrested out
18 of the grand jury, meaning if you want to arrest
19 somebody after indictment in the grand jury,
20 there's a process to get an arrest warrant after
21 you get indicted, as to people that are going to
22 flee or may be a danger to the community, but
23 most white collar criminals like this -- in
24 fact, the majority of the people just get
25 notices to show up.

80 (Pages 314 - 317)

Page 318

1  Q.   And why is that?  Why wouldn't he be
2  arrested?
3  A.   Because he's not a threat to the
4  community, he's not a flight risk, and that's
5  what we'd have to argue to the judge when you
6  want the warrant.  And he's not.  He's not going
7  anywhere.
8  MS. WOODS:  Can we go off the
9  record?
10  THE VIDEOGRAPHER:  Off the record,
11  4:40.
12  (Recess had.)
13  THE VIDEOGRAPHER:  On the record,
14  4:41.
15  MS. WOODS:  So in light of the
16  issues with document production, we will be
17  keeping this deposition open, and -- but I have
18  no further questions today nor do my
19  co-defendant counsel.
20  MR. SPELLACY:  Anyone on the phone?
21  MS. GATES:  I'm here.  Lisa Gates.
22  No questions.
23  MR. SPELLACY:  So your position is
24  you're keeping the deposition open?
25  MS. WOODS:  That's right.

Page 319

1  THE VIDEOGRAPHER:  Off the record,
2  4:42.
3
4  (Deposition concluded at 4:42 p.m.)
5  - - - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 320

1  Whereupon, counsel was requested to give
2  instruction regarding the witness' review of
3  the transcript pursuant to the Civil Rules.
4
5  SIGNATURE:
6  Transcript review was requested pursuant to
7  the applicable Rules of Civil Procedure.
8
9  TRANSCRIPT DELIVERY:
10  Counsel was requested to give instruction
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 321

1  REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3                       ) SS:
4  County of Cuyahoga.  )
5
6  I, Renee L. Pellegrino, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, JAMES A. GUTIERREZ,
10  ESQ., was by me first duly sworn to testify the
11  truth, the whole truth and nothing but the truth in
12  the cause aforesaid; that the testimony then given
13  by the above referenced witness was by me reduced to
14  stenotypy in the presence of said witness;
15  afterwards transcribed, and that the foregoing is a
16  true and correct transcription of the testimony so
17  given by the above referenced witness.
18  I do further certify that this
19  deposition was taken at the time and place in the
20  foregoing caption specified and was completed
21  without adjournment.
22
23
24
25

81 (Pages 318 - 321)

Page 322

```
1        I do further certify that I am not a
2  relative, counsel or attorney for either party,
3  or otherwise interested in the event of this
4  action.
5        IN WITNESS WHEREOF, I have hereunto set
6  my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 5th day of February, 2019.
8
9
10
11
12  _Renee L. Pellegrino_
13  Renee L. Pellegrino, Notary Public
14  within and for the State of Ohio
15
16  My commission expires October 12, 2020.
17
18
19
20
21
22
23
24
25
```

Page 324

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3208896
3  CASE NAME: In Re: National Prescription Opiate Litigation v
   DATE OF DEPOSITION: 1/31/2019
4  WITNESS' NAME: James A Gutierrez, Esq
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7     I have made no changes to the testimony
   as transcribed by the court reporter
8
9  Date          James A Gutierrez, Esq
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13 They signed the foregoing Sworn
   Statement; and
14 Their execution of this Statement is of
   their free act and deed
15
   I have affixed my name and official seal
16
   this _____ day of _____, 20____
17
18    Notary Public
19
      Commission Expiration Date
20
21
22
23
24
25
```

Page 323

```
1        Veritext Legal Solutions
         1100 Superior Ave
2        Suite 1820
         Cleveland, Ohio 44114
3        Phone: 216-523-1313
4
   February 5, 2019
5
   To: Leo M Spellacy, Jr
6
   Case Name: In Re: National Prescription Opiate Litigation v
7
   Veritext Reference Number: 3208896
8
   Witness: James A Gutierrez, Esq   Deposition Date: 1/31/2019
9
10 Dear Sir/Madam:
11
   The deposition transcript taken in the above-referenced
12
   matter, with the reading and signing having not been
13
   expressly waived, has been completed and is available
14
   for review and signature  Please call our office to
15
   make arrangements for a convenient location to
16
   accomplish this or if you prefer a certified transcript
17
   can be purchased
18
19 If the errata is not returned within thirty days of your
20 receipt of this letter, the reading and signing will be
21 deemed waived
22
23 Sincerely,
24 Production Department
25
   NO NOTARY REQUIRED IN CA
```

Page 325

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3208896
3  CASE NAME: In Re: National Prescription Opiate Litigation v
   DATE OF DEPOSITION: 1/31/2019
4  WITNESS' NAME: James A Gutierrez, Esq
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s)
9     I request that these changes be entered
   as part of the record of my testimony
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein
13
   Date          James A Gutierrez, Esq
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed
21    I have affixed my name and official seal
22 this _____ day of _____, 20____
23    Notary Public
24
      Commission Expiration Date
25
```

82 (Pages 322 - 325)

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

```
                                              Page 326
1          ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2             ASSIGNMENT NO: 1/31/2019
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date          James A. Gutierrez, Esq.
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25      Commission Expiration Date
```

Veritext Legal Solutions
www.veritext.com                          888-391-3376

**[& - 20]**

| & |
| --- |
| **&**   1:20 2:2 3:8,11 4:2,6 |

| 0 |
| --- |
| **000020887**   6:5 81:15 |
| **001368881**   7:17 248:21 |
| **001485599**   7:12 197:25 |
| **011231985**   6:8 82:24 |
| **012970490**   7:14 248:13 |

| 1 |
| --- |
| **1**   6:5 75:14 81:13 81:19,23 89:19 141:4 169:8 173:4 173:5 256:21,22 |
| **1,155**   83:19 |
| **1.2**   235:2 |
| **1.3**   235:2 |
| **1/31/2019**   323:8 324:3 325:3 326:2 |
| **10**   7:13 17:17 165:11 243:13 248:10 249:2,14 250:6,7,8,11 294:7 |
| **10,779**   256:9 |
| **100**   11:15 138:25 199:5 |
| **100,000**   247:10 |
| **1000**   2:18 |
| **10017**   2:9 |
| **102**   11:16 |
| **104**   11:16 |
| **106**   11:17 |
| **107**   11:17,18 |
| **108**   11:18,19 |

**10:27**   54:9
**10:35**   54:12
**11**   7:16 248:18 249:2 253:13 255:18,19,19
**110**   11:19 272:1
**1100**   3:13 323:1
**111**   6:10
**1111**   2:3
**112**   11:20
**113**   11:20,21,21
**114**   11:22
**117**   11:22
**119**   11:23
**11:58**   134:20
**12**   6:19 7:19 140:10 255:14 258:19 259:7 298:18 322:16
**120**   11:23,24
**1200**   301:12
**121**   12:3
**122**   12:3,4
**125**   12:4,5
**126**   12:5
**127**   3:9
**128**   12:6
**12:39**   135:2
**12th**   135:21 140:18
**13**   7:24 305:19 310:7,12 311:5,8
**13,000**   130:8
**1300**   1:21
**131**   6:12
**134**   12:6
**135**   5:10
**138**   6:15
**139**   12:7,7
**13th**   301:25

**14**   8:3 48:6 104:10 312:7,15
**140**   6:17
**148**   12:8
**15**   5:8 17:17 48:6 49:12 62:19 70:10 104:10,10 170:13 170:23,24 171:1 265:2,8 302:10
**150**   31:13
**153**   12:8
**156**   12:9
**159**   12:9
**16**   70:22
**16,700**   8:4 312:10 312:22 316:3,8
**163**   12:10
**165**   12:10
**167**   6:20 12:11
**17**   1:7 6:22 166:23 200:13
**172**   12:11
**173**   12:12
**174**   12:12,13
**176**   12:13,14
**177**   12:14
**178**   12:15
**179**   12:15
**18**   1:11 7:22 179:1 179:12,24 201:1 250:2,17 259:1 311:9
**180**   12:16,16
**1800**   2:18
**181**   12:17,17,18,18
**182**   12:19,19,20,20
**1820**   323:2
**183**   12:21,21
**184**   7:3
**185**   12:22 117:2

**188**   12:22,23
**19**   184:18 185:23 188:10
**190**   12:23
**191**   12:24 13:3,3,4
**193**   13:4
**194**   13:5
**195**   13:5
**196**   13:6
**1970s**   73:11
**198**   7:8
**1980**   15:16
**1989**   51:11 69:19 189:13,14
**199**   13:6
**1990**   172:22
**1990s**   23:1 51:20 52:18 53:18,22 54:16 55:2 58:4,4 58:9 59:17 62:1
**1993**   6:14 130:19 131:18 134:10,15
**1994**   19:16 172:16
**1996**   184:20
**1997**   6:22 166:4,23 167:5
**1998**   138:21
**1999**   6:16,19 137:16 138:2,13 140:10,18
**19th**   111:14 112:11 120:22
**1:54**   208:5

| 2 |
| --- |
| **2**   5:3 6:7 75:15,15 82:21 83:4 117:24 141:5 145:10 168:1 187:11 258:5 |
| **20**   16:20,20 70:10 94:23 105:23 |

[20 - 310]

106:2,18 107:24
107:25 108:8
125:23 156:16
163:25 165:11
194:11,19 243:14
247:9,10 294:7,15
299:23 302:10
324:16 325:22
326:22

**200** 31:14 163:7,8
194:18 242:18

**2000** 3:9 268:16

**20001-4956** 4:4

**2000s** 22:7 60:6
62:18 77:16
204:14 302:5

**20036-5807** 2:19

**2005** 22:7 23:1
189:23

**2006** 80:25 82:9
260:16

**2007** 74:12

**2008** 313:15,22

**2009** 78:24 112:23
120:19 232:7
244:14

**201** 3:4 13:7

**2010** 92:20 240:2
240:19 250:4,18
251:7 303:7,19

**2011** 112:23 257:4
257:10 283:18

**2012** 120:25 197:1
199:9

**2013** 74:13 111:14
112:11 120:22
121:4 122:22
274:22 275:3
283:23 301:16,23
301:25

**2014** 48:18 62:19
83:19 199:10
250:4,19 251:7
253:20 254:7

**2015** 6:7 7:13
70:22 82:22 83:9
83:19 248:11
249:17 250:8
254:11 256:10
257:2 290:23
303:21

**2016** 7:16 85:9,13
90:23 216:24
248:19 255:20
286:8

**2017** 75:24 249:19
260:17

**2018** 7:23 91:6
259:2 307:17
313:19

**2019** 1:16 45:21
184:21 199:11
312:18 322:7
323:4

**202** 2:19 4:5 13:7

**2020** 322:16

**203** 13:8,8,9

**204** 13:9,10

**205** 13:10,11

**206** 13:11,12,12

**207** 13:13,13

**208** 13:14

**21** 7:23 257:3
259:2

**210** 13:14

**212** 138:20

**213** 13:15,15,16,16

**214** 13:17

**215** 13:17

**216** 2:5,14 3:10,14

**216-523-1313**
323:3

**21st** 301:16,23

**22** 162:8 254:4

**2227** 322:12

**224** 13:18

**226** 112:11

**23** 9:3

**230** 13:18,19

**230-7676** 2:9

**232** 13:19

**233** 13:20

**237** 13:20

**238** 13:21

**24** 9:3

**244** 13:21

**245** 13:22

**247** 13:22

**248** 7:13,16

**25** 9:4,4 106:2
144:2 165:11
257:10 311:9

**250** 31:10

**252** 13:23

**252-9060** 3:5

**255-5434** 2:5

**257** 13:23

**258** 13:24

**259** 7:19

**25th** 312:18

**26** 9:5

**26,000** 131:8 132:5
134:3

**261** 14:3

**265** 14:3

**27** 9:5

**271** 14:4

**274** 14:4

**275** 14:5

**28** 6:16 9:6,6
138:2

**2804** 1:6,7

**284** 14:5

**286** 14:6

**287** 14:6,7

**288** 14:7

**28th** 138:13

**291** 14:8

**293** 14:8

**295** 14:9

**296** 14:9,10

**299** 14:10,11

**2:10** 208:8

**2:54** 248:4

**2s** 32:6

**3**

**3** 6:10 7:4 32:6
111:19 112:1
147:24 183:22
187:11

**3,000** 141:9 147:17
154:25 156:7
257:6

**30** 9:7 16:20 28:18
31:19 89:5 97:19
139:9 199:18
223:18 283:2
289:5 295:9

**300** 14:11 31:10

**301** 14:12

**302** 14:12

**304** 14:13

**305** 14:13

**306** 14:14

**307** 14:14

**308** 14:15

**31** 1:16 6:16 9:7,8
71:2 138:1,14
141:16

**31.2** 253:21

**310** 7:24 14:15

**312**  8:3 14:16
**313**  14:16,17,17
**314**  14:18,18,19,19
**315**  14:20,20,21
**316**  14:21
**3208896**  323:7
  324:2 325:2
**321**  5:12
**33**  9:8,9,9,10 71:3
  71:4 126:11
**33,000**  112:21
**330**  3:5
**35**  9:10
**36**  9:11
**360**  2:8
**37**  9:11,12,12
**38**  9:13,13
**3:10**  248:7
**3:47**  280:7
**3:49**  280:10

**4**

**4**  6:12 131:14,22
  132:6 187:11
**40**  9:14,14 289:5
**40,000**  118:6
**400**  74:13
**41**  9:15
**412**  2:4
**415**  4:8
**42**  9:15,16 168:3
**43**  9:16
**44**  9:17,17,18
**44113-7213**  3:14
**44114**  2:4,14 323:2
**44114-1214**  3:9
**44308**  3:4
**45**  9:18,19,19,20
**45004**  1:11
**46**  9:20,21
**47**  9:21,22,22,23

**4731**  162:2,7
**47700**  69:6 90:13
  90:18,25
**49**  9:23,24
**4:19**  308:16
**4:30**  308:19
**4:40**  318:11
**4:41**  318:14
**4:42**  319:2,4

**5**

**5**  6:15 75:13 89:19
  137:24 138:7
  184:2,3,10,17
  187:11 323:4
**5,000**  119:14
**50**  3:3 10:3,3
  139:2 165:7,9
  194:16 199:5
  218:14 260:19
  261:2
**503**  83:18
**51**  10:4,4,5
**52**  10:5,6,6
**53**  10:7
**54**  10:7,8
**56**  10:8
**58**  10:9,9,10,10
**586-3939**  2:14
**59**  10:11,11
**591-6000**  4:8
**592-5000**  3:14
**5th**  82:9 149:14
  322:7

**6**

**6**  5:4 6:17 28:18
  31:19 97:19
  135:22 140:7,16
  140:16 145:9
  147:24 187:9
  255:23 256:6

**60**  10:12,12 116:14
  116:19 118:21
  119:12 165:7,9
  218:14 297:12
**60,000**  199:19
  245:16
**61**  10:13,13
**62**  10:14 132:16
  254:3
**621-0200**  3:10
**63**  10:14
**640**  199:1
**66**  10:15
**662-6000**  4:5
**67**  10:15
**68**  10:16,16
**69**  10:17

**7**

**7**  6:20 166:20
  167:3 256:19
  258:5
**70**  10:17,18 164:8
**700**  96:19
**71**  10:18
**72**  127:5 168:17,19
**73**  10:19,19
**74**  10:20,20,21
  168:2
**76**  10:21
**77**  10:22
**778-1800**  2:19
**78**  10:22 191:20
**78,000**  117:2
**79**  10:23,23 191:20
**792**  96:20

**8**

**8**  6:14 7:3 131:18
  183:16,19 184:18
  259:14

**80**  10:24 11:3,3
  52:8,10 76:13
  141:9 164:8 295:7
**81**  6:5 11:4
**82**  11:4
**83**  6:7 11:5,5,6
**84**  15:21 254:6
**844**  2:9
**85**  11:6,7 18:7
**850**  4:4
**86**  11:7,8 18:8
**87**  11:8
**88**  11:9 19:14
**89**  19:13 70:22
  270:6

**9**

**9**  5:5 7:8 197:19
  198:4 259:15,17
**90**  11:9,10,10
**90,000**  246:4
**901**  2:13
**90s**  17:3 22:6
  51:14,16,24 52:3
  54:1 58:20,25
  62:18 63:1,9 64:2
  64:19,23 65:2
  71:10,14 77:16
  136:17 162:10
  285:13 296:19
  302:5
**91**  11:11,11,12
**92**  11:12
**93**  11:13
**94**  19:13
**94111-5356**  4:8
**95**  70:19
**950**  1:21 3:13
**97**  11:13,14 70:24
  250:25
**99**  11:14,15 70:24
  146:17 268:16

**99.9** 238:20
**9:48** 1:17 15:2

**a**

**a.m.** 1:17
**aaron** 1:8
**aback** 296:20
**abbreviated** 141:8
**abeyance** 252:12
  273:12
**ability** 101:16,18
  147:8 240:4
  291:14
**able** 39:11 76:9
  77:17 101:16
  105:18 116:15
  143:8 144:4
  146:16 158:24
  160:14,15 167:19
  174:24 206:6
  224:9 239:21
  252:15 269:6
  270:12 281:25
  283:9 294:1
**abroad** 204:18
**absolutely** 17:15
  41:8 51:18 52:20
  87:1 117:5 120:11
  129:1 132:25
  133:3,9 143:25
  151:10 153:7,15
  157:2 171:4 181:5
  196:2 240:14
  288:11,25 295:25
  298:8
**abuse** 44:24 53:23
  54:2,16 66:9
  118:16 208:11
  210:9,14,23 211:9
  211:20 213:5,19
  213:24 214:24
  216:12 254:17

261:3,8,12 265:13
267:5 286:16
287:12 291:15,20
292:6 295:17
**academic** 15:23
**accelerated**
  254:20 261:19
**access** 92:24 93:3
  93:6,9,12,16 96:9
  96:12,15 101:14
  196:20 279:5,9,10
  283:10 288:9
  290:7,16 301:10
**accessed** 95:17
**accessible** 71:25
**accessing** 38:20
**accidentally** 42:22
**accomplish** 323:16
**accomplished**
  128:15
**accord** 139:5
  141:12,19 200:3
  250:21 257:11
**account** 304:6
**accountable** 203:1
**accounting** 241:22
**accounts** 251:5
**accrue** 316:6
**accrued** 316:9
**accurate** 253:23
  257:13 298:25
**accused** 6:10,15
  110:22 111:20
  137:25
**acknowledge**
  324:11 325:16
**act** 107:16 149:8
  150:12 210:3
  228:17,22 295:1
  324:14 325:20

**acting** 129:17,19
  163:1 277:10
**action** 90:24 95:10
  96:19 120:6
  121:12,18 124:17
  160:1 178:2,3,4
  191:15 231:19
  238:6 277:23
  283:18 322:4
**actions** 177:24
  209:16
**active** 244:25
**activities** 123:2
  232:13 265:12
  268:3,10 271:16
  276:13 305:3
**activity** 16:2 17:21
  102:12
**actors** 290:7
**actual** 23:15 116:1
  150:18 152:17,24
  161:4 162:21,22
**acute** 286:8
**add** 199:20
**addicted** 49:4 72:7
  125:2,9 141:17
  144:12,15 272:24
  273:3 287:6
**addiction** 18:1
  42:9 155:19
  252:22 253:9
  261:15 265:24
**addictive** 53:5
  211:11,22 217:24
**addicts** 53:1,4,8
  53:14 138:16
  139:10 141:10
  156:1 202:12,18
  253:4 258:9
  262:11 264:6

**addition** 41:10
  144:1
**additional** 43:1
  91:9 245:4,8
  254:12,16 255:3
  261:11 292:3,5
**additionally**
  141:22
**address** 60:3
  304:13
**addresses** 304:5
**adequate** 313:10
**adjournment**
  321:21
**administration**
  21:11 37:22
  145:13 211:9
  212:2,16 214:15
**administrative**
  110:3 121:12
  124:17 146:19
  237:20 238:6
  277:23 290:3
**administratively**
  149:12,15,19
  150:2,4 182:14
**admissibility**
  268:12
**adult** 256:9
**advanced** 15:23
**advice** 129:7 278:1
  278:12,18
**advocacy** 268:5
  271:6
**advocating** 231:18
**affect** 43:23 44:5
  44:15 230:24
**affixed** 322:6
  324:15 325:21
**aforesaid** 321:12

[afternoon - appropriate]                                                    Page 5

**afternoon** 5:10
135:4
**ag's** 233:18 234:8
234:15
**age** 15:3
**agencies** 20:15,17
20:21,22 24:13
66:21 97:4 109:17
137:6 145:12
175:7 178:2 228:8
228:25 232:16
233:8 247:15,16
283:9
**agency** 20:23 93:2
93:5 109:19
175:23 178:22
247:14,16
**agents** 159:6
195:21 204:25
289:5 304:25
**aggravated** 62:7
**aggregate** 163:15
**ago** 70:22 71:2
91:12 124:21
156:16 163:25
203:22 281:12
296:5,13
**agree** 47:18 84:12
84:15 113:5 114:4
134:12 140:4
149:25 153:4
169:6 180:9 200:1
202:7,14,24 216:7
252:2 255:13
262:5 273:5 286:3
286:5 288:2
**agreed** 137:2
150:2
**agreement** 158:19
170:7 225:19
228:2

**agreements**
156:24 157:15,20
158:12 226:17,25
232:21,25
**agrees** 273:8
**ahead** 27:21 28:21
57:13 116:24
247:25 301:20
305:17 310:25
**aid** 240:1
**akron** 3:4 15:18
**al** 1:10
**align** 143:8
**alignment** 258:12
**allegations** 111:1
119:2 132:4
197:11 216:19
**allegedly** 313:3
**alleging** 141:24
142:5
**alleviate** 251:25
**allocated** 264:19
**allow** 47:25 212:5
**allowable** 141:18
**allowed** 36:21
37:22 39:8 69:22
145:22
**allowing** 270:14
**alternative** 214:1
214:2 251:24
263:6
**amazing** 131:4
**amending** 24:21
**amendment**
149:14
**american** 117:2
**amerisourceberg...**
3:2
**amount** 75:6,7,8
75:12,12 89:20,24
89:25,25 95:6

160:13 161:13
245:18 247:6
**amounts** 89:21,23
90:2
**amphetamine**
270:6
**amphetamines**
65:23 69:20,23
270:4
**analysis** 49:8
**angela** 198:13,22
199:22
**announced** 290:23
**annual** 249:7
**answer** 21:18
28:21 30:16 31:17
43:4 44:11 45:14
46:10 49:17 50:16
50:22 51:3 56:8
69:3 72:24 76:4
80:10 84:3,12
87:7 90:11,21
93:14,18 94:14
99:22 108:10
123:21,22 132:11
156:18,22 157:9
158:23 159:24
164:7 172:2 180:6
182:10 183:4
186:1 188:1,7,15
196:7 206:11
208:17 209:20
210:16 211:24
212:21 214:8,10
214:11 222:24
224:17,23,24
236:14 238:23
242:15,22 243:21
261:5,9 263:20
278:5,9 282:20
286:20,21 287:20

287:22,23 297:9
302:20 303:8
308:5 309:2
316:19
**answering** 152:8
**answers** 40:16
104:18,19 147:21
201:4 308:25
**anybody** 51:4
151:16 166:16
173:15,19 252:17
271:20 305:11
306:8
**anyway** 114:24
122:15 192:1
236:15
**apadukone** 4:9
**apart** 28:11 59:6
68:9 95:16 123:11
246:13
**appeal** 136:11
170:6
**appear** 82:4
187:24 324:11
325:15
**appearances** 2:1
3:1 4:1 5:3
**appeared** 132:13
**appears** 81:20
294:22
**appended** 325:11
325:18
**applicable** 320:7
**appoint** 264:13
**appreciation**
87:10
**approach** 44:8,19
244:18,22 284:23
**appropriate** 38:2
38:9 120:7 129:20
129:21 171:3

223:3 274:1 282:2 285:3
**approval** 228:1,3
**approved** 241:10
**approximate** 31:5 76:9 77:17 206:6 207:18
**approximately** 19:4 59:13 67:22 96:20 105:25 108:1 131:8 137:15 147:16 154:25 156:6 242:1 243:20,24 276:12 284:19
**april** 6:14 131:18
**archive** 307:1
**arcos** 95:23,25 96:5,9,9,12,16,17 96:19 279:5,9,24 280:16,17 281:8 281:14,19 282:7 282:16 290:19
**arduous** 289:15
**area** 44:17 57:8 173:18 206:5 268:12 276:1
**areas** 117:17
**argue** 318:5
**argument** 268:23
**argumentative** 184:22
**arguments** 269:2
**arraignment** 317:4,9,12,13
**arrangements** 323:15
**arrest** 219:14,21 272:7 317:8,14,18 317:20

**arrested** 144:1 317:17 318:2
**arrests** 227:18
**arrogant** 136:4
**article** 6:10,12,15 6:17,20 7:8 8:3 111:19 112:3,9,17 113:22 131:14,23 137:24 138:8,11 138:13,24 139:23 140:7,16,17 141:2 141:6,23 148:23 166:20 167:4,5 168:2 172:19 173:23 197:19 198:5,7,15 200:1 200:13 312:7,17 312:25 313:2,7
**articles** 140:25 313:8
**aseem** 4:7
**aside** 295:13
**asked** 26:9 42:12 43:15 90:12 150:11 184:3 209:5 287:15 300:5 306:12
**asking** 31:8 44:4 57:9,16 80:9 88:1 99:19 104:17 107:14,24 152:5 156:15 163:24 171:21 179:20 193:18 212:9 300:4 302:16
**assert** 270:22
**assessed** 262:20
**assignment** 324:2 325:2 326:2
**assist** 227:3 233:20 234:2

**assistance** 30:3 272:10
**assistant** 198:23 245:12
**assisted** 234:20 270:25
**associated** 227:18 263:9 274:5
**association** 24:3
**assume** 25:21 28:4 45:6 47:9 49:22 62:2 68:20,23 71:8,18 75:14 88:19 93:11 111:7 224:6 241:3,23 246:21 253:10 254:18,20 263:10 288:6 302:3,6 305:24
**assuming** 61:19 147:21 214:5
**attached** 325:7
**attack** 295:17
**attacked** 295:23
**attempt** 43:17 121:19 124:8 172:3 177:13 179:17 220:14 221:25 226:13 227:13
**attempted** 282:6
**attempting** 87:11 132:22 133:11 200:7 203:10
**attend** 15:13,17 216:22
**attended** 16:15 17:5 34:9 216:18 217:3,4 218:12 303:25 304:1

**attending** 17:1
**attention** 83:15 147:24 148:1 254:25 255:16,22 259:17 312:14
**attitude** 161:24 162:12
**attorney** 7:20 78:16 198:12,17 233:12 234:1 258:21 322:2
**attorney's** 136:18 136:23 274:15,21 275:2
**attorneys** 31:6,11
**august** 307:16,17 309:12,15,18
**authorities** 122:1 200:9
**authority** 25:2,7 25:12 109:11,17 149:8,19 153:25 212:11
**authorize** 325:11
**authorized** 93:2,4
**availability** 287:3
**available** 34:23 114:19 252:8 253:8 288:19,24 292:4 296:24 301:24 302:2,11 323:13
**ave** 323:1
**avenue** 1:21 2:3,8 2:13 3:13
**aware** 23:11,13 27:16,24 45:19 59:23 60:6,11 67:14 74:12 84:23 85:3,8,13 86:10,17 86:21 88:7 90:5,8

105:21 109:1
117:1 118:4
123:12,17,24
124:1 125:14,16
127:6 149:3
172:20,24 174:8
174:18 176:4
177:20,23 179:7
183:7 203:8
204:17 205:7
208:1 214:14,19
223:6 227:6
230:16 232:23
234:6 237:25
238:13 250:2
261:10 267:15
290:22 297:19
306:19 307:22
311:20 316:2,12

**b**

**b** 28:18 31:19
97:19 149:14
**back** 17:6,18 20:7
58:20,25 62:5
69:19 97:1 106:17
111:11 119:11
124:11,21 130:19
131:11 132:12
133:13 134:10,13
136:2 151:14
155:5 156:17
162:9 166:3
172:21 223:3
227:8 237:16
287:4 294:18
303:7
**background** 15:11
214:12
**backs** 217:16
**backtrack** 220:1
223:16

**backwards** 253:13
**bad** 61:4,25 79:15
106:23 151:10
162:11,13,14
229:12 239:19
277:10
**badala** 2:7
**baggie** 220:3
**baggies** 135:23
**bags** 135:24
**baker** 3:8
**bakerlaw.com**
3:10
**ban** 90:24
**bar** 290:9
**baseball** 308:9,9
**based** 36:17 38:5
41:22 45:18 48:9
48:14 49:8 72:10
73:7 75:21 84:7
85:18 86:1 87:8
89:17 97:18 119:5
137:14 154:2
162:20 177:1
188:3 204:24
221:5 223:1
244:15 258:15
261:15 272:24
285:2 286:14
291:18
**basic** 133:25
**basically** 21:3
44:12 51:10
107:20 111:8
200:5 289:21
311:6
**basis** 20:12 21:14
52:13 65:18 84:15
84:17 104:11,21
118:20,23 196:3
223:11 261:1

265:6 312:3
**bates** 6:5,8 7:11,14
7:17 81:14 82:24
197:25 248:12,20
**began** 120:19
**beginning** 6:8 7:11
7:14,17 82:23
178:16 197:24
248:12,20
**begins** 148:2
**behalf** 2:2,11,16
3:2,6,11 4:2 27:18
28:2,14,23
**behavior** 144:11
200:19 226:9
**belief** 118:13,20
118:24
**beliefs** 43:24
**believe** 22:14
48:17 52:8 82:2
96:3 97:12,17
103:19 114:9
118:14,14 123:1
128:13,23 129:13
155:3 163:19
165:1 175:5
179:14 181:23
187:15 196:4
197:7 201:23
208:13,18 213:18
215:9 233:23,23
238:23 244:20,23
245:15,24 274:6
281:11 283:15
287:10 294:6
304:16
**believed** 167:6
172:6 279:11
**believes** 182:16
**believing** 265:6

**bell** 81:1 186:17
187:14
**benefit** 37:23
157:1,16 275:13
**benefits** 254:4,7
**benign** 38:12
**best** 160:8,10
167:14 201:6
285:25 295:5
296:1
**better** 21:22
115:25 158:22
**big** 45:14 106:19
106:20 119:17
185:2 206:4
284:17,17
**bigger** 255:23
**biggest** 139:17,25
169:5,10
**bill** 272:1
**billions** 114:17
**biological** 79:12
**bit** 151:15 225:15
291:10 295:1
**blank** 7:9 101:14
195:11 197:21
**blatant** 135:25
**blew** 130:25
**blocking** 313:4
**blood** 114:17
217:16
**blown** 176:14
297:15
**blueprint** 292:16
**board** 20:20 23:24
59:2,5 66:22 68:6
87:19,21 91:13,13
91:16,22 92:9
95:4 109:21,25
121:15 122:8
123:13,19 124:2

[board - case]                                                                                          Page 8

127:9 137:7,10
145:13 146:16
147:2,7 149:1,1,7
149:7,23,23
150:12,12 175:12
176:1,2 181:23
182:3,5,11,18,20
182:22 183:1
184:14 189:17
191:24 192:19
233:3 237:3,6,12
237:13,21 238:1
238:12,17,20
239:6 269:21,22
269:24 279:20
281:15 282:10
283:6,8,13 285:15
289:6 290:2,6
292:10 304:25
**boat** 136:3,6,7
141:3
**bob** 58:25
**bodies** 48:7 62:9
62:20,21 72:2
74:16 254:19,23
261:17 280:23
287:8
**body** 43:10
**bold** 258:7
**boler** 89:4
**bona** 39:10
**bond** 124:22,22,23
317:2
**boss** 216:13 226:4
**bottle** 220:25
**bottom** 113:23
141:4 145:10
169:8 173:5
184:10
**boundaries** 184:5

**bounds** 161:20
**box** 281:3
**boy** 128:18 239:19
**boyfriend** 197:5
200:25
**brains** 130:25
**brazen** 135:16,25
**break** 29:22 54:5,7
130:13 134:17
202:20,25 203:13
208:3 211:13
248:1 278:10
280:2,5 308:12,14
**breaking** 107:10
**bring** 26:14,16,25
27:1,8 63:5,13,21
64:6 65:9,19,24
209:3 234:8
240:10
**bringing** 62:23
238:21
**broad** 56:17 67:6
67:7 88:1 278:4
**broader** 56:13
**broadly** 204:19
215:22
**broke** 54:14
212:24 298:10
**brought** 26:23
64:20,25 82:5
198:6
**bucks** 52:10
**budget** 25:24 26:1
26:4,5,6,11 240:24
241:2,6,10,15,19
242:1,8,12 246:7
253:21 254:3,7
264:19,22 274:9
**building** 135:21
**buildings** 196:19

**bulk** 75:12 89:20
89:23,24,25 90:2
**bullet** 83:15,23,24
84:4
**bunch** 174:6
191:21
**bureau** 20:24 21:5
**bureaucracy**
291:14
**burling** 4:2,6
**business** 83:6
107:8 117:18,20
214:5 218:21
226:2 304:9,11,15
304:24
**bust** 101:19
**buy** 64:15
**buying** 100:9

**c**

**c** 7:21 258:22
**ca** 323:25
**cabin** 130:25
**cabinet** 283:18
285:11 306:7
**calculations**
260:22
**california** 4:8
**call** 19:8 21:9
30:10 100:7
101:19 133:23
139:16 170:18
190:8 214:5
232:18 233:25
239:17 276:10
277:22 285:16
323:14
**called** 15:4 17:8,11
69:6 82:17 90:13
90:25 92:16 95:23
141:3 192:23
253:16 271:25

**campaign** 74:8,19
115:10 217:21
**cancer** 38:11
**candidly** 21:19
**capacity** 28:18
**capias** 317:13
**caption** 321:20
**card** 218:11,22
**cardinal** 117:20
227:10
**care** 38:11 150:6
153:11 162:5
269:3 308:23
**career** 16:18,24
24:16 29:7 44:22
78:1 186:11
**careful** 286:2
**carefully** 201:23
**carey** 130:20
132:4
**carfentanil** 33:17
36:4,14,15 79:17
80:6,16 84:25
85:4,20,22,24 86:4
88:14,17,22 89:10
89:13 90:6 205:18
**carried** 171:7
**carry** 25:4
**cartel** 101:2
**cartels** 205:17
209:2 210:6,22
**case** 1:7,11 22:12
26:14,16,23 28:6
32:22,24 34:25
35:18,24,25 36:7
36:13 51:7 63:2
66:17 68:21 73:20
77:12,13,14 78:13
78:22 79:6 80:24
81:2,25 82:5 85:1
97:18 111:11

112:4 115:18,23
116:3 123:11
124:7,15 130:11
130:16,19,22,23
131:5,6,23 134:2
135:15 136:2,13
136:18,20,24
137:6,21 138:9
140:17 141:1
142:19,25 144:9
147:25 149:5,16
150:10,16,16
151:4 153:8,21
154:21 158:3,24
161:11 162:15,18
163:24 164:16,18
166:9 167:18,18
167:22 172:14,15
180:9,25 181:1,2
186:14,19,21,21
187:20,20 190:9
190:13,13 191:19
193:5,8 194:3,24
196:25 197:2,9,12
198:8,11 199:10
199:22 200:1,7,22
202:2 204:3
206:22 211:7
226:22 227:6,9
228:3,9 229:20,24
230:3,9,12,14,20
231:5,20,23,25
233:2,21 235:18
238:14 239:23
247:1 252:14,14
269:13,25 270:6
270:11 273:17
277:21 279:2
299:4,6,6 300:19
300:25 302:23,24
306:5 307:8,22

308:3 312:25
315:6,12,14,17,19
316:17,21,24
323:6 324:3 325:3
**caseload**  70:6,11
235:22 236:1
244:10 249:23
257:17 262:6,8
294:4,5,7
**cases**  20:1,4,8
21:25 25:15 35:2
38:6 40:11 48:11
52:16 53:21 56:15
56:19 57:5,6 66:6
67:12 70:4,21,21
70:23 71:2,7,9
75:24 76:2,4,7
77:18,23,25 78:4
78:23 85:2 88:3
88:21,24 89:2
95:14 97:11 98:23
99:1 101:4,8
102:18 103:1,5,22
104:15,21,24
105:2 109:6
123:23 135:9
150:3 154:13
160:8 161:23
164:1,12 167:16
175:8 180:9 181:7
186:6 191:13,18
192:8 194:10,23
195:15,25 196:17
198:8,14,16,20,21
200:16 203:3,16
203:21 206:19
215:3 223:12
226:17 228:6
229:22 234:3,4,5,6
234:17 235:11
236:7 238:4,8,10

238:22 242:25
243:2,7,12,23
244:3 245:1,5,9
247:3 250:25
255:8,10,13,14
256:9 257:6
261:25 274:15,18
278:14 279:3
292:9 295:8 298:9
298:14 305:1
307:25 317:15
**cash**  101:19
**categories**  259:16
**category**  31:23
177:21 259:20
**catered**  109:2
**caught**  32:22
**cause**  41:3,5 42:7
42:21,25 43:4,7
142:13 143:2
167:17,19 174:24
208:14 210:22
211:9 213:24
214:24 321:12
**caused**  74:13
127:16
**causes**  113:18
143:2 208:14
216:12
**causing**  52:11
**caution**  218:1
**celeste**  110:11,14
111:2 112:10,21
112:25 113:17,24
114:4 120:9
123:11 124:7
126:10 130:8
**celeste's**  120:18
122:11 124:9
**cell**  305:5,6,9

**center**  83:16,23
187:9 259:17
**certain**  7:9 21:25
22:19 27:23 38:11
48:20 56:20 57:6
58:13 61:19 66:6
66:14 89:24 94:1
96:4 110:3 133:20
133:22 197:20
246:17 281:16
283:8 284:10,22
284:24 290:10,11
290:12 306:1
307:22
**certainly**  133:7
195:25 202:23
214:22 216:4
262:5 265:20
290:15
**certificate**  5:12
321:1 325:11
**certification**  283:8
324:1 325:1
**certified**  15:7
323:16
**certify**  321:8,18
322:1
**chain**  209:25
220:20 221:3
222:1
**chair**  21:20
**challenge**  40:13
180:10 181:1
201:12
**challenges**  40:11
40:17 160:7
167:16 293:21
**challenging**  41:16
41:20 281:19
282:3,5

**change** 54:4,5 71:5
  244:17,22 251:16
  251:17 268:12,18
  325:8 326:3
**changed** 31:16
  71:23 82:13 104:4
  240:4 242:4,20
  244:20,23 265:2
  270:14 284:13
  294:10
**changes** 239:10
  252:2 324:7 325:7
  325:9
**changing** 25:3,8
**characterization**
  281:20
**characterize** 35:3
  281:23
**characterized**
  169:9
**charge** 120:21
  163:13 172:10
  235:17 252:11
  258:14 273:9
**charged** 6:21
  111:5 138:19
  157:3 164:13
  166:12,22 167:7
  168:1,12,17 191:2
  250:4,18 251:6,20
  311:4,6
**charges** 26:25
  27:1,8 50:25 51:6
  163:14 169:19
  170:3 171:5,7
  273:16 311:9,10
  311:15
**charging** 228:13
  230:23 235:8
**charles** 166:3

**chart** 184:17
  185:8 186:7
  253:15,18 254:2
  256:2,8
**charts** 250:13
**cheaper** 71:24
  72:8 73:18 214:2
**checking** 238:1
**chesterfield**
  186:17 187:4,8,17
  190:19
**child** 18:24
**china** 205:12,13
  205:17 206:2,4
  209:2
**choice** 46:19 52:18
  52:25 53:8
**chronic** 38:12
  129:23 283:22
  284:7
**ci** 160:15 161:16
**ciaccio** 2:8
**circumstances**
  28:1 32:25 36:22
  37:7,12 38:13,24
  41:21 142:18
  193:1 194:3
  281:24 291:13
  295:5 300:25
  312:3
**circumstantial**
  41:23
**cites** 141:6
**cities** 21:5 206:14
**citizens** 66:21
  107:19 113:7
  159:1 203:9
**city** 176:24
**citycenter** 4:3
**civil** 15:5 120:6
  179:6 247:3 320:3

320:7 324:5 325:5
**civilly** 219:13
**claim** 180:13
  181:7,11
**claimed** 141:9
**clarify** 28:16,19
  308:21
**clark** 2:17
**classification** 33:8
  33:10
**clean** 294:25
**cleaning** 196:24
**clear** 42:16,17
  74:24 308:11,25
**clearer** 225:15
**clearly** 125:2
  130:6 286:21
**cleve** 7:12 197:25
**cleveland** 1:22 2:4
  2:14 3:9,14 66:23
  110:16 130:20
  137:11 138:12
  145:14 197:15
  218:16 322:7
  323:2
**client** 116:4 118:4
  118:14 290:7
**clinic** 6:12 105:7
  106:12 130:20
  131:14 197:16
  262:21 284:12
**clinics** 144:3
**closely** 23:3
**clout** 297:23
**clr** 1:25
**coach** 308:8
**cocaine** 33:21,24
  47:4,16 68:10
  85:4,9,14
**code** 236:8

**codes** 39:13,13
**cohen** 7:5 183:23
**cole** 58:25
**collar** 19:24
  317:23
**colleagues** 73:9
  86:2 87:9 173:8
  174:1 204:25
  288:14
**collect** 305:11
  306:8
**collected** 121:10
**collection** 43:12
  267:4
**college** 15:13
**columbus** 269:23
**combat** 291:15
  292:5,15 293:7
**combating** 296:4
**combination**
  105:16 143:1
  161:13
**combined** 254:6
**come** 17:18 18:17
  20:9 21:25 32:24
  35:12 59:3 63:10
  66:19,20 97:1
  107:20 145:22
  173:20 188:16
  204:15 205:15
  206:13 222:21
  229:11 234:14,19
  244:3 245:19
  274:8 282:24
**comes** 35:18,24
  107:21 125:1
  175:23 206:1
**coming** 23:12 92:1
  92:8 160:13
  173:17 178:7
  206:20 207:5

[coming - contributing]

227:15 251:21
279:13
**commingled** 164:3
**commission**
322:16 324:19
325:25 326:25
**commissioned**
321:8
**commit** 102:5
148:6
**committed** 101:23
102:1,9 120:10,13
272:23
**committing**
130:21 273:4
**common** 99:20,21
100:3 112:13
148:20 158:13
195:17 200:15
313:13
**communicate**
20:12 21:13 57:10
188:20 189:16
276:23
**communicated**
50:4 277:9 278:18
**communicating**
21:17
**communication**
22:5,9,15,23,25
231:24 238:18,25
**communications**
189:2,4 231:5
**community** 37:2
107:1 114:18
115:12 119:12
151:6 153:14
244:15 253:5
288:7 298:2
317:22 318:4

**companies** 3:7
277:19
**company** 117:2
275:19
**compare** 58:4
163:17
**compares** 73:10
256:13
**compartment**
49:15
**complaint** 96:18
115:14
**complaints** 66:13
66:19,20,24 67:16
67:19 107:19
148:25 149:3
172:21,24 207:25
**complete** 26:15
252:13 273:16
**completed** 146:23
256:9 321:20
323:13
**completely** 274:11
280:24 292:1
**complex** 103:22
178:18,24 208:16
208:17 229:24
**complexity** 56:21
**compliance** 92:12
236:23
**complicates** 143:4
**complicating**
143:14
**compromise**
122:15 149:13
150:7,9,13 170:8,9
**computer** 305:12
305:22 306:22
**concerning** 188:20
229:1 276:23
277:10

**concerns** 60:18,23
**conclude** 137:16
162:25 196:4
206:25 261:2
**concluded** 137:18
154:21 211:10,20
319:4
**conclusion** 262:3
**condition** 124:24
**conduct** 43:18
120:19 164:13,15
238:13 275:11
277:16 278:2
**conducted** 40:3
89:9 122:2
**conducting** 107:8
**confidential** 6:6,9
7:15,18 40:19
41:6 81:16 82:25
161:7 248:14,22
290:1 300:3,5
**confirms** 167:6
**conflict** 234:13
**conflicted** 234:13
234:17
**connection** 187:19
**consent** 41:9
**consider** 16:4 27:6
29:6 33:24 34:1
77:18 80:5 165:8
201:11 213:11
230:18 269:10
272:8 300:23
**considered** 27:13
32:7 33:3,21
50:25 51:6 241:18
**consistent** 294:12
**consult** 236:24
237:8,14
**consume** 100:10

**consumed** 97:6
**consumption**
97:14
**cont'd** 3:1 4:1 7:1
8:1 10:1 11:1 12:1
13:1 14:1
**contact** 122:11,18
**contacted** 275:20
**contain** 289:23
**contained** 85:14
93:23 214:7
**container** 219:25
220:8
**containing** 86:18
**contains** 289:18
**context** 39:14
77:21 99:10
105:10 108:17
150:21 177:5
180:20,24 223:1
223:20 238:19
274:2
**contexts** 129:21
**contextual** 39:6
40:14 97:17 183:5
190:23 224:18
279:1 290:14
**continue** 71:13
121:2 179:11
257:17
**continued** 122:5
135:5 145:19
**continuing** 71:16
183:2 212:5
**contribute** 113:1
**contributed**
118:18 143:5,15
211:19 212:3
**contributing**
113:11 210:1,22
213:4,19

[controlled - county]

controlled 112:22
212:4 228:17,22
convened 274:21
convenient 203:14
323:15
conversations
48:15 72:10 73:8
73:15,23 78:15
85:19 87:8 173:18
189:8 204:24
205:4,6 278:16
convict 122:9
143:9
convicted 75:5
110:20 122:23
147:13 179:4
236:17
conviction 150:19
252:10
convicts 236:12
convince 115:11
convinced 115:4
cooperate 155:11
155:12 225:9
226:14
cooperates 155:10
cooperating
160:16 172:13
cooperation
156:24 157:14
158:12,19 225:6
225:18 226:17,25
228:2
cooperators 158:9
225:24
coordinate 178:15
232:11
cop 160:16
copies 306:3,13,23
copy 111:25 219:2
232:8 298:23

306:9
corner 250:11
256:2,8
coroner 270:4
coroner's 254:22
corporation 3:2
4:2 116:5,8 117:5
227:10 297:23
correct 27:4,5
28:8,10 32:9,18
34:12 39:1,2 40:1
41:14 42:2,3
47:14 55:2 58:7
70:12 71:20 81:21
82:7,10 90:14,16
102:2,6 110:25
112:14 115:8
120:10,16,19,22
120:23 121:1
123:25 126:7,14
131:3 132:9,19
134:4,5,9,11
138:17,18,22
139:10 143:17
145:19 146:24
147:4,6,10,14,22
151:8 152:10,24
153:22,23 161:5,8
161:9 164:21,22
164:23 166:11
167:20,21 169:17
169:20,21 172:18
179:1,6 181:17
198:24 199:6,7,19
199:24 200:14,20
200:23 201:2,9
202:21 212:13,20
214:25 220:15
223:25 224:3,7
228:15 243:10
246:25 250:20

254:8,9 257:18
265:19,22 267:10
294:8 298:12,16
301:23 302:12
309:1,3 311:10
313:16 314:1
315:25 321:16
corrections 170:25
310:21 314:4
325:17
correctly 83:20
84:1 101:17
corresponds
187:12
corruption 8:4
312:9,21
corruptions 19:25
cost 232:24,25
254:21 314:11
costly 314:3
costs 233:3 261:6
261:11 263:9
315:2
council 241:12
311:7
counsel 115:18
130:12 157:11
209:10 218:1
318:19 320:1,10
322:2
counsels 268:23
count 138:15
235:23
counter 153:25
counterfeit 86:17
86:21 87:3,11,14
87:24 195:3,12,16
203:17 204:5,8
211:5
counterparts
22:25

counties 132:17
270:2
counting 194:22
297:1
countries 205:3
country 45:7
116:18 117:3
118:7,11 143:20
217:9
counts 112:11
138:14,20 163:7
168:2,4,18 311:9
county 1:10 2:2
7:13,16,19,20 8:3
18:4,18 21:7
23:24 25:21 26:3
30:24 31:1 34:17
44:23,25 45:4,10
45:21 46:4,20
47:5,12,15,19
50:15 51:20 52:19
53:17 66:9 67:3
68:12,18 69:1,11
71:23 72:23 73:3
74:1 76:20,25
80:7,17,21 82:13
85:10 86:19,23
91:5,14,18 92:1,9
96:21 97:6,12
103:25 105:22
108:3,15 109:2,12
112:13,18 113:2,7
118:17 123:12,17
127:12,17 133:7
133:16,17 139:18
139:21,23 140:1
153:17 159:1
169:5,10 174:7
182:1,8 183:7
184:16 189:6
195:21 201:12

204:12,18 205:2,9
206:7,14 207:13
208:12 210:10,15
210:23 211:10
213:20,25 214:25
215:6,10 216:9
217:17 218:7
219:14 222:20
223:8 231:18
233:20 234:12,14
234:24 235:3,5,10
235:13 236:11,16
236:22,23 239:1,4
239:5,25 241:3,11
246:10,10,13
248:10,18 249:3
254:21,22 258:19
258:22 261:15,20
261:23 267:5
270:3 274:6,12
279:13 281:16
289:6 292:20
298:11,18 304:7,7
304:10 310:21
311:7 312:8,20
314:6,12 315:2
316:5,10 317:7
321:4 324:10
325:15
**county's** 7:3 30:19
109:3 183:19
208:13 213:5
276:25 291:14
**couple** 63:4 92:2
115:20 127:2
157:25 176:6
216:15 256:22
276:16,17
**course** 20:11 28:7
40:13 83:6 186:11
188:24 189:9

207:3 216:10
266:12 275:9,21
290:8 300:13,13
302:22 304:23
**court** 1:1 5:14
41:16 112:14
115:9 141:24
179:6 251:13
262:12,17 263:3,4
263:9,13,18,21,24
264:6,9,12,16
265:18 268:23
270:13 272:8
273:5,7 279:2
293:17 324:7
**court's** 7:23 259:2
273:6
**courtroom** 262:22
**courtrooms** 57:6
**courts** 277:22
**cov.com** 4:5,9
**cover** 174:13
234:23
**covered** 92:4
159:8
**covering** 144:17
145:4
**covington** 4:2,6
**cpd** 22:20 30:9
137:8 145:15
**crack** 46:19
160:14 229:17
**create** 173:13
195:19
**created** 193:20,25
217:14 240:24
244:16
**creates** 195:13
**creating** 213:19
241:2 286:12

**creative** 268:22
**crime** 19:10,21,22
19:24 27:4 37:9
37:16 39:1 55:1
56:2,15 58:8
59:25 61:12 66:4
67:2 74:25 75:2
78:8 86:25 88:14
90:17 100:20,22
100:23,24 101:23
102:1,9 103:14
120:10 243:23
250:14 272:24
273:4 296:4,12
**crimes** 19:17
34:24 35:23 55:5
55:14 57:2,23
58:3 60:8 69:25
70:8,15 71:17
89:13 102:5
120:13 243:5,12
243:17 244:22
250:3,18 251:6
278:20 293:13
**criminal** 49:19
95:14 102:12
116:16 123:2
149:8,16 150:13
150:21 160:1
176:10 191:15
193:15 237:19
247:2,4,6 265:20
273:21 275:10
277:15 312:2
**criminally** 219:12
**criminals** 130:6
202:19 214:22
317:23
**crisis** 62:15 232:18
254:20 262:9
268:6 280:24

281:1 291:22
294:21
**criteria** 262:16
**critical** 165:20
**criticism** 251:18
**cross** 274:17
**current** 316:16
**currently** 22:14
46:20 70:12 193:6
242:17,24 305:18
316:21 317:5
**custodial** 298:19
298:20 299:3
**custody** 5:14
**customers** 118:6
**cut** 79:14 80:4
146:1,2 204:16
305:25
**cuyah** 6:5,8 7:14
7:17 81:15 82:24
248:13,21
**cuyahoga** 1:10 2:2
7:3,13,16,19,20
8:3 18:4,18 21:7
30:19,24 31:1
34:16 44:23 45:10
46:19 47:5 48:1
50:15 51:20 52:19
68:12 69:10 72:23
73:3 74:1 76:20
76:25 86:18,22
91:5,14 92:1
96:21 103:25
105:22 109:12
112:13,18 113:7
118:17 127:17
133:17 139:18,23
140:1 169:5,10
174:7 183:7,19
184:16 204:12
208:11 210:9,15

210:23 211:10
213:5,25 214:25
215:10 231:17
234:24 235:10
236:23 239:4
248:10,18 249:3
258:20,22 281:16
289:6 292:20
298:11,18 304:7,7
310:21 312:8,20
321:4
**cvs** 2:16,16 133:14
133:15,15

**d**

**d** 139:23
**d.c.** 2:19 4:4
**damage** 151:6
153:13 260:21
**damages** 259:10
259:25 260:16
261:3 314:21
**dan** 1:8
**danger** 113:25
114:5 317:22
**dangerous** 90:25
217:23 297:17
**data** 6:7 48:10
58:14 82:17,23
92:19 93:21,23,25
94:18 95:13 96:5
96:9,9,13,16,19
104:23 177:1
224:19 236:20
240:16 267:4
279:24 280:16,18
281:8,19 282:7,16
282:16 283:5,10
288:9 290:16
**database** 93:24
94:25 95:17,20,22
96:1 240:1 289:12

289:13,17
**databases** 236:9
**date** 290:12
320:11 323:8
324:3,9,19 325:3
325:13,25 326:20
326:25
**dated** 6:14,16,19
6:22 82:9 83:9
131:17 138:2,12
140:10,17 166:23
167:4 172:21
301:16 312:17
**dave** 307:11
**david** 7:5 183:23
**day** 2:12 133:22
138:25 142:16
145:5 209:12
299:13 322:7
324:16 325:22
326:22
**days** 38:20 289:7
323:19
**dea** 21:14,17,20,23
22:9,21,25 24:10
30:10 37:22 91:12
91:22 96:2,14
116:16 124:8,9,16
124:20,24 126:18
136:1,14,16 137:7
137:10 146:13,14
188:20 189:2,5
192:17 212:9,19
212:22 214:19
217:1,2 239:6
276:23 277:10,13
277:19,22,25
278:6,12,17,17,25
279:8,20,24
280:16,18 281:5,7
281:14,25 282:7

282:10 297:24
**dead** 43:9 48:7
62:8,20,20 72:2
74:16 129:24
254:19,23 261:17
280:23 287:8
**deadly** 85:25
**deal** 26:4 35:22
126:22 184:23
215:24 225:10
294:2
**dealer** 84:24 86:11
131:22,25 138:12
140:19 167:4
**dealers** 49:19
139:17 140:1
169:5,10 215:9,13
215:18 216:8
258:8 264:7
**dealing** 169:13
263:7
**dealt** 47:23 190:18
274:19
**dear** 323:10
**death** 77:3 88:8
97:11 104:14
143:6,13,16 166:7
167:20 180:14,17
181:8 266:25
298:11 314:11,14
314:25
**deaths** 74:13
76:22 83:11,18
85:14 90:5 104:16
127:17 314:16
315:7
**debatable** 290:12
**debate** 118:8
**decades** 47:12
189:9

**deceive** 114:1
**december** 111:14
120:22 122:22
313:24
**decide** 95:1 221:3
223:18
**decided** 136:2
172:10
**deciding** 228:6
230:19
**decision** 121:16
273:6 288:2
**decisions** 42:2
228:14 230:23,24
231:23 235:8
**declination** 78:11
79:5 230:7
**declinations** 78:25
**decline** 77:18 78:3
261:24
**declined** 77:23
78:8 136:24 230:9
230:12
**declines** 78:12
**decrease** 48:21
250:3,18 251:6
257:18
**decreased** 236:3
262:7,8 264:22
265:8
**decreasing** 257:25
**dedicated** 242:13
**deed** 324:14
325:20
**deemed** 323:21
**defang** 116:15
**defendant** 63:10
80:25 82:6 125:2
197:1,4 198:13
204:3 235:15
262:17 318:19

**defendant's** 64:3
65:5 203:24
**defendants** 7:4,22
103:5 183:21
227:8 257:3,25
258:25 263:24
**defense** 154:1
268:22
**defer** 46:24
**define** 160:10
213:15
**defined** 39:12
**definite** 170:22
**degree** 15:22
223:17
**degrees** 15:23
75:10 170:21
**delete** 301:6,13
303:15,17 304:3
307:5,7 308:10
**deleted** 301:8
304:4 307:19
308:6 310:1
**deliver** 117:9
**delivers** 118:5
**delivery** 320:9,11
**denied** 282:8
**department** 30:19
43:11 66:23
137:12 145:14
170:25 227:13,17
292:20 314:4
323:24
**departments** 21:8
175:10 225:3
232:12 235:5
**depend** 22:12
**depending** 75:8
78:14 89:20
142:18 279:1

**depends** 21:19
75:6,7 99:10
170:25 190:5
219:25 225:11
**deploy** 59:16
60:12 66:16
**deployed** 59:24
66:4
**depose** 307:15
**deposed** 15:7
309:13
**deposition** 1:14
28:8,12,17 31:20
81:12 82:20 97:19
111:18 131:13
137:23 140:6
166:19 183:18
197:18 248:9,17
258:18 309:18
310:6 312:6
318:17,24 319:4
321:19 323:8,11
324:1,3 325:1,3
**derivative** 32:4
207:8,9
**derivatives** 35:10
**derived** 73:14
**describe** 52:2
**described** 101:6
155:21 181:13
**describing** 53:3
**description** 6:3
**deserve** 38:15
203:1
**designated** 274:13
274:17
**despite** 212:18
298:13
**destiny** 197:1,4
200:21

**destroy** 253:5
**destroyed** 298:2
307:19
**detail** 52:2 272:21
300:25
**detailing** 230:8
**detect** 87:3,11,13
200:18 278:1
**detected** 106:25
**detecting** 88:4
195:22
**detective** 134:6
**detectives** 21:2,5
**determination**
148:13 169:23
**determine** 27:3
39:15 40:4,8 48:1
95:5,18 97:13
158:25 175:20
177:9,13 222:13
224:9,22 225:3
244:4 273:2
282:16
**determined** 89:24
107:9 170:2
**determining**
224:13 308:3
**detox** 144:3
**detroit** 206:20
207:1,5,13
**develop** 178:3
227:14 277:21
**developed** 41:24
285:13
**diary** 305:3
**die** 143:22
**died** 48:1 139:14
141:25 142:5
153:9,11 168:15
172:16 179:4
298:7 313:16,23

314:25
**diet** 70:21
**difference** 105:6
185:2 195:2,5,9
**different** 17:16
19:19 21:2,3,5
34:9 42:13 88:18
94:16 98:4 102:4
108:2 118:5
132:16,17 133:1
133:18,25 143:5
146:19 155:24
163:13 164:14
180:24 190:16
200:10,13 227:18
249:20 262:1
298:14,15 309:19
**difficult** 40:4,8
43:3 87:2 105:19
107:22 142:11,12
164:19 175:8
180:11 181:2,14
181:19 200:17
**difficulty** 87:10
**dig** 162:21
**dike** 283:1
**dilaudid** 35:10
**dined** 115:11
**dinsmore** 2:2
**dipping** 185:6
**direct** 83:14 147:3
147:8,23 148:1
**directly** 20:13
116:6 146:6,8
290:24 291:5
**director** 8:3
310:20 312:9,21
**directors** 21:23
**disagree** 38:14
84:8,16 150:1

discard  306:22
disciplinary
  284:23
disciplined  162:4
  187:23 237:13
  238:1
disciplining
  185:14
discretion  26:14
  26:15,19 27:12
discrimination
  162:5
discuss  60:18,23
discussed  68:10
  72:19 115:20
  161:7 216:11
  236:20
discussing  54:15
  110:24 135:9
discussion  218:13
disease  155:19
  253:4
disguised  86:11
disingenuous  57:5
  57:11
dismissed  252:14
dispense  209:18
  212:4
dispensed  95:19
  96:21 159:1
  163:18,20 180:2
dispensing  65:21
  160:19 163:21
  176:18 189:18
  212:7 222:7
  290:25 291:7
disposal  259:22
disproportionate
  282:18
dispute  261:23

distinct  30:25
distinguish  39:4
distribute  90:18
  117:8,21 135:19
  146:16 151:22
  152:12,16
distributed  123:3
  125:19 126:16
  127:3 204:9
distributing  75:5
  98:11 209:22
distribution  74:25
  75:17 82:7
distributor  7:4,22
  66:1 119:20 146:5
  153:2 183:21
  193:19,22 224:4
  227:8 258:25
distributors  93:12
  114:14 119:7,18
  127:8 145:23
  151:17,21 152:11
  152:16,20,22
  159:15 160:3
  204:9 208:19
  217:13 218:4
  222:8 267:25
  296:17
district  1:1,2
  270:9
diversion  17:9
  21:22 30:9 59:1
  66:22 72:17 97:21
  98:7 99:6 103:25
  128:7 154:15
  155:2 184:7
  222:17 239:7
  245:1 251:14
  292:15,21
divert  132:22
  133:12

diverted  88:10
  127:20 134:3
diverters  236:17
diverting  156:14
division  1:3 88:18
  266:13
doctor  6:10,12,15
  6:20 20:8 33:4
  39:10,18,20,23
  40:5,18 41:12,22
  62:23 65:17 95:6
  97:7,25 98:2,14
  103:11,14,17
  105:12 109:8
  110:15,17,22
  111:19 122:4
  123:20 124:15,22
  125:5,6,8 126:12
  127:3,4 129:4,9,18
  131:2,15 135:12
  137:24 142:9,14
  142:19,21 143:9
  143:13 144:16
  148:8,16 150:16
  152:14,19 153:1
  153:17 154:22
  155:7,9,14 158:16
  160:8,18 161:11
  163:1 164:15
  165:3,22 166:12
  166:21 167:6,10
  167:10,17 171:24
  172:17 174:15
  175:4 176:22
  177:5,10 178:14
  179:5 182:22
  183:2 188:25
  203:4,10 220:25
  221:1,10,19,21,24
  222:6 223:19,19
  223:24 226:21

229:12 237:8,14
  238:1,21 269:14
  270:22 275:11
  284:13 289:4,10
  295:8 298:7
doctor's  6:18
  41:17 110:6
  133:23 140:8
  142:17 180:10
  181:1 195:7
doctors  53:25 54:1
  55:6,7 61:25 63:4
  66:14 69:15 76:16
  77:22 92:22 93:6
  94:2 95:14 98:4
  103:20 108:14
  113:16,17 114:1
  114:19 115:11
  123:14 125:14
  128:24 129:11,11
  129:13,14 130:1,4
  144:22 146:17
  148:17 151:12,18
  153:4 154:13
  162:3 171:17
  173:5,6,11,17,24
  177:14 178:6
  179:10 180:13
  181:7 190:22
  208:23 209:7,23
  212:4,19 213:25
  215:3,5 238:5
  268:1 274:7
  277:16 284:15
  288:9 289:22
  290:16 293:4
  294:25 296:24
  298:5,10,15
document  1:8 6:7
  82:11,21 84:1,21
  111:15 112:6

[document - drugs]                                                    Page 17

148:7 229:6
250:24 259:12
260:10,24 283:24
306:17 309:2
318:16
**documentation**
146:21 231:8
**documented** 145:1
**documents** 41:7
112:13 228:24
241:14 258:3
278:11 298:18,22
304:20 305:12
306:4,9 307:20
310:2
**doing** 27:24 41:22
51:11 59:20
101:21 103:18
105:11 113:15
129:17 135:16,17
145:1 148:8
149:15 189:10
190:6,24 231:9
275:17 283:2
288:16 293:3
295:11
**dolan** 2:2
**dollar** 52:9
**dollars** 114:17
246:2 253:21
260:19 261:2
**donte** 197:5
**dosage** 119:14
132:5 134:3 139:2
**dosages** 158:25
**doses** 96:20
125:18 126:16
159:5
**doubled** 83:18
**doubt** 118:10
144:14 257:13

**douglas** 3:8
**downplay** 217:22
**downtown** 218:16
**dozen** 72:20
**dozens** 101:9
**dr** 77:13 106:6,7
106:11,21 110:14
111:2 112:25
113:24 114:4
120:9,18 122:11
123:11 124:7,9
126:10 130:8
135:12 136:15
137:3 138:8,14
139:1,6,9,17
140:17 141:7,14
144:9,16 145:18
148:11 153:5,16
153:25 154:21,24
156:6,25 157:15
158:3,24 159:12
162:15 163:4,6,18
166:3 167:18,25
169:1,4,15 170:11
171:15 172:10
173:21,21 178:9
178:25 179:10
180:8 239:18
270:8,13 303:1
**draft** 23:8
**draw** 259:16
**drop** 306:1
**dropped** 169:18
273:17
**drops** 306:2
**drug** 3:2 6:7,12,21
7:9 17:9 21:10
23:15,24,25 25:10
29:15,16,17,25
37:21,25 45:9,20
46:19 48:2,16

49:19 50:4 52:7
52:18,25 53:11
55:5 58:8,13
59:16,25 60:8
61:12,16 63:25
64:11,13,15 66:4,8
67:2 68:23 69:5,6
69:7,25 70:14
73:24 75:16 76:10
76:12 79:13,14
82:17,22 83:17
84:24 85:21 86:3
86:4,11,22 87:14
88:23 89:3,16,24
90:13 93:12,16
97:20 99:7 101:11
109:20 112:11,12
114:13 119:7,9,17
119:20 127:7
128:7 131:15
138:14 139:17,25
145:6,12 155:1
156:8 158:19
160:3,3 163:11,12
166:22 168:4,13
168:18 169:5,10
169:13 171:6
197:20 205:7,17
206:8 210:5,22
211:8 212:2,15
214:14 216:8
235:17 242:13
243:12,17,23
244:22 251:12,13
259:22 262:12,17
262:20 263:3,4,9
263:13,13,18,21
263:24 264:6,9,12
264:15,19 265:17
272:1,8,9,11
274:15 276:1

278:20 289:21
290:11 293:13
296:4,12 299:25
300:7,12,21 301:2
**drugs** 6:15 16:3,10
18:15 20:8 29:9
29:12 30:4,15
31:22 32:1,5,20,23
34:10 35:21 36:21
44:24 45:3,24,25
46:2,3,7 47:3
48:16 49:5,11,16
52:24 53:1,7,11,15
57:17 60:18 61:21
61:22 66:1 68:8
68:11,22 69:2,9
70:7 76:6,11,17
80:11,19 89:17
92:8 94:6,10,11
96:3,4 98:4,5
99:24,25 100:15
104:16 107:5
111:4 114:19
115:4,5 117:7,10
117:22 119:10
127:9 137:25
139:2 142:1,22
143:1,10,24 144:5
144:13 145:23,25
145:25 146:3
147:5 151:16
153:1 155:6 156:5
156:14 159:1,8,10
160:13 161:1,13
161:13,14,15
163:15,17 171:20
171:23,25 177:7
181:13,19 185:20
188:17 202:4,13
202:13,21 203:1
205:15 207:23

[drugs - enforcement]                                                    Page 18

209:23 210:12,12
210:24 211:1,3,6
215:1 216:4
217:22 222:18
223:16 224:10,14
227:4 235:12
245:1 271:23
272:25 274:19
275:7,8 281:2
296:18,23,25
297:3,4,17
**dshively** 3:10
**due** 37:23 48:2
78:9
**dug** 131:4
**duly** 15:6 321:7,10
**dunifer** 77:13
166:3 167:25
169:1,4,9,15
170:11 172:15
173:4,6 178:25
179:10 180:8
**dunifer's** 167:18
171:15 172:10,20
**duties** 43:13
**duty** 68:1,3
**dying** 62:16,17
104:13

**e**

**e** 299:3,7,8,9,11,13
299:20,25 300:3,6
300:11,15,17,21
301:1,7,8,9,12,15
301:20,22,24
302:1,2,4,7,13,22
302:23 303:4,6,11
303:12,13,16,17
303:18,21,22,25
304:3,5,6,10,12,24
305:16,20,21
306:1 307:1,7

308:6,6,7 309:10
309:20,22 310:2
**earlier** 31:19 34:8
76:14 90:12
128:15 135:11
136:15 137:18
167:15 181:13
216:17 228:11
236:20 239:9
246:23 258:6
267:7 279:11,25
**earliest** 301:15
**early** 17:3 51:14
51:16 58:4 60:6
62:18 63:1,9 64:2
64:19,23 65:2
77:16 162:10
204:14 302:5
**earned** 316:8,15
**easier** 133:13
195:18 256:18
**easily** 41:12 87:14
**east** 2:13 20:25
21:1,6
**eastern** 1:3
**easy** 87:23 141:11
**ebbs** 294:9
**economic** 19:10,17
19:21,22 34:24
55:1 56:2 70:8
243:5
**economy** 265:4,5
**educated** 128:24
**education** 15:11
267:20
**edwards** 6:5 80:25
81:13,20
**effect** 127:11
128:4,8,22 286:22
287:1,18,24

**effective** 182:12
**effectively** 278:19
294:2 295:18
**effectuate** 41:5
**effectuated** 273:10
**effort** 148:15
163:16 175:3
276:20
**efforts** 61:11
121:8 122:10,24
123:12,17,24
124:1 151:1
156:12 171:12
203:8 266:9
267:21 268:5,11
271:6
**egregious** 164:1
164:12 175:17
**eighth** 313:23
**either** 18:11 20:13
77:16 106:8
121:12 127:25
144:24 186:4
187:20 191:8
207:6 225:23
234:14 263:20,23
275:5 282:16
322:2
**elaborate** 72:3
**elected** 25:22 26:3
241:3 295:16
**electronic** 290:24
291:6 298:23
304:19
**eliminate** 103:16
**ellis** 3:12
**embraced** 273:24
**emergency** 144:2
266:3,5,9
**emphasis** 252:22

**empire** 298:1
**employee** 316:5,5
**employees** 31:2,9
117:3 271:5
278:17
**employment** 15:11
18:3 196:21
**employs** 117:2
**enabling** 66:5
**enact** 126:22
**encompasses**
32:13
**encounter** 40:10
53:22 227:15
**encountered** 36:11
293:12
**encourage** 213:25
225:6,18 288:9
**encouraged**
288:13
**endangered** 113:6
**ended** 130:21
169:15
**endo** 3:6,6
**endocet** 32:5
**enforced** 273:20
**enforcement** 16:2
17:21 20:24 21:4
21:11 25:10 59:10
68:7 87:3 93:2,5
97:4 107:8,20,21
109:15,16,18,23
122:1,25 132:15
145:12 148:6
159:6 175:22
177:1,12 195:21
204:25 212:2,15
214:15 222:12,20
223:7 224:9
228:25 232:12,16
247:19 259:19

260:2 267:9,12,18
276:1 281:18
283:9 288:1 290:9
292:10 293:9
295:14 304:25
**enforcement's**
291:19,22
**enforcing** 109:20
**engage** 42:3,6,20
100:14 197:5
265:12 267:3,11
267:21,24 268:4
**engaged** 184:7
**engages** 266:2
**enlist** 41:25 102:4
**enlisted** 153:21
**entered** 158:19
204:18 226:16,25
325:9
**entering** 157:14
158:12 228:1
**entire** 56:13 77:25
146:23 324:5
325:5
**entities** 186:6
219:10 292:22
**entitled** 6:7,10,12
6:15,17,20 8:3
82:22 111:19
131:14 137:24
140:7 166:20
309:10 312:7,20
**entity** 31:1
**entries** 185:23
187:3
**entry** 207:22
**episode** 297:12
**equipment** 247:23
**equipped** 175:10
**er** 23:25

**errata** 323:19
325:7,10,18 326:1
**especially** 52:8
104:7 175:9 283:3
284:16
**esq** 1:15 2:3,7,8,13
2:17 3:3,8,13 4:3
4:7 5:7 15:3,8
135:6 321:10
323:8 324:4,9
325:4,13 326:20
**essential** 269:12
**essentially** 317:11
**establish** 41:1,4
110:9 164:20
174:24
**established** 225:15
226:7,8
**establishments**
176:19
**estimate** 108:1
125:17,25 126:1,3
180:4 196:3
243:19
**estimation** 223:23
**et** 1:10
**evade** 132:15
200:9
**evaluate** 26:24
**evaluated** 273:1
**evaluation** 274:5
**evasive** 132:24
133:10
**event** 74:24 322:3
**eventually** 144:20
**everybody** 31:7
107:5 115:4,8
148:18 217:23
225:10 252:8,17
295:4 297:4,17

**evidence** 27:1,3,8
41:23 78:6 120:2
120:3 121:10
139:6,9 141:7,13
141:20 149:13
150:6 159:25
160:9,11,23
161:10 176:10,13
178:3,4 199:21
206:24 214:6
221:5,6,7 231:2
238:10 269:8
**evil** 298:1
**evolution** 285:22
286:15
**evolved** 240:23
285:13 286:1
**ex** 7:20 258:21
**exactly** 50:1
103:23 130:7
143:7 170:22
177:11 220:10
264:5 289:13
**examination** 5:7
15:4,8 135:5
**examiner's** 23:20
43:9
**example** 23:21
32:22 42:22 70:20
88:6 119:11,11
133:2,24 135:17
142:15 153:6
162:5 165:7
177:10 194:24
211:6 227:19
233:2,5 252:5
266:11 277:2,11
289:3,4 292:19
293:15 295:7
308:7 317:3

**examples** 192:7
209:2 293:20
**excel** 260:10
**exchange** 157:3,17
169:19
**exclusively** 57:23
206:2 242:9
**excuse** 17:21
290:18 294:14
313:21
**excused** 120:12
**executed** 325:10
**execution** 324:14
325:19
**exercise** 26:13
27:12
**exhibit** 5:14 6:5,7
6:10,12,15,17,20
7:3,8,13,16,19,24
8:3 81:13,19,23
82:21 83:4 111:19
112:1 131:14,22
137:24 138:7
140:7,16,16 145:9
147:24 166:20
167:3 183:16,19
188:13 197:19
198:4 248:10,18
249:2,14 250:7,8
253:13 255:17,17
255:19 256:19
258:19 259:7
310:7,12 311:5,8
312:7,14
**exhibits** 5:4 6:1
7:1 8:1
**exist** 37:23
**expansion** 259:18
259:21 260:1
**expected** 317:10

expects 261:7
expend 315:11
expenses 254:16
254:23 255:3
274:4
experience 35:7
35:15 38:5 45:18
46:25 48:10 51:10
52:15 53:16 58:16
67:9,14 69:1 73:8
84:7,19 85:19
86:1 87:12 98:25
99:5 100:13
104:20 106:24
109:5 132:21
182:25 201:17
202:18 204:1
227:2 230:1
240:12,15 244:19
244:21 245:18
250:22 252:9
257:12 281:17
285:2 311:21
experienced 87:13
246:7 261:24
experiences 43:23
44:5,13,16,17
291:18
experiencing
38:15 272:11
expert 42:1 59:21
59:22 66:5 153:22
154:6,21 160:25
161:3,19 233:4
experts 42:3
expiration 324:19
325:25 326:25
expires 322:16
explain 43:16
155:17 272:20
309:3 310:14

explained 202:11
223:15 287:2
exploded 51:22
294:19
expressly 323:13
extent 24:16,20
25:23 26:13 27:17
178:11 196:8
230:17 232:10
296:15
extreme 38:15
extremely 85:24

**f**

face 74:8,18,19
faced 293:21
facilities 201:23
313:5
facility 101:13
facing 45:9 113:2
fact 27:24 38:18
68:1 88:12 107:10
113:5 119:1 134:6
139:8,16,22 153:8
154:11 171:6
200:12 205:24
211:21 212:18
219:20 221:21
272:24 273:3,5,16
290:10 291:24
298:13 313:15,23
314:15 317:24
factor 142:14
143:5 200:15
210:2 213:4,19
factors 27:6,7,13
143:15 169:22
241:18 251:10
facts 97:18 114:24
116:1,2 131:10
141:6 142:24
194:2 197:14

199:25 200:4
214:6,7,12 300:24
312:2
fail 273:19
failing 237:8,14
313:9
failure 237:18
fair 44:21 139:16
165:24 178:17
252:24 281:20
313:9
faith 162:11,13,14
fall 216:4 234:25
falls 216:3
familiar 69:7 74:7
80:24 82:16 90:13
92:15 93:20 95:22
244:12 262:12,14
271:8,21 272:4,6
272:13,14 275:22
283:16,21 286:6
310:19
families 253:5
family 161:14,15
179:5
far 50:13 57:15
130:3 141:18
155:5 169:24
261:15 294:20
fault 142:17
favor 270:16
fbi 311:7
fda 211:16,18,19
211:24
february 138:21
244:14 322:7
323:4
federal 15:5 24:13
39:13 204:16
211:8 232:17
233:12,16 246:19

246:22
feds 96:11 230:4
235:14,15
feel 114:1 282:25
283:2
feelings 43:24
felonies 75:11
235:8 251:15
felony 18:23 19:1
19:3,7 20:5,9
56:20,23 57:18,22
75:13,14 89:19,19
188:18 190:12
243:3 252:17
fentanyl 33:14,16
36:3 46:14 48:24
49:20 52:6,6
79:10,23 80:4,5,15
80:21 82:6,12
83:11,17 84:9,25
85:3,9,15 86:11,18
88:8,9,10,13,17,22
89:10,13 90:3,9
127:16 205:18
206:1 227:20
ferraro 1:20
fewer 257:3
fide 39:10
field 130:3 229:3,9
229:18,19
figure 97:5 125:4
220:18 229:16
263:16
file 79:2,3,3,6 81:7
111:12 124:12,13
131:11 132:12
156:17 173:2
180:5,6 201:5
231:5,25 232:9
298:19,21 299:3
306:7,20,20,21

**[filed - funds]**

**filed** 51:12 119:2
148:25 150:17
314:16,18
**files** 225:2 229:20
299:4,6,6 306:5,22
306:24 307:23
308:3
**filing** 50:25 51:6
314:11
**fill** 101:17 102:5
133:21 135:18
199:23 200:8
229:5
**filled** 7:11 94:13
132:16 133:16
171:25 197:24
202:5 281:16
**filling** 151:23
209:24
**fills** 195:12,14
**final** 38:19 121:16
**finally** 268:16
**financial** 314:2
**find** 107:15,17
166:16 219:15,18
223:1 231:6 299:8
301:14 303:18,22
**finding** 84:9
261:17 273:11,12
**findings** 6:8 82:17
82:23
**fine** 104:19 297:18
309:10
**finger** 283:1
**finish** 157:4
**firms** 18:6,10,12
**first** 16:25 18:24
31:8 50:14,18,24
51:5,12,24 60:16
61:11,15 62:22
63:5,13,21 64:6,20

64:24 65:9,19,24
69:20 74:11 76:20
80:20 83:10,15,24
84:4 94:20 105:9
105:13 110:9
114:23 132:2
160:12 166:12
167:5,7 170:21
229:6 240:2,16,18
245:14,19 259:18
270:19 280:18,20
281:4 287:14,15
307:14 321:10
**fiscal** 242:12
**fit** 20:1 33:9
**fits** 33:8
**five** 19:14 75:10
94:24 242:5 269:4
276:18 284:20
294:19
**flag** 127:8 177:3
**flee** 317:22
**flex** 116:15
**flight** 318:4
**flooded** 254:23
**flows** 294:9
**fluid** 239:10
**focus** 16:10,12
49:12 55:14,17,19
56:2 57:2,4,12,12
57:15,22 76:14
103:20 262:11
**focused** 16:16 17:1
43:12
**focuses** 57:8,17
**follow** 220:19
221:3 239:20
314:13
**followed** 42:13
60:5 270:10
317:16

**following** 184:15
**follows** 15:7
**food** 37:21
**foot** 192:1
**force** 22:20,21
29:16 30:11,15
271:22 275:2
**forces** 29:8,11,16
29:17,21,24 30:3
275:7
**foregoing** 321:15
321:20 324:13
325:18
**foreign** 205:2
**forfeiture** 233:4,6
247:10,13,17
**forfeitures** 246:24
247:7
**forged** 63:6 98:18
101:25 195:3,6,10
195:16,18,23
196:9
**forgery** 194:5
**forget** 44:14 52:5
89:5
**forging** 194:13
**forgot** 68:16 131:5
**formed** 30:5 275:3
**former** 6:20 8:3
116:1 166:20
310:20 312:8,20
**forms** 97:20 214:2
**formulated** 116:22
**fortunately**
111:24
**forward** 53:19
238:11,16
**found** 40:4 121:7
128:3 139:13
154:7 220:16,25
224:14 273:20

307:14
**four** 19:14 62:8,15
108:20,23 128:12
158:2,18 187:3,7
196:10 261:20
280:25 283:3
294:19
**frame** 96:22 163:2
184:9
**framing** 61:18,19
**francisco** 4:8
**fraud** 275:19
**free** 324:14 325:20
**frequently** 249:6
301:6
**friend** 98:22
**friends** 7:10
197:23 199:23
**front** 4:7 29:4
46:13 72:12
131:24 201:5
241:11 258:4
**frustration** 293:11
**full** 31:2,9 115:9
132:2 135:24
142:15 176:14
**fun** 119:24
**function** 237:2
240:3
**fund** 247:19
**fundamental**
214:12 262:23
**funded** 34:14,16
74:19 263:22
274:11
**funding** 245:4,8
246:14,24 292:5
292:22
**funds** 274:4
276:19

**further** 155:17 162:10 223:22 318:18 321:18 322:1
**furtherance** 94:18 96:6 158:13
**future** 261:6

**g**

**gain** 290:7
**gallucci** 306:12
**game** 229:16
**gangs** 100:19
**gates** 2:13 318:21 318:21
**gather** 94:17 161:10 164:18 289:5
**geared** 169:13
**gears** 114:21
**geez** 35:9 77:15
**general** 6:8 18:23 19:1,2,6 20:5,9 40:16 56:19,23 57:17,22 69:4 75:9 80:3 82:23 105:11 107:14 111:1 115:22 144:10 188:18 190:12 200:22 207:10 222:23,25 243:2 264:3 284:1 302:16,19,20
**general's** 198:12 198:17 233:13 234:2
**generally** 32:11 33:7 34:17 40:15 66:18 89:14,15 101:10 103:9,20 107:17 109:6,7 141:15 155:5

161:21 164:24 165:19 190:17 200:5 245:9 252:4 265:3 283:25 284:9,21
**generated** 193:13 260:22
**geographic** 184:5 234:22
**george** 135:12 173:21 178:7
**getting** 49:4 53:12 53:14 62:19 104:8 139:1 144:15 146:3 149:4 155:6 155:8 165:8 177:7 178:8 202:4,5 221:20 277:7 280:24 282:18 290:19,21
**girlfriend** 191:22
**give** 30:6 40:16 46:9 49:16 58:24 70:19 80:2,10 102:8 119:11 124:20,24 127:4 145:24 171:17 196:7 198:4,14 222:24 223:18 225:18 229:3,14 244:5 252:5,10 280:18 281:5,8 289:3 292:19 301:19 305:16 306:16,20 312:16 320:1,10
**given** 119:15 129:8 161:1 171:24 185:18 199:17 209:1 263:19 295:6

308:1 321:12,17
**gives** 41:8 142:14 246:10 283:9
**giving** 6:15 121:21 137:25 142:22 207:10 209:22 219:20 221:21 270:4
**go** 18:25 19:6 27:21 28:21 39:13 41:9 49:5 53:25 54:7 56:19 57:5 57:13 72:8 74:23 75:13,14 94:20 102:4 105:14 110:12 111:11 113:24 116:24 124:11,13 130:2,5 131:11 132:12 133:15,18,19 144:2,22 145:15 146:18 148:19 149:19 155:5,13 155:14,16,25 156:1 160:15 162:10,21 164:5 165:13 166:3,5 175:16 176:23 177:6 178:5,6 188:18 196:1,4 199:23 221:18 223:21 225:1 226:4 228:5 229:13 235:9 237:16 241:11 243:2 247:20,25 259:15 263:24 266:13,22 269:22 273:18 274:18 276:15 283:5 285:6 287:7 289:9

289:14 290:3 301:20 305:17 310:25 318:8
**goal** 124:6
**god** 20:24 35:11 125:24
**goes** 98:3,19 112:17 169:24 247:13,24
**going** 27:3 48:25 52:9,10 67:11 72:5 77:21 89:6 103:10 112:1 113:23 116:17 118:8 127:15 129:22 130:12 133:15,25 138:6 140:14 144:24,25 145:8 146:17 147:19 149:11 150:7,8 156:4 160:17 163:3 164:2 166:3 170:3 170:20 171:1 181:2 183:12 186:9 190:9 198:4 200:9 202:3 205:22 209:20,21 209:21 210:17 220:5 223:21 229:16 240:21 244:4 251:13 256:1,17 265:4,5 266:10 285:7,22 286:19 287:3 293:25 294:18 295:2 296:7,22 297:15 300:15 302:25 305:16,25 309:6,13,22 310:17 314:11

**[going - heroin]**

Page 23

317:21 318:6
**good**  96:23 115:5
  115:12 159:13,14
  174:9 178:23
  208:2 223:19
  228:10 252:18
  267:2
**google**  138:10
**gotcha**  96:24
**gotten**  92:23 104:6
**governing**  225:23
**government**  30:20
  129:14 230:18
  233:8,12,16
  291:13 295:15
**governor**  90:24
  290:22
**governor's**  283:18
  285:10
**governors**  291:11
**grab**  156:5 289:7
  289:14
**graduate**  15:15,19
**grand**  247:11
  317:18,19
**grants**  233:8
  246:17,20
**graphs**  250:13
**grave**  192:1
**great**  130:17
  132:14 248:2
  289:2
**greater**  272:20
**greed**  162:14
**griffin**  92:14
**groups**  129:4
**guard**  201:24
**guess**  41:17 95:7
  276:10 290:12,14
**guest**  309:24

**guidance**  27:11
  56:11
**guide**  26:18
**guidelines**  283:17
  283:22 284:6
  285:10,16,25
  286:7,12,17
  287:10 288:2,5
**guilty**  6:16,21
  110:21 121:7
  122:23 137:17
  138:1,14 166:6,21
  169:16,19 172:17
  252:11 273:8,10
  273:11,11,20,21
**gutierrez**  1:15 5:7
  15:3,8 81:12
  82:20 111:18
  131:13 135:6
  137:23 140:6
  148:5 152:5
  166:19 169:9
  183:18 197:18
  248:9,17 258:18
  310:6 312:6 321:9
  323:8 324:4,9
  325:4,13 326:20
**guy**  56:5 71:6 89:5
  124:21 151:10,11
  191:20,25 233:9
  299:7 305:15
**guy's**  131:5 218:21
**guys**  115:3,9
  118:16 138:10
  151:20 173:22
  209:16,22 217:13
  217:20,21 218:4
  296:15 297:1,16
  297:24,25 298:1
  306:16 307:15
  309:9

**h**

**half**  19:5,14,15
  85:14 250:3,17
  281:12
**halfway**  271:14
**hand**  112:1 138:6
  280:24 310:11
  322:6
**handed**  55:24
  138:21 249:1
**handful**  59:14
  61:6 155:4 174:19
  174:21 245:25
**handing**  83:3
  131:21 167:2
  259:6
**handle**  235:11
**handled**  36:6 89:1
  135:10 293:17
**handling**  235:18
**hands**  41:6 100:4
  185:6 281:19
**happen**  42:24
**happened**  30:12
  43:19 44:14 79:2
  79:3,8 134:7
  144:8 156:16
  287:5
**happening**  52:1,3
  85:6 86:8 262:4
**happens**  42:25
  99:22 143:20
  317:6
**hard**  76:3 108:10
  117:17 142:8
  195:20 222:25
  232:8,9 243:1
  298:23 306:3,9,13
  306:23
**harm**  298:11
  313:11

**he'll**  100:11
**head**  98:17 309:12
**headline**  255:8,10
  255:12
**health**  3:7 23:24
  313:11 314:3
**hear**  205:13
**heard**  36:11 74:10
  74:11,22 85:6
  86:8,15,16 116:7
  116:12 246:9
**hearing**  173:21
  205:12 240:16
**hearings**  316:24
  316:25 317:2
**heavily**  273:7
**held**  203:1 209:15
  252:12 317:5
**help**  7:10 26:18
  41:25 109:23
  114:2 128:20
  129:3 153:21
  197:23 269:19
  288:7
**helped**  126:22
  139:9
**helpful**  240:13
  288:14 291:3
**hereinafter**  15:6
**hereunto**  322:5
**heroin**  32:19,23,24
  33:2,8 35:16,23
  36:24 46:14 48:23
  49:20 52:6 68:10
  71:1,7,9,14,17,19
  71:22 72:8,22
  73:1,2,9,10,25
  74:8,13,19,25 75:2
  75:5,12,19,23 76:2
  76:6,12,21 77:2
  79:14,23 80:4

[heroin - incorporated]

84:24 127:16
128:9 204:19
205:8 211:2
227:20 274:21
275:2 287:7
**hey** 173:20 229:12
239:18 282:4
**hiatus** 309:17
**hicks** 198:13,17,22
199:17,22 202:19
**hide** 309:25
**hidta** 275:23 276:4
276:13
**high** 107:6 108:15
141:1 160:20
173:12 174:6,9,14
174:18,23 175:20
176:5,18 177:17
221:23 245:22
276:1
**highlights** 198:7
255:8
**hipaa** 161:8 269:1
290:9,13
**hire** 59:21,21 66:5
254:12 292:7,13
**hiring** 313:4
**history** 94:1 163:5
**hit** 22:2,11 173:10
173:14 272:1
**hold** 151:19
181:14,19 212:22
307:3 308:21
309:2,8,20
**holding** 151:19
**holds** 273:11
**holy** 253:22
**homicides** 266:14
266:16 267:1
**honest** 25:1
182:23 222:9

283:11
**hopefully** 273:17
**horrific** 38:23
**hospital** 24:3
198:23 200:23
**hospitals** 196:18
201:14
**hostetler** 3:8
**hostility** 129:12
**hours** 127:5
**house** 271:9,10,11
271:14,25
**how's** 158:22
**huh** 96:24
**hum** 54:17 55:3
97:22,24 98:1
99:17 100:2 112:8
112:20,24 118:22
131:4 132:8,18
136:12 137:4
139:4 146:9 148:4
149:2 168:5
169:11 176:8
179:2 184:12
198:10 219:24
249:5 250:10,15
254:5 255:21
260:15 277:17
**hundred** 56:25
57:1,21 94:21
174:19 246:1
307:25
**hundreds** 226:25
**hydromorphone**
35:10

| **i** |
| --- |

**i.e.** 264:6
**idea** 43:15 235:23
240:25 276:21
288:8 291:9
301:11

**identification**
81:17 83:1 111:22
131:19 138:4,7
140:12,15 166:25
167:3 183:25
198:2 248:15,23
259:4 310:9
312:12
**identified** 177:2
291:19,21
**identifies** 182:15
**identify** 106:3
165:6 184:4
193:18,19
**identifying** 87:24
227:3 269:18
**identities** 239:2
**ignored** 119:8
**illegal** 43:6 69:15
82:6 112:12 148:8
155:8 163:12
165:9 171:14
205:14 206:1
215:10,21,25
216:1,3,5
**illegally** 49:20
64:22 65:10 88:8
98:15 131:3
163:19 168:25
189:18 202:4
209:23 210:4
213:9,10 215:19
298:5
**illegitimate** 97:14
163:22 164:4,10
**illicit** 100:14,14
205:25 207:22
**illnesses** 117:16
**imagine** 136:10
**immediate** 60:20

**immunity** 272:2,7
**impact** 256:23
287:11,11,11
**implemented**
223:7
**important** 128:23
129:2 222:12
269:5
**importation** 206:1
**impossible** 171:20
**impractical** 123:9
**impression** 270:20
**improper** 43:14
43:19 165:23
**improperly**
166:13 183:9
188:21 213:2,12
276:24 277:4
**improvement**
259:19,21 260:1
**inability** 293:16
**inappropriate**
57:15
**inbox** 301:12
**incentives** 225:5
225:17,25
**incentivize** 165:15
**incident** 21:9
**incidents** 314:3
**include** 29:3 31:23
32:19 79:5
**included** 34:2 86:4
232:3
**includes** 32:16
**including** 31:9
97:23 123:18
168:2 180:25
206:13 211:5
**incorporated**
325:12

increase 48:5,17
54:21 60:2,3 90:1
280:22 294:17
increased 48:4
60:8 66:4 261:14
262:9 264:22
265:7 314:8
incur 261:7 315:3
incurred 254:16
255:2 259:25
261:12 263:9
index 5:1,4,5 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1
indiana 2:16
indicate 88:4
144:11 154:15,16
161:1
indicated 156:13
162:10 175:2
221:22 252:6
indicates 256:9
indicators 105:8
indict 163:4
165:12 228:3,6
251:22
indicted 8:4
111:14 112:10
163:6 167:25
257:3 312:9,21
316:22,23 317:7
317:21
indictment 6:5
7:24 78:16 81:8
81:14,20 82:5
111:8,25 138:20
163:3 168:12,21
251:25 252:1
310:8 317:19

indictments 236:2
257:9 312:4
indirectly 20:14
indiscriminately
111:3
individual 28:18
45:12 48:11 63:6
63:14,22 64:7,21
64:25 77:1 92:23
98:3 104:21 136:4
155:9 168:19
172:4 176:25
185:23 187:5
218:23 219:15,21
221:8 222:6
224:15 225:2,6
226:14 253:3
272:23 273:13
300:14 308:8
individual's
101:20
individuals 22:19
52:23 53:10 58:23
59:6 61:7 72:18
76:16 87:16,18
100:25 101:5,20
102:3,9 113:14
132:14,22 133:11
168:25 169:2
177:7,21,24
196:18 200:7
202:24 207:2
212:17 215:24
219:11 221:22
223:1 226:20
236:12 245:25
269:16,18 277:19
289:19,22 295:12
industries 267:25
influence 230:23
231:22

inform 182:21
228:9
informal 35:4
informally 29:12
information 26:10
40:18,19 43:12
46:16 47:25 80:3
126:15 147:22
162:23 182:23
185:18 190:1
227:23 228:7
232:3 238:11,17
238:22 239:12,16
240:5 269:16
281:11,13,25
289:19,24 297:2
307:6
informed 58:14
149:24 309:6,7
informing 125:14
ingenious 144:17
ingested 181:18
ingesting 86:5
154:10
inherent 160:7
initial 235:7
initially 204:14
initiated 307:4
injection 136:3,7,8
141:4
injunction 150:17
inmate 313:23
315:6
inmate's 313:11
314:13
inmates 313:15
innate 129:12
inner 176:24
innocent 121:6
input 231:3

inquiry 221:10
inside 79:5 101:12
160:15
instance 28:5
96:10 195:22
instances 37:18
84:23 86:10 88:2
99:23 164:25
194:5 205:1
225:24 237:25
instruction 320:2
320:10
insurance 275:18
275:19
insurers 213:23
integrate 290:23
291:5 293:7
intel 221:20
intend 67:7 99:7
intended 60:7
185:8
intending 57:10
302:18
intensely 295:23
intensity 276:1
intensive 273:14
interact 233:11,15
interested 230:19
322:3
interface 293:8
interim 179:3
international
73:24 206:8 210:5
210:21
internet 99:2,4
204:11,15 302:5
interrogatory 7:4
7:22 183:13,22
259:1,8
interrupt 209:11
209:12 218:2

297:9
**interrupted**
209:12
**interrupting** 297:8
**interruption** 195:8
**intervening**
121:25
**interventions**
259:20 260:2
**interview** 220:14
**interviewed** 28:5
**interviews** 28:12
**introduce** 229:7
**invalid** 200:8
**investigate** 66:16
95:2 137:21
156:12 178:5
190:2 223:4,12
228:6 267:1
278:13,19
**investigated** 6:13
119:19 131:16
154:25 156:7
179:25 184:5,6,16
185:12 186:3
189:23 191:1
193:6 194:4
219:10
**investigating**
130:18 137:5
145:18 160:7
178:22 186:15
225:3
**investigation**
77:24 116:17
122:2,12,16 124:4
136:14 137:3,15
137:18 145:11
147:10,15 148:11
149:9,14 150:7,8
150:13 157:18

158:13 159:12,16
176:11,15 178:12
178:15,25 179:13
187:16 193:4,15
206:25 222:21
223:21 229:7
278:7 282:1 292:8
300:12,21 312:2
**investigations**
19:9,12 20:5 23:6
40:2 54:20 94:22
178:18,24 184:19
188:25 206:23
207:3 228:18
229:1 242:13
265:21 266:25
275:10 277:15
299:25 300:7
301:2
**investigative**
20:15,17 66:21
171:13 178:2
190:4 228:8 240:8
247:14 289:2
**investigator**
173:20 229:11
300:14
**investigators** 17:9
29:5 59:5 60:25
66:23 67:12 72:17
73:22 87:12,15
95:12 172:20
173:10,13 174:8
175:9 217:9
223:11 239:7
240:9 292:8,13,14
**invited** 233:20
**involuntary** 76:21
166:7 168:3 171:8
**involve** 18:12,15
19:20 35:23 38:6

76:2,11 77:19
89:10
**involved** 24:17,21
25:24 26:1 100:19
100:23 103:11,17
126:12 132:4
137:12 168:19
178:12,19 184:19
186:19,20 190:15
191:12 251:10
255:10 266:8,8,17
266:24 268:9,11
271:25 275:1,20
308:2 311:12
**involvement** 25:3
25:8 101:3 116:4
**involves** 36:1,7
**involving** 40:3
53:22 56:15 78:8
78:25 80:25 88:21
89:13 97:11
102:19 103:1
124:15 130:19
150:16 154:13
186:6 187:16
196:25 198:8,11
198:12 203:3,17
215:3 222:22
226:17 230:12
235:11 243:7,12
245:1 298:14
**irrespective** 149:8
**issue** 21:8 47:2
61:16,20,21,24
62:6,6,12,14 69:21
78:11 104:3
108:11 129:20
143:3 232:17
261:21 270:8,19
284:17 288:2

**issued** 283:17,23
284:7 285:10
286:8,25 287:17
317:14
**issues** 16:7 20:13
25:24 26:1,4
52:11 60:17 68:23
69:24 78:9 115:19
253:9 284:21
311:16,19 318:16
**italics** 256:22
**item** 255:3
**items** 242:8

**j**

**jackson** 3:2
264:10
**jacksonkelly.com**
3:5
**jail** 8:3 110:13
312:8,21 313:5,10
**jailbreak** 51:22
**jails** 311:21
**james** 1:15 5:7
15:3,8 135:6
321:9 323:8 324:4
324:9 325:4,13
326:20
**janssen** 3:11
**january** 1:16
184:21 312:18
**jciaccio** 2:10
**jeffrey** 3:13
**jeffrey.whitesell**
3:15
**jim** 59:2,4
**job** 20:11 35:4
44:20 57:18
117:14 299:9
311:24
**jobs** 18:11 196:18

**joe** 4:10 173:21 178:9 239:18 303:1
**johnson** 3:11,11
**join** 18:17 165:14 165:16
**joined** 71:2
**joint** 282:1
**jointly** 274:14
**jones** 2:12 197:5
**jonesday.com** 2:15
**joseph** 2:8
**joshua** 199:22
**jr** 2:3 323:5
**judge** 1:8 264:10 264:10,12 273:11 318:5
**judges** 264:8 270:16,20,21
**judgment** 180:10 181:2
**judicial** 235:16
**july** 121:4 309:15
**jurisdiction** 96:4 125:20 126:17 206:16 207:15,23 233:19 235:1,6 282:17
**jurisdictions** 21:3 21:7
**jury** 136:8,11 317:18,19
**justice** 78:20 229:21 232:3,5
**justify** 160:21 229:25
**juvenile** 18:24

**k**

**k** 3:3
**keep** 38:18 171:21 173:17 179:20 209:21 231:4,8 238:18 261:17,18 280:22 294:18 306:6,24
**keeping** 318:17,24
**keeps** 173:19
**kelley** 1:20
**kelly** 3:2
**ken** 310:20
**kenneth** 7:24 310:7
**kent** 15:14
**kept** 141:16 142:22 191:5 224:20
**kill** 85:23 89:6 151:15 153:6
**killed** 151:5
**killing** 48:24 151:13
**kind** 7:9 19:22 20:1 22:2 51:19 102:12 108:16 119:15 130:7 136:1 161:13,16 192:2 197:20 221:23 227:14 294:3 313:13
**kinds** 25:15 37:1
**knew** 114:24 115:8,24 297:3
**knock** 175:18
**know** 22:17 26:5 29:4 30:9,16,22 31:11,17 33:6,12 33:13,20 34:6,7,18 38:1 41:12,15

43:21 44:11 45:12 46:3,11,17 47:4,22 48:3 49:11,18,24 50:1,13,16,18,22 51:3,4 52:12 53:11,13 56:24 57:2,25 59:9 60:15 62:4 67:8 68:21 71:22 72:1 73:1,19 74:16,18 74:22 75:4,23 76:24,25 77:15 80:1,3,14,23 81:5 81:6 82:1,15 84:13 85:2,12,17 86:7 88:2,12,20 89:1,8,12,21 90:2 90:17 91:4,20,21 91:21 92:7 93:10 93:14,18 94:14,14 95:4,21 96:12,17 97:10 104:5 106:11 107:3,13 107:22 109:13 110:2 114:22 115:1,2 116:1 117:8,9,19,23 118:1,2 119:13,16 119:17 121:20 123:22 125:9 128:21 129:12 131:10 133:15 134:7 136:20 137:1,10 140:25 142:7 146:4 151:14,17 153:3 157:5,7 158:2 159:5,14,23 163:9 165:9 168:24 170:4,14,22 172:13 173:15,21

175:18 176:21 178:7,8 180:1 186:1,18 188:8,12 190:25 191:4,8,9,9 192:2 196:21,24 197:13,13 203:3 205:19 206:12,18 206:20,21 207:12 209:1,2 214:6,12 214:18 217:25 220:6 221:23 222:23 223:9,10 224:21 225:13,14 227:21,22,24 228:23 229:8,24 232:24 233:9 234:4,21,25 236:2 236:4,6,7,10,13,14 236:18 237:12 238:4,5,7,22,24 239:1,5,19 241:1,5 241:7,9,13,17,21 241:23,24,25 242:3,4,7,10,11,15 242:19,23 243:16 244:16,24 245:2,3 245:6,7,10 246:6 246:15,16,19,21 246:22 247:4,9,12 247:21 249:6,9,15 249:21 251:5,18 252:6 253:7,25 254:10,11,14,15 254:22 255:2 256:13 260:4,21 261:6,13 262:15 262:16,23 263:5,8 263:10,11,12,17 263:20,21,23 264:8,10,12,18,20 265:15 266:2,15

266:19 267:6,14
267:16,23 268:8,9
271:19 272:3
273:9 274:10,12
274:16,24 275:5
275:25 276:3,19
278:5,7,8 279:17
279:19,21 281:10
281:22,22,23
282:3 284:12
285:12,12,21,22
286:11,14 287:15
287:21 288:5
289:11 291:8,17
291:17 293:4
296:3 297:21,22
299:2,22,23 300:9
300:9 301:18,19
301:21 302:3
303:20,23 305:15
307:2,14 309:18
311:18,18 313:8
314:18,19,21,24
**knowing** 296:11
**knowledge** 24:5,8
33:2 34:19 36:17
46:22 47:24 54:25
60:1,4,10 69:4
73:5,7,13,14 77:4
81:2 82:12 84:10
90:20 91:15 97:2
104:22 119:5
122:17 149:6
167:14 185:13
187:22 188:2,3
204:22 211:23
214:21 230:11
233:7 234:18
237:7,11 243:22
255:5 259:24
260:6 264:21,25

268:2 271:4,7,24
274:16 286:13
310:1 311:23
**knowledgeable**
132:3
**known** 44:23
107:1,4,7 173:12
296:5,13
**knows** 107:6
182:20

**l**

**l** 1:25 2:8 3:8
106:8,8,8 321:6
322:13
**l.p.** 1:10
**labeling** 146:20
**lacked** 230:13
**laid** 119:1
**lake** 133:16
**lakeside** 2:13
**lalli** 106:6
**lalli's** 106:11
**lambert** 307:11
314:20
**large** 95:6
**larger** 30:19
139:20 148:17
**late** 51:24 52:3,18
53:17,22 54:16
58:4,8 59:17 62:1
62:18 69:19 71:10
77:16 296:19
302:5
**launch** 176:10
**law** 15:17,19,22
16:2 17:21 18:7
26:20,21,25 27:2
39:14 41:16 59:10
68:2,4,7 87:2 93:2
93:4 97:3 107:7
107:10,20,21

109:15,16,18,23
122:1,24 128:16
132:15 148:6
159:6 170:19
175:22 177:1,12
195:20 202:20,25
204:25 212:24
222:12,19 223:7
224:8 228:25
232:12,16 235:5
247:19,21 259:19
260:1 267:9,12,18
268:12,16,18
270:13 272:4,6,13
281:18 283:9
284:12 288:1
290:8 291:19,22
292:10 293:9
295:13 298:10
304:25
**lawful** 15:3 36:19
36:24 39:4,15,19
39:21 42:6,20
212:17,17 224:7
**lawfully** 39:12,12
43:14,19
**laws** 48:20 49:1
109:20 127:2
128:19
**lawsuit** 114:22
119:2 311:17,19
**lawsuits** 314:13,15
314:17,22
**lawyers** 129:13
314:10
**lay** 252:16
**layers** 102:12
**lead** 89:21 220:8
315:16,16
**leading** 46:19

**learn** 46:18 73:24
205:16,24 255:9
296:21 298:17
**learned** 60:16 86:2
184:6,7 205:1
216:18 252:19
296:10
**leave** 265:4
**led** 41:13 127:15
206:25 267:17
**left** 130:3 135:9
201:18 250:11
253:14 256:2,8
295:10 313:24
**legal** 139:2 323:1
326:1
**legally** 39:16
141:18 213:8
**legislate** 129:15
**legislation** 126:22
126:25 127:11
128:3,10 268:4
271:1,6 287:5
293:18
**legislative** 269:20
**legislature** 89:23
126:21 128:15
270:10 291:11
**legitimate** 38:9
39:9,24 40:6 97:8
97:14 105:7 118:9
151:23 161:2
163:22 164:3
180:15 181:9
204:6,9 223:20
**legitimately** 37:2
97:7
**lengths** 132:14
**lens** 45:13,14
**leo** 2:3 323:5

lessened  286:16
lesser  225:20
lessons  296:10
letter  78:12
    231:17,20 323:20
letters  78:18,24
level  56:20 165:2
    196:18 257:9
leverage  225:21
lexington  2:8
lgates  2:15
license  18:7 110:6
    121:9,13,19,21
    146:14,15 147:2
    150:18 179:19
    192:4
licensed  19:24
    39:18,23 65:25
    151:22,25 152:18
    212:10,17,19
    252:7
licenses  123:14,20
    191:14
lie  202:20
lied  313:3
lies  114:1
lieu  252:10 272:16
    272:18 273:24
life  6:12 38:20
    43:23 44:5 117:16
    131:15 285:8
light  121:9 318:15
liked  136:8
limit  263:17
limited  233:19
    258:16 291:25
line  54:3 209:22
    242:8 255:3
    310:23 325:7
    326:3

lines  72:12
linked  90:5
lisa  2:13 318:21
list  27:13 173:5,6
    173:8,10,14,16,19
    173:24 174:2
    175:23,24,25
    185:8 186:12
    187:25 188:4
    239:8,13 292:7
listed  186:6,14
    187:5 255:14
    325:7,17
listing  186:8 325:7
lists  184:18 239:12
    260:16
literal  174:5
literally  289:8
litigation  1:6
    137:19 188:19
    216:19 234:16
    276:22 298:24
    305:13 306:10
    307:4,24 309:8,20
    323:6 324:3 325:3
little  7:10 31:13
    49:15 85:23
    106:20 151:15
    197:22 223:20
    225:15 255:23
    256:18 281:2
    291:10 295:1
live  117:16
lives  151:5
llc  2:16,16
llp  2:17 3:12 4:6
loaded  44:2
    159:22 292:25
local  20:22,22 21:7
    22:20 24:13 59:10
    66:22,22 87:21

109:23 135:21
    137:9 175:9
    232:17 235:19
    239:6 292:10
    304:25
locally  21:20
    126:19
locals  277:21
located  218:15
location  323:15
locations  207:14
lodged  67:15
logan  270:3
long  19:2,11 47:4
    71:19 107:23
    115:5 122:3 148:5
    148:6,18 157:6
    182:25 189:11
    203:22 273:23
    274:2 284:25
    285:4 288:18
    299:11 302:4
    306:25
look  27:2 43:9
    45:12 81:6 93:5
    94:19 95:5 105:15
    111:7 121:21
    124:11,13 130:5
    131:11 156:17
    160:12 161:14
    165:5 168:21
    180:6 184:10
    186:22 209:1
    220:7 222:7 240:8
    240:9,10 244:10
    244:10 253:12
    254:2 256:1,16
    268:24 282:23
    290:4 293:7 294:6
    297:24 301:11

looked  141:5
    294:4
looking  45:13,15
    48:12 58:12 93:1
    94:2 167:4 173:1
    177:6 182:22
    186:13 221:1,19
    226:8 289:12
    308:13
looks  228:10
    239:18 311:9
loss  69:19,21,23
lost  191:14 192:4
lot  17:11 56:19
    99:22 111:12
    126:2,4 133:13
    148:15 159:4
    169:7 170:18
    174:16 175:3,8
    180:7 185:4 243:2
    254:1 294:23
    297:23 298:4
    299:22 314:12
    316:14
love  119:22,23
low  75:12 190:8
    196:18 251:14
    257:9 285:5
lspellacy  2:5
lunch  130:13
    134:18
luncheon  134:22
lying  311:6,7
lynn  59:2

**m**

m  2:3,18 3:13
    323:5
ma'am  19:18
    32:14 40:14 55:3
    57:4 61:3 64:5
    65:8 141:21 194:3

194:8 210:3 215:8
241:7,16,20 242:6
259:13 316:1
**mackerel** 253:22
**macro** 251:12
**madam** 323:10
**mail** 299:7,9,11
300:3,11,15,21
301:9,15,22,24
302:2,7 303:12,18
304:5,6,10,12
308:7 317:8
**mails** 299:3,8,13
299:20,23 300:6
300:17 301:1,7,8
301:12,20 302:1,4
302:13,22,23
303:4,6,11,13,16
303:17,21,22,25
304:3,24 305:16
305:20,21 306:1
307:1,7 308:6,6
309:10,20,22
310:2
**main** 1:21 3:3,13
20:19
**maintain** 173:14
231:24 240:22
306:3
**maintained** 78:19
78:25 96:2 229:19
305:2
**maintains** 173:16
**major** 49:12 88:23
89:3 208:19
266:13
**majority** 88:7
246:3 317:24
**making** 50:11
214:2

**malpractice**
161:24 162:4,8,12
**man** 144:21 151:4
151:5,5
**manage** 178:15
**management**
105:12 283:22
284:4,6,11,22
285:14,20,23
286:7
**manager** 275:13
**manages** 279:2
**manslaughter**
6:21 76:22 77:2,7
142:8,20 143:9
166:7,13,22 167:7
167:11,16 168:3
169:20 171:8
180:19,25 181:7
**manual** 228:13
**manuals** 23:4
**manufacture**
117:7 205:25
**manufactured**
117:22
**manufacturer**
222:2
**manufacturers**
93:16 114:13
117:10 159:18
160:4 208:19
214:16 217:14
218:4 296:17
**march** 170:20
301:16,22,25
**marijuana** 33:25
34:2 68:25
**mark** 89:4 92:14
**marked** 6:3,6,9
7:14,17 81:15,16
82:25,25 83:3

111:21 131:18,22
138:3,7 140:11,15
166:24 167:2
183:15,24 198:1
248:13,14,21,22
249:2 259:3,6
310:8,12 312:11
**market** 51:25
217:15 297:20
**marketed** 115:4
217:15,22 297:16
**marketing** 115:2,3
115:10 217:21
296:16
**marking** 81:19
**mason** 139:24
251:19
**mass** 165:20
**master** 7:5 183:23
**materials** 218:20
219:5,6 278:12
307:20
**matia** 264:10
**matter** 54:24
80:13 108:12
111:25 116:2
214:9 223:17
266:12 275:21
293:23 302:21
323:12
**matters** 23:25
78:20 143:4
229:22 232:4,6
254:13
**maximum** 170:24
214:15
**mccarthy** 162:9
**mcginty** 251:22
258:14
**mcgriff** 270:8

**mckesson** 4:2
116:4,7,13,15
117:1,6 118:9,14
118:15 119:6,16
227:9 297:19,21
297:22
**mckesson's** 117:13
117:18,19,25
**mclark** 2:20
**md** 1:7
**mdl** 1:6
**mean** 22:16,17
24:19 30:11,22
44:3 46:7 65:15
67:6 79:19 100:17
100:24 101:1,2
106:20 107:3,13
109:13 110:2
114:11 126:10
128:19 129:10
132:10 135:24
162:1 169:24
174:8 211:1,3
213:17 215:13
217:4,13 218:4
225:10,12 228:19
244:9 252:4
255:11,12 256:16
262:14 266:4
269:3 277:1 279:2
285:7 290:9
292:25 293:15
295:7,10 297:15
298:20 299:2,3,4
315:4,9
**meaning** 229:11
317:18
**means** 32:15 178:6
218:25 251:1
252:11 275:25
291:8,9 314:25

measures 67:9
132:24 200:8
media 28:6,11
48:12,15 73:21
151:3 202:3,11
medicaid 213:24
medical 23:20
37:23 39:9,24
40:6,18,21,23 41:9
41:17 42:1 43:8
63:15 76:15 97:8
101:13,13 103:11
103:20 105:8,11
109:25 115:12
121:15 122:8
123:13,19 144:23
144:23,25 145:4
149:1,7,23 150:12
151:25 152:13,18
153:25 154:2
160:25 161:2,17
161:18,24 162:12
174:25 179:17
180:10 181:1,9
182:3,5,17,20,22
183:1 196:19
198:23 201:19,23
208:24 209:8
268:13,20,25
269:6,9,10,17,21
270:14 271:2
272:10 285:15
289:18,23 290:24
291:6 293:5,16
313:10 314:8
medically 38:1,9
148:9
medicate 99:23
156:2
medicating 99:15
190:8

medication 151:22
152:23 154:10
171:18 179:12
190:7 221:9
294:24
medications
171:18
medicine 17:22
38:20 98:22 115:6
117:15 121:3
129:16 145:19
152:12 161:21
171:14 172:3,6
181:24 182:11
237:13 298:5
medicines 70:17
118:6
meet 177:21
300:14,16 302:24
melvin 6:5 80:25
81:13,20
member 273:19
members 161:14
216:14
memo 230:1,2,7,8
memoranda
232:20
memory 81:9,24
91:1 106:23 139:5
141:12 144:10
147:19 187:6
200:3 309:5
mention 141:3
302:25
mentioned 34:8
61:5 66:3 68:16
72:9 97:25 105:9
118:21 135:11
154:3 162:3 173:3
210:5 246:23
262:10 267:7

297:11
mentioning
310:17
merry 273:18
message 129:16
metal 296:20
metaphorical
175:24
methamphetamine
33:9 47:20,23
68:17
methodology
241:5
mexican 205:7
mexico 209:3
michael 7:21
216:13 258:22
mid 23:1 55:2
middle 19:13 22:6
22:7 112:10
136:17 253:15
270:7 285:13
midwest 326:1
miles 2:17
mill 6:10 65:11,13
65:15,16 105:7
109:12,14,22
110:1 111:20
124:3 126:12,23
127:12,25 144:7
145:6 164:4 181:3
milligram 52:9,10
million 96:20
119:14 235:2,3
242:3 253:21
260:19 261:2
millions 114:17
mills 7:24 105:4
105:21 106:15,25
107:18 108:1,2,7
108:17 109:1,7

110:23 125:19
126:17 139:20
189:5 277:11,13
310:7,20 311:4,10
311:13,15,20
312:25 313:3,16
313:24 315:12,14
315:22 316:2,17
316:21,24
mind 35:12 46:2
59:3 63:11 296:22
309:19
mine 314:10
mined 309:23
minimal 245:18
minimum 170:17
170:24
minnesota 218:7
minor 272:9
minute 211:13
minutes 116:14,20
118:21 119:12
297:12
misnomer 19:22
316:4
missing 120:3
188:5
mistresses 6:19
140:10
misunderstood
231:10
misuses 181:12
mix 80:4 85:9
mixed 84:24 85:4
85:24 290:20
mixing 85:20
modalities 162:6
model 244:15
modifying 24:21
modus 133:25

**moment** 114:21
198:14
**money** 59:21
114:18 148:7
217:16 246:11
247:17,24 254:1
254:21 314:12
315:1 316:13
**monitor** 236:22
**monitors** 175:23
**month** 18:23
127:4 179:12
264:13,14
**months** 179:1,25
309:15,17
**morning** 171:22
202:16 252:6
**motion** 150:17
**move** 235:16
253:2 259:14
**moving** 53:19
183:6
**mudra** 59:2
**multi** 6:7 82:21
284:23
**multiple** 100:4
102:13 133:1
168:23 177:14
208:14 247:15
315:6
**mumbling** 168:9
**municipal** 235:5
**muscle** 116:15
**mute** 50:11

**n**

**naddi** 17:11
**naloxone** 272:1
**name** 20:25 31:25
55:22 64:4 65:5
89:6 92:13 106:3
106:7,11 131:5,7

132:7 136:3 148:3
182:17 193:18
197:13 203:24
218:9 323:6 324:3
324:4,15 325:3,4
325:21
**named** 87:19
130:20 136:7
197:1 321:9
**names** 58:24 59:2
59:9 61:2,4,8
63:10 94:4 103:4
103:8 106:14,22
106:23 157:24,25
158:6 186:13,22
187:1,14 216:16
**nap** 168:10
**napoli** 2:7
**napolilaw.com**
2:10,10
**narcotic** 235:12,17
284:25 285:4
**narcotics** 6:13
131:17 132:6
**narrow** 165:10
**national** 1:6 17:7,8
323:6 324:3 325:3
**nature** 22:13
27:23 29:23 68:23
101:10 117:18,19
120:8 133:24
171:10 225:12
240:6 247:24
293:9 306:14
308:10
**ndo** 205:5
**near** 141:4 169:8
**nearly** 74:13 257:6
**necessarily** 57:23
**necessary** 313:4

**need** 39:24 40:25
41:1 62:25 109:23
149:20 154:2
160:14,15,24,25
161:3,18 162:20
162:21 225:14
228:2 251:2
282:23 285:17,19
298:6 309:1
315:11
**needed** 59:20
148:7 153:24
282:1
**needing** 227:25
**needs** 157:8
**negative** 128:8
286:25 287:11,18
**negotiation** 121:15
**negotiations**
121:14
**never** 36:13,19,24
46:2 65:12,22
66:2 74:22 77:6
84:1 85:1 86:16
125:12 134:4
150:24 159:9
171:23 174:10
192:18 246:9
264:15 283:12
296:16,24 300:20
301:8,12,13
304:15 309:8
**new** 2:9,9 229:7
293:18
**news** 7:8 8:3 112:3
112:9 131:23
135:22 138:8
140:21 167:4
172:19 173:23
197:19 198:5
200:1,12 312:7,17

312:24
**nice** 115:10 116:14
**night** 133:22
**nilly** 280:19
**nine** 141:24 142:5
143:21 153:8,11
**noise** 50:11
**nope** 153:19
**norco** 32:5
**normal** 304:23
**northern** 1:2
**nos** 168:6
**notary** 321:6
322:13 323:25
324:10,18 325:15
325:23 326:23
**notebook** 305:2
**noted** 257:24
**notes** 83:10 138:24
148:23 218:17
305:3
**notice** 48:7 104:8
142:21 307:3,9,12
317:8
**noticeable** 54:15
**noticed** 58:7,11
61:15
**notices** 317:25
**notifications**
275:12 304:20
**notify** 124:16
**november** 7:23
259:2
**number** 6:3,8 7:4
7:11,14,17 30:6
34:9 48:21 49:2
54:1,19 56:25
58:2 60:2,7 62:16
62:17 68:8 82:24
89:8 91:14,17,25
92:4,8 95:18 96:3

107:25 111:6
125:17 126:16
127:13 128:4
146:19 159:3
160:21 163:17,18
164:13 173:17
183:22 197:25
207:12 219:22
242:20 248:12,20
257:24 261:21,24
272:1 277:24
279:13 282:18
298:9,14,25 323:7
**numbered** 6:5
81:14
**numbers** 31:15
46:13 47:8 91:11
91:23,24 126:5
145:8 235:24
265:1,10 279:10
279:18 280:22
282:4 325:7
**numerous** 29:20
140:25 189:10
194:15 270:1
**nurse** 56:5
**nurses** 55:21,24
244:2 252:5,9
**nursing** 313:4
**nut** 229:17
**nw** 2:18 4:4

**o**

**o'clock** 135:22
**o'malley** 216:13
**o'malley's** 7:21
258:23
**oarrs** 92:16,18,24
93:3,5,6,9,13,17
93:21,24 94:1,3,12
94:17,25 95:5,13
95:16 105:15

165:7 175:21,22
175:23 177:1,6,9
177:13 236:19,24
237:9,14 238:2
240:1,2,4,10,12,16
282:16 283:5,10
283:15 288:9,14
288:19,23 289:17
289:20 290:16,17
290:18,20,23
291:5
**object** 157:12
257:19 310:23
**objection** 9:3,3,4,4
9:5,5,6,6,7,7,8,8,9
9:9,10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20,21,21,22
9:22,23,23,24 10:3
10:3,4,4,5,5,6,6,7
10:7,8,8,9,9,10,10
10:11,11,12,12,13
10:13,14,14,15,15
10:16,16,17,17,18
10:18,19,19,20,20
10:21,21,22,22,23
10:23,24 11:3,3,4
11:4,5,5,6,6,7,7,8
11:8,9,9,10,10,11
11:11,12,12,13,13
11:14,14,15,15,16
11:16,17,17,18,18
11:19,19,20,20,21
11:21,22,22,23,23
11:24 12:3,3,4,4,5
12:5,6,6,7,7,8,8,9
12:9,10,10,11,11
12:12,12,13,13,14
12:14,15,15,16,16

12:17,17,18,18,19
12:19,20,20,21,21
12:22,22,23,23,24
13:3,3,4,4,5,5,6,6
13:7,7,8,8,9,9,10
13:10,11,11,12,12
13:13,13,14,14,15
13:15,16,16,17,17
13:18,18,19,19,20
13:20,21,21,22,22
13:23,23,24 14:3,3
14:4,4,5,5,6,6,7,7
14:8,8,9,9,10,10
14:11,11,12,12,13
14:13,14,14,15,15
14:16,16,17,17,18
14:18,19,19,20,20
14:21,21 23:19
24:24 25:5,11
26:7 27:20 28:3,9
30:21 31:4,24
33:11,15,18,22
35:8 36:20 37:4
37:10,24 38:3,22
40:7,12 41:18
42:10,23 43:2
44:1,7,10 45:1,5
45:11,22 46:6,21
47:1,6,17,21 49:14
49:21 50:5,21
51:2,8,17 52:4,14
52:21 53:20 54:18
54:22 56:16 58:1
58:5,10,22 59:12
59:18 60:9,14
61:13,17 62:3
63:17 66:11 67:4
68:13,19 69:12
70:9,18 71:11
73:4,12 74:2,15,20
76:23 77:20 78:5

79:11,24 80:8,18
80:22 81:4 82:14
83:7,13,21 85:11
85:16 86:6,13
87:5 88:11 90:7
90:10,19 91:2,7,10
92:11,25 97:9,16
99:9,13 100:16
102:20 104:1
106:1 107:2,12
108:4,9 110:7
112:15 113:3,8,13
114:6 116:25
119:21 120:4,15
121:5 122:13,21
125:7,21 126:8
128:17 134:14
139:11,19 148:12
153:10 156:9
159:21 163:23
165:4 167:13
172:5,25 174:4,20
176:12,20 177:4
178:13 179:23
180:16,22 181:4
181:10,16,21
182:2,9,13,19
183:3,10 185:16
188:6,23 189:25
191:3,7,10,16
193:10 194:12
195:1 196:6
199:13 201:20,25
203:6,11,19
204:13,21 205:10
205:20 206:3,10
206:15 207:16,19
208:15 210:7
212:25 213:6,16
213:21 214:4
215:12 224:16

230:15,21 232:14
233:22 237:1
238:3 243:25
245:13 247:8
252:3 258:1 261:4
265:14 271:18
274:23 275:4
284:8 286:9
287:13,19 288:4
291:16 293:14
295:21 296:6,14
299:1,15 300:8
301:17 302:15
304:22 305:14
306:11 307:13
308:4 311:25
313:6,12,17,25
314:5,9,23 315:5
315:13,24 316:18
**objections**  5:5 7:3
7:22 9:1 10:1 11:1
12:1 13:1 14:1
183:20 258:24
**obligation**  68:1
**observations**
104:12
**obstacles**  293:11
293:21
**obtain**  39:17 40:23
41:1,11 144:4
177:15 196:19
202:21,25 219:2
222:14 288:9
**obtained**  199:18
220:9 222:14
239:2
**obvious**  41:22
119:9
**occasion**  96:8
233:25

**occasions**  28:13
67:23 94:17
226:12
**occur**  51:23 98:8
**occurred**  48:18
118:17
**occurring**  210:14
284:18
**occurs**  99:6
**october**  6:19 82:9
140:10,18 184:20
322:16
**offender**  99:6
**offenders**  263:13
264:4
**offense**  225:20
236:8 237:19,20
**offenses**  30:1
235:12
**offer**  170:1 225:6
225:24
**offered**  141:13
**office**  7:13,16 18:4
18:8,18 20:2 23:4
23:12,21 24:6,17
24:23 25:4,15,17
25:19,24 26:2
27:19,24 28:2,15
28:24 30:14,18,23
31:3,12,22 34:4,14
34:19 42:7 43:1,5
43:17 45:19 46:25
47:3 48:13 49:12
49:19,25 50:3,8,24
51:6 56:13,13,14
58:3 59:15 60:2
60:12,19,24 61:15
66:4,7 67:1,10,18
71:1,13,16 74:14
75:24 78:1,7,11
82:5 88:16 89:9

92:6 95:9,17 97:3
101:13 105:3,8
106:16 107:23
112:19,19 120:21
120:24 121:8
122:1,10,19,24
123:18 124:2,8
125:1,13 126:18
131:1 133:23
135:20,20,23
136:18,23 139:1
146:2,16 155:1
156:11 159:9
160:17 163:16
167:11 169:18
171:13 177:25
178:1,11,18
179:16 182:15
185:14,24 186:3
187:22 188:10,16
188:20 189:22
191:2,12 192:12
194:4,10 197:2
198:9,12,17,18
203:4,9,12,16
207:21,21 218:11
222:7 225:5,22
228:5,12 229:19
230:11,17 231:18
232:10 233:7,11
233:13 234:2,9,15
234:23 235:11,18
235:21 236:4,11
237:5,7 241:21
242:7,17,25
244:13,25 245:3,7
245:12,23 246:1,3
246:6 247:6,18
248:10,18 249:3,7
250:4,22 251:7,19
251:19 252:21

253:16 254:12,15
254:22 255:1,2,8
257:2 259:25
261:2,7,12 262:6
262:11 263:8
265:1,12,17,23,25
266:2,24 267:3,11
267:17,21,24
268:3 271:5,15,20
271:24 272:15
273:23 274:10,13
274:15,20 275:1
276:3,23 277:9
278:1 282:25
283:11,15 286:12
292:5,12,17,24
293:9 295:4,8,22
302:2 304:8 306:4
306:17,25 307:23
311:2 315:10,11
315:14,17 322:6
323:14
**office's**  61:10 99:5
228:21 240:24
241:25 242:12
244:18 246:14
249:23 257:17,24
258:13 265:7
274:8 294:5
**officer**  30:9 87:6
88:3 283:11,15
**officers**  22:20
49:10 58:17,18
72:16 87:9
**offices**  196:24
201:15,19 233:19
274:22 276:6
315:16
**official**  173:19
304:6 324:15
325:21

**officially** 29:10,14
**officials** 123:12,18
  230:18 233:16
  295:15
**oh** 35:11 38:17
  52:5 102:23 116:9
  116:11 117:4
  119:24 125:24
  132:25 133:6,9
  135:14 151:10
  166:10 197:3
  216:21 219:1
  240:14
**ohio** 1:2,22 2:4,14
  3:4,9,14 6:7 7:19
  7:20 24:2 40:21
  75:11 82:17,22
  83:18 90:18 92:21
  109:19 126:22
  138:12 145:13
  149:1,1 150:22
  162:9 165:14,16
  166:12,16 170:17
  182:5 184:14
  189:17 192:19
  198:12 215:11
  228:17,22 233:12
  233:18 234:1
  258:20,20 268:20
  276:4,13 284:17
  285:14 289:25
  290:22 295:16
  321:2,7 322:7,14
  323:2
**okay** 15:12 20:3
  20:11 22:3 25:1
  27:2 28:7,11 29:1
  29:7 32:16 33:9
  35:3,19 37:14
  39:16 40:2,10,14
  40:17 41:25 42:15

43:16 44:18 48:14
53:25 55:8,17
56:7,12 57:8,9,18
57:20 61:20,25
62:22 64:1 65:14
66:7 68:16,25
69:19 70:20 75:11
78:18 82:4 84:7
84:19,22 89:7
94:16 98:10
101:22 104:17,25
105:5,21 112:2,6
113:16 114:15
115:22 116:19
118:10 119:5
128:2,10 131:21
135:8 140:14,20
140:24 142:14
143:11,21 145:9
145:16 147:23
150:10,23 151:1
151:17 154:5,12
156:3 160:23
162:6,8 164:11
165:6 168:24
169:15 171:17
172:23 174:8
176:23 183:14
186:9,10 187:3,7
187:10,15 190:6
190:10,12,16,16
193:5,23 195:9,10
198:18 200:6
210:11,18 215:17
215:23 218:5
220:1,7 221:2,17
221:25 222:11
223:16 229:13
231:10,12,14,16
231:21 232:2
235:10 236:21

237:4 238:9 239:1
245:17 247:2,5
249:24 250:1,12
251:17 255:7,16
256:7,17,20 257:5
257:8 259:9,11,14
259:15,23 260:8
260:12,18,20
262:5,10 266:24
276:19 277:12
280:12,20 281:2
281:17 282:6,24
283:16 284:12,25
285:24 289:17
290:19,20 298:1
302:12 303:11
308:21 313:20
315:18
**old** 71:6 191:23
**older** 191:19
**oldest** 301:9
**once** 89:25 142:17
  178:4 304:17
**ones** 21:23 35:11
  61:5 68:9 106:19
  106:20,20 130:1,2
  148:17 161:6
  174:9 175:17,17
  176:24 186:2
  210:3 240:21,22
  240:23 297:2
**ongoing** 178:12
  179:13 193:15
  201:12 312:1
**onward** 55:2
  249:19
**op** 1:11
**open** 256:15
  284:11,14,15
  318:17,24

**operandi** 133:25
**operate** 17:10
**operated** 105:22
  109:2,6,7
**operating** 6:10
  65:11,13 107:18
  109:12 110:23
  111:20 147:1
  189:6 242:1
  253:20
**operation** 108:3,7
**opiate** 1:6 50:25
  111:4 171:18
  271:21 275:2
  283:18 309:23
  323:6 324:3 325:3
**opiates** 129:20
**opinion** 41:17
  80:12,14,15
  112:25 120:9
  127:17 128:2
  148:10 154:2
  171:2 201:22
  209:7 210:21
  211:8,19 212:1
  213:23 214:9,11
  222:11 253:1
  286:15 291:2
  295:17
**opioid** 20:4 23:5
  31:21 33:3,8,10,21
  33:24 39:1,5 40:5
  43:20 48:21 51:7
  53:23 54:2,16,20
  55:14,19 56:2,15
  58:3 60:13 62:24
  63:7,23 64:1,8,10
  64:11,12,16,22
  76:2 86:12 90:25
  91:4,17 96:20
  103:24 113:1,11

113:19 118:16
125:18 127:14
155:22 206:7
207:1 208:11
210:8,9,14,22
211:9,20 213:19
213:24 214:24
215:13 216:12
232:12 236:17,25
237:10,15 242:25
245:5,9 254:13,17
255:4,15 259:19
259:21 260:1
261:3,8,12 262:9
265:13 267:4
268:6 278:14
280:24 281:1
283:17 286:16
287:12 288:3
291:15,20,22
292:6 294:20,20
295:17
**opioids**  16:13,16
17:2,5,14 18:13
19:20 20:14 23:12
23:18 24:10,14
31:22 32:8,11,12
32:14 34:1,5,11,21
35:6,14 36:1,10,18
36:23 37:1 38:2,6
38:10 39:17 40:3
42:6,20 43:14,25
44:6 48:22 49:4,6
49:6 50:14,19
51:13,15 57:3,24
63:15 65:21,23,23
68:11 69:10 70:16
70:24 72:6,8
77:10,19 78:9
95:18 97:5,6,15
98:7 99:3 103:2

107:11 117:24
121:3 122:6,25
123:3,4 125:3,4,9
125:10 127:3
128:24 129:24
130:9 131:3
132:23 133:12
134:12 143:2
145:20 152:17
153:18 160:20
166:14 169:1
177:18 180:1
183:8 184:8
188:22 189:12,18
192:14 194:7
203:18 204:12,17
204:19,20 205:1
206:12,13,20
207:4,13 208:24
209:8,18 210:13
211:11,21 213:3
213:13 214:1,2,17
214:23 215:19
216:2 222:22
226:18 227:7,15
227:19 230:12
234:20 236:5,8
238:2 239:3 242:9
243:7 255:10
261:16 266:3,9,17
267:13,18,22
268:1 271:2
272:15 276:25
277:5 278:3
279:13 282:19
286:4 287:4 294:8
302:13,14 304:21
307:20 310:2
**opportunity**
157:12 272:25
310:14

**opposed**  53:12
70:7,16 99:14,15
100:10 133:17
315:22
**order**  7:23 153:1
162:25 174:25
192:24 193:12,20
193:25 196:19
202:20,25 259:2
281:8 315:11
**ordering**  145:25
**orders**  119:9
127:7 152:3,20
153:1 192:14,21
222:8
**organization**  17:8
17:8 207:25
**organizations**
205:7 206:9
**organize**  101:20
**organized**  76:18
100:22,24,25
101:5 196:15
**oriana**  271:8,10,11
**original**  220:22
224:13
**originally**  18:21
138:19
**outpatient**  286:7
**outrageous**  139:7
**outreach**  267:20
267:25
**outside**  60:24
109:2 175:7
206:16 207:14,23
**overall**  165:5
265:1
**overdose**  6:7,22
42:22 48:2 76:22
77:2,9 82:17,22
83:11,17 85:14

87:4 104:16
142:21 166:23
266:10,22 272:2
272:12
**overdosed**  50:14
50:19 125:3 166:8
**overdoses**  42:9
43:4 97:12,13
139:14 141:25
142:6 143:24
**overdosing**  128:9
167:12
**overruled**  226:13
**oversight**  182:12
**overtaxed**  175:12
**overwhelmed**
175:13 282:25
291:25 292:1,11
293:24
**owned**  136:5
141:3
**oxycodone**  32:4
35:9 37:8 207:8,8
**oxycontin**  32:3
46:15 51:21,24
52:5,17 58:13
60:17 88:5 207:9
287:6 296:19
**oxycontin's**  71:10
**oxycontins**  207:7

**p**

**p.m.**  319:4
**pad**  65:1 101:23
199:3,3,4 201:11
**pads**  7:9 98:9,12
103:15 196:20
197:21 201:18,24
**padukone**  4:7
**page**  6:7 82:21
83:10,16,24
112:10 113:23,24

131:24 139:24
141:4,5 145:10
147:24 168:1
169:8 173:4,5
184:2,3,10,17,18
187:9,9 250:6,11
253:13,13,14
255:14,23 256:5,6
256:19,19 258:5
259:14,15,17
260:8,9,11 325:7
326:3
**pager** 229:6
**paid** 6:18 140:9
**pain** 7:10 38:12,15
38:16 105:7,12
115:6 129:21,23
129:23 171:17,18
197:22 283:23
284:3,7,11,22
285:14,20,22
286:8
**painkillers** 141:17
**pale** 130:3
**palliative** 38:11
**paper** 73:6
**papers** 74:4 141:1
204:23 285:16
306:14
**par** 3:7,7
**paragraph** 132:2
148:2 173:4
**parasites** 114:3
**part** 23:8 28:17
30:18 57:18 67:25
116:17 121:14,17
121:21 124:5,18
124:18,19,23,23
208:20,21,24
209:9,18,25 212:9
214:23 218:22

222:21 238:7,14
246:16 315:20,21
325:9
**participants** 217:6
267:9
**participate** 201:1
263:13,18 265:23
**participated** 271:5
274:20 276:4,7
**participates**
265:17
**participating**
157:18 276:13
**particular** 16:13
16:17 21:9 22:3
39:14 57:8 66:6
77:21 89:22 97:18
119:7 123:23
135:12 176:17
177:2 184:24
193:13 198:7
216:22 218:13,23
219:9 221:9
226:14 230:9,20
231:19,19 237:2
242:8 247:1
262:22 264:23
266:1 279:14,23
312:24
**particularly**
167:22
**parties** 230:19
231:4
**partner** 178:21
**partners** 171:13
**party** 275:12,18
322:2
**pass** 100:3
**passage** 270:25
271:25

**passed** 48:20 49:2
127:2 128:11,16
128:20 138:25
148:24 268:17
269:4
**pat** 89:4
**path** 74:23
**patient** 39:10
40:18 41:8 62:25
94:3 127:4 142:22
142:23 145:5
147:18 154:7
155:6,7,20 161:4
162:22,22 163:3
164:16 166:8
167:12 168:14
172:16 179:4
181:12,18 213:12
221:8 222:13
226:21 303:1
**patient's** 167:20
179:5 288:10
**patients** 39:16
92:23 94:2,7,13
111:4 113:6 114:5
117:14 122:12,17
138:25 139:14
141:10,17,25
142:5,25 143:22
144:2,12 147:17
148:24 154:8,9,22
154:25 155:4,12
155:14,17 156:7
156:12,25 157:15
158:6,8,9,11,18
159:10 163:8,9
164:3,4,5,9,14,25
165:7,10,11,12,20
168:14,19,23
171:15 172:4,10
172:13 176:25

177:2,14 179:11
180:2 209:24
213:2,22 215:5
226:19 264:7
284:24 289:24
**pattern** 105:15,18
161:12 164:20
165:6,23 219:20
**patterns** 240:8
**paul** 55:23 60:22
216:14
**pay** 196:23 264:1
**payer** 275:12,18
**payout** 8:4 312:10
312:22 316:3
**pays** 274:7,10
**pedal** 296:19
**pediatric** 198:22
**pellegrino** 1:25
321:6 322:13
**penalties** 89:12,17
90:1
**penalty** 75:4
**pending** 308:22,24
**pennsylvania**
130:25 131:25
**people** 19:25 20:8
32:23 37:2 38:14
42:5,19 48:13,23
49:3 53:5,7 55:8
56:10 58:25 59:10
59:11 62:16,17
69:4 72:7,12,14,20
76:5 87:20 89:3
99:23,24 100:14
100:18 101:18
104:13 107:4
114:1,3,9,12
117:21 119:14
125:19 127:24
128:9 129:22

135:23 139:10 151:5,13 153:6,9 153:11 155:15 156:4 175:14 183:8 201:1 202:5 203:2 217:8,17 218:12 230:22 235:20 246:3 251:20 252:7 253:3 263:18 264:5 265:4,5 273:2 274:17 284:14 285:3,5 287:6 294:23 295:9 298:6,7 317:21,24

**percent** 70:10,19 70:25 74:14 76:13 117:24 141:9 146:17 164:9 206:7 238:20 243:14 247:9 250:3,17,25 254:3 254:4,6 257:3,10 294:7 295:8

**percentage** 70:6 70:15 76:1,3,8 97:5 163:21 196:4 224:8,12 243:11 243:20 244:8 263:12

**percocet** 32:3 132:6 135:24 142:15 207:7,10 223:18 287:7

**perfectly** 42:6,20 104:19 143:8

**period** 16:22 21:16 22:18 30:2 61:8,14 108:6 125:22 131:8

132:7 143:22 147:9 179:24 279:14 284:19

**periods** 133:22

**permits** 272:8

**permitted** 121:2 268:19

**person** 101:22,25 219:18 220:16,18 225:18 272:10 273:3,15

**person's** 92:13 180:14 181:8 218:9

**personal** 35:6,14 43:22 44:5,16,17 46:22,25 52:15 68:14 73:13 77:4 84:10 104:20 118:13 201:17 269:16 294:4 304:12 305:6,9

**personality** 53:6

**personally** 29:8 81:24 99:8 186:5 197:8 203:20 233:15 271:19 311:12 324:11 325:15

**perspective** 68:15 252:20 314:2

**perused** 114:23 115:16

**pete** 307:11

**pharma** 1:10

**pharmaceutical** 3:7 88:10 117:21

**pharmaceuticals** 3:6,7,12

**pharmacies** 67:15 93:8 102:4 117:10

132:16 133:2,4,5,8 133:19,20,20 134:1 135:18 145:24 146:1,2 151:23 171:25 176:17,22 184:4 184:15,18,23 185:11,15 187:23 188:4,11 191:1,13 200:10,13,18 204:6 277:10 289:8

**pharmacist** 33:20 33:23 65:20,22 80:2 185:1 188:17 190:3,6,6 226:21 275:11

**pharmacists** 67:20 67:25 93:8 107:19 159:11 183:6,7 184:15,17,24 185:5,9,15,19 186:9,10,12 187:5 187:24 188:5,10 188:16,21 189:17 189:22 190:17,22 190:25 191:13 192:13,21 200:18 209:17,24 210:1 212:4 268:1 277:16 293:5

**pharmacologist** 33:5

**pharmacy** 17:24 20:19 59:1,5 65:10,12 66:22 68:5 87:19,21 91:12,13,16,22 92:10 95:4 109:21 118:6 124:3,3 127:9 137:7,10

145:13 146:15 147:2,7 149:1,7,23 150:11 175:12 176:1,2 184:14 186:17,18,19 187:4,8,17 189:17 190:15,20 191:24 192:20 193:23 224:1 233:2 237:3 237:6,12,21,25 238:12,17,21 239:6 240:21 269:22,24 275:13 277:2 279:20 281:14 282:10 283:8,13 289:5,9 290:2,4,6,25 291:6 292:9 304:24

**phentermine** 69:16,17 70:21

**phentermines** 70:23

**phone** 50:10,12 305:5,6,10 318:20 323:3

**phrase** 162:1

**phrases** 127:18

**physical** 79:6 175:24

**physically** 289:15

**physician** 181:14 181:20 182:16 201:14 239:3

**physician's** 182:17

**physicians** 181:25 182:8,12 212:10 212:12

**pick** 135:8

**picture** 249:14

**pie** 253:18 254:2

**piece** 128:3 256:15
  269:8
**pill** 6:10,18 52:10
  65:11,13,15,16
  87:11,14 88:5,5
  98:21 105:4,7,21
  106:15,24 107:18
  107:25 108:2,7,17
  109:1,7,11,14,22
  110:1,23 111:20
  124:3 125:19
  126:12,16,23
  127:12 139:20
  140:9 141:10
  144:7 145:6
  146:20 164:4
  189:5 220:25
  222:1 277:11,13
**pills** 7:10 32:17
  86:17,22 87:3,24
  100:3 127:14,19
  127:20,22,25
  134:4,8 141:18
  154:17 197:22
  203:17 204:6,8
  219:16,19,22
  220:1,2,5,17,18
  221:11,13,13
  222:15,21 223:2,8
  225:7 227:19
  297:1
**place** 94:20 235:12
  244:13 321:19
**placed** 192:13
**plain** 131:22,25
  138:11 140:18
  167:4 201:18
**plaintiffs** 7:19
  138:16 183:12
  184:3 258:19
  259:8

**plan** 190:4 229:16
**plans** 296:17
**play** 185:14 210:6
  263:2
**played** 113:10
  286:12
**player** 206:5
**plea** 121:14,14,17
  121:22 124:19
  169:20,25 170:1,3
  170:7 273:10,20
**plead** 252:11
  273:8
**pleaded** 138:14
**pleading** 122:23
  169:16
**pleads** 6:15,21
  138:1 166:21
**pleas** 112:13
**please** 42:18 50:12
  72:3 209:13
  323:14
**pled** 110:21
  137:17 166:6
  172:17
**pllc** 2:7 3:2
**plus** 57:21 142:24
**pockets** 282:17
**point** 50:7 56:9
  83:15,23,24 84:4
  104:12 126:21
  130:13 134:7
  135:17 145:21
  171:1 199:10
  229:15 239:22
  267:2 290:3 306:1
**police** 21:8 30:9
  66:23,24 72:15
  87:6,9,21 88:3
  137:11 145:14
  175:10 219:14,21

  225:2 290:15
  295:3
**policies** 21:24
  24:21 25:8,22
  26:17 27:10,14
  222:19 223:6,9
  225:22 228:16,20
  306:18
**policy** 24:17
  125:13 226:7
  228:13 251:17
  258:13 273:24,25
**political** 175:6
  297:23
**polster** 1:8
**popping** 261:18
**population** 147:18
**portion** 43:13
  242:11 264:18
**posed** 53:16 69:10
**poses** 45:20
**posing** 51:20
**position** 318:23
**positive** 128:4
  253:2 286:25
  287:10,17,24
**possess** 36:19,22
  36:24 37:2 90:18
**possessing** 37:13
**possession** 37:8
  38:25 39:4 63:14
  63:23 75:2,19
  163:12 225:7
  272:9 298:23
  305:18
**possible** 184:7
  199:18 220:23
**possibly** 295:5
  296:2
**posture** 316:20

**potency** 73:9,10
  79:23
**potent** 79:20 85:24
**potential** 23:15
  229:1 266:14,16
**potentially** 278:2
**pound** 221:18
**poverty** 245:15
**powerful** 73:18
  117:4 297:22
**powerpoint**
  218:24 219:3
**powers** 290:3
**practice** 6:18 79:4
  129:15 140:9
  145:19 169:12
  183:2 226:10,11
  256:24
**practiced** 121:25
  159:2
**practices** 24:22
  25:9 26:18 27:11
  107:9 172:21
  181:25 182:8
  285:25 287:5
**practicing** 121:3
  179:15 239:4
**practitioner** 45:16
  59:20 69:20 94:20
  105:12,19 109:10
  178:14
**practitioners**
  51:11 55:16,18
  56:6 105:18 124:5
  189:13 243:13
  268:21 269:7
**pre** 78:16 252:1
**precisely** 64:18
**precursor** 19:9
**preface** 147:21
  201:4

prefer   323:16
preliminary
    176:13
preparation
    229:25
prepared   26:6
    230:2,8 241:14
prescribe   39:24
    69:22 113:17
    114:19 145:20
    153:5 179:12
    209:8 214:1
prescribed   43:14
    43:20 94:7 95:19
    97:7 123:1 163:17
    163:19 168:25
    180:2 213:4,8,8,10
    213:14 221:9
    298:5
prescribers
    236:23 239:3
prescribes   174:15
    174:16
prescribing   62:24
    98:14 111:3 121:3
    128:24 131:3
    141:17 143:10
    151:13 153:17
    160:19 165:23
    166:13 181:25
    182:7 208:23
    209:23 212:6
    236:25 237:9,15
    238:2 283:17,22
    286:7
prescription   1:6
    6:17 7:9 16:12,16
    17:1,5,14 18:13
    19:20 20:4 32:8
    32:17,23 34:10,21
    35:14,18 36:1,10

36:21 37:5,6 38:2
38:6,10 39:1,5,9
39:11,17,18,20,22
40:3,6 41:13
43:24 44:6 45:16
45:24 46:2 49:6
49:16 50:19 51:7
51:13,15 52:24
53:1,10,15,23 54:2
54:15,19 55:5,14
55:19 56:2,10,15
57:3,17,24 58:2,8
59:16,25 60:8,13
60:17 61:12,16,22
62:24 63:7,15,16
63:23,24 64:8,9,11
64:16,17,22 65:1
65:21 66:1,3,8
67:2 68:7,10 69:9
69:25 70:7,14,15
70:16 76:1,6,10,11
76:19 77:9,19
78:9 86:12,22
91:17 92:8 94:1
94:10 95:18 96:3
97:6,15 98:7,9,11
98:19 99:7 101:23
103:2,15 104:16
105:15 107:11
108:21 113:1,11
113:18 117:14,23
122:25 125:3,4,10
125:18 127:14,19
127:23 132:23
133:12,16 134:12
139:3 140:8 142:1
143:24 144:4
145:20 147:5
151:24 152:13,16
152:24 153:3,18
155:22 158:25

160:20 163:5,10
166:14 171:14
172:3 176:23
177:17 180:1
183:8 184:8,8
188:22 189:12
192:14 194:5,7
195:3,4,6,7,10,11
195:12,13 196:20
197:21 199:1,4
201:11,18,24
202:13,21,25
203:17 204:11,20
206:13 208:11
209:18 210:12
211:4,5,11,21
212:11 213:3,13
214:17,23 215:18
219:16,17,23
220:9 221:14
222:15,22 223:2,3
223:19 224:7,10
224:14 226:18
227:4,7,19 236:17
236:25 237:9,15
238:2 239:3
242:25 243:7,12
243:17,23 244:3
245:1,5 255:10
261:16,18 275:8
276:24 277:5
278:3,13,20 281:2
282:19 286:4
287:4 290:1,5,11
293:13 294:8
296:4,12 302:14
323:6 324:3 325:3
prescriptions   6:13
    36:8 48:22 53:9
    55:7 57:7 65:17
    66:15 67:21 69:15

76:5 91:5,14,18,25
92:21,22 94:13
95:7 98:18 101:14
101:15 102:1,5,8
105:16,17 111:9
112:22 117:11
122:6 126:11
130:8 131:7,9,17
132:5,16 133:21
135:19 151:24
152:17 155:22
167:8 168:13
173:7,25 174:16
194:13 195:23
196:9 199:11,24
200:8 202:6 213:7
281:15 284:16
288:3,10 289:7,10
294:21,24
presence   321:14
present   4:10
presentation
    218:18,24 219:3
presented   178:4
    218:5,22 288:13
presenting   219:11
presently   177:22
preserved   303:13
    303:14
preside   264:8
press   115:9
presume   168:18
presumed   121:6
pretrial   251:1
pretty   41:22 87:14
    139:7
prevalent   46:4
    196:9
prevent   183:1
    203:9 207:22

**previous** 256:14
**previously** 15:6
  86:24 87:18 88:2
  161:7 215:4
  253:14
**primarily** 76:15
  241:1
**primary** 73:25
**prior** 18:3 71:10
  78:23 116:3
  142:21 150:18
  188:19 232:7
  236:25 237:9,14
  238:2 249:16,16
  252:23 257:16,23
  276:22 301:22,24
  309:1 310:14
  311:21
**priorities** 25:14
  50:4 292:22
**prioritize** 49:23
**priority** 49:18,25
**prison** 6:18 140:8
  258:8
**prisoners** 253:8
**prisons** 253:8
**private** 18:9 40:23
  289:18
**privilege** 270:23
  270:23
**proactive** 66:13
  67:1,9 108:13
**proactively** 95:1,9
  177:13 282:15
**probable** 41:3,4
  174:24
**probably** 17:17
  70:24 120:6 158:2
  158:22 162:18
  164:2 216:24
  226:24 299:18

**probation** 252:13
  273:14
**probe** 6:12 8:4
  131:15 132:3
  312:10,21
**problem** 43:5,9
  44:25 45:2,4,9,20
  47:5,16,20 51:15
  51:19 53:17 68:11
  68:17,24,25 69:5
  69:10 73:25 80:6
  80:16,21 113:1,21
  114:10,20 126:23
  127:12 134:13,16
  148:20 204:12
  208:14,20,21,25
  209:9,19 210:6,8,8
  210:9,14,23
  211:10,20 212:3
  212:10,16 213:5,9
  213:9,12,15,17,24
  214:24 216:12
  232:18 261:15
  262:20 263:7
  286:16 291:15,20
  292:6 293:6 294:2
  295:17,23
**problems** 42:7,21
  43:1,7 88:4
  113:12,19 206:7
  208:11 213:20
  254:17,19 267:5
**procedural** 300:19
  316:20
**procedure** 15:5
  150:21 320:7
  324:5 325:5
**procedures** 228:13
  285:6
**proceed** 150:2,3
  231:1

**proceeding** 147:16
**proceeds** 233:5
**process** 26:6 40:22
  41:11 121:13
  146:24 235:9,16
  241:6,15,19
  289:16 317:16,20
**processes** 223:10
  223:14
**processing** 112:12
  163:13
**produce** 308:3
**produced** 88:9
  111:24 298:18
  301:18 307:23
**production** 214:16
  318:16 323:24
**productive** 252:15
  253:6 273:18
**professional**
  103:11 151:25
  152:14,18 281:18
  304:9
**professionals**
  19:25 76:15
  103:21 252:8
  271:2 293:6
**profile** 141:1
  289:21
**profit** 99:8
**program** 95:7
  252:13 262:13,18
  273:13
**programs** 34:5
  252:1 253:7
  259:22 263:14
  265:15 267:17
  272:15 288:12
**progress** 245:21
**prohibited** 141:24
  142:4

**project** 290:23
**proof** 120:7
**proper** 26:24
  146:20,20
**properly** 129:19
  213:3,7,13
**prosecute** 25:16
  35:23 66:16 71:14
  71:17 77:18,24
  78:3,8 103:22
  105:18,19 122:3
  130:1 144:22
  148:16 155:11
  160:18 165:3,17
  191:25 197:8
  219:12 225:19
  230:13,20 233:20
  264:3 269:7
  270:12 278:13,19
  289:4 315:12
**prosecuted** 54:1
  55:5 58:3 65:12
  65:22 69:14,14
  70:4,20 75:24
  77:1,6 88:16,21
  102:19 105:2
  106:15,25 110:18
  119:20 126:13
  129:25 135:12
  142:19 155:1
  156:8 157:17
  159:11,15,18
  164:14 167:11
  185:5,20,23
  186:10 187:23
  188:9,10 189:23
  192:5 194:11
  198:19 203:4,16
  204:3 209:15
  219:10 227:7
  237:8 270:3 311:1

**prosecuting** 7:20
38:5 52:16 71:1,7
71:9 76:21 103:10
109:5 135:13
185:14 186:16
189:12 258:21
293:13
**prosecution** 24:22
29:25 51:1,13
62:23 63:6,14,22
64:7,21,25 65:10
65:20,25 158:16
160:21 187:16
228:21 229:25
230:2 244:15
252:23 268:21
271:1 272:7 278:8
296:12 300:12,22
310:20 311:13
315:22
**prosecutions** 23:6
23:15 54:20 55:19
56:3 76:10 89:9
228:18 229:2
234:20 236:5
240:1 242:14
244:18 264:19
265:11,21 288:15
293:22 300:1,7
301:4 315:23
**prosecutor** 7:13
7:16 25:22 26:3
35:1,7,15 36:18
39:3 44:22 55:20
84:20 88:20 116:1
127:19 139:23
148:21 197:10
202:23 218:6,7
219:9 225:12
234:1,12,14 241:4
244:1,6 245:12

248:11,19 249:3
249:20 251:17,21
258:14 260:13
263:2,4 270:1,3
273:9 274:3
**prosecutor's** 18:4
18:8,18 26:18
30:18,23 31:3,12
45:19 55:22 56:13
112:19 231:18
235:11 249:7
255:1,2 293:8
295:4 304:7
**prosecutorial**
315:16
**prosecutors** 25:3,9
55:9,13,18 56:1,14
56:22 57:1,21
60:3,7 88:21 89:1
138:16 141:8,23
205:5 217:9
234:19 242:16,24
243:6,16 244:25
245:4,8 266:7,13
267:16 268:19
274:14 290:15
291:12 295:14
**protocol** 190:21
**protocols** 223:10
223:13 285:7
**prove** 18:25 27:4
142:8 154:3
161:23 162:7,11
162:13 167:19
**provide** 26:9
27:11,12 30:3
34:4,20 118:11
182:17 194:23
220:8 265:25
**provided** 15:4
91:24 267:8

301:15
**provider** 105:11
**provides** 184:17
272:7
**providing** 278:12
**proving** 167:17
269:13
**proximate** 142:13
143:2 167:17,19
**psych** 262:21
274:5
**psychiatric** 273:2
**psychologist** 273:2
**public** 3:9 7:14,17
19:25 248:12,20
249:4 250:9 255:7
267:20 316:5,24
321:6 322:13
324:10,18 325:15
325:23 326:23
**publicly** 27:18
28:2,14 215:4
**published** 140:18
249:16
**publishes** 249:7
**purchased** 323:17
**purdue** 1:10
**purpose** 39:9 40:6
97:8 208:24 209:9
**purposes** 81:17
83:1 111:22 118:9
131:19 138:3
140:11 155:8
161:2 166:24
183:24 198:1
222:12 248:15,23
259:3 310:8
312:12
**pursuant** 7:23
117:10 123:1
151:24 152:12,17

152:23 259:1
320:3,6
**pursue** 191:15
**pursued** 136:14
**purview** 110:8
274:25
**push** 269:20
**put** 39:14 76:8
78:17 79:1 104:2
108:16 113:20
151:7 170:20
171:16 195:7
238:19 247:21
252:12,21 258:3
261:21 262:21
273:13 284:24
285:7 300:2
**puts** 285:15
**putting** 114:18
283:1 295:13

**q**

**qualified** 321:8
**qualify** 56:8
188:14 222:5
**qualitative** 26:10
241:18
**quality** 53:11
**quantify** 58:6
**quantitate** 67:24
**quantitative** 26:10
241:17
**quantities** 94:9
177:17
**question** 21:18
25:1 28:20 30:17
31:18 37:11 38:4
42:12,14 43:3,12
44:2,12 45:15
47:11 49:17 50:17
50:23 51:4 56:18
57:11,16,19 61:19

| | | | |
|---|---|---|---|
| 63:20 67:6 71:12 | quicker 148:19 | read 73:6 74:3 | 262:2 |
| 72:24 84:3 93:15 | quickly 117:15 | 83:20,25 115:14 | recall 16:25 22:4,8 |
| 93:19 94:15 96:23 | 295:18,23 | 140:23 162:18 | 30:7 59:7 62:22 |
| 97:1 108:10 123:7 | quit 316:6 | 204:23 312:24 | 63:2 64:3 65:4 |
| 123:15,21 157:4 | quite 102:21 | 324:5,6,12 325:5,6 | 67:9 90:23 92:3 |
| 157:13 159:13,14 | quotas 214:16,20 | 325:17 | 103:4 106:14 |
| 159:22 164:7 | quote 140:3 | readers 198:6 | 111:9 130:18 |
| 171:21,23 172:2 | 161:24 258:7,7 | readily 71:24 | 131:6 135:13,15 |
| 179:21 180:6,23 | quoted 147:25 | 133:21 | 140:21 141:20 |
| 188:1,7 191:6 | **r** | reading 147:20 | 150:10,14,15 |
| 208:17 209:4,20 | | 156:17 297:14 | 154:6,11,20 |
| 210:16,18,19 | r 2:17 | 323:12,20 | 156:10,11,20,21 |
| 211:14,18,25 | racketeering | reads 83:16 | 156:23 157:14,21 |
| 212:9,14 214:7 | 168:3 | real 88:5 113:25 | 158:22 159:4,14 |
| 215:21 223:5 | radar 221:24 | 114:5 153:13 | 169:3 170:10 |
| 224:11,18,20,23 | rae 4:3 | 161:17 298:7 | 172:9,12,12 173:1 |
| 224:25 231:6,11 | raided 120:24 | reality 171:6 | 179:8 180:3 |
| 236:15 237:17,22 | raised 176:18 | realize 142:7 | 183:11 186:15 |
| 237:24 238:23 | 177:2 214:20 | 152:1 | 187:17 189:3,4 |
| 243:21 257:21 | 311:16 | realized 296:16 | 192:22 196:25 |
| 260:3 261:5,9 | ramos 197:1,5 | really 24:25 40:9 | 200:6 203:22 |
| 277:6 278:4,9 | 198:8 200:21 | 41:19 44:11 45:14 | 204:2 205:11,11 |
| 280:13 282:20 | 202:2,19 | 47:22 54:23 67:6 | 230:10 240:16 |
| 286:20,21 287:9 | range 75:4 89:22 | 76:4,8 79:12,14 | 278:15 279:4 |
| 287:15,16 292:25 | 170:15 245:11,22 | 80:10 98:23,25 | 282:12 300:11 |
| 296:8 300:6 | ranks 245:22 | 99:21 143:7 | receipt 323:20 |
| 303:11 308:22,23 | rare 38:12 143:18 | 144:18 155:13 | receive 16:23 |
| 315:8 | 143:20 222:9 | 159:23,23 173:18 | 23:17,23 24:2,6,9 |
| questioning 54:4 | rarely 79:8 | 182:10 190:20 | 24:12 83:5 122:18 |
| 310:24 | rate 236:12,16 | 193:3,14 194:2 | 192:12,16 228:25 |
| questions 15:10 | 250:25 | 196:7 211:14 | 231:3,20 233:8 |
| 17:19 57:9 69:3 | reach 117:17 | 212:8 242:2 | 239:11,13,15 |
| 80:9 88:1 90:21 | 279:8 | 261:19 296:16,21 | 246:24 283:4 |
| 104:18 107:15 | reached 156:24 | 296:21 297:15 | 299:21,22 303:25 |
| 110:10 130:11,16 | reaches 165:1 | reason 84:8 94:17 | 304:21,24 305:1,8 |
| 132:11 152:6,9 | reaching 100:4 | 115:9 136:19 | 307:3,9,12 316:12 |
| 156:15,19 157:6 | react 66:15 207:25 | 176:7 257:13 | received 8:4 16:1 |
| 179:9 222:24,25 | reaction 59:24 | 279:23 325:8 | 157:1,16 168:25 |
| 249:22 296:22 | reactive 66:12 | 326:3 | 170:11 247:6 |
| 302:17,21 303:9 | 108:13 207:24 | reasons 137:1 | 278:11 302:13 |
| 318:18,22 | reactively 95:3 | 174:22 181:6 | 303:5 312:10,22 |

[received - remember]

316:3
**receiving** 99:6
　144:13 154:10
　155:21 163:11
**recess** 54:10
　134:22 208:6
　248:5 280:8
　308:17 318:12
**recidivism** 236:12
　236:16
**recipients** 102:7
**recognize** 80:20
**recollection** 82:2
　137:14 201:7
**recommendations**
　285:18
**record** 15:1 41:9
　54:7,8,11 78:12
　79:5 134:19 135:1
　144:23,25 145:4
　208:4,7 225:14
　248:3,6 269:9,17
　280:6,9 308:15,18
　308:24 318:9,10
　318:13 319:1
　325:9
**recording** 129:18
**records** 40:21,23
　41:11 78:19,24
　144:23 154:8
　161:4,6 162:21
　175:1 184:13
　191:5 224:24
　231:4 238:18
　268:13,20,25
　269:6,11 270:15
　290:24 291:6
　293:17 307:5
**recover** 122:25
　123:4 171:14,20
　171:23 172:3

**recovered** 134:4
　159:6 222:15
**recruited** 199:22
　200:25
**red** 177:3
**redact** 269:15
**redid** 170:19
**reduced** 49:2 72:6
　127:13 321:13
**reducing** 128:4
**reduction** 257:6
**refer** 114:12
　277:18
**reference** 323:7
　324:2 325:2
**referenced** 83:4
　321:13,17 323:11
　324:11 325:15
**referral** 229:6
**referred** 35:13
　139:24 161:22
**referring** 26:22,23
　84:20 118:15
　173:8 174:1 194:1
　196:13 204:19
　229:10 254:25
**refers** 258:6
**reform** 269:20
**refresh** 81:9,23
　82:2 91:1 187:5
**regard** 231:23
**regarding** 16:7
　27:11 66:13 70:23
　84:9 127:2 141:6
　178:14 189:5
　228:13,16,21
　243:13 250:14
　259:10 261:11,20
　268:6 277:22
　285:14,20 286:4
　300:7,11,21

302:13 308:5
　309:2 320:2,11
**regions** 244:16
**registered** 146:10
**registering** 212:3
**registrants** 212:24
**registration**
　124:10,20,25
　277:23
**regs** 96:17
**regular** 20:12
　21:14 22:15,17,23
　23:9,11,17 24:9,12
　24:15 65:18 83:6
**regularly** 21:17
**regulate** 181:24
　182:6,7
**regulations** 48:20
　127:6 204:16
　284:10
**rehabilitation**
　265:24
**rehired** 309:16
**reimbursement**
　232:25
**rel** 7:20 258:21
**relate** 20:13 29:12
　43:13 70:15 242:8
　265:13 298:24
　305:9 311:16
**related** 17:5 23:14
　23:24,24,25 24:13
　29:8 30:3,15 34:5
　34:10 50:25 51:13
　57:2,23 69:25
　70:2,8 75:23 77:9
　83:11,17 104:20
　164:13 167:12
　168:13 232:12
　234:20 236:5,7
　254:13,17 259:19

259:21,25 260:1
　266:3,9 267:4,13
　267:18,21 268:1
　271:1,16 278:2
　288:3 304:21
　305:12 307:20
　310:2
**relates** 1:8 43:18
　70:7 193:5 210:24
　294:8
**relating** 16:2 23:5
　23:12,18 24:10
　34:20 191:5 223:8
　272:15
**relationship** 21:21
　39:10 235:4
**relationships**
　21:22
**relative** 22:5,9
　79:23 98:22 163:8
　181:3 322:2
**relatives** 148:25
**release** 71:10
**relevant** 280:21
　282:3 307:6
**reliably** 293:16
**rely** 26:25 96:5
　132:10
**relying** 297:11
**remember** 20:7
　29:19 61:8 63:4
　77:22 103:7
　106:21,22 124:20
　130:23 142:2,24
　154:23 156:10
　157:22,24 158:1,6
　166:9 190:19
　191:19 192:2
　203:21 206:4
　216:16,20 227:12
　246:10 267:19

281:12 282:9,11
303:2 309:12,16
**remind**  242:16
**renee**  1:25 321:6
322:13
**renewed**  262:11
**repeat**  63:19
123:15 152:15
157:13 180:23
260:3 277:6
280:13 300:5
**rephrase**  42:14
57:19 210:19
231:13 277:8
**report**  7:13,16
68:5 82:17 83:4,9
84:9 95:11 192:24
193:9,13,13,20
194:1 229:9
248:11,19 249:7
250:9 254:11
255:7,20,23
256:16 279:12,16
317:11
**reporter**  5:14
324:7
**reporter's**  5:12
321:1
**reporting**  67:25
**reports**  23:9,11,14
23:17,23 24:2,7,9
24:12,15 48:15
83:5 88:8 192:13
192:16,20 229:4
229:15,19 249:3
249:11,15 304:20
**represent**  297:25
298:1
**representatives**
295:16

**representing**
114:10,12 133:14
**request**  26:11 96:8
279:24 280:15,17
282:7 283:14
325:9,11
**requested**  245:4,8
262:21 281:11
314:22 320:1,6,10
**requesting**  281:9
**require**  281:7
**required**  323:25
**requirement**
236:24
**requirements**
240:6
**research**  49:8
104:22 115:7
143:19
**resident**  6:13
130:19 131:16
**residents**  48:1
91:6 109:3 234:25
276:25 277:5
**resign**  316:7
**resigned**  8:5
312:11,22 316:3
**resolutions**  251:24
**resolved**  250:25
**resource**  78:9
**resources**  54:24
59:16,23 60:13
66:5,16 126:20
148:15 170:5
175:3,16 230:13
258:16 292:1,3
293:24 294:1
315:11
**respect**  25:9
107:10 156:24
164:15 167:7

180:8 200:21
202:2 231:19
235:6,16 236:19
243:15 268:4
286:17
**respond**  66:8
**response**  7:3 61:11
67:2 183:13,20
184:11 259:7
266:3,5,9 287:9
291:20,22
**responses**  7:21
258:24
**responsibilities**
232:11
**responsibility**
25:4
**responsible**  27:18
28:14 48:17
118:16 143:13
151:18,19,20
155:15 181:15,20
205:8,17 209:15
212:23 241:2
**responsibly**
128:25
**rest**  171:17 247:12
285:8
**restructuring**
244:13
**result**  28:6 48:23
88:8 180:15 181:8
189:19 261:3,7,12
298:6 314:7
**resulted**  97:13
298:11
**retail**  67:15,20
100:6,8
**retailer**  276:24
277:1

**retain**  121:13
**retained**  5:14
**retention**  306:18
**retired**  58:24
264:11 309:14
**returned**  323:19
**review**  48:9 154:7
161:3 188:4
198:14 224:24
268:4 271:6 306:9
320:2,6 323:14
324:1 325:1
**reviewed**  104:14
193:9 241:14
**reviewing**  81:8
193:21
**revoke**  110:5
123:14,20 124:9
147:8
**rewritten**  7:5
183:22
**rich**  117:4
**rico**  102:14,16,19
103:22
**right**  28:24 30:8
35:12 36:22 37:19
38:21 39:18,25
41:17 42:4 49:1
55:5,23 61:3 62:5
71:6 79:7 86:25
101:23 103:16
108:14 110:12
111:13 112:5,16
113:19 125:11
126:13 131:24
132:1 138:23
146:3,7 149:15
153:20 154:18
174:5 175:13
185:10 187:13
193:4 201:3 216:6

220:12 225:20
248:1 250:16
251:3,4 253:19
255:25 265:21
268:24 279:14
281:24 286:23
287:8,25 289:19
289:24 293:2,19
305:22 314:4
318:25
**ring** 56:10 66:14
76:19 81:1 98:20
101:1,5,11 103:10
103:12 187:14
190:16 196:16
197:6,14 198:13
201:1
**rings** 108:21
176:23 186:17
196:11,12 261:18
294:17 295:2
**rise** 56:20 83:10
**risk** 318:4
**risks** 85:20
**road** 178:9
**robbed** 146:22
**role** 39:3 101:21
113:10 121:11
185:13 210:6
263:2 286:11
313:3
**roll** 226:3
**rolling** 226:3
**ronald** 110:11
**room** 144:2
306:21
**rose** 74:13
**rotation** 18:23
**roughly** 85:13
263:12

**routed** 262:17
**routine** 22:4 65:18
223:11
**routinely** 214:20
277:18 280:15,17
**row** 187:11 260:13
**rpr** 1:25
**ruined** 151:4
**ruining** 114:18
**rule** 270:20
**ruled** 270:9,16
**rules** 15:5 146:19
320:3,7 324:5
325:5
**run** 181:3
**running** 311:21
**rural** 117:17
**rwoods** 4:5
**rx** 2:16
**rye** 59:2,4

**s**

**s** 325:8,8 326:3
**saddened** 44:18
**sagetti** 307:11
**salacious** 162:18
**salaries** 247:22
254:4 256:3
**salary** 245:11,15
245:23 254:7
**sale** 88:13,16
100:7,8,14
**sales** 99:2,4 117:25
204:11
**salt** 221:18
**salvatore** 2:7
**san** 4:8
**sanctions** 273:22
**sandra** 3:3
**saves** 170:4
**saw** 41:12 70:23
108:6 116:14

**saying** 56:8 62:11
147:21 152:21
184:23 201:4
215:20 218:3
266:21 280:23
303:10
**says** 39:14,21
141:7 250:17
253:20 258:8
305:15
**sbadala** 2:10
**scan** 306:21
**scanned** 78:21
**scenario** 99:11
**scene** 87:4 266:10
**scenes** 266:14
**schedule** 32:6
75:15,15
**scheduled** 37:25
94:10
**school** 15:17,20
246:4
**scientific** 115:7
**scratch** 136:21,22
137:2 194:9
**screens** 154:9
155:23 156:13
**screwed** 136:1
297:24
**scrip** 66:14 127:25
190:15 196:10,12
197:6,14 198:13
201:1 294:17
295:2
**scrips** 49:3 101:19
178:7,9 196:15
215:13,14
**seal** 322:6 324:15
325:21
**sealed** 252:15
273:17

**sean** 130:20
**search** 40:24,25
41:1,5 174:25
305:12
**searched** 131:1
146:2 159:9
**second** 7:21 41:17
105:14 113:23
139:24 170:21
237:22 258:23
259:20 260:9,11
280:1,3,4
**section** 256:21,22
256:25 258:5,7
**sector** 18:9
**see** 19:21 33:1
41:12 42:11 61:23
72:22 74:4 83:12
84:6 99:11 100:19
100:22 132:23
133:11 136:9
140:3 143:18
155:10,18 160:17
161:16 165:1
174:25 184:11
186:24 187:11,13
192:11 193:1
195:15 196:17
220:8 221:20
250:13,20 254:3
256:11,21,24
257:17,24 258:10
260:10 263:23
270:18,21 275:17
282:9 287:3
288:20 289:9
292:4,24
**seeing** 140:21
147:16
**seeking** 107:5

seeks  272:10

seen  84:2 93:21,25
108:21 112:5,6
154:13 192:23
196:10 201:18
204:5,8 249:11
253:4 259:12
260:24 289:20

self  99:15,23 156:2
190:8 317:11

sell  99:8,24,25
102:8 127:25
156:5 171:19
214:22 215:19

selling  49:20 76:17
100:9,10,11
154:19

seminar  17:1 29:6
119:3 216:18,23
216:25 217:3,11
217:19 219:7
247:21 288:17
297:13 306:14

seminars  16:4,6,9
16:15 17:4,12,16
27:23 28:11,22,23
29:3 34:9,13
115:20 118:25
205:22,25 216:15
247:23 276:8,9,11
303:24 304:1

send  152:22 258:8
299:14,16 300:6
305:8

sending  297:3,4

seniority  245:22

sense  19:23 163:20
188:15 235:25
244:7 247:5
270:21

sensical  313:14

sensitive  289:18

sent  299:24 300:11
300:17,20 301:1
302:13

sentence  84:6
167:5 170:4,10,15
170:18 171:3

sentences  256:22

sentencing  75:20
89:22 170:22
171:10

separate  30:25
36:7 163:8 164:25
164:25 262:2

separately  227:17

september  6:16
112:11 120:25
137:16 138:2,12

serious  136:10
264:4

served  29:8,11
30:14

service  118:11

services  2:16 18:1
265:24 266:1

session  5:10 135:4

set  25:14 190:2
322:5

sets  25:22 214:15

setting  24:18
68:24

settled  179:6

seven  6:18 140:9
313:15

sex  6:15 137:25
162:14 191:21

shady  284:15

share  96:11
192:20 232:11

shared  115:22
118:13 160:6
192:18 277:25

sharing  98:21,21
149:13 232:25

sheet  199:4,11
279:18 325:7,10
325:18 326:1

sheets  199:2,17

sheriff's  134:6
292:20

shift  114:21

shifted  244:14

shipped  119:10

shively  3:8

shkolnik  2:7

shop  203:10

shoppers  20:8
176:22

shopping  97:25
98:2 154:22
177:10 203:4

short  71:5 106:23
282:20

shortly  313:24

show  130:4,10
140:14 143:12
165:22 183:12
317:8,12,13,25

showed  111:15
154:9

showing  62:9

shows  145:1

shut  109:14,21
110:1 124:3,6

side  20:25 21:1,6
45:16,16 110:15
253:15

sight  201:19

signature  320:5
322:12 323:14

signed  324:13
325:18

significant  44:24
45:2,3,9,20,24
53:17 80:6,16
83:10 103:24
104:3 108:12
113:10,18 242:20
256:24

signing  323:12,20

silly  123:6,6,10
171:22 231:6
303:11

similar  20:24 21:1
23:5 192:16
232:21

similarly  176:16

simple  188:17
190:13 208:17

simply  117:9,12
152:22 160:18
212:23 256:18

sincerely  323:23

single  139:3
164:15,16

singular  105:20
163:14

sir  323:10

sit  44:13 45:8 47:7
118:8 128:19
229:15 230:5
296:11

sitting  21:19 66:25
176:4,16 189:21
244:24 261:10
286:23 300:10

situation  102:11
103:14 105:20
129:3 132:13
222:6 251:13
284:4 285:3

**situations** 29:6
38:12 42:5,19
86:3 102:15
125:15 208:1
216:7 272:9
290:10 315:3
**six** 55:12,13 243:6
284:20
**size** 145:7
**skip** 272:1
**skzerussen** 3:5
**slowly** 148:11
**small** 18:6,10
119:12 285:1
**smart** 174:12
**smirnoff** 106:21
135:13 136:15
137:3 138:14
139:6,9,17 140:17
141:7,14 144:9,16
145:3,18 148:11
148:16 153:5,16
154:21 158:3
159:12 163:4,6,18
163:25 164:11
186:19,20 187:20
270:13
**smirnoff's** 138:8
139:1 141:25
153:25 154:24
156:6,25 157:15
158:24 162:15
164:9
**snapshot** 253:16
**society** 114:3
273:19
**socioeconomics**
208:22
**sold** 64:22 86:18
86:22 183:8
203:17 204:6

**sole** 109:9
**solutions** 3:7
323:1 326:1
**somebody** 43:4
64:12 99:14
101:12 125:9
175:14 195:11,13
196:14,23 226:3,3
247:20 269:23
302:24 309:21
314:25 317:17,19
**sooner** 128:16
286:18 288:24
**sorry** 71:4 106:22
157:7,10 168:8
237:22 256:5
257:22 259:14
282:11 310:13
315:9
**sort** 93:23 108:17
229:5 232:2
238:10 239:20
314:21
**sorts** 52:11 129:7
170:6 232:16
278:24
**soucie** 55:24 60:22
216:14
**sound** 111:13
132:9,19 138:22
253:23 298:25
**sounds** 112:16
138:23 165:18
201:3,9 252:21
**source** 73:2,25
114:10,20 132:3
205:14 220:2,22
221:11 222:13
224:9,14 297:10
**sources** 58:14 59:7
160:9,11 175:19

246:14
**south** 3:3
**southern** 284:17
**southwest** 200:22
**spaeder** 2:17
**speak** 29:4 58:19
108:14 221:24
**speakers** 216:15
**speaking** 27:18
28:14 32:10 33:7
40:15 59:8 66:18
89:14 103:9
141:15 155:6
164:24 190:17
252:4 258:6 284:9
284:21 294:3
315:10,14
**special** 7:5 19:8,11
20:5 118:21
183:23 234:1,19
270:1,2 272:14
**specialized** 16:1
17:20,22 234:16
**specific** 35:20 47:8
53:24 58:18 63:2
67:5 88:2,25
105:2 109:16
131:10 137:1
146:15 162:22
174:2 185:17
206:24 207:4
210:17 215:16
222:24 236:8
261:21 283:24
302:17
**specifically** 20:10
26:22 31:25 34:11
34:20 35:13 50:20
66:21 115:3 119:1
119:3,6,16 123:22
150:11,14 156:18

157:23 158:4,5
205:16 236:5
252:9 255:1
269:19 285:21
311:8
**specifics** 187:18
261:11 302:23
**specified** 321:20
**speck** 85:23
**speculate** 46:12
47:9 128:18,21
286:19 287:22
293:3
**spell** 106:7
**spellacy** 2:3 23:19
24:24 25:5,11
26:7 27:20 28:3,9
28:16 30:21 31:4
31:24 33:11,15,18
33:22 35:8 36:20
37:4,10,24 38:3,22
40:7,12 41:18
42:10,23 43:2
44:1,7,10 45:1,5
45:11,22 46:6,21
47:1,6,17,21 49:14
49:21 50:5,10,21
51:2,8,17 52:4,14
52:21 53:20 54:3
54:18,22 56:16
58:1,5,10,22 59:12
59:18 60:9,14
61:13,17 62:3
63:17 66:11 67:4
68:13,19 69:12
70:9,18 71:11
73:4,12 74:2,15,20
76:23 77:20 78:5
79:11,24 80:8,18
80:22 81:4 82:14
83:7,13,21,25

| | | | |
|---|---|---|---|
| 85:11,16 86:6,13 | 237:1 238:3 | **stack** 74:17 | 233:11,16 246:20 |
| 87:5 88:11 90:7 | 243:25 245:13 | **staff** 31:7,9 307:5 | 258:20 268:20 |
| 90:10,19 91:2,7,10 | 247:8 248:2 252:3 | 313:4 | 273:8 277:20,22 |
| 92:11,25 97:9,16 | 256:4,7 257:19 | **staffing** 31:15 | 285:14 289:25 |
| 99:9,13 100:16 | 258:1 261:4 | 265:1 313:10 | 290:25 291:7 |
| 102:20 104:1 | 265:14 271:18 | **stage** 251:1 | 321:2,7 322:14 |
| 106:1,10 107:2,12 | 274:23 275:4 | **stand** 61:5 151:9 | 324:10 325:15 |
| 108:4,9 110:7 | 284:8 286:9 | 186:14 187:1 | **stated** 22:14 76:14 |
| 112:15 113:3,8,13 | 287:13,19 288:4 | 215:6 | 167:15 169:12 |
| 114:6 116:25 | 291:16 293:14 | **standard** 120:7 | 228:11 279:11 |
| 119:21 120:4,15 | 295:21 296:6,14 | 161:22 162:20 | 294:7 303:15 |
| 121:5 122:13,21 | 297:7 299:1,15 | 266:22 | **statement** 84:1,16 |
| 125:7,21 126:8 | 300:8 301:17 | **standards** 161:20 | 202:8,15 211:24 |
| 128:17 130:12,17 | 302:15 304:22 | **standing** 187:21 | 252:25 257:11,14 |
| 134:14 139:11,19 | 305:14 306:11 | **stands** 186:24 | 324:13,14 325:19 |
| 148:12 153:10 | 307:13 308:4,12 | 192:9 | 325:19 |
| 156:9 159:21 | 310:23 311:25 | **stars** 143:7 | **statements** 57:10 |
| 163:23 165:4 | 313:6,12,17,25 | **start** 54:20 105:3 | 215:4,7 297:10 |
| 167:13 168:6,9 | 314:5,9,23 315:5 | 137:2 156:17 | **states** 1:1 113:25 |
| 172:5,25 174:4,20 | 315:13,24 316:18 | 221:1,19,20 | 132:2 145:11 |
| 176:12,20 177:4 | 318:20,23 323:5 | 239:24,25 284:16 | 205:15 206:14 |
| 178:13 179:23 | **spending** 265:7 | 314:10 | 250:24 257:2 |
| 180:16,22 181:4 | 314:8 | **started** 18:8 48:7 | 285:1 |
| 181:10,16,21 | **spent** 247:18 | 51:11 74:16 92:20 | **stating** 139:25 |
| 182:2,9,13,19 | 276:13 315:22 | 135:19 136:21,21 | **station** 135:21 |
| 183:3,10 185:16 | **spike** 85:8 196:10 | 146:3 149:4 | **statistic** 250:16 |
| 188:6,23 189:25 | **spitting** 149:16 | 204:15 251:11 | **statistical** 47:25 |
| 191:3,7,10,16 | **split** 233:3,5 | 254:18 296:21 | 49:8 |
| 193:10 194:12 | 247:15 | 297:14 | **statistics** 48:10 |
| 195:1 196:6 | **spoke** 17:12,13 | **starting** 48:6,23 | 104:14,22 224:20 |
| 199:13 201:20,25 | 28:2,23 151:3 | 245:15 274:22 | 227:14 |
| 203:6,11,13,19 | 227:25 | 294:25 296:18 | **status** 20:1 316:16 |
| 204:13,21 205:10 | **spoken** 115:17 | **stash** 219:15,22 | **statute** 39:21 |
| 205:20 206:3,10 | **sponsored** 17:4 | **state** 7:19 15:14 | 102:14,16 154:3 |
| 206:15 207:16,19 | 216:25 | 24:13 39:13 40:21 | 162:2,3 269:4 |
| 208:15 209:10 | **spread** 289:6 | 75:11 90:24 92:20 | 272:18 274:1 |
| 210:7 212:25 | **spreadsheet** | 109:19 112:17 | **statutes** 89:16 |
| 213:6,16,21 214:4 | 260:10 279:18 | 133:3,5 150:21 | 285:18 |
| 215:12 218:1 | **square** 3:9 | 162:9,9 182:5 | **stay** 170:17 265:5 |
| 224:16 230:15,21 | **ss** 321:3 | 184:14 215:11 | **stayed** 265:8 |
| 232:14 233:22 | | 216:9 232:16 | |

stays  277:21
steal  101:15
  195:18 202:20
stealing  20:8 98:9
  185:20 188:17
  190:7 191:21
steals  196:15
stenotypy  321:14
step  162:10
steps  59:15 60:11
  67:1 179:17 190:3
  207:22 219:17
  220:17 241:9
  254:12
steroids  70:2 99:4
sticks  192:3
stimulant  69:18
stole  64:7,9,11,12
  65:1 66:15 101:22
  199:1,18
stolen  103:15
stop  109:11 221:4
  297:7,9
story  6:11 111:21
  140:21 144:24
straight  253:6
straighten  252:16
  272:25 273:14
street  2:18 3:3 4:4
  4:7 32:20 35:21
  45:25 48:22 49:5
  49:10 53:13 68:22
  69:2 72:5,7 76:17
  80:11 100:19
  107:5 127:14,20
  127:23 135:21
  143:1 173:11
  199:5 202:13
  210:11,24 211:1
  214:23 271:23
  274:19 275:7

streets  49:1 52:1,3
  58:17 72:13,23
  73:2,10 140:2
  222:18
strict  286:1,17
strike  151:2
stripper  191:22
strong  161:11
  167:22
stuff  115:12
  119:15 126:20
  145:3 147:20
  155:15 161:16
  170:6 209:3
  217:15 280:19
  283:14 290:10
  308:21
stymied  291:14
subject  220:14
  232:22 273:21
subscribed  324:10
  325:14 326:21
subsection  52:25
  53:4,14 202:12
subset  52:23 285:1
  285:4
subsets  96:9
substances  112:22
  212:5 215:10,22
  215:25 216:1,3,5
  228:17,22
substantial  251:6
  261:24
substantially
  262:7
substantiate
  275:10
substantive
  300:18,20,24
suburban  66:24
  175:10

succeed  195:21
successful  224:13
successfully  165:2
  227:3 273:16
sudden  62:19
sued  179:5
sufficient  27:4,8
  176:10 230:13
  310:13
suggesting  143:4
suicide  130:21
suing  218:8
  219:13
suit  270:10
suite  1:21 2:4,18
  3:4,9,13 323:2
suits  314:11,25
sum  44:12
summarizing
  230:2
summer  216:24
summits  274:21
superficial  161:18
superior  2:3 323:1
supervisor  59:1
  60:20 92:12
  216:14 226:2,13
  228:9 246:2
supervisor's  228:1
  228:3
supplemental  7:3
  7:21 183:20
  258:23
supplied  277:4
supplier  77:1
  147:3,9
suppliers  76:21
  227:3
supply  215:2
supplying  188:21
  276:24

support  18:24
  26:11 31:6,9
  95:13 240:17
  247:22 265:24
supported  160:1
supporting  241:13
supposed  127:8
  129:17 142:16
  145:2 222:14
  301:19 306:15
supposedly  306:21
sure  20:6 29:2
  42:17 54:6 56:4
  61:6 62:10 75:6
  82:3 103:17 106:9
  117:14 121:23
  127:1 128:12
  136:16 137:8,8,9
  137:13,20 143:11
  148:19 152:2
  155:3 157:11,23
  159:3 165:19
  166:15 186:21,23
  188:24 194:19
  197:14,16 207:11
  217:1 219:6
  221:12 233:24
  235:3 238:12
  268:8 276:5
  280:14 281:1
  293:1,12 304:2
  305:24 306:19
  307:10 308:11,24
  310:15
surge  54:15 58:8
  58:11 59:24
  108:17,19
surplus  246:7
surprise  46:18
  250:5 255:9
  298:17 301:14

surrounding   43:6
suspend   110:5
  121:12 123:13,19
  124:9 147:8
  150:18 179:17
suspended   121:9
  121:19
suspicions   176:18
suspicious   67:21
  68:6 107:8 119:9
  127:7,9 152:3
  176:7 182:16
  192:13,21,24
  193:9,12,20,25
switched   42:11
sworn   15:6 321:10
  324:10,13 325:14
  325:18 326:21
symptoms   114:2
  144:4
synthetic   90:25
system   78:21
  92:19 241:22
  291:24 306:2
systems   290:25
  291:7

t

tackle   232:17
tactic   158:11,14
tactics   133:10
tails   170:18,20
take   54:4,6 57:5
  59:15 121:18
  128:1 132:24
  134:17 137:15,20
  142:16,16 144:6
  171:13,19 178:1,3
  178:4 179:16
  183:1 190:9,11
  196:18 207:22
  218:17 220:17

235:12 244:4,6
245:14 247:9,10
247:25 251:11
252:18 280:2,5
308:12,14 309:24
taken   1:19 67:1
  122:24 140:1
  177:25 219:18
  241:10 251:2
  254:12 269:3
  287:4 296:20
  321:19 323:11
takes   6:12 122:3
  131:15 148:14
  175:2 221:6
talk   22:18 27:22
  31:22 78:15 122:8
  165:13 166:2
  221:16 226:1
  243:4 280:3
  288:21 302:22,25
  305:10
talked   32:15 53:9
  68:8 97:20 119:3
  129:4 161:12
  207:3 239:8
  288:17,18 291:10
  293:15 298:4,9,13
talking   16:7 27:14
  31:6 34:1 40:15
  48:13 49:9 53:4,7
  56:12,17 58:16
  62:12,13,14 72:15
  72:15 73:21
  121:24 127:20,24
  152:19 156:1,4
  161:21 174:15
  180:17,19,24
  191:20 196:14
  208:10 209:11
  210:11,13 215:17

215:18 225:13
275:6,7 281:1
284:3,5 293:2
294:21 300:24
309:5
talks   293:3
targeting   49:19
task   22:19,21 29:8
  29:11,15,16,17,20
  29:24 30:3,10,15
  271:22 275:2,6
tasked   109:19
tasks   49:23
tddlaw.com   2:5
teachers   246:4
teaching   67:11
team   165:14,16
  283:19 315:20
technically   98:24
  228:4 309:14
techs   190:15
telephone   2:6,12
tell   17:6,7 20:6,10
  30:12 39:7 45:23
  45:25 46:1 51:9
  56:18,24 57:13
  59:19 61:3 62:4
  69:13 79:1,7 94:3
  94:6,12 105:6
  106:5 111:16
  127:9 136:25
  142:10 144:24
  148:14 161:19
  168:22 174:6
  185:18,22,25
  186:2,4,11 189:21
  191:18 193:3,14
  193:15 194:2
  197:11 208:18
  217:23 229:13
  243:2 246:15,17

261:13,16 278:6
278:24 279:12
288:21 295:3
302:21 309:4,20
312:1,2 315:15
telling   57:14
  189:20 211:16
  214:13 278:23
  307:4
tells   6:10 111:21
  220:4
ten   102:24 223:18
  242:21 288:18
  294:11,16 296:5
  296:13
tens   118:5
tenth   4:4
tenure   50:7
term   32:12 106:23
  115:5 275:22
  284:25 285:4
terminally   38:19
terms   25:15
territory   234:22
testified   202:10
  216:17
testify   42:1 269:23
  321:10
testifying   157:17
testimony   157:4
  281:21 310:14
  321:12,16 324:6,7
  325:6,9,12
texts   305:8
thank   50:12
  210:20 226:11
  255:19 271:11
thasher   2:2
theft   97:23 190:13
  201:12

therapeutic  161:2
therapy  115:6
  180:15 181:9
  214:3 284:25
  285:4
thing  36:5 59:19
  69:13 96:25 97:18
  105:13,14 116:14
  124:23 128:14
  148:14 160:12
  188:17 220:3
  235:14 241:7
  280:20 281:4
  304:4 309:4
things  22:12 27:23
  44:14 61:20 79:2
  101:1 103:18
  107:15 110:3
  111:7 119:9,10
  120:8 133:24
  148:19 159:7
  162:7 212:17,20
  217:24 225:11
  238:19 240:6
  246:17 247:23
  251:12,21 252:19
  261:14,19 262:3
  262:23 278:24
  284:24 293:2,9,25
  294:19 296:3,11
  297:14 306:14
  308:10,21 309:6
  309:19 310:17
  316:1
think  17:10 28:23
  28:24 33:12 41:20
  44:6 55:23 66:25
  67:13,20 68:6,15
  69:4 80:19 88:25
  92:20 96:10 98:16
  106:8,10 110:13

120:5 121:20,22
127:5,13 128:19
129:14 137:18
150:20 155:7
158:1,21 162:7
166:15 171:22
178:23 186:20
191:25 193:11
195:20 199:9,15
202:16 217:1,2
218:8,21 219:13
224:17,23 226:22
228:11 229:12
230:22 236:14
237:18,19 239:23
245:24 251:21
252:24 258:5
266:1,12,22
280:20 282:5
286:24 287:16
288:8 291:13,24
293:1,25 295:1,20
295:22 296:7
298:3 304:17,18
313:13,22
thinking  96:25
  130:14 270:5
thinks  145:4
third  113:23,25
  260:13 270:9
  275:12,18
thirds  148:1
thirty  323:19
thought  144:18
  180:24
thousand  194:20
  194:21 246:1
thousands  118:5
  126:6,6
threat  318:3

threatening
  117:16
three  18:23 19:4
  47:12 59:6 61:4
  62:8,15 87:18
  108:20,23 132:17
  137:15 145:11,12
  145:17 162:7
  170:12,17,23,24
  172:16 189:9
  243:8 261:20
  280:25 299:18
threw  219:8
tightened  285:19
till  185:7
time  16:22,25
  21:16 30:2 31:2,9
  31:16 44:23 47:15
  47:19 50:14,18,24
  51:5,12 54:21
  56:9 60:12,21
  61:8,14 64:20,24
  68:6 71:19,23
  74:11 82:13 87:24
  94:19 96:22
  103:13 104:4
  108:6,16 121:25
  122:3,5 125:22
  130:13 137:19
  140:22 143:22
  146:17 147:15
  148:5,7,15,18
  150:1 155:12
  157:8 163:10
  166:12,17 168:11
  168:11 170:4
  171:7 175:3 179:4
  179:24 182:20
  184:9 208:2 224:8
  224:12 238:20
  239:21,22 254:10

254:17 257:18
258:2,14 262:7
263:19 273:3
276:12 279:14
282:25 284:19
286:15 288:18
290:4 295:11
296:23 297:8
302:9 306:1
315:21 316:6,7,9
316:15 321:19
times  6:16 30:13
  94:21 108:7 138:1
  139:2 147:25
  189:10 194:15
  226:16 264:23
  276:16,17
tips  278:1,7,18
tired  277:7 290:21
titled  7:8 197:19
  272:1
today  16:8 17:10
  28:7 31:19 45:8
  45:21 66:25 68:9
  71:17 73:10
  135:11 139:25
  152:5 171:11
  176:4,17 189:21
  202:11 208:10
  244:24 246:23
  261:10 296:3,11
  298:4 300:10
  303:8 318:18
today's  28:12
told  87:23 115:19
  149:22 205:23
  221:18 222:9
  270:5 294:16
  297:17 306:13
  307:7,10,25 309:8
  309:9,17,21,21

[ton - type]

Page 53

**ton**  62:19 145:3
  217:16
**tool**  240:8,13
  288:15 289:2
**top**  49:18,24 50:2
  50:4 98:17 113:24
  139:24 146:21
  168:2 184:3 239:2
  250:11 256:2,8
  260:14
**topic**  17:13 72:19
  217:10 218:5,13
**topics**  217:12,18
  217:20
**total**  77:25 89:8
  91:17 92:3,7
  115:15 168:25
  184:18 207:12
  241:25 250:3,18
  251:6 279:12
**totaling**  260:19
**tournaments**
  308:9
**town**  293:4
**toxic**  80:4
**toxicology**  154:8
  155:23 156:13
**trace**  221:13,25
  225:8
**traced**  206:8 227:8
**tracing**  222:20
  223:8
**track**  43:17 91:20
  96:2 126:15 220:4
  227:18 235:21
  236:11,16
**tracked**  133:19
  236:8
**tracking**  91:16
  238:24 281:15
  296:25

**tracks**  92:21
  144:17 174:13
  227:22 236:4
**trade**  32:23 76:5
**traditional**  19:23
**trafficked**  88:9
**trafficker**  7:9
  197:20
**traffickers**  73:24
  158:20
**trafficking**  98:24
  99:15 111:6,8
  112:12 138:15
  155:25 156:8
  168:4,13,18 171:7
  274:15
**tragic**  38:18
  130:24,24
**train**  35:1
**trained**  295:9
**training**  15:24
  16:2,4,9 17:20,22
  29:4,5 34:5,9,13
  34:20,23 35:4
  200:22 267:8,12
  267:17 276:9,10
  288:12
**trainings**  16:23
**trajectory**  294:5
**transaction**
  163:14
**transcribed**
  321:15 324:7
**transcript**  5:1
  320:3,6,9,11
  323:11,16 324:5
  324:12 325:5,11
  325:17
**transcription**
  321:16

**transpire**  194:25
**treat**  38:17,25
  117:15 129:21
  179:11
**treated**  37:9,15
  38:16
**treating**  129:23
**treatment**  161:17
  161:19 181:9
  214:1 252:10,22
  253:7 258:9
  262:12 272:8,16
  272:18 273:24
**treatments**  314:8
**trend**  108:6
**trends**  250:14
**trial**  6:16 138:2
  141:8 251:2
  266:13
**tried**  97:4 115:11
  217:22,23 282:15
**tries**  181:1
**true**  233:18 255:6
  257:20 321:16
**truly**  211:22
**trust**  193:17
  247:19
**truth**  321:11,11,11
**try**  41:16 67:8
  104:18 123:5,8,13
  123:19 125:4,8
  130:4 150:18
  165:6,19 168:6
  171:14,20 175:16
  175:19 180:9
  220:1 222:12
  223:15 224:22
  232:15 251:22,24
  252:7 253:6 263:6
  279:9 293:5

**trying**  28:22 84:14
  87:25 108:5 114:2
  129:14 190:23
  222:24 225:8
  251:14 252:18
  262:2 294:23,24
**tucker**  3:12
**tuckerellis.com**
  3:15
**turn**  48:23 139:9
  184:2 250:6
  255:22 256:18
  260:8
**turned**  254:19
**turning**  255:16
  312:14
**tv**  74:4 135:21
**two**  18:6,10 19:4
  46:4 70:21 77:23
  77:25 78:4 91:11
  102:22 103:7
  122:2 131:8 132:7
  148:1 157:22
  158:18 198:8
  207:7 243:16
  249:2,10 259:16
  262:3 264:8
  273:12 279:21
  281:12 282:14
  299:18 309:5,15
  309:17,19 310:3
  310:16
**tylenol**  132:6
**type**  32:5,5 45:19
  72:14 99:1 100:13
  100:17,20,23
  101:2 103:13
  105:16 156:18
  157:8 164:18
  193:19 195:17
  200:16 204:3

[type - vacuum]                                                                          Page 54

207:4 220:3
228:24 247:23
251:14 252:1
263:6 268:10
292:9
**types** 29:20 40:11
72:22 83:5 89:2
95:16 161:23
195:15 227:18
267:12 314:3
**typical** 190:3
194:24
**typically** 99:7
183:1 228:7

**u**

**u** 69:6 90:13,18,25
**u.s.** 136:18,23
274:14,21 275:2
**ultimate** 124:5
273:6
**ultimately** 122:23
130:21 168:15
169:15 172:17
191:15
**um** 54:17 55:3
97:22,24 98:1
99:17 100:2 112:8
112:20,24 118:22
131:4 132:8,18
136:12 137:4
139:4 146:9 148:4
149:2 168:5
169:11 176:8
179:2 184:12
198:10 219:24
249:5 250:10,15
254:5 255:21
260:15 277:17
**unaware** 86:3
**unbelievable**
51:25

**unconventional**
148:9
**uncovered** 238:9
277:15
**underappreciated**
246:5
**undercover** 155:5
**undergone** 176:14
**underpaid** 241:8
246:4
**understand** 24:25
29:3 52:22 55:1
65:14 71:12 84:14
85:18 104:18
115:25 117:6,13
117:17 130:1
143:12 144:22
151:21 152:7,11
183:15 193:17
209:4 211:15
212:8 221:12
224:11 240:3
257:21 266:5
293:6 296:25
309:14 315:8
**understanding**
31:20 32:12 38:8
48:16,19,25 49:7
62:11 65:16 72:4
72:10 73:17 74:5
74:6 79:9,13,16,22
115:23 152:4,25
232:21 262:24
284:2 306:23
309:11
**understood** 61:9
148:22 258:13
310:16
**undertake** 40:23
41:10 122:11

**undertaken** 203:9
**undetected** 196:1
196:5
**unfortunate** 151:4
**unfortunately**
43:8
**unintentional**
83:17 180:14
181:8
**unit** 18:20 19:10
19:17,21,22 20:9
21:4 34:22,24
35:20 36:7 55:1,4
55:9 56:2,10,21,23
57:22 88:23 89:4
190:9,11 216:14
234:16 243:5,5,6
243:16 244:1
274:7 292:15,21
**united** 1:1 205:15
285:1
**units** 19:19 20:2
119:15 132:5
134:3
**university** 15:14
15:18 198:23
**unlawful** 163:11
212:19 278:2
**unlawfully** 62:24
65:17,21 98:4
163:1 208:23
209:8,17 212:6
**unnecessarily**
129:22
**unusual** 144:6
203:25 316:11
**updated** 239:11,15
**upwards** 164:2,8
**urban** 68:24
**urology** 6:13
130:19 131:16

**use** 7:11 37:3 39:5
42:6 43:19 71:22
82:12 95:1,2,9
99:7 102:14,16
127:18 133:11
158:14 162:5,6
177:13 184:25
197:24 213:2
218:24 223:11
236:19 240:7
265:13 267:4
269:6 270:14
272:19 282:16
288:14 293:16
299:9 301:22
302:22 304:5,10
305:6
**user** 100:5
**users** 86:3
**uses** 38:2,9 42:20
43:14 213:12
**usual** 20:7 48:8
**usually** 100:6,6
101:11,12 109:9
124:18 162:13
165:10 168:10
171:19 178:16
185:20 189:19
190:9 226:1 264:6
275:6 277:20
278:21
**utilize** 268:20
**utilized** 155:4
274:1

**v**

**v** 1:10 7:24 310:7
323:6 324:3 325:3
**vacation** 316:6,7,9
316:15
**vacuum** 202:4,5

**valid** 39:17 63:15
63:24 127:23
219:17
**valuable** 118:11
**vandetta** 4:10
**variety** 315:25
**various** 16:6 97:20
178:6
**verbal** 239:14
**verbalize** 230:6
**verbally** 230:5
**veres** 134:6
**veritext** 323:1,7
326:1
**versus** 97:14
163:22 227:19,20
252:23
**viable** 150:20
**viagra** 191:21,24
192:6
**vial** 142:15 146:20
**vicodin** 32:3 37:8
37:13,22 132:6
135:24 285:8
**victim** 103:14
231:15,24 275:21
**victimize** 215:10
216:8
**victimized** 215:5
**victims** 230:19
**videographer** 4:10
15:1 54:8,11
134:19 135:1
208:4,7 248:3,6
280:6,9 308:15,18
318:10,13 319:1
**videotaped** 1:14
**view** 32:14 104:6
119:8 182:11
251:12,22 252:19
280:23

**views** 116:22
230:18
**violations** 228:17
**virginia** 119:13
**visits** 23:25
**vital** 269:8,11
**volume** 160:20
**voluntary** 262:25
**vow** 245:14
**vs** 162:9

**w**

**wait** 149:18
211:13
**waived** 323:13,21
**walked** 145:6
**walking** 135:23
**walmart** 2:11
**want** 15:10 21:24
22:22,22 28:19
29:2 31:25 42:17
47:8,9 52:24 53:1
62:10 67:8 71:4
78:16 84:11,12
105:1 110:10
115:25 129:21,22
135:8 146:22
147:23 148:1
155:13,14,16
166:2 171:16
175:11 188:14
201:3 202:12
215:16 222:17
226:5,5 227:11
232:18 249:22
258:8 259:16
263:24 264:1
280:2 281:1
292:12 308:5,11
308:24 309:3
310:11 317:18
318:6

**wanted** 18:19 92:7
136:19 224:22
303:18 307:15
310:15
**wanting** 58:13
**wants** 157:11
225:10 247:20
291:4 300:14
302:24
**warn** 122:11 125:5
125:8
**warnings** 122:18
**warrant** 40:24,25
41:2,5 174:25
317:20 318:6
**washington** 2:19
4:4
**watch** 313:16
**watched** 116:19
**way** 7:10 25:3
44:5,8,19 62:5
75:14,21 84:17
91:16 97:12
129:15 130:2
134:13 145:7
148:2 149:17
163:15 166:1
178:23 184:20
196:22 197:21
199:8 202:6 205:2
218:8 220:4 221:8
222:1 242:20
263:6 266:19
273:18 278:21
308:2 311:16
**ways** 98:6
**we've** 68:9 104:15
110:23 208:10
226:23 284:20
291:10 298:4,9

**weaknesses**
291:19,21
**weasel** 116:16
**web** 20:23 175:14
**week** 48:2 299:19
299:21,23 306:12
317:4
**weighs** 273:7
**weight** 69:19,21
69:23 75:22 89:17
**went** 17:11 51:25
115:21 118:25
119:4 130:24
131:25 148:11
169:22 200:13
216:15 256:3
296:19 297:14
**west** 110:15
119:13
**westshore** 20:23
21:4
**whereof** 322:5
**white** 19:24
317:23
**whitesell** 3:13
**wholesaler** 100:12
**wide** 315:25
**wife's** 131:7 132:7
**william** 139:23
**willing** 202:19
**willy** 280:19
**wind** 149:17
**window** 108:8
**wined** 115:10
**wise** 288:8
**wiser** 296:8
**wish** 288:23 292:7
296:5,8,13
**withdrawal** 144:3
**witness** 125:2
153:22 154:7

160:16 168:8,10
209:11 297:8
309:7 320:2 321:9
321:13,14,17
322:5 323:8 324:1
324:4,11 325:1,4
325:15
**witnesses** 66:5
138:24
**woods** 4:3 5:8 15:9
54:6,13 130:15
134:17 135:7
203:15 208:2,9
247:25 248:25
256:6 280:5,11
308:14 318:8,15
318:25
**word** 57:14 58:12
93:1 184:25 226:8
**words** 104:2 151:7
163:20 169:4
220:19 256:23
257:12
**work** 18:5,12,20
19:20 20:3,16,18
21:3,10 22:20
23:8 29:18,23
30:11,23 31:2,12
35:7,15 36:12
38:25 43:1,13,18
44:9,15,16 56:14
59:4,17 60:7,13
72:20 76:2 85:19
87:16,19,20,22
94:18 96:6 97:4
101:11 124:8
155:8 164:24
220:13 228:10
232:15 242:24
243:6,11,16,22
245:5,9 254:13

271:16,16 274:14
281:3 282:24,24
283:12 295:6
296:1 302:7 305:3
305:5,7,9
**worked** 18:6,9
23:2 29:15 58:25
61:1,7 81:3,24
85:1 89:4 101:4,8
136:17 137:6
186:5 187:15
264:15 269:21
277:12 278:5
**working** 46:25
104:20,24 195:20
239:24 294:6
311:21 315:19
316:10
**works** 177:8
178:10
**worse** 79:18,19
104:6,9
**worth** 199:5,11
239:23
**write** 41:13 122:6
170:5
**writer** 174:14
**writers** 107:6
108:15 173:12
174:7,9,18,23
175:20 176:5
221:23
**writes** 65:17 130:8
145:3 231:17
**writing** 78:17 95:6
131:7 233:1
284:16
**written** 23:9 27:10
27:14 40:5 49:3
91:5 92:22 132:4
151:24 152:13,18

220:11 223:6
225:23 226:6
228:12,20 303:5
**wrong** 119:6,8
136:13 164:7
223:24 224:2,5
**wrongdoing** 110:9
**wrongful** 184:8
314:11,24
**wrote** 111:10
112:21 126:10
173:6,24

| x |
| :-: |

**xanax** 69:25

| y |
| :-: |

**y** 106:9
**yacht** 6:18 136:5
140:9
**yeah** 22:22 42:24
43:6 59:9 63:8
102:23 110:12
112:5 113:20
116:9,11 130:17
132:1 133:6
145:21 151:14
155:18 158:5
165:25 168:22
178:8 181:11
187:13,19 197:3
199:3 205:5
216:21 219:1
233:17 252:4
258:16 263:1
266:21 268:14
276:6 277:8 282:5
300:15,18 306:5
313:22 316:14
**year** 18:7,9,24
22:18 91:9,11
103:7 104:9 108:8

117:2 122:2 126:3
130:9 131:8 132:7
137:20 242:1,12
246:2 252:12
256:14 257:7,17
257:24 260:16
273:12 276:16
281:12 309:15
313:18
**years** 16:7 19:4,5
19:15 21:21 22:1
22:3,5,8,10,24
27:19 29:20 30:12
46:5 48:4,5,21
49:13 55:24 60:5
62:8,15 70:21
71:2 72:5,21
74:17 89:5 92:2,4
94:24 97:2 104:7
105:3,23 106:17
106:18 107:24
108:20,23 125:23
127:2 128:13
136:2 137:15
145:11,17 148:20
148:24 156:16
159:2 163:25
172:16 185:6,19
194:11,19 196:10
203:5 205:5
214:20 236:1
240:5,23 242:5,21
246:8 249:16,16
249:19,25 252:23
261:14,20 265:2,9
269:4 270:2
273:12 276:14,18
277:12,14 278:6
279:21 280:25
281:12,16 283:2,3
284:20 285:21,24

288:18 294:11,15
294:16,19 295:9
296:5,13 299:24
300:6 302:10
303:5 310:3 316:9
**york**  2:9,9
**younger**  35:1

**z**

**zero**  175:3
**zerrusen**  3:3
**zuckerman**  2:17
**zuckerman.com**
  2:20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.