Highly Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE: NATIONAL | : |
| PRESCRIPTION | : MDL No. 2804 |
| OPIATE LITIGATION | : |
| _____ | : Case No. |
| | : 1:17-MD-2804 |
| THIS DOCUMENT RELATES | : |
| TO ALL CASES | : Hon. Dan A. Polster |

- - -

Tuesday, February 19, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of CANDACE HARBAUER,

held at the Hilton Garden Inn, Perrysburg, Ohio,

commencing at 9:02 a.m., on the above date, before

Carol A. Kirk, Registered Merit Reporter and Notary

Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

1  A P P E A R A N C E S :
2  On behalf of the Plaintiffs:
3  MCHUGH FULLER LAW GROUP
   BY: LANCE REINS, ESQUIRE
4  lance@mchughfuller.com
   ALLAN (A J ) L ELKINS, ESQUIRE
5  allan@mchughfuller com
   (via teleconference)
6  97 Elias Whiddon Road
   Hattiesburg, Mississippi 39402
7  601-261-2220
8
9  On behalf of AmerisourceBergen Corporation (via
   teleconference and text/video streaming):
10 JACKSON KELLY PLLC
   BY: SANDRA K ZERRUSEN, ESQUIRE
11 skzerrusen@jacksonkelly com
   50 South Main Street, Suite 201
12 Akron, Ohio 44308
   330-252-9060
13
14 On behalf of HBC (via teleconference and text/video
   streaming):
15
   MARCUS & SHAPIRA LLP
16 BY: ELLY HELLER-TOIG, ESQUIRE
   ehtoig@marcus-shapira.com
17 One Oxford Center, 35th Floor
   301 Grant Street
18 Pittsburgh, Pennsylvania 15219-6401
   412-338-3345
19
20 On behalf of Walmart (via teleconference and
   text/video streaming):
21
   JONES DAY
22 BY: NICOLE LANGSTON, ESQUIRE
   nlangston@jonesday com
23 77 West Wacker Drive
   Chicago, Illinois 60601
24 312-782-3939

## Page 3

1  On behalf of Prescription Supply, Inc
2  FOX ROTHSCHILD LLP
   BY: JAMES C CLARK, ESQUIRE
3  jclark@foxrothschild com
   STEPHAN A CORNELL, ESQUIRE
4  scornell@foxrothschild com
   (via teleconference and text/video
5  streaming)
   2700 Kelly Road, Suite 300
6  Warrington, Pennsylvania 18976-3624
   330-305-6400
7
8  On behalf of Endo Pharmaceuticals, Inc ,
   Endo Health Solutions, Inc , and Par Pharmaceutical
9  Companies, Inc (via teleconference and text/video
   streaming):
10
   ARNOLD & PORTER KAYE SCHOLER, LLP
11 BY: CAITLIN MARTINI MIKA, ESQUIRE
   caitlin mika@arnoldporter com
12 70 West Madison Street, Suite 4200
   Chicago, Illinois 60602
13 312-583-2300
14
15 On behalf of Johnson & Johnson and
   Janssen Pharmaceuticals:
16 TUCKER ELLIS LLP
   BY: JENNIFER L STEINMETZ, ESQUIRE
17 jennifer steinmetz@tuckerellis com
   950 Main Avenue, Suite 1100
18 Cleveland, Ohio 44113
   216-592-5000
19
20 On behalf of McKesson (via teleconference and
   text/video streaming):
21 COVINGTON & BURLING LLP
   BY: GABRIEL FULMER, ESQUIRE
22 gfulmer@cov com
   One CityCenter
23 850 Tenth Street, NW
   Washington, DC 20001
24 202-662-5110

## Page 4

1  ALSO PRESENT:
2  Michael Newell, Videographer
   Zachary Hone, Trial Technician
3
4  - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 5

1  VIDEOTAPED DEPOSITION OF CANDACE HARBAUER
2  INDEX TO EXAMINATION
3  WITNESS                    PAGE
4  CANDACE HARBAUER
5  CROSS-EXAMINATION BY MR. REINS:        10
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

---

Page 6

1    VIDEOTAPED DEPOSITION OF CANDACE HARBAUER
2              INDEX TO EXHIBITS
3    PSI-HARBAUER   DESCRIPTION              PAGE
4    PSI-Harbauer 1  Document titled "Current      30
         Employees," Bates-stamped
5         PSI0000145-147
6    PSI-Harbauer 2  Code of Federal Regulations,  52
         21 C F R  1301 74
7
     PSI-Harbauer 3  Document titled "Inventory    83
8         Controls, Document Control
          Number: WP-1, Effective
9         Date: June 2000," Bates-
          stamped PSI0000648-652
10
     PSI-Harbauer 4  Document titled "Document     89
11        Name:  Controlled Substances,
          Document Control Number:
12        WP-2, Effective Date:  June
          2000," Bates-stamped
13        PSI0000653-654
14   PSI-Harbauer 5  Document titled "Document     89
          Name:  REMS DO NOT SHIP
15        PROGRAM, Document Control
          Number:  WP-13, Effective
16        Date:  February 2011," Bates-
          stamped PSI0000690-692
17
     PSI-Harbauer 6  Document titled "Maximum     100
18        Monthly Quantity Prescription
          Supply," dated 10/2/2008,
19        Bates-stamped PSI0000280-285
20   PSI-Harbauer 7  Letter from Mr  Rannazzisi,  105
          dated 9/27/2006, Bates-
21        stamped CAH_MDL_PRIORPROD_
          DEA07_00837645-837648
22
     PSI-Harbauer 8  Letter from Mr  Rannazzisi,  109
23        dated 12/27/2007, Bates-
          stamped CAH_MDL_PRIORPROD_
24        DEA12_00010980-10980

---

Page 7

1              - - -
2         P R O C E E D I N G S
3              - - -
4         THE VIDEOGRAPHER:  We are now
5    on the record.  My name is Michael
6    Newell.  I'm a videographer for
7    Golkow Litigation Services.
8    Today's date is February 19, 2019.
9    The time is 9:02 a.m.
10        This video deposition is
11   being held in Perrysburg, Ohio in
12   the matter of National Prescription
13   Opiate Litigation.  The deponent
14   today is Candace Harbauer.
15        Will counsel please identify
16   themselves.
17        MR. REINS:  Lance Reins with
18   McHugh Fuller here on behalf of the
19   Plaintiff.
20        MS. STEINMETZ:  Jennifer
21   Steinmetz from Tucker Ellis on
22   behalf of Janssen and Johnson &
23   Johnson.
24        MR. CLARK:  Jim Clark from

---

Page 8

1    Fox Rothschild on behalf of
2    Prescription Supply.
3         THE VIDEOGRAPHER:  Anyone on
4    the phone?
5         MS. HELLER-TOIG:  Elly
6    Heller-Toig from Marcus & Shapira
7    for HBC Service Company.  And I
8    also e-mailed my appearance.
9         MS. MIKA:  Caitlin Mika from
10   Arnold & Porter on behalf of Endo
11   and Par entities.
12        MR. ELKINS:  A.J. Elkins,
13   McHugh Fuller law firm, on behalf
14   of the Plaintiffs.
15        MS. LANGSTON:  Nicole
16   Langston from Jones Day on behalf
17   of Walmart.
18        MR. FULMER:  Gabriel Fulmer
19   on behalf of Covington & Burling on
20   behalf of McKesson.
21        MS. ZERRUSEN:  And Sandy
22   Zerrusen from Jackson Kelly on
23   behalf of AmerisourceBergen.
24        MR. CORNELL:  Stephan Cornell

---

Page 9

1    from Fox Rothschild for
2    Prescription Supply.
3         THE VIDEOGRAPHER:  The court
4    reporter today is Carol Kirk and
5    will now swear in the witness.
6         (Witness sworn.)
7         MR. CLARK:  Mr. Reins, before
8    we begin, I just want to put on the
9    record what we discussed out in the
10   hallway a short time ago.
11        Ms. Harbauer has been out of
12   work for the last ten days dealing
13   with some health issues related to
14   her asthma.
15        She has assured me that she'd
16   like to proceed today and is
17   confident to do so.  I raise it
18   just because we may need to take a
19   few extra breaks so that she can do
20   a breathing treatment.
21             - - -
22        CANDACE HARBAUER
23   being by me first duly sworn, as hereinafter
24   certified, deposes and says as follows:

---

3 (Pages 6 to 9)

Highly Confidential - Subject to Further Confidentiality Review

Page 10

CROSS-EXAMINATION

BY MR. REINS:

Q. Ms. Harbauer, as we discussed before we began, please let me know whenever that arises. You don't need to put yourself through any additional strain here today. So just let us know, okay?

A. Thank you.

Q. You're welcome.

Could I get you to introduce yourself for the record, please.

A. Candace Harbauer.

Q. And, Ms. Harbauer, have you been through a deposition before?

A. Never.

Q. Okay. Your counsel has probably advised you but just a couple ground rules before we begin. Obviously I'm going to be asking you some questions here today.

Please, because we have a court reporter taking everything down, please let me finish my question before you begin your answer, okay?

At the end of this there will be a

Page 11

written record of what transpired today so we want to be able to have a clean question and a clean answer, okay?

A. Fine.

Q. For those same reasons, please verbalize all your answers. No "uh-huhs," "huh-uhs" or head nods. I may remind you, "Is that a yes," "Is that a no," if you shake your head, because we need a verbal response, okay?

A. Okay.

Q. Lastly, if you answer my question, I'm going to assume two things. One, you understood it, and, two, you're telling the truth.

Is that fair?

A. Yes.

Q. If you don't know something or you need me to rephrase a question, just say so, okay?

A. Okay.

Q. All right. Can you please tell us what you do for a living?

A. I work for Prescription Supply.

Q. What do you do for Prescription

Page 12

Supply?

A. I'm a VP of administration and also human resources and designated representative.

Q. And Prescription Supply, Inc. also goes by the acronym, I guess, PSI?

A. Correct.

Q. Okay. Tell me a little bit about the company, if you don't mind, the historic background. Do you know when it was formed?

A. It was started in 1955 by my grandfather and two of his siblings. Two of them were pharmacists, and there was a need for a regional pharmaceutical distributor. It has always been a family run, very small, independent company. We've grown through the years. There are approximately 12 family members that work for us now.

We -- because we're small, we have a great communication base with one another and an interworking relationship. We strive to -- service is our priority, to meet the customers' needs whenever possible and to maintain, you know, a positive, ethical stance.

Page 13

The company is now run by my mother and my uncle as corporate principals.

Q. And who would that be?

A. Thomas Schoen and Jacquelyn Harbauer.

Q. Do you know when Mr. Schoen, Thomas Schoen, took over?

MR. CLARK: Objection to form.

A. Precisely, no. He went through several positions before taking on president.

Q. Understanding your answer about the company's overall business operations, can you kind of simplify it, if you would. What exactly do you do? Do you supply medications, narcotics, things of that nature? Tell me a little bit in laymen's terms what you do.

MR. CLARK: Objection to form.

A. The company is a pharmaceutical wholesaler, primarily.

Q. And what does that mean?

A. That we buy directly from the manufacturer and sell to pharmacies or long-term

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1   care facilities.  Our primary business is
2   independent pharmacies, retail.
3       Q.   And does that include the supply
4   of narcotics?
5       A.   Some.
6       Q.   Which ones?
7       A.   I wouldn't -- couldn't tell you.
8       Q.   All right.  And you began with the
9   company when?
10      A.   About 22, 23 years ago.
11      Q.   Has the company grown in that time
12  period?
13      A.   Yes.
14      Q.   How so?
15      A.   We've developed as -- with
16  technology, computers.  All the legal
17  regulations that have come up the pike.  We've
18  grown in size.  Moved into -- built and moved
19  into a new building.
20      Q.   When you say "grown in size," does
21  that include your customer base?
22          MR. CLARK:  Objection to
23      form.
24      Q.   Let me just ask it this way:  How

Page 15

1   have you grown in size?
2       A.   Number of employees, increased
3   sales, and customer base.
4       Q.   Let's work in reverse.  Customer
5   base, do you know how many customers you have
6   presently?
7       A.   No.
8       Q.   Thousands or --
9           MR. CLARK:  Objection.  Form.
10      Q.   If you know.
11      A.   My guess would be -- I really
12  can't give you a definitive answer.  We might
13  have two or three thousand customers.  They're
14  all not active.
15      Q.   What geographical area are they
16  spread throughout?
17          MR. CLARK:  Objection to
18      form.
19      A.   We are in -- predominantly a
20  regional supplier, but we do service many
21  states.
22      Q.   Do you know which ones?
23      A.   Not offhand all of them, no.
24      Q.   Do you know ballpark how many

Page 16

1   states?
2           MR. CLARK:  Objection to
3       form.
4       A.   In my opinion, 30.
5       Q.   Okay.  So when you say small
6   family business, large customer base, though,
7   right?
8           MR. CLARK:  Objection.  Form.
9       A.   Large -- can you define what you
10  mean by "large" --
11      Q.   That's okay.
12      A.   -- because that's a comparative
13  statement.
14      Q.   Sure.  That's fair.
15          How many employees do you have?
16      A.   Approximately 80.
17      Q.   And you said you moved into a
18  larger facility.  What do you mean?  How large
19  is your facility?
20          MR. CLARK:  Objection.  Form.
21      A.   We are in a building we built
22  specifically -- well, Prescription Supply -- we
23  rent a building that was designed for us, and
24  it's, I believe, 30,000 square feet.

Page 17

1       Q.   You said your sales have
2   increased.  How so?
3           MR. CLARK:  Objection to
4       form.
5       A.   Just based on the fact that we've
6   been able to increase our employee base and have
7   added additional state licenses.
8       Q.   Do you know since 1996 how much
9   your sales have increased?
10      A.   No.  I couldn't tell you.
11      Q.   Do you know who would be most
12  knowledgeable about that?
13      A.   Probably the corporate president.
14      Q.   You just know they have increased?
15      A.   I -- yes.
16      Q.   But you don't know by what grade
17  percentage?
18      A.   No.
19      Q.   Tell me a little bit about when
20  you started.
21          MR. CLARK:  Objection to
22      form.
23      A.   I was actually with the company
24  for a short time when I graduated from college

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    before I went into my career choice at that
2    point, which was education, and did warehouse
3    work, learning the business and did some
4    accounting work.  Then after many years, came
5    back and started serving as credit manager,
6    human resources.  We are a small company and,
7    therefore, we wear many hats and develop into
8    positions.
9        Q.   When you say "small company," do
10   you know how you rank in the industry, if you
11   know?
12           MR. CLARK:  Objection to
13   form.
14       A.   I really don't have a clue.  I
15   know we are the smallest in Ohio.
16       Q.   And do you know what your average
17   sales are in a given year?
18           MR. CLARK:  Objection.  Form.
19       A.   No.
20       Q.   Do you know if they're in the
21   millions?
22           MR. CLARK:  Same objection.
23       A.   I -- I don't know.
24       Q.   You don't see the books?

Page 19

1        A.   I don't review the books, no.
2        Q.   Fair enough.
3            All right.  I do want to talk to
4    you -- I know you said it's a family business.
5    I want to kind of talk to you about the cast of
6    characters, the folks that work in the business,
7    okay?
8            So we're going to look at a
9    document.  Specifically this is PSI-1010.
10       A.   Okay.
11           MR. REINS:  I have a hard
12   copy if you want one.
13           MR. CLARK:  I appreciate it.
14           MR. REINS:  So, Zach, if you
15   could kind of zoom in at the top
16   and we'll work our way down.  All
17   right.  Perfect.
18   BY MR. REINS:
19       Q.   All right.  So we're just learning
20   a little bit about your company today, so
21   obviously we've received some items in discovery
22   kind of telling us who's who and maybe you can
23   help elaborate on that.
24           Obviously you've mentioned the

Page 20

1    president is Thomas Schoen, and it also says "DR
2    supervisor."
3            Do you know what that stands for?
4        A.   Designated representative
5    supervisor.  So he is my supervisor.
6        Q.   Okay.  Is he everyone's
7    supervisor?
8        A.   Yes.
9        Q.   Okay.  There's no DR supervisor
10   he's subservient to I'm guessing?
11           MR. CLARK:  Objection to
12   form.
13       A.   Correct.
14       Q.   Now, underneath that is
15   secretary-treasurer.  And who would that be?
16       A.   Jacquelyn Harbauer.
17       Q.   All right.  And what relation
18   would that be to you?
19       A.   My mother.
20       Q.   Gotcha.  And then that would be
21   your, obviously, uncle's sister?
22       A.   Correct.
23       Q.   All right.  And then we have VP of
24   sales, Christopher Schoen?

Page 21

1        A.   Correct.
2        Q.   What relation?
3        A.   Cousin.
4        Q.   Okay.  And who is he the son of?
5        A.   Tom.
6        Q.   Okay.  And do you know what -- and
7    forgive me.  I skipped your mom.  Do you know
8    what your mom does as a secretary and treasurer?
9            MR. CLARK:  Objection to
10   form.
11       A.   I -- I know she is overall
12   responsible for board minutes, you know,
13   financial, overseeing the accounting department,
14   controller, those types of things.
15           (Reporter clarification.)
16       A.   Controller.  Sorry.  Controller.
17   And the licensing, regulatory.  She's over
18   myself as well.
19   BY MR. REINS:
20       Q.   Okay.  And so the -- and I'm
21   sorry.  When you said earlier you came back
22   after several years, what year was that?
23       A.   That I came back?
24       Q.   Yes, ma'am.

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1       A.   I'm guessing it was 1996, '97.
2       Q.   Okay.  Probably finish up
3  your time.  So when you first came back, what
4  was your position?
5       A.   Credit manager.
6       Q.   What did that mean?
7       A.   I worked with collections,
8  accounts receivable and the controller.
9       Q.   What's your educational
10 background?  What was your degree in?
11      A.   I have a Master's of Science in
12 administration, educational administration, and
13 a bachelor of education.
14      Q.   Gotcha.  And so when you finished
15 that first position, you transitioned into a new
16 one obviously?
17           MR. CLARK:  Objection to
18      form.
19      A.   When I finished being credit
20 manager?
21      Q.   Yes, ma'am.
22      A.   I transitioned, yes, into more of
23 the vice president and was assisting the
24 secretary/treasurer with licensing,

Page 23

1  developmental for our VAWD certifications.  As
2  the regulatory requirements have blossomed in
3  the last 20 years, the need to have a person
4  directly involved with that, is what I came
5  into.
6           I also do human resources, some --
7  it's delegated responsibilities.  Primarily I
8  deal with job descriptions and training.
9       Q.   When you talk about your
10 regulatory position, is that that you are an
11 assistant, I guess, to your mother in that role?
12      A.   Correct.
13           MR. CLARK:  Objection to
14      form.
15      Q.   When did you begin doing that?
16      A.   When did I begin doing that?
17      Q.   Yes, ma'am.
18           MR. CLARK:  Objection to
19      form.
20      Q.   You said as time went on --
21      A.   I -- I honestly don't remember
22 when.
23      Q.   Would it be longer than two, three
24 years ago or --

Page 24

1       A.   Oh, longer than that.
2       Q.   Okay.
3       A.   I -- I know that -- as I said, as
4  the regulatory environments increased, so did
5  the development of the position, licensing and
6  all of that.
7       Q.   So -- and you might not be able to
8  answer this.  Before 2010 or after, if you know?
9           MR. CLARK:  Objection to
10      form.
11      A.   I couldn't say.  It would be pure
12 guess.
13      Q.   All right.  Do you know how long
14 after you left the credit manager position you
15 got into regulatory services?
16           MR. CLARK:  Objection to
17      form.
18      Q.   Months, years?
19      A.   I --
20           MR. CLARK:  Same objection.
21      Go ahead.
22      A.   When I transitioned from one, I
23 had been out ill for a period of time, so when I
24 came back, the credit management position had

Page 25

1  been filled by another personnel, so I began to
2  work more closely with the corporate
3  secretary/treasurer and develop that.
4       Q.   So I'm going to say this as
5  carefully as I can.  I do not want to know
6  anything about your health condition whatsoever.
7  But given that you had a health issue, does
8  that -- do you know when that was, without
9  revealing anything about your health condition?
10           MR. CLARK:  Objection to
11      form.
12      A.   I'm guessing seven years ago.
13      Q.   Okay.
14      A.   But it -- in my -- that's to the
15 best of my recollection.
16      Q.   And I appreciate that.
17           And I guess this would be a good
18 time to -- when you start -- when you got
19 transitioned into that role, can you tell me
20 specifically what your duties and
21 responsibilities were?
22           MR. CLARK:  Objection to
23      form.
24      A.   It began with getting our VAWD

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 certification.
2 Q. Your what? I'm sorry?
3 A. VAWD, verified authorized
4 wholesale distributor, verification through the
5 National Association of Boards of Pharmacy.
6 Q. What did that certification allow
7 you to do?
8 A. To sell in multiple states as that
9 is a requirement for licensure.
10
11
12
13
14
15
16
17
18 Q. So I'm going to ask you this
19 question, but I want you to understand I know
20 dates and times may be difficult for you. Just
21 do the best you can, okay?
22 Do you know when that
23 certification was ultimately approved?
24 MR. CLARK: Objection to

Page 27

1 form.
2 A. I believe nine or ten years ago,
3 to the best of my recollection.
4 Q. Okay. So when you came back after
5 your health issue, was it already approved?
6 A. No.
7 Q. Okay. I'm not really a math guy,
8 but I think we approximated that into about
9 seven years?
10 A. Seven years? Then I would have
11 misspoken.
12 Q. That's okay.
13 A. I -- again, it's hard to recall.
14 Q. Those are not points I'll be
15 scoring today on math, so I promise you. So
16 we're just trying -- that actually is a helpful
17 process. So if we know that it was about ten or
18 eleven years ago, do you know how long you
19 worked on it before it was approved?
20 MR. CLARK: Objection to
21 form.
22 A. I know the process was begun
23 before I came back. The entire length of time,
24 maybe a year.

Page 28

1 Q. Okay. That's wonderful.
2 MR. CLARK: Before you ask
3 the next question, did we lose
4 power here?
5 THE WITNESS: I have no
6 screen.
7 MR. REINS: I just hadn't
8 talked about it in a while.
9 MR. CLARK: I want to make
10 sure we're up and running.
11 MR. REINS: The power is
12 still running.
13 MR. CLARK: Okay.
14 BY MR. REINS:
15 Q. All right. So after that, you
16 helped in that process, what other regulatory
17 duties and responsibilities did you have, if
18 any?
19 MR. CLARK: Objection to
20 form.
21 A. I had responsibility to keep a
22 knowledge base, if possible, of regulatory
23 requirements, working with the licensures, so
24 ensuring that we are compliant with all the

Page 29

1 regulations for each license, including DEA,
2 being aware of governmental changes.
3 Q. All right. Any other duties and
4 responsibilities, other than what we've
5 discussed so far, when you transitioned to your
6 new role?
7 MR. CLARK: Objection to
8 form.
9 Q. I think you touched on the human
10 resource aspect as well, so I didn't know if
11 there was anything else.
12 A. Those are my primary
13 responsibilities.
14 Q. Okay. And you've held those
15 consistently since the best you've approximated
16 for us here today?
17 A. Yes.
18 Q. Okay.
19 MR. CLARK: Objection to
20 form.
21 Just give me a second to get
22 my objection on --
23 THE WITNESS: Yeah. I'm
24 sorry.

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review



Page 30

1    MR. CLARK: No problem.
2    You're doing fine.
3    - - -
4    (PSI-Harbauer Exhibit 1 marked.)
5    - - -
6    BY MR. REINS:
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4    Q.   When you look at all of that, the
5    telemarketing staff, the customer service staff,
6    Chris, any of the other people that work with
7    him, Mr. Schoen -- I say Chris because he's --
8    there's several Mr. Schoens. Do you know how
9    many people that would be, approximately?
10    MR. CLARK: Objection to
11    form.
12    A.   My guess would be eight to ten.
13    Q.   And then you've got the one and a
14    half person? You got --
15    A.   He's -- the half person is a
16    part-time buyer --
17    Q.   Okay.
18    A.   -- and a part-time sales rep where
19    he would visit Michigan stores. And then we
20    have a gentleman who visits our Ohio stores.
21    Q.   That's a good definition of half a
22    person. I got it.
23    We were talking about the
24    regulatory. There's you, your mom. Is there

Page 32

1    anybody else that's part of the regulatory
2    division in the time period we've discussed?
3    MR. CLARK: Objection to
4    form. Misstates the testimony.
5    A.   I think that many of our personnel
6    have to be aware of the rules and regulations.
7    Q.   Sure. But how many are actually
8    designated in the regulatory department, besides
9    you and -- it is you and your mom, right?
10    A.   My --
11    MR. CLARK: Same objection.
12    Q.   You can answer.
13    A.   Tom also oversees so, you know.
14    Q.   Okay. Anyone else?
15    A.   No.
16    Q.   All right. And here's where you
17    can educate me, because VP-IS Kirk Harbauer --
18    A.   Correct.
19    Q.   -- he is your --
20    A.   Brother.
21    Q.   -- brother. I see a lot of
22    report -- his name is involved in different
23    reporting and e-mails and letters and things.
24    Is he not involved in the regulatory process?

Page 33

1    MR. CLARK: Objection to
2    form.
3    A.   His -- he carries -- he ensures
4    that the necessary reporting is sent, for
5    example, ARCOS reporting, or there are states
6    that require we send in sales history of
7    controlled substances, so the computer
8    department -- well, Kirk. I should rephrase
9    that. Kirk will develop the necessary program
10    to do that. And so we say that he is involved
11    because of that purpose.
12    Q.   But he actually just completes the
13    reporting --
14    A.   Technology.
15    MR. CLARK: Hold on. Let him
16    finish his question.
17    A.   I apologize.
18    Q.   No, that's okay. I think I might
19    have got it out there.
20    He's responsible for executing the
21    reporting necessary pursuant to the regulations,
22    safety rules?
23    MR. CLARK: Objection to
24    form.

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1          Go ahead.
2      A.  He gets the reports out.
3      Q.  Okay.  Who has decided or who has
4   made the decision as to how to report?
5          MR. CLARK:  Objection to
6      form.
7      Q.  What to report, how to report.
8          MR. CLARK:  Same objection.
9      A.  It depends on the rules and
10  regulations.
11     Q.  So let's start with that then.
12  What rules and regulations are you obligated to
13  follow as the regulatory -- what position is it,
14  regulatory advisor?
15         MR. CLARK:  Objection to
16     form.
17     A.  My title is VP admin and human
18  resources and DR, designated representative.
19     Q.  So in order to comply with the
20  rules, you need to know what they are, right?
21     A.  Are.
22     Q.  So what rules are you required to
23  follow?
24     A.  All --

Page 35

1          MR. CLARK:  Objection to
2      form.
3      A.  All federal.  With the state,
4   local.
5      Q.  Have you reviewed all of those
6   rules and regulations?
7          MR. CLARK:  Objection to
8      form.
9      Q.  The ones that apply to your
10  business, of course.
11     A.  Have I reviewed them all?
12     Q.  Yes.
13     A.  Honestly, I couldn't believe that
14  it -- that was even possible.  I would say no.
15  I will say that I am aware of the requirements
16  of many things.
17     Q.  What are you -- are you aware of
18  the Controlled Substances Act?
19     A.  Yes.
20     Q.  What do you believe that obligates
21  you to do or not do?
22         MR. CLARK:  Objection to
23     form.
24     A.  I see it as --

Page 36

1          MR. CLARK:  I just want to
2      object to the extent it calls for a
3      legal conclusion.
4          MR. REINS:  And I will
5      recognize, because I read some of
6      your prior depos, that that is well
7      contemplated in any objections to
8      form.
9          MR. CLARK:  Okay.
10         MR. REINS:  But you are
11     welcome to state your objections as
12     you see fit.
13     A.  Would you repeat the question,
14  please?
15     Q.  Of course I will.
16         MR. CLARK:  Just to be clear,
17     I have not been involved in any
18     other depositions.
19         MR. REINS:  Oh, really?  Oh,
20     okay.  I've seen that objection
21     several times.
22  BY MR. REINS:
23     Q.  I think the question that was
24  posed to you is:  Sitting here today, what do

Page 37

1   you believe the Controlled Substances Act
2   obligates your company to do or not to do?
3          MR. CLARK:  Same objection.
4      A.  I see the purpose of the act is to
5   regulate the flow of pharmaceuticals throughout
6   the industry.  There are many requirements in
7   monitoring, licensing, regulatory -- monitoring,
8   licensing, reporting.
9      Q.  Do you know why these rules and
10  regulations have come into play?
11         MR. CLARK:  Objection to
12     form.
13     A.  I couldn't state the intent of
14  them, but I -- I think it's to regulate the
15  industry.
16     Q.  Do you know why the industry needs
17  to be regulated?
18         MR. CLARK:  Same objection.
19     A.  As with most industries, there is
20  always illegal activity involved, and so by
21  regulating, I see it as an attempt to try to
22  keep things in proper channels.
23     Q.  You understand that we're in the
24  midst of an opioid crisis?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1      MR. CLARK: Objection to
2  form.
3      Q.  Correct?
4      A.  I agree from what I have read and
5  heard on the news, that I believe there is an
6  opioid crisis.
7      Q.  You understand and recognize it's
8  affecting all races, all genders, in this
9  country, correct?
10      MR. CLARK: Objection to
11  form.
12      A.  It affects many people.
13      Q.  Many communities in this country,
14  correct?
15      MR. CLARK: Same objection.
16      A.  Yes.
17      Q.  And it's found to be, some of the
18  drugs, specifically oxycodone, have been abused
19  heavily in this nation, correct?
20      MR. CLARK: Objection to
21  form.
22      A.  I can't -- that's what the news
23  says.
24      Q.  Do you not agree with that?

Page 39

1      MR. CLARK: Objection to
2  form.
3      A.  I can't disagree or agree. I have
4  no personal knowledge of it.
5      Q.  Sitting here today, as someone
6  who's involved in the regulatory safety rules
7  and employing those in your company for PSI, you
8  don't know one way or another whether we're --
9  oxycodone is addictive?
10      MR. CLARK: Objection to
11  form.
12      A.  Do I know if oxycodone is
13  addictive, is that what you just stated?
14      Q.  Yes. Based on all the literature,
15  publications, congressional hearings, everything
16  that's available to you, do you know that?
17      MR. CLARK: Objection to
18  form.
19      A.  I have been told that OxyContin is
20  addictive, yes.
21      Q.  Who told you that?
22      MR. CLARK: Objection to
23  form.
24      A.  That's from the news and -- that's

Page 40

1  where I would get my information.
2      Q.  Your company has not had meetings
3  on the addictive nature of a product that you're
4  distributing?
5      MR. CLARK: Objection to
6  form. Argumentative.
7      A.  To my knowledge, we have not.
8      Q.  Okay. I think we're on a new
9  title now. VP HR manager DR. Have we
10  covered -- I think we have -- all the duties and
11  responsibilities for which you hold?
12      A.  Yes.
13      Q.  All right. You're also vendor
14  verification. What does that mean?
15      A.  Part of the requirements of VAWD
16  are to ensure that who we are purchasing from
17  and selling to are properly licensed, inspected,
18  and so I do verify all licenses of potential
19  vendors and maintain records on those.
20      Q.  Assistant to the president, James
21  Schoen. What relation is he to the president?
22      A.  Son.
23      Q.  How does he assist his dad?
24      MR. CLARK: Objection to

Page 41

1  form.
2      A.  I really couldn't tell you what he
3  does in that respect.
4      Q.  Okay. Does he get a paycheck?
5      MR. CLARK: Objection to
6  form.
7      MR. REINS: Withdraw.
8  BY MR. REINS:
9      Q.  Next we have -- and I'm not quite
10  sure what that position is, Robert Schoen, what
11  relation?
12      A.  That's also a son of Tom.
13      Q.  And what does that stand for?
14      A.  Warehouse manager.
15      Q.  Gotcha. And what are his duties
16  and responsibilities?
17      A.  To oversee the warehouse.
18      Q.  The warehouse is where all the --
19      A.  Product.
20      Q.  Is kept?
21      So oversee it. Are there policies
22  and procedures that govern the warehouse, if you
23  know?
24      A.  Yes.

11  (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1      Q.   Okay.  As part of your position,
2  are you responsible for implementing and
3  revising policies and procedures within your
4  company?
5           MR. CLARK:  Objection to
6       form.
7       A.   I work with the development of the
8  policy in writing, along with Mr. Schoen, Tom
9  Schoen, to ensure that our policies are
10  compliant to rules and regs, and that the
11  procedures can best meet those.
12      Q.   It's you and Mr. Schoen, Thomas
13  Schoen, that do that --
14      A.   And --
15           MR. CLARK:  Hold on a second.
16      Let him finish the question.
17      Q.   Sorry.  That's okay.  I was done.
18  That's okay.
19           MR. CLARK:  Objection to
20      form.
21           Can you read back the
22      question --
23      A.   Repeat that.  I'm sorry.
24      Q.   No.  You don't have to be.  And

Page 43

1  remember my standing offer for breaks.  Whenever
2  you get to that point, okay?
3       A.   I'm getting close.
4       Q.   Okay.  We'll just finish this part
5  up, and then we'll go --
6       A.   Thank you.
7       Q.   -- unless you just give me the
8  look, okay?
9           I believe the question was, in
10  regards to the development and revision of
11  policies and procedures specifically, who was
12  involved -- and I thought I understood you to
13  say yourself and Thomas Schoen --
14      A.   Okay.
15      Q.   -- but I may be incorrect.
16           MR. CLARK:  Objection to
17      form.
18      A.   And it would be all relevant
19  personnel.  If it was a warehouse procedure,
20  warehouse manager.  If it is sales or
21  purchasing, it -- relevant personnel.
22      Q.   How about when we're talking about
23  the Controlled Substances Act or the federal
24  regulations regarding shipping and/or diversion

Page 44

1  of narcotics, who would that be?
2       A.   That would also include Jim
3  Schoen, Jim Schoen, the --
4       Q.   The assistant?
5       A.   He is the assistant, but he is --
6  he also is the controlled substance handler,
7  Schedule II.
8       Q.   What does that -- we tried to talk
9  about his job a little bit ago, but I think --
10      A.   Well --
11           MR. CLARK:  Let him finish
12      his question.
13      Q.   Yeah.  That's okay.  That's how
14  it's going to work.  Something will come to you.
15  It's not a gotcha game.  So it's great when that
16  happens.
17           So tell me -- now that we've
18  discussed that, tell me what exactly he does in
19  that position based on what you just described.
20           MR. CLARK:  Objection to
21      form.
22      A.   Jim is the one who monitors and
23  fills controlled substance orders.  He's
24  responsible for knowing the customer,

Page 45

1  maintaining education within the field.
2       Q.   So he would participate in the
3  development and/or revision of those policies
4  that touched those issues?
5       A.   Yes.
6           MR. CLARK:  Objection to
7      form.
8       Q.   Would he be the ultimate one to,
9  according to the federal regulations, stop a
10  shipment if it's "suspicious"?
11           MR. CLARK:  Objection to
12      form.
13      Q.   If you know.
14      A.   He would be part of the process.
15           MR. REINS:  Take a break?
16      You want to take a break?
17           MR. CLARK:  Yes.
18           THE WITNESS:  Could I please?
19           MR. REINS:  Yeah, of course
20      you can.
21           THE WITNESS:  Thank you.
22           MR. REINS:  Yes, ma'am.
23           THE VIDEOGRAPHER:  We're
24      going off the record at 9:40 a.m.

12  (Pages 42 to 45)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

```
 1              (Recess taken.)
 2              THE VIDEOGRAPHER:  We're back
 3    on the record at 9:50.
 4    BY MR. REINS:
 5       Q.   All right.  Going back and looking
 6    at the exhibit here.  I think we -- we have
 7    covered the warehouse manager, Mr. Robert
 8    Schoen.  The next two I think are pretty
 9    self-explanatory.
10              Director of purchasing, what does
11    that mean?
12       A.   Our primary buyer.
13       Q.   Okay.  Can you explain?
14       A.   John Cromly buys many of our lines
15    of -- from the manufacturers and making sure we
16    have product.
17       Q.   How does he do that, if you know?
18              MR. CLARK:  Objection to
19    form.
20       A.   I know that he places -- you know,
21    he looks at usage and he places the orders.
22       Q.   Okay.  How many set of eyes do you
23    think in the company looks at an order before it
24    gets filled?
```

Page 47

```
 1              MR. CLARK:  Objection to
 2    form.
 3       A.   I couldn't say.  It depends on how
 4    the order comes in.
 5       Q.   Sure.
 6       A.   It -- I couldn't say.
 7       Q.   Multiple folks, fair to say?
 8              MR. CLARK:  Objection to
 9    form.
10       A.   A few will see it.  I mean, the --
11    if it comes in via computer, it can be held, it
12    can not be held.  The person who pulls it sees
13    the order.  The person who checks it sees the
14    order.
15       Q.   So if you get it on a computer, is
16    it e-mailed?  How do you get the order on a
17    computer?
18              MR. CLARK:  Objection to
19    form.
20       Q.   I'll rephrase.
21              You mentioned computer.  You might
22    get an order.  Please tell me how that works.
23       A.   EDI.  We have a website.  They can
24    buy directly on the website.  That's our
```

Page 48

```
 1    primary.  Or the telemarketer or salesperson can
 2    enter the order directly into the computer.
 3       Q.   Where does it go from there?
 4              MR. CLARK:  Objection to
 5    form.
 6       A.   It's either held or it's released
 7    to a pick slip.
 8       Q.   Tell me -- a pink slip I think.
 9       A.   Pick.
10              MR. CLARK:  Pick.
11       Q.   Pick slip.  What is a pick slip?
12       A.   We are a manual wholesaler, so
13    it's a piece of paper that has the products
14    listed for our pullers to go to the shelves and
15    get.
16       Q.   Okay.  So it comes in -- so it
17    would come through -- if they did it on the
18    website, it would go -- so how would it get to
19    the pullers?
20              MR. CLARK:  Objection to
21    form.
22       A.   If the order -- if there's no
23    reason to stop it, the order would be translated
24    to a pick slip, piece of -- physical piece of
```

Page 49

```
 1    paper, and the pullers take the paper with a
 2    cart and go and pull the product.
 3       Q.   Who is the one that makes the
 4    decision whether to stop it?
 5              MR. CLARK:  Objection to
 6    form.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 50

Page 52

    1    MR. CLARK:  Good job.
    2    MR. REINS:  Yeah.
    3  BY MR. REINS:
    4    Q.   All right.  So before I leave you
    5  here today -- this is probably not going to
    6  break your heart -- those would be the better
    7  folks to ask about the threshold limits and the
    8  criteria?
    9    A.   In my opinion, yes.
   10    Q.   Fair.
   11    Let's talk about the other things,
   12  though, the unusual size, unusual frequency.
   13  And probably not a bad time, because that
   14  language sounds kind of familiar for me -- to
   15  me -- to pull up PSI-103.
   16    This look familiar?
   17    MR. CLARK:  Objection to
   18  form.
   19    - - -
   20  (PSI-Harbauer Exhibit 2 marked.)
   21    - - -
   22  BY MR. REINS:
   23    Q.   So this is going to be -- let me
   24  withdraw that.

Page 53

    1    Ma'am, we're looking now at -- and
    2  this will be Plaintiff's Exhibit Number 2 to the
    3  deposition.  This is the Code of Federal
    4  Regulations, which you identified earlier,
    5  Subsection 1301.74, specifically Subsection (b).
    6    And we'll be talking about the
    7  last sentence there, "Suspicious orders include
    8  orders of unusual size, orders deviating
    9  substantially from a normal pattern, and orders
   10  of unusual frequency," kind of the language you
   11  just used, if not identical, right?
   12    MR. CLARK:  Objection to
   13  form.
   14    A.   Similar language.
   15    Q.   Fair.
   16
   17
   18
   19
   20
   21
   22
   23
   24

   19    Q.   No.  Don't be.
   20    MR. CLARK:  You've been doing
   21  well so far.
   22    MR. REINS:  Yeah.  I mean,
   23  that's an amazingly long stretch
   24  for a rookie.

Highly Confidential - Subject to Further Confidentiality Review



Page 54

Page 55

1     Q.   And that's two really good points.
2    Let me start with the first one.  The first,
3    does Jim see every order?
4     A.   Yes.
5     Q.   Okay.  The due diligence that you
6    spoke to me about, because your uncle had made
7    reference that you might be someone that kind of
8    is the record keeper or keeping of certain
9    documents.  Are there documents to reflect the
10   due diligence was actually done?
11     MR. CLARK:  Objection to
12    form.
13     A.   The controlled substance
14   questionnaire is there.  I don't do the actual
15   in-depth investigation.  That's Jim Schoen, and
16   so you would have to ask him.
17     Q.   And that's fair.  You'll never
18   hurt my feelings if you say that.  Don't abuse
19   it, though, just because you want to leave here
20   today.
21     The -- understanding everything
22   you just said, is there not a trigger in the
23   system, if you know, that if there is a certain
24   percentage of an increase in an order or certain

Page 56

1    type of mathematical formula that would trigger
2    a review, if you know?
3     MR. CLARK:  Objection to
4    form.
5     A.   I don't know.
6     Q.   Okay.  Would that be a Jim
7    question?
8     A.   Probably.
9     Q.   Okay.
10     A.   Or Kirk.
11     Q.   Or Kirk.
12     And the follow-up to that question
13   is, if you know, do you have to exceed the
14   threshold in order for this review to take
15   place?
16     MR. CLARK:  Objection to
17    form.
18     Q.   If you know.
19     A.   I don't know.
20     Q.   Okay.  Going back now to what is
21   Exhibit 1, which is PSI-1010, and it's actually
22   going to be the third page of that document.
23     So now we're looking at a -- do
24   you know what this is, let me just say?

Page 57

1     A.   Yes.
2     Q.   What is it?
3     A.   It's an organizational chart of
4    the company.
5     Q.   Yes, ma'am.  And so we've got at
6   the top the board of directors, which is your
7   uncle and your mother; is that correct?
8     A.   Correct.
9     Q.   Are they the only two board
10   members?
11     A.   They're the officers of the
12   company and the board members.
13     Q.   Okay.  Are there any other board
14   members, if you know?
15     A.   Not to my knowledge.
16     Q.   Okay.
17     MR. CLARK:  Lance, before you
18    go on --
19     MR. REINS:  Sure.
20     MR. CLARK:  -- can I ask a
21   housekeeping question?
22     MR. REINS:  Yeah.
23     MR. CLARK:  The document has
24   two different Bates numbers and

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    you're referring to the one up top.
2           MR. REINS:  I am.
3           MR. CLARK:  I'm not sure
4    where that comes from.
5           MR. REINS:  Yeah.  So we have
6    internal numbers.  I'm happy to use
7    the other one.  I can identify it
8    for Zach, and then we can use the
9    other one for the record as well.
10          MR. CLARK:  If we can just
11   clarify, just so if we're looking
12   back at exhibits --
13          MR. REINS:  Absolutely.
14          MR. CLARK:  -- I'll know
15   we'll have the exhibits.
16          MR. REINS:  So to be clear,
17   those are your Bates numbers on the
18   bottom, correct?
19          MR. CLARK:  Correct.
20          MR. REINS:  So Exhibit No. 1
21   is Bates numbered PSI-145 through
22   147.  We're looking at 147 right
23   now.
24          MR. CLARK:  Thank you.

Page 59

1           MR. REINS:  Yeah, of course.
2    BY MR. REINS:
3        Q.   And then obviously underneath
4    that -- and we're not going over the things
5    we've already established, but under Mr. Schoen,
6    Thomas Schoen, that is, there are several
7    positions, and then I think you did this -- it
8    was helpful.  You've already kind of covered
9    this, which is, you're on your -- and I don't
10   mean this lightly.  I mean it's your mother,
11   Ms. Harbauer's side of the chart; is that right?
12       A.   Correct.
13       Q.   And what do we call -- that right
14   side of the chart where you're under and
15   Mr. Buck is under, is this more the regulatory
16   side then?
17          MR. CLARK:  Objection to
18       form.
19       Q.   Or you could characterize it some
20   other way if it's more appropriate.
21       A.   It really isn't the regulatory
22   side.  It has to do more with secretarial and
23   treasurer.
24       Q.   Chain of command, right, I guess?

Page 60

1           MR. CLARK:  Same objection.
2        A.   You have to categorize, so that's
3    how they broke it down.
4        Q.   You do report directly to your
5    mother?
6        A.   And to Tom.
7        Q.   And to Tom.  Okay.  And then
8    Mr. Buck we've kind of talked about -- have we
9    talked about Mr. Buck's position?  Controller.
10   No, I don't think we did.
11          What's his position?
12       A.   He oversees the accounting
13   department and controller AP.
14       Q.   Okay.  All right.  Let me just
15   look and see if there's anything else.  I think
16   we've talked about the other folks for the most
17   part.
18          Order checker, what do those folks
19   do?
20          MR. CLARK:  Objection to
21       form.
22       Q.   Do you see them there in the
23   middle?
24       A.   When an order has been manually

Page 61

1    pulled, it's sent down the run.
2           (Reporter clarification.)
3        A.   The pick slip is scanned into the
4    computer with a bar code, and then each product
5    bar code is scanned to verify accuracy of the
6    order fulfillment.
7    BY MR. REINS:
8        Q.   Got it.
9           Fleet manager?
10       A.   We deliver locally with our own
11   set of cars.  He's responsible for overseeing
12   vehicles.
13       Q.   Okay.  The other states, how do
14   you get the drugs there?
15          MR. CLARK:  Objection to
16       form.
17       Q.   The other states, how do you get
18   the products there?  I'm sorry.
19       A.   Common carrier.
20          MR. CLARK:  Same objection.
21       Go ahead.
22       A.   Common carrier.
23       Q.   Okay.  All right.  Thank you.  I
24   think we're done with this one.  I'll hand these

16  (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review



Page 62

1    over so I don't misplace them.
2            We did take your uncle's
3    deposition.  He was actually specifically
4    delegated -- designated as a 30(b)
5    representative to speak on behalf of the
6    company.  I'd like to look at, if we could, from
7    that deposition, PSI-1006, page 66.
8            Starting at line 11.  His
9    testimony was -- and going to line 21.  Yes.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 64

1
2
3
4
5
6
7
8
9    Q.    Would you be -- I get one shot
10    with you.  So should I -- would he be more
11    appropriate to ask than yourself, based on what
12    you've told me already?
13    A.    As I don't -- I do not personally
14    deal with orders.
15    Q.    And that's fair.  I hope you
16    understand I just have to -- if I don't ask you
17    a question, I have to establish why I didn't.
18    So ...
19            Now, sitting here today, we'll
20    look at the same deposition, page 150, starting
21    on line 11 going to line 17.  Again, this is
22    Mr. Schoen.
23
24

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review



Page 66

Page 68

18    Q.   Okay.  Fair.
19          All right.  Shifting gears.  I'm
20   going to now talk to you about -- because you're
21   uncle did identify you as someone with
22   knowledge, and I think we spoke about the
23   policies and procedures.  So we're going to talk
24   about some of those, okay?

Page 69

1    A.   Yes.
2    Q.   We are going to look at --
3          MR. REINS:  So, Zach, for
4    your purposes, PSI-4040.
5          For record purposes, PSI-648.
6    And, folks, I have hard copies.  If
7    anybody wants one, just let me
8    know, but --
9    Q.   All right.  So we're --
10         MR. CLARK:  I'll take a hard
11   copy.
12         MR. REINS:  Oh, absolutely.
13         MR. CLARK:  Thank you.
14   BY MR. REINS:
15    Q.   So we are going to talk here
16   about -- this one is called Prescription Supply,
17   Inc.  This is Inventory Controls, and obviously
18   that's the document name.  And then underneath
19   it says "Document control number:  WP-1."
20         Do you know what that is
21   indicative of?
22    A.   Warehouse procedure 1.
23    Q.   Gotcha.  And forgive me.  I don't
24   believe we have it, but if we have, I apologize,

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1   but -- so obviously there are warehouse policies
2   and procedures.  Do you know how many there are?
3         MR. CLARK: Objection.  Form.
4         Q.   Let me ask a better question.
5   There's a table of contents, correct?
6         MR. CLARK: Same objection.
7         A.   All the policies and -- the
8   written policies and procedures we have are in
9   the documents that have been provided.
10        Q.   Just to cover myself, there are
11  warehouse policies and procedures.  Are there
12  other department policies and procedures?
13        MR. CLARK: Same objection.
14        A.   For example, human resources, HR1,
15  2, or 3, background checks, those types of
16  things.
17        Q.   Got it.
18        A.   So the control number was placed
19  simply for organizational purposes.
20        Q.   What do you mean?
21        A.   The document -- so that -- it was
22  easier to reference.
23        Q.   How many WPs are there?
24        A.   I believe 13 or 14.

Page 71

1         Q.   And those have developed over the
2   years?
3         A.   Correct.
4         Q.   For instance, this one was -- the
5   effective date is June 2000, meaning that's when
6   it first became -- came into effect, correct?
7         A.   Correct.
8         Q.   Now, if we wanted to see --
9   there's a number of revision dates there.  If we
10  wanted to know what was revised specifically in
11  accordance with a particular date, do you have
12  the older versions so that we can compare to see
13  what was added and/or edited?
14        MR. CLARK: Objection to
15  form.
16        A.   There may be some if it was saved
17  to the cloud.  And all documents were not always
18  saved to the cloud originally back then.  The
19  revision dates coincide with annual reviews.
20        Q.   Well, you say "annual reviews,"
21  but there's not a revision date until 2008,
22  which would be eight afters after it was
23  created, correct?
24        A.   A revision date.  That doesn't

Page 72

1   mean it wasn't reviewed.
2         Q.   Gotcha.  So it was reviewed
3   annually but the first time it was revised was
4   2008?
5         A.   Correct.
6         MR. CLARK:  Objection to
7   form.  Give me a second.
8         THE WITNESS:  Yes.  Thank
9   you.
10        MR. REINS:  Got it.
11        I'm going to -- if there
12  isn't a request out there -- and
13  that would be my ignorance -- but I
14  will simply put and make it known
15  that we're going to want those,
16  whatever is available in the cloud,
17  to try to determine the revisions
18  that have been made historically,
19  okay?
20        MR. CLARK:  We'll take it
21  under advisement.
22        MR. REINS:  Sure.  Yeah.  I
23  know you're not agreeing, but I
24  guess finding out what's out there

Page 73

1   is going to be the first step.
2   BY MR. REINS:
3         Q.   All right.  So this policy says,
4   "Prescription Supply, Inc. will monitor
5   inventory for cyclical accounts."
6         What does that mean?
7         A.   We do inventory checks on lines on
8   a regular basis so that we are not overstocking
9   product.  So we do counts -- they're cyclical in
10  that they're every month or every two months or
11  whatever.
12        Q.   Okay.  Suspicious purchases and
13  losses, I think we've covered that as best we
14  can.
15        Theft or otherwise missing
16  products.
17
18
19
20
21
22
23
24

19  (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review



Page 74

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 76

| | |
|---|---|
| 12 | Q.  Okay. |
| 13 | MR. CLARK:  Just go off the |
| 14 | record for one second. |
| 15 | MR. REINS:  Sure. |
| 16 | (Brief off-record discussion.) |
| 17 | MR. REINS:  Are we off or on? |
| 18 | THE VIDEOGRAPHER: I need -- |
| 19 | MR. REINS:  That's okay.  No, |
| 20 | no.  We'll stay on. |
| 21 | BY MR. REINS: |
| 22 | Q.  And this might be my ignorance. |
| 23 | Do you have more than one uncle in the business? |
| 24 | A.  No. |

Highly Confidential - Subject to Further Confidentiality Review



Page 78

Page 80

1  that -- in fairness to you, I know what this
2  says, but you've testified here today honestly,
3  correct?
4      A.  Absolutely.
5      Q.  So meaning -- and what I mean by
6  that is, even though it says your position,
7  you've really elaborated for us the folks that
8  are truly involved in maintaining these records,
9  correct?
10         MR. CLARK:  Objection to
11      form.
12      A.  They are also -- yeah.  They're --
13  they are involved in the process, yes.
14      Q.  Heavily involved, respectfully?
15         MR. CLARK:  Same objection.
16      A.  I would agree with that.
17      Q.  Okay.  We saw the quote, and you
18  agreed with it, from your uncle's deposition
19  that -- regarding the shipping requirement or
20  the prevention of shipping in certain instances.
21  I have a hard copy of this document just so you
22  can take a look at it.
23         I don't see anything in this
24  policy and procedure -- and I'm not here to rush

Page 81

1  you, so take -- I'm sure you've seen this
2  before, this policy?
3      A.  I have.
4      Q.  Okay.  Maybe even in preparation
5  for today.  So my question to you is, I did not
6  see anything in here regarding the shipping
7  requirement.
8         MR. CLARK:  Objection to
9      form.
10      Q.  First question is, am I correct?
11         MR. CLARK:  Same objection.
12      A.  The shipping requirement?
13      Q.  Meaning stopping orders from being
14  shipped for unusual activity, "suspicious
15  orders."
16         MR. CLARK:  Objection to
17      form.
18      A.  I would have to reread this
19  thoroughly.  I believe more specifically it's
20  covered under a different procedure.
21      Q.  And that was going to be my next
22  question.  Do you know what procedure that would
23  be?
24         MR. CLARK:  Objection to

6      Q.  "DR" -- this is the third full
7  paragraph, "DR/DR supervisor shall jointly
8  review all reports and information approving
9  necessary changes, formulating and carrying out
10  all internal investigations, recommending and
11  establishing necessary procedural changes,
12  notifying all applicable agencies, which are
13  identified therein, storage of records as
14  required by law for at least six years."
15         Again, that would be Jim, Kirk,
16  correct?
17         MR. CLARK:  Objection to
18      form.
19      A.  It says "DR/DR supervisor."  I'm
20  not clear on your question.
21      Q.  Who is it referring to, the DR/DR
22  supervisor?
23      A.  Tom and myself.
24      Q.  Okay.  But I think we've covered

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    form.
2         A.   I believe it's the controlled
3    substance.
4         Q.   Okay.
5         A.   I don't recall the number,
6    document control number.
7         Q.   We'll get there.  I think I have
8    that one.  So my -- let me just finish up with
9    this one.
10             Was there any policies and
11   procedures dealing with these issues that are
12   dealt with in here, suspicious orders,
13   reporting, things of that nature, before June of
14   2000?
15             MR. CLARK:  Objection to
16   form.
17        A.   There were no written policies.
18        Q.   Okay.  Were there non-written
19   ones?
20             MR. CLARK:  Same objection.
21        Q.   If you know.
22        A.   I believe so, because we -- again,
23   I'm not filling the orders, so I --
24        Q.   Okay.  Fair enough.

Page 83

1             MR. CLARK:  Are you finished?
2    Were you done?
3             THE WITNESS:  Yeah.
4    BY MR. REINS:
5         Q.   But you're not aware of any
6    written procedures prior to this one, correct?
7             MR. CLARK:  Objection to
8    form.
9         A.   That is correct.
10        Q.   And if I wanted to -- given the
11   time frame you told me you came back, you're not
12   the one to ask if there are policies that are
13   unwritten, correct?
14             MR. CLARK:  Same objection.
15        A.   Tom and Jackie -- Tom -- well, Tom
16   primarily would -- is the one.
17        Q.   Okay.
18             MR. REINS:  We'll make that
19   Exhibit 3.
20                  ---
21        (PSI-Harbauer Exhibit 3 marked.)
22                  ---
23   BY MR. REINS:
24        Q.   So if we go back to his

Page 84

1    deposition, this is 1006, page 155, line 12.  He
2    was asked the question, specifically your uncle,
3    in the deposition:
4             "Do you know if Prescription
5    Supply has maintained copies from the original
6    of June of 2000?
7             "I don't know.
8             "Who would be the best person at
9    Prescription Supply to ask.  Any idea?
10            "Well, yeah.  I mean the --
11            "And what I'm looking for, is
12   there someone that would just deal with this
13   administrative stuff, that may be --
14            Answer, "Candy would have -- Candy
15   Harbauer would have probably been doing most of
16   this."
17            You've testified to the best of
18   your abilities as to what you recall, correct?
19            MR. CLARK:  Objection to the
20   preamble.
21            Go on.
22        Q.   Are you Candy?
23        A.   I am.
24        Q.   Okay.  Fair enough.

Page 85

1             All right.  I do want to talk
2    about -- there's -- the next policy and
3    procedure.
4             MR. REINS:  And this is going
5    to be, Zach, for you, this is PSI
6    1007.
7             For record purposes, it's PSI
8    653.
9    BY MR. REINS:
10        Q.   All right.  And here's the one I
11   think we're talking about, controlled
12   substances.  And you said, I think there's
13   another one that deals with that, right?  The
14   issue of the shipment issue, correct?
15        A.   Correct.
16        Q.   Now, I'm going to -- this is a
17   short one.  So I'm going to give you a hard
18   copy.
19        A.   Thank you.
20        Q.   You're welcome.
21             This will be Plaintiff's
22   Exhibit 4.  And correct me if I'm wrong.  I
23   don't see it in -- anything about shipping or
24   stopping shipments regarding suspicious orders

22 (Pages 82 to 85)

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    in here?
2        A.   I -- as I quickly scan this, I
3    concur it's not written there.
4        Q.   Okay.
5        A.   I know it's written.  I just can't
6    tell you where.
7        Q.   I'll just put on the record that
8    if you have a policy that deals with that, if
9    you could produce it to us.
10       Now, there is one we're going
11   to -- there's one more we're talking about,
12   which we'll talk about it in a minute.  But
13   these were all the ones that were in effect in
14   2000, correct?
15       MR. CLARK:  Objection to
16       form.
17       A.   These were written --
18       Q.   Yes.
19       A.   -- in 2000.
20       Q.   Okay.  And this is WP-2, so this
21   would be the warehouse policy number 2, correct?
22       A.   Correct.
23       Q.   I think it kind of touches on what
24   we just went over, correct, the other policy,

Page 87

1    for the most part?
2        MR. CLARK:  Objection.  Form.
3        A.   I don't understand your question.
4        Q.   Let me withdraw it and rephrase.
5        Under "Responsibilities," third
6    paragraph, it says, "IT manager shall compile
7    reports monthly regarding purchases of
8    controlled substances, threshold limits and
9    suspicious order monitoring."
10       Next paragraph, "DR/DR
11   supervisor" -- that's you, and your uncle,
12   correct?
13       A.   Correct.
14       Q.   -- "shall review all relevant
15   purchase and sales reports, consult with IT
16   manager for necessary changes and handle any
17   concerns or problems as they arise."
18       If he saw something suspicious or
19   if he saw an order of concern, he should have
20   advised you, correct?
21       MR. CLARK:  Objection to
22       form.
23       A.   When Kirk was doing the variance
24   reports, yes, he did advise Tom of concerns --

Page 88

1        Q.   Okay.
2        A.   -- of orders of interest.  The
3    threshold system stops orders.
4        Q.   Okay.  Do you know -- other than
5    the reporting that Kirk did, are you aware of
6    any other documents that were created regarding
7    potential concerns in regarding to ordering?
8        MR. CLARK:  Objection to
9        form.
10       A.   Can you explain your question a
11   little more for me.
12       Q.   Yeah.  Of course.  Are there --
13   were there any other documents generated as a
14   result of what we just read, if you know?
15       MR. CLARK:  Same objection.
16       A.   The variance reports, you'd have
17   to ask -- because I'm not dealing with it.  I
18   know we have other forms that are used by Jim
19   Schoen.
20       Q.   Okay.  That is exactly what I was
21   trying to ask you, so thank you.
22       That's Exhibit Number 4.
23       ---
24       (PSI-Harbauer Exhibit 4 marked.)

Page 89

1        ---
2    BY MR. REINS:
3        Q.   Same question, just to finish up
4    on that policy, whether there were policies
5    regarding that particular issues covered in
6    there before 2000, you would be -- you're not
7    aware of any written policies, correct?
8        MR. CLARK:  Objection to
9        form.
10       A.   I am not aware of any written
11   policies prior to that.
12       Q.   Okay.  We'll move on to another
13   policy that has been produced to us.  This might
14   be the one you were thinking of.  It's called
15   "The REMS do not ship program."
16       I'm going to hand that to you so
17   you have a hard copy.  This will be Plaintiffs'
18   Exhibit Number 5.
19       ---
20       (PSI-Harbauer Exhibit 5 marked.)
21       ---
22   BY MR. REINS:
23       Q.   Take a moment and look it over.
24   And I'm just going to level with you.  I did not

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review



Page 90

Page 92

9    Were you involved in the
10   investigation by the Ohio State Board of
11   Pharmacy?
12        MR. CLARK:  Objection to
13        form.
14        A.   Involved in what way?
15        Q.   That's what I want to know.  You
16   either were or you weren't.  I have the reports.
17   I just didn't know if you were personally
18   involved in that.  The investigation of it, the
19   due diligence, the working with the state,
20   any -- I don't know the answer to it, so ...
21        MR. CLARK:  Objection to
22        form.
23        A.   I guess I need to clarify.  Are
24   you talking about the initial one that was in

Highly Confidential - Subject to Further Confidentiality Review

Page 94

```
 1    spring, or the October one.
 2        Q.   Let's take them one at a time.
 3        A.   Okay.
 4        Q.   The one in spring of what year?
 5        A.   Was it 2017, I believe?
 6        Q.   Right.
 7        A.   I think --
 8        Q.   Do you -- so go ahead.  Yes,
 9    ma'am.  Were you involved in that one?  Sorry.
10        A.   I was asked to present documents
11    of policies and procedures.  I was asked
12    information about continuing education.  As I
13    recall, that's predominantly -- I was basically
14    pulled in and out.
15        Q.   Okay.  Limited involvement?
16        A.   Yes.
17        Q.   Specifically regarding the
18    policies?
19        A.   Correct.
20            MR. CLARK:  Objection to
21        form.
22        Q.   Were there policies that you
23    provided to them that we haven't looked at
24    today?
```

Page 95

```
 1            MR. CLARK:  Objection to
 2        form.
 3        A.   You have all our policies.
 4        Q.   Okay.  But did you speak with them
 5    about any policies that we didn't talk about
 6    here today?
 7            MR. CLARK:  Objection to
 8        form.
 9        A.   I do not recall.  I do not believe
10    so.
11        Q.   Are there separate policies and
12    procedures regarding the compliance of the state
13    regulations versus the federal regulations, are
14    there -- or should they be compiled in both?
15            MR. CLARK:  Objection to
16        form.
17        A.   You have all the policies and
18    everything is one --
19        Q.   Policy?
20        A.   -- policy.
21        Q.   Okay.  Do you know what they were
22    investigating in the spring?
23            MR. CLARK:  Objection to
24        form.
```

Page 96

```
 1        A.   In the spring?
 2        Q.   The one you were just speaking of.
 3        A.   I believe they were just coming in
 4    for a routine inspection.  They had not been
 5    there since we moved into the building.
 6        Q.   All right.  And then when was the
 7    second one that you were referencing?
 8            MR. CLARK:  Objection to
 9        form.
10        A.   We -- in the fall, we received a
11    investigation, I guess is the word.  They were
12    requesting information about some specific
13    pharmacies.
14        Q.   Do you know what the outcome of
15    that investigation -- well, first of all, were
16    you involved in that investigation?
17            MR. CLARK:  Objection to
18        form.
19        A.   What I did was to basically
20    compile the information, type the responses and
21    submit them.
22        Q.   You typed them?
23            MR. CLARK:  Objection to
24        form.
```

Page 97

```
 1        Q.   I'm sorry.  You were the one who
 2    actually responded, or was it Tom?
 3            MR. CLARK:  Same objection.
 4        A.   As a small company, we interface.
 5        Q.   Okay.
 6        A.   And so it's all together.  I mean,
 7    we -- we talk about it.  We formulate it.  I do
 8    the physical typing.  He reviews.
 9        Q.   Okay.  Did you verify the
10    information before you typed it?
11            MR. CLARK:  Objection to
12        form.
13        A.   I received the information from
14    sales history, reporting that they pulled up, or
15    from Jim Schoen and his information, and from
16    Tom.
17        Q.   Gotcha.  So you were more of a
18    facilitator of the information, not the
19    originator, so to speak?
20        A.   That's a fair statement.
21        Q.   Okay.  Do you know what the
22    outcome was of that?
23            MR. CLARK:  Objection to
24        form.
```

25 (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review



Page 98

1      A.   I understand that they replied
2   back, and then my assumption and my opinion was
3   that -- that there were no -- they understood
4   what the explanations were and it was
5   satisfactory because there was no responses
6   after that.
7      Q.   Do you know that to be true,
8   meaning, did you ever see any documentation
9   either clearing the company or finding no
10  deficiencies?
11          MR. CLARK:  Objection to
12      form.
13      Q.   Meaning -- no disrespect, but
14  there might have been something that came
15  through the course of correspondence that you
16  may not have seen, for whatever reason.  But
17  have you ever seen anything in writing clearing
18  the company?
19          MR. CLARK:  Objection to
20      form.
21      A.   Boy.  I honestly can't tell you
22  whether there was a final e-mail that said thank
23  you very much.  You know, that's very probable,
24  but I couldn't swear to it one way or the other.

Page 99

1      Q.   Fair.
2      A.   I know -- that's fine.

Page 100

Highly Confidential - Subject to Further Confidentiality Review



Page 102

7    Q.    And I had a feeling. I'm going to
8  take those back.  And I will attach not -- well,
9  yeah, I will attach it so we know what we have
10  looked at.
11          MR. CLARK:  When you have a
12  good moment to break, I'd like to
13  take another five minutes.
14          MR. REINS:  Yeah.  I'll tell
15  you, though, I'm getting -- I'm
16  almost done, for what it's worth.
17          MR. CLARK:  Can we still do a
18  five-minute break?
19          MR. REINS:  Oh, yeah, of
20  course.  Let's do it now.
21          MR. CLARK:  Okay.  Good.
22          THE VIDEOGRAPHER:  We're
23  going off the record at 10:45.
24          (Recess taken.)

Page 103

1          THE VIDEOGRAPHER:  We're back
2  on the record at 10:53.
3  BY MR. REINS:
4
21          MR. CLARK:  Hold on a second.
22  Let him finish.
23          Objection to form.
24    Q.    So I think -- and this is -- I

Page 104

1  should have said this a while ago.  It's not
2  just let me finish.  It's your attorney wants to
3  object potentially.
4    A.    I understand.
5    Q.    So it's kind of a me finish and a
6  pause and then answer, so ... and that's my
7  fault.  I should have said that before.
8          There's no way you remember my
9  question, so let me go ahead and rephrase it.

5    Q.    All right.  I'm going to show you
6  now --
7          MR. REINS:  This is going to
8  be, Zach, PSI-301.  Record
9  purposes -- no, we're going to go
10  with that.  That's a real long
11  number.  It will ultimately be
12  Exhibit Number 7.
13          - - -
14  (PSI-Harbauer Exhibit 7 marked.)
15          - - -
16  BY MR. REINS:
17    Q.    You're free to -- I'll give you a
18  hard copy.
19    A.    Thank you.
20    Q.    All right.  So we're going to now
21  look at -- and I'll tell you a little bit of
22  background, because you're going to say, "Why am
23  I looking at this?"
24          This document was specifically

27  (Pages 102 to 105)

Page 106

1    mailed out to all of the distributors. It's
2    been my understanding, stipulated, that PSI also
3    received one of these, but you all don't have a
4    copy anymore so we're using this one as a go by
5    because we believe the language is standard,
6    okay?
7         A.    I accept that.
8         Q.    Okay. Fair enough.
9         MR. CLARK: I object to the
10   form. But go ahead.
11        Q.    Hopefully I didn't misstate that.
12        So this is going to be dated
13   September 27, 2006, and this is going to be
14   basically from the Department of -- I'm sorry.
15   U.S. Department of Justice Drug Enforcement
16   Agency Administration. Take a moment and look
17   it over because my first question is going to
18   be, do you recall this, receiving this letter?
19        MR. CLARK: Before you
20   answer, I object to the form.
21        MR. REINS: You certainly
22   find me objectionable, sir.
23        MR. CLARK: Nothing personal.
24        MR. REINS: None taken.

Page 107

1         A.    Just reading the first few
2    paragraphs, I can tell you I don't believe I
3    have seen this document.
4         Q.    Fair enough.
5         My second question is going to
6    build off of that but it may not make sense
7    based on what you just said. But there were
8    some revisions not before 2008. I know you said
9    you would review the policies and procedures
10   annually.
11        Let me start again, okay, so we
12   get a clean -- so let me shift gears, okay.
13        You testified earlier that you
14   would review the company's policies and
15   procedures annually; am I correct?
16        A.    That is correct.
17        Q.    You said that doesn't necessarily
18   mean we would revise it, and there were no
19   revisions, according to the policies and
20   procedures we discussed, before December of
21   2008, I'll represent to you.
22        MR. CLARK: Objection to
23   form.
24        Q.    This letter was in September of

Page 108

1    2006 regarding a number of things, including
2    shipping requirements. Do you recall ever
3    having a conversation with anybody within your
4    company about this letter in relation to the
5    existing policies and procedures?
6         MR. CLARK: Objection. Form.
7         A.    I, having not seen the letter,
8    can't -- would not have discussed it.
9         Q.    Thank you.
10        MR. CLARK: Did you mark
11   this?
12        MR. REINS: I did, Number 7.
13        MR. CLARK: Okay.
14        MR. REINS: Did you get a
15   copy? Yeah.
16        MR. CLARK: I did. Thank
17   you.
18        MR. REINS: Madam court
19   reporter, I accidentally gave you
20   my highlighted copy. Can you
21   restamp it? Make a copy of it. I
22   don't like the highlighting in the
23   record.
24        ---

Page 109

1    (PSI-Harbauer Exhibit 8 marked.)
2         ---
3    BY MR. REINS:
4         Q.    All right. So this is another one
5    that was done December of the following year.
6    This will be Plaintiff's Exhibit Number 8. And
7    you probably know we're going to treat it the
8    same way. This was December 27, 2007. This is
9    again by the DEA regarding the rules and
10   regulations regarding controlled substances and
11   the duties and obligations.
12        And so my question to you will be,
13   do you recall reviewing this one?
14        MR. CLARK: Objection to
15   form.
16        A.    I do not recall, to the best of my
17   knowledge, after just scanning this, that I saw
18   this.
19        Q.    Fair to say, then, that you do not
20   have a recollection or belief that this was
21   contemplated in regards to amending or revising
22   the policies and procedures for the company?
23        MR. CLARK: Objection to
24   form.

28 (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110



22    Q.  And to try and prevent drug
23    diversion, which has affected many communities
24    in this country, correct?

Page 112

1         MR. CLARK:  Objection to
2    form.
3         A.   The whole Controlled Substances
4    Act is to help regulate and to follow these
5    regulations, and if I -- that letter appeared to
6    be a further explanation of that process; is
7    that correct?
8         Q.   That's correct.
9         A.   Okay.
10         Q.   I guess what -- and I'm not
11    debating it -- I don't think I am.  The purpose
12    of the Controlled Substances Act is to try and
13    minimize abuse and diversion in this country,
14    correct?
15         MR. CLARK:  Objection.
16         Argumentative.  Calls for a legal
17         conclusion.  Form.
18         A.   I would agree that it's -- it is
19    trying to regulate the process and keep the
20    product in -- yes.
21         Q.   Keep people safe, correct?
22         MR. CLARK:  Objection to
23    form.
24         A.   To keep the pharmaceutical

Page 113

1    industry regulated and to keep the drugs in the
2    system, keep it legal is ...
3         Q.   Let me give you back that
4    document.
5         A.   Thank you.
6         Q.   I'm sorry.  That's the wrong one.
7    The one before it, which is going to be Exhibit
8    Number 7.
9         A.   Thank you.
10         Q.   Are you with me?
11         A.   I have 7.
12         MR. CLARK:  Before -- this is
13         your highlighted copy.
14         MR. REINS:  Okay.  Yeah.  Let
15         me -- I'm going to fix that.  We'll
16         get that fixed.
17         MR. CLARK:  I'll give her my
18         clean copy.
19         MR. REINS:  Okay.  Thank you,
20         sir.
21         THE WITNESS:  Thank you.
22    BY MR. REINS:
23         Q.   So we're now looking at Exhibit
24    Number 7, which is specifically from the DEA,

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    and I want to look quickly at the background
2    paragraph. "As each of you is undoubtedly
3    aware, the abuse (nonmedical use) of controlled
4    prescription drugs is a serious and growing
5    health problem in this country."
6              Do you take issue with that
7    sentence --
8              MR. CLARK: Objection to
9         form.
10        Q.    -- by the -- by the Drug
11   Enforcement Administration?
12             MR. CLARK: Same objection.
13        A.    That is their stance. That's what
14   it says they believe.
15        Q.    I know what it says, ma'am,
16   respectfully, but do you take issue with that
17   statement?
18             MR. CLARK: Same objection.
19        A.    No, I do not.
20        Q.    You know that this is a growing
21   health crisis in our nation; do you not?
22             MR. CLARK: Objection to
23        form. Argumentative.
24        A.    I know that illegal diversion of

Page 115

1    drugs causes problems.
2         Q.    You know that the abuse of legal
3    drugs is causing a problem, correct?
4              MR. CLARK: Objection to
5         form. Argumentative.
6         A.    Based on the news that I have
7    heard, yes, I would say that abuse of drugs is
8    creating a health problem.
9         Q.    And as a distributor of some of
10   those drugs, you have an obligation -- you
11   mentioned to me in the beginning of this
12   deposition -- do you remember the word you
13   used -- "ethics." You have an ethical
14   obligation to make sure you are not part of the
15   problem but part of the solution; is that fair
16   to say?
17             MR. CLARK: Objection to
18        form. Misstates the testimony.
19        Argumentative.
20        Q.    Would you agree with that?
21             MR. CLARK: Same objection.
22        A.    I'm sorry. Would you repeat it?
23        Q.    Sure.
24             You stated at the beginning of

Page 116

1    this deposition that you try to operate your
2    company in an ethical manner; is that right?
3         A.    Yes.
4         Q.    What I'm asking you is, you have
5    an ethical obligation to make sure, follow all
6    of these safety rules and regulations to the
7    utmost of your abilities to make sure that you
8    are not part of the problem of the opioid
9    crisis, correct?
10             MR. CLARK: Objection to
11        form.
12        A.    We have -- we have the
13   responsibility and the legal duty to comply with
14   the law to the best of our ability and, you
15   know, to -- to follow the rules and regs.
16   That's what we're obligated to do.
17        Q.    And the reason why we started this
18   discussion is, the very purpose of these rules
19   and regs are to protect the safety of our
20   citizens, correct?
21             MR. CLARK: Objection to
22        form.
23        A.    Based on what you showed me, the
24   reading of the words, it appears that's what it

Page 117

1    said, yes, that -- I can't speak to their
2    intent, but that's what it looks like.
3         Q.    Based on what you read?
4              MR. CLARK: Objection to
5         form.
6         A.    What you showed me earlier.
7         Q.    But no internal investigation as
8    to how the company, your company -- let me
9    rephrase that. I'm going to withdraw that
10   question.
11             The only information you've heard
12   regarding the epidemic, as some are calling it,
13   is based on what you've seen on the news,
14   correct?
15             MR. CLARK: Objection to
16        form.
17        Q.    And what you're reading here?
18             MR. CLARK: Same objection.
19        A.    Yes.
20             MR. REINS: I have no more
21        questions, ma'am. I appreciate
22        your time here today.
23             THE WITNESS: Thank you.
24             MR. CLARK: I have no

30 (Pages 114 to 117)

Highly Confidential - Subject to Further Confidentiality Review

Page 118

```
 1        questions.
 2            THE VIDEOGRAPHER:  We're
 3        going off the record at 11:07 a.m.
 4            (Signature not waived.)
 5                    - - -
 6            Thereupon, at 11:07 a.m., on Tuesday,
 7        February 19, 2019, the deposition was concluded.
 8                    - - -
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 119

```
 1                CERTIFICATE
 2    STATE OF OHIO    :
                       SS:
 3    COUNTY OF _____ :
 4
 5        I, CANDACE HARBAUER, do hereby certify that
 6    I have read the foregoing transcript of my
 7    cross-examination given on February 19, 2019; that
 8    together with the correction page attached hereto
 9    noting changes in form or substance, if any, it is
10    true and correct.
11        _____
                CANDACE HARBAUER
12
13        I do hereby certify that the foregoing
14    transcript of the cross-examination of CANDACE
15    HARBAUER was submitted to the witness for reading and
16    signing; that after she had stated to the undersigned
17    Notary Public that she had read and examined her
18    cross-examination, she signed the same in my presence
19    on the _____ day of _____, 2019.
20
        _____
21        NOTARY PUBLIC - STATE OF OHIO
22
23    My Commission Expires:
24    _____, _____.
```

Page 120

```
 1                CERTIFICATE
 2    STATE OF OHIO    :
                       SS:
 3    COUNTY OF FRANKLIN :
 4        I, Carol A. Kirk, a Registered Merit
      Reporter and Notary Public in and for the State of
 5    Ohio, duly commissioned and qualified, do hereby
      certify that the within-named CANDACE HARBAUER was by
 6    me first duly sworn to testify to the truth, the whole
      truth, and nothing but the truth in the cause
 7    aforesaid; that the deposition then given by her was
      by me reduced to stenotype in the presence of said
 8    witness; that the foregoing is a true and correct
      transcript of the deposition so given by her; that the
 9    deposition was taken at the time and place in the
      caption specified and was completed without
10    adjournment; and that I am in no way related to or
      employed by any attorney or party hereto or
11    financially interested in the action; and I am not,
      nor is the court reporting firm with which I am
12    affiliated, under a contract as defined in Civil Rule
      28(D)
13
14        IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at Columbus, Ohio
15    on this 22nd day of February 2019
16
17
18        _____
          CAROL A. KIRK, RMR
19        NOTARY PUBLIC - STATE OF OHIO
20    My Commission Expires:  April 9, 2022
21                - - -
22
23
24
```

Page 121

```
 1        DEPOSITION ERRATA SHEET
 2    I, CANDACE HARBAUER, have read the transcript
      of my deposition taken on the 19th day of February
 3    2019, or the same has been read to me   I request that
      the following changes be entered upon the record for
 4    the reasons so indicated   I have signed the signature
      page and authorize you to attach the same to the
 5    original transcript
 6    Page Line  Correction or Change and Reason:
 7    ___  ____  _____
 8    ___  ____  _____
 9    ___  ____  _____
10    ___  ____  _____
11    ___  ____  _____
12    ___  ____  _____
13    ___  ____  _____
14    ___  ____  _____
15    ___  ____  _____
16    ___  ____  _____
17    ___  ____  _____
18    ___  ____  _____
19    ___  ____  _____
20    ___  ____  _____
21    ___  ____  _____
22    ___  ____  _____
23    ___  ____  _____
24    Date _____ Signature _____
```

31  (Pages 118 to 121)