Page 1

1

                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE NORTHERN DISTRICT OF OHIO
                          EASTERN DIVISION

3

4       _____

5       IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804

        OPIATE LITIGATION                  Case No. 17-md-2804

6

7       This document relates to:          Judge Dan
                                           Aaron Polster

8

        The County of Cuyahoga v. Purdue

9       Pharma, L.P., et al.
        Case No. 17-OP-45005

10

        City of Cleveland, Ohio vs. Purdue

11      Pharma, L.P., et al.
        Case No. 18-OP-45132

12

        The County of Summit, Ohio,

13      et al. v. Purdue Pharma, L.P.,
        et al.

14      Case No. 18-OP-45090

        _____

15

16

17            Videotaped 30(b)(6) Deposition of the

18               Drug Enforcement Administration

19         through the testimony of Stacy Harper-Avilla

20                      Washington, D.C.

21                      April 11, 2019

22                         9:16 a.m.

23

24      Reported by:  Bonnie L. Russo

25      Job No. 3282688

Page 2

```
 1    Videotaped 30(b)(6) Deposition of Drug
 2    Enforcement Administration through the
 3    testimony of Stacy Harper-Avilla held at:
 4
 5
 6
 7
 8          Arnold & Porter, LLP
 9          601 Massachusetts Avenue, N.W.
10          Washington, D.C.
11
12
13    Pursuant to Notice, when were present on behalf
14    of the respective parties:
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1    APPEARANCES (CONTINUED):
 2    On behalf of Plaintiffs:
      PAUL T FARRELL, JR , ESQ
 3    (Via Teleconference)
      GREENE KETCHUM, LLP
 4    419 Eleventh Street
      Huntington, West Virginia 25701
 5    304-525-9115
      paul@greeneketchum com
 6
      On behalf of Purdue Pharma, L P
 7    JENNA C NEWMARK, ESQ
      DECHERT, LLP
 8    Three Bryant Park
      1095 Avenue of the Americas
 9    New York, New York 10036
      212-698-3500
10    jenna newmark@dechert com
11    On behalf of Johnson & Johnson and Janssen
      Pharmaceuticals, Inc
12    EMILIE K  WINCKEL, ESQ
      O'MELVENY & MYERS, LLP
13    1625 Eye Street, N W
      Washington, D C  20006
14    202-383-5129
      ewinckel@omm com
15       -and-
      AMY R  LUCAS, ESQ
16    (Via Teleconference)
      O'MELVENY & MYERS, LLP
17    1999 Avenue of the Stars, 8th Floor
      Los Angeles, California 90067
18    310-553-6700
      alucas@omm com
19
20
21
22
23
24
25
```

Page 3

```
 1    APPEARANCES:
 2    On behalf of the U S  Department of Justice and
      the Witness:
 3    ROBERT E CHANDLER, ESQ
      U S  Department of Justice
 4    Civil Division
      3CON
 5    175 N Street, NE
      Washington, DC 20002
 6    202-514-4678
      robert chandler@usdoj gov
 7       -and-
      MARIAMA C  SPEARS, ESQ
 8    U S  Department of Justice
      Drug Enforcement Administration
 9    Office of Chief Counsel
      8701 Morrissette Drive
10    Springfield, Virginia 22152
      202-598-6204
11    mariama c spears@usdoj gov
12
      On behalf of the U S  Department of Justice:
13    JAMES R  BENNETT, II, ESQ
      UNITED STATES ATTORNEY'S OFFICE
14    801 West Superior Avenue
      Suite 400
15    Cleveland, Ohio 44113
      216-622-3988
16    james bennett4@usdoj gov

      On behalf of Summit County:
18    MICHAEL E  ELSNER, ESQ
      MOTLEY RICE, LLC
19    28 Bridgeside Boulevard
      Mt  Pleasant, South Carolina 29464
20    843-216-9250
      melsner@motleyrice com
21       -and-
      LINDA SINGER, ESQ
22    MOTLEY RICE, LLC
      401 9th Street, N W
23    Suite 1001
      Washington, D C  20004
24    202-386-9626
      lsinger@motleyrice com
25
```

Page 5

```
 1    APPEARANCES (CONTINUED):
 2
      On behalf of Walmart, Inc
 3    NEAL J  STEPHENS, ESQ
      JONES DAY
 4    1755 Embarcadero Road
      Palo Alto, California 94303
 5    650-739-3939
      nstephens@jonesday com
 6       -and-
      PATRICK J  BEISELL, ESQ
 7    (Via Teleconference)
      JONES DAY
 8    77 West Wacker
      Chicago, Illinois 60601
 9    312-269-4066
      pbeisell@jonesday com
10
11    On behalf of Endo Pharmaceuticals , Inc , Endo
      Health Solutions, Inc , Par Pharmaceuticals,
12    Inc and Par Pharmaceutical Companies, Inc :
      JOSHUA M  DAVIS, ESQ
13    JOANNA PERSIO, ESQ
      ARNOLD & PORTER
14    1601 Massachusetts Avenue, N W
      Washington, D C  20001
15    202-942-5000
      joshua davis@arnoldporter com
16    joanna persio@arnoldporter com
17    On behalf of Rite Aid of Maryland:
      JOHN P  LAVELLE, JR
18    MORGAN, LEWIS & BOCKIUS, LLP
      1701 Market Street
19    Philadelphia, Pennsylvania 19103
      215-963-4824
20    john lavelle@morganlewis com
21    On behalf of Teva Pharmaceutical Industries:
      MAUREEN K  BARBER, ESQ
22    (Via Teleconference)
      MORGAN LEWIS & BOCKIUS, LLP
23    One Oxford Centre
      Thirty Second Floor
24    Pittsburgh, Pennsylvania 15219
      412-560-7463
25
```

2 (Pages 2 - 5)

Page 6

1  APPEARANCES (CONTINUED):
2  On behalf of Cardinal Health, Inc :
   BRAD MASTERS, ESQ
3  WILLIAMS & CONNOLLY, LLP
   725 12th Street, N W
4  Washington, D C  20005
   202-434-5000
5  bmasters@wc com
6  On behalf of CVS Indiana, LLC and CVS Rx
   Services, Inc :
7  ANTHONY M  RUIZ, ESQ
   ZUCKERMAN SPAEDER, LLP
8  1800 M Street, N W
   Suite 1000
9  Washington D C  20036
   202-778-1800
10 aruiz@zuckerman com
11 On behalf of AmerisourceBergen
   Corporation:
12 SHANNON McCLURE, ESQ
   REED SMITH, LLP
13 Three Logan Square, Suite 3100
   1717 Arch Street
14 Philadelphia, Pennsylvania 19103
   215-241-7910
15 smclure@reedsmith com
16 On behalf of Henry Schein, Inc
   BRANDAN MONTMINY, ESQ
17 (Via Teleconference)
   LOCKE LORD, LLP
18 2200 Ross Avenue
   Suite 2800
19 Dallas, Texas 75201
   214-740-8554
20 brandan montminy@lockelord com
21
22
23
24
25

Page 7

1  APPEARANCES (CONTINUED):
2  On behalf of McKesson Corporation:
   MEGHAN E  MONAGHAN, ESQ
3  COVINGTON & BURLING, LLP
   One CityCenter
4  850 Tenth Street, N W
   Washington, D C  20001
5  202-662-6000
   mmonaghan@cov com
6     -and-
   CHRISTOPHER K  EPPICH, ESQ
7  COVINGTON & BURLING, LLP
8  1999 Avenue of the Stars
   Los Angeles, California 90067
9  424-332-4764
   ceppich@cov com
10 On behalf of Allergan Finance, LLC:
   JENNIFER LEVY, ESQ
11 CATIE VENTURA, ESQ
   KIRKLAND & ELLIS, LLP
12 655 Fifteenth Street, N W
   Washington, D C  20005
13 202-879-5907
   jennifer levy@kirkland com
14 catie ventura@kirkland com
15 On behalf of Mallinckrodt and Spec Gx, LLC:
   ANDREW O'CONNOR, ESQ
16 WILLIAM DAVISON, ESQ
   ROPES & GRAY, LLP
17 Prudential Tower
   800 Boylston Street
18 Boston, Massachusetts 02199
   617-951-7000
19 andrew o'connor@ropesgray com
   william davison@ropesgray com
20
   On behalf of H D  Smith:
21 WILLIAM HAHN, ESQ
   (Via Teleconference)
22 BARNES & THORNBURG, LLP
   11 South Meridian Street
23 Indianapolis, Indiana 46204
   317-231-7364
24 william hahn@btlaw com
25

Page 8

1  APPEARANCES (CONTINUED):
2  On behalf of Anda, Inc
   KRISTINA J  MATIC, ESQ
3  (Via Teleconference)
   FOLEY & LARDNER, LLP
4  777 East Milwaukee, Wisconsin 53202
   414-297-5913
5  kmatic@foley com
6  On behalf of HBC:
   JOSHUA A  KOBRIN, ESQ
7  MARCUS & SHAPIRA, LLP
   One Oxford Centre, 35th Floor
8  301 Grant Street
   Pittsburgh, Pennsylvania 15219
9  412-338-5208
   kobrin@marcus-shapira com
10
   On behalf of Walgreen Co  and Walgreen Eastern
11 Co , Inc :
   SHARON DESH, ESQ
12 (Via Teleconference)
   BARTLIT BECK, LLP
13 54 West Hubbard Street
   Suite 300
14 Chicago, Illinois 60654
   sharon desh@bartlitbeck com
15 312-494-4445
16 On behalf of Prescription Supply, Inc :
   MARTIN ZACHARY, ESQ
17 (Via Teleconference)
   FOX ROTHSCHILD, LLP
18 Stone Manor Corporate Center
   2700 Kelly Road, Suite 300
19 Warrington, Pennsylvania 18976
   215-918-3680
20 zmartin@foxrothschild com
21 On behalf of Discounted Drug Mart:
   ERIC WEISS, ESQ
22 (Via Teleconference)
   CAVITCH FAMILO & DURKIN
23 1300 East 9th Street, 20th Floor
   Cleveland, Ohio 44114
24 216-621-7860
25

Page 9

1  ALSO PRESENT:
2  Kaitlyn Eekhoff, Research Analyst, Motley Rice
   Daniel Russo, Videographer
3  Solomon Francis, IT Specialist
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3 (Pages 6 - 9)

Page 10

1  C O N T E N T S
2  EXAMINATION OF STACY HARPER-AVILLA      PAGE
3  BY MR O'CONNOR                16
4                                219
5  BY MR EPPICH                108
6  BY MR ELSNER                136
7
8       EXHIBITS
9
10  Exhibit 1  Notice of Videotaped        18
        30(b)(6) Deposition of
        Stacy Harper-Avilla
11
    Exhibit 2  Part 1303-Quotas           49
12
    Exhibit 3  Report to Congressional    57
13      Requesters
        February 2015
14      US-DEA-00015423-506
15  Exhibit 4  APQ Review and Approval    81
        2011-2018
16
    Exhibit 5  Section 1303 21            84
17
    Exhibit 6  Section 1303 12            91
18
    Exhibit 7  Aggregate Production       96
19      Quota History for
        Selected Substances
20      Updated 1-13-10
21  Exhibit 8  Aggregate Production       96
        Quota History for
22      Selected Substances
        Updated 1-22-19
23
    Exhibit 9  Excerpt of Transcript     140
24      6-20-17
25  Exhibit 10  DEA/OD 11th Pharmaceutical  158
        Industry Conference

Page 11

1  EXHIBITS (CONTINUED):
2
    Exhibit 11  E-Mail Chain             164
3      dated 5-28-97
        P 081098-099
4
    Exhibit 12  E-Mail Chain             172
5      dated 4-4-05
        P4241610-1612
6
    Exhibit 13  House Hearing            188
7      107 Congress
8   Exhibit 14  E-Mail dated 5-29-01     192
        Attachment
9       PPLPC045000005405-5425
10  Exhibit 15  E-Mail Chain             199
        dated 5-28-01
11      Attachment
        PPLPC045000005398-5404
12
    Exhibit 16  Letter dated 6-8-01      204
13      PKY181383991-994
14  Exhibit 17  Federal Register         208
        Vol 83, No 76
15      4-19-18
16  Exhibit 18  E-Mail Chain             214
        dated 7-12-18
17      Attachment
        PPLPC032000404799-4807
18
19
20
21
22
23
24  (Exhibits included with transcript )
25

Page 12

1       P R O C E E D I N G S
2
3       THE VIDEOGRAPHER:  Good morning.
4  We are going on the record at 9:16 a m. on
5  April 11, 2019.
6       Please note that the microphones
7  are sensitive and may pick up whispering,
8  private conversations and cellular
9  interference.  Please turn off all cell phones
10  or place them away from the microphones as they
11  can interfere with the deposition audio.  Audio
12  and video recording will continue to take place
13  unless all parties agree to go off the record.
14       This is Media Unit 1 of the
15  video-recorded deposition of the DEA, appearing
16  on their behalf is Stacy Harper-Avilla, taken
17  by counsel for defendant in the matter of In
18  Re:  National Prescription Opiate, filed in the
19  United States District Court, Northern District
20  of Ohio, Eastern Division, Case Number MDL 2804
21  17-MD-2804.
22       This deposition is being held at
23  Arnold & Porter located at 601 Massachusetts
24  Avenue, Northwest, Washington, D.C.
25       My name is Daniel Russo from the

Page 13

1  firm Veritext Legal Solutions, I'm your
2  videographer.  The court reporter is Bonnie
3  Russo from the firm Veritext Legal Solutions.
4       Counsel and all present in the room
5  and everyone attending remotely will now state
6  their appearances and affiliations for the
7  record.
8       MR. O'CONNOR:  Andrew O'Connor,
9  Ropes and Gray, for Mallinckrodt LLC and Spec
10  GX.
11       MR. DAVISON:  William Davison of
12  Ropes and Gray for Mallinckrodt LLC and Spec
13  GX.
14       MR. KOBRIN:  Josh Kobrin, Marcus &
15  Shapira for HBC.
16       MR. EPPICH:  Chris Eppich of
17  Covington & Burling for McKesson.
18       MS. MONAGHAN:  Megan Monaghan on
19  behalf of McKesson.
20       MS. LEVY:  Jennifer Levy of Kirkland
21  & Ellis, for the Allergan defendants.
22       MS. VENTURA:  Catie Ventura for the
23  Allergan defendants.
24       MR. RUIZ:  Anthony Ruiz, Zuckerman
25  Spaeder for CVS Indiana, LLC and CVS Rx

4 (Pages 10 - 13)

Page 14

1  Services, Inc.
2      MS. McCLURE:  Shannon McClure, Reed
3  Smith, AmerisourceBergen.
4      MR. DAVIS:  Josh Davis of Arnold &
5  Porter for the Endo and Par defendants.
6      MS. NEWMARK:  Jenna Newmark from
7  Dechert for the Purdue defendants.
8      MR. LAVELLE:  John Lavelle, Morgan
9  Lewis for defendant Rite Aid of Maryland.
10      MR. MASTERS:  Brad Masters, Williams
11  & Connolly, Cardinal Health.
12      MR. STEPHENS:  Neal Stephens, Jones
13  Day, for Walmart.
14      MS. WINCKEL:  Emilie Winckel,
15  O'Melveny and Myers, for the J&J defendants.
16      MR. ELSNER:  Michael Elsner from
17  Motley Rice on behalf of the plaintiffs.
18      MR. BENNETT:  James Bennett from
19  U.S. Attorney's Office, Cleveland, on behalf of
20  the United States and the Department of Justice
21  DEA.
22      MS. SPEARS:  Mariama Spears on
23  behalf of the Drug Enforcement Administration.
24      MR. CHANDLER:  Robert Chandler,
25  United States Department of Justice on behalf

Page 15

1  of the United States.
2      MR. BEISELL:  Patrick Beisell, Jones
3  Day on behalf of Walmart.
4      MS. LUCAS:  Amy Lucas, O'Melveny &
5  Myers, on behalf of Janssen Pharmaceuticals and
6  Johnson & Johnson.
7      MS. MATIC:  Kristina Matic on behalf
8  of Anda.
9      MS. BARBER:  Maureen Barber from
10  Morgan Lewis for the Teva defendants.
11      MS. DESH:  Sharon Desh on behalf of
12  Walgreens.
13      MR. WEISS:  Eric Weiss of Cavitch
14  Familo & Durkin on behalf of Discounted Drug
15  Mart.
16      MR. MARTIN:  Zachary Martin, Fox
17  Rothschild, on behalf of Prescriptions Supply.
18      MR. HAHN:  William Hahn on behalf of
19  H.D. Smith from Barnes and Thornburg.
20      MR. MONTMINY:  Brandon Montminy on
21  behalf of the Henry Schein defendants.
22      THE VIDEOGRAPHER:  Will the court
23  reporter please swear in the witness.
24
25      STACY HARPER-AVILLA,

Page 16

1  being first duly sworn, to tell the truth, the
2      whole truth and nothing but the truth,
3          testified as follows:
4
5      THE VIDEOGRAPHER:  You may proceed,
6  Counsel.
7
8  EXAMINATION BY COUNSEL FOR DEFENDANTS
9      MALLINCKRODT AND SPEC GX LLC
10      BY MR. O'CONNOR:
11  Q.  Ms. Avilla, good morning.
12  A.  Morning.
13  Q.  I am Andrew O'Connor.  I represent
14  Mallinckrodt in this case.  I will be asking
15  you some questions on behalf of the
16  manufacturing defendants.
17      Would you just state your full name
18  for the record.
19  A.  Stacy Harper-Avilla.
20  Q.  And have you ever had your
21  deposition taken before?
22  A.  No.
23  Q.  You can cross that off your bucket
24  list.
25      So just a few rules of the road

Page 17

1  before we get going.  First, just to make the
2  court reporter's life a little easier, we're
3  going to try to talk one at a time.  I will ask
4  my question and I would just ask that you wait
5  until I finish before you start and I will do
6  the same as you are answering.  Rather than
7  shaking your head or nodding, also make sure to
8  give verbal answers.
9      Does that make sense?
10  A.  Yes.
11  Q.  And if I ask a question and I am not
12  clear or you don't understand, just let me
13  know, and if you don't let me know, I'm just
14  going to assume that you understood the
15  question as I asked it.
16      Does that make sense?
17  A.  Yes.
18  Q.  Is there anything that would prevent
19  you from testifying completely and truthfully
20  today?
21  A.  No.
22  Q.  And you understand that today you
23  are providing testimony on behalf of the DEA?
24  A.  Yes.
25      MR. O'CONNOR:  I'm going to mark

5 (Pages 14 - 17)

Page 18

1    Exhibit 1.
2         (Deposition Exhibit 1 was marked for
3    identification.)
4         BY MR. O'CONNOR:
5    Q.   This is a notice of deposition.
6         Have you ever seen this document
7    before?
8    A.   Yes.
9    Q.   And I'm going to ask you to turn to
10   Exhibit B, which is the letter from the U.S.
11   Department of Justice.
12        Have you ever seen this document
13   before?
14   A.   Yes.
15   Q.   Okay.  And do you understand it to
16   be the letter authorizing testimony on certain
17   subjects on behalf of the DEA?
18   A.   Yes.
19   Q.   Let's go ahead and turn to Page 6
20   and I direct your attention to Topic 13.
21        It says:  "Topic 13.  Your practices
22   and procedures related to the establishment of
23   opioid procurement quotas and opioid production
24   quotas for prescription opioids."
25        Are you authorized by the DEA to

Page 19

1    testify regarding that topic today?
2    A.   Yes.
3    Q.   And I now direct your attention to:
4    "Topic 14, the basis for opioid procurement
5    quotas and opioid production quotas of
6    prescriptions from 1995 to 2018."
7         Are you authorized by the DEA to
8    provide testimony regarding that topic today?
9    A.   Yes.
10   Q.   Okay.
11        MR. CHANDLER:  I do want to note for
12   the record that Ms. Avilla's authorization
13   extends insofar as the qualifications that are
14   also included in this letter.
15        MR. O'CONNOR:  Understood.
16        BY MR. O'CONNOR:
17   Q.   If you could turn to Page 9 of that
18   same document.
19        And look at Topic 3, which reads:
20   "DEA's establishment of quotas for the
21   production of opioids in the United States
22   including aggregate production quotas,
23   individual quotas and procurement quotas, the
24   disclosure of quota to registrants,
25   communications with registrants regarding quota

Page 20

1    requests and the disposition of quota requests
2    and the relationship between quota, suspicious
3    orders, diversion and lawful medical,
4    scientific or industrial channels or use."
5         Did I read that correctly?
6    A.   Yes.
7    Q.   And are you authorized by DEA to
8    provide testimony on that topic today?
9    A.   Yes.
10   Q.   So when I ask a question, unless I
11   specifically indicate that I am asking for your
12   personal opinion, I am going to be asking for
13   the DEA's answer to that question.
14        Does that make sense?
15   A.   Yes.
16        MR. CHANDLER:  Andrew, so that I
17   understand, is your initial questioning going
18   to relate to plaintiff's Topic No. 3 as well,
19   or is that only going to be sort of
20   reexamination following the plaintiff's
21   examination?
22        MR. O'CONNOR:  There will probably
23   be some overlap so it could pertain to any one
24   of those three topics.
25        MR. CHANDLER:  Okay.  And that is

Page 21

1    understood between you and the plaintiffs?  I
2    am trying to understand how this is going to
3    flow back and forth between the two notices.
4         MR. O'CONNOR:  I think we are
5    entitled to question on any one of the topics
6    for which she is authorized, and so we will be
7    proceeding on that basis.
8         MR. CHANDLER:  Okay.
9         MR. ELSNER:  This is Michael
10   Elsner.  I'm going to object.  You are entitled
11   to ask questions on your topics but not on our
12   topics.
13        MR. O'CONNOR:  I think we would
14   disagree about that, but I think -- let's see
15   how it goes and if we need to resolve it, we
16   can do so offline.
17        BY MR. O'CONNOR:
18   Q.   Ms. Avilla, what is your current
19   role at DEA?
20   A.   I'm the section chief of United
21   Nations Reporting and Quota Section.
22   Q.   And what are your responsibilities in
23   that role include?
24   A.   The responsibilities are to manage
25   the quotas for controlled substances in

6 (Pages 18 - 21)

Page 22

1  Schedules I and II, report back to the UN on
2  the U.S. -- usage consumption of those
3  substances as well as for setting the
4  assessments and estimates for items in
5  Schedules III through V, controlled substances
6  in III through V.
7      Q.   How long have you been in that
8  position?
9      A.   Since July of last year.
10     Q.   Before that, did you hold any
11 position at DEA?
12     A.   Yes, I did.
13     Q.   What was that?
14     A.   I was the unit chief of the same
15 section.
16     Q.   You were working with quotas in that
17 role as well?
18     A.   Yes.
19     Q.   What was your position at DEA, if
20 any, before that time?
21     A.   I don't understand the question.
22     Q.   Did you have a job at DEA before
23 that role as unit chief?
24     A.   Yes.
25     Q.   What was that?

Page 23

1      A.   Drug science specialist.
2      Q.   Okay.  When you were a drug science
3  specialist, did you have any involvement in
4  quota issues?
5      A.   Yes.
6      Q.   Was that role your first at DEA?
7      A.   Yes.
8      Q.   And when did you start in that role?
9      A.   2008.
10     Q.   So am I correct that you joined the
11 Drug Enforcement Administration in 2008?
12     A.   Correct.
13     Q.   Okay.  And since that time, your
14 work has included work on quota-related
15 matters?
16     A.   Yes.
17     Q.   Okay.  Did you prepare for this
18 deposition?
19     A.   Yes.
20     Q.   How did you prepare?
21     A.   By reviewing the statute, the regs.
22     Q.   Did you review anything else?
23     A.   Yes.  Yes.
24     Q.   What else did you review?
25     A.   Documents for clarification.

Page 24

1      Q.   Okay.  Do you remember what sorts of
2  documents?
3      A.   No.
4      Q.   Were they e-mails?
5      A.   There were a lot of documents.  I
6  don't know.  I don't remember precisely what
7  now.
8      Q.   Okay.  Without getting into any
9  communications you had with lawyers, what are
10 the names of the people that you spoke with to
11 prepare for this deposition?
12     A.   I spoke with Dr. Chris Sannerud and
13 Mr. Joe Rannazzisi.
14     Q.   Who is Ms. Sannerud?
15     A.   Dr. Sannerud was the section chief
16 before me.
17     Q.   Okay.  And is Dr. Sannerud still
18 employed by DEA?
19     A.   No.
20     Q.   When did she leave the DEA?
21     A.   July of last year.
22     Q.   And who is Mr. Rannazzisi?
23     A.   He is a retired DEA special agent.
24     Q.   During your discussions -- or your
25 discussions with Dr. Sannerud, was there anyone

Page 25

1  else in the room or on the phone?
2      A.   I don't understand the question.
3      Q.   When you had discussions to prepare
4  for this deposition with Dr. Sannerud --
5      A.   Yes.
6      Q.   -- was there anyone else in the room
7  with you?
8      A.   The lawyers.
9      Q.   The lawyers.  Okay.  And when you
10 say, "the lawyers," who do you mean?
11     A.   The DEA lawyers, DEA attorneys.
12     Q.   Okay.  Were there any attorneys
13 besides attorneys working for DEA?
14     A.   The ones working for DOJ.
15     Q.   Okay.  And besides lawyers working
16 for DOJ, were there any other lawyers?
17     A.   Not that I know of.  Not that I
18 remember.
19     Q.   And during your conversations with
20 Mr. Rannazzisi, who was in the room with you or
21 on the phone?
22     A.   In the room where the DOJ and DEA
23 attorneys.
24     Q.   Okay.  And besides those attorneys,
25 was there anyone else on the phone or in the

7 (Pages 22 - 25)

Page 26

1    room?
2        A.   In the room, no.
3        Q.   Were there others on the phone?
4        A.   I don't know.
5        Q.   Do you know if anyone was on the
6    phone?
7        A.   Mr. Rannazzisi was on the phone.
8        Q.   Okay.  And regarding the documents
9    that you reviewed in preparation for today, did
10   you choose those documents yourself?
11       A.   Yes.
12       Q.   How did you choose those documents?
13       A.   They were areas that encompassed
14   what was required for the UN reporting and
15   quota section.
16       Q.   Okay.  What sort of documents are we
17   talking about?
18       MR. CHANDLER:  I'm going to step in
19   here.
20       To the extent that your answer
21   requires you to disclose any of our
22   communications or communications with any of
23   the government lawyers, I will instruct you not
24   to answer.
25       If you can answer subject to that,

Page 27

1    that caveat, you can answer.
2        BY MR. O'CONNOR:
3        Q.   So without getting into the
4    communications with your lawyers, what sorts of
5    documents did you select?
6        A.   I can't answer.
7        Q.   I'm sorry?
8        A.   I can't answer.
9        Q.   And why can't you answer?
10       A.   A lot of that is communication
11   shared with the attorneys.
12       Q.   Okay.  In preparing for today's
13   deposition, did you speak with anyone else at
14   DEA other than the lawyers, Dr. Sannerud and
15   Mr. Rannazzisi?
16       A.   No.
17       Q.   Did you speak with anyone else who
18   has testified previously in this matter?
19       A.   Not to my knowledge.
20       Q.   Did you speak with anyone outside
21   DEA in preparing for this deposition, other
22   than those we've already discussed?
23       A.   No.
24       Q.   Okay.  About how much time did you
25   spend preparing for today?

Page 28

1        A.   I don't know.  I didn't quantify it.
2        Q.   Okay.  Roughly how many meetings did
3    you have with DOJ or DEA attorneys about today?
4        A.   I don't have an exact number.
5        Q.   How about an estimate?
6        A.   Less than ten.
7        Q.   Less than ten.  Okay.  About how
8    long were those meetings?
9        A.   They were usually several hours.
10       Q.   Okay.  When you say, "less than
11   ten," do you think there was more than five?
12       A.   Probably.
13       Q.   Okay.  All right.  So I want to turn
14   back to your responsibilities as unit chief of
15   the UN reporting and quota section.
16       In that role, what responsibility
17   did you have with respect to establishing
18   quotas for Schedule I and II controlled
19   substances?
20       A.   To review the incoming applications,
21   to review documentation, review and assess
22   whether it was scientifically accurate.
23       Q.   Okay.  Who did you report to when
24   you were unit chief?
25       A.   Dr. Chris Sannerud.

Page 29

1        Q.   Okay.  And did there come a time
2    where you were promoted to section chief?
3        A.   Yes.
4        Q.   And at that time, who did you report
5    to?
6        A.   Susan Gibson.
7        Q.   And what is Ms. Gibson's position?
8        A.   I'm not sure.
9        Q.   Okay.
10       A.   I'm not sure.  She is in New Jersey
11   at this point.
12       Q.   Okay.  Is she your current
13   supervisor?
14       A.   No.
15       Q.   Who is your current supervisor?
16       A.   Raymond Brown, Special Agent Raymond
17   Brown.
18       Q.   And what is his position at DEA?
19       A.   Deputy assistant administrator.
20       Q.   In your role as unit chief and now
21   section chief, did you come to have an
22   understanding of the DEA's practices and
23   procedures related to the establishment of
24   quotas?
25       A.   Yes.

8 (Pages 26 - 29)

Page 30

1    Q.   And did that include -- did your
2  understanding include the procedures and
3  practices specifically related to aggregate
4  production quota?
5    A.   Yes.
6    Q.   And does it also include practices
7  and procedures related to the procurement quota
8  process?
9    A.   Yes.
10   Q.   Does it also include individual
11 manufacturing quotas?
12   A.   Yes.
13   Q.   In those positions, did you also
14 gain an understanding of the basis or the
15 reasons why those quotas were set where they
16 were?
17   A.   Yes.
18   Q.   And through your work, did you also
19 get an understanding of the reasons the DEA had
20 for increasing the quota from year to year with
21 respect to certain substances?
22       MR. CHANDLER: Objection.  Vague.
23       BY MR. O'CONNOR:
24   Q.   You can answer the question.
25   A.   Each year the quota is built

Page 31

1  individually.  It's not a year-to-year
2  situation.
3    Q.   Okay.  And in any given year during
4  your time at DEA, you understood the reasons
5  the quota was set at the level that it was set
6  at; is that fair?
7    A.   Yes.
8        MR. CHANDLER: Objection.  Vague.
9        BY MR. O'CONNOR:
10   Q.   Are you familiar with the term
11 "closed system of distribution?"
12   A.   Yes.
13   Q.   What do you understand that term to
14 mean?
15       MR. CHANDLER: Objection.  Scope.
16       You can answer.
17       THE WITNESS:  It means that the
18 controlled substance is monitored within a
19 system set up by the Controlled Substances Act
20 from the manufacturer down to the pharmacy
21 level in the ultimate locations.
22       BY MR. O'CONNOR:
23   Q.   And the players at those various
24 levels that you just mentioned are all DEA
25 registrants, correct?

Page 32

1        MR. CHANDLER: Objection. Vague.
2        THE WITNESS:  From the manufacturers
3  to the pharmacy, yes, they should be.
4        BY MR. O'CONNOR:
5    Q.   Okay.  So manufacturers,
6  distributors, pharmacies are all DEA
7  registrants, correct?
8    A.   If they handle controlled
9  substances, yes.
10   Q.   I want to turn to manufacturers for
11 a minute.
12       In order to manufacture controlled
13 substances with approval from DEA, what steps
14 does a manufacturer need to take?
15       MR. CHANDLER: Objection. Vague.
16 Scope.
17       BY MR. O'CONNOR:
18   Q.   You can answer.
19   A.   I don't understand the question.
20   Q.   Okay.  Do manufacturers need to
21 request a quota grant before they can produce
22 controlled substances?
23   A.   Yes.
24   Q.   Are manufacturers permitted to
25 manufacture any more of a controlled substance

Page 33

1  than DEA permits through its quota process?
2    A.   No.
3    Q.   Is it fair to say that DEA has the
4  ability to decline to provide any given
5  manufacturer with a quota grant?
6    A.   I don't understand the question.
7    Q.   Is DEA required to grant
8  manufacturers quota?
9        MR. CHANDLER: Objection. Vague.
10       THE WITNESS:  I don't understand the
11 question.
12       BY MR. O'CONNOR:
13   Q.   So in your role, are you involved
14 with the consideration and approval of quota
15 requests?
16   A.   Yes.
17   Q.   Are you required to approve every
18 request?
19   A.   No.
20   Q.   That's because the DEA does not --
21 is not required to approve every request,
22 correct?
23   A.   Correct.
24   Q.   Are you familiar with any statute
25 that sets forth DEA's authority to grant quota?

9 (Pages 30 - 33)

Page 34

1    A.   I don't understand the question.
2    Q.   Is there any statute that grants the
3  Drug Enforcement Administration the authority
4  to set quota for controlled substances?
5    A.   Yes.
6    Q.   Are you familiar with that statute?
7    A.   Yes.
8    Q.   Are there any regulations that DEA
9  has promulgated that set forth the process for
10  setting the quota for controlled substances?
11    A.   Yes.
12    Q.   And in your role as unit chief and
13  then section chief, was one of your
14  responsibilities to apply the processes that
15  were described by statute and regulation in
16  determining the amount of quota?
17        MR. CHANDLER:  Objection.  Vague.
18  Compound.
19        BY MR. O'CONNOR:
20    Q.   You can answer.
21    A.   Yes.
22    Q.   Are you familiar with the term
23  "aggregate production quota?"
24    A.   Yes.
25    Q.   What does that term mean?

Page 35

1    A.   In summary, it is the maximum amount
2  that the United States actually needs for its
3  domestic needs, for legitimate, medical,
4  scientific, research needs, exportation needs
5  and inventory allowances.
6    Q.   Okay.  Does DEA determine what that
7  number is on an annual basis?
8        MR. CHANDLER:  Objection.  Vague.
9        You can answer.
10        THE WITNESS:  I don't understand the
11  question.
12        BY MR. O'CONNOR:
13    Q.   Is DEA responsible for determining
14  the aggregate production quota?
15    A.   DEA is the agency that publishes it,
16  but we work in concert with other agencies.
17    Q.   Okay.  What other agencies do you
18  work with?
19    A.   FDA.
20    Q.   Any other agencies?
21    A.   When necessary, yes.
22    Q.   What would those other agencies be?
23    A.   Those within the bounds of DOJ and
24  HHS.
25    Q.   When you work with FDA in connection

Page 36

1  with quota, what is the nature of the FDA's
2  involvement?
3        MR. ELSNER:  Objection.
4        MR. CHANDLER:  I will object.  Vague
5  as to time.
6        BY MR. O'CONNOR:
7    Q.   Do you recall any times in which FDA
8  was involved in discussions regarding quota?
9    A.   I don't understand the question.
10    Q.   You mentioned that at times, you
11  consulted with FDA in connection with quota,
12  correct?
13    A.   Yes.
14    Q.   When did that happen?
15        MR. CHANDLER:  Objection.  Vague.
16        You can answer.
17        THE WITNESS:  By statute, by FDA
18  statute, they are required to consult with us.
19  We are required to have a dialogue however it
20  takes place.
21        BY MR. O'CONNOR:
22    Q.   And did DEA comply with its
23  obligation to have discussions with FDA?
24    A.   Yes.
25    Q.   Did DEA consult with FDA in

Page 37

1  connection with the aggregate production quota
2  every year?
3    A.   I can't guarantee every year, but
4  yes, as far as I know, I have seen
5  documentation for almost every year.
6    Q.   Okay.  What form did that
7  documentation take?
8    A.   A letter.
9    Q.   Okay.  Would there be discussions
10  between the FDA and DEA prior to FDA sending
11  that letter?
12    A.   Not that I'm aware of.  There may
13  be, but I don't know of any that were
14  documented.
15    Q.   Okay.  Besides yourself, how many
16  others at DEA work on quota-related issues?
17        MR. ELSNER:  Objection.  Timing.
18        BY MR. O'CONNOR:
19    Q.   Today -- strike that.
20        Today, how many people at DEA work
21  on quota-related issues?
22        MR. CHANDLER:  Objection.  Vague.
23        THE WITNESS:  I'm not sure I
24  understand the question.
25        BY MR. O'CONNOR:

10 (Pages 34 - 37)

Page 38

1    Q.   You are not the only person at DEA
2  that works on quota, correct?
3    A.   Correct.
4    Q.   Okay.  Roughly how many other people
5  are involved in the process of setting
6  aggregate production quotas?
7    A.   There are several people involved in
8  several different sections for setting an
9  aggregate production quota and I don't know who
10  all of the people are, just the sections that
11  they go through.
12    Q.   Okay.  When you were unit chief, how
13  many people approximately worked in your
14  section -- in your unit.  Sorry.
15    A.   It varied over the years.
16    Q.   So when you first started as unit
17  chief, approximately how many people worked in
18  your unit?
19    A.   Four or five people.
20    Q.   Okay.  Were they full-time
21  employees?
22    A.   Yes.
23    Q.   Did that number change over time?
24    A.   Yes.
25    Q.   When did it change?

Page 39

1    A.   I don't recall.  It just -- it
2  changed when people made clearance.
3    Q.   Did the group get bigger or smaller?
4    A.   Bigger.
5    Q.   Okay.  Roughly how big did it get?
6    A.   I don't understand the question.
7    Q.   When the group was at its biggest,
8  how many people were in it?
9    A.   Ten, 12 people.
10    Q.   Were all of those individuals
11  involved in the process of determining quota?
12    A.   Yes.
13    Q.   Okay.  Did those individuals who
14  were involved in the quota process receive any
15  training regarding quota?
16    MR. CHANDLER:  Objection.  Vague.
17    THE WITNESS:  I'm not sure I
18  understand the question.
19    BY MR. O'CONNOR:
20    Q.   Did the people who worked on quota
21  have the training they needed in your view to
22  do their job?
23    MR. CHANDLER:  Objection.  Vague.
24  Scope.
25    THE WITNESS:  Yes.

Page 40

1    BY MR. O'CONNOR:
2    Q.   Safe to say that as the unit chief,
3  if you felt they were not able to discharge
4  their duties, you would have done something
5  about that, right?
6    MR. ELSNER:  Objection.
7    THE WITNESS:  I would have provided
8  extra training, yes.
9    BY MR. O'CONNOR:
10    Q.   You mentioned that at times, DEA
11  communicated with HHS in connection with the
12  quota.
13    On what subjects would DEA
14  communicate with HHS when it came to quota
15  issues?
16    A.   So I mentioned that DEA communicated
17  with FDA within HHS on quota issues.
18    Q.   Were there any other agencies or
19  departments within HHS that DEA communicated
20  with on quota issues?
21    MR. ELSNER:  Objection.
22    BY MR. O'CONNOR:
23    Q.   You can answer the question.
24    A.   There would have been SAMSHA at the
25  time probably.

Page 41

1    Q.   What is SAMSHA?
2    A.   I don't remember the full name.
3    Q.   Fair enough.  Do you know generally
4  speaking what SAMSHA does?
5    A.   Substance abuse and mental health.
6    Q.   Okay.  Between 1995 and 2018, was
7  DEA -- or did DEA consult with SAMSHA on a
8  regular basis in connection with quota?
9    MR. CHANDLER:  Objection.  Vague.
10    THE WITNESS:  I don't understand the
11  question.
12    BY MR. O'CONNOR:
13    Q.   Did DEA communicate with SAMSHA more
14  than once?
15    A.   Yes.
16    Q.   Did DEA communicate with SAMSHA on a
17  yearly basis regarding quota?
18    A.   Probably, not directly.
19    Q.   If not directly, how would DEA
20  communicate with SAMSHA?
21    A.   SAMSHA's concerns were usually
22  placed in FDA's letter to DEA.
23    Q.   Okay.  Would DEA consider the FDA's
24  input when determining the aggregate production
25  quota?

11 (Pages 38 - 41)

1    A.   Yes.

2    Q.   And would DEA consider SAMSHA's
3 input when determining the aggregate production
4 quota?

5    A.   Yes, when it was there.

6    Q.   Okay.  What else would DEA consider
7 when determining the aggregate production
8 quota?

9    A.   DEA would also consider the
10 manufacturer's quota application, changes in
11 marketplace, manufacturer's changes to their
12 processes, export requirements, inventory
13 allowances that needed to be done, new
14 indication, removal of indications, changes in
15 FDA approval.  Or changes in -- yeah, changes
16 in FDA approval.

17    Q.   Okay.  Between 1995 and 2018, did
18 the DEA consider all those factors when setting
19 quota?

20    A.   Yes, that's part of the whole
21 statement.

22    Q.   So if someone claimed that DEA made
23 a decision about quota based on only one of
24 those factors, would you agree with them?

25       MR. CHANDLER:  Objection.  Vague.

1 Scope.

2       MR. ELSNER:  Objection.

3       THE WITNESS:  I would not agree with
4 them.

5       BY MR. O'CONNOR:

6    Q.   DEA sets aggregate production quotas
7 for each individual class of controlled
8 substances; is that fair?

9    A.   DEA sets quota for each class of
10 Schedule I or Schedule II controlled substance.

11    Q.   Fair enough.  And what do you mean
12 when you say, "class of controlled substance?"

13    A.   A class is the basic substance.

14    Q.   Would that include things like
15 oxycodone?

16    A.   Yes.

17    Q.   Hydrocodone?

18    A.   Yes.

19    Q.   Hydromorphone?

20    A.   Yes.

21    Q.   Morphine?

22    A.   Yes.

23    Q.   Oxymorphone?

24    A.   Yes.

25    Q.   And when DEA is setting the

1 aggregate production quota for each of those
2 individual classes, does it consider all those
3 factors that you mentioned a moment ago?

4    A.   Yes.

5    Q.   Let's talk for a minute about
6 manufacturing quotas.

7       What do you understand the term
8 "manufacturing quota" to mean?

9    A.   It is the quota granted to a bulk
10 manufacturer who synthesizes or extracts
11 aggregate -- active pharmaceutical ingredients
12 from either a noncontrolled substance or a
13 plant or from one controlled substance into
14 another.

15    Q.   Okay.  How does DEA determine what
16 manufacturing quotas to grant?

17       MR. CHANDLER:  Objection.  Vague.

18       MR. ELSNER:  Objection.

19       BY MR. O'CONNOR:

20    Q.   You can answer.

21    A.   For the manufacturing quota, it is
22 built on their customers and their
23 manufacturing processes, as well as inventory
24 allowances and any other FDA notifications that
25 we have received.

1    Q.   Okay.  And couldn't the -- can any
2 given manufacturer make more of a particular
3 class of controlled substances than the DEA
4 permits?

5       MR. ELSNER:  Objection.

6       THE WITNESS:  I think there is a
7 difference between "can" and "should."

8       BY MR. O'CONNOR:

9    Q.   Fair enough.  Would it be legal for
10 a manufacturer to produce more of a controlled
11 substance than permitted by its DEA quota?

12    A.   Not to my knowledge, it's not legal.

13    Q.   Okay.  And are you aware of any
14 circumstances in which a manufacturer did make
15 more than what it was permitted?

16    A.   It has occurred on occasion and DEA
17 has taken action with the manufacturer.

18    Q.   Okay.  Is it fair to say that DEA
19 takes steps to ensure that manufacturers don't
20 make more than what they are permitted to under
21 their DEA quota?

22       MR. CHANDLER:  Objection.  Scope.

23       THE WITNESS:  Can you repeat the
24 question.

25       BY MR. O'CONNOR:

12 (Pages 42 - 45)

1    Q.   Sure.  Is it fair to say that DEA
2  takes steps to ensure that manufacturers don't
3  make more than what they are permitted to under
4  their DEA quota?
5         MR. CHANDLER:  Same objection.
6         THE WITNESS:  When DEA has notice of
7  it, yes.
8       BY MR. O'CONNOR:
9    Q.   Are you familiar with the term
10  "procurement quota?"
11   A.   Yes.
12   Q.   What is procurement quota?
13   A.   Procurement quota is the maximum
14  amount of quota -- maximum amount of material a
15  manufacturer can obtain.
16   Q.   Is the amount of -- strike that.
17         DEA sets the procurement quota for
18  each manufacturer, correct?
19   A.   Of a Schedule I or II controlled
20  substance, yes.
21   Q.   How does DEA determine how to set
22  the production quota for any given
23  manufacturer?  I'm sorry, strike that.
24         How does DEA determine the
25  procurement quota for any given registrant?

1    A.   It would be based on their business
2  activity which is individual to the
3  manufacturer.
4    Q.   Okay.  When you say, "business
5  activity," what do you mean?
6    A.   It is based on the rationale that
7  they provide DEA on the reason why they need
8  quota.
9    Q.   What is the -- is it fair to say
10  that one of the purposes of granting
11  procurement quota is to ensure an adequate and
12  uninterrupted supply of medications?
13   A.   It is one purpose.
14   Q.   Is it also fair to say that if DEA
15  did not grant procurement quotas, there would
16  be a risk to the adequate and uninterrupted
17  supply of medications?
18         MR. CHANDLER:  Objection.  Vague.
19         THE WITNESS:  I don't understand the
20  question.
21       BY MR. O'CONNOR:
22   Q.   Okay.  Unlike the adequate
23  production quota, procurement quotas are
24  granted on an individual class of controlled
25  substances, correct?

1    A.   Correct.
2    Q.   So, for example, oxycodone would
3  have -- strike that.
4         So, for example, there would be a
5  specific procurement quota grant to a
6  manufacturer for oxycodone?
7    A.   Correct.
8    Q.   That would be separate from any
9  procurement grant for Hydrocodone?
10   A.   Correct.
11   Q.   And DEA would make an assessment
12  about the appropriate procurement quota for
13  each molecule separately?
14   A.   Yes.
15   Q.   And a manufacturer would not be
16  allowed to procure more of that molecule than
17  the DEA permitted, correct?
18   A.   Can I have the question repeated.
19   Q.   Sure.  And a manufacturer would not
20  be allowed to procure more of that molecule
21  than the DEA permitted, correct?
22   A.   I think there is a difference
23  between would or ability to and should they,
24  when the processes work, no they cannot do
25  that.  If the process does not work, then they

1  may.
2    Q.   Okay.
3         MR. O'CONNOR:  I'm going to mark
4  Exhibit 2.
5         (Deposition Exhibit 2 was marked for
6  identification.)
7       BY MR. O'CONNOR:
8    Q.   Do you recognize this document?
9    A.   Yes.
10   Q.   What is it?
11   A.   It is a page from the C.F.R.
12   Q.   Okay.  Was this a portion of the
13  C.F.R. that you used in connection with your
14  role as unit chief and section chief?
15         MR. CHANDLER:  Objection.  Vague as
16  to time.
17         THE WITNESS:  I don't understand the
18  question.
19       BY MR. O'CONNOR:
20   Q.   Okay.  When you were working on
21  quota issues, did you ever refer to this
22  regulation?
23         MR. CHANDLER:  Same objection.
24         THE WITNESS:  Can I have the
25  question back.

13 (Pages 46 - 49)

1    BY MR. O'CONNOR:
2    Q.   Sure.  When you were working on
3  quota issues, did you ever refer to this
4  regulation?
5    A.   When I was working on the aggregate
6  production quota, then this section that you
7  printed, yes.
8    Q.   And specifically, I would like to
9  talk about Section 1303.11(b), which says:  "In
10  making this determination, the administrator
11  shall consider the following factors."
12        Do you see that?
13    A.   Yes.
14    Q.   Okay.  And then it goes on to list
15  five items.
16        The first is:  "Total net disposal
17  of the class by all manufacturers during the
18  current and two preceding years."
19        Did DEA consider that factor when
20  setting the aggregate production quotas between
21  1995 and 2018?
22    A.   Yes.
23    Q.   And what does it mean to say the
24  "total net disposal of the class?"
25    A.   So total net disposal would be the

1  aggregate disposal disposition of all the
2  manufacturers, not counting their manufacturing
3  losses or their returns to other manufacturers.
4    Q.   Okay.  Okay.  No. 2 says:  "Trends
5  in the national rate of net disposal of the
6  class."
7        What does that mean?
8    A.   Trends in national rate would be
9  changes in disposal rates.
10    Q.   How would DEA take into account
11  trends in the national rate of net disposal
12  when determining aggregate production quotas?
13    A.   The main factor would be from FDA.
14    Q.   Okay.  And in each year from 1995 to
15  2018, did DEA, in fact, consider the trends in
16  the national rate of net disposal of the class
17  when setting aggregate production quotas?
18    A.   Yes.
19    Q.   No. 3 says:  "The total actual or
20  estimated inventories of the class and of all
21  substances manufactured from the class and
22  trends in inventory accumulation."
23        What does that mean?
24    A.   Total inventory would be the amount
25  that the manufacturers have remaining after

1  they have manufactured a substance but had not
2  disposed of it.
3    Q.   Okay.  And did the DEA take that
4  into account each year between 1995 and 2018
5  when setting the aggregate production quota?
6    A.   Yes.
7    Q.   No. 4 says:  "Projected demand for
8  such class as indicated by procurement quotas
9  requested pursuant to Section 1303.12."
10        What does that mean?
11    A.   Projected demand would be the amount
12  of material being requested through procurement
13  quotas.
14    Q.   And did the DEA consider that factor
15  each year in setting aggregate production
16  quota?
17    A.   Yes.
18    Q.   No. 5 says:  "Other factors
19  affecting medical, scientific research and
20  industrial needs in the United States and
21  lawful export requirements as the administrator
22  finds relevant."
23        What other factors did DEA consider
24  when setting the aggregate production quota?
25        MR. CHANDLER:  Objection.  Form.

1        THE WITNESS:  It would depend on the
2  substance.
3    BY MR. O'CONNOR:
4    Q.   So by way of example of oxycodone,
5  what other factors contemplated by Subsection 5
6  did the DEA consider when setting aggregate
7  production quota?
8        MR. CHANDLER:  Objection.  Vague.
9        THE WITNESS:  It would be the number
10  of manufacturers, their actual use and need for
11  the material, known diversion, known abuse.
12        BY MR. O'CONNOR:
13    Q.   And were those factors you just
14  listed considered every year between 1995 and
15  2018?
16        MR. ELSNER:  Objection.
17        THE WITNESS:  When there was data,
18  yes.
19        BY MR. O'CONNOR:
20    Q.   Were there any years in which there
21  was not data on those factors you named?
22        MR. CHANDLER:  Objection.  Vague.
23  Scope.
24        THE WITNESS:  I didn't memorize
25  every year so I don't know.

Page 54

1    BY MR. O'CONNOR:
2    Q.   But speaking here today with respect
3 to the DEA practices on setting quota, were
4 there any years in which DEA did not consider
5 the number of manufacturers when setting
6 aggregate production quota?
7         MR. CHANDLER:  Objection.  Vague.
8 Scope.
9         THE WITNESS:  It's a factor to be
10 considered.
11        BY MR. O'CONNOR:
12    Q.   Were there any years between 1995
13 and 2018 when DEA did not consider the actual
14 use and need for the material?
15    A.   It is still --
16        MR. CHANDLER:  Objection.  Vague.
17 Scope.
18        You can answer.
19        THE WITNESS:  It is still a factor.
20        BY MR. O'CONNOR:
21    Q.   Were there any years in which DEA
22 did not consider known diversion when
23 determining the aggregate production quota?
24        MR. CHANDLER:  Objection.  Vague.
25 Scope.

Page 55

1         THE WITNESS:  It's still a factor.
2         BY MR. O'CONNOR:
3    Q.   And were there any years between
4 1995 and 2018 in which DEA did not consider
5 known abuse when setting aggregate production
6 quota?
7         MR. CHANDLER:  Objection.  Vague.
8 Scope.
9         THE WITNESS:  True abuse lay with
10 the FDA so it's a factor once again.
11        BY MR. O'CONNOR:
12    Q.   Between 1998 and 2018, did the DEA
13 consider changes in the currently accepted
14 medical use and treatment with the class when
15 considering or setting the aggregate production
16 quota?
17    A.   As set forth by FDA, yes.
18    Q.   Between 1995 and 2018, did DEA
19 consider the economic and physical availability
20 of raw materials for use in manufacturing --
21        MR. CHANDLER:  Objection.  Vague.
22        BY MR. O'CONNOR:
23    Q.   -- when setting the aggregate
24 production quota?
25    A.   When provided with that information,

Page 56

1 yes.
2    Q.   And in each year from 1995 to 2018,
3 did DEA consider the potential disruptions to
4 production when setting the aggregate
5 production quota?
6         MR. CHANDLER:  Objection.  Vague.
7         THE WITNESS:  It's -- it can be
8 considered when it's known.  Potential is not
9 known.
10        BY MR. O'CONNOR:
11    Q.   If there was, for example, a recall
12 in the marketplace of a particular kind of
13 drug, would DEA consider that when setting the
14 aggregate production quota?
15    A.   If the recall was verified through
16 FDA, then yes.
17    Q.   Who at DEA was responsible for
18 communicating with FDA regarding aggregate
19 production quota?
20    A.   The DEA sends a letter signed by Mr.
21 Rannazzisi to FDA requesting that information.
22    Q.   On the occasions that Mr. Rannazzisi
23 requested the information, did FDA respond?
24    A.   Yes, in a letter form back.
25    Q.   Would DEA consider those letters

Page 57

1 from FDA when making a decision on aggregate
2 production quota?
3    A.   Yes.
4         MR. O'CONNOR:  We have been going a
5 little over an hour.  Should we take a break?
6         THE VIDEOGRAPHER:  We are going off
7 the record.  This is the end of Media Unit No.
8 1.  The time is 10:23.
9         (A short recess was taken.)
10        THE VIDEOGRAPHER:  We are back on
11 the record.  This is the beginning of Media
12 Unit No. 2.  The time is 10:57.
13        You may proceed, Counsel.
14        MR. O'CONNOR:  Thank you.  I'm going
15 to mark Exhibit 3.
16        (Deposition Exhibit 3 was marked for
17 identification.)
18        BY MR. O'CONNOR:
19    Q.   Ms. Harper-Avilla, are you familiar
20 with this document?
21    A.   I'm aware of this document.
22    Q.   Have you seen it before?
23    A.   I have.
24    Q.   Would you mind turning to Page 10.
25        On Page 10, the report reads in

15 (Pages 54 - 57)

1  part: "In establishing APQs for each basic
2  class of Schedule I and Schedule II controlled
3  substances, DEA considers information from many
4  sources, including," and then it lists several
5  sources of information.
6      First of all, would you agree with
7  the statement that in setting aggregate
8  production quotas, DEA considers information
9  from many sources?
10    A.  Yes.
11    Q.  I just want to walk through each of
12  these bullets.
13      In setting the aggregate production
14  quota, does DEA consider manufacturer's
15  production history and anticipated needs?
16    A.  As provided to DEA, yes.
17    Q.  And does DEA consider in determining
18  aggregate production quota estimates from IMS
19  Health on retail consumption based on
20  prescriptions dispensed?
21    A.  Yes.
22    Q.  In each year from 1995 through 2018,
23  did DEA consider information from IMS Health on
24  retail consumption based on prescriptions
25  dispensed when setting aggregate production

1  quotas?
2    A.  For the years that IMS Health was in
3  existence, yes.  I don't know what was used
4  prior to that.
5    Q.  Okay.  During which years was IMS
6  Health used?
7      MR. ELSNER:  Objection.
8      THE WITNESS:  For the years in which
9  they had a contract with DEA.
10      BY MR. O'CONNOR:
11    Q.  What years were those?
12    A.  I am not in charge of contracts.  I
13  don't know the answer.
14    Q.  Okay.  But in connection with the
15  DEA's practice of setting aggregate production
16  quota, during what years did DEA use estimates
17  from IMS Health on retail consumption based on
18  prescriptions dispensed?
19      MR. ELSNER:  Objection.
20      THE WITNESS:  For the years in which
21  DEA had a contract with IMS Health, I am not
22  familiar with these -- those years.
23      BY MR. O'CONNOR:
24    Q.  Can you provide an estimate?
25    A.  No.

1    Q.  Did you use it last year?
2    A.  IMS Health no longer exists.
3    Q.  Okay.  Did the DEA obtain any data
4  to use in its place?
5      MR. ELSNER:  Objection.
6      MR. CHANDLER:  Objection.  Vague.
7      THE WITNESS:  DEA has a contract
8  with another vendor, yes.
9      BY MR. O'CONNOR:
10    Q.  Which vendor is that?
11    A.  IQVIA.
12    Q.  And does IQVIA provides estimates on
13  retail consumption based on prescriptions
14  dispensed?
15    A.  Yes.
16    Q.  When you became unit chief in 2008,
17  did DEA use IMS data on retail consumption
18  based on prescriptions dispensed when setting
19  the aggregate production quota?
20    A.  Yes.
21    Q.  And in every year between 2008 and
22  the time when DEA switched to IQVIA data, did
23  DEA use IMS Health data when setting the
24  aggregate production quota?
25      MR. ELSNER:  Objection.

1      THE WITNESS:  Yes.
2      BY MR. O'CONNOR:
3    Q.  So just to be clear, in the years
4  2009, '10, '11, '12, '13, '14, '15, '16 and
5  '17, DEA used IMS Health data on retail
6  consumption based on prescriptions dispensed
7  when determining the aggregate production
8  quota?
9      MR. CHANDLER:  Objection.  Misstates
10  prior testimony.
11      THE WITNESS:  Because I'm not aware
12  of when the contract changed, I'm not sure
13  which year IMS Health ceased to exist and
14  became IQVIA.
15      BY MR. O'CONNOR:
16    Q.  But in every year between 2008 and
17  2018, DEA used data either from IMS or IQVIA
18  when setting the annual production quota,
19  correct?
20    A.  It was a factor and consideration,
21  yes.
22    Q.  And prior to 2008, did DEA consider
23  IMS Health data when setting the aggregate
24  production quota?
25    A.  If the contract existed, yes, it

16 (Pages 58 - 61)

Page 62

1   did.
2       Q.   And were there any years in which
3   you believe the contract did not exist between
4   1995 and 2008?
5       A.   I don't know when IMS Health came
6   into existence so I cannot speak to that.
7       Q.   During the years in which DEA used
8   IMS Health data or IQVIA data, did it use that
9   data when setting the aggregate production
10  quota for oxycodone?
11          MR. CHANDLER: Objection.  Scope.
12          THE WITNESS:  The estimate was a
13  factor, a single factor in a multi-factor
14  system.
15          BY MR. O'CONNOR:
16      Q.   And during the years in which DEA
17  used IMS Health data or IQVIA data, did it use
18  that data when setting the aggregate production
19  quota for Hydrocodone?
20          MR. CHANDLER: Objection.  Scope.
21          THE WITNESS:  It was a factor in it.
22          BY MR. O'CONNOR:
23      Q.   And during the years in which DEA
24  used IMS Health data or IQVIA data, did it use
25  that data when setting the aggregate production

Page 63

1   quota for every other basic class of controlled
2   substances for which quota was granted?
3           MR. CHANDLER: Objection.  Scope.
4           THE WITNESS:  Can I have the
5   question again.
6           BY MR. O'CONNOR:
7       Q.   Sure.  During the years in which DEA
8   used IMS Health data or IQVIA data, did it use
9   that data when setting the aggregate production
10  quota for every other basic class of controlled
11  substances for which quota was granted?
12      A.   No.
13      Q.   For which classes of controlled
14  substances did DEA not use IMS Health or IQVIA
15  data when setting the aggregate production
16  quota?
17          MR. CHANDLER: Objection.  Scope.
18          THE WITNESS:  For those that are not
19  FDA approved.
20          BY MR. O'CONNOR:
21      Q.   But for all those classes of
22  controlled substances that are FDA approved,
23  DEA considered IMS Health or IQVIA data when
24  setting the aggregate production quota,
25  correct?

Page 64

1           MR. CHANDLER: Objection.  Scope.
2           THE WITNESS:  Only for domestic
3   prescription data, yes.
4           BY MR. O'CONNOR:
5       Q.   And they considered that in every
6   year from at least 2008 to the present,
7   correct?
8           MR. CHANDLER: Objection.  Scope.
9           THE WITNESS:  Prescription data
10  would be considered as a one point, one single
11  factor in a multi-factored system, yes.
12          BY MR. O'CONNOR:
13      Q.   And it would be considered in each
14  and every year between 2008 and 2018, correct?
15          MR. CHANDLER: Objection.  Scope.
16          THE WITNESS:  If the data existed.
17          BY MR. O'CONNOR:
18      Q.   Were there any years between 2008
19  and 2018 in which the data did not exist?
20          MR. ELSNER:  Objection.
21          THE WITNESS:  When FDA changed
22  treatment marketing, then the data did not
23  exist.
24          BY MR. O'CONNOR:
25      Q.   What do you mean by that?

Page 65

1       A.   If FDA decided that something needed
2   to be pulled from the market, then it did not
3   exist.  If FDA decided that they were granting
4   a new product to the market, the data did not
5   exist.
6       Q.   Okay.  But for those classes of
7   controlled substances that were already on the
8   market, the DEA considered IMS Health data or
9   IQVIA data in each and every year between 2008
10  and 2018 when determining aggregate production
11  quota, correct?
12          MR. CHANDLER: Objection.  Scope.
13          THE WITNESS:  If the FDA pulled a
14  product in the middle of the year, then no, we
15  could not consider already granted prescription
16  data foreset [sic] in the next year.
17          BY MR. O'CONNOR:
18      Q.   Were there any products that you can
19  recall that were pulled mid-year?
20      A.   Yes.
21      Q.   What were those?
22      A.   Can I have a moment, please, with my
23  attorney?
24      Q.   You can answer the question unless
25  you have a question about privilege.

17 (Pages 62 - 65)

Page 66

1    MR. CHANDLER: Is there a question
2  of communication or privilege?
3    Go off the record for a minute.
4    MR. O'CONNOR: Sure.
5    THE VIDEOGRAPHER: We are going off
6  the record. The time is 11:00.
7    (A short recess was taken.)
8    THE VIDEOGRAPHER: We are back on
9  the record. The time is 11:06.
10    You may proceed, Counsel.
11    BY MR. O'CONNOR:
12    Q.  So Ms. Harper-Avilla, when we left,
13  I think you were -- needed to consult with your
14  attorney.
15    Do you have an answer to the
16  question?
17    A.  Can I have the question back,
18  please.
19    Q.  We will strike that question.
20    Take a look at the next bullet point
21  on the list.
22    It says: "Data from DEA's internal
23  system for tracking controlled substances
24  transactions known as the Automation of Reports
25  and Consolidated Order System, ARCOS."

Page 67

1    Did DEA consider data from ARCOS in
2  each year between 1995 and 2018 when
3  determining the aggregate production quota?
4    A.  Yes.
5    Q.  And did it use data from ARCOS in
6  determining the aggregate production quota in
7  each of those years for every opioid product
8  for which it granted quota?
9    A.  Where it was known that the data was
10  valid, yes.
11    Q.  Were there any products for which
12  the data was not valid in any of those years
13  between 1995 and 2018?
14    MR. ELSNER: Objection.
15    THE WITNESS: The data is only as
16  good as the manufacturers put into it and there
17  were errors with that in some cases.
18    BY MR. O'CONNOR:
19    Q.  Where does the data from ARCOS come
20  from?
21    MR. CHANDLER: Objection.
22    I'm going to instruct the witness
23  not to answer. She is not designated to
24  testify about ARCOS.
25    BY MR. O'CONNOR:

Page 68

1    Q.  Were there any years in which you
2  understood the ARCOS data to be invalid?
3    MR. ELSNER: Objection.
4    MR. CHANDLER: Objection.
5    And I will instruct the witness not
6  to answer.
7    You can ask about the quota
8  section's use of ARCOS data, but as far as the
9  validity or operation of ARCOS, no, we will
10  oppose that.
11    BY MR. O'CONNOR:
12    Q.  When considering the aggregate
13  production quota, were there any years in which
14  DEA did not rely on ARCOS data for a particular
15  substance?
16    A.  The data was considered, but it is a
17  factor.
18    Q.  And the data was considered in each
19  and every year between 1995 and 2018, correct?
20    A.  Within its known limitations of the
21  data, yes.
22    Q.  And it was considered for each and
23  every opioid product for which quota was
24  granted during those years, correct?
25    A.  Within the limitations, yes.

Page 69

1    Q.  And what are those limitations?
2    A.  That the data may not always be
3  valid because of a manufacturing input.
4    Q.  Were there any years when you did
5  not feel comfortable considering that data
6  because you believed it was unreliable?
7    A.  The data was always considered
8  suspect for each year.
9    Q.  What do you mean when you say, "it
10  was considered suspect?"
11    A.  That the data was only as good as
12  the input from the manufacturers.
13    Q.  The next bullet says: "Past history
14  of the quota granted for each substance from
15  YERS/QMS."
16    What is YERS/QMS?
17    A.  It's a year-end reporting system,
18  quota management system.
19    Q.  That's maintained by DEA?
20    A.  Yes.
21    Q.  And what data does it include?
22    A.  Manufacturing and disposition data
23  for manufacturers who are registered for
24  Schedule I and II controlled substances as well
25  as internationally controlled III through V.

18 (Pages 66 - 69)

Page 70

1    Q.   Okay.  The next bullet says:
2  "Estimates of the projected medical, scientific
3  and reserve stock needs provided by FDA's
4  controlled substances staff."
5        Were such estimates considered when
6  determining the aggregate production quota?
7    A.   For every year that a letter
8  existed, yes.
9    Q.   And between the years 1995 and 2018,
10  are you aware of any years in which FDA did not
11  provide a letter?
12    A.   I am not aware.
13    Q.   And did DEA consider the estimates
14  provided by FDA when determining the aggregate
15  production quota of each and every opioid
16  product for which it granted quota?
17    A.   Yes.
18    Q.   How would DEA receive estimates of
19  the projected medical, scientific and reserve
20  stock needs from the FDA?
21    A.   In a letter.
22    Q.   The same letter, same type of letter
23  you mentioned earlier today?
24    A.   It's the exact letter.
25        MR. O'CONNOR:  Counsel, I don't know

Page 71

1  that we received those letters but we make a
2  request on the record to get them.
3        MR. CHANDLER:  Okay.  We can discuss
4  that afterwards.
5        BY MR. O'CONNOR:
6    Q.   And did the DEA consider any other
7  estimates of the projected medical, scientific
8  and reserve stock needs besides the ones
9  provided by FDA when determining aggregate
10  production quota?
11    A.   Yes.  Those provided by the
12  companies themselves.
13    Q.   In addition to estimates provided to
14  the DEA of the projected medical, scientific
15  and reserve stock needs, did DEA come to its
16  own determination of the projected medical,
17  scientific and reserve stock needs when
18  considering aggregate production quota?
19    A.   DEA took into account the
20  manufacturing needs in order to make those
21  projected accounts from FDA.
22    Q.   I'm sorry.  I'm not sure I
23  understand the answer.
24        Could you just explain?
25        MR. ELSNER:  Objection.

Page 72

1        THE WITNESS:  FDA's projected
2  medical, scientific needs did not include
3  manufacturing needs in terms of yield and
4  losses from the manufacturers.  DEA had to
5  consider that in order to reach that estimate.
6        BY MR. O'CONNOR:
7    Q.   So in addition to the estimates
8  provided by FDA, the DEA also considered the
9  amounts needed to account for yield or loss in
10  production?
11    A.   Yes.
12    Q.   Is that fair?
13        Okay.  And is it fair to say that
14  under the regulations regarding quota, DEA was
15  responsible for setting quota at a level that
16  was consistent with the medical, scientific and
17  industrial needs of the United States?
18    A.   Yes.  And the reserve stock.
19    Q.   The last bullet says:  "Data on the
20  diversion of controlled substances, such as
21  information from case seizures and national
22  databases of drug evidence."
23        Did the DEA consider that data when
24  establishing aggregate production quota in each
25  and every year between 1995 and 19 -- or in

Page 73

1  2018?
2        MR. ELSNER:  Objection.
3        THE WITNESS:  When the data was
4  available, yes.
5        BY MR. O'CONNOR:
6    Q.   During which years between 1995 and
7  2018, did DEA not consider data on the
8  diversion of controlled substances when setting
9  the aggregate production quota?
10        MR. ELSNER:  Objection.
11        THE WITNESS:  When the data was not
12  available.
13        BY MR. O'CONNOR:
14    Q.   In what years was the data not
15  available?
16        MR. ELSNER:  Objection.
17        THE WITNESS:  When the case was
18  still open against a manufacturer.
19        BY MR. O'CONNOR:
20    Q.   So let's talk for a moment about
21  what data on diversion of controlled substances
22  was considered.
23        When setting the aggregate
24  production quotas, what data on diversion did
25  the agency use?

19 (Pages 70 - 73)

Page 74

1    A.    Internal data.
2    Q.    What sorts of internal data?
3    A.    Known quantifiable seizure data,
4  known quantifiable information received from
5  state and local law enforcement agencies or
6  labs.
7    Q.    And to the extent DEA had data on
8  diversion that was quantifiable, did it
9  consider that data in connection with setting
10  the aggregate production quotas for opioids?
11    A.    Yes.
12    Q.    Did it consider that data in setting
13  the aggregate production quota for opioids in
14  each and every year between 1995 and 2018?
15    A.    Where it existed, yes.
16    Q.    Were there any years during that
17  time period where, to your knowledge, the data
18  did not exist?
19        MR. CHANDLER:  Objection.  Vague.
20        You can answer.
21        THE WITNESS:  There are years where
22  the data was not broken out by controlled
23  substance, so we could not quantify it per
24  controlled substance, and that led to other
25  issues.

Page 75

1        BY MR. O'CONNOR:
2    Q.    Where the data could not be broken
3  out by controlled substance, did the DEA still
4  consider that information when setting
5  aggregate production quota?
6    A.    It could not be attributed to a
7  specific controlled substance, so no.
8    Q.    In what years did the data not allow
9  the diversion data to be attributed to a
10  particular substance?
11        MR. ELSNER:  Objection.
12        THE WITNESS:  It varied in the years
13  based on how the data was submitted to DEA.
14  Once again, it's not our internal data.
15        BY MR. O'CONNOR:
16    Q.    And who were you receiving the data
17  from?
18    A.    It would have been state and local
19  labs.
20    Q.    Are you aware of any year between
21  '95 -- 1995 and 2018 in which diversion data
22  regarding oxycodone was not considered when
23  setting the oxycodone aggregate production
24  quota?
25    A.    I am not aware when it was not

Page 76

1  considered.
2    Q.    Are you aware of any year between
3  1995 and 2018 in which diversion data regarding
4  Hydrocodone was not considered when setting the
5  Hydrocodone aggregate production quota?
6        MR. ELSNER:  Objection.
7        THE WITNESS:  I'm not aware of when
8  it was not considered.
9        BY MR. O'CONNOR:
10    Q.    Are you aware of any year between
11  1995 and 2018 in which diversion data regarding
12  any other opioid product was not considered
13  when setting aggregate production quotas?
14    A.    I am not aware, if it's spelled out
15  a controlled substance, then we considered it.
16    Q.    So to be clear, was there any year
17  between 1995 and 2018 in which DEA did not
18  consider diversion data involving any other
19  opioid product when setting aggregate
20  production quotas?
21        MR. ELSNER:  Objection.
22        THE WITNESS:  DEA considered
23  diversion data when it was a specific
24  controlled substance, not a vague term opioid.
25        BY MR. O'CONNOR:

Page 77

1    Q.    Okay.  But when DEA had data on
2  those specific opioids, it considered that
3  diversion data when setting the aggregate
4  production quota, correct?
5    A.    Yes, if we have the data.
6    Q.    And during what years did DEA not
7  have the data?
8    A.    I don't recall.
9    Q.    Do you recall any year in which DEA
10  did not have that data?
11        MR. ELSNER:  Objection.
12        THE WITNESS:  There were -- there
13  was a time frame where the data was not
14  specific to the controlled substance.  It was
15  just termed opioid or termed narcotic, and in
16  which case, we could not consider it for the
17  individual scope.
18        BY MR. O'CONNOR:
19    Q.    During what years or what time frame
20  did you receive the data that was just termed
21  opioid or narcotic and not broken out by
22  individual molecule?
23    A.    There are various times.  I don't
24  recall specific ones.
25    Q.    So you recall no specific times in

20 (Pages 74 - 77)

Page 78

1   which the data wasn't broken out?
2         MR. ELSNER: Objection.
3         MR. CHANDLER: Objection. Scope.
4       BY MR. O'CONNOR:
5     Q.  You can answer the question.
6     A.   The data was whatever it was at the
7   time.  If it was broken out by controlled
8   substance, we had it.  If it was just termed
9   narcotic, we could not use it for the specific
10  controlled substance, and that could occur at
11  any point in time because we did not input the
12  data, that came from state and local labs.
13    Q.   Okay.  If we had to find out which
14  years DEA wasn't able to use the individualized
15  data, how would we do that?
16        MR. CHANDLER: Objection. Scope.
17        THE WITNESS: I'm not sure.  I don't
18  know.
19        BY MR. O'CONNOR:
20    Q.   Is there anyone else at DEA who
21  might know the answer to that question?
22        MR. ELSNER: Objection.
23        THE WITNESS: I don't know.
24        BY MR. O'CONNOR:
25    Q.   Is there a particular process that

Page 79

1   DEA follows when setting its aggregate
2   production quota for opioid products?
3     A.   Yes.
4     Q.   Could you describe that process?
5     A.   It takes into account all of the
6   steps that you just mentioned earlier.
7     Q.   And who is involved at DEA in the
8   process?
9     A.   There are various people in
10  different sections involved in the process.
11    Q.   Can you give me some examples?
12    A.   The quota section is involved, the
13  reg writing group is involved, chief counsel is
14  involved.  It's various sections within the
15  agency.
16    Q.   Through that process, the agency
17  determines an aggregate production quota for
18  various individual classes of controlled
19  substances, correct?
20    A.   In Schedule I and II, yes.
21    Q.   And those proposed for a proposal
22  for those quotas are then published in the
23  Federal Register; is that correct?
24    A.   Yes.
25    Q.   Before they are published in the

Page 80

1   Federal Register, who at DEA needs to approve
2   the aggregate production quota numbers?
3     A.   I don't understand your question.
4     Q.   Before the aggregate production
5   quota numbers are published in the Federal
6   Register, does someone at the agency have to
7   approve those numbers?
8     A.   The final approval of those numbers
9   is by the person who signs the Federal
10  Register.
11    Q.   And who is that in the case of
12  aggregate production quotas?
13    A.   It would be the administrator or
14  active administrator or the deputy
15  administrator depending on who is in charge at
16  that time.
17    Q.   Okay.  Before the aggregate
18  production quota numbers go to any of the
19  individuals you just mentioned, are there
20  others at DEA that have to sign off first?
21    A.   Yes.
22    Q.   Okay.  Who are those people that
23  need to sign off first?
24    A.   I don't know the exact list of
25  people who sign off, but it would be the head

Page 81

1   of diversion, as well as whoever is in the
2   chain between that person and the
3   administrator.
4     Q.   Okay.  When you were --
5         MR. CHANDLER: I'm sorry, I will
6   jump in here.  Stacy prepared a list of people
7   in the approval chain going back to at least
8   2011, so I think that would be a good time to
9   work from this, so if you want to testify from
10  that, and we have a copy for you all.
11        MR. O'CONNOR: Thank you.
12  Appreciate that.
13        BY MR. O'CONNOR:
14    Q.   And Ms. Harper-Avilla, have you
15  reviewed this document before?
16    A.   Yes.
17    Q.   And is all the information contained
18  in it accurate?
19    A.   Yes.
20    Q.   Okay.
21        MR. O'CONNOR: I'm going to mark
22  this Exhibit 4.
23        (Deposition Exhibit 4 was marked for
24  identification.)
25        BY MR. O'CONNOR:

Page 82

1    Q.   Just so I understand, this document
2    lists the individuals at DEA who were required
3    to review and approve aggregate production
4    quota before it was published in the Federal
5    Register; is that correct?
6        A.   Yes.
7        Q.   And while you were unit chief and
8    then section chief, did you also have to
9    approve the quota numbers before they were
10   published in the Federal Register?
11       A.   Yes.
12       Q.   During any year in which you
13   approved those numbers, did you feel that they
14   did not reflect the legitimate medical,
15   scientific and industrial needs of the United
16   States?
17           MR. CHANDLER: Objection. Scope.
18           THE WITNESS: No.
19           BY MR. O'CONNOR:
20       Q.   After the proposed aggregate
21   production quotas are published in the Federal
22   Register, do members of the public have an
23   opportunity to comment on them?
24       A.   Yes.
25       Q.   So if someone felt that the

Page 83

1    aggregate production quotas were too high, for
2    example, would they have an opportunity to
3    submit comments to the DEA reflecting that
4    view?
5        A.   Yes.
6        Q.   If the DEA received any comments
7    regarding the aggregate production quota, would
8    it take them into account when deciding the
9    final aggregate production quota numbers?
10       A.   Can I have the question again.
11       Q.   Sure. If the DEA received any
12   comments regarding the aggregate production
13   quota, would it take them into account when
14   deciding the final aggregate production quota
15   numbers?
16       A.   Yes.
17       Q.   Is there a process in place at DEA
18   for determining individual manufacturing
19   quotas?
20       A.   Yes.
21       Q.   What is that process?
22       A.   I don't have it detailed. It's in
23   the C.F.R., but basically, a bulk manufacturer
24   would be required to provide information
25   regarding why they needed that quota.

Page 84

1    Q.   And who considers that request
2    within the agency?
3        A.   The UN reporting section does.
4        Q.   What factors does DEA take into
5    account when deciding whether to grant or how
6    much to grant with respect to individual
7    manufacturing quota?
8        A.   The factors are laid out in the
9    regulation and we consider those factors.
10       Q.   Okay. As you sit here today, do you
11   recall what those factors are?
12       A.   I have the C.F.R. with me, but I
13   don't remember them verbatim.
14       Q.   Fair enough. Fair enough. Let's
15   take a look at -- see if we can help.
16           MR. O'CONNOR: I'm going to mark
17   this as Exhibit 5.
18           (Deposition Exhibit 5 was marked for
19   identification.)
20           BY MR. O'CONNOR:
21       Q.   Was this the regulation that you
22   were thinking of a minute ago?
23       A.   Yes.
24       Q.   All right. So I am looking at
25   Section 1303.23(a).

Page 85

1           Is that the section that describes
2    the factors DEA considers when determining
3    individual manufacturing quotas?
4        A.   Yes.
5        Q.   Okay. And in Subsection 2, it says
6    that the individual manufacturing quota can be
7    adjusted "by any other factors which the
8    administrator deems relevant."
9           Is that your understanding of the
10   regulation?
11           MR. CHANDLER: Objection. Vague.
12           THE WITNESS: I don't understand
13   your question.
14           BY MR. O'CONNOR:
15       Q.   Fair enough. The DEA is permitted
16   to adjust individual manufacturing quotas based
17   on any factor the administrator deems relevant,
18   correct?
19           MR. ELSNER: Objection.
20           THE WITNESS: Yes.
21           BY MR. O'CONNOR:
22       Q.   Among those factors listed here is
23   the extent of any diversion of the controlled
24   substance.
25           Do you see that?

22 (Pages 82 - 85)

Page 86

1    A.   In Subsection 2?
2    Q.   Yes.
3         MR. CHANDLER:  Are we looking at
4    (a)(2) or (b)(2)?
5         MR. O'CONNOR:  (a)(2).
6         THE WITNESS:  I do not.
7    BY MR. O'CONNOR:
8    Q.   So does the DEA consider, in setting
9    individual manufacturing quotas, the extent of
10   diversion of a particular controlled substance?
11   A.   It depends on the manufacturer.
12   Q.   What do you mean by that?
13   A.   The CSA and these implemented regs
14   were written at a time when most manufacturers
15   were vertically integrated from top to bottom
16   and put to actual patient pill form, but
17   currently, that is not the case for most of the
18   manufactures who are applying to be a bulk
19   manufacturer.  They are applying to provide
20   material to a second manufacturer who is then
21   authorized to do dosage form to the patient, so
22   there is a disconnect apparently between how
23   these regs were written and actual business
24   practices today.  If a manufacturer is
25   vertically integrated, then yes, it would be

Page 87

1    considered.
2    Q.   Okay.  To the extent a manufacturer
3    is not vertically integrated, would the DEA
4    still consider the extent of diversion of a
5    particular controlled substance when
6    determining the appropriate individual
7    manufacturing quota?
8    A.   Yes.
9    Q.   In determining the individual
10   manufacturing quota, would the DEA also
11   consider whether the manufacturer was complying
12   with the Controlled Substances Act?
13   A.   I don't understand your question.
14   Q.   If the DEA believed a manufacturer
15   was not complying with the Controlled
16   Substances Act, would it grant that
17   manufacturer an individual manufacturing quota?
18        MR. ELSNER:  Objection.
19        THE WITNESS:  I still don't
20   understand your question.
21   BY MR. O'CONNOR:
22   Q.   In the course of the approval
23   process for an individual manufacturing quota,
24   if it came to your attention that the requester
25   was not complying with the Controlled

Page 88

1    Substances Act, would you grant that quota
2    request?
3         MR. ELSNER:  Objection.
4         MR. CHANDLER:  Objection.  Vague.
5         THE WITNESS:  The Controlled
6    Substances Act is a multipiece document and it
7    would depend on what violation they are
8    supposedly accused of.
9         BY MR. O'CONNOR:
10   Q.   If the DEA believed that a
11   manufacturer did not have effective controls
12   against diversion in place, would it grant that
13   manufacturer an individual manufacturing quota?
14        MR. CHANDLER:  Objection.  Vague.
15        MR. ELSNER:  Objection.
16        THE WITNESS:  Can I have the
17   question again.
18   BY MR. O'CONNOR:
19   Q.   Sure.  If the DEA believed that a
20   manufacturer did not have effective controls
21   against diversion in place, would it grant that
22   manufacturer an individual manufacturing quota?
23        MR. ELSNER:  Objection.
24        MR. CHANDLER:  Same objection.
25        THE WITNESS:  The DEA has to act on

Page 89

1    more than belief.  As a government entity, it
2    is fact-based, fact-driven.
3         BY MR. O'CONNOR:
4    Q.   If the DEA was aware of any facts
5    that a manufacturer was not maintaining
6    effective controls against diversion, would it
7    grant that manufacturer an individual
8    manufacturing quota?
9         MR. ELSNER:  Objection.
10        MR. CHANDLER:  Objection.  Form.
11        THE WITNESS:  Each manufacturer is
12   allowed due process until the fact is proven
13   with certainty.
14   BY MR. O'CONNOR:
15   Q.   So it's your testimony here today,
16   that if you were aware that a manufacturer was
17   not maintaining effective controls against
18   diversion, you would still grant that
19   manufacturer an individual manufacturing quota?
20        MR. ELSNER:  Objection.
21        MR. CHANDLER:  Objection.  Vague.
22   Form generally.
23        THE WITNESS:  If the DEA had
24   knowledge, it would investigate it, and that's
25   what would occur in between whether a quota was

23 (Pages 86 - 89)

Page 90

1    granted or not.
2          BY MR. O'CONNOR:
3      Q.   And if that investigation determined
4    that the manufacturer was not maintaining
5    effective controls against diversion, the DEA
6    would not grant it a manufacturing quota,
7    correct?
8          MR. ELSNER:  Objection.
9          MR. CHANDLER:  Objection.  Form.
10          THE WITNESS:  If the DEA had
11   evidence and the due process was completed, the
12   manufacturer would not be granted quota.
13          BY MR. O'CONNOR:
14      Q.   Okay.  I want to turn to procurement
15   quota now.
16          What does procurement quota refer
17   to?
18      A.   Procurement quota is the quota
19   granted for a manufacturer to receive or
20   procure aggregate production -- active
21   pharmaceutical ingredients, API, from a bulk
22   manufacturer, so this is where I talk about the
23   fact that the manufacturing process is not
24   vertically integrated and bulk manufacturers
25   will sell to dosage form manufacturers who are

Page 91

1    not the same company.  Therefore, a procurement
2    quota is necessary.
3      Q.   Fair to say that procurement quota
4    is what allows a manufacturer to buy the raw
5    material that it needs to produce a dosage
6    product?
7      A.   Correct.
8      Q.   Okay.  Is there a process in place
9    at DEA for considering and approving
10   procurement quotas?
11      A.   Yes.
12      Q.   What is that process?
13      A.   It depends on the manufacturer's
14   business practice and it's written out in the
15   C.F.R. under procurement quota.
16      Q.   Okay.
17          MR. O'CONNOR:  We will mark this
18   Exhibit 6.
19          (Deposition Exhibit 6 was marked for
20   identification.)
21          BY MR. O'CONNOR:
22      Q.   Are you familiar with this
23   regulation?
24      A.   Yes.
25      Q.   And it's the regulation that governs

Page 92

1    the allocation of procurement quota, correct?
2          MR. CHANDLER:  Objection.  Vague as
3    to time.
4          BY MR. O'CONNOR:
5      Q.   You can answer the question.
6      A.   It does, after the effective date.
7      Q.   Fair enough.  And to your knowledge,
8    has this regulation changed significantly in
9    the last 20 years?
10          MR. CHANDLER:  Objection.  Vague.
11   Scope.
12          MR. ELSNER:  Objection.
13          THE WITNESS:  It changed last year.
14          BY MR. O'CONNOR:
15      Q.   Do you know which -- in what way it
16   changed?
17          MR. ELSNER:  Objection.
18          BY MR. O'CONNOR:
19      Q.   Strike that.
20          Let's move on.  Do you agree with
21   the statement in Subsection A that one of the
22   purposes of the procurement quota is to ensure
23   an adequate and uninterrupted supply of basic
24   classes of controlled substances?
25          MR. CHANDLER:  Objection.  Scope.

Page 93

1          THE WITNESS:  That's what is written
2    there, yes.
3          BY MR. O'CONNOR:
4      Q.   Okay.  And in setting procurement
5    quotas, do you consider the need to ensure an
6    adequate and uninterrupted supply of basic
7    classes of controlled substances?
8      A.   Yes.
9      Q.   How does the DEA determine how much
10   procurement quota to allocate to a particular
11   manufacturer?
12      A.   It depends on the manufacturer's
13   business activity on what considerations are
14   taken into account.
15      Q.   What are some of the considerations
16   that might be taken into account?
17      A.   FDA approval.
18      Q.   Okay.
19      A.   Manufacturing yields and losses.
20      Q.   Are there any other factors that DEA
21   takes into account when considering how much
22   procurement quota to grant?
23      A.   Yes.
24      Q.   What are those factors?
25      A.   Basic market share, FDA recalls.

24 (Pages 90 - 93)

Page 94

1    Q.   Okay.  Are there any other factors,
2  other than those we just discussed, that the
3  DEA considers when setting procurement quota?
4    A.   Known cases against a manufacturer.
5    Q.   What do you mean by "known cases?"
6    A.   We can't consider something we don't
7  know.  If there is unfortunately a case going
8  on from another part of DEA that we are not
9  apprised of, then we cannot consider it.
10   Q.   What do you mean by "a case?"
11   A.   An investigation.
12   Q.   If DEA had reason to believe that a
13  manufacturer was causing controlled substances
14  to be diverted, would it grant that
15  manufacturer a procurement quota?
16       MR. CHANDLER:  Objection.
17       THE WITNESS:  It would be turned
18  over to the field investigators to determine.
19       BY MR. O'CONNOR:
20   Q.   And if those field investigators
21  determined that the manufacturer was causing
22  controlled substances to be diverted, would it
23  grant that manufacturer a procurement quota?
24       MR. CHANDLER:  Objection.  Vague.
25  Incomplete hypothetical.

Page 95

1        MR. ELSNER:  Objection.
2        THE WITNESS:  The manufacturer would
3  still end up going through due process.
4        BY MR. O'CONNOR:
5    Q.   But at the end of the day, if DEA
6  found that that manufacturer was diverting
7  controlled substances or causing them to be
8  diverted, DEA would not give them a procurement
9  quota, correct?
10       MR. ELSNER:  Objection.
11       MR. CHANDLER:  Objection.  Vague.
12  Incomplete hypothetical.
13       THE WITNESS:  At the end of due
14  process, if the manufacturer was found to be in
15  violation, then there would be no quota, but
16  during the due process, it is open.
17       MR. O'CONNOR:  We have gone about
18  another hour.  Should we take a break?
19       MR. CHANDLER:  Okay.
20       THE VIDEOGRAPHER:  We are going off
21  the record.  This is the end of Media Unit No.
22  2.  The time is 11:58.
23       (A short recess was taken.)
24       THE VIDEOGRAPHER:  We are back on
25  the record.  This is the beginning of Media

Page 96

1  Unit No. 3.  The time is 1:07.
2        You may proceed, Counsel.
3        BY MR. O'CONNOR:
4    Q.   Welcome back.
5    A.   Thank you.
6        MR. O'CONNOR:  I'm going to mark two
7  documents here as Exhibits 7 and 8.
8        (Deposition Exhibit 7 was marked for
9  identification.)
10       (Deposition Exhibit 8 was marked for
11  identification.)
12       BY MR. O'CONNOR:
13   Q.   These are documents that appeared on
14  DEA's website.
15   A.   Okay.
16       MR. CHANDLER:  Just so we are clear,
17  Document 7 is the one updated January 13, 2010;
18  is that right?
19       MR. O'CONNOR:  That's correct.
20       MR. CHANDLER:  And 8 is the January
21  22nd.
22       MR. O'CONNOR:  That's right.
23       BY MR. O'CONNOR:
24   Q.   Starting with No. 7, which reflects
25  the aggregate production quota history for

Page 97

1  selective substances between 2000 and 2010.
2        Do you see that?
3    A.   Yes.
4    Q.   Do you recognize this chart?
5    A.   I recognize the format of the chart,
6  yes.
7    Q.   Do you agree that it reflects the
8  aggregate production quota history for the
9  substances listed here on the left?
10       MR. ELSNER:  Objection.
11       THE WITNESS:  With the exception of
12  2010, it reflects the aggregate production
13  quota as finalized from 2000 to 2009.
14       BY MR. O'CONNOR:
15   Q.   Okay.  And with respect to 2010,
16  what does it reflect?
17   A.   It would reflect the established.
18   Q.   And is it fair to state the
19  established quota might change over the course
20  of the year?
21   A.   Correct.
22   Q.   Let's look at No. 8, Exhibit 8.
23   A.   Yes.
24   Q.   And do you agree that this reflects
25  the aggregate production quota history for the

25 (Pages 94 - 97)

Page 98

1  substances listed on the left between the years
2  2009 through at least 2018?
3      A.   The final aggregate production
4  quota, yes.
5      Q.   And I want to direct your attention
6  on Exhibit 7 to the lines that say: "Oxycodone
7  (sale) and oxycodone (CONV)."
8      What does oxycodone (sale) mean?
9      A.   That that is the aggregate
10  production quota set for oxycodone that will go
11  to dosage form manufacturers.
12      Q.   Okay.  And what does oxycodone
13  (CONV) mean?
14      A.   So CONV stands for conversion and
15  that is the amount of oxycodone that will be
16  converted to a different substance.
17      Q.   And you agree that the numbers
18  listed to the right of oxycodone (sale) reflect
19  the final aggregate production quota for the
20  years listed in the column headings?
21      MR. CHANDLER:  Objection.
22  Mischaracterizes prior testimony.
23      THE WITNESS:  For 2000 through 2009,
24  yes.
25      BY MR. O'CONNOR:

Page 99

1      Q.   Okay.  So just to make sure I am
2  reading this correctly, if we look in the
3  column 2008, the number is for oxycodone (sale)
4  70,000.
5      What does that 70,000 represent?
6      A.   That 70,000 represents the DEA's
7  estimated final number of the amount of
8  oxycodone for sale that may be required to
9  fulfill legitimate, scientific, medical,
10  research, industrial needs, export as well as
11  inventory requirements.
12      Q.   Okay.  And in coming to that number,
13  did DEA take into account the factors that it
14  was required to consider under the Controlled
15  Substances Act?
16      MR. ELSNER:  Objection.
17      THE WITNESS:  Yes.
18      BY MR. O'CONNOR:
19      Q.   And in coming to that number, did
20  DEA consider the factors it was required to
21  under the regulation related to aggregate
22  production quota?
23      A.   Yes.
24      Q.   And with respect to the numbers
25  listed for the other substances here, did the

Page 100

1  DEA consider all of the factors it was required
2  to consider under the Controlled Substances Act
3  in determining those numbers?
4      MR. CHANDLER:  Objection.  Scope.
5      THE WITNESS:  So far as the factors
6  related to that substance, then yes.
7      BY MR. O'CONNOR:
8      Q.   Just to address counsel's objection
9  to scope, with respect to all the numbers
10  listed in Exhibits 7 and 8 that are opioids,
11  did the DEA consider all of the factors that it
12  was required to consider by the Controlled
13  Substances Act?
14      A.   Where appropriate, yes.
15      Q.   Were there any instances in which
16  DEA did not consider factors it was required to
17  consider under the Controlled Substances Act?
18      A.   If there was no data for it, then
19  no, we could not consider it.
20      Q.   Are there any substances for which
21  there was no data to consider the factors the
22  DEA was required to consider?
23      MR. ELSNER:  Objection.
24      MR. CHANDLER:  Objection.
25      BY MR. O'CONNOR:

Page 101

1      Q.   You can answer.
2      A.   Yes.
3      Q.   And which were those?
4      A.   Alfentanil is only for export so
5  there is not -- the other factors are missing
6  when we do the request.
7      Q.   So with respect to codeine -- and
8  just to be clear, you said Alfentanil, correct?
9      A.   Correct.
10      Q.   I want to make sure the court
11  reporter has that.  Thank you.
12      With respect to codeine, fentanyl,
13  hydromorphone, levorphanol, methadone,
14  morphine, opium, oxycodone, hydromorphone and
15  sufentanil, are you aware of any year in which
16  the data DEA was required to consider to
17  determine the aggregate production quota was
18  not available?
19      A.   That list that you mentioned is
20  rather long and I don't remember all the
21  substances so where the substances had data for
22  every single factor, those factors were
23  considered.  If there was a place where FDA did
24  not approve or it was not marketed in the U.S.,
25  then it could not be considered.

26 (Pages 98 - 101)

Page 102

1    Q.   With the exception of Alfentanil,
2  which you already mentioned, are there any
3  other products for which DEA did not have the
4  data necessary for it to consider the factors
5  that it's required by statute and regulation to
6  consider in establishing the aggregate
7  production quota?
8         MR. CHANDLER:  Objection.
9         THE WITNESS:  There would be places
10  -- there would be substances where DEA could
11  not have full data, yes.
12         BY MR. O'CONNOR:
13    Q.   And which are those substances?
14    A.   Opium.
15    Q.   Okay.  Are there any other
16  substances for which DEA did not have the data
17  it needed to determine aggregate production
18  quota?
19         MR. CHANDLER:  Objection.
20         THE WITNESS:  Yes, there's other
21  places.
22         BY MR. O'CONNOR:
23    Q.   And what are those?
24    A.   Methadone.
25    Q.   Okay.  What information was lacking

Page 103

1  with respect to Methadone?
2         MR. CHANDLER:  Objection.
3         THE WITNESS:  Methadone is used in
4  narcotics treatment facilities and therefore,
5  it is not always recorded accurately.
6  Therefore, actual usage is not always captured
7  correctly.
8         BY MR. O'CONNOR:
9    Q.   Okay.  So for oxycodone, in
10  particular, for each of the years listed here,
11  did DEA consider the factors it was required by
12  statute and regulation to consider in setting
13  the aggregate production quota?
14    A.   Yes, where data is available, yes.
15    Q.   Were there any years during which
16  data was not available for oxycodone?
17         MR. ELSNER:  Objection.
18         THE WITNESS:  There were years where
19  manufacturers did not submit complete and
20  timely information in order for us to do our
21  work.
22         BY MR. O'CONNOR:
23    Q.   When DEA granted the quota for
24  oxycodone during those years, on what
25  information did it rely?

Page 104

1         MR. CHANDLER:  Objection.
2         THE WITNESS:  I don't understand the
3  question.
4         BY MR. O'CONNOR:
5    Q.   If you didn't have data from
6  manufacturers, how did you make that decision?
7    A.   For which?
8    Q.   Oxycodone.
9    A.   For which?  Our aggregate production
10  quota?
11    Q.   Yes.
12    A.   DEA made the decision based on
13  manufacturing data, FDA data as well as other
14  information as required in the CSA.  However,
15  DEA bills each year separately so if a
16  manufacturer pulled out of the market, they
17  would not submit that data.  However, a new
18  manufacturer may come into the market and have
19  a different weighted value for the market at
20  that time.
21    Q.   Would you agree that with respect to
22  aggregate production quota for oxycodone, that
23  DEA considered the factors it was legally
24  required to consider?
25    A.   Yes.

Page 105

1    Q.   Okay.  With respect to
2  Hydromorphone, in each of the years listed
3  here, do you agree that with respect to
4  aggregate production quota, DEA considered the
5  factors it was legally required to consider?
6    A.   Yes.
7    Q.   With respect to Hydromorphone --
8  sorry, strike that.
9         With respect to Hydrocodone, in each
10  of the years listed, do you agree that with
11  respect to aggregate production quota, DEA
12  considered the factors it was legally required
13  to consider?
14    A.   Yes.
15    Q.   With respect to oxymorphone, in
16  setting the aggregate production quota in each
17  of the years listed, do you agree that DEA
18  considered the factors it was legally required
19  to consider?
20    A.   Yes.
21    Q.   With respect to fentanyl, in setting
22  the aggregate production quota for the years
23  listed here, did DEA consider the factors it
24  was legally required to consider?
25    A.   Yes.

27 (Pages 102 - 105)

1    Q.   With respect to morphine, in setting
2  the aggregate production quota, did DEA
3  consider all of the factors it was legally
4  required to consider?
5    A.   Yes.
6    Q.   As a representative of DEA sitting
7  here today, do you believe the DEA is
8  responsible for the numbers that appear on this
9  sheet?
10      MR. ELSNER:  Objection.
11      MR. CHANDLER:  Objection.  Scope.
12  Vague.
13      THE WITNESS:  The DEA is known to
14  put the numbers out, yes, correct.
15      BY MR. O'CONNOR:
16    Q.   So you would agree that DEA is
17  responsible for the aggregate production quota
18  set each year for these products?
19      MR. CHANDLER:  Objection.  Scope.
20  Vague.
21      MR. ELSNER:  Objection.
22      THE WITNESS:  DEA is required to
23  publish the value, correct, yes.
24      BY MR. O'CONNOR:
25    Q.   DEA also determines the value of the

1  quota for each of these substances, correct?
2      MR. CHANDLER:  Objection.
3      MR. ELSNER:  Objection.
4      THE WITNESS:  DEA is required to
5  provide an estimated value for these
6  substances.
7      BY MR. O'CONNOR:
8    Q.   And the numbers that are ultimately
9  published as the aggregate production quota for
10  each of these substances are determined by DEA,
11  correct?
12      MR. CHANDLER:  Objection.
13      THE WITNESS:  With assistance from
14  other agencies, yes.
15      BY MR. O'CONNOR:
16    Q.   Does DEA set an aggregate production
17  quota for the total amount of Hydrocodone that
18  can be manufactured in a given year?
19    A.   Yes.
20    Q.   So when Hydrocodone is used in
21  combination product, like Vicodin, the amount
22  of Hydrocodone used counts against the quota
23  amount, correct?
24    A.   Yes.
25    Q.   And that was true when Hydrocodone

1  combination products were listed as Schedule
2  III controlled substances, correct?
3    A   Yes
4      MR  O'CONNOR:  Can we take a short
5  break
6      THE VIDEOGRAPHER:  We are going off
7  the record  The time is 1:25
8      (A short recess was taken )
9      THE VIDEOGRAPHER:  We are back on
10  the record  The time is 1:41
11      You may proceed, Counsel
12  EXAMINATION BY COUNSEL FOR DEFENDANT McKESSON
13      BY MR  EPPICH:
14    Q   Ms Harper-Avilla, my name is Chris
15  Eppich  I'm from the law firm of Covington &
16  Burling and I represent McKesson in this
17  matter
18      Are you familiar with the
19  distributor defendants in this case?
20    A   I know of McKesson
21    Q   McKesson and AmerisourceBergen and
22  Cardinal Health?
23    A   Yes
24    Q   Those are -- I represent those folks
25  today for this portion of your testimony

1      Let me -- let me pick up where Mr.
2  O'Connor just left off.  He asked you a
3  question referring to Exhibit 7 and 8.
4      He asked you, and I will just read
5  it right from the record.  He said: "So just
6  to make sure I am reading this correctly, if we
7  look at the column 2008, the number for
8  oxycodone sales 70,000, what does that 70,000
9  represent?"
10      And your testimony, ma'am, your
11  answer: "That 70,000 represents the DEA's
12  estimated final number of the amount of
13  oxycodone for sale that may be required to
14  fulfill legitimate, scientific, medical
15  research, industrial needs as well as inventory
16  requirements."
17      Do you remember providing that
18  testimony, ma'am?
19    A.   Yes.
20    Q.   And would your answer be the same
21  for every year reflected on Exhibit 7 and 8?
22      MR. CHANDLER:  Objection.  Vague.
23      THE WITNESS:  It would -- it would
24  be for legitimate medical needs, scientific
25  research, industrial, export as well as

28 (Pages 106 - 109)

Page 110

1  inventory needs, yes, and then the
2  manufacturing losses that are necessary to make
3  those final figures.
4      BY MR. EPPICH:
5      Q.   Thank you.  And is it also true for
6  every opioid that is listed on Exhibit 7 and 8?
7      MR. CHANDLER:  Objection.  Vague.
8      THE WITNESS:  It would -- it would
9  work for those that are -- have FDA-approved
10  products.  Those that do not, no.
11      BY MR. EPPICH:
12      Q.   And which ones have FDA-approved
13  products, ma'am?
14      A.   That, I can't -- I couldn't cite all
15  of those.
16      Q.   Well, oxycodone is one of them,
17  correct?
18      A.   Correct.
19      Q.   Hydrocodone?
20      A.   Yes.
21      Q.   Hydromorphone?
22      A.   Yes.
23      Q.   Morphine?
24      A.   Yes.
25      Q.   Fentanyl?

Page 111

1      A.   Yes.
2      Q.   Do any others come to mind after we
3  just reviewed five?  Oxymorphone, for example?
4      A.   Correct.
5      Q.   Oxy -- I will leave it at that.
6          Now, Mr. O'Connor asked you several
7  questions about the information DEA considers
8  in setting the aggregate production quota.
9          Do you remember that testimony
10  today?
11      A.   Yes.
12      Q.   You testified that DEA sets each of
13  these quotas annually, correct?
14      A.   Correct.
15      Q.   Now, do wholesale manufacturers such
16  as McKesson, Cardinal and AmerisourceBergen
17  provide any information to DEA that is used to
18  set those quotas?
19      MR. ELSNER:  Objection.
20      THE WITNESS:  Quotas are not related
21  to distributors, so no.
22      BY MR. EPPICH:
23      Q.   And pharmacy chains, such as CVS,
24  Walgreens, Rite Aid, Walmart, Giant Eagle, HBC,
25  they also don't provide any information to DEA

Page 112

1  that is used to set the quotas, correct?
2      MR. ELSNER:  Objection.
3      MR. CHANDLER:  Objection.
4      THE WITNESS:  The list of companies
5  you just provided do not receive quota and
6  therefore, are not considered for aggregate
7  production quotas.
8      BY MR. EPPICH:
9      Q.   DEA does not consult with wholesale
10  distributors, such as McKesson, Cardinal and
11  AmerisourceBergen when DEA sets the quotas for
12  controlled substances, correct?
13      A.   Correct.
14      Q.   And DEA does not consult with
15  pharmacy chains, such as CVS, Walgreens, Rite
16  Aid, Walmart, Giant Eagle, HBC, when DEA sets
17  quotas for controlled substances?
18      A.   Correct.
19      MR. CHANDLER:  Objection.
20      BY MR. EPPICH:
21      Q.   Wholesale distributors, such as
22  McKesson, Cardinal, AmerisourceBergen, they do
23  not apply for DEA -- to DEA for quotas, do
24  they?
25      MR. CHANDLER:  Objection.

Page 113

1      THE WITNESS:  Correct.
2      BY MR. EPPICH:
3      Q.   And pharmacy chains, such as CVS,
4  Walgreens, Rite Aid, Walmart, Giant Eagle, HBC,
5  they also do not apply to DEA for quotas,
6  correct?
7      MR. CHANDLER:  Objection.  Scope.
8      MR. ELSNER:  Objection.
9      THE WITNESS:  Correct.
10      BY MR. EPPICH:
11      Q.   Now, DEA is required by law to
12  establish aggregate production quotas for
13  certain controlled substances, correct?
14      A.   Correct.
15      Q.   There are a number of statutes and
16  regulations that govern the process DEA must
17  follow and the considerations DEA must consider
18  in establishing quotas for controlled
19  substances?
20      MR. CHANDLER:  Objection.
21      THE WITNESS:  Correct.
22      BY MR. EPPICH:
23      Q.   And DEA endeavors to comply with
24  these statutes and regulations governing the
25  establishment of quotas for controlled

29 (Pages 110 - 113)

Page 114

1 substances, correct?
2    A.   Correct.
3    Q.   In following these statute and
4 regulations, the aggregated production quota
5 reflects the estimated medical, scientific
6 research and industrial needs of the United
7 States, correct?
8    A.   Along with export requirements and
9 inventory requirements and manufacturing yield
10 and losses counted in, yes.
11    Q.   The aggregate production quota is
12 the maximum amount of a controlled substance
13 that can be manufactured and distributed in a
14 year, correct?
15    A.   It's the maximum amount that can be
16 manufactured within a year.
17    Q.   In setting the quota, the aggregate
18 production quota for a prescription opioid, DEA
19 understands that pharmaceutical manufacturers
20 may manufacture, wholesale distributors may
21 distribute, and pharmacies may dispense to
22 patients up to the amount the DEA allowed,
23 correct?
24       MR. CHANDLER:  Objection.
25       THE WITNESS:  I don't understand

Page 115

1 your question.
2       BY MR. EPPICH:
3    Q.   Well, I am just asking.  If DEA sets
4 an aggregate production quota, DEA understands
5 that the manufacturers may manufacturer up to
6 that limit, correct?
7       MR. CHANDLER:  Objection.
8       THE WITNESS:  I don't understand
9 your question.
10       BY MR. EPPICH:
11    Q.   Let me try again.  I will try and
12 make it more clear, ma'am.
13       In setting the quota --
14    A.   The aggregate production quota?
15    Q.   The aggregate production quota, the
16 DEA understands that pharmaceutical
17 manufacturers, they are going to manufacture
18 enough drugs to supply up to that quota amount,
19 correct?
20       MR. CHANDLER:  Objection.
21       THE WITNESS:  No.  So the
22 manufacturer, if they are granted an individual
23 quota, will manufacture up to that individual
24 quota, not up to the APQ.  The APQ is the
25 aggregate of all manufacturers and it's the

Page 116

1 estimated need, not the granted need.
2       BY MR. EPPICH:
3    Q.   And so the aggregate production
4 quota is the total of all the individual
5 manufactured quotas that DEA expect
6 manufacturers to manufacture that year?
7       MR. CHANDLER:  Objection.
8       MR. ELSNER:  Objection.
9       THE WITNESS:  It's an estimate.
10       BY MR. EPPICH:
11    Q.   But it's true that DEA understands
12 that ultimately, pharmacies may dispense to
13 patients across this country, an amount of the
14 controlled substance that is set by the
15 aggregate production quota, correct?
16       MR. ELSNER:  Objection.
17       MR. CHANDLER:  Objection.
18       THE WITNESS:  A pharmacy may
19 dispense an amount needed for legitimate
20 patient need.
21       BY MR. EPPICH:
22    Q.   If the DEA increases the aggregate
23 production quota for prescription opioids, DEA
24 understands that it is allowing more opioids in
25 the communities, correct?

Page 117

1       MR. CHANDLER:  Objection.
2       MR. ELSNER:  Objection.
3       THE WITNESS:  The reason for an
4 increase in an aggregate production quota is
5 not automatically equated with what goes out to
6 the community itself.  It could be used for
7 scientific and research needs which are
8 different and separate from what is seen in --
9 for patient needs.
10       BY MR. EPPICH:
11    Q.   How much of the aggregate production
12 quota goes to patient needs on a given year?
13       MR. CHANDLER:  Objection.
14       THE WITNESS:  I don't know off the
15 top of my head.
16       BY MR. EPPICH:
17    Q.   But you would agree with me that
18 each time the DEA increases that quota, the
19 amount of -- in this case, prescription opioids
20 that goes into the community increases?
21       MR. CHANDLER:  Objection.
22       MR. ELSNER:  Objection.
23       THE WITNESS:  I would not -- I would
24 suggest that it would go towards a scientific
25 or research need perhaps or export need which

30 (Pages 114 - 117)

Page 118

1 has nothing to do with domestic communities.
2     BY MR. EPPICH:
3     Q.   Do you know or are you guessing when
4 you provide that response?
5         MR. CHANDLER:  Objection.
6         MR. ELSNER:  Objection.
7         THE WITNESS:  It would depend on the
8 year.
9         BY MR. EPPICH:
10     Q.   Do you agree that in setting the
11 annual production quota, the DEA has the
12 ability to control the amount of prescription
13 opioids available to the public?
14         MR. CHANDLER:  Objection.
15         THE WITNESS:  I don't understand the
16 question.
17         BY MR. EPPICH:
18     Q.   Well, in setting the annual
19 production quota, would you agree that DEA has
20 the ability to control how much of a
21 prescription opioid is available to the public?
22         MR. CHANDLER:  Objection.
23         MR. ELSNER:  Objection.
24         THE WITNESS:  I would not.
25         BY MR. EPPICH:

Page 119

1     Q.   Why not?
2     A.   Because there are many other factors
3 in between the number that is set and what goes
4 out to the public.
5     Q.   What are those factors?
6     A.   Manufacturing losses and yield, FDA
7 recalls, FDA changes in market practices,
8 manufacturers losing contracts, among others.
9     Q.   We talked a fair amount today about
10 the process by which DEA sets the aggregate
11 production quota.
12         Are there any DEA guides or manuals
13 or written standards of operation procedures
14 explaining the process how DEA sets the annual
15 production quota?
16     A.   Yes.
17     Q.   And what are those documents called?
18     A.   SOPs, standard operating procedures.
19     Q.   Is there a specific one that you
20 have in mind for setting the aggregate
21 production quota?
22     A.   Not one in mind definitely.
23     Q.   There are multiple?
24     A.   They -- the document exists.
25     Q.   Where would I find that document?

Page 120

1     A.   It is not for public consumption.
2     Q.   Where do you find that document?
3         MR. ELSNER:  Objection.
4         THE WITNESS:  Within DEA's internal
5 control.
6         BY MR. EPPICH:
7     Q.   Is there a server that it's stored
8 on, is there a bookshelf that it's stored on?
9     A.   More than likely a server.
10     Q.   You access it electronically is what
11 you are saying?
12     A.   It would be.
13     Q.   Do you access it?
14     A.   I do not because it's the same as
15 the regs in the statute, and therefore, if you
16 can read the regs in the statute, for the most
17 part, the information is there, as well as the
18 FDA letter that comes in.
19     Q.   Does your team rely on these
20 standard operating procedures?
21     A.   Yes.
22     Q.   And where do they go to look for it?
23 Do they know the name of this document?
24     A.   I'm sure they do.
25     Q.   But you do not sitting here today?

Page 121

1     A.   It is just called SOPs, quota SOPs.
2     Q.   Thank you.  Earlier today, you
3 testified that you met with Mr. Joe Rannazzisi
4 and Dr. Chris Sannerud, correct?
5         MR. CHANDLER:  Objection.
6         THE WITNESS:  Correct.
7         BY MR. EPPICH:
8     Q.   That was in preparation for your
9 deposition today?
10     A.   Yes.
11     Q.   And before your preparation sessions
12 with your counsel, when was the last time that
13 you communicated with Mr. Rannazzisi?
14     A.   2015.
15     Q.   And when was the last time that you
16 communicated with Ms. Sannerud?
17     A.   March perhaps.
18     Q.   In your communications with Ms.
19 Sannerud, were those in relation to preparing
20 for the deposition today?
21     A.   Not all of those, no.
22     Q.   What did you discuss with Ms.
23 Sannerud during those conversations?
24     A.   The ones in March?
25     Q.   Yes, ma'am.

31 (Pages 118 - 121)

Page 122

1    A.    The birth of her grandson.
2    Q.    You're friends?
3    A.    We've worked together for a long
4    time.
5    Q.    Are you aware that Mr. Rannazzisi
6    has been subpoenaed to testify in this case?
7    A.    Yes.
8    Q.    When did you become aware of that?
9         MR. CHANDLER:  Objection.  Scope.
10        THE WITNESS:  Probably last year
11   sometime.
12        BY MR. EPPICH:
13   Q.    Are you aware that he will be
14   deposed in the coming weeks?
15        MR. CHANDLER:  Objection.  Scope.
16        THE WITNESS:  No.
17        BY MR. EPPICH:
18   Q.    Are you aware that defendants have
19   requested the deposition of Ms. Sannerud in
20   this litigation?
21        MR. CHANDLER:  Objection.  Scope.
22        THE WITNESS:  Yes.
23        BY MR. EPPICH:
24   Q.    When did you -- when did you become
25   aware of that?

Page 123

1         MR. CHANDLER:  Same objection.
2         THE WITNESS:  Last year sometime.
3         BY MR. EPPICH:
4    Q.    Now, earlier today, you were asked
5    who was present during your preparation
6    sessions.
7         Do you remember that?
8    A.    Yes.
9    Q.    And I believe you responded that
10   counsel for the DOJ was there with you?
11   A.    Yes.
12   Q.    Were there any other -- were there
13   any other people present, other than yourself,
14   Mr. Rannazzisi, Ms. Sannerud and counsel for
15   DOJ present during those discussions?
16        MR. CHANDLER:  Objection.
17   Mischaracterizes prior testimony.
18        THE WITNESS:  Mr. Rannazzisi and I
19   were not in the same room so I don't know who
20   was on the other end of the phone with him.
21        BY MR. EPPICH:
22   Q.    Was there someone else on the phone
23   with him?
24   A.    I don't know.  I can't answer what I
25   could not see.

Page 124

1    Q.    How many -- how many phone calls did
2    you have with Mr. Rannazzisi in preparation for
3    today's deposition?
4    A.    One.
5    Q.    And how long did that conversation
6    last?
7    A.    Approximately an hour.
8    Q.    I would like to return to Exhibit 4.
9         Exhibit 4 is the document that I
10   understand you or your counsel prepared titled:
11   "APQ Review and Approval."
12   A.    Yes.
13   Q.    Did you prepare this document,
14   ma'am?
15   A.    I assisted in it.
16   Q.    Now, the document starts in 2011,
17   correct?
18   A.    Correct.
19   Q.    And it identifies in July 2011 --
20   Joseph T.  Rannazzisi is the first name on the
21   list?
22   A.    Yes.
23   Q.    Does that -- does that indicate that
24   Mr. Rannazzisi was the final approver of the
25   proposed adjustments for 2011?

Page 125

1    A.    No.
2    Q.    Who would be the final approver in
3    this list?
4    A.    Michelle Leonard.
5    Q.    And so does the list -- does the way
6    your approval process works, Mr. Rannazzisi
7    would approve it, Mr. Ryan would then approve
8    it, Mr. Mullinax -- or Ms. Mullinax would
9    approve it, Mr. Tuggle would then approve it
10   and Ms. Leonard would approve it?  Is that
11   -- is that how it works?
12   A.    Yes.
13   Q.    And is that process the same for
14   each -- each of these tables that you prepared
15   for us for each of the years in Exhibit No. 4?
16        MR. CHANDLER:  Objection.
17        THE WITNESS:  It does not seem to be
18   in that same order on all of these.
19        BY MR. EPPICH:
20   Q.    Okay.  For 2011, we are looking at
21   2011 in particular, Mr. Rannazzisi would have
22   approved the aggregate production quota amounts
23   for each of the classes in 2011, correct?
24        MR. ELSNER:  Objection.
25        THE WITNESS:  Yes.

32 (Pages 122 - 125)

Page 126

1    BY MR. EPPICH:
2    Q.   And the same is true for each year
3  that we see Mr. Rannazzisi's name in Exhibit 4;
4  is that correct?
5    A.   Yes.
6    Q.   Now, Mr. Rannazzisi joined the
7  office of diversion control before 2011,
8  correct?
9    A.   Yes.
10    Q.   And he had a role in his approval or
11  authorization of the aggregate production quota
12  before 2011?
13    A.   Yes.
14    Q.   And that would be true for his
15  tenure as the deputy assistant administrator
16  for the office of diversion control, correct?
17    A.   Correct.
18    MR. EPPICH:  Let's take a short
19  break.
20    THE VIDEOGRAPHER:  We are going off
21  the record.  This is the end of Media Unit No.
22  3.  The time is 2:02.
23    (A short recess was taken.)
24    THE VIDEOGRAPHER:  We are going back
25  on the record.  This is the start of Media Unit

Page 127

1  No. 4.  The time is 2:12.
2    You may proceed, Counsel.
3    BY MR. EPPICH:
4    Q.   Ms. Harper-Avilla, you testified
5  today as DEA's 30(b)(6) witness for almost
6  three hours.
7    Has any of your testimony been
8  informed by your discussions with Mr.
9  Rannazzisi and Ms. Sannerud?
10    MR. CHANDLER:  Objection.
11    MR. ELSNER:  Objection.
12    THE WITNESS:  They have clarified
13  issues that I may have had in preparation, but
14  -- they clarified issues I had in preparation.
15    BY MR. EPPICH:
16    Q.   And what issues were clarified,
17  ma'am?
18    A.   Whether certain documents existed
19  for me to review or not.
20    Q.   Which documents were those?
21    A.   Documents related to setting the
22  APQ.
23    Q.   And what information specifically
24  did you discuss with Mr. Rannazzisi that
25  clarified issues for you?

Page 128

1    MR. CHANDLER:  Objection.
2    THE WITNESS:  That in 2013, there
3  was a 25 percent buffer added to the APQ for
4  FDA-approved products.
5    BY MR. EPPICH:
6    Q.   And what did he mention about that?
7    A.   That there were meetings held
8  between DEA and the bulk manufacturers
9  regarding that issue.
10    Q.   Anything else?
11    A.   No.  That was a point of
12  clarification for me.
13    Q.   Were there any other points of
14  clarification Mr. Rannazzisi made to you?
15    A.   For that?  No.
16    Q.   For any other topic, ma'am.
17    A.   Yes.
18    Q.   What did he say?
19    A.   That it was a point of clarification
20  on the section's ability to speak to
21  registrants.
22    Q.   And what was discussed?
23    A.   The basis for that.
24    Q.   What is the basis that he mentioned?
25    A.   That there were former DEA personnel

Page 129

1  who called various sections that were not
2  related to the topic at hand.
3    Q.   I am not understanding that.
4    A.   There were former DEA personnel
5  hired by manufacturers who would call a section
6  in order to seek guidance or special favor that
7  was not that section's ability or place.
8    Q.   And which sections were those that
9  were called?
10    A.   It varied.  It just was a matter of
11  the fact that it was not -- they didn't call to
12  do work for that section or with that section.
13    Q.   Did you discuss any other points of
14  clarification?
15    A.   Yes.
16    Q.   And what were those points?
17    A.   DEA's investigation of the necessary
18  -- the need to actually change the regulations.
19    Q.   Which regulations?
20    A.   The ones in the C.F.R. or quota.
21    Q.   The regulations for quota?
22    A.   Correct.
23    Q.   And what did he say about the DEA's
24  need to change the regulations for quota?
25    MR. CHANDLER:  Objection.  Scope.

33 (Pages 126 - 129)

Page 130

1 THE WITNESS: That the document had
2 not been completed under him.
3 BY MR. EPPICH:
4 Q. What is the document, ma'am?
5 A. The proposed document, the proposed
6 notice of proposed rule making had not occurred
7 under him.
8 Q. Why was that important to him?
9 MR. CHANDLER: Objection.
10 THE WITNESS: It was not. It was
11 just a point of clarification.
12 BY MR. EPPICH:
13 Q. And you are referring to the 2018
14 revision to the C.F.R.; is that correct?
15 MR. CHANDLER: Objection. Scope.
16 THE WITNESS: I think we were
17 talking about things that he noticed needed to
18 be changed within the C.F.R.
19 BY MR. EPPICH:
20 Q. Limited to the quota or other
21 sections of the C.F.R.?
22 A. Not limited to quota.
23 Q. What other sections of the C.F.R.
24 did Mr. Rannazzisi say should be changed?
25 A. We did not --

Page 131

1 MR. CHANDLER: Objection. Scope.
2 MR. ELSNER: Objection.
3 THE WITNESS: We didn't talk about
4 it that much because it was not relevant to my
5 preparation here.
6 BY MR. EPPICH:
7 Q. Did he mention any section at all?
8 MR. CHANDLER: Objection. Scope.
9 MR. ELSNER: Objection.
10 THE WITNESS: Just that he wanted to
11 make other changes.
12 BY MR. EPPICH:
13 Q. But he did not mention a specific
14 section that he wanted to change?
15 MR. CHANDLER: Objection. Scope.
16 MR. ELSNER: Objection.
17 THE WITNESS: He mentioned the fact
18 that in the course of making changes for the
19 quota, that there were other pieces that he had
20 not gotten to.
21 BY MR. EPPICH:
22 Q. Were there any other points of
23 clarification that you discussed with Mr.
24 Rannazzisi in preparation for today's
25 deposition?

Page 132

1 A. Yes.
2 Q. And what were those, ma'am?
3 A. In regard to pharmaceutical training
4 seminars not going on through 2012 through
5 2015, being replaced instead by the pharmacy
6 diversion awareness conferences.
7 Q. And what did you discuss on that
8 topic?
9 A. Why -- we discussed whether or not
10 -- why they both could not go on at the same
11 time for each year.
12 Q. And why is that?
13 A. He felt that they overlapped and
14 caused confusion and it would be better served
15 to the agency if pharmaceutical -- that the
16 pharmaceutical diversion awareness conference
17 occurred instead, pharmacy diversion
18 conference.
19 Q. Were there any other points of
20 discussion or clarification that you discussed
21 with him in preparation for today's deposition?
22 A. Yes.
23 Q. What were those points?
24 A. The change in signature authority on
25 the individual quota letters.

Page 133

1 Q. And what did -- what did you
2 discuss?
3 A. Clarification on the change that
4 occurred.
5 Q. What was the change that occurred?
6 A. That quota letters went from being
7 signed by the section chief to Mr. Rannazzisi.
8 Q. And when did that occur?
9 A. 2011.
10 Q. And these letters would be sent from
11 the DEA to who?
12 A. Individual manufacturers.
13 Q. And was there an issue with the
14 change in signatory?
15 MR. ELSNER: Objection.
16 MR. CHANDLER: Objection.
17 THE WITNESS: Not an issue with it.
18 Just a time and make sure I am clear on the
19 timing of when it occurred.
20 BY MR. EPPICH:
21 Q. And why would that be important?
22 MR. CHANDLER: Objection.
23 THE WITNESS: It was something that
24 I did not know at the time. I did not recall
25 correctly.

34 (Pages 130 - 133)

Page 134

1    BY MR. EPPICH:
2    Q.    Were there any other points of
3    clarification that you discussed with Mr.
4    Rannazzisi during preparation sessions?
5    A.    Not that I can recall at this time.
6    Q.    Were there any points of
7    clarification that you discussed with Ms.
8    Sannerud?
9    A.    Yes.
10   Q.    And will you please explain those
11   points to us?
12       MR. ELSNER:  Objection.
13       THE WITNESS:  It was the signature
14   authority on the individual quota letters.
15       BY MR. EPPICH:
16   Q.    Any other points of clarification?
17   A.    And again, also the 25 percent
18   increase put on to the APQ in 2013.
19   Q.    And what did Ms. Sannerud say about
20   the 25 percent increase put on to the APQ in
21   2013?
22   A.    That she remembered that it went to
23   only Schedule II substances.
24   Q.    Anything else?
25   A.    Just the time frame.  That was it.

Page 135

1    Q.    Did you discuss any other points of
2    clarification with Ms. Sannerud in preparation
3    for today's deposition?
4    A.    Also the ability of the section to
5    speak to registrants.
6    Q.    And what did you discuss in that
7    capacity?
8    A.    Whether or not she could remember
9    the time frame that it occurred in.
10   Q.    Was MS. Sannerud present for the
11   phone call with Mr. Rannazzisi?
12   A.    No, she was not.
13   Q.    These were separate phone calls?
14   A.    Correct.
15   Q.    Do you recall any other points of
16   clarifications or topics that you discussed
17   with Mr. Rannazzisi or Ms. Sannerud in
18   preparation for today's deposition?
19   A.    Not that I remember at this time,
20   no.
21   Q.    Did you discuss -- in your
22   preparations for today's deposition, did you
23   meet with any other members of the DEA?
24   A.    Not that I recall.
25       MR. EPPICH:  Let's go ahead and take

Page 136

1    a short break.
2        THE VIDEOGRAPHER:  We are going off
3    the record.  The time is 2:24.
4        (A short recess was taken.)
5        THE VIDEOGRAPHER:  We are back on
6    the record.  The time is 2:37.
7        You may proceed, Counsel.
8        MR. EPPICH:  Thank you for your time
9    this afternoon, Ms. Harper-Avilla.  We will
10   reserve -- we will pass the witness and reserve
11   our time for after your testimony.
12       EXAMINATION BY COUNSEL FOR PLAINTIFFS
13       BY MR. ELSNER:
14   Q.    Good afternoon.
15   A.    Good afternoon.
16   Q.    My name is Mike Elsner, I'm from the
17   law firm Motley Rice and I represent the
18   plaintiffs.
19       Does the Controlled Substances Act
20   create a closed system for manufacturing,
21   distributing and dispensing of controlled
22   substances?
23       MR. CHANDLER:  Objection.  Scope.
24       THE WITNESS:  It is supposed to do
25   that.

Page 137

1        BY MR. ELSNER:
2    Q.    And the DEA quota system is one
3    element within that closed system, but it's not
4    the only element; is that right?
5    A.    Correct.
6        MR. CHANDLER:  Objection.  Scope.
7        BY MR. ELSNER:
8    Q.    And do manufacturers and
9    distributors of controlled substances like
10   opioids have a responsibility to design a
11   system to monitor and detect suspicious orders?
12       MR. CHANDLER:  Objection.  Scope.
13       MR. O'CONNOR:  Objection.
14       THE WITNESS:  Yes.
15       BY MR. ELSNER:
16   Q.    And when suspicious orders are
17   detected, do manufacturers and distributors
18   have a duty to stop shipments of those orders
19   and report those orders to the DEA?
20       MR. O'CONNOR:  Objection.  Scope.
21       MR. CHANDLER:  I'm going to direct
22   the witness not to answer, this is way outside
23   the scope.
24       MR. ELSNER:  I will tie it together
25   quickly.  I just want to give her a basic

35 (Pages 134 - 137)

Page 138

1  overview.
2       MR. CHANDLER:  Can you explain, tied
3  together on what basis?  How does this tie
4  together?
5       MR. ELSNER:  You will see in the --
6  within the next few exhibits, I will show you.
7  There's certain statements made by counsel in
8  relationship to their responsibilities that
9  don't exist because there is a quota system in
10  place.
11       MR. CHANDLER:  Are these questions
12  really necessary to get there?
13       MR. ELSNER:  I think it sets the
14  stage for that, yes.
15       MR. O'CONNOR:  Defendants object.
16       MR. CHANDLER:  You can answer.
17       Do you need the question again?
18       THE WITNESS:  I need the question
19  again.
20       BY MR. ELSNER:
21    Q.   Sure.  When suspicious orders are
22  detected, do manufacturers and distributors
23  have a duty to stop shipments of those orders
24  and report those suspicious orders to the DEA?
25       MR. O'CONNOR:  Objection.  Form.

Page 139

1       MR. CHANDLER:  Objection.  Scope.
2       You can answer.
3       THE WITNESS:  I can't answer your
4  question fully because that's not quite my area
5  of expertise.
6       They definitely have a requirement
7  to notify DEA.
8       BY MR. ELSNER:
9    Q.   Okay.  And you mentioned among the
10  other factors that the DEA may consider is
11  known diversion.
12       What did you mean by "known?"
13    A.   Known would be something that had
14  been adjudicated through the process.
15    Q.   Is the responsibility for
16  manufacturers and distributors to monitor for
17  suspicious orders, stopping shipments of
18  suspicious orders and inform the DEA, does that
19  responsibility go away because there is a quota
20  system in place by the DEA?
21       MR. O'CONNOR:  Object to form and
22  scope.
23       MR. CHANDLER:  Objection.  Scope.
24       MR. EPPICH:  Objection.  Foundation.
25       THE WITNESS:  So the quota system is

Page 140

1  one portion of it, but it's incumbent upon the
2  manufacturers and distributors and all of the
3  participants within the quota system, within
4  the controlled substance system, to do their
5  part as per the regulations.
6       BY MR. ELSNER:
7    Q.   Okay.  So simply because there is a
8  quota system in place, that doesn't excuse
9  manufacturers and distributors from fulfilling
10  their other obligations under the Controlled
11  Substances Act; is that right?
12       MR. CHANDLER:  Objection.  Scope.
13       MR. O'CONNOR:  Objection.
14       THE WITNESS:  True.
15       MR. ELSNER:  I want to mark Exhibit
16  9.  This is a transcript.
17       (Deposition Exhibit 9 was marked for
18  identification.)
19       BY MR. ELSNER:
20    Q.   This is a transcript of a hearing in
21  federal court in West Virginia and I want you
22  to turn to Page 12 of the transcript and I want
23  to review certain statements made in this
24  transcript and see if you agree or disagree
25  with them.  Okay?

Page 141

1       Are you on Page 12?
2    A.   Yes.
3    Q.   Okay.  At the very top of the page,
4  it says: "We, the distributors, Your Honor,
5  have absolutely no role in determining what the
6  supply needs to be or in making a determination
7  of what the demand is."
8       Do you see that?
9    A.   Yes.
10    Q.   Okay.  And then if you go down, it
11  says, after the dashes: "But the DEA every
12  year sets the quota in this country for all
13  Schedule I and Schedule II controlled
14  substances that may be manufactured by the
15  manufacturers and it sets that quota based on
16  its evaluation of legitimate medical,
17  scientific, industrial need for those
18  substances."
19       Did I read that correctly?
20    A.   Yes.
21    Q.   Okay.  The Court asks: "Is that a
22  nationwide or is it a state specific?  How is
23  it broken down?"
24       Counsel for the distributors
25  responds: "It's nationwide, Your Honor."

36 (Pages 138 - 141)

Page 142

1    The Court then asks -- if you are
2  with me under where the Court -- it says:
3  "Does that overcome the obligation of the
4  distributors to be on the look out for
5  suspicious high numbers of drugs going into
6  specific areas?"
7    And the distributors lawyer says:
8  "It does."
9    Is that statement accurate or
10  inaccurate?
11    MR. EPPICH: Objection. Foundation.
12  Form. Outside the scope.
13    MR. CHANDLER: Objection.
14    MR. O'CONNOR: Objection.
15    THE WITNESS: I'm not sure what the
16  Court's question refers to at this point. I
17  apologize.
18    BY MR. ELSNER:
19    Q.  That's okay. The Court is asking
20  whether that obviates the distributors need to
21  be on the lookout for suspicious high numbers
22  of drugs going into specific areas, and the
23  distributors lawyer says that it does.
24    That statement is not true; is that
25  right?

Page 143

1    MR. EPPICH: Objection. Foundation.
2  Form. Scope.
3    MR. O'CONNOR: Objection. Scope.
4    MR. CHANDLER: This is well outside
5  Topics 13 and 14 and outside the Touhy
6  authorization.
7    Is this the big tie together that
8  you promised a moment ago?
9    MR. ELSNER: I don't -- it is. I
10  don't think that it is beyond the scope. The
11  distributors have taken the responsibility
12  before federal court that they are -- they are
13  not obligated to fulfill their responsibilities
14  because there is a quota system in place, and I
15  want to make sure that that is inconsistent
16  with the DEA's view of their responsibilities
17  under the quota system.
18    MR. CHANDLER: Ms. Harper-Avilla has
19  not been designated to testify about
20  distributors' obligations related to reporting
21  before the Court.
22    MR. ELSNER: No, I understand that,
23  but she is responsible for the quota system and
24  I think she's -- and I think whether that
25  obviates the other responsibilities under the

Page 144

1  Controlled Substances Act is a fair inquiry.
2    MR. CHANDLER: Well, she is not
3  going to testify or designated to testify about
4  the establishment of quotas and the quota
5  setting process, not other impacts it may have
6  on other obligations of distributors or
7  registrants.
8    MR. ELSNER: I think she is entitled
9  to answer this question. She already answered
10  the question essentially.
11    MR. O'CONNOR: The Touhy
12  authorization is pretty limited in terms of the
13  policies around the quota process and certain
14  other topics that don't include obligations
15  when there's suspicious monitoring.
16    MR. EPPICH: The distributors would
17  also agree that this is well beyond the scope
18  of the 30(b)(6) topics and any testimony that
19  she may or may not provide would be personal
20  testimony and no foundation has been
21  established for any such testimony.
22    MR. RUIZ: The pharmacies would
23  agree as well.
24    MR. CHANDLER: Yeah, I mean, Topic 3
25  is establishment of quotas for production of

Page 145

1  opioids in the United States, not secondary
2  impacts or other obligations of registrants as
3  a result of quotas.
4    MR. ELSNER: I understand. I think
5  if I get an answer to this question, we can
6  move on. I'm not going to belabor this.
7    MR. CHANDLER: This is the last
8  question on this topic?
9    MR. ELSNER: Yes.
10    MR. CHANDLER: All right.
11    MR. EPPICH: We can still make our
12  objection.
13    MR. CHANDLER: Our scope objection
14  stands. I will allow the witness to answer in
15  her personal capacity, not on behalf of the
16  DEA.
17    You can answer if you know.
18    THE WITNESS: Can I have the
19  question again?
20    BY MR. ELSNER:
21    Q.  You may. The simple question is, is
22  -- the Court asked counsel whether -- in the
23  transcript, as a federal district court judge,
24  whether the quota system overcame the
25  obligations of the distributors to be on the

37 (Pages 142 - 145)

1  lookout for suspicious high numbers of drugs
2  going into specific areas, and counsel for the
3  distributors said, it did.  It overcame that
4  responsibility.
5       And my question to you is:  In your
6  personal capacity, is that consistent or
7  inconsistent with your understanding of the
8  Controlled Substances Act?
9       MR. CHANDLER:  I will renew my
10  objection.
11       MR. O'CONNOR:  Objection.  Scope.
12       MR. EPPICH:  Same objection.  In
13  addition to any -- to the extent it
14  mischaracterizes the testimony on this
15  document.
16       MS. McCLURE:  Object to this line of
17  questioning and the characterization of
18  distributors and treating this argument as on
19  behalf of the distributors as a whole.
20       MR. CHANDLER:  You can answer if you
21  know.
22       THE WITNESS:  The quota system does
23  not change the obligation of the distributors
24  under this CSA.
25       BY MR. ELSNER:

1    Q.   Thank you.  I want to turn to
2  procurement quotas for a second, and in the
3  procurement quota process, does the DEA approve
4  in the quota system the dose of an opioid
5  product that a manufacturer may make?
6    A.   No.
7       MR. O'CONNOR:  Objection to form.
8       BY MR. ELSNER:
9    Q.   The DEA is really just authorizing a
10  gross bulk amount of a controlled substance
11  that a manufacturer may acquire to create a
12  dose; is that right?
13       MR. O'CONNOR:  Objection to form.
14       THE WITNESS:  Correct.
15       BY MR. ELSNER:
16    Q.   Okay.  The DEA cannot issue a quota
17  or a limit on the dosage units or number of
18  specific opioid pills that a manufacturer can
19  make, can they?
20       MR. MASTERS:  Objection.
21       MR. CHANDLER:  Objection.
22       THE WITNESS:  The quota that is
23  granted is by weight, kilogram, and in the
24  sense, it will limit it that way, but it does
25  not specific -- specify X number of tablets to

1  be made.
2       BY MR. ELSNER:
3    Q.   Okay.  So can the DEA tell Purdue
4  you cannot manufacture an 80 milligram
5  OxyContin pill under the quota system?
6       MR. MASTERS:  Objection.
7       MR. CHANDLER:  Objection.
8       THE WITNESS:  The DEA would be able
9  to limit them only if it was not FDA-approved.
10       BY MR. ELSNER:
11    Q.   Okay.  But otherwise, they can --
12  but in any case, they cannot approve or
13  disapprove of a particular dose of the use of
14  the bulk substance, correct?
15       MR. CHANDLER:  Objection.
16       MR. O'CONNOR:  Object to form.
17       THE WITNESS:  Correct.
18       BY MR. ELSNER:
19    Q.   Would you agree with me that there
20  are some types of drugs that are more abused
21  than other drugs?
22       MR. CHANDLER:  Objection.  Scope.
23       MR. O'CONNOR:  Objection.
24       MR. EPPICH:  Objection.  Vague.
25       THE WITNESS:  I would not have a

1  basis for that.
2       BY MR. ELSNER:
3    Q.   Are you aware just in your personal
4  capacity whether a red flag for diversion could
5  be when a patient refers to an oxycodone pill
6  as a blue or a panda bear or an octagon?
7       MS. McCLURE:  Objection to form.
8       MR. EPPICH:  Objection to form.
9       MR. O'CONNOR:  Objection to form.
10  Scope.
11       MR. CHANDLER:  Objection to form.
12  Scope.
13       THE WITNESS:  I would think that
14  that means that it's not for the intended
15  purpose.
16       BY MR. ELSNER:
17    Q.   Okay.  And we all understand that
18  there are certain drugs that are more subject
19  to abuse than other drugs, but can the DEA
20  through the quota system focus on creating a
21  limit on the specific type of drug that is most
22  subject to abuse?
23       MR. O'CONNOR:  Object to form.
24       MR. CHANDLER:  Objection.  Scope.
25       MR. EPPICH:  Objection.  Foundation.

38 (Pages 146 - 149)

Page 150

1    THE WITNESS:  I don't understand
2  your question.  I'm sorry.
3    BY MR. ELSNER:
4    Q.   That's okay.  My question is, is
5  whether the DEA in the quota system could limit
6  the authorization and just restrict
7  authorization to the drugs that are most
8  subject to abuse?
9    MR. CHANDLER:  Objection.  Scope.
10    MR. O'CONNOR:  Objection.
11    THE WITNESS:  Within the quota
12  system, if it's an FDA-approved product without
13  actual case data, then it would not be limited.
14    BY MR. ELSNER:
15    Q.   Because what the DEA is looking at
16  is the gross -- is the gross bulk amount of the
17  substance, right?
18    They are not looking at the specific
19  type of medicine or the specific dose, correct?
20    MR. O'CONNOR:  Objection.  Form.
21    MS. McCLURE:  Objection.  Form.
22  Vague.  Compound.
23    THE WITNESS:  The DEA looks at bulk
24  data.
25    BY MR. ELSNER:

Page 151

1    Q.   Okay.  The quota system run by the
2  DEA is also national in scope; is that right?
3    A.   Correct.
4    Q.   Okay.  It didn't -- it doesn't look
5  at -- the quota system for the DEA doesn't look
6  at how many pills a distributor like
7  AmerisourceBergen or Cardinal could distribute
8  to a particular pharmacy in a particular
9  community, does it?
10    MR. CHANDLER:  Objection.  Scope.
11    MR. MASTERS:  Objection.
12    THE WITNESS:  It does not.
13    BY MR. ELSNER:
14    Q.   Okay.  And the quota system, even if
15  you reduce the quota, it couldn't prevent a
16  distributor like McKesson from distributing
17  112,000 doses units of Hydrocodone products
18  into one pharmacy in West Virginia with a
19  population of 1500 people, could it?
20    MR. CHANDLER:  Object to form.
21    MR. O'CONNOR:  Objection.  Scope.
22    MR. EPPICH:  Objection.
23    THE WITNESS:  The quota system is
24  national so it has no control over distributor
25  contracts.

Page 152

1    BY MR. ELSNER:
2    Q.   And the DEA, through the quota
3  system, it doesn't analyze and approve
4  individual orders from pharmacies, to
5  manufacturers or to wholesale distributors,
6  does it?
7    A.   It does not.
8    Q.   Okay.  And the quota system doesn't
9  authorize the number of pills that could be
10  distributed into Summit County or Cabell County
11  in West Virginia, does it?
12    MR. CHANDLER:  Object to form.
13    MR. O'CONNOR:  Object to form.
14    THE WITNESS:  It does not.
15    BY MR. ELSNER:
16    Q.   And it doesn't authorize the number
17  of pills that a distributor could send to any
18  city or county in the United States, does it?
19    A.   It does not.  It is national.  It is
20  not county, not city, not state-specific.
21    Q.   Okay.  So the DEA is really just
22  approving a gross bulk amount of a controlled
23  substance that a manufacturer can acquire to
24  produce certain drugs that could be then made
25  into any type of drug at any dose and sold into

Page 153

1  any town into America; is that right?
2    MS. McCLURE:  Object to form.
3    MR. EPPICH:  Objection.  Vague.
4    MR. O'CONNOR:  Object to form.
5    MR. CHANDLER:  Object to form.
6    THE WITNESS:  Quota is granted for
7  any FDA-approved product to be distributed into
8  the patient population.
9    BY MR. ELSNER:
10    Q.   Without respect to the particular
11  location of national scope, correct?
12    A.   It is national in scope.
13    Q.   Now, correct me if I am wrong, but
14  it's the manufacturer that requests
15  authorization to purchase a bulk amount of a
16  certain drug; is that right?
17    MR. O'CONNOR:  Object to form.
18    THE WITNESS:  Correct.
19    BY MR. ELSNER:
20    Q.   Okay.  And at any time a
21  manufacturer can say, I no longer want
22  authorization to purchase these controlled
23  substances, right?
24    MR. O'CONNOR:  Object to form.
25    THE WITNESS:  Correct.

39 (Pages 150 - 153)

Page 154

1       BY MR. ELSNER:
2       Q.   It's not the U.S. -- the U.S.
3   Government cannot make a manufacturer seek an
4   authorization to purchase bulk controlled
5   drugs, right?
6       A.   Correct.
7       Q.   In fact, DEA, through the quota
8   system, cannot make a manufacturer seek a
9   specific authorization for a specific type of
10  drug either, can it?
11      A.   I don't understand the question.
12      Q.   The DEA -- can the DEA instruct a
13  manufacturer to seek an authorization for a
14  specific type of controlled substance to make a
15  particular product?
16      A.   No, it cannot.
17      Q.   And the DEA cannot require
18  manufacturers or distributors to distribute
19  controlled substance down through the supply
20  chain, can it?
21          MR. MASTERS: Objection. Scope.
22          MR. EPPICH: Objection. Foundation.
23          THE WITNESS: No.
24          BY MR. ELSNER:
25      Q.   Just because a manufacturer may be

Page 155

1   able to obtain an authorization for an opioid,
2   that doesn't mean a manufacturer needs to
3   actually purchase the opioids, right?
4          MR. MASTERS: Objection. Scope.
5          MR. EPPICH: Objection. Foundation.
6          MR. CHANDLER: Objection.
7          THE WITNESS: Correct.
8          BY MR. ELSNER:
9       Q.   And once a quota is issued, it can
10  be increased or decreased throughout the year;
11  is that true?
12      A.   At the request of the manufacturer
13  itself.
14      Q.   Can the DEA request the manufacturer
15  to decrease or increase the quota?
16      A.   No.
17      Q.   And if a manufacturer receives an
18  authorization for a quota and purchases the
19  bulk amount of that drug, that doesn't mean
20  they need to use all of that drug in a given
21  year to manufacture pills. They could spread
22  it over several years if they informed the DEA;
23  is that true?
24          MS. McCLURE: Object to form.
25  Compound. Vague.

Page 156

1          MR. CHANDLER: Object to form.
2          MR. EPPICH: Object to form.
3          THE WITNESS: Based on the
4   application that the manufacturer submitted, it
5   could -- they did not -- they do not need to
6   use it for that year, but they should use it in
7   the second year as an inventory allowance.
8          BY MR. ELSNER:
9       Q.   The statute says that the DEA was to
10  establish the total annual needs of controlled
11  substances in the United States to provide for
12  the estimated medical, scientific research and
13  industrial needs in the U.S.; is that right?
14      A.   And inventory allowance and export
15  included.
16      Q.   And one of the factors that the DEA
17  must consider when establishing the quota is
18  whether there is an adequate supply of a given
19  drug; is that right?
20      A.   Correct.
21      Q.   And, in fact, the DEA must ensure
22  that there is both an adequate and an
23  uninterrupted supply of those controlled
24  substances available for legitimate medical use
25  and other things, correct?

Page 157

1       A.   Correct.
2       Q.   It is also true, isn't it, that
3   under the Food & Drug Administration Safety
4   Innovation Act, that the FDA could request that
5   the DEA increase quotas applicable to a
6   particular substance if the FDA determines
7   that's necessary; is that true?
8          MR. EPPICH: Objection. Vague.
9          THE WITNESS: Can I have that asked
10  again, please.
11          BY MR. ELSNER:
12      Q.   If the FDA is notified of a supply
13  disruption of certain drugs that contain
14  controlled substances subject to a quota, the
15  FDA, under the Food & Drug Administration
16  Safety Innovation Act, requires that the FDA
17  request DEA to increase the quota applicable to
18  that controlled substance if the FDA determines
19  it's necessary; is that true?
20          MR. EPPICH: Objection.
21          MR. O'CONNOR: Objection.
22          MR. CHANDLER: Objection.
23          THE WITNESS: It requires that the
24  FDA and DEA enter into a dialogue in order to
25  determine whether it's necessary or not to

40 (Pages 154 - 157)

Page 158

1 increase the quota.
2         MR. ELSNER: I will mark this as
3 Exhibit 10.
4         (Deposition Exhibit 10 was marked
5 for identification.)
6         BY MR. ELSNER:
7     Q.   This is a DEA PowerPoint
8 presentation and it's from a presentation done
9 in New Orleans, and it's the 11th
10 Pharmaceutical Industry Conference.
11         There is not a year on the beginning
12 of the document but we have been able to
13 determine that that conference occurred in
14 2003. Okay?
15     A.   Okay.
16     Q.   I'm going to ask you to turn to Page
17 10 of the presentation. There is a slide there
18 that reads: "Quota factors."
19         The second bullet there, it reads:
20 "There is no real means of determining
21 legitimate medical need for product substance
22 class."
23         And then it says underneath that:
24 "Because we are treating symptoms, pain,
25 insomnia and the like."

Page 159

1         Do you agree with that bullet point
2 from the DEA presentation that there is no real
3 means of determining legitimate medical need
4 for a product?
5         MR. O'CONNOR: Objection.
6         THE WITNESS: That is the FDA's role
7 in all of this so DEA cannot respond to that.
8         BY MR. ELSNER:
9     Q.   But just in terms of practical
10 sense, the role of the DEA is to establish an
11 estimate of medical need. You could never
12 determine the exact precise medical need at any
13 given point in time; is that fair?
14         MR. CHANDLER: Objection. Form.
15         MS. McCLURE: Objection. Form.
16 Vague.
17         THE WITNESS: Correct.
18         BY MR. ELSNER:
19     Q.   So you rely on a bunch of different
20 factors to consider that, but at the end of the
21 day, it's an estimate because you can never be
22 exactly precise; is that true?
23         MS. McCLURE: Objection.
24         MR. O'CONNOR: Objection.
25         MR. CHANDLER: Object to form.

Page 160

1         THE WITNESS: Correct.
2         BY MR. ELSNER:
3     Q.   And the third bullet there says
4 there's no federal regulation of the practice
5 of medicine and so the DEA cannot regulate the
6 practice of medicine; is that true?
7         MR. CHANDLER: Objection. Scope.
8         THE WITNESS: I'm not sure of your
9 question.
10         BY MR. ELSNER:
11     Q.   Well, my question was just whether
12 you agreed with that bullet, that the DEA
13 cannot regulate the practice of medicine,
14 certainly not through the quota system,
15 correct?
16         MR. CHANDLER: Objection. Scope.
17 Vague.
18         MR. MASTERS: Counsel, is there a
19 Bates number for this document?
20         MR. ELSNER: It's on the last page.
21         MS. McCLURE: For purposes of the
22 record, it is Bates 03000179742, TPLCP
23 030000179742.
24         THE WITNESS: So DEA will regulate
25 only as far as a doctor who writes a

Page 161

1 prescription for a controlled substance needs
2 to be registered with the DEA.
3         BY MR. ELSNER:
4     Q.   Okay. Because there is no precise
5 means of determining the exact medical need,
6 one of the factors that the DEA considers are
7 data that is provided by the manufacturers such
8 as sales data, correct?
9         MR. O'CONNOR: Objection. Form.
10         THE WITNESS: Correct.
11         MS. NEWMARK: Counsel, I'm going to
12 object to the use of this document, the Purdue
13 document that was produced pursuant to the
14 protective order in this case. If you would --
15 you haven't established a foundation for what
16 this document -- where it came from.
17         MR. ELSNER: Well, it's a DEA
18 document.
19         MS. NEWMARK: Did you seek
20 permission to use it from Purdue?
21         MR. ELSNER: I don't need to seek
22 permission to use a DEA document from Purdue.
23         MS. NEWMARK: Well, you haven't --
24 it is marked confidential. You have not
25 established that this is a DEA document.

41 (Pages 158 - 161)

1      BY MR. ELSNER:
2      Q.   Ma'am, is there a DEA logo on the
3   front page of the document?
4      A.   Yes.
5      Q.   Does it read DEA OD 11th
6   Pharmaceutical Industry Conference?
7      A.   Yes.
8      Q.   Okay.  Isn't it true that individual
9   quotas for each registrant are calculated based
10  on the business activities and justification
11  they provide to the DEA?
12        MR. O'CONNOR:  Objection. Form.
13        THE WITNESS:  It's based on their
14  business activities and a part of it on their
15  justification, yeah.
16        BY MR. ELSNER:
17     Q.   Okay.  And you'd agree that the
18  quality of the data -- that the quality of the
19  quota calculation is based on the quality of
20  the data provided in part by the manufacturers.
21  Would you agree with that?
22        MR. O'CONNOR:  Objection. Form.
23        MR. EPPICH:  Objection. Vague.
24        THE WITNESS:  Part of that data is
25  the consideration, yes.

1      BY MR. ELSNER:
2      Q.   Okay.  And there would be an
3   expectation that the data that would be
4   provided would be both accurate and complete,
5   right?
6         MR. EPPICH:  Object to form.  Vague.
7         THE WITNESS:  So DEA was -- is
8   skeptical of data submitted by the
9   manufacturers and therefore relies on the
10  third-party prescription data as well.
11        BY MR. ELSNER:
12     Q.   For sure.  And we will get to the
13  prescription data.
14     Why is the DEA skeptical of the data
15  provided by manufacturers?
16        MR. O'CONNOR:  Objection. Form.
17        THE WITNESS:  Because based on the
18  business activities, the manufacturers may not
19  fully state what is actually being -- what is
20  actually necessary for patient consumption.
21        BY MR. ELSNER:
22     Q.   And when they do that, that could
23  impact the size of the quota, correct?
24     A.   Correct.
25     Q.   When the DEA is reviewing the sales

1   data as reported by the manufacturers, does the
2   DEA have the ability to actually look in
3   realtime behind the sales data that is
4   provided?
5         MR. O'CONNOR:  Objection to form.
6         THE WITNESS:  No.
7         BY MR. ELSNER:
8      Q.   And so, in part, you are relying on
9   -- although you are skeptical, you are relying
10  on the information that the manufacturers
11  provide to you in order to assess legitimate
12  medical need in part, correct?
13        MR. CHANDLER:  Objection. Form.
14        MR. O'CONNOR:  Objection. Form.
15        MR. EPPICH:  Objection. Form.
16        THE WITNESS:  Yes.
17        MR. ELSNER:  This is Exhibit 11.
18        (Deposition Exhibit 11 was marked
19  for identification.)
20        BY MR. ELSNER:
21     Q.   I'm going to ask you to -- it's a
22  collection of e-mails.  I'm going to ask you to
23  turn to the very last page of the document.
24     This is an e-mail from Richard
25  Sackler of Purdue.

1         MS. NEWMARK:  Objection to form.
2         BY MR. ELSNER:
3      Q.   And he writes:  "I think we should
4   move our allocation upward again.  I believe
5   that we should be able to handle an increase up
6   to 175 million for this year in demand and well
7   above 200 million next year.  Michael will give
8   you numbers today but I think this is close to
9   ballpark."
10     Then he asks:  "What is our
11  allocation for now?  Am I right in estimating
12  that we are earning about $60,000 per kilogram
13  sold.  If so, it would appear that we need
14  about 2,925 kilograms of oxycodone HCL for this
15  year and something approaching 4,000 kilograms
16  next year."
17     Did I read that correctly?
18     A.   Yes.
19        MR. O'CONNOR:  Object to form.
20        MS. NEWMARK:  Object to form, and
21  I'm going to object to the use of this e-mail.
22  Once again, this is a Purdue document that was
23  produced pursuant to a confidentiality order.
24  There is no indication that -- yet again, that
25  counsel sought permission to use this e-mail

42 (Pages 162 - 165)

Page 166

1    and it's outside the scope of the permit.
2        BY MR. ELSNER:
3        Q.   Did DEA know that Purdue had
4    internal estimates that they could earn $60,000
5    for every kilogram of oxycodone authorized?
6        MR. O'CONNOR:  Objection to form and
7    scope.
8        MR. CHANDLER:  Objection to scope
9    and I will instruct witness not to answer.
10   Specifically excluded from the deposition
11   notice, any consideration of particular quota
12   amounts for particular years for particular
13   registrants.
14       MR. ELSNER:  My question -- my
15   question is not to analyze whether the DEA
16   considered any specific quota requests from any
17   manufacturer.
18       My question is simply whether the
19   DEA was aware that certain manufacturers were
20   calculating quota based on the dollars they
21   could earn off the kilograms authorized.
22   That's my question.
23       MR. O'CONNOR:  Objection.
24       MR. CHANDLER:  With reference to
25   this particular e-mail and those particular

Page 167

1    amounts, I'm going to instruct the witness not
2    to answer that.
3        BY MR. ELSNER:
4        Q.   Was the DEA aware, ma'am, that
5    manufacturers of opioids were establishing
6    quota based on the dollars they could earn off
7    the quota authorized?
8        MR. O'CONNOR:  Objection to form.
9        MS. NEWMARK:  Object to form.
10   Object to foundation.
11       MR. CHANDLER:  Object to form.
12       THE WITNESS:  The DEA was not aware.
13       BY MR. ELSNER:
14       Q.   The quota authorization was supposed
15   to be based on legitimate medical need,
16   correct?
17       A.   Yes.
18       Q.   It's not supposed to -- it's not
19   supposed to be based on how much profit you can
20   earn of the quota authorized, correct?
21       MR. O'CONNOR:  Objection.
22       THE WITNESS:  Correct.
23       BY MR. ELSNER:
24       Q.   And if you calculate a quota based
25   on how much you could earn instead of

Page 168

1    legitimate medical need, it could offset an
2    impact to the quota authorization, right?
3        MR. O'CONNOR:  Objection.  Form.
4        MR. CHANDLER:  Objection.  Vague.
5    Form.
6        THE WITNESS:  I'm not -- I don't
7    understand your question.
8        BY MR. ELSNER:
9        Q.   Okay.  If a manufacturer was seeking
10   authorization of quota, not by determining
11   actual medical data but instead by determining
12   how much profit they could earn, that could
13   offset the quota authorization, correct?
14       MS. McCLURE:  Objection to form.
15   Foundation.  Vague.  Compound.
16       MR. CHANDLER:  Objection.  Form.
17       MR. O'CONNOR:  Objection.
18       MS. McCLURE:  Calls for speculation.
19       THE WITNESS:  The DEA would seek a
20   third-party data in terms of trying to
21   determine actual legitimate medical need for
22   that particular manufacturer.
23       BY MR. ELSNER:
24       Q.   I understand that the DEA has other
25   systems it could use.  It looks at IMS data,

Page 169

1    prescription data, we're going to get there.
2        But my question is that if
3    manufacturers are giving the DEA data and
4    requesting quota authorizations based on the
5    profit they could earn instead of legitimate
6    medical need, that could impact the quota
7    authorization?
8        MR. CHANDLER:  Objection.
9        MS. McCLURE:  Same objection.
10       MR. CHANDLER:  Vague.  Calls for
11   speculation.  Objection to form.
12       THE WITNESS:  If a manufacturer used
13   that process, then they would probably
14   overestimate the amount of quota.
15       BY MR. ELSNER:
16       Q.   Just above the e-mail from Richard
17   Sackler, there is a e-mail from James
18   Sullivan, and at the end of the second
19   paragraph, he says: "I'd asked for 1,1800-plus
20   and I have been given 1,412.  I will ask for a
21   plus-700 and probably get 400, then go back
22   again in the summer for more."
23       MS. NEWMARK:  Counsel, again, I'm
24   objecting to the use of this e-mail.  This
25   e-mail was produced in a different litigation

43 (Pages 166 - 169)

1  pursuant to a confidentiality order and Mr.
2  Chandler already instructed the witness not to
3  answer subject to that.
4       MR. MASTERS:  And further, I would
5  add that pursuant to the DEA's authorization
6  letter, to the extent that these -- that this
7  e-mail reflects procurement quota applications,
8  it is outside the scope of the DEA
9  authorization which is not the decision with
10  respect to individual procurement quota for any
11  given year.
12       BY MR. ELSNER:
13    Q.  My question is whether the DEA was
14  aware that manufacturers would sometimes ask
15  for more quota than they actually needed with
16  the hope that they would -- sorry, my question
17  is whether -- let me strike that.
18       My question is whether DEA was aware
19  that manufacturers would sometimes ask for more
20  quota than they actually needed.
21       MR. O'CONNOR:  Objection to form.
22       MR. CHANDLER:  Objection.  Scope.
23       MS. McCLURE:  Form.  Speculation.
24  Foundation.
25       MR. MASTERS:  We object as well.

1       MR. CHANDLER:  You can answer.
2       THE WITNESS:  DEA was aware that
3  manufacturers asked for larger quotas than was
4  supported by actual documentation.
5       BY MR. ELSNER:
6    Q.  Was that another reason the DEA was
7  skeptical of manufacturer's quota requests?
8    A.  Yes.
9    Q.  Among the factors that the DEA would
10  look at in examining a mid-year quota change,
11  would they look at sales compared to inventory?
12    A.  Yes.
13    Q.  And so if a manufacturer was able to
14  show a lot of sales and no inventory, then that
15  might support an increase in their quota
16  authorization; is that right?
17       MR. CHANDLER:  Objection.  Calls for
18  speculation.  Incomplete hypothetical.
19       MR. O'CONNOR:  Objection.
20       MS. McCLURE:  Object to form.
21  Scope.
22       MR. MASTERS:  Objection to
23  highlighting part of the document rather than
24  the entire paragraph.
25       MS. McCLURE:  Objection as to the

1  instruction as to whether this witness is
2  permitted to answer questions regarding
3  individual situations or not.
4       MR. CHANDLER:  You can answer the
5  question subject to my objection.
6       THE WITNESS:  If a manufacturer
7  suggested that their sales outpaced and that
8  they had used up their inventory, it would
9  result in probably a higher quota.
10       MR. ELSNER:  Mark this document as
11  Exhibit 12.
12       (Deposition Exhibit 12 was marked
13  for identification.)
14       MS. McCLURE:  For the record, could
15  you please read the confidentiality designation
16  that may appear on the document as well as the
17  Bates numbers for the record as per the
18  deposition protocol.
19       MR. ELSNER:  I will give the Bates
20  numbers.  P 2421610 through 1612.
21       MS. NEWMARK:  Object to the extent
22  this is in violation of the protective order in
23  this case and the information that appears in
24  the foot of the document is in a different
25  lawsuit.

1       And I am going to repeat the same
2  objection and object again to the fact that
3  this is a highly confidential document and as
4  counsel -- Mr. Chandler stated before, he
5  instructed his client not to answer and this is
6  outside the scope of the designations for which
7  the witness was designated to testify.
8       BY MR. ELSNER:
9    Q.  I'm going to ask you to look at the
10  last page of the document here.
11       The third to last paragraph just
12  under "total available," it reads:  "Based on
13  the conversation with DEA recently, their
14  stated position is that Rhodes will not be
15  awarded additional quota allocation until we
16  generate sales and submit a new quota request.
17  My recommendation is to ship (sell) every
18  kilogram we can from Rhodes in April, hold back
19  only what we estimate R&D may want for
20  development purposes.  Rhodes would then
21  prepare and submit a new quota request to DEA
22  on May 1st for 3,000-plus kilograms and a 50
23  percent inventory build allowance or a total of
24  4,500-plus kilograms."
25       Did I read that correctly?

44 (Pages 170 - 173)

1        MS. NEWMARK:  Objection.
2        MR. O'CONNOR:  Objection.
3        MS. NEWMARK:  Again to the use of
4   this document.
5        MR. ELSNER:  Your objection is
6   preserved.  You don't need to give a speaking
7   objection that lasts three minutes every time.
8        MS. NEWMARK:  I'm going to keep
9   repeating my objection as long as you keep
10  trying to violate the confidentiality order in
11  this case and in the Kentucky case.
12       MS. McCLURE:  I will note for the
13  record the inconsistent instruction from DEA
14  counsel as to whether witnesses are or are not
15  permitted to answer questions.
16       MR. MASTERS:  Objection.
17       MR. CHANDLER:  And I am going to
18  object on scope grounds, and instruct the
19  witness not to answer.
20       Again, the witness is not designated
21  to testify about individual determinations as
22  to particular registrants, particular years,
23  particular substances and I -- if you want to
24  ask about a policy or a practice, that's fine,
25  but I don't see any connection between this

1   document and the policy or practice.
2        MR. ELSNER:  I appreciate the
3   objection.  I just haven't asked the question
4   yet.
5        BY MR. ELSNER:
6    Q.  My question is, is that if a
7   manufacturer was selling all the product that
8   they have and then requesting a mid-year review
9   saying that we sold all of our product and our
10  inventory is down to nothing, would that
11  potentially impact the DEA's decision to
12  increase their quota?
13       MR. CHANDLER:  And --
14       MR. O'CONNOR:  Objection.
15       MR. CHANDLER:  -- I'm going to
16  object on scope grounds, and if you are asking
17  the question in the abstract separate from
18  Exhibit 12, then I will allow the witness to
19  answer.
20       Subject to the further objection
21  that it is vague, calls for speculation and
22  it's an incomplete hypothetical.
23       MS. McCLURE:  Objection.  Incomplete
24  hypothetical.  Objection to form, speculation
25  and scope.

1        MR. CHANDLER:  You can answer
2   without reference to the document.
3        THE WITNESS:  If a manufacturer came
4   for a mid-year revision for a quota because it
5   sold all that it had, DEA would consider that,
6   but once again, with a skeptical eye and a look
7   to third-party data to see that prescriptions
8   were being filled.
9        BY MR. ELSNER:
10   Q.  But it could potentially impact the
11  quota authorization, correct?
12       MS. McCLURE:  Same objection.
13       MR. CHANDLER:  Same objection.
14       MR. O'CONNOR:  Objection.
15       THE WITNESS:  It could.
16       MR. ELSNER:  Why don't we take a
17  quick break.
18       THE VIDEOGRAPHER:  We are going off
19  the record.  This is the end of Media Unit No.
20  4.  The time is 3:23.
21       (A short recess was taken.)
22       THE VIDEOGRAPHER:  We are going back
23  on the record.  This is the start of Media Unit
24  No. 5.  The time is 3:44.
25       You may proceed, Counsel.

1        MR. ELSNER:  Thank you.
2        BY MR. ELSNER:
3    Q.  Ma'am, as you pointed out, the DEA
4   didn't just rely on the manufacturer's
5   information to set quota.  The DEA also looked
6   at prescription data; is that true?
7    A.  Correct.
8        MR. O'CONNOR:  Object to form.
9        BY MR. ELSNER:
10   Q.  And did that include data provided
11  by IMS and later equivalence of that company?
12   A.  Yes.
13   Q.  And would you agree with me that if
14  manufacturers and distributors of opioids had
15  misled doctors and the public about the health
16  benefits and the addictive nature of opioids
17  they were manufacturing and distributing
18  causing sales to rise, then the DEA's estimate
19  of the medical need could be above the actual
20  medical need in the United States?
21       MR. CHANDLER:  Objection.
22       MS. McCLURE:  Objection.  Form.
23  Speculation.  Incomplete hypothetical.  Vague.
24  Compound.  Foundation.
25       THE WITNESS:  Yes.

45 (Pages 174 - 177)

Page 178

1      BY MR. ELSNER:
2    Q.   And among the factors that could
3  impact quota and the medical need, if you turn
4  to -- back to Exhibit 10, which is a PowerPoint
5  and I will ask you to look at Page 28.  This is
6  the DEA's PowerPoint again.
7      And the heading on the top of the
8  PowerPoint says: "Factors hindering
9  determination of legitimate medical need."
10      Did I read that correctly?
11    A.   Yes.
12    Q.   Okay.  And one of those factors on
13  the bottom is an unusually aggressive,
14  innovative, persuasive marketing and promotion.
15  Would you agree that that would potentially
16  impact the determination of legitimate medical
17  need?
18      MR. CHANDLER: Object to form.
19      MR. O'CONNOR: Object to form.
20      MS. McCLURE: Same objection.
21  Speculation.
22      THE WITNESS: It would definitely
23  overestimate legitimate medical need.
24      BY MR. ELSNER:
25    Q.   Okay.  Now, the DEA doesn't have

Page 179

1  control over the marketing and promotional
2  activities of manufacturers; is that correct?
3      MR. O'CONNOR: Object to form.
4      MR. CHANDLER: Objection. Scope.
5      MS. McCLURE: Foundation.
6      THE WITNESS: Correct.
7      BY MR. ELSNER:
8    Q.   Now, this slide has some pictures in
9  it.  It has a stuffed animal and it has a mug,
10  it reads: "The one to start with."  And then
11  the other mug has "OxyContin" written on it.
12      Do you see that?
13      MR. EPPICH: Objection. Foundation.
14  Speculation.
15      THE WITNESS: Yes.
16      BY MR. ELSNER:
17    Q.   Are these some promotional items
18  that Purdue would send out?
19      MS. McCLURE: Foundation.
20      MS. NEWMARK: Objection.
21  Foundation. Form.
22      MR. EPPICH: Scope.
23      MR. CHANDLER: Objection. Form.
24      THE WITNESS: I'm unaware of the
25  promotional items that they sent out.

Page 180

1      BY MR. ELSNER:
2    Q.   Okay.  If you look at the notes at
3  the bottom of the slide under the heading:
4  "Unusually aggressive, innovative, persuasive
5  marketing promotion."
6      Do you see where I am at?
7    A.   Yes.
8    Q.   The first bullet reads: "Much more
9  promotional money spent on OxyC than equivalent
10  products."
11      Could that promotional money spent
12  on OxyContin impact the determination of
13  legitimate medical need of the DEA?
14      MR. CHANDLER: Objection. Vague.
15      MR. EPPICH: Objection. Foundation.
16  Form.  Outside the scope.
17      MR. CHANDLER: Objection.
18  Foundation. Form.
19      THE WITNESS: Only if it impacted
20  physician's prescription writing.
21      BY MR. ELSNER:
22    Q.   And there are a number of other
23  bullets here.
24      The second one reads: "Scope of the
25  medical specialty groups promoted to the widest

Page 181

1  for OxyC."
2      Next is: "IMS messaging site.
3  Physicians heard use OxyC for moderate to
4  severe pain, acute and chronic pain."
5      Next one: "Effective pain relief,
6  use it for everyone."
7      Next one: "OxyC reports of
8  diversion and abuse routinely downplayed."
9      These are all items listed as
10  factors that could hinder the determination of
11  legitimate medical need in the DEA's
12  presentation; is that true?
13      MR. O'CONNOR: Objection. Form.
14  Scope.
15      MR. CHANDLER: Objection. Form.
16      THE WITNESS: Correct.
17      BY MR. ELSNER:
18    Q.   Do you agree with them?
19      MR. CHANDLER: Objection. Scope.
20  Form.
21      THE WITNESS: If those statements
22  are true, they would impact estimations of
23  legitimate medical need.
24      BY MR. ELSNER:
25    Q.   Okay.  And if these extensive

46 (Pages 178 - 181)

Page 182

1    marketing campaigns encouraged doctors to
2    prescribe and patients to seek opioids for the
3    treatment of ankle sprains and backaches and
4    all other types of nonchronic pain, and sales
5    increased dramatically, it would impact the
6    DEA's estimate of potential medical need
7    because it would impact the number of
8    prescription written, correct?
9           MR. CHANDLER: Objection. Vague.
10   Incomplete hypothetical. Form.
11          MR. MASTERS: Form. Foundation.
12   Speculation.
13          MS. NEWMARK: Scope.
14          MR. O'CONNOR: Objection. Form.
15          THE WITNESS: DEA does not determine
16   which legitimate medical needs require
17   controlled substances and which ones do not.
18   That is up to the FDA and the physicians
19   themselves.
20          BY MR. ELSNER:
21   Q.   If you turn to Page 29 in the
22   presentation.
23          The top of the slide reads: "The
24   limitations of quotas."
25          Did I read that right?

Page 183

1    A.   Yes.
2    Q.   Okay. And it shows dollars in
3    thousands and it shows OxyContin reaching over
4    $1.6 billion in total sales.
5           Do you see that in the red bar?
6    A.   Yes.
7    Q.   And then on the bottom, there's some
8    notes from DEA and there is a heading that
9    says: "Drawbacks of quotas."
10          Do you see that?
11   A.   Yes.
12   Q.   Then there is:  "Marketing
13   promotional techniques," that's underlined.
14          Do you see that?
15   A.   Yes.
16   Q.   And it reads:  "Massive promotional
17   dollars spent."
18          Did I read that correctly?
19   A.   Yes.
20   Q.   "Promoted to nontraditional pain
21   specialty groups implied and inferred OxyContin
22   messages to prescribers."
23          Did I read that correctly?
24   A.   Yes.
25   Q.   Okay. This presentation lists these

Page 184

1    as factors that could limit -- under the
2    limitations of quotas, do you agree that
3    marketing these products to nontraditional pain
4    groups and spending massive promotional dollars
5    could impact the quota and the definition of
6    legitimate medical need?
7           MR. O'CONNOR: Objection. Form.
8           MR. CHANDLER: Objection. Form.
9    Scope. Foundation. Form.
10          THE WITNESS: They would limit
11   quota, yes.
12          BY MR. ELSNER:
13   Q.   Okay. If -- you said, "they would
14   limit quota."
15          Do you mean -- I just want to make
16   sure I understand. Are you saying that these
17   types of activities, they would limit the
18   ability to accurately determine quota; is that
19   what you mean?
20   A.   Correct.
21          MR. CHANDLER: Objection. Scope.
22   Foundation. Form.
23          MR. O'CONNOR: Object to form.
24          BY MR. ELSNER:
25   Q.   If you could turn to Page 11 of the

Page 185

1    presentation.
2           The title of this slide is:
3    "Consumption of analgesics for the treatment of
4    moderate to severe pain."
5           Is that what it says?
6    A.   Yes.
7    Q.   And it shows that the number of
8    prescriptions for the -- the number of
9    prescriptions for the treatment of moderate to
10   severe pain increased as a result of the those
11   promotional activities from '98, '99 through
12   2002, correct?
13          MR. CHANDLER: Objection. Scope.
14   Foundation.
15          MR. EPPICH: Objection. Foundation.
16   Form.
17          THE WITNESS: So it shows that
18   prescriptions increased.
19          BY MR. ELSNER:
20   Q.   For the treatment of moderate to
21   severe pain, correct?
22   A.   Correct.
23   Q.   And consequently, the quota
24   authorization also increased, correct?  In the
25   red bars?

47 (Pages 182 - 185)

Page 186

1      MR. CHANDLER: Objection. Form.
2  Foundation.
3      THE WITNESS: Yes.
4      BY MR. ELSNER:
5   Q.  Okay.  Now if the supply was limited
6  -- so I am done with the document now.
7      If the supply were limited, if you
8  decreased the quota, would that stop all
9  diversion?
10      MR. CHANDLER: Objection. Form.
11      THE WITNESS: No.
12      BY MR. ELSNER:
13   Q.  It would simply mean that the gross
14  bulk amount of a particular gross drug type
15  would be less, right?
16      MR. CHANDLER: Objection. Form.
17      THE WITNESS: Can you repeat the
18  question.
19      BY MR. ELSNER:
20   Q.  It would simply mean that gross bulk
21  amount of a particular gross drug type would be
22  less, correct?
23      MR. CHANDLER: Same objection.
24      MR. O'CONNOR: Object to form.
25      THE WITNESS: Correct.

Page 187

1      BY MR. ELSNER:
2   Q.  Okay.  And when it was reduced, it
3  would be reduced both for the illicit market
4  and the licit market, correct?
5      MR. MASTERS: Objection. Scope.
6      MS. McCLURE: Objection. Form.
7  Speculation. Foundation.
8      MR. CHANDLER: Objection. Form.
9      THE WITNESS: The quota is only for
10  the legitimate medical needs and so it's only
11  for the legitimate market.
12      BY MR. ELSNER:
13   Q.  But we recognize that pills are
14  diverted, correct?
15      MR. O'CONNOR: Objection. Form.
16      MS. McCLURE: Foundation.
17      MR. CHANDLER: Objection.
18      THE WITNESS: Yes.
19      BY MR. ELSNER:
20   Q.  And so if we reduce the size of the
21  quota simply reduces the pool of available
22  drugs, both to the licit and illicit users of
23  that drug, correct?
24      MS. McCLURE: Form. Foundation.
25  Speculation. Scope.

Page 188

1      MR. CHANDLER: Object to form.
2      MR. O'CONNOR: Object to form.
3      THE WITNESS: It reduces the amount
4  of material available, period.
5      BY MR. ELSNER:
6   Q.  Across the board?
7   A.  Across the board.
8      MR. EPPICH: Object to form.
9      MS. McCLURE: All the same
10  objections.
11      BY MR. ELSNER:
12   Q.  In 2001, the DEA administrator Donny
13  Marshall testified before Congress.
14      Are you familiar with that
15  testimony?
16   A.  I am.
17   Q.  Okay.
18      MR. ELSNER: I'm going to mark it as
19  the next exhibit.
20      (Deposition Exhibit 13 was marked
21  for identification.)
22      BY MR. ELSNER:
23   Q.  I'm going to ask you to turn to Page
24  115 of 228.
25      MS. McCLURE: Can you read the Bates

Page 189

1  number into the record.
2      MR. ELSNER: There is not a Bates
3  number but this is the -- it's testimony of
4  Donny Marshall before a subcommittee of the
5  committee of appropriations in the House of
6  Representatives in 2001.
7      BY MR. ELSNER:
8   Q.  And about in the middle of the page,
9  there is a paragraph that -- it begins with:
10  "We begin to see this problem."
11      Do you see where I am at?
12   A.  Yes.
13   Q.  Okay.  And he is asked about
14  oxycodone and he says: "We begin to see this
15  problem as a result of some developments that
16  began four or five years ago.  What we saw
17  about four or five years in 1996 or
18  thereabouts, was that the AMA and a number of
19  pain management groups that made the case and
20  contended that we are under-treating pain in
21  this country or that we are not effectively
22  treating pain in this country."
23      Did I read that correctly?
24   A.  Yes.
25   Q.  And if you go to the next page, in

48 (Pages 186 - 189)

Page 190

1  the middle of the paragraph, it starts at the
2  third full paragraph: "We are asking the
3  industry to do several things."
4       Do you see where I am at?
5     A.  Yes.
6     Q.  It says: "No. 1, we are asking that
7  the company do a more balanced approach in
8  their marketing of this drug.  We are asking
9  them to educate doctors and patients about the
10  dangers of the drug.  We are asking them not to
11  advertise in such a way that gives a physician,
12  for instance, who is not well-trained in pain
13  management, it gives that physician the
14  impression that this might be the painkiller of
15  first resort rather than the painkiller of last
16  resort.  We are asking them and others perhaps
17  to come up with what we refer to as a
18  restricted distribution, in other words,
19  recommend that doctors only prescribe and
20  pharmacists only distribute this for certain
21  types of pain, so that the kidney stone patient
22  may get a different version of it, but the
23  terminal cancer patient may well get the 160
24  milligram oxycodone."
25       Do you see that?

Page 191

1     A.  Yes.
2     Q.  Did I read it correctly?
3     A.  Yes.
4     Q.  Okay.  And then in the second to
5  last paragraph, he states: "Frankly, the
6  manufacturer of this, they have met us on some
7  of these issues, on others, they have not met
8  us."
9       And then he says: "And I have to
10  tell you, sir, that we need more cooperation
11  from that company, and if we cannot find some
12  more middle ground in this area, I am seriously
13  considering rolling back the corners of th
14  quotas that the DEA set, rolling back those
15  quotas to 1996 levels until we find ways to
16  control this."
17     Q.  Did I read this correctly?
18     A.  Yes.
19     Q.  Were you aware that the DEA was
20  considering rolling back quotas to 1996 levels
21  for oxycodone?
22     MR. CHANDLER:  Objection.  Scope.
23     MR. O'CONNOR:  Objection.
24     THE WITNESS:  I am aware that it had
25  been considered.

Page 192

1     MR. ELSNER:  Mark this next document
2  as the next exhibit.
3     (Deposition Exhibit 14 was marked
4  for identification.)
5     MR. ELSNER:  It bears the Bates
6  range PPLPC045 and then a bunch of zeros, 5405
7  through 5425.
8     BY MR. ELSNER:
9     Q.  Was the DEA aware --
10     MS. NEWMARK:  I will object to the
11  use of this document.  I have not gotten a
12  chance to look through it but it appears to be
13  a Purdue produced e-mail and you are showing it
14  to the witness in violation of the protective
15  order as it's marked confidential, and you did
16  not seek permission from Purdue to show this to
17  the witness.
18     MR. ELSNER:  First, your
19  understanding of the protective order is wrong.
20  Section 33M states that there is only a
21  restriction in sharing it with another -- an
22  employee of another party.  This is not another
23  party in the litigation.  So your objection is
24  completely wrong.
25     Furthermore, the Government has

Page 193

1  signed the confidentiality order and they're --
2  and I am entitled to use it in this deposition
3  and I don't need to ask for permission.
4     Secondly, the repeated extensive
5  objections are interfering with the flow of the
6  deposition unnecessarily, and I think
7  intentionally, and I ask you simply to say
8  objection.  Your objections are always
9  preserved and you can raise them at a later
10  time.
11     MS. NEWMARK:  Counsel, I am entitled
12  to object to whenever you ask a question that
13  is objectionable.  Furthermore, under Section
14  33H of the confidentiality order, if a designee
15  -- you're required to give the designee party
16  notice of your intent to disclose a document to
17  state or federal law enforcement agencies, even
18  if they have completed the certification in
19  Exhibit A and the acknowledgement to be bound,
20  and if the designating party, which here is
21  Purdue, objects to the disclosure, then the
22  designating party may request a meet and confer
23  and resolve the protective order from the
24  Court.
25     MR. ELSNER:  This is not that

49 (Pages 190 - 193)

Page 194

1  situation.  I'm not disclosing it for that
2  situation.
3       MS. NEWMARK:  This is that
4  situation, and we can call Colin right now if
5  you want to have a dispute about this.
6       MR. ELSNER:  Well, we have a dispute
7  about it, but we are not going to waste any
8  more time.  Your objection is preserved.
9       MS. NEWMARK:  I'm going to continue
10  to object to your use of this document and
11  furthermore, it is outside the scope of what
12  this witness is permitted to testify about
13  today.
14  BY MR. ELSNER:
15    Q.  Ma'am, were you aware that Purdue,
16  in response to Mr. Marshall's testimony, began
17  writing letters to its customers, to pain
18  management groups and to members of Congress?
19       MR. O'CONNOR:  Objection.  Form.
20  Scope.
21       MR. CHANDLER:  Objection.  Scope.
22       MS. NEWMARK:  Objection.
23  Foundation.
24       THE WITNESS:  The DEA is aware of
25  that.

Page 195

1       BY MR. ELSNER:
2    Q.  Okay.  I'm going to ask you to look
3  at the second page of the document.  This is
4  one of the drafts.
5       MS. NEWMARK:  So again, I'm going to
6  object to the use of this document.
7       MR. ELSNER:  Your objection is
8  preserved.
9       MS. NEWMARK:  That it's violating
10  the protective order in this case, and I'm
11  going to keep objecting as long as you keep
12  violating the protective order.
13       MR. ELSNER:  I'm going to ask
14  questions on this document.  Your objection is
15  preserved.  You don't need to raise it every
16  single question that I ask.  It's preserved.
17  You can simply say objection.
18       BY MR. ELSNER:
19    Q.  I'm going to ask you to look at the
20  middle of this document, at the end of the
21  second full paragraph.
22       It reads: "The 1996 level would
23  represent a 95 percent reduction in raw
24  material allowing only one prescription of 20
25  to be filled."

Page 196

1       Did I read that correctly?
2    A.  Yes.
3    Q.  Okay.  It reads that -- under that:
4  "In human terms, such a rollback would mean,
5  No. 1, in 1996, the amount of oxycodone
6  allocated to Purdue allowed us to supply enough
7  OxyContin to fill approximately 29,000
8  prescriptions per year.  In 2000, the amount of
9  oxycodone allocated to Purdue allowed us to
10  supply enough OxyContin to fill approximately
11  5.4 million prescriptions a year."
12       It then says, under Item 3:  "If the
13  quota were reduced as suggested by Mr.
14  Marshall, we would not be able to supply 95
15  percent of the demand for OxyContin.  19 out of
16  every 20 patients would be unable to fill their
17  doctor's prescriptions."
18       Did I read that correctly?
19    A.  Yes.
20    Q.  On the next page, the second
21  paragraph, the first line reads:  "If the DEA
22  were to impose even a small restriction on
23  Purdue's quota for oxycodone, the war on drugs
24  would turn into a war on people in pain."
25       Did I read that correctly?

Page 197

1    A.  Yes.
2    Q.  Was the DEA aware that Purdue was
3  sending letters out to its customers telling
4  them that the DEA was engaged in a war on
5  people in pain?
6       MR. O'CONNOR:  Objection.  Form.
7  Scope.
8       MR. CHANDLER:  Objection.
9       MS. NEWMARK:  Objection.
10  Foundation.
11       MR. O'CONNOR:  Can the DOJ instruct
12  the witness not to answer on the basis of
13  scope.
14       MR. CHANDLER:  No.  The witness can
15  answer.
16       THE WITNESS:  I'm not sure we -- DEA
17  was aware of it going to actual patients.  We
18  knew it went to Congress.
19       BY MR. ELSNER:
20    Q.  And the DEA wasn't engaged in a war
21  on people in pain, was it?
22       MR. O'CONNOR:  Objection.  Scope.
23       MR. CHANDLER:  Objection.
24  Foundation.
25       THE WITNESS:  No.

50 (Pages 194 - 197)

Page 198

1     BY MR. ELSNER:
2     Q.   You were trying to set the
3  legitimate medical need for the country,
4  correct?
5     A.   Correct.
6        MR. EPPICH: Objection. Vague.
7        BY MR. ELSNER:
8     Q.   Among the items that the DEA was
9  attempting to work with manufacturers on, which
10  included a more balanced approach to marketing,
11  better education, better -- less advertising,
12  those items including the addictive nature of
13  the drug are not revealed in this letter, are
14  they?
15        MR. O'CONNOR: Objection. Form.
16  Scope.
17        MR. CHANDLER: Objection. Form.
18        THE WITNESS:  No, it does not look
19  like it.
20        BY MR. ELSNER:
21     Q.   If you turn to the next letter, the
22  next draft letter, you mentioned that you were
23  aware that letters had been sent from Purdue to
24  members of Congress.
25        This is a draft letter to be sent to

Page 199

1  Congressional members in North Carolina, and in
2  this letter, Purdue is threatening that they
3  are going to close their plant in Wilson, North
4  Carolina, if the 1996 rollback occurs.
5        Was the DEA aware of that?
6        MR. O'CONNOR: Objection. Form.
7  Scope. Mischaracterizes prior testimony.
8        THE WITNESS: DEA knew that
9  manufacturers tended to threaten Congress with
10  closing their facilities.
11        BY MR. ELSNER:
12     Q.   Okay.  If we turn to --
13        MR. ELSNER:  Mark this as the next
14  exhibit.
15        (Deposition Exhibit 15 was marked
16  for identification.)
17        MR. ELSNER:  This is another Purdue
18  document.  Your objections are preserved.
19        MS. NEWMARK:  I'm going to repeat my
20  objection.  Obviously an objection to the use
21  of the prior document, the document is under
22  the protective order in this case and counsel's
23  violating Section 33H of the protective order
24  by continuing to use all of these Purdue
25  documents that are clearly marked confidential.

Page 200

1     BY MR. ELSNER:
2     Q.   If you look at the bottom of the
3  first page of this exhibit, there is a dash 8
4  there.
5        And it reads:  "A version of this
6  letter should go to pain physicians as well.
7  This is a clear attack on the pain movement.
8  There can be no other interpretation."
9        Did I read that correctly?
10     A.   Yes.
11     Q.   And was the DEA trying to attack the
12  pain movement by trying to set the appropriate
13  quota authorization for oxycodone?
14        MR. O'CONNOR: Objection.
15        MR. EPPICH: Objection. Scope.
16        THE WITNESS: No.
17        BY MR. ELSNER:
18     Q.   The DEA was just simply trying to
19  correctly determine the legitimate medical need
20  for oxycodone; is that right?
21        MR. O'CONNOR: Objection.
22        MR. EPPICH: Objection. Calls for
23  speculation.
24        MR. CHANDLER: Objection. Form.
25        THE WITNESS: So the DEA was hoping

Page 201

1  to find that the FDA would provide better data
2  for legitimate medical need, yes, as they are
3  the agency required to do so.
4        BY MR. ELSNER:
5     Q.   But the DEA was not trying to attack
6  the pain movement in trying to set the right
7  quota, correct?
8        MR. O'CONNOR: Objection. Form.
9        THE WITNESS:  Correct.
10        BY MR. ELSNER:
11     Q.   Now, under No. 10, it says:  "The
12  AAFP," this is the American Association of
13  Family Practitioners, "would be very interested
14  in this testimony.  Want me to call Henely or
15  to send him an e-mail this weekend with the
16  testimony?  He will be incensed at the
17  suggestion that prescribing will be limited."
18        Did I read that correctly?
19     A.   Yes.
20     Q.   Now one of the things that the DEA
21  was hoping to work cooperatively with the
22  industry with, was to restrict the number of
23  doctors who could prescribe this medication to
24  those who specialized in pain management,
25  correct?

51 (Pages 198 - 201)

1    MR. O'CONNOR: Object to form.
2 Scope.
3    MR. CHANDLER: Objection to scope.
4 I will instruct the witness not to answer that
5 one.
6    BY MR. ELSNER:
7    Q.   Was the DEA aware that Purdue was
8 sending letters to pain physicians and to pain
9 -- patient advocacy groups to oppose Mr.
10 Marshall's testimony in the quota
11 authorization?
12    MR. O'CONNOR: Objection. Form.
13 Scope.
14    THE WITNESS: I'm unaware that the
15 DEA knew about that.
16    BY MR. ELSNER:
17    Q.   Okay. If you turn to the second to
18 the last page of the document, the document
19 bearing the Bates number -- the last numbers
20 being 5403.
21    There is a comment there on the
22 right-hand side and it reads: "Again, if this
23 becomes public, do we think that our employees
24 will understand that we don't expect the
25 reduction in quota to happen, wouldn't it be

1 better to make this point verbally over the
2 telephone rather than in a letter, which may be
3 leaked intentionally or unintentionally. I'm
4 sure that between us three, we can get
5 eventually every Senator and Congressman we
6 want to talk to us on the phone in the next 72
7 hours."
8    Did I read that correctly?
9    A.   Yes.
10    Q.   Was the DEA aware that Purdue had
11 done an outreach by phone to members of
12 Congress?
13    MR. O'CONNOR: Object to form.
14    MR. CHANDLER: Objection to form.
15 Foundation.
16    THE WITNESS: DEA was aware that
17 there was an outreach to Congress, not the form
18 that it took.
19    BY MR. ELSNER:
20    Q.   If you turn to --
21    MR. ELSNER: Actually, can we go off
22 the record real quick.
23    THE VIDEOGRAPHER: We are going off
24 the record. The time is 4:15.
25    (A short recess was taken.)

1    THE VIDEOGRAPHER: We are back on
2 the record. The time is 4:34.
3    You may proceed, Counsel.
4    (Deposition Exhibit 16 was marked
5 for identification.)
6    BY MR. ELSNER:
7    Q.   I placed before you Exhibit 16 which
8 is the letter that was written by the American
9 Academy of Pain Management to the DEA, Donnie
10 Marshall, on June 8, 2001.
11    Do you see that?
12    A.   Yes.
13    Q.   And this is in response to Mr.
14 Marshall's testimony, and if you go to the
15 middle of the second paragraph, it begins:
16 "CSA requirement."
17    Do you see where I am at? "For
18 determination of legitimate medical need."
19    You can see it on the screen
20 perhaps?
21    A.   Yes.
22    Q.   Okay. It reads: "CSA requirement
23 for determination of legitimate medical need is
24 based on the undisputed position that patients
25 and pharmacies should be able to obtain

1 sufficient quantities of any Schedule II drug
2 to fill prescriptions. A therapeutic drug
3 should be available to patients when they need
4 it."
5    Did I read that correctly?
6    A.   Yes.
7    Q.   Okay. And then on the next page in
8 the second full paragraph, second sentence, it
9 states -- in the second sentence: "For 30
10 years, the U.S. Government has waged a war
11 against this epidemic problem with limited
12 success, choking off the supply of one opioid
13 analgesic oxycodone does not solve the
14 underlying problem of consumer demand. In
15 fact, declaring oxycodone highly dangerous only
16 adds to its mystique and desirability by drug
17 abusers and addicts."
18    Did I read that correctly?
19    A.   Yes.
20    Q.   In the next paragraph, it says that:
21 "The manufacturer of the most highly sought
22 after form of oxycodone, Purdue Pharma L.P., is
23 one of the most ethical pharmaceutical
24 companies in the United States."
25    Did I read that correctly?

52 (Pages 202 - 205)

Page 206

1     A.  Yes.
2     Q.  When the DEA received this letter,
3  did it know that Purdue Pharma had provided
4  financial support for this organization?
5         MS. McCLURE:  Objection.
6  Foundation.  Form.
7         MR. O'CONNOR:  Objection.
8         THE WITNESS:  I do not think DEA was
9  aware of that.
10        BY MR. ELSNER:
11    Q.  The next sentence in that paragraph,
12  it says:  "Unlike many other pharmaceutical
13  companies, Purdue Pharma consistently offers
14  the best continuing medical education
15  conferences, does not engage in covert bribery
16  and even discourages its representatives from
17  providing alcohol."
18    This was at least five years before
19  Purdue pled guilty in federal court; is that
20  correct?
21        MR. O'CONNOR:  Objection.
22        MR. CHANDLER:  Objection.  Scope.
23        MS. McCLURE:  Objection.  Form.
24        MS. NEWMARK:  Objection.  Form.
25        MR. EPPICH:  Foundation.

Page 207

1         THE WITNESS:  I don't remember the
2  exact year that they were in court.
3         BY MR. ELSNER:
4     Q.  You do remember that Purdue has pled
5  guilty to a felony of misbranding their drug
6  with an intent to defraud and mislead?
7         MR. CHANDLER:  Objection.  Scope.
8         MS. NEWMARK:  Objection.
9         MR. O'CONNOR:  Objection.
10        BY MR. ELSNER:
11    Q.  Are you aware of that?
12    A.  Yes.
13    Q.  This wasn't the only letter that DEA
14  received in response to Mr. Marshall's
15  testimony, was it?
16        MR. O'CONNOR:  Objection.  Form.
17        MR. CHANDLER:  Objection.
18  Foundation.  Form.
19        THE WITNESS:  Not that I'm aware of.
20        BY MR. ELSNER:
21    Q.  And the letter doesn't indicate,
22  does it, that Purdue had given financial
23  support to this organization, the American
24  Academy of Pain Management, does it?
25        MR. O'CONNOR:  Objection.  Form.

Page 208

1  Foundation.  Scope.
2         MR. CHANDLER:  Objection.  Form.
3         Unless you want the witness to spend
4  the next few minutes reading through the entire
5  letter.
6         You can answer.
7         THE WITNESS:  I haven't read the
8  full letter but -- so I don't know.
9         BY MR. ELSNER:
10    Q.  I will represent to you that it
11  doesn't, but in April of 2018 --
12        MR. ELSNER:  Can I see -- we will
13  mark this as the next exhibit.
14        (Deposition Exhibit 17 was marked
15  for identification.)
16        BY MR. ELSNER:
17    Q.  In April of 2018, the DEA published
18  a notice of proposed rulemaking related to
19  quotas, and if you look on the summary, it
20  reads:  "The Drug Enforcement Administration is
21  publishing this proposed rule to strengthen
22  controls over diversion of controlled
23  substances and make other improvements to the
24  quota management regulatory system for their
25  production, manufacturing and procurement of

Page 209

1  controlled substances."
2         Did I read that correctly?
3     A.  Yes.
4     Q.  And the purpose in the third column
5  on the first page in the second full paragraph,
6  where it starts:  "The current regulations."
7         Do you see where I am at?
8     A.  Yes.
9     Q.  "The current regulations issued
10  initially in 1971 need to be updated to reflect
11  changes in the manufacture of controlled
12  substances, changing patterns of substance
13  abuse and markets in illicit drugs, and the
14  challenges presented by the current national
15  crisis of controlled substance abuse.  This
16  proposed rule modifies the regulations to
17  strengthening controls over diversion."
18        Was that the intent?
19        MR. O'CONNOR:  Objection.
20        THE WITNESS:  Yes.
21        BY MR. ELSNER:
22    Q.  And if you go to the next page in
23  the regulations, in the second full paragraph
24  beginning with "first."
25        Do you see where I am at?

53 (Pages 206 - 209)

Page 210

1    A.   Yes.
2    Q.   It reads: "First, it would" --
3         MR. CHANDLER: I'm going to object
4    to the characterization of this document as the
5    regulations.
6         MR. ELSNER: I didn't mean to
7    suggest. I meant the proposed regulation.
8         MR. CHANDLER: I just wanted to be
9    clear.
10        MR. ELSNER: No problem.
11   BY MR ELSNER:
12   Q.   The proposed regulation as expressed
13   here in that paragraph reads: "First, it would
14   add to the list the extent of any diversion of
15   the controlled substance in the class."
16        Did I read that correctly?
17   A.   Yes.
18   Q.   Okay. Is this the first time that
19   diversion is expressly mentioned in the statute
20   or in the regulatory scheme related to quotas?
21        MR. EPPICH: Object to form.
22   Foundation. Vague.
23        THE WITNESS: Yes.
24        BY MR. ELSNER:
25   Q.   Okay. And so prior to this, there

Page 211

1    was no expressed list or item in any of the
2    regulations related to quota that mentioned
3    diversion; is that right?
4         MR. O'CONNOR: Objection.
5         THE WITNESS: Correct.
6         BY MR. ELSNER:
7    Q.   Okay. In the end of the -- say, the
8    -- the proposed regulation also expressly
9    permits the DEA to consider state's relevant
10   data from its prescription monitoring program;
11   is that true?
12        MR. CHANDLER: Objection. Vague.
13        THE WITNESS: To allow DEA to
14   consider data from the states, yes.
15        BY MR. ELSNER:
16   Q.   And the other thing that it
17   expressly clarified at the bottom of the second
18   column on this page, the last full paragraph.
19        Do you see where I'm at?
20   A.   Yes.
21   Q.   Okay. It reads: "The proposed rule
22   would amend Section 1303.12(b) to clarify that
23   the administrator may require additional
24   comparable information from applicants that may
25   help to detect or prevent diversion including

Page 212

1    customer identities and the amounts of
2    controlled substances sold to each customer."
3         Did I read that correctly?
4    A.   Yes.
5    Q.   Is this the first time where the DEA
6    has -- where there is a proposed rule for the
7    DEA to expressly consider customer information
8    from manufacturers?
9         MR. O'CONNOR: Objection.
10   Foundation.
11        MR. EPPICH: Objection. Foundation.
12   Scope.
13        THE WITNESS: I don't understand the
14   question.
15        BY MR. ELSNER:
16   Q.   Okay. The proposed rule provides
17   that manufacturers could -- clarifies that the
18   manufacturers may be required to provide
19   information about their customers; is that
20   right?
21   A.   Correct.
22   Q.   Why was that important?
23        MR. CHANDLER: Object to form.
24        MR. O'CONNOR: Objection.
25        MR. CHANDLER: Scope.

Page 213

1         THE WITNESS: One factor that arose
2    with this proposed rule was to remind
3    manufacturers of their requirements to know
4    their customers.
5         BY MR. ELSNER:
6    Q.   And why were you reminding
7    manufacturers of that responsibility?
8         MR. O'CONNOR: Objection. Form.
9    Scope.
10        THE WITNESS: So that the
11   manufacturers would not be surprised when we
12   said -- we suggested that they did not know
13   their customers.
14        BY MR. ELSNER:
15   Q.   Sorry. Go ahead.
16   A.   No.
17   Q.   Okay. And that's one of the
18   requirements under the Controlled Substances
19   Act, right? In any event, for manufacturers to
20   know their customers?
21        MR. O'CONNOR: Objection. Form.
22   Scope.
23        MR. CHANDLER: Objection. Scope.
24        THE WITNESS: It is part of the
25   regulatory framework.

54 (Pages 210 - 213)

Page 214

1    BY MR. ELSNER:
2    Q.   In response to this proposed
3 rulemaking, the DEA also received comments.
4    MR. ELSNER:  I will mark this as an
5 exhibit.
6    (Deposition Exhibit 18 was marked
7 for identification.)
8    BY MR. ELSNER:
9    Q.   One of the comments was from the
10 PHRMA which is on the third page.
11    Do you see that?
12    MS. NEWMARK:  I will object to the
13 use of this document as violating the
14 protective order in this case and I repeat all
15 my prior objections.
16    THE WITNESS:  Yes.
17    BY MR. ELSNER:
18    Q.   And on the second page of that
19 letter, it reads "under diversion and
20 legitimate medical need."
21    "We're concerned that the DEA seems
22 to conflate legitimate need for opioid
23 treatment with legitimate use of opioids."
24    Do you see that?
25    A.   Yes.

Page 215

1    Q.   And then further down, it reads --
2 the sentence beginning:  "However, illegitimate
3 use of diverted controlled substances."
4    Do you see that?
5    A.   No.  Hold on a sec.
6    Q.   Take your time.
7    A.   Yes.
8    Q.   It says:  "However, illegitimate use
9 of diverted controlled substances does not
10 extinguish legitimate need for a drug.  For
11 example, if someone steals a pain patient's
12 legally prescribed opioid, the pain patient
13 still has a legitimate need for opioid, even
14 though some of the opioids were diverted for
15 illegitimate uses."
16    Did I read that correctly?
17    A.   Yes.
18    Q.   And so what is being argued here is
19 that -- that diversion does not affect need; is
20 that a fair summary?
21    MR. O'CONNOR:  Object to form.
22    MR. CHANDLER:  Objection.
23    MS. McCLURE:  Object to form.
24    MR. EPPICH:  Object to form.
25 Mischaracterization of the document.

Page 216

1    THE WITNESS:  So that piece suggests
2 that those are two separate factors that should
3 be considered.
4    BY MR. ELSNER:
5    Q.   And so even in 2018, there were
6 still objections being raised by pain
7 management groups and others to the reminders
8 from the DEA to manufacturers to know their
9 customers and provide that data to the DEA,
10 correct?
11    MR. O'CONNOR:  Objection.  Form.
12 Scope.
13    MR. CHANDLER:  Objection.  Form.
14 Scope.
15    THE WITNESS:  I don't understand the
16 question.
17    BY MR. ELSNER:
18    Q.   Even in 2018, as late as that, there
19 were still objections by pain management groups
20 and others to the DEA's proposed rulemaking
21 adding diversion as one of the criteria to
22 consider, correct?
23    MR. CHANDLER:  I'm going to renew my
24 objection.
25    MR. O'CONNOR:  Objection.

Page 217

1    THE WITNESS:  They submitted
2 comments objecting, yes.
3    BY MR. ELSNER:
4    Q.   And were you aware -- this document
5 was produced to us by Purdue and if you look at
6 the very first page, you can see there is an
7 e-mail from Purdue attaching the letter to the
8 DEA.
9    Was the DEA aware that Purdue was
10 encouraging letters like this to be written to
11 the DEA?
12    MR. CHANDLER:  Objection.  Form.
13 Foundation.  Characterization of the document.
14    MR. O'CONNOR:  Objection.  Form.
15    MR. CHANDLER:  Scope.
16    MR. O'CONNOR:  Scope and foundation.
17    THE WITNESS:  DEA was not aware.
18    MR. ELSNER:  Go off the record for a
19 minute.
20    THE VIDEOGRAPHER:  We are going off
21 the record.  The time is 4:51.
22    (A short recess was taken.)
23    THE VIDEOGRAPHER:  We are back on
24 the record.  The time is 4:55.
25    You may proceed, Counsel.

55 (Pages 214 - 217)

Page 218

1       BY MR. ELSNER:
2       Q.   Earlier in the deposition, you were
3   asked a question that -- during the years that
4   you approved the quota numbers, did you feel
5   that they reflected the medical need of the
6   United States?
7           Do you remember that line of
8   questioning?
9       A.   Yes.
10          MR. CHANDLER:  Objection.
11  Mischaracterizes the prior question.
12          MR. O'CONNOR:  Objection.
13          BY MR. ELSNER:
14      Q.   And you answered that you believed
15  that when you were approving quota allocations,
16  they were based on legitimate medical need.
17          Do you remember that testimony?
18          MR. CHANDLER:  Objection.
19  Mischaracterizes prior testimony.
20          MR. O'CONNOR:  Objection.
21          THE WITNESS:  So when I approved
22  quota, it was for a legitimate medical need or
23  scientific or research purposes or export or
24  inventory.
25          BY MR. ELSNER:

Page 219

1       Q   When you approved those quota
2   allocation, you were doing that based on the
3   information that you had available to you and
4   to the office of the DEA, correct?
5           MR O'CONNOR:  Objection  Form
6           THE WITNESS:  Yes
7           BY MR ELSNER:
8       Q   And you did your very best with the
9   information that you had to make that
10  determination; is that true?
11          MR O'CONNOR:  Objection
12          THE WITNESS:  Yes
13          MR ELSNER:  I will pass the witness
14  at this time  Go off the record
15          THE VIDEOGRAPHER:  We are going off
16  the record  This is the end of Media Unit No
17  5  The time is 4:56
18          (A short recess was taken.)
19          THE VIDEOGRAPHER:  We are going back
20  on the record  This is the beginning of Media
21  Unit No 6  The time is 5:23
22          You may proceed, Counsel
23  FURTHER EXAMINATION BY COUNSEL FOR DEFENDANTS
24          BY MR O'CONNOR:
25      Q   Ms Harper-Avilla, hello again

Page 220

1       A.   Hello.
2       Q.   I will try to be quick.
3           Could you turn to Exhibit No. 10,
4   please.
5           When counsel for plaintiffs asked
6   you some questions about this document, he
7   represented that it was delivered in 2003.
8           Do you recall that?
9       A.   Yes, that's what he stated.
10      Q.   Where were you in 2003?
11      A.   I was not at DEA.
12      Q.   Did you have any involvement in
13  preparing this presentation?
14      A.   No, I did not.
15      Q.   Do you know who prepared the
16  presentation?
17      A.   No, I do not.
18      Q.   Had you ever seen this presentation
19  before today?
20      A.   Not this one, no.
21      Q.   And can you personally vouch for any
22  of the information contained in this
23  presentation?
24          MR. ELSNER:  Objection.
25          THE WITNESS:  I have not reviewed

Page 221

1   the whole presentation at this point, so no.
2           BY MR. O'CONNOR:
3       Q.   Do you have any personal knowledge
4   about the statements made in this presentation?
5           MR. CHANDLER:  Object to form.
6           THE WITNESS:  I have not reviewed
7   the entire presentation so I cannot speak to
8   that.
9           BY MR. O'CONNOR:
10      Q.   Fair to say, you were not involved
11  in making any of the statements in this
12  presentation, correct, because it was delivered
13  in 2003?
14      A.   So I do not know if these are
15  statements that DEA has continued to use since
16  that time, so at the time that this
17  presentation was made, I am not aware of those
18  statements.  I have not reviewed the entire
19  presentation.
20          MR. O'CONNOR:  I have no further
21  questions at the moment, but we do reserve the
22  right to leave this deposition open pending the
23  production of the letters from DEA and we are
24  happy to discuss that more offline.
25          MR. CHANDLER:  Okay.

56 (Pages 218 - 221)

Page 222

1    MR. O'CONNOR:  Thank you for your
2    time.
3        THE VIDEOGRAPHER:  Does anyone else
4    have any questions?  We are off the record at
5    5:26 p.m., and this concludes today's testimony
6    given by DEA and appearing on their behalf was
7    Stacy Harper-Avilla.
8        The total number of media units used
9    was six and will be retained by Veritext Legal
10   Solutions.
11       (Whereupon, the proceeding was
12   concluded at 5:26 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 224

1        Veritext Legal Solutions
         1100 Superior Ave
2            Suite 1820
         Cleveland, Ohio 44114
3        Phone: 216-523-1313
4
  April 16, 2019
5
  To: Robert Chandler
6
  Case Name: In Re: National Prescription Opiate Litigation v
7
  Veritext Reference Number: 3282688
8
  Witness: Stacy Harper-Avilla    Deposition Date: 4/11/2019
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext com
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 223

1    CERTIFICATE OF NOTARY PUBLIC
2        I, Bonnie L. Russo, the officer before
3    whom the foregoing deposition was taken, do
4    hereby certify that the witness whose testimony
5    appears in the foregoing deposition was duly
6    sworn by me; that the testimony of said witness
7    was taken by me in shorthand and thereafter
8    reduced to computerized transcription under my
9    direction; that said deposition is a true
10   record of the testimony given by said witness;
11   that I am neither counsel for, related to, nor
12   employed by any of the parties to the action in
13   which this deposition was taken; and further,
14   that I am not a relative or employee of any
15   attorney or counsel employed by the parties
16   hereto, nor financially or otherwise interested
17   in the outcome of the action.
18
19       _Bonnie L Russo_
20       Notary Public in and for
21       the District of Columbia
22
23   My Commission expires:  June 30, 2020
24
25

Page 225

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3282688
3 CASE NAME: In Re: National Prescription Opiate Litigation v
  DATE OF DEPOSITION: 4/11/2019
4 WITNESS' NAME: Stacy Harper-Avilla
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7    I have made no changes to the testimony
     as transcribed by the court reporter
8
9 Date          Stacy Harper-Avilla
10   Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11 the referenced witness did personally appear
     and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
     Statement; and
14   Their execution of this Statement is of
     their free act and deed
15
     I have affixed my name and official seal
16
   this _____ day of_____, 20____
17
18   Notary Public
19   _____
     Commission Expiration Date
20
21
22
23
24
25

57 (Pages 222 - 225)

Page 226

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3282688
3  CASE NAME: In Re: National Prescription Opiate Litigation v
   DATE OF DEPOSITION: 4/11/2019
4  WITNESS' NAME: Stacy Harper-Avilla
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s)
9     I request that these changes be entered
   as part of the record of my testimony
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein
13 _____
   Date          Stacy Harper-Avilla
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed
21 I have affixed my name and official seal
22 this _____ day of _____, 20____
23 _____
      Notary Public
24
25 _____
      Commission Expiration Date
```

Page 227

```
1        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 3282688
3  PAGE/LINE(S) /      CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____   _____
20 Date          Stacy Harper-Avilla
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
      Notary Public
24
25 _____
      Commission Expiration Date
```

58 (Pages 226 - 227)

**[& - 2018]**                                                                 Page 1

| & |
| --- |
| **&**  2:8 4:11,12,16 |
| 5:13,18,22 6:3 7:3 |
| 7:7,11,16,22 8:3,7 |
| 8:22 12:23 13:14 |
| 13:17,21 14:4,11 |
| 15:4,6,14 108:15 |
| 157:3,15 |

| 0 |
| --- |
| **00015423-506** |
| 10:14 |
| **02199**  7:18 |
| **030000179742** |
| 160:23 |
| **03000179742** |
| 160:22 |
| **081098-099**  11:3 |

| 1 |
| --- |
| **1**  10:9 12:14 18:1 |
| 18:2 57:8 190:6 |
| 196:5 |
| **1,1800**  169:19 |
| **1,412**  169:20 |
| **1-13-10**  10:20 |
| **1-22-19**  10:22 |
| **1.6**  183:4 |
| **10**  10:25 57:24,25 |
| 61:4 158:3,4,17 |
| 178:4 201:11 |
| 220:3 |
| **1000**  6:8 |
| **1001**  3:23 |
| **10036**  4:9 |
| **107**  11:7 |
| **108**  10:5 |
| **1095**  4:8 |
| **10:23**  57:8 |
| **10:57**  57:12 |
| **11**  1:21 7:22 11:2 |
| 12:5 61:4 164:17 |

164:18 184:25
**1100**  224:1
**112,000**  151:17
**115**  188:24
**11937**  223:19
**11:00**  66:6
**11:06**  66:9
**11:58**  95:22
**11th**  10:25 158:9
162:5
**12**  11:4 39:9 61:4
140:22 141:1
172:11,12 175:18
**12th**  6:3
**13**  11:6 18:20,21
61:4 96:17 143:5
188:20
**1300**  8:23
**1303**  10:11
**1303.11**  50:9
**1303.12**  10:17
211:22
**1303.12.**  52:9
**1303.21**  10:16
**1303.23**  84:25
**136**  10:6
**14**  11:8 19:4 61:4
143:5 192:3
**140**  10:23
**15**  11:10 61:4
199:15
**1500**  151:19
**15219**  5:24 8:8
**158**  10:25
**16**  10:3 11:12 61:4
204:4,7 224:4
**160**  190:23
**1612**  172:20
**1625**  4:13
**164**  11:2

**17**  1:5,9 11:14
12:21 61:5 208:14
**1701**  5:18
**1717**  6:13
**172**  11:4
**175**  3:5 165:6
**1755**  5:4
**18**  1:11,14 10:9
11:16 214:6
**1800**  6:8
**1820**  224:2
**188**  11:6
**18976**  8:19
**19**  72:25 196:15
**19103**  5:19 6:14
**192**  11:8
**1971**  209:10
**199**  11:10
**1995**  19:6 41:6
42:17 50:21 51:14
52:4 53:14 54:12
55:4,18 56:2
58:22 62:4 67:2
67:13 68:19 70:9
72:25 73:6 74:14
75:21 76:3,11,17
**1996**  189:17
191:15,20 195:22
196:5 199:4
**1998**  55:12
**1999**  4:17 7:7
**1:07**  96:1
**1:25**  108:7
**1:41**  108:10
**1st**  173:22

| 2 |
| --- |
| **2**  10:11 49:4,5 |
| 51:4 57:12 85:5 |
| 86:1,4,4,5 95:22 |
| **2,925**  165:14 |

**20**  92:9 195:24
196:16 225:16
226:22 227:22
**200**  165:7
**2000**  97:1,13 98:23
196:8
**20001**  5:14 7:4
**20002**  3:5
**20004**  3:23
**20005**  6:4 7:12
**20006**  4:13
**2001**  188:12 189:6
204:10
**2002**  185:12
**2003**  158:14 220:7
220:10 221:13
**20036**  6:9
**2008**  23:9,11 60:16
60:21 61:16,22
62:4 64:6,14,18
65:9 99:3 109:7
**2009**  61:4 97:13
98:2,23
**2010**  96:17 97:1,12
97:15
**2011**  81:8 124:16
124:19,25 125:20
125:21,23 126:7
126:12 133:9
**2011-2018**  10:15
**2012**  132:4
**2013**  128:2 134:18
134:21
**2015**  10:13 121:14
132:5
**2018**  19:6 41:6
42:17 50:21 51:15
52:4 53:15 54:13
55:4,12,18 56:2
58:22 61:17 64:14
64:19 65:10 67:2

**[2018 - 80]**                                                                                                Page 2

67:13 68:19 70:9
73:1,7 74:14
75:21 76:3,11,17
98:2 130:13
208:11,17 216:5
216:18
**2019**   1:21 12:5
224:4
**202-383-5129**   4:14
**202-386-9626**   3:24
**202-434-5000**   6:4
**202-514-4678**   3:6
**202-598-6204**   3:10
**202-662-6000**   7:5
**202-778-1800**   6:9
**202-879-5907**   7:13
**202-942-5000**   5:15
**2020**   223:23
**204**   11:12
**208**   11:14
**20th**   8:23
**212-698-3500**   4:9
**214**   11:16
**214-740-8554**   6:19
**215-241-7910**   6:14
**215-918-3680**   8:19
**215-963-4824**   5:19
**216-523-1313**
224:3
**216-621-7860**   8:24
**216-622-3988**   3:15
**219**   10:4
**2200**   6:18
**22152**   3:10
**228**   188:24
**22nd**   96:21
**2421610**   172:20
**25**   128:3 134:17,20
**25701**   4:4
**2700**   8:18

**28**   3:19 178:5
**2800**   6:18
**2804**   1:5,5 12:20
12:21
**29**   182:21
**29,000**   196:7
**29464**   3:19
**2:02**   126:22
**2:12**   127:1
**2:24**   136:3
**2:37**   136:6

### 3

**3**   10:12 19:19
20:18 51:19 57:15
57:16 96:1 126:22
144:24 196:12
**3,000**   173:22
**30**   1:17 2:1 10:10
127:5 144:18
205:9 223:23
**300**   8:13,18
**301**   8:8
**304-525-9115**   4:5
**310-553-6700**   4:18
**3100**   6:13
**312-269-4066**   5:9
**312-494-4445**   8:15
**317-231-7364**   7:23
**3282688**   1:25
224:7 225:2 226:2
227:2
**33h**   193:14 199:23
**33m**   192:20
**35th**   8:7
**3:23**   176:20
**3:44**   176:24
**3con**   3:4

### 4

**4**   10:15 52:7 81:22
81:23 124:8,9

125:15 126:3
127:1 176:20
**4,000**   165:15
**4,500**   173:24
**4-19-18**   11:15
**4-4-05**   11:5
**4/11/2019**   224:8
225:3 226:3
**400**   3:14 169:21
**401**   3:22
**412-338-5208**   8:9
**412-560-7463**   5:24
**414-297-5913**   8:4
**419**   4:4
**424-332-4764**   7:8
**44113**   3:15
**44114**   8:23 224:2
**45005**   1:9
**45090**   1:14
**45132**   1:11
**46204**   7:23
**49**   10:11
**4:15**   203:24
**4:34**   204:2
**4:51**   217:21
**4:55**   217:24
**4:56**   219:17

### 5

**5**   10:16 52:18 53:5
84:17,18 176:24
219:17
**5-28-01**   11:10
**5-28-97**   11:3
**5-29-01**   11:8
**5.4**   196:11
**50**   173:22
**53202**   8:4
**54**   8:13
**5403**   202:20
**5405**   192:6

**5425**   192:7
**57**   10:12
**5:23**   219:21
**5:26**   222:5,12

### 6

**6**   1:17 2:1 10:10
10:17 18:19 91:18
91:19 127:5
144:18 219:21
**6-20-17**   10:24
**6-8-01**   11:12
**60,000**   165:12
166:4
**601**   2:9 5:14 12:23
**60601**   5:8
**60654**   8:14
**617-951-7000**   7:18
**650-739-3939**   5:5
**655**   7:12

### 7

**7**   10:18 96:7,8,17
96:24 98:6 100:10
109:3,21 110:6
**7-12-18**   11:16
**70,000**   99:4,5,6
109:8,8,11
**700**   169:21
**72**   203:6
**725**   6:3
**75201**   6:19
**76**   11:14
**77**   5:8
**777**   8:4

### 8

**8**   10:21 96:7,10,20
97:22,22 100:10
109:3,21 110:6
200:3 204:10
**80**   148:4

**[800 - aggregate]**

**800**   7:17
**801**   3:14
**81**   10:15
**83**   11:14
**84**   10:16
**843-216-9250**   3:20
**850**   7:4
**8701**   3:9
**8th**   4:17

**9**

**9**   10:23 19:17
   140:16,17
**90067**   4:17 7:8
**91**   10:17
**94303**   5:4
**95**   75:21 195:23
   196:14
**96**   10:18,21
**98**   185:11
**99**   185:11
**9:16**   1:22 12:4
**9th**   3:22 8:23

**a**

**a.m.**   1:22 12:4
**aafp**   201:12
**aaron**   1:7
**ability**   33:4 48:23
   118:12,20 128:20
   129:7 135:4 164:2
   184:18
**able**   40:3 78:14
   148:8 155:1
   158:12 165:5
   171:13 196:14
   204:25
**absolutely**   141:5
**abstract**   175:17
**abuse**   41:5 53:11
   55:5,9 149:19,22
   150:8 181:8

209:13,15
**abused**   148:20
**abusers**   205:17
**academy**   204:9
   207:24
**accepted**   55:13
**access**   120:10,13
**account**   51:10
   52:4 71:19 72:9
   79:5 83:8,13 84:5
   93:14,16,21 99:13
**accounts**   71:21
**accumulation**
   51:22
**accurate**   28:22
   81:18 142:9 163:4
**accurately**   103:5
   184:18
**accused**   88:8
**acknowledge**
   225:11 226:16
**acknowledgement**
   193:19
**acquire**   147:11
   152:23
**act**   31:19 87:12,16
   88:1,6,25 99:15
   100:2,13,17
   136:19 140:11
   144:1 146:8 157:4
   157:16 213:19
   225:14 226:20
**action**   45:17
   223:12,17
**active**   44:11 80:14
   90:20
**activities**   162:10
   162:14 163:18
   179:2 184:17
   185:11

**activity**   47:2,5
   93:13
**actual**   51:19 53:10
   54:13 86:16,23
   103:6 150:13
   168:11,21 171:4
   177:19 197:17
**acute**   181:4
**add**   170:5 210:14
**added**   128:3
**addictive**   177:16
   198:12
**addicts**   205:17
**adding**   216:21
**addition**   71:13
   72:7 146:13
**additional**   173:15
   211:23
**address**   100:8
   224:15
**adds**   205:16
**adequate**   47:11,16
   47:22 92:23 93:6
   156:18,22
**adjudicated**
   139:14
**adjust**   85:16
**adjusted**   85:7
**adjustments**
   124:25
**administration**
   1:18 2:2 3:8 14:23
   23:11 34:3 157:3
   157:15 208:20
**administrator**
   29:19 50:10 52:21
   80:13,14,15 81:3
   85:8,17 126:15
   188:12 211:23
**advertise**   190:11

**advertising**   198:11
**advocacy**   202:9
**affect**   215:19
**affiliations**   13:6
**affixed**   225:15
   226:21
**afternoon**   136:9
   136:14,15
**agencies**   35:16,17
   35:20,22 40:18
   74:5 107:14
   193:17
**agency**   35:15
   73:25 79:15,16
   80:6 84:2 132:15
   201:3
**agent**   24:23 29:16
**aggregate**   10:18
   10:21 19:22 30:3
   34:23 35:14 37:1
   38:6,9 41:24 42:3
   42:7 43:6 44:1,11
   50:5,20 51:1,12,17
   52:5,15,24 53:6
   54:6,23 55:5,15,23
   56:4,14,18 57:1
   58:7,13,18,25
   59:15 60:19,24
   61:7,23 62:9,18,25
   63:9,15,24 65:10
   67:3,6 68:12 70:6
   70:14 71:9,18
   72:24 73:9,23
   74:10,13 75:5,23
   76:5,13,19 77:3
   79:1,17 80:2,4,12
   80:17 82:3,20
   83:1,7,9,12,14
   90:20 96:25 97:8
   97:12,25 98:3,9,19
   99:21 101:17

102:6,17 103:13
104:9,22 105:4,11
105:16,22 106:2
106:17 107:9,16
111:8 112:6
113:12 114:11,17
115:4,14,15,25
116:3,15,22 117:4
117:11 119:10,20
125:22 126:11
**aggregated** 114:4
**aggressive** 178:13
180:4
**ago** 44:3 84:22
143:8 189:16
**agree** 12:13 42:24
43:3 58:6 92:20
97:7,24 98:17
104:21 105:3,10
105:17 106:16
117:17 118:10,19
140:24 144:17,23
148:19 159:1
162:17,21 177:13
178:15 181:18
184:2
**agreed** 160:12
**ahead** 18:19
135:25 213:15
**aid** 5:17 14:9
111:24 112:16
113:4
**al** 1:9,11,13,13
**alcohol** 206:17
**alfentanil** 101:4,8
102:1
**allergan** 7:10
13:21,23
**allocate** 93:10
**allocated** 196:6,9

**allocation** 92:1
165:4,11 173:15
219:2
**allocations** 218:15
**allow** 75:8 145:14
175:18 211:13
**allowance** 156:7
156:14 173:23
**allowances** 35:5
42:13 44:24
**allowed** 48:16,20
89:12 114:22
196:6,9
**allowing** 116:24
195:24
**allows** 91:4
**alto** 5:4
**alucas** 4:18
**ama** 189:18
**amend** 211:22
**america** 153:1
**american** 201:12
204:8 207:23
**americas** 4:8
**amerisourceberg...**
6:11 14:3 108:21
111:16 112:11,22
151:7
**amount** 34:16
35:1 46:14,14,16
51:24 52:11 98:15
99:7 107:17,21,23
109:12 114:12,15
114:22 115:18
116:13,19 117:19
118:12 119:9
147:10 150:16
152:22 153:15
155:19 169:14
186:14,21 188:3
196:5,8

**amounts** 72:9
125:22 166:12
167:1 212:1
**amy** 4:15 15:4
**analgesic** 205:13
**analgesics** 185:3
**analyst** 9:2
**analyze** 152:3
166:15
**anda** 8:2 15:8
**andrew** 7:15 13:8
16:13 20:16
**andrew.o'connor**
7:19
**angeles** 4:17 7:8
**animal** 179:9
**ankle** 182:3
**annual** 35:7 61:18
118:11,18 119:14
156:10
**annually** 111:13
**answer** 20:13
26:20,24,25 27:1,6
27:8,9 30:24
31:16 32:18 34:20
35:9 36:16 40:23
44:20 54:18 59:13
65:24 66:15 67:23
68:6 71:23 74:20
78:5,21 92:5
101:1 109:11,20
123:24 137:22
138:16 139:2,3
144:9 145:5,14,17
146:20 166:9
167:2 170:3 171:1
172:2,4 173:5
174:15,19 175:19
176:1 197:12,15
202:4 208:6

**answered** 144:9
218:14
**answering** 17:6
**answers** 17:8
**anthony** 6:7 13:24
**anticipated** 58:15
**api** 90:21
**apologize** 142:17
**apparently** 86:22
**appear** 106:8
165:13 172:16
225:11 226:15
**appearances** 3:1
4:1 5:1 6:1 7:1 8:1
13:6
**appeared** 96:13
**appearing** 12:15
222:6
**appears** 172:23
192:12 223:5
**appended** 226:11
226:18
**applicable** 157:5
157:17
**applicants** 211:24
**application** 42:10
156:4
**applications** 28:20
170:7
**apply** 34:14
112:23 113:5
**applying** 86:18,19
**appreciate** 81:12
175:2
**apprised** 94:9
**approach** 190:7
198:10
**approaching**
165:15
**appropriate** 48:12
87:6 100:14

200:12
appropriations
189:5
approval 10:15
32:13 33:14 42:15
42:16 80:8 81:7
87:22 93:17
124:11 125:6
126:10
approve 33:17,21
80:1,7 82:3,9
101:24 125:7,7,9,9
125:10 147:3
148:12 152:3
approved 63:19
63:22 82:13 110:9
110:12 125:22
128:4 148:9
150:12 153:7
218:4,21 219:1
approver 124:24
125:2
approving 91:9
152:22 218:15
approximately
38:13,17 124:7
196:7,10
apq 10:15 115:24
115:24 124:11
127:22 128:3
134:18,20
apqs 58:1
april 1:21 12:5
173:18 208:11,17
224:4
arch 6:13
arcos 66:25 67:1,5
67:19,24 68:2,8,9
68:14
area 139:4 191:12

areas 26:13 142:6
142:22 146:2
argued 215:18
argument 146:18
arnold 2:8 5:13
12:23 14:4
arnoldporter.com
5:15,16
arose 213:1
aruiz 6:10
asked 17:15 109:2
109:4 111:6 123:4
145:22 157:9
169:19 171:3
175:3 189:13
218:3 220:5
asking 16:14
20:11,12 115:3
142:19 175:16
190:2,6,8,10,16
asks 141:21 142:1
165:10
assess 28:21
164:11
assessment 48:11
assessments 22:4
assignment 225:2
226:2 227:2
assistance 107:13
assistant 29:19
126:15
assisted 124:15
association 201:12
assume 17:14
attached 226:7
attaching 217:7
attachment 11:8
11:11,17
attack 200:7,11
201:5

attempting 198:9
attending 13:5
attention 18:20
19:3 87:24 98:5
attorney 65:23
66:14 223:15
attorney's 3:13
14:19
attorneys 25:11,12
25:13,23,24 27:11
28:3
attributed 75:6,9
audio 12:11,11
authority 33:25
34:3 132:24
134:14
authorization
19:12 126:11
143:6 144:12
150:6,7 153:15,22
154:4,9,13 155:1
155:18 167:14
168:2,10,13 169:7
170:5,9 171:16
176:11 185:24
200:13 202:11
authorizations
169:4
authorize 152:9
152:16 226:11
authorized 18:25
19:7 20:7 21:6
86:21 166:5,21
167:7,20
authorizing 18:16
147:9
automatically
117:5
automation 66:24
availability 55:19

available 73:4,12
73:15 101:18
103:14,16 118:13
118:21 156:24
173:12 187:21
188:4 205:3 219:3
ave 224:1
avenue 2:9 3:14
4:8,17 5:14 6:18
7:7 12:24
avilla 1:19 2:3
10:2,10 12:16
15:25 16:11,19
21:18 57:19 66:12
81:14 108:14
127:4 136:9
143:18 219:25
222:7 224:8 225:4
225:9 226:4,13
227:20
avilla's 19:12
awarded 173:15
aware 37:12 45:13
57:21 61:11 70:10
70:12 75:20,25
76:2,7,10,14 89:4
89:16 101:15
122:5,8,13,18,25
149:3 166:19
167:4,12 170:14
170:18 171:2
191:19,24 192:9
194:15,24 197:2
197:17 198:23
199:5 202:7
203:10,16 206:9
207:11,19 217:4,9
217:17 221:17
awareness 132:6
132:16

**b**

**b** 1:17 2:1 10:10
18:10 50:9 86:4
127:5 144:18
211:22
**back** 21:3 22:1
28:14 49:25 56:24
57:10 66:8,17
81:7 95:24 96:4
108:9 126:24
136:5 169:21
173:18 176:22
178:4 191:13,14
191:20 204:1
217:23 219:19
224:15
**backaches** 182:3
**balanced** 190:7
198:10
**ballpark** 165:9
**bar** 183:5
**barber** 5:21 15:9,9
**barnes** 7:22 15:19
**bars** 185:25
**bartlit** 8:12
**bartlitbeck.com**
8:14
**based** 42:23 47:1,6
58:19,24 59:17
60:13,18 61:6
75:13 85:16 89:2
104:12 141:15
156:3 162:9,13,19
163:17 166:20
167:6,15,19,24
169:4 173:12
204:24 218:16
219:2
**basic** 43:13 58:1
63:1,10 92:23
93:6,25 137:25

**basically** 83:23
**basis** 19:4 21:7
30:14 35:7 41:8
41:17 128:23,24
138:3 149:1
197:12
**bates** 160:19,22
172:17,19 188:25
189:2 192:5
202:19
**bear** 149:6
**bearing** 202:19
**bears** 192:5
**beck** 8:12
**began** 189:16
194:16
**beginning** 57:11
95:25 158:11
209:24 215:2
219:20
**begins** 189:9
204:15
**behalf** 2:13 3:2,12
3:17 4:2,6,11 5:2
5:11,17,21 6:2,6
6:11,16 7:2,10,15
7:20 8:2,6,10,16
8:21 12:16 13:19
14:17,19,23,25
15:3,5,7,11,14,17
15:18,21 16:15
17:23 18:17
145:15 146:19
222:6
**beisell** 5:6 15:2,2
**belabor** 145:6
**belief** 89:1
**believe** 62:3 94:12
106:7 123:9 165:4
**believed** 69:6
87:14 88:10,19

218:14
**benefits** 177:16
**bennett** 3:13 14:18
14:18
**best** 206:14 219:8
**better** 132:14
198:11,11 201:1
203:1
**beyond** 143:10
144:17
**big** 39:5 143:7
**bigger** 39:3,4
**biggest** 39:7
**billion** 183:4
**bills** 104:15
**birth** 122:1
**blue** 149:6
**bmasters** 6:5
**board** 188:6,7
**bockius** 5:18,22
**bonnie** 1:24 13:2
223:2
**bookshelf** 120:8
**boston** 7:18
**bottom** 86:15
178:13 180:3
183:7 200:2
211:17
**boulevard** 3:19
**bound** 193:19
**bounds** 35:23
**boylston** 7:17
**brad** 6:2 14:10
**brandan** 6:16
**brandan.montmi...**
6:20
**brandon** 15:20
**break** 57:5 95:18
108:5 126:19
136:1 176:17

**bribery** 206:15
**bridgeside** 3:19
**broken** 74:22 75:2
77:21 78:1,7
141:23
**brown** 29:16,17
**bryant** 4:8
**btlaw.com** 7:24
**bucket** 16:23
**buffer** 128:3
**build** 173:23
**built** 30:25 44:22
**bulk** 44:9 83:23
86:18 90:21,24
128:8 147:10
148:14 150:16,23
152:22 153:15
154:4 155:19
186:14,20
**bullet** 66:20 69:13
70:1 72:19 158:19
159:1 160:3,12
180:8
**bullets** 58:12
180:23
**bunch** 159:19
192:6
**burling** 7:3,7
13:17 108:16
**business** 47:1,4
86:23 91:14 93:13
162:10,14 163:18
**buy** 91:4

**c**

**c** 3:7 4:7 10:1 12:1
**c.f.r.** 49:11,13
83:23 84:12 91:15
129:20 130:14,18
130:21,23
**ca** 224:25

| | | | |
|---|---|---|---|
| cabell 152:10 | catie.ventura 7:14 | 42:25 44:17 45:22 | 157:22 159:14,25 |
| calculate 167:24 | caused 132:14 | 46:5 47:18 49:15 | 160:7,16 164:13 |
| calculated 162:9 | causing 94:13,21 | 49:23 52:25 53:8 | 166:8,24 167:11 |
| calculating 166:20 | 95:7 177:18 | 53:22 54:7,16,24 | 168:4,16 169:8,10 |
| calculation 162:19 | caveat 27:1 | 55:7,21 56:6 60:6 | 170:2,22 171:1,17 |
| california 4:17 5:4 | cavitch 8:22 15:13 | 61:9 62:11,20 | 172:4 173:4 |
| 7:8 | ceased 61:13 | 63:3,17 64:1,8,15 | 174:17 175:13,15 |
| call 129:5,11 | cell 12:9 | 65:12 66:1 67:21 | 176:1,13 177:21 |
| 135:11 194:4 | cellular 12:8 | 68:4 71:3 74:19 | 178:18 179:4,23 |
| 201:14 | center 8:18 | 78:3,16 81:5 | 180:14,17 181:15 |
| called 119:17 | centre 5:23 8:7 | 82:17 85:11 86:3 | 181:19 182:9 |
| 121:1 129:1,9 | ceppich 7:9 | 88:4,14,24 89:10 | 184:8,21 185:13 |
| calls 124:1 135:13 | certain 18:16 | 89:21 90:9 92:2 | 186:1,10,16,23 |
| 168:18 169:10 | 30:21 113:13 | 92:10,25 94:16,24 | 187:8,17 188:1 |
| 171:17 175:21 | 127:18 138:7 | 95:11,19 96:16,20 | 191:22 194:21 |
| 200:22 | 140:23 144:13 | 98:21 100:4,24 | 197:8,14,23 |
| campaigns 182:1 | 149:18 152:24 | 102:8,19 103:2 | 198:17 200:24 |
| cancer 190:23 | 153:16 157:13 | 104:1 106:11,19 | 202:3 203:14 |
| capacity 135:7 | 166:19 190:20 | 107:2,12 109:22 | 206:22 207:7,17 |
| 145:15 146:6 | certainly 160:14 | 110:7 112:3,19,25 | 208:2 210:3,8 |
| 149:4 | certainty 89:13 | 113:7,20 114:24 | 211:12 212:23,25 |
| captured 103:6 | certificate 223:1 | 115:7,20 116:7,17 | 213:23 215:22 |
| cardinal 6:2 14:11 | 226:11 | 117:1,13,21 118:5 | 216:13,23 217:12 |
| 108:22 111:16 | certification | 118:14,22 121:5 | 217:15 218:10,18 |
| 112:10,22 151:7 | 193:18 225:1 | 122:9,15,21 123:1 | 221:5,25 224:5 |
| carolina 3:19 | 226:1 | 123:16 125:16 | change 38:23,25 |
| 199:1,4 | certify 223:4 | 127:10 128:1 | 97:19 129:18,24 |
| case 1:5,9,11,14 | chain 11:2,4,10,16 | 129:25 130:9,15 | 131:14 132:24 |
| 12:20 16:14 72:21 | 81:2,7 154:20 | 131:1,8,15 133:16 | 133:3,5,14 146:23 |
| 73:17 77:16 80:11 | chains 111:23 | 133:22 136:23 | 171:10 224:13,14 |
| 86:17 94:7,10 | 112:15 113:3 | 137:6,12,21 138:2 | 226:8 227:3 |
| 108:19 117:19 | challenges 209:14 | 138:11,16 139:1 | changed 39:2 |
| 122:6 148:12 | chance 192:12 | 139:23 140:12 | 61:12 64:21 92:8 |
| 150:13 161:14 | chandler 3:3 | 142:13 143:4,18 | 92:13,16 130:18 |
| 172:23 174:11,11 | 14:24,24 19:11 | 144:2,24 145:7,10 | 130:24 |
| 189:19 195:10 | 20:16,25 21:8 | 145:13 146:9,20 | changes 42:10,11 |
| 199:22 214:14 | 26:18 30:22 31:8 | 147:21 148:7,15 | 42:14,15,15 51:9 |
| 224:6 225:3 226:3 | 31:15 32:1,15 | 148:22 149:11,24 | 55:13 119:7 |
| cases 67:17 94:4,5 | 33:9 34:17 35:8 | 150:9 151:10,20 | 131:11,18 209:11 |
| catie 7:11 13:22 | 36:4,15 37:22 | 152:12 153:5 | 224:12 225:7 |
| | 39:16,23 41:9 | 155:6 156:1 | 226:7,9 |

**changing** 209:12
**channels** 20:4
**characterization**
  146:17 210:4
  217:13
**charge** 59:12
  80:15
**chart** 97:4,5
**chicago** 5:8 8:14
**chief** 3:9 21:20
  22:14,23 24:15
  28:14,24 29:2,20
  29:21 34:12,13
  38:12,17 40:2
  49:14,14 60:16
  79:13 82:7,8
  133:7
**choking** 205:12
**choose** 26:10,12
**chris** 13:16 24:12
  28:25 108:14
  121:4
**christopher** 7:6
**chronic** 181:4
**circumstances**
  45:14
**cite** 110:14
**city** 1:10 152:18
  152:20
**citycenter** 7:3
**civil** 3:4 225:5
  226:5
**claimed** 42:22
**clarification** 23:25
  128:12,14,19
  129:14 130:11
  131:23 132:20
  133:3 134:3,7,16
  135:2
**clarifications**
  135:16

**clarified** 127:12
  127:14,16,25
  211:17
**clarifies** 212:17
**clarify** 211:22
**class** 43:7,9,12,13
  45:3 47:24 50:17
  50:24 51:6,16,20
  51:21 52:8 55:14
  58:2 63:1,10
  158:22 210:15
**classes** 44:2 63:13
  63:21 65:6 79:18
  92:24 93:7 125:23
**clear** 17:12 61:3
  76:16 96:16 101:8
  115:12 133:18
  200:7 210:9
**clearance** 39:2
**clearly** 199:25
**cleveland** 1:10
  3:15 8:23 14:19
  224:2
**client** 173:5
**close** 165:8 199:3
**closed** 31:11
  136:20 137:3
**closing** 199:10
**codeine** 101:7,12
**colin** 194:4
**collection** 164:22
**columbia** 223:21
**column** 98:20 99:3
  109:7 209:4
  211:18
**combination**
  107:21 108:1
**come** 29:1,21
  67:19 71:15
  104:18 111:2
  190:17

**comes** 120:18
**comfortable** 69:5
**coming** 99:12,19
  122:14
**comment** 82:23
  202:21
**comments** 83:3,6
  83:12 214:3,9
  217:2
**commission**
  223:23 225:19
  226:25 227:25
**committee** 189:5
**communicate**
  40:14 41:13,16,20
**communicated**
  40:11,16,19
  121:13,16
**communicating**
  56:18
**communication**
  27:10 66:2
**communications**
  19:25 24:9 26:22
  26:22 27:4 121:18
**communities**
  116:25 118:1
**community** 117:6
  117:20 151:9
**companies** 5:12
  71:12 112:4
  205:24 206:13
**company** 91:1
  177:11 190:7
  191:11
**comparable**
  211:24
**compared** 171:11
**complete** 103:19
  163:4

**completed** 90:11
  130:2 193:18
  224:15
**completely** 17:19
  192:24
**comply** 36:22
  113:23
**complying** 87:11
  87:15,25
**compound** 34:18
  150:22 155:25
  168:15 177:24
**computerized**
  223:8
**concerned** 214:21
**concerns** 41:21
**concert** 35:16
**concluded** 222:12
**concludes** 222:5
**confer** 193:22
**conference** 10:25
  132:16,18 158:10
  158:13 162:6
**conferences** 132:6
  206:15
**confidential**
  161:24 173:3
  192:15 199:25
**confidentiality**
  165:23 170:1
  172:15 174:10
  193:1,14
**conflate** 214:22
**confusion** 132:14
**congress** 11:7
  188:13 194:18
  197:18 198:24
  199:9 203:12,17
**congressional**
  10:12 199:1

congressman
  203:5
connection  35:25
  36:11 37:1 40:11
  41:8 49:13 59:14
  74:9 174:25
connolly  6:3 14:11
consequently
  185:23
consider  41:23
  42:2,6,9,18 44:2
  50:11,19 51:15
  52:14,23 53:6
  54:4,13,22 55:4,13
  55:19 56:3,13,25
  58:14,17,23 61:22
  65:15 67:1 70:13
  71:6 72:5,23 73:7
  74:9,12 75:4
  76:18 77:16 84:9
  86:8 87:4,11 93:5
  94:6,9 99:14,20
  100:1,2,11,12,16
  100:17,19,21,22
  101:16 102:4,6
  103:11,12 104:24
  105:5,13,19,23,24
  106:3,4 113:17
  139:10 156:17
  159:20 176:5
  211:9,14 212:7
  216:22
consideration
  33:14 61:20
  162:25 166:11
considerations
  93:13,15 113:17
considered  53:14
  54:10 56:8 63:23
  64:5,10,13 65:8
  68:16,18,22 69:7

69:10 70:5 72:8
  73:22 75:22 76:1
  76:4,8,12,15,22
  77:2 87:1 101:23
  101:25 104:23
  105:4,12,18 112:6
  166:16 191:25
  216:3
considering  55:15
  68:12 69:5 71:18
  91:9 93:21 191:13
  191:20
considers  58:3,8
  84:1 85:2 94:3
  111:7 161:6
consistent  72:16
  146:6
consistently
  206:13
consolidated
  66:25
consult  36:18,25
  41:7 66:13 112:9
  112:14
consulted  36:11
consumer  205:14
consumption  22:2
  58:19,24 59:17
  60:13,17 61:6
  120:1 163:20
  185:3
contain  157:13
contained  81:17
  220:22
contemplated  53:5
contended  189:20
continue  12:12
  194:9
continued  4:1 5:1
  6:1 7:1 8:1 11:1
  221:15

continuing  199:24
  206:14
contract  59:9,21
  60:7 61:12,25
  62:3
contracts  59:12
  119:8 151:25
control  118:12,20
  120:5 126:7,16
  151:24 179:1
  191:16
controlled  21:25
  22:5 28:18 31:18
  31:19 32:8,12,22
  32:25 34:4,10
  43:7,10,12 44:13
  45:3,10 46:19
  47:24 58:2 63:1
  63:10,13,22 65:7
  66:23 69:24,25
  70:4 72:20 73:8
  73:21 74:22,24
  75:3,7 76:15,24
  77:14 78:7,10
  79:18 85:23 86:10
  87:5,12,15,25 88:5
  92:24 93:7 94:13
  94:22 95:7 99:14
  100:2,12,17 108:2
  112:12,17 113:13
  113:18,25 114:12
  116:14 136:19,21
  137:9 140:4,10
  141:13 144:1
  146:8 147:10
  152:22 153:22
  154:4,14,19
  156:10,23 157:14
  157:18 161:1
  182:17 208:22
  209:1,11,15

210:15 212:2
  213:18 215:3,9
controls  88:11,20
  89:6,17 90:5
  208:22 209:17
conv  98:7,13,14
conversation
  124:5 173:13
conversations
  12:8 25:19 121:23
conversion  98:14
converted  98:16
cooperation
  191:10
cooperatively
  201:21
copy  81:10
corners  191:13
corporate  8:18
corporation  6:11
  7:2
correct  23:10,12
  31:25 32:7 33:22
  33:23 36:12 38:2
  38:3 46:18 47:25
  48:1,7,10,17,21
  61:19 63:25 64:7
  64:14 65:11 68:19
  68:24 77:4 79:19
  79:23 82:5 85:18
  90:7 91:7 92:1
  95:9 96:19 97:21
  101:8,9 106:14,23
  107:1,11,23 108:2
  110:17,18 111:4
  111:13,14 112:1
  112:12,13,18
  113:1,6,9,13,14,21
  114:1,2,7,14,23
  115:6,19 116:15
  116:25 121:4,6

124:17,18 125:23
126:4,8,16,17
129:22 130:14
135:14 137:5
147:14 148:14,17
150:19 151:3
153:11,13,18,25
154:6 155:7
156:20,25 157:1
159:17 160:1,15
161:8,10 163:23
163:24 164:12
167:16,20,22
168:13 176:11
177:7 179:2,6
181:16 182:8
184:20 185:12,21
185:22,24 186:22
186:25 187:4,14
187:23 198:4,5
201:7,9,25 206:20
211:5 212:21
216:10,22 219:4
221:12
**corrections** 224:12
226:17
**correctly** 20:5
99:2 103:7 109:6
133:25 141:19
165:17 173:25
178:10 183:18,23
189:23 191:2,17
196:1,18,25 200:9
200:19 201:18
203:8 205:5,18,25
209:2 210:16
212:3 215:16
**counsel** 3:9 12:17
13:4 16:6,8 57:13
66:10 70:25 79:13
96:2 108:11,12

121:12 123:10,14
124:10 127:2
136:7,12 138:7
141:24 145:22
146:2 160:18
161:11 165:25
169:23 173:4
174:14 176:25
193:11 204:3
217:25 219:22,23
220:5 223:11,15
**counsel's** 100:8
199:22
**counted** 114:10
**counting** 51:2
**country** 116:13
141:12 189:21,22
198:3
**counts** 107:22
**county** 1:8,12 3:17
152:10,10,18,20
225:10 226:15
**course** 87:22
97:19 131:18
**court** 1:1 12:19
13:2 15:22 17:2
101:10 140:21
141:21 142:1,2,19
143:12,21 145:22
145:23 193:24
206:19 207:2
225:7
**court's** 142:16
**cov.com** 7:5,9
**covert** 206:15
**covington** 7:3,7
13:17 108:15
**create** 136:20
147:11
**creating** 149:20

**crisis** 209:15
**criteria** 216:21
**cross** 16:23
**csa** 86:13 104:14
146:24 204:16,22
**current** 21:18
29:12,15 50:18
209:6,9,14
**currently** 55:13
86:17
**customer** 212:1,2
212:7
**customers** 44:22
194:17 197:3
212:19 213:4,13
213:20 216:9
**cuyahoga** 1:8
**cvs** 6:6,6 13:25,25
111:23 112:15
113:3

**d**

**d** 12:1
**d.c.** 1:20 2:10 3:23
4:13 5:14 6:4,9
7:4,12 12:24
**dallas** 6:19
**dan** 1:7
**dangerous** 205:15
**dangers** 190:10
**daniel** 9:2 12:25
**dash** 200:3
**dashes** 141:11
**data** 53:17,21 60:3
60:17,22,23 61:5
61:17,23 62:8,8,9
62:17,17,18,24,21
62:25 63:8,8,9,15
63:23 64:3,9,16,19
64:22 65:4,8,9,16
66:22 67:1,5,9,12
67:15,19 68:2,8,14

68:16,18,21 69:2,5
69:7,11,21,22
72:19,23 73:3,7,11
73:14,21,24 74:1,2
74:3,7,9,12,17,22
75:2,8,9,13,14,16
75:21 76:3,11,18
76:23 77:1,3,5,7
77:10,13,20 78:1,6
78:12,15 100:18
100:21 101:16,21
102:4,11,16
103:14,16 104:5
104:13,13,17
150:13,24 161:7,8
162:18,20,24
163:3,8,10,13,14
164:1,3 168:11,20
168:25 169:1,3
176:7 177:6,10
201:1 211:10,14
216:9
**databases** 72:22
**date** 92:6 224:8
225:3,9,19 226:3
226:13,25 227:20
227:25
**dated** 11:3,5,8,10
11:12,16
**davis** 5:12 14:4,4
**davison** 7:16
13:11,11
**day** 5:3,7 14:13
15:3 95:5 159:21
225:16 226:22
227:22
**days** 224:18
**dc** 3:5
**dea** 10:14,25 12:15
14:21 17:23 18:17
18:25 19:7 20:7

21:19 22:11,19,22
23:6 24:18,20,23
25:11,11,13,22
27:14,21 28:3
29:18 30:19 31:4
31:24 32:6,13
33:1,3,7,20 34:8
35:6,13,15 36:22
36:25 37:10,16,20
38:1 40:10,13,16
40:19 41:7,7,13,16
41:19,22,23 42:2,6
42:9,18,22 43:6,9
43:25 44:15 45:3
45:11,16,18,21
46:1,4,6,17,21,24
47:7,14 48:11,17
48:21 50:19 51:10
51:15 52:3,14,23
53:6 54:3,4,13,21
55:4,12,18 56:3,13
56:17,20,25 58:3,8
58:14,16,17,23
59:9,16,21 60:3,7
60:17,22,23 61:5
61:17,22 62:7,16
62:23 63:7,14,23
65:8 67:1 68:14
69:19 70:13,18
71:6,14,15,19 72:4
72:8,14,23 73:7
74:7 75:3,13
76:17,22 77:1,6,9
78:14,20 79:1,7
80:1,20 82:2 83:3
83:6,11,17 84:4
85:2,15 86:8 87:3
87:10,14 88:10,19
88:25 89:4,23
90:5,10 91:9 93:9
93:20 94:3,8,12

95:5,8 99:13,20
100:1,11,16,22
101:16 102:3,10
102:16 103:11,23
104:12,15,23
105:4,11,17,23
106:2,6,7,13,16,22
106:25 107:4,10
107:16 111:7,12
111:17,25 112:9
112:11,14,16,23
112:23 113:5,11
113:16,17,23
114:18,22 115:3,4
115:16 116:5,11
116:22,23 117:18
118:11,19 119:10
119:12,14 128:8
128:25 129:4
133:11 135:23
137:2,19 138:24
139:7,10,18,20
141:11 145:16
147:3,9,16 148:3,8
149:19 150:5,15
150:23 151:2,5
152:2,21 154:7,12
154:12,17 155:14
155:22 156:9,16
156:21 157:5,17
157:24 158:7
159:2,7,10 160:5
160:12,24 161:2,6
161:17,22,25
162:2,5,11 163:7
163:14,25 164:2
166:3,15,19 167:4
167:12 168:19,24
169:3 170:8,13,18
171:2,6,9 173:13
173:21 174:13

176:5 177:3,5
178:25 180:13
182:15 183:8
188:12 191:14,19
192:9 194:24
196:21 197:2,4,16
197:20 198:8
199:5,8 200:11,18
200:25 201:5,20
202:7,15 203:10
203:16 204:9
206:2,8 207:13
208:17 211:9,13
212:5,7 214:3,21
216:8,9 217:8,9,11
217:17 219:4
220:11 221:15,23
222:6

**dea's**  19:20 20:13
29:22 33:25 59:15
66:22 96:14 99:6
109:11 120:4
127:5 129:17,23
143:16 170:5
175:11 177:18
178:6 181:11
182:6 216:20

**dear**  224:10

**dechert**  4:7 14:7

**dechert.com**  4:10

**decided**  65:1,3

**deciding**  83:8,14
84:5

**decision**  42:23
57:1 104:6,12
109:9 175:11

**declaring**  205:15

**decline**  33:4

**decrease**  155:15

**decreased**  155:10
186:8

**deed**  225:14
226:20

**deemed**  224:19

**deems**  85:8,17

**defendant**  12:17
14:9 108:12

**defendants**  13:21
13:23 14:5,7,15
15:10,21 16:8,16
108:19 122:18
138:15 219:23

**definitely**  119:22
139:6 178:22

**definition**  184:5

**defraud**  207:6

**delivered**  220:7
221:12

**demand**  52:7,11
141:7 165:6
196:15 205:14

**department**  3:2,3
3:8,12 14:20,25
18:11 224:22

**departments**
40:19

**depend**  53:1 88:7
118:7

**depending**  80:15

**depends**  86:11
91:13 93:12

**deposed**  122:14

**deposition**  1:17
2:1 10:10 12:11
12:15,22 16:21
18:2,5 23:18
24:11 25:4 27:13
27:21 49:5 57:16
81:23 84:18 91:19
96:8,10 121:9,20
122:19 124:3
131:25 132:21

135:3,18,22
140:17 158:4
164:18 166:10
172:12,18 188:20
192:3 193:2,6
199:15 204:4
208:14 214:6
218:2 221:22
223:3,5,9,13 224:8
224:11 225:1,3
226:1,3
**deputy** 29:19
80:14 126:15
**describe** 79:4
**described** 34:15
**describes** 85:1
**desh** 8:11 15:11,11
**design** 137:10
**designated** 67:23
143:19 144:3
173:7 174:20
**designating**
193:20,22
**designation**
172:15
**designations** 173:6
**designee** 193:14
193:15
**desirability**
205:16
**detailed** 83:22
**detect** 137:11
211:25
**detected** 137:17
138:22
**determination**
50:10 71:16 141:6
178:9,16 180:12
181:10 204:18,23
219:10

**determinations**
174:21
**determine** 35:6
44:15 46:21,24
93:9 94:18 101:17
102:17 157:25
158:13 159:12
168:21 182:15
184:18 200:19
**determined** 90:3
94:21 107:10
**determines** 79:17
106:25 157:6,18
**determining** 34:16
35:13 39:11 41:24
42:3,7 51:12
54:23 58:17 61:7
65:10 67:3,6 70:6
70:14 71:9 83:18
85:2 87:6,9 100:3
141:5 158:20
159:3 161:5
168:10,11
**development**
173:20
**developments**
189:15
**dialogue** 36:19
157:24
**difference** 45:7
48:22
**different** 38:8
79:10 98:16
104:19 117:8
159:19 169:25
172:24 190:22
**direct** 18:20 19:3
98:5 137:21
**direction** 223:9
**directly** 41:18,19

**disagree** 21:14
140:24
**disapprove** 148:13
**discharge** 40:3
**disclose** 26:21
193:16
**disclosing** 194:1
**disclosure** 19:24
193:21
**disconnect** 86:22
**discounted** 8:21
15:14
**discourages**
206:16
**discuss** 71:3
121:22 127:24
129:13 132:7
133:2 135:1,6,21
221:24
**discussed** 27:22
94:2 128:22
131:23 132:9,20
134:3,7 135:16
**discussion** 132:20
**discussions** 24:24
24:25 25:3 36:8
36:23 37:9 123:15
127:8
**dispense** 114:21
116:12,19
**dispensed** 58:20
58:25 59:18 60:14
60:18 61:6
**dispensing** 136:21
**disposal** 50:16,24
50:25 51:1,5,9,11
51:16
**disposed** 52:2
**disposition** 20:1
51:1 69:22

**dispute** 194:5,6
**disruption** 157:13
**disruptions** 56:3
**distribute** 114:21
151:7 154:18
190:20
**distributed** 114:13
152:10 153:7
**distributing**
136:21 151:16
177:17
**distribution** 31:11
190:18
**distributor** 108:19
151:6,16,24
152:17
**distributors** 32:6
111:21 112:10,21
114:20 137:9,17
138:22 139:16
140:2,9 141:4,24
142:4,7,20,23
143:11,20 144:6
144:16 145:25
146:3,18,19,23
152:5 154:18
177:14
**district** 1:1,2
12:19,19 145:23
223:21
**diversion** 20:3
53:11 54:22 72:20
73:8,21,24 74:8
75:9,21 76:3,11,18
76:23 77:3 81:1
85:23 86:10 87:4
88:12,21 89:6,18
90:5 126:7,16
132:6,16,17
139:11 149:4
181:8 186:9

208:22 209:17
210:14,19 211:3
211:25 214:19
215:19 216:21
**diverted** 94:14,22
95:8 187:14 215:3
215:9,14
**diverting** 95:6
**division** 1:2 3:4
12:20
**doctor** 160:25
**doctor's** 196:17
**doctors** 177:15
182:1 190:9,19
201:23
**document** 1:7 18:6
18:12 19:18 49:8
57:20,21 81:15
82:1 88:6 96:17
119:24,25 120:2
120:23 124:9,13
124:16 130:1,4,5
146:15 158:12
160:19 161:12,13
161:16,18,22,25
162:3 164:23
165:22 171:23
172:10,16,24
173:3,10 174:4
175:1 176:2 186:6
192:1,11 193:16
194:10 195:3,6,14
195:20 199:18,21
199:21 202:18,18
210:4 214:13
215:25 217:4,13
220:6
**documentation**
28:21 37:5,7
171:4

**documented** 37:14
**documents** 23:25
24:2,5 26:8,10,12
26:16 27:5 96:7
96:13 119:17
127:18,20,21
199:25
**doing** 219:2
**doj** 25:14,16,22
28:3 35:23 123:10
123:15 197:11
**dollars** 166:20
167:6 183:2,17
184:4
**domestic** 35:3
64:2 118:1
**donnie** 204:9
**donny** 188:12
189:4
**dosage** 86:21
90:25 91:5 98:11
147:17
**dose** 147:4,12
148:13 150:19
152:25
**doses** 151:17
**downplayed** 181:8
**dr** 24:12,15,17,25
25:4 27:14 28:25
121:4
**draft** 198:22,25
**drafts** 195:4
**dramatically**
182:5
**drawbacks** 183:9
**drive** 3:9
**driven** 89:2
**drug** 1:18 2:1 3:8
6:11 8:21 14:23
15:14 23:1,2,11
34:3 56:13 72:22

149:21 152:25
153:16 154:10
155:19,20 156:19
157:3,15 186:14
186:21 187:23
190:8,10 198:13
205:1,2,16 207:5
208:20 215:10
**drugs** 115:18
142:5,22 146:1
148:20,21 149:18
149:19 150:7
152:24 154:5
157:13 187:22
196:23 209:13
**due** 89:12 90:11
95:3,13,16
**duly** 16:1 223:5
**durkin** 8:22 15:14
**duties** 40:4
**duty** 137:18
138:23

**e**

**e** 3:3,18 7:2 10:1
11:2,4,8,10,16
12:1,1 24:4
164:22,24 165:21
165:25 166:25
169:16,17,24,25
170:7 192:13
201:15 217:7
**eagle** 111:24
112:16 113:4
**earlier** 70:23 79:6
121:2 123:4 218:2
**earn** 166:4,21
167:6,20,25
168:12 169:5
**earning** 165:12
**easier** 17:2

**east** 8:4,23
**eastern** 1:2 8:10
12:20
**economic** 55:19
**educate** 190:9
**education** 198:11
206:14
**eekhoff** 9:2
**effective** 88:11,20
89:6,17 90:5 92:6
181:5
**effectively** 189:21
**either** 44:12 61:17
154:10
**electronically**
120:10
**element** 137:3,4
**eleventh** 4:4
**ellis** 7:11 13:21
**elsner** 3:18 10:6
14:16,16 21:9,10
36:3 37:17 40:6
40:21 43:2 44:18
45:5 53:16 59:7
59:19 60:5,25
64:20 67:14 68:3
71:25 73:2,10,16
75:11 76:6,21
77:11 78:2,22
85:19 87:18 88:3
88:15,23 89:9,20
90:8 92:12,17
95:1,10 97:10
99:16 100:23
103:17 106:10,21
107:3 111:19
112:2 113:8 116:8
116:16 117:2,22
118:6,23 120:3
125:24 127:11
131:2,9,16 133:15

134:12 136:13,16
137:1,7,15,24
138:5,13,20 139:8
140:6,15,19
142:18 143:9,22
144:8 145:4,9,20
146:25 147:8,15
148:2,10,18 149:2
149:16 150:3,14
150:25 151:13
152:1,15 153:9,19
154:1,24 155:8
156:8 157:11
158:2,6 159:8,18
160:2,10,20 161:3
161:17,21 162:1
162:16 163:1,11
163:21 164:7,17
164:20 165:2
166:2,14 167:3,13
167:23 168:8,23
169:15 170:12
171:5 172:10,19
173:8 174:5 175:2
175:5 176:9,16
177:1,2,9 178:1,24
179:7,16 180:1,21
181:17,24 182:20
184:12,24 185:19
186:4,12,19 187:1
187:12,19 188:5
188:11,18,22
189:2,7 192:1,5,8
192:18 193:25
194:6,14 195:1,7
195:13,18 197:19
198:1,7,20 199:11
199:13,17 200:1
200:17 201:4,10
202:6,16 203:19
203:21 204:6

206:10 207:3,10
207:20 208:9,12
208:16 209:21
210:6,10,11,24
211:6,15 212:15
213:5,14 214:1,4,8
214:17 216:4,17
217:3,18 218:1,13
218:25 219:7,13
220:24
**email** 224:17
**embarcadero** 5:4
**emilie** 4:12 14:14
**employed** 24:18
223:12,15
**employee** 192:22
223:14
**employees** 38:21
202:23
**enclosed** 224:11
**encompassed**
26:13
**encouraged** 182:1
**encouraging**
217:10
**endeavors** 113:23
**endo** 5:11,11 14:5
**enforcement** 1:18
2:2 3:8 14:23
23:11 34:3 74:5
193:17 208:20
**engage** 206:15
**engaged** 197:4,20
**ensure** 45:19 46:2
47:11 92:22 93:5
156:21
**enter** 157:24
**entered** 226:9
**entire** 171:24
208:4 221:7,18
225:5 226:5

**entitled** 21:5,10
144:8 193:2,11
**entity** 89:1
**epidemic** 205:11
**eppich** 7:6 10:5
13:16,16 108:13
108:15 110:4,11
111:22 112:8,20
113:2,10,22 115:2
115:10 116:2,10
116:21 117:10,16
118:2,9,17,25
120:6 121:7
122:12,17,23
123:3,21 125:19
126:1,18 127:3,15
128:5 130:3,12,19
131:6,12,21
133:20 134:1,15
135:25 136:8
139:24 142:11
143:1 144:16
145:11 146:12
148:24 149:8,25
151:22 153:3
154:22 155:5
156:2 157:8,20
162:23 163:6
164:15 179:13,22
180:15 185:15
188:8 198:6
200:15,22 206:25
210:21 212:11
215:24
**equated** 117:5
**equivalence**
177:11
**equivalent** 180:9
**eric** 8:21 15:13
**errata** 224:13,18
226:7,10,18 227:1

**errors** 67:17
**esq** 3:3,7,13,18,21
4:2,7,12,15 5:3,6
5:12,13,21 6:2,7
6:12,16 7:2,6,10
7:11,15,16,21 8:2
8:6,11,16,21
**essentially** 144:10
**establish** 113:12
156:10 159:10
**established** 97:17
97:19 144:21
161:15,25
**establishing** 28:17
58:1 72:24 102:6
113:18 156:17
167:5
**establishment**
18:22 19:20 29:23
113:25 144:4,25
**estimate** 28:5
59:24 62:12 72:5
116:9 159:11,21
173:19 177:18
182:6
**estimated** 51:20
99:7 107:5 109:12
114:5 116:1
156:12
**estimates** 22:4
58:18 59:16 60:12
70:2,5,13,18 71:7
71:13 72:7 166:4
**estimating** 165:11
**estimations**
181:22
**et** 1:9,11,13,13
**ethical** 205:23
**evaluation** 141:16
**event** 213:19

eventually 203:5
evidence 72:22
  90:11
ewinckel 4:14
exact 28:4 70:24
  80:24 159:12
  161:5 207:2
exactly 159:22
examination 10:2
  16:8 20:21 108:12
  136:12 219:23
examining 171:10
example 48:2,4
  53:4 56:11 83:2
  111:3 215:11
examples 79:11
exception 97:11
  102:1
excerpt 10:23
excluded 166:10
excuse 140:8
executed 226:10
execution 225:14
  226:19
exhibit 10:9,11,12
  10:15,16,17,18,21
  10:23,25 11:2,4,6
  11:8,10,12,14,16
  18:1,2,10 49:4,5
  57:15,16 81:22,23
  84:17,18 91:18,19
  96:8,10 97:22
  98:6 109:3,21
  110:6 124:8,9
  125:15 126:3
  140:15,17 158:3,4
  164:17,18 172:11
  172:12 175:18
  178:4 188:19,20
  192:2,3 193:19
  199:14,15 200:3

204:4,7 208:13,14
  214:5,6 220:3
exhibits 10:8 11:1
  11:24 96:7 100:10
  138:6
exist 61:13 62:3
  64:19,23 65:3,5
  74:18 138:9
existed 61:25
  64:16 70:8 74:15
  127:18
existence 59:3
  62:6
exists 60:2 119:24
expect 116:5
  202:24
expectation 163:3
expertise 139:5
expiration 225:19
  226:25 227:25
expires 223:23
explain 71:24
  134:10 138:2
explaining 119:14
export 42:12
  52:21 99:10 101:4
  109:25 114:8
  117:25 156:14
  218:23
exportation 35:4
expressed 210:12
  211:1
expressly 210:19
  211:8,17 212:7
extends 19:13
extensive 181:25
  193:4
extent 26:20 74:7
  85:23 86:9 87:2,4
  146:13 170:6
  172:21 210:14

extinguish 215:10
extra 40:8
extracts 44:10
eye 4:13 176:6

**f**

facilities 103:4
  199:10
fact 51:15 89:2,2
  89:12 90:23
  129:11 131:17
  154:7 156:21
  173:2 205:15
factor 50:19 51:13
  52:14 54:9,19
  55:1,10 61:20
  62:13,13,13,21
  64:11 68:17 85:17
  101:22 213:1
factored 64:11
factors 42:18,24
  44:3 50:11 52:18
  52:23 53:5,13,21
  84:4,8,9,11 85:2,7
  85:22 93:20,24
  94:1 99:13,20
  100:1,5,11,16,21
  101:5,22 102:4
  103:11 104:23
  105:5,12,18,23
  106:3 119:2,5
  139:10 156:16
  158:18 159:20
  161:6 171:9 178:2
  178:8,12 181:10
  184:1 216:2
facts 89:4
fair 31:6 33:3 41:3
  43:8,11 45:9,18
  46:1 47:9,14
  72:12,13 84:14,14
  85:15 91:3 92:7

97:18 119:9 144:1
  159:13 215:20
  221:10
familiar 31:10
  33:24 34:6,22
  46:9 57:19 59:22
  91:22 108:18
  188:14
familo 8:22 15:14
family 201:13
far 37:4 68:8
  100:5 160:25
farrell 4:2
favor 129:6
fda 35:19,25 36:7
  36:11,17,23,25
  37:10,10 40:17
  42:15,16 44:24
  51:13 55:10,17
  56:16,18,21,23
  57:1 63:19,22
  64:21 65:1,3,13
  70:10,14,20 71:9
  71:21 72:8 93:17
  93:25 101:23
  104:13 110:9,12
  119:6,7 120:18
  128:4 148:9
  150:12 153:7
  157:4,6,12,15,16
  157:18,24 182:18
  201:1
fda's 36:1 41:22
  41:23 70:3 72:1
  159:6
february 10:13
federal 11:14
  79:23 80:1,5,9
  82:4,10,21 140:21
  143:12 145:23
  160:4 193:17

206:19
**feel** 69:5 82:13
  218:4
**felony** 207:5
**felt** 40:3 82:25
  132:13
**fentanyl** 101:12
  105:21 110:25
**field** 94:18,20
**fifteenth** 7:12
**figures** 110:3
**filed** 12:18
**fill** 196:7,10,16
  205:2
**filled** 176:8 195:25
**final** 80:8 83:9,14
  98:3,19 99:7
  109:12 110:3
  124:24 125:2
**finalized** 97:13
**finance** 7:10
**financial** 206:4
  207:22
**financially** 223:16
**find** 78:13 119:25
  120:2 191:11,15
  201:1 224:11
**finds** 52:22
**fine** 174:24
**finish** 17:5
**firm** 13:1,3 108:15
  136:17
**first** 16:1 17:1
  23:6 38:16 50:16
  58:6 80:20,23
  124:20 180:8
  190:15 192:18
  196:21 200:3
  209:5,24 210:2,13
  210:18 212:5
  217:6

**five** 28:11 38:19
  50:15 111:3
  189:16,17 206:18
**flag** 149:4
**floor** 4:17 5:23 8:7
  8:23
**flow** 21:3 193:5
**focus** 149:20
**foley** 8:3
**foley.com** 8:5
**folks** 108:24
**follow** 113:17
**following** 20:20
  50:11 114:3
**follows** 16:3 79:1
**food** 157:3,15
**foot** 172:24
**foregoing** 223:3,5
  225:13 226:18
**foreset** 65:16
**form** 37:6 52:25
  56:24 86:16,21
  89:10,22 90:9,25
  98:11 138:25
  139:21 142:12
  143:2 147:7,13
  148:16 149:7,8,9
  149:11,23 150:20
  150:21 151:20
  152:12,13 153:2,4
  153:5,17,24
  155:24 156:1,2
  159:14,15,25
  161:9 162:12,22
  163:6,16 164:5,13
  164:14,15 165:1
  165:19,20 166:6
  167:8,9,11 168:3,5
  168:14,16 169:11
  170:21,23 171:20
  175:24 177:8,22

178:18,19 179:3
  179:21,23 180:16
  180:18 181:13,15
  181:20 182:10,11
  182:14 184:7,8,9
  184:22,23 185:16
  186:1,10,16,24
  187:6,8,15,24
  188:1,2,8 194:19
  197:6 198:15,17
  199:6 200:24
  201:8 202:1,12
  203:13,14,17
  205:22 206:6,23
  206:24 207:16,18
  207:25 208:2
  210:21 212:23
  213:8,21 215:21
  215:23,24 216:11
  216:13 217:12,14
  219:5 221:5
**format** 97:5
**former** 128:25
  129:4
**forth** 21:3 33:25
  34:9 55:17
**forward** 224:15
**found** 95:6,14
**foundation** 139:24
  142:11 143:1
  144:20 149:25
  154:22 155:5
  161:15 167:10
  168:15 170:24
  177:24 179:5,13
  179:19,21 180:15
  180:18 182:11
  184:9,22 185:14
  185:15 186:2
  187:7,16,24
  194:23 197:10,24

203:15 206:6,25
  207:18 208:1
  210:22 212:10,11
  217:13,16
**four** 38:19 189:16
  189:17
**fox** 8:17 15:16
**foxrothschild.com**
  8:20
**frame** 77:13,19
  134:25 135:9
**framework**
  213:25
**francis** 9:3
**frankly** 191:5
**free** 225:14 226:20
**friends** 122:2
**front** 162:3
**fulfill** 99:9 109:14
  143:13
**fulfilling** 140:9
**full** 16:17 38:20
  41:2 102:11 190:2
  195:21 205:8
  208:8 209:5,23
  211:18
**fully** 139:4 163:19
**further** 170:4
  175:20 215:1
  219:23 221:20
  223:13
**furthermore**
  192:25 193:13
  194:11

**g**

**g** 12:1
**gain** 30:14
**generally** 41:3
  89:22
**generate** 173:16

**getting** 24:8 27:3
**giant** 111:24
  112:16 113:4
**gibson** 29:6
**gibson's** 29:7
**give** 17:8 79:11
  95:8 137:25 165:7
  172:19 174:6
  193:15
**given** 31:3 33:4
  45:2 46:22,25
  107:18 117:12
  155:20 156:18
  159:13 169:20
  170:11 207:22
  222:6 223:10
**gives** 190:11,13
**giving** 169:3
**go** 12:13 18:19
  38:11 66:3 80:18
  98:10 117:24
  120:22 132:10
  135:25 139:19
  141:10 169:21
  189:25 200:6
  203:21 204:14
  209:22 213:15
  217:18 219:14
**goes** 21:15 50:14
  117:5,12,20 119:3
**going** 12:4 17:1,3
  17:14,25 18:9
  20:12,17,19 21:2
  21:10 26:18 49:3
  57:4,6,14 66:5
  67:22 81:7,21
  84:16 94:7 95:3
  95:20 96:6 108:6
  115:17 126:20,24
  132:4 136:2
  137:21 142:5,22

144:3 145:6 146:2
158:16 161:11
164:21,22 165:21
167:1 169:1 173:1
173:9 174:8,17
175:15 176:18,22
188:18,23 194:7,9
195:2,5,11,13,19
197:17 199:3,19
203:23 210:3
216:23 217:20
219:15,19
**good** 12:3 16:11
  67:16 69:11 81:8
  136:14,15
**gotten** 131:20
  192:11
**govern** 113:16
**governing** 113:24
**government** 26:23
  89:1 154:3 192:25
  205:10
**governs** 91:25
**grandson** 122:1
**grant** 8:8 32:21
  33:5,7,25 44:16
  47:15 48:5,9 84:5
  84:6 87:16 88:1
  88:12,21 89:7,18
  90:6 93:22 94:14
  94:23
**granted** 44:9
  47:24 63:2,11
  65:15 67:8 68:24
  69:14 70:16 90:1
  90:12,19 103:23
  115:22 116:1
  147:23 153:6
**granting** 47:10
  65:3

**grants** 34:2
**gray** 7:16 13:9,12
**greene** 4:3
**greeneketchum....**
  4:5
**gross** 147:10
  150:16,16 152:22
  186:13,14,20,21
**ground** 191:12
**grounds** 174:18
  175:16
**group** 39:3,7
  79:13
**groups** 180:25
  183:21 184:4
  189:19 194:18
  202:9 216:7,19
**guarantee** 37:3
**guessing** 118:3
**guidance** 129:6
**guides** 119:12
**guilty** 206:19
  207:5
**gx** 7:15 13:10,13
  16:9

## h

**h.d.** 7:20 15:19
**hahn** 7:21 15:18
  15:18
**hand** 129:2 202:22
**handle** 32:8 165:5
**happen** 36:14
  202:25
**happy** 221:24
**harper** 1:19 2:3
  10:2,10 12:16
  15:25 16:19 57:19
  66:12 81:14
  108:14 127:4
  136:9 143:18
  219:25 222:7

224:8 225:4,9
226:4,13 227:20
**hbc** 8:6 13:15
  111:24 112:16
  113:4
**hcl** 165:14
**head** 17:7 80:25
  117:15
**heading** 178:7
  180:3 183:8
**headings** 98:20
**health** 5:11 6:2
  14:11 41:5 58:19
  58:23 59:2,6,17,21
  60:2,23 61:5,13,23
  62:5,8,17,24 63:8
  63:14,23 65:8
  108:22 177:15
**heard** 181:3
**hearing** 11:6
  140:20
**held** 2:3 12:22
  128:7
**hello** 219:25 220:1
**help** 84:15 211:25
**henely** 201:14
**henry** 6:16 15:21
**hereto** 223:16
**hhs** 35:24 40:11,14
  40:17,19
**high** 83:1 142:5,21
  146:1
**higher** 172:9
**highlighting**
  171:23
**highly** 173:3
  205:15,21
**hinder** 181:10
**hindering** 178:8
**hired** 129:5

**history**  10:19,21
  58:15 69:13 96:25
  97:8,25
**hold**  22:10 173:18
  215:5
**honor**  141:4,25
**hope**  170:16
**hoping**  200:25
  201:21
**hour**  57:5 95:18
  124:7
**hours**  28:9 127:6
  203:7
**house**  11:6 189:5
**hubbard**  8:13
**human**  196:4
**huntington**  4:4
**hydrocodone**
  43:17 48:9 62:19
  76:4,5 105:9
  107:17,20,22,25
  110:19 151:17
**hydromorphone**
  43:19 101:13,14
  105:2,7 110:21
**hypothetical**
  94:25 95:12
  171:18 175:22,24
  177:23 182:10

**i**

**identification**  18:3
  49:6 57:17 81:24
  84:19 91:20 96:9
  96:11 140:18
  158:5 164:19
  172:13 188:21
  192:4 199:16
  204:5 208:15
  214:7
**identifies**  124:19

**identities**  212:1
**ii**  3:13 22:1 28:18
  43:10 46:19 58:2
  69:24 79:20
  134:23 141:13
  205:1
**iii**  22:5,6 69:25
  108:2
**illegitimate**  215:2
  215:8,15
**illicit**  187:3,22
  209:13
**illinois**  5:8 8:14
**impact**  163:23
  168:2 169:6
  175:11 176:10
  178:3,16 180:12
  181:22 182:5,7
  184:5
**impacted**  180:19
**impacts**  144:5
  145:2
**implemented**
  86:13
**implied**  183:21
**important**  130:8
  133:21 212:22
**impose**  196:22
**impression**  190:14
**improvements**
  208:23
**ims**  58:18,23 59:2
  59:5,17,21 60:2,17
  60:23 61:5,13,17
  61:23 62:5,8,17,24
  63:8,14,23 65:8
  168:25 177:11
  181:2
**inaccurate**  142:10
**incensed**  201:16

**include**  21:23 30:1
  30:2,6,10 43:14
  69:21 72:2 144:14
  177:10
**included**  11:24
  19:14 23:14
  156:15 198:10
  224:13
**including**  19:22
  58:4 198:12
  211:25
**incoming**  28:20
**incomplete**  94:25
  95:12 171:18
  175:22,23 177:23
  182:10
**inconsistent**
  143:15 146:7
  174:13
**incorporated**
  226:12
**increase**  117:4
  134:18,20 155:15
  157:5,17 158:1
  165:5 171:15
  175:12
**increased**  155:10
  182:5 185:10,18
  185:24
**increases**  116:22
  117:18,20
**increasing**  30:20
**incumbent**  140:1
**indiana**  6:6 7:23
  13:25
**indianapolis**  7:23
**indicate**  20:11
  124:23 207:21
**indicated**  52:8
**indicating**  224:13

**indication**  42:14
  165:24
**indications**  42:14
**individual**  19:23
  30:10 43:7 44:2
  47:2,24 77:17,22
  79:18 83:18 84:6
  85:3,6,16 86:9
  87:6,9,17,23 88:13
  88:22 89:7,19
  115:22,23 116:4
  132:25 133:12
  134:14 152:4
  162:8 170:10
  172:3 174:21
**individualized**
  78:14
**individually**  31:1
**individuals**  39:10
  39:13 80:19 82:2
**industrial**  20:4
  52:20 72:17 82:15
  99:10 109:15,25
  114:6 141:17
  156:13
**industries**  5:21
**industry**  10:25
  158:10 162:6
  190:3 201:22
**inferred**  183:21
**inform**  139:18
**information**  55:25
  56:21,23 58:3,5,8
  58:23 72:21 74:4
  75:4 81:17 83:24
  102:25 103:20,25
  104:14 111:7,17
  111:25 120:17
  127:23 164:10
  172:23 177:5
  211:24 212:7,19

219:3,9 220:22
**informed** 127:8
155:22
**ingredients** 44:11
90:21
**initial** 20:17
**initially** 209:10
**innovation** 157:4
157:16
**innovative** 178:14
180:4
**input** 41:24 42:3
69:3,12 78:11
**inquiry** 144:1
**insofar** 19:13
**insomnia** 158:25
**instance** 190:12
**instances** 100:15
**instruct** 26:23
67:22 68:5 154:12
166:9 167:1
174:18 197:11
202:4
**instructed** 170:2
173:5
**instruction** 172:1
174:13
**integrated** 86:15
86:25 87:3 90:24
**intended** 149:14
**intent** 193:16
207:6 209:18
**intentionally**
193:7 203:3
**interested** 201:13
223:16
**interfere** 12:11
**interference** 12:9
**interfering** 193:5
**internal** 66:22
74:1,2 75:14

120:4 166:4
**internationally**
69:25
**interpretation**
200:8
**invalid** 68:2
**inventories** 51:20
**inventory** 35:5
42:12 44:23 51:22
51:24 99:11
109:15 110:1
114:9 156:7,14
171:11,14 172:8
173:23 175:10
218:24
**investigate** 89:24
**investigation** 90:3
94:11 129:17
**investigators**
94:18,20
**involved** 33:13
36:8 38:5,7 39:11
39:14 79:7,10,12
79:13,14 221:10
**involvement** 23:3
36:2 220:12
**involving** 76:18
**iqvia** 60:11,12,22
61:14,17 62:8,17
62:24 63:8,14,23
65:9
**issue** 128:9 133:13
133:17 147:16
**issued** 155:9 209:9
**issues** 23:4 37:16
37:21 40:15,17,20
49:21 50:3 74:25
127:13,14,16,25
191:7
**item** 196:12 211:1

**items** 22:4 50:15
179:17,25 181:9
198:8,12

**j**

**j** 5:3,6 8:2
**j&j** 14:15
**james** 3:13 14:18
169:17
**james.bennett4**
3:16
**janssen** 4:11 15:5
**january** 96:17,20
**jenna** 4:7 14:6
**jenna.newmark**
4:10
**jennifer** 7:10
13:20
**jennifer.levy** 7:13
**jersey** 29:10
**joanna** 5:13
**joanna.persio**
5:16
**job** 1:25 22:22
39:22
**joe** 24:13 121:3
**john** 5:17 14:8
**john.lavelle** 5:20
**johnson** 4:11,11
15:6,6
**joined** 23:10 126:6
**jones** 5:3,7 14:12
15:2
**jonesday** 5:5
**jonesday.com** 5:9
**joseph** 124:20
**josh** 13:14 14:4
**joshua** 5:12 8:6
**joshua.davis** 5:15
**jr** 4:2 5:17
**judge** 1:7 145:23

**july** 22:9 24:21
124:19
**jump** 81:6
**june** 204:10
223:23
**justice** 3:2,3,8,12
14:20,25 18:11
**justification**
162:10,15

**k**

**k** 4:12 5:21 7:6
**kaitlyn** 9:2
**keep** 174:8,9
195:11,11
**kelly** 8:18
**kentucky** 174:11
**ketchum** 4:3
**kidney** 190:21
**kilogram** 147:23
165:12 166:5
173:18
**kilograms** 165:14
165:15 166:21
173:22,24
**kind** 56:12
**kirkland** 7:11
13:20
**kirkland.com** 7:13
7:14
**kmatic** 8:5
**knew** 197:18
199:8 202:15
**know** 17:13,13
24:6 25:17 26:4,5
28:1 37:4,13 38:9
41:3 53:25 59:3
59:13 62:5 70:25
78:18,21,23 80:24
92:15 94:7 108:20
117:14 118:3
120:23 123:19,24

133:24 145:17
146:21 166:3
206:3 208:8 213:3
213:12,20 216:8
220:15 221:14
**knowledge** 27:19
45:12 74:17 89:24
92:7 221:3
**known** 53:11,11
54:22 55:5 56:8,9
66:24 67:9 68:20
74:3,4 94:4,5
106:13 139:11,12
139:13
**kobrin** 8:6,9 13:14
13:14
**kristina** 8:2 15:7

**l**

**l** 1:24 223:2
**l.p.** 1:9,11,13 4:6
205:22
**labs** 74:6 75:19
78:12
**lacking** 102:25
**laid** 84:8
**lardner** 8:3
**larger** 171:3
**lasts** 174:7
**late** 216:18
**lavelle** 5:17 14:8,8
**law** 74:5 108:15
113:11 136:17
193:17
**lawful** 20:3 52:21
**lawsuit** 172:25
**lawyer** 142:7,23
**lawyers** 24:9 25:8
25:9,10,11,15,16
26:23 27:4,14
**lay** 55:9

**leaked** 203:3
**leave** 24:20 111:5
221:22
**led** 74:24
**left** 66:12 97:9
98:1 109:2
**legal** 13:1,3 45:9
45:12 222:9 224:1
227:1
**legally** 104:23
105:5,12,18,24
106:3 215:12
**legitimate** 35:3
82:14 99:9 109:14
109:24 116:19
141:16 156:24
158:21 159:3
164:11 167:15
168:1,21 169:5
178:9,16,23
180:13 181:11,23
182:16 184:6
187:10,11 198:3
200:19 201:2
204:18,23 214:20
214:22,23 215:10
215:13 218:16,22
**leonard** 125:4,10
**letter** 11:12 18:10
18:16 19:14 37:8
37:11 41:22 56:20
56:24 70:7,11,21
70:22,22,24
120:18 170:6
198:13,21,22,25
199:2 200:6 203:2
204:8 206:2
207:13,21 208:5,8
214:19 217:7
224:19

**letters** 56:25 71:1
132:25 133:6,10
134:14 194:17
197:3 198:23
202:8 217:10
221:23
**level** 31:5,21 72:15
195:22
**levels** 31:24
191:15,20
**levorphanol**
101:13
**levy** 7:10 13:20,20
**lewis** 5:18,22 14:9
15:10
**licit** 187:4,22
**life** 17:2
**limit** 115:6 147:17
147:24 148:9
149:21 150:5
184:1,10,14,17
**limitations** 68:20
68:25 69:1 182:24
184:2
**limited** 130:20,22
144:12 150:13
186:5,7 201:17
205:11
**linda** 3:21
**line** 146:16 196:21
218:7 224:13
226:7 227:3
**lines** 98:6
**list** 16:24 50:14
66:21 80:24 81:6
101:19 112:4
124:21 125:3,5
210:14 211:1
**listed** 53:14 85:22
97:9 98:1,18,20
99:25 100:10

103:10 105:2,10
105:17,23 108:1
110:6 181:9 226:7
226:17
**listing** 226:7
**lists** 58:4 82:2
183:25
**litigation** 1:5
122:20 169:25
192:23 224:6
225:3 226:3
**little** 17:2 57:5
**llc** 3:18,22 6:6
7:10,15 13:9,12,25
16:9
**llp** 2:8 4:3,7,12,16
5:18,22 6:3,7,12
6:17 7:3,7,11,16
7:22 8:3,7,12,17
**local** 74:5 75:18
78:12
**located** 12:23
**location** 153:11
**locations** 31:21
**locke** 6:17
**lockelord.com**
6:20
**logan** 6:13
**logo** 162:2
**long** 22:7 28:8
101:20 122:3
124:5 174:9
195:11
**longer** 60:2 153:21
**look** 19:19 66:20
84:15 97:22 99:2
109:7 120:22
142:4 151:4,5
164:2 171:10,11
173:9 176:6 178:5
180:2 192:12

195:2,19 198:18
200:2 208:19
217:5
**looked**   177:5
**looking**   84:24 86:3
125:20 150:15,18
**lookout**   142:21
146:1
**looks**   150:23
168:25
**lord**   6:17
**los**   4:17 7:8
**losing**   119:8
**loss**   72:9
**losses**   51:3 72:4
93:19 110:2
114:10 119:6
**lot**   24:5 27:10
171:14
**lsinger**   3:24
**lucas**   4:15 15:4,4

**m**

**m**   5:12 6:7,8
**ma'am**   109:10,18
110:13 115:12
121:25 124:14
127:17 128:16
130:4 132:2 162:2
167:4 177:3
194:15
**madam**   224:10
**mail**   11:2,4,8,10
11:16 164:24
165:21,25 166:25
169:16,17,24,25
170:7 192:13
201:15 217:7
**mails**   24:4 164:22
**main**   51:13
**maintained**   69:19

**maintaining**   89:5
89:17 90:4
**making**   50:10 57:1
130:6 131:18
141:6 221:11
**mallinckrodt**   7:15
13:9,12 16:9,14
**manage**   21:24
**management**
69:18 189:19
190:13 194:18
201:24 204:9
207:24 208:24
216:7,19
**manor**   8:18
**manuals**   119:12
**manufacture**
32:12,25 114:20
115:17,23 116:6
148:4 155:21
209:11
**manufactured**
51:21 52:1 107:18
114:13,16 116:5
141:14
**manufacturer**
31:20 32:14 33:5
44:10 45:2,10,14
45:17 46:15,18,23
47:3 48:6,15,19
73:18 83:23 86:11
86:19,20,24 87:2
87:11,14,17 88:11
88:13,20,22 89:5,7
89:11,16,19 90:4
90:12,19,22 91:4
93:11 94:4,13,15
94:21,23 95:2,6,14
104:16,18 115:5
115:22 147:5,11
147:18 152:23

153:14,21 154:3,8
154:13,25 155:2
155:12,14,17
156:4 166:17
168:9,22 169:12
171:13 172:6
175:7 176:3 191:6
205:21
**manufacturer's**
42:10,11 58:14
91:13 93:12 171:7
177:4
**manufacturers**
32:2,5,10,20,24
33:8 45:19 46:2
50:17 51:2,3,25
53:10 54:5 67:16
69:12,23 72:4
86:14 90:24,25
98:11 103:19
104:6 111:15
114:19 115:5,17
115:25 116:6
119:8 128:8 129:5
133:12 137:8,17
138:22 139:16
140:2,9 141:15
152:5 154:18
161:7 162:20
163:9,15,18 164:1
164:10 166:19
167:5 169:3
170:14,19 171:3
177:14 179:2
198:9 199:9 212:8
212:17,18 213:3,7
213:11,19 216:8
**manufactures**
86:18
**manufacturing**
16:16 30:11 44:6

44:8,16,21,23 51:2
55:20 69:3,22
71:20 72:3 83:18
84:7 85:3,6,16
86:9 87:7,10,17,23
88:13,22 89:8,19
90:6,23 93:19
104:13 110:2
114:9 119:6
136:20 177:17
208:25
**march**   121:17,24
**marcus**   8:7,9
13:14
**mariama**   3:7
14:22
**mariama.c.spears**
3:11
**mark**   17:25 49:3
57:15 81:21 84:16
91:17 96:6 140:15
158:2 172:10
188:18 192:1
199:13 208:13
214:4
**marked**   18:2 49:5
57:16 81:23 84:18
91:19 96:8,10
140:17 158:4
161:24 164:18
172:12 188:20
192:3,15 199:15
199:25 204:4
208:14 214:6
**market**   5:18 65:2
65:4,8 93:25
104:16,18,19
119:7 187:3,4,11
**marketed**   101:24
**marketing**   64:22
178:14 179:1

180:5 182:1
183:12 184:3
190:8 198:10
**marketplace**
42:11 56:12
**markets** 209:13
**marshall** 188:13
189:4 196:14
204:10
**marshall's** 194:16
202:10 204:14
207:14
**mart** 8:21 15:15
**martin** 8:16 15:16
15:16
**maryland** 5:17
14:9
**massachusetts** 2:9
5:14 7:18 12:23
**massive** 183:16
184:4
**masters** 6:2 14:10
14:10 147:20
148:6 151:11
154:21 155:4
160:18 170:4,25
171:22 174:16
182:11 187:5
**material** 46:14
52:12 53:11 54:14
86:20 91:5 188:4
195:24
**materials** 55:20
**matic** 8:2 15:7,7
**matter** 12:17
27:18 108:17
129:10
**matters** 23:15
**maureen** 5:21
15:9

**maximum** 35:1
46:13,14 114:12
114:15
**mcclure** 6:12 14:2
14:2 146:16 149:7
150:21 153:2
155:24 159:15,23
160:21 168:14,18
169:9 170:23
171:20,25 172:14
174:12 175:23
176:12 177:22
178:20 179:5,19
187:6,16,24 188:9
188:25 206:5,23
215:23
**mckesson** 7:2
13:17,19 108:12
108:16,20,21
111:16 112:10,22
151:16
**md** 1:5 12:21
**mdl** 1:5 12:20
**mean** 25:10 31:14
34:25 43:11 44:8
47:5 50:23 51:7
51:23 52:10 64:25
69:9 86:12 94:5
94:10 98:8,13
139:12 144:24
155:2,19 184:15
184:19 186:13,20
196:4 210:6
**means** 31:17
149:14 158:20
159:3 161:5
**meant** 210:7
**media** 12:14 57:7
57:11 95:21,25
126:21,25 176:19
176:23 219:16,20

222:8
**medical** 20:3 35:3
52:19 55:14 70:2
70:19 71:7,14,16
72:2,16 82:14
99:9 109:14,24
114:5 141:16
156:12,24 158:21
159:3,11,12 161:5
164:12 167:15
168:1,11,21 169:6
177:19,20 178:3,9
178:16,23 180:13
180:25 181:11,23
182:6,16 184:6
187:10 198:3
200:19 201:2
204:18,23 206:14
214:20 218:5,16
218:22
**medication** 201:23
**medications** 47:12
47:17
**medicine** 150:19
160:5,6,13
**meet** 135:23
193:22
**meetings** 28:2,8
128:7
**megan** 13:18
**meghan** 7:2
**melsner** 3:20
**members** 82:22
135:23 194:18
198:24 199:1
203:11
**memorize** 53:24
**mental** 41:5
**mention** 128:6
131:7,13

**mentioned** 31:24
36:10 40:10,16
44:3 70:23 79:6
80:19 101:19
102:2 128:24
131:17 139:9
198:22 210:19
211:2
**meridian** 7:22
**messages** 183:22
**messaging** 181:2
**met** 121:3 191:6,7
**methadone** 101:13
102:24 103:1,3
**michael** 3:18
14:16 21:9 165:7
**michelle** 125:4
**microphones** 12:6
12:10
**mid** 65:19 171:10
175:8 176:4
**middle** 65:14
189:8 190:1
191:12 195:20
204:15
**midwest** 224:17
227:1
**mike** 136:16
**milligram** 148:4
190:24
**million** 165:6,7
196:11
**milwaukee** 8:4
**mind** 57:24 111:2
119:20,22
**minute** 32:11 44:5
66:3 84:22 217:19
**minutes** 174:7
208:4
**misbranding**
207:5

**mischaracterizat...** 215:25
**mischaracterizes** 98:22 123:17 146:14 199:7 218:11,19
**mislead** 207:6
**misled** 177:15
**missing** 101:5
**misstates** 61:9
**mmonaghan** 7:5
**moderate** 181:3 185:4,9,20
**modifies** 209:16
**molecule** 48:13,16 48:20 77:22
**moment** 44:3 65:22 73:20 143:8 221:21
**monaghan** 7:2 13:18,18
**money** 180:9,11
**monitor** 137:11 139:16
**monitored** 31:18
**monitoring** 144:15 211:10
**montminy** 6:16 15:20,20
**morgan** 5:18,22 14:8 15:10
**morganlewis.com** 5:20
**morning** 12:3 16:11,12
**morphine** 43:21 101:14 106:1 110:23
**morrissette** 3:9
**motley** 3:18,22 9:2 14:17 136:17

**motleyrice.com** 3:20,24
**move** 92:20 145:6 165:4
**movement** 200:7 200:12 201:6
**mt** 3:19
**mug** 179:9,11
**mullinax** 125:8,8
**multi** 62:13 64:11
**multipiece** 88:6
**multiple** 119:23
**myers** 4:12,16 14:15 15:5
**mystique** 205:16

**n**

**n** 3:5 10:1,1 12:1
**n.w.** 2:9 3:22 4:13 5:14 6:3,8 7:4,12
**name** 12:25 16:17 41:2 108:14 120:23 124:20 126:3 136:16 224:6 225:3,4,15 226:3,4,21
**named** 53:21
**names** 24:10
**narcotic** 77:15,21 78:9
**narcotics** 103:4
**national** 1:5 12:18 51:5,8,11,16 72:21 151:2,24 152:19 153:11,12 209:14 224:6 225:3 226:3
**nations** 21:21
**nationwide** 141:22 141:25
**nature** 36:1 177:16 198:12

**ne** 3:5
**neal** 5:3 14:12
**necessary** 35:21 91:2 102:4 110:2 129:17 138:12 157:7,19,25 163:20
**need** 21:15 32:14 32:20 47:7 53:10 54:14 80:23 93:5 116:1,1,20 117:25 117:25 129:18,24 138:17,18 141:17 142:20 155:20 156:5 158:21 159:3,11,12 161:5 161:21 164:12 165:13 167:15 168:1,21 169:6 174:6 177:19,20 178:3,9,17,23 180:13 181:11,23 182:6 184:6 191:10 193:3 195:15 198:3 200:19 201:2 204:18,23 205:3 209:10 214:20,22 215:10,13,19 218:5,16,22
**needed** 39:21 42:13 65:1 66:13 72:9 83:25 102:17 116:19 130:17 170:15,20
**needs** 35:2,3,4,4 52:20 58:15 70:3 70:20 71:8,15,17 71:20 72:2,3,17 80:1 82:15 91:5 99:10 109:15,24

110:1 114:6 117:7 117:9,12 141:6 155:2 156:10,13 161:1 182:16 187:10
**neither** 223:11
**net** 50:16,24,25 51:5,11,16
**never** 159:11,21
**new** 4:9,9 29:10 42:13 65:4 104:17 158:9 173:16,21
**newmark** 4:7 14:6 14:6 161:11,19,23 165:1,20 167:9 169:23 172:21 174:1,3,8 179:20 182:13 192:10 193:11 194:3,9,22 195:5,9 197:9 199:19 206:24 207:8 214:12
**nodding** 17:7
**nonchronic** 182:4
**noncontrolled** 44:12
**nontraditional** 183:20 184:3
**north** 199:1,3
**northern** 1:2 12:19
**northwest** 12:24
**notarized** 224:14
**notary** 223:1,20 224:25 225:10,18 226:15,23 227:23
**note** 12:6 19:11 174:12 224:12
**notes** 180:2 183:8
**notice** 2:13 10:9 18:5 46:6 130:6

[notice - objection]

166:11 193:16
208:18
**noticed**  130:17
**notices**  21:3
**notifications**  44:24
**notified**  157:12
**notify**  139:7
**nstephens**  5:5
**number**  12:20
28:4 35:7 38:23
53:9 54:5 99:3,7
99:12,19 109:7,12
113:15 119:3
147:17,25 152:9
152:16 160:19
180:22 182:7
185:7,8 189:1,3,18
201:22 202:19
222:8 224:7,13
**numbers**  80:2,5,7
80:8,18 82:9,13
83:9,15 98:17
99:24 100:3,9
106:8,14 107:8
142:5,21 146:1
165:8 172:17,20
202:19 218:4
226:7

**o**

**o**  10:1 12:1
**o'connor**  7:15
10:3 13:8,8 16:10
16:13 17:25 18:4
19:15,16 20:22
21:4,13,17 27:2
30:23 31:9,22
32:4,17 33:12
34:19 35:12 36:6
36:21 37:18,25
39:19 40:1,9,22
41:12 43:5 44:19

45:8,25 46:8
47:21 49:3,7,19
50:1 53:3,12,19
54:1,11,20 55:2,11
55:22 56:10 57:4
57:14,18 59:10,23
60:9 61:2,15
62:15,22 63:6,20
64:4,12,17,24
65:17 66:4,11
67:18,25 68:11
70:25 71:5 72:6
73:5,13,19 75:1,15
76:9,25 77:18
78:4,19,24 81:11
81:13,21,25 82:19
84:16,20 85:14,21
86:5,7 87:21 88:9
88:18 89:3,14
90:2,13 91:17,21
92:4,14,18 93:3
94:19 95:4,17
96:3,6,12,19,22,23
97:14 98:25 99:18
100:7,25 102:12
102:22 103:8,22
104:4 106:15,24
107:7,15 108:4
109:2 111:6
137:13,20 138:15
138:25 139:21
140:13 142:14
143:3 144:11
146:11 147:7,13
148:16,23 149:9
149:23 150:10,20
151:21 152:13
153:4,17,24
157:21 159:5,24
161:9 162:12,22
163:16 164:5,14

165:19 166:6,23
167:8,21 168:3,17
170:21 171:19
174:2 175:14
176:14 177:8
178:19 179:3
181:13 182:14
184:7,23 186:24
187:15 188:2
191:23 194:19
197:6,11,22
198:15 199:6
200:14,21 201:8
202:1,12 203:13
206:7,21 207:9,16
207:25 209:19
211:4 212:9,24
213:8,21 215:21
216:11,25 217:14
217:16 218:12,20
219:5,11,24 221:2
221:9,20 222:1
**o'melveny**  4:12,16
14:15 15:4
**object**  21:10 36:4
138:15 139:21
146:16 148:16
149:23 151:20
152:12,13 153:2,4
153:5,17,24
155:24 156:1,2
159:25 161:12
163:6 165:19,20
165:21 167:9,10
167:11 170:25
171:20 172:21
173:2 174:18
175:16 177:8
178:18,19 179:3
184:23 186:24
188:1,2,8 192:10

193:12 194:10
195:6 202:1
203:13 210:3,21
212:23 214:12
215:21,23,24
221:5
**objecting**  169:24
195:11 217:2
**objection**  30:22
31:8,15 32:1,15
33:9 34:17 35:8
36:3,15 37:17,22
39:16,23 40:6,21
41:9 42:25 43:2
44:17,18 45:5,22
46:5 47:18 49:15
49:23 52:25 53:8
53:16,22 54:7,16
54:24 55:7,21
56:6 59:7,19 60:5
60:6,25 61:9
62:11,20 63:3,17
64:1,8,15,20 65:12
67:14,21 68:3,4
71:25 73:2,10,16
74:19 75:11 76:6
76:21 77:11 78:2
78:3,16,22 82:17
85:11,19 87:18
88:3,4,14,15,23,24
89:9,10,20,21 90:8
90:9 92:2,10,12,17
92:25 94:16,24
95:1,10,11 97:10
98:21 99:16 100:4
100:8,23,24 102:8
102:19 103:2,17
104:1 106:10,11
106:19,21 107:2,3
107:12 109:22
110:7 111:19

112:2,3,19,25
113:7,8,20 114:24
115:7,20 116:7,8
116:16,17 117:1,2
117:13,21,22
118:5,6,14,22,23
120:3 121:5 122:9
122:15,21 123:1
123:16 125:16,24
127:10,11 128:1
129:25 130:9,15
131:1,2,8,9,15,16
133:15,16,22
134:12 136:23
137:6,12,13,20
138:25 139:1,23
139:24 140:12,13
142:11,13,14
143:1,3 145:12,13
146:10,11,12
147:7,13,20,21
148:6,7,15,22,23
148:24 149:7,8,9
149:11,24,25
150:9,10,20,21
151:10,11,21,22
153:3 154:21,22
155:4,5,6 157:8,20
157:21,22 159:5
159:14,15,23,24
160:7,16 161:9
162:12,22,23
163:16 164:5,13
164:14,15 165:1
166:6,8,23 167:8
167:21 168:3,4,14
168:16,17 169:8,9
169:11 170:21,22
171:17,19,22,25
172:5 173:2 174:1
174:2,5,7,9,16

175:3,14,20,23,24
176:12,13,14
177:21,22 178:20
179:4,13,20,23
180:14,15,17
181:13,15,19
182:9,14 184:7,8
184:21 185:13,15
186:1,10,16,23
187:5,6,8,15,17
191:22,23 192:23
193:8 194:8,19,21
194:22 195:7,14
195:17 197:6,8,9
197:22,23 198:6
198:15,17 199:6
199:20,20 200:14
200:15,21,22,24
201:8 202:3,12
203:14 206:5,7,21
206:22,23,24
207:7,8,9,16,17,25
208:2 209:19
211:4,12 212:9,11
212:24 213:8,21
213:23 215:22
216:11,13,24,25
217:12,14 218:10
218:12,18,20
219:5,11 220:24
**objectionable**
193:13
**objections** 188:10
193:5,8 199:18
214:15 216:6,19
**objects** 193:21
**obligated** 143:13
**obligation** 36:23
142:3 146:23
**obligations** 140:10
143:20 144:6,14

145:2,25
**obtain** 46:15 60:3
155:1 204:25
**obviates** 142:20
143:25
**obviously** 199:20
**occasion** 45:16
**occasions** 56:22
**occur** 78:10 89:25
133:8
**occurred** 45:16
130:6 132:17
133:4,5,19 135:9
158:13
**occurs** 199:4
**octagon** 149:6
**od** 10:25 162:5
**offers** 206:13
**office** 3:9,13 14:19
126:7,16 219:4
**officer** 223:2
**official** 225:15
226:21
**offline** 21:16
221:24
**offset** 168:1,13
**ohio** 1:2,10,12
3:15 8:23 12:20
224:2
**okay** 18:15 19:10
20:25 21:8 23:2
23:13,17 24:1,8,17
25:9,12,15,24 26:8
26:16 27:12,24
28:2,7,10,13,23
29:1,9,12 31:3
32:5,20 35:6,17
37:6,9,15 38:4,12
38:20 39:5,13
41:6,23 42:6,17
44:15 45:1,13,18

47:4,22 49:2,12,20
50:14 51:4,4,14
52:3 59:5,14 60:3
65:6 70:1 71:3
72:13 77:1 78:13
80:17,22 81:4,20
84:10 85:5 87:2
90:14 91:8,16
93:4,18 94:1
95:19 96:15 97:15
98:12 99:1,12
102:15,25 103:9
105:1 125:20
139:9 140:7,25
141:3,10,21
142:19 147:16
148:3,11 149:17
150:4 151:1,4,14
152:8,21 153:20
158:14,15 161:4
162:8,17 163:2
168:9 178:12,25
180:2 181:25
183:2,25 184:13
186:5 187:2
188:17 189:13
191:4 195:2 196:3
199:12 202:17
204:22 205:7
210:18,25 211:7
211:21 212:16
213:17 221:25
**omm.com** 4:14,18
**once** 41:14 55:10
75:14 155:9
165:22 176:6
**ones** 25:14 71:8
77:24 110:12
121:24 129:20
182:17

**op** 1:9,11,14
**open** 73:18 95:16
 221:22
**operating** 119:18
 120:20
**operation** 68:9
 119:13
**opiate** 1:5 12:18
 224:6 225:3 226:3
**opinion** 20:12
**opioid** 18:23,23
 19:4,5 67:7 68:23
 70:15 76:12,19,24
 77:15,21 79:2
 110:6 114:18
 118:21 147:4,18
 155:1 205:12
 214:22 215:12,13
**opioids** 18:24
 19:21 74:10,13
 77:2 100:10
 116:23,24 117:19
 118:13 137:10
 145:1 155:3 167:5
 177:14,16 182:2
 214:23 215:14
**opium** 101:14
 102:14
**opportunity** 82:23
 83:2
**oppose** 68:10
 202:9
**order** 32:12 66:25
 71:20 72:5 103:20
 125:18 129:6
 157:24 161:14
 164:11 165:23
 170:1 172:22
 174:10 192:15,19
 193:1,14,23
 195:10,12 199:22

**199:23** 214:14
**orders** 20:3
 137:11,16,18,19
 138:21,23,24
 139:17,18 152:4
**organization**
 206:4 207:23
**orleans** 158:9
**outcome** 223:17
**outpaced** 172:7
**outreach** 203:11
 203:17
**outside** 27:20
 137:22 142:12
 143:4,5 166:1
 170:8 173:6
 180:16 194:11
**overcame** 145:24
 146:3
**overcome** 142:3
**overestimate**
 169:14 178:23
**overlap** 20:23
**overlapped** 132:13
**overview** 138:1
**oxford** 5:23 8:7
**oxy** 111:5
**oxyc** 180:9 181:1,3
 181:7
**oxycodone** 43:15
 48:2,6 53:4 62:10
 75:22,23 98:6,7,8
 98:10,12,15,18
 99:3,8 101:14
 103:9,16,24 104:8
 104:22 109:8,13
 110:16 149:5
 165:14 166:5
 189:14 190:24
 191:21 196:5,9,23
 200:13,20 205:13

 205:15,22
**oxycontin** 148:5
 179:11 180:12
 183:3,21 196:7,10
 196:15
**oxymorphone**
 43:23 105:15
 111:3

**p**

**p** 5:17 11:3 12:1
 172:20
**p.m.** 222:5,12
**p4241610-1612**
 11:5
**page** 10:2 18:19
 19:17 49:11 57:24
 57:25 140:22
 141:1,3 158:16
 160:20 162:3
 164:23 173:10
 178:5 182:21
 184:25 188:23
 189:8,25 195:3
 196:20 200:3
 202:18 205:7
 209:5,22 211:18
 214:10,18 217:6
 224:13,15 226:7
 227:3
**pain** 158:24 181:4
 181:4,5 182:4
 183:20 184:3
 185:4,10,21
 189:19,20,22
 190:12,21 194:17
 196:24 197:5,21
 200:6,7,12 201:6
 201:24 202:8,8
 204:9 207:24
 215:11,12 216:6
 216:19

**painkiller** 190:14
 190:15
**palo** 5:4
**panda** 149:6
**par** 5:11,12 14:5
**paragraph** 169:19
 171:24 173:11
 189:9 190:1,2
 191:5 195:21
 196:21 204:15
 205:8,20 206:11
 209:5,23 210:13
 211:18
**park** 4:8
**part** 10:11 42:20
 58:1 94:8 120:17
 140:5 162:14,20
 162:24 164:8,12
 171:23 213:24
 226:9
**participants** 140:3
**particular** 45:2
 56:12 68:14 75:10
 78:25 86:10 87:5
 93:10 103:10
 125:21 148:13
 151:8,8 153:10
 154:15 157:6
 166:11,12,12,25
 166:25 168:22
 174:22,22,23
 186:14,21
**parties** 2:14 12:13
 223:12,15
**party** 163:10
 168:20 176:7
 192:22,23 193:15
 193:20,22
**pass** 136:10
 219:13

**patient** 86:16,21
  116:20 117:9,12
  149:5 153:8
  163:20 190:21,23
  202:9 215:12
**patient's** 215:11
**patients** 114:22
  116:13 182:2
  190:9 196:16
  197:17 204:24
  205:3
**patrick** 5:6 15:2
**patterns** 209:12
**paul** 4:2,5
**pbeisell** 5:9
**pending** 221:22
**pennsylvania** 5:19
  5:24 6:14 8:8,19
**people** 24:10
  37:20 38:4,7,10,13
  38:17,19 39:2,8,9
  39:20 79:9 80:22
  80:25 81:6 123:13
  151:19 196:24
  197:5,21
**percent** 128:3
  134:17,20 173:23
  195:23 196:15
**period** 74:17
  188:4
**permission** 161:20
  161:22 165:25
  192:16 193:3
**permit** 166:1
**permits** 33:1 45:4
  211:9
**permitted** 32:24
  45:11,15,20 46:3
  48:17,21 85:15
  172:2 174:15
  194:12

**persio** 5:13
**person** 38:1 80:9
  81:2
**personal** 20:12
  144:19 145:15
  146:6 149:3 221:3
**personally** 220:21
  225:11 226:15
**personnel** 128:25
  129:4
**persuasive** 178:14
  180:4
**pertain** 20:23
**pharma** 1:9,11,13
  4:6 205:22 206:3
  206:13
**pharmaceutical**
  5:12,21 10:25
  44:11 90:21
  114:19 115:16
  132:3,15,16
  158:10 162:6
  205:23 206:12
**pharmaceuticals**
  4:11 5:11,11 15:5
**pharmacies** 32:6
  114:21 116:12
  144:22 152:4
  204:25
**pharmacists**
  190:20
**pharmacy** 31:20
  32:3 111:23
  112:15 113:3
  116:18 132:5,17
  151:8,18
**philadelphia** 5:19
  6:14
**phone** 25:1,21,25
  26:3,6,7 123:20,22
  124:1 135:11,13

203:6,11 224:3
**phones** 12:9
**phrma** 214:10
**physical** 55:19
**physician** 190:11
  190:13
**physician's** 180:20
**physicians** 181:3
  182:18 200:6
  202:8
**pick** 12:7 109:1
**pictures** 179:8
**piece** 216:1
**pieces** 131:19
**pill** 86:16 148:5
  149:5
**pills** 147:18 151:6
  152:9,17 155:21
  187:13
**pittsburgh** 5:24
  8:8
**pky181383991-...**
  11:13
**place** 12:10,12
  36:20 60:4 83:17
  88:12,21 91:8
  101:23 129:7
  138:10 139:20
  140:8 143:14
**placed** 41:22
  204:7
**places** 102:9,21
**plaintiff's** 20:18
  20:20
**plaintiffs** 4:2
  14:17 21:1 136:12
  136:18 220:5
**plant** 44:13 199:3
**players** 31:23
**pleasant** 3:19

**please** 12:6,9
  15:23 65:22 66:18
  134:10 157:10
  172:15 220:4
  224:11,11
**pled** 206:19 207:4
**plus** 169:19,21
  173:22,24
**point** 29:11 64:10
  66:20 78:11
  128:11,19 130:11
  142:16 159:1,13
  203:1 221:1
**pointed** 177:3
**points** 128:13
  129:13,16 131:22
  132:19,23 134:2,6
  134:11,16 135:1
  135:15
**policies** 144:13
**policy** 174:24
  175:1
**polster** 1:7
**pool** 187:21
**population** 151:19
  153:8
**porter** 2:8 5:13
  12:23 14:5
**portion** 49:12
  108:25 140:1
**position** 22:8,11
  22:19 29:7,18
  173:14 204:24
**positions** 30:13
**potential** 56:3,8
  182:6
**potentially** 175:11
  176:10 178:15
**powerpoint** 158:7
  178:4,6,8

pplpc03200040...
  11:17
pplpc045  192:6
pplpc04500000...
  11:11
pplpc04500000...
  11:9
practical  159:9
practice  59:15
  91:14 160:4,6,13
  174:24 175:1
practices  18:21
  29:22 30:3,6 54:3
  86:24 119:7
practitioners
  201:13
preceding  50:18
precise  159:12,22
  161:4
precisely  24:6
preparation  26:9
  121:8,11 123:5
  124:2 127:13,14
  131:5,24 132:21
  134:4 135:2,18
preparations
  135:22
prepare  23:17,20
  24:11 25:3 124:13
  173:21
prepared  81:6
  124:10 125:14
  220:15
preparing  27:12
  27:21,25 121:19
  220:13
prescribe  182:2
  190:19 201:23
prescribed  215:12
prescribers
  183:22

prescribing
  201:17
prescription  1:5
  8:16 12:18 18:24
  64:3,9 65:15
  114:18 116:23
  117:19 118:12,21
  161:1 163:10,13
  169:1 177:6
  180:20 182:8
  195:24 211:10
  224:6 225:3 226:3
prescriptions
  15:17 19:6 58:20
  58:24 59:18 60:13
  60:18 61:6 176:7
  185:8,9,18 196:8
  196:11,17 205:2
present  2:13 9:1
  13:4 64:6 123:5
  123:13,15 135:10
presentation
  158:8,8,17 159:2
  181:12 182:22
  183:25 185:1
  220:13,16,18,23
  221:1,4,7,12,17,19
presented  209:14
preserved  174:6
  193:9 194:8 195:8
  195:15,16 199:18
pretty  144:12
prevent  17:18
  151:15 211:25
previously  27:18
printed  50:7
prior  37:10 59:4
  61:10,22 98:22
  123:17 199:7,21
  210:25 214:15
  218:11,19

private  12:8
privilege  65:25
  66:2
probably  20:22
  28:12 40:25 41:18
  122:10 169:13,21
  172:9
problem  189:10
  189:15 205:11,14
  210:10
procedure  225:5
  226:5
procedures  18:22
  29:23 30:2,7
  119:13,18 120:20
proceed  16:5
  57:13 66:10 96:2
  108:11 127:2
  136:7 176:25
  204:3 217:25
  219:22
proceeding  21:7
  222:11
process  30:8 33:1
  34:9 38:5 39:11
  39:14 48:25 78:25
  79:4,8,10,16 83:17
  83:21 87:23 89:12
  90:11,23 91:8,12
  95:3,14,16 113:16
  119:10,14 125:6
  125:13 139:14
  144:5,13 147:3
  169:13
processes  34:14
  42:12 44:23 48:24
procure  48:16,20
  90:20
procurement
  18:23 19:4,23
  30:7 46:10,12,13

46:17,25 47:11,15
  47:23 48:5,9,12
  52:8,12 90:14,16
  90:18 91:1,3,10,15
  92:1,22 93:4,10,22
  94:3,15,23 95:8
  147:2,3 170:7,10
  208:25
produce  32:21
  45:10 91:5 152:24
produced  161:13
  165:23 169:25
  192:13 217:5
product  65:4,14
  67:7 68:23 70:16
  76:12,19 91:6
  107:21 147:5
  150:12 153:7
  154:15 158:21
  159:4 175:7,9
production  10:18
  10:21 18:23 19:5
  19:21,22 30:4
  34:23 35:14 37:1
  38:6,9 41:24 42:3
  42:7 43:6 44:1
  46:22 47:23 50:6
  50:20 51:12,17
  52:5,15,24 53:7
  54:6,23 55:5,15,24
  56:4,5,14,19 57:2
  58:8,13,15,18,25
  59:15 60:19,24
  61:7,18,24 62:9,18
  62:25 63:9,15,24
  65:10 67:3,6
  68:13 70:6,15
  71:10,18 72:10,24
  73:9,24 74:10,13
  75:5,23 76:5,13,20
  77:4 79:2,17 80:2

80:4,12,18 82:3,21
83:1,7,9,12,14
90:20 96:25 97:8
97:12,25 98:3,10
98:19 99:22
101:17 102:7,17
103:13 104:9,22
105:4,11,16,22
106:2,17 107:9,16
111:8 112:7
113:12 114:4,11
114:18 115:4,14
115:15 116:3,15
116:23 117:4,11
118:11,19 119:11
119:15,21 125:22
126:11 144:25
208:25 221:23
224:15,17,22
**products** 65:18
67:11 79:2 102:3
106:18 108:1
110:10,13 128:4
151:17 180:10
184:3
**profit** 167:19
168:12 169:5
**program** 211:10
**projected** 52:7,11
70:2,19 71:7,14,16
71:21 72:1
**promised** 143:8
**promoted** 29:2
180:25 183:20
**promotion** 178:14
180:5
**promotional** 179:1
179:17,25 180:9
180:11 183:13,16
184:4 185:11

**promulgated** 34:9
**proposal** 79:21
**proposed** 79:21
82:20 124:25
130:5,5,6 208:18
208:21 209:16
210:7,12 211:8,21
212:6,16 213:2
214:2 216:20
**protective** 161:14
172:22 192:14,19
193:23 195:10,12
199:22,23 214:14
**protocol** 172:18
**proven** 89:12
**provide** 19:8 20:8
33:4 47:7 59:24
70:11 83:24 86:19
107:5 111:17,25
118:4 144:19
156:11 162:11
164:11 201:1
212:18 216:9
**provided** 40:7
55:25 58:16 70:3
70:14 71:9,11,13
72:8 112:5 161:7
162:20 163:4,15
164:4 177:10
206:3
**provides** 60:12
212:16
**providing** 17:23
109:17 206:17
**prudential** 7:17
**public** 82:22
118:13,21 119:4
120:1 177:15
202:23 223:1,20
225:10,18 226:15
226:23 227:23

**publish** 106:23
**published** 79:22
79:25 80:5 82:4
82:10,21 107:9
208:17
**publishes** 35:15
**publishing** 208:21
**pulled** 65:2,13,19
104:16
**purchase** 153:15
153:22 154:4
155:3
**purchases** 155:18
**purdue** 1:8,10,13
4:6 14:7 148:3
161:12,20,22
164:25 165:22
166:3 179:18
192:13,16 193:21
194:15 196:6,9
197:2 198:23
199:2,17,24 202:7
203:10 205:22
206:3,13,19 207:4
207:22 217:5,7,9
**purdue's** 196:23
**purpose** 47:13
149:15 209:4
**purposes** 47:10
92:22 160:21
173:20 218:23
**pursuant** 2:13
52:9 161:13
165:23 170:1,5
**put** 67:16 86:16
106:14 134:18,20

**q**

**qms** 69:15,16
**qualifications**
19:13

**quality** 162:18,18
162:19
**quantifiable** 74:3
74:4,8
**quantify** 28:1
74:23
**quantities** 205:1
**question** 17:4,11
17:15 20:10,13
21:5 22:21 25:2
30:24 32:19 33:6
33:11 34:1 35:11
36:9 37:24 39:6
39:18 40:23 41:11
45:24 47:20 48:18
49:18,25 63:5
65:24,25 66:1,16
66:17,19 78:5,21
80:3 83:10 85:13
87:13,20 88:17
92:5 104:3 109:3
115:1,9 118:16
138:17,18 139:4
142:16 144:9,10
145:5,8,19,21
146:5 150:2,4
154:11 160:9,11
166:14,15,18,22
168:7 169:2
170:13,16,18
172:5 175:3,6,17
186:18 193:12
195:16 212:14
216:16 218:3,11
**questioning** 20:17
146:17 218:8
**questions** 16:15
21:11 111:7
138:11 172:2
174:15 195:14
220:6 221:21

| | | | r |
|---|---|---|---|
| 222:4 | 88:1,13,22 89:8,19 | 167:6,7,14,20,24 | **r** 3:13 4:15 12:1 |
| **quick** 176:17 | 89:25 90:6,12,15 | 168:2,10,13 169:4 | **r&d** 173:19 |
| 203:22 220:2 | 90:16,18,18 91:2,3 | 169:6,14 170:7,10 | **raise** 193:9 195:15 |
| **quickly** 137:25 | 91:15 92:1,22 | 170:15,20 171:7 | **raised** 216:6 |
| **quite** 139:4 | 93:10,22 94:3,15 | 171:10,15 172:9 | **range** 192:6 |
| **quota** 10:19,21 | 94:23 95:9,15 | 173:15,16,21 | **rannazzisi** 24:13 |
| 19:24,25 20:1,2 | 96:25 97:8,13,19 | 175:12 176:4,11 | 24:22 25:20 26:7 |
| 21:21 23:4,14 | 97:25 98:4,10,19 | 177:5 178:3 184:5 | 27:15 56:21,22 |
| 26:15 28:15 30:4 | 99:22 101:17 | 184:11,14,18 | 121:3,13 122:5 |
| 30:7,20,25 31:5 | 102:7,18 103:13 | 185:23 186:8 | 123:14,18 124:2 |
| 32:21 33:1,5,8,14 | 103:23 104:10,22 | 187:9,21 196:13 | 124:20,24 125:6 |
| 33:25 34:4,10,16 | 105:4,11,16,22 | 196:23 200:13 | 125:21 126:6 |
| 34:23 35:14 36:1 | 106:2,17 107:1,9 | 201:7 202:10,25 | 127:9,24 128:14 |
| 36:8,11 37:1,16,21 | 107:17,22 111:8 | 208:24 211:2 | 130:24 131:24 |
| 38:2,9 39:11,14,15 | 112:5 114:4,11,17 | 218:4,15,22 219:1 | 133:7 134:4 |
| 39:20 40:12,14,17 | 114:18 115:4,13 | **quotas** 10:11 | 135:11,17 |
| 40:20 41:8,17,25 | 115:14,15,18,23 | 18:23,24 19:5,5,20 | **rannazzisi's** 126:3 |
| 42:4,8,10,19,23 | 115:24 116:4,15 | 19:22,23,23 21:25 | **rate** 51:5,8,11,16 |
| 43:9 44:1,8,9,21 | 116:23 117:4,12 | 22:16 28:18 29:24 | **rates** 51:9 |
| 45:11,21 46:4,10 | 117:18 118:11,19 | 30:11,15 38:6 | **rationale** 47:6 |
| 46:12,13,14,17,22 | 119:11,15,21 | 43:6 44:6,16 | **raw** 55:20 91:4 |
| 46:25 47:8,11,23 | 121:1 125:22 | 47:15,23 50:20 | 195:23 |
| 48:5,12 49:21 | 126:11 129:20,21 | 51:12,17 52:8,13 | **raymond** 29:16,16 |
| 50:3,6 52:5,16,24 | 129:24 130:20,22 | 58:8 59:1 73:24 | **reach** 72:5 |
| 53:7 54:3,6,23 | 131:19 132:25 | 74:10 76:13,20 | **reaching** 183:3 |
| 55:6,16,24 56:5,14 | 133:6 134:14 | 79:22 80:12 82:21 | **read** 20:5 109:4 |
| 56:19 57:2 58:14 | 137:2 138:9 | 83:1,19 85:3,16 | 120:16 141:19 |
| 58:18 59:16 60:19 | 139:19,25 140:3,8 | 86:9 91:10 93:5 | 162:5 165:17 |
| 60:24 61:8,18,24 | 141:12,15 143:14 | 111:13,18,20 | 172:15 173:25 |
| 62:10,19 63:1,2,10 | 143:17,23 144:4 | 112:1,7,11,17,23 | 178:10 182:25 |
| 63:11,16,24 65:11 | 144:13 145:24 | 113:5,12,18,25 | 183:18,23 188:25 |
| 67:3,6,8 68:7,13 | 146:22 147:3,4,16 | 116:5 144:4,25 | 189:23 191:2,17 |
| 68:23 69:14,18 | 147:22 148:5 | 145:3 147:2 157:5 | 196:1,18,25 200:9 |
| 70:6,15,16 71:10 | 149:20 150:5,11 | 162:9 171:3 | 201:18 203:8 |
| 71:18 72:14,15,24 | 151:1,5,14,15,23 | 182:24 183:9 | 205:5,18,25 208:7 |
| 73:9 74:13 75:5 | 152:2,8 153:6 | 184:2 191:14,15 | 209:2 210:16 |
| 75:24 76:5 77:4 | 154:7 155:9,15,18 | 191:20 208:19 | 212:3 215:16 |
| 79:2,12,17 80:2,5 | 156:17 157:14,17 | 210:20 | 225:5,6,12 226:5,6 |
| 80:18 82:4,9 83:7 | 158:1,18 160:14 | | 226:17 |
| 83:9,13,14,25 84:7 | 162:19 163:23 | | |
| 85:6 87:7,10,17,23 | 166:11,16,20 | | |

**reading** 99:2
109:6 208:4
224:19
**reads** 19:19 57:25
158:18,19 173:12
179:10 180:8,24
182:23 183:16
195:22 196:3,21
200:5 202:22
204:22 208:20
210:2,13 211:21
214:19 215:1
**real** 158:20 159:2
203:22
**really** 138:12
147:9 152:21
**realtime** 164:3
**reason** 47:7 94:12
117:3 171:6
224:14 226:8
227:3
**reasons** 30:15,19
31:4
**recall** 36:7 39:1
56:11,15 65:19
77:8,9,24,25 84:11
133:24 134:5
135:15,24 220:8
**recalls** 93:25
119:7
**receipt** 224:18
**receive** 39:14
70:18 77:20 90:19
112:5
**received** 44:25
71:1 74:4 83:6,11
206:2 207:14
214:3
**receives** 155:17
**receiving** 75:16

**recess** 57:9 66:7
95:23 108:8
126:23 136:4
176:21 203:25
217:22 219:18
**recognize** 49:8
97:4,5 187:13
**recommend**
190:19
**recommendation**
173:17
**record** 12:4,13
13:7 16:18 19:12
57:7,11 66:3,6,9
71:2 95:21,25
108:7,10 109:5
126:21,25 136:3,6
160:22 172:14,17
174:13 176:19,23
189:1 203:22,24
204:2 217:18,21
217:24 219:14,16
219:20 222:4
223:10 226:9
**recorded** 12:15
103:5
**recording** 12:12
**red** 149:4 183:5
185:25
**reduce** 151:15
187:20
**reduced** 187:2,3
196:13 223:8
**reduces** 187:21
188:3
**reduction** 195:23
202:25
**reed** 6:12 14:2
**reedsmith.com**
6:15

**reexamination**
20:20
**refer** 49:21 50:3
90:16 190:17
**reference** 166:24
176:2 224:7 225:2
226:2
**referenced** 225:11
226:15
**referring** 109:3
130:13
**refers** 142:16
149:5
**reflect** 82:14 97:16
97:17 98:18
209:10
**reflected** 109:21
218:5
**reflecting** 83:3
**reflects** 96:24 97:7
97:12,24 114:5
170:7
**reg** 79:13
**regard** 132:3
**regarding** 19:1,8
19:25 26:8 36:8
39:15 41:17 56:18
72:14 75:22 76:3
76:11 83:7,12,25
128:9 172:2
**register** 11:14
79:23 80:1,6,10
82:5,10,22
**registered** 69:23
161:2
**registrant** 46:25
162:9
**registrants** 19:24
19:25 31:25 32:7
128:21 135:5
144:7 145:2

166:13 174:22
**regs** 23:21 86:13
86:23 120:15,16
**regular** 41:8
**regulate** 160:5,13
160:24
**regulation** 34:15
49:22 50:4 84:9
84:21 85:10 91:23
91:25 92:8 99:21
102:5 103:12
160:4 210:7,12
211:8
**regulations** 34:8
72:14 113:16,24
114:4 129:18,19
129:21,24 140:5
209:6,9,16,23
210:5 211:2
**regulatory** 208:24
210:20 213:25
**relate** 20:18
**related** 18:22
23:14 29:23 30:3
30:7 37:16,21
99:21 100:6
111:20 127:21
129:2 143:20
208:18 210:20
211:2 223:11
**relates** 1:7
**relation** 121:19
**relationship** 20:2
138:8
**relative** 223:14
**relevant** 52:22
85:8,17 131:4
211:9
**relief** 181:5
**relies** 163:9

rely 68:14 103:25
  120:19 159:19
  177:4
relying 164:8,9
remaining 51:25
remember 24:1,6
  25:18 41:2 84:13
  101:20 109:17
  111:9 123:7 135:8
  135:19 207:1,4
  218:7,17
remembered
  134:22
remind 213:2
reminders 216:7
reminding 213:6
remotely 13:5
removal 42:14
renew 146:9
  216:23
repeat 45:23 173:1
  186:17 199:19
  214:14
repeated 48:18
  193:4
repeating 174:9
replaced 132:5
report 10:12 22:1
  28:23 29:4 57:25
  137:19 138:24
reported 1:24
  164:1
reporter 13:2
  15:23 101:11
  225:7
reporter's 17:2
reporting 21:21
  26:14 28:15 69:17
  84:3 143:20
reports 66:24
  181:7

represent 16:13
  99:5 108:16,24
  109:9 136:17
  195:23 208:10
representative
  106:6
representatives
  189:6 206:16
represented 220:7
represents 99:6
  109:11
request 32:21
  33:18,21 71:2
  84:1 88:2 101:6
  155:12,14 157:4
  157:17 173:16,21
  193:22 226:9,11
requested 52:9,12
  56:23 122:19
requester 87:24
requesters 10:13
requesting 56:21
  169:4 175:8
requests 20:1,1
  33:15 153:14
  166:16 171:7
require 154:17
  182:16 211:23
required 26:14
  33:7,17,21 36:18
  36:19 82:2 83:24
  99:8,14,20 100:1
  100:12,16,22
  101:16 102:5
  103:11 104:14,24
  105:5,12,18,24
  106:4,22 107:4
  109:13 113:11
  193:15 201:3
  212:18 224:25

requirement
  139:6 204:16,22
requirements
  42:12 52:21 99:11
  109:16 114:8,9
  213:3,18
requires 26:21
  157:16,23
research 9:2 35:4
  52:19 99:10
  109:15,25 114:6
  117:7,25 156:12
  218:23
reserve 70:3,19
  71:8,15,17 72:18
  136:10,10 221:21
resolve 21:15
  193:23
resort 190:15,16
respect 28:17
  30:21 54:2 84:6
  97:15 99:24 100:9
  101:7,12 103:1
  104:21 105:1,3,7,9
  105:11,15,21
  106:1 153:10
  170:10
respective 2:14
respond 56:23
  159:7
responded 123:9
responds 141:25
response 118:4
  194:16 204:13
  207:14 214:2
responsibilities
  21:22,24 28:14
  34:14 138:8
  143:13,16,25
responsibility
  28:16 137:10

139:15,19 143:11
  146:4 213:7
responsible 35:13
  56:17 72:15 106:8
  106:17 143:23
restrict 150:6
  201:22
restricted 190:18
restriction 192:21
  196:22
result 145:3 172:9
  185:10 189:15
retail 58:19,24
  59:17 60:13,17
  61:5
retained 222:9
retired 24:23
return 124:8
returned 224:18
returns 51:3
revealed 198:13
review 10:15
  23:22,24 28:20,21
  28:21 82:3 124:11
  127:19 140:23
  175:8 224:12
  225:1 226:1
reviewed 26:9
  81:15 111:3
  220:25 221:6,18
reviewing 23:21
  163:25
revision 130:14
  176:4
rhodes 173:14,18
  173:20
rice 3:18,22 9:2
  14:17 136:17
richard 164:24
  169:16

**right** 28:13 40:5
84:24 96:18,22
98:18 109:5 137:4
140:11 142:25
145:10 147:12
150:17 151:2
153:1,16,23 154:5
155:3 156:13,19
163:5 165:11
168:2 171:16
182:25 186:15
194:4 200:20
201:6 202:22
211:3 212:20
213:19 221:22
**rise** 177:18
**risk** 47:16
**rite** 5:17 14:9
111:24 112:15
113:4
**road** 5:4 8:18
16:25
**robert** 3:3 14:24
224:5
**robert.chandler**
3:6
**role** 21:19,23
22:17,23 23:6,8
28:16 29:20 33:13
34:12 49:14
126:10 141:5
159:6,10
**rollback** 196:4
199:4
**rolling** 191:13,14
191:20
**room** 13:4 25:1,6
25:20,22 26:1,2
123:19
**ropes** 7:16 13:9,12

**ropesgray.com**
7:19,19
**ross** 6:18
**rothschild** 8:17
15:17
**roughly** 28:2 38:4
39:5
**routinely** 181:8
**ruiz** 6:7 13:24,24
144:22
**rule** 130:6 208:21
209:16 211:21
212:6,16 213:2
**rulemaking**
208:18 214:3
216:20
**rules** 16:25 225:5
226:5
**run** 151:1
**russo** 1:24 9:2
12:25 13:3 223:2
**rx** 6:6 13:25
**ryan** 125:7

**s**

**s** 10:1 12:1 224:15
226:8,8 227:3
**sackler** 164:25
169:17
**safe** 40:2
**safety** 157:3,16
**sale** 98:7,8,18 99:3
99:8 109:13
**sales** 109:8 161:8
163:25 164:3
171:11,14 172:7
173:16 177:18
182:4 183:4
**samsha** 40:24 41:1
41:4,7,13,16,20
**samsha's** 41:21
42:2

**sannerud** 24:12,14
24:15,17,25 25:4
27:14 28:25 121:4
121:16,19,23
122:19 123:14
127:9 134:8,19
135:2,10,17
**saw** 189:16
**saying** 120:11
175:9 184:16
**says** 18:21 50:9
51:4,19 52:7,18
66:22 69:13 70:1
72:19 85:5 141:4
141:11 142:2,7,23
156:9 158:23
160:3 169:19
178:8 183:9 185:5
189:14 190:6
191:9 196:12
201:11 205:20
206:12 215:8
**schedule** 28:18
43:10,10 46:19
58:2,2 69:24
79:20 108:1
134:23 141:13,13
205:1
**schedules** 22:1,5
**schein** 6:16 15:21
**scheme** 210:20
**science** 23:1,2
**scientific** 20:4
35:4 52:19 70:2
70:19 71:7,14,17
72:2,16 82:15
99:9 109:14,24
114:5 117:7,24
141:17 156:12
218:23

**scientifically**
28:22
**scope** 31:15 32:16
39:24 43:1 45:22
53:23 54:8,17,25
55:8 62:11,20
63:3,17 64:1,8,15
65:12 77:17 78:3
78:16 82:17 92:11
92:25 100:4,9
106:11,19 113:7
122:9,15,21
129:25 130:15
131:1,8,15 136:23
137:6,12,20,23
139:1,22,23
140:12 142:12
143:2,3,10 144:17
145:13 146:11
148:22 149:10,12
149:24 150:9
151:2,10,21
153:11,12 154:21
155:4 160:7,16
166:1,7,8 170:8,22
171:21 173:6
174:18 175:16,25
179:4,22 180:16
180:24 181:14,19
182:13 184:9,21
185:13 187:5,25
191:22 194:11,20
194:21 197:7,13
197:22 198:16
199:7 200:15
202:2,3,13 206:22
207:7 208:1
212:12,25 213:9
213:22,23 216:12
216:14 217:15,16

[screen - simply]

Page 34

screen  204:19
seal  225:15 226:21
sec  215:5
second  5:23 86:20
  147:2 156:7
  158:19 169:18
  180:24 191:4
  195:3,21 196:20
  202:17 204:15
  205:8,8,9 209:5,23
  211:17 214:18
secondary  145:1
secondly  193:4
section  10:16,17
  21:20,21 22:15
  24:15 26:15 28:15
  29:2,21 34:13
  38:14 49:14 50:6
  50:9 52:9 79:12
  82:8 84:3,25 85:1
  129:5,12,12 131:7
  131:14 133:7
  135:4 192:20
  193:13 199:23
  211:22
section's  68:8
  128:20 129:7
sections  38:8,10
  79:10,14 129:1,8
  130:21,23
see  21:14 50:12
  84:15 85:25 97:2
  123:25 126:3
  138:5 140:24
  141:8 174:25
  176:7 179:12
  180:6 183:5,10,14
  189:10,11,14
  190:4,25 204:11
  204:17,19 208:12
  209:7,25 211:19

214:11,24 215:4
  217:6
seek  129:6 154:3,8
  154:13 161:19,21
  168:19 182:2
  192:16
seeking  168:9
seen  18:6,12 37:4
  57:22 117:8
  220:18
seizure  74:3
seizures  72:21
select  27:5
selected  10:19,22
selective  97:1
sell  90:25 173:17
selling  175:7
seminars  132:4
senator  203:5
send  152:17
  179:18 201:15
sending  37:10
  197:3 202:8
sends  56:20
sense  17:9,16
  20:14 147:24
  159:10
sensitive  12:7
sent  133:10 179:25
  198:23,25
sentence  205:8,9
  206:11 215:2
separate  48:8
  117:8 135:13
  175:17 216:2
separately  48:13
  104:15
seriously  191:12
served  132:14
server  120:7,9

services  6:6 14:1
sessions  121:11
  123:6 134:4
set  30:15 31:5,5,19
  34:4,9 46:21
  55:17 98:10
  106:18 107:16
  111:18 112:1
  116:14 119:3
  177:5 191:14
  198:2 200:12
  201:6
sets  33:25 43:6,9
  46:17 111:12
  112:11,16 115:3
  119:10,14 138:13
  141:12,15
setting  22:3 34:10
  38:5,8 42:18
  43:25 50:20 51:17
  52:5,15,24 53:6
  54:3,5 55:5,15,23
  56:4,13 58:7,13,25
  59:15 60:18,23
  61:18,23 62:9,18
  62:25 63:9,15,24
  72:15 73:8,23
  74:9,12 75:4,23
  76:4,13,19 77:3
  79:1 86:8 93:4
  94:3 103:12
  105:16,21 106:1
  111:8 114:17
  115:13 118:10,18
  119:20 127:21
  144:5
severe  181:4 185:4
  185:10,21
shaking  17:7
shannon  6:12 14:2

shapira  8:7 13:15
shapira.com  8:9
share  93:25
shared  27:11
sharing  192:21
sharon  8:11 15:11
sharon.desh  8:14
sheet  106:9 224:13
  226:7,10,18 227:1
ship  173:17
shipments  137:18
  138:23 139:17
short  57:9 66:7
  95:23 108:4,8
  126:18,23 136:1,4
  176:21 203:25
  217:22 219:18
shorthand  223:7
show  138:6 171:14
  192:16
showing  192:13
shown  224:16
shows  183:2,3
  185:7,17
sic  65:16
side  202:22
sign  80:20,23,25
signatory  133:14
signature  132:24
  134:13 223:19
  224:14
signed  56:20 133:7
  193:1 225:13
  226:18
significantly  92:8
signing  224:19
signs  80:9
simple  145:21
simply  140:7
  166:18 186:13,20
  187:21 193:7

195:17 200:18
**sincerely** 224:21
**singer** 3:21
**single** 62:13 64:10
101:22 195:16
**sir** 191:10 224:10
**sit** 84:10
**site** 181:2
**sitting** 106:6
120:25
**situation** 31:2
194:1,2,4
**situations** 172:3
**six** 222:9
**size** 163:23 187:20
**skeptical** 163:8,14
164:9 171:7 176:6
**slide** 158:17 179:8
180:3 182:23
185:2
**small** 196:22
**smaller** 39:3
**smclure** 6:15
**smith** 6:12 7:20
14:3 15:19
**sold** 152:25 165:13
175:9 176:5 212:2
**solomon** 9:3
**solutions** 5:11
13:1,3 222:10
224:1 227:1
**solve** 205:13
**sops** 119:18 121:1
121:1
**sorry** 27:7 38:14
46:23 71:22 81:5
105:8 150:2
170:16 213:15
**sort** 20:19 26:16
**sorts** 24:1 27:4
74:2

**sought** 165:25
205:21
**sources** 58:4,5,9
**south** 3:19 7:22
**spaeder** 6:7 13:25
**speak** 27:13,17,20
62:6 128:20 135:5
221:7
**speaking** 41:4
54:2 174:6
**spears** 3:7 14:22
14:22
**spec** 7:15 13:9,12
16:9
**special** 24:23
29:16 129:6
**specialist** 9:3 23:1
23:3
**specialized** 201:24
**specialty** 180:25
183:21
**specific** 48:5 75:7
76:23 77:2,14,24
77:25 78:9 119:19
131:13 141:22
142:6,22 146:2
147:18,25 149:21
150:18,19 152:20
154:9,9,14 166:16
**specifically** 20:11
30:3 50:8 127:23
166:10
**specify** 147:25
**speculation**
168:18 169:11
170:23 171:18
175:21,24 177:23
178:21 179:14
182:12 187:7,25
200:23

**spelled** 76:14
**spend** 27:25 208:3
**spending** 184:4
**spent** 180:9,11
183:17
**spoke** 24:10,12
**sprains** 182:3
**spread** 155:21
**springfield** 3:10
**square** 6:13
**stacy** 1:19 2:3 10:2
10:10 12:16 15:25
16:19 81:6 222:7
224:8 225:4,9
226:4,13 227:20
**staff** 70:4
**stage** 138:14
**standard** 119:18
120:20
**standards** 119:13
**stands** 98:14
145:14
**stars** 4:17 7:7
**start** 17:5 23:8
126:25 176:23
179:10
**started** 38:16
**starting** 96:24
**starts** 124:16
190:1 209:6
**state** 13:5 16:17
74:5 75:18 78:12
97:18 141:22
152:20 163:19
193:17 225:10
226:15
**state's** 211:9
**stated** 173:4,14
220:9
**statement** 42:21
58:7 92:21 142:9

142:24 225:13,14
226:19,19
**statements** 138:7
140:23 181:21
221:4,11,15,18
**states** 1:1 3:13
12:19 14:20,25
15:1 19:21 35:2
52:20 72:17 82:16
114:7 145:1
152:18 156:11
177:20 191:5
192:20 205:9,24
211:14 218:6
**statute** 23:21
33:24 34:2,6,15
36:17,18 102:5
103:12 114:3
120:15,16 156:9
210:19
**statutes** 113:15,24
**steals** 215:11
**step** 26:18
**stephens** 5:3 14:12
14:12
**steps** 32:13 45:19
46:2 79:6
**stock** 70:3,20 71:8
71:15,17 72:18
**stone** 8:18 190:21
**stop** 137:18
138:23 186:8
**stopping** 139:17
**stored** 120:7,8
**street** 3:5,22 4:4
4:13 5:18 6:3,8,13
7:4,12,17,22 8:8
8:13,23
**strengthen** 208:21
**strengthening**
209:17

[strike - taken]                                                                                    Page 36

strike 37:19 46:16
  46:23 48:3 66:19
  92:19 105:8
  170:17
stuffed 179:9
subcommittee
  189:4
subject 26:25
  149:18,22 150:8
  157:14 170:3
  172:5 175:20
subjects 18:17
  40:13
submit 83:3
  103:19 104:17
  173:16,21
submitted 75:13
  156:4 163:8 217:1
subpoenaed 122:6
subscribed 225:10
  226:14 227:21
subsection 53:5
  85:5 86:1 92:21
substance 31:18
  32:25 41:5 43:10
  43:12,13 44:12,13
  45:11 46:20 52:1
  53:2 68:15 69:14
  74:23,24 75:3,7,10
  76:15,24 77:14
  78:8,10 85:24
  86:10 87:5 98:16
  100:6 114:12
  116:14 140:4
  147:10 148:14
  150:17 152:23
  154:14,19 157:6
  157:18 158:21
  161:1 209:12,15
  210:15

substances 10:19
  10:22 21:25 22:3
  22:5 28:19 30:21
  31:19 32:9,13,22
  34:4,10 43:8 45:3
  47:25 51:21 58:3
  63:2,11,14,22 65:7
  66:23 69:24 70:4
  72:20 73:8,21
  79:19 87:12,16
  88:1,6 92:24 93:7
  94:13,22 95:7
  97:1,9 98:1 99:15
  99:25 100:2,13,17
  100:24 101:21,21
  102:10,13,16
  107:1,6,10 108:2
  112:12,17 113:13
  113:19 114:1
  134:23 136:19,22
  137:9 140:11
  141:14,18 144:1
  146:8 153:23
  156:11,24 157:14
  174:23 182:17
  208:23 209:1,12
  212:2 213:18
  215:3,9
success 205:12
sufentanil 101:15
sufficient 205:1
suggest 117:24
  210:7
suggested 172:7
  196:13 213:12
suggestion 201:17
suggests 216:1
suite 3:14,23 6:8
  6:13,18 8:13,18
  224:2

sullivan 169:18
summary 35:1
  208:19 215:20
summer 169:22
summit 1:12 3:17
  152:10
superior 3:14
  224:1
supervisor 29:13
  29:15
supply 8:16 15:17
  47:12,17 92:23
  93:6 115:18 141:6
  154:19 156:18,23
  157:12 186:5,7
  196:6,10,14
  205:12
support 171:15
  206:4 207:23
supported 171:4
supposed 136:24
  167:14,18,19
supposedly 88:8
sure 17:7 29:8,10
  37:23 39:17 46:1
  48:19 50:2 61:12
  63:7 66:4 71:22
  78:17 83:11 88:19
  99:1 101:10 109:6
  120:24 133:18
  138:21 142:15
  143:15 160:8
  163:12 184:16
  197:16 203:4
surprised 213:11
susan 29:6
suspect 69:8,10
suspicious 20:2
  137:11,16 138:21
  138:24 139:17,18
  142:5,21 144:15

146:1
swear 15:23
switched 60:22
sworn 16:1 223:6
  225:10,13 226:14
  226:18 227:21
symptoms 158:24
synthesizes 44:10
system 31:11,19
  62:14 64:11 66:23
  66:25 69:17,18
  136:20 137:2,3,11
  138:9 139:20,25
  140:3,4,8 143:14
  143:17,23 145:24
  146:22 147:4
  148:5 149:20
  150:5,12 151:1,5
  151:14,23 152:3,8
  154:8 160:14
  208:24
systems 168:25

t

t 4:2 10:1,1 124:20
tables 125:14
tablets 147:25
take 12:12 32:14
  37:7 51:10 52:3
  57:5 66:20 83:8
  83:13 84:4,15
  95:18 99:13 108:4
  126:18 135:25
  176:16 215:6
taken 12:16 16:21
  45:17 57:9 66:7
  93:14,16 95:23
  108:8 126:23
  136:4 143:11
  176:21 203:25
  217:22 219:18
  223:3,7,13

**takes** 36:20 45:19
46:2 79:5 93:21
**talk** 17:3 44:5 50:9
73:20 90:22 131:3
203:6
**talked** 119:9
**talking** 26:17
130:17
**team** 120:19
**techniques** 183:13
**teleconference** 4:3
4:16 5:7,22 6:17
7:21 8:3,12,17,22
**telephone** 203:2
**tell** 16:1 148:3
191:10
**telling** 197:3
**ten** 28:6,7,11 39:9
**tended** 199:9
**tenth** 7:4
**tenure** 126:15
**term** 31:10,13
34:22,25 44:7
46:9 76:24
**termed** 77:15,15
77:20 78:8
**terminal** 190:23
**terms** 72:3 144:12
159:9 168:20
196:4
**testified** 16:3
27:18 111:12
121:3 127:4
188:13
**testify** 19:1 67:24
81:9 122:6 143:19
144:3,3 173:7
174:21 194:12
**testifying** 17:19
**testimony** 1:19 2:3
17:23 18:16 19:8

20:8 61:10 89:15
98:22 108:25
109:10,18 111:9
123:17 127:7
136:11 144:18,20
144:21 146:14
188:15 189:3
194:16 199:7
201:14,16 202:10
204:14 207:15
218:17,19 222:5
223:4,6,10 225:6,7
226:6,9,12
**teva** 5:21 15:10
**texas** 6:19
**th** 191:13
**thank** 57:14 81:11
96:5 101:11 110:5
121:2 136:8 147:1
177:1 222:1
**therapeutic** 205:2
**thereabouts**
189:18
**thing** 211:16
**things** 43:14
130:17 156:25
190:3 201:20
**think** 21:4,13,14
28:11 45:6 48:22
66:13 81:8 130:16
138:13 143:10,24
143:24 144:8
145:4 149:13
165:3,8 193:6
202:23 206:8
**thinking** 84:22
**third** 160:3 163:10
168:20 173:11
176:7 190:2 209:4
214:10

**thirty** 5:23 224:18
**thornburg** 7:22
15:19
**thousands** 183:3
**threaten** 199:9
**threatening** 199:2
**three** 4:8 6:13
20:24 127:6 174:7
203:4
**tie** 137:24 138:3
143:7
**tied** 138:2
**time** 17:3 22:20
23:13 27:24 29:1
29:4 31:4 36:5
38:20,23 40:25
49:16 57:8,12
60:22 66:6,9
74:17 77:13,19
78:7,11 80:16
81:8 86:14 92:3
95:22 96:1 104:20
108:7,10 117:18
121:12,15 122:4
126:22 127:1
132:11 133:18,24
134:5,25 135:9,19
136:3,6,8,11
153:20 159:13
174:7 176:20,24
193:10 194:8
203:24 204:2
210:18 212:5
215:6 217:21,24
219:14,17,21
221:16,16 222:2
**timely** 103:20
**times** 36:7,10
40:10 77:23,25
**timing** 37:17
133:19

**title** 185:2
**titled** 124:10
**today** 17:20,22
19:1,8 20:8 26:9
27:25 28:3 37:19
37:20 54:2 70:23
84:10 86:24 89:15
106:7 108:25
111:10 119:9
120:25 121:2,9,20
123:4 127:5 165:8
194:13 220:19
**today's** 27:12
124:3 131:24
132:21 135:3,18
135:22 222:5
**top** 86:15 117:15
141:3 178:7
182:23
**topic** 18:20,21
19:1,4,8,19 20:8
20:18 128:16
129:2 132:8
144:24 145:8
**topics** 20:24 21:5
21:11,12 135:16
143:5 144:14,18
**total** 50:16,24,25
51:19,24 107:17
116:4 156:10
173:12,23 183:4
222:8
**touhy** 143:5
144:11
**tower** 7:17
**town** 153:1
**tplcp** 160:22
**tracking** 66:23
**trained** 190:12
**training** 39:15,21
40:8 132:3

**transactions**  66:24
**transcribed**  225:7
**transcript**  10:23
  11:24 140:16,20
  140:22,24 145:23
  224:11,12 225:5
  225:12 226:5,11
  226:17
**transcription**
  223:8
**treating**  146:18
  158:24 189:20,22
**treatment**  55:14
  64:22 103:4 182:3
  185:3,9,20 214:23
**trends**  51:4,8,11
  51:15,22
**true**  55:9 107:25
  110:5 116:11
  126:2,14 140:14
  142:24 155:11,23
  157:2,7,19 159:22
  160:6 162:8 177:6
  181:12,22 211:11
  219:10 223:9
**truth**  16:1,2,2
**truthfully**  17:19
**try**  17:3 115:11,11
  220:2
**trying**  21:2 168:20
  174:10 198:2
  200:11,12,18
  201:5,6
**tuggle**  125:9
**turn**  12:9 18:9,19
  19:17 28:13 32:10
  90:14 140:22
  147:1 158:16
  164:23 178:3
  182:21 184:25
  188:23 196:24

198:21 199:12
  202:17 203:20
  220:3
**turned**  94:17
**turning**  57:24
**two**  21:3 50:18
  96:6 216:2
**type**  70:22 149:21
  150:19 152:25
  154:9,14 186:14
  186:21
**types**  148:20 182:4
  184:17 190:21

**u**

**u.s.**  3:2,3,8,12
  14:19 18:10 22:2
  101:24 154:2,2
  156:13 205:10
**ultimate**  31:21
**ultimately**  107:8
  116:12
**un**  22:1 26:14
  28:15 84:3
**unable**  196:16
**unaware**  179:24
  202:14
**underlined**  183:13
**underlying**  205:14
**underneath**
  158:23
**understand**  17:12
  17:22 18:15 20:17
  21:2 22:21 25:2
  31:13 32:19 33:6
  33:10 34:1 35:10
  36:9 37:24 39:6
  39:18 41:10 44:7
  47:19 49:17 71:23
  80:3 82:1 85:12
  87:13,20 104:2
  114:25 115:8

118:15 124:10
  143:22 145:4
  149:17 150:1
  154:11 168:7,24
  184:16 202:24
  212:13 216:15
**understanding**
  29:22 30:2,14,19
  85:9 129:3 146:7
  192:19
**understands**
  114:19 115:4,16
  116:11,24
**understood**  17:14
  19:15 21:1 31:4
  68:2
**undisputed**  204:24
**unfortunately**
  94:7
**unintentionally**
  203:3
**uninterrupted**
  47:12,16 92:23
  93:6 156:23
**unit**  12:14 22:14
  22:23 28:14,24
  29:20 34:12 38:12
  38:14,16,18 40:2
  49:14 57:7,12
  60:16 82:7 95:21
  96:1 126:21,25
  176:19,23 219:16
  219:21
**united**  1:1 3:13
  12:19 14:20,25
  15:1 19:21 21:20
  35:2 52:20 72:17
  82:15 114:6 145:1
  152:18 156:11
  177:20 205:24
  218:6

**units**  147:17
  151:17 222:8
**unnecessarily**
  193:6
**unreliable**  69:6
**unusually**  178:13
  180:4
**updated**  10:20,22
  96:17 209:10
**upward**  165:4
**usage**  22:2 103:6
**usdoj.gov**  3:6,11
  3:16
**use**  20:4 53:10
  54:14 55:14,20
  59:16 60:1,4,17,23
  62:8,17,24 63:8,14
  67:5 68:8 73:25
  78:9,14 148:13
  155:20 156:6,6,24
  161:12,20,22
  165:21,25 168:25
  169:24 174:3
  181:3,6 192:11
  193:2 194:10
  195:6 199:20,24
  214:13,23 215:3,8
  221:15
**users**  187:22
**uses**  215:15
**usually**  28:9 41:21

**v**

**v**  1:8,13 22:5,6
  69:25 224:6 225:3
  226:3
**vague**  30:22 31:8
  32:1,15 33:9
  34:17 35:8 36:4
  36:15 37:22 39:16
  39:23 41:9 42:25
  44:17 47:18 49:15

53:8,22 54:7,16,24
55:7,21 56:6 60:6
74:19 76:24 85:11
88:4,14 89:21
92:2,10 94:24
95:11 106:12,20
109:22 110:7
148:24 150:22
153:3 155:25
157:8 159:16
160:17 162:23
163:6 168:4,15
169:10 175:21
177:23 180:14
182:9 198:6
210:22 211:12
**valid**  67:10,12
69:3
**validity**  68:9
**value**  104:19
106:23,25 107:5
**varied**  38:15 75:12
129:10
**various**  31:23
77:23 79:9,14,18
129:1
**vendor**  60:8,10
**ventura**  7:11
13:22,22
**verbal**  17:8
**verbally**  203:1
**verbatim**  84:13
**verified**  56:15
**veritext**  13:1,3
222:9 224:1,7
227:1
**veritext.com.**
224:17
**version**  190:22
200:5

**vertically**  86:15,25
87:3 90:24
**vicodin**  107:21
**video**  12:12,15
**videographer**  9:2
12:3 13:2 15:22
16:5 57:6,10 66:5
66:8 95:20,24
108:6,9 126:20,24
136:2,5 176:18,22
203:23 204:1
217:20,23 219:15
219:19 222:3
**videotaped**  1:17
2:1 10:9
**view**  39:21 83:4
143:16
**violate**  174:10
**violating**  195:9,12
199:23 214:13
**violation**  88:7
95:15 172:22
192:14
**virginia**  3:10 4:4
140:21 151:18
152:11
**vol**  11:14
**vouch**  220:21
**vs**  1:10

**w**

**wacker**  5:8
**waged**  205:10
**wait**  17:4
**waived**  224:19
**walgreen**  8:10,10
**walgreens**  15:12
111:24 112:15
113:4
**walk**  58:11
**walmart**  5:2 14:13
15:3 111:24

112:16 113:4
**want**  19:11 28:13
32:10 58:11 81:9
90:14 98:5 101:10
137:25 140:15,21
140:22 143:15
147:1 153:21
173:19 174:23
184:15 194:5
201:14 203:6
208:3
**wanted**  131:10,14
210:8
**war**  196:23,24
197:4,20 205:10
**warrington**  8:19
**washington**  1:20
2:10 3:5,23 4:13
5:14 6:4,9 7:4,12
12:24
**waste**  194:7
**way**  53:4 92:15
125:5 137:22
147:24 190:11
**ways**  191:15
**wc.com**  6:5
**we've**  27:22 122:3
**website**  96:14
**weekend**  201:15
**weeks**  122:14
**weight**  147:23
**weighted**  104:19
**weiss**  8:21 15:13
15:13
**welcome**  96:4
**went**  133:6 134:22
197:18
**west**  3:14 4:4 5:8
8:13 140:21
151:18 152:11

**whispering**  12:7
**wholesale**  111:15
112:9,21 114:20
152:5
**widest**  180:25
**william**  7:16,21
13:11 15:18
**william.davison**
7:19
**william.hahn**  7:24
**williams**  6:3 14:10
**wilson**  199:3
**winckel**  4:12
14:14,14
**wisconsin**  8:4
**witness**  3:2 15:23
31:17 32:2 33:10
35:10 36:17 37:23
39:17,25 40:7
41:10 43:3 45:6
45:23 46:6 47:19
49:17,24 53:1,9,17
53:24 54:9,19
55:1,9 56:7 59:8
59:20 60:7 61:1
61:11 62:12,21
63:4,18 64:2,9,16
64:21 65:13 67:15
67:22 68:5 72:1
73:3,11,17 74:21
75:12 76:7,22
77:12 78:17,23
82:18 85:12,20
86:6 87:19 88:5
88:16,25 89:11,23
90:10 92:13 93:1
94:17 95:2,13
97:11 98:23 99:17
100:5 102:9,20
103:3,18 104:2
106:13,22 107:4

107:13 109:23
110:8 111:20
112:4 113:1,9,21
114:25 115:8,21
116:9,18 117:3,14
117:23 118:7,15
118:24 120:4
121:6 122:10,16
122:22 123:2,18
125:17,25 127:5
127:12 128:2
130:1,10,16 131:3
131:10,17 133:17
133:23 134:13
136:10,24 137:14
137:22 138:18
139:3,25 140:14
142:15 145:14,18
146:22 147:14,22
148:8,17,25
149:13 150:1,11
150:23 151:12,23
152:14 153:6,18
153:25 154:23
155:7 156:3 157:9
157:23 159:6,17
160:1,8,24 161:10
162:13,24 163:7
163:17 164:6,16
166:9 167:1,12,22
168:6,19 169:12
170:2 171:2 172:1
172:6 173:7
174:19,20 175:18
176:3,15 177:25
178:22 179:6,15
179:24 180:19
181:16,21 182:15
184:10 185:17
186:3,11,17,25
187:9,18 188:3

191:24 192:14,17
194:12,24 197:12
197:14,16,25
198:18 199:8
200:16,25 201:9
202:4,14 203:16
206:8 207:1,19
208:3,7 209:20
210:23 211:5,13
212:13 213:1,10
213:24 214:16
216:1,15 217:1,17
218:21 219:6,12
219:13 220:25
221:6 223:4,6,10
224:8,11 225:1,4
225:11 226:1,4,15
witnesses  174:14
witness'  224:14
words  190:18
work  23:14,14
30:18 35:16,18,25
37:16,20 48:24,25
81:9 103:21 110:9
129:12 198:9
201:21
worked  38:13,17
39:20 122:3
working  22:16
25:13,14,15 49:20
50:2,5
works  38:2 125:6
125:11
writes  160:25
165:3
writing  79:13
180:20 194:17
written  86:14,23
91:14 93:1 119:13
179:11 182:8
204:8 217:10

wrong  153:13
192:19,24

**x**

x  147:25

**y**

yeah  42:15 144:24
162:15
year  22:9 24:21
30:20,20,25 31:1,1
31:3 37:2,3,5
51:14 52:4,15
53:14,25 56:2
58:22 60:1,21
61:13,16 64:6,14
65:9,14,16,19 67:2
68:19 69:8,17
70:7 72:25 74:14
75:20 76:2,10,16
77:9 82:12 92:13
97:20 101:15
104:15 106:18
107:18 109:21
114:14,16 116:6
117:12 118:8
122:10 123:2
126:2 132:11
141:12 155:10,21
156:6,7 158:11
165:6,7,15,16
170:11 171:10
175:8 176:4 196:8
196:11 207:2
yearly  41:17
years  38:15 50:18
53:20 54:4,12,21
55:3 59:2,5,8,11
59:16,20,22 61:3
62:2,7,16,23 63:7
64:18 67:7,12
68:1,13,24 69:4

70:9,10 73:6,14
74:16,21 75:8,12
77:6,19 78:14
92:9 98:1,20
103:10,15,18,24
105:2,10,17,22
125:15 155:22
166:12 174:22
189:16,17 205:10
206:18 218:3
yers  69:15,16
yield  72:3,9 114:9
119:6
yields  93:19
york  4:9,9

**z**

zachary  8:16
15:16
zeros  192:6
zmartin  8:20
zuckerman  6:7
13:24
zuckerman.com
6:10

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.