Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4                        -   -   -
 5

    IN RE:  NATIONAL          :    MDL NO. 2804
 6  PRESCRIPTION OPIATE       :
    LITIGATION                :
 7                            :
    -----------------------------------------------
 8  THIS DOCUMENT RELATES TO  :   CASE NO.
    ALL CASES                 :   1:17-MD-2804
 9                            :
                              :   Hon. Dan A.
10                            :   Polster
11                        -   -   -
12                    January 30, 2019
13                        -   -   -
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                 CONFIDENTIALITY REVIEW
15
16              Videotaped deposition of JANET
    GETZEY HART taken pursuant to notice, was held at
17  the law offices of Morgan, Lewis & Bockius LLP,
    1701 Market Street, Philadelphia, Pennsylvania,
18  beginning at 9:34 a.m., on the above date, before
    Ann Marie Mitchell, a Federally Approved
19  Certified Realtime Reporter, Registered Diplomate
    Reporter, Registered Merit Reporter and Notary
20  Public.
21                        -   -   -
22              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
23                 deps@golkow.com
24
```

Page 2

1   APPEARANCES:
2
3       BARON & BUDD, P.C.
        BY: WILLIAM POWERS, ESQUIRE
4       600 New Hampshire Avenue NW
        The Watergate, Suite 10-A
5       Washington, DC 20037
        (202) 333-4562
6       wpowers@baronbudd.com
        Representing the Plaintiffs
7
8
        BARON & BUDD, P.C.
9       BY: MARK PIFKO, ESQUIRE
        15910 Ventura Boulevard
10      Suite 1600
        Encino, California 91436
11      (818) 839-2333
        mpifko@baronbudd.com
12      Representing the Plaintiffs
13
14      MORGAN, LEWIS & BOCKIUS LLP
        BY: ELISA P. McENROE, ESQUIRE
15      BY: MATTHEW R. LADD, ESQUIRE
        1701 Market Street
16      Philadelphia, Pennsylvania 19103
        (215) 963-5000
17      elisa.mcenroe@morganlewis.com
        matthew.ladd@morganlewis.com
18      Representing Rite Aid
19
20      MORGAN, LEWIS & BOCKIUS LLP
        BY: KELLY A. MOORE, ESQUIRE
21      101 Park Avenue
        New York, New York 10178
22      (212) 309-6000
        kelly.moore@morganlewis.com
23      Representing Rite Aid
24

Page 3

1   APPEARANCES (cont'd):
2
3       ARNOLD & PORTER KAYE SCHOLER LLP
        BY: ELISEO R. PUIG, ESQUIRE
4       370 Seventeenth Street
        Denver, Colorado 80202
5       (303) 863-1000
        eliseo.puig@apks.com
6       Representing Endo Health Solutions Inc.,
        Endo Pharmaceuticals Inc., Par
7       Pharmaceutical, Inc. and Par Pharmaceutical
        Companies, Inc.
8
9
        PIETRAGALLO GORDON ALFANO BOSICK &
10      RASPANTI, LLP
        BY: ALEXANDER M. OWENS, ESQUIRE
11      1818 Market Street
        Suite 3402
12      Philadelphia, Pennsylvania 19103
        (215) 320-6200
13      amo@pietragallo.com
        Representing Cardinal Health
14
15
        COVINGTON & BURLING, LLP
16      BY: KEVIN KELLY, ESQUIRE
        One City Center
17      850 Tenth Street, NW
        Washington, DC 20001
18      (202) 662-5272
        kkelly@cov.com
19      Representing McKesson
20
21
22
23
24

Page 4

1   APPEARANCES VIA TELEPHONE AND STREAM:
2
3       BARON & BUDD, P.C.
        BY: GRETCHEN KEARNEY, ESQUIRE
4       BY: JAY LICHTER, ESQUIRE
        BY: NOAH RICH, ESQUIRE
5       BY: W. SCOTT SIMMER, ESQUIRE
        600 New Hampshire Avenue NW
6       The Watergate, Suite 10-A
        Washington, DC 20037
7       (202) 333-4562
        gkearney@baronbudd.com
8       jlichter@baronbudd.com
        nrich@baronbudd.com
9       ssimmer@baronbudd.com
        Representing the Plaintiffs
10
11
        MORGAN, LEWIS & BOCKIUS LLP
12      BY: JOHN M. MALOY, ESQUIRE
        1701 Market Street
13      Philadelphia, Pennsylvania 19103
        (215) 963-5000
14      john.maloy@morganlewis.com
        Representing Rite Aid
15
16
        BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
17      BY: ALEXANDRA K. HUGHES, ESQUIRE
        440 College Avenue
18      Suite 320
        Athens, Georgia 30601
19      (706) 744-4135
        ahughes@bbga.com
20      Representing the Plaintiffs
21
22
23
24

Page 5

1   APPEARANCES VIA TELEPHONE AND STREAM (cont'd):
2
3       JACKSON KELLY PLLC
        BY: SYLVIA WINSTON NICHOLS, ESQUIRE
4       150 Clay Street
        Morgantown, West Virginia 26501
5       (304) 284-4105
        sylvia.winston@jacksonkelly.com
6       Representing AmerisourceBergen Drug
        Corporation
7
8
        JONES DAY
9       BY: MIRIAM LIABO, ESQUIRE
        77 West Wacker
10      Chicago, Illinois 60601
        (312) 782-3939
11      mliabo@jonesday.com
        Representing Walmart
12
13
        BAILEY & WYANT, PLLC
14      BY: HARRISON M. CYRUS, ESQUIRE
        500 Virginia Street East
15      Suite 600
        Charleston, West Virginia 25301
16      (304) 345-4222
        hcyrus@baileywyant.com
17
18      VIDEOGRAPHER:
          DAVID LANE
19
        ALSO PRESENT:
20        DAVID SAYRES
          Precision Trial Solutions
21
22        EMMA KABOLI
          Baron & Budd, P.C.
23        (via stream)
                    - - -
24

Page 6

- - -
INDEX

Testimony of: JANET GETZEY HART
By Mr. Powers     10

- - -
EXHIBITS
- - -

NO.     DESCRIPTION     PAGE

Rite     Distribution/Customer     99
Aid-Hart-1    Support Center, DEA
Regulatory Guidelines,
Policy, Bates stamped
Rite_Aid_OMDL_0046157
through
Rite_Aid_OMDL_0046226

Rite     Rite Aid Distribution     120
Aid-Hart-2    Center DEA Regulatory
Guidelines,
Rite_Aid_OMDL_0014804
through
Rite_Aid_OMDL_0014874

Rite     Controlled Drug Above     124
Aid-Hart-3    Average Order Monitoring
Program, Bates stamped
Rite_Aid_OMDL_0015079
through
Rite_Aid_OMDL_0015081

Page 7

Rite     Pharmacy Replenishment     140
Aid-Hart-4    System Store Order
History, Bates stamped
Rite_Aid_OMDL_0015302
through
Rite_Aid_OMDL_0015307

Rite     Excel Spreadsheet     160
Aid-Hart-5    Printout, Bates stamped
Rite_Aid_OMDL_0013151

Rite     Rite Aid Controlled Drug     172
Aid-Hart-6    Reporting Above Average
Controlled Drug
Purchases Report, Bates
stamped
Rite_Aid_OMDL_0046227
through
Rite_Aid_OMDL_0046319

Rite     Email chain, top one     183
Aid-Hart-7    dated 2010-11-16, Bates
stamped
Rite_Aid_OMDL_0050632

Rite     Email chain, top one     185
Aid-Hart-8    dated 2010-11-17, Bates
stamped
Rite_Aid_OMDL_0050633

Rite     Email chain top one     194
Aid-Hart-9    dated Email dated
2010-04-11, Bates
stamped
Rite_Aid_OMDL_0050628
through
Rite_Aid_OMDL_0050630

Rite     Email dated 2011-06-03,     199
Aid-Hart-10    Bates stamped
Rite_Aid_OMDL_0050634

Page 8

Rite     Email chain, top one     201
Aid-Hart-11    dated 2002-05-14, Bates
stamped
Rite_Aid_OMDL_0046770
through
Rite_Aid_OMDL_0046789

Rite     Email chain, top one     209
Aid-Hart-12    dated 2012-07-11, Bates
stamped
Rite_Aid_OMDL_0013345
and
Rite_Aid_OMDL_0013346

Rite     Email dated 2012-05-18,     213
Aid-Hart-13    Bates stamped
Rite_Aid_OMDL_0046855
through
Rite_Aid_OMDL_0046875

Rite     Email chain, top one     226
Aid-Hart-14    dated 2012-12-18, Bates
stamped
Rite_Aid_OMDL_0038054
and
Rite_Aid_OMDL_0038055

Rite     Email dated 2013-09-04,     238
Aid-Hart-15    Bates stamped
Rite_Aid_OMDL_0046648
through
Rite_Aid_OMDL_0046662

Rite     Email dated 2013-12-24,     249
Aid-Hart-16    Bates stamped
Rite_Aid_OMDL_0016186
and
Rite_Aid_OMDL_0016187

Page 9

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer

Page Line

62    8

Request for Production of Documents

Page Line

Stipulations
Page Line

Question Marked
Page Line

Page 10

1    THE VIDEOGRAPHER:  We're now on
2  the record.  My name is David Lane,
3  videographer for Golkow Litigation
4  Services.  Today's date is January 30,
5  2019.  The time is 9:34 a.m.
6    This deposition is taking place
7  in Philadelphia, Pennsylvania in the
8  matter of National Opiate Litigation,
9  MDL.
10    Our deponent today is Janet
11  Getzey Hart.  Counsel will be noted on
12  the stenographic record.
13    Our court reporter is Ann Marie
14  Mitchell, who will now swear in the
15  witness.
16    - - -
17    JANET GETZEY HART, after having
18  been duly sworn, was examined and
19  testified as follows:
20    - - -
21    EXAMINATION
22    - - -
23  BY MR. POWERS:
24    Q.    Good morning.

Page 11

1    A.    Good morning.
2    Q.    My name is Will Powers and I
3  represent the plaintiffs in this litigation.
4    Can you please state your full
5  name and spell it for the record?
6    A.    Sure.  Janet Getzey Hart.
7  J-A-N-E-T, Getzey, G-E-T-Z-E-Y, last name Hart,
8  H-A-R-T.
9    Q.    And we are here for your
10  deposition today.
11    Do you understand that?
12    A.    I do.
13    Q.    Have you ever been deposed
14  before?
15    A.    I have.
16    Q.    When was that?
17    A.    20 years ago.
18    Q.    Was that the only time you've
19  been deposed?
20    A.    I've been deposed twice.
21    Q.    What was the other time you were
22  deposed?
23    A.    Probably ten years ago.
24    Q.    And the first time you were

Page 12

1  deposed, 20 years ago, what was that in
2  connection with?
3    A.    It was related to an alleged
4  price fixing for third parties in Baltimore,
5  Maryland.
6    Q.    And were you working at Rite Aid
7  at that point?
8    A.    I was.
9    Q.    And were you a fact witness
10  during that deposition?
11    A.    I was.
12    Q.    What was the subject of your
13  testimony for that deposition?
14    A.    That there was no collusion as
15  far as not taking a third-party plan.
16    Q.    You also mentioned that you were
17  deposed ten years ago.
18    What was that in connection with?
19    A.    That was in connection with a
20  doctor.
21    Q.    Do you remember the doctor's
22  name?
23    A.    I do not.
24    Q.    When you say in connection with a

Page 13

1  doctor, what do you mean?
2    A.    I believe there was an action
3  against a doctor and I was deposed in that
4  action.
5    Q.    Why were you deposed?
6    A.    Because I worked for Rite Aid and
7  they had dispensed prescriptions for the doctor.
8    MS. McENROE:  And, Janet, just
9  let him finish his questions before you
10  answer.
11    THE WITNESS:  Oh, okay.
12    MS. McENROE:  Take your time.
13    THE WITNESS:  Sorry.
14  BY MR. POWERS:
15    Q.    Do you know where that doctor was
16  operating?
17    A.    The deposition was in Harrisburg.
18  That's all I remember.
19    Q.    You don't recall where the doctor
20  was actually writing the prescriptions from?
21    A.    I do not.
22    Q.    Do you know which Rite Aid stores
23  were dispensing those prescriptions?
24    A.    I do not.

Page 14

1    Q.    And your counsel just informed
2 you about one of the rules today.  I just want to
3 go over a couple others.
4         Is that all right?
5    A.    Certainly.
6    Q.    Because the court reporter is
7 here writing down everything that we're saying,
8 it's important that only one person is speaking
9 at a time.  So as you've been going back and
10 forth here, you obviously can anticipate some of
11 my questions, but I just ask you to allow me to
12 finish my question fully before you start your
13 answer.
14        Is that okay?
15   A.    Perfect.
16   Q.    And then likewise, I'll let you
17 finish your answer before I ask my questions.
18        Does that sound okay?
19   A.    Perfect.
20   Q.    And the other thing, too, is I
21 need verbal answers.  So no nods of the heads,
22 uh-huhs, uh-uhs, things like that.
23        Does that make sense?
24   A.    Yes.

Page 15

1    Q.    And if for any reason you do not
2 understand a question and require some
3 clarification or explanation of the words I'm
4 using, you must tell me and we'll get that matter
5 resolved before you answer the question.
6         Is that okay?
7    A.    Yes.
8    Q.    So then if you answer any of my
9 questions, I will assume that you understand it.
10        Is that okay?
11   A.    Yes.
12   Q.    Are you currently suffering from
13 any medical disease or illness that in any way
14 interferes with your ability to answer truthfully
15 and completely my questions here today?
16   A.    No.
17   Q.    Are you currently taking any
18 medication or drugs that may in any way interfere
19 with your ability to answer truthfully and
20 completely here today?
21   A.    No.
22   Q.    And the court reporter just swore
23 you in, so do you understand that the testimony
24 you give here today is under oath, just as it

Page 16

1 would be in a courtroom?
2    A.    I do.
3    Q.    So because you're under oath, if
4 you lie or provide intentionally misleading
5 answers, you may be subject to civil or criminal
6 penalties.
7         Do you understand that?
8         MS. McENROE:  Objection to form.
9         THE WITNESS:  I do.
10 BY MR. POWERS:
11   Q.    And we can take breaks when you
12 need them, but you have to answer the question if
13 there is one pending.
14        Is that okay?
15   A.    That's fine.
16   Q.    And as your counsel just did a
17 minute ago, your counsel from time to time may
18 object to my questions, but I'm still entitled to
19 an answer unless your counsel specifically
20 instructs you not to answer.
21        Do you understand that?
22   A.    I do.
23   Q.    Did you prepare for this
24 deposition here today?

Page 17

1    A.    I did.
2    Q.    How did you do that?
3    A.    I met with outside counsel to go
4 over some documents and to discuss Rite Aid's
5 policies, procedures, things along those lines.
6    Q.    And when you say outside counsel,
7 you're referring to Morgan Lewis counsel?
8    A.    I am.
9    Q.    When did you meet with Morgan
10 Lewis counsel?
11   A.    I have met with them various
12 times over the past several months.
13   Q.    About how many times?
14   A.    Perhaps six.
15   Q.    On average, how long were those
16 meetings you had with outside counsel?
17   A.    Some were three to four hours.
18 Some were a complete day.
19   Q.    I want to start with your
20 educational background, Ms. Hart.
21        Actually, before I continue, is
22 it Ms. Hart or Ms. Getzey Hart?
23   A.    Ms. Hart is fine.
24   Q.    Okay.  Did you complete high

Page 18

1  school?
2      A.    I did.
3      Q.    Where did you complete high
4  school?
5      A.    Greater Johnstown Vocational and
6  Technical High School in Johnstown, Pennsylvania.
7      Q.    And what year did you graduate
8  from high school?
9      A.    1979.
10      Q.    Just let me -- I know you can
11  anticipate my question, but just can you please
12  let me finish my question --
13      A.    I'm sorry.
14      Q.    -- and then you can answer the
15  question.
16          It's okay.
17          So just to be clear, what year
18  did you graduate high school?
19      A.    1979.
20      Q.    Do you have any education beyond
21  high school?
22      A.    I do.
23      Q.    What is that education?
24      A.    It is a BS in pharmacy.

Page 19

1      Q.    Where did you get your BS in
2  pharmacy?
3      A.    Duquesne University.
4      Q.    And where is that located?
5      A.    Pittsburgh, Pennsylvania.
6      Q.    What year did you graduate
7  Duquesne University?
8      A.    1984.
9      Q.    Besides your college education,
10  do you have any other educational background?
11      A.    I do not.
12      Q.    Do you have any certifications of
13  any kind?
14      A.    I am a pharmacist.
15      Q.    What does that mean, that you're
16  a pharmacist?
17      A.    It means I'm registered with the
18  state of Pennsylvania as a pharmacist.
19      Q.    Is that registration current?
20      A.    Yes.
21      Q.    When did you get that?  When did
22  you first get that registration as a pharmacist?
23      A.    1984.
24      Q.    Have you kept your registration

Page 20

1  as a pharmacist up to date and current between
2  1984 and now?
3      A.    Yes.
4      Q.    I believe you said you're
5  registered in Pennsylvania.  Right?
6      A.    (Witness nods head.)
7      Q.    Are you registered as a
8  pharmacist in any other states?
9      A.    New Jersey.
10          MS. McENROE:  Again, just a
11      reminder to respond verbally.  So that
12      first answer had been yes.
13          THE WITNESS:  Okay.
14  BY MR. POWERS:
15      Q.    So you're registered as a
16  pharmacist in Pennsylvania and New Jersey; is
17  that correct?
18      A.    That is correct.
19      Q.    Any other states?
20      A.    No.
21      Q.    When did you first become
22  registered as a pharmacist in New Jersey?
23      A.    Probably two years after
24  Pennsylvania.

Page 21

1      Q.    And are you currently still
2  registered as a pharmacist in New Jersey?
3      A.    I am.
4      Q.    So from about 1986 to present,
5  you were registered as a pharmacist in New
6  Jersey; is that right?
7      A.    That sounds about right.
8      Q.    No breaks for that registration?
9      A.    No breaks.
10      Q.    After graduation from college in
11  1984, did you start working at Rite Aid at that
12  point?
13      A.    I did.
14      Q.    Are you still currently employed
15  by Rite Aid?
16      A.    I am.
17      Q.    Have you been employed by Rite
18  Aid the entire time, from 1984 until present?
19      A.    I have.
20      Q.    When you started working at Rite
21  Aid in 1984, what was your position?
22      A.    I was a pharmacy intern.
23      Q.    As a pharmacy intern, where did
24  you work?

Page 22

1　　A.　　Johnstown, Pennsylvania.
2　　Q.　　How long were you a pharmacy
3　intern for?
4　　A.　　Approximately four months.
5　　Q.　　After your position as a pharmacy
6　intern, what was your next title?
7　　A.　　Pharmacist.
8　　Q.　　Now, was that also located in
9　Johnstown, Pennsylvania?
10　　A.　　It was.
11　　Q.　　And when you say located in
12　Johnstown, Pennsylvania, is that the Rite Aid
13　corporate offices?
14　　A.　　It is not.  It's a retail
15　pharmacy location.
16　　Q.　　Approximately how long were you a
17　pharmacist for at Rite Aid?
18　　　　MS. McENROE:  Objection to form.
19　　　　THE WITNESS:  At the Johnstown
20　　store, about six months.
21　BY MR. POWERS:
22　　Q.　　Where did you go after that?
23　　A.　　I became a floater pharmacist and
24　worked at various Rite Aid pharmacy locations in

Page 23

1　the general area.
2　　Q.　　You say -- when you say the
3　general area, what do you mean by that?
4　　A.　　Around Johnstown.
5　　Q.　　How long were you a floater
6　pharmacist for?
7　　A.　　Approximately two years.
8　　Q.　　So that would be about 1986 you
9　stopped being a floater pharmacist?
10　　A.　　That sounds correct.
11　　Q.　　After a floater pharmacist, what
12　was your next position at Rite Aid?
13　　A.　　I was a pharmacy manager.
14　　Q.　　How long were you a pharmacy
15　manager for?
16　　A.　　Approximately one year.
17　　Q.　　What were your job
18　responsibilities as a pharmacy manager?
19　　A.　　I was responsible for the
20　profitability of that particular pharmacy.
21　　Q.　　When you say that particular
22　pharmacy, are you referring to a Rite Aid retail
23　pharmacy location?
24　　A.　　I am.

Page 24

1　　Q.　　Where was that location where
2　you --
3　　A.　　Johnstown.
4　　Q.　　Sorry.
5　　A.　　Oh, I'm sorry.
6　　Q.　　What was the location where you
7　were a pharmacy manager?
8　　A.　　Johnstown.
9　　Q.　　Did you have any other
10　responsibilities besides the profitability while
11　you were a pharmacy manager?
12　　A.　　The responsibilities were to
13　dispense prescriptions, payroll, just running the
14　basic business of the pharmacy.
15　　Q.　　After your year as a pharmacy
16　manager, what was your next position at Rite Aid?
17　　A.　　I remained a pharmacist.  But
18　then at that particular time, Rite Aid was
19　purchasing some stores, another drugstore chain,
20　Gray Drug.  And so after that I went out of the
21　pharmacy and was a training pharmacist as new
22　pharmacists were coming on board from the
23　acquisition.
24　　Q.　　So this would have been around

Page 25

1　1987 that you became a training pharmacist?
2　　A.　　That sounds correct.
3　　Q.　　How long did you hold the
4　position as training pharmacist?
5　　A.　　Probably eight months.
6　　Q.　　And you said there was a
7　acquisition that Rite Aid made around that time.
8　Correct?
9　　A.　　Correct.
10　　Q.　　And the name of the other
11　business that Rite Aid acquired was Gray Drug, do
12　I have that correct?
13　　A.　　Gray Drug, yes.
14　　Q.　　So it was your job while you were
15　a training pharmacist to go around to the Gray
16　Drug locations and train them on Rite Aid
17　procedures.
18　　　　Do I have that correct?
19　　A.　　Yes.  On procedures and the
20　computer system.
21　　Q.　　And was that also around the
22　Johnstown, Pennsylvania area?
23　　A.　　That was actually throughout the
24　country.

Page 26

1  Q.  After your time as a training
2  pharmacist, what was your next position at Rite
3  Aid?
4      A.  I moved to Baltimore to become a
5  pharmacy manager.
6      Q.  So that would have been around
7  1988 when you moved to Baltimore?
8      A.  That sounds correct.
9      Q.  And was that position as a
10 pharmacy manager also for a retail location?
11     A.  It was.
12     Q.  Were your job responsibilities
13 the same as your previous stint as a pharmacy
14 manager in Johnstown, Pennsylvania?
15     A.  They were.
16     Q.  How long were you the pharmacy
17 manager in Baltimore?
18     A.  Approximately two years.
19     Q.  After being a pharmacy manager in
20 Baltimore, what was your next job at Rite Aid?
21     A.  I got promoted to be a pharmacy
22 district manager.
23     Q.  And that would have been around
24 1990?

Page 27

1      A.  Yes.
2      Q.  How long were you a pharmacy
3  district manager for?
4      A.  Approximately two years.
5      Q.  Was that also in Baltimore,
6  Maryland?
7      A.  It was.
8      Q.  What were your responsibilities
9  as a pharmacy district manager?
10     A.  Similar to that as a pharmacy
11 manager, the pharmacy district manager was
12 responsible for anywhere between 25 to 30 stores,
13 as far as staffing, training, profitability.
14     Q.  And the 25 to 30 stores that you
15 were responsible for, were those all in the
16 Maryland area?
17     A.  Yes.
18     Q.  What was your next position after
19 pharmacy district manager?
20     A.  Director of professional
21 placement.
22     Q.  How long were you the director of
23 professional placement?
24     A.  For approximately a year.

Page 28

1      Q.  So that would have been around
2  1992 to 1993.  Right?
3      A.  Correct.
4      Q.  What did you do as the director
5  of professional placement?
6      A.  I was responsible for going to
7  schools of pharmacy and recruiting pharmacy
8  students to come to work for Rite Aid.  And I was
9  responsible for putting together training
10 programs for the region.
11     Q.  When you say the region, what
12 region are you referring to?
13     A.  Baltimore metro market.
14     Q.  After your year as the director
15 of professional placement, what was your next
16 position at Rite Aid?
17     A.  Pharmacy division manager.
18     Q.  How long were you a pharmacy
19 division manager for?
20     A.  Two years.
21     Q.  So that would be approximately
22 1993 through 1995?
23     A.  That is correct.
24     Q.  And what were your job

Page 29

1  responsibilities as a pharmacy division manager?
2      A.  Similar to the pharmacy manager
3  and the pharmacy district manager.  I was
4  responsible for the profitability and operations
5  of approximately 150 Rite Aid pharmacies in the
6  Baltimore metro market.
7      Q.  After your time as the pharmacy
8  division manager, what was your next position at
9  Rite Aid?
10     A.  I moved -- I got promoted into
11 the corporate office, and I became a manager of
12 government affairs.
13     Q.  And that would have been around
14 1995?
15     A.  Correct.
16     Q.  Now, when you say the corporate
17 office, are you referring to the Rite Aid offices
18 in Camp Hill, Pennsylvania?
19     A.  I am.
20     Q.  Were you physically located
21 starting in 1995 in the offices in Camp Hill,
22 Pennsylvania?
23     A.  I believe I moved to Camp Hill in
24 1996.

Page 30

1    Q.    When you moved to Camp Hill, it
2  was for the position that you just described, the
3  manager of government affairs.  Right?
4    A.    It was.
5    Q.    What were your job
6  responsibilities as a manager of government
7  affairs?
8    A.    I was responsible for varying --
9  many times varying number of states to follow
10  regulatory and legislation concerning anything
11  that would impact the Rite Aid book of business.
12  I was responsible for compliance with DEA rules
13  and regulations.  And I was responsible for
14  prescription drug monitoring programs and
15  submitting data to a limited number of programs
16  that were there in 1995.
17    Q.    How long were you the manager of
18  government affairs?
19    A.    From 1995 to 2006.
20    Q.    In that time period from 1995 to
21  2006, who was your supervisor?
22    A.    James Krahulec.
23    Q.    Can you spell that last name,
24  please?

Page 31

1    A.    K-R-A-H-U-L-E-C.
2    Q.    Was there anyone else in the
3  government affairs division at Rite Aid during
4  that time period, 1995 to 2006?
5    A.    Can you repeat the question?
6    Q.    Sure.
7          Was anyone else in the government
8  affairs division, let's say, of Rite Aid between
9  that period, 1995 to 2006?
10    A.    We had like an administrative
11  staff, but during that time it was Mr. Krahulec
12  and myself.
13    Q.    Who was the administrative staff?
14    A.    Deb Hurley.
15    Q.    Can you spell the last name?
16    A.    H-U-R-L-E-Y.
17    Q.    How did you train for your job as
18  manager of government affairs?
19    A.    Well, in my capacity as the
20  pharmacy regional person in Baltimore, I had the
21  opportunity at that time to go and testify in
22  Annapolis, meet with legislators.  Mr. Krahulec
23  obviously was only one person and couldn't be at
24  that time in approximately 15 states.  And so if

Page 32

1  there was someone that needed to go before a
2  Senate committee or something like that, they
3  would ask me to go and to provide testimony or to
4  speak on behalf of Rite Aid.  And so having done
5  that a number of times in my previous capacity,
6  the opportunity came up for the additional
7  position in the Rite Aid corporate headquarters,
8  so that's when they promoted me into that
9  position.
10          And then after that, it was
11  really hands-on training with the individuals at
12  the corporate office.
13    Q.    Who were some of the individuals
14  who you did the hands-on training with?
15    A.    Mike Podgurski.
16    Q.    Anyone else?
17    A.    I'm trying to think who else was
18  there at that time.
19          It was pretty much Mike and --
20  Mike and Jim.
21    Q.    When you say Jim, that's James
22  Krahulec?
23    A.    (Witness nods head.)
24          MS. McENROE:  Is that a yes?

Page 33

1          THE WITNESS:  Yes.
2          MR. POWERS:  Sorry.  Yeah, thank
3    you.
4  BY MR. POWERS:
5    Q.    And what was Mike Podgurski's
6  title?
7    A.    I don't know what his title was
8  at that time.  He's had a lot of titles, I don't
9  know what it was specifically at that time.
10    Q.    We've been talking about the
11  government affairs division.
12          What division did Mike Podgurski
13  work in?
14    A.    More pharmacy ops.
15    Q.    And I'm using the word
16  "division."
17          Is that the correct term or
18  department or is there a better term in how Rite
19  Aid describes the organizational structure?
20    A.    It's government affairs
21  department.  It's very small.
22    Q.    Okay.  So it's department, I
23  guess?
24    A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.   Okay.  How does the government
2  affairs department fit into the larger
3  organizational structure of the Rite Aid
4  corporate office?
5         MS. McENROE:  Objection to form.
6         THE WITNESS:  We monitor
7     legislation and then provide updates to
8     the corporate departments that are
9     involved.  If it's a tax issue, we would
10    forward the legislation to the tax
11    department.  If it was a pharmacy issue,
12    we would forward it to the pharmacy
13    department.  We also had control or
14    looked over DEA rules and regulations.
15    And if there was a question concerning,
16    you know, a DEA rule or regulations,
17    pharmacy operations or the other
18    departments would come and ask us
19    questions or ask us to investigate and
20    provide an answer back to them.
21  BY MR. POWERS:
22    Q.   For DEA issues, you mentioned the
23  pharmacy departments.
24         Any other departments you worked

Page 35

1  with on DEA issues?
2    A.   Logistics.
3    Q.   And who did you work with in the
4  logistics department?
5    A.   I don't remember who was in
6  logistics back then.
7    Q.   Besides logistics and pharmacy,
8  any other departments you worked with on DEA
9  issues for your time period '95 through 2006?
10    A.   I think that's it.
11    Q.   Anyone else besides the pharmacy
12  department, besides Mike Podgurski that you
13  worked with?
14    A.   There were various individuals in
15  the various -- in that department that I would
16  work with.
17    Q.   Can you name the ones you
18  remember?
19    A.   Sure.  Scott Jacobson.
20    Q.   Do you remember Scott Jacobson's
21  title?
22    A.   VP pharmacy operations.
23    Q.   Anyone else?
24    A.   Not at this time.

Page 36

1    Q.   You also mentioned before that
2  you gave testimony, I believe you said, to
3  governmental organizations; is that correct?
4    A.   That is correct.
5    Q.   What test -- can you give me some
6  examples of the testimony that you gave?
7    A.   Certainly.  There were pieces of
8  legislation to -- where there was going to be a
9  reimbursement cut to Medicaid where the
10  dispensing fee was going to be reduced.  And we
11  obviously, from a business perspective, we did
12  not want that to occur, so we would testify in
13  order to maintain the dispensing fee.
14    Q.   Did you give testimony to state
15  government agencies?
16    A.   I did.
17    Q.   What were the state government
18  agencies that you testified to?
19    A.   I've testified before the
20  Maryland General Assembly, or a subcommittee of
21  the assembly.
22    Q.   Anywhere else besides the
23  Maryland General Assembly?
24    A.   The Pennsylvania General

Page 37

1  Assembly.
2    Q.   Anywhere else?
3    A.   Maine.
4    Q.   Anywhere else?
5    A.   Vermont.
6    Q.   Anywhere else?
7    A.   Those are the ones that I can
8  recall.
9    Q.   Did you ever testify about DEA
10  compliance issues before any of the state bodies
11  that you just named?
12         MS. McENROE:  Objection to form.
13         THE WITNESS:  For the time period
14    when I was a manager of government
15    affairs, not that I remember.
16  BY MR. POWERS:
17    Q.   Did you ever testify before
18  federal agencies during the time period of 1995
19  through 2006?
20    A.   I did not.
21    Q.   Have you ever testified before
22  federal agencies during your entire time at Rite
23  Aid?
24    A.   I believe no.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.    And to be clear, when I say
2 federal agencies, I'm also including legislative
3 bodies.
4         Is that okay?
5    A.    That's fine.
6    Q.    Does that change your answer?
7    A.    No.
8    Q.    What is the government affairs
9 department relationship with the distribution
10 centers?
11         MS. McENROE:  Objection to form.
12         THE WITNESS:  We work together.
13 BY MR. POWERS:
14    Q.    Do the distribution centers
15 report to the government affairs office?
16    A.    They do not.
17    Q.    Was there a typical contact
18 person at each distribution center that you would
19 work with?
20    A.    There were contact individuals at
21 the distribution centers.
22    Q.    Did those contact individuals
23 have a particular title at the distribution
24 centers?

Page 39

1    A.    DEA coordinator.
2    Q.    So is it fair to say then the
3 government affairs office would interact with the
4 DEA coordinators at each individual distribution
5 center?
6    A.    I myself would interact more with
7 the person that was in charge of the DEA
8 coordinators at the corporate office.
9    Q.    Who was the person in charge of
10 the DEA coordinators at the corporate office?
11    A.    There was a director of
12 logistics, regulatory, something along that title
13 line.  I don't know the official title.
14    Q.    Would that be the logistics -- in
15 the logistics department that you talked about
16 earlier?
17    A.    Yes.
18    Q.    Does the name Kevin Mitchell ring
19 a bell for you?
20    A.    Yes.
21    Q.    Is that one of the people that
22 you would have been working with in the logistics
23 department?
24    A.    Yes.

Page 40

1    Q.    How about Chris Belli, does that
2 name sound familiar to you?
3    A.    Yes.
4    Q.    Is that one of the people you've
5 been working with in the logistics department?
6    A.    Yes.
7    Q.    And are those people, Chris Belli
8 and Kevin Mitchell, the people you're referring
9 to when you say the person in charge of the DEA
10 coordinators at the logistics department?
11    A.    Yes.
12    Q.    So after 2006, you ceased -- your
13 title ceased to be manager of government affairs.
14 Correct?
15    A.    Correct.
16    Q.    What did your title become at
17 that point?
18    A.    Director, government affairs.  I
19 got a promotion.
20    Q.    Is that your current title,
21 director of government affairs?
22    A.    It is.
23    Q.    Have you held the position of
24 director of government affairs continuously from

Page 41

1 2006 until the present?
2    A.    I have.
3    Q.    What happened to James Krahulec
4 when you became the director of government
5 affairs?
6    A.    James Krahulec passed away in
7 2006 or so.  And Mike Podgurski moved in to
8 government affairs.  So from when I was a
9 director of government affairs, Mike Podgurski
10 then became my boss.
11    Q.    Did that move of Mike Podgurski
12 to becoming your boss happen at the same time you
13 became director of government affairs?
14    A.    Close to the same time frame,
15 yes.
16    Q.    Who else was in your department
17 when you became the director of government
18 affairs?
19    A.    There would have been an
20 individual, Michael Yount.
21    Q.    How do you spell that last name?
22    A.    Y-O-U-N-T.
23    Q.    When did Mr. Yount start in the
24 government affairs department?

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    A.    I don't remember.
2    Q.    Was it around the time you became
3 the director of government affairs?
4    A.    I believe it was prior to that
5 point.
6    Q.    So Michael Yount was part of the
7 government affairs department before you became
8 director of government affairs?
9    A.    Yes.
10   Q.    How long did Michael Yount work
11 in the government affairs office?
12   A.    I don't recall.
13   Q.    Does he still work in the
14 government affairs office?
15   A.    He does not.
16   Q.    Do you know when he left?
17   A.    I don't remember.
18   Q.    Was it more or less than ten
19 years ago when Michael Yount left?
20   A.    It was more than ten years ago
21 that he left.
22   Q.    How come you did not mention
23 Michael Yount before when I asked you who else
24 worked in the government affairs office while you

Page 43

1 were the manager of government affairs?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  I just completely
4    forgot about Michael.
5 BY MR. POWERS:
6    Q.    Besides Michael Yount, anyone
7 else work in the government affairs office
8 between '95 and present?
9    A.    Not that I remember.
10   Q.    Did Amy Knisely ever work in the
11 government affairs department?
12   A.    Amy Knisely did, yes.
13   Q.    How come you didn't mention her
14 when I asked who else worked in the government
15 affairs department just now?
16   A.    You didn't specify a time frame.
17 We were discussing until -- we were discussing
18 the 2006.  And Amy Knisely wasn't in the
19 government affairs department in those.
20   Q.    My question was -- I'm reading
21 off the transcript here, besides Michael Yount,
22 anyone else work in the government affairs office
23 between 1995 and the present?
24   A.    Oh, okay.  Yes.

Page 44

1    Q.    Who else worked in the government
2 affairs office between 1995 and the present?
3    A.    Amy Knisely.
4    Q.    Anyone else?
5    A.    Sarah Everingham, Andrea Bucher.
6    Q.    Anyone else?
7    A.    Derrick Ridley.
8    Q.    How do you spell that last name?
9    A.    R-I-D-L-E-Y.
10   Q.    Anyone else?
11   A.    Sarah Hilbolt.
12   Q.    How do you spell that last name?
13   A.    H-I-L-B-O-L-T.
14   Q.    Anyone else?
15   A.    In government affairs was Grace
16 Schuyler.
17   Q.    Anyone else?
18   A.    Jermaine Smith.
19   Q.    And when I say anyone else, feel
20 free to name more than one person at a time.
21   A.    Okay.
22   Q.    Anyone else besides who you've
23 mentioned so far?
24   A.    I'm thinking.

Page 45

1        Yong Choe.
2        Those are to the best of my
3 knowledge.
4    Q.    I believe you testified earlier
5 that in -- from 1995 to 2006, the only people in
6 the government affairs office were yourself,
7 James Krahulec, and for some period of that time
8 Michael Yount.  Right?
9    A.    And Deb Hurley.
10   Q.    How come the government affairs
11 office got so much bigger after 2006?
12       MS. McENROE:  Objection, form.
13       THE WITNESS:  There was the
14   addition of additional people because the
15   responsibilities were expanding.
16 BY MR. POWERS:
17   Q.    Why do you say the
18 responsibilities were expanding?
19   A.    Prior to 2006, there were a very
20 limited number of state prescription monitoring
21 programs.  And more states kept coming onboard
22 with prescription monitoring programs.  So there
23 was more data submission to those programs.  And
24 then error corrections, when there would be an

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 error that was sent to the program. And that was
2 taking up increasing amounts of time.
3         There was also additional
4 heightened awareness around DEA rules and
5 regulations. Legislation was getting more
6 involved.
7     Q.    During that period after 2006,
8 who in the government affairs office had
9 responsibility in any shape or form for dealing
10 with the DEA rules and regulations?
11         MS. McENROE: Objection to form.
12         THE WITNESS: That would be
13 myself.
14 BY MR. POWERS:
15     Q.    Anyone else?
16     A.    Yes.
17         May I make an addition to an
18 individual in government affairs?
19     Q.    Sure.
20     A.    I don't believe I mentioned
21 Andrea Bucher.
22     Q.    Okay. Anyone else besides
23 yourself in the government affairs office that
24 dealt with DEA's rules and regulations?

Page 47

1     A.    Since then?
2     Q.    Since 2006.
3     A.    Amanda Glover.
4     Q.    Was she also in the government
5 affairs office?
6     A.    She is in regulatory affairs, but
7 she dealt with DEA.
8     Q.    Anyone else besides Amanda
9 Glover?
10     A.    Mike Podgurski.
11     Q.    But he's not in government
12 affairs. Right?
13     A.    No. Mike was in government
14 affairs.
15     Q.    Oh, okay.
16     A.    He was in operations prior to
17 2006.
18         Grace Schuyler.
19     Q.    Anybody else?
20     A.    Not that I remember at this time.
21     Q.    And you mentioned, was it Amanda
22 Glover?
23     A.    Yes.
24     Q.    That she was in the regulatory

Page 48

1 affairs department. Right?
2     A.    Yes.
3     Q.    Is that a separate department
4 from government affairs?
5     A.    Yes.
6     Q.    Did you ever work with other
7 people from the regulatory affairs department
8 while you were the director of government
9 affairs?
10     A.    Yes.
11     Q.    Who else from regulatory affairs
12 did you interact with?
13     A.    Zach Hicks.
14     Q.    Can you spell that?
15     A.    H-I-C-K-S.
16     Q.    Anyone else?
17     A.    Greg Mills. That's it.
18     Q.    Do you know who the director of
19 the regulatory affairs office was during this
20 time period, starting in 2006?
21     A.    There was no regulatory affairs
22 department in 2006. I think why there's some
23 confusion here is what happened was government
24 affairs split off from regulatory affairs

Page 49

1 approximately two years ago. And so that's why
2 there's some confusion as far as the individuals
3 and where they worked, because what happened is,
4 even though I still maintained the title of
5 government affairs, I'm in regulatory affairs.
6 So that may be adding to the confusion.
7     Q.    Okay. Just so I have this
8 correctly here, the department was the department
9 of government affairs from 1995 up until about
10 2017?
11     A.    There still is a department of
12 government legislative and regulatory, but --
13 from following that. But there's a regulatory --
14 department of reg -- a department of regulatory
15 affairs as well. So you still -- you have two
16 now.
17     Q.    Okay. So from 1995 until
18 current, there was a department of government and
19 regulatory affairs. Right?
20     A.    (Witness nods head.)
21         Yes.
22     Q.    And then approximately two years
23 ago, around 2017, there's a separate department
24 named regulatory affairs?

Page 50

1    A.    Correct.

2    Q.    Okay.  Why was the regulatory
3 affairs department created in 2017?

4    A.    There was heightened awareness on
5 many regulatory affairs issues, such as DEA,
6 HIPAA, and so the decision was made to create a
7 department.

8    Q.    Who was the person in charge of
9 the regulatory affairs office starting in 2017?

10    A.    Amanda Glover.

11    Q.    And she would have been
12 previously employed in the government affairs and
13 regulatory affairs department prior to 2017; is
14 that right?

15    A.    She was not.

16    Q.    Do you know where she was before?

17    A.    Pharmacy operations, I believe.

18    Q.    How did your job responsibilities
19 as the director of government affairs change when
20 the new regulatory affairs department was
21 created?

22    A.    I had less responsibilities for
23 state legislative and regulatory following
24 legislation than I had previously.  I had bumped

Page 51

1 up and down between the number of states that I
2 covered.  And I went down to two states to cover
3 because of the other increasing responsibilities.

4    Q.    What were your increasing
5 responsibilities?

6    A.    DEA compliance, prescription
7 monitoring program compliance.

8    Q.    You started talking a little bit
9 about it there, but as the director of government
10 affairs between 2006 and 2017, what were your job
11 responsibilities?

12    A.    Similar to my responsibilities as
13 manager of government affairs.

14    Q.    Can you explain what you mean by
15 that?

16    A.    Sure.  I did the same thing,
17 pretty much.  I was in charge of DEA compliance
18 as far as providing information, questions to the
19 various departments throughout the company.  I
20 was responsible for prescription monitoring
21 programs.  And I was responsible for legislative
22 and regulatory for two states.  At present, I'm
23 down to one state.

24    Q.    What two states were you in

Page 52

1 charge of legislative and regulatory for?

2    A.    Maryland and Delaware.

3    Q.    When you say in charge of
4 legislative and regulatory, what do you mean by
5 that?

6    A.    I mean follow any legislation
7 that impacts Rite Aid's book of business and then
8 provide that information to the various
9 departments that would be impacted by the
10 legislation or the regulation, work with groups
11 to put forth a response to the legislation,
12 provide comments, anything that needed to be done
13 related to those issues.

14    Q.    And you also mentioned that you
15 had responsibility for prescription monitoring
16 programs.

17    Can you explain that?

18    A.    Certainly.  In each state that
19 Rite Aid does business, we're required by law to
20 report any controlled substance data for
21 prescriptions that we dispense to the state.  In
22 each state, we send the data on a daily basis.
23 And then what happens is we get errors back,
24 where the stores will say put a symbol in the

Page 53

1 name.  They'll say -- it's a K9 and they put
2 parentheses around the K9, so that comes back as
3 an error.  And then we're responsible for
4 correcting that and sending it back to the
5 prescription monitoring program.

6    We need to stay up on all of the
7 different formats and all of the different
8 standards related to the prescription monitoring
9 program so that we stay in compliance, because
10 there are significant fines associated with it if
11 we're not in compliance.

12    Q.    Are you talking about the
13 prescription monitoring programs, are those
14 particular prescription monitoring programs in
15 each state?

16    A.    Yes, they're in each state.

17    Q.    And the prescription monitoring
18 programs, are they different in each state?

19    A.    They are.

20    Q.    Do the prescription monitoring
21 programs have anything to do with Rite Aid's role
22 as a distributor of controlled substances?

23    MS. McENROE:  Objection, form.

24    THE WITNESS:  There are certain

Page 54

1 states that require distributor data to
2 be sent to them.
3 BY MR. POWERS:
4 Q. You also mentioned that as
5 director of government affairs that you were in
6 charge of DEA compliance.
7 Can you explain what you mean by
8 that?
9 A. Certainly. If there was a DEA
10 question or a new DEA rule or regulation that
11 came up, it's my job to communicate that to store
12 operations; to logistics, if it involves
13 transporting drugs; to provide, you know,
14 guidance into policies and procedures as far as
15 compliance with DEA rules and regulations.
16 Q. You said it's your job to
17 communicate the DEA compliance issues.
18 How would you communicate to the
19 other Rite Aid employees?
20 A. If there was a proposed piece of
21 legislation, I would either forward an email to
22 the individuals that are in the correct
23 department. We could possibly have a discussion
24 about the proposed regulation to determine how it

Page 55

1 would impact the Rite Aid book of business.
2 Q. So besides emailing the
3 appropriate people and having discussions, did
4 you do anything else to communicate new rules and
5 regulations?
6 A. I mean, we might have a meeting,
7 a meeting as such to discuss it and determine
8 what our action plan would be.
9 And then we could -- we would
10 have an email communication as far as rolling it
11 out to the stores and what we were going to
12 communicate to stores to do to be compliant. So
13 that was all a part of the process.
14 Q. Was there any standard procedure
15 about how to communicate a new DEA rule or
16 regulation?
17 A. The standard procedure for myself
18 is to communicate it to our VP of pharmacy
19 operations. If it was logistics, the VP of
20 logistics. Anybody that was involved in that
21 particular matter would be communicated on so
22 that they were aware of pending or then passed
23 legislation.
24 Q. When you say communicated to the

Page 56

1 VP of operations or the VP of logistics, was that
2 just communicate via email?
3 A. Email typically, yes. And then
4 typically what would happen is they would read it
5 and call me back and then we'd start a
6 discussion.
7 Q. We've been talking about new
8 rules and regulations.
9 How do you communicate
10 long-standing rules and regulations regarding DEA
11 compliance?
12 MS. McENROE: Objection to form.
13 THE WITNESS: We do that in a
14 number of ways. We have DEA reminder
15 messages that we send to all of our
16 stores on a weekly basis. Those messages
17 include compliance with CSA and the CFR,
18 where they are how to execute an order
19 form, things along those lines.
20 BY MR. POWERS:
21 Q. How are those DEA reminder
22 messages sent to the stores?
23 A. They are sent in what we call a
24 management planner.

Page 57

1 Q. What is a management planner?
2 A. It's a weekly message board that
3 goes out to all of our pharmacies.
4 Q. Is this an electronic system?
5 A. Yes.
6 Q. Who would have access to that
7 electronic system?
8 A. The pharmacist, our field
9 management, people in corporate.
10 Q. You've been talking about
11 communicating with the stores.
12 How about DEA policies and
13 procedures related to distribution, how did you
14 communicate those?
15 A. DEA with -- for distribution,
16 would go to the VP of logistics. And then
17 they're individuals during that time period that
18 we mentioned, Kevin Mitchell, Chris Belli,
19 communication would go to them if there was
20 something impacting the distribution centers.
21 Q. And those communications would
22 also be just via email?
23 A. Typically, yes.
24 Q. Any other ways besides email?

Page 58

1      A.   Normal communications.  Their
2  offices are not too -- their office was not too
3  far from mine, so we would have conversations.
4      Q.   You mean just like walk down to
5  their office?
6      A.   Yep.
7      Q.   How did you communicate existing
8  or long-standing DEA regulations regarding
9  distribution of controlled substances?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  I didn't
12     communicate to the distribution centers.
13     That responsibility would have been on
14     Chris or Kevin Mitchell, depending on the
15     time.  But I was not directly
16     communicating to the distribution
17     centers.
18  BY MR. POWERS:
19     Q.   How did you communicate existing
20  DEA rules and regulations to either Chris Belli
21  or Kevin Mitchell?
22     A.   I don't know that I did that on a
23  routine basis.  I believe they were very well
24  versed in existing DEA rules and regulations.

Page 59

1      Q.   You also mentioned that it was
2  your job to formulate guidance as to the policies
3  and procedures regarding DEA compliance; is that
4  right?
5      A.   That is correct.
6      Q.   How did you formulate the
7  guidance?
8      A.   I would look at a regulation
9  and/or a proposed rule and say, how would this
10  impact Rite Aid.  And then if there was a certain
11  action plan that I thought would work as far as
12  rolling out the guidance, then I would put a
13  communication together and say, hello, this is
14  the new DEA regulation and this is how I feel we
15  should do something with it.
16     Q.   What did you rely on when you
17  were formulating the guidance?
18     A.   The -- what had been proposed or
19  what had come out, the industry information that
20  it was out there, and my own knowledge.
21     Q.   Did you ever consult anyone else
22  within Rite Aid about formulating guidance
23  regarding DEA regulations?
24     A.   Certainly.

Page 60

1      Q.   Who?
2      A.   Amanda Glover.
3      Q.   Anyone else?
4      A.   Mike Podgurski, Zach Hicks, Greg
5  Mills.
6      Q.   Anyone else?
7      A.   Scott Jacobson.
8      Q.   Did you ever consult anyone
9  outside of Rite Aid when you were formulating
10  guidance on DEA regulations?
11     A.   Occasionally.
12     Q.   Who?
13     A.   We had outside counsel at one
14  point, Hyman, Phelps & McNamara.
15     Q.   When was that, when you had
16  Hyman, Phelps & McNamara help you with
17  formulating DEA guidance?
18     A.   2010 and back.
19     Q.   You say and back, do you mean
20  before 2010?
21     A.   Yes, yes.  And that could give or
22  take.  That was just pretty much when we stopped
23  communicating.  But we still sent communications
24  to them, but not like asking questions or

Page 61

1  whatever.
2      Q.   Do you know approximately when
3  you started using Hyman, Phelps & McNamara for
4  guidance -- excuse me, to formulate guidance on
5  DEA regulations?
6      A.   I don't remember.
7      Q.   Can you give me an approximate
8  date?
9      A.   At least 2000.
10     Q.   And who would you talk to at
11  Hyman, Phelps & McNamara about DEA regulations?
12     A.   Karla Palmer.
13     Q.   Anyone else?
14     A.   Larry Houck.
15     Q.   Can you spell that last name?
16     A.   H-O-U-C-K.
17     Q.   Anyone else besides Karla Palmer
18  and Larry Houck?
19     A.   John Gilbert.
20     Q.   Anyone else?
21     A.   Those were the three main
22  individuals.
23     Q.   How did you communicate with
24  Hyman, Phelps & McNamara?

Page 62

1    A.    Either email or a phone call.
2    Q.    And you mentioned there was some
3  communication with Hyman, Phelps & McNamara after
4  2010.  Right?
5    A.    There is, yes.
6    Q.    What was the nature of that
7  communication after 2010?
8         MS. McENROE:  Objection, calls
9    for privileged information.  I instruct
10   the witness not to answer.
11        Do you have a more specific
12   question not seeking privileged
13   information?  The word "nature" is not
14   specific to not seek privileged
15   communications.
16 BY MR. POWERS:
17   Q.    After 2010, how did your -- or
18 how did Rite Aid's relationship with Hyman,
19 Phelps & McNamara change?
20   A.    I would occasionally call them to
21 ask them a question.  I also communicate with
22 Karla Palmer in the instance where there is a
23 prescriber --
24        MS. McENROE:  Hold on -- nothing

Page 63

1    substantive.  So just in terms of the
2    nuts and bolts.  That's it.
3         THE WITNESS:  Okay.  So I would
4    send email communications to them or call
5    them.
6  BY MR. POWERS:
7    Q.    I'm just trying to understand why
8  you gave 2010 as the end date for your
9  relationship with Hyman, Phelps & McNamara.
10        How come you used 2010 as the
11 date that you ended the relationship, but it
12 seems like you communicate after 2010 with Hyman,
13 Phelps?
14   A.    They were primarily our counsel
15 prior to that time.  And then at that point we
16 had a settlement agreement and they worked us
17 through the settlement agreement.  And then our
18 counsel went to another firm.
19   Q.    What was the firm after Hyman,
20 Phelps & McNamara?
21   A.    Morgan Lewis.
22        THE WITNESS:  May we take a
23   break?
24        MS. McENROE:  Yeah.  It's been

Page 64

1    about an hour anyway.
2         MR. POWERS:  Sure.  That's fine.
3         THE VIDEOGRAPHER:  Going off the
4    record at 10:30 a.m.
5         - - -
6         (A recess was taken from
7    10:30 a.m. to 10:44 a.m.)
8         - - -
9         THE VIDEOGRAPHER:  We're back on
10   the record at 10:44 a.m.
11 BY MR. POWERS:
12   Q.    Welcome back, Ms. Hart.
13        Before we took the break, we were
14 talking about a settlement agreement that Rite
15 Aid had had.
16        Can you explain what that
17 settlement agreement was?
18   A.    Rite Aid entered into a
19 settlement agreement with the Drug Enforcement
20 Administration in 2009.
21   Q.    What was the nature of that
22 settlement?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  There are alleged

Page 65

1    recordkeeping violations, alleged missing
2    drugs.
3  BY MR. POWERS:
4    Q.    Did you have any involvement in
5  the discussions that led to that settlement
6  agreement?
7    A.    I did.
8    Q.    What was the nature of your
9  involvement?
10        MS. McENROE:  Objection to form.
11        Also, just careful caution
12   here -- and I know it originally came up
13   in the context of privileged information
14   and communication with counsel.
15        I caution you not to discuss
16   anything you discussed with counsel or
17   you learned from counsel.
18        THE WITNESS:  Okay.
19        For the settlement agreement, I
20   had obtained documents, looked at the
21   records based on the allegations of the
22   Drug Enforcement Administration and
23   reviewed the documents to determine if
24   the allegations were correct or not.  I

Page 66

1    visited various stores to look for
2    records.  I met with various AUSAs to
3    provide records with outside counsel.
4  BY MR. POWERS:
5    Q.    Was there anything else in the
6  settlement agreement beyond recordkeeping
7  violations?
8         MS. McENROE:  Objection to form.
9         THE WITNESS:  There were
10   allegations of medications lost or
11   medications that weren't accounted for.
12   That was the other part of my
13   recollection of it.
14 BY MR. POWERS:
15   Q.    Anything else?
16        MS. McENROE:  Objection to form.
17        THE WITNESS:  There could be
18   more, I just don't remember.
19 BY MR. POWERS:
20   Q.    Did the settlement agreement have
21 any allegations regarding Rite Aid knowingly
22 filling prescriptions for controlled substances
23 that were not issued for legitimate medical
24 purposes?

Page 67

1         MS. McENROE:  Objection to form.
2         THE WITNESS:  It did.
3  BY MR. POWERS:
4    Q.    In your role as the director of
5  the government affairs office in 2009, did you
6  make any changes as a result of that 2009
7  settlement with the Department of Justice?
8         MS. McENROE:  Objection to form.
9         THE WITNESS:  Rite Aid had been
10   making changes up to the settlement
11   agreement.  Part of the settlement
12   agreement was counting of hydrocodone and
13   acetaminophen on a quarterly basis.  We
14   implemented the MethCheck system in our
15   stores.
16        But prior to the 2009 settlement,
17   we had put in a comprehensive program.
18   And that program continues to evolve.
19 BY MR. POWERS:
20   Q.    Let me specify my question.
21        As a direct result of the 2009
22 settlement, what changes were made at Rite Aid?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  We updated our DEA

Page 68

1    computer-based training.  We enhanced our
2    DEA store checklist.
3  BY MR. POWERS:
4    Q.    Anything else?
5    A.    There could be more, I just don't
6  remember.
7    Q.    As a result of the 2009
8  settlement, did Rite Aid make any changes with
9  regards to its operations as a controlled
10 substance distributor?
11        MS. McENROE:  Objection to form.
12        THE WITNESS:  We did not.  The
13   Rite Aid distribution center was not
14   involved in the settlement agreement.
15 BY MR. POWERS:
16   Q.    I think you mentioned -- you
17 referred to it as a counting on a quarterly basis
18 of hydrocodone.
19        What does that mean?
20   A.    That means that every quarter
21 Rite Aid would count the hydrocodone that we had
22 on our shelves and balance it to make sure that
23 the inventory was correct.
24   Q.    When you say on the shelves, you

Page 69

1  mean on the shelves at the individual pharmacies?
2    A.    In the stores, yes.
3    Q.    What is the DEA computer-based
4  training that you referred to earlier?
5    A.    It is training for pharmacists
6  to -- in all aspects of DEA guidance related to
7  222 Forms, everything that -- what to look for
8  for a prescription.  Everything that would be
9  required.
10   Q.    And that DEA computer-based
11 training, was that only for the individual Rite
12 Aid stores?
13        MS. McENROE:  Object to the form.
14        THE WITNESS:  It was.
15 BY MR. POWERS:
16   Q.    So we were talking earlier about
17 resources outside of Rite Aid that you used in
18 your position in government affairs to formulate
19 guidance on DEA regulations.  Right?
20   A.    Correct.
21   Q.    And you mentioned outside
22 counsel, which we've talked about.
23        Is there anyone else outside of
24 Rite Aid that you used to formulate guidance

Page 70

1  about DEA regulations?
2      A.   I would utilize trade groups.
3      Q.   Which trade groups?
4      A.   The National Association of Chain
5  Drug Stores, the individual state associations,
6  Maryland Association of Chain Drug Stores.  There
7  are retail groups or -- in each of the states
8  that would work on legislation or regulation and
9  formulate information in how it should be rolled
10  out.
11      Q.   Besides those trade groups you
12  just mentioned, anything else?  Any other parties
13  or organizations outside of Rite Aid that you
14  used to formulate guidance about controlled
15  substances in Rite Aid?
16      A.   The National Association of
17  Boards of Pharmacy.
18      Q.   Did you ever consult guidance
19  from the Healthcare Distributors Alliance, the
20  HDA?
21      A.   Never.
22      Q.   How about the HDMA, I believe is
23  the prior name?
24      A.   No.

Page 71

1      Q.   So besides outside counsel and
2  the trade groups you mentioned, did you rely on
3  any other outside individuals or groups to help
4  you formulate guidance about the rules and
5  regulations surrounding controlled substances?
6      A.   Not that I can recall.
7      Q.   To be clear, this is for the
8  entire time that you were working in the
9  government affairs office between 1995 and 2006?
10      A.   Yes.
11      Q.   And your answer is the same?
12      A.   Yes.
13      Q.   When you started in the
14  government affairs office in 1995, what efforts
15  did you make to make sure that Rite Aid was in
16  compliance with the current and existing
17  regulations regarding controlled substances at
18  that point?
19      MS. McENROE:  Objection to form.
20      You may respond.
21      THE WITNESS:  We reviewed the
22      policies and procedures that were in
23      place.  We looked at organization in our
24      stores.  We looked at distribution

Page 72

1  centers as far as their compliance.  So
2  we did an overall view of our entire
3  processes.
4  BY MR. POWERS:
5      Q.   When you say "we" in your
6  previous answer, who are you referring to?
7      A.   Jim Krahulec, myself, pharmacy
8  operations.
9      Q.   Who from pharmacy operations?
10      A.   It would have been Scott Jacobson
11  or Mike Podgurski.
12      Q.   How did you do your review of the
13  policies and procedures that were in place?
14      A.   We looked at issues that had come
15  in from various state inspection notices.  If
16  there was a recordkeeping allegation from a state
17  board of pharmacy, we looked at those and
18  determined what some of the more prevalent ones
19  were, ones that we were seeing at that point.
20  And then we developed different tools that our
21  pharmacists could use to organize recordkeeping
22  and maintain proper compliance.
23      Q.   You also said you looked at the
24  organization in your stores, what did you mean by

Page 73

1  that?
2      A.   What we were finding was that one
3  store would keep invoices in one location in one
4  drawer and the other store would keep them in the
5  back room with other documentation.  And it was
6  not -- there was not consistency throughout.  So
7  at that point then, we developed a DEA
8  recordkeeping box that we sent to the store on a
9  yearly basis where there are specific folders for
10  all of the required DEA documents.  So that in
11  every store, all the documents are in one place
12  and can be located.
13      Q.   Is that a physical box you --
14      A.   It's a physical box, yes.
15      Q.   You also said that you looked at
16  the distribution centers as far as their
17  compliance.
18      What do you mean by that?
19      A.   I mean, we looked at the
20  distribution centers from the standpoint of was
21  the cage secure, were there good security
22  policies and procedures in place.  Were there
23  criminal background checks.  Was the alarm system
24  working.  Were the SOPs correct.

Page 74

1    Q.    How did you determine whether the
2  SOPs were correct?
3    A.    I got together with logistics,
4  and we had a discussion and went through that,
5  through the SOPs.
6    Q.    And logistics, that would have
7  been Chris Belli or Kevin Mitchell?
8    A.    Yes.
9    Q.    Did you do a periodic review of
10  the SOPs for the distribution centers?
11    A.    I did not.  They were done by our
12  IA team, internal assurance team, and by the
13  logistics Chris Belli/Kevin Mitchell team.
14    Q.    And, sorry, we've been saying
15  SOPs.  We should be clear for the record.
16        We're talking about standard
17  operating procedures?
18    A.    Correct.
19    Q.    Before you reviewed the company's
20  SOPs for compliance, how did you familiarize
21  yourself with what was required from a compliance
22  perspective?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  I was pretty

Page 75

1    familiar in my role as the PDM, pharmacy
2    district manager, in my role as the
3    pharmacy division manager with compliance
4    with DEA rules and regulations.  From the
5    standpoint of, that was -- at that point,
6    you were also responsible for that in the
7    stores.
8        From the distribution side, it
9    was sort of a read and learn and
10    understand the rules and regulations.
11  BY MR. POWERS:
12    Q.    So you just read the rules
13  yourself regarding the rules and regulations
14  about dispensing controlled substances; is that
15  right?
16    A.    Or I'd interact with the industry
17  leaders to have discussions about what they were
18  doing, the different best practices that were out
19  there.
20    Q.    Who were the industry leaders you
21  interacted with?
22    A.    People at NACDS, people at the
23  Maryland Association of Chain Drug Stores.
24    Q.    Anyone else at Rite Aid that you

Page 76

1  consulted about the policies and procedures
2  regarding the distribution of controlled
3  substances?
4    A.    Back in the -- when I first came,
5  1995, Jim Krahulec was well versed.  And he was
6  my mentor, so I learned a lot from him as well.
7    Q.    Did you ever update your
8  understanding of what was required under the
9  Controlled Substances Act or other regulations
10  regarding controlled substances?
11        MS. McENROE:  Objection to form.
12        THE WITNESS:  Can you repeat the
13    question?
14  BY MR. POWERS:
15    Q.    Sure.
16        Besides when you started in the
17  government affairs office in 1995, what other
18  actions did you take to familiarize yourself with
19  the rules and regulations regarding the
20  distribution of controlled substances?
21    A.    I would attend various
22  conferences throughout the country to attain
23  knowledge.
24    Q.    Besides the conferences, what

Page 77

1  else did you do to familiarize yourself with the
2  rules and regulations surrounding the
3  distribution of controlled substances?
4    A.    That was pretty much it.
5    Q.    Did you do any periodic review of
6  the Rite Aid policies and procedures regarding
7  distribution during your time in the government
8  affairs office?
9    A.    I may have.  That responsibility
10  to put those into the distribution center rested
11  with Chris and Kevin to work with the SOPs.  That
12  was their primary responsibility.
13    Q.    So it's your testimony that the
14  logistics department was primarily responsible
15  for the Rite Aid policies regarding compliance
16  with the rules and regulations about the
17  distribution of controlled substances; is that
18  right?
19        MS. McENROE:  Objection.
20        THE WITNESS:  They were the
21    experts of logistics and what went on at
22    the distribution centers.  So, yes, they
23    were responsible for the SOPs.  I myself
24    would coordinate with them to review the

Page 78

1    SOPs and determine if they were correct.
2 BY MR. POWERS:
3    Q.    In determining whether those SOPs
4 were correct, what did you rely on?
5    A.    DEA rule and regulation, various
6 industry resources.
7    Q.    Did anyone else at Rite Aid help
8 you determine whether those regulations were
9 correct?
10    A.    Mr. Krahulec in the beginning.
11 And then once I had a better knowledge base,
12 primarily myself.
13    Q.    And you mentioned that you went
14 to some conferences about the rules and
15 regulations regarding controlled substance
16 distribution.
17        What were those conferences?
18    A.    I went to a DEA conference, a
19 pharmacy diversion awareness conference where
20 that was discussed.
21        So various DEA conferences.
22    Q.    When you say DEA conferences, are
23 you talking about conferences put on by the DEA?
24    A.    Yes.

Page 79

1    Q.    And you also mentioned a
2 diversion awareness conference.
3        What was that?
4    A.    That was the DEA also.
5    Q.    Do you remember how many DEA
6 conferences you actually attended?
7    A.    From 1995 to present?
8    Q.    Yes.
9    A.    12, 15.
10    Q.    And before you started working in
11 the government affairs office, do you know how
12 Rite Aid ensured compliance with the rules and
13 regulations regarding the distribution of
14 controlled substances?
15        MS. McENROE:  Objection to form.
16        THE WITNESS:  Could you state
17    that again?
18 BY MR. POWERS:
19    Q.    Sure.
20        Before you started working in the
21 government affairs office, do you know how Rite
22 Aid ensured compliance with the rules and
23 regulations regarding the distribution of
24 controlled substances?

Page 80

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  I do not.
3 BY MR. POWERS:
4    Q.    During your time in the
5 government affairs office, did you implement any
6 new procedures or policies regarding the
7 distribution of controlled substances by Rite
8 Aid?
9        MS. McENROE:  Objection.
10        THE WITNESS:  I myself did not
11    implement any policies and procedures for
12    the distribution of controlled
13    substances.  The logistics team may have
14    done that, something I was not aware of.
15    But I myself did not implement any.
16 BY MR. POWERS:
17    Q.    Do you know if the logistics team
18 implemented any new policies or procedures
19 regarding the distribution of controlled
20 substances during your time in the government
21 affairs office?
22        MS. McENROE:  Objection.
23        THE WITNESS:  I believe they did.
24 BY MR. POWERS:

Page 81

1    Q.    What were those procedures, new
2 procedures and policies?
3    A.    A lot around implementing
4 upgraded camera systems, upgrading cages,
5 upgrading picking directions.
6    Q.    Anything else?
7    A.    Those are the ones that come to
8 mind.
9    Q.    When you say "upgrading picking
10 directions," what do you mean by that?
11    A.    There were various pick machines
12 that were in the distribution center.  And in
13 order to be -- have orders more accurate, they
14 would develop upgrades to those machines so that
15 the actual people that pick the product in the DC
16 had a much easier job.
17    Q.    And you said it was possible that
18 the logistics department implemented policies and
19 procedures for the distribution centers that you
20 were not aware of; is that right?
21    A.    That is correct.
22    Q.    Did the logistics department have
23 to get your approval or -- let me phrase that a
24 different way.

Page 82

1        Did the logistics department have
2    to get government affairs department approval
3    before implementing a new policy or procedure at
4    the distribution centers?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  Typically they
7       would get approval, yes.
8    BY MR. POWERS:
9       Q.    Was it required?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  I don't know that
12       it was required.  That was just our
13       process.
14    BY MR. POWERS:
15       Q.    And Rite Aid distributed
16    controlled substances up until late 2014.
17    Correct?
18       A.    That's correct.
19       Q.    And the products that Rite Aid
20    distributed included hydrocodone combination
21    products.  Right?
22       A.    That is correct.
23       Q.    When Rite Aid was distributing
24    controlled substances -- actually, let me back up

Page 83

1    a second here.
2          When we're talking about Rite
3    Aid's distribution, can we agree that we're just
4    talking about the time period up until late 2014
5    when Rite Aid was distributing controlled
6    substances?
7       A.    Yes.
8       Q.    Okay.  When Rite Aid was
9    distributing controlled substances, did Rite Aid
10    have a suspicious order monitoring program?
11       A.    We did.
12       Q.    When has that suspicious order
13    monitoring program been in place since?
14       A.    The suspicious order monitoring
15    program has been in place since 1995, when --
16    that I became aware of it.  It could have been in
17    place prior to that, but...
18       Q.    To the best of your knowledge,
19    the suspicious order monitoring program was in
20    place from 19 -- at least 1995 until 2014?
21       A.    Yes.
22       Q.    How did you familiarize yourself
23    with the suspicious order monitoring program when
24    you first started in the government affairs

Page 84

1    office?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  I read the SOPs and
4       reviewed the policies and procedures and
5       became aware of the different aspects of
6       the suspicious order monitoring program.
7    BY MR. POWERS:
8       Q.    Did the suspicious order
9    monitoring program change at all between when you
10    first became aware of it and when Rite Aid
11    stopped distributing controlled substances?
12         MS. McENROE:  Objection to form.
13         THE WITNESS:  It did change.
14    BY MR. POWERS:
15       Q.    How did it change?
16       A.    We added another -- a component
17    of -- we had an asset protection that would
18    monitor part of our suspicious order monitoring
19    program.  And we upgraded and updated asset
20    protection monitoring of our -- portion of our
21    suspicious order monitoring program.
22       Q.    When did that happen?
23       A.    I would say around 2010.
24       Q.    And what was the nature of that

Page 85

1    upgrade?
2       A.    We got a new computer system that
3    asset protection used to -- for the detection of
4    theft and diversion called NaviScript/NaviCase.
5    And that particular system had a series of key
6    performance indicators that were monitored by
7    asset protection.  Those key performance
8    indicators were previously monitored by another
9    system, but this was just an upgraded system.
10       Q.    What was the previous system that
11    monitored the KPIs?
12       A.    That was an internal system in
13    asset protection.  I don't know the name of it.
14       Q.    And the NaviCase/NaviScript
15    system you just talked about, that was to monitor
16    theft of controlled substances.  Right?
17         MS. McENROE:  Objection, form.
18         THE WITNESS:  That was to monitor
19       theft, but the other key performance
20       indicators also monitored ordering, cycle
21       counts.  There were 90 KPIs.
22    BY MR. POWERS:
23       Q.    What do you mean by cycle counts?
24       A.    A cycle count is when a

Page 86

1 pharmacist in a store goes into the system and
2 says that we have -- they have 96 tablets on the
3 shelf. And what happens is the system says
4 they're supposed to have 100. And they count
5 down to 96 and say, okay, I now have 96 instead
6 of the 100.
7     Q. Did the NaviScript/NaviCase
8 system keep track of the inventory at the
9 distribution centers?
10     MS. McENROE: Objection to form.
11     THE WITNESS: Can you phrase the
12     question differently?
13 BY MR. POWERS:
14     Q. It sounds to me like you were
15 talking about the NaviScript/NaviCase system with
16 regards to the individual stores. Right?
17     A. Yes.
18     Q. Did the NaviScript/NaviCase
19 system have any functionality with regards to the
20 distribution centers?
21     MS. McENROE: Objection to form.
22     THE WITNESS: The Navi system
23     from a distribution standpoint, it did
24     not maintain inventory, but it maintained

Page 87

1     order data from the distribution center
2     to the stores.
3 BY MR. POWERS:
4     Q. So the Navi -- you said the Navi
5 system could see what was being sent from the
6 distribution center to the individual stores; is
7 that right?
8     A. Yes.
9     Q. Do you know who designed Rite
10 Aid's suspicious order monitoring system
11 originally?
12     A. I do not.
13     Q. Did you personally make any
14 changes to the Rite Aid suspicious order
15 monitoring program?
16     MS. McENROE: Objection to form.
17     THE WITNESS: I don't recall
18     making any changes. From my perspective,
19     again, I may have reviewed some changes
20     that logistics were doing, but I myself,
21     I don't recall making any changes.
22 BY MR. POWERS:
23     Q. That suspicious order monitoring
24 system that Rite Aid had used thresholds. Right?

Page 88

1     MS. McENROE: Objection to form.
2     THE WITNESS: That was one of the
3     components.
4     Oops, sorry.
5 BY MR. POWERS:
6     Q. And the thresholds were set at
7 5,000 dosage units, 5,000 dosage units for each
8 national drug code. Right?
9     MS. McENROE: Objection to form.
10     THE WITNESS: 5,000 dosage units
11     per each NDC per order.
12 BY MR. POWERS:
13     Q. Per order.
14     And when you say "per order,"
15 that's per order by each individual pharmacy.
16 Right?
17     A. Yes.
18     Q. And you said the thresholds was
19 one component of the suspicious order monitoring
20 system.
21     What were the other components?
22     A. Another component was our
23 ordering process and an algorithm that was
24 established by Rite Aid to submit orders to the

Page 89

1 distribution center from our corporate office,
2 based on an individual store's movement.
3     Q. The ordering process you're
4 talking about there, is that the auto
5 replenishment system?
6     A. It is.
7     Q. So the auto replenishment system
8 is part of your suspicious order monitoring
9 program?
10     A. It is.
11     Q. How long has the auto
12 replenishment system been in place for?
13     A. As far back as I know, as I can
14 recall.
15     Q. Even as your time as a
16 pharmacist?
17     A. I don't know that.
18     Q. But --
19     A. Definitely since 1995.
20     Q. How is the auto replenishment
21 system used in the Rite Aid suspicious order
22 monitoring system?
23     MS. McENROE: Objection to form.
24     THE WITNESS: It is utilized to

Page 90

1  generate an order for an individual
2  store.
3        From the suspicious order
4  monitoring process, we know our stores'
5  volume, we know our stores' dispensing,
6  and we're able to take ███████ worth of
7  that dispensing data, place an order so
8  that there's the correct amount on hand,
9  put a slight override into that and
10 place -- provide that to our stores to
11 place an order.
12       An order cannot go over that
13 algorithm coming out of -- from the --
14 from the order going to the distribution
15 center.
16 BY MR. POWERS:
17      Q.   How is the limit of the -- just
18 the auto replenishment system different than the
19 threshold limit?
20       MS. McENROE:  Objection to form.
21       THE WITNESS:  The automated
22 system is different in that it generates
23 an order based on that store's need.
24       When you get to the threshold of

Page 91

1  the 5,000 dosage units, that threshold
2  was established as another parameter as
3  part of the process.  So it is quite
4  possible that an order could be placed
5  that met the algorithm that was for 5,100
6  tablets to be ordered and the threshold
7  system then at that point in time would
8  kick in and drop that down to 5,000
9  tablets.
10 BY MR. POWERS:
11      Q.   But the 5,000 dosage unit
12 threshold, that's not in any electronic form, is
13 it?
14      A.   The 5,000 threshold is based on
15 the pickers at the distribution center.
16      Q.   So the auto replenishment system
17 could generate an order that was above the 5,000
18 unit thresholds.  Right?
19      A.   That is correct.
20      Q.   And it would then fall on the
21 responsibility of the individuals in the
22 distribution center to then enforce that 5,000
23 dosage unit threshold.  Right?
24      A.   That is correct.

Page 92

1       Q.   How does the auto replenishment
2  system identify, report or not ship suspicious
3  orders?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  The auto
6  replenishment system does not generate a
7  suspicious order.
8  BY MR. POWERS:
9       Q.   It is impossible for the auto
10 replenishment system to generate a suspicious
11 order; is that right?
12       MS. McENROE:  Objection to form.
13       THE WITNESS:  Based on the
14 algorithm and what is built into it,
15 there's not a suspicious order that's
16 generated by the order system.
17 BY MR. POWERS:
18      Q.   My question, though, is, is it
19 impossible for the auto replenishment system to
20 generate a suspicious order?
21       MS. McENROE:  Objection to form,
22 asked and answered.
23       THE WITNESS:  Could you ask the
24 question again?

Page 93

1  BY MR. POWERS:
2       Q.   Sure.
3        Is it impossible for the Rite Aid
4  auto replenishment system to generate a
5  suspicious order?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  Yes.
8  BY MR. POWERS:
9       Q.   The auto replenishment system you
10 said was based on the need of the individual
11 pharmacy.  Right?
12      A.   Correct.
13      Q.   What do you mean when you say by
14 need?
15      A.   Based on what is needed to
16 service our patient base, based on that store's
17 previous movement of a particular product.
18       So you would have a drug.  We
19 would look at that drug and look at ██████
20 worth of data.  Look at the highest week of that
21 ██████ worth of data and determine a percentage
22 above the highest order that the store could
23 generate.  That would go through the system and
24 be -- then would go to the store to be reviewed.

Page 94

1    Q.    And the data you're talking
2  about, that is dispensing data.  Right?
3    A.    Dispensing data.
4    Q.    And the dispensing data is simply
5  the amount of product that was sold at that
6  particular Rite Aid location.  Right?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  The amount of
9      product that was dispensed to our
10     patients, yes.
11 BY MR. POWERS:
12     Q.    So the auto replenishment system
13 doesn't look at who is writing the prescriptions
14 for those patients?
15        MS. McENROE:  Objection to form.
16        THE WITNESS:  It does not.
17 BY MR. POWERS:
18     Q.    It doesn't look at the amount of
19 controlled substances as opposed to the amount of
20 noncontrolled substances at that Rite Aid
21 location.  Right?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  It does not, but
24      the asset protection KPIs would look at

Page 95

1      that.
2  BY MR. POWERS:
3    Q.    The auto replenishment system
4  doesn't do anything to determine the medical need
5  for the individual patients, does it?
6        MS. McENROE:  Object to form.
7        THE WITNESS:  It does not.
8        Sorry.
9  BY MR. POWERS:
10     Q.    Have you ever heard of the term
11 "red flags of diversion"?
12        MS. McENROE:  Objection to form.
13        THE WITNESS:  I've heard of the
14      term "red flags."
15 BY MR. POWERS:
16     Q.    What is your understanding of the
17 term "red flags"?
18     A.    Red flags is when dispensing a
19 controlled substance prescription, a pharmacist
20 has a corresponding responsibility to make sure
21 that the prescription is dispensed for a valid
22 medical need in the course of the usual practice
23 of the prescription.  The pharmacist is to review
24 the prescription and look at various elements of

Page 96

1  the prescription to make sure that it is for a
2  valid medical reason.
3    Q.    What are the various elements of
4  the prescription to make sure that it is valid --
5  to make sure that it is valid for a medical
6  reason?
7    A.    You need to know the patient,
8  does the pharmacist know the patient.  You need
9  to know the prescriber, is the prescriber known
10 to the patient.  You would look at, as far as a
11 red flag, what is the distance between the
12 patient and the prescriber.
13        You would look at the original
14 hard copy prescription that's presented to you to
15 determine, does it look like it's a forgery.  Is
16 there watermarks on it or something that would
17 identify it as a fraudulent prescription.
18        You would look at the particular
19 type of prescription and prescriber to make sure
20 that it was a proper prescription.  Then you
21 could -- and if all of those were met, then at
22 that point the pharmacist would make the decision
23 to dispense the prescription.
24     Q.    How about payment in cash, was

Page 97

1  that a red flag of diversion?
2    A.    It could be.
3    Q.    Does the auto replenishment
4  system look at any of the red flags of diversion
5  you just discussed in your previous answer?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  It does not.
8  BY MR. POWERS:
9    Q.    So if those red flags of
10 diversion that we just talked about were
11 occurring, forged prescriptions, paying in cash,
12 things like that, the auto replenishment system
13 would not have any way of detecting that.  Right?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  It would not.
16 BY MR. POWERS:
17     Q.    You also talked about the auto
18 replenishment system relying on ▮▮▮▮ of data.
19        Is that just the dispensing data?
20     A.    Yes.
21     Q.    And that's just purely the volume
22 of product dispensed.  Right?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  Yes.  Dispensed to



Page 98

1    the patient.
2  BY MR. POWERS:
3    Q.    The 5,000 dosage unit threshold
4  that the distribution center -- well, let me back
5  up there.
6        The 5,000 dosage unit threshold
7  was used by the distribution centers; right?
8    A.    That is correct.
9    Q.    And that 5,000 dosage unit
10  threshold was the same for every distribution
11  center?
12    A.    It was.
13    Q.    And it was -- that 5,000 dosage
14  unit threshold was the same for every store that
15  the distribution centers distributed to.
16  Correct?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  It was.
19  BY MR. POWERS:
20    Q.    Were there any exceptions to that
21  5,000 dosage unit threshold?
22    A.    There were exceptions.
23    Q.    So besides some of the stores
24  with exceptions, there was a generic threshold

Page 99

1  limit for all Rite Aid stores?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  Yes.  5,000 per
4    NDC.
5        - - -
6        (Deposition Exhibit No. Rite
7    Aid-Hart-1, Distribution/Customer Support
8    Center, DEA Regulatory Guidelines,
9    Policy, Bates stamped
10    Rite_Aid_OMDL_0046157 through
11    Rite_Aid_OMDL_0046226, was marked for
12    identification.)
13        - - -
14  BY MR. POWERS:
15    Q.    I'm going to hand what's been
16  marked as Rite Aid-Hart Exhibit 1.  It's a
17  document, somewhat lengthy, but I'm going to
18  direct your attention to a particular page in it.
19  The Bates number on the document is
20  Rite_Aid_OMDL_0046157 through 46226.



Highly Confidential - Subject to Further Confidentiality Review



Page 106

Page 108

Page 107

Page 109



Page 110

Page 112

1 or procedures about how the distribution center
2 was supposed to determine whether an order was
3 suspicious?
4     MS. McENROE: Objection to form.
5     THE WITNESS: There are policies
6     and procedures to determine a suspicious
7     order, yes.
8 BY MR. POWERS:
9     Q. You were talking about the
10 distribution center looking at the history of the
11 order.
12     A. Uh-huh.
13     Q. Was there any guidance given to
14 the distribution centers to determine what would
15 be used to determine, regarding order history,
16 what was suspicious?
17     MS. McENROE: Objection, form.
18     THE WITNESS: Can you repeat the
19     question?
20 BY MR. POWERS:
21     Q. Sure.
22     You said the distribution center
23 employees knew the stores they were picking for.
24 Right?

Page 111

1     A. I do.
2     Q. Is the distribution center the
3 one who is determining whether the order is
4 suspicious or not?
5     MS. McENROE: Objection to form.
6     THE WITNESS: They are.
7 BY MR. POWERS:
8     Q. How do they determine whether the
9 order is suspicious or not?
10     MS. McENROE: Objection, form.
11     THE WITNESS: They would look at
12     the quantity of the order. They would
13     look at the -- at the distribution
14     center, they know the previous store's
15     history from picking the order every
16     week. They may see a store that has
17     ordered five of a particular item. And
18     then one week off, there could be 15
19     ordered. So at that point they would
20     say, this store always gets five. Let's
21     call the store and determine if they
22     really wanted 15.
23 BY MR. POWERS:
24     Q. Were there any written policies

Page 113

1     A. Correct.
2     Q. And they gained that knowledge
3 through picking for those stores periodically
4 during their jobs. Right?
5     MS. McENROE: Objection to form.
6     THE WITNESS: Correct. They pick
7     a store once a week.
8 BY MR. POWERS:
9     Q. So besides just being the one who
10 picks that store every week, was there any way --
11 any other way that the distribution center
12 employees were supposed to determine whether or
13 not an order was suspicious?
14     MS. McENROE: Objection to form.
15     THE WITNESS: To the best of my
16     knowledge, no.
17 BY MR. POWERS:
18     Q. And in paragraph 4 here, it says,
19 "Any order which is determined to be suspicious
20 will be immediately reported to the corporate
21 office."
22     Who at the corporate office would
23 the suspicious orders be reported to?
24     A. That would be me.

Page 114

1    Q.    Were any suspicious orders ever
2  reported to you at the corporate office?
3    A.    There were none reported to me.
4    Q.    And to be clear, you never
5  received a report of a suspicious order your
6  entire time working in the corporate office from
7  1995 through 2018.  Correct?
8    A.    I did not.
9    Q.    Going down to paragraph 5, it
10 says, if a suspicious order is reported to
11 corporate, the corporate government affairs will
12 determine whether to "ship" or "do not ship."
13       Do you see that?
14   A.    I do.
15   Q.    And this is the same corporate
16 office that we just referred to, the government
17 affairs office.  Right?
18   A.    That is correct.
19   Q.    So that would be you?
20   A.    That would be me.
21   Q.    How would you make the
22 determination of whether to ship or not ship?
23   A.    There would be a number of
24 factors that would come into play.  The very

Page 115

1  first factor that I would look at is if it was an
2  auto ship order, that it came through the
3  algorithm and that was what the algorithm
4  provided.  That would be a key one.
5       A second one would be to look at
6  the size of the order, to determine if the
7  unusual size of it was due to something at the
8  pharmacy that was placing the order, if there was
9  something unusual happening at that pharmacy.
10   Q.    Anything else you would look at?
11   A.    That would be it.
12   Q.    Was there any written policy or
13 procedure about how to make that decision about
14 whether to ship or not ship?
15   A.    To the best of my knowledge, no.
16   Q.    So the factors you just testified
17 about that you would use to determine whether to
18 ship or not ship, those were just ones that you
19 yourself personally came up with.  Right?
20   A.    Yes.
21       MS. McENROE:  Objection to form.
22       THE WITNESS:  Sorry.
23 BY MR. POWERS:
24   Q.    What were those based on, those

Page 116

1  factors based on?
2    A.    Based on my knowledge of the
3  industry, based on my years of experience having
4  dealt with the DEA for a period of -- for a long
5  period of time, and knowing how to review a store
6  as far as its book of business, going way back to
7  even my days as the pharmacy district manager in
8  the Baltimore market.
9    Q.    But to be clear, you never had to
10 make the decision whether to ship or not ship
11 because you never received any report of a
12 suspicious order.  Right?
13   A.    That is correct.
14   Q.    And going down to paragraph 6, it
15 says, "All discussions, investigations and
16 reports will be maintained in the file designated
17 'Suspicious Orders.'"
18       Do you see that?
19   A.    I do.
20   Q.    Am I correct to assume that there
21 was no file designated suspicious orders because
22 there were no suspicious orders?
23   A.    You are correct.
24   Q.    Who would keep that file, if

Page 117

1  there was one?
2    A.    Our office would maintain a file.
3  And there would be a file maintained at the
4  individual distribution center.
5    Q.    How did you ensure that the
6  policy we just talked about in Exhibit 1
7  reflected on page 46179 was followed at the
8  distribution centers?
9        MS. McENROE:  Objection to form.
10       THE WITNESS:  The distribution
11       center has constant monitoring.  They
12       have audits completed by our internal
13       audit group and by asset protection, and
14       by logistics and transportation, where
15       there are individual groups that go into
16       each of the distribution centers once a
17       year on behalf of Rite Aid and have a
18       checklist of compliance to review at the
19       distribution centers.
20           So there is a review done to make
21       sure that the processes are being
22       followed related to suspicious orders,
23       security.  All of the policies and
24       procedures are reviewed and there is a

Highly Confidential - Subject to Further Confidentiality Review



Page 118

1  specific checklist completed.
2  BY MR. POWERS:
3    Q.   Did you personally have any
4  responsibility for ensuring compliance with the
5  excessive or suspicious order monitoring
6  procedure?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  Those particular
9      checklists were, again, completed by
10     logistics.
11 BY MR. POWERS:
12   Q.   But my question is, did you have
13 any personal responsibility for ensuring the
14 distribution center compliance with the excessive
15 order monitoring or suspicious order monitoring
16 procedure?
17       MS. McENROE:  Objection to form.
18       THE WITNESS:  I had
19     responsibility for reviewing the policies
20     and procedures and the checklists and
21     that, but the sole responsibility as far
22     as like the monitoring and if there was
23     something that needed to be corrected or
24     something along those lines, that would

Page 119

1  rest with logistics.
2        MS. McENROE:  Hey, Will, we've
3  been going about an hour.  When you find
4  a good time for a break, that would be
5  appreciated.
6        MR. POWERS:  Yeah, we can take a
7  break now.  That's fine.
8        MS. McENROE:  Great.  Thank you.
9        THE VIDEOGRAPHER:  Going off the
10 record at 11:41 a.m.
11       - - -
12       (A recess was taken from
13 11:41 a.m. to 11:58 a.m.)
14       - - -
15       THE VIDEOGRAPHER:  We're back on
16 the record at 11:58 a.m.
17 BY MR. POWERS:
18   Q.   Welcome back, Ms. Hart.  I'm
19 going to hand you what's been marked as Rite
20 Aid-Hart Exhibit 2.  It's, once again, a large
21 document, but I'm only going to talk to you about
22 one page.  It is Bates number
23 Rite_Aid_OMDL_0014804 through 14873.  Take a look
24 at that.

Page 120

1        - - -
2        (Deposition Exhibit No. Rite
3  Aid-Hart-2, Rite Aid Distribution Center
4  DEA Regulatory Guidelines,
5  Rite_Aid_OMDL_0014804 through
6  Rite_Aid_OMDL_0014874, was marked for
7  identification.)
8        - - -
9        THE WITNESS:  Thank you.
10 BY MR. POWERS:

Page 121

Highly Confidential - Subject to Further Confidentiality Review

Page 122

Page 124

```
8      Q.    You can put those exhibits to the
9   side.
10         I'm going to hand you what's been
11  marked as Hart Exhibit 3.  The Bates number on
12  this exhibit is Rite_Aid_OMDL_0015079 through
13  15081.
14              - - -
15         (Deposition Exhibit No. Rite
16     Aid-Hart-3, Controlled Drug Above Average
17     Order Monitoring Program, Bates stamped
18     Rite_Aid_OMDL_0015079 through
19     Rite_Aid_OMDL_0015081, was marked for
20     identification.)
21              - - -
22  BY MR. POWERS:
23     Q.    Take a look at that.
24     A.    (Reviewing document.)
```

Page 123

Page 125



Highly Confidential - Subject to Further Confidentiality Review



Page 126

Page 128

Page 127

Page 129

Highly Confidential - Subject to Further Confidentiality Review



Page 130

Page 131

Page 132

Page 133

Highly Confidential - Subject to Further Confidentiality Review



Page 134

Page 136

Page 135

Page 137

Page 138

Page 140

4          - - -
5          (Deposition Exhibit No. Rite
6     Aid-Hart-4, Pharmacy Replenishment System
7     Store Order History, Bates stamped
8     Rite_Aid_OMDL_0015302 through
9     Rite_Aid_OMDL_0015307, was marked for
10    identification.)
11          - - -
12  BY MR. POWERS:
13       Q.    I'm going to hand you what's been
14  marked as Hart Exhibit 4.  It is a document that
15  is Bates labeled Rite_Aid_OMDL_0015302 through
16  15307.  Take a look at that.
17       A.    Thank you.
18          MS. McENROE:  Just for the
19  record, Will, so that I'm not confusing
20  myself, I agree the Bates range goes that
21  direction.
22       Do you know how this was produced
23  together with an email behind a document?
24          MR. POWERS:  I believe this Bates

Page 139

Page 141

1     range was identified by Rite Aid in its
2     interrogatory responses in this
3     particular order and range.
4          MS. McENROE:  Got it.  Okay.
5          THE WITNESS:  (Reviewing
6     document.)
7  BY MR. POWERS:





Highly Confidential - Subject to Further Confidentiality Review



Page 146

Page 147

Page 148

Page 149

Highly Confidential - Subject to Further Confidentiality Review





Page 154

2    MS. McENROE: Will, before we
3 move on, if it's a good time for lunch at
4 some point soon, if you'll let us know.
5    MR. POWERS: Yeah. Are you okay
6 to do one more document and then we can
7 break for lunch?
8    THE WITNESS: Sure.
9    MR. POWERS: Okay. Actually, you
10 know what, let's just take a break now
11 for lunch. That's fine.
12    MS. McENROE: Great.
13    THE VIDEOGRAPHER: Going off the
14 record at 12:38 p.m.
15       - - -
16    (A luncheon recess was taken from
17 12:38 p.m. to 1:30 p.m.)
18       - - -
19    THE VIDEOGRAPHER: Back on the
20 record at 1:30 p.m.
21 BY MR. POWERS:
22    Q.   Welcome back, Ms. Hart.
23    A.   Thank you.
24    Q.   You understand that you're still

Page 155

1 under oath. Right?
2    A.   I do.

Page 156

Page 157

Page 158



Page 160

12    Q.    I'm going to hand you what's been
13  marked as Hart Exhibit 5.
14          - - -
15          (Deposition Exhibit No. Rite
16    Aid-Hart-5, Excel Spreadsheet Printout,
17    Bates stamped Rite_Aid_OMDL_0013151, was
18    marked for identification.)
19          - - -
20          THE WITNESS:  Thank you.
21  BY MR. POWERS:
22    Q.    It's, once again, a multiple-page
23  document.  And it --
24          MS. McENROE:  Will, do you have

Page 159

Page 161

1    the Bates range for this?  And can you
2    represent it's a complete document?
3          MR. POWERS:  That's a good
4    question.
5          I can grab the Bates number
6    range.
7          I believe it's a native Excel
8    sheet, so --
9          MS. McENROE:  And this is the
10   full printout of the full thing?
11         MR. POWERS:  Yes.
12         The Bates number on the document
13   is Rite_Aid_OMDL_0013151.
14         MS. McENROE:  Thank you.
15         And are these different workbooks
16   from the Excel spreadsheet?  Because I'm
17   having a hard time.  It kind of looked
18   like the columns are cut off.
19         MR. POWERS:  I believe there are
20   different tabs in the spreadsheet.
21         MS. McENROE:  Okay.
22         MR. POWERS:  And I'll say right
23   now, I'm not going to get too much into
24   the substance of it, so I don't think



Page 162

1    that will matter about the different
2    cutoffs and things.
3         THE WITNESS:  (Reviewing
4    document.)
5  BY MR. POWERS:
6       Q.    I realize the formatting might be
7  a little bit off in Exhibit 5, but generally do
8  you recognize what is reflected in Exhibit 5?
9         MS. McENROE:  Objection to form.

Page 163

Page 164

Page 165

Highly Confidential - Subject to Further Confidentiality Review



Page 170

▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪

4 BY MR. POWERS:

5     Q.   Did you make a record of those

6 communications at all?

7     A.   If I did, it would be in email.

8 Typically it may be a phone call.

9     Q.   So besides an email, there was

10 no -- there was no log of these communications

11 that you would have had with the distribution --

12 or, excuse me -- with the individual pharmacy

13 managers about particular stores that you had

14 questions about from the threshold log; is that

15 right?

16     A.   Pharmacy district managers. And

17 that is right.

18     Q.   Do you ever recall noticing

19 abnormalities of stores consistently ordering

20 hydrocodone products?

21     A.   There could be stores that

22 consistently ordered hydrocodone, of course.

23     Q.   But I'm saying in this process

24 we've just talked about, where you contact the

Page 171

1 pharmacy district manager as a result of the

2 threshold log, do you specifically recall any

3 instances where you contacted the pharmacy

4 district manager as a result of hydrocodone

5 orders?

6     A.   I don't remember specific to

7 hydrocodone.

8     Q.   How about specific to any opioid

9 product that Rite Aid distributed?

10     MS. McENROE: Objection to form.

11     THE WITNESS: I do not.

12 BY MR. POWERS:

13     Q.   Did you use these threshold logs

14 that you were reviewing quarterly to determine

15 whether particular orders were suspicious orders?

16     A.   I did not.

17     Q.   Do you know if Chris Belli and

18 Kevin Mitchell used these logs to determine if

19 orders were suspicious orders?

20     MS. McENROE: Objection to form.

21     THE WITNESS: I do not.

22 BY MR. POWERS:

23     Q.   To be clear, when you got these

24 threshold logs, these orders reflected in the

Page 172

1 threshold logs had already been shipped.

2 Correct?

3     A.   Yes.

4     Q.   I'm going to hand you what's been

5 marked as Rite Aid Exhibit Number -- or Rite

6 Aid_Hart Exhibit Number 6. It's a multi-page

7 document with the Bates number

8 Rite_Aid_OMDL_46227 through 46319. It's a pretty

9 long document. I'm just going to ask you

10 questions about the first page.

11     MS. McENROE: And, Will, do

12 you -- can you reference this is a

13 complete document?

14     MR. POWERS: I believe, once

15 again, it's the range that was identified

16 in the interrogatory responses.

17     - - -

18     (Deposition Exhibit No. Rite

19 Aid-Hart-6, Rite Aid Controlled Drug

20 Reporting Above Average Controlled Drug

21 Purchases Report, Bates stamped

22 Rite_Aid_OMDL_0046227 through

23 Rite_Aid_OMDL_0046319, was marked for

24 identification.)

Page 173

1     - - -

2     THE WITNESS: (Reviewing

3     document.)

4 BY MR. POWERS:



Highly Confidential - Subject to Further Confidentiality Review



Page 178



12 BY MR. POWERS:
13     Q.   Are you familiar with the Buzzeo
14 company?
15     A.   I am.
16     Q.   Is it also called -- I don't know
17 how to pronounce this exactly, but Cegedim?
18     A.   I am.
19     Q.   It's the same company?
20     A.   (Witness nods head.)
21     Q.   You have to answer --
22     A.   Yes. I'm sorry, yes.
23     Q.   So if we just refer to it --
24 throughout our discussion, I can just refer to it

Page 179

1 as the Buzzeo company, we'll know what we're
2 talking about?
3     A.   That's fine, yes.
4     Q.   What kind of services did Buzzeo
5 offer?
6     MS. McENROE: Objection to form.
7     THE WITNESS: Ron Buzzeo offered
8   services related to regulatory compliance
9   with DEA rules and regulations. There
10   was a wealth of services that Ron and his
11   company offered.
12     They offered a program to go into
13   pharmacies and review the pharmacies as
14   far as compliance with DEA rules and
15   regulations. They offered programs on
16   suspicious order monitoring. They
17   ordered up programs on how to detect
18   theft and diversion. There was a wide
19   gamut of programs that they had offered
20   related to controlled substances.
21 BY MR. POWERS:
22     Q.   Did Rite Aid ever use any of
23 those Buzzeo services?
24     A.   I believe we did, yes.

Page 180

1     Q.   What was the extent of Rite Aid's
2 use of Buzzeo services?
3     A.   Our logistics teams utilized
4 Buzzeo services to review and inspect the
5 distribution centers for compliance.
6     Q.   Are you referring to audits when
7 you say review and inspect?
8     MS. McENROE: Objection to form.
9     THE WITNESS: Define what you
10   mean by "audit."
11 BY MR. POWERS:
12     Q.   There's been testimony that
13 Buzzeo company came in and audited the Perryman
14 Distribution Center at some point in time.
15     Is that the same thing you're
16 referring to when you say reviewed and inspected?
17     MS. McENROE: Objection to form.
18     THE WITNESS: I guess there's two
19   terms for the definition "audit."
20     There's an audit of everything in
21   the entire distribution center, from
22   paperwork to security to everything along
23   those lines. And then there's an
24   individual audit for like specific

Page 181

1   controlled substances, so that you would
2   balance when a controlled substance came
3   in and when it came out to make sure that
4   all the drugs in the distribution center
5   were accounted for. So, yes, I would say
6   that would be an audit.
7 BY MR. POWERS:
8     Q.   Did Buzzeo ever perform audits on
9 Rite Aid facilities, as you just described an
10 audit?
11     A.   I believe he did at the Perryman
12 Distribution Center.
13     Q.   Do you know when that was?
14     A.   I don't remember.
15     Q.   Were you involved in that process
16 of Buzzeo auditing the Perryman Distribution
17 Center?
18     A.   I was not.
19     Q.   You also mentioned that Buzzeo
20 had conferences. Right?
21     A.   I don't think I mentioned
22 conferences.
23     Q.   Did Buzzeo have conferences?
24     A.   Buzzeo had conferences.

Page 182

1      Q.    Did you ever attend any of the
2  Buzzeo conferences personally?
3      A.    I may have attended one
4  conference when I first came into government
5  affairs, but that was pretty much the extent of
6  my attending Buzzeo conferences.
7      Q.    Do you know if anyone else from
8  Rite Aid attended Buzzeo conferences?
9      A.    Yes.  Members of the logistics
10  team would attend the conferences.
11      Q.    Who from the logistics team would
12  attend the Buzzeo conferences?
13      A.    It varied from year to year, but
14  typically either the person that was in the
15  position of Kevin Mitchell or Chris Belli.  I
16  know that occasionally the DEA coordinators would
17  attend the Buzzeo conference.
18      Q.    When you say "DEA coordinators,"
19  you're talking about distribution center
20  employees?
21      A.    Yes.
22      Q.    I am going to hand you what's
23  been marked as Exhibit 7.  It's a one-page email
24  Bates stamped Rite_Aid_OMDL_0050632.

Page 183

1              - - -
2          (Deposition Exhibit No. Rite
3       Aid-Hart-7, Email chain, top one dated
4       2010-11-16, Bates stamped
5       Rite_Aid_OMDL_0050632, was marked for
6       identification.)
7              - - -
8  BY MR. POWERS:



Page 184

Page 185

2              - - -
3          (Deposition Exhibit No. Rite
4       Aid-Hart-8, Email chain, top one dated
5       2010-11-17, Bates stamped
6       Rite_Aid_OMDL_0050633, was marked for
7       identification.)
8              - - -
9  BY MR. POWERS:
10      Q.    I'm going to hand you what's been
11  marked as Exhibit 8.  It is another email, one
12  page, with Bates number Rite_Aid_OMDL_0050633.



Page 186

9    Q.    And why did you send this to
10 Maggie Perritt?
11         Am I pronouncing her name
12 correctly?
13    A.    Yeah, you're pronouncing it
14 correctly.
15    Q.    Why did you send this email about
16 suspicious order monitoring to Maggie Perritt?
17    A.    Maggie Perritt was in pharmacy
18 operations and was knowledgeable of the
19 suspicious order monitoring algorithm and how the
20 system worked.
21    Q.    When you say "suspicious order
22 monitoring algorithm," what are you referring to?
23    A.    The algorithm for placing the
24 store's order through the -- looking at the 13

Page 187

1  weeks and then going a certain percentage above
2  to place the order.
3     Q.    Is that also the auto
4  replenishment system that we talked about before?
5     A.    Yes.
6     Q.    Why are you referring to it as a
7  suspicious order monitoring system?
8          MS. McENROE:  Objection, form.
9          THE WITNESS:  In this one, since
10         it's under suspicious monitoring, that's
11         why I was referring to that, is that --
12         because that was the title of this
13         particular meeting and she was bringing
14         that aspect of it into it.
15 BY MR. POWERS:
16    Q.    So Maggie Perritt was the expert
17 on the auto replenishment system that was invited
18 to the suspicious order monitoring meeting; is
19 that right?
20         MS. McENROE:  Objection to form.
21         THE WITNESS:  From the pharmacy
22         operations side, yes.
23 BY MR. POWERS:
24    Q.    And then we talked about Kevin

Page 188

1  Mitchell.
2          Who was Andrew Palmer?
3     A.    Andrew Palmer was a director in
4  asset protection at the time, I believe.
5     Q.    Why did you invite him to this
6  meeting about suspicious order monitoring?
7     A.    Because he was also key as part
8  of it as well.  Him and his team were involved
9  with the analytics related to asset protection
10 and the analytics related to the key performance
11 indicators that were looked at from the asset
12 protection side.
13    Q.    How did you use the -- let me
14 back up.
15         Did you use the asset protection
16 analytics to determine whether orders were
17 suspicious or not?
18         MS. McENROE:  Objection to form.
19         THE WITNESS:  We used the asset
20         protection analytics to review orders and
21         look for abnormalities.  We did not use
22         the analytics from asset protection prior
23         to an order being shipped.
24 BY MR. POWERS:

Page 189





Page 190

Page 192

Page 191

Page 193

21    Q.    I'm going to hand you what's been
22  marked as Hart Exhibit 9.
23           - - -
24           (Deposition Exhibit No. Rite



Page 194

1     Aid-Hart-9, Email chain top one dated

2     Email dated 2010-04-11, Bates stamped

3     Rite_Aid_OMDL_0050628 through

4     Rite_Aid_OMDL_0050630, was marked for

5     identification.)

6         - - -

7 BY MR. POWERS:

8     Q.    This is Rite_Aid_OMDL_0050628

9 through 0050630.  Take a look at that.

10     A.    (Reviewing document.)

Page 195

Page 196

24     Q.    You said that you determined that

Page 197

1 the Rite Aid system was compliant.

2        How did you make that

3 determination?

4     A.    We looked at the different

5 components of it and determined that, because of

6 the Code of Federal Regulations, the DEA not

7 providing true guidance on a suspicious order

8 monitoring program, we met the -- we met the

9 requirements of that.

10     Q.    What do you mean by the DEA --

11 when you said the DEA did not provide true

12 guidance?

13     A.    The DEA did not put out what an

14 order -- a suspicious order monitoring program

15 should look at exactly.  They would say that it

16 should meet your book of business, but they never

17 put out a list of -- suspicious order monitoring

18 must be numbers 1 through 8 that you must have in

19 your program.

20     Q.    Did you look at anything else

21 besides the Code of Federal Regulations itself to

22 determine that your suspicious order monitoring

23 system was compliant?

24     A.    I don't remember if we did or

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  not.

2     Q.   Did you look at any Buzzeo

3  materials to determine whether it was compliant

4  or not?

5     A.   We did not.

6     Q.   Did you look at other

7  distributors' suspicious order monitoring

8  programs to determine whether your Rite Aid

9  system was compliant?

10       MS. McENROE:  Objection to form.

11       THE WITNESS:  We did not, from

12     the perspective of our system was

13     different than other distributors and our

14     system was different from the Buzzeo

15     programs that were offered in the fact

16     that we were a closed system.  Part of

17     other distributors that are out there,

18     their system was know -- part of it is

19     know your customer, where obviously we

20     know our customer.  And so we looked at

21     it from that approach.

22  BY MR. POWERS:

23     Q.   When you say you know your

24  customer, are you referring to the customers as

Page 199

1  the individual Rite Aid stores?

2     A.   I am.

3     Q.   So in your view, you never got

4  DEA guidance on the sufficiency of Rite Aid's

5  suspicious order monitoring program; is that

6  right?

7       MS. McENROE:  Objection to form.

8       THE WITNESS:  We never got DEA

9     guidance.

10        - - -

11     (Deposition Exhibit No. Rite

12     Aid-Hart-10, Email dated 2011-06-03,

13     Bates stamped Rite_Aid_OMDL_0050634, was

14     marked for identification.)

15        - - -

16  BY MR. POWERS:



Page 201

15       MS. McENROE:  When you got a

16  chance, we have been going about an hour,

17  for a quick break.

18       MR. POWERS:  Okay.  I got it.

19  Just a couple more questions on this

20  line.

21       MS. McENROE:  Sure.

22        - - -

23     (Deposition Exhibit No. Rite

24     Aid-Hart-11, Email chain, top one dated



Page 202

```
1      2002-05-14, Bates stamped
2      Rite_Aid_OMDL_0046770 through
3      Rite_Aid_OMDL_0046789, was marked for
4      identification.)
5              - - -
6   BY MR. POWERS:
7      Q.   I should have asked you.
8           Are you okay to go a few more
9   minutes?
10     A.   (Witness nods head.)
11     Q.   I'm going to hand you what's
12  marked Exhibit 11.  It's a document, an email and
13  attachment, Bates number Rite_Aid_OMDL_0046770
14  through 46789.
15     A.   (Reviewing document.)
16     Q.   Are you familiar with the
17  document in Exhibit 11?
18     A.   (Reviewing document.)
19     Q.   I'll say that I'm not going to
20  ask you direct questions about the email
21  attachment.
22          I'm just saying, are you
23  generally familiar with this document in
24  Exhibit 11?
```

Page 204

Page 203

Page 205

```
3      Q.   So were you asking whether or not
4   Chris Belli was setting up webinars and visits
5   with the Buzzeo folks?
6      A.   It could be.
7      Q.   Do you know if he ever did that?
8      A.   I don't remember.
9           Before we go back to -- go to
10  another document, may I go back and expand upon
11  an answer to a past question?
12     Q.   Sure.
13     A.   You had asked me the question,
14  had Rite Aid seeked guidance from the DEA or had
15  gotten any comments from the DEA.
16          The Perryman Distribution Center
17  was inspected by the DEA in 2005, 2009 and 2012.
18  As the standard operating procedures and the
19  suspicious order monitoring programs were
20  reviewed at all of those times, and there was no
21  deficiencies noted.  I just wanted to make that
22  part of the record, to say -- when I say we
23  didn't seek DEA guidance, but we had the DEA that
24  went to the distribution centers and did some
```

Page 206

2    Q.    Were you present at any of those
3  DEA audits?
4    A.    I was not.
5    Q.    So you don't have any firsthand
6  knowledge of those audits, do you?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  I have -- there's
9     various emails and communications from
10    the individuals that were at the DEA
11    audits.
12  BY MR. POWERS:
13    Q.    But you didn't talk to any of the
14  DEA agents who did the inspections, did you?
15    A.    Not that I remember.
16    Q.    So all the information that you
17  learned about those DEA audits was from someone
18  at the distribution center itself?
19    A.    That is correct.
20         MS. McENROE:  Will, before we
21    move to another document, can we take a
22    comfort break?
23         MR. POWERS:  Sure.
24         THE VIDEOGRAPHER:  Going off the

Page 207

1     record at 2:30.
2              - - -
3         (A recess was taken from
4     2:30 p.m. to 2:51 p.m.)
5              - - -
6         THE VIDEOGRAPHER:  Back on the
7     record at 2:51 p.m.
8  BY MR. POWERS:
9    Q.    Right before the break we were
10  talking about DEA inspectors.  Right?
11    A.    Yes.
12    Q.    Do you know any DEA inspectors
13  personally?
14    A.    I know a lot of DEA inspectors.
15    Q.    Do you know any DEA -- do you
16  know -- let me back up here.
17         Those DEA inspectors that you
18  know personally, do you know any of them who
19  audited the Perryman Distribution Center?
20    A.    I do know one of the DEA agents
21  that audited Perryman.
22    Q.    Who was that?
23    A.    Doug -- Don Tush.
24    Q.    How do you know Don Tush?

Page 208

1    A.    When I had the Baltimore market,
2  that was also Don's area from the DEA.  So he
3  would visit stores or seek prescriptions, things
4  like that.
5    Q.    When you say you had the
6  Baltimore market, what time period was that from?
7    A.    That was prior to 1995 when I
8  moved into the corporate office.
9    Q.    So you knew him from your time in
10  Baltimore.  Right?
11    A.    I did.
12    Q.    So that would have been sometime
13  before '95.  Right?
14    A.    Yes.
15    Q.    So you knew Don Tush for a while
16  before he audited the Perryman facility in 2012.
17  Right?
18         MS. McENROE:  Objection to form.
19         THE WITNESS:  Yes.  But then I
20    moved out of the area to Camp Hill.
21  BY MR. POWERS:
22    Q.    I'm going to hand you what's been
23  marked as Hart Exhibit 12.  It's some emails with
24  the Bates stamp Rite_Aid_OMDL_0013345 through

Page 209

1  3346.
2              - - -
3         (Deposition Exhibit No. Rite
4     Aid-Hart-12, Email chain, top one dated
5     2012-07-11, Bates stamped
6     Rite_Aid_OMDL_0013345 and
7     Rite_Aid_OMDL_0013346, was marked for
8     identification.)
9              - - -
10  BY MR. POWERS:
11    Q.    Take a look at that.
12    A.    (Reviewing document.)



Page 210



Page 212

1   expertise.
2   BY MR. POWERS:
3       Q.   Do you know if the Buzzeo
4   organization had former DEA employees in its
5   employment?
6       A.   They did.
7       Q.   Rite Aid used the Buzzeo
8   organization to perform some audits at the
9   distribution center, at least the distribution
10  center in Perryman.  Right?
11      A.   We did.
12      Q.   So if Buzzeo did not have the
13  expertise, why did you allow -- why did Rite Aid
14  allow Buzzeo to come do audits?
15          MS. McENROE:  Objection.
16          THE WITNESS:  He was -- the
17          Buzzeo organization had knowledge of the
18          rules and laws and regulations.  And many
19          times, it's much better to have someone
20          with eyes from the outside come in and
21          look at your operations and do an audit
22          and review, as a second set of eyes
23          looking at your policies and procedures.
24  BY MR. POWERS:

Page 211

14          Before the break, we were also
15  talking about the Buzzeo organization.  Correct?
16      A.   Correct.
17      Q.   And the Buzzeo organization had
18  expertise in things like suspicious order
19  monitoring.  Correct?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  I'm not sure that I
22          would say that they had expertise.  I
23          think they had presentations and
24          programs.  I'm not sure they had

Page 213

1       Q.   Do you consider Buzzeo's
2   knowledge of the rules and laws and regulations
3   not to be expertise?
4           MS. McENROE:  Objection to form.
5           THE WITNESS:  I think they are
6           one of the industry-leading companies
7           that have products that they sell to
8           pharmacies and distribution centers to go
9           out and do audits and accountabilities.
10              - - -
11          (Deposition Exhibit No. Rite
12          Aid-Hart-13, Email dated 2012-05-18,
13          Bates stamped Rite_Aid_OMDL_0046855
14          through Rite_Aid_OMDL_0046875, was marked
15          for identification.)
16              - - -
17  BY MR. POWERS:
18      Q.   I'm going to hand you what's been
19  marked Rite Aid-Hart Exhibit 13.  The Bates
20  number on this exhibit is Rite_Aid_OMDL_46855
21  through 46875.  It's an email and an attachment.
22          Why don't you take a look at
23  that.
24      A.   (Reviewing document.)

Highly Confidential - Subject to Further Confidentiality Review

Page 214

```
1      Q.    Once again, this is a multi-page
2  document.  I'm going to tell you, I'm going to
3  ask questions about the email and only particular
4  pages in the attachment, if that helps your
5  review.
6      A.    Pardon me.  The first page and
7  what other pages?
8      Q.    Please feel free to review the
9  attachments to the extent you need to, but I will
10 only be asking questions about a couple
11 particular pages that we can -- that I can
12 identify to you when we get to them.
13     A.    Okay.
14         (Reviewing document.)
```



Page 216

Page 215

Page 217

Highly Confidential - Subject to Further Confidentiality Review



Page 218

Page 220

Page 219

Page 221

Highly Confidential - Subject to Further Confidentiality Review



Page 222

Page 224

Page 223

Page 225



Page 226

Page 228

12  BY MR. POWERS:
13      Q.   I'm going to hand you what's been
14  marked as Rite Aid Hart Exhibit 14.  It's an
15  email exchange, 38054 through 38055.
16          Take a look at that.
17          - - -
18          (Deposition Exhibit No. Rite
19      Aid-Hart-14, Email chain, top one dated
20      2012-12-18, Bates stamped
21      Rite_Aid_OMDL_0038054 and
22      Rite_Aid_OMDL_0038055, was marked for
23      identification.)
24          - - -

Page 227

1      THE WITNESS:  (Reviewing
2  document.)
3  BY MR. POWERS:

Page 229



Page 230

Page 232

Page 231

Page 233

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Page 238

Page 240

```
19              - - -
20          (Deposition Exhibit No. Rite
21      Aid-Hart-15, Email dated 2013-09-04,
22      Bates stamped Rite_Aid_OMDL_0046648
23      through Rite_Aid_OMDL_0046662, was marked
24      for identification.)
```

Page 239

```
 1              - - -
 2  BY MR. POWERS:
 3      Q.    I'm going to hand you what's been
 4  marked as Rite Aid-Hart Exhibit 15.  This is an
 5  email, again with some attachments.  The Bates
 6  numbers on this exhibit are Rite_Aid_OMDL_0046648
 7  through 46662.
 8          And I'm going to try to do the
 9  same thing as we've done with some of these other
10  emails with long attachments.  I'm just going to
11  ask you about the initial email and just a
12  particular couple pages that are attached to the
13  email.
14      A.    (Reviewing document.)
15      Q.    Have you had a chance to review
16  Exhibit 15?
17      A.    I have.
```

Page 241



Highly Confidential - Subject to Further Confidentiality Review





Page 246

Page 247

Page 248

23
24          - - -
         (Deposition Exhibit No. Rite

Page 249

1          Aid-Hart-16, Email dated 2013-12-24,
2          Bates stamped Rite_Aid_OMDL_0016186 and
3          Rite_Aid_OMDL_0016187, was marked for
4          identification.)
5          - - -
6  BY MR. POWERS:
7          Q.    I'm going to hand you what has
8  been marked as Rite Aid-Hart Exhibit Number 16.
9  It is -- surprise, surprise -- another email and
10 attachments.  The email is Bates stamp
11 Rite_Aid_OMDL_0016186.  And the attachment, which
12 was a native Excel sheet, just has one Bates
13 number, although it's a couple different pages.
14 The Bates number of the attachment is
15 Rite_Aid_OMDL_0016187.
16         A.    (Reviewing document.)
17         Q.    Is the document -- the email and
18 attachment reflected in Exhibit 16 familiar to
19 you?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 254

Page 256

Page 255

Page 257

Highly Confidential - Subject to Further Confidentiality Review

Page 258



Page 260

1  things that we talked about in the daily column
2  here on the "Specialist, Regulatory Compliance"
3  page, you said those were being done at the
4  distribution center.  Right?
5      A.    Yes.
6      Q.    What's your basis for saying
7  that?
8      A.    The distribution center was
9  responsible for the picking, reviewing the
10 orders, determining if it was suspicious or not,
11 making the phone call to the pharmacist.  And at
12 the same time, if there was a suspicious order,
13 the distribution center was responsible to report
14 that in to corporate.  That was part of their
15 standard operating procedures.
16     Q.    I just want to be clear.  You
17 just said that the distribution center was
18 responsible for determining whether a particular
19 order was suspicious or not; is that right?
20     A.    The distribution center was
21 responsible for identifying orders and
22 determining if they were suspicious, yes.
23     Q.    Moving on to the next page, the
24 one entitled "Senior Analyst, Controlled

Page 259

Page 261



Highly Confidential - Subject to Further Confidentiality Review



Page 266

Page 267

Page 268

Page 269

```
 7          MS. McENROE:  We've been going a
 8    little over an hour.
 9          MR. POWERS:  You read my mind.
10    Let's take a break.
11          THE VIDEOGRAPHER:  Going off the
12    record at 3:56.
13             -  -  -
14          (A recess was taken from
15    3:56 p.m. to 4:26 p.m.)
16             -  -  -
17          THE VIDEOGRAPHER:  We're back on
18    the record at 4:26 p.m.
19          MR. POWERS:  I have no further
20    questions for the witness.
21          MS. McENROE:  Great.  Thank you.
22    We have no further questions as well.
23    And we view this as the end of Ms. Hart's
24    fact deposition.
```

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 270 |
|---|---|
| 1 | MR. POWERS:  Yes.  She's coming |
| 2 | back for the 30(b)(6) tomorrow. |
| 3 | MS. McENROE:  Agreed.  Thank you. |
| 4 | THE VIDEOGRAPHER:  This ends |
| 5 | today's deposition.  We're going off the |
| 6 | record.  The time is 4:26 p.m. |
| 7 | (Witness excused.) |
| 8 | (Deposition concluded at |
| 9 | approximately 4:26 p.m.) |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 272 |
|---|---|
| 1 | INSTRUCTIONS TO WITNESS |
| 2 | |
| 3 | Please read your deposition over |
| 4 | carefully and make any necessary corrections. |
| 5 | You should state the reason in the appropriate |
| 6 | space on the errata sheet for any corrections |
| 7 | that are made. |
| 8 | After doing so, please sign the |
| 9 | errata sheet and date it. |
| 10 | You are signing same subject to |
| 11 | the changes you have noted on the errata sheet, |
| 12 | which will be attached to your deposition. |
| 13 | It is imperative that you return |
| 14 | the original errata sheet to the deposing |
| 15 | attorney within thirty (30) days of receipt of |
| 16 | the deposition transcript by you.  If you fail to |
| 17 | do so, the deposition transcript may be deemed to |
| 18 | be accurate and may be used in court. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 271 |
|---|---|
| 1 | |
| 2 | CERTIFICATE |
| 3 | |
| 4 | |
| 5 | I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a |
| 6 | true record of the testimony given by the witness. |
| 7 | |
| 8 | It was requested before completion of the deposition that the witness, JANET GETZEY HART, have the opportunity to read |
| 9 | and sign the deposition transcript. |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | _____ ANN MARIE MITCHELL, a Federally Approved Certified Realtime |
| 15 | Reporter, Registered Diplomate Reporter, Registered Merit Reporter and |
| 16 | Notary Public |
| 17 | |
| 18 | |
| 19 | (The foregoing certification of |
| 20 | this transcript does not apply to any |
| 21 | reproduction of the same by any means, unless |
| 22 | under the direct control and/or supervision of |
| 23 | the certifying reporter.) |
| 24 | |

|  | Page 273 |
|---|---|
| 1 | - - - - - - |
| | E R R A T A |
| 2 | - - - - - - |
| 3 | |
| 4 | PAGE  LINE  CHANGE |
| 5 | ____  ____  _____ |
| 6 | REASON: _____ |
| 7 | ____  ____  _____ |
| 8 | REASON: _____ |
| 9 | ____  ____  _____ |
| 10 | REASON: _____ |
| 11 | ____  ____  _____ |
| 12 | REASON: _____ |
| 13 | ____  ____  _____ |
| 14 | REASON: _____ |
| 15 | ____  ____  _____ |
| 16 | REASON: _____ |
| 17 | ____  ____  _____ |
| 18 | REASON: _____ |
| 19 | ____  ____  _____ |
| 20 | REASON: _____ |
| 21 | ____  ____  _____ |
| 22 | REASON: _____ |
| 23 | ____  ____  _____ |
| 24 | REASON: _____ |

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5    hereby certify that I have read the foregoing
6    pages, 1 - 274, and that the same is a correct
7    transcription of the answers given by me to the
8    questions therein propounded, except for the
9    corrections or changes in form or substance, if
10   any, noted in the attached Errata Sheet.
11
12
13   _____
14   JANET GETZEY HART              DATE
15
16
17   Subscribed and sworn
     to before me this
18   _____ day of _____, 20_____.
19   My commission expires:_____
20
     _____
21   Notary Public
22
23
24