```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE NORTHERN DISTRICT OF OHIO
 3                        EASTERN DIVISION
 4                          -   -   -
 5

    IN RE:  NATIONAL            :   MDL NO. 2804
 6  PRESCRIPTION OPIATE         :
    LITIGATION                  :
 7                              :
    -----------------------------------------------
 8  THIS DOCUMENT RELATES TO    :   CASE NO.
    ALL CASES                   :   1:17-MD-2804
 9                              :
                                :   Hon. Dan A.
10                              :   Polster
11                          -   -   -
12                      January 30, 2019
13                          -   -   -
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                  CONFIDENTIALITY REVIEW
15
16              Videotaped deposition of JANET
    GETZEY HART taken pursuant to notice, was held at
17  the law offices of Morgan, Lewis & Bockius LLP,
    1701 Market Street, Philadelphia, Pennsylvania,
18  beginning at 9:34 a.m., on the above date, before
    Ann Marie Mitchell, a Federally Approved
19  Certified Realtime Reporter, Registered Diplomate
    Reporter, Registered Merit Reporter and Notary
20  Public.
21                          -   -   -
22              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
23                   deps@golkow.com
24
```

Page 2

APPEARANCES:

BARON & BUDD, P.C
BY: WILLIAM POWERS, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
wpowers@baronbudd.com
Representing the Plaintiffs

BARON & BUDD, P.C.
BY: MARK PIFKO, ESQUIRE
15910 Ventura Boulevard
Suite 1600
Encino, California 91436
(818) 839-2333
mpifko@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: ELISA P. McENROE, ESQUIRE
BY: MATTHEW R. LADD, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5000
elisa.mcenroe@morganlewis.com
matthew.ladd@morganlewis.com
Representing Rite Aid

MORGAN, LEWIS & BOCKIUS LLP
BY: KELLY A. MOORE, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6000
kelly.moore@morganlewis.com
Representing Rite Aid

Page 3

APPEARANCES (cont.'d):

ARNOLD & PORTER KAYE SCHOLER LLP
BY: ELISEO R. PUIG, ESQUIRE
370 Seventeenth Street
Denver, Colorado 80202
(303) 863-1000
eliseo.puig@apks.com
Representing Endo Health Solutions Inc.,
Endo Pharmaceuticals Inc., Par
Pharmaceutical, Inc. and Par Pharmaceutical
Companies, Inc.

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: ALEXANDER M. OWENS, ESQUIRE
1818 Market Street
Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
amo@pietragallo.com
Representing Cardinal Health

COVINGTON & BURLING, LLP
BY: KEVIN KELLY, ESQUIRE
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5272
kkelly@cov.com
Representing McKesson

Page 4

APPEARANCES VIA TELEPHONE AND STREAM:

BARON & BUDD, P.C.
BY: GRETCHEN KEARNEY, ESQUIRE
BY: JAY LICHTER, ESQUIRE
BY: NOAH RICH, ESQUIRE
BY: W. SCOTT SIMMER, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
gkearney@baronbudd.com
jlichter@baronbudd.com
nrich@baronbudd.com
ssimmer@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN M. MALOY, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5000
john.maloy@morganlewis.com
Representing Rite Aid

BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
BY: ALEXANDRA K. HUGHES, ESQUIRE
440 College Avenue
Suite 320
Athens, Georgia 30601
(706) 744-4135
ahughes@bbga.com
Representing the Plaintiffs

Page 5

APPEARANCES VIA TELEPHONE AND STREAM (cont.'d):

JACKSON KELLY PLLC
BY: SYLVIA WINSTON NICHOLS, ESQUIRE
150 Clay Street
Morgantown, West Virginia 26501
(304) 284-4105
sylvia.winston@jacksonkelly.com
Representing AmerisourceBergen Drug
Corporation

JONES DAY
BY: MIRIAM LIABO, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
mliabo@jonesday.com
Representing Walmart

BAILEY & WYANT, PLLC
BY: HARRISON M. CYRUS, ESQUIRE
500 Virginia Street East
Suite 600
Charleston, West Virginia 25301
(304) 345-4222
hcyrus@baileywyant.com

VIDEOGRAPHER:
   DAVID LANE

ALSO PRESENT:
   DAVID SAYRES
   Precision Trial Solutions

   EMMA KABOLI
   Baron & Budd, P.C.
   (via stream)
      - - -

Page 6

1
2           - - -
3        I N D E X
4
5   Testimony of:  JANET GETZEY HART
6   By Mr. Powers          10
7
8           - - -
9      E X H I B I T S
10          - - -
11
12  NO.        DESCRIPTION        PAGE

13  Rite        Distribution/Customer    99
    Aid-Hart-1   Support Center, DEA
14              Regulatory Guidelines,
                Policy, Bates stamped
15              Rite_Aid_OMDL_0046157
                through
16              Rite_Aid_OMDL_0046226

17  Rite        Rite Aid Distribution    120
    Aid-Hart-2   Center DEA Regulatory
18              Guidelines,
                Rite_Aid_OMDL_0014804
19              through
                Rite_Aid_OMDL_0014874
20  Rite        Controlled Drug Above    124
    Aid-Hart-3   Average Order Monitoring
21              Program, Bates stamped
                Rite_Aid_OMDL_0015079
22              through
                Rite_Aid_OMDL_0015081
23
24

Page 8

1   Rite        Email chain, top one     201
    Aid-Hart-11  dated 2002-05-14, Bates
2               stamped
                Rite_Aid_OMDL_0046770
3               through
                Rite_Aid_OMDL_0046789
4
5   Rite        Email chain, top one     209
    Aid-Hart-12  dated 2012-07-11, Bates
6               stamped
                Rite_Aid_OMDL_0013345
7               and
                Rite_Aid_OMDL_0013346
8   Rite        Email dated 2012-05-18,  213
    Aid-Hart-13  Bates stamped
9               Rite_Aid_OMDL_0046855
10              through
                Rite_Aid_OMDL_0046875
11  Rite        Email chain, top one     226
    Aid-Hart-14  dated 2012-12-18, Bates
12              stamped
                Rite_Aid_OMDL_0038054
13              and
                Rite_Aid_OMDL_0038055
14
15  Rite        Email dated 2013-09-04,  238
    Aid-Hart-15  Bates stamped
16              Rite_Aid_OMDL_0046648
                through
17              Rite_Aid_OMDL_0046662
18  Rite        Email dated 2013-12-24,  249
    Aid-Hart-16  Bates stamped
19              Rite_Aid_OMDL_0016186
                and
20              Rite_Aid_OMDL_0016187
21
22
23
24

Page 7

1   Rite        Pharmacy Replenishment   140
    Aid-Hart-4   System Store Order
2               History, Bates stamped
                Rite_Aid_OMDL_0015302
3               through
                Rite_Aid_OMDL_0015307
4
5   Rite        Excel Spreadsheet        160
    Aid-Hart-5   Printout, Bates stamped
6               Rite_Aid_OMDL_0013151
7   Rite        Rite Aid Controlled Drug 172
    Aid-Hart-6   Reporting Above Average
8               Controlled Drug
                Purchases Report, Bates
9               stamped
                Rite_Aid_OMDL_0046227
10              through
                Rite_Aid_OMDL_0046319
11  Rite        Email chain, top one     183
    Aid-Hart-7   dated 2010-11-16, Bates
12              stamped
                Rite_Aid_OMDL_0050632
13
14  Rite        Email chain, top one     185
    Aid-Hart-8   dated 2010-11-17, Bates
15              stamped
                Rite_Aid_OMDL_0050633
16  Rite        Email chain top one      194
    Aid-Hart-9   dated Email dated
17              2010-04-11, Bates
                stamped
18              Rite_Aid_OMDL_0050628
19              through
                Rite_Aid_OMDL_0050630
20  Rite        Email dated 2011-06-03,  199
    Aid-Hart-10  Bates stamped
21              Rite_Aid_OMDL_0050634
22
23
24

Page 9

1           - - -
2   DEPOSITION SUPPORT INDEX
3           - - -
4
    Direction to Witness Not to Answer
5
        Page Line
6
        62   8
7
8
9
    Request for Production of Documents
10
        Page Line
11
12
13
14  Stipulations
15      Page Line
16
17
18
19  Question Marked
20      Page Line
21
22
23
24

Page 10

1    THE VIDEOGRAPHER: We're now on
2  the record. My name is David Lane,
3  videographer for Golkow Litigation
4  Services. Today's date is January 30,
5  2019. The time is 9:34 a.m.
6    This deposition is taking place
7  in Philadelphia, Pennsylvania in the
8  matter of National Opiate Litigation,
9  MDL.
10   Our deponent today is Janet
11 Getzey Hart. Counsel will be noted on
12 the stenographic record.
13   Our court reporter is Ann Marie
14 Mitchell, who will now swear in the
15 witness.
16      - - -
17   JANET GETZEY HART, after having
18 been duly sworn, was examined and
19 testified as follows:
20      - - -
21   EXAMINATION
22      - - -
23 BY MR. POWERS:
24   Q.   Good morning.

Page 11

1    A.   Good morning.
2    Q.   My name is Will Powers and I
3  represent the plaintiffs in this litigation.
4    Can you please state your full
5  name and spell it for the record?
6    A.   Sure. Janet Getzey Hart.
7  J-A-N-E-T, Getzey, G-E-T-Z-E-Y, last name Hart,
8  H-A-R-T.
9    Q.   And we are here for your
10 deposition today.
11   Do you understand that?
12   A.   I do.
13   Q.   Have you ever been deposed
14 before?
15   A.   I have.
16   Q.   When was that?
17   A.   20 years ago.
18   Q.   Was that the only time you've
19 been deposed?
20   A.   I've been deposed twice.
21   Q.   What was the other time you were
22 deposed?
23   A.   Probably ten years ago.
24   Q.   And the first time you were

Page 12

1  deposed, 20 years ago, what was that in
2  connection with?
3    A.   It was related to an alleged
4  price fixing for third parties in Baltimore,
5  Maryland.
6    Q.   And were you working at Rite Aid
7  at that point?
8    A.   I was.
9    Q.   And were you a fact witness
10 during that deposition?
11   A.   I was.
12   Q.   What was the subject of your
13 testimony for that deposition?
14   A.   That there was no collusion as
15 far as not taking a third-party plan.
16   Q.   You also mentioned that you were
17 deposed ten years ago.
18   What was that in connection with?
19   A.   That was in connection with a
20 doctor.
21   Q.   Do you remember the doctor's
22 name?
23   A.   I do not.
24   Q.   When you say in connection with a

Page 13

1  doctor, what do you mean?
2    A.   I believe there was an action
3  against a doctor and I was deposed in that
4  action.
5    Q.   Why were you deposed?
6    A.   Because I worked for Rite Aid and
7  they had dispensed prescriptions for the doctor.
8    MS. McENROE: And, Janet, just
9  let him finish his questions before you
10 answer.
11   THE WITNESS: Oh, okay.
12   MS. McENROE: Take your time.
13   THE WITNESS: Sorry.
14 BY MR. POWERS:
15   Q.   Do you know where that doctor was
16 operating?
17   A.   The deposition was in Harrisburg.
18 That's all I remember.
19   Q.   You don't recall where the doctor
20 was actually writing the prescriptions from?
21   A.   I do not.
22   Q.   Do you know which Rite Aid stores
23 were dispensing those prescriptions?
24   A.   I do not.

Page 14

1    Q.    And your counsel just informed
2  you about one of the rules today.  I just want to
3  go over a couple others.
4          Is that all right?
5    A.    Certainly.
6    Q.    Because the court reporter is
7  here writing down everything that we're saying,
8  it's important that only one person is speaking
9  at a time.  So as you've been going back and
10 forth here, you obviously can anticipate some of
11 my questions, but I just ask you to allow me to
12 finish my question fully before you start your
13 answer.
14         Is that okay?
15   A.    Perfect.
16   Q.    And then likewise, I'll let you
17 finish your answer before I ask my questions.
18         Does that sound okay?
19   A.    Perfect.
20   Q.    And the other thing, too, is I
21 need verbal answers.  So no nods of the heads,
22 uh-huhs, uh-uhs, things like that.
23         Does that make sense?
24   A.    Yes.

Page 15

1    Q.    And if for any reason you do not
2  understand a question and require some
3  clarification or explanation of the words I'm
4  using, you must tell me and we'll get that matter
5  resolved before you answer the question.
6          Is that okay?
7    A.    Yes.
8    Q.    So then if you answer any of my
9  questions, I will assume that you understand it.
10         Is that okay?
11   A.    Yes.
12   Q.    Are you currently suffering from
13 any medical disease or illness that in any way
14 interferes with your ability to answer truthfully
15 and completely my questions here today?
16   A.    No.
17   Q.    Are you currently taking any
18 medication or drugs that may in any way interfere
19 with your ability to answer truthfully and
20 completely here today?
21   A.    No.
22   Q.    And the court reporter just swore
23 you in, so do you understand that the testimony
24 you give here today is under oath, just as it

Page 16

1  would be in a courtroom?
2    A.    I do.
3    Q.    So because you're under oath, if
4  you lie or provide intentionally misleading
5  answers, you may be subject to civil or criminal
6  penalties.
7          Do you understand that?
8          MS. McENROE:  Objection to form.
9          THE WITNESS:  I do.
10 BY MR. POWERS:
11   Q.    And we can take breaks when you
12 need them, but you have to answer the question if
13 there is one pending.
14         Is that okay?
15   A.    That's fine.
16   Q.    And as your counsel just did a
17 minute ago, your counsel from time to time may
18 object to my questions, but I'm still entitled to
19 an answer unless your counsel specifically
20 instructs you not to answer.
21         Do you understand that?
22   A.    I do.
23   Q.    Did you prepare for this
24 deposition here today?

Page 17

1    A.    I did.
2    Q.    How did you do that?
3    A.    I met with outside counsel to go
4  over some documents and to discuss Rite Aid's
5  policies, procedures, things along those lines.
6    Q.    And when you say outside counsel,
7  you're referring to Morgan Lewis counsel?
8    A.    I am.
9    Q.    When did you meet with Morgan
10 Lewis counsel?
11   A.    I have met with them various
12 times over the past several months.
13   Q.    About how many times?
14   A.    Perhaps six.
15   Q.    On average, how long were those
16 meetings you had with outside counsel?
17   A.    Some were three to four hours.
18 Some were a complete day.
19   Q.    I want to start with your
20 educational background, Ms. Hart.
21         Actually, before I continue, is
22 it Ms. Hart or Ms. Getzey Hart?
23   A.    Ms. Hart is fine.
24   Q.    Okay.  Did you complete high

Page 18

1  school?
2      A.    I did.
3      Q.    Where did you complete high
4  school?
5      A.    Greater Johnstown Vocational and
6  Technical High School in Johnstown, Pennsylvania.
7      Q.    And what year did you graduate
8  from high school?
9      A.    1979.
10     Q.    Just let me -- I know you can
11 anticipate my question, but just can you please
12 let me finish my question --
13     A.    I'm sorry.
14     Q.    -- and then you can answer the
15 question.
16           It's okay.
17           So just to be clear, what year
18 did you graduate high school?
19     A.    1979.
20     Q.    Do you have any education beyond
21 high school?
22     A.    I do.
23     Q.    What is that education?
24     A.    It is a BS in pharmacy.

Page 19

1      Q.    Where did you get your BS in
2  pharmacy?
3      A.    Duquesne University.
4      Q.    And where is that located?
5      A.    Pittsburgh, Pennsylvania.
6      Q.    What year did you graduate
7  Duquesne University?
8      A.    1984.
9      Q.    Besides your college education,
10 do you have any other educational background?
11     A.    I do not.
12     Q.    Do you have any certifications of
13 any kind?
14     A.    I am a pharmacist.
15     Q.    What does that mean, that you're
16 a pharmacist?
17     A.    It means I'm registered with the
18 state of Pennsylvania as a pharmacist.
19     Q.    Is that registration current?
20     A.    Yes.
21     Q.    When did you get that?  When did
22 you first get that registration as a pharmacist?
23     A.    1984.
24     Q.    Have you kept your registration

Page 20

1  as a pharmacist up to date and current between
2  1984 and now?
3      A.    Yes.
4      Q.    I believe you said you're
5  registered in Pennsylvania.  Right?
6      A.    (Witness nods head.)
7      Q.    Are you registered as a
8  pharmacist in any other states?
9      A.    New Jersey.
10           MS. McENROE:  Again, just a
11     reminder to respond verbally.  So that
12     first answer had been yes.
13           THE WITNESS:  Okay.
14 BY MR. POWERS:
15     Q.    So you're registered as a
16 pharmacist in Pennsylvania and New Jersey; is
17 that correct?
18     A.    That is correct.
19     Q.    Any other states?
20     A.    No.
21     Q.    When did you first become
22 registered as a pharmacist in New Jersey?
23     A.    Probably two years after
24 Pennsylvania.

Page 21

1      Q.    And are you currently still
2  registered as a pharmacist in New Jersey?
3      A.    I am.
4      Q.    So from about 1986 to present,
5  you were registered as a pharmacist in New
6  Jersey; is that right?
7      A.    That sounds about right.
8      Q.    No breaks for that registration?
9      A.    No breaks.
10     Q.    After graduation from college in
11 1984, did you start working at Rite Aid at that
12 point?
13     A.    I did.
14     Q.    Are you still currently employed
15 by Rite Aid?
16     A.    I am.
17     Q.    Have you been employed by Rite
18 Aid the entire time, from 1984 until present?
19     A.    I have.
20     Q.    When you started working at Rite
21 Aid in 1984, what was your position?
22     A.    I was a pharmacy intern.
23     Q.    As a pharmacy intern, where did
24 you work?

Page 22

1    A.    Johnstown, Pennsylvania.
2    Q.    How long were you a pharmacy
3 intern for?
4    A.    Approximately four months.
5    Q.    After your position as a pharmacy
6 intern, what was your next title?
7    A.    Pharmacist.
8    Q.    Now, was that also located in
9 Johnstown, Pennsylvania?
10    A.    It was.
11    Q.    And when you say located in
12 Johnstown, Pennsylvania, is that the Rite Aid
13 corporate offices?
14    A.    It is not.  It's a retail
15 pharmacy location.
16    Q.    Approximately how long were you a
17 pharmacist for at Rite Aid?
18        MS. McENROE:  Objection to form.
19        THE WITNESS:  At the Johnstown
20    store, about six months.
21 BY MR. POWERS:
22    Q.    Where did you go after that?
23    A.    I became a floater pharmacist and
24 worked at various Rite Aid pharmacy locations in

Page 23

1 the general area.
2    Q.    You say -- when you say the
3 general area, what do you mean by that?
4    A.    Around Johnstown.
5    Q.    How long were you a floater
6 pharmacist for?
7    A.    Approximately two years.
8    Q.    So that would be about 1986 you
9 stopped being a floater pharmacist?
10    A.    That sounds correct.
11    Q.    After a floater pharmacist, what
12 was your next position at Rite Aid?
13    A.    I was a pharmacy manager.
14    Q.    How long were you a pharmacy
15 manager for?
16    A.    Approximately one year.
17    Q.    What were your job
18 responsibilities as a pharmacy manager?
19    A.    I was responsible for the
20 profitability of that particular pharmacy.
21    Q.    When you say that particular
22 pharmacy, are you referring to a Rite Aid retail
23 pharmacy location?
24    A.    I am.

Page 24

1    Q.    Where was that location where
2 you --
3    A.    Johnstown.
4    Q.    Sorry.
5    A.    Oh, I'm sorry.
6    Q.    What was the location where you
7 were a pharmacy manager?
8    A.    Johnstown.
9    Q.    Did you have any other
10 responsibilities besides the profitability while
11 you were a pharmacy manager?
12    A.    The responsibilities were to
13 dispense prescriptions, payroll, just running the
14 basic business of the pharmacy.
15    Q.    After your year as a pharmacy
16 manager, what was your next position at Rite Aid?
17    A.    I remained a pharmacist.  But
18 then at that particular time, Rite Aid was
19 purchasing some stores, another drugstore chain,
20 Gray Drug.  And so after that I went out of the
21 pharmacy and was a training pharmacist as new
22 pharmacists were coming on board from the
23 acquisition.
24    Q.    So this would have been around

Page 25

1 1987 that you became a training pharmacist?
2    A.    That sounds correct.
3    Q.    How long did you hold the
4 position as training pharmacist?
5    A.    Probably eight months.
6    Q.    And you said there was a
7 acquisition that Rite Aid made around that time.
8 Correct?
9    A.    Correct.
10    Q.    And the name of the other
11 business that Rite Aid acquired was Gray Drug, do
12 I have that correct?
13    A.    Gray Drug, yes.
14    Q.    So it was your job while you were
15 a training pharmacist to go around to the Gray
16 Drug locations and train them on Rite Aid
17 procedures.
18        Do I have that correct?
19    A.    Yes.  On procedures and the
20 computer system.
21    Q.    And was that also around the
22 Johnstown, Pennsylvania area?
23    A.    That was actually throughout the
24 country.

Page 26

1　Q.　After your time as a training
2　pharmacist, what was your next position at Rite
3　Aid?
4　A.　I moved to Baltimore to become a
5　pharmacy manager.
6　Q.　So that would have been around
7　1988 when you moved to Baltimore?
8　A.　That sounds correct.
9　Q.　And was that position as a
10　pharmacy manager also for a retail location?
11　A.　It was.
12　Q.　Were your job responsibilities
13　the same as your previous stint as a pharmacy
14　manager in Johnstown, Pennsylvania?
15　A.　They were.
16　Q.　How long were you the pharmacy
17　manager in Baltimore?
18　A.　Approximately two years.
19　Q.　After being a pharmacy manager in
20　Baltimore, what was your next job at Rite Aid?
21　A.　I got promoted to be a pharmacy
22　district manager.
23　Q.　And that would have been around
24　1990?

Page 27

1　A.　Yes.
2　Q.　How long were you a pharmacy
3　district manager for?
4　A.　Approximately two years.
5　Q.　Was that also in Baltimore,
6　Maryland?
7　A.　It was.
8　Q.　What were your responsibilities
9　as a pharmacy district manager?
10　A.　Similar to that as a pharmacy
11　manager, the pharmacy district manager was
12　responsible for anywhere between 25 to 30 stores,
13　as far as staffing, training, profitability.
14　Q.　And the 25 to 30 stores that you
15　were responsible for, were those all in the
16　Maryland area?
17　A.　Yes.
18　Q.　What was your next position after
19　pharmacy district manager?
20　A.　Director of professional
21　placement.
22　Q.　How long were you the director of
23　professional placement?
24　A.　For approximately a year.

Page 28

1　Q.　So that would have been around
2　1992 to 1993.　Right?
3　A.　Correct.
4　Q.　What did you do as the director
5　of professional placement?
6　A.　I was responsible for going to
7　schools of pharmacy and recruiting pharmacy
8　students to come to work for Rite Aid.　And I was
9　responsible for putting together training
10　programs for the region.
11　Q.　When you say the region, what
12　region are you referring to?
13　A.　Baltimore metro market.
14　Q.　After your year as the director
15　of professional placement, what was your next
16　position at Rite Aid?
17　A.　Pharmacy division manager.
18　Q.　How long were you a pharmacy
19　division manager for?
20　A.　Two years.
21　Q.　So that would be approximately
22　1993 through 1995?
23　A.　That is correct.
24　Q.　And what were your job

Page 29

1　responsibilities as a pharmacy division manager?
2　A.　Similar to the pharmacy manager
3　and the pharmacy district manager.　I was
4　responsible for the profitability and operations
5　of approximately 150 Rite Aid pharmacies in the
6　Baltimore metro market.
7　Q.　After your time as the pharmacy
8　division manager, what was your next position at
9　Rite Aid?
10　A.　I moved -- I got promoted into
11　the corporate office, and I became a manager of
12　government affairs.
13　Q.　And that would have been around
14　1995?
15　A.　Correct.
16　Q.　Now, when you say the corporate
17　office, are you referring to the Rite Aid offices
18　in Camp Hill, Pennsylvania?
19　A.　I am.
20　Q.　Were you physically located
21　starting in 1995 in the offices in Camp Hill,
22　Pennsylvania?
23　A.　I believe I moved to Camp Hill in
24　1996.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  Q.  When you moved to Camp Hill, it
2  was for the position that you just described, the
3  manager of government affairs.  Right?
4      A.  It was.
5      Q.  What were your job
6  responsibilities as a manager of government
7  affairs?
8      A.  I was responsible for varying --
9  many times varying number of states to follow
10  regulatory and legislation concerning anything
11  that would impact the Rite Aid book of business.
12  I was responsible for compliance with DEA rules
13  and regulations.  And I was responsible for
14  prescription drug monitoring programs and
15  submitting data to a limited number of programs
16  that were there in 1995.
17      Q.  How long were you the manager of
18  government affairs?
19      A.  From 1995 to 2006.
20      Q.  In that time period from 1995 to
21  2006, who was your supervisor?
22      A.  James Krahulec.
23      Q.  Can you spell that last name,
24  please?

Page 31

1      A.  K-R-A-H-U-L-E-C.
2      Q.  Was there anyone else in the
3  government affairs division at Rite Aid during
4  that time period, 1995 to 2006?
5      A.  Can you repeat the question?
6      Q.  Sure.
7          Was anyone else in the government
8  affairs division, let's say, of Rite Aid between
9  that period, 1995 to 2006?
10      A.  We had like an administrative
11  staff, but during that time it was Mr. Krahulec
12  and myself.
13      Q.  Who was the administrative staff?
14      A.  Deb Hurley.
15      Q.  Can you spell the last name?
16      A.  H-U-R-L-E-Y.
17      Q.  How did you train for your job as
18  manager of government affairs?
19      A.  Well, in my capacity as the
20  pharmacy regional person in Baltimore, I had the
21  opportunity at that time to go and testify in
22  Annapolis, meet with legislators.  Mr. Krahulec
23  obviously was only one person and couldn't be at
24  that time in approximately 15 states.  And so if

Page 32

1  there was someone that needed to go before a
2  Senate committee or something like that, they
3  would ask me to go and to provide testimony or to
4  speak on behalf of Rite Aid.  And so having done
5  that a number of times in my previous capacity,
6  the opportunity came up for the additional
7  position in the Rite Aid corporate headquarters,
8  so that's when they promoted me into that
9  position.
10          And then after that, it was
11  really hands-on training with the individuals at
12  the corporate office.
13      Q.  Who were some of the individuals
14  who you did the hands-on training with?
15      A.  Mike Podgurski.
16      Q.  Anyone else?
17      A.  I'm trying to think who else was
18  there at that time.
19          It was pretty much Mike and --
20  Mike and Jim.
21      Q.  When you say Jim, that's James
22  Krahulec?
23      A.  (Witness nods head.)
24          MS. McENROE:  Is that a yes?

Page 33

1          THE WITNESS:  Yes.
2          MR. POWERS:  Sorry.  Yeah, thank
3      you.
4  BY MR. POWERS:
5      Q.  And what was Mike Podgurski's
6  title?
7      A.  I don't know what his title was
8  at that time.  He's had a lot of titles, I don't
9  know what it was specifically at that time.
10      Q.  We've been talking about the
11  government affairs division.
12          What division did Mike Podgurski
13  work in?
14      A.  More pharmacy ops.
15      Q.  And I'm using the word
16  "division."
17          Is that the correct term or
18  department or is there a better term in how Rite
19  Aid describes the organizational structure?
20      A.  It's government affairs
21  department.  It's very small.
22      Q.  Okay.  So it's department, I
23  guess?
24      A.  Yeah.

Page 34

1    Q.    Okay.  How does the government
2  affairs department fit into the larger
3  organizational structure of the Rite Aid
4  corporate office?
5         MS. McENROE:  Objection to form.
6         THE WITNESS:  We monitor
7      legislation and then provide updates to
8      the corporate departments that are
9      involved.  If it's a tax issue, we would
10     forward the legislation to the tax
11     department.  If it was a pharmacy issue,
12     we would forward it to the pharmacy
13     department.  We also had control or
14     looked over DEA rules and regulations.
15     And if there was a question concerning,
16     you know, a DEA rule or regulations,
17     pharmacy operations or the other
18     departments would come and ask us
19     questions or ask us to investigate and
20     provide an answer back to them.
21  BY MR. POWERS:
22     Q.    For DEA issues, you mentioned the
23  pharmacy departments.
24        Any other departments you worked

Page 35

1  with on DEA issues?
2     A.    Logistics.
3     Q.    And who did you work with in the
4  logistics department?
5     A.    I don't remember who was in
6  logistics back then.
7     Q.    Besides logistics and pharmacy,
8  any other departments you worked with on DEA
9  issues for your time period '95 through 2006?
10    A.    I think that's it.
11    Q.    Anyone else besides the pharmacy
12  department, besides Mike Podgurski that you
13  worked with?
14    A.    There were various individuals in
15  the various -- in that department that I would
16  work with.
17    Q.    Can you name the ones you
18  remember?
19    A.    Sure.  Scott Jacobson.
20    Q.    Do you remember Scott Jacobson's
21  title?
22    A.    VP pharmacy operations.
23    Q.    Anyone else?
24    A.    Not at this time.

Page 36

1    Q.    You also mentioned before that
2  you gave testimony, I believe you said, to
3  governmental organizations; is that correct?
4     A.    That is correct.
5     Q.    What test -- can you give me some
6  examples of the testimony that you gave?
7     A.    Certainly.  There were pieces of
8  legislation to -- where there was going to be a
9  reimbursement cut to Medicaid where the
10  dispensing fee was going to be reduced.  And we
11  obviously, from a business perspective, we did
12  not want that to occur, so we would testify in
13  order to maintain the dispensing fee.
14    Q.    Did you give testimony to state
15  government agencies?
16    A.    I did.
17    Q.    What were the state government
18  agencies that you testified to?
19    A.    I've testified before the
20  Maryland General Assembly, or a subcommittee of
21  the assembly.
22    Q.    Anywhere else besides the
23  Maryland General Assembly?
24    A.    The Pennsylvania General

Page 37

1  Assembly.
2     Q.    Anywhere else?
3     A.    Maine.
4     Q.    Anywhere else?
5     A.    Vermont.
6     Q.    Anywhere else?
7     A.    Those are the ones that I can
8  recall.
9     Q.    Did you ever testify about DEA
10  compliance issues before any of the state bodies
11  that you just named?
12        MS. McENROE:  Objection to form.
13        THE WITNESS:  For the time period
14     when I was a manager of government
15     affairs, not that I remember.
16  BY MR. POWERS:
17    Q.    Did you ever testify before
18  federal agencies during the time period of 1995
19  through 2006?
20    A.    I did not.
21    Q.    Have you ever testified before
22  federal agencies during your entire time at Rite
23  Aid?
24    A.    I believe no.

Page 38

1    Q.    And to be clear, when I say
2    federal agencies, I'm also including legislative
3    bodies.
4          Is that okay?
5    A.    That's fine.
6    Q.    Does that change your answer?
7    A.    No.
8    Q.    What is the government affairs
9    department relationship with the distribution
10   centers?
11         MS. McENROE:  Objection to form.
12         THE WITNESS:  We work together.
13   BY MR. POWERS:
14   Q.    Do the distribution centers
15   report to the government affairs office?
16   A.    They do not.
17   Q.    Was there a typical contact
18   person at each distribution center that you would
19   work with?
20   A.    There were contact individuals at
21   the distribution centers.
22   Q.    Did those contact individuals
23   have a particular title at the distribution
24   centers?

Page 39

1    A.    DEA coordinator.
2    Q.    So is it fair to say then the
3    government affairs office would interact with the
4    DEA coordinators at each individual distribution
5    center?
6    A.    I myself would interact more with
7    the person that was in charge of the DEA
8    coordinators at the corporate office.
9    Q.    Who was the person in charge of
10   the DEA coordinators at the corporate office?
11   A.    There was a director of
12   logistics, regulatory, something along that title
13   line.  I don't know the official title.
14   Q.    Would that be the logistics -- in
15   the logistics department that you talked about
16   earlier?
17   A.    Yes.
18   Q.    Does the name Kevin Mitchell ring
19   a bell for you?
20   A.    Yes.
21   Q.    Is that one of the people that
22   you would have been working with in the logistics
23   department?
24   A.    Yes.

Page 40

1    Q.    How about Chris Belli, does that
2    name sound familiar to you?
3    A.    Yes.
4    Q.    Is that one of the people you've
5    been working with in the logistics department?
6    A.    Yes.
7    Q.    And are those people, Chris Belli
8    and Kevin Mitchell, the people you're referring
9    to when you say the person in charge of the DEA
10   coordinators at the logistics department?
11   A.    Yes.
12   Q.    So after 2006, you ceased -- your
13   title ceased to be manager of government affairs.
14   Correct?
15   A.    Correct.
16   Q.    What did your title become at
17   that point?
18   A.    Director, government affairs.  I
19   got a promotion.
20   Q.    Is that your current title,
21   director of government affairs?
22   A.    It is.
23   Q.    Have you held the position of
24   director of government affairs continuously from

Page 41

1    2006 until the present?
2    A.    I have.
3    Q.    What happened to James Krahulec
4    when you became the director of government
5    affairs?
6    A.    James Krahulec passed away in
7    2006 or so.  And Mike Podgurski moved in to
8    government affairs.  So from when I was a
9    director of government affairs, Mike Podgurski
10   then became my boss.
11   Q.    Did that move of Mike Podgurski
12   to becoming your boss happen at the same time you
13   became director of government affairs?
14   A.    Close to the same time frame,
15   yes.
16   Q.    Who else was in your department
17   when you became the director of government
18   affairs?
19   A.    There would have been an
20   individual, Michael Yount.
21   Q.    How do you spell that last name?
22   A.    Y-O-U-N-T.
23   Q.    When did Mr. Yount start in the
24   government affairs department?

Page 42

1  A.  I don't remember.

2  Q.  Was it around the time you became

3  the director of government affairs?

4  A.  I believe it was prior to that

5  point.

6  Q.  So Michael Yount was part of the

7  government affairs department before you became

8  director of government affairs?

9  A.  Yes.

10  Q.  How long did Michael Yount work

11  in the government affairs office?

12  A.  I don't recall.

13  Q.  Does he still work in the

14  government affairs office?

15  A.  He does not.

16  Q.  Do you know when he left?

17  A.  I don't remember.

18  Q.  Was it more or less than ten

19  years ago when Michael Yount left?

20  A.  It was more than ten years ago

21  that he left.

22  Q.  How come you did not mention

23  Michael Yount before when I asked you who else

24  worked in the government affairs office while you

Page 43

1  were the manager of government affairs?

2  MS. McENROE:  Objection to form.

3  THE WITNESS:  I just completely

4  forgot about Michael.

5  BY MR. POWERS:

6  Q.  Besides Michael Yount, anyone

7  else work in the government affairs office

8  between '95 and present?

9  A.  Not that I remember.

10  Q.  Did Amy Knisely ever work in the

11  government affairs department?

12  A.  Amy Knisely did, yes.

13  Q.  How come you didn't mention her

14  when I asked who else worked in the government

15  affairs department just now?

16  A.  You didn't specify a time frame.

17  We were discussing until -- we were discussing

18  the 2006.  And Amy Knisely wasn't in the

19  government affairs department in 2006.

20  Q.  My question was -- I'm reading

21  off the transcript here, besides Michael Yount,

22  anyone else work in the government affairs office

23  between 1995 and the present?

24  A.  Oh, okay.  Yes.

Page 44

1  Q.  Who else worked in the government

2  affairs office between 1995 and the present?

3  A.  Amy Knisely.

4  Q.  Anyone else?

5  A.  Sarah Everingham, Andrea Bucher.

6  Q.  Anyone else?

7  A.  Derrick Ridley.

8  Q.  How do you spell that last name?

9  A.  R-I-D-L-E-Y.

10  Q.  Anyone else?

11  A.  Sarah Hilbolt.

12  Q.  How do you spell that last name?

13  A.  H-I-L-B-O-L-T.

14  Q.  Anyone else?

15  A.  In government affairs was Grace

16  Schuyler.

17  Q.  Anyone else?

18  A.  Jermaine Smith.

19  Q.  And when I say anyone else, feel

20  free to name more than one person at a time.

21  A.  Okay.

22  Q.  Anyone else besides who you've

23  mentioned so far?

24  A.  I'm thinking.

Page 45

1  Yong Choe.

2  Those are to the best of my

3  knowledge.

4  Q.  I believe you testified earlier

5  that in -- from 1995 to 2006, the only people in

6  the government affairs office were yourself,

7  James Krahulec, and for some period of that time

8  Michael Yount.  Right?

9  A.  And Deb Hurley.

10  Q.  How come the government affairs

11  office got so much bigger after 2006?

12  MS. McENROE:  Objection, form.

13  THE WITNESS:  There was the

14  addition of additional people because the

15  responsibilities were expanding.

16  BY MR. POWERS:

17  Q.  Why do you say the

18  responsibilities were expanding?

19  A.  Prior to 2006, there were a very

20  limited number of state prescription monitoring

21  programs.  And more states kept coming onboard

22  with prescription monitoring programs.  So there

23  was more data submission to those programs.  And

24  then error corrections, when there would be an

Page 46

1 error that was sent to the program. And that was
2 taking up increasing amounts of time.
3 There was also additional
4 heightened awareness around DEA rules and
5 regulations. Legislation was getting more
6 involved.
7 Q. During that period after 2006,
8 who in the government affairs office had
9 responsibility in any shape or form for dealing
10 with the DEA rules and regulations?
11 MS. McENROE: Objection to form.
12 THE WITNESS: That would be
13 myself.
14 BY MR. POWERS:
15 Q. Anyone else?
16 A. Yes.
17 May I make an addition to an
18 individual in government affairs?
19 Q. Sure.
20 A. I don't believe I mentioned
21 Andrea Bucher.
22 Q. Okay. Anyone else besides
23 yourself in the government affairs office that
24 dealt with DEA's rules and regulations?

Page 47

1 A. Since then?
2 Q. Since 2006.
3 A. Amanda Glover.
4 Q. Was she also in the government
5 affairs office?
6 A. She is in regulatory affairs, but
7 she dealt with DEA.
8 Q. Anyone else besides Amanda
9 Glover?
10 A. Mike Podgurski.
11 Q. But he's not in government
12 affairs. Right?
13 A. No. Mike was in government
14 affairs.
15 Q. Oh, okay.
16 A. He was in operations prior to
17 2006.
18 Grace Schuyler.
19 Q. Anybody else?
20 A. Not that I remember at this time.
21 Q. And you mentioned, was it Amanda
22 Glover?
23 A. Yes.
24 Q. That she was in the regulatory

Page 48

1 affairs department. Right?
2 A. Yes.
3 Q. Is that a separate department
4 from government affairs?
5 A. Yes.
6 Q. Did you ever work with other
7 people from the regulatory affairs department
8 while you were the director of government
9 affairs?
10 A. Yes.
11 Q. Who else from regulatory affairs
12 did you interact with?
13 A. Zach Hicks.
14 Q. Can you spell that?
15 A. H-I-C-K-S.
16 Q. Anyone else?
17 A. Greg Mills. That's it.
18 Q. Do you know who the director of
19 the regulatory affairs office was during this
20 time period, starting in 2006?
21 A. There was no regulatory affairs
22 department in 2006. I think why there's some
23 confusion here is what happened was government
24 affairs split off from regulatory affairs

Page 49

1 approximately two years ago. And so that's why
2 there's some confusion as far as the individuals
3 and where they worked, because what happened is,
4 even though I still maintained the title of
5 government affairs, I'm in regulatory affairs.
6 So that may be adding to the confusion.
7 Q. Okay. Just so I have this
8 correctly here, the department was the department
9 of government affairs from 1995 up until about
10 2017?
11 A. There still is a department of
12 government legislative and regulatory, but --
13 from following that. But there's a regulatory --
14 department of reg -- a department of regulatory
15 affairs as well. So you still -- you have two
16 now.
17 Q. Okay. So from 1995 until
18 current, there was a department of government and
19 regulatory affairs. Right?
20 A. (Witness nods head.)
21 Yes.
22 Q. And then approximately two years
23 ago, around 2017, there's a separate department
24 named regulatory affairs?

Page 50

1    A.    Correct.
2    Q.    Okay.  Why was the regulatory
3 affairs department created in 2017?
4    A.    There was heightened awareness on
5 many regulatory affairs issues, such as DEA,
6 HIPAA, and so the decision was made to create a
7 department.
8    Q.    Who was the person in charge of
9 the regulatory affairs office starting in 2017?
10    A.    Amanda Glover.
11    Q.    And she would have been
12 previously employed in the government affairs and
13 regulatory affairs department prior to 2017; is
14 that right?
15    A.    She was not.
16    Q.    Do you know where she was before?
17    A.    Pharmacy operations, I believe.
18    Q.    How did your job responsibilities
19 as the director of government affairs change when
20 the new regulatory affairs department was
21 created?
22    A.    I had less responsibilities for
23 state legislative and regulatory following
24 legislation than I had previously.  I had bumped

Page 51

1 up and down between the number of states that I
2 covered.  And I went down to two states to cover
3 because of the other increasing responsibilities.
4    Q.    What were your increasing
5 responsibilities?
6    A.    DEA compliance, prescription
7 monitoring program compliance.
8    Q.    You started talking a little bit
9 about it there, but as the director of government
10 affairs between 2006 and 2017, what were your job
11 responsibilities?
12    A.    Similar to my responsibilities as
13 manager of government affairs.
14    Q.    Can you explain what you mean by
15 that?
16    A.    Sure.  I did the same thing,
17 pretty much.  I was in charge of DEA compliance
18 as far as providing information, questions to the
19 various departments throughout the company.  I
20 was responsible for prescription monitoring
21 programs.  And I was responsible for legislative
22 and regulatory for two states.  At present, I'm
23 down to one state.
24    Q.    What two states were you in

Page 52

1 charge of legislative and regulatory for?
2    A.    Maryland and Delaware.
3    Q.    When you say in charge of
4 legislative and regulatory, what do you mean by
5 that?
6    A.    I mean follow any legislation
7 that impacts Rite Aid's book of business and then
8 provide that information to the various
9 departments that would be impacted by the
10 legislation or the regulation, work with groups
11 to put forth a response to the legislation,
12 provide comments, anything that needed to be done
13 related to those issues.
14    Q.    And you also mentioned that you
15 had responsibility for prescription monitoring
16 programs.
17          Can you explain that?
18    A.    Certainly.  In each state that
19 Rite Aid does business, we're required by law to
20 report any controlled substance data for
21 prescriptions that we dispense to the state.  In
22 each state, we send the data on a daily basis.
23 And then what happens is we get errors back,
24 where the stores will say put a symbol in the

Page 53

1 name.  They'll say -- it's a K9 and they put
2 parentheses around the K9, so that comes back as
3 an error.  And then we're responsible for
4 correcting that and sending it back to the
5 prescription monitoring program.
6          We need to stay up on all of the
7 different formats and all of the different
8 standards related to the prescription monitoring
9 program so that we stay in compliance, because
10 there are significant fines associated with it if
11 we're not in compliance.
12    Q.    Are you talking about the
13 prescription monitoring programs, are those
14 particular prescription monitoring programs in
15 each state?
16    A.    Yes, they're in each state.
17    Q.    And the prescription monitoring
18 programs, are they different in each state?
19    A.    They are.
20    Q.    Do the prescription monitoring
21 programs have anything to do with Rite Aid's role
22 as a distributor of controlled substances?
23          MS. McENROE:  Objection, form.
24          THE WITNESS:  There are certain

Page 54

1    states that require distributor data to
2    be sent to them.
3  BY MR. POWERS:
4       Q.    You also mentioned that as
5  director of government affairs that you were in
6  charge of DEA compliance.
7            Can you explain what you mean by
8  that?
9       A.    Certainly.  If there was a DEA
10  question or a new DEA rule or regulation that
11  came up, it's my job to communicate that to store
12  operations; to logistics, if it involves
13  transporting drugs; to provide, you know,
14  guidance into policies and procedures as far as
15  compliance with DEA rules and regulations.
16      Q.    You said it's your job to
17  communicate the DEA compliance issues.
18           How would you communicate to the
19  other Rite Aid employees?
20      A.    If there was a proposed piece of
21  legislation, I would either forward an email to
22  the individuals that are in the correct
23  department.  We could possibly have a discussion
24  about the proposed regulation to determine how it

Page 55

1  would impact the Rite Aid book of business.
2       Q.    So besides emailing the
3  appropriate people and having discussions, did
4  you do anything else to communicate new rules and
5  regulations?
6       A.    I mean, we might have a meeting,
7  a meeting as such to discuss it and determine
8  what our action plan would be.
9            And then we could -- we would
10  have an email communication as far as rolling it
11  out to the stores and what we were going to
12  communicate to stores to do to be compliant.  So
13  that was all a part of the process.
14      Q.    Was there any standard procedure
15  about how to communicate a new DEA rule or
16  regulation?
17      A.    The standard procedure for myself
18  is to communicate it to our VP of pharmacy
19  operations.  If it was logistics, the VP of
20  logistics.  Anybody that was involved in that
21  particular matter would be communicated on so
22  that they were aware of pending or then passed
23  legislation.
24      Q.    When you say communicated to the

Page 56

1  VP of operations or the VP of logistics, was that
2  just communicate via email?
3       A.    Email typically, yes.  And then
4  typically what would happen is they would read it
5  and call me back and then we'd start a
6  discussion.
7       Q.    We've been talking about new
8  rules and regulations.
9            How do you communicate
10  long-standing rules and regulations regarding DEA
11  compliance?
12           MS. McENROE:  Objection to form.
13           THE WITNESS:  We do that in a
14      number of ways.  We have DEA reminder
15      messages that we send to all of our
16      stores on a weekly basis.  Those messages
17      include compliance with CSA and the CFR,
18      where they are how to execute an order
19      form, things along those lines.
20  BY MR. POWERS:
21      Q.    How are those DEA reminder
22  messages sent to the stores?
23      A.    They are sent in what we call a
24  management planner.

Page 57

1       Q.    What is a management planner?
2       A.    It's a weekly message board that
3  goes out to all of our pharmacies.
4       Q.    Is this an electronic system?
5       A.    Yes.
6       Q.    Who would have access to that
7  electronic system?
8       A.    The pharmacist, our field
9  management, people in corporate.
10      Q.    You've been talking about
11  communicating with the stores.
12           How about DEA policies and
13  procedures related to distribution, how did you
14  communicate those?
15      A.    DEA with -- for distribution,
16  would go to the VP of logistics.  And then
17  they're individuals during that time period that
18  we mentioned, Kevin Mitchell, Chris Belli,
19  communication would go to them if there was
20  something impacting the distribution centers.
21      Q.    And those communications would
22  also be just via email?
23      A.    Typically, yes.
24      Q.    Any other ways besides email?

Page 58

1   A.   Normal communications.  Their
2  offices are not too -- their office was not too
3  far from mine, so we would have conversations.
4   Q.   You mean just like walk down to
5  their office?
6   A.   Yep.
7   Q.   How did you communicate existing
8  or long-standing DEA regulations regarding
9  distribution of controlled substances?
10      MS. McENROE:  Objection to form.
11      THE WITNESS:  I didn't
12   communicate to the distribution centers.
13   That responsibility would have been on
14   Chris or Kevin Mitchell, depending on the
15   time.  But I was not directly
16   communicating to the distribution
17   centers.
18  BY MR. POWERS:
19   Q.   How did you communicate existing
20  DEA rules and regulations to either Chris Belli
21  or Kevin Mitchell?
22   A.   I don't know that I did that on a
23  routine basis.  I believe they were very well
24  versed in existing DEA rules and regulations.

Page 59

1   Q.   You also mentioned that it was
2  your job to formulate guidance as to the policies
3  and procedures regarding DEA compliance; is that
4  right?
5   A.   That is correct.
6   Q.   How did you formulate the
7  guidance?
8   A.   I would look at a regulation
9  and/or a proposed rule and say, how would this
10  impact Rite Aid.  And then if there was a certain
11  action plan that I thought would work as far as
12  rolling out the guidance, then I would put a
13  communication together and say, hello, this is
14  the new DEA regulation and this is how I feel we
15  should do something with it.
16   Q.   What did you rely on when you
17  were formulating the guidance?
18   A.   The -- what had been proposed or
19  what had come out, the industry information that
20  it was out there, and my own knowledge.
21   Q.   Did you ever consult anyone else
22  within Rite Aid about formulating guidance
23  regarding DEA regulations?
24   A.   Certainly.

Page 60

1   Q.   Who?
2   A.   Amanda Glover.
3   Q.   Anyone else?
4   A.   Mike Podgurski, Zach Hicks, Greg
5  Mills.
6   Q.   Anyone else?
7   A.   Scott Jacobson.
8   Q.   Did you ever consult anyone
9  outside of Rite Aid when you were formulating
10  guidance on DEA regulations?
11   A.   Occasionally.
12   Q.   Who?
13   A.   We had outside counsel at one
14  point, Hyman, Phelps & McNamara.
15   Q.   When was that, when you had
16  Hyman, Phelps & McNamara help you with
17  formulating DEA guidance?
18   A.   2010 and back.
19   Q.   You say and back, do you mean
20  before 2010?
21   A.   Yes, yes.  And that could give or
22  take.  That was just pretty much when we stopped
23  communicating.  But we still sent communications
24  to them, but not like asking questions or

Page 61

1  whatever.
2   Q.   Do you know approximately when
3  you started using Hyman, Phelps & McNamara for
4  guidance -- excuse me, to formulate guidance on
5  DEA regulations?
6   A.   I don't remember.
7   Q.   Can you give me an approximate
8  date?
9   A.   At least 2000.
10   Q.   And who would you talk to at
11  Hyman, Phelps & McNamara about DEA regulations?
12   A.   Karla Palmer.
13   Q.   Anyone else?
14   A.   Larry Houck.
15   Q.   Can you spell that last name?
16   A.   H-O-U-C-K.
17   Q.   Anyone else besides Karla Palmer
18  and Larry Houck?
19   A.   John Gilbert.
20   Q.   Anyone else?
21   A.   Those were the three main
22  individuals.
23   Q.   How did you communicate with
24  Hyman, Phelps & McNamara?

Page 62

1    A.    Either email or a phone call.

2    Q.    And you mentioned there was some

3 communication with Hyman, Phelps & McNamara after

4 2010.  Right?

5    A.    There is, yes.

6    Q.    What was the nature of that

7 communication after 2010?

8         MS. McENROE:  Objection, calls

9    for privileged information.  I instruct

10    the witness not to answer.

11         Do you have a more specific

12    question not seeking privileged

13    information?  The word "nature" is not

14    specific to not seek privileged

15    communications.

16 BY MR. POWERS:

17    Q.    After 2010, how did your -- or

18 how did Rite Aid's relationship with Hyman,

19 Phelps & McNamara change?

20    A.    I would occasionally call them to

21 ask them a question.  I also communicate with

22 Karla Palmer in the instance where there is a

23 prescriber --

24         MS. McENROE:  Hold on -- nothing

Page 63

1    substantive.  So just in terms of the

2    nuts and bolts.  That's it.

3         THE WITNESS:  Okay.  So I would

4    send email communications to them or call

5    them.

6 BY MR. POWERS:

7    Q.    I'm just trying to understand why

8 you gave 2010 as the end date for your

9 relationship with Hyman, Phelps & McNamara.

10    How come you used 2010 as the

11 date that you ended the relationship, but it

12 seems like you communicate after 2010 with Hyman,

13 Phelps?

14    A.    They were primarily our counsel

15 prior to that time.  And then at that point we

16 had a settlement agreement and they worked us

17 through the settlement agreement.  And then our

18 counsel went to another firm.

19    Q.    What was the firm after Hyman,

20 Phelps & McNamara?

21    A.    Morgan Lewis.

22         THE WITNESS:  May we take a

23    break?

24         MS. McENROE:  Yeah.  It's been

Page 64

1    about an hour anyway.

2         MR. POWERS:  Sure.  That's fine.

3         THE VIDEOGRAPHER:  Going off the

4    record at 10:30 a.m.

5         - - -

6         (A recess was taken from

7    10:30 a.m. to 10:44 a.m.)

8         - - -

9         THE VIDEOGRAPHER:  We're back on

10    the record at 10:44 a.m.

11 BY MR. POWERS:

12    Q.    Welcome back, Ms. Hart.

13         Before we took the break, we were

14 talking about a settlement agreement that Rite

15 Aid had had.

16         Can you explain what that

17 settlement agreement was?

18    A.    Rite Aid entered into a

19 settlement agreement with the Drug Enforcement

20 Administration in 2009.

21    Q.    What was the nature of that

22 settlement?

23         MS. McENROE:  Objection to form.

24         THE WITNESS:  There are alleged

Page 65

1    recordkeeping violations, alleged missing

2    drugs.

3 BY MR. POWERS:

4    Q.    Did you have any involvement in

5 the discussions that led to that settlement

6 agreement?

7    A.    I did.

8    Q.    What was the nature of your

9 involvement?

10         MS. McENROE:  Objection to form.

11         Also, just careful caution

12    here -- and I know it originally came up

13    in the context of privileged information

14    and communication with counsel.

15         I caution you not to discuss

16    anything you discussed with counsel or

17    you learned from counsel.

18         THE WITNESS:  Okay.

19         For the settlement agreement, I

20    had obtained documents, looked at the

21    records based on the allegations of the

22    Drug Enforcement Administration and

23    reviewed the documents to determine if

24    the allegations were correct or not.  I

Page 66

1 visited various stores to look for
2 records. I met with various AUSAs to
3 provide records with outside counsel.
4 BY MR. POWERS:
5     Q. Was there anything else in the
6 settlement agreement beyond recordkeeping
7 violations?
8        MS. McENROE: Objection to form.
9        THE WITNESS: There were
10     allegations of medications lost or
11     medications that weren't accounted for.
12     That was the other part of my
13     recollection of it.
14 BY MR. POWERS:
15     Q. Anything else?
16        MS. McENROE: Objection to form.
17        THE WITNESS: There could be
18     more, I just don't remember.
19 BY MR. POWERS:
20     Q. Did the settlement agreement have
21 any allegations regarding Rite Aid knowingly
22 filling prescriptions for controlled substances
23 that were not issued for legitimate medical
24 purposes?

Page 67

1        MS. McENROE: Objection to form.
2        THE WITNESS: It did.
3 BY MR. POWERS:
4     Q. In your role as the director of
5 the government affairs office in 2009, did you
6 make any changes as a result of that 2009
7 settlement with the Department of Justice?
8        MS. McENROE: Objection to form.
9        THE WITNESS: Rite Aid had been
10     making changes up to the settlement
11     agreement. Part of the settlement
12     agreement was counting of hydrocodone and
13     acetaminophen on a quarterly basis. We
14     implemented the MethCheck system in our
15     stores.
16     But prior to the 2009 settlement,
17     we had put in a comprehensive program.
18     And that program continues to evolve.
19 BY MR. POWERS:
20     Q. Let me specify my question.
21     As a direct result of the 2009
22 settlement, what changes were made at Rite Aid?
23        MS. McENROE: Objection to form.
24        THE WITNESS: We updated our DEA

Page 68

1     computer-based training. We enhanced our
2     DEA store checklist.
3 BY MR. POWERS:
4     Q. Anything else?
5     A. There could be more, I just don't
6 remember.
7     Q. As a result of the 2009
8 settlement, did Rite Aid make any changes with
9 regards to its operations as a controlled
10 substance distributor?
11        MS. McENROE: Objection to form.
12        THE WITNESS: We did not. The
13     Rite Aid distribution center was not
14     involved in the settlement agreement.
15 BY MR. POWERS:
16     Q. I think you mentioned -- you
17 referred to it as a counting on a quarterly basis
18 of hydrocodone.
19     What does that mean?
20     A. That means that every quarter
21 Rite Aid would count the hydrocodone that we had
22 on our shelves and balance it to make sure that
23 the inventory was correct.
24     Q. When you say on the shelves, you

Page 69

1 mean on the shelves at the individual pharmacies?
2     A. In the stores, yes.
3     Q. What is the DEA computer-based
4 training that you referred to earlier?
5     A. It is training for pharmacists
6 to -- in all aspects of DEA guidance related to
7 222 Forms, everything that -- what to look for
8 for a prescription. Everything that would be
9 required.
10     Q. And that DEA computer-based
11 training, was that only for the individual Rite
12 Aid stores?
13        MS. McENROE: Object to the form.
14        THE WITNESS: It was.
15 BY MR. POWERS:
16     Q. So we were talking earlier about
17 resources outside of Rite Aid that you used in
18 your position in government affairs to formulate
19 guidance on DEA regulations. Right?
20     A. Correct.
21     Q. And you mentioned outside
22 counsel, which we've talked about.
23     Is there anyone else outside of
24 Rite Aid that you used to formulate guidance

Page 70

1 about DEA regulations?

2     A.    I would utilize trade groups.

3     Q.    Which trade groups?

4     A.    The National Association of Chain

5 Drug Stores, the individual state associations,

6 Maryland Association of Chain Drug Stores. There

7 are retail groups or -- in each of the states

8 that would work on legislation or regulation and

9 formulate information in how it should be rolled

10 out.

11     Q.    Besides those trade groups you

12 just mentioned, anything else?  Any other parties

13 or organizations outside of Rite Aid that you

14 used to formulate guidance about controlled

15 substances in Rite Aid?

16     A.    The National Association of

17 Boards of Pharmacy.

18     Q.    Did you ever consult guidance

19 from the Healthcare Distributors Alliance, the

20 HDA?

21     A.    Never.

22     Q.    How about the HDMA, I believe is

23 the prior name?

24     A.    No.

Page 71

1     Q.    So besides outside counsel and

2 the trade groups you mentioned, did you rely on

3 any other outside individuals or groups to help

4 you formulate guidance about the rules and

5 regulations surrounding controlled substances?

6     A.    Not that I can recall.

7     Q.    To be clear, this is for the

8 entire time that you were working in the

9 government affairs office between 1995 and 2006?

10     A.    Yes.

11     Q.    And your answer is the same?

12     A.    Yes.

13     Q.    When you started in the

14 government affairs office in 1995, what efforts

15 did you make to make sure that Rite Aid was in

16 compliance with the current and existing

17 regulations regarding controlled substances at

18 that point?

19     MS. McENROE:  Objection to form.

20     You may respond.

21     THE WITNESS:  We reviewed the

22     policies and procedures that were in

23     place.  We looked at organization in our

24     stores.  We looked at distribution

Page 72

1 centers as far as their compliance.  So

2 we did an overall view of our entire

3 processes.

4 BY MR. POWERS:

5     Q.    When you say "we" in your

6 previous answer, who are you referring to?

7     A.    Jim Krahulec, myself, pharmacy

8 operations.

9     Q.    Who from pharmacy operations?

10     A.    It would have been Scott Jacobson

11 or Mike Podgurski.

12     Q.    How did you do your review of the

13 policies and procedures that were in place?

14     A.    We looked at issues that had come

15 in from various state inspection notices.  If

16 there was a recordkeeping allegation from a state

17 board of pharmacy, we looked at those and

18 determined what some of the more prevalent ones

19 were, ones that we were seeing at that point.

20 And then we developed different tools that our

21 pharmacists could use to organize recordkeeping

22 and maintain proper compliance.

23     Q.    You also said you looked at the

24 organization in your stores, what did you mean by

Page 73

1 that?

2     A.    What we were finding was that one

3 store would keep invoices in one location in one

4 drawer and the other store would keep them in the

5 back room with other documentation.  And it was

6 not -- there was not consistency throughout.  So

7 at that point then, we developed a DEA

8 recordkeeping box that we sent to the store on a

9 yearly basis where there are specific folders for

10 all of the required DEA documents.  So that in

11 every store, all the documents are in one place

12 and can be located.

13     Q.    Is that a physical box you --

14     A.    It's a physical box, yes.

15     Q.    You also said that you looked at

16 the distribution centers as far as their

17 compliance.

18     What do you mean by that?

19     A.    I mean, we looked at the

20 distribution centers from the standpoint of was

21 the cage secure, were there good security

22 policies and procedures in place.  Were there

23 criminal background checks.  Was the alarm system

24 working.  Were the SOPs correct.

Page 74

1    Q.    How did you determine whether the
2  SOPs were correct?
3    A.    I got together with logistics,
4  and we had a discussion and went through that,
5  through the SOPs.
6    Q.    And logistics, that would have
7  been Chris Belli or Kevin Mitchell?
8    A.    Yes.
9    Q.    Did you do a periodic review of
10 the SOPs for the distribution centers?
11   A.    I did not.  They were done by our
12 IA team, internal assurance team, and by the
13 logistics Chris Belli/Kevin Mitchell team.
14   Q.    And, sorry, we've been saying
15 SOPs.  We should be clear for the record.
16          We're talking about standard
17 operating procedures?
18   A.    Correct.
19   Q.    Before you reviewed the company's
20 SOPs for compliance, how did you familiarize
21 yourself with what was required from a compliance
22 perspective?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  I was pretty

Page 75

1    familiar in my role as the PDM, pharmacy
2    district manager, in my role as the
3    pharmacy division manager with compliance
4    with DEA rules and regulations.  From the
5    standpoint of, that was -- at that point,
6    you were also responsible for that in the
7    stores.
8          From the distribution side, it
9    was sort of a read and learn and
10   understand the rules and regulations.
11 BY MR. POWERS:
12   Q.    So you just read the rules
13 yourself regarding the rules and regulations
14 about dispensing controlled substances; is that
15 right?
16   A.    Or I'd interact with the industry
17 leaders to have discussions about what they were
18 doing, the different best practices that were out
19 there.
20   Q.    Who were the industry leaders you
21 interacted with?
22   A.    People at NACDS, people at the
23 Maryland Association of Chain Drug Stores.
24   Q.    Anyone else at Rite Aid that you

Page 76

1  consulted about the policies and procedures
2  regarding the distribution of controlled
3  substances?
4    A.    Back in the -- when I first came,
5  1995, Jim Krahulec was well versed.  And he was
6  my mentor, so I learned a lot from him as well.
7    Q.    Did you ever update your
8  understanding of what was required under the
9  Controlled Substances Act or other regulations
10 regarding controlled substances?
11          MS. McENROE:  Objection to form.
12          THE WITNESS:  Can you repeat the
13   question?
14 BY MR. POWERS:
15   Q.    Sure.
16          Besides when you started in the
17 government affairs office in 1995, what other
18 actions did you take to familiarize yourself with
19 the rules and regulations regarding the
20 distribution of controlled substances?
21   A.    I would attend various
22 conferences throughout the country to attain
23 knowledge.
24   Q.    Besides the conferences, what

Page 77

1  else did you do to familiarize yourself with
2  rules and regulations surrounding the
3  distribution of controlled substances?
4    A.    That was pretty much it.
5    Q.    Did you do any periodic review of
6  the Rite Aid policies and procedures regarding
7  distribution during your time in the government
8  affairs office?
9    A.    I may have.  That responsibility
10 to put those into the distribution center rested
11 with Chris and Kevin to work with the SOPs.  That
12 was their primary responsibility.
13   Q.    So it's your testimony that the
14 logistics department was primarily responsible
15 for the Rite Aid policies regarding compliance
16 with the rules and regulations about the
17 distribution of controlled substances; is that
18 right?
19          MS. McENROE:  Objection.
20          THE WITNESS:  They were the
21   experts of logistics and what went on at
22   the distribution centers.  So, yes, they
23   were responsible for the SOPs.  I myself
24   would coordinate with them to review the

Page 78

1    SOPs and determine if they were correct.
2  BY MR. POWERS:
3    Q.    In determining whether those SOPs
4  were correct, what did you rely on?
5    A.    DEA rule and regulation, various
6  industry resources.
7    Q.    Did anyone else at Rite Aid help
8  you determine whether those regulations were
9  correct?
10    A.    Mr. Krahulec in the beginning.
11  And then once I had a better knowledge base,
12  primarily myself.
13    Q.    And you mentioned that you went
14  to some conferences about the rules and
15  regulations regarding controlled substance
16  distribution.
17        What were those conferences?
18    A.    I went to a DEA conference, a
19  pharmacy diversion awareness conference where
20  that was discussed.
21        So various DEA conferences.
22    Q.    When you say DEA conferences, are
23  you talking about conferences put on by the DEA?
24    A.    Yes.

Page 79

1    Q.    And you also mentioned a
2  diversion awareness conference.
3        What was that?
4    A.    That was the DEA also.
5    Q.    Do you remember how many DEA
6  conferences you actually attended?
7    A.    From 1995 to present?
8    Q.    Yes.
9    A.    12, 15.
10    Q.    And before you started working in
11  the government affairs office, do you know how
12  Rite Aid ensured compliance with the rules and
13  regulations regarding the distribution of
14  controlled substances?
15        MS. McENROE:  Objection to form.
16        THE WITNESS:  Could you state
17    that again?
18  BY MR. POWERS:
19    Q.    Sure.
20        Before you started working in the
21  government affairs office, do you know how Rite
22  Aid ensured compliance with the rules and
23  regulations regarding the distribution of
24  controlled substances?

Page 80

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  I do not.
3  BY MR. POWERS:
4    Q.    During your time in the
5  government affairs office, did you implement any
6  new procedures or policies regarding the
7  distribution of controlled substances by Rite
8  Aid?
9        MS. McENROE:  Objection.
10        THE WITNESS:  I myself did not
11    implement any policies and procedures for
12    the distribution of controlled
13    substances.  The logistics team may have
14    done that, something I was not aware of.
15    But I myself did not implement any.
16  BY MR. POWERS:
17    Q.    Do you know if the logistics team
18  implemented any new policies or procedures
19  regarding the distribution of controlled
20  substances during your time in the government
21  affairs office?
22        MS. McENROE:  Objection.
23        THE WITNESS:  I believe they did.
24  BY MR. POWERS:

Page 81

1    Q.    What were those procedures, new
2  procedures and policies?
3    A.    A lot around implementing
4  upgraded camera systems, upgrading cages,
5  upgrading picking directions.
6    Q.    Anything else?
7    A.    Those are the ones that come to
8  mind.
9    Q.    When you say "upgrading picking
10  directions," what do you mean by that?
11    A.    There were various pick machines
12  that were in the distribution center.  And in
13  order to be -- have orders more accurate, they
14  would develop upgrades to those machines so that
15  the actual people that pick the product in the DC
16  had a much easier job.
17    Q.    And you said it was possible that
18  the logistics department implemented policies and
19  procedures for the distribution centers that you
20  were not aware of; is that right?
21    A.    That is correct.
22    Q.    Did the logistics department have
23  to get your approval or -- let me phrase that a
24  different way.

Page 82

1 Did the logistics department have
2 to get government affairs department approval
3 before implementing a new policy or procedure at
4 the distribution centers?
5 MS. McENROE: Objection to form.
6 THE WITNESS: Typically they
7 would get approval, yes.
8 BY MR. POWERS:
9 Q. Was it required?
10 MS. McENROE: Objection to form.
11 THE WITNESS: I don't know that
12 it was required. That was just our
13 process.
14 BY MR. POWERS:
15 Q. And Rite Aid distributed
16 controlled substances up until late 2014.
17 Correct?
18 A. That's correct.
19 Q. And the products that Rite Aid
20 distributed included hydrocodone combination
21 products. Right?
22 A. That is correct.
23 Q. When Rite Aid was distributing
24 controlled substances -- actually, let me back up

Page 83

1 a second here.
2 When we're talking about Rite
3 Aid's distribution, can we agree that we're just
4 talking about the time period up until late 2014
5 when Rite Aid was distributing controlled
6 substances?
7 A. Yes.
8 Q. Okay. When Rite Aid was
9 distributing controlled substances, did Rite Aid
10 have a suspicious order monitoring program?
11 A. We did.
12 Q. When has that suspicious order
13 monitoring program been in place since?
14 A. The suspicious order monitoring
15 program has been in place since 1995, when --
16 that I became aware of it. It could have been in
17 place prior to that, but...
18 Q. To the best of your knowledge,
19 the suspicious order monitoring program was in
20 place from 19 -- at least 1995 until 2014?
21 A. Yes.
22 Q. How did you familiarize yourself
23 with the suspicious order monitoring program when
24 you first started in the government affairs

Page 84

1 office?
2 MS. McENROE: Objection to form.
3 THE WITNESS: I read the SOPs and
4 reviewed the policies and procedures and
5 became aware of the different aspects of
6 the suspicious order monitoring program.
7 BY MR. POWERS:
8 Q. Did the suspicious order
9 monitoring program change at all between when you
10 first became aware of it and when Rite Aid
11 stopped distributing controlled substances?
12 MS. McENROE: Objection to form.
13 THE WITNESS: It did change.
14 BY MR. POWERS:
15 Q. How did it change?
16 A. We added another -- a component
17 of -- we had an asset protection that would
18 monitor part of our suspicious order monitoring
19 program. And we upgraded and updated asset
20 protection monitoring of our -- portion of our
21 suspicious order monitoring program.
22 Q. When did that happen?
23 A. I would say around 2010.
24 Q. And what was the nature of that

Page 85

1 upgrade?
2 A. We got a new computer system that
3 asset protection used to -- for the detection of
4 theft and diversion called NaviScript/NaviCase.
5 And that particular system had a series of key
6 performance indicators that were monitored by
7 asset protection. Those key performance
8 indicators were previously monitored by another
9 system, but this was just an upgraded system.
10 Q. What was the previous system that
11 monitored the KPIs?
12 A. That was an internal system in
13 asset protection. I don't know the name of it.
14 Q. And the NaviCase/NaviScript
15 system you just talked about, that was to monitor
16 theft of controlled substances. Right?
17 MS. McENROE: Objection, form.
18 THE WITNESS: That was to monitor
19 theft, but the other key performance
20 indicators also monitored ordering, cycle
21 counts. There were 90 KPIs.
22 BY MR. POWERS:
23 Q. What do you mean by cycle counts?
24 A. A cycle count is when a

Page 86

1 pharmacist in a store goes into the system and
2 says that we have -- they have 96 tablets on the
3 shelf. And what happens is the system says
4 they're supposed to have 100. And they count
5 down to 96 and say, okay, I now have 96 instead
6 of the 100.
7 Q. Did the NaviScript/NaviCase
8 system keep track of the inventory at the
9 distribution centers?
10 MS. McENROE: Objection to form.
11 THE WITNESS: Can you phrase the
12 question differently?
13 BY MR. POWERS:
14 Q. It sounds to me like you were
15 talking about the NaviScript/NaviCase system with
16 regards to the individual stores. Right?
17 A. Yes.
18 Q. Did the NaviScript/NaviCase
19 system have any functionality with regards to the
20 distribution centers?
21 MS. McENROE: Objection to form.
22 THE WITNESS: The Navi system
23 from a distribution standpoint, it did
24 not maintain inventory, but it maintained

Page 87

1 order data from the distribution center
2 to the stores.
3 BY MR. POWERS:
4 Q. So the Navi -- you said the Navi
5 system could see what was being sent from the
6 distribution center to the individual stores; is
7 that right?
8 A. Yes.
9 Q. Do you know who designed Rite
10 Aid's suspicious order monitoring system
11 originally?
12 A. I do not.
13 Q. Did you personally make any
14 changes to the Rite Aid suspicious order
15 monitoring program?
16 MS. McENROE: Objection to form.
17 THE WITNESS: I don't recall
18 making any changes. From my perspective,
19 again, I may have reviewed some changes
20 that logistics were doing, but I myself,
21 I don't recall making any changes.
22 BY MR. POWERS:
23 Q. That suspicious order monitoring
24 system that Rite Aid had used thresholds. Right?

Page 88

1 MS. McENROE: Objection to form.
2 THE WITNESS: That was one of the
3 components.
4 Oops, sorry.
5 BY MR. POWERS:
6 Q. And the thresholds were set at
7 5,000 dosage units, 5,000 dosage units for each
8 national drug code. Right?
9 MS. McENROE: Objection to form.
10 THE WITNESS: 5,000 dosage units
11 per each NDC per order.
12 BY MR. POWERS:
13 Q. Per order.
14 And when you say "per order,"
15 that's per order by each individual pharmacy.
16 Right?
17 A. Yes.
18 Q. And you said the thresholds was
19 one component of the suspicious order monitoring
20 system.
21 What were the other components?
22 A. Another component was our
23 ordering process and an algorithm that was
24 established by Rite Aid to submit orders to the

Page 89

1 distribution center from our corporate office,
2 based on an individual store's movement.
3 Q. The ordering process you're
4 talking about there, is that the auto
5 replenishment system?
6 A. It is.
7 Q. So the auto replenishment system
8 is part of your suspicious order monitoring
9 program?
10 A. It is.
11 Q. How long has the auto
12 replenishment system been in place for?
13 A. As far back as I know, as I can
14 recall.
15 Q. Even as your time as a
16 pharmacist?
17 A. I don't know that.
18 Q. But --
19 A. Definitely since 1995.
20 Q. How is the auto replenishment
21 system used in the Rite Aid suspicious order
22 monitoring system?
23 MS. McENROE: Objection to form.
24 THE WITNESS: It is utilized to

Page 90

1  generate an order for an individual
2  store.
3       From the suspicious order
4  monitoring process, we know our stores'
5  volume, we know our stores' dispensing,
6  and we're able to take ███████ worth of
7  that dispensing data, place an order so
8  that there's the correct amount on hand,
9  put a slight override into that and
10  place -- provide that to our stores to
11  place an order.
12       An order cannot go over that
13  algorithm coming out of -- from the --
14  from the order going to the distribution
15  center.
16  BY MR. POWERS:
17       Q.    How is the limit of the -- just
18  the auto replenishment system different than the
19  threshold limit?
20           MS. McENROE:  Objection to form.
21           THE WITNESS:  The automated
22  system is different in that it generates
23  an order based on that store's need.
24       When you get to the threshold of

Page 91

1  the 5,000 dosage units, that threshold
2  was established as another parameter as
3  part of the process.  So it is quite
4  possible that an order could be placed
5  that met the algorithm that was for 5,100
6  tablets to be ordered and the threshold
7  system then at that point in time would
8  kick in and drop that down to 5,000
9  tablets.
10  BY MR. POWERS:
11       Q.    But the 5,000 dosage unit
12  threshold, that's not in any electronic form, is
13  it?
14       A.    The 5,000 threshold is based on
15  the pickers at the distribution center.
16       Q.    So the auto replenishment system
17  could generate an order that was above the 5,000
18  unit thresholds.  Right?
19       A.    That is correct.
20       Q.    And it would then fall on the
21  responsibility of the individuals in the
22  distribution center to then enforce that 5,000
23  dosage unit threshold.  Right?
24       A.    That is correct.

Page 92

1       Q.    How does the auto replenishment
2  system identify, report or not ship suspicious
3  orders?
4           MS. McENROE:  Objection to form.
5           THE WITNESS:  The auto
6  replenishment system does not generate a
7  suspicious order.
8  BY MR. POWERS:
9       Q.    It is impossible for the auto
10  replenishment system to generate a suspicious
11  order; is that right?
12           MS. McENROE:  Objection to form.
13           THE WITNESS:  Based on the
14  algorithm and what is built into it,
15  there's not a suspicious order that's
16  generated by the order system.
17  BY MR. POWERS:
18       Q.    My question, though, is, is it
19  impossible for the auto replenishment system to
20  generate a suspicious order?
21           MS. McENROE:  Objection to form,
22  asked and answered.
23           THE WITNESS:  Could you ask the
24  question again?

Page 93

1  BY MR. POWERS:
2       Q.    Sure.
3       Is it impossible for the Rite Aid
4  auto replenishment system to generate a
5  suspicious order?
6           MS. McENROE:  Objection to form.
7           THE WITNESS:  Yes.
8  BY MR. POWERS:
9       Q.    The auto replenishment system you
10  said was based on the need of the individual
11  pharmacy.  Right?
12       A.    Correct.
13       Q.    What do you mean when you say by
14  need?
15       A.    Based on what is needed to
16  service our patient base, based on that store's
17  previous movement of a particular product.
18       So you would have a drug.  We
19  would look at that drug and look at ██████
20  worth of data.  Look at the highest week of that
21  ███████ worth of data and determine a percentage
22  above the highest order that the store could
23  generate.  That would go through the system and
24  be -- then would go to the store to be reviewed.

Page 94

1    Q.    And the data you're talking
2  about, that is dispensing data.  Right?
3    A.    Dispensing data.
4    Q.    And the dispensing data is simply
5  the amount of product that was sold at that
6  particular Rite Aid location.  Right?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  The amount of
9         product that was dispensed to our
10         patients, yes.
11  BY MR. POWERS:
12    Q.    So the auto replenishment system
13  doesn't look at who is writing the prescriptions
14  for those patients?
15         MS. McENROE:  Objection to form.
16         THE WITNESS:  It does not.
17  BY MR. POWERS:
18    Q.    It doesn't look at the amount of
19  controlled substances as opposed to the amount of
20  noncontrolled substances at that Rite Aid
21  location.  Right?
22         MS. McENROE:  Objection to form.
23         THE WITNESS:  It does not, but
24         the asset protection KPIs would look at

Page 95

1         that.
2  BY MR. POWERS:
3    Q.    The auto replenishment system
4  doesn't do anything to determine the medical need
5  for the individual patients, does it?
6         MS. McENROE:  Object to form.
7         THE WITNESS:  It does not.
8         Sorry.
9  BY MR. POWERS:
10    Q.    Have you ever heard of the term
11  "red flags of diversion"?
12         MS. McENROE:  Objection to form.
13         THE WITNESS:  I've heard of the
14         term "red flags."
15  BY MR. POWERS:
16    Q.    What is your understanding of the
17  term "red flags"?
18    A.    Red flags is when dispensing a
19  controlled substance prescription, a pharmacist
20  has a corresponding responsibility to make sure
21  that the prescription is dispensed for a valid
22  medical need in the course of the usual practice
23  of the prescription.  The pharmacist is to review
24  the prescription and look at various elements of

Page 96

1  the prescription to make sure that it is for a
2  valid medical reason.
3    Q.    What are the various elements of
4  the prescription to make sure that it is valid --
5  to make sure that it is valid for a medical
6  reason?
7    A.    You need to know the patient,
8  does the pharmacist know the patient.  You need
9  to know the prescriber, is the prescriber known
10  to the patient.  You would look at, as far as a
11  red flag, what is the distance between the
12  patient and the prescriber.
13         You would look at the original
14  hard copy prescription that's presented to you to
15  determine, does it look like it's a forgery.  Is
16  there watermarks on it or something that would
17  identify it as a fraudulent prescription.
18         You would look at the particular
19  type of prescription and prescriber to make sure
20  that it was a proper prescription.  Then you
21  could -- and if all of those were met, then at
22  that point the pharmacist would make the decision
23  to dispense the prescription.
24    Q.    How about payment in cash, was

Page 97

1  that a red flag of diversion?
2    A.    It could be.
3    Q.    Does the auto replenishment
4  system look at any of the red flags of diversion
5  you just discussed in your previous answer?
6         MS. McENROE:  Objection to form.
7         THE WITNESS:  It does not.
8  BY MR. POWERS:
9    Q.    So if those red flags of
10  diversion that we just talked about were
11  occurring, forged prescriptions, paying in cash,
12  things like that, the auto replenishment system
13  would not have any way of detecting that.  Right?
14         MS. McENROE:  Objection to form.
15         THE WITNESS:  It would not.
16  BY MR. POWERS:
17    Q.    You also talked about the auto
18  replenishment system relying on ████ of data.
19         Is that just the dispensing data?
20    A.    Yes.
21    Q.    And that's just purely the volume
22  of product dispensed.  Right?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  Yes.  Dispensed to



Page 98

1    the patient.
2 BY MR. POWERS:
3    Q.    The 5,000 dosage unit threshold
4 that the distribution center -- well, let me back
5 up there.
6        The 5,000 dosage unit threshold
7 was used by the distribution centers; right?
8    A.    That is correct.
9    Q.    And that 5,000 dosage unit
10 threshold was the same for every distribution
11 center?
12    A.    It was.
13    Q.    And it was -- that 5,000 dosage
14 unit threshold was the same for every store that
15 the distribution centers distributed to.
16 Correct?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  It was.
19 BY MR. POWERS:
20    Q.    Were there any exceptions to that
21 5,000 dosage unit threshold?
22    A.    There were exceptions.
23    Q.    So besides some of the stores
24 with exceptions, there was a generic threshold

Page 99

1 limit for all Rite Aid stores?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  Yes.  5,000 per
4    NDC.
5        -  -  -
6        (Deposition Exhibit No. Rite
7    Aid-Hart-1, Distribution/Customer Support
8    Center, DEA Regulatory Guidelines,
9    Policy, Bates stamped
10    Rite_Aid_OMDL_0046157 through
11    Rite_Aid_OMDL_0046226, was marked for
12    identification.)
13        -  -  -
14 BY MR. POWERS:
15    Q.    I'm going to hand what's been
16 marked as Rite Aid-Hart Exhibit 1.  It's a
17 document, somewhat lengthy, but I'm going to
18 direct your attention to a particular page in it.
19 The Bates number on the document is
20 Rite_Aid_OMDL_0046157 through 46226.

Case: 1:17-md-02804-DAP Doc #: 1978-1 Filed: 07/24/19 27 of 70. PageID #: 227369



Page 102

Page 104

Page 103

Page 105



Page 106

Page 107

Page 108

Page 109

**Page 110**



**Page 112**

1 or procedures about how the distribution center
2 was supposed to determine whether an order was
3 suspicious?
4　　　　MS. McENROE:　Objection to form.
5　　　　THE WITNESS:　There are policies
6　　　and procedures to determine a suspicious
7　　　order, yes.
8 BY MR. POWERS:
9　　　Q.　　You were talking about the
10 distribution center looking at the history of the
11 order.
12　　　A.　Uh-huh.
13　　　Q.　　Was there any guidance given to
14 the distribution centers to determine what would
15 be used to determine, regarding order history,
16 what was suspicious?
17　　　　MS. McENROE:　Objection, form.
18　　　　THE WITNESS:　Can you repeat the
19　　　question?
20 BY MR. POWERS:
21　　　Q.　Sure.
22　　　You said the distribution center
23 employees knew the stores they were picking for.
24 Right?

**Page 111**

1　　　A.　I do.
2　　　Q.　　Is the distribution center the
3 one who is determining whether the order is
4 suspicious or not?
5　　　　MS. McENROE:　Objection to form.
6　　　　THE WITNESS:　They are.
7 BY MR. POWERS:
8　　　Q.　　How do they determine whether the
9 order is suspicious or not?
10　　　　MS. McENROE:　Objection, form.
11　　　　THE WITNESS:　They would look at
12　　　the quantity of the order.　They would
13　　　look at the -- at the distribution
14　　　center, they know the previous store's
15　　　history from picking the order every
16　　　week.　They may see a store that has
17　　　ordered five of a particular item.　And
18　　　then one week off, there could be 15
19　　　ordered.　So at that point they would
20　　　say, this store always gets five.　Let's
21　　　call the store and determine if they
22　　　really wanted 15.
23 BY MR. POWERS:
24　　　Q.　　Were there any written policies

**Page 113**

1　　　A.　Correct.
2　　　Q.　　And they gained that knowledge
3 through picking for those stores periodically
4 during their jobs.　Right?
5　　　　MS. McENROE:　Objection to form.
6　　　　THE WITNESS:　Correct.　They pick
7　　　a store once a week.
8 BY MR. POWERS:
9　　　Q.　　So besides just being the one who
10 picks that store every week, was there any way --
11 any other way that the distribution center
12 employees were supposed to determine whether or
13 not an order was suspicious?
14　　　　MS. McENROE:　Objection to form.
15　　　　THE WITNESS:　To the best of my
16　　　knowledge, no.
17 BY MR. POWERS:
18　　　Q.　　And in paragraph 4 here, it says,
19 "Any order which is determined to be suspicious
20 will be immediately reported to the corporate
21 office."
22　　　Who at the corporate office would
23 the suspicious orders be reported to?
24　　　A.　That would be me.

Page 114

1  Q.  Were any suspicious orders ever
2  reported to you at the corporate office?
3  A.  There were none reported to me.
4  Q.  And to be clear, you never
5  received a report of a suspicious order your
6  entire time working in the corporate office from
7  1995 through 2018.  Correct?
8  A.  I did not.
9  Q.  Going down to paragraph 5, it
10 says, if a suspicious order is reported to
11 corporate, the corporate government affairs will
12 determine whether to "ship" or "do not ship."
13     Do you see that?
14 A.  I do.
15 Q.  And this is the same corporate
16 office that we just referred to, the government
17 affairs office.  Right?
18 A.  That is correct.
19 Q.  So that would be you?
20 A.  That would be me.
21 Q.  How would you make the
22 determination of whether to ship or not ship?
23 A.  There would be a number of
24 factors that would come into play.  The very

Page 115

1  first factor that I would look at is if it was an
2  auto ship order, that it came through the
3  algorithm and that was what the algorithm
4  provided.  That would be a key one.
5     A second one would be to look at
6  the size of the order, to determine if the
7  unusual size of it was due to something at the
8  pharmacy that was placing the order, if there was
9  something unusual happening at that pharmacy.
10 Q.  Anything else you would look at?
11 A.  That would be it.
12 Q.  Was there any written policy or
13 procedure about how to make that decision about
14 whether to ship or not ship?
15 A.  To the best of my knowledge, no.
16 Q.  So the factors you just testified
17 about that you would use to determine whether to
18 ship or not ship, those were just ones that you
19 yourself personally came up with.  Right?
20 A.  Yes.
21     MS. McENROE:  Objection to form.
22     THE WITNESS:  Sorry.
23 BY MR. POWERS:
24 Q.  What were those based on, those

Page 116

1  factors based on?
2  A.  Based on my knowledge of the
3  industry, based on my years of experience having
4  dealt with the DEA for a period of -- for a long
5  period of time, and knowing how to review a store
6  as far as its book of business, going way back to
7  even my days as the pharmacy district manager in
8  the Baltimore market.
9  Q.  But to be clear, you never had to
10 make the decision whether to ship or not ship
11 because you never received any report of a
12 suspicious order.  Right?
13 A.  That is correct.
14 Q.  And going down to paragraph 6, it
15 says, "All discussions, investigations and
16 reports will be maintained in the file designated
17 'Suspicious Orders.'"
18     Do you see that?
19 A.  I do.
20 Q.  Am I correct to assume that there
21 was no file designated suspicious orders because
22 there were no suspicious orders?
23 A.  You are correct.
24 Q.  Who would keep that file, if

Page 117

1  there was one?
2  A.  Our office would maintain a file.
3  And there would be a file maintained at the
4  individual distribution center.
5  Q.  How did you ensure that the
6  policy we just talked about in Exhibit 1
7  reflected on page 46179 was followed at the
8  distribution centers?
9     MS. McENROE:  Objection to form.
10    THE WITNESS:  The distribution
11    center has constant monitoring.  They
12    have audits completed by our internal
13    audit group and by asset protection, and
14    by logistics and transportation, where
15    there are individual groups that go into
16    each of the distribution centers once a
17    year on behalf of Rite Aid and have a
18    checklist of compliance to review at the
19    distribution centers.
20    So there is a review done to make
21    sure that the processes are being
22    followed related to suspicious orders,
23    security.  All of the policies and
24    procedures are reviewed and there is a

Page 118

1    specific checklist completed.
2  BY MR. POWERS:
3    Q.    Did you personally have any
4  responsibility for ensuring compliance with the
5  excessive or suspicious order monitoring
6  procedure?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  Those particular
9        checklists were, again, completed by
10       logistics.
11 BY MR. POWERS:
12   Q.    But my question is, did you have
13 any personal responsibility for ensuring the
14 distribution center compliance with the excessive
15 order monitoring or suspicious order monitoring
16 procedure?
17       MS. McENROE:  Objection to form.
18       THE WITNESS:  I had
19       responsibility for reviewing the policies
20       and procedures and the checklists and
21       that, but the sole responsibility as far
22       as like the monitoring and if there was
23       something that needed to be corrected or
24       something along those lines, that would

Page 119

1  rest with logistics.
2        MS. McENROE:  Hey, Will, we've
3  been going about an hour.  When you find
4  a good time for a break, that would be
5  appreciated.
6        MR. POWERS:  Yeah, we can take a
7  break now.  That's fine.
8        MS. McENROE:  Great.  Thank you.
9        THE VIDEOGRAPHER:  Going off the
10 record at 11:41 a.m.
11       - - -
12 (A recess was taken from
13 11:41 a.m. to 11:58 a.m.)
14       - - -
15       THE VIDEOGRAPHER:  We're back on
16 the record at 11:58 a.m.
17 BY MR. POWERS:
18   Q.    Welcome back, Ms. Hart.  I'm
19 going to hand you what's been marked as Rite
20 Aid-Hart Exhibit 2.  It's, once again, a large
21 document, but I'm only going to talk to you about
22 one page.  It is Bates number
23 Rite_Aid_OMDL_0014804 through 14873.  Take a look
24 at that.

Page 120

1        - - -
2        (Deposition Exhibit No. Rite
3  Aid-Hart-2, Rite Aid Distribution Center
4  DEA Regulatory Guidelines,
5  Rite_Aid_OMDL_0014804 through
6  Rite_Aid_OMDL_0014874, was marked for
7  identification.)
8        - - -
9        THE WITNESS:  Thank you.
10 BY MR. POWERS:



Page 122



Page 124

8    Q.    You can put those exhibits to the
9    side.
10        I'm going to hand you what's been
11    marked as Hart Exhibit 3.  The Bates number on
12    this exhibit is Rite_Aid_OMDL_0015079 through
13    15081.
14            - - -
15        (Deposition Exhibit No. Rite
16    Aid-Hart-3, Controlled Drug Above Average
17    Order Monitoring Program, Bates stamped
18    Rite_Aid_OMDL_0015079 through
19    Rite_Aid_OMDL_0015081, was marked for
20    identification.)
21            - - -
22    BY MR. POWERS:
23    Q.    Take a look at that.
24    A.    (Reviewing document.)

Page 123

Page 125



Page 126

Page 128

Page 127

Page 129



Page 130

Page 131

Page 132

Page 133

Highly Confidential - Subject to Further Confidentiality Review





Page 138

Page 140

4         - - -
5         (Deposition Exhibit No. Rite
6    Aid-Hart-4, Pharmacy Replenishment System
7    Store Order History, Bates stamped
8    Rite_Aid_OMDL_0015302 through
9    Rite_Aid_OMDL_0015307, was marked for
10   identification.)
11        - - -
12   BY MR. POWERS:
13       Q.    I'm going to hand you what's been
14   marked as Hart Exhibit 4.  It is a document that
15   is Bates labeled Rite_Aid_OMDL_0015302 through
16   15307.  Take a look at that.
17       A.    Thank you.
18        MS. McENROE:  Just for the
19   record, Will, so that I'm not confusing
20   myself, I agree the Bates range goes that
21   direction.
22        Do you know how this was produced
23   together with an email behind a document?
24        MR. POWERS:  I believe this Bates

Page 139

Page 141

1    range was identified by Rite Aid in its
2    interrogatory responses in this
3    particular order and range.
4         MS. McENROE:  Got it.  Okay.
5         THE WITNESS:  (Reviewing
6    document.)
7    BY MR. POWERS:

Highly Confidential - Subject to Further Confidentiality Review





Page 146

Page 147

Page 148

Page 149

Case: 1:17-md-02804-DAP Doc #: 1978-1 Filed: 07/24/19 39 of 70. PageID #: 227381
Highly Confidential - Subject to Further Confidentiality Review





Page 154

2          MS. McENROE:  Will, before we
3     move on, if it's a good time for lunch at
4     some point soon, if you'll let us know.
5          MR. POWERS:  Yeah.  Are you okay
6     to do one more document and then we can
7     break for lunch?
8          THE WITNESS:  Sure.
9          MR. POWERS:  Okay.  Actually, you
10    know what, let's just take a break now
11    for lunch.  That's fine.
12         MS. McENROE:  Great.
13         THE VIDEOGRAPHER:  Going off the
14    record at 12:38 p.m.
15              - - -
16         (A luncheon recess was taken from
17    12:38 p.m. to 1:30 p.m.)
18              - - -
19         THE VIDEOGRAPHER:  Back on the
20    record at 1:30 p.m.
21 BY MR. POWERS:
22    Q.    Welcome back, Ms. Hart.
23    A.    Thank you.
24    Q.    You understand that you're still

Page 155

1 under oath.  Right?
2    A.    I do.

Page 156

Page 157



Page 158

Page 160

12      Q.    I'm going to hand you what's been
13  marked as Hart Exhibit 5.
14             -  -  -
15         (Deposition Exhibit No. Rite
16      Aid-Hart-5, Excel Spreadsheet Printout,
17      Bates stamped Rite_Aid_OMDL_0013151, was
18      marked for identification.)
19             -  -  -
20         THE WITNESS:  Thank you.
21  BY MR. POWERS:
22      Q.    It's, once again, a multiple-page
23  document.  And it --
24         MS. McENROE:  Will, do you have

Page 159

Page 161

1    the Bates range for this?  And can you
2    represent it's a complete document?
3         MR. POWERS:  That's a good
4    question.
5         I can grab the Bates number
6    range.
7         I believe it's a native Excel
8    sheet, so --
9         MS. McENROE:  And this is the
10   full printout of the full thing?
11        MR. POWERS:  Yes.
12        The Bates number on the document
13   is Rite_Aid_OMDL_0013151.
14        MS. McENROE:  Thank you.
15        And are these different workbooks
16   from the Excel spreadsheet?  Because I'm
17   having a hard time.  It kind of looked
18   like the columns are cut off.
19        MR. POWERS:  I believe there are
20   different tabs in the spreadsheet.
21        MS. McENROE:  Okay.
22        MR. POWERS:  And I'll say right
23   now, I'm not going to get too much into
24   the substance of it, so I don't think



Page 162

1    that will matter about the different
2    cutoffs and things.
3         THE WITNESS:  (Reviewing
4    document.)
5    BY MR. POWERS:
6    Q.    I realize the formatting might be
7    a little bit off in Exhibit 5, but generally do
8    you recognize what is reflected in Exhibit 5?
9         MS. McENROE:  Objection to form.

Page 164

Page 163

Page 165

Case: 1:17-md-02804-DAP Doc #: 1978-1 Filed: 07/24/19 43 of 70. PageID #: 227385
Highly Confidential - Subject to Further Confidentiality Review



Page 166

Page 167

Page 168

Page 169



**Page 170**

[redacted]

4 BY MR. POWERS:

5     Q.   Did you make a record of those

6 communications at all?

7     A.   If I did, it would be in email.

8 Typically it may be a phone call.

9     Q.   So besides an email, there was

10 no -- there was no log of these communications

11 that you would have had with the distribution --

12 or, excuse me -- with the individual pharmacy

13 managers about particular stores that you had

14 questions about from the threshold log; is that

15 right?

16     A.   Pharmacy district managers. And

17 that is right.

18     Q.   Do you ever recall noticing

19 abnormalities of stores consistently ordering

20 hydrocodone products?

21     A.   There could be stores that

22 consistently ordered hydrocodone, of course.

23     Q.   But I'm saying in this process

24 we've just talked about, where you contact the

**Page 171**

1 pharmacy district manager as a result of the

2 threshold log, do you specifically recall any

3 instances where you contacted the pharmacy

4 district manager as a result of hydrocodone

5 orders?

6     A.   I don't remember specific to

7 hydrocodone.

8     Q.   How about specific to any opioid

9 product that Rite Aid distributed?

10     MS. McENROE: Objection to form.

11     THE WITNESS: I do not.

12 BY MR. POWERS:

13     Q.   Did you use these threshold logs

14 that you were reviewing quarterly to determine

15 whether particular orders were suspicious orders?

16     A.   I did not.

17     Q.   Do you know if Chris Belli and

18 Kevin Mitchell used these logs to determine if

19 orders were suspicious orders?

20     MS. McENROE: Objection to form.

21     THE WITNESS: I do not.

22 BY MR. POWERS:

23     Q.   To be clear, when you got these

24 threshold logs, these orders reflected in the

**Page 172**

1 threshold logs had already been shipped.

2 Correct?

3     A.   Yes.

4     Q.   I'm going to hand you what's been

5 marked as Rite Aid Exhibit Number -- or Rite

6 Aid_Hart Exhibit Number 6. It's a multi-page

7 document with the Bates number

8 Rite_Aid_OMDL_46227 through 46319. It's a pretty

9 long document. I'm just going to ask you

10 questions about the first page.

11     MS. McENROE: And, Will, do

12 you -- can you reference this is a

13 complete document?

14     MR. POWERS: I believe, once

15 again, it's the range that was identified

16 in the interrogatory responses.

17     - - -

18     (Deposition Exhibit No. Rite

19 Aid-Hart-6, Rite Aid Controlled Drug

20 Reporting Above Average Controlled Drug

21 Purchases Report, Bates stamped

22 Rite_Aid_OMDL_0046227 through

23 Rite_Aid_OMDL_0046319, was marked for

24 identification.)

**Page 173**

1     - - -

2     THE WITNESS: (Reviewing

3 document.)

4 BY MR. POWERS:

[redacted]





Page 178

BY MR. POWERS:

12
13     Q.     Are you familiar with the Buzzeo
14  company?
15     A.     I am.
16     Q.     Is it also called -- I don't know
17  how to pronounce this exactly, but Cegedim?
18     A.     I am.
19     Q.     It's the same company?
20     A.     (Witness nods head.)
21     Q.     You have to answer --
22     A.     Yes. I'm sorry, yes.
23     Q.     So if we just refer to it --
24  throughout our discussion, I can just refer to it

Page 179

1   as the Buzzeo company, we'll know what we're
2   talking about?
3       A.     That's fine, yes.
4       Q.     What kind of services did Buzzeo
5   offer?
6           MS. McENROE:  Objection to form.
7           THE WITNESS:  Ron Buzzeo offered
8   services related to regulatory compliance
9   with DEA rules and regulations.  There
10  was a wealth of services that Ron and his
11  company offered.
12          They offered a program to go into
13  pharmacies and review the pharmacies as
14  far as compliance with DEA rules and
15  regulations.  They offered programs on
16  suspicious order monitoring.  They
17  ordered up programs on how to detect
18  theft and diversion.  There was a wide
19  gamut of programs that they had offered
20  related to controlled substances.
21  BY MR. POWERS:
22      Q.     Did Rite Aid ever use any of
23  those Buzzeo services?
24      A.     I believe we did, yes.

Page 180

1       Q.     What was the extent of Rite Aid's
2   use of Buzzeo services?
3           A.     Our logistics teams utilized
4   Buzzeo services to review and inspect the
5   distribution centers for compliance.
6           Q.     Are you referring to audits when
7   you say review and inspect?
8               MS. McENROE:  Objection to form.
9               THE WITNESS:  Define what you
10          mean by "audit."
11  BY MR. POWERS:
12          Q.     There's been testimony that
13  Buzzeo company came in and audited the Perryman
14  Distribution Center at some point in time.
15          Is that the same thing you're
16  referring to when you say reviewed and inspected?
17              MS. McENROE:  Objection to form.
18              THE WITNESS:  I guess there's two
19          terms for the definition "audit."
20          There's an audit of everything in
21          the entire distribution center, from
22          paperwork to security to everything along
23          those lines.  And then there's an
24          individual audit for like specific

Page 181

1   controlled substances, so that you would
2   balance when a controlled substance came
3   in and when it came out to make sure that
4   all the drugs in the distribution center
5   were accounted for.  So, yes, I would say
6   that would be an audit.
7   BY MR. POWERS:
8       Q.     Did Buzzeo ever perform audits on
9   Rite Aid facilities, as you just described an
10  audit?
11      A.     I believe he did at the Perryman
12  Distribution Center.
13      Q.     Do you know when that was?
14      A.     I don't remember.
15      Q.     Were you involved in that process
16  of Buzzeo auditing the Perryman Distribution
17  Center?
18      A.     I was not.
19      Q.     You also mentioned that Buzzeo
20  had conferences.  Right?
21      A.     I don't think I mentioned
22  conferences.
23      Q.     Did Buzzeo have conferences?
24      A.     Buzzeo had conferences.



Page 182

1    Q.    Did you ever attend any of the
2  Buzzeo conferences personally?
3    A.    I may have attended one
4  conference when I first came into government
5  affairs, but that was pretty much the extent of
6  my attending Buzzeo conferences.
7    Q.    Do you know if anyone else from
8  Rite Aid attended Buzzeo conferences?
9    A.    Yes.  Members of the logistics
10  team would attend the conferences.
11    Q.    Who from the logistics team would
12  attend the Buzzeo conferences?
13    A.    It varied from year to year, but
14  typically either the person that was in the
15  position of Kevin Mitchell or Chris Belli.  I
16  know that occasionally the DEA coordinators would
17  attend the Buzzeo conference.
18    Q.    When you say "DEA coordinators,"
19  you're talking about distribution center
20  employees?
21    A.    Yes.
22    Q.    I am going to hand you what's
23  been marked as Exhibit 7.  It's a one-page email
24  Bates stamped Rite_Aid_OMDL_0050632.

Page 183

1          - - -
2          (Deposition Exhibit No. Rite
3      Aid-Hart-7, Email chain, top one dated
4      2010-11-16, Bates stamped
5      Rite_Aid_OMDL_0050632, was marked for
6      identification.)
7          - - -
8  BY MR. POWERS:

Page 184

Page 185

2          - - -
3          (Deposition Exhibit No. Rite
4      Aid-Hart-8, Email chain, top one dated
5      2010-11-17, Bates stamped
6      Rite_Aid_OMDL_0050633, was marked for
7      identification.)
8          - - -
9  BY MR. POWERS:
10    Q.    I'm going to hand you what's been
11  marked as Exhibit 8.  It is another email, one
12  page, with Bates number Rite_Aid_OMDL_0050633.

Page 186



9     Q.   And why did you send this to
10 Maggie Perritt?
11     Am I pronouncing her name
12 correctly?
13     A.   Yeah, you're pronouncing it
14 correctly.
15     Q.   Why did you send this email about
16 suspicious order monitoring to Maggie Perritt?
17     A.   Maggie Perritt was in pharmacy
18 operations and was knowledgeable of the
19 suspicious order monitoring algorithm and how the
20 system worked.
21     Q.   When you say "suspicious order
22 monitoring algorithm," what are you referring to?
23     A.   The algorithm for placing the
24 store's order through the -- looking at the 13

Page 187

1 weeks and then going a certain percentage above
2 to place the order.
3     Q.   Is that also the auto
4 replenishment system that we talked about before?
5     A.   Yes.
6     Q.   Why are you referring to it as a
7 suspicious order monitoring system?
8     MS. McENROE: Objection, form.
9     THE WITNESS: In this one, since
10     it's under suspicious monitoring, that's
11     why I was referring to that, is that --
12     because that was the title of this
13     particular meeting and she was bringing
14     that aspect of it into it.
15 BY MR. POWERS:
16     Q.   So Maggie Perritt was the expert
17 on the auto replenishment system that was invited
18 to the suspicious order monitoring meeting; is
19 that right?
20     MS. McENROE: Objection to form.
21     THE WITNESS: From the pharmacy
22     operations side, yes.
23 BY MR. POWERS:
24     Q.   And then we talked about Kevin

Page 188

1 Mitchell.
2     Who was Andrew Palmer?
3     A.   Andrew Palmer was a director in
4 asset protection at the time, I believe.
5     Q.   Why did you invite him to this
6 meeting about suspicious order monitoring?
7     A.   Because he was also key as part
8 of it as well. Him and his team were involved
9 with the analytics related to asset protection
10 and the analytics related to the key performance
11 indicators that were looked at from the asset
12 protection side.
13     Q.   How did you use the -- let me
14 back up.
15     Did you use the asset protection
16 analytics to determine whether orders were
17 suspicious or not?
18     MS. McENROE: Objection to form.
19     THE WITNESS: We used the asset
20     protection analytics to review orders and
21     look for abnormalities. We did not use
22     the analytics from asset protection prior
23     to an order being shipped.
24 BY MR. POWERS:

Page 189





Page 190

Page 191

Page 192

Page 193



Page 194

1    Aid-Hart-9, Email chain top one dated
2    Email dated 2010-04-11, Bates stamped
3    Rite_Aid_OMDL_0050628 through
4    Rite_Aid_OMDL_0050630, was marked for
5    identification.)
6            - - -
7 BY MR. POWERS:
8    Q.    This is Rite_Aid_OMDL_0050628
9 through 0050630.  Take a look at that.
10    A.    (Reviewing document.)

Page 196

24    Q.    You said that you determined that

Page 195

Page 197

1 the Rite Aid system was compliant.
2            How did you make that
3 determination?
4    A.    We looked at the different
5 components of it and determined that, because of
6 the Code of Federal Regulations, the DEA not
7 providing true guidance on a suspicious order
8 monitoring program, we met the -- we met the
9 requirements of that.
10    Q.    What do you mean by the DEA --
11 when you said the DEA did not provide true
12 guidance?
13    A.    The DEA did not put out what an
14 order -- a suspicious order monitoring program
15 should look at exactly.  They would say that it
16 should meet your book of business, but they never
17 put out a list of -- suspicious order monitoring
18 must be numbers 1 through 8 that you must have in
19 your program.
20    Q.    Did you look at anything else
21 besides the Code of Federal Regulations itself to
22 determine that your suspicious order monitoring
23 system was compliant?
24    A.    I don't remember if we did or

Page 198

1 not.
2    Q.    Did you look at any Buzzeo
3 materials to determine whether it was compliant
4 or not?
5    A.    We did not.
6    Q.    Did you look at other
7 distributors' suspicious order monitoring
8 programs to determine whether your Rite Aid
9 system was compliant?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  We did not, from
12    the perspective of our system was
13    different than other distributors and our
14    system was different from the Buzzeo
15    programs that were offered in the fact
16    that we were a closed system.  Part of
17    other distributors that are out there,
18    their system was know -- part of it is
19    know your customer, where obviously we
20    know our customer.  And so we looked at
21    it from that approach.
22 BY MR. POWERS:
23    Q.    When you say you know your
24 customer, are you referring to the customers as

Page 199

1 the individual Rite Aid stores?
2    A.    I am.
3    Q.    So in your view, you never got
4 DEA guidance on the sufficiency of Rite Aid's
5 suspicious order monitoring program; is that
6 right?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  We never got DEA
9    guidance.
10        -  -  -
11    (Deposition Exhibit No. Rite
12    Aid-Hart-10, Email dated 2011-06-03,
13    Bates stamped Rite_Aid_OMDL_0050634, was
14    marked for identification.)
15        -  -  -
16 BY MR. POWERS:



Page 200

Page 201

15        MS. McENROE:  When you got a
16 chance, we have been going about an hour,
17 for a quick break.
18        MR. POWERS:  Okay.  I got it.
19 Just a couple more questions on this
20 line.
21        MS. McENROE:  Sure.
22        -  -  -
23    (Deposition Exhibit No. Rite
24    Aid-Hart-11, Email chain, top one dated

Page 202

1    2002-05-14, Bates stamped

2    Rite_Aid_OMDL_0046770 through

3    Rite_Aid_OMDL_0046789, was marked for

4    identification.)

5         - - -

6  BY MR. POWERS:

7    Q.   I should have asked you.

8         Are you okay to go a few more

9  minutes?

10    A.   (Witness nods head.)

11    Q.   I'm going to hand you what's

12  marked Exhibit 11.  It's a document, an email and

13  attachment, Bates number Rite_Aid_OMDL_0046770

14  through 46789.

15    A.   (Reviewing document.)

16    Q.   Are you familiar with the

17  document in Exhibit 11?

18    A.   (Reviewing document.)

19    Q.   I'll say that I'm not going to

20  ask you direct questions about the email

21  attachment.

22         I'm just saying, are you

23  generally familiar with this document in

24  Exhibit 11?

Page 203



Page 204

Page 205

3    Q.   So were you asking whether or not

4  Chris Belli was setting up webinars and visits

5  with the Buzzeo folks?

6    A.   It could be.

7    Q.   Do you know if he ever did that?

8    A.   I don't remember.

9         Before we go back to -- go to

10  another document, may I go back and expand upon

11  an answer to a past question?

12    Q.   Sure.

13    A.   You had asked me the question,

14  had Rite Aid seeked guidance from the DEA or had

15  gotten any comments from the DEA.

16         The Perryman Distribution Center

17  was inspected by the DEA in 2005, 2009 and 2012.

18  As the standard operating procedures and the

19  suspicious order monitoring programs were

20  reviewed at all of those times, and there was no

21  deficiencies noted.  I just wanted to make that

22  part of the record, to say -- when I say we

23  didn't seek DEA guidance, but we had the DEA that

24  went to the distribution centers and did some

Page 206

1  [REDACTED]

2      Q.    Were you present at any of those

3  DEA audits?

4      A.    I was not.

5      Q.    So you don't have any firsthand

6  knowledge of those audits, do you?

7          MS. McENROE:  Objection to form.

8          THE WITNESS:  I have -- there's

9      various emails and communications from

10     the individuals that were at the DEA

11     audits.

12  BY MR. POWERS:

13     Q.    But you didn't talk to any of the

14  DEA agents who did the inspections, did you?

15     A.    Not that I remember.

16     Q.    So all the information that you

17  learned about those DEA audits was from someone

18  at the distribution center itself?

19     A.    That is correct.

20         MS. McENROE:  Will, before we

21     move to another document, can we take a

22     comfort break?

23         MR. POWERS:  Sure.

24         THE VIDEOGRAPHER:  Going off the

Page 207

1      record at 2:30.

2              - - -

3          (A recess was taken from

4      2:30 p.m. to 2:51 p.m.)

5              - - -

6          THE VIDEOGRAPHER:  Back on the

7      record at 2:51 p.m.

8  BY MR. POWERS:

9      Q.    Right before the break we were

10  talking about DEA inspectors.  Right?

11     A.    Yes.

12     Q.    Do you know any DEA inspectors

13  personally?

14     A.    I know a lot of DEA inspectors.

15     Q.    Do you know any DEA -- do you

16  know -- let me back up here.

17         Those DEA inspectors that you

18  know personally, do you know any of them who

19  audited the Perryman Distribution Center?

20     A.    I do know one of the DEA agents

21  that audited Perryman.

22     Q.    Who was that?

23     A.    Doug -- Don Tush.

24     Q.    How do you know Don Tush?

Page 208

1      A.    When I had the Baltimore market,

2  that was also Don's area from the DEA.  So he

3  would visit stores or seek prescriptions, things

4  like that.

5      Q.    When you say you had the

6  Baltimore market, what time period was that from?

7      A.    That was prior to 1995 when I

8  moved into the corporate office.

9      Q.    So you knew him from your time in

10  Baltimore.  Right?

11     A.    I did.

12     Q.    So that would have been sometime

13  before '95.  Right?

14     A.    Yes.

15     Q.    So you knew Don Tush for a while

16  before he audited the Perryman facility in 2012.

17  Right?

18         MS. McENROE:  Objection to form.

19         THE WITNESS:  Yes.  But then I

20     moved out of the area to Camp Hill.

21  BY MR. POWERS:

22     Q.    I'm going to hand you what's been

23  marked as Hart Exhibit 12.  It's some emails with

24  the Bates stamp Rite_Aid_OMDL_0013345 through

Page 209

1  3346.

2              - - -

3          (Deposition Exhibit No. Rite

4      Aid-Hart-12, Email chain, top one dated

5      2012-07-11, Bates stamped

6      Rite_Aid_OMDL_0013345 and

7      Rite_Aid_OMDL_0013346, was marked for

8      identification.)

9              - - -

10  BY MR. POWERS:

11     Q.    Take a look at that.

12     A.    (Reviewing document.)





Page 210

Page 212

```
 1    expertise.
 2  BY MR. POWERS:
 3        Q.   Do you know if the Buzzeo
 4  organization had former DEA employees in its
 5  employment?
 6        A.   They did.
 7        Q.   Rite Aid used the Buzzeo
 8  organization to perform some audits at the
 9  distribution center, at least the distribution
10  center in Perryman.  Right?
11        A.   We did.
12        Q.   So if Buzzeo did not have the
13  expertise, why did you allow -- why did Rite Aid
14  allow Buzzeo to come do audits?
15        MS. McENROE:  Objection.
16        THE WITNESS:  He was -- the
17        Buzzeo organization had knowledge of the
18        rules and laws and regulations.  And many
19        times, it's much better to have someone
20        with eyes from the outside come in and
21        look at your operations and do an audit
22        and review, as a second set of eyes
23        looking at your policies and procedures.
24  BY MR. POWERS:
```

Page 211

Page 213

```
14        Before the break, we were also
15  talking about the Buzzeo organization.  Correct?
16        A.   Correct.
17        Q.   And the Buzzeo organization had
18  expertise in things like suspicious order
19  monitoring.  Correct?
20        MS. McENROE:  Objection to form.
21        THE WITNESS:  I'm not sure that I
22        would say that they had expertise.  I
23        think they had presentations and
24        programs.  I'm not sure they had
```

```
 1        Q.   Do you consider Buzzeo's
 2  knowledge of the rules and laws and regulations
 3  not to be expertise?
 4        MS. McENROE:  Objection to form.
 5        THE WITNESS:  I think they are
 6        one of the industry-leading companies
 7        that have products that they sell to
 8        pharmacies and distribution centers to go
 9        out and do audits and accountabilities.
10        - - -
11        (Deposition Exhibit No. Rite
12        Aid-Hart-13, Email dated 2012-05-18,
13        Bates stamped Rite_Aid_OMDL_0046855
14        through Rite_Aid_OMDL_0046875, was marked
15        for identification.)
16        - - -
17  BY MR. POWERS:
18        Q.   I'm going to hand you what's been
19  marked Rite Aid-Hart Exhibit 13.  The Bates
20  number on this exhibit is Rite_Aid_OMDL_46855
21  through 46875.  It's an email and an attachment.
22        Why don't you take a look at
23  that.
24        A.   (Reviewing document.)
```



Page 214

1     Q.   Once again, this is a multi-page
2 document. I'm going to tell you, I'm going to
3 ask questions about the email and only particular
4 pages in the attachment, if that helps your
5 review.
6     A.   Pardon me. The first page and
7 what other pages?
8     Q.   Please feel free to review the
9 attachments to the extent you need to, but I will
10 only be asking questions about a couple
11 particular pages that we can -- that I can
12 identify to you when we get to them.
13     A.   Okay.
14     (Reviewing document.)

Page 216

Page 215

Page 217



Page 218

Page 220

Page 219

Page 221



Page 222

Page 223

Page 224

Page 225



Page 226

BY MR. POWERS:

Q.    I'm going to hand you what's been marked as Rite Aid Hart Exhibit 14.  It's an email exchange, 38054 through 38055.

Take a look at that.

- - -

(Deposition Exhibit No. Rite Aid-Hart-14, Email chain, top one dated 2012-12-18, Bates stamped Rite_Aid_OMDL_0038054 and Rite_Aid_OMDL_0038055, was marked for identification.)

- - -

Page 227

THE WITNESS:  (Reviewing document.)

BY MR. POWERS:

Page 228

Page 229

Highly Confidential - Subject to Further Confidentiality Review



Page 230

Page 232

Page 231

Page 233

Highly Confidential - Subject to Further Confidentiality Review





Page 238

Page 240

19        - - -
20        (Deposition Exhibit No. Rite
21    Aid-Hart-15, Email dated 2013-09-04,
22    Bates stamped Rite_Aid_OMDL_0046648
23    through Rite_Aid_OMDL_0046662, was marked
24    for identification.)

Page 239

Page 241

1        - - -
2  BY MR. POWERS:
3      Q.    I'm going to hand you what's been
4  marked as Rite Aid-Hart Exhibit 15.  This is an
5  email, again with some attachments.  The Bates
6  numbers on this exhibit are Rite_Aid_OMDL_0046648
7  through 46662.
8          And I'm going to try to do the
9  same thing as we've done with some of these other
10 emails with long attachments.  I'm just going to
11 ask you about the initial email and just a
12 particular couple pages that are attached to the
13 email.
14     A.    (Reviewing document.)
15     Q.    Have you had a chance to review
16 Exhibit 15?
17     A.    I have.



Page 242

Page 244

Page 243

Page 245



Page 246

Page 248

23

24     - - -

(Deposition Exhibit No. Rite

Page 247

Page 249

1       Aid-Hart-16, Email dated 2013-12-24,

2       Bates stamped Rite_Aid_OMDL_0016186 and

3       Rite_Aid_OMDL_0016187, was marked for

4       identification.)

5       - - -

6    BY MR. POWERS:

7       Q.    I'm going to hand you what has

8    been marked as Rite Aid-Hart Exhibit Number 16.

9    It is -- surprise, surprise -- another email and

10   attachments.  The email is Bates stamp

11   Rite_Aid_OMDL_0016186.  And the attachment, which

12   was a native Excel sheet, just has one Bates

13   number, although it's a couple different pages.

14   The Bates number of the attachment is

15   Rite_Aid_OMDL_0016187.

16      A.    (Reviewing document.)

17      Q.    Is the document -- the email and

18   attachment reflected in Exhibit 16 familiar to

19   you?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Page 254

Page 256

Page 255

Page 257

Page 258

Page 259

Page 260

 1  things that we talked about in the daily column
 2  here on the "Specialist, Regulatory Compliance"
 3  page, you said those were being done at the
 4  distribution center.  Right?
 5       A.    Yes.
 6       Q.    What's your basis for saying
 7  that?
 8       A.    The distribution center was
 9  responsible for the picking, reviewing the
10  orders, determining if it was suspicious or not,
11  making the phone call to the pharmacist.  And at
12  the same time, if there was a suspicious order,
13  the distribution center was responsible to report
14  that in to corporate.  That was part of their
15  standard operating procedures.
16       Q.    I just want to be clear.  You
17  just said that the distribution center was
18  responsible for determining whether a particular
19  order was suspicious or not; is that right?
20       A.    The distribution center was
21  responsible for identifying orders and
22  determining if they were suspicious, yes.
23       Q.    Moving on to the next page, the
24  one entitled "Senior Analyst, Controlled

Page 261



Highly Confidential - Subject To Further Confidentiality Review





Page 266

Page 268

Page 267

Page 269

7       MS. McENROE:  We've been going a
8    little over an hour.
9       MR. POWERS:  You read my mind.
10   Let's take a break.
11      THE VIDEOGRAPHER:  Going off the
12   record at 3:56.
13           -  -  -
14      (A recess was taken from
15   3:56 p.m. to 4:26 p.m.)
16           -  -  -
17      THE VIDEOGRAPHER:  We're back on
18   the record at 4:26 p.m.
19      MR. POWERS:  I have no further
20   questions for the witness.
21      MS. McENROE:  Great.  Thank you.
22   We have no further questions as well.
23   And we view this as the end of Ms. Hart's
24   fact deposition.

Page 270

```
1        MR. POWERS:  Yes.  She's coming
2   back for the 30(b)(6) tomorrow.
3        MS. McENROE:  Agreed.  Thank you.
4        THE VIDEOGRAPHER:  This ends
5   today's deposition.  We're going off the
6   record.  The time is 4:26 p.m.
7      (Witness excused.)
8      (Deposition concluded at
9   approximately 4:26 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 272

```
1           INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the appropriate
6   space on the errata sheet for any corrections
7   that are made.
8        After doing so, please sign the
9   errata sheet and date it.
10       You are signing same subject to
11  the changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13       It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt of
16  the deposition transcript by you.  If you fail to
17  do so, the deposition transcript may be deemed to
18  be accurate and may be used in court.
19
20
21
22
23
24
```

Page 271

```
1
2              CERTIFICATE
3
4
5        I HEREBY CERTIFY that the witness
    was duly sworn by me and that the deposition is a
6   true record of the testimony given by the
    witness.
7
         It was requested before
8   completion of the deposition that the witness,
    JANET GETZEY HART, have the opportunity to read
9   and sign the deposition transcript.
10
11
12
13
    _____
14   ANN MARIE MITCHELL, a Federally
     Approved Certified Realtime
15   Reporter, Registered Diplomate
     Reporter, Registered Merit Reporter and
16   Notary Public
17
18
19       (The foregoing certification of
20  this transcript does not apply to any
21  reproduction of the same by any means, unless
22  under the direct control and/or supervision of
23  the certifying reporter.)
24
```

Page 273

```
1           - - - - - -
               E R R A T A
2           - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____ ____ _____
6        REASON: _____
7   ____ ____ _____
8        REASON: _____
9   ____ ____ _____
10       REASON: _____
11  ____ ____ _____
12       REASON: _____
13  ____ ____ _____
14       REASON: _____
15  ____ ____ _____
16       REASON: _____
17  ____ ____ _____
18       REASON: _____
19  ____ ____ _____
20       REASON: _____
21  ____ ____ _____
22       REASON: _____
23  ____ ____ _____
24       REASON: _____
```

Page 274

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
 4         I,_____, do
 5   hereby certify that I have read the foregoing
 6   pages, 1 - 274, and that the same is a correct
 7   transcription of the answers given by me to the
 8   questions therein propounded, except for the
 9   corrections or changes in form or substance, if
10   any, noted in the attached Errata Sheet.
11
12
13   _____
14   JANET GETZEY HART            DATE
15
16
17   Subscribed and sworn
     to before me this
18   _____ day of _____, 20_____.
19   My commission expires:_____
20
     _____
21   Notary Public
22
23
24
```