```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                        -  -  -
 5

    IN RE:  NATIONAL        :   MDL NO. 2804
 6  PRESCRIPTION OPIATE     :
    LITIGATION              :
 7                          :
    -----------------------------------------------
 8  THIS DOCUMENT RELATES TO  :  CASE NO.
    ALL CASES                 :  1:17-MD-2804
 9                            :
                              :  Hon. Dan A.
10                            :  Polster
11                        -  -  -
12                   January 31, 2019
13                        -  -  -
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                 CONFIDENTIALITY REVIEW
15
16            Videotaped deposition of JANET
    GETZEY HART taken pursuant to notice, was held at
17  the law offices of Morgan, Lewis & Bockius LLP,
    1701 Market Street, Philadelphia, Pennsylvania,
18  beginning at 9:38 a.m., on the above date, before
    Ann Marie Mitchell, a Federally Approved
19  Certified Realtime Reporter, Registered Diplomate
    Reporter, Registered Merit Reporter and Notary
20  Public.
21                        -  -  -
22            GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23               deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

---

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: MARK PIFKO, ESQUIRE
15910 Ventura Boulevard
Suite 1600
Encino, California 91436
(818) 839-2333
mpifko@baronbudd.com
Representing the Plaintiffs

BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
wpowers@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: ELISA P. McENROE, ESQUIRE
BY: MATTHEW R. LADD, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5000
elisa.mcenroe@morganlewis.com
matthew.ladd@morganlewis.com
Representing Rite Aid

MORGAN, LEWIS & BOCKIUS LLP
BY: KELLY A. MOORE, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6000
kelly.moore@morganlewis.com
Representing Rite Aid

---

Page 3

APPEARANCES (cont.'d):

ARNOLD & PORTER KAYE SCHOLER LLP
BY: ELISEO R. PUIG, ESQUIRE
370 Seventeenth Street
Denver, Colorado 80202
(303) 863-1000
eliseo.puig@apks.com
Representing Endo Health Solutions Inc.,
Endo Pharmaceuticals Inc., Par
Pharmaceutical, Inc. and Par Pharmaceutical
Companies, Inc.

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: ALEXANDER M. OWENS, ESQUIRE
1818 Market Street
Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
amo@pietragallo.com
Representing Cardinal Health

COVINGTON & BURLING, LLP
BY: KEVIN KELLY, ESQUIRE
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5272
kkelly@cov.com
Representing McKesson

---

Page 4

APPEARANCES VIA TELEPHONE AND STREAM:

BARON & BUDD, P.C.
BY: GRETCHEN KEARNEY, ESQUIRE
BY: JAY LICHTER, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
gkearney@baronbudd.com
jlichter@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN M. MALOY, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5000
john.maloy@morganlewis.com
Representing Rite Aid

BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
BY: ALEXANDRA K. HUGHES, ESQUIRE
440 College Avenue
Suite 320
Athens, Georgia 30601
(706) 744-4135
ahughes@bbga.com

---

Page 5

APPEARANCES VIA TELEPHONE AND STREAM (cont.'d):

JACKSON KELLY PLLC
BY: SYLVIA WINSTON NICHOLS, ESQUIRE
150 Clay Street
Morgantown, West Virginia 26501
(304) 284-4105
sylvia.winston@jacksonkelly.com
Representing AmeriSource Bergen Drug
Corporation

JONES DAY
BY: MIRIAM LIABO, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
mliabo@jonesday.com
Representing Walmart

BAILEY & WYANT, PLLC
BY: HARRISON M. CYRUS, ESQUIRE
500 Virginia Street East
Suite 600
Charleston, West Virginia 25301
(304) 345-4222
hcyrus@baileywyant.com

VIDEOGRAPHER:
DAVID LANE

ALSO PRESENT:
DAVID SAYRES
Precision Trial Solutions

EMMA KABOLI
Baron & Budd, P.C.
(via stream)
- - -

---

Page 6

- - -

I N D E X

- - -

Testimony of: JANET GETZEY HART
By Mr. Pifko                    11, 285
By Ms. McEnroe                  274

- - -

E X H I B I T S

- - -

NO.         DESCRIPTION              PAGE

Hart-      Second Notice of            14
30(b)(6)-   Deposition Pursuant to
1          Rule 30(B)(6) and Document
           Request Pursuant to Rule
           30(B)(2) and Rule 34 to
           Defendant Rite Aid of
           Maryland, Inc., d/b/a Rite
           Aid and Mid-Atlantic
           Customer Support Center,
           Inc..

Hart-      First Notice of Deposition   18
30(b)(6)-   Pursuant to Rule 30(B)(6)
2           and Document Request
           Pursuant to Rule 30(B)(2)
           and Rule 34 to Defendant
           Rite Aid of Maryland,
           Inc., d/b/a Rite Aid and
           Mid-Atlantic Customer
           Support Center, Inc.

Hart-      Email chain, top one dated   41
30(b)(6)-   2010-11-24, Bates stamped
3          Rite_Aid_OMDL_0046695

Page 7

Hart-      Index of Binder             113
30(b)(6)-
4

Hart-      Email chain, top one dated  135
30(b)(6)-   16 Sep 2011, Bates stamped
5          MCKMDL00632923 through
           MCKMDL00632925

Hart-      Email dated 2011-02-01,     175
30(b)(6)-   Bates stamped
6          Rite_Aid_OMDL_0013134
           through
           Rite_Aid_OMDL_0013136

Hart-      Press Release entitled      179
30(b)(6)-   "Akron Doctor Pleads
7          Guilty to Illegally
           Prescribing Painkillers,
           Indictment, Case No.:
           5:14CR096

Hart-      Press Release, "Rite Aid    188
30(b)(6)-   Corporation and
8          Subsidiaries Agree to Pay
           $5 Million in Civil
           Penalties to Resolve
           Violations in Eight States
           of the Controlled
           Substances Act," 2 pages

Hart-      Order of the State Board    197
30(b)(6)-   of Pharmacy, Docket Number
10         D-110127-163

Hart-      Order of the State Board    214
30(b)(6)-   of Pharmacy Docket Number
11         D-100621-134

Hart-      Project Initiation for 504  221
30(b)(6)-   Suspicious Order
12         Monitoring, Bates stamped
           Rite_Aid_OMDL_0040184
           through
           Rite_Aid_OMDL_0040198

Page 8

Hart-      Email chain, top one dated  224
30(b)(6)-   2013-08-07, Bates stamped
13         Rite_Aid_OMDL_0024599 and
           Rite_Aid_OMDL_0024600

Hart-      Handwritten notes,          277
30(b)(6)-   11/23/10, Bates stamped
14         Rite_Aid_OMDL_0046066

Hart-      PowerPoint slides, Bates    278
30(b)(6)-   stamped
15         Rite_Aid_OMDL_0046067
           through
           Rite_Aid_OMDL_0046072

Hart-      Email dated 2010-12-10,     279
30(b)(6)-   Bates stamped
16         Rite_Aid_OMDL_0020381 and
           Rite_Aid_OMDL_0020381

Hart-      Handwritten notes,          280
30(b)(6)-   12/14/10, Bates stamped
17         Rite_Aid_OMDL_0046066

Hart-      Email dated 2011-01-21,     282
30(b)(6)-   Bates stamped
18         Rite_Aid_OMDL_0020541 and
           Rite_Aid_OMDL_0020542

- - -

PREVIOUSLY MARKED EXHIBITS USED

- - -

Rite Aid-Hart-15

Page 9

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line

132 19

Request for Production of Documents

Page Line

Stipulations
Page Line

Question Marked
Page Line

---

Page 10

1      THE VIDEOGRAPHER: We're now on
2 the record. My name is David Lane,
3 videographer from Golkow Litigation
4 Services. Today's date is January 31,
5 2019. Our time is 9:38 a.m. This
6 deposition is taking place in
7 Philadelphia, Pennsylvania in the matter
8 of National Opiate Litigation, MDL.
9      Our deponent today is Janet
10 Getzey Hart. Counsel will be noted on
11 the stenographic record. Our court
12 reporter is Ann Marie Mitchell.
13      Ms. Hart, I just want to remind
14 you, you're still under oath.
15      MR. PIFKO: Can we get people on
16 the phone to just state their name and
17 firm and who they represent real quick?
18      MS. LIABO: Hi, this is Miriam
19 Liabo from Jones Day on behalf of
20 Walmart.
21      MS. McENROE: Anybody else?
22      MS. WATSON: This is Sylvia
23 Watson from Jackson Kelly on behalf of
24 AmeriSource Bergen.

---

Page 11

1      MR. PIFKO: Anyone else?
2      MR. MALOY: This is John Maloy
3 from Morgan Lewis on behalf of Rite Aid.
4      MR. PIFKO: Anyone else?
5      - - -
6      JANET GETZEY HART, after having
7 been previously duly sworn, continued to
8 be examined and testified as follows:
9      - - -
10      EXAMINATION
11      - - -
12 BY MR. PIFKO:
13     Q. All right. Now that we got that
14 out of the way.
15      My name is Mark Pifko. We kind
16 of met yesterday a little bit. I'm going to be
17 asking you some questions today. I represent the
18 plaintiffs in the litigation.
19      MR. PIFKO: So -- was she
20 administered the oath?
21      THE REPORTER: She's still under
22 oath from yesterday.
23      MR. PIFKO: Okay.
24 BY MR. PIFKO:

---

Page 12

1     Q. So you understand that you're
2 still under oath? Do you understand that?
3     A. Yes.
4     Q. Okay. Yes? Sorry, I spoke over
5 you.
6     A. Yes, yes.
7     Q. And we'll fast forward through a
8 bunch of the ground rules. I know we covered
9 that yesterday and had your deposition taken.
10      So you understand that your
11 testimony here today is under penalty of perjury.
12 Correct?
13      MS. McENROE: Objection to form.
14      THE WITNESS: I do.
15 BY MR. PIFKO:
16     Q. And you understand that if you're
17 untruthful or intentionally dishonest in some
18 way, that you could be subject to criminal
19 penalties or civil penalties or some other sort
20 of punishment from the court.
21      Do you understand that?
22      MS. McENROE: Objection to form.
23      THE WITNESS: I do.
24 BY MR. PIFKO:

---

Page 13

1     Q. Is there any reason why you can't
2 provide truthful and accurate testimony today?
3     A. There is not.
4     Q. Do you have any medical
5 condition, are you taking any medication or
6 undergoing any sort of treatment that would
7 impact your ability to tell the truth?
8     A. No.
9     Q. Are you taking any medication or
10 suffering from any condition that would impact
11 your memory?
12     A. No.
13     Q. From time to time, I'm obviously
14 going to be asking you, as you know from
15 yesterday, about past events. Okay? And I don't
16 want you to guess, but I do -- I am entitled to
17 your best recollection of events. Okay?
18     A. Yes.
19     Q. Okay. You intend to provide that
20 today?
21     A. I do.
22     Q. All right. So one other thing
23 that's different today, we'll get into it in just
24 a moment, as opposed to yesterday, is that

---

Page 14

1 today's deposition, you are providing testimony
2 on behalf of the company.
3        Do you understand that?
4    A.   I do.
5    Q.   Okay.  So when I ask you
6 questions -- I'm going to hand you a notice in a
7 minute and there's some topics.
8        When I ask you questions within
9 those topics, you're going to be providing
10 testimony on behalf of the company, not just you.
11        Do you understand that?
12    A.   I do.
13    Q.   All right.  Let's start by
14 handing you that document.  I'm sure that you saw
15 it in preparing for today's deposition.
16             - - -
17        (Deposition Exhibit No.
18        Hart-30(b)(6)-1, Second Notice of
19        Deposition Pursuant to Rule 30(B)(6) and
20        Document Request Pursuant to Rule
21        30(B)(2) and Rule 34 to Defendant Rite
22        Aid of Maryland, Inc., d/b/a Rite Aid and
23        Mid-Atlantic Customer Support Center,
24        Inc., was marked for identification.)

Page 15

1             - - -
2 BY MR. PIFKO:
3    Q.   I'm handing you what's marked as
4 Hart-30(b)(6) Exhibit 1, which is a copy of a
5 deposition notice.
6        Have you seen this before?  Take
7 a minute to look at it.
8        MS. McENROE:  Mark, if it would
9    help, I'm happy to stipulate to which
10    topics from the second notice --
11        MR. PIFKO:  Yeah, I'm going to
12    ask her.  I have got your letter in front
13    of me.
14        MS. McENROE:  Great.  Thank you.
15        THE WITNESS:  I'm fine.
16 BY MR. PIFKO:
17    Q.   All right.  Have you seen this
18 before?
19    A.   I have.
20    Q.   When was the last time you saw
21 this?
22    A.   Within the past few days.
23    Q.   Okay.  When was the first time
24 you recall seeing this?

Page 16

1    A.   Months ago.
2    Q.   Sometime in the third quarter of
3 last year?
4    A.   Seems familiar, yes.
5    Q.   So you see if you -- there's
6 numbered pages on the bottom.
7        If you turn to the page that's
8 numbered 6, it's got "Subject Matters for
9 Testimony," letters A through O.
10        Do you see that?
11        MS. McENROE:  I think you may be
12    looking at notice 1 and you may have
13    handed us notice 2.  That may be what's
14    going on.
15        The second notice is the one that
16    you handed us.
17        MR. PIFKO:  That's Will's fault.
18        We can hand her both of them.
19 I'll ask you some questions about that.
20 I'll hand you notice 1 in just a
21 minute.  Thanks for clarifying.
22 BY MR. PIFKO:
23    Q.   So with respect to notice 2, you
24 see that there's topics that start on -- well,

Page 17

1 they do the same thing.  They start on page 6
2 here.
3        Do you see that?
4    A.   I do.
5    Q.   Okay.  And they go through page
6 11.
7        Do you see that?
8    A.   I do.
9    Q.   So looking at this -- this is
10 called the second notice.
11        Do you understand yourself to be
12 designated for topics 6, 12, 17, 18, 20, 21 and
13 22?
14    A.   6, 12 -- what were the other
15 numbers?
16    Q.   17, 18, 20, 21 and 22.
17        MS. McENROE:  Just preserving for
18    the record that 20, 21 and 22 are as
19    modified by a ruling from Special Master
20    Cohen.
21        THE WITNESS:  I do.
22 BY MR. PIFKO:
23    Q.   Is there any reason why you can't
24 provide testimony on those topics today?

Page 18

1   A.   There is not.
2   Q.   Let's look at the first notice.
3        - - -
4        (Deposition Exhibit No.
5   Hart-30(b)(6)-2, First Notice of
6   Deposition Pursuant to Rule 30(B)(6) and
7   Document Request Pursuant to Rule
8   30(B)(2) and Rule 34 to Defendant Rite
9   Aid of Maryland, Inc., d/b/a Rite Aid and
10  Mid-Atlantic Customer Support Center,
11  Inc., was marked for identification.)
12       - - -
13  BY MR. PIFKO:
14  Q.   Which is marked as Exhibit 2.
15       Take a moment to review that and
16  let me know when you're done.
17  A.   (Reviewing document.)
18       Okay.
19  Q.   Have you seen Exhibit 2 before?
20  A.   I have.
21  Q.   When was the last time you saw
22  Exhibit 2?
23  A.   Within the past few days.
24  Q.   When was the first time you

Page 19

1   believe you saw Exhibit 2?
2   A.   I don't remember when I first saw
3   it.
4   Q.   Do you believe it would have been
5   on or around the same time you saw Exhibit 1?
6   A.   A little after. Oh, this one
7   here is Exhibit 1 that we're talking about now?
8   Q.   I'm asking about Exhibit 2.
9   A.   Okay. Exhibit 2 is the first
10  notice, though. Right?
11  Q.   Right.
12  A.   So I would have saw the first
13  notice before the second notice.
14  Q.   Okay. That's your recollection,
15  is that you saw the first one before you saw the
16  second one?
17  A.   I believe so.
18  Q.   Just so you know, they're dated
19  the same day.
20       Does that refresh your
21  recollection at all about when you saw them?
22  A.   It does not.
23  Q.   Okay. All right. Well, you see
24  on page 6 -- well, so you believe, though, it

Page 20

1   would have been around a few months ago, like the
2   other notice, roughly?
3   A.   Yes.
4   Q.   Okay. If you turn to page 6 of
5   Exhibit 2, you see there's a bunch of letter
6   topics that goes from page 6 to page 7.
7        Are you there?
8   A.   I am.
9   Q.   Do you understand yourself to be
10  designated to speak on behalf of the company with
11  respect to topics A through N?
12       Take a minute to look at them.
13  A.   I do.
14  Q.   Is there any reason why you can't
15  provide testimony on behalf of the company with
16  respect to topics A through N in Exhibit 2?
17  A.   There is not.
18  Q.   Do you know what diversion is?
19       MS. McENROE: Objection to form.
20       THE WITNESS: I do.
21  BY MR. PIFKO:
22  Q.   What's your understanding of what
23  diversion is?
24  A.   Diversion is any time that a

Page 21

1   controlled substance gets out of the normal
2   channel of controlled substance delivery to a
3   patient, not to the patient based upon a valid
4   medical intent.
5   Q.   Do you understand that Rite Aid
6   has a duty to prevent diversion?
7        MS. McENROE: Objection, calls
8        for a legal conclusion.
9        THE WITNESS: I do.
10  BY MR. PIFKO:
11  Q.   Do you understand that during
12  certain relevant time periods to this case, Rite
13  Aid was a, what's called a distributor under the
14  Controlled Substances Act?
15  A.   I do.
16  Q.   What's your understanding of how
17  Rite Aid fit into a definition of a distributor
18  under the Controlled Substances Act?
19       MS. McENROE: Objection to form.
20       THE WITNESS: Rite Aid
21       distributed its Schedule III, IV and V
22       controlled substances to our various Rite
23       Aid locations.
24  BY MR. PIFKO:

Page 22

1    Q.    And Rite Aid purchased those
2  products directly from manufacturers?
3    A.    I believe so, yes.
4    Q.    And then warehoused them and
5  ultimately shipped them to its stores?
6    A.    That is correct.
7    Q.    And so you understand as a
8  distributor that Rite Aid had a duty to prevent
9  diversion.  Correct?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  I do.
12 BY MR. PIFKO:
13    Q.    And do you also have an
14 understanding that Rite Aid had a duty to
15 identify, report and halt the shipment of
16 suspicious orders?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  I do.
19 BY MR. PIFKO:
20    Q.    Okay.  And do you know what a
21 suspicious order is?
22    A.    I do.
23    Q.    What is a suspicious order?
24    A.    A suspicious order is an unusual

Page 23

1  frequency, an unusual pattern, orders of that
2  nature.
3    Q.    Bear with me a second here.
4        Do you understand the purpose for
5  which Rite Aid, as a registrant under the
6  Controlled Substances Act, has a duty to prevent
7  diversion?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  I do.
10 BY MR. PIFKO:
11    Q.    What's your understanding of what
12 that purpose is?
13    A.    Our purpose is to make sure the
14 controlled substances are kept in the normal
15 channel of distribution and dispensing to the end
16 patient, make sure that it does not end in the
17 hands of any other one that's not in that
18 distribution channel.
19    Q.    Do you understand that one of the
20 purposes of preventing diversion is to protect
21 the public health?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  I do.
24 BY MR. PIFKO:

Page 24

1    Q.    And is that consistent with Rite
2  Aid's understanding of why we want to prevent
3  diversion?
4    A.    It is.
5    Q.    I believe -- I was just looking
6  for it, but I couldn't find it, but I believe
7  that's in one of Rite Aid's policy documents.
8        Do you recall seeing that?
9    A.    I do.
10    Q.    So you agree that that's a stated
11 policy of Rite Aid, is that they want to prevent
12 diversion because they want to protect the public
13 health.  Correct?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  I'm not sure if
16     it's part of a policy or a statement or
17     whatever, but yes.
18 BY MR. PIFKO:
19    Q.    All right.  You understand that
20 Rite Aid has a duty to -- we talked earlier, to
21 identify, report and halt the shipment of any
22 suspicious orders that it may find in its system.
23 Correct?
24        MS. McENROE:  Objection to form.

Page 25

1        THE WITNESS:  I do.
2  BY MR. PIFKO:
3    Q.    And did you also understand that
4  Rite Aid has a duty to design a system to
5  identify suspicious orders.  Correct?
6        MS. McENROE:  Objection to form.
7     And Mark, this is pretty heavily on the
8     legal interpretation end, from which
9     Special Master Cohen specifically ruled
10     the topics do not cover, despite how
11     they're drafted.  So I just wanted to
12     make sure that we don't go too far down
13     that road.
14        THE WITNESS:  Could you repeat
15     the question?
16 BY MR. PIFKO:
17    Q.    Yeah.
18        I was just asking, you understand
19 that Rite Aid has a duty to design and maintain a
20 system to identify and report suspicious orders.
21 Correct?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  I do.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.   Did Rite Aid have such a system?
2    A.   We did.
3    Q.   When did Rite Aid first design a
4 system to identify and report and halt the
5 shipment of suspicious orders?
6    A.   I came into the Rite Aid
7 corporate office in 1995. And at that point
8 there was a program to report suspicious orders.
9    Q.   How about a program to identify
10 suspicious orders?
11    A.   I think same time.
12    Q.   Do you know anything about who
13 designed the system that you're describing to
14 identify and report suspicious orders?
15    A.   I do not.
16    Q.   Okay. But it's your testimony
17 that that system was in place in 1995?
18    A.   Yes.
19    Q.   Were there any changes to that
20 system? You've been employed by, we discussed
21 yesterday, by Rite Aid since the '80s; is that
22 correct?
23      MS. McENROE: Objection to form.
24      THE WITNESS: Yes.

Page 27

1      MS. McENROE: It's okay. Give me
2    time to get my objections in.
3 BY MR. PIFKO:
4    Q.   So you're familiar with Rite
5 Aid's policies and procedures with respect to
6 suspicious orders and preventing diversion.
7 Correct?
8    A.   Yes.
9    Q.   And are you familiar with whether
10 there are any changes to Rite Aid's system to
11 identify and report suspicious orders from 1995
12 to present?
13    A.   I believe that the system itself
14 has been in place. There has been minor changes
15 or tweaks along the way, but the basics of the
16 system have remained the same.
17    Q.   To your knowledge, has Rite Aid
18 ever identified a suspicious order?
19    A.   We have not.
20    Q.   Do you believe that there's never
21 been a suspicious order that's occurred within
22 Rite Aid's distribution system?
23      MS. McENROE: Objection to form.
24      THE WITNESS: Could you repeat

Page 28

1 the question?
2 BY MR. PIFKO:
3    Q.   Yeah.
4    Do you believe that there's never
5 been a suspicious order that has occurred within
6 Rite Aid's distribution center -- system?
7      MS. McENROE: Objection to form.
8      THE WITNESS: I do.
9 BY MR. PIFKO:
10    Q.   So it's your testimony that
11 there's never been a suspicious order that's
12 occurred within Rite Aid's distribution of
13 Schedule III controlled substances?
14      MS. McENROE: Objection to form.
15      THE WITNESS: I do.
16 BY MR. PIFKO:
17    Q.   Are you familiar with the
18 scheduling of controlled substances?
19    A.   I am.
20    Q.   Are you aware of -- that there's
21 Schedule I through VI?
22    A.   Schedule I through V.
23    Q.   I'm sorry, I through V, yes.
24    A.   Yes.

Page 29

1    Q.   Okay. Keeping you on your toes.
2    Do you have an understanding
3 about what the differences are as you move along
4 the schedules?
5    A.   I do.
6      MS. McENROE: Objection to form.
7 BY MR. PIFKO:
8    Q.   From I to V?
9      MS. McENROE: Objection to form.
10      THE WITNESS: I do.
11 BY MR. PIFKO:
12    Q.   What is your understanding of the
13 difference between a Schedule I controlled
14 substance and a Schedule V controlled substance?
15      MS. McENROE: Just real quick, I
16    want to make sure I understand.
17    Which topic is this part of?
18      MR. PIFKO: I'm asking the
19    questions. I don't need to identify the
20    topics.
21      MS. McENROE: I understand. So
22    you're asking topics from a 30(b)(6)
23    witness designated for specific
24    testimony.

Page 30

1    MR. PIFKO: You can object to
2  scope, but I'm going to ask the
3  questions.
4    MS. McENROE: I can object to
5  scope. I'm just trying to understand
6  where you're going with this, so --
7    MR. PIFKO: I'm asking her
8  questions.
9    MS. McENROE: -- if you're just
10 laying the basis for something in scope,
11 then that's fine, Mark. But I just want
12 to make sure that we're not going to
13 spend all day, she's a talented
14 pharmacist with a lot of experience,
15 getting every dot of the Controlled
16 Substances Act, make sure that we're
17 staying within the nature of the topics.
18    So that all being said, I will
19 say objection to scope.
20 BY MR. PIFKO:
21    Q.    All right. So let's go back to
22 my question.
23    Do you understand the difference
24 between a Schedule I substance and a Schedule V

Page 31

1  substance?
2    MS. McENROE: Objection to form.
3    THE WITNESS: I do.
4  BY MR. PIFKO:
5    Q.    What is your understanding of the
6  difference between those substances, as you move
7  through the scale?
8    A.    Schedule I has an abusive -- has
9  the most abusive properties. They are typically
10 the illicit drugs. Schedule V is the least
11 addictive, and they are the products that may be
12 able to be sold over the counter.
13    Q.    And so as you moved down the
14 scale, there's -- all these substances have been
15 identified by the government as having a
16 potential for abuse. Correct?
17    MS. McENROE: Objection to form.
18    THE WITNESS: Abuse, addiction,
19 yes.
20 BY MR. PIFKO:
21    Q.    And as you move down the scale,
22 there's a lower potential for abuse and
23 addiction; is that correct?
24    A.    As you go to Schedule V, there is

Page 32

1  less potential for that, yes.
2    Q.    And Rite Aid was a distributor of
3  Schedule III controlled substances. Correct?
4    MS. McENROE: Objection to form.
5    THE WITNESS: We were.
6  BY MR. PIFKO:
7    Q.    But you also sold Schedule II
8  controlled substances. Correct?
9    MS. McENROE: Objection to form.
10 I just want to make sure we are
11 clear in which "you" we are using here.
12 So she is here testifying as a 30(b)(6)
13 witness for Rite Aid Maryland, Inc.,
14 doing business as Mid-Atlantic Customer
15 Support Center, which is the Perryman
16 Distribution Center. So I just want to
17 make sure the witness is not going to be
18 getting confused or misled that it's her
19 personally or the Rite Aid family of
20 companies.
21 BY MR. PIFKO:
22    Q.    You understand that Rite Aid
23 Corporation operates pharmacies, correct, through
24 its various subsidiaries?

Page 33

1    A.    I do.
2    Q.    And those pharmacies sell
3  Schedule II substances. Correct?
4    A.    Those pharmacies dispense
5  Schedule II controlled substances.
6    Q.    And they also sell Schedule III
7  substances. Correct?
8    A.    Yes.
9    Q.    So we talked about the system for
10 identifying, reporting and halting the shipments
11 of suspicious orders.
12    You said that there was a system
13 in place in 1995. Correct?
14    A.    Yes.
15    Q.    And then I asked you if there
16 were changes over the years. And you said there
17 might have been some little changes, but the
18 basic functions of the system have been the same;
19 is that correct?
20    A.    That is correct.
21    Q.    All right. So can you tell me
22 what are the basic functions or features of the
23 Rite Aid system to identify, report and halt the
24 shipment of suspicious orders?

Page 34

1    MS. McENROE: Objection to form.
2    THE WITNESS: I can.
3 BY MR. PIFKO:
4    Q.   All right.  Let's start with the
5 first element of Rite Aid's system.
6          And let's talk about what was in
7 place in 1995, and then we'll move through and
8 talk about any potential changes.  Okay?
9          MS. McENROE: Objection in terms
10   of scope of the time period.  Discovery
11   starts in this case in 2006 for the
12   relevant purposes.  So I know the witness
13   said that she started in this role in
14   1995, but I just want to make sure we
15   don't end up spending all day on portions
16   of discovery that are not even within
17   scope.
18 BY MR. PIFKO:
19   Q.   Do you recall my question?
20   A.   Please repeat it.
21   Q.   All right.
22        MR. PIFKO: Do you recall Special
23 Master Cohen ordered objections to stay
24 under 10 seconds, so let's try to

Page 35

1 remember that rule.
2        MS. McENROE: I talk real fast.
3 I think it was under 10 seconds.
4        MR. PIFKO: All right.
5 BY MR. PIFKO:
6    Q.   What I asked you was to identify
7 the features of Rite Aid's system to identify,
8 report and halt the shipment of suspicious
9 orders.  Okay?
10   A.   Okay.
11   Q.   And what we talked about is you
12 said you're familiar with the system that was in
13 place from 1995 until present.  Correct?
14   A.   Correct.
15   Q.   Okay.  And so what I want you to
16 do is start with the features of the system that
17 you're familiar with from the earliest time frame
18 from which you're familiar, which you said was
19 1995.  Correct?
20   A.   Correct.
21   Q.   And then we'll go through various
22 changes that may have occurred over the years.
23        So let's start in 1995, what's
24 the first step in Rite Aid's system to identify,

Page 36

1 report and halt the shipment of suspicious
2 orders?
3        MS. McENROE: Objection to form.
4        Yeah.  We're here giving 30(b)(6)
5   testimony on behalf of the distribution
6   center that I mentioned earlier.  You
7   know, in terms of -- that distribution
8   center wasn't even in existence in 1997,
9   Mark.  So I'm worried that we're really
10   going far afield here on a number of
11   different avenues.
12 BY MR. PIFKO:
13   Q.   Can you answer the question?
14        MS. McENROE: Objection on
15   multiple grounds.
16        THE WITNESS: I can.
17 BY MR. PIFKO:
18   Q.   Okay.  So let's start.
19        What was the first feature of the
20 system?
21   A.   The Rite Aid suspicious order
22 monitoring program had various features to it.
23 One of the features was a threshold quantity of
24 5,000 dosage units for any single NDC, National

Page 37

1 Drug Code, product per order.
2    Q.   Do you know how that threshold
3 was calculated?
4    A.   As far as how was it established?
5    Q.   Right.
6    A.   I do not know.
7    Q.   Do you know why 5,000 was picked?
8    A.   I do not know.
9    Q.   Throughout the entirety of your
10 knowledge, that threshold was the same.  Correct?
11   A.   That threshold remained the same
12 until we stopped distributing controlled
13 substances in 2014.
14   Q.   So from 1995 to 2014, the
15 threshold was always 5,000 dosage units per NDC?
16        MS. McENROE: Objection to form.
17 BY MR. PIFKO:
18   Q.   Per week? Per order? Sorry.
19   A.   That is correct.
20   Q.   And what was the same threshold
21 at all stores, with a handful of exceptions.
22 Correct?
23        MS. McENROE: Objection to form.
24        THE WITNESS: That is correct.

Page 38

1  BY MR. PIFKO:
2      Q.   Do you know approximately how
3  many stores had exceptions to that threshold?
4      A.   My guess would be less than a
5  dozen.
6      Q.   Can you name them?
7      A.   I can name a few.  Rite Aid 777.
8  I believe Rite Aid number 408.  Those are the two
9  that I remember.
10      Q.   Do you know where those are
11  located?  How about 777, where is that located?
12      A.   It was located in New Jersey.
13      Q.   How about 408?
14      A.   I don't know where that one is
15  located.
16      Q.   You can't recall any others?
17      A.   There were others with
18  exceptions.  I believe yesterday we discussed
19  3151.
20      Q.   Do you know where that store is
21  located?
22      A.   Ohio.
23      Q.   Do you know where in Ohio?
24      A.   I believe Akron.

Page 39

1      Q.   Any others?
2      A.   Those are the ones that I
3  remember.
4      Q.   So that's a feature of Rite Aid's
5  suspicious order monitoring system.  And that
6  feature has been the same over the entirety of
7  your knowledge up to and including 2014, when you
8  stopped distributing Schedule III controlled
9  substances.  Correct?
10          MS. McENROE:  Objection to the
11      form.
12          THE WITNESS:  To the best of my
13      knowledge, yes.
14  BY MR. PIFKO:
15      Q.   Were there ever any discussions
16  about changing that number?
17          MS. McENROE:  Objection to form.
18          THE WITNESS:  I don't recall any
19      discussions.  There may have been
20      discussions within the logistics team to
21      change the number.
22  BY MR. PIFKO:
23      Q.   Were you part of any of those
24  discussions?

Page 40

1      A.   I don't recall being a part of
2  those discussions.
3      Q.   Do you know what the nature of
4  those discussions were with the logistics team to
5  change those numbers?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  I do not.
8  BY MR. PIFKO:
9      Q.   Do you know why they were having
10  such discussions?
11          MS. McENROE:  Objection to form.
12          THE WITNESS:  I think part of it
13      always to look at the program and
14      determine if it's adequate or not.
15  BY MR. PIFKO:
16      Q.   And was at some point someone was
17  concerned that it wasn't adequate?
18          MS. McENROE:  Objection to form.
19          THE WITNESS:  No.  I did not say
20      that.  I said they were looking at it to
21      continue to make sure that it was
22      adequate.
23              - - -
24          (Deposition Exhibit No.

Page 41

1      Hart-30(b)(6)-3, Email chain, top one
2      dated 2010-11-24, Bates stamped
3      Rite_Aid_OMDL_0046695, was marked for
4      identification.)
5              - - -
6  BY MR. PIFKO:
7      Q.   I'm handing you what's marked as
8  Exhibit 3.
9          For the record, Exhibit 3 is a
10  single page document Bates labeled
11  Rite_Aid_OMDL_0046695.
12          Let me know -- take a minute to
13  review that and let me know when you're done.
14      A.   (Reviewing document.)
15      Q.   Are you ready?
16      A.   I'm ready.
17      Q.   Have you seen this before?
18      A.   I have.
19      Q.   When was the last time you saw
20  this?
21      A.   Within the past few days.
22      Q.   Is this something you reviewed in
23  preparing for your 30(b)(6) deposition?
24      A.   Yes.



Page 42

1    Q.    In preparing for the 30(b)(6)
2 deposition, did you discuss this document with
3 anyone from the company?
4    A.    From Rite Aid?
5    Q.    Yes.
6    A.    I did not.
7    Q.    Who is Owen McMahon?
8    A.    Owen, at this time, was our
9 senior director of generic purchasing and
10 specialty programs.
11    Q.    Is he still with the company?
12    A.    He is.
13    Q.    What's his current role?
14    A.    Vice president of pharmacy
15 purchasing in some capacity.





Page 50

fill quantities of prescriptions that have been
stolen, do you believe that order could be
suspicious?
        MS. McENROE:  Objection to form.
        THE WITNESS:  Can you repeat the
    question?
BY MR. PIFKO:
    Q.    Yeah.
        If a store has a certain amount
of inventory of controlled substances, and for
purposes of this discussion let's keep it
Schedule III controlled substances.  Okay?
        So if a store has a material
volume of Schedule III controlled substances
stolen and it needs to place an order to
replenish that inventory as a result of the
theft, do you believe that that could be a
suspicious order?
        MS. McENROE:  Objection to form.
        THE WITNESS:  I do not believe
    it's a suspicious order.  If you are --
    theft and diversion in a store does not
    impact a suspicious order, per se.
BY MR. PIFKO:

Page 51

Page 52

Page 53

    Q.    Do you believe that if the
quantities of Schedule III controlled substances
that are ordered are increased because theft is
occurring at the store, that that could be a
suspicious order?
        MS. McENROE:  Objection, form.
        THE WITNESS:  It could not be --
    excuse me -- a suspicious order to the
    distribution center in simply ordering
    the product.  The distribution center
    does not know the nature of what is going
    to happen to those drugs.
BY MR. PIFKO:
    Q.    Do you believe that the
distribution center and the company has a duty to
know that the theft is occurring and factor that
into their shipping of orders?
        MS. McENROE:  Objection to form.
        THE WITNESS:  Can you repeat the
    question?  I'm sorry.
BY MR. PIFKO:
    Q.    Yeah.
        Do you believe that the
distribution center and Rite Aid in general have

BY MR. PIFKO:
    Q.    If an order is placed in order to

Page 54

1 a duty to know that the theft is occurring and
2 factor that into their evaluation of whether
3 they're shipping orders to a specific store?
4          MS. McENROE:  Objection to form.
5          THE WITNESS:  I believe Rite Aid
6     has a duty, from a pharmacy registrant
7     perspective, to identify theft and
8     diversion and to follow DEA protocol and
9     report it.
10          From the distribution side,
11     there -- just because simply a store has
12     diversion of an associate does not mean
13     that an order would be suspicious.
14 BY MR. PIFKO:
15     Q.    Have you heard the term "know
16 your customer"?
17     A.    I have.
18     Q.    What's your understanding of what
19 that teams?
20          MS. McENROE:  Objection, form.
21          THE WITNESS:  Know your customer
22     is that you identify everyone that you
23     ship to.  In the course of Rite Aid, our
24     customers are ourselves.  To know your

Page 55

1     customer, you should make sure that their
2     licenses are correct.  You should make
3     sure that they have a physical building
4     that is licensed by the Board of
5     Pharmacy.  You should make sure that they
6     have a DEA registration.  Knowing your
7     customer is making sure that they are
8     registered, that they are a pharmacy, and
9     they are entitled to be able to receive
10     and dispense controlled substances.
11          In Rite Aid's case, our customer
12     is ourselves.  So from a licensing
13     perspective, the licensing coordinator is
14     in our corporate office.  And so we know
15     the stores are licensed.  We know the
16     whole process.
17 BY MR. PIFKO:
18     Q.    This question came up yesterday,
19 so I know you know the answer, but I'll ask you
20 for purposes of the 30(b)(6).
21          Do you know what red flags of
22 diversion are?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  I know what red

Page 56

1     flags are, yes.
2 BY MR. PIFKO:
3     Q.    What's your understanding of what
4 red flags of diversion are?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  Red flags are
7     identified by the Drug Enforcement
8     Administration for a pharmacist when
9     dispensing a controlled substance
10     prescription.  There are numerous red
11     flags.  They include, does the pharmacist
12     know the patient, is it a known patient.
13     They include, does the pharmacist know
14     the prescriber, is it a known prescriber.
15     They include a valid patient relationship
16     between the prescriber and the patient.
17     It also requires you to check to
18     determine, from a red flag standpoint, is
19     it in the geographic area.  They
20     require -- a red flag can be to look at a
21     prescription to determine if it was a
22     forged prescription or not, to determine
23     if perhaps another pharmacy had declined
24     to fill and had noted on the

Page 57

1     prescription.  Red flag would be to make
2     sure that the prescription was issued for
3     a valid medical reason by a prescriber in
4     the course of their due diligence and
5     their specialty.
6 BY MR. PIFKO:
7     Q.    Did Rite Aid ever consider any
8 red flags of diversion with respect to whether it
9 was going to fill an order placed by any of its
10 pharmacies for a Schedule III controlled
11 substance?
12          MS. McENROE:  Objection to form.
13          THE WITNESS:  Rite Aid and all of
14     our pharmacies identify red flags.  If a
15     red flag is identified, the prescription
16     is not filled at that particular time and
17     declined and provided back to the
18     patient.  Should that be -- should there
19     be a red flag that meets our criteria, it
20     would not be dispensed.
21 BY MR. PIFKO:
22     Q.    Do you believe that theft is one
23 of the red flags of diversion?
24          MS. McENROE:  Objection to form.

Page 58

1      THE WITNESS:  Theft is not a red
2  flag of the prescription processing.
3  Part of theft is diversion, yes, but
4  involved in the red flag process, it's
5  not diversion as such in a red flag
6  process.
7  BY MR. PIFKO:
8      Q.    When I asked you about "know your
9  customer," do you believe that the
10  know-your-customer requirement includes a
11  requirement to know about whether the red flags
12  of diversion are occurring at your customer's
13  location?
14      MS. McENROE:  Objection to form.
15      THE WITNESS:  I believe know your
16  customer, yes, would include if the
17  pharmacies are following the red flags
18  process.
19  BY MR. PIFKO:
20      Q.    Okay.  And so with respect to
21  Rite Aid's duty to prevent diversion and to
22  identify suspicious orders, did Rite Aid have any
23  system in place to consider red flags of
24  diversion when an order was placed at any of its

Page 59

1  pharmacies?
2      MS. McENROE:  Objection to form.
3      THE WITNESS:  If red flags were
4  identified when a prescription was being
5  dispensed, the prescription would not be
6  dispensed.  So that would not result in
7  an order to the distribution center.
8  BY MR. PIFKO:
9      Q.    So it's your testimony that in
10  every instance throughout the relevant time
11  period, if a red flag occurred, it was always
12  caught and observed at the pharmacy and never
13  resulted in a prescription being dispensed?
14      MS. McENROE:  Objection to form.
15      THE WITNESS:  Can you repeat
16  that, please?
17  BY MR. PIFKO:
18      Q.    Yes.
19      So my question is, it's your
20  testimony that is it -- are you saying that in
21  every instance throughout the relevant time
22  period, if a red flag occurred, it was always
23  caught and observed at the pharmacy, and that
24  prescription was never dispensed?

Page 60

1      MS. McENROE:  Objection to form.
2      THE WITNESS:  I would never say
3  in every instance.
4  BY MR. PIFKO:
5      Q.    Okay.  In most instances?
6      A.    In the majority, yes.
7      MS. McENROE:  Objection to form.
8      Mark, we've been going about an
9  hour.
10      Are you looking for a break, too?
11      THE WITNESS:  (Witness nods
12  head.)
13      MS. McENROE:  Okay.  The witness
14  is asking for a break, too.
15      MR. PIFKO:  Okay.
16      THE VIDEOGRAPHER:  Going off the
17  record at 10:27 a.m.
18          - - -
19      (A recess was taken from
20  10:27 a.m. to 10:41 a.m.)
21          - - -
22      THE VIDEOGRAPHER:  We're back on
23  the record at 10:41 a.m.
24  BY MR. PIFKO:

Page 61

1      Q.    Welcome back.
2      Okay.  Before we took a break, we
3  were talking about red flags of diversion and
4  knowing your customer.  Okay?
5      A.    Yes.
6      Q.    Do you remember that?
7      So I was asking you if there was
8  a way that Rite Aid factors in the red flags of
9  diversion into a suspicious order that could be
10  placed -- or, sorry, an order that could be
11  placed.
12      MS. McENROE:  Objection to form.
13  BY MR. PIFKO:
14      Q.    Do you recall that discussion?
15      A.    Yes.
16      Q.    Okay.  And am I correct that your
17  testimony was that Rite Aid factors in red flags
18  of diversion into its order system because the
19  pharmacist would identify that and that
20  prescription would never be filled; is that
21  correct?
22      MS. McENROE:  Objection to form.
23      THE WITNESS:  Could you do that
24  again, please?

Page 62

BY MR. PIFKO:

2  Q.   Yep.

3       My question is -- well, why don't

4  you just tell me.  How does Rite Aid factor red

5  flags of diversion into an order for a Schedule

6  III controlled substance?

7       MS. McENROE:  Objection to form.

8       THE WITNESS:  If there was a red

9  flag that was identified for a

10  prescription in a pharmacy, the

11  pharmacist has the ability to assess that

12  prescription and determine if their

13  prescription should be filled or not.

14  Simply because there's one red flag

15  doesn't mean that the prescription should

16  not be filled.

17       That being said, if there's a red

18  flag and the prescription is not filled,

19  and the pharmacist refuses to fill it,

20  there's no way that that's ever going to

21  get to be an order to go to the

22  distribution center, because at that

23  point, there's no dispensing of the drug.

24  There's no need for replenishment from

Page 63

1  the distribution center.

2  BY MR. PIFKO:

3       Q.   Is it your testimony that red

4  flags of diversion are always caught and stopped

5  by pharmacists before a prescription is filled?

6       MS. McENROE:  Objection to form.

7       THE WITNESS:  Not all red flags

8  are caught before diversion occurs or

9  before they're filled.

10  BY MR. PIFKO:

11       Q.   So there are occasions when an

12  order is placed from a pharmacy where a

13  prescription has been filled even though there

14  were red flags; is that correct?

15       MS. McENROE:  Objection to form.

16       THE WITNESS:  Can you repeat,

17  please?

18  BY MR. PIFKO:

19       Q.   You agree that there are

20  instances where a prescription is placed to be

21  filled at a Rite Aid pharmacy that may have

22  indicia of red flags.  Correct?

23       MS. McENROE:  Objection to form.

24       THE WITNESS:  There could be a

Page 64

1  prescription presented with red flags,

2  yes.

3  BY MR. PIFKO:

4       Q.   And you agree that that's not

5  always caught by a pharmacist.  Correct?

6       MS. McENROE:  Objection to form.

7       THE WITNESS:  The majority of the

8  time it would be caught.  But, yes, there

9  are instances where a red flag is not

10  caught or red flags are not caught.

11  BY MR. PIFKO:

12       Q.   So my question is, in these

13  instances where red flags are not caught, is

14  there any system in place where Rite Aid takes

15  those red flags into account when considering

16  whether to ship an order to one of its

17  pharmacies?

18       MS. McENROE:  Objection to form.

19       THE WITNESS:  There is not.

20  BY MR. PIFKO:

21       Q.   Does Rite Aid have any system in

22  place to evaluate whether prescriptions are being

23  placed without legitimate medical need at its

24  pharmacies when it's filling an order of Schedule

Page 65

1  III controlled substances for that pharmacy?

2       MS. McENROE:  Objection to form.

3       THE WITNESS:  The red flags

4  process is in place in Rite Aid

5  pharmacies to identify fraudulent

6  activity or activity related to a

7  prescription to identify the red flags on

8  a prescription for controlled substances.

9  BY MR. PIFKO:

10       Q.   The only process in place is at

11  the pharmacy through the pharmacist; is that

12  correct?

13       MS. McENROE:  Objection to form.

14       THE WITNESS:  When dispensing a

15  prescription, the pharmacist is the front

16  line.  And yes, they're a licensed

17  individual that's trained and schooled to

18  be able to identify red flags.  So yes,

19  the red flags and the prescription is

20  identified by the pharmacist.  It has

21  nothing to do with the distribution

22  center.

23  BY MR. PIFKO:

24       Q.   All I'm trying to understand, is

Page 66

1  there any way that that kind of information is
2  passed on to the distribution center.
3           So is your testimony that
4  potential red flag activity at a store location
5  is never passed on to the distribution center?
6           MS. McENROE:  Objection to form.
7           THE WITNESS:  To the best of my
8      knowledge, the red flag activity is not
9      passed on to the distribution center back
10     when we distributed controlled substances
11     up till 2014.
12 BY MR. PIFKO:
13     Q.    And there's no -- that means that
14 there was no system in place to consider red
15 flags of diversion at the distribution center
16 when an order was being shipped.  Correct?
17          MS. McENROE:  Objection to form.
18          THE WITNESS:  That is correct.
19     The red flags are determined by the
20     pharmacist that is in the pharmacy in
21     whether or not to dispense the
22     prescription.
23 BY MR. PIFKO:
24     Q.    Let's go back to the thresholds.

Page 67

1           Remember we were talking about
2  attributes of Rite Aid's system to identify,
3  report and halt suspicious orders.
4           MS. McENROE:  Objection to form.
5  BY MR. PIFKO:
6      Q.    You recall us discussing that?
7      A.    I do.
8      Q.    Okay.  So it was your testimony
9  that thresholds are one attribute of the system.
10 Correct?
11     A.    That is correct.
12     Q.    And other than a -- less than a
13 dozen, all store locations had a threshold of
14 5,000 dosage units per NDC per order.  Correct?
15          MS. McENROE:  Objection.
16          THE WITNESS:  Correct.
17 BY MR. PIFKO:
18     Q.    And that was a threshold that was
19 in place for multiple decades.  Correct?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  Yes.  Keep in mind
22     for this, the Perryman Distribution
23     Center did not open until I believe 1998
24     or somewhere in that time frame.

Page 68

1  BY MR. PIFKO:
2      Q.    So from the entirety of its
3  operation, that was the threshold when Rite Aid
4  was shipping Schedule III controlled substances
5  as a distributor.  Correct?
6           MS. McENROE:  Objection to form.
7           THE WITNESS:  Correct.
8  BY MR. PIFKO:
9      Q.    And we talked about a meeting,
10 when I showed you Exhibit 3, discussing the
11 thresholds.  Correct?
12     A.    We discussed a meeting.
13     Q.    So you -- we talked about the
14 people who are present at the meeting, and you
15 said that Andy Palmer was there because he had
16 the asset protection program.  Correct?
17     A.    That is correct.
18     Q.    And you clarified that NaviScript
19 is never used to identify or report a suspicious
20 order.  Correct?
21          MS. McENROE:  Objection to form.
22          THE WITNESS:  That is correct.
23 BY MR. PIFKO:
24     Q.    All right.  And so Maggie Perritt

Page 69

1  was another person who was there from operations.
2  Correct?
3      A.    Yes.
4      Q.    And you invited her to that
5  meeting?
6      A.    I don't remember who invited
7  whom, but yes, she was at the meeting.
8      Q.    Why was she invited to the
9  meeting?
10     A.    Maggie was the pharmacy
11 operations person at the meeting that knew
12 algorithms, and also was the operator there that
13 would be impacted by thresholds.
14     Q.    When you say she would be
15 impacted by thresholds, what do you mean?
16     A.    The service to the stores and the
17 pharmacies obtaining their drugs.  Pharmacy
18 operations obviously is in charge of who -- the
19 pharmacists that are dispensing the drugs and the
20 operating of the pharmacies.
21     Q.    So if there was a change in the
22 threshold, it would impact the pharmacy
23 operations?
24          MS. McENROE:  Objection to form.

Page 70

1    THE WITNESS:  It could.  It
2    could.
3    BY MR. PIFKO:
4    Q.    How would it impact the pharmacy
5    operations?
6    A.    It may impact their ordering.  It
7    may impact the amount of product that they would
8    have on their shelves.  There could be any number
9    of ways that it could be impacted.
10    Q.    Was that part of the discussion
11    at this meeting?
12    A.    At this meeting -- I don't
13    recall.
14    Q.    Do you recall discussing -- you
15    said Maggie had some knowledge about algorithms;
16    is that correct?
17    A.    That is correct.
18    Q.    Do you recall a specific
19    discussion with Maggie about algorithms and
20    suspicious order monitoring at this meeting?
21    A.    I recall what occurred at the
22    meeting was that we were trying to put down in
23    detail the algorithms that were used in our
24    suspicious order monitoring program so that we

Page 71

1    could communicate it effectively to our
2    distribution centers on a one-page document so
3    that the DC would have something to present to
4    government agency, the Drug Enforcement
5    Administration, that would visit and do an
6    inspection.
7    Q.    So prior -- and this meeting
8    occurred, if we look back at Exhibit 3, the email
9    is at the end of 2010.  Agree?
10    A.    Yes.
11    Q.    Do you have a recollection about
12    when this meeting occurred after that email?
13    A.    Maybe early 2011.  I don't
14    recall.
15    Q.    That's your best estimate, is
16    early 2011 when this meeting occurred?
17    A.    Best estimate, yes.  I don't -- I
18    don't recall truly.
19    Q.    You said that you wanted to put
20    detail down concerning the algorithms so that you
21    could communicate them to the distribution
22    centers.
23           Prior to this discussion, did the
24    distribution centers have any document to present

Page 72

1    to a government agency, such as the DEA,
2    concerning the algorithms that may have been
3    used?
4    MS. McENROE:  Objection to form.
5    THE WITNESS:  I believe the
6    distribution centers had information as
7    far as obtaining the orders and the
8    thresholds and part of their suspicious
9    order program, but they did not know the
10    detail of the algorithms to the effect of
11    what was included and how the algorithms
12    work.  There's numerous algorithms that
13    come together.  And they did not have all
14    of that, no.
15    They had a document to provide to
16    the DEA.  They really did provide -- that
17    was sufficient for DEA inspections 2005,
18    2009, prior to this meeting.  So the
19    documentation on suspicious order
20    monitoring was at the distribution center
21    and adequate for the DEA.
22    BY MR. PIFKO:
23    Q.    There's a document that was
24    created in 2005?

Page 73

1    A.    There was a DEA inspection in
2    2005 at the distribution center.  And as part of
3    their standard operating procedures in suspicious
4    order monitoring program, the distribution center
5    at that time had passed inspection.
6    Q.    There was another inspection in
7    2009?
8    A.    There was another inspection in
9    2009.
10    Q.    Which specific facility are we
11    talking about with respect to the 2005 and 2009
12    inspections?
13    A.    We are speaking of the Perryman
14    Distribution Center.
15    Q.    You're opening a binder.
16    Can you tell me what that is?
17    A.    Sure.  It's a binder of documents
18    that I asked counsel to prepare for me to review
19    for the deposition.
20    Q.    And you're looking for something
21    specific in there right now?
22    A.    I was looking for a memo on the
23    DEA audit summary for 2005 and 2009.
24    Q.    It's your understanding that

Page 74

1 there was some documentation concerning
2 algorithms that may have been provided during
3 those inspections?
4         MS. McENROE:  Objection to form.
5         THE WITNESS:  I was not at the
6     inspections.  I do not know.  I know that
7     there was an inspection and what was
8     provided to the DEA through their normal
9     routine audit, which is looking for
10    suspicious order monitoring.  The
11    distribution centers had no violations at
12    those times.
13 BY MR. PIFKO:
14    Q.    You don't know what was provided
15 to the DEA in connection with those inspections,
16 though?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  I do not.
19 BY MR. PIFKO:
20    Q.    Did the DEA provide any written
21 documentation after those inspections?
22    A.    I will check.
23    Q.    If you can narrate for me what
24 you're checking, I would appreciate it.

Page 75

1    A.    Sure.
2          I am narrating a communication
3 from Kevin Mitchell, who was our senior manager
4 of regulatory compliance, for the distribution
5 centers as an update of the inspection.
6          Typically when you have a DEA
7 inspection, they will leave you -- if there are
8 deficiencies, they typically do not leave you any
9 documentation.  If you have passed a DEA
10 inspection, you can receive a letter of
11 admonition.
12         And in this particular
13 correspondence, the words were -- the closing
14 comments specifically mentioned that they have no
15 words of advice for the staff for improvement.
16 It was a flawless audit.
17    Q.    Can you read the -- you are
18 looking at a document that was produced in the
19 case.  Correct?
20    A.    Yes.
21    Q.    What's the Bates number for that
22 document?  Do you know what that -- on the bottom
23 right-hand corner, there's a number.
24    A.    0047171.

Page 76

1         MS. McENROE:  And that was a Rite
2     Aid produced document.
3 BY MR. PIFKO:
4    Q.    There's some words before the
5 number.
6         Can you read those words, too?
7    A.    Yes.  Rite_Aid_OMDL_.
8    Q.    Thanks.
9         So there was no DEA documentation
10 provided after that audit.  Correct?
11        MS. McENROE:  Objection to form.
12        THE WITNESS:  Correct.
13 BY MR. PIFKO:
14    Q.    The only documentation that you
15 have is a summary written by Kevin Mitchell?
16        MS. McENROE:  Objection to form.
17        THE WITNESS:  Yes.
18 BY MR. PIFKO:
19    Q.    Let's talk about these algorithms
20 that you've been referring to.
21         So is it your testimony that
22 these algorithms are part of Rite Aid's
23 suspicious order monitoring system?
24    A.    They are.

Page 77

1    Q.    You've made it sound like there's
2 more than one?
3    A.    Yes.
4    Q.    Is that correct?
5         So what are the algorithms that
6 you contend are part of Rite Aid's suspicious
7 order monitoring system?
8         MS. McENROE:  Objection to form.
9         THE WITNESS:  In an overall
10    perspective, what happens is Rite Aid's
11    system, in order to place an order,
12    reviews a store's order history for the
13    ███████████████████████████████████
14    ███████████████████████████████████
15    ██████████████
16         At that particular point, it
17    places an order based on that individual
18    ████████████████████████████████████
19    history.  And it allows the store to
20    █████████████████████████████████████
21    ██████████████████
22         There are other factors that come
23    into play, such as a weighted moving
24    average, depending on what time the order

Page 78

1 is placed. There's calculate regular
2 movement averages, perform checks on
3 weeks with no movement.
4     So there's a series of
5 algorithms, but the general overall one
6 is looking at that specific store's data,
7 analyzing it, looking at what's on hand
8 in the store, and analyzing to determine
9 what order should be placed for that
10 store.
11 BY MR. PIFKO:
12     Q.    Can orders be placed manually?
13         MS. McENROE:  Object to the form.
14         THE WITNESS:  Once the order gets
15     to the store, there is the ability for
16     the pharmacist to override the order,
17     yes.
18 BY MR. PIFKO:
19     Q.    How does that process work, the
20 manual process?
21     A.    If the algorithm says to order
22 60, and the pharmacist has an order for 90
23 tablets, then at that point the pharmacist can
24 override to get the additional tablets that they

Page 79

1 need in the order.
2     Q.    So when an order is going to be
3 placed, the pharmacist has access to see what
4 that order is?
5         MS. McENROE:  Objection.
6         THE WITNESS:  Yes.  The
7     pharmacist has to have access to see that
8     order.
9 BY MR. PIFKO:
10     Q.    So it's in this automated system,
11 but then there's some screen where the pharmacist
12 can see what the automated system is calculating
13 for the order?
14     A.    Yes.
15     Q.    Is there a name for that screen?
16     A.    I don't know what the name is.
17     Q.    Is the pharmacist required to
18 check the order before it's placed every time?
19     A.    Typically they do.  I don't know
20 if it's required.
21     Q.    And so orders are placed by Rite
22 Aid stores with a regular frequency.  Correct?
23     A.    Orders are placed once a week,
24 once every other week in a limited number of

Page 80

1 stores, and twice a week in a very limited number
2 of stores.
3     Q.    So let me break that down.
4         So most -- what most -- what's
5 the ordering pattern for most stores?
6     A.    Most stores, Rite Aid places an
7 order once a week.
8     Q.    Some stores place two orders a
9 week?
10     A.    Some stores place two orders a
11 week, yes.
12     Q.    Some stores place orders every
13 two weeks?
14     A.    Yes.
15     Q.    Is there any other ordering
16 pattern that we haven't discussed?
17     A.    No.  The stores are -- once a
18 store is programmed in, they can't place
19 additional orders.
20     Q.    Well, I'm just trying to
21 understand.  So there's three categories here.
22         There's stores that order once a
23 week, which is most of the stores.
24         Then there's another category of

Page 81

1 stores that can order two orders in a week.
2 Correct?
3     A.    Correct.
4     Q.    And then there's another category
5 of stores that place one order every two weeks.
6 Correct?
7     A.    Correct.
8     Q.    And there's no other pattern
9 within Rite Aid for ordering.  Correct?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  From the
12     distribution center, no.
13 BY MR. PIFKO:
14     Q.    When you say most stores are on
15 this one order every week pattern, do you have an
16 understanding about the percentage of stores that
17 are in that pattern?
18     A.    Best guess estimate is 90 percent
19 are on that pattern.
20     Q.    How about stores that place two
21 orders a week, do you have a sense of the
22 percentage of stores that fit in that category?
23     A.    Let's reduce the first one to
24 80 percent.  Sorry.

Page 82

1    Q.    Okay.  So 80 percent of the
2  stores place one order every week.  Correct?
3    A.    Correct.
4    Q.    What percentage of stores place
5  two orders a week?
6    A.    To the best of my knowledge,
7  about 15 percent.
8    Q.    What percentage of stores place
9  one order every two weeks?
10    A.    5 percent.
11    Q.    The stores that place two orders
12  a week, are they located in specific areas?
13        MS. McENROE:  Objection.
14        THE WITNESS:  The stores that
15        order twice a week typically are in urban
16        areas such as Center City Philadelphia,
17        Center City New York City, where to get
18        one order once a week, there's not enough
19        room in the store itself to hold the
20        front end merchandise.
21        So an order needs to be shipped
22        twice a week in order to keep the
23        merchandise in the store to be sold.
24        That's typically when a store gets two

Page 83

1        orders a week.
2  BY MR. PIFKO:
3    Q.    So those stores are -- the square
4  footage of the stores is somewhat smaller and
5  they don't have room for inventory.
6        Is that what you're saying?
7    A.    Typically, yes.
8    Q.    Are there other occasions where a
9  store would have two orders a week?
10    A.    No.  That's primarily it.
11    Q.    What about stores that order once
12  every two weeks, is there some sort of
13  characteristic about those stores?
14    A.    Those may be the lower volume
15  stores that dispense less prescriptions or have
16  less movement of front end merchandise.  A lower,
17  slower front end selling front end merchandise
18  may get it every two weeks.
19    Q.    And just for clarity, when you
20  talk about "front end," that's everything that's
21  not in the pharmacy.  Correct?
22    A.    That is correct.
23    Q.    Is that an internal term that
24  Rite Aid uses, front end versus pharmacy

Page 84

1  operations?
2    A.    I think a lot of people in the
3  industry use the term "front end" versus
4  pharmacy.
5    Q.    But that's also a term that Rite
6  Aid uses?
7    A.    Yes.
8    Q.    Let's go back to the algorithms
9  of ordering.
10        So a pharmacist can see the order
11  that's about to be placed in advance of it being
12  placed.  Correct?
13    A.    Yes.
14    Q.    How far in advance of it being
15  placed can a pharmacist see it?
16    A.    I believe a day.  And then they
17  have time to review it and then make changes,
18  should they decide to.
19    Q.    And then when a pharmacist sees
20  the order that's about to be placed, they can
21  manually increase the volumes that are on the
22  order; is that correct?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  They can manually

Page 85

1        increase the volumes or they can
2        decrease the volumes.
3  BY MR. PIFKO:
4    Q.    So you talked about the highest
5  ████████████████████████████████
6  █ ████████████████████████
7  █ ████████████████████████████████
8  █ ██████████████████████████
9    A.    Yes.
10    Q.    Okay.  But then the pharmacist
11  could manually increase that.  Correct?
12        MS. McENROE:  Objection to form.
13        THE WITNESS:  They have the
14        ability to do that.
15  BY MR. PIFKO:
16    Q.    Are there any other algorithms
17  that are in place?
18    A.    There are other algorithms or
19  there are other pieces of the program which
20  allows no greater than 99 bottles to be
21  distributed in -- of any given product at any
22  given time as well.
23    Q.    Can a pharmacist manually
24  override that?

Page 86

1  A. The pharmacist has the ability
2 to -- no. Pardon me. Step back.
3       The pharmacist cannot override
4 the 99 bottles.
5  Q. Are there any other algorithms in
6 place?
7       And you're looking at a document.
8 Can you read the Bates number of the document?
9  A. I can. 004 -- oh.
10 Rite_Aid_OMDL_0045426.
11  Q. Is there a name for that
12 document?
13  A. It is called pharmacy
14 replenishment algorithm. Okay.
15       There are other parts to the
16 algorithm that come into play as well, one of
17 them being making an account for what we call
18 90-day fills at the pharmacy.
19       So what that means is a patient
20 comes in and has a 30 -- a prescription for 30
21 days of like their blood pressure medication.
22 The patient chooses to get a 90-day supply or
23 three months at a time.
24       So instead of having the

Page 87

1 replenishment algorithm ship that product to the
2 store for the 30 days, 30 days and 30 days, the
3 algorithm takes into effect that that patient's
4 not coming back until 90 days. So you have to
5 have that product in 90 days instead of two 30
6 days. So that's part of the algorithm as well.
7       And that's the gist of the
8 algorithms. The rest of it can be found in the
9 document.
10  Q. Were there any changes to the
11 algorithms?
12       MS. McENROE: Objection to form.
13       THE WITNESS: To the best of my
14 knowledge, no.
15 BY MR. PIFKO:
16  Q. Then going back to this meeting,
17 Kevin Mitchell was another person who was
18 invited. Correct?
19  A. Correct.
20  Q. Why was he invited?
21  A. Kevin has responsibility for
22 the controlled -- had responsibility for the
23 controlled substance cages at the distribution
24 centers and was working with the DEA coordinators

Page 88

1 in each of the facilities.
2  Q. And why did that make him someone
3 that was invited to this meeting?
4  A. He owned the process of the
5 distribution of the controlled substances and the
6 pickers, was involved with -- directly involved
7 with the individual pickers that picked, the
8 operations of the controlled substance cages.
9       So because of that and impacting
10 thresholds, he was invited to the meeting. And
11 also he was the one that attended the Buzzeo
12 conference that wanted to have some discussion
13 around it.
14  Q. Were there any -- you talked
15 about putting together a document.
16       That was something that was
17 discussed at this meeting. Correct?
18  A. It was.
19  Q. Did this meeting ultimately
20 result in a document being created?
21  A. It did not.
22  Q. Why was that?
23  A. Several -- an individual at the
24 meeting left the company.

Page 89

1  Q. Who is that?
2  A. Maggie Perritt.
3  Q. And she was going to be
4 responsible for putting this documentation
5 together?
6  A. Yes.
7  Q. Do you know why she left?
8  A. To take a job elsewhere. She
9 moved to Florida.
10  Q. Did she make any comments on the
11 perceived sufficiency of Rite Aid's suspicious
12 order monitoring processes?
13       MS. McENROE: Objection to form.
14       THE WITNESS: After we had the
15 meetings -- the meeting, and everybody
16 came together, everyone was overly
17 confident that our suspicious order
18 monitoring program was adequate and met
19 DEA rule and regulation. The idea was
20 again to put everything together in one
21 space and in one document to be able to
22 provide for the DEA. There were no --
23 from Kevin to Andy to Maggie to myself,
24 there were no changes at that time that

Page 90

1  were noted to be made to the suspicious
2  order monitoring program, just to put it
3  into a format that could be provided to
4  governmental agencies when needed.
5  BY MR. PIFKO:
6      Q.   Did anyone write down anything
7  after that meeting stating that they were
8  satisfied with Rite Aid's procedures?
9          MS. McENROE:  Objection to form.
10         THE WITNESS:  I don't know that
11     anyone said that they were satisfied with
12     it.  There were communications from Kevin
13     asking to -- for Maggie to put it in so
14     that they could get it to distribution
15     centers, but I don't know that there was
16     anything that said everybody signed off
17     at the meeting.
18 BY MR. PIFKO:
19     Q.   Are there any other features of
20 Rite Aid's procedures with respect to identifying
21 suspicious orders?
22         MS. McENROE:  Objection to form.
23         THE WITNESS:  Sure.  There is an
24     asset protection side of our suspicious

Page 91

1      order monitoring program which has a
2      number of KPIs which look at cycle counts
3      down, which look at ordering
4      abnormalities.  So there are part of the
5      asset protection, part of the suspicious
6      order monitoring.  And that can lead to
7      investigations into stores, into theft,
8      diversion, whatever it may be.
9  BY MR. PIFKO:
10     Q.   But you testified earlier that
11 that system was never used to identify and report
12 a suspicious order.  Correct?
13         MS. McENROE:  Objection to form.
14         THE WITNESS:  I did.
15 BY MR. PIFKO:
16     Q.   Any other systems in place that
17 Rite Aid had to identify, report and halt the
18 shipment of suspicious orders?
19         MS. McENROE:  Objection to form.
20         THE WITNESS:  Those were the
21     major three components.
22 BY MR. PIFKO:
23     Q.   So to be clear, we talked about
24 the thresholds, the algorithm and then you

Page 92

1  mentioned the asset protection aspects?
2      A.   Correct.
3      Q.   When you say those are the three
4  components, that's what you were referring to?
5      A.   Yes.
6      Q.   Let's talk about the thresholds
7  for a moment.
8          So I want to talk about how they
9  work.
10         So every store, except for the
11 less than a dozen that you mentioned, has a limit
12 of 5,000 dosage units per NDC per order.
13 Correct?
14     A.   Correct.
15     Q.   And how is that limitation
16 implemented?
17     A.   It is implemented by the pickers
18 in the distribution centers.
19     Q.   How specifically does that occur?
20     A.   In the distribution center, when
21 an item is lit up to be picked, there's a device
22 called the pick -- Pick-to-Light and it lights up
23 and there's a quantity of the item to be picked.
24 When it lights up, it will say the number of

Page 93

1  packages to be picked.
2          If the picker sees, say, it's a
3  bottle of 100, 53 packages to be picked, they
4  will set -- they won't pick the item and they
5  will immediately report it to their supervisor.
6      Q.   So an order is placed that
7  exceeds the threshold, the picker sees that on
8  the lighting system?
9      A.   Pick-to-Light, yes.
10     Q.   So the lighting system identifies
11 that it exceeds the threshold or the picker does?
12         MS. McENROE:  Objection to form.
13         THE WITNESS:  The picker does.
14 BY MR. PIFKO:
15     Q.   So the pickers know that there's
16 this 5,000 dosage unit per NDC per order
17 requirement?
18     A.   The pickers are very well versed
19 in the threshold, yes.
20     Q.   Is there documentation that
21 they're provided with that tells them about that
22 threshold?
23     A.   Each of the pickers has an
24 attestation that they understand the 5,000 dosage

Page 94

1  unit limit.
2      Q.   What do you mean by dosage unit?
3      A.   A tablet, a capsule, any
4  individual dose.
5      Q.   Okay.  So the picker has to look
6  and see if it's 10 bottles of 50, they have to
7  make that calculation?
8      A.   Yes.  They make that calculation.
9  Pharmacy packages are typically bottles of 100 or
10 bottles of 500 or bottles of 1,000.  So it's a
11 simple calculation.  There's not half bottles or
12 anything along those lines.  It's typically 100,
13 500 and 1,000.
14     Q.   Is there any automation that
15 makes that calculation for them?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  From the
18 Pick-to-Light, there's not.
19 BY MR. PIFKO:
20     Q.   So an order comes in and they --
21 if it says six bottles of 1,000, that exceeds the
22 threshold.  Correct?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  Correct.

Page 95

1  BY MR. PIFKO:
2      Q.   And then if it exceeds the
3  threshold, they have to call their supervisor?
4      A.   They do.
5      Q.   What do they do when they call
6  their supervisor?
7      A.   The supervisor comes over, stops
8  the pick and then investigates the order to
9  determine, was it an auto ship order, what was
10 the nature of the order.
11         And at that particular time, they
12 would short the order to the 5,000 threshold and
13 then inquire from the store, if it wasn't an auto
14 replenishment order, why they ordered the
15 additional bottle.
16     Q.   So let's break that process out a
17 little bit.
18         You said the supervisor comes
19 over and looks at the order.
20         How do they tell if it's an auto
21 ship order?
22     A.   There is -- once they realize the
23 drug in that, there is a terminal in the
24 distribution center in the cage.  They can go to

Page 96

1  a computer and determine if the order was on a
2  replenishment and an auto ship or not.
3      Q.   And we talked earlier about
4  manually overriding by the pharmacist.
5          Do you recall that?
6      A.   I do.
7      Q.   Is that what you're
8  distinguishing between a manual override and an
9  order that's not -- that has no manual overrides?
10     A.   Yes.
11     Q.   How does the supervisor see that
12 on a computer screen?
13     A.   You can identify the particular
14 drug.  And it would say what your projected order
15 was.
16         So let's say that we took those
17 6,000 dosage units that you were discussing, they
18 would be able to see that the auto generated
19 order was six bottles to know that that was the
20 case.
21     Q.   And if the pharmacist manually
22 overrides it, then there's something they can see
23 on there that shows that the amount is different
24 than what the auto replenishment system would

Page 97

1  have placed?
2      A.   That is correct.  I believe
3  some -- one of the exhibits that we discussed
4  yesterday had a screenshot of a suggested order
5  and where you could see what the suggested order
6  was, when we were discussing 3151.
7      Q.   And so where it says suggested
8  order, that's what the auto replenishment system
9  would order?
10     A.   That is correct.
11     Q.   And so if it's an auto
12 replenishment system order, what is the
13 supervisor supposed to do?
14     A.   The supervisor -- the order is
15 still cut to the normal -- to the 5,000
16 threshold.  And at that point, the supervisor
17 would reach out and contact the pharmacy to
18 determine, did they need the 6,000 dosage units
19 and if they did, what was the reason.  And if
20 they -- if it continued to go above what the
21 threshold was, how they could get an increase to
22 their threshold.
23     Q.   Is the order filled before that
24 conversation occurs?

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    MS. McENROE: Objection to form.
2    THE WITNESS: The order is
3    reduced to the 5,000, yes. And the
4    conversation can occur after the order is
5    reduced.
6  BY MR. PIFKO:
7    Q.    Is there any documentation of
8  this conversation that occurs?
9    A.    There is documentation in the
10 controlled drug cage.
11   Q.    Is there a name of a form or a
12 logbook or something where they write down
13 anything about the conversation?
14   A.    There is a log, yes.
15   Q.    What's it called?
16   A.    Let me look.
17   Q.    And when you get to what you're
18 looking at, please identify the Bates number.
19   A.    I'm going to flip through,
20 because I'm not finding what I wanted to see.
21   Q.    What specifically are you looking
22 for?
23   A.    There is a threshold log that is
24 created at the distribution centers that would

Page 99

1  identify who was called on what date and what
2  their response was.
3    Q.    And when you're looking through
4  that binder -- I assume you've looked at all the
5  materials in the binder. Correct?
6    A.    I have.
7    Q.    Are you looking for an example of
8  a threshold log, or are you looking for a policy
9  that discusses it?
10   A.    I'm looking for an example of a
11 threshold log. And it is called the Controlled
12 Drug Above Average Order Monitoring Log.
13   Q.    And that's the document that --
14 where the supervisor notates any conversation
15 they may have had with the pharmacist?
16   A.    That is correct.
17   Q.    Is there any other place where
18 they would note their discussion?
19   A.    This is the primary document
20 where they would note their discussion.
21   Q.    You said primary.
22        Is there a secondary document?
23   A.    They may have an Excel
24 spreadsheet that they would create a log as well,

Page 100

1  but this is the hands-on log in the cage.
2    Q.    So any notes of any discussion
3  would be contained in that log?
4    A.    Yes.
5    Q.    What happens to that log after
6  it's -- where do they keep their log?
7        MS. McENROE: Objection to form.
8        THE WITNESS: They keep the log
9    in the controlled drug cage with the
10   other DEA records.
11 BY MR. PIFKO:
12   Q.    Do they send it to anyone with
13 some frequency?
14   A.    This log, they may send it to
15 myself or Kevin Mitchell or Chris Belli for
16 review as well.
17   Q.    They may, but they're not
18 required to do so?
19       MS. McENROE: Objection to form.
20       THE WITNESS: They're not
21   required to do so.
22 BY MR. PIFKO:
23   Q.    So they would call the pharmacist
24 to ask if they -- in a situation where the order

Page 101

1  exceeds the threshold, they would call the
2  pharmacist and ask if that was -- they intended
3  to place that order. Correct?
4    A.    That is correct.
5    Q.    But regardless of what the
6  pharmacist says, the order is cut to threshold?
7        MS. McENROE: Objection to form.
8        THE WITNESS: That is correct.
9  BY MR. PIFKO:
10   Q.    And that may be shipped before
11 that conversation occurs. Correct?
12   A.    That is also correct.
13       The number on the log that I'm
14 looking at, do you want that?
15   Q.    Oh, yes. Thank you.
16   A.    Okay. Rite_Aid_OMDL_0024039.
17   Q.    Is there any other discussion
18 that occurs in the situation where an order
19 exceeds the threshold?
20       MS. McENROE: Objection to form.
21       THE WITNESS: The discussion is
22   at the distribution center when the order
23   is -- to the best of my knowledge, no.
24 BY MR. PIFKO:

Page 102

1 Q. So other than calling the
2 pharmacist to ask if they intended to place that
3 order, there is no other discussion. Correct?
4 A. If they're -- part of the policy
5 is if there was an order that there was deemed to
6 be suspicious, part of the policy then is to
7 contact government affairs, myself, to
8 investigate and determine if there was any
9 suspicion or diversion or anything.
10 Q. But that's never happened.
11 Correct?
12 A. It has not.
13 Q. No one has ever called you and
14 said an order is potentially suspicious?
15 MS. McENROE: Objection to form.
16 THE WITNESS: They have not.
17 BY MR. PIFKO:
18 Q. So other than this conversation
19 with the pharmacist, is there anything else that
20 happens?
21 MS. McENROE: Objection to form.
22 THE WITNESS: After the
23 conversation with the pharmacist, and if
24 the pharmacist deems that it's necessary,

Page 103

1 that they need the additional product to
2 service their patients and meet their
3 patients' healthcare needs, then they can
4 reach out to their pharmacy district
5 manager who, at that term will determine,
6 yes, there is a valid need to increase
7 the threshold. And then ask me to
8 complete a threshold override so that
9 they can go above the 5,000 dosage units
10 based on valid patient need.
11 BY MR. PIFKO:
12 Q. Let's hold on to that for a
13 second.
14 Other than making a request to
15 increase the threshold, is there any other
16 discussion that occurs?
17 MS. McENROE: Objection to form.
18 THE WITNESS: There is not.
19 BY MR. PIFKO:
20 Q. And there's -- other than writing
21 down this log, there is no other documentation
22 that's made. Correct?
23 MS. McENROE: Objection to form.
24 THE WITNESS: The log is the

Page 104

1 documentation of the call.
2 BY MR. PIFKO:
3 Q. That's the only documentation of
4 any investigation that may be conducted.
5 Correct?
6 MS. McENROE: Objection to form.
7 THE WITNESS: Yes. The log is
8 the documentation.
9 BY MR. PIFKO:
10 Q. So let's talk about the override
11 or threshold increase.
12 Can the -- is it possible to make
13 a one-time override?
14 MS. McENROE: Objection to form.
15 THE WITNESS: I don't know that
16 it's ever been done, but it could be
17 possible for someone to call me and ask
18 for a one-time override. And yes, it
19 could be done.
20 BY MR. PIFKO:
21 Q. But to your knowledge, that's
22 never happened?
23 A. No.
24 Q. So when you mentioned that

Page 105

1 someone could ask for a threshold increase, that
2 would be a permanent increase for that location.
3 Correct?
4 MS. McENROE: Objection to form.
5 THE WITNESS: That would be an
6 increase that would be put in place and
7 then monitored routinely to make sure
8 that the usage and the reason for the
9 override would occur.
10 I would foresee a one-time
11 threshold override if there was a store
12 that had a night burglary and all of the
13 products were stolen from the store. So
14 obviously you would need to get product
15 into that store. So there may be the
16 potential for an override in situations
17 like that.
18 BY MR. PIFKO:
19 Q. Do you recall that ever
20 occurring?
21 A. There are night break-ins, yes.
22 I don't recall ever doing a threshold override,
23 but we do have night break-ins and armed
24 robberies, yes.

Page 106

1    Q.    In situations where an order is
2  placed to fill product that's been stolen in an
3  overnight robbery, is there any -- other than
4  reporting theft to the DEA, is there any
5  reporting of that order being potentially
6  suspicious?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  There is not.
9  BY MR. PIFKO:
10    Q.    So then when we're talking about
11  this override of the threshold, the store can
12  then request that their threshold be increased?
13    A.    If it was a one-time threshold,
14  typically the pharmacy district manager would
15  make a call and ask for it because of the
16  extenuating circumstance.
17    Q.    But we talked this, there's never
18  been to your knowledge a one-time increase?
19    A.    To the best of my knowledge, no.
20    Q.    So if after this call -- so you
21  said that on the call, the supervisor asked the
22  pharmacist if they intended to place that order.
23  Correct?
24        MS. McENROE:  Objection to form.

Page 107

1        THE WITNESS:  Correct.
2  BY MR. PIFKO:
3    Q.    And then if they say yes, the
4  next thing that the supervisor tells them is
5  how -- the process that they can go through to
6  get their threshold increased.  Correct?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  That is correct.
9  BY MR. PIFKO:
10    Q.    And so what is the process then
11  that a store would undertake to get a threshold
12  increase?
13    A.    At that particular time, the
14  store would reach out to their pharmacy district
15  manager or immediate supervisor and say, my order
16  has been cut back.  I can't service my patients.
17  Please seek a threshold increase on hydrocodone
18  for my particular store.  And then the pharmacy
19  district manager would send that increase request
20  to myself or a member of my team.
21    Q.    Is there a name for that team?
22    A.    Regulatory compliance, government
23  affairs.  It's both one and the same.
24    Q.    So you talked yesterday about the

Page 108

1  organizational structure of your department.
2  Correct?
3    A.    I did.
4    Q.    Is there any sort of
5  suborganizational structure of people who would
6  just deal with threshold increases?
7    A.    From the distribution center,
8  when we distributed, there was myself and Andrea
9  Bucher.
10    Q.    So only the two of you would have
11  been the only people who would deal with
12  threshold increases?
13    A.    I'm thinking of the time frame of
14  when individuals entered the department.  There
15  is the possibility that another member of my
16  team, Amy Knisely, may have looked at thresholds
17  as well.
18    Q.    Anyone else?
19    A.    No.
20    Q.    So you, Andrea Bucher or Amy
21  Knisely would be the only people that would have
22  evaluated a threshold increase request?
23    A.    Yes.
24    Q.    Is there a document that has to

Page 109

1  be created to get requests to threshold increase?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  There is no
4    document, just an email with the reason
5    why the increase is needed and -- on an
6    email.
7  BY MR. PIFKO:
8    Q.    So the district manager sends an
9  email to you or one of the members of your team?
10    A.    They do.
11    Q.    Can the pharmacist go directly to
12  you?
13    A.    If the pharmacists come directly
14  to us, we reroute it to the pharmacy district
15  manager in order to make sure that they're aware
16  that there's a request in for them to say, yes,
17  please look at the request.
18        MS. McENROE:  Mark, we've been
19    going for about an hour, so whenever is a
20    good time for a break.
21        MR. PIFKO:  Okay.
22  BY MR. PIFKO:
23    Q.    The district manager has to
24  approve sending the request to you and your team?

Page 110

1    A.    Yes.
2    Q.    And even if a pharmacist makes it
3  directly, you then back route it to the district
4  manager to make sure that they would approve it
5  first?
6    A.    Sure.  I would -- I could make a
7  phone call to the pharmacy district manager and
8  say, hey, we have a request that came in from
9  your store 1234, you know, do you want us to work
10  on it or look at it.  And they would say yes or
11  no once they determined if it was needed or not.
12  But yes.
13    Q.    We'll take a break in just a
14  moment, but I want to ask you, are there any
15  criteria or attributes of the pharmacy that you
16  look for when you're evaluating a threshold
17  increase?
18         MS. McENROE:  Objection to form.
19         THE WITNESS:  For a threshold
20      increase, we look at usage from the
21      store, the order history, the suggested
22      order and an average of the monthly
23      dispensings of that particular drug for
24      the store.

Page 111

1  BY MR. PIFKO:
2    Q.    When they make the request to
3  you, though, do they have to provide any specific
4  type of information in the email request?
5    A.    Sometimes they do and sometimes
6  they don't.  Sometimes they would say, a new
7  clinic opened down the street, depending on the
8  request that came in.
9    Q.    But my question was different.
10         Are they required to provide
11  certain types of information in the email making
12  the request to you?
13    A.    They are not required to put it
14  in the email, but that does not mean that we
15  don't follow up and get the extenuating
16  circumstance of why they're asking for the
17  increase.
18    Q.    So the only thing that's required
19  is that they tell you that they want the
20  increase?
21         MS. McENROE:  Objection to form.
22         THE WITNESS:  In the email, yes.
23      But there would be follow-up with them.
24  BY MR. PIFKO:

Page 112

1    Q.    Okay.  And so then upon receiving
2  that, you would then look at the data for that
3  pharmacy as you just testified a few minutes ago?
4    A.    We would.  Similar to what we
5  looked at yesterday for 3151.
6         MR. PIFKO:  Okay.  We can take a
7  break.
8         MS. McENROE:  Okay.
9         THE VIDEOGRAPHER:  Going off the
10  record at 11:35 a.m.
11         - - -
12      (A recess was taken from
13      11:35 a.m. to 11:53 a.m.)
14         - - -
15         THE VIDEOGRAPHER:  We're back on
16      the record at 11:53 a.m.
17  BY MR. PIFKO:
18    Q.    I want to ask you some questions.
19         You brought a binder with you
20  today.  Correct?
21    A.    I did.
22    Q.    Can you describe for the record
23  what that binder is?
24    A.    Sure.  It was documents that I

Page 113

1  asked counsel to put together and make copies of
2  for me as part of my testimony, or depositions so
3  that I could refer to them.
4    Q.    I'm handing you what's marked as
5  Exhibit 4.
6         - - -
7      (Deposition Exhibit No.
8      Hart-30(b)(6)-4, Index of Binder, was
9      marked for identification.)
10         - - -
11  BY MR. PIFKO:





Page 114

Page 116

Page 115

Page 117

6    Q.    Did you review all these
7  documents prior to today's deposition?
8    A.    I did.
9    Q.    Did you review any other
10 documents prior to today's deposition, beyond
11 what's in this -- that binder?
12    A.    I did.
13    Q.    What was the basis for reviewing
14 the other documents that you reviewed other than
15 the ones that are in the binder?
16         MS. McENROE:  Objection.  I just
17    want to caution the witness in terms of
18    not revealing substance discussed with
19    counsel, to avoid divulging any verbally,
20    of course, privileged information.
21         Can you restate the question?
22    Just so I make sure I understand how it's
23    not asking for privileged information.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  Q.   Yeah.
2        So you reviewed the documents in
3  the binder to prepare for the deposition.
4  Correct?
5  A.   Correct.
6  Q.   And you reviewed other documents
7  that aren't in the binder to prepare for the
8  deposition; is that correct?
9  A.   Correct.
10 Q.   Okay.  When did you review the
11 other documents that weren't in the binder?
12 A.   When I met with counsel to
13 prepare.
14 Q.   Okay.  It's like a two-inch
15 binder that you have in front of you.
16       It's basically full.  Agreed?
17 A.   Yes.
18 Q.   And is it double-sided?
19 A.   Yes.
20 Q.   The volume of documents that you
21 reviewed that's not in the binder, how does that
22 compare to the volume of documents that's in the
23 binder?
24       MS. McENROE:  Objection to form.

Page 119

1        THE WITNESS:  Many more documents
2        were reviewed aside from this -- these
3        27.
4  BY MR. PIFKO:
5  Q.   So you would say there's a lot
6  more documents that you reviewed to prepare for
7  the deposition that aren't in the binder.
8  Correct?
9  A.   There were.
10 Q.   You just went through the
11 exercise of reading all those numbers.  As we
12 discussed, those are Bates numbers.
13       Do you believe that all the
14 documents that you reviewed to prepare for the
15 deposition had those kinds of numbers on them?
16 A.   I believe so, yes.
17 Q.   Do you know if there's any
18 documents that you reviewed to prepare for the
19 deposition that were not provided to the
20 plaintiffs in the litigation?
21       MS. McENROE:  What he means by
22       that is, if it has a Bates number, that
23       it would be provided to plaintiffs in the
24       litigation.

Page 120

1        THE WITNESS:  I believe all the
2        documents that I reviewed were provided.
3  BY MR. PIFKO:
4  Q.   How did you decide what documents
5  that you wanted to review?
6  A.   I looked at the importance of the
7  documents and what I might make part of my
8  deposition.  And picked some of the positives or
9  like in the analytics part of it, the algorithms.
10 I'm not an algorithm person, so I wanted to have
11 something in front of me to be able to review.
12 Q.   Did you speak to anyone other
13 than counsel to prepare for the deposition?
14 A.   Today or previously?
15 Q.   At any time.
16 A.   I have.
17 Q.   Okay.  Who did you speak with?
18 A.   I spoke with Marcia Brumbaugh,
19 who is in our IT department.  Charlie Miller,
20 Andy Palmer, Ron Chima.
21       I'm trying to think.
22       Those are the people within the
23 corporation that I spoke to, or with or former.
24 Q.   How long did you speak to Marcia?

Page 121

1  A.   I believe it was about an
2  hour-and-a-half.
3  Q.   Did you have more than one
4  conversation with her?
5  A.   I had one conversation with her.
6  Q.   What did you discuss with her to
7  prepare for the deposition?
8        MS. McENROE:  Objection.  I just
9        want to interject.  To the extent counsel
10       was involved, that you shouldn't discuss
11       the substance as privileged.
12       THE WITNESS:  Okay.
13       MR. PIFKO:  Well, preparations
14       for a 30(b)(6) are not -- if she's trying
15       to inform herself, they're not
16       privileged.
17       MS. McENROE:  On the underlying
18       facts, I agree with you.  I just want to
19       make sure that any of the substance that
20       could have been discussed at the
21       direction of counsel or with input from
22       counsel is not divulged inadvertently.
23       THE WITNESS:  Can you repeat the
24       question?

Page 122

1 BY MR. PIFKO:
2 Q. Yeah.
3 I just want to know -- okay.
4 So you had one conversation with
5 Marcia to prepare for the deposition. Correct?
6 A. I did.
7 Q. Okay. And my question is, and
8 you said that you spoke to her for about an
9 hour-and-a-half. Correct?
10 A. That is correct.
11 Q. Sorry. You need to give an
12 audible response.
13 Did you speak to her in person or
14 on the phone?
15 A. In person.
16 Q. Who else was present at that
17 meeting?
18 A. Counsel.
19 Q. Anyone else?
20 A. That was it.
21 Q. Okay. And for purposes of
22 preparing of the deposition, what did you discuss
23 with her?
24 A. We discussed the algorithm.

Page 123

1 Q. Anything else?
2 A. That was primarily it.
3 Q. What's Marcia's background?
4 A. She is in our information -- IT
5 department.
6 Q. Does she have knowledge about the
7 algorithm?
8 A. She does.
9 Q. Did she have any role in
10 designing it?
11 A. I don't know that.
12 Q. Do you know how long she's been
13 with the company?
14 A. I'm going to say at least 15
15 years.
16 Q. Do you know if Marcia had any
17 role in modifying the algorithm at any time?
18 A. I don't know that.
19 Q. Okay. For purposes of preparing
20 for the deposition, what did Marcia tell you
21 about the algorithm?
22 A. We went over the document on the
23 algorithm that was involved in here, just to give
24 an overview of the algorithm.

Page 124

1 Q. And which tab was that?
2 A. Let me look.
3 That would be 7 and 8.

15 Q. You also spoke to Charlie Miller?
16 A. I did.
17 Q. Who is Charlie Miller?
18 A. Charlie Miller is a pharmacist
19 for Rite Aid at present.
20 Q. Where is he based?
21 A. He is in Pennsylvania.
22 Q. Does he work for a specific
23 store?
24 A. Yes, he's a pharmacist in a

Page 125

1 store. I don't know the location.
2 Q. Somewhere in Pennsylvania?
3 A. Yes.
4 Q. In Philadelphia, or you don't
5 know that?
6 A. I think closer to York.
7 Q. And what did you speak with Mr.
8 Miller to prepare for the deposition about?
9 MS. McENROE: Same objection,
10 same instruction, in terms of any
11 involvement of counsel, stay away from
12 any of that sort of privileged
13 discussion. But for the underlying
14 facts, so long as you're not divulging
15 privileged information, you may answer.



Page 126

⁶  Q.   So you spoke to him on the phone?
⁷  A.   Yes.
⁸  Q.   Less than 20 minutes?
⁹  A.   Yes.
¹⁰  Q.   Less than five minutes?
¹¹  A.   Yes.
¹²  Q.   Andy Palmer, you spoke to him to
¹³ prepare for the deposition?
¹⁴  A.   I did.
¹⁵  Q.   How many times did you speak with
¹⁶ him?
¹⁷  A.   Twice.
¹⁸  Q.   Were those in person or on the
¹⁹ phone?
²⁰  A.   They were in person.
²¹  Q.   When was the first time that you
²² spoke to Andy?
²³  A.   Two to three weeks ago.
²⁴  Q.   When was the second time you

Page 127

¹ spoke to him?
²  A.   Within the last week or two.
³  Q.   The first conversation that you
⁴ had with him, how long was that?
⁵  A.   A few hours.

²⁰ BY MR. PIFKO:
²¹  Q.   Anything else?
²²  A.   That was primarily that.
²³  Q.   Did you review any documents with
²⁴ him to have that discussion?

Page 128

¹  A.   We did review some documents.
²  Q.   What documents did you review?
³  A.   Some Above Average logs.
⁴  Q.   Anything else?
⁵  A.   That was primarily it.
⁶  Q.   Are you aware that Andy Palmer
⁷ was deposed in this case?
⁸  A.   I am.
⁹  Q.   Did you review his deposition
¹⁰ transcripts to prepare for this deposition?
¹¹  A.   I did not review Andy's
¹² transcripts.
¹³  Q.   Did you review any deposition
¹⁴ transcripts to prepare for this deposition?
¹⁵  A.   I reviewed Chris Belli's
¹⁶ transcript, Rick Chapman's transcript and part of
¹⁷ Andrea Bucher's transcript.
¹⁸  Q.   Only part of Andrea's transcript?
¹⁹  A.   Yes.
²⁰  Q.   What part of her transcript did
²¹ you review?
²²  A.   I briefly read through
²³ approximately the first half of it and then that
²⁴ was it.

Page 129

¹  Q.   Why was it that you only
² looked at the first half?
³  A.   I simply didn't have enough time.
⁴  Q.   What did you learn from reviewing
⁵ her transcript?
⁶     MS. McENROE:  Objection to form.
⁷     THE WITNESS:  When she was --
⁸     MS. McENROE:  You can answer.
⁹     THE WITNESS:  What she was asked
¹⁰ questions about, similar to what I was
¹¹ asked questions about.
¹² BY MR. PIFKO:
¹³  Q.   So then you said you met with
¹⁴ Andy Palmer again in the last week or so?
¹⁵  A.   Yes.
¹⁶  Q.   How long was that meeting?
¹⁷  A.   An hour, an hour-and-a-half.
¹⁸  Q.   What did you discuss during that
¹⁹ meeting?
²⁰     MS. McENROE:  Same objection and
²¹ same instruction with respect to not
²² divulging privileged communications.  But
²³ to the extent that you learned facts that
²⁴ you're testifying about here today, you



Page 130

1    may testify.

Page 131

Page 132

5    Q.    Did you discuss anything else
6    with Mr. Palmer in the second meeting?
7         MS. McENROE:  Same instruction
8    with respect to privilege.
9         You may answer.
10        THE WITNESS:  Not that I
11   remember, no.
12   BY MR. PIFKO:
13        Q.    How about Ron Chima, what did
14   you --
15        MS. McENROE:  Go ahead.
16   BY MR. PIFKO:
17        Q.    What did you discuss with Mr.
18   Chima?
19        MS. McENROE:  I'm going to object
20   and instruct the witness not to answer.
21   Mr. Chima is in-house counsel for Rite
22   Aid, and so I -- I have given you some
23   leeway with respect to the underlying
24   fact witnesses, but I'm sorry that I

Page 133

1    can't do the same with respect to Mr.
2    Chima.
3    BY MR. PIFKO:
4         Q.    Did you discuss any facts that
5    you needed to know to serve as the 30(b)(6)
6    witness with Mr. Chima?
7         MS. McENROE:  That's just a yes
8    or no.
9         THE WITNESS:  I did not discuss
10   any facts.
11   BY MR. PIFKO:
12        Q.    How long did you meet with Mr.
13   Chima?
14        A.    Not long at all.  I would -- you
15   know, a short meeting.  Not even a meeting, a
16   conversation.
17        MS. McENROE:  Okay.
18   BY MR. PIFKO:
19        Q.    Was that in person?
20        MS. McENROE:  You may answer that
21   question.
22        THE WITNESS:  Yes.
23   BY MR. PIFKO:
24        Q.    When was that?



**Page 134**

1    A.    Way back when the whole process
2 started.
3    Q.    So a few months ago?
4    A.    Yes.
5    Q.    On or around the time that you
6 first saw the notices?
7    A.    Yes.
8        MR. PIFKO:  Why don't take a --
9 it looks like it's 12:20, we'll take a
10 lunch break.
11        MS. McENROE:  Sure.
12        THE VIDEOGRAPHER:  Going off the
13 record at 12:16 p.m.
14        - - -
15        (A recess was taken from
16 12:16 p.m. to 1:10 p.m.)
17        - - -
18        THE VIDEOGRAPHER:  Back on the
19 record at 1:10 p.m.
20 BY MR. PIFKO:
21    Q.    Welcome back.
22    A.    You too.
23    Q.    Before the break, we were talking
24 about threshold increases.

**Page 135**

1        Do you recall that?
2    A.    I do.
3        - - -
4        (Deposition Exhibit No.
5 Hart-30(b)(6)-5, Email chain, top one
6 dated 16 Sep 2011, Bates stamped
7 MCKMDL00632923 through MCKMDL00632925,
8 was marked for identification.)
9        - - -
10 BY MR. PIFKO:

**Page 136**

**Page 137**

Highly Confidential - Subject to Further Confidentiality Review



Page 142



Page 144

Page 143

Page 145

```
 8        MS. McENROE:  Objection to form.
 9   And again, you already elicited the
10   testimony that Rite Aid did not consider
11   the McKesson thresholds to be part of the
12   suspicious order monitoring.
13        MR. PIFKO:  You're giving a
14   speaking objection.  You can't do that.
15   You've got to stop --
16        MS. McENROE:  You said I could
17   have 10 seconds.  And you're going far
18   beyond --
19        MR. PIFKO:  No, no.  I didn't say
20   you could have 10 seconds.  You can
21   object to scope and that's it.  You're
22   coaching the witness.  You need to stop.
23        MS. McENROE:  I'm not coaching
24   the witness.  I'm trying to speak to you.
```



Page 146

1    MR. PIFKO:  You're speaking here,
2 you're giving testimony.
3    MS. McENROE:  Do you want to go
4 off the record --
5    MR. PIFKO:  No.
6    MS. McENROE:  -- and you and I
7 can go talk in the hallway?
8    MR. PIFKO:  No, I don't.
9    MS. McENROE:  Then that's fine.
10    MR. PIFKO:  I want you to object
11 properly.
12    MS. McENROE:  I'm objecting just
13 fine.  You are all over the place.
14    MR. PIFKO:  Okay.
15    MS. McENROE:  Can you tell me
16 which 30(b)(6) topic --
17    MR. PIFKO:  No.  I'm asking the
18 questions here.  Okay?
19    MS. McENROE:  -- you are talking
20 about?
21    MR. PIFKO:  If you want to --
22    MS. McENROE:  I understand you're
23 asking questions, but you're way beyond
24 the scope.  She already gave you

Page 147

1 testimony, this isn't part of our
2 suspicious order monitoring program.
3 Where is your basis for asking the
4 question?
5    MR. PIFKO:  Are you done
6 speaking?  Are you done speaking?
7    MS. McENROE:  Are you just not
8 going to tell me?
9    MR. PIFKO:  You're interrupting
10 the deposition.  Okay?
11    MS. McENROE:  Are you not going
12 to tell me?
13    MR. PIFKO:  You can object to
14 form.  You can object to scope.  Other
15 than that, you need to be quiet.
16    MS. McENROE:  Well, I'm going to
17 take that as a concession that you don't
18 have a 30(b)(6) topic, so a full --
19    MR. PIFKO:  I'm not conceding
20 anything.
21    MS. McENROE:  -- line of
22 questioning is improper.
23    MR. PIFKO:  I'm asking my
24 questions.  Okay?  We can fight about the

Page 148

1 scope of it after the deposition is over.
2    MS. McENROE:  Objection as to
3 scope.
4 BY MR. PIFKO:





Page 154

Page 156

Page 155

Page 157

3   BY MR. PIFKO:

4       Q.   Have you heard of the concept

5   "the holy trinity"?

6           MS. McENROE:  Objection to form,

7       objection to scope.

8           THE WITNESS:  I have.

9   BY MR. PIFKO:

10      Q.   What does that mean to you?

11      A.   The holy trinity is an opioid, a

12  benzodiazepam -- benzodiazepine and a muscle

13  relaxant prescribed for a person at one time.

14      Q.   Is that a red flag?

15          MS. McENROE:  Objection to form,

16      objection to scope.

17          THE WITNESS:  The trinity is a

18      red flag, yes.

19  BY MR. PIFKO:

20      Q.   And why is that a red flag?

21          MS. McENROE:  Objection to form,

22      objection to scope.

23          THE WITNESS:  The DEA has come

24      out and stated that there should be no

Page 158

1 reason why a prescriber should prescribe
2 those three medications for one patient
3 at one time.
4 BY MR. PIFKO:
5 Q. Would you also look at the nature
6 of the patients when you ran some of this
7 prescriber level analysis?
8 MS. McENROE: Objection to form,
9 objection to scope.
10 THE WITNESS: We would look at
11 patients if one -- when we ran our
12 analysis, if one patient stood out, we
13 would look at a particular patient, yes.
14 BY MR. PIFKO:
15 Q. Would you look at the actual
16 scripts that were written?
17 MS. McENROE: Objection to form,
18 objection to scope.
19 THE WITNESS: We would look at
20 original scripts as well.
21 BY MR. PIFKO:
22 Q. Would you look at the conditions
23 for which the prescription was being written?
24 MS. McENROE: Objection to form,

Page 159

1 objection to scope.
2 THE WITNESS: We would look if
3 there was a description.
4 BY MR. PIFKO:
5 Q. Okay. But you wouldn't -- what
6 would you do -- if there was a description, what
7 would you do with that information?
8 MS. McENROE: Objection to form,
9 objection to scope.
10 THE WITNESS: It would remain on
11 the prescription.
12 BY MR. PIFKO:
13 Q. But would you look if there
14 was -- a prescription was being written for a
15 medication that the reason on the prescription
16 seemed unusual to you?
17 MS. McENROE: Objection to form,
18 objection to scope.
19 THE WITNESS: Yes.
20 BY MR. PIFKO:
21 Q. And what would you do with that
22 information?
23 MS. McENROE: Objection to form,
24 objection to scope.

Page 160

1 THE WITNESS: We would look at
2 the patient profile and look at the type
3 of the prescriber and review it.
4 BY MR. PIFKO:
5 Q. Would you look at the physical
6 location of the prescriber in relationship to the
7 patient?
8 MS. McENROE: Objection to form,
9 objection to scope.
10 THE WITNESS: We could look at
11 that, yes.
12 BY MR. PIFKO:
13 Q. You would agree that one red flag
14 is if you have patients from out of the area
15 filling a prescription, that could be a red flag?
16 MS. McENROE: Objection to form,
17 objection to scope.
18 THE WITNESS: Patients traveling
19 distance to get a prescription filled
20 could be a red flag or it may not be a
21 red flag.
22 BY MR. PIFKO:
23 Q. Would you agree that -- in what
24 situation would it be a red flag?

Page 161

1 MS. McENROE: Objection to form,
2 objection to scope.
3 THE WITNESS: It could possibly
4 be a red flag if a patient lived two
5 hours away from a pharmacy and drove by
6 two other pharmacies to get to the
7 pharmacy where they were filling it.
8 BY MR. PIFKO:
9 Q. What about if a doctor is from
10 out of the area and the patient is bringing a
11 script from a far away doctor? Is that a red
12 flag?
13 MS. McENROE: Objection to form,
14 objection to scope.
15 THE WITNESS: Again, it all
16 depends on the type of doctor, where the
17 patient and the pharmacy is located.
18 There are things to consider if it's,
19 say, Johns Hopkins -- if the doctor is
20 from Johns Hopkins and the patient is
21 filling it on the Eastern Shore of
22 Maryland, I wouldn't -- that may not be a
23 red flag as obviously Johns Hopkins is a
24 medical hub type thing.

Page 162

1 BY MR. PIFKO:

2     Q.   On these occasions when you would

3 run these prescriber analyses, would you document

4 your findings?

5         MS. McENROE: Objection to form,

6     objection to scope.

7         THE WITNESS: We would maintain a

8     file on the doctor.

9         Again, this was Sophia, but -- in

10     this instance, but if we were reviewing

11     doctors, yes, we would maintain a file on

12     that doctor.

13 BY MR. PIFKO:

14     Q.   What would that file be called?

15         MS. McENROE: Objection to form,

16     objection to scope.

17         THE WITNESS: The file would be

18     the DEA number of the doctor and their

19     name.

20 BY MR. PIFKO:

21     Q.   Is there some sort of specific

22 use that you would do with that file?

23         MS. McENROE: Objection to form,

24     objection to scope.

Page 163

1         THE WITNESS: We just store it on

2     our drives.

3 BY MR. PIFKO:

4     Q.   Would there be occasions if you

5 found -- I believe you said on certain occasions

6 there can be a suspicious prescriber; is that

7 correct?

8         MS. McENROE: Objection to form,

9     objection to scope.

10         THE WITNESS: That is correct.

11 BY MR. PIFKO:

12     Q.   If you found a prescriber to be a

13 suspicious prescriber, what would you do?

14         MS. McENROE: Objection to form,

15     objection to scope.

16         THE WITNESS: If we found a

17     suspicious prescriber, we would then look

18     at the profile, verify the profile and

19     send out a clinic protocol to the field

20     teams, the asset protection district

21     manager and the pharmacy district

22     manager, to go and visit the prescriber's

23     office.

24 BY MR. PIFKO:

Page 164

1     Q.   And what would the nature of the

2 visit to the prescriber's office be?

3         MS. McENROE: Objection to form,

4     objection to scope.

5         THE WITNESS: We have all of the

6     data in front of us, but we don't know

7     what the office looks like, if it's a

8     functioning office, if it's in an office

9     building that would look like a

10     physician's office. And so the PDM and

11     the APDM are responsible for sending back

12     pictures of the doctor's office if

13     possible, looking at the doctor's office

14     to determine if there are people walking

15     in and out and getting prescriptions

16     every five minutes and not what would be

17     a normal doctor visit.

18         So they would be the eyes and

19     ears looking for things like that.

20 BY MR. PIFKO:

21     Q.   When you said PDM, you meant

22 pharmacy district manager?

23     A.   Yes.

24     Q.   And APM is assistant pharmacy

Page 165

1 manager?

2     A.   Asset protection.

3     Q.   Okay. Thank you.

4         In connection with those visits,

5 would they speak to the doctor?

6         MS. McENROE: Objection to form,

7     objection to scope.

8         THE WITNESS: They would ask to

9     speak with office staff or to speak with

10     the doctor. They would provide

11     information on Rite Aid, such as the

12     ability to get a flu shot at Rite Aid,

13     things along those lines.

14 BY MR. PIFKO:

15     Q.   Would they tell the doctor that

16 they were investigating that doctor as a

17 potentially suspicious prescriber?

18         MS. McENROE: Objection to form,

19     objection to scope.

20         THE WITNESS: They would not.

21 BY MR. PIFKO:

22     Q.   So then at some point this

23 inquiry into the suspicious prescriber reaches

24 some resolution. Agreed?

Page 166

1        MS. McENROE:  Objection to form,
2    objection to scope.
3        THE WITNESS:  Yes.
4  BY MR. PIFKO:
5    Q.    If Rite Aid finds that a
6  prescriber is a suspicious prescriber after
7  finishing that investigation, what does it do?
8        MS. McENROE:  Objection to form,
9    objection to scope.
10       THE WITNESS:  We have the
11   pictures come back and we have a file of
12   all the data that we've run.  And at that
13   point, if there's -- if we believe that
14   it is a suspicious prescriber, we have a
15   committee of three pharmacists at our
16   corporate office that will sit down and
17   look at the data, look at the pictures,
18   and make a determination if that
19   prescriber is a book of business that we
20   wanted or not.
21  BY MR. PIFKO:
22   Q.    So ultimately a decision could be
23  made not to service prescriptions from that
24  doctor; is that correct?

Page 167

1        MS. McENROE:  Objection to form,
2    objection to scope.
3        THE WITNESS:  Controlled
4    substance prescriptions, yes.
5  BY MR. PIFKO:
6    Q.    To your knowledge, has that
7  happened on occasion?
8        MS. McENROE:  Objection to form,
9    objection to scope.
10       THE WITNESS:  It has.
11  BY MR. PIFKO:
12   Q.    And when Rite Aid makes a
13  determination that they're not going to service a
14  prescriber anymore because they deem that
15  prescriber's practice to be sufficiently
16  suspicious, what would they do to implement that
17  decision?
18       MS. McENROE:  Objection to form,
19   objection to scope.
20       THE WITNESS:  Once the three
21   pharmacists at the corporate office sign
22   off that it's a book of business that we
23   don't want for the controlled substance,
24   then I notify the prescriber in a letter

Page 168

1    that states that because of the
2    prescription of oxycodone, or whatever
3    the drug may be, that effective at a
4    certain date, Rite Aid will no longer
5    dispense controlled substance
6    prescriptions under their DEA number.
7  BY MR. PIFKO:
8    Q.    Do they have an appeal process or
9  anything or is that decision final once it's
10  made?
11       MS. McENROE:  Objection to form,
12   objection to scope.
13       THE WITNESS:  Typically when we
14   get to that point, they may call and ask
15   for an appeal, but when we reach that
16   decision, that's a very serious decision
17   that we don't take lightly.  So typically
18   there is no appeal.
19  BY MR. PIFKO:
20   Q.    To your knowledge, has that
21  happened ever?
22       MS. McENROE:  Objection to form,
23   objection to scope.
24       THE WITNESS:  Has what happened?

Page 169

1  BY MR. PIFKO:
2    Q.    You've made a determine to stop
3  servicing business from a particular prescriber?
4        MS. McENROE:  Objection to form,
5    objection to scope.
6        THE WITNESS:  Yes, we have.
7  BY MR. PIFKO:
8    Q.    Do you have a rough estimate
9  about how many times it's happened in your
10  career?
11       MS. McENROE:  Objection to form,
12   objection to scope.
13       THE WITNESS:  Over 150 times.
14  BY MR. PIFKO:
15   Q.    That number came rather quickly.
16       You feel like that's a --
17   A.    Very close, yes.
18       MS. McENROE:  Objection to form,
19   objection to scope.
20  BY MR. PIFKO:
21   Q.    Okay.  Do you keep statistics on
22  that somewhere?
23       MS. McENROE:  Objection to form,
24   objection to scope.

Page 170

1    THE WITNESS:  We do.
2 BY MR. PIFKO:
3    Q.    That's a statistic that you have
4 reviewed in the recent past?
5         MS. McENROE:  Objection to form,
6    objection to scope.
7         THE WITNESS:  I'm familiar with
8    it on a daily basis.
9 BY MR. PIFKO:
10    Q.    That's something you check every
11 day?
12         MS. McENROE:  Objection to form,
13    objection to scope.
14         THE WITNESS:  Not every day, but
15    at least monthly.
16 BY MR. PIFKO:
17    Q.    Can a doctor get reinstated after
18 they've been terminated?
19         MS. McENROE:  Objection to form,
20    objection to scope.
21         THE WITNESS:  Yes.  A doctor can
22    get reinstated.
23 BY MR. PIFKO:
24    Q.    Is there a formal process that

Page 171

1 they have to follow?
2         MS. McENROE:  Objection to form,
3    objection to scope.
4         THE WITNESS:  The doctor makes a
5    request of -- from myself that they would
6    like to be reinstated.  And then I go in
7    and look at the prescriber's history.
8         So let's say it's been a year
9    since we shut the doctor off.  What then
10    happens is he requests to be reinstated a
11    year later.  I would look at that
12    doctor's history for the year, his
13    prescribing pattern for that year, to
14    determine if it has changed from when we
15    shut the person off.
16 BY MR. PIFKO:
17    Q.    But you wouldn't have a history
18 on the substances, the controlled substances that
19 you shut off because you weren't servicing that.
20 Correct?
21         MS. McENROE:  Objection to form,
22    objection to scope.
23         THE WITNESS:  That is not
24    correct.  We have a tool -- from 2013 on,

Page 172

1 we had a tool that was through IQVIA that
2    would provide industry data deidentified
3    for about 87 percent of retail
4    pharmacists.
5 BY MR. PIFKO:
6    Q.    Okay.  When you found that a
7 store has been servicing a suspicious prescriber,
8 have you ever undertaken anything to flag the
9 orders from that pharmacy as suspicious?
10         MS. McENROE:  Objection to form,
11    objection to scope.
12         THE WITNESS:  Could you repeat
13    the question, please?
14 BY MR. PIFKO:
15    Q.    So if a store is filling
16 prescriptions from a physician who's been
17 determined to be a suspicious prescriber, does
18 Rite Aid undertake any effort to identify orders
19 from that store as suspicious as a result of them
20 being from the suspicious prescriber?
21         MS. McENROE:  Objection to form.
22         THE WITNESS:  One more time, I'm
23    sorry.
24 BY MR. PIFKO:

Page 173

1    Q.    If a store is filling
2 prescriptions from a prescriber who's been
3 determined to be a suspicious prescriber, does
4 Rite Aid undertake any efforts to identify the
5 orders that come from that store -- during the
6 time when that suspicious prescriber was sending
7 patients to that store, does Rite Aid undertake
8 any effort to identify those orders as
9 suspicious?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  We do not.
12 BY MR. PIFKO:
13    Q.    So Rite Aid does not use any of
14 the suspicious prescriber information that it may
15 have collected in determining whether an order
16 from any location is suspicious.  Correct?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  The order has
19    already been shipped to the store, so
20    there's -- that's not incorporated -- the
21    suspicious prescriber isn't incorporated
22    in.
23 BY MR. PIFKO:
24    Q.    What about when an investigation



Page 174

1   is going on, does Rite Aid undertake any effort
2   to look at the orders that are continuing to come
3   in as a result of prescriptions being placed
4   through that doctor?
5           MS. McENROE:  Objection to form.
6           THE WITNESS:  We continue to
7       monitor the prescriptions that would be
8       coming in, but we do not consider that a
9       suspicious order to place.
10  BY MR. PIFKO:
11      Q.    So I believe we -- I asked you a
12  little bit earlier, do you remember discussing
13  this doctor, Dr. Harper?
14          MS. McENROE:  Objection to form,
15      objection to scope.
16          THE WITNESS:  I don't remember
17      discussing the doctor with Sophia.
18  BY MR. PIFKO:

Page 175

16              - - -
17          (Deposition Exhibit No.
18      Hart-30(b)(6)-6, Email dated 2011-02-01,
19      Bates stamped Rite_Aid_OMDL_0013134
20      through Rite_Aid_OMDL_0013136, was marked
21      for identification.)
22              - - -
23  BY MR. PIFKO:
24      Q.    I'm handing you what's marked as

Page 176

1   Exhibit 6.
2           For the record, Exhibit 6 is a
3   three-page document Bates labeled
4   Rite_Aid_OMDL_0013134 through 36.
5           Please take a moment to look at
6   that and let me know when you're done.
7       A.    (Reviewing document.)
8       Q.    Have you seen this document
9   before?
10      A.    I don't believe so, no.
11      Q.    In reviewing this, do you know
12  what this document is?

Page 177



Page 178

Page 179

```
21              - - -
22          (Deposition Exhibit No.
23      Hart-30(b)(6)-7, Press Release entitled
24      "Akron Doctor Pleads Guilty to Illegally
```

Page 180

```
 1      Prescribing Painkillers," was marked for
 2      identification.)
 3              - - -
 4   BY MR. PIFKO:
 5      Q.   I'm handing you what was
 6   previously marked as Novack Exhibit 8 and I'm
 7   marking here as Hart-30(b)(6) Exhibit 7.
 8           Please take a moment to review
 9   this.  Note it's double sided.
10           Let me know when you're done.
11           MS. McENROE:  I'm also going to
12      make another scope objection for the
13      record.
14           THE WITNESS:  (Reviewing
15      document.)
16           I'm done.
17   BY MR. PIFKO:
18      Q.   Have you seen this before?
19      A.   Yes.
20      Q.   When was the last time you saw
21   this?
22      A.   Within the past several days.
23      Q.   This is something you reviewed in
24   preparing for this deposition?
```

Page 181

```
 1      A.   Yes.
 2      Q.   Do you see the first sentence
 3   here above the -- the headline reads, "Akron
 4   Doctor Pleads Guilty to Illegally Prescribing
 5   Painkillers."
 6           Do you see that?
 7      A.   I do.
 8      Q.   It's dated October 20, 2014.
 9           Do you see that?
10      A.   I do.
11      Q.   Do you see the first sentence
12   here, it says, "An Akron physician pleaded guilty
13   to illegally prescribing hundreds of thousands of
14   doses of painkillers and other pills to customers
15   for no legitimate medical purpose, even after he
16   learned some customers had died from
17   overdose-related deaths, law enforcement
18   officials said."
19           Do you see that?
20      A.   I do.
21      Q.   Did Rite Aid institute efforts to
22   shut this particular doctor down from its --
23   serving his customers?
24           MS. McENROE:  Objection to form,
```

Page 182

1    objection to scope.
2        THE WITNESS:  I don't remember.
3            - - -
4        (Deposition Exhibit No.
5    Hart-30(b)(6)-8, Indictment, Case No.:
6    5:14CR096, was marked for
7    identification.)
8            - - -
9  BY MR. PIFKO:
10       Q.    I'm handing you what was
11   previously marked as Novack Exhibit 7 and I've
12   also marked here as Hart-30(b)(6) Exhibit 8.  For
13   the record, it's an indictment of Dr. Harper.
14       MS. McENROE:  For the record,
15       again, objection as to scope.  And can
16       you tie this to any of the 30(b)(6)
17       topics?  Because the witness already
18       said --
19  BY MR. PIFKO:
20       Q.    It's dated March 25, 2014.
21           Please take a moment to review
22   this document and let me know when you're done.
23       MS. McENROE:  I'm going to take
24       that as a no for purposes of the record.

Page 183

1        MR. PIFKO:  I'm disagreeing with
2        your characterization.  You can object to
3        scope.  And I'm not going to answer
4        questions from you.
5        THE WITNESS:  (Reviewing
6        document.)
7  BY MR. PIFKO:
8        Q.    As an initial matter, have you
9  seen this document before?
10       A.    I have.
11       Q.    When did you see this?
12       A.    The past several days.
13       Q.    Is this something you reviewed in
14   connection with preparing for this 30(b)(6)
15   deposition?
16       A.    It is.
17       Q.    You can feel free to look at it
18   as much as you want to, but I want to just ask
19   you, on the second page here, it notes that Dr.
20   Harper had issues with Schedule III substances.
21           Do you see that?  At the top of
22   the second page.
23       MS. McENROE:  Objection to form.
24       Where are you looking, Mark?  I'm sorry,

Page 184

1    I don't see what paragraph.
2        MR. PIFKO:  It's paragraph 1.  It
3    continues from the bottom of the first
4    page to the top of the second page.
5        MS. McENROE:  And objection to
6    the scope as well.
7        THE WITNESS:  I see hydrocodone.
8  BY MR. PIFKO:
9        Q.    And specifically it says that Dr.
10   Harper and some of his colleagues, who they refer
11   to as the Harper Drug Trafficking Organization,
12   it says, starting on the first page that they
13   "agreed to illegally distribute hundreds of
14   thousands of doses of prescription painkillers to
15   customers located in the Northern District of
16   Ohio and elsewhere.  They did so using ADOLPH
17   HARPER, JR.'S 'medical' offices located in Akron,
18   Ohio, by issuing drug orders purporting to be
19   'prescriptions' for Schedule II controlled
20   substances, primarily oxycodone, oxymorphone,
21   methadone, and amphetamines, Schedule III
22   controlled substances, primarily buprenorphine
23   and hydrocodone, and Schedule IV controlled
24   substances."  It continues on.

Page 185

1        Do you see that?
2        MS. McENROE:  Objection to form,
3        objection to scope.
4        THE WITNESS:  I do.
5  BY MR. PIFKO:
6        Q.    So you agree that part of this
7  indictment concerns Schedule III substances?
8        MS. McENROE:  Objection to form,
9        objection to scope.
10       THE WITNESS:  I do.
11  BY MR. PIFKO:
12       Q.    And those were substances that
13   Rite Aid self-distributed during this time
14   period.  Agree?
15       MS. McENROE:  Objection to scope.
16       THE WITNESS:  The hydrocodone was
17       distributed by Rite Aid.
18  BY MR. PIFKO:
19       Q.    Did Rite Aid ever identify any
20   orders from the pharmacies that serviced Dr.
21   Harper's customers as suspicious?
22       MS. McENROE:  Objection to form.
23       THE WITNESS:  Could you repeat
24       the question?  I'm sorry.

Page 186

1  BY MR. PIFKO:
2      Q.    Yeah.
3           Did Rite Aid ever identify any
4  orders from the pharmacies that serviced Dr.
5  Harper's customers as suspicious?
6           MS. McENROE:  Objection to form.
7           THE WITNESS:  To the best of my
8      knowledge, no.
9  BY MR. PIFKO:
10     Q.    Do you know if Rite Aid was aware
11 of this indictment on or around the time that it
12 occurred?
13          MS. McENROE:  Object to the form,
14     objection to scope.
15          THE WITNESS:  I do not know.
16 BY MR. PIFKO:
17     Q.    Does Rite Aid track whether any
18 prescribers and -- who have customers that come
19 to Rite Aid stores are indicted?
20          MS. McENROE:  Objection to form,
21     objection to scope.
22          THE WITNESS:  We do not.
23 BY MR. PIFKO:
24     Q.    Does Rite Aid track whether

Page 187

1  prescribers have lost their licenses?
2           MS. McENROE:  Objection to form,
3      objection to scope.
4           THE WITNESS:  We have a database
5      in our NextGen system that updates the
6      prescriber file on a daily basis.  Once a
7      DEA license becomes invalid, that license
8      becomes invalid in our system and no
9      prescriptions can be dispensed under that
10     prescriber's DEA number.  It's a national
11     database that's out there.
12 BY MR. PIFKO:
13     Q.    How long has that been in place?
14          MS. McENROE:  Objection to scope.
15          THE WITNESS:  I'm going to say
16     2000 -- late 2000s, early 2000 -- late
17     2000s, like '9, '10, '11.  That's just
18     speculation.  It could have been there
19     before that, but...
20 BY MR. PIFKO:
21     Q.    I'm handing you what's marked as
22 Hart-30(b)(6) Exhibit 9.
23               - - -
24          (Deposition Exhibit No.

Page 188

1      Hart-30(b)(6)-9, Press Release, "Rite Aid
2      Corporation and Subsidiaries Agree to Pay
3      $5 Million in Civil Penalties to Resolve
4      Violations in Eight States of the
5      Controlled Substances Act," 2 pages, was
6      marked for identification.)
7               - - -
8  BY MR. PIFKO:
9      Q.    Take a moment to review that.
10          If you recall, there was a brief
11 discussion of this yesterday.
12          MS. McENROE:  Again, for the
13     record, objection as to scope as to the
14     line of questioning pertaining to this
15     exhibit as outside the scope of the
16     30(b)(6) topics.
17          THE WITNESS:  (Reviewing
18     document.)
19 BY MR. PIFKO:
20     Q.    Have you seen this document
21 before?
22     A.    I have.
23     Q.    When was the last time you saw
24 this?

Page 189

1      A.    Within the last several days.
2      Q.    This is a document that you
3  reviewed in preparing for your 30(b)(6)
4  deposition?
5      A.    Yes.
6      Q.    Can you tell me what this is?
7           MS. McENROE:  Objection to form,
8      objection to scope.
9           THE WITNESS:  It's an
10     announcement of a settlement agreement
11     between Rite Aid and the Drug Enforcement
12     Administration from 2009.
13 BY MR. PIFKO:
14     Q.    Does this refresh your
15 recollection about when Rite Aid instituted the
16 system that it uses to check whether prescribers'
17 DEA licenses are invalid?
18          MS. McENROE:  Objection to form,
19     objection to scope.
20          THE WITNESS:  I don't know that
21     that coincides.  I couldn't say that for
22     sure.
23 BY MR. PIFKO:
24     Q.    You agree this happened in 2009?

Page 190

1 It says here -- it's dated -- this press release
2 is dated January 12, 2009.  Do you agree?
3          MS. McENROE:  Objection to form,
4     objection to scope.
5          THE WITNESS:  I do.
6 BY MR. PIFKO:
7     Q.    And you testified that you
8 believe that Rite Aid instituted its efforts to
9 check prescriber licenses sometime in 2009, '10
10 or '11; is that correct?
11          MS. McENROE:  Objection to form.
12          THE WITNESS:  I said that was --
13     I will correct the record then.
14          There was a system in place to
15     check licenses prior to that.  There was
16     enhancement to the system as well.
17 BY MR. PIFKO:
18     Q.    The enhancement was sometime in
19 2009, '10 or '11?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  Again, I don't know
22     the date line of that.  I don't have that
23     knowledge.
24 BY MR. PIFKO:

Page 191

1     Q.    Was that made as a result of this
2 settlement?
3          MS. McENROE:  Objection to form,
4     objection to scope.
5          THE WITNESS:  It was not.
6 BY MR. PIFKO:
7     Q.    There are some bullet points here
8 about halfway down the page.
9          Do you see those?
10     A.    I do.
11     Q.    It talks about some of the
12 alleged violations that occurred in connection
13 with this settlement.
14          Do you see that?
15     A.    I do.
16          MS. McENROE:  Objection.
17 BY MR. PIFKO:
18     Q.    One of them is that "Rite Aid
19 knowingly filled prescriptions for controlled
20 substances that were not issued for a legitimate
21 medical purpose pursuant to a valid
22 physician-patient relationship."
23          Do you see that?
24          MS. McENROE:  Objection to scope.

Page 192

1          THE WITNESS:  I see that.
2 BY MR. PIFKO:
3     Q.    Do you agree that that was part
4 of the scope of the settlement agreement?
5          MS. McENROE:  Objection to form,
6     objection to scope.
7          THE WITNESS:  I do.
8 BY MR. PIFKO:
9     Q.    It also says that, "Rite Aid
10 failed to notify the DEA in a timely manner of
11 significant thefts and losses of controlled
12 substances, thus permitting the diversion of
13 controlled substances to continue and undermining
14 DEA's ability to investigate such thefts...or
15 losses."
16          Do you see that?
17          MS. McENROE:  Objection to form,
18     objection to scope.
19          THE WITNESS:  I do.
20 BY MR. PIFKO:
21     Q.    Do you agree that that was part
22 of the 2009 settlement?
23          MS. McENROE:  Objection to form,
24     objection to scope.

Page 193

1          THE WITNESS:  I do.
2 BY MR. PIFKO:
3     Q.    It also says, "Rite Aid failed to
4 properly execute DEA forms used to ensure that
5 the amount of Schedule II drugs ordered by Rite
6 Aid were actually received."
7          Do you see that?
8          MS. McENROE:  Objection to form,
9     objection to scope.
10          THE WITNESS:  I do.
11 BY MR. PIFKO:
12     Q.    Was that part of the settlement
13 as well?
14          MS. McENROE:  Objection to form,
15     objection to scope.
16          THE WITNESS:  That was part of
17     the settlement.
18          It should be noted that the Rite
19     Aid distribution center in Perryman was
20     not included or mentioned in the
21     settlement agreement.
22 BY MR. PIFKO:
23     Q.    It says here in the paragraph
24 after those bullet points, part of the last

Page 194

1 sentence, that accountability audits reflected "a
2 pattern of non-compliance with the requirements
3 of the Controlled Substances Act and federal
4 regulations that lead to the diversion of
5 controlled substances."
6           Do you see that?
7           MS. McENROE:  Objection to form,
8     objection to scope.
9           THE WITNESS:  You lost me on that
10    one.
11 BY MR. PIFKO:
12    Q.    It's highlighted on the screen
13 for you.
14    A.    Oh, okay.  Sorry.
15    I do.
16    Q.    Do you agree that that was part
17 of the settlement?
18           MS. McENROE:  Objection to form,
19    objection to scope.
20           THE WITNESS:  It was.
21 BY MR. PIFKO:
22    Q.    There's a quote here from the DEA
23 acting administrator, two paragraphs down, second
24 to last paragraph on the first page there.

Page 195

1           It says, at the bottom of that
2 paragraph, "Our nation's pharmacies must play a
3 major role in the fight against drug abuse, so
4 that together we can protect public health and
5 keep our communities safe."
6           Do you see that?
7           MS. McENROE:  Objection to form,
8     objection to scope.
9           THE WITNESS:  I do.
10 BY MR. PIFKO:
11    Q.    Do you agree with that statement?
12           MS. McENROE:  Objection to form,
13    objection to scope.
14           THE WITNESS:  I do.
15           MS. McENROE:  Mark, when you get
16    a chance, we've been going about an hour
17    for a break.
18           MR. PIFKO:  Yeah.
19 BY MR. PIFKO:
20    Q.    Did Rite Aid identify any
21 suspicious orders as a result of any of the
22 allegations in connection with the settlement?
23           MS. McENROE:  Objection to form.
24           THE WITNESS:  Can you repeat the

Page 196

1 question?
2 BY MR. PIFKO:
3    Q.    Yeah.
4           Like, for example, the settlement
5 concerned Rite Aid knowingly filling
6 prescriptions for controlled substances that were
7 not issued for a legitimate medical purpose
8 pursuant to a valid physician-patient
9 relationship.
10           Do you see that?
11           MS. McENROE:  Objection to form,
12    objection to scope.
13           THE WITNESS:  I do.
14 BY MR. PIFKO:
15    Q.    Did Rite Aid identify any
16 suspicious orders as a result of prescriptions
17 that were filled that were not issued for a
18 legitimate medical purpose?
19           MS. McENROE:  Objection to form.
20           THE WITNESS:  We did not.
21           MR. PIFKO:  All right.  We can
22    take a break.
23           THE WITNESS:  Wait.
24           THE VIDEOGRAPHER:  Going off the

Page 197

1 record at 2 --
2           THE WITNESS:  Wait, wait.  May I
3 make a comment also, though?
4           As part of the press release, it
5 does state that "The settlement agreement
6 is neither an admission of liability by
7 Rite Aid nor a concession by the United
8 States that its claims" were not founded.
9           Thank you.
10           THE VIDEOGRAPHER:  Going off the
11 record at 2:08 p.m.
12           - - -
13           (A recess was taken from
14 2:08 p.m. to 2:23 p.m.)
15           - - -
16           THE VIDEOGRAPHER:  Going back on
17 the record at 2:23 p.m.
18           - - -
19           (Deposition Exhibit No.
20 Hart-30(b)(6)-10, Order of the State
21 Board of Pharmacy, Docket Number
22 D-110127-163, was marked for
23 identification.)
24           - - -

Page 198

BY MR. PIFKO:

Q. I'm handing you what's marked as Exhibit 10.

For the record, this is an order from the Ohio State Board of Pharmacy. The document itself is four pages. Take a moment to review it. Let me know when you're ready.

The part I consider to be the document, just so you can understand, is this docket number D-110127-163, concerning Marcus -- or Brian Marcus Kins.

MS. McENROE: Starting in the middle of the first page?

MR. PIFKO: Yeah.

MS. McENROE: And then going until where, Mark?

MR. PIFKO: It continues onto the last page, but only the top quarter of the last page.

MS. McENROE: Where it says 11:30 a m.?

MR. PIFKO: Yes.

MS. McENROE: For the record, I'm going to object to this document and the

Page 199

line of questioning that will be related to it as beyond the scope and not being tied to one of the topics.

MR. PIFKO: You haven't heard the questions yet.

MS. McENROE: I know. Just in terms of the document.

THE WITNESS: (Reviewing document.)

Okay.

BY MR. PIFKO:

Q. Have you seen this before?

A. I have not.

Q. It mentions here, as an aside, Kevin Mitchell here as being a member of the board of the Ohio Board of Pharmacy.

I assume that's not the same Kevin Mitchell who works at Rite Aid?

A. Okay.

Q. Is it?

A. This Kevin Mitchell is a pharmacist for Rite Aid in Ohio, not the Kevin Mitchell that's involved in this case.

Q. Okay. So this Kevin Mitchell

Page 200

does work for Rite Aid?

A. Yes.

Q. When one serves on the Board of Pharmacy, is that concurrent with him working for Rite Aid?

A. Yes.

Q. So he still holds that -- does this Kevin Mitchell still work for Rite Aid?

A. Yes. This Kevin Mitchell left from Rite Aid, went to work for the board, and came back to Rite Aid.

Q. Okay.

A. So he is currently a pharmacist for Rite Aid.

Q. But he doesn't currently serve on the Board of Pharmacy?

A. No. His term was up.

Q. At the time that he was sitting on the Board of Pharmacy here, did he still work for Rite Aid?

A. I don't -- I'm going to say yes, but again, my recollection could be wrong. But it looks around the time frame, yes.

Q. Does anyone else who is a member

Page 201

of the board reflected here in that section under introduction work for Rite Aid?

MS. McENROE: Objection, scope.

THE WITNESS: No.

BY MR. PIFKO:

Q. Do you know who Michael Mone is?

A. Yes.

Q. Who is he?

A. Michael Mone works for Cardinal.

Q. Do you know what he does for Cardinal?

A. He is an attorney and a pharmacist and does regulatory affairs.

Q. Do you know if he was employed by Cardinal at the time that he sat on the Board of Pharmacy here?

MS. McENROE: Objection to scope.

THE WITNESS: I don't know his employment.

BY MR. PIFKO:

Q. How do you know who Mr. Mone is?

A. I am on the Pennsylvania State Board of Pharmacy here in the state, and I interact with Mr. Mone on a routine basis at NABP

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 meetings, National Association of Boards of
2 Pharmacy meetings, or district -- NABP district
3 meetings and occasionally at NACDS meetings.
4     Q.    In connection with those kind of
5 meetings, do you meet with any other distributors
6 of pharmaceutical products?
7         MS. McENROE:  Objection to form,
8     objection to scope.
9         THE WITNESS:  Not really.  And
10     Michael and I are there as members of the
11     Board of Pharmacy.  We are not meeting on
12     behalf of our jobs.
13 BY MR. PIFKO:
14     Q.    So, to your knowledge, you don't
15 meet with, for example, anyone who works for
16 AmeriSource Bergen at those meetings?
17         MS. McENROE:  Objection, form,
18     objection to scope.
19         THE WITNESS:  There could be
20     someone at one of those meetings.  I
21     don't know a lot of people from
22     AmeriSource Bergen since we don't -- Rite
23     Aid doesn't do business with them.
24 BY MR. PIFKO:

Page 203

1     Q.    How about McKesson, is anyone
2 from McKesson at those meeting?
3         MS. McENROE:  Objection to form,
4     objection to scope.
5         THE WITNESS:  Occasionally, yes.
6 BY MR. PIFKO:
7     Q.    Who from McKesson attends those
8 meetings?
9         MS. McENROE:  Objection to form,
10     objection to scope.
11         THE WITNESS:  I don't remember
12     who from McKesson.  I apologize.
13 BY MR. PIFKO:
14     Q.    How about from any of the
15 manufacturers, do you know if there are people at
16 those meetings who work for drug manufacturers?
17         MS. McENROE:  Objection to form,
18     objection to scope.
19         THE WITNESS:  At the NACDS
20     meetings?  There are drug manufacturers
21     that are members of NACDS, yes.
22 BY MR. PIFKO:
23     Q.    Do you know which ones?
24         MS. McENROE:  Objection to form,

Page 204

1     objection to scope.
2         THE WITNESS:  Not off the top of
3     my head, no.
4 BY MR. PIFKO:
5     Q.    Do you know if any of the
6 defendants in this litigation are members of the
7 NACDS?
8         MS. McENROE:  Objection to form,
9     objection to scope.
10         THE WITNESS:  I would say yes.
11 BY MR. PIFKO:
12     Q.    What's the basis for saying that?
13         MS. McENROE:  Objection to scope.
14         THE WITNESS:  Reading the
15     documentation as far as the case and
16     industry newsletters and things like
17     that.
18 BY MR. PIFKO:
19     Q.    When you say documentation for
20 the case, you've seen documents that have a list
21 of defendants on it, like the interrogatory
22 responses, things like that?
23     A.    Yeah.  Or there could be
24 something published in like a Pharmacy Times or

Page 205

1 something like that.
2     Q.    So you're talking about -- to the
3 extent there's been media coverage of the case
4 and you see who's involved, that's what you're
5 talking about?
6         MS. McENROE:  Objection to form,
7     objection to scope.
8         THE WITNESS:  Yes.
9 BY MR. PIFKO:
10     Q.    Okay.  Turning back to this
11 particular Exhibit 10, this incident here, are
12 you familiar with this pharmacist, Mr. Kins?
13         MS. McENROE:  Objection to form.
14     Objection to form, objection to scope.
15         THE WITNESS:  I am not.
16 BY MR. PIFKO:
17     Q.    If you turn to the second page,
18 there's a heading "Findings of Fact."
19         Do you see that?
20     A.    I do.
21     Q.    There's numbered paragraphs there
22 with parentheses.
23         Do you see that?  Like 1, 2?
24     A.    Yes.

Page 206

1    Q.   Paragraph 1, towards the bottom,
2  it says that Mr. Kins was the Responsible
3  Pharmacist at Rite Aid Pharmacy #4764 in
4  Broadview Heights, Ohio.
5         Do you see that?
6         MS. McENROE:  Objection to scope.
7         THE WITNESS:  I do.
8  BY MR. PIFKO:
9    Q.   Do you know what the term
10  "responsible pharmacist" means?
11        MS. McENROE:  Objection to scope.
12        THE WITNESS:  I do.
13  BY MR. PIFKO:
14   Q.   What does that mean?
15   A.   It means that is the pharmacist
16  in charge, the head pharmacist for the store.
17   Q.   Okay.  And that's what I was
18  going to ask you, is -- so there's a hierarchy of
19  the pharmacists who work at any particular store?
20        MS. McENROE:  Objection to form,
21  objection to scope.
22        THE WITNESS:  In -- there is a
23  pharmacist that's in charge or the
24  pharmacist that's responsible for the

Page 207

1     recordkeeping.  And then there could be a
2     staff pharmacist or a floater pharmacist
3     that may work in the store.
4  BY MR. PIFKO:
5    Q.   And so you just alluded to some
6  of it, but the responsibilities of the pharmacist
7  in charge include recordkeeping and what else?
8         MS. McENROE:  Objection to form,
9     objection to scope.
10        THE WITNESS:  Typically the
11     pharmacist in charge is of staffing and
12     maintenance of prescriptions and that.
13  BY MR. PIFKO:
14   Q.   I believe in Sophia Lai's
15  deposition it was discussed that she had profit
16  and loss responsibility for the pharmacy
17  operations at her pharmacy at one point.
18        Does the pharmacist in charge
19  have that kind of responsibility as well?
20        MS. McENROE:  Objection to form,
21     objection to scope.
22        THE WITNESS:  Can you repeat the
23     question?
24  BY MR. PIFKO:

Page 208

1    Q.   We talked about -- I forget the
2  term you used now -- the front of the store?
3    A.   Front end?
4    Q.   Front end and the pharmacy.
5  Right?
6    A.   Right.
7    Q.   So those operations -- there's
8  some degree of separation between those
9  operations at a store.  Correct?
10        MS. McENROE:  Objection to form,
11     objection to scope.
12        THE WITNESS:  That is correct.
13  BY MR. PIFKO:
14   Q.   Okay.  And somebody at the
15  pharmacy is responsible for the profit and loss
16  operations of the pharmacy.  Correct?
17        MS. McENROE:  Objection to form,
18     objection to scope.
19        THE WITNESS:  That is correct.
20  BY MR. PIFKO:
21   Q.   And is that the pharmacist in
22  charge?
23        MS. McENROE:  Objection to scope.
24        THE WITNESS:  That is correct.

Page 209

1  BY MR. PIFKO:
2    Q.   So in this particular case, Mr.
3  Kins was in charge of the profit and loss of this
4  particular Rite Aid, 4764; is that correct?
5         MS. McENROE:  Objection to form,
6     objection to scope.
7         THE WITNESS:  That is correct.
8  BY MR. PIFKO:
9    Q.   It says here under the second
10  paragraph of "Findings of Fact" that Mr. Kins "is
11  addicted to or abusing drugs."
12        Do you see that?
13   A.   I do.
14   Q.   Do you have any reason to dispute
15  that finding?
16        MS. McENROE:  Objection to form,
17     objection to scope.
18        THE WITNESS:  I do not.
19  BY MR. PIFKO:
20   Q.   If you go to the next page, well,
21  starting at the bottom of the second page and
22  continuing to the third page, it says, "Brian
23  Marcus Kins has admitted to Board agents that he
24  is addicted to controlled substances; that Brian

Page 210

1 Marcus Kins has stolen controlled substances from
2 his employer for personal abuse;" and "that Brian
3 Marcus Kins altered prescriptions to obtain
4 controlled substances for his abuse and to sell."
5        Do you see that?
6     A.    I do.
7     Q.    Do you have any reason to dispute
8 those findings of fact in here?
9        MS. McENROE:  Objection to form,
10 objection to scope.
11        THE WITNESS:  I do not.
12 BY MR. PIFKO:
13     Q.    Did Rite Aid ever report any
14 suspicious orders from store Rite Aid 4764 while
15 Mr. Kins was the responsible pharmacist?
16        MS. McENROE:  Objection to form.
17        THE WITNESS:  We did not report
18 any suspicious orders.
19 BY MR. PIFKO:
20     Q.    Does Rite Aid have a process of
21 disciplining an employee or terminating them when
22 they have a Board of Pharmacy action brought
23 against them?
24        MS. McENROE:  Objection to form,

Page 211

1     objection to scope.
2        THE WITNESS:  Any time an
3     employee diverts controlled substances,
4     they would be terminated and Rite Aid
5     would turn that individual into the state
6     Board of Pharmacy.
7 BY MR. PIFKO:
8     Q.    Other than terminating them, is
9 there any other investigation with respect to the
10 order history at that store that would occur in
11 connection with a finding that a pharmacist in
12 charge or any other pharmacist diverted
13 controlled substances?
14        MS. McENROE:  Objection to form,
15 objection to scope.
16        THE WITNESS:  Rite Aid would
17     conduct an accountability of all of the
18     drugs that entered into the pharmacy
19     in -- or dispensed to determine if there
20     was a loss of controlled substances.
21 BY MR. PIFKO:
22     Q.    By loss, you mean theft?
23     A.    Theft.
24     Q.    What if a pharmacist doesn't

Page 212



Page 213

1        THE WITNESS:  That would be part
2     of the asset protection's investigation
3     into the theft.
4 BY MR. PIFKO:
5     Q.    And what would be the outcome if
6 they found that there was theft?
7        MS. McENROE:  Objection to form,
8     objection to scope.
9        THE WITNESS:  If there was theft
10     and the loss of drugs, the loss would be
11     reported to the Ohio Board of Pharmacy
12     and to the Drug Enforcement
13     Administration.
14 BY MR. PIFKO:
15     Q.    But Rite Aid wouldn't make any
16 reports concerning suspicious orders.  Correct?
17        MS. McENROE:  Objection to form,
18     objection to scope.
19        THE WITNESS:  We would not make a
20     report of a suspicious order.
21 BY MR. PIFKO:
22     Q.    Would Rite Aid make any
23 adjustments to its auto replenishment system if
24 it knew that, for example, in this case, that the

Page 214

1 pharmacist was stealing prescriptions for
2 personal use or selling them to others?
3       MS. McENROE:  Objection to form.
4       THE WITNESS:  We would not adjust
5    the auto replenishment.
6 BY MR. PIFKO:
7    Q.   So when it's conducting its
8 analysis of ▮▮▮▮▮▮▮▮ and the like, it's
9 including that conduct as well, potentially.
10 Correct?
11       MS. McENROE:  Objection to form.
12       THE WITNESS:  It would be
13    including the prescriptions that were
14    fraudulently dispensed, because they
15    would be through the system.  So yes.
16 BY MR. PIFKO:
17    Q.   I'm handing you what's been
18 marked as Hart-30(b)(6) Exhibit 11.
19          -  -  -
20       (Deposition Exhibit No.
21    Hart-30(b)(6)-11, Order of the State
22    Board of Pharmacy Docket Number
23    D-100621-134, was marked for
24    identification.)

Page 215

1          -  -  -
2 BY MR. PIFKO:
3    Q.   It's another order of the state
4 Board of Pharmacy.  This one's five pages.
5    Direct your attention to the bottom
6 that begins on the bottom of the first page
7 concerning Henry Kozik, docket number
8 D-100621-134.
9       Take a moment to review that and
10 let me know when you're done.
11       MS. McENROE:  For the record, I'm
12    going to object to the use of this
13    document as being outside the scope of
14    the 30(b)(6) for this deposition.
15       THE WITNESS:  I have a question.
16    Here it makes note under the
17    State's Exhibit Number 3, "Rite Aid
18    Corporation Letter of Explanation."
19       Is that available to review?
20 BY MR. PIFKO:
21    Q.   I don't have a copy of that with
22 me.  Maybe Kevin Mitchell can get it for us.
23       Are you ready?
24    A.   I am ready.

Page 216

1    Q.    Have you seen this before?
2    A.    I have not.
3    Q.    Do you know who Henry Kozik is?
4    A.    A pharmacist, yes.
5    Q.    Someone who was employed by Rite
6 Aid?
7       MS. McENROE:  Objection to scope.
8       THE WITNESS:  Based on the order,
9    yes.
10 BY MR. PIFKO:
11    Q.    The order has a number of
12 findings of fact concerning thefts committed by
13 Mr. Kozik on various dates, specifically
14 identifying various thefts of product that he
15 made.
16       Do you see that?
17       MS. McENROE:  Objection to form,
18    objection to scope.
19       THE WITNESS:  I do.
20 BY MR. PIFKO:
21    Q.    Paragraph 5 also says -- it's on
22 the third page.
23       Are you there?
24    A.    I'm fine.

Page 217

1    Q.    It says, "Henry F. Kozik did, on
2 or about June 2, 2007, knowingly sell a
3 controlled substance when the conduct was not in
4 accordance with Chapters 3719., 4729., and 4731.
5 of the Ohio Revised Code, to wit:  Henry F. Kozik
6 gave a female at least 33 hydrocodone/APAP 5/500
7 tablets and at least 43 tablets of
8 hydrocodone/APAP 7.5/750 without a valid
9 prescription from a prescriber and not for a
10 legitimate medical purpose."
11       Do you see that?
12       MS. McENROE:  Objection to scope.
13       THE WITNESS:  I do.
14 BY MR. PIFKO:
15    Q.    To your knowledge, did Rite Aid
16 report any suspicious orders from the pharmacies
17 where Mr. Kozik worked --
18       MS. McENROE:  Objection to form.
19 BY MR. PIFKO:
20    Q.    -- as a result of these
21 incidents?
22       MS. McENROE:  Objection to form.
23       THE WITNESS:  We did not.
24 BY MR. PIFKO:

Page 218

Q. Do you know if Rite Aid conducted an investigation into this conduct?

MS. McENROE: Objection to scope, objection to form.

THE WITNESS: An investigation would have been completed by our asset protection team.

BY MR. PIFKO:

Q. What's the basis for you believing that such an investigation would have occurred?

MS. McENROE: Objection to scope.

THE WITNESS: Any theft of controlled substances results in an asset protection investigation.

BY MR. PIFKO:

Q. And if Mr. Kozik was disciplined by the Board of Pharmacy, Rite Aid would know about that?

MS. McENROE: Objection to form, objection to scope.

THE WITNESS: Yes, we would know. We have a system that we use to verify our associates and their licenses to make

Page 219

sure that they remain valid.

BY MR. PIFKO:

Q. As we discussed with respect to the prior Board of Pharmacy order, with respect to paragraph 5 here, there would not have been any adjustments to Rite Aid's auto replenishment system as a result of this sale to a female of certain hydrocodone tablets without a valid prescription.

Do you agree?

MS. McENROE: Objection to form, objection to scope.

THE WITNESS: There would be no revision.

BY MR. PIFKO:

Q. If a pharmacist conducts any due diligence of any suspected red flags, does -- at the time when Rite Aid was self-distributing Schedule III controlled substances, did the distribution center who would sell to that pharmacy have any visibility into the investigation being conducted by the pharmacist?

MS. McENROE: Objection. Objection to form.

Page 220

THE WITNESS: They did not.

BY MR. PIFKO:

Q. Did Rite Aid have any policy whereby if a pharmacist conducted such an investigation, they needed to report that back up to the distribution center?

MS. McENROE: Objection to form.

THE WITNESS: The pharmacist, if they did an investigation, would report that to their pharmacy district manager or their asset protection district manager, not to the distribution center.

BY MR. PIFKO:

Q. Would anybody in that chain ultimately provide information that there was a potential red flag to the distribution center?

MS. McENROE: Objection to form.

THE WITNESS: Typically, no.

BY MR. PIFKO:

Q. I'm handing you a document that was previously marked in Mr. Belli's deposition as Exhibit 15. And I have marked it as Exhibit 12 to Rite Aid's 30(b)(6) deposition.

- - -

Page 221

(Deposition Exhibit No. Hart-30(b)(6)-12, Project Initiation for 504 Suspicious Order Monitoring, Bates stamped Rite_Aid_OMDL_0040184 through Rite_Aid_OMDL_0040198, was marked for identification.)

- - -

BY MR. PIFKO:





Highly Confidential - Subject to Further Confidentiality Review

Page 222

Page 224

```
7              - - -
8         (Deposition Exhibit No.
9    Hart-30(b)(6)-13, Email chain, top one
10   dated 2013-08-07, Bates stamped
11   Rite_Aid_OMDL_0024599 and
12   Rite_Aid_OMDL_0024600, was marked for
13   identification.)
14             - - -
15   BY MR. PIFKO:
16       Q.    I'm handing you another exhibit
17   concerning this project.  You can keep that one
18   with you as well.
19          It's marked as Exhibit
20   Hart-30(b)(6)-13.
21          For the record, Exhibit 13 is
22   Bates labeled Rite_Aid_OMDL_0024599, and it has
23   an attachment which is a spreadsheet, which is
24   Bates labeled Rite_Aid_OMDL_0024600.
```

Page 223

Page 225

```
1          Let me know when you're done
2    reading Exhibit 13.
3       A.    I'm done reading number 13.
4       Q.    Have you seen Exhibit 13 before?
5       A.    I have.
6       Q.    When was the last time you saw
7    that?
8       A.    Within the past few days.
9       Q.    This is a document that you
10   reviewed in preparing for your 30(b)(6)
11   deposition?
12      A.    It is.
13      Q.    When do you believe was the first
14   time you saw this document?
```

Highly Confidential - Subject To Further Confidentiality Review



Page 226

Page 228

Page 227

Page 229

Highly Confidential - Subject To Further Confidentiality Review



Page 230

Page 232

Page 231

Page 233

Highly Confidential - Subject to Further Confidentiality Review

Page 234

Page 236

Page 235

```
1    have been speaking about as far as
2    replenishment and billing in our current
3    system.  And this would enhance the
4    system.
5  BY MR. PIFKO:
6    Q.    It says that -- where it says,
7  "Today blanket thresholds are manually enforced
8  at 5,000 dosage units per individual ndc per week
9  per store regardless of dispensing volume or
10 trends."
11         Do you see that?
12   A.    Yes.
13   Q.    Is that an accurate statement
14 about the system as of when this was written, in
15 August 7, 2013?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  Yes.  Blanket
18   controls were in place of 5,000 dosage
19   units per store.
20 BY MR. PIFKO:
21   Q.    Regardless of dispensing volume
22 or trends.  Correct?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  Correct.
```

Page 237



Highly Confidential - Subject To Further Confidentiality Review



Page 238

Page 239

Page 240

Page 241



Page 242

Page 244

Page 243

Page 245



Page 246

Page 247

Page 248

```
 1            - - -
 2        (A recess was taken from
 3     3:23 p.m. to 3:46 p.m.)
 4            - - -
 5        THE VIDEOGRAPHER:  Back on the
 6     record.  The time is 3:46 p.m.
 7  BY MR. PIFKO:
 8     Q.    Let's go back to Exhibit 12.
 9        Do you have it in front of you?
10     A.    I've got it.  Thank you.
```

Page 249

```
21        MR. PIFKO:  We can take a break.
22        MS. McENROE:  Thank you.
23        THE VIDEOGRAPHER:  Going off the
24     record at 3:23 p.m.
```





Page 254

22 BY MR. PIFKO:
23   Q.   I want to hand you -- or refer
24 you back to an exhibit that was introduced

Page 255

1 yesterday as Exhibit 15.
2        MS. McENROE:  Why don't we make a
3 pile of today's separate a little bit, so
4 that we -- is that okay, Mark?  I just
5 don't want to --
6        MR. PIFKO:  Well, I'm still
7 looking at those.
8        MS. McENROE:  Oh, you're still
9 looking at these?  Okay.
10       MR. PIFKO:  Yes.
11       MS. McENROE:  Okay.  Then don't
12 put those away.
13       MR. PIFKO:  I just -- I want to
14 direct you to what was marked yesterday
15 as Exhibit 15.
16       MS. McENROE:  1-5?
17       MR. PIFKO:  Yeah.
18 BY MR. PIFKO:
19   Q.   Have you got that in front of
20 you?
21   A.   I do.
22   Q.   Okay.  Do you recall this
23 document?
24   A.   I do.

Page 256

Page 257

Highly Confidential - Subject to Further Confidentiality Review



Page 258

Page 259

Page 260

Page 261



Page 262

Page 264

Page 263

Page 265

Highly Confidential - Subject to Further Confidentiality Review





Page 270

Page 272

Page 271

Page 273

Page 274

1      MR. PIFKO: All right. Subject
2  to any direct examination your counsel
3  may have, I don't have any other
4  questions at this time.
5      MS. McENROE: Thanks. Let's take
6  a quick break and then we'll be back.
7      MR. PIFKO: Going off the record
8  at 4:17 p.m.
9          - - -
10     (A recess was taken from
11  4:17 p.m. to 4:42 p.m.)
12         - - -
13     THE VIDEOGRAPHER: We're back on
14  the record at 4:42 p.m.
15         - - -
16     EXAMINATION
17         - - -
18  BY MS. McENROE:
19     Q.  Good afternoon, Ms. Hart. You
20  understand my name is Elisa McEnroe. I'm counsel
21  for Rite Aid in this matter?
22     A.  I do.
23     Q.  I have a couple questions for
24  you.

Page 275

1      Do you remember earlier today you
2  were asked some questions about the auto
3  replenishment system?
4      A.  I do.
5      Q.  And you were asked some questions
6  specifically about the concept of a manual
7  override to that system?
8      A.  Yes.
9      Q.  And you testified that there was
10  a 99-bottle block to manual overrides in that
11  system.
12     Do you remember that?
13     A.  I do.
14     MR. PIFKO: Objection, leading.
15  BY MS. McENROE:
16     Q.  Are there any other blocks in the
17  manual override process of the auto replenishment
18  system?
19     A.  There are -- there is a block.
20  The algorithm takes the on-hand quantity, looks
21
22
23

Page 276

1  quantity.
2
3
4
5
6
7
8
9
10
11
12
13
14
15     A.  I do.
16     Q.  And then you were asked some
17  questions about a meeting you had with others at
18  Rite Aid regarding Rite Aid's suspicious order
19  monitoring program.
20     Do you remember those questions?
21     A.  Yes.
22     Q.  I'm going to mark Exhibit 14.
23         - - -
24     (Deposition Exhibit No.

Page 277

1  Hart-30(b)(6)-14, Handwritten notes,
2  11/23/10, Bates stamped
3  Rite_Aid_OMDL_0046066, was marked for
4  identification.)
5         - - -
6  BY MS. McENROE:
7      Q.  Do you recognize this document?
8      A.  I do.
9      Q.  What is this document?
10
11
12
13
14
15
16
17
18
19
20
21
22
23         - - -
24     (Deposition Exhibit No.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1      Hart-30(b)(6)-15, PowerPoint slides,

2      Bates stamped Rite_Aid_OMDL_0046067

3      through Rite_Aid_OMDL_0046072, was marked

4      for identification.)

5           - - -

6  BY MS. McENROE:

7     Q.   I hand you what I've marked as

8  Exhibit 15.

9        Do you recognize this document?

10    A.   I do.

11    Q.   What is it?

Page 280

Page 279

3           - - -

4        (Deposition Exhibit No.

5      Hart-30(b)(6)-16, Email dated 2010-12-10,

6      Bates stamped Rite_Aid_OMDL_0020381 and

7      Rite_Aid_OMDL_0020381, was marked for

8      identification.)

9           - - -

10  BY MS. McENROE:

22           - - -

23        (Deposition Exhibit No.

24      Hart-30(b)(6)-17, Handwritten notes,

Page 281

1      12/14/10, Bates stamped

2      Rite_Aid_OMDL_0046065, was marked for

3      identification.)

4           - - -

5      (Phone interruption.)

6           - - -

7  BY MS. McENROE:

8     Q.   Wait until the phone stops

9  ringing.  Hold on one second.

10        Ms. Hart, I handed you what's

11  been marked as Exhibit Number 17.

12    A.   Yes.

13    Q.   Do you recognize this document?





Page 282

5                     - - -
6          (Deposition Exhibit No.
7     Hart-30(b)(6)-18, Email dated 2011-01-21,
8     Bates stamped Rite_Aid_OMDL_0020541 and
9     Rite_Aid_OMDL_0020542, was marked for
10    identification.)
11                    - - -
12  BY MS. McENROE:
13        Q.   I'm going to hand you what I have

Page 283

Page 284

8          MS. McENROE:  I have no further
9   questions.  Thank you.
10         MR. PIFKO:  I don't think we have
11  questions, but let me just look at the
12  documents real quick.
13         MS. McENROE:  Let's go off the
14  record real quick.
15         THE VIDEOGRAPHER:  Going off the
16  record, 4:50 p.m.
17                  - - -
18         (A recess was taken from 4:50
19  p.m. to 4:51 p.m.)
20                  - - -
21         THE VIDEOGRAPHER:  Back on the
22  record at 4:51 p.m.
23
24

Page 285

1                   - - -
2              EXAMINATION
3                   - - -
4   BY MR. PIFKO:
5        Q.    I want to direct your attention
6   to Exhibit 15 that your counsel just introduced
7   to you.
8           For the record, it's a multi-page
9   document, Bates labeled Rite_Aid_OMDL_004607
10  through 46072.
11          Can you tell me what this is?



Page 286

Page 287

Page 288

```
20        MR. PIFKO:  Okay.  No further
21   questions.
22        MS. McENROE:  Thank you.  That
23   concludes the 30(b)(6) deposition of Ms.
24   Hart.
```

Page 289

```
1         THE VIDEOGRAPHER:  Going off the
2    record.  The time is 4:55 p.m.
3         (Witness excused.)
4         (Deposition concluded at
5    approximately 4:55 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

|  | Page 290 |
|---|---|

```
 1
 2              CERTIFICATE
 3
 4
 5        I HEREBY CERTIFY that the witness
      was duly sworn by me and that the deposition is a
 6    true record of the testimony given by the
      witness.
 7
            It was requested before
 8    completion of the deposition that the witness,
      JANET GETZEY HART, have the opportunity to read
 9    and sign the deposition transcript.
10
11
12
13
      _____
14       ANN MARIE MITCHELL, a Federally
         Approved Certified Realtime
15       Reporter, Registered Diplomate
         Reporter, Registered Merit Reporter and
16       Notary Public
17
18
19       (The foregoing certification of
20    this transcript does not apply to any
21    reproduction of the same by any means, unless
22    under the direct control and/or supervision of
23    the certifying reporter.)
24
```

|  | Page 291 |
|---|---|

```
 1         INSTRUCTIONS TO WITNESS
 2
 3            Please read your deposition over
 4    carefully and make any necessary corrections.
 5    You should state the reason in the appropriate
 6    space on the errata sheet for any corrections
 7    that are made.
 8            After doing so, please sign the
 9    errata sheet and date it.
10            You are signing same subject to
11    the changes you have noted on the errata sheet,
12    which will be attached to your deposition.
13            It is imperative that you return
14    the original errata sheet to the deposing
15    attorney within thirty (30) days of receipt of
16    the deposition transcript by you.  If you fail to
17    do so, the deposition transcript may be deemed to
18    be accurate and may be used in court.
19
20
21
22
23
24
```

|  | Page 292 |
|---|---|

```
 1            - - - - - -
              E R R A T A
 2            - - - - - -
 3
 4    PAGE  LINE  CHANGE
 5    ____  ____  _____
 6      REASON: _____
 7    ____  ____  _____
 8      REASON: _____
 9    ____  ____  _____
10      REASON: _____
11    ____  ____  _____
12      REASON: _____
13    ____  ____  _____
14      REASON: _____
15    ____  ____  _____
16      REASON: _____
17    ____  ____  _____
18      REASON: _____
19    ____  ____  _____
20      REASON: _____
21    ____  ____  _____
22      REASON: _____
23    ____  ____  _____
24      REASON: _____
```

|  | Page 293 |
|---|---|

```
 1
 2         ACKNOWLEDGMENT OF DEPONENT
 3
 4         I,_____, do
 5    hereby certify that I have read the foregoing
 6    pages, 1 - 293, and that the same is a correct
 7    transcription of the answers given by me to the
 8    questions therein propounded, except for the
 9    corrections or changes in form or substance, if
10    any, noted in the attached Errata Sheet.
11
12
13    _____
14    JANET GETZEY HART            DATE
15
16
17    Subscribed and sworn
      to before me this
18    _____ day of _____, 20____.
19    My commission expires:_____
20
      _____
21    Notary Public
22
23
24
```