```
 1            UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF OHIO

 2                 EASTERN DIVISION

 3

    IN RE: NATIONAL          )

 4  PRESCRIPTION             )  MDL No. 2804

    OPIATE LITIGATION        )

 5  _____   )  Case No.

                             )  1:17-MD-2804

 6                           )

    THIS DOCUMENT RELATES  )  Hon. Dan A.

 7  TO ALL CASES           )  Polster

 8

             TUESDAY, JULY 31, 2018

 9

      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

10             CONFIDENTIALITY REVIEW

11                    - - -

12          Videotaped deposition of Nathan J.

13  Hartle, held at the offices of Covington &

14  Burlington, LLP, One City Center, 850 Tenth

15  Street Northwest, Washington, DC, commencing

16  at 9:04 a.m., on the above date, before

17  Carrie A. Campbell, Registered Diplomate

18  Reporter, Certified Realtime Reporter,

19  Illinois, California & Texas Certified

20  Shorthand Reporter, Missouri & Kansas

21  Certified Court Reporter.

22                    - - -

            GOLKOW LITIGATION SERVICES

23     877.370.3377 ph | 917.591.5672 fax

                deps@golkow.com

24

25
```

```
 1                  A P P E A R A N C E S :
 2

 3        MCHUGH FULLER LAW GROUP
          BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4             mike@mchughfuller.com
          97 Elias Whiddon Road
 5        Hattiesburg, Mississippi 39402
          (601) 261-2220
 6

          GREENE KETCHUM BAILEY WALKER FARRELL
 7        & TWEEL
          BY:  PAUL T. FARRELL, JR., ESQUIRE
 8             paul@greeneketchum.com
          419 Eleventh Street
 9        Huntington, West Virginia 25701
          (314) 525-9115
10

          LEVIN, PAPANTONIO, THOMAS, MITCHELL,
11        RAFFERTY & PROCTOR, P.A.
          BY:  TROY RAFFERTY, ESQUIRE
12             trafferty@levinlaw.com
               BRANDON BOGLE, ESQUIRE
13             bbogle@levinlaw.com
          316 South Baylen Street, Suite 600
14        Pensacola, Florida 32502
          (850) 435-7000
15

          SPANGENBERG SHIBLEY & LIBER LLP
16        BY:  PETER H. WEINBERGER, ESQUIRE
               pweinberger@spanglaw.com
17             (VIA TELECONFERENCE)
          1001 Lakeside Avenue East
18        Cleveland, Ohio 44114
          (216) 600-0114
19        Counsel for Plaintiffs
20

          COVINGTON & BURLING LLP
21        BY:  EMILY JOHNSON HENN, ESQUIRE
               ehenn@cov.com
22             MEGHAN MONAGHAN, ESQUIRE
               mmonaghan@cov.com
23        850 Tenth Street, NW
          Washington, DC 20001-4956
24        (202) 662-6000
          Counsel for McKesson Corporation
25
```

```
 1        WILLIAMS & CONNOLLY LLP
          BY:  COLLEEN MCNAMARA, ESQUIRE
 2             cmcnamara@wc.com
               MIRANDA PETERSEN, ESQUIRE
 3             mpetersen@wc.com
          725 Twelfth Street, N.W.
 4        Washington, DC 20005
          (202) 434-5331
 5        Counsel for Cardinal Health, Inc.
 6
          REEDSMITH LLP
 7        BY:  THOMAS H. SUDDATH, JR., ESQUIRE
               tsuddath@reedsmith.com
 8        Three Logan Square
          1717 Arch Street, Suite 3100
 9        Philadelphia, Pennsylvania 19103
          (215) 851-8100
10        Counsel for AmerisourceBergen
11
          JONES DAY
12        BY:  CHRISTOPHER J. LOVRIEN, ESQUIRE
               cjlovrien@jonesday.com
13        555 South Flower Street, 50th Floor
          Los Angeles, California 90071-2452
14        (213) 489-3939
          Counsel for Walmart
15
16        PELINI, CAMPBELL & WILLIAMS LLC
          BY:  CRAIG G. PELINI, ESQUIRE
17             cgp@pelini-law.com
          8040 Cleveland Avenue NW, Suite 400
18        North Canton, Ohio 44720
          (330) 305-6400
19        Counsel for Prescription Supply,
          Inc.
20
21        JACKSONKELLY PLLC
          BY:  WILLIAM J. AUBEL, ESQUIRE
22             william.j.aubel@jacksonkelly.com
               (VIA TELECONFERENCE)
23        500 Lee Street East, Suite 1600
          Charleston, West Virginia 25301
24        (304) 340-1146
          Counsel for Miami-Luken
25
```

```
 1        ZUCKERMAN SPAEDER LLP
          BY:  CONOR B. O'CROININ, ESQUIRE
 2             cocroinin@zuckerman.com
          100 East Pratt Street, Suite 2440
 3        Baltimore, Maryland 21202-1031
          (202) 778-1800
 4        Counsel for CVS Indiana, LLC, and
          CVS RX Services, Inc.
 5
 6        ARNOLD & PORTER
          BY:  DAVID D. FAUVRE, ESQUIRE
 7             David.Fauvre@arnoldporter.com
          601 Massachusetts Avenue, NW
 8        Washington, DC 20001-3743
          (202) 942-5000
 9        Counsel for Endo Pharmaceuticals
          Inc., and Endo Health Solutions Inc.
10
11        ROPES & GRAY
          BY:  WILLIAM T. DAVISON, ESQUIRE
12             william.davison@ropesgray.com
          800 Boylston Street
13        Boston, Massachusetts 02199-3600
          (617) 951-7000
14        Counsel for Mallinckrodt
15
          MARCUS & SHAPIRA LLP
16        BY:  SCOTT D. LIVINGSTON, ESQUIRE
               livingston@marcus-shapira.com
17        301 Grant Street, 35th Floor
          Pittsburgh, Pennsylvania 15219-6401
18        (412) 338-4690
          Counsel for HBC
19
20        MORGAN, LEWIS & BOCKIUS LLP
          BY:  MONICA C. PEDROZA, ESQUIRE
21             monica.pedroza@morganlewis.com
               (VIA TELECONFERENCE)
22        77 West Wacker Drive, Fifth Floor
          Chicago, Illinois 60601
23        (312) 324-1000
          Counsel for Teva Pharmaceuticals
24        USA, Inc., Cephalon, Inc., Watson
          Laboratories, Actavis LLC, Actavis
25        Pharma, Inc., f/k/a Watson Pharma
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MORGAN, LEWIS & BOCKIUS LLP
          BY:  JOHN P. LAVELLE, JR., ESQUIRE
 2             john.lavelle@morganlewis.com
               (VIA TELECONFERENCE)
 3        1701 Market Street
          Philadelphia, Pennsylvania 19103-2921
 4        (215) 963-5000
          Counsel for Rite Aid
 5
 6        LOCKE LORD LLP
          BY:  BRANDAN MONTMINY, ESQUIRE
 7             brandan.montminy@lockelord.com
               (VIA TELECONFERENCE)
 8        2200 Ross Avenue, Suite 2800
          Dallas, Texas 75201
 9        (214) 740-8445
          Counsel for Henry Schein, Inc., and
10        Henry Schein Medical Systems, Inc.
11
          KIRKLAND & ELLIS
12        BY:  KAITLYN L. COVERSTONE, ESQUIRE
               kaitlyn.coverstone@kirkland.com
13             (VIA TELECONFERENCE)
          300 North LaSalle
14        Chicago, IL 60654
          (312) 862-3671
15        Counsel for Allergan Finance, LLC
16
     VIDEOGRAPHER:
17        DANIEL HOLMSTOCK,
          Golkow Litigation Services
18
19   TRIAL TECHNICIAN:
          COREY SMITH,
20        Golkow Litigation Services
21                    - - -
22
23
24
25
```



1          INDEX
2                                        PAGE

   APPEARANCES.................................... 2
4  EXAMINATIONS
5   BY MR. FARRELL........................... 15
6
7              EXHIBITS
8        No.     Description           Page



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





25



(Exhibits attached to the deposition.)

CERTIFICATE.................................368
ACKNOWLEDGMENT OF DEPONENT..................370
ERRATA......................................371
LAWYER'S NOTES..............................372

 1           VIDEOGRAPHER:  All right.  We

 2      are now on the record.

 3           My name is Daniel Holmstock.  I

 4      am the videographer for Golkow

 5      Litigation Services.

 6           Today's date is July 31, 2018.

 7      The time on the video screen is

 8      9:04 a.m.

 9           This video deposition is being

10      recorded at the law firm of Covington

11      & Burling LLP at 850 Tenth Street,

12      Northwest, in Washington, DC, in the

13      matter of In Re: National Prescription

14      Opiate Litigation.  It is pending

15      before the United States District

16      Court for the Northern District of

17      Ohio, Eastern Division.

18           The deponent today is Mr. Nate

19      Hartle.

20           Will counsel please introduce

21      themselves and whom they represent.

22           MR. FARRELL:  Paul Farrell on

23      behalf of the plaintiffs.

24           MR. RAFFERTY:  Troy Rafferty on

25      behalf of the plaintiffs.

```
 1                    MR. FULLER:  Mike Fuller on
 2           behalf of plaintiffs.
 3                    MR. SUDDATH:  Tom Suddath on
 4           behalf of AmerisourceBergen.
 5                    MR. BOGLE:  Brandon Bogle on
 6           behalf of the plaintiffs.
 7                    MR. PELINI:  Craig Pelini,
 8           Prescription Supply.
 9                    MR. FAUVRE:  David Fauvre on
10           behalf of the Endo and Par
11           Pharmaceutical defendants.
12                    MR. LOVRIEN:  Chris Lovrien,
13           Jones Day, on behalf of Walmart.
14                    MR. DAVISON:  Bill Davison,
15           Ropes & Gray, on behalf of
16           Mallinckrodt, LLC, and SpecGx, LLC.
17                    MS. PETERSEN:  Miranda
18           Petersen, Williams & Connolly, on
19           behalf of Cardinal Health, Inc.
20                    MS. MCNAMARA:  Colleen
21           McNamara, Williams & Connolly, on
22           behalf of Cardinal Health, Inc.
23                    MR. LIVINGSTON:  Scott
24           Livingston on behalf of HBC.
25                    MR. O'CROININ:  Conor
```

```
 1        O'Croinin, CVS.

 2             MS. MONAGHAN:  Meghan Monaghan,

 3        Covington & Burling, on behalf of

 4        McKesson and the witness.

 5             MS. HENN:  Emily Henn,

 6        Covington & Burling, on behalf of

 7        McKesson and the witness.

 8             VIDEOGRAPHER:  Via telephone?

 9             MS. PEDROZA:  This is Monica

10        Pedroza on behalf of Teva

11        Pharmaceuticals USA, Inc., Cephalon

12        Inc., Watson Laboratories, Inc.,

13        Actavis, LLC, and Actavis Pharma, Inc.

14             MR. LAVELLE:  John Lavelle on

15        behalf of Rite Aid.

16             MR. MONTMINY:  Brendan Montminy

17        on behalf Henry Schein, Inc., and

18        Henry Schein Medical Systems, Inc.

19             MR. AUBEL:  Bill Aubel, Jackson

20        Kelly, on behalf of Miami-Luken, Inc.

21             MR. WEINBERGER:  Pete

22        Weinberger on behalf of the

23        plaintiffs.

24             VIDEOGRAPHER:  The court

25        reporter is Carrie Campbell, who will
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          now administer the oath to the

 2          witness.

 3

 4               NATHAN J. HARTLE,

 5    of lawful age, having been first duly sworn

 6    to tell the truth, the whole truth and

 7    nothing but the truth, deposes and says on

 8    behalf of the Plaintiffs, as follows:

 9

10               DIRECT EXAMINATION

11    QUESTIONS BY MR. FARRELL:

12         Q.    Good morning.

13         A.    Good morning.

14         Q.    Please state your name.

15         A.    My name is Nathan -- I go by

16    Nate -- John Hartle.

17         Q.    And what is your occupation,

18    and who is your employer?

19         A.    I'm currently a vice president

20    of regulatory affairs and compliance for

21    McKesson Corporation.

22         Q.    How long have you been employed

23    by McKesson?

24         A.    Since May of 2014.

25         Q.    Have you ever had your
```

Highly Confidential - Subject to Further Confidentiality Review

1    deposition taken before?

2         A.    20 years ago when I -- when I

3    worked at a previous employer for a theft

4    case, investigative.

5         Q.    So if you'll bear with me,

6    we're going to do a little bit of paperwork

7    to start -- to start off.

8         A.    Okay.

9         Q.    The first thing is, is are you

10   aware that today you'll be testifying not as

11   Nate Hartle but as McKesson Corporation?

12        A.    I am.

13              (McKesson-Hartle Exhibit 1

14        marked for identification.)

15   QUESTIONS BY MR. FARRELL:

16        Q.    I'm going to have marked and

17   show you McKesson 30(b)(6) Document 1, and

18   this is the first notice of deposition that

19   was filed in this case.

20              Have you had a chance to review

21   this document before today?

22        A.    I do.  I have copies of this.

23        Q.    And you understand that today

24   I'll be asking you questions about the

25   subject matters that are in Exhibit 1, and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   McKesson has been kind enough to designate
 2   you as its spokesman to answer these
 3   questions?
 4               MS. HENN:  Objection to form.
 5               THE WITNESS:  I understand.
 6               (McKesson-Hartle Exhibit 2
 7        marked for identification.)
 8   QUESTIONS BY MR. FARRELL:
 9        Q.    There's a second notice.  We'll
10   have that marked as Exhibit 2, and it's MCK
11   30(b)(6)_02.
12               Have you had a chance to review
13   this document before today?
14        A.    I have.
15        Q.    Now, it's my understanding that
16   McKesson has designated you to testify on
17   certain subject matters within this document
18   but not all.
19               Is that your understanding?
20        A.    Correct.
21        Q.    And those numbers are numbers
22   9, 14, 16, 17, 18, 19, 20, 21 and 22.
23               Is that your understanding as
24   well?
25        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (McKesson-Hartle Exhibit 3

 2          marked for identification.)

 3   QUESTIONS BY MR. FARRELL:

 4          Q.     The next document, just to be

 5   fair, is I'm going to mark as Exhibit 3

 6   McKesson's objections and responses to each

 7   of these subject matters to create the whole

 8   record, if anybody wants to see it.  This

 9   will be McKesson 30(b)(6)_3.

10                    Have you had a chance to review

11   this document before today?

12          A.     I have.

13          Q.     It's much longer, isn't it?

14                    (McKesson-Hartle Exhibit 4

15          marked for identification.)

16   QUESTIONS BY MR. FARRELL:

17          Q.     And finally, I'm going to show

18   you McKesson 30(b)(6)_4, which we've also

19   labeled as Exhibit 4, which is simply the

20   redesignation of the date and location and

21   the subject matters of today's deposition.

22                    Have you had a chance to review

23   this document?

24          A.     I have.

25          Q.     So that everybody is on the
```

Highly Confidential - Subject to Further Confidentiality Review

 1   same page, what you'll notice is that there

 2   are a number of different Bates stamps that

 3   we'll see throughout the day.  For purposes

 4   of this deposition, what we've done is we've

 5   created a unique and separate Bates stamp

 6   just for your deposition, which can be found

 7   in the top right-hand corner of, I hope, all

 8   of the exhibits today.  And some of them,

 9   start MCK 30(b)(6) and then underscore, and

10   then the first number you'll see is the

11   sequential number of exhibits, followed by a

12   dash and then individual page numbers.

13             As we go through later today, I

14   abandon the normal sequential numbering

15   system because we're going to bounce around

16   the timeline a little bit, and instead I use

17   basically a date indicator in the top

18   right-hand corner.

19        A.    Okay.

20        Q.    Now, that being said for

21   everybody on the telephone, a lot of these

22   documents have been produced in this

23   litigation, and what you'll find, to the best

24   of my ability, is I've always tried to find

25   the document that contains the MDL Bates

Highly Confidential - Subject to Further Confidentiality Review

```
 1    stamp in the bottom right-hand corner.

 2    Sometimes it's not been all that successful

 3    because sometimes the document comes from a

 4    prior production and has not yet matriculated

 5    or made its way over to the MDL production.

 6              But nonetheless, those are the

 7    three different Bates stamp numbering systems

 8    that we're going to come across today, and

 9    when I talk on the record, I'll try to refer

10    just to the MDL number.

11              For the people on the telephone

12    and the record and then for you and I, it'll

13    be easiest for us to use the top right-hand

14    corner.

15         A.    Okay.

16         Q.    When did you first learn that

17    you would be designated as the corporate

18    witness for McKesson?

19         A.    I don't know the exact date,

20    but I believe within the last, say, 30 days

21    or so.

22         Q.    Do you know Gary Boggs?

23         A.    I do know Gary.

24         Q.    Are you aware that he has been

25    designated as a 30(b)(6) designee in another
```

1    litigation pending in West Virginia?

2         A.    I am aware.

3         Q.    Have you read the deposition of

4    McKesson from that litigation?

5         A.    I have.

6         Q.    Is there anything in that

7    deposition that you think is wrong or

8    factually inaccurate?

9         A.    Not that I can recall.

10        Q.    Are you prepared, sitting here

11   today, to adopt or affirm the representations

12   McKesson made in the West Virginia Attorney

13   General litigation?

14             MS. HENN:  Objection to form.

15             THE WITNESS:  Can you ask that

16        again, please?

17   QUESTIONS BY MR. FARRELL:

18        Q.    So it's a little bit of a

19   Plato's Theory of the Forms right now, but

20   for all intents and purposes, McKesson is

21   sitting here in front of me today, and

22   McKesson was sitting before Mr. Lee Javins

23   from the West Virginia Attorney General

24   litigation pending in Boone County several

25   weeks ago.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And so I'm trying to make the

 2    connection that sitting here today McKesson

 3    affirms or adopts all of its testimony from

 4    the West Virginia litigation.

 5              MS. HENN:  Objection to form.

 6         This witness is here on -- designated

 7         on behalf of McKesson for the topics

 8         you've indicated.

 9              But you can answer the

10         question.

11              THE WITNESS:  I'm not sure how

12         to answer that question.

13    QUESTIONS BY MR. FARRELL:

14         Q.    Okay.  So the answer is either

15    you adopt your testimony from the prior

16    litigation or you choose not to today.

17              MS. HENN:  Objection to form.

18    QUESTIONS BY MR. FARRELL:

19         Q.    It's okay either way.

20         A.    What's that?

21         Q.    It's okay either way.

22         A.    Yeah.

23         Q.    It's just a question of whether

24    or not I'm going to go back through some of

25    the other subject matters that Gary Boggs
```

```
 1    testified to or whether or not I can rely on

 2    that sworn testimony --

 3         A.    Okay.

 4         Q.    -- to be applicable today.

 5               MS. HENN:  Objection to form,

 6         and same comment as I made before.

 7               MR. FARRELL:  So, Counsel,

 8         that's your second speaking objection,

 9         and so I would ask that you keep your

10         comments from the record.

11    QUESTIONS BY MR. FARRELL:

12         Q.    So it's okay if you do not want

13    to adopt that prior testimony.  We can go

14    through it today.  You may not have the

15    authority by McKesson to do so.

16         A.    Yeah.  Again, I'm not sure how

17    to answer that question specifically.

18         Q.    It's not a problem.

19         A.    Yeah.  Okay.

20         Q.    Can you tell me what documents

21    you reviewed to prepare for today's

22    testimony?

23               MS. HENN:  I'm going to object

24         to that question as calling for

25         attorney work product and instruct the
```

Highly Confidential - Subject to Further Confidentiality Review

1          witness not to respond if you're being

2          asked, as I understand you are, for a

3          list of documents counsel showed you.

4   QUESTIONS BY MR. FARRELL:

5          Q.     Okay.  Have all of the

6   documents that counsel shared with McKesson

7   been disclosed in the MDL?

8                  MS. HENN:  Do you mean to ask

9          whether the documents Mr. Hartle has

10         used in preparing for the deposition,

11         have they been produced?

12                 MR. FARRELL:  Yes.

13                 MS. HENN:  I believe that to be

14         the case, yes.

15  QUESTIONS BY MR. FARRELL:

16         Q.     Okay.  So is it fair to say

17  that everything Mr. Hartle reviewed has

18  actually been produced in the litigation

19  today?

20                 MS. HENN:  That is my

21         understanding.

22                 MR. FARRELL:  The reason I ask

23         is because when I read Mr. Boggs'

24         testimony, there are references to a

25         dozen or so documents that he relied

Highly Confidential - Subject to Further Confidentiality Review

```
 1          upon and discussed that have not yet

 2          been disclosed in the MDL.

 3                Are you aware of any documents

 4          that are pending that have not been

 5          produced?

 6                MS. HENN:  I know that we're

 7          not complete with our productions, but

 8          I'm not -- I don't know what those

 9          documents -- what documents you're

10          referring to.

11                MR. FARRELL:  So to the extent

12          that there are future documents that

13          are produced that are relevant to the

14          subject matters that are in the

15          30(b)(6) notices, we reserve our right

16          to petition the Court for good cause

17          to extend or continue this deposition.

18                MS. HENN:  I note your

19          reservation of rights.  We may

20          disagree on the ability of plaintiffs

21          to continue this deposition, but let's

22          continue.

23     QUESTIONS BY MR. FARRELL:

24          Q.    Other than the documents

25     provided by counsel to you in preparation for
```

Highly Confidential - Subject to Further Confidentiality Review

 1   this deposition, did you on your own review

 2   any documents?

 3        A.    Yes, I reviewed a handful of

 4   documents that are standard with our program.

 5        Q.    Okay.  Can you tell me which

 6   ones they are?

 7        A.    Can I ask a clarifying

 8   question?  Can you repeat -- do the documents

 9   that had already -- documents that haven't

10   been produced?  Anything in addition to

11   what --

12        Q.    That would be a swell place to

13   start.

14        A.    You know, as I think about

15   things that I've reviewed, it's standard

16   operating manuals and procedures, and I think

17   likely all that -- that stuff is part of what

18   was produced, so I don't --

19        Q.    That's actually not a very fair

20   way to place it because you probably haven't

21   studied the production list yet from

22   McKesson.

23        A.    No.  No.

24        Q.    So let's talk about it in a

25   different context.

```
 1      A.      Okay.

 2      Q.      I'm assuming at some point in

 3   time your counsel provided you some documents

 4   that they culled through based upon the legal

 5   documents, and that, arguably, has been the

 6   subject of some debate between the lawyers on

 7   whether that list is producible or not.

 8              Aside from that, did you

 9   independently go and review anything on your

10   own, document-wise, to prepare for today?

11      A.      Document-wise?  You know, I

12   looked at files of mine, you know, just, you

13   know, what I -- what I have in my own, you

14   know, storage on things that I've done or

15   projects that I've been on and reviewed just

16   a variety of different pieces of information

17   that personally I have.

18      Q.      Where would those files be

19   located?

20      A.      On my computer, whether it be

21   e-mails or in documents on my standard

22   storage on my computer.

23      Q.      Would it be documents from

24   MCK.NET?

25      A.      I don't think there was
```

```
 1    anything stored on MCK.NET, our intra -- the

 2    company's intra site.

 3          Q.     I just wanted to say MCK.NET.

 4          A.     MCK.NET, yeah.

 5          Q.     Did you review documents that

 6    were on your personal computer -- that's a

 7    bad question.

 8                 Did you review documents that

 9    are located on your hard drive of your

10    computer?

11          A.     My work computer?

12          Q.     Yes.

13          A.     Yes.

14          Q.     Would those documents also have

15    been on the server?

16          A.     Could you clarify "server"?

17          Q.     Yeah.  So in general, when you

18    have a network of computers, sometimes

19    there's a central repository where

20    everybody's computer can pull up files from,

21    and then there's also on your own computer a

22    hard drive that nobody else can look at,

23    except you, from your computer station.

24          A.     I understand that, sir, but

25    I -- you know, in terms of the shared
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    repository that we use in regulatory affairs,

 2    yes, there's documents stored on there that

 3    I've reviewed.

 4         Q.     What about documents on your

 5    personal hard drive on your office computer?

 6         A.     Yes, I store documents on my

 7    personal office computer.

 8         Q.     And those documents you

 9    reviewed prior to today's deposition?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  There are some

12         documents.

13    QUESTIONS BY MR. FARRELL:

14         Q.     Did you rely on any of those

15    documents or did any of those documents

16    refresh your recollection about the subject

17    matters of today's deposition?

18         A.     I used --

19              MS. HENN:  Objection to form.

20              Go ahead.

21              THE WITNESS:  I used them to

22         refresh.

23    QUESTIONS BY MR. FARRELL:

24         Q.     Okay.  How about e-mails?  Did

25    you go and review any old e-mails?
```

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      I may have looked at a few

 2   e-mails.

 3          Q.      Do any of them particularly

 4   stand out?

 5          A.      No.

 6          Q.      Who would the e-mails have come

 7   from that you were reviewing?

 8                  MS. HENN:  Objection to form.

 9                  THE WITNESS:  Could be a

10          variety of people.  I don't recall,

11          you know, specific e-mails that I

12          looked at.  Could be from my team or

13          part of a project or...

14   QUESTIONS BY MR. FARRELL:

15          Q.      And I'm sorry if I asked this

16   before.  How long have you been with

17   McKesson?

18          A.      Since 2014.  May of 2014.

19          Q.      You understand that some of the

20   subject matters today may predate 2014?

21          A.      I do understand that.

22          Q.      Other than documents provided

23   by your lawyer, where did you find documents

24   that predated 2014?

25                  MS. HENN:  Objection to form.

```
 1               THE WITNESS:  They would be on
 2        our shared drive or our space where
 3        regulatory affairs -- it's called the
 4        R drive.  That's where we would share
 5        information.
 6   QUESTIONS BY MR. FARRELL:
 7        Q.    Okay.  Other than the R drive,
 8   where else would we find those documents?
 9               MS. HENN:  Objection to form.
10               THE WITNESS:  I'm not sure -- I
11        don't believe I accessed anything else
12        outside of the hard drive.  I know
13        there's other sites, a share point
14        site in the past, but I believe mine
15        were all from the R drive.
16   QUESTIONS BY MR. FARRELL:
17        Q.    Have you reviewed any documents
18   or seen any documents that predate 2006?
19        A.    I have.
20        Q.    And did you -- where did those
21   documents come from?
22               I'll make it easier.  Did those
23   documents come from the lawyers?
24        A.    I have some in the -- the -- my
25   preparation over the past few days, but also
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I do have documents, as I joined McKesson,

 2    that I reviewed and had stored either on my

 3    personal computer, on my work computer, or

 4    the R drive that predate 2006.

 5         Q.    All right.  So we're going to

 6    jump into some topics.

 7         A.    Okay.

 8         Q.    Have you read the Masters

 9    Pharmaceutical case?

10         A.    Not for a while.  I read it

11    when it first came out, you know.

12         Q.    That was June of 2017.

13               So when I start asking

14    questions, I'm going to do my very best to

15    keep envisioning McKesson's logo sitting in

16    front of me instead of Nate Hartle.

17         A.    Okay.

18         Q.    So let me ask a different way.

19               Is McKesson aware of the

20    publishing of the Masters Pharmaceutical

21    case?

22               MS. HENN:  Objection to form.

23               THE WITNESS:  We are.

24    QUESTIONS BY MR. FARRELL:

25         Q.    You're aware that in Masters
```

Highly Confidential - Subject to Further Confidentiality Review

 1   Pharmaceutical there was a discussion of the

 2   reporting requirement?

 3          A.      I am.

 4          Q.      And does McKesson acknowledge

 5   that is the law in the United States?

 6                  MS. HENN:  Objection to form.

 7                  THE WITNESS:  Could you ask

 8          that question again, please?  Do I --

 9   QUESTIONS BY MR. FARRELL:

10          Q.      Sure.

11                  I'm jumping out of order a

12   little bit, but I'm going to see if I can

13   actually grab the folder for you.

14                  We're not going to premark this

15   because that will absolutely mess up my

16   numbering system, but the top right-hand

17   corner it's Bates stamped 2017_06_30.

18                  And I apologize for the

19   flopping of the documents across the big

20   table.

21                  This is Masters Pharmaceutical.

22   Has McKesson read this document?

23                  MS. HENN:  Objection to form.

24                  THE WITNESS:  I believe that

25          several have read this document.

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Have you read this document in

 3    preparation for today's deposition?

 4         A.    Did I have it in the past?

 5         Q.    No.

 6               In preparation for today's

 7    deposition, have you read this as McKesson's

 8    corporate designee?

 9         A.    I did not read this specific

10    right before the deposition.

11         Q.    So it's not -- it's not a

12    memory contest --

13         A.    Right.

14         Q.    -- and that's why I brought the

15    documents --

16         A.    Right.

17         Q.    -- so that -- so that we can

18    talk about some of the subject matters.

19               The first thing I'd like you to

20    do is turn to the Bates stamp page 7.  And

21    you'll notice that there are two columns, and

22    in the bottom right-hand corner the paragraph

23    heading number 2.

24               Do you see that?

25         A.    Yes.
```

```
 1          Q.      And midway down through, you'll
 2   see that in the parentheses it says the
 3   "reporting requirement."
 4          A.      I see that.
 5          Q.      Do you see it?
 6          A.      I do.
 7          Q.      And then immediately after
 8   that, it describes what the reporting
 9   requirement is.  And I don't know if you do
10   better reading it aloud or reading it to
11   yourself.
12                  Would you like me to read it,
13   or would you like to read it?
14          A.      I can read it.
15          Q.      All right.  Starting with "the
16   reporting requirement is a relatively modest
17   one," will you finish the sentence?
18          A.      I read that sentence.
19          Q.      Okay.  Now, will you read it
20   aloud?
21          A.      "It requires only that a
22   distributor provide basic information about
23   certain orders to DEA so that DEA
24   investigators in the field can aggregate
25   reports from every point along the legally
```

```
 1    regulated supply chain and use the

 2    information to ferret out potentially illegal

 3    activity."

 4         Q.     Does McKesson acknowledge that

 5    it has a duty under the reporting

 6    requirement?

 7              MS. HENN:  Objection to form.

 8              THE WITNESS:  Acknowledge that

 9         we -- we, as part of the designing and

10         operating the suspicious order system,

11         have to report suspicious orders.

12    QUESTIONS BY MR. FARRELL:

13         Q.     That wasn't my question.

14              My question is:  Does McKesson

15    acknowledge the reporting requirement, as you

16    just read aloud, is a duty owed by McKesson

17    under the federal regulations and United

18    States Code?

19              MS. HENN:  Objection to form.

20              THE WITNESS:  And it's our

21         responsibility to report suspicious

22         orders.

23    QUESTIONS BY MR. FARRELL:

24         Q.     So the answer to my question is

25    yes --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      -- no, or I don't know.

 3                  MS. HENN:  Objection to form.

 4                  THE WITNESS:  It is our -- yes.

 5   QUESTIONS BY MR. FARRELL:

 6          Q.      Okay.  Now, I want you to go

 7   down, and if you actually flip the page,

 8   we'll cheat to the end, and it's the end of

 9   the first sentence in the top left-hand

10   corner.  In parentheses it says, "The

11   shipping requirement."

12                  Do you see that?

13          A.      Where am I looking again?

14   Sorry.

15          Q.      Very top left-hand corner

16   there's a --

17          A.      Okay.  Shipping requirement.  I

18   see that.

19          Q.      All right.  Now what we're

20   going to do is go to the beginning of that

21   sentence on the previous page, and it's the

22   last full sentence.  It starts with "once a

23   distributor has."

24                  Do you see that sentence?

25          A.      I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Now I'm going to give you a

2  chance to read it without -- and digest it

3  for a second.

4    A.    I've read that.

5    Q.    All right.  Now, can you read

6  it aloud for the record?

7    A.    "Once a distributor has

8  reported a suspicious order, it must make one

9  of two choices, decline to ship the order or

10  conduct some due diligence, and if it is able

11  to determine that the order is not likely to

12  be diverted into illegal channels, ship the

13  order."

14    Q.    Does McKesson acknowledge that

15  the shipping requirement is a duty it owes

16  under the United States Code and the Code of

17  Federal Regulations?

18         MS. HENN:  Objection to form.

19         THE WITNESS:  Yes.

20         (McKesson-Hartle Exhibit 5

21    marked for identification.)

22  QUESTIONS BY MR. FARRELL:

23    Q.    We'll come back to this later.

24         All right.  The next document

25  we're going to reference is MCK 30(b)(6)_5.

Highly Confidential - Subject to Further Confidentiality Review

```
1    And so to make this easy so I don't have to

2    say all those letters and numbers, as we move

3    forward I'm just going to refer to it exhibit

4    such-and-such.

5         A.    Okay.

6         Q.    And when I do, we're talking

7    about the exhibit for this deposition.

8              I'm going to represent to you

9    that there are four pages to this exhibit,

10   that you won't find this exhibit anywhere on

11   the Internet because I made them myself.  I'm

12   going to give you a second to flip through

13   them, and what I'm going to represent to you

14   is that these are four different provisions

15   from four different United States Code

16   provisions.  So I'll give you a second to

17   review.

18        A.    Okay.

19        Q.    So the first thing I want you

20   to take note of on Exhibit 5, page 1, is the

21   top left-hand corner, which is the great seal

22   of our United States Congress.

23              And if you look under the

24   United States Code, Title 21, for food and

25   drugs, under Chapter 13, Drug Abuse
```

 1    Prevention and Control, Subchapter 1, Control

 2    and Enforcement, Part A, Introductory

 3    Provisions, this is the beginning of the

 4    Controlled Substances Act.

 5              McKesson is aware of and

 6    acknowledges that its role in the chain of

 7    distribution of opioids is governed by the

 8    Controlled Substances Act, agreed?

 9              MS. HENN:  Objection to form.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. FARRELL:

12         Q.    Now, I'm going to have you look

13    down all the way at all those letters and

14    numbers at the very bottom, Public Law

15    91-513, Title 2.  And the date there is

16    October 27, 1970.

17              McKesson is aware that the

18    Controlled Substances Act has been in force

19    and effect since 1970, correct?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  Correct.

22    QUESTIONS BY MR. FARRELL:

23         Q.    So Section 801, which is on the

24    first page, is Congressional findings and

25    declarations regarding controlled substances.

```
 1                   Do you see that?

 2        A.    I do.

 3        Q.    And it says, "The Congress

 4   agrees makes the following findings and

 5   declarations."

 6                   And to be fair, paragraph 1,

 7   will you read it aloud?

 8        A.    "Many of the drugs included

 9   within this subchapter have a useful and

10   legitimate medical purpose and are necessary

11   to maintain the health and general welfare of

12   the American people."

13        Q.    Does McKesson acknowledge and

14   agree with that finding?

15             MS. HENN:  Objection to form.

16             THE WITNESS:  Yes.

17   QUESTIONS BY MR. FARRELL:

18        Q.    Now, will you read Section 2

19   aloud, please?

20        A.    "The illegal importation,

21   manufacture, distribution and possession and

22   improper use of controlled substances have

23   substantially and detrimentally effect --

24   have a substantial and detrimental effect on

25   the health and general welfare of the
```

1    American people."

2         Q.    Does McKesson acknowledge and

3    agree with those findings?

4              MS. HENN:  Objection to form.

5              THE WITNESS:  Yes.

6    QUESTIONS BY MR. FARRELL:

7         Q.    So you'll notice in paragraph 2

8    it includes distribution, correct?

9         A.    Correct.

10         Q.    And McKesson is engaged in the

11    distribution business, agreed?

12         A.    We are.

13         Q.    And that if they do not follow

14    the law as provided by the US code and the

15    Code of Federal Regulations, it has a

16    substantial and detrimental effect on the

17    health and general welfare of the American

18    people, agreed?

19              MS. HENN:  Objection to form.

20              THE WITNESS:  Could you restate

21         that question for me, please?

22    QUESTIONS BY MR. FARRELL:

23         Q.    Yeah.

24              You agree with paragraph 2 --

25         A.    Right.

1      Q.     -- as McKesson's

2    representative, correct?

3      A.     Correct.

4      Q.     And what it says is that the

5    illegal, and one of the words is

6    distribution, of controlled substances has a

7    substantial and detrimental effect on the

8    health and general welfare of the American

9    people.

10            I'm asking you if McKesson

11   agrees and acknowledges with this finding by

12   Congress in 1970.

13            MS. HENN:  Objection to form.

14            THE WITNESS:  Yes, that the

15        illegal distribution can -- could

16        potentially have an impact on the

17        American --

18   QUESTIONS BY MR. FARRELL:

19      Q.     Well, it doesn't say

20   "potential" in paragraph 2, does it?

21      A.     It doesn't.

22      Q.     It says that if you break the

23   law, it has a substantial and detrimental

24   effect on the health and general welfare of

25   the American people.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      That's what it says, correct.

 2          Q.      Does McKesson agree and

 3   acknowledge that finding?

 4                  MS. HENN:  Objection to form.

 5                  THE WITNESS:  Yes.

 6   QUESTIONS BY MR. FARRELL:

 7          Q.      Now, if you flip to page 2,

 8   this is section A 12 of the Controlled

 9   Substances Act, and what it says is it places

10   drugs into one of several categories.

11                  Is McKesson aware of the

12   scheduling of controlled substances?

13          A.      We are.

14          Q.      Okay.  And what we're dealing

15   with in this litigation primarily today are

16   Schedule II drugs, correct?

17          A.      Correct.

18          Q.      Now, there was a period of time

19   when certain hydrocodone combination products

20   were Schedule III, but they've since been

21   reclassified as Schedule II, agreed?

22          A.      Agreed.

23          Q.      And McKesson picked up a book

24   of business when that happened on the HCPs,

25   agreed?
```

 1                MS. HENN:  Objection to form.

 2                THE WITNESS:  Can you rephrase

 3          the book of business and the question

 4          a little bit?

 5    QUESTIONS BY MR. FARRELL:

 6          Q.    Yeah, that was a little too

 7    country.

 8                Is McKesson aware that its

 9    sales of hydrocodone combination products

10    rose following the reclassification of those

11    opioids from Schedule III to Schedule II?

12          A.    Yes.

13          Q.    So nonetheless, when we're

14    talking about these products, I'm referencing

15    Schedule II for today.

16          A.    Understood.

17          Q.    So the Schedule II has a

18    definition, does it not, under the United

19    States Code?

20          A.    It does.

21          Q.    There's three aspects to it.

22                Do you see those three aspects?

23          A.    I do.

24          Q.    Could you read aspect A?

25          A.    "The drug or other substance

1  has a high potential for abuse."

2      Q.     McKesson is aware since 1970

3  that it was engaging in business of

4  distributing Schedule II controlled

5  substances which have a high potential for

6  abuse, agreed?

7      A.     Agreed.

8      Q.     And you agree that the opioids,

9  whether they're Schedule II or formerly

10  Schedule III, are drugs that have a high

11  potential for abuse?

12      A.     Agree.

13      Q.     McKesson knows this?

14      A.     We do.

15      Q.     And McKesson has known this

16  from the very beginning of their decision to

17  distribute controlled substances?

18      A.     Agreed.

19      Q.     Would you read paragraph B,

20  please?

21      A.     "The drug or other substance

22  has a currently accepted medical use and

23  treatment in the United States or a currently

24  accept medical use with severe restrictions."

25      Q.     Does McKesson agree and

```
 1    acknowledge with this statement from

 2    Congress?

 3                MS. HENN:  Objection to form.

 4                THE WITNESS:  Yes.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    Now, read paragraph C, please.

 7         A.    "Abuse of a drug or other

 8    substances may lead to severe psychological

 9    or physical dependence."

10         Q.    Does McKesson agree and

11    acknowledge this finding?

12                MS. HENN:  Objection to form.

13                THE WITNESS:  Yes.

14    QUESTIONS BY MR. FARRELL:

15         Q.    So just to be clear, when we're

16    talking about controlled substances in this

17    litigation, we're talking about opiates and

18    opioids, agreed?

19         A.    Agreed.

20         Q.    And what these are, are these

21    are derivatives of opium in the form of a

22    pill, agreed?

23                MS. HENN:  Objection to form.

24                THE WITNESS:  It's multiple

25         formulations but, yes.
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    What we start with is we start

 3   with the poppy plant, agreed?

 4             MS. HENN:  Objection to form.

 5             THE WITNESS:  Agreed.

 6   QUESTIONS BY MR. FARRELL:

 7        Q.    Well -- and it's okay if -- I'm

 8   just trying to figure out what McKesson

 9   knows.

10             McKesson distributes pills from

11   a manufacturer to pharmacies.  That's what

12   they do, yes?

13        A.    Correct.

14        Q.    The pills that you're

15   distributing, you're aware they originally

16   come from the poppy plant?

17             MS. HENN:  Objection to form.

18        Outside the scope.

19             THE WITNESS:  I'm not an expert

20        in the medical field and design, but I

21        understand that, yes.

22   QUESTIONS BY MR. FARRELL:

23        Q.    Does McKesson acknowledge or

24   appreciate that what they're selling are

25   opium pills?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  We understand

 3      how -- what's in the pills, so, yes.

 4   QUESTIONS BY MR. FARRELL:

 5      Q.     Okay.  So the opium can be

 6   manipulated by the manufacturers to be

 7   opiate-like?  Opiate-like, right?  There's

 8   opiates and opioid, or opiate-like, and

 9   that's how you get hydrocodone and oxycodone

10   and all the different types of opium pills,

11   agreed?

12      A.     Correct.

13              MS. HENN:  Objection to form.

14   QUESTIONS BY MR. FARRELL:

15      Q.     So when I say "opium pills,"

16   what I'm talking about is the big

17   classification of all of these pills derived

18   from the poppy plant.

19              Is that fair?

20      A.     Understood.

21      Q.     All right.  And when we talk

22   about any of the individual pills, whether

23   it's hydrocodone or oxycodone, those all fall

24   within the opium pill umbrella, right?

25              MS. HENN:  Objection to form.
```

```
 1                    THE WITNESS:  Yes.

 2    QUESTIONS BY MR. FARRELL:

 3         Q.     So when McKesson is

 4    distributing opium pills, it knows and

 5    understands that these pills have a high

 6    potential for abuse?

 7         A.     We do.

 8         Q.     Now, they also -- you also --

 9    McKesson understands that these pills do have

10    an accepted medical use in treatment, but

11    they have severe restrictions, agreed?

12                    MS. HENN:  Objection to form.

13                    THE WITNESS:  We understand the

14         language, yes.

15    QUESTIONS BY MR. FARRELL:

16         Q.     You understand the language of

17    paragraph B?

18         A.     Right.

19         Q.     Opium pills have a place in

20    current medical practice?

21         A.     Yes.

22         Q.     But abusing opium pills may

23    lead to severe psychological and physical

24    dependence?

25         A.     Correct.
```

1        Q.      McKesson understands and

2    acknowledges this?

3        A.      Yes.

4        Q.      And that's why the unlawful

5    distribution of these opium pills, relating

6    back to page 1, has a substantial and

7    detrimental effect on the health and general

8    welfare of the American people.

9                Does McKesson acknowledge that?

10               MS. HENN:  Objection to form.

11               THE WITNESS:  Yes.

12   QUESTIONS BY MR. FARRELL:

13       Q.      Now we're going to flip to

14   page 3, which is Section 821, rules and

15   regulations.

16               Will you please read this

17   aloud?

18       A.      "The Attorney General is

19   authorized to promulgate rules and

20   regulations and to charge reasonable fees

21   relating to the registration and control of

22   the manufacture, distribution and dispensing

23   of controlled substances and to listed

24   chemicals."

25       Q.      All right.  Do you see the date

1    of this?

2         A.    I do.

3         Q.    What is the date?

4         A.    October 27, 1970.

5         Q.    Does McKesson acknowledge that

6    Congress gave the United States Attorney

7    General the authority to promulgate rules

8    regarding the distribution of opium pills?

9              MS. HENN:  Objection to form.

10             THE WITNESS:  Yes.

11   QUESTIONS BY MR. FARRELL:

12        Q.    Now let's flip to the next

13   page.  This is the -- this is where we'll be

14   spending most of our time today.  This is

15   page 4, Section 823.

16             This is from the United States

17   Code, and it includes, as you'll see down in

18   paragraph 1, what Congress has said is

19   McKesson's duty.  I'd like you to first read

20   that to yourself.

21        A.    I've read it.

22        Q.    All right.  Does McKesson

23   acknowledge that it has a duty to maintain

24   effective control against diversion of opium

25   pills as mandated by Congress?

```
 1                    MS. HENN:  Objection to the

 2         form.

 3                    THE WITNESS:  We do.

 4                    (McKesson-Hartle Exhibit 6

 5         marked for identification.)

 6   QUESTIONS BY MR. FARRELL:

 7         Q.    Now this is a much bigger

 8   document, but I promise we won't go through

 9   every page.

10                    This is going to be marked as

11   Exhibit 6 in the bottom right-hand corner,

12   and in the top right-hand corner it's MCK

13   30(b)(6)_6.

14                    For our fans following on the

15   telephone, this is the Congressional history

16   that can be found at 91-1444.  It is Public

17   Law 91-513.

18                    Do you remember when we were

19   looking at the United States Code and it

20   referenced Public Law 91-513 from Exhibit 5?

21         A.    Yes.

22         Q.    This is that document, I'll

23   represent to you.

24         A.    Okay.

25         Q.    And what this is, is this is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the Congressional history of all those codes

 2    that we just walked through.  And I'm not

 3    going to ask you to read the entire document

 4    because I've highlighted certain sections for

 5    you.

 6              The first thing I'd like you to

 7    do is I'd like for you to turn to Bates stamp

 8    page 5.  And while you read the document to

 9    yourself, I'm going to read it out loud to

10    save you some time.

11         A.   Okay.

12         Q.   Under Title 2, Control and

13    Enforcement, it states, "The bill provides

14    for control by the Justice Department of

15    problems related to drug abuse through

16    registration of manufacturers, wholesalers,

17    retailers and all others in the legitimate

18    distribution chain and makes transactions

19    outside the legitimate distribution chain

20    illegal."

21              Does McKesson acknowledge this

22    finding from Congress?

23              MS. HENN:  Objection to form.

24              THE WITNESS:  Yes.

25
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     I'm going to have you to turn

 3   to Bates stamp page 8.  And again, these are

 4   my highlights.  Congress didn't highlight

 5   this in 1970; Paul Junior did.  So while you

 6   read it, I'm going to read it out loud.

 7             "The bill was designed to

 8   improve the administration and regulation of

 9   the manufacturing, distribution and

10   dispensing of controlled substances by

11   providing for a closed system of drug

12   distribution for legitimate handlers of such

13   drugs.  Such a closed system should

14   significantly reduce the widespread diversion

15   of these drugs out of the legitimate channels

16   into the illicit market, while at the same

17   time providing the legitimate drug industry

18   with a unified approach to narcotic and

19   dangerous drug control."

20             Does McKesson acknowledge the

21   truth of this finding by Congress?

22             MS. HENN:  Objection to form.

23             THE WITNESS:  Yes.

24   QUESTIONS BY MR. FARRELL:

25        Q.     So let's just talk about this
```

1    for a minute.

2              McKesson understands that in

3    1970 Congress created a closed system,

4    agreed?

5         A.    Agree.

6         Q.    What a closed system means is

7    that laissez-faire economics don't apply,

8    agreed?

9              MS. HENN:  Objection to form.

10             THE WITNESS:  Have to refresh

11        my memory on laissez-faire economics.

12   QUESTIONS BY MR. FARRELL:

13        Q.    It's just a fancy French word

14   for "hands off."  The government is

15   intervening in the marketplace of the chain

16   of distribution for opium pills, agreed?

17        A.    For controlled substances.

18        Q.    Well, for all controlled

19   substances --

20        A.    Correct.

21        Q.    -- but today we're talking

22   about opium pills.

23        A.    Understood.

24        Q.    So the controlled substances

25   are in a chain of distribution that are

Highly Confidential - Subject to Further Confidentiality Review

```
 1    closed off to the rest of the marketplace.

 2    McKesson acknowledges that?

 3              MS. HENN:  Objection to form.

 4              THE WITNESS:  Correct.  It's a

 5         closed system.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.     And in order to participate in

 8    the closed system, you have to be one of the

 9    select few that gets a registration

10    certificate from the DEA, agreed?

11         A.     Agreed.

12         Q.     And the reason Congress did

13    this was to reduce diversion.  Does McKesson

14    acknowledge that?

15              MS. HENN:  Objection to form.

16              THE WITNESS:  Yes, I believe

17         that was the overall intent.

18    QUESTIONS BY MR. FARRELL:

19         Q.     So it's creating rules to

20    prevent diversion to the best of their

21    ability.  McKesson acknowledges that fact?

22              MS. HENN:  Objection to form.

23              THE WITNESS:  Yes.

24    QUESTIONS BY MR. FARRELL:

25         Q.     Because if McKesson doesn't
```

Highly Confidential - Subject to Further Confidentiality Review

1  follow the law, then diversion is likely.

2  You agree with that statement?

3           MS. HENN:  Objection to form.

4           THE WITNESS:  I don't know if

5      I'd say -- always characterize it as

6      likely all the time, but diversion can

7      happen.

8  QUESTIONS BY MR. FARRELL:

9      Q.    Okay.  Well, in this specific

10  provision, the United States Congress passed

11  a law to close the system of distribution and

12  enact laws to reduce the widespread diversion

13  of these drugs.  You agree with that?  That's

14  the purpose of this law?

15          MS. HENN:  Objection to form.

16          THE WITNESS:  Yes.

17  QUESTIONS BY MR. FARRELL:

18      Q.    So the idea here is that -- to

19  close the system of distribution so that we

20  keep these dangerous opium pills inside the

21  legitimate market for medical care, agreed?

22      A.    Agreed.

23      Q.    And that's why we have these

24  laws enacted, so that we can do our best to

25  keep these drugs to the patients that need

Highly Confidential - Subject to Further Confidentiality Review

```
 1   them, agreed?

 2        A.    Agreed.

 3        Q.    And if you don't follow those

 4   laws, then what happens is we have diversion

 5   into the illicit market?

 6             MS. HENN:  Objection to form.

 7             THE WITNESS:  That can happen

 8        if you don't follow those laws.

 9   QUESTIONS BY MR. FARRELL:

10        Q.    And that's the reason Congress

11   created the laws as stated in this finding?

12             MS. HENN:  Objection to form.

13             THE WITNESS:  Correct.

14   QUESTIONS BY MR. FARRELL:

15        Q.    Next I'm going to have you flip

16   to page 11.  And I just highlighted one

17   sentence in here.  And it says, "The price

18   for participation in this traffic," which is

19   illicit drug trafficking, "should be

20   prohibitive."

21             Do you see that sentence?

22        A.    I see that.

23        Q.    Does McKesson acknowledge that?

24             MS. HENN:  Objection to form.

25
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     Does McKesson acknowledge that

 3    sentence to be true?

 4              MS. HENN:  Objection to form.

 5              THE WITNESS:  Yes.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.     It just makes sense, right?  If

 8    you're going to punish somebody and the

 9    punishment isn't very severe, they're likely

10    to what?

11              MS. HENN:  Objection to form.

12              THE WITNESS:  To do it again.

13    QUESTIONS BY MR. FARRELL:

14         Q.     Why?

15         A.     There's no penalty or

16    accountability.

17         Q.     And so by making the penalty

18    prohibitive, what does it do?

19              MS. HENN:  Objection to form.

20              THE WITNESS:  Could you ask the

21         question in a -- again?  What --

22    QUESTIONS BY MR. FARRELL:

23         Q.     If you make the penalty

24    prohibitive, then what happens?

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MONTMINY:  Objection to
 2         form.  Calls for speculation.  This is
 3         Brandon Montminy for Henry Schein.
 4              MS. HENN:  And just to note for
 5         everyone's knowledge, many of you know
 6         this, but in the deposition protocol,
 7         one defendant's objection counts for
 8         all defendants, so there's no need to
 9         do depositions {sic} if I'm done them.
10         But if on the phone you can't hear me,
11         I can try to speak up.
12              MR. FARRELL:  So that means
13         you're not allowed to object to this
14         question because Henry Schein objected
15         to it.
16              MS. HENN:  I already did, I'm
17         afraid to say.  There are two.
18    QUESTIONS BY MR. FARRELL:
19         Q.    So back to my original
20    question.
21         A.    Yeah, could you put it in
22    simpler terms in --
23         Q.    Yeah.  Let me put it --
24         A.    Just so I know.
25         Q.    -- in other terms.
```

```
1         A.      Yeah.

2         Q.      Let's say that a speeding

3   ticket is a dollar.  What would happen across

4   America if a speeding ticket was a dollar?

5             MS. HENN:  Objection to form.

6   QUESTIONS BY MR. FARRELL:

7         Q.      What would happen?

8         A.      It wouldn't hold the same

9   weight or it wouldn't -- it may not deter

10  people from speeding.

11        Q.      What if the speeding ticket was

12  a million dollars?  What would that do?

13            MS. HENN:  Objection to form.

14            THE WITNESS:  I'm just

15        guessing, but likely people would not

16        speed.

17  QUESTIONS BY MR. FARRELL:

18        Q.      Because the penalty would be

19  prohibitive, agreed?

20        A.      Agreed.

21        Q.      Like not to be cute, but

22  McKesson was fined $13 million in 2008 and

23  then was fined again in 2017 $150 million.

24            Do you think that the second

25  fine was intended to be more prohibitive than
```

Highly Confidential - Subject to Further Confidentiality Review

1    the first fine?

2              MS. HENN:  Objection to form.

3              THE WITNESS:  I believe so.

4    QUESTIONS BY MR. FARRELL:

5         Q.    All right.  Now, let's go to

6    Bates stamp page 26.

7              And it says, "Titles 2 and 3 of

8    the bill deal with law enforcement aspect of

9    drug abuse and provide authority for the

10   Department of Justice to keep track of all

11   drugs subject to abuse, manufactured or

12   distributed in the United States, in order to

13   prevent diversion of these drugs from

14   legitimate channels of commerce."

15             Does McKesson acknowledge the

16   truth of that statement?

17             MS. HENN:  Objection to form.

18             THE WITNESS:  Yes.

19   QUESTIONS BY MR. FARRELL:

20        Q.    This is just another reflection

21   of the US Code that we were reading that

22   Congress is giving the authority to the

23   Department of Justice to enact safety rules

24   in order to prevent the diversion of

25   controlled substances, including opium pills,

```
 1   from legitimate channels into illegitimate

 2   channels.

 3             Does McKesson acknowledge that?

 4             MS. HENN:  Objection to form.

 5             THE WITNESS:  Yes.

 6   QUESTIONS BY MR. FARRELL:

 7        Q.    Flip to page 27, the very next

 8   page.

 9             It says, "The legislation

10   provides that all persons engaged in a

11   legitimate distribution chain involving drugs

12   included in one of the schedules under the

13   bill must be registered with the Attorney

14   General."

15             So again, this is bringing full

16   circle the authority of the Attorney General

17   and the Department of Justice to promulgate

18   rules for those that wish to engage in the

19   closed system of distribution for controlled

20   substances, and McKesson acknowledges that?

21             MS. HENN:  Objection to form.

22             THE WITNESS:  Yes.

23   QUESTIONS BY MR. FARRELL:

24        Q.    Now flip to page 34.  And I

25   would like for you to please read that
```

```
 1    provision that's highlighted aloud.

 2         A.     One second.

 3                "The illegal importation,

 4    manufacture, distribution and possession and

 5    improper use of controlled substances have a

 6    substantial detrimental effect on the

 7    public's health and general welfare."

 8         Q.     Does McKesson acknowledge the

 9    truth of that statement?

10         A.     Yes.

11         Q.     So if somebody in the chain of

12    distribution breaks the law, it has a

13    substantial detrimental effect on the public

14    health and general welfare, agreed?

15                MS. HENN:  Objection to form.

16                THE WITNESS:  It can.

17    QUESTIONS BY MR. FARRELL:

18         Q.     Now go to page 44.

19                Again, this is another

20    reiteration that Congress authorizes the

21    Attorney General to "promulgate rules and

22    regulations and to charge reasonable fees

23    relating to the registration and control of

24    the manufacture, distribution and dispensing

25    of substances covered by the Act."
```

```
 1                 Does McKesson acknowledge the

 2     authority of the Department of Justice and

 3     the Attorney General to do so?

 4                 MS. HENN:  Objection to form.

 5                 THE WITNESS:  Yes.

 6     QUESTIONS BY MR. FARRELL:

 7         Q.    Now flip to page 45, the very

 8     next one.  This is a little bit longer, so

 9     I'm going to give you a chance to read it

10     real quick.

11         A.    Okay.  I've read it.

12         Q.    So I'm going to read it aloud,

13     and I'm going to stop and ask you some

14     questions.

15                 It's -- Section B of

16     Section 303 states that the Attorney General,

17     when issuing registrations, is going to

18     consider several factors, agreed?

19         A.    Can you say that again?  I was

20     looking at --

21         Q.    Yeah, I was trying to summarize

22     the first four lines.

23         A.    Yeah.

24         Q.    Basically, what it really boils

25     down to is this is a reiteration of the
```

1    findings behind the statute that I showed you

2    regarding maintaining effective control.

3              So if you drop down to where it

4    says number 1 at the bottom of the page --

5    can you start reading there?

6         A.    Yeah.  Okay.

7         Q.    Will you read that aloud,

8    please, starting with "maintenance of

9    effective controls"?

10        A.    "Maintenance of effective

11   controls against diversion of particular

12   controlled substances into other than

13   legitimate medical, scientific and industrial

14   channels."

15        Q.    All right.  So again, what

16   we're talking about is the enactment of rules

17   to prevent diversion?

18        A.    Correct.

19        Q.    Last factor, factor 5, would

20   you read that?

21        A.    "Such other factors as may be

22   relevant to and consistent with the public

23   health and safety."

24        Q.    Does McKesson acknowledge that

25   Congress gave the Department of Justice the

```
 1   authority to promulgate rules which govern

 2   McKesson so that they maintain effective

 3   controls against diversion, and to adopt any

 4   other rule they want that may be relevant and

 5   consistent with public health and safety?

 6               MS. HENN:  Objection to form.

 7               THE WITNESS:  Agree.

 8   QUESTIONS BY MR. FARRELL:

 9       Q.    I just want to make sure that

10   we start off with the premise that the rules

11   we're about to go through aren't designed

12   to -- let me ask it in a better way.

13               The rules that we're about to

14   get into, McKesson acknowledges, are designed

15   with the primary purpose of preventing

16   diversion?

17               MS. HENN:  Objection to form.

18               THE WITNESS:  Correct.

19   QUESTIONS BY MR. FARRELL:

20       Q.    Because diversion impacts

21   public health and safety, and McKesson

22   acknowledges that?

23       A.    Yes.

24               MS. HENN:  Objection to form.

25               (McKesson-Hartle Exhibit 7
```

```
 1              marked for identification.)

 2    QUESTIONS BY MR. FARRELL:

 3         Q.    The next exhibit we'll have is

 4    marked as Exhibit 7, and correspondingly in

 5    the top right-hand corner it's MCK

 6    30(b)(6)_07-01, and it's just one page.

 7              Once we get through this

 8    section, we can take a break if you like.

 9              All right.  So what I'm going

10    to represent to you is that you will not find

11    this anywhere on the Internet either because

12    I made it.  In the top left-hand corner is

13    the Department of Justice seal, and in the

14    top right-hand corner is the Drug Enforcement

15    Administration seal, and in the middle is

16    where you can trace down the rules that

17    govern McKesson.

18              Does McKesson acknowledge that

19    Title 21 CFR 1301.74 governs its conduct with

20    the distribution of controlled substances,

21    including opium pills?

22              MS. HENN:  Objection to form.

23              THE WITNESS:  Yes.

24    QUESTIONS BY MR. FARRELL:

25         Q.    Part B is what we're going to
```

```
 1    spend the rest of the day on.

 2                  Have you read part B before?

 3         A.     Yes.

 4         Q.     Does McKesson acknowledge that

 5    part B governs its conduct?

 6                  MS. HENN:  Objection to form.

 7                  THE WITNESS:  Yes.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.     Does McKesson acknowledge that

10    for it to be lawfully carrying out its job of

11    dispensing controlled substances and opium

12    pills, it must follow paragraph B?

13                  MS. HENN:  Objection to form.

14                  THE WITNESS:  Yes.

15    QUESTIONS BY MR. FARRELL:

16         Q.     And if McKesson does not follow

17    paragraph B, its conduct is illegal?

18                  MS. HENN:  Objection to form.

19                  THE WITNESS:  Yes.

20    QUESTIONS BY MR. FARRELL:

21         Q.     To make it clear --

22         A.     Yeah.

23         Q.     -- if McKesson follows

24    paragraph B, its conduct is legal?

25         A.     Correct.
```

1      Q.     And if McKesson does not follow

2   paragraph B, its conduct is illegal?

3             MS. HENN:  Objection to form.

4             THE WITNESS:  Correct.

5   QUESTIONS BY MR. FARRELL:

6      Q.     And so bringing full circle, we

7   understand that the purpose of this

8   regulation, one of them, is the prevention of

9   diversion, correct?

10             MS. HENN:  Objection to form.

11             THE WITNESS:  Correct.

12   QUESTIONS BY MR. FARRELL:

13      Q.     So if you engage in illegal

14   conduct and violate paragraph B, the result

15   of that is diversion?

16             MS. HENN:  Objection to form.

17   QUESTIONS BY MR. FARRELL:

18      Q.     It's the whole reason this law

19   was enacted?

20             MS. HENN:  Objection to form.

21   QUESTIONS BY MR. FARRELL:

22      Q.     Does McKesson acknowledge that?

23      A.     Could you ask the specific

24   question again?

25             MS. HENN:  Objection to form.

1  QUESTIONS BY MR. FARRELL:

2     Q.     Yeah, it got very complicated

3  because it was a compound question with

4  compound objections.

5             Does McKesson acknowledge that

6  paragraph B that we're looking at here is

7  intended to prevent diversion?

8             MS. HENN:  Objection to form.

9             THE WITNESS:  Yes.

10  QUESTIONS BY MR. FARRELL:

11     Q.     And that if you follow -- if

12  McKesson abides by paragraph B, its conduct

13  is legal and diversion is prevented?

14             MS. HENN:  Objection to form.

15             THE WITNESS:  Agreed.

16  QUESTIONS BY MR. FARRELL:

17     Q.     And if McKesson does not abide

18  by paragraph B, its conduct is illegal and

19  the result could be diversion?

20             MS. HENN:  Objection to form.

21             THE WITNESS:  Agree.  The

22       result could be diversion.

23  QUESTIONS BY MR. FARRELL:

24     Q.     Well, if McKesson is

25  distributing orders of unusual size, could it

```
 1    be anything other than diversion?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  It could.

 4    QUESTIONS BY MR. FARRELL:

 5         Q.    All right.  Give me some

 6    examples.

 7              MS. HENN:  Objection to form.

 8              THE WITNESS:  Maybe the best --

 9         a customer adds, you know -- their

10         business model changes or they add --

11         for example, a pharmacy may add

12         contracts with multiple long-term care

13         facilities and require that they now

14         dispense more for legitimate reasons,

15         so they could order more in that

16         context.

17    QUESTIONS BY MR. FARRELL:

18         Q.    So what's the purpose of the

19    Department of Justice making McKesson follow

20    paragraph B?

21              MS. HENN:  Objection to form.

22              THE WITNESS:  Say that again?

23              What's the purpose of why we

24         follow that?  To try to prevent

25         diversion.
```

```
 1                 MS. HENN:  Mr. Farrell, we've
 2          been going over an hour.  Would this
 3          be a good time for a five-minute
 4          break?
 5                 MR. FARRELL:  Let me close up
 6          this thing and then we'll get there.
 7                 MS. HENN:  All right.
 8                 MR. FARRELL:  Is that okay?
 9                 MS. HENN:  If it's all right
10          with the witness.
11                 THE WITNESS:  It's okay.
12   QUESTIONS BY MR. FARRELL:
13          Q.    Okay.  At the bottom of
14   Exhibit 7, do you see the numbers in the
15   brackets?
16          A.    I do.
17          Q.    36 FR 7778.  Do you know what
18   that means?
19          A.    I don't know off the top of my
20   head.
21          Q.    What about the letters and
22   numbers after that; do you know what that
23   means?
24          A.    The date?
25          Q.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.     Of course I know the date.

2              Q.     Yes.

3                     Does McKesson acknowledge that

4    21 CFR Section 1301.74 has been in force and

5    effect since 1971?

6                     MS. HENN:  Objection to form.

7                     THE WITNESS:  Yes.

8                     (McKesson-Hartle Exhibit 8

9            marked for identification.)

10   QUESTIONS BY MR. FARRELL:

11             Q.     Just to make sure, I actually

12   pulled 36 Federal Register 778.  I'm going to

13   have it marked as Exhibit 8.

14                    And I'm not going to ask you to

15   read the whole thing because I was kind

16   enough to highlight for you Bates stamp

17   page 10.

18                    And this is from 1971, and this

19   is the document in our United States Archives

20   which adopts the language that we just read

21   in 21 CFR 1301.74.

22                    Does McKesson acknowledge this

23   is the law and it has been the law since

24   1971?

25                    MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  Yes.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.    The language that you just read

 4   in paragraph B, is it the same language

 5   that's in the CFR provision that I showed

 6   you?

 7        A.    It's similar.  Not word for

 8   word.

 9        Q.    Okay.  Is there any meaningful

10   difference?

11        A.    No.

12        Q.    You'll acknowledge that that is

13   the law today as reflected in the 2016

14   version that we're not going to have marked

15   but I'm going to show and ask for -- for --

16   you can just trust me on it if you'd like,

17   but you acknowledge that in 20 -- it's the

18   law today, the same?

19                   MR. SUDDATH:  Objection.

20   QUESTIONS BY MR. FARRELL:

21        Q.    Well, and just to be sure, what

22   I did was I went and ordered the CFR from

23   every year between 1971 and this year, and I

24   looked at every single one of them just to

25   make sure that the law is, and always has
```

```
 1    been, what it says in Masters Pharmaceutical,

 2    including in 1996 when OxyContin was

 3    launched.

 4              So does McKesson acknowledge

 5    that the CFR provision in McKesson {sic} is

 6    and always has been the law governing

 7    McKesson's conduct since 1971?

 8              MS. HENN:  Objection to form.

 9              THE WITNESS:  Yes.

10    QUESTIONS BY MR. FARRELL:

11        Q.    I'm sorry.  I misspoke.

12              So does McKesson acknowledge

13    that the CFR provision we cited in the

14    Masters Pharmaceutical case is and always has

15    been the law governing McKesson's conduct

16    since 1971?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  Can I read what

19        was in the Masters case again?

20              (McKesson-Hartle Exhibit 9

21        marked for identification.)

22    QUESTIONS BY MR. FARRELL:

23        Q.    Absolutely.

24              And at this point if you hand

25    it back to me, this'll be a good point for us
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to mark it as Exhibit 9.

 2         A.     So your question again?

 3         Q.     Yeah.

 4                Does McKesson acknowledge that

 5    the CFR provision cited in Masters

 6    Pharmaceutical case, which is 21 CFR

 7    1301.74 B, is and always has been the law

 8    governing McKesson's conduct since 1971?

 9                MS. HENN:  Objection to form.

10                THE WITNESS:  Yes.

11                MR. FARRELL:  And

12           unfortunately, I'm not going to be

13           able to get all of my pretty-colored

14           books on the videotape.

15                Let the record reflect that the

16           office of the Federal Register has a

17           kaleidoscope of colors that it uses

18           for the front cover of all of its CFR

19           booklets.

20                And with that, we'll take our

21           first break.

22                VIDEOGRAPHER:  The time is

23           10:23 a.m.  We're going off the

24           record.

25           (Off the record at 10:23 a.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOGRAPHER:  The time is

 2         10:40 a.m., and we're back on the

 3         record.

 4   QUESTIONS BY MR. FARRELL:

 5         Q.    I forgot to warn you before the

 6   break, but during the break, did you have any

 7   meaningful conversations with your counsel

 8   about your testimony?

 9              MS. HENN:  Objection to form.

10              THE WITNESS:  No.

11   QUESTIONS BY MR. FARRELL:

12         Q.    Did you talk about your

13   testimony at all?

14              MS. HENN:  Objection to form.

15              THE WITNESS:  Not really my

16         testimony, just --

17              MS. HENN:  And I'm just going

18         to instruct the witness not to divulge

19         what we talked about.  I don't think

20         that's an appropriate question.  I

21         think you got the answer you were

22         looking for.

23              MR. FARRELL:  I think I almost

24         got the answer I'm looking for.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    Did you talk to your lawyer

 3   about the substance of your testimony during

 4   the break?

 5             MS. HENN:  And I'll instruct

 6        the witness not to divulge particulars

 7        of what we talked about.

 8             But you may answer that

 9        question yes or no.

10             THE WITNESS:  Yes.

11   QUESTIONS BY MR. FARRELL:

12        Q.    Okay.  What did you talk about?

13             MS. HENN:  I'm going to

14        instruct the witness not to answer

15        that question as calling for

16        privileged information.

17             MR. FARRELL:  Right.  But the

18        deposition protocol and the rules

19        governing this litigation state that

20        counsel is not allowed to discuss with

21        the witness the substance of any

22        testimony during a break.

23             And so his answer in the

24        affirmative indicates that that

25        occurred, and so I should be allowed
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          to inquire about that.
 2              MS. HENN:  All right.  Well,
 3          let's take a break, and we will
 4          discuss outside and have a privileged
 5          conversation, and we'll see if there's
 6          any answer that he can provide without
 7          divulging privileged information that
 8          I don't believe you're entitled to.
 9              MR. FARRELL:  Okay.  So you're
10          going to have a second conversation
11          during a break about the substance of
12          his testimony?
13              MS. HENN:  No, Counsel, that's
14          not what's going to happen.  But I'd
15          like to take a break so that I can
16          talk to my witness about answering the
17          question inquiring into discussions
18          with counsel.
19              MR. FARRELL:  Okay.
20              MS. HENN:  Thank you.
21              VIDEOGRAPHER:  The time is
22          10:42 a.m.  We're going off the
23          record.
24           (Off the record at 10:42 a.m.)
25              VIDEOGRAPHER:  The time is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        10:46 a.m.  We're back on the record.

 2             MR. FARRELL:  So what did you

 3        find out?

 4             MS. HENN:  Counsel, just to

 5        protect the privilege, I'm just going

 6        to instruct the witness that when he

 7        answered yes to your question and

 8        indicated affirmatively that we'd

 9        talked about the substance of his

10        testimony, I'm going to ask him to

11        answer your question and tell you what

12        he deemed to be the substance of his

13        testimony, but I'm also going to ask

14        him not to repeat what I -- my

15        response.

16             So let's do that, and we can

17        discuss if you're still concerned.

18             Okay?

19             MR. FARRELL:  Not really.  Let

20        me make --

21             MS. HENN:  Go ahead and ask

22        your question.

23             MR. FARRELL:  Let me make it

24        even easier.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Did anything your lawyer say to

 3    you cause you to change or withdraw anything

 4    you said this morning?

 5         A.    Absolutely not.

 6         Q.    Did anything your lawyer told

 7    you during the break impact or affect your

 8    testimony the rest of the day?

 9         A.    No.

10         Q.    That's fair enough.

11         A.    Okay.

12         Q.    Aside from the statutory duty

13    and the duty that's in the regulation, does

14    McKesson acknowledge that it has a general

15    duty to protect the public against diversion

16    of controlled substances and opium pills?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  Could you restate

19         that, please?

20    QUESTIONS BY MR. FARRELL:

21         Q.    Does McKesson acknowledge that

22    it has a general duty to protect the public

23    against diversion of controlled substances

24    and opium pills into the illicit market?

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes, a general

 2         duty as part of our responsibility,

 3         regulatory responsibilities and

 4         general responsibilities.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    So let's be careful.  I want

 7    to -- the wording sometimes makes a

 8    difference.

 9         A.    Okay.

10         Q.    Aside from the statute from the

11    United States Code and the regulations

12    promulgated by the Department of Justice,

13    does McKesson acknowledge that it owes a duty

14    to the general public to prevent diversion of

15    controlled substances and opium pills into

16    the illicit market?

17                    MS. HENN:  Objection to form.

18                    THE WITNESS:  We do feel

19         strongly about playing a role in

20         preventing diversion.

21    QUESTIONS BY MR. FARRELL:

22         Q.    So the answer needs to be

23    "yes," "no," or "I don't know."

24         A.    Yes.

25                    MS. HENN:  Objection to form.
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    So your answer is, yes, aside

 3   from the statutory and regulatory provisions,

 4   McKesson acknowledges that it owes a duty to

 5   the general public to prevent diversion of

 6   controlled substances and opium pills into

 7   the illicit market?

 8              MS. HENN:  Objection to form.

 9              THE WITNESS:  Yes.

10              (McKesson-Hartle Exhibit 10

11        marked for identification.)

12   QUESTIONS BY MR. FARRELL:

13        Q.    I'm going to mark what is going

14   to be Deposition Exhibit 10.  The top

15   right-hand corner is going to be 1910_01_11.

16   And I'll show it to you, to counsel, two

17   extra copies for my new best friends.  And

18   I'm going to give you a little introduction

19   to this document before you start flipping

20   through it.

21              The front is the HathiTrust.

22   Are you familiar with the HathiTrust?

23        A.    I am not.

24        Q.    I wasn't either until this

25   litigation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              The HathiTrust is an

 2    organization, nonprofit organization, that

 3    collects public documents and puts them

 4    online.

 5         A.      Okay.

 6         Q.      This one is from December 1910

 7    and January 1911.  That's a long time ago,

 8    isn't it?

 9         A.      That would be a long time ago.

10         Q.      100 years ago.

11              This predates 1970s US Code and

12    the 1971 Code of Federal Regulations, agreed?

13         A.      Clearly, yes.

14         Q.      This is a hearing on -- take a

15    guess.

16         A.      Opioids.

17         Q.      In particular, opium.  And it

18    was about the importation of opium into

19    America back in the early turn of the

20    century.

21              McKesson was around back then,

22    wasn't they?

23         A.      McKesson was -- has been

24    around.

25         Q.      They were around back during
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   this time frame, agreed?

 2        A.      Agreed.

 3        Q.      So why do you think I'm

 4   bringing this up?

 5               MS. HENN:  Objection to form.

 6               THE WITNESS:  I don't want to

 7          speculate why I think you're bringing

 8          it up.

 9   QUESTIONS BY MR. FARRELL:

10        Q.      Guess who testified during this

11   hearing.

12               MS. HENN:  Objection to form.

13               THE WITNESS:  Don't know.

14   QUESTIONS BY MR. FARRELL:

15        Q.      Take a wild guess.

16               MS. HENN:  Same objection.

17               THE WITNESS:  I don't have

18          honestly a guess.

19   QUESTIONS BY MR. FARRELL:

20        Q.      Mr. McKesson.

21               So what I'm going to have you

22   flip to, is I'm going to have you flip to

23   page 72.

24               Now, without going through the

25   entire boring history of commerce clause, the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    United States Constitution, I'm just going to

 2    give you a broad statement.

 3              What this is, is this is

 4    America's first attempt to regulate opium

 5    trafficking in America.  And back then there

 6    was a big debate on whether or not this was

 7    something the federal government can do or

 8    it's something that should be left to the

 9    states.

10              So what the federal government

11    decided to do was pass the Harrison Narcotic

12    Act.  What that did was it basically taxed

13    opium as a way for the federal government to

14    control, and this is a debate about the

15    taxation on the importation of opium.

16         A.    Okay.

17         Q.    Page 72 is the beginning of the

18    testimony of Mr. McKesson from McKesson &

19    Robbins, which is the predecessor and when

20    McKesson Corporation was in the private hands

21    of the McKesson family.

22              You acknowledge that?

23         A.    Correct.

24         Q.    I'm going to have you flip to

25    page 75.  And if you look near the top, one
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of congressmen asks Mr. McKesson about

 2    whether or not he supports this bill.  And

 3    I'm going to give you an opportunity to read

 4    to yourself the provision before I ask you to

 5    read it aloud.

 6         A.    Which specific part do you want

 7    me to start and end at?

 8         Q.    The first time it says

 9    "Mr. McKesson."

10         A.    Okay.

11         Q.    He's asked about whether or not

12    he's in favor of the bill.

13               Do you see that?

14         A.    I do.

15         Q.    And his answer is, "Yes, very

16    much in favor of the bill."

17               Do you see that provision?

18         A.    I do.

19         Q.    Now, would you please begin

20    reading the next sentence?

21         A.    Out loud?

22         Q.    Please.

23         A.    "Our firm was founded in 1832,

24    and we have been ever since against the sale

25    of habit-forming drugs and all that kind of
```

1    thing.  Orders which have come to us from

2    suspicious people we have put in the hands of

3    the proper authorities for tracing and

4    prosecution, if necessary."

5          Q.    So you agree with me that even

6    before the enactment of the Controlled

7    Substances Act and the Code of Federal

8    Regulations, which we discussed earlier this

9    morning, is that McKesson, Mr. McKesson

10   hisself, was acknowledging that if they have

11   suspicious people, they're going to turn it

12   over to law enforcement for prosecution,

13   agreed?

14             MS. HENN:  Objection to form.

15             THE WITNESS:  Agreed based on

16        what I'm reading in this document.

17   QUESTIONS BY MR. FARRELL:

18         Q.    And this duty predates the US

19   Code and predates the Code of Federal

20   Regulations, agreed?

21             MS. HENN:  Objection to form.

22             THE WITNESS:  Agreed.

23   QUESTIONS BY MR. FARRELL:

24         Q.    So would you agree, would

25   McKesson agree, that it owes a common law

```
 1    duty to the American public to prevent

 2    diversion if it's engaged in the distribution

 3    of controlled substances, including opium

 4    pills, to prevent their diversion into the

 5    illicit market?

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  Can you ask it in

 8       a shorter version there?

 9    QUESTIONS BY MR. FARRELL:

10       Q.    Probably not.

11              Does McKesson acknowledge it

12    owes a common law duty to the American public

13    to prevent the diversion of controlled

14    substances, including opium pills, into the

15    illicit market?

16              MS. HENN:  Objection to form.

17              THE WITNESS:  Yes.

18    QUESTIONS BY MR. FARRELL:

19       Q.    Now, the first part of the

20    sentence, it kind of grabbed my attention.

21    It says, "McKesson has ever since been

22    against the sale of habit-forming drugs."

23    And this was in 1910.

24              Do you see that?

25       A.    I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.     When did McKesson begin the

 2   business of selling opium pills?

 3              MS. HENN:  Objection to form.

 4              THE WITNESS:  I do not know.

 5   QUESTIONS BY MR. FARRELL:

 6         Q.     At some point in time

 7   McKesson's philosophy changed, and it went

 8   from not selling habit-forming drugs to now

 9   selling habit-forming drugs, agreed?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  Agreed.

12   QUESTIONS BY MR. FARRELL:

13         Q.     Has McKesson considered, given

14   the presence of the opioid epidemic in

15   America, perhaps returning to the stance of

16   1910 of its founder, Mr. McKesson?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  Again, I'm not

19         aware of that.  Can't answer that

20         question.

21   QUESTIONS BY MR. FARRELL:

22         Q.     Well, you could choose not to

23   sell opium pills anymore in America, could

24   you not?

25         A.     You could choose to.
```

```
 1          Q.     But McKesson chooses to

 2   continue to sell opium pills in America,

 3   despite the fact that we have an opiate pill

 4   epidemic?

 5                MS. HENN:  Objection to form.

 6                THE WITNESS:  We do.

 7                (McKesson-Hartle Exhibit 11

 8          marked for identification.)

 9   QUESTIONS BY MR. FARRELL:

10          Q.     The next exhibit we're going to

11   have marked as Exhibit 11.  In the top

12   right-hand corner, this is 1996, 04, 01.

13                We've acknowledged that in

14   1971, Department of Justice adopted CFR

15   provision 1301.74, agreed?

16          A.     Agree.

17          Q.     And then we went through and

18   it's the law today, agreed?

19          A.     Agreed.

20          Q.     It's the law that was

21   referenced in the Masters Pharmaceutical

22   case, agreed?

23          A.     Agreed.

24          Q.     And it hadn't changed through

25   all those colorful books I showed you,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    agreed?

 2                 MS. HENN:  Objection to form.

 3                 THE WITNESS:  Agreed.

 4    QUESTIONS BY MR. FARRELL:

 5         Q.    This is a specific year.

 6               Can you tell me what year it

 7    is?

 8         A.    1996.

 9         Q.    Why do you think I picked this

10    year?

11                 MS. HENN:  Objection to form.

12                 THE WITNESS:  I'm not -- I'm

13         not sure.

14    QUESTIONS BY MR. FARRELL:

15         Q.    What happened in 1996 that

16    changed the face of opioid sales in America?

17                 MS. HENN:  Objection to form.

18                 THE WITNESS:  I'm not

19         100 percent sure.  I'd be speculating.

20    QUESTIONS BY MR. FARRELL:

21         Q.    Well, McKesson's in the

22    business of selling opium pills, correct?

23                 MS. HENN:  Objection to form.

24                 THE WITNESS:  As part of

25         controlled substances, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    And in 1996, business began

 3    hopping, agreed?

 4              MS. HENN:  Objection to form.

 5              THE WITNESS:  I'm not sure.  I

 6         don't -- I don't -- I can't answer

 7         that.  I don't know what the business

 8         was before or --

 9    QUESTIONS BY MR. FARRELL:

10         Q.    That's fair enough.

11         A.    Yeah.

12         Q.    In 1996, I'll represent to you,

13    OxyContin was launched.  So all I'm trying to

14    establish on page 2 of the exhibit is that

15    under 1301.74 B, the same law was in place

16    when OxyContin was launched.

17              MS. HENN:  Objection to form.

18    QUESTIONS BY MR. FARRELL:

19         Q.    Agreed?

20         A.    Understood.

21         Q.    Not understood --

22         A.    Agreed.

23         Q.    Yeah.

24         A.    Sorry.

25         Q.    This might take a little bit
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   longer because, as you can see, this next

 2   exhibit is a little bit thicker.

 3            (McKesson-Hartle Exhibit 12

 4       marked for identification.)

 5   QUESTIONS BY MR. FARRELL:

 6       Q.    We're going to have it marked

 7   as Exhibit 12.

 8            MR. FARRELL:  So for the

 9       record, the top right-hand corner is

10       2000_07.  The bottom right-hand

11       corner, for all the fans listening on

12       the telephone, is an actual Bates

13       stamp number.  And while this was

14       previously produced to some Attorney

15       Generals, it was also produced in the

16       MDL, so I have an MDL number.  And

17       it's MCKMDL00337660.

18   QUESTIONS BY MR. FARRELL:

19       Q.    Now, does McKesson recognize

20   this document?

21       A.    I do.

22       Q.    And has McKesson reviewed this

23   document in preparation for today's

24   testimony?

25            MS. HENN:  Objection to form.
```

```
1                    THE WITNESS:  I have.

2    QUESTIONS BY MR. FARRELL:

3         Q.     What is this document?

4         A.     This is the operational manual

5    for how controlled substances are handled

6    within McKesson.

7         Q.     And what was the date of

8    enactment?

9         A.     I believe July of 2000.

10        Q.     Okay.  Prior to July of 2000,

11   what was the policy at McKesson regarding the

12   distribution of controlled substances?

13                    MS. HENN:  Objection to form.

14        Outside the scope.

15                    THE WITNESS:  I can't speak to

16        that.

17   QUESTIONS BY MR. FARRELL:

18        Q.     To your understanding and

19   belief sitting here today as the

20   representative of McKesson, is this document

21   the earliest version of the controlled

22   substance monitoring program adopted by the

23   company?

24                    MS. HENN:  Same objections.

25                    THE WITNESS:  I can't say for
```

1       certain this is the only one I know

2       of.

3    QUESTIONS BY MR. FARRELL:

4       Q.      I'm not asking you to --

5       A.      Yeah.

6       Q.      -- foreclose the existence of

7    anything else.

8       A.      Right.

9       Q.      Sitting here today as the

10   McKesson designee for the 30(b)(6)

11   deposition, what we're showing you here as

12   Exhibit 12 is the earliest version you're

13   aware of for McKesson's controlled substance

14   monitoring program?

15              MS. HENN:  Objection to form.

16       Outside the scope.

17              THE WITNESS:  Correct, that I'm

18       aware of.

19   QUESTIONS BY MR. FARRELL:

20       Q.      So when I asked you in the

21   30(b)(6) deposition notice to testify

22   regarding all past and present suspicious

23   order policies and procedures, this, to the

24   best of your knowledge, is the first time

25   McKesson has adopted a policy and procedure

1    in compliance with the United States Code

2    that we discussed this morning and the Code

3    of Federal Regulations we discussed this

4    morning.

5              MS. HENN:  Objection.

6    QUESTIONS BY MR. FARRELL:

7         Q.    Agreed?

8              MS. HENN:  Objection to form.

9         Outside the scope.

10             THE WITNESS:  I can't -- I

11        can't speak to things that may have

12        happened prior to this date that maybe

13        weren't put in this format and written

14        down on paper, but on paper, this is

15        the one that I recognize.

16   QUESTIONS BY MR. FARRELL:

17        Q.    I need to be a little more

18   clear about it.

19             Are you aware of any other

20   piece of paper in the annals of McKesson

21   Corporation that talk about the duty to

22   comply with the United States Code and the

23   Code of Federal Regulations regarding the

24   distribution of controlled substances?

25             MS. HENN:  Objection to form.

```
 1        Outside the scope.

 2             MR. FARRELL:  Counsel, it seems

 3        to be directly within point A of the

 4        30(b)(6) notice.

 5             MS. HENN:  We can disagree

 6        about that.

 7             MR. FARRELL:  Well, I'll read

 8        it out loud.

 9             "Your past, present, suspicious

10        orders monitoring system, SOMS

11        program, policies and procedures."

12             MS. HENN:  And I'll just object

13        again to the question as outside the

14        scope.

15             And to respond to you,

16        Mr. Farrell, the -- Special Master

17        Cohen has made rulings about the

18        proper time frame for discovery, and

19        so our position is that asking about

20        the annals of McKesson Corporation is

21        outside the scope.

22             But he can answer your question

23        if you want to state it again.

24             MR. FARRELL:  That's a fair

25        point.
```

```
1    QUESTIONS BY MR. FARRELL:

2         Q.    So sitting here today as

3    McKesson Corporation, you're unaware of any

4    piece of paper that predates Exhibit 12, but

5    there may be; is that fair?

6              MS. HENN:  Objection to form.

7         Outside the scope.

8              THE WITNESS:  That's fair.  I'm

9         unaware, but I -- there may be.

10   QUESTIONS BY MR. FARRELL:

11        Q.    So you don't have any basis in

12   fact, as the McKesson designee today, to

13   discuss what the policies and procedures were

14   for McKesson related to the distribution of

15   controlled substances and opium pills between

16   '96 when OxyContin was launched and the

17   adoption of Section 55, Exhibit 12, in July

18   of 2000; is that a fair statement?

19             MS. HENN:  Objection to form.

20        Outside the scope.

21             THE WITNESS:  That's a fair

22        statement.

23   QUESTIONS BY MR. FARRELL:

24        Q.    So what we're looking at is

25   Exhibit 12.
```

```
 1                    Can you tell me the name of
 2   this document?
 3        A.     It's the drug operation manual.
 4   It's been -- but it's known as Section 55,
 5   often within McKesson, which is also in the
 6   title.
 7        Q.     And as of July 2000, is there
 8   any other document related to the
 9   distribution of controlled substances in the
10   prevention of diversion other than
11   Section 55?
12                MS. HENN:  Objection to form.
13        Outside the scope.
14                THE WITNESS:  I'm not following
15        your question 100 percent.
16   QUESTIONS BY MR. FARRELL:
17        Q.     Okay.  Are you a sports fan?
18        A.     I am.
19        Q.     What's your favorite sport?
20        A.     Wrestling.
21        Q.     Very good.
22                How many rules are in the
23   wrestling rule book?
24        A.     I couldn't even guess.  I don't
25   know.
```

```
 1          Q.     But the wrestling rule book is

 2    intended to be comprehensive, agreed?

 3          A.     I would agree.

 4          Q.     If you're a referee, how many

 5    different books do you have to read to know

 6    the rules of wrestling on the mat?

 7          A.     Should be one.

 8          Q.     Is that the same for this

 9    document, Exhibit 12?  Is this intended to be

10    the rule book for the distribution of

11    controlled substances for McKesson

12    Corporation?

13               MS. HENN:  Objection to form.

14               THE WITNESS:  For which time

15        frame?

16    QUESTIONS BY MR. FARRELL:

17          Q.     July 2000 until -- and I'll

18    give you a hint -- the 2007 Lifestyles

19    program.

20               MS. HENN:  Objection to form.

21        Outside the scope.

22               THE WITNESS:  I'm not aware of

23        another one.

24    QUESTIONS BY MR. FARRELL:

25          Q.     All right.  On page 1, the very
```

```
 1    first paragraph under general, I'd like you

 2    to take a minute and read that.  And I've

 3    never liked just having you -- or just spring

 4    that on you.  I want you to kind of digest

 5    it.

 6         A.    Just the first paragraph?

 7         Q.    Just the first paragraph.

 8         A.    I read it.

 9         Q.    All right.  Now, I'm going to

10    have you read aloud just the first sentence,

11    and I'm going to compliment you that all of

12    your testimony this morning is spot-on with

13    that very first sentence.  I couldn't trip

14    you up at all.  So I'd like you to read the

15    first sentence aloud, please.

16         A.    "The aim of the Controlled

17    Substance Act is to prevent diversion of

18    abusable substances into illicit traffic

19    while ensuring their availability for

20    legitimate medical purposes."

21         Q.    So again, we're back to this

22    theme that the Controlled Substances Act was

23    intended to prevent diversion, agreed?

24              MS. HENN:  Objection to form.

25              THE WITNESS:  Agreed.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.      And in July of 2000, McKesson

 3    adopted a policy to accomplish that

 4    objective; is that fair?

 5              MS. HENN:  Objection to form.

 6              THE WITNESS:  They formalized a

 7         policy within -- within this document.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.      That's the purpose of this

10    document?

11         A.      Right.

12         Q.      Who wrote this document?

13         A.      I'm not 100 percent sure

14    exactly who wrote it within the McKesson

15    team, but a combination of people.

16         Q.      Whose document is this?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  McKesson's.

19    QUESTIONS BY MR. FARRELL:

20         Q.      Is this a document that is kept

21    in the regular course of business for

22    McKesson?

23              MS. HENN:  Objection to form.

24              THE WITNESS:  It is.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     Is this a true and authentic

 3   copy of Section 55 of McKesson's policy?

 4             MS. HENN:  Objection to form.

 5             THE WITNESS:  I know it's

 6        undergoing some revisions.

 7   QUESTIONS BY MR. FARRELL:

 8        Q.     Well, not as of July 2000.

 9        A.     Oh, can you say it again?

10        Q.     Yeah.  This document, sitting

11   here today --

12        A.     Right.

13        Q.     -- is this a document that as

14   of July of the year 2000 was a document

15   created by McKesson in the course of

16   conducting its regular business activities?

17             MS. HENN:  Objection to form.

18             THE WITNESS:  Yes.

19   QUESTIONS BY MR. FARRELL:

20        Q.     So if I hold this document up

21   in a courtroom I can say this is McKesson's

22   drug operations manual related to the

23   distribution of controlled substances that

24   was adopted in July of 2000?

25        A.     Yes.
```

Highly Confidential — Subject to Further Confidentiality Review

```
 1          Q.      Now, the second sentence,

 2    starting with "The Drug Enforcement

 3    Administration," can you read that sentence

 4    aloud?

 5          A.      Sure.

 6                  "The Drug Enforcement

 7    Administration strictly interprets the law

 8    and regulations and has imposed significant

 9    fines for technical errors in completing

10    forms and keeping records."

11          Q.      So the DEA, even as of July

12    2000, took the Controlled Substances Act very

13    seriously, and McKesson acknowledges that,

14    agreed?

15                  MS. HENN:  Objection to form.

16                  THE WITNESS:  Correct, or

17          agreed.

18    QUESTIONS BY MR. FARRELL:

19          Q.      Now, would you read the last

20    sentence?

21          A.      "It's extremely important that

22    McKesson employees comply fully with the

23    regulations and the following guidelines."

24          Q.      How important is it?

25                  MS. HENN:  Objection to form.
```

```
 1                    THE WITNESS:  To recite, it

 2         says "extremely important."

 3  QUESTIONS BY MR. FARRELL:

 4         Q.     And why?

 5         A.     To prevent the diversion of

 6  controlled substances.

 7         Q.     I'm going to have you now flip

 8  to page 27.  I'll give you a minute to kind

 9  of --

10         A.     The whole --

11         Q.     Yeah, you can just glance it.

12  We're going to walk through it a little bit.

13                We can start with the heading,

14  paragraph A.  What's paragraph A, the very

15  top of the page?  What's it say?

16                Oh, wait a minute, I'm sorry.

17         A.     Am I on the right page here?

18         Q.     I was on the wrong page.

19                Page 27, paragraph G.  Will you

20  read the first paragraph?

21         A.     The heading or the entire --

22  the first --

23         Q.     You can read the heading if

24  you'd like.

25         A.     "DEA continuing education"?
```

1    That piece?

2         Q.    Yes.  And then there's another

3    word underneath that.

4         A.    "Documentation."

5         Q.    What does documentation mean?

6         A.    Is you document something on

7    paper.

8         Q.    Okay.  And will you read the

9    sentence, please?

10        A.    "All compliance training

11   sessions, formal and informal, held in your

12   distribution center must be logged and

13   documented on the DEA continuing education

14   report."

15        Q.    What does that mean?

16             MS. HENN:  Objection to form.

17        Outside the scope.

18             THE WITNESS:  It means you

19        should document the training that's

20        conducted related to compliance.

21   QUESTIONS BY MR. FARRELL:

22        Q.    Okay.  Is there a DEA

23   continuing education report that you're aware

24   of?

25        A.    Not that I'm aware of.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      You haven't seen any such

2  thing?

3      A.      I don't believe I have, no.

4      Q.      But if we ask for it, it's

5  something McKesson could theoretically go and

6  look for?

7              MS. HENN:  Objection to form.

8        Outside the scope.

9              THE WITNESS:  Theoretically.

10 QUESTIONS BY MR. FARRELL:

11     Q.      All right.  Because the policy

12 seems to indicate you guys have this

13 documentation of compliance training

14 sessions.  And I'll admit to you I haven't

15 seen any, so I was wondering if you'd seen

16 any.

17     A.      I have not.

18     Q.      Now, if you flip to the next

19 page, page 28, at the top it's paragraph A.

20 And will you read the title of paragraph A?

21     A.      "Detecting suspicious orders."

22     Q.      And what's it say over there on

23 the right, that number?

24     A.      1301.74.

25     Q.      What do you think that is?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      That's from the CFR.

2          Q.      All right.  And then under

3    paragraph 1, you see where it says, "DEA

4    regulation defines suspicious orders as

5    follows"?

6          A.      I do.

7          Q.      Will you read what's in the

8    quotation marks?

9          A.      "Suspicious orders include

10   orders of unusual size, orders deviating

11   substantially from a normal pattern and

12   orders of unusual frequency."

13         Q.      Now, if you go down to the

14   paragraph that starts "recent cases," do you

15   see that?

16                 Will you read the first

17   sentence?

18         A.      "Recent cases indicate that DEA

19   will seek large penalties from distributors

20   who fail to comply with this regulation."

21         Q.      What do you interpret that to

22   mean?

23                 MS. HENN:  Objection.  Outside

24         the scope.

25                 THE WITNESS:  Exactly what it

```
 1          says.

 2     QUESTIONS BY MR. FARRELL:

 3          Q.     You got to follow the law?

 4               MS. HENN:  Objection to form.

 5               THE WITNESS:  Right.

 6     QUESTIONS BY MR. FARRELL:

 7          Q.     And if McKesson doesn't follow

 8     the law, that makes its conduct unlawful?

 9               MS. HENN:  Objection to form.

10               THE WITNESS:  Yes.

11     QUESTIONS BY MR. FARRELL:

12          Q.     And McKesson has acknowledged

13     that as early as July of 2000?

14               MS. HENN:  Objection to form.

15          Outside the scope.

16               THE WITNESS:  In this document,

17          yes.

18     QUESTIONS BY MR. FARRELL:

19          Q.     The next sentence says, "It is

20     left to the distributor to define what

21     constitutes an unusual or suspicious order."

22               Do you see that sentence?

23          A.     I do.

24          Q.     And to comply with this,

25     McKesson has adopted this policy; is that
```

1    fair?

2                MS. HENN:  Objection to form.

3          Outside the scope.

4                THE WITNESS:  Yes.

5    QUESTIONS BY MR. FARRELL:

6          Q.    Now, in here it says at the

7    very bottom of the -- it says, "The following

8    reports are produced:  The Drohan data

9    reports."

10               Do you see that, the Drohan

11   Data Center reports?

12         A.    I do see that.

13         Q.    What are the Drohan Data Center

14   reports?

15               MS. HENN:  Objection.  Outside

16         the scope.

17               THE WITNESS:  They're

18         multiple -- that's the -- they're

19         multiple reports that are generated

20         from the system.

21   QUESTIONS BY MR. FARRELL:

22         Q.    Okay.  Is that system still in

23   place, to your knowledge?

24         A.    Not to my knowledge.

25         Q.    Who would I ask if I was going

```
 1    to ask questions about the reports in the

 2    Drohan Data Center?

 3              MS. HENN:  Objection to form.

 4              THE WITNESS:  Somebody in our

 5         IT department.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    Okay.  Flip to the next page,

 8    page 29.  Little A talks about controlled

 9    substances sales reports.

10              Do you see that?

11         A.    I do.

12         Q.    That's a document that should

13    exist as of July of 2000, agreed?

14              MS. HENN:  Objection to form.

15         Outside the scope.

16              THE WITNESS:  Agreed.

17    QUESTIONS BY MR. FARRELL:

18         Q.    Little B says, "Controlled

19    substance customer purchase report."

20              That's a document that should

21    exist as of July of 2000, agreed?

22              MS. HENN:  Objection to form.

23         Outside the scope.

24              THE WITNESS:  Agreed.

25
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Little C says, "Daily

 3    controlled substance suspicious order warning

 4    report."

 5               That's a document that should

 6    exist as of July 2000, agreed?

 7               MS. HENN:  Objection to form.

 8         Outside the scope.

 9               THE WITNESS:  Agreed.

10    QUESTIONS BY MR. FARRELL:

11         Q.    Next page, little D, "Monthly

12    controlled substance suspicious purchases

13    report."

14               That's a document that should

15    exist as of July 2000, agreed?

16               MS. HENN:  Objection to form.

17         Outside the scope.

18               THE WITNESS:  Agreed.

19    QUESTIONS BY MR. FARRELL:

20         Q.    And little E, "Monthly ARCOS

21    customer recap variance."  Again, another

22    document that should exist as of July 2000 as

23    part of the McKesson suspicious order

24    detecting policy.

25               MS. HENN:  Objection to form.
```

```
 1          Outside the scope.

 2   QUESTIONS BY MR. FARRELL:

 3          Q.     Agreed?

 4          A.     Can you rephrase that in terms

 5   of...

 6          Q.     Yeah.  We're talking about

 7   under paragraph A, which is "Detecting

 8   Suspicious Orders."

 9          A.     Agreed.

10          Q.     Now, on page 30 there,

11   paragraph B, "Reporting," it says, "The

12   Drohan Data Center will generate the daily

13   controlled substance suspicious order warning

14   reports every two hours, 24 hours a day."

15                 Do you see that?

16          A.     I see that.

17          Q.     Have you seen any of those

18   reports?

19                 MS. HENN:  Objection.  Outside

20          the scope.

21                 THE WITNESS:  I have.

22   QUESTIONS BY MR. FARRELL:

23          Q.     Did you review them in

24   anticipation of today's deposition?

25          A.     I did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And how far back did you review
 2   them?
 3        A.    I'm not certain of the dates on
 4   the examples that I had.
 5        Q.    How old?
 6        A.    In the early 2000s, I believe.
 7   I'd have to look.
 8        Q.    Did those reports help inform
 9   you of the policies and procedures for
10   McKesson in preparation for today's
11   deposition?
12             MS. HENN:  Objection to form.
13             THE WITNESS:  They did.
14   QUESTIONS BY MR. FARRELL:
15        Q.    And did they help refresh your
16   recollection in preparation for today's
17   testimony?
18             MS. HENN:  Objection to form.
19             THE WITNESS:  They did.
20   QUESTIONS BY MR. FARRELL:
21        Q.    Are those documents important
22   to McKesson for purposes of complying with
23   its duties under the Controlled Substances
24   Act beginning in July of 2000?
25             MS. HENN:  Objection to form.
```

1      Outside the scope.

2             THE WITNESS:  Can you say it

3      again one more time?

4   QUESTIONS BY MR. FARRELL:

5      Q.    Are those documents important

6   to McKesson for purposes of complying with

7   its duties under the Controlled Substances

8   Act beginning in July of 2000?

9             MS. HENN:  Objection to form.

10      Outside the scope.

11            THE WITNESS:  They are

12      important.





```
 8              MS. HENN:  Objection to form.

 9       Outside the scope.

10  QUESTIONS BY MR. FARRELL:

11       Q.    Would you like me to restate

12  it?

13       A.    Yeah, please.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential — Subject to Further Confidentiality Review

3          MS. HENN:  Objection to form.

4     Outside the scope.

5  QUESTIONS BY MR. FARRELL:

6     Q.    It's what the policy says?

7          MS. HENN:  Same objections.

8          THE WITNESS:  Can you say that

9     again or point me to the policy

10    section you're referring to?

11 QUESTIONS BY MR. FARRELL:

12    Q.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Case: 1:17-md-02804-DAP Doc #: 1978-3 Filed: 07/24/19 127 of 372. PageID #: 227613





20       Q.      So you acknowledge, sitting

21   here today as McKesson, that simply

22   submitting reports to the DEA does not comply

23   with the US Code or the Code of Federal

24   Regulations?

25              MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



1    Outside the scope.

2         THE WITNESS:  Agree.

3    QUESTIONS BY MR. FARRELL:

4    Q.    You have a duty to review and

5    note orders of unusual size?

6    A.    It's part of our -- this

7    document program, yes.

25



```
 6              MS. HENN:  Objection to form.

 7         Outside the scope.

 8              THE WITNESS:  One more time,

 9         please.

10    QUESTIONS BY MR. FARRELL:
```

Highly Confidential - Subject to Further Confidentiality Review



21    QUESTIONS BY MR. FARRELL:

22        Q.    This goes back to what we were

23    talking about earlier, is that aside from

24    your regulatory responsibilities, you also

25    perform a function that serves the public

1    interest at large?

2         A.    Correct.



Highly Confidential - Subject to Further Confidentiality Review

7    QUESTIONS BY MR. FARRELL:

8         Q.    Sitting here today, though, you

9    have not seen any such document?

10        A.    I've not reviewed a completed

11   one.  I've seen one.

12        Q.    Do they still exist?

13             MS. HENN:  Objection to form.

14   Outside the scope.

15             THE WITNESS:  I'm not sure.

16             (McKesson-Hartle Exhibit 13

17        marked for identification.)

18   QUESTIONS BY MR. FARRELL:

19        Q.    I'm going to have marked as the

20   next sequential exhibit Exhibit 13.  The

21   document in the right-hand corner is

22   2001_0828.

23             Again, this is from the

24   HathiTrust.

25        A.    I see that.

1          Q.     It's a Congressional record

2     from 2001.

3                 Can you read the title of the

4     Congressional investigation?

5          A.     "OxyContin:  Its use and abuse:

6     Hearing before the Subcommittee and Oversight

7     and Investigations of the Committee on Energy

8     and Commerce, House of Representatives, 107th

9     Congress, First Session, August 28th of

10    2001."

11         Q.     Does McKesson acknowledge that

12    the use and abuse of OxyContin was on the

13    national radar at least as early as

14    August 28, 2001, with a Congressional

15    hearing?

16                MS. HENN:  Objection to form.

17                THE WITNESS:  Yes.

18    QUESTIONS BY MR. FARRELL:

19         Q.     I'm going to have you flip to

20    page 8.  This is the introductory statement

21    from the chairman, James Greenwood, on the

22    Subcommittee on Oversight and Investigations.

23    He's from Pennsylvania.

24                Two-thirds of the way down, the

25    sentence says, "These actions, though

Highly Confidential - Subject to Further Confidentiality Review

 1    commendable, also appear long overdue."

 2              Do you see that sentence?

 3         A.    I do see that.

 4         Q.    Will you begin reading,

 5    starting with "according"?

 6         A.    "According to DEA, the number

 7    of oxycodone-related deaths has increased

 8    400 percent since 1996, the same time period

 9    in which the annual number of prescriptions

10    for OxyContin has risen from approximately

11    300,000 to almost 6 million."

12         Q.    And how did these

13    prescriptions -- how did these pills get from

14    Purdue Pharma, who makes OxyContin, to the

15    pharmacies?

16              MS. HENN:  Objection to form.

17              THE WITNESS:  After being

18         prescribed by a doctor --

19    QUESTIONS BY MR. FARRELL:

20         Q.    Yes.

21         A.    -- and sent to pharmacies --

22         Q.    Yes.

23         A.    -- or other by distributors.

24         Q.    Right.

25              So between 1996 and the year

Highly Confidential - Subject to Further Confidentiality Review

1   2001, the number of prescriptions went from

2   300,000 to almost 6 million.  So the

3   OxyContin business was a-booming, wasn't it?

4             MS. HENN:  Objection to form.

5       Outside the scope.

6             THE WITNESS:  It increased

7       significantly.

8   QUESTIONS BY MR. FARRELL:

9       Q.    And McKesson was amongst the

10  distributors that were delivering the pills

11  from Purdue Pharma to the pharmacies?

12            MS. HENN:  Objection to form.

13            THE WITNESS:  We were.

14  QUESTIONS BY MR. FARRELL:

15      Q.    Do you believe that the

16  increase from 300,000 prescriptions to 6

17  million is an increase of unusual size?

18            MS. HENN:  Objection to form.

19      Outside the scope.

20            THE WITNESS:  Could you ask

21      that again?

22  QUESTIONS BY MR. FARRELL:

23      Q.    You go from 300,000

24  prescriptions to 6 million in five years.  Do

25  you think that that is an unusual increase?

```
 1                  MS. HENN:  Objection to form.
 2        Outside the scope.
 3                  THE WITNESS:  It appears to be
 4        a significant increase.  I don't -- I
 5        don't have the context of before --
 6        everything before, but it's a large
 7        increase.
 8   QUESTIONS BY MR. FARRELL:
 9        Q.    Well, assuming in 1996 there
10   were 300,000 prescriptions and five years
11   later there were 6 million, would you --
12   would you characterize that increase as
13   unusual?
14                  MS. HENN:  Objection to form.
15        Outside the scope.
16                  THE WITNESS:  I don't know if I
17        would characterize it as -- it's
18        significant.
19   QUESTIONS BY MR. FARRELL:
20        Q.    Significant enough to get
21   McKesson's attention?
22                  MS. HENN:  Objection to form.
23                  THE WITNESS:  Significant
24        enough.
25
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Yes?

 3         A.    Yes.

 4         Q.    Now, two paragraphs down it

 5    says, "In its testimony today" --

 6              Do you see that paragraph?

 7         A.    I do.

 8         Q.    -- "Purdue Pharma will argue

 9    that the death figures heralded by newspapers

10    nationwide are inaccurate and are the prime

11    mover of the negative hype surrounding

12    OxyContin."

13              Do you see that sentence?

14         A.    I do see that sentence.

15         Q.    So does McKesson acknowledge

16    that death figures are being heralded by

17    newspapers nationwide as of 2001?

18              MS. HENN:  Objection to form.

19         Outside the scope.

20              THE WITNESS:  Could you ask

21         that again in a different way, maybe?

22    QUESTIONS BY MR. FARRELL:

23         Q.    Yeah.

24              This is saying that there's

25    newspaper headlines across the country of
```

```
 1    people dying taking opium pills that McKesson

 2    is distributing.

 3              Does McKesson acknowledge that?

 4              MS. HENN:  Objection to form.

 5         Outside the scope.

 6              THE WITNESS:  Not that --

 7         there's certainly headlines of

 8         opioid-related deaths.

 9    QUESTIONS BY MR. FARRELL:

10         Q.    In 2001?

11         A.    I don't know of any

12    specifically.  I'm assuming there were in

13    that time frame.

14         Q.    And it's a little unfair to ask

15    you because you weren't there in 2001, but as

16    McKesson's corporate designee I'm simply

17    looking for an acknowledgement that the chain

18    of distribution McKesson was involved in is

19    being heralded in newspapers as causing

20    deaths across the country.

21              MS. HENN:  Objection to form.

22         Outside the scope.

23    QUESTIONS BY MR. FARRELL:

24         Q.    Does McKesson acknowledge that

25    fact?
```

```
 1              MS. HENN:  Same objections.

 2              THE WITNESS:  I haven't seen

 3         any of those headlines, so I can't

 4         speak to whether us as a distributor

 5         was called out in those.

 6   QUESTIONS BY MR. FARRELL:

 7         Q.    I'm not asking you if you were

 8   called out as a distributor.  What I'm asking

 9   you is if McKesson acknowledged that the

10   pills that it was selling was causing deaths

11   nationwide and resulted in newspaper

12   headlines across the country.

13              MS. HENN:  Objection to form.

14         Outside the scope.

15              THE WITNESS:  Yes, pills that

16         we distribute were in headlines.

17   QUESTIONS BY MR. FARRELL:

18         Q.    And Purdue Pharma says that

19   "those headlines are inaccurate and the prime

20   mover of the negative hype surrounding

21   OxyContin."

22              Does McKesson Corporation,

23   sitting here today, concur with Purdue

24   Pharma?

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Outside the scope.

 2                 THE WITNESS:  Reading the rest

 3          of this if you don't -- I'm reading

 4          down a little bit more, so...

 5                 Can you ask your question

 6          again?

 7   QUESTIONS BY MR. FARRELL:

 8          Q.     Yeah.

 9                 Does McKesson Corporation,

10   sitting here today and testifying, concur

11   with Purdue Pharma that the nationwide

12   newspapers about overdose deaths are

13   inaccurate?

14                 MS. HENN:  Objection to form.

15          Outside the scope.

16                 THE WITNESS:  I can't speak to

17          that.  I'd just be speculating.

18   QUESTIONS BY MR. FARRELL:

19          Q.     You don't share Purdue Pharma's

20   disavow of the problems caused by its

21   OxyContin pills?

22                 MS. HENN:  Objection to form.

23          Outside the scope.

24                 THE WITNESS:  I'm not saying

25          that.  I'm saying I can't answer the
```

```
 1          question that you asked earlier.

 2                   (McKesson-Hartle Exhibit 14

 3          marked for identification.)

 4    QUESTIONS BY MR. FARRELL:

 5          Q.     Next exhibit we'll have marked

 6    sequentially as Exhibit 4.  It's from the

 7    Internet.  It's document 2002_09_26.

 8                   MS. HENN:  Mr. Farrell, did you

 9          mean Exhibit 4 or 14?

10                   MR. FARRELL:  14.

11                   MS. HENN:  Okay.

12                   MR. FARRELL:  You caught me.

13    QUESTIONS BY MR. FARRELL:

14          Q.     And I'm not going to bore you

15    with the details of this, but are you aware

16    of the Office of Inspector General?

17          A.     I am.

18          Q.     This is a report generated by

19    the OIG in 2002, and what it was talking

20    about was it was talking about the opioid

21    epidemic, and it was talking about the DEA's

22    ability to regulate the industry.

23                   Have you reviewed this document

24    before today?

25          A.     I have not.
```

```
 1          Q.      Give me a second here.

 2                  On Bates stamp page 12, it's

 3    talking about diversion investigators.  And

 4    it says there were 55 at headquarters and 455

 5    in the domestic field offices and 13

 6    overseas.

 7                  Do you see that?

 8          A.      I do see that.

 9          Q.      So that means there's just over

10    500 DEA diversion investigators in the

11    country in 2001.

12                  MS. HENN:  Objection to form.

13          Outside the scope.

14    QUESTIONS BY MR. FARRELL:

15          Q.      Responsible for regulating the

16    entire industry of the distribution of

17    controlled substances.

18                  Do you know how many

19    transactions McKesson engaged in in the

20    distribution of controlled substances in

21    2001?

22                  MS. HENN:  Objection to form.

23          Outside the scope.

24                  THE WITNESS:  I do not have the

25          number off the top of my head.
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     The OIG report basically says

 3   that as of 2001 there needed to be

 4   reassessment because the DEA was understaffed

 5   and underfunded and didn't have sufficient

 6   tools to be able to regulate the industry.

 7             Does McKesson acknowledge and

 8   agree with that assessment?

 9             MS. HENN:  Objection to form.

10        Outside the scope.

11             THE WITNESS:  Could you ask

12        that again?

13             MR. FARRELL:  Yeah, obviously

14        I'm leading up to some other

15        documents.

16   QUESTIONS BY MR. FARRELL:

17        Q.     But does McKesson acknowledge

18   that in 2001 there were 500 DEA diversion

19   investigators trying to monitor all of the

20   transactions in the country?

21             MS. HENN:  Objection to form.

22        Outside the scope.

23             THE WITNESS:  I see that in the

24        documents.  I can't speak to, you

25        know, the DEA's total -- their
```

1          response in total, so I can confirm

2          that's in -- what's in this document.

3     QUESTIONS BY MR. FARRELL:

4          Q.     All right.  So let's talk about

5     it from a theoretical standpoint.

6                 Let's say there were 500

7     highway patrol officers charged with

8     regulating the speed on the highways in the

9     United States of America in the year 2001.

10                Do you believe that that would

11    be a significant challenge, a somewhat of a

12    challenge or not very challengeable at all?

13                MS. HENN:  Objection to form.

14         Outside the scope.

15                THE WITNESS:  Again, just

16         speculating, it would be a challenge.

17    QUESTIONS BY MR. FARRELL:

18         Q.     How many people would speed in

19    America if there were only 500 highway

20    patrolmen in the country?

21                MS. HENN:  Same objections.

22                THE WITNESS:  I can't even

23         guess or speculate.

24    QUESTIONS BY MR. FARRELL:

25         Q.     Do you think that would be a

```
 1    lot of people or not a lot of people?

 2                 MS. HENN:  Same objections.

 3                 THE WITNESS:  Again, that

 4         depends on how many law-abiding

 5         citizens you have.  I don't know if I

 6         can speculate.

 7    QUESTIONS BY MR. FARRELL:

 8         Q.    That is so true.

 9                 What do you think the American

10    citizen would do if they knew there were only

11    500 highway patrolmen?

12                 MS. HENN:  Objection to form.

13         Outside the scope.

14                 THE WITNESS:  Again, I don't

15         know.  Some people might speed.  Some

16         people might not change their behavior

17         at all.

18    QUESTIONS BY MR. FARRELL:

19         Q.    That's right.

20                 What if the penalty, if you did

21    get caught, was only $10?

22                 MS. HENN:  Objection to scope.

23    QUESTIONS BY MR. FARRELL:

24         Q.    How would that impact your view

25    of the regulation of the American highways?
```

```
 1              MS. HENN:  Objection to form.

 2        Outside the scope.

 3              THE WITNESS:  Again, you can

 4        speculate.  Some might see that as

 5        a -- yeah, it depends.  It really

 6        depends.

 7   QUESTIONS BY MR. FARRELL:

 8        Q.    What if the biggest weapon the

 9   highway patrolmen had, which is the

10   revocation of the driver's license, was

11   changed and so now you don't even lose your

12   license?  How would that impact the system?

13              MS. HENN:  Same objections.

14              THE WITNESS:  Impact the

15        system?

16   QUESTIONS BY MR. FARRELL:

17        Q.    Yeah, impact the number of

18   speeders.

19              MS. HENN:  Objection to form.

20        Outside the scope.

21              THE WITNESS:  You can speculate

22        that it may go down.

23   QUESTIONS BY MR. FARRELL:

24        Q.    The number of speeders would go

25   down if you can't lose your license anymore?
```

```
 1                MS. HENN:  Same objections.

 2                THE WITNESS:  Oh, if you

 3        can't -- sorry, excuse me.  It may go

 4        up.

 5   QUESTIONS BY MR. FARRELL:

 6        Q.    So if there's -- if there's a

 7   limited number of regulators and a fine is

 8   not substantial and you don't lose your

 9   license, are we going to have more speeders

10   or less speeders?

11                MS. HENN:  Objection to form.

12        Outside the scope.

13                THE WITNESS:  Can you rephrase

14        that a little bit?

15   QUESTIONS BY MR. FARRELL:

16        Q.    Yeah.

17        A.    You rolled a few things in

18   there.

19        Q.    You know what I'm trying to get

20   to, right?  If there's not enough law

21   enforcement and the penalty isn't

22   prohibitive, what happens to conduct?

23                MS. HENN:  Objection to form.

24        Outside the scope.

25                THE WITNESS:  Again, it's
```

```
 1        speculative, but it could -- you know,

 2        behavior could change.

 3   QUESTIONS BY MR. FARRELL:

 4        Q.    What if you made billion of

 5   dollars by speeding, and there was not enough

 6   regulation by law enforcement and the penalty

 7   was not very big?  What would that do as an

 8   incentive?

 9             MS. HENN:  Same objections.

10             THE WITNESS:  Again, it depends

11        on the situation, the scenario.

12   QUESTIONS BY MR. FARRELL:

13        Q.    It really depends on whether or

14   not the individual is a law-abiding citizen

15   or a criminal, agreed?

16             MS. HENN:  Same objections.

17        Object to form.  Outside the scope.

18             THE WITNESS:  It's part of it.

19             (McKesson-Hartle Exhibit 15

20        marked for identification.)

21             MR. FARRELL:  Last exhibit and

22        then we'll take a break, if that's

23        okay.

24             MS. HENN:  That works.

25   QUESTIONS BY MR. FARRELL:
```

1      Q.      I'm going to have marked

2   Exhibit 15, and the exhibit in the top

3   right-hand corner is 2004_ 06_17.  And for

4   those of you playing at home, this is an

5   excerpt from another Congressional record.

6              This Congressional record was

7   900 pages long, and so I did not copy the

8   whole thing; I just pulled out the part that

9   interested me.

10             This is part of the US Senate

11  Permanent Subcommittee on Investigations, and

12  it was a hearing in June of 2004.  And the

13  title of the hearing was "Buyers Beware:  The

14  Dangers of Purchasing Pharmaceuticals Over

15  the Internet."

16             Now, McKesson has some

17  experience with this, agreed?

18             MS. HENN:  Objection to form.

19             THE WITNESS:  Can you define --

20      experience.  What type of experience?

21  QUESTIONS BY MR. FARRELL:

22      Q.      Well, McKesson was selling to

23  Internet pharmacies in this time frame,

24  agreed?

25             MS. HENN:  Objection to form.

```
 1                    THE WITNESS:  I believe so.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     Well, McKesson should know so

 4   because you paid a $13 million fine to the

 5   DEA for doing that very thing in 2008.

 6                    MS. HENN:  Objection to form.

 7                    THE WITNESS:  Understood.

 8   QUESTIONS BY MR. FARRELL:

 9        Q.     Okay.  So this is a report, and

10   it was -- if you flip to page 2, it was

11   generated by a company called the

12   Pharmaceutical Research Manufacturers of

13   America.  I guess they call it PhRMA.

14                    Is that how you say it?

15        A.     I don't know.

16        Q.     Well, McKesson is a member of

17   this organization, and so colloquially within

18   your ranks do you call it PhRMA?  PhRMA?

19   PhRMA?  What do you say?

20                    MS. HENN:  Counsel, I'm sorry,

21            just a quick clarification.  I'm not

22            seeing a reference -- I see reference

23            to Giuliani and his organization, but

24            I don't see PhRMA.

25                    Can you just point out where
```

Highly Confidential — Subject to Further Confidentiality Review

1        you're seeing that?

2                MR. FARRELL:  Yeah, it's up on

3        the screen there, and it's in the very

4        middle.

5                MS. HENN:  Thank you.  I

6        appreciate that.

7    QUESTIONS BY MR. FARRELL:

8        Q.      So does McKesson -- first, does

9    McKesson acknowledge that it is an associate

10   member of the Pharmaceutical Research and

11   Manufacturers of America?

12               MS. HENN:  Objection to form.

13       Outside the scope.

14               THE WITNESS:  I can't speak to

15       that.  I don't know.

16   QUESTIONS BY MR. FARRELL:

17       Q.      I'll represent to you -- I'll

18   represent to you that you are.

19       A.      Okay.

20       Q.      And do you know who this Rudy

21   Giuliani fellow is?

22       A.      I do know who Mr. Giuliani is.

23       Q.      He's a lawyer, too, isn't he?

24       A.      He is.

25       Q.      And he was hired to do this

Highly Confidential - Subject to Further Confidentiality Review

```
 1    investigation by the pharmaceutical industry.

 2                Do you see that?

 3                MS. HENN:  Objection to form.

 4         Outside the scope.

 5                THE WITNESS:  I don't know if I

 6         see where specifically it states that.

 7    QUESTIONS BY MR. FARRELL:

 8         Q.    It says, "Giuliani Partners has

 9    been" --

10         A.    Oh, in the middle.  Okay.

11    Sorry.

12         Q.    They have been retained by

13    PhRMA to do an evaluation.

14         A.    Understood.  I see that.

15         Q.    Now what I'm going to have you

16    do is I'm going to have you flip over to

17    page 4, and it's interesting what Rudy

18    Giuliani found.

19                Do you see where it says "the

20    distribution chain"?

21                It says, "On its face, it

22    appears that the distribution chain for

23    prescription medicines in the United States

24    is fairly straightforward."

25         A.    I was on the wrong number 4.
```

```
 1              I see where it says that.
 2      Q.      And it says, "Manufacturers
 3  sell their products to wholesalers."
 4              That'd be you, McKesson,
 5  correct?
 6      A.      Correct.
 7      Q.      "Who, in turn, sell the
 8  products to retail pharmacies and stores,
 9  who, in turn, dispense medicines to patients
10  with prescriptions."
11              Do you see that?
12      A.      Yes.
13      Q.      And that's a straightforward
14  system is what Rudy Giuliani is saying.
15              Will you read the next
16  sentence, please?
17      A.      "It is not until the system is
18  studied in greater detail that one begins to
19  appreciate both the complexities and the
20  vulnerability of the distribution chain and
21  potential for exploitation or abuse."
22      Q.      So big pharma is acknowledging
23  in 2004, through hiring their own expert in
24  presenting to Congress, that this chain of
25  distribution that McKesson is engaged in is
```

1   complex and vulnerable for exploitation or

2   abuse, agreed?

3            MS. HENN:  Objection to form.

4        Outside the scope.

5            THE WITNESS:  It's what they

6        listed in here and documented, yes.

7   QUESTIONS BY MR. FARRELL:

8        Q.    And the very first factor for

9   contributing factors, will you read aloud

10  what it says?

11       A.    "Wholesalers or distributors

12  are primarily regulated by the states, with

13  no uniform standards across state borders.

14  States have a comparatively small number of

15  investigators to monitor the licensed

16  wholesalers; thus, given the sheer number of

17  wholesalers, oversight is minimal."

18       Q.    In the very next paragraph it

19  says, "There are thousands of secondary

20  pharmaceutical wholesalers in addition to

21  McKesson, AmerisourceBergen and Cardinal

22  Health, the big three."

23            Do you see that sentence?

24       A.    I see that.

25       Q.    So this is a recognition by big

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharma's own consultant that the chain of

 2    distribution, at least in 2004 with respect

 3    to rogue Internet pharmacies in particular,

 4    was subject to exploitation or abuse.

 5              MS. HENN:  Objection to form.

 6        Outside the scope.

 7    QUESTIONS BY MR. FARRELL:

 8        Q.    Agreed that's what it says?

 9              MS. HENN:  Same objections.

10              THE WITNESS:  Agree that's what

11        it says.

12    QUESTIONS BY MR. FARRELL:

13        Q.    And in fact, McKesson paid a

14    fine for some of these exploitations and

15    abuse in 2008.

16              MS. HENN:  Objection to form.

17    QUESTIONS BY MR. FARRELL:

18        Q.    Agreed?

19        A.    There was a fine as part of the

20    settlement.

21        Q.    Related to this specific topic?

22              MS. HENN:  Objection to form.

23              THE WITNESS:  It was included

24        in the settlement.

25
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     So yes?

 3         A.     Yes.

 4         Q.     So in 2004, we've got big

 5    pharma acknowledging the chain of custody for

 6    wholesalers is subject to exploitation or

 7    abuse because of a lack of oversight?

 8                MS. HENN:  Objection to form.

 9         Outside the scope.

10                THE WITNESS:  Would you say

11         that again?  Ask --

12    QUESTIONS BY MR. FARRELL:

13         Q.     In 2004, big pharma hired Rudy

14    Giuliani's firm to do an evaluation of the

15    chain of distribution of prescription

16    medicines, and what he found was that the

17    chain of distribution was subject to

18    exploitation or abuse because of lack of

19    oversight?

20         A.     That's what's stated in the

21    document, correct.

22         Q.     And that during this time

23    frame, McKesson paid a fine for that very

24    thing?

25                MS. HENN:  Objection to form.
```

```
 1                    THE WITNESS:  In the 2008

 2        settlement, yes.

 3   QUESTIONS BY MR. FARRELL:

 4        Q.     And that fine was related to

 5   McKesson selling an unusual size of

 6   prescription opiate pills to rogue Internet

 7   pharmacies?

 8                    MS. HENN:  Objection to form.

 9                    THE WITNESS:  Can you ask that

10        again, one more time?  Sorry.

11   QUESTIONS BY MR. FARRELL:

12        Q.     Yeah.

13               In this time frame, McKesson

14   ended up paying a fine to the DEA for selling

15   too many opium pills to rogue Internet

16   pharmacies in violation of federal law?

17                    MS. HENN:  Objection to form.

18                    THE WITNESS:  To be accurate,

19        I'd have to look at the document again

20        in terms of specific language, but it

21        was part of the settlement.

22   QUESTIONS BY MR. FARRELL:

23        Q.     We'll get to that after lunch.

24        A.     Okay.

25        Q.     But you acknowledge that what
```

```
 1    Rudy Giuliani said in 2004 came home to roost

 2    with McKesson when it paid a fine in 2008?

 3              MS. HENN:  Objection to form.

 4         Outside the scope.

 5              THE WITNESS:  I don't know if I

 6         would characterize it as coming home

 7         to roost, but they're connected or

 8         they're related.

 9              MR. FARRELL:  Take a break.

10              VIDEOGRAPHER:  The time is

11         12:04 p.m.  We're going off the

12         record.

13          (Off the record at 12:04 p.m.)

14              VIDEOGRAPHER:  The time is

15         1:05 p.m.  We're back on the record.

16              (McKesson-Hartle Exhibit 16

17         marked for identification.)

18    QUESTIONS BY MR. FARRELL:

19         Q.    I'm going to reference

20    Exhibit 16 which we've just had marked.  The

21    top right-hand corner is 2006_09_27,

22    Bates-stamped MCKMDL00478906.

23              Do you recognize this document?

24         A.    I do.

25         Q.    What is it?
```

1       A.      It's a letter from DEA to

2   registrants from Joe Rannazzisi.

3       Q.      Is this -- you might need help

4   with counsel a little bit on this.

5               I don't see where this letter

6   is addressed to McKesson as the recipient;

7   however, this document was produced by

8   McKesson.  And I'm assuming this is the 2006

9   Rannazzisi letter that was sent to McKesson.

10              Is that your understanding?

11      A.      Yes.

12      Q.      So there's no question

13  September 27, 2006, McKesson received this

14  communication.

15              Do you know whether or not

16  there was one document sent to McKesson or

17  there was a letter sent to each of your

18  distribution facilities?

19      A.      That, I do not know.

20              MR. FARRELL:  Okay.  Can I ask,

21          Counsel, do you know?

22              MS. HENN:  I'm sorry, I don't.

23  QUESTIONS BY MR. FARRELL:

24      Q.      Anyway, if in fact there is

25  another document that has a specific one,

 1    you'll agree with me that all of these 2006

 2    letters that were sent out, they were sent

 3    out to all the registrants across the

 4    country?

 5                MS. HENN:  Objection to form.

 6                THE WITNESS:  Yeah, that's what

 7        I believe to be the case, yeah.

 8    QUESTIONS BY MR. FARRELL:

 9        Q.    In fact, the first sentence

10    says --

11        A.    Right.

12        Q.    -- this letter is being sent to

13    every commercial entity in the United

14    States --

15        A.    Right.

16        Q.    -- registered --

17        A.    Whether it went to all of our

18    individual DCs, I can't confirm, but --

19        Q.    But sitting here today as the

20    McKesson corporate designee, you acknowledge

21    receipt of the September 27, 2006 letter from

22    Joe Rannazzisi?

23        A.    Yes.

24        Q.    My understanding -- and we'll

25    get into it other documents -- is that prior

1    to this there was actually meetings with the

2    DEA regarding allegations that you were not

3    complying with your federal regulations; is

4    that fair?

5            MS. HENN:  Objection to form.

6            THE WITNESS:  I'm aware that

7        there were meetings.

8    QUESTIONS BY MR. FARRELL:

9        Q.    I have been unaware of any

10   documents produced related to this time

11   frame, meaning 2004, 2005, 2006, related to

12   the initial investigations or internal

13   documents relating to the DEA's

14   investigation.

15           Have you seen any of those

16   documents?

17           MS. HENN:  Objection to form.

18           THE WITNESS:  Documents prior

19       to -- leading up to the settlement or

20       the investigation?  I don't recall.

21   QUESTIONS BY MR. FARRELL:

22       Q.    Okay.

23       A.    I don't believe so.

24       Q.    I've got some things that we'll

25   go through.  What I'm really curious about,

```
 1    whether or not there was anything prior to

 2    September 27, 2006, that you recall?

 3                MS. HENN:  Objection to form.

 4                THE WITNESS:  Not that I

 5         recall.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    So at this point in time, the

 8    Section 55 policy was still in force and

 9    effect, correct?

10         A.    Yes.

11         Q.    Are you sure?

12         A.    Yes.

13         Q.    Okay.  This letter was

14    received.

15                Do you know whether or not it

16    was circulated amongst McKesson or it was

17    discussed or reviewed or analyzed?

18                MS. HENN:  Objection to form.

19                THE WITNESS:  I'm not

20         100 percent sure I know who all

21         received it, so I can't answer that --

22         I can't answer that specifically.

23    QUESTIONS BY MR. FARRELL:

24         Q.    Did McKesson change its conduct

25    at all based upon this correspondence?
```

1      A.      From what I understand in

2    talking with a former McKesson employee

3    before this deposition, this was mostly a

4    confirmation or a reiteration of the

5    regulations, which McKesson knew, and

6    highlighting things that were -- you know,

7    that the team was doing.  And it was sort of

8    a validation of some of the things that they

9    had been doing, so the red flags and things

10   like that.  So not significant changes that

11   I'm aware of.

12      Q.      Have you had an opportunity to

13   review the 2006 Rannazzisi letter in

14   preparation for today's deposition?

15      A.      Yes.

16      Q.      On behalf of McKesson

17   Corporation, are you willing to affirm,

18   acknowledge and validate all of the

19   statements Mr. Rannazzisi places in his

20   September 27, 2006 correspondence?

21          MS. HENN:  Objection to form.

22      Outside the scope.

23          THE WITNESS:  Could you be more

24      specific?  Validate every single

25      statement and...

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     Yeah.

 3                Paragraph C of the 30(b)(6)

 4    notice asks for "testimony regarding

 5    McKesson's past and present interpretation,

 6    compliance, agreement and/or disagreement

 7    with this letter from the DEA outlining the

 8    duties imposed on a distributor under federal

 9    law."

10                So let's start with this:  Is

11    there anything in this letter that you

12    disagree with?

13                MS. HENN:  Objection to form.

14                THE WITNESS:  I don't believe

15         there's anything I would disagree

16         with.

17    QUESTIONS BY MR. FARRELL:

18         Q.     Is this an accurate statement

19    of the law?

20                MS. HENN:  Objection to form.

21                THE WITNESS:  I believe it is.

22    QUESTIONS BY MR. FARRELL:

23         Q.     So as of September 27, 2006,

24    the DEA is advising McKesson -- not advising,

25    but referencing the fact that there was a
```

Highly Confidential — Subject to Further Confidentiality Review

 1    prescription drug abuse problem in the United

 2    States of America.  That's in the very first

 3    paragraph.

 4                Does McKesson acknowledge that?

 5        A.    Yes.

 6        Q.    The next sentence says, "As

 7    each of you is undoubtedly aware, the abuse,

 8    nonmedical use, of controlled prescription

 9    drugs is a serious and growing health problem

10    in the country."

11                Does McKesson agree and

12    acknowledge that fact as of 2006?

13                MS. HENN:  Objection to form.

14                THE WITNESS:  Yes.

15    QUESTIONS BY MR. FARRELL:

16        Q.    The next full paragraph says,

17    "The Controlled Substances Act was designed

18    by Congress to combat diversion by providing

19    for a closed system of drug distribution in

20    which all legitimate handlers of controlled

21    substances must obtain a DEA registration; as

22    a condition of maintaining such registration,

23    must take reasonable steps to ensure that

24    their registration is not being utilized as a

25    source of diversion."

```
 1                  Does McKesson acknowledge and

 2      agree with that statement?

 3                  MS. HENN:  Objection to form.

 4                  THE WITNESS:  I agree with

 5          that.

 6      QUESTIONS BY MR. FARRELL:

 7          Q.     I'd like you to read the next

 8      sentence aloud, please.

 9          A.     Where it starts "distributors

10      are"?

11          Q.     Yes.

12          A.     "Distributors are, of course,

13      one of the key components of the distribution

14      chain."

15          Q.     Keep going, please.

16          A.     You want me to read the whole

17      paragraph?  Okay.

18                  "If the closed system is to

19      function properly as Congress envisioned,

20      distributors must be vigilant in deciding

21      whether a prospective customer can be trusted

22      to deliver controlled substances only for

23      lawful purposes.  The responsibility is

24      critical, as Congress has expressly declared

25      that the illegal distribution of controlled
```

1  substances has a substantial and detrimental

2  effect on the health and general welfare of

3  the American people."

4      Q.    So again, this is the DEA

5  reiterating what we've discussed before:

6  that failing to abide by the Code of Federal

7  Regulations has a substantial and detrimental

8  effect on the health and general welfare of

9  the American people.

10          Does McKesson agree and

11  acknowledge with that fact?

12          MS. HENN:  Objection to form.

13          THE WITNESS:  Yes.

14  QUESTIONS BY MR. FARRELL:

15      Q.    Go to the next page, page 2,

16  the second full paragraph.  It says,

17  "Nonetheless, given the extent of

18  prescription drug abuse in the United States,

19  along with the potential -- along with

20  dangerous and potentially lethal consequences

21  of such abuse" -- will you please finish that

22  sentence?

23      A.    "Even just one distributor that

24  uses its DEA registration to facilitate

25  diversion can cause enormous harm."

```
 1          Q.     Does McKesson acknowledge and

 2    accept that fact?

 3                 MS. HENN:  Objection to form.

 4                 THE WITNESS:  I agree with

 5          that.

 6    QUESTIONS BY MR. FARRELL:

 7          Q.     If you go down to the third to

 8    last paragraph, it says, "In addition to

 9    reporting all suspicious orders, a

10    distributor has a statutory responsibility to

11    exercise due diligence to avoid filling

12    suspicious orders that might be diverted into

13    other than legitimate medical, scientific and

14    industrial channels."

15                 Does McKesson acknowledge and

16    accept that to be true?

17                 MS. HENN:  Objection to form.

18                 THE WITNESS:  Yes.

19    QUESTIONS BY MR. FARRELL:

20          Q.     And then the last sentence of

21    the next paragraph says at the end, "The

22    distributor should exercise due care in

23    confirming the legitimacy of all orders prior

24    to filing."

25                 Do you see that sentence?
```

```
 1                 Not "filing."  "Prior to
 2      filling."
 3          A.     I see that sentence.
 4          Q.     All right.  Since I butchered
 5      that sentence, will you please read the last
 6      sentence that's highlighted on the screen?
 7          A.     "The distributor should
 8      exercise due care in confirming the
 9      legitimacy of all orders prior to filling."
10          Q.     Now, this is in September
11      of 2006, agreed?
12          A.     Agreed.
13          Q.     And this is a clear statement
14      from the DEA; would you agree with that?
15          A.     I would agree with that.
16          Q.     McKesson's official position is
17      that when it received communications from the
18      DEA, the DEA was clear as of 2006?
19                 MS. HENN:  Objection to form.
20          Also beyond the scope.
21                 THE WITNESS:  The only question
22          I would have about possibility is due
23          care, what the definition of what due
24          care means.
25
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Okay.  Fair.  Fair enough.

 3               If you flip to the next page,

 4    there's a laundry list of due care.

 5               Do you agree on page 3 going

 6    through this, the DEA was clear with McKesson

 7    about the circumstances that might be

 8    indicative of diversion?

 9               MS. HENN:  Objection to form.

10               THE WITNESS:  I wouldn't

11          classify these -- I wouldn't call them

12          due care.  These are to be red flags,

13          indicators.

14    QUESTIONS BY MR. FARRELL:

15         Q.    So in 2006, the DEA is telling

16    McKesson, you have to exercise due care prior

17    to filling an order which you deem to be

18    suspicious, agreed?

19               MS. HENN:  Objection to form.

20               THE WITNESS:  Could you ask

21          that again?  Restate that?

22    QUESTIONS BY MR. FARRELL:

23         Q.    In 2006, the DEA is telling

24    McKesson, you have to exercise due care prior

25    to filling an order which you deem to be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   suspicious, agreed?

 2          A.     That's what's in the document,

 3   yes.

 4          Q.     Okay.  Do you disagree with

 5   that?

 6          A.     That they shared that, they --

 7   I don't disagree with that.

 8          Q.     Yet your Section 55 policy, you

 9   testified this morning, you were shipping

10   suspicious orders?

11              MS. HENN:  Objection to form.

12              THE WITNESS:  There was a

13       process by which those reports were

14       reviewed, which I would consider to be

15       part of due care in a review.

16   QUESTIONS BY MR. FARRELL:

17          Q.     Is there a due care file for

18   each of those?

19              MS. HENN:  Objection to form.

20              THE WITNESS:  Not that I'm

21       aware of.

22   QUESTIONS BY MR. FARRELL:

23          Q.     So there's no documentation of

24   the due care of each suspicious order that

25   was shipped by McKesson in accordance with
```

```
 1    the July 2000 policies and procedures?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  Could you restate

 4         that, please?

 5    QUESTIONS BY MR. FARRELL:

 6         Q.     Is there any documentation of

 7    the due care performed by McKesson from

 8    July 2000 onward pursuant to Section 55 with

 9    regard to suspicious orders that were

10    shipped?

11              MS. HENN:  Objection to form.

12         Outside the scope.

13              THE WITNESS:  I can't speak to

14         the specific documentation and how it

15         was documented those reviews that were

16         conducted of those specific reports

17         that were generated.  Could have been

18         documentation on a form.

19    QUESTIONS BY MR. FARRELL:

20         Q.     Have you seen such

21    documentation?

22              MS. HENN:  Objection to form.

23              THE WITNESS:  I haven't

24         personally seen examples of that.

25
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    Have you seen any piece of

 3   paper that indicates that the suspicious

 4   orders that were shipped were subject to a

 5   due diligence review beforehand, from

 6   July 2000 to 2007?

 7             MS. HENN:  Objection to form.

 8        Outside the scope.

 9   QUESTIONS BY MR. FARRELL:

10        Q.    It doesn't mean they don't

11   exist.

12        A.    Right.

13        Q.    I'm just asking if you've seen

14   them.

15             MS. HENN:  Same objections.

16             THE WITNESS:  I don't believe

17        I've seen -- I haven't seen examples.

18   QUESTIONS BY MR. FARRELL:

19        Q.    So you're taking it on faith

20   that due diligence was, in fact, performed?

21             MS. HENN:  Objection to form.

22        Outside the scope.

23             THE WITNESS:  From what I

24        understand and some of the

25        conversations I've had, that due
```

```
 1        diligence processes did happen and

 2        exist, yes.

 3   QUESTIONS BY MR. FARRELL:

 4        Q.    Well, you'll agree with me that

 5   Section 55 seems to indicate that there's no

 6   subjective involvement regarding the

 7   reporting of suspicious orders; it was a

 8   statistical fact.

 9             MS. HENN:  Objection to form.

10        Outside the scope.

11             THE WITNESS:  Can you ask that

12        one again?

13   QUESTIONS BY MR. FARRELL:

14        Q.    Yeah, I'm not trying to play

15   word games.

16        A.    I know.

17        Q.    It appears from the Section 55

18   policy that's in writing that McKesson's

19   position was to eliminate subjective review

20   of whether or not a suspicious order was

21   reportable, and that the policy states if

22   it's deemed suspicious as a statistical fact,

23   it should be reported to the DEA.  Agreed?

24             MS. HENN:  Objection to form.

25        Outside the scope.
```

```
 1                    THE WITNESS:  Agreed.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.    So every single order that was

 4   deemed suspicious by your monitoring program

 5   should have been reported to the DEA from

 6   July 2000, at least through Rannazzisi's 2006

 7   letter?

 8                    MS. HENN:  Objection to form.

 9        Outside the scope.

10                    THE WITNESS:  I believe that's

11        the case, to have faxed that or sent

12        it to the local diversion office.

13   QUESTIONS BY MR. FARRELL:

14        Q.    If McKesson did not report

15   those orders, it was in violation of federal

16   law, agreed?

17                    MS. HENN:  Objection to form.

18        Outside the scope.

19                    THE WITNESS:  Can you ask that

20        one again or restate?

21   QUESTIONS BY MR. FARRELL:

22        Q.    Yeah.  It's a hypothetical.

23        A.    Right.

24        Q.    If McKesson did not report

25   suspicious orders detected following the
```

```
 1    July 2000 Section 55 policy -- let me start

 2    over.  Let me see if I can make this as

 3    simple as possible.

 4                Beginning in July of the year

 5    2000 --

 6        A.    Okay.

 7        Q.    -- if McKesson did not report a

 8    suspicious order it detected pursuant to the

 9    Section 55 policy, McKesson was in violation

10    of federal law; agreed or disagree?

11                MS. HENN:  Objection to form.

12            Outside the scope.

13                THE WITNESS:  I agree that it

14            would -- it's -- I don't know.  Maybe

15            ask it again.  I apologize for pausing

16            here.

17    QUESTIONS BY MR. FARRELL:

18        Q.    It's an important question.

19        A.    Yeah.

20        Q.    McKesson has a statutory and

21    regulatory responsibility under federal

22    law --

23        A.    Right.

24        Q.    -- to report suspicious orders

25    to the DEA?
```

 1          A.      Correct.

 2          Q.      McKesson, in July of 2000,

 3   adopted a policy that we've been referring to

 4   as Section 55 --

 5          A.      Correct.

 6          Q.      -- to do that very thing?

 7          A.      Correct.

 8          Q.      That policy states that it's

 9   not a subjective determination of whether to

10   report; it's a statistical fact of whether

11   you should report?

12              MS. HENN:  Objection to form.

13              THE WITNESS:  The report is a

14      statistical -- a statistically

15      generated one, yes.

16   QUESTIONS BY MR. FARRELL:

17          Q.      And whether to report it to the

18   DEA is not a subjective determination; it's

19   mandatory if you detect a suspicious order?

20              MS. HENN:  Objection to form.

21      Outside the scope.

22              THE WITNESS:  I believe that to

23      be the case.

24   QUESTIONS BY MR. FARRELL:

25          Q.      So if you didn't do that, it's

```
 1    a violation of federal law?

 2                MS. HENN:  Objection to form.

 3         Outside the scope.

 4                THE WITNESS:  I believe so.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    Big if, right?

 7         A.    If, right.

 8         Q.    If that happened, if McKesson

 9    detected a suspicious order following the

10    Section 55 enactment and did not report it to

11    the DEA, that's a violation of federal law?

12         A.    If.

13                MS. HENN:  Objection to form.

14                (McKesson-Hartle Exhibit 17

15         marked for identification.)

16    QUESTIONS BY MR. FARRELL:

17         Q.    I'm going to mark what's going

18    to be Exhibit 17.  The document ID is

19    2007_04_25.  I apologize, there is no MDL

20    Bates stamp that I could locate; however,

21    there is a prior production Bates stamp of

22    MCK-HOI-002 dash a whole bunch of zeros and

23    then 1.

24                I'll give you a few minutes to

25    look through this.
```

```
 1                    Sir, have you seen this

 2   document before today?

 3        A.    I don't believe I've seen this

 4   specific one.

 5        Q.    I'll give you a minute to

 6   review.

 7        A.    Okay.  I've read that.  Thank

 8   you for taking the time.

 9        Q.    No problem.

10                    So to start off with on this

11   exhibit, you acknowledge that there was a

12   meeting with the DEA on April 5, 2007.  It's

13   from the very first paragraph.

14        A.    Yes.

15        Q.    So at this point in time, the

16   DEA had issued an order to show cause against

17   McKesson, agreed?

18        A.    Correct.

19        Q.    I've yet to see any

20   documentation of anything that predates

21   April 25, 2007, related to this

22   investigation.

23                    Have you seen such documents?

24                    MS. HENN:  Objection to form.

25                    THE WITNESS:  I don't believe
```

 1          so, no.

 2     QUESTIONS BY MR. FARRELL:

 3          Q.     To the extent that such

 4     documents do exist, we again reserve our

 5     right to come back and discuss them further,

 6     subject to the objection of counsel.

 7               But for what we have here, this

 8     appears that at least in April of 2007, the

 9     DEA had already issued a rule to show cause

10     complaining that one of your distribution

11     centers was not following federal law,

12     agreed?

13               MS. HENN:  Objection to form.

14               THE WITNESS:  That's what they

15          alleged.

16     QUESTIONS BY MR. FARRELL:

17          Q.     When you go to page 2 under

18     Proposed Action Plan, does this indicate to

19     you that McKesson is acknowledging that they

20     need to do better to comply with federal law?

21               MS. HENN:  Objection to form.

22               THE WITNESS:  I think this is

23          acknowledge -- excuse me --

24          acknowledgement of just improvements

25          in the program, taking information in

1          to evolve the program based on

2          collaboration with DEA and information

3          they're receiving.

4     QUESTIONS BY MR. FARRELL:

5          Q.    You're in management, are you

6     not?

7          A.    I am.

8          Q.    And have you ever written a

9     proposed action plan for an employee?

10          A.    I have.

11          Q.    And is it just to document

12     something new, or are you trying to correct

13     something?

14               MS. HENN:  Objection to form.

15               THE WITNESS:  There can be many

16          different types of action plans.  I've

17          done both.

18     QUESTIONS BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12    QUESTIONS BY MR. FARRELL:

13         Q.    As a McKesson corporate

14    designee, are you willing to admit here today

15    that as of April 25, 2007, McKesson was not

16    fulfilling its obligations under federal law

17    regarding the monitoring of the distribution

18    of controlled substances?

19              MS. HENN:  Objection to form.

20              THE WITNESS:  Can you ask that

21         again, please?

22    QUESTIONS BY MR. FARRELL:

23         Q.    As a McKesson corporate

24    designee, are you willing to admit here today

25    that as of April 25, 2007, McKesson was not

Highly Confidential - Subject to Further Confidentiality Review

1   fulfilling its obligations under federal law

2   regarding the distribution of controlled

3   substances?

4               MS. HENN:  Objection to form.

5               THE WITNESS:  I believe in

6        partnership with DEA and always in

7        good faith, McKesson was believed to

8        be compliant with the regulations.

9   QUESTIONS BY MR. FARRELL:

10       Q.     I understand that McKesson as a

11  corporate entity -- McKesson, it's not a

12  person, right?  McKesson Corporation is a

13  fictional piece of paper that creates a

14  business model, agreed?

15              MS. HENN:  Objection to form.

16  QUESTIONS BY MR. FARRELL:

17       Q.     Is there a Mr. McKesson still

18  running the company?

19       A.     No, there's not.

20       Q.     All right.  So McKesson is a

21  corporation?

22       A.     Agreed.  I understand that.

23       Q.     And in April of 2007, it was

24  meeting with the federal government, the DEA,

25  and changing the way it was doing business,

```
 1   agreed?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  Changing,

 4        enhancing, adding.

 5   QUESTIONS BY MR. FARRELL:

 6        Q.    Okay.  And in part, it was

 7   because McKesson was not fulfilling its

 8   obligations under federal law?

 9              MS. HENN:  Objection to form.

10   QUESTIONS BY MR. FARRELL:

11        Q.    Can that even be disputed?

12              MS. HENN:  Same objection.

13   QUESTIONS BY MR. FARRELL:

14        Q.    You paid a $13 million fine as

15   a result of this investigation.

16              Can you not acknowledge today,

17   in 2007 there were shortcomings in your

18   controlled substance monitoring program?

19              MS. HENN:  Objection to form.

20              THE WITNESS:  We denied those

21        allegations in that settlement, and we

22        obviously -- as any program does,

23        wants to improve and expand and take

24        new information in.

25
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    So you paid $13 million as a

 3   tax write-off?

 4             MS. HENN:  Objection to form.

 5             THE WITNESS:  As a settlement

 6        between both parties.

 7   QUESTIONS BY MR. FARRELL:

 8        Q.    To settle what?  Allegations of

 9   what?

10             MS. HENN:  Objection to form.

11             THE WITNESS:  Issues related to

12        the regulations.

13   QUESTIONS BY MR. FARRELL:

14        Q.    The allegations were that

15   McKesson was not fulfilling its obligations

16   under federal law, agreed?

17        A.    That was the allegations.

18        Q.    And McKesson wrote an action

19   plan and paid a fine to the DEA to get a

20   release for its conduct?

21             MS. HENN:  Objection to form.

22             THE WITNESS:  I think that's

23        accurate.  We did.

24   QUESTIONS BY MR. FARRELL:
```

Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12        Q.      In fact, nobody in the country

13   was doing thresholds prior to this?

14              MS. HENN:  Objection to form.

15        Outside the scope.

16              THE WITNESS:  I'm not aware if

17        others were.

4    QUESTIONS BY MR. FARRELL:

5         Q.    So going back to the 2006

6    Rannazzisi letter, this is an acknowledgement

7    under the shipping requirement that you must

8    halt suspicious orders until due diligence is

9    performed?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  Can you ask that

12        again or restate that, please?

13   QUESTIONS BY MR. FARRELL:

14        Q.    Mr. Rannazzisi, in his 2006

15   letter from the DEA to McKesson, informed

16   McKesson of its duty to halt suspicious

17   orders, agreed?

18        A.    Was that the specific language

19   or was that the due --

20        Q.    We can go back and take a look

21   at it.

22        A.    Yeah.  Exercise due care.

23        Q.    I mean, I don't care what

24   standard we're using right now; you can say

25   due diligence or due care.  But the idea

1    being is in 2006, the DEA is telling McKesson

2    if you get a suspicious order, you have to

3    halt and you cannot ship it until you look

4    into it.

5              MS. HENN:  Objection to form.

6              THE WITNESS:  Can we look at

7        that specific language?

8    QUESTIONS BY MR. FARRELL:

9        Q.    Sure.

10       A.    Can you point it out to me?

11       Q.    I hope so.  2006_09_27, page 2,

12   beginning with the paragraph, "Thus,"

13   two-thirds of the way down, "in addition to

14   reporting all suspicious orders" -- right?

15   What does that say?  "In addition to

16   reporting all suspicious orders."

17             "All" means what?

18       A.    All.

19       Q.    So if you get a suspicious

20   order, what is McKesson supposed to do?

21       A.    To report it.

22       Q.    And if you don't, is that

23   lawful or unlawful?

24             MS. HENN:  Objection to form.

25             THE WITNESS:  That doesn't meet

```
 1          the expectation or the guideline that

 2          they lay out in this communication.

 3    QUESTIONS BY MR. FARRELL:

 4          Q.    Which makes -- and that

 5    guideline is premised upon what?

 6               MS. HENN:  Objection to form.

 7               THE WITNESS:  The CFR.

 8    QUESTIONS BY MR. FARRELL:

 9          Q.    And so that makes it lawful or

10    unlawful?

11               MS. HENN:  Objection to form.

12               THE WITNESS:  Unlawful.

13    QUESTIONS BY MR. FARRELL:

14          Q.    The next part:  "A distributor

15    has a statutory responsibility to exercise

16    due diligence to avoid filling suspicious

17    orders."

18               Agreed?

19          A.    I agree with that language.  It

20    doesn't say -- that's not halt.

21          Q.    Well, it's a halt until you do

22    due diligence --

23          A.    Yeah.

24          Q.    -- right?

25          A.    It's not a block.  Yeah, it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   a...

 2        Q.     Maybe this is just a

 3   terminology issue.

 4        A.     Might be.

 5        Q.     Block -- all I'm saying is, is

 6   that McKesson's not allowed to ship a

 7   suspicious order without looking into it

 8   first, agreed?

 9             MS. HENN:  Objection to form.

10             THE WITNESS:  That's how I read

11        that language.

12   QUESTIONS BY MR. FARRELL:

13        Q.     That is the law?

14        A.     Yeah.

15        Q.     Yes?

16             MS. HENN:  Objection to form.

17             THE WITNESS:  The law is to

18        design a system to identify suspicious

19        orders.

20   QUESTIONS BY MR. FARRELL:

21        Q.     That's one part of the law.

22        A.     Right.

23        Q.     What does the CFR say?

24             MS. HENN:  Objection to form.

25             THE WITNESS:  To identify
```

```
 1          orders of unusual size, pattern and

 2          frequency.

 3     QUESTIONS BY MR. FARRELL:

 4          Q.     And so if you ship a suspicious

 5     order without doing due diligence, is that

 6     lawful or unlawful?

 7               MS. HENN:  Objection to form.

 8               THE WITNESS:  Again, I'm -- the

 9          CFR says you must design and operate a

10          system, right, and to identify

11          suspicious orders.  I don't believe it

12          says to halt them.

13     QUESTIONS BY MR. FARRELL:

14          Q.     It does?

15          A.     In that specific language.

16          Q.     It does or does not?

17          A.     Does not.

18          Q.     Is your interpretation of

19     federal law that you're allowed to ship a

20     suspicious order without conducting due

21     diligence?

22               MS. HENN:  Objection to form.

23     QUESTIONS BY MR. FARRELL:

24          Q.     Maybe this explains why

25     McKesson paid a $150 million fine.
```

```
 1                    MS. HENN:  Objection to form.
 2   QUESTIONS BY MR. FARRELL:
 3        Q.     Let's get back to it.
 4               Masters Pharmaceutical has a
 5   reporting requirement and a shipping
 6   requirement.  We reviewed it this morning,
 7   agreed?
 8        A.     Parts of it, correct.  Agreed.
 9        Q.     It's premised upon a code
10   provision.  The United States Congress passed
11   a US Code provision in 1970, agreed?
12        A.     Agreed.
13        Q.     And it passed -- the Department
14   of Justice enacted regulations which are
15   binding as federal law related to this very
16   topic, agreed?
17        A.     Agreed.
18        Q.     And if you don't follow those
19   rules, McKesson can be fined by the federal
20   government?
21        A.     Agreed.
22        Q.     McKesson's been fined twice
23   that I know of, once for 13 million in 2008
24   and once for 150 million in 2017, for
25   violating these very laws.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  That's what was

 3        alleged.

 4   QUESTIONS BY MR. FARRELL:

 5        Q.    So my question to you is:  Is

 6   that the shipping requirement that you have

 7   to halt a suspicious order under federal law

 8   until you do due diligence is and always has

 9   been the law in the United States of America?

10              MS. HENN:  Objection to form.

11        Outside the scope.

12              THE WITNESS:  Can you ask that

13        again, please?

14   QUESTIONS BY MR. FARRELL:

15        Q.    The shipping requirement and

16   the reporting requirement as outlined in the

17   Masters Pharmaceutical case is and always has

18   been the law in the United States of America?

19              MS. HENN:  Objection to form.

20        Outside the scope.

21              THE WITNESS:  I believe that's

22        the law.  I mean...

23   QUESTIONS BY MR. FARRELL:

24        Q.    Well, you're McKesson --

25              MS. HENN:  Did you finish your
```

1     answer?

2              THE WITNESS:  I did.  I didn't

3        really have a -- yeah.

4              MS. HENN:  Okay.  Just making

5        sure.

6     QUESTIONS BY MR. FARRELL:

7        Q.     So your answer is yes?

8              MS. HENN:  Objection to form.

9              THE WITNESS:  Yes.

10    QUESTIONS BY MR. FARRELL:

11       Q.     I don't want to -- I don't want

12    you to hesitate.

13       A.     I'm not a legal expert.

14       Q.     I'm not asking you to be a

15    legal expert.

16       A.     Right.

17       Q.     I'm asking McKesson

18    Corporation -- I know this -- to be fair, I

19    understand you are in a role with McKesson

20    being asked to step in the shoes of a

21    corporation and answer on its behalf.

22       A.     Right.

23       Q.     So I'm not trying to be rude,

24    and I know I'm pressing you.

25       A.     Right.

1    Q.    But what I'm trying to do is,

2  for the record, create McKesson's position.

3  And I've asked for McKesson to designate

4  someone to announce its position, and

5  fortunately it's you.

6           So let me repeat the question.

7  The shipping requirement and the reporting

8  requirement as outlined and defined in the

9  Masters Pharmaceutical case is and always has

10  been the law in the United States of America;

11  agree or disagree?

12           MS. HENN:  Object to the form

13      of the question.  It's outside the

14      scope.

15           THE WITNESS:  I agree that

16      that's the law.

17  QUESTIONS BY MR. FARRELL:

18    Q.    And if you don't follow the

19  law, that makes it unlawful?

20           MS. HENN:  Objection to form.

21           THE WITNESS:  If you don't

22      follow a law, that would be unlawful.

23  QUESTIONS BY MR. FARRELL:

24    Q.    And if you don't follow the

25  shipping requirement, that's unlawful?

```
 1                    MS. HENN:  Objection to form.

 2                    THE WITNESS:  And if you don't

 3           follow the law, I would agree.

 4   QUESTIONS BY MR. FARRELL:

 5           Q.    And if you don't follow the

 6   reporting requirement, that's the law?

 7                    MS. HENN:  Objection to form.

 8                    THE WITNESS:  Again, if you

 9           don't follow the law, if you don't

10           follow the guidelines, it would be

11           unlawful.

12   QUESTIONS BY MR. FARRELL:

13           Q.    So when you look at paragraph 7

14   of Exhibit 17, the 2007 correspondence from

15   McKesson to the DEA, you are announcing that

16   you're going to adopt new measures,

17   additional measures, revised, amended,

18   changed, more measures, to comply with

19   federal law?

20                    MS. HENN:  Objection to form.

21   QUESTIONS BY MR. FARRELL:

22           Q.    Agree or disagreed?

23                    MS. HENN:  Objection to form.

24                    THE WITNESS:  We're

25           communicating that we were enhancing
```

```
 1        the program.
 2   QUESTIONS BY MR. FARRELL:
 3        Q.     In response to allegations that
 4   you were not fulfilling your obligations
 5   under the shipping requirement and reporting
 6   requirement?
 7             MS. HENN:  Objection to form.
 8             THE WITNESS:  In part due to
 9        allegations.
10   QUESTIONS BY MR. FARRELL:
11        Q.     Now, this letter is addressed
12   to Linden Barber.
13             Do you know who Linden Barber
14   is?
15        A.     I've heard of Linden Barber.
16        Q.     How have you heard of him?
17        A.     Just in my past experience even
18   prior to McKesson, knowing he was in DEA.
19        Q.     Do you know where he is now?
20        A.     He's at Cardinal.
21        Q.     Cardinal Health?
22             How come you-all didn't hire
23   him?
24        A.     I can't speak to that.  I don't
25   know.  I'm confident in the people we have on
```

Highly Confidential - Subject to Further Confidentiality Review

1    the team.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





12      Q.      Perfect.

13              Have you seen the customer

14   files for Cuyahoga County and Summit County?

15      A.      I have not.

16      Q.      Me either.

17              Do they exist?

18      A.      I can't speak to that.  I don't

19   know.

20      Q.      Okay.  One of the 30(b)(6)

21   topics that I asked was to talk about these

22   due diligence files.

23              You're telling me you haven't

24   seen any of the due diligence files for any

25   pharmacy in Summit County and Cuyahoga

```
 1   County?

 2              MS. HENN:  Objection to form.

 3       Outside the scope.

 4   QUESTIONS BY MR. FARRELL:

 5       Q.    It's okay if you haven't, and I

 6   don't want you guessing.

 7       A.    No, I understand.

 8              I've seen files.  I don't know

 9   about files during this time frame with a

10   Level 1, 2 or 3 review.  I can't recall.

11       Q.    Let me ask you this:  How --

12   how many pharmacies in May of 2007, in

13   Cuyahoga and Summit County, do you reckon

14   ordered more than 8,000 pills of hydrocodone

15   or oxycodone?

16              MS. HENN:  Objection to form.

17       Outside the scope.

18              THE WITNESS:  I don't know.

19       I'd be guessing.

20   QUESTIONS BY MR. FARRELL:

21       Q.    Let's say there's ten.  Should

22   there be ten customer files that document why

23   McKesson was exceeding 8,000 pills a month?

24              MS. HENN:  Objection to form.

25              THE WITNESS:  There should be
```

 1      documentation.

 2  QUESTIONS BY MR. FARRELL:

 3      Q.      And if there was no due

 4  diligence performed but those pills were

 5  still shipped, is that lawful or unlawful?

 6          MS. HENN:  Objection to form.

 7  QUESTIONS BY MR. FARRELL:

 8      Q.      Do you want me to repeat the

 9  question?

10      A.      Sure.

11      Q.      If, if, if, three ifs, no due

12  diligence was performed, yet McKesson still

13  shipped more than 8,000 oxycodone pills to a

14  pharmacy in Cuyahoga or Summit County in May

15  of 2007, is that lawful or unlawful according

16  to the federal regulations?

17          MS. HENN:  Objection to form.

18  QUESTIONS BY MR. FARRELL:

19      Q.      Why are you struggling with

20  this?

21      A.      I'm just thinking.  I mean,

22  it's -- if it's -- it wouldn't be lawful.

23      Q.      That makes it...

24      A.      If there weren't documentation.

25  Or due diligence, excuse me.

```
 1          Q.     Then it would be lawful or

 2   unlawful?

 3                 MS. HENN:  Objection to form.

 4                 THE WITNESS:  It would be

 5          unlawful.

 6   QUESTIONS BY MR. FARRELL:

 7          Q.     So it's summarizing altogether.

 8   If in May of 2007 McKesson is shipping to a

 9   pharmacy in Cuyahoga or Summit County,

10   Cleveland, Ohio, or Akron, Ohio, more than

11   8,000 pills of hydrocodone or more than 8,000

12   pills of oxycodone, without conducting a due

13   diligence review, then McKesson is engaging

14   in unlawful conduct according to federal law,

15   agreed?

16                 MS. HENN:  Objection to form.

17                 THE WITNESS:  Can you ask it

18          again?  I apologize.  Let's pause

19          here.  I'm not a lawyer.

20   QUESTIONS BY MR. FARRELL:

21          Q.     I know you're not.  And again,

22   I'm going to reiterate --

23          A.     There's discretion in how this

24   due diligence is done and documented, so I'm

25   trying to understand.
```

```
 1          Q.     That's right.  So -- you're

 2   right.  So let me see if I can say it again.

 3                 If in May of 2007 McKesson

 4   Corporation is shipping to a pharmacy in

 5   Cuyahoga or Summit County, Cleveland, Ohio,

 6   or Akron, Ohio, more than 8,000 pills of

 7   oxycodone or more than 8,000 pills of

 8   hydrocodone without conducting due diligence,

 9   then McKesson Corporation is engaging in

10   unlawful conduct according to federal law?

11                 MS. HENN:  Object to form.

12                 THE WITNESS:  I don't know how

13        to answer that exactly.  It depends.

14   QUESTIONS BY MR. FARRELL:

15          Q.     Depends on what?

16                 If you ship more than 8,000

17   pills without conducting due diligence,

18   McKesson is engaging in unlawful conduct

19   according to federal law?

20                 MS. HENN:  Objection to form.

21                 Go ahead.

22                 THE WITNESS:  It can be

23        interpreted that way.  I mean, it --

24   QUESTIONS BY MR. FARRELL:

25          Q.     Well, the DEA certainly
```

1    interprets it that way, agreed?

2         A.      They have.

3         Q.      And McKesson has paid fines

4    based on that DEA interpretation, agreed?

5                 MS. HENN:  Objection to form.

6                 THE WITNESS:  We've paid fines.

7         Again, we're --

8    QUESTIONS BY MR. FARRELL:

9         Q.      Based on the allegations by the

10   DEA that you shipped suspicious orders

11   without conducting due diligence?

12                MS. HENN:  Objection to form.

13                Go ahead.

14                THE WITNESS:  Based on those

15        allegations.

16   QUESTIONS BY MR. FARRELL:

17        Q.      Yes.

18        A.      Right.

19        Q.      The answer is yes?

20        A.      Yes.

21        Q.      See, a yes just gets me moving

22   faster.  Oh, this one's gonna be fun.

23                MR. FARRELL:  Why don't we take

24        a quick break.

25                MS. HENN:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  The time is

 2        2:08 p.m., and we're going off the

 3        record.

 4         (Off the record at 2:08 p.m.)

 5                VIDEOGRAPHER:  The time is

 6        2:20 p.m., and we're back on the

 7        record.

 8                (McKesson-Hartle Exhibit 18

 9        marked for identification.)

10   QUESTIONS BY MR. FARRELL:

11        Q.    The next exhibit we're going to

12   have marked is Exhibit 18.

13                For reference, the top

14   right-hand corner is 2007_04_XX.  The reason

15   it's XX is the metadata has not yet told me

16   what day of the month it is.

17                Do you know what day of the

18   month this conference was back in 2007?

19        A.    I can't think off the top of my

20   head, no.  Yeah.

21        Q.    The Bates stamp, we have a MDL

22   Bates stamp of MCKMDL00403340.

23                Do you recognize this document?

24        A.    I do.

25        Q.    What is it?
```

1      A.     This is a presentation given by

2   Don Walker about -- at a company meeting

3   about the Lifestyle Drug Program.

4      Q.     And Don Walker at the time

5   was -- would be working for McKesson?

6      A.     Yes.

7      Q.     So this is a McKesson document?

8      A.     Excuse me, yes.

9      Q.     It's produced in the MDL by the

10  McKesson lawyers?

11     A.     Yes.

12     Q.     From the McKesson files?

13     A.     Yes.

14     Q.     And is a true and accurate copy

15  of the presentation given at the national

16  operations conference in 2007?

17          MS. HENN:  Objection to form.

18          THE WITNESS:  Yes, I believe

19      so.  I wasn't there, but I believe so,

20      yeah.

21  QUESTIONS BY MR. FARRELL:

22     Q.     So this national operations

23  conference 2007, this is a conference that is

24  just for McKesson employees.  Is that your

25  understanding?

```
 1          A.     Yeah, they typically are.

 2          Q.     It's from -- Mr. Boggs

 3   testified about it previously.  So this was

 4   in 2007.  Management basically gets together,

 5   and Don Walker is the senior vice president

 6   of distribution operations, is giving a

 7   presentation on a number of topics in the

 8   form of a PowerPoint slide?

 9          A.     Correct.

10                 MS. HENN:  Objection to form.

11   QUESTIONS BY MR. FARRELL:

12          Q.     Yes?

13          A.     Correct.

14          Q.     So the title of this is

15   "Lifestyle Drugs and Internet Pharmacies."

16                 "Lifestyle drugs" is an

17   interesting choice of words.

18                 Do you know where it came from?

19          A.     It's my understanding that's

20   the language that was -- the DEA used as well

21   and had referenced.

22          Q.     Some of the files that I've

23   seen has the DEA asking McKesson where you

24   came up with the oxycodone, hydrocodone and

25   opium pills as lifestyle drugs.
```

```
1              MS. HENN:  Objection to form.

2              THE WITNESS:  All I can tell

3         you is I -- what I've heard is that

4         it's the term that came from DEA.

5  QUESTIONS BY MR. FARRELL:

6         Q.    On page 2, it identifies

7  several different topics:  public health

8  issue, DEA focus, McKesson involvement,

9  current status, and Lifestyle Drug Monitoring

10 Program.  So these will be our jeopardy

11 questions today.

12              Public health issues.  Can you

13 read what the very -- on page 3, can you read

14 what the first item is?

15        A.    "Abuse of prescription drugs

16 has risen 66 percent since 2000."

17        Q.    So this is McKesson telling

18 McKesson employees that we're in the business

19 of selling opium pills, and abuse has risen

20 66 percent since 2000.

21              Does that not give you,

22 Mr. McKesson Corporation, pause to think

23 about whether or not your role in the chain

24 of distribution is contributing to the abuse?

25              MS. HENN:  Objection to form.
```

```
1                    THE WITNESS:  Can you ask that

2         again, please?

3    QUESTIONS BY MR. FARRELL:

4         Q.    This is McKesson telling

5    McKesson employees that abuse of prescription

6    drugs has risen 66 percent since the year

7    2000.

8                    Does that not give you,

9    Mr. McKesson Corporation, pause to think

10   about whether or not your role in the chain

11   of distribution is contributing to such

12   abuse?

13                   MS. HENN:  Objection to form.

14                   THE WITNESS:  I think it's --

15        it should give everybody pause that

16        that was the trend that was going on,

17        and it's a piece of information shared

18        with leaders to inform them.  So --

19   QUESTIONS BY MR. FARRELL:

20        Q.    But not everybody is selling

21   opium pills; McKesson is.

22                   MS. HENN:  Counsel, can we just

23        make sure we let the witness finish

24        his answers?

25                   MR. FARRELL:  Sure.  I was
```

```
 1              trying to make a snarky remark.

 2                   MS. HENN:  Thank you.

 3    QUESTIONS BY MR. FARRELL:

 4         Q.     Not everyone is engaged in the

 5    chain of distribution of opium pills, though?

 6                   MS. HENN:  Objection to form.

 7                   THE WITNESS:  Agree.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.     So I'm asking you, McKesson

10    Corporation, whether or not you have any

11    regrets about selling so many opium pills.

12                   MS. HENN:  Objection to form.

13              Outside the scope.

14                   THE WITNESS:  Back to your

15              question about this, I would -- sure

16              that gives you pause, I mean, to

17              understand that there's an epidemic

18              out there.  And clearly there's many

19              players involved in the flow of

20              distribution.

21    QUESTIONS BY MR. FARRELL:

22         Q.     As of 2007, McKesson is

23    recognizing that opioid painkillers kill more

24    than cocaine and heroin combined, agreed?

25                   MS. HENN:  Objection to form.
```

```
 1                    THE WITNESS:  Agree.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.    And these are McKesson's words.

 4              Where is McKesson getting this

 5   data from?

 6              MS. HENN:  Objection to form.

 7        Outside the scope.

 8              THE WITNESS:  I don't know

 9        specifically where they -- their

10        source of data for that particular

11        line, but information from different

12        sources.  Could be DEA, could be CDC,

13        it could be wherever.

14   QUESTIONS BY MR. FARRELL:

15        Q.    It says here, "Rogue Internet

16   pharmacies distributing oxycodone,

17   hydrocodone, phentermine and alprazolam," yet

18   McKesson was selling to rogue Internet

19   pharmacies, true?

20              MS. HENN:  Objection to form.

21        Outside the scope.

22              THE WITNESS:  Can you ask that

23        again, please?

24   QUESTIONS BY MR. FARRELL:

25        Q.    McKesson is noting that rogue
```

1    Internet pharmacies are selling oxycodone and

2    hydrocodone, yet what's missing from this

3    slide is the fact that McKesson was supplying

4    the pills to the rogue Internet pharmacies.

5                  MS. HENN:  Objection to form.

6                  THE WITNESS:  And what's your

7         specific question again?

8    QUESTIONS BY MR. FARRELL:

9         Q.     What gives?

10                 MS. HENN:  Objection to form.

11                 THE WITNESS:  I don't know what

12        type of response a "what gives"

13        question is.

14   QUESTIONS BY MR. FARRELL:

15        Q.     Yeah.  You're noting that

16   people are dying, and part of the reason is

17   that rogue Internet pharmacies are out there.

18   Yet McKesson, during this time frame, is

19   selling to some of those very same Internet

20   pharmacies, and that's what the DEA fined you

21   for.

22                 So is this ignorance of who

23   you're selling to?  Is this repackaging,

24   reframing the issue?  Or is it just flat out

25   a misrepresentation?

```
 1              MS. HENN:  Objection to form.

 2         Outside the scope.

 3              THE WITNESS:  This is raising

 4         awareness in -- about the issues that

 5         are the public health issues,

 6         communicating with leaders and sharing

 7         the -- where McKesson is enhancing the

 8         program.

 9   QUESTIONS BY MR. FARRELL:

10         Q.    But you understand that the

11   rogue Internet pharmacies were getting their

12   pills from, among other people, McKesson,

13   agreed?

14         A.    I understand.

15              MS. HENN:  Objection to form.

16   QUESTIONS BY MR. FARRELL:

17         Q.    Agreed?

18         A.    I understand.  Agreed.

19         Q.    I'm asking if you understand.

20   I want you to confirm that the rogue Internet

21   pharmacies were in fact getting some of their

22   pills from McKesson.

23              MS. HENN:  Objection to form.

24              THE WITNESS:  I don't have

25         specific details on that, but --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     You understand that to be true?

 3        A.     -- I understand that to be

 4   true.

 5        Q.     So McKesson Corporation admits

 6   it was selling oxycodone and hydrocodone to

 7   rogue Internet pharmacies in and around 2007?

 8             MS. HENN:  Objection to form.

 9        Outside the scope.

10             THE WITNESS:  Again, I don't

11        know the specific examples and --

12   QUESTIONS BY MR. FARRELL:

13        Q.     I'm not asking for specific

14   examples.

15        A.     Right.

16        Q.     I'm asking you to confirm that

17   in 2007, McKesson Corporation was selling

18   oxycodone and hydrocodone to rogue Internet

19   pharmacies.

20             MS. HENN:  Objection to form.

21             And, Counsel, I'll just ask you

22        to let him finish his answers so that

23        he can get his answers out.

24             MR. FARRELL:  Yes, ma'am.

25             THE WITNESS:  Again, I don't
```

```
 1          have the specific examples.  I believe
 2          that to be true, but I don't know the
 3          specific details.
 4     QUESTIONS BY MR. FARRELL:
 5          Q.     The next page, page 4,
 6     "Internet pharmacies."  It says,
 7     "Investigative work hours have doubled."
 8               Do you know what it doubled
 9     from or to?
10          A.     I do not.
11          Q.     "Cutting supply critical to
12     success."
13               What does that mean?
14          A.     I don't know.  I don't know
15     what the speaking points or -- it's one
16     bullet.  I'm not sure how it was represented
17     or communicated.
18          Q.     Do you know what price
19     diversion is?
20          A.     Not specifically.
21          Q.     Was McKesson at this time
22     considering that some of the Internet
23     pharmacies were competing with McKesson for
24     business?
25               MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I do not know.

 2          Pricing is not my area.

 3    QUESTIONS BY MR. FARRELL:

 4          Q.    Okay.  It says, "Wholesalers.

 5    DEA expects that you know your customers."

 6                    What does that mean?  It's in

 7    quotations.

 8          A.    Right.

 9                    MS. HENN:  Objection to form.

10                    MR. FARRELL:  Well, it is in

11          quotations, isn't it?

12                    MS. HENN:  I was objecting to

13          asking what DEA means when they said

14          "know your customers."  That was what

15          was my objection.

16    QUESTIONS BY MR. FARRELL:

17          Q.    So McKesson is writing a slide

18    following a meeting with the DEA, reporting

19    to the DEA employees what the DEA's focus

20    was, and what McKesson is reporting is that

21    the DEA expects you to know your customers.

22                    Is that fair?

23          A.    That's fair.

24          Q.    And when we do, quote, "know

25    our customers," end quote, that's a tag line
```

```
 1    for distributors with regard to knowing the

 2    customers you're selling opium pills to?

 3                   MS. HENN:  Objection to form.

 4                   THE WITNESS:  That is a DEA tag

 5         line.

 6    QUESTIONS BY MR. FARRELL:

 7         Q.    And then the next sentence, can

 8    you read it out loud, please?

 9         A.    The next bullet?

10         Q.    Yes.

11         A.    "Wholesalers accountable for

12    controlling quantities shipped."

13         Q.    Is that true or not true?

14                   MS. HENN:  Objection to form.

15                   THE WITNESS:  Can you add a

16         little more context to your question?

17         I know it's a true/false question,

18         but --

19    QUESTIONS BY MR. FARRELL:

20         Q.    Yes.

21               The DEA expects the wholesalers

22    to be accountable for controlling quantities

23    that they ship.

24               Is that fair or unfair?

25                   MS. HENN:  Objection to form.
```

1          Go ahead.

2          THE WITNESS:  That's what

3     the -- that's what the DEA expects, I

4     guess, yeah.

5  QUESTIONS BY MR. FARRELL:

6     Q.    Does McKesson acknowledge that

7  it is accountable for controlling the

8  quantities of opium pills shipped to American

9  pharmacies?

10    A.    We're accountable as a

11 distributor.

12    Q.    The next thing says, "5,000

13 dose units is average."

14          The average American pharmacy

15 in 2007, as reported by the DEA to McKesson,

16 was that 5,000 doses of oxycodone or 5,000

17 doses of hydrocodone was average.

18    A.    That's what the DEA -- DEA

19 calculations.

20    Q.    And McKesson at least validated

21 that number by repeating it on a slide to the

22 national operations conference in 2007.

23          MS. HENN:  Objection to form.

24 QUESTIONS BY MR. FARRELL:

25    Q.    Agreed?

1       A.    I wouldn't say that they

2    validated.  We just repeated what was shared.

3       Q.    Did McKesson undertake any

4    investigation to determine what the average

5    was itself?

6       A.    I believe they did.  I can't

7    speak to the examples, but we've used

8    analysts and reviewed data when developing

9    thresholds and...

10      Q.    Does McKesson acknowledge that

11   in 2007 5,000 dose units was average in the

12   United States of America?

13            MS. HENN:  Objection to form.

14        Outside the scope.

15            THE WITNESS:  We acknowledge

16        that's what the DEA shared.  I mean,

17        there's many ways to get averages.

18   QUESTIONS BY MR. FARRELL:

19      Q.    Sitting here today, does

20   McKesson Corporation have any reason to

21   disagree or dispute the DEA's estimation of

22   what the average dose unit was?

23            MS. HENN:  Objection to form.

24        Outside the scope.

25            THE WITNESS:  What I would

1       share is I believe that average is a

2       very rudimentary average, all

3       pharmacies divided by pills, and so it

4       doesn't account for different pharmacy

5       size.  So it's the number that is the

6       result of that basic calculation.

7    QUESTIONS BY MR. FARRELL:







Highly Confidential - Subject to Further Confidentiality Review



12    QUESTIONS BY MR. FARRELL:

13         Q.    As of April of 2007, which we

14    believe to be the date of this conference,

15    have you seen any documentation anywhere in

16    the records of McKesson Corporation that

17    indicate that any message from the DEA to

18    date had been unclear?

19              MS. HENN:  Objection to form.

20         Outside the scope.

21              THE WITNESS:  Have I seen

22         formal documentation where somebody

23         said DEA was unclear?

24    QUESTIONS BY MR. FARRELL:

25         Q.    That was my question, yes.

Highly Confidential - Subject to Further Confidentiality Review

1          A.       I have not seen any of that

2     documentation.



Highly Confidential - Subject to Further Confidentiality Review







13            (McKesson-Hartle Exhibit 19

14       marked for identification.)

15   QUESTIONS BY MR. FARRELL:

16       Q.    We'll mark as 19, top

17   right-hand corner is 2007_5_15, Bates-stamped

18   MCKMDL00337303.

19            Is this, in fact, the Lifestyle

20   Drug Monitoring Program at McKesson?

21       A.    Yes.

22       Q.    Do you recognize this document

23   as a true and authentic version of the

24   Lifestyle Drug Monitoring Program?

25       A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And is it a document kept in

2    the regular course of business and produced

3    by your lawyers in this litigation?

4            MS. HENN:  Objection to form.

5            THE WITNESS:  Yeah.

6    QUESTIONS BY MR. FARRELL:

18           (McKesson-Hartle Exhibit 20

19    marked for identification.)

20    QUESTIONS BY MR. FARRELL:

21    Q.    Exhibit 20, top right-hand

22    corner, 2007_06_12, Bates-stamped

23    MCKMDL00355527.

24            I'll represent to you again,

25    this was produced by your counsel in this



Highly Confidential - Subject to Further Confidentiality Review







11          Q.      Right.

12                  (McKesson-Hartle Exhibit 21

13          marked for identification.)

14   QUESTIONS BY MR. FARRELL:

15          Q.      Next document is 21.   Top

16   right-hand corner, 2007_11_26.   This is a

17   February 2008 PowerPoint presentation

18   entitled "Controlled Substance Monitoring

19   Program, CSMP, Implementation Strategy -

20   Regulatory Review Document."

21                  Have you seen this document

22   before?

23          A.      I don't believe I've seen this

24   document.

25          Q.      All right.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      No.

 2        Q.      It's my understanding that the

 3  CSMP was going to replace the Lifestyles

 4  program?

 5        A.      Correct.

 6        Q.      And this document is talking

 7  about in March of 2008 you're going to be

 8  implementing pilot programs and then rolling

 9  it across the country?

10                MS. HENN:  Objection to form.
```

(redacted)

(redacted)

(redacted)

(redacted)

(redacted)

```
16        A.      Can I finish reading this?

17        Q.      Sure.

18        A.      Pretty quickly.  Thank you.

19                Okay.  Thank you.

20        Q.      Yeah.

21                So you agree with what I said?

22        A.      You'll need to restate whatever

23  you said.
```

(redacted)

(redacted)







22          (McKesson-Hartle Exhibit 23

23      marked for identification.)

24  QUESTIONS BY MR. FARRELL:

25      Q.    Next document, Exhibit 23,

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    2007_12_27, Bates stamp MCKMDL00478910.  This

 2    is the December 27, 2007 Rannazzisi letter.

 3               Do you recognize this document?

 4        A.    I do.

 5        Q.    McKesson Corporation

 6    acknowledges receipt of this communication

 7    from the DEA dated December 27, 2007,

 8    correct?

 9               MS. HENN:  Objection to form.

10               THE WITNESS:  Yes, we received

11        it.

12    QUESTIONS BY MR. FARRELL:

13        Q.    This is a true and authentic

14    version of the McKesson letter?

15        A.    I believe so.

16        Q.    And you kept it in the routine

17    business of collecting records,

18    record-keeping at McKesson?

19        A.    I can't speak to where this was

20    stored and -- I don't know, but --

21        Q.    But it came from McKesson; it's

22    got your Bates stamp on it?

23        A.    I may be a little confused on

24    your question.

25        Q.    I just want you to validate --
```

```
 1          A.      It came us.

 2          Q.      You're just acknowledging you

 3    received this letter?

 4          A.      Correct.

 5          Q.      All right.  We can walk through

 6    this entire letter, but I'm going to first

 7    start broadly.

 8                  Does McKesson acknowledge that

 9    the facts and guidelines set forth in the

10    2007 Rannazzisi letter are true and an

11    accurate representation of the obligations

12    McKesson has under federal law?

13                  MS. HENN:  Objection to form.

14                  THE WITNESS:  Can you ask that

15        question again?

16    QUESTIONS BY MR. FARRELL:

17          Q.      Yeah.

18                  This is the second time the DEA

19    is writing a dear registrant letter to

20    everybody in the country.

21          A.      Understood.

22          Q.      Basically what it's saying is,

23    you people still aren't getting it; here's

24    what your obligations are under federal law.

25                  And it includes the duty to
```

```
 1   halt suspicious orders, perform due diligence

 2   and report when necessary to the DEA, agreed?

 3             MS. HENN:  Objection to form.

 4   QUESTIONS BY MR. FARRELL:

 5        Q.    Could it be any clearer?

 6             MS. HENN:  Objection to form.

 7             THE WITNESS:  It's the same

 8        information they've shared before,

 9        with some additions.

10   QUESTIONS BY MR. FARRELL:

11        Q.    And it's clear, you have a duty

12   to halt suspicious orders, perform due

13   diligence and report when necessary.

14             This is an affirmation a decade

15   preceding the shipping requirement and the

16   reporting requirement in the Masters

17   Pharmaceutical case, agreed?

18             MS. HENN:  Objection to form.

19             THE WITNESS:  You rolled a

20        couple things in there together.  Can

21        you ask me -- what's the specific

22        question?

23   QUESTIONS BY MR. FARRELL:

24        Q.    This is a 2007 letter, which

25   predates the Masters Pharmaceutical case by a
```

```
 1    decade.  And I'm asking you whether or not

 2    you agree that this letter sets forth the

 3    shipping requirements and the reporting

 4    requirements as outlined in Masters

 5    Pharmaceutical.

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  I'm going to read

 8        this again just so --

 9    QUESTIONS BY MR. FARRELL:

10        Q.    Sure.

11              The second to the last

12    paragraph is probably the most helpful.

13        A.    What's that?

14        Q.    The second to last paragraph

15    may be the most helpful.

16        A.    On the very last -- okay.

17    Before I get there --

18        Q.    It states, "Lastly, registrants

19    that routinely report suspicious orders, yet

20    fill these orders without first determining

21    that order is not being diverted, may be

22    failing to maintain effective controls

23    against diversion."

24              It's what you and I have been

25    talking about for the last two hours,
```

```
 1    correct?

 2         A.     Correct.

 3         Q.     This is an accurate statement

 4    of federal law from the DEA to McKesson,

 5    agreed?

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  Agreed.

 8    QUESTIONS BY MR. FARRELL:

 9         Q.     This is the same thing the DC

10    Circuit Court of Appeals said in 2017,

11    agreed?

12              MS. HENN:  Objection to form.

13              THE WITNESS:  Agreed.

14    QUESTIONS BY MR. FARRELL:

15         Q.     I don't need to put this in

16    there.  But backing up to the last exhibit we

17    had from February of 2008, can you pull that

18    up?

19              MS. HENN:  You talking about

20         Exhibit 21?

21              MR. FARRELL:  Yes.

22    QUESTIONS BY MR. FARRELL:

23         Q.     I'm going to represent to you

24    that the way that we pull these documents up

25    on the electronic system is you can pull it
```

Highly Confidential - Subject to Further Confidentiality Review

1    up in a -- basically a photocopy version like

2    you're seeing here, but there's also a native

3    format, which is actually the PowerPoint.

4         A.    Okay.

5         Q.    And so what I'm showing you on

6    the screen is the same exact document, and

7    the only reason I produced it in native

8    format is that at the very bottom of each of

9    the pages, except for the first one, there's

10   a date.

11             MR. FARRELL:  So if you flip to

12        the next page on the screen up there,

13        Corey.

14             MS. HENN:  Do you want to just

15        hand the copy over --

16             MR. FARRELL:  Yeah.

17             MS. HENN:  -- if that's easier?

18             MR. FARRELL:  I just want you

19        to affirm the date on it.

20             MS. HENN:  And do you have like

21        an identifier?  I know for these kinds

22        of native documents --

23             MR. FARRELL:  Not that I can

24        figure out.  I'm not that good.

25             MS. HENN:  All right.

```
 1              THE WITNESS:  So what do you

 2       need me to do?  What are you asking?

 3   QUESTIONS BY MR. FARRELL:

 4       Q.     What the date is.

 5       A.     On the front page?

 6       Q.     On the color version, on page 2

 7   maybe.

 8       A.     Oh, on the bottom?  11/26 of

 9   '07.  November 26, 2007.

10              (McKesson-Hartle Exhibit 24

11       marked for identification.)

12   QUESTIONS BY MR. FARRELL:

13       Q.     Okay.  The next exhibit is

14   going to be Exhibit 24.  It's 2008_03_10.

15   It's another PowerPoint presentation at the

16   Denver sales meeting, March 10, 2008.

17              Have you seen this document

18   before?

19       A.     I do not believe I've seen this

20   one.

21       Q.     It has a bunch of redacted

22   stuff in here.

23              MR. FARRELL:  Counsel, do you

24       know if that was recorded in the

25       privilege log?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  I don't know off the
 2         top of my head, but we can certainly
 3         check.
 4              MR. FARRELL:  I think that's
 5         the main reason.  It basically is
 6         talking about your CSMP, the
 7         three-level review, and the rollout
 8         with a bunch of stuff redacted.  I
 9         just wanted to put it in the record so
10         we can fool with it later.
11              MS. HENN:  Is this a good --
12         the witness would like a break.
13              MR. FARRELL:  Sure.
14              MS. HENN:  Could we just maybe
15         pause for just five minutes?
16              MR. FARRELL:  Yep.
17              VIDEOGRAPHER:  The time is
18         3:08 p.m.  We're going off the record.
19          (Off the record at 3:08 p.m.)
20              VIDEOGRAPHER:  The time is
21         3:16 p.m.  We're back on the record.
22              (McKesson-Hartle Exhibit 25
23         marked for identification.)
24    QUESTIONS BY MR. FARRELL:
25         Q.    We'll mark Exhibit 25.  It's a
```

```
 1    2008_05_02, Bates stamp MCKMDL00355561.

 2              Do you recognize this document?

 3       A.    I do.

 4       Q.    What is it?

 5       A.    It's the settlement agreement

 6    from 2008.

 7       Q.    Between?

 8       A.    Between McKesson and the DEA,

 9    DOJ.

10       Q.    Settling what?

11       A.    Settling allegations of things

12    related to our responsibilities as a

13    distributor.

14       Q.    Right.

15              So you'll forgive me for

16    spending so much time for the last several

17    hours building up to the duties and

18    responsibilities under the federal

19    regulations, leading up to May 2, 2008, where

20    you signed a memorandum -- administrative

21    memorandum of agreement paying a $13 million

22    fine for allegedly violating all of those

23    rules we've been discussing.

24              MS. HENN:  Objection to form.

25
```

```
1    QUESTIONS BY MR. FARRELL:

2         Q.    And I'll acknowledge on page 2

3    the middle whereas clause that McKesson

4    denied doing anything wrong.

5              Sitting here today, McKesson

6    continue to assert that it did nothing wrong

7    despite the fact that it paid a fine in 2008?

8              MS. HENN:  Objection to form.

9              THE WITNESS:  We do.  I believe

10        we were in good faith working with DEA

11        and denied the allegations.

12   QUESTIONS BY MR. FARRELL:

13        Q.    So you deny you did anything

14   wrong.  You deny you broke the law?

15             MS. HENN:  Objection to form.

16             THE WITNESS:  I stand behind

17        what's in this document.

18   QUESTIONS BY MR. FARRELL:

19        Q.    Now, you weren't at McKesson,

20   but you're sitting here as McKesson, so

21   you're taking the position that's in the

22   document:  We didn't do anything wrong.

23             But you acknowledge that at

24   least in 2008 the DEA -- it's beyond doubt

25   now what the DEA could possibly mean when
```

1    they want you to fulfill your obligations

2    under federal law, agreed?

3                MS. HENN:  Objection to form.

4                THE WITNESS:  It is beyond

5         doubt -- can you say that again?

6         Rephrase it?

7    QUESTIONS BY MR. FARRELL:

8         Q.    I can rephrase it, yes.

9         A.    Yeah.

10        Q.    I'm trying to establish whether

11   or not McKesson Corporation believes as of

12   May 2, 2008, the DEA could be any clearer

13   about its expectations of McKesson

14   Corporation under the federal regulations

15   related to the distribution of opium pills.

16                MS. HENN:  Objection to form.

17        Outside the scope.

18   QUESTIONS BY MR. FARRELL:

19        Q.    I can walk through all of the

20   various communications leading up to this,

21   but you'll agree with me there was a 2006

22   letter, a 2007 letter, there were

23   presentations, there were meetings, there was

24   a rule to show cause, there's a settlement

25   agreement, you got fined $13 million.

```
 1                   Nobody, no reasonable person,
 2     could say that the DEA failed to tell
 3     McKesson what the rules of the road were.
 4                   MS. HENN:  Objection to form.
 5           Outside the scope.
 6                   THE WITNESS:  I agree that they
 7           mentioned that in many -- in many ways
 8           and many times.  There's still -- you
 9           know, there are areas of the
10           regulation that are still unclear, and
11           DEA does not provide clear guidance on
12           what is an order of unusual size,
13           frequency and pattern.  They put that
14           back on the distributors to design our
15           own.
16                   So they're not -- they're clear
17           on that guidance, but not on how to do
18           it all the time.
19     QUESTIONS BY MR. FARRELL:
20           Q.    All right.  So it's clear in
21     2008 what they're telling the DEA -- telling
22     McKesson is that whatever you're doing, we
23     think it's not enough?
24                   MS. HENN:  Objection to form.
25                   THE WITNESS:  It's clear that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        that's what they were alleging.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.    And one of the things that's

 4   clear is that you have a duty to halt

 5   suspicious orders and perform due diligence.

 6              Is there any reasonable person

 7   in the United States of America as of 2008

 8   could possibly argue that it's unclear

 9   whether or not you should halt a suspicious

10   order before shipping?

11              MS. HENN:  Objection to form.

12              THE WITNESS:  I can't speak for

13        all reasonable people in the US.

14   QUESTIONS BY MR. FARRELL:

15        Q.    Well, what if somebody came up

16   and said, "We don't know whether or not we

17   have a duty to halt before shipping a

18   suspicious order," what you say to them as of

19   May 2, 2008, on the heels of paying

20   $13 million to the DEA?

21              MS. HENN:  Objection to form.

22        Outside the scope.

23              THE WITNESS:  Can you ask that

24        again?

25
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Yes.

 3               Would you be a moron if you

 4    took the position out of May 2, 2008, that

 5    the DEA was unclear as to whether or not you

 6    could ship a suspicious order?

 7               MS. HENN:  Objection to form.

 8         Outside the scope.

 9               THE WITNESS:  I wouldn't call

10         anybody a moron, but it's clear what

11         they expect.

12    QUESTIONS BY MR. FARRELL:

13         Q.    And they expect what?

14         A.    To design and operate a system

15    to disclose suspicious orders.

16         Q.    And?

17               MS. HENN:  Objection to form.

18               THE WITNESS:  And report.

19    QUESTIONS BY MR. FARRELL:

20         Q.    And?

21               MS. HENN:  Same objection.

22    QUESTIONS BY MR. FARRELL:

23         Q.    Is it clear whether or not you

24    can ship a suspicious order without

25    conducting due diligence?
```

```
 1                 MS. HENN:  Objection to form.

 2        Outside the scope.

 3                 THE WITNESS:  I think it

 4        depends.  It's -- there are other

 5        types of suspicious order systems.

 6   QUESTIONS BY MR. FARRELL:

 7        Q.    I understand.  I'm just trying

 8   to take it from a very basic standpoint.

 9                 Could the DEA have made it any

10   clearer that McKesson has a duty to monitor

11   and detect suspicious orders?

12                 MS. HENN:  Objection to form.

13        Outside the scope.

14                 THE WITNESS:  To monitor and

15        detect suspicious orders.

16   QUESTIONS BY MR. FARRELL:

17        Q.    That's what it says.

18        A.    Very clear.

19        Q.    Could they have been any

20   clearer that if you get a suspicious order,

21   you can't just ship it?

22                 MS. HENN:  Objection to form.

23        Outside the scope.

24                 THE WITNESS:  That's clear.

25
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     Clear or very clear?

 3               MS. HENN:  Objection to form.

 4               THE WITNESS:  It's very clear.

 5   QUESTIONS BY MR. FARRELL:

 6        Q.     Can you report the suspicious

 7   order to the DEA and still ship it?

 8               MS. HENN:  Objection to form.

 9        Outside the scope.

10               THE WITNESS:  Can you ask that

11        one again or restate it?

12   QUESTIONS BY MR. FARRELL:

13        Q.     Can you report the suspicious

14   order to the DEA and still ship it?

15               MS. HENN:  Same objections.

16               THE WITNESS:  Without due

17        diligence or some sort of review?

18   QUESTIONS BY MR. FARRELL:

19        Q.     If you're reporting a

20   suspicious order to the DEA, what are you

21   doing?

22               MS. HENN:  Objection to form.

23               THE WITNESS:  Okay.  Can we

24        start with the original question?  I'm

25        getting a little -- I want to make
```

```
 1          sure I'm going to answer your question

 2          right --

 3    QUESTIONS BY MR. FARRELL:

 4          Q.     Yeah, I'm going to show you --

 5          A.     -- the right question.

 6          Q.     I'm going to show you here in a

 7    few minutes some of your brethren who still

 8    haven't gotten the message by May 2008, and

 9    I'm trying to see if you'll call them morons.

10                 So what I'm asking you is from

11    McKesson's corporation, is it clear by May 2,

12    2008, you -- the shipping requirement and the

13    reporting requirement?

14                 MS. HENN:  Objection to form.

15          Outside the scope.

16                 THE WITNESS:  That's how we

17          designed our program, and that's what

18          we believed it to be.

19    QUESTIONS BY MR. FARRELL:

20          Q.     Based on federal law?

21                 MS. HENN:  Objection to form.

22                 THE WITNESS:  Based on the

23          regulations and the guidance and the

24          information we collected.

25                 (McKesson-Hartle Exhibit 26
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            marked for identification.)

 2    QUESTIONS BY MR. FARRELL:

 3        Q.    I'll mark Exhibit 26.  Top

 4    right is 2008_07_031.  It's Bates stamp

 5    MCK-HOI-002-0000042.

 6             Have you seen this document

 7    before?

 8        A.    Yes, I have.

 9        Q.    And what is it?

10        A.    This is a PowerPoint.

11        Q.    Made by who?

12        A.    By McKesson.

13        Q.    For purposes of?

14        A.    Discussion with DEA.

15        Q.    Regarding?

16        A.    Our controlled substance

17    monitoring program.

18        Q.    And it's dated when?

19        A.    It's dated July 31, 2008.

20        Q.    So this is before or after your

21    settlement agreement with the DEA?

22        A.    Shortly after.

23        Q.    So that must have been kind of

24    awkward, right, your coming in after paying

25    the fine?
```

1          What are you doing here?  Are

2     you giving the DEA an update of all of the

3     parts of your action plan you're

4     implementing?

5               MS. HENN:  Objection to form.

6               THE WITNESS:  I can't say if it

7          was awkward or not, but standard -- or

8          a communication and updating them on

9          what we were doing.

10     QUESTIONS BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          Q.     The more pills that get

13    diverted, what happens?

14               MS. HENN:  Objection to form.

15               THE WITNESS:  You can assume

16        that there's more abuse.

17    QUESTIONS BY MR. FARRELL:

18          Q.     Do you believe there's a direct

19    correlation between the more pills that get

20    sold and the more pills that get diverted?

21               MS. HENN:  Objection to form.

22               THE WITNESS:  Can you rephrase

23        that question?

24    QUESTIONS BY MR. FARRELL:

25          Q.     Yes.

```
 1                    Is there a relationship between

 2       the number of pills that get sold and the

 3       number of pills that get diverted?

 4                    MS. HENN:  Objection to form.

 5                    THE WITNESS:  It's hard to say,

 6             but you could assume that the -- you

 7             know --

 8       QUESTIONS BY MR. FARRELL:

 9             Q.     I don't want you to assume.

10             A.     Yeah.

11             Q.     I want you to use common sense.

12             A.     Yeah.  Using common sense and

13       basic logic, you could assume the more pills

14       that are out there, the more potential for

15       diversion there could be.

16             Q.     So if I were to tell you that a

17       company sold 100 pills and 10 of them got

18       diverted, and then I come back to you and say

19       a year later, a thousand pills got sold, what

20       does common sense and logic tell you as

21       McKesson Corporation how many pills get

22       diverted?

23                    MS. HENN:  Objection to form.

24                    THE WITNESS:  I don't think

25             it's that easy of a connection to say
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1          that happened.  There could be many

 2          different reasons why a thousand

 3          pills -- there may be an increase of a

 4          thousand pills with zero diversion.

 5   QUESTIONS BY MR. FARRELL:

 6          Q.    That's true.

 7                Do you expect as McKesson

 8   Corporation to find in general a direct

 9   correlation to volume of pills sold and

10   volume of pills diverted?

11                MS. HENN:  Objection to form.

12          Outside the scope.

13                THE WITNESS:  Depends.  I don't

14          know if there's a statistic on how

15          many pills are diverted.  Again,

16          there's reasons why you may have very

17          large volumes of pills for legitimate

18          reasons and there may be zero

19          diversion.

20   QUESTIONS BY MR. FARRELL:

21          Q.    That's true.  Let me ask it a

22   different way.

23                Do you believe it's foreseeable

24   that the more pills you sell, the more pills

25   get diverted?
```

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  I would say that

 3      there -- that, you know, the volume

 4      of -- the more pills you have, there

 5      could be, could be more to diversion.

 6      It doesn't mean that there is.  Or I

 7      would foresee that just an increase in

 8      volume is going to increase diversion.

 9      There could be.

10  QUESTIONS BY MR. FARRELL:

11      Q.    The more pills that are

12  diverted -- let me ask you a different way.

13      A.    Okay.

14      Q.    Does McKesson believe that the

15  more pills that get diverted, the more pills

16  get abused?

17              MS. HENN:  Objection to form.

18      Outside the scope.

19              THE WITNESS:  Sorry, could you

20      rephrase that one again?  Let me --

21  QUESTIONS BY MR. FARRELL:

22      Q.    As McKesson Corporation, do you

23  acknowledge that the more pills that get

24  diverted, the more pills get abused?

25              MS. HENN:  Same objections.
```

```
 1                 THE WITNESS:  Again, I'd say
 2          what I said previously:  It could --
 3          that could be a possibility.  It
 4          depends, but...
 5   QUESTIONS BY MR. FARRELL:
 6          Q.     Are people diverting pills to
 7   engage in lawful conduct?
 8                 MS. HENN:  Objection to form.
 9                 THE WITNESS:  I don't know why
10          everybody is diverting pills every
11          single time, but generally, no.
12   QUESTIONS BY MR. FARRELL:
13          Q.     Right.
14                 So in general, the more pills
15   that gets diverted, the more abuse and
16   addiction we find with prescription opium
17   pills?
18          A.     There's that possibility.
19                 (McKesson-Hartle Exhibit 27
20          marked for identification.)
21   QUESTIONS BY MR. FARRELL:
22          Q.     I'm going to have marked what
23   is Deposition Exhibit 27.  The top right-hand
24   corner is 2012_5_9.
25                 This is an amicus brief.
```

 1                    Do you know what an amicus

 2    brief is?

 3         A.    I do not.  I do not have legal

 4    background.

 5         Q.    Okay.  McKesson Corporation is

 6    a member of the Healthcare Distributors and

 7    Manufacturers Association, now known as the

 8    Healthcare Distributors Association, agreed?

 9         A.    Healthcare Distributors

10    Management Association?

11         Q.    Management, I'm sorry, yes.

12         A.    Yes.

13         Q.    Okay.  And on May 9, 2012,

14    Cardinal Health had gotten itself into a

15    little trouble with the DEA, hadn't it?

16              MS. HENN:  Objection to form.

17              THE WITNESS:  I'm aware of that

18         time frame and...

19    QUESTIONS BY MR. FARRELL:

20         Q.    They got in trouble with the

21    DEA, very similar to how McKesson got in

22    trouble with the DEA in 2008, agreed?

23              MS. HENN:  Objection to form.

24              THE WITNESS:  I haven't

25         reviewed this document or all the

```
 1           details, but in spirit, in general.

 2    QUESTIONS BY MR. FARRELL:

 3           Q.     So in -- on May 9th of 2012,

 4    HDMA, the Healthcare Distribution Management

 5    Association, wrote a brief to a federal court

 6    here in Washington, DC, in support of

 7    Cardinal Health and against the DEA.

 8                  Was McKesson Corporation aware

 9    of this amicus brief?

10                  MS. HENN:  Objection to form.

11           Outside the scope.

12                  MR. FARRELL:  It's actually

13           not.  It's actually referenced

14           directly in the notice.

15                  MS. HENN:  I'm not sure that's

16           the case, but we can disagree about

17           that.

18                  THE WITNESS:  I don't know for

19           100 percent certain, but I assume so.

20    QUESTIONS BY MR. FARRELL:

21           Q.     Well, I don't want you to

22    guess.  This is relatively important.

23                  Have you seen any

24    acknowledgement within McKesson Corporation

25    validating or affirming or reviewing or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    participating in this amicus brief?

 2        A.      I have not.

 3        Q.      Are you aware of McKesson being

 4    involved at all in the amicus briefs?

 5              MS. HENN:  Objection to form.

 6              THE WITNESS:  I'm not.

 7              (McKesson-Hartle Exhibit 28

 8        marked for identification.)

 9    QUESTIONS BY MR. FARRELL:

10        Q.      I'm going to have marked

11    Exhibit 28, 2012_05_05.

12              Are you aware of the Wayback

13    Machine?

14        A.      Excuse me?

15        Q.      Are you aware of the Wayback

16    Machine?

17        A.      I am not.

18        Q.      The Wayback Machine is an

19    Internet service that's free, and what it

20    does is it's able to go and bring up old

21    websites based on dates and time.

22              And it just so happens that the

23    Wayback Machine captured the HDMA website in

24    May of 2012.  This comes from the HDMA

25    website, and this is a list of the board of
```

1   directors.

2           Now, what's an executive

3   committee on a board of directors?

4           MS. HENN:  Objection to form.

5       Outside the scope.

6           THE WITNESS:  That's the senior

7       leaders driving this group.

8   QUESTIONS BY MR. FARRELL:

9       Q.    And, Mr. McKesson Corporation,

10  you were on the executive committee of HDMA

11  of 2012, were you not?

12          MS. HENN:  Objection to form.

13      Outside the scope.

14          THE WITNESS:  One of our senior

15      leaders is.

16  QUESTIONS BY MR. FARRELL:

17      Q.    You're in the senior leadership

18  of HDMA, and you signed off on an amicus

19  brief submitted to a federal court in

20  Washington, DC, in support of one of your

21  colleagues and members, Cardinal Health.

22          MS. HENN:  Objection to form.

23      Outside the scope.

24  QUESTIONS BY MR. FARRELL:

25      Q.    So I'm going to ask you a

```
 1   couple of questions about it.

 2       A.     Okay.

 3       Q.     If you flip to page 3...

 4       A.     Of the brief?

 5       Q.     Of the brief.

 6              The very bottom of the page --

 7              MS. HENN:  Are you talking

 8       about the Bates numbers or the --

 9              MR. FARRELL:  Yeah, the Bates

10       number.

11              MS. HENN:  Thank you.

12   QUESTIONS BY MR. FARRELL:

13       Q.     It says, "HDMA's members have

14   not only statutory and regulatory

15   responsibilities to detect and prevent

16   diversion of controlled prescription drugs,

17   but undertake such efforts as responsible

18   members of society."

19              Do you see that?

20       A.     I do.

21       Q.     Do you recognize this as an

22   acknowledgement that all of the distributors

23   in the country have a common law duty to the

24   people of the United States of America to

25   prevent diversion of controlled substances
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    because you're selling controlled substances?

 2                  MR. SUDDATH:  Objection.

 3                  MS. HENN:  Objection to form.

 4         Outside the scope.

 5                  THE WITNESS:  Okay.  Could you

 6         ask me that again?

 7    QUESTIONS BY MR. FARRELL:

 8         Q.     Do you recognize this as an

 9    acknowledgement that all of the distributors

10    in the country have a common law duty to the

11    American citizens to prevent controlled

12    substances from being diverted into the

13    illicit market?

14                  MR. SUDDATH:  Objection.

15                  MS. HENN:  Objection to form.

16         Outside the scope.

17    QUESTIONS BY MR. FARRELL:

18         Q.     I mean, isn't this what we

19    talked about earlier?

20         A.     I do.

21         Q.     You do, don't you?  Yes?

22         A.     Yes.

23         Q.     Because it's not just

24    statutory, regulatory.  You're engaged in

25    selling opium pills.  You owe a duty to the
```

```
 1    American people to do your very best to

 2    prevent diversion.

 3              MS. HENN:  Objection to form.

 4         Outside the scope.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.     Agreed?

 7         A.     Agreed.

 8         Q.     And this is your trade

 9    organization making the same representation

10    to a federal court in Washington, DC?

11              MS. HENN:  Same objections.

12         Objection to form.  Outside the scope.

13              THE WITNESS:  Yes.

14    QUESTIONS BY MR. FARRELL:

15         Q.     Next sentence:  "The public

16    health dangers associated with the diversion

17    and abuse of controlled prescription drugs

18    have been well-recognized over the years by

19    Congress, DEA, HDMA and its members, and

20    public health authorities."

21              Is that all true?

22              MS. HENN:  Objection to form.

23         Outside the scope.

24              THE WITNESS:  Yes.

25
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.     The next sentence.  This is the

 3   part that I'd like to talk to you about, the

 4   highlighted part.  "The agency," meaning DEA,

 5   "has failed to provide meaningful guidance to

 6   assist the regulated industry in complying

 7   with the DEA's interpretation of its

 8   implementing regulations.  HDMA respectfully

 9   submits that despite the agency's oft-recited

10   refrain that the regulations are clear, the

11   regulated industry does not know the rules of

12   the road because DEA has not adequately

13   explained them."

14             McKesson has said the opposite

15   publicly and to its own people, agreed?

16             MS. HENN:  Object to form.

17   QUESTIONS BY MR. FARRELL:

18        Q.     Remember the slide that said

19   clear?  Remember your testimony about the

20   letters and the settlement agreement?  You

21   said a few minutes ago it was clear.

22        A.     I do remember all of that.  I

23   also --

24             MS. HENN:  Object to form.

25             Go ahead.
```

```
 1                    THE WITNESS:  Oh, excuse me.

 2                    I also remember saying that

 3          certain parts of those regulations

 4          related to what a suspicious order is

 5          is not clear.

 6      QUESTIONS BY MR. FARRELL:

 7          Q.     Page 7.  "The societal costs of

 8      prescription drug abuse are" -- what's it

 9      say?

10          A.     I flipped to the wrong page.

11      Excuse me.

12                    "Huge."

13          Q.     And if a distributor engages in

14      unlawful conduct, should the distributor be

15      held accountable for such societal costs?

16                    MS. HENN:  Objection to form.

17          Outside the scope.

18                    THE WITNESS:  Can you repeat

19          that, please?

20      QUESTIONS BY MR. FARRELL:

21          Q.     If a wholesale distributor

22      engages in unlawful conduct, should it be

23      held accountable for the societal costs of

24      prescription drug abuse?

25                    MR. SUDDATH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. HENN:  Same objections.
2              THE WITNESS:  I believe
3         distributors have a responsibility in
4         preventing diversion.
5    QUESTIONS BY MR. FARRELL:
6         Q.    So should they be held
7    accountable for the societal costs that are
8    documented in this pleading and referenced as
9    huge?
10        A.    I think it depends.
11             MS. HENN:  Objection to form.
12   QUESTIONS BY MR. FARRELL:
13        Q.    Depends on what?
14             MS. HENN:  Same objection.
15             Go ahead.
16             THE WITNESS:  It depends on the
17        facts and circumstances and, you know,
18        the information about the specific
19        situation.
20   QUESTIONS BY MR. FARRELL:
21        Q.    If a distributor repeatedly
22   fails to report suspicious orders, do you
23   believe it should be held accountable for the
24   societal costs of prescription drug abuse?
25             MR. SUDDATH:  Objection.
```

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  And I believe it

 3         depends.

 4    QUESTIONS BY MR. FARRELL:

 5         Q.    On?

 6         A.    The facts and circumstances.

 7         Q.    How about the facts and

 8    circumstances which led to McKesson paying

 9    $150 million fine?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  Again, I think it

12         depends.

13    QUESTIONS BY MR. FARRELL:

14         Q.    Do you think McKesson is partly

15    responsible for the societal costs of

16    prescription drug abuse in America?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  Could you ask

19         that one again, please?

20    QUESTIONS BY MR. FARRELL:

21         Q.    Do you think McKesson is partly

22    responsible for the societal costs of

23    prescription drug abuse in America?

24              MS. HENN:  Objection to form.

25              THE WITNESS:  Again, there's a
```

```
 1          lot of people involved in -- it's a

 2          very complicated and multi-faceted

 3          issue, so...

 4   QUESTIONS BY MR. FARRELL:

 5          Q.    We'll get to the other people

 6   in a second.

 7                MS. HENN:  Are you done with

 8          your answer?

 9                THE WITNESS:  I am done.

10                MS. HENN:  Okay.

11   QUESTIONS BY MR. FARRELL:

12          Q.    We'll get to the others in a

13   second.  I want to talk about McKesson first.

14                This is your opportunity to

15   accept partial responsibility for the

16   societal costs of prescription drug abuse in

17   America; yes or no?

18                MS. HENN:  Objection to form.

19          Also outside the scope.

20                THE WITNESS:  So again, it

21          depends on -- it depends.

22   QUESTIONS BY MR. FARRELL:

23          Q.    You're McKesson Corporation.

24          A.    Right.

25          Q.    You're sitting here today.  You
```

```
 1   have the opportunity to look in the camera

 2   and tell the jury whether or not you accept

 3   partial responsibility for the societal costs

 4   of prescription drug abuse in America.

 5              MS. HENN:  Objection to form.

 6         Outside the scope.

 7   QUESTIONS BY MR. FARRELL:

 8         Q.     I'd ask you to answer yes or

 9   no.

10              MS. HENN:  Same objections.

11              THE WITNESS:  I'm not sure how

12         to answer that -- that question

13         specifically.

14   QUESTIONS BY MR. FARRELL:

15         Q.     Well, you can say yes or --

16         A.     I understand that.

17         Q.     -- you can say no.

18         A.     I understand that.

19              MS. HENN:  Objection to form.

20   QUESTIONS BY MR. FARRELL:

21         Q.     If I asked you the same

22   question in your personal capacity, would

23   that help you answer the question better?

24              MS. HENN:  Same objection.

25         Objection to form.
```

```
 1                THE WITNESS:  Again, it

 2          depends -- I would say it doesn't

 3          change my answer.  It depends on the

 4          role that they played.

 5   QUESTIONS BY MR. FARRELL:

 6          Q.    Well, back to McKesson

 7   Corporation, which is you sitting in the

 8   chair today.  Knowing what you know as the

 9   30(b)(6) representative, the corporate

10   designee, knowing about your past conduct,

11   knowing about the past interactions with the

12   DEA, I'm going to ask you again:  Does

13   McKesson Corporation accept partial

14   responsibility for the societal costs of

15   prescription drug abuse in America?

16                MS. HENN:  Objection to form.

17                THE WITNESS:  Again, you know,

18          I -- we're part of the closed system,

19          so we're responsible for preventing

20          diversion.

21   QUESTIONS BY MR. FARRELL:

22          Q.    So the answer is?

23                MS. HENN:  Objection to form.

24                THE WITNESS:  Again, I think

25          we're responsible for something.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          don't know what -- how you define all

 2          societal costs and -- I still believe

 3          it depends on different circumstances.

 4   QUESTIONS BY MR. FARRELL:

 5          Q.     Sir, we're not going to parse

 6   out percentages.

 7          A.     Yeah.

 8          Q.     Let's just talk globally for

 9   McKesson Corporation.  So I don't want to put

10   words in your mouth because it's got to come

11   out of your mouth.  So the answer is yes or

12   no.

13               MS. HENN:  Objection to form.

14               THE WITNESS:  I would say yes,

15          partially.

16   QUESTIONS BY MR. FARRELL:

17          Q.     How about Purdue Pharma?  Does

18   McKesson Corporation take the position that

19   Purdue Pharma is partially responsible for

20   the societal costs of prescription drug abuse

21   in America?

22               MS. HENN:  Objection to form.

23          Outside the scope.

24               THE WITNESS:  I'm not going to

25          answer for other companies.  I'm --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           it's like I answered my question:

 2           Those involved in this space,

 3           depending on the facts and

 4           circumstances, may be.  So, yes.

 5   QUESTIONS BY MR. FARRELL:

 6       Q.    Flip to page 8, the last

 7   paragraph.  Your trade organization is saying

 8   that the "DEA's goal, the prevention of

 9   diversion of controlled prescription drugs,

10   is, of course, a public good."

11             Does McKesson validate,

12   acknowledge and affirm that statement?

13             MS. HENN:  Objection to form.

14             THE WITNESS:  Absolutely.  The

15        prevention of the diversion of

16        controlled substances is good for the

17        public.

18             (McKesson-Hartle Exhibit 29

19        marked for identification.)

20   QUESTIONS BY MR. FARRELL:

21       Q.    Next exhibit I'm going to have

22   marked is Exhibit 29.  It's Exhibit

23   2013_09_13.  It's Bates stamp

24   MCK-AGMS-006000880.

25             Have you seen this document?
```

```
 1          A.      I have not.

 2          Q.      Do you know who Gary Boggs is?

 3          A.      I do know Gary.

 4          Q.      I'll represent to you that on

 5   the metadata that was provided by the --

 6   McKesson, indicates that this presentation is

 7   dated in late 2012 -- wait, late 2013, I

 8   think, probably before Gary Boggs came on to

 9   McKesson.  We'll ask him when we depose him.

10               But anyway, this is a McKesson

11   spreadsheet from Gary Boggs.  Gary Boggs is

12   former DEA.

13          A.      PowerPoint, not spreadsheet.

14          Q.      Yeah, I'm sorry.

15          A.      Okay.

16          Q.      He's former DEA, correct?

17          A.      Correct.

18          Q.      He was the number 2 man on Joe

19   Rannazzisi, yes?

20          A.      Yes.

21          Q.      And as we'll see later, he was

22   actually in the room for one of the

23   presentations when DEA was negotiating with

24   McKesson on the 2008 settlement.

25               Is that your memory as a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    corporate entity?

 2                MS. HENN:  Objection to form.

 3                THE WITNESS:  I wasn't aware

 4          that he was specifically in the room,

 5          but...

 6    QUESTIONS BY MR. FARRELL:

 7          Q.     The title of this PowerPoint

 8    slide is what?

 9          A.     Oh, "State of prescription drug

10    abuse."

11          Q.     And on the second page, talks

12    about the impact of effective compliance.

13    And it uses lots of America-related stuff,

14    eagles and flags and such.

15                Do you see that?

16          A.     I do see that.

17          Q.     "Protecting America from

18    Prescription Drug Diversion."

19                The next page is a history of

20    understanding the problem, and on page 4 it

21    talks about a collision course.

22                And presumably this is two

23    planes colliding in the air, and that's

24    OxyContin and Percocet.

25                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   MS. HENN:  Objection to form.

 2                   THE WITNESS:  I see that.

 3    QUESTIONS BY MR. FARRELL:

 4        Q.     "In the late 1990s, doctors

 5    aggressively prescribing painkillers - a

 6    radical change in health care behavior."

 7                   And that radical change in

 8    health care behavior did what to the number

 9    of prescriptions?

10                   MS. HENN:  Objection to form.

11                   THE WITNESS:  Increased them.

12    QUESTIONS BY MR. FARRELL:

13        Q.     Which resulted in an increase

14    or decrease in the number of pills McKesson

15    sold?

16        A.     I don't know exact numbers, but

17    it increased.

18        Q.     And then the last part,

19    "Manufacturers fueled the use of prescription

20    painkillers."

21                   This is coming from your new

22    head of regulatory affairs at McKesson,

23    agreed?

24                   MS. HENN:  Objection to form.

25                   THE WITNESS:  Can you say that
```

Highly Confidential - Subject to Further Confidentiality Review

1      again?

2    QUESTIONS BY MR. FARRELL:

3        Q.     Yeah.

4        A.     He's not -- he wasn't the head

5    of regulatory affairs.

6        Q.     Then, but he is now?

7        A.     He's one of the leaders on the

8    regulatory affairs team.

9        Q.     Okay.  And this is his

10   statement that "Manufacturers fueled the use

11   of prescription painkillers."

12             Is that McKesson's position?

13             MS. HENN:  Objection to form.

14             THE WITNESS:  I don't know if

15       that's his own specific words or he

16       got that from a previous deck from

17       DEA.  I'm not sure.

18   QUESTIONS BY MR. FARRELL:

19       Q.     We'll have to ask him.

20             But I'm asking McKesson whether

21   or not it shares this view.

22             MS. HENN:  Objection to form.

23       Outside the scope.

24             THE WITNESS:  Manufacturers are

25       part of the closed system, like -- and

```
 1          played a role.

 2   QUESTIONS BY MR. FARRELL:

 3          Q.    Does McKesson believe the

 4   manufacturers fueled the use of prescription

 5   painkillers?

 6                MS. HENN:  Objection to form.

 7          Outside the scope.

 8                THE WITNESS:  I think they

 9          played a role.  I think there's many

10          reasons -- many things that fueled the

11          epidemic.

12   QUESTIONS BY MR. FARRELL:

13          Q.    So would you rather just punt

14   on the question?

15                MS. HENN:  Objection to form.

16                THE WITNESS:  That's what I'm

17          going to share.  That's my answer.

18   QUESTIONS BY MR. FARRELL:

19          Q.    So yes or no, does McKesson

20   Corporation believe manufacturers fueled the

21   use of prescription painkillers?

22                MS. HENN:  Objection to form.

23          Outside the scope.

24                THE WITNESS:  Like I said,

25          my -- they're part of the system.
```

```
 1            They played a role.

 2     QUESTIONS BY MR. FARRELL:

 3            Q.     So the answer is?

 4            A.     They played a role.  I wouldn't

 5     say -- I wouldn't characterize it as fueled.

 6     I don't know that I would use that language.

 7            Q.     Fair enough.

 8                   The next page, 5 and 6,

 9     document Purdue Pharma's $635 million fine,

10     Cephalon's $425 million fine.

11                   Going to page 7, it's comparing

12     the US rates of opioid overdose deaths, sales

13     and treatment admissions.

14                   Do you see that?

15            A.     I see that.

16            Q.     What is the correlation between

17     opioid sales and opioid deaths?  Are they

18     related or unrelated?

19                   MS. HENN:  Objection to form.

20                   THE WITNESS:  They're both

21         increasing at a similar rate.

22     QUESTIONS BY MR. FARRELL:

23            Q.     So that means they're related

24     or unrelated?

25                   MS. HENN:  Objection to form.
```

```
 1                    THE WITNESS:  They appear to be

 2         related.

 3    QUESTIONS BY MR. FARRELL:

 4         Q.      Does McKesson believe that

 5    opioid sales are related to opioid deaths?

 6                    MS. HENN:  Objection to form.

 7         Outside the scope.

 8                    THE WITNESS:  Can you ask that

 9         one more time, please?

10    QUESTIONS BY MR. FARRELL:

11         Q.      Does McKesson believe that

12    opioid sales are related to opioid deaths?

13                    MS. HENN:  Objection to form.

14         Outside the scope.

15                    THE WITNESS:  The volume of

16         opioids in the market and diversion is

17         related to opioid deaths, certainly.

18    QUESTIONS BY MR. FARRELL:

19         Q.      Page 8, the Controlled

20    Substances Act, the very last provision says,

21    "Creates checks and balances between

22    registrants to protect the public health and

23    safety."

24                    Again, this is again a

25    reaffirmation from Gary Boggs, who is now one
```

```
 1    of your senior regulatory affairs management,

 2    acknowledging that the registrants and the

 3    DEA have a duty to protect the public health

 4    and safety, agreed?

 5         A.    Agreed.

 6         Q.    Page 13.  It says, "What can

 7    happen when these checks and balances

 8    collapse?"

 9              What do you believe this is a

10    picture of?

11              MS. HENN:  Objection to form.

12              THE WITNESS:  It's a building

13         falling down.

14    QUESTIONS BY MR. FARRELL:

15         Q.    A disaster?

16         A.    It's a building that's falling

17    down.  Why it fell down could be a disaster.

18         Q.    What do you infer from

19    Mr. Boggs' implication?

20         A.    That things can go wrong,

21    something can happen.

22         Q.    Page 16, pictures of pain

23    clinics and people waiting in line to

24    purchase pills sold by McKesson to

25    pharmacies.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. HENN:  Objection to form.

2              MR. FARRELL:  You're right.

3        That's not necessarily a picture of

4        McKesson.

5    QUESTIONS BY MR. FARRELL:
```

12   QUESTIONS BY MR. FARRELL:

13        Q.    Page 17, historical comparison.

14   He's comparing the opioid crisis to the BP

15   oil spill where 11 people were killed and BP

16   paid 40 billion, plus 16 billion to the Clean

17   Water Act.

18              Have more or less than 11

19   people been killed by the opioid crisis?

20        A.    Clearly more.

21        Q.    Have more people died today

22   than 11 people?

23              MS. HENN:  Objection to form.

24              THE WITNESS:  Based on the

25        statistics, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    Page 24.  Does McKesson

 3   acknowledge and agree there is a national

 4   epidemic of prescription pill addiction,

 5   abuse, morbidity and mortality?

 6             MS. HENN:  Objection to form.

 7             THE WITNESS:  Absolutely.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review

4    QUESTIONS BY MR. FARRELL:

5         Q.    They all originate within the

6    closed network, do they not?

7              MS. HENN:  Objection to form.

8              THE WITNESS:  What do you mean

9         by "all originate"?

10   QUESTIONS BY MR. FARRELL:

11        Q.    Well, Bob, in his trailer in

12   southern West Virginia, isn't making

13   OxyContin pills.

14        A.    No, I'm saying there's other --

15   I understand your point.  They come

16   ultimately from the manufacturer,

17   distributor, pharmacy.

18              (McKesson-Hartle Exhibit 30

19        marked for identification.)

20   QUESTIONS BY MR. FARRELL:

21        Q.    Exhibit 30, 2013_10_23, Bates

22   stamp MCKMDL00409046.  This is October 23,

23   2013.

24              McKesson is in trouble again

25   with the DEA, agreed?

```
 1                 MS. HENN:  Objection to form.

 2                 THE WITNESS:  There's

 3        allegations.

 4   QUESTIONS BY MR. FARRELL:

 5        Q.    Same ones as before, agreed?

 6                 MS. HENN:  Objection to form.

 7                 THE WITNESS:  Related to the

 8        regulations.

 9   QUESTIONS BY MR. FARRELL:

10        Q.    Same as the 2008?

11                 MS. HENN:  Objection to form.

12                 THE WITNESS:  Around suspicious

13        orders.

14                 (McKesson-Hartle Exhibit 31

15        marked for identification.)

16   QUESTIONS BY MR. FARRELL:

17        Q.    Exhibit 31, dated November 6,

18   2013.  It's 2013_11_6, MCKMDL00409048.

19                 It's again from the United

20   States Attorney in the Northern District of

21   West Virginia.  It's talking about further

22   explanations.

23                 You would agree with me this is

24   the same conduct that McKesson got in trouble

25   for in 2008?
```

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  Yeah, it has to

 3         do with suspicious orders, which is

 4         similar.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    And it's Covington & Burlington

 7    at a place called 1201 Pennsylvania Avenue,

 8    Northwest.

 9              Do you know where that is?

10    Isn't that here?

11              MS. HENN:  Old office.

12              MR. FARRELL:  The old office.

13         All right.

14              THE WITNESS:  In town.

15    QUESTIONS BY MR. FARRELL:

16         Q.    But again, this is the same

17    thing.

18              Do you know Bill Ihlenfeld?

19         A.    I do not.

20         Q.    Yeah, he was the US Attorney

21    for the Northern District of West Virginia

22    and a classmate of mine.  He's calling on

23    McKesson, and he's essentially telling

24    McKesson, "Hey, you're not doing your job

25    again."
```

```
 1                  MS. HENN:  Objection to form.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     "And you're dumping pills into

 4   my state."

 5                  MS. HENN:  Same objection.

 6                  (McKesson-Hartle Exhibit 32

 7         marked for identification.)

 8   QUESTIONS BY MR. FARRELL:

 9        Q.     Exhibit 32, 2014_1_XX,

10   MCKMDL00409050.  In fact, they put a whole

11   presentation together.

12                  Have you seen this

13   presentation?

14        A.     I have seen this one.

15        Q.     I'm not going to go through

16   this because we'll go through with it a lot

17   more tomorrow.

18                  In essence, what I'm trying to

19   accomplish here is that you understand that

20   the United States District Attorney for the

21   Northern District of Ohio, and then it turns

22   out other ones, including Colorado, are

23   basically telling McKesson:  You have a

24   systemic failure to monitor, detect and

25   report suspicious orders.
```

```
 1                    Is that what they're alleging?

 2                    MS. HENN:  Objection to form.

 3                    THE WITNESS:  Yes, that's what

 4           they're alleging.

 5                    (McKesson-Hartle Exhibit 33

 6           marked for identification.)

 7    QUESTIONS BY MR. FARRELL:

 8        Q.     Exhibit 33, this is your

 9    response, 2014_03_12, Bates-stamped

10    MCKMDL00409116.

11                    This is you responding, saying,

12    "Nuh-uh, no, we didn't."

13                    Does that about wrap it up?

14                    MS. HENN:  Objection to form.

15    QUESTIONS BY MR. FARRELL:

16        Q.     You've seen this document

17    before?

18        A.     I have not, so I'm going to go

19    through it.
```



13          MS. HENN:  Objection to form.

14          (McKesson-Hartle Exhibit 34

15      marked for identification.)

16  QUESTIONS BY MR. FARRELL:

17      Q.      In fact, Exhibit 34 is the

18  response to the presentation, March 20, 2014.

19  It's 2014_03_20, MCKMDL00409174, from my good

20  friend Bill Ihlenfeld's office, which

21  basically says "bull."

22          MS. HENN:  Counsel, just to

23      clarify, I think Exhibit 33 you

24      might -- you have two documents in

25      here.

```
 1              MR. FARRELL:  Maybe.  It may
 2       have included it.
 3              MS. HENN:  Ah, is that why?
 4              MR. FARRELL:  Maybe.
 5              MS. HENN:  Okay.  That's fine.
 6       Just wanted to make sure you knew.
 7  QUESTIONS BY MR. FARRELL:
 8       Q.    And at this point in time, it
 9  appears that McKesson had hired AGI --
10       A.    Can I read this one?  I have
11  not read this one before.
12       Q.    Okay.  I'm not going to drill
13  you on that letter.  It's got --
14       A.    No, I'm about done.  I just
15  wanted to read the summary here, too.
16              Okay.  Thank you.
17       Q.    Now, skipping through all of
18  the other correspondence because we'll get
19  into that more tomorrow, more recently, as a
20  result of all of this, even though McKesson
21  is denying liability, you understand that
22  McKesson did enter into another settlement
23  agreement?
24       A.    I understand that.
25              (McKesson-Hartle Exhibits 35,
```

```
 1              36 and 37 marked for identification.)

 2    QUESTIONS BY MR. FARRELL:

 3         Q.    2017_01_05A, 35, Exhibit 35,

 4    MCKMDL00355322, the settlement agreement and

 5    release.

 6              Exhibit 37, 2017_01_5B,

 7    MCKMDL00355477.

 8              MS. HENN:  Did you skip 36?

 9    QUESTIONS BY MR. FARRELL:

10         Q.    I didn't.

11              36 will be 2017_01_05B, the

12    compliance addendum.

13              MS. HENN:  37.

14              MR. FARRELL:  Oh, okay, I'm

15         sorry.  But it's okay because we'll

16         just put 36 as the administrative

17         memorandum, which is 2017_01_5C,

18         MCKMDL0355513.

19              MS. HENN:  And, Counsel, we've

20         been going about an hour, so if we

21         could have a break at a good stopping

22         point.  It doesn't have to be this

23         second, but if there's one very soon,

24         that would be great.

25              MR. FARRELL:  Yeah, very soon.
```

```
 1                  MS. HENN:  Great.

 2   QUESTIONS BY MR. FARRELL:

 3        Q.     Just to acknowledge, McKesson's

 4   still is denying liability, and this time the

 5   cost has become more prohibitive with the

 6   fine, 150 million.

 7                  MS. HENN:  Objection to form.

 8   QUESTIONS BY MR. FARRELL:

 9        Q.     Agreed?

10        A.     Agreed.  We settled with the

11   settlement agreement, agreed.

12        Q.     McKesson's distribution

13   facilities were systematically failing to

14   report suspicious orders and resulted in a

15   $150 million fine assessed by the DEA and

16   paid by McKesson Corporation; true or not

17   true?

18                  MS. HENN:  Objection to form.

19                  THE WITNESS:  We did pay that

20        fine, $150 million.

21   QUESTIONS BY MR. FARRELL:

22        Q.     Because you were systematically

23   not reporting suspicious orders?

24                  MS. HENN:  Same objection.

25                  THE WITNESS:  That was at the
```

```
 1          core of it.

 2     QUESTIONS BY MR. FARRELL:

 3          Q.     So let's just be fair.  There

 4     were certain distribution facilities that

 5     utterly failed to fulfill their obligations

 6     under federal law to monitor, detect, halt

 7     and report suspicious orders, which resulted

 8     in McKesson paying the largest fine in the

 9     history of the DEA; true or not true?

10               MS. HENN:  Objection to form.

11               THE WITNESS:  Could you

12          simplify that question a little bit?

13     QUESTIONS BY MR. FARRELL:

14          Q.     Yeah.

15               McKesson wasn't following the

16     law and got fined $150 million?

17               MS. HENN:  Objection to form.

18               THE WITNESS:  We acknowledged

19          that certain orders did not get

20          flagged in our system.

21     QUESTIONS BY MR. FARRELL:

22          Q.     Thousands.

23               MS. HENN:  Objection to form.

24     QUESTIONS BY MR. FARRELL:

25          Q.     Thousands of orders?
```

```
 1        A.      Orders.

 2        Q.      Like some facilities reported

 3   none.

 4                MS. HENN:  Objection to form.

 5   QUESTIONS BY MR. FARRELL:

 6        Q.      Yes?

 7        A.      Systematically none.

 8        Q.      Systematically none.

 9                And it wasn't just an isolated

10   distribution facility.  It was several

11   different facilities across the spectrum at

12   McKesson had utterly failed to comply with

13   federal regulations to prevent diversion of

14   controlled substances?

15                MS. HENN:  Objection to form.

16                THE WITNESS:  We believed we

17           were in good faith working with DEA as

18           part of the 2008 agreement to report

19           customers and report orders in a

20           different way that was mutually agreed

21           upon.  So --

22   QUESTIONS BY MR. FARRELL:

23        Q.      Yeah, I'm not asking --

24        A.      -- I would say --

25                MR. FARRELL:  You're right.
```

```
 1           You're right.

 2                THE WITNESS:  I know you say

 3           zero, but I -- you know, there are

 4           situations and scenarios where we

 5           reported based on what we agreed to

 6           with the DEA, based on that settlement

 7           agreement.

 8                So I understand systematically

 9           they weren't being reported, but they

10           were being reported in other ways.

11   QUESTIONS BY MR. FARRELL:

12           Q.    Sitting here today does

13   McKesson Corporation acknowledge that it

14   utterly failed in its obligations to prevent

15   diversion of opium pills into the American

16   illicit market?

17                MS. HENN:  Objection to form.

18                THE WITNESS:  No, I don't

19           believe we utterly failed.  We, again,

20           in good faith over the years have

21           worked with DEA, taken guidance,

22           developed programs, enhanced programs,

23           evolved them over the course of time.

24                So I wouldn't characterize it

25           as utterly failing.
```

```
 1   QUESTIONS BY MR. FARRELL:

 2        Q.    Well, when you report zero

 3   suspicious orders over years at the same time

 4   selling tens of millions of opium pills into

 5   a community, you're not meeting your

 6   obligations under federal law, agreed?

 7              MS. HENN:  Objection to form.

 8              THE WITNESS:  Again, there's

 9         certain times in which we acknowledged

10         that we did not report orders.  That

11         does not mean that we did not conduct

12         diligence, that we did not evolve our

13         program to help prevent.

14   QUESTIONS BY MR. FARRELL:

15        Q.    And I understand the desire to

16   want to say in good faith you did your best.

17   What I'm asking for is a very simple

18   acknowledgement that McKesson was not

19   following the law and got fined for it on two

20   occasions.

21              MS. HENN:  Objection to form.

22              THE WITNESS:  Those were the

23         allegations.

24   QUESTIONS BY MR. FARRELL:

25        Q.    Do you accept those allegations
```

```
 1   as partially true?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  Again, we --

 4         partially, in the second agreement, we

 5         did acknowledge that, you know, we

 6         didn't identify all the suspicious

 7         orders that we could have.

 8   QUESTIONS BY MR. FARRELL:

 9         Q.     In fact, in some distribution

10   facilities you didn't identify any?

11              MS. HENN:  Objection to form.

12   QUESTIONS BY MR. FARRELL:

13         Q.     This isn't like we missed a

14   needle in a haystack.  This is we missed the

15   hay.

16              MS. HENN:  Objection to form.

17              THE WITNESS:  So the thing I

18         would just share is that, again, all

19         of those orders were blocked and not

20         shipped.  And we may not have

21         systematically, as I mentioned

22         earlier, reported, but --

23              MR. FARRELL:  Hold on.

24              MS. HENN:  Wait, he's not done

25         with his answer.
```

```
 1                  THE WITNESS:  I'm just
 2         reiterating the point I made earlier
 3         about the 2008 agreement, mutually
 4         discussing with DEA the fact that we
 5         were focusing on customers and would
 6         report suspicious orders in a mutually
 7         format -- a mutually-agreed-upon
 8         format.
 9                  So you say zero, but it may not
10         always be zero.
11    QUESTIONS BY MR. FARRELL:
12         Q.     Just to be fair with you, we're
13    going to take a break.
14         A.     All right.
15         Q.     I have the transactional data
16    in Cuyahoga and Summit County from McKesson
17    sales of opium pills.  I also have the
18    suspicious order reports.
19                  So let's be clear:  McKesson
20    didn't get in trouble for blocking orders and
21    not reporting them.  McKesson paid a record
22    fine for shipping suspicious orders and not
23    reporting them.
24                  MS. HENN:  Objection to form.
25                  THE WITNESS:  Say that again.
```

Highly Confidential -- Subject to Further Confidentiality Review

1       I want to be very clear what I heard.

2   QUESTIONS BY MR. FARRELL:

3       Q.     Me, too.

4       A.     Yeah.

5       Q.     You're telling me that

6   McKesson's conduct that it admitted to,

7   McKesson's position is that it blocked

8   suspicious orders and then just simply didn't

9   report them in the right way.  That's your

10  position?

11      A.     We systematically -- based on

12  the design of our system, orders were

13  blocked.

14      Q.     You believe that McKesson was

15  blocking all the suspicious orders and paid

16  $150 million because of the manner in which

17  it reported?

18      A.     Earlier I said we did

19  acknowledge that some orders, not all, we

20  didn't block.

21      Q.     Okay.  So let's get back --

22      A.     We didn't -- let me rephrase

23  that.  We acknowledge that our system may not

24  have detected orders that could be deemed as

25  suspicious.

1    Q.    And that the orders that your

2    system did detect as suspicious, you still

3    shipped anyway without reporting them?

4         MS. HENN:  Objection to form.

5         THE WITNESS:  No.

6    QUESTIONS BY MR. FARRELL:

7    Q.    You believe that's not true?

8    A.    Based on my understanding of

9    our systems and how things work in -- when

10   they hit a threshold and they're blocked,

11   those do not get shipped.

12   Q.    All right.  So fair --

13   A.    That's how we define those

14   suspicious orders.

15   Q.    Fair enough.

16        Let me ask you this:  If your

17   system detects a suspicious order and you

18   ship it anyway and you don't report it, is

19   that unlawful?

20        MS. HENN:  Objection to form.

21        THE WITNESS:  Please say that

22        again.

23   QUESTIONS BY MR. FARRELL:

24   Q.    If your system detects a

25   suspicious order and you ship it anyway

```
 1    without reporting it, is that unlawful?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  I think it

 4         depends.

 5    QUESTIONS BY MR. FARRELL:

 6         Q.    On?

 7         A.    There could be a technical

 8    glitch --

 9         Q.    Okay.

10         A.    -- or some computer error.  I

11    mean --

12         Q.    I'm talking about hundreds and

13    hundreds and hundreds of orders that are

14    red-flagged by McKesson and shipped anyway

15    without reporting a suspicious order.

16              The US Attorney for the

17    Northern District of West Virginia doesn't

18    say this was a technical glitch.  He says it

19    was a systematic failure by your company to

20    abide by West Virginia law -- or federal law.

21              You paid a record fine, and

22    you're disavowing the underlying conduct

23    today?

24              MS. HENN:  Objection to form.

25              THE WITNESS:  I'm just trying
```

```
1        to communicate that our system that

2        was designed to detect suspicious

3        orders using the concept of thresholds

4        blocked all of the -- blocked those

5        suspicious orders.

6             We recognize that and

7        acknowledge that it may not have

8        picked up on all of the suspicious

9        orders and...

10            MR. FARRELL:  One more and

11       we'll take a quick break.

12            MS. HENN:  If it's okay, I'd

13       like to take it now.  It's been now an

14       hour and 15 minutes.  It's pretty

15       tiring to be a witness.  So if we

16       could just take a five-minute break,

17       that would be great.

18            MR. FARRELL:  Okay.

19            MS. HENN:  Thank you.

20            VIDEOGRAPHER:  The time is 4:29

21       p.m.  We're going off the record.

22        (Off the record at 4:29 p.m.)

23            VIDEOGRAPHER:  The time is

24       4:45 p.m.  We're back on the record.

25            MR. FARRELL:  Thank you.
```

```
 1              So we have about an hour left;

 2         we've been going about -- almost six

 3         hours.  So by agreement we've kept the

 4         deposition days to seven hours long,

 5         and I'll honor that.

 6              MS. HENN:  More than by

 7         agreement.  It's also ordered by the

 8         judge.

 9              MR. FARRELL:  No question.

10              MS. HENN:  Just a slight

11         clarification.

12              MR. FARRELL:  No question.

13         Seven hours of answering questions is

14         enough for anybody.

15              MS. HENN:  It is.

16              MR. FARRELL:  That being said,

17         I know there's a burden on travel and

18         arrangements; we have a tight

19         schedule.  So what I'm going to do is

20         I'm going to finish up some topics,

21         and I'm going to state for the record

22         that I have not been able to get

23         through all of the designated topics

24         today.

25              That being said, there are some
```

1       additional topics that you were not

2       designated for.  There's essentially

3       two notices.

4            So what we're -- what I'm going

5       to do is recommend that I finish up

6       the topics that I want to get to, and

7       then tomorrow is your fact deposition.

8       And what we'll do is work out with

9       counsel if there are any of these

10      questions that can be answered in

11      writing to avoid you having to come

12      back and testify on things that can be

13      answered.

14           And then in addition, there are

15      records and there are -- there is

16      transactional data historically and

17      suspicious order report historically

18      that have not been disclosed yet

19      because of our tight schedules that

20      I'll -- I will be going to ask --

21      eventually to ask for some additional

22      time from you to finish the stuff we

23      didn't get to finish and to ask

24      questions about documents that have

25      not been disclosed yet.

 1          Obviously, it's going to be

 2      subject to the objection of your

 3      lawyers, and I just wanted to place

 4      that on the record.

 5  QUESTIONS BY MR. FARRELL:

 6      Q.    Jumping in real quick, I'm not

 7  going to spend a whole lot of time on this; I

 8  have a very specific question.

 9          Before we get into the

10  document, there's a reference in here about

11  heroin, and I just wanted to see if I could

12  cut to the chase with you.

13      A.    Okay.

14      Q.    As the McKesson corporate

15  representative, do you acknowledge that abuse

16  of prescription opium pills is a gateway to

17  the initiation of heroin?

18          MS. HENN:  Objection to form.

19      Outside the scope.

20          THE WITNESS:  Based on

21      everything that I've read and in the

22      media and statistics and discussion, I

23      would agree -- agree to that.

24  QUESTIONS BY MR. FARRELL:

25      Q.    If you abuse prescription

```
 1    opiates, the CDC says that you're 40 times

 2    more likely to initiate heroin use.

 3              Does McKesson acknowledge

 4    that -- that prescription opiate pill abuse

 5    is a driving factor in the heroin epidemic

 6    we're also experiencing?

 7              MS. HENN:  Objection to form.

 8        Outside the scope.

 9              THE WITNESS:  Yeah, it's a

10        factor.

11    QUESTIONS BY MR. FARRELL:

12        Q.    That was easy.

13        A.    Yeah.

14        Q.    All right.  Back to this amicus

15    business.

16              (McKesson-Hartle Exhibit 38

17        marked for identification.)

18    QUESTIONS BY MR. FARRELL:

19        Q.    I'm going to mark as

20    Exhibit 38, it's 2016_04_04.  This is another

21    amicus brief.  This one is Masters

22    Pharmaceutical.

23              Does McKesson acknowledge that

24    in 2016 when this amicus brief was submitted

25    that it was still on the executive committee
```

```
 1    of HDMA?

 2                    MS. HENN:  Objection to form.

 3           Outside the scope.

 4                    THE WITNESS:  I can't speak to

 5           that.  If I saw a list of who was on

 6           the executive committee...

 7                    (McKesson-Hartle Exhibit 39

 8           marked for identification.)

 9    QUESTIONS BY MR. FARRELL:

10           Q.     Fair enough.  Exhibit 39,

11    2016_04_05, the Wayback Machine.

12                    So looking at the Exhibit 39,

13    can you acknowledge that McKesson was on the

14    executive board of HDMA --

15           A.     Yes.

16           Q.     -- at the time that this amicus

17    brief was submitted?

18           A.     Yes.

19           Q.     Have you had a chance to review

20    the amicus brief?

21           A.     I had a chance to look at some

22    of the highlighted sections.

23           Q.     So let's go to 2016_04_04,

24    page 5.

25           A.     Page 5.
```

```
 1          Q.     Down the right-hand side, you

 2   can see two-thirds of the way down it starts,

 3   "DEA."  The one below that.  Yeah.

 4              "DEA has required distributors

 5   not only to report suspicious orders but to

 6   investigate orders by interrogating

 7   pharmacies and physicians and take action to

 8   halt suspicious orders before they are

 9   filled.  Those added obligations would

10   significantly expand a report-only duty of

11   distributors under the long-standing

12   regulatory scheme and impose impractical

13   obligations on distributors."

14              Is that McKesson's position?

15              MS. HENN:  Objection to form.

16         Outside the scope.

17              THE WITNESS:  Obviously we're

18         part of the organization.  In parts,

19         you know, I agree with the added --

20         what it would -- you know, the added

21         responsibility or time that it would

22         take to -- you know, to investigate

23         each order.

24              I don't know if I'm answering

25         your question, but...
```

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.     You're stumbling toward it.

 3         A.     Yeah.

 4         Q.     Let's go to page 6, a little

 5    more direct.  The second highlighted

 6    provision:  "As the final order in this case

 7    underscores, however, DEA now appears to have

 8    changed its position to require that

 9    distributors not only report suspicious

10    orders but investigate and halt suspicious

11    orders."

12              This is a 2016 document by your

13    trade organization, of which McKesson sits on

14    the executive board, and its telling the DC

15    Circuit Court of Appeals that it does not

16    have a duty to investigate and halt

17    suspicious orders.

18              Does McKesson validate this

19    position?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  Can you rephrase

22         that for me?

23    QUESTIONS BY MR. FARRELL:

24         Q.     Yeah.

25              In 2016, your trade
```

1    organization is telling the second highest

2    court in the land, the DC Circuit Court of

3    Appeals, that the DEA is now requiring them

4    to investigate and halt suspicious orders.

5              Haven't we agreed that's been

6    the duty since 1971?

7              MS. HENN:  Objection to form.

8         Outside the scope.

9    QUESTIONS BY MR. FARRELL:

10        Q.    Tough position to defend, isn't

11   it?

12             MS. HENN:  Same objections.

13             THE WITNESS:  You know, again,

14        I -- I recognize that other

15        distributors have different systems

16        and have worked with DEA over the

17        years on different methodologies,

18        whether it's a threshold to block it

19        or it's a hold and investigate and

20        then block it.  And so, you know, I

21        recognize that.

22   QUESTIONS BY MR. FARRELL:

23        Q.    You recognize this position is

24   problematic given your experience, McKesson

25   Corporation, with the DEA?

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  I recognize that

 3         I'm sure there's lots of disagreements

 4         about this.

 5  QUESTIONS BY MR. FARRELL:

 6         Q.    Yeah.

 7              But we're still trying to

 8  figure out from internal communications

 9  whether or not McKesson signed off on this

10  brief.

11              Are you aware of whether or not

12  they signed off on this?

13              MS. HENN:  Objection to form.

14              THE WITNESS:  I don't -- I am

15         not aware of the process that goes

16         into signing off on these briefs and

17         what that specific looks like.  I know

18         how trade organizations work and how

19         they get to a point of consensus.

20  QUESTIONS BY MR. FARRELL:

21         Q.    Let me ask you in a different

22  way.

23              We talked about the original

24  enactment of the Controlled Substances Act

25  where the penalty for engaging in unlawful
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    conduct should be prohibitive.

2              Do you remember talking about

3    that this morning?

4         A.    I do.

5         Q.    And so in 2008, McKesson

6    Corporation paid $13 million, and in 2017,

7    McKesson paid $150 million.

8              What would happen in today's

9    world if McKesson went to the DEA and said,

10   "We don't have a duty to investigate and halt

11   suspicious orders"?  What do you reckon would

12   happen then?

13             MS. HENN:  Objection to form.

14        Outside the scope.

15             THE WITNESS:  I'm not sure

16        exactly what would happen, but they

17        wouldn't be thrilled.

18   QUESTIONS BY MR. FARRELL:

19        Q.    So what do you think the fine

20   will be next time?

21        A.    I can't speculate what it would

22   be.  It depends on the facts and

23   circumstances and...

24        Q.    So just simply stated, sitting

25   here today, McKesson Corporation, do you
```

```
 1   accept or reject the position your trade

 2   organization is taking regarding the

 3   interpretation of the shipping requirement

 4   and reporting requirement?

 5           MS. HENN:  Objection to form.

 6        Outside the scope.

 7           THE WITNESS:  I apologize.  Can

 8        you ask -- ask me again or rephrase?

 9        Do we accept --

10   QUESTIONS BY MR. FARRELL:

11        Q.    Yeah.

12           The sentence you see up there

13   on the screen --

14        A.    Yeah.

15        Q.    -- submitted by your trade

16   organization to which McKesson sits as an

17   executive board member, this is a position in

18   a legal document submitted to the second

19   highest court in the United States of

20   America.

21           Sitting here today, does

22   McKesson Corporation accept or reject this

23   position?

24           MS. HENN:  Objection to form.

25        Outside the scope.
```

```
 1              THE WITNESS:  I'd say we accept

 2         this -- accept this --

 3    QUESTIONS BY MR. FARRELL:

 4         Q.     You accept --

 5         A.     -- as part of that

 6    organization.

 7         Q.     What is that?

 8         A.     As being part of that

 9    organization.

10         Q.     So your position today is

11    McKesson does not have a duty to investigate

12    and halt suspicious orders?

13              MS. HENN:  Objection to form.

14    QUESTIONS BY MR. FARRELL:

15         Q.     You're in a tough spot here.

16         A.     I can tell you what our program

17    does, right?  We halt -- we block suspicious

18    orders.

19         Q.     All right.  So let's go

20    further.  Page 8.  "The 2006 letter from Joe

21    Rannazzisi fails to explain how the statutory

22    command of the US Code 823 Section E, a

23    command that the Attorney General consider

24    when adjudicating an application for

25    registration of the applicant's maintenance
```

 1   of effective controls against diversion" --

 2               MS. HENN:  I'm sorry, you're on

 3        page 8.  I believe the witness is on

 4        page 9.

 5               THE WITNESS:  Oh, excuse me.

 6        Sorry.  I was figuring that out when I

 7        looked up there.

 8   QUESTIONS BY MR. FARRELL:

 9        Q.    I'm sorry.

10        A.    No, that's me.

11        Q.    Basically, the position in this

12   brief is they're trying to figure out how in

13   the world that 2006 letter became a command

14   to distributors to engage in due diligence

15   and avoid filling suspicious orders.

16               MS. HENN:  Objection to form.

17   QUESTIONS BY MR. FARRELL:

18        Q.    How can you defend this

19   position, knowing that Masters Pharmaceutical

20   opinion that was released rejected in its

21   entirety this position?

22               So what I'm really trying to

23   figure out is whether McKesson has been so

24   intransigent that it continues to pay fines

25   to the DEA fighting its interpretation of the

Highly Confidential — Subject to Further Confidentiality Review

```
 1   federal regulations until such time as the DC

 2   Circuit Court of Appeals told them so.

 3                 MS. HENN:  Objection to form.

 4                 MR. FARRELL:  Terrible

 5      question?

 6   QUESTIONS BY MR. FARRELL:

 7      Q.    You get the gist of what I'm

 8   asking you?

 9      A.    Can you ask it in a different

10   way?

11      Q.    Yeah.

12            This appears to say that

13   McKesson does not have a duty to engage in

14   due diligence, nor does it need to avoid

15   filling suspicious orders.

16            Is that your position sitting

17   here today?

18                 MS. HENN:  Objection to form.

19   QUESTIONS BY MR. FARRELL:

20      Q.    "You can't make me," is that

21   the position McKesson is taking?

22                 MS. HENN:  Objection to form.

23   QUESTIONS BY MR. FARRELL:

24      Q.    I promise I'll quit if you just

25   simply say that this position here is
```

```
 1    nonsense.

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  I can say -- I

 4         can't say that it's nonsense.  I'm not

 5         sure how to answer this one

 6         specifically.

 7    QUESTIONS BY MR. FARRELL:

 8         Q.    Go to page Bates stamp 9.

 9    "Nothing in the federal regulations requires

10    distributors to investigate the legitimacy of

11    orders or to halt shipments of any orders

12    deemed to be suspicious."

13              Does McKesson disavow this

14    statement or agree with it?

15              MS. HENN:  Objection to form.

16              THE WITNESS:  You know, I do

17         think the language of the regulations,

18         you know, "design and operate a system

19         to disclose suspicious orders," gets

20         interpreted in many different ways,

21         and that -- and that's how different

22         organizations, distributors, develop

23         their program.

24    QUESTIONS BY MR. FARRELL:

25         Q.    Respectfully, that's how you
```

```
 1   get fined $150 million.

 2              MS. HENN:  Objection to form.

 3   QUESTIONS BY MR. FARRELL:

 4        Q.    The next sentence:  "There is

 5   no prohibition on shipment of suspicious

 6   orders."

 7              That's wrong, isn't it?

 8              MS. HENN:  Objection to form.

 9   QUESTIONS BY MR. FARRELL:

10        Q.    Make it easier.  Let's go to

11   page 12.

12              "DEA's regulations had sensibly

13   imposed a duty on distributors simply to

14   report suspicious orders, but left it to DEA

15   and its agents to investigate and halt

16   suspicious orders."

17              Nonsense or not nonsense?

18              MS. HENN:  Objection to form.

19   QUESTIONS BY MR. FARRELL:

20        Q.    Or no comment?  I'm giving you

21   an out.

22        A.    I would say no comment.  I'm

23   not sure how to answer that specifically.

24        Q.    Well, the answer should be

25   someone needs to call HDMA and figure out why
```

```
 1    they're taking nonsense positions, but I'll

 2    leave that to somebody else.

 3              All right.  Homestretch.  Some

 4    toys.  As many at this table probably know,

 5    I'm the ARCOS nerd.

 6              You're familiar with ARCOS?

 7       A.    I'm familiar with what it is,

 8    yep.

 9       Q.    I'm the guy that's been banging

10    away trying to get access to ARCOS for the

11    better part of a year and a half, and I got

12    some.

13              Now, what this is is the

14    transactions by every distributor in the

15    country between 2006 and 2014, and it's

16    related to Cuyahoga and Summit County.  Now,

17    we also have the rest of the country, so I'm

18    able to determine national averages, state

19    averages and county averages for every

20    distributor, including McKesson.  But we're

21    not going to get into all of that today

22    because what I really need is I need the

23    transactional data dating back to 1996.  I'm

24    missing a decade.  I have '06 to 2014.

25              Last week, July 25th, your
```

1    counsel provided a spreadsheet that gave us

2    2006 to 2018.  All right?  So we've had it

3    for a week.  I played with it a little bit.

4              But I don't have the decade

5    from the launch of OxyContin to 2006 yet, but

6    I'm working on it.  So one day we may come

7    back and have to talk about this

8    transactional data in a different context.

9              But that being said, one of the

10   interesting things that I did was I grabbed

11   the data provided by your counsel, and I

12   pulled it up and took a look at it.

13             MR. FARRELL:  Corey, can you

14      pull that up?

15   QUESTIONS BY MR. FARRELL:

16      Q.    Now, the first thing I want you

17   to note is this is highly confidential.

18   Nobody in here is allowed to talk about it

19   outside this room.

20             And it's MCKMDL00478913.

21             MR. FARRELL:  Is that right?

22             MS. HENN:  I see

23      MCKMDL00478913.  That may be the same.

24   QUESTIONS BY MR. FARRELL:

25      Q.    Okay.  Can either you or your

```
 1   counsel confirm that this is the complete

 2   transactional data for McKesson in Cuyahoga

 3   and Summit counties between 2006 and 2018?

 4            MS. HENN:  Object to form.

 5            Go ahead.

 6            THE WITNESS:  I wasn't involved

 7        in pulling it, so I can't -- without

 8        seeing, I can't confirm that it's

 9        everything.

10            MR. FARRELL:  Yeah, it's really

11        a question for your counsel, but I'm

12        not allowed to put her under oath, so

13        I'm hoping she'll volunteer.

14            MS. HENN:  That's my

15        understanding, but I'm not the person

16        who is most knowledgeable about this,

17        so you should ask one of my

18        colleagues.

19   QUESTIONS BY MR. FARRELL:

20        Q.    So all of these questions are

21   predicated on the fact that this appears to

22   be the transactional data that was uploaded

23   to RICOH Relativity by McKesson, but because

24   there's no discovery document that itemizes

25   what's what, this is all I know.
```

```
 1              Spreadsheet has up top the
 2    Bates stamp number.
 3              MR. FARRELL:  And, Corey, if
 4         you'll click on the letter A, it'll
 5         tell us how many transactions there
 6         are.
 7    QUESTIONS BY MR. FARRELL:
```







Highly Confidential - Subject to Further Confidentiality Review

7            MS. HENN:  Objection to form.

8   QUESTIONS BY MR. FARRELL:

9       Q.     Because remember, there was a

10   period of time where there were 300,000

11   prescriptions of OxyContin, and then -- in

12   '96, and then by 2001 there were 6 million,

13   right?

14            So when we get the data for the

15   first ten years, we're going to see a

16   progression of the number of pills being

17   delivered.  Okay?

18            So one of the things that I'm

19   going to have you do is we're able to do some

20   analysis with the ARCOS data.

21            MR. FARRELL:  So, Corey, if

22       you'll bring up Summit County PDF.

23            MS. HENN:  Do you have a

24       document that we can look at?  No?

25            MR. FARRELL:  Not yet, no.

1    QUESTIONS BY MR. FARRELL:



 1          MS. HENN:  Counsel, just -- I

 2      just want to interpose really quickly.

 3      We would like this in the record with

 4      an exhibit number, at least maybe the

 5      version you have.  I think that's

 6      going to be necessary to understand

 7      the deposition transcript and required

 8      by the protocol.

 9          MR. FARRELL:  That's fair

10      enough.

11          MS. HENN:  But I don't want to

12      interrupt you.  Please continue.

13  QUESTIONS BY MR. FARRELL:

14      Q.    So now what I'm going to do is

15  I'm going to -- we're going --  --



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



25        Q.      Okay.  Fair enough.



1     A.     Okay.

2     Q.     Maybe somebody can testify that

3  they recall about it.

4     A.     Yeah.





15          MR. FARRELL:  Counsel?

16          MS. HENN:  Again, I'm not the

17     best person to ask that question of.

18          You can ask the witness if you'd like.

19     QUESTIONS BY MR. FARRELL:



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







```
 4        Q.      So you understand the position

 5   about reporting suspicious customers McKesson

 6   made to the United States District Attorney

 7   in northern West Virginia and resulted in

 8   you-all getting fined 150 million.  So what

 9   I'm trying to figure out is whether or not

10   the same systemic errors were going on for --

11   which resulted in these pills going to

12   Cuyahoga and Summit County.

13              Do you see where I'm going with

14   it?

15              MS. HENN:  And, Counsel, I

16        would just point out that he said he

17        had a couple parts to his answer, and

18        we need to listen to his whole answer

19        to know what it is.

20              Go right ahead.
```



14      QUESTIONS BY MR. FARRELL:

Highly Confidential - Subject to Further Confidentiality Review









 6   QUESTIONS BY MR. FARRELL:

 7        Q.    Do you agree that one of the

 8   foreseeable harms of engaging in unlawful

 9   conduct in the distribution of prescription

10   opioids is diversion?

11              MS. HENN:  Objection.  Form.

12              THE WITNESS:  Could you ask

13        that again?

14   QUESTIONS BY MR. FARRELL:

15        Q.    One of the harms --

16        A.    You said foreseeable first, but

17   harms --

18        Q.    I'll go back and do it.

19              Do you agree that one of the

20   foreseeable harms of engaging in unlawful

21   conduct in the distribution of prescription

22   opioids is diversion?

23              MS. HENN:  Objection to form.

24              THE WITNESS:  I think it can

25        be.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FARRELL:

 2         Q.    Do you agree that filling

 3    suspicious orders is a direct and proximate

 4    cause of prescription opioid abuse,

 5    addiction, morbidity and mortality?

 6              MS. HENN:  Objection to form.

 7              THE WITNESS:  Filling specific

 8         orders?

 9              MS. HENN:  Suspicious orders is

10         the word he used.

11              THE WITNESS:  Suspicious

12         orders.

13              There's a lot of reasons for --

14         that orders may get flagged as

15         suspicious, so I think it depends.

16    QUESTIONS BY MR. FARRELL:

17         Q.    That's fair.

18         A.    They'll get flagged as an order

19    of unusual size, frequency or pattern and not

20    mean that it's suspicious or

21    diversion-related.

22         Q.    Do you believe the prescription

23    opiate epidemic is an immediate hazard to

24    public health and safety?

25              MS. HENN:  Objection to form.
```

```
 1                 THE WITNESS:  How do you -- how

 2          are you defining "immediate hazard"?

 3   QUESTIONS BY MR. FARRELL:

 4          Q.    A hazard.

 5          A.    A hazard?

 6                Sure.

 7                MR. FARRELL:  Okay.  We will

 8          adjourn with the reservation of rights

 9          for one day, continuing the subject

10          matters that most interest the

11          plaintiffs in the MDL in the 30(b)(6)

12          notices.

13                MS. HENN:  And, I mean, we will

14          object to continuing past the limit

15          set by the Court.  We feel that there

16          was a lot of time today that was spent

17          asking legal questions that could have

18          been spent on topics.

19                MR. FARRELL:  There was also a

20          lot of time spent reading documents

21          that were listed in my 30(b)(6).

22                MS. HENN:  Documents that you

23          put in front of the witness and wanted

24          him to read.

25                But more importantly, I wanted
```

```
 1          to ask the court reporter to please

 2          designate this transcript

 3          provisionally highly confidential,

 4          which is required under the deposition

 5          protocol, and I also wanted to reserve

 6          the right to read and sign.

 7              I have no questions, and so I

 8          think we are finished.

 9              VIDEOGRAPHER:  Okay.  The time

10          is 5:47 p.m., July 31, 2018.  Going

11          off the record completing today's

12          videotaped session.

13              (McKesson-Hartle Exhibit 40

14          marked for identification.)

15      (Deposition concluded at 5:47 p.m.)

16              - - - - - - -

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     CERTIFICATE
 2
 3           I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
 4  Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
 5  of the examination, Nathan J. Hartle was duly
    sworn by me to testify to the truth, the
 6  whole truth and nothing but the truth.
 7           I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
             I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.
14
15
           _____
17       CARRIE A. CAMPBELL,
         NCRA Registered Diplomate Reporter
18       Certified Realtime Reporter
         California Certified Shorthand
19       Reporter #13921
         Missouri Certified Court Reporter #859
20       Illinois Certified Shorthand Reporter
         #084-004229
21       Texas Certified Shorthand Reporter #9328
         Kansas Certified Court Reporter #1715
22       Notary Public
23       Dated:  August 3, 2018
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3             Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8             After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13             It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3

4          I,_____, do

    hereby certify that I have read the foregoing

5   pages and that the same is a correct

    transcription of the answers given by me to

6   the questions therein propounded, except for

    the corrections or changes in form or

7   substance, if any, noted in the attached

    Errata Sheet.

8

9

10

11

12  _____

    Nathan J. Hartle                DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  - - - - - - -

                       ERRATA

 2                  - - - - - - -

 3      PAGE    LINE    CHANGE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

                   LAWYER'S NOTES

 2                    - - - - - -

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```