```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

     IN RE: NATIONAL         )
 4   PRESCRIPTION            )  MDL No. 2804
     OPIATE LITIGATION       )
 5   _____  )  Case No.
                             )  1:17-MD-2804
 6                           )
     THIS DOCUMENT RELATES )  Hon. Dan A.
 7   TO ALL CASES            )  Polster

 8

               WEDNESDAY, AUGUST 1, 2018

 9

      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10            CONFIDENTIALITY REVIEW

11                    - - -

12           Videotaped deposition of Nathan J.
13   Hartle, held at the offices of Covington &
14   Burlington, LLP, One City Center, 850 Tenth
15   Street Northwest, Washington, DC, commencing
16   at 9:03 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter, Certified Realtime Reporter,
19   Illinois, California & Texas Certified
20   Shorthand Reporter, Missouri & Kansas
21   Certified Court Reporter.
22                    - - -

             GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24

25
```

```
 1              A P P E A R A N C E S :
 2
 3      MCHUGH FULLER LAW GROUP
        BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4           mike@mchughfuller.com
        97 Elias Whiddon Road
 5      Hattiesburg, Mississippi 39402
        (601) 261-2220
 6
 7      GREENE KETCHUM BAILEY WALKER FARRELL
        & TWEEL
 8      BY:  PAUL T. FARRELL, JR., ESQUIRE
             paul@greeneketchum.com
 9      419 Eleventh Street
        Huntington, West Virginia 25701
10      (314) 525-9115
11
        LEVIN, PAPANTONIO, THOMAS, MITCHELL,
12      RAFFERTY & PROCTOR, P.A.
        BY:  MICHAEL PAPANTONIO, ESQUIRE
13           mpapantonio@levinlaw.com
             TROY RAFFERTY, ESQUIRE
14           trafferty@levinlaw.com
             BRANDON BOGLE
15           bbogle@levinlaw.com
        316 South Baylen Street, Suite 600
16      Pensacola, Florida 32502
        (850) 435-7000
17      Counsel for Plaintiffs
18
        COVINGTON & BURLING LLP
19      BY:  EMILY JOHNSON HENN, ESQUIRE
             ehenn@cov.com
20           MEGHAN MONAGHAN, ESQUIRE
             mmonaghan@cov.com
21      850 Tenth Street, NW
        Washington, DC 20001-4956
22      (202) 662-6000
        Counsel for McKesson Corporation
23
24
25
```

```
 1      WILLIAMS & CONNOLLY LLP
        BY:  MIRANDA PETERSEN, ESQUIRE
 2           mpetersen@wc.com
        725 Twelfth Street, N.W.
 3      Washington, DC 20005
        (202) 434-5331
 4      Counsel for Cardinal Health, Inc.
 5
        REEDSMITH LLP
 6      BY:  THOMAS H. SUDDATH, JR., ESQUIRE
             tsuddath@reedsmith.com
 7      Three Logan Square
        1717 Arch Street, Suite 3100
 8      Philadelphia, Pennsylvania 19103
        (215) 851-8100
 9      Counsel for AmerisourceBergen
10
        JONES DAY
11      BY:  CHRISTOPHER J. LOVRIEN, ESQUIRE
             cjlovrien@jonesday.com
12      555 South Flower Street, 50th Floor
        Los Angeles, California 90071-2452
13      (213) 489-3939
        Counsel for Walmart
14
15      PELINI, CAMPBELL & WILLIAMS LLC
        BY:  CRAIG G. PELINI, ESQUIRE
16           cgp@pelini-law.com
        8040 Cleveland Avenue NW, Suite 400
17      North Canton, Ohio 44720
        (330) 305-6400
18      Counsel for Prescription Supply,
        Inc.
19
20      JACKSONKELLY PLLC
        BY:  WILLIAM J. AUBEL, ESQUIRE
21           william.j.aubel@jacksonkelly.com
             (VIA TELECONFERENCE)
22      500 Lee Street East, Suite 1600
        Charleston, West Virginia 25301
23      (304) 340-1146
        Counsel for Miami-Luken
24
25
```

```
 1      ZUCKERMAN SPAEDER LLP
        BY:  CONOR B. O'CROININ, ESQUIRE
 2           cocroinin@zuckerman.com
        100 East Pratt Street, Suite 2440
 3      Baltimore, Maryland 21202-1031
        (202) 778-1800
 4      Counsel for CVS Indiana, LLC, and
        CVS RX Services, Inc.
 5
 6      ARNOLD & PORTER
        BY:  DAVID D. FAUVRE, ESQUIRE
 7           David.Fauvre@arnoldporter.com
        601 Massachusetts Avenue, NW
 8      Washington, DC 20001-3743
        (202) 942-5000
 9      Counsel for Endo Pharmaceuticals
        Inc., and Endo Health Solutions Inc.
10
11      ROPES & GRAY
        BY:  WILLIAM T. DAVISON, ESQUIRE
12           william.davison@ropesgray.com
        800 Boylston Street
13      Boston, Massachusetts 02199-3600
        (617) 951-7000
14      Counsel for Mallinckrodt
15
        MARCUS & SHAPIRA LLP
16      BY:  SCOTT D. LIVINGSTON, ESQUIRE
             livingston@marcus-shapira.com
17      301 Grant Street, 35th Floor
        Pittsburgh, Pennsylvania 15219-6401
18      (412) 338-4690
        Counsel for HBC
19
20      MORGAN, LEWIS & BOCKIUS LLP
        BY:  MONICA C. PEDROZA, ESQUIRE
21           monica.pedroza@morganlewis.com
             (VIA TELECONFERENCE)
22      77 West Wacker Drive, Fifth Floor
        Chicago, Illinois 60601
23      (312) 324-1000
        Counsel for Teva Pharmaceuticals
24      USA, Inc., Cephalon, Inc., Watson
        Laboratories, Actavis LLC, Actavis
25      Pharma, Inc., f/k/a Watson Pharma
```

```
 1        MORGAN, LEWIS & BOCKIUS LLP
          BY:   MATTHEW R. LADD, ESQUIRE
 2              matthew.ladd@morganlewis.com
                (VIA TELECONFERENCE)
 3        101 Park Avenue
          New York, NY 10178-0060
 4        (212) 309-6000
          Counsel for Rite Aid
 5
 6        LOCKE LORD LLP
          BY:   BRANDAN MONTMINY, ESQUIRE
 7              brandan.montminy@lockelord.com
                (VIA TELECONFERENCE)
 8        2200 Ross Avenue, Suite 2800
          Dallas, Texas 75201
 9        (214) 740-8445
          Counsel for Henry Schein, Inc., and
10        Henry Schein Medical Systems, Inc.
11
          KIRKLAND & ELLIS
12        BY:   KAITLYN L. COVERSTONE, ESQUIRE
                kaitlyn.coverstone@kirkland.com
13              (VIA TELECONFERENCE)
          300 North LaSalle
14        Chicago, IL 60654
          (312) 862-3671
15        Counsel for Allergan Finance, LLC
16
     VIDEOGRAPHER:
17        DANIEL HOLMSTOCK,
          Golkow Litigation Services
18
19   TRIAL TECHNICIAN:
          COREY SMITH,
20        Golkow Litigation Services
21                   - - -
22
23
24
25
```

Case: 1:17-md-02804-DAP Doc #: 1978-4 Filed: 07/24/19 6 of 517. PageID #: 227864

1                                INDEX

2                                                          PAGE

   APPEARANCES...................................   2

4   EXAMINATIONS

5      BY MR. RAFFERTY...........................   15

6      BY MR. PAPANTONIO.........................  325

7      BY MS. HENN...............................  490

8      BY MR. RAFFERTY...........................  501

9

10                             EXHIBITS

11       No.        Description                     Page

12

23

24

25









Highly Confidential - Subject to Further Confidentiality Review



1

       (Exhibits attached to the deposition.)

7

8     CERTIFICATE...................................513

9     ACKNOWLEDGMENT OF DEPONENT....................515

10    ERRATA.......................................516

11    LAWYER'S NOTES...............................517

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    VIDEOGRAPHER:  We are now on
 2        the record.
 3                    My name is Daniel Holmstock.  I
 4        am the videographer for Golkow
 5        Litigation Services.
 6                    Today's date is August 1, 2018.
 7        The time is 9:03 a.m.
 8                    This deposition is being held
 9        at the law offices of Covington &
10        Burling, LLP, at 850 Tenth Street,
11        Northwest, in Washington, DC, in the
12        matter of In Re: National Prescription
13        Opiate Litigation, pending before the
14        United States District Court for the
15        Northern District of Ohio, Eastern
16        Division, Case Number 1:17-MD-2804.
17                    The deponent today is Mr. Nate
18        Hartle.
19                    Will counsel please introduce
20        themselves and whom they represent.
21             MR. RAFFERTY:  Troy Rafferty on
22        behalf of the plaintiffs.
23             MR. BOGLE:  Brandon Bogle on
24        behalf of the plaintiffs.
25             MR. PAPANTONIO:  Mike
```

1     Papantonio on behalf of the

2     plaintiffs.

3               MR. FARRELL:  Paul Farrell on

4     behalf of plaintiffs.

5               MR. SUDDATH:  Tom Suddath on

6     behalf of AmerisourceBergen.

7               MR. PELINI:  Craig Pelini on

8     behalf of Prescription Supply.

9               MR. FAUVRE:  David Fauvre on

10    behalf of the Endo and Par

11    Pharmaceutical defendants.

12              MR. DAVISON:  William Davison

13    on behalf of Mallinckrodt LLC, and

14    SpecGx LLC.

15              MR. LOVRIEN:  Chris Lovrien,

16    Jones Day, on behalf of Walmart.

17              MS. PETERSEN:  Miranda

18    Petersen, Williams & Connolly, on

19    behalf of Cardinal Health.

20              MR. LIVINGSTON:  Scott

21    Livingston on behalf of HBC.

22              MR. O'CROININ:  Conor O'Croinin

23    on behalf of CVS.

24              MS. MONAGHAN:  Meghan Monaghan

25    from Covington & Burling on behalf of

1        McKesson and the witness.

2                MS. HENN:  Emily Henn on behalf

3        of McKesson and the witness.

4                VIDEOGRAPHER:  Okay.  Will the

5        court reporter please administer the

6        oath?

7                Telephone, sorry, yes.  Yeah,

8        telephone?

9                MS. PEDROZA:  Monica Pedroza on

10       behalf of Teva Pharmaceuticals USA,

11       Inc., Cephalon Inc., Watson

12       Laboratories, Inc., Actavis, LLC and

13       Actavis Pharma, Inc.

14               MR. LADD:  Matthew Ladd on

15       behalf of Rite Aid.

16               MR. AUBEL:  Bill Aubel, Jackson

17       Kelly, on behalf of Miami-Luken, Inc.

18               VIDEOGRAPHER:  Okay.

19               MR. RAFFERTY:  Anybody else?

20               VIDEOGRAPHER:  The court

21       reporter is Carrie Campbell, who will

22       now administer the oath.

23

24               NATHAN J. HARTLE,

25    of lawful age, having been first duly sworn

Highly Confidential - Subject to Further Confidentiality Review

1  to tell the truth, the whole truth and

2  nothing but the truth, deposes and says on

3  behalf of the Plaintiffs, as follows:

4

5           DIRECT EXAMINATION

6  QUESTIONS BY MR. RAFFERTY:

7       Q.    Could you state your name,

8  please?

9       A.    Nathan John Hartle.  I go by

10 Nate.

11      Q.    Mr. Hartle, my name is Troy

12 Rafferty.  I'm going to be asking you some

13 questions today.

14           Okay?

15      A.    Okay.

16      Q.    Who is your current employer?

17      A.    McKesson Corporation.

18      Q.    Okay.  What is your current

19 position?

20      A.    I'm currently the vice

21 president of compliance -- regulatory affairs

22 and compliance.

23      Q.    Vice president of regulatory

24 affairs and compliance.

25      A.    Correct.

1    Q.      Is that a new position?

2    A.      It is a new position, new

3  title, as of July 1st.  Prior to that, I

4  was -- senior director of regulatory affairs

5  was my title.

6    Q.      Senior director of regulatory

7  affairs for the retail national accounts or

8  in some other capacity?

9    A.      Correct.  For the retail

10  national accounts.  The new title, I will be

11  taking on the statistics and analytics team

12  here shortly.

13    Q.      Okay.  So is that a

14  different -- the title is different, but is

15  the position different from what you had

16  before?

17    A.      I maintain the certain

18  regulatory -- or the chain responsibilities,

19  and in addition to that will be statistics

20  and analytics.

21          (McKesson-Hartle Exhibit 41

22    marked for identification.)

23  QUESTIONS BY MR. RAFFERTY:

24    Q.      Okay.  I'm going to show you --

25          MR. RAFFERTY:  If we could pull

Highly Confidential - Subject to Further Confidentiality Review

```
 1             up, Corey, 1.795, which we will mark
 2             as Exhibit 41 to the deposition.
 3   QUESTIONS BY MR. RAFFERTY:
 4        Q.    Okay.  What I'm showing you --
 5   I'm going to show you some documents
 6   throughout the deposition, Mr. Hartle.  I'm
 7   going to direct you to certain areas.  If
 8   there's a different part that you want to
 9   look at or if you want to take a minute to
10   review, I'm fine with that.  Just let me
11   know.
12             Okay?
13        A.    Okay.
14        Q.    But to try and keep things
15   moving, we're under a time -- you know, I've
16   only got a certain amount of time, so I'm
17   going to try and direct you to those areas.
18             Okay?
19        A.    Understood.
20        Q.    All right.  What we have here,
21   if you look, is something entitled
22   "McKesson's Controlled Substance Monitoring
23   Program, Regulatory Affairs Training."
24             Do you see that?
25        A.    I do.
```

1    Q.    Okay.  And I will represent to

2  you that there's not a date on this, but we

3  looked at the production, and there's

4  something referred to as metadata that

5  established that this was produced

6  December 31, 2015.

7            Okay?

8            You were there in your role as

9  senior director of retail and national

10  accounts, correct?

11    A.    Correct.

12    Q.    You started there when?  In

13  McKesson.

14    A.    In May of 2014.

15    Q.    May of 2014.  Okay.

16            And you maintained that same

17  position in charge of retail national

18  accounts until July of this year when your

19  position changed, correct, or your title

20  changed?

21    A.    Title changed, yeah.  And I've

22  added different responsibilities, but I've

23  always had the chain responsibility.

24    Q.    So you've added additional

25  responsibilities, yes?

```
 1        A.      Correct.

 2        Q.      Okay.  If you'll turn to

 3   page .9, I want to just make sure I

 4   understand who -- where you sit in the

 5   hierarchy of McKesson.  Okay?

 6               And in particular, US pharma is

 7   the division of McKesson that handles and

 8   sells the narcotics, right?  That's the

 9   division?

10        A.      Correct.  Correct.

11        Q.      Okay.  So if you look up here,

12   you've got regulatory affairs, retail

13   national accounts, and it says, "Nate Hartle,

14   senior director," right?

15        A.      It does.

16        Q.      Nobody above you?

17        A.      Not on this slide.

18        Q.      Not on that.  Not in terms of

19   retail national accounts?

20        A.      Correct.

21        Q.      Okay.  Because there's one

22   other person, a vice president, I think, at

23   the time, Krista Peck?

24        A.      Senior vice president.

25        Q.      Senior vice president.
```

1          Okay.  So -- and we'll look at

2    that in just a minute.  But you have

3    underneath you some direct reports, including

4    Micheal Bishop.

5          Do you know who Micheal Bishop

6    is?

7          A.     I do.

8          Q.     Okay.  Michael Oriente.  Do you

9    know who that is?

10         A.     I do.

11         Q.     Okay.  Jay Espaillat?

12         A.     Espaillat.

13         Q.     Espaillat.

14                And then Adam Palmer, who

15    reports to Michael Oriente.

16                Do you see that?

17         A.     I do.

18         Q.     And then Jennifer Sheffield,

19    the regulatory affairs admin?

20         A.     Yeah.

21         Q.     Okay.  And that was your team,

22    right?

23         A.     Was, yeah.  It's changed over

24    time.

25         Q.     Okay.  It's changed.  In

1    fact -- yeah.  Okay.

2                    So if we go now to point --

3    well, how long was that your team?  How long

4    did you have -- in particular looking at the

5    director of regulatory affairs, Michael

6    Oriente, and Micheal Bishop, the regulatory

7    affairs manager, how long were they with you?

8         A.    So it's evolved.  When I --

9    Michael joined the team -- Michael, Adam

10   Palmer -- well, two Michaels and Adam Palmer

11   joined the team in 2014.  Jay was added -- I

12   can't remember the exact time frame, but

13   right around in 2015.  He supports some work

14   I do for the entire regulatory affairs team

15   focused on threshold methodology and some

16   advancements we made.

17        Q.    Okay.  All right.  My specific

18   question is how long they've been with you.

19        A.    How long --

20        Q.    How long were they on your

21   team?

22        A.    Michael's been on the team

23   since 2014.  Adam's been 2014.  Jay's been

24   2015.

25        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      Micheal Bishop is no longer

 2   here.  We've had some adjustments.

 3        Q.      But he was with you until 2018,

 4   correct?

 5        A.      Yes.

 6        Q.      Okay.  Let's take a look now at

 7   the US pharma regulatory affairs.  And the

 8   reason I want to do this is I want to make

 9   sure I know when we're talking today and

10   you're answering questions, in what capacity

11   you're answering them in terms of the

12   hierarchy of regulatory affairs at McKesson.

13             Okay?

14        A.      Understood.

15        Q.      All right.

16             MR. RAFFERTY:  So if we could,

17        turn to page .4, Corey.

18   QUESTIONS BY MR. RAFFERTY:

19
```



Highly Confidential - Subject to Further Confidentiality Review

1
2
3
4
5
6
7
8
9    QUESTIONS BY MR. RAFFERTY:
10
11
12
13
14
15
16          Q.    Okay.  And if we look at the
17   hierarchy here, there's Gary -- okay, Krista
18   Peck, who is the senior vice president.  I
19   assume above her is the president of
20   McKesson?
21          A.    Correct.
22          Q.    Okay.  That's Mr. Hammergren
23   right now?
24          A.    No.  Above Krista or that
25   position is the president of US pharma.

 1        Q.      Of US pharma, I'm sorry.

That's what -- okay.

 3               And who was that at the time;

do you remember?

 5        A.      It was Mark Walchirk.

 6        Q.      Okay.  So you got Krista Peck,

who is one step away from the president of US

pharma, right?

 9        A.      Correct.

10        Q.      And then right below her you've

got Nate Hartle sitting there as senior

director, right?

13        A.      Correct.

14        Q.      You got Lisa Young as the

senior director for the west region, right?

16        A.      Correct.

17        Q.      And then Gary Boggs is the

senior director for the east region, right?

19        A.      Correct.

20        Q.      Okay.  So there were two

regions, east and west, and then you, who

covered, I assume, regional national -- I

always say regional national account --

retail national accounts for the entire

country, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, that's correct.

2    Q.    Okay.  Now, when we talk about

3    the retail national accounts, we're talking

4    about -- that you were in charge of, we're

5    talking about the Rite Aids, CVS, Walgreens,

6    Walmarts and a bunch of others that I'm not

7    listing, right?

8    A.    A variety of chains.

9    Q.    Chains.  Okay.

10    A.    Chains is the best way to talk

11    about it.

12    Q.    Okay.  But literally thousands

13    of stores in those chains, right?

14    A.    In some of them.

15    Q.    In some of them.

16          And you're over all of that?

17    A.    Correct, those chains.

18    Q.    From a regulatory controlled

19    substance monitoring program standpoint,

20    true?

21    A.    True.

22          MS. HENN:  Objection to form.

23    QUESTIONS BY MR. RAFFERTY:

24    Q.    So tell me, how much of the

25    business in terms of US pharma compared to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the -- because there's another category of

 2    stores called the -- I believe you refer to

 3    them as ISMCs; is that right?

 4         A.      Correct.

 5         Q.      Okay.  And that is the

 6    independent small medium chains?

 7         A.      Correct.

 8         Q.      Is that what that stands for?

 9         A.      That's what it stands for, yes.

10         Q.      Okay.  All right.  And that's

11    what Gary Boggs and Lisa Young would have

12    been over in their regions?

13         A.      Yes, that's part of their

14    responsibility.

15
```

Highly Confidential - Subject to Further Confidentiality Review





1

24    QUESTIONS BY MR. RAFFERTY:

25          Q.    Well, in fact, the two -- and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in fact -- I'm sorry.  And if I speak over

 2    you at any time, it's just -- it's just a

 3    habit, and so I apologize.  And so just let

 4    me know, or I'm sure Ms. Henn will let me

 5    know, and I'll try not to do that.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

QUESTIONS BY MR. RAFFERTY:

12      Q.      Okay.  Thank you.

13              All right.  I want to talk for

14      a few minutes about the opioid epidemic in

15      the United States.

16              First of all, you agree that

17      there is, in fact, an opioid epidemic in the

18      United States, true?

19      A.      I do agree.

20      Q.      And that epidemic has been

21      going on for years, correct?

22      A.      Based on what I read and what I

23      know, absolutely.

24

Highly Confidential - Subject to Further Confidentiality Review



13       Q.     Okay.

14       A.     It's why I do what I do.

15       Q.     All right.  In fact, you would

16 agree that this epidemic has had a

17 devastating effect on public health and

18 welfare throughout the country, true?

19       A.     It has.

20       Q.     And in fact, you have spoken

21 and actually given presentations about the

22 opioid epidemic in the country, correct?

23       A.     I have.

24       Q.     In fact, would you agree that

25 the opioid epidemic in the United States of

Highly Confidential - Subject to Further Confidentiality Review

1    America is the deadliest drug epidemic on

2    record in our country's history?

3         A.    I'm not an epidemiologist, but

4    I would believe, yes.

5         Q.    Okay.  Well, let's look at

6    1437.3, which we will mark as Exhibit 41 --

7    42.

8              (McKesson-Hartle Exhibit 42

9         marked for identification.)

10   QUESTIONS BY MR. RAFFERTY:

11

16        Q.    Okay.  And it appears, though

17   this one does have a date on it, it's

18   September 29, 2017.  So not really all that

19   long ago, right?

20        A.    Correct.

21        Q.    Okay.  Less than a year ago,

22   right?

23        A.    That is.

24        Q.    And you see down there Nate

25   Hartle, senior director, regulatory affairs,

```
 1   right?

 2         A.     Yeah, it's my document.

 3         Q.     Okay.  Do you recall giving

 4   this presentation?

 5         A.     I do.

 6                MR. RAFFERTY:  If we could,

 7         let's turn to .3, Corey.

 8   QUESTIONS BY MR. RAFFERTY:

 9         Q.     You see that up in the top of

10   one of your slides there on page 3, a

11   headline, "Deadliest Drug Epidemic on Record

12   in Our Nation's History"?

13                Do you see that?

14         A.     Yep.

15         Q.     You wouldn't have put that in

16   your presentation unless you thought it was

17   true, right?

18         A.     No.

19         Q.     So you don't dispute that,

20   right?

21         A.     I do not.

22         Q.     Okay.  It then goes on and

23   says, "The drug problems of past decades pale

24   when compared to the current opioid epidemic

25   which has killed 165,000 Americans from 2000
```

```
 1    to 2014."

 2                  Did I read that right?

 3         A.      You did.

 4         Q.      Okay.  Once again, you agree

 5    with that statement, right?

 6         A.      These are part of the

 7    presentation that I gave.

 8         Q.      Okay.  If we now go to the next

 9    page, page 4, it says over there, "Scope of

10    the problem."  On an average day, an average

11    day in the US, more than 650,000 opioid

12    prescriptions are dispensed.

13                  Do you see that?

14         A.      I do.

15         Q.      3,900 people initiate

16    non-medical use of prescription opioids, and

17    then it says 580 people initiate heroin use.

18                  You see that?

19         A.      I see those.

20         Q.      And in fact, opioid abuse and

21    addiction is a gateway to heroin use and

22    addiction, correct?

23                  MS. HENN:  Objection to form.

24                  THE WITNESS:  I'm not a medical

25          expert, but, you know, I've read
```

1          things, I use data from different

2          sources, and they say that.

3    QUESTIONS BY MR. RAFFERTY:

4          Q.     I don't -- okay.  As head of

5    regulatory affairs and the controlled

6    substance monitoring program for national

7    chains of McKesson, would you agree that in

8    fact narcotic painkiller abuse, opioid abuse,

9    is a gateway to heroin use?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  I would agree

12          that it can be, yeah.

13    QUESTIONS BY MR. RAFFERTY:

14          Q.     Okay.  And in fact, 78 people

15    die from an opioid-related overdose every day

16    according to your slide.

17              Do you see that?

18          A.     I see that.

19          Q.     In fact, if you go on to your

20    presentation, page 16, .16, talking about the

21    heroin use, it says -- or what you say in

22    your presentation, or what you put in your

23    presentation, was people who are addicted

24    to -- and then it says, "Opioid painkillers

25    are 40 times more likely to be addicted to

Highly Confidential - Subject to Further Confidentiality Review

1    heroin."

2              Do you see that?

3       A.      I see that.

4       Q.      And you agree with that?

5       A.      I put them in the slides as

6    part of the information that I keep current

7    on.

8       Q.      You agree with that?

9       A.      Again, I'm not an expert in

10   terms of numbers, but I agree with what

11   they're putting out.

12      Q.      Okay.

13      A.      The concepts --

14      Q.      And you wouldn't have put it

15   out there if you thought it was inaccurate,

16   right?

17      A.      I would not have.

18      Q.      Okay.  Talking about the

19   heroin, the gateway to heroin, if we could,

20   let's have 1580.

21              (McKesson-Hartle Exhibit 43

22       marked for identification.)

23   QUESTIONS BY MR. RAFFERTY:

24      Q.      This is another presentation

25   that you gave, Mr. Hartle.  We'll mark this

1    as Exhibit 43.  This is another presentation

2    that you gave.  If you look at this --

3              MR. RAFFERTY:  Corey, if you

4         could pull it up, please, 1.580 --

5         1.1580.

6              All right.  Just give me the

7         Elmo.  I'll just use the Elmo.

8    QUESTIONS BY MR. RAFFERTY:

9         Q.    You see there it says,

10   "Regulatory affairs update, RNA leadership

11   team, Nate Hartle, senior director,

12   regulatory affairs."

13             Do you see that?

14        A.    Yes.

15        Q.    November 20, 2015.

16             You see that?

17        A.    I do.

18        Q.    Okay.  Do you recall giving

19   this presentation?

20        A.    I'm going to scan through it

21   real quick just so I can refresh --

22        Q.    Well, let me -- and feel free

23   to, but I'm just going to -- I'm going to

24   start with the second page, so...

25        A.    I -- I believe it was a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    conference call, maybe.  I don't remember

 2    exactly all the details from back then, but

 3    this is my work, yeah.

 4          Q.     It doesn't matter.  This is

 5    your work.

 6          A.     Yeah.

 7          Q.     That's all I wanted to get.

 8
```

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9          MR. RAFFERTY:  Now, if we could

10     have 1.1355, Corey, that we'll mark as

11     Exhibit 44.

12          (McKesson-Hartle Exhibit 44

13     marked for identification.)

14 QUESTIONS BY MR. RAFFERTY:

15     Q.    Oh, this is a document that

16 says -- it's titled "Prescription Drug Abuse:

17 The National Perspective."

18          It's got McKesson up there in

19 the top right corner.

20          Do you see that?

21     A.    I see that.

22     Q.    And down by the bottom middle

23 it's 2014, McKesson Corporation, correct?

24     A.    Correct.

25     Q.    Okay.  If we go into this and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you turn to the second page -- .2, Corey --

 2    and it talks about the current landscape,

 3    epidemic.

 4              Do you see that?

 5         A.   I see that.

 6
```

```
18         Q.   Okay.  In fact, your company

19    has been in the business of selling opioid

20    and narcotic painkillers for many years,

21    hasn't it?

22         A.   It has.

23
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





23     Q.      That's right.

24             And in fact, what you said

25   yesterday, so that we're clear, if I could



1    have the Elmo --

2              MR. RAFFERTY:  And this is

3         yesterday's rough transcript at

4         page 283, starting on line 17,

5         Counsel.

6    QUESTIONS BY MR. RAFFERTY:

7

Highly Confidential - Subject to Further Confidentiality Review





```
 1

 8              MS. HENN:  Objection to form.
 9    QUESTIONS BY MR. RAFFERTY:
10         Q.    Do you recall giving that
11    testimony yesterday?
12         A.    I do.
13         Q.    Okay.  You understand that
14    yesterday when you were sitting in that chair
15    you were under oath, correct?
16         A.    Absolutely.
17         Q.    Okay.  Just like you are today?
18         A.    Absolutely.
19
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8

 9        Q.      And in fact, you've been -- you

10   have faced investigations by the DEA and the

11   Department of Justice in regards to your

12   failure to prevent diversion of those

13   narcotics in America, true?

14            MS. HENN:  Objection to form.

15            THE WITNESS:  Could you restate

16       that?

17   QUESTIONS BY MR. RAFFERTY:

18
```

Highly Confidential - Subject to Further Confidentiality Review



16      Q.      And in 2017, in the 2017

17  settlement -- you've reviewed that, right?

18      A.      I have.

19      Q.      You were actually there as

20  senior director of regulatory affairs during

21  the time that McKesson was being investigated

22  and at the time that that -- that agreement

23  was entered into between McKesson and the

24  Department of Justice, right?

25              MS. HENN:  Objection to form.



1          THE WITNESS:  I was there

2     during -- during that time.

3  QUESTIONS BY MR. RAFFERTY:





12    QUESTIONS BY MR. RAFFERTY:

13         Q.    Why do you report suspicious

14    orders, Mr. Hartle?  Is it just to check the

15    box kind of thing?

16              MS. HENN:  Objection to form.

17    QUESTIONS BY MR. RAFFERTY:



15    Q.    Now, you know that since

16  2002 -- since 2002, the diversion of

17  narcotics in the United States has resulted

18  in an epidemic in the United States and

19  incalculable costs to society.

20          Would you agree with that

21  statement?

22          MS. HENN:  Objection to form.

23          THE WITNESS:  Can you say it

24      once again, please?

25

```
 1    QUESTIONS BY MR. RAFFERTY:

 2         Q.     Yeah.

 3                The costs are so high as a

 4    result of the epidemic in the United States

 5    of the use of narcotics that the GAO

 6    specifically said, "Diversion is a

 7    multi-billion dollar illicit market

 8    nationwide, and diversion is causing

 9    incalculable costs to society."

10                Have you ever seen that?

11                MS. HENN:  Objection to form.

12

18                (McKesson-Hartle Exhibit 45

19         marked for identification.)

20    QUESTIONS BY MR. RAFFERTY:

21         Q.     I'm attaching Exhibit 45, the

22    May of 2002 GAO report.

23                Did you ever see a copy of

24    this?  And it's a long document.  I'm going

25    to just refer you to one particular piece.
```

```
 1           A.      I don't think I've seen this
 2   specific document, no.
 3           Q.      You've never reviewed this?  In
 4   the five years you've been involved in
 5   monitoring the narcotics being sold by
 6   McKesson, you never went back and reviewed
 7   any of this?
 8                   MS. HENN:  Objection to form.
 9                   THE WITNESS:  I don't recall
10           this specific one.
11   QUESTIONS BY MR. RAFFERTY:
12           Q.      All right.
13           A.      I don't.
14           Q.      Take a look at page --
15                   MR. RAFFERTY:  For the record,
16           that was P1.1076, which is now
17           Exhibit 45 to the deposition.
18   QUESTIONS BY MR. RAFFERTY:
19           Q.      And if you could, look at the
20   cover page --
21                   MR. RAFFERTY:  Oh, I need the
22           computer back, please.
23   QUESTIONS BY MR. RAFFERTY:
24           Q.      You see that, the GAO?  Are you
25   familiar with the GAO?
```

```
1         A.      I am.

2         Q.      United States government

3  accounting office?

4         A.      It's a part of some of the work

5  in my previous career.

6         Q.      Okay.  In May 2002,

7  "Prescription drug state monitoring programs

8  provide useful tools to reduce diversion."

9                 Do you see that?

10        A.      I see that.

11        Q.      Okay.  And then if you turn to

12 .6, "The diversion" -- down in background.

13 It says, "The diversion and abuse" --

14                You see where it starts to say

15 that?

16        A.      I do.

17        Q.      Why don't you read that first

18 sentence for me out loud.

19
```

Highly Confidential - Subject to Further Confidentiality Review



19          (McKesson-Hartle Exhibit 46

20      marked for identification.)

21  QUESTIONS BY MR. RAFFERTY:

22      Q.    This will be Exhibit P1.851,

23  which will be Exhibit 46 to the deposition.

24          Do you recall being shown this

25  presentation earlier?

```
 1        A.      I do remember this from

 2   yesterday.

 3        Q.      Okay.

 4                MR. RAFFERTY:  If we could pull

 5        it up, Corey, please.  1.851.

 6                Not that one.  That's 84.

 7        1.851.

 8                There we go.  All right.

 9   QUESTIONS BY MR. RAFFERTY:

10        Q.      "State of prescription drug

11   abuse."  Once again, I'll tell you that the

12   metadata -- because there's no date on this

13   once again, but the metadata indicates that

14   this was created September 30, 2015.

15                Okay?

16        A.      Okay.

17        Q.      All right.  At that time you

18   were there at McKesson, senior director of

19   regulatory affairs, right?

20        A.      I was.

21        Q.      And you know Gary Boggs?

22        A.      I do know Gary.

23        Q.      He was the senior director in

24   charge of the east -- the east region,

25   correct?
```

```
 1                    MS. HENN:  Objection to form.

 2                    THE WITNESS:  He was and still

 3         is.

 4    QUESTIONS BY MR. RAFFERTY:

 5         Q.     Okay.  Now, in talking about

 6    the state of prescription drug abuse, down

 7    here at the bottom of this, if you look at

 8    that cover page, it says, "Privileged and

 9    confidential.  For internal use only."

10                    Do you see that?

11         A.     I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

10    QUESTIONS BY MR. RAFFERTY:

11        Q.    All right.  Let's look at what

12    Mr. Boggs says in this in terms of the costs

13    associated with this epidemic.

14              If you would, turn to page .7.

15        A.    Can I ask a clarifying

16    question?  You mentioned 2015.

17        Q.    Yeah.

18        A.    Maybe I'm wrong, but I thought

19    yesterday we were talking about 2013, right

20    around the time that when Gary joined.

21        Q.    I don't -- all I can tell you

22    is what the -- the material that was provided

23    to me by McKesson and their counsel --

24        A.    Okay.

25        Q.    -- indicates that this was

Highly Confidential - Subject to Further Confidentiality Review



```
1    produced in September of 2015.

2         A.    Okay.

3         Q.    Okay?

4         A.    Okay.

5

24   QUESTIONS BY MR. RAFFERTY:

25         Q.    Right.
```

```
 1            And then if you go to .24, "A
 2   national epidemic.  More than 45 people die
 3   per day" -- I'm sorry, I'll wait until you
 4   get there.
 5        A.    24, you said?
 6        Q.    .24, sir.
 7        A.    Okay.  Sorry.
 8        Q.    You there?
 9        A.    I am.
10
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. RAFFERTY:

 2         Q.    Okay.  All right.  We talked a

 3    little bit earlier about the rights or --

 4    excuse me, strike that.

 5              We talked a little bit earlier

 6    about the duties and responsibilities that

 7    come along with selling and distributing

 8    narcotics in the United States.

 9              Do you recall that?

10         A.    We have talked about that.

11
```



1    QUESTIONS BY MR. RAFFERTY:

2         Q.    Okay.  If we could, let's go

3    to --

4              MS. HENN:  Counsel, I just

5         wanted to make one clarifying note.

6              Yesterday Mr. Farrell said that

7         the McKesson metadata for this

8         document indicated that the

9         presentation date is late 2013.  So

10        there's some discrepancy between what

11        he said and what you said.

12             MR. RAFFERTY:  I say it's

13        September 2015.

14             MS. HENN:  Just wanted to make

15        that clear for the record because the

16        witness had noted that he recalled

17        that.

18             MR. RAFFERTY:  I'm sorry, I

19        didn't mean to interrupt you,

20        Ms. Henn.

21             MS. HENN:  That's all right.

22   QUESTIONS BY MR. RAFFERTY:

23        Q.    Does that change your testimony

24   in regards to that document we went through?

25        A.    No, it doesn't change my

1   testimony.  I just wanted to be clear of the

2   timing in terms of, you know, Gary's role,

3   when he came on board with McKesson and the

4   context of the presentation.

5        Q.     But it doesn't change your

6   testimony, true?

7        A.     It doesn't change my testimony.

8        Q.     Okay.  If we could, let's go to

9   .8 of the presentation.  "The Controlled

10  Substances Act.  Congress" --

11             You there?

12       A.     Yeah.  Sorry.

13       Q.     "The Controlled Substances

14  Act."  Talked about that earlier.  That's the

15  act that was passed by United States Congress

16  in 1971.

17             You recall that, right?

18       A.     I do.

19



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18      Q.      You can't get the general

19   import of that particular slide from this?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  I understand --

22   QUESTIONS BY MR. RAFFERTY:

23

Highly Confidential - Subject to Further Confidentiality Review







11    QUESTIONS BY MR. RAFFERTY:

12         Q.     And he's a senior director of

13    regulatory affairs, same hierarchical

14    position as you are, right?

15              MS. HENN:  Objection to form.

16    QUESTIONS BY MR. RAFFERTY:

17         Q.     What we saw there back in 2015?

18         A.     He is.



 8       Q.      That's right.

 9               And that's the reason -- I

10    think you agreed with me earlier, that's the

11    reason you report and -- you monitor and

12    report suspicious orders.  Because if you

13    determine there's a suspicious order, you

14    don't ship or you're not -- or let me

15    rephrase that -- you're not supposed to ship

16    it, right?

17               MS. HENN:  Objection to form.

18               THE WITNESS:  Can you ask the

19       question again?

20    QUESTIONS BY MR. RAFFERTY:

21       Q.      Yeah.  Yeah.

22

Highly Confidential - Subject to Further Confidentiality Review



```
 1
  
  
  
  
  
  
  
  
  
  
  
  
  
  
  
  
  
  
  
20    QUESTIONS BY MR. RAFFERTY:
21
```



1

10    QUESTIONS BY MR. RAFFERTY:

11

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15    Q.    Okay.  And for the record,

16    Mr. Boggs, you know, was formerly with the

17    DEA before being hired by McKesson, right?

18    A.    I'm aware of that.

19    Q.    And involved in diversions with

20    the FDA {sic} or for the FDA, right?

21         MS. HENN:  Objection to form.

22    QUESTIONS BY MR. RAFFERTY:

23    Q.    Diversion compliance?

24    A.    For the DEA, not the FDA.

25    Q.    For the -- did I say FDA?

```
1        A.     You did.

2        Q.     For --

3        A.     I want to be accurate.

4        Q.     He was formerly -- no, I

5   appreciate that.  Thank you.

6        A.     Yeah.

7        Q.     Let me rephrase it so the

8   record is clear.

9               Mr. Boggs was formerly involved

10  in the diversion compliance with the DEA,

11  correct?

12       A.     Yes, he was part of the Office

13  of Diversion Control.

14
```



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



1

10          (McKesson-Hartle Exhibit 47

11     marked for identification.)

12  QUESTIONS BY MR. RAFFERTY:

13          Q.     All right.  Let's take a look

14  at 1.1455.  This is a presentation that you

15  gave, and, once again, there is a habit

16  evidently at McKesson of not putting dates on

17  things.  We don't have a date on this one, so

18  the metadata according to our records

19  produced by McKesson indicate that this was

20  done in August of 2014.  August 20, 2014.

21          A.     August 2014.

22          Q.     That would have been a few

23  months after you started, right?  If you

24  started --

25          A.     Right.  I started in May.

1    Q.    And we will mark this as

2    Exhibit 47, I believe.

3         MR. RAFFERTY:  Okay.  For the

4         record, this is P1.1455, which is now

5         Exhibit 47 to the deposition.

6    QUESTIONS BY MR. RAFFERTY:

7    Q.    Do you recognize this

8    particular document, sir?

9    A.    I do.  These are -- yeah, these

10   are notes as I prepare to give presentations.

11   Q.    Right.  These are your speaker

12   notes, for example, for a corresponding

13   PowerPoint slide, right?

14   A.    Correct.

15   Q.    Okay.  Because it says

16   "slide 1" there up at the top, right?

17   A.    Correct.

18   Q.    Okay.  RNA VP.  That's you,

19   right?

20   A.    No.

21   Q.    Okay.  Who is that?

22   A.    So within that retail national

23   accounts or chain segment, each chain has

24   a -- there's vice presidents that manage the

25   relationships with the chains.  So they own

Highly Confidential - Subject to Further Confidentiality Review

1    the relationship to the chain.

2         Q.    Okay.  So do you know who that

3    person was at this time, RNA VP?

4         A.    There are multiple RNA VPs, and

5    this is the presentation that is given at

6    different times to different chains, so I'm

7    not sure which one it would be --

8         Q.    Okay.  So whoever -- whoever it

9    is --

10        A.    -- of that chain.

11        Q.    -- of that chain at that time?

12        A.    Correct.

13        Q.    Okay.

14        A.    Correct.

15        Q.    It goes down and it says, "My

16   name is Nate Hartle."  That's you?

17        A.    Right.

18        Q.    We know that?

19        A.    Right.

20        Q.    Okay.  "And I am senior

21   director of regulatory affairs for McKesson

22   dedicated to our retail national accounts."

23             Do you see that?

24        A.    Right.

25        Q.    "My background is in retail in

Highly Confidential - Subject to Further Confidentiality Review

1     the assets protection and corporate security

2     world, and I have experience and knowledge in

3     the diversion space, including leading

4     efforts focused on both internal theft and

5     the CSMP on the dispensing side."

6              Do you see that?

7     A.      I see that.

8     Q.      You were with Target before you

9     started at McKesson, right?

10    A.      I was.

11    Q.      Okay.  Were you in -- did you

12    have a role or were you in charge of the

13    diversion of narcotics compliant -- the

14    compliance with the regulations of the

15    diversion of narcotics while at Target?

16    A.      While at Target, there was

17    multiple functions involved in pharmacy.  I

18    had a very specific team that was focused on,

19    you know, monitoring diversion, monitoring

20    dispensing across the stores.  So I played a

21    role.

22              We investigated internal theft.

23    We monitored -- we worked internally to

24    create training and education and awareness.

25    So I played a role along with other

1    components within Target.

2        Q.    Okay.

3            MR. RAFFERTY:  Let's go to .5

4    of this presentation, Corey.

5    QUESTIONS BY MR. RAFFERTY:

6        Q.    So this is being given to the

7    retail chains, right?

8        A.    So these presentations are

9    given to -- were given initially to retail

10   chains in -- when I first joined the team.

11   And I will -- to add some context to this, as

12   I prepared, these were not read word for

13   word.  This is me preparing and using as a

14   guideline.

15       Q.    I understand.

16       A.    So this is not a presentation;

17   it's just speaking points.  But I -- so I

18   wanted you to understand.

19       Q.    I wasn't suggesting it was.

20       A.    Right.

21       Q.    But this is something that you

22   wrote, right?

23       A.    It is.

24

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5        Q.     Mr. Rannazzisi, he's with the

6  DEA, right?

7        A.     He was.

8        Q.     Was.

9        And he's the one that actually

10  wrote those letters back in 2006 and 2007

11  reiterating what your responsibilities are

12  under the Controlled Substances Act, true?

13        MS. HENN:  Objection to form.

14        THE WITNESS:  He wrote those.

15  QUESTIONS BY MR. RAFFERTY:

16        Q.     Okay.

17        A.     They came from him, sure.

18

Highly Confidential - Subject to Further Confidentiality Review







1

12    QUESTIONS BY MR. RAFFERTY:

13         Q.    Okay.  And you don't have any

14    reason to dispute that, right?

15         A.    I don't.

16

Highly Confidential - Subject to Further Confidentiality Review





1

10          MS. HENN:   Just a note to try

11      not to talk over each other, but go

12      ahead with your question.

13  QUESTIONS BY MR. RAFFERTY:

14      Q.      I'm sorry, you want to finish?

15

25

Highly Confidential - Subject to Further Confidentiality Review



1

24          Q.      Okay.

25                  MS. HENN:  Counsel, we've been

1    going over an hour.  Would this be a

2    good time for a quick break?  We can

3    make it five minutes.

4         MR. RAFFERTY:  I'll tell you,

5    can I just finish this one document

6    and then we can take ten?

7         THE WITNESS:  That's fine.

8    That's okay.

9    QUESTIONS BY MR. RAFFERTY:

10



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4          MR. RAFFERTY:  Okay.  We can

5     take a break now.

6          MS. HENN:  Thank you.

7          VIDEOGRAPHER:  The time is

8     10:16 a.m.  We're going off the

9     record.

10      (Off the record at 10:16 a.m.)

11          VIDEOGRAPHER:  The time is

12     10:29 a.m., and we're back on the

13     record.

14          MR. RAFFERTY:  All right.  Just

15     a little housekeeping here.

16          In a stunning twist of fate, I

17     was actually wrong and Paul Farrell

18     was right.  The date on the Boggs'

19     presentation, which is Exhibit 46 to

20     the deposition, is September 30, 2013.

21          MR. FARRELL:  I'm sorry, Troy,

22     I missed that.

23          MS. HENN:  Thank you, sir.

24          THE WITNESS:  Thank you.

25          MR. RAFFERTY:  It won't happen

1          again.   There's a first time for

2          everything.

3    QUESTIONS BY MR. RAFFERTY:

4          Q.    Okay.  Now, getting back to the

5    questions.

6                Mr. Hartle, so we talked

7    earlier about the roles and responsibilities

8    that McKesson has as a distributor of

9    narcotics under the Controlled Substances

10   Act.

11               You would agree with me that in

12   2006 Mr. Rannazzisi, who we just talked about

13   a few minutes ago, on behalf of the United

14   States Department of Justice and the Drug

15   Enforcement Administration, sent a letter to

16   all distributors and registrants reiterating

17   the responsibilities and duties under the

18   Controlled Substance Act, right?

19               MS. HENN:  Objection to form.

20               THE WITNESS:  Yes, he did send

21        that.

22               (McKesson-Hartle Exhibit 49

23        marked for identification.)

24   QUESTIONS BY MR. RAFFERTY:

25         Q.    Okay.  All right.  If we could

```
 1    1.1464, which will be exhibit -- excuse me --

 2    which will be Exhibit 49 to the deposition.

 3

 6        Q.    Okay.  And in the letter it

 7    specifically says at the top, "September 27,

 8    2006."

 9             Do you see that?  Oh, no,

10    it's 1.1464.

11             All right.  Looking at this

12    particular letter, once again, it's dated

13    September 27, 2006, right?

14        A.    Correct.

15        Q.    Okay.  And he says here, "This

16    letter is being sent to every commercial

17    entity in the United States registered with

18    the DEA to distribute controlled substances."

19             Did I read that right?

20        A.    Yes.

21        Q.    "The purpose of this letter is

22    to reiterate the responsibilities of

23    controlled substance distributors in view of

24    the prescription drug abuse problem our

25    nation currently faces. "
```

1        Did I read that right?

2    A.    You did.









1    Q.     The DEA -- the next paragraph

2  says -- lays out that CFR we read about

3  designing and operating a system to disclose

4  suspicious orders.

5            You see that?

6    A.     I do.

7    Q.     Okay.  And then going down to

8  the next one it says, "It bears emphasis that

9  the foregoing reporting requirement is in

10 addition to and not in lieu of the general

11 requirement under 21 USC 823(e) that a

12 distributor maintain effective controls

13 against diversion."

14           Do you see that?

15   A.     I do.

16 

19   Q.     Okay.  "Thus, in addition to

20 reporting all suspicious orders, a

21 distributor has a statutory responsibility to

22 exercise due diligence to avoid filling

23 suspicious orders that might be diverted into

24 other than legitimate medical, scientific and

25 industrial channels."

1          Did I read that correctly?

2     A.     You did.

3

11     Q.     Okay.  "Due diligence to avoid

12  filling suspicious orders," correct?

13          Okay.  "In a similar vein,

14  given the requirements under 823(e) that a

15  distributor maintain effective controls

16  against diversion, a distributor may not

17  simply rely on the fact that the person

18  placing the suspicious order is a DEA

19  registrant and turn a blind eye to the

20  suspicious circumstances."

21          You see that?

22     A.     I do.

23



15     Q.     Okay.  "Again, to maintain

16   effective controls against diversion as

17   Section 823(e) requires, the distributor

18   should exercise due care in confirming the

19   legitimacy of all orders prior to filling."

20            You see that?

21     A.     I do.

22     Q.     Okay.  And you see going to

23   page 4, that's signed by Joseph T.

24   Rannazzisi, Deputy Assistant Administrator,

25   Office of Diversion Control.

1              You see that?

2       A.     I see that.

3       Q.     Okay.  Now, that was in

4  September of 2006.

5              Now, in December of 2007,

6  Mr. Rannazzisi sent another letter.  You're

7  aware of that, correct?

8       A.     Correct.

9              (McKesson-Hartle Exhibit 50

10      marked for identification.)

11 QUESTIONS BY MR. RAFFERTY:

12      Q.     Okay.  And this will be marked

13 as Exhibit 50 to the deposition.

14              So here, December 27, 2007.

15 Just so happens to be the monitor that I

16 can't see that is there.

17              You see the date there,

18 December 27, 2007, sir?

19      A.     I do.

20      Q.     Okay.  Once again, this one

21 is -- now, this one is specifically addressed

22 to McKesson Corporation.

23              Do you see that?

24      A.     I see that.

25

Highly Confidential — Subject to Further Confidentiality Review

```
 1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

 ▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

 ▓  ▓▓▓▓▓▓▓▓

 ▓      ▓▓▓    ▓▓▓▓

 5      Q.     All right.  Once again he says,

 6  "This letter is being sent to every entity in

 7  the United States registered with the DEA to

 8  manufacture or distribute controlled

 9  substances."

10            Do you see that?

11      A.     I do.

12      Q.     Okay.  Once again he says, "The

13  purpose of this letter is to reiterate the

14  responsibilities of controlled substance

15  manufacturers and distributors to inform DEA

16  of suspicious orders in accordance with 21

17  CFR 1301.74 subsection B.

18            Do you see that?

19      A.     Right.  I do.

20      Q.     Once again he uses that word

21  "reiterate," right?

22      A.     Yes.

23      Q.     Okay.  Down to the next

24  paragraph it says, "In addition to and not in

25  lieu of the general requirement under 21 USC
```

Highly Confidential -- Subject to Further Confidentiality Review

1    823 that manufacturers and distributors

2    maintain effective controls against

3    diversion, DEA require -- regulations require

4    all manufacturers and distributors to report

5    suspicious orders of controlled substances."

18          Q.    Okay.  Then going down, the

19   regulation -- the regulation clearly

20   indicates that "it is the sole responsibility

21   of the registrant to design and operate such

22   a system."

23          Did I read that right?

24   A.    Yes.



1

2

3

4

5          Q.       Okay.   And then going further

6    down it says, "The regulation also" -- this

7    is the third full paragraph, sir, I'm sorry.

8               "The regulation also requires

9    that the registrant inform the local DEA

10   division office of suspicious orders when

11   discovered by the registrant."

12              Do you see that?

13         A.    I see that.

14

1

5     Q.    Okay.  "Filing a monthly report

6    of completed transactions does not meet the

7    regulatory requirement to report suspicious

8    orders."

9           Do you see that?

10    A.    I see that.

11    Q.    "Registrants are reminded that

12    their responsibility does not end merely with

13    the filing of a suspicious order report.

14    Registrants must conduct an independent

15    analysis of suspicious orders prior to

16    completing a sale to determine whether the

17    controlled substances are likely to be

18    diverted from legitimate channels."

19



6    QUESTIONS BY MR. RAFFERTY:

7        Q.      "Reporting an order as

8    suspicious will not absolve the registrant of

9    responsibility if the registrant knew or

10   should have known that the controlled

11   substances were being diverted."

12              Do you see that?

13       A.      I see that.

14       Q.      So what he's saying there is

15   you must not ship suspicious orders.

16   Reporting isn't enough.  If you have a

17   suspicious order, you must not ship it, true?

18              MS. HENN:  Objection to form.

19              THE WITNESS:  Can you say that

20       once again?

21   QUESTIONS BY MR. RAFFERTY:

22       Q.      And then it goes through and

25       Q.      And then it goes through and

1   describes again that suspicious orders are

2   orders of unusual size, pattern or frequency.

3           You see that?

4       A.      I see that, yeah.

5       Q.      All right.  Then finally

6   turning to page 2, "Registrants" -- the top

7   paragraph.

8           "Registrants that rely on rigid

9   formulas to define whether an order is

10  suspicious may be failing to detect

11  suspicious orders."

12          You see that?

13      A.      I see that.

14      Q.      "For example, a system that

15  identifies orders as suspicious only if the

16  total amount of a controlled substance

17  ordered during one month exceeds the amount

18  ordered the previous month by a certain

19  percentage or more is insufficient."

20          You see that?

21      A.      I see that.

22      Q.      "This system fails to identify

23  orders placed by a pharmacy if the pharmacy

24  placed unusually large orders from the

25  beginning of its relationship with the

1    distributors."

2              So if you have -- you have to

3    have more than just an algorithm or a formula

4    to detect suspicious orders; that's what he's

5    telling you there, right?

6              MS. HENN:  Objection to form.

7              THE WITNESS:  Can you ask your

8        question again, clarify your question?

9    QUESTIONS BY MR. RAFFERTY:

10        Q.    Yeah.

1

3    QUESTIONS BY MR. RAFFERTY:

4          Q.    All right.  "Also, this system

5    would not identify orders as suspicious if

6    the order were solely for one highly abused

7    controlled substance if the orders never grew

8    substantially."

9                Do you see that?

10         A.    I see that.

11         Q.    "Nevertheless, ordering one

12   highly abused controlled substance, and

13   little or nothing else, deviates from normal

14   pattern of what pharmacies generally order."

15

20   QUESTIONS BY MR. RAFFERTY:

21         Q.    Okay.  All right.  In

22   implementing a -- in designing and operating

23   an effective system to detect suspicious

24   orders or in performing the due diligence to

25   detect a suspicious order, you would agree

1    with me that a distributor of narcotics

2    should err on the side of the public safety

3    and health in making those decisions,

4    correct?

5            MS. HENN:  Objection to form.

6            THE WITNESS:  Can you -- can

7        you restate that or --

8    QUESTIONS BY MR. RAFFERTY:

9        Q.    Yeah.

10

Highly Confidential - Subject to Further Confidentiality Review



 1

 2

 3

 4

 5

 6

 7

 8

 9    QUESTIONS BY MR. RAFFERTY:

10

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review

1









1

▓

▓

▓

▓

6          (McKesson-Hartle Exhibit 51

7     marked for identification.)

8          MR. RAFFERTY:  This is -- I'm

9     handing counsel P1.345, which is

10     Exhibit 51 to the deposition.

11   QUESTIONS BY MR. RAFFERTY:

12

▓

▓

▓

▓

▓

▓

▓

▓

▓

▓

▓

▓

▓











Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2          MS. HENN:  Objection to form.

3     QUESTIONS BY MR. RAFFERTY:







Highly Confidential - Subject to Further Confidentiality Review



QUESTIONS BY MR. RAFFERTY:

Q.     I think you've already got this
in front of you.  It's Exhibit 47.  It's your
presentation notes.

And we also know that doctor --

Highly Confidential - Subject to Further Confidentiality Review

```
1    or that Mr. Rannazzisi specifically said in

2    his 2007 letter you can't simply rely or turn

3    a blind eye simply because the Rite Aid

4    you're providing drugs to or the CVS you're

5    providing drugs to has their own

6    registrant -- are registrants of the DEA,

7    right?

8               MS. HENN:  Sorry, could you

9          just read that again?  It was a little

10         hard to hear.

11   QUESTIONS BY MR. RAFFERTY:

12         Q.    Yeah.

13

21   QUESTIONS BY MR. RAFFERTY:

22
```

Case: 1:17-md-02804-DAP Doc #: 1978-4 Filed: 07/24/19 147 of 517. PageID #: 228005







1

(McKesson-Hartle Exhibit 52

marked for identification.)

1    QUESTIONS BY MR. RAFFERTY:

2          Q.      Okay.  All right.  Well, let's

3    talk about a couple of those.  Let's look at

4    1.1470, which is going to be Exhibit 52.

5

8          Q.      Okay.  And have you reviewed

9    this particular one?

10          A.      Let me take a peek real quick

11    here.

12          Q.      It was in 2008, so it was

13    before you --

14          A.      Well before I joined McKesson,

15    certainly.

16          Q.      Right.

17                  But I'm curious if you've seen

18    it since coming to --

19          A.      I have.

20

Highly Confidential - Subject to Further Confidentiality Review



18    Q.    Do you have, since you're in

19  charge of the national -- the retail national

20  accounts -- CVS would be one of those, right?

21           Now you are, I'm talking about.

22    A.    Yes.

23    Q.    Okay.  And you have been since

24  2014?

25    A.    2014.

1     Q.     I'm not suggesting you were at

2  this time.

3     A.     Right.







Highly Confidential - Subject to Further Confidentiality Review





17          (McKesson-Hartle Exhibit 53

18      marked for identification.)

19   QUESTIONS BY MR. RAFFERTY:

1      Q.     Okay.  Have you reviewed this

2  before?

3      A.     I have not.





13    Q.    Okay.  RNA, that's the retail

14  national accounts.  Those are the big ones,

15  right?

16    A.    Those are chains.

17    Q.    Chains.  The big chains,

18  national chains, right?

19         MS. HENN:  Objection to form.

20         THE WITNESS:  There's actually

21      a variety of chains.  Some can be

22      specific to a state, to a geography,

23      national.  There's variety of them.

24  QUESTIONS BY MR. RAFFERTY:

25    Q.    Well, you call them retail

1    national accounts, right?

2         A.    That's the name of the

3    segments, but I'm saying within there there's

4    variations.



Case: 1:17-md-02804-DAP Doc #: 1978-4 Filed: 07/24/19 160 of 517. PageID #: 228018





Highly Confidential — Subject to Further Confidentiality Review

1

7          Do you know who Dave Gustin is?

8     A.     I do know who Dave Gustin is.

9     Q.     Okay.  Who he is?

10     A.     Dave is a former McKesson

11 employee.  He was a director of regulatory

12 affairs at times.

13     Q.     Okay.  A director of regulatory

14 affairs, right?

15     A.     Correct.

16     Q.     Okay.  One step below you,

17 right?

18     A.     Yes.  One level, yeah.

19     Q.     One level.

20

23     Q.     All right.  From Dave Gustin to

24 Micheal Bishop.

25          Do you know who Micheal Bishop

Highly Confidential — Subject to Further Confidentiality Review

1   is?

2        A.     I do.  Micheal used to work on

3   my team.

4        Q.     Okay.  And in fact, I think we

5   saw him up there earlier this morning.

6   That's one of the reasons I put that chart up

7   there, so we could go back and reference who

8   some people are.

9              Micheal Bishop was on your

10  team, and what position was he?

11       A.     He was a regulatory affairs

12  manager.

13       Q.     Manager.  Okay.

14

Highly Confidential – Subject to Further Confidentiality Review



















1          Thanksgiving is not a permanent

2   holiday, is it?

3          MS. HENN:   Objection to form.

4   QUESTIONS BY MR. RAFFERTY:

5      Q.     Pretty sure for the week after

6   Thanksgiving, Thanksgiving is not around for

7   another year, right?

8      A.     Permanent in that it happens

9   every year, but not permanent in that sense.

Highly Confidential - Subject to Further Confidentiality Review





18          (McKesson-Hartle Exhibit 54

19     marked for identification.)

20  QUESTIONS BY MR. RAFFERTY:

21     Q.    Let's go to 1.1433.  This will

22  be Exhibit 54.

23

Highly Confidential - Subject to Further Confidentiality Review



1

2

3          Q.      August 13, 2014.  This is while

4    you're there at McKesson now, right?

5          A.      Excuse me?

6          Q.      You're at McKesson as of August

7    13, 2014?

8          A.      I am.  In May, yeah.

9          Q.      Okay.  You are senior

10   regulatory affairs director for national

11   accounts at that time, true?

12         A.      Correct.

13



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



3          MS. HENN:  Counsel, can I just

4     pause for a minute?

5          Counsel, if there's a need to

6     have conversations, we reserved a room

7     just next door, and I would ask you to

8     either refrain from talking and

9     distracting the witness or please

10    leave the room.  Is that okay?

11         Thank you, sir.

12 QUESTIONS BY MR. RAFFERTY:











Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







1

QUESTIONS BY MR. RAFFERTY:

17    Q.    All right.  Now let's --

18          MS. HENN:  Counsel, it's

19    getting close to lunch and we've been

20    going on an hour and 20 minutes.

21    Would this be a good time for a break

22    to get some lunch?

23          MR. RAFFERTY:  Well, it's up to

24    the witness, obviously, but if we

25    could accommodate ten more minutes, I

1    can get through this particular --

2              THE WITNESS:  What time is it?

3              MS. HENN:  It's 11:52 or 3.

4              THE WITNESS:  That's fine.

5              MR. RAFFERTY:  Is that okay?

6              THE WITNESS:  That's okay.

7              MR. RAFFERTY:  Totally up to

8    you.  I don't want to force you.

9              THE WITNESS:  No, that's okay.

10             MS. HENN:  Don't push it.

11             (McKesson-Hartle Exhibit 55

12    marked for identification.)

13   QUESTIONS BY MR. RAFFERTY:

14   

24   QUESTIONS BY MR. RAFFERTY:

25             Q.    Okay.  And if we look at

```
 1    1.1461, which will be Exhibit 55 to the

 2    deposition.

 3              Now, this is from Nate Hartle.

 4    Do you see that at the top?

 5         A.    I do.

 6         Q.    Okay.  Now -- and this is dated

 7    July 23, 2014, right?

 8         A.    Yes.

 9         Q.    So just about a month before

10    that letter from the US Attorney, right?

11         A.    Correct.

12         Q.    That we just looked at?

13         A.    Right after I joined.

14         Q.    Okay.  And this is right after

15    you joined, right?

16              (McKesson-Hartle Exhibit 56

17         marked for identification.)

18    QUESTIONS BY MR. RAFFERTY:

19         Q.    Okay.  Now I want to show you

20    1.1458, which will be Exhibit 56 to the

21    deposition.

22              All right.  This is another

23    e-mail from Nate Hartle, September 9, 2014.

24              Do you see that?

25         A.    I do.
```

```
1         Q.     Okay.  Let's focus on -- now,
2    this is about a month after you got the
3    letter, so let's be clear.
```







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review

1

2

3   QUESTIONS BY MR. RAFFERTY:

4        Q.     All right.  Now --

5               MS. HENN:  Counsel, we're going

6        to need to take a break.  It's been an

7        hour and 40 minutes.

8               VIDEOGRAPHER:  Okay.  The time

9        is 12:08 p.m., and we're going off the

10       record.

11        (Off the record at 12:08 p.m.)

12               VIDEOGRAPHER:  The time is

13       1:01 p.m., and we're back on the

14       record.

15   QUESTIONS BY MR. RAFFERTY:

16        Q.     Mr. Hartle, just to kind of

17   close the loop on where we were before the

18   lunch break.

19



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review















Highly Confidential - Subject to Further Confidentiality Review



16                    (McKesson-Hartle Exhibit 58

17         marked for identification.)

18    QUESTIONS BY MR. RAFFERTY:

19         Q.    Okay.  Now -- all right.

20    Looking at P1.88, this is a copy of the

21    administrative memorandum of agreement

22    pertaining to the 2017 settlement.

23                    Have you reviewed this before?

24         A.    I have.

25         Q.    Okay.  And if you would, please

1  turn to the back page, which is P -- I'm

2  sorry, page 14.  Page 14.

3          Oh, I'm sorry, it's 58.  I'm

4  sorry, did you -- have you seen this before,

5  Mr. Hartle?

6       A.    I have.

7       Q.    Okay.  If you would, turn to

8  page 14.  And if you look over there, the

9  signatures of the acting administrator of the

10 Drug Enforcement Administration and assistant

11 administrator for the Diversion Control

12 Division of DEA; do you see that?

13      A.    I see that.

14      Q.    And those are dated January 17,

15 2017, right?

16      A.    Correct.

17      Q.    And that's the date that the

18 agreement was finalized and the $150 million

19 fine was levied, correct?

20          MS. HENN:  Objection to form.

21          THE WITNESS:  That's the date.

22          (McKesson-Hartle Exhibit 59

23      marked for identification.)

24 QUESTIONS BY MR. RAFFERTY:

25



Highly Confidential – Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review





1

2      Q.     Well, let me show you what

3   we're going to mark as Exhibit 60, which is

4   P1.1453.

5            So here, if you look at the

6   date at the top, it's March 2017.

7            You see that?

8      A.     I do.

9      Q.     Three months after -- roughly

10  three months after your e-mail, correct, of

11  January 2017?

12     A.     Three months after.

13     Q.     So here's what the headline is.

14  Have you ever looked at this article before?

15  You ever seen this?

16     A.     I don't recognize this one.

17     Q.     It says -- the headline is, or

18  the title of it is, "Too Many Bodies in Ohio

19  Morgue, So Coroner Gets Death Trailer."

20           Have you ever heard that phrase

21  "death trailer"?

22     A.     I have not.

23     Q.     Do you know that Ohio, the

24  State of Ohio, had to go out and buy a death

25  trailer because of the number of opioid

1    deaths that were occurring in that state back

2    when you were telling your customers it's

3    business as usual?

4                MS. HENN:  Objection to form.

5                THE WITNESS:  I did not know of

6        a death trailer.

7    QUESTIONS BY MR. RAFFERTY:

8        Q.    Okay.  Well, let's look and see

9    what it says.

10                It says, "It's moot testimony

11    to the opioid addiction plague that has been

12    ravaging Ohio, a 20-foot-long air-conditioned

13    trailer with room for 18 bodies."

14                Do you see that?

15        A.    I do see that.

16        Q.    "The Stark County coroner in

17    Canton had a cold storage mass casualty

18    trailer trucked in on Saturday because the

19    morgue was overflowing with bodies, nearly

20    half of the victims from drug overdoses."

21                Do you see that?

22        A.    I do.

23        Q.    Okay.  If you turn to .3, this

24    is a picture from inside the death trailer.

25                Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I do.

2      Q.      And then if you go to .4, and

3  if you look, it says specifically, "Coroners

4  in the counties of Ashtabula and Cuyahoga,"

5  which is where Cleveland is located, "have

6  had to deploy the trailers when their morgues

7  became too jammed, he said.  The medical

8  examiner in Summit County," where Akron is

9  located, "asked the Ohio department to send

10  one over last summer when there was a spike

11  in drug overdoses, the Akron Beacon Journal

12  reported.  Just this year alone, there have

13  been 90 overdose deaths in Stark County and

14  109 in Cuyahoga County, according to the

15  Akron newspaper."

16          Did I read that correctly?

17      A.      You did.

18      Q.      "But the situation in the rust

19  belt states like Ohio, where the drug

20  overdose rate is 2015, was most -- the most

21  recent federal figures available was 29.9 per

22  100,000 people is especially dire."

23          Is that what that says?

24      A.      It does say that.

25      Q.      Now, this is in March of 2017.

 1    And you're saying even in your position now,

 2    which is, if I wrote it down correctly,

 3    senior vice -- or vice -- yeah, senior vice

 4    president, right?  Are you vice president or

 5    senior vice president?

 6         A.     Right now?

 7         Q.     Yeah.

 8         A.     Vice president.

 9         Q.     Vice president of regulatory

10    affairs and compliance; is that right?

11         A.     Yes.

12

Highly Confidential - Subject to Further Confidentiality Review

```
1
```

2            (McKesson-Hartle Exhibit 48

3      marked for identification.)

4   QUESTIONS BY MR. RAFFERTY:

5      Q.     If we look now at

6   Exhibit 1153 -- you got it?  I already marked

7   these -- which is -- I'm sorry, is marked

8   Exhibit 48.

9            And if you turn to page -- this

10  is the -- just so the -- we identify the

11  document, it's P1.1153, and it is from the

12  DEA, "Effective controls against diversion."

13            Have you seen this before?

14            You know what?  I withdraw the

15  question.  Let's just go to .44.

16      A.     I'd still like to take a quick

17  peek.  I want to see...

18      Q.     Okay.  Go to .44, please.

19            You there?

20      A.     Almost.  .44.  Okay.

21



Highly Confidential - Subject to Further Confidentiality Review



And then the second bullet

Highly Confidential - Subject to Further Confidentiality Review

1    point is, "Is there a problem with controlled

2    substances in this particular state?  If so,

3    what is the problem, what are the controlled

4    substances involved," right?

5         A.    That's what it says.

Highly Confidential - Subject to Further Confidentiality Review



24          MS. HENN:  Pardon me, Counsel.

25      My realtime -- oh, and the phone cut

```
 1          out.

 2                  MR. RAFFERTY:  Okay.  Well,

 3          let's take five minutes and just get

 4          it on.

 5                  MS. HENN:  Let's go off the

 6          record for a second.

 7                  VIDEOGRAPHER:  The time is

 8          1:30 p.m., and we're going off the

 9          record.

10           (Off the record at 1:29 p.m.)

11                  VIDEOGRAPHER:  The time is

12          1:32 p.m., and we're back on the

13          record.

14     QUESTIONS BY MR. RAFFERTY:

15          Q.    All right.  Let's -- all right.

16     Let's look at what else is going on.

17                  During 2014, there were some --

18     you're familiar with HDMA.  We talked a

19     little bit about that earlier, right?

20          A.    I am.

21          Q.    That's your trade organization?

22          A.    Right.  Correct.

23                  (McKesson-Hartle Exhibit 61

24          marked for identification.)

25
```

```
 1   QUESTIONS BY MR. RAFFERTY:

 2        Q.     Okay.  And if we look at 1490,

 3   which will be Exhibit 61 to the depo.

 4             So this is right around the

 5   time you're starting at McKesson, right, May

 6   2014?

 7        A.     In 2014.

 8        Q.     Okay.  "SGAC annual meeting."

 9             Do you see that?

10        A.     I see that.

11        Q.     And what is that; do you know?

12        A.     I don't know.

13        Q.     It says "HDMA" down at the

14   bottom, Healthcare Distribution Management

15   Association.  You guys are on the -- you

16   guys.  You're -- McKesson is on the executive

17   committee of that, right?

18        A.     Correct.

19        Q.     Okay.  And it says, if you look

20   at point 2, "HDMA state government affairs

21   capabilities, prepared for the HDMA executive

22   committee expense working group."

23             Do you see that?

24        A.     I do see that.

25        Q.     And one of the things, if you
```

Highly Confidential - Subject to Further Confidentiality Review

1    turn over a couple of pages to .4, one of the

2    things it says is, "Challenges on the

3    horizon:  State efforts to address, reduce,

4    prevent prescription abuse and diversion."

5              Do you see that?

6        A.    I see that.

7

Highly Confidential - Subject to Further Confidentiality Review



11    Q.    Okay.  Well, let's see what --

12    14.55, please.  This is already 47.

13            MS. HENN:  Counsel, one note.

14        This document was labeled Exhibit 48

15        on the actual document, which I'm not

16        sure is right.

17            MR. RAFFERTY:  You know, I

18        know, because I went to mark it and

19        then I set it aside, so...

20            MS. HENN:  At a break or

21        something.  Okay.

22            MR. RAFFERTY:  All right.  So

23        this is already Exhibit 47 that I'm

24        looking at now.

25            MS. HENN:  Okay.

1        MR. RAFFERTY:  Is it 47?  No,

2    no, no.  It's already -- no.  No.  I

3    was saying it's previously been

4    marked.  It's your presentation notes.

5        THE WITNESS:  Oh.

6        MS. HENN:  Oh, I see what

7    you're saying.

8        MR. RAFFERTY:  Yeah.

9        MS. HENN:  Pardon me.

10        MR. RAFFERTY:  We had just

11    skipped the number 48 because I took

12    it out of order.

13        MS. HENN:  Understood.

14  QUESTIONS BY MR. RAFFERTY:

15

Highly Confidential - Subject to Further Confidentiality Review



15    Q.    Okay.  Now, the fact of the

16  matter is is you did start seeing, for

17  example, different states and state Boards of

18  Pharmacy cracking down and trying to make

19  sure and reduce diversion through their

20  states, correct?

21         MS. HENN:  Objection to form.

22         THE WITNESS:  Could you ask

23    that again?

24  QUESTIONS BY MR. RAFFERTY:

25    Q.    Yeah.



1           You did see that --

2      A.   Yeah.

3





Highly Confidential - Subject to Further Confidentiality Review



16    QUESTIONS BY MR. RAFFERTY:

17         Q.    So you've never seen this

18    before?

19         A.    I don't recall it.  I can't say

20    I've never seen it.

21              (McKesson-Hartle Exhibit 63

22         marked for identification.)

23    QUESTIONS BY MR. RAFFERTY:

24         Q.    Let me show you 1456.

25              Now this was, what, nine months

1   ago, right?  Roughly?  It's October 2017.

2   What is that, nine, ten months ago?

3          A.      Right.

4          Q.      And I'll hand you what's been

5   marked as 63.





Highly Confidential - Subject to Further Confidentiality Review





12          (McKesson-Hartle Exhibit 64

13      marked for identification.)

14  QUESTIONS BY MR. RAFFERTY:

15      Q.    Okay.  In fact, let's look

16  at -- sorry about that.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1    QUESTIONS BY MR. RAFFERTY:

 2         Q.     Okay.  And as I said before,

 3    this isn't -- there have been -- there was in

 4    2008 a settlement that we talked a little bit

 5    about earlier involving the failure for -- a

 6    failure of McKesson to report suspicious

 7    orders of its narcotics, right?

 8                MS. HENN:  Objection to form.

 9                THE WITNESS:  I apologize.  Can

10         you say that one again?

11    QUESTIONS BY MR. RAFFERTY:

12         Q.     2008 --

13         A.     2008.

14
```

```
19                (McKesson-Hartle Exhibit 65

20         marked for identification.)

21    QUESTIONS BY MR. RAFFERTY:

22         Q.     Okay.  If we could look now at

23    1.889, which will be Exhibit 65.

24                This is a copy of the

25    settlement and release agreement and
```

1   administrative memorandum of agreement from

2   the 2008 settlement.

3            Do you see that?

4       A.    I do see that.

5       Q.    Okay.  Now, if we turn to -- I

6   just want to make a list here.

7            Now, this resulted in the

8   $13.25 million fine, right?

9       A.    Correct.

10           MR. RAFFERTY:  Okay.  So if I

11      could have a piece of paper, Carol.

12  QUESTIONS BY MR. RAFFERTY:

13      Q.    So if we look over on

14  page .2 -- not .2 -- on page -- Bates

15  stamp -- you see the Bates number down at the

16  bottom?

17      A.    Yeah.

18      Q.    1060 is the page we need to go

19  to.  Sorry, mine is not numbered.

20           All right.  So this 2008

21  involved -- and it says, "Covered Conduct."

22  Covered conduct involved in this, in the --

23  involved, A, within the District of Maryland,

24  and it involved McKesson-Landover.

25           Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    So that's Landover, Maryland.

3          And in Landover, Maryland, they

4    allege that there was approximately 3 million

5    dosage units of hydrocodone sold to New Care

6    Pharmacy in Baltimore, and failed to report

7    these as suspicious orders to the DEA when

8    discovered, right?

9          MS. HENN:  Objection to form.

10   QUESTIONS BY MR. RAFFERTY:

11   Q.    That's what it says?

12   A.    That's what it says.

13

20   QUESTIONS BY MR. RAFFERTY:

21   Q.    Okay.  And then second, letter

22   B down there is, "Within the middle district

23   of Florida, in October 2005,

24   McKesson-Lakeland sold approximately

25   2.1 million dosage units of hydrocodone to

1    seven pharmacies in the Tampa area and failed

2    to report these as suspicious orders."

3    Right?

4                   MS. HENN:  Objection to form.

5                   THE WITNESS:  That's what it

6        says.

7    QUESTIONS BY MR. RAFFERTY:

8        Q.    Okay.  C is, "From February to

9    September 2007, McKesson-Conroe sold

10   approximately 2 million dosage units of

11   hydrocodone."

12                  That's Conroe, Texas, right?

13                  MS. HENN:  Objection to form.

14   QUESTIONS BY MR. RAFFERTY:

15       Q.    It says "within the Southern

16   District of Texas"?

17                  MS. HENN:  Objection to form.

18                  THE WITNESS:  Correct.

19   QUESTIONS BY MR. RAFFERTY:

20       Q.    And then turning the page:

21   "Within the District of Colorado, from

22   September 2005 through November 2007,

23   McKesson-Aurora sold large quantities of

24   hydrocodone to three Colorado pharmacies and

25   failed to report these as suspicious orders."

1           That's what it says, correct?

2    A.     That's what it says.

3    Q.     F -- or I'm sorry, E.  "Within

4    the District of Utah, from January 2005

5    through October 2007, McKesson-Salt Lake City

6    sold approximately 824,000 dosage units of

7    hydrocodone, oxycodone and fentanyl and

8    methadone to the Blackfeet Clinic in

9    Browning, Montana, and failed to report these

10   sales as suspicious orders."

11          Is that right?

12   A.     That's what it says.

13   Q.     Okay.  "Within the Eastern

14   District of California, from October 2007

15   through June 2007, McKesson-West Sacramento

16   suffered theft and significant loss of

17   controlled substances on 28 separate

18   occasions and failed to timely submit

19   required theft and loss reports to the DEA."

20          Do you see that?

21   A.     That's what it says as well.

22   Q.     And if you turn to page --

23   Bates number ending 1062, so a couple pages

24   over, "Terms and Conditions."  And it lists

25   out the way the 13.25 million got calculated,

1    right?

2         A.    It does.

3         Q.    Okay.  It goes through all

4    those.

5

12   QUESTIONS BY MR. RAFFERTY:

13        Q.    Okay.  In fact, it also says,

14   "McKesson represents that it's taking -- it

15   has taken good faith actions to detect and

16   prevent diversion, including agreeing to

17   implement the policies and procedures that

18   are subject of an administrative settlement

19   agreement between it and DEA dated May 2,

20   2008."

21              And then if you turn to the

22   first page, that discusses some of the items

23   that they have discussed, and in particular

24   if you turn to Bates number page ending 1050.

25              And it goes on and says,

1    "Obligations" -- under terms and conditions.

2    "Obligations of McKesson.  McKesson agrees to

3    maintain a compliance program designed to

4    detect and prevent diversion of controlled

5    substances as required under the CSA and

6    applicable DEA regulations."

7                Do you see that?

8        A.    I see that.

9        Q.    "This program shall include

10   procedures to review orders for controlled

11   substances.  Orders that exceed established

12   thresholds and criteria will be reviewed by a

13   McKesson employee trained to detect

14   suspicious orders."

15               Did I read that correctly?

16       A.    Yes.

17       Q.    "Such orders should not be

18   filled" -- I'm sorry, I missed a part

19   there -- "will be reviewed by a McKesson

20   employee trained to detect suspicious orders

21   for the purpose of determining whether, one,

22   such orders should be not filled and reported

23   to the DEA, or based on a detailed review,

24   the order is for legitimate purposes and the

25   controlled substances are not likely to be

Highly Confidential — Subject to Further Confidentiality Review

```
1   diverted into other than legitimate medical,

2   scientific and industrial channels."

3            Do you see that?

4       A.    Yep.  That's what it says.

5       Q.    "Orders identified as

6   suspicious will be reported to the DEA as

7   discussed in Subsection 2."

8            And then it says, "This

9   compliance program shall apply to all current

10  and future McKesson distribution centers."

11           You see that?

12      A.    I do.

13
```



```
24  QUESTIONS BY MR. RAFFERTY:

25      Q.    Okay.  And then it goes on to
```

1    talk about "the obligations undertaken in

2    this paragraph do not fulfill the totality of

3    its obligations to maintain effective

4    controls against diversion."

5              Do you see that?

6        A.    I see that.

22              (McKesson-Hartle Exhibit 66

23    marked for identification.)

24    QUESTIONS BY MR. RAFFERTY:

25        Q.    Okay.  Well, let's take a look

1    at 1.1432.  This is Exhibit 66.  This is

2    dated November 6, 2013.

3





Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14          (McKesson-Hartle Exhibit 68
15      marked for identification.)
16  QUESTIONS BY MR. RAFFERTY:
17
```

Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review



















17    QUESTIONS BY MR. RAFFERTY:



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 6              MS. HENN:  Counsel, is this a
 7     good time for a five-minute?
 8              MR. RAFFERTY:  Yeah.
 9              MS. HENN:  Thank you very much.
10              VIDEOGRAPHER:  The time is
11     2:18 p.m., and we're going off the
12     record.
13       (Off the record at 2:18 p.m.)
14              VIDEOGRAPHER:  The time is
15     2:28 p.m., and we're back on the
16     record.
17     QUESTIONS BY MR. RAFFERTY:
18
```





1

2

3      QUESTIONS BY MR. RAFFERTY:

4

18                     MS. HENN:   Objection to form.

19                     THE WITNESS:   Excuse me.

20      QUESTIONS BY MR. RAFFERTY:

21

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11    Q.    Okay.  And when you came on

12  board with your experience from Target and

13  you, as part of your job, have to know what

14  the CSMP is, you knew this was in there,

15  right?

16          MS. HENN:  Objection to form.

17  QUESTIONS BY MR. RAFFERTY:

18    Q.    You reviewed these policies?

19    A.    I reviewed this document, yeah.

20    Q.    Right.

21





Highly Confidential - Subject to Further Confidentiality Review

1

11      Q.      Okay.  All right.  Let's look

12  at 1.1443.  Oh, that's what was -- that's the

13  one we're on now.

14              Oh, 43.  Yes.  And that has

15  previously been marked as Exhibit 54.  Oh,

16  40, I'm sorry.  The numbers are too close.

17  They're 1433 and 1443.  Okay.  So this is

18  Exhibit 1.1443.

19              (McKesson-Hartle Exhibit 69

20       marked for identification.)

21  QUESTIONS BY MR. RAFFERTY:

22      Q.      This is Exhibit 1.1443, now

23  marked as Exhibit 69.

24              This is November 4, 2014, and

25  it is from the US Department of Justice DEA

Highly Confidential - Subject to Further Confidentiality Review

1    in Springfield, Virginia.

2              Do you see that?

3      A.     Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



1

                    Now, if we go forward now, this

23  is in November 2014.

24                    Now -- well, first of all,

25  let's take a look at 1.098.

1          (McKesson-Hartle Exhibit 70

2      marked for identification.)

3  QUESTIONS BY MR. RAFFERTY:

4      Q.    This will be marked as

5  Exhibit 70, and this is the McKesson

6  Corporation's response to the Teamsters.

7          Let's see what happens in 2015,

8  if you look.

9

1

2

3

4

5

6

7

8    Q.      Yet in 2015, you-all --

9    A.      What page are we on?

10   Q.      Sorry.  Page 24 of the report.

11           In 2015, the bottom paragraph:

12   "Since 2015" -- the company provided the

13   following data:  In 2015, after it's been --

14   being investigated by the DEA, the DOJ, the

15   company reported over 230,000 suspicious

16   orders.

17           MS. HENN:  Sorry, so you're on

18       page --

19           MR. RAFFERTY:  Page 24.

20           MS. HENN:  Not .28.

21           MR. RAFFERTY:  Oh, yeah, I'm

22       sorry, mine's not -- sorry.

23   QUESTIONS BY MR. RAFFERTY:

24       Q.      Last sentence on that page.

25       A.      Okay.

Highly Confidential - Subject to Further Confidentiality Review

1

14        Q.      Okay.  Now, if we could go to

15    the -- let's see, 1.088.  Exhibit 58.  This

16    is the copy we talked about earlier, so I'm

17    only going to go through one particular

18    aspect of it.

19        A.      I apologize, I don't have my 58

20    quite yet.  I'm a bit out of order.

21        Q.      Okay.

22        A.      Sorry about that.  I have it

23    now.

24        Q.      Okay.  If you look at page --

25    this is the administrative memorandum of

```
 1   agreement for the 2017 $150 million

 2   settlement, correct?

 3        A.     Correct.

 4        Q.     Okay.  So in here it says on

 5   page 3, .3, it says, "Covered Conduct."

 6               Do you see that?

 7               "For the purpose of this

 8   agreement, covered conduct means the

 9   following conduct alleged by the government

10   for the covered time period."

11               And it says, "McKesson failed

12   to maintain effective controls against

13   diversion of particular controlled substances

14   into other than legitimate medical,

15   scientific and industrial channels by sales

16   to certain of its customers, in violation of

17   the CSA and CSA's implementing regulations at

18   McKesson distribution centers, including the

19   following."

20               So we're going to go through

21   and list those, and if they're not on this

22   list already, I'm going to add them, okay?

23        A.     Okay.

24        Q.     Aurora, Colorado, that's on

25   there.
```

1                    Aurora, Illinois, is not on

2    there.

3                    Delran, New Jersey, not on

4    there.

5                    Lacrosse, Wisconsin, not on

6    there.

7                    Lakeland, Florida, that's on

8    there.

9                    Landover, Maryland, that's on

10    there.

11                    La Vista, Nebraska.

12                    Livonia, Michigan, that's on

13    there.

14                    Methuen, Massachusetts, that's

15    on there.

16                    Santa Fe Springs, California,

17    that's not on there.

18                    Washington Court House, Ohio,

19    that's on there.

20                    And West Sacramento,

21    California, that's on there.

22                    Those are all the distribution

23    centers in the different states that the

24    allegations from -- in the 2008 and 2017

25    settlement -- if I could have the Elmo --

1    involved, correct?

2



1

2

3

4

5

6

7

8

9

10

11    Q.     In fact, there's migration all

12   the way -- and it's been well-known and shown

13   that in terms of the drugs, for example, the

14   narcotics that were being sold by McKesson in

15   Florida, and the migration all the way up

16   through the Midwest, into Ohio and throughout

17   the country, correct?

18           MS. HENN:  Objection to form.

19           THE WITNESS:  Can you say that

20      again?  I want to make sure --

21   QUESTIONS BY MR. RAFFERTY:

22      Q.     Yeah.  You're familiar -- well,

23   let me show you this.  Let's just look at

24   this.

25           This is from Exhibit 44, and I

Highly Confidential - Subject to Further Confidentiality Review

```
1    can just put this up, if you want.  It's a
2    chart.
3              This is from, just so you are
4    aware, the prescription drug abuse we looked
5    at earlier.
6         A.   I've seen it before.
7         Q.   Okay.
8         A.   Okay.
9
```



18          Q.      Right.  So what we're talking

19   about when we talk about 12 states being

20   implicated, that's just the 12 states where

21   the distribution centers are.

22               But when we're talking about

23   systemic and nationwide failures at these

24   distribution centers, we're talking about

25   drugs migrating and the distribution centers

1   servicing many other surrounding states as

2   well, correct?

3            MS. HENN:  Objection to form.

4            THE WITNESS:  Can you clarify

5      that question for me, please?

6   QUESTIONS BY MR. RAFFERTY:

7      Q.    Yeah.





Highly Confidential - Subject to Further Confidentiality Review



13    QUESTIONS BY MR. RAFFERTY:

14         Q.    Okay.  Now, one last thing.

15    You were...

16              MR. RAFFERTY:  Let's take a

17    five-minute break.  I think we

18    might -- my part might be wrapping up.

19              VIDEOGRAPHER:  The time is

20    3:08 p.m., and we're going off the

21    record.

22       (Off the record at 3:08 p.m.)

23              VIDEOGRAPHER:  The time is

24    3:17 p.m., and we're back on the

25    record.

```
 1                    DIRECT EXAMINATION
 2   QUESTIONS BY MR. PAPANTONIO:
 3        Q.      You've been questioned about
 4   the migration of opioids, narcotics, that
 5   your company sold, correct?
 6                 That was right where
 7   Mr. Rafferty left off, was asking you about
 8   how narcotics that your company distributed
 9   migrated around the United States, right?
10                 MS. HENN:  Objection to form.
11   QUESTIONS BY MR. PAPANTONIO:
12        Q.      Remember the question before
13   the break?
14        A.      Yeah, we were talking about the
15   concept of migration.
16        Q.      And he talked about the fact
17   that not only was there migration, but you --
18   everywhere this list that he made -- how
19   about -- let me put that back on here.
20                 This list that Mr. Rafferty
21   made, these are actually what we call
22   distribution centers, correct?  These are
23   distribution centers, right?
24        A.      Those are the locations of our
25   distribution centers, correct.
```

1        Q.      Right.

2

14       Q.      And as a matter of fact, in

15   addition to these, how many distribution

16   sites did you have total?

17              MS. HENN:  Objection to form.

18              THE WITNESS:  It's

19       approximately 30.

20   QUESTIONS BY MR. PAPANTONIO:

21       Q.      Okay.  So in addition to

22   this -- I'm going to mark this exhibit up a

23   little more.  And you had 30 total

24   distribution centers?

25       A.      Approximately.

Highly Confidential - Subject to Further Confidentiality Review

1

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

7      Q.      And in addition to that, we

8   would have the problem as you talked about,

9   migration.  And my partner there showed you

10  what he called the oxy express.

11             You've heard the oxy express,

12  right?

13             MS. HENN:  Objection to form.

14             THE WITNESS:  He mentioned

15       that, yeah; he didn't show us

16       anything.

17  QUESTIONS BY MR. PAPANTONIO:

18      Q.      And you would agree that the

19  oxy express you're familiar with before you

20  came in here today.  It's not the first time

21  you've heard it, true?

22      A.      It's not the first time I've

23  heard it.

24

[REDACTED]

Highly Confidential - Subject to Further Confidentiality Review



11  QUESTIONS BY MR. PAPANTONIO:

12      Q.      Did you ever study, sir, any

13  details about the findings that my partner

14  went over with you this morning that the DEA

15  had made in your failure to report suspicious

16  orders and the end result of what that meant

17  in human life, people dying?

18              Did you ever independently do

19  that in your position in regulatory?

20              MS. HENN:  Objection to form.

21  QUESTIONS BY MR. PAPANTONIO:

22      Q.      At any time.

23              MS. HENN:  Objection to form.

24              THE WITNESS:  Could you

25      rephrase that question, please?

1    QUESTIONS BY MR. PAPANTONIO:

2         Q.     Yes, sir.  Yeah.

3



```
 1          Q.     Okay.  And you also -- so my
 2   question is:  Did you ever go find out what
 3   the net result of that was when you would
 4   have an excess of your narcotics shipped to a
 5   pharmaceutical company -- or excuse me,
 6   scratch that.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 6    QUESTIONS BY MR. PAPANTONIO:

 7         Q.    You understand this -- this

 8    case isn't about statistics; it's about human

 9    life, right?  You understand that, right?

10              MS. HENN:  Objection to form.

11              THE WITNESS:  I understand

12         that.

13    QUESTIONS BY MR. PAPANTONIO:
```

1

2

3

4

5

6

7

8  QUESTIONS BY MR. PAPANTONIO:

9      Q.     Uh-huh.  And as a matter of

10 fact, before you came in here today --

11          MR. PAPANTONIO:  Would you

12      share with him 324, please.

13          (McKesson-Hartle Exhibit 89

14      marked for identification.)

15          MS. MOORE:  That would be

16      McKesson-Hartle 89.

17 QUESTIONS BY MR. PAPANTONIO:

18      Q.     Before you came in here today,

19 sir, you knew that the CDC had been -- had

20 been studying and following exactly what the

21 loss of human life was because of the sale of

22 narcotics in the United States.  You knew

23 that they had been studying that, right?

24      A.     I do.

25      Q.     And so when did you take this

Highly Confidential -- Subject to Further Confidentiality Review

```
 1   map that's -- you see this map in front of

 2   you?

 3        A.     I do.

 4        Q.     When did you take it and study

 5   it to find out what the net effect was in the

 6   loss of human life because of diversion of

 7   narcotics from your company?  When is the

 8   first time you did that --

 9             MS. HENN:  Objection to form.

10   QUESTIONS BY MR. PAPANTONIO:

11        Q.     -- if ever?

12             MS. HENN:  Objection to form.

13             THE WITNESS:  Can you please

14        rephrase that for me?

15   QUESTIONS BY MR. PAPANTONIO:

16        Q.     Yeah.

17
```

1

6      Q.    Okay.  And it's -- so here's

7    what I want to find out:  You knew that in

8    1999 -- see that map up there?

9            You knew in 1999 that is what

10    the death map looked like in 1999, correct?

11            MS. HENN:  Objection to form.

12    QUESTIONS BY MR. PAPANTONIO:

13      Q.    The CDC death map, you know

14    that's what it looked like in 1999, true?

15      A.    True, I've seen this before.

16      Q.    Okay.  Let me ask you while

17    we're talking about that:  Any of these other

18    companies that said they were here today,

19    Cardinal or CVS, were any of them at this

20    place where you talked about the death map?

21            MS. HENN:  Objection to form.

22    QUESTIONS BY MR. PAPANTONIO:

23      Q.    In your lecture, as you

24    describe it?

25            MS. HENN:  Same objection.

1          THE WITNESS:  I didn't describe

2     it as a lecture.

3          I'm not sure if any -- I've

4     talked with different individual

5     chains.

6  QUESTIONS BY MR. PAPANTONIO:





1

2    Q.    Who did you share it with?

3          MS. HENN:  Objection to form.

4          Go ahead.

5

19    Q.    Shared it.  Okay.

20         So if we look --

21    A.    I understand the map.

22    Q.    Okay.  Good.  Good.

23         Do you know who Mr. Oriente is?

24    A.    I do.

25    Q.    He worked for you, didn't he?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Object to the form.

 2                    THE WITNESS:  He does.

 3    QUESTIONS BY MR. PAPANTONIO:

 4          Q.      Did anybody show you the

 5    deposition of Mr. Oriente before you came in

 6    here today?

 7                    Did anybody show you that

 8    deposition where we questioned him for seven

 9    hours?

10          A.      I have not seen it.
```

11

23    QUESTIONS BY MR. PAPANTONIO:

24          Q.      Uh-huh.  And the reason it's

25    been published, sir, is to be able to have

```
 1    people like you understand what the expansion

 2    of your narcotics was doing to human life in

 3    this country.  That's one reason the CDC did

 4    this; you understand that, right?

 5              MS. HENN:  Objection to form.

 6    QUESTIONS BY MR. PAPANTONIO:

 7         Q.    Did you know that?

 8         A.    Can you rephrase that, please?

 9         Q.    Yeah.

10              One reason the CDC came up with

11    this map is so the entire country could

12    understand what the expansion of narcotics

13    was doing in relation to the loss of human

14    life in this country.

15              Did you know that?

16         A.    Correct, yes.

17         Q.    Okay.  And you know part of

18    this case is involved -- the jury is going to

19    hear economists in this case talk about what

20    the economic losses were because of that

21    human life.

22              Did you understand that that's

23    part of the issue that we're involved with

24    here today?

25              MS. HENN:  Objection to form.
```

1    QUESTIONS BY MR. PAPANTONIO:

2         Q.      Did you know that?

3         A.      Yes.

4         Q.      Okay.  Did you go out and find

5    out what it is that -- when you have people

6    dying or people addicted to drugs in a county

7    or a city, what the economic impact is on

8    that city or county?

9              Did you do any kind of study at

10   all to find out what that economic impact is?

11             MS. HENN:  Objection to form.

12             And I'll advise the witness if

13        counsel is asking about attorney work

14        product in relation to the case, he

15        should not respond.

16             MR. PAPANTONIO:  I'm not asking

17        him about anything work product.

18   QUESTIONS BY MR. PAPANTONIO:

19

Highly Confidential - Subject to Further Confidentiality Review

1 ████████████████████████████████

2 ████████████      ████████████████

3 ████████████  ████████

4  QUESTIONS BY MR. PAPANTONIO:

5       Q.      All right.  So if we look at

6  this map, we start in 1999.  You see, that's

7  the first one.  And you see down at the very

8  bottom, you see where the brown is at the

9  very bottom?  It says that's 30 deaths per

10  every 100,000.

11       A.      I see that.

12       Q.      Right?

13              Now, when you took -- when you

14  looked at this -- I've already asked you

15  whether or not you took it on yourself to

16  find out by going to these various states and

17  counties and cities and finding out what the

18 ████████████████      ████████████████

19 ████████████████████

20 ████████████      ████████████████

21 ████████████      ████████████

22 ████████████████

23 ████████████████████

24 ████  ████████████████████

25 ████████████████████████



21          Q.      Well, let's see how much

22    attention you paid here.   Okay?

23                  Because the loss of human life

24    starts in 1999.  You know where Virginia --

25    West Virginia is on that map?

1     A.     I do.

2     Q.     What would you -- how would you

3  describe where it is on that map?  Would it

4  be the brown place right there?

5     A.     In here.

6     Q.     You're going to have to -- are

7  you pointing to the brown area there?

8            Can I put a circle around the

9  brown area?

10    A.     Yeah.  Right there.

11    Q.     That's West Virginia, right?

12    A.     Correct.

13    Q.     Now, that's in 1999.  They're

14 telling you by this map that 30 people for

15 every 100,000 people have died, correct?

16           MS. HENN:  Objection to form.

17 QUESTIONS BY MR. PAPANTONIO:

18    Q.     That's the information that map

19 gives you in 1999.

20           MS. HENN:  Objection to form.

21           THE WITNESS:  Correct.  That's

22      the mortality rate.

23 QUESTIONS BY MR. PAPANTONIO:

24    Q.     And then the -- well, the

25 mortality rate is people dying, right?

```
 1        A.      Correct.

 2        Q.      Okay.  And then we look at the

 3   brown place on the map over here to the west,

 4   and that's -- where is that, New Mexico?

 5        A.      Right there.

 6        Q.      Is that New Mexico?

 7        A.      I can't tell the outline of the

 8   state, but I...

 9        Q.      Well, there's one big brown

10   area right there.

11                Do you understand that that --

12        A.      Yeah, that area.

13        Q.      Okay.  You understand that's a

14   county, right?

15        A.      Right.  Correct.

16        Q.      And what they've -- what the

17   map actually does is it breaks it down into

18   counties.  It doesn't just tell you a state.

19   It says, in this county in 1999, we had 30

20   people for every 100,000 people who were

21   dying.

22                That's what this map told you

23   in 1999, right?

24                MS. HENN:  Objection to form.

25
```

```
1    QUESTIONS BY MR. PAPANTONIO:

2         Q.      Correct?

3         A.      Correct.

4         Q.      And nevertheless, you're
```

5 �altaindividua

██ 

██

██

██

██

```
11   QUESTIONS BY MR. PAPANTONIO:

12        Q.      And your company is the number

13   one pharmaceutical company selling narcotics

14   in this country, correct?  Number one.  Isn't

15   that what --

16             MS. HENN:  Objection to form.

17   QUESTIONS BY MR. PAPANTONIO:

18
```



Highly Confidential - Subject to Further Confidentiality Review

1

5    Q.    As a matter of fact, you've

6  gone to conventions where all of you-all have

7  been together talking about these types of

8  issues, about the problem of drugs being

9  spread out across the country.

10        MS. HENN:  Objection to form.

11  QUESTIONS BY MR. PAPANTONIO:

12

25

```
1    QUESTIONS BY MR. PAPANTONIO:

2         Q.      Right?

3                 Okay.  And when you talked

4    about it, you actually talked about issues

5    about how many people are dying in these

6    various counties around the country from

7    overdose on their narcotics and your

8    narcotics, right?

9                 MS. HENN:  Objection to form.

10   QUESTIONS BY MR. PAPANTONIO:

11        Q.      That's correct, isn't it?

12        A.      Could you restate that?

13        Q.      Yeah.

14
```





1

        Q.     Have you ever had that

conversation in a room or out of a room, sir?

            MS. HENN:  Objection to form.

            MR. PAPANTONIO:  Give me the

        document.

            MR. SUDDATH:  Objection.

QUESTIONS BY MR. PAPANTONIO:

        Q.     Have you?  Yes or no?

            MS. HENN:  Objection to form.

QUESTIONS BY MR. PAPANTONIO:

15

25

        Q.     All right.  Sir, let's go to

```
 1    2000.  Let's go to -- the next page is 2000.

 2              Could we do something -- what

 3    I'd like to do here is keep 1999 up on the

 4    left, and let's go through a comparison on

 5    the right.

 6              So in 2000 -- let's look at

 7    that.  Actually, what I'd really --

 8              MR. PAPANTONIO:  Can you

 9         understand what I'm saying here?  Can

10         you just put one and one, or is that

11         not possible?  One on each -- one on

12         each screen.

13              VIDEOGRAPHER:  No, they're

14         connected.

15              MR. PAPANTONIO:  Okay.  That's

16         fine.  We can do this.

17    QUESTIONS BY MR. PAPANTONIO:

18         Q.    All right.  So you see -- does

19    it look like in 2000 that there's an

20    expansion of the death data taking place, or

21    do you see any difference in that between

22    1999 and 2000?

23              Do you see any appreciable

24    differences in death occurring in this

25    country?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MS. HENN:  Objection to form.
 2    QUESTIONS BY MR. PAPANTONIO:
 3         Q.      2000.
 4         A.      Yeah, you see different
 5    states -- or different counties are shaded
 6    different colors.
 7         Q.      It's expanding, isn't it?
 8    Death in the United States is expanding, and
 9    this map shows that, doesn't it?
10         A.      Correct.
11
19    QUESTIONS BY MR. PAPANTONIO:
20         Q.      All right.  Let's go to the
21    next one.
22                 Can I tell you something?  I
23    want you to understand.  I'm not blaming you
24    for all this; you understand that?
25         A.      I understand.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.      Okay.  I'm just asking

2   questions.

3       A.      I understand.

4       Q.      So please don't think I'm

5   blaming you.  You didn't even get there until

6   2008.

7       A.      2014.

8       Q.      2014.

9               So obviously we're not at 2014

10  now.

11              But what is important to me,

12  Mr. Hartle, is this information was available

13  to McKesson.  That's all I'm trying to get at

14  right here right now.  Okay?

15      A.      Understood.

16      Q.      Okay.  So we go to 2001.  Tell

17  me whether you see any appreciable difference

18  in the amount of death taking place in the

19  United States between 1999 -- you know what

20  you can do?  If it helps you, you can keep

21  1999 right next to you and just tell me

22  whether or not you see an expansion of death

23  in human -- whether you see an expansion of

24  human death because of narcotics in this

25  country.
```

1          Do you see an expansion here?

2          MS. HENN:  Objection to form.

3    QUESTIONS BY MR. PAPANTONIO:

4          Q.     In 2001, would you have -- is

5    there anything appreciable that you see that

6    maybe we ought to know about, 2001?

7          A.     Again, different -- different

8    shadings and different expansions.

9          Q.     And tell me what's significant,

10   sir, about the shading and the expansions.

11   Let's focus on that.

12          Do you see the one right in the

13   middle that's kind of a tan, it's -- let's

14   call it a white.  It's says there's 15.9

15   human beings dying from drug overdoses for

16   every 100,000 people in those areas.

17          Do you see that tan area?

18          A.     The scale and the shading?

19          Q.     Yes, sir.  Yes, sir.

20          A.     I do see that.

21          Q.     Okay.  I want you to watch that

22   as we go, okay?  There's two things I'd like

23   you to watch.  I'd like you to watch that,

24   which is about middle of the graph, right?

25   The middle of the graft is -- graph is 14 --

1    14 to 15.9 human deaths per hundred thousand.

2              And I'd like you to keep your

3    eye on that 30 at the bottom where that's 30

4    human beings dying for every 100,000.

5              So let's go to the next one.

6    The next one is 2002.

7

14    Q.    Yes, sir.

15          And would you agree that in

16    each one of those -- each one of those areas

17    where we have some color beyond the blue that

18    you had -- that your company was distributing

19    in those areas?

20    A.    Sorry, can you rephrase that?

21    Q.    Yeah, I'm trying to take the

22    blue out right now.  I'm going to talk about

23    the blue in just a minute.

24    A.    Okay.

25



```
 9   QUESTIONS BY MR. PAPANTONIO:

10        Q.    Yes, sir, that's what I'm

11   trying to figure out.

12              All right.  Now, the next

13   thing -- that's 2002, and then we have 2003.

14              And in 2003, do you still

15   continue to see an expansion of human death

16   from narcotic overdoses taking place in the

17   United States?  2003.

18        A.    Yes.

19
```

```
24        Q.    When did you start distributing

25   narcotics?  What year?
```

 1                    MS. HENN:  Objection to form.

 2                    THE WITNESS:  I'm not 100

 3         percent sure.

 4    QUESTIONS BY MR. PAPANTONIO:

 5         Q.     It was around 1999, wasn't it?

 6                    MS. HENN:  Objection to form.

 7    QUESTIONS BY MR. PAPANTONIO:

 8         Q.     Do you know?

 9         A.     I don't know.

10         Q.     Okay.

11         A.     I actually don't know.

12         Q.     I'll show you more details on

13    that, but I want to go through this map.

14                    Let's go through 2004.  You see

15    an expansion of human death on that map in

16    2004?

17                    Are you able to see an

18    appreciable difference between 1999 where

19    people were dying and 2004 where people were

20    dying from narcotic overdoses in the United

21    States?

22         A.     Yes.

23

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5      Q.      And then in 2005, you start

6    seeing -- do you -- can you -- it may just be

7    me, but do you start seeing there's even an

8    expansion between New Mexico and California,

9    that it seems to be more and more growing in

10   those areas on the West Coast?

11             Do you see that expansion, sir?

12             If you don't, it might just be

13   my imagination, but it looks like there's an

14   expansion of human death between New Mexico

15   and California.

16             MS. HENN:  Objection to form.

17   QUESTIONS BY MR. PAPANTONIO:

18      Q.      Correct?

19      A.      I can see the shading

20   differences, yeah.

21      Q.      Yeah.

22             And also, if you take -- take a

23   close look around.  Look around where West

24   Virginia is.  You see we started off with

25   just kind of that brown area and then we had

Highly Confidential - Subject to Further Confidentiality Review

```
 1    blue?  You see the tan that's expanding?
 2              MR. PAPANTONIO:  Could you put
 3         a circle around that, Corey?
 4    QUESTIONS BY MR. PAPANTONIO:
 5         Q.    You see how that's expanding?
 6    Even right around West Virginia there's an
 7    expansion area there?
 8         A.    I do.
 9         Q.    Okay.  In -- after we're done
10    with this, I'm going to be talking about some
11    areas in West Virginia that were affected.
12              We've talked about Landover and
13    Lakeland and Aurora, Salt Lake City.  There's
14    some areas we haven't talked about, and I
15    want to talk to you about West Virginia.
16              And do you know approximately
17    where the pharmacy -- do you know where
18    Kermit, West Virginia, is there?
19         A.    I don't know its exact location
20    in West Virginia, but --
21         Q.    You're familiar with what
22    happened in Kermit?
23         A.    I am.
24         Q.    Okay.  We'll talk about that in
25    just a minute, but let's go through this map.
```

1          Okay.  The next one is 2006.

2          Do you have any kind of

3    appreciation in what the expansion of human

4    death was in 2006 when you compare it to

5    2000 -- to 1999?

6          MS. HENN:  Objection to form.

7          THE WITNESS:  Again, it

8      continues to expand.

9    QUESTIONS BY MR. PAPANTONIO:

10         Q.    Yeah.  If I see some and you

11   don't see it, feel free to tell me.  I say,

12   you know, I may be seeing something that you

13   don't see, and that's fair enough.  We see

14   things different.

15         But do you see where even that

16   area around West Virginia is continuing to

17   expand as far as human death?

18         MS. HENN:  Objection to form.

19   QUESTIONS BY MR. PAPANTONIO:

20         Q.    I'm in 2006.

21         A.    Oh, in 2006?

22         Q.    Yes, sir.

23         A.    Yeah.

24         Q.    When you make that comparison,

25   can you tell an appreciable difference in the

1    expansion even beyond 2005?

2         A.    I can see a difference, a few

3    more counties shaded different colors.

4         Q.    Yes, sir.

5              Okay.  And as we go forward --

6    let's continue.  2007, you see an expansion

7    there, don't you?  Look at that West Virginia

8    area.

9              MR. PAPANTONIO:  Circle that

10         West Virginia area for me, would you,

11         Corey?  And then also circle that

12         brown area out west.

13             Do you know where that is?  See

14         that big brown area out west next

15         to -- see that?  There you go.

16   QUESTIONS BY MR. PAPANTONIO:

17   

22         Q.    Okay.  And you know what?  Just

23   for matter of time, let's go ahead -- let me

24   just go ahead and show you what -- let me

25   show you what 2016 looks like.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PAPANTONIO:  How about
 2          putting up 2006 for me, would you?
 3                    And what I'd like to you do if
 4          you could -- is there any way I could
 5          get a comparison between 2016 and a
 6          comparison between 2009 up on the
 7          screen?  Okay.
 8   QUESTIONS BY MR. PAPANTONIO:
 9          Q.     Do you see a difference between
10   19 -- excuse me, 1999 and 2016?  You see
11   how -- 2016 is the expansion of human death
12   in the United States.
13          A.     Clearly I see the difference.
14                    MS. HENN:  Objection to form.
15   QUESTIONS BY MR. PAPANTONIO:
16          Q.     You see a clear difference
17   there.
18                    And not only that, but do you
19   also appreciate the fact that of the brown
20   area that has expanded, it is -- that's area
21   that is 30 -- that brown area is 30 human
22   lives per every 100,000 people and -- you see
23   that?
24          A.     I do.
25          Q.     And, sir, I'm not suggesting
```

```
 1    this is -- what year did you get with the

 2    company?

 3         A.      2014.

 4         Q.      And it appears to me that what

 5    you did when you came to the company is you

 6    did -- you did due diligence on what had

 7    occurred before you got there.  As I listened

 8    to your testimony this morning, it sounded

 9    like you actually did due diligence to figure

10    out how you could do your job, correct?

11                 MS. HENN:  Objection to form.

12                 THE WITNESS:  Yes, and I had a

13            previous job in which I was doing -- I

14            was focused on diversion and these

15            trends as well.

16    QUESTIONS BY MR. PAPANTONIO:

17         Q.      But you feel like there were

18    certain things that my partner went through

19    with you, some of those documents that nobody

20    had ever shown to you; is that a fair

21    statement?

22                 MS. HENN:  Objection to form.

23                 THE WITNESS:  There were a few

24            that I hadn't seen.

25
```

1    QUESTIONS BY MR. PAPANTONIO:

2         Q.     Yeah.

3

18   QUESTIONS BY MR. PAPANTONIO:

19        Q.     Yes, sir.

20              All right.  The -- we talked

21   about -- earlier we talked about a hierarchy,

22   and I think it was on -- I think it was on

23   document 7 -- well, it was number 41.  If you

24   look at 41, my partner, Troy, went over

25   details about what the hierarchy is with the

1    company.  And it -- 795 is my document, but I

2    think it was marked as 41.

3            Well, let me just ask you --

4    you don't have to go there.  It's okay.  I

5    can just ask you.

6            The structure is Nate Hartle

7    would be senior director.  Underneath you

8    would be Michael Oriente and a guy named

9    Micheal Bishop and Jay Es -- what is it,

10   Espaillat?

11       A.      Espaillat.

12       Q.      Espaillat.

13           And then you've got another

14   one, Adam Palmer.

15       A.      Palmer, right.

16

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. PAPANTONIO:

2         Q.    Okay.  And one thing that

3    you --

4              MR. PAPANTONIO:  Would you put

5         up -- would you put up photograph --

6         this is -- this is a photograph of

7         Mr. Oriente, and I'm putting it up

8         there because the jury has seen his

9         deposition, and I just want to make

10        sure they know we're talking about the

11        same person.

12             Put up 1557, please.

13             MS. HENN:  And, Counsel, could

14        you please mark it for the record, a

15        demonstrative?

16             MR. PAPANTONIO:  Yeah, we'll

17        mark it as a demonstrative.  What is

18        it?

19             Okay.  Well, excuse me, 1627.

20        1627.  Could you put that up on the

21        screen?

22             MS. HENN:  Will you please mark

23        it with a sticker?

24             MR. PAPANTONIO:  We will mark

25        it.  We will mark it.
```

```
 1              MS. MOORE:  McKesson-Hartle

 2         149.

 3              (McKesson-Hartle Exhibit 149

 4         marked for identification.)

 5    QUESTIONS BY MR. PAPANTONIO:

 6         Q.    That fellow worked for you,

 7    didn't he?

 8         A.    He works for me, correct.

 9         Q.    And he worked at a place -- you

10    remember all of the discussion about Landover

11    that you had with my partner today?

12         A.    Correct.

13         Q.    That's where he was -- he was

14    director of Landover --

15              MS. HENN:  Objection to form.

16    QUESTIONS BY MR. PAPANTONIO:

17         Q.    -- right?  That was a

18    distribution center.

19         A.    Right.

20         Q.    He was a director of Landover,

21    correct?

22         A.    He was in that facility, yes.

23         Q.    Yeah.

24              And he was the head guy in

25    charge in Landover, true, or were you also
```

```
 1   involved with Landover?

 2              MS. HENN:  Objection to form.

 3              THE WITNESS:  I was not.

 4   QUESTIONS BY MR. PAPANTONIO:

 5        Q.    Yeah, Landover had already been

 6   closed by the time you got there to the

 7   company, right?

 8        A.    Yes.

 9
```

```
19   QUESTIONS BY MR. PAPANTONIO:

20        Q.    It was closed 2012, right?

21        A.    If that's the specific time

22   frame before I got there.

23        Q.    Yeah.  Yes, sir, it's 2012.

24              And this guy, this Oriente who

25   we're looking at right here, he was the one
```

1    in charge of making the decisions about the

2    sale of narcotics from your company to

3    pharmacies in the Landover -- I mean, out of

4    the Landover facility, right?

5              MS. HENN:  Objection to form.

6              THE WITNESS:  I believe that's

7         true.

8    QUESTIONS BY MR. PAPANTONIO:

9         Q.    And after it was closed, where

10   did you -- where did he go, do you know?

11             MS. HENN:  Objection to form.

12             THE WITNESS:  He became a

13        director of regulatory affairs.

14   QUESTIONS BY MR. PAPANTONIO:

15        Q.    Okay.  And could you -- I'm

16   sorry, go ahead.

17        A.    He was a director of regulatory

18   affairs.  He ultimately came to the RNA team.

19        Q.    He's still there.  He's still

20   there, isn't he?

21        A.    He is.

22

Highly Confidential - Subject to Further Confidentiality Review



21    QUESTIONS BY MR. PAPANTONIO:

22         Q.    Good integrity?

23               Integrity matters in your

24    company, doesn't it?

25               MS. HENN:  Objection to form.

```
 1                    THE WITNESS:  It does.
 2   QUESTIONS BY MR. PAPANTONIO:
 3        Q.      Don't you even have -- don't
 4   you even have little jingle about integrity?
 5   What is -- some kind of mission statement.
 6   Do you know what it is?
 7                    MS. HENN:  Objection to form.
 8   QUESTIONS BY MR. PAPANTONIO:
 9        Q.      What is that mission statement
10   about integrity?
11        A.      The ICARE principles.
12        Q.      ICARE, that's right.
13                And ICARE, the first thing in
14   it is integrity, right?
15        A.      Right.
16        Q.      And integrity really matters
17   when you're dealing with narcotics, the sale
18   of narcotics, around the country.  That's
19   pretty important, isn't it?
20        A.      It is.
21        Q.      And as a matter of fact, it's
22   such -- it is such part of your mission
23   statement that you actually put it on your
24   documents, the -- what do you call it?  I
25   what?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      It's called ICARE.

 2        Q.      ICARE.

 3                And it's called the ICARE

 4   program, and that's the mission statement for

 5   your company, right?

 6                MS. HENN:  Objection to form.

 7   QUESTIONS BY MR. PAPANTONIO:

 8        Q.      It's important, isn't it?

 9        A.      It's important.

10

20   QUESTIONS BY MR. PAPANTONIO:

21        Q.      All right.  And so --

22        A.      That's why --

23        Q.      I'm sorry, go ahead.  Are you

24   finished?

25        A.      We'll talk about it later, I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sure.
 2         Q.     Well, let's go ahead and talk
 3    about it right now, okay?
 4              You actually --
 5              MR. PAPANTONIO:  Could you put
 6         up -- could you put up 1564?
 7              You're going to have mark that
 8         for them.  It's 1564, and I don't know
 9         what exhibit list -- what the number
10         is going to be.
11              (McKesson-Hartle Exhibit 161
12         marked for identification.)
13    QUESTIONS BY MR. PAPANTONIO:
14         Q.     Why do you --
15              MS. MOORE:  McKesson-Hartle
16         161.
17    QUESTIONS BY MR. PAPANTONIO:
18         Q.     Let me say something clear
19    here.  I'm not questioning your integrity --
20         A.     Right.
21         Q.     -- okay, just so you know that.
22
```









Highly Confidential - Subject to Further Confidentiality Review



15      Q.      Okay.

16      A.      But I do want to clarify one

17 thing, and I'll explain more later.

18      Q.      That's okay.  I don't -- I want

19 you to explain it.

20

24      Q.      Let me talk some more.  Okay?

25      A.      Okay.

Highly Confidential - Subject to Further Confidentiality Review



```
 1

12    QUESTIONS BY MR. PAPANTONIO:

13         Q.      Right.

14                 And that's what my partner,

15    Troy Rafferty, has been asking you about all

16    morning?

17         A.      Right.

18
```



1     QUESTIONS BY MR. PAPANTONIO:

2          Q.     Yes, sir.

3



13          MS. HENN:  Let's just have that

14     read back or if you could repeat it,

15     please, because we're having --

16          MR. PAPANTONIO:  Yeah, it

17     says -- I feel like I'm in a clown car

18     here.  Okay?

19          MS. HENN:  Thank you, sir.

20  QUESTIONS BY MR. PAPANTONIO:

21



Highly Confidential - Subject to Further Confidentiality Review

1

10          MR. PAPANTONIO:  Show them,

11     please, 1579.

12  QUESTIONS BY MR. PAPANTONIO:

13          Q.     Now, I want to -- you

14  understand before you got -- before you got

15  to McKesson, there was a lot of water under

16  the bridge about the sale of narcotics all

17  over the country.  There had been a lot of

18  things that occurred with the company in the

19  sale of narcotics --

20          A.     Right.

21          Q.     -- true?

22          MS. HENN:  Objection to form.

23  QUESTIONS BY MR. PAPANTONIO:

24

Highly Confidential - Subject to Further Confidentiality Review



```
 1

13        Q.      Okay.  Let's go on to this --

14               MS. MOORE:  McKesson-Hartle

15        162.

16               (McKesson-Hartle Exhibit 162

17        marked for identification.)

18    QUESTIONS BY MR. PAPANTONIO:

19
```

Highly Confidential - Subject to Further Confidentiality Review



    16        Q.    Okay.  But he was working with

    17   Oriente, correct, Michael Oriente?

    18        A.    He was.

    19        Q.    So he would have been working

    20   in Landover?  Landover?  Was he working

    21   Landover?

    22        A.    No.

    23              MS. HENN:  Objection to form.

    24              THE WITNESS:  No.  No.

    25

1    QUESTIONS BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



1

25        Q.      All right.  Well, let's -- you

1    were asked earlier about -- I don't know what

2    this is.  It's this map.  It's 88 -- mine is

3    872.  It's the McKesson --

4              MR. PAPANTONIO:  What was that

5          actually marked?

6              MS. MOORE:  McKesson-Hartle 100

7          is his copy.

8              MR. PAPANTONIO:  Okay.  This is

9          McKesson-Hartle 100.

10             (McKesson-Hartle Exhibit 100

11         marked for identification.)

12   QUESTIONS BY MR. PAPANTONIO:

13

25             Q.    If I didn't characterize that

1    right --

2             MS. HENN:  Objection to form.

3    QUESTIONS BY MR. PAPANTONIO:

4        Q.    Right?

5        A.    Yeah, as part of my entire

6    career, I want to stay in tune with --

7        Q.    And you saw where my partner

8    actually showed you that you were doing what

9    the DEA told you to do, which was to stay

10    abreast of what the newspaper reports are in

11    any given area about problems that there may

12    be with opioids.

13             MS. HENN:  Objection to form.

14    QUESTIONS BY MR. PAPANTONIO:

15

Highly Confidential - Subject to Further Confidentiality Review

1

2    QUESTIONS BY MR. PAPANTONIO:

3         Q.     Okay.  Explain to the jury,

4    because this might be the first time they

5    hear this.  Explain to the jury why that

6    information gathering of staying abreast of

7    what newspaper articles are reporting might

8    be important.

9              Go ahead, Mr. Hartle.

10        A.     Okay.  Could you ask that

11   question again?

12        Q.     Yes, sir.

13

Highly Confidential - Subject to Further Confidentiality Review



17    Q.    And as a matter of fact, this

18  document actually reiterated what you, I

19  think -- from what I'm understanding what

20  you're saying, this document reiterated what

21  you were doing on your own, and that is

22  seeking out information in various news

23  sources to find out what's going on in the

24  country.

25              This document -- if you'll go

1   to .3.  See that .3 there?  You see it

2   actually goes -- it actually does what you're

3   talking about.  This document actually is a

4   presentation that's being made to somebody

5   through McKesson.

6            Do you know who this

7   presentation would be made to?

8            MS. HENN:  Objection to form.

9   QUESTIONS BY MR. PAPANTONIO:

10       Q.    Would it be salespeople?

11            MS. HENN:  Objection to form.

12            THE WITNESS:  I think it was

13       used in a variety of ways.  I know it

14       was given to, you know, our chain

15       partners.  I've given part of this

16       presentation, versions of it, to

17       external partners as well.

18   QUESTIONS BY MR. PAPANTONIO:

19



Highly Confidential - Subject to Further Confidentiality Review

1

2     Q.     Okay.  The -- here's what --

3 here's what I want to be clear about, because

4 I'm not -- it's just not clear to me as I

5 listened to everything.  Maybe you can clear

6 this up.

7              If you've got -- let's say

8 you've got -- let's get Kermit.

9              MR. PAPANTONIO:  Can I get this

10        thing on here just -- we're going to

11        go back to that same document.

12 QUESTIONS BY MR. PAPANTONIO:

13     Q.     Here's Kermit.

14

22 QUESTIONS BY MR. PAPANTONIO:

23     Q.     Yes, sir.

24              And one thing they do is they

25 drive around in various areas, true?

1           I mean, they drive around in

2      the areas where they live, right?

3           A.      True.

4                MS. HENN:  Objection to form.

5      QUESTIONS BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review

1



24      Q.      As a matter of fact, you have a
25  pill mill -- let's draw a pill mill here.

Highly Confidential - Subject to Further Confidentiality Review



17    Q.    Yes, sir.

18          And the other thing at a pill

19    mill that this salesperson could ascertain

20    pretty quickly is whether there's -- whether

21    there's being cash exchanged in the mill; in

22    other words, are these people going and

23    buying these pills for cash?

24          They can ascertain that, right?

25    All they got to do is walk in.



1          MS. HENN:  Objection to form.

2   QUESTIONS BY MR. PAPANTONIO:

3

9   QUESTIONS BY MR. PAPANTONIO:

10        Q.      Yes, sir.

11              And so that really is one of

12   the responsibilities for -- and I'm coming

13   back to your theory, because I agree with you

14   on your theory and I'm going to talk to you

15   more about it.

16

Highly Confidential - Subject to Further Confidentiality Review

11      Q.      Yes, sir.

12              And in this trial, the jury is

13      going to hear about something called notice.

14      You ever heard that term?  And that is,

15      notice is when your company is told,

16      "something's wrong here, and you ought to

17      take action on it."

18              You ever heard that term?

19      Maybe it's not a term you've heard, but I'm

20      just -- I'm curious, have you ever heard the

21      term?

22              MS. HENN:  Objection to form.

23      QUESTIONS BY MR. PAPANTONIO:

24      Q.      You're on notice that

25      something's wrong in Kermit.

1          MS. HENN:  Objection to form.

2          THE WITNESS:  I've heard the

3     term "notice."

4  QUESTIONS BY MR. PAPANTONIO:

5          Q.     Okay.  You understand what it

6  is.

7          A.     I do.

8          Q.     Now, just because I've looked

9  at your file and I didn't see any time when

10  you were doing any kind of field work on the

11  ground where you were -- it was your

12  responsibility to observe pill mills, to

13  observe the news that was taking place in

14  these various counties all over the country.

15  I never saw where that was your

16  responsibility.

17          Is that a fair statement, or

18  did I miss is that?

19          I just reviewed your record.

20          MS. HENN:  Objection.

21  QUESTIONS BY MR. PAPANTONIO:

22          Q.     You were never a salesperson?

23          A.     No, that's a fair statement.

24          Q.     Okay.  You went right up to

25  management in regulatory, correct?

```
 1          A.     Correct.

 2          Q.     But you're familiar with what

 3     these salespeople did, true?

 4               MS. HENN:  Objection to form.

 5               THE WITNESS:  I'm familiar with

 6        it.

 7     QUESTIONS BY MR. PAPANTONIO:

 8          Q.     Okay.  So let's mark that --

 9               MS. MOORE:  McKesson-Hartle

10        163.

11               (McKesson-Hartle Exhibit 163

12        marked for identification.)

13     QUESTIONS BY MR. PAPANTONIO:

14          Q.     What I'm going to do here,

15     if -- you might want to keep this document in

16     front of you that I have here.  I'm just

17     going to go through these -- some of these

18     articles that are here, sir.

19               Okay?

20          A.     Okay.

21          Q.     I want to talk to you about

22     them.  And what I want to ask you about since

23     they're all -- these articles that I'm going

24     to go through are actually in your own -- not

25     yours but your company's flyer that I'm
```

```
 1    showing you here right now, okay, the

 2    PowerPoint.

 3              So the first thing in there is

 4    a discussion about CDC.  I think it's on the

 5    previous page.  But you would agree that the

 6    CDC was an important source of information

 7    for your company.  And I want to be careful I

 8    say something.  I want to be careful of

 9    something.

10              Anytime I say "you," I'm not

11    talking about you, Mr. Hartle.  I'm talking

12    about your company.  So don't be offended by

13    that.  Understand I'm talking about your

14    company.

15              Okay?

16        A.    Okay.

17        Q.    So anytime -- so you understand

18    that one source of information that your

19    company used was the CDC, right?

20        A.    Correct.

21        Q.    Yes?

22              Okay.  And as a matter of fact,

23    that death map that we just went over, that

24    was created by the CDC, correct, where we saw

25    the progression of death from 1999 to -- yes,
```

1    sir, that was created by the CDC.

2         A.    Correct, I believe it was.

3         Q.    Okay.  And this one I want to

4    show you is 1062.

5              MS. MOORE:  McKesson-Hartle

6         102.

7              (McKesson-Hartle Exhibit 102

8         marked for identification.)

9    QUESTIONS BY MR. PAPANTONIO:

10        Q.    You know why I want to go over

11   some facts here right now?  What I want to do

12   here, Mr. Hartle, is I want to review some of

13   this literature, and I just want to see what

14   it is you observed firsthand after you got

15   there.  Nothing you could have --

16             What were you doing before you

17   went for McKesson, work for McKesson?

18        A.    I worked for Target Corporation

19   where I led -- for about 19 years led

20   investigations on a lot of different

21   subjects, different areas, including in

22   health care --

23        Q.    Right.

24        A.    -- in monitoring diversion,

25   monitoring dispensing.

1      Q.      You had -- exactly.  You had a

2   long history of doing that.  That's why they

3   hired you and they made you a supervisor --

4      A.      Correct.

5      Q.      -- correct?

6              You did have a lot of

7   experience there.

8      A.      Correct.

9      Q.      But this was kind of moving you

10   into a new area when you went to work where

11   it dealt with the sale of narcotics.  That's

12   the first time you'd actually dealt with the

13   sale of narcotics, correct?

14      A.      Correct.

15              MS. HENN:  Objection to form.

16   QUESTIONS BY MR. PAPANTONIO:

17      Q.      Okay.  So --

18      A.      As a distributor.

19      Q.      Yes, sir, I gotcha.

20      A.      Yeah.

21      Q.      I gotcha.

22              So as we look at this, I want

23   to ask you about what you would agree with,

24   what you knew, some of this information.  I

25   want to find out how much information you had

1    as you were proceeding in your job.

2              This is the CDC.  It says, "CDC

3    grand rounds prescription drug overdoses, a

4    US epidemic."

5              Now, what I see here is that

6    this is January 2012.  And I get that you

7    still weren't there in 2012, correct?

8         A.    Correct.

9         Q.    All right.  And it says -- if

10   you look at this first paragraph, this says,

11   in 20 -- in 20 -- "in 2007" -- you see where

12   I am here?  "In 2007" --

13        A.    Yes.

14        Q.    -- "approximately 27,000

15   unintentional drug overdose deaths occurred

16   in the United States, one death every

17   19 minutes."

18              Now, you know, sir, that

19   actually progressed, that number of death

20   actually progressed at -- went higher after

21   2007.  You know that, or do you?

22        A.    I do.

23        Q.    Okay.  It says, "Prescription

24   drug abuse is the fastest growing drug

25   problem in the United States."

1           You, I think, have already said

2   that you agreed with that, and I'm not --

3   well, maybe I misunder -- maybe I did.

4           Do you agree with that?  I want

5   to be fair and make sure I got this right.

6

11      Q.      Okay.  And again, this is not

12   your responsibility at this place.  At this

13   time you're still at Target, correct?

14      A.      Correct.

15      Q.      You don't have anything to do

16   with all this.

17           It says, "The increase of

18   unintentional drug overdose death rates in

19   years" -- and it gives us -- it gives us a

20   figure we can go to, but it -- "has been

21   driven by increased use of a class of

22   prescription drugs called opioid analgesics.

23   Since 2003, more overdose deaths have

24   involved opioid analgesics than heroin and

25   cocaine combined."

1          Right?

2          And you're familiar with that.

3    You understood as we just looked at the map,

4    sir, the progression is pretty apparent.  I

5    mean, this is the CDC talking about starting

6    in 2007, but the progression is pretty

7    apparent, isn't it?  It was apparent to you

8    when you got there?

9          MS. HENN:  Objection to form.

10   QUESTIONS BY MR. PAPANTONIO:

11

14        Q.     All right.  Then if you look at

15   the bottom it says, "Drug distribution

16   through the pharmaceutical supply chain was

17   the equivalent of 96 milligrams of morphine

18   per person in 1997 and approximately

19   700 milligrams per person in 2007, an

20   increase of 600 percent.  That 700 milligrams

21   of morphine per person is enough for everyone

22   in the United States to take a typical

23   5-milligram dose of Vicodin, hydrocodone,

24   every four hours for three weeks."

25

Highly Confidential - Subject to Further Confidentiality Review



1

25          Q.      I didn't see that in your

1    record.  If it's there, please tell me if it

2    is.

3         A.    It's a true statement.

4

22        Q.    Okay.  So the next -- I'm going

23   to continue with some of these articles.  I

24   just want to -- I'm not going to be able to

25   go through the whole thing, but if there's

1   something in an article that you say, "Look,

2   I want to talk about this," feel free to do

3   it.

4              This next one -- this next one

5   is document 1620.

6              MS. MOORE:  That would be

7        McKesson-Hartle 148.

8              (McKesson-Hartle Exhibit 148

9        marked for identification.)

10  QUESTIONS BY MR. PAPANTONIO:

11       Q.    You want to take a look at

12  that, Mr. Hartle, and see what you think?

13             This is -- also, everything

14  that I'm doing right now, up to a certain

15  point, and I'll tell you when that point is,

16  this is simply coming from that document that

17  you have in front of you that is McKesson

18  talking about newspaper articles that were

19  important, right?

20             MS. HENN:  Objection to form.

21        I'm sorry, I don't understand what you

22        just said.

23  QUESTIONS BY MR. PAPANTONIO:

24       Q.    Okay.  Well, let me

25  restatement -- let me restate it.

1          I'm going to be talking about

2    that -- that PowerPoint, that McKesson

3    PowerPoint, and in there it is -- there's

4    footnotes, there's places where they talk

5    about news articles.  Okay?

6          I'm going to be talking about

7    those, and so as I go forward, that's what

8    I'm trying to tell you.

9        A.    Okay.

10       Q.    This one is called, "Let's Come

11   Together to Solve the Opioid Crisis."

12            MS. HENN:  Counsel, I'm not

13        sure we have the right document.

14            THE WITNESS:  Yeah.  This is a

15        Wikipedia page.

16            MR. PAPANTONIO:  Oh, wait,

17        wait.  I'm sorry.  1561.  Give him --

18        hold that because I'm going to get to

19        that in just a minute.  1561.

20            MS. MOORE:  McKesson-Hartle

21        145.

22            (McKesson-Hartle Exhibit 145

23        marked for identification.)

24            MR. PAPANTONIO:  Could we blow

25        that up?  He's not going to be able to

1          see that.  I can't even read the

2          thing.  If you could read that.  I

3          can't even read it on the paper.

4          Let's see if we can blow it up on the

5          screen.

6     QUESTIONS BY MR. PAPANTONIO:

7          Q.     Did you know that McKesson did

8     an -- they did an ad in the Wall Street

9     Journal?  Do you remember this ad they did?

10              This is after they had been

11    punished by the DEA in 2008, after they had

12    been punished by the Department of Justice in

13    2015, after they had been fined $150 million,

14    after they had been fined $13 million.  I

15    could go on.  But then they put this ad in

16    the newspaper.

17              Did you see this ad in the

18    newspaper?

19         A.     I don't recall.

20              MS. HENN:  Objection to form.

21              THE WITNESS:  Excuse me.

22    QUESTIONS BY MR. PAPANTONIO:

23         Q.     "Let's Come Together to Solve

24    the Opioid Crisis."

25              You see that?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I see that.

2       Q.      You understand if we look at

3   that map that we -- that death map that takes

4   us all through 2016, this is a little bit

5   late for solving the opioid crisis.  If they

6   had an ad in the newspaper, Wall Street

7   Journal, like this that says -- let's read

8   it.  Let's read what it says, because these

9   are really nice words, and I want to see

10  which...

11              It says, "Our nation is in the

12  midst of an enormous epidemic."

13              Now, we can agree, the epidemic

14  had started long before 2017, right?  Right?

15      A.      Yeah, based on CDC information.

16      Q.      But right after they get hit by

17  the Department of Justice for $150 million

18  where they have to admit they were -- they

19  were unlawfully failing to report suspicious

20  orders, those types of things, then this ad

21  comes out and it says, "Our nation is in the

22  midst of an enormous epidemic," right?

23      A.      There's what it says.

24              MS. HENN:  Objection to form.

25



1    QUESTIONS BY MR. PAPANTONIO:

2         Q.    It says, "The only way we can

3    solve it is by coming together to create a

4    practical solution."

1

2

3

4

5

6

7

8

9

10

11   QUESTIONS BY MR. PAPANTONIO:

12        Q.      Okay.  So it says, "The only

13   way we're going to solve it is by coming

14   together."

15             What is -- what do you mean,

16   "coming together"?  What -- what was -- how

17   were you going to come together to solve

18   that -- the problem that we saw on that death

19   map that extended from New York to

20   California?  What was -- what is coming

21   together?

22             Would you underline "coming

23   together"?

24             How do you want to come

25   together to solve that problem?  What is --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    did they -- did you have a come-together

 2    meeting or something where they said, "We got

 3    a solution; now we're going to come

 4    together"?

 5              MS. HENN:  Objection to form.

 6              THE WITNESS:  No, I didn't

 7         write this, so I don't know exactly

 8         what the meaning was.

 9    QUESTIONS BY MR. PAPANTONIO:

10         Q.    I know you didn't write it.

11         A.    Yeah.

12         Q.    I'm not -- again, this isn't a

13    blame game.  I'm just wondering.

14              Do you remember a meeting where

15    we're going to come together and here is our

16    practical solutions to all these people dying

17    in the United States from our narcotics?

18              MS. HENN:  Objection to form.

19    QUESTIONS BY MR. PAPANTONIO:

20         Q.    I'm sorry.

21         A.    Could you ask the question

22    again?

23         Q.    Yes, sir.

24
```



16    QUESTIONS BY MR. PAPANTONIO:

17         Q.    All right.  Do you know -- I'm

18    just -- let's read on.  It says, "At McKesson

19    we're working to do our part by continuously

20    enhancing our programs designed to detect and

21    prevent opioid diversion."

22              Isn't that what you told the

23    DEA you were going to do in 2008?

24              Underline that.

25              In 2008, the president of your

1    company -- you know Mr. Hammergren?  Have you

2    ever met Mr. Hammergren?

3         A.     Not in person.  I've been to

4    conferences with him.  I know who he is.  He

5    is our CEO.

6         Q.     You know what else I'm

7    interested in?  You ever met Mr. Hobart?  We

8    saw Mr. Hobart's name a lot.  He's an

9    attorney, right?  You've met him?

10        A.     I have.

11        Q.     As a matter of fact, we're here

12   in Covington & Burling here in Washington,

13   DC, and this is where Mr. Hobart's office is,

14   right?  True?

15        A.     Correct.

16        Q.     Did you meet him here in this

17   office?

18        A.     I've met Geoff.

19        Q.     You've met Geoff.  That's his

20   name, Geoff Hobart?

21        A.     Correct.

22        Q.     Did you know also in this --

23   also in this building that we're sitting

24   right here -- you know who Eric Holder is?

25        A.     I do.



1     Q.     Did you meet Mr. Eric Holder?

2            You been up to his office?

3            MS. HENN:  Objection to form.

4            THE WITNESS:  I have not.

5     QUESTIONS BY MR. PAPANTONIO:

6     Q.     You haven't met him, right?

7     A.     No.

8

25

Highly Confidential - Subject to Further Confidentiality Review

1

6          Q.     And you know about the article

7    where the DEA was complaining that they had

8    made recommendations about Aurora, where they

9    suggested that Aurora, because of all the bad

10   things that were done in Aurora, that there

11   should be -- there should be fines in excess

12   of a billion dollars.  Do you know that?

13              Do you remember that article

14   that appeared in the Wall Street Journal?

15              MS. HENN:  Objection to form.

16   QUESTIONS BY MR. PAPANTONIO:

17         Q.     I'll get to it in a minute, but

18   I'm just --

19         A.     I think I recall, yeah.

20         Q.     You do recall that.

21              And you recall that those same

22   DEA agents -- the same DEA -- well, let me

23   show it to you.  You've seen it, I know.

24   This is --

25              MS. MOORE:  McKesson-Hartle 84.

1      It's P1.108.

2              (McKesson-Hartle Exhibit 84

3      marked for identification.)

4  QUESTIONS BY MR. PAPANTONIO:

5      Q.     And you've seen this, right?

6  It's attached -- that's actually attached to

7  one of these documents, but I want to make

8  sure you've seen this before.

9      A.     I have.

10     Q.     All right.  Well, let's read it

11  together since -- let's go from this -- this

12  ad that appeared in the Wall Street Journal

13  about how you're going to come together to

14  solve the crisis in the United States.

15             This headline on this article

16  is, "We feel like our system was highjacked.

17  DEA agents say a huge opioid case ended in a

18  whimper."

19             Now you were actually

20  involved -- at this point, sir, you were

21  involved in the process of simply trying to

22  do your job and provide information to the

23  people so they could work through this

24  problem that existed in 2015, right?

25             MS. HENN:  Objection to form.

```
 1    QUESTIONS BY MR. PAPANTONIO:

 2         Q.     You were providing them

 3    information.  We got to work through the

 4    problem of -- we got to work through this

 5    problem.  We've been accused of certain

 6    things like not reporting suspicious orders

 7    in Aurora, right?

 8         A.     Could you rephrase that?

 9               MS. HENN:  Objection to form.

10    QUESTIONS BY MR. PAPANTONIO:

11         Q.     Yes, sir.

12         A.     I don't understand who is

13    "they."

14         Q.     I want to make sure that I'm

15    clear.

16               You did not participate in

17    anything that occurred dealing with the

18    $150 million fine; yes or no?

19               MS. HENN:  Objection to form.

20               THE WITNESS:  That was before I

21         joined McKesson.

22    QUESTIONS BY MR. PAPANTONIO:

23         Q.     That's right.

24               But nevertheless, you were

25    familiar with the fact that the question had
```

1    been raised by the DEA where they had -- they

2    had actually -- they had actually made a

3    recommendation that there be criminal charges

4    brought against McKesson, true?

5              MS. HENN:  Objection to form.

6    QUESTIONS BY MR. PAPANTONIO:

7        Q.    Take a minute and look at this.

8    I want you to be familiar with it.  I don't

9    want you guessing about this because these

10   questions I'm about to ask you are important.

11             Are you familiar with that

12   article, sir?

13       A.    I am.

14       Q.    I'm kind of short on time so I

15   want to move through this.

16

Highly Confidential - Subject to Further Confidentiality Review

1

14  QUESTIONS BY MR. PAPANTONIO:

15      Q.    And Mr. Hobart is a partner

16  with the Attorney General Eric Holder, a law

17  partner at Covington & Burling with Eric

18  Holder.  You know that, correct?

19          MS. HENN:  Objection to form.

20          THE WITNESS:  I do.

21  QUESTIONS BY MR. PAPANTONIO:

22      Q.    And as a matter of fact, we're

23  sitting in an office as we take this

24  deposition, and in this office is Mr. Eric

25  Holder's office, right?  You know that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HENN:  Objection to form.

 2                    THE WITNESS:  I know it's in

 3          this complex, sure.

 4    QUESTIONS BY MR. PAPANTONIO:

 5          Q.    In this complex.

 6                    And you know Mr. Hobart's

 7    office is in this complex, correct?

 8                    MS. HENN:  Objection to form.

 9                    THE WITNESS:  Correct.

10    QUESTIONS BY MR. PAPANTONIO:

11
```

Highly Confidential - Subject to Further Confidentiality Review



1

 24        Q.      Okay.   That's fine.   It's okay.

 25   If you don't remember, you don't have to --

```
 1          A.     I understand.

 2          Q.     You don't have to make anything

 3     up or try to remember.

 4                 Okay.  Let me keep working

 5     here.  Here's another news article.  It's

 6     1526, Document 1526.

 7                 MR. PAPANTONIO:  Carol, do you

 8          have a --

 9                 MS. MOORE:  Yes, sir.  1556.

10                 MR. PAPANTONIO:  Oh, I'm sorry,

11          1556.  Yeah.  I got it.  I got it.  I

12          got it.

13                 MS. MOORE:  McKesson-Hartle

14          141, P1.1556.

15                 (McKesson-Hartle Exhibit 141

16          marked for identification.)

17     QUESTIONS BY MR. PAPANTONIO:

18          Q.     Mr. Hartle, this is -- take a

19     minute and look at this.  Just breeze through

20     it if you can.  I got a couple of just small

21     questions for you.

22                 But it's got your name at the

23     top of it; do you see that?  Nate Hartle.

24                 Do you see that, Mr. --

25          A.     I do.
```

1    Q.    Okay.  And you know who Karen

2  Harper is?  You've dealt with Karen Harper?

3    A.    I do.

4    Q.    Okay.  Now, did you know that

5  there was a representation that was made -- a

6  representation that was made to Congress that

7  your company did not have any way to find out

8  what other drug companies were selling to the

9  various pharmacies?  Did you know that?

10            MS. HENN:  Objection to form.

11            THE WITNESS:  Could you say

12      that again, please?  Did I know --

13  QUESTIONS BY MR. PAPANTONIO:

14    Q.    Yes, sir.

15            Did you know that there was a

16  representation made -- it wasn't from your

17  company, but there was a representation made

18  to Congress during the Congressional hearings

19  that there -- the reason they didn't know

20  exactly how many drugs were being told --

21  sold in a pharmacy is they didn't know what

22  the other companies were selling to the

23  pharmacy.

24            You ever heard that?

25            MS. HENN:  Objection to form.

1        THE WITNESS:  I've heard

2    statements like that.

3  QUESTIONS BY MR. PAPANTONIO:

4

19        Q.     That's what I'm trying to get

20  at.  I just want to be clear about something.

21        MS. HENN:  Counsel, let's make

22    sure we don't talk on top of each

23    other.

24  QUESTIONS BY MR. PAPANTONIO:

25        Q.     Yeah.  So I just want to be

1    clear.  I think you're -- you're already

2    answering the question.  I want to get to a

3    little more direct.

4         A.    Okay.



Highly Confidential - Subject to Further Confidentiality Review



```
1
10          MS. HENN:  Objection to form.
11          THE WITNESS:  I need you to
12      please restate that again --
13  QUESTIONS BY MR. PAPANTONIO:
14      Q.    Yes, sir.
15      A.    -- so I can be very clear.
16      Q.    Yeah, I want to be clear.
17          MR. PAPANTONIO:  Would you read
18      that back?  Read that back if you
19      don't mind.
20          She'll read that back to you.
21          (Court Reporter read back
22      question.)
23          MS. HENN:  Objection to form.
24  QUESTIONS BY MR. PAPANTONIO:
25      Q.    That's a fair question, isn't
```

1    it?  I mean, you know the answer to that.

2

6        Q.     That's all I'm trying to get

7    to.  I just want to make sure I didn't

8    misunderstand it.

9        A.     Right.

10       Q.     And it wasn't you that

11   testified in front of Congress; I'm not

12   suggesting that you did.  But if that was

13   represented in front of Congress, that just

14   wouldn't -- if it was represented in front of

15   Congress that it would be absolute -- that

16   McKesson had no way of finding out what other

17   drug companies were selling to any given

18   pharmacy, if that was represented, that

19   wouldn't be true, correct?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  Can you please

22       say that again?

23   QUESTIONS BY MR. PAPANTONIO:

24       Q.     Yes, sir.

25       A.     Yeah.



1    Q.    If it was represented to

2  Congress that McKesson had no way of knowing

3  what other drug companies were selling to any

4  given pharmacy, narcotics, that wouldn't be

5  true, correct?

6         MS. HENN:  Objection to form.

7

25



 1

 20     Q.     Correct.  If you look at this

 21  document that's in front of you, it's 1526.

 22          MR. PAPANTONIO:  What did you

 23     say that number was?

 24          MS. HENN:  And, Counsel, we

 25     need to take a break relatively soon.

1    We've been going an hour and ten

2    minutes.

3            MR. PAPANTONIO:  Yeah, okay.

4    You want to take a break right now?

5    We'll come back at it.

6            How much -- what have I got,

7    another 45 minutes, something like

8    that?

9            MS. HENN:  I think more like an

10   hour.

11           VIDEOGRAPHER:  Six hours 10

12   minutes on the record.

13           MR. PAPANTONIO:  Okay.  And why

14   don't you take a break.

15           THE WITNESS:  That's fine.

16           VIDEOGRAPHER:  The time is

17   4:39 p.m., and we're going off the

18   record.

19    (Off the record at 4:39 p.m.)

20           VIDEOGRAPHER:  The time is

21   4:50 p.m., and we're back on the

22   record.

23  QUESTIONS BY MR. PAPANTONIO:

24       Q.   Sir, I want to show you -- I

25  want to talk to you about -- you know I used

1    that word "glut"?

2         A.    You did.

3              MR. PAPANTONIO:  Okay.  Carol,

4         can I have a piece of white -- just a

5         white piece of paper?  Don't worry

6         about that other.  Give me a piece of

7         white paper and then we'll move on.

8    QUESTIONS BY MR. PAPANTONIO:

9         Q.    I want to show you this 1556.

10   It'll be up on the screen, and I want to ask

11   you about this.

12              Standby.

13              MR. PAPANTONIO:  Oh, here it

14        is.  Let's -- hold on just a second.

15        Let's back up to the beginning of it.

16        It shouldn't be that big.

17              Why don't we start it over.

18        Okay.

19              (Video played.)

20   QUESTIONS BY MR. PAPANTONIO:

21

Highly Confidential - Subject to Further Confidentiality Review

1

10          Q.      Well, here's what I'm getting

11     at.  Here's really what I'm trying to get to,

12     okay?

13                    Let's go back to this.  Let's

14     go back to Kermit.  If you got a town like

15     Kermit -- and in a minute -- you don't have

16     to take my word for it; I'll show you the

17     actual numbers -- that Kermit had a

18     population of about 400 -- I think it's 406

19     people, okay? -- during the time that the --

20     during the time that Congress actually wrote

21     a letter to your president, Mr. Hammergren.

22                    Have you ever reviewed that

23     letter that Congress wrote to Mr. Hammergren?

24                    MS. HENN:  Objection to form.

25                    THE WITNESS:  Dated when?

```
 1    QUESTIONS BY MR. PAPANTONIO:

 2        Q.      I'll have to get to it in a

 3    minute.  But I'm going to rely on the facts

 4    in that letter, and if I misstate it, it'll

 5    be in that letter.

 6                But Kermit was in West

 7    Virginia, correct?  You know that?

 8        A.      Correct.

 9        Q.      And it had a population of

10    about 406 people; you know that.  It's a very

11    small population.

12                MS. HENN:  Objection to form.

13                THE WITNESS:  Small population.

14    QUESTIONS BY MR. PAPANTONIO:

15        Q.      Okay.  But nevertheless, it was

16    getting millions of pills shipped into this

17    little area of a population of 406 people;

18    did you know that?

19

20

21

22

23

24

25
```

```
 1    QUESTIONS BY MR. PAPANTONIO:

 2          Q.     Okay.  We'll talk about

 3    specifics in a minute.  I don't expect you to

 4    remember numbers.  These are big numbers.

 5                 So let's just say if I've got

 6    millions of pills being shipped into a town

 7    that there's only 406 people, part of those

 8    are children, right?  So it's not -- it's not

 9    406 adults, 406 people in the town -- in this

10    town of Kermit.  And you've got millions of

11    pills being shipped in there, right?

12    ███████████████████████████

      ██████████████████████  ████████████

      ████████████████████████████████

      ████

      ██████████████  ███████████████████

      ████████████████  ███████████████

18    QUESTIONS BY MR. PAPANTONIO:

19          Q.     Yeah.

20                 I don't want to put words in

21    your mouth, but we're talking logic now.  If

22    you got a population of 406 people, they

23    can't -- they can't absorb -- I'm going to

24    write those words so we're going to come back

25    to that.  They can't absorb millions of
```



Highly Confidential - Subject to Further Confidentiality Review



15          Q.      Yeah.  So let me show you this

16    film again because I'm going to go from this

17    film, and then we're going to talk about

18    specifics about what the actual Congressional

19    letter said about places like Kermit and...

20                  There's a family.  There's

21    pills coming in from Judy's Pharmacy.

22                  You remember us talking about

23    Judy's Pharmacy earlier on?  I just called it

24    Judy's Pharmacy.

25          A.      I do remember that.

1    Q.    Okay.  So Judy's Pharmacy is

2    selling more -- they're getting in all these

3    pills, but the population -- if the

4    population can't cover the pills, then the

5    excess has to go somewhere, correct?

6              MS. HENN:  Objection to form.

7    QUESTIONS BY MR. PAPANTONIO:

8

Highly Confidential - Subject to Further Confidentiality Review



17   QUESTIONS BY MR. PAPANTONIO:

18        Q.    All right.  So two things I

19   want to mark.  I want to mark -- I'm going to

20   give you a hard copy of what we just put up

21   there, and let's get it marked.

22             MS. MOORE:  This is

23        McKesson-Hartle 165.

24             MR. PAPANTONIO:  This is the

25        drawing that I did.

```
1              MS. MOORE:  The video is --

2              MR. PAPANTONIO:  And then we'll

3        get the video put in.  I might have --

4        anyway, let me keep moving.

5              MS. MOORE:  1526.

6        McKesson-Hartle 140.

7              (McKesson-Hartle Exhibits 165

8        and 140 marked for identification.)

9   QUESTIONS BY MR. PAPANTONIO:

10
```

QUESTIONS BY MR. PAPANTONIO:

```
21  QUESTIONS BY MR. PAPANTONIO:

22        Q.    All right.  So now let's go and

23  let's look at what -- let's look at what

24  the -- what Congress wrote to the president

25  of your company, what they said about what
```

1    was happening in this little area called

2    Kermit.

3              You know where Kermit is,

4    correct?

5              MR. PAPANTONIO:  Let's give him

6         P144.

7              MS. MOORE:  McKesson-Hartle 76.

8              (McKesson-Hartle Exhibit 76

9         marked for identification.)

10   QUESTIONS BY MR. PAPANTONIO:

11        Q.    Okay.  So if we go through this

12   document, this is written Congress -- this is

13   Congress of the United States and -- it's

14   Congress of the United States, and it's

15   written to Mr. Hammergren.

16              Do you see that?

17        A.    Yes.

18        Q.    And Mr. Hammergren is the

19   president of the company.  He's president and

20   chief executive officer of your company,

21   McKesson, and has been all the time you've

22   worked there, correct?

23        A.    Correct.

24        Q.    All right.  So the first

25   paragraph -- let's look at that first

```
 1    paragraph.  It says, "Pursuant to the Rules X
 2    and XI of the US House of Representatives,
 3    the committee is continuing to investigate
 4    the opioid epidemic in the US that is taking
 5    115 lives a day."
 6              You've known that that's a
 7    figure that's been thrown around there for a
 8    long time, and that is 115 people die every
 9    day because of the opioid crisis, correct?
10              MS. HENN:  Object to form.
11              THE WITNESS:  I've seen those
12         type of figures, yeah.
13    QUESTIONS BY MR. PAPANTONIO:
14         Q.    And then it says, "As part of
15    our investigation, the committee wrote to
16    you" -- he's talking to Mr. Hammergren -- "on
17    May 8, 2017, regarding your distribution
18    practices generally, and in particular with
19    West Virginia -- with respect to West
20    Virginia.  As we mentioned in that letter,
21    the opioid epidemic has been particularly
22    devastating to West Virginia."
23              Now, you knew that when you
24    came to work with this company, that West
25    Virginia -- not just West Virginia but other
```

Highly Confidential - Subject to Further Confidentiality Review

1    parts of this country were devastated by an

2    overabundance, a glut, of opioids.

3              You know that, right?

4              MS. HENN:  Objection to form.

5              THE WITNESS:  I knew certain

6         parts of the country, sure, were

7         impacted by the epidemic.

8    QUESTIONS BY MR. PAPANTONIO:

9         Q.    It wasn't just West Virginia;

10   you know that?

11        A.    I know that.

12        Q.    You knew it was New Mexico.

13   That comes to your mind, doesn't it?

14        A.    Correct.  I know different

15   parts of the country.

16        Q.    Ohio, right?  Kentucky, right?

17              I mean, other -- other parts

18   besides West Virginia.  I'm going to just

19   talk about West Virginia right here.

20              But it says, "As we mentioned

21   in that letter, the opioid epidemic has been

22   particularly devastating to West Virginia.

23   For example, in 2015, West Virginia had the

24   highest opioid overdose death rate in the

25   nation.  In addition to leading to numerous

Highly Confidential - Subject to Further Confidentiality Review

```
 1    deaths, the opioid crisis in West Virginia

 2    has also caused many social challenges for

 3    its residents and has devastated the

 4    economy."

 5               Now, you remember me asking

 6    you -- we started off, and we were talking

 7    about the loss of life.  And we looked at

 8    the -- we looked at the death map.  And --

 9    but this is saying, yes, loss of life is

10    something that we see, and we also see that

11    loss of life --

12               MR. PAPANTONIO:  Would you

13         underline "devastating the economy"

14         for me, Corey.

15    QUESTIONS BY MR. PAPANTONIO:

16         Q.    It says, "Press reports

17    indicate the epidemic is now estimated to

18    cost West Virginia $8.8 billion a year."

19
```



20    QUESTIONS BY MR. PAPANTONIO:

21         Q.      Okay.   Fair enough.

22              You see it says -- page 2 --

23    page 2.  Go to page 2, please.

24              It says, "Sav-Rite No. 1,

25    Kermit, West Virginia."

1          That's a store that you sold

2   pharmaceuticals -- that McKesson sold

3   narcotics to, correct?

4          A.    Correct.  I said correct.

5          Q.    I'm sorry, I didn't hear.

6              It said, "In December of 2016,

7   the Charleston Gazette reported that the

8   Sav-Rite Pharmacy located in Kermit, West

9   Virginia, was among the top purchasers of

10  hydrocodone in West Virginia between 2007 and

11  2012.  According to US Census data, the town

12  of Kermit had a population of 406 individuals

13  in 2010."

14             I used the 400.  You remember

15  using 406 as the population in Kermit?

16         A.    I do.

17         Q.    Okay.  And then it says, "DEA

18  data indicates that over a two-year period,

19  McKesson shipped nearly 5 million doses of

20  opioids to a pharmacy in a town of 406

21  people."

22

Highly Confidential - Subject to Further Confidentiality Review



13   QUESTIONS BY MR. PAPANTONIO:

14        Q.     Okay.  It says, "According to

15   the DEA, automation of reports and

16   consolidation orders, data obtained by the

17   committee, in 2006 McKesson shipped 2,211,630

18   hydrocodone pills and 78,500 oxycodone to

19   Strosnider Pharmacy, a/k/a Sav-Rite Pharmacy

20   No. 1."

21             Do you see that?

22        A.     I see that.

23             MR. PAPANTONIO:  Underline 78

24        million 500 -- 78,500 oxycodone pills.

25   QUESTIONS BY MR. PAPANTONIO:

1    Q.    It says, "This means that in

2   2006, McKesson would have shipped in an

3   average of 186,303 codone {sic} pills per

4   month, for a 6,059 hydrocodone pills per

5   day."

6           Do you see that?

7           MS. HENN:  Objection to form.

8           THE WITNESS:  I see that.

9   QUESTIONS BY MR. PAPANTONIO:

10

16    Q.    Okay.  And it says -- it says,

17   the bottom line in that paragraph, "Applying

18   the DEA data, it can be determined that

19   McKesson supplied 76 percent of the Sav-Rite

20   Pharmacy No. 1 hydrocodone pills that year."

21

24    Q.    You agree by the time you got

25   involved, all the damage had been done to

1    Kermit, right?

2              MS. HENN:  Objection to form.

3    QUESTIONS BY MR. PAPANTONIO:

4

8              MS. HENN:  Objection to form.

9              THE WITNESS:  I joined in 2014.

10   QUESTIONS BY MR. PAPANTONIO:

11       Q.    That's all I'm trying to get

12   at.

13             Now the next paragraph it says,

14   "The ARCOS data further shows that in the

15   following year, 2007, McKesson shipped

16   2,624,680 hydrocodone pills and 40,900

17   oxycodone pills to Sav-Rite Pharmacy No. 1.

18   This is equivalent to an average of 218,723

19   hydrocodone pills per month, or 7,191

20   hydrocodone pills per day."

21             Now, sir, if that was shipped

22   into Kermit, those are startling numbers,

23   aren't they?  I mean, look, just common

24   sense, those are startling numbers.  And I'm

25   not saying you did that, but those are



1    startling numbers, aren't they?

2              MS. HENN:   Objection to form.

3    QUESTIONS BY MR. PAPANTONIO:

18             Q.      Okay.

19             A.      You'll have to refresh my

20   memory on that.

21

1

2

3    QUESTIONS BY MR. PAPANTONIO:

4         Q.    Okay.  All right.  It says, "In

5    that same year, other distributors shipped

6    1,651,160 total opioids to this pharmacy,"

7    meaning that Sav-Rite No. 1 received --

8    received a total of 4,316,740 doses of

9    opioids pills from all distributors in 7 --

10   in 2007.

11             Now, let me just take a minute

12   here at this very place where we're talking

13   about those number of pills, and let me go

14   back and talk to you about this picture that

15   deals with glut.  Okay?

16             I'm going to use the word

17   "glut."  If that doesn't work for you, let's

18   call it an overabundance of pills, if you

19   want.

20

1

2

3

4

5

6

7

8

9        Q.     All right.  Let's go now back

10   to this.  And it says -- all right.  I'm at

11   the top of page 3.  The top of page 3 says,

12   "McKesson alone supplied Sav-Rite No. 1 with

13   roughly eight times the amount of hydrocodone

14   for an average retail pharmacy in rural West

15   Virginia in 2006."

16          In 2006, you were still at

17   Target; is that a correct statement?  You

18   weren't at -- you were not at McKesson?

19        A.     I was at Target.

20        Q.     And almost ten times the amount

21   of hydrocodone that an average retail

22   pharmacy -- here's what I'm getting at, you

23   see.  They've looked at average comparisons,

24   and it says that that's -- first of all, you

25   see --

```
 1            MR. PAPANTONIO:  Underline

 2       McKesson at the top of that paragraph

 3       there.  McKesson.  We're talking about

 4       McKesson.  We're not talking about any

 5       other company besides McKesson.

 6  QUESTIONS BY MR. PAPANTONIO:

 7       Q.     It says, "McKesson alone" --

 8            MR. PAPANTONIO:  Underline

 9       "alone," please.

10  QUESTIONS BY MR. PAPANTONIO:

11       Q.     -- "supplied Sav-Rite No. 1

12  with roughly eight times the amount of

13  hydrocodone that an average retail pharmacy

14  in rural West Virginia received in 2006, and

15  almost ten times the amount of hydrocodone

16  that an average retail pharmacy -- that an

17  average retail pharmacy in rural West

18  Virginia received in 2007."

19            To be real clear -- I want to

20  make it clear -- this all had happened by the

21  time you got there, correct?

22       A.     It did.

23       Q.     It wasn't -- at this point

24  there's nothing you can do about water under

25  that bridge.  There's nothing you can do
```

1    about what happened in Kermit.

2              Can we agree to that?

3              MS. HENN:  Objection to form.

4              THE WITNESS:  Agreed.

5    QUESTIONS BY MR. PAPANTONIO:

6         Q.    Now, let's go down to -- let's

7    go down here, B.  It says, "B, McKesson

8    resumed supplying opioids to Sav-Rite after

9    federal authorities began investigating the

10   pharmacy and after press accounts publicized

11   law enforcement raids on the pharmacy."

12             Now -- okay.  They'd had -- the

13   place had been raided by the DEA, right?

14             They -- they -- everybody

15   understood at this point that the numbers for

16   400 -- a population of 406 people were ten

17   times what they should have been compared to

18   the average pharmacy, right?

19             According to what we just saw,

20   true?

21             MS. HENN:  Objection to form.

22             THE WITNESS:  According to

23        what's in here, correct.

24   QUESTIONS BY MR. PAPANTONIO:

25        Q.    All right.  And then it goes

Highly Confidential - Subject to Further Confidentiality Review

```
 1    down and says, "In March 2008, federal

 2    authorities began investigating Sav-Rite

 3    No. 1 and a medical complex owned by

 4    individuals associated with Sav-Rite.  In

 5    2009, authorities conducted a raid on the

 6    medical complex and on Sav-Rite.  This raid

 7    was publicized by, among other sources, the

 8    Huntington, West Virginia, Herald Tribune,

 9    which reported" -- let's go to the next page.

10              Now, first of all, I want to

11    say this:  You've been here all day long and

12    people have been asking you tough questions,

13    but I want to -- I want to say this:  You

14    knew that the importance of looking at news

15    reports was something that you did in your

16    regulatory process, right?

17              MS. HENN:  Objection to form.

18    QUESTIONS BY MR. PAPANTONIO:

19
```

Highly Confidential - Subject to Further Confidentiality Review

1

2         Q.      But back here they're taking --

3    they're saying that the Gazette newspaper

4    right there in town was telling this story.

5    And let's read what it said.  Let's see what

6    the Gazette said in that newspaper report.

7                 It says, "In an area with a

8    population of just a few hundred, the two

9    Sav-Rite pharmacies received millions of

10   doses -- units of the painkiller hydrocodone

11   in 2006, enough to rank 22nd nationally in

12   most hydrocodone units purchased by retail

13   pharmacies."

14                It says, "One federal agent who

15   investigated the pharmacies said

16   prescriptions are filled in such a rate that

17   Sav-Rite workers literally throw bags

18   containing the drugs over a divider and onto

19   a counter in order to keep up the pace.  The

20   agent also noticed that one cash drawer was

21   so full that the clerk could not get it to

22   close properly."

23                Now, let me take you back up

24   with a couple of facts.

25                When you came along -- what

Highly Confidential - Subject to Further Confidentiality Review

1    year was it?

2         A.      2014.

3         Q.      2014.



24        Q.      Okay.  And so 75 percent of

25   this problem that we're looking at -- well,

Highly Confidential - Subject to Further Confidentiality Review

1   let me scratch that.  I'll just keep on

2   reading so we can get through this.

3              It says, "The owner of

4   Sav-Rite, James Wooley, was ultimately

5   convicted of conspiracy to acquire or obtain

6   controlled substances and sentenced to prison

7   in 2012."

8              Mr. Hartle would have never

9   made the decision to go back and do business

10  with these people after all this happened,

11  would you?

12             MS. HENN:  Objection to form.

13  QUESTIONS BY MR. PAPANTONIO:

14      Q.     I'm trying to use your

15  judgment.  Understand, the raid took place;

16  man went to prison; McKesson's selling

17  75 percent of the drugs.  It's 10 percent --

18  it's ten times the national average of

19  narcotics.

20



19    Q.    Yeah.

20         It says, "It does not appear

21  that McKesson shipped drugs to Sav-Rite No. 1

22  between 2008 and 2010; however, DEA data

23  acquired by the committee indicates that in

24  2011 McKesson again began shipping drugs to

25  Sav-Rite No. 1."

1          Do you see that?

2     A.     I see that.

3     Q.     Now, let's take a look at the

4  last paragraph there.  "According to federal

5  search warrant, Sav-Rite Kermit was ranked

6  22nd in the nation among retail pharmacies

7  with respect to purchase of hydrocodone dose

8  units.  The average per pharmacy, 2006, was

9  97,431.  Reports citing residents of Kermit

10 and surrounding region state that everyone in

11 Kermit, just about everyone in the wooded

12 hollows of Mingo County" -- that's where my

13 partner there, Paul Farrell, is from.

14          You met Paul Farrell yesterday,

15 right?

16     A.     I did.

17     Q.     Yeah.  It says, "They knew that

18 Sav-Rite was a pill mill."  Sav-Rite was a

19 pill mill.

20

1      Q.     And in the records of McKesson

2   we'll get to in a minute, you remember

3   pictures of pill mills actually being

4   included in PowerPoints that were presented

5   at McKesson, at their meetings, actual

6   PowerPoints of what pill mills looked like,

7   people standing around in line.

8              You remember pictures like

9   that, don't you?

10     A.     I do.

11     Q.     Okay.  It says, "Press reports

12  describe a stampede of customers frequenting

13  the pharmacy, so many that the town had to

14  hire an extra police officer to handle a

15  spike in crime, extra crews to clean up the

16  mess that the clientele left behind."

17             Now here's my -- here's my

18  question:  Why should taxpayers be

19  responsible for cleaning up the mess that was

20  left by McKesson because of what was created

21  by this glut of pills in this town?

22             MS. HENN:  Objection to form.

23  QUESTIONS BY MR. PAPANTONIO:

24

Highly Confidential - Subject to Further Confidentiality Review







1

2

3

4

5

6

7

8

9          Q.      Mr. Hartle, you know what, I've

10   become accustomed to us talking logic and

11   common sense.  So let me continue that.

12   Okay?

13

Highly Confidential - Subject to Further Confidentiality Review



11        Q.      Okay.  So let me go down here.

12   It says, A.  Go down -- see where it says,

13   "According to DEA data, McKesson supplied a

14   pharmacy in Mount Gay-Shamrock" --

15                MR. PAPANTONIO:  Ms. Henn, tell

16          me when I'm -- you're watching the

17          time; I'm not.

18                MS. HENN:  That's not what was

19          that was about, but the videographer

20          can tell you.

21                MR. PAPANTONIO:  How much time

22          do I have left here?

23                VIDEOGRAPHER:  18 minutes, sir.

24                MR. PAPANTONIO:  18 minutes.

25                THE WITNESS:  What page are you

1     on, sir?

2     QUESTIONS BY MR. PAPANTONIO:

3          Q.     I'm on the same page.

4          A.     On the same page still?

5          Q.     I'm on the same page.

6               It says, "According to DEA

7     data, McKesson supplied a pharmacy in Mount

8     Gay-Shamrock, West Virginia, with more than

9     six times the amount of hydrocodone that an

10    average pharmacy in rural West Virginia would

11    have been expected to receive."

12              Do you see that?

13         A.     I'm sorry, I was on the

14    previous page.  Let me read that real quick.

15         Q.     "According to DEA data."  Yeah.

16    Yeah.

17              "According to the DEA data,

18    McKesson supplied a pharmacy in Mount

19    Gay-Shamrock, West Virginia, with more than

20    six times the amount of hydrocodone" --

21              It's talking about McKesson

22    here, right?

23         A.     I see that.

24         Q.     Okay.

25              -- "more than six times the

Highly Confidential -- Subject to Further Confidentiality Review

1    amount of the hydrocodone that an average

2    pharmacy in rural West Virginia would have

3    been expected to receive."

4              I read that.

5              Then it goes on to say,

6    "DEA" --

7              MR. PAPANTONIO:  When I'm ten

8        minutes -- let me know when I'm ten

9        minutes out.

10   QUESTIONS BY MR. PAPANTONIO:

11       Q.    "DEA ARCOS data showed that

12   between 2006 and 2014, McKesson supplied

13   Family Discount Pharmacy in Mount Shamrock

14   {sic} with 5,122,290 {sic} hydrocodone

15   pills" -- you see that? -- "and 695,000

16   oxycodone pills, for a total of 5,818,020

17   pills."

18             Do you know what the -- do you

19   know what the population of that place was?

20             If I told you it was 1,700,

21   would you be surprised?  Population of 1,700

22   people, would that surprise you?

23             MS. HENN:  Objection to form.

24             THE WITNESS:  It would surprise

25       me.  I don't know what the number is,

1       but...

2    QUESTIONS BY MR. PAPANTONIO:

3        Q.      If it's only 1,700, those are

4    startling numbers, aren't they?

5        A.      It's a small population.

6        Q.      Yeah.

7                Okay.  It says, "McKesson

8    provided this pharmacy with 986,500 oxycodone

9    pills, in addition to 300,100 oxycodone

10   pills, a 193 percent increase from the year

11   prior."

12               Do you see that?  "193 percent

13   increase from the year prior" in the amount

14   of narcotics that they're selling to this

15   area.

16               And from -- "this equals an

17   average rate in 2013 of 82,000 hydrocodone

18   pills per month or 2,703 pills per day."

19               You see that?

20       A.      I see those numbers.

21       Q.      "And 25,000 oxycodone pills per

22   month."

23   ▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬    ▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9          MR. PAPANTONIO:  All right.

10     We're going to take a quick break and

11     save ten minutes and see if we can

12     wrap this up real quick.

13          MS. HENN:  All right.

14          MR. PAPANTONIO:  Thank you.

15          VIDEOGRAPHER:  The time is

16     5:25 p.m., and we're going off the

17     record.

18      (Off the record at 5:25 p.m.)

19          VIDEOGRAPHER:  The time is

20     5:34 p.m., and we're back on the

21     record.

22     QUESTIONS BY MR. PAPANTONIO:

23          Q.    Sir, the -- in document 1165 --

24     let me show this to you and just put this up

25     on the screen.  This is 1280.  I'll get to

```
 1    this.  It's in 1165, what I'm looking for.
 2    1280.
 3              MR. PAPANTONIO:  This is --
 4         we're going to give you a copy of
 5         these pictures.
 6              MS. HENN:  Okay.  Just as
 7         long --
 8              MR. PAPANTONIO:  They are
 9         attached -- just so you know, they are
10         attached to 1165.
11              MS. HENN:  I see.
12              MS. MOORE:  This is
13         McKesson-Hartle 135.
14              (McKesson-Hartle Exhibit 135
15         marked for identification.)
16              MR. PAPANTONIO:  Sir, do we
17         have that?  Do we have that, Corey?
18         Do we have those pictures?  Because I
19         can put them up on the -- I can put
20         them on right here if you don't.
21              Okay.  Let me go -- oh, there
22         they are.  Okay.
23    QUESTIONS BY MR. PAPANTONIO:
24
```

Highly Confidential - Subject to Further Confidentiality Review



19    Q.    Okay.  Let's mark --

20        MR. PAPANTONIO:  Did we mark

21    this picture right here?

22        MS. HENN:  Yes.

23        MR. PAPANTONIO:  Okay.

24    QUESTIONS BY MR. PAPANTONIO:

25        Q.    And then I -- let me just go

1   through some -- through a couple -- we don't

2   have much time, but let me just go through a

3   couple of other things.

4           Your theory about -- again,

5   about newspaper articles and reading them and

6   why it's so important for people to know

7   what's going on in the news, I want to show

8   you 951.

9           Had you ever heard of a town of

10  Williamson in West Virginia that actually

11  took on the name of Pilliamson?

12          MS. MOORE:  McKesson-Hartle

13      101.

14          (McKesson-Hartle Exhibit 101

15      marked for identification.)

16  QUESTIONS BY MR. PAPANTONIO:

17      Q.    Had anybody ever told you that

18  the problem was so bad all the way back in

19  2011 -- this is the Charleston Gazette-Mail.

20  And, sir, this is actually -- had you seen

21  see this article before?  This the

22  Gazette-Mail talking about the very area

23  we've been talking about.

24      A.    I'm not sure.

25      Q.    Okay.  Well, just for the

1    record, I want to point out that as we go

2    forward, this is a document -- this is a

3    newspaper article that is actually attached

4    to the Congressional record.

5          A.     Okay.

6          Q.     This came out of the hearings

7    of the Congressional record.

8          A.     Okay.

9          Q.     But I just want to ask you:

10   Had you ever heard of Williamson, West

11   Virginia, being -- it called Pilliamson?

12   Headline's "2011," that's the date,

13   "prescription drug abuse plagues small West

14   Virginia town."  And that's in the

15   Gazette-Mail.  And then it says, "a Pulitzer

16   Prize-winning newspaper."

17          Have you ever seen that before,

18   the term "Pilliamson," I guess is what I'm

19   wondering.

20          A.     I believe I may have, yes.

21          Q.     And it says -- I have it

22   right -- it says, "A couple of blocks away,

23   people lined up before 6 a.m. to visit

24   another doctor's -- another clinic's doctor.

25   The community was frustrated.  They called it

 1    Pilliamson instead of Williamson, said Mingo

 2    County prosecuting attorney Michael Sparks.

 3    It was an open secret, you might say, federal

 4    and state authorities are handling an ongoing

 5    investigation of the clinics, but Sparks says

 6    prescription drug abuse causes most of the

 7    local crimes he prosecutes - robberies,

 8    assaults, forgery."

 9              Do you see that?

10              "Even though the clinics are

11    now shuttered, substance abuse still plagues

12    the area.  People can still find pills."

13              Do you see that?

14         A.    I do.

15



22      Q.      Yes, sir.

23              Okay.  This is a chart that is

24   a -- also a part of 1165, document there in

25   front of you.  It's on page -- it's on .7 of

Highly Confidential - Subject to Further Confidentiality Review

```
1    1165.

2              No, sir, it's not in there.

3    It's in 1165.  Let me hand you another copy

4    just so I make sure you have it.

5              MS. MOORE:  McKesson-Hartle

6         134.

7              (McKesson-Hartle Exhibit 134

8         marked for identification.)

9    QUESTIONS BY MR. PAPANTONIO:

10        Q.    If you'll go to their --

11   Mr. Hartle, if you'll look at page 7, .7 --

12   let's say .7 in the top right-hand corner.

13        A.    Okay.

14        Q.    Is that -- do you see a chart

15   there?

16        A.    Yes.

17
```



21    QUESTIONS BY MR. PAPANTONIO:

22         Q.    Yeah, but this is -- in other

23    words, this is a document -- this is

24    McKesson -- you see on the bottom, this is a

25    McKesson document?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HENN:  Objection to form.

2     QUESTIONS BY MR. PAPANTONIO:

3



Highly Confidential - Subject to Further Confidentiality Review



QUESTIONS BY MR. PAPANTONIO:

Q.    All right.  Fair enough.

Sir, you would agree, won't

you, if my partner there, Paul Farrell -- if

Paul Farrell were -- just wanted to say,

"Hey, this is a pretty good money maker.  I

want to go to Kermit and I just want to

distribute 8 million pills," if he did that,

he'd end up in prison, wouldn't he?

MS. HENN:  Objection to form.

```
 1    QUESTIONS BY MR. PAPANTONIO:

 2         Q.    Wouldn't he?

 3               He can't do that.  He can't

 4    go -- he can't go to Kermit and distribute 8

 5    million narcotic pills.  He'd go to prison,

 6    wouldn't he?

 7               MS. HENN:  Objection to form.

 8               THE WITNESS:  He can't as an

 9         individual.

10    QUESTIONS BY MR. PAPANTONIO:

11         Q.    Well, what if he was a

12    corporation, he called it Farrell,

13    Incorporated, and he likes the idea that he

14    can make money selling narcotic pills because

15    he's making a lot of money, what happens if

16    he goes to Kermit and sells 8 million pills?

17               Does he go to prison?

18               MS. HENN:  Objection to form.

19               THE WITNESS:  I don't know.

20    QUESTIONS BY MR. PAPANTONIO:

21         Q.    Well, it's illegal, isn't it --

22               MS. HENN:  Objection to form.

23    QUESTIONS BY MR. PAPANTONIO:

24         Q.    -- for him to go to town and

25    sell 8 million pills.  Paul Farrell shows up
```

1    with a big bag of pills, 8 million pills, and

2    starts selling them in Kermit, that's

3    breaking the law, isn't he?

4              MS. HENN:  Objection to form.

5              THE WITNESS:  It depends on the

6         scenario.  Is he a distributor?  I

7         mean, I don't know.

8    QUESTIONS BY MR. PAPANTONIO:

9         Q.    Well, that's the point, isn't

10   it?  That's the point.

11             You had a special license to do

12   that, and Paul Farrell doesn't, correct?

13   That's the only thing that's different.  You

14   had a license to do it that you -- you had

15   the license based on your obligation to

16   ▓▓▓▓▓▓▓▓▓▓▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  ▓▓▓▓▓▓

▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓       ▓▓▓▓▓▓▓▓▓▓  ▓▓▓▓▓▓▓▓▓

▓       ▓▓▓▓▓▓▓▓  ▓▓▓▓▓▓

▓     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓  ▓▓▓▓▓▓▓

▓     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
1
```

19      MR. PAPANTONIO:  All right.

20    Thank you, sir.  I don't have any

21    further questions.

22      MS. HENN:  Okay.  Let's go off

23    the record.  I do have some questions,

24    and we'll need to change spots.

25      VIDEOGRAPHER:  Okay.  The time

```
1            is 5:46 p.m.  We're going off the

2            record.

3             (Off the record at 5:46 p.m.)

4                    VIDEOGRAPHER:  The time is

5            5:48 p.m.  We're back on the record.

6                    CROSS-EXAMINATION

7      QUESTIONS BY MS. HENN:

8            Q.     Good afternoon, Mr. Hartle.

9            A.     Good afternoon.

10           Q.     You testified yesterday and

11     today that you joined McKesson in 2014; is

12     that right?

13           A.     I did.

14           Q.     Before joining McKesson, you

15     explained that you worked at Target?

16           A.     I did.

17           Q.     What positions did you hold at

18     Target?

19           A.     I had a variety of positions in

20     the almost 19 years that I worked for Target.

21     I worked in both the assets protection and

22     the corporate security divisions and held

23     many different roles at many different

24     levels, from being in the actual stores to

25     leading districts or groups or larger groups
```

 1    of stores, primarily focused on threat and

 2    fraud in investigations.

 3              I additionally led some of the

 4    more specialized strategies for Target

 5    related to things like organized retail crime

 6    and fraud.

 7              I worked at headquarters for

 8    several years helping develop strategies and

 9    building specialized teams, including one

10    focused on health care.

11        Q.    Could you describe the team

12    that you were involved with at Target that

13    focused on health care?

14        A.    Sure.

15              It was a team that was designed

16    to do several different things.  I had been

17    involved in investigating pharmacy cases for

18    years, all way back to when I was in the

19    stores.  This team was designed to, you know,

20    help identify and support investigations of

21    pharmacy cases in the field, develop new ways

22    to identify theft in pharmacies through data

23    and in other ways was designed to help

24    develop tools to monitor dispensing of Target

25    stores, and at the base code level across the

1  country to drive action and follow up with

2  different locations.

3          We used other analytics related

4  to prescribers to determine when we may want

5  to shut off a particular prescriber, and we

6  also monitored trends across the country and

7  proactively engaged with different offices of

8  diversion control.

9          All of that helped us also

10  influence and help teach and train Target

11  internally and help revise policies and

12  procedures related to pharmacy and diversion

13  specifically.

14      Q.      When you joined McKesson in

15  2014, you were a senior director of

16  regulatory affairs?

17      A.      Yes.

18      Q.      Why did you join McKesson in

19  2014?

20      A.      I had a great career at Target

21  and many opportunities, in fact had just been

22  given some additional responsibilities, but

23  have always been driven by the work that

24  we -- my team started and was doing at Target

25  related to diversion.  I had an opportunity

1    to help teach and train Target team members,

2    help build programs and processes focused on

3    diversion.

4              And when an opportunity came up

5    with McKesson, you know, I -- you know, it

6    allowed me and I felt like I could make a

7    bigger difference across multiple chains.  If

8    I could replicate some of the things that I

9    was doing at Target in any way and help other

10   chains and be involved, personally I think I

11   could help make a difference.

12   Q.      And in that vein, did you have

13   a particular focus as senior director of

14   regulatory affairs at McKesson?

15   A.      Yeah, I was hired to focus on

16   the chains and -- oh.

17   Q.      Go ahead.

18   ▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬

▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮   ▬▬▬▬▬▬▬▬▬▬▬▬

▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬

▮   ▮   ▬▬▬▬▬▬▬▬▬▬▬

▮   ▬▬▬▬▬▬▬▬▬▬▬▬

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
13              MS. HENN:  Thank you,

14      Mr. Hartle.  I have no further

15      questions.

16              Should we go off the record?

17              MR. RAFFERTY:  Yeah.  Yeah,

18      I'll swap back around.  I've got to

19      grab a couple of documents.

20              VIDEOGRAPHER:  The time is 6:00

21      p.m., and we're going off the record.

22       (Off the record at 6:00 p.m.)

23              VIDEOGRAPHER:  The time is

24      6:03 p.m., and we're back on the

25      record.
```

```
 1              REDIRECT EXAMINATION
 2  QUESTIONS BY MR. RAFFERTY:
 3      Q.      Mr. Hartle, you were just asked
 4  some questions by your counsel.  I just want
 5  to follow up on a couple of them.
 6      A.      Sure.
 7      Q.      First of all, you were asked
 8  about the evolution of the CSMP.
 9              Do you recall that?
10      A.      I do.
11      Q.      And you talked about how you
12  continued to make improvements throughout
13  from 2008 forward, correct?
14      A.      I remember that.
15      Q.      All right.  From 2008, you'll
16  agree with me, though, that your company,
17  McKesson, made an awful lot of mistakes that
18  fed and created the opioid epidemic for many,
19  many years, correct?
20
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5   QUESTIONS BY MR. RAFFERTY:

6       Q.      Okay.  And now that you're

7   making -- I think what I showed you earlier,

8   that now with your evolution of your CSMP,

9   you now went from making zero -- for many

10  years making zero suspicious order reports to

11  making hundreds of thousands now.

12              But my question is this:

13  Because now you are making hundreds of

14  thousands, we shouldn't -- you don't think

15  that that should absolve McKesson of the

16  deaths that you saw with my partner, Mike

17  Papantonio, that were created because of the

18  oversupply and McKesson shipping suspicious

19  orders throughout the country, right?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  Could you ask

22      that, please, again?

23  QUESTIONS BY MR. RAFFERTY:

24      Q.      Yeah.  Yeah.

25













1

4      Q.     But they're a customer of --

5      A.     They're a customer of

6  McKesson's.

7

Highly Confidential - Subject to Further Confidentiality Review



17  QUESTIONS BY MR. RAFFERTY:

18      Q.    Now, also, you mentioned -- you

19  were asked questions about your work at

20  Target.  So you said you actually did some

21  work in the pharmacy, in pharmacy security

22  and that type of thing at Target, right?

23      A.    Yeah, I had a team -- yeah, in

24  a variety of different ways over the course

25  of time.

```
1        Q.      And were you there in 2012?

2        A.      I was.

3        Q.      Were you there in 2012 when

4   Target paid a $232,000 fine for overcharging

5   cities, municipalities, for prescription drug

6   coverage?

7                MS. HENN:  Objection to form.

8                THE WITNESS:  I was there

9        during that time frame.

10  QUESTIONS BY MR. RAFFERTY:

11       Q.      Do you recall that?

12       A.      I actually don't.

13       Q.      You don't?

14       A.      Not top of mind.

15       Q.      Well, you said that you'd also

16  worked in doing some diversion, right, when

17  you were at Target, or worked in the

18  diversion prevention at Target?

19       A.      Right.  Right.

20       Q.      So when you came to -- when you

21  came to McKesson then, you certainly should

22  have known the responsibilities and duties of

23  a distributor of drugs, of narcotics, under

24  the Controlled Substances Act, right?

25               MS. HENN:  Objection to form.
```

1    THE WITNESS:  I knew what they

2    were.

3    QUESTIONS BY MR. RAFFERTY:

4

15    MR. RAFFERTY:  Nothing further.

16    MS. HENN:  Thank you.

17    Before we go off the record the

18    last time, I would just, again, ask

19    the court reporter to please mark the

20    transcript highly confidential pending

21    review as ordered by the Court, and we

22    will also reserve the right to read

23    and sign.

24    Thank you very much.

25    VIDEOGRAPHER:  The time is

```
1            6:11 p.m., August 1, 2018.  Going off

2         the record completing the videotaped

3         deposition.

4      (Deposition concluded at 6:11 p.m.)

5              - - - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2
 3          I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Nathan J. Hartle was duly
     sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.
 7          I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
            I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
     _____
17   CARRIE A. CAMPBELL,
     NCRA Registered Diplomate Reporter
18   Certified Realtime Reporter
     California Certified Shorthand
19   Reporter #13921
     Missouri Certified Court Reporter #859
20   Illinois Certified Shorthand Reporter
     #084-004229
21   Texas Certified Shorthand Reporter #9328
     Kansas Certified Court Reporter #1715
22   Notary Public
23   Dated:  August 6, 2018
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8               After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13               It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do

    hereby certify that I have read the foregoing

 5  pages and that the same is a correct

    transcription of the answers given by me to

 6  the questions therein propounded, except for

    the corrections or changes in form or

 7  substance, if any, noted in the attached

    Errata Sheet.

 8

 9

10

11

12  _____

    Nathan J. Hartle                 DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  - - - - - -

                        ERRATA

 2                  - - - - - -

 3      PAGE     LINE    CHANGE

 4      _____    _____   _____

 5      _____    _____   _____

 6      _____    _____   _____

 7      _____    _____   _____

 8      _____    _____   _____

 9      _____    _____   _____

10      _____    _____   _____

11      _____    _____   _____

12      _____    _____   _____

13      _____    _____   _____

14      _____    _____   _____

15      _____    _____   _____

16      _____    _____   _____

17      _____    _____   _____

18      _____    _____   _____

19      _____    _____   _____

20      _____    _____   _____

21      _____    _____   _____

22      _____    _____   _____

23      _____    _____   _____

24      _____    _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                     LAWYER'S NOTES

 2                    - - - - - - -

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```