Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OHIO
EASTERN DIVISION
- - -
IN RE:  NATIONAL  :  MDL NO. 2804
PRESCRIPTION OPIATE :
LITIGATION       :
----------------------------------------
: CASE NO.
THIS DOCUMENT     : 1:17-MD-2804
RELATES TO ALL CASES:
: Hon. Dan A.
: Polster
- - -
Friday November 16, 2018
- - -
HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of
JOHN HASSLER, taken pursuant to notice,
was held at Golkow Litigation Services,
One Liberty Place, 1650 Market Street,
Suite 5150, Philadelphia, Pennsylvania
19103, beginning at 10:43 a.m., on the
above date, before Amanda Dee
Maslynsky-Miller, a Certified Realtime
Reporter.

- - -

GOLKOW LITIGATION SERVICES
877 370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 2

1
2
3  APPEARANCES:
3
    WAGSTAFF & CARTMELL, LLP
    BY: THOMAS P. CARTMELL, ESQUIRE
4   BY: ANDREW N. FAES, ESQUIRE
    4740 Grand Avenue
5   Suite 300
    Kansas City, Missouri 64112
6   (816) 701-1100
    Tcartmell@wcllp.com
7   Afaes@wcllp.com
    Representing the Plaintiffs
8
9
10
    SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
11  BY: MARK G. CRAWFORD, ESQUIRE
    BY: DYLAN JENSEN, ESQUIRE
12  One Sansome Street
    Suite 2830
13  San Francisco, California 94104
    (415) 546-7300
14  Mcrawford@skikos.com
    Djensen@skikos.com
15  Representing the Plaintiffs
16
17
18  WILLIAMS & CONNOLLY, LLP
    BY: MATTHEW P. MOONEY, ESQUIRE
19  725 Twelfth Street, N.W.
    Washington, DC  20005
20  (202) 434-5000
    mmooney@wc.com
21  Representing the Defendant,
    Cardinal Health
22
23
24

Page 3

1  APPEARANCES:  (Continued)
2
3  JONES DAY
   BY: LOUIS P. GABEL, ESQUIRE
4  150 West Jefferson Street
   Suite 2100
5  Detroit, Michigan 48226
   (313) 733-3939
6  lpgabel@jonesday.com
   Representing the Defendant,
7  Walmart
8
9
   MORGAN LEWIS & BOCKIUS, llp
10 BY: REBECCA J. HILLYER, ESQUIRE
   BY: EVAN K. JACOBS, ESQUIRE
11 1701 Market Street
   Philadelphia, Pennsylvania 19103
12 (215) 963-5000
   Rebecca.hillyer@morganlewis.com
13 Evan.jacobs@morganlewis.com
   Representing the Defendant,
14 Teva Pharmaceuticals
15
16 VIA TELEPHONE/LIVESTREAM:
17
18
   KIRKLAND & ELLIS LLP
19 BY: JENNIFER LEVY, P.C, ESQUIRE
   BY: CATIE VENTURA, ESQUIRE
20 655 Fifteenth Street, N.W.
   Washington, D.C. 20005
21 (202) 879-5000
   Jennifer.levy@kirkland.com
22 Catie.ventura@kirkland.com
   Representing the Defendant,
23 Allergan Finance, LLC
24

Page 4

1  APPEARANCES:  (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
   JACKSON KELLY PLLC
4  BY: SANDRA K  ZERRUSEN, ESQUIRE
   50 South Main Street
5  Suite 201
   Akron, Ohio 44308
6  (330) 252-9060
   Skzerrusen@jacksonkelly.com
7  Representing the Defendant,
   AmerisourceBergen Corporation
8
9
   COVINGTON & BURLING LLP
10 BY: CLAYTON BAILEY, ESQUIRE
   850 Tenth Street, NW
11 Suite 856N
   Washington, DC 20001
12 (202) 662-5000
   cbailey@cov.com
13 Representing the Defendant,
   McKesson Corporation
14
15
   ARNOLD & PORTER KAYE SCHOLER, LLP
16 BY: CAITLIN MARTINI MIKA, ESQUIRE
   70 West Madison Street
17 Suite 4200
   Chicago, Illinois 60602
18 (312) 583-2300
   Caitlin.mika@arnoldporter.com
19 Representing the Defendant,
   Endo Pharmaceuticals, Endo Health
20 Solutions Inc and Par
   Pharmaceutical, Inc , Par
21 Pharmaceutical Companies, Inc
   (F/K/A Par Pharmaceutical Holdings,
22 Inc )
23 ALSO PRESENT:
   David Lane, Videographer
24

DRAFT COPY

Page 5

```
 1              - - -
 2          I N D E X
 3              - - -
 4
    Testimony of:  JOHN HASSLER
 5
 6   By Mr  Crawford          11, 406
     By Mr  Cartmell         178, 396
 7   By Ms  Hillyer           391
 8              - - -
 9          E X H I B I T S
10
11              - - -
12   NO          DESCRIPTION          PAGE
13   Teva-Hassler
     Exhibit-001  Teva Defendants 30(b)(6)
14       Deposition; Topic, Objections,
         Notes, References          33
15
16   Teva-Hassler
     Exhibit-002  John Hassler Deposition
17       Preparation          26
18   Teva-Hassler
     Exhibit-003  Written Responses of
19       Defendants Cephalon, Inc
         Teva Pharmaceuticals USA,
20       Inc  Actavis LLC, Actavis
         Pharma, Inc , and Watson
21       Laboratories, Inc  To
         Plaintiffs' Fourth Amended
22       Notice of Deposition
         Pursuant to Rule 30(b)(6)  119
23   Teva-Hassler
     Exhibit-004  Appendix 1          34
24
```

Page 6

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4
    NO     DESCRIPTION          PAGE
 5
 6   Teva-Hassler
     Exhibit-005  ALLERGAN_MDL_02186860-869  59
 7   Teva-Hassler
     Exhibit-006  Appendix 2 - Topic 3 -
 8       Boards of Directors      64
 9   Teva-Hassler
     Exhibit-007  Appendix 3 - Topic 5 -
10       Identification of SOM
         Policies          72
11
     Teva-Hassler
12   Exhibit-008  Appendix 4 - Topic 10 -
         Identification of Policies
13       And Procedures          101
14   Teva-Hassler
     Exhibit-009  Appendix 5 - Topic 11     331
15
     Teva-Hassler
16   Exhibit-010  TEVA_MDL_A_01087806-808   110
17   Teva-Hassler
     Exhibit-011  Fourth Amended Notice of
18       Deposition Pursuant to
         Rule 30(b)(6) and Document
19       Request Pursuant to Rule
         30(b)(2) and Rule 34 to
20       Defendants Teva
         Pharmaceuticals USA, Inc ,
21       Cephalon, Inc , Watson
         Laboratories, Inc , Actavis,
22       LLC, and Actavis Pharma,
         Inc , F/K/A Watson
23       Pharma, Inc          17
24
```

Page 7

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4
    NO.     DESCRIPTION          PAGE
 5
 6   Teva-Hassler
     Exhibit-012  ALLERGAN_MDL_01373716-721  17
 7   Teva-Hassler
     Exhibit-013  List of Defendants      149
 8
 9   Teva-Hassler
     Exhibit-014  TEVA_MDL_A_01373059-150   195
10   Teva-Hassler
     Exhibit-015  TEVA_MDL_A_02383521-526   206
11
12   Teva-Hassler
     Exhibit-016  TEVA_MDL_A_02383517   209
13   Teva-Hassler
     Exhibit-017  U.S. Pharmaceutical
14       Operations          212
15   Teva-Hassler
     Exhibit-018  TEVA_MDL_A_01130623      270
16
17   Teva-Hassler
     Exhibit-019  TEVA_MDL_A_02914333      276
18   Teva-Hassler
     Exhibit-020  Corporate Integrity Agreement
19       Between the Office of
         Inspector General of the
20       Department of Health and
         Human Services and
21       Cephalon, Inc.          293
22   Teva-Hassler
     Exhibit-021  TEVA_MDL_A_03272088-117   299
23
24
```

Page 8

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4
    NO.     DESCRIPTION          PAGE
 5
 6   Teva-Hassler
     Exhibit-022  TEVA_MDL_A_06557274-277    363
 7   Teva-Hassler
     Exhibit-023  TEVA_MDL_A_06557278      364
 8
 9   Teva-Hassler
     Exhibit-024  TEVA_MDL_A_03413816      374
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

DRAFT COPY

Page 9

```
 1              - - -
 2        DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5    Direction to Witness Not to Answer
 6    Page Line    Page Line    Page Line
 7    None
 8
 9
10    Request for Production of Documents
11    Page Line    Page Line    Page Line
12    None
13
14
15    Stipulations
16    Page Line    Page Line    Page Line
17    10   1
18
19
20    Question Marked
21    Page Line    Page Line    Page Line
22    None
23
24
```

Page 10

```
 1              - - -
 2        (It is hereby stipulated and
 3    agreed by and among counsel that
 4    sealing, filing and certification
 5    are waived; and that all
 6    objections, except as to the form
 7    of the question, will be reserved
 8    until the time of trial.)
 9              - - -
10        VIDEO TECHNICIAN:  We are
11    now on the record.  My name is
12    David Lane, videographer for
13    Golkow Litigation Services.
14    Today's date is November 16th,
15    2018.  Our time is 10:43 a.m.
16        This deposition is taking
17    place in Philadelphia,
18    Pennsylvania, in the matter of
19    National Prescription Opioid
20    Litigation, MDL.  Our deponent
21    today is John Hassler.
22        Our counsel will be noted on
23    the stenographic record.  The
24    court reporter today is Amanda
```

Page 11

```
 1    Miller, who will now swear in our
 2    witness.
 3              - - -
 4        JOHN HASSLER, after having
 5    been duly sworn, was examined and
 6    testified as follows:
 7              - - -
 8        VIDEO TECHNICIAN:  Please
 9    begin.
10              - - -
11           EXAMINATION
12              - - -
13    BY MR. CRAWFORD:
14        Q.   Good morning.
15        A.   Good morning.
16        Q.   Could you please state your
17    full name for the record?
18        A.   John David Hassler.
19        Q.   My name is Mark Crawford,
20    I'm with Skikos Crawford, and I represent
21    the plaintiffs.  I'm here with Mr. Tom
22    Cartmell, who also will be asking
23    questions today, from Wagstaff Cartmell.
24        Are you here today to
```

Page 12

```
 1    testify as a Rule 30(b)(6) designee?
 2        A.   Yes.
 3        Q.   And can you please state
 4    your current employer?
 5        A.   Teva Sales and Marketing.
 6        Q.   Is that the actual name of
 7    the company?
 8        A.   Yes.
 9        Q.   Is it Sales and Marketing,
10    Inc., or have any -- what's its full
11    legal corporate name?
12        A.   I believe it's just Teva
13    Sales and Marketing.
14        Q.   And does it have a parent
15    corporation?
16        A.   Yes.
17        Q.   And what is that?
18        A.   It's a subsidiary of Teva
19    Pharmaceuticals USA.
20        Q.   And that's one of the
21    defendants here you're testifying on
22    behalf of today, right?
23        A.   Yes.
24        Q.   And what is your current
```

Page 13

1    position at -- please repeat the name of
2    the company.
3         A.   Teva Sales and Marketing.
4             My current title is senior
5    vice president and general manager, Teva
6    CNS.
7         Q.   And is that -- do you have
8    any responsibility over sales and
9    marketing of opioid products?
10        A.   Not currently.
11        Q.   And had you had any
12   responsibility previously?
13        A.   Yes.  Between 2015 and 2017,
14   I had responsibility for Actiq and
15   Fentora in my portfolio of products.
16        Q.   Just the brand, or was it
17   brand and generic?
18        A.   Just brands.
19        Q.   And what were your
20   responsibilities with regard to those
21   drugs?
22        A.   Approving the work plans
23   that were developed by -- at that time,
24   the brand team was only -- it only

Page 14

1    included Fentora, we didn't do anything
2    with Actiq.
3         Q.   And who was head of the
4    brand team during this time period?
5         A.   At that time it was Jeff
6    Dirks.
7         Q.   How do you spell Dirks?
8         A.   D-I-R-K-S.
9         Q.   And have you been deposed
10   before?
11        A.   I have.
12        Q.   And how many times?
13        A.   I believe there have been
14   four different deposition days, and three
15   issues that I was deposed on.
16        Q.   And were any of those
17   depositions related to opioids?
18        A.   Yes.
19        Q.   And can you describe for me
20   the matter that you testified in with
21   regard to opioids?
22        A.   I represented the company as
23   a 30(b)(6) witness in a suit that was
24   brought by the state of Oklahoma.  And

Page 15

1    I've been through two days of deposition
2    in that capacity.
3         Q.   And when was that
4    deposition?
5         A.   One was just last week, and
6    the other, I believe it was in September.
7         Q.   Both in that case, correct?
8         A.   Yes.
9         Q.   And any other depositions
10   related to opioids?
11        A.   No.
12        Q.   Any other depositions
13   related to a pharmaceutical product?
14        A.   Yes.
15        Q.   And what were they, those
16   products?
17        A.   Copaxone, and it was a
18   patent dispute.
19        Q.   And the other matter?
20        A.   The other matter was a
21   lawsuit brought against the company by
22   two individual sales reps.
23        Q.   And what were they claiming,
24   basically?

Page 16

1         A.   It's been a few years ago.
2         Q.   That's okay.
3         A.   They were claiming
4    inappropriate speaker program
5    compensation.
6         Q.   And were they claiming that
7    they were speakers at the program and
8    should have been compensated, or what was
9    the --
10        A.   No.  They were claiming that
11   speakers were compensated when programs
12   never took place.
13        Q.   And what state was that
14   lawsuit taking place in?
15        A.   I don't remember.
16        Q.   All right.  And since you've
17   been deposed, I think you know the rules.
18            You're under oath, correct?
19        A.   Yes.
20        Q.   And you know you're to wait
21   for me to finish my question and --
22   before responding and not to talk over
23   each other.  You seem pretty attuned to
24   that, correct?

Page 17

1    A.  Yes.
2    Q.  Great.  Thank you.
3         Let's mark -- or let's pull
4    out Exhibit-11, which was the notice of
5    deposition.
6         - - -
7         (Whereupon, Teva-Hassler
8    Exhibit-011, Fourth Amended Notice
9    of Deposition Pursuant to Rule
10   30(b)(6) and Document Request
11   Pursuant to Rule 30(b)(2) and Rule
12   34 to Defendants Teva
13   Pharmaceuticals USA, Inc.,
14   Cephalon, Inc., Watson
15   Laboratories, Inc., Actavis, LLC,
16   and Actavis Pharma, Inc., F/K/A
17   Watson Pharma, Inc., was marked
18   for identification.)
19        - - -
20        (Whereupon, Teva-Hassler
21   Exhibit-012,
22   ALLERGAN_MDL_01373716-721, was
23   marked for identification.)
24        - - -

Page 18

1         MR. CRAWFORD:  These are
2    premarked exhibits.  I'll put it
3    on the record here.
4    BY MR. CRAWFORD:
5    Q.   Before I get there, what's
6    your current office address?
7    A.   11 -- 11100 Nall Avenue,
8    Overland Park, Kansas.
9    Q.   And what's your home
10   address, please?
11   A.
12
13   Q.   All right.  So we marked --
14   or have premarked exhibits.  Exhibits-1
15   through 10 were exhibits that were
16   provided to us by counsel today.
17        Do you have those in front
18   of you?
19   A.   Yes.
20   Q.   And are these documents that
21   you reviewed prior to the deposition?
22   A.   Yes.
23   Q.   And are you relying on them
24   for the deposition?

Page 19

1    A.   Yes.
2    Q.   And did you help prepare
3    these documents?
4    A.   Yes.  I had requested the
5    information and reviewed and asked for
6    edits to the information, just to serve
7    as a reminder to me of what we had
8    reviewed.
9    Q.   Okay.  And so these were
10   helped -- were prepared to help you
11   testify today, correct?
12   A.   Yes.
13   Q.   All right.  Who else was
14   involved in preparing these?
15   A.   My counsel, Becca and Evan.
16   Q.   Thank you.
17        Anyone else, editing or
18   writing?
19   A.   Monica.  I believe her last
20   name is Padroza.
21   Q.   Is she with the law firm?
22   A.   Yes.
23        That's -- and those are the
24   only people that I'm aware that I

Page 20

1    interacted with.
2    Q.   Great.  Thank you.
3         And we premarked here
4    Exhibit-11, which is the fourth amended
5    notice of deposition pursuant to Rule
6    30(b)(6), and document requests pursuant
7    to Rule 30(b)(2) and Rule 34 to
8    defendants Teva Pharmaceuticals, USA
9    Inc., Cephalon, Inc., Watson
10   Laboratories, Inc., Actavis LLC and
11   Actavis Pharma Inc., f/k/a Watson Pharma,
12   Inc.
13        Have you seen this document
14   before?
15   A.   Yes.
16   Q.   And are you here to
17   testify -- designated by these entities
18   to testify in this deposition?
19   A.   I am.
20   Q.   And do you understand you're
21   testifying, in fact, for the company on
22   behalf of the company?
23   A.   I do.
24   Q.   You've reviewed the topics

Page 21

1    listed here today, correct?
2         A.   Yes.
3         Q.   And is it your understanding
4    that you're testifying as to a limited
5    number of these topics today, and there
6    will be a second day with regard to the
7    other topics?
8         A.   Yes.
9         Q.   And I'm just going to read
10   off the topics.  I don't know if you'll
11   remember them.
12        But my understanding is
13   you're testifying as to Topics 1, 3, 4,
14   5, 7, 8, 10, 11, 19, 21, 28, 35 and 45
15   today.
16        A.   That sounds right.
17        Q.   Great.  Thank you.
18        And I see the first document
19   that was provided to us is a rather large
20   chart here.  This is a table, it looks
21   like.
22        There are additional topics
23   on here, but these are -- the other
24   topics are information about topics you

Page 22

1    anticipate testifying to in the second
2    day, correct?
3         A.   These topics, the 17 that
4    are listed here, are the ones that I've
5    been preparing for.
6         Q.   Okay.  And I think some of
7    them are for the second day?
8         MR. CRAWFORD:  Is that
9    correct?
10        MS. HILLYER:  Mark, no.  My
11   understanding was all the ones
12   that he's prepared for today were
13   ones that we agreed on for today,
14   and I think we have written
15   correspondence pretty clearly
16   delineating those topics as to
17   which would be covered today.
18        So --
19        MR. CRAWFORD:  Can we go off
20   the record real briefly?  Because
21   we do need to get clear on the
22   topics we're testifying to.  It
23   will just be very brief.
24        VIDEO TECHNICIAN:  Going off

Page 23

1    the record.  10:54 a.m.
2         - - -
3         (Whereupon, a brief recess
4    was taken.)
5         - - -
6         VIDEO TECHNICIAN:  Back on
7    record at 10:57 a.m.
8         MR. CRAWFORD:  Ms. Hillyer
9    was entirely correct.  We have
10   four additional topics that you're
11   testifying to today, that's 37,
12   38, 40 and 6.
13   BY MR. CRAWFORD:
14        Q.   So you're prepared to
15   testify as to those topics as well,
16   correct?
17        A.   Yes.
18        Q.   Are you here at all to
19   testify on behalf of Allergan Finance,
20   LLC?
21        A.   No.
22        Q.   Are you here to testify on
23   behalf of Allergan, PLC?
24        A.   No.

Page 24

1         Q.   Are you here to testify on
2    behalf of any corporate entity that's
3    related in any way right now to Allergan,
4    PLC?
5         A.   Not that I'm aware of.
6         Q.   Let's just go briefly, your
7    work history.  You're currently at Teva
8    Sales and Marketing.
9         Did you work for any Teva
10   entity prior to that one?
11        A.   Yes.
12        Q.   And what were those
13   entities?
14        A.   My first working
15   relationship with Teva was in a joint
16   venture partnership that was launched
17   between Teva and Marion Merrell Dow
18   called Teva Marion Partners, and I was
19   responsible for the marketing function in
20   that partnership.
21        I moved from that role to
22   Teva Marion Partners Canada and was the
23   general manager over that group.  During
24   2001, Teva purchased the partnership and

Page 25

```
 1    it became wholly owned by Teva.
 2         And I have worked for Teva
 3    in various capacities since that point.
 4         Q.   Teva Sales and Marketing?
 5         A.   It was Teva Marion Partners.
 6    When Teva bought the company, it became
 7    Teva Neuroscience.
 8         Q.   When you say "Teva bought
 9    the company," you mean Teva Limited?
10         A.   I don't know who the buying
11    entity was there.  It was a subsidiary
12    under Teva USA.  And I worked in that
13    capacity in different roles since that
14    point in time.
15         I don't recall when Teva
16    Sales and Marketing came about as a legal
17    entity and when we were moved into that
18    legal entity.
19         Q.   Okay.  So it was not that
20    you moved entities, but the entity's name
21    was changed to Teva Sales and Marketing?
22         A.   I don't know how -- I just
23    know the name on the checks where we got
24    paid changed.
```

Page 26

```
 1         Q.   And the check would be from
 2    Teva Sales and Marketing?
 3         A.   Yes.
 4         Q.   And how long have you been
 5    working for Teva Sales and Marketing,
 6    then?
 7         A.   A few years.
 8         Q.   And your only involvement
 9    with opioids at any Teva entity was from
10    2015 to 2017, right?
11         A.   Yes.
12              - - -
13         (Whereupon, Teva-Hassler
14    Exhibit-002, John Hassler
15    Deposition Preparation, was marked
16    for identification.)
17              - - -
18         MR. CRAWFORD:  We premarked
19    Exhibit-2, which I believe is your
20    discussions you've had -- is this
21    the correct way to put it --
22              - - -
23         (Whereupon, a discussion off
24    the record occurred.)
```

Page 27

```
 1              - - -
 2    BY MR. CRAWFORD:
 3         Q.   So we marked Exhibit-2,
 4    which you provided to us.
 5         And this is a list of the
 6    people that you met with to prepare for
 7    this deposition under the first heading,
 8    right?
 9         A.   Yes.
10         Q.   And then below that are the
11    outside lawyers you met with, meaning the
12    ones you mentioned, the dates and the
13    times you met, correct?
14         A.   Yes.
15         Q.   And did you have personal
16    meetings with all of the people under the
17    first line?
18         A.   They were either in person
19    or via conference calls, video and
20    telephone.
21         Q.   And approximately how much
22    time did you spend -- let me ask this:
23    Were counsel present during these
24    meetings or calls?
```

Page 28

```
 1         A.   Counsel was present during
 2    these calls, and then I have --
 3         Q.   "These" meaning?
 4         A.   The contacts with all of the
 5    people that are listed under meetings
 6    with Teva employees.
 7         Q.   Okay.  And you say counsel
 8    was present during each of those
 9    meetings?
10         A.   Yes.  They were either in
11    the room or they were on the phone.
12         Q.   And did they participate
13    verbally or just listen in?
14         A.   It varied.
15         Q.   All right.  And were there
16    any meetings that you had just with those
17    employees or calls with no counsel
18    present?
19         A.   Yes.  There have been other
20    meetings with these folks, just as part
21    of our -- my routine business activities.
22         Q.   I mean in preparation for
23    the deposition.
24         A.   I can recall two phone calls
```

Page 29

1    that stemmed from one of the meetings
2    with counsel where I had contacted Susan
3    Larijani and Jim King, just for
4    clarification of a question that I had
5    related to the -- understanding the
6    product labeling.
7        Q.    All right.  And do you know
8    approximately how many conversations you
9    had with each person, kind of an average?
10       A.    It varied.  Some people on
11   the list I would have had three or four
12   conversations with, and others I only had
13   one.
14       Q.    And do you recall or can you
15   give an estimate of how much time you
16   spent having discussions with these
17   people overall?
18       A.    I would say that there was
19   probably a week's -- a business week's
20   worth of discussions and interactions;
21   approximately 40 hours.
22       Q.    And was that time that was
23   spent preparing, as well, for the
24   Oklahoma case that you were deposed in?

Page 30

1        A.    No, I was --
2        Q.    Was there cross-over?
3        A.    I was trying to split that
4    activity with this preparation.
5        Q.    And what was the Oklahoma
6    testimony about?  General topics of the
7    30(b)(6).
8             It was a 30(b)(6), correct?
9        A.    Yes, it was.
10       Q.    And what were the general
11   topics?
12       A.    Sales and marketing
13   practices of the company.  That was the
14   gist of the discussion.
15       Q.    With relation to opioids?
16       A.    Yes.
17       Q.    And what company was it --
18   who were you representing or designated
19   for, for that deposition?
20       A.    I'm sorry, I don't know the
21   specific entity.  I don't recall that.
22       Q.    Was it Teva Pharmaceuticals
23   USA?
24       A.    I believe so.

Page 31

1        Q.    How about Cephalon?
2        A.    And Cephalon, yes.
3        Q.    How about the Actavis
4    generic entities that you're testifying
5    for here today, any of those?
6        A.    I believe it was all of the
7    Teva subsidiaries, Teva USA subsidiaries,
8    and it included the generics as well.
9        Q.    The Actavis generic
10   companies?
11       A.    I believe so.  To the best
12   of my recollection, yes.
13       Q.    Any other generic companies
14   that you were designated to testify for
15   in that deposition?
16       A.    Not that I recall.
17       Q.    And were you designated by
18   Teva Pharmaceuticals Industries Limited
19   to testify?
20       A.    Not that I'm aware.
21       Q.    And what were the claims
22   being made, if you know, in the Oklahoma
23   case?
24       A.    I believe they were false

Page 32

1    marketing practices and -- that were both
2    branded and unbranded.
3        Q.    And was that brought by the
4    Oklahoma attorney general?
5        A.    It was the state of
6    Oklahoma.
7        Q.    State of Oklahoma.
8             And was it pending in state
9    court or federal court there?
10       A.    My understanding is it's
11   state court.
12       Q.    And then did you review
13   documents in preparation for this
14   deposition?
15       A.    Many.
16       Q.    And do you have -- recall
17   generally which ones you reviewed?  Maybe
18   kind of a laundry list that comes to
19   mind.
20       A.    There were hundreds of
21   documents.  They focused on sales and
22   marketing materials, training materials,
23   suspicious order monitoring policies,
24   compliance policies, sales and marketing

Page 33

1    policies.  That's where the main focus
2    was, was under those umbrella topics.
3        Q.   Let's go to Exhibit-1, which
4    is premarked.
5             - - -
6        (Whereupon, Teva-Hassler
7        Exhibit-001, Teva Defendants
8        30(b)(6) Deposition; Topic,
9        Objections, Notes, References, was
10       marked for identification.)
11            - - -
12       MR. CRAWFORD:  Does anyone
13   have a clean copy of that?
14   BY MR. CRAWFORD:
15       Q.   The first topic you're here
16   to testify about is Topic 1, the
17   organizational structure and changes
18   related to the acquisitions and changes
19   to your corporate organization, et
20   cetera; is that right?
21       A.   Yes.
22       Q.   Let's put this on here.
23            This was produced, again, at
24   the deposition.  And I don't know if --

Page 34

1        MR. CRAWFORD:  Can we zoom
2    out a little bit?
3        Actually, take a look at
4    Exhibit-4.  Let's see that.
5             - - -
6        (Whereupon, Teva-Hassler
7        Exhibit-004, Appendix 1, was
8        marked for identification.)
9             - - -
10   BY MR. CRAWFORD:
11       Q.   This was produced by you.
12       This is the corporate
13   structure of the Teva Pharmaceuticals
14   Industries Limited umbrella, right?
15       MS. HILLYER:  Objection to
16       form.
17       You can answer.
18       THE WITNESS:  A component of
19   that, yes.
20   BY MR. CRAWFORD:
21       Q.   Correct.  And this is the
22   corporate family tree that drills down
23   into the entities you're currently
24   testifying on behalf of, correct?

Page 35

1        MS. HILLYER:  Objection to
2    the characterization of the
3    document.
4        You can answer.
5        THE WITNESS:  Yes.
6    BY MR. CRAWFORD:
7        Q.   And Cephalon, then, would be
8    an indirect subsidiary of Teva
9    Pharmaceuticals Industries Limited,
10   correct?
11       A.   It's a -- yeah, it's a
12   sister organization.
13       Q.   To --
14       A.   To Teva USA.
15       Q.   And Teva USA is an indirect
16   subsidiary of Teva Pharmaceuticals
17   Industries Limited as well, correct?
18       A.   Yes.
19       Q.   But they have no direct
20   relationship; as you pointed out, they
21   are sister companies, correct?
22       A.   From a legal entity
23   structure standpoint, yes.
24       Q.   And then the Actavis

Page 36

1    entities you are representing, or
2    designated by, is Actavis Pharma, Inc.,
3    Watson Laboratories, Inc. and Actavis
4    LLC, right?
5        A.   Yes.
6        Q.   And they are, it looks like,
7    indirect subsidiaries of Teva
8    Pharmaceuticals USA, Inc., correct?
9        A.   Yes.
10       Q.   And Actavis Holding U.S.,
11   Inc., is that company here in the United
12   States?
13       A.   I don't know.
14       Q.   Teva Limited -- we'll
15   shorthand Teva Pharmaceuticals Industries
16   Limited to Teva Limited, is that okay?
17       A.   Yes.
18       Q.   So Teva Limited acquired
19   Cephalon in 2011, correct?
20       A.   Yes.
21       Q.   And it acquired the
22   Watson/Actavis entities you are
23   designated by in 2016, correct?
24       A.   Correct.

Page 37

```
 1        Q.   And I think I'd like to go
 2   to your chart right here and go down.
 3             So it's written here that,
 4   Teva defendants' reasonable investigation
 5   to date, the following acquisitions
 6   involved entities that manufactured,
 7   marketed, sold, and distributed opioids
 8   or opioid products.
 9             You indicate -- or it's
10   indicated here that in 2006 Teva Limited
11   acquired Ivax Corporation.
12             Did Ivax manufacture any
13   opioid -- Class II opioid products?
14        A.   I don't know the class, but
15   they had Guiatuss syrup at that time,
16   which was -- the sale was discontinued in
17   2007, and Tramadol/acetaminophen tablets,
18   which was discontinued in 2013.
19        Q.   And did they sell or market
20   or distribute any other opioids?
21        A.   Not that I'm aware of.
22        Q.   And then in 2008, Teva
23   Limited acquired Barr Pharmaceuticals,
24   Inc. and you indicate -- or it's
```

Page 38

```
 1   indicated here Barr manufactured
 2   acetaminophen with codeine, which is
 3   still sold.
 4             Did it manufacture any
 5   opioid products?
 6        A.   The only scheduled product
 7   that I was aware of was the acetaminophen
 8   with codeine.
 9        Q.   And did it sell, distribute,
10   market, or promote any other opioid
11   products at any time, Barr
12   Pharmaceuticals, Inc.?
13        A.   Not that I'm aware of.
14        Q.   Did any Barr entity acquired
15   by Teva Limited manufacture, sell,
16   promote, or distribute any opioid
17   products at any time?
18             MS. HILLYER:  Objection to
19        the form.
20             THE WITNESS:  I don't know.
21   BY MR. CRAWFORD:
22        Q.   How about generic Actiq; did
23   Barr or any Barr entity sell or promote
24   Actiq, generic Actiq?
```

Page 39

```
 1        A.   They were allowed to sell a
 2   generic Actiq.
 3        Q.   And what time period was
 4   that did they sell it?
 5        A.   I believe beginning in 2007,
 6   or the very end of '06.
 7        Q.   And how long did they sell
 8   that product for?
 9        A.   I don't know.
10             MS. HILLYER:  I'm just going
11        to put an objection that these are
12        going a little bit far afield of
13        the topic.
14             But he can answer to the
15        extent he knows.
16             MR. CRAWFORD:  With the
17        objection, I think it's directly
18        asked for.
19             But I appreciate you'll
20        testify as to what you know.
21             THE WITNESS:  I know that
22        they were allowed to launch Actiq
23        following the approval of Fentora.
24        I don't know whether they did or
```

Page 40

```
 1        not.
 2   BY MR. CRAWFORD:
 3        Q.   And do you know who -- if
 4   they did, do you know who manufactured
 5   the product for them, if anybody?
 6             MS. HILLYER:  Same
 7        objection.
 8             THE WITNESS:  No, I don't
 9        know for sure.
10   BY MR. CRAWFORD:
11        Q.   So your testimony is you're
12   not aware if they manufactured, sold,
13   promoted, or distributed Actiq at any
14   time?
15        A.   I know that they had the
16   right to do so.
17        Q.   But you don't know --
18        A.   I've seen that.  But I have
19   not seen any sales data.  I don't know
20   whether they did so.
21        Q.   And then it's indicated here
22   that in 2011 Teva acquired Cephalon.  And
23   it states that Cephalon manufactured
24   Actiq and Fentora.
```

Page 41

```
 1          And do they continue to do
 2  so today?
 3          MS. HILLYER:  Objection to
 4  form.
 5          "They" who?
 6          MR. CRAWFORD:  Cephalon.
 7  Sorry.
 8          THE WITNESS:  I believe so,
 9  yes.
10  BY MR. CRAWFORD:
11      Q.   And do they market, sell, or
12  distribute Actiq or Fentora?
13          MS. HILLYER:  Objection to
14  form.
15          MR. CRAWFORD:  That's
16  Cephalon.
17          THE WITNESS:  No.  The
18  product is sold and distributed by
19  Teva USA.
20  BY MR. CRAWFORD:
21      Q.   And who distributes the
22  product?
23      A.   Teva USA.
24      Q.   And who markets the product?
```

Page 42

```
 1          MS. HILLYER:  Objection to
 2  form.  Assumes facts not in
 3  evidence.
 4  BY MR. CRAWFORD:
 5      Q.   Who markets Fentora?
 6      A.   They are not -- they're not
 7  promoted any longer.
 8      Q.   Fentora is no longer
 9  promoted?
10      A.   No.
11      Q.   So -- but it's sold and
12  manufactured and distributed, Fentora,
13  correct?
14      A.   Yes.  It's manufactured by
15  Cephalon and sold and distributed by Teva
16  USA.
17      Q.   And did Teva USA, at any
18  time, manufacture Fentora?
19          I'm sorry, did they, at any
20  time, market or promote Fentora?
21      A.   After the acquisition of
22  Cephalon, Teva CNS had a pain care group.
23  Fentora was part of that pain care group,
24  and it did promote Fentora as part of
```

Page 43

```
 1  their sales effort.
 2      Q.   Is Teva CNS a separate Teva
 3  company --
 4      A.   No.
 5      Q.   -- from Teva USA?
 6      A.   Not that I'm aware of.  It's
 7  a managerial structure.
 8      Q.   A division within Teva USA?
 9      A.   I'm not sure of how the
10  employees relate to the specific legal
11  entity structure.
12          The operation of the
13  business was to have all of the CNS
14  products, which included a pain
15  portfolio, under a CNS business unit.
16          But they may have had
17  employees that would have actually been
18  employed by different legal entities.
19  I'm not sure.
20      Q.   Okay.  I think that's one of
21  the other topics.  We'll get into that.
22          So when did -- whatever Teva
23  entity was marketing and promoting
24  Fentora, when did they stop doing that?
```

Page 44

```
 1      A.   The end of 2015.
 2      Q.   And is there a reason why
 3  they stopped?
 4      A.   We had other products that
 5  we were preparing to launch and needed to
 6  apply our sales resources there.
 7      Q.   And what were those
 8  products?
 9      A.   Just after that, Ajovy --
10  I'm sorry, Austedo, which is a product
11  for Huntington's disease and tardive
12  dyskinesia, those products were coming to
13  market.
14          I'm trying to remember,
15  around that same time period we also had
16  a product called Zecuity, but that may
17  have been pulled off the market by that
18  point.  I don't remember the specific
19  dates.
20      Q.   Does any -- does Teva USA --
21  and when I say "Teva USA," I mean Teva
22  Pharmaceuticals USA, Inc.; is that how
23  you understand it?
24      A.   Yes.
```

Page 45

1      Q.  Does Teva USA or any
2   Teva/Cephalon/Actavis entity owned under
3   the Teva Limited umbrella, manufacture,
4   market, sell, or promote any other opioid
5   product besides -- branded opioid product
6   besides Actiq or Fentora?
7          MS. HILLYER:  Objection to
8   form.
9          But you can answer.
10         THE WITNESS:  I'm trying to
11   remember all of the --
12   BY MR. CRAWFORD:
13     Q.  Right.  Does any Teva entity
14   that you're testifying for, or anyone
15   that you know of under the Teva umbrella,
16   manufacture, market, sell, or distribute
17   any branded opioid product besides Actiq
18   or Fentora?
19     A.  Teva manufacturers a branded
20   product for Allergan.
21     Q.  Is that Kadian?
22     A.  Yes.
23     Q.  Are there any other opioid
24   products that they manufacture or sell?

Page 46

1          MS. HILLYER:  Branded, you
2   mean?
3          MR. CRAWFORD:  Branded, yes.
4          THE WITNESS:  I don't
5   believe so.
6   BY MR. CRAWFORD:
7      Q.  How about any branded opioid
8   treatments?
9          MS. HILLYER:  Objection to
10   form.
11   BY MR. CRAWFORD:
12     Q.  Anything to treat --
13     A.  How is that different --
14     Q.  Anything to treat opioid
15   addiction.  I'm sorry.
16         MS. HILLYER:  Objection to
17   form.  Vague.
18         You can answer if you
19   understand.
20         THE WITNESS:  I believe that
21   Suboxone is a product that's used
22   to treat addiction.  And I believe
23   that we sell -- we have sold that,
24   or Teva has sold that.

Page 47

1   BY MR. CRAWFORD:
2      Q.  Is that a branded name,
3   Suboxone?
4      A.  Yes, that's the branded
5   name.  But they only sold the generic.
6      Q.  And does Teva, any of the
7   entities you're testifying for, sell a
8   generic opioid Class II product?
9      A.  Yes.
10     Q.  And let's start with Teva
11   USA, do they sell, market, or -- let's
12   just put sell -- do they sell any opioid
13   products?
14     A.  Yes.
15     Q.  And what are those?
16     A.  There are several.
17         MS. HILLYER:  Objection to
18   form.
19   BY MR. CRAWFORD:
20     Q.  Can you name them?
21         MS. HILLYER:  Objection to
22   form.
23         THE WITNESS:  Not all of
24   them.

Page 48

1   BY MR. CRAWFORD:
2      Q.  How about some of them?
3      A.  Hydrocodone with
4   acetaminophen, or APAP.  Oxycodone.  I
5   believe -- I believe oxymorphone.  I
6   believe morphine sulfate.
7          I've looked at a list, and
8   that's what I recall from the list.
9      Q.  Thank you.
10         And did they sell any prior
11   to the acquisition of Cephalon in 2011?
12     A.  Yes.
13     Q.  And what were those?
14         MS. HILLYER:  Objection to
15   form.
16         THE WITNESS:  We know the
17   ones that were listed here as part
18   of the Ivax purchase, that they
19   were -- sold Guiatuss syrup until
20   '07 and Tramadol/acetaminophen
21   until '13.
22         They also sold oxycodone
23   that was not part of the Actavis
24   purchase.

Page 49

```
 1    BY MR. CRAWFORD:
 2       Q.   Do you recall when you
 3    started -- Teva USA started selling that
 4    product, the oxycodone?
 5       A.   No.  But I know there was an
 6    agreement that's been produced that would
 7    have that date.  I don't remember, top of
 8    mind.
 9       Q.   And who is the agreement
10    with?
11       A.   Purdue.
12       Q.   Any other Class II generic
13    opioids that you recall Teva USA selling
14    prior to 2011?
15          MS. HILLYER:  Same
16       objection.
17          THE WITNESS:  No specific
18       products come to mind.
19    BY MR. CRAWFORD:
20       Q.   Cephalon, let's move on to
21    them.
22          They are -- you state that
23    they manufacture Fentora and Actiq,
24    right?
```

Page 50

```
 1       A.   Yes.
 2       Q.   And that Teva USA had
 3    marketed and sold and distributed the
 4    drugs, right, at some point?
 5       A.   Teva USA was a distributor
 6    for those drugs.
 7       Q.   And how did it come about
 8    that Teva and Cephalon got together --
 9    that started in 2011, right?
10          MS. HILLYER:  Objection to
11       form.  What?  Can you rephrase
12       that?
13    BY MR. CRAWFORD:
14       Q.   Right.  After the
15    acquisition of Cephalon, Cephalon and
16    Teva USA entered into some kind of
17    relationship whereby Teva USA started
18    selling, marketing and distributing
19    Fentora and Actiq, right?  Or let's just
20    say Fentora.
21       A.   I don't know if they -- I
22    don't know the legal entity structure
23    under which the people who marketed
24    Fentora at that time reported.  They may
```

Page 51

```
 1    have still been Cephalon employees.  I
 2    don't know that.
 3          But when Teva purchased
 4    Cephalon, all of Cephalon products were
 5    integrated underneath Teva USA as the
 6    distributor for those products.  So Teva
 7    would distribute and book the sales of
 8    those products.
 9       Q.   And who made the decision to
10    integrate that?
11          MS. HILLYER:  Objection to
12       form.
13    BY MR. CRAWFORD:
14       Q.   What company?
15          MS. HILLYER:  Same
16       objection.
17          THE WITNESS:  I'm not sure
18       who actually made the decision.
19       That was a common practice that I
20       had seen from the Ivax and the
21       Barr acquisitions, that they would
22       be brought in underneath Teva USA
23       and they would consolidate systems
24       and processes and become the
```

Page 52

```
 1       distributor and the entity that
 2       booked the sales for those
 3       products.
 4    BY MR. CRAWFORD:
 5       Q.   And was any of the planning
 6    for doing that done by Teva Limited?
 7          MS. HILLYER:  Objection to
 8       form.
 9          You can answer.
10    BY MR. CRAWFORD:
11       Q.   Any employees at Teva
12    Limited?
13       A.   No, not that I recall.  I
14    was on the integration team that worked
15    with Cephalon to bring the branded
16    products over.  And I don't recall anyone
17    from Teva Limited on those integration
18    teams.
19       Q.   Who made the decision to
20    integrate the two companies' operations?
21          MS. HILLYER:  Objection to
22       form.
23    BY MR. CRAWFORD:
24       Q.   Do you recall any of the
```

Page 53

1    people who made that decision?
2        A.  I don't.  I don't know
3    specifically.  I wasn't exposed to who
4    was making that decision.  That was just
5    the pattern that I had seen with the
6    other acquisitions that Teva had made in
7    the U.S.
8        Q.  Who was on the team that
9    integrated the two companies?
10       A.  There was -- there were
11   probably 100 people in different facets
12   of the company.
13       The team that I was -- that
14   I participated on, John Condleton, Bill
15   Campbell, myself, Mike Dirks, we were
16   working on the integration of the sales
17   and marketing effort for the branded CNS
18   products that Cephalon had.
19       Q.  And that included Fentora?
20       A.  Yes.
21       Q.  Do you know what companies
22   were involved, that people worked for, in
23   the integration of the Teva companies?
24       A.  Within that group, it would

Page 54

1    have been Cephalon for Mike and Bill, and
2    it would have either been Teva
3    Neuroscience, which would have been a
4    subsidiary of Teva USA, or it would have
5    been Teva Sales and Marketing.
6        I don't remember when that
7    changed.  But in either case they would
8    have been subsidiaries of Teva USA for
9    Condleton and myself.
10       Q.  And you don't know, as you
11   sit here today, whether any employees of
12   Teva Limited were involved in the
13   transition or integration teams?
14       MS. HILLYER:  Objection.
15   Mischaracterizes his testimony.
16   BY MR. CRAWFORD:
17       Q.  Do you know?
18       A.  I wasn't exposed to any Teva
19   Limited people being engaged in that
20   integration effort.
21       Q.  Do you know for sure if any
22   were engaged?
23       A.  I don't know.
24       Q.  Can you testify if any Teva

Page 55

1    Limited people were engaged?
2        I know you say you don't
3    know of any, but can you say absolutely
4    that none were involved?
5        A.  No.  I can only say that I'm
6    not aware of any involvement.  I would
7    not have been exposed to all of the
8    teams.
9        Q.  Okay.  Thank you.
10       Who was in charge of the
11   overall integration of the two companies,
12   Teva USA and Cephalon, their operations?
13       A.  We had a number of mergers.
14   To the best of my recollection, I think
15   that Marty Barron was involved in leading
16   the integration effort.
17       Q.  And do you know who was
18   involved in any due diligence, or,
19   actually, who was leading the due
20   diligence effort prior to the purchase?
21       A.  No, I don't.
22       Q.  And after the acquisition,
23   did Teva or any Teva entity actively sell
24   or distribute Actiq?

Page 56

1        MS. HILLYER:  Sorry?
2    BY MR. CRAWFORD:
3        Q.  After the purchase, did Teva
4    actively sell or distribute Actiq,
5    branded Actiq?
6        A.  Teva -- yes.  Teva USA
7    continues to sell -- continues to sell
8    and distribute Actiq.
9        Q.  To this day?
10       A.  Yes.
11       Q.  Let's just go to the Actavis
12   generic entities.
13       They were purchased in 2016,
14   right?
15       A.  Yes.
16       Q.  Were you involved in the
17   integration of their operations with
18   Teva?
19       A.  No.
20       Q.  And who would have been in
21   charge of the integration?
22       A.  I don't know specifically.
23       Q.  After the integration, what
24   Teva entities manufactured the Actavis

Page 57

1    opioid products?
2        A.   What Teva entities?  Just
3    for the generic products, since we've
4    already covered the Cephalon?
5        Q.   Yes, yes.
6        A.   I know that Actavis LLC had
7    several plants that produced opioids at
8    each of those plants.  I don't know
9    whether they continued to do so after the
10   acquisition.
11           I can't answer who actually
12   manufactured -- which legal entity
13   manufactures the opioid product.
14       Q.   Okay.  Do you know what
15   entity now markets the Actavis generic
16   opioid products?
17           MS. HILLYER:  Objection to
18   form.
19           THE WITNESS:  All of the
20       generic products are integrated
21       underneath Teva USA, and there is
22       an operations group that manages
23       all of the product announcements,
24       pricing, customer service

Page 58

1    interaction and sales activity for
2    those generics.
3    BY MR. CRAWFORD:
4        Q.   And also the distribution
5    activities?
6        A.   Yes.
7        Q.   So it comes under Teva USA,
8    then?
9        A.   Yes.
10           MR. CRAWFORD:  Can we take a
11       quick break?  Just, like, two
12       minutes.
13           MS. HILLYER:  Okay.
14           VIDEO TECHNICIAN:  Going off
15       record.  11:35.
16               - - -
17       (Whereupon, a brief recess
18       was taken.)
19               - - -
20           VIDEO TECHNICIAN:  Back on
21       record at 11:42 a.m.
22   BY MR. CRAWFORD:
23       Q.   One of the documents you
24   provided today, your counsel did, was

Page 59

1    Exhibit-5, which is a series of
2    organizational charts.
3               - - -
4        (Whereupon, Teva-Hassler
5        Exhibit-005,
6        ALLERGAN_MDL_02186860-869, was
7        marked for identification.)
8               - - -
9    BY MR. CRAWFORD:
10       Q.   Can you briefly explain to
11   me what these are?
12       A.   The first one is the U.S.
13   commercial organization structure for the
14   senior management group under Teva USA
15   North America generics.
16       Q.   And what time period?
17       A.   This would have been just
18   after the merger of the two companies.
19       Q.   So you mean the Actavis
20   generic companies and Teva?
21       A.   This would have been after
22   Teva's purchase and the management
23   integration into Teva USA.
24       Q.   Was there a management

Page 60

1    integration between Teva USA and the
2    Actavis generics that were acquired,
3    those two entities -- or those entities,
4    right?
5            MS. HILLYER:  Objection to
6        form.
7            THE WITNESS:  I don't
8        understand the question.
9    BY MR. CRAWFORD:
10       Q.   So there was an integration
11   of management after the 2016 acquisition.
12           And the companies'
13   management that were integrated were the
14   Actavis entities' management with the
15   Teva USA entity's management, correct?
16           MS. HILLYER:  Same
17       objection.
18           THE WITNESS:  That's my
19       understanding.
20   BY MR. CRAWFORD:
21       Q.   Okay.  And then what is the
22   rest of this?  Just kind of generally,
23   what is it?
24       A.   It drills down into other

Page 61

1    sections of the generics business
2    operation within the U.S.
3        Q.   For what time period?
4        A.   I believe it would have been
5    following the acquisition of the Actavis
6    entities.  And then -- I don't know how
7    long it would have been.
8        Q.   Is this the current
9    organization, within the company, of the
10   generic business?
11       A.   No.
12       Q.   And at some point -- prior
13   to the acquisition, the generic business
14   was separate from the brand business at
15   Teva, correct?
16       A.   Yes.
17       Q.   And at some point they've
18   merged the two, correct?
19            MS. HILLYER:  Objection to
20       form.
21   BY MR. CRAWFORD:
22       Q.   The brand and generic groups
23   or divisions, right?
24            MS. HILLYER:  Objection to

Page 62

1    form.
2            THE WITNESS:  The management
3    structure in -- at the beginning
4    of -- or at the end of 2017, early
5    2018, was integrated underneath
6    Brendan O'Grady as the executive
7    vice president for the generics
8    and branded businesses.
9    BY MR. CRAWFORD:
10       Q.   So previous they were
11   separate, right?
12       A.   Yes.
13       Q.   And who was over each one
14   right before the merger of the two?
15            MS. HILLYER:  Objection to
16       the form.
17            You can answer.
18            THE WITNESS:  Larry Downey
19       was the most senior manager for
20       Teva's U.S. -- actually, Teva's
21       North American specialty medicine
22       business, so all of the branded
23       products within Teva.
24            And Andy Boyer would have

Page 63

1        been the president for the
2        generics company.
3    BY MR. CRAWFORD:
4        Q.   And he came over from
5    Actavis, Mr. Boyer, right?
6        A.   I believe so.
7        Q.   And who was head of that
8    generics structure prior to the
9    acquisition of Actavis, for Teva?
10            MS. HILLYER:  Objection to
11       form.
12            THE WITNESS:  Sorry, I'm
13       just trying to remember.
14   BY MR. CRAWFORD:
15       Q.   That's okay.  Let's move on.
16            Were any Actavis entities
17   acquired by Teva, other than the three
18   you're testifying for, as part of the
19   2016 acquisition?
20       A.   I believe so, yes.
21       Q.   And what entities were
22   those?
23            MS. HILLYER:  Objection to
24       the form.

Page 64

1            THE WITNESS:  I don't know.
2    BY MR. CRAWFORD:
3        Q.   And just very quickly, what
4    is your e-mail address?
5        A.   John.hassler@Tevapharm.com.
6        Q.   Is that --
7        A.   P-H-A-R-M.
8        Q.   Right.  Let's go to Topic 3,
9    which is board of directors.
10            And if you'll turn to Page 2
11   of the chart, I believe we have an
12   exhibit on that as well.
13            - - -
14       (Whereupon, Teva-Hassler
15       Exhibit-006, Appendix 2 - Topic 3
16       - Boards of Directors, was marked
17       for identification.)
18            - - -
19   BY MR. CRAWFORD:
20       Q.   You provided here a list of
21   board of directors in response to this
22   question, correct?
23       A.   That's correct.
24            MS. HILLYER:  Objection to

Page 65

1      form.
2          Go ahead.
3    BY MR. CRAWFORD:
4          Q.   Or your counsel did, rather.
5          So the current board members
6    of Teva USA are Deborah Griffin, Asaph
7    Naaman and Brendan O'Grady, correct?
8          A.   Yes.
9          Q.   And what are their positions
10   within the company, as far as are they
11   officers of the company as well?
12         A.   Brendan is the senior -- the
13   executive vice president for North
14   American commercial.
15         Q.   And who does he work for?
16         A.   He reports in to Kåre
17   Schultz, the CEO of Teva.
18         Q.   And who is Mr. O'Grady's
19   employer?
20         A.   He is employed by Teva Sales
21   and Marketing.
22         Q.   And Mr. Schultz is CEO of
23   Teva Limited, correct?
24         A.   That's correct.

Page 66

1          Q.   And how about Asaph Naaman,
2    who does he work for?
3          A.   I believe Asaph reports in
4    to Brendan.
5          Q.   And is he a Teva Sales and
6    Marketing employee?
7          A.   I don't know who employs
8    him.
9          Q.   How about Deborah Griffin,
10   who does she report to?
11         A.   She is in finance, and I
12   don't know who she reports to.
13         Q.   Do you know who she works
14   for?
15         MS. HILLYER:  I'm objecting
16   to these questions to the extent
17   they're outside of the scope.  You
18   have the identity of them.
19         MR. CRAWFORD:  I'm just
20   trying to find out who their
21   employer is, if he knows.
22         THE WITNESS:  I believe her
23   employer is Teva USA.  I don't
24   know who she reports to.

Page 67

1    BY MR. CRAWFORD:
2          Q.   And she's -- what's her
3    position?
4          A.   She's a finance person.
5          Q.   Okay.  And then the question
6    to the other entities, does Cephalon have
7    any current board of directors?
8          A.   The Cephalon board has the
9    same membership as the Teva USA board.
10         Q.   But they are not listed as
11   directors here on your chart.  Oh, that's
12   pre-2011.
13         So you're saying that
14   basically that the Teva USA board of
15   directors is the same as the Cephalon
16   board of directors after 2011?
17         A.   They have the same
18   membership, yes.
19         Q.   Turning to the second page,
20   these are the Actavis-acquired entities.
21         Who are the current board
22   members for Watson Laboratories, Inc.?
23   Is it Ms. Griffin, Mr. Shanahan and Mr.
24   Vella?

Page 68

1          A.   That's my understanding,
2    yes.
3          Q.   Because it says 2018, and
4    one of them says to present.
5          Does that mean -- the ones
6    in 2018, are they still presently board
7    members?
8          A.   That's my understanding.
9          Q.   And who is Mr. Shanahan's
10   employer?
11         MS. HILLYER:  Same
12   objections.
13         You can answer if you know.
14         THE WITNESS:  I'm not sure.
15   BY MR. CRAWFORD:
16         Q.   And Mr. Vella?
17         A.   I don't know.
18         Q.   And for Actavis LLC, there
19   are no current board members.
20         Wait.  Do they currently
21   have a board?
22         A.   Not that I'm aware of.
23         Q.   And how about Watson Pharma,
24   Inc., do they currently have a board?

Page 69

1          A.    Not that I'm aware of.
2          Q.    And Actavis Pharma Inc.,
3    their board members currently are Ms.
4    Griffin, Mr. Shanahan and Mr. O'Grady,
5    correct?
6          A.    Yes.
7          Q.    Are there minutes kept --
8    are there regularly scheduled board
9    meetings for all of these boards that are
10   currently active?
11         MS. HILLYER:  Objection.
12   Outside the scope.
13         You can answer if you know.
14         THE WITNESS:  I don't know.
15   BY MR. CRAWFORD:
16         Q.    Do you know if there are
17   minutes kept for these boards' meetings?
18         MS. HILLYER:  Same
19   objection.
20         THE WITNESS:  I know that
21   there are board minutes kept.  I
22   don't know for which entities.
23   BY MR. CRAWFORD:
24         Q.    And are there any

Page 70

1    committees, task forces, working groups
2    regarding opioids for any of these
3    boards?
4          A.    No.  We haven't come across
5    any.
6          Q.    How about any with regard to
7    the opioid litigation?
8          A.    Not that I'm aware of.
9          Q.    Are there any reports that
10   have been provided to these board members
11   on opioids, like white papers, or on DEA
12   activities or on the lawsuits or
13   marketing in general?
14         MS. HILLYER:  Objection.
15   Beyond the scope.
16         You can answer if you know.
17         THE WITNESS:  None that I've
18   seen.
19   BY MR. CRAWFORD:
20         Q.    Let's go to Topic 4.
21         If you need to refresh your
22   recollection on the subject of the topic,
23   Exhibit-11, if you could take a look at
24   that at Page 6, that's where we're at

Page 71

1    right now.
2          MS. HILLYER:  Exhibit-1 has
3    all the topics on it.
4          MR. CRAWFORD:  Exhibit-11.
5          MS. HILLYER:  You want to go
6    to 11?
7          MR. CRAWFORD:  Yeah.
8          MS. HILLYER:  That's the --
9    sorry, which one is that, Mark?
10         MR. CRAWFORD:  That's the
11   notice of deposition, sorry.
12         Actually, we should go to
13   Topic 5, rather.  Let's turn the
14   page.
15   BY MR. CRAWFORD:
16         Q.    Topic 5 concerns your
17   policies and procedures for sales,
18   marketing, regulatory, pharmacovigilance
19   and drug safety, compliance regarding
20   sales and marketing and distribution of
21   opioids.
22         MS. HILLYER:  Hold on one
23   second.  I don't think you were
24   just -- no, no, no.

Page 72

1          Were you just reading 5?
2    That's not what I have.
3          MR. CRAWFORD:  Yeah.  I kind
4    of was summarizing it.
5          MS. HILLYER:  Okay.
6    BY MR. CRAWFORD:
7          Q.    But you've looked at these
8    topics and you're familiar with them,
9    right?
10         A.    Yes.
11         Q.    So for Topic 5, I think
12   you've given us an exhibit, 7, which is a
13   listing of various policies and
14   procedures.
15                - - -
16         (Whereupon, Teva-Hassler
17         Exhibit-007, Appendix 3 - Topic 5
18         - Identification of SOM
19         Policies, was marked for
20         identification.)  Was marked for
21         identification.)
22                - - -
23   BY MR. CRAWFORD:
24         Q.    Is that correct?

Page 73

1    Are these policies and
2  procedures in each of the areas listed in
3  Topic 5?
4         MS. HILLYER:  Can you repeat
5     that question, Mark?  He's just
6     getting the exhibit.
7         MR. CRAWFORD:  Right.  I'm
8     sorry.
9  BY MR. CRAWFORD:
10    Q.   So Exhibit-5 -- I'm sorry,
11  Exhibit-7, is this generally a listing of
12  the policies and procedures in the topic
13  areas that are listed in Topic 5?
14    A.   This would represent the
15  policies, yes.
16    Q.   Let's read this one into the
17  record.  This one is, Identification of
18  your policies and procedures for and the
19  identities of all persons responsible for
20  monitoring suspicious orders or potential
21  diversion of opioids or opioid products
22  or for auditing or investigating
23  suspicious orders or potential diversion
24  of opioids or opioid products and, A,

Page 74

1  identification of your systems or
2  processes to disclose suspicious orders
3  of opioids or report potential diversion
4  of opioids or opioid products and, B,
5  identification of your systems or
6  processes to report or halt sales to
7  those involved in any suspicious orders
8  of opioids or opioid products or
9  potential diversion of opioids or opioid
10  products.
11        This topic also seeks
12  information regarding any and all third
13  parties or vendors, including UPS, or any
14  other third party who performed these
15  functions on your behalf, as well as all
16  persons who interacted with UPS or any
17  other third party or vendor.
18        For each person identified,
19  please provide whether the person's
20  compensation was based, in whole or in
21  part, on levels of sales of controlled
22  substances or opioid products.
23        So are these, in
24  Exhibit-3 -- or Exhibit-7, Appendix 3,

Page 75

1  are these all the policies and procedures
2  that were in place with regard to
3  suspicious order monitoring that you
4  found?
5         MS. HILLYER:  Objection to
6     form.
7         THE WITNESS:  I don't know
8     whether these are all of the
9     policies, but these represent the
10     policies that I've reviewed
11     related to suspicious order
12     monitoring.
13  BY MR. CRAWFORD:
14    Q.   Okay.  And the first one,
15  Cephalon, you have one listed for 2009.
16        Were there any other
17  policies that you were able to locate or
18  identify for Cephalon regarding
19  suspicious order monitoring?
20    A.   Not that I recall.
21    Q.   And you next list -- or next
22  listed here, one, two, three, four
23  categories of policies for Teva, right?
24    A.   Yes.

Page 76

1    Q.   And the earliest one is
2  under customer site visits, August 1st,
3  2014.  And then below that, DEA order
4  hold, the same date.  And below that, Do
5  not ship list, the same date.
6         Are there any other policies
7  or procedures regarding suspicious order
8  monitoring that Teva had prior to August
9  1st, 2014?
10         MS. HILLYER:  Objection to
11     form.
12         THE WITNESS:  I don't recall
13     any policies that I've reviewed.
14     I have talked with people in our
15     suspicious order monitoring
16     program that have described
17     policies that existed back as far
18     as 2008.
19  BY MR. CRAWFORD:
20    Q.   Were those written policies?
21    A.   I don't know.
22    Q.   And who did you speak with
23  about that?
24    A.   Joe Tomkiewicz.

Page 77

1    Q.   Anyone else?
2    A.   Not for Teva.
3    Q.   Were -- the Cephalon
4  policies, did they remain in place after
5  the 2011 acquisition?
6    A.   Not that I'm aware of.
7  There would have been a time period
8  during the integration to manage the
9  transition.  But I believe that they've
10  all been transitioned over to Teva USA.
11    Q.   Are you aware of any
12  suspicious order monitoring policies or
13  procedures that were in place between
14  2011 and August 1st, 2014, listed here?
15    MS. HILLYER:  Objection.
16    Asked and answered.
17    THE WITNESS:  There were
18    policies, and Joe had described
19    practices to me.  But I have -- I
20    don't recall reading them.
21  BY MR. CRAWFORD:
22    Q.   Do you know if there were
23  any written policies in place during that
24  time period?

Page 78

1    MS. HILLYER:  Same
2  objection.
3    THE WITNESS:  I believe so,
4    but I don't -- I don't know.
5  BY MR. CRAWFORD:
6    Q.   And do you know if there
7  were any written policies and procedures
8  in place regarding suspicious order
9  monitoring for Teva, any Teva entity,
10  prior to the Cephalon acquisition?
11    MS. HILLYER:  Same
12  objection.
13    THE WITNESS:  Yes, there
14    would have been Teva policies
15    related to the suspicious order
16    monitoring program that Teva had
17    dating back at least to 2008.
18  BY MR. CRAWFORD:
19    Q.   And were they written
20  policies and procedures?
21    A.   I believe so, but -- I
22  believe so, but I can't point -- point to
23  one.
24    Q.   Okay.  Who would be most

Page 79

1  knowledgeable about Teva's suspicious
2  order monitoring system prior to 2011?
3    A.   I would speak with Joe to
4  find out who those people would have
5  been.
6    Q.   And is that Mr. Tomkiewicz?
7    A.   Yes.
8    Q.   And when did he join the
9  company?
10    A.   I believe in 2015.
11    Q.   So he wouldn't have actually
12  been there at Teva at the time these
13  policies were in place?
14    A.   No.  But he would have
15  interacted with those who may have been.
16    Q.   And who was that?
17    A.   I don't know.
18    Q.   So Mr. Tomkiewicz would be
19  most knowledgeable about, A, the
20  identification of your systems or
21  processes to disclose suspicious orders
22  of opioids or report potential diversion
23  of opioid products, right?
24    MS. HILLYER:  Objection to

Page 80

1  form.  Mr. Hassler is designated
2  to testify on those topics as the
3  person most knowledgeable for the
4  company.
5  BY MR. CRAWFORD:
6    Q.   Okay.  What were the
7  systems, then?
8    MS. HILLYER:  Can you be
9  more specific?
10    MR. CRAWFORD:  Prior to
11  2011?  I'm sorry.
12    THE WITNESS:  There was a
13  system called SORDS, which was an
14  order pending system, that
15  identified any orders that
16  exceeded certain quantity
17  thresholds that would cause the
18  order to be pended and reviewed by
19  the SOM group.
20    That automated system was
21  updated in 2012 to the SORDS 2
22  system.  And it was once again
23  updated in 2015 to the DEF OPS
24  system.

Page 81

1          All of them were order
2     pending systems that evaluated
3     orders that came in.  And if
4     anything was of an unusual volume,
5     timing, or it was -- it was
6     unusual timing, volume or the
7     nature of the order was odd, they
8     would get pended in that system.
9          They would be reviewed,
10    then, by the DEA monitoring group
11    within Teva, Joe Tomkiewicz and
12    Sara Everingham.
13    BY MR. CRAWFORD:
14    Q.    This is pre-2011, though?
15    A.    I'm sorry, I don't know the
16    individuals there.
17    Q.    So it would be reported to
18    some individual, but you don't know who
19    they are.
20          And then what would happen?
21    A.    When the order was pended?
22    Q.    Yes.
23    A.    They would review the order
24    to try to identify why it differed from

Page 82

1     an expected size, frequency or volume.
2          And in some cases, they
3     would go back to the customer to
4     understand why the order differed from
5     the normal variation that they would have
6     expected.
7          And then the suspicious
8     order monitoring group could release the
9     order, or, if it was deemed a suspicious
10    order, continue to hold that order and,
11    through consultation with a team, if the
12    order was deemed suspicious, notify the
13    DEA.
14    Q.    What department would
15    contact the customer under the system
16    pre-2011?
17    A.    To the best of my knowledge,
18    within Teva, it would have -- I believe
19    it was customer service.
20    Q.    And then they would report
21    back to the DEA compliance group at Teva
22    pre-2011?
23    A.    The information that they
24    had received.

Page 83

1     Q.    And let me ask you this:  On
2     this Exhibit-1 chart here, we're looking
3     at these employees, these are the
4     employees that were involved in the
5     suspicious order monitoring systems at
6     these entities; is that your
7     understanding?
8     A.    It is.
9     Q.    And, overall, this document
10    that you prepared, you believe -- or
11    you're testifying that all of this
12    information is accurate, correct?
13    A.    To the best of my knowledge,
14    yes.
15    Q.    All right.  So what was the
16    system to halt the sales of any
17    suspicious orders at that time?
18    A.    It was called SORD.
19    Q.    To stop it, though.
20          Did you have processes, once
21    it was identified, to stop the order?
22          MS. HILLYER:  Objection.
23          Asked and answered.
24          You can answer it again.

Page 84

1          THE WITNESS:  The order --
2     if the order varied from the
3     tolerances that were in that
4     system, the order would have been
5     pended and would not have shipped
6     without going in and releasing it.
7     BY MR. CRAWFORD:
8     Q.    Are you aware of any
9     suspicious order that was stopped prior
10    to 2011, through this system?
11          MS. HILLYER:  Objection.
12    Beyond the scope.
13          You can answer if you know.
14    Prior to 2011 in Teva?
15          MR. CRAWFORD:  Yes.
16          MS. HILLYER:  Same
17    objection.  Beyond the scope.
18          THE WITNESS:  No, I'm not
19    aware.
20    BY MR. CRAWFORD:
21    Q.    So does that mean no
22    suspicious orders were stopped, or you
23    just don't know the answer?
24    A.    I don't know the answer.

Page 85

1    Q.   How about for Cephalon, do
2  you know if any suspicious orders were
3  stopped under its system?
4         MS. HILLYER:  Objection
5    beyond the scope.
6         You can answer if you know.
7         THE WITNESS:  I don't know.
8  BY MR. CRAWFORD:
9    Q.   And what was -- was
10  Cephalon's system the same or was it
11  different, prior to 2011?
12    A.   I don't know.
13    Q.   All right.  So for Actavis,
14  let's go to their system.
15         What was their system prior
16  to -- immediately prior to the
17  acquisition in 2016 by Teva, their system
18  for identifying suspicious orders?
19    A.   They had an order pending
20  system as well that would identify orders
21  that varied -- varied from specific
22  tolerances that had been set into the
23  system and had to have an individual
24  review those orders for release.

Page 86

1    Q.   And what was the individual
2  who viewed the order?  What department
3  did they work for?
4         MS. HILLYER:  What time
5    frame are you talking about?
6         MR. CRAWFORD:  Just prior to
7    the acquisition.
8         THE WITNESS:  I don't
9    recall.
10  BY MR. CRAWFORD:
11    Q.   And what was the practice
12  for halting orders at the Actavis
13  entities immediately prior to the
14  acquisition?
15    A.   The order was flagged if it
16  was -- if it exceeded specific tolerances
17  that were built into their order
18  management system.
19    Q.   And once they were flagged,
20  what was the process for halting an
21  order?
22    A.   I don't recall whether it
23  was halted automatically through that
24  flag or not.

Page 87

1    Q.   And let's put this chart up
2  here again.
3         MS. HILLYER:  He's directing
4    you to Exhibit-7.
5         MR. CRAWFORD:  Yes.  This is
6    Exhibit-7.
7  BY MR. CRAWFORD:
8    Q.   Here we're talking Actavis.
9         Is this -- which Actavis
10  entity are we talking about on this first
11  page?  Are these all the Actavis generic
12  entities?
13    A.   This would have been any
14  that distributed -- I'm only aware of the
15  Actavis Pharma distributing.
16    Q.   So "Actavis" means Actavis
17  Pharma?
18    A.   That's my understanding.
19    Q.   All right.  I think we need
20  to shortcut this a little bit, because we
21  do have a limited time.
22         Let me ask it this way:  Do
23  all these policies and procedures that
24  are referenced by Bates there -- that's

Page 88

1  what these Bates numbers are, the actual
2  policies and procedures, the written ones
3  that you've been able to locate, right?
4    A.   Yes.
5    Q.   Do you know if there are any
6  other written policies and procedures out
7  there that are not identified?  Can you
8  identify them right now?
9         MS. HILLYER:  Objection to
10    form.  Assumes facts not in
11    evidence.
12         THE WITNESS:  I am not aware
13    of any others.
14  BY MR. CRAWFORD:
15    Q.   And would these policies and
16  procedures, are they -- were they in
17  effect from these time periods under the
18  date -- how long -- were these the
19  starting dates of these policies listed
20  under date?
21    A.   I don't believe so.  I think
22  these would have been the policy that was
23  updated or changed at that point in time.
24  And in many cases, they refer to policies

Page 89

1  that were dated earlier and revisions
2  from those earlier policies.
3      Q.   So, for instance, under Teva
4  SOP, customer site visits, these are the
5  only two policies you're aware of that
6  were in effect for customer site visits,
7  correct, for Teva USA?
8      A.   At that point in time.  They
9  may refer to policies that would have
10 been earlier versions.
11     Q.   All right.  So for August
12 1st, 2014, you're saying this policy
13 might refer to an earlier written
14 version, right?
15     A.   Yes.
16     Q.   And do you know if there, in
17 fact, was an earlier written version, as
18 you sit here?
19     A.   There were for some of these
20 policies.  I don't recall which ones.
21     Q.   Can you identify them as you
22 sit here today, any earlier ones?
23     A.   No.
24     Q.   Okay.  The same -- same on

Page 90

1  down, these are the only ones you can
2  identify, as you sit here today, all of
3  these policies?  There are no other
4  written policies that you can identify?
5      MS. HILLYER:  Objection to
6  form.  I think he's asked and
7  answered that a few times now.
8      THE WITNESS:  These were the
9  policies that were in place at
10 that time.  They may refer to
11 earlier policies and changes that
12 were made from those policies that
13 were reflected in these current
14 versions.
15 BY MR. CRAWFORD:
16     Q.   But this topic asks you to
17 identify your policies and procedures as
18 you sit here today, and I'm just trying
19 to get all the ones that you can identify
20 as you sit here today.
21      And these are the only ones
22 that you can actually identify?
23     A.   That's correct.
24     Q.   But what you're saying is

Page 91

1  that there may be some referenced in
2  there, in some of these, that may refer
3  to a predecessor policy, correct?  But
4  you don't know it, as you sit here today,
5  what those are; is that accurate?
6      A.   In the policies, in some of
7  these policies, it will refer to a
8  previous policy and the change that was
9  represented in the current version versus
10 what was in the previous version.
11     Q.   But for the earliest
12 policies you reference here, they may
13 refer to an earlier policy, but, as you
14 sit here today, you can't identify them,
15 right?
16     A.   Yes.
17     Q.   And so that understanding of
18 how these dates operate is consistent for
19 all the entities listed on Exhibit-7,
20 correct?
21     A.   Yes.
22     Q.   So if we went to the written
23 policies here referenced in the Bates
24 number, that would accurately represent

Page 92

1  what the policies were in place for
2  suspicious monitoring -- order monitoring
3  for these companies; is that correct?
4      A.   Yes.
5      Q.   Outside of these written
6  policies, are there any other policies
7  and procedures you're aware of that
8  relate to any of these entities on
9  Exhibit-7, the suspicious order
10 monitoring program?
11     MS. HILLYER:  Objection to
12 form.  I think he's asked and
13 answered.
14      But you can answer it again.
15     THE WITNESS:  Not that I'm
16 aware of.
17 BY MR. CRAWFORD:
18     Q.   Did any third party or
19 vendor perform any suspicious order
20 monitoring services for Teva, Cephalon or
21 the Actavis entities, that you're aware
22 of?
23     A.   Yes.
24     Q.   And which entities or third

Page 93

1 parties or vendors were those?
2 A. UPS served as a secondary
3 suspicious order monitoring check for
4 Actavis.
5 Q. And by "check," what do you
6 mean by that?
7 A. Actavis had a suspicious
8 order monitoring process. They utilized
9 UPS as a logistics vendor who also had a
10 suspicious order monitoring process, so
11 that there were two checks on the
12 distribution of the opioids or controlled
13 substances that they distributed through
14 UPS.
15 Q. And what was that process?
16 Are you able to testify to that today,
17 the UPS process?
18 MS. HILLYER: Sorry.
19 Objection to that. And we
20 objected in our response to the
21 topics that he's not here to
22 testify as to UPS's or any other
23 third-party vendor's processes or
24 policies.

Page 94

1 But if he knows, he can
2 answer.
3 THE WITNESS: I'm not aware
4 of the UPS process. I'm not aware
5 of what it was.
6 BY MR. CRAWFORD:
7 Q. There's a policy and
8 procedure listed here on Exhibit 7 that
9 says, UPS suspicious order system,
10 November 3, 2010, Actavis.
11 Can you explain what that
12 is?
13 MS. HILLYER: Objection to
14 form. Do we have a document here
15 for him to look at?
16 MR. CRAWFORD: No.
17 BY MR. CRAWFORD:
18 Q. Can you identify what that
19 system is that's referenced there that
20 was part of your designated topics?
21 MS. HILLYER: Objection.
22 It's not part of the designated
23 topics, because we objected to
24 testimony that requires him to

Page 95

1 testify about some third party.
2 He can testify about
3 Actavis's policies and procedures.
4 To the extent this was part of
5 that, he can testify about that
6 interrelationship, which I believe
7 he did, but you can ask him
8 questions about that, not what
9 UPS's was.
10 BY MR. CRAWFORD:
11 Q. So this reference here is to
12 the actual UPS policy, not Actavis's
13 policy, then, right?
14 MS. HILLYER: He's on the
15 back side.
16 MR. CRAWFORD: It says, UPS
17 suspicious order system, November
18 3rd, 2010. And it lists Actavis
19 as the company, and then lists a
20 Bates number.
21 BY MR. CRAWFORD:
22 Q. So is this Actavis's policy
23 or is this UPS's policy?
24 A. I believe this is UPS's

Page 96

1 policy.
2 Q. And you're not prepared to
3 testify as to what this policy is, as you
4 sit here?
5 A. No.
6 Q. Were there any other third
7 parties or vendors that you're aware of,
8 for any of the entities that you're
9 designated to testify for today, that
10 assisted in the suspicious monitoring
11 or -- program at these companies?
12 A. I don't believe so.
13 I want to amend that last
14 statement.
15 Q. Yes.
16 A. Because I do not know
17 whether or not this is a UPS policy or
18 not. I don't remember whether it was a
19 policy that related to how Allergan
20 interacted -- or Actavis interacted with
21 UPS or whether it was their policy
22 specifically. I just don't recall.
23 Q. All right. And can you
24 identify any specifics with regard to how

Page 97

```
 1      Allergan interacted with -- or Actavis
 2   interacted with UPS?
 3          MS. HILLYER:  Objection.
 4      Asked and answered.
 5          You can explain it again.
 6          THE WITNESS:  What I'm aware
 7      of is that UPS had an SOM policy
 8      and that that could serve as a
 9      secondary check against the policy
10      that Actavis had for their
11      suspicious order monitoring
12      program.  Because it would flow
13      from Actavis to UPS.
14   BY MR. CRAWFORD:
15      Q.   But I'm just trying to get
16   to the specifics of that policy.  There's
17   apparently a written policy that might be
18   how they interacted.
19          I'm wondering if you know
20   the specifics about how they interacted?
21      A.   I don't recall the
22   specifics.
23      Q.   Were there any -- who were
24   the people at Actavis who interacted with
```

Page 98

```
 1   UPS for this process?
 2      A.   I'm not sure who on this
 3   list of contacts would have been the
 4   specific contact for UPS.
 5      Q.   Let's go to the next
 6   exhibit, the next topic.
 7          The next topic is Topic 7,
 8   testing for long-term use in chronic
 9   pain.  And if you could turn to Page 7 of
10   the notice, Exhibit-11, it's, The
11   identity of all persons who were
12   responsible for testing the safety and
13   efficacy of opioid products for long-term
14   use or for chronic pain or who received
15   reports, test results, studies or any
16   other documentation regarding the testing
17   of the safety and efficacy of opioid
18   products for long-term use for chronic
19   pain or long-term use and the results of
20   any such testing.
21          The question I have here --
22   let's see.  You do have information on
23   this topic in Exhibit-1.
24          So this accurately reflects
```

Page 99

```
 1   your response to this topic, right?
 2          MS. HILLYER:  Objection to
 3      form.
 4          THE WITNESS:  It does.
 5   BY MR. CRAWFORD:
 6      Q.   And in this, I mean, what
 7   you list here in Exhibit-1 under Topic 7,
 8   correct?
 9      A.   Yes.
10          MS. HILLYER:  Same
11      objection.
12   BY MR. CRAWFORD:
13      Q.   And what were the -- can you
14   testify right now, today, what the
15   results were of such testing or what
16   tests were conducted?
17          MS. HILLYER:  Objection.
18      Beyond the scope.
19          You can answer if you know.
20          MR. CRAWFORD:  It does ask
21      for the results of any such
22      testing.
23          MS. HILLYER:  No, it
24      doesn't.  It asks for the identity
```

Page 100

```
 1   of all persons who were
 2   responsible for testing the safety
 3   and efficacy of opioid products
 4   for long-term use or chronic pain
 5   or who received reports, test
 6   results, studies or any other
 7   documentation regarding the
 8   testing of the safety and efficacy
 9   of opioid products for long-term
10   use or for chronic pain or for
11   long-term use and the results of
12   any such testing.
13          I read that to be the people
14      who received those reports.
15          MR. CRAWFORD:  Fair enough.
16   BY MR. CRAWFORD:
17      Q.   So you're not here to
18   testify about the results, right?
19      A.   Correct.
20      Q.   So let's go to Topic 10.
21          So you have Appendix 4,
22   which is providing information about
23   Topic 10, correct?  Topic 10 is
24   identification -- let me -- I just asked
```

| Page 101 | Page 102 |
|---|---|

Page 101

1 the question.
2         So is that Appendix 4 you're
3 providing for that?
4     A.   Yes.
5     Q.    So this is not all of the
6 policies and procedures in Exhibit-8, but
7 this is a sampling, correct?
8             - - -
9         (Whereupon, Teva-Hassler
10     Exhibit-008, Appendix 4 - Topic 10
11     - Identification of Policies and
12     Procedures, was marked for
13     identification.)
14             - - -
15 BY MR. CRAWFORD:
16     Q.    Let's get a clean copy.
17 Right?
18     A.    What are you -- I'm sorry,
19 would you repeat the question?
20     Q.    I'm sorry.  It looked like
21 that Exhibit-8 was a sampling of the
22 policies and procedures in these areas
23 listed in Topic 10, correct?
24     A.    Yes.

Page 102

1     Q.    All right.  And are you
2 aware of any policies or procedures for
3 sales and marketing that Teva USA had?
4 Because I see none listed on Appendix A.
5 And that would be -- let's start with
6 prior to 2011.
7     A.    Prior to 2011?  Any policies
8 on sales and marketing?
9     Q.    Right.  For Teva USA.
10         MS. HILLYER:  Related to
11     opioids?
12         MR. CRAWFORD:  Yes.  That
13     would relate to opioid products or
14     the sale of it.
15 BY MR. CRAWFORD:
16     Q.    And I don't mean
17 specifically related.  I mean just that
18 somehow the sales and marketing
19 procedures would involve or be related
20 to, in any way, the sale of an opioid
21 product, including other generic
22 products.
23         Teva had no brand -- let me
24 strike that.

Page 103

1         Teva had no brand opioid
2 products prior to 2011, correct, that
3 they marketed or sold?
4     A.    Correct.
5     Q.    So I'm just wondering if
6 any -- there were any marketing and sale
7 policies and procedures in effect prior
8 to 2011 that would have kind of governed
9 opioid products, along with other generic
10 products.
11     A.    There weren't any sales and
12 marketing policies that were specific to
13 opioid products.  They would have been
14 sales and marketing policies for all of
15 our products.
16         There was a code of conduct
17 that would have been, I believe,
18 applicable to Teva USA that would date
19 back, I believe, to 2006 that would have
20 governed expectations and interactions.
21     Q.    Is that listed in -- is this
22 on Page -- the last page --
23 second-to-last page of the appendix,
24 listed there, code of business conduct,

Page 104

1 that's Teva MDLA00553166?
2     A.    Yes.
3     Q.    And that's what you were
4 referring to?
5     A.    Yes.
6     Q.    But nothing specific for
7 sales and marketing that you can recall
8 that would have -- you know, that opioids
9 would have -- maybe not what it's
10 specific to but would have been governed
11 by?
12         Let me ask it this way:  Did
13 you have any sales and marketing
14 procedures in place that governed any of
15 your generic products prior to 2011?
16     A.    There would have been
17 procedures in place to validate the
18 accuracy, legality and regulatory
19 compliance with any announcements or
20 communications of new generics that were
21 being introduced into the marketplace.
22     Q.    Anything else?
23     A.    The other -- the code of
24 conduct would have also addressed

1   expectations around interaction with
2   customers.  So there would have been
3   applicability to sales and marketing in
4   that code and expectations created by
5   compliance with that code.
6       Q.   The Actavis entities listed
7   here in this chart are -- just sell
8   marketed -- just sold generic products,
9   right, generic opioid products?
10      A.   The entities that we've been
11  talking about today, yes.
12      Q.   So Actavis, under sales and
13  marketing, has a bunch of policies and
14  procedures, including U.S. policy on
15  promotion, nonpromotional and off-label
16  interactions and materials, right?
17          That's down at the bottom of
18  Page 2.
19      A.   Yes, I see that.
20      Q.   And that would have been
21  applicable to their generic products,
22  correct?
23      A.   My understanding is that
24  they had a common policy across their

1   branded and their generics, unless it was
2   specifically cited as a site-specific or
3   ANDA-specific policy.
4       Q.   Did Teva USA, at any time,
5   have a similar type of policy with regard
6   to its generic products?
7           MS. HILLYER:  Similar to
8   what?
9           MR. CRAWFORD:  To U.S.
10  policy on promotion,
11  nonpromotional and off-label
12  interactions and materials.
13          MS. HILLYER:  Objection.
14  Vague.  I don't know what you mean
15  by "similar."
16          MR. CRAWFORD:  I mean, I'm
17  just trying to find out if they
18  have any policies that deal with
19  those topics with regard to their
20  generic products.
21          MS. HILLYER:  Objection to
22  form.
23          You can answer if you
24  understand.

1           THE WITNESS:  They had -- I
2   can't speak to the time period.
3   They had an approval process for
4   promotional materials to be
5   reviewed by legal, regulatory and
6   the commercial group that was
7   creating the announcements.  I
8   don't remember whether they're
9   referenced in some of these
10  overarching policies or not.
11  BY MR. CRAWFORD:
12      Q.   Let's break it down.
13          Did they have any policy at
14  Teva with regard to its generic products
15  on off-label interactions?
16          MS. HILLYER:  At what point
17  in time?
18          MR. CRAWFORD:  Any time.
19          THE WITNESS:  The code of
20  conduct would have prohibited
21  off-label interactions for anyone
22  underneath Teva USA.
23  BY MR. CRAWFORD:
24      Q.   Any other sales and

1   marketing type --
2       A.   Any promotional, off-label
3   interactions.
4       Q.   Any other sales or marketing
5   type policies or procedures that governed
6   off-label interactions at Teva USA for
7   its generic products?
8       A.   Not that I'm aware of.  It
9   just wasn't a practice that they would
10  talk about the therapeutic information in
11  the product.  They typically just ran
12  with the brand name, the dosage strength,
13  and the availability of the product.
14      Q.   As you sit here today, I
15  know this is a sampling you provided me,
16  Exhibit-8, but can you think of any other
17  policies or procedures that you can
18  identify regarding any of the topics in
19  Question 10 that aren't listed here?
20          MS. HILLYER:  Objection to
21  form.  It's pretty broad.
22          THE WITNESS:  No, there are
23  none that come to mind.
24  BY MR. CRAWFORD:

Page 109

1    Q.   Let's move on to the next
2  topic.  This is Topic 19.
3        MS. HILLYER:  How long do
4  you have, do you think, on this
5  topic?  I'm just thinking of when
6  we might want to break for a quick
7  bite.
8        MR. CRAWFORD:  We can take a
9  quick break now, if you want.
10       MS. HILLYER:  I'm happy to
11 keep going a little bit.
12       MR. CRAWFORD:  Let's go with
13 this topic, then.
14 BY MR. CRAWFORD:
15   Q.   So Topic 19.
16       MS. HILLYER:  As long as you
17 are --
18       THE WITNESS:  I'm fine, yes.
19 BY MR. CRAWFORD:
20   Q.   The role of wholesalers,
21 distributors, pharmacies, hospitals,
22 formularies and government entities,
23 agencies and departments, including but
24 not limited to defendants, in the supply

Page 110

1  chain of your opioids and the
2  responsibilities of each with respect to
3  marketing, sales, supply, suspicious
4  order monitoring and potential diversion.
5        So for this topic, I think
6  you have something on Exhibit-11, you've
7  referenced this letter to Claire
8  McCaskill, right?
9    A.   Yes.
10   Q.   And that would be Exhibit
11 10, right?  Is this the letter?
12   A.   Yes.
13       - - -
14       (Whereupon, Teva-Hassler
15 Exhibit-010,
16 TEVA_MDL_A_01087806-808, was
17 marked for identification.)
18       - - -
19 BY MR. CRAWFORD:
20   Q.   So let's turn to the second
21 page of the letter.
22       And you write here -- Teva
23 writes here that -- their lawyer, Like
24 healthcare -- this is the first full

Page 111

1  paragraph.
2        Like healthcare providers
3  and pharmacies, manufacturing companies
4  like Teva and distributors and
5  wholesalers also have specific
6  obligations within the closed system of
7  distribution.  In particular,
8  manufacturers and distributors must
9  establish safeguards against theft and
10 diversion of controlled substances while
11 those substances are within their
12 physical control.  Both must also develop
13 and implement systems to identify, quote,
14 suspicious orders, unquote, and any
15 orders identified as potentially
16 suspicious must be reported to the DEA.
17       Is that an accurate
18 statement?
19   A.   Yes.
20   Q.   And so Teva, and the
21 entities you are here designated for,
22 have been required, during the entire
23 period that they were marketing opioids,
24 to have a suspicious -- a system in place

Page 112

1  to identify suspicious orders, correct?
2    A.   Yes.
3    Q.   And then also a system,
4  during the entire period they were
5  marketing opioids, to identify any orders
6  as potentially suspicious and report them
7  to the DEA, correct?
8        MS. HILLYER:  I'm just going
9  to object to the extent these call
10 for legal conclusions.  But he can
11 answer.
12       THE WITNESS:  That's my
13 understanding, yes.
14 BY MR. CRAWFORD:
15   Q.   And it's your understanding
16 as well that Teva had an obligation also,
17 once it identified a suspicious order,
18 that it must stop the order as well?
19       MS. HILLYER:  Same
20 objection.
21       THE WITNESS:  That's my
22 understanding, yes.
23 BY MR. CRAWFORD:
24   Q.   And then go down to the last

Page 113

1  paragraph, it says, Second, as previously
2  discussed in prior communications, in
3  addition to taking all appropriate steps
4  to prevent theft and diversion of
5  controlled substances, including opioids,
6  while they are in the company's physical
7  possession, Teva maintains a robust
8  system for identifying, monitoring,
9  preventing and reporting suspicious
10  orders of opioid products, as that term
11  is understood in the industry and
12  described by the DEA.
13        How long has Teva maintained
14  a robust system referenced here?
15        MS. HILLYER:  Objection to
16     form.
17        You can answer.
18        THE WITNESS:  Which entity?
19  BY MR. CRAWFORD:
20     Q.   Let's start out with Teva
21  Pharmaceuticals USA.
22        MS. HILLYER:  I believe he
23     asked -- objection.  Asked and
24     answered.

Page 114

1        But you can answer it again.
2        THE WITNESS:  I had
3  discussions with Joe regarding the
4  SORDS program, SORDS 1, that dated
5  back to 2008.  And he referenced
6  an SOM program that may not have
7  been an automated program that
8  preceded that in the Watson and
9  Actavis programs.
10        I think that there are
11  policies that date back, my
12  recollection, one of them as far
13  as 2001, I believe.  And there may
14  have been a Teva document that
15  went back to '06.
16        On the Actavis side, my
17  recollection is there are
18  documents with regard to those
19  programs that date back to, I
20  believe, '04.
21  BY MR. CRAWFORD:
22     Q.   Would you describe them as
23  robust systems?
24        MS. HILLYER:  Objection.

Page 115

1  BY MR. CRAWFORD:
2     Q.   I'm talking about these
3  SORDS programs you're talking about.
4     A.   The SORDS program was Teva's
5  system, and it was an automated order
6  pending system.  So, yes, I would
7  describe that as robust.  Orders were
8  stopped and had to be released.  There
9  had to be an overt action to release
10  them, so that strikes me as robust.
11     Q.   And are you aware of any
12  criticisms ever of this system by
13  anybody, DEA or FDA or consultants?
14        MS. HILLYER:  Objection.
15     Beyond the scope.
16        You can answer if you know.
17        THE WITNESS:  I saw a
18     document that a consultant
19     criticized one of the company's
20     programs and identified some areas
21     of opportunity to enhance it, as
22     part of the consulting services
23     that they were selling.
24  BY MR. CRAWFORD:

Page 116

1     Q.   And who was the consultant?
2     A.   That, I don't remember.
3     Q.   And was the consultant
4  retained ultimately to implement these
5  enhancements?
6        MS. HILLYER:  Objection.
7     Beyond the scope.
8        You can answer if you know.
9        THE WITNESS:  I don't know.
10  BY MR. CRAWFORD:
11     Q.   And about what year was
12  that?
13        MS. HILLYER:  Same
14     objection.
15        THE WITNESS:  I'm not sure.
16  BY MR. CRAWFORD:
17     Q.   So prior to that criticism,
18  would you still describe the system as
19  robust?
20        MS. HILLYER:  Objection to
21     form.
22        THE WITNESS:  Yes.
23  BY MR. CRAWFORD:
24     Q.   And how many suspicious

Page 117

```
 1   orders were identified prior to the
 2   consultant's retention?
 3          MS. HILLYER:  Objection.
 4       Asked and answered.  And beyond
 5       the scope.
 6          You can answer if you know.
 7       Again.
 8          THE WITNESS:  I don't have
 9       that data.
10   BY MR. CRAWFORD:
11       Q.   Would it surprise you that
12   not a single suspicious order was ever
13   reported prior to that consultant being
14   retained?
15          MS. HILLYER:  Objection to
16       form.  And beyond the scope.
17          You can answer if you have
18       your own opinion.
19          THE WITNESS:  I haven' given
20       it any thought.
21   BY MR. CRAWFORD:
22       Q.   Do you know that, in fact,
23   the consultant informed the company that
24   no suspicious order had ever been
```

Page 118

```
 1   reported under the old system prior to
 2   being retained, prior to his retention?
 3          MS. HILLYER:  Objection.
 4       Assumes facts not in evidence.
 5       And beyond the scope.
 6          You can answer if you know,
 7       Mr. Hassler.
 8          THE WITNESS:  No, I didn't
 9       know that.
10          MS. HILLYER:  We've been
11       going about an hour.  Are you at a
12       good stopping point?
13          MR. CRAWFORD:  Yes.  Okay.
14       I just have a few more questions
15       on this, but we can come back to
16       it.
17          MS. HILLYER:  Okay.  Why
18       don't we go off the record?
19          VIDEO TECHNICIAN:  Going off
20       the record at 12:46 p.m.
21          - - -
22          (Whereupon, a luncheon
23       recess was taken.)
24          - - -
```

Page 119

```
 1          VIDEO TECHNICIAN:  Back on
 2       record at 1:20.
 3          MR. CRAWFORD:  You had one
 4       correction on the record, do you
 5       want to make that, for the chart?
 6          MS. HILLYER:  Sure.  On
 7       Exhibit-1, Page 4, the column
 8       marked references, it says,
 9       Materials in Appendix 2.  It
10       should be materials in Appendix 3.
11       That's it.
12   BY MR. CRAWFORD:
13       Q.   Let me do a housecleaning
14   matter.
15          Can you pull out Exhibit-3,
16   please?  That would be the written
17   responses here.
18          - - -
19          (Whereupon, Teva-Hassler
20       Exhibit-003, Written Responses of
21       Defendants Cephalon, Inc., Teva
22       Pharmaceuticals USA, Inc., Actavis
23       LLC, Actavis Pharma, Inc., and
24       Watson Laboratories, Inc. To
```

Page 120

```
 1   Plaintiffs' Fourth Amended Notice
 2   of Deposition Pursuant to Rule
 3   30(b)(6), was marked for
 4   identification.)
 5          - - -
 6   BY MR. CRAWFORD:
 7       Q.   So this was something
 8   provided by your counsel today entitled,
 9   Written Responses of Defendant Cephalon,
10   Inc., Teva Pharmaceuticals USA, Inc., et
11   cetera, et cetera, to plaintiffs'
12   amended notice of deposition pursuant to
13   Rule 30(b)(6).
14          Have you reviewed this
15   document previously?
16       A.   Yes.
17       Q.   And did you help prepare
18   these responses?
19       A.   Not specifically.
20       Q.   But did you review them for
21   accuracy at all?
22       A.   Yes.
23       Q.   And, let's see, are they
24   signed and executed here?  Let me check.
```

1    They are signed by your
2 attorneys. But have you reviewed the
3 entire document?
4    A.   No.  I reviewed the -- no, I
5 haven't.
6    Q.   Are these responses accurate
7 responses of the company to these
8 questions?
9        MS. HILLYER:  Objection.
10 Beyond the scope.
11        I mean, these are clearly
12 topics that are not for today.
13        MR. CRAWFORD:  Right.  But
14 my question is, these were
15 30(b)(6) topics, responses of the
16 company.  I just want to see,
17 since he's the designee, that he
18 agrees and believes they are
19 accurate responses.
20        MS. HILLYER:  Well, right.
21 But to be clear, we agreed that he
22 wouldn't be testifying on these
23 topics and that we would be
24 providing written responses in

1 lieu of oral testimony.  So he's
2 not prepared to talk about or
3 testify or confirm the accuracy of
4 what's written in this document.
5        MR. CRAWFORD:  I'm not going
6 to ask him questions about it, but
7 I want to be sure that we're on
8 the record that these are -- since
9 we agreed to the 30(b)(6) topics
10 to be in writing, that they are
11 actually the responses of the
12 company and that they affirm them,
13 under oath, that these are
14 accurate.
15        Should I do it through him,
16 or should we have a written
17 verification?
18        MS. HILLYER:  We can talk
19 about that separately.  But he's
20 certainly not -- not prepared to
21 talk about that today.
22        MR. CRAWFORD:  He can't
23 verify the accuracy today?
24        MS. HILLYER:  Correct.

1 Whether or not he's the person to
2 do that or not, my understanding
3 is that no written responses in
4 this case have been verified.
5        MR. CRAWFORD:  Okay.  And
6 I'll address this on a leadership
7 level.  But we may want a written
8 verification of this one, since it
9 is a 30(b)(6) type of thing.
10        MS. HILLYER:  Right.  And my
11 point --
12        MR. CRAWFORD:  But he's not
13 prepared to do that?
14        MS. HILLYER:  -- is written
15 responses to 30(b)(6) in this
16 case, not just from Teva but any
17 party, have not been verified.
18        MR. CRAWFORD:  Right.
19 That's why I understand we may
20 need to address it on a global
21 level.
22        MS. HILLYER:  Sure.
23        MR. CRAWFORD:  But this
24 witness is not prepared today to

1 say -- affirm that these are
2 accurate responses for the
3 company?
4        MS. HILLYER:  That's
5 correct.
6 BY MR. CRAWFORD:
7    Q.   Is that right?
8    A.   Yes.
9    Q.   Back to 19.
10        I just wanted to ask you,
11 with regard to generic products, Teva
12 products, let's start out with that, ask
13 you about the role of the wholesalers in
14 the supply chain of Teva's generic opioid
15 products and the responsibilities of each
16 with regard to the marketing of those
17 products.
18        So what do the wholesalers
19 do with regard to Teva's generic products
20 with regard to marketing them?
21        MR. BAILEY:  Objection to
22 form.
23        MS. HILLYER:  And I'm going
24 to object to the extent this is --

Page 125

1  to the extent you're asking him
2  for something that's beyond the
3  Teva defendant's purview, which we
4  wrote into our objections to the
5  30(b)(6) topics.
6      He can testify from Teva's
7  perspective.
8      MR. CRAWFORD:  Right.
9      THE WITNESS:  Would you ask
10  your question again?
11  BY MR. CRAWFORD:
12  Q.  Yeah.  And I'm just -- just
13  kind of throw out the form of the
14  question here, and kind of the gist of
15  what I'm trying to find out is, what are
16  the roles of the wholesalers, from Teva's
17  point of view or perspective, maybe --
18  whether it's contractual, whatever, that
19  the wholesalers play in the marketing of
20  the Teva opioid products?
21  A.  In terms of supporting
22  product announcements, the wholesalers
23  may send out communication to their
24  customers about the availability of a new

Page 126

1  generic.  I'm not aware of anything
2  that's specific to opioids that would be
3  different from anything else.
4      Q.  But are there any agreements
5  between Teva and, say, McKesson, as a
6  wholesaler or a distributor, about
7  marketing Teva's generic products, which
8  would include opioids in its portfolio?
9      A.  I know that there is a
10  distribution agreement between McKesson
11  and Teva.  I don't have the specifics
12  about the components of that agreement.
13      Q.  But I'm more interested in
14  marketing.
15      So do you have any
16  agreements -- does Teva have any
17  agreements with a wholesaler or
18  distributor that will -- that govern or
19  concern those entities going out and
20  marketing Teva's generic products,
21  including opioids?
22      MR. BAILEY:  Objection to
23  form.
24      MR. CRAWFORD:  Who is

Page 127

1  objecting, by the way?
2      MR. BAILEY:  Sorry.  This is
3  Clayton Bailey of Covington and
4  Burling for McKesson.
5      THE WITNESS:  The only
6  initiatives I'm aware of are
7  communication initiatives that
8  Teva can engage the wholesaler to
9  announce to the pharmacies the
10  availability of a new generic.  I
11  believe they're called fax blasts.
12  But through fax or e-mail, they
13  can announce that to their
14  downstream customers.
15  BY MR. CRAWFORD:
16  Q.  Is there any -- besides what
17  you just mentioned, are there any other
18  ways or any other roles that wholesalers
19  or distributors play in the marketing of
20  Teva's generic products, including
21  opioids?
22  A.  Other than those two
23  announcements?
24  Q.  Right.

Page 128

1      A.  There's nothing else, top of
2  mind, that I can think of.
3      Q.  What about for pharmacies,
4  hospitals and formularies, how does --
5  does Teva utilize wholesalers or
6  distributors to market their generic
7  products to those entities?
8      MR. MOONEY:  Object to form.
9      THE WITNESS:  If they are a
10  customer of the wholesaler, that
11  would fall under the same comments
12  that I shared earlier, that they
13  can make those announcements to
14  those customers about the
15  availability of the product.
16  BY MR. CRAWFORD:
17  Q.  Is there any relationship
18  whereby the wholesalers or distributors
19  provide information to Teva USA about
20  their customers so that Teva USA can, or
21  one of its affiliate entities, can then
22  market or engage in promotion of their
23  generic products to the customers of the
24  distributors or wholesalers?

Page 129

1    MS. HILLYER: Objection.
2  Vague.
3    You can answer if you
4  understand.
5    THE WITNESS: I'm not sure.
6  BY MR. CRAWFORD:
7    Q.  Other than simply just
8  having a wholesaler distributor do some
9  kind of announcement of a new generic
10  product available to its customers, is
11  there any other way that you're aware of
12  that wholesalers or distributors are
13  utilized to market Teva generic products?
14    MS. HILLYER: Objection to
15  form.
16  BY MR. CRAWFORD:
17    Q.  Or to promote them?
18    MS. HILLYER: Objection.
19  Assumes facts not in evidence.
20    THE WITNESS: No, I'm not
21    aware of those, of any other way
22    other than the product
23    announcements.
24  BY MR. CRAWFORD:

Page 130

1    Q.  Is there any dedicated sales
2  team to go out and visit or make contact
3  with pharmacies or hospitals or
4  formularies or government entities with
5  regard to marketing or promoting its
6  generic products to those entities?
7    MS. HILLYER: Whose
8  generics?
9    MR. CRAWFORD: Teva's.
10    THE WITNESS: There is a
11    sales organization that
12    specifically goes out and attempts
13    to contract with group purchasing
14    organizations, large hospitals, or
15    integrated healthcare systems and
16    chain pharmacies.
17  BY MR. CRAWFORD:
18    Q.  And what's that group
19  called?
20    Why don't we do it before
21  the merger of the groups.  So before
22  2016, what was that group called?
23    A.  I believe there are two
24  groups.  One would be the account

Page 131

1  management or trade team, and another
2  team would be the generic sales team.
3    Q.  And how would they -- how
4  would they market to these -- promote the
5  generic products to these pharmacies,
6  hospitals, formularies?  What would the
7  team -- would they pitch a product
8  portfolio to them, or what would they do?
9    MS. HILLYER: Objection.
10  Beyond the scope.
11    You can answer if you know
12  in your personal capacity.
13    THE WITNESS: Yes, they
14    would -- they would propose
15    specific products and specific
16    pricing for that institution,
17    whichever institution it might be.
18  BY MR. CRAWFORD:
19    Q.  And how did they identify
20  what pharmacies and hospitals and
21  formularies and government entities to go
22  out and market to them?
23    MS. HILLYER: Objection.
24  Beyond the scope.

Page 132

1    You can answer if you know
2  in your personal capacity.
3    MR. CRAWFORD: Just, my view
4  is that it fits, I think, under
5  one of the other categories that
6  we added on to this day.
7    MS. HILLYER: Which one?
8    MR. CRAWFORD: So I'm
9  skipping ahead.  I think it's 37
10  or 38.  It's identifying
11  customers.
12    But why isn't he
13  testifying --
14    MS. HILLYER: That's for
15  medical professionals specifically
16  that sales reps would contact.
17  Are you talking about sales reps
18  or marketing of generic products?
19    MR. CRAWFORD: Marketing of
20  generic products.
21    MS. HILLYER: Which is
22  different.  They don't have sales
23  reps in the same way.
24    MR. CRAWFORD: Then testify,

Page 133

1  if you can -- and thank you for
2  your personal knowledge on that.
3      MS. HILLYER:  Then my
4  objection stands.
5      You can answer in your
6  personal capacity.
7      THE WITNESS:  Would you ask
8  me again?
9  BY MR. CRAWFORD:
10     Q.   Okay.  How does Teva USA
11  identify the pharmacies, hospitals,
12  formularies and government entities to
13  target for promoting or marketing its
14  generic portfolio of products?
15      And I'm talking about prior
16  to the 2016 purchase.
17      MS. HILLYER:  Same
18  objection.
19      THE WITNESS:  They have
20  access to IMS data that would
21  identify specific drugs that are
22  being sold through different
23  entities or that are affiliated
24  with different entities.

Page 134

1  BY MR. CRAWFORD:
2      Q.   And then one of the teams
3  from the departments you mentioned would
4  go out, or could go out or send people
5  out, to promote the product portfolio to
6  that entity, right?
7      MS. HILLYER:  Same
8  objection.
9      THE WITNESS:  They would go
10  out to share the portfolio of
11  generic products that they have
12  and typically negotiate contracts
13  for those products that that
14  entity was interested in
15  purchasing.
16  BY MR. CRAWFORD:
17     Q.   And would they use the IMS
18  data prior to 2016 to identify
19  particular medical professionals who were
20  prescribing generic products to go out
21  and detail them about prescribing?
22      MS. HILLYER:  Objection to
23  form.
24      MR. CRAWFORD:  Teva

Page 135

1  products.
2      MS. HILLYER:  I'm sorry,
3  objection to form.  And still
4  beyond the scope.
5      THE WITNESS:  Typically, for
6  generic products, Teva relies on
7  the pharmacy to determine what
8  product gets filled when a generic
9  is available.
10      So a prescription that a
11  doctor writes is the drug that's
12  chosen, the specific
13  manufacturer's product, for an
14  AB-rated drug, is typically chosen
15  at pharmacies.  So that's where
16  the generic business tends to
17  concentrate its effort.
18      There's -- it's very
19  atypical that you would contact a
20  physician audience.
21  BY MR. CRAWFORD:
22     Q.   It does happen, but it's
23  atypical?
24      MS. HILLYER:  Same

Page 136

1  objection.
2      THE WITNESS:  It has
3  happened, but it's very unusual.
4  BY MR. CRAWFORD:
5      Q.   And since 2016, acquiring
6  Actavis, has there ever been -- has there
7  been any kind of stepped-up effort, do
8  you know, to directly market to doctors a
9  generic opioid portfolio, directly to
10  doctors?
11      MS. HILLYER:  Hold on one
12  second.
13      Objection to form.  I don't
14  know what "stepped-up" means.
15      MR. CRAWFORD:  Just more
16  than prior to the acquisition.
17      MS. HILLYER:  Same
18  objection.  And beyond the scope.
19      You can answer if you know.
20      THE WITNESS:  No, not that
21  I'm aware of, not for a portfolio.
22  BY MR. CRAWFORD:
23     Q.   Who at Teva USA would have
24  the most knowledge, personal, factual

| Page 137 |
|---|

1    knowledge, about the marketing efforts of
2    the Teva products to the pharmacies,
3    hospitals and formularies and government
4    entities?
5            MS. HILLYER:  Objection.
6        Beyond the scope.
7            THE WITNESS:  I would start
8        with Christine Bader.  And
9        Christine would likely identify
10       others that would be specific to
11       those subsets.
12   BY MR. CRAWFORD:
13       Q.   I think there was someone
14   identified in here, Ms. Cavanaugh.
15           Is she -- what is her
16   position?
17       A.   She's no longer with the
18   organization.
19       Q.   And what was her position?
20       A.   She was the senior vice
21   president and chief operating officer for
22   Teva North America generics.
23       Q.   And what was her role?
24           MS. HILLYER:  Objection.

| Page 138 |
|---|

1            Beyond the scope.
2    BY MR. CRAWFORD:
3        Q.   I mean, what did she do?
4    What were her job duties?
5            We're looking at Exhibit-5.
6        A.   Yes.
7        Q.   Page 2, Maureen Cavanaugh.
8        A.   Yes.  She worked with the --
9    Tim McFadden's team in marketing strategy
10   that I believe dealt with a lot of the
11   copy and labeling and packaging when
12   products would be introduced, as well as
13   John Wordarczyk.
14           So this would have been the
15   product communications contracting.  New
16   product launch activities would have
17   fallen under Maureen's area of
18   responsibility.
19       Q.   Which -- on Exhibit-5, which
20   team would have been in charge, or
21   primarily in charge of identifying, you
22   know, the customers, the pharmacies, the
23   formularies, and sending sales teams out
24   to market or promote their generic

| Page 139 |
|---|

1    products?
2            MS. HILLYER:  Objection.
3        Assumes facts not in evidence.
4            THE WITNESS:  Mark Falkin
5        was the head of the sales team.
6    BY MR. CRAWFORD:
7        Q.   And is he on this chart
8    anywhere?
9        A.   Yes.
10       Q.   And what page is that?
11       A.   On the first page of
12   Exhibit-5, in the top right-hand corner.
13       Q.   So how long has he been with
14   the company, approximately?
15       A.   I don't have that
16   information at hand.
17       Q.   And then is there -- there
18   are marketing operation for generics with
19   Teva?
20       A.   Yes.  Under Christine Bader,
21   you can see the marketing activities.
22   And, typically, that related to pricing
23   and analytics, in terms of forecasting
24   from a financial standpoint, as well as

| Page 140 |
|---|

1    forecasting for operations and producing
2    the materials, as well as the customer
3    service function to interface with the
4    customers when they called -- when they
5    contacted Teva with regard to orders.
6        Q.   Is there any -- so why would
7    they -- the customers being the
8    wholesalers and distributors or the
9    pharmacies and formularies, or all of
10   them?
11       A.   Potentially all of them.
12       Q.   And then have you ever heard
13   of the term "chargeback"?
14       A.   Yes.
15       Q.   And chargebacks -- can you
16   briefly describe what a chargeback is?
17       A.   When Teva contracts with a
18   pharmacy at a specific price that may be
19   lower than the price that the wholesaler
20   sells the product to that pharmacy for,
21   Teva provides reimbursement for that
22   margin difference back to the wholesaler
23   to make them whole.
24       Q.   Is there any type of

Page 141

1  verification process that Teva uses with
2  regard to determining the chargeback
3  amounts?
4          MS. HILLYER:  Objection to
5      form.  And to the extent it's
6      beyond the scope.
7          THE WITNESS:  There are
8      contracts to determine what the
9      pricing is and contracts with the
10     wholesalers that speak
11     specifically to how those
12     chargebacks would be managed.
13  BY MR. CRAWFORD:
14     Q.   And so do they -- is there
15  any database or something that they keep
16  or data that they collect from the
17  wholesalers or distributors to verify
18  that chargeback amount?
19     A.   There is.
20     Q.   And what's that database
21  called?  Is it kept in a database?
22     A.   Yes, I believe that it's
23  kept in a database.  I do not know the
24  name of that database.

Page 142

1      Q.   And is that database used at
2  all in its current suspicious order
3  monitoring analytics?
4      A.   Yes.
5      Q.   And would Mr. Tomkiewicz be
6  the most knowledgeable factual witness in
7  that regard?
8      A.   Yes.
9          MS. HILLYER:  Objection to
10     the form.  To the extent you're
11     talking about one of the topics
12     today that goes to the policies
13     and procedures around suspicious
14     order monitoring, Mr. Hassler has
15     been designated to testify on that
16     topic.
17  BY MR. CRAWFORD:
18     Q.   And how are the charge --
19  how is the chargeback data used currently
20  to analyze suspicious orders?
21     A.   The chargeback data goes all
22  the way down to the pharmacy level, but
23  it only represents about half the volume
24  of Teva's products.

Page 143

1          So those sales are to
2  customers that have contracted with Teva.
3  And we can see what specific stores
4  purchase, in terms of the product that
5  actually gets sold from the wholesaler.
6      Q.   So you're seeing the actual
7  orders by the pharmacies, is that right,
8  or the hospitals or formularies that
9  purchased it --
10     A.   Yes.
11     Q.   -- from the chargeback data?
12     A.   Yes.
13     Q.   And does the chargeback data
14  also -- can you trace it back to the
15  practitioners that prescribe the drug?
16     A.   Not that I'm aware of.
17     Q.   So how long has Teva been
18  using the chargeback data to monitor
19  suspicious orders?
20         MS. HILLYER:  Objection to
21     form.
22         You can answer.
23         MR. CRAWFORD:  What's the
24     form objection?

Page 144

1          MS. HILLYER:  I don't know
2      that -- the way you're saying
3      that, that they've been using it
4      to monitor suspicious orders, I
5      don't think that's really what the
6      witness testified.  It's more
7      nuanced than that.
8          THE WITNESS:  I'm not aware
9      of a time when they were not
10     reviewing the chargeback data to
11     look for any suspicious orders.
12  BY MR. CRAWFORD:
13     Q.   How about prior to 2012 when
14  the consultant was brought in?
15         MS. HILLYER:  Objection to
16     form.  That was -- that assumes
17     facts not in evidence, as to --
18  BY MR. CRAWFORD:
19     Q.   So prior to 2012, how about,
20  did they use chargeback data to
21  monitor -- in any way to monitor
22  suspicious orders?
23         MS. HILLYER:  Same objection
24     to the form of the question as I

Page 145

1    did previously.
2        THE WITNESS:  I don't have
3    that information.  I can't recall
4    it.
5    BY MR. CRAWFORD:
6        Q.    So as you sit here today,
7    you don't know the time, the approximate
8    time Teva started using suspicious
9    order -- started using data, chargeback
10   data as part of its suspicious order
11   monitoring system?
12       A.    In my discussions with Joe,
13   he has said that Teva has used chargeback
14   data.  I don't know when that started.
15       Q.    Fair enough.  Thank you.
16           How about for Actavis, the
17   Actavis entities, have they -- do they
18   have chargebacks, a chargeback system as
19   well for their generics?  And how far
20   back did that stretch?
21       MS. HILLYER:  Objection to
22   the extent that's beyond the
23   scope.
24           You're talking about in

Page 146

1    relation to the SOM processes?
2        MR. CRAWFORD:  I'm getting
3    there.  I just want to establish
4    that they have access to
5    chargeback information.
6        THE WITNESS:  I believe that
7    that was referenced in some of the
8    materials that I reviewed, but I
9    can't point to a specific document
10   or time.
11   BY MR. CRAWFORD:
12       Q.    And so has Actavis utilized
13   chargeback data to analyze suspicious
14   orders prior to the acquisition by Teva?
15       A.    I don't know.
16           Is there a -- never mind.
17       Q.    Let's go on to Topic 21.
18       A.    Could I take a moment just
19   to look through the policies and see if
20   that triggers --
21       MR. CRAWFORD:  Sure.  Can we
22   go off the record, if he's going
23   to do that?
24       MS. HILLYER:  Do you need

Page 147

1    a -- well, he's just looking at a
2    one-page document.
3        MR. CRAWFORD:  Okay.
4        THE WITNESS:  I thought that
5    might refresh my memory.  I know
6    we've reviewed a ton of these
7    documents.  I thought that I would
8    recall it, but I can't point to a
9    specific one.
10   BY MR. CRAWFORD:
11       Q.    And you're looking at which
12   exhibit?
13       A.    The Actavis SOP program, the
14   various policies.
15       MS. HILLYER:  It's
16   Exhibit-7.
17       THE WITNESS:  Exhibit-7.
18   BY MR. CRAWFORD:
19       Q.    None of those refresh your
20   recollection that they had a policy, a
21   suspicious order policy, that utilizes
22   chargebacks?
23       MS. HILLYER:  Well, he
24   just -- he doesn't have the

Page 148

1    specific documents that are
2    referenced in here right now,
3    unless you do.
4    BY MR. CRAWFORD:
5        Q.    Is that accurate?
6        A.    Yeah, I could not identify
7    it from these titles.  I may be able to
8    identify it if I could look at the
9    policy.
10       Q.    Right.  We don't have it,
11   because we just got that, so --
12       A.    I understand.
13       MS. HILLYER:  For the
14   record, this was the topic and you
15   could have identified these
16   policies just as easily as we
17   could have.
18       MR. CRAWFORD:  Maybe not
19   just as easily.
20       MS. HILLYER:  Believe me,
21   just as easily.
22       MR. CRAWFORD:  Well, you
23   have access to company personnel
24   who can help you.

Page 149

1      MS. HILLYER:  They don't
2   know where in the database these
3   policies are either.
4      But go ahead.
5      MR. CRAWFORD:  It's somewhat
6   Blind Man's Bluff for us.
7      I marked the next exhibit,
8   which I think is 13.
9            - - -
10     (Whereupon, Teva-Hassler
11   Exhibit-013, List of Defendants,
12   was marked for identification.)
13           - - -
14   BY MR. CRAWFORD:
15     Q.   Topic 21 is, All financial
16   and business arrangements with any of the
17   defendants in this matter, including any
18   contractual relationships between you and
19   any of the defendants in this matter.
20     And I took the liberty --
21   I'm not going -- you don't have to accept
22   my representation.
23     But I took the liberty of
24   collecting up all of the defendants that

Page 150

1   I think are listed in all the trial track
2   1 cases and put them there.
3      I don't know if you can scan
4   through them and tell me any of these
5   defendants you think there's a contract
6   for or with between any Teva entity
7   you're testifying for.
8      And by "Teva entity," I mean
9   Teva or Actavis entity.
10     MS. HILLYER:  And just for
11   the record, we objected to this
12   topic to the extent it requires
13   Mr. Hassler to identify each and
14   every specific individual,
15   financial and business arrangement
16   with any individual defendant.
17     But he can testify
18   generally.
19     MR. CRAWFORD:  Well, just do
20   your best.  It's one of the
21   topics.
22     THE WITNESS:  So in order
23   for a wholesaler or distributor to
24   buy from Teva, they would have to

Page 151

1      have a contract with Teva to
2      purchase the product.
3        So those companies listed on
4      here that are wholesalers and
5      distributors who would have
6      purchased from Teva, there would
7      be a contract.
8   BY MR. CRAWFORD:
9      Q.   Can you identify -- just
10   scanning down, can you identify some from
11   the list, so we have at least examples of
12   a wholesaler/distributor you're referring
13   to?
14     A.   AmerisourceBergen Drug
15   Corporation, McKesson.  Those would be
16   two.
17     Q.   How about Cardinal Health?
18     A.   Yes.
19     Q.   What about Anda, Inc.?
20     MS. HILLYER:  Objection.
21   What about it?
22   BY MR. CRAWFORD:
23     Q.   Are there any contracts with
24   Anda, Inc. between any of the entities

Page 152

1   you're designated by?
2      A.   I don't know anything about
3   Anda.
4      Q.   Is Anda -- Anda is owned by
5   Teva Limited, or Teva Limited is one of
6   its indirect parents, right?
7      MS. HILLYER:  Objection.
8   Beyond the scope.
9      MR. CRAWFORD:  I think it's
10   part of Question 1.
11     MS. HILLYER:  No, that's
12   about the structure of the
13   entities which Mr. Hassler is here
14   to testify on behalf of.
15     Anda and Teva Limited are
16   neither of those, they are not --
17   sorry, I didn't say proper English
18   there.
19     Anda and Teva Limited are
20   not two of the entities on which
21   Mr. Hassler is here to testify on
22   behalf of.  So it is beyond the
23   scope.
24     MR. CRAWFORD:  Just hold for

Page 153

1      one second.
2          MS. HILLYER: Okay.
3          MR. CRAWFORD: So Topic 1
4      deals with not only Cephalon and
5      the Actavis entities, but also any
6      acquisition of any other entity or
7      business that manufactured,
8      marketed, sold or distributed
9      opioids or opioid products.
10         I do list Barr
11     Pharmaceuticals on there.
12  BY MR. CRAWFORD:
13     Q.   But didn't Teva Limited also
14  acquire Anda, Inc. at some point?
15         MS. HILLYER: Same
16     objection. He's not here to
17     testify on behalf of Teva Limited
18     or as to Teva Limited. Teva
19     Limited is beyond the scope.
20         You can answer if you know.
21         THE WITNESS: I don't know
22     who bought Anda.
23  BY MR. CRAWFORD:
24     Q.   Anda, Inc. is a defendant in

Page 154

1   this case but you don't know who bought
2   Anda?
3      A.   No.
4      Q.   Do you know of any contracts
5   or other relationships that any of the
6   entities you're designated by have with
7   Anda?
8      A.   No.
9      Q.   Do you know that Anda is a
10  distributor of opioids?
11     A.   I know that Anda is a
12  distributor. I didn't know whether they
13  distributed opioids.
14     Q.   Okay. So there are
15  contracts you have with wholesalers and
16  distributors.
17         What other types of
18  contracts do you have with these
19  defendants?
20     A.   There's a contract with
21  Purdue. My understanding is it's a
22  contract to distribute specific dosage
23  strengths, under limited quantities, of
24  OxyContin. And there is a supply

Page 155

1   agreement with Allergan.
2      Q.   That's a second contract?
3   You're talking about two contracts there?
4      A.   Two separate contracts.
5      Q.   The Purdue one and Allergan,
6   they are two separate contracts, right?
7      A.   Yes.
8      Q.   Let's stop with the Purdue
9   one.
10         That is to distribute, you
11  said various strengths of oxycodone
12  products, generic?
13     A.   Yes.
14     Q.   And who makes the oxycodone
15  products that are the subject of the
16  contract? Who manufacturers them?
17     A.   I am not sure, but I think
18  that that's listed in the contract.
19     Q.   And then is this to allow
20  Teva to market or sell those products, or
21  Actavis, whoever entered into the
22  contract?
23     A.   Yes. It gives Teva the
24  right to distribute certain strengths of

Page 156

1   oxycodone, with quantity limits.
2      Q.   And they distribute it as a
3   generic version, right?
4      A.   Yes.
5      Q.   And is it -- is the product
6   that they contracted about, is that -- is
7   it off patent, or is it still under a
8   patent that Purdue has?
9          MS. HILLYER: Objection.
10     Beyond the scope.
11         You can answer if you know.
12         THE WITNESS: I don't know.
13     It was --
14  BY MR. CRAWFORD:
15     Q.   Do you know when the
16  contract was executed?
17     A.   Do you happen to have a
18  copy?
19     Q.   I do not.
20     A.   No, I don't know
21  specifically.
22     Q.   And was the contract
23  originally between Teva, a Teva entity,
24  and Purdue, or an Actavis entity and

Page 157

1    Purdue?
2        A.    There was a contract between
3    a Teva entity and Purdue.  And I see from
4    my notes that it was dated 2014.
5        Q.    And the Teva entity, what is
6    the Teva entity that entered into the
7    contract?
8        A.    I need to look at the
9    specific contract to see the entity.
10       Q.    Do you know if it was Teva
11   USA or Teva Limited, one of those?
12       A.    I would be guessing.
13       Q.    All right.  Okay.  Any
14   other -- and the contract with Allergan
15   was to manufacture Kadian, right?
16       A.    Yes.
17       Q.    And that's between Allergan
18   PLC and -- what Allergan entity entered
19   into that contract?
20       A.    I don't know the specific
21   entity.
22       Q.    All right.  And then what
23   Teva entity was in the contract?
24       A.    I have seen this.

Page 158

1        Q.    If you can't remember,
2    that's fine.  We can find it.
3        A.    Okay.
4        Q.    Thank you.
5        Any other types of contracts
6    that you have here with any of these
7    entities?  I appreciate you're just
8    speaking generally about some of them.
9        A.    Other than the wholesaler
10   agreements, there would have also been
11   chain pharmacies that we would have had
12   chargeback agreements with.
13       Q.    Is that in addition to sale
14   of the product to them?
15       A.    It's an agreement to sell
16   the product to them at a specific price.
17   And then the chargeback flows to make the
18   wholesaler whole for selling them to the
19   pharmacy at that price.
20       Q.    I see.  So, basically, they
21   get the supply of the product from the
22   wholesaler at the price negotiated by
23   Teva with the pharmacy?
24       A.    Yes.

Page 159

1        Q.    Is it similar for
2    formularies and hospitals and -- do you
3    have similar contracts with them?
4        MS. HILLYER:  Objection to
5    form.
6        You can answer.
7        THE WITNESS:  There are
8    hospital buying groups that would
9    have similar contracts.  And some
10   institutions may choose to buy
11   from those GPO contracts, or they
12   may choose to buy directly.
13       And so there may be specific
14   contracts with institutions as
15   well.
16   BY MR. CRAWFORD:
17       Q.    All right.  Let's go to the
18   next topic.  This would be Topic 28 we'll
19   cover.
20       So 28 is --
21       MR. CRAWFORD:  If you could
22   move it down to 28 there.
23   BY MR. CRAWFORD:
24       Q.    28 is, Warning letters sent

Page 160

1    to you by the FDA and the DEA regarding
2    your sale, marketing or distribution of
3    your opioid products, your response to
4    those letters, all subsequent actions you
5    took in response to those communications
6    and all budgets for any such actions, by
7    year.
8        And on Exhibit-1, you have
9    listed, for 28, just one letter, correct,
10   from the FDA?  Is that accurate?
11       MS. HILLYER:  Objection to
12   form.
13       You can answer.
14       THE WITNESS:  We received an
15   untitled letter from the FDA
16   regarding links, that we responded
17   to immediately, and then resolved
18   in a letter dated May 13th.
19   BY MR. CRAWFORD:
20       Q.    And that's with regard to a
21   website?
22       A.    Yes.
23       Q.    And is that the only
24   instance that you're aware of, or that

Page 161

1　the company is aware of where it received
2　a warning letter from the FDA or DEA?
3　　　　MS. HILLYER:  Objection.
4　　　　Assumes facts not in evidence.  He
5　　　　didn't testify that that was a
6　　　　warning letter.
7　BY MR. CRAWFORD:
8　　　Q.   Was that a warning letter?
9　　　A.   No.
10　　　Q.   Are you aware of any other
11　letters like the one you referenced here,
12　or any type of warning letter from the
13　FDA or DEA, regarding the topic in 28?
14　　　　MS. HILLYER:  Objection to
15　　　　form.  And to the extent you're
16　　　　asking about anything other than a
17　　　　warning letter, that would go
18　　　　beyond the scope.
19　　　　　But you can answer.
20　　　　MR. CRAWFORD:  But that was
21　　　　listed there.  So you're saying
22　　　　that's beyond the scope, what's
23　　　　listed?
24　　　　MS. HILLYER:  Yes.

Page 162

1　　　Technically.
2　BY MR. CRAWFORD:
3　　　Q.   So anything -- any warning
4　letter that you're aware of?
5　　　A.   No other warning letters
6　related to the sale, marketing or
7　distribution of opioids.
8　　　Q.   In 2004, are you aware that
9　the FDA had approached Cephalon regarding
10　off-label marketing?
11　　　　MS. HILLYER:  Objection.
12　　　　Beyond the scope.
13　　　　You can answer.
14　　　　THE WITNESS:  Yes.
15　BY MR. CRAWFORD:
16　　　Q.   And was there any type of
17　warning letter or other letter from the
18　FDA of admonishment about that conduct?
19　　　A.   I'm not aware of any warning
20　letter.
21　　　Q.   Are you aware of any action,
22　disciplinary action, the FDA took with
23　regard to that incident?
24　　　　MS. HILLYER:  Objection to

Page 163

1　　　form.  And to the extent it's
2　　　beyond the scope.
3　　　　THE WITNESS:  I'm not aware
4　　　of any FDA action.
5　BY MR. CRAWFORD:
6　　　Q.   Let's go to the next topic,
7　which is -- for me will be 45.
8　　　　And this one is the
9　organizational communications or
10　reporting structure between you and Teva
11　Pharmaceuticals Industries Limited and
12　opioids or opioid products.
13　　　　Teva Limited is the parent
14　company, we saw, an indirect parent of
15　the five entities you're testifying about
16　today, correct?
17　　　A.   Yes.
18　　　Q.   And can you describe for me
19　the organizational -- or the
20　communications and the reporting
21　structure between those entities, the
22　five, and Teva Pharmaceuticals Industries
23　Limited?
24　　　　I think we went over

Page 164

1　organizational.  So I'm just limiting my
2　question here about communications and
3　reporting.
4　　　A.   Brendan O'Grady is the
5　executive vice president for North
6　America Commercial, and he -- his boss is
7　Kåre Schultz, the CEO for Teva Limited.
8　And they interact with one another.
9　Brendan provides information to Kåre on a
10　periodic basis.  And the financials from
11　Teva USA are rolled up and communicated
12　to Teva Limited.
13　　　Q.   Through Mr. O'Grady?
14　　　A.   Through Mr. O'Grady and the
15　finance organization.  We talked about
16　Asaph and Deb --
17　　　Q.   Those are the board of
18　directors?
19　　　A.   Yes.
20　　　Q.   That was exhibit -- what
21　exhibit are you looking at?  I think it
22　was exhibit --
23　　　　MS. HILLYER:  What he has in
24　his hand.  Not the board.

Page 165

1      THE WITNESS:  Deb Griffin,
2  that's what I was looking for.
3  BY MR. CRAWFORD:
4      Q.   So the primary communicators
5  are Mr. O'Grady, Ms. Griffin and Mr.
6  Shanahan?
7      A.   I don't know that.  I would
8  say the primary communicator would be Mr.
9  O'Grady.
10      Q.   And secondary would be Ms.
11  Griffin, and any others?
12      MS. HILLYER:  Objection to
13      form.
14      THE WITNESS:  No.  No one
15      specific.
16  BY MR. CRAWFORD:
17      Q.   How about Asaph Naaman for
18  Teva USA, does he communicate with Teva
19  Limited on a regular basis?
20      MS. HILLYER:  Objection to
21      form.
22      THE WITNESS:  He would -- I
23      believe that he would communicate
24      the financial results of Teva USA

Page 166

1  to Teva Limited.
2  BY MR. CRAWFORD:
3      Q.   How is it that Cephalon and
4  Teva USA do business together?  You said
5  Cephalon manufactures Fentora but that
6  Teva USA markets -- at least at some
7  point it marketed it, sells it and
8  distributes it.
9      Is there a contract between
10  the two companies that governs that
11  relationship?
12      A.   I don't know whether there
13  is a contract between the two
14  organizations.
15      When Cephalon was purchased,
16  like other acquisitions before it, those
17  products were brought in underneath Teva
18  USA and managed by the management team
19  that reported in to that Teva USA
20  structure.
21      Q.   And what part of the
22  organization, or people within the
23  organization, brought the two companies
24  together and directed them to integrate

Page 167

1  their management?
2      MS. HILLYER:  Objection to
3      form.  And asked and answered.
4      I'm not sure I understand what
5      you're asking.
6      You can answer if you
7      understand.
8      MR. CRAWFORD:  Yes.
9      THE WITNESS:  I thought that
10  Marty Barron was involved in that
11  integration process and the
12  coordination.
13  BY MR. CRAWFORD:
14      Q.   But not the physically doing
15  it.
16      Who made the decision that,
17  hey, I think I'm going to have Cephalon
18  integrate with Teva USA and combine their
19  operations?  Who had that idea and then
20  said, let's do that?  Not the mechanics
21  of it.
22      MS. HILLYER:  Objection to
23      form and to the extent that's
24      beyond the scope.

Page 168

1      You can answer if you know.
2      THE WITNESS:  I don't know
3  specifically who would have made
4  that decision.
5      Bill Marth was the head of
6  Teva USA or Teva North America at
7  the time.  The best of my
8  recollection is he would have been
9  the one that would have driven how
10  those organizations were brought
11  together.
12  BY MR. CRAWFORD:
13      Q.   But I'm asking a different
14  question.
15      Who made the decision to
16  actually do it, now how to do it, but to
17  actually do it?  Did that emanate from
18  someone in Israel at Teva Limited?
19      MS. HILLYER:  Objection to
20      form.  And beyond the scope.
21      You can answer if you know
22      in your personal capacity.
23      THE WITNESS:  I don't know.
24  BY MR. CRAWFORD:

1      Q.   Do any -- is there any Teva
2  entity, beyond the five that you're here
3  for, that manufactures any of the opioid
4  products that are marketed or sold by
5  Teva in the U.S.?
6          MS. HILLYER:  Objection to
7      form and to the extent it's beyond
8      the scope.
9          THE WITNESS:  Is there any
10     manufacturer?
11  BY MR. CRAWFORD:
12     Q.   Right.  Any other Teva
13  entity, besides the five that you're
14  designated for, that manufactures
15  opioids?
16         MS. HILLYER:  Objection.  To
17     the extent you're asking about
18     other entities other than the five
19     on which he's prepared to testify.
20     But I don't know what you mean by
21     "Teva entity."  That could include
22     some of the Actavis manufacturing
23     entities that he's already
24     testified about.  So I'm not sure

1      what you mean.
2  BY MR. CRAWFORD:
3      Q.   Besides from the five, is
4  there any other entity -- Teva Limited is
5  the primary parent corporation of all
6  five entities?  It's the parent of all
7  five, right?
8          MS. HILLYER:  Objection to
9      form.  He's testified about the
10     relationship, and that's an
11     inaccurate statement.
12         MR. CRAWFORD:  I'm just
13     setting up the question.
14         MS. HILLYER:  But it's an
15     inaccurate statement.
16  BY MR. CRAWFORD:
17     Q.   Teva Limited is the parent
18  of all of those companies, right,
19  indirect parent?
20     A.   Yes.
21     Q.   I'm just wondering, under
22  the Teva Limited umbrella, are there any
23  other Teva entities that manufacture the
24  opioid products that are marketed or sold

1  by the five you're here for?
2          MS. HILLYER:  Same
3      objection.
4          You can answer.
5          THE WITNESS:  Not that I'm
6      aware of.  I focused specifically
7      on these five entities.
8  BY MR. CRAWFORD:
9      Q.   Right.  But you don't know
10  if anyone else outside of the company
11  manufactures their opioid products,
12  besides Purdue?
13     A.   I don't.
14     Q.   Does Teva Limited have any
15  involvement in the distribution of the
16  opioid products manufactured by any of
17  the entities that you're here for?
18     A.   No.
19     Q.   Does Teva Limited do any
20  kind of pharmacovigilance, or any of its
21  other subsidiaries, pharmacovigilance
22  that is shared with any of the five
23  entities you represent with regard to
24  opioid products?

1          MS. HILLYER:  Objection to
2      form and to the extent it's beyond
3      the scope.  You're talking about
4      other entities that -- for which
5      he's not here to testify on behalf
6      of.
7          You may want to restate that
8      question.
9          THE WITNESS:  I want to
10     answer your question, so could you
11     ask it again?
12  BY MR. CRAWFORD:
13     Q.   Sure.  I'm just wondering if
14  there's any Teva entity or Teva Limited,
15  beyond the five you represent, that do
16  any pharmacovigilance that they share
17  with any of your five entities, on
18  opioids.
19         MS. HILLYER:  Objection to
20     form.  And beyond the scope.
21         You can answer if you know.
22         THE WITNESS:  The way that I
23     understand the pharmacovigilance
24     system works is we have a local

Page 173

1    pharmacovigilance and drug safety
2    lead in the country who is
3    responsible for the
4    pharmacovigilance activities
5    within the U.S.
6         They capture the information
7    and report it to regulatory
8    authorities, as well as
9    communicate it to Teva Limited,
10   that integrates that information
11   across all of the different
12   subsidiaries in the countries.
13   BY MR. CRAWFORD:
14        Q.   And is there a lead
15   organization within the Teva umbrella
16   that kind of directs this whole process?
17        MS. HILLYER:  Objection to
18   the extent it's beyond the scope.
19        You can answer.
20        THE WITNESS:  Other than the
21   pharmacovigilance team?
22   BY MR. CRAWFORD:
23        Q.   No, no.  A company, a
24   particular company.

Page 174

1         Is it Teva Limited?  Is it
2    some Teva subsidiary in Europe that does
3    it?  Or is it a holding company?  Or is
4    it Teva USA that does it for the world?
5         Who kind of is the, you
6    know, the quarterback for the
7    pharmacovigilance process?
8         A.   The quarterback for the
9    local process would be --
10        Q.   No, I mean global.  Global.
11        A.   I don't know.  I didn't --
12        Q.   All right.  And does any --
13   does Teva Limited, you know, do any type
14   of audits or recommendations about what
15   Teva USA should be doing with regard to
16   opioids?
17        A.   No, I'm not aware of any
18   communications specific to opioids from
19   Teva Limited at all.
20        Q.   How about decisions about
21   hiring or firing the key officers of Teva
22   USA?  Who makes those decisions?
23        MS. HILLYER:  Objection to
24   form.

Page 175

1    BY MR. CRAWFORD:
2         Q.   The CEO or CFO or the COO?
3         MS. HILLYER:  Objection to
4    form.
5         You can answer.
6         THE WITNESS:  I've never
7    been involved, and I haven't had
8    exposure to who makes those
9    decisions.
10   BY MR. CRAWFORD:
11        Q.   Okay.  So you don't know?
12        A.   I don't know.
13        Q.   Okay.  That's fine.
14        Is there a global regulatory
15   entity, or is there an entity that kind
16   of monitors global regulatory matters for
17   the Teva companies, which would include
18   Teva USA?
19        MS. HILLYER:  Objection.
20   Beyond the scope.
21        You can answer if you know.
22        THE WITNESS:  There are
23   global functions, as I mentioned,
24   with -- pharmacovigilance is an

Page 176

1    example where they will
2    consolidate information from the
3    various countries.
4    BY MR. CRAWFORD:
5         Q.   And that would include
6    regulatory, too?
7         A.   I believe that there is a --
8    actually, I don't know if there's a
9    global regulatory function.
10        MR. CRAWFORD:  Your
11   objection is beyond the scope?
12        MS. HILLYER:  Yes.
13   BY MR. CRAWFORD:
14        Q.   If this opioid litigation is
15   resolved, and I mean the one that's the
16   subject of this -- that's on the caption
17   of this deposition notice, who are the
18   decision-makers that are going to be
19   involved in that decision?
20        MS. HILLYER:  Objection.
21   Beyond the scope.
22   BY MR. CRAWFORD:
23        Q.   Is it going -- what company?
24        MS. HILLYER:  Objection.

| | |
|---|---|
| Page 177 | Page 178 |

Page 177

1    Beyond the scope.
2        You can answer if you know
3    in your personal capacity.
4        And objection to form.
5        If you understand.
6        THE WITNESS:  I do not know.
7    BY MR. CRAWFORD:
8        Q.   That's fine.
9        A.   I don't know.
10       MR. CRAWFORD:  I'm going to
11   pass the questioning on to Mr.
12   Cartmell, and then I'm going to
13   pick up on the questions which
14   were added later, which I agreed
15   to.
16       VIDEO TECHNICIAN:  Going off
17   the record.  2:17 p.m.
18       - - -
19       (Whereupon, a brief recess
20   was taken.)
21       - - -
22       VIDEO TECHNICIAN:  Back on
23   record.  2:28 p.m.
24       - - -

Page 178

1        EXAMINATION
2        - - -
3    BY MR. CARTMELL:
4        Q.   Mr. Hassler, my name is Tom
5    Cartmell.  I'm going to follow-up and ask
6    you some questions about additional
7    topics that you've been designated to
8    testify about today, okay?
9        A.   Yes.
10       Q.   I'm probably going to
11   condense things a little bit, because
12   you've already discussed some of the
13   things in my topics that I was going to
14   ask you questions about.
15       But if you don't understand
16   me for any reason, just tell me that, and
17   I'll restate the question or rephrase it,
18   okay?
19       Is that okay?
20       A.   Yes.
21       Q.   Before I get started,
22   though, you understand you're here today
23   as a corporate designee; you've been
24   designated specifically by Teva, I

| | |
|---|---|
| Page 179 | Page 180 |

Page 179

1    believe, USA, also Cephalon and certain
2    Actavis entities as a designated
3    corporate representative to testify on
4    certain topics, correct?
5        A.   Yes.
6        Q.   And you understand that by
7    being a corporate designee and testifying
8    to these topics, you can bind the
9    corporations with your testimony?
10       Do you understand that?
11       A.   Yes.
12       Q.   You mentioned previously
13   that you spent a substantial amount of
14   time preparing for this deposition.
15       And if I understand you
16   correctly, prior to being the corporate
17   designee in this case, you actually had
18   very little involvement with Teva's
19   marketing and promotion of opioids,
20   correct?
21       A.   Yes.
22       Q.   And you had very little
23   involvement with Teva's actual sales of
24   opioids, correct?

Page 180

1        A.   Only during the two years
2    that I was general manager.
3        Q.   And that was '15 to '17?
4        A.   Yes.
5        Q.   But other than that, you
6    didn't have any opioid experience before
7    this deposition, or being designated to
8    testify, correct?
9        MS. HILLYER:  Objection to
10   form.
11       THE WITNESS:  That's
12   correct.
13   BY MR. CARTMELL:
14       Q.   And with respect to
15   Cephalon, who you're designated to
16   testify on behalf of, you never worked at
17   Cephalon, did you?
18       A.   I did not.
19       Q.   And you never had,
20   therefore, any experience with marketing
21   or selling opioids for Cephalon, fair?
22       A.   Yes.
23       Q.   And as far as the Actavis
24   entities that Teva acquired, you also

Page 181

1  never worked for Actavis or Allergan; is
2  that fair?
3      A.   I did not.
4      Q.   So same is true that you
5  never had any experience selling or
6  promoting or marketing the Actavis entity
7  generics before this lawsuit, correct?
8      A.   That's correct.
9      Q.   And you had no knowledge of
10  how those corporations, including
11  Cephalon and Actavis entities, operated
12  from a sales or marketing or promotion
13  standpoint until you were designated in
14  this lawsuit, correct?
15      A.   Yes.
16      Q.   And so once you were
17  designated by these corporations to be
18  their corporate designee, I take it, at
19  that point, you had to look at lots of
20  documents; is that right?
21      A.   That's correct.
22      Q.   You had to spend lots of
23  time with lawyers; is that right?
24      A.   Yes.

Page 182

1      Q.   In fact, I think that we've
2  seen, from the documents you brought
3  today, you outlined that you spent --
4  just preparing for today's deposition,
5  you spent time with the lawyers for 59.75
6  hours; is that right?
7      MS. HILLYER:  Objection to
8  form.
9      THE WITNESS:  That's what's
10  listed here, in terms of the
11  in-person meetings with outside
12  counsel.  It's actually been more
13  than that with phone calls and
14  video conferences, as well as with
15  all of these other colleagues, to
16  gain an understanding of how their
17  business practices did work and to
18  validate what I was reading in a
19  lot of the -- a lot of the
20  policies and procedures.
21  BY MR. CARTMELL:
22      Q.   I see.  So how many hours
23  more than 59.75 hours do you think you
24  spent with the lawyers preparing for

Page 183

1  today?
2      MS. HILLYER:  To testify as
3  to all the 30(b)(6) topics, or
4  just today's topics?  Because
5  that's a different question.
6      MR. CARTMELL:  Just prior to
7  today.
8      MS. HILLYER:  I just want to
9  be clear.
10      MR. CARTMELL:  Let me
11  restate it.
12  BY MR. CARTMELL:
13      Q.   Prior to today, how many
14  hours have you spent with the lawyers
15  preparing for your testimony in this
16  30(b)(6) deposition?
17      A.   Including the time that the
18  lawyers were meeting with us and these
19  other folks?
20      Q.   Yes.
21      A.   I would say at least 80
22  hours.
23      Q.   Okay.  And then I think you
24  testified there's been some time outside

Page 184

1  of the time you spent with the lawyers
2  that you spent preparing, reviewing
3  documents and meeting with other
4  employees of these corporations; is that
5  correct?
6      A.   Yes.
7      Q.   I'm trying to get an
8  estimation, your best estimation, of the
9  total amount of time you have spent
10  preparing for this deposition.
11      A.   I would estimate probably
12  about a month.
13      Q.   A month's time?
14      A.   Yes.
15      Q.   Are you talking about a
16  typical week being 40 hours?
17      MS. HILLYER:  Typical for
18  whom?
19      Go ahead.
20      MR. CARTMELL:  That's a good
21  point.
22  BY MR. CARTMELL:
23      Q.   Typical being 60 hours?
24      A.   Yeah, 50 -- I would say

Page 185

1  routinely 50-, 55-hour weeks.
2      Q.   So you think that you've
3  probably spent between 200 and 250 hours
4  preparing for this deposition?
5      A.   That would be my rough
6  estimate, yes.
7      Q.   Okay.  And during that
8  period of time, did you take notes on a
9  notepad or anything like that?
10     A.   No.  I was asked not to take
11  notes during those calls.
12     Q.   Lawyers told you not to take
13  notes?
14     A.   Yes.
15     Q.   And then you brought with
16  you today, though, a document that we've
17  marked as Exhibit-1.  It's been shown
18  multiple times.  It's, I think, on giant
19  paper, legal-sized paper.
20         Just to be clear, did the
21  lawyers prepare this for you?
22     A.   Yes.  I had asked them,
23  given the volume of material that I had
24  been reviewing, if I could have something

Page 186

1  that would give me notes that I could
2  refer back to, just to help trigger
3  recollection of some of those documents
4  that we had reviewed.
5      Q.   Okay.  So -- and it's been
6  shown, here is an example of it.  I'm
7  showing it right now.
8          But it's got the topic and
9  then it's got an objection.  That's
10  lawyer mumbo jumbo that you wouldn't
11  prepare, correct?
12     A.   No.  I didn't have anything
13  to do with that.
14     Q.   And then there's a notes
15  section, as you see here.
16         And that's what you asked
17  the lawyers to prepare from -- excuse me,
18  for today so that it would give you
19  enough information so that your memory or
20  recollection would come back on the
21  things you've seen and learned about; is
22  that correct?
23     A.   Yes, yes.
24     Q.   And so during the 250 or so

Page 187

1  hours, have you been asked, essentially,
2  to memorize kind of what the information
3  is in each topic because you didn't
4  experience it in a day-to-day fashion?
5         MS. HILLYER:  Objection to
6         form.
7         THE WITNESS:  I haven't been
8         asked to memorize it.  I've been
9         asked to try to gain an
10         understanding of what took place
11         relative to those topics by these
12         entities.
13  BY MR. CARTMELL:
14     Q.   Just so it's clear, have you
15  been in sales and marketing for
16  pharmaceutical companies your entire
17  career?
18     A.   For the vast majority of it.
19  I also spent time in an administration
20  and planning role, where I had finance,
21  HR training and IT that reported in to me
22  for a few years.
23     Q.   How many years have you been
24  at Teva?

Page 188

1      A.   The joint venture
2  partnership, when I started working with
3  Teva, began in 1996.  I actually became
4  an employee of Teva, I believe in 2001,
5  when Teva bought out the partnership, or
6  bought out the joint venture.
7      Q.   Okay.  So for 20-plus years
8  you've been in sales and marketing at
9  Teva; is that fair to say?
10     A.   Aside from the three or four
11  years that I was in administration, but
12  that was at Teva as well.
13     Q.   All right.  Thanks.
14         Let's go and start talking
15  about some of the topics that you've been
16  designated to be a corporate
17  representative testifying about under
18  oath today.
19         And I want to start, if you
20  don't mind, with Topic 4.  This is a
21  topic that I would classify sort of as an
22  organizational chart topic or the
23  structure of the company topic.
24         I'll read it into the

Page 189

```
 1    record.  It's being shown here.  The
 2    structure of your sales and/or marketing
 3    departments for opioid products,
 4    including divisions within each
 5    department, for example, regional,
 6    segment, area divisions for sales and
 7    marketing, and marketing divisions
 8    responsible for CME, KOLs, speakers,
 9    e-detailing, medical communications,
10    Internet websites, public relations, et
11    cetera, the job responsibilities for each
12    position in your sales and marketing
13    departments, the lines of direct and
14    indirect reporting for each position and
15    whether the position's compensation is
16    based, in whole or in part, on levels of
17    sales of controlled substances or opioid
18    products.
19            Do you see that?
20        A.   I do.
21        Q.   Okay.  And I kind of want to
22    divide this up, this topic, and ask you
23    questions.  I'll try to do it in an
24    organized fashion.
```

Page 190

```
 1            But my understanding is that
 2    you didn't work for Cephalon, but as far
 3    as the corporate structure of Cephalon,
 4    from the time they started selling
 5    opioids until the time that Teva
 6    purchased Cephalon and its opioid
 7    products, you have set out to gain an
 8    understanding about the corporate
 9    structure of their sales and marketing
10    department during that time; is that
11    fair?
12        A.   Yes.
13        Q.   And I take it you reviewed
14    lots of documents, including
15    organizational charts, to do that; is
16    that fair?
17        A.   Yes.
18        Q.   And the documents that you
19    reviewed, were they all provided by
20    defense counsel to you?
21        A.   Yes.
22        Q.   In other words, you didn't
23    set out and do any independent
24    investigation or go looking for certain
```

Page 191

```
 1    documents yourself, fair?
 2        A.   I didn't look for documents.
 3        Q.   Okay.  Now, you've spoken
 4    some about the corporate structure.  And
 5    you provided today with you your notes on
 6    this topic, which we'll show on
 7    Exhibit-1, under the notes section.
 8            And you'll see you start by
 9    talking about Actiq and Fentora.
10            Do you see that?
11            MS. HILLYER:  Sorry, Topic
12    4?
13    BY MR. CARTMELL:
14        Q.   Exhibit-1, Page 2, Number 4.
15        A.   Yes.
16        Q.   Just so it's clear, is your
17    understanding that Cephalon started
18    selling opioids in the year 2000?
19        A.   It is.
20        Q.   And that would have been an
21    opioid called Actiq; is that right?
22        A.   Yes.
23        Q.   And Actiq is a
24    fentanyl-based opioid that actually is in
```

Page 192

```
 1    the shape of a lollipop?
 2            MS. HILLYER:  Objection to
 3    form.  And beyond the scope.
 4            You can answer if you know.
 5            THE WITNESS:  Yes.
 6    BY MR. CARTMELL:
 7        Q.   And you know that because,
 8    ultimately, Teva ended up purchasing
 9    Actiq, right, through Cephalon?
10        A.   When they purchased
11    Cephalon?
12        Q.   Yes.
13        A.   Yes.
14        Q.   So in 2000, they started
15    selling opioids.  And did you gain an
16    understanding of what their sales and
17    marketing department was like at that
18    time?
19        A.   Yes.
20        Q.   And is your understanding,
21    then, that they continued to sell
22    opioids -- or, strike that.
23            Is your understanding that
24    they continued to sell Actiq as an opioid
```

Page 193

1  until the patent ran out in 2006?
2      A.  Yes.
3      Q.  And at that time, is your
4  understanding that they launched a new
5  fentanyl-based opioid called Fentora?
6      A.  Yes.
7      Q.  And that was launched, I
8  think in maybe 2007; is that fair enough?
9      A.  Yes.
10      Q.  Right.  And they continued
11  selling both Actiq and Fentora until Teva
12  purchased Cephalon in 2011; is that
13  right?
14      A.  Yes.
15      Q.  Is your understanding that
16  Cephalon's sales and marketing
17  departments, or the structure of the
18  company related to sales and marketing,
19  stayed the same with respect to the sale
20  of opioids from 2000 until 2011, when it
21  was purchased by Teva?
22      A.  For the most part.
23      Q.  Okay.  Tell me, if you can,
24  what you mean and how it changed, if it

Page 194

1  did?
2      A.  The basic structure of
3  having a pain care sales force that
4  reported in to a pain care sales lead
5  remained consistent throughout most of
6  the brand's lifecycle.  There was a brief
7  period of time when the sales force was
8  integrated with the CNS sales force.
9          So that was the reason for
10  my comment, my modifier on the comment.
11      Q.  Okay.  And you've stated
12  that for Actiq and Fentora, the sales
13  department was generally structured that
14  there would be a vice president or a
15  senior director of sales, and then there
16  would be a regional director under that
17  vice president, and then there would be
18  an area manager under that regional
19  director, right?
20      A.  Yes.
21      Q.  And that's for the sales
22  department, right?
23      A.  Correct.
24      Q.  And then there was a

Page 195

1  separate marketing department at
2  Cephalon; is that right?
3      A.  Yes.
4      Q.  And you have stated that in
5  the marketing department, it was
6  typically structured similarly in that
7  there would be a vice president for that
8  area, and then there were directors and
9  senior directors under the vice
10  president, and product managers and
11  senior product managers who would report
12  to the directors; is that fair?
13      A.  Yes.
14      Q.  And I want to -- sometimes
15  it's good to look at things.  I want to
16  show you what we found in the documents
17  that Teva produced to us.
18          If you go to Exhibit-14, at
19  Page 42, I think that's the page -- let
20  me make sure that's the right page.  That
21  may not be right.
22              - - -
23          (Whereupon, Teva-Hassler
24          Exhibit-014,

Page 196

1          TEVA_MDL_A_01373059-150, was
2          marked for identification.)
3              - - -
4  BY MR. CARTMELL:
5      Q.  I'm showing what is marked
6  in Exhibit-14, an organizational chart.
7  This, I will represent to
8  you, is from -- and you'll see in the
9  left-hand corner -- from 2004 at
10  Cephalon.  And it looks like an org chart
11  related to a marketing department.
12          Do you see that?
13      A.  Yes.
14      Q.  Okay.  And like you said,
15  there's a vice president on top.  And I
16  think you mentioned that then there were
17  directors for each different area under
18  that.
19          Do you see that?
20      A.  Yes.
21      Q.  And, for example, Andy Pyfer
22  is the product director for Actiq, right?
23      A.  Yes.
24      Q.  And that was the opioid that

Page 197

1  Cephalon was selling in 2004, right?
2      A.   Yes.
3      Q.   And then under that, under
4  Mr. Pyfer, it looks like there's three
5  product managers and a marketing services
6  employee.
7      Do you see that?
8      A.   Yes.
9      Q.   And what -- do you know what
10  the product managers did, what types of
11  marketing activities they would do?
12      MS. HILLYER:  Just, I'll
13      object to the extent we objected
14      to this topic, to the extent it
15      asked about very specific roles
16      and responsibilities for
17      individuals or individual roles in
18      any given year and each position.
19      But he can answer if he
20      knows.
21      THE WITNESS:  In general, it
22      would -- they would be given
23      specific assignments related to
24      marketing the product.  And it may

Page 198

1  be a specific customer group, or
2  it could be a specific channel
3  that they were responsible for
4  managing or -- it varied depending
5  on what the individual product
6  manager's development needs were
7  in order to grow into a brand
8  director.
9  BY MR. CARTMELL:
10      Q.   Okay.  And in the marketing
11  department, we mentioned in this
12  question, this topic, that we were
13  interested in things like promotional
14  activities involving hiring by the
15  company of key opinion leaders, doctors
16  who might give speaking engagements for
17  the company about opioids or might give
18  dinner speeches or presentations about
19  opioids or might be hired as consultants
20  on advisory boards by the company related
21  to opioids.
22      Those sorts of things are
23  promotional, marketing-type activities,
24  correct?

Page 199

1      A.   Some, but not all.
2      So consultants that would be
3  hired for advisory work may be hired to
4  advise on the development of a particular
5  compound and what other indications we
6  may choose to pursue or how we would go
7  about entering a specific therapeutic
8  area that we may not be familiar with as
9  an organization.
10      There also may be advisory
11  meetings that were specific to providing
12  feedback on marketing.
13      But, typically, advisory
14  activity is the consultant giving
15  information to the organization.
16      The speaker programs that
17  you mentioned would be -- if the company
18  controlled the content, then those would
19  be promotional initiatives.
20      Q.   And I take it you
21  understand, from your review of the
22  documents in this case, that, in fact,
23  Cephalon would hire or retain doctors
24  from across the country to give speeches

Page 200

1  and give them slide decks, which they
2  would control the content on, for the
3  doctors to speak from?  You understand
4  that?
5      A.   Yes.
6      Q.   And that's a promotional
7  activity, correct?
8      A.   It is.
9      Q.   Okay.  And advisory boards,
10  did you know that Cephalon actually
11  considered, when they would go to doctors
12  and say, we want to make you a part of
13  our advisory board, did you understand or
14  know that that was from the marketing
15  department and considered promotional
16  activity?
17      A.   I think that it could be,
18  depending on the topic and the specific
19  type of advisory function.
20      Q.   In this case, though, do you
21  know whether or not Cephalon considered
22  that for opioids, when they would hire
23  these doctors for advisory boards, would
24  they consider that to be a promotional

Page 201

1   marketing-type activity?
2           MS. HILLYER:  Objection.
3       Asked and answered.  I think he's
4       qualifying what you're asking.
5           THE WITNESS:  It would
6       depend on the topic.  There may be
7       topics where an advisory board or
8       a member could give feedback on
9       promotion, or it may be on
10      clinical or it may be on other
11      things, depending on what the
12      topic of the advisory board was.
13          But I think in my
14      discussions with the brand
15      management people who were engaged
16      then, advisory activity was always
17      intake, it wasn't a promotional
18      push.
19  BY MR. CARTMELL:
20      Q.   Okay.  And other things
21  like, though, attending congresses for
22  organizations like the American Academy
23  of Pain or other societies, pain
24  societies, or other professional

Page 202

1   organizations like that, lots of times
2   companies, through their marketing
3   department, in fact, would attend those
4   and provide dinners or transportation for
5   doctors, and ask doctors to maybe man
6   their booths that they would have outside
7   of the presentation areas.
8           And those were marketing or
9   promotional types of activities at
10  Cephalon that they were doing as well for
11  opioids, correct?
12          MS. HILLYER:  Objection to
13      form.
14  BY MR. CARTMELL:
15      Q.   Or do you know?
16      A.   I'm trying to recall the
17  discussions I've had with them that date
18  back that far.
19          It is true that they would
20  have had booths at these meetings that
21  would have been specifically designated
22  in a promotional area.  I don't recall
23  them.
24          And the policies that I read

Page 203

1   would indicate that they didn't pay to
2   send people to a meeting unless they were
3   performing a service for the company.  So
4   that if they were going to a meeting in
5   exchange for services that they were
6   providing, there should -- there were
7   service agreements for those.
8       Q.   Okay.  At any rate, you know
9   that the company, Cephalon, when it was
10  marketing Actiq, and later Fentora, had
11  consulting agreements and was making
12  payments to doctors all over America for
13  various promotional and marketing
14  activities, correct?
15          MS. HILLYER:  Objection to
16      form.
17          THE WITNESS:  I know that
18      they made payments to physicians
19      who are on their speaker bureau
20      and that those speakers would go
21      out and present, on behalf of the
22      organization, promotional content
23      that Cephalon controlled.
24  BY MR. CARTMELL:

Page 204

1       Q.   Is that the only promotional
2   activity or marketing activity you know
3   about, as far as Cephalon doing, related
4   to Actiq or Fentora?
5           MS. HILLYER:  Objection.
6       Beyond the scope.
7           You can answer if you know.
8           THE WITNESS:  No.  There
9       were other promotional activities.
10  BY MR. CARTMELL:
11      Q.   We'll talk about that a
12  little bit later.
13          I want to look now at the
14  sales department.  This is in 2004,
15  United States sales.  If you go to
16  Page -- let's look at Page 54.  And I
17  want to focus specifically on something
18  for a minute.
19          This talks about a sales
20  department.  And I think you mentioned
21  that it would be divided up into separate
22  territories or areas, is that right, as
23  far as the sales force?
24      A.   Yes.

Page 205

1      Q.   And, for example, this is
2   the Midwest.  And this mentions here
3   Northern Ohio.
4           Do you see that?
5      A.   I'm sorry?
6      Q.   54.
7      A.   Detroit?  Where are you
8   looking?
9      Q.   Northern Ohio.
10     A.   I see it.
11     Q.   So, for example, they would
12   have -- Phil Tocco, for example, would be
13   a manager of these several sales
14   representatives listed below for that
15   territory --
16     A.   Yes.
17     Q.   -- is that correct?
18     A.   Yes.
19     Q.   And they were sales
20   representatives, correct?
21     A.   Yes.
22     Q.   These were representatives
23   for Cephalon who would go into doctor's
24   offices all around the country, we're

Page 206

1   focusing on Northern Ohio, and that would
2   be to what they would call detail doctors
3   about Actiq, for instance, and try to
4   promote or market their products to
5   doctors, correct?
6      A.   Yes.
7      Q.   At some point at Cephalon
8   there developed another marketing
9   department that I want to ask you about.
10          - - -
11          (Whereupon, Teva-Hassler
12   Exhibit-015,
13   TEVA_MDL_A_02383521-526, was
14   marked for identification.)
15          - - -
16          MR. CARTMELL:  Exhibit-15
17   I'll hand you.
18   BY MR. CARTMELL:
19     Q.   And I just have really quick
20   questions about this.
21          MS. HILLYER:  Take your time
22   to look at the document.
23   BY MR. CARTMELL:
24     Q.   This is another document or

Page 207

1   organizational type chart that we found
2   in the documents that were produced by
3   Teva in this lawsuit.
4          And on the first page, you
5   can see it's talking about marketing
6   department.  And I want to direct your
7   attention, it looks like there's one
8   department called, Oncology marketing.
9          Do you see that?
10     A.   Yes.
11     Q.   Now, do you know what the
12   oncology marketing department was?
13          MS. HILLYER:  This is part
14   of a larger document?  Do you have
15   a time frame on this?
16          MR. CARTMELL:  I didn't see
17   a date on this.  So I don't know.
18   It wasn't on the document.
19          MS. HILLYER:  Okay.
20          THE WITNESS:  I'm not -- I'm
21   not sure, without knowing the
22   specific date.
23          Cephalon had a business unit
24   that was specifically dedicated to

Page 208

1   oncology, but I don't know the
2   timing of this org chart versus
3   that BU development.
4   BY MR. CARTMELL:
5      Q.   And I'll show you another
6   document in a minute that might ferret
7   that out, as far as dates.
8          But you say that Cephalon
9   had a business unit related to oncology.
10          Is that because they had a
11   pharmaceutical, a drug, that they were
12   selling or distributing related to
13   oncology?
14     A.   Yes.
15     Q.   What was that drug called,
16   do you know?
17     A.   They've had several.  I
18   would have to know the time period.
19     Q.   Okay.  But the opioid
20   medications that they were selling and
21   distributing that were indicated for
22   patients who had breakthrough pain with
23   cancer, those drugs, Actiq and Fentora,
24   were not a part of the oncology division,

Page 209

```
1    correct?
2         A.   Generally, no.
3         Q.   Is there a -- is there a
4    caveat to no?  You said "generally."
5              I'm just following up
6    because you said "generally."  In what
7    respect were they a part of the oncology
8    department?
9         A.   In my discussions with
10   Cephalon-background colleagues, they said
11   that they didn't have the oncology group,
12   at different time points for brief
13   periods, promote Actiq or Fentora, I
14   don't remember which, at different time
15   points.
16             But it was largely held out
17   as a separate, distinct pain care-focused
18   effort.
19        Q.   Okay.  Let me hand you
20   Exhibit-16.
21             - - -
22             (Whereupon, Teva-Hassler
23             Exhibit-016, TEVA_MDL_A_02383517,
24             was marked for identification.)
```

Page 210

```
1              - - -
2    BY MR. CARTMELL:
3         Q.   This is another --
4              MS. HILLYER:  Are you done
5    with 14 and 15 or do you want him
6    to hold on to them?
7              MR. CARTMELL:  I'm done with
8    them.
9              MS. HILLYER:  Just trying to
10   make it clear for him.
11             MR. CARTMELL:  Sure.  No
12   problem.
13   BY MR. CARTMELL:
14        Q.   I'm handing you Exhibit-16.
15   This is another organizational chart that
16   was produced by Teva in this litigation.
17   And this, we know, is dated, you'll see,
18   May 15th of 2006.  You'll see that in the
19   upper left-hand corner.
20             This looks to have the
21   organizational structure of the U.S.
22   pharmaceutical operations.  And then as
23   you said, it has separate -- this is at
24   Cephalon, and it had separate sales and
```

Page 211

```
1    marketing departments.  And then there's
2    an oncology department there.
3              I don't see any medications
4    or drugs listed in the oncology
5    department.  Do you?
6         A.   No.
7         Q.   But under the marketing
8    department, there is a pain franchise.
9              And your understanding is
10   that's where they would market the Actiq
11   and later the Fentora, the opioids,
12   correct?
13        A.   Yes.
14        Q.   And then under the sales
15   here, there are the directors and the
16   regional directors.  There is one that is
17   entitled Addiction -- excuse me, that's
18   titled, Addiction, director of addiction.
19   I'm trying to circle that.  There you go.
20             Do you know what that refers
21   to?  Did Cephalon have medications that
22   it was actually also selling for
23   drug-addicted patients?
24             MS. HILLYER:  Is that
```

Page 212

```
1    addiction or should it be
2    addition?  Because the bottom one
3    says, Addition west.
4              MR. CARTMELL:  You can
5    answer.
6              MS. HILLYER:  I'm not asking
7    a question.  Sorry.
8              Go ahead.
9              THE WITNESS:  I'm not aware
10   that Cephalon had an addiction
11   medication that it sold.
12   BY MR. CARTMELL:
13        Q.   Okay.  All right.  Thanks.
14             And then I want to now go
15   to, Mr. Hassler, I'll hand you
16   Exhibit-17, another organizational chart
17   that we received from Teva in this
18   lawsuit.
19             - - -
20             (Whereupon, Teva-Hassler
21             Exhibit-017, U.S. Pharmaceutical
22             Operations, was marked for
23             identification.)
24             - - -
```

Page 213

1    BY MR. CARTMELL:
2        Q.   And just a real quick
3    question.
4            MS. HILLYER:  This is 17?
5            MR. CARTMELL:  17.
6    BY MR. CARTMELL:
7        Q.   And you'll see here it's
8    still senior VP, U.S. pharmaceutical
9    operations at the top.  And then we have
10   the sales on the left side.
11           It looks like -- who is the
12   actual director in charge of Ohio -- or,
13   excuse me, I'm talking about sales --
14       A.   The regional manager?
15       Q.   -- regional manager, yes.
16       A.   Michael Moreale.
17       Q.   Do you know him?
18       A.   Yes.
19       Q.   Did you talk to him in
20   preparation for this deposition?
21       A.   No.
22       Q.   And is he still at Teva now?
23       A.   Last I knew, yes.
24       Q.   And he would have been, as

Page 214

1    regional manager, in charge of sales at
2    this time, in 2008, of Fentora and Actiq
3    at Cephalon for Ohio?
4        A.   Yes.  I don't believe that
5    they were -- he would have been
6    responsible for pain care sales at this
7    point in time.  I don't believe that they
8    were selling Actiq any longer.  I believe
9    that they were promoting --
10       Q.   Fentora?
11       A.   -- Fentora.
12           And I believe Amrix may have
13   been on at this point as well.
14       Q.   Now, we haven't talked yet
15   about Teva's organizational structure
16   prior to 2011.  And I think you have
17   mentioned previously, though, that Teva
18   USA was selling and distributing Class II
19   opioids prior to 2011, correct?
20       A.   Yes.
21       Q.   And they were all generic
22   opioids, or were some of them brand name
23   as well, prior to 2011?
24       A.   All would have been generic.

Page 215

1        Q.   All would have been generic.
2            And did Teva have a sales
3    organization that would have been
4    responsible for the sales and -- well,
5    for the sales of the generic opioids
6    prior to 2011 when it bought Cephalon?
7        A.   They had a sales
8    organization that was responsible for all
9    of the generic products.  They didn't
10   have anything that was specific to
11   opioids.
12       Q.   Explain how it would be, as
13   far as the sales team -- strike that.
14           Would there be a sales team,
15   though, in that department that was
16   dedicated to generic opioids that they
17   were selling?
18       A.   There may have been opioids
19   as part of the generic portfolio that the
20   sales team would have been responsible
21   for selling, and they would predominantly
22   work with, depending on the sales
23   organization, wholesalers and
24   distributors or chain pharmacies or

Page 216

1    hospital buying groups or hospitals.
2        Q.   But was there one person or
3    a group of people, prior to 2011, that
4    their expertise would include the sales
5    of the opioids, the generic opioids that
6    Teva was selling?
7            MS. HILLYER:  Objection to
8    form.
9            THE WITNESS:  Not that I'm
10   aware of.  I'm not aware that they
11   ever -- the generic group ever did
12   anything that was unique to
13   opioids versus the way that they
14   announced and sold all of the
15   other generics, aside from just
16   the DEA management criteria that
17   was required.
18   BY MR. CARTMELL:
19       Q.   And there was a DEA
20   management requirement, and FDA
21   requirement as well, related to your sale
22   at Teva of generic opioids, correct?
23           MS. HILLYER:  Objection.
24   Beyond the scope.

Page 217

```
 1          You can answer.
 2          THE WITNESS:  Can you be
 3     more specific?
 4     BY MR. CARTMELL:
 5          Q.   Well, you just mentioned a
 6     DEA requirement.
 7          A.   Right.
 8          Q.   And that applied to the
 9     generic opioids that Teva was selling,
10     correct?
11          A.   Yes.
12          Q.   At all times, right?
13          A.   Yes.
14          Q.   And do you think that Teva
15     first started selling generic opioids
16     prior -- let me strike that.
17          When do you think Teva first
18     started selling generic opioids?
19          MS. HILLYER:  Objection.
20     Asked and answered.
21          THE WITNESS:  With the
22     acquisition of Ivax.
23     BY MR. CARTMELL:
24          Q.   In 2006?
```

Page 218

```
 1          A.   Let me go back and look.
 2     Yes.
 3          Q.   So from 2006 all the way
 4     until today, they have continued to sell
 5     generic opioids, correct, Teva has?
 6          A.   I believe so, yes.  Yes.
 7          Q.   And during some of the
 8     period of time, and I guess up until
 9     today, they have sold branded opioids as
10     well, correct?
11          A.   With the acquisition of
12     Cephalon in '11, they've sold branded
13     opioids, correct.
14          Q.   And so at all times from
15     2006 until now, because they are selling
16     opioids, whether generic or branded, they
17     have had a requirement from federal
18     statutes that say they have to have a
19     structure set up to monitor the sale and
20     distribution of those, correct?
21          MS. HILLYER:  Objection to
22     the extent it calls for a legal
23     conclusion, and to the extent it's
24     beyond the scope.  He can answer.
```

Page 219

```
 1          You can answer.
 2          THE WITNESS:  Yes, they have
 3     to have suspicious order
 4     monitoring programs in place and
 5     controls around how the opioids
 6     are stored and transported.
 7     BY MR. CARTMELL:
 8          Q.   And what about any
 9     requirements or regulations related to
10     the FDA for the sale of the opioids that
11     they have been selling since 2006?
12          MS. HILLYER:  Objection.
13     Beyond the scope.  And vague as to
14     what your question is about, the
15     FDA.
16     BY MR. CARTMELL:
17          Q.   Do you know of any FDA
18     requirements that have applied to Teva
19     since 2006?
20          MS. HILLYER:  Hold on.
21     Objection.  That's extremely broad
22     and to the extent it calls for a
23     legal conclusion and it's beyond
24     the scope of any of today's
```

Page 220

```
 1     topics.
 2          But you can answer if you
 3     know in your personal capacity.
 4          THE WITNESS:  Teva has had a
 5     risk management program, and most
 6     recently a TIRF REMS program that
 7     places constraints on the
 8     transmucosal immediate release
 9     fentanyl products that it has
10     helped to develop and administers
11     for -- that it helped develop, and
12     a group administers that for all
13     of the TIRF REMS products.  That
14     puts constraints on what
15     physicians can write it, requires
16     education of the physician, the
17     pharmacist, the distributor and
18     requires the patient to sign
19     consent that they understand the
20     risks that are associated with
21     taking that medicine.
22     BY MR. CARTMELL:
23          Q.   When did that TIRF REMS
24     program start at Teva?
```

Page 221

1     MS. HILLYER:  Objection.
2     Beyond the scope of today's
3     topics.
4         But you can answer if you
5     know.
6     THE WITNESS:  In 2012.
7     BY MR. CARTMELL:
8     Q.   And has continued since?
9     A.   Yes.
10    Q.   And you said a risk
11    management program related to the opioids
12    it was selling?
13    A.   Yes.  For those specific
14    opioids, they had risk map programs prior
15    to that.
16    Q.   For which specific opioids
17    that Teva was selling?
18    A.   For Actiq and Fentora.
19    Q.   And Teva, when they acquired
20    Cephalon, continued those programs?
21    A.   Yes.
22    Q.   And started the TIRF REMS in
23    2012, correct?
24    A.   Yes.

Page 222

1     Q.   A year after the purchase,
2     basically?
3     A.   Yes.  That's when the FDA
4     had basically approved the program for
5     all of the entities.
6     Q.   And these programs that were
7     being run, what department were they run
8     out of?
9     MS. HILLYER:  Objection.
10    Beyond the scope of today's
11    topics.
12        You can answer if you know.
13    THE WITNESS:  I don't know.
14    BY MR. CARTMELL:
15    Q.   Was it in the sales or
16    marketing departments?
17    A.   Initially, I know that the
18    marketing department was involved in
19    supporting the cost of developing the
20    program.  I believe that medical and
21    regulatory are engaged in the program
22    itself and the evaluation and management
23    of that program.  But I don't know the
24    specific department within regulatory and

Page 223

1     medical.  But that's where I believe it
2     resides.
3     Q.   Medical affairs?
4     A.   Yes.
5     Q.   Going back to this sales
6     related to the generic opioid
7     medications, I understand you say that
8     there is no different or unusual
9     department set up specifically for that.
10        But just tell me how it is
11    that the opioids -- because I think you
12    testified previously that, you know,
13    there is sales activities related to the
14    generics, in other words, they might go
15    to pharmacies, they might go to
16    hospitals, they might go to other
17    customers related to sales of those
18    products, correct?
19    A.   Yes.
20    Q.   So tell me since -- and I
21    want to go pre-2011 with opioids, how
22    that would occur.  I want the sales
23    structure for the generic opioids
24    pre-2011.

Page 224

1     MS. HILLYER:  I'm just going
2     to object to form, because I think
3     you just asked two questions.  One
4     was how they do the sales, and one
5     was what is the structure of the
6     sales.
7         So the latter, I think, is
8     within scope and he's prepared to
9     testify.  The former, I object to
10    being beyond the scope.
11        But you can answer those.
12    MR. CARTMELL:  And I think
13    that's a good objection.  I asked
14    two questions, and they were
15    different.  But I meant the same
16    thing, frankly.
17    BY MR. CARTMELL:
18    Q.   I'm really trying to just
19    figure out, you say there weren't sales
20    representatives, correct?
21    A.   No, there are sales
22    representatives that call on the
23    distributors, the group purchasing
24    organizations, the chain pharmacies.

Page 225

1      Q.   Okay.  And what you're
2  saying is they would -- each sales
3  representative isn't necessarily
4  designated to opioids, they would have a
5  whole portfolio of medications that were
6  generic that they were responsible for,
7  correct?
8      A.   Yes.
9      Q.   But there is a sales team,
10  and among that team for the generic
11  opioids pre-2011, they would go to
12  customers and sell the products, correct?
13          MS. HILLYER:  Objection to
14      form.
15          You can answer.
16          THE WITNESS:  They would,
17      yes.  They would sell the opioid
18      products, just like they would
19      sell every other product within
20      their portfolio.
21  BY MR. CARTMELL:
22      Q.   And I think you mentioned
23  previously that sometimes they might
24  offer a pharmacy a rebate on their

Page 226

1  opioids and charge the pharmacy less than
2  actually the wholesalers would charge
3  them, correct?
4          MS. HILLYER:  Objection to
5      the extent that mischaracterizes
6      the testimony and is beyond the
7      scope.
8          You can answer.
9          THE WITNESS:  For all of the
10      generic products, they could go in
11      and offer pricing that may be
12      below what the wholesaler was
13      purchasing the product for and
14      that's what would trigger a
15      chargeback.
16  BY MR. CARTMELL:
17      Q.   And I'm just talking about
18  opioids.
19          But that's true with
20  opioids, correct?
21          MS. HILLYER:  Same
22      objection.
23          THE WITNESS:  I don't know
24      that they were treated any

Page 227

1      differently.
2  BY MR. CARTMELL:
3      Q.   And what's the reason why
4  the sales representatives who were
5  selling opioids to a pharmacy might
6  charge less?
7          MS. HILLYER:  Objection.
8      Beyond the scope.
9          You can answer if you know
10      in your personal capacity.
11          THE WITNESS:  If they
12      weren't -- in order to have that
13      pharmacy use Teva's product,
14      Teva's generic product and fill
15      with Teva's generic as opposed to
16      another company's generic, they
17      would have to offer pricing that
18      made that attractive for that
19      pharmacy.
20  BY MR. CARTMELL:
21      Q.   Right.  So it's a sales call
22  to a pharmacy, for example, where they
23  say, we'll give you a better price if you
24  choose our product, for example, correct?

Page 228

1          MS. HILLYER:  Objection to
2      form.  And beyond the scope of
3      today's topics.
4          You can answer if you know
5      in your personal capacity.
6          THE WITNESS:  That's
7      consistent with my understanding.
8  BY MR. CARTMELL:
9      Q.   And so we know that
10  pharmacists, when they get a prescription
11  for an opioid, right, they, with
12  automatic substitution, even if the
13  prescription is for the brand name, they
14  are, in most states, 100 percent of the
15  time going to prescribe an opioid that is
16  generic, correct?
17          MS. HILLYER:  Objection to
18      form.  Assumes facts not in
19      evidence and beyond the scope of
20      today's topics.
21          You can answer if you know
22      in your personal capacity.
23          THE WITNESS:  When a product
24      is AB-rated and the pharmacist

Page 229

```
 1        gets a script for it, they choose
 2        what manufacturer's product to
 3        fill that aligns with that script.
 4   BY MR. CARTMELL:
 5        Q.    So you want the pharmacists
 6   all over the country to choose your
 7   generic opioid, and that's why you might
 8   give them a price reduction to make it
 9   attractive for them to choose your
10   opioid, correct?
11           MS. HILLYER:  Objection.
12        Asked and answered.  And beyond
13        the scope of today's topics.
14           You can answer if you know
15        in your personal capacity.
16           THE WITNESS:  For any of the
17        areas that Teva has generic
18        products, they would want to try
19        to gain a certain share position
20        of those products, assuming they
21        have the capacity to be able to
22        fulfill that.
23           So I don't know if I'm
24        answering your question.
```

Page 230

```
 1   BY MR. CARTMELL:
 2        Q.    I don't think -- I'm not
 3   sure you are.
 4           But my question is simply,
 5   because Teva wants the pharmacist who
 6   gets to choose the opioid that they fill
 7   the prescription from the doctor with,
 8   they might give them a rebate or a more
 9   attractive price so the pharmacist
10   chooses Teva generic opioids, correct?
11           MS. HILLYER:  Same
12        objections.
13           You can answer in your
14        personal capacity if you know.
15           THE WITNESS:  They may offer
16        better pricing to that pharmacist
17        in order to get the pharmacist to
18        choose Teva's medication over
19        another one, that's true.
20   BY MR. CARTMELL:
21        Q.    Now, in your answers to
22   Number 4, you've also included the
23   organizational structure for the Actavis
24   entities, correct?
```

Page 231

```
 1           And that's on Page 3 of
 2   Exhibit-1, that's the big document.
 3           MS. HILLYER:  Hold on one
 4        second.  Let me get there.
 5   BY MR. CARTMELL:
 6        Q.    Do you see that?
 7        A.    Yes.
 8        Q.    So does this outline your
 9   understanding of the actual sales and
10   marketing departments at Actavis at all
11   times while they were selling generic
12   opioids, even before the acquisition by
13   Teva in 2016?
14           MS. HILLYER:  Are you
15        looking at structure of time of
16        Actavis acquisition or for the
17        acquired Actavis entities?
18           MR. CARTMELL:  Well, I think
19        up above structure of time is
20        related to Teva and below is
21        related to Actavis.
22           MS. HILLYER:  Sorry.  Yep.
23           MR. CARTMELL:  That's all
24        right.
```

Page 232

```
 1           THE WITNESS:  And your
 2        question?
 3   BY MR. CARTMELL:
 4        Q.    My question was, this is a
 5   summary of your understanding, from
 6   talking to people and reading documents
 7   from the Actavis entities, about the
 8   structure of their sales and marketing
 9   before they were acquired by Teva in
10   2016; is that correct?
11        A.    The structure at the time
12   shows the integrated structure.  So where
13   it says -- the first black bullet point,
14   that is at the time of the acquisition.
15   So that would have been the integration
16   of the two companies.
17        Q.    Did you go back in time and
18   see what their structure of sales and
19   marketing was?
20        A.    I did.  I did speak with --
21   yes, I did.
22        Q.    And what was that?  Because
23   I don't see it here, and maybe I'm
24   missing it.
```

Page 233

1    A.   It varied, depending on the
2  time period.  But in general, the -- they
3  separated generics from branded.
4         And within the generics
5  group, they would have a product
6  management-type function, a customer
7  service type-function, a pricing and
8  contracting-type function, and an account
9  management-type function.
10    Q.   Okay.  And then Exhibit-5
11  you brought with you today, I want to
12  make sure I understand.
13         Was this the --
14         MS. HILLYER:  Let us get it
15     out first for a second, sorry.
16  BY MR. CARTMELL:
17    Q.   Exhibit-5 that you brought
18  with you today that includes, I think
19  it's three or four pages of
20  organizational charts, this is Teva's
21  sales and marketing structure starting
22  when?
23         MS. HILLYER:  Asked and
24     answered.

Page 234

1         You can answer again.
2         THE WITNESS:  This would
3     have been immediately following
4     the acquisition.
5  BY MR. CARTMELL:
6    Q.   In 2016?
7    A.   Yes.
8    Q.   And has that continued like
9  this until today?
10         MS. HILLYER:  Asked and
11     answered.
12         You can answer again.
13         THE WITNESS:  No.  There
14     have been changes, in terms of
15     people and positions.
16  BY MR. CARTMELL:
17    Q.   Let me ask you, there's been
18  news about, for example, Purdue
19  decreasing their sales force related to
20  opioids.
21         Have you read that?
22         MS. HILLYER:  Objection.
23     Beyond the scope.
24         You can answer.

Page 235

1         THE WITNESS:  I have not
2     read that.
3  BY MR. CARTMELL:
4    Q.   Has Teva done any reduction
5  of its sales force or changes,
6  substantial changes like that, related to
7  opioid sales since 2016?
8         MS. HILLYER:  Objection to
9     form.  To the extent you're saying
10     like that, and he's testified he
11     doesn't know what the "that" is.
12         MR. CARTMELL:  I mentioned
13     it in my question.  It's the
14     reduction of the sales force.
15         MS. HILLYER:  He's not aware
16     of what that means.  There could
17     be lots of reasons to reduce a
18     sales force.
19         MR. CARTMELL:  You can
20     answer.
21         THE WITNESS:  I am not aware
22     of any reductions in the sales
23     force that are specific to
24     opioids.

Page 236

1         We don't -- we don't have
2     any sales force opioid promotion,
3     since that ended in 2015.  And
4     that would have been only for the
5     branded products.
6  BY MR. CARTMELL:
7    Q.   The second part of Question
8  Number 4, you'll recall, asked
9  specifically about whether or not sales
10  or marketing positions are based, in
11  whole or in part, on levels of sales of
12  controlled substances or opioids.
13         Do you see that?
14         MS. HILLYER:  Topic 4.
15         THE WITNESS:  Yes, I see
16     that.
17  BY MR. CARTMELL:
18    Q.   And so tell me if you're
19  with me, but this is talking about, for
20  example, lots of times pharmaceutical
21  companies will -- I take it you know --
22  will provide incentive pay or bonus pay
23  to sales representatives or managers or
24  directors based on whether or not they

Page 237

1  sell a quota or meet a goal of the amount
2  to be sold.
3        Are you familiar with that?
4        A.   I am.
5        Q.   Okay.  And so you, I take it
6  in preparation for today, went back in
7  time and reviewed documents and talked to
8  Cephalon employees from back to 2000 when
9  they started selling -- when Cephalon
10  started selling Actiq, the branded
11  fentanyl controlled substance, until 2011
12  when your company, Teva, purchased
13  Cephalon?
14        I take it you looked back to
15  see about their compensation plans during
16  that time and whether or not there was a
17  bonus system?
18        MS. HILLYER:  Objection to
19    form.
20        You can answer.
21        THE WITNESS:  Yes.
22  BY MR. CARTMELL:
23        Q.   And, first of all, let me
24  ask, is it fair to say, based on your

Page 238

1  review of their documents and talking to
2  sales and marketing employees from
3  Cephalon, that at all times from 2000
4  until 2011 Cephalon had a bonus or
5  incentive program for its sales
6  representatives based on how much of the
7  opioid controlled substances they sold?
8        MS. HILLYER:  Objection to
9    form.
10        You can answer.
11        THE WITNESS:  That was
12    always a component of the program.
13  BY MR. CARTMELL:
14        Q.   Okay.  And the same was
15  true, I take it you know, based on your
16  review of documents and talking to
17  Cephalon employees, that the managers or
18  product directors above the sales reps
19  always, from 2000 to 2011, had as a
20  component of their pay the amount of
21  opioids that were sold?
22        MS. HILLYER:  Objection to
23    form.  It assumes facts not in
24    evidence.

Page 239

1        THE WITNESS:  The sales
2    directors, not the product
3    directors.
4  BY MR. CARTMELL:
5        Q.   Okay.  Sales directors were
6  in the sales department, correct?
7        A.   Yes, yes.  I just wanted to
8  clarify the question.
9        Q.   I got it.
10        Product directors are in the
11  marketing department, right?
12        A.   Yes.
13        Q.   But in the sales department,
14  at all levels, and I think there were
15  three, at all times from 2000 to 2011,
16  they had a bonus or incentive program in
17  place that they would make more money if
18  they sold more opioids, correct?
19        MS. HILLYER:  Sorry.  You're
20    saying "they."  Sales directors?
21        MR. CARTMELL:  I'm talking
22    about the sales representatives --
23        MS. HILLYER:  The prior
24    question you didn't.

Page 240

1        MR. CARTMELL:  -- and the
2    directors and the managers.
3  BY MR. CARTMELL:
4        Q.   Correct?
5        A.   Yes.  The specific quotas.
6  And to the extent that they met or
7  exceeded their quota, they would make
8  more or less money.
9        Q.   And this is kind of common
10  knowledge or basic, but would you agree
11  with me that a system like that for
12  controlled substances incentivizes those
13  salespeople to try to sell as much of the
14  opioid controlled substances as possible?
15        MS. HILLYER:  Objection to
16    form.  And beyond the scope.
17        THE WITNESS:  No.  I
18    wouldn't agree with that.
19        Based on what I've read and
20    the people that I've talked to,
21    there was a diligent effort on
22    behalf of the company and those
23    that I spoke with to make sure
24    that the right patients, the

Page 241

1    appropriate patients, were getting
2    these drugs, not all patients.
3    BY MR. CARTMELL:
4        Q.   Are you talking about at all
5    times during 2000 to 2011?
6        A.   I know that there was a
7    period of time in 2001 that Cephalon had
8    admitted to off-label promotion on some
9    of their brands.  And following that,
10   there was significant effort on behalf of
11   the organization to make sure that reps
12   promoted on label.
13       Q.   Right.  They actually were
14   fined $425 million for off-label
15   marketing, correct?
16           MS. HILLYER:  Objection.
17       Beyond the scope of today's
18       topics.
19           You can answer if you know
20       in your personal capacity.
21           THE WITNESS:  Yes.
22   BY MR. CARTMELL:
23       Q.   And they also pled guilty to
24   a charge of off-label and illegal

Page 242

1    marketing, correct?
2            MS. HILLYER:  Objection.
3        Assumes facts not in evidence.
4        And beyond the scope of today's
5        topics.
6            You can answer if you know
7        in your personal capacity.
8            THE WITNESS:  They did plead
9        guilty to a charge.  I'd have to
10       look at the document for the
11       specific charge.
12   BY MR. CARTMELL:
13       Q.   Let's now talk about Teva's
14   compensation system and whether or not,
15   when Teva was selling opioid generic
16   medications, 2011, did they have, as a
17   part of the compensation system for their
18   sales representatives, the amount of
19   opioids or controlled substance, generic
20   controlled substance being sold?
21       A.   Nothing that was specific to
22   opioids.
23       Q.   And I understand you said
24   that in this document, you said nothing

Page 243

1    specific to it.
2            But is it a component of it,
3    in other words, the amount of opioids
4    being sold?
5        A.   The overall sales of the
6    company was what I understand they were
7    compensated on.
8        Q.   And the individual sales
9    overall for all products, too, correct?
10           MS. HILLYER:  Objection to
11       form.
12           THE WITNESS:  I don't
13       understand the distinction.
14   BY MR. CARTMELL:
15       Q.   Well, I think what you've
16   said is that for an individual in the
17   sales department, you would look as a
18   component, first of all, at the overall
19   sales of the company, right?
20       A.   Yes.
21       Q.   And then you would look
22   individually, too, at the individual's
23   performance, correct?
24       A.   And what they were

Page 244

1    accountable for selling that year.
2        Q.   And that would include, if
3    they had as a part of their portfolio,
4    opioids, correct?
5            MS. HILLYER:  And now you're
6        talking about sales for generic or
7        brand?  You're still on generic?
8            MR. CARTMELL:  He can
9        answer.  If you have an objection,
10       make it.
11           MS. HILLYER:  I was just
12       trying to get clear, okay.
13           THE WITNESS:  I want to
14       look.
15           What topic was this?
16           MS. HILLYER:  He's still on
17       4.
18   BY MR. CARTMELL:
19       Q.   This is Topic 4, the second
20   half of the question.
21           MS. HILLYER:  It continues
22       onto the next page, too.
23           THE WITNESS:  I know that
24       they were compensated on the

Page 245

```
 1        overall performance of the company
 2    sales.  What I'm trying to recall
 3        is whether they had any component
 4        of their compensation based on
 5        their individual performance.
 6    BY MR. CARTMELL:
 7        Q.    If you would, Mr. Hassler,
 8    go to Page 4 under your notes, the second
 9    bullet point at the top.
10        A.    Yes.
11        Q.    You're talking about Teva, I
12    believe.  Tell me if I'm wrong.
13        But you say specifically,
14    Compensation was based in part on the
15    company's performance and in part on an
16    individual's performance based on
17    performance goals set by individual
18    managers.
19        Do you see that?
20        A.    Yes.
21        Q.    So my question is that for
22    the generic sales or the brand opioid
23    sales at Teva, at all times they had, as
24    a component of their compensation, the
```

Page 246

```
 1    amount of sales of opioids, correct?
 2        MS. HILLYER:  Objection to
 3    form.
 4        THE WITNESS:  They would
 5    have had all of sales, all of
 6    Teva's sales incorporated.
 7    Opioids would have been a subpart
 8    of those sales.
 9        And then they would have had
10    individual performance objectives.
11    And these, typically, were
12    referred to as management by
13    objectives, and they may be
14    specific administration goals or
15    customer contact goals.
16        I don't recall seeing any
17    goals that were specific on the
18    generic side to a subset of sales
19    goal.
20    BY MR. CARTMELL:
21        Q.    No, I understand.
22        But because the equation
23    includes their entire sales for all of
24    their generics, and opioids is a part of
```

Page 247

```
 1    that, it is one component -- the sales of
 2    opioids is one component of whether or
 3    not they're compensated, or how they're
 4    compensated, correct?
 5        MS. HILLYER:  Objection to
 6    form.
 7        THE WITNESS:  Yes, it would
 8    have been a piece of that overall
 9    compensation.
10    BY MR. CARTMELL:
11        Q.    And is the same true, based
12    on you going back in time and looking at
13    Actavis's compensation plans, related to
14    the sales of opioids?
15        A.    Yes.  That's what I've been
16    told.
17        Q.    In other words, even at
18    Actavis, at all times for their
19    salespeople, their compensation included,
20    as an element, the amount of controlled
21    substances or opioids they were selling,
22    correct?
23        MS. HILLYER:  Objection to
24    form.
```

Page 248

```
 1        THE WITNESS:  They were
 2    compensated on overall sales as
 3    well, to the extent that opioids
 4    were a part of that.
 5        MR. CARTMELL:  I want to
 6    move on now to Topic 6.
 7        MS. HILLYER:  Want to take a
 8    quick break?  We've been going an
 9    hour.
10        MR. CARTMELL:  Sure.
11        VIDEO TECHNICIAN:  Going off
12    record.  3:34 p.m.
13             - - -
14        (Whereupon, a brief recess
15    was taken.)
16             - - -
17        VIDEO TECHNICIAN:  Back on
18    the record.  The time is 3:45.
19    BY MR. CARTMELL:
20        Q.    Mr. Hassler, we're back on
21    the record.
22        Are you ready to proceed?
23        A.    Yes.
24        Q.    I want to move on to another
```

Page 249

1    topic that you've been designated by
2    Cephalon and Teva and Actavis to testify
3    about.  And it's Topic 6, which I'll
4    read.  It's right here.
5           The identity of all sales,
6    marketing, advertising and promotional
7    materials and websites you used to market
8    or promote opioids or opioid products,
9    including the location and manner of
10   identifying final versions of such
11   materials and the manner of identifying
12   the dates, venues and geographic
13   locations in which they were used.  Such
14   materials include detail pieces,
15   promotional items, leave-behinds, patient
16   starter kits, patient materials, patient
17   pain monitoring materials/devices,
18   e-newsletters, medical communications,
19   for example, responses to doctor
20   questions, journal and other ads, CME
21   materials, speakers program materials,
22   website content, web casts and pod casts,
23   videos, including for use in websites,
24   CMEs, speaker programs, conventions,

Page 250

1    convention materials, journal wraps,
2    audio files, including on-demand audio
3    case studies.
4           Do you see that?
5      A.   I do.
6      Q.   And do you feel like you
7    have the expertise and knowledge to bind
8    these companies with your testimony on
9    that subject?
10     A.   Yes.
11     Q.   Now, did you -- tell me what
12   you reviewed to prepare for this topic.
13     A.   I reviewed several marketing
14   pieces, sales training pieces,
15   presentations that were provided, as well
16   as a number of policies that related to
17   the funding of some of the activities
18   that you mentioned, as well as the
19   development of materials through these
20   various channels.
21     Q.   Okay.  Did you have any
22   experience with any of those materials,
23   prior to being designated in this lawsuit
24   as the person with knowledge about this

Page 251

1    topic?
2      A.   Yes.  I would have seen the
3    promotional materials for Fentora during
4    the time that I was managing that brand.
5      Q.   At Teva?
6      A.   At Teva.
7      Q.   But as far as Cephalon, you
8    didn't have any experience with any of
9    their promotional materials, correct?
10     A.   That's correct.
11     Q.   And same is true with
12   Actavis; is that right?
13     A.   Yes.
14          MS. HILLYER:  Objection to
15   form.
16   BY MR. CARTMELL:
17     Q.   So for your knowledge in
18   that respect, you had to go talk to
19   people who had that expertise, correct?
20     A.   Yes.  I talked to people
21   that worked in those areas and developed
22   some of those materials, as well as read
23   the policies on how they were to be
24   developed.

Page 252

1      Q.   Okay.  And, again, you have
2    provided today some notes to us related
3    to your answer to this topic, or your
4    testimony to this topic.
5           And, again, this was
6    prepared by counsel for you, correct?
7      A.   Yes.  I had asked them for
8    this.
9      Q.   And I want to follow-up on
10   this.  This is the section where you give
11   your notes on this topic.
12          And I think a good way to
13   organize your answer on this is, again,
14   by talking about the time when Cephalon
15   was marketing and promoting their Class
16   II opioids called Actiq and then
17   subsequently Fentora.
18          I want to talk about that
19   first, okay?
20     A.   Yes.
21     Q.   And going back to 2000, did
22   you -- were you able to locate for us and
23   identify all of those sales and marketing
24   materials that they used at Cephalon to

Page 253

1    market Actiq and Fentora?
2         MS. HILLYER:  Just an
3    objection on the record that we
4    objected to this topic, to the
5    extent it requires a witness to
6    testify regarding the identity of
7    all sales, marketing, advertising
8    and promotional materials and
9    websites, which is impracticable.
10   And that we agreed to put forth a
11   witness to testify generally about
12   sales, marketing, advertising and
13   promotional materials and websites
14   generally.
15        MR. CARTMELL:  Well, let me
16   follow-up on that.
17   BY MR. CARTMELL:
18        Q.   Mr. Hassler, did you attempt
19   to try to identify all those materials at
20   Cephalon?
21        MS. HILLYER:  Same
22   objection.
23        THE WITNESS:  Yes.  We
24   went -- we went back through their

Page 254

1    VIVA system, which would identify
2    materials from 2014 to the
3    present, and their ZINC system to
4    be able to identify materials from
5    2009 to 2013, and had requested
6    whether there were any materials
7    that we could identify from files,
8    physical hardcopy files, for
9    anything prior to that.
10   BY MR. CARTMELL:
11        Q.   Okay.  So let's break that
12   down.
13        You're saying that there's a
14   database that started in 2009 to
15   warehouse all of these sales and
16   promotional and marketing and advertising
17   materials that are identified in this
18   topic; is that right?
19        A.   Yes.
20        Q.   And that started in 2009 and
21   it's called the ZINC database; is that
22   right?
23        A.   Yes.
24        Q.   Was that a database that

Page 255

1    Cephalon owned?
2         MS. HILLYER:  Objection.
3    Beyond the scope.
4         THE WITNESS:  It was a
5    database they used.  I don't know
6    if they owned it.
7    BY MR. CARTMELL:
8         Q.   But it was used at Cephalon
9    starting in 2009; and then with the
10   acquisition by Teva in 2011, it was
11   transferred to Teva and continued
12   thereafter until 2013?
13        MS. HILLYER:  Objection to
14   form.
15   BY MR. CARTMELL:
16        Q.   Is that right?
17        A.   They continued to use that
18   database for a period of time while they
19   were integrated with Teva.
20        So they had their own copy
21   approval to track the copy submission,
22   route it and house finished materials.
23        Q.   So is your understanding
24   that the ZINC database is only going to

Page 256

1    provide us with promotional advertising
2    and sales and marketing materials for the
3    time period 2009 to 2013?
4         A.   Yes.
5         Q.   So what about all of the
6    promotional advertising, sales, marketing
7    materials that Cephalon created and used
8    to promote their opioids prior to 2009,
9    where are those?
10        A.   For that, we had to go back
11   and ask individuals that worked in those
12   areas for documents from their physical
13   files and made our best effort to pull as
14   many of those documents as existed.
15        Q.   How many of those documents
16   did you pull from 2000 to 2009 that were
17   the promotional, advertising, sales,
18   marketing materials related to Actiq and
19   Fentora?
20        MS. HILLYER:  Objection to
21   the form.  That's beyond the scope
22   of what the -- what counsel did to
23   produce documents in this case.
24        You can ask him what he

Page 257

1    reviewed, perhaps that's a better
2    question.  But --
3              MR. CARTMELL:  She makes a
4    good point.
5    BY MR. CARTMELL:
6         Q.   Did you not go look for any
7    of them, you relied on counsel to do
8    that?
9         A.   I relied on counsel to work
10   with employees that -- who had been at
11   Cephalon.
12        Q.   So you didn't do any
13   independent investigation to see that you
14   were finding all that you could, as far
15   as sales and marketing and promotional
16   and advertising materials, related to
17   Actiq and Fentora before 2009, correct?
18             MS. HILLYER:  Objection to
19   form.
20             THE WITNESS:  I've validated
21        with the people that I talked to
22        that they were providing all of
23        the information that we had.
24   BY MR. CARTMELL:

Page 258

1         Q.   Well, you said we pulled as
2    many of those materials from 2000 to 2009
3    as possible, correct?
4         A.   Yes.
5         Q.   Where are they?
6              MS. HILLYER:  Objection to
7    the extent that's beyond the
8    scope.
9              MR. CARTMELL:  Well, I've
10        asked for the identity of them.
11             MS. HILLYER:  He's -- you
12        can answer if you know.
13             We've said we're not -- he's
14        not going to be prepared to
15        testify as to the identity of
16        every single piece of information.
17        He can testify generally about the
18        relevant materials.
19   BY MR. CARTMELL:
20        Q.   Where are all the ones you
21   pulled, when you say you pulled as many
22   as you can?  Where are they?
23        A.   My understanding is they
24   would have been produced.

Page 259

1         Q.   Just produced in the general
2    production that came from Teva?
3         A.   Yes.
4         Q.   So you didn't look, or
5    counsel didn't look to try to archive
6    those or warehouse those or identify
7    those individually; is that correct?
8              MS. HILLYER:  Objection to
9        form.  He's not here to testify as
10       to what counsel did.  He can
11       testify in response to the topic.
12       What counsel did is not responsive
13       to the topic.
14             MR. CARTMELL:  Well, the
15       topic is the identity of all those
16       things.  And I'm asking why we
17       don't get any testimony about
18       where things are from 2000 to
19       2009.
20             MS. HILLYER:  He testified
21       where they were.  He testified
22       that they came from people.  He
23       testified that they went back and
24       looked for them in hardcopy.  He

Page 260

1        testified that they were produced
2        in this litigation.
3              I don't know what else you
4        want for identification.  We said
5        we're not going to identify every
6        single piece.
7    BY MR. CARTMELL:
8         Q.   So is your testimony that we
9    just need to do searches to try to find
10   those from 2000 to 2009?  Those nine
11   years, for all the promotional,
12   marketing, sales, advertising materials,
13   they haven't been archived, as far as you
14   know, or they're not in any databases or
15   they're not in any specific Bates ranges,
16   your testimony is simply that they're out
17   there, you haven't seen them or put them
18   anywhere for us to identify; is that
19   fair?
20             MS. HILLYER:  Objection to
21       form.  That is not fair.  And it's
22       beyond the scope.
23             He's not here to do your
24       work for you, to identify the

Page 261

1    Bates ranges.  You want that, you
2    can ask counsel.  Sometimes we've
3    been doing that.  You have the
4    documents.
5         We understood, and I believe
6    the witness understands, this
7    topic to ask about the identity of
8    these materials as to where they
9    may or may not be housed within
10   the company.  What happens in this
11   litigation is not part of the
12   scope of what happened -- the
13   responsiveness to this topic.
14       If you want to ask him about
15   where they are housed in the
16   company and how they are
17   maintained, that's responsive to
18   the topic.  If you want to ask a
19   question about what documents were
20   produced in this case, that's
21   between counsel.
22   BY MR. CARTMELL:
23   Q.   Let's start with all of the
24   Fentora and Actiq sales, marketing,

Page 262

1    advertising, and promotional materials.
2         Where are those documents
3    located from 2000 to 2009?
4         MS. HILLYER:  Asked and
5    answered.
6         You can answer again.
7         THE WITNESS:  To the extent
8    that they exist, they would be in
9    individual employee files who were
10   engaged in the PDRC process.
11   BY MR. CARTMELL:
12   Q.   Can you tell us the identity
13   of people's -- or the identity of people
14   whose files we should look, during 2000
15   and 2009, for all of this promotional
16   advertising and sales information for
17   Actiq and Fentora?
18   A.   People that I spoke with who
19   would have been engaged in that activity
20   during that time period would have been
21   Paula Williams and Matt Day.
22   Q.   Any other names of people we
23   should look in their files to find these
24   promotional sales, advertising and

Page 263

1    marketing materials related to Fentora
2    and Actiq from 2000 to 2009?
3    A.   I'm not aware of anybody
4    else still with the company.
5    Q.   Do you know if they were
6    warehoused anywhere within the company?
7    A.   I don't.
8    Q.   How do we identify them?  In
9    other words, is there a way that we can
10   identify them when we go looking?
11        MS. HILLYER:  Objection to
12        form.
13        THE WITNESS:  They would
14        have a copy approval number on
15        them that would have been assigned
16        to each piece that went through
17        the PDRC process.
18   BY MR. CARTMELL:
19   Q.   Okay.  So is there any
20   indication of what those numbers might be
21   that you can tell us to look for?
22   A.   No, I don't know the
23   numbering sequence.
24   Q.   Is there any specific

Page 264

1    document with a title that we should
2    search for to find those types of
3    documents that are being sent through the
4    PDRC?
5         MS. HILLYER:  Objection to
6         form.
7         THE WITNESS: To my
8         knowledge, we have searched for
9         all of them that we can find and
10        they have been produced.  I don't
11        know that we know of any other
12        places to look.
13   BY MR. CARTMELL:
14   Q.   Were they produced in a
15   certain file, do you know?
16        MS. HILLYER:  Objection.
17        Beyond the scope.
18        THE WITNESS:  I would have
19        to defer that to the attorneys.  I
20        don't know how they produced it.
21   BY MR. CARTMELL:
22   Q.   But as far as whether you
23   were able to identify, individually,
24   documents during that period of time, you

Page 265

1    didn't do anything to identify documents,
2    you relied on counsel to do that,
3    correct?
4        A.   I relied on counsel and
5    discussions with the people that I
6    mentioned.
7        Q.   Now, your response states,
8    as you mentioned, that from 2009 to 2013,
9    ZINC will have all of the promotional
10   sales, advertising and marketing
11   materials for the promotion of the opioid
12   products; is that correct?
13       A.   For Cephalon's products,
14   yes.
15       Q.   What about from 2011 to
16   2013, I believe Teva was selling those
17   products, the branded products, meaning
18   Fentora and Actiq.
19           So will ZINC have all of
20   Teva's promotional, advertising, sales
21   and marketing documents in there, or is
22   it just Cephalon?
23       A.   I'm not aware of any
24   documents that Teva would have produced,

Page 266

1    any promotional documents that they would
2    have produced during that time period.
3        Q.   You mean marketing documents
4    during that time period?
5        A.   Those would have been
6    produced by Cephalon.
7        Q.   Okay.  Just so it's clear
8    for the record, I want to make sure we
9    have it down.
10           Your understanding, based on
11   your review of documents, conversations
12   with people and your investigation of
13   this topic is that after Teva acquired
14   Cephalon, Teva didn't create any
15   advertising, sales, marketing or
16   promotional materials for Actiq or
17   Fentora, correct?
18       MS. HILLYER:  Objection to
19       form.
20       THE WITNESS:  I have not
21       seen any that Teva would have
22       created.
23   BY MR. CARTMELL:
24       Q.   Okay.  So your understanding

Page 267

1    is they don't exist, correct?
2        A.   To my knowledge, yes.
3        Q.   Okay.  And then VIVA came
4    into play in 2014 through the present; is
5    that correct?
6        A.   Yes.
7        Q.   And VIVA, tell us what kind
8    of database that is and what it houses.
9        A.   In this case, it's the
10   promotional materials database.  And it
11   houses the copy submission, it routes
12   those submissions through the approvers,
13   and it maintains a copy of the approved
14   copy that then is produced and
15   distributed.
16       Q.   And in VIVA, are there
17   promotional sales and advertising and
18   sales materials that were created by
19   Teva?
20       A.   Yes.
21       Q.   For opioids?
22       A.   Yes.
23       Q.   Okay.  So why is it that
24   Teva wasn't creating promotional sales,

Page 268

1    marketing, advertising materials from
2    2011 to 2013, but they did from '14 to
3    present?
4        A.   The management structure
5    fell under a CNS business unit that
6    included people that had come from
7    Cephalon, as well as people that were
8    from Teva.
9            The promotion for the
10   Fentora at that point in time would have
11   been developed through a common platform
12   that was developed for both
13   organizations.  And that was VIVA.  And
14   that's what was -- that's how the
15   submissions were made and how the
16   material was routed.
17           The individuals that were
18   approving that may have still been the
19   Cephalon legacy people.
20       Q.   But they were Teva
21   employees?
22       A.   That's what I don't know, if
23   they were -- in some capacity they were,
24   but they may have actually been employed

Page 269

1    by the Cephalon entity.
2         So that's why I'm having
3    trouble answering your question.
4         Q.   Okay.  At any rate, what
5    you're saying is that we've got two
6    databases, starting in 2009 through '13,
7    and then another one starting in '14,
8    that should have all the materials we're
9    asking about in this question for those
10   years, correct?
11        A.   Yes.
12        Q.   Is there a year gap?  In
13   other words, ZINC ends in '13 and VIVA
14   doesn't start until '14?
15        A.   No.  Teva debated adopting
16   ZINC as the platform and chose to go with
17   VIVA instead.  So everything migrated
18   over to VIVA at the same point in time.
19        Q.   So will VIVA actually have
20   the things back to 2009, or they just
21   started when --
22        A.   No.
23        Q.   Okay.  I got you.
24             I'm going to hand you

Page 270

1    Exhibit-18, which is, I think, a printout
2    from VIVA, which your testimony is --
3    started at 2014 at Teva.
4              - - -
5         (Whereupon, Teva-Hassler
6         Exhibit-018, TEVA_MDL_A_01130623,
7         was marked for identification.)
8              - - -
9    BY MR. CARTMELL:
10        Q.   It has promotional,
11   advertising, sales and marketing
12   materials for the opioids; is that
13   correct?
14        A.   Yes.
15        Q.   Can you tell me, Mr.
16   Hassler, from looking through this, if
17   you look at the second page, for example,
18   you'll see the printout has a document
19   number and then it has a product, right?
20        A.   Yes.
21        Q.   And then it actually has an
22   audience, either consumer or HCP, which
23   is healthcare provider, correct?
24        A.   Yes.

Page 271

1         Q.   And it starts with a
2    document name, so it has a brief
3    description of what type of marketing or
4    sales or advertising piece this is,
5    correct?
6         A.   That's correct.
7         Q.   And this appears to be only
8    for branded products.  In other words,
9    it's got Fentora or pain TA -- do you
10   know what pain TA is?
11        A.   Therapeutic area.
12        Q.   And then it's got Actiq.
13             Do you know if there's a
14   separate part of VIVA for branded versus
15   generic?
16        A.   I believe that there's a
17   separate generic.
18        Q.   But it's still in VIVA?
19        A.   I believe so.
20        Q.   So your understanding is
21   that in VIVA they sort out separately the
22   advertising, sales, marketing and
23   promotional materials for the generic
24   opioids from the brand-name opioids,

Page 272

1    correct?
2         A.   Yes.  The notes that I had
3    taken from February '15 forward, the
4    generic companies -- the generic company
5    used VIVA as well.
6         Q.   Okay.  And when it says
7    audience, is -- your understanding is
8    that these promotional or marketing or
9    sales materials, when it says HCP, that
10   means it's going directly to the
11   healthcare provider?
12        A.   No.  That means that it can
13   be used with a healthcare provider.
14        Q.   Okay.  Some of it is left
15   with a healthcare provider, correct?
16        A.   There are leave-behinds that
17   are left.
18        Q.   And then when it says
19   consumer, what does that mean?
20        A.   Usually a patient, or it may
21   be just a general consumer.
22        Q.   Like sort of
23   direct-to-consumer marketing, correct?
24        A.   Yes.

Page 273

1    Q.   And it's got an
2  approved-for-distribution date.
3        So that's going to give us
4  the date when we know that the marketing
5  piece has been approved; is that right?
6    A.   Approved for release, yes.
7    Q.   And then it's got an
8  expiration date.  So if, in fact, it has
9  expired for use, we'll have the
10  expiration date, correct?
11    A.   Yes.
12    Q.   And then there's 2253
13  submission required.
14        Is that the federal
15  regulation that requires the piece to be
16  sent to the FDA?
17    A.   Yes.
18    Q.   And it says yes or no on
19  those, correct?
20    A.   Yes.
21    Q.   And the company makes a
22  determination on -- excuse me, that
23  certain promotional or marketing or sales
24  materials don't have to be provided to

Page 274

1  the FDA; is that correct?
2        MS. HILLYER:  Objection.
3    Beyond the scope.
4        You can answer if you know
5    in your personal capacity.
6        THE WITNESS:  The FDA has
7    requirements on what the company
8    has to submit.  And there may be
9    promotional materials that are
10    generated that the FDA has no
11    interest in seeing or hasn't --
12    doesn't require us to send.
13  BY MR. CARTMELL:
14    Q.   But the company decides
15  that --
16        MS. HILLYER:  Objection.
17  BY MR. CARTMELL:
18    Q.   -- for each piece, correct?
19        MS. HILLYER:  Sorry.  Same
20    objection.
21        THE WITNESS:  The company
22    decides it based on the criteria
23    that the FDA sets.
24  BY MR. CARTMELL:

Page 275

1    Q.   Is it basically whether the
2  company makes a determination if it's
3  promotional or not?
4        MS. HILLYER:  Same
5    objection.
6        You can answer if you know
7    in your personal capacity.
8        THE WITNESS:  It's generally
9    on whether the brand is being
10    promoted within the piece or not.
11  BY MR. CARTMELL:
12    Q.   Okay.  These pieces, I think
13  you -- excuse me.
14        All of these marketing,
15  sales, advertising pieces that are in
16  VIVA that we're showing are national in
17  scope?  In other words, they are able to
18  be used all over America; is that right?
19    A.   Yes.
20    Q.   So, in other words -- strike
21  that.
22        And I also -- my
23  understanding is that the company, Teva,
24  as well as Cephalon, and Actavis for that

Page 276

1  matter, did not track where each
2  marketing piece was being used, correct?
3    A.   Yes.
4    Q.   Is that correct?
5    A.   Yes.
6    Q.   So, for example, if we had
7  on here an approved piece during a period
8  of time, a marketing piece, the company
9  couldn't say, for example, well, that
10  piece wasn't used in Ohio, for example,
11  correct?
12        MS. HILLYER:  Objection to
13    form.
14  BY MR. CARTMELL:
15    Q.   Because they don't track
16  that info?
17    A.   That's true.
18    Q.   Okay.  I think we have a
19  printout of the generic part of VIVA that
20  I'll mark as Exhibit-19.
21        - - -
22        (Whereupon, Teva-Hassler
23    Exhibit-019, TEVA_MDL_A_02914333,
24    was marked for identification.)

Page 277

1           - - -
2    BY MR. CARTMELL:
3        Q.   I just want to ask you, it
4    looks like the fields on here are
5    similar.
6            But as you can see here,
7    they actually call out that the product
8    is generic, correct?
9        A.   Yes.
10       Q.   Or, excuse me, that the
11   marketing or promotional or sales piece
12   is generic, correct?
13       A.   Yes.
14       Q.   And so these will identify
15   the -- all of -- or, excuse me, VIVA
16   during this period of time will identify
17   all of the marketing, sales, promotional
18   or advertising pieces related to the
19   opioid generic products, correct?
20       A.   Yes.
21       Q.   And all of these say that
22   they don't need to be -- well, not all of
23   them, I take that back.  I apologize.
24           Most all of them say that

Page 278

1    they don't have to be submitted to the
2    FDA.
3            Do you know what that reason
4    is?
5            MS. HILLYER:  Objection.
6    Beyond the scope.
7            You can answer if you know
8    in your personal capacity.
9            THE WITNESS:  I don't know
10   specifically.  If they didn't
11   include specific drug names,
12   specific drugs within the
13   document, then they would not be
14   submitted.
15   BY MR. CARTMELL:
16       Q.   So if they were general
17   about a class of drugs, like opioids, but
18   didn't mention a specific generic type,
19   then they wouldn't have to submit it to
20   the FDA; is that fair?
21           MS. HILLYER:  Objection to
22   form.  And beyond the scope.
23           You can answer if you know
24   in your individual capacity.

Page 279

1            THE WITNESS:  For the -- I
2    was just reading the brand to
3    generic reference digital guide.
4    And if -- or facts about generics
5    which may talk about the industry
6    and have no specific drug
7    mentioned, then in those cases,
8    there would be no FDA submission.
9    BY MR. CARTMELL:
10       Q.   Okay.  But what if there was
11   something, a promotional or sales or
12   advertising or marketing piece, that
13   dealt with treatment of pain, for
14   example, with opioids but didn't mention
15   a specific opioid, is your understanding
16   that the company wouldn't have to submit
17   that to the FDA?
18           MS. HILLYER:  Objection to
19   the extent it calls for a legal
20   conclusion.  And beyond the scope
21   of today's topics.
22           You can answer if you know
23   in your individual capacity.
24           THE WITNESS:  Typically,

Page 280

1    generics wouldn't get involved or
2    engaged in that type of activity.
3            For the brands, we may have
4    disease state materials that could
5    be used promotionally that would
6    not have to go to the FDA if they
7    didn't mention a drug name.
8    BY MR. CARTMELL:
9        Q.   Well, for example, if you
10   see down here, there's buprenorphine
11   transdermal system indications and ISI
12   consumer.
13           That's a generic, correct?
14       A.   It appears to be, yes.
15       Q.   And that's a generic drug
16   for the treatment of addiction, it
17   includes opioids, correct?
18           MS. HILLYER:  Objection.
19   Beyond the scope.
20           THE WITNESS:  Yes.
21   BY MR. CARTMELL:
22       Q.   And that one, for example,
23   doesn't have to be, I take it -- it
24   mentions that generic, but it doesn't

Page 281

1    have to be sent to the FDA, correct?
2         A.   That's what this report
3    indicates.
4         Q.   Is that consistent with your
5    understanding?
6              MS. HILLYER:  Objection.
7         Beyond the scope.
8              THE WITNESS:  For an ISI
9         that's a regulatory document, yes.
10   BY MR. CARTMELL:
11        Q.   Now, for generics, does this
12   database only include material beginning
13   in February 2015 forward?
14        A.   I believe so, yes.
15        Q.   Why didn't VIVA include
16   generics when it started back in '14?
17        A.   I don't know.
18        Q.   Is there another place where
19   we can find that information for generics
20   for Teva?
21        A.   My understanding is if it
22   exists, we would have produced it.  We
23   would have looked among those that are
24   involved in the copy approval process to

Page 282

1    see if they had anything in their files
2    that would have been generic promotion of
3    these materials.  And I'm not aware of
4    anything else.
5         Q.   Let's talk about Actavis and
6    the identity of all their sales,
7    marketing, advertising and promotional
8    materials for the generic controlled
9    substance opioids that Actavis was
10   selling prior to 2016 when those Actavis
11   entities were acquired by Teva.
12             What did you find and
13   identify as far as those materials?
14        A.   As the notes indicate, the
15   generics were limited to product
16   availability announcements and ads that
17   notified the customer of availability,
18   form, strength.
19             They didn't typically make
20   any therapeutic claims or product
21   efficacy claims.  Actavis used VIVA,
22   beginning in 2014 and '15, as a
23   repository for sales and marketing
24   materials.  And they're listed with these

Page 283

1    Bates numbers.
2              I also spoke to David Myers,
3    who indicated that it was his
4    responsibility for assigning numbers to
5    those materials that went through this
6    process, to identify promotional
7    materials that Actavis produced for their
8    generic products.
9         Q.   How do you spell his last
10   name?
11        A.   M-Y-E-R-S.
12        Q.   What was his position at
13   Actavis at that time?
14        A.   He worked within the
15   marketing function.
16        Q.   And just like Teva and
17   Cephalon, the Actavis entities did not
18   track these marketing, sales, advertising
19   materials as far as the venues or
20   geographic locations where they were
21   used, correct?
22        A.   That's my understanding,
23   yes.
24        Q.   There were no databases or

Page 284

1    other warehousing or archiving of these
2    types of materials at Actavis, other than
3    what started in 2014; is that your
4    understanding?
5         A.   Yes.  David mentioned that
6    they just had a spreadsheet with code
7    names on it that they used as a tracking
8    mechanism.
9         Q.   And those spreadsheets have
10   been produced?
11        A.   To my knowledge, yes.
12        Q.   Did you see any of them?
13        A.   I did not.  I just asked him
14   whether they had been -- I asked him how
15   they were tracked, and he told me, and
16   that they had been made available.
17        Q.   I may have asked you this,
18   and I apologize if I did, but for the
19   Cephalon promotional and advertising and
20   sales materials for Actiq and Fentora
21   from 2000 to 2009, how do you -- how will
22   we know that they are final and approved
23   for use?  Did you tell me that?
24        A.   They will have a PDRC number

Page 285

1    on the piece that would indicate that
2    that's a final production copy.
3        Q.   And who do you think the
4    person most knowledgeable about that
5    process and what pieces are final, that
6    sort of thing, would be from 2000 to 2009
7    at Cephalon?
8        MS. HILLYER:  Again, to the
9        extent that's encompassed in Topic
10       6, Mr. Hassler is identified as
11       the person most knowledgeable to
12       testify about those topics on
13       behalf of the companies.
14       You can answer.
15       THE WITNESS:  The people
16       that I talked to about that were
17       Paula and Matt.  The only other
18       person that I can think of is
19       Jamie Burlanska, and she's not
20       with the organization anymore.
21   BY MR. CARTMELL:
22       Q.   Anyone else?
23       A.   No.
24       Q.   Is your understanding that

Page 286

1    the databases include website information
2    that was promotional in nature?
3        A.   Yes.
4        Q.   I'm going to move on to the
5    next topic.
6        The next topic, Mr. Hassler,
7    is Topic 8.  You've been designated as
8    the corporate representative that can
9    bind the company with your testimony in
10   this regard, correct?
11       A.   Yes.
12       Q.   It states, The identity of
13   the persons responsible for developing or
14   implementing training for your sales and
15   marketing departments, including for
16   developing or implementing any written
17   materials or instructions to your
18   marketing or salespeople regarding
19   promoting or selling opioids or opioid
20   products or for developing or
21   implementing any training or identifying,
22   reporting or investigating the possible
23   diversion of opioids or opioid products
24   or identifying, investigating or

Page 287

1    reporting suspicious orders, and the
2    identity and location of materials
3    utilized for these topics.
4        What did you review or do in
5    order to prepare to testify on this
6    topic?
7        A.   I reviewed organizational
8    charts to identify who was involved in
9    the training department for these
10   products, and reviewed several pieces of
11   sales training material.
12       And I had also asked Paula
13   and Matt, on the Cephalon side, who was
14   involved in the training related to Actiq
15   and Fentora.
16       And I spoke with David
17   Myers, for the Actavis products, and
18   Napoleon Clark to get an understanding of
19   how any promotion or training took place
20   at the legacy Watson companies.
21       Q.   So I want to follow up.
22       I think this is sort of a
23   two-part question as well.  The first is,
24   you know, the training materials for

Page 288

1    salespeople related to promotion, and
2    then the second part is sort of the
3    training related to recognizing diversion
4    and reporting suspicious orders and
5    things like that.
6        Did you read the question
7    that way?
8        A.   Yes.
9        Q.   Let's talk about Cephalon
10   from 2000 to 2011, when they were selling
11   brand-name Class II opioids.  And that
12   was the time before your company, Teva
13   USA, or Teva, one of the Teva entities
14   acquired them.
15       What is your understanding
16   of who would actually train the
17   salespeople, the sales force, who were
18   going out to the offices of doctors all
19   over America and trying to promote and
20   market and get doctors to purchase or
21   prescribe these brand-name opioids, Actiq
22   and later Fentora?
23       A.   A sales training group that
24   was identified here, with Joe Cantinetti,

Page 289

1    Dan Scott, Cynthia Condodina and the
2    others that are listed in my notes, they
3    would have been responsible for product
4    training for Fentora.  They were also
5    responsible for sales force training on
6    compliance policies and conducting new
7    hire training.
8            In some of the earlier time
9    periods, the product management team
10   would have been responsible for training
11   the sales force on Actiq.
12       Q.   And you're talking about
13   those are the structure that we talked
14   about before that had product managers
15   and directors over the sales reps in the
16   field for Actiq?
17       A.   No.  The product managers
18   would have been in the marketing
19   function.
20       Q.   Okay.  That's right.
21       Sales managers --
22       A.   Sales managers and directors
23   would have been over the field.
24       Q.   Okay.  And they would --

Page 290

1    when a sales rep, for example, was hired
2    by Cephalon to sell, go sell Actiq or
3    Fentora, they would get this training
4    from their managers above them, correct?
5        A.   Later in the process, they
6    would get training from the sales
7    training team on both compliance and
8    product training and sales training as
9    part of their onboarding process as a new
10   hire.
11           And then their managers
12   would continue that training, just in
13   their routine interaction with the reps.
14       Q.   Okay.  Now, as far as -- you
15   mentioned compliance training.
16           Are you talking about
17   training related to the diversion of the
18   opioids or the SOM training?
19       A.   Not SOM specifically.  It
20   was training related to what they -- what
21   they could promote, what they could use
22   to promote, what the expectations were of
23   them, in terms of who they could call on.
24           There were a number of

Page 291

1    compliance-related policies that they had
2    to be trained on and understand what they
3    could do and what they couldn't.
4        Q.   When Actiq was approved by
5    the FDA, there was a risk map that they
6    were required to put in place associated
7    with that, correct?
8            MS. HILLYER:  Objection.
9    Beyond the scope.
10           THE WITNESS:  Yes.
11   BY MR. CARTMELL:
12       Q.   Who would do the training at
13   Cephalon related to the risk map?
14       A.   For the sales force?
15       Q.   Yes.
16       A.   The product management
17   group.
18       Q.   Okay.  So that was within
19   the sales department, correct?
20       A.   No.  That would have been in
21   the marketing department.  The product
22   management group.
23       Q.   Who would do the training
24   related to compliance issues?  Was that

Page 292

1    outside the marketing group and in the
2    compliance department?
3        A.   In those early days?
4        Q.   Yes.
5        A.   There was training that was
6    driven by compliance across the entire
7    organization, and there was also specific
8    compliance training that was implemented
9    by the sales training team when that team
10   was developed.
11       Q.   But with respect to, for
12   instance, the corporate integrity
13   agreement that I believe was in place
14   starting in 2008, was it the corporate
15   compliance group that would train
16   salespeople on that at Cephalon?
17       A.   Yes.  I believe that that
18   training was developed by compliance.
19   And then every employee had to sign off
20   on that training, that they understood
21   and would abide by that training.  And
22   the managers over each of those functions
23   had to sign off and validate that their
24   subordinates had read and agreed to that

Page 293

1    training.
2        Q.   Okay.  I want to hand you
3    Exhibit-20.
4            - - -
5        (Whereupon, Teva-Hassler
6        Exhibit-020, Corporate Integrity
7        Agreement Between the Office of
8        Inspector General of the
9        Department of Health and Human
10       Services and Cephalon, Inc., was
11       marked for identification.)
12           - - -
13   BY MR. CARTMELL:
14       Q.   This is the corporate
15   integrity agreement that was in play
16   related to Cephalon's plea of guilty to
17   illegal marketing and a fine of $425
18   million for illegal off-label marketing.
19       Do you understand that?
20           MS. HILLYER:  Objection to
21       form.  It mischaracterizes.  Did
22       you say the CIA was the guilty
23       plea --
24           MR. CARTMELL:  No, I did

Page 294

1    not.
2            MS. HILLYER:  Then maybe I
3        misheard you.  Could you restate
4        that?
5    BY MR. CARTMELL:
6        Q.   Are you familiar with the
7    corporate integrity agreement?
8        A.   Yes.
9        Q.   And you understand that this
10   agreement was required by U.S. Attorneys
11   following a plea of guilty to illegal
12   marketing?
13           MS. HILLYER:  Objection to
14       form.
15   BY MR. CARTMELL:
16       Q.   Do you understand that?
17       A.   Yes.  I understand that it
18   was in agreement with the OIG.  I don't
19   recall the specific -- what Cephalon
20   specifically pled guilty to.
21       Q.   You've mentioned the code of
22   conduct previously -- strike that.
23           You understand that Teva was
24   bound by this agreement when they

Page 295

1    purchased Cephalon in 2011, correct?
2            MS. HILLYER:  Objection to
3        the extent it's beyond the scope.
4        And calls for a legal conclusion.
5            THE WITNESS:  Yes.
6    BY MR. CARTMELL:
7        Q.   And that was because it was
8    a five-year agreement and went into play
9    in 2008 and Teva was now selling the
10   branded opioid Class II narcotics that
11   are at issue, correct?
12           MS. HILLYER:  Same
13       objections.
14           THE WITNESS:  That's my
15       understanding.
16   BY MR. CARTMELL:
17       Q.   You mentioned the code of
18   conduct that was in place at Cephalon, I
19   think previously, did you not?
20       A.   I believe so.
21       Q.   And if you go to Page 7 in
22   this corporate integrity agreement, it
23   mentions the code of conduct at Cephalon.
24       Do you see that?

Page 296

1        A.   Page 7?
2        Q.   Yes.
3        A.   Yes.
4        Q.   And it states that all
5    employees or covered persons who are
6    employees -- I won't represent to you --
7    are bound by Cephalon's code of conduct.
8        Do you see that?
9        A.   I do.
10       Q.   It says, The code of conduct
11   sets forth and shall continue to set
12   forth, at a minimum -- and I want to show
13   you where I'm talking about, the third --
14   excuse me, C -- the requirement that all
15   Cephalon's covered persons shall be
16   expected to report to the chief
17   compliance officer, or other appropriate
18   individual designated by Cephalon,
19   suspected violations of any federal
20   healthcare program and FDA requirement or
21   of Cephalon's own policies and
22   procedures.
23       Do you see that?
24       A.   I do.

Page 297

1      Q.   And maybe this is what you
2  were referring to, but according to
3  Cephalon's own code of conduct and as a
4  result of the written agreement that they
5  had to enter into after pleading guilty
6  to illegal marketing, it states that,
7  essentially, all employees at Cephalon
8  were required to report violations of the
9  law, correct?
10         MS. HILLYER:  Objection to
11     the form.  Calls for a legal
12     conclusion.  And beyond the scope.
13         You can answer if you know
14     in your personal capacity.
15         THE WITNESS:  That's my
16     understanding.
17  BY MR. CARTMELL:
18     Q.   So would it be true that all
19  of the employees at Cephalon, if they
20  learned of, for example, off-label
21  marketing of the drug Fentora or Actiq,
22  had a duty to report that?
23     A.   Yes.
24     Q.   Is that the same at Teva?

Page 298

1      A.   Yes.
2      Q.   And has it been that way
3  since you've been there?
4      A.   Yes.
5      Q.   In other words, if there's a
6  violation of the law going on, including
7  off-label marketing of Class II narcotics
8  like opioids, then that's something that
9  every employee there must report,
10  correct?
11         MS. HILLYER:  Objection.
12     Assumes facts not in evidence.
13     And beyond the scope.
14         You can answer if you know
15     in your personal capacity.
16         THE WITNESS:  It's not
17     specific to opioids.  It's a
18     general expectation.
19  BY MR. CARTMELL:
20     Q.   But it includes opioids?
21     A.   Yes.
22         MS. HILLYER:  Same
23     objection.
24  BY MR. CARTMELL:

Page 299

1      Q.   I'll show you real quickly
2  Exhibit-21, which I believe is a copy of
3  the risk map that was provided to us or
4  produced to us by Teva in this litigation
5  from back in 2001.
6         Do you see that?
7      A.   Yes.
8              - - -
9         (Whereupon, Teva-Hassler
10     Exhibit-021,
11     TEVA_MDL_A_03272088-117, was
12     marked for identification.)
13              - - -
14  BY MR. CARTMELL:
15     Q.   And as we discussed before,
16  the FDA, when it approved Actiq, required
17  Cephalon to have a risk management
18  program in place; is that right?
19         MS. HILLYER:  Objection.
20     Beyond the scope.
21         You can answer if you know.
22         THE WITNESS:  That's my
23     understanding.
24  BY MR. CARTMELL:

Page 300

1      Q.   And there were certain
2  requirements for that, that I want to
3  just ask you about real quick.
4         If you turn to Section 5.2
5  of the document, the last four numbers of
6  the Bates range are 2103.  5.2 talks
7  about --
8         MS. HILLYER:  Let him get
9     there.
10  BY MR. CARTMELL:
11     Q.   -- the oncology sales
12  specialist, Cephalon, Inc. sales
13  organization.
14         And it states, Full-time
15  oncology sales specialists have been
16  placed in the field to personally call on
17  the target audience.  The oncology sales
18  specialists are the primary day-to-day
19  link to the physicians, nurses and
20  pharmacists who will be using the
21  product.  The oncology sales specialists
22  play a key role in implementing the risk
23  map.
24         Do you see that?

Page 301

1      A.   I do.
2      Q.   Do you know, at the time of
3  the purchase by Teva of Cephalon in 2011,
4  did Cephalon have these sales -- oncology
5  sales specialists?
6      A.   Cephalon had an oncology
7  business unit that had sales specialists.
8      Q.   And is your understanding
9  that the sales specialists in the
10  oncology department that you just
11  identified would be the ones who were
12  fulfilling this risk map and going to
13  doctors, oncologists, and educating them
14  about the risks associated with opioids?
15      A.   No.
16      Q.   Because I think you
17  previously testified that the oncology
18  department was not the department at
19  Cephalon where the opioids were sold or
20  marketed out of, correct?
21      A.   Yes.
22      Q.   So do you know whether or
23  not they had these full-time oncology
24  sales specialists required by the risk

Page 302

1  map?
2      MS. HILLYER:  Objection to
3  form.  The document -- I don't
4  know that the document actually
5  says that.
6      But you can answer it.
7      And this is beyond the scope
8  of topics.
9      You can answer if you know
10  in your personal capacity.
11      THE WITNESS:  Would you ask
12  me the question again, please?
13  BY MR. CARTMELL:
14      Q.   Do you know -- I'm going to
15  broaden the question.
16      Do you know whether -- or
17  have you seen documents related to
18  oncology sales specialists at Cephalon
19  that were going to oncology --
20  oncologists and explaining the risks and
21  dangers associated with opioids?
22      A.   Yes, I know that that
23  occurred.  It was not the predominant
24  group.  The group that sold those

Page 303

1  products predominantly were the pain
2  management specialists.  And they did
3  communicate the risk map to the customers
4  that they called on.
5      Q.   During what years?
6      MS. HILLYER:  Objection.
7      Vague.
8      THE WITNESS:  For the
9  majority of the time that the
10  products were promoted.
11  BY MR. CARTMELL:
12      Q.   It states, in the third
13  paragraph under this section, In the
14  approximately three months between
15  product approval and product
16  availability, the oncology specialists
17  personally called on 1,000 of the 2,000
18  pharmacies dispensing the largest volume
19  of CH products.
20      Do you see that?
21      A.   C-II products.
22      Q.   I'm sorry, C-II, Class II
23  products.
24      A.   Yes.

Page 304

1      Q.   That's referring to opioids,
2  correct?
3      A.   Schedule II products, which
4  would include opioids, yes.
5      Q.   And this says three months
6  between product approval and product
7  availability.
8      Is your belief that that was
9  done by Anesta and not Cephalon?
10      MS. HILLYER:  Objection to
11  the extent --
12  BY MR. CARTMELL:
13      Q.   Or do you know?
14      A.   I don't know.
15      MS. HILLYER:  -- this is
16  beyond the scope.
17  BY MR. CARTMELL:
18      Q.   But you don't know of or
19  haven't seen documents suggesting that at
20  any time sales oncology specialists from
21  Cephalon did that, correct?
22      MS. HILLYER:  Did what?
23      MR. CARTMELL:  Did what I
24  just referred to, which is call

Page 305

1    on, personally, 1,000 of the 2,000
2    pharmacies dispensing the largest
3    volume of C-II products.
4         THE WITNESS:  I don't know
5    who made those calls.  I do know
6    that Cephalon oncology sales
7    specialists did carry Actiq as one
8    of their brands for periods of
9    time.  I don't know specifically
10   what periods.  I wasn't able to
11   determine that based on the
12   conversations that I had.
13   BY MR. CARTMELL:
14        Q.   Would the three months
15   between product approval and product
16   availability have been before Cephalon
17   purchased Anesta and Actiq?
18        A.   I believe that the product
19   was approved in '99.  I'm not sure.  I
20   don't know.
21        Q.   Well, '99 was well before
22   Cephalon purchased the product, correct?
23        A.   Yeah, yeah.  I just don't
24   know -- I don't know that that's right.

Page 306

1         Q.   That's fine.  I guess what
2    I'm really trying to get at is, have you
3    ever seen a document, I haven't found
4    one, that talks about these oncology
5    sales specialists at Cephalon?
6         And I'm trying to figure
7    out, was that actually somebody at Anesta
8    who was doing that and whether Cephalon
9    continued to have that person in their
10   sales or marketing department.  Because I
11   haven't seen it on any of their org
12   charts.
13        MS. HILLYER:  Objection to
14   form.
15        You can answer.
16        THE WITNESS:  I haven't seen
17   that in the material that I've
18   reviewed.
19   BY MR. CARTMELL:
20        Q.   So as far as you know, based
21   on everything you've reviewed, at least
22   at Cephalon, they didn't have that sales
23   oncology specialist on their org charts?
24        MS. HILLYER:  Objection to

Page 307

1    form.
2         THE WITNESS:  They did have
3    oncology sales specialists who did
4    carry Actiq.  What I haven't been
5    able to determine, despite
6    conversations and efforts to find
7    it, I haven't been able to
8    determine specifically when.
9    BY MR. CARTMELL:
10        Q.   Where are these training
11   materials warehoused or found, do you
12   know, from Cephalon?
13        A.   They would, as we talked
14   earlier, for the time periods that we had
15   discussed, they would have been in ZINC
16   or in VIVA.  Prior to that, it would be
17   individual files that we would have to go
18   through because it was a hardcopy
19   process.
20        Q.   So same thing we talked
21   about before, there would be a PDRC
22   number that would help us identify those?
23        A.   Yes.  There should be a PDRC
24   number on any of those pieces.

Page 308

1         Q.   For Teva, after it acquired,
2    was there sales training that was given
3    to your Teva sales force to sell Fentora
4    after 2011?
5         A.   Yes.  For the pain care
6    sales force, they would have -- they
7    would have received training on the
8    product for any new representative that
9    came in.
10        Q.   What about the ones that
11   were already there when the acquisition
12   occurred?
13        A.   Any changes to labeling or
14   process, they would have been trained on
15   that as well.
16        So when the TIRF REMS
17   program went into place, that entire
18   group would have been trained on that
19   program.
20        Q.   But I'm talking now around
21   the time of 2011.
22        Now, all of a sudden, for
23   the first time, Teva has a brand-name
24   opioid that it's selling, correct?

Page 309

1      A.   Teva became the distributor
2  for it.  But the same group that was
3  selling it at Cephalon continued to sell
4  Fentora.
5      Q.   Okay.  So Teva wasn't
6  selling Fentora, it was just distributing
7  it?
8          MS. HILLYER:  Objection to
9  form.
10         THE WITNESS:  I want to be
11  more clear than I was.
12         Teva distributed and booked
13  the sales for the product.
14  BY MR. CARTMELL:
15     Q.   So they were selling it?
16     A.   Yes.
17         The group that promoted the
18  product was the same group, in the pain
19  care sales force, who had had it
20  previously.
21     Q.   They came over from
22  Cephalon?
23     A.   Yes.  Under the management
24  structure that we had.

Page 310

1      Q.   Okay.  So you had sales reps
2  now who were going to doctors' offices
3  all over America selling Fentora,
4  correct?
5          MS. HILLYER:  Objection to
6  form.
7          THE WITNESS:  As they had
8  previously for the -- for that
9  branded product, yes.
10  BY MR. CARTMELL:
11     Q.   And those sales reps, did
12  you just keep the ones from Cephalon and
13  hire them under your umbrella at Teva?
14     A.   I don't know who actually
15  employed them, in terms of which legal
16  entity employed them.
17         But, yes, from a management
18  structure standpoint, they were brought
19  over and we maintained a pain care sales
20  force underneath Teva CNS, which was all
21  of our branded CNS products.
22     Q.   And that's why you said it
23  wasn't new sales training, because these
24  were salespeople who had come from

Page 311

1  Cephalon and had already had training, is
2  your testimony?
3      A.   For those that came over.
4          For any new hires that came
5  in, then they would have been trained by
6  the sales training group.
7          For any changes that
8  occurred to the labelling or our
9  practices, that whole sales force would
10  have been trained on that.
11         The most -- the largest
12  change that occurred there was the
13  implementation of the TIRF REMS program
14  and the training that needed to take
15  place in order for physicians to write
16  and pharmacies to be able to dispense the
17  product.
18     Q.   But after the acquisition of
19  Cephalon, is it fair to say that if you
20  had new salespeople start, now they're at
21  Teva under the Teva umbrella, Teva CNS,
22  would you still use the Cephalon --
23  former Cephalon employees or salespeople
24  to train them, or did Teva have a new

Page 312

1  group of its own employees who would
2  train them on Fentora?
3      A.   I believe that the training
4  team was integrated.  So it -- the
5  branded product sales training group, I
6  believe, became one team.  They may or
7  may not have had legacy Cephalon trainers
8  continuing to train them.
9      Q.   But there were legacy
10  Cephalon salespeople still on that
11  training team, correct?
12     A.   There were legacy Cephalon
13  trainers there.  I don't know what their
14  background was, whether they came from
15  sales or not.
16     Q.   Who did the Kadian sales
17  training?
18         MS. HILLYER:  Objection.
19  Beyond the scope.
20  BY MR. CARTMELL:
21     Q.   Do you know?
22     A.   No.  I have no information
23  on that.
24     Q.   There was a sales force at

Page 313

1    Teva to sell Kadian, an opioid, correct?
2         MS. HILLYER:  Objection.
3    Beyond the scope and assumes facts
4    not in evidence.
5         THE WITNESS:  Not that I'm
6    aware of.
7         Can I take a very brief
8    break?
9         MS. HILLYER:  We have been
10   going a little over an hour
11   anyway.
12        VIDEO TECHNICIAN:  Going off
13   the record at 4:50 p.m.
14             - - -
15        (Whereupon, a brief recess
16   was taken.)
17             - - -
18        VIDEO TECHNICIAN:  Back on
19   the record.  5:02.
20   BY MR. CARTMELL:
21        Q.   Mr. Hassler, we're back on
22   the record.
23        Are you ready to proceed?
24        A.   I am.

Page 314

1         Q.   A few more questions about
2    Topic 8 that we're talking about, which
3    is dealing with the training of
4    salespeople related to promotion and
5    related to suspicious order monitoring,
6    things like that.
7         I don't think I've asked you
8    yet about Actiq -- or, excuse me, about
9    Actavis training and where the materials
10   would be for that type of training at
11   Actavis.
12        Do you know?
13        A.   No.  I'm not aware of sales
14   training materials at Actavis, other than
15   an oxymorphone announcement.  That's the
16   only training that I can think of.
17        Q.   But did you go back and try
18   to find out, either from individuals or
19   their documents, whether or not they were
20   training their salespeople related to the
21   promotion or marketing of their generic
22   opioids?
23        MS. HILLYER:  Objection.
24   Assumes facts not in evidence.

Page 315

1         You can answer.
2         THE WITNESS:  No, I'm not
3    aware that they trained their
4    salespeople on their products.
5    BY MR. CARTMELL:
6         Q.   Do you know if they trained
7    them on, you know, things like diversion
8    of opioids or trained them on a
9    suspicious order monitoring and reporting
10   and investigating, things like that?  Do
11   you know whether they did that?
12        A.   I've seen policies for their
13   customer service group and for their
14   suspicious order monitoring group, DEA
15   safety group.  But I have not seen any
16   training on those topics outside of those
17   that were directly involved, other than
18   just general corporate standards type
19   expectations.
20        Q.   Just to be clear for the
21   record, so you haven't seen any
22   indication that Actavis was training
23   their salespeople related to those topics
24   for opioids, correct?

Page 316

1         A.   That's correct.
2         Q.   Okay.  And you have not seen
3    any training materials that suggest that
4    either, right?
5         A.   Correct.
6         Q.   Okay.  A few things I wanted
7    to follow up on.  I'm sure I'll draw an
8    objection from your counsel, but you
9    talked about TIRF REMS.
10        And are those applicable to
11   generic TIRFs?
12        MS. HILLYER:  Beyond the
13   scope.
14        But you can answer.
15        THE WITNESS:  They are.
16   BY MR. CARTMELL:
17        Q.   So those TIRF REMS would
18   apply to all of Teva's or Actavis --
19   acquired Actavis generics, correct?
20        MS. HILLYER:  Same
21   objection.
22   BY MR. CARTMELL:
23        Q.   Generic TIRFs?
24        A.   Yes.  It would apply to all

Page 317

1  TIRFs.
2      Q.    And are there any other REMS
3  that apply to non-TIRF opioids?
4          MS. HILLYER:  Objection.
5      Beyond the scope.
6          You can answer if you know
7      in your individual capacity.
8          THE WITNESS:  I believe so.
9      I don't know those criteria as
10     well -- I don't know those
11     criteria.  I do know them for the
12     TIRF REMS.
13  BY MR. CARTMELL:
14     Q.    But is your understanding
15  that there is a REMS for Teva's generic
16  opioids?
17         MS. HILLYER:  Same
18     objection.
19  BY MR. CARTMELL:
20     Q.    That are non-TIRF?
21     A.    I believe that there is a --
22  actually, I don't want to comment on
23  that.  I don't know for sure.
24     Q.    Do you know whether Teva's

Page 318

1  generic sales force and marketing
2  personnel were trained on the generic --
3  for example, the generic TIRF REMS?
4      A.    Not that I'm aware of.
5      Q.    Let's move on to the next
6  topic.  That is going to be Topic 11.
7          Let's read Topic 11.  Topic
8  11, as you can see, states, Your
9  relationship with, compensation paid by
10  you to, and identity of the persons who
11  interacted with the following persons,
12  entities, regarding opioids or opioid
13  products.
14         And then, as you can see, it
15  lists American Academy of Pain Medicine,
16  American Pain Society, American Pain
17  Foundation, American Geriatrics Society,
18  American Chronic Pain Association,
19  American Society of Pain Educators, and I
20  am not going to read them all, but
21  several other organizations, societies
22  and groups.
23         And on the next page, there
24  is a list of the joint commission, the

Page 319

1  pain care forum.
2          And then from R to AA is a
3  list of doctors.
4          Do you see that?
5      A.    Yes.
6      Q.    And when this question asked
7  your relationship with, you understand
8  this is asking about Cephalon's or Teva's
9  or Actavis's relationship with these
10  groups or individuals, correct?
11     A.    Yes.
12     Q.    And the question is also
13  asking how much was paid by those
14  companies to each of these organizations
15  or individuals.
16         Do you understand that?
17     A.    I do.
18     Q.    Okay.  So, Doctor -- strike
19  that.
20         So, Mr. Hassler, you have
21  been chosen to be the representative with
22  knowledge of these payments and
23  relationship with these organizations and
24  doctors, correct?

Page 320

1      A.    Yes.
2      Q.    And so tell us -- strike
3  that.
4          Did you have personal
5  knowledge and experience with working
6  with, first of all, these organizations,
7  these paying foundations and societies,
8  prior to being picked to be the corporate
9  representative in this lawsuit?
10     A.    No.
11     Q.    Did you have any experience
12  with any of the doctors listed here?  Did
13  you have any experience working with them
14  in any respect prior to being asked to
15  testify as the corporate representative
16  in this lawsuit?
17     A.    Not that I recall.
18     Q.    Okay.  So you, I take it,
19  had to go back and look through documents
20  and meet with people and talk to others
21  who have personal experience with these
22  organizations and payments to these
23  organizations and people, correct?
24     A.    Yes.

Page 321

1    Q.   So what did you do?
2    A.   I spoke with Paula Williams
3  and Matt Day, Dolly Judge, to try to
4  assess whether Teva had relationships
5  with these organizations.  I had reviewed
6  some of the grants that were made to
7  these organizations to understand the
8  structure, as well as reviewed policies
9  on the grant process at different points
10 in time.
11        I had also reviewed policies
12 related to Watson, and I believe -- I
13 believe Actavis, but Watson certainly, on
14 interaction with customers.
15        Let me just double check
16 that.  I think that was the policy that I
17 had looked at.  But I had reviewed a
18 number of documents to understand how
19 that process would work to provide grants
20 of support to these organizations.
21    Q.   And the people you mentioned
22 are the people you thought or were told
23 by counsel were people that might be most
24 knowledgeable about these topics?

Page 322

1        MS. HILLYER:  Objection to
2  form.
3        THE WITNESS:  Discussion
4  with counsel, as well as having
5  been the general manager, I had
6  worked with Matt and knew Matt had
7  experience in this area.
8        I was also familiar with
9  Paula and knew that she had worked
10 in this space.  So it was -- I
11 followed up with her as well.
12 BY MR. CARTMELL:
13    Q.   And let's talk first about
14 payments to these societies that are
15 listed on your Exhibit-1 and foundations
16 and medical boards and all these
17 organizations.
18        Why is it that Cephalon, for
19 instance, during the time it was selling
20 Actiq and then Fentora from 2000 to 2009,
21 why is it that Cephalon was making
22 payments to these organizations?
23    A.   The organizations would
24 request grants to support educational

Page 323

1  initiatives.  And where those objectives
2  for those educational initiatives aligned
3  with Cephalon's educational objectives,
4  they would issue grants in support of
5  those proposals.
6        Educational grants had to be
7  independent of company influence over the
8  content, and there were letters of
9  agreement signed for those grants that
10 were issued that would specify that.
11    Q.   Now, these -- for example,
12 let's talk about Cephalon first, these
13 payments to these organizations, the
14 request for those payments to be made to
15 these organizations, were those requests
16 made to the marketing department at
17 Cephalon?
18    A.   Early on they could come
19 through marketing, and then would be
20 transferred to medical.  Over time,
21 marketing was excluded from that and they
22 had to be made online for the request to
23 come directly in to medical.
24    Q.   When was that, that

Page 324

1  marketing was excluded, do you know?  Was
2  that after the 2008 corporate integrity
3  agreement?
4    A.   I don't know the specific
5  date of that.  If you have the
6  independent grant policy, I know it's
7  listed in there.  I just don't know the
8  date of that policy.
9    Q.   But payments to these
10 organizations were not made just for
11 educational purposes, correct?
12    A.   That's correct.  There were
13 also payments that were sponsorships.
14 And corporate memberships were also made
15 to some of these organizations.
16    Q.   Right.  For instance, these
17 organizations, like the American Academy
18 of Pain Medicine or the American Pain
19 Society, some of those types of
20 organizations allow pharmaceutical
21 companies like Cephalon or Teva to
22 actually become members of the society or
23 the organization, correct?
24    A.   Yes.

Page 325

1    Q.   And they may charge the
2  pharmaceutical company like Cephalon or
3  Teva a fee to be a member, correct?
4    A.   Yes.
5    Q.   And so I think when you
6  said -- what did you say, you called
7  those corporate membership payments?
8    A.   Corporate sponsorships or
9  corporate memberships.
10   Q.   So, in fact, I take it you
11 know that at Cephalon, and also at Teva,
12 those pharmaceutical companies, as well
13 as lots of other pharmaceutical companies
14 who sell opioids, have become, in the
15 past, members or corporate sponsors of
16 these companies, correct?
17   A.   Yes.
18   Q.   Or these organizations,
19 correct?
20   A.   Yes.
21   Q.   And that's thought to be --
22 within the companies, typically, that is
23 a sort of marketing-type of activity or
24 promotion-type activity, or it can be,

Page 326

1  correct?
2    MS. HILLYER:  Objection to
3  form.
4    THE WITNESS:  Marketing can
5  issue sponsorships or can issue
6  membership payments, but they have
7  to be approved via our compliance
8  process.
9  BY MR. CARTMELL:
10   Q.   Right.  But do they come out
11 of the marketing budget?
12   A.   They can.
13   Q.   And also Cephalon and other
14 companies can pay, in these grants that
15 they pay these organizations and
16 societies for, publications or to help
17 with publications, for example, that
18 support the use of opioids, correct?
19   MS. HILLYER:  Objection to
20 form.
21   THE WITNESS:  The payments
22 that we make to these
23 organizations, or the grants that
24 are given, would be given for a

Page 327

1  specific educational objective.
2    But we wouldn't control any
3  of the content of those materials
4  that are associated with that
5  grant.
6    MR. CARTMELL:  I'm going to
7  object and move to strike that, I
8  don't think that answered my
9  question.
10 BY MR. CARTMELL:
11   Q.   My question is a little
12 different.  I'm not asking who controls
13 the content.
14   Cephalon and Teva and other
15 opioid selling pharmaceutical companies
16 have provided, I take it you know from
17 your experience, grants to these types of
18 organizations, pain organizations, that
19 the money can be used for publication of
20 papers or pamphlets, those types of
21 things, that support the use of opioids,
22 correct?
23   MS. HILLYER:  Objection to
24 form.  And asked and answered.

Page 328

1    You can answer it again.
2    THE WITNESS:  They may.  But
3  they may not as well.  They
4  typically are publications in
5  support of pain management, which
6  may include components of opioid
7  use.
8  BY MR. CARTMELL:
9    Q.   And lots of these
10 organizations, like The American Academy
11 of Pain Medicine and American Pain
12 Society, the American Pain Foundation,
13 organizations like that will have annual
14 meetings, things like that?
15   A.   Yes.
16   MS. HILLYER:  Objection.
17 Beyond the scope.
18 BY MR. CARTMELL:
19   Q.   And sometimes you know that
20 Cephalon and Teva, and other
21 pharmaceutical companies that sell
22 opioids, will make payments to those
23 organizations to help sponsor their
24 annual meetings that doctors come to,

Page 329

1    correct?
2        A.   They can issue sponsorship
3    payments, yes.
4        Q.   And when they go to those
5    meetings for these types of events, for
6    example, some of the money that they may
7    pay may go to entertainment of the
8    doctors, correct?
9        MS. HILLYER: Objection.
10   Assumes facts not in evidence.
11   And beyond the scope of the topic.
12       You can answer if you know
13   in your personal capacity.
14       THE WITNESS: We're
15   prohibited from making payments
16   specific -- specifically for
17   entertainment activities.
18   BY MR. CARTMELL:
19       Q.   Since when?
20       A.   Dating back to the
21   mid-2000s.
22       Q.   Right. So early in the
23   2000s, do you know whether Cephalon was
24   making payments to doctors or

Page 330

1    organizations who would help them promote
2    opioids for entertainment purposes?
3        A.   I do not know that.
4        Q.   You just don't know one way
5    or the other?
6        A.   Correct.
7        Q.   Do you know if Teva was
8    doing that back in the early 2000s?
9        MS. HILLYER: Objection to
10   form.
11       Go ahead.
12       THE WITNESS: There were no
13   opioid -- opioids in Teva in the
14   early 2000s.
15   BY MR. CARTMELL:
16       Q.   Now, you have listed here in
17   your notes sort of what you found. And
18   you've also provided us with Appendix 5
19   that I'll show in a minute.
20       MR. CARTMELL: Has that been
21   marked yet?
22       MS. HILLYER: Yes, 9.
23       MR. CARTMELL: It's
24   Exhibit-9, Appendix 5.

Page 331

1            - - -
2        (Whereupon, Teva-Hassler
3        Exhibit-009, Appendix 5 - Topic
4        11, was marked for
5        identification.)
6            - - -
7    BY MR. CARTMELL:
8        Q.   That is a list of payments
9    made to some of these organizations; is
10   that correct?
11       MS. HILLYER: Objection to
12   form.
13       THE WITNESS: This is a list
14   of grants or payments that we have
15   been able to identify for each of
16   these organizations.
17   BY MR. CARTMELL:
18       Q.   Okay. And I just want to
19   make sure I understand.
20       Here is Appendix 5, and you
21   have identified that Cephalon or Teva,
22   and maybe you can tell me, has made
23   payments over the years to American
24   Academy of Pain Medicine, correct?

Page 332

1        A.   Yes.
2        Q.   And they've supported them
3    through continuing medical education or
4    symposiums and other educational grants,
5    correct?
6        A.   Yes.
7        Q.   American Pain Society,
8    right?
9        A.   Yes.
10       Q.   Payments have been made to
11   them by Teva or Cephalon, or both?
12       A.   Yes.
13       Q.   American Pain Foundation is
14   another one that Teva or Cephalon, or
15   both, have made payments to?
16       A.   Yes.
17       Q.   Same is true with American
18   Geriatric Society, correct?
19       MS. HILLYER: Objection to
20   form.
21       THE WITNESS: There weren't
22   any payments identified there.
23   BY MR. CARTMELL:
24       Q.   I'm sorry. Strike that. I

Page 333

1    didn't read.  Sorry.
2         You didn't identify any
3    payments to the American Geriatrics
4    Society, correct?
5         A.   That's correct.
6         Q.   American Chronic Pain
7    Association, you did find payments by
8    Teva or Cephalon, or both?
9         A.   Yes.
10        Q.   You didn't identify any from
11   the American Society of Pain Educators,
12   but did find payments from Cephalon or
13   Teva, or both, to the National Pain
14   Foundation, Pain and Policy Studies
15   Group, Federation of State Medical
16   Boards, American Society of Pain
17   Management Nursing, U.S. Pain Foundation,
18   Center for Practical Bioethics, correct?
19        A.   Yes.
20        Q.   And then you've indicated on
21   here some that you didn't identify any
22   payments; is that right?
23        A.   That's correct.
24        Q.   Now, what I want to make

Page 334

1    sure of is, did you do an exhaustive look
2    for all types of payments to all of the
3    organizations listed in Number -- Topic
4    Number 11 that are listed here?
5         A.   We did an exhaustive look,
6    yes.
7         Q.   For all of these
8    organizations?
9         A.   Yes.
10        Q.   And I want to make sure you
11   didn't just look for, for example,
12   educational grants.
13        A.   No.  I believe that we also
14   would have queried the Care System for
15   any sponsorships or grants as well.
16        Q.   What's the Care System?
17        A.   That's the compliance system
18   that we have for any grants made to
19   healthcare professionals.  And it also
20   records any payments to physicians that
21   we report for purposes of The Sunshine
22   Act.
23        Q.   Is that included in your
24   response here, or your notes, the Care

Page 335

1    System?
2         A.   It's not in my notes.
3         Q.   So let's make sure we nail
4    this down.
5         There is a database at Teva
6    that records all payments to physicians?
7         A.   Yes.
8         Q.   And it's called -- is that
9    the Compliance Payments Database?
10        A.   That may be the database
11   that houses it.
12        MS. HILLYER:  Objection to
13   form.
14        THE WITNESS:  The system
15   that I was referring to is the
16   Care System.
17   BY MR. CARTMELL:
18        Q.   The Care System.  And is
19   that a Teva system?
20        A.   It was originally a Cephalon
21   system.
22        Q.   And when did that start?
23        A.   In the mid-2000s.
24        Q.   Before 2009?

Page 336

1         A.   Yes.
2         Q.   And does that only track
3    payments to doctors?
4         A.   No.  Sponsorships would be
5    in there as well.
6         Q.   Okay.
7         A.   So this would reference
8    that, the 2009 to 2017 data on payments
9    made to physicians.
10        Q.   Okay.  You're talking about
11   where you say, Payments made to specific
12   healthcare providers were tracked
13   electronically from 2009 to '17?
14        A.   Yes.
15        Q.   And that data can be found
16   at -- and it gives MDL number, a Teva MDL
17   number, correct?
18        A.   Yes.
19        Q.   Is that the Care Database?
20        MS. HILLYER:  Objection to
21   form.
22        THE WITNESS:  That's my
23   assumption.
24   BY MR. CARTMELL:

Page 337

1      Q.   Okay.  But you just told me
2  this started before 2009.
3      A.   No.  I thought you asked if
4  it was -- I'm sorry if I misstated that.
5  I believe that it was in 2009.
6      Q.   That's when the Care
7  Database started?
8      A.   I believe so.
9      Q.   Okay.  Are there any other
10 databases at Teva or at Cephalon, that
11 were at Cephalon, that tracked either
12 payments to doctors or payments to
13 organizations like those listed here?
14      MS. HILLYER:  Objection to
15      the extent it's beyond the scope
16      of the topics.
17      You can answer if you know.
18      THE WITNESS:  Those are the
19      only two that I'm aware of.
20 BY MR. CARTMELL:
21      Q.   Okay.  Prior to 2009, how
22 would we find out what payments had been
23 made to these organizations?
24      MS. HILLYER:  Same

Page 338

1      objection.
2  BY MR. CARTMELL:
3      Q.   By Teva or Cephalon or
4  Actavis?
5      A.   Other than by search of the
6  database and the hardcopy grant requests,
7  I'm not aware of another place to look
8  for that information.
9      Q.   Sometimes there would be
10 payments as consulting fees to doctors,
11 correct?
12      A.   Yes.
13      Q.   Would that be in the
14 database, the Care Database that you
15 identified?
16      A.   If it occurred, yes, after
17 the time that that came into effect, it
18 should be in there.
19      Q.   Okay.  And that -- I want to
20 also ask about compensation, including
21 serving as a faculty or speaker at a
22 venue other than a continuing education
23 program.
24      Would those payments be

Page 339

1  located in the Care Database?
2      A.   Yes.  There may be an
3  exception for clinical research work.  I
4  don't believe that that would have been
5  in Care.
6      Q.   Where would the donations or
7  grants for clinical study or research
8  work be tracked?
9      MS. HILLYER:  Objection.
10      Beyond the scope of the topics.
11      You can answer if you know
12      in your personal capacity.
13      THE WITNESS:  Within the
14      clinical or medical department.
15 BY MR. CARTMELL:
16      Q.   Do you know the names of any
17 databases?
18      A.   No.
19      MS. HILLYER:  Same
20      objection.
21 BY MR. CARTMELL:
22      Q.   Do you know the people who
23 would have most knowledge about that?
24      MS. HILLYER:  Same

Page 340

1      objection.
2      THE WITNESS:  No, I don't.
3  BY MR. CARTMELL:
4      Q.   To be clear, those donations
5  or grants for clinical research, are
6  those sometimes made to organizations
7  like these academies and societies and
8  foundations?
9      A.   Not that I'm aware of.
10      Q.   But did you look for that?
11      MS. HILLYER:  Objection to
12      form.
13      THE WITNESS:  When we looked
14      for the payments that were made to
15      these, I don't recall seeing any
16      payments for clinical research
17      work.
18 BY MR. CARTMELL:
19      Q.   Well, what was your search
20 term or your query that allowed you to
21 find these payments to these companies?
22      MS. HILLYER:  Objection to
23      form.
24 BY MR. CARTMELL:

Page 341

1      Q.   Do you know, or did counsel
2   do it?
3      A.   I believe that the --
4         MS. HILLYER:  Objection to
5   the form.  And beyond the scope.
6         You can answer if you know.
7         THE WITNESS:  I don't know
8   specifically how that was done.
9   BY MR. CARTMELL:
10      Q.   Well, you know you didn't do
11   it, right?
12      A.   That's correct.
13      Q.   You know -- you left that to
14   counsel?
15         MS. HILLYER:  Objection to
16   form.
17         THE WITNESS:  Yes.
18   BY MR. CARTMELL:
19      Q.   So your notes say you looked
20   for educational grants and other support
21   on a search of hardcopy grant request
22   forms, as well as educational grants that
23   were tracked electronically from 2012 to
24   2016.

Page 342

1         Is that all that you looked
2   for, for payments to these societies?
3         MS. HILLYER:  Objection to
4   form.
5         THE WITNESS:  That's all
6   that I'm aware of where to look.
7   BY MR. CARTMELL:
8      Q.   But there's other types of
9   payments that could be made to these
10   societies that aren't educational grants.
11         And that's what you looked
12   for, right?
13         MS. HILLYER:  Objection to
14   form.  It says "and other
15   support."
16         THE WITNESS:  Or hardcopy
17   grant requests.  So any grant
18   requests that came in that we
19   could identify hardcopies, we also
20   searched for those for these
21   organizations.
22   BY MR. CARTMELL:
23      Q.   What other type of support
24   did you look for?  Did you look for any

Page 343

1   payments made by Teva or Cephalon or
2   Actavis to any of these foundations or
3   societies from 2000 until today?
4         MS. HILLYER:  Objection to
5   form.  And asked and answered.
6         You can answer again.
7         THE WITNESS:  We searched
8   these databases and we searched
9   hardcopy grant request forms for
10   all of these organizations,
11   regardless of the type of grant
12   request.
13   BY MR. CARTMELL:
14      Q.   And is your understanding
15   that by calling it a grant request that
16   would cover every type of payment to
17   these foundations and organizations that
18   are listed in Topic 11?
19         MS. HILLYER:  Objection to
20   form.  Mischaracterizes testimony.
21         MR. CARTMELL:  I just don't
22   want you guys -- I'm not trying to
23   parse your words, but if there's a
24   trick here, I want to know about

Page 344

1   it.
2         Because I've got a hard time
3   believing this is all the payments
4   for those 20 years to these
5   organizations.  In fact, I know
6   it's not.
7         So I'm trying to figure out
8   what you did to try to get all of
9   the payments to these
10   organizations.
11         MS. HILLYER:  Rather than
12   try to trip him up, if you have
13   another document that shows the
14   document he's created is not
15   accurate, then why don't you show
16   that to him and ask him?  Because
17   that's what he's here to testify
18   about, the identification of this
19   paper.
20         MR. CARTMELL:  I don't have
21   another document with me.
22         MS. HILLYER:  Then how can
23   you be so sure that he's wrong?
24         MR. CARTMELL:  Because I've

Page 345

1    seen documents.
2        MS. HILLYER:  Then you
3    should have brought them today,
4    that was the topic.
5        MR. CARTMELL:  Well, I
6    thought he was --
7        MS. HILLYER:  All right.
8    This is your chance to do it.
9        MR. CARTMELL:  I thought he
10   was bringing -- this asks for all
11   the money paid to them,
12   compensation paid by you to all of
13   these organizations.  And he
14   brings with him Exhibit-5 that I
15   believe is incomplete.
16       MS. HILLYER:  And he
17   references to lots of other Bates
18   numbers here.
19       MR. CARTMELL:  So I just
20   want to make sure we're covering
21   everything.
22   BY MR. CARTMELL:
23       Q.   Did you search for the
24   entire time period from 2000 to 2018, or

Page 346

1    today, to see if Cephalon or Actavis or
2    Teva made any payments, regardless of
3    whether it's related to opioids, to these
4    organizations?
5        MS. HILLYER:  Objection.
6    Because the topic is about
7    opioids.
8        MR. CARTMELL:  No.
9        MS. HILLYER:  Yes, it is.
10   Regarding opioids or opioid
11   products.  It's right in the
12   topic.
13       MR. CARTMELL:  It's talking
14   about the people you interacted
15   with regarding opioids.
16       MS. HILLYER:  The whole
17   topic is limited to opioids and
18   opioid products.  We have no
19   obligation to look for payments to
20   doctors or any organization that
21   has to do with any other thing
22   besides opioids in this
23   litigation.
24       MR. CARTMELL:  Why?

Page 347

1        MS. HILLYER:  Why?
2        MR. CARTMELL:  We're
3    entitled to know about bias.  Bias
4    is always an issue.  It's always
5    an issue.
6        MS. HILLYER:  That's what
7    the topic is.  And to the extent
8    you want to go beyond that, we can
9    take it up with the special
10   master.
11   BY MR. CARTMELL:
12       Q.   I'm going to ask beyond it.
13       Did you search from 2000 to
14   2020 for any types of payments made,
15   regardless of what it is, whether it's an
16   educational grant, whether it's an
17   honorarium, whether it's membership dues,
18   whether it's any type of payment to these
19   organizations for those 18 years, for
20   Cephalon, Actavis and Teva?
21       MS. HILLYER:  Objection to
22   form.  Beyond the scope.
23   Tom, I think it's very
24   clear, the topic; your

Page 348

1    relationship with, compensation
2    paid by you to, and identity of
3    the persons who interacted with
4    the following persons/entities
5    regarding opioids or opioid
6    products.
7        Mr. Hassler, you can answer
8    if you know in your individual
9    capacity.
10       THE WITNESS:  What I know is
11   we've made a diligent effort to
12   try to find the payments to these
13   organizations, and this is what
14   we've been able to come up with.
15   BY MR. CARTMELL:
16       Q.   And was it limited to
17   payments that you believed were related
18   to opioid marketing or promotion or
19   sales?
20       MS. HILLYER:  Same
21   objection.
22       THE WITNESS:  Yes, I believe
23   that it was related to those
24   issues.

Page 349

```
 1    BY MR. CARTMELL:
 2        Q.   So if Teva or Cephalon or
 3    Actavis made payments to these
 4    organizations that you didn't determine
 5    were related to marketing or promotion or
 6    sales of opioids, you didn't include
 7    that, correct?
 8            MS. HILLYER:  Same
 9        objection.
10            THE WITNESS:  I don't know
11        that there were any to exclude.
12            But I can't -- I cannot
13        answer that they would have been
14        included if they clearly were not
15        related to opioids.
16    BY MR. CARTMELL:
17        Q.   You don't know because all
18    you know is what was provided to you by
19    counsel, correct?
20            MS. HILLYER:  Objection.
21        Beyond the scope.
22            You can answer in your
23        individual capacity.
24            THE WITNESS:  By counsel and
```

Page 350

```
 1    through the discussions that I've
 2    had with others.
 3    BY MR. CARTMELL:
 4        Q.   Okay.  Now, what -- were
 5    there any other pain drugs that were
 6    marketed by Cephalon or Teva or Actavis
 7    during 2000 to 2020?
 8            MS. HILLYER:  Objection.
 9        Beyond the scope.
10            MR. CARTMELL:  Excuse me.
11        2018.
12            MS. HILLYER:  Objection.
13        Beyond the scope.
14            You can answer if you know
15        in your individual capacity.
16            THE WITNESS:  Amrix is
17        another product for -- it's a
18        muscle relaxant that can be used
19        for low back pain.
20    BY MR. CARTMELL:
21        Q.   So if payments were made by
22    Cephalon or Teva or Actavis related to
23    Amrix or other pain medications, were
24    those payments identified on Appendix 5?
```

Page 351

```
 1            MS. HILLYER:  Objection.
 2        Beyond the scope.
 3            THE WITNESS:  There wouldn't
 4        have been payments specific to a
 5        brand to these organizations.
 6        These would have been grants for
 7        memberships, sponsorships,
 8        promotional presence at a meeting,
 9        if they charged for booth space,
10        or educational grants.
11    BY MR. CARTMELL:
12        Q.   Okay.  And your testimony is
13    that your counsel looked for all of those
14    things that you just listed?
15            MS. HILLYER:  Objection to
16        form.
17    BY MR. CARTMELL:
18        Q.   Or do you know?
19        A.   In my discussion with
20    counsel and my discussion with Paula --
21            MS. HILLYER:  I don't want
22        you to testify as to anything you
23        discussed with counsel.
24            But as to Paula, you can to
```

Page 352

```
 1    the extent it wasn't something
 2    privileged.
 3            But if you have an
 4        understanding of what -- what this
 5        exhibit is or your notes here, you
 6        can testify about that.
 7            THE WITNESS:  So I can't say
 8        anything about discussions with
 9        counsel.
10            In my discussions with
11        Paula, my understanding is that
12        she has produced all of the
13        information that she has regarding
14        payments to these organizations,
15        in addition to the database
16        search.
17    BY MR. CARTMELL:
18        Q.   And that would include all
19    of the things you listed, not just
20    educational grants, but honorarium, dues
21    and all the other things you listed; is
22    that right?
23        A.   The only other area is any
24    charitable grants that would have come
```

Page 353

1 through the Department of Social
2 Responsibility.  And I'm not aware of any
3 grants to these organizations for -- from
4 that group.
5    Q.    But did you look to see if
6 Cephalon made them or Actavis made them
7 or Teva made them?
8        MS. HILLYER:  Objection to
9        form.
10 BY MR. CARTMELL:
11    Q.    Or do you know?
12    A.    I don't know.
13    Q.    When you mention grants made
14 to these companies, are there typically
15 any, or are there ever any agreements or
16 strings attached related to those grants?
17        MS. HILLYER:  Objection to
18        form.
19        THE WITNESS:  There are
20        agreements that stipulate that for
21        educational grants that the
22        company cannot be involved in the
23        development of the content or
24        review of the content that's

Page 354

1 developed in conjunction with the
2 grant.
3        There are also stipulations
4        that if all of the grant money
5        that was requested for a specific
6        educational event is not -- or
7        activity or program is not used
8        for that program, that the
9        organization has to return that
10        money.
11 BY MR. CARTMELL:
12    Q.    Okay.  But there's a written
13 agreement, typically?
14    A.    Yes.
15    Q.    I take it there's other
16 terms of that agreement?
17    A.    Yes.
18    Q.    And those were produced in
19 this case?
20        MS. HILLYER:  Objection to
21        the extent that's beyond the
22        scope.
23        You can answer if you know.
24        THE WITNESS:  To the extent

Page 355

1        that we were able to find them, I
2        believe so.
3 BY MR. CARTMELL:
4    Q.    Okay.  Back to Appendix 5.
5 This lists all the societies you found
6 payments to and some that you say you
7 didn't find any.
8        You don't give any amounts
9 for the payments.  But, yet, the question
10 asks for the amount paid by Cephalon and
11 Teva and Actavis.
12        Why didn't you list any
13 amounts?
14    A.    I believe that they are
15 included in these documents that have
16 been produced.
17    Q.    Okay.  Do you have any idea,
18 as you sit here today, testifying under
19 oath, what those amounts are?
20        MS. HILLYER:  Objection to
21        form, to the extent you're asking
22        him to identify the individual
23        payments made, over a 20-some-year
24        period, for five different

Page 356

1        companies to -- I can't even do
2        the math on how many entities and
3        individuals.
4        But you can answer.
5        MR. CARTMELL:  So here is
6 the problem, and I'm objecting to
7 this.
8        MS. HILLYER:  Okay.
9        MR. CARTMELL:  Because we
10 asked for the amount paid to each
11 of these organizations.  We wanted
12 testimony, under oath, from a
13 corporate representative that
14 binds the company on those
15 amounts.
16        Your testimony so far, Mr.
17 Hassler, has been that these
18 documents have these amounts, but
19 yet you didn't provide that.
20        So I object.  And we will
21 want testimony on the amounts, as
22 we asked, under oath.
23        MS. HILLYER:  And to respond
24 to that, you have an obligation to

Page 357

1    come here with whatever you want
2    to ask him about. He's here to
3    testify and answer your questions.
4        The question of what was
5    paid for 20 years for five
6    companies to 20-some entities is
7    not a legitimate question in a
8    deposition.
9        He's given you notes and
10   documents that refer to many, many
11   Bates numbers, including
12   databases, where he's testified
13   where all of the numbered -- all
14   of those numbers are located.
15       You knew about these
16   databases. You've asked us about
17   these databases. We've had
18   conversation with our handler, Mr.
19   Crawford, who is at the table,
20   about these kind of databases. So
21   you knew about them and could have
22   brought them here to have him
23   confirm or validate, or whatever
24   you want him to do.

Page 358

1        This is your deposition, you
2    can control it how you want to.
3        He's answering your
4    questions.
5        MR. CARTMELL: Just to
6    respond -- we'll take it up, we
7    don't need to do this. But for
8    the record, we're entitled to a
9    period of time, and 20 years is
10   not too much. And you have the
11   information and you have the
12   obligation to provide a witness to
13   testify to it.
14       MS. HILLYER: And we've done
15   that.
16       MR. CARTMELL: Regardless of
17   what we have, because we don't
18   know that you produced everything.
19       So -- and I did bring some
20   documents, and we'll look at those
21   in a second.
22       MS. HILLYER: Okay.
23   BY MR. CARTMELL:
24   Q.   Okay. So is the answer, as

Page 359

1    you sit here today, you do not know any
2    specific amounts paid by either Cephalon,
3    Actavis or Teva to any of these
4    organizations that you have identified
5    received payments from those companies;
6    is that correct?
7        MS. HILLYER: Objection.
8    Asked and answered. And
9    mischaracterizes his testimony.
10       You can answer.
11       THE WITNESS: I don't know
12   the specific amounts paid to each
13   organization.
14   BY MR. CARTMELL:
15   Q.   And have you, under
16   contacts, identified the people that you
17   believe were the ones who interacted with
18   these companies related to the payments?
19   A.   Yes. That were related to
20   the payments or that interacted with
21   those companies.
22   Q.   Okay.
23   A.   Interacted with those
24   organizations.

Page 360

1    Q.   Your notes say that for
2    Actavis you don't believe that they made
3    any payments to any of the organizations
4    listed, correct?
5        Let me show you what I'm
6    talking about. For the acquired Actavis
7    entities, based on a reasonable
8    investigation, they did not provide
9    compensation related to their generic
10   opioids to the entities or doctors
11   listed.
12       Is that true?
13   A.   That is my understanding.
14   Q.   And how did you come to that
15   understanding?
16   A.   In asking my counsel whether
17   they had -- whether Actavis had any
18   materials that spoke to this issue and
19   whether there were any payments that
20   could be identified, they were unable to
21   produce any information that showed
22   payments to these organizations or these
23   doctors.
24   Q.   Okay. And then as far as

Page 361

1    Teva payments prior to 2009 related to --
2    well, strike that.
3         As far as Teva payments to
4    any of these organizations that are
5    listed here, prior to 2009, you have
6    looked within the hardcopies or in the
7    documents, or your counsel has, and have
8    not -- or have only found the payments
9    that are listed on Appendix 5, correct?
10        MS. HILLYER:  Objection to
11   form.
12        You can answer.
13        MR. CARTMELL:  What's the
14   reason for the objection?
15        MS. HILLYER:  I think some
16   of these other Bates numbers here,
17   perhaps, I don't know exactly if
18   they identify payments prior to
19   2009 or not.
20        So you're limiting it to
21   Appendix 5, but there's other
22   Bates labeled numbers in
23   Appendix -- Exhibit-1.
24        MR. CARTMELL:  Okay.

Page 362

1    BY MR. CARTMELL:
2         Q.   You think there's some
3    payments from Teva to these organizations
4    before 2009 when they became tracked?
5         A.   I don't know specifically
6    which organization had payments listed
7    prior to 2009.
8         But I do believe that there
9    are payments, as part of these materials,
10   that predate 2009.
11        Q.   Let me ask you, Mr. Hassler,
12   some of these payments listed on Appendix
13   5, is your understanding that they came
14   from Teva, and -- prior to 2011, and not
15   Cephalon?
16        MS. HILLYER:  Objection to
17   form.
18   BY MR. CARTMELL:
19        Q.   Or do you know?
20        A.   In looking at the grants
21   that I had reviewed, I don't recall any
22   payments from Teva to any of these
23   organizations prior to the Cephalon
24   acquisition.

Page 363

1         Q.   Okay.  I'm sticking with
2    organizations right now, and I want to
3    hand you what's been marked as
4    Exhibit-22.
5         MR. JENSEN:  It's two
6    documents and they're bound
7    separately.  So it would just be
8    unwieldy if we gave it to you as a
9    single document.  But it's an
10   e-mail and an attachment.
11        MS. HILLYER:  Are they
12   consecutive Bates numbers or no?
13        MR. JENSEN:  Yes, they are
14   consecutive.
15        MS. HILLYER:  Do you want to
16   make it -- do you just want to do
17   22 and 23?  I'm afraid it will get
18   lost, because it has no label on
19   it.
20        MR. CARTMELL:  That's fine.
21   That's cool.
22             - - -
23        (Whereupon, Teva-Hassler
24   Exhibit-022,

Page 364

1    TEVA_MDL_A_06557274-277, was
2    marked for identification.)
3             - - -
4         (Whereupon, Teva-Hassler
5    Exhibit-023, TEVA_MDL_A_06557278,
6    was marked for identification.)
7             - - -
8    BY MR. CARTMELL:
9         Q.   You'll see that on
10   Exhibit-22, which is the e-mail, attached
11   is a grant history report that I just ran
12   from January 1, 2013 through September 1,
13   2014.
14        Do you see that?
15        A.   Yes.
16        Q.   And attached to this is the
17   grant history report that is being
18   referred to that's Exhibit-24.  It's very
19   small writing.
20        But do you know what
21   database this is?
22        A.   Could I take a moment to
23   review it?
24        Q.   Sure.

Page 365

1        Is this one of the databases
2   that was searched so you could testify
3   under oath about this Topic 11?
4        MS. HILLYER:  Objection to
5   the form to the extent that's
6   beyond the scope.
7        You can answer if you know.
8        The question is the
9   relationship --
10       MR. CARTMELL:  He was
11  supposed to do the work.  You guys
12  did it.  He has to know what you
13  did.
14       MS. HILLYER:  That's
15  actually not -- he has to know the
16  answers to the topic.  The topic
17  isn't the database where your
18  information about this is made.
19       MR. CARTMELL:  You responded
20  to the topic with an answer that
21  says, here is the database.  So he
22  has to know what the database is.
23       MS. HILLYER:  He answered
24  about those databases.

Page 366

1        MR. CARTMELL:  Your answer
2   is, it's a database.
3        MS. HILLYER:  But you don't
4   know what's in this exhibit.  So
5   you're asking him a question with
6   a printout that he has no context
7   for, and you're saying, is this
8   what you looked at?  And that's an
9   unfair question.
10       And it's beyond the scope to
11  take some random document out of
12  context and ask about the
13  database.  -
14       MR. CARTMELL:  We know
15  that -- his response was we
16  searched a database on grants.  We
17  have an e-mail from Teva saying,
18  this is a database on grants.
19       I'm entitled to ask him, and
20  it's not beyond the scope, whether
21  this is the database he searched.
22  And he should know.
23       MS. HILLYER:  We can
24  disagree about that.  He's

Page 367

1        testified about what the database
2   was.
3   BY MR. CARTMELL:
4        Q.   Do you know the answer to
5   the question, sir?
6        A.   I can't tell whether this --
7   what database this was pulled from.
8        Q.   Okay.  But this looks
9   like to be a database from Teva during
10  that period of time, '13 to '14, that
11  shows that grants were made to
12  organizations, correct?
13       A.   Yes.
14       Q.   And it gives things like the
15  reason for the grant.
16       So I'm looking at one called
17  pain warrior bracelets and advocacy
18  program, I'll highlight it for you, for
19  instance.  That's the U.S. Pain
20  Foundation, Inc.
21       A.   What page is this?
22       Q.   Right on the inside cover.
23       MS. HILLYER:  He's looking
24  right on here.  It's in here

Page 368

1        somewhere.  This one.
2   BY MR. CARTMELL:
3        Q.   And the U.S. Pain Foundation
4   was one of the organizations on the list
5   that we asked you about, correct?
6        A.   Yes.
7        Q.   And this is a $30,000
8   request and a payment of $20,000.  And
9   then it says the reason is policy
10  advocacy, correct?
11       A.   I see that.
12       Q.   What does that mean, policy
13  advocacy?  Were you trying to get these
14  organizations to advocate for policies
15  that you wanted?
16       MS. HILLYER:  Objection to
17  form.
18       THE WITNESS:  I don't know
19  specifically what -- what that was
20  endorsing or supporting.
21  BY MR. CARTMELL:
22       Q.   I'm just curious, a few
23  above that, it says there's a grant
24  request invisible project, U.S. Pain

Page 369

1  Foundation, Inc.
2       Do you know what an
3  invisible project is?
4       A.   I do not.
5       Q.   It's a request for $125,000.
6  Do you see that?  And that
7  one was declined.
8       A.   Yes, I see it.
9       MS. HILLYER:  It might be
10 easier to look on there.
11      THE WITNESS:  Yes, I see it.
12 BY MR. CARTMELL:
13      Q.   You also have -- I want to
14 go to another page and ask you if you
15 know what something means.  There's --
16 I'll show it to you on the Elmo for you.
17      But it talks about payments
18 to the U.S. Pain Foundation, more
19 payments to them, for pain warrior
20 initiative.
21      Do you know what the pain
22 warrior initiative is?
23      A.   I don't.
24      Q.   I'm going to put mine up.

Page 370

1       You'll see it at the bottom
2  here, I've highlighted it.  It's for
3  general advocacy.
4       What does general advocacy
5  mean?  Why were you paying $40,000 in
6  these last two entries to the U.S. Pain
7  Foundation for general advocacy?
8       MS. HILLYER:  Objection to
9  form.
10      THE WITNESS:  We would have
11 to look at the specific grant
12 request.
13 BY MR. CARTMELL:
14      Q.   Do you have any idea what
15 "general advocacy" means, as you sit here
16 today?
17      A.   In this context, no.
18      Q.   Now, in response to this
19 topic, we also asked for payments, as we
20 discussed, to multiple doctors.
21      And did you provide any
22 specific payments, or response on
23 Appendix 5, for any payments to doctors?
24      A.   It was --

Page 371

1       Q.   It's under your notes?
2       A.   Yes.
3       I don't believe in Appendix
4  5 that we had -- I had listed any.  I
5  believe that those are --
6       Q.   On Exhibit-1?
7       A.   -- are listed on the
8  exhibits that are listed on the note.
9       Q.   And I'm pointing to it, I
10 think.
11      What you listed, is this,
12 did you include all the documents that
13 exhaust all those payments to these
14 doctors?
15      A.   I don't know what you mean.
16      Q.   Well, I'm trying to
17 understand.
18      You cite to one, two, three,
19 four documents here, and you say that
20 they, I'm guessing, are going to show us
21 that payments were made to the doctors
22 you list here, correct?
23      A.   Yes.
24      Q.   So were you trying to list

Page 372

1  or give us every document that you found
2  that had to do with a payment made to
3  these doctors, or were you just giving
4  examples?
5       A.   My understanding of these
6  documents is these are the payments that
7  we were able to find that were made
8  directly from the company to these
9  doctors.
10      Q.   So we should have the
11 documents for -- all the documents you
12 were able to find reflecting payments to
13 these doctors that we've asked for,
14 correct?
15      A.   That's my understanding.
16      Q.   Do you know any totals for
17 the amounts of the payments made to
18 doctors that we've asked about here?  Let
19 me show the list.
20      Here is a list of doctors.
21 Do you have any totals for the amount of
22 money that either Cephalon or Actavis or
23 Teva paid these doctors from 2000 until
24 2018?

Page 373

1      A.   I believe that these
2  documents list those payments, the sums
3  that we were able to identify and the
4  date, the year date, that they were paid.
5      Q.   So we can get those
6  documents that you've identified, go
7  through them, and that would be, in your
8  mind, the sum total of the payments made
9  by either Actavis or Cephalon or Teva
10 related to opioids?
11     A.   That's what we've been able
12 to find, based on the investigation that
13 we've made to date.
14     Q.   Did you determine whether or
15 not some payments could be made to these
16 doctors related to any other medications,
17 like Amrix, or did you just look for the
18 opioid?
19         MS. HILLYER:  Objection.
20     Beyond the scope.
21     You can answer.
22 BY MR. CARTMELL:
23     Q.   Or do you know?
24     A.   I don't know whether we put

Page 374

1  any criteria around the payments to these
2  doctors or not, to exclude any.
3      Q.   That's because they did the
4  search and you don't remember whether
5  they did or not, correct?
6         MS. HILLYER:  Objection.
7     Mischaracterizes his testimony.
8         THE WITNESS:  I don't -- I
9     don't know whether we put any
10    exclusion criteria in place.
11             - - -
12        (Whereupon, Teva-Hassler
13    Exhibit-024, TEVA_MDL_A_03413816,
14    was marked for identification.)
15             - - -
16 BY MR. CARTMELL:
17     Q.   I'm going to hand you what's
18 been marked as Exhibit-24.
19        Exhibit-24 was produced by
20 Teva in this litigation.  And it's really
21 small writing, so I apologize for that.
22        But my belief is that this
23 is some sort of database that tracks
24 payments to physicians.

Page 375

1         Do you see that?
2         MS. HILLYER:  For the
3     record, this is the Bates number
4     that's referenced in his notes.
5         MR. CARTMELL:  Which Bates
6     number?  Why don't you read it in,
7     if you don't mind?
8         MS. HILLYER:
9     TEVA_MDL_A_03413816.
10 BY MR. CARTMELL:
11     Q.   Do you know the name of this
12 database that tracks payments to doctors?
13     A.   I've always referred to that
14 as the Care System.
15     Q.   Your counsel indicated to
16 us, in written correspondence, that there
17 was a database called Compliance Payments
18 Database.  And it states, Since 2009, the
19 compliance department has maintained data
20 regarding payments made to healthcare
21 professionals, organizations and
22 institutions in its payment database.
23     A.   That sounds like the same
24 database.

Page 376

1         MR. CARTMELL:  Is it?
2         MS. HILLYER:  I'm not under
3     oath.  I'd have to look at the
4     document.  I think it is.
5         MR. CARTMELL:  You can't
6     tell me.
7         MS. HILLYER:  If we don't
8     have Care on there otherwise,
9     then, yes, that's the same.  I
10    mean, Care is a major.
11        MR. CARTMELL:  There is a
12    Care System.
13        MS. HILLYER:  System and
14    database may be two different
15    things.
16        MR. CARTMELL:  I think it's
17    different.
18        MS. HILLYER:  If you want to
19    show him that.
20 BY MR. CARTMELL:
21     Q.   Look at the Care --
22        MS. HILLYER:  He's comparing
23    this versus this.
24        THE WITNESS:  So I believe

Page 377

1      the Care System feeds the
2  Compliance Payments Database.
3  BY MR. CARTMELL:
4      Q.   I'm sorry?
5      A.   I believe the Care System
6  feeds the Compliance Payments Database.
7            The Care System is the
8  system that captures the request,
9  captures the evaluation and approval of
10  the payment and the payment made.  And I
11  believe that that feeds the Compliance
12  Payments Database.
13      Q.   I see.  And your
14  recollection is that this database
15  started with Cephalon in 2009 and came
16  with Cephalon after the acquisition,
17  correct?
18      A.   Yes.
19      Q.   So as far as finding
20  payments to doctors prior to 2009, how do
21  we find those?
22      A.   Paula Williams would have
23  had grant requests that would have been
24  paper-based requests.  And her files for

Page 378

1  Cephalon would be the place that -- and
2  then any specific projects, it would be
3  all a hardcopy search.
4      Q.   Okay.  But prior to 2009, at
5  least at Cephalon, you don't know of any
6  database or warehousing or archiving of
7  payments made to doctors; is that fair to
8  say?
9      A.   Yes.
10      Q.   Okay.  And just so I don't
11  forget to ask, at Teva, prior to 2009,
12  was there any archiving or warehousing,
13  or how would we find payments made to
14  doctors by Teva related to opioids prior
15  to 2011 -- 2009, excuse me?
16      A.   I'm not aware of any
17  payments that we would have been -- that
18  would have been made by Teva to doctors,
19  prior to the acquisition of Cephalon.
20      Q.   And what about Actavis,
21  prior to 2016, did they have any
22  databases or warehousing or archiving of
23  payments made to doctors related to their
24  generic opioids?

Page 379

1      A.   Not that I'm aware of.
2      Q.   Okay.  But you mentioned a
3  minute ago that we're talking about
4  grants.
5            But on this database that
6  comes from Teva and started with
7  Cephalon --
8            MS. HILLYER:  And you're
9  looking at Exhibit-24?
10            MR. CARTMELL:  Exhibit-24.
11  BY MR. CARTMELL:
12      Q.   -- it talks about a lot of
13  different types of payments made to
14  doctors, including -- and I'm going to
15  point to them, it's so small --
16  consulting fees --
17            MS. HILLYER:  Print it on
18  big paper.
19            MR. CARTMELL:  Okay.  I do
20  have it on bigger paper.
21            MS. HILLYER:  It's all
22  right.
23            MR. CARTMELL:  I'll show it
24  to you on bigger paper.  Here it

Page 380

1  is.  You've got to trust me,
2  though, that this is everything.
3            You can double check me.
4  BY MR. CARTMELL:
5      Q.   These are the payments that
6  you identify at Teva and at Cephalon,
7  consulting fees to doctors; compensation
8  for services other than consulting,
9  including serving as a faculty or as a
10  speaker at a venue other than a
11  continuing education program; honoraria;
12  gifts to doctors; entertainment payments
13  for doctors; food and beverage payments
14  for doctors; travel and lodging payments
15  for doctors; education payments for
16  doctors; charitable contributions to
17  doctors; royalty or license for doctors;
18  current or prospective ownership or
19  investment interests; compensation for
20  serving as faculty or as a speaker for a
21  non-accredited and non-certified
22  continuing education program;
23  compensation for serving as a faculty or
24  a speaker for an accredited or certified

Page 381

1    continuing education program; a grant --
2    and you've talked a lot about grants,
3    right?  That's one type of payment,
4    right?
5         A.   Yes.
6         Q.   And then space rental or
7    facility fees are another type of
8    payment, correct?
9         A.   Yes.
10        Q.   So those are all the types
11   of payments that Teva or Cephalon were
12   making to doctors, correct?
13        A.   This is the list of all of
14   the payments that would be captured in
15   the Care System.
16        Q.   Okay.  And could be
17   categorized, each type of payment, by one
18   of those categorizations, correct?
19        A.   Yes.
20        Q.   And I want to ask about
21   this.
22             If you look at the inside
23   page, there's a reference to Vantrela.
24             Do you see that?

Page 382

1         A.   Yes.
2         Q.   Vantrela is a Class II
3    opioid, correct, or was?
4         A.   It was in development, yes.
5         Q.   Vantrela was an opioid that
6    was in development at Teva, correct?
7         A.   Yes.
8         Q.   And it was Vantrela ER, I
9    think, which is -- does that mean early
10   release?
11        A.   Extended release.
12        Q.   Extended release, okay.
13             And, actually, Teva sought
14   approval from the FDA for Vantrela,
15   correct?
16        A.   Yes.
17        Q.   And Teva got approval for
18   Vantrela ER, correct?
19        A.   Yes.  Much later than we
20   anticipated.
21        Q.   And then, actually, I think,
22   Teva launched Vantrela ER, correct?
23        A.   No.
24        Q.   Never put it on the market?

Page 383

1         A.   No.
2         Q.   Didn't sell it to anybody?
3         A.   No.
4         Q.   Or prescribe it to anybody?
5         A.   No.
6         Q.   Why was it that it was
7    approved by the FDA but then never
8    launched by Teva?
9             MS. HILLYER:  Objection.
10   Beyond the scope.
11             You can answer to the extent
12   you know.
13             THE WITNESS:  Teva was
14   attempting to develop an
15   abuse-deterrent formulation of
16   opioids.  This was the first one
17   among a group of three.
18             The product took much longer
19   to come to market and gain
20   approval than we had anticipated.
21   During that time period, we
22   learned more about the product and
23   the marketplace and found that
24   payors didn't want to reimburse a

Page 384

1    product at a higher price than
2    they were paying for the generics
3    for an abuse-deterrent product.
4             Patients didn't perceive the
5    need for the product, because they
6    didn't perceive themselves as
7    abusers.  Physicians didn't want
8    to be gatekeepers and force this
9    onto patients.
10             We had -- through that time
11   period, we came across some
12   intellectual property concerns
13   that we weren't aware of early on
14   that raised questions as to, even
15   after approval, whether we would
16   be able to bring the product to
17   market.
18             And at least one of the two
19   follow-on products failed to meet
20   the profile that we had
21   anticipated when we initiated
22   development of the product.
23             And so it just didn't look
24   like this product was going to be

Page 385

1      well accepted in the market.  And,
2   at the same time, Teva ran into
3   some financial difficulties and
4   had to prioritize which products
5   they were going to launch and
6   which ones they weren't.  And the
7   decision was made not to launch
8   this drug.
9   BY MR. CARTMELL:
10      Q.   What were the other two
11  opioids in development?
12      MS. HILLYER:  Objection.
13  Beyond the scope.
14      You can answer.
15      THE WITNESS:  I don't
16  remember the specific
17  formulations.
18  BY MR. CARTMELL:
19      Q.   They didn't have names yet?
20      A.   No.  They were
21  immediate-release opioid products, I just
22  don't remember the type.
23      Q.   Okay.  Why was it that Teva
24  was paying doctors for things like food

Page 386

1   and beverage, travel and lodging,
2   consulting related to Vantrela, if it was
3   never on the market?
4      A.   Do you have that list that
5   provided any more detail?  Because I'm
6   speculating.
7      I know that we had
8   launched -- or that we had advisory
9   meetings to seek advice and counsel from
10  thought leaders in this area.  But
11  without being able to look specifically,
12  I'm not sure if that's what these
13  particular payments were for.
14      Q.   Do you know the names of any
15  of those thought leaders that gave advice
16  to Teva about those opioids?
17      MS. HILLYER:  Objection.
18  Beyond the scope.
19      THE WITNESS:  I don't.  I
20  know that there were some that
21  were involved in our preparation
22  for the FDA advisory meeting, but
23  I do not recall who they were.
24  BY MR. CARTMELL:

Page 387

1      Q.   Okay.  Does Teva have any
2   abuse-deterrent opioids on the market?
3      MS. HILLYER:  Objection.
4   Beyond the scope.
5      THE WITNESS:  Not that I'm
6   aware of.
7   BY MR. CARTMELL:
8      Q.   Any plans to launch any of
9   those?
10      MS. HILLYER:  Objection.
11  Beyond the scope.
12      We've been going an hour and
13  ten minutes.
14      MR. CARTMELL:  We can take a
15  break, and then we're done with
16  this topic.  We'll kind of
17  decide --
18      MS. HILLYER:  Let's go off
19  the record.
20      VIDEO TECHNICIAN:  Going off
21  the record.  Time is 6:11 p.m.
22      - - -
23      (Whereupon, a brief recess
24  was taken.)

Page 388

1      - - -
2      VIDEO TECHNICIAN:  Back on
3   the record at 6:23 p.m.
4   BY MR. CARTMELL:
5      Q.   Mr. Hassler, I want to ask
6   just a few more questions about Topic 11.
7      We're talking about payments
8   made to doctors by Cephalon and Teva and
9   Actavis.  And we know from the Teva
10  database that we looked at that tracks
11  payments to doctors, I think that was
12  Exhibit-24, there's a listing of the
13  nature of the payments and the form of
14  the payments.
15      You'll remember that that's
16  the small language here.  And I put on
17  the document -- I put on the Elmo the
18  blow-up of what it says.  And I asked you
19  about the nature of payments or transfer
20  of value that is tracked by Teva, and was
21  by Cephalon, but I didn't ask you about
22  the form of payment or transfer of value.
23      It states that, The form of
24  payments can be in cash or the cash

Page 389

1    equivalent or in-kind items and services
2    or stock, or stock options, or any other
3    ownership interest or dividend, profit or
4    other return on investment.
5            Do you see that?
6        A.   I do.
7        Q.   So your company was tracking
8    these types of payments, whether it's
9    cash or stock or options or other things,
10   to these doctors, correct?
11           MS. HILLYER:  Objection to
12       the extent this document doesn't
13       reflect payments to the doctors
14       identified in Topic 11.
15           But you can answer.
16           THE WITNESS:  That's my
17       understanding.
18   BY MR. CARTMELL:
19       Q.   And did you, in your search,
20   or did the lawyers for you, search for
21   these types of payments other than just
22   cash?  Did you search for payments to
23   doctors that were in the form of in-kind
24   items or services or stock or stock

Page 390

1    options or dividends or profits or things
2    like that?
3        A.   Not that I'm aware of.  But
4    I also don't know that we made any of
5    those payments in the U.S.
6        Q.   But you wouldn't know if
7    Cephalon did, right, because you weren't
8    there?
9        A.   That's correct.
10       Q.   And you wouldn't know if
11   Actavis did, correct?
12       A.   Correct.
13           MR. CARTMELL:  That's all I
14       have.  Thanks.
15           MR. CRAWFORD:  Just for the
16       record, I think we're reserving,
17       what, four topics for next time?
18           MS. HILLYER:  Sounds about
19       right.
20           MR. CRAWFORD:  35, 37, 38,
21       40, and that will be joined with
22       the remaining topics that we
23       didn't cover today.  And whatever
24       remaining time we have left.

Page 391

1            Thank you.
2            MS. HILLYER:  And I just
3        want to put a marker on the record
4        here as to this is the time
5        they've gone on the record so far.
6            VIDEO TECHNICIAN:
7        Six/fourteen.
8            - - -
9            EXAMINATION
10           - - -
11   BY MS. HILLYER:
12       Q.   Mr. Hassler, I just have a
13   few brief questions for you.
14           MR. CRAWFORD:  Let me just
15       state on the record, I don't know
16       if your voice does, but it's six
17       hours, 14 minutes is what we took
18       today.
19   BY MS. HILLYER:
20       Q.   The documents that you
21   brought with you today, Mr. Hassler, you
22   testified that you were relying on them
23   for purposes of your deposition today; is
24   that correct?

Page 392

1        A.   Yes.
2        Q.   Did you rely on them to
3    prepare for your deposition?
4        A.   No.  There were other
5    documents that I read to prepare.  These
6    were my notes to try to help remind me of
7    the other documents and what I had
8    prepared for to answer the questions.
9        Q.   And in Exhibit-1, the
10   columns that say notes and references,
11   are those -- did you intend for those to
12   be comprehensive answers to the topics
13   listed here?
14       A.   No.  These were my -- these
15   were my notes to help me answer the
16   questions.
17       Q.   I want to clarify some
18   questioning around sales and marketing
19   for generics that occurred earlier today.
20           Mr. Hassler, did Teva detail
21   doctors for generics?
22       A.   No.
23       Q.   Did Actavis detail doctors
24   for generics?

Page 393

1      A.   No.
2      Q.   Did Teva promote for
3   generics?
4      A.   No.  They announced product
5   availability.
6      Q.   And did Actavis promote for
7   generics?
8      A.   No.
9      Q.   There was also testimony
10   earlier today concerning the components
11   of compensation for Teva generics and
12   Actavis generics, I believe it was sales
13   and marketing.
14          Do you recall that
15   testimony?
16      A.   Yes.
17      Q.   Can you please clarify
18   what -- to what extent opioids or the
19   sale of opioids is or is not a component
20   of compensation for Teva generics sales
21   and marketing?
22      A.   The --
23          MR. CARTMELL:  Let me just
24      object.

Page 394

1          MS. HILLYER:  You know what,
2   we're still on mute.  We've been
3   on mute.  We're off mute.  Sorry.
4          Do you remember the
5   question?
6          THE WITNESS:  Yes.
7          The bonus component was
8   based on overall company sales.
9   The mix didn't matter of the
10   portfolio and what products sold.
11   The bonus component was the extent
12   to which the company met, exceeded
13   or failed to meet the target
14   objectives for overall sales.
15   BY MS. HILLYER:
16      Q.   So if sales for generic
17   opioids that year had been zero, the
18   target bonus still could have been met;
19   is that accurate?
20          MR. CARTMELL:  Object.
21   Asked and answered.  Misstates the
22   witness's testimony.
23   BY MS. HILLYER:
24      Q.   Can you clarify your

Page 395

1   testimony on that?
2          MR. CARTMELL:  Same
3      objections.
4          THE WITNESS:  It didn't
5      matter what individual product
6      sold.  What mattered was, did the
7      portfolio reach the threshold that
8      had been set as a goal for the
9      year.
10   BY MS. HILLYER:
11      Q.   And is that the same for
12   Actavis generics?
13      A.   Yes.
14      Q.   There was also testimony
15   about where to locate sales and marketing
16   materials for Actiq and Fentora before
17   2009.
18          Do you recall that
19   testimony?
20      A.   I do.
21      Q.   And you testified that that
22   could be found in certain individuals'
23   files.
24          Do you recall that?

Page 396

1      A.   Yes.
2      Q.   Are you aware of any other
3   locations now that -- where that
4   information could be found that you
5   recall now?
6      A.   Yes.  After thinking about
7   it, there's also a shared drive for sales
8   and marketing that would house those
9   materials.  And that's another place that
10   could be searched.
11      Q.   Okay.  And, lastly, you
12   mentioned the name Jamie Burlanska who
13   might have had involvement with PDRC.
14          Did you mean to say that?
15      A.   It was a Jamie.  But I got
16   the last name wrong.  I can't recall
17   the -- her -- Jamie's last name that
18   worked in regulatory.
19          MS. HILLYER:  Okay.  I have
20   no further questions at this time.
21          MR. CARTMELL:  Let me just
22   follow-up real quick, Mr. Hassler,
23   on the questions about the bonus
24   structure.

Page 397

1    MS. HILLYER:  Just to be
2    clear, you have a
3    minute-for-minute reply.
4         - - -
5         EXAMINATION
6         - - -
7    BY MR. CARTMELL:
8    Q.   You're talking about Teva's
9    policy related to compensation for the
10   salespeople, correct?
11   A.   Yes.
12   Q.   And I take it there's a
13   policy related to; is there not?
14   A.   There was an annual bonus
15   program.
16   Q.   Okay.  And do you know if
17   the documents related to what matters, as
18   far as salespeople's compensation at
19   Teva, have been produced in this
20   litigation?
21   A.   I don't know specifically
22   what's been produced.
23   Q.   But is there an SOP or a
24   policy that talks about bonus or

Page 398

1    incentive pay for salespeople that has
2    been in force at Teva?
3    A.   On the branded side, there
4    has been.  On the generic side, my
5    understanding is that it was a common
6    bonus program across all the
7    bonus-eligible associates on the generic
8    side, based on whether they hit their
9    sales thresholds or not.
10        And then underneath that,
11   individual performance objectives for
12   that person and how well they performed
13   certain aspects of their job that they
14   identified with their boss, goals at the
15   beginning of the year, and then evaluated
16   against those goals at the end of the
17   year.
18   Q.   But you identified, and I
19   think you did before, and I want to make
20   sure you haven't changed your testimony,
21   but I think you said one factor is how
22   the organization does as far as meeting
23   their goals on sales, right?
24   A.   Yes.

Page 399

1    Q.   And that's the whole
2    organization, right, that you're talking
3    about, that that's the first factor,
4    correct?
5    A.   For -- that was Teva U.S.
6    generics.  For how that -- how that --
7    Q.   Right.
8    A.   -- entity did.
9    Q.   And then the second factor,
10   you look at the individual and how their
11   performance was, correct?
12   A.   Yes.
13   Q.   And one element of their
14   performance is their sales of their
15   products, correct?
16   A.   Not that I'm aware of on the
17   generic side.
18   Q.   It is on the branded side?
19   A.   Yes.
20   Q.   So when they were selling
21   Fentora or Actiq, it would apply to them?
22   The amount of opioids they sold would
23   affect their bonus, correct?
24   A.   Yes, on the branded side it

Page 400

1    did.
2    Q.   Okay.  On the generic side,
3    your testimony is that, even if a
4    salesperson had a generic opioid in their
5    portfolio that they were supposed to
6    sell, the fact that they had a down year
7    of opioids, or any other product,
8    wouldn't affect their bonus?
9    A.   I don't -- I'm not aware of
10   sales quotas at the sales representative
11   level on the generic side.  My
12   understanding, what's been shared with
13   me, is they got paid on whether or not
14   the company hit its sales objectives
15   overall, and then evaluated by their
16   manager as to how well they performed
17   their job.
18   Q.   Okay.  But would you agree
19   with me that because the company's sales
20   quotas are a factor, then, obviously, the
21   amount of opioid sales is one component
22   of that?
23        MS. HILLYER:  Asked and
24   answered.  And mischaracterizes

Page 401

1    his testimony.
2         THE WITNESS:  The component
3    is the sales goal.
4    BY MR. CARTMELL:
5         Q.   Right.  Of opioids we're
6    talking about?
7         MS. HILLYER:  Objection.
8         THE WITNESS:  No.  The
9    component is Teva generic sales
10   relative to their goal.
11        The mix of the portfolio to
12   achieve that sales component
13   didn't matter.  Any mix of
14   products that got to that sales
15   level would -- was what determined
16   their payout.
17   BY MR. CARTMELL:
18        Q.   I understand.  But if you
19   had a mix of a portfolio that included
20   opioids, and you didn't sell a single
21   opioid, that could prohibit you, as an
22   individual, to meeting your quota?
23        MS. HILLYER:  Objection to
24   form.

Page 402

1         THE WITNESS:  It wasn't on
2    an individual level, it was at the
3    company level for Teva generics.
4    BY MR. CARTMELL:
5         Q.   I understand.
6         So if opioids performed
7    horribly in the mix of all the generics,
8    that could cause the quota for the
9    company not to be met, potentially?
10        A.   Unless you had sales of some
11   of the other products that would
12   compensate for it.
13        Q.   I understand.
14        But my point is simply that
15   the sales of opioids are a component of
16   that, because they're one of many
17   generics being sold; that's my only
18   point?
19        MS. HILLYER:  Objection to
20   form.  I'm just quibbling with the
21   term "component."  But I think
22   we're almost getting to the point
23   where we all understand each
24   other.

Page 403

1    BY MR. CARTMELL:
2         Q.   Am I right?
3         MS. HILLYER:  Objection to
4    form.
5         THE WITNESS:  Let me use my
6    words.  And that is that the
7    component that they paid on for
8    that piece of the bonus was based
9    on overall sales results.
10        The portfolio of products,
11   which could include opioids, would
12   feed into that component or be
13   compensated -- if they were low on
14   opioids, it could be compensated
15   by other products.
16   BY MR. CARTMELL:
17        Q.   Right.  So my point is,
18   would you agree with me, then, that in
19   any one individual, if the portfolio
20   included opioids -- or for the company as
21   a whole, if the company has a sales goal
22   and it -- included in the portfolio is
23   opioids, the fact that if opioid sales
24   were way down, that could, I'm not saying

Page 404

1    it would, that could potentially affect
2    the bonus, because the goal wouldn't be
3    met?
4         MS. HILLYER:  Objection to
5    form.  And asked and answered.
6         You can answer again.  And I
7    think you're just about out of
8    time.
9         MR. CRAWFORD:  I have one
10   question, too.
11        MS. HILLYER:  Your time is
12   up.
13        THE WITNESS:  If the company
14   failed to meet its overall sales
15   goal, then all of the individuals
16   that were part of that bonus plan
17   would suffer the consequence of
18   that.
19   BY MR. CARTMELL:
20        Q.   And if opioids was a really
21   bad performer in a year that some other
22   drug didn't pick it up, it could be a
23   factor in not meeting a bonus quota?
24   That's my only point.

Page 405

1    MS. HILLYER:  Objection.
2  Asked and answered.  Repeatedly.
3  We're out of time.
4    MR. CARTMELL:  Go ahead.
5    MS. HILLYER:  Last answer.
6    THE WITNESS:  Any product
7  that underperformed would need to
8  be compensated by another
9  product's overperformance in order
10  to hit the goal.
11  BY MR. CARTMELL:
12    Q.  Including opioids?
13    MS. HILLYER:  He's not going
14  to answer the question again.
15  You've answered -- you asked it
16  six times.  And you're over time.
17  There's a minute-for-minute
18  recross.
19    MR. CARTMELL:  We just got
20  to the point where what you did
21  was absolutely wrong, because he's
22  now admitted that it could be, if
23  something else didn't compensate.
24    MS. HILLYER:  I think

Page 406

1  we're all on the same page.
2  That's been made clear.  He's
3  answered your questions.
4    MR. CARTMELL:  No.  I need
5  an answer to this last question.
6  BY MR. CARTMELL:
7    Q.  Including opioids, correct?
8    MS. HILLYER:  Motion to
9  strike.
10    Go ahead, you can answer.
11  And I'll strike that, too.
12    THE WITNESS:  Yes, all
13  products, that includes all
14  products.
15    MS. HILLYER:  Mark, I'll
16  give professional courtesy to ask
17  your one question.
18    MR. CRAWFORD:  I think it's
19  actually covered.
20    - - -
21    EXAMINATION
22    - - -
23  BY MR. CRAWFORD:
24    Q.  When you said they didn't

Page 407

1  promote opioids, that was your testimony,
2  did they promote a product portfolio that
3  contained opioids?
4    MS. HILLYER:  Objection to
5  the term "promotion."
6    THE WITNESS:  They announce
7  product availability and pricing
8  for all of the generic products.
9  They don't promote the therapeutic
10  benefit of any of the generic
11  products.
12  BY MR. CRAWFORD:
13    Q.  But they promote their
14  product portfolio in some way, even if
15  it's not the therapeutic benefit; they're
16  promoting it based on pricing or other
17  advantages to their product portfolio
18  over a competitor's, right?
19    MS. HILLYER:  Objection to
20  form.
21    THE WITNESS:  I view that
22  more as making product
23  announcements and availability.
24    My experience has been

Page 408

1  promotion, and I've spent my life
2  on the branded side, has been
3  promoting the therapeutic
4  benefits, the efficacy and risks
5  associated with a drug.
6    MR. CRAWFORD:  Thank you.
7    VIDEO TECHNICIAN:  This ends
8  today's deposition.  We're going
9  off the record at 6:38 p.m.
10    - - -
11    (Whereupon, the deposition
12  concluded at 6:38 p.m.)
13    - - -
14
15
16
17
18
19
20
21
22
23
24

Page 409

CERTIFICATE

1
2
3
4     I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
        Amanda Maslynsky-Miller
11      Certified Realtime Reporter
        Dated: November 18, 2018
12
13
14
15
16
17      (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 410

INSTRUCTIONS TO WITNESS

1
2
3     Please read your deposition
4  over carefully and make any necessary
5  corrections. You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8     After doing so, please sign
9  the errata sheet and date it.
10     You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14     It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you. If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 411

1          - - - - - -
              E R R A T A
2          - - - - - -
3  PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Page 412

1       ACKNOWLEDGMENT OF DEPONENT
2        I,_____, do
3  hereby certify that I have read the
   foregoing pages, 1 - 409, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8  _____
   JOHN HASSLER          DATE
9
10
11 Subscribed and sworn
   to before me this
12 _____ day of _____, 20_____.
13
14 My commission expires:_____
15 _____
   Notary Public
16
17
18
19
20
21
22
23
24

DRAFT COPY

Page 413

```
 1            LAWYER'S NOTES
 2     PAGE  LINE
 3     ____ ____ _____
 4     ____ ____ _____
 5     ____ ____ _____
 6     ____ ____ _____
 7     ____ ____ _____
 8     ____ ____ _____
 9     ____ ____ _____
10     ____ ____ _____
11     ____ ____ _____
12     ____ ____ _____
13     ____ ____ _____
14     ____ ____ _____
15     ____ ____ _____
16     ____ ____ _____
17     ____ ____ _____
18     ____ ____ _____
19     ____ ____ _____
20     ____ ____ _____
21     ____ ____ _____
22     ____ ____ _____
23     ____ ____ _____
24     ____ ____ _____
```

DRAFT COPY