1

1        UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF OHIO

3            EASTERN DIVISION

4

5    ------------------------) MDL No. 2804

6    IN RE:  NATIONAL         )

7    PRESCRIPTION OPIATE      )

8    LITIGATION               )

9    ------------------------) Case No. 17-md-2804

10   THIS DOCUMENT RELATES TO:)

11   ALL CASES                )

12   ------------------------) Hon. Dan A. Polster

13

14            HIGHLY CONFIDENTIAL

15     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

16

17          VIDEOTAPED DEPOSITION OF

18               RANDY HEISER

19

20            February 19, 2019

21

22         Pittsburgh, Pennsylvania

23

24

2

1

2

3

4

5

6          The videotaped deposition of RANDY HEISER,

7    called by the Plaintiffs for examination, taken

8    pursuant to the Federal Rules of Civil Procedure of

9    the United States District Courts pertaining to the

10   taking of depositions, taken before JULIANA F.

11   ZAJICEK, a Registered Professional Reporter and a

12   Certified Shorthand Reporter, at the offices of

13   Marcus & Shapira, LLP, Suite 3500, One Oxford Centre,

14   Pittsburgh, Pennsylvania, on February 19, 2019, at

15   9:02 a.m.

16

17

18

19

20

21

22

23

24

3

1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFFS:

3         WAGSTAFF & CARTMELL LLP
          4740 Grand Avenue, Suite 300
4         Kansas City, Missouri 64112
          816-701-1100
5         BY:  TYLER W. HUDSON, ESQ.
               thudson@wcllp.com

6

7    ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
     AMERISOURCEBERGEN DRUG CORPORATION:
8
          JACKSON KELLY PLLC
9         500 Lee Street East, Suite 1600
          Charleston, West Virginia 25301-3202
10        304-340-1018
          BY:  GRETCHEN M. CALLAS, ESQ. (Telephonically)
11             gcallas@JacksonKelly.com

12

13   ON BEHALF OF CARDINAL HEALTH, INC.:

          PIETRAGALLO GORDON ALFANO
14        BOSICK & RASPANTI, LLP
          One Oxford Centre
15        301 Grant Street, 38th Floor
          Pittsburgh, Pennsylvania 15219
16        412-263-4348
          BY:  JOHN A. SCHWAB, ESQ.
17             jas@pietragallo.com

18

     ON BEHALF OF CVS INDIANA, LLC AND CVS RX SERVICES,
19   INC. AND THE WITNESS IN HIS CAPACITY AS A CURRENT
     EMPLOYEE OF CVS:
20
          ZUCKERMAN SPAEDER LLP
21        1800 M Street, NW, Suite 1000
          Washington, D.C. 20036
22        202-778-1800
          BY:  PAUL B. HYNES, JR., ESQ.
23             phynes@zuckerman.com

24

4

1    APPEARANCES: (Continued)

2    ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
     PHARMACEUTICALS INC., PAR PHARMACEUTICAL, INC. AND PAR
3    PHARMACEUTICAL COMPANIES, INC. (FKA PAR PHARMACEUTICAL
     HOLDINGS, INC.):
4
            ARNOLD & PORTER KAYE SCHOLER LLP
5           777 South Figueroa Street, 44th Floor
            Los Angeles, California 90017-5844
6           213-243-4238
            BY:  SEAN A. McCORMICK, ESQ. (Telephonically)
7                sean.mccormick@arnoldporter.com

8
     ON BEHALF OF HBC SERVICES AND THE WITNESS:
9
            MARCUS & SHAPIRA LLP
10          One Oxford Centre, 35th Floor
            Pittsburgh, Pennsylvania 15219
11          412-471-3490
            BY:  JOSHUA A. KOBRIN, ESQ.
12               kobrin@marcus-shapira.com

13
     ON BEHALF OF McKESSON CORPORATION:
14
            COVINGTON & BURLING, LLP
15          One City Center
            850 Tenth Street, NW
16          Washington, D.C. 20001
            202-662-5531
17          BY:  RAJ PAUL, ESQ.
                 rpaul@cov.com
18

19   ON BEHALF OF WALMART INC.:

20          JONES DAY
            150 West Jefferson, Suite 2100
21          Detroit, Michigan 48226-4438
            313-733-3939
22          BY:  RICHARD M. BRODSKY, ESQ. (Telephonically)
                 rbrodsky@jonesday.com
23

24

5

1    ALSO PRESENT:

2         COREY SMITH, Trial Technician

3         CHRIS RITONA, Videographer

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

6

1                          I N D E X

2

3      WITNESS:                              PAGE:

4       RANDY HEISER

5           EXAM BY MR. HUDSON...................    8

6

7                          *****

8

9                      E X H I B I T S

10     HBC SERVICES-HEISER EXHIBITS         MARKED FOR ID

11      No. 1     Randy Heiser's LinkedIn Profile      11

12      No. 2     HBC Service Company's Second         34

13                Amended Responses to Plaintiffs'

14                (First) Set of Combined Discovery

15                Requests

16      No. 3     E-mail chain, top one dated          43

17                11/1/2010, Subject: RE: Pain mgt;

18                MCKMDL00512974 - 977

19

20

21

22

23

24

7

1          THE VIDEOGRAPHER:  We are now on the record.  My

2     name is Chris Ritona.  I am the videographer for

3     Golkow Litigation Services.

4              Today's date is February 19th, 2019, and

5     the time is approximately 9:02 a.m.

6              This video deposition is being held in

7     Pittsburgh, PA at Marcus & Shapira, LLP, One Oxford

8     Centre, 35th Floor, In the Matter of National

9     Prescription Opiate Litigation, MDL No. 2804, Case

10    No. 17-md-2804, before the United States District

11    Court, Northern District of Ohio, Eastern Division.

12              The deponent today is Randy Heiser.

13              Will all counsel please identify

14    themselves for the record.

15        MR. HUDSON:  Ty Hudson of Wagstaff & Cartmell

16    for the Plaintiffs.

17        MR. SCHWAB:  John Schwab on behalf of Cardinal

18    Health.

19        MR. PAUL:  Raj Paul of Covington on behalf of

20    McKesson.

21        MR. HYNES:  Paul Hynes from Zuckerman Spaeder on

22    behalf of CVS and on behalf of the witness in his

23    capacity as a current employee of CVS.

24        MR. KOBRIN:  Josh Kobrin of Marcus & Shapira on

1    behalf of HBC Service Company and the witness.

2        THE VIDEOGRAPHER:  Thank you.

3            The court reporter today is Juliana

4    Zajicek and she will now please swear in the witness.

5                (WHEREUPON, the witness was duly

6                 sworn.)

7                    RANDY HEISER,

8    called as a witness herein, having been first duly

9    sworn, was examined and testified as follows:

10                  EXAMINATION

11   BY MR. HUDSON:

12       Q.    Good morning, sir.

13             Could you state your name, please?

14       A.    Randy Heiser.

15       Q.    And, Mr. Heiser, where do you currently

16   reside?

17       A.    I currently reside at 5620 King School

18   Road in Bethel Park, Pennsylvania.

19       Q.    Have you ever had your deposition taken

20   before?

21       A.    Yes.

22       Q.    How many times?

23       A.    I think it's three prior to this.

24       Q.    Okay.  If you could, just briefly describe

9

1       what those cases involved?

2            A.     One was with Rite Aid Corporation.  I

3       believe it involved some type of pricing litigation,

4       but it was in the mid to early '90s.  And I believe

5       there were two other situations where I was deposed

6       with Giant Eagle.  One in a class action suit

7       concerning pricing with branded pharmaceuticals and I

8       think there was another deposition concerning some

9       type of a prescription issue.

10           Q.     And do you recall, again, a ballpark for

11      those last two depositions, when those occurred?

12           A.     I do not.  It was sometime in my 15-year

13      career with Giant Eagle, but I don't recall.  The --

14      the first one had to do with the class action suit

15      with pricing, I believe it was within the first five

16      years, but I don't know the exact timing.

17           Q.     Okay.  Well, it sounds like it has been a

18      while since you've had your deposition taken, right?

19           A.     Correct.

20           Q.     Okay.  So before we get going, let's just

21      make sure we are on the same page.

22                  You understand that you are under oath

23      just like we would -- you would be if you were in a

24      courtroom in front of a judge or a jury?

1  A. Yes, sir.

2  Q. And do you also -- will you also let me

3 know if I ask an unclear question so I can rephrase

4 it?

5  A. Sure.

6  Q. Okay.  And is it fair that if you answer

7 my question that I can assume that you understood it?

8  A. Yes.

9  Q. And if you want to take a break at any

10 time, just let me know and we can go off the record.

11 Okay?

12  A. Okay.

13  Q. The only thing I would ask is just if

14 there is a question pending that you answer it before

15 we go off the record.

16  A. Okay.

17  Q. Is that fair?

18  A. Yes, sir.

19  Q. Okay.  Tell me, what did you do to prepare

20 for the deposition today?

21  A. I spent a couple of hours yesterday with

22 this office talking to -- to attorneys.

23  Q. Did you do anything else?

24  A. No, sir.

1     Q.     Did you look at any documents that

2  refreshed your recollection about any topics relating

3  to your time at Giant Eagle?

4     A.     Yesterday, yes.

5     Q.     Anything that sticks out that you recall?

6     MR. KOBRIN:  Objection.  We showed him certain

7  documents and I'm going to assert that the collection

8  of those documents is work product privilege.  You can

9  ask him if he remembers anything, but I don't want you

10  to go too far beyond that.

11     MR. HUDSON:  Yeah, that's what I'm asking him,

12  is what --

13  BY MR. HUDSON:

14     Q.     Do you -- did that re --

15     MR. KOBRIN:  Just yes or no.

16  BY MR. HUDSON:

17     Q.     -- refresh your recollection?

18     A.     Yes.

19     Q.     If we could, just shift gears.  I'm going

20  to mark here as Exhibit 1 a print-off off of LinkedIn.

21              (WHEREUPON, a certain document was

22               marked HBC - Heiser Deposition

23               Exhibit No. 1, for identification, as

24               of 02/19/2019.)

12

```
1   BY MR. HUDSON:

2        Q.    Does this look like your CV or resume?  Or

3   I would -- not sure of the right term to use, but your

4   information from LinkedIn relating to your

5   professional career?

6        A.    It seems to be correct.

7        Q.    Okay.  And there on the second page of

8   Exhibit 1 it lists your education?

9        A.    That is correct.

10        Q.    Okay.  Did you obtain a degree from The

11   Wharton School?

12        A.    I did not.  Those were certificate

13   programs for week-long educational classes.

14        Q.    Okay.  And then how about Shenandoah

15   University?

16        A.    Yes, I have a Doctor of Pharmacy from

17   Shenandoah University.

18        Q.    And then if we go back to the first page,

19   does this accurately describe your professional

20   experience?

21        A.    Yes.

22        Q.    And this indicates that you spent 16 years

23   at Giant Eagle as the VP of Pharmacy?

24        A.    Well, the math doesn't -- the math is not
```

1    correct.  It is 15 years.

2        Q.    Oh.

3        A.    '96 to 2011.

4        Q.    Okay.

5        A.    And the math is not correct with McKesson.

6    That was not two years.  If you can start in '12 and

7    leave in '13, it is not going to be two years.

8        Q.    Right.  No, I understand that.  I -- I --

9    my guess is that's probably something on LinkedIn

10   where they --

11       A.    It could -- could be how they calculate

12   it, but --

13       Q.    -- do the math based on the months or

14   something.  But anyway...

15       A.    -- but these positions are correct.  The

16   timing is not correct.

17       Q.    Yeah, the -- the ballpark?

18       A.    The positions are correct.

19       Q.    Right.  Okay.  15, 16 years at Giant

20   Eagle.

21   ██████████████████████████████████

22   ████████████████████████████████████

23   ███████████████████████

24   ███████████████







1    the license is HBC Service Company.

2            Do you have any recollection of -- you

3    know, or involvement in that decision-making that the

4    licensee for that -- or the -- or the -- the name on

5    the license was HBC as opposed to Giant Eagle?

6        MR. KOBRIN:  Object to form.

7    BY THE WITNESS:

8        A.    I -- I don't recall how that was decided.

9    I'm assuming it was a combination of legal and

10   distribution people making that decision.

11   BY MR. HUDSON:

12       Q.    Were -- did you play any role in -- in

13   that decision?

14       A.    Not that I recall.

15       Q.    And is it your recollection that HBC

16   started acting as a distributor of Schedule III, IV

17   and V controlled substances in around November

18   of 2009?

19            Does that sound about right?

20       A.    That sounds about right.

21       Q.    Okay.  And then you left Giant Eagle at

22   some point in 2011, correct?

23       A.    Correct.  October of 2011.

24       Q.    So -- so Giant -- or HBC acted as a

1    distributor of controlled substances for a little less

2    than two years while you were still there?

3         A.    That's -- well, I don't recall when we

4    actually brought the controls in.  I know that we

5    started with generics and then my recollection is at

6    some point we added the controls.  That dating sounds

7    about correct, but I don't recall the exact date.

8         Q.    Sure, sure.

9              And the records will reflect what they

10   were.  And, again, I'll -- I'll represent to you that

11   they show that -- that the -- the controlleds started

12   in -- in about November of 2009 --

13        A.    Okay.

14        Q.    -- so...

15             During that time period, do you have any

16   recollection of whether or not HBC designed a system

17   to identify suspicious orders of controlled

18   substances?

19        A.    We had an integrated system in place to

20   monitor the movement of all controls.  It started as

21   we received product from the warehouse.  It was

22   scanned and electronically recorded.  When it was

23   placed on the shelves, again, it was scanned and

24   electronically recorded.  When it was dispensed or

1    when it was -- an order was picked based upon a

2    store's order, it was scanned and electronically

3    recorded.  When the totes were placed in a truck, it

4    was scanned and electronically recorded.  When those

5    delivery vehicles arrived at the Giant Eagle location,

6    the totes were scanned and electronically recorded.

7    When the merchandise was unpacked, it was, again,

8    scanned and electronically recorded.  When we

9    dispensed the product through our dispensing system,

10   the product was scanned and electronically recorded.

11   When we gave the medicine to the patient, it went

12   through our cash register, it was scanned and

13   recorded.

14          We also had corporate oversight of both

15   the stores and the warehouse.  The warehouse had

16   buyers that were monitoring from a human perspective

17   the orders that were placed by the stores and also the

18   orders that were placed to the manufacturers.  The

19   system to monitor the store activity involved our

20   pharmacists who are required to on a monthly basis

21   compare dispensing activity to purchase activity,

22   identify discrepancies, and try to find out what

23   those -- why those discrepancies occurred.

24          Our district managers were responsible to

1  verify that that analysis of dispensing activity

2  versus purchasing activity was being conducted

3  properly.  And our vice president of pharmacy

4  operations was responsible to see that our district

5  managers were performing those particular follow-ups.

6  So we had a -- a fully integrated system

7  of controls in place to be sure that we were trying to

8  detect and prevent any type of theft or diversion.

9  Q.  My question was more specific.  My

10  question was:  Did HBC design a system to identify

11  suspicious orders of controlled substances?

12  So my question is what -- to you, what is

13  a suspicious order of a controlled substance?

14  A.  I mean, we -- me -- our integrated system

15  looked for, you know, any -- any types of -- of

16  deviations.  Our focus was on theft and the -- you

17  know, ways to -- to get it -- get it out if anyone was

18  taking it out of the system.

19  The buyers were looking at, you know,

20  orders as they were coming in.  So if someone, you

21  know, was on -- if they saw something that came in and

22  they said they wanted 40 pieces and they have never

23  ordered 40 pieces, they would typically call to see if

24  it was a -- a fat finger situation or if the system,

1  you know, somehow made a computer error and set that

2  order up and it should have been four rather than 40.

3  You know, that's, you know, an example of something

4  that, you know, might be considered suspicious.

5      Q.    Do you -- but do you have a definition of

6  a suspicious order?  In other words, during -- and let

7  me be more specific about that.

8          During the time that you were at Giant

9  Eagle and Giant Eagle was considering becoming a

10  distributor of controlled substances, was one of the

11  things that Giant Eagle looked at is trying to design

12  a system specifically focused on suspicious orders?

13      MR. KOBRIN:  Object to form.

14  BY THE WITNESS:

15      A.    Well, I think -- I mean, the integrated

16  system that I described is in place to identify any

17  type of suspicious orders or theft or diversion.

18  BY MR. HUDSON:

19      Q.    Okay.  And so in your mind, what is a

20  suspicious order?

21      MR. KOBRIN:  Object to form, asked and answered.

22      THE WITNESS:  Am I supposed to answer that?

23      MR. KOBRIN:  I'll tell you -- if you are not

24  meant to answer it, I will definitely say stop, hold











27













33



34



1   10, the companies responded, and do you see at the

2   bottom of Page 9, the first written policy identified

3   is there at that Bates range and then it says it's

4   effective from 8/1 of 2014.

5          Do you see -- do you see that at the

6   bottom?

7      A.   I see the sentence:  "Apparent version of

8   HBC policy effective 8/1 of 2014."

9      Q.    Okay.  And then if we look to the next

10  page, I think you'll see that the rest of the written

11  policies identified become later, you know, later in

12  time as opposed to earlier in time.

13          My -- my -- given that the company has

14  identified the first written policy as being

15  August 1st of 2014, my question is simply:  Do you

16  have any recollection of any written policies or

17  procedures relating to suspicious order -- a

18  suspicious order monitoring system that were in effect

19  prior to August 1st of 2014?

20      A.    I mean, I think I've already described

21  these integrated systems that were in place to monitor

22  the movement of all products throughout the Giant

23  Eagle supply chain.

24      Q.    And can you say under oath today whether

1    or not that integrated system had components that were

2    specifically designed to identify suspicious orders of

3    controlled substances?

4        MR. KOBRIN:  Object to form.

5    BY THE WITNESS:

6        A.    I think I've already described how the

7    system was in place to -- to monitor the movement and

8    to identify anything that was out of line.

9    BY MR. HUDSON:

10       Q.    Right.  And as part of that, do you know

11   as you sit here today whether or not that involved

12   monitoring and identifying orders of controlled

13   substances of unusual size?

14       MR. KOBRIN:  Object to form, asked and answered.

15   BY THE WITNESS:

16       A.    I -- I think I've already answered the

17   fact that we had people at a corporate level that were

18   monitoring the orders that were sent from the store to

19   the HBC warehouse.  Those buyers were also monitoring

20   the orders that were sent from the warehouse to the

21   manufacturers.

22   BY MR. HUDSON:

23       Q.    So who -- who at corporate was monitoring

24   orders of controlled substances to identify those of

37

```
 1    unusual size?

 2         MR. KOBRIN:  Object to form.

 3    BY THE WITNESS:

 4         A.    I think I already -- I already stated they

 5    were -- they were pharmacy buyers that were

 6    responsible for monitor -- monitoring those orders.

 7    BY MR. HUDSON:

 8         Q.    And who were the pharmacy buyers, what

 9    were their names?

10         A.    I don't recall.

11         Q.    What did the pharmacy buyers do to monitor

12    the orders to try to identify those of unusual size?

13         A.    They are -- they are looking at the orders

14    that came from the pharmacies before they actually

15    submit their orders into the manufacturers.

16         Q.    How often did they review those orders?

17         A.    I don't recall.

18         Q.    Well, what was the criteria being applied

19    to try to determine whether it was an order of unusual

20    size?

21         A.    I don't recall.

22         Q.    How many orders did the pharmacy buyers

23    identify during the time that you were there that --

24    that were identified as being potentially suspicious
```

38









42



43





45



46



47



















56





58



59



60



15      Q.     After you left Giant Eagle, you joined

16   McKesson?

17      A.     Correct.

18      Q.     And what was your role there?

19      A.     My role was Director of National Accounts

20   Six Sigma.

21      Q.     And it looks like you stayed in that role

22   a little less than two years?

23      A.      It was less -- it was actually less than a

24   year.

61

```
 1          Q.    Okay.  Less than a year.

 2                And then why did you leave McKesson?

 3          A.    It just was not a good fit.  My position

 4   was to look for cost savings between the national

 5   accounts and McKesson and it was very numbers and

 6   commodity driven and it was not a good fit for me.  I

 7   need to be around people.

 8          Q.    And then what did you do after you left

 9   McKesson?

10          A.    I started working for CVS as a pharmacist.

11          Q.    And is your job just to be a pharmacist at

12   a specific pharmacy?

13          A.    I'm currently a pharmacy manager at a

14   specific pharmacy south of Pittsburgh in McKeesport,

15   Pennsylvania.

16          Q.    And then prior to that you were in -- out

17   of -- a pharmacist in Masontown, Pennsylvania?

18          A.    Correct.  Masontown, I was a staff

19   pharmacist there.

20          Q.    And what does that mean, staff pharmacist?

21          A.    I wasn't the pharmacy manager.

22          Q.    Okay.  How many pharmacists are there at

23   your current pharmacy in McKeesport?

24          A.    One-and-a-half.
```

62

1      Q.    You being the one?

2      A.    Me being the one.

3      MR. HUDSON:  Okay.  I think that's all I've got.

4   No further questions.  Thanks.

5      MR. KOBRIN:  Can we just take a quick break.

6   I'm not going to have very much redirect either.

7      THE VIDEOGRAPHER:  10:35, we are off the record.

8                 (WHEREUPON, a recess was had

9                  from 10:35 to 10:42 a.m.)

10     THE VIDEOGRAPHER:  10:42, we are on the video

11   record.

12     MR. KOBRIN:  We have no additional questions.

13     THE VIDEOGRAPHER:  10:42, we are off the video

14   record.  This concludes the video deposition.

15                 (Time Noted:  10:42 a.m.)

16             FURTHER DEPONENT SAITH NAUGHT.

17

18

19

20

21

22

23

24

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5          That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9          That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14          That the said deposition was taken before

15    me at the time and place specified;

16          That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21          IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 19th day of February, 2019.

23

24          JULIANA F. ZAJICEK, Certified Reporter
```

64

1                    DEPOSITION ERRATA SHEET

2

3

4    Case Caption:  In Re: National Prescription

5                       Opiate Litigation

6

7           DECLARATION UNDER PENALTY OF PERJURY

8

9           I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                            RANDY HEISER

19

20   SUBSCRIBED AND SWORN TO

21   before me this        day

22   of                 , A.D. 20__.

23

24           Notary Public

1                           DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                           RANDY HEISER

```
 1                    DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24                       RANDY HEISER
```