EXHIBIT 405

```
 1            IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

 4   In re:  NATIONAL PRESCRIPTION   )   CASE NO.

     OPIATE LITIGATION               )   1:17-MD-2804

 5                                   )

     APPLIES TO ALL CASES            )   Hon. Dan A. Polster

 6

 7       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

 8

 9               DEPOSITION FOR PLAINTIFF

10

11

12               ***   ***   ***

13   DEPONENT:      SHAUNA HELFRICH

14   DATE:          JANUARY 10, 2019

15               ***   ***   ***

16

17

18

19

20

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX
```

```
 2   Examination by Mr. Goetz......................... 8
     Examination by Mr. Delinsky..................... 242
 3   Re-examination by Mr. Goetz..................... 249
     Reporter's Certificate......................... 257
```

```
 4
 5                     EXHIBIT INDEX
```

```
 6   CVS-Helfrich-2.................................. 56
     IRR, 8-30-13                 CVS-MDLT1-10672-757
 7                                Highly Confidential
 8   CVS-Helfrich-3................................. 100
     Email chain                     CVS-MDLT1-83064
 9                                       Confidential
10   CVS-Helfrich-4................................. 100
     SOM Process                     CVS-MDLT1-83065
11                                       Confidential
12   CVS-Helfrich-5.................................. 79
     Time study                     CVS-MDLT1-112702
13                                       Confidential
14   CVS-Helfrich-6.................................. 83
     LP Analyst Time Study          CVS-MDLT1-112686
15                                       Confidential
16   CVS-Helfrich-7.................................. 85
     LP Analyst Time Study          CVS-MDLT1-112690
17                                       Confidential
18   CVS-Helfrich-8.................................. 90
     LP Analyst Time Study          CVS-MDLT1-112698
19                                       Confidential
20   CVS-Helfrich-9................................. 205
     Controlled Drug-DEA SOP Manual    CVS-MDLT1-8506
21                                       Confidential
22   CVS-Helfrich-10................................ 166
     Email chain,                    CVS-MDLT1-88516
23                                       Confidential
```

```
24
25
```

```
 1              EXHIBIT INDEX - Continued
 2   CVS-Helfrich-12................................. 172
     Email chain,                    CVS-MDLT1-31518
 3                              Confidential
 4   CVS-Helfrich-13................................. 109
     Order sheets                    CVS-MDLT1-10268
 5                          Highly Confidential
 6   CVS-Helfrich-14................................. 130
     Chart Title, Series 1           CVS-MDLT1-10235
 7
 8   CVS-Helfrich-18.................................  37
     INCB statistics 2012
 9
10   CVS-Helfrich-19.................................  39
     Publication: 2012 Ohio Drug Overdose Deaths
11
12   CVS-Helfrich-20.................................  51
     NVSS graph, U.S. Rates of Opioid Overdose Deaths,
13       Sales and Treatment Admissions, 1999-2010
14   CVS-Helfrich-21................................. 216
     Notice of Inspection of Controlled Premises
15   CVS-MDLT1-10522                 Highly confidential
16   CVS-Helfrich-23................................. 235
     Suspicious Order Monitoring Report update
17                                   confidential
18   CVS-Helfrich-24................................. 235
     Logistics Planning Update, 9-15-14
19   CVS-MDLT1-19836                 Highly Confidential
20   CVS-Helfrich-25................................. 216
     DEA Visit 8/5 - 8/8 2013 - Notes
21   CVS-MDLT1-61230                 Highly Confidential
22   CVS-Helfrich-26................................. 217
     Email chain                     CVS-MDLT1-409
23                              Highly Confidential
24   CVS-Helfrich-27................................. 232
     Email chain                     CVS-MDLT1-76135
25                              Highly Confidential
```

```
 1               EXHIBIT INDEX - Continued
 2   CVS-Helfrich-29................................. 233
     DEA correspondence              CVS-MDLT1-8014
 3                            Highly Confidential
 4   CVS-Helfrich-30................................. 237
     Email chain                     CVS-MDLT1-8016
 5                            Highly Confidential
 6   CVS-Helfrich-31.................................
     Email                           CVS-MDLT1-22284
 7                            Highly Confidential
 8   CVS-Helfrich-33................................. 113
     Track One CVS Store Information CVS-MDLT1-7362
 9                                   Confidential
10   CVS-Helfrich-34.................................  68
     Irregular Order - Logistics Communication
11   CVS-MDLT1-3346             Highly Confidential
12   CVS-Helfrich-35................................. 146
     Email chain                     CVS-MDLT1-8496
13   Highly Confidential - Protected Health Information
14   CVS-Helfrich-36................................. 179
     List I Chemicals and Control Drug Policy/Procedure
15   CVS-MDLT1-25018                 Confidential
16   CVS-Helfrich-37................................. 119
     Irregular Order - Logistics Communication
17   CVS-MDLT1-3348             Highly Confidential
18   CVS-Helfrich-38................................. 120
     Email chain                     CVS-MDLT1-8483
19   Highly Confidential - Protected Health Information
20   CVS-Helfrich-41................................. 254
     Email                           CVS-MDLT1-118312
21                                   Confidential
22   CVS-Helfrich-43................................. 254
     Fulfillment Check Register
23

24

25
```

```
 1   A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:      DANIEL GOETZ, Esquire
                             BRIAN ROOF, Esquire
 4                           Weisman, Kennedy & Berris Co., L.P.A.
                             101 West Prospect Street
 5                           Cleveland, Ohio  44115
                             216-781-1111
 6                           dgoetz@weismanlaw.com
                             broof@weismanlaw.com
 7
 8   Via speakerphone:       MICHAEL ELSNER, Esquire
                             KAITLYN EEKHOFF, Esquire
 9                           AMANDA UNTERREINER, Esquire
                             Motley Rice, LLC
10                           28 Bridgeside Boulevard
                             Mount Pleasant South Carolina
11                                               29464
                             843-216-9250
12                           843-216-9210
                             843-216-9493
13                           melsner@motleyrice.com
                             keekhoff@motleyrice.com
14                           aunterreiner@motleyrice.com
15
16   FOR THE DEFENDANT:      ERIC DELINSKY, Esquire
     CVS entities           Zuckerman Spaeder, LLP
17                           Suite 1000
                             1800 M Street
18                           Washington, DC  20036
                             202-778-1800
19                           edelinsky@zuckerman.com
20
21   FOR THE DEFENDANT:      SARAH HARMON, Esquire
     Cardinal Health        Armstrong Teasdale, LLP
22                           Suite 1800
                             7700 Forsyth Boulevard
23                           St. Louis, Missouri  63105
                             314-552-6672
24                           sharmon@ArmstrongTeasdale.com
25
```

```
 1                 APPEARANCES - Continued

 2

 3   FOR THE DEFENDANT:     JAMES PETKUN, Esquire
     AmerisourceBergen      Reed Smith, LLP
 4   via speakerphone       Three Logan Square
                            Suite 3100
 5                          1717 Arch Street
                            Philadelphia, PA  19103
 6                          215-851-8204
                            jpetkun@reedsmith.com
 7

 8   FOR THE DEFENDANT:     ANGELA VICARI, Esquire
     Endo & Par entities    Arnold & Porter Kaye Scholer, LLP
 9   via speakerphone       250 West 55th Street
                            New York, New York  10019
10                          212-836-7408
                            angela.vicari@arnoldporter.com
11

12   FOR THE DEFENDANT:     PATRICK DUBOIS, Esquire
     Walmart                Jones Day
13   via speakerphone       77 West Wacker Street
                            Chicago, Illinois  60601
14                          312-269-4251
                            pdubois@jonesday.com
15

16   ALSO PRESENT:     Ben Stanson, videographer
                       Jon Knowles, technologist
17

18

19

20

21

22

23

24

25
```

```
 1              The deposition of SHAUNA HELFRICH taken on

 2    discovery, pursuant to Notice heretofore filed, in the

 3    Latitude Room, 2nd Floor, of Le Meridien Indianapolis,

 4    123 South Illinois Street, Indianapolis, Indiana, on

 5    January 10, 2019, at approximately 8:22 a.m.; upon

 6    oral examination, and to be used in accordance with

 7    the Federal Rules of Civil Procedures.

 8

 9                        *      *      *

10

11              THE VIDEOGRAPHER:  We are now on the record.

12    My name is Ben Stanson.  I'm a videographer for Golkow

13    Litigations Services.  Today's date is January 10,

14    2018, and the time is 8:22 a.m.

15              This video deposition is being held in

16    Indianapolis, Indiana, in the matter of National

17    Prescription Opioid Litigation, MDL No. 2084 pending

18    in the United States District Court for the eastern

19    district of Ohio.

20              The witness is Shauna Helfrich.

21              Counsel, please identify yourselves for the

22    record?

23              MR. GOETZ:  Dan Goetz on behalf of

24    plaintiffs.

25              MR. ROOF:  Brian Roof on behalf of
```

```
 1   plaintiffs.

 2          MS. HARMON:  Sarah Harmon for Cardinal

 3   Health.

 4          MR. DELINSKY:  Eric Delinsky, Zuckerman

 5   Spaeder on behalf CVS Indiana, LLC; CVS Rx Services,

 6   Inc, and on behalf of Ms. Helfrich as well.

 7          THE VIDEOGRAPHER:  The court reporter is Kim

 8   Keene.

 9          Will you please swear in the witness?

10

11                     *     *     *

12          SHAUNA HELFRICH, after having first been duly

13   administered an oath, testified as follows:

14                     *     *     *

15

16                     EXAMINATION

17   BY MR. GOETZ:

18       Q.  And am I pronouncing your name correctly?

19   Helfrich?

20       A.  Uh-huh.

21       Q.  When did you come to work for CVS?

22       A.  I can't recall the exact date.  Possibly in

23   October, the end of October, I believe.

24       Q.  Of what year?

25       A.  Of 2012.
```

```
 1        Q.  And when you started at the end of October of

 2   2012, who was your employer?

 3        A.  CVS Pharmacy, Indianapolis.

 4        Q.  Is that the name of the company you worked

 5   for?

 6        A.  Yes.

 7        Q.  Is that the name of the company you currently

 8   work for?

 9        A.  I believe so, yes.

10            (CVS-Helfrich-43 was marked for

11   identification.)

12        Q.  Okay.  I'm going to hand you Exhibit 43.  We

13   are not actually putting these up on the screen.

14            Throughout the day as we hand you exhibits,

15   if you want to look, the exhibits will actually go up

16   on the screen, but these were not -- that's for the

17   jury to see.  These aren't really necessary.

18        A.  Okay.

19        Q.  Does this refresh your recollection of when

20   you came to work for CVS?

21        A.  I can't really recall.  It has -- has the

22   date of 11-16, so...

23        Q.  That was your first paycheck from CVS --

24        A.  Okay.

25        Q.  -- correct, according to the records?
```

```
 1      A.  Yeah.

 2      Q.  Okay.  And these actually reflect your time

 3   records, I believe, and your payment through

 4   9-19-2014.

 5      A.  Yes.

 6      Q.  Okay.  As you look at them, do they seem

 7   generally accurate?

 8      A.  Uh-huh.

 9          MR. DELINSKY:  Object to form.

10      A.  That I -- I cannot say.

11      Q.  Do you have any reason to dispute that the

12   hours shown are wrong?

13          MR. DELINSKY:  Object to form.

14      A.  I can't really -- I -- see -- I really can't

15   say.  I don't -- I don't have my records.

16      Q.  Well, you can put that aside.  We will move

17   on.

18          If we have time, we will come back to that.

19          Who is Frank Helfrich?

20      A.  My father.

21      Q.  And what does Frank Helfrich do?

22      A.  He is logistics ops manager.

23      Q.  For -- for whom?

24      A.  CVS dis...

25      Q.  How long has he been --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. DELINSKY:  I'm sorry, Dan.  I just want

 2    to make sure.  Shauna's voice is a little -- is quiet,

 3    so -- you said CVS?

 4         A.  Distribution center.

 5         Q.  Okay.  Is that the same place you work?

 6         A.  Yes.

 7         Q.  Okay.  That's the same place that you went to

 8    work in 2012 and -- is that correct?

 9         A.  Yes.

10         Q.  Is that how you got your job?  Through your

11    father?

12         A.  No.  He informed me that there was an

13    opening, but my application and everything was pulled

14    by their HR department.

15         Q.  Okay.  What is your educational background?

16         A.  I have a high school diploma.

17         Q.  When?

18         A.  20 -- 2003.

19         Q.  2003.

20              And after high school, do you have any other

21    college, any training, any other training?

22         A.  No.

23         Q.  And after high school, graduating high

24    school, where did you go to work?

25         A.  Right after -- out of high school, I worked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   at a law firm.

 2        Q.  For how long?

 3        A.  I can't -- the exact, I want to say maybe

 4   about seven years or so.

 5        Q.  Till around 2010?

 6        A.  Yeah.  I think so.

 7        Q.  Okay.

 8        A.  I'm not sure.

 9        Q.  What did you do after that?

10        A.  I moved to Florida.

11        Q.  You moved to Florida?

12        A.  Uh-huh.

13        Q.  And you did what in Florida?

14        A.  I volunteered at a wildlife refuge.

15        Q.  How long did do you that?

16        A.  Florida?   Maybe only a couple of years,

17   maybe.  I don't -- I can't recall how long I was -- I

18   know it wasn't for very long I was there.

19        Q.  Okay.  In between working at a law firm and

20   coming to CVS in either October or November of 2012,

21   did you do anything other than volunteer at a wildlife

22   refuge?

23        A.  No.

24        Q.  What did you do at the wildlife refuge?

25        A.  Fostered and took care of animals.
```

1    Q.  And what did you do at the law firm for seven

2  years?

3    A.  I was a legal assistant.

4    Q.  Meaning what?

5    A.  I helped prepare correspondence and emails

6  and other documentation.

7    Q.  For what type of practice?

8    A.  Corporate.

9    Q.  There was no regulatory aspect to your legal

10  assisting, was there?

11      MR. DELINSKY:  Object to the form.

12    A.  What are you saying?

13    Q.  Did you work with the Controlled Substances

14  Act as part of your work at the law firm?

15    A.  No.

16    Q.  Okay.  Did you work with anything related to

17  the DEA as part of your work at the law firm?

18    A.  Not that I can recall.

19    Q.  When you came to CVS in October or November

20  of 2012, what was your title?

21    A.  I was an RX picker.

22    Q.  What is that?

23    A.  You work in the RX department and you pick

24  the orders.

25    Q.  How long were you an RX picker?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.  I do not know how long I was classified as an

 2    RX picker.

 3         Q.  So, how long did you pick orders?

 4         A.  Honestly, I can't -- I don't -- I don't

 5    really know and -- the exact dates, possibly 2013.  I

 6    was continuously picking.  I can't exactly remember

 7    the exact dates in which I stopped picking and went to

 8    SOM.

 9              MR. DELINSKY:  And you'll hear that a lot.

10    That's S-O-M.

11         Q.  And when you had a -- when you went to SOM,

12    can you give me a period?  Was it the fall of 2013?

13    The winter of 2013?

14         A.  When I went to SOM full-time?  Maybe -- maybe

15    fall, I don't -- I honestly, I don't know the exact

16    dates.

17         Q.  When you say "maybe fall," are we talking

18    about October of 2013?

19              Do you have any idea?

20         A.  I have no idea.

21         Q.  When you went to SOM, did you go full-time?

22         A.  No.  I -- I was help -- I would help out here

23    and there with SOM from when I started, whenever they

24    needed help, I would help.

25         Q.  When you went -- you started part-time,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   correct?

 2        A.  Yes.

 3        Q.  When you went full-time, were you in SOM or

 4   were you a picker?

 5        A.  When my -- are you asking when my status

 6   changed from a part-time associate to a full-time

 7   associate?

 8        Q.  Yes.

 9        A.  That, I do not know.  I don't -- I don't know

10   if I was -- if I went full-time for SOM or if I went

11   full-time before SOM.

12        Q.  Well, as a picker, can you tell me what you

13   did?

14        A.  We had a -- you would pick up an order, and

15   you would go through the bays and pick the product and

16   put it in the tote.

17        Q.  You said the base?

18        A.  The bays.

19        Q.  The bays?

20        A.  There are bays.

21        Q.  What were you picking?

22        A.  That I'm -- I -- I don't know.  I know it

23   wasn't the controlled substances.  They were --

24   because it wasn't in the cage.  I'm not for sure

25   exactly.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  Did you ever work in the cage?

 2        A.  No.

 3        Q.  So you never ever were a picker for

 4   controlled substances?

 5        A.  No.

 6        Q.  When you were a picker, which we don't know

 7   the time period, did you have a chance to visualize

 8   the cage?

 9            MR. DELINSKY:  Object to the form.

10        A.  To see the cage?

11        Q.  Yeah.

12        A.  I was in the RX department.

13        Q.  You were in the RX department?

14        A.  Yeah.  The cage is within the RX

15   department.

16        Q.  Okay.  And in that period, how big was that

17   cage?

18        A.  That I do not re -- I don't -- I don't really

19   know.

20        Q.  Can you give me an estimate?

21        A.  I really -- I can't.

22        Q.  How many bays were in the cage?

23        A.  That I -- I don't know.  I was not in the

24   cage, so...

25        Q.  Do you know who was in the cage --
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19        Q.   You ultimately became the SOM manager, didn't

20   you?

21        A.   No.

22        Q.   No?  Did you replace the SOM manager?

23        A.   No.

24        Q.   No?

25
```

```
 1              (CVS-Helfrich-41 was marked for

 2    identification.)

 3              I'm going to show you Exhibit 41.

 4              MR. DELINSKY:  I would like to take a break.

 5    Can we do it now?  Is that okay?

 6              MR. GOETZ:  Now is fine.

 7              MR. DELINSKY:  Thank you.

 8              THE VIDEOGRAPHER:  We are off the record at

 9    9:02 a.m.

10              (There was a brief recess.)

11              THE VIDEOGRAPHER:  We are back on the record

12    at 9:10 a.m.

13    BY MR. GOETZ:

14         Q.  Ms. Helfrich, when you earlier were saying

15    Aaron, you were speaking of Aaron Burtner; is that

16    correct?

17         A.  Yes.

18         Q.  Yes?

19         A.  Yes.

20         Q.  Okay.  And there came a point in time when

21    Aaron Burtner left, correct?

22         A.  Yes.

23         Q.  Do you know when that was?

24         A.  I do not recall.  I don't -- I don't

25    remember.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  When Mr. Burtner was working in the

2    SOM at CVS Indiana, you were assisting him, correct?

3    A.   Yes.

4    Q.   Was there anybody else working in that

5    department at that time?

6         MR. DELINSKY:  Object to the form.

7         THE WITNESS:  Kelly Baker.  I believe, I

8    can't -- he was there.  Gary Millikan helped

9    periodically when needed.

10        I can't exactly recall.  Let me see.  I'm not

11   for certain if pharma compliance came on board at that

12   time or not.

13   Q.   Do you know when Kelly Baker left the CVS

14   Indiana distribution center?

15   A.   That, I do not remember.

16   Q.   Can you give me a guess?

17   A.   Guessing?  Maybe possibly later in 2013,

18   maybe like the later -- maybe December.

19   Q.   And when Mr. Burtner left, they went to

20   pharma compliance for somebody to run the SOM; is that

21   correct?

22        MR. DELINSKY:  Object to form.

23        THE WITNESS:  I can't -- I can't remember

24   when they came on.  I don't know.  I can't remember if

25   it was -- it may have been after Aaron left.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  When Kelly Baker was at the CVS Indiana, was

 2    it your understanding that he was the SOM manager?

 3            MR. DELINSKY:  Object to form.

 4            THE WITNESS:  I have -- I have no idea if he

 5    was ever given that position.  Me, personally, I

 6    thought he was still an analyst.

 7        Q.  Okay.  I'm handing you what has been marked

 8    as CVS-Helfrich-41.  It starts at Bates No. CVS118312.

 9            That is an email that I do not believe you

10    were copied on.  I could -- I'm sorry.  I'm wrong.

11    You are copied on it.

12            Do you know who John Mortelliti is?

13        A.  I've heard of the name, but no.

14        Q.  John Mortelliti, in the first sentence at the

15    top, do you see that?  What he says?

16            MR. DELINSKY:  Ms. Helfrich, do you need to

17    read that?

18            THE WITNESS:  Yes.

19    BY MR. GOETZ:

20        Q.  Ms. Helfrich, you are more than welcome to

21    read the email, but I promise you, to the extent I'm

22    asking you questions, I'll point it out.

23            If you want to read the whole email, that's

24    fine.

25        A.  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  That first sentence, tell me if I'm reading

 2   this correctly, it says, "Shauna is replacing our SOM

 3   manager and is responsible for DEA compliance."

 4            I had earlier asked you if you were the SOM

 5   manager ever, and you said, "No."

 6        A.  Correct.

 7        Q.  Were you not informed of this?

 8        A.  I honestly -- to my understanding, I was an

 9   analyst.  I -- I can't really comment what John

10   Mortelliti was referencing or -- but to my knowledge,

11   I was -- I was a SOM analyst.

12        Q.  Okay.  Were you ever told you were

13   responsible for DEA compliance?

14        A.  No.

15        Q.  No?

16            Could you go back to the second page of that

17   document, please?

18            And it says -- there is an email from Pam

19   Hinkle that says, tell me if I'm reading it correctly,

20   "Novistor is Viper that no longer functional and is

21   probably why it was denied."

22            Do you know when Viper became no longer

23   functional?

24        A.  I do not.

25        Q.  You had been looking for, according to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    email down below, Viper access for months as of

 2    November of '13, correct?

 3            MR. DELINSKY:  Object to form.

 4            THE WITNESS:  According to Bill Klenotic,

 5    that's what it reads.

 6        Q.  Do you remember that?

 7        A.  I -- I can't ever really recall, as far as I

 8    remember, needing that access.

 9        Q.  So you don't recall ever needing to access

10    Viper?

11            MR. DELINSKY:  Object to form.

12            THE WITNESS:  No.  I recall not having that

13    access.  It was -- it's been -- I just can't recall

14    not having access to a program that I needed.

15        Q.  So am I correct, I just want to make sure

16    that I understand your testimony:  You don't have an

17    independent memory of this, but you -- to your

18    knowledge, everything you thought you needed, you had

19    access to?

20            MR. DELINSKY:  Object to form.

21            THE WITNESS:  Yes, reading this email, I

22    believe I had access to what I needed when I needed

23    it.

24        Q.  You were copied on this email, correct, on

25    November 6 of '13?
```

```
 1      A.  Yes.

 2      Q.  And according to this email string, you never

 3   responded, correct?

 4      A.  No.

 5      Q.  That's correct?

 6      A.  Yes.

 7      Q.  So you never responded and said, "I don't

 8   need access.  I have everything I need," correct?

 9      A.  I never responded.

10      Q.  When you started at CVS, we spoke a little

11   bit about your training.

12          Were you aware of the opioid epidemic?

13          MR. DELINSKY:  Object to form.

14          THE WITNESS:  I can't exactly recall what I

15   knew back then, but I know that there were drugs that

16   could be abused and diverted.

17          But an epidemic, I don't necessarily think

18   I'm actually qualified to establish whether there was

19   an epidemic or not.  But, I mean, I knew there were

20   drugs that were abused.

21      Q.  When you went to work in the SOM at CVS, the

22   Suspicious Order Monitoring, were you aware that you

23   were going to be monitoring hydrocodone combination

24   products which are an opioid?

25          MR. DELINSKY:  Object to form.
```

```
 1          THE WITNESS:  When I worked for SOM, I knew

 2    there was going to be, yes, various drugs that I would

 3    monitor; hydro being one of them.

 4       Q.  Okay.  And were you aware of an epidemic

 5    surrounding hydro or HCPs?

 6          MR. DELINSKY:  Object to form.

 7          THE WITNESS:  I knew they could be abused.  I

 8    don't think I can really comment on epidemic.

 9       Q.  Did anybody at CVS, when you were at the --

10    in the SOM department, tell you that there was an

11    epidemic of hydrocodone combination products?

12       A.  Not that I can remember.

13       Q.  Okay.  You never got any training surrounding

14    the prevalence of hydrocodone combination products?

15          MR. DELINSKY:  Object to form.

16          THE WITNESS:  Not that I can remember.

17       Q.  Did anybody ever tell you that your role in

18    the Suspicious Order Monitoring Program would be

19    critical as it relates to hydrocodone combination

20    products?

21          MR. DELINSKY:  Object to form.

22          THE WITNESS:  I don't remember that exactly

23    being said.  I mean, I know they voiced how important

24    SOM was.

25       Q.  How did they voice it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  Well, I can remember possibly what the SOM --

 2   what SOM was for and how important that was.

 3        Q.  What was SOM for, as you said?

 4        A.  SOM was for monitoring potentially suspicious

 5   orders.

 6        Q.  Suspicious orders of what?

 7            MR. DELINSKY:  Object to form.

 8            THE WITNESS:  Potentially suspicious

 9   orders.

10        Q.  Of what?

11        A.  That were -- that hit our IRR.

12        Q.  Okay.  I don't fully follow you, but I think

13   we'll figure it out later.

14            (CVS-Helfrich-18 was marked for

15   identification.)

16        Q.  I'm showing you Helfrich-18.  These are

17   statistics from the United States Drug Enforcement

18   Administration.

19            Do you see the first bullet point?

20        A.  Yes.

21        Q.  And could you read that, please?

22            MR. DELINSKY:  Object to form.

23            THE WITNESS:  "The US was the country with

24   the highest consumption of hydrocodone.  Approximately

25   45.5 tons or 99 percent of global consumption."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  That was the drug you were monitoring as part

 2   of SOM, correct?

 3             MR. DELINSKY:  Object to form.

 4             THE WITNESS:  Yes.

 5        Q.  Okay.  And no one ever told you that the US

 6   consumed 99 percent of the hydrocodone in the United

 7   States, did they?

 8        A.  No.

 9        Q.  Okay.  Do you think that would have been

10   helpful to know?

11        A.  I don't -- I know my job was to review orders

12   to the best of my ability thorough.  I would presume

13   if this was something that I needed to know, I would

14   have been -- I would have been informed.

15        Q.  Okay.  You have that much faith in CVS?

16        A.  I have that much faith in what I did.

17        Q.  But you said you would have been informed had

18   you needed to know?

19        A.  Uh-huh.

20        Q.  Who would have informed you?

21        A.  That, I do not know.

22        Q.  Somebody at CVS would have informed you?

23        A.  I would presume so.

24        Q.  Somebody at CVS never told you, you were

25   responsible for DEA compliance, did they?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. DELINSKY:  Object to form.

2              THE WITNESS:  From what I can recall, no.

3       Q.  Okay.  So somebody at CVS never told you that

4  you were the SOM manager, did they?

5              MR. DELINSKY:  Object to form.

6              THE WITNESS:  From what I can recall, no.

7              (CVS-Helfrich-19 was marked for

8  identification.)

9       Q.  I'm handing you what has been marked as

10 Exhibit 19.

11             CVS Indiana, your distribution center,

12 delivered HCPs.

13             Do you know what I'm talking about when I say

14 HCPs?

15             MR. DELINSKY:  Object to form.

16             THE WITNESS:  Hydrocodone?

17      Q.  Combination products?

18      A.  Yes.

19      Q.  Okay.  And you are aware that's an opioid?

20      A.  Yeah.

21      Q.  Okay.  CVS Indiana distribution center that

22 you worked at, are you aware that they delivered HCPs

23 to Ohio?

24      A.  During?

25             MR. DELINSKY:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  While you were there.

 2        A.  While I was --

 3        Q.  Yeah.

 4        A.  -- doing SOM?

 5            MR. DELINSKY:  I object to the form of the

 6   question.

 7            You may answer, Ms. Helfrich.

 8            MR. GOETZ:  I'm not sure -- can you tell me

 9   why?  I mean, I'm asking her if she is aware if while

10   she was at CVS Indiana, they were directing HCPs to

11   Ohio.

12            MR. DELINSKY:  Okay.  And the form of

13   objection is that CVS -- the distribution center in

14   Indiana, on behalf of CVS, distributed to CVS

15   pharmacies.  It didn't distribute to Ohio at large.

16            That was the basis of my objection.

17   BY MR. GOETZ:

18        Q.  Do you understand what I was asking you?

19            Did you understand that I was asking you if

20   the distribution center you worked at in Indiana,

21   whether -- when I said they distributed to Ohio, that

22   I was speaking about Ohio CVS pharmacies?

23        A.  Yes.

24        Q.  And, in fact, let's be fair, the CVS

25   distribution center in Indiana only distributed to CVS
```

```
 1   pharmacies?

 2      A.  I believe so.

 3      Q.  Okay.  Now, when you were at the distribution

 4   center in Indiana in the Suspicious Order Monitoring

 5   Program, they distributed hydrocodone combination

 6   products to CVS pharmacies in Ohio.

 7          Are you aware of that?

 8      A.  At the time doing SOM, I can't exactly recall

 9   whether I did or not.

10      Q.  You don't remember that they were

11   distributing to Ohio, as you sit here today?

12          You don't have that memory?

13          MR. DELINSKY:  Object to form.  You can

14   answer, Ms. Helfrich.

15          THE WITNESS:  I don't really know what -- who

16   or where Indiana DC delivers.

17      Q.  Okay.  Are you aware that they were

18   delivering hydrocodone combination products to CVS

19   pharmacies in Cuyahoga and Summit County?

20      A.  I -- I don't remember.

21      Q.  And part of the reason you don't remember

22   might be because when you were reviewing IRRs, you

23   were reviewing IRRs for the entire country, weren't

24   you?

25          MR. DELINSKY:  Object to form.
```

```
 1              THE WITNESS:  For all of our DCs, for -- I

 2    can't exactly recall.

 3              At some point in 2014, they started going

 4    over to the new system, so it wasn't the whole time.

 5         Q.  Before they migrated to the new system in

 6    2014, while you were there at CVS Indiana, they were

 7    reviewing the Item Review Reports for all 11

 8    distribution centers in the United States?

 9              MR. DELINSKY:  Object to form.

10              THE WITNESS:  I believe so, yes.

11         Q.  Okay.  Are you aware that this first trial

12    involves two of the largest counties in Ohio?

13         A.  No.

14         Q.  Okay.  So you have no knowledge that this

15    first trial involves two of the largest counties in

16    Ohio that have been decimated by the opioid crisis?

17              MR. DELINSKY:  Object.

18    BY MR. GOETZ:

19         Q.  Are you aware of that?

20              MR. DELINSKY:  Object to form.

21              THE WITNESS:  I'm not for certain that the --

22    the two counties or -- I'm not familiar with how

23    they're affected.

24         Q.  Are you aware how the state was affected by

25    the opioid crisis?
```

```
 1      A.  No.

 2      Q.  Okay.  Could you read the first paragraph,

 3  please, where it begins, "Drug overdose deaths..."?

 4      A.  "Unintentional drug overdose" --

 5      Q.  No, I apologize.  First paragraph.

 6      A.  "Drug overdose deaths continue to be a public

 7  health crisis in Ohio with a 366 percent increase in

 8  the number of deaths from 2000 to 2012."

 9      Q.  Were you aware of that when you were doing

10  SOM?

11          MR. DELINSKY:  Object to form.

12          THE WITNESS:  I don't know, no.

13      Q.  Can you read the second bullet point that

14  begins with "In 2012..."?

15      A.  "In 2012, five Ohioans died every day from

16  unintentional drug overdose or one every five hours."

17      Q.  If those statistics hold today, while we are

18  here today, two Ohioans will die from drug overdose.

19          Were you aware of those statistics when you

20  were doing SOM?

21          MR. DELINSKY:  Object to form.

22          THE WITNESS:  No.

23      Q.  Okay.  Could you read the bullet point that

24  begins "Opioids" and then the open paren?

25      A.  "Opioids, prescription or heroin, remain the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    driving factor behind the unintentional drug overdose

 2    epidemic in Ohio.  Approximately two-thirds or 1,272,

 3    66.5 percent, of the drug overdoses involved any

 4    opioid in 2012 similar to 2011, 1,154 or 65 percent."

 5        Q.  Were you aware of that statistic?

 6            MR. DELINSKY:  Object to form.

 7            THE WITNESS:  No.

 8        Q.  Okay.  Can you read the next bullet point,

 9    just the first paragraph -- first sentence?

10        A.  "Prescription opioids are involved in most of

11    the unintentional drug overdoses and have largely

12    driven the rise in deaths over the past decade."

13        Q.  Were you aware of that statistic?

14        A.  No.

15        Q.  Okay.  When we talk about SOM, Suspicious

16    Order Monitoring, sounds pretty generic, right, pretty

17    benign?

18            MR. DELINSKY:  Object to form.

19            THE WITNESS:  Meaning to some who don't know

20    what it is?

21        Q.  Right.

22            But the whole point of a Suspicious Order

23    Monitoring Program was to monitor diversion, not ship

24    potentially suspicious orders.

25            Do you agree?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. DELINSKY:  Object to form.

 2              THE WITNESS:  To -- yeah, potentially

 3  suspicious.

 4       Q.  Correct.

 5              It was -- the whole point of SOM was so that

 6  we don't end up with this, correct?

 7              MR. DELINSKY:  Object to form.

 8              THE WITNESS:  That, I am -- that, I really I

 9  can't comment on.  I know SOM was there to help to --

10  one of the -- one tool to prevent diversion.

11              But I know what I did.

12              MR. DELINSKY:  Are you done?

13              THE WITNESS:  Yes.

14       Q.  These statistics are a result of diversion.

15              Do you disagree with that?

16              MR. DELINSKY:  Object to form.

17              THE WITNESS:  I -- I'm just now seeing this

18  document for the first time.  I don't -- I don't know

19  where this came from, who had written it.

20              Their analysis.

21       Q.  Do you see the bottom?  Sorry for

22  interrupting.

23       A.  Yes.

24       Q.  Do you see where that came from?

25       A.  Yes.
```

```
 1        Q.  Do you dispute the accuracy of this

 2   document?

 3            MR. DELINSKY:  Object to form.

 4            THE WITNESS:  I don't know the background

 5   information.  I don't -- I just -- I can't really

 6   comment on how they came about their -- their

 7   findings.

 8        Q.  If true, it is a shocking document, isn't it?

 9   I mean, that's what we're grappling with.

10            MR. DELINSKY:  Object to form.

11            THE WITNESS:  I can't really comment.

12        Q.  You don't think it is shocking?

13            MR. DELINSKY:  Object to form.

14            THE WITNESS:  This is my first time seeing

15   it.

16        Q.  Do you think it's shocking?

17            MR. DELINSKY:  Object to the form.

18            Asked and answered.

19            THE WITNESS:  Again, it's the first time

20   seeing this.  I can't really comment on it.

21        Q.  Do you -- I understand.

22            Do you think it is shocking?  That really is

23   a yes or no.  I'm not asking if it is the first time

24   that you saw it.

25            Do you think it is shocking?
```

```
1           MR. DELINSKY:  Object to form.  The question

2  has been asked and answered.

3           THE WITNESS:  I can't -- I can't comment on

4  it.

5      Q.  You have no opinion?

6           MR. DELINSKY:  Object to form.

7           THE WITNESS:  I have -- I would want -- I

8  would want more information.  I would want to know --

9  I would need more information, more background, more

10 where this came from.  Who --

11     Q.  What information?

12     A.  Seeing it for the first time in this

13 situation, I can't -- I can't think of what the exact

14 things that -- that I would need.

15     Q.  Would you want to know the age of those

16 people that died?

17          MR. DELINSKY:  Object to form.

18     Q.  Would that help you determine if it is

19 shocking?

20          MR. DELINSKY:  Object to form.

21          THE WITNESS:  Still would not be able to

22 comment on it.

23     Q.  What about if they were someone's son or

24 daughter, would that help you determine if it's

25 shocking?
```

```
 1              MR. DELINSKY:  Object to form.

 2              THE WITNESS:  Still would not be able to

 3    comment on it.

 4       Q.  You just can't think of anything that would

 5    help you determine if it's shocking?

 6       A.  Not without more information.

 7              MR. DELINSKY:  I object to the form of the

 8    question.

 9              Ms. Helfrich, just make sure you pause so I

10    have an opportunity to interpose my objections.

11       Q.  You said that SOM was one part of -- of

12    preventing diversion.

13              Do you remember that?

14              MR. DELINSKY:  Object to form.

15              THE WITNESS:  I believe it was one tool.

16       Q.  One tool?

17       A.  Yeah.

18       Q.  Okay.  So you said SOM is one tool to prevent

19    diversion?

20              MR. DELINSKY:  Object to form.

21              THE WITNESS:  One tool used to prevent

22    diversion.

23       Q.  Okay.  And are you telling me it is one tool

24    used at the Indiana distribution center to prevent

25    diversion?
```

```
 1        A.  It's one tool that -- that I know of with SOM

 2   that was used to prevent diversion.

 3        Q.  What else prevents diversion?  What else that

 4   you know of?

 5        A.  For me?  There was -- it was SOM, and that

 6   was my main focus.

 7        Q.  You said SOM was one tool.  I'm asking what

 8   the other tools are to prevent diversion.

 9        A.  I know it is -- I -- I know SOM is one tool

10   that prevented diversion.  And that was my main focus.

11   I'm uncertain of the others.

12        Q.  Okay.  Do you think there are others?

13            MR. DELINSKY:  Object to form.

14            THE WITNESS:  I know SOM was my main focus.

15   That was what I did.  That was my -- my purpose.

16        Q.  You're not answering my question.  It is:  Do

17   you think there are other tools to prevent

18   diversion?

19            MR. DELINSKY:  Object to form.

20        Q.  I'm asking for your opinion, what you know.

21            MR. DELINSKY:  Object to form.

22            THE WITNESS:  I know SOM was one tool used,

23   and that is what I focused on.

24        Q.  Tell me the other tools that you know of.

25        A.  I -- I vaguely recall a -- CVS, when I would
```

```
1    call the -- the doctors -- or not the doctors, the

2    pharmacists, I -- they had their -- their method, but

3    I -- I can't recall because SOM was mine.

4        Q.  So you think that the CVS pharmacies, the

5    pharmacists also had tools to prevent diversion, was

6    your understanding?

7            MR. DELINSKY:  Object to form.

8            THE WITNESS:  I just vaguely recall something

9    in regards to them.  What exactly it is...

10       Q.  Ms. Helfrich, I'm not trying to trick you.

11   I'm really trying to figure out what was being done at

12   the Indiana distribution center while you were there

13   and while people thought you were the SOM manager and

14   while people thought that you were in charge of DEA

15   compliance.  I'm trying to find out what was being

16   done.

17           What I worry about is when you say "it's one

18   tool," that later then you offer testimony, if this

19   goes to trial, that you come up with three other

20   things that were being done at the distribution center

21   to prevent diversion.  Okay?

22           Do you know of any other tools, then, at the

23   Indiana distribution center, while you were working

24   there, to help prevent diversion?

25           MR. DELINSKY:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  At the distribution center?

 2   There would be pickers that would notice an irregular

 3   order, and I would be shot an email.

 4       Q.  Okay.  So, we have pickers and we have the

 5   SOM, which -- the Item Review Report, essentially,

 6   correct?

 7              MR. DELINSKY:  Object to form.

 8              THE WITNESS:  Yeah.

 9       Q.  Anything else besides those two that you can

10   think of?

11       A.  That I can recall, those are the two that

12   stick out.

13              (CVS-Helfrich-20 was marked for

14   identification.)

15       Q.  I'm showing you what has been marked as

16   Exhibit 20, and I apologize for throwing them at you.

17              MR. DELINSKY:  Did you say Exhibit 29?

18              MR. GOETZ:  This is Exhibit 20.

19       Q.  When you started in 2012, were you aware that

20   there was a direct correlation between opioid overdose

21   deaths and opioid sales?

22              MR. DELINSKY:  Object to form.

23              THE WITNESS:  I did not.

24       Q.  You did not know?

25       A.  No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  Okay.  Does -- can -- that chart indicates

 2   there's a correlation, doesn't it?

 3             MR. DELINSKY:  Object to form.

 4             THE WITNESS:  I can't -- I don't know where

 5   this -- this information came from, like how it was

 6   gathered.

 7        Q.  I'm not asking you to -- to challenge the

 8   validity of the report.  We can talk about whether you

 9   think the report is valid or not based on your

10   expertise.

11             But this report was put together by the Drug

12   Enforcement Administration.  According to them, there

13   is a correlation between opioid sales and opioid

14   deaths as shown in this chart, correct?

15             MR. DELINSKY:  Object to form.

16             THE WITNESS:  Well, if you're asking what I'm

17   seeing, that's --

18        Q.  You see the correlation, correct?

19             MR. DELINSKY:  Object to form.

20             THE WITNESS:  I see it.  I -- I see what's on

21   the chart.

22        Q.  And what is on the chart?

23        A.  The opioid sales versus deaths versus opioid

24   treatment admissions.

25        Q.  And they all run semi-parallel to each other,
```

```
 1   correct?

 2           MR. DELINSKY:  Object to form.

 3           THE WITNESS:  I really don't --

 4      Q.  Let me ask --

 5      A.  -- feel comfortable commenting on a document

 6   I've just seen.

 7      Q.  Just so you do not see the correlation?  You

 8   can't acknowledge the correlation?

 9           MR. DELINSKY:  Object to form.

10           THE WITNESS:  I can't -- I can't really

11   comment.

12      Q.  Why can't you comment?

13      A.  Because I -- it is the first time I'm seeing

14   it.  I don't -- I don't know the reasoning behind it,

15   what -- what went into it.

16      Q.  What was your understanding of the legal

17   obligations that CVS had to monitor for suspicious

18   orders?

19      A.  I know that it's a DEA required -- it's

20   something that DEA requires, but the actual context

21   and -- I'm not familiar with.

22      Q.  Are you finished?

23      A.  Yes.

24      Q.  I don't understand your answer.  You know

25   that DEA requires but you're not familiar with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    actual context.

 2         A.  Yeah.

 3         Q.  I don't understand what you said.

 4         A.  I'm not -- I'm not familiar with the exact --

 5    like the language or -- of the requirement that DEA

 6    imposes, but I know there is one.

 7         Q.  Okay.  So you don't know the exact language.

 8    Is that what you're telling me?

 9         A.  Yeah.

10         Q.  But you know there is a requirement?

11         A.  Yes.

12         Q.  Okay.  What is that requirement?  I'm not

13    asking for exact language.  I'm asking you to give it

14    to me in your words.

15         A.  In general, the DEA requires monitoring of

16    potential suspicious drugs.

17              MR. DELINSKY:  Drugs or orders.

18              MR. GOETZ:  I'm sorry.  What?

19              Did you catch that?

20              What did you say?

21              MR. DELINSKY:  I said drugs or orders.

22              MR. GOETZ:  I don't --

23              MR. DELINSKY:  Drugs or orders.

24              MR. GOETZ:  Okay.

25              MR. DELINSKY:  Potentially suspicious drugs
```

Highly Confidential - Subject to Further Confidentiality Review

1    or potentially suspicious orders.

2             MR. GOETZ:  Oh, is that what she said?

3             MR. DELINSKY:  Yes.

4             MR. GOETZ:  Oh, okay.  You were just

5    repeating it.

6             MR. DELINSKY:  Yes.

7             THE REPORTER:  Ma'am, you're going to have to

8    keep your voice up.  I didn't know you said that.

9             MR. GOETZ:  I didn't hear drugs either.

10            THE REPORTER:  So --

11            MR. GOETZ:  I thought Mr. Delinsky and I was

12   going to have to swear him in.

13       Q.  So your general understanding is that the DEA

14   requires CVS to monitor for potentially suspicious

15   drugs or orders; is that correct?

16       A.  Yes.

17       Q.  Okay.

18            MR. GOETZ:  This is a good time to take a

19   five-minute break.

20            MR. DELINSKY:  Okay.

21            THE VIDEOGRAPHER:  We are off record at 9:54

22   a.m.

23            (There was a brief recess.)

24            THE VIDEOGRAPHER:  We are back on the record

25   at 10:12 a.m.

```
 1            (CVS-Helfrich-2 was marked for

 2    identification.)

 3    BY MR. GOETZ:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9          THE VIDEOGRAPHER:  We are back on the record

10   at 11:25 a.m.

11   BY MR. GOETZ:

12       Q.  Ms. Helfrich, in August of 2013, when you

13   were working in the Suspicious Order Monitoring at CVS

14   in Indiana, when was your typical day?

15          MR. DELINSKY:  Object to form.

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1  ████████████████████████████████████████

 2       Q.  What is an IRR Recap?

 3       A.  I don't recall.

 4       Q.  You don't recall?

 5           Did you look at any documents to prep?

 6       A.  No.

 7       Q.  No?  Ms. Helfrich, do you --

 8           MR. DELINSKY:  Did you look at any documents

 9  in preparing for the deposition?

10           It's not a complicated question.  Did you

11  look at any documents to prepare for the deposition?

12  In meeting with me, did you look at documents?

13           Dan, let's take a break.   Let's take a

14  break.

15           THE VIDEOGRAPHER:  We are off the record at

16  11:58.

17           (There was a luncheon recess.)

18           THE VIDEOGRAPHER:  We are back on the record

19  at 12:30 p.m.

20  BY MR. GOETZ:

21       Q.  Ms. Helfrich, before we took a break, I had

22  asked you a question, if you had reviewed any

23  documents in preparation for today.

24           Did you review any documents in preparation

25  for today?
```

 1      A.  Yes.

 2      Q.  Can you tell me what those documents are?

 3          MR. DELINSKY:  Instruct the witness not to

 4  answer on privileged grounds.  If you ask a question

 5  about a particular document, you can ask that

 6  document.  But her selection and the selection of

 7  documents that she was shown reflects privileged

 8  communications and work product.

 9  BY MR. GOETZ:

10      Q.  Ms. Helfrich, did you review an Item Review

11  Report in preparation for today?

12      A.  I want to -- I believe I saw a portion of

13  one.

14      Q.  Did you review an IRR Recap Report --

15      A.  Recap?

16      Q.  -- in preparation for today?

17      A.  Not that I can recall, unless I'm confusing

18  it with something.

19          (CVS-Helfrich-13 was marked for

20  identification.)

21      Q.  So, I'm going to hand you something that we

22  have marked as Exhibit 13.

23          MR. GOETZ:  Do you want a copy?

24          MS. HARMON:  No, thank you.

25          MR. GOETZ:  I couldn't imagine that you

Highly Confidential - Subject to Further Confidentiality Review

1    would.

2        Q.  Ms. Helfrich, would you briefly leaf through

3    those pages and tell me what that document is.

4        A.  To me, this looks like what we -- we called

5    the max tracker.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
```

15      Q.  Ms. Helfrich, in 2014, there was a new system

16  that was coming into being, right?

17      A.  Yes.

18      Q.  Okay.  And in -- and in 2014, they started

19  hiring additional people, correct?

20      A.  I believe so.

21      Q.  Yeah.  And before that new system came in,

22  you started having actually the opportunity to do

23  additional due diligence on more orders that were

24  identified by the IRR as potentially suspicious,

25  correct?

```
 1                MR. DELINSKY:  Object to form.

 2                THE WITNESS:  That, I don't -- I don't

 3    remember that being the case.

 4        Q.   There were more people hired in the beginning

 5    of 2014, correct?

 6        A.   For the new SOM team?

 7        Q.   Yeah.  And to ramp up for the new SOM and at

 8    the end of '13 and into '14, they were hiring

 9    additional people for the suspicious order monitoring

10    program?

11                MR. DELINSKY:  Object to form.

12                THE WITNESS:  I believe those were -- that

13    was probably the time frame, but how many people they

14    actually hired I'm uncertain of.

15        Q.   And so since they hired additional people,

16    that allowed the opportunity to do additional due

17    diligence in the older system, correct?  What -- I'm

18    talking about the system pre-March of '14.

19                MR. DELINSKY:  Object to form.

20                THE WITNESS:  I don't think -- I don't

21    believe that changed the way I did my -- my job.

22                (CVS-Helfrich-14 was marked for

23    identification.)

24        Q.   I'm going to show you what we have marked as

25    Exhibit 14.
```

```
 1              What is that document?

 2       A.  It looks like the max tracker.

 3       Q.  It is -- it is the same document as the other

 4  one, correct?  Same form?

 5       A.  Yes.

 6       Q.  Okay.  If you see across the top, it will

 7  give you the report date; is that correct?

 8       A.  Yes.

 9       Q.  And it gives you the report?  Do you see

10  that?

11       A.  Yes.

12       Q.  Okay.  And that report under it says FRR?

13       A.  Yes.

14       Q.  That's a Florida Review Report, correct?

15       A.  Yes.

16       Q.  That was a specific report because of all of

17  the problems CVS had had in Florida, correct?

18       A.  I --

19            MR. DELINSKY:  Object to form.

20            THE WITNESS:  -- don't -- I don't know the

21  reasoning behind that report.

22       Q.  Did you ever ask anybody why there was a

23  separate report for Florida?

24       A.  If I did, I don't -- I don't remember.

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential -- Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          So, again, this reflects the orders from the

18    Item Review Report that were identified as potentially

19    suspicious that received additional due diligence --

20          MR. DELINSKY:  Object to form.

21    BY MR. GOETZ:

22        Q.  -- from 1-2 of '14 to 2-11 of '14?

23          MR. DELINSKY:  Object to form.

24          THE WITNESS:  I don't remember.

25        Q.  You think it might reflect the entirety of

1  the Item Review Report, correct, for that time

2  period?

3          MR. DELINSKY:  Object to form.

4          MR. GOETZ:  You can have a running objection

5  to form.  Seriously.  Everything.

6          Go ahead.

7          THE WITNESS:  I just don't remember.

8      Q.  Okay.  For this time period I will represent

9  to you -- tell me if you're surprised -- that there is

10  one store flagged that either showed up on the IRR,

11  because you're not sure, or received additional due

12  diligence after it showed up on the IRR as a

13  potentially suspicious order.  There is one of those

14  orders for the CT-1 jurisdiction.

15          Does that surprise you?

16          MR. DELINSKY:  Object to form.

17          THE WITNESS:  I don't -- I don't remember.

18      Q.  Does it surprise you that that is how few

19  orders were investigated?

20          MR. DELINSKY:  Object to form.

21          THE WITNESS:  It's been so many -- so many

22  years.  It's -- hard to recall.

23      Q.  I appreciate that.

24          Unfortunately, you were the person doing

25  suspicious order monitoring in 2013 and through 2014

 1    at the CVS Indiana distribution center that was

 2    distributing hydrocodone combination products into the

 3    CT-1 pharmacies.

 4            So you are the person I have to get these

 5    answers from.

 6            MR. DELINSKY:  Object to form.

 7    BY MR. GOETZ:

 8        Q.  Do you know anybody else that would know the

 9    answer?

10            MR. DELINSKY:  Object to form.

11            THE WITNESS:  I mean, I didn't work alone.

12        Q.  Okay.  Ms. Helfrich, the -- the orders we

13    looked at all bore -- had your name on them.

14            Who else besides you could tell me about

15    them?

16            And I'll point out to you the order on CT-1

17    on Exhibit 14 that's on page 10254.

18            Do you see that?

19        A.  Yes.

20        Q.  That has your name, correct?

21        A.  The --

22            MR. DELINSKY:  Which one?  There is...

23            MR. GOETZ:  Well, it is the same store.  It

24    is the same date.

25            MR. DELINSKY:  The 3314, store 3314?

```
 1              MR. GOETZ:  Yes.

 2              MR. DELINSKY:  At the very bottom?

 3              MR. GOETZ:  Yeah.  It is actually the only

 4     one that is a nonFlorida, I believe.  I apologize,

 5     it's not, but it is the bottom store.

 6              THE WITNESS:  Yes.

 7     BY MR. GOETZ:

 8        Q.  Who else could tell me that?

 9        A.  During that time, we had pharma compliance, I

10     believe.

11        Q.  Are they going to tell me what you are doing

12     with this order, Ms. Helfrich?

13              MR. DELINSKY:  Object to form.

14              THE WITNESS:  They probably wouldn't be able

15     to recall.  They probably might not be able to

16     remember, just like I'm kind of struggling to

17     remember.

18        Q.  You think maybe pharma compliance might be

19     able to tell me something?

20              MR. DELINSKY:  Object to form.

21              THE WITNESS:  At the time, that -- they may

22     have been the only assistance that I had.

23        Q.  At that time?

24        A.  Possibly.

25        Q.  Who was person from pharma compliance?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.  We had maybe a few different people at

2     different times.  The main one, I can't recall his

3     last name, but it was Steve.

4               MR. DELINSKY:  Excuse me.  Could you put your

5     phone on mute?

6               MR. GOETZ:  You need to mute.

7               (CVS-Helfrich-35 was marked for

8     identification.)

9          Q.  I'm going hand you Exhibit 35.

10              And I -- I've previously showed you Exhibit

11    34.

12              Can you pull that up, please?

13              Thirty-four and 35, those are for the same

14    orders, correct?

15         A.  Yes.

16         Q.  And that actually happens to be the exact

17    same order that is shown in Exhibit 14 down at the

18    bottom, correct?

19

20

21

22

23

24

25
```

Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential – Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10     Q.  Are you aware that CVS paid over a $132

11  million in fines related to controlled substances and

12  pseudoephedrine?

13        MR. DELINSKY:  Objection.

14     Q.  Are you aware of that?

15        MR. DELINSKY:  Object to form.

16        THE WITNESS:  I don't recall having that

17  information.

18     Q.  Okay.  As you sit here today, do you know

19  that?

20        MR. DELINSKY:  Object to form.

21        THE WITNESS:  I vaguely recall something of

22  that nature.

23     Q.  You're still at CVS, correct?

24     A.  Yes.

25     Q.  Yeah.  So you have never left, even though

```
1    you left SOM, Suspicious Order Monitoring, you're

2    still there?

3         A.  Yes.

4         Q.  You're still at the warehouse?

5         A.  Yes.

6         Q.  Are you aware that they had a show cause

7    order in Florida for how much Oxycodone and OxyContin

8    they were spitting out of their pharmacies?  Are you

9    aware of that?

10             MR. DELINSKY:  Object to form.

11             THE WITNESS:  Not that I can recall, no.

12        Q.  Are you aware that when this model was

13   changed from .65 to -- from .15 to .65, that it

14   actually was done internally, the experts were not

15   consulted?

16             MR. DELINSKY:  Object to form.

17             That's a false statement.

18             MR. GOETZ:  Let me have 10.

19        Q.  Are you aware of that?

20        A.  No, I did not know that.

21        Q.  I might have misspoke, and I believe the

22   experts were told after the fact.  And they were

23   surprised at the -- at the departure, but we will see

24   if I'm wrong.

25
```

```
 1            (CVS-Helfrich-10 was marked for

 2   identification.)

 3        Q.  I'm going to hand to you Exhibit 10.

 4            Do you see the last page?  It is 88518.

 5        A.  Yes.

 6        Q.  And if you turn to the page before it, 88517,

 7   that's an email from John Mortelliti to Robert

 8   Williamson.

 9            MR. DELINSKY:  Ms. Helfrich, if you have not

10   seen this document before, I would ask that you take a

11   moment to read it, in full.

12            THE WITNESS:  Okay.

13        Q.  Can you -- did you get a chance to read it

14   all?

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7      Q.  Ms. Helfrich, are you sure you're not

8  confusing this with the new IRR system which came

9  online March of 2014?

10      A.  The new IRR system?

11      Q.  There was a new SOM system that came online

12  in March of '14, correct?

13      MR. DELINSKY:  The wind socket system,

14  Shauna.

15      THE WITNESS:  Oh.  Okay.  Yes.

16      Q.  There was correct?

17      A.  Yes.

18      Q.  And for a period, that system was going --

19  was also out of the Indianapolis distribution center,

20  correct?

21      A.  The new SOM?

22      Q.  You never worked on that?

23      A.  The new SOM?

24      Q.  Yes.

25      A.  I've seen it.  I don't recall working on

```
 1   it.

 2       Q.  You don't ever recall working on that?

 3       A.  I don't recall.

 4       Q.  Did Gary Millikan always work out of the

 5   Indiana distribution center in 2014 or did he actually

 6   go to Rhode Island?

 7       A.  From -- I don't know.  I don't know Gary.

 8           MR. DELINSKY:  All right.  Let's take a

 9   break.

10           THE VIDEOGRAPHER:  We are off record at 3:31

11   p.m.

12           (There was a brief recess.)

13           THE VIDEOGRAPHER:  We are back on the record

14   at 3:40 p.m.

15   BY MR. GOETZ:

16       Q.  Ms. Helfrich, I think the last thing we were

17   talking about is what that data can and can't show.

18           Can that data up there tell me anything about

19   the doctors that had prescribed that drug in the past

20   of patients that use that pharmacy?

21       A.  Still not familiar with exactly remembering

22   what this -- but possibly, no.

23       Q.  And can that data up there -- strike that.

24           Do you know what the "Trinity" is?

25       A.  I have heard of the Trinity.  I can't exactly
```

1    recall which ones are in it.

2        Q.  You don't remember?

3        A.  I think possibly hydrocodone, maybe

4    oxycodone, and I'm not for sure of the last.

5        Q.  So the Trinity was the hydrocodone,

6    benzodiazepine, and a muscle relaxer.

7            Does that refresh your recollection?

8        A.  Yes.

9        Q.  And benzodiazepine is an anxiety medication,

10   correct?

11       A.  Yes, I believe so.

12       Q.  Okay.  Can -- can that -- and the Trinity was

13   really significant for a SOM program because if you

14   saw those three drugs going out in combination, that

15   was usually an indication of diversion, correct?

16           MR. DELINSKY:  Object to form.

17           THE WITNESS:  I'm not certain of that.  I do

18   remember something in regards to the cocktails that

19   was -- that was of interest if we saw that.

20       Q.  Why was it of interest?

21       A.  For -- I believe, if recall correctly, I --

22   potential abuse when you get those three together.

23       Q.  Can that information up there tell me

24   anything about the Trinity?

25       A.  I don't believe so.

1      Q.  Can we talk generically about what due

2   diligence can be done to figure out whether or not a

3   order is suspicious?

4           So you can contact and speak to the

5   pharmacist, correct?

6      A.  Yes.

7      Q.  Okay.  And what would you ask the

8   pharmacist?

9      A.  I can't recall the exact conversations.

10          I know in -- in general, it regarded to --

11  possibly asking them what their balance on hand was,

12  possibly let them know what was ordered, and my due

13  diligence that I did, what I found.

14          And if they had -- if they had any, you know,

15  patients or doctors of -- of interest.  If this was

16  a -- if it was an order that they actually wanted to

17  place.

18          I can't recall what other questions I might

19  have asked.

20     Q.  And that information could be important to

21  you in investigating whether or not an order is a

22  potentially suspicious?

23          MR. DELINSKY:  Object to form.

24          THE WITNESS:  I -- I did not have that -- I

25  did not deem whether an order was suspicious or not.

```
 1    That was actually -- if it was an order I was

 2    concerned with, it was elevated up.

 3            But those questions could help me figure out

 4    what happened in the ordering.

 5        Q.  How often did you elevate an order?

 6        A.  That, I -- I don't remember.

 7        Q.  What was the form that you used to elevate an

 8    order?

 9        A.  I would notify Pam Hinkle and Dean Vanelli of

10    my concerns.

11        Q.  How?

12        A.  Either via phone or email.

13        Q.  And then what would happen to them?

14        A.  Then it was out of my hands.

15        Q.  You would email them your due diligence,

16    correct?

17        A.  Yes.

18        Q.  We have not seen one order that you elevated

19    in our discovery.

20            Does that surprise you?

21        A.  Considering I know there were orders that I

22    elevated.

23        Q.  Would you elevate orders once a week?  Once a

24    day?  Once a month?

25            Approximately how often?
```

```
 1      A.  I don't -- I don't remember.

 2      Q.  I need some -- you have no idea whether it

 3   was once day or once every six months?

 4          MR. DELINSKY:  Object to form.

 5          THE WITNESS:  Not -- every day was different.

 6   I just don't remember.

 7      Q.  Could have elevated an order once every six

 8   months?

 9          MR. DELINSKY:  Object to form.

10          THE WITNESS:  I don't remember.

11      Q.  Once every eight months?

12          MR. DELINSKY:  Object to form.

13          THE WITNESS:  I don't remember.

14      Q.  Once every nine months?

15      A.  I don't remember.

16      Q.  Did you have a subject line you would put on

17   there when you would elevate an order?

18      A.  I believe there is something that I put in

19   the email.  I just don't recall what it was exactly.

20      Q.  And you would attach and send your due

21   diligence when you sent that email?

22          MR. DELINSKY:  Object to form.

23          THE WITNESS:  I don't remember if it was

24   attached with that email or -- or later.  I -- I

25   believe -- gosh, it's hard to recall.
```

```
1              I want to say, if I recall correctly, it may

2    have been with the initial email.

3         Q.  That information you indicated that you could

4    gather from -- that was part of due diligence, decide

5    whether or not to elevate an order by calling the

6    pharmacist, none of that is reflected in the Item

7    Review Report entries, is it?

8         A.  No.

9         Q.  No?

10             So if you want that due diligence to evaluate

11   an order, you actually have to do that separate due

12   diligence and contact the pharmacist, correct?

13        A.  After the review of the IRR?

14        Q.  Yes.

15        A.  Yes.

16        Q.  Yes.

17             If you want to -- okay.

18             And there was actually a pharmacy contact

19   form?

20        A.  That, I don't remember.

21        Q.  How often did you contact a pharmacy?

22        A.  I would contact pharmacies daily.

23        Q.  Daily?

24        A.  Yes.

25        Q.  Would you fill out a form?
```

```
 1              MR. DELINSKY:  Object to form.

 2              THE WITNESS:  I don't remember.

 3        Q.  How many times per day do you think that you

 4   would contact the pharmacy?

 5        A.  It varies from day to day, but the calls were

 6   frequent.

 7              I don't -- I don't remember an actual

 8   number.

 9        Q.  I'm asking you:  Was it once a day?  Five

10   times a day?  Ten times a day?

11        A.  I don't remember.

12        Q.  Might have been once?  It might have been

13   five?

14        A.  I don't remember.

15              MR. DELINSKY:  Shauna, was there a range that

16   you can recall?  It may have been three or something

17   else?

18              THE WITNESS:  Oh, man.  I know that the calls

19   were -- were frequent, depending on, obviously, the

20   volume.

21        Q.  You predominately would call, because we

22   looked at that report earlier that said, was this

23   order a mistake, right?

24              You said fat finger, that was whether or not

25   it was a fat finger, you remember a yes or no?
```

```
 1        A.  Yes.

 2        Q.  And that is predominantly why you would call

 3   and say, "Hey, was this a fat finger?"

 4            And you would get a no or a yes, and you

 5   would enter that in?

 6            MR. DELINSKY:  Object to form.

 7            THE WITNESS:  No.  That would -- that's

 8   usually information that they would have given me.  I

 9   don't -- that's not something that I asked them.

10        Q.  You would say, "Did you order 50,000 hydros?"

11            And they said, "No, we meant to order 5,000."

12            Is that what you are telling me?

13            MR. DELINSKY:  Object to form.

14            THE WITNESS:  If there is an error in the

15   order, yeah, they would let me know.

16        Q.  Other due diligence that you can do is

17   looking at ordering versus dispensing data.

18            And we have talked about that earlier,

19   correct?

20        A.  Yes.

21        Q.  Okay.  You don't know why -- I remember you

22   are not sure what the significance of it was, but is

23   that showing up there on that report?

24            MR. DELINSKY:  Object to form.

25            THE WITNESS:  I don't know much about what
```

Highly Confidential — Subject to Further Confidentiality Review

```
 1   that -- what that -- I can't really recall what that

 2   is showing.

 3        Q.  Are you finished?

 4        A.  Yes.

 5        Q.  So you don't know?

 6        A.  I don't know.

 7             MR. DELINSKY:  Object to form.

 8             THE WITNESS:  I don't recall.

 9        Q.  Another thing you could do would be to

10   determine whether or not doctors make up a

11   disproportionate share of those prescriptions for a

12   pharmacy, correct?

13             MR. DELINSKY:  Object to form.

14             THE WITNESS:  Of like -- like top doctors --

15        Q.  Yes?

16        A.  -- of -- yes.

17        Q.  Yeah.

18             You would want to know, what are the top

19   doctors?  Who are they?  What are their specialties?

20   And how much of this drug are they actually

21   prescribing that -- that is being -- that is being

22   sold at that pharmacy, correct?

23        A.  Yes.

24

25
```

Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



1

2

3      Q.  I'm going to hand what you has been marked as

4  CVS Exhibit 25, Helfrich 25.  These are notes from the

5  DEA visit.

6        Have you ever seen these notes?

7      A.  Not that I can recall.

8      Q.  If you look at -- under the second bullet, it

9  says, on the second page, 61235, it says "SOM."

10        MR. DELINSKY:  61235?  So it's the second

11  page?

12        MR. GOETZ:  You're right.  61235 is the fifth

13  page.

14      Q.  That's the SOM section.  And it says in the

15  second bullet, "DEA explained that it is imperative

16  that CVS know its customers."

17        Did you know that the DEA believed that that

18  was imperative?

19        MR. DELINSKY:  Object to form.

20        THE WITNESS:  No.

21      Q.  Do you ever learn that it was imperative to

22  know your customers?

23      A.  I've heard that phrase before.

24      Q.  When?

25      A.  I can't recall when.

```
 1        Q.  You didn't know it was imperative, it is just

 2   a phrase that you heard?

 3        A.  I did not know.

 4        Q.  Okay.  Can you look at the -- the bottom

 5   bullet where it says, "Director Nicastro provided the

 6   DEA with examples of actual irregular store orders and

 7   the research completed to validate as legitimate.

 8   They were impressed with the research and said this is

 9   exactly what we want to see."

10            Do you know what they saw?

11            MR. DELINSKY:  Object to form.

12        Q.  Do you know?  I couldn't hear you.

13        A.  I can't -- I can't really, I mean, comment on

14   this.  I have never -- that I can recall seeing it.  I

15   don't know what Mr. Nicastro is -- is -- is saying.

16            We had earlier looked at 35, if you want to

17   look at that.  I believe Exhibit 37 might be, but

18   Exhibit 35 is -- is a sample of the due diligence that

19   you had done.  Is that --

20        A.  I have that.

21        Q.  And other than -- strike that.

22            That Exhibit 35 is probably what the type of

23   documents that were shown to the DEA, correct, same

24   time period, same type of investigation?

25            MR. DELINSKY:  Object to form.  She testified
```

1    that she had no involvement in communications with the

2    DEA.

3              THE WITNESS:  I don't -- I don't know.

4         Q.  Other than that investigation that's shown in

5    Exhibit 35, the only two other things that could have

6    been done that we know CVS was doing was calling the

7    pharmacy or running a Store Metrics report, correct?

8         A.  From what I can recall, I -- that was my due

9    diligence.

10        Q.  Yes.  Those three things shown there and then

11   calling a pharmacy, running the Store Metrics report,

12   if you chose to do that, and printing that and putting

13   it in the file, correct?

14        A.  Yes.

15        Q.  Okay.  And so, when they show the DEA the

16   investigation, more than likely we know they're

17   probably showing them those five documents, correct?

18        A.  I was not involved in it.  I don't -- I don't

19   know.

20        Q.  You were doing the investigations around this

21   time period.  You were the one doing the

22   investigations.  They would have pulled your files for

23   this.

24        A.  But I'm not sure exactly what was -- what was

25   given.  I don't -- I wasn't -- I wasn't involved.

1    Q.  It would have been based upon what

2    investigations you were doing at the time, all five or

3    a -- a portion of those five, some combination of

4    those five?

5          MR. DELINSKY:  Object to form.  Objection,

6    misstates the testimony.  Mischaracterizes the time

7    frame.

8          THE WITNESS:  I don't -- I don't -- I don't

9    know.

10   Q.  We know your due diligence consisted of

11   either all five of those things that we talked about,

12   those three documents, plus the Store Metrics plus

13   maybe calling the pharmacy, it consisted of one or, in

14   some cases, all five of those items, correct?

15   A.  Yes.

16   Q.  Okay.  If they pulled your due diligence, if

17   they pulled one of your files to show the DEA and they

18   said, "Here's a recent file to show the DEA," they

19   would have pulled one of yours, correct?

20         MR. DELINSKY:  Objection.  Object to form.

21   Objection.  Misstates the evidence and testimony.

22         THE WITNESS:  I mean, that's my due

23   diligence.

24   Q.  Okay.  So let's assume that that's -- they

25   showed them those five documents.  The DEA was

1    impressed with that, weren't they?

2          MR. DELINSKY:  Object to form.

3          THE WITNESS:  I don't feel comfortable

4    commenting on it since I was not involved.

5      Q.  Did anybody ever talk to you about this

6    investigation?

7      A.  Not that I can remember.

8      Q.  You were working in SOM at Indiana, the SOM

9    system in Indiana is subject to a DEA audit, and no

10   one ever spoke to you about it?

11         MR. DELINSKY:  Object to form.

12         THE WITNESS:  I was aware one was going on,

13   but I -- I did my -- I continued to do my -- do my job

14   as thoroughly as possible.

15     Q.  Do you know if the DEA was ever told, "Look

16   at our great due diligence.  By the way, we did this

17   on two stores over a one-year period in Cuyahoga and

18   Summit County"?

19         MR. DELINSKY:  Object.

20     Q.  Do you know if they were ever told that?

21         MR. DELINSKY:  Dan, I'm going to instruct the

22   witness -- start instructing the witness not to

23   answer.  You are overtly asking her to speculate on

24   conversations and a series of events that she said she

25   didn't participate in.

```
1            I've given you leash, but this line of

2   questioning has to come to an end.

3        Q.  Exhibit 26.  Have you ever seen this

4   document?

5        A.  I don't recall ever seeing this email.

6        Q.  Do you know who Mark Nicastro is?

7        A.  Yes.  Yes.

8        Q.  Who is Mark Nicastro?

9        A.  Is the director of the Indianapolis DC.

10       Q.  And this appears to be an email from him

11  attaching some files -- some different files and

12  things to Daniel Gillen at the DEA, okay?

13       A.  Uh-huh.

14       Q.  Can you go to page 410?  And if you look at

15  that, page 410 and 411, that is a letter that

16  Mr. Nicastro wrote to Mr. Gillen, it appears.

17       A.  Yes.

18       Q.  I'm only going to go ask you about one -- one

19  paragraph.  It says -- it is at the bottom, the bottom

20  paragraph says, "Any order that is flagged by our SOM

21  model or questioned by our DC team is initially

22  identified as an order of interest and has additional

23  due diligence conducted by the SOM team."

24            Do you see that?

25       A.  Yes.
```

1    Q.  That SOM model that he's speaking about, that

2  is the Item Review Report that we have talked about

3  today, correct?

4    A.  I believe so.

5    Q.  All right.  I'm just -- I want to make sure

6  there is nothing else that --

7    A.  I -- well, I don't exactly know what he is --

8    Q.  So --

9    A.  -- trying to say here.  I am not him.  I

10  can't really comment on what he's -- he's saying.

11    Q.  You were doing suspicious order monitoring

12  during this period for the CVS Indiana distribution

13  center.

14        And are you aware of any SOM model other than

15  the IRR algorithm we have talked about today?

16    A.  I can't remember.  I can't remember.

17    Q.  Do you think there might have been another

18  SOM model that you just don't remember about?

19    A.  I remember the -- the IRR.

20    Q.  Okay.  And that was a SOM model?

21        MR. DELINSKY:  Object to form.

22        THE WITNESS:  I don't know what the language

23  he is -- is using.

24    Q.  In November of '13, Mr. Baker was gone,

25  correct?

```
 1        A.  I believe so.

 2        Q.  Aaron Burtner was gone, correct?

 3        A.  Yes.

 4        Q.  It was you, and you think it might have been

 5   Gary Millikan doing SOM?

 6        A.  With the assistance of pharma compliance.

 7        Q.  And pharma compliance would provide -- what

 8   did you say -- one person?

 9        A.  Yes.

10        Q.  And would they work for you or would you

11   report to them?

12        A.  That, I -- I don't exactly remember a

13   reporting tier of any sort.

14        Q.  They were there to help shepherd in the new

15   system, gather all of the data for the new system or

16   no?  They were there to do separate SOM?

17            MR. DELINSKY:  Object to form.

18            THE WITNESS:  I'm not for sure of their -- of

19   their reasoning for being there.  I know they were

20   there and they watched over and helped me with what I

21   did.

22        Q.  Okay.  He says in this -- this sentence, "Any

23   order that is flagged by our SOM model" -- I want you

24   to assume that is the IRR.  That's only thing that

25   makes sense.  -- "or questioned by our DC team is
```

Highly Confidential - Subject to Further Confidentiality Review

1    initially identified as an order of interest and has

2    additional due diligence conducted by the SOM team."

3            Did I read that correctly?

4            MR. DELINSKY:  Object to form.

5            THE WITNESS:  Yes.

6        Q.  That's not true, is it?

7            MR. DELINSKY:  Object to form.

8            THE WITNESS:  I know -- I know what I did.

9    What was flagged, I did my due diligence.

10       Q.  And when you did your due diligence, you

11   printed it and put it in a file?

12           MR. DELINSKY:  Object to form.  Misstates the

13   testimony.

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential — Subject to Further Confidentiality Review



20      MR. DELINSKY:  Dan, I just want to let you

21   know that I have five minutes of questions, so if you

22   want reserve.

23      MR. GOETZ:  I'm not sure that's -- that's not

24   rule.  If you go five minute, I get five.

25      MR. DELINSKY:  Okay.  Well, I hope you don't

```
 1    make me miss my plane.

 2          MR. GOETZ:  I'm doing my best, but --

 3       Q.  Are you aware that the DEA believed that the

 4    Indianapolis distribution center did not have a SOM

 5    system in place?

 6          MR. DELINSKY:  Object to form.

 7          THE WITNESS:  I was not.

 8       Q.  You were not aware of that?

 9          Does that surprise you?

10       A.  Considering I was doing SOM.

11       Q.  You would think they would have told you,

12    though, right?

13          That's an email from Mark Nicastro to Dan

14    Gillen.  And it appears to recap a call in the -- the

15    second paragraph says, "Regarding our call today.  I

16    am disappointed to hear that you do not believe we

17    have a suspicious order monitoring program in place,

18    but I can assure you that we do."

19          No one ever told you that that's what the DEA

20    thought?

21       A.  No, not that I recall.

22       Q.  You were doing suspicious order monitoring at

23    this time, right?

24       A.  Yes.

25
```

```
 1           (CVS-Helfrich-27 was marked for

 2    identification.)

 3      Q.  Are you aware that the DEA had serious

 4    concerns with the amount of -- I'm showing you Exhibit

 5    27 -- with the amount of hydrocodone that was being

 6    shipped by your distribution center?

 7           MR. DELINSKY:  Object to form.

 8           THE WITNESS:  Not that I can recall.

 9      Q.  Excuse me?

10      A.  Not that I can recall.

11      Q.  No one ever told you about that, either?

12      A.  Not that I can recall.

13      Q.  Are you aware that the DEA issued a letter of

14    admonishment related to the SOM program that you were

15    working at for this period, for the Indianapolis

16    distribution center?

17      A.  Not that I can recall.

18           (CVS-Helfrich-29 was marked for

19    identification.)

20      Q.  Okay.  I'm going to show you CVS 29.

21           This relates to the 2013 investigation.

22           Can you read paragraph 1, please?

23      A.  Failure to design and maintain a system to

24    detect suspicious and report suspicious orders for

25    Schedule III through V Controlled Substances as
```

1   required by Title 21, United States Code (USC) 821,

2   Title 21 USC 823(e)(1), and Title 21 Code of Federal

3   Regulations, (CFR) 1301.74 (b) in violation of the

4   Title 21 USC 842(a)(5), in that CVS failed to detect

5   orders that should have been identified as suspicious

6   for retail locations in Vincennes and Kokomo,

7   Indiana.

8       Q.   No one ever made you aware of that, that the

9   DEA found that while you were working in the SOM at

10  the Indianapolis distribution center, that it had

11  significant problems?

12          No one ever told you that?

13          MR. DELINSKY:  Object to form.

14          THE WITNESS:  Not that I can remember.

15      Q.  Does that disappoint you?

16          MR. DELINSKY:  Object to form.

17          THE WITNESS:  I trust if it was something

18  that I needed to know, I would have -- I would --

19      Q.  I'm asking if --

20          MR. DELINSKY:  Let her finish, Dan.

21          THE WITNESS:  -- I would be informed.

22      Q.  Does the finding that the DEA issued a letter

23  of admonishment partially related to the period while

24  you were there doing SOM, does that disappoint you?

25          MR. DELINSKY:  Object to form.

```
 1            THE WITNESS:  I've only seen this for the

 2    first time.  I can't really comment on the document,

 3    but I -- I have not seen.

 4        Q.  You have no opinion?

 5            (CVS-Helfrich-23 was marked for

 6    identification.)

 7            (CVS-Helfrich-24 was marked for

 8    identification.)

 9        Q.  I'm going to show you Exhibit 23 and 24.

10            I'm only going ask you a couple of brief

11    questions.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14          Q.   Right.  What you had been using, it was --

15               (CVS-Helfrich-30 was marked for

16     identification.)

17               Let me show you Exhibit 30.

18               MR. DELINSKY:  Ms. Helfrich, would you like a

19     break or are you okay?

20               MR. GOETZ:  We'll do this, and take a break.

21     It will be two minutes.

22               THE WITNESS:  Restroom.

23          Q.   Do you see 8017?

24          A.   Yes.

25          Q.   Could you look at the next page, please?

```
 1          That's a letter from Elizabeth Ferguson?

 2     A.  Yes.

 3     Q.  Do you know who that is?

 4     A.  Yes, I believe I know her as Betsy.

 5     Q.  Okay.  And she is CVS's legal counsel?

 6     A.  Yes.

 7     Q.  And if you look at the front page of that

 8  letter, she is writing a letter to Mr. Gillen,

 9  correct?

10     A.  Yes.

11     Q.  And Mr. Gillen is the DEA person that

12  actually audited the Indianapolis distribution center,

13  correct?

14     A.  I'm unsure of --

15     Q.  In any event, this is her letter to him.

16          And I want to read to you the third

17  paragraph.  It says, "As we discussed in the closing

18  interview, in the fall of 2013, CVS had just rolled

19  out a new SOM system and had invested substantial

20  resources to design and implement it."

21          That's not true, is it?

22     A.  I'm not --

23          MR. DELINSKY:  Object to form.

24          THE WITNESS:  I really can't comment on her

25  letter.  I don't know what she is meaning.
```

1      Q.  Is that --

2      A.  The context.

3      Q.  Is that true?

4          Based upon what you know about the CVS SOM

5      system and when it was rolled out, and when it was

6      implemented, and when the new one was in your period

7      there, is that -- is that statement, that in the fall

8      of '13, CVS had just rolled out a new SOM system; is

9      that true?

10     A.  Again, I'm not -- I'm not Betsy.  I don't

11     exactly know what she's -- what she's saying in her

12     wording.

13     Q.  Is it correct?

14         Go back to the rollout page, please?

15         Go back to Exhibit 30, 23 or 24.

16         Go back to Exhibit 23, please.

17     A.  Yes.

18     Q.  That page clearly says the first time this

19     system goes live in any distribution center was March

20     3rd of '14, correct?

21     A.  It looks like --

22     Q.  And --

23     A.  -- an outline.

24     Q.  Look at Exhibit 24.

25         By September 15, 2014, 14 of the 19 DCs are

```
 1    on the new system.

 2              So even by then, the system is not fully

 3    functional in all of the DCs, is it?

 4         A.   Seeing this, I can't really comment on it.

 5         Q.   You can comment on this:  When she says, "In

 6    the fall of 2013, CVS had just rolled out a new SOM

 7    system and had invested substantial resources to

 8    design and implement it."

 9              MR. DELINSKY:  Object to form.

10    BY MR. GOETZ:

11         Q.   Either we don't know about what system she

12    talking about -- she is talking about, or this is a

13    misstatement.

14              MR. DELINSKY:  Object to form.

15              THE WITNESS:  Again, I can't comment on what

16    Betsy is trying -- what she is saying or trying to

17    say.

18         Q.   Based on the facts that you know, is that

19    accurate, that statement?

20              MR. DELINSKY:  Object to form.

21    BY MR. GOETZ:

22         Q.   "As we discussed in the closing interview, in

23    the fall of 2013, CVS had just rolled out a new SOM

24    system and had invested substantial resources to

25    design and implement it."
```

```
 1              MR. DELINSKY:  Object to form.  Asked and

 2    answered.

 3              THE WITNESS:  I can't comment on what

 4    Betsy --

 5        Q.  And this letter is dated January 22 of '15.

 6              I don't know for sure because we have not

 7    gotten the documents, but I do know as of 9-15-2014,

 8    four months earlier, it still wasn't operational in

 9    five DCs.

10              It might not have even been fully operational

11    when she is writing this letter two years after the

12    fact, correct?

13              MR. DELINSKY:  Object to form.

14              THE WITNESS:  That I can't comment on it.  I

15    don't --

16        Q.  Because you don't want to say that it was not

17    an accurate letter?

18              MR. DELINSKY:  Object to form.

19              This has been asked and answered several

20    times.

21              MR. GOETZ:  I will reserve the rest of my

22    time plus your time when you question.

23              MR. DELINSKY:  Well, no, Dan.  I don't think

24    that's right.

25              MR. GOETZ:  That's how it reads.
```

```
 1              MR. DELINSKY:  Let me see it.  I don't

 2    believe that is correct.

 3              MR. GOETZ:  We can take a break.  We'll show

 4    it to you.

 5              MR. DELINSKY:  All right.  Five minutes.

 6              THE VIDEOGRAPHER:  We are off record at

 7    5:00 p.m.

 8              (There was a brief recess.)

 9              THE VIDEOGRAPHER:  We're back on the record

10    at 5:09 p.m.

11

12                       EXAMINATION

13    BY MR. DELINSKY:

14         Q.  Ms. Helfrich, have you ever been deposed

15    before?

16         A.  No.

17         Q.  Have you ever seen a deposition before?

18         A.  No.

19         Q.  Have you ever testified in court before?

20         A.  No.

21         Q.  Also, has this deposition been a brand new

22    experience for you?

23         A.  Yes.

24         Q.  Were you nervous for this deposition?

25         A.  Very, yes.
```

Highly Confidential — Subject to Further Confidentiality Review

```
 1        Q.  Have you ever been nervous -- have you stayed

 2   nervous throughout the deposition today?

 3        A.  Yes.

 4        Q.  Do you suffer any physical symptoms of your

 5   nervousness?

 6        A.  My neck gets real red.

 7        Q.  Are you nervous now?

 8        A.  Yes.

 9        Q.  Mr. Goetz put a lot of questions to you,

10   correct?

11        A.  Yes.

12        Q.  Do you feel that you answered all of the

13   questions that Mr. Goetz put to you perfectly?

14        A.  No.

15        Q.  Was it difficult for you to answer a lot of

16   his questions?

17        A.  Yes.

18        Q.  Was this process of testifying hard for

19   you?

20        A.  Yes.

21        Q.  Is that because you're nervous?

22        A.  Yes.

23        Q.  Is it because this is new for you?

24        A.  Yes.  Yes.

25        Q.  Were many of the questions confusing for you
```

 1   and just hard to answer?

 2       A.  Yes.

 3       Q.  Did you still do your best to answer

 4   Mr. Goetz's questions as best and as honestly as you

 5   were capable of doing in the moment?

 6       A.  Yes.

 7       Q.  You were a SOM analyst for CVS many years

 8   ago, correct?

 9       A.  Yes.

10       Q.  How many years ago?

11       A.  Like, five or so.

12       Q.  Do you remember all of the details of what

13   you did as a SOM analyst?

14       A.  No.

15       Q.  Is that because it was about five years

16   ago?

17       A.  Yes.

18       Q.  Is it hard to remember -- is it hard for you

19   to remember work that you have not performed for four

20   or five years?

21       A.  Yes.

22       Q.  Do you remember all of the details of the

23   various documents and reports that related to your SOM

24   work?

25       A.  No.

1    Q.  Do you remember the details of how you read

2    the IRR?

3    A.  No.

4    Q.  Do you recall that you understood the IRR at

5    the time you were a SOM analyst?

6    MR. GOETZ:  Objection.

7    Q.  I'll rephrase the question.

8    Ms. Helfrich, do you recall whether at the

9    time you were a SOM analyst you felt you understood

10   the IRR?

11   A.  Yes.

12   Q.  Did you understand the IRR at the time that

13   you were a SOM analyst?

14   A.  I believe so, yes.

15   Q.  Do you have general memory of how you went

16   about your work as a SOM analyst?

17   A.  Yes.

18   Q.  Do you remember whether you reviewed all of

19   the orders that CVS's system flagged?

20   A.  Yes.

21   Q.  When you were a SOM analyst, did you always

22   review all of the orders that the system flagged?

23   A.  Yes.

24   Q.  Ms. Helfrich, do you remember whether you

25   conducted due diligence on flagged orders that you

```
 1    believed was necessary?

 2         A.  Yes.

 3              MR. GOETZ:  Objection.

 4         Q.  When you were a SOM analyst, did you always

 5    conduct the due diligence that you believed was

 6    necessary?

 7         A.  Yes.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential – Subject to Further Confidentiality Review

1

2

3

4      Q.   Do you remember whether you worked hard in

5   reviewing the orders that CVS's SOM system flagged?

6      A.   Yes.

7      Q.   Did you work hard in reviewing the orders

8   that the system flagged?

9      A.   Yes, I did.

10      Q.   How hard did you work?

11      A.   Very hard.

12      Q.   Is it fair to say that you spilled blood,

13   sweat and tears on this?

14          MR. GOETZ:  Objection.

15          THE WITNESS:  And then some.

16      Q.   How early in the day would you get to the

17   office to begin your review?

18      A.   3:00 a.m., at times at 4:00 a.m.

19      Q.   Did it depend on the day?

20      A.   It did, yeah.

21      Q.   Were you able to review all of the orders

22   flagged by the SOM system each day?

23      A.   Yes.

24      Q.   Was there ever a day when you were unable to

25   review all of the flagged orders?

```
 1      A.  No.

 2      Q.  When you were a SOM analyst, did you always

 3   have access to all of the information that you

 4   believed you needed --

 5      A.  Yes.

 6      Q.  -- to thoroughly review the orders that the

 7   SOM system flagged?

 8      A.  Yes.

 9      Q.  Did you ever let an order ship that you were

10   concerned might be suspicious?

11      A.  No.

12      Q.  Did you ever let an order ship that you

13   believed might be misused?

14          UNIDENTIFIED SPEAKER:  Objection.

15          THE WITNESS:  No.

16      Q.  Did you ever let an order ship that you

17   believed had an illegal purpose?

18          UNIDENTIFIED SPEAKER:  Objection.

19          THE WITNESS:  No.

20      Q.  Did you ever let an order ship that you

21   believed might be diverted?

22          UNIDENTIFIED SPEAKER:  Objection.

23          THE WITNESS:  No.

24      Q.  Did CVS ever let an order ship that you had

25   concerns about?
```

```
 1        A.  Not that I can recall.

 2        Q.  To your knowledge, did you let an order ship

 3   that was suspicious in nature?

 4            UNIDENTIFIED SPEAKER:  Objection.

 5            THE WITNESS:  Not that I can recall, no.

 6            MR. DELINSKY:  I have nothing further.

 7                       RE-EXAMINATION

 8   BY MR. GOETZ:

 9        Q.  Ms. Helfrich --

10        A.  Uh-huh.

11        Q.  -- I'm going to hand you Exhibit 43.  I've

12   already given you this.  It is in the record, but you

13   just talked about how hard you worked and you would

14   get there at 3:00 in the morning, correct?

15        A.  At times.

16        Q.  Okay.

17        A.  3:00 a.m.  It varies.

18        Q.  We spent a lot of time today looking at an

19   IRR from August 30, 2013, correct?

20        A.  Yes.

21        Q.  And so for that time period, actually looks

22   like you worked -- the most hours you ever did, you

23   worked 39.98 hours one week and 40 hours the next.

24            Is that what you were talking about your

25   blood, sweat and tears?
```

```
 1        A.   Considering -- yes.

 2        Q.   And in fact, in August 9th of '13, you worked

 3   34 hours one week and 27 the next.

 4             That's what you were talking about your

 5   blood, sweat and tears?

 6        A.   When was it?

 7        Q.   August the 9th, 2013, that pay period.

 8        A.   I can't recall when I went full time, but,

 9   yes, I -- yes.

10        Q.   Those were the long hours that you were

11   talking about.

12             Could you go back to exhibit 2, please?

13             It's the large document, probably on the

14   bottom.

15        A.   Okay.  Yes.

16        Q.   And you just -- can you go to 10693, please?

17             And you just testified you conducted due

18   diligence on all SOM system flagged orders that you

19   believed was necessary, correct?

20             MR. DELINSKY:  Object to form.

21             THE WITNESS:  Yes.

22        Q.   Tell me what due diligence would be necessary

23   for this order.

24        A.   I don't -- being since it was so long ago and

25   not being in the -- I don't -- I don't remember.
```

```
 1      Q.  Tell me -- tell me whether or not extra due

 2  diligence would be necessary on this order.

 3          MR. DELINSKY:  Object to form.  Asked and

 4  answered.

 5          THE WITNESS:  I don't -- I don't remember.

 6      Q.  So tell me, did do you additional due

 7  diligence on this order?  Looking at it now, can you

 8  tell me?

 9      A.  I don't remember.

10      Q.  So when you testified that you did additional

11  due diligence on all orders that were necessary, what

12  was that based on?

13          MR. DELINSKY:  Object to form.

14          THE WITNESS:  From what I can remember.  I

15  would review the IRR.  That's considered due

16  diligence.

17      Q.  Okay.  So, reviewing the IRR is -- is, in

18  your mind, due diligence, correct?

19      A.  Yes.  Yes.

20      Q.  But as you sit here today, you can't tell me

21  what one of those numbers on that IRR mean, can you?

22          MR. DELINSKY:  Object to form.

23          THE WITNESS:  But the IRR report that I saw

24  and populated into an Excel spreadsheet looked -- it

25  would look different than this.
```

```
 1        Q.  Well, what -- what -- what numbers were on

 2   the IRR spreadsheet that was populated then?  I mean,

 3   it's the same -- same data, but tell me what was on

 4   there that -- that you knew what it meant.

 5        A.  I don't remember.

 6        Q.  Okay.  And so, when you say -- I'm just

 7   trying to figure out when you say, "I did -- every

 8   order that needed additional due diligence, I did it,"

 9   but you have no idea -- we have no facts what that is

10   based upon other than you just saying, "I put my

11   blood, sweat and tears into it and I did it"?

12            MR. DELINSKY:  Object to form.

13            THE WITNESS:  I don't remember.

14        Q.  Not only do you not know what those numbers

15   mean, you can't tell me how they're calculated, can

16   you?

17            MR. DELINSKY:  Object to form.  Asked and

18   answered.

19            THE WITNESS:  I don't remember.

20        Q.  And so as you sit here today, you can't tell

21   me whether or not that order is an order that I would

22   -- you would do additional due diligence on, or that

23   order is an order that you would say, "I looked at it,

24   that's my due diligence, I don't need to do anything

25   else"?
```

 1          You have no idea what you would do with that

 2   order, do you?

 3          MR. DELINSKY:  Object to form.  Asked and

 4   answered.

 5          THE WITNESS:  I don't remember.

 6      Q.  Okay.  You have no idea, do you?

 7          MR. DELINSKY:  Same objection.

 8      Q.  The only thing you remember is that you did

 9   appropriate due diligence, but you don't remember any

10   facts surrounding that?

11          MR. DELINSKY:  Object to form.

12          THE WITNESS:  It was long ago.  I don't

13   remember.

14      Q.  I understand it was long ago.

15          You were the last person reviewing suspicious

16   orders in CVS Indiana, correct?

17          MR. DELINSKY:  Object to form.

18      Q.  Correct?

19      A.  Yes.

20      Q.  You are it?  You are the person we have to

21   come to, to get this information from.

22          MR. DELINSKY:  I don't believe there is a

23   question, Dan.

24      Q.  There is a question.

25          Is there anybody else that was there in March

```
 1    of '14 when this system transferred to Rhode Island,

 2    that was full-time reviewing suspicious orders other

 3    than you?

 4         A.  Full-time?  Just me.

 5         Q.  Just you.  And so, if you can't give us the

 6    information, do you know anybody that can?

 7         A.  I had help from Gary Millikan.

 8         Q.  Okay.

 9         A.  But it was so long ago.

10         Q.  And I just want the record to be clear:  Over

11    a ten-month period or 11-month period in 2013, we have

12    evidence that CVS did due diligence beyond what is

13    shown on the IRR for one order, for pharmacies in

14    Cuyahoga and Summit County.  One order.

15              Do you have any reason to dispute that?

16              MR. DELINSKY:  Object to form.  Object.

17    Asked and answered.

18              THE WITNESS:  I don't remember.

19         Q.  Is that a no?

20              Do you have any reason to dispute it?  I

21    don't remember of -- you either have facts or you

22    don't have facts.

23              MR. DELINSKY:  Same objections.

24              THE WITNESS:  I don't remember.

25         Q.  I don't understand what that means.  I'm
```

1    asking you:  Do you have any evidence to dispute it?

2         MR. DELINSKY:  Object to form.  Objection.

3    Asked and answered.

4         THE WITNESS:  I don't remember.

5    Q.  As you sit here today, do you have any

6    evidence to dispute that CVS investigated one order

7    for the CT-1 pharmacies outside of the IRR in 2013?

8         MR. DELINSKY:  Object to form.  Objection.

9    Asked and answered.

10        THE WITNESS:  I don't remember.

11   Q.  I don't understand what "I don't remember"

12   means when I'm asking you if you have any evidence.

13        You don't remember if you have evidence?

14        MR. DELINSKY:  Objection.  Object to form.

15        THE WITNESS:  Seems like you're asking me to

16   recall.

17   Q.  I'm asking you, as you sit here today, do you

18   dispute that?  Today, as you sit here, do you dispute

19   it?

20        MR. DELINSKY:  Object to form.  Objection,

21   asked and answered.

22        THE WITNESS:  It's been many years.  I just

23   don't remember.

24        MR. GOETZ:  Thank you, Ms. Helfrich.

25        THE VIDEOGRAPHER:  We are off the record at

1    5:26 p.m.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                    CERTIFICATE

 3

 4

 5           I HEREBY CERTIFY that the
        witness was duly sworn by me and that the
 6      deposition is a true record of the
        testimony given by the witness.
 7
                 It not was requested before
 8      completion of the deposition that the
        witness, SHAUNA HELFRICH, have the
 9      opportunity to read and sign the
        deposition transcript.
10

11

             _____
12           Kimberley Ann Keene
             Certified Reporter
13           Notary Public
             Dated:  January 17, 2019
14

15

16
                 (The foregoing certification
17      of this transcript does not apply to any
18      reproduction of the same by any means,
19      unless under the direct control and/or
20      supervision of the certifying reporter.)
21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10             You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   -  -  -  -  -  -

                 E R R A T A

 2                   -  -  -  -  -  -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6       REASON:    _____

 7    _____  _____  _____

 8       REASON:    _____

 9    _____  _____  _____

10       REASON:    _____

11    _____  _____  _____

12       REASON:    _____

13    _____  _____  _____

14       REASON:    _____

15    _____  _____  _____

16       REASON:    _____

17    _____  _____  _____

18       REASON:    _____

19    _____  _____  _____

20       REASON:    _____

21    _____  _____  _____

22       REASON:    _____

23    _____  _____  _____

24       REASON:    _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2            ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     SHAUNA HELFRICH                    DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2    PAGE  LINE

 3    ____  ____   _____

 4    ____  ____   _____

 5    ____  ____   _____

 6    ____  ____   _____

 7    ____  ____   _____

 8    ____  ____   _____

 9    ____  ____   _____

10    ____  ____   _____

11    ____  ____   _____

12    ____  ____   _____

13    ____  ____   _____

14    ____  ____   _____

15    ____  ____   _____

16    ____  ____   _____

17    ____  ____   _____

18    ____  ____   _____

19    ____  ____   _____

20    ____  ____   _____

21    ____  ____   _____

22    ____  ____   _____

23    ____  ____   _____

24    ____  ____   _____

25    ____  ____   _____
```