```
 1              UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4    _____

                                      )
 5    IN RE:  NATIONAL PRESCRIPTION  ) MDL No. 2804

      OPIATE LITIGATION              )

 6                                   ) Case No. 17-MD-2804

      THIS DOCUMENT RELATES TO:      )

 7    ALL CASES                      ) Hon. Dan A. Polster

      _____)

 8

 9

10              ** HIGHLY CONFIDENTIAL **

11     ** SUBJECT TO FURTHER CONFIDENTIALITY REVIEW **

12

13          VIDEOTAPED 30(b)(6) DEPOSITION OF

14                   DORON HERMAN

15               TEL AVIV, ISRAEL

16            THURSDAY, JUNE 20, 2019

17                   9:08 A.M.

18

19

20

21

22          GOLKOW LITIGATION SERVICES

23      877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Videotaped 30(b)(6) deposition of DORON
 2   HERMAN, taken in the above-entitled cause pending
 3   in the United States District Court, Northern
 4   District of Ohio, Eastern Division, pursuant to
 5   notice, before BRENDA MATZOV, CA CSR 9243, at
 6   the Carlton Hotel, 10 Eliezer Peri Street, Sepia
 7   Hall, 14th Floor, Tel Aviv, Israel, on Thursday,
 8   the 20th day of June, 2019, at 9:08 a.m.
 9
10
11   APPEARANCES:
12   FOR THE PLAINTIFFS:
13           SKIKOS CRAWFORD SKIKOS & JOSEPH, LLP
             By:  MARK G. CRAWFORD, ESQ.
14           One Sansome Street, Suite 2830
             San Francisco, California 94104
15           (415) 546-7300 / Fax (415) 546-7301
             mcrawford@skikos.com
16
17           WAGSTAFF & CARTMELL, LLP
             By:  THOMAS P. CARTMELL, ESQ.
18           4740 Grand Avenue, Suite 300
             Kansas City, Missouri 64112
19           (816) 701-1100 / Fax (816) 531-2372
             tcartmell@wcllp.com
20
21           SIMMONS HANLY CONROY, LLC
             By:  SANFORD SMOKLER, ESQ.
22                (via video/audio link)
             112 Madison Avenue, 7th Floor
23           New York, New York 10016-7416
             (212) 784-6400 / Fax (212) 213-5949
24           ssmokler@simmonsfirm.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2    FOR THE TEVA DEFENDANTS:

 3            MORGAN LEWIS & BOCKIUS, LLP
              By:  REBECCA J. HILLYER, ESQ.
 4            1701 Market Street
              Philadelphia, Pennsylvania 19103-2921
 5            (215) 963-5000 / Fax (215) 963-5001
              rebecca.hillyer@morganlewis.com
 6
 7            MORGAN LEWIS & BOCKIUS, LLP
              By:  JONATHAN E. MAIER, ESQ.
 8            1111 Pennsylvania Avenue NW
              Washington, DC 20004-2541
 9            (202) 739-5806 / Fax (202) 739-3001
              jonathan.maier@morganlewis.com
10

11

12    ALSO PRESENT:

13            VINCENT ROSICA, Videographer

14            ZACH HONE, Trial Technician

15            KATHLEEN HUDNALL, Wagstaff & Cartmell

16            GAL ORMAN, ADV., Teva Pharmaceutical
              Industries, Ltd.
17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I N D E X
 2   WITNESS
 3   Doron Herman
 4
 5   EXAMINATION                                    PAGE
 6   By Mr. Crawford                       17, 366, 387
 7   By Mr. Cartmell                           194, 382
 8   By Ms. Hillyer                                 371
 9
10                  E X H I B I T S
11   NUMBER          DESCRIPTION                  MARKED
12   Exhibit 1       Document Entitled "First
                     Amended Notice of Deposition
13                   Pursuant to Rule 30(b)(6) to
                     Defendant Teva Pharmaceutical
14                   Industries Ltd.," Dated
                     June 6, 2019
15                   (No Bates Number)               21
16   Exhibit 2       Document Entitled "Doron
                     Herman, SVP, Head of Global
17                   Tax, Teva Pharmaceuticals"
                     (No Bates Number)               27
18
     Exhibit 3       Organizational Chart
19                   (No Bates Number)               35
20   Exhibit 4       Spreadsheet
                     (TEVA_MDL_A_02419959.xlsx)      42
21
     Exhibit 5       Organizational Chart
22                   Entitled "Teva Pharmaceutical
                     Industries Ltd., Legal
23                   Structure," Dated March 1,
                     2006
24                   (TEVA_MDL_JD_000001 to
                     TEVA_MDL_JD_000003)             51
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      E X H I B I T S
 2   NUMBER             DESCRIPTION               MARKED
 3   Exhibit 6          Organizational Chart
                        Entitled "Teva Organizational
 4                      Chart Worldwide (Active
                        Subsidiaries Incl. Barr/Pliva),"
 5                      Dated February 2009
                        (TEVA_MDL_JD_000010 to
 6                      TEVA_MDL_JD_000013)            51
 7   Exhibit 7          Organizational Chart
                        Entitled "Teva Organizational
 8                      Chart Worldwide," Dated
                        July 2011
 9                      (TEVA_MDL_JD_000038 to
                        TEVA_MDL_JD_000043)            51
10
     Exhibit 8          Organizational Chart
11                      Entitled "Teva Organizational
                        Chart Worldwide," Dated
12                      March 2010
                        (TEVA_MDL_JD_000014 to
13                      TEVA_MDL_JD_000017)            51
14   Exhibit 9          Organizational Chart
                        Entitled "Teva Organizational
15                      Chart Worldwide," Dated
                        April 17, 2019
16                      (TEVA_MDL_JD_000059 to
                        TEVA_MDL_JD_000066)            51
17
     Exhibit 10         Website Printout Entitled
18                      "Our History, Bringing
                        Quality Medicines to the
19                      World Since 1901"
                        (No Bates Number)              55
20
     Exhibit 11         Press Release Entitled
21                      "Teva Completes Acquisition
                        of IVAX," Dated January 26,
22                      2006
                        (No Bates Number)              67
23
     Exhibit 12         Press Release Entitled
24                      "Teva to Acquire Barr,"
                        Dated July 18, 2008
25                      (No Bates Number)              67
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   E X H I B I T S
 2   NUMBER          DESCRIPTION                 MARKED
 3   Exhibit 13      Website Printout Entitled
                     "Teva Completes Acquisition
 4                   of Cephalon," Dated October 14,
                     2011
 5                   (No Bates Number)              67
 6   Exhibit 14      Website Printout Entitled
                     "Teva Completes Acquisition
 7                   of Actavis Generics,"
                     Dated August 2, 2016
 8                   (No Bates Number)              67
 9   Exhibit 15      Website Printout Entitled
                     "Teva Completes Acquisition
10                   of Anda, Inc.," Dated
                     October 3, 2016
11                   (No Bates Number)              67
12   Exhibit 16      Document Entitled "Settlement
                     Agreement and Mutual Releases,"
13                   Dated January 31, 2018
                     (No Bates Number)              81
14
     Exhibit 17      Website Printout Entitled
15                   "Teva Reports Fourth Quarter
                     and Full Year 2018 Financial
16                   Results," Dated February 13,
                     2019
17                   (No Bates Number)              91
18   Exhibit 18      Website Printout Entitled
                     "Corporate Officers"
19                   (No Bates Number)              94
20   Exhibit 19      Website Printout Entitled
                     "Kare Schultz, President
21                   & CEO"
                     (No Bates Number)              99
22
     Exhibit 20      Website Printout Entitled
23                   "David M. Stark, Executive
                     Vice President, Chief Legal
24                   Officer"
                     (No Bates Number)              99
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2   NUMBER          DESCRIPTION                    MARKED
 3   Exhibit 21      Website Printout Entitled
                     "Iris Beck-Codner, Executive
 4                   Vice President, Global Brand &
                     Communications"
 5                   (No Bates Number)                99
 6   Exhibit 22      Website Printout Entitled
                     "Michael (Mike) McClellan,
 7                   Executive Vice President,
                     Chief Financial Officer"
 8                   (No Bates Number)                99
 9   Exhibit 23      Website Printout Entitled
                     "Brendan O'Grady, Executive
10                   Vice President, North America
                     Commercial"
11                   (No Bates Number)                99
12   Exhibit 24      Website Printout Entitled
                     "Dr. Hafrun Fridriksdottir,
13                   Executive Vice President,
                     Global R & D"
14                   (No Bates Number)                99
15   Exhibit 25      Website Printout Entitled
                     "Dr. Carlo de Notaristefani,
16                   Executive Vice President,
                     Global Operations"
17                   (No Bates Number)                99
18   Exhibit 26      Website Printout Entitled
                     "Nir Baron, Senior Vice
19                   President, Chief Internal
                     Auditor"
20                   (No Bates Number)                99
21   Exhibit 27      Website Printout Entitled
                     "Lori Queisser, Sr. Vice
22                   President & Global Compliance
                     Officer"
23                   (No Bates Number)                99
24
25
```

```
 1                    E X H I B I T S
 2    NUMBER           DESCRIPTION                  MARKED
 3    Exhibit 28       Website Printout Entitled
                       "Sven Dethlefs, Executive
 4                     Vice President, Global
                       Marketing & Portfolio"
 5                     (No Bates Number)               99
 6    Exhibit 29       Document Entitled "Asaph
                       Naaman, SVP & CFO North
 7                     America at Teva Pharmaceuticals"
                       (No Bates Number)              119
 8
      Exhibit 30       Document Entitled "Debra
 9                     Barrett, Founder at Barrett
                       Strategies LLC"
10                     (No Bates Number)              119
11    Exhibit 31       PowerPoint Presentation
                       Printout Entitled "U.S.
12                     Government Affairs Strategic
                       Planning," Dated July 20,
13                     2017
                       (TEVA_MDL_A_13646476 to
14                     TEVA_MDL_A_13646493)           119
15    Exhibit 32       Document Entitled "Teva
                       Pharmaceutical Industries
16                     Limited, Notes to Consolidated
                       Financial Statements" and
17                     Related Document Entitled
                       "Segment Reporting Memorandum
18                     Q1 2018"
                       (TEVA_MDL_JD_000839 to
19                     TEVA_MDL_JD_000861 and
                       TEVA_MDL_JD_00001128 and
20                     TEVA_MDL_JD_00001580)          127
21    Exhibit 33       Website Printout Entitled
                       "Corporate Governance"
22                     (No Bates Number)              139
23    Exhibit 34       Website Printout Entitled
                       "Committees of the Board"
24                     (No Bates Number)              140
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2    NUMBER              DESCRIPTION                MARKED
 3    Exhibit 35          Document Entitled "Teva
                          Pharmaceutical and Teva
 4                        Parenteral Medicines Inc.
                          Corporate Histories"
 5                        (No Bates Number)             142
 6    Exhibit 36          Document Entitled "Summary
                          of Certain Teva Subsidiaries
 7                        (Active as of April 2019)"
                          (No Bates Number)             142
 8
      Exhibit 37          Document Entitled "Guidelines
 9                        for Composition and Governance
                          of Subsidiary Boards," Dated
10                        December 2015
                          (No Bates Number)             157
11
      Exhibit 38          Organizational Charts,
12                        Multiple Dates
                          (TEVA_MDL_JD_000028 to
13                        TEVA_MDL_JD_000032 and
                          TEVA_MDL_JD_000054 and
14                        TEVA_MDL_JD_000059 to
                          TEVA_MDL_JD_000066)           159
15
      Exhibit 39          Spreadsheets Entitled "Sample
16                        Page from GL File 6243" and
                          "Sample Page from GL File 6244"
17                        (No Bates Number)             160
18    Exhibit 40          Document Entitled "Teva
                          Pharmaceutical Industries
19                        Limited, Notes to Consolidated
                          Financial Statements -
20                        (Continued)," Dated
                          December 31, 2018
21                        (No Bates Number)             180
22    Exhibit 41          Document Entitled "Teva to
                          Sell Oxycodone through the
23                        End of 2007"
                          (TEVA_MDL_A_12122432)         197
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2   NUMBER           DESCRIPTION                  MARKED
 3   Exhibit 42       PowerPoint Presentation
                      Printout Entitled "Welcome
 4                    to Teva Pharmaceutical
                      Industries Ltd.," Dated
 5                    2017
                      (TEVA_MDL_A_09643590)            207
 6
     Exhibit 43       E-mail from Jon Miller to
 7                    Cynthia Condodina and Others,
                      Dated June 13, 2016, Subject:
 8                    "FW:  CEO Leadership Forum
                      Deck" and Related PowerPoint
 9                    Presentation Printout
                      Entitled "CEO Leadership
10                    Forum," Dated May 31, 2016
                      (TEVA_MDL_A_01071814 to
11                    TEVA_MDL_A_01071815)            218
12   Exhibit 44       E-mail from Shlomit Faier
                      to Fred Andrush and Others,
13                    Dated July 27, 2011, Subject:
                      "Life Cycle Management Meeting -
14                    Diamonds Summary" and Related
                      E-mail Chain and PowerPoint
15                    Presentation Printout Entitled
                      "Global Generic Resources,"
16                    Dated February 14, 2008
                      (TEVA_MDL_A_12265532 and
17                    TEVA_MDL_A_12265535)            225
18   Exhibit 45       E-mail from Colleen McGinn
                      to Michael Edwards and
19                    Others, Dated August 19,
                      2015, Subject:  "FW:  Global
20                    Internal Audit:  DEA - Final
                      Report" and Related E-mail
21                    Chain and Document Entitled
                      "DEA, Drug Enforcement
22                    Administration - Handling
                      Controlled Substances in
23                    US," Dated August 19, 2015
                      (TEVA_MDL_A_02475564 to
24                    TEVA_MDL_A_02475585)            240
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       E X H I B I T S
 2    NUMBER              DESCRIPTION                    MARKED
 3    Exhibit 46          E-mail from Matthew Benkert
                          to Arie Arditi and Others,
 4                        Dated August 30, 2016,
                          Subject:  "RE:  DEA-Monitoring
 5                        Table-June25-2016" and
                          Related E-mail Chain and
 6                        Attachment Entitled
                          "OP2015-04-DEA Audit
 7                        Monitoring Table"
                          (TEVA_MDL_A_02338969 to
 8                        TEVA_MDL_A_02338988)          259
 9    Exhibit 47          E-mail from Eric Elbaz to
                          Joyce Godshall and Others,
10                        Dated May 31, 2011, Subject:
                          "PhV Internal Audit Report -
11                        Final" and Related Document
                          Entitled "Teva Pharmaceuticals
12                        Pharmacovigilance Audit
                          Report," Dated January 25-27,
13                        2011
                          (TEVA_MDL_A_13580697 to
14                        TEVA_MDL_A_13580760)          261
15    Exhibit 48          E-mail from Hedva Voliovitch
                          to James Ottinger and Others,
16                        Dated March 14, 2012, Subject:
                          "Intro to PhV for Regulatory
17                        Affairs (Jim Ottinger's Group) -
                          14 March 2012.pptx" and
18                        Related PowerPoint Presentation
                          Printout Entitled "Introduction
19                        to Teva Global Drug Safety &
                          Pharmacovigilance," Dated
20                        March 14, 2012
                          (TEVA_MDL_A_01352261 to
21                        TEVA_MDL_A_01352262)          280
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   E X H I B I T S
 2   NUMBER              DESCRIPTION                    MARKED
 3   Exhibit 49          E-mail from Tal Kleinfeld
                         to Wendy Huisman and Others,
 4                       Dated October 28, 2010,
                         Subject:  "No Subject-111
 5                       EML" and Related Document
                         Entitled "Safety Information
 6                       on Company Products,"
                         Effective Date May 1, 2010
 7                       (TEVA_MDL_A_13240798 to
                         TEVA_MDL_A_13240802)            289
 8
     Exhibit 50          Document Entitled "Handling
 9                       Safety Information on Company
                         Products," Effective Date
10                       November 15, 2016
                         (TEVA_MDL_A_03011230 to
11                       TEVA_MDL_A_03011237)            289
12   Exhibit 51          E-mail from Dennis Miley
                         to Tal Kleinfeld and Others,
13                       Dated April 20, 2010, Subject:
                         "Fw:  Cases to QA Dept -
14                       Breakthrough Pain on Fentanyl"
                         and Related E-mail Chain
15                       (TEVA_MDL_A_10159045 to
                         TEVA_MDL_A_10159046)            294
16
     Exhibit 52          E-mail from Susan Larijani
17                       to Mark Hewitt and Others,
                         Dated November 13, 2014,
18                       Subject:  "FW:  Pharmacovigilance
                         Training_Nov 2014.pptx" and
19                       Related E-mail Chain and
                         PowerPoint Presentation
20                       Printout Entitled "Annual
                         Medical Information
21                       Pharmacovigilance Review,"
                         Dated November 13-14, 2014
22                       (TEVA_MDL_A_11283916 to
                         TEVA_MDL_A_11283918)            298
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2   NUMBER           DESCRIPTION                  MARKED
 3   Exhibit 53       Document Entitled "Innovating
                      for Better Health, Teva 2014
 4                    Global Citizenship Report"
                      (No Bates Number)                306
 5
     Exhibit 54       E-mail from Jamie Warner
 6                    to James Ciciriello, Dated
                      February 19, 2014, Subject:
 7                    "FW:  Corporate Safety Board
                      Meeting Minutes" and Related
 8                    Document Entitled "Corporate
                      Safety Board Meeting Minutes
 9                    29-Jan-2014" and PowerPoint
                      Presentation Printout Entitled
10                    "Corporate Safety Board Meeting -
                      Fentanyl Issues," Dated
11                    January 29, 2014
                      (TEVA_MDL_A_03486360 to
12                    TEVA_MDL_A_03486363 and
                      TEVA_MDL_A_03486365 to
13                    TEVA_MDL_A_03486366)             312
14   Exhibit 55       PowerPoint Presentation
                      Printout Entitled "Medical
15                    Scientific Evaluation,"
                      Dated April 2013
16                    (TEVA_MDL_A_06437424)            322
17   Exhibit 56       E-mail from Matthew Day
                      to John Hassler and Dalton
18                    Tomlinson, Dated December 21,
                      2017, Subject:  "Re:  Vantrela"
19                    and Related E-mail Chain
                      (Cut-Off Bates Number)           331
20
     Exhibit 57       Document Entitled "Joint
21                    Meeting of the Anesthetic
                      and Analgesic Drug Products
22                    Advisory Committee and the
                      Drug Safety and Risk Management
23                    Advisory Committee," Dated
                      June 7, 2016
24                    (No Bates Number)                344
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         E X H I B I T S
 2    NUMBER              DESCRIPTION                     MARKED
 3    Exhibit 58          E-mail from James Sterchele
                          to Arvind Narayana, Dated
 4                        October 23, 2012, Subject:
                          "Fw:  Hydrocodone C33237/1099
 5                        and C33237/1106 Protocols
                          for Your Endorsement" and
 6                        Related E-mail Chain and
                          Document Entitled "Clinical
 7                        Study Protocol"
                          (TEVA_MDL_A_01874331 to
 8                        TEVA_MDL_A_01874409)            347
 9    Exhibit 59          Website Printout Entitled
                          "Danny Bar-Zohar, Global
10                        Head, Neuroscience Development
                          at Novartis Pharma"
11                        (No Bates Number)               349
12    Exhibit 60          E-mail from Ginneh Earle
                          to Arvind Narayana, Dated
13                        March 20, 2012, Subject:
                          "RE:  Effentora - Product
14                        Working Group" and Related
                          E-mail Chain
15                        (TEVA_MDL_A_02077435 to
                          Cut-Off Bates Number)           353
16
      Exhibit 61          Document Entitled "Global
17                        Publication Policy," Dated
                          June 6, 2012
18                        (TEVA_MDL_A_00553097 to
                          TEVA_MDL_A_00553102)            356
19
      Exhibit 62          E-mail from Brian Rubenstein
20                        to Marc Goshko and Others,
                          Dated June 29, 2010, Subject:
21                        "July 6-7" and Related
                          Document Entitled "Product
22                        Liability Conference Agenda"
                          (TEVA_MDL_A_13233302 to
23                        TEVA_MDL_A_13233304)            358
24
25
```

```
 1                    E X H I B I T S

 2   NUMBER           DESCRIPTION              MARKED

 3   Exhibit 63       E-mail from Shannon Dzubin
                      to Shannon Dzubin and Others,
 4                    Dated September 27, 2017,
                      Subject:  "Government Affairs:
 5                    Opioid Workgroup"
                      (TEVA_MDL_A_13481057 to
 6                    TEVA_MDL_A_13481058)            361

 7   Exhibit 64       Document Entitled "Teva
                      Pharmaceutical Industries
 8                    Ltd., Form 1120F, Tax Year
                      2015"
 9                    (TEVA_MDL_JD_000099 to
                      TEVA_MDL_JD_000115)             366

10

11

12

13        Q U E S T I O N S   I N S T R U C T E D

14             N O T   T O   A N S W E R

15                    PAGE       LINE

16                     88         10

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           TEL AVIV, ISRAEL; THURSDAY, JUNE 20, 2019

 2                         9:08 A.M.

 3

 4           THE VIDEOGRAPHER:  We are now on record.

 5   My name is Vince Rosica.  I'm a videographer

 6   for Golkow Litigation Services.  Today's date

 7   is June 20th, 2019, and the time is 9:08 a.m.

 8   This video deposition is being held in Tel Aviv,

 9   Israel, in the matter of National Prescription

10   Opiate Litigation, MDL No. 2804, for the United

11   States District Court, for the Northern District

12   of Ohio, Eastern Division.

13           The deponent is Doron Herman.

14           Counsel will be noted on the stenographic

15   record.

16           The court reporter is Brenda Matzov,

17   who will now swear in the witness.

18

19                  DORON HERMAN,

20        called as a witness, being first duly

21        sworn, was examined and testified as

22        hereinafter set forth.

23

24   //

25   //
```

```
 1                      EXAMINATION

 2   BY MR. CRAWFORD:

 3        Q.   Good morning.  Could you please state

 4   your full name for the record?

 5        A.   Doron Herman.

 6        Q.   My name is Mark Crawford.  I represent

 7   the plaintiffs in the National Opioid Litigation

 8   in Federal Court 1 in Cleveland, Ohio.  I'll be

 9   asking you questions today, as will my colleague,

10   Tom Cartmell, who also represents the plaintiffs

11   in this litigation.

12             I understand you're a lawyer; correct?

13        A.   I'm a lawyer by training.

14        Q.   And you received your graduate legal

15   education in the US; correct?

16        A.   I did.

17        Q.   And I presume you're fluent in English

18   and able to understand English?

19        A.   I do.

20        Q.   We're -- we're here today to record

21   your deposition by court reporter and videotape.

22             You understand you were sworn in by

23   the court reporter under oath to tell the truth;

24   correct?

25        A.   I do.
```

1    Q.   And have you ever had your deposition

2  taken before?

3    A.   No.

4    Q.   So there are some basic rules.  One

5  is -- and the court reporter reminded everybody

6  about that -- is to wait for me to finish the

7  question, and I will do the same to wait for

8  you to finish the answer, because she's taking

9  everything down verbatim.  And that's really

10  mostly for a clean record but also for her

11  benefit too so we're not talking over each

12  other.

13    A.   Agreed.

14    Q.   Good.  If a question is unclear,

15  please ask me to rephrase it, and I'll try

16  to ask it more clear, better fashion.  Don't

17  hesitate to do that.  And, of course, we will

18  be taking breaks.  So if you want to take a

19  break earlier, please let me know, as long as

20  we're not in the middle of a question.

21         Understood?

22    A.   Understood.

23    Q.   Okay.  Can you state your employer?

24    A.   Teva Pharmaceutical Industries Ltd.

25    Q.   And can we refer to it or do you have

Highly Confidential - Subject to Further Confidentiality Review

1    a shorthand way of referring to your employer?

2        A.    Teva Pharmaceuticals -- "Teva" is -- can

3    be confusing because Teva is a group of companies.

4    We're not very imaginative in calling our companies

5    different names, so all of them are called Teva

6    something.  So Teva USA, Teva UK.  So "Teva" can

7    be confusing.

8              So let's stick with TPI, which is Teva

9    Pharmaceutical Industries abbreviated.

10       Q.    Okay.  "TPI," is that kind of the normal

11   lingo that you use --

12       A.    Yes.  Yes.

13       Q.    Hold on.  Let me finish my question.

14       A.    Sorry.

15       Q.    -- the normal lingo you use?

16             I'm pretty slow at asking my questions,

17   so bear with me.

18       A.    Sorry about that.

19       Q.    If you're around the office, would you

20   normally refer to it as TPI, Teva Pharmaceutical

21   Industries Ltd.?

22       A.    Yes.  TPI.

23       Q.    Have you ever heard people use the

24   term "Teva Ltd." to refer to your employer?

25       A.    They might.  But it's not -- it doesn't

```
 1    represent anything specific.  We have several

 2    companies that could go by the name Teva Ltd.

 3         Q.   So TPI is the preferred shorthand.

 4    Yeah.  All right.  I'll try to remember to do

 5    that because I keep calling it Teva Ltd. back

 6    in the States.  So I'll change here.

 7              What is your current work address?

 8         A.   5 Basel Street, Petach Tikva, Israel.

 9         Q.   What is your current position?

10         A.   Head of tax.

11         Q.   And how long have you been with TPI?

12         A.   For 13 and a half years.

13         Q.   And so you've been with Teva for that

14    long or longer?

15         A.   No, that's the term.  I joined TPI,

16    always been TPI.

17         Q.   And always been head of tax?

18         A.   Yes.

19         Q.   Are you represented here by counsel

20    today?

21         A.   Yes, I am.

22         Q.   And who is that?

23         A.   These are Rebecca and Jon.  And Gal

24    from our internal legal department.

25         Q.   And -- and do you know what law firm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they're with?

 2        A.   Morgan Lewis.

 3        Q.   And do they also represent Teva or

 4    TPI in this case?  Do you know?

 5        A.   Yes, they do.

 6             MR. CRAWFORD:  All right.  I want

 7    to mark the first exhibit, which is the Amended

 8    Notice of Deposition.  It will be Exhibit 1.

 9             (Exhibit 1 marked.)

10             MS. HILLYER:  Do you have more, Mark,

11    or just one?

12             MR. CRAWFORD:  Just one.  I mean, given

13    the --

14             MS. HILLYER:  Okay.

15             MR. CRAWFORD:  -- circumstances, we

16    were not able to make tons of copies.  But we're

17    flashing it up on the screen, if anyone wants to --

18             MS. HILLYER:  Okay.

19             MR. CRAWFORD:  -- look at it there.

20        Q.   BY MR. CRAWFORD:  All right.  Have you

21    seen this document before?

22        A.   (Examining.)  I've been informed of the

23    nature of my deposition today as a representative

24    of TPI.

25        Q.   But have you actually seen this document
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   or something similar to it in this case?
 2        A.   No.
 3        Q.   Okay.  And for the record, it's the:
 4             "First Amended Notice of Deposition
 5   Pursuant to Rule 30(b)(6) to Defendant Teva
 6   Pharmaceutical Industries Ltd."
 7             So we're here today to take your
 8   deposition because you've been designated
 9   by TPI to testify as to certain topics under
10   this Rule 30(b)(6).
11             Do you understand that?
12        A.   Yes.
13        Q.   Okay.  And those topics are listed
14   on pages 5 to 8.
15        A.   Yes.
16        Q.   And you see that at the bottom --
17   at the bottom of page 5 starts with Topic 1:
18             "Your corporate organizational
19   structure and governance," et cetera.
20             It leads on to 8; correct?
21        A.   Yes.
22        Q.   There are 13 topics total.
23             So you understand that you're here
24   testifying on behalf of Teva Ltd., or TPI, on
25   their behalf or designated on their behalf?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And do you understand that you were

 3  required to have undergone a reasonable search

 4  for information related to these topics?

 5        A.    Yes.

 6        Q.    And did you, in fact, conduct that

 7  search?

 8        A.    I did.

 9        Q.    And about how long -- well, first of

10  all, are you prepared to testify as to these

11  topics today?

12        A.    Yes.

13        Q.    And about how long did you prepare

14  for the deposition?

15        A.    In aggregate, about four to five days.

16        Q.    And what did you do to prepare?

17        A.    I reviewed documents, corporate documents,

18  agreements, talked to people with the relevant

19  information.  A lot of it I know from my own

20  work in Teva.  That is largely it.

21        Q.    Okay.  And who did you talk to at the

22  company?  Or did you talk to people at the company

23  or outside the company?

24        A.    Yes.  People in our tax department, in

25  our legal department.  Questions have been asked
```

```
 1    to our HR department to the extent the relevant

 2    data is human resources related.

 3          Q.    Any other departments?

 4          A.    Not that I can recall.

 5          Q.    And did you talk to the lawyers here

 6    from Morgan Lewis?

 7          A.    I have.

 8          Q.    And about how long?

 9          A.    A day and a half.

10          Q.    And how did you become familiar with

11    these topics if you hadn't seen this before?

12          A.    I've been given the topics themselves.

13    I've been given, but not in this document.

14          Q.    In writing, you mean?

15          A.    In writing, yes.

16          Q.    Did the writing have anything else

17    on it or just -- just the topics?

18                MS. HILLYER:  And just caution you

19    not to disclose any substantive communications

20    from your counsel.

21                THE WITNESS:  Yes, I have seen the

22    topics themselves in writing.

23          Q.    BY MR. CRAWFORD:  Okay.

24          A.    But not in the context of the ...

25          Q.    Is there anything else that you can
```

Highly Confidential - Subject to Further Confidentiality Review

1    disclose from the writing without violating the

2    privilege that you saw in this memo or whatever

3    it was?

4        A.    I'm not sure what you mean.

5        Q.    Okay.  So you saw a paper with the

6    topics listed; right?

7        A.    Yes.

8        Q.    And were there other things written

9    on the paper besides the topics?

10       A.    No.  These were referred to as the

11   topics I needed to be familiar with in order

12   to testify.

13       Q.    Right.

14             So they just had the topics on them?

15       A.    Yes.

16       Q.    Okay.  Can you just generally describe

17   the documents you reviewed?

18             MS. HILLYER:  And, again, I'll just

19   caution you to just give very high-level categories

20   so as not to divulge any attorney work product.

21             THE WITNESS:  Yes.  As I said, corporate

22   documents, organizational charts, agreements,

23   inter-company agreements within the Teva group.

24       Q.    BY MR. CRAWFORD:  A lot of corporate --

25   corporate governance docs?  Is that what you

1    looked at?

2         A.   Yes.

3         Q.   Okay.  And how about SEC filings and --

4    and government filings?

5         A.   Not so much.

6         Q.   Okay.  Now, are you -- do you understand

7    that this notice also requests production of

8    documents?  And -- and we have received documents

9    from your counsel here.

10             But were you aware that there are

11   topics -- categories of documents you were to

12   produce?

13        A.   Yes.

14        Q.   Okay.  I think there are five categories

15   on page 5.

16             Did you undertake a search for these

17   documents, or did someone assist you with it?

18             MS. HILLYER:  Objection to the extent

19   this was not directed at a witness as much as

20   to TPI.

21             MR. CRAWFORD:  Okay.

22        Q.   BY MR. CRAWFORD:  But did you under --

23   personally undergo any search?  Or were you part

24   of the search?

25        A.   As head of tax, I was responsible to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    produce the tax returns of TPI.  None of the

 2    others was I personally involved in producing.

 3         Q.   All right.  Thank you.

 4         A.   With correction, the general ledger.

 5         Q.   Oh, okay.  And the ledger, is that

 6    production -- or have you given all the ledgers

 7    to your counsel that were requested?

 8              MS. HILLYER:  Same objection.

 9              THE WITNESS:  We have given ledgers.

10    I'm not sure about all the ledgers that were

11    requested.  I can't attest to that.  We've

12    given a substantial amount of ledgers, journal

13    entries related to what was asked.

14         Q.   BY MR. CRAWFORD:  And were you the

15    person in charge of collecting up the ledgers

16    for the request?

17         A.   I oversaw the collection.

18         Q.   Okay.  Next, Exhibit 2, we're marking

19    the -- a LinkedIn page that we've pulled for

20    you.

21              Did you bring a CV at all?

22         A.   Not --

23         Q.   Oh, hold on.  Let's let the court

24    reporter --

25              (Exhibit 2 marked.)
```

```
 1              MS. HILLYER:  And just for the record,

 2   we produced the witness' CV to you, Mark, prior

 3   to today.  I think last week.

 4              MR. CRAWFORD:  All right.  I -- sorry.

 5   I must have missed that.  So we have a -- thank

 6   you, Becca.

 7       Q.  BY MR. CRAWFORD:  So we have a LinkedIn

 8   page instead.

 9              Is this something that -- you have a

10   LinkedIn page?

11       A.   I do.

12       Q.   Okay.  And did you prepare your LinkedIn

13   page?

14       A.   I did.

15       Q.   And does this look like the information

16   you put on your LinkedIn page?

17       A.   I did.  It does.

18       Q.   All right.  And it references that you're

19   head of tax at Teva Pharmaceutical since January

20   2006.  So you -- I think you were explaining before

21   why, if you worked at TPI, you put it down as Teva

22   Pharmaceuticals.

23       A.   That just has to do with the way LinkedIn

24   works.  And it has -- when you start writing, it

25   has specific names of companies that it knows.
```

Highly Confidential - Subject to Further Confidentiality Review

1  And if they're not on the list, you cannot choose

2  them.  So in order to be associated with other

3  people in Teva, I need to choose from a very

4  specific list of companies.  And the best match

5  I could find was Teva Pharmaceuticals.

6      Q.   What is TPI's primary business?

7      A.   TPI is a developer, manufacturer, and

8  distributor of pharmaceutical products.

9      Q.   And how many employees does TPI have

10  globally?

11      A.   TPI's employees are almost predominantly

12  in Israel.  I'm not sure about the actual current

13  number.  We've been downsizing.  I think it's

14  around 5,000.

15      Q.   And they're -- those employees are

16  predominantly in Israel; correct?

17      A.   Yes.  TPI employees are predominantly

18  in Israel.

19      Q.   And as head of tax, what are your

20  responsibilities?

21      A.   I'm responsible for the tax compliance

22  and tax planning for TPI and its subsidiaries.

23  So I ensure that TPI files its tax returns as

24  required, adequately, fully reflecting the correct

25  facts and circumstances and the results of our

1    business.  And I also oversee the preparation

2    of tax returns in our subsidiaries.

3         Q.    Would that include your US subsidiaries?

4         A.    That includes our US subsidiaries.

5         Q.    And can you elaborate more on your role

6    of overseeing the preparation your subsidiary

7    tax returns?

8         A.    We have -- Teva USA has a tax team

9    responsible for preparing the tax returns.  My

10   role is to ensure that they are trained, that

11   they have the adequate resources, and that they

12   actually do what they need to do on time so that

13   Teva USA is compliant with its requirements --

14   with its legal requirements in the US.

15        Q.    Okay.  So does that require your

16   department to have some familiarity with US

17   tax law?

18        A.    Very general.  Because we just make

19   sure that it happens.  We don't actually prepare

20   tax returns for the US -- for the US subsidiaries.

21   We just need to understand that it's within reason

22   what they are doing.

23        Q.    And do you make any examination of the

24   numbers and make sure the basic numbers are correct?

25        A.    High --

```
 1                 MS. HILLYER:  Objection to form.

 2                 Go ahead.

 3                 THE WITNESS:  High-level review of the

 4     numbers to ensure that they look reasonable compared

 5     to what we know about the business of Teva USA.

 6          Q.   BY MR. CRAWFORD:  And how many are in

 7     your department, in the tax department?

 8          A.   Globally, there are 70 people.

 9          Q.   For -- for TPI?

10          A.   No.  For the various subsidiaries.

11               In TPI there are -- we are six, including

12     myself.

13          Q.   And do the US subs' tax people -- to

14     the extent the subs have a tax person -- do they

15     report to you?

16          A.   They are employees of Teva USA.  They

17     have a professional reporting line, professional

18     community that is the 70 people tax group of Teva.

19               (Court reporter clarification.)

20               THE WITNESS:  It's the professional

21     community, the professional reporting line.  So

22     they have two reportings.

23          Q.   BY MR. CRAWFORD:  What do you mean by

24     "two reportings"?

25          A.   They are part of Teva USA.  But
```

Highly Confidential - Subject to Further Confidentiality Review

1  professionally they are also part of this

2  global organization that is the Teva tax group.

3      Q.   And you oversee the whole Teva tax

4  group globally?

5      A.   Yes.

6      Q.   And of all the US subs, how many have

7  a tax department that -- that you interface with?

8      A.   Teva USA is the only -- is where our

9  tax group sits.  They are now between 13 and 15

10  people strong.  And they do the tax work for all

11  the US subsidiaries because our subsidiaries file

12  a consolidated tax return.  So it's not separate

13  tax returns.  Although, for state, they are

14  separate -- some of them are separate.  But we

15  file a consolidated tax return.  And, therefore,

16  the tax team for TUSA does the work for all of

17  the US subsidiaries.

18      Q.   Okay.  And who is the head of tax at

19  Teva USA?

20      A.   Patricia Sestak.

21      Q.   And does she report to you?

22      A.   She does.

23      Q.   Is there an approval process for the

24  US tax return?  I mean, do you have to sign off

25  on them?  Or -- or do you just look them over

Highly Confidential - Subject to Further Confidentiality Review

1   and give them feedback?  Or how does that work?

2            MS. HILLYER:  Objection to form and

3   to the extent it's beyond the scope.

4            THE WITNESS:  There is a dual approval

5   process.  At the end of the day, the officers

6   of the legal entity need to sign the tax return

7   and, outside the US, also the financial statements

8   of that legal entity.  And so the tax -- the

9   local tax team's task is to prepare the tax

10  return and also get the officers comfortable

11  that they can sign on the tax return, although

12  they are not tax experts.  But they can sign

13  as officers of the company on the tax return.

14            So that is this route of approval.

15  And, concurrently, there is an overview by

16  the group, by me, someone in my team, of the

17  tax return that has been prepared.

18       Q.   BY MR. CRAWFORD:  So the signing,

19  that was the tax preparers within the tax

20  department at Teva USA?  Is that what you're

21  saying?

22       A.   No.

23       Q.   Okay.  Who signs?

24       A.   The tax preparer -- the tax -- the

25  tax -- will prepare the tax returns.  But these

1    are the officers, the directors of the legal

2    entity that need to sign the financial statements --

3    not in the US, but outside the US -- and the tax

4    return.

5         Q.   So the tax return in the US has to be

6    signed by an officer of -- of -- of the local

7    subsidiary --

8         A.   Yes.

9         Q.   -- correct?

10        A.   Yes.

11        Q.   And -- but there's an approval process

12   too -- do you have to approve too of the tax form

13   before it's filed internally?

14             MS. HILLYER:  Objection to form.

15             THE WITNESS:  I review the tax return.

16   I pose questions.  But I don't -- I don't approve

17   it in a formal way.

18        Q.   BY MR. CRAWFORD:  Thank you.

19             Now, are you aware of -- of the --

20   that there are various TPI -- get it right

21   there -- TPI subsidiaries or indirect or

22   wholly-owned subsidiaries that are -- that

23   are named as defendants in the federal opiate

24   litigation?

25        A.   Not all of them.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  But you're aware that some

2  TPI subs are named as defendants in the US

3  opiate litigation; right?

4    A.   Yes.

5    Q.   Okay.  And I was going to read you

6  their names that I know of.

7          Teva Pharmaceuticals USA Inc., which

8  we're calling Teva USA; right?

9    A.   Yes.

10   Q.   Okay.

11   A.   Or TUSA.

12   Q.   And Cephalon Inc.  Watson Laboratories

13  Inc.  Actavis LLC.  Actavis Pharma Inc., fka

14  Watson Pharma Inc.  And Anda Inc.

15          Are these all Teva Ltd. direct or

16  indirect subsidiaries?

17   A.   Yes.

18          MR. CRAWFORD:  Yeah.  Let's mark the

19  next exhibit.

20          (Exhibit 3 marked.)

21   Q.   BY MR. CRAWFORD:  We've marked Exhibit

22  3, which is a corporate org chart.  And this was

23  a chart in another deposition, 30(b)(6) deposition,

24  in this case of John Hassler.

25          Do you know John Hassler at all?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I know of John Hassler.

 2        Q.    And I just want to go over some of these

 3   corporate relationships with you.

 4              Does this -- does this look like an

 5   accurate --

 6        A.    Yeah.

 7              (Brief interruption in the proceedings.)

 8              MR. CRAWFORD:  Okay.  I think there's

 9   a ghost making coffee here.

10        Q.    BY MR. CRAWFORD:  All right.  Okay.

11              So does this chart look like an accurate

12   representation of the corporate family relationship

13   of Teva?

14        A.    (Examining.)  It has the main holdings.

15   Correct.

16        Q.    All right.  Okay.  So -- so let's go

17   to Teva Pharmaceuticals USA Inc.

18              Their direct parents are Orvet UK and

19   Teva Pharmaceutical Holdings Cooperatieve UA;

20   correct?

21        A.    Yes.

22        Q.    And what is Teva Ltd.'s relationship,

23   if any, with Teva Pharmaceutical Holdings

24   Cooperatieve UA?

25        A.    Teva Pharmaceutical Holdings Cooperatieve
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    was part of a transaction -- internal transaction

2    that the group undertook about ten years ago,

3    an internal restructuring of our corporate --

4    corporation resulting in a Dutch cooperative

5    that is both a shareholder in TUSA but also

6    indirectly a subsidiary of TUSA.

7        Q.   Subsidiary of what?

8        A.   Of TUSA, of Teva USA.  It's owned

9    indirectly by TUSA -- TUSA.  But it's also

10   a shareholder in TUSA.

11       Q.   You're saying "TUSA"?

12       A.   Teva USA.  Teva Pharmaceuticals USA.

13   TUSA.

14       Q.   T-U-S-A?

15       A.   Yes.

16       Q.   All right.

17       A.   Teva USA.

18       Q.   That's kind of the shorthand that you

19   guys use around the office to refer to Teva USA?

20       A.   Yes.

21       Q.   Okay.  Do you mind if I call them Teva

22   USA?

23       A.   Not at all.  I will try to do the same.

24       Q.   Okay.  All right.  So who owns Teva

25   Pharmaceutical Holdings Cooperatieve?
```

1        A.    IVAX LLC, as it shows here.  That is

2    a subsidiary of Teva Pharmaceuticals, Teva USA.

3        Q.    So IVAX LLC owns Teva Pharmaceutical

4    Holdings?

5        A.    Yes.  These are circular holdings.

6        Q.    It is a circle.

7        A.    That resulted from a corporate

8    restructuring.

9        Q.    So, in effect, Teva USA is a sub of

10   Teva Pharmaceutical Holdings, which is a sub

11   of IVAX, which is a sub of Teva Pharmaceuticals

12   USA?

13       A.    Yes.  This is commonly referred to

14   as hook stock, a circle of holdings.

15       Q.    A hook stock?

16       A.    Hook stock.

17             (Court reporter clarification.)

18             THE WITNESS:  Hook stock.  These are --

19   this is the jargon in US corporate law.  The

20   company that holds its own -- a subsidiary that

21   holds its own parent shares.

22       Q.    BY MR. CRAWFORD:  Okay.  And stock

23   is s-t-o-c-k?

24       A.    Yes, shares.

25       Q.    All right.  So are Orvet and Teva

```
 1    Pharmaceutical Holdings, are they basically

 2    holding companies?

 3         A.   Yes, they are.

 4         Q.   So they -- how many employees do each

 5    of them have?

 6         A.   None.

 7         Q.   And they don't have any operations;

 8    correct?

 9         A.   No.

10         Q.   Well, they don't have any operations?

11    Is that --

12              MS. HILLYER:  It's a double negative --

13              MR. CRAWFORD:  It is.

14              MS. HILLYER:  -- if you say "no."

15              THE WITNESS:  They don't have -- correct,

16    they don't have any operations.

17         Q.   BY MR. CRAWFORD:  Thank you.

18              So Teva Pharmaceuticals USA is the

19    direct parent of IVAX LLC and Actavis Holdco

20    US Inc.; correct?

21         A.   Yes.

22         Q.   Okay.  Are those two holding companies?

23         A.   Given that the business in the US is

24    very integrated, I am not sure what part of the

25    US business operates in which company below Teva
```

```
 1    USA.

 2         Q.   But do you know how many employees each

 3    of those has?

 4         A.   Not individually.

 5         Q.   Is it possible they don't have any

 6    employees?

 7         A.   It can be.  We have 120 legal entities

 8    in the US that operate as one economic unit.

 9    Some of them have specific roles.  But, generally,

10    all of them are engaged in the same business in

11    the US.

12         Q.   And the operations primarily for that

13    integrated business is out of Teva USA; correct?

14         A.   It is --

15              MS. HILLYER:  Objection to form.

16              THE WITNESS:  The business is run in

17    the US.  And they're all subsidiaries of Teva

18    USA.

19         Q.   BY MR. CRAWFORD:  All right.  But --

20    okay.  Cephalon, though, is a subsidiary of

21    Cupric Holding, which is then a sub of TPI;

22    correct?

23         A.   Correct.

24         Q.   So there's no ownership of Teva USA

25    of Cephalon, no direct ownership line; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Right.

 2          Q.    And so is Cupric basically a holding

 3    company?  Correct?

 4          A.    Yes.

 5          Q.    And they have no employees or operations;

 6    correct?

 7          A.    Not that I know of.

 8          Q.    Okay.  But Cephalon, do they have any

 9    operations?

10          A.    Yes.

11          Q.    And how many employees does Cephalon

12    have?

13          A.    I'm not sure.

14          Q.    And what are their operations?

15          A.    They develop and manufacture and sell

16    pharmaceutical products more on the innovative --

17    innovative side versus Teva USA whose main business

18    is generics.

19          Q.    And so Cephalon, do you know if they

20    have more than 50 employees?

21                MS. HILLYER:  Objection to the extent

22    it calls for speculation.

23                THE WITNESS:  I don't know.

24          Q.    BY MR. CRAWFORD:  How about IVAX LLC,

25    is their -- they're a holding company?  Or do
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you not know?

 2         A.    I'm not sure.

 3         Q.    And do they have any operations?  Do

 4    you know?

 5         A.    I'm not sure.  We bought the IVAX group

 6    in 2006.  And its business, largely generics,

 7    integrated with Teva USA.  So I'm not sure which

 8    employees sit where.  But the generics business

 9    is run as one.

10              MR. CRAWFORD:  All right.  Let's mark

11    the next exhibit.

12              (Exhibit 4 marked.)

13         Q.   BY MR. CRAWFORD:  Okay.  We've marked

14    here Exhibit 4, which is a spreadsheet from an

15    Excel file that was produced by Teva in this

16    case.  The Bates number is down below.

17              Does Exhibit 4 look familiar to you

18    at all?

19         A.    (Examining.)

20              MS. HILLYER:  Just objection to the

21    extent this is an excerpt.  It -- it's not clear

22    whether this is the entire file, et cetera.

23              MR. CRAWFORD:  Good point.  I think

24    it's an extracted file, maybe an excerpt.

25              MS. HILLYER:  And to the extent it
```

1    was highlighted.  I don't know if that highlighting

2    was part of the document or not.

3            MR. CRAWFORD:  It was not.  So the

4    highlighting, I think, was our work.

5        Q.   BY MR. CRAWFORD:  But I want to find

6    out whether you're familiar with this document

7    at all or the -- the database it came from.

8        A.   No.

9        Q.   All right.  Do you have an understanding

10   of what this exhibit is or what this represents?

11       A.   I think I do.

12       Q.   Okay.  And what's your understanding?

13       A.   These are products, meaning molecules,

14   dosages, form of delivery, syrup, tablets,

15   et cetera.

16           (Court reporter clarification.)

17           THE WITNESS:  Form of delivery, syrup,

18   tablets, et cetera.

19           I don't know what "NDC" is.  It also

20   has "Acquired From" or how we acquired the product.

21   So it lists the various companies that we acquired,

22   IVAX, Barr.  I saw Actavis here too.

23           And then the last page, page 6, is

24   products that -- as I understand, these are

25   products that were developed by Teva, so they

Highly Confidential - Subject to Further Confidentiality Review

 1    were not acquired through acquisitions.

 2        Q.   BY MR. CRAWFORD:  All right.  So,

 3    basically -- I think you -- you hit it here.

 4             But, basically, that third-to-last

 5    column, "Month of First Teva Sale," that roughly

 6    corresponds with the date of acquisition of the

 7    entity that brought -- brought it into the family;

 8    right?

 9             MS. HILLYER:  Objection to the extent

10    that this is beyond the scope.  He doesn't have

11    context for what this spreadsheet is.  We don't

12    have context for what this spreadsheet is or

13    represents or what it's extracted from.

14             And objection to form.

15        Q.   BY MR. CRAWFORD:  Okay.  It says:

16             "Month of First Teva Sale."

17             Does that generally correspond with

18    the acquisition of these entities?

19             MS. HILLYER:  Same objections.

20             THE WITNESS:  Yeah, I -- I don't know.

21    We acquired IVAX in 2006.  I can confirm this

22    IVAX 2006 acquisition.

23        Q.   BY MR. CRAWFORD:  So at the time of

24    the acquisition, IVAX was making -- these are

25    listing opioid products; right?

```
 1              MS. HILLYER:  Objection to the --

 2              THE WITNESS:  I don't know.

 3              MS. HILLYER:  Objection to the extent

 4    it's beyond the scope and we don't have the

 5    context for this document.

 6        Q.   BY MR. CRAWFORD:  Do you know if IVAX

 7    sold opioids before it was acquired?

 8              MS. HILLYER:  Objection to the extent

 9    it's beyond the scope.

10              You can answer if you have personal

11    knowledge.

12              THE WITNESS:  No, I -- I don't know.

13        Q.   BY MR. CRAWFORD:  And do you know if

14    Teva sold these products after these dates?

15              MS. HILLYER:  Objection to the extent

16    it's beyond the scope.

17              You can answer if you know from your --

18              THE WITNESS:  No.

19              MS. HILLYER:  -- personal knowledge.

20              THE WITNESS:  I don't.

21              (Court reporter clarification.)

22              MS. HILLYER:  No, that's right.

23              You can answer if you know from your

24    personal knowledge.

25              THE WITNESS:  I don't know.
```

```
 1        Q.   BY MR. CRAWFORD:  All right.  So the

 2   first page, it lists as the "Acquired From" as --

 3   as the:

 4             "IVAX Entities."

 5             Correct?

 6             MS. HILLYER:  Same objection to the

 7   document.

 8             THE WITNESS:  That's what it says.

 9        Q.   BY MR. CRAWFORD:  So is it your

10   understanding that Teva acquired these products

11   from IVAX and first sold the product on the date

12   listed?

13             MS. HILLYER:  Objection.  Assumes facts

14   not in evidence.  The witness doesn't even know

15   what this document is or where this data came

16   from.  And he said he doesn't know these specific

17   products.

18             So you can answer if you have personal

19   knowledge.

20             THE WITNESS:  No, I don't.

21        Q.   BY MR. CRAWFORD:  Do you think it's

22   a logical interpretation of this document?

23             MS. HILLYER:  Objection to form.  No

24   context for this document.  Calls for speculation

25   and beyond the scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You can answer if you have personal

 2    knowledge.

 3              THE WITNESS:  All I can do is personally

 4    speculate.

 5        Q.   BY MR. CRAWFORD:  Okay.  I don't want

 6    you to speculate.  So let's move on to page 2.

 7    It says:

 8              "Acquired From."

 9              "Barr Entities."

10              "Month of First Teva Sale."

11              "12/1/2008."

12              Does that roughly correspond, in your

13    recollection, of the year in which the Barr

14    entities were acquired by Teva?

15        A.   2008 is the year -- end of 2008 is

16    when we acquired Barr.

17        Q.   And then looking at the third page:

18              "Acquired From."

19              "Cephalon."

20              "Month of First Teva Sale."

21              "10/1/2011."

22              Does that correspond, in your estimation,

23    with Teva's acquisition of Cephalon?

24        A.   2011 is -- we acquired Cephalon.  Yes.

25        Q.   Okay.  And looking at the next page,
```

```
 1   4 and 5, it lists as:

 2           "Acquired From."

 3           "Actavis Entities."

 4           And it lists:

 5           "8/1/2016."

 6           Does that roughly correspond with the

 7   date Teva acquired the Actavis entities?

 8      A.   We closed the Actavis acquisition in

 9   August of 2016.

10      Q.   So it does; correct?

11           MS. HILLYER:  Objection to form.

12           THE WITNESS:  That's what I know.  We

13   closed -- I don't know about sales.  I know about

14   closing of transactions.

15      Q.   BY MR. CRAWFORD:  Right.

16           But you know that the closing of the

17   transaction occurred in August of 2016?

18      A.   Yes.

19      Q.   Okay.

20      A.   That I can confirm.

21      Q.   All right.  And then going to the last

22   page, I think you referenced it.  It says:

23           "N/A - Teva" under "Acquired From."

24           That means "not applicable"; correct?

25      A.   Yes.
```

```
 1              MS. HILLYER:  Objection to the extent

 2    he has no context for this document.

 3         Q.   BY MR. CRAWFORD:  And your understanding

 4    of this was that these were legacy Teva products

 5    that were developed internally rather than getting

 6    through an acquisition?

 7              MS. HILLYER:  Objection.  Assumes fact

 8    not in evidence.  The witness has no knowledge

 9    of this document.

10              You can answer if you know of personal

11    knowledge.

12              This is beyond the scope.

13              THE WITNESS:  I speculate that this is

14    what it means.

15              MR. CRAWFORD:  I think you're coaching

16    the witness at this point.  I need you to stick

17    to a form objection.

18              MS. HILLYER:  I'm stating my objection.

19              MR. CRAWFORD:  No.  I'd prefer --

20              MS. HILLYER:  Well --

21              MR. CARTMELL:  -- if you would just

22    state --

23              MS. HILLYER:  Okay.

24              MR. CRAWFORD:  -- you would just state

25    an objection.  And all of them are preserved.  But
```

1    I think you're coaching.  Because every time you

2    say the objection, he parrots your words.

3              MS. HILLYER:  He doesn't parrot a single

4    word.  I'm saying it's beyond the scope.  He can

5    answer in his personal knowledge.  That needs

6    to be on the record so that my question -- my

7    objection is clear that what the witness is now

8    testifying, after my objection, is from his personal

9    knowledge and not on behalf of TPI.  So I'm going

10   to --

11             MR. CARTMELL:  I agree with that.

12             MS. HILLYER:  -- make that on the record.

13             MR. CRAWFORD:  I agree with that.  But

14   the other objections are really coaching objections.

15             MS. HILLYER:  I disagree.

16             MR. CRAWFORD:  So let's move on.

17             MS. HILLYER:  We can move on.

18             MR. CRAWFORD:  Okay.  Let's mark the

19   next set of exhibits.  These are a set of five.

20   So just mark the five of them in this order.

21             MS. HILLYER:  Do we have clips or

22   staples?

23             MR. CRAWFORD:  No.  I'm going to go

24   through them separately.  I just want to mark

25   them as a batch.

```
 1              MS. HILLYER:  Okay.  Mark, I think --
 2    we're marking them separately?
 3              MR. CRAWFORD:  Yeah.
 4              MS. HILLYER:  Oh, okay.  I thought you
 5    just said you wanted them as a batch.
 6              MR. CRAWFORD:  Right.  But I'm going
 7    to mark them separately, five exhibits.
 8              MS. HILLYER:  Okay.
 9              (Exhibit 5, Exhibit 6, Exhibit 7,
10         Exhibit 8, and Exhibit 9 marked.)
11         Q.   BY MR. CRAWFORD:  A couple follow-up
12    questions on the last exhibit.
13              Did Teva USA sell those products that
14    are listed there?
15              MS. HILLYER:  Objection.  Beyond the
16    scope.
17              You can answer if you have personal
18    knowledge.
19              THE WITNESS:  I don't know.  And I
20    am part of TPI.  We usually do not engage in
21    that level of detail.  This is what we have
22    Teva USA for.
23         Q.   BY MR. CRAWFORD:  And do you know
24    where the Teva entity that sells it, where they
25    get the raw materials from to make the product?
```

```
 1              MS. HILLYER:  Objection.  Beyond the

 2    scope.

 3              You can answer if you have personal

 4    knowledge.

 5              THE WITNESS:  No.

 6         Q.   BY MR. CRAWFORD:  Are you familiar with

 7    a Teva entity called Teva Active Pharmaceutical

 8    Ingredients?

 9              (Court reporter clarification.)

10              MR. CRAWFORD:  Teva Pharmaceutical

11    Active Ingredients.  [sic]

12         Q.   BY MR. CRAWFORD:  TAPI?

13         A.   Uh-huh.  Yes.

14         Q.   Okay.  And that's a Teva Ltd. subsidiary

15    of some sort; correct?

16         A.   I assume you refer to Teva API Inc. --

17         Q.   Okay.

18         A.   -- a US company.  We have several Teva

19    API across the world, legal entities.  So I just

20    want to make sure that we talk about the same

21    entity.

22         Q.   So there are several entities with

23    the same name that are separate?

24              MS. HILLYER:  Objection to form.

25    Mischaracterizes his testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  We have many companies

 2   in the group that are called "Teva."  We have

 3   several companies engaged in producing active

 4   pharmaceutical ingredients.  When abbreviated,

 5   some of them have very similar names.

 6       Q.   BY MR. CRAWFORD:  Is there one that --

 7   that -- that's called Teva Active Pharmaceutical

 8   Ingredients that's a Teva subsidiary?

 9       A.   I believe there are two like that,

10   at least two like this, one in the US and one

11   in the Netherlands.

12       Q.   And do you know if TAPI makes any of

13   the ingredients for Teva USA's opioid products?

14              MS. HILLYER:  Objection.  Beyond the

15   scope.

16              You can answer if you have personal

17   knowledge.

18              THE WITNESS:  No, I don't.

19       Q.   BY MR. CRAWFORD:  All right.  We've

20   marked a series of five corporate organizational

21   charts.  These were produced for this -- in

22   relationship to this deposition.  And I really

23   just want to go through -- they are delineated

24   by year at the top.  And I want you to take

25   a look at them.  One year is 2006.  Another
```

```
 1    is July of 2011.  And another is March 2010.

 2    And then April 17th, 2019.

 3               MR. CRAWFORD:  Is that just four --

 4    four exhibits?

 5               MS. HILLYER:  Five.

 6               THE WITNESS:  Five.  One is 2006.

 7         Q.   BY MR. CRAWFORD:  Oh, okay.

 8         A.   (Examining.)  2009, '11, '10, and

 9    '19.

10         Q.   And are these -- these documents

11    produced -- strike that.

12               Have you ever seen these documents?

13         A.   Yes.

14         Q.   And did you collect these or help

15    collect them up for this deposition?

16         A.   I have not.

17         Q.   Okay.  But you reviewed them in

18    preparation for the deposition?

19         A.   Yes.

20         Q.   And are they accurate to the best

21    of your knowledge?

22         A.   Yes.

23         Q.   And were these produced in the ordinary

24    course of the Teva business?

25               MS. HILLYER:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes.  They are produced --
 2    ordinary, they are produced.
 3              MR. CRAWFORD:  All right.  Let's move
 4    to the next group.  We're marking Exhibit 10.
 5              (Exhibit 10 marked.)
 6         Q.   BY MR. CRAWFORD:  All right.  We've
 7    marked what I'll represent is a printout from
 8    the TevaPharm webpage or website.  It's called:
 9              "Our History.  Bringing quality"
10    medications "to the world since 1901."  (As read.)
11              Let me just ask you some foundational
12    questions.  Does Teva -- I've lost track of the
13    name of it already -- Teva Ltd. --
14              MS. HILLYER:  TPI.
15              MR. CRAWFORD:  TPI.  Thank you.
16         Q.   BY MR. CRAWFORD:  Does TPI have a
17    website?
18              MS. HILLYER:  Objection to the extent
19    it's beyond the scope.
20              THE WITNESS:  TPI maintains a website.
21    It is a portal, a door to all of our subsidiaries.
22         Q.   BY MR. CRAWFORD:  So the subsidiaries
23    don't have a separate website?  It's all through
24    the -- the TPI website?
25         A.   Some of them do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Objection -- objection

 2    to the form to the extent it's beyond the scope.

 3        Q.   BY MR. CRAWFORD:  How about Teva USA,

 4    do they have a separate website?

 5              MS. HILLYER:  Objection to the extent

 6    it's beyond the scope.

 7              You can answer if you have personal

 8    knowledge.

 9              THE WITNESS:  Yeah, I -- I -- they had

10    a website.  I'm not sure if it's on still.  They

11    had a website, a separate website.

12        Q.   BY MR. CRAWFORD:  And what is the TPI

13    website?  Www dot something; right?

14              MS. HILLYER:  Objection to the extent

15    it's beyond the scope.

16              You can answer if you have personal

17    knowledge of the website as for TPI.

18              MR. CARTMELL:  Sorry.  I want to make

19    a record right now about the coaching of the

20    witness and -- because I think this is going

21    to be read later.  I think the proper form is

22    to object to the form --

23              MS. HILLYER:  Not if it's beyond the

24    scope.

25              MR. CARTMELL:  Let me finish.
```

```
 1              MS. HILLYER:  All right.  Go ahead, Tom.

 2              MR. CARTMELL:  Object to the form.  If

 3     it's beyond the scope, I'll tell you that we're

 4     willing to let you preserve any of those objections

 5     to any question.  In other words, there's no need --

 6     and you didn't know this.  I'm telling you now.

 7              MS. HILLYER:  Okay.  I'll respond in

 8     a minute.

 9              MR. CARTMELL:  There's no reason for

10     you to make that objection.  Because, for any

11     question we ask today, we are willing to give

12     you the right to challenge it as being outside

13     the scope of the notice.  Therefore, there's

14     no reason to make that.

15              When you then go beyond that and say

16     to the witness over and over again, you can answer

17     if you have personal knowledge, that's coaching

18     of the witness.  And it's inappropriate according

19     to the rules.

20              You don't -- we can tell the witness

21     right now we're only asking him to answer questions

22     that he has personal knowledge of.  And he can

23     tell us if he doesn't have personal knowledge of

24     something.  That goes for every single question

25     we -- we ask today.  So that's clear.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Okay.  I disagree.  It's --

 2    the record is clear that I'm not coaching the

 3    witness.  And I am entitled to say it's beyond

 4    the scope.  I appreciate your offer, but I'm not

 5    taking you up on it.  I will continue to make my

 6    objection on the record, as I'm entitled to do,

 7    to the extent it's beyond the scope and that he

 8    may answer in his personal knowledge.  That is

 9    not coaching at all.  That's the rule.

10              You may answer the question.

11              MR. CARTMELL:  I'll respond to that.

12    That's not the rule.

13              MS. HILLYER:  Okay.

14              MR. CARTMELL:  The rule is clear.

15    There's case law out the ying-yang about how

16    the proper objection in Federal Court is "object

17    to the form."

18              MS. HILLYER:  Not if it's beyond the

19    scope.

20              MR. CARTMELL:  If I ask you -- if I

21    ask you --

22              MS. HILLYER:  It's not a form objection,

23    Tom.

24              MR. CARTMELL:  -- the reason for your --

25    no.  No.  It is.  Because what we're asking today
```

```
 1    is 30(b)(6) noticed questions.  And we've given

 2    you the right to -- to object later on to anything

 3    as outside the scope.

 4              MS. HILLYER:  Well, I don't have to do

 5    it that way.

 6              MR. CARTMELL:  Well --

 7              MS. HILLYER:  I can make my --

 8              MR. CARTMELL:  -- you do have to do

 9    it that --

10              MS. HILLYER:  -- objections on the

11    record.  You want to call Special Master Cohen?

12              MR. CARTMELL:  -- especially when it's

13    coaching.  And that's what's clear --

14              MS. HILLYER:  Tom.

15              MR. CARTMELL:  -- you don't need to

16    make it.  But you make it to every question

17    because you're trying to coach the witness.

18    And he adopts exactly what you say.

19              MS. HILLYER:  He answers --

20              MR. CARTMELL:  That's what we're --

21              MS. HILLYER:  -- questions --

22              MR. CARTMELL:  -- noticing.

23              MS. HILLYER:  -- if he knows in his

24    personal capacity.  I'm allowed to state on

25    the record if --
```

```
 1                    MR. CARTMELL:  No.

 2                    MS. HILLYER:  You want to call --

 3      we can go off the record and call Cohen in

 4      the middle of the night and wake him up.

 5                    MR. CARTMELL:  If --

 6                    MS. HILLYER:  I'm making my objections

 7      on the record if it's beyond the scope.  I'm not

 8      waiving that.  And I'm not waiting until after

 9      the deposition to do it.  That's how it's going

10      to go down.  You can take it now, or we can call

11      Cohen on your direct.

12                    MR. CARTMELL:  No.  I'm making a record

13      now because you're right --

14                    MS. HILLYER:  Okay.

15                    MR. CARTMELL:  -- Special Master Cohen

16      is asleep in the middle of the night.

17                    MS. HILLYER:  Yes.

18                    MR. CARTMELL:  I want this to be clear

19      to him --

20                    MS. HILLYER:  Okay.

21                    MR. CARTMELL:  -- when we go to him and

22      ask him --

23                    MS. HILLYER:  Okay.

24                    MR. CARTMELL:  -- for relief.

25                    MS. HILLYER:  So I think that we've
```

Highly Confidential - Subject to Further Confidentiality Review

1    taken enough time.  You've made your case.

2    I've made mine.  We're going to keep going.

3         Q.   BY MR. CRAWFORD:  All right.  We've

4    marked a -- going back to the website, you don't

5    know the name of the web -- or do you know the

6    name of the website that Teva Ltd. uses?

7              MS. HILLYER:  Objection.  Beyond the

8    scope.

9              THE WITNESS:  I know, from personal

10   knowledge, that we had issues with the Teva.com

11   domain name.  It was taken.  It took us time to

12   get a commercial, acceptable domain name.  Now --

13   it's now TevaPharm.com.

14             We've been unifying our appearance to

15   the world as a group.  This is relatively new.

16   And, therefore, I'm not sure if the Teva USA

17   site that was separate from the TPI site, whether

18   Teva USA site was integrated into our global, new --

19   relatively new global site or is it still up and

20   running concurrently.

21        Q.   BY MR. CRAWFORD:  What do you mean by

22   "unifying our appearance"?

23        A.   Until recently, like till a year ago,

24   and even still today, the companies that comprise

25   the Teva group each had its own logo.  We acquired

Highly Confidential - Subject to Further Confidentiality Review

```
 1    companies and did not require them to change

 2    their appearance -- their visual appearance.

 3              So in Germany, the company remained

 4    Ratiopharm by name.  And also the logo was orange.

 5    Our colors are green.  It was orange and had the

 6    Ratiopharm name.  It means they also --

 7         Q.   You're saying "Ratiopharm"?

 8         A.   Ratiopharm.  That's the German subsidiary.

 9              In Chile, we have Lab Chile.  It is part

10    of the Teva group.  But it kept its separate name,

11    not only legal name, but also commercial name,

12    trademark, and logo.  So we were -- we did not

13    have a common visual representation to the outside

14    world and internally as a group of companies.

15              In recent years, we are trying to get --

16    with the notion that, like many other companies,

17    the brand -- the corporate brand can have a value

18    if we invest in -- in having the same appearance,

19    we tried to unify the way we look to the -- to

20    the world.

21         Q.   Okay.  These other entities with different

22    names, Ratiopharm, are they required, under this

23    new regiment, to change their name to Teva or just

24    adopt the appearance?

25         A.   The appearance.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MS. HILLYER:  Objection to form.  Beyond

 2   the scope.

 3      Q.   BY MR. CRAWFORD:  So they'll keep their

 4   name.  But then --

 5      A.   The legal --

 6      Q.   -- are they going to put a -- are they

 7   going to put a Teva logo on it as well?  Or how

 8   are they going to do it?

 9          MS. HILLYER:  Objection.  Beyond the

10   scope.

11          THE WITNESS:  The legal entity names

12   do not change unless there's a reason, not

13   commercial, not marketing, to change.  They

14   will or they are supposed to adopt the Teva

15   logo with or instead of their existing logos.

16      Q.   BY MR. CRAWFORD:  And how about Cephalon,

17   do they have their own logo that they use?  Or

18   are they going to phase that out?  How does that

19   work?

20          MS. HILLYER:  Objection to form and

21   beyond the scope.

22          THE WITNESS:  I'm not sure what the

23   plan and timing is for Cephalon.

24      Q.   BY MR. CRAWFORD:  Okay.  So we've marked

25   Exhibit 10 here.  It's called:
```

1          "Our History."

2          It's been, I'll represent, pulled from

3     the Teva website.  Does this look familiar to

4     you at all?

5          A.   (Examining.)  It does.

6          Q.   And is the website content, is that

7     prepared by or with the approval of employees

8     of Teva or -- or TPI?

9               MS. HILLYER:  Objection.  Beyond the

10    scope.

11              THE WITNESS:  The website is prepared

12    by TPI.

13         Q.   BY MR. CRAWFORD:  And as far as you

14    know, this history that's -- and they try to

15    make it as accurate as possible; correct?

16              MS. HILLYER:  Objection.  Beyond the

17    scope.

18              THE WITNESS:  They try to make it as

19    clear to the layman as possible.  They usually

20    don't stick to legal entity names.  They tend to

21    generalize what we understand is a more complex

22    environment.

23              For example, the fact that they -- and

24    I admit even myself refer to "we" as if it's a

25    collective being, where we know that these are

Highly Confidential - Subject to Further Confidentiality Review

1    450 legal entities that are comprising this "we."

2        Q.   BY MR. CRAWFORD:  But the new plan is

3    to try and present it as a single global entity;

4    right?

5            MS. HILLYER:  Objection to form.

6            THE WITNESS:  No.  It is to convey

7    that this group has shared quality standards,

8    shared aspirations to make people's life better.

9    We operate as we operate.

10       Q.   BY MR. CRAWFORD:  Can these companies,

11   these Teva subsidiaries, opt out of this kind

12   of visual plan that you're putting together?

13       A.   They have some leeway in the way they

14   will implement.  For example, we mentioned whether

15   it's only the Teva logo or Teva logo with the

16   legacy logo together.  But, generally, we believe --

17   the group believes that it has value -- can create

18   value in unifying the marketing appearance and the

19   visual language.

20       Q.   So is -- is it a requirement to at least

21   accept some of the visual aids that you have?

22           MS. HILLYER:  Objection to form.  Vague.

23           THE WITNESS:  If a subsidiary sees the

24   logo as a detriment to its business, it will signal

25   it and will get an exception.  I am not aware of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a company that has signaled that moving to this

 2    new logo will harm its business, will jeopardize

 3    its position in the market, et cetera.

 4         Q.   BY MR. CRAWFORD:  Okay.  So this --

 5    was this a -- who came up with the idea or --

 6    or -- or directive to do this?

 7              MS. HILLYER:  Objection.  Beyond the

 8    scope.

 9              THE WITNESS:  In TPI, we have a

10    communications department.  And they have

11    devised the logo and the graphical language.

12    The logo is just part of a larger set of

13    graphical rules.

14         Q.   BY MR. CRAWFORD:  Okay.  And as far

15    as Exhibit 10, is this true and accurate to

16    the best of your knowledge?

17              MS. HILLYER:  Objection.  Beyond the

18    scope.

19              Are you asking is it a true printout

20    or the information --

21              MR. CRAWFORD:  That the information

22    is accurate.

23              MS. HILLYER:  Okay.  So take your time.

24    Look through all of the information.

25              THE WITNESS:  (Examining.)  On the face
```

```
1    of it, it looks accurate.  The years look correct,

2    with the caveat that it does not have the legal

3    entity names.  It is very layman oriented, not

4    detailed or accurate -- legally accurate.  It's

5    a -- it's a marketing tool.

6              (Court reporter clarification.)

7              THE WITNESS:  It's a marketing tool,

8    not a manifestation of the legal situation.

9              MR. CRAWFORD:  Thank you.

10             I'm going to hand you another group

11   of exhibits, 11 through 15.  Maybe you want to

12   hand me the stickers and I'll put them on?

13             (Exhibit 11, Exhibit 12, Exhibit 13,

14        Exhibit 14, and Exhibit 15 marked.)

15             MS. HILLYER:  We've been going about an

16   hour.  Do you want to take a break?

17             MR. CRAWFORD:  Sure.

18             THE VIDEOGRAPHER:  The time is 10:05 a.m.

19   We are now off the record.

20             (Recess from 10:05 a.m. to 10:16 a.m.)

21             THE VIDEOGRAPHER:  The time is 10:16 a.m.

22   We are back on the record.

23             MS. HILLYER:  Mark, do you just want

24   to make sure we are on the same page as to which

25   exhibit is which?  I want to make sure that I
```

1    have them numbered right and --

2            MR. CRAWFORD:  Yeah.  Okay.

3            So we've marked here Exhibits 11 through

4    15.  That's five press releases we've marked.  And

5    11 deals with the acquisition of IVAX.  12 deals

6    with TPI's acquisition of Barr.  13 deals with

7    TPI's acquisition of Cephalon.  14 deals with TPI's

8    acquisition of the Actavis generic entities.  And

9    15 deals with TPI's acquisition of Anda Inc. from

10   Allergan.

11           MS. HILLYER:  Okay.

12       Q.   BY MR. CRAWFORD:  So we just marked

13   here, as I mentioned, Exhibits 11 through 15.

14           Do you recognize these as Teva press

15   releases?

16       A.   (Examining.)  Yes, I do.

17       Q.   And does the -- if you could turn to

18   Exhibit 11, that's the press release for TPI's

19   acquisition of I -- IVAX.

20           Correct?

21       A.   That is the press release that TPI

22   issued when the group acquired IVAX.  The legal

23   acquirer was Teva USA, as you can see in the

24   previous -- in one of those previous org charts.

25       Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    The legal entity acquiring was Teva

 2   USA.

 3          Q.    So let's -- let's look at Exhibit 11.

 4                So are these press releases prepared

 5   internally by TPI?

 6                MS. HILLYER:  Objection as to beyond

 7   the scope and to form.

 8                THE WITNESS:  Yes.  These are prepared

 9   by TPI, with the assistance of certain people,

10   employees of Teva USA, which TPI maintains as

11   service providers for what we call investors

12   relations.

13          Q.    BY MR. CRAWFORD:  And what do you

14   mean by "service providers"?

15          A.    TPI pays TUSA for their services.

16          Q.    Pays Teva USA for their services?

17          A.    Yes.

18          Q.    What services are they providing?

19          A.    Investor relations services.

20          Q.    So Teva USA provides investor relation

21   services to TPI in helping them prepare the press

22   releases?  Is that what you're saying?

23          A.    Yes.

24          Q.    And -- but TPI issues the press releases?

25                MS. HILLYER:  Objection.  Beyond the
```

Highly Confidential - Subject to Further Confidentiality Review

1    scope.

2              THE WITNESS:  Yes.  TPI is obligated

3    under SEC rules, as a traded company in New York

4    Stock Exchange in the US capital markets, to

5    issue press releases informing investors about

6    major business developments in the group of

7    companies that we hold -- that it holds.

8         Q.   BY MR. CRAWFORD:  And because it's

9    an SEC requirement, it's very important that

10   information in the press release be accurate;

11   correct?

12             MS. HILLYER:  Objection.  Beyond the

13   scope.

14             THE WITNESS:  I am not sure if the SEC

15   requires that the legal acquirer within the group

16   be specified.

17        Q.   BY MR. CRAWFORD:  But, generally, the

18   SEC wants these press releases to be accurate;

19   correct?

20             MS. HILLYER:  Objection.  Beyond the

21   scope.

22             THE WITNESS:  "Accuracy" can have many

23   meanings.  I am not sure the rule -- the SEC

24   rules mandates that the legal acquirer within

25   a group of companies that is consolidated for

Highly Confidential - Subject to Further Confidentiality Review

1  GAAP, for accounting purposes, that the legal

2  acquirer be specified.

3      Q.   BY MR. CRAWFORD:  But, internally, is --

4  does TAPI -- TPI strive to make its press releases

5  as accurate as possible?

6          MS. HILLYER:  Objection.  Beyond the

7  scope and form.

8          THE WITNESS:  We strive to comply with

9  SEC rules about what needs to be in these press

10 releases and how they portray the transaction.

11     Q.   BY MR. CRAWFORD:  But does the company

12 internally strive to make them as accurate as

13 possible in addition to complying with SEC rules?

14         MS. HILLYER:  Same objection.

15         THE WITNESS:  Accuracy as we understand

16 as mandated by the rules.

17     Q.   BY MR. CRAWFORD:  And so for this IVAX

18 press release, is everything within this true

19 and correct to your knowledge?

20     A.   It has been --

21         MS. HILLYER:  Object -- hold on.

22         Objection to form and to the extent

23 it's beyond the scope and broad.

24         THE WITNESS:  It has been 12 years

25 since I read the press release.  So if you wish,

Highly Confidential - Subject to Further Confidentiality Review

1    I can read it through.

2        Q.   BY MR. CRAWFORD:  If you could take

3    a look at it.  You -- you've done some -- some

4    investigation for this deposition about corporate

5    organization and structure; right?

6        A.   Yes.

7        Q.   And did you bring any materials with

8    you today?

9        A.   I have -- yeah, I have materials.

10   I have corporate histories of some of the

11   subsidiaries.  I have a list of subsidiaries

12   that TPI -- a partial list of the subsidiaries

13   that TPI owns directly and indirectly and

14   generally what they're engaged in, what kind

15   of business they are engaged in, and other

16   materials that relate to the topics that were

17   on the -- on the notice.

18       Q.   So you've looked at some of the corporate

19   history, including the acquisitions of various

20   Teva entities; right?

21       A.   Yes.

22       Q.   Okay.  And what materials did you bring?

23       A.   We have -- I have the history of Teva

24   USA, corporate history of Teva USA.

25       Q.   And where did you get that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   From our legal department.  Also the

 2   corporate history of one subsidiary.  A summary

 3   of our main subsidiaries around the world and

 4   their primary activities.

 5             To the topic that discusses governance,

 6   I have the board membership over the years, who

 7   served on the board and on which committees they

 8   were, what ad hoc committees the board had.

 9             Our top management is called -- used

10   to be called TEC, Teva Executive Committee.  Now

11   they're called Executive Management.  They had

12   a few sub-committees, sub -- topical sub-committees.

13   I have a list of these right here.  A list of

14   global policies that TPI issues to its subsidiaries.

15   I have guidelines that TPI issues for composition

16   and governance of subsidiary boards.  And I think

17   that's it.  Oh, and -- and the organizational

18   charts I believe were already produced.

19             MR. CRAWFORD:  Do you -- do you have

20   an extra copy of these?  Thank you very much,

21   Becca.  Always on the ball.  So thank you.  All

22   right.  Give me a moment.  On a break we'll look

23   at these.

24        Q.   BY MR. CRAWFORD:  Okay.  So for the --

25   for IVAX, this acquisition, you were going to
```

1   look and see if there's anything that's inaccurate

2   in that press release.

3        A.   Okay.  (Examining.)

4             MS. HILLYER:  Objection to the extent

5   it's beyond the scope and to form.

6             THE WITNESS:  Okay.  I don't see anything

7   that is false in the statement here.  But they

8   are not legally accurate or full.  They're lacking

9   some of the details of the legal transaction itself,

10  details that are of less importance to the investor

11  community but for lawyers and tax people make a

12  lot of difference.

13            For example, here there's a -- it says --

14  it mentioned a merger agreement between the parties,

15  which is correct, but not complete.  Because there

16  was a third participant in this merger agreement

17  and that is Teva USA.

18       Q.   BY MR. CRAWFORD:  Explain to me how

19  the merger agreement worked.

20            MS. HILLYER:  Objection to the extent

21  that's beyond the scope.

22            THE WITNESS:  IVAX was a publicly traded

23  company.  The merger agreement had Teva USA receive

24  the IVAX shares from the IVAX shareholders, giving

25  them in exchange TPI shares, so that IVAX became

```
 1   a subsidiary of Teva USA.  TPI -- the IVAX

 2   shareholders became shareholders in TPI.

 3           TPI issued the number of shares

 4   required, invested it through the holding

 5   chain, as was portrayed in the holding structure,

 6   to Teva USA for Teva USA to have these shares to

 7   give the IVAX shareholders in consideration for

 8   their IVAX shares.  So there were three participants

 9   in this merger.

10       Q.  BY MR. CRAWFORD:  And the other -- and

11   TPI was a participant; right?

12           MS. HILLYER:  Was what?

13           THE WITNESS:  TPI -- that -- that's

14   why I said it's not -- it's not false but it's

15   not complete.  The legal complete statement

16   would have three parties in the agreement.  It's

17   just this is a -- investors -- this is a document

18   that is -- that talks to the investor community.

19           And the investor community, the capital

20   markets, care less about the legal minutia of

21   what exactly happened.  They are interested in

22   that the group that is called "Teva" has acquired

23   the business that is called "IVAX."  And that's

24   what's portrayed here.

25       Q.  BY MR. CRAWFORD:  Okay.  And is there
```

Highly Confidential - Subject to Further Confidentiality Review

1    anything else that you want to clarify in here?

2         A.    No.

3         Q.    Okay.  Let's go to the next exhibit.

4    That would be 12.  That's the acquisition of

5    Barr.  And I have the same set of questions

6    here.

7              Actually, let me go back to IVAX.

8    What happened to the IVAX employees after

9    the acquisition?

10        A.    They -- to the extent they stayed --

11             MS. HILLYER:  Objection to the extent

12   it's beyond the scope.

13             Go ahead.

14             THE WITNESS:  To the extent they stayed

15   in employment, they are part of the Teva USA group

16   now in the US.

17        Q.    BY MR. CRAWFORD:  Who eventually became

18   their employer?  Did they transition to be Teva

19   USA employees?

20             MS. HILLYER:  Objection to form and

21   to the extent it's beyond the scope.

22             THE WITNESS:  Yeah, I -- I don't know

23   if they actually changed employers.

24        Q.    BY MR. CRAWFORD:  And was this acquisition

25   approved by Teva Ltd.'s board of directors?

```
 1              MS. HILLYER:  Objection to the extent

 2     it's beyond the scope.

 3              THE WITNESS:  Yes.

 4      Q.   BY MR. CRAWFORD:  Okay.  And the same

 5     questions for Barr.

 6              Is there anything in Exhibit 12 that

 7     you believe is inaccurate?

 8              MS. HILLYER:  Objection to form and

 9     to the extent it's beyond the scope.

10              THE WITNESS:  As with the case of IVAX,

11     it's accurate but lacks the legal level of detail

12     regarding the transaction itself.

13      Q.   BY MR. CRAWFORD:  And explain why.

14      A.   Because Barr was very similar to IVAX.

15     Teva USA acquired the legal entity Barr using

16     Teva -- TPI stock as consideration for the shares

17     of Barr.  So Barr shareholders became shareholders

18     of TPI.  And Barr itself -- the group of companies

19     called Barr became a subsidiary of Teva USA.

20      Q.   So how come Teva USA is not announcing

21     that it acquired Barr?

22              MS. HILLYER:  Objection.  Beyond the

23     scope.

24              THE WITNESS:  Because Teva USA is

25     not a reporting entity for SEC capital markets.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TPI is a traded company, and it makes all the

 2   announcements, reports, annual financial

 3   statements, et cetera.

 4       Q.   BY MR. CRAWFORD:  Anything else

 5   inaccurate in here or that you want to clarify?

 6            MS. HILLYER:  Same objection.

 7            THE WITNESS:  I would need to read

 8   it, as it's substantially longer than the previous

 9   one.

10       Q.   BY MR. CRAWFORD:  If you want to skim

11   it, that's fine.

12            MS. HILLYER:  Well, you want him to say

13   that everything's accurate in it.

14            Take the time to read it.

15            THE WITNESS:  (Examining.)  Same as

16   with IVAX, I -- with a cursory reading of this,

17   I don't see anything that is inaccurate.  But

18   it's not complete in the legal details sense.

19       Q.   BY MR. CRAWFORD:  All right.  Did the

20   board of directors approve this acquisition for

21   Teva, TPI?

22            MS. HILLYER:  Objection.  Beyond the

23   scope.

24            THE WITNESS:  TPI board of directors

25   approved.  Teva USA board of directors approved.
```

```
 1   I would assume the Barr board of directors

 2   approved.

 3        Q.   BY MR. CRAWFORD:  All right.  Okay.

 4   Turn to Exhibit 13.

 5             This is the press release for the

 6   acquisition of Cephalon by TPI; correct?

 7        A.   Yes.

 8        Q.   And the board of directors made the

 9   decision -- the board of directors of TPI made

10   the decision to proceed with this acquisition;

11   correct?

12             MS. HILLYER:  Objection.  Beyond the

13   scope.

14             THE WITNESS:  The board of directors

15   of TPI approved this acquisition.  Yes.

16        Q.   BY MR. CRAWFORD:  And do you know what

17   happened to the Cephalon employees?  Did they

18   change -- the -- the ones that stayed, did they

19   change employers?  Or did they stay employees

20   of Cephalon?

21             MS. HILLYER:  Objection to form and

22   beyond the scope.

23             THE WITNESS:  I don't know.  I --

24        Q.   BY MR. CRAWFORD:  Oh, you don't know?

25   Okay.  I thought you were --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    I don't know.

 2           Q.    Okay.  All right.  Let's go to the next

 3     one, Exhibit 14.  That's the acquisition of the

 4     generic entities.  This is the press release here.

 5     It's -- it's got some faults in the copy of the

 6     printing of it because it didn't print right from

 7     the website.  But that's where I got it.

 8                 Does this look like the Actavis -- my --

 9     my copy's bad.  That looks a lot better.  Okay.

10                 So does this look like the press release

11     for Actavis generics?

12           A.    (Examining.)  Yes.

13           Q.    And -- and the board of directors made

14     the decision to acquire these Actavis generic

15     entities; correct?

16                 MS. HILLYER:  Objection.  Beyond the

17     scope.

18                 THE WITNESS:  TPI board of directors

19     approved these acquisitions.  I say "approved"

20     because the legal structure is significantly

21     more complicated than what is depicted here.

22                 There were actually 15 or 16 different

23     transactions required in order to acquire the

24     various elements of what is generally referred

25     to as Actavis generics.  But it's actually a
```

1    large group of companies in various locations.

2            Again, these are documents that are

3    meant for the investors community.  They don't

4    care much about legal details.  The acquisition

5    of Actavis was a very complex legal deal, very

6    abbreviated in what is described here.

7        Q.   BY MR. CRAWFORD:  All right.  Let's

8    go to the next exhibit, please.  This is the

9    Teva press release for the acquisition of Anda

10   Inc. from Allergan.

11           Is that what you recognize this to be?

12       A.   Yes.

13       Q.   Let's move on to Exhibit 9000 [sic] --

14   or Exhibit 16, internal number 9000.  Okay.

15   We'll be here for a lifetime with that.  Okay.

16           (Exhibit 16 marked.)

17       Q.   BY MR. CRAWFORD:  This is a document

18   entitled:

19           "Settlement Agreement and Mutual

20   Release."

21           It's dated January 31st, 2018.  And

22   this -- was this a settlement of disputes between

23   Teva Ltd. and Allergan PLC that arose after the

24   2016 acquisition of the Actavis generic entities?

25           Correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Objection to the extent
 2    it's beyond the scope.
 3              THE WITNESS:  (Examining.)  That's what
 4    it appears to be.
 5       Q.   BY MR. CRAWFORD:  I'm sorry.  What did
 6    you say?  It appears so?
 7       A.   That's what it appears to be.
 8       Q.   Okay.  And did you sign this agreement?
 9       A.   I may have as I have -- I'm a signatory --
10    I have signatory powers for TPI.  And I sign a
11    lot of things.  I may have.  Yeah.  That's me.
12       Q.   Okay.  You're looking at what page?
13       A.   The very end.
14       Q.   Okay.
15       A.   I lost track.  Perhaps 12.
16       Q.   Right.
17              And it was also signed by Michael
18    McClellan; correct?
19       A.   Yes.
20       Q.   Now, is Mr. McClellan a employee of
21    Teva or TPI?
22       A.   Mr. McClellan is a loaned employee.
23    He's on secondment from Teva USA.  So his
24    employment agreement is with Teva USA.  But
25    he is seconded for a period of time for this
```

1    position to Teva -- to TPI.

2         Q.   Did you say "seconded"?

3         A.   "Seconded."

4         Q.   What does that mean?

5         A.   It means that the functional employer,

6    the company who -- his manager is a TPI employee.

7    His subordinates are TPI employees.  This function,

8    if it weren't for Mr. McClellan, would be filled

9    by a TPI employee.  His salary is paid by Teva

10   USA.  And then TPI pays Teva USA for the salary

11   that Teva USA pays Mr. McClellan.

12        Q.   Okay.  And why is he being loaned to

13   the company?  Why isn't -- why aren't they using

14   a regular TPI employee?

15             MS. HILLYER:  Objection to form and

16   to the extent it's beyond the scope.

17             THE WITNESS:  On occasion, we identify

18   key talented people that in the group -- a company

19   in the group can have use of their talents, but

20   they are residents and employed by another Teva

21   company.  And we -- the -- that Teva company

22   seconds them for a period of time to the other

23   Teva company.

24        Q.   BY MR. CRAWFORD:  All right.  But he

25   has -- he has enough authority to bind TPI by

```
 1   signing this agreement; correct?

 2        A.   Yes.

 3             MS. HILLYER:  Objection.  Beyond the

 4   scope and to the extent it calls for a legal

 5   conclusion.

 6             THE WITNESS:  In -- so long that he

 7   is seconded and, every practical purpose, is

 8   a TPI employee, except his salary is paid by

 9   Teva USA, he is authorized -- he's an authorized

10   signatory for Teva -- for TPI.

11        Q.   BY MR. CRAWFORD:  Where is he located?

12        A.   In Israel.

13        Q.   Israel.

14             And where does he live in Israel?

15        A.   In Jaffa.

16        Q.   And how long has he lived in Israel?

17             MS. HILLYER:  Objection.  Beyond the

18   scope.

19        Q.   BY MR. CRAWFORD:  To the extent you

20   know.

21        A.   I believe something like a year,

22   about a year.

23        Q.   And why did he move?  Where was he

24   before that?

25             MS. HILLYER:  Objection.  Beyond the
```

Highly Confidential - Subject to Further Confidentiality Review

1    scope.

2              THE WITNESS:  In the Netherlands.

3        Q.   BY MR. CRAWFORD:  And what was his

4    position in the Netherlands?

5              MS. HILLYER:  Objection.  Beyond the

6    scope.

7              THE WITNESS:  He was transitioning from

8    a position he held in Teva USA to a position he

9    was supposed to be filling in Teva Pharmaceutical

10   [sic] Europe, TPE, our Dutch main entity.  With

11   the events of 2017, he was offered the opportunity

12   to be the Chief Financial Officer -- officer of

13   TPI and moved with his family to Israel.

14       Q.   BY MR. CRAWFORD:  Okay.  And can you --

15   this basically was a settlement dispute that

16   arose between Allergan PLC and TPI that emanates

17   from the 2016 agreement to sell the generic

18   Actavis entities; right?

19             MS. HILLYER:  Objection.  Beyond the

20   scope and to the extent it calls for a legal

21   conclusion.

22             THE WITNESS:  It is a settlement

23   agreement that TPI signed with Allergan.

24       Q.   BY MR. CRAWFORD:  And was one of the

25   disputes in here a dispute about who would pay

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for the opioid litigation in the United States?

 2            MS. HILLYER:  Objection.  Beyond the

 3    scope.  You know it's very beyond the scope

 4    now, Mark.  I'll give you maybe one or two

 5    more questions.

 6            This settlement agreement has nothing

 7    to do with a single topic.  As directed by Cohen,

 8    he directed that this is not a fact witness

 9    deposition.  And he made that clear.  That

10    issue is settled.  I'll give you a little bit

11    more leeway, but you are far afield.

12            MR. CRAWFORD:  I disagree with that.

13    I think this is right on topic.

14            MS. HILLYER:  Which topic?

15            MR. CRAWFORD:  It's on a bunch of them.

16            MS. HILLYER:  Tell me.

17            MR. CRAWFORD:  We'll have to talk about

18    it at break.

19            MS. HILLYER:  No.  I want to know now

20    which topics you think this covers or touches on.

21    If -- actually, if there's several, then go ahead

22    and name them.

23            MR. CRAWFORD:  I have a pending question.

24    So if the witness can answer.

25            MS. HILLYER:  My objection's on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    record.

 2         Q.   BY MR. CRAWFORD:  Do you need the

 3    question read back?

 4         A.   Yes.

 5              (Record read as follows:

 6              "QUESTION:  And was one of the disputes

 7         in here a dispute about who would pay for

 8         the opioid litigation in the United States?")

 9              MS. HILLYER:  Objection.  Beyond the

10    scope and calls for a legal conclusion.

11              THE WITNESS:  As stated in Section 4,

12    we agreed, as part of the agreement, that Teva,

13    as defined here, will be responsible for the

14    defense of the claims, et cetera, regarding

15    the opioids.

16         Q.   BY MR. CRAWFORD:  And how is "Teva"

17    defined?

18              MS. HILLYER:  Objection.  Beyond the

19    scope and calls for a legal conclusion.

20              Now you're asking him to interpret

21    the document.  That is also beyond the scope.

22    We can go off the record, and we can talk about

23    whether this is on the scope.  But this is the

24    last question on this document.

25         Q.   BY MR. CRAWFORD:  Do you need the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    question read back?

 2        A.    No.

 3              Teva -- there are, I think, two

 4    definitions that go to this.  One is the

 5    very beginning that says Teva Pharmaceutical

 6    Industries Ltd., Teva.  And then it says

 7    that capitalized terms are -- where is it?

 8    Capitalized terms are as defined in the

 9    master purchase agreement.

10        Q.    So would it include Teva or TPI?

11              MS. HILLYER:  No.  No.  I'm -- I'm

12    going to stop this.  We can talk about it on

13    the break, if you want to.  But that's it on

14    this document.  You know this is beyond the

15    scope.  If you want to sit here and tell me

16    where you think it falls, then let's do that.

17    Otherwise, I'm not wasting the witness' time

18    on this.

19              MR. CRAWFORD:  Well, we've got seven

20    hours here.  So --

21              MS. HILLYER:  Okay.

22              MR. CRAWFORD:  -- we're not wasting

23    anyone's time.

24              MS. HILLYER:  You're wasting his time

25    as a fact witness.  He's not a fact witness.
```

Highly Confidential - Subject to Further Confidentiality Review

1    You fought that and lost, twice.

2            MR. CRAWFORD:  Are you going to

3    instruct him not to answer?

4            MS. HILLYER:  I am, unless you want

5    to tell me which one this falls under.  And

6    then we can fight about that.

7            And it calls for a legal conclusion

8    for a document that he referenced that is not

9    even in front of him.

10           MR. CRAWFORD:  All right.  We'll talk

11   about it at break, then.

12           MS. HILLYER:  Okay.

13           MR. CRAWFORD:  So you're not going

14   to let him answer any more questions about

15   this document?

16           MS. HILLYER:  Not until we settle

17   whether you think it's in scope and whether

18   I agree.  At this point, I don't.  I'm open

19   to hear the arguments.  But ...

20       Q.   BY MR. CRAWFORD:  What were Teva Ltd.'s

21   global revenues in 2018?

22           MS. HILLYER:  Objection to the extent

23   that's beyond the scope.

24           THE WITNESS:  I don't recall by --

25   by heart.  It's in our financial statements.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    BY MR. CRAWFORD:  And do you know --

 2          A.    And I should mention that our financial

 3    statements are consolidated, meaning they aggregate

 4    the results of all of our subsidiaries.  This is

 5    what US generally accepted accounting principles

 6    require us to do.

 7          Q.    And do you know what percentage of

 8    Teva Ltd. sales are in the US --

 9                MS. HILLYER:  Objection.

10          Q.    BY MR. CRAWFORD:  -- in, say, 2018?

11                MS. HILLYER:  Objection to form.

12                THE WITNESS:  No.

13          Q.    BY MR. CRAWFORD:  Do you have an

14    approximate?

15                MS. HILLYER:  Objection to form,

16    "Teva Ltd. sales in the US."

17                MR. CRAWFORD:  Revenue.

18                THE WITNESS:  Let me explain.

19                TPI does not sell to third parties

20    in the US.  TPI sells to Teva USA.  Teva USA

21    is a manufacturer by its own right but also

22    a distributor of TPI and other Teva companies

23    in the US.  So Teva USA buys from TPI.  If

24    you refer to this internal sale as a sale of --

25    as a revenue of TPI, then we can count it.
```

```
 1              Otherwise, if you're looking at --

 2    our consolidated financial statements show our

 3    sales to third parties.  And TPI does not sell

 4    to third parties in the US.  It sells to Teva

 5    USA.

 6        Q.   BY MR. CRAWFORD:  So what percentage

 7    of the revenues of TPI are US revenues derived

 8    from the US?

 9        A.   I don't know the number, the percentage.

10             MR. CRAWFORD:  Okay.  Let's do the next

11    one.

12             (Exhibit 17 marked.)

13        Q.   BY MR. CRAWFORD:  Okay.  We marked

14    Exhibit 17, which is another press release:

15             "Teva Reports Fourth Quarter and Full

16    Year 2018 Financial Results."

17             Is this, again, another Teva press

18    release?

19        A.   (Examining.)  It is.

20        Q.   Yeah.  And if you look at the first

21    page, does it look like Teva's reporting $18.9

22    billion in revenue for its global business?

23             Correct?

24        A.   That is correct.

25        Q.   And it looks like on page 6 -- it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   not numbered.  But the sixth page, it starts

 2   with:

 3            "GAAP financial expenses."

 4            On the top line.  Do you see that?

 5       A.   Yeah.

 6            MS. HILLYER:  Hold on.  Yes.

 7       Q.   BY MR. CRAWFORD:  If you look under

 8   "Segment Results for the Fourth Quarter," are

 9   there basically three segments described here?

10       A.   Yes.

11       Q.   Okay.

12       A.   We report three segments.

13       Q.   And that's North America, Europe, and

14   International; right?

15       A.   Yes.

16       Q.   And can you explain to me what a segment

17   is?

18       A.   It's an accounting concept of -- I

19   believe -- now I recite from recollection of

20   the GAAP principle.  But I believe that financial

21   statements should reflect -- or the reporting --

22   that's not a exact statement -- should reflect

23   the way the management runs the company.

24            And as we run our company by region

25   or by three regional segments, we should be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    breaking up to a certain extent -- it's not

 2    full detailed financials -- but we should

 3    break some key financials into these segments.

 4         Q.   One of the segments is North America,

 5    that US and Canada; right?

 6         A.   Yes.

 7         Q.   And do you have employees at any of

 8    the Teva entities or at Teva USA running both

 9    USA and Canada operations?

10              MS. HILLYER:  Objection to form.

11              "You have employees"?

12              MR. CRAWFORD:  "Teva USA" I said.

13    Okay.  Let me strike that, then.

14         Q.   BY MR. CRAWFORD:  Does Teva USA have

15    employees that run both US and Canada operations?

16              MS. HILLYER:  Objection to the extent

17    that's beyond the scope.

18              THE WITNESS:  Teva USA has employees

19    overseeing Canadian operations.  Teva Canada has

20    a complete body of people and assets to run its

21    own business.

22         Q.   BY MR. CRAWFORD:  So -- but Teva USA,

23    there are employees there that also work on the

24    operations of the Canadian companies?

25         A.   Teva USA --
```

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HILLYER:  Objection.  Beyond the

2    scope.

3          THE WITNESS:  Teva USA has a few people

4    whose job is defined "global," meaning exceeding --

5    their purview exceeds US -- the US territory.  And

6    they oversee the Canadian operations.  They don't

7    do Canadian operations.  They oversee Canadian

8    operations.

9      Q.   BY MR. CRAWFORD:  What does that mean,

10    to oversee?

11      A.   Review, comment, challenge, as needed,

12    projections or --

13          MS. HILLYER:  Keep your voice up.

14          THE WITNESS:  Yeah, sorry.

15          -- projections or budgets that the

16    Canadian operation -- that the Canadian company

17    prepares for its operations.

18      Q.   BY MR. CRAWFORD:  And are the people --

19    the people at Teva USA who oversee both US and

20    Canada, the people in Canada, do they report

21    to that Teva USA person?

22      A.   Yes.  There are reporting lines.

23      Q.   Okay.  That's all I have on that.

24          (Exhibit 18 marked.)

25      Q.   BY MR. CRAWFORD:  So this is another

Highly Confidential - Subject to Further Confidentiality Review

```
 1    page I took from the Teva website, TevaPharm.com.

 2    And the second page has a bunch of pictures of

 3    individuals under the heading:

 4            "Corporate Officers."

 5            Are all these individuals here corporate

 6    officers of Teva Ltd. or T -- TPI?

 7       A.   (Examining.)  Yes.  I -- I believe

 8    they are.

 9       Q.   Okay.  And so are they also -- since

10    they're officers, they're also employees of

11    TPI; correct?

12       A.   No.

13       Q.   Okay.  So --

14       A.   Not all of the officers here are

15    employees of TPI.

16       Q.   Which ones are not employees?

17            MS. HILLYER:  Objection to the extent

18    it's beyond the scope.

19            THE WITNESS:  We can go from the top

20    left.  Kare Schultz, CEO, is an employee of TPI.

21            Iris Beck-Codner is an employee of TPI,

22    head of communication.

23            Richard Daniel is head of our European

24    segment.  And he's an employee of TPE, of the

25    Dutch subsidiary.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Sven Dethlefs is an -- I'm not sure --
 2    I think an employee of Teva USA.  But I'm not
 3    sure.
 4                    Hafrun is an employee of one of our
 5    US companies.  That's the second row from the
 6    left.
 7                    Mike McClellan is, as we talked about,
 8    a TUSA employee seconded to TPI.
 9                    Gianfranco, leading our international
10    segment, he's an employee of TPI.
11                    Carlo de Notaristefani, last on the
12    second row -- last to the right on the second
13    row, is a Teva USA employee.
14                    Brendan O'Grady -- third row from the
15    left, Brendan O'Grady is a Teva USA employee.
16                    Mark Sabag is a TPI employee.
17                    David Stark is a Teva USA employee.
18                    Nir -- last name escapes me now --
19    is a --
20                    MS. HILLYER:  Baron.  Baron.
21                    THE WITNESS:  Baron.
22                    -- is a TPI employee.
23                    And Lori is a Teva USA employee.
24         Q.   BY MR. CRAWFORD:  Okay.  And why
25    are all these individuals listed under the
```

1    Teva Pharmaceutical Industries Ltd. website?

2              Do you see at the top of the page,

3    it says:

4              "Teva Pharmaceutical Industries Ltd."

5              MS. HILLYER:  Objection to the extent

6    it's beyond the scope.

7              THE WITNESS:  Teva -- TPI, Teva Ltd.,

8    oversees a larger diverse group of companies.

9    And the management and oversight requires many

10   subject-matter experts, some of which are in

11   our subsidiaries and not in TPI itself, not

12   living in Israel.

13             They fulfill management functions

14   for the group.  Therefore, they are officers

15   of TPI.  That's the ultimate parent company

16   of the entire group.  But they are employees

17   of their respective entities.  TPI pays the

18   respective entities for these services.

19        Q.   BY MR. CRAWFORD:  So they --

20        A.   So the economic burden is borne

21   ultimately by TPI.  But they are employees

22   of the companies in the countries where they

23   reside.

24        Q.   So is it similar to Mr. McClellan

25   where they have been seconded, you said, to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TPI?

 2          MS. HILLYER:  Objection to form.

 3      Q.   BY MR. CRAWFORD:  This is the non-TPI

 4   employees.

 5      A.   Not exactly.

 6      Q.   Are there any of them here that are

 7   seconded like Mr. McClellan?

 8      A.   Gianfranco Nazzi may be, the head

 9   of our international.  I am not sure if he

10   is employed by TPI fully because he resides

11   in Israel.  Yeah, I think he is employed by

12   TPI.  So yeah, it's only Mike -- Michael

13   McClellan that is seconded.

14      Q.   And why is TPI paying for these

15   employees and its subs?  What's -- why are

16   they paying that?

17      A.    TPI, as the parent company, has a --

18   an obvious vested interest in the financial

19   success and -- and business success of its

20   subsidiaries.  This oversight requires people

21   that manage, that see a broader picture and

22   look at the group as a whole but are close to

23   the markets.  So the head of the US, Brendan

24   O'Grady, sits in the US.  The head of Europe

25   sits in Europe.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CRAWFORD:  Okay.  So let's mark

 2    the next set of exhibits here.  Can we take

 3    a little break?  Because we're going to mark

 4    a bunch of them.

 5              MS. HILLYER:  Okay.  Do you want to

 6    take a break-break or --

 7              MR. CRAWFORD:  Yeah.  Let's take a

 8    five-minute break.

 9              THE VIDEOGRAPHER:  The time is 10:59

10    a.m.  We are now off the record.

11              (Recess from 10:59 a.m. to 11:12 a.m.)

12              (Exhibit 20, Exhibit 21, Exhibit 22,

13         Exhibit 23, Exhibit 24, Exhibit 25, Exhibit

14         26, Exhibit 27, and Exhibit 28 marked.)

15              THE VIDEOGRAPHER:  The time is 11:12

16    a.m.  We are back on the record.

17         Q.   BY MR. CRAWFORD:  Just pull up Exhibit

18    18 again.  That was the --

19         A.   Yes.

20         Q.   -- pictures of the corporate officers.

21    Right?  I want to ask you about this.

22              This is on the -- the top of the Teva

23    Pharmaceutical Industries' logo on the top of

24    this webpage; correct?

25         A.   It says:
```

1            "Teva Pharmaceutical Industries Ltd."

2       Q.   And under that, it says:

3            "Corporate Officers."

4            And then it has these individuals.

5            You testified they are corporate

6    officers of Teva Ltd. or TPI; right?

7       A.   Yes.

8       Q.   And they're also corporate officers

9    of their respective entities that you mentioned

10   when we went through them -- right? -- if they're

11   different from TPI?

12           MS. HILLYER:  Objection to the extent

13   that's beyond the scope.

14           THE WITNESS:  Some of them are.  And --

15   and I would like to, to the extent it's important,

16   correct the record on who is employed by whom.

17      Q.   BY MR. CRAWFORD:  Yeah.

18      A.   I made two mistakes that I verified

19   on the --

20      Q.   Okay.

21      A.   -- break.

22           Gianfranco Nazzi, our head of

23   international is -- international markets,

24   is actually employed by TPE, Teva Pharmaceutical

25   Europe in the Netherlands and is seconded to

 1    TPI the same way Mr. McClellan is seconded from

 2    Teva USA.

 3             And Richard Daniel, the head of Europe,

 4    is in -- is employed by Teva UK Ltd. and seconded

 5    to Teva Pharmaceutical [sic] Europe BV.

 6             (Court reporter clarification.)

 7             THE WITNESS:  "BV."

 8        Q.   BY MR. CRAWFORD:  So he's seconded

 9    to Teva Pharmaceuticals Europe BV?  Is that

10    what you said?

11        A.   Yes.

12        Q.   But they're all officers of Teva --

13        A.   Yes.

14        Q.   -- Pharmaceutical Industries Ltd.?

15             And they have responsibilities and

16    duties to TPI; right?

17        A.   Yes.

18        Q.   And they also have responsibilities

19    and duties with respect to -- if they're employer

20    is different from TPI, they have duties and

21    responsibilities as to those entities as well;

22    correct?

23             MS. HILLYER:  Objection to the extent

24    that's beyond the scope.

25             THE WITNESS:  Some of them do.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.   BY MR. CRAWFORD:  And -- and they're

 2    being paid for, ultimately, their services to

 3    TPI by TPI money; right?

 4         A.   Yes.

 5         Q.   All right.  I've handed you a stack

 6    of bios which were taken off of the Teva Ltd.

 7    website.

 8              All of them have the Teva Pharmaceutical

 9    Industries Ltd. name and logo at the top; correct?

10         A.   (Examining.)  Yes.

11         Q.   And these are most of the individuals

12    that were on Exhibit 18; correct?

13              MS. HILLYER:  Do you want --

14              THE WITNESS:  Yes.  Most, if not all.

15              MS. HILLYER:  -- to verify for the

16    record to make sure I have what's -- which one

17    is exhibit which?

18              MR. CRAWFORD:  Okay.

19              MS. HILLYER:  Because --

20              MR. CRAWFORD:  Yeah.

21              MS. HILLYER:  -- I just have a stack.

22    I don't --

23         Q.   BY MR. CRAWFORD:  So we have -- I

24    tried to put it in order, so I think they are.

25    Exhibit 19 is Kare Schultz.  And I'm going to
```

```
 1    botch all kinds of names here, so bear with me.

 2    20 is David Stark.  That's an easy one.  21 is

 3    Iris Beck-Codner.  22 is Mike McClellan.  23 is

 4    Brendan O'Grady.  24 is Hafrun Fridriksdottir.

 5    And 25 is Carlo de Notaristefani.

 6            How am I doing so far?

 7       A.   Yeah.

 8       Q.   Okay.  All right.  26 is Nir Baron.

 9    And 27 is Lori Queisser.

10            MS. HILLYER:  "Queisser."

11       Q.   BY MR. CRAWFORD:  Queisser.  28 is

12    Sven Dethlefs.  All right.  So let's go to the

13    first one, Kare Schultz.

14            He is the -- Teva's current president

15    and CEO; correct?

16       A.   Yes.

17       Q.   And he became that in -- November 1st,

18    2017; correct?

19       A.   Yes.

20       Q.   And 20 is David Stark; correct?

21       A.   Yes.

22       Q.   And he is Executive Vice President,

23    Chief Legal Officer of TPI; correct?

24       A.   Yes.

25       Q.   And you've said he has a position
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with a -- an officer position with a US company.

 2              What is that position?

 3              MS. HILLYER:  Objection to the extent

 4    that's beyond the scope.

 5              THE WITNESS:  Yeah, I'm not sure --

 6    I don't think he has a position with Teva USA.

 7    I believe Teva USA has a legal officer for Teva

 8    USA first, professionally reporting to David

 9    Stark.

10        Q.   BY MR. CRAWFORD:  So basically he's

11    not -- is -- is he an employee of Teva USA?

12        A.   He is an employee of Teva USA.

13        Q.   But he doesn't have a position with

14    Teva USA?

15              MS. HILLYER:  Objection to form --

16              THE WITNESS:  I --

17              MS. HILLYER:  -- and -- sorry -- and

18    to the extent it's beyond the scope.

19              THE WITNESS:  I'm hesitant just because

20    I don't recall the exact composition of Teva USA's

21    board.  And he may or may not be on the board

22    of Teva USA.  I don't recall who are the people

23    currently on the board of Teva USA as directors.

24              But Teva USA has a legal officer serving

25    its legal needs, reporting professionally to David
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Stark.

 2        Q.   BY MR. CRAWFORD:  And who is that officer?

 3             MS. HILLYER:  Objection.  Beyond the

 4   scope.

 5             THE WITNESS:  Kirsten Bauer.

 6        Q.   BY MR. CRAWFORD:  So she reports to

 7   David Stark, who is the Executive Vice President,

 8   Chief Legal Officer of TPI; correct?

 9        A.   Yes.

10        Q.   And you're not sure if he has an officer

11   position within Teva USA; correct?

12        A.   Right.

13        Q.   But you think he might be on the board

14   of directors -- correct? -- of Teva USA?

15        A.   I don't recall if he is or isn't.

16        Q.   But that's what you were trying to

17   recall; right?

18        A.   Yes.

19        Q.   And who was the report from Teva USA

20   that was reporting to him?

21        A.   Kirsten Bauer.

22        Q.   Kirsten Bauer?

23        A.   (Witness nods head in the affirmative.)

24        Q.   Okay.  And in what capacity -- or what's

25   her position with Teva USA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Objection to the extent
 2    that's beyond the scope.
 3              THE WITNESS:  She's, if I recall correctly
 4    the title, the -- okay, I will paraphrase.  But
 5    something like the head of legal for US business.
 6         Q.   BY MR. CRAWFORD:  Okay.  And is she
 7    also a TPI officer?
 8         A.   No.
 9         Q.   And where is David Stark based?
10         A.   In the US.
11         Q.   So what capacity is David Stark when
12    the US counterpart reports to him?
13              MS. HILLYER:  Objection to form.
14         Q.   BY MR. CRAWFORD:  I can't remember her
15    name.
16              MS. HILLYER:  And to the extent it's
17    beyond the scope.
18              THE WITNESS:  Could you clarify?
19              Her name is Kirsten Bauer.  But could
20    you clarify the question?
21         Q.   BY MR. CRAWFORD:  Yeah.  So what --
22    what capacity is he in when she reports to him?
23    Is he -- is he a TPI officer when she reports
24    to him?
25              MS. HILLYER:  Objection to form.
```

```
 1              THE WITNESS:  No.  In this capacity,

 2   his role is similar to my role in -- in -- in

 3   the tax domain.  And that is, he is responsible

 4   and oversees the legal -- internal legal work

 5   that is being done in the Teva subsidiaries.

 6       Q.   BY MR. CRAWFORD:  Globally?

 7       A.   Globally.  All of the lawyers and

 8   paralegals and all of the people employed in

 9   our legal departments across the world have

10   professional reporting lines ultimately to

11   David Stark.

12       Q.   As a TPI officer; correct?

13       A.   As the --

14              MS. HILLYER:  Objection to form to

15   the extent that's beyond the scope.

16              You can answer.

17              THE WITNESS:  As the Chief Legal

18   Officer for the group.

19       Q.   BY MR. CRAWFORD:  And an officer

20   of TPI; right?

21       A.   He is also an officer of TPI.

22       Q.   So are they reporting to him as

23   the officer of TPI?

24       A.   They're reporting --

25              MS. HILLYER:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE WITNESS:  They're reporting to

 2   him as the Chief Legal Officer of the company --

 3   of -- sorry -- of the group.  The company is

 4   TPI.  We have several -- 450 companies.

 5            We have management structures that

 6   are designed to allow the group of companies

 7   to operate effectively.  The legal structure,

 8   managerial structure is similar to the tax and --

 9   that we talked about.

10       Q.   BY MR. CRAWFORD:  So I -- I'm sorry.

11   It's just not clear to me.

12            So there -- Ms. Bauer is reporting

13   to him as the Chief Legal Officer of, you said,

14   the group; right?

15       A.   Yes.

16       Q.   So what does that mean?  What group?

17       A.   The Teva group of companies.

18       Q.   And what is that defined as?

19       A.   That defines as TPI and all of its

20   subsidiaries.

21       Q.   So he's in charge of TPI legal and

22   all of its subsidiaries ultimately; correct?

23       A.   He's in charge of the legal -- yeah,

24   of the legal work that's done in Teva, in the

25   Teva group, in all the subsidiaries, the same
```

1    as I am in charge of the tax work that's done

2    in the group for -- in all the subsidiaries.

3          Q.    Next go to Exhibit 21, Iris Beck-Codner.

4                She is Executive Vice President, Global

5    Brand and Communications; correct?

6          A.    Yes.

7          Q.    And I didn't write it down.

8                What was her -- who is her employer?

9          A.    TPI.

10         Q.    TPI.

11               And is she based in Israel?

12         A.    Yes.

13         Q.    And what her -- are her -- does she

14    have somebody reporting to her from Teva USA?

15         A.    Yes.

16         Q.    And who is that?

17         A.    I don't recall the name.

18         Q.    Okay.  And she is Executive VP, Global

19    Brand and Communications.

20               So is she in the same position as far

21    as group -- what do you call it?  Group leader?

22         A.    Uh-huh.  Yes.

23         Q.    Is she in the same position as you

24    and Mr. Stark with regard to communications?

25               MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE WITNESS:  It's the same kind
2    of structure.  She oversees the work of the
3    communications people that are in the various
4    businesses in the companies around the world.
5         Q.   BY MR. CRAWFORD:  And so all the
6    top people in communications at the companies
7    around the world that have them report to her;
8    right?
9         A.   Yes.
10        Q.   And that includes Teva USA's top
11   communications person?
12        A.   Yes.
13        Q.   Next was Exhibit 22, Michael McClellan.
14   I think we talked about him.
15             And he is based in Israel, you said;
16   right?
17        A.   Yes.
18        Q.   And he is Executive Vice President,
19   Chief Financial Officer.
20             Again, would he be in the same position
21   as you and Ms. Iris -- Ms. Beck-Codner and Mr. Stark
22   as far as being group leader for the financial
23   officer department?
24        A.   Yes.
25             MS. HILLYER:  Objection to form.
```

```
 1              THE WITNESS:  Yes.  Financial people --
 2    the finance people around the world report
 3    professionally to him ultimately.
 4       Q.   BY MR. CRAWFORD:  And what are his
 5    responsibilities in that position?
 6       A.   He is responsible for the -- for the
 7    oversight and management of the financial --
 8    the finance group activities within Teva.
 9              And he's also, as a TPI officer --
10    he is a TPI officer, signing off on our financial
11    statements.  So he is responsible towards the
12    market, him and the CEO, Kare Schultz, for the
13    completeness and accuracy of our financial
14    statements.
15       Q.   For TPI and the subsidiaries or just
16    TPI?
17       A.   We -- based on US GAAP, US generally
18    accepted accounting principles, the financial
19    statements that we produce to the market are
20    consolidated financial statements that have
21    TPI and all of its subsidiaries' results
22    consolidated.
23       Q.   Exhibit 23 is Brendan O'Grady.
24              You said he is a Teva USA employee
25    and he's also a TPI officer; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    And he's based out of where?

3        A.    Out of the US.

4        Q.    And what city?

5              MS. HILLYER:  Objection to the extent

6    it's beyond the scope.

7              THE WITNESS:  I believe it's in

8    Parsippany, New Jersey.

9        Q.    BY MR. CRAWFORD:  And he is Executive

10   Vice President, North America Commercial.

11             What is North America Commercial?

12       A.    Our commercial operations in the US

13   and Canada.

14       Q.    So who reports to him from Teva USA?

15             MS. HILLYER:  Objection to the extent

16   that's beyond the scope.

17             THE WITNESS:  All of the commercial

18   organization, sales, distribution, and supporting

19   functions that support the commercial purchase.

20       Q.    BY MR. CRAWFORD:  Would that include

21   marketing and sales?

22       A.    Yes.

23       Q.    He's had that position since November

24   2017; correct?

25       A.    Yes.
```

```
 1          Q.    Next is Dr. Hafrun Fridriksdottir.

 2   She is Executive Vice President, Global R & D.

 3                Is that -- what is that position?

 4   What does she do there, her responsibilities?

 5          A.    She oversees our R & D operations

 6   around the world.

 7          Q.    And that would -- does Teva USA have

 8   an R & D department?

 9          A.    It has.  But Dr. Fridriksdottir is

10   not primarily engaged in that -- in managing

11   that activity because there's a US manager

12   for that activity.  She has a -- what we call

13   a global role, meaning she oversees the entire

14   group of people engaged in R & D throughout the

15   world.

16          Q.    So the Teva USA person does report

17   to her; correct?

18          A.    Yes.

19          Q.    And her over -- oversight includes

20   Teva USA; right?

21          A.    Yes.

22          Q.    Next is Dr. Carlo de Notaristefani.

23   And he is Executive Vice President, Global

24   Operations.

25                What does he do in that position?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.   He oversees our operation -- our

2   manufacturing operations throughout the world.

3       Q.   And does that include in the US?

4       A.   There is a -- regional and country

5   managers managing the sites in the US.  But

6   they report professionally to him.

7       Q.   And who owns the sites in the US?

8            MS. HILLYER:  Objection to the extent

9   it's beyond the scope.

10           THE WITNESS:  Teva USA and its

11  subsidiaries.

12      Q.   BY MR. CRAWFORD:  Do you know which

13  subsidiaries own it?

14      A.   I don't recall.  We have several sites.

15  I don't recall which holds which.

16      Q.   Does TAPI own any of the sites?

17           MS. HILLYER:  Objection to the extent

18  that's beyond the scope.

19           THE WITNESS:  I believe not.

20      Q.   BY MR. CRAWFORD:  Next is Nir Baron,

21  Exhibit 26.  He is Senior Vice President, Chief

22  Internal Auditor.

23           What are his functions?

24      A.   Internal audit is the function that

25  audits internally and sees that Teva operates --

Highly Confidential - Subject to Further Confidentiality Review

1    the Teva subsidiaries operates according to the

2    requirements, the guidelines, standard operating

3    procedures that TPI, as the parent company, issues

4    on various or limited matters.

5         Q.   Okay.  And that would include, you said,

6    Teva subsidiaries.

7              That would include Teva USA; correct?

8         A.   Yes.

9         Q.   So who reports to him in Teva USA?

10        A.   I don't recall their exact structure.

11   So I don't know the names.

12        Q.   But do you know how big his compliance

13   department is at Teva Ltd?

14             MS. HILLYER:  Objection to the extent

15   it's beyond the scope --

16             THE WITNESS:  No, I don't.

17             MS. HILLYER:  -- and to form.

18        Q.   BY MR. CRAWFORD:  Do you know if Itai

19   Rigbi works at Teva Ltd. under his leadership?

20             MS. HILLYER:  Objection --

21             THE WITNESS:  No, I don't know.

22             MS. HILLYER:  -- to the extent it's

23   beyond the scope.

24        Q.   BY MR. CRAWFORD:  Do you know Itai

25   Rigbi?

```
 1                 THE COURT REPORTER:  Wait.

 2                 MS. HILLYER:  Hold on.

 3                 THE COURT REPORTER:  You guys are

 4     talking at the same time.

 5                 MS. HILLYER:  Objection to the extent

 6     it's beyond the scope.

 7          Q.   BY MR. CRAWFORD:  Do you know Itai

 8     Rigbi?

 9                 THE COURT REPORTER:  I don't have

10     his answer.

11                 MS. HILLYER:  I don't think he answered --

12     well, loudly enough to the last one.

13                 THE WITNESS:  So no, I don't know who

14     Itai Rigbi is.

15          Q.   BY MR. CRAWFORD:  Next is Lori Queisser.

16     She is Senior Vice President and Global Compliance

17     Officer.

18                 What's -- what are her responsibilities?

19          A.   She's responsible for the activities we

20     do to ensure compliance with our legal requirements

21     in operating our business.

22          Q.   And that would include Teva USA?

23          A.   That includes Teva USA.

24          Q.   And next is Sven Dethlefs, Executive

25     Vice President, Global Marketing and Portfolio.
```

```
 1              What are -- what does his position

 2   entail?

 3        A.   The Global Marketing and Portfolio

 4   is a very recent, new organization that is meant

 5   to address the potential for economic benefit

 6   from synchronizing the activities that we do

 7   across the world.  We, as we said, are managed --

 8   the Teva group manages locally and regionally --

 9   locally and regionally.

10              When Kare Schultz becomes -- became

11   CEO, he thought there could be value in looking

12   horizontally across regions to see if there are

13   things done in one region or in one country that

14   can be leveraged in other countries.  And that's

15   basically what Sven is doing.

16        Q.   Okay.  And where is Sven based out of?

17        A.   In the US.

18        Q.   And how about Ms. Queisser, where is

19   she based?

20        A.   In the US.

21        Q.   Nir Baron?

22        A.   In Israel.

23        Q.   Notaristefani?

24        A.   In the US.

25        Q.   And Fridriksdottir?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    In the US.

 2          Q.    So she actually lives in the US and

 3    works out of the US office?

 4          A.    Yes.

 5          Q.    And do these TPI corporate officers,

 6    are there regular meetings of the officers that

 7    occur now?

 8          A.    Yes.

 9          Q.    And how are they scheduled?  Or what --

10    you know, what's their spacing and what are they

11    about?

12          MS. HILLYER:  Objection to form.

13          THE WITNESS:  I -- they are -- I don't

14    know the exact frequency.  They're relatively

15    frequent, meaning once a month at least, depending

16    on the business and -- and the needs.

17          Q.    BY MR. CRAWFORD:  And are the meetings

18    videoconference or in person or both?

19          MS. HILLYER:  Objection to form and

20    beyond the scope.

21          THE WITNESS:  All of the above.

22          Q.    BY MR. CRAWFORD:  Okay.  So, oftentimes,

23    the TPI corporate officers who don't live in Israel

24    travel for a meeting in Israel?  Does that happen?

25          A.    It happens.
```

```
 1              MR. CRAWFORD:  All right.  Let's mark

 2    the next exhibit.  Actually, let's mark the next

 3    three.  Actually, just the next two.

 4              (Exhibit 29, Exhibit 30, and Exhibit 31

 5        marked.)

 6        Q.   BY MR. CRAWFORD:  Okay.  We've marked

 7    Exhibits 29 to 31.  I'm going to ask some questions

 8    about these.  Let's go to Exhibit 29.  And this

 9    is -- how do you pronounce his name?

10        A.   Asaph Naaman.

11        Q.   Okay.  And he is Senior Vice President

12    and CFO North America at Teva Pharmaceuticals.

13              What -- what does that mean?

14              MS. HILLYER:  Objection to form.

15              THE WITNESS:  He is a chief financial

16    officer for Teva USA and our US business.

17        Q.   BY MR. CRAWFORD:  It says:

18              "At Teva Pharmaceuticals."

19              What Teva Pharmaceuticals?

20        A.   As I explained in my answer regarding

21    my own LinkedIn profile, LinkedIn has a limited

22    set of company names.  And if you want -- I want

23    myself and Asaph to be associated in LinkedIn

24    under the same group, the -- the choices are

25    very limited.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So is one of the choices, though,
 2   Teva Pharmaceutical Industries Ltd.?
 3        A.   No.  That's why I chose Teva
 4   Pharmaceuticals.  And I see Asaph has chosen
 5   as well.
 6        Q.   Can you customize it so it says
 7   "Teva Pharmaceutical Industries Ltd."?
 8             MS. HILLYER:  Objection.  Beyond
 9   the scope.
10             THE WITNESS:  I -- I haven't been
11   to the site for a while.  So I don't know.
12        Q.   BY MR. CRAWFORD:  Okay.  You said
13   he's -- he's with USA.
14             But he's Senior Vice President and
15   CFO of North America; correct?
16        A.   Yes.
17        Q.   And that includes responsibility for
18   Canada as well; right?
19        A.   That includes oversight of Canada.
20        Q.   And he's based in Philadelphia; correct?
21             MS. HILLYER:  Objection.  Beyond the
22   scope.
23             THE WITNESS:  Yes.  I think he's now
24   based in Parsippany or in --
25        Q.   BY MR. CRAWFORD:  Is he also an officer
```

```
 1   at TPI?

 2        A.   No.

 3        Q.   Does he have any position with TPI?

 4        A.   No.

 5        Q.   Next is a Debra Barrett.

 6             MS. HILLYER:  Is this 30?

 7             MR. CRAWFORD:  Yeah, 30.

 8        Q.   BY MR. CRAWFORD:  That's a LinkedIn

 9   page for her.

10             She is -- well, she's now not with

11   Teva anymore; correct?

12        A.   Yeah.

13        Q.   Do you know Ms. Barrett?

14        A.   Yes.

15        Q.   Okay.  And she indicates she was at

16   Teva Pharmaceuticals, Senior Vice President,

17   Global Government Affairs and Public Policy,

18   from January 2006 to March 2018; correct?

19             MS. HILLYER:  Object -- sorry.

20             Objection to form.

21             You're asking if her LinkedIn profile

22   is correct?

23        Q.   BY MR. CRAWFORD:  Well, she had that

24   position; is that correct?

25             MS. HILLYER:  So same objection.  You
```

```
 1    said "Teva Pharmaceuticals."

 2              THE WITNESS:  Ms. Barrett was a Teva

 3    USA employee that served in a global role, meaning

 4    she was providing the government affairs services

 5    to the entire Teva group of companies.  And the

 6    group of companies -- the various companies that

 7    benefited from that service paid for Teva -- paid

 8    Teva USA for that cost.

 9       Q.   BY MR. CRAWFORD:  And so she's kind

10    of like in your position and Mr. Stark's position

11    in that she has global responsibilities for this

12    area except for the fact that she is not a TPI

13    officer but just a Teva USA officer; correct?

14              MS. HILLYER:  Objection to form.

15              THE WITNESS:  Not exactly.

16       Q.   BY MR. CRAWFORD:  Okay.  What's --

17    what's different between her position and your

18    position other than the employer?

19              MS. HILLYER:  Objection to form.

20              THE WITNESS:  If we didn't have --

21    if the Teva group could not gain access

22    to Ms. Barrett's services in global -- in

23    government affairs, we would need to go out

24    and hire a third-party government affairs

25    person to do the lobbying and the work that
```

```
 1    she has done.  This is why TPI and other group

 2    companies paid Teva USA for that service.  She

 3    was a Teva USA employee but was benefiting other

 4    entities.  And, therefore, the other entities

 5    paid for it.

 6            My role, I ensure compliance of the

 7    subsidiaries.  Because, if a subsidiary is not

 8    compliant with its tax require -- local tax laws,

 9    it has financial and potential other consequences

10    to the subsidiary but also harms -- could harm

11    the goodwill and good standing of TPI and of

12    the group at a -- at large.  And, therefore,

13    the benefit is -- therefore, my cost is not

14    billed to the various subsidiaries.  Whereas,

15    she provides a very distinct service.  We have

16    many people like that.

17        Q.   BY MR. CRAWFORD:  But do people report

18    to her --

19        A.   Yes.

20        Q.   -- from the other entities that have

21    government affairs people?

22            Right?

23        A.   Yes.

24        Q.   And -- okay.  And then is she head

25    of the -- who's head of the Teva USA government
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   public affairs department?

 2          MS. HILLYER:  Objection to the extent

 3   that's beyond the scope.

 4      Q.   BY MR. CRAWFORD:  Is she also --

 5      A.   I don't know.

 6      Q.   -- the head of that?

 7          Okay.  What -- what is her job

 8   responsibilities in this position?

 9      A.   What were?

10      Q.   Yeah.  What are her responsibilities?

11          MS. HILLYER:  Objection to the extent

12   that's beyond the scope.

13          THE WITNESS:  She was responsible for

14   our global -- or government affairs activities

15   around the world, in the US.  But also she had

16   a team in the US.  But we have other teams in

17   other places where we correspond with government

18   on issues related to our business.

19      Q.   BY MR. CRAWFORD:  Does that include

20   lobbying?

21      A.   Yes, that includes lobbying.  Included.

22   I don't know today what we ...

23      Q.   Okay.  Well, let's turn to the next

24   exhibit, which is 31.  And this is a PowerPoint

25   called:
```

```
 1                "US Government Affairs Strategic

 2     Planning."

 3                It's presented by Shannon Dzubin,

 4     Senior Director Public Policy North America.

 5                So she -- is she basically, Ms. Dzubin,

 6     in charge of the North American public policy?

 7                MS. HILLYER:  Can you read that back?

 8                MR. CRAWFORD:  Okay.

 9                MS. HILLYER:  Or read it -- say that

10     again.

11                MR. CRAWFORD:  It's just identifying

12     the document.

13                MS. HILLYER:  Okay.

14                MR. CRAWFORD:  "US Government Affairs

15     Strategic Planning" is a PowerPoint by Shannon

16     Dzubin, D-z-u-b-i-n.

17                MS. HILLYER:  Okay.  You're just saying

18     what it is.  Sorry.  Go ahead.

19          Q.   BY MR. CRAWFORD:  Okay.  So she's Senior

20     Director of Public Policy North America; correct?

21                MS. HILLYER:  Objection to the extent

22     that's beyond the scope.

23                THE WITNESS:  That's what it says here.

24     I don't know her personally.

25          Q.   BY MR. CRAWFORD:  You don't.  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So if we could go to -- let's see here.
 2    So go to page 2, if you can.
 3         A.   Two?
 4         Q.   Yeah.  So this is -- it looks like
 5    an org chart with Ms. Barrett on top.
 6              Right?
 7              MS. HILLYER:  This is Bates label
 8    477?  Okay.
 9              MR. CRAWFORD:  Yeah.
10         Q.   BY MR. CRAWFORD:  So she has reporting
11    to her a North American team, a growth markets
12    team, a European team, and a global public
13    policy team; correct?
14              MS. HILLYER:  Objection to the extent
15    it's beyond the scope and there's no foundation
16    for this document.
17              THE WITNESS:  That's what it says here.
18         Q.   BY MR. CRAWFORD:  All right.  And page
19    3, it looks like a local execution.
20              Does that mean by the four groups
21    underneath her?
22              MS. HILLYER:  Same objection.  It's
23    beyond the scope.  There's nothing about lobbying
24    in any of your topics, or government affairs, for
25    that matter.  And to form.  No -- no foundation
```

```
 1   for this document.

 2            THE WITNESS:  This is what it says.

 3   I am not familiar with the details of how global

 4   government affairs are -- were organized or are

 5   organized now.  But I would say that this is not

 6   different than how our professional functions like

 7   tax are organized.  Local execution, coordination

 8   from the top, and oversight from the global level.

 9       Q.   BY MR. CRAWFORD:  Thank you.  And then

10   page 4 references:

11            "GPC Members."

12            What's GPC?

13       A.   I don't know.

14            MS. HILLYER:  Same objections.

15            MR. CRAWFORD:  All right.  Let's go

16   to the next document.  Actually, let's go to

17   this one.  Let's go to --

18            MS. HILLYER:  Did you say 33 or 30 --

19   32?

20            MR. CRAWFORD:  Is it 32?  I'm sorry.

21            (Exhibit 32 marked.)

22       Q.   BY MR. CRAWFORD:  Okay.  We marked

23   here -- first page is an excerpt from a 2012

24   Form 20-F for Teva Pharmaceutical Industries

25   Ltd.  I want to look at the second document
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    here attached to it.  It's the next page,

 2    Teva_MDL_JD_000839:

 3              "Segment Reporting Memorandum Q1

 4    2018."

 5              MS. HILLYER:  Sorry.  Just to clarify

 6    for the record, Mark, there's no -- did you put

 7    two documents together that --

 8              MR. CRAWFORD:  Yes.

 9              MS. HILLYER:  The first one doesn't

10    have a Bates, but the rest do.  So I'm --

11              MR. CRAWFORD:  Right.

12              MS. HILLYER:  I just want to make sure.

13              MR. CRAWFORD:  That's right.  It was --

14    it was excerpts from several.  And I'm just going

15    to pay attention to the second document here.  So --

16              MS. HILLYER:  Okay.  So objection to the

17    extent that you're taking documents potentially

18    out of context.  I'm not sure I'm following what

19    you did.  But go ahead.

20              And the highlighting is yours?

21              MR. CRAWFORD:  That's our highlighting.

22    Yes.

23         Q.   BY MR. CRAWFORD:  So this is -- can

24    you tell me what this memorandum is?

25         A.   (Examining.)  That is our manual on
```

```
1    how we report, for financial reporting purposes,

2    our segments -- our business segments.

3         Q.   All right.  And if you look at -- on

4    the top right corner, we inserted page numbers

5    here.  That's our numbers.

6              MS. HILLYER:  That's why I was confused.

7    Okay.

8              MR. CRAWFORD:  It's not on the document.

9    It's just simply a way to reference the document.

10   So --

11             MS. HILLYER:  And the last page is also

12   not -- is a separate document.

13             MR. CRAWFORD:  Right.  Just rather than

14   killing trees and having 200-page documents for

15   one --

16             MS. HILLYER:  Okay.

17             MR. CRAWFORD:  -- little thing, we

18   took excerpts, and we tried to shortcut it here.

19   That's what this is.

20        Q.   BY MR. CRAWFORD:  So I'm going to come

21   back to this.  But I want to pay attention right

22   now to page 4.

23             MS. HILLYER:  The last two pages.

24        Q.   BY MR. CRAWFORD:  If you look at paragraph

25   2, it says:
```

```
 1              "Determination of Teva's Chief ...

 2   Decision Maker ('CODM')."  (As read.)

 3              Do you see that?

 4       A.   Uh-huh.

 5       Q.   Okay.  All right.  And then below that

 6   in 3 it says:

 7              "In November 2017, Teva announced

 8   the new organizational structure which will

 9   be effective immediately, but will affect

10   Teva financial reporting starting Q1, 2018."

11              What was the new organizational

12   structure that was announced?

13       A.    We have, I should say, re-aligned.

14   Because this is not the first -- we -- Teva's

15   management -- Teva group's management structure

16   has changed several times over the course of

17   my 13 and a half years in Teva.  We have moved

18   back and forth from a more regional view to a

19   more global view and then back into regional.

20              Since 2017, we are back in regional

21   overview.  And, therefore, our segmentation

22   for accounting purposes has changed.  The new --

23   the segments that we were referring to earlier

24   in the -- in the financial statements, North

25   America, Europe, and international markets,
```

Highly Confidential - Subject to Further Confidentiality Review

 1    are relatively recent, I think, from 2017,

 2    perhaps 2018 only.

 3         Q.   All right.  So is it now moved more

 4    towards a global view?

 5         A.   No.  It's now moved more to a regional

 6    view.

 7         Q.   And what does that mean?

 8         A.   It means that the decision maker in

 9    a stronger way is now the leader of the region.

10    The CEO of the Teva group, CEO of TPI, obviously,

11    oversees everything.  But the emphasis has moved.

12    And I should say moved back because we were there

13    before -- I don't know -- something like 2012,

14    '13, where we moved to a more globalized structure

15    and then we moved back in terms of how we managed

16    the business.

17         Q.   Okay.  Is this Mr. Kare Schultz that

18    was the CEO who implemented this new structure?

19         A.   Yes.

20         Q.   And it does say what we read first:

21              "Determination of Teva's Chief Operating

22    Decision Maker."

23              That is Mr. Schultz; correct?  He is

24    the CODM?

25         A.   I believe he is.  It's an accounting

Highly Confidential - Subject to Further Confidentiality Review

```
 1    definition.  It's not anything else.  It's an

 2    accounting definition of what is the CODM.

 3         Q.   All right.  And the second paragraph

 4    of -- of No. 3, it says:

 5              "The business will continue to be

 6    managed and orchestrated by Teva's CEO."

 7              That's Mr. Schultz; right?

 8         A.   Yes.

 9         Q.   And he's the CEO of TPI; correct?

10         A.   Yes.

11         Q.   So he's managing and orchestrating

12    all the Teva entities globally; correct?

13              MS. HILLYER:  Objection to form.

14              THE WITNESS:  He is managing and --

15    well, the document shows the word "orchestrating."

16    But he's definitely the manager of the Teva group

17    of companies, so TPI.

18         Q.   BY MR. CRAWFORD:  And he -- according

19    to this paragraph, he:

20              "Regularly reviews its results, is

21    directly involved in assessing performance and

22    making decisions on overall resource allocation,

23    and ultimately responsible for the allocation

24    of resources."

25              Is that an accurate statement?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Yes.

2             MS. HILLYER:  Objection to form.

3       Q.    BY MR. CRAWFORD:  So that's Mr. Schultz

4    who's performing all of those functions; right?

5             MS. HILLYER:  Objection to form.

6             THE WITNESS:  Yes, at the granularity

7    that fits the size of the business.

8       Q.    BY MR. CRAWFORD:  And then paragraph 3

9    [sic] says:

10            "The company's Chief Executive Officer" --

11            That would be Mr. Schultz; correct?

12      A.    Yes.

13      Q.    (Reading.)

14            -- "was identified as the CODM."

15            So he is the CODM; right?

16      A.    Yes.

17      Q.    Okay.  And he still is?

18            MS. HILLYER:  Objection to the extent

19   it's beyond the scope.

20      Q.    BY MR. CRAWFORD:  Do you want me to

21   repeat the question?

22            He still is the CODM?

23      A.    Yes.

24      Q.    Okay.  And "CODM" being the Chief

25   Operating Decision Maker, that's Mr. Schultz;

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2              MS. HILLYER:  Objection to form.

3              THE WITNESS:  That's the definition.

4        Q.   BY MR. CRAWFORD:  And then go down

5    to 5.2.  It says:

6              "The operating results of the component

7    are regularly reviewed by the entity's CODM to

8    assess the performance of the individual component

9    and make decisions about resources to be allocated"

10   that -- "to that component."  (As read.)

11             Under this system, that's Mr. Schultz;

12   right?

13             MS. HILLYER:  Objection to form.

14             THE WITNESS:  Yes.

15       Q.   BY MR. CRAWFORD:  Okay.  And who gave

16   him this power?

17             MS. HILLYER:  Objection to form and

18   to the extent it's beyond the scope.

19       Q.   BY MR. CRAWFORD:  Was it the board

20   of directors?

21       A.   Yes.

22       Q.   Okay.  If you could look at page 7,

23   up at the top right.

24             MS. HILLYER:  So, Mark, to clarify,

25   you -- the first page is not the first page

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of this document.

 2              MR. CRAWFORD:  Right.  We strung

 3    together --

 4              MS. HILLYER:  Okay.

 5              MR. CRAWFORD:  -- three documents,

 6    two with excerpts.

 7              MS. HILLYER:  Okay.  So I'm just

 8    going to make a -- well, actually, it's four.

 9    Because the last two pages are two different

10    documents.

11              MR. CRAWFORD:  Sure.

12              MS. HILLYER:  So one, two, three,

13    four, it seems at least.  So I'm going to

14    object to the extent any of this is taken

15    out of context out of the full document that

16    the witness doesn't have a chance to review.

17              MR. CRAWFORD:  Okay.

18              MR. CARTMELL:  We can, if you want,

19    give you the opportunity to provide you with

20    all the complete documents of each and then --

21    and then supplement the record with them if you

22    think it's necessary or not.

23              MS. HILLYER:  It's not so much the

24    record.  But, I mean, you're asking him about,

25    you know, a line here, a line there.  He hasn't
```

Highly Confidential - Subject to Further Confidentiality Review

1    had a chance -- he doesn't have the full document.

2    He doesn't know what it is.  I don't even know

3    what it is.  I don't even have a cover page of

4    what we're reading from.  So I just want to put

5    that objection on the record.

6            MR. CRAWFORD:  All right.  But right

7    now we're just looking at the Segment Reporting

8    Memorandum.  It's a full copy and he recognized

9    it.

10        Q.   BY MR. CRAWFORD:  Correct, Mr. Herman?

11           MS. HILLYER:  I -- I don't think you

12   established that.

13        Q.   BY MR. CRAWFORD:  Okay.  Is this a

14   complete copy of the memorandum?

15        A.   No, that's not -- it's part of the

16   memorandum.  Yeah, it appears to be --

17        Q.   All right.

18        A.   -- a complete copy of the Segment

19   Reporting Memorandum.

20        Q.   Actually, turn to page 8, please.

21   If you look at -- I'm sorry.  Go on back to

22   page 7.  It says in the second paragraph under

23   identity -- "Identify the CODM":

24           "The company's Chief Executive Officer

25   was identified as the CODM."

Highly Confidential - Subject to Further Confidentiality Review

```
1              Correct?

2        A.   Yes.

3        Q.   That's Mr. Schultz; correct?

4        A.   Yes.

5        Q.   It says:

6              "Starting Q1 2018, the CODM will

7    review the financial information based on

8    the new organizational structure described

9    above."

10             Is that the current process?

11       A.   Yes.

12       Q.   Okay.  And then at the bottom, it

13   says -- the last four words or five words:

14             "Comparison of the actual results"

15   versus "the LBE and AOP and additional key

16   issues such as an update on the progress

17   of the restructuring plan in the segment."

18   (As read.)

19             Is that what Mr. Schultz reviews

20   as well?

21       A.   Yes.

22       Q.   Okay.  And then he also reviews

23   the flash report and daily revenues; correct?

24       A.   Of the segments, yes.

25       Q.   And then right above 2, it says:
```

```
 1                "Decisions about Teva's overall
 2   resource allocation are made by the CODM
 3   based on the above information.  Certain
 4   decisions may be made at lower management
 5   levels (such as vice presidents, regional
 6   CEOs, et cetera) where more detailed
 7   disaggregated information is reviewed.
 8   However, the CODM is involved in assessing
 9   performance and making decisions on overall
10   resource allocation."
11                Is that a correct --
12        A.   That's a correct --
13        Q.   -- statement?
14                Okay.  So when you were saying it's
15   more regional, did you mean that -- that these
16   more granular functions are looked at by lower
17   management?
18        A.   Yes.
19        Q.   But overall responsibility or --
20   or -- or decision-making is done by Mr. Schultz;
21   correct?
22                MS. HILLYER:  Objection to form.
23                THE WITNESS:  The overall resource
24   allocation is controlled by the CODM, by the --
25   by the CEO.
```

1        Q.   BY MR. CRAWFORD:  And then below that

2   is -- is a chart that shows the basic reporting

3   structure up to Mr. Schultz; correct?

4        A.   Yes.

5        Q.   And then below that, it talks about

6   defining an operating segment as a component

7   of a public entity.

8             What's an operating segment?

9        A.   It's an accounting term.  And it's

10  defined earlier in the document, what needs

11  to be -- what needs to exist in order for a

12  segment to be broken from the consolidated

13  numbers.  Yeah, it's in the Executive Summary

14  in No. 5.  You can see a high-level description

15  of what it takes a business to become a segment

16  that is reported separately from the rest.

17            MR. CRAWFORD:  I'm going to mark

18  Exhibit 33.  And I just want to ask a brief

19  question about this.

20            (Exhibit 33 marked.)

21        Q.   BY MR. CRAWFORD:  I'll hand it to you.

22  But this is the board of directors for Teva Ltd.,

23  I believe, taken from the website.  I just want

24  you to confirm that.

25            Is that the current board?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   (Examining.)

2           MS. HILLYER:  This is 33?

3           MR. CRAWFORD:  Yeah.

4           THE WITNESS:  I believe it is.

5      Q.   BY MR. CRAWFORD:  And we're going to

6   look at 34 just very briefly.

7      A.   Just to verify, because I do have the

8   current names, make sure that the website matches

9   what I know, the subsidiaries.  Okay.  So I'll

10   just count them.  One, two, three, four, five,

11   six, seven, eight, nine, ten, eleven.

12           Yeah.  Yes, it appears to be the

13   current -- the updated current board.

14           MR. CRAWFORD:  All right.  I'm going

15   to mark the next one.

16           (Exhibit 34 marked.)

17      Q.   BY MR. CRAWFORD:  This is also taken

18   from the website.  It's the committees of the

19   board.  And this lists the Audit Committee, the

20   Human Resources and Compensation Committee, the

21   Corporate Governance and Nominating Committee,

22   the Finance and Investment Committee, Compliance

23   Committee, Science and Technology Committee.

24           Are these all committees of the board?

25      A.   Let me verify.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   All right.

 2          A.   (Examining.)  Yeah.  This appears

 3     to be the current -- an accurate list of the

 4     current committees of the board.

 5          Q.   Okay.  And you were reviewing one

 6     of your documents; right?

 7          A.   Yes.

 8          Q.   And what's the title of the document?

 9          A.   It's the Teva board membership.  It

10     has the board members, their years of service,

11     and what committees they served on.

12          Q.   Okay.  So if we looked at that document

13     which we have here, that would pretty much account

14     for all the -- all the committees that -- that

15     the board has?

16          A.   Yes, even more than what's current.

17     This is the -- Exhibit 34 is the current --

18     the current committees.  And there are some

19     that dis -- that were discontinued.  So they're

20     here in my document but not in this document.

21          Q.   Great.  Thank you.

22          MR. CRAWFORD:  I'm kind of at a natural

23     breaking point.  So can we take a lunch break

24     now?

25          MS. HILLYER:  Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE VIDEOGRAPHER:  The time -- the

 2    time is 12:04 p.m.  We are now off the record.

 3                (Recess from 12:04 p.m. to 1:11 p.m.)

 4                THE VIDEOGRAPHER:  The time is 1:11 p.m.

 5    We are now on the record.

 6                (Exhibit 35 and Exhibit 36 marked.)

 7                MR. CRAWFORD:  Okay.  It's after the

 8    lunch break.  And we've marked the materials

 9    that Mr. Herman brought with him.

10        Q.   BY MR. CRAWFORD:  And Exhibit 35,

11    if you could pull that out.  That is the Teva

12    Pharmaceutical corp -- TPM corporate histories.

13    I think you've already talked about that.  So

14    we've marked that as 35.

15                This is the document you brought with

16    you; right?

17        A.   Yes.

18        Q.   And then 36 is:

19                "Summary of Certain Teva Subsidiaries

20    (Active as of April 2019)."

21                You brought this document with you;

22    correct?

23        A.   Yes.

24        Q.   And what is this document?

25        A.   It's a list of main Teva subsidiaries
```

```
 1    in the Teva group as of April 2019 and their

 2    primary activities.

 3         Q.   What does that mean by "primary

 4    activities"?

 5         A.   The primary business endeavors they

 6    are engaged in.  Some of them are commercial.

 7    Some of them are manufacturing or any combination.

 8    Financial, marketing.  Some of them are simply

 9    holding companies with no other business.

10         Q.   All right.  And then if you scroll

11    on, there's:

12              "Teva Board Membership."

13              Or:

14              "Teva Board Membership."

15              These are the board members for the

16    years indicated; correct?

17         A.   Yes.

18         Q.   And then it lists their committees;

19    correct?

20         A.   And the committees they serve on.

21    Yes.

22         Q.   And the years; right?

23         A.   (Witness nods head in the affirmative.)

24         Q.   The years too?

25         A.   And -- and the years they served on
```

Highly Confidential - Subject to Further Confidentiality Review

1    these committees.

2         Q.   Right.  And then it says:

3              "Teva Board Ad Hoc Committees."

4              What are ad hoc committees?

5         A.   The board has permanent committees.

6    They change -- they may change a little bit

7    over time, but permanent committees that meet

8    regularly.  And then the board forms ad hoc

9    committees for specific issues or topics that

10   need to be addressed.

11        Q.   Is there an ad hoc committee for

12   opioid-related issues?  Was there ever one?

13             MS. HILLYER:  Sorry.

14             THE WITNESS:  Not that I know of.

15        Q.   BY MR. CRAWFORD:  All right.  Then

16   scrolling along, it says:

17             "Produced Global Policies."

18             What is this chart?

19        A.   On certain things, TPI, as the global

20   parent of the group, issues global policies that

21   it requires its subsidiaries to adhere to.  And

22   this is a list of the global policies that we

23   produced.

24        Q.   And who prepares these and -- and

25   requires them?  Is it the board or the officers

1    of Teva -- Teva Ltd.?

2            MS. HILLYER:  Objection to form and

3    to the extent it's beyond the scope.

4            THE WITNESS:  It varies depending on

5    the topic, usually prepared by the professional

6    function that is responsible for the subject

7    matter.

8        Q.   BY MR. CRAWFORD:  And by "professional

9    function," you mean function at Teva or TPI or

10   global?

11       A.   Function at the global.  So compliance

12   would be responsible for compliance policies.

13       Q.   Right.  If there's a tax policy --

14   I'm not saying there is -- you'd be --

15       A.   Yes.

16       Q.   -- in charge of that?

17            Okay.  And then the year's there.

18            Is this the year it went into effect?

19   Or what -- what does that mean?  Or date?

20       A.   It's -- I believe it's the most recent

21   version of the policy.  They do get updated.

22       Q.   And this is the -- these are current

23   policies in effect right now?

24       A.   Yes.

25       Q.   And these are applicable to the US

```
 1   subs as well; correct?

 2        A.   These are -- these are -- yes, to the

 3   US subs as any other subs.

 4        Q.   And globally; correct?

 5        A.   "Globally" meaning all subsidiaries

 6   of --

 7        Q.   Right.

 8        A.   -- TPI.

 9        Q.   Then the next page is:

10             "Teva Global Operations Departments."

11             What are these?

12        A.   As part of our organizational structure,

13   our global operations are overseen in a centralized

14   global manner.  So Carlo de Notaristefani, who

15   is global head of Global Operations, TGO, Teva

16   Global Operations, sees the global picture.  He

17   has reporting to him regional managers that oversee

18   the more daily work of the operating sites, the

19   manufacturing sites in the regions.  And these

20   are five centers of excellence, centers of topical

21   knowledge that -- that operate as a service to

22   the manufacturing sites.

23        Q.   By "manufacturing sites," you mean --

24   what do you mean by that?

25        A.   Plants that manufacture our -- the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Teva products.
 2         Q.   So this is just for manufacturer
 3    sites?  Or does it apply to kind of the regional
 4    headquarters?
 5              MS. HILLYER:  Objection to form.
 6              THE WITNESS:  This is -- these are
 7    centers of excellence that relate to our
 8    manufacturing.
 9         Q.   BY MR. CRAWFORD:  And would this --
10    these centers supply services to the various
11    subsidiaries?
12              Is that correct?
13         A.   Yes.
14         Q.   And that would include the US subs;
15    right?
16         A.   That includes the US subs.  Yes.
17         Q.   And Global Supply Chain, where is
18    that based out of?
19         A.   The present head of Global Supply
20    Chain sits in the US --
21         Q.   And who is that?
22         A.   -- is a TUSA employee.
23              MS. HILLYER:  Objection to the extent
24    it's beyond the scope.
25              THE WITNESS:  His name is Dan Huey,
```

Highly Confidential - Subject to Further Confidentiality Review

1    H-u-e-y.

2        Q.   BY MR. CRAWFORD:  And who employs him?

3        A.   He's an employee of Teva USA.

4        Q.   How about Global Procurement, who heads

5    that?  And where is that based?

6        A.   Global Procurement is led by Natasha

7    Vidmar, V-i-d-m-a-r.

8             She resides in the Netherlands and is

9    employed by Teva -- Teva BV -- Teva Pharmaceutical

10   Europe BV.

11       Q.   And what is Global Supply Chain?  What

12   is that?  What do you call them?  Functions or --

13   or services?  What do you call them?

14       A.   Global Supply Chain oversees the

15   flow of products from raw materials to active

16   pharmaceutical ingredients.  Teva is vertically

17   integrated.  We manufacture our own -- not all

18   of our raw materials.  But some of our raw materials

19   we manufacture in-house.  This is what we referred

20   to earlier as Teva API or companies that make API.

21             Supply Chain is responsible for the flow

22   of raw materials to API, API to the manufacturers

23   that manufacture finished goods, and then from

24   the manufacturers to the markets.

25       Q.   And that global supply is run out of

Highly Confidential - Subject to Further Confidentiality Review

```
1    the US on a global basis; correct?

2         A.   The global oversight is in the U --

3    currently resides in the US.  The formal --

4    the former head of Global Supply Chain was

5    based in Switzerland.  They don't -- they --

6    they have only -- let's put it this way.

7              They're not engaged in the US business

8    on a daily basis.  They have a global role.  They

9    oversee the entire -- the group picture.  They

10   have a regional manager for the Americas.  They

11   have a regional manager for Europe, et cetera.

12   So they're structured just as every other

13   professional unit that we've been discussing.

14        Q.   "They" meaning the global one?

15        A.   The Global Supply Chain.

16        Q.   Okay.  And then the -- the kind of

17   local ones or regional ones, do they -- do they

18   get direction from the Global Supply Chain?

19   Or do they get services?  What are they getting

20   from them?

21        A.   They get -- professionally, they are

22   reporting to them, to the -- to the structure

23   that is Global Supply Chain.  So the regional

24   supply chain leader for the Americas reports

25   to the Global Supply Chain manager.
```

1    Q.   And regional, the Americas, that's

2  US and Canada; right?

3    A.   Yes.

4    Q.   Global Procurement, you mentioned

5  that was run by someone out of the Netherlands;

6  right?

7    A.   Yes.

8    Q.   And what is Global Procurement?

9    A.   The organization of Procurement handles

10  the procurement of materials and services from

11  third parties.

12        The -- the economic idea behind Global

13  Procurement is that an organization oversees all

14  of the procurements done by the various companies.

15  And so that, if there's one supplier that supplies

16  three or four different Teva companies, we can

17  combine forces and negotiate together a better

18  price.

19    Q.   And then Environmental, Health & Safety,

20  does that pertain to internal issues?

21        MS. HILLYER:  Objection to form.

22        THE WITNESS:  EHS provides advisory

23  services on these topics to the manufacturing

24  sites.

25    Q.   BY MR. CRAWFORD:  And is it -- what

1    does the safety pertain to?

2        A.    Taking safety measures to reduce the

3    potential for damage to the employees --

4        Q.    Right.

5        A.    -- and similar stuff.  I'm not an expert

6    on safety.

7        Q.    And who runs it and where is it based

8    out of?

9        A.    EHS is run by Peter Tachner,

10   T-a-c-h-n-e-r.  I'm trying to remember where

11   he's based.  I'm not sure.  He may be based

12   in Europe.

13       Q.    All right.  And then Strategy, OPEX,

14   and MS & T, what's that?

15       A.    I don't recall what MS & T is.

16            OPEX is a method by which manufacturing

17   sites reviews its operations, its processes, and

18   improves them to get more efficient and more

19   effective.  The methodology is these people --

20   the OPEX people come to the sites -- to the

21   local sites and help the sites run through

22   that methodology in order to improve their

23   operations -- the local sites' operations.

24       Q.    So OPEX has a staff, a global staff

25   that will work globally to help the regional

```
1   entities?

2       A.   It has --

3            MS. HILLYER:  Objection to form.

4            THE WITNESS:  There are OPEX people

5   in -- that help the regions.  Yes.

6       Q.   BY MR. CRAWFORD:  Okay.  And each of

7   these departments have a staff that can fulfill

8   the functions; right?

9       A.   Each --

10           MS. HILLYER:  Objection to form.

11           THE WITNESS:  Each of these departments

12  have a staff that can fulfill.  Yes.

13      Q.   BY MR. CRAWFORD:  And is the staff

14  generally located where the head of it is?  Or

15  are they all over the world?

16      A.   They are all over the world.  It depends

17  on proficiency and talent and --

18      Q.   And -- and they could work for any number

19  of Teva subsidiaries, not just one; right?

20      A.   They are working -- they are involved

21  with all of the subsidiaries that are involved

22  in manufacturing.  And the subsidiaries pay for

23  these services.

24      Q.   "Global Quality," what's that?

25      A.   Global Quality is the organization
```

Highly Confidential - Subject to Further Confidentiality Review

1  that sets the standards on how manufacturing

2  sites do quality tests, quality checks, et cetera.

3  So it sets standards.  It sets procedures that

4  then the local -- the local manufacturing sites

5  exercise, do in order to ensure that Teva has --

6  as a group, has the highest standards of quality

7  that are required in the industry.

8      Q.  And who's heading that up and where?

9      A.  Eric Drape.  Eric Drape.  He's in Europe.

10 Whether France or the Netherlands escapes me,

11 but he's in Europe --

12     Q.  Okay.

13     A.  -- based in Europe.

14     Q.  And then the next page, "Historic TEC

15 Committees" -- what's TEC again?

16     A.  TEC.

17     Q.  What is that?

18     A.  TEC is Teva Executive Committee.  This

19 is the same body as executive management or the

20 Teva officers that we were looking -- the pictures

21 that we saw earlier.

22     Q.  Okay.  So that's -- the pictures from

23 the website, that's the Executive Committee,

24 those officers?

25     A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   All right.  Who selects the committee

 2  members?

 3           MS. HILLYER:  Objection to the extent

 4  that's beyond the scope.

 5           THE WITNESS:  I don't know how they

 6  manage internally their meetings.

 7      Q.   BY MR. CRAWFORD:  No.  But, I mean,

 8  who -- who appoints them to the Executive

 9  Committee?

10      A.   I don't know.  It's between them

11  in their meetings.

12      Q.   Okay.  Okay.  I'm trying to understand.

13           So there's an Executive Committee at

14  Teva; right?

15      A.   Yes.

16      Q.   And that committee right now are the

17  people from the website; right?

18      A.   Yes.

19      Q.   And then they have further committees

20  that they create?  Is that what this is?

21      A.   Yes.  They form themselves -- similar

22  to the board, they have topical, specific committees

23  that they form from time to time.

24      Q.   And -- and the board approves those

25  committees?
```

```
 1              MS. HILLYER:  Objection to the extent --

 2              THE WITNESS:  I'm not sure.

 3              MS. HILLYER:  -- it's beyond the scope.

 4       Q.   BY MR. CRAWFORD:  But they bring it to

 5   the board --

 6              MS. HILLYER:  Same.

 7       Q.   BY MR. CRAWFORD:  -- you said?

 8       A.   I don't know.  No, I said the board

 9   has similar --

10       Q.   Oh, I see.

11       A.   The board operates similarly with a

12   full board, but then topical, specific committees.

13       Q.   Okay.

14       A.   Okay.

15       Q.   My question wasn't going to how did

16   they come up with the sub-committees.

17              How -- how do they become a member

18   of the Executive Committee?

19       A.   Oh.  That's a very different question.

20       Q.   Yeah.

21       A.   They are appointed -- appointed by

22   the CEO, I believe.  Yeah.  They require board

23   approval, TPI board approval.

24       Q.   The CEO selects them and then gets

25   board approval of their selection?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah.

 2        Q.    So what are -- these committees are

 3   just ones that exist -- currently exist or exist

 4   only in the past?

 5        A.    These are committees that exist --

 6   that existed over the time of the relevant time

 7   period.  I don't know which of them currently

 8   exist.

 9        Q.    And these committees come up with --

10   I mean, what's the purpose of the committees,

11   the -- the TEC committees?

12             MS. HILLYER:  Objection to the extent

13   that's beyond the scope.

14             THE WITNESS:  If we take the Operations

15   Committee, then Operations Committee defines mid

16   and long-term global commercial priorities within

17   supply chain, manufacturing, and align R & D and

18   operations with the market -- with the markets

19   as to what -- what products we manufacture and

20   Teva, the group, will manufacture and sell.

21        Q.    BY MR. CRAWFORD:  So, ultimately, the

22   committees are working to effectuate policy and

23   procedures for the entire global operation?

24             MS. HILLYER:  Objection to form.

25             THE WITNESS:  Policy and procedures --
```

Highly Confidential - Subject to Further Confidentiality Review

 1    I'm not sure I would define it as such.  But being

 2    the top executive function of the group, the CEO

 3    and the TEC are the ones who determine within our --

 4    you know, it's very high-level decisions that's not

 5    granular in any way.  But they determine resource

 6    allocation and strategic direction.  It is then

 7    cascaded.  And mainly the markets take this very

 8    general direction and translate it into their

 9    business plans.

10        Q.   BY MR. CRAWFORD:  And so allocation

11    resources, that was, I think we read, ultimately

12    the -- in the abilities of the CEO of the company;

13    right?

14        A.   Yes.

15        Q.   Okay.

16             (Court reporter clarification.)

17             MR. CRAWFORD:  "Abilities."

18             (Exhibit 37 marked.)

19        Q.   BY MR. CRAWFORD:  Okay.  Let's go

20    to the next exhibit, 37.  This is the:

21             "Guidelines for Composition and

22    Governance of Subsidiary Boards."

23             Can you explain what these guidelines

24    are?

25        A.   (Examining.)  Yes.  As I mentioned,

1    Teva is a group of legal entities, more than

2    400 legal entities.  They are relatively

3    independent in their operations.

4              In order for the group to ensure that

5    they are operating within the parameters, they

6    are not breaching laws, they are not engaging

7    in activities that could be harmful to the

8    group and to TPI as the traded company, TPI

9    sets guidelines to who sits on the boards of

10   the subsidiaries and what type of transactions

11   need to be approved by the respective boards of

12   the subsidiaries and what decisions need to be

13   elevated up the chain to the holding companies

14   all the way up to the -- TPI, the ultimate parent.

15        Q.   So if you look at the composition of

16   boards, it looks like at least the first-tier

17   and second-tier boards must have a TEC member

18   on the board; right?

19        A.   Right.

20        Q.   So first tier would be, for example,

21   USA -- Teva USA would be a first-tier subsidiary;

22   correct?

23        A.   Yes.

24        Q.   And so they have to have at least one

25   Executive Committee member on their board; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   All right.  That's all I have on that

 3   one.

 4             MS. HILLYER:  And, Mark, just to clarify,

 5   we produced 37.  I'm going to try to get the Bates

 6   numbers.  We just didn't have it on this document.

 7             MR. CRAWFORD:  Okay.

 8             MR. MAIER:  I'll -- I'll find it.

 9             MS. HILLYER:  So just so you -- for

10   the record --

11             MR. CRAWFORD:  Thank you.

12             MS. HILLYER:  -- it's the same document.

13             (Exhibit 38 marked.)

14             MR. CRAWFORD:  And then Exhibit 37

15   [sic], these are just some more of the org

16   charts we've already --

17             MS. HILLYER:  38?

18             THE WITNESS:  38?

19             MR. CRAWFORD:  38.  Yeah.

20             THE WITNESS:  Yes.

21        Q.   BY MR. CRAWFORD:  And then if you look

22   at the 2019 -- April 17, 2019, is that the current

23   structure of TPI and its -- its family?

24        A.   (Examining.)  I believe there are

25   no material changes.  We do have companies in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    liquidation, companies in process of merging.

 2    So there may be minor changes.  But this is

 3    generally true.

 4            MR. CRAWFORD:  Mark the next exhibit,

 5    which would be 39.

 6            (Exhibit 39 marked.)

 7       Q.  BY MR. CRAWFORD:  Now, this might be

 8    up your alley.

 9            These are the ledgers that you said

10    you pulled together; is that right?

11            MR. CRAWFORD:  Sorry.

12            MS. HILLYER:  Okay.

13            THE WITNESS:  Thanks.  Yeah.  Okay.

14            MR. CRAWFORD:  Yeah.  Sorry about that.

15            Oh, wait.  Can you blow that up on the

16    screen?

17            MR. HONE:  Yeah.

18            MR. CRAWFORD:  Why don't you blow up

19    half of -- the left half.  You can look up here.

20            MS. HILLYER:  So this is 39?

21            MR. CRAWFORD:  Yeah.

22       Q.  BY MR. CRAWFORD:  So the first page is:

23            "Sample Page from GL File 6243."

24            I just want to understand what these

25    categories are and some -- have some questions
```

```
 1    about their -- further questions about them.

 2              Looks like the first category is --

 3              MS. HILLYER:  Sorry, Mark.  Before

 4    you go further, what is "GL File 6243"?  Is

 5    that your nomenclature or ours?

 6              MR. CRAWFORD:  That's on here.  Sorry.

 7              MS. HILLYER:  I know.  But was that on

 8    the document?

 9              MR. CRAWFORD:  Oh.

10              MS. HILLYER:  Is that, like, a file

11    name?  Is that a plaintiffs' file name?

12              MR. CRAWFORD:  That's a really good

13    question.  This must be a sample page.  That

14    must be our writing up there.  So ...

15              MS. HILLYER:  Because the next one

16    is a different file.

17              MR. CRAWFORD:  Yeah.

18              MS. HILLYER:  So I just don't know

19    if those are --

20              MR. CRAWFORD:  It probably was

21    pulled as an excerpt from one of the native

22    file spreadsheets to be a sample so we can

23    go through the categories here.

24              MS. HILLYER:  Okay.  So these are

25    excerpted from the documents we produced?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. CRAWFORD:  Right.  I think so.

2          MS. HILLYER:  Okay.  So just -- I'll

3    make an objection on the record, to the extent

4    it's not the full document, as to context.

5          MR. CRAWFORD:  Okay.

6          MS. HILLYER:  But go ahead.  And

7    they're two different documents in the exhibit.

8      Q.   BY MR. CRAWFORD:  Okay.  Under

9    "Description" there's a -- there's a date

10   and then "TBU."

11         What does that mean under "Description"?

12         MS. HILLYER:  Objection to the extent

13   it's beyond the scope.

14         THE WITNESS:  (Examining.)  Yeah.  I --

15   I'm not sure what "TBU" means.

16     Q.   BY MR. CRAWFORD:  So is that the date

17   range for the -- for the service for the invoice?

18         MS. HILLYER:  Same objection.

19         THE WITNESS:  I would expect it to be

20   since this is TUSA or T -- Teva Biopharmaceuticals

21   USA.  It doesn't say who's the payor.  But I think

22   we only produced TPI payables from the US.  So

23   I assume this is TPI owing various US companies

24   for various -- it's usually services.  We don't --

25   TPI does not buy from the US goods.  It only buys

```
1    services.  So this is probably services.

2         Q.   BY MR. CRAWFORD:  So TPI only buys

3    services from the subsidiaries?

4              Is that what you're saying?

5              MS. HILLYER:  Objection to form.

6              THE WITNESS:  No.

7         Q.   BY MR. CRAWFORD:  Okay.

8         A.   What I'm saying is, from Teva USA, TPI

9    does not buy goods, only services.

10        Q.   Okay.  So Teva USA only sells services

11   to TPI; is that right?

12        A.   Yes.

13        Q.   Did you produce ledgers showing money

14   flowing the other way, from TPI back to the --

15   the subs?

16        A.   This is actually money flowing -- this

17   is an obligation -- this page is an obligation

18   of TPI to US subsidiaries.

19        Q.   Okay.

20        A.   We did produce a file that shows the

21   other way around.  And --

22        Q.   Got it.

23        A.   -- there you will see mostly products.

24        Q.   Got it.  Okay.

25             The invoice date, if you look at that
```

1    column, is different from the accounting date

2    per line item.

3           Is there a reason for that?

4           MS. HILLYER:  Objection to the extent

5    it's beyond the scope.

6           THE WITNESS:  No.  I don't know what

7    this means, the dates.

8       Q.   BY MR. CRAWFORD:  Who is the person

9    that would be most knowledgeable in your company

10   about these ledgers and explaining them?

11      A.   These would be our accounting people,

12   either the Teva USA accounting people or TPI

13   accounting people.  These are the two sides

14   that book these entries.

15      Q.   Is there someone at Teva USA you can

16   think of that would know about these ledgers?

17      A.   These ledgers were produced from TPI

18   books.  And, therefore, if you need someone

19   to answer on these entries, you need a TPI

20   accountant.

21      Q.   Does Teva USA have its own ledgers

22   showing --

23      A.   Yes.

24      Q.   -- transactions?

25      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.

2    A.   They should show the exact -- the

3    reverse image of this.  So payable of TPI to

4    TUSA would be on TUSA's books as a receivable

5    from TPI and vice versa.  So they would show

6    the reverse image of these entries.

7    Q.   Are the two systems coordinated?

8    Are they -- they shared at all with regard

9    to the data in here?

10        MS. HILLYER:  Objection to form.

11        THE WITNESS:  They are coordinated

12   in a sense that -- they don't -- they're not

13   the same system, unfortunately.  It's very

14   difficult for us because they're even not in

15   the same operating system.  Okay.  That's not --

16   to get very technical, they're on different

17   instances of Oracle.  So the records cannot

18   be matched automatically.

19        But there's a process through which

20   every quarter and every year the accounting --

21   the accounting team in TPI ensures that what

22   they have on their books coordinates with what

23   the relevant subsidiaries have on their books

24   because we're obliged to keep full and accurate

25   books and records.  Each of our subsidiaries is

Highly Confidential - Subject to Further Confidentiality Review

1  required to do that.  So TUSA has their own.  We

2  have our own.

3       Q.   BY MR. CRAWFORD:  And then the last two

4  columns, "Liability Account" and "Charge Account,"

5  what are those numbers for these columns?

6            MS. HILLYER:  Objection to the extent

7  it's beyond the scope.

8            THE WITNESS:  These are the tagging

9  or the -- the coding of the exact accounts in

10  our P & L -- in our chart of accounts -- to

11  which these relate.

12       Q.   BY MR. CRAWFORD:  So the charge account

13  would be the account which charges that -- the --

14  that account for the service; right?

15            MS. HILLYER:  Objection to form.

16       Q.   BY MR. CRAWFORD:  So the money's taken

17  out of there, so to speak?

18       A.   It goes more to the -- what we call

19  P & L geography, the profit and loss report,

20  where -- in which line these entries should

21  show up.

22       Q.   Okay.  Is there a key or something

23  which will help us identify what these numbers

24  are that you're aware of?

25       A.   We can produce a key, our chart of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    accounts.  It's fairly long and detailed.  It's

 2    fairly long and detailed --

 3         Q.   Okay.

 4         A.   -- as you can see from the amount of

 5    numbers there.

 6         Q.   All right.  Let's go to the next page.

 7              So this is a bunch of -- again, a sample

 8    page that we extracted.  The customer name is Teva

 9    Pharmaceuticals USA Inc.

10              That's the entity that's purchasing the

11    services, so to speak?

12              MS. HILLYER:  Objection to form.

13              THE WITNESS:  That's the entity that's

14    purchasing what's in -- what these invoices or

15    journal entries relate to.  Some of it is products.

16    Some of it is services.

17              The description is -- some -- some --

18    some of the descriptions are more telling than

19    others.  So some of them would say "Copaxone,"

20    which is a product.  Some of them only accounting

21    people probably can understand.  Some of them say

22    "Insurance," as in TPI undertakes insurance for

23    the entire group of companies and then allocates

24    the cost of insurance to each legal entity.

25         Q.   BY MR. CRAWFORD:  What types of insurance
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    do they buy for the group?
 2            MS. HILLYER:  Objection to the extent
 3    it's beyond the scope.
 4            THE WITNESS:  I'm not sure about the
 5    full list, but directors and officers insurance,
 6    property insurance, product liability insurance.
 7    And then the premium is allocated and re-charged
 8    to the relevant entities based on several factors.
 9        Q.   BY MR. CRAWFORD:  Is there an insurance
10    department or group at TPI that performs this
11    function for the family?
12            MS. HILLYER:  Objection to the extent
13    it's beyond the scope.
14            THE WITNESS:  Yes.  There is a insurance
15    team that handles the insurance.
16        Q.   BY MR. CRAWFORD:  Who's head of that
17    right now?
18            MS. HILLYER:  Objection to the extent
19    it's beyond the scope.
20            THE WITNESS:  Limor Sagiv.
21        Q.   BY MR. CRAWFORD:  Where is he located?
22        A.   She's located in --
23        Q.   Oh.
24        A.   That's okay.  That's okay.
25        Q.   All right.
```

```
1        A.   She's located in -- in Israel.

2        Q.   Is she -- is she an employee of Teva

3   Ltd.?

4        A.   She's an employee of TPI.

5        Q.   And -- so just some of these categories --

6   five over from the left, "Customer_Class_CO DE" --

7   what does that mean?

8             MS. HILLYER:  Can you -- can you blow

9   that up?  Yeah.  And then, Doron, you can look

10  here.  (Indicating.)

11            THE WITNESS:  Yeah.

12            MS. HILLYER:  Objection to the extent

13  it's beyond the scope.

14            THE WITNESS:  Customer classification

15  code.  "IC" is "inter-company," as opposed to

16  third party.

17       Q.   BY MR. CRAWFORD:  And next one over,

18  "Invoice Date" -- "Description_First_Line," what

19  is that?

20            MS. HILLYER:  Same objection.

21            THE WITNESS:  What --

22       Q.   BY MR. CRAWFORD:  You have to move over --

23       A.   It's easier here.  Okay.

24       Q.   I'm going from left to right.

25            MS. HILLYER:  It's the American way.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CRAWFORD:  That's right.

 2              THE WITNESS:  Yeah.  The invoice that

 3   this journal entry documents may have a longer

 4   text in it.  The bookkeeper that puts the journal

 5   entry in only puts the first line of text.  So

 6   to the extent the invoice itself explains more

 7   about what this charge is about, you cannot see

 8   it from the journal entry.  The journal entry

 9   only has the first line.

10       Q.   BY MR. CRAWFORD:  How do you, then,

11   find out what the service was for if you were

12   going to try to look into this?

13              MS. HILLYER:  Objection to the extent

14   that's beyond the scope.

15              THE WITNESS:  To -- if you are an

16   accountant with Teva accounting, TPI accounting,

17   or TUSA accounting, the long list of numbers and

18   the account will tell you what type of service

19   this was, because this is how it's coded.

20              If you're unfamiliar with the 16-

21   or 20-digit coding, you will have to go to the

22   invoice.  The invoice will always explain what

23   are the services, if it's a service, what is

24   the period to which the invoice refers.  If it's

25   a product, then what products, what quantities,
```

```
 1    what dosages, et cetera.

 2         Q.   BY MR. CRAWFORD:  And is the number

 3    here in the column -- is it the last number like

 4    6005379, the first one?

 5              MS. HILLYER:  You can look on the screen

 6    too.

 7              THE WITNESS:  Yeah, I don't know what

 8    this refers to.

 9         Q.   BY MR. CRAWFORD:  But you just -- the

10    data is there somewhere where you can track down

11    that invoice?

12         A.   You can track the invoice --

13         Q.   That's the invoice number -- right? --

14    on the left?

15         A.   Where is the invoice number?

16         Q.   The second line to the left -- from

17    the left.

18         A.   The --

19              MS. HILLYER:  He --

20              THE WITNESS:  I don't know.  Could be.

21    I'm not sure.  The 6005379 could be the --

22         Q.   BY MR. CRAWFORD:  Okay.

23         A.   -- corresponding invoice number.  I'm

24    not sure.

25         Q.   Well, there's a column called "Invoice
```

Highly Confidential - Subject to Further Confidentiality Review

1    Number."  So it would probably be there.  It's

2    on the other side, I think, second from the left.

3              MS. HILLYER:  Objection to the extent

4    it's beyond the scope.

5              THE WITNESS:  Yeah.  That looks more

6    like an invoice number.

7         Q.   BY MR. CRAWFORD:  So if you wanted to

8    find out what this work was for, you would -- you

9    said the only way to do it is to go to the invoice

10   based on the invoice number?

11             MS. HILLYER:  Same objection.

12             THE WITNESS:  No.  If -- you can either

13   extract the invoice or ask -- consult the chart of

14   accounts to identify this long list of numbers at

15   the very -- it's not the very right-hand, but what

16   it -- Column 5 and 4 from the right -- no.  Sorry.

17   Sorry.  Sorry.

18             It's the revenue combination.  It's that

19   many, many-digit --

20        Q.   BY MR. CRAWFORD:  Oh, I see.

21        A.   -- in the column -- yeah.

22        Q.   "Revenue_Combination"?

23        A.   Yeah.  Revenue_Combination would tell

24   you, for someone familiar with the code -- I'm

25   only familiar with part of this -- parts of this --

```
 1    what the invoice is about.

 2         Q.   So you said there are a chart of accounts.

 3         A.   Yes.

 4         Q.   Is there some kind of a key or code

 5    that --

 6         A.   Exactly.  This would tell you what

 7    1200998 means.

 8         Q.   Yeah.  Okay.

 9         A.   Okay.  001 is TPI.  It's the entity

10    number.  05 is the business unit or the activity

11    type.  05 is our global headquarters activity.

12    And then zeros.  And then there's a specific

13    account that describes what this revenue is

14    about.

15         Q.   Okay.  And that's the next number,

16    the 1200998?

17         A.   Exactly.

18         Q.   And then on the last column, "Source,"

19    what does that mean?

20              MS. HILLYER:  Objection to the extent

21    it's beyond the scope.

22              THE WITNESS:  We -- we moved to Oracle

23    in 2007.  These invoices are pre-2007 and were

24    converted into Oracle.  So you have an invoice

25    number, but then you have another number from
```

Highly Confidential - Subject to Further Confidentiality Review

1   2007 of the conversion too.  And this just tells

2   you -- these are all automatic conversions that

3   were done when we moved to Oracle.

4           MR. CRAWFORD:  All right.  Let's go

5   to the next exhibit.  I'm trying to find my

6   outline in all this paper.  Sorry.

7           MS. HILLYER:  It's okay.

8           MR. CRAWFORD:  Yeah.  Actually, I had

9   markings on mine because I was trying to limit

10  the questions.  Let me find mine.  Can we take

11  a quick break while I find it?

12          MS. HILLYER:  Sure.

13          Before we go off, just the Exhibit 37

14  Bates number, TEVA_MDL_JD_00001244 through 1260.

15          MR. CRAWFORD:  Thank you.

16          THE VIDEOGRAPHER:  The time is 1:50 p.m.

17  We are now off the record.

18          (Recess from 1:50 p.m. to 1:59 p.m.)

19          THE VIDEOGRAPHER:  The time is 1:59 p.m.

20  We are back on the record.

21      Q.   BY MR. CRAWFORD:  All right.  I want

22  to shift courses here.  And I want to ask you if

23  you're familiar with the Teva trade receivables

24  securitization program?

25      A.   I'm generally familiar with the program.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And does that program apply to all the

2    Teva subs?

3              MS. HILLYER:  Objection to the extent

4    this is beyond the scope.

5              THE WITNESS:  It applies to the

6    subsidiaries that are in the program.  We're

7    gradually -- we have been expanding it gradually.

8    It's not immediately -- it was not made immediately,

9    effective date.

10    Q.   BY MR. CRAWFORD:  Does it apply to Teva

11    USA?

12              MS. HILLYER:  Objection to the extent

13    it's beyond the scope.

14              THE WITNESS:  I think -- I'm hesitating

15    because, over the course of the last few years,

16    there were discussions.  I believe not.  Not in

17    full at least.

18    Q.   BY MR. CRAWFORD:  But --

19    A.   Perhaps some of it.

20    Q.   -- parts of it.  Okay.

21    A.   Some of it.

22    Q.   Who would have the most knowledge about

23    that program and whether --

24    A.   Our head --

25              MS. HILLYER:  Let him finish.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   BY MR. CRAWFORD:  -- and whether it
 2   applies to Teva subs, including Teva USA?
 3        A.   Our head of treasury, Global Treasury.
 4        Q.   And who is that?
 5        A.   Tomer Amitai.
 6        Q.   And who at Teva USA would have the most
 7   knowledge about that?
 8             MS. HILLYER:  Objection to the extent
 9   it's beyond the scope.
10             THE WITNESS:  It's the Teva USA treasurer.
11   She is brand new to the position.  So I don't
12   recall her name.
13        Q.   BY MR. CRAWFORD:  And do you know if
14   the program applies to any US subsidiaries --
15             MS. HILLYER:  Objection --
16        Q.   BY MR. CRAWFORD:  -- currently?
17             MS. HILLYER:  Sorry.
18             Objection to the extent it's beyond
19   the scope.
20             THE WITNESS:  I'm not sure.
21        Q.   BY MR. CRAWFORD:  Do you know what the
22   name of the SPE is that's utilized for that program?
23             MS. HILLYER:  Same objection.
24             THE WITNESS:  I used to know.  It's
25   in Ireland.  It's an Irish company.  But it has
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    something with "nature" in the name because they

 2    translated "Teva," which in Hebrew means "nature."

 3    So it has "nature" in the name.

 4         Q.    BY MR. CRAWFORD:  Who would you ask

 5    to get that information?

 6         A.    Global Treasury would know, as well

 7    our legal department.

 8         Q.    All right.  And would you mind getting

 9    that information and conveying it to us through

10    your counsel?

11              MS. HILLYER:  No.  You can put a formal

12    request in through us.  I mean, he's not at --

13    he's not at liberty to say what we will or will

14    not produce.  And that's beyond the scope.

15              MR. CRAWFORD:  I'll put in a request.

16              MS. HILLYER:  Objection's on the record.

17              MR. CRAWFORD:  I'll put in a request.

18    Thank you.

19              MS. HILLYER:  Okay.

20         Q.    BY MR. CRAWFORD:  Who decides when and

21    which subsidiary's trade receivables will be sold

22    to BNP bank and then to the SPE controlled and

23    owned by Teva Ltd.?

24              MS. HILLYER:  Objection.

25              (Court reporter clarification.)
```

```
 1          Q.    BY MR. CRAWFORD:   BNP bank and then

 2     to the SPE controlled and owned by Teva Ltd.?

 3                MS. HILLYER:   Objection to form and

 4     to the extent it's beyond the scope.

 5                THE WITNESS:   The initiative is a

 6     global one.  Global Treasury manages the operation

 7     and the relationship with BNP.  The subsidiaries

 8     are offered to join to the extent that they have

 9     parameters to which subsidiaries are -- could

10     benefit from this.  And the subsidiaries generally

11     have chosen to join.  It gives them current cash

12     for what would otherwise be receivables collectible

13     in the future.

14          Q.    BY MR. CRAWFORD:   So how do the

15     subsidiaries get the cash flow by joining the

16     program?

17          A.    Yes.  They sell their receivables.

18     That's the -- securitization is you take your

19     receivables that are due further in time and

20     sell them at a discount to a third party through

21     this structure and get current cash.

22          Q.    Doesn't the cash, though -- the funds

23     go to Teva Ltd. first?

24          A.    I'm not sure of the exact flow of

25     funds within the bank accounts.  But they end
```

Highly Confidential - Subject to Further Confidentiality Review

 1    up definitely with the subsidiary who sold the

 2    receivables.

 3         Q.   But doesn't -- not all of it, does it?

 4    I mean, doesn't -- strike that.

 5              Doesn't Teva Ltd. have control of how

 6    resources are allocated?  That would include the

 7    funds received through the SPE; right?

 8              MS. HILLYER:  Objection to form.

 9              THE WITNESS:  No.  Teva has oversight --

10    Teva -- TPI has oversight, generally, high level,

11    on resource allocation in the company.  And the

12    securitization is a legal transaction entered

13    into by the local subsidiary and -- I will call

14    it the infrastructure, though, because there

15    are several companies involved.  Some of them

16    are Teva, and some of them are BNP.  Special

17    purpose vehicles as you call them.

18              But the -- the legal entity -- the

19    local legal entity, at the end of the day,

20    sells its receivables and gets to its bank

21    account cash.

22              MR. CRAWFORD:  I'm going to mark

23    an exhibit here.  This is an excerpt from the

24    Form 10-K, 10/31/18.

25              MS. HILLYER:  What number are we on?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. CRAWFORD:  We're on number 38?

2              MR. MAIER:  40.

3              MS. HUDNALL:  40.

4              MR. CRAWFORD:  40?  Sorry.

5              (Exhibit 40 marked.)

6       Q.   BY MR. CRAWFORD:  Does this document

7   or this excerpt from this form generally describe

8   under "Securitization" the -- how the trade

9   receivables securitization program works?

10             MS. HILLYER:  Objection to form and

11  to the extent this is an excerpt from the full

12  document.

13             THE WITNESS:  (Examining.)  Yes, I

14  believe it is.

15      Q.   BY MR. CRAWFORD:  And so skipping down

16  to the last line, it says:

17             "Once sold to BNP, the relevant Teva

18  subsidiary as seller has no retained interests

19  in the receivables sold and they are unavailable

20  to the relevant seller should the relevant seller

21  become insolvent."

22             Is that how the program works?

23      A.   Yes.

24      Q.   And so:

25             "The conduit has all the rights"
```

1    in the security -- "in the securitized trade

2    receivables, including the right to pledge

3    or dispose of such receivables."  (As read.)

4            What does that mean?

5        A.   It means that the receivables as an

6    asset, as a claim of right, move from the Teva

7    subsidiary that sold them to the special purpose

8    entity.  And the special purpose entity has all

9    owner's rights in these receivables.

10       Q.   So skipping to the second paragraph,

11   second sentence, it says:

12           "The conduit pays the SPE the DPP

13   from collections received by the conduit from

14   the securitized trade receivables (after paying

15   senior costs and expenses, including the conduit's

16   debt service obligations), which the SPE then pays

17   to Teva."

18           "Teva" is TPI; correct?

19       A.   Teva is not TPI.  Teva is the relevant

20   subsidiary that sold the receivables.  TPI, although

21   it facilitates the deal for the subsidiaries, same

22   way we facilitate insurance for the subsidiaries,

23   the transaction itself is a legal entity, a Teva

24   legal entity in a jurisdiction selling its

25   receivables, receiving cash, not the full amount.

Highly Confidential - Subject to Further Confidentiality Review

1   That's how these deals go.  Some of it is deferred

2   until the -- until the -- not credit line -- the

3   obligor actually pays the invoice.  There's a

4   mechanism that ensures the bank, BNP, that they

5   don't lose money on this deal, but it expedites

6   a significant portion of the cash that is trapped

7   in these receivables for the local subsidiary.

8       Q.   So when it refers to Teva, you're

9   100 percent sure that's referring to the Teva

10  subsidiary or entity that paid it in or that

11  sold it?

12      A.   I'm 100 percent sure that the entity

13  that sold the receivables ends up with the cash

14  resulting from this sale.  Yes.

15      Q.   And -- but it doesn't get paid first

16  to TPI, does it?

17      A.   It may move -- the funds may move

18  through bank accounts and entities along the

19  way, but it's only transitory.  The transaction

20  ends up with the money in the bank account of

21  the selling entity.  It cannot work otherwise.

22  Okay.

23          The legal entity in France or Italy

24  or Germany -- I'm just naming companies that I

25  know are in -- on this -- in this securitization --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they cannot divulge of their assets without

 2    consideration.  Even if they were to do it to

 3    the -- to an -- to an affiliate, they have to

 4    get fair market value for their assets.  And,

 5    therefore, they get cash.

 6            That's the reason their local boards

 7    signed up on this deal, because they get cash

 8    that they would otherwise have to wait for

 9    several months actually.

10    Q.    Is there a -- kind of a manual that

11    describes the program that exists or some --

12    some type of paper that describes it?

13    A.    There may be.

14    Q.    And who would have -- who would know

15    that?  Would it be the Treasury department?

16    A.    Yes.

17    Q.    Okay.  Let's go back to Exhibit 32,

18    which is the:

19            "Segment Reporting Memorandum."

20            Okay.  So if you could turn to --

21    we're going to go back into the Segment Reporting

22    Memorandum and go to page 26.  Actually, it's

23    the next document.

24    A.    Oh, it's the --

25            MS. HILLYER:  It's page 26 of the
```

1    exhibit.

2              THE WITNESS:  Yeah.  Okay.

3              MR. CRAWFORD:  Of the exhibit.  Okay.

4              THE WITNESS:  Yes.

5        Q.   BY MR. CRAWFORD:  So this is the

6    memorandum from Richard Egosi, Group Executive

7    Vice President, Chief Legal Officer and Company

8    Secretary to all Teva business units regarding

9    the contract review policy; correct?

10             MS. HILLYER:  Page 25.

11             THE WITNESS:  That's -- okay, 25.

12             MS. HILLYER:  You're on page 25?

13             MR. CRAWFORD:  Yeah.  It's on 25,

14   only reading the --

15             THE WITNESS:  Yeah.

16             MS. HILLYER:  Okay.  And 25 and 26

17   are unrelated.

18             MR. CRAWFORD:  Oh, they are?  Okay.

19             MS. HILLYER:  Well, I don't know if

20   they're unrelated.

21             MR. CRAWFORD:  They --

22             MS. HILLYER:  But they're different

23   documents, different Bates numbers that are --

24             MR. CRAWFORD:  Thank you, Becca.

25   That's right.

```
 1          Q.   BY MR. CRAWFORD:  Go to page 26.

 2    So this is the:

 3               "Prevention of Corruption SOP -

 4    Supporting Functions."

 5               And under "Application," it says:

 6               "This SOP applies worldwide" --

 7               MS. HILLYER:  He's on 26 now.

 8               THE WITNESS:  Yeah.  Aah, okay.

 9               MR. CRAWFORD:  Okay.

10               THE WITNESS:  So that's --

11               MS. HILLYER:  Sorry.  It's a little --

12               THE WITNESS:  So two memos here.

13               MR. CRAWFORD:  Yeah.

14               MS. HILLYER:  Two different pages --

15          Q.   BY MR. CRAWFORD:  Go to the very last

16    page.

17               MS. HILLYER:  -- seemingly unrelated.

18               THE WITNESS:  Yeah.  The:

19               "Prevention of Corruption."

20          Q.   BY MR. CRAWFORD:  Okay.  And then it

21    says:

22               "Application:  This SOP applies worldwide

23    to Teva's employees supporting the following

24    departments."

25               So what I want to ask here is that --
```

 1    so the staff of these departments provide support

 2    to Teva Ltd. worldwide subsidiaries, including

 3    US subsidiaries; correct?

 4         A.   Yes.

 5         Q.   And you agree that the Teva Ltd.

 6    subsidiaries pay or fund the costs to run the

 7    operations of the eleven departments; correct?

 8         A.   Yes.

 9         Q.   And then what support does Global

10    Finance provide?

11         A.   Global Finance has several functions,

12    all of them related to finance.  They -- we have

13    finance people supporting the business, finance

14    business partners.  They are referred to usually

15    as chief financial officers of the respective

16    entities.  And -- but there are more than just

17    the officers themselves, the finance people that

18    analyze, project, prepare budgets for the relevant

19    legal entities.

20              Global Finance also includes Treasury.

21    That is the local treasurers and the -- and

22    accumulating into a -- in -- in -- into a global

23    group, professional group of Global Treasury,

24    Global Tax that we discussed, tax people in

25    the countries working for the legal entities,

Highly Confidential - Subject to Further Confidentiality Review

1  the professional community called Global Tax.

2  So tax, treasury.  Insurance we mentioned is

3  also under finance.  Oh, and accounting.

4      Q.   Okay.  And we talked, I think,

5  earlier about Global Compliance.

6           Is that the same Global Compliance

7  we discussed earlier?

8           MS. HILLYER:  Objection to form.

9      Q.   BY MR. CRAWFORD:  That provided the

10  group services?

11     A.   Yes.

12     Q.   And the CEO Office, what -- what does

13  that do?

14     A.   These are the very few people who

15  work at the CEO office, helping the CEO perform

16  his management functions.

17     Q.   And how about a Global Business

18  Development and Strategy, what does that do?

19     A.   The Global Business Development and

20  Strategy team handles and leads our corporate

21  acquisitions, so big corporate transactions

22  like the acquisition of IVAX and Barr, Actavis

23  most recently.

24     Q.   Okay.  And then there's a Global Real

25  Estate and Facility Management.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                What does that do?
 2       A.    It coordinates the real estate ownership.
 3   So, for example, when an entity has real estate
 4   that it wants to divest, Global Real Estate will
 5   help in ensuring that it gets the best price, seek
 6   out -- our -- our real estate is very specific,
 7   usually manufacturing site of pharma specific.
 8             So Global Real Estate will try to check
 9   if other pharma companies could be interested
10   in that real estate because it is so specific.
11             And Facility Management deals with
12   ensuring or coordinating the facility management,
13   cleaning and other stuff that relates to facility
14   management.
15       Q.    Okay.  And is that -- where is that
16   based, that department?
17       A.    Currently --
18             MS. HILLYER:  Objection to form.
19             THE WITNESS:  Currently, it's part --
20   it's managed by the head of EHS, Peter Tachner.
21   That is part of Teva Global Operations.  It
22   used to be part of Finance.
23       Q.    BY MR. CRAWFORD:  Who heads that
24   department?
25       A.    I'm not sure who heads it right now.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Do you know what country?

2        A.    No.

3              MS. HILLYER:  Objection to form.

4        Q.    BY MR. CRAWFORD:  Okay.  Turn to page

5    5.  I just have a couple questions on this.

6              These are support functions, these

7    Roman numerals i through v; correct?

8        A.    No, these are not -- these are not

9    support functions.

10       Q.    Okay.  It says --

11       A.    Operations.  R & D.

12       Q.    -- that:

13             "Each" --

14             "Each segment result will include

15   direct charges, as well as fully allocated

16   expenses related to several support functions,

17   as" follows.  (As read.)

18             And then it says:

19             "Teva's Global Operations ("TGO") will

20   be allocated to each segment using three-step

21   approach based on the standard costs of the sold

22   products."

23             What -- what does the "support function"

24   mean as used in that first sentence?

25             MS. HILLYER:  Objection to the extent

1    it's beyond the scope.

2              THE WITNESS:  The way the business works

3    is that the market knows better than anybody else

4    what they can sell.  So they will turn to Global

5    R & D and say, these are the products that we

6    want to sell, develop these for us.  And then

7    R & D develops.  Or, if it cannot develop, the

8    business can go outside and procure development.

9              Once the product is developed, the

10   business -- the market would turn to Teva Global

11   Operations and say, I want this manufactured,

12   these quantities, or this period of time,

13   et cetera.  It then -- it is TGO that is

14   responsible for manufacturing and delivering

15   to the market the product based on the -- on

16   the demand.  And if Global Operations, the site --

17   the various sites -- none of the existing sites

18   can manufacture or it's not economic to manufacture

19   for some reason, then the market can buy the

20   products outside of Teva.

21        Q.   BY MR. CRAWFORD:  And so, then, the

22   next step, Global Marketing and Portfolio, they

23   step in and help the marketing function, then?

24        A.   They are not -- in practice, although

25   the name may suggest so, they're not involved

1  so much in marketing, and more in portfolio.

2  And these are these cross-regional opportunities

3  to identify a product we have in the US, for

4  example, that could also be sold in Europe with

5  small modifications for approval.

6      Q.   Okay.  So is Global R & D -- is that

7  a support function?

8      A.   We usually refer to support functions

9  as functions that are not related directly to

10  the value chain.  So R & D, manufacturing, sales

11  would be the value chain of our products.  And

12  support functions are HR, finance, functions

13  that are not in the value chain.

14          The -- the support, it's -- the --

15  the reference to "support functions" here just

16  illustrates why we don't have a segment called,

17  you know, financial reporting, called Teva

18  operations.  Because our business segments

19  are market based.  We think market.  The market

20  is the one that determines what they want to

21  sell and -- what they want to develop and what

22  they want sold -- manufactured so they can sell

23  it.  It all starts from the market.

24      Q.   So if Teva USA wanted to sell a product,

25  it -- it would go -- and wanted to develop one,

1    it would go to R & D here first to help assist

2    it in doing that.

3            Where -- where -- does this just exist

4    in the ether?  Or is there a kind of a base of

5    operations for Global R & D?

6            MS. HILLYER:  Objection to form.

7            THE WITNESS:  Global R & D, by its

8    name, is global.  There is a committee that

9    would meet.  Teva USA would produce its wish

10   list of the products that they think they can

11   sell at a profit in the market.  Global R & D

12   will then assess its capabilities, the various

13   development sites that the group has in many

14   locations, and will strive to accommodate the

15   request, unless it cannot.  And then sometimes

16   we go outside.  "We" as -- I mean the local

17   subsidiary, if they really think they can make --

18   you know, if this is a valuable product for them,

19   they would go outside of Teva for the development.

20   Q.   BY MR. CRAWFORD:  And why would a sub

21   go to Global Marketing and Portfolio?  What would --

22   what kind of advice would they seek there, or --

23   or information?

24           MS. HILLYER:  Objection to form.

25           THE WITNESS:  Global Marketing and

 1    Portfolio would review the -- the wish list

 2    and the portfolio of currently sold products

 3    in various subsidiaries and try to identify

 4    where we can get synergies by having a product

 5    that we already manufacture that -- let's say,

 6    Teva Czech or one of our largest manufacturing

 7    cities already manufactures for France that can

 8    also be sold in Italy.

 9          So they're -- they are the -- if we

10    think vertically in regions and below regions,

11    especially outside the US, we even think in

12    countries -- so France, Italy -- the Global

13    Marketing and Portfolio cuts across this, try

14    to identify where we can leverage things that

15    are made here somewhere else.

16       Q.   BY MR. CRAWFORD:  One more question.

17          Has any Teva entity pledged any of

18    its NDAs or ANDAs as security to anyone?

19          MS. HILLYER:  Objection to the extent

20    that's beyond the scope and -- and to form.

21          Did you say -- a security to what?

22    I thought there was more to that --

23          MR. CRAWFORD:  A security to anyone.

24    I mean --

25          MS. HILLYER:  Any.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   BY MR. CRAWFORD:  Do you know what
 2   an NDA is?
 3        A.   Yes, of course.
 4        Q.   Okay.  So -- okay.  So an NDA -- have
 5   they pledged an NDA or an ANDA as security for
 6   anything, any of the US subs?
 7        A.   I don't know.
 8             MR. CRAWFORD:  Okay.  Thank you.
 9             I'm going to pass the witness.
10             MR. CARTMELL:  Let's take a break.
11             THE VIDEOGRAPHER:  The time is 2:25 p.m.
12   We're now off the record.
13             (Recess from 2:25 p.m. to 2:36 p.m.)
14             THE VIDEOGRAPHER:  The time is 2:36 p.m.
15   We are back on the record.
16
17                     EXAMINATION
18   BY MR. CARTMELL:
19        Q.   Mr. Herman, my name Tom Cartmell,
20   and I'm going to ask you some questions.  It's
21   nice to meet you.
22             I want to say up front I'm going
23   to try to use "TPI" to identify Teva -- Teva
24   Pharmaceuticals [sic] Ltd.  But just like
25   Mr. Crawford, I have been calling it Teva
```

1    Ltd. myself.  So if I ever call it Teva Ltd.,

2    is it okay for you to understand that I'm

3    referring to Teva Pharmaceuticals [sic] Ltd.?

4         A.   If I'm unclear, I will try to clarify.

5         Q.   Okay.  Thank you.

6              Now, you mentioned a few times that

7    you were testifying about a relevant time period.

8              What -- what was it that you determined

9    to be a relevant time period related to your

10   testimony in this case?

11        A.   I --

12             MS. HILLYER:  Objection to form.

13             THE WITNESS:  I was informed that,

14   generally, the time frame is 2000 to the present.

15        Q.   BY MR. CARTMELL:  Okay.  Was it your

16   understanding that the general time frame would

17   be related to when it was that Teva or the Teva

18   entities globally started selling opioids?

19        A.   I don't know.

20        Q.   Do you understand generally that the

21   allegations in this case have to do with the

22   way that Teva -- I'm speaking in terms of the --

23   the Teva entities -- globally marketed or sold

24   or handled opioids?

25             MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  We don't market and sell

2     globally opioids.  These are controlled substances.

3     Only local subsidiaries can deal with controlled

4     substances.

5          Q.   BY MR. CARTMELL:  And I didn't mean to

6     say you were selling it globally.

7          What -- what I meant to say is when

8     Teva -- and I'm -- and I'm saying "Teva" meaning,

9     for instance, the group of Teva subsidiaries and,

10    in this case, Teva USA, started selling opioids.

11         MS. HILLYER:  Objection to form.

12         THE WITNESS:  I don't know when and

13    any details about Teva USA's selling of opioids.

14         Q.   BY MR. CARTMELL:  Okay.  Well, some

15    of the topics that you have been designated

16    to testify in regard the -- for example, the

17    structure of -- of TPI related to -- or during

18    the time period when they were selling opioids.

19         Do you understand that?

20         A.   Yes.

21         Q.   So have you determined or tried to

22    determine in any way when it was that Teva

23    USA, for example, started selling opioids?

24         A.   No.

25         MS. HILLYER:  Objection to form.

```
 1                (Court reporter clarification.)

 2                THE WITNESS:  No.

 3                (Exhibit 41 marked.)

 4        Q.   BY MR. CARTMELL:  I'm going to hand

 5   you what's been marked as Exhibit 41.

 6                MS. HILLYER:  Thanks.

 7        Q.   BY MR. CARTMELL:  Mr. Herman, Exhibit

 8   41 is a press release that we found in Teva Ltd. --

 9   or excuse me -- in Teva's files and was produced

10   in the course of this litigation.  I just have

11   a few quick questions about this.  It's titled:

12                "Teva to Sell Oxycodone Through the

13   End of 2007."

14                Do you see that?

15        A.   Yes.

16        Q.   Are you aware that oxycodone is an

17   opioid?

18                MS. HILLYER:  Objection.  Beyond the

19   scope.

20                THE WITNESS:  From my personal knowledge,

21   yes.

22        Q.   BY MR. CARTMELL:  Okay.  And this is

23   a press release dated March 6, 2007.

24                Do you see that?

25        A.   Yes.
```

```
 1        Q.    There's individuals listed on this

 2   press release, contacts.  And, for example,

 3   Dan Suesskind is one listed here, Chief

 4   Financial Officer from Teva Pharmaceuticals

 5   [sic] Industries Ltd.

 6             Do you see that?

 7        A.    Yes.

 8        Q.    And then there's George Barrett, from

 9   Teva North America, and Liraz Kalif, I think,

10   Teva Investor Relations.

11             Do you see that?

12        A.    Yes.

13        Q.    Is it your understanding that those

14   would be the individuals who would have drafted

15   this press release?

16             MS. HILLYER:  Objection.  Beyond the

17   scope.

18             THE WITNESS:  These are the people who

19   are mentioned as contacts that would -- for the

20   investors.  This is for the investors community.

21   So investors with questions would approach any

22   of these people here.

23        Q.    BY MR. CARTMELL:  And you can see in

24   the upper left-hand corner, this is from Teva

25   Pharmaceutical Industries Ltd. or at least it's
```

```
 1    on their letterhead; is that correct?

 2         A.   Yes.

 3         Q.   So it's your understanding this

 4    would be a press release that was written by

 5    Teva Pharmaceuticals [sic] Industries Ltd.?

 6         A.   This is --

 7              MS. HILLYER:  Objection.  Beyond the

 8    scope.

 9              THE WITNESS:  This is a press release

10    released by Teva Pharmaceutical Industries Ltd.

11    by --

12         Q.   BY MR. CARTMELL:  And you don't --

13    pardon me.  I -- I apologize.

14              You don't know who wrote it, I take

15    it?

16         A.   No.

17         Q.   It states:

18              "Teva Pharmaceutical Industries Ltd." --

19              And then gives the stock symbol.

20              -- "... announced today that it will

21    continue to sell its generic version of OxyContin

22    tablets at least through the end of 2007."

23    (As read.)

24              Do you see that?

25         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Is it fair to say that this would

2    indicate that, at least as of the date of this

3    March 6, 2007, press release by Teva Pharmaceutical

4    Industries Ltd., at that time Teva USA was selling

5    opioids in America?

6          MS. HILLYER:  Objection to the extent

7    that's beyond the scope.

8          THE WITNESS:  My interpretation of

9    "continue to sell" means that Teva USA has been

10   selling before that date.

11     Q.   BY MR. CARTMELL:  Right.

12          And this would be a press release,

13   based on your understanding, I take it, that

14   would be issued in the United States for the

15   public to see?

16          MS. HILLYER:  Objection to the extent

17   that's beyond the scope.

18          THE WITNESS:  That press release is

19   for the investors community in the capital market --

20   in the main capital market where Teva stock --

21   at that point, I believe it was Nasdaq but still

22   in the US.

23     Q.   BY MR. CARTMELL:  Okay.  And I think

24   you mentioned previously that these press releases

25   like this are for investors and they're sort of

Highly Confidential - Subject to Further Confidentiality Review

1    marketing in your mind?

2           MS. HILLYER:  Objection to form.

3    Mischaracterizes testimony.

4           THE WITNESS:  They are investors

5    related or investor destined.  So they speak

6    to the potential or the economic performance

7    of Teva -- TPI, Teva Pharmaceutical Industries

8    Ltd. and its subsidiaries.

9       Q.   BY MR. CARTMELL:  And is a press release

10   like this intended to positively affect the stock --

11   the stock price of Teva Pharmaceutical Industries

12   Ltd.?

13          MS. HILLYER:  Objection to the extent

14   it's beyond the scope.

15          THE WITNESS:  Not always.  They are

16   mandated.  They are -- the significant business

17   developments, we have to disclose by SEC rules.

18   Some of them support our stock price and --

19   and promote our stock price.  Some of them are

20   detriment -- detrimental to our stock price.

21      Q.   BY MR. CARTMELL:  And based on your

22   understanding and expertise, is this one that

23   is intended to support your stock price?

24          MS. HILLYER:  Hold on.

25          Objection.  He's not here as an expert.

 1    And it's beyond the scope.

 2              THE WITNESS:  And I don't know.

 3         Q.   BY MR. CARTMELL:  At any rate, is this

 4    an -- to the best of your knowledge, an accurate

 5    press release?

 6              MS. HILLYER:  Objection to form and

 7    to the extent it's beyond the scope.

 8              THE WITNESS:  It is not false.  It

 9    is not legally complete in a sense that TPI,

10    it says, it will sell.  TPI -- that I can

11    attest to -- never sold oxycodone, could not

12    sell oxycodone because of regulatory requirements

13    that, as a controlled substance, had to be

14    manufactured -- developed, manufactured, and

15    sold in the US.  And, therefore, TPI could not

16    have sold oxycodone.  So this is a shorthand

17    to say one of our subsidiaries sold and will

18    continue to sell.

19         Q.   BY MR. CARTMELL:  That's a good point.

20              This press release that was issued

21    in the United States to the public -- general

22    public, including investors, states that Teva

23    Pharmaceuticals [sic] Ltd., or TPI as you called

24    it, actually sold and would continue to sell

25    oxycodone; correct?

```
 1              MS. HILLYER:  Objection to form.

 2        Q.   BY MR. CARTMELL:  That's what it says?

 3        A.   It says -- it says Teva Pharmaceutical

 4   Industries Ltd., it will continue its generic

 5   version.  The -- this is a common shorthand

 6   for the Teva group of companies.  TPI by itself

 7   cannot -- because of -- because of regulatory

 8   constraints, TPI could not manufacture and sell

 9   FDA-approved oxycodone in the US.

10        Q.   So just so it's clear, your belief is

11   that this is -- is Teva Pharmaceutical Industries

12   Ltd. using shorthand when it says to the general

13   public that it is -- it's selling opioids, in

14   this case, oxy -- oxycodone?

15              Is that your testimony?

16              MS. HILLYER:  Objection to form.

17              THE WITNESS:  It's using --

18        Q.   BY MR. CARTMELL:  Is it shorthand?

19              MS. HILLYER:  Let him answer.

20              THE WITNESS:  Here I'm maybe at the

21   boundary of my English capabilities.

22        Q.   BY MR. CARTMELL:  Do you understand

23   what "shorthand" means?

24        A.   What "shorthand" means is "abbreviated."

25   Would that be a good synonym for "shorthand"?
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    So your testimony is that what Teva

2     Pharmaceutical Industries Ltd. was doing in

3     this press release when they told America's

4     public and investors that it was selling

5     oxycodone, it was just giving an abbreviated

6     version?

7               MS. HILLYER:  Objection to form.  And

8     this is beyond the scope.

9               THE WITNESS:  The press releases are --

10    are released through PR wire to the investors

11    community.  They are not only in the US -- not

12    only the US, but worldwide investors community

13    that invest in Teva, TPI, stock.  The value of

14    TPI stock is affected by -- affected by business

15    developments in TPI and its subsidiaries.

16              We usually -- and this is common practice

17    in the market, in the capital market.  We usually

18    refer only to the traded company.  But that does

19    not mean that we think that that parent company

20    is the one doing whatever is done here.  And

21    we have covered several instances before in

22    acquisitions where the description was very

23    high level, very abbreviated.

24         Q.    BY MR. CARTMELL:  So let me follow

25    up on that.

1          When you say we usually refer to

2     the parent company, meaning Teva Pharmaceutical

3     Industries Ltd., you're saying that that's the

4     way Teva Pharmaceuticals [sic] Industries Ltd.

5     usually does it; correct?

6          A.   Yes.

7          Q.   Okay.  And -- and so what you're saying

8     is that Teva Pharmaceutical Industries Ltd., when

9     talking to investors or issuing statements about,

10    for example, sales, they will usually just mention

11    that Teva Pharmaceutical Industries Ltd. is the

12    entity that is making the sales?

13         Fair enough?

14         MS. HILLYER:  Objection to form and

15    beyond the scope.

16         THE WITNESS:  Yes.  The -- it would

17    usually say TPI sells, sold profits for the

18    year, abbreviated for TPI and its subsidiaries.

19         Q.   BY MR. CARTMELL:  But -- but based

20    on your experience, it's not unusual for TPI

21    to say -- express that TPI is the one who is

22    selling the products?

23         Fair?

24         MS. HILLYER:  Objection to form.

25         THE WITNESS:  It is usual for TPI

Highly Confidential - Subject to Further Confidentiality Review

```
1    not to disclose too much of the legal entity

2    structure below -- that comprises the Teva

3    group.

4         Q.   BY MR. CARTMELL:  I understand.

5    But -- but my question's a little bit different.

6              It's not unusual for TPI to express

7    that TPI is the one who is selling the products?

8              Fair?

9              MS. HILLYER:  Objection to form.

10             THE WITNESS:  I honestly am not sure

11   how to respond to that.

12        Q.   BY MR. CARTMELL:  Well, I used your

13   words.  Okay.  You said we usually just simply

14   say the parent company when expressing those

15   things.

16             And I'm just confirming that, based

17   on your experience in press releases or materials

18   like this, it's true, sir, is it not, based on

19   your prior testimony, that usually TPI will just

20   say that -- or refer to the parent company, to

21   TPI, as the one selling the products?

22             MS. HILLYER:  Objection to form.

23             THE WITNESS:  In our press releases

24   we usually refer only to the parent company,

25   whether it's about sales or any other business
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    activity or development, unless there's a specific

 2    need to mention any of the subsidiaries by name.

 3         Q.   BY MR. CARTMELL:  Okay.  And when you

 4    say "the parent company," you mean TPI?

 5         A.   TPI.

 6         Q.   Okay.  This press release -- you

 7    mentioned earlier that you -- you -- you were

 8    referring to a press release as a marketing.

 9              Are these press releases at Teva

10    Pharmaceuticals [sic] Ltd. prepared by their

11    marketing department?

12              MS. HILLYER:  Sorry.  Hold on.

13              Objection to form.  Mischaracterizes

14    his testimony and beyond the scope.

15              THE WITNESS:  No.

16              (Exhibit 42 marked.)

17         Q.   BY MR. CARTMELL:  Okay.  Let me hand

18    you what's been marked as Exhibit 42.

19              We get the gold star for giving you

20    so many copies.  That's the Wagstaff Cartmell

21    firm.

22              MS. HUDNALL:  I can't guarantee that

23    with all of them.

24              MR. CARTMELL:  I spoke too soon.

25         Q.   BY MR. CARTMELL:  Mr. Herman, this
```

 1    exhibit is a PowerPoint presentation that was

 2    produced from Teva's files in this litigation.

 3    And the title of this is:

 4         "Welcome to Teva Pharmaceutical

 5    Industries Ltd., 2017."

 6         Do you see that?

 7    A.   (Examining.)  Yes.

 8    Q.   Is this a -- a PowerPoint presentation

 9    that you're familiar with?

10    A.   Yes.

11    Q.   And it looks like -- I don't want to

12    generalize or put words in -- in your mouth --

13    that this is some type of -- of marketing piece

14    for Teva Pharmaceuticals [sic] Industries Ltd.?

15    A.   This is meant to interest people in

16    investing in Teva.  This is not a marketing

17    of our products.  This is a marketing of our

18    company, of -- of the shares, of stock.

19    Q.   Marketing of your services that your

20    company provides?

21    A.   No.

22         MS. HILLYER:  Objection to form.

23    Q.   BY MR. CARTMELL:  Marketing of the

24    company as a whole?

25         MS. HILLYER:  Objection to form.

```
 1              THE WITNESS:  Marketing of the shares
 2    of Teva Ltd., TPI, as a good investment, or the
 3    bonds of Teva, of TPI, as a good debt instrument --
 4    debt -- debt investment.  It tells the corporate
 5    story of the group of companies, what do we do,
 6    why our -- why is Teva Ltd. -- why is TPI a good
 7    investment.
 8        Q.   BY MR. CARTMELL:  If you go to the --
 9    what looks like the fourth page after that, it
10    states:
11              "We came a long way in the last century
12    through mergers, acquisitions and organic growth."
13              Do you see that?
14              MS. HILLYER:  I'm not -- I'm not on that
15    page yet.  Sorry.  What page?
16              THE WITNESS:  It's the next one.
17              MR. CARTMELL:  We'll display it too, if
18    you want to see it on the display.
19              MS. HILLYER:  Got it.  Sorry.  Go ahead.
20        Q.   BY MR. CARTMELL:  Do you see that?  I
21    want to ask you questions about that.
22              You've talked some today about some
23    mergers and acquisitions that have transpired
24    over the years; correct?
25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   For example, there was an acquisition

2   or a merger with IVAX back in 2006, I believe?

3      A.   Yes.

4           MS. HILLYER:  Objection to form.

5      Q.   BY MR. CARTMELL:  And during your work

6   in this case, because of some of the topics here,

7   have you determined whether or not those companies

8   that Teva or -- well, that became a part of the

9   Teva -- Teva group of companies sold opioids?

10     A.   No.

11     Q.   Okay.  Did you know that IVAX, who

12  TPI acquired in 2006, was a seller of opioids?

13     A.   Not until preparing -- preparing for

14  this deposition, where I learned who are the

15  Teva entities that are being -- being charged

16  or ...

17     Q.   Okay.  And then in 2008, there was

18  a merger or acquisition with Barr; is that

19  correct?

20          MS. HILLYER:  Objection to form.

21          THE WITNESS:  Yes.

22     Q.   BY MR. CARTMELL:  And did you become

23  aware, through your work in preparing for this

24  deposition, that that was another company acquired

25  by the Teva group of companies that sold opioids?

```
 1        A.    So I understand, yes.

 2        Q.    Then in 2011, there was the acquisition

 3   of a company called Cephalon; correct?

 4        A.    Yes.

 5        Q.    And did you become aware that that

 6   company became a part -- or was acquired and

 7   became a part of the Teva group of companies

 8   and actually sold branded opioids?

 9        A.    Yes.

10        Q.    And was that the first time that

11   Teva had branched out into the world of

12   actually selling branded products?

13             MS. HILLYER:  Objection to form.

14             THE WITNESS:  I'm not sure what Teva --

15   the group?

16        Q.    BY MR. CARTMELL:  Yes.

17        A.    No.  We had Copaxone azelate.  A few

18   not-that-important products.  But Copaxone was

19   a leading branded product for many years.

20        Q.    But as far as opioids, that was the

21   first time that the Teva group had first started

22   selling branded opioid products?

23             Is that fair?

24             MS. HILLYER:  Objection.  Beyond the

25   scope.
```

```
 1                 THE WITNESS:  I don't know.

 2        Q.   BY MR. CARTMELL:  Okay.  And then, in

 3   2016, there was the acquisition of the Actavis

 4   generic companies; is that correct?

 5        A.   Yes.

 6        Q.   And as you said, that was several

 7   companies, several transactions; is that right?

 8        A.   Yes.

 9        Q.   And was your understanding, based

10   on your work in preparing for this deposition,

11   that the Actavis companies sold a large volume

12   of generic opioids?

13                 MS. HILLYER:  Objection to form.

14                 THE WITNESS:  I don't know about

15   volume.  And these are not the Actavis companies,

16   but rather the US Actavis because of the same

17   regulatory constraints that we talked about.

18   I understand that Actavis US also sold opioids.

19        Q.   BY MR. CARTMELL:  And during the

20   course of your work, did you learn that over

21   those approximately ten years of acquisitions

22   and mergers with other pharmaceutical companies,

23   that Teva group had become the largest seller

24   of opioids in the United States?

25                 MS. HILLYER:  Objection to form.
```

```
 1    Assumes facts not in evidence.  And beyond

 2    the scope.

 3              THE WITNESS:  I don't know.

 4         Q.   BY MR. CARTMELL:  It states here

 5    that -- and this is a Teva Pharmaceuticals

 6    [sic] Ltd. PowerPoint.  It says:

 7              "The leading global generic company."

 8              Do you see that?

 9         A.   Yes.

10         Q.   (Reading.)

11              "Commercial presence in 80 markets."

12              Correct?

13         A.   Yes.

14         Q.   That's presenting Teva Ltd., or TPI,

15    as sort of a global group of companies; is that

16    true?

17         A.   It presents the Teva group as a global

18    group of companies.  Yes.

19         Q.   Well, this is Teva Pharmaceutical Ltd.

20    who's making these statements; correct?

21         A.   This is Teva Pharmaceutical Ltd.

22    advertising its stock, its shares as a good

23    investment.

24         Q.   And it also states that it has

25    "57,000 employees"; correct?
```

```
 1        A.   It does.

 2        Q.   With a revenue --

 3        A.   It does state --

 4        Q.   I'm sorry?

 5        A.   It does state -- the presentation does

 6   state so.

 7        Q.   Okay.  With $21.9 billion in revenues

 8   in 2016; correct?

 9        A.   That's what it says.

10        Q.   If you turn the page, it talks about:

11             "Distributing medicines in approximately

12   100 markets around the world."

13             Do you see that?

14        A.   Yes.

15        Q.   (Reading.)

16             "Our business is divided across the

17   United States, Europe, and" the "Rest of the

18   World."  (As read.)

19             Do you see that?

20        A.   Yes.

21        Q.   This is Teva Pharmaceutical Ltd.

22   presenting this as a globe -- a global -- or

23   itself as a global business throughout America

24   with 100 markets around the world --

25             MS. HILLYER:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   BY MR. CARTMELL:  -- correct?

 2          A.   This is TPI advertising its stock,

 3   explaining what it and its subsidiaries as

 4   a group do around the world.

 5          Q.   Okay.  And then if you turn the page,

 6   it states that Teva -- strike that.

 7               If you turn the page, Teva Pharmaceutical

 8   Ltd. is -- states that it manufactures 120 billion

 9   tablets and capsules annually.

10               Do you see that?

11          A.   Yes.

12          Q.   And then the next page states that

13   Teva Pharmaceutical Ltd. is:

14               "The world's largest medicine cabinet."

15               Do you see that?

16          A.   Yes.

17          Q.   And I take it you've -- you've heard

18   that phrase or that -- that's something that

19   is in lots of internal documents at Teva?

20          A.   Yes.

21               MS. HILLYER:  Objection to form.

22               You have to slow down and --

23          Q.   BY MR. CARTMELL:  If you turn the page --

24               MS. HILLYER:  It's okay.

25          Q.   BY MR. CARTMELL:  If you turn the page,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    it states that:

2              "1 in 6 prescriptions in the US is

3    filled with a Teva medicine."

4              Do you see that?

5       A.   I do.  I see.

6       Q.   And you had mentioned previously that

7    part of Teva's branding had been that the group

8    of companies, including Teva USA, all make up

9    a global company.

10             Is this a part of that sort of branding?

11             MS. HILLYER:  Objection to form.  And

12   mischaracterizes his testimony.

13      Q.   BY MR. CARTMELL:  Well, I don't want

14   to mischaracterize your testimony.

15             Does that mischaracterize your testimony?

16      A.   You'll have to explain to me what

17   "mischaracterizing" --

18      Q.   That's okay.

19      A.   -- means.

20      Q.   That's all right.

21             I don't want to misstate your testimony.

22   But I think previously you said that Teva, as

23   part of sort of its branding, has turned to

24   presenting itself or the group of companies

25   as a global sort of unified group of companies.
```

```
 1                  Fair?

 2                  MS. HILLYER:  Objection to form.

 3                  THE WITNESS:  To the investor world,

 4      we have always reported consolidated financial

 5      results and have always marketed ourselves, TPI,

 6      as the ultimate parent of a group of companies

 7      that do a lot of good things, some mentioned

 8      here.

 9                  So to the investor coming -- investing

10      in TPI -- because they cannot invest in the US

11      business of ours or -- or in our operations --

12      they invest in the totality of the company.

13      The financial results of the totality of the

14      company comprise the group.

15                  So for the investor, we always --

16      TPI always presented itself and its subsidiaries

17      on what the -- what the financial jargon calls

18      a consolidated basis, everything together.

19          Q.   BY MR. CARTMELL:  All the companies

20      together, consolidated; correct?

21                  MS. HILLYER:  Objection to form.

22                  THE WITNESS:  Yes.  For the financial --

23      for the financial perspective.

24                  For other audiences -- patients,

25      caregivers, governments, et cetera -- until
```

1    relatively recently, a year, year and a half

2    ago, we did not -- we did not make any effort

3    to be consistent or -- or to appear as one.

4          This was manifested by the fact that

5    we let companies keep their pre-acquisition

6    brands.  So companies in the Teva group would

7    still have letterheads and -- and products that

8    had different brands.

9          MR. CARTMELL:  Okay.  I appreciate

10   that.  I'll follow up on that in a minute.

11         (Exhibit 43 marked.)

12     Q.    BY MR. CARTMELL:  Okay.  Let me hand

13   you Exhibit 43.  This is an e -- e-mail that

14   was produced from the files of the company and

15   also a presentation that we'll look at in a

16   minute called:

17         "CEO Leadership Forum, May 31, 2016."

18         Do you see that?

19     A.    Uh-huh.

20     Q.    If you would turn to the -- the

21   presentation, which is the third page of what

22   I handed you, are you familiar with the CEO

23   Leadership Forum?

24     A.    Yes.

25     Q.    And is that a presentation basically

1    by the CEO or the group, as you said, that helps

2    the CEO with his duties, that talks about the

3    strategies of the company and the priorities

4    of the company for the coming year?

5        A.   The Leadership Forum is senior management,

6    not -- a level or two below the Teva Executive

7    Committee that we discussed earlier, people

8    reporting to these eleven, I believe now, people.

9    And this is a presentation of the CEO to this

10   group about, again, the Teva group financial.

11       Q.   Who's -- who's the CEO?

12       A.   At that point in time, Erez Vigodman.

13       Q.   The CEO of TPI; correct?

14       A.   CEO of TPI.

15       Q.   And so the CEO of TPI is presenting

16   to the Executive Committee, for example?

17       A.   No.  The -- the Executive Committee

18   we talked about.  This is a larger forum of

19   people reporting to the Executive Committee.

20   So that would be me reporting to the CFO, the

21   Global Treasurer reporting to the CFO.

22       Q.   Teva USA employees?

23       A.   The --

24            MS. HILLYER:  Objection to form.

25       Q.   BY MR. CARTMELL:  Is that true?

1           MS. HILLYER:  Sorry.  I don't -- what's

2    the question?

3           Q.   BY MR. CARTMELL:  Teva USA employees

4    as well; true?

5           A.   Few people in Teva USA that report to --

6    I forget at that point in time who was head of

7    Americas.  But now it would be the people reporting

8    to Brendan O'Grady.

9           Q.   Okay.  All right.  At any rate, this

10   is a presentation that's given.  And then, as

11   we can see from the e-mails, this presentation

12   is circulated throughout the company, for example?

13          A.   To that forum.

14          MS. HILLYER:  Are you asking if that's

15   correct?

16          Q.   BY MR. CARTMELL:  Is that correct?

17          MS. HILLYER:  Objection to form.

18          THE WITNESS:  It's then -- there's a --

19   a videoconference or usually a phone conference.

20   And then this is distributed to the forum that

21   was invited to the conference.

22          Q.   BY MR. CARTMELL:  And then if you turn

23   to page 38 -- you won't have -- you won't have it.

24          MS. HILLYER:  Take your time and look

25   through it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   BY MR. CARTMELL:  So I'm going to show

 2     it to you, because it really doesn't have anything

 3     but about 20 words on it.

 4               MS. HILLYER:  They have -- they have

 5     them on there.

 6               MR. CARTMELL:  Oh, they do.  Okay.

 7               MS. HILLYER:  They're faded.

 8               MR. CARTMELL:  I didn't know that.

 9               MS. HILLYER:  I think.  Yeah.

10               THE WITNESS:  So yeah.

11          Q.   BY MR. CARTMELL:  So the CEO in this

12     presentation to those -- as you've explained,

13     that report to the CEO talks about this:

14               "One global brand.  One story.  One

15     Teva."

16               Do you see that?

17          A.   Yes.

18          Q.   Does that go along with sort of the

19     philosophy, as you said, that there was an

20     emphasis on presenting this group as a unified

21     global company?

22               MS. HILLYER:  Objection to form.

23               THE WITNESS:  This is the inception,

24     the start of our journey towards having one

25     brand.  This is not in any sense one company.
```

1    It is -- because we have many legal entities.

2    But it is an idea that we can, through the brand,

3    deliver consistent values of quality, of being

4    concerned about patients, et cetera, through

5    this visual.  And that visual, that logo, if

6    it were the same in all of our subsidiaries,

7    would convey a consistent message.  And that's --

8    that presentation in '16 was actually the very

9    start of it.

10    Q.   BY MR. CARTMELL:  You were saying '17.

11         But it was actually in 2016; correct?

12    A.   In '16, Iris Beck-Codner said:  Why

13    don't we go that direction?  We only started

14    actually converting companies to the new logo

15    in '17, that is, subsidiaries replacing their

16    letterhead only in '17.

17    Q.   If you go back to the front page,

18    the e-mail that was produced in this litigation

19    that was circulated, there is an e-mail from

20    Marty Berndt in June of 2016 to several other

21    individuals who are actually from Teva North

22    America and some, I believe, from Teva USA.

23    It states:

24         "Team.  Last week Erez Vigodman" --

25         The CEO I think you said.

```
 1              -- "held a CEO Leadership Forum Webcast

 2     sharing additional insight into where we have

 3     been over the past two years, where we are headed

 4     strategically and re-confirmed our priorities

 5     for 2016."

 6              Do you see that?

 7     A.   Yes.

 8     Q.   That is referring to the CEO's

 9     presentation.

10              It's true, is it not, that the CEO,

11     or Teva, TPI, through the CEO, gave direction

12     to Teva USA and the other entities of strategically

13     where the company was going, the group of companies

14     as a whole; correct?

15     A.   This is an excellent example.

16     Q.   Okay.  Can you answer my question?

17              MS. HILLYER:  He is answering.  Give

18     him a second.

19              MR. CARTMELL:  No, no, no, no.  What

20     he --

21              MS. HILLYER:  He -- he said three words.

22              MR. CARTMELL:  No, no.  What he can

23     do is he can answer it "yes" or "no" or "I can't

24     answer that" and then provide an explanation.  But

25     what he likes to do is not answer the question and
```

Highly Confidential - Subject to Further Confidentiality Review

1    then say it's an excellent example.

2         Q.   BY MR. CARTMELL:  I simply asked this:

3    Is this -- well, let me ask it a different way.

4              The CEO of TPI sets the strategy for

5    the company or the group of companies; correct?

6         A.   Yes, at that granularity that you see

7    in the presentation.

8         Q.   Okay.  And it also states here that

9    he "re-confirmed" -- that he "re-confirmed our

10   priorities for 2016."

11             Do you see that?

12        A.   Yes.

13        Q.   And is it true that the CEO, in

14   presentations like this or otherwise, sets --

15   strike that.

16             And is it true that the CEO for TPI

17   sets the priorities for the group of -- of

18   companies, Teva companies?

19        A.   Yes.

20             MS. HILLYER:  Objection to form.

21             THE WITNESS:  Yes, at this level of

22   granularity --

23        Q.   BY MR. CARTMELL:  Okay.

24        A.   -- that you see here.

25        Q.   Okay.  And that includes the strategy

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and the priorities, for example, of one of the

 2   subsidiaries, Teva USA?

 3         Fair?

 4     A.   At very high-level granularity, yes.

 5         (Exhibit 44 marked.)

 6         MR. CRAWFORD:  Okay.  I just have very

 7   few questions about this next exhibit.

 8         MS. HILLYER:  Take your time and look

 9   at it.

10         MR. CARTMELL:  This is Exhibit 44.  And --

11         MS. HILLYER:  You want to stick -- put

12   the sticker on them, I guess.

13         MR. CARTMELL:  What you're telling the

14   witness --

15         MS. HILLYER:  I said --

16         MR. CARTMELL:  -- was not on the record.

17         Did you get that?

18         MS. HILLYER:  I said:  Take your time

19   to look at it if you need to.

20         MR. CARTMELL:  Okay.

21         MS. HILLYER:  And then I said to you:

22   Just put the sticker on so it doesn't come off.

23         MR. CARTMELL:  Okay.

24         MS. HILLYER:  You can put that on the

25   record if you like.
```

```
 1              MR. CARTMELL:  That's fine.

 2       Q.   BY MR. CARTMELL:  Exhibit 44 is a

 3   PowerPoint presentation that was produced to

 4   us and also an e-mail that attaches.  It was

 5   produced from Teva's files in this case.  This

 6   is back in 2008.

 7              Do you see that?

 8       A.   (Examining.)  Yes.

 9       Q.   It's called:

10              "Global Generic Resources."

11              Do you see that?

12       A.   Yes.

13       Q.   Now, do you know what --

14              MS. HILLYER:  Sorry.  I think --

15              MR. CARTMELL:  I'm sorry.

16              MS. HILLYER:  -- it's missing two pages?

17   Or there's more to the e-mail?  The Bates numbers

18   are not consecutive.  They go from 32 to 35.

19              MR. CARTMELL:  What's that?

20              MS. HUDNALL:  Other attachments.

21              MS. HILLYER:  Other attachments?  Okay.

22              MR. CARTMELL:  Yeah.  Other attachments.

23       Q.   BY MR. CARTMELL:  Okay.  So let me ask

24   you, sir.

25              So "Alliance Boot Visit," that's --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   that's an actual visit by customers to Jerusalem;

2   is that right?

3           MS. HILLYER:  Objection to the extent

4   it goes beyond the scope.

5           THE WITNESS:  It appears to be.

6           MR. CARTMELL:  Okay.

7           MS. HILLYER:  Did you get that?  I --

8   I scratched the --

9           (Court reporter clarification.)

10          MS. HILLYER:  You want to say it again?

11          THE WITNESS:  It appears to be the

12  presentation for a customer, Alliance Boot.

13      Q.   BY MR. CARTMELL:  Who actually come

14  to Israel; correct?

15      A.   Probably.

16      Q.   Okay.  And then if -- if you look

17  at page -- are these numbered? -- 4, this is

18  talking about:

19          "Benefits from our global structure."

20          Do you see that?

21      A.   Yes.

22      Q.   And -- and you mentioned previously

23  that having sort of a global structure, a

24  united global structure, provides benefits

25  to the company; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Objection to form.
 2              THE WITNESS:  The -- our global
 3    manufacturing network is an economic --
 4    provides an economic value to the market
 5    subsidiaries.
 6         Q.   BY MR. CARTMELL:  Okay.  And what
 7    about actually marketing the companies as
 8    a whole, including the parent company and
 9    all the companies together as one global
10    unit?  Other than manufacturing benefits
11    for purchasing power, are there other
12    benefits to the company from that?
13              MS. HILLYER:  Objection to form.
14              THE WITNESS:  Yes.
15         Q.   BY MR. CARTMELL:  What are those?
16         A.   The fact that we can, as a group,
17    have sites that are -- that specialize in
18    certain technologies, while other sites are
19    specializing in other technologies, allows
20    the group to offer the markets the ability
21    to source cheaply and efficiently from what
22    is now called Global Operations.  At the time,
23    it was called that name at the top.
24         Q.   Okay.  If you turn to page 10, there's
25    a slide that says:
```

```
 1              "Global Generic Resources - Global

 2    Presence."

 3              Do you see that?

 4       A.   Yes.

 5       Q.   And this is Teva Pharmaceutical

 6    Industries Ltd. telling customers that it

 7    has a global presence throughout the world;

 8    correct?

 9              MS. HILLYER:  Objection.  Beyond

10    the scope.

11              THE WITNESS:  This is a presentation

12    by our -- one of our business units, our Global

13    Operations business unit, that shows customers

14    that we have manufacturing facilities across

15    the globe.

16       Q.   BY MR. CARTMELL:  Okay.  And is that

17    Global Operations unit that you're talking

18    about headquartered in -- in Israel?

19              MS. HILLYER:  Objection to form.

20              THE WITNESS:  In -- at that point in

21    time, it was.  The head -- I should explain that

22    these are global organizations.  They sit almost

23    everywhere.

24       Q.   BY MR. CARTMELL:  I'm just asking about

25    the Global --
```

```
 1        A.    Yes.

 2        Q.    -- Operations.

 3        A.    Right.  At that point in time, the

 4   head of Global Operations was an Israeli sitting

 5   in Israel.  Right now, his -- his predecessor --

 6   successor -- his successor, or several successors,

 7   but the person currently filling that role is

 8   Carlo de Notaristefani sitting in the US.

 9        Q.    I understand that.

10              But who was -- who was his predecessor?

11        A.    Carlo's --

12              MS. HILLYER:  Objection to form.

13              THE WITNESS:  Carlo's predecessor was

14   Arik Yaari, an Israeli.  Arik's predecessor was

15   Jacob Winter, an Israeli, whose name is on this

16   presentation.

17        Q.    BY MR. CARTMELL:  For how long was

18   the Global Operations department headquartered

19   in Israel?

20              MS. HILLYER:  Objection to form.

21              THE WITNESS:  I believe they started

22   in 2006 after the acquisition of IVAX.  This is

23   the first time the group has started to look at

24   manufacturing as something that can benefit from

25   a global view and not only local relations.  The
```

Highly Confidential - Subject to Further Confidentiality Review

1    first two hats were Israeli, and the third is --

2    is an American.

3         Q.    BY MR. CARTMELL:  Can you approximate

4    when it was that it changed from Israelis sitting

5    in Israel to an American?

6         A.    Actually don't need to, because I think,

7    in the bios, Carlo has his date of joining Teva.

8    So it's going to be very simple.  I can go to

9    Exhibit 25 and see that he joined Teva in 2012.

10         So until 2012, the heads of these --

11    of this business unit were in Israel.  And since

12    2012, the head of this unit sits in the US.

13         Q.    And during that time, from 2006 through

14    2012, Global Operations -- or the head of Global

15    Operations were employees of TPI?

16         A.    Yes.

17         Q.    Page 10 talks about global R & D sites.

18         Do you see that?

19         A.    Yes.

20         Q.    And at least as of this time -- as of

21    this time in 2008, there were two research and

22    development sites in the United States; correct?

23         A.    That's what it says here.

24         Q.    One was in Irvine, California, the

25    other in Sellersville, Pennsylvania; correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    That's what the picture shows.  I

 2   don't recall.

 3         Q.    And until when -- or strike that.

 4               Are there still two research and

 5   development sites related to products that

 6   Teva is selling in the United States?

 7               MS. HILLYER:  Objection to form.

 8               THE WITNESS:  There are, I believe,

 9   more.  Since then, we have acquired companies

10   and restructured R & D several times.  Their

11   locations have shifted.  For example, Irvine

12   is not engaged in R & D anymore.

13         Q.    BY MR. CARTMELL:  Just if you can --

14   tell me, to the best of your knowledge, if you

15   can give us a list of the research and development

16   Teva sites in the United States right now.

17               MS. HILLYER:  Objection to the extent --

18               THE WITNESS:  Hard to recite by --

19               MS. HILLYER:  -- it's beyond --

20         Q.    BY MR. CARTMELL:  Can you name --

21               MS. HILLYER:  Hold on.  Hold on.

22               Objection to the extent the last question

23   was beyond the scope.

24         Q.    BY MR. CARTMELL:  You can tell me as

25   many as you know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   We have R & D in Miami.  We have R & D

 2   that is legacy, our biologics R & D that is in

 3   the West Coast, but not in Irvine.

 4        Q.   Someplace in California?

 5        A.   Yeah.  I forget where they sit.

 6             I think we closed the one in -- just

 7   outside Washington, DC.  Then I'm less familiar

 8   with the -- the ones that came with Actavis.

 9        Q.   Are there dozens?

10        A.   Because they're -- no.  No.

11        Q.   Can you approximate how many?

12        A.   There's a couple.

13        Q.   Okay.  I actually said there were

14   only two at this time in 2008.  But it looks

15   like there was actually Sellersville, Congers,

16   Northvale, Fairfield, and Doral.

17             Correct?

18        A.   No.  These are manufacturing sites.

19        Q.   Oh, I gotcha.  That's just -- that's

20   just --

21        A.   Yeah.

22        Q.   -- R & D?

23        A.   The green dots are R & D.

24        Q.   Okay.  So there were two, Sellersville

25   and Irvine; is that right?
```

```
 1        A.    That's what the picture shows.

 2        Q.    Okay.  And you think today, though,

 3   there are how many more than that?

 4        A.    A handful in different -- in different

 5   locations than what you see here.

 6        Q.    Okay.  If you turn to page 23:

 7              "What Makes Teva Generic R & D

 8   Successful?"

 9              This is as of 2008.  It says:

10              "Truly Globalized Generic R & D."

11              "Integrated Systems."

12              "Interlinked Strategies."

13              Do you see that?

14        A.    Yes.

15        Q.    And is that still the case today?

16              MS. HILLYER:  Objection to form and

17   to the extent it's beyond the scope.

18              THE WITNESS:  It's -- it is.

19        Q.    BY MR. CARTMELL:  In other words,

20   all of the sites around the world are integrated

21   systems, meaning data systems and computer

22   systems, databases, that sort of thing?

23              MS. HILLYER:  Objection to form.

24              THE WITNESS:  Data systems are aligned.

25   I am not sure, you know, the IT exact definition
```

1    of "integrated."  I don't know how integrated

2    they are.  But yes, they are aligned.  And the

3    resource allocation within R & D is managed in

4    a -- in a global -- with a global view.

5        Q.   BY MR. CARTMELL:  And the strategies

6    globally in the company from the parent on down

7    are interlinked; correct?

8             MS. HILLYER:  Objection to form.

9             THE WITNESS:  I'm not sure what this

10   means.

11            MS. HILLYER:  Me neither.

12            THE WITNESS:  Sorry.  The strategy --

13   the head of Global R & D sets the strategy as

14   to how many sites we keep.  Do we open a new

15   one with technology that we currently don't

16   have?  She and her team determines which product

17   that the market request is best developed where,

18   depending on the capability of the site and

19   the people.

20       Q.   BY MR. CARTMELL:  Okay.  I want to

21   switch gears a little bit and talk to you about --

22   really it's Topic 3 today, which is the manner

23   in which TPI monitors, oversees, directs, and

24   controls certain things listed here as far as

25   Teva USA.  Okay?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Okay.

 2        Q.    And I take it you spent some time

 3   trying to determine those things; correct?

 4        A.    I don't recall the exact wording

 5   of the sections by heart.  So if you show

 6   them to me, I'll be happy --

 7        Q.    Well, I can -- I can -- you have

 8   it in front of you.

 9        A.    Oh, it's not -- right, it's there.

10   You're right.

11        Q.    Exhibit 1.

12        A.    You're right.  Sorry.  Yes.  So No. 3.

13        Q.    Right.  It states:

14              "The manner in which you" --

15              Meaning TPI.

16              -- "monitor, oversee, direct and

17   control your subsidiaries" --

18              Do you see that?

19        A.    Yes.

20        Q.    And then -- then it:

21              -- "with regard to ... development,

22   testing, approval, manufacture, marketing,

23   sale, promotion, distribution, suspicious

24   order monitoring, or pharmacovigilance."

25   (As read.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you see that?

 2      A.   Yes.

 3      Q.   And I take it you spent some time

 4  trying to determine, during the relevant time

 5  period, which is when these companies were

 6  selling opioids -- or Teva USA was in the

 7  United States; correct?

 8      A.   Yeah.

 9           MS. HILLYER:  Objection to form.

10      Q.   BY MR. CARTMELL:  Now, are you

11  familiar with suspicious order monitoring?

12      A.   Excuse me?

13      Q.   Do you know what "suspicious order

14  monitoring" is here that's referred to in

15  the notice, No. 3, as one of the topics to

16  discuss?

17           MS. HILLYER:  Objection to form.

18  Mischaracterizes the topics.

19           THE WITNESS:  No.

20      Q.   BY MR. CARTMELL:  You have -- you have

21  no idea what "suspicious order monitoring" is

22  as you sit here today?

23      A.   No.

24      Q.   Okay.  This states that you're to

25  testify about the manner in which TPI monitors,
```

Highly Confidential - Subject to Further Confidentiality Review

1    oversees, directs and controls subsidiaries,

2    including Teva USA.  One of the issues is

3    related to "suspicious order monitoring."

4          Do you see that?

5    A.    Yes.

6    Q.    Okay.  Did you determine that?

7          MS. HILLYER:  Objection to form.

8          THE WITNESS:  Did I determine what?

9    Q.    BY MR. CARTMELL:  Did you determine

10   the extent to which TPI, the parent company,

11   does those things related to suspicious order

12   monitoring?

13   A.    With respect to suspicious order

14   monitoring?  No.

15   Q.    Okay.  Did you know that a seller --

16   a pharmaceutical company who's selling Class 2

17   narcotics is required by law to have a suspicious

18   order monitoring program?

19         MS. HILLYER:  Objection to the extent

20   it's beyond the scope.

21         THE WITNESS:  No, I don't.  This is

22   not the level of detail that TPI would usually

23   be involved in with its subsidiaries.

24   Q.    BY MR. CARTMELL:  Do you know if Teva

25   had a suspicious order monitoring program at

```
 1    any relevant time why -- while Teva has been

 2    selling opioid narcotics?

 3              MS. HILLYER:  Objection to form.

 4              What Teva entity are you referring

 5    to?

 6              MR. CARTMELL:  I'll re-state it.

 7        Q.   BY MR. CARTMELL:  Do you know whether

 8    or not Teva USA has had a suspicious order

 9    monitoring program at any time while selling

10    opioid narcotics in the USA?

11              MS. HILLYER:  Objection to the extent

12    it's beyond the scope.

13              THE WITNESS:  No, I don't.

14              MR. CARTMELL:  How can that be beyond

15    the scope?

16              MS. HILLYER:  He's not here to testify

17    about Teva having suspicious order monitoring.

18    The -- the topic is the extent to which TPI may

19    oversee that.  And he just testified TPI doesn't

20    get into that kind of granularity --

21              MR. CARTMELL:  No.

22              MS. HILLYER:  -- about Teva USA --

23              MR. CARTMELL:  You testified to that.

24              MS. HILLYER:  No.  Go look up on your

25    realtime.  He said TPI doesn't get into the
```

1    granularity about SOM systems.

2             MR. CARTMELL:  Well, he has to know

3    whether they have a program and what it is in

4    order to know whether or not it's monitored

5    or overseen or directed or controlled.  Let

6    me -- that's for the record.

7        Q.  BY MR. CARTMELL:  Let me -- let me

8    ask you, sir.

9             Did you know that TPI oversaw the

10   suspicious order monitoring program at Teva

11   USA?

12            MS. HILLYER:  Objection.

13            THE WITNESS:  Is that --

14            MS. HILLYER:  Assumes facts not in

15   evidence.

16            THE WITNESS:  Is that a fact that

17   you're asking me if I'm -- if I know?  Or

18   is the question whether this fact happened

19   or not?

20       Q.  BY MR. CARTMELL:  Well, do you know

21   whether or not?

22       A.  No, I don't.

23       Q.  Okay.

24            (Exhibit 45 marked.)

25       Q.  BY MR. CARTMELL:  Let me hand you

Highly Confidential - Subject to Further Confidentiality Review

```
1    Exhibit 45.  Does --

2              MS. HILLYER:  Wait.  Hold on.

3              Oh, that's just the old exhibit number.

4              MR. CARTMELL:  Yeah.

5              MS. HILLYER:  Okay.  It was confusing.

6         Q.   BY MR. CARTMELL:  This is a document,

7    Exhibit 45, that was produced from Teva's files

8    in this lawsuit.  And you'll see that it is an

9    e-mail on the front page from Colleen McGinn,

10   who works in the Compliance -- DEA Compliance

11   department at Teva USA, to several individuals.

12             Do you see that?

13        A.   (Examining.)  Yes.

14        Q.   And this is dated 8 of 2015; correct?

15        A.   Yes.

16        Q.   Attached to that is a:

17             "Global Internal Audit."

18             Do you see that?

19        A.   Yes.

20        Q.   Now, just to make it clear, are you

21   familiar with TPI's Global Internal Audit

22   department?

23        A.   Yes.

24        Q.   Okay.  And that is a department within

25   TPI that actually sends -- with respect to Teva
```

Highly Confidential - Subject to Further Confidentiality Review

1    USA, for instance, sends employees of TPI to the

2    United States to audit -- audit various departments

3    within Teva USA?

4          A.    Right.

5          Q.    Okay.  And that is one way that TPI

6    monitors or oversees the actions of the departments

7    to ensure that the Teva USA departments are acting

8    in accordance with the law or follows -- following

9    the law and following the -- the global policies;

10   correct?

11              MS. HILLYER:  Objection to form.

12              THE WITNESS:  Yes.

13         Q.    BY MR. CARTMELL:  Okay.  Now, you'll

14   see here that this is a Global Internal Audit

15   from August 19th of 2015:

16              "DEA, Drug Enforcement Administration -

17   Handling Controlled Substances in US."

18              Do you see that?

19         A.    Yes.

20         Q.    Have you seen this document before

21   today?

22         A.    No.

23         Q.    Okay.  If you turn the page, under

24   the "Preface" it says:

25              "The Operational and R & D Audit Group

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of Global Internal Audit" (hereinafter "referred
 2    to as 'GIA') conducted during July" '15 "an audit
 3    of the Drug Enforcement Administration Department."
 4    (As read.)
 5              Do you see that?
 6        A.   Yes.
 7        Q.   Okay.  So real quick, I'd like you to
 8    just turn to the last page -- or excuse me --
 9    to the -- the page that the last three Bates
10    numbers are 571.
11        A.   Okay.
12        Q.   And -- and you'll see on that page
13    that this audit is actually -- there's a --
14    there's actually a signature block, and it
15    refers to "Itai Rigbi."
16              Do you see that?
17        A.   Yes.
18        Q.   I may have -- I may not have pronounced
19    that -- who is a Global Internal Audit, Senior
20    Director, Global Head of Operations and R & D.
21              Do you see that?
22        A.   Yes.
23        Q.   He is a TPI employee from Israel;
24    correct?
25        A.   I believe he is.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   He came from Israel to the United

2    States to the Teva USA offices, where they

3    have global -- or excuse me -- where they have

4    the DEA Compliance department and performed

5    an audit or looked at their processes in the

6    US, according to this document; correct?

7          A.   According --

8               MS. HILLYER:  Objection to form.

9               THE WITNESS:  Yes.  According to this

10   document, that's what he did.

11         Q.   BY MR. CARTMELL:  Okay.  It states,

12   under "Objectives, Scope and Method" --

13              MS. HILLYER:  Well, where -- where

14   are you?

15         Q.   BY MR. CARTMELL:  Back -- I'm sorry.

16   I'm back at -- at the:

17              "Executive Summary."

18              "The aims of the audit were to review

19   the overall way in which ... DEA activities are

20   handled in US by the DEA department, to assess"

21   and various -- "the various internal processes

22   and to ensure that the risks associated with"

23   the "activities are properly managed."  (As read.)

24              Do you see that?

25         A.   Yes.
```

```
 1          Q.   So this is a TPI employee from Israel

 2    coming to America to audit them to make sure

 3    that they are following appropriate policies

 4    and procedures set out by the parent company,

 5    TPI; correct?

 6               MS. HILLYER:  Objection to form.

 7               THE WITNESS:  Yes.

 8          Q.   BY MR. CARTMELL:  Okay.  It states

 9    that this is -- employee from Israel and TPI

10    came and had meetings with DEA members, as

11    well as with other TGO members who are also

12    involved in day-to-day interactions with the

13    DEA department.

14               Do you see that?

15          A.   Yes.

16          Q.   So at -- at this time, according

17    to this document, Teva Global Operations was

18    having day-to-day interaction with the DEA

19    department; correct?

20               MS. HILLYER:  Objection to form.

21               THE WITNESS:  Yes.  But it requires

22    clarification.

23          Q.   BY MR. CARTMELL:  Actually, you can

24    clarify it with your lawyer.  I'm just actually --

25               MS. HILLYER:  You're going to cut off
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    his answer?

 2              MR. CARTMELL:  He said -- he answered

 3    my question.  He said: "Yes."

 4              MS. HILLYER:  No.  He was still speaking.

 5              MR. CARTMELL:  Okay.

 6              THE WITNESS:  The local employees of

 7    the manufacturing site in, say, Sellersville

 8    are also referred to internally in Teva as TGO

 9    employees, although they don't have a global

10    role.  They are just line operators.  They are

11    still called TGO employees.

12              The people here, I believe, refer to

13    the local people in the US who are in operations

14    in the manufacturing sites.  And they have daily

15    interactions with DEA people of Teva USA.  These

16    are all Teva USA and its subsidiaries.

17         Q.   BY MR. CARTMELL:  I understand.  It

18    says "TGO," which is Global Operations.

19              There are Global Operations people

20    in Israel, and there are Global Operations

21    people in the United States; correct?

22         A.   Yes.

23         Q.   It doesn't say here who that is.

24         A.   No.

25         Q.   You're speculating?  Fair?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah.

 2        Q.    Okay.  If you -- if you turn the page,

 3   under "The DEA Department," this is referring

 4   to the department in the United States.  The

 5   fourth bullet point states:

 6              "The DEA department head reports

 7   to the SVP" --

 8              What does that stand for?

 9        A.    Senior Vice President.

10        Q.    Okay.  Senior Vice President.

11              -- "Head of Regional Manufacturing

12   Operations, who reports to the President and

13   CEO of TGO."

14              Do you see that?

15        A.    Yes.

16        Q.    Okay.  So I think this is sort of

17   what you were talking about previously as some --

18   sometimes the local subsidiary or -- or, in this

19   case, Teva USA has a direct report to somebody

20   regionally; correct?

21        A.    Yes.

22        Q.    And that's the case here; right?

23        A.    Yes.

24        Q.    And then that regional director reports

25   to somebody in Global Operations.
```

```
 1              And in this case, it was the president

 2   and CEO of TGO; correct?

 3        A.   Yes.

 4        Q.   Who was the president and CEO of TGO

 5   as of 2015?  Do you recall?

 6        A.   Carlo de Notaristefani.

 7        Q.   Okay.  And at that time, where was

 8   she employed?

 9        A.   He was --

10        Q.   I'm sorry.

11        A.   He was operating from the US.

12        Q.   Okay.  And he was the president and

13   CEO of Teva Global Operations; correct?

14        A.   Yes.

15        Q.   And was he one of those employees

16   sitting in the United States that was providing

17   global work and management around the world?

18        A.   Yes.

19        Q.   And as a result of that, TPI paid

20   a portion or all of his salary to Teva USA,

21   who then paid him?

22             MS. HILLYER:  Objection to form.

23             THE WITNESS:  Yes.  His costs of

24   employment was borne by the various entities

25   that -- around the world that manufacture
```

```
 1   and, therefore, benefit from his services.

 2       Q.   BY MR. CARTMELL:  Right.  So one

 3   of the people who paid his salary -- or strike

 4   that.

 5            One of the entities that paid his

 6   salary was TPI, who would pay it to Teva USA,

 7   and then Teva USA would pay it to him?

 8            Fair?

 9       A.   Yes.

10       Q.   Okay.

11            MS. HILLYER:  Are we at a good breaking

12   point?  We've been going over an hour.

13            MR. CARTMELL:  Sure.

14            THE VIDEOGRAPHER:  The time is 3:38 p.m.

15   We are now off the record.

16            (Recess from 3:38 p.m. to 3:57 p.m.)

17            THE VIDEOGRAPHER:  The time is 3:57 p.m.

18   We are back on the record.

19       Q.   BY MR. CARTMELL:  Mr. Herman, under the

20   "Preface," the second paragraph says:

21            "The audit was conducted in accordance

22   with the 2015 GIA Plan as approved by the Audit

23   Committee of Teva's Board of Directors."

24            Do you see that?

25       A.   Yes.
```

1          Q.    That's TPI's board of directors;

2    correct?

3          A.    Yes.

4          Q.    Okay.  And then there were findings

5    by TPI's auditor that was sent from Israel to

6    the US to audit the DEA Compliance department.

7    If you look under the second bullet point above,

8    it states:

9                "Isolated control and process deficiencies

10   were identified, which neither individually nor

11   collectively compromises the goals and deliverables

12   of the audited function/process; however,

13   remediation is necessary to better align with

14   company expectations, requirements and standards."

15               Do you see that?

16               MS. HILLYER:  Objection to form.

17               THE WITNESS:  Yes.

18               MR. CARTMELL:  Okay.  Just for the

19   record, I just read what it says.

20               MS. HILLYER:  Before that, you had

21   a prefatory comment that I was objecting to.

22         Q.    BY MR. CARTMELL:  Okay.  Now, as

23   this states -- and I take it you know from

24   your experience, when a TPI auditor comes

25   to the United States and audits the Teva USA

1    and they find, as this states, deficiencies,

2    they ask the Teva USA entity to remediate

3    those deficiencies; correct?

4            MS. HILLYER:  Objection to form.

5            THE WITNESS:  Yes.

6        Q.   BY MR. CARTMELL:  Okay.  And -- and --

7    and here the TPI auditor from Israel found that

8    remediation is necessary.  And it states:

9            "To better align with company

10   expectations, requirements and standards."

11           Do you see that?

12       A.   Yes.

13       Q.   Okay.  So TPI sets the expectations,

14   the requirements, and standards that Teva USA

15   DEA Compliance was expected to adhere to;

16   correct?

17           MS. HILLYER:  Objection to form.

18           THE WITNESS:  The purpose of the

19   audit -- the internal audit is exactly that,

20   to ensure that the subsidiaries of TPI complied

21   with laws, standards, professional requirements,

22   et cetera.  The language itself is standard.

23           So if the audit was on any other

24   entity and any other process or operation and

25   they found that the process is effective but

Highly Confidential - Subject to Further Confidentiality Review

1   there are opportunities to improve, you would

2   find the same language.  The expectation of

3   TPI is that TUSA complied with the requirements,

4   in this case, DEA requirements.

5         Q.   BY MR. CARTMELL:  I'll just move to

6   strike, and I'll ask it again.  My -- I think

7   my question's a little bit different than that.

8              T -- TPI, the parent corporation, sets,

9   as this -- states, the expectations, requirements,

10  and standards that Teva USA, in the DEA Compliance

11  section, was supposed to adhere to; correct?

12             MS. HILLYER:  Objection to form.

13             THE WITNESS:  Yes.  The expectation

14  is -- or let me rephrase it.

15             TPI does not set standards for DEA

16  compliance.  This is because DEA -- DEA is a

17  US -- as far as I know, a US governmental agency.

18             The people in Teva USA that function

19  for the USA -- Teva USA business that ensure the

20  compliance are being audited by internal audit to

21  make sure that what they do meets our expectation.

22  That is, the TPI expectation is that what they do

23  meets DEA government -- US government requirements

24  of a pharmaceutical company.

25        Q.   BY MR. CARTMELL:  And TPI is overseeing

1    and monitoring and auditing the Teva USA DEA

2    compliance to make sure that they are adhering

3    to those standards; correct?

4         A.   Yes.

5              MS. HILLYER:  Objection to form.

6         Q.   BY MR. CARTMELL:  Okay.

7         A.   Yes.

8         Q.   And, in fact, in this case, TPI in

9    Israel had been auditing the DEA Compliance

10   department at Teva USA for over a year and

11   a half at this point; correct?

12             MS. HILLYER:  Objection to form.

13             THE WITNESS:  I don't know.

14        Q.   BY MR. CARTMELL:  If you turn to --

15   if you turn to 570, the last three Bates, please.

16   Under "Audits," the last sentence on that page,

17   it states:

18             "Although internal auditing activity

19   has already been conducted for more than a year

20   and a half, a significant portion of the processes

21   are still insufficiently formulated."

22             Do you see that?

23        A.   Yes.

24        Q.   So according to this document, TPI

25   Israel had been routinely or regularly auditing

Highly Confidential - Subject to Further Confidentiality Review

```
1    the DEA Compliance company in Teva USA for a

2    year and a half at this time; correct?

3              MS. HILLYER:  Objection to form.

4              THE WITNESS:  This is what the text

5    says.

6         Q.   BY MR. CARTMELL:  Okay.  And the

7    standards, it referred -- in -- in the prior

8    page, when it talked about "standards," it's

9    true, is it not, that TPI globally sets forth,

10   through standard operating procedures, the

11   policies that Teva USA was supposed to follow?

12             MS. HILLYER:  Objection to form.

13             THE WITNESS:  TPI issues standard

14   operating procedures on certain topics.

15        Q.   BY MR. CARTMELL:  Right.

16             And those are -- I -- I've seen in

17   the documents those are typically referred to

18   as "global policies"?

19        A.   Yes.

20        Q.   Okay.  And those come from TPI, the

21   corporate parent, to Teva USA.  And they are

22   directives that Teva USA is supposed to follow;

23   correct?

24        A.   Yes.  These are usually in domains

25   that are -- that if the local subsidiary --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   the Teva USA or another subsidiary strays,

 2   it may hurt the parent company.

 3       Q.   That -- you mentioned that a few

 4   times.

 5            One of the reasons why Teva or TPI

 6   in Israel, the parent company, is overseeing

 7   and managing and -- and auditing Teva USA is

 8   because they don't want them to hurt the parent

 9   corporation, TPI, by doing something against

10   the law or not according to standards; correct?

11            MS. HILLYER:  Objection to form.

12            THE WITNESS:  TPI, as a traded company,

13   is under obligation to ensure that its subsidiaries

14   follow the law and the required regulations,

15   standards, et cetera.  Otherwise, as in the case

16   of FCPA, it is liable itself for the wrongdoing

17   of its subsidiaries.

18       Q.   BY MR. CARTMELL:  Okay.

19       A.   So this is why on specific issues

20   we, as TPI, do monitor the compliance of our

21   subsidiaries.

22       Q.   Right.

23            If you go to 581, please, one of

24   the areas that was looked at by TPI through

25   its employee auditor from Israel was the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   suspicious order monitoring process.

 2            Do you see that?

 3       A.   Let me -- 581. (Examining.)

 4       Q.   Do you see that?

 5       A.   Yeah.  I see that.

 6       Q.   And -- and I'll represent to you

 7   that one of the allegations in this case

 8   is that Teva -- the Teva entities did not

 9   have a valid or appropriate suspicious order

10   monitoring program, meaning that, when they

11   were selling and distributing opiate drugs,

12   they weren't monitoring those drugs for

13   diversion or abuse or mis-use adequately.

14            Did you know that?

15       A.   Not in that level of specificity.

16       Q.   Okay.  And -- and the last sentence

17   here states that the auditor from TPI in Israel

18   found that:

19            "Granting exclusive authority to

20   a single person to release a suspicious order

21   constitutes a risk for mistakes."

22            Do you see that?

23       A.   I see that.

24       Q.   Okay.  And then it states in this

25   table here that there were potential risks
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to the company.  Do you see that, potential

 2    risk?

 3         A.   Uh-huh.

 4         Q.   And it says:

 5              "False approval and release of

 6    suspicious sales orders."

 7              Do you see that?

 8         A.   Yes.

 9         Q.   Okay.  And that's what the -- the

10    Israeli TPI auditor found?

11              Is that your understanding?

12              MS. HILLYER:  Objection to form and

13    to the extent this is beyond the scope.

14              THE WITNESS:  Yes.

15         Q.   BY MR. CARTMELL:  Okay.  And then

16    there are recommendations that the auditor

17    actually gives to Teva USA DEA Compliance

18    department.

19              Do you see that?

20         A.   Yes.

21         Q.   And I take it you know from your

22    experience that, when an audit is done by

23    TPI, they send Israeli auditors over here --

24    or employees from the Israeli parent home

25    office to the USA.
```

Highly Confidential - Subject to Further Confidentiality Review

1              And if they find that there are

2    deficiencies, they give recommendations

3    that they expect Teva USA to then renumerate

4    [sic]; correct?

5              MS. HILLYER:  Objection to form.

6              THE WITNESS:  The process -- and you

7    can see that in the next column -- is -- yes,

8    there are recommendations and manage -- local

9    management either agrees or rejects.  There's a

10   conversation about the -- about the recommendations

11   and an agreed remediation plan.

12        Q.   BY MR. CARTMELL:  Well, the -- the Teva

13   USA, who's being audited, there are recommendations

14   made, and they are required to renumerate [sic];

15   correct?

16             MS. HILLYER:  Objection to form.

17   Mischaracterizes his testimony.

18             THE WITNESS:  That's not what it

19   says here.

20        Q.   BY MR. CARTMELL:  Well, do you know?

21        A.   It says:

22             "Management Response."

23             "Agreed."

24        Q.   Okay.

25        A.   And knowing -- not from this, because

1    I was not involved in this.  But I was involved

2    in other global internal audit reports.  The

3    process is global internal audit brings their

4    findings.  There is a discussion about what

5    could be an effective remediation of the risks

6    identified.  And then there's an agreed-upon

7    remediation plan --

8        Q.   Okay.

9        A.   -- that the local subsidiary undertakes.

10           (Exhibit 46 marked.)

11       Q.   BY MR. CARTMELL:  And I'll hand you

12   what's been marked as Exhibit 46, which is an

13   e-mail string that was produced from the files

14   of Teva in this lawsuit.  And I just have one --

15   or a few questions about the first e-mail on

16   the page.  You'll see that it's from Matthew

17   Benkert, who I will represent to you is from

18   the DEA department in Teva USA, to Arie Arditi.

19           You see that?

20       A.   (Examining.)  Uh-huh.

21       Q.   And Itai Rigbi is cc'd.  That was

22   the auditor that came from Israel to the USA

23   to audit the -- the Compliance department.

24           Do you remember that?

25       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And it says:

 2              "Arie.  Thank you for following up.

 3     I was planning on e-mailing you this week.

 4     As of last week, all action items have been

 5     completed."

 6              And -- and you'll see below that

 7     Arie had been following up with Matthew Benkert,

 8     asking him where -- what the status was of the

 9     action items.

10              Do you see that?

11        A.    Yes.

12        Q.    And -- and is that sort of typical?

13              If there is an agreement, that the

14     deficiencies will be renumerated [sic], then

15     they work together -- in other words, the

16     auditors -- or the auditing department from

17     TPI in Israel will work together with Teva

18     USA to renumerate [sic] and make sure that

19     the recommendations are carried out?

20              MS. HILLYER:  Objection to form

21     and mischaracterizes his testimony.

22              THE WITNESS:  No.

23        Q.    BY MR. CARTMELL:  Okay.

24        A.    And I explain.  "No" meaning, internal

25     audit does not remediate anything.  They point
```

Highly Confidential - Subject to Further Confidentiality Review

1    to a risk, to a potential risk, and they discuss

2    with management -- with the local management

3    responsible for the operation what could be

4    a mitigating plan and then follow up to see

5    that local management actually remediated.

6    The internal audit does not solve problems.

7    It just identifies them.

8         Q.   Gotcha.  Okay.  I'm done with that

9    document.

10            Another area that you were asked to

11   testify about has to do with TPI's control or

12   monitoring or overseeing of Teva USA related

13   to pharmacovigilance.

14            Do you see that?

15        A.   Yes.

16        Q.   Okay.  And I take it you're prepared

17   to testify in that regard?

18        A.   Yeah.

19            (Exhibit 47 marked.)

20        Q.   BY MR. CARTMELL:  Let me hand you

21   what's been marked as Exhibit 47.

22            Now, are you familiar with what the

23   process of pharmacovigilance is?

24        A.   In a broad sense.

25        Q.   Is your understanding that a company

Highly Confidential - Subject to Further Confidentiality Review

1    like Teva USA, for example, who is distributing

2    or selling or marketing pharmaceuticals, has a

3    requirement by law to have a pharmacovigilance

4    process in place?

5        A.   Yes.

6             MS. HILLYER:  Objection.  I'm sorry.

7    Objection.  Beyond the scope.

8        Q.   BY MR. CARTMELL:  And the process

9    of pharmacovigilance, is it your understanding

10   that that is a process related to the safety

11   of a drug like an opioid?

12            MS. HILLYER:  Same objection.

13            THE WITNESS:  Generally speaking, yes.

14       Q.   BY MR. CARTMELL:  And post-marketing,

15   or after a drug like an opioid comes to market

16   and is being sold, a company like Teva is --

17   who distributes opioids, or one of the member

18   companies of the group who distributes opioids,

19   has the requirement that they continue to track

20   and assess adverse events related to that drug,

21   for example, an opioid?

22            MS. HILLYER:  Objection to form and

23   beyond the scope.

24            THE WITNESS:  I'm not an expert on

25   pharmacovigilance rules in any specific country.

Highly Confidential - Subject to Further Confidentiality Review

 1    But, generally, the pharmacovigilance, as the

 2    name implies, is the monitoring and reporting

 3    system that any pharmaceutical company needs

 4    to set up to address -- to receive and address

 5    adverse effects related to its products.

 6         Q.   BY MR. CARTMELL:  Right.

 7              And one of the reasons for that is

 8    to try to ensure patient safety associated with

 9    the drugs; correct?

10              MS. HILLYER:  Objection.  Beyond the

11    scope.

12              THE WITNESS:  I presume yes.

13         Q.   BY MR. CARTMELL:  Okay.  Now, does

14    TPI in Israel have a pharmacovigilance department?

15         A.   We have a pharmacovigilance department

16    for the Israeli market that deals with complaints

17    and reports of adverse effects of our products

18    in Israel.

19         Q.   You also have a pharmacovigilance --

20    or a safety and pharmacovigilance department and

21    employees who oversee and audit the subsidiary

22    companies like Teva USA; correct?

23              MS. HILLYER:  Objection to form.

24              THE WITNESS:  Yes.

25         Q.   BY MR. CARTMELL:  And I've handed you

Highly Confidential - Subject to Further Confidentiality Review

1    this exhibit which was produced to us in this

2    lawsuit, which is, you'll see from the e-mail,

3    attaching an internal audit of the pharmacovigilance

4    system at Teva USA.

5                Do you see that?

6                MS. HILLYER:  Give him a second.

7                THE WITNESS:  (Examining.)  Okay.

8        Q.   BY MR. CARTMELL:  And if you go to

9    the next page, it states:

10               "Teva Pharmaceuticals Pharmacovigilance

11   Audit Report, January" 2011.  (As read.)

12               Do you see that?

13       A.   Yes.

14       Q.   Okay.  The next page, under "Executive

15   Summary," it states:

16               "A pharmacovigilance (PV) audit by

17   Barton Cobert, MD, FACP, FACG, FFPM of BLCMD

18   Associates ... and Mr. Eric Elbaz and Dr. Hila

19   Avidan of Teva Global Compliance was performed

20   on January 25-27, 2011 at the Teva offices in ...

21   Pennsylvania, USA."  (As read.)

22               Do you see that?

23       A.   Yes.

24       Q.   Okay.  So just like TPI in Israel

25   sending over an auditor from Israel to Teva

```
 1    USA and the DEA Compliance department, this

 2    is an example of TPI and Israel sending over

 3    auditors from Israel to audit Teva USA's

 4    pharmacovigilance department; correct?

 5              MS. HILLYER:  Objection to form.

 6              THE WITNESS:  The people -- there's

 7    a third party here, BLC -- the expert from BLCMD.

 8    But Eric Elbaz and Hila Avidan are part of Teva

 9    Global Compliance.  It's a global function.  They

10    happen to sit in Israel.  Their -- I don't know

11    if direct manager, but ultimate manager sits

12    in the US, Lori Queisser.  So it's a global --

13    global organization that is meant to ensure

14    the group -- the entities comply with the

15    requirements.

16        Q.   BY MR. CARTMELL:  Okay.  But --

17    I understand that.

18              But this is TPI sending auditors

19    from Israel as a part of their overseeing

20    Teva USA pharma -- pharmacovigilance; correct?

21              MS. HILLYER:  Objection to form.

22              THE WITNESS:  And I repeat, these are

23    TPI employees.

24        Q.   BY MR. CARTMELL:  Yes.

25        A.   They are functioning here as part of
```

1    their role -- their global role of overseeing

2    compliance, in this case, pharmacovigilance

3    compliance in one of the subsidiaries -- one

4    of the members of the group.

5        Q.   Okay.  I want to ask you just a few

6    things about this.

7            If you go to page 4, there's some

8    conclusions from the auditors from TPI who came

9    from Israel with a -- also with a consultant

10   that was hired by the company to audit Teva

11   USA.  And it says:

12           "The safety system in Teva US has

13   multiple gaps and the reporting of safety

14   matters to" the "FDA (and by extension other

15   regulatory agencies in the EU and elsewhere

16   as well as business partners) cannot be assured."

17   (As read.)

18           Do you see that?

19           MS. HILLYER:  Objection to form.

20           THE WITNESS:  I see that.

21       Q.   BY MR. CARTMELL:  Okay.

22           "It is recommended that Teva take

23   on a global review and upgrading of all" of

24   "its safety function ensuring that it is in

25   compliance and that it is scalable as new

Highly Confidential - Subject to Further Confidentiality Review

```
 1    products and companies are brought in."

 2    (As read.)

 3            Do you see that?

 4       A.   I see that.

 5       Q.   If you go to page 7, it states in the

 6    second paragraph:

 7            "Teva Pharmacovigilance is headquartered

 8    at the main site in Israel."

 9            Do you see that?

10       A.   Yes.

11       Q.   (Reading.)

12            "There are local safety offices in

13    multiple countries around the world.  Adverse

14    events come from clinical trials, post-marketing

15    reports, business partners, solicited cases, etc.,

16    and are entered into the global database in Israel,

17    the US, and Germany."

18            Do you see that?

19       A.   Yes.

20       Q.   Israel, at TPI, hosts the global adverse

21    event database; correct?

22       A.   Again?  Sorry.  Can you repeat the --

23       Q.   Israel, at TPI, hosts the global database

24    related to adverse events related to the sales of

25    its drugs; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

 1     A.    Yes.

 2     Q.    Including opioids; correct?

 3     A.    Including all of our products.  Yes.

 4     Q.    Including opioids that are sold in the

 5   United States; correct?

 6     A.    Yes.

 7     Q.    Okay.  And then if you turn to page 10,

 8   in the third paragraph, it states:

 9           "There are SOPs both at the Global level

10   and at the US level."

11           Do you see that?

12     A.    Where does it say -- oh, yeah.  Now

13   I see the paragraph.  It's in the middle.

14     Q.    And that's consistent with your --

15   your testimony that TPI creates standard operating

16   procedures that the subsidiaries, like Teva USA,

17   are supposed to follow, and at the local level

18   there are also some -- some standard operating

19   procedures as well; correct?

20           MS. HILLYER:  Objection to form.

21           THE WITNESS:  Yes.  On these matters,

22   yes.

23     Q.    BY MR. CARTMELL:  The global standard

24   operating procedures that are put in place and

25   sent to Teva USA Pharmacovigilance are directives

Highly Confidential - Subject to Further Confidentiality Review

```
 1    by Teva TPI to the local Teva USA; correct?

 2         A.    Yes.

 3         Q.    And the local-level Teva Pharmacovigilance

 4    is expected to follow those directives; correct?

 5         A.    Yes.  That's why they're limited in

 6    nature.

 7         Q.    If you go to page 21.  I'm under:

 8               "Quality/Compliance/Quality Management

 9    System."

10               And -- and this is written by the

11    consultant that was hired by TPI to do the

12    audit with the Israel employees; correct?

13               MS. HILLYER:  Objection.  Beyond

14    the scope.  And assumes facts not in evidence.

15               MR. CARTMELL:  I'll withdraw it.

16    It's not important.

17         Q.    BY MR. CARTMELL:  Under "Quality/

18    Compliance/Quality Management System," it

19    states in the second sentence:

20               "In discussion with DS and with Mr.

21    Arthur Hand, Director, QA R & D, the Americas,

22    it became clear that quality monitoring of"

23    pharmacovigilance, "particularly for marketed

24    products, resides in Israel."  (As read.)

25               Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   And that's true, is it not?

3      A.   I don't know if, as of 2011, that

4   was true.  It says this is their findings.

5      Q.   You have no reason to dispute that?

6   Fair enough?

7           MS. HILLYER:  Objection to form.

8           THE WITNESS:  This is what it says.

9      Q.   BY MR. CARTMELL:  It then states:

10          "There is no one in the US handling"

11   pharmacovigilance "quality."  (As read.)

12          Do you see that?

13     A.   Yes.

14     Q.   Below, it states:

15          "Mr. Arthur Hand was interviewed.

16   He notes that he and his group have no duties

17   in regard to DS or" pharmacovigilance.  "He

18   indicated that" pharmacovigilance "quality,

19   both for clinical trial and post-marketing, is

20   handled in Israel by Global Quality/Compliance."

21   (As read.)

22          Do you see that?

23     A.   Yeah.

24     Q.   And that's true even for the opioid

25   products that Teva USA was selling in the United

1    States; correct?

2        A.    I have no information to -- to state

3    that it's correct or not.  This is what it says.

4        Q.    You don't know, though; is that fair?

5        A.    Yes.

6        Q.    Then on the next page, at the top, it

7    states:

8              "We interviewed Tal Kleinfeld in Israel

9    by phone."

10             Do you see that?

11       A.    Yes.

12       Q.    And so they actually called Israel

13   to talk to somebody in the Pharmacovigilance

14   department at TPI; correct?

15             MS. HILLYER:  Objection.  Beyond the

16   scope.

17             THE WITNESS:  She is -- can you repeat

18   or rephrase the question?

19       Q.    BY MR. CARTMELL:  I was just saying

20   this reflects they actually called Israel and

21   TPI and the Pharmacovigilance department, and

22   a woman named -- or a man named Tal Kleinfeld;

23   correct?

24             MS. HILLYER:  Objection.  Beyond the

25   scope.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  That's what it says here.

 2    Yes.

 3         Q.   BY MR. CARTMELL:  Okay.

 4         A.   That's what it says.

 5         Q.   Yeah, "she."  Sorry about that.

 6              "She is head of Global PV Compliance.

 7    She confirmed that there is no US" pharmacovigilance

 8    "compliance group.  She indicates that her group" --

 9              And that would be in Israel.

10              -- "monitors the timely compliance of

11    submissions to FDA and other health authorities

12    with monthly compliance reports on late submissions

13    and that CAPAs" --

14              Which stands for "corrective and

15    preventive action plans."

16              -- "are performed on all late expedited

17    cases."  (As read.)

18              Do you see that?

19         A.   Yes.

20         Q.   Is that consistent with your understanding

21    of Teva -- or strike that.  Strike that.

22              Is that consistent with your understanding

23    of TPI's involvement in the pharmacovigilance

24    related to opioids and the other medications

25    it sends -- or it sells?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Objection to form.
 2              THE WITNESS:  According to this report,
 3      this is the situation that existed as of May '11.
 4         Q.   BY MR. CARTMELL:  And does -- does it
 5      still exist today?
 6              MS. HILLYER:  Objection to form.
 7              THE WITNESS:  They have gone through
 8      several restructuring.  I believe now they are
 9      structured more -- more similarly to other global
10      functions, meaning there'll be local people and
11      there'll be regional people and global people.
12         Q.   BY MR. CARTMELL:  Okay.  We'll talk
13      about that in a minute.  It -- it then states:
14              "Her group" --
15              Meaning TPI in Israel.
16              -- "monitors ongoing training efforts
17      in" pharmacovigilance.  (As read.)
18              Do you see that?
19         A.   Where does it say that?
20              Oh, yeah.  I see that.
21         Q.   So this report, this audit that
22      was done by TPI and its consultant in 2011 is
23      making it clear that TPI Pharmacovigilance is
24      very involved in the day-to-day pharmacovigilance
25      of even opioid sales in the United States;
```

```
 1   correct?

 2            MS. HILLYER:  Objection to form.

 3            THE WITNESS:  I cannot attest to

 4   opioids or not.  But it -- it shows that, as

 5   of this time, the pharmacovigilance compliance

 6   was done from Israel.

 7       Q.   BY MR. CARTMELL:  And it even says

 8   that they are actually monitoring the compliance

 9   of submissions to the FDA by Teva USA; correct?

10            MS. HILLYER:  Objection to the form.

11            THE WITNESS:  That's what it says.

12       Q.   BY MR. CARTMELL:  If you turn to page

13   29, under "Literature Cases" -- and it's true,

14   is it not, sir, that one of the ways that a

15   company like Teva USA or any company that sells

16   opioids can find out about adverse events associated

17   with the opioid or the medication is by looking

18   at the literature?  Is that true?

19            MS. HILLYER:  Objection.  Beyond the

20   scope.

21            THE WITNESS:  I'm not an expert on how

22   pharmacovigilance is conducted.  But from personal

23   knowledge, I know that this is true.

24       Q.   BY MR. CARTMELL:  Okay.  And it states

25   under this:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              "All literature searching is done in

 2     Israel."

 3              Do you see that?

 4        A.   I see that.

 5        Q.   (Reading.)

 6              "No local US/Canadian journals are

 7     searched."

 8              Do you see that?

 9        A.   I see that.

10        Q.   And then it states below in the

11     second-to-last line -- or third-to-last line:

12              "Cases from Israel arrive weekly in

13     the e-mail box on Mondays."

14              Do you see that?

15        A.   Yes.

16        Q.   So that is TPI in Israel involved heavily

17     in the day-to-day operations of pharmacovigilance

18     related to all of the medications sold in the

19     United States; correct?

20              MS. HILLYER:  Objection to form.

21     Mischaracterizes the document.

22              THE WITNESS:  Yeah, I don't see where

23     it says -- it says:

24              "Cases from Israel arrive weekly."

25              I don't see where --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   BY MR. CARTMELL:  Well, they're sent

 2   to the US, aren't they?

 3             MS. HILLYER:  Objection.  Assumes facts

 4   not in evidence.  And beyond the scope.

 5        Q.   BY MR. CARTMELL:  Do you see that?

 6        A.   Okay.  Yeah.  Need to read the entire

 7   paragraph to get -- to understand what's going

 8   on here.

 9             So Amelita Jacobo, as I see it here,

10   supposedly in the US -- because it doesn't say.

11   And we just said everything is done in Israel.

12   So --

13        Q.   Okay.

14        A.   -- she may very well be in Israel.

15   I'm not sure I understand how you draw these

16   conclusions from what is in here.

17        Q.   Okay.  Turn to 41, if you would,

18   please.  It states:

19             "Signaling."

20             During your work in this case, or

21   based on your personal experience, do you

22   understand that one of the requirements of a

23   company selling opioids or any other medication

24   on the market in the United States is that they

25   are supposed to continue assessing and searching
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for adverse events related to their medication

 2    and to look for safety signals?

 3              MS. HILLYER:  Objection to form

 4    and beyond the scope.

 5              THE WITNESS:  I'm no expert on --

 6    especially not on post-approval compliance.

 7    But I know of what are commonly called Phase

 8    4, meaning safety testing beyond approval of

 9    the FDA.

10        Q.    BY MR. CARTMELL:  Okay.  It states:

11              "Liat Fleishon (a physician) in Israel" --

12              Liat Fleishon's an employee of Teva --

13    of TPI; is that correct?  Or was at that time?

14              MS. HILLYER:  Objection to the extent

15    it's beyond the scope.

16              THE WITNESS:  I presume.

17        Q.    BY MR. CARTMELL:  Okay.  It states:

18              "She does signaling for Teva products."

19              Sir, did you know that as of this time

20    when Teva USA was sending -- excuse me -- was

21    selling opioids in the United States, that the

22    pharmacovigilance work related to signaling or

23    safety signals on opioids was done by TPI in

24    Israel?

25              MS. HILLYER:  Objection.  Assumes
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    facts not in evidence.

 2              THE WITNESS:  I learned this from

 3    the report.  It appears to be so.

 4         Q.   BY MR. CARTMELL:  And then if you turn

 5    to page 42, under "Overall Comments and Conclusion,"

 6    it states:

 7              "The safety system in Teva US is largely

 8    out of control and the reporting of safety matters

 9    to" --

10         A.   Where is that?

11              MS. HILLYER:  Where are you?

12         Q.   BY MR. CARTMELL:  I'm sorry.  Under

13    "Overall Comments and Conclusion."  I'll start

14    over.

15              Sir, if you look under "Overall Comments

16    and Conclusion," the second paragraph by the audit

17    that TPI did, it states:

18              "The safety system in Teva US is largely

19    out of control and the reporting of safety matters

20    to FDA (and by extension other regulatory agencies

21    and business partners) cannot be assured."

22              Do you see that?

23         A.   Yes.

24         Q.   Okay.  Then on the next page, 43, in --

25    the second paragraph states:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                "PV" --

 2                Or "pharmacovigilance."

 3                -- "compliance resides in Israel;

 4     Global" Pharmacovigilance "may want to consider

 5     having a representative of this function in

 6     the US in Horsham."  (As read.)

 7        A.    Where?

 8                MS. HILLYER:  He -- he's not following

 9     you.

10                MR. CARTMELL:  Okay.  I'll slow down.

11                THE WITNESS:  Okay.  Okay.

12                MS. HILLYER:  You've got to slow down.

13        Q.    BY MR. CARTMELL:  Let me start over.

14                And then it states in the second

15     paragraph:

16                Pharmacovigilance "compliance resides

17     in Israel.  Global" Pharmacovigilance "may want

18     to consider having a representative of this

19     function in the US in Horsham."  (As read.)

20                Do you see that?

21        A.    Yes.

22        Q.    (Reading.)

23                "A full Quality Management System

24     should be put in place" --

25                (Court reporter clarification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   BY MR. CARTMELL:  Sorry.
2               "A full Quality Management System
3     should be put in place as this is now expected
4     and required by FDA and the EU."
5               Do you see that?
6          A.   Yes.
7               (Exhibit 48 marked.)
8          Q.   BY MR. CARTMELL:  I'm going to hand
9     you what's been marked as Exhibit 49 [sic].
10              MS. HILLYER:  48.
11              MR. CARTMELL:  48.  I'm sorry.
12         Q.   BY MR. CARTMELL:  Mr. Herman, this
13    is an e-mail from Hedva Voliovitch to several
14    other people.
15              Who is Hedva Voliovitch?
16         A.   (Examining.)  She was the head of
17    Global Pharmacovigilance.
18         Q.   And she was a TPI employee; correct?
19         A.   Yes.
20         Q.   Residing in Israel and working in Israel;
21    correct?
22         A.   Yes.
23         Q.   Okay.  And she was the head of the Safety
24    and Pharmacovigilance department at TPI in Israel?
25              Is that your memory?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Objection to form.

 2              THE WITNESS:  She's a TPI employee, and

 3    she is the global -- global role, as we discussed

 4    before, Drug and Safety and Pharmacovigilance

 5    divisions.

 6       Q.   BY MR. CARTMELL:  If you look at the

 7    attached PowerPoint that was produced in this

 8    litigation.  This is from March of 2012, and it

 9    says:

10              "Introduction to Teva Global Drug Safety

11    & Pharmacovigilance."

12              Do you see that?

13       A.   Yes.

14       Q.   And I want to ask you a few questions

15    about this PowerPoint put together and presented

16    by Ms. Voliovitch.  Under Teva -- page 5, "Teva

17    Pharmacovigilance Mission" is:

18              "To detect and assess safety issues

19    that involve Teva products, in order to minimize

20    the risk to patients and Teva and support Teva's

21    leadership position in the generic and branded

22    business."

23              Do you see that?

24       A.   Yes.

25       Q.   And that's consistent with what we
```

Highly Confidential - Subject to Further Confidentiality Review

 1   talked -- talked about previously; correct?

 2            MS. HILLYER:  Objection to form.

 3            THE WITNESS:  Yes.  In general

 4   pharmacovigilance purposes.

 5        Q.   BY MR. CARTMELL:  If you turn to page

 6   7, it talks about levels of responsibility.  And

 7   I want to ask you about this.  But in the middle

 8   is the "Local" entity.

 9            That would be like Teva USA; correct?

10        A.   Yes.

11        Q.   And then, as you discussed, sometimes

12   there would be -- and I guess there was in --

13   in pharmacovigilance a regional entity?

14        A.   Regional --

15            MS. HILLYER:  Objection to form.

16            THE WITNESS:  Region -- regional

17   oversight.  There's no entity.

18        Q.   BY MR. CARTMELL:  Okay.

19        A.   But it's oversight.

20        Q.   In this case, do you know if Teva USA --

21   well, strike that.

22            I think we'll get to it in another --

23   in another slide.

24            And then the biggest blue circle is:

25            "Global."

```
 1            Do you see that?

 2      A.   Yes.

 3      Q.   And that's, in this case, TPI; correct?

 4           MS. HILLYER:  Objection to form.

 5           THE WITNESS:  No.

 6      Q.   BY MR. CARTMELL:  No?

 7      A.   No.

 8      Q.   Okay.  We'll get to that in a -- in

 9  a slide.

10           You -- you don't think that "Global"

11  here means TPI?

12           MS. HILLYER:  Well, objection to the

13  extent he knows nothing about this document.

14  He's had all of ten seconds with it, and you're

15  asking him to interpret it.  He's testified about

16  what he thinks "Global" means in a pharmacovigilance

17  sense.

18           MR. CARTMELL:  Okay.  As of -- as of --

19  let me re-state it, then.  That's a good objection.

20      Q.   BY MR. CARTMELL:  In March of 2012,

21  do you know whether the responsibility listed

22  under "Global" included TPI's responsibility

23  for pharmacovigilance of medications sold in

24  the US and elsewhere?

25           MS. HILLYER:  Objection to form.
```

1          THE WITNESS:  First, this slide does

2    not depict any -- it says -- it has names of

3    areas of domains of operation.

4        Q.   BY MR. CARTMELL:  I'm just asking if

5    you know --

6          MS. HILLYER:  Let him -- Tom, let him

7    finish.

8        Q.   BY MR. CARTMELL:  It doesn't say what

9    that --

10          MS. HILLYER:  Tom, let him finish.

11    You're cutting him off.

12          THE WITNESS:  There are domains of

13    activities within the pharmacovigilance world

14    and then there are circles.  No -- nothing in

15    this slide tells me what is done where.  And

16    "Global" in Teva does not mean TPI.  "Global"

17    means people who have oversight beyond their

18    specific country.

19        Q.   BY MR. CARTMELL:  Okay.  I think --

20    I think -- at any rate, sir, this has three

21    levels of responsibility.

22          The largest circle here refers to

23    "Global"; correct?

24        A.   The largest circle says "Global."  Yes.

25        Q.   Okay.  If you turn the page, there's

1    an organizational chart.

2           Do you see that?

3    A.    Yes.

4    Q.    And at the head of the organization

5    for pharmacovigilance in this PowerPoint put

6    out by TPI's employee Ms. Voliovitch is:

7           "Global Drug Safety and"

8    Pharmacovigilance, "Hedva Voliovitch."

9    (As read.)

10          Correct?

11   A.    Yes.

12   Q.    Okay.  And then there are several

13   regionals that report up to her; correct?

14   A.    Yes.

15   Q.    Okay.  At least as of this time,

16   the leader of the pharmacovigilance organization

17   is a Teva Ltd. employee; correct?

18   A.    Yes, because she happened to reside

19   in Israel.

20   Q.    Okay.  Well, she's an Israeli --

21   strike that.

22          She's a TPI employee?

23   A.    Because she happens to reside in --

24   in Israel.

25   Q.    Are you testifying that because she

Highly Confidential - Subject to Further Confidentiality Review

```
1   resides -- she's only an employee at TPI because

2   she resides in Israel?

3       A.   Yes.

4       Q.   So your testimony is that, if people

5   reside in Israel, that is the reason they become

6   employees of TPI?

7       A.   No.

8       Q.   Okay.  But -- so it's clear, I'm just

9   asking this question and this question only.

10          Your testimony is that Hedva Voliovitch

11  was only an employee of TPI because she resided

12  in Israel?

13      A.   Had she been residing elsewhere,

14  she would have been an employee of the local

15  entity in which she resides, same as Carlo de

16  Notaristefani and Harfun and other people we

17  were talking about.

18      Q.   She was never an employee of anyone

19  other than Teva Ltd. or Teva TPI; correct?

20      A.   Correct.

21      Q.   Okay.  When she was working in her --

22  this course and scope of her employment with

23  TPI in pharmacovigilance, she was working as

24  a TPI employee; correct?

25      A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. HILLYER:  Objection to form.

 2                THE WITNESS:  Yes.

 3        Q.   BY MR. CARTMELL:  If you turn to page

 4   24, it refers to the signal detection process

 5   that we talked about a minute ago.

 6                Do you see that?

 7                MS. HILLYER:  Hold on.  I'm not there

 8   yet.  Okay.

 9                THE WITNESS:  Yes.

10        Q.   BY MR. CARTMELL:  It states the:

11                "Process is described in Global"

12   Pharmacovigilance "SOP 50.11.13."  (As read.)

13                Do you see that?

14        A.   Yes.

15        Q.   And that is a TPI SOP; correct?

16                MS. HILLYER:  Objection to form.

17                THE WITNESS:  This is a Global

18   Pharmacovigilance SOP.

19                (Court reporter clarification.)

20                THE WITNESS:  This is a Global

21   Pharmacovigilance SOP.

22        Q.   BY MR. CARTMELL:  And the SOP was

23   put together by TPI; correct?

24        A.   I don't know who puts it together.

25   But it was authorized by Hedva Voliovitch, who
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was at the time a TPI -- was a TPI employee.

 2         Q.   The -- the page 41, which I think

 3    is the next-to-last page of Ms. Voliovitch's

 4    PowerPoint, states:

 5              Pharmacovigilance "is a Shared

 6    Responsibility."  (As read.)

 7              Do you see that?

 8         A.   Yes.

 9         Q.   Based on your review of this PowerPoint

10    or your knowledge of the responsibilities and

11    duties of TPI for pharmacovigilance at this

12    time in 2012, do you believe that part of that

13    responsibility for pharmacovigilance was TPI's?

14              MS. HILLYER:  Objection to form.

15              THE WITNESS:  Given the very broad

16    nature of this slide, it can mean so many things.

17    I probably need Hedva to say what she meant when

18    she put this visual and this very broad definition.

19    What is shared responsibility?  Who shares what

20    with whom?

21              So I'm trying to look back to see perhaps

22    this is a conclusion of something that was in the

23    presentation that can tell us what she meant when

24    she said "shared responsibility."

25         Q.   BY MR. CARTMELL:  Well, you think it has
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to do with the slide that we looked at that had the

 2    three rings that said "Levels of Responsibility"?

 3                MS. HILLYER:  Objection to form.

 4                THE WITNESS:  I have no idea what she

 5    meant --

 6                MR. CARTMELL:  Okay.

 7                THE WITNESS:  -- when she said "shared

 8    responsibility."  She could mean so many things.

 9                (Exhibit 49 marked.)

10        Q.   BY MR. CARTMELL:  All right.  Let's

11    move on.  I'll hand you Exhibit 49.  This was

12    a document from Teva's files that was produced

13    in this litigation.  You'll see that the first

14    page is an e-mail from Tal Kleinfeld to several

15    individuals.

16                Do you see that?

17        A.   (Examining.)  Yes.

18        Q.   Hedva Voliovitch, that we just talked

19    about, is cc'd on this; correct?

20        A.   Yes.

21        Q.   And this was in 2010?

22        A.   Yes.

23                MR. CARTMELL:  Just to save time, I'm

24    going to mark another exhibit, 8027.

25                (Exhibit 50 marked.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   BY MR. CARTMELL:  I'm going to hand

 2   you Exhibit 50 as well.

 3             Exhibit 49, if you turn the page,

 4   you'll see that this is a Teva corporate

 5   policy.

 6        A.   (Examining.)  Yes.

 7        Q.   (Reading.)

 8             "Teva Pharmaceutical Industries Ltd."

 9             Do you see that?

10        A.   Yes.

11        Q.   So this is a policy from the parent

12   corporation, TPI; correct?

13        A.   Yes.

14        Q.   Prepared by TPI.  And a policy --

15   standard operating policy that is provided

16   to subsidiaries like Teva USA and directives

17   to them that they're expected to follow;

18   correct?

19             MS. HILLYER:  Objection to form.

20             THE WITNESS:  Yes.

21        Q.   BY MR. CARTMELL:  The name of this

22   policy is:

23             "Safety Information on Company Products."

24             And down below you'll see, next to

25   "Domain" in the middle, it says:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              "Pharmacovigilance."

 2              Do you see that?

 3     A.    Yes.

 4     Q.    This is a policy in April of 2010.

 5              Do you see that?

 6     A.    Yes.

 7     Q.    And this is signed actually by two

 8  employees of TPI; right?

 9     A.    Yes.

10     Q.    And if -- if you go to the next page,

11  I want to refer you to some terms in this policy.

12  It states under "Purpose":

13              "It is the intention of Teva to optimize

14  the benefit/risk balance of Teva's medicinal

15  products and devices, facilitate early action

16  to address safety issues and thereby contribute

17  to patient safety and public health and to

18  maintain worldwide regulatory compliance."

19              Do you see that?

20     A.    Yes.

21     Q.    And then it says, 1.2:

22              "All decisions taken in response to

23  safety issues by Teva Global Drug Safety and

24  Pharmacovigilance (Global" Pharmacovigilance)

25  "are binding worldwide for the Teva group products.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    The implementation of these decisions must be

 2    given highest priority by each Teva affiliate."

 3    (As read.)

 4            Do you see that?

 5    A.   Yes.

 6    Q.   Okay.  This policy gives Teva Global

 7    Drug Safety and Pharmacovigilance the authority

 8    to make binding decisions related to safety

 9    information of its products -- or of Teva

10    products being sold in the US; correct?

11            MS. HILLYER:  Objection to form to

12    the extent this is beyond the scope.

13            THE WITNESS:  Decisions on products

14    worldwide, yes.

15    Q.   BY MR. CARTMELL:  Including opiate

16    sales in the United States; correct?

17            MS. HILLYER:  Same objection.

18            THE WITNESS:  It will include all

19    products sold by all Teva subsidiaries worldwide.

20    Q.   BY MR. CARTMELL:  Including opioids;

21    correct?

22    A.   Yes.

23    Q.   Okay.  And then on the second page --

24    or page 3 of 4, actually, it states:

25            "Safety Assessment."
```

```
 1              And it has:

 2              "Global" Pharmacovigilance "has the

 3     following responsibilities."  (As read.)

 4              Do you see that?

 5       A.   Yes.

 6       Q.   And these are the responsibilities

 7     at this time, in 2010, that were responsibilities

 8     of TPI; correct?

 9       A.   Responsibilities of Global

10     Pharmacovigilance, you mean.

11       Q.   Which was at TPI at this time; correct?

12            MS. HILLYER:  Objection to form.

13       Q.   BY MR. CARTMELL:  Or do you know?

14       A.   The -- 2010, I'm not sure.

15            By 2012, as we could see from the

16     presentation, pharmacovigilance was all over

17     the globe.  So --

18       Q.   Global Pharmacovigilance, as of this

19     time, was headed up by TPI employee Ms. Voliovitch;

20     correct?

21       A.   Yes.

22       Q.   And so when -- and I meant to ask you.

23     But when this policy says that the decisions are

24     binding by Teva Global, Ms. Voliovitch, a TPI

25     employee, was the head of that group; correct?
```

```
 1                MS. HILLYER:  Objection to form.

 2                THE WITNESS:  Yes.

 3        Q.   BY MR. CARTMELL:  And she would be

 4   granted the authority to make binding decisions

 5   on Teva USA related to safety information;

 6   correct?

 7        A.   Yes.  According to this policy, yes.

 8        Q.   Okay.  I've handed you Exhibit 50

 9   and -- and it is essentially the same policy

10   that had been revised in 2016.

11                You'll see that it's also a corporate

12   policy that comes from TPI; correct?

13        A.   (Examining.)  Yes.

14        Q.   And these are directives from TPI

15   to Teva USA and the other subsidiaries that

16   they are directed to follow; correct?

17                MS. HILLYER:  Objection to form.

18                THE WITNESS:  Yes.

19                (Exhibit 51 marked.)

20        Q.   BY MR. CARTMELL:  Okay.  Okay.  I'm

21   going to hand you what's been marked as Exhibit

22   51.  This is an e-mail that was produced in this

23   case from Teva's files.  It's just a one-page --

24   or two-page e-mail, front and back.  If you start

25   on the second page, there is an e-mail from --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is it Michael Gati or Michal?

 2         A.    Michal.

 3         Q.    Michal Gati.

 4              MS. HILLYER:  "Michal."

 5              MR. CARTMELL:  "Michal."

 6              MS. HILLYER:  "Chal."

 7              MR. CARTMELL:  "Michal."

 8              MS. HILLYER:  Good luck.

 9         Q.    BY MR. CARTMELL:  Who is -- is --

10    strike that.

11              Mr. Gati is a Teva Pharmaceutical

12    Industries employee residing in Israel; correct?

13         A.    Yes.

14         Q.    And at this time, in 2010, he's talking

15    about doing signal detection from Israel; correct?

16         A.    Let me read it and I'll tell you.

17    (Examining.)

18         Q.    He says:

19              "Hi.  During the signal detection review

20    of March 2010, we noticed a new case of breakthrough

21    pain on fentanyl.  Medical reviewer (Liat)" --

22              Liat was also a Teva Pharmaceutical Ltd.

23    employee; correct?

24         A.    I don't know.  Could be.  It doesn't

25    have the details here.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   (Reading.)

2             "Medical reviewer (Liat) asked that

3    this case will be forwarded to the" Quality

4    Assurance department.  (As read.)

5             Do you see that?

6        A.   Yes.

7        Q.   And do you understand that this

8    actually involves a signal detection exercise

9    being done on an opioid-containing product,

10   a fentanyl product?

11            Do you see that?

12       A.   I see that.

13       Q.   If you go to the front page, Dennis

14   Miley, who's a Teva USA employee, actually

15   responds -- responds to Tal Kleinfeld.

16            Do you know him?

17       A.   No.  But she was mentioned before.

18       Q.   Hedva Voliovitch, who's at TPI in

19   Israel, was on here as a carbon copy.

20            Do you see that?

21       A.   Yes.

22       Q.   And it says:

23            "Liat is asking that breakthrough pain

24   on an analgesic be sent to" Quality Assurance

25   "for investigation.  Our current practice is to
```

Highly Confidential - Subject to Further Confidentiality Review

1    send only cases reported as lack of effect to"

2    Quality Assurance.  "We code event reported and

3    do not conclude lack of effect unless reporter

4    states drug did not work, etc."  (As read.)

5              And then it explains what that is

6    akin to.  And it says at the bottom:

7              "Do you want us to change procedures?"

8              Do you see that?

9         A.   Yes.

10        Q.   This is an example related to a safety

11   investigation of an opioid where Teva USA is

12   asking Teva Pharmaceuticals [sic] Ltd. if they

13   want -- if Teva Pharmaceutical Ltd. wants them

14   to change their procedures; correct?

15             MS. HILLYER:  Objection.  Mischaracterizes

16   the document.

17             THE WITNESS:  This is a person -- the

18   initial signature does not identify Dennis Miley

19   with her position.  But this is a person in,

20   I would assume, Teva USA talking to a -- to

21   her professional community, asking whether

22   the procedures should be changed.  Given the

23   description here, it's too technical for me

24   to understand.  But yes, this is her asking

25   whether the procedures are adequate given the

```
 1   new facts.

 2        Q.   BY MR. CARTMELL:  Right.  And -- and

 3   TPI employees in Pharmacovigilance, who she is

 4   asking, have the authority to set the procedures;

 5   correct?

 6             MS. HILLYER:  Objection to form.

 7             THE WITNESS:  I cannot tell.  But Tal,

 8   Hedva Voliovitch, at this point in time this was

 9   written, had the authority, based on the SOP, to

10   determine what the right procedures are.  And the

11   subsidiaries comply with the requirements.

12        Q.   BY MR. CARTMELL:  Right.  At this time

13   at least, and related to the signal detection with

14   opioids, Hedva, the TPI employee and head of the

15   Pharmacovigilance in the companies, was given the

16   authority to set the procedures; correct?

17        A.   Yes.

18             (Exhibit 52 marked.)

19        Q.   BY MR. CARTMELL:  Let me hand you what's

20   been marked as Exhibit 52.

21             MS. HILLYER:  We've been going about an

22   hour again.  Do you want to break here or do one

23   more document?  Depending on how long you have

24   on that one.

25             MR. CARTMELL:  How long what?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. HILLYER:  I don't know how long
 2    you have on that one.
 3            MR. CARTMELL:  Let me see real quick --
 4            MS. HILLYER:  Yeah.
 5            MR. CARTMELL:  -- and I can tell you.
 6            Can we finish one more?  It'll be about
 7    five minutes.
 8        Q.   BY MR. CARTMELL:  Exhibit 52 -- hand
 9    you, sir, Exhibit 2 [sic], which are --
10            MS. HILLYER:  52.
11        Q.   BY MR. CARTMELL:  -- 52 -- excuse me --
12    which are documents produced in this litigation
13    by Teva.  And it is an e-mail from Susan Larijani
14    to several others.  And it has a PowerPoint attached
15    to it that I want to ask you a few questions about.
16            MS. HILLYER:  Take your time.
17            THE WITNESS:  (Examining.)
18        Q.   BY MR. CARTMELL:  But before I do that,
19    just on -- I'm sorry.  If you can go back.
20            Before I do that, this e-mail from Susan
21    Larijani to several others -- and I will represent
22    to you that they are representatives in Teva USA.
23    The attachment is:
24            "Pharmacovigilance Training."
25            And it states:
```

```
 1              "Mark and Team, slides for the training.

 2    Please distribute."

 3              Do you see that?

 4       A.   I see that.

 5       Q.   If you then look at the slides attached

 6    titled:

 7              "What is Pharmacovigilance all About?"

 8              Do you see that?

 9       A.   Yes.

10       Q.   This is in 2014; correct?

11       A.   This is 2014.  Yes.

12       Q.   Turn to page 10.

13              Part of this training was on situations

14    where employees of Teva USA would need to report

15    adverse events related to drugs; correct?

16              MS. HILLYER:  Objection to the extent

17    this is beyond the scope.

18              THE WITNESS:  This is what it appears

19    to be.

20       Q.   BY MR. CARTMELL:  If you look down in

21    the right-hand corner, this is a document prepared

22    by Global Patient Safety & Pharmacovigilance;

23    correct?

24              MS. HILLYER:  Objection.  Assumes

25    facts not in evidence.  It calls for speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  That's what it says.

 2        Q.   BY MR. CARTMELL:  And at this time,

 3   Global Patient Safety & Pharmacovigilance was

 4   headed up by Hedva Voliovitch, who was a TPI

 5   employee; correct?

 6        A.   2014?  I believe so, yeah.

 7        Q.   And this says that adverse events

 8   needed to be reported when there's an overdose

 9   with a medication, a drug diversion, drug abuse,

10   drug mis-use, or off-label use.

11                Do you see that?

12                MS. HILLYER:  Objection.  Mischaracterizes

13   the document and beyond the scope.

14                MR. CARTMELL:  Why is that

15   mischaracterizing?

16                MS. HILLYER:  It just says -- it

17   just lists things.  You're saying that this

18   is -- the document says that when -- that an

19   adverse event needs to be reported.  That page

20   doesn't say that.

21                MR. CARTMELL:  It says it.

22                MS. HILLYER:  Then show him where.

23   But either way, it's still beyond the scope.

24        Q.   BY MR. CARTMELL:  Okay.  If you go

25   back to page 6, it talks about what an adverse
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    event is.

 2            Do you see that?

 3       A.   Yes.

 4       Q.   And then there's examples of adverse

 5    events on page 7; correct?

 6       A.   Yes.

 7       Q.   And then on page 8, there's serious

 8    adverse events, and it defines what those are

 9    and gives examples of that.

10            Do you see that?

11       A.   Yes.

12       Q.   The next page is -- is still additional

13    examples of serious adverse events; right?

14       A.   Yes.

15       Q.   And then there's -- the next page,

16    page 10:

17            "Special Situations."

18            And it lists several things, including

19    "Overdose," "Drug abuse," "Drug mis-use," "Off-label

20    use."

21            Do you see that?

22       A.   I see that.  I don't see the -- it

23    don't [sic] logically follow from the previous

24    slides; right?

25       Q.   It doesn't.
```

```
 1        A.    It talks about adverse effects,

 2   and then it talks about special situations.

 3   I don't know.

 4        Q.    Do you know if these are special

 5   situations that was -- training being given

 6   to Teva USA about situations when an adverse

 7   event report should be made?

 8              MS. HILLYER:  Objection.  Beyond the

 9   scope.

10        Q.    BY MR. CARTMELL:  Is that what you

11   assume?  Or do you know?

12        A.    I have been through similar training,

13   because these trainings are done throughout the

14   Teva group to every employee with the idea --

15   and this may be what Hedva was referring back

16   then as "shared responsibility."  The idea is

17   that all employees of Teva, because they are

18   also parents and family members, are exposed --

19   or potentially exposed to adverse effects of

20   drugs.

21              And we can be ambassadors, and we can

22   be -- and we need to know that we can bring this

23   to the Pharmacovigilance.  And, therefore, this

24   training repeated -- it's repeated every once in

25   a while, telling us -- explaining to us what are
```

1    adverse events, what are the kind of things to

2    look for.

3            This is meant beyond the professional

4    community of pharmacovigilance.  This is meant

5    for the broader audience of Teva employees.

6    And so they're listings of all sort of things.

7    I don't know what "special situations" are.

8    Because this usually is accompanied by someone

9    talking --

10        Q.   I understand.

11        A.   -- through the slides.

12        Q.   Well, for example, if you go to page

13   16, one of these things is "Abuse" that's listed

14   here.  If you go to page 16, it further defines

15   abuse.  And it talks about, fourth bullet point:

16           "Important to collect for certain REMs

17   programs such as an opioid that has potential

18   for abuse."

19           Do you see that?

20        A.   Yes.

21        Q.   And this is talking specifically about,

22   with opioids, it's important to turn in or report

23   adverse events related to abuse?

24           MS. HILLYER:  Objection.  This is way

25   beyond the scope.  And I'm going to object to

 1    form.

 2         Q.   BY MR. CARTMELL:  Do you see that?

 3         A.   That's what it says.

 4         Q.   And if you go to page 24, in this

 5    training that is given to Teva USA employees

 6    from the Global Patient Safety & Pharmacovigilance

 7    group, it states:

 8              "Why Do You Have to Report" Adverse

 9    Events?  (As read.)

10              That's a -- a question to employees;

11    correct?

12              MS. HILLYER:  Objection.  Beyond the

13    scope and calls for speculation.

14         Q.   BY MR. CARTMELL:  Do you see that?

15         A.   Yes.  I see that.

16         Q.   It states:

17              "Why Do You Have to Report" Adverse

18    Events?  (As read.)

19              The first bullet point is:

20              "There is a Teva corporate policy about

21    safety information on company products."

22              Do you see that?

23         A.   Yes.

24         Q.   That's a directive from TPI that you

25    have to report adverse events because corporate

Highly Confidential - Subject to Further Confidentiality Review

```
 1    says so in their policies; correct?

 2            MS. HILLYER:  Objection to form.

 3    Mischaracterizes the document.

 4       Q.   BY MR. CARTMELL:  That's what it says?

 5       A.   That's what it says.

 6       Q.   Okay.

 7            MR. CARTMELL:  We can take a break.

 8            THE VIDEOGRAPHER:  The time is 5:03 p.m.

 9    We're now off the record.

10            (Recess from 5:03 p.m. to 5:24 p.m.)

11            THE VIDEOGRAPHER:  The time is 5:24 p.m.

12    We are back on the record.

13       Q.   BY MR. CARTMELL:  Mr. Herman, we're back

14    on the record after a short break.

15            Are you ready to proceed?

16       A.   Yes.

17            (Exhibit 53 marked.)

18       Q.   BY MR. CARTMELL:  I've handed you

19    Exhibit 53, which is a document -- you'll see

20    it's a PowerPoint presentation -- or, actually,

21    it's a brochure that was produced from Teva's

22    files in this case.  And you'll see, in the top

23    left hand, it says:

24            "Teva Pharmaceutical Industries Ltd."

25            Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    (Examining.)  Yes.

 2              MS. HILLYER:  Tom, do you have a Bates

 3    number or a cover document for this?

 4              MR. CARTMELL:  Oh, I'm sorry.  Strike

 5    all that.

 6              MS. HILLYER:  All right.

 7              MR. CARTMELL:  I've been told it's from

 8    the Internet.

 9              MS. HILLYER:  Okay.

10         Q.    BY MR. CARTMELL:  Okay.  Mr. Herman,

11    I've handed you Exhibit 53.  This is a document

12    that we obtained from the Internet, actually,

13    in this case.  And this is a Teva Pharmaceutical

14    Industries Ltd. document titled:

15              "Innovating for Better Health, Teva

16    2014 Global Citizenship Report."

17              Do you see that?

18         A.    Yes.

19         Q.    Are you familiar with this document?

20         A.    I've seen it before.

21         Q.    Okay.  I -- I just want to ask you

22    a question or two on page 32 of this -- this

23    document.

24              Is this a marketing document?

25              MS. HILLYER:  Objection to form and
```

```
 1    to the extent this is beyond the scope.

 2             THE WITNESS:  It is not meant to market

 3    any products or services.  It is meant to promote

 4    our image --

 5        Q.   BY MR. CARTMELL:  Okay.

 6        A.   -- as a group of companies.

 7        Q.   It states at page 32:

 8             "Maintaining world-class

 9    pharmacovigilance."

10             And we've been talking about

11    pharmacovigilance at TPI; correct?

12        A.   We were talking about pharmacovigilance

13    across the Teva group.

14        Q.   And in the second paragraph, it states:

15             "In 2014, our pharmacovigilance unit

16    improved current safety monitoring processes.

17    We also expanded our internal communication"

18    and "pharmacovigilance-related matters.  And

19    our internal" pharmacovigilance "portal currently

20    has almost 400 users who join monthly discussions

21    on patient safety and" pharmacovigilance.

22    (As read.)

23             Do you see that?

24        A.   I see that.

25        Q.   The internal portal that's being
```

```
 1    discussed there is a TPI portal hosted out

 2    of Israel; correct?

 3         A.   I don't know.  It may be hosted out

 4    of any --

 5         Q.   You don't know --

 6         A.   -- subsidiary.  I don't know where

 7    it's hosted.

 8         Q.   Okay.  It states:

 9              "Our Corporate Safety Board (CSB)

10    that includes our Chief Medical Officer and

11    senior managers in our global patient safety

12    and pharmacovigilance, regulatory affairs,

13    medical affairs and legal departments continued

14    its activities in 2014, meeting almost every

15    month to review all aspects of safety and"

16    pharmacovigilance "performance."  (As read.)

17              Do you see that?

18         A.   Yes.

19         Q.   And then it says:

20              "During the year" that -- "the"

21    Corporate Safety Board "oversaw 31 product

22    safety audits of our factories and third-party

23    manufacturing sites."  (As read.)

24              Do you see that?

25         A.   Yes.
```

 1       Q.    This is in, I believe, 2014, maybe

 2   produced in 2015.  But the Corporate Safety

 3   Board, that is a safety board that was created

 4   by Teva Pharmaceutical Ltd.; correct?

 5       A.    No.

 6       Q.    Was it created by the board of directors

 7   for Teva Pharmaceuticals [sic] Ltd.?

 8       A.    Not that I know of.

 9       Q.    Who created it?

10       A.    It's created by management.  The

11   management of the Teva group, as we've been

12   discussing, transcends geographical borders.

13   The people on this board are employees of

14   several Teva group legal entities.  As I said,

15   depending on where they reside, they would be

16   the employees of that respective subsidiary.

17             And the board is manned to bring all

18   the relevant knowledge and wisdom to the table

19   to enable the group, to ensure that the group

20   companies have world-class pharmacovigilance,

21   as stated here.

22       Q.    And the Corporate Safety Board --

23   one of the duties and responsibilities of that

24   board is to look at safety issues related to

25   medications -- all medications that Teva sells

```
 1    or manufactures or distributes; correct?

 2        A.   It says so here?  I don't see it.

 3        Q.   Okay.  And the Corporate Safety Board

 4    is a board that is chaired -- or the chairperson

 5    of that board is a Teva Pharmaceuticals [sic]

 6    Ltd. employee; correct?

 7        A.   In 2014, that was correct.

 8        Q.   Right.

 9             And is that still the case today?

10        A.   Our Chief Medical Officer?  I'm not

11    sure.

12        Q.   Could be?  You just don't know?

13        A.   Could be.  But I believe it's a US --

14    Teva USA employee.  But I --

15        Q.   Well, do you know?

16        A.   -- I'm trying to think.

17             No.  No, I don't know.

18        Q.   Okay.

19        A.   I can check.

20        Q.   All right.  Now, the Corporate Safety

21    Board -- one of the things that board does is

22    actually look at safety issues with medications,

23    like opioids and all the other medications, and

24    determine whether or not they need to make label

25    changes to the products based on the safety
```

Highly Confidential - Subject to Further Confidentiality Review

1    issues; correct?

2         A.   I don't know.

3         Q.   Pardon me?

4         A.   I don't know.

5         Q.   You don't know.

6              (Exhibit 54 marked.)

7         Q.   BY MR. CARTMELL:  Let me hand you

8    Exhibit 54.  Exhibit 54 is an e-mail with a

9    PowerPoint attached.  The e-mail at the top

10   of the page is from Jamie Warner to James

11   Ciciriello.  And the subject is:

12             "Corporate Safety Board meeting

13   minutes."

14             Do you see that?

15        A.   (Examining.)  Yes.

16        Q.   I want to ask you about the e-mail

17   below that, which is from Hila Horovitz.

18             Do you know Ms. Horovitz?

19        A.   Yes.  She's a -- she's an employee

20   of TPI.

21        Q.   Right.  So she resides and works in

22   TPI; correct?

23        A.   Yes.

24        Q.   Is she only an employee of TPI because

25   she resides in Israel?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Objection to form.

 2              THE WITNESS:  Her capacity, as part

 3     of the Global Pharmacovigilance team, is global.

 4     She is an employee -- or employed by TPI because

 5     she is Israeli, therefore employed by TPI.

 6         Q.   BY MR. CARTMELL:  Okay.  And when she

 7     works at TPI, she performs her duties on behalf

 8     of TPI; correct?

 9         A.   Her duties transcend TPI.  That's the

10     whole idea behind "global."

11         Q.   That's not my question.

12              When she works at TPI and she performs

13     her duties, she's performing those duties on

14     behalf of TPI; correct?

15         A.   Perhaps I'm misunderstanding the

16     question, what it means to perform on behalf

17     of TPI.

18         Q.   Well, when she's employed by TPI

19     and she's working in the ordinary course of

20     her employment with TPI, then she is performing

21     duties and responsibilities for the company;

22     correct?

23         A.   She's --

24              MS. HILLYER:  Objection to form.

25              THE WITNESS:  She's performing duties
```

Highly Confidential - Subject to Further Confidentiality Review

 1    and responsibilities for the group.

 2         Q.   BY MR. CARTMELL:  Okay.

 3         A.   That's her global role.

 4         Q.   And she is actually, I believe, a

 5    Pharmacovigilance Science Team Leader at Teva

 6    Ltd. -- or excuse me -- Teva Pharmaceuticals

 7    [sic] Ltd.; correct?

 8              MS. HILLYER:  Objection to form.

 9              THE WITNESS:  She's a Pharmacovigilance

10    Science Team Leader, as her e-mail signature

11    says.

12         Q.   BY MR. CARTMELL:  Okay.  And it says:

13              "Dear All.  Please find attached the

14    summary Corporate Safety Board meeting held on"

15    January 29, 2014.  (As read.)

16              Do you see that?

17         A.   Yes.

18         Q.   Do you know when this Corporate Safety

19    Board was first put in place?

20         A.   No.

21         Q.   Do you know who made the decision to

22    create a Corporate Safety Board?  Do you know?

23         A.   No.

24         Q.   Okay.  Do you know if it was TPI or

25    representatives of TPI or its board or executive

```
 1    officers, or whether it was somebody else?  Do

 2    you know?

 3         A.   No.

 4         Q.   Okay.  If you turn the page, there

 5    is:

 6              "Teva Global Patient Safety &

 7    Pharmacovigilance, Corporate Safety Board

 8    Meeting Minutes."

 9              Do you see that?

10         A.   Yes.

11         Q.   And this gives the board members

12    of the Corporate Safety Board as of January

13    of 2014.

14              Do you see that?

15         A.   Yes.

16         Q.   The chairperson of the board, as we

17    discussed, is a TPI employee, Hedva Voliovitch;

18    correct?

19         A.   Yes.

20         Q.   And as -- as the chairperson of the

21    group, she has the authority to make policy

22    with the other members of the group, the

23    Corporate Safety Board; correct?

24              MS. HILLYER:  Objection to form.

25              THE WITNESS:  Yes.  The board has
```

```
 1   authority.  Now she, as the chairman, does

 2   she have a decisive vote or overruling vote?

 3   I don't think so.

 4        Q.   BY MR. CARTMELL:  Do you know?

 5        A.   No.

 6        Q.   Okay.  Jon Isaacsohn, he was chief --

 7   Chief Medical Officer for Teva Ltd. from 2012

 8   to 2015; correct?

 9             MS. HILLYER:  Sorry.  Where -- where

10   are you?

11             THE WITNESS:  Jon Isaacsohn.

12             MS. HILLYER:  Oh.

13             THE WITNESS:  Not exactly sure on the

14   dates.  But that's around that time.

15        Q.   BY MR. CARTMELL:  Okay.

16             "Howard" --

17             Is it Cyr?

18             -- "(on behalf of Richard Egosi)."

19             "Egosi"?

20             MS. HILLYER:  "Egosi."  "Egosi."

21        Q.   BY MR. CARTMELL:  (Reading.)

22             "Howard Cyr (on behalf of Richard Egosi)."

23             Do you see that?

24        A.   Yes.

25        Q.   And was Richard Egosi the Chief Legal
```

```
1    Officer and employee of Teva Pharmaceuticals

2    [sic] Ltd.?

3         A.   No.  He was Chief Legal Officer but

4    employee of Teva USA.

5         Q.   Okay.  Has he ever been an employee

6    of Teva --

7         A.   Oh, you are right.

8         Q.   -- Pharmaceuticals [sic] Ltd.?

9         A.   You are right.  In fact Richard Egosi

10   has moved his residence several times during

11   his long tenure with the Teva group.  And he

12   has been, on occasion, an employee of TPI or

13   Teva USA under the same principle that the

14   person --

15        Q.   Right.

16        A.   -- is an employee of the company --

17        Q.   Okay.

18        A.   -- where he resides.

19        Q.   So another employee of TPI; correct?

20        A.   Who?

21             MS. HILLYER:  Objection to form.

22        Q.   BY MR. CARTMELL:  Richard Egosi, as

23   you said, from time to time has been an employee

24   of TPI?

25        A.   At -- I am not sure if in 2014 -- January
```

```
 1    2014 he was in -- residing in Israel or in the US,

 2    therefore whether he was a TPI employee or Teva

 3    USA employee.

 4         Q.   Okay.  You know he's been an employee

 5    of TPI.  You just don't know if he was at this

 6    time.

 7              Fair enough?

 8         A.   Yes.

 9         Q.   Jim Ott --

10         A.   Ottinger.

11         Q.   -- Ottinger, Senior VP and head of

12    Global Regulatory Affairs; correct?

13         A.   Yes.

14         Q.   And then Richard Nieman, Senior VP

15    and Head of Global Medical Affairs; correct?

16         A.   Yes.

17         Q.   Okay.  These are all senior management

18    people on the board; correct?

19              MS. HILLYER:  Objection to form.

20              THE WITNESS:  These are all senior

21    managers in the Teva group --

22         Q.   BY MR. CARTMELL:  Okay.

23         A.   -- on the board.  Yes.

24         Q.   Okay.  If you turn the page -- well,

25    strike that.
```

```
 1              Yeah.  If you turn the page, sir, to
 2   No. 2:
 3              "Fentanyl citrate" --
 4              Or "citrate."
 5              -- "suggestion for label changes."
 6              Do you see that?
 7       A.   Yes.  I see it.
 8       Q.   It says:
 9              "Several recommendations of the Medical
10   Scientific Group ... for label changes of Fentanyl
11   products were brought to the approval of the
12   Safety Board."  (As read.)
13              Do you see that?
14       A.   I see that.
15       Q.   And then below that, there are headings
16   of "Breastfeeding," "Brain Lesions," "Serotonin
17   Syndrome," "Anaphylaxis/Hypersensitivity."
18              Do you see that?
19       A.   Yes.
20       Q.   And -- and this board, as you can
21   see, is discussing whether or not changes to
22   the labeling for an opioid, fentanyl citrate,
23   should be made; correct?
24       A.   Yes.
25       Q.   And several employees from TPI are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    involved in these decisions; correct?

 2         A.   And also employees of Teva USA.

 3         Q.   And these employees, that include TPI

 4    as the chair of the committee, are talking about

 5    changing the label of -- of an opioid in several

 6    respects that is sold in the USA; correct?

 7         A.   This is what the protocol says.  This

 8    is what the protocol says.

 9         Q.   Okay.  And in several respects -- strike

10    that.

11              Turn to page 9 of the -- of the attached

12    PowerPoint, if you would.

13              MS. HILLYER:  So just -- again, these

14    are not -- it's missing a page.  I don't know

15    if it's missing an attachment or not.  But --

16              MR. CARTMELL:  Oh, it is.

17              MS. HILLYER:  -- the Bates numbers

18    are not consecutive.

19              MR. CARTMELL:  Okay.

20              MS. HILLYER:  It goes from 363 to 365.

21              MR. CARTMELL:  Okay.  We can replace

22    that if you're okay with it.  I'm --

23              MS. HILLYER:  Yeah.  I just don't know

24    for context, but yeah.

25              MR. CARTMELL:  It's just another
```

```
 1    attachment.

 2            MS. HILLYER:  That's fine.

 3            MR. CARTMELL:  Okay.

 4       Q.  BY MR. CARTMELL:  I just have a question

 5    about page 9.  It's talking about the group is

 6    considering changing the label of this opioid

 7    related to brain lesions in rats.  And it says

 8    in the second bullet:

 9            "Teva Pharmaceutical Industries Ltd.

10    was recently requested by the FDA to conduct

11    a mechanistic study with fentanyl citrate."

12            Do you see that?

13            MS. HILLYER:  Objection to the language

14    that you said before that.

15            THE WITNESS:  Yes.  I see that.

16       Q.  BY MR. CARTMELL:  And, in fact, Teva

17    Pharmaceutical Industries Ltd. has been involved

18    in actually the performance of studies involving

19    opioids that are sold in the USA; correct?

20       A.  I don't know.  It would be very

21    surprising --

22       Q.  Do you know?

23            MS. HILLYER:  Hold on.  Let him

24    finish.

25            THE WITNESS:  No.  It would be very
```

1    surprising that Teva Ltd. in Israel was involved

2    in a trial with rats that involves controlled

3    substances that can only be done in the US.

4         Q.   BY MR. CARTMELL:  So do you know?

5         A.   I said I don't know about this study.

6    But it would have been -- it's highly unlikely --

7         Q.   Okay.

8         A.   -- given that we're talking about

9    controlled substances.

10        Q.   Is it possible that employees of TPI

11   were involved and requested to be involved with

12   the study on the opioids?

13             MS. HILLYER:  Objection.  Beyond the

14   scope.

15             THE WITNESS:  That is -- I don't know.

16             (Exhibit 55 marked.)

17        Q.   BY MR. CARTMELL:  Okay.  Exhibit 55

18   deals with pharmacovigilance and was produced

19   to us in this -- this litigation from Teva's

20   files.

21             And this is another PowerPoint prepared

22   by a TPI employee living in Israel and involved

23   in the pharmacovigilance group; correct?

24             MS. HILLYER:  Objection.  We've no

25   foundation.  There's no cover e-mail.  We don't

Highly Confidential - Subject to Further Confidentiality Review

```
 1    know who prepared it.  You have a name on the

 2    front.  But that doesn't necessarily mean

 3    anything.

 4         Q.   BY MR. CARTMELL:  You can answer.

 5         A.   The name on the front refers to

 6    a TPI employee --

 7         Q.   Right.

 8         A.   -- living in Israel.  It's a global

 9    role.

10         Q.   And this is April 2013; correct?

11         A.   That's what it says.  Yes.

12         Q.   And there -- on the second page,

13    there's a:

14              "Medical Safety Evaluation Hierarchy."

15         A.   Yes.

16         Q.   We talked about the safety board.

17    There's also a "Medical Scientific Group" under

18    that.

19              Do you see that?

20         A.   Yes.

21         Q.   And there's a "Product Safety Group"

22    under the "Medical Scientific Group."

23              Do you see that?

24         A.   Yes.

25         Q.   And this --
```

```
 1        A.    That's what it says.

 2        Q.    This is a hierarchy in the pharmaco --

 3   strike that.

 4             This is a hierarchy in the

 5   pharmacovigilance global department; is

 6   that correct?

 7             MS. HILLYER:  Objection to the

 8   extent it's beyond the scope.

 9             THE WITNESS:  It says "hierarchy"

10   and there are three layers here.  So it appears

11   to be the hierarchy of the evaluation.

12        Q.    BY MR. CARTMELL:  We know that the

13   safety board includes members of TPI, including

14   the chair is an employee of T -- TPI.

15             Do you know whether or not there are

16   TPI employees involved on the Medical Scientific

17   Group?

18             MS. HILLYER:  Objection to the extent

19   it's beyond the scope.

20             THE WITNESS:  I am not sure, at any

21   point -- given point in time, who exactly is

22   on the core team of the Product Safety Group.

23        Q.    BY MR. CARTMELL:  What -- what about

24   the Medical Scientific Group?

25        A.    This document -- I'm not sure.
```

```
 1        Q.    If you turn to page 8, there's a:
 2              "Medical Safety Evaluation Organizational
 3    Chart."
 4              Do you see that?
 5        A.    Yes.
 6        Q.    And we just talked about the hierarchy
 7    in the medical safety evaluation; correct?
 8        A.    Yes.  We did talk about that.
 9        Q.    On this organizational chart, at
10    least as of 2013, the top of the organization --
11    pharmacovigilance medical safety evaluation
12    organization is a TPI employee named Hedva
13    Voliovitch; correct?
14        A.    Yes.
15        Q.    She's not only the chair of the
16    corporate safety board, but she's also the head
17    of the medical safety evaluation organization
18    as a whole; correct?
19        A.    That's what's depicted here.
20        Q.    And she resides in Israel, and she
21    is a TPI employee -- correct? -- at this time?
22        A.    Yes.
23        Q.    And the second person in command
24    or highest -- second highest person on the
25    organizational chart is Hila Horowitz, who
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is also a TPI employee at this time; correct?

 2              MS. HILLYER:  Objection.  Mischaracterizes

 3    the document.

 4              THE WITNESS:  Yes.  Actually, usually

 5    when people are broken up this way, they are more

 6    in an admin role, more in an administrative role

 7    than --

 8         Q.   BY MR. CARTMELL:  Okay.

 9         A.   It doesn't signify importance, as

10    an admin to Hedva.

11         Q.   That makes sense.

12              So Ms. Horowitz, who reports to

13    directly to Hedva Voliovitch, was likely more

14    in an administrative capacity?  Is that what

15    you're saying?

16         A.   It's likely more of a, as I said,

17    a coordination than responsibility for specific

18    actions.

19         Q.   At any rate, she was also at this time

20    a TPI employee; correct?

21         A.   Yes.

22         Q.   And these are the groups that are

23    looking at the safety of the medications Teva

24    USA and other Teva subsidiaries around the world

25    are selling; correct?
```

```
 1            MS. HILLYER:  Objection to form.

 2            THE WITNESS:  These are the people --

 3    yes, these are the people that look at the safety.

 4    They are -- the scope is global.  They are here

 5    aggregated by where they reside.

 6       Q.   BY MR. CARTMELL:  And the US individuals

 7    at Teva USA that are listed here are reporting

 8    to TPI's Hedva Voliovitch; correct?

 9       A.   Yes.

10       Q.   At least at this point, the medical

11    safety evaluation of drugs, like opioids sold

12    in the United States, was being headed up by

13    TPI through their employee Hedva Voliovitch;

14    correct?

15            MS. HILLYER:  Objection to form.

16            THE WITNESS:  These physicians are --

17    were employees of Teva USA.  They had also

18    reporting lines -- professional reporting

19    lines to Hedva Voliovitch in Israel.  This is

20    not different than any of our global structures.

21       Q.   BY MR. CARTMELL:  Move to strike

22    and I'll re-state -- state the question.

23            At least at this point, the medical

24    safety evaluation of drugs, like opioids sold

25    in the United States, was being headed up by
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TPI through its employee Hedva Voliovitch;

 2    correct?

 3              MS. HILLYER:  Objection to form.

 4              THE WITNESS:  No.  No.

 5        Q.   BY MR. CARTMELL:  No?

 6        A.   No.

 7              At this point, the Teva group medical

 8    safety evaluation organization was headed by

 9    a TPI employee.

10        Q.   Right.

11        A.   It's a global organization.  The

12    employee heading it happens to be a TPI employee.

13        Q.   Okay.  Let -- let me say that, then,

14    again.  I'll -- I'll state it just so the record

15    is clear.

16              At this point, the Teva safety evaluation

17    organization was headed by a TPI employee; correct?

18        A.   Yes.

19        Q.   And at this point in time, TPI employees

20    were involved in the day-to-day operation of the

21    medical safety evaluation of drugs like opioids

22    being sold in the United States; correct?

23        A.   Where did you get that from?

24        Q.   This is the organization that is formed

25    that's looking at drug safety; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.  And I see US employees here.

 2              So where did you get the Israeli

 3    employees -- TPI employees involved in the --

 4    where do you get that from the chart?  I don't --

 5        Q.    I'll state it again.

 6              At this point in time, TPI employees

 7    such as Ms. Voliovitch were involved in the

 8    day-to-day operation of the medical safety

 9    evaluation of drugs like opioids being sold

10    in the United States; correct?

11              MS. HILLYER:  Objection to form.

12              THE WITNESS:  At that point in time,

13    there were Teva USA employees responsible for

14    medical safety evaluation in the US.  They had

15    professional reporting lines to the global head

16    of medical safety evaluation that was, at that

17    point in time, a TPI employee.

18        Q.    BY MR. CARTMELL:  Okay.  I'll move to

19    strike it and -- and state my question and ask

20    you to answer my question.

21              At this point in time, TPI employees

22    such as Ms. Voliovitch were involved in the

23    day-to-day operation of the medical safety

24    evaluation of drugs like opioids being sold

25    in the United States; correct?
```

 1             MS. HILLYER:  Objection to form.

 2             THE WITNESS:  That's not a correct

 3     statement.

 4        Q.   BY MR. CARTMELL:  Okay.  At this point

 5     in time -- at this point in time, Ms. Voliovitch,

 6     a TPI employee, was involved in the medical safety

 7     evaluation of drugs being sold, including opioids

 8     being sold in the United States?

 9             MS. HILLYER:  Objection to form.

10             THE WITNESS:  At this point in time --

11        Q.   BY MR. CARTMELL:  I'm not asking about

12     the US employees.

13        A.   At this point in time, Hedva Voliovitch,

14     employed by TPI, oversaw medical safety evaluation

15     operations around the world, including the US.

16        Q.   Okay.  And that included overseeing

17     medical safety evaluation of products like the

18     opioids being sold in the US; correct?

19        A.   That include -- could you repeat that?

20        Q.   And that included overseeing medical

21     safety evaluation of products like the opioids

22     being sold in the US?

23        A.   It includes overseeing all of our

24     medical safety evaluations of all products.

25        Q.   Including opioids; correct?

 1        A.    Yes.

 2              (Exhibit 56 marked.)

 3        Q.    BY MR. CARTMELL:  I'm going to hand

 4    you what's been marked as Exhibit 56, which is

 5    an e-mail string that was produced from Teva's

 6    files in this litigation.  And I want to ask

 7    you a few questions about it.

 8              But -- but, first, I want to ask you

 9    if you are familiar with the opioid medication

10    that Teva developed called Vantrela ER?

11        A.    I've heard of Vantrela ER.

12        Q.    Were you aware before today that Vantrela

13    ER is an opioid medication that has been referred

14    to as abuse-deterrent by Teva Pharmaceutical Ltd.?

15              MS. HILLYER:  Objection.

16              THE WITNESS:  No.

17        Q.    BY MR. CARTMELL:  This is an e-mail -- if

18    you go to the back page and start chronologically.

19    Actually --

20              MS. HILLYER:  Wait.

21        Q.    BY MR. CARTMELL:  -- the bottom of the

22    third page --

23              MS. HILLYER:  Hold on.  Is it missing

24    Bates again?

25              MR. CARTMELL:  I'm sorry.  Excuse me.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  Oh, the end Bates is cut

 2   off.

 3              MR. CRAWFORD:  Yeah.

 4              MS. HILLYER:  Okay.  I was about to say

 5   it's the same Bates number.

 6       Q.   BY MR. CARTMELL:  Mr. Herman, if you --

 7   if you look at the last e-mail, which actually

 8   starts on the bottom of page 2 of the document,

 9   it's from Brendan -- Brendan O'Grady, who you

10   talked about previously, who was -- who is now,

11   I -- I believe, on the Executive Committee and

12   an officer of TPI.

13              Correct?

14       A.   (Examining.)  He is an officer of TPI.

15   Yes.

16       Q.   Okay.  And he's one of those employees

17   that actually resides in the United States and --

18   but he's an officer for TPI.  And TPI actually

19   pays his salary to Teva USA.  And then he's paid

20   by Teva USA with that money.

21              Correct?

22       A.   No.

23       Q.   That's not true?

24       A.   No.

25       Q.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Because he is the head of our commercial

2   operations in the US, so the benefit of his

3   management services is to Teva USA.  Therefore,

4   Teva USA bears the cost of his employment.

5      Q.   Is your testimony that he's not paid

6   for his services as an Executive Committee member

7   and officer of TPI?

8      A.   I don't believe --

9           MS. HILLYER:  Objection to the extent

10   that's beyond the scope.

11           THE WITNESS:  I don't believe he's paid

12   any additional amount for his membership in the

13   Executive Committee.

14      Q.   BY MR. CARTMELL:  You don't know?  Or

15   do you know?

16      A.   I don't know for a fact, no.

17      Q.   So as you sit here today, you don't

18   know whether or not TPI pays Mr. O'Grady personally

19   or pays Teva USA an amount that is then provided

20   to Mr. O'Grady; correct?

21      A.   No.

22           MS. HILLYER:  Objection.  Beyond the

23   scope.

24           THE WITNESS:  Teva Israel does not pay

25   any part of Mr. O'Grady's salary.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   BY MR. CARTMELL:  Okay.

 2          A.   Okay?  This is not a service that we

 3    get charged for -- that TPI gets charged for.

 4          Q.   I think my question's a little different.

 5               As you sit here today, you don't know

 6    whether or not TPI pays Mr. O'Grady any money

 7    directly or pays Teva USA any money that is then

 8    paid to him; correct?

 9          A.   No, that I can state.  TPI does not pay

10    Mr. O'Grady or TUSA for Mr. O'Grady's employment.

11          Q.   Okay.  What about for anything else,

12    any other services?

13          A.   No.

14               MS. HILLYER:  Objection to the extent

15    that's beyond the scope.

16               MR. CARTMELL:  Well, he just told me

17    he didn't know.

18          Q.   BY MR. CARTMELL:  And now are you

19    saying definitively that you know that he

20    doesn't get paid anything from TPI for his

21    services --

22          A.   Let me --

23          Q.   -- as an officer --

24          A.   -- clarify.

25          Q.   -- or an executive member?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HILLYER:  I think that

 2    mischaracterizes his testimony.

 3              MR. CARTMELL:  I -- I -- I may be

 4    lost.

 5              MS. HILLYER:  I -- I think we're

 6    talking past each other.

 7              THE WITNESS:  Let me clarify.  I think

 8    I -- I was confused.

 9              What I thought you asked is whether

10    Mr. O'Grady's compensation has an element that

11    relates to his US -- management of US business

12    and an element that is -- relates to his executive

13    management participation.  And I said I don't know

14    how they apprise the remuneration for Mr. O'Grady.

15              What I do know -- and that is because my

16    team oversees the services that are being charged

17    between legal entities within Teva -- that TPI

18    does not pay Teva USA for Brendan O'Grady's

19    services, different to Carlo de Notaristefani

20    and Harfun, where these are -- these charges

21    do exist.  Okay?

22              So Brendan O'Grady is not charged --

23    his costs are not charged to --

24         Q.   BY MR. CARTMELL:  Right.

25         A.   -- TPI.  I hope it's clear.
```

 1     Q.   Does any entity in Teva pay Mr. O'Grady

 2    any money for his services on the Executive

 3    Committee or as an officer of Teva Ltd.?

 4     A.   No.

 5     Q.   Okay.  Okay.  So the last e-mail is

 6    from Mr. O'Grady, who is an Executive Committee

 7    member and officer at TPI.  And he says:

 8          "Dear all.  Please see the attached

 9    revised forecast assumptions for Vantrela ER.

10    In most scenarios, Vantrela is not profitable.

11    In no scenario is it profitable in the two

12    years after launch."

13          And then he goes on to say:

14          "Due to decreasing resources and no

15    available sales force to promote this product,

16    my recommendation is to stop any further spending

17    on the product and not to file.  I do not want

18    to launch this product in the US.  If anyone

19    sees this differently, please let me know."

20          Do you see that?

21     A.   Yes.

22     Q.   Okay.  And he has written this e-mail,

23    I believe, to individuals, including some other

24    Executive Committee members or officers for

25    Teva Pharmaceuticals [sic] Ltd.; correct?

1        A.    Yes.

2        Q.    Okay.  These are all higher-ups at

3    the -- in the Teva organization; correct?

4              MS. HILLYER:  Objection to form.

5              THE WITNESS:  These are his peers.

6    Kare Schultz is CEO.  But everybody else are

7    his peers and his reportees.

8        Q.    BY MR. CARTMELL:  That's a good point.

9    I -- I -- I'd forgotten that.

10             He's also included on this e-mail Kare

11   Schultz, who is the actual CEO for the company

12   Teva Pharmaceuticals [sic] Ltd.; correct?

13       A.    Yes.

14       Q.    Okay.  And he's recommending that

15   the company not actually launch this opioid --

16   abuse-deterrent opioid called Vantrela; correct?

17             MS. HILLYER:  Objection.

18             THE WITNESS:  Again?  He is?  Sorry.

19   I was distracted.  The question was?  If you

20   can repeat.

21       Q.    BY MR. CARTMELL:  He is actually making

22   a recommendation that the company, or Teva USA,

23   not launch Vantrela, the opioid -- abuse-deterrent

24   opioid; correct?

25       A.    Yes.

1     Q.   Okay.  And then, if you go to the next

2    page, Rivka Kreitman responds and says:

3          "Thanks Brendan.  I need a clear decision

4    ASAP if to pull the NDA or are we divesting it?

5    Just for everyone's understanding, we did not

6    join the consortium nor started the PMRs - both

7    with significant financial implications."

8          Do you see that?

9     A.   Yes.

10     Q.   So Rivka is saying, I need to know

11    if we're going to pull the NDA, which is the

12    new drug application for this opioid; correct?

13     A.   Yes.

14     Q.   And -- and the application was pending

15    with the FDA?  Or it had already been approved?

16    Do you know?

17          MS. HILLYER:  Objection.  Beyond the

18    scope.

19          THE WITNESS:  I don't know at which

20    state it was.

21     Q.   BY MR. CARTMELL:  Okay.  But if the

22    company -- you do know, I take it, that if the

23    company pulled the NDA, the application, from

24    the FDA, then the -- the product would never

25    be launched; correct?

```
 1      A.   Yes.

 2      Q.   Okay.  And then Brendan responds again

 3  and says:

 4           "No idea on divestment."

 5           "Divestment" means selling it to somebody

 6  else; correct?

 7      A.   Yes.

 8      Q.   So -- so they were asking whether or

 9  not maybe the Vantrela asset that had been in

10  R & D and in development may be able to be sold

11  to another company; right?

12      A.   Yes.

13      Q.   Okay.  And then it says:

14           "I thought we had tried but could not

15  find a buyer.  If we do not intend to launch and

16  we have no potential buyer, my assumption would

17  be that we pull the plug on the NDA, but that

18  is probably Kare's call."

19           Do you see that?

20      A.   Yes.

21      Q.   So Mr. O'Grady, who's an Executive

22  Committee member and officer of TPI, is saying

23  that the ultimate decision related to whether

24  or not to launch this opioid -- abuse-deterrent

25  opioid would be with the CEO of TPI; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HILLYER:  Objection to form and

2     to the extent it's beyond the scope of this

3     particular document.

4          THE WITNESS:  No.

5     Q.   BY MR. CARTMELL:  It says that would

6     be -- is probably Kare's call; correct?

7     A.   Yes.  That's the language.

8          What it says is Brendan O'Grady,

9     head of our US business, our Americas business

10    for that purpose, the US market, is saying:  I

11    recommend that we pull the plug on the new -- a

12    new drug application that the group has invested

13    a significant amount into.  I as -- he said that

14    I, as commercial, don't want to sell this.

15         And remember, Teva works based on what

16    the market can sell, what Teva USA can sell.  The

17    R & D, the TGO, everybody are just operating based

18    on what Teva USA says they can sell -- say they

19    can sell.

20    Q.   Okay.  I'm going to object and move to

21    strike that.

22         I want to be clear for the jury who's --

23    who's watching this.  Okay?

24         When it says -- Mr. O'Grady says "my

25    assumption would be that we pull the plug," that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was his recommendation; correct?

 2         A.   Yes.

 3              MS. HILLYER:  Objection to the extent

 4    it calls for speculation as to what Mr. O'Grady --

 5         Q.   BY MR. CARTMELL:  And then just so it's --

 6              MS. HILLYER:  -- meant.

 7         Q.   BY MR. CARTMELL:  -- clear for the

 8    jury, when he then says "but that is probably

 9    Kare's call" -- when he then says it's Kare's --

10    or "probably Kare's call," what he's saying is

11    that the ultimate decision related to whether to

12    pull the plug is the CEO of TPI's call probably;

13    correct?

14              MS. HILLYER:  Objection to the extent

15    it's beyond the scope as to this document.  And

16    calls for speculation.

17              THE WITNESS:  It says "probably."  And

18    this is all speculative, because I did not talk

19    to Brendan O'Grady about this e-mail, what did

20    he mean.

21              But it looks like what he says is:

22    Given the significance of innovative products

23    to Teva -- we don't have that many.  Given the

24    importance that is broader than just Teva USA

25    and its financial results and its ability to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sell in the market, which he clearly stated

 2    this would not be contributing to --

 3            MR. CARTMELL:  I'll object to

 4    everything after his answer "it says probably."

 5            MS. HILLYER:  You didn't even let

 6    him finish the answer.

 7        Q.   BY MR. CARTMELL:  Are you done?

 8        A.   No.  Actually, let me -- so given the

 9    importance of this to the overall Teva, he says

10    "probably Kare."

11        Q.   BY MR. CARTMELL:  Probably, because

12    this is such an important decision, it should

13    be Kare's call, who's the CEO; correct?

14            MS. HILLYER:  Same objection.  This

15    is beyond the scope and calls for speculation.

16            THE WITNESS:  Probably because the

17    effect concerns Teva USA operations.

18        Q.   BY MR. CARTMELL:  Right.  And you

19    would expect a huge decision, like whether

20    or not to launch an opioid -- abuse-deterrent

21    opioid onto the market in -- in the USA, that

22    the CEO who's in charge would make that ultimate

23    decision; correct?

24            MS. HILLYER:  Objection to form.

25            THE WITNESS:  No.
```

1      Q.    BY MR. CARTMELL:   Okay.

2      A.    I would expect that in a significant

3   decision about a novel drug -- and Teva does not

4   have many novel drugs.  And TPI, when promoting

5   its equity and its debt to the investors, pride

6   itself with the number of novel drugs that we

7   develop.  Any change in that list is material

8   to TPI and to the group.  It transcends.  It's

9   not because it's an opiate.  It's because it's

10   a novel drug.

11         And pulling a novel drug when we're

12   at the approval stage -- so all of the money

13   already invested and the clinical trials --

14   pulling a drug is not -- is a very significant

15   decision to the group, not only to Teva USA.

16      Q.    Okay.  So I think what you're saying,

17   if I understand you, is that when making a decision

18   to pull off an NDA and not launch a novel drug,

19   regardless of what it is, an opioid or not, because

20   that is such a big decision and so much has been

21   invested, you would expect, like Mr. O'Grady says,

22   that the ultimate decision would be TPI's CEO;

23   correct?

24         MS. HILLYER:  Objection to form.

25         THE WITNESS:  I believe this is why he

Highly Confidential - Subject to Further Confidentiality Review

1   says "probably."

2          (Exhibit 57 marked.)

3      Q.   BY MR. CARTMELL:   Okay.   Let me hand

4   you what's been marked as Exhibit 57.   Really

5   quickly, I just have a few quick questions.

6   This is actually a document that was -- strike

7   that.

8          Mr. Herman, this document was located

9   on the FDA website that we found.   And it is

10  a Teva Pharmaceutical [sic] Ltd. document;

11  correct?

12     A.   (Examining.)   It appears to be.   Yes.

13     Q.   And this is titled:

14         "Vantrela ER."

15         And then it says:

16         "Open Session."

17         And it says:

18         "Joint Meeting of the Anesthetic and

19  Analgesic Drug Products Advisory Committee and

20  the Drug Safety and Risk Management Advisory

21  Committee."

22         Do you see that?

23     A.   Yes.

24     Q.   Do you know, based on your experience,

25  that that is a committee that is commissioned

```
 1   by the FDA?  It's called an FDA Advisory Committee?

 2              MS. HILLYER:  Objection.  Beyond the

 3   scope.

 4              THE WITNESS:  I actually don't know.

 5       Q.  BY MR. CARTMELL:  Okay.  Up above,

 6   it says:

 7              "Vantrela ER Briefing Document, FDA

 8   Advisory Committee Meeting, Final Version,"

 9   May 3rd, 2016.  (As read.)

10              Do you see that?

11       A.   Yes.

12       Q.   And it appears that Teva Pharmaceuticals

13   [sic]  Ltd. provided the FDA Advisory Committee

14   with this briefing document to be discussed at

15   the open session.

16              Does it appear to you that way?

17              MS. HILLYER:  Objection to the extent

18   that mischaracterizes the document.

19              THE WITNESS:  The document has the Teva

20   logo that we used at this point.  That specific

21   logo was used around the world.  It also has the

22   legal name.  Who prepared this document, I don't

23   know.

24       Q.   BY MR. CARTMELL:  You don't know whether

25   it was a Teva Pharmaceuticals [sic] Ltd. employee,
```

Highly Confidential - Subject to Further Confidentiality Review

1    like the logo on the document, or if it was

2    somebody else?  Fair?

3        A.    Yes.

4        Q.    Okay.  And you don't know, as you

5    sit here today, I take it, whether or not

6    Teva Pharmaceuticals [sic] Ltd. employees

7    were involved in drafting briefing that went

8    to the FDA about trying to get an opioid drug

9    approved in the USA?  Fair?

10            MS. HILLYER:  Objection to form.

11            THE WITNESS:  I -- I don't know if

12    any TPI employees were involved.

13        Q.    BY MR. CARTMELL:  Okay.  Do you know

14    whether or not TPI employees were involved in

15    the research and development related to Vantrela

16    ER, an opioid that was submitted to the FDA to

17    be launched in the USA?

18            MS. HILLYER:  Objection to form.

19            THE WITNESS:  To the best of my knowledge,

20    the research, development and would-be manufacturing

21    had we actually gone with the launch, is Teva USA

22    and Cephalon.  I'm not sure whether it's Teva USA

23    or Cephalon, but definitely a US entity lead or --

24    or work.

25            Whether employees of TPI were involved

1    in their capacity as global officers whose domains

2    relate to R & D, may very well be.  But the legal

3    entities involved are not TPI, are -- I think it's

4    Cephalon specifically for Vantrela.  But I'm --

5    I'm not sure if it's Cephalon.

6             (Exhibit 58 marked.)

7        Q.   BY MR. CARTMELL:  Let me -- let me hand

8    you Exhibit 58, which is a large document that

9    was produced in this litigation.  And the front

10   page has an e-mail from Corey Lamborn, the second

11   e-mail down, to several individuals, including

12   Dan Bar-Zohar.

13            Do you see that?

14       A.   (Examining.)  Dan Bar-Zohar.  Yeah.

15       Q.   Do you know Dan Bar-Zohar?

16       A.   No, I don't.

17       Q.   Do you know whether or not Dan

18   Bar-Zohar was a Teva Ltd. -- or excuse me --

19   Teva Pharmaceutical Ltd. employee?

20       A.   No, I don't.

21       Q.   Okay.  If you turn to the second page --

22   actually, I think we did this double-sided --

23   there is a clinical study protocol.  And this

24   study protocol involves a study being done

25   related to Vantrela ER.

```
 1              Do you see that?

 2      A.   Yes.

 3      Q.   And the experts -- sponsor's medical

 4  expert and safety officer, you'll see one is

 5  Danny Bar-Zohar and the other is Hedva Voliovitch,

 6  MD, PhD, MBA.

 7              Do you see that?

 8      A.   I see that.

 9      Q.   And at this time -- we are in October

10  of 2012 -- Ms. Voliovitch was a TPI employee;

11  correct?

12              MS. HILLYER:  Objection to form.

13              THE WITNESS:  Yes.  But then as you --

14      Q.   BY MR. CARTMELL:  Well, you --

15      A.   -- can see here --

16      Q.   You've answered my question.

17      A.   You -- as you can see here, she was

18  signing this or authorizing this not in her

19  capacity as a TPI employee.  Because it clearly

20  says:

21              "Teva Branded Pharmaceutical Products

22  R & D Inc."

23      Q.   Object and move to strike after the

24  answer "yes."

25              Just so it's clear, my question was:
```

```
 1   At this time, Ms. Voliovitch was an employee

 2   of TPI; correct?

 3        A.   Yes.

 4             MS. HILLYER:  Objection to form.

 5             MR. CARTMELL:  I -- actually, we can

 6   mark this if you want to, Becca.

 7        Q.   BY MR. CARTMELL:  But I've got a copy

 8   of Danny Bar-Zohar's LinkedIn page.

 9             Do you see this?

10        A.   (Examining.)  Yes.

11             MS. HILLYER:  Sorry.  What are you

12   asking?

13             MR. CARTMELL:  We can mark this if

14   you want to.  But I've only got one copy.  And

15   this is a --

16             MS. HILLYER:  Okay.

17             MR. CARTMELL:  -- copy of Danny

18   Bar-Zohar's LinkedIn page.

19             MS. HILLYER:  She has copies.

20             MR. CARTMELL:  Oh, that's so cool.

21   Amazing.

22             MS. HILLYER:  All right.  Do you

23   want to mark one?

24             MR. CARTMELL:  Yeah.  59.

25             (Exhibit 59 marked.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   BY MR. CARTMELL:  I'm handing you

 2   Exhibit 59, which is a copy of Dan Bar-Zohar's

 3   LinkedIn page.

 4             Do you see that?

 5        A.   (Examining.)  Yes.

 6        Q.   And if you go to the second page, he --

 7   he no longer works for a Teva entity.  But it

 8   states that he worked for Teva Pharmaceuticals

 9   Industries Ltd. in Israel from October of '10

10   to December of '12; correct?

11        A.   That's what he says.

12        Q.   Okay.  And so he was another TPI

13   employee who worked there that was involved

14   in studies for Vantrela, an opioid; correct?

15             MS. HILLYER:  Objection.  Form.

16             THE WITNESS:  I'm not sure.  You

17   cannot tell that from here which is his -- the

18   way he decided to write whatever he decided to

19   write.  We will need to check if he was at the

20   time a TPI or a TUSA employee.  Because here

21   it says:

22             "Global Branded Products."

23             TBP is -- Teva -- Teva Branded Products

24   is a -- is a US company.

25        Q.   BY MR. CARTMELL:  Okay.  Did -- did you
```

Highly Confidential - Subject to Further Confidentiality Review

 1    tell the jury earlier that there was no selection

 2    on LinkedIn for a company named Teva Pharmaceutical

 3    Industries Ltd.?

 4         A.    When I --

 5               MS. HILLYER:  Objection to form.

 6               THE WITNESS:  When I filled my LinkedIn --

 7         Q.    BY MR. CARTMELL:  It didn't exist?

 8         A.    -- I --

 9               MS. HILLYER:  Let him --

10               THE WITNESS:  -- could not find one.

11         Q.    BY MR. CARTMELL:  Okay.  But this

12    is a LinkedIn page that specifically says Teva

13    Pharmaceutical Industries Ltd., doesn't it?

14               MS. HILLYER:  Objection to form.  And

15    this is far afield of the topics.

16         Q.    BY MR. CARTMELL:  Correct?

17         A.    This is what it says.

18         Q.    Okay.  And at least this says -- and

19    that he was in Israel for three years, three

20    months during the period of time that he signed

21    off on -- as one of the medical experts involved

22    in a study involving Vantrela; correct?

23               MS. HILLYER:  Objection to form.

24               THE WITNESS:  I don't see where you

25    see he was in Israel.

Highly Confidential - Subject to Further Confidentiality Review

 1       Q.    BY MR. CARTMELL:  It says it on his

 2   LinkedIn page below where it says that he

 3   worked at Teva Pharmaceutical Industries Ltd.

 4   It says -- you can see it on the screen --

 5   "Israel."

 6       A.    It's very -- I don't know.  I don't

 7   know.

 8       Q.    Okay.

 9       A.    He --

10       Q.    You've answered my question.

11             You don't know?

12       A.    I don't know if it's his writing or

13   the -- whether, when you choose Teva Pharmaceutical

14   Industries Ltd., the automatic LinkedIn assumes

15   it's in Israel.  Because, since I joined LinkedIn

16   a while ago, things have changed.  I don't know.

17       Q.    Okay.  You think it might have been

18   just something that was a snafu in the LinkedIn

19   system?

20             MS. HILLYER:  Objection to form and --

21             THE WITNESS:  I don't know.

22             MS. HILLYER:  -- beyond the scope.

23             THE WITNESS:  I don't know.

24       Q.    BY MR. CARTMELL:  Was Mr. Bar-Zohar on

25   the Fentora, which is one of Teva USA's opioids

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sold in the USA -- was Mr. Bar-Zohar actually

 2    the VP clinical physician handling Fentora in

 3    the USA?

 4              MS. HILLYER:  Objection to form.

 5              THE WITNESS:  I don't know.

 6              (Exhibit 60 marked.)

 7        Q.   BY MR. CARTMELL:  I'll hand you Exhibit

 8    60, which is an e-mail string that was produced

 9    to us.  And there's an e-mail at the bottom from

10    Susan Franks to several individuals.  And the

11    subject or object here is:

12              "Effentora - Product Working Group."

13              Do you see that?

14        A.   (Examining.)  Yes.

15        Q.   It says:

16              "Hi Camille.  I cannot" access the --

17    "access the link to the shared area ... can you

18    kindly send the proposed SmPC as an attachment?

19    Not sure if others are having the same problem."

20    (As read.)

21              And then I want to focus on the next

22    line.  It says:

23              "Also, I just" noted "that Danny Bar-Zohar

24    (VP Clinical handling Fentora right now) is not

25    on your invited list."  Do "you want to include
```

Highly Confidential - Subject to Further Confidentiality Review

1    him?"  (As read.)

2           Do you see that?

3       A.   Yes.

4       Q.   So it looks like, from this e -- e-mail,

5    that Dan Bar-Zohar, who says on his LinkedIn that

6    he worked for Teva Pharmaceuticals [sic] Industries

7    Ltd. for three years and three months, from 2010

8    through the end of 2012 in Israel, was on the

9    Fentora product working group as the VP Clinical

10   handling Fentora.

11          At least that's what this e-mail says;

12   correct?

13          MS. HILLYER:  Objection to form and

14   beyond the scope.

15          THE WITNESS:  I don't know whether

16   he was a TPI employee, was he in Israel.  And

17   I don't know what "VP Clinical handling Fentora"

18   means.

19      Q.   BY MR. CARTMELL:  Okay.  But it's

20   possible, would you agree, that Mr. Bar-Zohar,

21   who was -- it's possible working at TPI at this

22   time, was involved in the Fentora product working

23   group and working on the day-to-day operations

24   related to that opioid?

25          It's possible; correct?

Highly Confidential - Subject to Further Confidentiality Review

 1              MS. HILLYER:  Objection to form and

 2      beyond the scope.

 3              THE WITNESS:  It's -- there's very

 4      low probability that an employee in Israel would

 5      be, on a daily basis, involved in a clinical --

 6      clinical trial that takes place in the US.

 7          Q.   BY MR. CARTMELL:  No.  Right now, this

 8      e-mail is just talking about him being the actual

 9      vice president for the company who was handling

10      that drug Fentora.

11              That's what that says; right?

12              MS. HILLYER:  Objection.  Mischaracterizes

13      the document.

14              THE WITNESS:  That is --

15              MR. CARTMELL:  How is that

16      mischaracterizing?

17              THE WITNESS:  -- very brief, abbreviated

18      to know what they mean by "handling Fentora" right

19      now.

20          Q.   BY MR. CARTMELL:  Is it possible that

21      Mr. Bar-Zohar was a TPI employee at this time and

22      was the vice president in the clinical department

23      handling Fentora?

24              Is that possible?

25              MS. HILLYER:  Same objections.

```
 1          Q.   BY MR. CARTMELL:  Or do you know?

 2          A.   I don't know, as I said.

 3          Q.   Okay.

 4          A.   I don't know if he is an -- he was

 5     a TPI employee at that time.  And I don't know

 6     what this means --

 7          Q.   Okay.

 8          A.   -- the "VP Clinical handling Fentora."

 9          Q.   Teva -- I'll start again.

10               TPI also has a publication policy

11     created by the corporate publication department

12     at TPI that deals with the publication of studies

13     for medications that Teva entities sell; correct?

14               MS. HILLYER:  Objection to form.

15               THE WITNESS:  Can you repeat that?  TPI?

16               MR. CARTMELL:  Sorry.  Let me -- let me

17     get this for you.

18               (Exhibit 61 marked.)

19          Q.   BY MR. CARTMELL:  I'm going to hand you

20     what's been marked as Exhibit 61, which is a:

21               "Global Publication Policy."

22               Do you see that?

23          A.   (Examining.)  Yes.

24          Q.   This is a policy that is put together

25     by TPI; correct?
```

```
1        A.   I don't know.  The person owning it is
2   not in TPI.  But --
3        Q.   Okay.  But this is a corporate or global
4   policy; correct?
5        A.   This is a global policy.  Yes.
6        Q.   Okay.  And it says under "Purpose":
7             "The objective of this document is
8   to outline the principles and responsibilities
9   governing the external publication of scientific
10  and medical information about products belonging
11  to Teva Pharmaceutical Industries Ltd. or disease
12  states of interest to Teva."
13            Do you see that?
14       A.   Yes.
15       Q.   Do you agree with that?
16       A.   No.
17            MS. HILLYER:  Objection to form.
18       Q.   BY MR. CARTMELL:  Pardon me?  Do you
19  agree with this?
20       A.   No.
21       Q.   At any rate, this is a corporate policy,
22  global policy that is given to subsidiaries like
23  Teva -- Teva USA as directives that are supposed
24  to be followed; correct?
25       A.   Yes.  Including TPI itself, of course.
```

```
 1                    (Exhibit 62 marked.)

 2          Q.   BY MR. CARTMELL:  I'll hand you what's

 3     been marked as Exhibit 62, which is an e-mail

 4     string that was produced in this case with an

 5     attached agenda to a product liability conference

 6     in the United States.

 7               Do you see that?

 8          A.   (Examining.)  Yes.

 9          Q.   If you go to the next page, there's

10     the product liability conference agenda.  And

11     this is happening in New York; correct?

12               Do you see that?

13          A.   Yes.

14          Q.   And this is on Teva Pharmaceutical

15     Industries Ltd. stationery?

16          A.   Yes.

17          Q.   Likely prepared by Teva Pharmaceutical

18     Ltd. employees; correct?

19               MS. HILLYER:  Objection to form and

20     beyond the scope.

21          Q.   BY MR. CARTMELL:  Or do you know?

22          A.   I don't.  But --

23          Q.   Okay.

24          A.   -- many of these are not.  So I don't

25     know.
```

 1     Q.   Okay.  This -- do you know what product

 2  liability is in the United States?

 3     A.   Does it have a different meaning in the

 4  US than elsewhere?

 5     Q.   I'm just asking, because this is in the

 6  US and involves United States product liability

 7  law discussion.

 8          Do you know what that is, product

 9  liability?

10     A.   Broadly.

11     Q.   What is it?

12     A.   The response -- the liability of a

13  maker of a product for adverse effect of that

14  product --

15     Q.   Okay.

16     A.   -- or consequences of using that product.

17     Q.   And this involves speakers who include

18  multiple employees of TPI from Israel; correct?

19     A.   I see employees from Israel, from the

20  US -- I mean Teva USA employees, TPI employee --

21  there's more than one.  I see Hedva, but I don't --

22  oh, and Tal.

23     Q.   Right.

24     A.   So two out of many.

25     Q.   Richard Egosi?

```
 1         A.    Yeah, that depends where he were [sic]

 2   at that time.  As I said, he re-located several

 3   times.

 4         Q.    Right.

 5         A.    So depending on the date --

 6         Q.    And --

 7         A.    -- he may or may not be a TPI person.

 8         Q.    Sorry.

 9               And -- and Richard and -- and Hedva

10   are speaking on liability law -- are speaking

11   at the seminar, I should say.

12               Correct?

13         A.    According to the agenda, they are

14   presenting.

15         Q.    So they would have come from Israel

16   from the home office -- TPI office in Israel

17   to the United States to talk about product

18   liability law as it applies to Teva's products?

19               MS. HILLYER:  Objection to form --

20               THE WITNESS:  Yeah, I'm not --

21               MS. HILLYER:  -- and to the extent

22   this is beyond the scope.

23               THE WITNESS:  I'm not sure what

24   Hedva would be speaking about.  The title

25   says pharmacovigilance, which is her domain --
```

Highly Confidential - Subject to Further Confidentiality Review

1    global domain in Teva.  It does not say product

2    liability.  So ...

3         Q.   BY MR. CARTMELL:  Well, the title of

4    the conference is:

5              "Product Liability Conference Agenda."

6              Do you see that?

7         A.   Yes.

8         Q.   Okay.  Why is it that TPI employees

9    would come to the USA from Israel to speak

10   about U -- United States product liability

11   law to representatives of Teva USA?

12             MS. HILLYER:  Objection to form.

13             THE WITNESS:  I don't know what was

14   discussed there.

15             But Hedva, in her global role as global

16   head of pharmacovigilance, traveled very frequently

17   to the subsidiaries to educate, to oversee, to

18   talk about how we keep pharmacovigilance standards,

19   et cetera.

20             (Exhibit 63 marked.)

21        Q.   BY MR. CARTMELL:  I'm going to hand

22   you what's been marked as Exhibit 63, which is

23   an e-mail produced from the files of Teva in

24   this case, and ask you a quick question or a

25   few quick questions.  This is dated October 4th

1    of 2017.

2            The e-mail is from Shannon Dzubin --

3            Do you see that?

4       A.   (Examining.)  Yes.

5       Q.   -- to several individuals.  And it's

6    about a meeting that is being put together by

7    someone named Peterburg.

8            Do you see that?

9       A.   Yes.

10      Q.   Who is Peterburg?

11      A.   Peterburg was at the -- at the time

12   the CEO -- the -- wait.  Because he was president.

13   Is that the time he was CEO?  This is probably

14   from the time he was CEO -- acting CEO of TPI.

15      Q.   Okay.  So the acting CEO of TPI in

16   Israel.

17           Did he reside in Israel at the time?

18      A.   Yes.

19      Q.   The acting CEO, who resides in Israel

20   and is the CEO of TPI, has asked that Teva USA

21   employees get together and meet.  It says:

22           "You've been invited to a GlobalMeet

23   web meeting."

24           Do you see that?

25      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Get together and meet:

2           "To review the US opioid epidemic and

3      consider Teva response options."

4           Do you see that?

5      A.   Yes.

6      Q.   As CEO of Teva Pharmaceutical Ltd.,

7      was Mr. Peterburg or has he been involved in

8      responding to the opioid epidemic in the United

9      States?

10          MS. HILLYER:  Hold on a second.

11          Objection to form and to the extent

12     this is beyond the scope.

13          THE WITNESS:  I have no information

14     and details of what Mr. Peterburg did or not.

15     What I see here that he requested, as you said,

16     Teva USA employees to review what Teva -- which

17     I assume here, because it's opioids, refers to

18     Teva USA -- response options are to the epidemic.

19     Q.   BY MR. CARTMELL:  Do you know if

20     Mr. Peterburg, on behalf of Teva Ltd. -- or

21     excuse me -- Teva Pharmaceutical Ltd. actually

22     provided a written response or oral response,

23     for that matter, to the US opioid epidemic that

24     we're going through in this -- or in the USA?

25          MS. HILLYER:  Objection to form and

```
 1   beyond the scope.

 2            THE WITNESS:  Reply to whom?

 3        Q.   BY MR. CARTMELL:  To anybody.  I'm

 4   asking.  Because it looks like here he's looking

 5   for response options.

 6            MS. HILLYER:  Objection to form and

 7   way beyond the scope.

 8            THE WITNESS:  I don't know.

 9        Q.   BY MR. CARTMELL:  Would you expect,

10   based on your experience, that the CEO in Israel,

11   TPI, would be the one to respond related to the

12   opioid epidemic in the United States?

13            MS. HILLYER:  Objection to form and

14   beyond the scope.  And calls for speculation.

15            THE WITNESS:  I don't think this

16   e-mail asks -- in this e-mail Peterburg asks

17   the team to provide him with what he responds.

18   It says what Teva needs to do.

19        Q.   BY MR. CARTMELL:  Who's "Teva"?

20   Do you know?

21            MS. HILLYER:  Objection to form.

22   This is beyond the scope.

23            THE WITNESS:  I can only speculate.

24   But these are all Teva US employees.  This is

25   an opioid epidemic in the US market.  This is
```

```
 1   a Teva USA issue.

 2       Q.   BY MR. CARTMELL:  Would you expect,

 3   on an issue like this of this magnitude, as

 4   you've talked about some issues, would you

 5   expect, if there was a response to the opioid

 6   epidemic because of the magnitude of that in

 7   the United States, that TPI's CEO would be

 8   involved in approving that response?

 9           MS. HILLYER:  Objection to form.

10   Calls for speculation.  And beyond the scope.

11           THE WITNESS:  If the CEO of TPI

12   believes that this issue or any other issue

13   can have bearing on the group at large beyond

14   the market, then he would be interested to

15   oversee or over -- or review what the local

16   market response is.

17           MR. CARTMELL:  Okay.  I don't have

18   anything further.  Thank you.

19           MS. HILLYER:  Nothing.

20           MR. CRAWFORD:  I have one more document

21   I wanted to ask about that I forgot.  So we don't

22   have any time left?

23           MS. HILLYER:  You have about four minutes.

24           MR. CRAWFORD:  Okay.  Let's just do it

25   real quick, then.
```

```
 1              THE VIDEOGRAPHER:  Go off the record?

 2              MS. HILLYER:  No.  I mean, he could

 3   do it from there if he can.

 4              MR. CRAWFORD:  Well, I want to --

 5              MS. HILLYER:  All right.  So why don't

 6   we go off the record and we can gather our --

 7              THE VIDEOGRAPHER:  The time is 6:33 p.m.

 8   We're now off the record.

 9              (Recess from 6:33 p.m. to 7:36 p.m.)

10              THE VIDEOGRAPHER:  The time is 7:36 p.m.

11   We're now on the record.

12              (Exhibit 64 marked.)

13

14                  FURTHER EXAMINATION

15   BY MR. CRAWFORD:

16       Q.   All right.  I marked another exhibit,

17   64.  This is -- they're Bates stamped on the

18   bottom.  Page 102, this document represents

19   the:

20              "Foreign Corporation Income Tax

21   Declaration for an IRS e-File Return."

22              Do you see on page 102 you signed

23   this as an officer of Teva --

24       A.   (Examining.)  Yes.

25       Q.   -- TPI; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And if you could turn now to page 105.

 3    And if you could look at Section W on the right.

 4    Tell me when you get there.

 5          A.    Yes.

 6          Q.    Okay.  Is this -- you checked "Yes" on

 7    this box.

 8                Is this you're attest -- attesting to

 9    the -- that your -- that the company is subject

10    to a treaty and, therefore, entitled to a reduction

11    in taxes?

12          A.    Yes.

13          Q.    And turning, then, to page 112, again,

14    that last kind of typed-in paragraph on the bottom.

15                Do you see that?

16          A.    Yes.

17          Q.    And it does say there that:

18                "Ltd. maintains that it qualifies for

19    the benefits of the US - Israel tax treaty as it

20    meets the requirements of Article 25, paragraph

21    3(C), the 'active trade or business' test."

22                So what is the benefit that the company's

23    attesting against here a reduction in taxes?

24          A.    Article 25 of the treaty sets forth

25    who is allowed to claim benefits under the treaty.
```

Highly Confidential - Subject to Further Confidentiality Review

1   And since TPI had an active trade or business in

2   Israel, it is entitled to benefit from the treaty.

3   The benefit is that TPI, if it sells to the US

4   versus selling in the US, is not taxed in the

5   US on its profit from these sales.

6       Q.   Okay.  And there's a number there at

7   the bottom.  It says:

8           "The gross receipts from US source

9   for the tax year ended were $46,020,426."

10          What number does that represent?

11      A.   This represents receipts that are from

12  US source of TPI.  I don't recall in 2015 what

13  exactly these were derived from.  But these are

14  usually from interest or dividends on marketable

15  securities that TPI holds as part of its investment

16  portfolio that may come from US companies.  This

17  is a small number.  It does not reflect our sales

18  to Teva USA.

19      Q.   And can you name the specific US

20  subsidiaries that make up the 46 million?

21      A.   No, this would not be from subsidiaries.

22  That would be from general marketing transactions,

23  securities.

24      Q.   All right.  Turn to the next page, 113.

25          Here -- these are listed here your US

Highly Confidential - Subject to Further Confidentiality Review

```
 1    subsidiaries; correct?

 2         A.   Yes.

 3         Q.   So, for instance, Teva Pharmaceuticals

 4    USA Inc. and subsidiaries, you have taxable

 5    income of $1.235 billion or thereabouts; right?

 6         A.   Yeah.  That's the taxable income of

 7    that corporation.

 8         Q.   Right.  Of Teva USA; correct?

 9         A.   Yes.

10         Q.   And then right below it --

11              MS. HILLYER:  Mark, just to let you

12    know your five minutes --

13              MR. CRAWFORD:  We'll wrap it up --

14              MS. HILLYER:  -- passed already.

15              MR. CRAWFORD:  -- here.  I just started.

16              MS. HILLYER:  You only had about five

17    minutes.

18              MR. CRAWFORD:  Okay.

19              MS. HILLYER:  And your five minutes

20    passed.

21              MR. CRAWFORD:  Let me just finish up

22    with this.

23              MS. HILLYER:  Go ahead.

24         Q.   BY MR. CRAWFORD:  So Cupric had a loss

25    of $586 million; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    That's what it says.

 2        Q.    So, basically, these numbers are lumped

 3   together -- or -- or a consolidated return of

 4   these -- these profits and losses are lumped

 5   together and -- and offset each other; right?

 6        A.    In some cases.  Not all of these

 7   consolidate under the same group.  We file

 8   several consolidated returns in the US.

 9        Q.    And consolidation means that you

10   are -- you lump them together so you can offset

11   profits and losses of the various entities that

12   are consolidated?

13        A.    For US tax.

14             MS. HILLYER:  Hold on.

15             Objection to form.

16             MR. CRAWFORD:  Okay.  That's all I have.

17   Thank you.

18             MS. HILLYER:  I still have -- I don't

19   want the camera on me.  Good?

20             THE VIDEOGRAPHER:  Yeah.

21             MS. HILLYER:  Okay.

22             MR. CRAWFORD:  You want to change?

23             MR. CARTMELL:  Yeah.

24             MS. HILLYER:  No, it's okay.  Let me --

25   while you're switching, I want to say one thing
```

```
 1    before I ask questions.
 2              MR. CARTMELL:  Okay.
 3              MS. HILLYER:  Just due to timing,
 4    I just want to put on the record we're going
 5    to take a closer look at Exhibit 62 and 63.
 6    And I mean, I guess, because we always have
 7    the right, but we reserve the right to claw
 8    those two documents back and to move to strike
 9    the testimony about them to the extent they're
10    privileged.  But we didn't get a chance to really
11    study those.  So I just wanted to put that on the
12    record for now.  All right.
13              MR. CARTMELL:  Okay.
14              MR. CRAWFORD:  You want your mike on?
15              MR. CARTMELL:  Yeah.  Yeah.  Oh, here
16    it is.  Yeah.  Got it.
17
18                    EXAMINATION
19    BY MS. HILLYER:
20        Q.  Mr. Herman, earlier you testified about
21    certain SEC filings that TPI makes.
22              Do you recall that?
23        A.  Yes.
24        Q.  Is it your understanding that all of
25    those SEC filings complied with all SEC regulations
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and laws?

 2        A.   Yes.

 3             MR. CARTMELL:  Object to form.

 4        Q.   BY MS. HILLYER:  We also looked at

 5   some press releases over the course of the day

 6   that TPI issues.

 7             When TPI issues a press release that

 8   may just say the word "Teva," what does that

 9   mean?

10        A.   It means TPI and/or any of its

11   subsidiaries.

12        Q.   If a press release mentions Teva

13   Pharmaceuticals [sic] Industries Ltd. may

14   sell X, Y, Z product or conduct this business,

15   does that actually mean TPI does those things?

16             MR. CRAWFORD:  Object to the form.

17             THE WITNESS:  No.

18        Q.   BY MS. HILLYER:  Does it imply that

19   TPI controls the day-to-day business of whichever

20   entity does that operation?

21        A.   No.

22        Q.   Are press releases that TPI issues

23   marketing of any Teva product?

24        A.   No.

25        Q.   Do you know who Kirsten Bauer reports
```

Highly Confidential - Subject to Further Confidentiality Review

1    to?

2        A.   Yes.  Kirsten Bauer reports to Brendan

3    O'Grady.

4        Q.   In his capacity as --

5        A.   In his capacity as head of Americas

6    Commercial.  And -- and she is -- just to remind

7    everybody, she's the legal -- she's head of legal

8    for the North American commercial business.

9        Q.   Earlier we looked at pictures and talked

10   about the corporate officers of TPI.

11            Do you recall that?

12       A.   Yes.

13       Q.   Do any of those corporate officers have

14   any involvement in or control of the day-to-day

15   operations of Teva USA?

16            MR. CARTMELL:  Object to the form.

17            MR. CRAWFORD:  Object to the form.

18            THE WITNESS:  The only corporate officer

19   that has any such involvement is Brendan O'Grady.

20       Q.   BY MS. HILLYER:  And why does he?

21       A.   Because he is response -- he's managing

22   the Americas commercial business.

23       Q.   And is his involvement in that capacity,

24   is -- is that because of his role as a corporate

25   officer of TPI?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CARTMELL:  Object to form.

 2              THE WITNESS:  It's the reverse.

 3              He's a member of the Executive

 4   Committee or the executive management because

 5   he is the manager of the commercial -- one of

 6   our commercial regions.

 7      Q.   BY MS. HILLYER:  I want to show you

 8   again -- I hope these are in order -- Exhibit

 9   36, which is one of the ones that you brought

10   in today with you.  I just want to clarify

11   something.  I'll show you mine.

12              There was a page that talked about

13   Teva board membership and Teva committees.

14              Do you recall that?

15      A.   Yes.

16      Q.   Okay.  What Teva entity is that for

17   that board and committees?

18      A.   TPI.

19      Q.   There was also some discussion about

20   where employees may go after a company was

21   acquired or merged with a Teva entity.

22              Do you recall that?

23              MR. CARTMELL:  Object to the form.

24              THE WITNESS:  Yes.

25      Q.   BY MS. HILLYER:  In any of those
```

Highly Confidential - Subject to Further Confidentiality Review

1    acquisitions or mergers that we talked about,

2    did any of those employees become employees

3    of TPI to your knowledge?

4        A.   No.

5        Q.   We also discussed, over the course

6    of the day, certain global functions within

7    the Teva group.

8            Is there any global function that

9    is headquartered in any one place?

10       A.   The global functions, as I mentioned,

11   are comprised of people residing in -- in many

12   places.  They're not headquartered any particular

13   location.  And, actually, the location tends to

14   shift depending on who's currently in a specific

15   position.

16       Q.   If -- if the head of a global function

17   is a TPI employee who resides in Israel, does

18   that mean that the global function is a TPI

19   function?

20       A.   No.

21       Q.   Is TGO the same as TPI?

22       A.   No.

23       Q.   Are there any global functions that

24   are the same as TPI?

25       A.   No.

1    Q.   You also testified about certain TGO

2    departments.  And I believe you brought in a

3    list of those with you.

4         Are those headquartered or run out

5    of any one place?

6    A.   No.  Same as with other corporate --

7    the other global functions, they -- the management

8    of them resides wherever the people who fulfill

9    the functions reside.  And that may be around

10   the globe.

11   Q.   And that can change?

12   A.   And that actually changes over time.

13   Q.   Earlier there was some questions and

14   answers around financing transactions.

15        Do you recall that testimony?

16        MR. CARTMELL:  Object to the form.

17        THE WITNESS:  Yes.

18   Q.   BY MS. HILLYER:  And -- and there was

19   discussion about what happens with money from

20   one asset -- from one entity to another.

21        In any of those processes or -- or

22   transactions, are any funds between two Teva

23   subsidiaries or entities ever commingled?

24        MR. CRAWFORD:  Objection.  Form.

25        THE WITNESS:  No.  Each subsidiary

1    always maintains his entitlement to the

2    consideration for the receivable they sold

3    or any asset that they sold.

4         Q.   BY MS. HILLYER:  Over the course of

5    the day, I've heard you reference or use the

6    phrase "the market" where the market drives

7    certain decisions.

8              Can you explain what you mean by

9    "the market"?

10             MR. CARTMELL:  Object to the form.

11             THE WITNESS:  It's the local Teva

12   subsidiary that is distributing and marketing

13   the products in that -- in that country.

14        Q.   BY MS. HILLYER:  And in USA, in the

15   US, what is that?

16        A.   That would be Teva USA for the most

17   part, some Cephalon to an extent.

18        Q.   Did TPI ever sell oxycodone in the

19   United States?

20        A.   No.

21        Q.   Do you know if it sold it elsewhere?

22        A.   I'm not sure regarding Israel, which

23   would be the only place that it could sell

24   oxycodone.

25        Q.   For opioids that are sold or distributed

 1    within the United States by Teva USA or any Teva

 2    entity, is any R & D for those products conducted

 3    outside of the United States?

 4        A.   No.

 5        Q.   Does TPI oversee TUSA's compliance

 6    with DEA regulations?

 7             MR. CARTMELL:  Object to the form.

 8             (Court reporter clarification.)

 9             MS. HILLYER:  Oh, sorry.

10        Q.   BY MS. HILLYER:  Does TPI oversee Teva

11    USA's compliance with DEA regulations?

12             MR. CARTMELL:  Same objection.

13             THE WITNESS:  TPI monitors compliance

14    with rules and regulations relevant to the

15    subsidiaries.  Generally, the DEA regulations

16    would be part of this.

17        Q.   BY MS. HILLYER:  And to the extent

18    suspicious order monitoring is part of a DEA

19    compliance, would that fall under that umbrella

20    as well?

21             MR. CARTMELL:  Objection to the form.

22             THE WITNESS:  Yes.

23        Q.   BY MS. HILLYER:  Does TPI control or

24    manage the day-to-day of Teva USA's compliance

25    with DEA regulations?

1    A.   No.

2         MR. CARTMELL:  Object to the form.

3    Q.   BY MS. HILLYER:  Is there any global

4    policy or standard by Teva -- any Teva entity

5    for DEA compliance?

6    A.   Not a global, because that's a local

7    issue.

8    Q.   Do subsidiaries in the Teva group

9    always have to accept the recommendation of

10   an audit?

11   A.   No.

12        MR. CARTMELL:  Object to the form.

13        THE WITNESS:  No.  They -- they cannot

14   reject the findings.  They can propose alternative

15   remediation plans and, in discussion with internal

16   audit, get to an agreement on what would be the

17   actual remediation that they will then implement.

18   Q.   BY MS. HILLYER:  Is there a Chief

19   Medical Officer for TPI?

20   A.   This is a global function that used

21   to exist.  Currently, it does not -- does not

22   exist in the United States.

23   Q.   I'm going to turn your attention to

24   Exhibit 54, page 9 of the attachment.

25        This was a document that you had never

```
 1    seen before today; correct?

 2         A.    Yes.

 3         Q.    And you don't know who wrote it; correct?

 4         A.    Yes.

 5         Q.    There's a reference on the -- in the

 6    second bullet to Teva Pharmaceutical Industries

 7    Ltd.

 8               Could that be a reference to another

 9    Teva entity?

10               MR. CARTMELL:  Object to the form.

11               THE WITNESS:  Yes.  This is probably

12    a misnomer.

13         Q.    BY MS. HILLYER:  What -- what is it

14    likely to have been?

15               MR. CARTMELL:  Object to the form.

16               THE WITNESS:  There are -- the FDA, on

17    a daily basis, transacts with US entities.  Even

18    when a product is developed outside of the US, we

19    ask TBPP, one of our subsidiaries, to be a front

20    that the relevant entity -- TPI, for example, would

21    ask TBPP to be a front to the FDA.  So it's highly

22    unlikely that the FDA requested TPI anything about

23    this product.

24         Q.    BY MS. HILLYER:  Does TPI manufacture,

25    promote, or sell any opioids in the United States?
```

```
 1              MR. CARTMELL:  Object to the form.

 2              THE WITNESS:  No.

 3         Q.   BY MS. HILLYER:  I'll turn your attention

 4    to Exhibit 58.  That was here.  Page 2 of the

 5    attachment -- I'm sorry -- page 2 of the document,

 6    first page of the attachment, there is a reference

 7    to Teva Branded Pharmaceutical Products R & D Inc.

 8              Do you see that?

 9         A.   Yes.

10         Q.   What is that entity?

11         A.   That is the entity I just referred

12    to as TBPP.  This is the entity that the Teva

13    subsidiaries usually use for interaction with

14    the FDA, particularly in new -- new drug approvals.

15         Q.   Earlier today, Mr. Herman, I believe

16    you referenced the FCPA.

17              Do you recall that?

18         A.   Yes.

19         Q.   What was the context in which you were

20    referencing that?

21         A.   I was pointing out to a law that may

22    impose liability on TPI's traded company in the

23    US, even though the wrongdoing was done by a

24    subsidiary of TPI, even a subsidiary outside

25    the US, as we have experienced.
```

1      Q.   But you weren't saying that TPI could

2   be liable for subsidiaries in any other context

3   when you said that, were you?

4           MR. CARTMELL:  Object to the form.

5           THE WITNESS:  That would require

6   a specific law that holds TPI liable to the

7   wrongdoings of subsidiaries.  FCPA is a good

8   example of such law.

9           MS. HILLYER:  I have no further

10  questions at this time subject to re-cross --

11  re-direct.

12          MR. CRAWFORD:  We have one.

13          MR. CARTMELL:  Do you want to go?

14          MS. HILLYER:  Do you want to take a --

15          MR. CRAWFORD:  No, it's fine.

16

17                  FURTHER EXAMINATION

18  BY MR. CARTMELL:

19      Q.   Mr. Herman, you just referenced again --

20  I think it was Exhibit 58, page 2, and that's

21  where Hedva Voliovitch signed off on a study

22  that was done during the R & D phase of an

23  opioid being tested and provided to the FDA.

24          Correct?

25          MS. HILLYER:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I'm not sure what "signed

 2    off on" means.  She served, as it says here, as

 3    the safety officer.  I believe that's an FDA-defined

 4    term, what is -- who's the -- the safety officer

 5    over clinical trials.

 6         Q.   BY MR. CARTMELL:  Okay.  So let's --

 7    let's make it clear.

 8              This was Ms. Voliovitch -- am I

 9    pronouncing that correctly?

10         A.   Yes.

11         Q.   Okay.  Let's make it clear.

12              Ms. Voliovitch at this time is an

13    employee of Teva Pharmaceutical Ltd. in Israel;

14    correct?

15         A.   Of TPI, yes.

16         Q.   Okay.  And there is an opioid drug that

17    is being developed by one of the Teva entities

18    or Teva as -- as a global entity so that it can

19    be sold in the United States; correct?

20              MS. HILLYER:  Objection to form.

21              THE WITNESS:  The first way you put

22    it was better.

23         Q.   BY MR. CARTMELL:  Okay.

24         A.   One of the Teva US entities was

25    developing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Well, the Teva -- do you --
 2   do you know who signed the NDA for that?
 3             MS. HILLYER:  Objection to the extent --
 4             THE WITNESS:  No, I don't.
 5             MS. HILLYER:  -- it's beyond the scope.
 6        Q.   BY MR. CARTMELL:  Do you know if that
 7   was a Teva USA employee?
 8        A.   No, I don't.
 9        Q.   Okay.  But you know that, during the
10   research and development of drugs like opioids
11   in this case, there's testing that's done related
12   to safety; correct?
13        A.   I know that there are testing done also
14   with respect to safety on developing new drugs.
15   And I know that drugs involving opioids cannot
16   be developed -- because of regulatory requirements,
17   DEA, cannot be developed outside the US.
18        Q.   Okay.  So -- so this drug -- this opioid
19   drug that Teva USA is planning to or has already
20   submitted an NDA on and at that time is planning
21   to sell in the United States is being tested --
22   right? -- at the time of that document?
23        A.   I --
24             MS. HILLYER:  Objection to the extent
25   that's beyond --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  -- assume so.
 2                MS. HILLYER:  -- beyond the scope.
 3        Q.   BY MR. CARTMELL:  Okay.  And there's
 4   a safety officer that is involved in that testing
 5   at that time.
 6                And that's Ms. Voliovitch; correct?
 7        A.   It says here she is the designated
 8   safety officer.  Her level of involvement I'm
 9   not -- I can only infer from the fact that she
10   is designated as the safety officer.
11        Q.   I understand that.
12                But -- but my point is:  At that time,
13   during the research and development of an opioid
14   that's going to be sold in the United States, she
15   is signing documents that are submitted to the FDA
16   in the United States.
17                And she is a TPI employee at that time;
18   correct?
19        A.   I don't know about signing.  I don't
20   know if this is -- if you consider this signing.
21   She is designated as a safety officer responsible
22   for safety of a clinical trial that is conducted
23   in the US.  Does that involve daily oversight or
24   just at periodic -- periodic reviews of safety
25   reports of people who are doing the daily work?
```

Highly Confidential - Subject to Further Confidentiality Review

1    I don't know.

2        Q.   But you know that, by -- by putting

3    her name on that document to the FDA, she's

4    representing to the FDA involvement, isn't

5    she?

6        A.   She's representing responsibility.

7    I'm not sure what level of daily involvement

8    that entails.

9        Q.   Okay.  Better said by you.  Let's use

10   your word.

11           Hedva Voliovitch, a TBI -- TBI -- start

12   over.  Sorry.

13           MS. HILLYER:  That's okay.

14       Q.   BY MR. CARTMELL:  Hedva Voliovitch, at

15   that time that she is listed there, is indicating

16   by being listed as the safety officer during the

17   development of an opioid in the US -- USA that

18   she has responsibility; correct?

19       A.   Yes.

20           MS. HILLYER:  Objection to form.

21           MR. CARTMELL:  Okay.  That's all

22   I have.

23           MS. HILLYER:  Do you need a mike?

24           MR. CRAWFORD:  No, that's okay.

25   //

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    FURTHER EXAMINATION

 2   BY MR. CRAWFORD:

 3        Q.   I think it's Exhibit 40, which is

 4   Form 10-K, 12/31/18.  It's the excerpt there.

 5   I just had a question about the trade receivables

 6   securitization program.  If you could look at

 7   the bottom sentence, it says:

 8             "Once sold to BNP, the relevant Teva

 9   subsidiary as seller has no retained interests

10   in the receivables sold and they are unavailable

11   to the relevant seller should the relevant seller

12   become insolvent."

13             So doesn't that mean that, once the

14   receivables are transferred, they have no

15   interest in it and no ability to get it back?

16        A.   That's exactly what it means.  They

17   got cash for it.

18        Q.   They didn't get the receivable back.

19   But you're saying they got cash back?

20        A.   No.  The receivable is the asset they

21   transferred.

22        Q.   Correct.

23        A.   They got cash.  So now they have the

24   cash.  They no longer have the receivable.

25        Q.   So what does it mean they have no
```

1    retained interest in the receivable?

2        A.    This is part of our notes to the

3    financial statements that explains why the

4    receivables are no longer on our books.  This

5    speaks to why we are, under accounting principles,

6    allowed not to have these receivables as assets.

7    Okay?

8        Q.    And so when you're -- so Teva Ltd.,

9    do they participate in the program, TPI?

10           MS. HILLYER:  Objection to form.

11           THE WITNESS:  I'm not sure.  They were

12    not -- at least as of two years ago, they were

13    not part of the plan.  Their receivables were

14    not secure -- securitized under this program.

15        Q.    BY MR. CRAWFORD:  And you testified --

16    and it's still your testimony -- that Teva --

17    or TPI never received a dollar from the SPE

18    for receivables that were sold --

19        A.    No.

20        Q.    -- or pledged by a subsidiary?

21           MS. HILLYER:  Objection to form.

22           THE WITNESS:  That is my testimony.

23    The funds went -- go -- go -- it's not only

24    history.  It's always now -- also now.  The

25    funds go to the subsidiary that sells the

Highly Confidential - Subject to Further Confidentiality Review

```
1   receivables.
2        Q.   BY MR. CRAWFORD:  You testified that
3   Mr. O'Grady, for example, has somebody reporting
4   to him in his capacity as a US officer and not
5   in his capacity as a Teva Ltd. officer; correct?
6        A.   Yes.
7        Q.   Is there something in writing?  Or how --
8   how -- how do you know that?
9             MS. HILLYER:  Objection to form.
10            THE WITNESS:  I'm not sure how to answer
11   this.
12        Q.   BY MR. CRAWFORD:  But what's -- what's
13   the basis for your statement that they're reporting
14   to O'Grady as -- as a subsidiary Teva USA officer,
15   not in his capacity as a Teva Ltd. officer?
16        A.   There are several documents talking
17   about the organizational change that was introduced
18   in '17 and -- gradually introduced, but started
19   in '17 where several functions were moved to
20   report to the commercial lead at the country
21   level, at the regional level.  Functions that
22   before that were more global became regional
23   or local respect.
24        Q.   So there's some document that says
25   it became more regional?  Therefore, does that
```

1    mean prior to that time, they were reporting

2    to -- to -- to O'Grady in his capacity or

3    whoever's in that position as a Teva Ltd.

4    officer?

5        A.   No.

6        Q.   Or --

7             MS. HILLYER:  Objection to form.

8             THE WITNESS:  No.  Before that, they

9    were reporting to the global head of legal,

10   Chief Legal Officer.  And now she is reporting

11   to the commercial lead of the region she oversees

12   the legal affairs of.

13       Q.   BY MR. CRAWFORD:  And "she" is who?

14       A.   Kirsten Bauer.

15       Q.   And who is the person she was reporting

16   to?

17       A.   Brendan O'Grady.

18       Q.   Brendan O'Grady.  Okay.

19            O'Grady reports to who?

20       A.   To Kare Schultz, CEO of Teva.

21       Q.   So how do you -- I mean, if he's reporting

22   to Schultz and the person below him is reporting

23   to him, is there -- I don't understand.

24            Is there anything in writing that

25   explains what -- why that's -- you're considering

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that reporting to him in his capacity as an

 2    officer of Teva USA?

 3              MS. HILLYER:  Objection to form.

 4              THE WITNESS:  I'm trying to think if

 5    there's a document that -- that really clearly

 6    explains it.  But I'm not sure.

 7              MR. CRAWFORD:  All right.  That's all

 8    I have.

 9              MS. HILLYER:  Nothing further.

10              THE VIDEOGRAPHER:  The time is 8:04 p.m.

11    We are now off the record.

12              (The deposition concluded at 8:04 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, BRENDA MATZOV, CA CSR 9243, do hereby

 4   certify:

 5          That, prior to being examined, the witness

 6   named in the foregoing deposition was duly sworn

 7   or affirmed by me to testify the truth, the whole

 8   truth, and nothing but the truth;

 9          That the foregoing deposition was taken

10   before me at the time and place herein set forth,

11   at which time the aforesaid proceedings were

12   stenographically recorded by me and thereafter

13   transcribed by me;

14          That the foregoing transcript, as typed,

15   is a true record of the said proceedings;

16          And I further certify that I am not

17   interested in the action.

18

19          Dated this 20th day of June, 2019.

20

21          Brenda Matzov

22          BRENDA MATZOV, CA CSR 9243

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  CERTIFICATE OF WITNESS

 2

 3          I, DORON HERMAN, witness herein, do

 4   hereby certify and declare the within and foregoing

 5   transcription to be my examination under oath

 6   in said action taken on June 20, 2019, with the

 7   exception of the changes listed on the errata sheet,

 8   if any;

 9          That I have read, corrected, and do hereby

10   affix my signature under penalty of perjury to said

11   examination under oath.

12

13

14

15

16   _____    _____

        DORON HERMAN                      Date

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         ERRATA SHEET

 2    Case:      IN RE:  NATIONAL PRESCRIPTION OPIATE

 3               LITIGATION

 4    Date:      JUNE 20, 2019

 5    Witness:  DORON HERMAN

 6

 7

 8    Page _____  Line _____  Change _____

 9    Reason _____

10    Page _____  Line _____  Change _____

11    Reason _____

12    Page _____  Line _____  Change _____

13    Reason _____

14    Page _____  Line _____  Change _____

15    Reason _____

16    Page _____  Line _____  Change _____

17    Reason _____

18    Page _____  Line _____  Change _____

19    Reason _____

20    Page _____  Line _____  Change _____

21    Reason _____

22

      _____   _____

23         DORON HERMAN                        Date

24

25
```