Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL          )    MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION,              )    Case No.
                              )    1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )    Hon. Dan A.
 6   ALL CASES                )    Polster
                              )
 7
 8                     __ __ __
 9            Tuesday, January 22, 2019

10                     __ __ __

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW

                       __ __ __
12
13
14
15        Videotaped 30(b)(6) Deposition of
     Walmart, through the testimony of Susanne
16   Hiland, held at 4206 South J.B. Hunt Drive,
     Rogers, Arkansas, commencing at 8:22 a.m., on
17   the above date, before Debra A. Dibble,
     Certified Court Reporter, Registered
18   Diplomate Reporter, Certified Realtime
     Captioner, Certified Realtime Reporter and
19   Notary Public.
20
                       __ __ __
21
22
23          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
24              deps@golkow.com
25
```

Page 2

A P P E A R A N C E S:

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
BY: ZACHARY BOWER, ESQUIRE
    Zbower@Carellabyrne.Com
    MICHAEL INNES, ESQUIRE
    minnes@Carellabryne.Com
5 Becker Farm Road
Roseland, New Jersey 07068-1739
(973) 994-1700
Counsel For Plaintiffs

JONES DAY
BY: TARA FUMERTON, ESQUIRE
    tfumerton@Jonesday.Com
    TINA TABACCHI, ESQUIRE
    ttabacchi@Jonesday.Com
    SCOTT ELMER, ESQUIRE
    selmer@Jonesday.Com
    JASON ZHOU, ESQUIRE
    jzhou@Jonesday.Com
    (Attending Telephonically)
77 West Wacker
Chicago, Illinois 60601-1692
312-782-1692
Counsel For Walmart

WRIGHT, LINDSEY & JENNINGS, LLP
BY: CALEY B. VO, ESQUIRE
    cvo@Wlj.Com
3333 Pinnacle Hills Parkway
Suite 510
Rogers, Arkansas 72758-8498
(479) 986-0888
Counsel For McKesson

REED SMITH, LLP
(Appearing Telephonically)
BY: MARY BALASTER, ESQUIRE
    mbalaster@Reedsmith.Com
811 Main Street
Suite 1700
Houston, Texas 77002-6110
(713) 469-3800
Counsel For AmerisourceBergen

Page 3

ARNOLD & PORTER KAYE SCHOLER, LLP
(Appearing Telephonically)
BY: SETH WIENER, ESQUIRE
    seth.wiener@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Counsel For Endo Health Solutions
Inc.; Endo Pharmaceuticals Inc.; Par
Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc.
Formerly Known As Par Pharmaceutical
Holdings, Inc.

BARBER LAW FIRM
BY: J. CARTER FAIRLEY, ESQUIRE
    cfairley@Barberlawfirm.Com
425 West Capitol Avenue
Suite 3400
Little Rock, Arkansas 72201
(501) 707-6182
Counsel For Cardinal Health, Inc.

BAILEY & WYANT, PLLC
BY: HARRISON M. CYRUS, ESQUIRE
    hcyrus@Baileywyant.Com
500 Virginia Street East
Suite 600
P.O. Box 3710
Charleston, West Virginia 25301
(304) 345-4222
Counsel For West Virginia Board of
Pharmacy

ALSO PRESENT:

Jennifer B. Bechet
Senior Associate Counsel
Walmart, Inc.

THE VIDEOGRAPHER:
Chris Ritona
Golkow Litigation Services

Page 4

INDEX

| | |
|---|---|
| APPEARANCES | 2 |
| PROCEEDINGS | 8 |

WALMART 30(b)(6) EXAMINATION OF
SUSANNE HILAND:
    DIRECT EXAMINATION          10
    BY MR. BOWER

Page 5

DEPOSITION EXHIBITS
30(b)(6) Susanne Hiland
January 22, 2019

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Walmart-Hiland 1 | First Notice of Deposition Pursuant to Rule 30(b)(6) and Document Request Pursuant to Rule 30(b)(6) and Rule 343 to Wal-Mart Incorporation D/B/A Walmart and Sam's Club | 24 |
| Walmart-Hiland 2 | Second Notice of Deposition Pursuant to Rule 30(b)(6) and Document Request Pursuant to Rule 30(b)(6) and Rule 343 to Wal-Mart Incorporation D/B/A Walmart and Sam's Club | 25 |
| Walmart-Hiland 3 | Administrative Memorandum of Agreement. WMT_MDL_000043490-43496 | 74 |
| Walmart-Hiland 4 | 3-11-10 email from Edward Harris. Subj: Updated: Wal-mart Dendrite Conf. Call-Mon. March 15 @ 11:00 Eastern/10:00 Central. WMT_MDL_000011558-11565 | 88 |
| Walmart-Hiland 5 | Letters from the U.S. Department of Justice/Drug Enforcement Administration. CAH_MDL2804_01564780-1564773 | 93 |

Page 6

| | | |
|---|---|---|
| Walmart-Hiland 6 | 12-27-07 letter from U.S. Department of Justice/Drug Enforcement Administration. WMT_MDL_000043648-43649 | 128 |
| Walmart-Hiland 7 | Tab 1 Walmart Responses to Plaintiffs (First) Combined Discovery Requests to National Retail Pharmacies Defendants. Tab A WMT_MDL_000044441-44499 Tab B WMT_MDL_000009423-9424, Tab C WMT_MDL_000053813-53815 Tab D WMT_MDL_0000 43316-43373, Tab 2 WMT_MDL_000011106, Tab 3 WMT_MDL_000011107-11109 Tab 4 WMT_MDL_000000963-965, Tab 5 WMT_MDL_000000966-968, Tab 6 WMT_MDL_000000969-971, Tab 7 WMT_MDL_000008377-8379, Tab 8 WMT_MDL_0000004237-4239 Tab 9 WMT_MDL_000004781-4783 | 165 |
| Walmart-Hiland 8 | Excel threshold spreadsheet WMT_MDL_000042877 | 305 |
| Walmart-Hiland 9 | September 2015 email chain. Subj: Areas of Focus - Week 35 WMT_MDL_000048214-48215 | 339 |

Page 7

| | | |
|---|---|---|
| Walmart-Hiland 10 | Masters decision | 346 |
| Walmart-Hiland 11 | September 2010 email chain. Subj: RE: DEA Audit at DC 6013 WMT_MDL_000057259-57260 | 393 |
| Walmart-Hiland 12 | February 2016 email chain. Subj: FW: Areas of Focus - 2/16 - 2/19. WMT_MDL_000003906-3907 | 419 |
| Walmart-Hiland 13 | March 2010 email chain. Subj: Updated: Wal-mart Dendrite Conf. Call-Mon. March 15 @ 11:00 Eastern/10:00 Central WWMT_MDL_000011558-11575 | 430 |
| Walmart-Hiland 14 | 11-30-17 email from Roxy Reed. Subj: DEA SOM reports. WMT_MDL-000055271-55276 | 437 |
| Walmart-Hiland 15 | 6-21-16 email from Patsy Little. Subj: Oxycodone marketing plan MNK-T1_0004830712 | 457 |
| Walmart-Hiland 16 | Chain Pharmacist Practice Memo. Vol. 6/Number 9. PKY181864224-PKY 181864229 | 460 |
| Walmart-Hiland 17 | August 2014 email chain. Subj: SOM Reqs. WMT-MDL_000028599 | 476 |
| Walmart-Hiland 18 | Witness reference binder LATE-FILED EXHIBIT | |

Page 8

PROCEEDINGS

(January 22, 2019 at 8:22 a.m.)

THE VIDEOGRAPHER:  We are now on the record.  My name is Chris Ritona.  I am the videographer with Golkow Litigation Services.  Today's date is January 22nd, 2019 and the time is approximately 8:22 a.m.

This video deposition is being held in Rogers, Arkansas, at Mitchell Williams, 4206 South J.B. Hunt Drive, Suite 200 in the Matter of National Prescription Opioid Litigation MDL No. 2804, Case No. 17-MD-2804 in the United States District Court, Northern District of Ohio, Eastern Division.  The deponent today is Susanne Hiland.  Will all counsel please identify themselves for the record.

MR. BOWER:  Good morning.  Zach Bower on behalf of MDL and the plaintiffs.

MR. INNES:  Good morning.  Michael Innes on behalf of the

Page 9

plaintiffs and the MDL.

MR. FAIRLEY:  Carter Fairley for Cardinal.

MS. BECHET:  Jennifer Bechet, senior associate counsel, Walmart, Incorporated.

MR. ELMER:  Scott Elmer from Jones Day on behalf of Walmart.

MS. FUMERTON:  Tara Fumerton from Jones Day on behalf of Walmart.

MR. TABACCHI:  Tina Tabacchi, Jones Day on behalf of Walmart.

THE VIDEOGRAPHER:  Will all counsel on the conference call please also identify themselves.

MS. BALASTER:  Mary Balaster, Reed Smith, on behalf of AmerisourceBergen Corporation.

MR. WIENER:  Seth Wiener, Arnold & Porter Kaye Scholer, on behalf of the Endo Par defendants.

MR. ZHOU:  Jason Zhou, Jones Day, on behalf of Walmart.

THE VIDEOGRAPHER:  The court

Highly Confidential - Subject to Further Confidentiality Review



Page 10

1    reporter today is Debbie Dibble.  And
2    she will please now swear in the
3    witness.
4        SUSANNE HILAND,
5    having first been duly sworn, was examined
6    and testified as follows:
7        DIRECT EXAMINATION
8    BY MR. BOWER:
9    Q.    Good morning, Ms. Hiland.  How
10   are you today?
11   A.    I'm fine, thank you.

Highly Confidential - Subject to Further Confidentiality Review

**Page 14**



22  Q.    So it seems like you're fairly
23  familiar with the ground rules for a
24  deposition.  Would that be accurate?

**Page 15**

1    A.    Yes.
2    Q.    Okay.
3          And so just to make sure we're
4    all on the same page, I just want to go over
5    a couple of those rules, just so there's no
6    issues moving forward.  I think probably the
7    most important one is to make sure that you
8    understand my question.  So if at any point
9    you don't understand the question, please
10   just let me know and I'll try to rephrase it.
11   Okay?
12   A.    Okay.
13   Q.    If you don't ask me to rephrase
14   it, I'll assume that you understand the
15   question as I asked it.  Okay?
16   A.    Okay.
17   Q.    And you understand that your
18   answers today are on behalf of Walmart;
19   correct?
20   A.    Yes.
21   Q.    And that tomorrow you will be
22   providing your own fact testimony; is that
23   correct?
24   A.    Yes.

**Page 16**

1    Q.    And do you understand,
2    therefore, that the testimony you will give
3    today can be binding on the corporation?
4    A.    Yes.
5    Q.    Okay.  How long have you been
6    working at Walmart?
7    A.    29 years.
8    Q.    And I don't want to spend too
9    much time on your employment history, but can
10   you just -- let's start maybe in 2005, give
11   or take.  Going forward.  Okay?
12   A.    Yes.
13   Q.    What was your position in 2005?
14   A.    At the start of 2005, I was a
15   regional director for operations.  And then I
16   transitioned to a director of professional
17   services.
18   Q.    And when would that transition
19   occur?
20   A.    March of 2005.
21   Q.    Okay.
22          During that time period, did
23   you have oversight over Walmart pharmacies?
24          MS. TABACCHI:  Object to the

**Page 17**

1    form.
2          THE WITNESS:  In the regional
3    role I had oversight, yes.
4    Q.    (BY MR. BOWER) And what about
5    in the director role?
6    A.    In the director role, I had
7    responsibilities for Board of Pharmacy
8    issues.
9    Q.    What was your next position at
10   Walmart?
11   A.    The next position was a
12   promotion to senior director.  It was the
13   same department, but we -- the name of the
14   department changed to regulatory affairs.
15   Q.    And when did that occur?
16   A.    2009.
17   Q.    And just generally what were
18   your duties and responsibilities as the
19   senior director in regulatory affairs?  Is
20   that an accurate description of your title at
21   that time?
22   A.    That was my title.
23   Q.    Okay.
24          And what were your -- just a

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 general description of your duties and
2 responsibilities in connection with that
3 title.
4    A.    I began to supervise the
5 directors that had responsibility for Board
6 of Pharmacy regulation.
7       I also had responsibility for
8 our licensing and registration function for
9 our facilities.  And I had federal regulatory
10 responsibility as it related to our licensed
11 pharmacies.
12       MS. TABACCHI:  Zach, of course,
13    you're welcome to inquire about the
14    witness's personal background, but
15    this is all beyond the scope of the
16    notice.
17       MR. BOWER:  I'm just trying to
18    get, like I said, a very high level.
19       MS. TABACCHI:  I just want to
20    make sure we're on the same page.  I'm
21    not going to object to every question
22    during this portion.
23       MR. BOWER:  No, I understand.
24    I'm just going to move quickly through

Page 19

1    this.
2    Q.    (BY MR. BOWER)  And what was
3 your next role at Walmart after senior
4 director of regulatory affairs?
5    A.    For a short period of time in
6 July 2011, I was senior director of
7 compliance and quality assurance.
8    Q.    So that was in 2011; is that
9 correct?
10    A.    Yes.
11    Q.    And then your next role after
12 that was?
13    A.    February 2012 of -- I'll likely
14 not get the title correct, but it was senior
15 director of clinical quality assurance.
16    Q.    Okay.
17    A.    And that was the general title.
18 I'd have to look back to get the title
19 exactly correct.
20    Q.    Approximately how many titles
21 would you say you've had at Walmart in your
22 29 years?
23    A.    One -- a different one every
24 three years approximately.

Page 20

1    Q.    What's your current title?
2    A.    My current title -- on paper my
3 title is Senior Director II, business
4 strategy.  That's an HR title.
5       In function, my title is senior
6 director of professional relations,
7 professional practice standards and clinical
8 services.
9    Q.    Do you believe you are the
10 person at Walmart with the most knowledge of
11 Walmart's maintenance and effective controls
12 against diversion?
13       MS. TABACCHI:  Object to the
14    form.
15       THE WITNESS:  I believe that
16    I'm prepared to speak to that topic on
17    behalf of Walmart.
18       MR. BOWER:  I move to strike
19    that answer.
20    Q.    (BY MR. BOWER)  I just would
21 ask you to please carefully listen to my
22 questions and answer the questions that I
23 ask.  Okay?
24    A.    Yes.

Page 21

1    Q.    The question is, do you believe
2 that you are the person at Walmart with the
3 most knowledge of Walmart's -- strike that.
4       Do you believe you are the
5 person at Walmart with the most knowledge on
6 Walmart's maintenance of effective controls
7 against diversion?
8       MS. TABACCHI:  Object to the
9    form, asked and answered.
10       THE WITNESS:  Yes.
11    Q.    (BY MR. BOWER)  How did you
12 prepare for today's deposition?
13    A.    I interviewed current and
14 former Walmart associates, I prepared with
15 counsel, and I reviewed documents.
16    Q.    Okay.  Let's take those one at
17 a time.  Get just a little more detail on

Highly Confidential - Subject to Further Confidentiality Review



Page 22

Page 23

Page 24

1  A.  Yes.  June 28th.
2  Q.  Okay.  And I see that, as I'm
3  asking my questions, you're referring to some
4  documents in front of you; is that correct?
5  A.  Yes.
6  Q.  Are you using those documents
7  to refresh your recollection for today's
8  deposition?
9  A.  Yes.
10  Q.  Is there any objection to
11  including that as an exhibit to today's
12  deposition?
13  MS. TABACCHI:  After she's
14  finished using it.
15  MR. BOWER:  Yes, yes, after
16  she's done using it.  I just don't
17  know if there's going to be any
18  dispute as to what's in there.
19  MS. TABACCHI:  We're not going
20  to dispute that.
21  MR. BOWER:  Okay.  Thank you.
22  (Whereupon, Deposition Exhibit
23  Walmart 1, First Notice of Deposition
24  Pursuant to Rule 30(b)(6) and Document

Page 25

1  Request Pursuant to Rule 30(b)(6) and
2  Rule 343 to Wal-Mart Incorporation
3  D/B/A Walmart and Sam's Club, was
4  marked for identification.)
5  (Whereupon, Deposition Exhibit
6  Walmart 2, Second Notice of Deposition
7  Pursuant to Rule 30(b)(6) and Document
8  Request Pursuant to Rule 30(b)(6) and
9  Rule 343 to Wal-Mart Incorporation
10  D/B/A Walmart and Sam's Club, was
11  marked for identification.)
12  Q.  (BY MR. BOWER)  Handing you
13  what's been marked as Exhibits 1 and 2 for
14  today's deposition, which is just the
15  deposition notices that were issued prior to
16  your first meeting with counsel in June.
17  Do you recognize those
18  documents?
19  A.  I do.
20  Q.  You've reviewed those documents
21  prior to today?
22  A.  Yes.
23  Q.  Some of the folks you mentioned
24  speaking with, such as Mr. Abernathy, also

10  Q.  Okay.  Can you represent for us
11  that every document you've reviewed has been
12  produced in this case?
13  MS. TABACCHI:  I can make that
14  representation.
15  Q.  (BY MR. BOWER)  And
16  approximately how much time did you spend
17  meeting with counsel in preparation for
18  today's deposition?
19  A.  We met on -- by phone or in
20  person.  I didn't add up the -- it was on 13
21  different occasions that ranged from
22  90 minutes to 11 hours.
23  Q.  Do you recall approximately
24  when the first of those meetings occurred?

Page 26

1 provided depositions in this case. Did you
2 review those depositions in preparation for
3 today's deposition?
4     A.    I reviewed depositions.
5     Q.    Did you --
6     A.    I --
7     Q.    I don't want to cut you off.
8 If not, please finish.
9     A.    I was finished.
10     Q.    Did you review Mr. Abernathy's
11 deposition?
12     A.    Yes.
13     Q.    Did you review Mr. Ducote's
14 deposition?
15     A.    Yes.
16     Q.    Did you review Ms. Hodges'
17 deposition?
18     A.    Yes.
19     Q.    Did you review Ms. Johnson's
20 deposition?
21     A.    Yes.
22     Q.    Did you review Ms. Reed's
23 deposition?
24     A.    Yes.

Page 27

1     Q.    When did you first review a
2 deposition transcript in this case in
3 preparation for today's deposition?
4     A.    It would have been -- if I
5 recall correctly, it would have been in -- it
6 was in December.
7     Q.    Were you reviewing the
8 deposition transcripts kind of after they
9 were happening or did you wait until a
10 certain time to prepare for today's
11 deposition?
12         MS. TABACCHI:  Object to the
13     form.
14         THE WITNESS:  I reviewed the
15     transcripts as they were made
16     available.
17     Q.    (BY MR. BOWER) Do you believe
18 you are the person at Walmart most
19 knowledgeable regarding Walmart's suspicious
20 order monitoring program for controlled
21 substances?
22     A.    Yes.
23         MS. TABACCHI:  Object to the
24     form.

Page 28

1     Q.    (BY MR. BOWER) Do you believe
2 you were the person at Walmart with the most
3 knowledge on Walmart's policies and
4 procedures related to due diligence following
5 the detection of a suspicious order?
6         MS. TABACCHI:  Object to the
7     form.
8         THE WITNESS:  Yes.
9     Q.    (BY MR. BOWER) Do you believe
10 you are the person at Walmart most
11 knowledgeable regarding the policies and
12 procedures and standards at Walmart used to
13 set and also thresholds for detecting orders
14 of interest?
15         MS. TABACCHI:  Object to the
16     form.
17         THE WITNESS:  Yes.
18         MS. TABACCHI:  I also object to
19     that as restating the topics.  So to
20     the extent that you're rephrasing the
21     topics that are either in the notice
22     or that we've agreed to, I will object
23     to those questions.
24     Q.    (BY MR. BOWER)  Are you

Page 29

1 familiar with the Controlled Substances Act?
2     A.    Yes.
3     Q.    And more specifically, are you
4 familiar with how the Controlled Substances
5 Act regulates distributors of controlled
6 substances?
7         MS. TABACCHI:  Object to the
8     form.  Calls for a legal conclusion,
9     beyond the scope of the notice.
10         THE WITNESS:  I'm aware that
11     there are obligations within the
12     Controlled Substances Act for
13     distributors.
14     Q.    (BY MR. BOWER)  Are you aware,
15 for example, that Walmart must be registered
16 in order to distribute controlled substances;
17 is that correct?
18     A.    Yes.  Walmart's DCs are
19 registered for the Controlled Substances Act.
20 We're registered.
21     Q.    Thank you for that
22 clarification.
23         And, in fact, Walmart DCs -- by
24 "DCs," you mean distribution centers;

Page 30

1  correct?
2      A.   Yes.
3      Q.   And in fact, Walmart
4  distribution centers were required to be
5  registered in order to distribute controlled
6  substances; is that an accurate statement?
7      A.   Yes. That's my understanding.
8      Q.   And in connection with that
9  requirement, those distribution centers were
10 obligated to institute suspicious order
11 monitoring programs for controlled
12 substances. Would you agree with that?
13         MS. TABACCHI: Object to the
14     form. Calls for a legal conclusion,
15     beyond the scope.
16         THE WITNESS: As a registrant,
17     we're required to implement systems to
18     detect orders and prevent diversion.
19         MS. TABACCHI: I'm sorry to
20     interrupt, but if someone has joined
21     the call, can we please get their
22     appearance for the record.
23         (Discussion off the record.)
24     Q.   (BY MR. BOWER) I'm just trying

Page 31

1  to get an understanding as to whether Walmart
2  acknowledges that, as a distributor of
3  controlled substances, it must be registered
4  with the DEA. Do you agree with that?
5         MS. TABACCHI: Object to the
6      form. Asked and answered. Calls for
7      a legal conclusion and beyond the
8      scope of the notice.
9         THE WITNESS: Yes.
10     Q.   (BY MR. BOWER) And would you
11 agree that, in order to maintain that
12 license, that registration, and in order to
13 maintain its ability to distribute controlled
14 substances, Walmart was obligated to
15 implement a program to monitor for the orders
16 of controlled substances.
17         Would you agree with that?
18         MS. TABACCHI: Object to the
19     form. Calls for a legal conclusion,
20     beyond the scope of the notice.
21         THE WITNESS: I'm aware that
22     there are requirements to implement
23     programs to alert us, the registrant,
24     of suspicious orders and investigate

Page 32

1  those orders.
2      Q.   (BY MR. BOWER) And when you
3  say "I'm aware," you're speaking on behalf of
4  Walmart; correct?
5      A.   Yes.
6      Q.   So every time today when you
7  say "I'm," you are referring to you, you're
8  speaking on behalf of Walmart. That's your
9  understanding; correct?
10         MS. TABACCHI: I object to that
11     question. The -- we will take those
12     questions as they come. And there
13     will be times when you ask a question
14     that is not calling for an answer that
15     is on behalf of the corporation, so
16     we're not going to agree to a blanket
17     assertion that every question is on
18     behalf of the corporation.
19     Q.   (BY MR. BOWER) Do you
20 understand that your answers today are on
21 behalf of the corporation?
22         MS. TABACCHI: To the extent
23     that they are within the scope of the
24     notice and our agreements.

Page 33

1          MR. BOWER: Look. I've let the
2      speaking objections go a little bit.
3      I would ask that you, so we don't take
4      time off the record the whole day,
5      just object to form and that way you
6      can sort it out later. But every
7      objection so far has been a lengthy
8      statement. I would ask if we could
9      save some time, just object to form so
10     we can move on.
11         MS. TABACCHI: I'll disagree.
12     I'll make my objections as
13     appropriate.
14     Q.   (BY MR. BOWER) Do you
15 understand that your testimony today is on
16 behalf of the corporation?
17     A.   Yes.
18     Q.   And in your previous answer,
19 you referred to "I." Were you speaking on
20 behalf of yourself or the corporation when
21 you provided that answer?
22         MS. TABACCHI: Can you please
23     restate the question that you're
24     asking about?

Highly Confidential - Subject to Further Confidentiality Review



Page 34

1    Q.    (BY MR. BOWER)  Can you answer
2  that question?
3    A.    Can you restate the question?
4    Q.    I'll move on.
5        Do you agree that Walmart must
6  be proactive in designing a system to prevent
7  diversion?
8        MS. TABACCHI:  Object to the
9    form, beyond the scope.  Calls for a
10   legal conclusion.
11       THE WITNESS:  I believe that we
12   have policies in place to detect and
13   prevent diversion.  I believe that's
14   an obligation that we have.
15   Q.    (BY MR. BOWER)  And do you agree
16 that Walmart must be proactive in preventing
17 diversion?
18       MS. TABACCHI:  Same objections.
19   Object to the form.
20       THE WITNESS:  Yes, I believe
21   our policies and procedures were in
22   place to be proactive and prevent
23   diversion.
24   Q.    (BY MR. BOWER)  Do you know how

Page 35

1  long the Controlled Substances Act has been
2  in place?
3        MS. TABACCHI:  Beyond the scope
4    of the notice.
5        THE WITNESS:  If I recall,
6    1970.
7    Q.    (BY MR. BOWER)  So Walmart is
8  aware that, going back to 1970, it had a --
9  to the extent it was distributing controlled
10 substances, it had an obligation to monitor
11 orders for those substances.
12       Would you agree with that?
13       MS. TABACCHI:  Object to the
14   form.  Beyond the scope of the notice.
15   Calls for a legal conclusion.
16       THE WITNESS:  The regulations
17   would apply during the time period
18   that we were distributing controlled
19   substances as a registrant.

Highly Confidential - Subject to Further Confidentiality Review



Page 38

Page 40

1    What information -- what time
2  period did you prepare for to answer that
3  question?
4      A.    The time period that was within
5  the scope of the notice.
6      Q.    And do you recall what time
7  period it was?
8      A.    I believe it was in the 2006
9  range.  There were different time periods.
10     Q.    Well, if you'd turn to
11  Exhibit 1, for example, and you turn to
12  page 5, do you see the relevant time period
13  on the bottom of page 5?  As defined?
14     A.    I do.
15     Q.    Okay.  So when your answer
16  referred to the notice, do you see the notice
17  asked for testimony from 1995 to the present?
18     A.    I do.
19     Q.    And as you sit here today,
20  you're prepared to answer questions from 2006
21  to the present; is that correct?
22         MS. TABACCHI:  We have asserted
23     an objection to the relevant time
24     period, as you know.

Page 39

Page 41

1         THE WITNESS:  Could you please
2      restate the question?
3      Q.    (BY MR. BOWER)  And as you sit
4  here today, you're only prepared to testify
5  and answer questions from the time period of
6  2006 to the present; is that correct?
7         MS. TABACCHI:  Per our
8      objection, and previous discussions.
9      Q.    (BY MR. BOWER)  Well, I
10  understand you've raised an objection, but
11  there was no previous discussions or
12  agreements to that time period.  So I'm just
13  trying to understand what you are prepared
14  today to testify to.  And the question is, am
15  I correct that you're only prepared to
16  testify today from the time period 2006 to
17  the present?
18         MS. FUMERTON:  I'd just like to
19     add that this did go before Special
20     Master Cohen, our letter dated
21     August 31st, stating what the relevant
22     time period would be, and the
23     plaintiffs at that point in time did
24     not raise any issue, and Special

23     Q.    (BY MR. BOWER)  Okay.  Thank
24  you for that answer.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  Master Cohen did issue at that point
2  in time.
3        So I don't think it's accurate
4  for you to say that there has not been
5  a sort of agreement or decision
6  reached on this issue.
7        Moreover, Federal Rule 2 and 3
8  also talk about what the relevant time
9  period is in this case.
10       MR. BOWER:  Do you need the
11  question read back to you?
12       THE WITNESS:  Yes, please.
13  Q.    (BY MR. BOWER)  Okay.
14       And I'll just rephrase it.  I'm
15  just trying to understand what you prepared
16  for today.  Okay?
17  A.    Yes.
18  Q.    I don't think it's complicated.
19  I don't think we need all of those
20  objections.  I'm just trying to find out what
21  you have in fact prepared for today.
22       Is it a fair statement that
23  you've prepared to testify today with respect
24  to the time period 2006 to the present?



Page 45

10  A.    Much of it was
11  experience-based.  There were very tenured
12  associates, and their jobs were
13  specifically -- they were specifically
14  assigned to the controlled substance
15  processing areas.  And so they were very
16  familiar with practices and what might be out
17  of the ordinary.
18       Q.    What specifically would they
19  look for?
20       A.    They would be looking for
21  orders that were of an unusual size.  They
22  would be monitoring for any type of an order
23  that was requested outside of a normal
24  ordering schedule that Walmart had

Highly Confidential - Subject to Further Confidentiality Review



Page 46

1  established.  And those were the -- those
2  were the things that they were looking for.
3      Q.    What do you mean by "normal
4  ordering schedule that Walmart had
5  established"?
6      A.    So for Walmart, the way that
7  our distribution was set up, every pharmacy
8  only received an order once a week.  And so
9  that was the schedule.  It was -- it was a
10 certain set of stores that would order four
11 days out -- one day of the week, but we only
12 distributed four days out of the week.  And
13 so they could see also if there were manual
14 orders coming in or requests for some
15 different order schedule.
16     Q.    So they were, for example,
17 looking at as to whether a store ordered more
18 than once a week?  Is that correct?
19     A.    What they would look for is --
20 there was a process for a store to order
21 outside of their normal pattern, so they
22 would be looking for those.  And then
23 understanding why they needed it outside of
24 that normal day.

Page 47

12     A.    My understanding was that there
13 were -- there were processes in place before
14 we distributed C-IIs, and that started in
15 2002.  So that when the DC was opened in
16 2002, there had been a lot of conversations
17 with the DEA prior to that, around current
18 processes, what needed to carry over and how
19 to open that building.

Page 48

Page 49

11     Q.    Did Mr. Culver convey to you
12 that he relied on those interactions with the
13 DEA in determining what policy would be used
14 to monitor for orders of controlled
15 substances?
16         MS. TABACCHI:  Object to the
17     form.  Beyond the scope.
18         You may answer.
19         THE WITNESS:  What he conveyed
20     to me was that he worked interactively
21     with the DEA around requirements and
22     understanding what their expectations
23     were that ranged from physical
24     security of the buildings, the

Highly Confidential - Subject to Further Confidentiality Review



Page 50

1  shipping mechanisms to ensure safe
2  transport, as well as any reporting or
3  processes that the associates were
4  conducting as they were order
5  monitoring.

Page 52

1  for unusual orders of unusual size as the
2  orders were being processed.
3     Q.     And how would they determine
4  whether an order was of unusual size?
5     A.     These were --
6        MS. TABACCHI:  Beyond the
7  scope.
8        THE WITNESS:  These were
9  long-tenured associates that
10  understood the business and the fact
11  that we were self-distributing.  So
12  they saw the -- they saw the patterns.
13  They worked with it every single day.

Page 51

Page 53

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 58

Page 60

Page 59

Page 61

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 70

Page 71

Page 72

Page 73

Highly Confidential - Subject to Further Confidentiality Review



Page 78



Page 80

1 facility. Over multiple interactions with
2 the DEA, they've seen our processes. They've
3 reviewed our reports. They've asked for
4 additional information which we've provided.
5 And so we have a -- we have a long history of
6 interaction, positive interaction, and
7 collaborative interaction with the DEA.
8 　　　Q.　(BY MR. BOWER) Okay. And now
9 I want to ask probably a better question than
10 the last one. So my question is more focused
11 than that. I want to ask specifically what
12 conversations has Walmart had with the DEA
13 regarding designing or implementing its
14 suspicious order monitoring program for
15 controlled substances?
16 　　　MS. TABACCHI: Object to the
17 　　form.
18 　　　THE WITNESS: The conversations
19 　　have occurred over time, again, as the
20 　　distribution center was established
21 　　and reporting was pulled and reviewed.
22 　　As a part, one part of our order
23 　　monitoring, the DEA reviewed those
24 　　reports, and at one point asked us to

Page 79

6 　　　Q.　(BY MR. BOWER) Did Walmart
7 rely on guidance from the DEA in implementing
8 or designing its suspicious order monitoring
9 programs?
10 　　　A.　We didn't solely rely on
11 guidance, but we certainly had conversations
12 with the DEA regarding our plans, and took
13 into consideration any recommendations,
14 thoughts, suggestions that they had for how
15 we established our policies and practices.
16 　　　Q.　And what conversations are you
17 referring to specifically?
18 　　　A.　We have -- so in speaking with
19 Scott Culver, Scott relayed the conversations
20 that he had with the DEA in establishing the
21 C-II facility, our distribution facility,
22 even before any plans were built. Blueprints
23 were reviewed. Contractors were -- or at
24 least DEA-approved contractors to build the

Page 81

1 begin sending those to them on a
2 regular basis. I learned that through
3 a conversation with Scott Culver.
4 　　　And then through the years, as
5 we've made certain changes, those
6 changes have been discussed through
7 audits that the DEA has conducted at
8 various of our facilities, where
9 they've -- they've actually asked to
10 review our order monitoring process.
11 It's a part of their audit on their
12 audit checklist, and we've -- we've
13 never had a reported deficiency in the
14 way that they've reviewed those
15 programs.
16 　　　Q.　(BY MR. BOWER) When was the
17 first time a conversation occurred between
18 someone at Walmart and someone at the DEA
19 regarding Walmart's design or implementation
20 of a suspicious order monitoring program?
21 　　　MS. TABACCHI: Object to the
22 　　form.
23 　　　THE WITNESS: So from an
24 　　overall perspective?

Highly Confidential - Subject to Further Confidentiality Review



Page 82

1  MS. TABACCHI: Beyond the scope
2  of the notice from a time period
3  perspective. I'm sorry.
4  THE WITNESS: Before we
5  started -- before we stood up the
6  distribution center to distribute
7  opioids, C-IIs, Scott Culver reached
8  out to the DEA to understand, make
9  sure that all of the plans that we had
10  that are inclusive of our obligations
11  around preventing diversion were
12  discussed with the DEA, and then,
13  again, ongoing conversations have
14  occurred as our program has evolved.
15  Q. (BY MR. BOWER) Were those
16  initial discussions that Scott Culver had
17  with the DEA specific to order monitoring?
18  A. There were -- there were
19  conversations around reporting and what
20  was -- what was expected. And how they --
21  how the operation would -- would be
22  established.
23  Q. And what did Walmart understand
24  that the DEA expected at that time?

Page 83

1  MS. TABACCHI: Beyond the
2  scope.
3  THE WITNESS: That our --
4  MS. TABACCHI: You may answer.
5  THE WITNESS: So the way that
6  our policies and procedures were set
7  up reflected our understanding of what
8  our obligations were at that time.
9  Q. (BY MR. BOWER) Well, I'm just
10  trying to get a little bit more information
11  as to what Walmart understood the DEA
12  expected.
13  So from those conversations,
14  what did Mr. Culver take away as to what the
15  DEA would require from a monitoring program?
16  MS. TABACCHI: Object to the
17  form. Beyond the scope.
18  THE WITNESS: We didn't discuss
19  in very specific detail any specific
20  ask.
21  What I do know is that the
22  programming that was implemented was
23  the result of those conversations.

Highly Confidential - Subject to Further Confidentiality Review



Page 86

Page 87

21      MR. BOWER:  Do you guys want to
22 take a break?  We've been going over
23 an hour.  Just take a quick break?
24      MS. TABACCHI:  Sure.

Page 88

1      THE VIDEOGRAPHER:  9:31.  Going
2 off the video record.
3      (Recess taken, 9:31 a.m. to
4 9:43 a.m.)
5      THE VIDEOGRAPHER:  9:43.  We
6 are on the video record.
7      Q.  (BY MR. BOWER)  All right.
8 We're back on the record, Ms. Hiland.  I'm
9 going to hand you what's been marked as
10 Exhibit 4.
11      (Whereupon, Deposition Exhibit
12 Walmart 4, 3-11-10 email from Edward
13 Harris.  Subj: Updated: Wal-mart
14 Dendrite Conf.  Call-Mon. March 15 @
15 11:00 Eastern/ 10:00 Central,
16 WMT_MDL_000011558-11565, was marked
17 for identification.)
18      Q.  (BY MR. BOWER)  And so while
19 you're reviewing that, please take a moment
20 to review it.  I will state for the record
21 that this is an email with several
22 attachments.  I only included one attachment,
23 which is the document beginning with 11562.
24 Because all the questions will be focused on

Page 89

1 this.

13      And just for the record, while
14 the witness is reviewing it, the Bates
15 number on this document is 11558, and
16 the attachment -- as I noted, there
17 are several attachments.  This
18 attachment, its Bates number is 11562
19 through 565.
20      MS. TABACCHI:  Zach, can you
21 tell us what are the pages that are
22 missing from this document?
23      MR. BOWER:  Do you mean the
24 Bates numbers?

Highly Confidential - Subject to Further Confidentiality Review



Page 90

1　　MS. TABACCHI: Yes. Well --
2　　MR. BOWER: I'm not sure. The
3　documents are referenced in the email,
4　so I'm sure they will be reflective of
5　Walmart's production.
6　　MS. TABACCHI: I know, but for
7　context, you've -- this is a partial
8　compilation.
9　　MR. BOWER: Yes, I already
10　stated that for the record.
11　　MS. TABACCHI: I know. What is
12　missing?
13　　MR. BOWER: The other documents
14　reflected in the attachments here.
15　　Do you see the cover email
16　references a bunch of attachments?
17　And because we only have a limited
18　time today, I didn't include all
19　those. I only included the document
20　that I have questions on.

Page 91

3　　MS. TABACCHI: Well, before we
4　go back to that, I would just ask that
5　you provide a complete copy to the
6　witness even if you're only going to
7　ask for a portion of it, rather than a
8　partial compilation. I don't know how
9　many other documents you have like
10　this, that you have partial
11　compilations.
12　　Would you mind just restating
13　the question? Or reading back the
14　question so the witness knows what the
15　question is?
16　　MS. FUMERTON: When she's
17　finished.
18　　MS. TABACCHI: Oh, sorry, let
19　her read.

Page 92

Page 93

18　　Q.　And that document is a part of
19　a binder you brought with you today; correct?
20　　A.　Yes.
21　　Q.　Okay. Okay. So let's -- why
22　don't we do this ...
23　　　(Whereupon, Deposition Exhibit
24　　Walmart 5, Letters from the U.S.

Highly Confidential - Subject to Further Confidentiality Review



**Page 94**

1  Department of Justice/Drug Enforcement
2  Administration, CAH_MDL2804_
3  01564780-1564773, was marked for
4  identification.)
5  Q.    (BY MR. BOWER)  You've been
6  handed what's been marked as Exhibit 5 to
7  today's deposition.  And this is -- Exhibit 5
8  includes all four Rannazzisi letters.  They
9  were produced by a different defendant in
10  this action.  But I'm just using them for
11  sake of completeness.

24  Do you see those?

**Page 95**

1       MS. TABACCHI:  Object to the
2  form, and in particular to the
3  reference to like all four Rannazzisi
4  letters.  As you noted, these are from
5  another defendant's production.
6       MR. BOWER:  And I will note
7  that each of the letters notes that
8  they were being sent to every
9  commercial entity in the United States
10  who had registered with the DEA to
11  distribute controlled substances.
12  Q.    (BY MR. BOWER)   And would you
13  agree that Walmart was registered with the
14  DEA to distribute controlled substances from
15  2006 through 2014?
16       MS. TABACCHI:  Zach, I'm sorry.
17  She's still trying to read.
18       MR. BOWER:  I'm not asking her
19  a question about the document.  She
20  can put that aside for the moment.
21       MS. TABACCHI:  You're not
22  asking her a question from the
23  document.
24       MR. BOWER:  Not at the moment,

**Page 96**

1  no.  You can put that aside.
2       Q.    (BY MR. BOWER) Would you agree
3  that Walmart was a commercial entity
4  registered with the Drug Enforcement
5  Administration to distribute controlled
6  substances from January 1st, 2006 through
7  2017?
8       MS. TABACCHI:  Object to the
9  form.

**Page 97**

Highly Confidential - Subject to Further Confidentiality Review



Page 98

Page 99

Page 100

Page 101

Highly Confidential - Subject to Further Confidentiality Review





Page 106

Page 108

Page 107

Page 109

Highly Confidential - Subject to Further Confidentiality Review



Page 110

Page 112

Page 111

Page 113

he

Highly Confidential - Subject to Further Confidentiality Review



Page 114

6    Q.    (BY MR. BOWER)  And by
7    "corporate office," is it the same or
8    synonymous to "home office"?
9    A.    Yes.
10    Q.    Okay.  And just to be clear,
11    you did review this letter in preparation for
12    your deposition today; correct?
13    A.    Yes.

Page 115

Page 116

Page 117

Highly Confidential - Subject to Further Confidentiality Review



Page 118

Page 120

Page 119

Page 121

Highly Confidential - Subject to Further Confidentiality Review



Page 122

23    Q.    And we can talk about that
24  maybe in a few minutes.  I just wanted to

Page 123

1  clear that up.

Page 124

Page 125

9        THE WITNESS:  So we continued
10  our collaborative work with the DEA.
11  But we didn't rely on a yes-or-no
12  opinion from the DEA.  We would put
13  policies, practices in place, and then
14  communicate with the DEA over time and
15  make changes if there were changes
16  that were suggested, and we
17  implemented changes to our policies
18  independently ahead of DEA approval or
19  blessing.
20    Q.    (BY MR. BOWER)  Is it Walmart's
21  testimony today that the DEA has ever
22  approved or blessed Walmart's policies for
23  monitoring orders of controlled substances?
24        MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1     form.
2         THE WITNESS:  We've had
3     conversations with the DEA where they
4     agreed with the process that we
5     were -- that we had implemented versus
6     an outright approval.
7         Q.    (BY MR. BOWER)  And when did
8     those conversations occur, where the DEA
9     occurred with the process that was
10    implemented?
11        A.    So Scott Culver relayed to me
12    the conversations that I testified to
13    earlier, with the DEA, around our early
14    programs.  And then we have, through audits
15    that were conducted, different -- at the
16    different distribution centers we have
17    associates relaying information from the DEA,
18    with no audit finding any deficiency.  And I
19    spoke to Mike Mullins, and he relayed to me
20    that on the DEA audit form, order monitoring
21    was one of the areas that they checked.  So
22    from that, we found -- we have not been aware
23    that we've had a deficiency in our program.
24        Q.    Well, my question is a little

Page 127

1     bit different, though.  As you sit here
2     today, can you provide to us any specific
3     conversations where the DEA blessed or
4     otherwise endorsed Walmart's suspicious order
5     monitoring program?
6         MS. TABACCHI:  Object to the
7     form.  Asked and answered.
8         THE WITNESS:  No, I testified
9     that there was no specific deeming of
10    appropriateness.  There were reviews
11    of our processes over time and never a
12    deficiency noted.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 134

[REDACTED]

3     Q.   (BY MR. BOWER) Okay. And
4 Walmart doesn't dispute that it had that
5 obligation in 2007; correct?
6     MS. TABACCHI: Object to the
7 form. What obligation?
8     Q.   (BY MR. BOWER) The obligation
9 that we've been talking about. To --
10     MS. TABACCHI: You're
11 paraphrasing.
12     Q.   (BY MR. BOWER) -- report as
13 suspicious an order that deviates
14 substantially from a normal pattern.
15     MS. TABACCHI: Object to the
16 form.
17     THE WITNESS: Our programs were
18 in place to meet those obligations.
19     Q.   (BY MR. BOWER) Did Walmart --
20 in 2000 -- let me strike that.
21     In January 2008, was Walmart
22 reporting as suspicious orders that deviated
23 substantially from a normal pattern, "yes" or
24 "no"?

Page 135

1     MS. TABACCHI: Object to the
2 form.
3     THE WITNESS: If they were
4 determined to deviate from a pattern,
5 our program would have been to notify
6 the DEA.
7     Q.   (BY MR. BOWER) And that's true
8 in January of 2008; correct?
9     A.   Yes.
10     Q.   Okay. And in January 2008,
11 would Walmart have reported to the DEA an
12 order that deviated substantially from a
13 normal size?
14     MS. TABACCHI: Object to the
15 form.
16     MR. BOWER: I'll strike that.
17     Q.   (BY MR. BOWER) Does Walmart
18 agree that in January of 2008, it was
19 obligated to report to the DEA orders that
20 deviated from a normal size?
21     MS. TABACCHI: Object to the
22 form. Calls for a legal conclusion.
23     THE WITNESS: Yes. Orders
24 deviating from -- I'm sorry. I --

Page 136

1 "orders deviating from a normal size,"
2 are you reading that from the ...
3     Q.   (BY MR. BOWER) I'm not reading
4 that from anywhere. It's just a question.
5     MS. TABACCHI: That's the
6 problem.
7     MR. BOWER: I don't think I
8 have to read my questions from
9 somewhere unless I'm familiar with
10 some --
11     MS. TABACCHI: If you're going
12 to try to represent what the law is --
13     MR. BOWER: I'm asking the
14 question.
15     Q.   (BY MR. BOWER) Does Walmart
16 agree that in January of 2008, it had an
17 obligation to report orders that deviated
18 substantially from a normal size?
19     MS. TABACCHI: Object to the
20 form. Calls for a legal conclusion.
21     THE WITNESS: If we detected an
22 order that deviated from size and
23 could not -- and could not explain the
24 reason for that, therefore deeming

Page 137

1 that order suspicious, we would have
2 contacted the DEA, notified the DEA.

[REDACTED]



**Page 138**

7    Q.    Did Walmart's policies and

8  procedures as of January 2008 take into

9  account this criteria as defined here by

10  Mr. Rannazzisi that I just read?

11      MS. TABACCHI:  Object to the

12  form.

13      THE WITNESS:  So our policies

14  and procedures were developed with our

15  understanding of what we were required

16  to -- our -- the obligations that we

17  had under the Controlled Substances

18  Act, in conversation with DEA agents

19  throughout the entirety of our

20  distribution of controlled substances.

21    Q.   (BY MR. BOWER)  Now, is it

22  Walmart's position that those conversations

23  somehow superseded this communication from

24  Mr. Rannazzisi?

**Page 139**

1      MS. TABACCHI:  Object to the

2  form.

3      THE WITNESS:  We were working

4  collaboratively with the DEA agents

5  that we had on the ground that were in

6  our buildings and saw our operations.

7  And so as time went on, and our

8  business evolved, our practices

9  evolved, we remained in communication

10  with those DEA agents that were

11  actually in our buildings.

**Page 140**

**Page 141**

Highly Confidential - Subject to Further Confidentiality Review



Page 142

10    Q.    (BY MR. BOWER)  Okay.  And if
11  you look back to Exhibit 5, you will see that
12  Mr. Rannazzisi also sent a letter to all
13  registrants in June 2012.
14         Okay.  If you could turn to the
15  second-to-the-last page of Exhibit 5.
16         Do you see that?  Do you see
17  the date on there, June 12, 2012?
18    A.    Yes.

Page 143

13    Q.    (BY MR. BOWER)  Do you disagree
14  that the DEA sent this letter to every entity
15  in the United States who was registered with
16  the Drug Enforcement Administration to
17  manufacture or distribute controlled
18  substances?
19         MS. TABACCHI:  Object to the
20  form.  Beyond the scope of the notice.
21  Lack of foundation.
22         THE WITNESS:  I see that in the
23  heading.
24    Q.    (BY MR. BOWER)  And during this

Page 144

1  time period, Walmart fit that definition;
2  correct?
3         MS. TABACCHI:  Object to the
4    form.
5         THE WITNESS:  Correct.
6    Q.    (BY MR. BOWER)  And do you see
7  here, again, if you look at the third
8  paragraph, in the last two sentences there,
9  Mr. Rannazzisi again is reemphasizing the
10  point about reliance of the DEA.  He says,
11  "This regulation clearly places the
12  responsibility on the registrant to design
13  and operate such a system.  Accordingly, DEA
14  does not approve or otherwise endorse any
15  specific system for reporting suspicious
16  orders."
17         Do you see that?
18    A.    I'm sorry, I don't -- I didn't
19  see where you were -- I didn't follow.
20    Q.    The first full paragraph there,
21  the paragraph starting "Under federal law"?
22    A.    I see that.
23    Q.    The last two sentences there.
24         I can read it again if that's

Page 145

1  helpful.  It starts with "This regulation."
2  And it states, "This regulation clearly
3  places the responsibility on the registrant
4  to design and operate such a system.
5  Accordingly, DEA does not approve or
6  otherwise endorse any specific system for
7  reporting suspicious orders."
8         Do you see that?
9         MS. TABACCHI:  Object to the
10  form.  Lack of foundation.  Beyond the
11  scope of the notice.
12         THE WITNESS:  Yes, I see that.
13    Q.    (BY MR. BOWER)  So if, in fact,
14  Walmart did receive this letter in 2012, then
15  it was again put on notice that it shouldn't
16  rely on its communications with the DEA for
17  approving its program for monitoring orders
18  of controlled substances.  Correct?
19         MS. TABACCHI:  Object to the
20  form.  Calls for a legal conclusion.
21  Improper hypothetical.  Beyond the
22  scope of the notice.
23         THE WITNESS:  So -- so, again,
24  we weren't relying on them to endorse

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  a specific system.  I mean, I can't --
2  I can't read into what is intended by
3  this.  We knew that our responsibility
4  was our own responsibility.  And that
5  if there was a program in place, it
6  was ours to develop.
7      We did not rely on the DEA to
8  say, "This system is blessed, move
9  forward."
10     We implemented programs over
11 time, that we had communications with
12 the DEA, and had -- and did not have
13 an indication from them that there
14 were gaps.

Page 148

Page 147

10     Q.   (BY MR. BOWER) Was Walmart
11 registered to distribute controlled
12 substances with the DEA?
13      MS. TABACCHI:  Object to the
14 form.  Time period.
15      MR. BOWER:  Ever.
16      THE WITNESS:  Yes.
17     Q.   (BY MR. BOWER)  During what
18 time period was Walmart registered?
19     A.    From the time period at least
20 from 2006 through the time that we ceased
21 distribution in 2018.

Page 149



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 161

3      MS. TABACCHI:  Object to the
4  form.  Beyond the scope of the notice,
5  improper hypothetical and beyond --
6  and legal conclusion.
7      THE WITNESS:  Can you repeat
8  the question?
9      MR. BOWER:  Okay.  So we've
10 been going a long time.  Not today.
11 I've been pretty consistent allowing
12 those objections.  You've taken a lot
13 of time on the record.  I would ask
14 again just to please object to form.
15 When you do so, the witness then asks
16 me to rephrase the question and we
17 waste more time on the record.
18      So I'm just going to keep
19 making that request and you can ignore
20 it if you want.

Highly Confidential - Subject to Further Confidentiality Review



Page 162

24    MR. BOWER: Okay. Why don't we

Page 164

24    MR. BOWER: You can put that

Page 163

1    take a break and then we'll do what
2    you just asked to do. Okay?
3        THE VIDEOGRAPHER: 10:46. We
4    are off the video record.
5        (Recess taken, 10:46 a.m. to
6    11:08 a.m.)
7        THE VIDEOGRAPHER: 11:09. We
8    are on the video record.
9        Q.    (BY MR. BOWER) Okay.
10   Ms. Hiland, we're back on the record. I just
11   have a couple more, very quick questions on
12   Exhibit 6, which is the Walmart letter.

Page 165

1    one aside for a moment, and we're
2    going to hand you a composite exhibit
3    which has been marked Exhibit 7.
4        (Whereupon, Deposition Exhibit
5    Walmart 7, Tab 1 Walmart Responses to
6    Plaintiffs' (First) Combined Discovery
7    Requests to National Retail Pharmacies
8    Defendants, Tab A
9    WMT_MDL_000044441-44499, Tab B
10   WMT_MDL_000009423-9424, Tab C
11   WMT_MDL_000053813-53815, Tab D
12   WMT_MDL_0000 43316-43373, Tab 2
13   WMT_MDL_000011106, Tab 3
14   WMT_MDL_000011107-11109, Tab 4
15   WMT_MDL_000000963-965, Tab 5
16   WMT_MDL_000000966-968, Tab 6
17   WMT_MDL_000000969-971, Tab 7
18   WMT_MDL_000008377-8379, Tab 8
19   WMT_MDL_0000004237-4239, Tab 9
20   WMT_MDL_000004781-4783, was marked for
21   identification.)
22   Q.    (BY MR. BOWER) So please take
23   a moment and review Exhibit 7. I imagine it
24   somewhat overlaps with the documents you have



Page 166

1  in your binder, but Exhibit 7 is Walmart's
2  responses to plaintiffs' combined discovery
3  requests.
4        A copy of that, and then the
5  exhibits, A, B, C, are just the documents
6  referenced therein.

Page 168

Page 167

Page 169

17        We were running -- and so -- so
18  as to those orders, if an order was
19  identified, they would alert a manager, and a
20  manager would work with the operations
21  leadership to determine the reason for that.
22        Q.   Now, if you look at Walmart's
23  responses to the combined discovery requests,
24  on page 4, the first bullet point, is that

Highly Confidential - Subject To Further Confidentiality Review



Page 170

1  the policy you're referring to?  Where it
2  says "From as early as 1994 until 2010,
3  employees in Walmart's pharmacy distribution
4  centers reviewed controlled drug stock
5  exception reports, followed up on orders by
6  speaking with pharmacists, and escalated



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 182

Page 184

Page 183

Page 185

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 190

Page 192

Page 191

Page 193

Highly Confidential - Subject to Further Confidentiality Review





Page 198

2    A.    They would hold that order,
3 conduct outreach to understand the nature of
4 the order, and then at the -- at the point at
5 which they were able to clear that order,
6 they -- that's the point at which it would be
7 shipped.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 210

Page 212

Page 211

Page 213

Highly Confidential - Subject to Further Confidentiality Review



**Page 214**

7  training as -- as the associates came
8  in around what their duties and
9  responsibilities were.
10  Q.  (BY MR. BOWER) And what
11  specific training was provided in connection
12  with monitoring for orders of controlled
13  substances?
14  MS. TABACCHI:  Same objections.
15  THE WITNESS:  I don't have
16  specific to that -- to that topic.
17  What they understood was their
18  responsibilities, how to perform their
19  duties in their area of
20  responsibility, and the nature of the
21  items that they were --
22  Q.  (BY MR. BOWER)  Well, how do

**Page 216**

1  was that there were long-tenured
2  logistics associates that had -- many
3  of them had been in that building
4  since the day that it opened.  They
5  understood their -- they understood
6  the products that they were
7  distributing.  They understood their
8  role.  And they were all engaged in
9  executing the policies and practices
10  at DC '45.
11  Q.  (BY MR. BOWER)  So is it a fair
12  statement that it was more their experience
13  and specific training that he had relied on
14  in reviewing orders for controlled
15  substances?
16  MS. TABACCHI:  Object to the
17  form.
18  THE WITNESS:  Their -- learning
19  how to do their job would be part of
20  their training.  And Walmart has other
21  training plans.  So to -- but specific
22  to order monitoring, it was part of
23  the job that they were trained to do.

**Page 215**

18  What did Scott tell you with
19  respect to the training for associates who
20  were reviewing orders of substances in 2007?
21  A.  What he told --
22  MS. TABACCHI:  Object to the
23  form.
24  THE WITNESS:  What he told me

**Page 217**



Page 218

Page 220

Page 219

Page 221

21  Q.   (BY MR. BOWER)  Were these
22  controlled drug stock exception reports used
23  by the associates at DC 6045 to monitor
24  orders for controlled substances as they

Highly Confidential - Subject to Further Confidentiality Review



Page 222

1  were -- came into the DC?
2          MS. TABACCHI:  Object to the
3  form.
4          THE WITNESS:  No.  These were
5  monthly reports.

Highly Confidential - Subject to Further Confidentiality Review



Page 226

Page 227

Page 228

Page 229

Highly Confidential - Subject to Further Confidentiality Review



Page 230

18    MS. TABACCHI:  Zach, our lunch
19  is here.
20    MR. BOWER:  Let's go a few more
21  minutes.  Get through at least this
22  bullet point and then we can take a
23  break.
24    MS. TABACCHI:  Okay.

Page 231

Page 232

Page 233

11    A.    Well, I had supervision -- I
12  had responsibility for the pharmacies that
13  they were distributing to.
14        So could you -- I could go
15  physically stand in the pharmacy and
16  understand what the need for the order was
17  that was -- that they were questioning.
18    Q.    Wait, your answer to my
19  previous question was, "If it was escalated
20  to me, they would want to know if I had
21  information about a specific order that they
22  might be asking about."
23        What specific information would
24  they be seeking from folks that were in your

Page 234

1  position?

2  MS. TABACCHI:  Object to the

3  form.

4  THE WITNESS:  The purpose of

5  the order from the pharmacy that I

6  supervised.

7  Q.    (BY MR. BOWER)  And how would

8  the folks in your position determine what the

9  purpose of that order was?

10  A.    I would --

11  MS. TABACCHI:  Object to the

12  form.

13  THE WITNESS:  -- do one of

14  several things that might include

15  talking to a pharmacist, talking to a

16  pharmacy manager.  I could go on-site.

17  I could look at their -- the specifics

18  around that drug.

19  There were -- there was a lot

20  of information that I had access to,

21  because I supervised those pharmacies.

22  Q.    (BY MR. BOWER)  Well, let's

23  break that down.  You give us some things you

24  would do.  Right?  So what would you talk to

Page 235

1  a pharmacist about?

2  A.    I would ask them why they

3  needed the order.

4  Q.    And would you rely on what they

5  told you?

6  A.    It would depend on the

7  circumstance --

8  Q.    Okay.

9  A.    -- of the response.

10  Q.    Can you recall any specific

11  time where you asked a pharmacist a question

12  and you needed more follow-up?

13  MS. TABACCHI:  Object to the

14  form.  Beyond the scope.

15  THE WITNESS:  I don't recall a

16  specific situation.

17  Q.    (BY MR. BOWER)  Not a single

18  time that you can recall specifically?

19  MS. TABACCHI:  Same objections.

20  THE WITNESS: No, I --

21  Q.    (BY MR. BOWER)  Okay.  And the





Page 238

Page 239

Page 240

Page 241

15    MS. TABACCHI:  Zach, can we
16  take a break?
17    MR. BOWER:  Well, I'm just
18  trying to get through this, because I
19  need an answer to this and I don't
20  think I've gotten one yet.



**Page 242**

8   MS. TABACCHI: Zach, object to
9   the form. You need to read the entire
10  bullet and we've been on this bullet
11  for a long time.
12  MR. BOWER: We have, but we
13  haven't got much answer on it, have
14  we?
15  MS. TABACCHI: You're just not
16  satisfied with the answer you have.
17  MR. BOWER: No, I am satisfied.
18  I just don't think the witness
19  understands what I'm asking, and I'm
20  trying to ask it in a way that she
21  maybe understands.
22  Q.   (BY MR. BOWER) So my question
23  is, when these orders are escalated to market
24  and/or region leadership as needed, what did

**Page 243**

1   those folks do? I'm just trying -- what was
2   the policy as to what those folks were
3   supposed to do?
4   MS. TABACCHI: Asked and
5   answered.
6   THE WITNESS: They would have a
7   conversation with the logistics
8   associate that was reaching out to
9   them to understand what the question
10  was, and then they would go find
11  whatever information, validate what
12  they had already heard from the
13  pharmacist, or follow up specific to
14  whatever the point of escalation was.
15  It says "as needed."

**Page 244**

3   MR. BOWER: All right. We can
4   take a break. Do you want to take a
5   lunch break now?
6   MS. TABACCHI: Yes.
7   THE VIDEOGRAPHER: 12:15. We
8   are off the video record.
9   (Recess taken, 12:15 p.m. to
10  1:02 p.m.)
11  THE VIDEOGRAPHER: 1:02. We
12  are on the video record.
13  Q.   (BY MR. BOWER) We're back from
14  lunch, Ms. Hiland. Do you understand you're
15  still under oath?
16  A.   Yes.
17  Q.   So we spent some time this
18  morning going through bullet point 1, and I
19  just have a couple broad follow-up questions
20  and we can move on. Okay?
21  A.   Okay.

**Page 245**

Highly Confidential - Subject to Further Confidentiality Review



Page 246

Page 248

Page 247

Page 249

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 254

Page 256

21   Now let's go to bullet point 4
22 for a minute.  Now we're in the time frame
23 2011 to 2015; correct?
24  A. Correct.

Page 255

Page 257

1  Q. And this is when Walmart first
2 implemented order alerts in Reddwerks;
3 correct?
4  A. Yes.
5  Q. Do you know when in 2011
6 Walmart first implemented order alerts in
7 Reddwerks?
8  A. I don't know the exact date.
9  Q. Is that something you prepared
10 to testify on today?
11  MS. TABACCHI:  Object to the
12 form.
13  THE WITNESS:  I don't have an
14 exact date.
15  Q. (BY MR. BOWER)  Do you know
16 whether it was -- could it have been 2012?
17  A. No.  It was 2011.

Highly Confidential - Subject to Further Confidentiality Review



Page 258

Page 260

Page 259

Page 261

Highly Confidential - Subject to Further Confidentiality Review



**Page 262**

17    Do you know whether during this
18 time period reflected in bullet point 4
19 there, whether Reddwerks was flagging orders
20 for non-controlleds of 50 bottles or more?
21    A.    Yes.

**Page 263**

**Page 264**

**Page 265**

1    Q.    (BY MR. BOWER)  When was
2 Walmart flagging orders for amounts
3 30 percent higher than a rolling four-week
4 average?
5    A.    That began in 2011.
6    Q.    And that again -- that began on
7 or about 12-20-2011; is that correct?
8    A.    That's correct.
9    Q.    And how long did that process
10 continue without any order alerts in place?
11    MS. TABACCHI:  Object to the
12 form.
13    THE WITNESS:  So I think I'm
14 confused about any order limits.
15    Q.    (BY MR. BOWER) Okay.
16    A.    The alerts included order
17 limits.
18    Q.    Did the alerts include order
19 limits from their initial implementation?
20    MS. TABACCHI:  Object to the
21 form.
22    THE WITNESS:  The 50-bottle
23 alert was part of the initial
24 implementation.

Highly Confidential - Subject to Further Confidentiality Review



Page 266

Page 267

Page 268

Page 269



Highly Confidential - Subject to Further Confidentiality Review



**Page 274**

**Page 276**

1 the policy and procedure at Walmart DC 6045?

2     A.    So the report would be

3 circulated for review. A report would be

4 created and then circulated for review by the

5 DC associates. And it was forwarded on to

6 our asset protection team as well, to -- to

7 just take a review of that location.

**Page 275**

9       In July 2012, Walmart also

10 begins to flag orders of more than 20 bottles

11 for Schedule II substances at DC 6045; is

12 that correct?

13     A.    Yes.

14       MS. TABACCHI: Object to --

15       Go ahead.

16     Q.    (BY MR. BOWER) And can you just

17 describe for us what that process was?

18       I know in here it says "for

19 further review and follow-up as needed."

20       Do you see that?

21     A.    Yes.

22     Q.    So let's say we're at the end

23 of 2012. An order for controlled substances

24 comes in for more than 20 bottles. What was

**Page 277**

Highly Confidential - Subject to Further Confidentiality Review



Page 278

Page 280

Page 279

Page 281

Highly Confidential - Subject To Further Confidentiality Review



Page 282

Page 284

Page 283

Page 285

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 290

Page 292

Page 291

Page 293

 7    Q.    (BY MR. BOWER)  Okay.  Because
 8   I think I understand what you're saying,
 9   because Mr. Abernathy, for example, testified
10   that he would do some reports if he was the
11   first one in the office, for example.
12   Correct?
13    A.    Correct.  I read that in his
14   deposition.
15    Q.    So under that circumstance, he
16   would be the one responsible for reporting to
17   the DEA a suspicious order?
18         MS. TABACCHI:  Object to the
19   form.
20         THE WITNESS:  If there was an
21   order that was identified in his
22   shift, he would be responsible for
23   that.

Highly Confidential - Subject to Further Confidentiality Review



Page 294

Page 296

Page 295

7    you're asking.
8    Q.    (BY MR. BOWER)  And I
9    appreciate that.  Bullet point 3 refers to
10   monthly reports; correct?
11   A.    Correct.
12   Q.    Okay.  So those reports
13   wouldn't have been used during this time
14   period, at least, to identify an order that
15   came in on a specific day --
16   A.    Now I understand the question.
17   Q.    -- for you; correct?
18   A.    Correct.

Page 297

Highly Confidential - Subject to Further Confidentiality Review



Page 298

Page 299

Page 300

1      (Recess taken, 1:55 p.m. to
2   2:13 p.m.)
3      THE VIDEOGRAPHER:  2:13.  We
4   are on video record.
5      Q.   (BY MR. BOWER)  Okay.  We're
6   back on the record.  I want to continue going
7   down through these bullet points and just
8   kind of finish them off.
9      Are you still on that page in
10  front of you?
11     A.   Yes.
12     Q.   I want to talk for a minute ...

Page 301

21     MR. BOWER:  All right.  Why
22  don't we take a quick break.
23     THE VIDEOGRAPHER:  1:55.  We
24  are off the video record.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 306

15    MS. TABACCHI:  Objection, form.
16  Beyond the scope of the notice.  The
17  witness was not prepared to testify
18  about any specific threshold.  I
19  thought that there was an agreement
20  already.
21    MS. FUMERTON:  Let's back up.
22    MR. BOWER:  Let's stop for a
23  second.  We're not having statements
24  on the record.  If we want to go off

Page 307

1  the record, we can talk about it.
2  Okay?  We're not doing this on the
3  record.
4    MS. FUMERTON:  I need to
5  respond to your --
6    MR. BOWER:  Not on the record.
7    MS. FUMERTON:  -- to your
8  statement.
9    MR. BOWER:  You don't need to
10  respond.
11    MS. FUMERTON:  Well, this
12  doesn't have --
13    MR. BOWER:  Okay.  We're going
14  off the record.
15    MS. TABACCHI:  We'd like to
16  have this on the record.
17    MR. BOWER:  Okay.  We can have
18  this on the record, but I will note
19  that this time is not counting against
20  my questioning.  So you can make
21  statements on the record, but I can't
22  agree to allow you to make statements
23  on the record that counts against my
24  time.

Page 308

15    MR. BOWER:  I'm not doing this
16  on the record.  We're done on the
17  record.  We can have a discussion off
18  the record.
19    MS. TABACCHI:  Fine.  We can go
20  off the record.
21    THE VIDEOGRAPHER:  2:21.  We
22  are off the video record.
23    (Recess taken, 2:21 p.m. to
24  2:22 p.m.)

Page 309

1    THE VIDEOGRAPHER:  2:22.  We
2  are on the video record.
3    Q.    (BY MR. BOWER)  We're back on
4  the record after a brief discussion off
5  record.

Highly Confidential - Subject to Further Confidentiality Review



Page 310

Page 311

Page 312

7  A.    The enhanced thresholds were
8  calculated using a year's worth of shipment
9  data, and then applying a formula, which was
10 the average weekly order, plus three standard
11 deviations over that 52-week shipment date.
12       Q.    And when that formula was used,
13 would that provide the enhancements for a
14 particular store?
15       MS. TABACCHI:  Object to the
16 form.
17       THE WITNESS:  It was store and
18 item specific.  And there were
19 additional defaults that were applied
20 to those thresholds as they were
21 calculated.
22       Q.    (BY MR. BOWER) And can you
23 describe for us how those defaults -- let me
24 break that down a little bit.

Page 313

1        How did Walmart go about
2  determining what the defaults would be?
3        A.    So again, based on enhancing
4  what we had in place, we continued to use
5  that 50-unit limit.  It was applied a little
6  bit differently in this context because we
7  took -- we took the dosage units and dropped
8  those down to item units to not exceed
9  5,000 units.
10       There was a default minimum
11 alert of 2,000 units applied, and then for
12 non-traited items for that location, there
13 was a limit set for a thousand dosage units.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review

Page 326

1 bullet point in the combined discovery
2 responses for a moment if we could. Same
3 bullet point referencing the enhanced
4 thresholds in Reddwerks.
5 So Walmart states that it
6 "implemented enhanced thresholds in Reddwerks
7 and the tiered review process."
8 Do you see that?
9 A. Yes.
10 Q. What is meant by a tiered
11 review process?
12 A. The process began to move --
13 still the process at the distribution center
14 was in place. But those alerts were then
15 reviewed by the logistics compliance team.
16 And then the tiering was that practice
17 compliance also was involved. So there were
18 additional teams that were involved in the
19 review.
20 Q. And is that tiered review
21 process reflected in any one of these written
22 policies and procedures on the previous page?
23 A. Yes.
24 Q. Okay.

Page 327

1 A. And those would be -- and
2 again, I have these in date order.
3 Q. Or if you give me the date, I
4 can point you to the tab. I have the dates
5 in front of me.
6 A. Sure. That tiered review
7 process started in 2015, the Bates No. 963 --
8 Q. Okay.
9 A. -- on the distribution center
10 policy.





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 338

Page 340

Page 339

Page 341

Highly Confidential - Subject to Further Confidentiality Review



Page 342

16    During this time period, was
17 Walmart a member of the NACDS?
18      MS. TABACCHI:  Object to the
19 form.
20      THE WITNESS:  Yes.

Page 344

Page 343

Page 345

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1 ██████████.

2 MR. BOWER: Why don't we take a

3 quick break.

4 MS. TABACCHI: Sure.

5 MR. BOWER: We can be quick, if

6 you want. I don't know how long you

7 need.

8 THE VIDEOGRAPHER: 3:00 p.m.

9 We are off the video record.

10 (Recess taken, 3:00 p.m. to

11 3:22 p.m.)

12 THE VIDEOGRAPHER: 3:22. We

13 are on the video record.

14 Q. (BY MR. BOWER) We are back on

15 the record. Let me hand you what is marked

16 as Exhibit 10, which is a copy of the Masters

17 decision. Take a moment to review it, but I

18 assume you're familiar with that decision;

19 correct?

20 MS. TABACCHI: Just have her

21 look at it, please.

22 (Whereupon, Deposition Exhibit

23 Walmart 10, Masters decision, was

24 marked for identification.)

Page 347

1 MS. TABACCHI: I did review the

2 decision in preparation.

3 Q. (BY MR. BOWER) Do you have a

4 copy of the decision in the binder you

5 brought with you today?

6 A. Yes.

7 Q. Does the copy that you have in

8 the binder have a Bates number on it?

9 A. It does not. It's one that I

10 printed.

11 Q. So I know there was

12 representation made that --

13 MS. TABACCHI: That would be

14 the one exception, something from a

15 public record.

16 MR. BOWER: No, that's fine.

17 MS. TABACCHI: I thought of

18 that when she mentioned she had it.

19 Otherwise, I'm not aware of anything

20 else. It's either produced or in the

21 public record. There was nothing

22 else.

23 MR. BOWER: Thank you for that.

24 Q. (BY MR. BOWER) So I want to

Page 348

1 have -- I have a few questions on the

2 decision. Feel free to review the one in the

3 binder or the one I've given you. They

4 should be identical.

5 A. I believe they're identical.

6 Q. Did you review this decision in

7 preparation for your testimony today?

8 A. Yes.

9 ██████ ██████████████████████

10 ███████████████████████████████

11 ████████ ████████████████

12 ████████████████ ██████████████

13 █████████ ███████████████████████

14 █████████████████████████████████

15 ██████ ██████████████████████████

16 ██████ ████████████████.

17 Q. (BY MR. BOWER) So if you just

18 turn -- look at the first page of the

19 Masters, right at the beginning there under

20 the opinion -- are you with me there?

21 The Court notes that -- about

22 two sentences down, that "Over the past two

23 decades, DEA has been battling a steep

24 increase in prescription opioid abuse, a

Page 349

1 problem DEA views as epidemic."

2 Do you see that?

3 MS. TABACCHI: I'm sorry, Zach.

4 I don't see where you are.

5 MR. BOWER: Sorry. Just on the

6 first page, bottom right-hand corner,

7 about the middle of that paragraph,

8 right under "Opinion."

9 MS. TABACCHI: The Court

10 notes -- oh, "The Court notes." Those

11 are your words.

12 MR. BOWER: Those are my words.

13 MS. TABACCHI: I'm trying to

14 find the Court notes.

15 MR. BOWER: Sorry about that.

16 MS. TABACCHI: Can you do that

17 again?

18 MR. BOWER: Sure.

19 Q. (BY MR. BOWER) The language in

20 the opinion reads, "Over the past two

21 decades, DEA has been battling a steep

22 increase in prescription opioid abuse, a

23 problem that DEA views as an epidemic."

24 Do you see that?

Highly Confidential - Subject to Further Confidentiality Review



Page 350

1   A.   Yes.
2   Q.   Does Walmart have a similar
3   feeling that there's been an opioid epidemic
4   for the past two decades?
5       MS. TABACCHI:  Object to the
6   form.  Beyond the scope.
7       THE WITNESS:  We are aware of
8   the issues, the health issues related
9   to the opioid crisis, epidemic,
10  however it's referred to in ...
11  Q.   (BY MR. BOWER) And does Walmart
12  disagree that the crisis has been going on
13  for approximately two decades?
14      MS. TABACCHI:  Object to the
15  form.  Beyond the scope of the notice.
16      The witness can testify in her
17  individual capacity, not on behalf of
18  Walmart, as to this particular
19  question.
20      THE WITNESS:  So I know that
21  there have been issues with controlled
22  substances, diversion, and misuse over
23  a period of -- a long period of time.

Page 352

6   Q.   Okay.  All right.  So I just
7   have a couple questions, then, on the
8   language of the opinion here.
9       If you could turn to page 2.
10  I'm looking at the right-hand column there.
11  The paragraph beginning "Whereas here."
12      Do you see that?
13  A.   I see that.
14  Q.   About halfway there, the Court
15  describes the reporting requirement.
16      Do you see that?
17  A.   Yes.

Page 351

Page 353

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 358

Page 360

Page 359

Page 361

Highly Confidential - Subject to Further Confidentiality Review



Page 362

Page 364

Page 363

Page 365

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 374

12    Q.    (BY MR. BOWER)  Sorry, we got
13  sidetracked for a minute.  Let's turn back to
14  Masters, if you would.  Going to that second
15  paragraph we were on in the second page of
16  Masters?
17    A.    Second page?
18    Q.    Yes.
19    A.    Okay.
20    Q.    So we've talked about the
21  reporting requirement.  I want to talk about
22  the next sentence where it states, "It
23  requires" -- now referring to the reporting
24  requirement -- "It requires only that a

Page 375

1   distributor provide basic information about
2   certain orders to the DEA so that DEA
3   investigators in the field can aggregate
4   reports for every point along the legally
5   regulated supply chain and use the
6   information to ferret out the potential
7   illegal activity."
8            Do you see that?
9       A.    Yes.

Page 376

11    Q.    (BY MR. BOWER)  Thank you.
12            If you could turn to page 4 of
13  the Masters opinion.
14            I'm looking on kind of the
15  right-hand column there.  The paragraph
16  reading "In the record, evidence showed."
17            Do you see that?
18    A.    I do.
19    Q.    If you go kind of a little bit
20  down in that paragraph, the Court states that
21  "Masters' employees deleted held orders or
22  reduced their size so that they would no
23  longer trigger the hold."
24            Do you see that?

Page 377

1       A.    I see that.

22            THE WITNESS:  I think there
23  were a couple of negatives in there.
24  So what -- our policies were designed

Highly Confidential - Subject to Further Confidentiality Review



Page 378

1  to detect orders of interest. We
2  conducted due diligence. And if an
3  order was determined to be suspicious,
4  we did not ship and notified DEA.

Highly Confidential - Subject To Further Confidentiality Review



Page 382

11 Q. Going back to Masters for a
12 second in that same paragraph?
13 A. I'm sorry, I've already lost my
14 spot.
15 Q. Oh, sorry about that.
16 A. I'm here.
17 Q. It's page 4.
18 So after that sentence, the
19 Court goes on to say, "Simply accepting
20 whatever the pharmacist told them without
21 taking requisite steps to determine whether
22 explanations were accurate or even
23 plausible."
24 Do you see that?

Page 383

1 A. I see that.

24 Q. (BY MR. BOWER) If you'd turn

Page 384

1 to page 6 in the Masters decision.
2 Again, the right-hand column,
3 looking at the paragraph starting with
4 "Those," towards the top there? The first
5 full paragraph?
6 A. (Witness nods.)
7 Q. Do you see that?
8 A. Yes.
9 Q. Do you see the second sentence
10 in that paragraph, the Court states, "Most
11 strikingly, in lieu of reporting all held
12 orders, Masters employees deleted some and
13 edited others so that they appeared to be of
14 a normal size and pattern and then proceeded
15 to fill them."
16 Do you see that?
17 A. Yes.

Page 385

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 390

18    Q.    (BY MR. BOWER)  If you'd turn
19  to page 9 of Masters.
20         Again, on the right-hand
21  column.  Do you see the first -- I guess the
22  first full paragraph, the reference to the
23  shipping requirement?
24    A.    On page 9?

Page 391

1     Q.    Yeah, page 9, right-hand
2   column, first full paragraph starting in -- I
3   guess it's Pet'r Br. 46.  That paragraph?
4     A.    I see the paragraph.
5     Q.    Do you see that?
6          So the second -- I think it's
7   the second full -- third full sentence.
8   States "As noted above, the shipping
9   requirement mandates that pharmaceutical
10  companies exercise due diligence before
11  shipping any suspicious order."
12         Do you see that?
13    A.    Yes.

Page 392

Page 393

2          (Whereupon, Deposition Exhibit
3   Walmart 11, September 2010 email
4   chain.  Subj: RE: DEA Audit at DC
5   6013, WMT_MDL_000057259-57260, was
6   marked for identification.)
7     Q.    (BY MR. BOWER)  I've handed you
8   what's marked as Exhibit 11 to today's
9   deposition.  The Bates number is 57259
10  through 60.

Highly Confidential - Subject to Further Confidentiality Review



Page 394

Page 396

Page 395

Page 397

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 402

Page 404

1 consider to be too few?

2      MS. TABACCHI: Same objections.

3      THE WITNESS: It would be

4 something that didn't make sense for

5 the business. That we were reviewing

Page 403

Page 405

24    Q.   (BY MR. BOWER) What did Walmart

Highly Confidential - Subject to Further Confidentiality Review



**Page 406**

**Page 407**

23
24      THE WITNESS:  I think you have
to look at the circumstances.  Our

**Page 408**

1  intent was never to ship a suspicious
2  order.  However, I think that if
3  there's too many false positives, it
4  could lead to missing --
5      I think one could lead to the
6  other from an unintended consequence
7  perspective.  That's why we were
8  working to get it right knowing that
9  neither situation was the ideal.  And
10  that's why we continued to adjust and
11  improve and make modifications to our
12  program over a continuum of time.
13      MS. TABACCHI:  Can we just take
14  a break when you come to a right
15  moment?
16      MR. BOWER:  Sure.  Go ahead.
17      THE VIDEOGRAPHER:  4:20.  We
18  are off the video record.
19      (Recess taken, 4:20 p.m. to
20  4:43 p.m.)
21      THE VIDEOGRAPHER:  4:43.  We
22  are on the video record.
23  Q.    (BY MR. BOWER)  All right.
24  We're back on the record.  I just would ask

**Page 409**

1  you to pull out Exhibit 9 again, if you
2  would.  I just have a couple of other
3  questions.

20      Q.    Did you talk with Ms. Johnson
21  about that work she performed in preparation
22  for today's deposition?
23      MS. TABACCHI:  Object to the
24  form.

Highly Confidential - Subject to Further Confidentiality Review



Page 410

1    THE WITNESS:  Yes.
2    Q.    (BY MR. BOWER) Do you have any
3  understanding -- or strike that.

Page 411

Page 412

Page 413

10    Q.    (BY MR. BOWER)  After
11  September 21st, 2015, when was the next time
12  Walmart improved its suspicious order
13  monitoring program?
14    MS. TABACCHI:  Object to the
15  form.
16    THE WITNESS:  So there were
17  ongoing processes that were being
18  worked on, the most significant of
19  which was the switch from the
20  Reddwerks program to the Buzzeo
21  program that occurred in 2017.



Page 414

Page 416

Page 415

Page 417

5      Q.    So is it accurate, then, to say

6   that Walmart began documenting its review of

7   orders of interest in Archer on or about

8   August of 2015?

9      A.    We were documenting those

10  reviews with that Reddwerks enhancement.

11  That was part of the enhancement that was

12  implemented.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 422

Page 424

Page 423

Page 425

Highly Confidential - Subject to Further Confidentiality Review



Page 426

Page 428

Page 427

Page 429

Highly Confidential - Subject to Further Confidentiality Review



Page 430

Page 432

Page 431

Page 433

Highly Confidential - Subject to Further Confidentiality Review



Page 434

Page 436

```
1   improvement.
2       Additionally, there was an
3   algorithm applied that Buzzeo
4   determined to set those thresholds.
5   So those were the largest changes
6   around how the program worked.
```

Page 435

```
2       THE WITNESS:  We did implement
3   Buzzeo at the end of 2017.
4       Q.    (BY MR. BOWER)  And was the
5   implementation of Buzzeo improvement of
6   Walmart's SOM program?
7       MR. TABACCHI:  Object to the
8   form.
9       THE WITNESS:  It was a
10  continuous evolution and improvement
11  in the automation of orders in how
12  they were flagged.
13      Q.    (BY MR. BOWER)  Okay.  And how,
14  if at all, did the change to Buzzeo impact
15  how orders of controlled substances were
16  flagged?
17      MR. TABACCHI:  Object to the
18  form.
19      THE WITNESS:  It specifically
20  sat ahead of the distribution system.
21  So an order was alerted -- an order
22  that was alerted came to the practice
23  compliance team before going to the
24  logistics team.  So that was an
```

Page 437

Highly Confidential - Subject to Further Confidentiality Review

Page 438

Page 440

16    MS. TABACCHI:  Zach, I'd
17    appreciate it if you would not
18    interrupt the witness.
19        MR. BOWER:  We all know we have
20    limited time.  The question she was
21    answering was not the question that
22    was pending, and so we need to move
23    forward.
24        MR. TABACCHI:  It's

Page 439

Page 441

1    disrespectful.
2        MR. BOWER:  I'm not trying to
3    be disrespectful.  I'm just trying to
4    focus --
5        MS. TABACCHI:  You are being
6    disrespectful.
7        MR. BOWER:  I'm just trying to
8    get her answers on the question that's
9    pending.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 450

9       MR. TABACCHI:  Objection.  To
10  the extent that the question calls for
11  you to reveal the substance of
12  attorney-client communications, I will
13  instruct you not to answer.
14      If you can answer without
15  revealing privileged communications,
16  you may.
17      THE WITNESS:  One --
18      MR. TABACCHI:  And if you are
19  unsure, we can -- we can discuss
20  whether there's a privilege issue.  I
21  just don't know what ...
22      MR. BOWER:  If you want to take
23  some time to discuss it, I'm happy to
24  give you that time.

Page 451

1       THE WITNESS:  Could --
2       MR. TABACCHI:  Do you want to
3   discuss it?  The privilege issue?
4       THE WITNESS:  Yes, please.
5       MR. TABACCHI:  Okay.
6       THE VIDEOGRAPHER:  5:24.  We
7   are off the video record.
8       (Recess taken, 5:24 p.m. to
9   5:34 p.m.)
10      THE VIDEOGRAPHER.  5:35.  We
11  are on the video record
12  Q.    (BY MR. BOWER)  Okay.  We're
13  back on the record, Ms. Hiland.  I understand
14  you may be answering one of the questions I
15  asked earlier; is that correct?
16  A.    Yes.
17  Q.    Please go ahead.

Page 452

Page 453





**Page 454**

ed

**Page 455**

7    MR. BOWER: Why don't we take a
8  quick break. I don't have too much
9  time left on the record, so I can
10  prioritize the rest of my notes.
11  Okay?
12    THE VIDEOGRAPHER: 5:37. We
13  are off the video record.
14    (Recess taken, 5:37 p.m. to
15  5:57 p.m.)
16    THE VIDEOGRAPHER: 5:57. We
17  are on the video record.
18    THE WITNESS: If I could, could
19  I add some information to a prior
20  question that you asked me?
21    Q.   (BY MR. BOWER)  Your counsel
22  will have time to ask you questions at the
23  end, so I would ask that you save any
24  statements for questions from your counsel.

**Page 456**

1  Okay?
2    A.    Okay.
3    Q.    Unless it's -- is it something
4  that your memory has been refreshed over the
5  break?
6    A.    It is information specific to
7  one of the exhibits.
8    Q.    Okay.  Well, I guess it's a
9  little bit unusual, but let's hear it.
10    A.    So in -- as we were talking
11  about the exhibit that -- I'll have to find
12  it -- that showed our reporting post
13  Masters --
14    Q.    Mm-hmm.
15    A.    -- of orders of interest, where
16  we reported orders of interest prior to due
17  diligence to determine whether or not they
18  were suspicious?
19    Q.    Okay.
20    A.    We did report those to DEA.
21  And after that reporting, we had two
22  different DEA offices contact us and ask us
23  why we were reporting those and asked us to
24  stop reporting.

**Page 457**

1    Q.    Okay.  Thank you for that.
2    (Whereupon, Deposition Exhibit
3  Walmart 15, 6-21-16 email from Patsy
4  Little.  Subj: Oxycodone marketing
5  plan, MNK-T1_0004830712, was marked
6  for identification.)
7    MR. BOWER:  You've been handed
8  what's been marked as Exhibit 15.
9    MS. TABACCHI:  Do you have a
10  copy for me?
11    MR. BOWER:  Oh, sorry.
12    Q.    (BY MR. BOWER) In preparation
13  for today's deposition, did you inquire
14  whether Walmart engaged in any marketing for
15  opioid products?
16    MS. TABACCHI:  Objection,
17  beyond the scope.
18    THE WITNESS:  I did read the
19  interrogatory and the response.
20    Q.    (BY MR. BOWER)  Okay.  Did you
21  talk to Ms. Little regarding monitoring for
22  oxycodone?
23    MS. TABACCHI:  Same objection.
24    THE WITNESS:  I did not



Page 458

1  interview Patsy Little in my
2  preparation.

Page 459

2      THE WITNESS:  My preparation
3  indicates that we did not participate
4  in marketing of opioids.

22      MS. TABACCHI:  Object to the
23  form.
24      (Whereupon, Deposition Exhibit

Page 460

1  Walmart 16, Chain Pharmacist Practice
2  Memo.  Vol. 6/Number 9,
3  PKY181864224-PKY181864229, was marked
4  for identification.)
5      Q.    (BY MR. BOWER)  You've been
6  handed what's been marked as Exhibit 16 to
7  today's deposition.
8          Just for the record, this is a
9  Purdue document that was produced as
10  non-confidential.  Bates number is
11  PKY181864224.  And it's a chain pharmacist
12  practice memo from September 2002.

Page 461

12      Q.    (BY MR. BOWER) And I just have
13  a couple of questions on this memo, then.
14      Do you see it says "Special
15  Issue:  Prescription Drug Misuse and Abuse."
16      Do you see that?
17      A.    Yes.
18      Q.    And do you see that it notes
19  that hydrocodone may be the most abused drug?
20      A.    I see that.
21      Q.    And then it goes on to mention
22  hydrocodone again kind of at the bottom,
23  right above the "Age and gender differences
24  in prescribing drug abuse trends."

Highly Confidential - Subject to Further Confidentiality Review



Page 462

1      Do you see right above that it
2  says, "Hydrocodone may be the most widely
3  misused opiate?"
4      Do you see that?
5  A.    Yes.

Page 463

3  Q.    (BY MR. BOWER)  Do you see in
4  the next page it referenced opiophobia in the
5  bottom there?  "Inappropriate pain management
6  and opiophobia"?
7  A.    Yes, I see that.

14  Q.    (BY MR. BOWER)  Do you
15  believe -- let me focus your attention on the
16  bottom of that box there.  The last two
17  sentences say, "Most patients being
18  adequately treated for severe pain do not
19  abuse or become addicted to their
20  medications.  One study found that only four
21  out of 12,000 patients given opioids for
22  acute pain become addicted."
23      Do you see that?
24  A.    I see that here.

Highly Confidential - Subject to Further Confidentiality Review



Page 466

Page 468

Page 467

Page 469

Highly Confidential - Subject to Further Confidentiality Review



Page 470

15    MS. TABACCHI:  Object to the
16  form.  Beyond the scope of the notice.
17    THE WITNESS:  Could you -- I'm
18  sorry, I didn't mean --
19    MS. TABACCHI:  No, I'm sorry.
20  Is there a -- I apologize.  Is there a
21  plug?
22    MR. BOWER:  Why don't we go off
23  the record.
24    THE VIDEOGRAPHER:  6:10 p.m.

Page 471

1    We are off the video record.
2    (Recess taken, 6:11 p.m. to
3  6:11 p.m.)
4    THE VIDEOGRAPHER:  6:11.  We
5  are on the video record.
6    Q.    (BY MR. BOWER)  All right.
7  We're back on the record.  And let me just
8  re-ask you the last question that was pending
9  before we went off.

Page 472

Page 473



Page 474

Page 475

Page 476

Page 477

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 482

4    MS. TABACCHI:  I would just
5 like to ask, are we out of time?
6    THE VIDEOGRAPHER:  About a
7 minute.
8    MR. BOWER:  We have a minute
9 left.
10    MS. TABACCHI:  One minute.  Go
11 ahead.
12    MR. BOWER:  Are you going to
13 cut me off right at seven hours even
14 though we've made several statements
15 on the record that I objected to?
16    I'm just asking so I know.
17    MS. TABACCHI:  We should
18 conclude the deposition when you're
19 out of time.
20    MR. BOWER:  So I have more
21 questions, so I'm going to keep asking
22 until your counsel cuts me off, okay?

Page 483

18    MS. TABACCHI:  I do believe
19 that the deposition -- that we're past
20 seven hours now; is that correct?
21    THE VIDEOGRAPHER:  We are.
22    MR. BOWER:  So I think you just
23 cut it off.  She was finishing her
24 answer.

Page 484

1    MS. TABACCHI:  I'm sorry.  Were
2 you not finished?
3    THE WITNESS:  I think I was.
4    MR. BOWER:  Okay.
5    And I take it that you won't
6 let me ask any follow-up questions at
7 least on that question.  Is that
8 correct?
9    MS. TABACCHI:  I mean, I think
10 we're -- you know, you've chose to use
11 your time in the way that you've used
12 your time.  You know, I don't know
13 what additional questions you have,
14 but, you know, we've been here for all
15 day.  It's dark.  It's -- you know,
16 it's almost 6:30.
17    MR. BOWER:  This is a big
18 important case.  We want to get to --
19 we need to get all of the facts out.
20 So we have more questions.
21    MS. TABACCHI:  The witness has
22 been here all day for you, so I think
23 we'll take a break now and we'll be
24 back in a moment.

Page 485

1    MR. BOWER:  So -- do you mean
2 for your questions or do you mean to
3 give me more time?
4    MS. TABACCHI:  We're going to
5 go off the record and take a break and
6 we'll be back in a moment.
7    MR. BOWER:  Okay.  While we're
8 still on the record, do you have any
9 questions for this witness?
10    MS. TABACCHI:  We'd like to
11 take a break, and then we will come
12 back.
13    MR. BOWER:  So before you know
14 whether you're going to have
15 questions, you're going to take a
16 break; is that correct?
17    MS. TABACCHI:  Correct.
18    THE VIDEOGRAPHER:  6:23.  We
19 are off the video record.
20    (Recess taken, 6:22 p.m. to
21 6:25 p.m.)
22    MS. TABACCHI:  We don't have to
23 go back on the record, because we
24 don't have any questions.

Page 486

1    We have no questions for this
2  witness.  So we can conclude for
3  today.
4      THE VIDEOGRAPHER:  6:26.  We
5  are on the video record.
6      Any further questions?
7      MS. TABACCHI:  No.  Thank you.
8      THE VIDEOGRAPHER:  6:27.  We
9  are off the video record.  This
10 concludes the video deposition.
11     (Proceedings recessed at 6:27
12 p.m.)
13        --o0o--
14
15
16
17
18
19
20
21
22
23
24

Page 488

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.
10     You are signing same subject to
11 the changes you have noted on the errata
12 sheet, which will be attached to your
13 deposition.
14     It is imperative that you return
15 the original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you.  If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24

Page 487

1              CERTIFICATE
2      I, DEBRA A. DIBBLE, Registered
   Diplomate Reporter, Certified Realtime
3  Reporter, Certified Realtime Captioner,
   Certified Court Reporter and Notary Public,
4  do hereby certify that prior to the
   commencement of the examination, Walmart
5  30(b)(6), Witness Susanne Hiland, was duly
   sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
       I DO FURTHER CERTIFY that pursuant
11 to FRCP Rule 30, signature of the witness was
   not requested by the witness or other party
12 before the conclusion of the deposition.
13     I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
14 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
15 employee of such attorney or counsel, and
   that I am not financially interested in the
16 action.
17
18
19 _____
   DEBRA A. DIBBLE, RDR, CRR, CRC
20 NCRA Registered Diplomate Reporter
   NCRA Certified Realtime Reporter
21 Certified Court Reporter
22
   Dated: 22 January 2019
23
24

Page 489

1            ERRATA
2  PAGE  LINE  CHANGE
3  ____ ____ _____
4      REASON: _____
5  ____ ____ _____
6      REASON: _____
7  ____ ____ _____
8      REASON: _____
9  ____ ____ _____
10     REASON: _____
11 ____ ____ _____
12     REASON: _____
13 ____ ____ _____
14     REASON: _____
15 ____ ____ _____
16     REASON: _____
17 ____ ____ _____
18     REASON: _____
19 ____ ____ _____
20     REASON: _____
21 ____ ____ _____
22     REASON: _____
23 ____ ____ _____
24     REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1        ACKNOWLEDGMENT OF DEPONENT

2

3

4        I, Walmart 30(b)(6) witness
         Susanne Hiland, do hereby certify that I have
5        read the foregoing pages and that the same is
         a correct transcription of the answers given
6        by me to the questions therein propounded,
         except for the corrections or changes in form
7        or substance, if any, noted in the attached
         Errata Sheet.

8

9

10

11

12        _____

         Susanne Hiland - Walmart 30(b)(6)     DATE
13

14

15

         Subscribed and sworn to before me this
16        _____ day of _____, 20 _____.

17       My commission expires: _____

18

19        _____

20       Notary Public

21

22

23

24

Page 491

1        LAWYER'S NOTES

2

3     PAGE   LINE

4     ____   ____   _____

5     ____   ____   _____

6     ____   ____   _____

7     ____   ____   _____

8     ____   ____   _____

9     ____   ____   _____

10    ____   ____   _____

11    ____   ____   _____

12    ____   ____   _____

13    ____   ____   _____

14    ____   ____   _____

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21    ____   ____   _____

22    ____   ____   _____

23    ____   ____   _____

24    ____   ____   _____

25