```
 1            UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3   IN RE: NATIONAL         )    MDL No. 2804
     PRESCRIPTION OPIATE     )
 4   LITIGATION,             )    Case No.
                             )    1:17-MD-2804
 5                           )
     THIS DOCUMENT RELATES TO)    Hon. Dan A.
 6   ALL CASES              )     Polster
                             )
 7
 8                  __ __ __
 9            Wednesday, January 23, 2019
10                  __ __ __
11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
12                  __ __ __
13
14
15         Videotaped Deposition of SUSANNE
     HILAND, held at 4206 South J.B. Hunt Drive,
16   Rogers, Arkansas, commencing at 8:25 a.m., on
     the above date, before Debra A. Dibble,
17   Certified Court Reporter, Registered
     Diplomate Reporter, Certified Realtime
18   Captioner, Certified Realtime Reporter and
     Notary Public.
19
20                  __ __ __
21
22
          GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | fax 917.591.5672
              deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S:
 2       CARELLA, BYRNE, CECCHI, OLSTEIN,
         BRODY & AGNELLO, P.C.
 3       BY:  ZACHARY BOWER, ESQUIRE
              zbower@carellabyrne.com
 4            MICHAEL INNES, ESQUIRE
              minnes@carellabryne.com
 5       5 Becker Farm Road
         Roseland, New Jersey 07068-1739
 6       (973) 994-1700
         Counsel for Plaintiffs
 7
 8       JONES DAY
         BY:  TINA TABACCHI, ESQUIRE
 9            ttabacchi@jonesday.com
              SCOTT ELMER, ESQUIRE
10            selmer@jonesday.com
              JASON ZHOU, ESQUIRE
11            jzhou@jonesday.com
              (Attending telephonically)
12       77 West Wacker
         Chicago, Illinois 60601-1692
13       312-782-1692
         Counsel for Walmart
14
15       WRIGHT, LINDSEY & JENNINGS, LLP
         BY:  CALEY B. VO, ESQUIRE
16            cvo@wlj.com
         3333 Pinnacle Hills Parkway
17       Suite 510
         Rogers, Arkansas 72758-8498
18       (479) 986-0888
         Counsel for McKesson
19
20       REED SMITH, LLP
         (appearing telephonically)
21       BY:  MARY BALASTER, ESQUIRE
              mbalaster@reedsmith.com
22       811 Main Street
         Suite 1700
23       Houston, Texas 77002-6110
         (713) 469-3800
24       Counsel for AmerisourceBergen
25
```

```
 1        ARNOLD & PORTER KAYE SCHOLER, LLP
          (appearing telephonically)
 2        BY:  KAREN RIGBERG, ESQUIRE
               Karen.Rigberg@arnoldporter.com
 3        777 South Figueroa Street
          44th Floor
 4        Los Angeles, California 90017-5844
          (213) 243-4000
 5        Counsel for Endo Health Solutions
          Inc.; Endo Pharmaceuticals Inc.; Par
 6        Pharmaceuticals, Inc.; Par
          Pharmaceutical Companies, Inc.
 7        formerly known as Par Pharmaceutical
          Holdings, Inc.
 8
 9        BARBER LAW FIRM
          BY:  J. CARTER FAIRLEY, ESQUIRE
10             cfairley@barberlawfirm.com
          425 West Capitol Avenue
11        Suite 3400
          Little Rock, Arkansas 72201
12        (501) 707-6182
          Counsel for Cardinal Health, Inc.
13
14
          ALSO PRESENT:
15
          Jennifer B. Bechet
16        Senior Associate Counsel
          Walmart, Inc.
17
18        THE VIDEOGRAPHER:
19        Chris Ritona
          Golkow Litigation Services
20                 — — —
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

1

INDEX

2

3    APPEARANCES                                    2

4    PROCEEDINGS                                    7

5

6    EXAMINATION OF SUSANNE HILAND:

7         DIRECT EXAMINATION                        9

          BY MR. INNES

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    DEPOSITION EXHIBITS
                        SUSANNE HILAND
 2                      January 23, 2019
 3     NUMBER              DESCRIPTION            PAGE
 4     Walmart-    12-4-07 email from Jimmie        81
       Hiland 1    Sherl to Mike Mullin.
 5                 Subj:  DEA Scheduled Visit
                   of DC 6045 120507.
 6                 WMT_MDL_000054021-54022
 7     Walmart     3-10-10 email chain.  Subj:     114
       Hiland 2    Re: NABP VAWD Mtg.
 8                 WMT_MDL_000016173-16174
 9     Walmart     10-4-11 email from Susanne      132
       Hiland 3    Hiland.  Subj: Significant
10                 Loss Guidelines -
                   Confidential - Do Not
11                 Forward.
                   WMT_MDL_000040775-40779
12
       Walmart     9-27-12 email from George       136
13     Hiland 4    Chapman.  Subj:  CII
                   utilization review.
14                 WMT_MDL_000012194
15     Walmart     August 2014 email chain.        164
       Hiland 5    Subj:  FW: Hydrocodone to
16                 CII meeting 8.25.14.
                   WMT_MDL_000047417-47419.
17
       Walmart     8-17-12 email from Susanne      187
18     Hiland 6    Hiland.  Subj: Prescription
                   Drug Abuse and Diversion -
19                 Senator Harkin.
                   WMT_MDL_000049685-49687
20
       Walmart     12-13-16 email from JoAnn       259
21     Hiland 7    Stevens.  Subj: H&W
                   Compliance Oversight
22                 Meeting Materials -
                   December 14-2016
23                 2:00-4:00pm, Soderquist
                   Hall Conference Room.
24                 WMT_MDL_ 000046442-46513
25
```

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Walmart | October 2017 email chain. | 274 |
| | Hiland 8 | Subj: Press Release from | |
| 2 | | McKesson. | |
| | | WMT_MDL_000002203-2205 | |
| 3 | | | |
| | Walmart | May 2015 email chain. | 279 |
| 4 | Hiland 9 | Subj: "4th Thursday" H&W | |
| | | Compliance Focus Areas | |
| 5 | | deck. | |
| | | WMT_MDL_000049545-49566 | |
| 6 | | | |
| | Walmart | December 2017 email chain. | 289 |
| 7 | Hiland 10 | Subj: RE Industry Letter. | |
| | | WMT_MDL_000032595-32599 | |
| 8 | | | |
| 9 | | | |
| 10 | | | |

— — — — — —

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS
 2              (January 23, 2019 at 8:25 a.m.)
 3              THE VIDEOGRAPHER:  We are now
 4     on the record.  My name is Chris
 5     Ritona.  I am videographer for Golkow
 6     Litigation Services.  Today's date is
 7     January 23, 2019.  The time is
 8     approximately 8:25 a.m.  This video
 9     deposition is being held in Rogers,
10     Arkansas at Mitchell Williams, 4206
11     South JB Hunt Drive, Suite 200, in the
12     matter of National Prescription Opioid
13     Litigation MDL No. 2804, Case
14     No. 17-MD-2804 in the United States
15     District Court Northern District of
16     Ohio, Eastern Division.  The deponent
17     today is Susanne Hiland.  Will all
18     counsel please identify themselves for
19     the record.
20              MR. INNES:  Good morning.
21     Michael Innes of Carella, Byrne for
22     plaintiffs in the MDL.
23              MR. BOWER:  Good morning.  Zach
24     Bower, Carella, Byrne, for the
25     plaintiffs in the MDL.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. FAIRLEY:  Carter Fairley on

2      behalf of Cardinal Health.

3          MR. VO:  Caley Vo, Wright,

4      Lindsey & Jennings on behalf of

5      McKesson.

6          MS. BECHET:  Jennifer Bechet,

7      senior associate counsel, Walmart,

8      Incorporated.

9          MR. ELMER:  Scott Elmer from

10     Jones Day on behalf of Walmart.

11         MS. TABACCHI:  Tina Tabacchi,

12     Jones Day, on behalf of Walmart and

13     the witness.

14         THE VIDEOGRAPHER:  And will the

15     participants on the conference call

16     also please identify themselves.

17         MS. RIGBERG:  Karen Rigberg

18     from Arnold & Porter on behalf of the

19     Endo and Par defendants.

20         MS. BALASTER:  And Mary

21     Balaster with Reed Smith on behalf of

22     AmerisourceBergen Corporation.

23         THE COURT REPORTER:  Anyone

24     else on the phone?

25         THE VIDEOGRAPHER:  The court

1                reporter today is Debbie Dibble and

2                she will now please swear in the

3                witness.

4                          SUSANNE HILAND,

5        having first been duly sworn, was examined

6        and testified as follows:

7                          DIRECT EXAMINATION

8        BY MR. INNES:

9              Q.      Good morning, Ms. Hiland.  My

10       name is Michael Innes.  We met yesterday,

11       where you sat as a corporate designee for

12       Walmart and provided testimony.

13                      Some of the questions I'm going

14       to ask you up front might sound redundant as

15       to the questions you were asked yesterday,

16       but I want to have a complete record.  So

17       I'll preface all of my questions with -- with

18       that.

19                      You do understand you're under

20       oath today; right?

21             A.      Yes.

22             Q.      And you might have to speak up

23       for the folks to hear on the phone.  I know

24       yesterday there were some complaints after

25       that it was difficult to hear all of us in

1    the room.  So I'll try to keep my voice up as

2    well.

3                Have you ever testified under

4    oath before?

5         A.    Yes.

6         Q.    And when was that?

7         A.    Yesterday and in depositions --

8    previous depositions related to my employment

9    with Walmart.

10         Q.    Okay.  And you understand that

11    even though you're in a law office today,

12    testimony you give under oath has the same

13    force and effect and penalties of perjury as

14    though you are testifying in a court of law?

15         A.    Yes.

16         Q.    If I ask you a question and you

17    provide an answer, I'm going to assume that

18    you understood my question.  Is that fair?

19         A.    Yes.

20         Q.    Is there anything that would

21    prevent you from thinking clearly today?

22         A.    No.

23         Q.    Is there anything that would

24    prevent you from testifying truthfully today?

25         A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      What did you do today -- or

2    what did you do to prepare for your

3    deposition today?

4        A.      I met with attorneys.

5        Q.      And how many times did you meet

6    with your attorneys?

7        A.      So specific to prepare for this

8    deposition, twice, that I recall.

9        Q.      So you met with your attorneys.

10   And the attorneys -- strike that.

11              Those two meetings were

12   specific to the testimony you were going to

13   give as a fact witness today?

14       A.      They were for this deposition.

15       Q.      Okay.  And during those

16   meetings, did -- were they -- did you discuss

17   anything related to your -- strike that.

18              Did those meetings in any way

19   touch upon the testimony that you gave as a

20   corporate designee yesterday?

21       A.      I think with the preparation

22   I've done, it's a little bit difficult for me

23   to separate out some of the preparation.  But

24   specific to my individual deposition, the two

25   times that I remember we said okay, well now

Highly Confidential - Subject to Further Confidentiality Review

```
 1      let's talk about the -- your individual

 2      deposition.  There were two where we

 3      separated that information out.

 4             Q.     And when did those occur?

 5             A.     One was last Thursday

 6      afternoon, and the other one was Monday of

 7      this week.

 8             Q.     The meeting on Thursday

 9      afternoon, how long did that last?

10             A.     That was about two hours.

11             Q.     And who was present at that

12      meeting?

13             A.     Walmart counsel and Jones Day.

14             Q.     And by "Walmart counsel," you

15      mean Walmart in-house counsel?

16             A.     Yes.

17             Q.     How many -- how many Walmart

18      in-house counsel were present?

19             A.     Two that I recall.

20             Q.     Okay.  And do you recall their

21      names?

22             A.     One was Jennifer, present here.

23      And I don't recall the other attorney that

24      was there.

25             Q.     That's okay.
```

1          Sometimes we're faceless in

2     this profession.

3              The meeting on Monday, how long

4     did that go for?

5          A.     That was about an hour.

6          Q.     Okay.  And who was present at

7     that meeting?

8          A.     It was the same as Thursday,

9     that I recall.

10          Q.     And so in those two meetings,

11     no one other than Walmart in-house counsel

12     and the attorneys from Jones Day were

13     present?

14          A.     Correct.

15          Q.     In either of those meetings,

16     did you review documents?

17          A.     Not specifically that I recall

18     for this.  Not that I recall specific to this

19     deposition.

20              Some of the documents that I --

21     that I reviewed for the corporate deposition

22     were -- were -- involved me.  And so the

23     things that I had personal knowledge of, we

24     didn't review in that preparation.

25          Q.     Okay.  Understood.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    But you did review documents in

 2      preparation for your testimony in your

 3      personal capacity?

 4                    MS. TABACCHI:  Object to the

 5             form.

 6                    THE WITNESS:  No.  In the

 7             preparation for the corporate

 8             deposition, there were documents that

 9             I reviewed that were from my personal

10             knowledge and my work history.

11                    What I don't recall is pulling

12             out additional documents that weren't

13             part of the overall preparation for my

14             corporate deposition.

15             Q.     (BY MR. INNES) I think I'm

16      getting a better understanding.  You reviewed

17      documents for your 30(b)(6) testimony?

18             A.     Correct.

19             Q.     But there's no documents

20      outside of those documents that you used in

21      preparation for your fact preparation; is

22      that right?

23             A.     Correct.

24             Q.     And by "fact preparation," I

25      mean individual.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Individually, yes.

 2          Q.      In preparation for today's

 3   testimony, did you review any deposition

 4   transcripts in this case?

 5          A.      Not for this individual.  I did

 6   review depositions for the corporate

 7   deposition that I gave, not in my individual

 8   capacity.

 9          Q.      Thank you for giving me that

10   precise answer.  I appreciate that.

11                  Did you review any court

12   documents in preparation for today?

13          A.      It would be the same answer.

14   For my corporate deposition I did.  Not in

15   the capacity of this individual deposition.

16          Q.      In preparation for today, did

17   you look at any of your own personal files?

18          A.      No.

19          Q.      Did you look at any documents

20   outside the presence of counsel in

21   preparation for today?

22          A.      No.

23          Q.      Prior to today, did you speak

24   with any representative of any other

25   defendant in this litigation?
```

1          MS. TABACCHI:  Object to the

2     form.  That's just kind of a broad

3     question, Mike.

4          MR. INNES:  Yeah.  Sorry.

5     Q.     (BY MR. INNES)  In preparation

6  for today, did you speak with any

7  representative of any defendant in this

8  litigation?

9     A.     No.

10     Q.     Other than the counsel that

11  you've identified in those two meetings, did

12  you speak with anyone else prior to your

13  deposition today regarding the testimony

14  you're about to provide?

15     A.     Not in my individual capacity.

16  There were -- there were other Walmart

17  attorneys that were present for some of the

18  other preparation that I did.  But there

19  was -- there was nothing outside of

20  preparation with counsel.

21     Q.     So no conversations in

22  preparation for today with persons other than

23  counsel?

24     A.     For today, correct.

25     Q.     Okay.

```
 1              A.      For today, correct.

 2              Q.      So you didn't speak to a

 3       colleague about the testimony you're about to

 4       give?

 5              A.      No.

 6              Q.      You didn't speak to a friend?

 7              A.      No.

 8              Q.      You didn't speak to a former

 9       colleague?

10              A.      No.

11                      So the reason I'm hesitating is

12       I'm trying to sort out ...

13                      I did, for the corporate

14       deposition, interview current and former

15       associates, but that was for the corporate,

16       not for my individual.  And all of those

17       interviews were in the presence of counsel.

18              Q.      Are you familiar with the term

19       "Just Culture"?

20              A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          Can you describe for me your

19  education following high school?

20          Start chronologically up until

21  I think you obtained your MBA relatively

22  recently.

23          So -- and then we're going to

24  cover some ground.

25          But let's start with college.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     My formal education, I attended
2   undergraduate at the University of Nebraska
3   Lincoln for pre-pharmacy.
4                 I then attended pharmacy school
5   at the University of Nebraska Medical Center,
6   where I obtained a PharmD in 1986.
7                 And then I completed my MBA in
8   2013 through Harding University.
9          Q.     When did you graduate from
10  undergrad?
11         A.     I did two years of undergrad.
12         Q.     Okay.
13         A.     And then entered pharmacy
14  school.
15         Q.     Did you obtain a degree in
16  those two years?
17         A.     No.
18         Q.     And I think you said PharmD.
19  Can you describe for me what the PharmD
20  degree is?
21         A.     It's a doctor of pharmacy
22  degree.
23         Q.     Did you have any particular
24  focus in your doctor of pharmacy studies?
25         A.     Pharmacy.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Right.  Within the category of

2   pharmacy, did you have a focus on, say, a

3   particular category of drugs?

4      A.     No.  It was a broad-based

5   education to -- PharmD at that time, Nebraska

6   was one of only eight colleges of pharmacy

7   that was PharmD only.  And so that's why it's

8   my original degree.  It was a more clinically

9   focused degree at that time.  The prior

10  degree was bachelor of pharmacy.

11            So we spent an additional year

12  in clinical rotations, but they were

13  broad-based, including hospital, community,

14  geriatrics, psychi -- we had a psychiatry

15  rotation.  But the PharmD was intended to be

16  more clinically based than the previous

17  degree.  And today PharmD is the degree.

18  It's the only degree.  It's evolved over time

19  that you can't earn a bachelor's degree

20  anymore.  Everyone's PharmD.

21      Q.     Did you ever have a clinical

22  rotation through a practice focused on pain

23  management?

24            MS. TABACCHI:  Object to the

25       form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Not specific to
 2         pain management.
 3              I had rotations that would have
 4         involved pain medications, but not
 5         specific to pain management.
 6         Q.    (BY MR. INNES)  Okay.  During
 7    those rotations, did you have opportunity to
 8    work with or -- and/or study opioid products?
 9              MS. TABACCHI:  Object to the
10         form.
11              THE WITNESS:  I would have
12         studied opioid products as part of the
13         curriculum.
14         Q.    (BY MR. INNES)  Okay.  Did you
15    take a -- was that a specific class part of
16    your curriculum?
17         A.    It would have been part of
18    pharmacology classes that I took, and it
19    likely would have been part of a therapeutics
20    course that was part of the curriculum.
21         Q.    Can you describe why you
22    believe it would have been part of a
23    therapeutics course?
24         A.    We did different disease state
25    modules through the therapeutics course
```

1    which covered all the drugs -- or the

2    majority of the drugs that we would have

3    studied in pharmacology.  Pharmacology was

4    more kind of a basic sciences, and then

5    therapeutics was more of the clinical

6    application.

7            Q.    Okay.

8                  In that -- those clinical

9    applications, you mentioned disease states.

10   Were opioids -- during those classes were

11   opioids discussed during a specific disease

12   state?

13           A.    I don't recall.

14           Q.    When you -- you also mentioned

15   that there was -- let's just bifurcate --

16   pharmacology and clinical.

17                 In pharmacology, did you study

18   the effects of opioids on the human body?

19           A.    Pharmacology would have been

20   kind of the chemistry behind the compound,

21   how they work, where they work.  So that

22   would have -- it would have been

23   understanding the chemical structure of the

24   drug, and then the process by which they work

25   in the body.

1      Q.     And did you come to understand

2   the chemical structure of opioids?

3                MS. TABACCHI:  Object to the

4         form.

5                THE WITNESS:  I believe it

6         would have been part of that course.

7      Q.     (BY MR. INNES)  Okay.  And then

8   in that course, did you also come to

9   understand the process by which opioids work

10  in the body?

11               MS. TABACCHI:  Object to the

12        form.

13               THE WITNESS:  I believe so.

14     Q.     (BY MR. INNES)  Okay.  Did you

15  study the differences between immediate

16  release and extended release tablets?

17     A.     I don't know if in 1980 --

18  well, that probably would have been 1984.  I

19  don't recall what formulations were

20  available.  I don't know if there were

21  extended release at that time.  I don't

22  recall that.

23     Q.     Okay.  Did you study -- strike

24  that.

25               As part of your studies for

Highly Confidential - Subject to Further Confidentiality Review

1    PharmD, did you receive any presentations or

2    courses from drug manufacturers?

3         A.     Not that I recall.  It would

4    have been university professors.

5         Q.     As part of your studies for

6    PharmD, did you take any classes specific to

7    the business of pharmacy?

8         A.     We had a pharmacy

9    administration class.

10        Q.     And what did that pharmacy

11   administration class cover generally?

12        A.     It was general business

13   operations, what -- probably is an equivalent

14   like an economics class but related to

15   pharmacy operation.

16        Q.     And by an "economics class,"

17   what do you mean by equivalent of an

18   economics class?

19        A.     It would be purchases and

20   finance of a pharmacy.  It was focused on

21   pharmacists who might want to open their own

22   business, be their own business owner.

23        Q.     So not macroeconomic theory or

24   something like that?

25        A.     Nothing that detailed.

1          Q.     Following the degree you

2     obtained -- the PharmD degree you obtained --

3     strike that.

4               Let's go over the history of

5     your employment now.

6               Did you have a job while you

7     were in college?

8          A.     Yes.

9          Q.     Where was that?

10         A.     So two.  I worked at a local

11    pharmacy in Omaha, Nebraska.  We had a

12    requirement to gain experience hours on our

13    own, so I worked at a -- I was an intern at a

14    pharmacy in Omaha.

15              I also was a member of the

16    Nebraska National Guard.

17         Q.     Did you have any

18    responsibilities regarding -- any pharmacy

19    responsibilities during your service in the

20    Nebraska National Guard?

21         A.     No.

22         Q.     Following your graduation from

23    PharmD, or obtaining your PharmD, where were

24    you employed?

25         A.     I went on active duty in the

Highly Confidential - Subject to Further Confidentiality Review

1    Navy as a pharmacist.

2         Q.     Okay.  And how long were you on

3    active duty in the Navy?

4         A.     Three years.

5         Q.     And what were your

6    responsibilities as an active duty pharmacist

7    in the Navy?

8         A.     I was stationed at Naval

9    Hospital, Jacksonville, Florida.  I was the

10   inpatient pharmacist, so my responsibilities

11   included rounds with physicians.  We had a

12   family practice residency through the Navy,

13   so all Navy doctors that were in family

14   practice went through that residency.

15             So I did rounds with the

16   residents and with the attending.  I sat on

17   the pharmacy and therapeutics committee for

18   the hospital.  I checked carts.  I

19   compounded.  I made TPNs and chemo IVs.

20             And then I supplemented -- we

21   had an outpatient pharmacy that dispensed --

22   was very high-volume, so I also had duties,

23   when my inpatient responsibilities were

24   complete, to go help out in the outpatient

25   pharmacy.

```
 1          Q.    Okay.  In that role, did you

 2    have occasion to dispense opioid products?

 3          A.    Yes.

 4          Q.    And do you recall specifically

 5    what those conditions were that you were

 6    treating with opioids at that time?

 7               MS. TABACCHI:  Object to the

 8          form.

 9               THE WITNESS:  I don't.  We used

10          opioids inpatient for pain management

11          post surgery, and we dispensed

12          outpatient prescriptions that we

13          received.

14          Q.    (BY MR. INNES)  Outside of

15    postsurgical dispensing, did you -- do you

16    recall if you ever dispensed opioids to treat

17    chronic pain?

18               MS. TABACCHI:  Object to the

19          form.

20               THE WITNESS:  Not that I

21          recall.  The inpatient, we didn't --

22          the inpatient stay was limited, and so

23          I don't recall that.

24          Q.    (BY MR. INNES)  Okay.  I

25    believe you also -- maybe I misheard you, but
```

1    I thought you said you had some outpatient

2    responsibilities as well?

3        A.    Yes.

4        Q.    Did those involve treatment of

5    chronic pain through dispensing of opioids?

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  We dispensed

9         opioids outpatient.  There were -- I

10        just -- I don't know -- I didn't

11        always know what the diagnosis was

12        that we were dispensing for.

13       Q.    (BY MR. INNES)  When did you

14   leave active duty in the Navy?

15       A.    1989.

16       Q.    And from there, where was your

17   next -- what was your next job?

18       A.    Walmart.

19       Q.    What was the first role you

20   held at Walmart?

21       A.    I was a part-time pharmacist.

22       Q.    And where was that?

23       A.    San Antonio, Texas.

24       Q.    How long were you a part-time

25   pharmacist in San Antonio Texas?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      About six weeks.

2        Q.      Okay.  And following that

3   six-week stint in 1989 as a part-time

4   pharmacist, what was your next role at

5   Walmart?

6        A.      I was full-time.

7        Q.      Full-time.  Okay.  And how long

8   were you full time -- the full-time

9   pharmacist in San Antonio?

10       A.      About nine months.

11       Q.      And then what was your next

12  title?

13       A.      My husband was in the Navy, so

14  we transitioned to a new duty station.  And I

15  came to Florida as a staff pharmacist in the

16  Orlando area.

17       Q.      Also at a Walmart?

18       A.      Yes.  Let me check that.  That

19  is not true.  We went to Pensacola after

20  San Antonio.

21       Q.      Okay.

22       A.      And I was a staff pharmacist in

23  Pensacola.

24       Q.      At a Pensacola, Florida

25  Walmart?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.     Yes.

 2           Q.     And what was your next job

 3    after the Pensacola pharmacy?

 4           A.     We were there about a year, and

 5    we transferred again to Orlando, and I was a

 6    staff pharmacist.

 7           Q.     Okay.

 8                  And after Orlando?

 9           A.     I was promoted to pharmacy

10    manager of Mount Dora, Florida Walmart around

11    1993 or '4.

12           Q.     Can you spell Mount Dora for

13    the benefit of the court reporter?

14           A.     M-O-U-N-T, D-O-R-A.

15           Q.     And after the new pharmacy

16    manager position at Mount Dora, what was your

17    next position?

18           A.     I was promoted to district

19    manager, still in Florida.

20           Q.     And what year was that?

21           A.     1998.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

██        ██        ██

2          Q.      What was your next position at

3      Walmart?

4          A.      In 2002, I was director of

5      professional services.

6          Q.      So in 2002, you're director of

7      professional services and also regional

8      manager?

9          A.      Oh, I'm sorry, did I say '2?  I

10     meant '5.  2005, I was director of

11     professional services.

12         Q.      What were your duties as

13     director of professional services?

14         A.      I had responsibility for Board

15     of Pharmacy issues, policies, as well as --

16     it was -- it was largely regulatory issues

17     around the practice of pharmacy for the

18     states that I was responsible for.

██        ██        ████████████████

██        ██        ████████████████

██        ████████████████████████

██        ████████████    ████████████████████

██        ██████████████████████████

██        ██████████████████████████

██        ████████████

Highly Confidential - Subject to Further Confidentiality Review



21      Q.      How long were you a director of

22   professional services?

23      A.      Until 2009.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24        Q.        So I believe we're at 2009.

25    What role did you have after the director of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    professional services?

 2         A.     In 2009, I was a senior

 3    director, regulatory affairs.  Regulatory

 4    affairs was the new name for professional

 5    services.

 6         Q.     Okay.  Was that a title change?

 7    Was there a functional change to your

 8    day-to-day work?

 9         A.     I was promoted in that 2009

10    title.

11         Q.     And what were your

12    responsibilities as senior director of

13    regulatory affairs at that time?

14         A.     I had responsibility for the

15    directors, the previous role that I had been

16    in.

17         Q.     Okay.

18         A.     As well as the licensing

19    function for our -- any license that a

20    pharmacy or distribution center held.
```



Highly Confidential - Subject to Further Confidentiality Review



3          Q.     How long did you hold that

4     title?

5          A.     In July of 2011, I was moved to

6     a role that was operations.  I was senior

7     director of compliance and quality assurance.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



25              MR. INNES:  Okay.  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1    So July 11th, you take over senior

2    director of compliance and quality

3    assurance.  Is that right?

4           THE WITNESS:  Yes.

5       Q.    (BY MR. INNES)  And how long

6    did you hold that title?

7       A.    Seven months.

8       Q.    And what were your

9    responsibilities --

10      A.    Five months.

11      Q.    Okay.

12      A.    Five months.

13      Q.    And what were your

14   responsibilities during that five-month time

15   period?

16      A.    The role was more around

17   Walmart -- other compliance work, so where we

18   had practice of pharmacy in my regulatory

19   affairs work.  This was things like HIPAA

20   compliance, billing compliance.

21           I also had -- that's when I

22   first picked up the quality assurance team.

Highly Confidential - Subject to Further Confidentiality Review





2          MS. TABACCHI:  Mike, whenever

3     you get to a good point for a break,

4     let me know.  I was trying to let you

5     get through the employment history,

6     but I'm not sure I'm going to make it.

7     So just at a good point for you.

8          MR. INNES:  Maybe we'll just

9     finish this role.

10          MS. TABACCHI:  Okay.  Sure.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3          MR. INNES:  Okay.  Let's go off

4      the record.  Take a short break.

5          THE VIDEOGRAPHER:  9:57.  We

6      are off the video record.

7          (Recess taken, 9:57 a.m. to

8      10:09 a.m.)

9          THE VIDEOGRAPHER:  10:09.  We

10     are on video record.

11         (Whereupon, Deposition Exhibit

12     Walmart-Hiland 1, 12-4-07 email from

13     Jimmie Sherl to Mike Mullin.  Subj:

14     DEA Scheduled Visit of DC 6045 120507.

15     WMT_MDL_000054021-54022, was marked

16     for identification.)

17     Q.     (BY MR. INNES)  Okay.

18  Ms. Hiland, we're back.  You've been handed

19  what's been marked as Exhibit 1.  I'll give

20  you a few minutes to review it.

21         When you're ready, let me know

22  but, for the record, let me read in the Bates

23  number.  It's a Walmart document beginning

24  with 54021 and ending in 54022.

25         [Document review.]

Highly Confidential - Subject to Further Confidentiality Review



1      Q.     (BY MR. INNES) All set?

2      A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6          Q.     (BY MR. INNES)  Now let's

7     return to your employment history.  See if we

8     can't push through that.

9               Okay.  So in July of 2011, you

10    were the senior director of compliance and

11    quality assurance.  You held that title for

12    about seven months?  Is that what you said?

13    Five, seven months?

14         A.     Approximately.  It was from

15    July until, in title change, February 1st of

16    2012.

17         Q.     And how did your title change

18    February 1st of '12?

19         A.     This is the one I can't

20    specifically recall, but I think it was

21    senior director of professional relations and

22    clinical quality assurance?  Clinical quality

23    improvement?

24         Q.     And were your roles -- what was

25    your role and responsibility under that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    title?
 2         A.    I had responsibility for the
 3    quality assurance program that evolved to
 4    quality improvement program.  I had
 5    responsibility for professional -- the
 6    professional relations function was largely
 7    associated with our relationships with our --
 8    with optometrists that were leasing space in
 9    our Supercenters.  And I had responsibility
10    for the health and wellness, so the broad
11    health and wellness training function.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

■
■

3          Q.      What was the next role you took

4    on after 2012?

5          A.      So from 2012 to present, my

6    role has evolved slightly in title.

7                  I pick -- after 20 -- so around

8    the time of 2015, I picked up clinical

9    services.  So I think my title in or around

10   2015 was quality improvement in clinical

11   services, senior director.

12                 And at that time, I no longer

13   had the training function or professional --

14   or the optical professional relations

15   function.

16         Q.      But otherwise, your function

17   was the same?

18         A.      From a quality improvement it

19   was the same.  And then I took on

20   responsibility for pharmacy clinical

21   services.

22         Q.      And what did that entail?

23         A.      Developing and executing our

24   immunization program, as well as our

25   medication therapy management program and

Highly Confidential - Subject to Further Confidentiality Review

1    other clinical practice services that

2    pharmacists provide.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15        A.        The recertification of our

16    distribution center for the VAWD

17    certification.

18        Q.        And what is the -- which

19    distribution center in particular?

20        A.        I believe at this time, this

21    was recertification, so all of them?

22              I -- I'd have to check their

23    certification dates, but all of our

24    distribution centers were VAWD certified.  I

Highly Confidential - Subject to Further Confidentiality Review



2          Q.     Okay.   I mean, at this time,

3    can we agree that the 6045 was VAWD

4    certified?

5          A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





20    Q.    So is it fair to say that if

21   they all went through them, and there were

22   inspections of all of them, 6045 was in fact

23   inspected?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



10    think we had access to some training, but we

11    weren't members of HDMA, so -- so some of the

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8        Q.      (BY MR. INNES)  Did you come to

9    learn what VAWD would consider to be

10   acceptable programs?

11       A.      Our pharmacy -- our

12   distribution centers were reaccredited.  So

13   we would have met the criteria required by

14   the VAWD certification.  At no time in this

15   process were we unaccredited.  The point of

16   this was to make sure that we were prepared

17   and had as much information as possible to

18   prepare for that recertification process.

19       Q.      How long did that

20   recertification process take?

21       A.      I think in this case there

22   was -- I think there were some delays as

23   we -- again, because there were additional

24   documentation requirements.  I don't remember

25   specifically what those were.  I think it was

1    a longer recertification process in this time

2    frame.

3         Q.     What do you mean by

4    "documentation requirements"?

5         A.     So documenting practices in --

6    in a policy that could be reflected and

7    inspected by the VAWD inspector.

8         Q.     Okay.  So at the time of the

9    reapplication process, did Walmart have its

10   practices documented in a policy that could

11   be reviewed by the VAWD inspector?

12              MS. TABACCHI:  Object to the

13         form.

14              THE WITNESS:  As I recall,

15         there were -- there were written

16         policies memorialized around practices

17         that we had in place in this time

18         frame as a result -- to meet those

19         recertification -- those new

20         recertification requirements.

21              MS. TABACCHI:  Mike, before you

22         get to another document, can we take

23         another quick break?

24              I just don't want to get -- I

25         want to catch you before you start

Highly Confidential - Subject to Further Confidentiality Review

1          another document.

2                    MR. INNES:  Yeah, we can take a

3          break.

4                    THE VIDEOGRAPHER:  11:11 a.m.

5          we are off the video record.

6                    (Recess taken, 11:11 a.m. to

7          11:24 a.m.)

8                    THE VIDEOGRAPHER:  11:25.  We

9          are on the video record.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11      THE VIDEOGRAPHER:  11:33.  We

12  are off the video record.

13      (Recess taken, 11:32 a.m. to

14  11:39 a.m.)

15      THE VIDEOGRAPHER:  11:39.  We

16  are on the video record.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

███  ██    ████████████████

███    ██████████████████████████

███    █████████████████████████████████████

███    █████████████████████████████████████

███    █████████████████████████████████████

███    █████████████████████████████████████

███    █████████████████████████████████████

███    ██████████████████████████████████

███    █████████████████████████████████████

███    ██████████████

11        Q.      And why, at that time, did

12    Walmart decide that it needed additional

13    monitoring of oxycodone 30s?

14        A.      We had received information

15    from a DEA agent that oxycodone 30 was on

16    their radar to be -- I mean, just to kind of

17    simplify.

18            That they had heightened

19    concerns about oxycodone 30.  During that

20    meeting they indicated that Walmart was not a

21    focus of the concerns that they had, but we

22    wanted to proactively establish additional

23    due diligence to ensure that we didn't become

24    part of the DEA's concern around oxy 30.

███      ██      ███████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17        MR. INNES:  Why don't we do --

18    why don't we go off the record for a

19    minute.

20        THE VIDEOGRAPHER:  12:00 p.m.

21    We are off the video record.

22        (Recess taken, 12:00 p.m. to

23    12:44 p.m.)

24        THE VIDEOGRAPHER:  12:45.  We

25    are on the video record.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13        A.      This was part of efforts that

14    we had ongoing.  This was in the -- kind of

15    in the same time frame that we were hearing

16    about the oxy 30 issues from the DEA.  I know

17    that there were actions taken against some of

18    our competitors around their dispensing

19    habits, and so we were seeing the issues

20    related to opioid use continuing to rise,

21    just coming from an environmental scan.

22        Q.      Did you say opioid use or

23    opioid abuse?

24        A.      I meant abuse, if ...

25        Q.      So the reason why, in August of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    2012, you believe the matter was urgent was

 2    because of the conversations you had had with

 3    the DEA regarding oxy 30 and the fines and

 4    penalties that were leveled against folks who

 5    were similarly situated to Walmart in the

 6    dispensing and distribution of opioids.

 7              MS. TABACCHI:  Object to the

 8         form.

 9              THE WITNESS:  Really what we

10         were -- what we were seeing as a

11         continuing issue related to the opioid

12         abuse.

13         Q.    (BY MR. INNES)  Okay.  And you

14    mentioned that the DEA told you that they

15    weren't focused on Walmart in particular for

16    oxy 30s at that point in time; right?

17         A.    That is correct.

18         Q.    And these actions that you

19    referenced were brought against companies

20    other than Walmart?  That's right?

21         A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15        MS. TABACCHI:  Mike, before we

16    keep going, could we take another

17    break, please?

18        MR. INNES:  You were done

19    answering that question?  I'm sorry.

20        MS. TABACCHI:  You were

21    finished; right?

22        THE WITNESS:  I was.

23        MR. INNES:  Sure, we can take a

24    break.

25        THE VIDEOGRAPHER:  1:54.  We

Highly Confidential - Subject to Further Confidentiality Review

```
1        are off the video record.

2              (Recess taken, 1:54 p.m. to

3        2:12 p.m.)

4              THE VIDEOGRAPHER:  2:12.  We

5        are on the video record.

6              MR. INNES:  Okay.  We're back

7        on the record.  There was a -- before

8        we start, Ms. Hiland, I'm just going

9        to make a statement on the record

10       here.

11             And correct me if I'm wrong,

12       Ms. Tabacchi, but there is a

13       discrepancy between what was

14       transcribed and perhaps what the

15       witness said occurring around 1:40, I

16       believe.  We've agreed that we will

17       take care of that discrepancy via the

18       errata.

19             MS. TABACCHI:  Correct.  It's a

20       discrepancy between the word "would"

21       and "wouldn't."  So we will -- we have

22       agreed that we will address it in the

23       errata.

24       Q.    (BY MR. INNES)  So let's march

25    forward.  We'll see if we can't make sure
```

Highly Confidential - Subject to Further Confidentiality Review



1    everyone makes their flights.  Try to quicken

2    the pace a little bit.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24          MS. TABACCHI:  Mike, you know,

25     you've asked this question a number of

Highly Confidential - Subject to Further Confidentiality Review

1        times.

2                 MR. INNES:  And the answer has

3        changed a couple of times.

4                 MS. TABACCHI:  I think she's

5        done her best to give you the answer,

6        and you just don't like it so you keep

7        asking the same question over and over

8        and over.

9                 MR. INNES:  I have to keep

10       following up on different pieces of

11       information and data points that she's

12       giving me.

13                And to be clear, I'm not --

14                MS. TABACCHI:  You're not

15       trying to harass the witness?

16                MR. INNES:  I'm trying not to

17       harass you.  And this is part of the

18       stilted nature of such a conversation

19       where I'm addressing your counsel.

20       And I don't mean to be rude.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
13          Q.      This isn't a game of gotcha.
14   I'm really just trying to figure it out.
15                  MS. TABACCHI:  Really?
16                  MR. INNES:  Other times it
17       might be.
18                  Kidding.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



25                    MS. TABACCHI:  When we can.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. INNES:  Are you done with

2       that answer?

3              THE WITNESS:  Yes.

4              MR. INNES:  Okay.  Let's go off

5       the record and take a quick break.

6              THE VIDEOGRAPHER:  3:11.  We

7       are off the video record.

8              (Recess taken, 3:11 p.m. to

9       3:33 p.m.)

10             THE VIDEOGRAPHER:  3:33.  We

11      are on the video record.

12             MR. INNES:  Okay.  Hi,

13      Ms. Hiland.  Welcome back.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





      4    October 24th, 2017.  Remind me when Walmart

      5    decided to exit the distribution --

      6    self-distribution of Schedule II narcotics.

      7              MS. TABACCHI:  Object to the

      8         form.  Lack of foundation.

      9              THE WITNESS:  I don't know when

     10         the decision was made.  We exited in

     11         April 2018 for C-IIs.

     12         Q.    (BY MR. INNES)  Okay.  Was that

     13    all C-IIs?

     14         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21        Q.      (BY MR. INNES)   The first

22    paragraph reads -- I can read it in total,

23    "By any measure, opioid abuse in the

24    United States has reached crisis proportions.

25    The number of opioid prescriptions has nearly

Highly Confidential - Subject to Further Confidentiality Review

1    tripled from 76 million in 1991 to

2    approximately 207 million in 2013.

3            "The U.S. accounts for

4    80 percent of the world's consumption of

5    opioid painkillers and 99 percent of the

6    hydrocodone.  This remarkable volume is

7    severely harming consumer health, costing the

8    country more than $78 billion annually in

9    associated costs and taking a tragic toll on

10   countless individuals and society as a

11   whole."

12           Do you agree with the sum and

13   substance of that paragraph?

14           MS. TABACCHI:  Object to the

15       form.

16           THE WITNESS:  I don't have any

17       reason to dispute these as being

18       accurate.

19       Q.    (BY MR. INNES)  Okay.  What's

20   interesting to me is that this paragraph

21   discusses opioid prescriptions.  It doesn't

22   discuss opioid distribution, does it?

23       A.    Not -- no.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6          MR. INNES:  Can we go off the

7     record?

8          THE VIDEOGRAPHER:  4:35.  We

9     are off the video record.

10          (Recess taken, 4:35 p.m. to

11     4:44 p.m.)

12          THE VIDEOGRAPHER:  4:45.  We

13     are on the video record.

14     Q.    (BY MR. INNES)  Okay,

15 Ms. Hiland, we're back.  We'll make one final

16 push.  I think we can be quick about this.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

███  ████████████████████

███  ██████████

3             MR. INNES:  Okay.  I have no

4       further questions.

5             Do you guys have any questions?

6             Anyone here?

7             MS. TABACCHI:  We have no

8       questions for the witness.

███              ████████  ██████  ██████████

███  ███████████████████████████████████████

███  ████████████████████████████████████

███  ████████████████████████  ██████████████

███  ██████████████████  █████████████████████

███  ██████████████████████

15            We would also like to hold it

16      open because we believe there were

17      certain areas of documents -- and

18      we'll send you a letter on this as

19      well -- that we don't have production

20      of that are -- we believe would be

21      relevant and should have been produced

22      and we'd like to question Ms. Hiland

23      on.  And we can -- we can put that in

24      a letter too as well.

25            MS. TABACCHI:  We can agree to

1      disagree as to certain aspects of

2      that.  But I appreciate your statement

3      for the record, and I think we're

4      concluded for today.

5              MR. INNES:  Okay.

6              MS. TABACCHI:  Thank you.

7              MR. INNES:  Thank you.

8              THE VIDEOGRAPHER:  4:48.  We

9      are off the video record.  This

10     concludes the video deposition.

11             (Proceedings recessed at

12     4:48 p.m.)

13                  --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2          I, DEBRA A. DIBBLE, Registered
     Diplomate Reporter, Certified Realtime
 3   Reporter, Certified Realtime Captioner,
     Certified Court Reporter and Notary Public,
 4   do hereby certify that prior to the
     commencement of the examination, SUSANNE
 5   HILAND was duly sworn by me to testify to the
     truth, the whole truth and nothing but the
 6   truth.
 7          I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10

            I DO FURTHER CERTIFY that pursuant
11   to FRCP Rule 30, signature of the witness was
     not requested by the witness or other party
12   before the conclusion of the deposition.
13          I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
14   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
15   employee of such attorney or counsel, and
     that I am not financially interested in the
16   action.
17
18
19
     _____
20   DEBRA A. DIBBLE, RDR, CRR, CRC
     NCRA Registered Diplomate Reporter
21   NCRA Certified Realtime Reporter
     Certified Court Reporter
22
23   Dated: 23 January 2019
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4      carefully and make any necessary corrections.

 5      You should state the reason in the

 6      appropriate space on the errata sheet for any

 7      corrections that are made.

 8              After doing so, please sign the

 9      errata sheet and date it.

10              You are signing same subject to

11      the changes you have noted on the errata

12      sheet, which will be attached to your

13      deposition.

14              It is imperative that you return

15      the original errata sheet to the deposing

16      attorney within thirty (30) days of receipt

17      of the deposition transcript by you.  If you

18      fail to do so, the deposition transcript may

19      be deemed to be accurate and may be used in

20      court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                            ERRATA

 2      PAGE   LINE   CHANGE

 3      _____  _____  _____

 4             REASON: _____

 5      _____  _____  _____

 6             REASON: _____

 7      _____  _____  _____

 8             REASON: _____

 9      _____  _____  _____

10             REASON: _____

11      _____  _____  _____

12             REASON: _____

13      _____  _____  _____

14             REASON: _____

15      _____  _____  _____

16             REASON: _____

17      _____  _____  _____

18             REASON: _____

19      _____  _____  _____

20             REASON: _____

21      _____  _____  _____

22             REASON: _____

23      _____  _____  _____

24             REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3

4         I, SUSANNE HILAND, do hereby
      certify that I have read the foregoing pages
5     and that the same is a correct transcription
      of the answers given by me to the questions
6     therein propounded, except for the
      corrections or changes in form or substance,
7     if any, noted in the attached
      Errata Sheet.
8

9

10

11

12    _____
       SUSANNE HILAND                    DATE
13

14

15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18

19    _____
20    Notary Public
21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2

 3       PAGE      LINE

 4       _____     _____      _____

 5       _____     _____      _____

 6       _____     _____      _____

 7       _____     _____      _____

 8       _____     _____      _____

 9       _____     _____      _____

10       _____     _____      _____

11       _____     _____      _____

12       _____     _____      _____

13       _____     _____      _____

14       _____     _____      _____

15       _____     _____      _____

16       _____     _____      _____

17       _____     _____      _____

18       _____     _____      _____

19       _____     _____      _____

20       _____     _____      _____

21       _____     _____      _____

22       _____     _____      _____

23       _____     _____      _____

24       _____     _____      _____

25
```