Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE: NATIONAL          )    MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION               )    Case No. 1:17-MD-2804
                              )
 5                            )    Hon. Dan A. Polster
     THIS DOCUMENT RELATES TO )
 6   ALL CASES                )
                              )
 7
 8
 9                      __ __ __
10             Thursday, January 10, 2019
                        __ __ __
11
12      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
               CONFIDENTIALITY REVIEW
                        __ __ __
13
14
15
16       Videotaped Deposition of GARY HILLIARD,
     held at Winstead PC, 2728 N. Harwood St.,
17   Dallas, Texas, commencing at 9:06 a.m. on the
     above date, before Susan Perry Miller,
18   Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Realtime
19   Captioner, and Notary Public.
20
21
                        __ __ __
22
              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | fax 917.591.5672
                   deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:

 2

 3        LEVIN PAPANTONIO THOMAS MITCHELL
          RAFFERTY PROCTOR, P.A.
 4        BY:  BRANDON L. BOGLE, ESQUIRE
               bbogle@levinlaw.com
 5        316 South Baylen Street
          Pensacola, Florida 32502
 6        (850) 435-7000
          Counsel for Plaintiffs
 7

 8

          COVINGTON & BURLING LLP
 9        BY:  CHRISTOPHER K. EPPICH, ESQUIRE
               ceppich@cov.com
10        1999 Avenue of the Stars
          Los Angeles, California 90067-4643
11        (424) 332-4764
          Counsel for McKesson Corporation and
12        the Witness

13

14        COVINGTON & BURLING LLP
          BY:  KEVIN M. KELLY, ESQUIRE
15             kkelly@cov.com
          One City Center
16        850 Tenth Street, N.W.
          Washington, D.C. 20001
17        (202) 662-6000
          Counsel for McKesson Corporation and
18        the Witness

19

20        WILLIAMS & CONNOLLY LLP
          BY:  JULI ANN LUND, ESQUIRE
21             jlund@wc.com
          725 Twelfth Street, N.W.
22        Washington, D.C. 20005
          (202) 434-5000
23        Counsel for Cardinal Health, Inc.

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A P P E A R A N C E S, Continued:
 2
 3       JONES DAY
         BY:  RICHARD M. BRODSKY
 4            rbrodsky@jonesday.com
         150 W. Jefferson Street, Suite 2100
 5       Detroit, Michigan 48226-4438
         (313) 733-3939
 6       Counsel for Walmart
 7
 8       REED SMITH LLP
         BY:  STAN PERRY, ESQUIRE
 9            sperry@reedsmith.com
         811 Main Street, Suite 1700
10       Houston, Texas 77002
         (713) 469-3800
11       Counsel for AmerisourceBergen Drug
         Corporation
12
13
         ARNOLD & PORTER KAYE SCHOLER LLP
14       BY:  JOHN D. LOMBARDO, ESQUIRE
              john.lombardo@arnoldporter.com
15            (via teleconference)
         777 South Figueroa Street, 44th Floor
16       Los Angeles, California 90017-5844
         (213) 243-4000
17       Counsel for Endo Health Solutions
         Inc., Endo Pharmaceuticals Inc., Par
18       Pharmaceutical, Inc. and Par
         Pharmaceutical Companies, Inc.
19
20
         COLLINSON DAEHNKE INLOW & GRECO
21       BY:  LAURA S. LUCERO, ESQUIRE
              laura.lucero@cdiglaw.com
22            (via teleconference)
         2110 East Flamingo Road, Suite 305
23       Las Vegas, Nevada 89119
         (702) 979-2132
24       Counsel for C&R Pharmacy
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A P P E A R A N C E S, Continued:
 2
 3        MARCUS & SHAPIRA LLP
          BY:  ELLY HELLER-TOIG, ESQUIRE
 4             ehtoig@marcus-shapira.com
          One Oxford Center, 35th Floor
 5        301 Grant Street
          Pittsburgh, Pennsylvania 15219
 6        (412) 471-3490
          Counsel for HBC
 7
 8
          ALLEGAERT BERGER & VOGEL LLC
 9        BY:  JOHN S. CRAIG, ESQUIRE
               jcraig@abv.com
10             (via teleconference)
          111 Broadway, 20th Floor
11        New York, New York 10006
          (212) 571-0550
12        Counsel for Rochester Drug
          Cooperative, Inc.
13
14
          BAILEY & WYANT PLLC
15        BY:  HARRISON M. CYRUS, ESQUIRE
               hcyrus@baileywyant.com
16             (via teleconference)
          500 Virginia Street East, Suite 600
17        Charleston, West Virginia 25301
          (304) 345-4222
18        Counsel for West Virginia Board of
          Pharmacy
19
20
          FOX ROTHSCHILD LLP
21        BY:  EILEEN O. MUSKETT, ESQUIRE
               emuskett@foxrothschild.com
22             (via teleconference)
          1301 Atlantic Avenue
23        Atlantic City, New Jersey 08401-7212
          (609) 572-2355
24        Counsel for Validus Pharmaceuticals
25
```

```
 1          A P P E A R A N C E S, Continued:

 2

 3

            TRIAL TECHNICIAN:

 4

                 RICHARD RIENSTRA,

 5               Complete Litigation Support

 6

 7          VIDEOGRAPHER:

 8               BRIAN BOBBITT,

                 Golkow Litigation Services

 9

10

            ALSO PRESENT:

11

                 RICHARD WOODS, Paralegal, Levin

12               Papantonio

13                       --oOo--

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       INDEX

 2                                          Page

 3     APPEARANCES                            2

 4

 5     EXAMINATION OF GARY HILLIARD:

 6     BY MR. BOGLE.............................. 14

 7     BY MR. EPPICH............................. 318

 8     BY MR. BOGLE.............................. 340

 9

10

11     CERTIFICATE                            352

12     ACKNOWLEDGMENT OF DEPONENT             353

13     ERRATA                                 354

14     LAWYER'S NOTES                         355

15

16

17

18

19

20

21

22

23

24                  --oOo--

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Index of Media
 2     File 1                           12
 3     File 2                           72
 4     File 3                          162
 5     File 4                          208
 6     File 5                          281
 7
 8
 9
10
11
12                 --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T   I N D E X
 2                   Description              Page
 3   McKesson-       E-mail from Walker,        35
     Hilliard        5/2/2012, with
 4   Exhibit 1       Attachment(s)
                     P1.1651
 5                   MCKMDL00498169 - 498183
 6   McKesson-       U.S. House of              40
     Hilliard        Representatives
 7   Exhibit 2       Committee on Energy and
                     Commerce Memo dated May
 8                   4, 2018
                     P1.264
 9                   (9 pages, no Bates)
10   McKesson-       U.S. Department of         53
     Hilliard        Justice Drug Enforcement
11   Exhibit 3       Administration Letter
                     dated September 27,
12                   2006, from Joseph T.
                     Rannazzisi
13                   P1.1464
                     MCKMDL00478906 - 478909
14
     McKesson-       DEA Memorandum dated Oct   79
15   Hilliard        20, 2005, Subject:
     Exhibit 4       Internet Presentation
16                   with McKesson Corp. on
                     September 1, 2005
17                   P1.1946
                     MCKMDL00496859 - 496875
18
     McKesson-       DEA Memorandum dated Jan  107
19   Hilliard        23, 2006, Subject:
     Exhibit 5       Meeting Between Office
20                   of Diversion Control
                     (OD) and McKesson Corp.
21                   on January 3, 2006
                     P1.1789
22                   MCKMDL00496876 - 496878
23   McKesson-       DEA List of Pleadings in  124
     Hilliard        Order to Show Cause Re
24   Exhibit 6       McKesson Corporation
                     P1.1943
25                   MCKMDL00496306 - 496525
```

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | McKesson-<br>Hilliard<br>Exhibit 7 | Chart and Table,<br>"McKesson hydrocodone<br>sales for October 1,<br>2005 through<br>January 31, 2006"<br>P1.1947<br>MCKMDL00497154 - 497155 | 145 |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | McKesson-<br>Hilliard<br>Exhibit 8 | "Pharmacy Rankings for<br>Hydrocodone, October 1,<br>2005 to January 31, 2006"<br>P1.1951<br>MCKMDL00496536 - 496549 | 152 |
| 7 | | | |
| 8 | | | |
| 9 | McKesson-<br>Hilliard<br>Exhibit 9 | Drug Operations Manual<br>Section 55-Controlled<br>Substances<br>P1.1555<br>MCKMDL00346554 - 346690 | 164 |
| 10 | | | |
| 11 | | | |
| 12 | McKesson-<br>Hilliard<br>Exhibit 10 | McKesson DU45 Report,<br>Date 04/03/07<br>P1.2100<br>MCKMDL00660789 - 661435 | 169 |
| 13 | | | |
| 14 | McKesson-<br>Hilliard<br>Exhibit 11 | Summary of the DEA-HDMA<br>Meeting on Suspicious<br>Orders, Meeting Date:<br>Sept. 7, 2007<br>P1.1823<br>MCKMDL00574906 - 574907 | 187 |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | McKesson-<br>Hilliard<br>Exhibit 12 | E-mail Chain ending with<br>E-mail from Gustin,<br>2/4/2011<br>P1.1667<br>MCKMDL00510747 - 510752 | 195 |
| 19 | | | |
| 20 | | | |
| 21 | McKesson-<br>Hilliard<br>Exhibit 13 | Settlement and Release<br>Agreement and<br>Administrative<br>Memorandum of Agreement<br>between DEA and<br>McKesson, May 2, 2008<br>P1.889<br>MCKMDL00337001 - 337024 | 210 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Highly Confidential - Subject to Further Confidentiality Review

| | | |
|---|---|---|
| McKesson-Hilliard Exhibit 14 | Presentation, "Lifestyle Drugs & Internet Pharmacies" P1.1830 MCKMDL00403340 - 403348 | 215 |
| McKesson-Hilliard Exhibit 15 | Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit P1.1887 MCKMDL00591949 - 591953 | 225 |
| McKesson-Hilliard Exhibit 16 | Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit, Landover, Maryland DC P1.1913 MCKMDL00591841 - 591844 | 235 |
| McKesson-Hilliard Exhibit 17 | McKesson Operations Manual for Pharma Distribution, Lifestyle Drug Monitoring Program P1.1333 MCKMDL00330211 - 330216 | 239 |
| McKesson-Hilliard Exhibit 18 | Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit, So Cal DC P1.1918 MCKMDL00591858 - 591861 | 242 |
| McKesson-Hilliard Exhibit 19 | McKesson Internal Audit, Audit Report, DEA Licensure Compliance and LDMP Audit, U.S. Pharmaceuticals P1.1917 MCKMDL00591251 - 591262 | 244 |
| McKesson-Hilliard Exhibit 20 | E-mail Chain ending with E-mail from Hilliard, 12 Sep 2007, RE: Mapes and ABC presentation notes P1.2002 MCKMDL00622532 - 622534 | 248 |

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | McKesson-Hilliard Exhibit 21 | E-mail Chain ending with E-mail from Hilliard, 10/18/2009 | 259 |
| 3 | | P1.1856 MCKMDL00573535 - 573539 | |
| 4 | | | |
| 5 | McKesson-Hilliard Exhibit 22 | E-mail Chain ending with E-mail from Walker, 4/17/2008 | 272 |
| 6 | | P1.1962 MCKMDL00543610 - 543615 | |
| 7 | | | |
| 8 | McKesson-Hilliard Exhibit 23 | E-mail Chain ending with E-mail from Pacheco, 11/3/2006 | 278 |
| 9 | | P1.1804 MCKMDL00543971 - 543973 | |
| 10 | | | |
| 11 | McKesson-Hilliard Exhibit 24 | E-mail Chain ending with E-mail from Hilliard, 27 Aug 2008, RE: CSMP Suspicious Transaction Reporting to the DEA | 288 |
| 12 | | | |
| 13 | | P1.1937 MCKMDL00623568 - 623589 | |
| 14 | | | |
| 15 | McKesson-Hilliard Exhibit 25 | DEA Letter to Geoffrey Hobart dated November 4, 2014 | 300 |
| 16 | | P1.1443 MCKMDL00409453 - 409458 | |
| 17 | | | |
| 18 | McKesson-Hilliard Exhibit 26 | United States Department of Justice Letter to Geoffrey E. Hobart dated November 6, 2013 | 309 |
| 19 | | | |
| 20 | | P1.1432 MCKMDL00409048 - 409049 | |
| 21 | | | |
| 22 | | --oOo-- | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
 1            (Thursday, January 10, 2019, 9:06 a.m.)

 2                 THE VIDEOGRAPHER:  All right,

 3         stand by.  We are now on the record.

 4         My name is Brian Bobbitt.  I'm a

 5         videographer for Golkow Litigation

 6         Services.  Today's date is

 7         January 10th, 2019, and the time is

 8         9:06 a.m.

 9                 This video deposition is being

10         held in Dallas, Texas, in the National

11         Prescription Opiate Litigation, MDL

12         No. 2804.  The deponent is Gary

13         Hilliard.

14                 Would counsel like to identify

15         themselves for the record.

16                 MR. BOGLE:  Brandon Bogle

17         representing the plaintiffs.  He's my

18         paralegal.

19                 MS. HELLER-TOIG:  Elly

20         Heller-Toig from Marcus & Shapira for

21         HBC Service Company.

22                 MR. PERRY:  Stan Perry for

23         AmerisourceBergen.

24                 MR. BRODSKY:  Richard Brodsky

25         from Jones Day on behalf of Walmart.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. LUND:  Juli Ann Lund from
 2         Williams & Connolly on behalf of
 3         Cardinal Health.
 4              MR. KELLY:  Kevin Kelly of
 5         Covington & Burling on behalf of
 6         McKesson.
 7              MR. EPPICH:  Chris Eppich of
 8         Covington & Burling on behalf of
 9         McKesson and the witness.
10              THE REPORTER:  Thank you.
11         Would those on the phone announce,
12         please?
13              MR. LOMBARDO:  Good morning.
14         John Lombardo with Arnold & Porter for
15         the Endo and Par defendants.
16              MS. LUCERO:  Good morning.
17         Laura Lucero from Collinson Daehnke on
18         behalf of C&R Pharmacy.
19              MS. MUSKETT:  Good morning.
20         Eileen Muskett from Fox Rothschild on
21         behalf of Validus.
22              THE REPORTER:  Anyone else?
23              (No response.)
24              (Witness sworn by the
25         reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P R O C E E D I N G S

 2                   GARY HILLIARD,

 3    having taken an oath to tell the truth, the

 4    whole truth, and nothing but the truth,

 5    testified as follows:

 6                   EXAMINATION

 7    QUESTIONS BY MR. BOGLE:

 8         Q.    Good morning.

 9         A.    Good morning.

10         Q.    Can I get your full name,

11    please?

12         A.    Gary Lawrence Hilliard.

13         Q.    And, Mr. Hilliard, my name is

14    Brandon Bogle.  I'm going to be asking you

15    some questions today.  Before we get into the

16    substance, though, have you ever had your

17    deposition taken before?

18         A.    I have not.

19         Q.    Okay.  Just a few ground rules

20    to hopefully make things go as smoothly as

21    possible for us.  I'm going to ask questions

22    and I'd ask that you wait till I finish my

23    question before you provide an answer, number

24    one, to make sure you understand my question;

25    number two, to allow the court reporter to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      more easily transcribe things.

 2               Does that make sense?

 3      A.      Yes, it does.

 4      Q.      Okay.  And if at any point in

 5      time you want to take a break, just let me or

 6      your counsel know.  I'm happy to do that.

 7      It's not an endurance contest.

 8               The other thing is if I ask a

 9      question that you don't hear or don't

10      understand, please ask me to repeat it or

11      rephrase it and I will do so.  Otherwise, I

12      assume if you're answering my question that

13      you understood it.  Is that fair?

14      A.      Yes.

15      Q.      Okay.  Where are you currently

16      employed, sir?

17      A.      Tech Data Corporation.

18      Q.      Where is that located?

19      A.      The corporate office is in

20      Clearwater, Florida.

21      Q.      Okay.  Are you out of

22      Clearwater or somewhere else?

23      A.      I'm out of a Fort Worth

24      facility.

25      Q.      Give me just a general sketch
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     of what you do at Tech Data.  What is your

 2     job?

 3          A.    I'm a dangerous goods safety

 4     advisor, so my role is to manage hazardous

 5     materials for our company in the United

 6     States, Canada and Mexico.

 7          Q.    Okay.  Does Tech Data in any

 8     way, shape or form sell, distribute or deal

 9     in opioids?

10          A.    No.  It's all electronics.

11          Q.    All electronics, okay.

12                When did you start working for

13     Tech Data?

14          A.    In September 2016.

15          Q.    Okay.  And prior to working at

16     Tech Data, were you employed at McKesson?

17          A.    I was.

18          Q.    Okay.  Can you give me the span

19     of time that you worked for McKesson?

20          A.    From 1997 till 2016.

21          Q.    Okay.  And why did you leave

22     McKesson?

23          A.    I was part of a workforce

24     reduction.

25          Q.    Okay.  Were you given the
```

Highly Confidential - Subject to Further Confidentiality Review

1    opportunity to transfer to another department

2    or just outright told that they were

3    eliminating your position and there was no

4    other position for you?

5         A.      Outright elimination.

6         Q.      Okay.  Now, the time from 1997

7    to 2016 while you were at McKesson, during

8    that entire span, were you a director of

9    regulatory affairs?

10        A.      I started as a manager of

11   regulatory affairs.

12        Q.      Okay.  So tell me what time

13   period you were the manager.

14        A.      It was approximately a year, so

15   approximately '97-98.

16        Q.      Okay.

17        A.      I don't remember the exact time

18   frame.

19        Q.      That approximation is good

20   enough.  So approximately 1998 you take over

21   as director of regulatory affairs.  Do you

22   hold that position until 2016 when you leave?

23        A.      That's correct.

24        Q.      Okay.  Do you know what month

25   in 2016 you left?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      July, I believe.

2        Q.      Okay.  So give me a sense,

3    while you were at McKesson working at

4    director of regulatory affairs, what your

5    general job responsibilities were.

6        A.      My role changed over the years,

7    but as I started, I had responsibility for

8    DEA compliance for our pharma distribution

9    centers within the U.S.  I was over 30

10   facilities, I don't recall exactly, but...

11   so that entailed things such as the

12   management of the SOP, the audit, ARCOS, loss

13   and theft, any issue resolution; I would

14   assist with fiscal DEA audits, also with

15   corrective actions if there were any

16   corrective actions with that; the suspicious

17   order program that was in place at the time.

18       Q.      Okay.

19       A.      And then additionally I also

20   had responsibility for HAZMAT, hazardous

21   materials.  I also had responsibility for EPA

22   environmental issues, waste disposal.  I also

23   had responsibility for DEA registrations,

24   state licensure.  I was also active with the

25   industry association with NWDA on working
```

```
 1     committees for both federal and state.

 2          Q.     Is that the -- I'm sorry, go

 3     ahead.  Keep going.

 4          A.     And did some work on the OSHA

 5     side as well for safety.

 6          Q.     Okay.

 7          A.     Also, I had responsibility for

 8     FDA actions for -- as it related to our

 9     operations.

10          Q.     Okay.  I've got a few follow-up

11     questions for you.  Are you done?  I want to

12     make sure you're done.

13          A.     That's fine.

14          Q.     Good.  Okay.  A few follow-up

15     questions for you on a couple of these points

16     you gave me.  You said you were responsible

17     for the SOP.  What SOP are you referring to?

18          A.     Section 55 is what we referred

19     it to when we started.  It was already in

20     place when I arrived at McKesson, and follow

21     up on that until a migration took place,

22     changes took place in the 2006 time frame.

23          Q.     Okay.  Because you guys went

24     from Section 55 to approximately 2007, you go

25     to the LDMP, the Lifestyle Drug Management
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Program?  True?
 2         A.      True.
 3         Q.      Okay.  And then in
 4    approximately 2008, you go to the Controlled
 5    Substances Monitoring Program, otherwise
 6    known as the CSMP.  True?
 7         A.      True.
 8         Q.      Okay.  So did you have
 9    responsibility for -- let's do one by one.
10    So the Section 55 component, you had
11    responsibility for Section 55 in what
12    respect?
13         A.      Updates and adherence for our
14    operations to the policy.
15         Q.      For what period of time did you
16    have that responsibility?
17         A.      From '97 till 2006.
18         Q.      Okay.  Let's talk about the
19    LDMP.  Did you have any responsibility
20    related to the LDMP?
21         A.      I helped create that LDMP
22    process.
23         Q.      Okay.  So after it was created,
24    what was your responsibility in relationship
25    to that program?
```

```
 1          A.      I worked with our team to

 2     ensure compliance with that program and to

 3     develop it.

 4          Q.      Okay.  What about the CSMP?

 5     What involvement did you have with the CSMP?

 6          A.      I also helped write that SOP as

 7     well.

 8          Q.      What sort of experience did you

 9     have with drafting SOPs prior to drafting the

10     LDMP, for example?

11          A.      I had drafted SOPs in the past

12     with my previous employers as well, so no

13     formal training, if you will, for SOPs.  But

14     just -- when something needed to be revised

15     or something wasn't in place and needed to be

16     created, then I would work on the SOPs for

17     that.

18          Q.      Okay.  Prior to drafting the

19     LDMP, had you had any experience drafting any

20     SOPs that related to suspicious order

21     monitoring for controlled substances?

22          A.      Just the experience from what

23     we gained from the original Section 55, and

24     then the changes that were necessary as we

25     developed that program.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  And where did you work

 2    before you came to McKesson?

 3          A.     FoxMeyer Drug Company.

 4          Q.     What did you do for them just

 5    generally?

 6          A.     Same thing, manager of

 7    regulatory affairs.

 8          Q.     How long were you with them?

 9          A.     Approximately two years.

10          Q.     Immediately before McKesson?

11          A.     Immediately before.  McKesson

12    acquired FoxMeyer so it was part of the

13    acquisition.

14          Q.     Gotcha.

15                 Did you have any sort of

16    regulatory job prior to working at FoxMeyer?

17          A.     I did.  I worked regulatory for

18    a reverse distributor of pharmaceuticals.

19          Q.     Can you say that again?  I'm

20    sorry.

21          A.     A reverse distributor.

22          Q.     Reverse distributor.

23          A.     RDS was the name, Reverse

24    Distribution Services.

25          Q.     How long did you work for them?
```

```
 1          A.      Two years.

 2          Q.      Immediately preceding FoxMeyer?

 3          A.      Correct.

 4          Q.      Any other regulatory position

 5     that you held prior to joining McKesson?

 6          A.      I worked in environmental, and

 7     so I gained an environmental background

 8     through waste management, Chemical Waste

 9     Management to be more specific, so we were

10     trained in EPA requirements and Department of

11     Transportation, FAA requirements as well.

12          Q.      What company are you referring

13     to there?

14          A.      Chemical Waste Management.

15          Q.      Chemical Waste Management.

16                  Okay.  Any others prior to

17     McKesson that are regulatory-related?

18          A.      No.

19          Q.      All right.  So a couple of

20     other follow-ups.  You mentioned, while at

21     McKesson, having responsibility related to

22     audit processes.  In what respect were you

23     responsible for audit processes at McKesson?

24          A.      I would update the audit as

25     necessary and then I'd go out to our
```

1     facilities and conduct audits.

2          Q.     Okay.  You're talking about a

3     specific SOP that you would update for

4     audits, or what are you referring to by

5     "update the audit"?

6          A.     There was an audit that was

7     already written and it correlated to

8     Section 55, and I audited against that.

9          Q.     Okay.  How long did you have

10    responsibility for audits?

11         A.     From '97 till approximately

12    2014.

13         Q.     Okay.  Just from prior

14    depositions, I understand that Tracy Jonas

15    also had some responsibility for audits.  How

16    did your responsibility for audits compare to

17    his?

18         A.     So when the audit was changed

19    to -- we referred to it as a STARs audit, and

20    so we co-wrote good portions of those audits,

21    and then he ultimately took over facilitation

22    of the audit program.

23         Q.     Okay.  And that would have been

24    in 2014, you're saying?

25         A.     I'm not sure when -- the STARs

Highly Confidential - Subject to Further Confidentiality Review

1    audit took place probably before 2014, but

2    I'm not exactly sure of the date.

3         Q.    Okay.  All right.  You

4    mentioned responsibilities related to

5    suspicious order -- I think "purchasing" was

6    the term you used.  Maybe you used a

7    different term, but something related to

8    suspicious order monitoring or purchasing.

9         A.    Monitoring.

10        Q.    What was your responsibility

11   there?

12        A.    To -- adherence to our SOP.

13        Q.    Okay.  Going back to

14   Section 55, the LDMP and the CSMP?

15        A.    Correct.

16        Q.    During what time period did you

17   have those responsibilities?

18        A.    1997 until -- again, I'm not

19   sure when the STARs ended.  It was handed off

20   to Dave Gustin.  I don't know, 2013 -- 2014,

21   maybe.

22        Q.    An approximation is fine.

23        A.    I'm not sure.

24        Q.    I'm not going to hold you to an

25   exact date.  I just want to get a sense of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what the scope is here.

 2              You also said you handled DEA

 3    registrations and state licensure?

 4         A.   Correct.

 5         Q.   For what time period did you

 6    have those responsibilities?

 7         A.   '97 till 2016.

 8         Q.   Okay.  You mentioned being

 9    actively involved in the -- I think it was

10    NWMA?  Is that right?

11         A.   HDMA.

12         Q.   Right.  I think you mentioned

13    the predecessor term.

14         A.   NWDA, National Wholesale Drug

15    Association.

16         Q.   Which then became the HDMA,

17    right?

18         A.   And now is NDA, I believe, yes.

19         Q.   I think maybe HDA.

20         A.   HDA.

21         Q.   I think so.  It doesn't matter.

22         A.   Okay.

23         Q.   Okay.  What sort of committees

24    were you on at NWDA?

25         A.   I was on the federal committees
```

1    in reference to DEA, also state committee,

2    pharmaceutical waste management committee,

3    transportation committee.

4         Q.    Okay.  Let's talk about the

5    federal DEA committee.  What did you do --

6    what was your involvement with that

7    committee?  What did you do?

8         A.    We would meet typically

9    annually and with our counterparts from other

10   wholesalers and sometimes manufacturers, and

11   we would discuss issues that were happening,

12   proposed regulations that were coming up.

13   That's primarily it.

14        Q.    Okay.  And so this NWDA was a

15   trade association for pharmaceutical

16   distributors primarily, correct?

17        A.    That's correct.

18        Q.    Okay.  And so as part of that

19   association, as a member of that association,

20   you would have interactions with other

21   employees of other pharmaceutical

22   distributors.  Is that fair?

23        A.    That's correct.

24             MR. EPPICH:  Object to the

25        form.

```
 1                    Give me a minute to object, if
 2          you don't mind.
 3     QUESTIONS BY MR. BOGLE:
 4          Q.      How frequently would you attend
 5     meetings for NWDA, approximately?
 6          A.      Approximately twice a year.
 7          Q.      Okay.  Would those meetings
 8     generally be attended by employees of other
 9     pharmaceutical distributors as well?
10          A.      That's correct.
11          Q.      Okay.  You also mentioned
12     having responsibility for ARCOS.  Can you
13     tell me what you did related to ARCOS?
14          A.      I would train our employees at
15     our facilities when they needed training.  I
16     would assist in problems that they may have
17     understanding what types of code assignments
18     would be associated with a type of
19     transaction.  If they had error reports that
20     they needed assistance with, and any
21     communications from ARCOS corporate, then I
22     would typically work with them on that.
23          Q.      Okay.  And when it came to the
24     ARCOS training you're referring to, are you
25     talking about training people at the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distribution centers?

 2         A.     That's correct.

 3         Q.     All right.  So from 1997 to

 4    2007, would you have had responsibility for

 5    regulatory compliance for all of McKesson's

 6    distribution centers?

 7         A.     For the pharmaceutical

 8    division.

 9         Q.     Okay.  Well, let me rephrase it

10    because I think that's a fair clarification.

11              So from 1997 to 2007, would you

12    have had responsibility for compliance with

13    the Controlled Substances Act as it pertained

14    to all of McKesson's distribution centers?

15         A.     That would be correct.

16         Q.     Okay.  And, now, in 2008, as I

17    understand it, there were some additional

18    people added to McKesson's regulatory team.

19    Is that true?

20         A.     That's correct.

21         Q.     Okay.  And so when that change

22    occurred and additional people were added, as

23    I understand it, you would then have not been

24    responsible for all of those distribution

25    centers when it pertains to Controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Substance Act compliance.  True?

 2                 MR. EPPICH:  Object to the

 3         form.

 4         A.    There were regional directors

 5    and I did not have a region.  So the regional

 6    directors specifically worked with the new

 7    programs that were being developed, whereas I

 8    worked on other operational aspects.

 9    QUESTIONS BY MR. BOGLE:

10         Q.    Okay.  From the information

11    that I've looked at from the time period of

12    1997 to 2007, when it came to Controlled

13    Substances Act compliance at McKesson, you

14    guys had a three-person team which consisted

15    of Donald Walker, yourself, and Bruce

16    Russell.  Is that true?

17         A.    When I started, there was -- I

18    reported to Dan White, who was a VP of

19    regulatory, and I reported to -- I'm sorry,

20    not reported.  I also had a colleague that

21    was a director of regulatory affairs, Rolly

22    Blythe.

23         Q.    Okay.  When did Mr. White leave

24    the company, roughly?

25         A.    He transitioned to a different
```

1    role, and I do not recall the date.

2         Q.    The other name was Rolly White,

3    I believe you gave me?

4         A.    Blythe.

5         Q.    Oh, Blythe, I'm sorry.  When

6    did that individual cease working in

7    regulatory affairs, roughly?

8         A.    He retired, and again, I don't

9    recall the exact time frame, but it was

10   probably a few years, three, four years, in.

11        Q.    To your tenure?

12        A.    Correct.

13        Q.    What did Rolly Blythe, what did

14   that person generally do during that time

15   period that they were there?

16        A.    The same role, so he was my

17   predecessor, and he managed the DEA

18   compliance.

19        Q.    Okay.  And Mr. White, what was

20   his role?

21        A.    He oversaw the regulatory

22   department, which included DEA compliance.

23        Q.    So would he have been --

24   Mr. White been in that role during the same

25   time that Donald Walker was working in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    regulatory affairs?

 2         A.      No.

 3         Q.      No.  So did Mr. Walker sort of

 4    take his role over?

 5         A.      Mr. Walker took over SVP of

 6    operations, and then I started reporting up

 7    through him.

 8         Q.      Okay.

 9         A.      Again, I don't remember the

10    exact time frame.

11         Q.      That's fine.

12                 Do you agree that there is an

13    ongoing opioid epidemic in this country?

14         A.      I don't know about opioid

15    epi- -- sorry, epidemic, in those term- -- in

16    that terminology.

17         Q.      Okay.  Do you believe there's

18    any sort of problem in this country as it

19    relates to opioids?

20                 MR. EPPICH:  Object to the

21         form.

22                 MR. PERRY:  Object to form.

23         A.      I don't know.

24    QUESTIONS BY MR. BOGLE:

25         Q.      You don't know, okay.
```

```
 1                    Did you ever receive any

 2    training, formal or informal, about a

 3    potential epidemic in this country while at

 4    McKesson?

 5                    MR. EPPICH:  Object to the

 6         form.

 7    QUESTIONS BY MR. BOGLE:

 8         Q.     Related to opioids?

 9                    MR. EPPICH:  Object to the

10         form.

11         A.     I don't know.

12    QUESTIONS BY MR. BOGLE:

13         Q.     Did you ever have any

14    discussions with any of your colleagues at

15    McKesson about a potential opioid epidemic in

16    this country?

17         A.     Not that I recall in that

18    frame -- of that terminology.

19         Q.     Okay.  Any other sort of

20    terminology that you would utilize that you

21    did have such a discussion?

22                    MR. EPPICH:  Object to the

23         form.
```

Highly Confidential - Subject to Further Confidentiality Review



22          MR. EPPICH:  Object to the

23      form.

24  QUESTIONS BY MR. BOGLE:

25          Q.    Okay.  Are you familiar with

Highly Confidential - Subject to Further Confidentiality Review

1      the term "diversion"?

2            A.      I am.

3            Q.      What do you understand that

4      term to mean?

5                    MR. EPPICH:  Object to the

6            form.  Calls for a legal conclusion.

7            A.      Controlled substance

8      pharmaceuticals being utilized outside the

9      course of legal requirements under the CSA.

10     QUESTIONS BY MR. BOGLE:

17     QUESTIONS BY MR. BOGLE:

18           Q.      All right.  I'm going to hand

19     you what I'm marking as Exhibit 1.1651, which

20     is also Exhibit 1 to your deposition, and

21     that's MCKMDL00498169.

22                   (McKesson-Hilliard Exhibit 1

23           was marked for identification.)

24     QUESTIONS BY MR. BOGLE:

25           Q.      There you go, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                Okay, Mr. Hilliard.  What I've
 2   handed you as Exhibit 1 you see is an e-mail
 3   on the first page and then sort of a
 4   PowerPoint slide deck behind it.
 5                Do you see that?
 6       A.     I see that.
 7       Q.     Okay.  And starting with the
 8   e-mail on the first page, you see that's an
 9   e-mail from Donald Walker dated May 2, 2012,
10   to several individuals, including yourself,
11   right?
12       A.     I see that.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          I'm going to hand you what I'm

21    marking as Exhibit 2 to your deposition,

22    which is Exhibit 1.264.  This is a public

23    document so no Bates numbers.

24              (McKesson-Hilliard Exhibit 2

25          was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. BOGLE:

 2         Q.    Okay.  You see here this is a

 3    document from the U.S. House of

 4    Representatives Committee on Energy and

 5    Commerce from May 4, 2018.

 6               Do you see that?

 7         A.    I see that.

 8         Q.    Okay.  And it's -- the

 9    regarding line says:  Hearing entitled

10    "Combatting the Opioid Epidemic:  Examining

11    Concerns About Distribution and Diversion."

12               Do you see that there?

13         A.    I do see that.

14         Q.    Okay.  Have you followed the

15    outcomes of any of these congressional

16    hearings on the opioid epidemic?

17         A.    I have not.

18         Q.    You said you were aware of

19    them, right?

20         A.    I am aware of them but I have

21    not followed them.  I've been out of

22    pharmaceuticals for a while now.

23         Q.    If you look at the second page

24    of this document, underneath the chart it

25    says:  The U.S. continues to experience an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opioid epidemic, which has worsened over the

 2    last two decades.  Opioid-involved overdose

 3    deaths are the leading cause of injury death

 4    in the U.S. and take the lives of 115

 5    Americans per day.

 6              Is that a statistic you've seen

 7    before?

 8              MR. EPPICH:  Objection,

 9         foundation.

10         A.    It is not.

11    QUESTIONS BY MR. BOGLE:

12         Q.    "According to a recent report

13    issued by the Centers for Disease Control and

14    Prevention (CDC), prescription or illicit

15    opioids were involved in nearly two-thirds of

16    all drug overdose deaths in the U.S. during

17    2016 - a 27.7 percent increase from 2015.  In

18    total, more than 351,000 people have died

19    since 1999 due to an opioid-involved

20    overdose."

21              And then it says:  The crisis

22    has become so severe that the average life

23    expectancy declined in 2016 from the previous

24    year, largely because of opioid overdoses.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. EPPICH:  Objection,

 2         foundation.

 3         A.     I see it on the page.

 4    QUESTIONS BY MR. BOGLE:

 5         Q.     Okay.  And the information I

 6    read to you, those last three sentences

 7    there, any of that information you were aware

 8    of prior to today?

 9         A.     I was not.

10         Q.     And so from our discussion at

11    the beginning of the deposition, you worked

12    at McKesson for, what, just shy of 20 years,

13    right?

14         A.     Correct.

15         Q.     Okay.  And so during that time

16    period, did you have the belief that

17    protecting the health and safety of the

18    public should be the most important

19    consideration for a pharmaceutical

20    distributor like McKesson?

21              MR. EPPICH:  Object to the

22         form.

23         A.     I don't know.

24    QUESTIONS BY MR. BOGLE:

25         Q.     Okay.  Did you ever consider
```

1    what sort of considerations should be most

2    important for your job as you performed it?

3              MR. EPPICH:  Object to the

4         form.

5         A.    We complied with the CSA

6    requirements.

7    QUESTIONS BY MR. BOGLE:

8         Q.    Okay.  Did you ever consider

9    why those requirements existed?

10             MR. EPPICH:  Object to the

11        form.

12   QUESTIONS BY MR. BOGLE:

13        Q.    What their purpose was?

14             MR. EPPICH:  Object to the

15        form.

16        A.    Protection of the supply chain

17   under controlled substances.

18   QUESTIONS BY MR. BOGLE:

19        Q.    When you mean -- when you say

20   "protection of the supply chain," what do you

21   mean by that?

22        A.    Controlled substances stay in

23   legitimate markets.

24        Q.    And why would it be important

25   for controlled substances to stay in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    legitimate markets --

 2                MR. EPPICH:  Object to the

 3         form.

 4    QUESTIONS BY MR. BOGLE:

 5         Q.     -- from your understanding?

 6                MR. EPPICH:  Object to the

 7         form.  Foundation.

 8         A.     It's a requirement of the CSA.

 9    QUESTIONS BY MR. BOGLE:

10         Q.     Okay.  Anything beyond that?

11                MR. EPPICH:  Same objections.

12         A.     I don't know.

13    QUESTIONS BY MR. BOGLE:

14         Q.     Okay.  While you were with

15    McKesson, the company was a distributor of

16    controlled substances, right?

17         A.     That's correct.

18         Q.     Okay.  And those controlled

19    substances included opioid products, right?

20         A.     That's correct.

21         Q.     Okay.  And opioid products are

22    generally in the class of drugs known as

23    narcotics, right?

24                MR. EPPICH:  Object to the

25         form; foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      Some of them can be.

2    QUESTIONS BY MR. BOGLE:

3           Q.      Okay.  Are you aware of any

4    opioids that are nonnarcotic?

5                   MR. EPPICH:  Same objections.

6           A.      Not that I recall.

7    QUESTIONS BY MR. BOGLE:

8           Q.      We talked about this a little

9    bit at the beginning of the deposition, but

10   in your role as manager and then director of

11   regulatory affairs, you would have had

12   responsibility for having understanding of

13   the Controlled Substances Act, right?

14          A.      Correct.

15          Q.      And the Controlled Substances

16   Act itself, you understand, is designed to

17   prevent the diversion of controlled

18   substances like opioids, right?

19                  MR. EPPICH:  Object to the

20          form.  Calls for a legal conclusion.

21          A.      I don't know.

22   QUESTIONS BY MR. BOGLE:

23          Q.      Okay.  Do you have any sense as

24   to what the purpose of the Controlled

25   Substances Act was while you worked at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    McKesson?

 2         A.    To prevent diversion.

 3         Q.    Okay.  And under the Controlled

 4    Substances Act while you were with McKesson,

 5    one of McKesson's responsibilities was to

 6    have effective controls against diversion,

 7    right?

 8         A.    That's correct.

 9              MR. EPPICH:  Object to the

10         form.  Calls for a legal conclusion.

11    QUESTIONS BY MR. BOGLE:

12         Q.    Another responsibility under

13    the Controlled Substances Act while you were

14    with McKesson would be to monitor for

15    suspicious controlled substances orders,

16    right?

17              MR. EPPICH:  Object to the

18         form.  Calls for a legal conclusion.

19         A.    We followed the processes and

20    procedures that we had in place that were to

21    comply with the CSA requirements.

22    QUESTIONS BY MR. BOGLE:

23         Q.    Okay.  But did you have an

24    understanding while you were at McKesson that

25    the company had a responsibility to monitor
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for suspicious orders --

 2              MR. EPPICH:  Same objections.

 3    QUESTIONS BY MR. BOGLE:

 4         Q.    -- for controlled substances?

 5         A.    We did monitor for controlled

 6    substance orders.

 7         Q.    Okay.  Did you know where that

 8    responsibility came from?

 9         A.    CSA requirements.

10         Q.    Okay.  And while you were at

11    McKesson, did you also understand that there

12    was a responsibility to report suspicious

13    orders when they were detected to the DEA?

14              MR. EPPICH:  Object to the

15         form.  Calls for a legal conclusion.

16         A.    The process was to report

17    controlled substances orders according to the

18    SOP.

19    QUESTIONS BY MR. BOGLE:

20         Q.    Okay.  And the SOP required

21    that if suspicious orders were detected, they

22    were to be reported to the DEA, correct?

23              MR. EPPICH:  Object to the

24         form.

25         A.    They were reported to the DEA.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. BOGLE:

 2         Q.    Okay.  When you say "they,"

 3    we're talking about suspicious orders, right,

 4    for controlled substances?

 5         A.    That's correct.

 6         Q.    Okay.  And did you also

 7    understand while you were at McKesson that

 8    the company was to block any orders that it

 9    deemed suspicious?

10              MR. EPPICH:  Object to the

11         form.

12         A.    That was not a requirement of

13    the CSA.

14    QUESTIONS BY MR. BOGLE:

15         Q.    Okay.  At any point in time

16    while you were at the company?

17              MR. EPPICH:  Object to the

18         form.  Calls for a legal conclusion.

19         A.    We made changes, developed

20    changes to our processes, and -- with the

21    CSMP program, and so with the CSMP program

22    that program did block.

23    QUESTIONS BY MR. BOGLE:

24         Q.    Okay.  Do you have an

25    understanding as to why the CSMP blocked
```

```
 1    suspicious orders?

 2              MR. EPPICH:  Object to the

 3         form.

 4    QUESTIONS BY MR. BOGLE:

 5         Q.    Why that was a component of it?

 6              MR. EPPICH:  Object to the

 7         form.

 8         A.    A guidance document provided by

 9    Rannazzisi.

10    QUESTIONS BY MR. BOGLE:

11         Q.    And do you recall when you

12    first saw that guidance document?

13              MR. EPPICH:  Object to the

14         form.

15         A.    Approximately 2006.

16    QUESTIONS BY MR. BOGLE:

17         Q.    Okay.  And so prior to

18    receiving that document in approximately

19    2006, it was your personal belief that there

20    was no responsibility for McKesson to block

21    suspicious orders.  Is that true?

22              MR. EPPICH:  Object to the

23         form.  Calls for a legal conclusion.

24         A.    It was not a requirement of the

25    CSA.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. BOGLE:

2         Q.    Okay.  And so if I'm

3    understanding your testimony correctly, prior

4    to the implementation of the CSMP in 2008, it

5    was not McKesson's policy to block suspicious

6    orders.  Is that true?

7              MR. EPPICH:  Object to the

8         form.

9         A.    Blocking of the orders was not

10   a requirement under the CSA.

11   QUESTIONS BY MR. BOGLE:

12        Q.    Yeah.  I'm just asking whether

13   it was a company policy to block suspicious

14   orders prior to 2008.  I'm not asking about

15   the CSA right now.

16             MR. EPPICH:  Object to the

17        form.

18        A.    We complied with requirements

19   under the CSA.

20   QUESTIONS BY MR. BOGLE:

21        Q.    Yeah.  I'm just asking whether

22   prior to 2008 when the CSMP was implemented,

23   was it McKesson's policy to not block

24   suspicious orders when they were detected?

25             MR. EPPICH:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              form.
2         A.    We complied with the CSA
3     requirements.
4     QUESTIONS BY MR. BOGLE:
5         Q.    Okay.  I guess I don't
6     understand how that applies to my question.
7     I'm just asking if you guys blocked
8     suspicious orders prior to 2008.
9              MR. EPPICH:  Object to the
10             form.
11        A.    Blocking was not a requirement.
12    QUESTIONS BY MR. BOGLE:
13        Q.    So the answer is no, that that
14    wasn't done --
15             MR. EPPICH:  Object to the
16             form.
17    QUESTIONS BY MR. BOGLE:
18        Q.    -- prior to 2008?
19        A.    We complied with the CSA
20    requirements.
21        Q.    Okay.  I got that that's your
22    answer, but I'm trying to just get a specific
23    answer to a specific question, which is to
24    nail down in time when McKesson, to your
25    understanding, started blocking suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders for controlled substances.  Can you

 2    tell me when that started occurring?

 3         A.     The CSMP, which was about 2008.

 4         Q.     Okay.  I'm going to hand you

 5    what I'm marking as Exhibit 3, which is

 6    1.1464, and that's MCKMDL00478906.

 7                (McKesson-Hilliard Exhibit 3

 8         was marked for identification.)

 9    QUESTIONS BY MR. BOGLE:

10         Q.     And you see this is a letter

11    from the U.S. Department of Justice Drug

12    Enforcement Administration dated

13    September 27, 2006.

14                Do you see that?

15         A.     I see that.

16         Q.     Is this the guidance document

17    from Mr. Rannazzisi that you were referring

18    to a minute ago?

19         A.     Yes, it is.

20         Q.     Okay.  So you've seen this

21    document before.  True?

22         A.     Yes.

23         Q.     Okay.  I want to look at a

24    couple of components of this letter.  It

25    says, in the first line:  This letter is
```

Highly Confidential - Subject to Further Confidentiality Review

1    being sent to every commercial entity in the

2    United States registered with the Drug

3    Enforcement Administration (DEA) to

4    distribute controlled substances.  The

5    purpose of this letter is to reiterate the

6    responsibilities of controlled substance

7    distributors in view of the prescription drug

8    abuse problem our nation currently faces.

9            Do you see that?

10    A.    I see that.

11    Q.    The term "reiterate" is used

12    there in that sentence.  What do you

13    understand the term "reiterate" to mean?

14            MR. EPPICH:  Object to the

15        form.  Foundation.

16    A.    This is written by

17    Mr. Rannazzisi.  I don't know what he's

18    referring to, reiterate.

19    QUESTIONS BY MR. BOGLE:

20    Q.    I'm just asking if you

21    understand what the term "reiterate" means.

22            MR. EPPICH:  Asked and

23        answered.

24    A.    I don't know.

25                    --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. BOGLE:

 2         Q.    You don't know what the term

 3    "reiterate" means in general use?

 4               MR. EPPICH:  Object to the

 5         form.  Foundation.

 6         A.    I don't know.

 7    QUESTIONS BY MR. BOGLE:

 8         Q.    Okay.  Going down to the third

 9    paragraph in this letter, I'm looking at the

10    sentence that starts with "Distributors are,

11    of course."

12               Do you see that in the middle

13    of the paragraph?

14         A.    Third paragraph?  Yes, I see

15    that now.

16         Q.    All right.  It says:

17    Distributors are, of course, one of the key

18    components of the distribution chain.  If the

19    closed system is to function properly as

20    Congress envisioned, distributors must be

21    vigilant in deciding whether a prospective

22    customer can be trusted to deliver controlled

23    substances only for lawful purposes.

24               Do you see that?

25         A.    Yes, I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    Okay.  Do you agree with that

 2    sentence?

 3              MR. EPPICH:  Object to the

 4         form.  Foundation.

 5         A.    I don't know.

 6    QUESTIONS BY MR. BOGLE:

 7         Q.    You don't have an opinion one

 8    way or the other whether that's an accurate

 9    statement?

10         A.    No, I don't.

11         Q.    Okay.  Do you have any opinion

12    as to whether McKesson should have at all

13    times been vigilant in deciding which

14    customers got controlled substances from

15    them?

16              MR. EPPICH:  Object to the

17         form.

18         A.    I don't know.

19    QUESTIONS BY MR. BOGLE:

20         Q.    Okay.  And it says -- it goes

21    on:  This responsibility is critical, as

22    Congress has expressly declared that the

23    illegal distribution of controlled substances

24    has a substantial and detrimental effect on

25    the health and general welfare of the
```

 1    American people.

 2                    Do you see that?

 3         A.    Yes, I see that.

 4         Q.    Okay.  Do you agree that

 5    illegal distribution of controlled substances

 6    has a substantial and detrimental effect on

 7    the health and general welfare of the

 8    American people?

 9                    MR. EPPICH:  Object to the

10         form.  Foundation.

11         A.    I don't know.

12    QUESTIONS BY MR. BOGLE:

13         Q.    Okay.  Is that something you

14    ever considered while you were at McKesson,

15    that concept?

16                    MR. EPPICH:  Object to the

17         form.

18         A.    I don't recall.

19    QUESTIONS BY MR. BOGLE:

20         Q.    Okay.  Going to the second page

21    here of the letter, the third paragraph that

22    starts with "The statutory factors."

23                    Do you see that?

24         A.    Yes, I see that.

25         Q.    It says there:  The statutory

```
 1    factors DEA must consider in deciding whether

 2    to revoke a distributor's registration are

 3    set forth in 21 U.S.C. 823(e).  Listed first

 4    among these factors is the duty of

 5    distributors to maintain effective controls

 6    against diversion of controlled substances

 7    into other than legitimate medical,

 8    scientific, and industrial channels.

 9            Do you see that?

10       A.    Yes, I see that.

11       Q.    And you're familiar with that

12    portion of the regulations, right?

13            MR. EPPICH:  Object to the

14       form.

15       A.    I don't recall.

16    QUESTIONS BY MR. BOGLE:

17       Q.    Okay.  If you go to the next

18    paragraph, it starts with:  The DEA

19    regulations require all distributors to

20    report suspicious orders of controlled

21    substances.

22            Do you see that?

23       A.    Yes, I see that.

24       Q.    Okay.  And you understand that

25    at all times that you were with McKesson that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the DEA regulations did require distributors

 2    to report suspicious orders of controlled

 3    substances?

 4             MR. EPPICH:  Object to the

 5        form.  Calls for a legal conclusion.

 6        A.    It was under the CSA.

 7    QUESTIONS BY MR. BOGLE:

 8        Q.    Right.  So you knew that's

 9    something that McKesson was supposed to do

10    under the CSA, right?

11             MR. EPPICH:  Same objections.

12        A.    Yes, I recall.

13    QUESTIONS BY MR. BOGLE:

14        Q.    Okay.  The next paragraph that

15    starts with "It bears emphasis," do you see

16    that?

17        A.    Yes, I see that.

18        Q.    It says:  It bears emphasis

19    that the foregoing reporting requirement is

20    in addition to, and not in lieu of, the

21    general requirement under 21 U.S.C. 823(e)

22    that a distributor maintain effective

23    controls against diversion.

24             Do you see that sentence?

25        A.    Yes, I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      Were you aware while you were

 2   at McKesson that these were two different

 3   concepts and that there was a reporting

 4   requirement and a separate requirement to

 5   maintain effective controls against

 6   diversion?

 7                MR. EPPICH:  Object to the

 8        form.  Calls for a legal conclusion.

 9        A.      I don't recall.

10   QUESTIONS BY MR. BOGLE:

11        Q.      Okay.  While you were working

12   at McKesson, did you operate as if there were

13   two separate requirements, a reporting

14   requirement and also a requirement to have

15   effective controls against diversion?

16                MR. EPPICH:  Object to the

17        form.

18        A.      I don't recall.

19   QUESTIONS BY MR. BOGLE:

20        Q.      Okay.  It goes on and says:

21   Thus, in addition to reporting all suspicious

22   orders, a distributor has a statutory

23   responsibility to exercise due diligence to

24   avoid filling suspicious orders that might be

25   diverted into other than legitimate medical,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    scientific, and industrial channels.

 2              Do you see that?

 3        A.    I see that.

 4        Q.    Okay.  And that's referring to

 5    the requirement to block suspicious orders

 6    when they're detected, right?

 7              MR. EPPICH:  Object to the

 8        form.  Foundation.

 9        A.    I'm not sure.

10    QUESTIONS BY MR. BOGLE:

11        Q.    Okay.  What do you think that

12    refers to, then?

13        A.    I don't know.

14        Q.    Okay.  So do you have any

15    understanding of what that -- what he's

16    getting at there in that sentence?

17        A.    I don't know.

18        Q.    Okay.  Do you recall ever

19    asking any of your colleagues to help you

20    understand what Mr. Rannazzisi was saying in

21    that sentence that I just read?

22        A.    Not that I recall.

23        Q.    Okay.  Do you ever recall

24    reaching out to anyone at the DEA asking them

25    to explain to you what was meant by the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    sentence I just read?

2         A.     Not that I recall.

3         Q.     Okay.  That would have fallen

4    within your purview, though.  If the DEA's

5    view is that this is part of McKesson's

6    responsibilities under the Controlled

7    Substances Act in 2006 time frame, that would

8    have been within your purview of your

9    responsibilities, right?

10              MR. EPPICH:  Object to the

11         form.  Assumes facts not in evidence.

12        A.     I don't recall.

13   QUESTIONS BY MR. BOGLE:

14        Q.     Okay.  I think we talked about

15   earlier in the deposition that compliance

16   with the Controlled Substances Act would have

17   been part of your responsibilities in this

18   time frame, right?

19        A.     That's correct.

20        Q.     Okay.  So if the DEA --

21   Mr. Rannazzisi from the DEA is indicating

22   here that there's a requirement here, a

23   regulatory requirement, to avoid filling

24   suspicious orders of controlled substances,

25   would that not have fallen within your
```

Highly Confidential - Subject to Further Confidentiality Review

1    purview to make sure that McKesson complied

2    with that portion of the regulations?

3              MR. EPPICH:  Object to --

4         object to the form.



Highly Confidential - Subject to Further Confidentiality Review

10    QUESTIONS BY MR. BOGLE:

11         Q.    Okay.  The next paragraph down

12    says:  In a similar vein, given the

13    requirement under Section 823(e) that a

14    distributor maintain effective controls

15    against diversion, a distributor may not

16    simply rely on the fact that the person

17    placing the suspicious order is a DEA

18    registrant and turn a blind eye to the

19    suspicious circumstances.  Again, to maintain

20    effective controls against diversion as

21    Section 823(e) requires, the distributor

22    should exercise due care in confirming the

23    legitimacy of all orders prior to filling.

24              Do you see that?

25         A.    Yes, I see that.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      The last sentence I just read

2    there, what do you understand that to mean?

3                  MR. EPPICH:  Objection to the

4          form; foundation.

5          A.      I'm not sure what it means.

6    QUESTIONS BY MR. BOGLE:

7          Q.      Okay.  So while you were

8    working at McKesson after you read this

9    letter, you were unclear on what was meant by

10   that last sentence there about confirming the

11   legitimacy of all orders prior to filling?

12                 MR. EPPICH:  Object to the

13         form.  Misstates prior testimony.

14         A.      I don't recall what I thought

15   at that time.

16   QUESTIONS BY MR. BOGLE:

17         Q.      Okay.  But as you read it here

18   today, you're not sure what is meant by that.

19   Is that true?

20                 MR. EPPICH:  Same objections.

21         A.      I don't recall.

22   QUESTIONS BY MR. BOGLE:

23         Q.      No.  I'm asking what you think

24   today.

25         A.      I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.  You don't have an

2  opinion about what that means?

3      A.      No.

4      Q.      Okay.  But we can agree that

5  you did perform regulatory compliance,

6  including for the Controlled Substances Act

7  for McKesson, all the way up until about two

8  years ago, right?

9      A.      That's correct.

10     Q.      Okay.  And we can also agree

11  this is a letter that you would have read in

12  your course of employment at McKesson, right?

13     A.      That's correct.

14     Q.      Did you follow up with anyone

15  at DEA about any of -- anything in this

16  letter that you were unclear on?

17     A.      Not that I recall.

18     Q.      Did you follow up with any of

19  your colleagues at McKesson about anything in

20  this letter that you felt you were unclear

21  on?

22     A.      I don't recall.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11    QUESTIONS BY MR. BOGLE:

12         Q.    Okay.  Do you recall there

13    being any meetings with yourself and other

14    people at the regulatory department at

15    McKesson to sort of walk through this letter

16    we're looking at here in Exhibit 3?

17              MR. EPPICH:  Object to the

18         form.

19         A.    I really don't recall.

20    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





19      Q.      Okay.

20              MR. EPPICH:  Is this a good

21      time to take a break?

22              MR. BOGLE:  Sure.

23              THE VIDEOGRAPHER:  Off the

24      record at 10:01.

25              (Recess taken, 10:01 a.m. to

```
 1          10:16 a.m.)

 2                  THE VIDEOGRAPHER:  All right,

 3          stand by.  The time is 10:16, back on

 4          the record.  Beginning of File 2.

 5    QUESTIONS BY MR. BOGLE:

 6          Q.    Mr. Hilliard, I want to go back

 7    just a step here and talk a little bit about

 8    sort of the hierarchy of the regulatory

 9    department while you were at McKesson.  So

10    let's focus on while you were director of

11    regulatory affairs, which I think you told me

12    was roughly 1998 to 2016.

13                  So during that time frame, as

14    director of regulatory affairs, who would

15    have been your superiors in the regulatory

16    department?

17          A.    Dan White, and when I started

18    in '97 to -- again, I don't remember the

19    exact time frame, a couple of years; and then

20    Ron Bone.

21          Q.    What was his title?

22          A.    SVP, operations.

23          Q.    And that's senior vice

24    president?

25          A.    Yes, correct.
```

```
 1          Q.      All right.  Of operations?

 2          A.      Correct.

 3          Q.      Okay.

 4          A.      Regulatory rolled up under

 5     that.

 6          Q.      Okay.

 7          A.      Don Walker after that.  And

 8     then at some point there, Bruce Russell came

 9     in between us and I reported directly to

10     Bruce instead of Don.

11          Q.      Okay.

12          A.      And then it was back to Don

13     directly, and then finally to Krista Peck.

14          Q.      What was her job title?

15          A.      SVP of regulatory department.

16     QUESTIONS BY MR. BOGLE:

17          Q.      Okay.

18          A.      That's not the exact -- correct

19     title, but SVP of regulatory.

20          Q.      And again, when you say "SVP,"

21     it means senior vice president.

22          A.      Senior vice president.

23          Q.      I just want to make sure the

24     record is clear.  I think I know what you

25     mean but I want to make sure it's clear.
```

```
 1                      Okay.  Let me ask it to you

 2      this way just so I understand.  So at all

 3      times from 1998 to 2016, would there have

 4      only been one position in the regulatory

 5      department higher than yours on the corporate

 6      ladder?

 7           A.     No, because at the time point

 8      for which I reported to Bruce Russell, he

 9      would have been a VP, and then Bruce would

10      have reported to Don, so there would have

11      been one additional level there.

12           Q.     Okay.  So in what time period

13      would that have been where there was two

14      levels above yours?

15           A.     I would say 2000, early --

16      first part of the 2000s.  I'm not sure how

17      far that goes into.

18           Q.     Okay.

19           A.     I don't remember when Bruce

20      retired.

21           Q.     Okay.

22           A.     I want to say 2014, he retired,

23      approximately.

24           Q.     Okay.  So from this time period

25      from 1998 to 2016, there were points in time
```

Highly Confidential - Subject to Further Confidentiality Review

 1   where there's one person, one position higher

 2   than yours in the regulatory department, and

 3   some points in time where there's two

 4   positions higher than yours in the regulatory

 5   department.  Am I understanding that right?

 6        A.    That's correct.

 7        Q.    Okay.  So as director of

 8   regulatory affairs, then, from '98 to 2016,

 9   were there positions below yours in the

10   regulatory department, people that reported

11   to you?

12        A.    I had one direct report.

13        Q.    Okay.  And during what time

14   period?

15        A.    Approximately 2013 to 2016.

16        Q.    Okay.  Who was that?

17        A.    Cynthia.  My mind is going

18   blank on her last name.  All she managed was

19   licensure for our facilities.

20        Q.    Okay.  All right.  Shifting

21   gears a little bit, then -- actually, strike

22   that.

23             Again, when we started the

24   deposition, you listed off quite a few

25   different areas of responsibility that you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    had over time in the regulatory department.

 2    Did you consider each of the areas that you

 3    had responsibility for to be important areas,

 4    important things to you?

 5                 MR. EPPICH:  Object to the

 6         form.

 7         A.     My job was important to me.

 8    QUESTIONS BY MR. BOGLE:

 9         Q.     Okay.  And did you feel that

10    you had an important job for McKesson

11    generally, that you held an important role at

12    the company?

13                 MR. EPPICH:  Object to the

14         form.

15         A.     In my opinion, I felt worthy

16    and important to the company.

17    QUESTIONS BY MR. BOGLE:

18         Q.     Okay.  I guess my question is a

19    little different.  Did you feel like your

20    position itself was an important position to

21    the company, that it performed important

22    functions to the company?

23                 MR. EPPICH:  Object to the

24         form.

25         A.     In my opinion, I felt it was
```

Highly Confidential - Subject to Further Confidentiality Review

1    important.

2    QUESTIONS BY MR. BOGLE:

22   QUESTIONS BY MR. BOGLE:

23        Q.    Okay.  And do you recall the

24   Lakeland distribution center at all, that it

25   existed?

Highly Confidential - Subject to Further Confidentiality Review



1          A.     Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review



17          Q.      Okay.   I'm going to hand you

18     what I'm marking as Exhibit 4, which is

19     1.1946, and that's MCKMDL00496859.

20               There you go, sir.

21               (McKesson-Hilliard Exhibit 4

22          was marked for identification.)

23     QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  And you knew in 2005

2   that that was part of McKesson's obligations

3   were to report suspicious orders of

4   controlled substances when they were -- to

5   the DEA when they were discovered, right?

6              MR. EPPICH:  Object to the

7        form.  Calls for a legal conclusion.

12             MR. BOGLE:  Okay.  Move to

13       strike as nonresponsive.

14   QUESTIONS BY MR. BOGLE:

15      Q.     My question simply was:  You

16   understood at this point in 2005, by

17   September 2005, that there was an obligation

18   for McKesson to report suspicious orders to

19   the DEA when they were discovered.  True?

20             MR. EPPICH:  Object to the

21       form.  Foundation.

22      A.     McKesson did report suspicious

23   orders to the DEA.

24   QUESTIONS BY MR. BOGLE:

25      Q.     Okay.

```
 1              MR. BOGLE:  Move to strike as

 2         nonresponsive.

 3    QUESTIONS BY MR. BOGLE:

 4         Q.    My question was simply:  You

 5    did have an understanding as of 2005 that

 6    there was an obligation for McKesson to

 7    report suspicious orders to the DEA when they

 8    were discovered.  True?

 9              MR. EPPICH:  Object to the

10         form; calls for a legal conclusion,

11         asked and answered.

12         A.    We submitted the reports to the

13    DEA for the controlled substance suspicious

14    order reports.

15    QUESTIONS BY MR. BOGLE:

16         Q.    Okay.  And why would you do

17    that, then?

18         A.    That was the agreed reporting

19    mechanism for the suspicious order that was

20    created from the Suspicious Order Task Force

21    that DEA had agreed was the methodology.

22         Q.    What time period are you

23    referring to?

24         A.    Approximately '95.

25         Q.    Okay.  So before you were with
```

```
 1    the company.

 2         A.     That's correct.

 3         Q.     Okay.  So you were not a member

 4    of any such task force, right?

 5         A.     That's correct.

 6         Q.     Okay.  And so anything that you

 7    would know about the task force came to you

 8    from somebody other than yourself, right?

 9    You don't have any firsthand knowledge of

10    that.

11              MR. EPPICH:  Object to the

12         form.

13    QUESTIONS BY MR. BOGLE:

14         Q.     True?

15         A.     I was not there.

16         Q.     Right.  So you don't have any

17    firsthand knowledge of it, true?

18              MR. EPPICH:  Object to the

19         form.

20         A.     I was not at the meeting.

21    QUESTIONS BY MR. BOGLE:

22         Q.     Okay.  So therefore you could

23    not have any firsthand knowledge, right?

24              MR. EPPICH:  Object to the

25         form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I was not -- I did not attend

 2    the meeting of the task force.

 3    QUESTIONS BY MR. BOGLE:

 4          Q.     Okay.  Do you know of anyone

 5    from McKesson that did?

 6          A.     I don't recall.

 7          Q.     Okay.  Did you keep any written

 8    documentation from the DEA that would have

 9    come from this task force you're referencing

10    that says, you know, the DEA -- this is our

11    stamp of approval that this is the mechanism

12    that we approved to report suspicious orders?

13              MR. EPPICH:  Objection --

14    QUESTIONS BY MR. BOGLE:

15          Q.     Did you keep a file like that?

16              MR. EPPICH:  Object to the

17          form.

18          A.     I don't recall if there was a

19    form associated with the outcome of that

20    meeting.

21    QUESTIONS BY MR. BOGLE:

22          Q.     Okay.  I'm just asking if you

23    had any sort of documentation that you kept

24    for yourself to make sure that you felt

25    comfortable that that was the proper
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reporting mechanism.

 2              MR. EPPICH:  Object to the

 3         form.  Vague.

 4         A.     Through my career, whenever I

 5    had information from the DEA, then I would

 6    maintain copies of it.

 7    QUESTIONS BY MR. BOGLE:

 8         Q.     Okay.  So if you had any

 9    correspondence from the DEA that said that

10    this was a reporting mechanism they signed

11    off on, you would have kept that, right?

12              MR. EPPICH:  Object to the

13         form.

14         A.     I wasn't at the meeting, so I

15    don't have -- I didn't have any documentation

16    on that, I don't recall having documentation

17    on that.

18              But as I said, throughout the

19    course of my career, if I did receive some

20    type of letter, like an extension to DEA

21    registrations, then we would maintain that

22    letter.

23    QUESTIONS BY MR. BOGLE:

24         Q.     So let's go to page .10 then.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 7    QUESTIONS BY MR. BOGLE:

 8         Q.     You would agree with me that

 9    the primary responsibility for investigating

10    suspicious orders or suspicious customers or

11    suspicious activity for a customer falls on

12    McKesson, right?  For any product it's

13    selling.

14              MR. EPPICH:  Object to the

15         form; foundation.  Calls for a legal

16         conclusion.

17         A.     Okay.  Restate the question.

18    QUESTIONS BY MR. BOGLE:

19         Q.     Sure.

20              You would agree the primary

21    responsibility for investigating suspicious

22    orders or suspicious activity of a customer

23    of McKesson's falls primarily on McKesson,

24    right?

25              MR. EPPICH:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1           form.  Foundation.  Calls for a legal

 2           conclusion.

 3           A.     I'm not sure.

 4    QUESTIONS BY MR. BOGLE:

 5           Q.     Okay.  Is that not the way that

 6    you performed your job, with that sort of

 7    belief in mind?

 8                  MR. EPPICH:  Object to the

 9           form.  Foundation.  Calls for a legal

10           conclusion.

11           A.     I don't know.

12    QUESTIONS BY MR. BOGLE:

13           Q.     You don't know?  Okay.

14                  So when you came in to work

15    every day as director of regulatory affairs,

16    would you or would you not have the mindset

17    that the primary responsibility to make sure

18    that we're not putting out suspicious orders

19    of controlled substances falls on us as

20    McKesson?

21                  MR. EPPICH:  Object to the

22           form.
```

Highly Confidential - Subject to Further Confidentiality Review

3    QUESTIONS BY MR. BOGLE:

4         Q.    Yeah, I guess I'm asking the

5    question a little differently than that,

6    though.  What I'm asking is:  When you came

7    to work every day from 1997 to 2016 and were

8    director of regulatory affairs at McKesson,

9    with what you've said is an important job,

10   did you take that job to mean that the

11   primary responsibility for making sure that

12   suspicious orders didn't go out to customers

13   fell on McKesson as opposed to somebody else?

14            MR. EPPICH:  Object to the form

15        to the extent it calls for a legal

16        conclusion.

17        A.    I don't recall what I thought

18   when I walked into the office each day.

19   QUESTIONS BY MR. BOGLE:

20        Q.    Okay.  Do you ever recall a day

21   at work where you sat down and said, "I've

22   got to make sure, as director of regulatory

23   affairs, that suspicious orders do not go to

24   customers from McKesson when it comes to

25   controlled substances"?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Object to the

 2          form.

 3          A.     I don't recall what I thought

 4     when I sat down each day.

 5     QUESTIONS BY MR. BOGLE:

 6          Q.     Okay.  Any day, that thought

 7     cross your mind that you can think of?

 8                    MR. EPPICH:  Object to the

 9          form; asked and answered.

10          A.     Not from 10 years ago.

11     QUESTIONS BY MR. BOGLE:

12          Q.     What about from two years ago?

13          A.     I wasn't involved in the DRA

14     CSMP process at that point in time.

15          Q.     What about five years ago?

16                    MR. EPPICH:  Same objections.

17          Asked and answered.

18          A.     I don't recall.

19     QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10    QUESTIONS BY MR. BOGLE:

11        Q.    Okay.  I'm going to hand you

12    what I'm marking as Exhibit 5, which is

13    1.1789, and that's MCKMDL00496876.

14            (McKesson-Hilliard Exhibit 5

15        was marked for identification.)

16    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
18          Q.     Who is Mr. Gilbert?

19          A.     Outside counsel.

20          Q.     So he's you guys' lawyer,

21   right?

22          A.     Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6    Q.    So having a DEA registration

7  surrendered or having an Order to Show Cause

8  brought against a distribution center, those

9  are serious enforcement actions, right?

10        MR. EPPICH:  Object to the

11        form.

12    A.    They are serious.

13  QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16            MR. BOGLE:  Let me get my

17      copies here, sorry.  Slight delay.

18      I'm emptying boxes.

19            MR. EPPICH:  I'm going to stand

20      up for this one.

21  QUESTIONS BY MR. BOGLE:

22      Q.    All right.  I'm handing you

23  what I'm marking as Exhibit 6, which is

24  1.1943, MCKMDL00496306.

25            (McKesson-Hilliard Exhibit 6

Highly Confidential - Subject to Further Confidentiality Review



1              was marked for identification.)

2       QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          MR. EPPICH:  Hold on.  Hold on.

21      Let me pause here.  I'd just caution

22      the witness that if this question is

23      seeking anything that's any

24      discussions or conferences with

25      counsel, that those would be

Highly Confidential - Subject to Further Confidentiality Review



1          privileged discussions and I'd

2          instruct the witness not to answer.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19    QUESTIONS BY MR. BOGLE:

20          Q.    Okay.  Let's look at

21    Exhibit 1.1947, which is Exhibit 7 to your

22    deposition, and that's MCKMDL00497154.

23              (McKesson-Hilliard Exhibit 7

24          was marked for identification.)

25              --oOo--

Highly Confidential - Subject to Further Confidentiality Review

1     QUESTIONS BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    1.1951, Bates number is MCKMDL00496536.

14              THE REPORTER:  10?

15              MR. BOGLE:  Did I skip one?

16         I'm sorry, let me get that number

17         back.  I may have skipped -- missing

18         some stickers here.  Oh, I buried it.

19         Okay.  Sorry.

20              (McKesson-Hilliard Exhibit 8

21         was marked for identification.)

22    QUESTIONS BY MR. BOGLE:

23         Q.    So it's actually Exhibit 8 is

24    Exhibit 1.1951, so correcting the number.

25    Same document, just correcting the exhibit

1    number.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





2          MR. EPPICH:  Objection.  I

3     think that we are now on the edge of

4     seeking attorney-client

5     communications.

6          MR. BOGLE:  I'm just asking him

7     whether the communication occurred,

8     not the substance of it.

9  QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



```
 9              MR. EPPICH:  I'm going to

10        instruct the witness not to answer

11        that question.  You're treading on

12        that line again.  You may ask him if

13        he had a communication with his

14        counsel about the document.

15              MR. BOGLE:  I think that's what

16        I just asked.

17              MR. EPPICH:  No, you stepped

18        over the line.

19   QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

 9              MR. EPPICH:  Brandon, let's go

10        ahead and take a break.

11              MR. BOGLE:  Okay.

12              THE VIDEOGRAPHER:  Off the

13        record at 11:34.

14              (Recess taken, 11:34 a.m. to

15        11:45 a.m.)

16              THE VIDEOGRAPHER:  All right,

17        stand by.  The time is 11:45, back on

18        the record.  Beginning of File 3.

19   QUESTIONS BY MR. BOGLE:

20        Q.    All right, Mr. Hilliard, I want

21   to shift gears to a different topic here with

22   you.  We talked a little bit earlier just

23   briefly about the DU45 report.

24              Do you recall that discussion

25   generally?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2          Q.     Okay.  And also talked a little

 3    bit about Section 55 generally.

 4                 Do you recall that discussion?

 5          A.     Yes.

 6          Q.     Okay.  So Section 55 was the

 7    standard operating procedure that was in

 8    place when you joined McKesson that was meant

 9    to be the Suspicious Order Monitoring Program

10    for the company.  True?

11                 MR. EPPICH:  Object to the

12          form.

13          A.     There was a section within

14    Section 55 that contained that type of

15    information.

16    QUESTIONS BY MR. BOGLE:

17          Q.     Okay.  So it was included

18    within Section 55.  True?

19          A.     Correct.

20          Q.     Okay.  I think you told me, I

21    just want to make sure I understand.  When

22    you joined the company in 1997, Section 55,

23    and specifically the components with the

24    suspicious order monitoring provisions, were

25    already in place.  True?
```

```
 1          A.      Correct.

 2          Q.      Okay.  And the DU45 was one of

 3     the reports listed in Section 55 that would

 4     be produced and submitted to the DEA,

 5     correct?

 6          A.      That's correct.

 7          Q.      Okay.  I'll take a look at a

 8     few components of Section 55 here.  So I'm

 9     going to hand you what I'm marking as

10     Exhibit 9, which is 1.1555.  The Bates number

11     is MCKMDL00346554.

12                  (McKesson-Hilliard Exhibit 9

13          was marked for identification.)

14     QUESTIONS BY MR. BOGLE:

15          Q.      When I read all those Bates

16     numbers, you can ignore me.  I'm supposed to

17     do that, unfortunately.  I won't be asking

18     you Bates number quizzes, I can promise you

19     that.

20          A.      Thank you.

21          Q.      Okay.  What I've handed you

22     here is the Drug Operations Manual,

23     Section 55, dated July 2000, correct?

24          A.      That is correct.

25          Q.      Okay.  And again, I think you
```

```
 1    said this, but you're familiar with this

 2    manual, correct?

 3         A.    Yes, I am.

 4         Q.    All right.  Let's go to -- ah

 5    jeez, wrong page number.  Page .29.  Sorry.

 6         A.    I'm sorry, repeat that?

 7         Q.    .29?

 8         A.    .29.

 9         Q.    Yes, sir.

10               Okay.  On this page, you see

11    there's a section (c) titled Daily Controlled

12    Substance Suspicious Order Warning Report,

13    and then it's listed a bunch of other stuff,

14    but including DU45L500.

15               Do you see that?

16         A.    Yes, I see that.

17         Q.    Okay.  So this section here

18    talks about the daily version of the DU45

19    report.  True?

20         A.    Yes.

21         Q.    Okay.  And if you go down to

22    the next paragraph, it says:  The same

23    factors that are used for the Customer Recap

24    Variance -- and then it gives a description

25    of the report -- are also used for the Daily
```

```
 1    Controlled Substance Suspicious Order Warning

 2    Report.

 3              Then it says:  3X monthly

 4    average for Schedule II and Schedule III

 5    reportables and 8X/monthly averages for

 6    IIIN-V.

 7              Do you see that?

 8        A.    Yes, I see that.

 9        Q.    Okay.  So I want to break that

10    down and make sure it's clear on what that

11    means.  So both for the DU45 reports run

12    daily and monthly, an order would appear on

13    the report for any controlled substance

14    that's in Schedule II or Schedule III if the

15    order was three times the average for

16    customers of McKesson for that product.

17    True?

18              MR. EPPICH:  Object to the

19        form.

20        A.    It was three times the monthly

21    average for 12-month sales and it was for

22    Schedule II and III narcotics.

23    QUESTIONS BY MR. BOGLE:

24        Q.    Okay.  So included within that

25    would be opioids, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Correct.

 2          Q.      Okay.  So you said a 12-month

 3     history, so let's talk about how that worked.

 4     Was it a 12-month same customer history that

 5     this number would be derived from?

 6          A.      Yes, that's correct.

 7          Q.      Okay.  So, for example, you

 8     would look at the 12 months for X pharmacy,

 9     the prior 12 months, and you would do what

10     with that data to determine how the three

11     times average would be generated?

12               MR. EPPICH:  Object to the

13          form; foundation.

14     QUESTIONS BY MR. BOGLE:

15          Q.      Walk me through that process.

16          A.      The system is taking 12 months'

17     worth of sales history based on that item and

18     then adds a factor of three times, I'm sorry,

19     three times the average, and if the orders

20     exceed that threshold then it shows up on the

21     report.

22          Q.      Okay.  And so an average is

23     generated from the prior 12 months.  Does

24     that roll over every month so it's looking at

25     a new 12-month period?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. EPPICH:  Object to the

 2       form.

 3       A.      As I recall, it's a rolling

 4   12-month period.

 5   QUESTIONS BY MR. BOGLE:

 6       Q.      Right.  So we'll walk through

 7   this just to make sure it's clear.  So let's

 8   say, for example, we're in February 2007.

 9   The prior 12 months' data that would be

10   looked at for February 2007 would be the 12

11   months prior to that month.  True?

12       A.      Correct.

13       Q.      Okay.  So, for example, when

14   you go to March 2007, that would then include

15   the February 2007 data and the first month

16   from the prior 12 months would drop off the

17   analysis.  True?

18       A.      I believe that to be correct.

19       Q.      Okay.  So if a customer's

20   orders for a given month did not exceed three

21   times their prior 12-month average, they

22   would not appear on the DU45 report.  True?

23       A.      That's correct.

24       Q.      Okay.  Were there any other

25   calculations that went into the DU45 report
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    other than the prior 12 months' average and

2    looking at three times that average, if it

3    hits that, it gets kicked to the report?  Any

4    other variables?

5                   MR. EPPICH:  Object to the

6         form.

7         A.      Not to my knowledge.

8    QUESTIONS BY MR. BOGLE:

9         Q.      Okay.  All right.  I want to

10   look at a DU45 report that was produced to

11   us.  You may want to keep this exhibit kind

12   of just near you, but I want to look at a

13   sample DU45 with you.

14                  All right.  I'm going to hand

15   you what I'm marking as Exhibit 10, which is

16   1.2100.  Bates number is MCKMDL00660789.

17                  (McKesson-Hilliard Exhibit 10

18        was marked for identification.)

19   QUESTIONS BY MR. BOGLE:

20        Q.      Here's your version.  I

21   shouldn't say "version," they're all the

22   same, but your copy.  It's beefy.

23                  Okay.  And what I've handed

24   you, Mr. Hilliard, I'll represent to you was

25   produced to us as part of this litigation as
```

Highly Confidential - Subject to Further Confidentiality Review

1    being a DU45 report from -- I believe it's

2    the Oklahoma City distribution center.  I

3    think you can determine that on the second

4    page of the document, that that's the

5    distribution center this pertains to.  Let me

6    know if you disagree with that.

7         A.    Yes.  This does appear to come

8    from the Oklahoma City distribution center.

9         Q.    Okay.  And going back to the

10   first page, this is noted to be a monthly

11   report that I'm showing you here, right?

12        A.    That is correct.

13        Q.    Okay.  And it's dated

14   April 3rd, 2007.  That's the date on the

15   first page, right?

16        A.    That's what's stated on the

17   first page.

18        Q.    Okay.  So you obviously have an

19   understanding and knowledge of DU45 reports.

20   Is what I'm showing you here consistent with

21   what a DU45 report would look like, a monthly

22   report?

23        A.    Yes.

24        Q.    Okay.  Now, these would -- so

25   this would be submitted to the DEA on a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    monthly basis, correct?  This version.

 2         A.    That's correct.

 3               MR. EPPICH:  Object to the

 4         form.

 5    QUESTIONS BY MR. BOGLE:

 6         Q.    And just looking, for example,

 7    at a few of these pages, I'm looking at the

 8    second page, which is Bates ending 0790,

 9    there's three fentanyl orders listed here for

10    this customer, right?

11               MR. EPPICH:  Objection,

12         foundation.

13         A.    Fentanyl is listed here, yes.

14    QUESTIONS BY MR. BOGLE:

15         Q.    Okay.  Fentanyl being an opioid

16    product, right?

17               MR. EPPICH:  Objection,

18         foundation.

19         A.    Yes, it is.

20    QUESTIONS BY MR. BOGLE:

21         Q.    Okay.  And go to the next page,

22    for example, there's an order listed for this

23    customer for oxycodone, an oxycodone

24    combination product, right?

25         A.    That's what's stated, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Okay.  Again, another opioid,
2     right?
3          A.      Yes, that's correct.
4          Q.      Okay.  If you flip over to the
5     next page, Bates page ending 0792, there are
6     what I count to be 11 separate orders here
7     for this customer, again, all for various
8     opioid products, right?
9               MR. EPPICH:  Objection,
10         foundation.
11         A.      That is what's listed here.
12    QUESTIONS BY MR. BOGLE:
13         Q.      Okay.  And I'm not going
14    through every page here, but just one more
15    just to show you.
16              Page 0793, for this customer,
17    there are -- looks like nine different orders
18    for either hydrocodone or oxycodone listed
19    here, right?
20         A.      That is what's listed.
21         Q.      Okay.  And so what's listed in
22    this report, for example, at this time
23    period, April 2007, would have been orders
24    that were placed by a customer, filled by
25    McKesson, and then appeared on this report
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    thereafter and sent to the DEA, right?

 2                MR. EPPICH:  Object to the

 3         form.  Calls for speculation.

 4         A.    That would have been the

 5    process.

 6    QUESTIONS BY MR. BOGLE:

 7         Q.    Right.  Because these are all

 8    sales.  This product was provided to the

 9    customers, right?  Everything listed in this

10    report.

11                MR. EPPICH:  Object to the

12         form, the characterization.

13         A.    That is my recollection.

14    QUESTIONS BY MR. BOGLE:

15         Q.    Right.  So the DU45 report is

16    listing sales, not just the order prior to

17    the sale, right?

18                MR. EPPICH:  Object to the

19         form, characterization.

20         A.    My recollection is it contains

21    the sales.

22    QUESTIONS BY MR. BOGLE:

23         Q.    Right.  And, for example, if

24    you see on 0793 in the left-hand column,

25    there's actually invoice numbers and invoice
```

Highly Confidential - Subject to Further Confidentiality Review

1    dates for each of these, right?

2          A.     Yes, there is.

3          Q.     And you invoice at the time of

4    sale, right?

5                 MR. EPPICH:  Objection;

6          foundation, calls for speculation.

7          A.     I don't recall if it was the

8    time of sale or date of shipment.

9    QUESTIONS BY MR. BOGLE:

10         Q.     Or of shipment, okay.

11         A.     Shipment date.

12         Q.     All right.  So, for example,

13   what we've got here as Exhibit 10 is, I

14   believe, about 600-plus pages of what

15   McKesson deemed for this month to be

16   suspicious Schedule II or Schedule III

17   controlled substance orders, right?

18                MR. EPPICH:  Objection to the

19         form.

20         A.     These are what showed up on our

21   suspicious order report as -- and then

22   reported to the DEA.

23   QUESTIONS BY MR. BOGLE:

24         Q.     Right.  But what the whole

25   purpose of this was, you're providing 600 --

Highly Confidential - Subject to Further Confidentiality Review

1    in this instance, 600-plus pages to the DEA

2    for this month of suspicious controlled

3    substance sales that McKesson had made from

4    the prior month, right?

5              MR. EPPICH:  Objection to the

6         form and the characterization.

7         A.    They were submitted for DEA to

8    review.  The report is titled "suspicious"

9    but it's orders that need to be reviewed and

10   they were supplied to DEA for review.

11   QUESTIONS BY MR. BOGLE:

12        Q.    Okay.  So let me make sure I

13   understand that.  So when these reports would

14   have been submitted to the DEA, it was not

15   the intent of the regulatory department for

16   the conclusion to be drawn that McKesson

17   believed these were suspicious orders.  Is

18   that true?

19              MR. EPPICH:  Object to the

20        form; calls for speculation.

21        A.    This was part of the Suspicious

22   Order Task Force.  This was the format for

23   which industry came to the conclusion to

24   provide this information to the DEA and DEA

25   was good with it.  There was DEA inspections

Highly Confidential - Subject to Further Confidentiality Review

 1    that had occurred in our facilities and there

 2    was never an issue with that.  So this is the

 3    format for which the original documentation

 4    was supplied to DEA.

 5              MR. BOGLE:  I move to strike as

 6         nonresponsive.

 7    QUESTIONS BY MR. BOGLE:

 8         Q.    My question was simply that

 9    during the time that you were with McKesson

10    in the regulatory department, was it your

11    understanding that the intent was when a DU45

12    report like the one we're looking at here was

13    supplied to the DEA, was that -- was that

14    intended to or not intended to be what

15    McKesson deemed to be suspicious orders from

16    the prior month?

17              MR. EPPICH:  Object to the

18         form.  It calls for speculation; asked

19         and answered.

20         A.    Yeah.  Again, it was -- this is

21    what needed to be reviewed.  This was not

22    specifically a suspicious order.

23    QUESTIONS BY MR. BOGLE:

24         Q.    Okay.  So the view during this

25    time period when DU45s were used were that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this is not specifically a suspicious order

 2    report.  Am I understanding you right?

 3                 MR. EPPICH:  Object to the

 4         form.  Misstates prior testimony.

 5    QUESTIONS BY MR. BOGLE:

 6         Q.    If I'm misstating it, let me

 7    know.  I'm trying to understand.

 8         A.    The title was Suspicious Order

 9    Report or Suspicious Purchase Report, but

10    this -- with the vast quantity of orders that

11    are conducted on a daily and nightly basis,

12    this provides a threshold for which to

13    review.

14                 And so reviews would be

15    conducted nightly on the reports and they'd

16    be flagged and then submitted to the DEA, and

17    then the report in its entirety would be

18    provided to the DEA on a monthly basis.  So

19    they would have all this information.

20         Q.    Right.  I'm asking about from

21    McKesson's perspective, though, not DEA's

22    perspective.  So from McKesson's perspective

23    as you understood it in the regulatory

24    department -- strike that, let me make it

25    even easier.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Your perspective while you were

 2    in the regulatory department when the DU45s

 3    were used, did you understand these reports

 4    to be suspicious order reports from the prior

 5    month?

 6              MR. EPPICH:  Objection to the

 7         form.  Calls for a legal conclusion.

 8         Asked and answered.

 9         A.    Again, this was a -- an

10    identifier for review.  This didn't mean that

11    every order on here was suspicious.

12    QUESTIONS BY MR. BOGLE:

13         Q.    Okay.  So I think we talked

14    about this earlier, but you do understand

15    that during this time period, 2007, for

16    example, that the Controlled Substances Act

17    did require distributors to report suspicious

18    orders, right?

19         A.    Correct.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12      QUESTIONS BY MR. BOGLE:

13          Q.      Okay.

14              (McKesson-Hilliard Exhibit 11

15      was marked for identification.)

16      QUESTIONS BY MR. BOGLE:

17          Q.      I'm going to hand you what I'm

18      marking as Exhibit 1.1823, which is

19      Exhibit 11 to your deposition, and that's

25          Q.      And you would have been a

Highly Confidential - Subject to Further Confidentiality Review

1    member of HDMA at this point in time, right?

2         A.    I was a member during this

3    time.

4         Q.    Okay.  What does HDMA stand

5    for?

6         A.    Healthcare Distribution

7    Management Association.

8         Q.    And again, that was y'all's

9    trade association, right?

10        A.    That's correct.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 3          Q.      Okay.  I'll hand you what I'm

 4     marking as Exhibit 12, which is 1.1667, and

 5     that's MCKMDL00510747.

 6                  (McKesson-Hilliard Exhibit 12

 7          was marked for identification.)

 8     QUESTIONS BY MR. BOGLE:

 9          Q.      All right.  And we're going to

10     walk through from back to front here, but

11     just starting at the front, you see that top

12     e-mail there is one that you're copied on,

13     right?

14          A.      Yes, I am copied on it.

15          Q.      And you understand sort of how

16     e-mails work; once you appear on this e-mail,

17     the ones prior to it, you would also have

18     been able to view, right?

19          A.      Okay.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2    QUESTIONS BY MR. BOGLE:

3         Q.     Yeah.  I'm just asking whether

4    you agree or disagree that simply reporting

5    larger-than-usual orders does not meet the

6    spirit and letter of the suspicious order

7    reporting regulation.  Agree or disagree?

8              MR. EPPICH:  Object to the

9         form; asked and answered.

Highly Confidential - Subject to Further Confidentiality Review



11    QUESTIONS BY MR. BOGLE:

12         Q.    Okay.  Well, do you want to

13    look at the -- I'm happy to give you whatever

14    time you need to look at the full e-mail

15    chain.  I'm not trying to take anything out

16    of context for you here.  Feel free.  Let's

17    do that.

18              Let's take -- take a minute.

19    It's, I think, seven pages or eight pages --

20    six pages.  Let me know when you're done

21    reading the six pages, but that's my question

22    that I'm going to ask you again.  Let me know

23    when you're ready.

24              (Document review by witness.)

25         A.    Restate your question.

Highly Confidential - Subject to Further Confidentiality Review



1      QUESTIONS BY MR. BOGLE:

20              MR. BOGLE:  Move to strike as

21        nonresponsive.

22   QUESTIONS BY MR. BOGLE:

23        Q.    Let me reask my question

24   because I think it's very straightforward.

25              My question is, simply:  Do you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    agree or disagree that, standing alone,

 2    providing a report that simply lists

 3    larger-than-usual orders does not comply with

 4    the suspicious order reporting requirements

 5    of the Controlled Substances Act?

 6              MR. EPPICH:  Object to the

 7         form.

 8    QUESTIONS BY MR. BOGLE:

 9         Q.    I'm not asking about additional

10    stuff.  I'm asking whether you think that

11    alone is good enough to meet that regulation.

12    Yes or no?

13              MR. EPPICH:  Object to form;

14         asked and answered, calls for a legal

15         conclusion.

16    QUESTIONS BY MR. BOGLE:

17         Q.    We'll talk about the rest of it

18    later, I promise you.

19              MR. EPPICH:  He's answered this

20         question three times now.

21              MR. BOGLE:  He hasn't come

22         close.  I mean, I'd love it if he had.

23              MR. EPPICH:  You're looking for

24         a yes-or-no answer.  He's given you

25         the answer.  It may not be the answer
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          you want --

 2               MR. BOGLE:  He hasn't said yes

 3          or no.

 4               MR. EPPICH:  -- but he has

 5          answered the question.

 6     QUESTIONS BY MR. BOGLE:

 7          Q.    Listen, here's what we can do.

 8     You can say yes or no and then provide

 9     whatever response thereafter you want.

10               MR. EPPICH:  I said you're

11          looking for a yes-or-no answer but

12          he's not providing that to you.

13          That's why you're upset, Brandon.

14               MR. BOGLE:  Right, because I

15          just want him to answer my question.

16          That does upset me, you're right.

17          You're right.  That's frustrating.

18               MR. EPPICH:  I'll allow him to

19          answer your question again.

20     QUESTIONS BY MR. BOGLE:

21          Q.    Can you just answer -- I mean,

22     I think it's a very straightforward question.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



            MR. BOGLE:  Okay.  I'm going to

        something else, so if you want to take

        it now or I can plug along if you

        want.

            MR. EPPICH:  That's fine, let's

        take a lunch.

            THE VIDEOGRAPHER:  Off the

        record at 12:31.

            (Recess taken, 12:31 p.m. to

        1:17 p.m.)

            THE VIDEOGRAPHER:  Stand by.

        The time is 1:17 p.m.  Back on the

        record, beginning of File 4.

    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



16    QUESTIONS BY MR. BOGLE:

17         Q.    Okay.  And you're aware that

18    occurred, right?  That a settlement occurred

19    in 2008?

20         A.    Yes, I am.

21         Q.    Okay.  And you're aware that

22    settlement pertained to allegations from the

23    DEA that McKesson violated the Controlled

24    Substances Act in distributing opioids from

25    several of its distribution centers, right?

```
 1          A.      Correct.

 2          Q.      Okay.  Have you seen the

 3   settlement agreement itself?

 4          A.      I have seen it at one time.

 5          Q.      Okay.  All right.  I'm going to

 6   hand you what I'm marking as Exhibit 13,

 7   which is also 1.889, and that's

 8   MCKMDL00337001.

 9               (McKesson-Hilliard Exhibit 13

10          was marked for identification.)

11   QUESTIONS BY MR. BOGLE:

12          Q.      Here you go, sir.

13               Okay.  What I've just handed

14   you, Mr. Hilliard, as Exhibit 13 is titled at

15   the top Settlement and Release Agreement and

16   Administrative Memorandum Agreement dated in

17   the first paragraph May 2nd, 2008.

18               Do you see that?

19          A.      Yes, I see that.

20          Q.      Okay.  And do you recognize

21   this to be the settlement agreement we just

22   referenced from 2008?

23          A.      Yes.

24          Q.      Okay.  And if we'd go

25   specifically to -- let's see, my page numbers
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    are different here.  There's an Appendix B

 2    about halfway through the document that

 3    starts the actual settlement agreement.  Do

 4    you see where I'm at there?  Sorry, my page

 5    numbers don't match yours on this so I can't

 6    give you a specific number.  I'm sorry, I

 7    would if I could.  For reason -- but that's

 8    what the page looks like right there.

 9              MR. EPPICH:  I think it's on

10         Bates 337012.

11    QUESTIONS BY MR. BOGLE:

12         Q.    It says Appendix B at the top

13    left, Settlement Agreement at the top middle.

14              See where I'm at?

15         A.    Found it.

16         Q.    All right.  So this starts the

17    actual settlement agreement itself.  So I

18    want to go to the next page that talks about

19    the covered conduct in the agreement, which

20    is number 8 in the middle of the page.

21              Do you see where I'm at?

22         A.    Yes, I do.

23         Q.    Okay.  And A there says:

24    Within the District of Maryland:  From

25    January 2005 through October 2006,
```

1    McKesson-Landover sold approximately

2    3 million dosage units of hydrocodone to

3    NewCare Pharmacy in Baltimore, and failed to

4    report these sales as suspicious orders to

5    DEA when discovered, as required by and in

6    violation of -- and then it lists the C.F.R.

7    and the U.S.C.

8                    And then it says:  Further,

9    from August 2006 to February 2007,

10   McKesson-Landover sold large quantities of

11   phentermine-based products to Smeeta Pharmacy

12   in Highland, Maryland, and failed to report

13   these sales as suspicious orders to DEA when

14   discovered, as required by and in violation

15   of -- and again it lists the statutes.

16                   Do you see where I'm reading

17   there?

18        A.    I see that.

23        Q.    Okay.  Then if you see in

24   section B, and I wasn't going to read this

25   whole section but you can look at it here for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    yourself, this talks about the conduct that
 2    we actually covered for the seven
 3    pharmacies -- seven Florida pharmacies that
 4    were handled by the Lakeland distribution
 5    center, right?
 6         A.    Yes.  It's listed here.
 7         Q.    And that's the same conduct we
 8    talked about before, right?  That's what they
 9    discuss here.
10         A.    Yes.
11         Q.    Okay.  And then in letter C:
12    Within the Southern District of Texas, it
13    says:  From February to September 2007,
14    McKesson-Conroe sold approximately 2.6
15    million dosage units of hydrocodone to
16    Mercury Drive Pharmacy and Maswoswe's
17    Alternative Pharmacy and failed to report
18    these sales as suspicious orders to DEA when
19    discovered, as required by and in violation
20    of -- and again it lists the statutes.
21              You see that there?
22         A.    I see that.
23         Q.    And on the next page, it
24    continues with letters D, E and F.  Letters D
25    involve allegations of large quantities of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    hydrocodone sent to three Colorado pharmacies

2    out of the McKesson-Aurora distribution

3    center from September 2005 to November 2007,

4    right?

5         A.    I see that.

6         Q.    E involves McKesson-Salt Lake

7    and distribution of 824,000 units of

8    hydrocodone, oxycodone, fentanyl and

9    methadone to the Blackfeet Clinic in

10   Browning, Montana from January 2005 to

11   October 2007.

12              Do you see that?

13        A.    I see that.

14        Q.    Okay.  And then finally, there

15   is, from McKesson-West Sacramento,

16   allegations of theft or significant loss of

17   controlled substances on 28 separate

18   occasions that were not reported timely to

19   the DEA.

20              Do you see that?

21        A.    I see that.

22        Q.    Okay.  And you know that for

23   this covered conduct, there was a fine paid

24   of $13.25 million by McKesson, right?

25        A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



11    QUESTIONS BY MR. BOGLE:

12         Q.    Okay.  We'll take a look at a

13    few things related to the LDMP -- you're okay

14    with me calling it LDMP?

15         A.    Please.

16         Q.    Okay.  I think we're talking

17    about the same thing there.

18               All right.  So I'm going to

19    hand you what I'm marking as Exhibit 1.1830,

20    which is Exhibit 14 to your deposition, and

21    that is, for those keeping track of these

22    things, MCKMDL00403340.

23               (McKesson-Hilliard Exhibit 14

24          was marked for identification.)

25                    --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
1       QUESTIONS BY MR. BOGLE:

2            Q.      There's yours, sir, and there's

3       yours.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          Q.     Okay.  You were actually

23    involved in auditing the Lifestyle Drug

24    Monitoring Program in 2007, right?

25          A.     I don't recall specifically

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what was in the audit at that time, but it's

 2    possible.

 3          Q.    Okay.  And you recall that

 4    during that 2007 audit process, there were

 5    some significant shortcomings found with the

 6    program, right?

 7                MR. EPPICH:  Objection, form.

 8          A.    I don't recall.

 9                MR. EPPICH:  Assumes facts not

10          in evidence.

11    QUESTIONS BY MR. BOGLE:

12          Q.    Okay.  I'm going to hand you

13    what I'm marking as Exhibit 15, which is

14    1.1887, MCKMDL00591949.

15                (McKesson-Hilliard Exhibit 15

16          was marked for identification.)

17    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    you Exhibit 1.1913, also marked as

21    Exhibit 16.

22                    (McKesson-Hilliard Exhibit 16

23         was marked for identification.)

24    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



12          MR. LOMBARDO:  Excuse me, does

13     this exhibit have a Bates number?

14          MR. BOGLE:  MCKMDL00591841.

15     QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 9    QUESTIONS BY MR. BOGLE:

10          Q.     Okay.  Well, let's take a look

11    at the SOP itself on this issue, then, so we

12    can sew that up.  It's 1.1333, Exhibit 17 to

13    your deposition, which is MCKMDL00330211.

14                (McKesson-Hilliard Exhibit 17

15          was marked for identification.)

16    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21    QUESTIONS BY MR. BOGLE:

22         Q.    Okay.  And I'm going to hand

23    you next, then, what I'm marking as

24    Exhibit 18, which is 1.1918, and that's

25    MCKMDL00591858.

Highly Confidential - Subject to Further Confidentiality Review

1                    (McKesson-Hilliard Exhibit 18

2         was marked for identification.)

3    QUESTIONS BY MR. BOGLE:

4         Q.     There you go, sir.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13   QUESTIONS BY MR. BOGLE:

14          Q.    All right.  I just want to show

15   you one more of these audits, which is

16   Exhibit 1.1917, marked as Exhibit 19 to your

17   deposition, and that's MCKMDL00591251.

18                (McKesson-Hilliard Exhibit 19

19          was marked for identification.)

20   QUESTIONS BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    QUESTIONS BY MR. BOGLE:

21          Q.    All right.  Let's take a look

22    at Exhibit 1.2002, which is Exhibit 20 to

23    your deposition.

24                (McKesson-Hilliard Exhibit 20

25          was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
1     QUESTIONS BY MR. BOGLE:

2          Q.    All right.  And here we've got

3     a series of e-mails and we're going to walk

4     through a couple of portions here with you.

5     This is MCKMDL00622532.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12    QUESTIONS BY MR. BOGLE:

13         Q.    Okay.  Let's take a look at

14    what I'm marking as Exhibit 21, which is

15    1.1856, and that's MCKMDL00573535.

16              (McKesson-Hilliard Exhibit 21

17         was marked for identification.)

18    QUESTIONS BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6        Q.      Okay.  But you're aware that

7   significant additions to McKesson's

8   regulatory team did not occur, in fact, until

9   the 2013-2014 time frame, right?

10              MR. EPPICH:  Object to the

11          form.

12       A.      There were -- we doubled in

13  size when the regional DRAs came aboard, so

14  that was a major change from that aspect.

15  There were certainly much larger numbers that

16  came onboard as the department developed.

17  QUESTIONS BY MR. BOGLE:

18       Q.      Right.  But we just looked at

19  this discussion from 2009.  So it wasn't --

20  after 2009, it wasn't until late 2013, early

21  2014, that significant additions were made as

22  far as staffing in the regulatory department

23  of McKesson, right?

24              MR. EPPICH:  Objection to form;

25          asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I'm not sure exactly on the

 2   dates.  We doubled in size in the 2009 time

 3   frame, and at this point and juncture of 2013

 4   and such, I'm no longer working actively in

 5   the CSMP program.  But there were

 6   additional -- significant additional head

 7   count that was produced to the department.  I

 8   just don't know exact dates when that

 9   occurred.

10   QUESTIONS BY MR. BOGLE:

11          Q.      When you say you doubled in

12   size in around 2009, that's doubling from

13   three people to six people, right?

14          A.      Four more were added, so it's

15   from three to seven.

16          Q.      Three to seven people, okay.

17          A.      Yeah.

18          Q.      And that's to cover, again,

19   what is approximately 30 distribution

20   centers, right?

21          A.      Correct.

22          Q.      Okay.  And you're aware of --

23   well, strike that.
```

Highly Confidential - Subject to Further Confidentiality Review

 3              MR. EPPICH:  Object to the

 4        form.  Calls for speculation.

 5        A.     I didn't have any control on

 6   the head count in the department.  That would

 7   be our -- Don Walker's position to decide

 8   what type of head counts we needed to cover

 9   the area.  Again, I wasn't assigned to a

10   region for those processes.

11   QUESTIONS BY MR. BOGLE:

12        Q.     Okay.  So additional staffing

13   wouldn't have been your call.  Is that what

14   you're saying?

15        A.     That's correct.

16        Q.     We touched on this a little

17   bit, but I want to talk more specifically

18   about it.  In 2008, following the settlement

19   we saw with the DEA, the CSMP was

20   implemented, right?

21        A.     Correct.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6  QUESTIONS BY MR. BOGLE:

7      Q.    Okay.  But we looked at the

8  2008 settlement agreement where there were --

9  there was a $13.25 million fine paid for

10  conduct related to various distribution

11  centers for distribution of opioids.

12            In your view, after that, was

13  there not some reason to change the course of

14  conduct at McKesson as it pertained to

15  controlled substance distribution?

16            MR. EPPICH:  Objection to the

17        form; calls for speculation.

18        Foundation.

19      A.    McKesson, we worked to develop

20  new and enhanced programs that demonstrates

21  activity that occurred after that agreement.

22  QUESTIONS BY MR. BOGLE:

23      Q.    Okay.  But with the conduct

24  that we looked at in that settlement

25  agreement, do you agree or not agree that

Highly Confidential - Subject to Further Confidentiality Review

1    changes needed to be made in the controlled

2    substance monitoring practices at McKesson?

3              MR. EPPICH:  Object to form.

4        A.    There were changes made.

5    That's how we came to develop the LDMP and

6    then developed the more robust CSMP program.

7    QUESTIONS BY MR. BOGLE:

8        Q.    And if those changes are going

9    to be meaningful, then it shouldn't be

10   business as usual for customers, should it?

11   It should be more difficult for customers to

12   get controlled substances, right?

13             MR. EPPICH:  Object to the

14        form.  Vague.

15       A.    You can work collaboratively

16   with your customers and not make it painful

17   for them, so, you know, it's -- business

18   doesn't have to be painful.  Changing

19   processes, enhancing programs, working

20   collaborative with customers, is what was

21   needed and what we developed and it could

22   enhance the program.

23   QUESTIONS BY MR. BOGLE:

24       Q.    Okay.  So then when the CSMP

25   was developed, was it your understanding that

1    the ultimate goal was to make sure that

2    customers stayed happy and kept getting the

3    product that they wanted to get?

4              MR. EPPICH:  Object to the

5         form; vague, misstates prior

6         testimony.

7         A.    Obviously that wasn't the

8    purpose.

9    QUESTIONS BY MR. BOGLE:

10        Q.    Okay.  So is it an accurate

11   statement that the goal was to make sure that

12   there was no disruption in the business

13   activities of any McKesson customer?

14             MR. EPPICH:  Objection to the

15        form; misstates prior testimony.

16        Calls for speculation.

17        A.    As stated before, there were

18   customers that we discontinued doing business

19   with.  So in some cases, customers would be

20   unhappy.  But that doesn't mean that all

21   customers are going to get discontinued

22   business.  They're all going to get reviewed,

23   and again, it doesn't mean it has to disrupt

24   the business between the companies.

25                       --oOo--

```
 1    QUESTIONS BY MR. BOGLE:

 2         Q.    But if it becomes more

 3    difficult for customers to get opioid

 4    products, isn't that justified if you're

 5    facing an epidemic?

 6              MR. EPPICH:  Objection to the

 7         form.  Vague.  Calls for speculation.

 8         A.    I don't know what that would

 9    affect to the customer.  Just because you're

10    doing a review and you're knowing your

11    customer, you're making sure they obtain the

12    amount of product that they need for

13    legitimate purposes.  That's not painful for

14    a customer.

15    QUESTIONS BY MR. BOGLE:

16         Q.    Okay.  So it's your testimony,

17    then, that -- I'm trying to make sure I

18    understand what you're saying here.  So the

19    business-as-usual attitude did exist in

20    creation of the CSMP, right?

21              MR. EPPICH:  Objection.

22    QUESTIONS BY MR. BOGLE:

23         Q.    Am I understanding you

24    correctly?

25              MR. EPPICH:  Objection, form.
```

```
1              Misstates prior testimony.

2         A.    No.  We put together processes

3     and our functions changed.  We had different

4     procedures that we had to comply with and

5     that also meant working with customers.

6     QUESTIONS BY MR. BOGLE:

7         Q.    Okay.  I'm handing you what I'm

8     marking as Exhibit 22 to your deposition,

9     which is Exhibit 1.1962, and that's

10    MCKMDL00543610.

11              (McKesson-Hilliard Exhibit 22

12         was marked for identification.)

13    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



7    QUESTIONS BY MR. BOGLE:

8         Q.    Okay.  I'm going to hand you

9    what I'm marking as Exhibit 23, which is

10   1.1804, and that's MCKMDL00543971.

11              (McKesson-Hilliard Exhibit 23

12         was marked for identification.)

13   QUESTIONS BY MR. BOGLE:

14         Q.    There you go, sir.



Highly Confidential - Subject to Further Confidentiality Review



21          MR. EPPICH:  Are you at a good

22     place to take another break?

23          MR. BOGLE:  Yeah, I was

24     actually about to say the same thing.

25     You read my mind.

```
 1                    MR. EPPICH:  Let's go ahead and

 2          go off the record.

 3                    THE VIDEOGRAPHER:  Off the

 4          record at 2:34.

 5                    (Recess taken, 2:34 p.m. to

 6          2:50 p.m.)

 7                    THE VIDEOGRAPHER:  Stand by.

 8          The time is 2:50.  Back on the record,

 9          beginning of File 5.

10          QUESTIONS BY MR. BOGLE:
```



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

10        Q.      Okay.  Then if we go back to

11   Exhibit 3, which is the Rannazzisi letter

12   from September 27, 2006, you recall

13   discussing this letter with me earlier today,

14   right?

15        A.      Yes, I do.

16        Q.      Okay.  If we go to the second

17   page of the letter, there is a paragraph

18   about three-quarters of the way down that

19   says, "Thus, in addition to."

20              Do you see that?

21        A.      Yes, I do.

22        Q.      It says:  Thus, in addition to

23   reporting all suspicious orders, a

24   distributor has a statutory responsibility to

25   exercise due diligence to avoid filling

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious orders that might be diverted into

2    other than legitimate medical, scientific,

3    and industrial channels.

4            Do you see that?

5        A.    I see that.

6        Q.    Okay.  And the next paragraph

7    down that we read before talks about the

8    distributor needing to exercise due care in

9    confirming the legitimacy of orders prior to

10   filling.

11           Do you see that reference in

12   the last sentence?

13       A.    Yes, I see that now.

14       Q.    Okay.  So, again, this letter

15   from September 27, 2006, you would agree with

16   me makes clear that the expectation is that

17   McKesson will be reporting suspicious orders

18   and not filling them if it deems them

19   suspicious, right?

20           MR. EPPICH:  Object to the

21       form.  The document speaks for itself.

22       A.    That's what's stated on here.

23   QUESTIONS BY MR. BOGLE:

24       Q.    Okay.  And so the idea, then,

25   is not to report suspicious sales, because

```
 1    you're not supposed to make the sale if the

 2    order is suspicious, right?

 3                 MR. EPPICH:  Object to the

 4         form.  Calls for speculation.

 5         A.    It states "suspicious orders."

 6    QUESTIONS BY MR. BOGLE:

 7         Q.    And not "suspicious sales,"

 8    right?

 9                 MR. EPPICH:  Object to the

10         form; calls for speculation.

11         A.    I don't recall seeing "sales"

12    listed here.

13    QUESTIONS BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20      Q.      All right.  I'm going to hand

21   you now what I'm marking as Exhibit 24, which

22   is 1.1937, and that's MCKMDL00623568.

23              (McKesson-Hilliard Exhibit 24

24        was marked for identification.)

25                    --oOo--

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. BOGLE:

 2         Q.    I put the sticker at the top so

 3    we don't cover up the writing.  Okay.  This

 4    is a series of e-mails, and again we're going

 5    to kind of work our way earliest in time to

 6    newest -- closest in time.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    QUESTIONS BY MR. BOGLE:

21         Q.    Okay.  All right.  Let me hand

22    you what I'm marking as Exhibit 25.  It's

23    1.1443.  It's also MCKMDL00409453.

24              (McKesson-Hilliard Exhibit 25

25         was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

1      QUESTIONS BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    QUESTIONS BY MR. BOGLE:

21         Q.     Okay.  I'm going to hand you

22    now what I'm marking as Exhibit 26, which is

23    1.1432, and that's MCKMDL00409048.

24              (McKesson-Hilliard Exhibit 26

25         was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

1     QUESTIONS BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



21    QUESTIONS BY MR. BOGLE:

22         Q.    Okay.  I'm just asking if you

23    know one was entered.

24         A.    Yes, I know that one was

25    entered.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  Where there was a

 2    $150 million fine assessed?

 3                 MR. EPPICH:  Objection; calls

 4          for speculation.

 5          A.     That was my understanding.

 6    QUESTIONS BY MR. BOGLE:

 7          Q.     Okay.  And do you also

 8    understand that as a part of that settlement

 9    agreement, McKesson accepted responsibility

10    for failing to report suspicious orders?

11                 MR. EPPICH:  Objection to the

12          form; calls for speculation.

13          A.     No, I'm not aware of that.  I

14    don't think I was with McKesson when that was

15    finalized.

16    QUESTIONS BY MR. BOGLE:
```



19    QUESTIONS BY MR. BOGLE:

20         Q.    All right.  We'll mark for you

21    Exhibit 27, which is 1.88.  That's

22    MCKMDL00355350.  And what I've handed you,

23    sir, is the Administrative Memorandum

24    Agreement that accompanied the 2017

25    settlement between DOJ and McKesson, okay?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      Yes, I have it.

 2        Q.      Okay.  And I want to just point

 3   you to one specific passage here, and it's

 4   on .3.  Number 2 says "Acceptance of

 5   Responsibility."

 6                Are you with me there?

 7        A.      Yes, I am.

 8        Q.      It says:  On or about

 9   September 27, 2006, February 7, 2007, and

10   December 27, 2007, DEA's Deputy Assistant

11   Administrator, Office of Diversion Control,

12   sent letters to every entity in the United

13   States that was registered with DEA to

14   manufacture or distribute controlled

15   substances, including McKesson.

16                Now, the September 27, 2006

17   letter, that's one that we've actually

18   reviewed here today, right?

19        A.      The Rannazzisi?

20        Q.      Yes, sir.

21                MR. EPPICH:  Objection to the

22        form; foundation.

23   QUESTIONS BY MR. BOGLE:

24        Q.      You recall reading that letter

25   with me?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      The Rannazzisi letter, yes.

 2          Q.      Okay.  And again, that was a

 3    letter that you received, right?

 4                  MR. EPPICH:  Objection to the

 5          form; foundation.

 6          A.      I did receive it at some point,

 7    yes.

 8    QUESTIONS BY MR. BOGLE:

 9          Q.      Okay.  It continues here:  The

10    DEA Letters contained, among other things,

11    guidance for the identification and reporting

12    of suspicious orders to DEA as required by

13    21 C.F.R. Section 1301.74(b).  McKesson

14    acknowledges that, at various times during

15    the time period from January 1, 2009 up

16    through and including the Effective Date of

17    this Agreement (the "Covered Time Period"),

18    it did not identify or report to DEA certain

19    orders placed by certain pharmacies which

20    should have been detected by McKesson as

21    suspicious based on the guidance contained in

22    the DEA Letters about the requirements set

23    forth in 21 C.F.R. 1301.74(b) and

24    21 U.S.C. Section 842(a)(5).

25                  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I see that.

 2              MR. EPPICH:  Objection;

 3        foundation.

 4   QUESTIONS BY MR. BOGLE:
```

16   QUESTIONS BY MR. BOGLE:

17        Q.    Okay.  While you were with

18   McKesson, did you have a sense -- I mean, you

19   were there for nearly 20 years.  Did you have

20   a sense and feeling that McKesson would

21   accept responsibility for things that it

22   didn't do?

23              MR. EPPICH:  Object to the

24        form; calls for speculation.

25        A.    I wasn't part of the agreement

Highly Confidential - Subject to Further Confidentiality Review

1   and I'm not familiar with this document, so I

2   don't know.

3   QUESTIONS BY MR. BOGLE:

4       Q.    I'm not specifically asking you

5   about the document right now.  I'm saying,

6   during your 20 years spent at McKesson, do

7   you have a belief that McKesson would accept

8   responsibility for things that it didn't do?

9           MR. EPPICH:  Object to the

10          form; calls for speculation.

11      A.    I don't know.

12  QUESTIONS BY MR. BOGLE:

13      Q.    Okay.  And can you think of any

14  other instance in the 20 years you were at

15  McKesson where the company paid anything

16  approaching a $150 million fine for something

17  it didn't do?

18          MR. EPPICH:  Object to the

19          form; calls for speculation.

20      A.    I don't know.

21  QUESTIONS BY MR. BOGLE:

22      Q.    Can you think of any off the

23  top of your head?

24          MR. EPPICH:  Same objections.

25      A.    I'm not aware of any.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BOGLE:  Okay.  No further
 2         questions for you, sir.
 3              THE WITNESS:  Thank you.
 4              MR. EPPICH:  Let's go ahead and
 5         take a break and go off the record.
 6              THE VIDEOGRAPHER:  Off the
 7         record at 3:25.
 8              (Recess taken, 3:25 p.m. to
 9         3:46 p.m.)
10              THE VIDEOGRAPHER:  All right,
11         stand by.  The time is 3:46.  Back on
12         the record.
13                   EXAMINATION
14    QUESTIONS BY MR. EPPICH:
15         Q.    Good afternoon, Mr. Hilliard.
16    My name is Chris Eppich, and I'm just going
17    to ask a few questions of you this afternoon.
18         A.    Okay.
19         Q.    I know it's been a long day so
20    I'll keep it pretty short.
21              You testified earlier today
22    that you joined McKesson in 1997.  Is that
23    right?
24         A.    That's correct.
25         Q.    And can you briefly describe
```

Highly Confidential - Subject to Further Confidentiality Review

1    for us your duties as director of regulatory

2    affairs from 1997 to, say, 2006?

3         A.    Well, from '97 to

4    approximately '98, the title was manager of

5    regulatory affairs.  Still carried the same

6    job functions when I went to director of

7    regulatory affairs.

8          I had DEA oversight in regards

9    to compliance with DEA's Section 55, which

10    was the operating procedures for all things

11    DEA, and so that also included the suspicious

12    order monitoring program within it as well,

13    which was based on the previous working group

14    from the Suspicious Order Task Force that

15    McKesson was involved with prior to my

16    arrival.  So that product, that result of

17    that meeting was developed into the

18    Section 55.

19         So I worked with our DC

20    managers to ensure that they were in

21    compliance with the Section 55 requirements,

22    including the suspicious order aspect of it.

23    I audited them as well and worked with them

24    with any issues that they may bring to my

25    attention, and I also worked on the ARCOS

Highly Confidential - Subject to Further Confidentiality Review

1    part of it and training the associates there

2    at the facilities in theft and loss reports

3    and sometimes investigations.

4              Also, I mentioned the audits, I

5    conducted the DEA audits as well as other

6    regulatory audits for the operations.  In

7    addition to the DEA responsibilities, I also

8    had responsibilities under the waste

9    management or environmental aspect of it for

10   EPA, also for hazardous materials for DOT and

11   FAA transportation aspects of it; for

12   registrations, including the DEA

13   registrations for our facilities, and our

14   state licensures and state-controlled

15   substance licensures for our facilities.

16             I also worked with FDA

17   compliance for our facilities as well, and

18   that carried up to about 2006.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15    Q.    Now, I interrupted you when you

16    were talking about your responsibilities as

17    the director of regulatory affairs.  What

18    were your responsibilities between the years

19    2006 to 2008?

20    A.    I still had the same

21    responsibilities, with additional

22    responsibilities as it related to working

23    with our DC managers on identified customers

24    by the DEA and then starting to develop the

25    LDMP processes and crafting the SOP, which

Highly Confidential - Subject to Further Confidentiality Review

```
 1    then developed into the CSMP.

 2         Q.     So you worked on the

 3    development of the LDMP and then the

 4    development of the CSMP.  Is that right?

 5         A.     Correct.

 6         Q.     Now, that -- and do you recall

 7    when the CSMP was released?

 8         A.     I believe it was 2008.

 9         Q.     Okay.  And after 2008, after

10    the release of the CSMP, what were your

11    responsibilities as a director of regulatory

12    affairs at McKesson?

13         A.     I still helped to work with the

14    SOPs, but the regional directors came onboard

15    and so they managed the correlation with the

16    DCs, their respective DCs in those regions as

17    it relates to the CSMP processes and

18    procedures, and I still continued with --

19    again, with the normal DEA audits and then

20    also continued with my other responsibilities

21    under FDA and HAZMAT and EPA.

22         Q.     Now, do you recall -- do you

23    recall who your supervisors were?  Let's go

24    ahead and take it back in time.  Let's take

25    it from about 1997 to the 2006 time period.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Do you recall who your supervisors were?

2         A.    So when I joined in '97, Dan

3    White was my boss and he was a VP of

4    regulatory.  And then after Dan White, I

5    believe it was Don Walker.  Again, I don't

6    remember the exact dates.  I believe it was

7    Don Walker, and then to Ron Bone.  I know I

8    was reporting to Ron Bone in the 2005-2006

9    time frame.

10              Ron left and then I was

11   reporting to Bruce and -- Bruce Russell and

12   Don Walker; and then once Bruce retired, it

13   was directly to Don Walker.  And then finally

14   I reported to Krista Peck.

15        Q.    You testified earlier today

16   that you were familiar with the Controlled

17   Substances Act.

18              Do you remember that testimony?

19        A.    Yes, I do.

20        Q.    Now, during -- and you

21   testified that you were in the regulatory

22   affairs department at McKesson from 1997 all

23   the way to 2016, correct?

24        A.    That's correct.

25        Q.    Now, during your time at

Highly Confidential - Subject to Further Confidentiality Review

```
1    McKesson, are you aware of any changes to the

2    Controlled Substances Act?

3         A.     No, I'm not.

4         Q.     The CSA didn't change at all

5    during your tenure at McKesson?

6              MR. BOGLE:  Object to form.

7         A.     That's correct.

8    QUESTIONS BY MR. EPPICH:

9         Q.     Now, have directives from the

10   DEA changed over that period?

11        A.     Yes, they have.

12        Q.     Can you provide us any examples

13   of how DEA directives have changed while you

14   were at McKesson?

15             MR. BOGLE:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 7    QUESTIONS BY MR. EPPICH:

 8         Q.      Mr. Hilliard, are you familiar

 9    with the ARCOS reporting system?

10         A.      Yes, I am.

11         Q.      What is the ARCOS reporting

12    system?

13         A.      It's a reporting system that's

14    put in place way past when I started in the

15    industry, that the DEA runs.  It's run out of

16    headquarters and it's a reporting system for

17    manufacturers and distributors.

18               So manufacturers and

19    distributors have to submit essentially all

20    the raw data for their transactions for

21    Schedule IIs and Schedule III narcotics, and

22    this included all the sales receipts,

23    returns, theft/loss, no activity, if you had

24    no activity for a registrant during the

25    month.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   So it had monthly reporting

 2    requirements for every registrant that's a

 3    manufacturer or distributor.

 4         Q.     So McKesson has to submit its

 5    sales data to the DEA as a part of this ARCOS

 6    reporting requirement?  Is that correct?

 7                   MR. BOGLE:  Object.  Object to

 8         form.

 9         A.     That's correct.

10    QUESTIONS BY MR. EPPICH:

11         Q.     And do other distributors have

12    to similarly report their sales data for

13    controlled substances to this ARCOS reporting

14    system?

15                   MR. BOGLE:  Object to form.

16         A.     That's correct.

17    QUESTIONS BY MR. EPPICH:

18         Q.     Does McKesson have access to

19    other distributors' data that's reported to

20    ARCOS?

21         A.     No, they don't.  We asked for

22    it.

23         Q.     Who has access to the ARCOS

24    reporting data?

25         A.     Only the DEA.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Did McKesson have the ability

 2     to know -- let me strike that.
```

```
17     QUESTIONS BY MR. EPPICH:

18          Q.      You may recall a few moments

19     ago Mr. Bogle asked you some questions about

20     Exhibit 27.  Do you have Exhibit 27 in front

21     of you?

22          A.      Yes, I do.

23          Q.      Now, Exhibit 27 is titled the

24     Administrative Memorandum of Agreement.

25                  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      I see it.

2          Q.      Mr. Bogle had you turn to

3    page 3 of this document, which is Bates

4    ending 355352.

5          A.      I see that.

6          Q.      Do you remember that, sir?

7          A.      Yes, I do.

8          Q.      And he read Section 2,

9    Acceptance of Responsibility, to you.

10                 Do you remember that testimony?

11         A.      Yes, I do.

12         Q.      Now, about halfway down this

13   paragraph, the paragraph reads:  McKesson

14   acknowledges that, at various times during

15   the period from January 1, 2009, up through

16   and including the Effective Date of this

17   Agreement, it did not identify or report to

18   DEA certain orders placed by certain

19   pharmacies which should have been detected by

20   McKesson as suspicious based on the guidance

21   contained in the DEA Letters and -- about the

22   requirements set forth in 21 C.F.R.

23   1307.174(b) and 21 U.S.C. 842(a)(5).

24                 Do you see that, sir?

25         A.      Yes, I see it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Now, before your deposition
 2    today, had you ever seen Exhibit 27?
 3          A.      No, I haven't.
 4          Q.      And while you were at McKesson,
 5    did anyone ask you to investigate any of the
 6    pharmacies' alleged activity that's described
 7    in this document for this period January 1,
 8    2009, to the date of this agreement?
 9          A.      No.
10          Q.      Do you have any knowledge about
11    the allegations described in Exhibit 27?
12          A.      Not that I recall.
13          Q.      If you could turn to
14    Exhibit 26.  Mr. Bogle introduced Exhibit 26
15    to you.
16                  Do you remember that?
17          A.      Yes, I do.
```

Highly Confidential - Subject to Further Confidentiality Review



6        Q.    If we could turn to Exhibit 25.

7   Do you have that one in front of you?

8        A.    Yes, I do.

22        Q.    Thank you.

23        We mentioned -- you discussed

24   earlier, testified earlier with Mr. Bogle

25   about the LDMP and the CSMP program.



```
 1              Do you remember that testimony?

 2        A.    Yes, I do.

17   QUESTIONS BY MR. EPPICH:

18        Q.    You talked briefly earlier

19   about the evolution of the CSMP.

20              Do you remember that testimony?

21        A.    I believe so.
```



17      Q.      Thank you, Mr. Hilliard.

18              Mr. Hilliard, you worked at

19      McKesson for over 20 years.  How would you

20      describe McKesson's culture in the area of

21      compliance and regulatory affairs?

22      A.      I enjoyed working at McKesson

23      and working with my colleagues.  I know that

24      myself and my colleagues always worked with

25      the utmost integrity and always believed in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what we were doing and strived to do the

 2    right thing, and as they brought new folks in

 3    and I worked with some of them, they too were

 4    on the same page and had the same goals that

 5    we had.

 6         Q.    Thank you, Mr. Hilliard.

 7              MR. EPPICH:  I have no further

 8         questions.

 9              MR. BOGLE:  I've just got a few

10         follow-ups.  It's your call,

11         Mr. Hilliard.  If you're okay looking

12         straight ahead, I've probably got like

13         six or seven questions for you.

14              THE WITNESS:  That's fine.

15              MR. BOGLE:  If you want me to

16         move back over there, I really don't

17         care.

18              THE WITNESS:  That's fine.

19              MR. BOGLE:  You good?  Okay.

20         Just -- Chris is going to tell you to

21         look straight ahead.  Don't look at

22         me, which is probably easy for you to

23         do.

24              All right.  I'm ready.

25                   --oOo--
```

Highly Confidential - Subject to Further Confidentiality Review

1                    FURTHER EXAMINATION

2       QUESTIONS BY MR. BOGLE:





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2    QUESTIONS BY MR. BOGLE:

3         Q.    Yeah.  So I'm not talking about

4    the CSA.  I'm talking about, again, what a

5    good company would do.

6              Do you think it would be a bad

7    thing for McKesson, in an attempt to be a

8    good corporate citizen, to at all times know

9    what its customers were doing with the

10   opioids it was distributing to them?

11             MR. EPPICH:  Object to the

12        form; asked and answered.

13        A.    We had processes in place to

14   comply with the CSA, and I can't specifically

15   speak to everybody in McKesson.

16   QUESTIONS BY MR. BOGLE:

17        Q.    Okay.  And I'm not -- okay.

18   Let me ask it to you this way:  Do you think,

19   as Gary Hilliard, director of regulatory

20   affairs for nearly 20 years at McKesson,

21   that -- is your personal belief that it would

22   be a bad thing for McKesson to know what its

23   customers were doing with opioids McKesson

24   was distributing to them?  What is your

25   personal opinion?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Object to the

 2            form; asked and answered.

 3            A.      As I say, we believed that we

 4       were doing what was required, and we had

 5       means to investigate and look into our

 6       customers and their business activities.

 7       QUESTIONS BY MR. BOGLE:

 8            Q.      Would it be a bad thing to know

 9       what your customer is doing with the opioids

10       you're giving them?  That's my question.

11                    MR. EPPICH:  Objection, form.

12            Asked and answered.

13            A.      Our customers were registered

14       with the DEA.  We serviced our customers that

15       had DEA registrations and were receiving

16       prescriptions from DEA-registered physicians.

17       We believed we were complying with the CSA

18       requirements.

19       QUESTIONS BY MR. BOGLE:

20            Q.      Okay.  So as long as they were

21       registered with the DEA, that was all you

22       needed to know about your customer, right?

23                    MR. EPPICH:  Objection.

24            Misstates the prior testimony.  Form.

25            A.      Again, we were doing what we
```

Highly Confidential - Subject to Further Confidentiality Review

1    believed was correct under the CSA.

2    QUESTIONS BY MR. BOGLE:

3         Q.    Which was if they had a

4    registration, they were good to go, right?

5              MR. EPPICH:  Objection to form;

6         asked and answered.



Highly Confidential - Subject to Further Confidentiality Review



19              MR. BOGLE:  Okay.  No further

20        questions.

21              MR. EPPICH:  Thank you.

22              Before we get off the record,

23        let me designate the transcript as

24        highly confidential, and we'll read

25        and sign.

```
1                    THE REPORTER:  Thank you, sir.

2                    MR. EPPICH:  Thank you.

3                    THE VIDEOGRAPHER:  Off the

4         record at 4:20.

5                    (Deposition recessed at

6         4:20 p.m.)

7                         --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         CERTIFICATE
 2
 3              I, SUSAN PERRY MILLER, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter, Certified Court Reporter and Notary
      Public, do hereby certify that prior to the
 5    commencement of the examination, GARY
      HILLIARD was duly sworn by me to testify to
 6    the truth, the whole truth and nothing but
      the truth;
 7              That pursuant to Rule 30 of the
      Federal Rules of Civil Procedure, signature
 8    of the witness was reserved by the witness or
      other party before the conclusion of the
 9    deposition;
10              That the foregoing is a verbatim
      transcript of the testimony as taken
11    stenographically by and before me at the
      time, place and on the date hereinbefore set
12    forth, to the best of my ability.
13              I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18
19    _____
      Susan Perry Miller
20    CSR-TX, CCR-LA, CSR-CA-13648
      Registered Diplomate Reporter
21    Certified Realtime Reporter
      Certified Realtime Captioner
22    NCRA Realtime Systems Administrator
      Notary Public, State of Texas
23    My Commission Expires 03/30/2020
24
      Dated: 14th of January, 2019
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, GARY HILLIARD, do hereby
      certify that I have read the foregoing pages
 5    and that the same is a correct transcription
      of the answers given by me to the questions
 6    therein propounded, except for the
      corrections or changes in form or substance,
 7    if any, noted in the attached
      Errata Sheet.

 8

 9

10

11

12    _____
       GARY HILLIARD                    DATE

13

14

15

16

17

18    Subscribed and sworn
      to before me this
19    _____ day of _____, 20_____.
20    My commission expires:_____
21

      _____
22    Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    __ __ __ __ __ __

2                         ERRATA


                    __ __ __ __ __ __

3

4      PAGE   LINE   CHANGE

5      _____  _____  _____

6      REASON: _____

7      _____  _____  _____

8      REASON: _____

9      _____  _____  _____

10     REASON: _____

11     _____  _____  _____

12     REASON: _____

13     _____  _____  _____

14     REASON: _____

15     _____  _____  _____

16     REASON: _____

17     _____  _____  _____

18     REASON: _____

19     _____  _____  _____

20     REASON: _____

21     _____  _____  _____

22     REASON: _____

23     _____  _____  _____

24     REASON: _____

25                    __ __ __ __ __ __
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

                            __ __ __ __ __ __
 2

 3      PAGE      LINE

 4      _____     _____     _____

 5      _____     _____     _____

 6      _____     _____     _____

 7      _____     _____     _____

 8      _____     _____     _____

 9      _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24

25
```