```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION,              )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES               )   Polster
                              )
 7
 8                   __ __ __
 9           Friday, January 11, 2019
                     __ __ __
10
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW
                     __ __ __
12
13
14
15   Videotaped Deposition of DEBBIE HODGES, held
     at 4206 South J.B. Hunt Drive, Rogers,
16   Arkansas, commencing at 8:15 a.m., on the
     above date, before Debra A. Dibble, Certified
17   Court Reporter, Registered Diplomate
     Reporter, Certified Realtime Captioner,
18   Certified Realtime Reporter and Notary
     Public.
19
20
21
                     __ __ __
22
           GOLKOW LITIGATION SERVICES
23     877.370.3377 | fax 917.591.5672
              deps@golkow.com
24
25
```

Page 2

```
 1  A P P E A R A N C E S:
 2  CARELLA, BYRNE, CECCHI, OLSTEIN,
    BRODY & AGNELLO
 3  BY:  MICHAEL A. INNES, ESQUIRE
         minnes@carellabyrne.com
 4       ZACHARY S. BOWER, ESQUIRE
         zbower@carellabyrne.com
 5  5 Becker Farm Avenue
    Roseland, New Jersey 07068-1739
 6  (973) 994-1700.
 7  Counsel for Plaintiffs
 8  JONES DAY
    BY:  TINA M. TABACCHI, ESQUIRE
 9       tmtabacchi@jonesday.com
         PATRICK J. BEISELL, ESQUIRE
10       pbeisell@jonesday.com
11  77 West Wacker
    Chicago, Illinois 60601-1692
12  312-782-1695
13  Counsel for Walmart
14  MARCUS & SHAPIRA, LLP
    (appearing telephonically)
15  BY:  DARLENE NOWAK, ESQUIRE
         dnowak@marcus-shapira.com
16  301 Grant Street
    35th Floor
17  Pittsburgh, Pennsylvania 15219-6401
    (412) 338-4690
18  Counsel for HBC
19  WRIGHT, LINDSEY & JENNINGS, LLP
20  BY:  CALEY B. VO, ESQUIRE
         cvo@wlj.com
21  3333 Pinnacle Hills Parkway
    Suite 510
22  Rogers, Arkansas 72758-8498
    (479) 986-0888
23  Counsel for McKesson
24
25
```

Page 4

```
 1           I N D E X
 2  DEBBIE HODGES                    PAGE
 3  DIRECT EXAMINATION BY MR. INNES      7
 4
 5          E X H I B I T S
 6  No.      Description        Page
 7  Walmart  10-13-17 email from Nick   286
    Hodges 1  Tallman to Debbie Hodges.
 8            Subj: H&W Weekly Update
              Week 37.
 9            WMT_MDL_000002636-2638.
10  Walmart  June 2017 email chain.     311
    Hodges 2  Subj: RE: Thursday, July 6.
11            WMT_MDL_000006197.
    Walmart  October 2017 email chain.  326
12  Hodges 3  Subj: Re: Buzzed.
13            WMT_MDL_000008328.
14
15
    CERTIFICATE                     356
16
    ERRATA                      358
17
    ACKNOWLEDGMENT OF DEPONENT      359
18
    LAWYER'S NOTES              360
19
20
21
22
23
24
25
```

Page 3

```
 1  ARNOLD & PORTER KAYE SCHOLER, LLP
    (appearing telephonically)
 2  BY:  WREDE SMITH
         wrede.smith@arnoldporter.com
 3  777 South Figueroa Street
    44th Floor
 4  Los Angeles, California 90017-5844
    (202) 942-5000
 5  Counsel for Endo Health Solutions
    Inc.; Endo Pharmaceuticals Inc.; Par
 6  Pharmaceuticals, Inc.; Par
    Pharmaceutical Companies, Inc.
 7  formerly known as Par Pharmaceutical
    Holdings, Inc.
 8
 9  BARBER LAW FIRM, LLP
    (appearing telephonically)
10  BY:  J. CARTER FAIRLEY
         cfairley@barberlawfirm.com
11  425 West Capitol Avenue
    Suite 3400
12  Little Rock, Arkansas 72201
    (501) 707-6182
13  Counsel for Cardinal Health, Inc.
14
    REED SMITH, LLP
15  BY:  RYAN K. BLAKE, ESQUIRE
         rblake@reedsmith.com
16  Three Logan Square, 1717
    Arch Street, Suite 3100
17  Philadelphia, PA, 19103
    (215) 851-8100
18  Counsel for AmerisourceBergen
19
20  ALSO PRESENT:
21  Jennifer B. Bechet
    Senior Associate Counsel
22  Walmart, Inc.
23  THE VIDEOGRAPHER:
24  Chris Ritona
25  GOLKOW LITIGATION SERVICES
```

Page 5

```
 1           PROCEEDINGS
 2       (January 11, 2019 at 8:05 a.m.)
 3       THE VIDEOGRAPHER:  We are now
 4  on the record.  My name is
 5  Chris Ritona.  I'm the videographer
 6  for Golkow Litigation Services.
 7  Today's date is January 11, 2019.  And
 8  the time is approximately 8:06 a.m.
 9  This video deposition is being held in
10  Rogers, Arkansas at Mitchell Williams,
11  4206 South J.B. Hunt Drive, Suite 200,
12  in the matter of National Prescription
13  Opioid Litigation, MDL No. 2804, Case
14  No. 17-MD-2804.  United States
15  District Court, Northern District of
16  Ohio, Eastern Division.  The deponent
17  today is Debbie Hodges.
18       Will all counsel please
19  identify themselves for the record.
20       MR. INNES:  Good morning.  My
21  name is Michael Innes with the law
22  firm of Carella Byrne on behalf of
23  plaintiffs in the MDL.
24       MR. BOWER:  Good morning.
25  Zach Bower, also Carella Byrne, on
```

Highly Confidential - Subject to Further Confidentiality Review

| Page 6 |
|---|

behalf of plaintiffs in the MDL.

MR. VO: Caley Vo, Wright Lindsey & Jennings on behalf of McKesson.

MR. FAIRLEY: Carter Fairley from the Barber Law Firm on behalf of Cardinal Health.

MS. BECHET: Jennifer Bechet, senior associate counsel at Walmart, Incorporated.

MR. BEISELL: Patrick Beisell, associate at Jones Day on behalf of Walmart.

MS. TABACCHI: Good morning. Tina Tabacchi, Jones Day, on behalf of defendant Walmart and the witness.

THE VIDEOGRAPHER: Will all counsel on the conference call please identify themselves.

MR. SMITH: This is Wrede Smith from Arnold & Porter representing Endo and Par.

MS. NOWAK: This is Darlene Nowak, Marcus & Shapira, for HBC Services.

| Page 7 |
|---|

MR. BLAKE: This is Ryan Blake with Reed Smith on behalf of AmerisourceBergen.

THE VIDEOGRAPHER: And the court reporter today is Debbie Dibble, and she will now please swear in the witness.

DEBBIE HODGES, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. INNES:

Q. Good morning, Ms. Hodges. I just introduced myself. My name is Michael Innes. I'm with the law firm of Carella Byrne in Roseland, New Jersey. I represent the plaintiffs in this case.

You understand you're under oath, correct?

A. Correct.

Q. You may have to speak up so the folks on the phone can hear you.

Have you ever testified under oath before?

A. Yes.

| Page 8 |
|---|

Q. You understand that even though you're in a law office today, that the testimony you give under oath here is subject to the same penalty of perjury as if you were testifying in a court of law?

A. Yes.

Q. I'm going to assume you understand the questions that I ask you unless you tell me that I don't understand them that. Fair?

A. Yes. If I don't understand them, I'll ask.

Q. Thank you. Is there anything that would prevent you from thinking clearly today?

A. No.

Q. Is there anything that would prevent you from testifying truthfully today?

A. No.

Q. What, if anything, did you do to prepare for this deposition today?

A. So counsel -- counsel and I had a session the day before yesterday, a brief session, and then we prepared yesterday as well. And then sometime -- sometime before

| Page 9 |
|---|

the first of the year, we briefly met and prepared.

Q. Okay. Let's take that in reverse order. The time before the first of the year. Was that an in-person meeting or by telephone?

A. There was an in-person meeting.

Q. And was that at your offices?

A. It was here in Bentonville.

Q. And was that at a law office in Bentonville?

A. It was here in Bentonville. I don't recall where it was, the location.

Q. You don't recall the address of that meeting?

A. No. I don't recall the location.

Q. Okay. Was it in a conference room?

A. I don't recall the location.

Q. Do you remember who attended a meeting?

A. Sure. It was Tina, myself, Patrick.

Q. What's Patrick's last name?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A.    I don't know.
2    Q.    Is it the Patrick that's
3  sitting at counsel table?
4    A.    It is.  It is.
5    Q.    Thank you.
6          Anyone else other than
7  yourself, Tina, or Patrick attend that
8  meeting?
9    A.    There were a couple of Walmart
10  attorneys that came in and out, but ...
11          And I couldn't tell you who
12  their names were.
13    Q.    How are you certain that they
14  were Walmart attorneys if you did not know
15  their names?
16    A.    They identified themselves, and
17  they gave their names.  I just can't -- I
18  don't recall their names.
19          MS. TABACCHI:  I can represent
20    to you, Michael, that there's been
21    nobody other than counsel in any of
22    these meetings.
23          MR. INNES:  Thank you, Tina.
24    Q.    (BY MR. INNES)  Approximately
25  how long was that first session?

Page 11

1    A.    It was a few hours.
2    Q.    During that session did you
3  review any documents?
4    A.    No, I don't believe I did.
5    Q.    Did you review any deposition
6  testimony in this case?
7    A.    No.
8    Q.    Did you review any court
9  documents?
10    A.    I don't -- no.
11    Q.    Do you not recall or do you
12  just not know?
13    A.    No, I said no.
14          MS. TABACCHI:  I think that was
15    no.  N-O.
16          THE WITNESS:  Right, it was.
17    It was no.
18    Q.    (BY MR. INNES)  When was the
19  date of the second session that you met with
20  counsel?
21    A.    It was Wednesday of this week.
22    Q.    Okay.  And who attended that
23  session?
24    A.    Tina, Patrick, Jennifer, and
25  there was another Walmart attorney that

Page 12

1  dropped in for a bit.
2    Q.    And do you know Jennifer's last
3  name?
4    A.    I don't.
5    Q.    Is Jennifer here today?
6    A.    Correct, she is.
7    Q.    And Jennifer is seated at the
8  end of the table?
9    A.    She is.
10    Q.    And you said there was one
11  other Walmart attorney that attended?
12    A.    Mm-hmm.  And I believe it was
13  Rob.  But I don't know Rob's last name.
14    Q.    I'll just take you to the third
15  and final session.
16          Well, strike that.
17          How long was the second
18  session?
19    A.    It was four hours,
20  approximately.
21    Q.    And where did that occur?
22    A.    It occurred in the -- a
23  conference room.
24    Q.    At Walmart?
25    A.    Correct.

Page 13

1    Q.    And what's -- which -- what's
2  Walmart's address?
3    A.    It's on Walton Boulevard.
4    Q.    The location on Walton
5  Boulevard?
6    A.    Correct.
7    Q.    And the final session, the one
8  the day before yesterday?
9    A.    Same location.
10    Q.    And what was the date of that
11  session?
12          MS. TABACCHI:  I'm sorry, just
13    to clarify, the final session was
14    yesterday, not the day before
15    yesterday.
16          MR. INNES:  I'm sorry.
17    Q.    (BY MR. INNES)  What was the
18  date of the final session?
19    A.    It was yesterday.
20    Q.    Yesterday?
21    A.    Yes.
22    Q.    And for how many hours did you
23  meet?
24    A.    Approximately six to seven.
25    Q.    And who was present at that

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 meeting?
2 A. Tina, Patrick, Jennifer.
3 Q. The same Jennifer that's seated
4 at the end of the table?
5 A. Yes.
6 Q. Anyone else?
7 A. No.
8 Q. In the second session, did you
9 review any documents?
10 A. Yes.
11 Q. Did you review any deposition
12 testimony?
13 A. No.
14 Q. Did you review any court
15 documents?
16 A. No.
17 Q. In the third session, did you
18 review any documents?
19 A. Yes.
20 Q. Did you review any testimony?
21 A. Did I what?
22 Q. Did you review any deposition
23 testimony?
24 A. No.
25 Q. Did you review any court

Page 15

1 documents?
2 A. No.
3 Q. Have you read the complaint
4 that was filed in this case?
5 A. No.
6 Q. Are you familiar with the
7 allegations in the complaint as they relate
8 to Walmart?
9 MS. TABACCHI: Object to the
10 form. I'm also going to caution the
11 witness not to reveal the substance of
12 any communications with counsel.
13 If you can answer the question
14 without revealing the substance of
15 communications with counsel, you may.
16 Otherwise, I will instruct you not to
17 answer the question if your
18 understanding comes from
19 communications with counsel, to the
20 extent you had one.
21 THE WITNESS: Can you repeat
22 the question?
23 Q. (BY MR. INNES) Other than your
24 conversations with counsel, what is your
25 knowledge, if any, of the allegations in the

Page 16

1 complaint in this case?
2 A. I don't have any knowledge,
3 other than communication with counsel.
4 Q. Do you agree that the
5 United States is currently in an opioid
6 crisis?
7 A. Yes.
8 Q. What's the basis for your
9 agreement with that statement?
10 A. I'm aware of the -- what media
11 publishes.
12 Q. And what media sources
13 specifically?
14 A. I read newspapers.
15 Q. Which newspapers do you read?
16 A. I read the Benton County
17 Gazette, or the Gazette. Democrat-Gazette, I
18 think it's called. Occasionally I read the
19 Wall Street Journal. I read an investment
20 newspaper.
21 Q. What investment newspaper is
22 that?
23 A. I think it's called IBD.
24 Q. Are you aware that between 2000
25 and -- year 2000 and year 2014, unintentional

Page 17

1 drug overdose deaths in the U.S. increased by
2 137 percent?
3 A. No.
4 Q. Can you hear me?
5 MS. TABACCHI: I'm having a
6 little trouble hearing you.
7 MR. INNES: I'll try to speak
8 up.
9 THE WITNESS: When he bends his
10 head down. So just -- I have a
11 hearing disability, and so I can watch
12 your lips, and I'll be able to pick up
13 on it. I have hearing aids. But when
14 you bend your head down, it's very
15 difficult for me to see your lips.
16 MR. INNES: Sure. Thank you
17 very much for pointing that out. And
18 I'll do my best to speak with my face
19 up so you can see my lips moving.
20 Q. (BY MR. INNES) So maybe if I
21 can, just do a little rearranging here.
22 So I'll reread the --
23 A. Sure.
24 Q. -- re-ask the question.
25 Between the year 2000 and 2014,

Page 18

1 are you aware that unintentional drug
2 overdose deaths in the U.S. increased
3 137 percent?
4     A.    I was not aware of that.
5     Q.    Between -- were you aware that
6 between the year 2000 and 2014, there were
7 500,000 deaths due to prescription overdoses?
8     A.    No, I was not aware of that.
9     Q.    Were you aware that in 2015,
10 over 47,000 drug-related -- there were over
11 47,000 drug-related deaths?
12     A.    No.  I was not aware.
13     Q.    Do you recall attending a DEA
14 Distributor Conference in Indianapolis,
15 Indiana on May 10th or 11th of 2016?
16     A.    No.  I did not attend that
17 conference.
18 ████████████████████████████████
19 ████████████████████████████████
20 ███████████████████████████████
21 █████
22     Q.    In preparation for today's
23 testimony, have you looked in your own
24 personal paper files for documents that might
25 be relevant to your testimony today?

Page 19

1     A.    I don't have any paper files.
2     Q.    Have you looked in any
3 electronic files prior to today to help
4 prepare for your testimony?
5         MS. TABACCHI:  Object to the
6     form.
7         THE WITNESS:  I have looked at
8     documents that we reviewed over the
9     past couple of days.
10     Q.    (BY MR. INNES) The documents
11 that you reviewed in preparation for today,
12 the only documents you reviewed, were those
13 with counsel?
14     A.    Correct.
15     Q.    You did not review any
16 documents outside of the presence of counsel?
17     A.    Correct.
18     Q.    Did you endeavor to look in
19 your own electronic or paper files for
20 documents that may help refresh your
21 recollections of any events that might be
22 relevant for today?
23     A.    I did not look at any documents
24 in my files, either paper or electronic.
25     Q.    Thank you.

Page 20

1         My question is slightly
2 different.
3         I'm wondering if you attempted
4 to find such documents.
5     A.    No.
6     Q.    Did you -- prior to today, in
7 preparation for your testimony, did you speak
8 with any colleagues about your testimony?
9     A.    No.
10     Q.    Have you spoken with any family
11 members about the testimony you were about to
12 give?
13     A.    No.
14     Q.    Have you spoken with any
15 non-Walmart employees regarding the testimony
16 that you are about to give today?
17     A.    No.
18     Q.    Ms. Hodges, where did you
19 attend college?
20     A.    Southwest Missouri State
21 University.
22     Q.    And when did you graduate from
23 Southwest Missouri University?
24         MS. TABACCHI:  Object to the
25     form.

Page 21

1     Q.    (BY MR. INNES) Strike that.
2 When did you graduate from Southwest Missouri
3 State University?
4     A.    1985.
5     Q.    Okay.  Did you attend any
6 graduate programs after your graduation from
7 college?
8     A.    I did.
9     Q.    And what school was that?
10     A.    University of Missouri
11 Columbia.
12     Q.    And what degree did you obtain
13 from University of Missouri Columbia?
14     A.    A JD.
15     Q.    And what year was that?
16     A.    1988.
17     Q.    You graduated in 1988?
18     A.    Correct.
19     Q.    Did you sit for a bar exam
20 after your graduation?
21     A.    I did.
22     Q.    In what state did you sit for
23 the bar exam?
24     A.    Missouri.
25     Q.    And what year were you admitted

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  to -- strike that.
2        Were you ever admitted to the
3  state of Missouri?
4     A.    Yes.
5     Q.    And what year was that?
6     A.    I believe it was '90.  '90 or
7  '91.
8     Q.    So you sat for the bar exam
9  in -- Missouri State Bar exam in 1988?
10    A.    Correct.
11    Q.    And your date of admission to
12 the state of Missouri is 1990?
13    A.    '90 or '91.  Correct.
14    Q.    How many times did you sit for
15 the Missouri State Bar exam?
16    A.    Two or three.
17    Q.    Have you taken any other bar
18 exams?
19    A.    No.
20    Q.    Are you admitted in any other
21 states?
22    A.    No.
23    Q.    Upon your admission, did you
24 practice law?
25    A.    No.

Page 23

1     Q.    Let's begin with -- well,
2  strike that.
3        Do you hold any other advanced
4  degrees?
5     A.    No.
6     Q.    So this is a long period of
7  time that we're going to cover now.  I'd like
8  to cover your employment history.
9     A.    Okay.
10    Q.    And I think we can probably
11 move forward in time, but I'd like to get a
12 record of your employment from '91 to
13 present.
14       We might stop along the way.  I
15 might want to investigate a little bit
16 further, based on what you tell me.  But we
17 might be able to keep this moving pretty
18 quickly.
19       After you became admitted to
20 the bar, in 1990 or '91, were you employed?
21    A.    Yes.
22    Q.    And where were you employed?
23    A.    Walmart.
24    Q.    And what was your role at
25 Walmart in that time?

Page 24

1     A.    I was a real estate manager.
2     Q.    Do you recall your title?
3     A.    Real estate manager.
4     Q.    And what was your general job
5  duties as a real estate manager?
6     A.    It was a site selection job.
7  And so we selected the sites for Walmart
8  stores.
9     Q.    And where were you based at
10 that time?
11    A.    Bentonville.  Bentonville,
12 Arkansas.
13    Q.    Thank you.  Did the site
14 selection process take into account the
15 siting of pharmacies?
16       MS. TABACCHI:  Object to the
17    form.
18       THE WITNESS:  It took into
19    account the selection of Walmart
20    buildings.  Walmart stores.
21    Q.    (BY MR. INNES)  Walmart retail
22 locations?
23    A.    Correct.
24    Q.    Did those retail locations
25 include pharmacies?

Page 25

1       MS. TABACCHI:  Object to the
2    form.
3       THE WITNESS:  I -- I don't
4    know.
5     Q.    (BY MR. INNES)  Do you recall
6  if Walmart had retail pharmacies in 1991?
7     A.    I don't recall.
8     Q.    How long did you hold the title
9  of real estate manager?
10    A.    From '88 to -- '88 to '91.
11    Q.    So from 1988 to 1991, you were
12 a real estate manager with Walmart here in
13 Bentonville?
14    A.    Correct.
15    Q.    And during that same period of
16 time, you were enrolled in a JD program; is
17 that correct?
18       MS. TABACCHI:  Object to the
19    form.
20       THE WITNESS:  Incorrect.
21    Q.    (BY MR. INNES)  I'm sorry, I
22 just want to make sure I have the record
23 clear.
24       My mistake.  Let me clean that
25 up so it's okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    You graduated with a JD in
2  1988; is that correct?
3    A.    Correct.
4    Q.    And you passed -- you sat and
5  passed for the bar in '90 or '91.
6    A.    Correct.
7    Q.    And you were admitted in '90 or
8  '91?
9    A.    Correct.
10    Q.    And in 1988, you became a real
11  estate manager for Walmart?
12    A.    Correct.
13    Q.    And you held that title until
14  1991?
15    A.    Correct.
16    Q.    What was your next employment?
17    A.    I -- for approximate -- I went
18  out to the store -- and I think they called
19  me a trainee -- but long story short, it was
20  much like an assistant manager job in the
21  store for eight months or so.
22    Q.    And when you refer to "store,"
23  that's a Walmart retail location?
24    A.    Correct.
25    Q.    In your role, in that assistant

Page 27

1  manager role, did you have any duties as it
2  related to -- strike that.
3    In that location, was there a
4  pharmacy?
5    A.    There was.
6    Q.    And in your role as an
7  assistant manager, did you have any duties
8  relating to that pharmacy?
9    A.    So my role was not considered
10  an assistant manager.  My role was considered
11  a trainee.  I said it was like
12  responsibilities of an assistant manager.
13    And then to answer your
14  question, no, I did not have any
15  responsibility as it relates to the pharmacy.
16    Q.    Thank you.
17    And after eight months as a
18  trainee, what was your next employ?
19    A.    I was in merchandising as a
20  buyer.
21    Q.    And your role as a buyer in
22  merchandising, was that back at the home
23  office?
24    A.    Correct.
25    Q.    And how long did you hold that

Page 28

1  role?
2    A.    I held various roles in
3  merchandising.  So that first role was
4  probably less than a year, probably less than
5  six months, that first role.
6    Q.    Okay.  In that first role, what
7  were the products that you were -- strike
8  that.
9    What was your -- can you
10  describe your role?
11    A.    In the very first role in
12  merchandising, it was menswear.  And it was
13  ball caps that I bought.
14    Q.    All right.  We can talk about
15  that off-line.
16    Following your role as a -- in
17  merchandising as a buyer of ball caps, what
18  was your next role?
19    A.    It was a buyer in what we call
20  the infant department.
21    Q.    In that role in the infant
22  department, what, if any, medical products
23  did you purchase?
24    A.    None.
25    Q.    Were you primarily purchasing

Page 29

1  apparel for infants?
2    A.    I purchased apparel.
3    Q.    How long were you in that role?
4    A.    Approximately three to four
5  years.
6    Q.    Okay.  After your role in
7  merchandising as a buyer for infants, what
8  was your next role?
9    A.    It was a buyer in ladies' wear.
10    Q.    And how long were you in that
11  position?
12    A.    Approximately two, two and a
13  half years.
14    Q.    And what was your next role?
15    A.    It was a buyer in cosmetics and
16  skin care.
17    Q.    And what was your role after
18  that?
19    A.    I had a -- I was promoted to a
20  DMM in cosmetics and skin care.
21    Q.    Just for the record, what does
22  DMM stand for?
23    A.    Divisional merchandise manager.
24    Q.    So you're no longer a buyer,
25  but you're a divisional merchandise manager?

Page 30

1    A.   Correct.
2    Q.   Did your responsibilities
3 change at that point?
4    A.   Yes, they did.
5    Q.   And what was your role or
6 function as a divisional merchandise manager?
7    A.   It was to oversee buyers that
8 bought product for the cosmetic and skin care
9 business.
10    Q.   And how -- approximately how
11 long did you hold that title?
12    A.   Approximately three and a half,
13 four years.
14    Q.   And what was your next
15 position?
16    A.   It was in supply chain, and it
17 was position of vice president over safety
18 and compliance of supply chain.
19    Q.   Approximately what year did you
20 begin in that role?
21    A.   I don't recall the year. I'd
22 have to do a math problem and figure it out,
23 but I don't recall the year.
24    Q.   Maybe we can figure this one
25 out together. So in '91, you're a real

Page 31

1 estate manager.
2    A.   From '88 to '91.
3    Q.   Right.
4    A.   Correct.
5    Q.   And then from approximately '91
6 to maybe '92, you're a trainee assistant?
7    A.   So collectively in
8 merchandising, I've spent about 15 years.
9    Q.   Okay. So does that help you?
10    A.   15 years, and if I started in
11 '88 -- '98 -- probably -- approximately 2004,
12 if my math is right.
13    Q.   So approximately 2004, you take
14 on the role of supply chain vice president,
15 safety and compliance.
16    A.   Correct.
17    Q.   And what were your
18 responsibilities in that role?
19    A.   It was a safety -- it was to
20 lead the asset protection team.
21    Q.   And what assets were you
22 protecting in that role?
23    A.   The -- I wasn't protecting, but
24 it was to lead the team that protected. And
25 we called it asset protection, safety and

Page 32

1 compliance.
2    Q.   Okay. And what products was
3 that team responsible for, if any?
4    A.   Products in the general
5 distributions -- or grocery distribution
6 center and regional distribution center and
7 apparel distribution center.



Page 33

9    MS. TABACCHI: Object to the
10 form.
11    Q.   (BY MR. INNES) And I'll just
12 say this now before we get too far. We might
13 have sort of rapid-fire, faster exchanges.
14 If you can just pause, let your attorney
15 interpose an objection.
16    A.   Yes, I got in a little hurry,
17 didn't I?
18    Q.   Yeah. I suffer from the same
19 thing as well. So I will try to keep my pace
20 at a reasonable level so I don't egg you on.
21    The -- okay. So for how long
22 did you hold the role of vice president,
23 safety and compliance in supply chain?
24    A.   Approximately three years.
25    Q.   So 2007 time period?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.    Correct.
2    Q.    What role did you take on after
3 vice president, safety and compliance?
4    A.    It was over operations, so vice
5 president of operations over the Great Lakes.
6    Q.    I'm sorry, let me cycle back to
7 your prior role as the vice president in
8 safety and compliance.
9         Who did you report to in 2004?
10   A.    Johnny Dobbs.
11   Q.    And for the record, do you --
12 can you spell Mr. Dobbs's last name?
13   A.    I think it's -- I think it's
14 D-O-B-B-S.
15   Q.    And during that timeframe, how
16 many people reported directly to you?
17        MS. TABACCHI:  Object to the
18 form.
19        Sorry, are you talking about
20 2004?
21        MR. INNES:  Yes.
22        THE WITNESS:  Approximately
23 six?
24   Q.    (BY MR. INNES)  And in 2005,
25 who did you report to?

Page 35

1    A.    When I was over operations?  Is
2 that your question?
3    Q.    In 2005, you held the title
4 supply chain vice president, safety and
5 compliance; is that right?
6    A.    In 2000 --
7    Q.    '5?
8    A.    '5.  Correct.
9    Q.    Johnny Dobbs?
10   A.    Johnny Dobbs.
11   Q.    And was Mr. Dobbs also -- did
12 you report to Mr. Dobbs in 2006 as well?
13   A.    Yes.
14   Q.    And between 2004 and 2006, in
15 your role as a vice president, I think your
16 testimony is that for a portion of that time,
17 approximately six folks reported directly to
18 you.
19   A.    Correct.
20   Q.    Was that approximately the same
21 number of folks over the entire period of
22 time that you held that role?
23        MS. TABACCHI:  Object to form.
24        THE WITNESS:  Correct.
25   Q.    (BY MR. INNES)  So now let's

Page 36

1 move forward to 2007.  You're the vice
2 president of -- well, I know I asked this
3 question again, but let's get it right for
4 the record.
5         In 2007, what was your title?
6    A.    After the position of safety
7 and compliance, I took the job of vice
8 president over operations of Great Lakes.



Page 37

23   Q.    Does a regional distribution
24 facility -- strike that.
25        In your role as a VP of



Page 38

1  operations for the Great Lakes region, what,
2  if any, responsibility did you have for the
3  distribution of Schedule II substances?
4      A.    None.
5      Q.    During your time as a VP of
6  operations of the Great Lakes region, did
7  Walmart ever conduct training?
8          MS. TABACCHI:  Object to the
9      form.
10         THE WITNESS:  Can you be more
11     specific as it relates to training?
12     Q.    (BY MR. INNES)  Did you ever
13  attend any training as the vice president of
14  operations for Great Lakes related to your
15  role?
16     A.    So clarification.  Are you
17  talking internal training?  External
18  training?
19     Q.    Yeah, I think I'm going to
20  withdraw it.  That's a horrible question.
21     A.    What?
22     Q.    That's a horrible question.
23  I'm going to withdraw it.  We'll move on.
24     A.    Okay.
25     Q.    Where were you based as a vice

Page 39

1  president of operations for Great Lakes?
2      A.    Detroit.  Livonia, to be
3  specific.
4      Q.    How do you spell that name?
5      A.    I don't know.  Livonia,
6  Michigan.
7      Q.    And Livonia is in proximity,
8  close proximity to Detroit?
9      A.    Correct.
10     Q.    Now, you said you were the vice
11  president of operations for the Great Lakes
12  region.  Were there other vice presidents
13  for -- I'm sorry, strike that.
14         What other regions are there
15     for Walmart?
16         MS. TABACCHI:  Object to the
17     form.
18         THE WITNESS:  There are other
19     regions.  I can't name them all, but
20     there are other regions.

Page 40

Page 41

Highly Confidential - Subject to Further Confidentiality Review



Page 42

Page 44

20     Q.    (BY MR. INNES) So did your
21  title change at any time after 2007?
22     A.    At any time after 2007.  From
23  now to present -- or from 2007 to present?
24     Q.    That's a fair point.  I
25  appreciate the clarification.

Page 43

Page 45

1       What role did you take on after
2  the vice president, if any?
3     A.    So I had a -- took on --
4  after -- in the chronological that you're
5  talking.
6     Q.    Yes.
7     A.    After the vice president of the
8  Great Lakes, then I was the divisional vice
9  president of Central Plains.
10     Q.    And what year was that?
11     A.    Well, it was right after -- it
12  was two years after the Great Lakes.
13     Q.    So beginning sometime 2009?
14     A.    Correct.  '9 or '10.

Page 46



15    Q.    What position did you take on
16  immediately after the Central Plains role?
17    A.    It was the vice president of
18  supply chain services.
19    Q.    Is that sometime in 2000 --
20  well, you tell me.  What was the date that
21  you took the --
22    A.    A math problem.  I'm not good
23  at keeping track of that math problem.  So I
24  was four years in operations, and so it was
25  after that.

Page 47

1    Q.    And by "operations," which role
2  are you referring to?
3    A.    I'm referring to the
4  Great Lakes and Central Plains jobs.
5    Q.    Okay.  I'm going to try to help
6  us through the math problem together.  The
7  operations position started in 2007.  You
8  think you were there for about four years
9  over those two roles.  So now we're --
10    A.    A little over, but yes.
11    Q.    So about 2011 --
12    A.    Correct.
13    Q.    -- you take on the vice
14  president of supply chain services?
15    A.    Yes.  Vice president of supply
16  chain services.
17    Q.    And can you describe your
18  responsibilities and duties in that role?
19    A.    It was a solution-based team.
20  And so I managed several solution-based teams
21  predominantly for the flow of merchandise
22  through the RDCs and GDCs.
23    Q.    Okay.  Let's break that down a
24  little bit.  What do you mean by
25  "solution-based team"?

Page 48

1    A.    What I mean is if there were
2  any issues of product coming through the RDC
3  or GDC, I had teams that managed through
4  those -- managed through those issues.
5    Q.    And what do you mean by --
6    A.    And --
7    Q.    I'm sorry.
8    A.    Go ahead.
9    Q.    I try not to cut you off, so I
10  apologize if I did.
11          If I do cut you off and you
12  want to continue speaking, please do.
13          What do you mean by "issues"?
14    A.    So if a supplier were to ship
15  in product that was more product than the
16  PO -- the PO called for, then my team had to
17  help resolve that.
18    Q.    Does "PO" mean purchase order?
19    A.    Correct.
20    Q.    How long did you hold this role
21  of VP supply chain services?
22    A.    Approximately three and a half
23  years.
24    Q.    Sometime in the area of 2014,
25  2015 is when you ended that position?

Page 49

1    A.    No.  It would have to be -- I
2  had to end that sometime in the neighborhood
3  of '17, wasn't it?  '17, '18, '19 because
4  I've been in this role a year and a half.  So
5  it had to be sometime in that neighborhood of
6  '17.
7    Q.    Maybe I can help us out here.
8    A.    Yeah.
9    Q.    So what's the next role that
10  you took on?
11    A.    So then the next role is vice
12  president over pharmacy.  So I went from the
13  supply chain services to pharmacy.
14    Q.    Okay.
15    A.    Network pharmacy.  And it
16  wasn't just pharmacy, it's health and
17  wellness.  So health and wellness and print
18  solutions.
19    Q.    Okay.  Is that your current
20  title?
21    A.    Correct.
22    Q.    I have your current title as
23  vice president, health and wellness, PM DC
24  supply chain.
25    A.    Right.  So that's print

Page 50

1  solutions.
2      And I don't know what PM DC
3  stands for, but it's the old nomenclature for
4  print solutions.
5      Q.  So anytime I see PM DC --
6      A.  It's print solutions.
7      Q.  Okay.  They're synonymous?
8      A.  Correct.
9      Q.  Thank you.
10      That might help us out later.
11  I appreciate that.
12      A.  Okay.
13      Q.  So vice president, health and
14  wellness, PM DC supply chain.
15      A.  Correct.
16      Q.  Is it better for me to refer to
17  that as "vice president, health and wellness,
18  print solutions"?
19      A.  It's either one is fine.
20      Q.  Okay.
21      Did you take on that position
22  in June of 2017?  Is that correct?
23      A.  That is correct.
24      Q.  So now I just want to make sure
25  I have the timeline right.

Page 51

1      So immediately prior to your
2  current title, you were the vice president of
3  supply chain services?
4      A.  Correct.
5      Q.  Okay.  And we believe that ran
6  from approximately 2011 until June of '17?
7      A.  There's something not right
8  with that math.  Because I -- it was only
9  about three and a half years.  So we'll have
10  to back up through there.
11      Q.  Well, maybe we're missing a
12  role.
13      A.  I don't think we're -- we
14  haven't missed any roles.
15      Q.  Okay.
16      A.  We might have -- I don't know
17  that we've added the math up correctly.  I
18  haven't been -- I don't have a tally sheet
19  here, but ...
20      Q.  Okay.  I'm relying on you for
21  that.  And I'm relying on the time frames
22  you're giving me.
23      A.  So to put an easy math problem,
24  I was in merchandising roughly 15 years.  So
25  I was in real estate roughly three and a

Page 52

1  half, I was in merchandising roughly 15, and
2  I've been in distribution roughly 15.
3      So if you add -- or, let's see.
4  So that's not quite right.  So I was in
5  merchandising and real estate approximately
6  15, and then I've been in supply chain
7  approximately 13 to 15, I guess.
8      Q.  So all in, somewhere between 28
9  and 30 years as a Walmart employee?
10      A.  I just hit my 30-year, right.
11      Q.  All right.  Congratulations.
12      A.  So there's a math problem.
13      Q.  There's a math problem.  We're
14  doing algebra at this point.
15      A.  A little complicated.
16      Q.  All right.  So let's go back to
17  the title you had immediately before your
18  present title.
19      A.  Okay.
20      Q.  And that's the vice president
21  of supply chain services.
22      A.  Correct.
23      Q.  Were there any regional
24  limitations on that role or was that a
25  national role?

Page 53

1      A.  Were there any -- repeat the
2  question?
3      Q.  Was there --
4      Prior to your role, as you
5  mentioned, you had responsibility over a
6  particular region.
7      I'm wondering if, in the role
8  of vice president of supply chain services,
9  you were also limited to a particular region.
10      A.  No.  It covered all RDCs and
11  GDCs.
12      Q.  And by "all," you mean
13  nationally?
14      A.  Correct.
15      Q.  Were there any international
16  facilities you had --
17      A.  No.



Page 54

5    Q.    In June of 2017, you take on
6  the role of vice president, health and
7  wellness, print solutions.
8    A.    Correct.
9    Q.    What were your job
10 responsibilities -- what are your job
11 responsibilities?
12   A.    It's to oversee the
13 distribution of -- the distribution of the
14 distribution centers.  And it's also to
15 oversee the operation of the optical
16 distribution center.
17   Q.    And are you describing your
18 role present day?
19   A.    Correct.
20   Q.    Okay.  So I want to maybe
21 refocus my question.
22   A.    Okay.
23   Q.    In June of '17, what were your
24 responsibilities?
25   A.    It was to oversee the operation

Page 55

1  of the distribution center.  The
2  distribution -- the pharmacy distribution
3  centers.  And it was to oversee the operation
4  of the optical distribution centers.  And it
5  was to oversee the operation of print
6  solutions.

Page 56

15   Q.    Okay.  Thank you.
16        In response to one of my
17 earlier questions, I think you said the
18 "distribution of the distribution centers."
19   A.    Yes.  I misspoke.
20   Q.    Okay.  All right.
21   A.    I meant to say the "operation
22 of the distribution centers."
23   Q.    Okay.  Thank you.
24        Is it operation of the pharmacy
25 distribution centers?

Page 57

1    A.    Correct.



Highly Confidential - Subject to Further Confidentiality Review







Page 70

22       MR. INNES: We've been going
23 for maybe an hour now, right?
24       THE VIDEOGRAPHER: Hour and 15.
25       MR. INNES: I'm about to jump

Page 71

1 into another long topic. Maybe we
2 take -- you know, take five, ten.
3       I mean, you guys --
4       We can go off the record.
5       THE VIDEOGRAPHER: 9:21. We
6 are off video record.
7       (Recess taken, 9:21 a.m. to
8 9:38 a.m.)
9       THE VIDEOGRAPHER: 9:38. We
10 are on the video record.
11       Q. (BY MR. INNES) Okay.
12 Ms. Hodges, we're back from our first morning
13 break. I just wanted to take the opportunity
14 to go back and cover one area that I missed.
15       You -- I believe your prior
16 testimony is that you've given a deposition
17 before?
18       A. Yes.
19       Q. How many times have you sat for
20 a deposition?
21       A. A couple.
22       Q. Were those all in the same
23 case?
24       A. No.
25       Q. So two separate cases?

Page 72

1       MS. TABACCHI: Object to the
2 form.
3       THE WITNESS: Yes.
4       Q. (BY MR. INNES) I can re-ask
5 the question.
6       By "couple" do you mean two?
7       A. Yes.
8       Q. Do you recall if you've given
9 more than two depositions?
10       A. I don't recall.
11       Q. And I know you have a JD, so
12 just so we're clear, when we're referring to
13 depositions, these are depositions where you
14 were being deposed?
15       A. Correct.
16       Q. Have you taken depositions
17 before?
18       A. No.
19       Q. The first case where you sat
20 for a deposition, when was that? Approximate
21 year?
22       A. Let's see. So I was born in
23 '63.
24       So it was -- '77.
25       Q. And in 1977, you sat for a

Page 73

1 deposition. What was the nature of the case?
2       A. The nature of the case was an
3 insurance claim.
4       Q. And that was an insurance
5 claim -- can you describe that in a little
6 bit more detail?
7       A. Sure. The -- our family had a
8 pet raccoon, and we were moving its house out
9 to our new house, and the neighbor girl came
10 over and pulled the tail of the raccoon. It
11 turned around and bit her. And there was a
12 lawsuit that pursued. (sic)
13       And there were depositions that
14 were pursued by that.
15       Q. So I'm just going to do some
16 quick arithmetic. You sat for a deposition
17 in the raccoon bite case --
18       A. The raccoon bite case, yes,
19 sir.
20       Q. -- at the age of 14?
21       A. 14.
22       Q. Somewhere around that?
23       A. You're right.
24       Q. So you've got early experience
25 with the format of the conversation?



Page 74

1    A.    Early experience.  That's
2  right.
3    Q.    The second case, did that
4  involve a raccoon as well?
5         I'll strike that.
6         The second case you sat for a
7  deposition, what was the nature of that case?
8    A.    There was a real estate case
9  with Walmart.
10   Q.    Okay.  And was Walmart the
11 plaintiff or the defendant in that case?
12   A.    Defendant.
13   Q.    And did this case take place
14 during the time period where you were in the
15 real estate division at Walmart?
16   A.    I don't -- don't know that the
17 case took place while I was in the real
18 estate.  It was about the real estate.
19   Q.    Okay.
20   A.    It was about a deal.
21   Q.    All right.  And what was the
22 exact -- strike that.
23         You were not a party to that
24 litigation, were you?
25         MS. TABACCHI:  Object to the

Page 75

1  form.
2    Q.    (BY MR. INNES)  You were not
3  named as a defendant in that case?
4    A.    No.
5    Q.    Okay.  Let's go back closer to
6  present day.
7         June of 2017 is when you took
8  on the role of vice president, health and
9  wellness, printing solutions; is that right?
10   A.    Correct.

Page 76

Page 77

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 98

1       MS. TABACCHI: I'm just going
2 to object to the form and again
3 caution the witness not to reveal the
4 substance of communications with
5 counsel.
6       You may answer the question if
7 you can do that without revealing a
8 privilege.
9       MR. INNES: Before you answer,
10 I just want to respond to the
11 privilege instruction.
12       I'm not sure that I understand
13 your privilege instruction. She's
14 certainly -- do you want to articulate
15 that a little bit better?
16       MS. TABACCHI: You're asking
17 the witness to share her
18 understanding -- you've been asking a
19 number of questions of an obligation
20 that you consider to be a legal
21 obligation. You're asking the witness
22 about her understanding of a legal
23 obligation that the company had. And
24 to the extent that she has an
25 understanding based on conversations

Page 99

1 with counsel, those communications
2 would be privileged.
3       So I just don't want her to
4 share information that she learned
5 from lawyers.
6       She can answer the question.
7 I'm just trying to protect the
8 privilege of the company.
9       MR. INNES: But you understand
10 that in her role, she is responsible
11 for Walmart -- carrying out Walmart's
12 compliance with --
13       THE WITNESS: No.
14       MR. INNES: -- the Controlled
15 Substances Act.
16       MS. TABACCHI: Okay. Well,
17 there's not a question pending, but I
18 think that's part of the confusion is
19 that you're making some assumptions.
20       MR. INNES: I don't think
21 there's any confusion here at all.
22 But we can take the answer to the
23 question.
24       MS. TABACCHI: You're presuming
25 that she had a compliance obligation.

Page 100

1 I think that's what you just said.
2       MR. INNES: So we have an order
3 in this case from Judge Polster that
4 discusses the metes and bounds of
5 privilege as it relates to suspicious
6 order monitoring. My questions are
7 directed at Walmart's suspicious order
8 monitoring program.
9       MS. TABACCHI: You are free to
10 ask any question about what Walmart
11 did, what Walmart's program was, what
12 Walmart's policies were. I'm just
13 asking that you not ask about
14 conversations between the witness and
15 the lawyers that are protected by the
16 attorney-client privilege.
17       If you want to ask about what
18 Walmart's suspicious order monitoring
19 policies were, process, program, yes.
20 Ask those questions. We're not trying
21 to prevent you from getting that
22 information. We're just not going to
23 have witnesses testify about the
24 conversation with a lawyer.
25       MR. INNES: And I'm not asking

Page 101

1 about conversations with a lawyer.
2       MS. TABACCHI: Okay.
3       MR. INNES: I can preface each
4 one of these questions that I'm not
5 interested in conversations with a
6 lawyer. I'm only interested in her
7 understanding of the obligations that
8 she had to carry out. That's the
9 question.
10       THE WITNESS: So, the question?
11       MS. TABACCHI: Hold on. Wait
12 until he asks you a question.
13       Are you and I finished?
14       MR. INNES: I'm finished,
15 unless you --
16       MS. TABACCHI: No, no, that's
17 fine.
18       MR. INNES: Now I've had a long
19 colloquy. I'm going to have trouble
20 finding this question. Bear with me
21 for a second here.
22       MS. TABACCHI: It's okay. Just
23 wait until he asks you a question,
24 then you can answer it.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 126

13      MS. TABACCHI:  Let us know,
14  Mike, whenever it's a good time to
15  take another break.  If you're in the
16  middle of something, you know, go
17  ahead.
18      MR. INNES:  Let me just ask two
19  questions, see if we can't nail down
20  the rest of this process, and then we
21  can take a break.

Page 127

Page 128

Page 129

21      Q.    And at this point in time,
22  you're aware that the United States is
23  undergoing an opioid crisis; is that right?
24      A.    Yeah.  I think we established
25  that in the very beginning of this





Highly Confidential - Subject to Further Confidentiality Review



Page 138

Page 139

23    MS. TABACCHI:  Michael, we
24  asked for a break a few minutes ago.
25  Are you close?

Page 140

1       MR. INNES:  I'm sorry.  We --
2       MS. TABACCHI:  You were on a
3  roll?
4       MR. INNES:  Yeah, we can take
5  one now.  Yeah, I just got on a roll.
6       THE VIDEOGRAPHER:  10:49.  We
7  are off the video record.
8       (Recess taken, 10:49 a.m. to
9  11:08 a.m.)
10      THE VIDEOGRAPHER:  11:08.  We
11  are on the video record.
12  Q.    (BY MR. INNES)  Okay.
13  Ms. Hodges, we're back on the record.

Page 141

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





22    Q.    Okay.  And at this point you're
23  aware that the country is in an opioid
24  crisis.  That is correct; right?
25    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Page 154

Page 155

Page 156

Page 157

9     Q.     And during this time period,
10 you're aware of the opioid crisis; is that
11 right?
12     A.     Correct.
13     Q.     And did you ever inquire --
14 strike that.



Highly Confidential - Subject to Further Confidentiality Review





Page 166

Page 167

Page 168

Page 169

```
15        MS. TABACCHI:  I'm sorry, could
16   you say that -- could you just repeat
17   that?  I didn't --
18        MR. INNES:  I can rephrase it,
19   if that's the objection.  Or if there
20   is an objection.
21        MS. TABACCHI:  I couldn't hear
22   you.  I'm sorry, I just couldn't hear
23   you.
```

Highly Confidential - Subject to Further Confidentiality Review



**Page 170**

**Page 171**

**Page 172**

12      MS. TABACCHI: Michael, let me
13 know whenever you're ready to break
14 for lunch. I know our food is out
15 there.
16      MR. INNES: Let me see if I
17 can't just close out this line. It
18 might take 15 to 20. Unless you guys
19 are hungry and you want to take a
20 break now, we can do that. It's --
21      MS. TABACCHI: Okay.
22      MR. INNES: I'm leaving it in
23 your hands. However you want to do
24 it.
25      MS. TABACCHI: I mean, if you

**Page 173**

1 have 20 more minutes, I'd just as soon
2 take a break. But if you have a few
3 more minutes --
4      MR. INNES: That's okay. No,
5 we can take a break.
6      MS. TABACCHI: Okay.
7      THE VIDEOGRAPHER: 11:46. We
8 are off the video record.
9      (Recess taken, 11:46 a.m. to
10 12:38 p.m.)
11      THE VIDEOGRAPHER: 12:38. We
12 are on the video record.
13      Q. (BY MR. INNES) Good afternoon,
14 Ms. Hodges. We're back on the record. You
15 understand you're still under oath?
16      A. Correct. Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 218

Page 220

5      MS. TABACCHI:  Mike, whenever
6   you're at a good point for a quick
7   break, let me know.
8      MR. INNES:  Do you want to take
9   five right now?
10     MS. TABACCHI:  Sure.
11     MR. INNES:  Okay.
12     THE VIDEOGRAPHER:  1:31.  We
13  are off the video record.
14     (Recess taken, 1:31 p.m. to
15  1:36 p.m.)
16     THE VIDEOGRAPHER:  1:36.  We
17  are on the video record.

Page 219

Page 221

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Page 254

Page 256

Page 255

Page 257

1    Do you have knowledge of the
2    opioid crisis?
3    A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review



Page 258

Page 259

Page 260

Page 261

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 274

12    MR. INNES:  Did you need --
13    MS. TABACCHI:  Well --
14    THE WITNESS:  I need some
15  water.
16    MS. TABACCHI:  If we can take a
17  short break, when you're -- when you
18  have the right place.  I don't know
19  how much longer you have.  I don't
20  want to throw off your plans.
21    MR. INNES:  Sure.
22    MS. TABACCHI:  But ...

Page 275

Page 276

Page 277

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 282

Page 284

24      MS. TABACCHI:  Mike, just
25  whenever you --

Page 283

Page 285

1          MR. INNES:  I'm sorry, I ran
2      over you.  You asked for a break.  We
3      can go --
4          MS. TABACCHI:  We'll be speedy.
5          THE VIDEOGRAPHER:  2:37.  We
6      are off the video record.
7          (Recess taken, 2:38 p.m. to
8      2:50 p.m.)
9          THE VIDEOGRAPHER:  2:50.  We
10      are on the video record.
11      Q.    (BY MR. INNES)  Okay,
12  Ms. Hodges.  We are back.  I think we'll make
13  one final push here.  Before I begin with
14  some documents I want to ask if -- first of
15  all, are you aware that the trials in this
16  case are scheduled to go forward in Ohio in
17  the first bellwether trials?
18      A.    I'm aware of that.
19      Q.    And would you be willing to
20  come and testify in that trial to tell your
21  story to the jury?
22          MS. TABACCHI:  You can consult
23      with us about the testimony of our
24      Walmart witnesses when there's a
25      pretrial order.  I'm not sure you need



Page 286

1  to ask the witness that question
2  today.
3      MR. INNES:  I'm not asking
4  whether she will or will not come, I'm
5  asking if she's willing to come.
6      THE WITNESS:  It will be
7  determined by counsel whether I should
8  be there or not, I think.
9  Q.    (BY MR. INNES)  Thank you for
10  that.
11      Okay.  So let me hand you
12  what's been marked as Exhibit 1.
13      (Walmart-Hodges Deposition
14  Exhibit 1 was marked for
15  identification.)
16      MR. INNES:  I have copies here
17  for your counsel.
18      Tina, you'll notice that there
19  are hole punches in the side.  Those
20  are not part of the original.  Those
21  are part of the copy job.  You'll see
22  that on all three exhibits.  I
23  apologize for that.  I don't believe
24  that will impact any part of the
25  questions that I need to ask the

Page 287

1  witness or that the witness needs to
2  understand, but I'll let you be the
3  judge of that.
4      Ms. Hodges, when you've had a
5  chance to review the document, please
6  let me know and we can start some --
7  I'll ask my questions.
8      [Document review.]
9      MR. INNES:  If it helps, I can
10  direct your attention to --
11      THE WITNESS:  I was just
12  reading all of it.
13      MR. INNES:  You're more than
14  welcome to.  I'm going to represent to
15  you that I'm only going to ask you
16  questions about the one topic on the
17  page ending in Bates number -- that's
18  the number at the bottom right-hand
19  corner -- 263 --
20      THE WITNESS:  The top what?
21  Q.    (BY MR. INNES)  The bottom
22  right-hand corner.  2637.
23  A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 334

Page 335

Page 336

Page 337

Highly Confidential - Subject to Further Confidentiality Review





Page 342

Page 344

5    MS. TABACCHI:  Do you mind if I
6    just -- I don't -- there were lawyers
7    present at this meeting, and I would
8    appreciate just an opportunity to talk
9    to the client before we talk about the
10   substance of what was discussed in
11   this meeting to make sure that there
12   is no privilege issue.
13        MR. INNES:  We can do that.
14        I'm a little surprised that you
15   haven't talked to her about this
16   meeting yet, but if you'd like to take
17   a few minutes to do so, I'm happy to
18   do it.
19        THE WITNESS:  She hasn't.
20        MS. TABACCHI:  Thank you.
21   We'll be back.
22        THE VIDEOGRAPHER:  3:55.  We
23   are off the video record.
24        (Recess taken, 3:55 p.m. to
25   3:59 p.m.)

Page 343

Page 345

1    THE VIDEOGRAPHER:  3:59.  We
2    are on the video record.
3        MR. INNES:  We're back on the
4    record.  We took a break to allow
5    counsel for Walmart to confer with
6    Ms. Hodges regarding the pending
7    question.  I'll just read back the
8    pending question so you have it.

Highly Confidential - Subject to Further Confidentiality Review



Page 346

Page 348

1  bank; is that correct?
2      A.    Correct.
3      Q.    And it's owned by a member of
4  the Walton family?  Is that --
5      A.    You've got me.
6          I should have said "I don't
7  know" rather than "You've got me."  I don't
8  know.
9      Q.    It's getting late in the day.

Page 347

Page 349

17     Q.    Do you know where
18 Lisa Holland -- strike that.
19         Do you know if Lisa Holland
20 obtained employment elsewhere after Walmart?
21     A.    Yes.
22     Q.    Do you know where she's
23 employed?
24     A.    Arvest.
25     Q.    Arvest?  Arvest is a regional

Highly Confidential - Subject to Further Confidentiality Review



Page 350

Page 351

Page 352

Page 353

19    MR. INNES:  Why don't you just
20    give me a couple minutes.
21        We can go off the record.
22        THE VIDEOGRAPHER:  4:07.  We
23    are off the video record.
24        (Recess taken, 4:07 p.m.
25    4:11 p.m.)



Page 354

1  THE VIDEOGRAPHER: 4:11. We
2  are on the video record.

Page 355

1  Q.  (BY MR. INNES) Okay.
2      MR. INNES: No further
3  questions. Unless you've got
4  questions, I'm fine to end the
5  deposition.
6      MS. TABACCHI: We have no
7  questions, no.
8      Thank you.
9      MR. INNES: All right. Thank
10 you.
11     MS. TABACCHI: We'll reserve
12 signature.
13     THE VIDEOGRAPHER: 4:12 p.m.
14 We are off the record. This concludes
15 the video deposition.
16     (Proceedings recessed at
17 4:12 p.m.)
18     --o0o--
19
20
21
22
23
24
25

Page 356

1
2          CERTIFICATE
    I, DEBRA A. DIBBLE, Registered
3  Diplomate Reporter, Certified Realtime
   Reporter, Certified Realtime Captioner,
   Certified Court Reporter and Notary Public,
4  do hereby certify that prior to the
   commencement of the examination, DEBBIE
5  HODGES was duly sworn by me to testify to the
   truth, the whole truth and nothing but the
6  truth.
7       I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
11      I DO FURTHER CERTIFY that pursuant
   to FRCP Rule 30, signature of the witness
12  was not requested by the witness or other party
   before the conclusion of the deposition.
13      I DO FURTHER CERTIFY that I am
14  neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
15  action, and that I am neither a relative nor
   employee of such attorney or counsel, and
16  that I am not financially interested in the
   action.
17
20  _____
    DEBRA A. DIBBLE, RDR, CRR, CRC
    NCRA Registered Diplomate Reporter
21  NCRA Certified Realtime Reporter
    Certified Court Reporter
22
23  Dated: 15 January 2018
24
25

Page 357

1       INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8       After doing so, please sign the
9  errata sheet and date it.
10      You are signing same subject to
11 the changes you have noted on the errata
12 sheet, which will be attached to your
13 deposition.
14      It is imperative that you return
15 the original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you. If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 358

```
 1          ERRATA
 2  PAGE  LINE  CHANGE
 3  ____  ____  _____
 4          REASON: _____
 5  ____  ____  _____
 6          REASON: _____
 7  ____  ____  _____
 8          REASON: _____
 9  ____  ____  _____
10          REASON: _____
11  ____  ____  _____
12          REASON: _____
13  ____  ____  _____
14          REASON: _____
15  ____  ____  _____
16          REASON: _____
17  ____  ____  _____
18          REASON: _____
19  ____  ____  _____
20          REASON: _____
21  ____  ____  _____
22          REASON: _____
23  ____  ____  _____
24          REASON: _____
25
```

Page 360

```
 1          LAWYER'S NOTES
 2
 3  PAGE   LINE
 4  ____   ____   _____
 5  ____   ____   _____
 6  ____   ____   _____
 7  ____   ____   _____
 8  ____   ____   _____
 9  ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____
25
```

Page 359

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4      I, DEBBIE HODGES, do hereby certify
        that I have read the foregoing pages and that
 5      the same is a correct transcription of the
        answers given by me to the questions therein
 6      propounded, except for the corrections or
        changes in form or substance, if any, noted
 7      in the attached
        Errata Sheet.
 8
 9
10
11
12
        _____
        DEBBIE HODGES              DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  _____
20  Notary Public
21
22
23
24
25
```