Page 1

1                IN THE UNITED STATES COURT

2                NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5              ~~~~~~~~~~~~~~~~~~~~~

6   IN RE:  NATIONAL PRESCRIPTION    MDL NO. 2804

7   OPIATE LITIGATION

8                                Case No. 17-mdl-284

9                                Judge Dan Polster

10

11   This document relates to:

12   The County of Summit, Ohio, et al.,

13        V.

14   Purdue Pharma L.P., et al.,

15   Case No. 1:18-OP-45090 (N.D. Ohio)

16

17              ~~~~~~~~~~~~~~~~~~~~~

18           Videotaped deposition of

19                ERIC HUTZELL

20              January 8, 2019

21                  9:09 a.m.

22                 Taken at:
                Jackson Kelly PLLC
            50 South Main Street Street

23                 Akron, Ohio

24            Wendy L. Klauss, RPR

25

Page 2

1  APPEARANCES:
2
   On behalf of the City of Akron, Summit
3  County, and the Witness:
   Motley Rice LLC
4      ANNIE E. KOUBA, ESQ.
       JAMES W. LEDLIE, ESQ.
5      DANIELLE M. SALERNO, ESQ.
       28 Bridgeside Boulevard
6      Mt. Pleasant, SC  29464
       (843) 216-9000
7      Akouba@motleyrice.com
       Jledlie@motleyrice.com
8      Dsalerno@motleyrice.com
9  On behalf of Cardinal Health, Inc.,
   Co-Liaison Counsel for the Distributor
10 Defendants:
   Williams & Connolly LLP
11     BRAD MASTERS, ESQ.
       725 Twelfth Street, N.W.
12     Washington, DC  20005
       (202) 434-5000
13     Bmasters@wc.com
14 On behalf of Teva Pharmaceutical
   Industries Ltd.:
15     Morgan Lewis, LLP
       WENDY WEST FEINSTEIN, ESQ.
16     MAUREEN K. BARBER, ESQ.
       One Oxford Centre, 32nd Floor
17     301 Grant Street
       Pittsburgh, PA  15219-6401
18     (412) 471-3490
       Wendy.feinstein@morganlewis.com
19     Maureen.barber@morganlewis.com
20 On behalf of Walmart Inc. F/K/A Wal-Mart
   Stores, Inc.:
21     Jones Day
       SHIRLETHIA V. FRANKLIN, ESQ.
22     51 Louisiana Avenue, N.W.
       Washington, D.C.  20001-2113
23     (202) 879-3939
       Sfranklin@jonesday.com
24
25

Page 3

1  APPEARANCES, Continued:
2
   On behalf of Johnson & Johnson and
3  Janssen Pharmaceuticals, Inc.:
       Tucker Ellis, LLP
4      BRENDA A. SWEET, ESQ.
       950 Main Avenue, Suite 1100
5      Cleveland, OH  44113
       (216) 592-5000
6      Brenda.sweet@tuckerellis.com
7  On behalf of the Distributor Defendant
   McKesson Corporation:
8      Covington & Burling LLP
       ASEEM PADUKONE, ESQ.
9      One Front Street
       San Francisco, CA  94111-5356
10     (415) 591-6000
       Apadukone@cov.com
11
12
   On behalf of Endo Health Solutions, Inc.,
13 Endo Pharmaceuticals Inc., Par
   Pharmaceutical, Inc., and Par
14 Pharmaceutical Companies, Inc.,(FKA Par
   Pharmaceutical Holdings, Inc.)
15     Arnold & Porter
       GREGORY L. SCHINNER, ESQ.
16     601 Massachusetts Avenue, N.W.
       Washington, D.C.  20001-3743
17     (202) 942-5000
       Gregory.Schinner@arnoldporter.com
18
   On behalf of Distributor
19 AmerisourceBergen Drug Corporation
   Reed Smith, LLP
20     MICHAEL J. SALIMBENE, ESQ.
       Three Logan Square
21     1717 Arch Street, Suite 3100
       Philadelphia, PA  19103
22     (215) 851-8100
       Msalimbene@reedsmith.com
23     ~ ~ ~ ~ ~
24 ALSO PRESENT:
       Joe VanDetta, Videographer
25     ~ ~ ~ ~ ~

Page 4

1          TRANSCRIPT INDEX
2  APPEARANCES:............................   2
3  INDEX OF EXHIBITS ......................   5
4  EXAMINATION OF ERIC HUTZELL
   By Mr. Masters...........................   16
5  By Ms. Feinstein........................  265
   By Ms. Franklin.........................  304
6
   REPORTER'S CERTIFICATE...................  320
7
   EXHIBIT CUSTODY
8  EXHIBITS RETAINED BY COURT REPORTER
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          INDEX OF EXHIBITS
   NUMBER      DESCRIPTION        MARKED
2
   Exhibit 1   Email with Resume Attached, ..  23
3      Beginning with Bates Label
       Summit 001774240
4
   Exhibit 2   Email Exchange, Beginning ....  63
5      with Bates Label SUMMIT
       001077027
6
   Exhibit 3   Email Exchange Between .......  66
7      Birmingham and Hutzell,
       Beginning with Bates Label
8      SUMMIT 001788704
9  Exhibit 4   Program Evaluation, Deterra ..  97
       Drug Disposal System, 2016,
10     Beginning with Bates Label
       SUMMIT 001776772
11
   Exhibit 5   Opiate Task Force Data ....... 108
12     Dashboard, Beginning with
       Bates Label SUMMIT 001795395
13
   Exhibit 6   Email From Hutzell, with ..... 141
14     Quarterly Stakeholders
       Meeting, March 14, 2018
15     Attached, Beginning with
       Bates Label SUMMIT
16     0008711963
17 Exhibit 7   Email Conversation Between ... 166
       Hutzell, Smalley and Smith,
18     Beginning with Bates Label
       SUMMIT 000885081
19
   Exhibit 8   January 2018 Email Exchange, . 174
20     Beginning with Bates Label
       SUMMIT 001790151
21
   Exhibit 9   February 6, 2018 Email ....... 184
22     Exchange, Beginning with
       Bates Label SUMMIT 001065634
23
   Exhibit 10  November 17, 2017 Email ...... 191
24     Exchange, Beginning with
       Bates Label SUMMIT 001095232
25
   Exhibit 11  February 1, 2017 Email ....... 198

2 (Pages 2 - 5)

Page 6

1    Exchange, Beginning with .....
      Bates Label SUMMIT 000884505
2
     Exhibit 12  Presentation, Opioid ......... 206
3        Epidemic: An Overview in
         Summit County, Bates Label
4        SUMMIT 001742658
5  Exhibit 13  Email Exchange with Report ... 211
         Attached, Beginning with
6        Bates Label SUMMIT 001405605
7  Exhibit 14  Summit County Quick Response . 218
         Team Meeting Report,
8        Beginning with Bates Label
         SUMMIT 001793050
9
     Exhibit 15  Email Exchange with Health ... 224
10       Advisory Attached, Beginning
         with Bates Label SUMMIT
11       001407955
12  Exhibit 16  November 23, 2016 Email, ..... 232
         Subject Drug Overdose Deaths
13       and Opiate-Related Deaths,
         Beginning with Bates Label
14       Summit 001056544
15  Exhibit 17  May 25, 2018 Email Exchange .. 236
         Between Patton and Hutzell,
16       Beginning with Bates Label
         SUMMIT 00097076
17
     Exhibit 18  Email Exchange, Subject ...... 245
18       Opioid Grand Update and a
         Potential QRT Project for
19       This Summer, Beginning with
         Bates Label SUMMIT 000969892
20
     Exhibit 19  Email Exchange, Beginning .... 250
21       with Bates Label SUMMIT
         001401097
22
23
24
25

Page 7

1          INDEX OF VIDEO OBJECTION
2   OBJECT                          PAGE
3   object....................................    20
4   object....................................    22
5   object....................................    23
6   object....................................    27
7   object....................................    31
8   object....................................    33
9   object....................................    35
10  object....................................    40
11  objection..................................    40
12  object....................................    40
13  object....................................    43
14  object....................................    45
15  object....................................    46
16  object....................................    48
17  object....................................    50
18  object....................................    50
19  object....................................    51
20  object....................................    54
21  object....................................    56
22  object....................................    60
23  object....................................    61
24  object....................................    64
25  object....................................    68

Page 8

1   object....................................    71
2   object....................................    74
3   object....................................    76
4   object....................................    77
5   object....................................    78
6   object....................................    79
7   object....................................    80
8   object....................................    82
9   object....................................    83
10  object....................................    83
11  object....................................    86
12  object....................................    91
13  object....................................    93
14  object....................................    94
15  object....................................    95
16  object....................................    96
17  object....................................    96
18  object....................................   100
19  object....................................   104
20  objection..................................   104
21  objection..................................   104
22  objection..................................   104
23  object....................................   105
24  object....................................   107
25  object....................................   114

Page 9

1   object....................................   117
2   objection..................................   118
3   objection..................................   120
4   object....................................   122
5   object....................................   122
6   object....................................   125
7   object....................................   127
8   object....................................   130
9   objection..................................   132
10  object....................................   133
11  object....................................   134
12  object....................................   134
13  object....................................   134
14  objection..................................   135
15  object....................................   136
16  objection..................................   136
17  object....................................   139
18  object....................................   145
19  object....................................   146
20  objection..................................   149
21  object....................................   150
22  object....................................   150
23  object....................................   150
24  object....................................   151
25  object....................................   153

3 (Pages 6 - 9)

Page 10

1 object.................................... 154
2 object.................................... 154
3 object.................................... 154
4 object.................................... 154
5 object.................................... 155
6 object.................................... 155
7 object.................................... 156
8 object.................................... 163
9 object.................................... 167
10 object.................................... 169
11 objection.................................... 170
12 object.................................... 170
13 object.................................... 170
14 object.................................... 171
15 object.................................... 172
16 object.................................... 172
17 object.................................... 179
18 object.................................... 180
19 object.................................... 181
20 object.................................... 181
21 object.................................... 181
22 object.................................... 182
23 object.................................... 187
24 object.................................... 189
25 object.................................... 190

Page 11

1 object.................................... 190
2 object.................................... 195
3 object.................................... 196
4 object.................................... 199
5 object.................................... 200
6 object.................................... 200
7 object.................................... 203
8 object.................................... 205
9 object.................................... 208
10 object.................................... 208
11 object.................................... 210
12 object.................................... 210
13 objection.................................... 213
14 object.................................... 215
15 object.................................... 216
16 object.................................... 217
17 object.................................... 218
18 object.................................... 222
19 object.................................... 223
20 objection.................................... 226
21 object.................................... 226
22 objection.................................... 226
23 object.................................... 227
24 object.................................... 227
25 object.................................... 228

Page 12

1 object.................................... 228
2 object.................................... 229
3 object.................................... 229
4 object.................................... 229
5 object.................................... 230
6 object.................................... 232
7 object.................................... 232
8 object.................................... 234
9 object.................................... 235
10 object.................................... 236
11 object.................................... 238
12 object.................................... 240
13 object.................................... 240
14 object.................................... 240
15 object.................................... 240
16 object.................................... 240
17 object.................................... 241
18 object.................................... 241
19 object.................................... 242
20 object.................................... 242
21 object.................................... 243
22 object.................................... 243
23 objection.................................... 249
24 object.................................... 250
25 object.................................... 250

Page 13

1 objection.................................... 255
2 objection.................................... 256
3 object.................................... 256
4 object.................................... 257
5 object.................................... 259
6 object .................................... 260
7 object.................................... 260
8 object.................................... 261
9 object.................................... 261
10 object.................................... 263
11 object.................................... 264
12 object.................................... 264
13 object.................................... 264
14 object.................................... 269
15 object.................................... 277
16 object.................................... 278
17 object.................................... 281
18 object.................................... 282
19 object.................................... 282
20 object.................................... 283
21 object.................................... 284
22 object.................................... 284
23 objection.................................... 284
24 object.................................... 285
25 object.................................... 291

4 (Pages 10 - 13)

Page 14

1  object.................................... 294
2  object.................................... 297
3  object.................................... 297
4  object.................................... 298
5  object.................................... 299
6  object.................................... 300
7  object.................................... 302
8  object.................................... 303
9  objection................................ 305
10  object.................................... 306
11  object.................................... 306
12  object.................................... 308
13  objection................................ 308
14  object.................................... 309
15  object.................................... 313
16  object.................................... 313
17  objection................................ 313
18  object.................................... 313
19  objection................................ 314
20  object.................................... 315
21  object.................................... 316
22
23
24
25

Page 15

1      THE VIDEOGRAPHER: We are now on
2  the record. The date is January 8, 2019. The
3  time is 9:09 a.m. The caption of this case is
4  In Re: National Prescription Opiate Litigation.
5  The name of the witness is Eric Hutzell.
6      At this time the attorneys present
7  and those attendings remotely will identify
8  themselves and the parties they represent.
9      MR. MASTERS: My name is Brad
10  Masters. I represent Cardinal Health.
11      MS. FEINSTEIN: Wendy West
12  Feinstein, with Morgan Lewis, for the Teva
13  Defendants.
14      MS. FRANKLIN: Shirlethia Franklin,
15  with Jones Day, on before of Walmart, Inc.
16      MS. SWEET: Brenda Sweet, with
17  Tucker Ellis LLP, on behalf of Janssen and
18  Johnson & Johnson.
19      MS. KOUBA: Annie Kouba for County
20  of Summit, City of Akron and the witness, from
21  Motley Rice.
22      MR. LEDLIE: James Ledlie, from
23  Motley Rice, on behalf of the City of Akron,
24  Summit County, and the witness.
25      MS. SALERNO: Danielle Salerno,

Page 16

1  Motley Rice, for the City of Akron and Summit
2  County --
3      MR. SALIMBENE: I can't hear great
4  on the phone, but this is Michael Salimbene for
5  AmerisourceBergen.
6      MR. PADUKONE: Hi. This is Aseem
7  Padukone, from Covington & Burling, on behalf
8  of McKesson Corporation.
9      MR. SCHINNER: Greg Schinner, of
10  Arnold & Porter, on behalf of the Endo and Par
11  Defendants.
12      THE VIDEOGRAPHER: Would the court
13  reporter please swear in the witness.
14      ERIC HUTZELL, of lawful age, called
15  for examination, as provided by the Statute,
16  being by me first duly sworn, as hereinafter
17  certified, deposed and said as follows:
18      EXAMINATION OF ERIC HUTZELL
19  BY MR. MASTERS:
20      THE VIDEOGRAPHER: Hold on one
21  second. I apologize.
22      Off the record, 9:11.
23      (Recess taken.)
24      THE VIDEOGRAPHER: On the record,
25  9:23.

Page 17

1      Q.  Good morning, Mr. Hutzell. I
2  introduced myself off the record. My name is
3  Brad Masters. I represent Cardinal Health.
4      Would you please state your full
5  name for the record.
6      A.  My name is Eric Gerald Hutzell.
7      Q.  And what is your current home
8  address?
9      A.  7415 Westlake Boulevard, Kent,
10  Ohio, 44240.
11      Q.  And which county is that in?
12      A.  Portage County.
13      THE VIDEOGRAPHER: People on the
14  phone, can you please mute on your end, please.
15  We can hear you typing. Thank you.
16      Q.  And have you ever been deposed
17  before?
18      A.  No, I have not.
19      Q.  So let's go over a few ground rules
20  then about how this is going to work before we
21  get underway.
22      First, when I ask a question, your
23  response needs to be audible, okay? This is
24  going to be recorded -- this is being recorded
25  by a court reporter, and nods are not always

5 (Pages 14 - 17)

1   seen through on the transcript.
2       Sometimes I might ask a question
3   that's unclear, I certainly will, and if I
4   catch it, I will reword it myself.  If I ask
5   you a question that you don't understand,
6   however, please feel free to ask for
7   clarification, okay?
8       We will need to be mindful that we
9   don't speak over each other.  So even if you
10  know the question that I'm asking before I
11  finish, please let me finish asking the
12  question so that it can be reflected on the
13  transcript.  Once I have finished, then you can
14  feel free to respond.
15      Sometimes other attorneys in the
16  room or on the phone might make an objection.
17  Just because there is an objection does not
18  mean that you shouldn't answer the question.
19  You should answer every question, unless your
20  attorney instructs you not to answer, okay?
21      Do you understand that you are
22  under oath today?
23      A.   Yes, I do.
24      Q.   And do you know what that means?
25      A.   Yes.

1       Q.   What does that mean, to be under
2   oath?
3       A.   To be under oath, such as the one
4   that this lady had given me, means that I have
5   to tell the truth.
6       Q.   Is there any reason that you might
7   not be able to provide truthful, accurate
8   testimony?
9       A.   No, there is no reason.
10      Q.   When did you first learn that you
11  were going to be deposed in this case?
12      A.   I believe sometime in November.
13      Q.   How did you learn?
14      A.   I got told that there were two
15  lawyers that wanted to talk to me about this
16  case.
17      Q.   Who told you that?
18      A.   Jerry, my supervisor.
19      Q.   Jerry, what's his last name?
20      A.   Craig.
21      Q.   And did you prepare for today's
22  deposition?
23      A.   No, I have not.
24      Q.   You didn't meet with any lawyers in
25  advance of this meeting today?

1       MS. KOUBA:  Object, to the extent
2   that it would ask you to reveal anything you
3   spoke about with your attorneys, on the basis
4   of attorney-client privilege.
5       A.   Sorry.  I didn't understand the
6   question exactly.
7       Q.   So did you meet with any lawyers in
8   preparation for today's meeting?  I'm not
9   asking what you spoke about with those lawyers,
10  just whether or not you met with lawyers in
11  advance of today's meeting?
12      A.   Yes, I did.
13      Q.   How many times?
14      A.   Four, including today.  Four.
15      Q.   Four times.  And how long were each
16  of these meetings -- sorry.
17      How long was the first meeting?
18      A.   Approximately one hour.
19      Q.   And how long was the second
20  meeting?
21      A.   The same length of time.
22      Q.   And the third?
23      A.   Same length of time.
24      Q.   And the fourth?
25      A.   About the same length of time.

1       Q.   When did the first meeting occur?
2       A.   I don't know the exact date, but I
3   believe it was in November.
4       Q.   And who did you meet with?
5       A.   I met with Annie Kouba, and then
6   Anne, the other lawyer from Motley Rice, but I
7   forgot her last name.
8       Q.   Anne Kearse?
9       A.   It might be.  I don't know her last
10  name.
11      Q.   Were there any nonlawyers present
12  in these meetings or in -- sorry.
13      Were there any nonlawyers present
14  in this first meeting?
15      A.   No.
16      Q.   Did you review -- well, the second
17  meeting, when did the second meeting occur?
18      A.   I would say sometimes in December.
19      Q.   And who did you meet with for that
20  second meeting?
21      A.   The same two lawyers.
22      Q.   Any nonlawyers present?
23      A.   No.
24      Q.   When was the third meeting?
25      A.   The third meeting was yesterday.

6 (Pages 18 - 21)

Page 22

1     Q.    And who did you meet with?
2     A.    The lawyers from Motley Rice that
3  are currently present.
4     Q.    Any nonlawyers present?
5     A.    No.
6     Q.    And I think you said the fourth
7  meeting was this morning; is that right?
8     A.    Yes.
9     Q.    Were you ever asked to preserve and
10 not throw away documents, as part of this
11 litigation?
12    A.    No.
13    Q.    Have you deleted and/or thrown away
14 documents that could be related to this case in
15 the past -- in the past year?
16        MS. KOUBA:  Object to form.
17    A.    No.
18    Q.    No?
19    A.    No, I have not.
20    Q.    Did someone come and collect
21 documents from you?
22    A.    Not from me.
23    Q.    From your recollection, are there
24 any documents that you have in your possession
25 that relate to opioids, both prescription and

Page 23

1  illicit, and your work at Summit County ADM
2  that are in your possession, which lawyers from
3  Motley Rice or employees at Summit ADM have not
4  collected from you?
5     A.    Could you rephrase the question
6  because I --
7     Q.    Sure.  Do you have documents
8  relating to opioids that have not been
9  collected and produced to the defendants in
10 this litigation?
11    A.    No.  Everything is at the ADM
12 Board.
13    Q.    So you don't have anything in your
14 own personal possession at home or otherwise?
15    A.    No, I do not.
16    Q.    What about email relating to
17 opioids, such as in your personal email?
18        MS. KOUBA:  Object to form.
19    A.    No.
20    Q.    No?
21    A.    No.
22        - - - - -
23        (Thereupon, Deposition Exhibit 1,
24        Email with Resume Attached,
25        Beginning with Bates Label Summit

Page 24

1        001774240, was marked for purposes
2        of identification.)
3        - - - - -
4     Q.    Mr. Hutzell, I'm showing you what
5  has been marked as Exhibit 1.  Do you recognize
6  this document, Mr. Hutzell?
7     A.    Yes, I do.
8     Q.    What is it?
9     A.    It's my cover letter and resume.
10    Q.    Who is Aimee Wade?
11    A.    She is the associate clinical
12 director of the Summit County ADM Board.
13    Q.    Did you know her prior to sending
14 this application?
15    A.    Yes, I did.
16    Q.    It looks like this was dated March
17 7, 2016.  When were you hired at Summit ADM?
18    A.    When was I hired or when did I
19 start?
20    Q.    When did you start?
21    A.    I started on May 2, 2016.
22    Q.    If you turn to the second page,
23 which is -- which appears to be a cover letter
24 written by you; is that right?
25    A.    Yes, sir.

Page 25

1     Q.    You state in this letter that
2  Thomas Grande was your former supervisor.  Who
3  is Thomas Grande?
4     A.    He was the continuous quality
5  improvement coordinator at the ADM Board.
6     Q.    Did you succeed Thomas Grande in
7  this position?
8     A.    Yes, I did.
9     Q.    How did you know him before?
10    A.    I did an internship with the ADM
11 Board.
12    Q.    You note that you have a passion
13 for mental health research.  Is that what
14 motivated you to apply for this position?
15    A.    Yes.
16    Q.    What kind of mental health research
17 have you done prior to joining Summit ADM?
18    A.    I did a research project on CIT, or
19 the crisis intervention training.
20    Q.    What is CIT?
21    A.    CIT is a program that trains police
22 officers on how to deal with people who are
23 having mental health distress.
24    Q.    What was the nature of your
25 research?

7 (Pages 22 - 25)

Page 26

1     A.    It was a spacial analysis of
2  policing patterns.
3     Q.    Policing partners refers to what?
4     A.    Policing patterns, referring to the
5  different calls that they responded to that
6  were CIT related.
7     Q.    You also note in here that you have
8  a desire for helping people who have mental
9  health illnesses and for mental health
10  advocacy.
11        Had you done any mental health
12  advocacy prior to joining Summit ADM?
13     A.    Define advocacy, what do you mean
14  by advocacy?
15     Q.    I'm simply using the words as you
16  used them here.  So perhaps, I guess, one
17  question might be how did you understand the
18  term mental health advocacy when you put it in
19  your cover letter?
20     A.    What I put in my cover letter, I
21  meant that, you know, in my everyday, like,
22  activities and stuff, if I'm, you know, dealing
23  with a person who has a mental health illness
24  and stuff, I want to be able to help them the
25  best that I can.

Page 27

1        Also by advocacy I meant that if
2  I'm talking to somebody who may not have an
3  understanding of mental health illnesses or had
4  somebody who has a mental health illness, you
5  know, to help them with, like, coping with
6  that.
7     Q.    So prior to joining Summit ADM, you
8  never had any professional experience in mental
9  health advocacy?
10        MS. KOUBA:  Object to form.
11     A.    Again, what do you mean advocacy?
12     Q.    Just simply using your words here
13  in terms of -- well, let me rephrase.
14        Have you ever been employed or done
15  professional work advocating for policies
16  and/or programs relating to mental health,
17  other than CIT, prior to joining Summit ADM?
18     A.    I'm still not understanding, like,
19  your question, the reason being, I think it
20  needs to be more defined and stuff.
21        When you say like -- like, do you
22  mean like as a job position, like did I have a
23  job position that did that?
24     Q.    Let's come back to it.  We'll get
25  to this later.

Page 28

1        You indicate that your educational
2  experience was focused on mental health policy
3  research, which includes research on opioid
4  addicted pregnant women, methamphetamine use,
5  and skipping a little bit, mental health and
6  substance use disorder benefits under the
7  Patient Protection and Affordable Care Act and
8  GIS.
9        What was your mental health policy
10  research relating to opiate addicted pregnant
11  women?
12     A.    Those are two different things.  Do
13  you want to know about both of them or --
14     Q.    So, Mr. Hutzell, if you refer to
15  the letter that is in front of you, it seems to
16  suggest that, in the second paragraph, this
17  includes research on opiate addicted pregnant
18  women.
19        So my question is, did you do
20  research relating to opiate addicted pregnant
21  women, and if so, what was the nature of that
22  research?
23     A.    This is part of my educational
24  experience and stuff, and my role was a
25  research assistant, and stuff like that.

Page 29

1     Q.    And that kind of research did you
2  do relating to opiate addicted pregnant women?
3     A.    My involvement in this was making
4  phone calls to the women and also collecting
5  data.
6     Q.    What kind of data did you collect?
7     A.    Survey data.
8     Q.    Survey data, asking what kinds of
9  questions?
10     A.    I don't remember at this time.
11  This was in grad school, so I don't remember
12  exactly.
13     Q.    And you went to grad school where?
14     A.    Kent State University.
15     Q.    The next subject on which you did
16  mental health policy research is
17  methamphetamine use.  What was the nature of
18  your research relating to methamphetamine use?
19     A.    I believe my role was the same and
20  stuff.  I was a research assistant and stuff,
21  so I was entering data and stuff for the
22  methamphetamine use research project.
23     Q.    And this data was relating to users
24  of methamphetamine?
25     A.    Yes.

8 (Pages 26 - 29)

Page 30

1     Q.    Who was this research project --
2   strike that.  Let me rephrase.
3           For whom were you working when you
4   did this project relating to methamphetamine
5   use?
6     A.    I was a research assistant for Dr.
7   Deric Kenne.
8     Q.    And who is Dr. Kenne?
9     A.    He is a professor at Kent State
10  University.
11    Q.    Did he specialize in
12  methamphetamine use?
13    A.    I believe he specializes in all
14  substance use disorders.
15    Q.    Do you recall what data -- what
16  kinds of data you entered relating to
17  methamphetamine use?
18    A.    I believe it was the same as the
19  survey data.
20    Q.    And you don't remember what the
21  nature of that survey data was?
22    A.    No, I don't exactly.
23    Q.    Okay.  Let's turn to the next page,
24  which is -- which appears to be a copy of your
25  CV at the time; is that correct?

Page 31

1     A.    Yes.  It's a copy of my resume.
2     Q.    You note that you are a public
3   health specialist.  What did you mean by that
4   term?
5     A.    A person who specializes in public
6   health.
7     Q.    You note that your relevant skills
8   include evidence-based methodology.  What is
9   evidence-based methodology?
10    A.    That is different methodologies
11  that are used to track evidence-based data or
12  research.
13    Q.    So what kind -- so evidence-based
14  methodology means evidence-based methodology;
15  is that right?
16          The term is just self-explanatory,
17  there is nothing else that might be baked into
18  the term evidence-based methodology that's not
19  clear from the face of the term?
20          MS. KOUBA:  Object to form.
21    A.    No, that's pretty much the
22  definition and stuff of what I previously said.
23    Q.    Okay.  Some of these terms are new
24  to me.  I don't have any experience in the
25  statistical world.  So I may be asking all

Page 32

1   kinds of questions like this throughout the
2   deposition, and feel free to think of me as a
3   student of statistics here, and I'm attempting
4   to understand some of these terms, because they
5   are pretty new to me, and I'm not exactly a
6   math whiz.
7           You note that a relevant skill of
8   yours is statistical analysis.  What do you
9   understand the term statistical analysis to
10  mean?
11    A.    Using different statistical methods
12  for analyzing data over other problems.
13    Q.    And how have you obtained that
14  relevant skill of statistical analysis?
15    A.    Schooling and also self-taught.
16    Q.    What kinds of schooling
17  specifically related to statistical analysis
18  have you done?
19    A.    The Masters of Public Health uses
20  statistical analysis in just about everything.
21    Q.    What courses did you take in
22  statistical analysis?
23    A.    There was two biostatistics courses
24  that I took and one epidemiology course.
25    Q.    What did those biostatical courses

Page 33

1   cover?
2     A.    How to use statistics in the public
3   health realm.
4     Q.    And what about the epidemiology
5   class?
6     A.    Epidemiology is, you know, again
7   using statistical methods, but in a different
8   realm and stuff, as far as, like, trying to
9   quantify, like, what is happening and stuff,
10  with whatever issue you are dealing with.
11    Q.    So what's the difference between
12  epidemiology and biostatistics?
13    A.    Biostatistics will tell you, like,
14  what is happening.  Epidemiology will tell you
15  how it's happening.
16    Q.    Can you please explain the
17  difference between what those two things mean?
18          MR. LEDLIE:  Object to form.
19    A.    By difference, do you want examples
20  or definitions?
21    Q.    Examples would be helpful.  What is
22  the difference between, when you say what is
23  happening, which is biostatistics, and how it
24  is happening, which you say is epidemiology?
25    A.    Well, doing a statistical analysis,

9 (Pages 30 - 33)

Page 34

1  like let's say you -- let's say you work in an
2  area of a city and you are finding, like, out
3  that the police officers are finding more guns
4  in this area than previously.  You can put up
5  that, like, you know, there has been a 42
6  percent increase in the number of guns that
7  have been found.
8        Now, with epidemiology, it goes a
9  little bit more indepth, to say, like, just
10  because you found the 42 percent, is that a
11  reason to freak out and stuff, you know, and it
12  might not be, because out of that 42 percent,
13  you know, say, like, that number is 100, maybe
14  70 of those and stuff guns that have been found
15  are people who have conceal-carry weapons,
16  another 29 people might be people who are off
17  duty police officers or off duty security
18  officers that are allowed to carry their
19  weapon, but somehow it just got found and stuff
20  that they were in that area.
21        And then you get your one person
22  who might be illegally carrying a gun and
23  stuff, so even though I have a 42 percent
24  increase and stuff, which is biostatistics,
25  once you break it down, you are able to

Page 35

1  understand what is actually going on.
2     Q.   That's helpful.  Thank you.
3        So do you understand biostatistics
4  to not entail that look-under-the-hood kind of
5  analysis that you just mentioned is associated
6  with epidemiology?
7     A.   How I have used biostatistics?
8     Q.   Sure.
9     A.   Yes.
10    Q.   So biostatistics is strictly
11  concerned with describing the state of affairs
12  in a given problem?
13        MS. KOUBA:  Object to form.
14    A.   Yes, that's how I have used it.
15    Q.   And epidemiology then, is it fair
16  to say, would be a more indepth look at what is
17  going on and whether there is cause for concern
18  in the community?
19    A.   Yes, that's how I have used it.
20    Q.   And are you an epidemiologist?
21    A.   No, I am not.
22    Q.   What kind of training would you
23  need in order to become an epidemiologist?
24    A.   You can get a master's of public
25  health.

Page 36

1     Q.   And you have a master's of public
2  health?
3     A.   Yes, I do.
4     Q.   So what different training than
5  what you have would you need in order to become
6  an epidemiologist?
7     A.   Are you talking about formal or
8  informal?
9     Q.   Formal.
10    A.   Formal education, I would say if
11  you went into it formally, there is, like, an
12  epidemiologist track for a Master's of Public
13  Health.
14    Q.   And you were not on that track?
15    A.   No, I was not.
16    Q.   Do you have to get a certificate or
17  accreditation to become an epidemiologist?
18    A.   No, you don't.
19    Q.   Have you received any formal
20  statistical training, other than through your
21  associates, bachelor's or master's degree at
22  Kent State?
23    A.   Yes, I have.
24    Q.   Where did you receive additional
25  statistical training?

Page 37

1     A.   Through Udemy and Coursera courses.
2     Q.   What is Udemy and Coursera?
3     A.   Those are both educational course
4  websites.
5     Q.   Are they independent study types of
6  courses?
7     A.   Yes, they are.  Some are
8  university, some aren't.
9     Q.   And can anyone take these, or do
10  you need to apply?
11    A.   Anybody can take those.
12    Q.   And how many of these courses did
13  you take?
14    A.   I can't be exact, but if I was to
15  guess and stuff, I would definitely say over 50
16  and stuff.
17    Q.   How long is each course?
18    A.   It ranges from an hour to 75 hours
19  and possibly higher than 75 hours.
20    Q.   If you had to estimate, how many
21  hours did you spend on these Udemy and Coursera
22  courses?
23    A.   I would have, just guessing,
24  without doing the exact math and stuff, I would
25  say well over 2- or 300 hours.

10 (Pages 34 - 37)

Page 38

1    Q.    Were these courses take on your own
2  initiative, or were you asked as part of your
3  employment and/or education to take them?
4    A.    It was on my own initiative.
5    Q.    Why did you seek out these courses
6  on your own initiative?
7    A.    Because I knew it was necessary to
8  be able to do my job effectively at the ADM
9  Board.
10    Q.    When did you take these courses?
11    A.    From 2016 to present.
12    Q.    Have you had any training, formal
13  education training, in a Ph.D. setting,
14  relating to statistical analysis?
15    A.    Yes, I have.
16    Q.    Were you a Ph.D. student?
17    A.    I was a Ph.D. student, yes.
18    Q.    Are you still a Ph.D. student?
19    A.    No, I am not.
20    Q.    How far along in the program did
21  you get?
22    A.    I took three or four courses.
23    Q.    Have you completed your coursework?
24    A.    No, I have not.
25    Q.    Are you still planning to resume

Page 39

1  that coursework in the future?
2    A.    Not with that particular degree.
3    Q.    Which degree was that?
4    A.    That was a degree in cognitive
5  psychology.
6    Q.    Why did you decide to study
7  cognitive psychology?
8    A.    Because it seemed interesting at
9  the time.
10    Q.    Was that a different direction from
11  your public health degree?
12    A.    No, it wasn't.
13    Q.    Did you study cognitive psychology
14  in your master's or bachelor's program?
15    A.    Yes, I have.
16    Q.    As part of your Ph.D. coursework,
17  did you take any statistical analysis classes?
18    A.    I took classes that used
19  statistical analysis, but not specific
20  statistical analysis courses.
21    Q.    Is statistical analysis
22  important -- is statistical analysis part of
23  what is expected of a Ph.D. student to know?
24    A.    Yes.
25    Q.    Had you resumed or completed your

Page 40

1  coursework, would you have taken more
2  statistical analysis classes?
3        MS. KOUBA:  Object to form.
4        MR. LEDLIE:  Objection.
5    A.    I'm trying to remember the catalog.
6    Q.    Take your time.  No problem.
7    A.    I believe so.
8    Q.    So you still have more to learn in
9  the statistical analysis realm?
10    A.    Yes.
11    Q.    Do you consider yourself an expert
12  statistician?
13        MS. KOUBA:  Object to form.
14    A.    What do you mean by expert
15  statistician?
16    Q.    Would you hold yourself out as an
17  expert in the field of statistics?
18    A.    Not statistics, no.
19    Q.    What about in the field of
20  statistical analysis, would you hold yourself
21  out as an expert?
22    A.    What do you mean by statistical
23  analysis?
24    Q.    You mentioned -- you defined it as
25  using different statistical and methods -- or

Page 41

1  different statistical methods for analyzing
2  data or other problems.  Would you consider
3  yourself an expert -- would you hold yourself
4  out to the world as an expert in statistical
5  analysis?
6    A.    For using statistics and stuff to
7  analyze data, yes.
8    Q.    You would hold yourself out as an
9  expert?
10    A.    Yes.
11    Q.    Okay.  According to your resume
12  here, it says you previously worked at Summit
13  ADM.  What was the nature of your work -- of
14  your prior work at Summit ADM before joining
15  again in 2016?
16    A.    Are you talking about the 2013 and
17  2014 timeframe?
18    Q.    I am.
19    A.    That was a CIT internship practical
20  project.
21    Q.    Is that the one where Thomas Grande
22  was your supervisor?
23    A.    Yes.
24    Q.    Did you work with anyone else
25  during that time at Summit ADM?

11 (Pages 38 - 41)

Page 42

1     A.   No, I did not.
2     Q.   Prior to that, it appears that you
3  did an internship at Oriana House.  What is
4  Oriana House?
5     A.   Oriana House is one of the agencies
6  that deals with people who are in, like, kind
7  of like a halfway house and stuff, you know,
8  before they go to jail.  That's my
9  understanding of it.
10    Q.   And what was the nature of your
11 work for Oriana House?
12    A.   I was a data analyst for them.
13    Q.   What kind of data did you analyze?
14    A.   I analyzed clerk of court records.
15    Q.   What were you looking at these
16 clerk of court records for?
17    A.   We were looking at, like,
18 recidivism and stuff for people who had been
19 released.
20    Q.   What is recidivism?
21    A.   Recidivism is like, you know, in
22 that specific instance, is looking to see if
23 after they have been released from Oriana
24 House, are they coming back into the criminal
25 justice system.

Page 43

1     Q.   Does Oriana House do a lot of work
2  with drug courts or -- sorry.  Let me rephrase.
3         Does Oriana House do a lot of work
4  with courts and recidivism?
5     A.   To my understanding and my, like,
6  small role, yes, but I don't know exactly
7  what -- to what extent they do.
8     Q.   Did any of the court records that
9  you analyzed include records from drug courts?
10    A.   No.  It was only the clerk of
11 courts records.
12    Q.   In your time at Oriana House, did
13 you discuss, analyze, comment on issues
14 relating to opioid use and abuse?
15         MS. KOUBA:  Object to form.
16    A.   No.
17    Q.   Since the time that you sent this
18 application, what, if anything, has been added
19 to your resume?
20    A.   I'm sorry.  Could you repeat that.
21    Q.   Since the time that you submitted
22 this resume to the Summit ADM Board, what, if
23 anything, have you added to your resume?
24    A.   I think the two major things that
25 is not on this resume is data analysis and

Page 44

1  database management.
2     Q.   And what is data analysis and
3  database management?
4     A.   Data analysis is using statistical
5  analysis and methodologies to interpret data.
6  Database management is managing your data into
7  a form that can be analyzed.
8     Q.   Let's take those one at a time.
9         Data analysis, do you understand
10 that to be different from statistical analysis?
11    A.   Yes, I do.
12    Q.   What is the difference?
13    A.   The difference being that a
14 statistician looks solely into statistical,
15 like, methods and stuff.  It is one of the
16 things that's, like, that kind of blurs over
17 into a gray area too, because a data analyst
18 uses statistical methods, and so does a
19 biostatistics, but a data analyst, to my
20 understanding, is using -- is preparing and,
21 you know, utilizing data a lot more than a
22 statistician would, but it kind of goes back
23 and forth, to be honest.
24    Q.   A lot more than a statistician
25 would?

Page 45

1     A.   Yes.
2     Q.   Why is that?
3     A.   Why is that?  Well, to my
4  understanding and how I've been a data analyst
5  and stuff, it's a lot more computer science and
6  stuff than what biostatisticians that I have
7  encountered and stuff have used.
8     Q.   What do you mean by a lot more
9  computer science?
10    A.   Using different types of software
11 to analyze data.
12    Q.   What kinds of software do you use
13 or are you trained in or experienced with?
14         MS. KOUBA:  Object to form.
15    A.   I'm experienced in Python and R and
16 SQL.
17    Q.   Is it fair to say that statistical
18 analysis doesn't entail digging into the weeds
19 of a database?
20    A.   Yes.
21    Q.   And prior to joining Summit ADM,
22 data analysis was not listed as a relevant
23 skill on your resume?
24    A.   That's true.
25    Q.   So this is something that over the

12 (Pages 42 - 45)

1  course of the past couple of years you have
2  developed as a skill?
3      A.    Yes.
4      Q.    The second that you mentioned was
5  not -- or is not on your resume is database
6  management; is that correct?
7      A.    That's correct.
8      Q.    And what is database management?
9      A.    From how I have used database
10  management, I've used it to create -- take
11  unstructured data and put it in a structured
12  form so that it could be analyzed better.
13      Q.    What is unstructured data?
14      A.    Paperwork and stuff.  Anything
15  that's on, you know, paper.  Sometimes it's
16  electronic that's not in a format that can be
17  analyzed.
18      Q.    So you have paperwork and you input
19  the data into some database; is that right?
20      A.    Yes.
21      Q.    What considerations do you make
22  when you are inputting data from -- inputting
23  unstructured data into a structured data form?
24          MR. LEDLIE:  Object to the form of
25  the question.

1      A.    What do you mean?
2      Q.    Like walk me through that process.
3  For example, is database management simply data
4  entry?
5      A.    Yes and no.
6      Q.    What is it about database
7  management that is different than simple data
8  entry?
9      A.    The coding and stuff.  I mean, you
10  can enter stuff into an Excel spreadsheet and
11  that would be considered data entry and stuff,
12  but if you are doing, like, database managed
13  and stuff, you are actually entering it into a
14  database and stuff and, like, extrapolating
15  that database and stuff and using that to
16  compare other datasets to.
17      Q.    And by coding, do you mean software
18  coding?
19      A.    Yes.
20      Q.    Okay.  And that is another skill
21  that you have gained since applying to Summit
22  ADM?
23      A.    Yes.
24      Q.    Did you develop that skill as part
25  of your work at Summit ADM?

1      A.    Yes, I did.
2      Q.    What about your work at Summit ADM
3  required you to develop that skill?
4      A.    We needed to be able to come up
5  with bigger insights -- or better insights
6  into, like, what our data would say and stuff.
7  So the easiest way to do that was to do
8  database management and using SQL coding for
9  that.
10      Q.    Why did you need to come up with
11  better insights about what the data was saying?
12      A.    Because it was unstructured, and
13  the data that I worked with was unstructured
14  and it wasn't in a usable format.
15      Q.    Which data are you referring to?
16      A.    I'm referring to outcomes reports.
17      Q.    What are outcomes reports?
18      A.    That's what the agencies, like,
19  report on and stuff for whatever program that
20  we are funding and stuff.  They are giving us
21  outcome reports to let us know what the outcome
22  of their program was.
23      Q.    What kinds of outcomes?
24          MS. KOUBA:  Object to form.
25      A.    Just whatever metrics that they

1  could use to approve what they are trying to
2  prove.
3      Q.    Can you give me some examples?
4      A.    Let's say you have got a program,
5  and program A is supposed to be helping people
6  who have mental health illnesses by getting
7  them into focus groups, and then your outcome
8  is supposed to be like a -- to have, say, 70
9  percent of the people complete this particular
10  program.
11          Then outcomes would be, like, how
12  many people actually did, like, finish that
13  program and stuff.  So the 70 percent is your
14  goal, so you are going to say, like, you know,
15  if you said 65 percent and stuff, then you are
16  going to state, like, why you were under goal
17  and stuff, like, to accommodate that.
18      Q.    What kinds of programs did you
19  improve the database for?
20      A.    Mental health and substance use
21  programs.
22      Q.    And specifically at ADM, which
23  programs in particular did you work on for
24  improving the database?
25      A.    In regards to outcomes, all of

1  them.
2      Q.   How many?
3      A.   I don't know, off the top of my
4  head.
5      Q.   Can you estimate?
6      A.   A lot.  I can't say.
7      Q.   More than five?
8      A.   Definitely more than five.
9      Q.   More than ten?
10      A.   Maybe, maybe 100 and stuff, but I'm
11  not really exactly sure how many that was.
12      Q.   How much of your work at ADM was
13  focused on these outcomes for -- strike that.
14          How much of your work at ADM was
15  focused on understanding outcomes relating to
16  these hundred or so programs?
17          MR. LEDLIE:  Object to the form of
18  the question.
19      A.   Can you rephrase the question.
20      Q.   Would you say it was -- if you
21  could estimate, what percentage of your job was
22  relating to trying to understand outcomes
23  relating to the hundred or so programs at ADM?
24          MS. KOUBA:  Object to form.
25      A.   I'm sorry.  Can you say that again.

1      Q.   Was it a big part of your job?
2      A.   It was a decent part of the job,
3  yes.
4      Q.   You mentioned before that you
5  developed the skill of database management
6  because of the need to develop better insights
7  into the statistics, and you cited, as an
8  example of that, outcomes, understanding
9  outcomes for the many programs at Summit ADM.
10          What, if any, other data did you
11  work on with respect to database management at
12  Summit ADM?
13          MS. KOUBA:  Object to form.
14      A.   Can I take a break real quick?  I
15  have to use the restroom.
16      Q.   Sure.
17          MS. FEINSTEIN:  There is a question
18  pending.
19      Q.   Sorry.  Please, there is a question
20  pending, so after the question is done, please,
21  we can take a break.
22      A.   Can you repeat the question,
23  please.
24      Q.   Yes.  I'll rephrase it.
25          Other than outcomes for programs at

1  Summit ADM, what other data did you analyze in
2  order to get better insights?
3      A.   Different sets of, like, public
4  records and police records and medical examiner
5  records.
6      Q.   Any others?
7      A.   No, other than the programs that we
8  needed, like, outcomes and stuff.
9          MR. MASTERS:  Okay.  Let's take a
10  break.
11          THE VIDEOGRAPHER:  Off the record,
12  10:10.
13          (Recess taken.)
14          THE VIDEOGRAPHER:  On the record,
15  10:21.
16      Q.   Welcome back, Mr. Hutzell.
17      A.   Thank you.
18      Q.   We are still looking at Exhibit 1,
19  which is Bates stamped Summit 001774240.
20          You mentioned earlier that you
21  consider yourself an expert in statistical
22  analysis.
23      A.   Yes.
24      Q.   How many years have you been
25  employed professionally in a job that requires

1  statistical analysis?
2      A.   I'd say four.
3      Q.   When did you develop --
4          THE NOTARY:  I'm sorry.  What did
5  you say?
6      A.   Four.  Or, I apologize, six.
7      Q.   So beginning in 2013?
8      A.   Roger.
9      Q.   And roger means yes?
10      A.   Yes.
11      Q.   I assume that is from your days in
12  the Army?
13      A.   Yes.
14      Q.   Ten years; is that right?
15      A.   Yes, sir.
16      Q.   Did you do any statistical analysis
17  while you were employed with the Army?
18      A.   Yes, sir.
19      Q.   And did you have training -- was
20  that based on training that you had received
21  from the Army related to statistical analysis?
22      A.   No, it wasn't.
23      Q.   How did you -- how did you obtain
24  the training to do the statistical analysis
25  that you did in the Army?

14 (Pages 50 - 53)

Page 54

1      A.    There was a need for it to do my
2  job effectively.
3      Q.    Where did you get the training?
4      A.    From coursework.
5      Q.    Coursework from where?
6      A.    From universities and also from
7  different courses and different books online.
8      Q.    Which universities?
9      A.    University of Incarnate Word.
10     Q.    When did you attend the University
11  of Incarnate Word?
12          MS. KOUBA:  Object to form.
13     A.    I'm sorry.  Could you rephrase
14  that.
15     Q.    When did you attend the University
16  of Incarnate Word?
17     A.    In -- I want to say 2006 is when I
18  first attended.  Around there, 2006 to 2008.
19  So I'm not exactly sure.
20     Q.    Was this during your time in the
21  Army?
22     A.    Yes, it was.
23     Q.    Did you receive a degree from the
24  University of Incarnate Word?
25     A.    No, I did not.

Page 55

1      Q.    How many courses at Incarnate Word
2  did you take related to statistical analysis?
3      A.    I believe one.
4      Q.    And how many courses at Kent State,
5  in connection with your associates and bachelor
6  degree, did you take relating to statistical
7  analysis?
8      A.    Two.
9      Q.    And how many courses as part of
10  your master's did you take relating to
11  statistical analysis?
12     A.    Two.
13     Q.    So other than the one course at
14  Incarnate Word and the four courses at Kent
15  State, have you had -- have you taken any other
16  statistical analysis courses at a university or
17  other educational institution?
18     A.    Yes, I have.
19     Q.    Where?
20     A.    At Coursera courses and Udemy.
21     Q.    And these are the courses that you
22  took on your own initiative that you described
23  earlier, right?
24     A.    Yes.
25     Q.    Have you ever testified as an

Page 56

1  expert in a court and/or deposition about
2  statistical analysis?
3          MS. KOUBA:  Object to form.
4      A.    I'm sorry.  Could you rephrase
5  that.
6      Q.    Have you ever testified as an
7  expert relating to statistical analysis?
8      A.    No, I have not.
9      Q.    Have you ever been hired as a
10  consulting expert on matters relating to
11  statistical analysis?
12     A.    No, I have not.
13     Q.    Other than your work for Summit ADM
14  and your internships that you mentioned
15  previously, have you ever been employed in a
16  position that requires statistical analysis?
17     A.    Yes, I have.
18     Q.    What were those employment
19  positions?
20     A.    I was employed by Coleman
21  Professionals.
22     Q.    What is Coleman Professionals?
23     A.    Or contracted by Coleman
24  Professionals.  They are a mental health
25  agency.

Page 57

1      Q.    Is that reflected on your resume?
2      A.    No, it's not.
3      Q.    When were you employed by Coleman
4  Professionals?
5      A.    I believe about early 2015.
6      Q.    What was the nature of your work
7  for Coleman Professionals?
8      A.    I was doing GIS mapping.
9      Q.    What is GIS mapping?
10     A.    Geographical information systems
11  and stuff.  It is creating maps.
12     Q.    What do you use GIS for?
13     A.    To come up with different patterns.
14     Q.    And what specifically did you use
15  GIS mapping for in your work for Coleman
16  Professionals?
17     A.    It was to, like, see where exactly
18  their population was and the distance between
19  the individual and grocery stores.
20     Q.    What was the purpose of this GIS
21  mapping?  Let me rephrase.
22          Why was Coleman Professionals
23  trying to understand the distance between the
24  population and the nearest grocery store?
25     A.    Because they were looking into food

Page 58

1  insecurity and determining, like,
2  transportational issues.
3      Q.    And so other than your work in the
4  Army, your previous internships, your work at
5  Coleman Professionals and your work at Summit
6  ADM Board, have you been employed in any other
7  professional position that has required the use
8  of statistical analysis?
9      A.    I'm sorry.  Could you go over that
10  work again of what you said.
11      Q.    The Army, your internships as part
12  of your education, Coleman Professionals, and
13  the Summit ADM Board.
14      A.    Yes.
15      Q.    Where else?
16      A.    Kent State University GIS Health
17  and Hazards Lab.
18      Q.    What did you do for them?
19      A.    I was the lab manager.
20      Q.    What does that entail?
21      A.    That entails, like, oversight over
22  the lab and stuff, and different projects that
23  were occurring.
24      Q.    And what specifically relating to
25  statistical analysis did you do in this lab?

Page 59

1      A.    I did GIS mapping.
2      Q.    Any other employment positions
3  relating to statistical analysis?
4      A.    No.
5      Q.    Are you still employed at Summit
6  ADM?
7      A.    No, I'm not.
8      Q.    When did you leave Summit ADM?
9      A.    December 31.
10      Q.    And where do you work now?
11      A.    I work at The Cleveland Clinic.
12      Q.    And what do you do for The
13  Cleveland Clinic?
14      A.    I'm a department analyst.
15      Q.    What is a department analyst?
16      A.    Well, I just started January 2, so
17  I'm still trying to figure that out.  But
18  basically it's a combination of a financial
19  analyst and a data analyst.
20      Q.    Is financial analysis something you
21  have had experience in before?
22      A.    Yes.
23      Q.    In what capacity?
24      A.    Through coursework and through the
25  Army.

Page 60

1      Q.    What kind of financial analysis
2  have you had experience with?
3      A.    Analyzing, like, how much money is
4  being spent on contracts and stuff, and
5  determining, like, how that's best analyzed.
6      Q.    Did you do any of that at Summit
7  ADM?
8      A.    No, I did not.
9      Q.    You didn't do any financial
10  analysis?
11      A.    None at all.
12      Q.    What kind of data are you
13  analyzing -- are you expecting that you will be
14  analyzing at The Cleveland Clinic?
15          MS. KOUBA:  Object to form.
16      A.    I'm expecting and stuff to analyze
17  data within the protective services, but I have
18  to guess, because I haven't -- like I said, I
19  started January 2, so I haven't even seen the
20  data and stuff to be able to give a solid
21  answer on that.
22      Q.    So when you were interviewing for
23  this position, did anyone indicate what kinds
24  of projects they hoped someone of your
25  experience would work on?

Page 61

1      A.    Yes, they did.
2      Q.    And what did they tell you?
3      A.    They wanted to -- their goal is to
4  get a better understanding of their data, get
5  it more in a structured and systematic form to
6  get better use out of it and stuff, and then
7  also creating reports for the executive
8  director -- I believe that's his title, I'm not
9  quite sure and stuff -- to, like, have him be
10  able to talk to other directors and outside
11  stakeholders.
12      Q.    Did they mention what kind of data
13  specifically they want you to help get a better
14  handle on?
15      A.    I think there is, like, some
16  mapping data and also some comparison data.
17      Q.    Anything relating to opioids?
18      A.    No.
19      Q.    No one has mentioned at The
20  Cleveland Clinic that they want you to start
21  looking at opioid-related data?
22          MS. KOUBA:  Object to form.
23      A.    No.
24      Q.    Why did you leave Summit ADM?
25      A.    I left for a change of career.

16 (Pages 58 - 61)

Page 62

1  Q.  What do you mean by a change of
2  career?
3  A.  Well, I wanted to have, like, more
4  opportunity for growth and stuff, and Summit
5  County ADM Board, while it was great place to
6  work, didn't have the growth that I wanted and
7  stuff, so I went to a bigger company.
8  Q.  What kind of growth were you
9  looking for?
10  A.  Career advancement.
11  Q.  And you didn't see a chance for
12  career advancement at Summit ADM?
13  A.  No.
14  Q.  Why is that?
15  A.  Because it's a small agency, and so
16  there is no other positions, other than the one
17  I had.
18  Q.  Any other reasons why you left
19  Summit ADM?
20  A.  No.
21  Q.  Are you in a specific department at
22  Cleveland Clinic?
23  A.  Yes, I am.
24  Q.  What is that department?
25  A.  Protective services department.

Page 63

1  Q.  So what is protective services?
2  A.  From my understanding, again only
3  being there since January 2 and stuff, it
4  entails the parking, transportation, and EMS
5  services and also the police and security.
6  Q.  You said parking, transportation,
7  EMS, police and security; is that right?
8  A.  Uh-huh.
9  Q.  And so you expect to be analyzing
10  data relating to those categories?
11  A.  Yes, I do.
12  Q.  Who do you report to at The
13  Cleveland Clinic?
14  A.  Julie Marth.
15  Q.  And what is her position?
16  A.  She is the administrator.
17  - - - - -
18  (Thereupon, Deposition Exhibit 2,
19  Email Exchange, Beginning with Bates
20  Label SUMMIT 001077027, was marked
21  for purposes of identification.)
22  - - - - -
23  Q.  I'm handing you what has been
24  marked as Exhibit 2, and it has been Bates
25  stamped as Summit 001077027.  Do you recognize

Page 64

1  this document?
2  A.  Yes, I do.
3  Q.  What is it?
4  A.  It is an email.
5  Q.  And is this an email you received?
6  A.  Yes, I did.
7  Q.  If we look down at the bottom of
8  the document, it appears there that an
9  individual named Dan Gregory sent an email to
10  Jerry Craig, who you said previously was your
11  supervisor at ADM Board?
12  A.  He was the executive director.
13  Q.  And do you know who Dan Gregory is?
14  A.  Not off the top of my head.
15  Q.  He asked if there was someone in
16  your office who is that definitive person on
17  the statistics surrounding the opioid and
18  heroin problem; is that right?
19  A.  Yes.
20  Q.  And Jerry Craig responded and said,
21  "Eric Hutzell is our data guru"; is that right?
22  A.  Yes.
23  Q.  What did he mean by, "Eric Hutzell
24  is our data guru"?
25  MS. KOUBA:  Object to form.

Page 65

1  A.  I'm not quite sure.  That might be
2  a better question for him.
3  Q.  If you had to guess -- when you
4  received this email, what did you understand
5  that to mean?
6  A.  That Jerry wanted Dan Gregory to
7  talk to me about that.
8  Q.  And did you understand that to be
9  in response to Dan Gregory's request
10  for -- request to speak with the definitive
11  person on the statistics surrounding the opioid
12  and heroin problem?
13  A.  Yes.
14  Q.  And do you consider yourself,
15  during your time at Summit ADM, as that
16  definitive person on the statistics of the
17  opioid and heroin problem?
18  A.  Yes.
19  Q.  Prior to joining Summit ADM, would
20  you have considered yourself a definitive
21  person on the statistics surrounding the opioid
22  and heroin problem?
23  A.  I wouldn't consider myself an
24  expert, no.
25  Q.  So this is something that you

17 (Pages 62 - 65)

Page 66

1  developed over the course of your time at
2  Summit ADM?
3      A.   Yes.
4      Q.   Did you ever put "data guru" on a
5  shirt or something like that to wear it as a
6  badge of pride?
7      A.   No.
8          - - - - -
9          (Thereupon, Deposition Exhibit 3,
10         Email Exchange Between Birmingham
11         and Hutzell, Beginning with Bates
12         Label SUMMIT 001788704, was marked
13         for purposes of identification.)
14         - - - - -
15     Q.   I'm showing you now what I'm
16  marking as Exhibit 3, which is Bates stamped
17  Summit 001788704.
18         Do you recognize this document?
19     A.   Yes, I do.
20     Q.   Is this an email that -- an email
21  conversation of which you were a part?
22     A.   Yes, it was.
23     Q.   Who is Lauren Birmingham?
24     A.   She's a -- well, at this time, she
25  worked for Summa Health.

Page 67

1      Q.   Did you know her prior to this?
2      A.   Yes, I did.
3      Q.   How did you know her?
4      A.   She was a student at Kent State
5  University for the Ph.D. program.
6      Q.   And you knew her while you were at
7  Kent State?
8      A.   Yes, I did.
9      Q.   Mr. Hutzell, I'm going to draw your
10  attention to just a couple parts of this
11  thread, so that I can understand what you meant
12  by some of the statements in here.
13         You indicated in this top email
14  that there would be a Summit Opiate Task Force
15  meeting on December 13, right?
16     A.   Yes, that's what I said.
17     Q.   And you indicated that you might be
18  presenting that day, but you weren't sure?
19     A.   Yes.
20     Q.   And then you said, "Either way,
21  about 99.9 percent, haha, of the data that
22  comes from the ADM Board originates from me";
23  is that right?
24     A.   Yes.
25     Q.   What did you mean by that

Page 68

1  statement?
2      A.   I meant that most of the data that
3  comes from the ADM Board originates through me,
4  in regards to the Opiate Task Force.
5      Q.   So you were the primary -- sorry.
6  Strike that.  Let me rephrase.
7          Were you the only data analyst at
8  Summit ADM?
9      A.   Yes.
10     Q.   And people looked to you to compile
11  and understand data relating to the Opiate Task
12  Force?
13     A.   Yes.
14     Q.   Did you rely on anyone else to help
15  you with that data analysis?
16     A.   What do you mean by help?
17     Q.   You indicated that "99.9 percent of
18  the data that comes from the ADM Board
19  originates from me."  Did you have anybody else
20  assisting you in developing that data?
21     A.   What do you mean by developing?
22     Q.   Publishing, producing, analyzing.
23         MS. KOUBA:  Object to form.
24     A.   I'm still not clear and stuff.
25  What do you mean by the question?

Page 69

1      Q.    Did you have a team of people
2  working under you that helped analyze data?
3      A.   No, I don't have a team to work
4  with me.
5      Q.   And you indicate that you have tons
6  and tons of data, in the next paragraph; is
7  that right?
8      A.   Yes.
9      Q.   And you say, "Because I am a data
10  hoarder"?
11     A.   Yes.
12     Q.   What is a data hoarder?
13     A.   Somebody who hoards data.
14     Q.   What does that mean?
15     A.   Just gathering a lot of data.  So
16  as much as I possibly could.
17     Q.   Was this data that Summit
18  ADM -- was this new data that you were
19  hoarding?
20     A.   What do you mean by new data?
21     Q.   So you say you are a data hoarder.
22  What kinds of data were you hoarding?
23     A.    Anything that would relate to
24  mental health or substance use disorders.
25     Q.    Were you a data hoarder with

18 (Pages 66 - 69)

Page 70

1  respect to opioid data?
2      A.    Yes.
3      Q.    What kinds of opioid data did you
4  hoard?
5      A.    Any police records or medical
6  examiner's records or things with the quick
7  response team or the Deterra bag project, and
8  there is others too.
9      Q.    You mentioned 99.9 percent of the
10  data originates from you.  Where does that .1
11  percent come from?
12      A.    Well, 99.9 percent is a statistics
13  joke, because nothing is for certain and stuff,
14  so that is why it is 99.9 percent.
15      Q.    So the haha was a joke --
16      A.    Yeah.
17      Q.    -- that another statistics-minded
18  person might understand?
19      A.    Yeah.  It's definitely what they
20  would understand.
21      Q.    And what you were saying was that
22  basically all of the data comes from you?
23      A.    For the Opiate Task Force, yes.
24      Q.    You indicated next that you are
25  more than happy to discuss projects,

Page 71

1  publications, anything that we could
2  potentially collaborate on to help the
3  community or general science knowledge.
4          Is collaboration with non-ADM
5  individuals something that happened regularly
6  in your capacity at Summit ADM?
7          MS. KOUBA:  Object to form.
8      A.    Yes, it is.
9      Q.    I'm sure we will return to that
10  some more later, but you indicate on the next
11  page that "My perspective is based in data
12  science and how data sharing can create better
13  programs and decisionmaking"; do you see that?
14      A.    Where exactly are you?
15      Q.    It's on the second page in your
16  email to Lauren, the first paragraph, in the
17  middle.
18      A.    Yes, I did say that.
19      Q.    How can data science and data
20  sharing create better programs and
21  decisionmaking?
22      A.    By analyzing the data and stuff, so
23  that the decisionmakers and other stakeholders
24  are able to make solid decisions.
25      Q.    And how does data sharing help

Page 72

1  that?
2      A.    Data sharing helps with that,
3  because then you get other perspectives and
4  stuff from other agencies.
5      Q.    Who might have different data than
6  your agency?
7      A.    Yes.
8      Q.    What kinds of data -- well, strike
9  that.
10          Did you and Lauren engage in any
11  kind of data sharing?
12      A.    No, we did not.
13      Q.    So nothing came of your offer?
14      A.    No.
15      Q.    So looking back again at that
16  comment about how data sharing can create
17  better programs and decisionmaking, does the
18  quality of data influence the quality of a
19  program or decision?
20      A.    Can you repeat that question,
21  please.
22      Q.    Does the quality of data influence
23  the quality of a program or decision?
24      A.    What do you mean by quality of
25  data?

Page 73

1      Q.    Does the integrity of the data?
2      A.    Okay.  And what do you mean by
3  quality of the program?
4      Q.    Whether it is good or not.
5      A.    Yes.
6      Q.    How does data integrity, or the
7  quality of data, impact the quality of a
8  program or decision?
9      A.    Because if you have -- just because
10  you have a dataset, it doesn't necessarily mean
11  that it's going to be informative and stuff.
12  You have to understand the limitations and
13  strengths of each dataset and stuff, and
14  understand where it came from, what it means,
15  and how it was entered.
16      Q.    So some datasets are better than
17  others?
18      A.    Yes.
19      Q.    What makes a dataset more reliable
20  than another?
21      A.    Consistency.
22      Q.    Consistency, what do you mean by
23  consistency?
24      A.    I mean having a consistent, like,
25  data reporting system.

19 (Pages 70 - 73)

Page 74

1    Q.    Is inconsistency a frequent problem
2  with databases?
3         MR. LEDLIE:  Object to the form of
4  the question.
5    A.    Would you repeat that, please.
6    Q.    You indicated that consistency is
7  something that makes data more reliable.
8    A.    Okay.
9    Q.    Is inconsistency in data something
10 that you encounter when reviewing databases?
11   A.    What do you mean by inconsistency?
12   Q.    The opposite of consistency.
13   A.    Well, what is consistency then?
14 What does that mean to you?
15   Q.    What does it mean to you?
16   A.    Being reliable.
17   Q.    So I asked previously what makes a
18 dataset more reliable, and you said
19 consistency.
20   A.    Uh-huh.
21   Q.    And then you defined consistency as
22 reliable.  Help me understand, because -- help
23 me and the uninitiated, what is consistency?
24   A.    Consistency in regards to database,
25 like we talked about, it means that you have a

Page 75

1  database, like, reporting system and stuff.
2  Everybody is entering in data the same way.
3         What I think that you mean by
4  inconsistency is that if you don't have a good
5  reporting system, if everybody is entering in
6  data differently, then you don't have a good
7  database.
8    Q.    Okay.  What else -- what other
9  considerations would you give when looking at a
10 database to determine if it is reliable, other
11 than consistency?
12   A.    Limitations, like what are the
13 limitations of the database.
14   Q.    What do you mean by the word
15 limitations?
16   A.    In regards to databases, what I
17 mean is limitations being that if there is any
18 type of, like, qualitative data in a set, then
19 it's going to be -- it can be varied, depending
20 on who is entering in the data.  Also -- so
21 that's one thing you have to note.
22         And you have to understand what the
23 database is actually saying and what it is
24 actually recording.
25         An example of that, you know, is

Page 76

1  what we previously talked about, my internship,
2  the CIT reporting and stuff that I did with the
3  ADM Board.  We didn't know if that was, like,
4  a -- you know, doing the kernel density
5  estimates, we didn't know whether we were
6  picking up CIT incidence or good police
7  patterns and stuff.
8         So you have to be able to
9  understand, like, what exactly the database is
10 saying and stuff before you can come up with,
11 like, interpretations and stuff often.
12   Q.    So in that instance, because of
13 limitations in the data, you said you couldn't
14 tell whether you were picking up CIT incidence
15 or good police patterns?
16         MS. KOUBA:  Object to form.
17   Q.    Is that right; is that what you
18 said?
19   A.    Can you repeat that.
20   Q.    Just to repeat what you said, just
21 so I understand, because of limitations in the
22 data you were looking at, you said, "We didn't
23 know whether or not we were picking up CIT
24 incidence or good police patterns"?
25   A.    Yes, I said that.

Page 77

1    Q.    So are you saying that the data
2  affected the kinds of decision -- the kinds of
3  conclusions you could draw from the data?
4    A.    Yes, it could.
5    Q.    Is that something that you see
6  generally, that the inputs determine and/or
7  limit the conclusions that can be drawn from a
8  dataset?
9         MS. KOUBA:  Object to form.
10   A.    Can you repeat that again.
11   Q.    Is it fair to say that the data
12 that is -- the kinds of data that is collected
13 can impact or limit the decisions that can be
14 drawn from the data?
15   A.    I would say yes.
16   Q.    So to use a phrase that is
17 sometimes used in this realm, have you ever
18 heard the phrase, "Garbage in, garbage out"?
19   A.    Yes, I have.
20   Q.    What does that mean, from a data
21 analyst's perspective?
22   A.    What you put into it is what you
23 get out of it.
24   Q.    And if you put in compromised data,
25 is it fair to say that the conclusions would be

Page 78

1  compromised?
2       A.   What do you mean by compromised?
3       Q.   If you put in data that is not
4  reliable, then the conclusions are not -- are
5  likely not reliable as well, right?
6       A.   Yes, that's correct.
7       Q.   So would you say a big part of your
8  job as a data analyst is to assess the
9  reliability of data?
10      A.   Yes.
11      Q.   Because the reliability of data
12  impacts the conclusions you can draw from it?
13      A.   Yes.
14      Q.   You mentioned where the data came
15  from, what it means, and how it was entered, in
16  your previous testimony about what you are
17  looking for in assessing the reliability of
18  data.
19           Anything else that you look at in
20  determining whether a dataset or a database is
21  reliable?
22           MS. KOUBA:  Object to form.
23      A.   I'm sorry.  Could you rephrase that
24  question, because I'm not quite understanding
25  what you are asking.

Page 79

1       Q.   Sure.  So you mentioned
2  consistency, you've mentioned where data comes
3  from, and you mentioned looking at what data
4  means, you mentioned that looking at how it was
5  entered, in order to assess whether a dataset
6  is reliable.
7           Is there anything else that you
8  look at, in order to assess whether a database
9  is reliable?
10           MS. KOUBA:  Object to form.
11      A.   What do you mean by anything else?
12      Q.   Anything other than those four
13  things that I just mentioned.
14      A.   Yes.
15      Q.   What else, what else would you look
16  at to determine if a dataset is reliable?
17      A.   The source of the data.
18      Q.   And is that different from where it
19  came from?
20      A.   It can be.
21      Q.   How?
22      A.   Again, it depends on who is, like,
23  you know, entering it and stuff, and where that
24  data originates from and stuff.
25           If you are getting a data source

Page 80

1  and stuff from an agency, it doesn't
2  necessarily mean that it is originated from
3  that agency.  So that would be the where from.
4           The originators of the dataset
5  would be a primary data source and stuff, and
6  the dependability would depend on, like, you
7  know, the, I guess, the consistency of the
8  original -- the primary data source itself.
9       Q.   So walk me through the process.
10  You receive a database or a dataset and you
11  want to say -- you want to determine if you can
12  rely on this database to draw conclusions.
13  What steps do you take?
14           MS. KOUBA:  Object to form.
15      A.   What do you mean by what steps you
16  take?
17      Q.   What do you do to determine if it
18  is reliable?
19      A.   I'm sorry.
20      Q.   Do you call the people who sent the
21  data over to you?  Do you talk to the people
22  who entered the data?  Do you have -- you know,
23  what kinds of things, what kinds of steps would
24  you take to determine the reliability of data?
25      A.   Well, to see, like, if it is

Page 81

1  reasonable, you know, and stuff, to expect that
2  it may be an outlier and stuff.
3           If you have, like, an agency that's
4  posting, like, an 85 percent, like, success
5  rate, and the national average is 42 percent,
6  then you want to know how they got to the 85
7  percent and stuff, you know, and how are they
8  calculating that 85 percent.
9           So, yeah, I would definitely
10  contact the agency and figure it out, like, you
11  know, what exactly -- how did they come up with
12  their numbers and stuff and determine whether
13  that was like a mistake or whether that was
14  something that was truly what I thought it
15  meant.
16      Q.   And do you usually -- do you often
17  dig into the data yourself and try to assess
18  what's going on?
19      A.   What do you mean by that and stuff,
20  dig into the data?
21      Q.   So other than calling them up and
22  saying, hey, why is your number -- why are your
23  numbers so much higher than the national
24  average, would you also look at the data and
25  try to figure out if there is something going

21 (Pages 78 - 81)

Page 82

1    on?
2        A.    That would probably be my first
3    step, to see, like -- if the raw data is
4    available and stuff, then I would go through it
5    and see if I could replicate what the agency
6    had given me.
7            If I could replicate it and stuff,
8    I would still call them, and I would still say,
9    like, I'm noticing you have got, like, an 85
10   percent success rate, that's higher than, you
11   know, the national average is, what did you do?
12           Because we want to know -- like, if
13   it's a success story, we want to know what was
14   done so that we can replicate that throughout
15   our system and stuff, or let other stakeholders
16   know what's going on.
17       Q.    And what do you mean by replicate?
18       A.    Reproduce.
19       Q.    What do you mean by reproduce?
20       A.    Duplicate.
21       Q.    What do you mean by duplicate?
22       A.    What other words do you want?
23       Q.    So what does it mean to replicate
24   somebody's data?
25           MS. KOUBA:  Object to form.

Page 83

1            MR. LEDLIE:  Object to the form of
2    the question.
3        Q.    I'm simply asking, when you said
4    you would try to replicate the data, walk me
5    through what that process might entail?
6            MS. KOUBA:  Object to form.
7        A.    Yeah, I don't replicate data and
8    stuff.  I replicate the analysis.
9        Q.    Okay.  What does it mean to
10   replicate the analysis?
11       A.    Replicate the analysis is that I
12   want to be able to do what they did to come up
13   with that conclusion and stuff.
14       Q.    So if they say this is an 85
15   percent success rate, you would look at the
16   data to see if you can come to the same
17   conclusion, that there was an 85 percent
18   success rate?
19       A.    Yes, that's what I would do.
20       Q.    Is it important, was it -- strike
21   that.
22           In your position as a data analyst,
23   did you ever accept that data was reliable
24   without investigating it first?
25       A.    No.

Page 84

1        Q.    So every time you get a database,
2    you would try to make a determination about its
3    reliability before relying on it?
4        A.    I would want to understand where it
5    came from and how it came to be.
6        Q.    And, again, is it fair to say that
7    that is because you wanted to ensure that you
8    could draw reliable conclusions from the
9    database?
10       A.    Yes.
11       Q.    How does the way a term is defined
12   in the data collection process important to the
13   reliability of data?
14       A.    That's very important.
15       Q.    Why?
16       A.    Because if you have a
17   definition of -- if I'm thinking of one
18   definition and the person, like, entering it is
19   thinking of another definition, it could
20   possibly compromise the dataset.
21           So you want to make sure that you
22   communicate that through whoever is collecting
23   it, to make sure that the database could be
24   consistent.
25       Q.    How could it compromise the

Page 85

1    dataset?
2        A.    Because then you get, like,
3    unreliabilities, or you may not be able to use
4    that if you are cross-comparing, like,
5    different datasets.
6        Q.    Do you have any examples of how the
7    way a term is defined has compromised a
8    conclusion that can be drawn from it?
9        A.    Yes, I do.
10       Q.    Can you give me one?
11       A.    Like, for instance, with cities and
12   stuff, if you put down, like, the City of
13   Akron, and you put down the zip code 44312,
14   that actually could be two different cities and
15   stuff, which is Green and then Akron City
16   itself.
17           So you have to be able to
18   understand, like, where exactly that came from
19   and be able to pinpoint that.  Otherwise, you
20   wouldn't know whether it came from Akron or
21   Green.
22       Q.    So if somebody says I want to know
23   how many grocery stores there are in Akron, and
24   your dataset shows the number of grocery stores
25   in zip code 44132, you wouldn't be able to

22 (Pages 82 - 85)

Page 86

1 answer the question because of the data that
2 you had collected?
3         MS. KOUBA:  Object to form.
4     A.   Could you repeat that.
5     Q.   I'm just using an example here, a
6 hypothetical, to try to understand what you
7 said.
8         The hypothetical is, somebody asks
9 the question, how many grocery stores are there
10 in Akron, and you have a dataset that says
11 there is ten grocery stores within zip code
12 44132. From that dataset, could you answer the
13 person's question?
14     A.   When you are saying 44132, are you
15 meaning 44312?
16     Q.   Yes, I am.
17     A.   I just want to make sure we're
18 clear.
19     Q.   Yes.  Just the zip code that I
20 mentioned, it doesn't matter what zip code we
21 are talking about, I'm just using it as an
22 example.
23     A.   You would be able to tell and stuff
24 how many grocery stores are in there.
25     Q.   I guess I must be confused.  So you

Page 87

1 said earlier -- let me just repeat what you
2 said.
3         If you put down, like, the City of
4 Akron, and you put down the zip code 44312,
5 that actually could be two different cities?
6     A.   Yes.
7     Q.   Which is Green and then Akron City
8 itself.
9         So if you only have -- so if I
10 understand, am I understanding you correctly,
11 that if you only have data for zip code 44312,
12 that you couldn't differentiate between Akron
13 and Green, based on the dataset that you have?
14     A.   Yes, you could differentiate it.
15     Q.   How?
16     A.   The example that I stated and what
17 you are saying is two different things.  The
18 example that I stated was based on, you know --
19 let me clarify that -- was based on residency
20 and stuff.  But what you are talking about is
21 if you have the ability to, like, figure out
22 where the grocery store is, and, yes, you can
23 do that.
24         Now, if you just look at a dataset
25 itself and you don't look at anything else,

Page 88

1 then you might have an issue, but most people,
2 at least in my field and other related fields,
3 would look at more of, like, a mapping and GIS
4 and other information to be able to figure out
5 where the grocery stores are and wouldn't just
6 look at the zip code.
7     Q.   Okay.  So if all you had was the
8 dataset, the definition -- or that data
9 wouldn't be enough, but you could look beyond
10 the dataset to try to understand further?
11     A.   Yes.
12     Q.   But if you don't have more data,
13 then you can't answer the question that I
14 asked -- strike that.
15         If all you have is the zip code
16 data, then you can't answer the question about
17 how many grocery stores in a particular city?
18     A.   No.  You would only be answering
19 how many are in that zip code.
20     Q.   Okay.  What other limitations might
21 exist in data, beyond what we have identified
22 already?
23     A.   None that I could think of right
24 now.
25     Q.   Okay.  Let's turn to your roles and

Page 89

1 responsibilities at Summit ADM.
2         The title of your position was
3 research and quality improvement coordinator;
4 is that correct?
5     A.   Yes.
6     Q.   What were your responsibilities as
7 research and quality improvement coordinator?
8     A.   To -- I mean, in general, to
9 coordinate research with other stakeholders,
10 internally and externally, and also with
11 quality improvement, how do you improve the
12 operations of whatever task I was assigned to.
13     Q.   Anything else?
14     A.   No, that's pretty much in general.
15     Q.   Did you have any involvement in
16 budgeting matters?
17     A.   No, I did not.
18     Q.   Did you ever look at budgets?
19     A.   Other than my own contracts, no.
20     Q.   What do you mean by your own
21 contracts?
22     A.   I had one contract that I worked on
23 a research project with, and it had a budget.
24     Q.   What was that contract?
25     A.   It was a contract looking at

23 (Pages 86 - 89)

Page 90

1   long-acting injectables and stuff, and their
2   affects on people who have schizophrenia, and
3   how it affected their involvement in the
4   criminal justice system.
5       Q.   Where was this contract -- where
6   did it originate from?
7       A.   It originated from -- Dr. Smith had
8   been approached by representatives from Janssen
9   Pharmaceuticals.
10      Q.   And Dr. Smith is who again?
11      A.   Dr. Smith is the medical director
12  at Summit County ADM Board.
13      Q.   Was your time divided between the
14  AOD and the mental health sides of Summit ADM?
15      A.   What do you mean by divided?
16      Q.   Did you -- was all of your work in
17  the substance use disorder aspects of ADM's
18  operations?
19      A.   No, it wasn't.
20      Q.   How much time did you spend -- if
21  you had to estimate, how much time did you
22  spend in both areas?
23      A.   I would say that, you know, since I
24  did come in 2016, the majority of my time was
25  spent on the opiate epidemic.

Page 91

1       Q.   You mentioned that you, prior to
2   joining ADM, you didn't have any -- you didn't
3   have a whole lot of understanding about
4   statistics relating to opioids.  So did you do
5   a lot of on-the-job learning and education
6   about that?
7           MS. KOUBA:  Object to form.
8       A.   What do you mean by statistics
9   related to opioids?
10      Q.   Just referring to your earlier
11  testimony, you said you were not that
12  definitive person on statistics relating to the
13  opioid and heroin problem in Summit County
14  prior to joining Summit ADM Board.  What did
15  you do to become that definitive person?
16      A.   I learned my job and reached out to
17  stakeholders to get more of a knowledge base on
18  that topic.
19      Q.   Did you read anything related --
20  like, did you read any reports about the opioid
21  abuse problem?
22      A.   Yes, research.
23      Q.   What reports did you read?
24      A.   I don't know all the data and
25  stuff.

Page 92

1       Q.   Can you remember some of them?
2       A.   No.  I can't remember, like, all
3   the names and specifics of the reports that
4   I've read.
5       Q.   Did you ever read the State of
6   Ohio's Prescription Drug Abuse Task Force
7   report that was created in 2010 about the
8   opioid epidemic?
9       A.   I can't remember whether I have or
10  not.
11      Q.   Other than reading reports, what
12  else did you do to become the definitive person
13  on statistics relating to the opioid epidemic?
14      A.   I did, like, what I was tasked
15  with.
16      Q.   Anything beyond what you were
17  tasked with?  Did you do any extracurricular
18  research or study relating to the opioid
19  epidemic?
20      A.   What do you mean by
21  extracurricular?
22      Q.   Outside of what you were tasked
23  with.
24      A.   Outside of what I was tasked with,
25  yes.

Page 93

1       Q.   What did you do?
2       A.   Again, I read different research
3   and stuff, different books, you know, did a
4   couple research projects and stuff that was
5   related to the opioid epidemic.
6       Q.   What research projects?
7       A.   There was a couple research
8   projects that I did with students and other
9   professors from different universities and
10  stuff, that kind of went over the opioid
11  epidemic in Summit County.
12      Q.   Were you a mentor to these
13  students?
14      A.   Yes, I was.
15      Q.   Is this something you did
16  frequently, mentoring students?
17      A.   Probably throughout my entire time
18  at the ADM Board, yes.
19      Q.   Do you recall the subject matter of
20  these projects that you worked on, the specific
21  subject matter; in other words, it was about
22  the opioid epidemic problem, but what
23  specifically about the opioid epidemic?
24          MS. KOUBA:  Object to the form.
25      A.   I'm sorry.  Could you be more

24 (Pages 90 - 93)

Page 94

1   detailed and stuff?
2       Q.    These projects that you worked on
3   with these students, what specifically,
4   relating to opioids, were these projects about?
5       A.    A lot of it was involving the
6   medical examiner's records.  Some of it was on
7   Barberton Police Department, their Narcan
8   usage.
9       Q.    Anything else?
10      A.    No.  That's the overarching topics
11  of those research projects.
12      Q.    You mentioned that you succeeded
13  Thomas Grande?
14      A.    Yes.
15      Q.    How long was he there, prior to you
16  joining Summit ADM?
17      A.    I believe 26 years, but I'm not
18  exactly sure how many years, but it was around
19  there.
20      Q.    How were your responsibilities as
21  research and quality improvement coordinator
22  different from what he did in his role?
23          MS. KOUBA:  Object to the form of
24  the question.
25      A.    I'm not sure and stuff.

Page 95

1       Q.    Was Mr. Grande a statistical
2   analysis expert?
3       A.    Yes, he was.
4       Q.    So did he do the same -- did he
5   do the -- did he analyze databases as part of
6   his job at Summit ADM?
7           MS. KOUBA:  Object to the form of
8   the question.
9       A.    No, he didn't, not the same way I
10  did.
11      Q.    What do you mean by that?
12      A.    He got his data and information
13  from IT and stuff, and they helped him with
14  whatever reports he needed.  At least that's my
15  understanding.
16      Q.    What do you mean by IT?
17      A.    Information technology department.
18      Q.    At Summit ADM?
19      A.    Yes.
20      Q.    And how is that different from what
21  you do?
22      A.    I got it directly from our servers
23  and our databases.
24      Q.    Why did you choose to do it
25  differently?

Page 96

1       A.    Because if I had an understanding
2   of the limitations of our data's strengths, I
3   would be able to use that in getting better
4   interpretations and stuff.
5       Q.    So examining the data yourself
6   enabled you to understand the limitations of
7   the data?
8       A.    Yes, that and speaking with our IT
9   department, to make sure whatever I was coming
10  up with or interpreting is correct.
11      Q.    Did you think that made a
12  difference?
13          MR. LEDLIE:  Object to form of the
14  question.
15      A.    A difference in what?
16      Q.    Do you think it improved the
17  quality of the data analysis?
18      A.    Improve the quality of data
19  analysis to compare to what exactly?
20      Q.    Did your decision to dig into the
21  data itself improve the kinds of insights that
22  you were able to obtain while working at Summit
23  ADM?
24          MS. KOUBA:  Object to the form of
25  the question.

Page 97

1       A.    I'm not sure, because I don't know
2   what you are saying and stuff, you know, as far
3   as, like, improving and stuff, because -- could
4   you, like, rephrase that or add more to it and
5   stuff, because I just don't understand exactly
6   what you are saying.
7       Q.    Sure.  Let's move on.
8           You mentioned these reports that
9   you worked on with students.  Did you generate
10  reports -- sorry.  Strike that.
11          You mentioned these projects that
12  you were working on with students.  Did you
13  generate reports as a result of these projects?
14      A.    Yes.
15      Q.    And were they published?
16      A.    None were published at this time.
17          - - - - -
18          (Thereupon, Deposition Exhibit 4,
19          Program Evaluation, Deterra Drug
20          Disposal System, 2016, Beginning
21          with Bates Label SUMMIT 001776772,
22          was marked for purposes of
23          identification.)
24          - - - - -
25      Q.    I'm showing you what is being

25 (Pages 94 - 97)

Page 98

1   marked as Exhibit 4, Bates stamped Summit
2   001776772.  Do you recognize this document?
3       A.   Yes, I do.
4       Q.   What is it?
5       A.   This is a report that a student
6   did.
7       Q.   Is this one of those reports that
8   you mentioned -- that you were referring to
9   earlier?
10      A.   Yes.
11      Q.   And this wasn't published?
12      A.   This was not published, no.
13      Q.   If you look at the first page,
14  there is a comment from EH1.  Is that you?
15      A.   Yes, it is.
16      Q.   The EH is Eric Hutzell?
17      A.   Yes.
18      Q.   And 1 refers to comment number 1?
19      A.   Yes.
20      Q.   If you look at EH2, it appears that
21  EH2 is pointing toward the number 215; is that
22  right?
23      A.   Yes.
24      Q.   And you wrote, "The actual number
25  of 215, with 200 being Summit County residents.

Page 99

1   There has been a lot of miscommunication on the
2   actual numbers."  What did you mean by that?
3       A.   The health department uses a
4   different source than what we use.  We use the
5   medical examiner's office numbers, and they use
6   the Ohio Department of Health numbers.
7       Q.   When you refer to the health
8   department, what are you referring to?
9       A.   Summit County Health Department.
10      Q.   So Summit County Health Department
11  uses the Ohio Department of Health numbers?
12      A.   Yes.
13      Q.   What does the medical examiner's
14  office use?
15      A.   The medical examiner's office
16  numbers.
17      Q.   And you indicate that there has
18  been a lot of miscommunication.  What are you
19  referring to?
20      A.   Well, because it comes from two
21  different datasets, both are correct, but it's
22  different points in time and stuff, and
23  different -- you know, and sometimes, I'm not
24  exactly clear, sometimes different definitions
25  and stuff.

Page 100

1       Q.   Do you recall what those different
2   definitions are?
3       A.   No, I do not.  That's the medical
4   examiner's department would have more
5   understanding of that than I do.
6       Q.   The medical examiner's department
7   would have more understanding about --
8       A.   Their numbers.
9       Q.   -- about the definitional
10  differences between Summit County Public Health
11  and the medical examiner?
12      A.   I believe so.  You would have to
13  ask them.
14      Q.   But you, sitting here, can't say
15  what the difference is between the definitions
16  employed by the Summit County Health Department
17  and the medical examiner?
18          MS. KOUBA:  Object to form of the
19  question.
20      A.   What do you mean by definitions?  I
21  guess I should ask that.
22      Q.   I'm just referring to what you said
23  here.
24          You said, "It comes from two
25  different datasets, both are correct but is

Page 101

1   different points in time and stuff, and
2   different -- you know, and sometimes, I'm not
3   exactly clear, sometimes different
4   definitions."
5           And I'm simply asking, what are
6   those different definitions that you are
7   referring to?
8       A.   When we are talking about -- like,
9   two things pop in my head and stuff, as far as
10  definitions.  One is the point in time itself.
11  I mean, how you define what period is going to
12  give you different numbers.
13          The medical examiner's office
14  defines things through a calendar year, which
15  is January 1 to December 31.  My understanding
16  of what the health department does, through the
17  Ohio Department of Health and their vital
18  statistics program, is that they define it up
19  to July -- or June 30 and stuff.  They cut it
20  off from like July 1 to June 30, was my
21  understanding and stuff about that.
22      Q.   And you said two points pop in your
23  head.  That was one.  Is there another one?
24      A.   Well, when you talk about
25  definitions, I think that you are -- when you

26 (Pages 98 - 101)

Page 102

1 say that, I think you are more or less talking
2 about like how do you define a death and stuff,
3 and that part, I don't know and stuff, because
4 I'm not the expert on defining deaths.
5    Q.    But you are aware of definitional
6 differences in defining death?
7    A.    Yeah, how you do it, a drug
8 overdose death.
9    Q.    And the Summit County defined it
10 differently than the medical examiner?
11    A.    To my understanding.
12    Q.    And how did you obtain that
13 understanding?
14    A.    Through talking with people from
15 the medical examiner's office.
16    Q.    But you don't -- but do you recall
17 what that difference is?
18    A.    Yes, I do.
19    Q.    What is it?
20    A.    If you -- well, probably the better
21 is giving an example than trying to define it.
22       If a person dies at their place of
23 residence, and EMS shows up, they are already
24 dead, they do a toxicology report and they find
25 opiates, and they are going to relate it to a

Page 103

1 drug overdose death.
2       If that same person is alive when
3 they get there, but then they go to the
4 hospital, say they are still alive in the
5 hospital, and then all of a sudden their liver
6 fails, then they die due to the liver failure.
7       And so that would be the difference
8 in the definition.  It has to do with place and
9 stuff, and again that's my understanding of it.
10 The health department and the medical
11 examiner's office would be able to tell more
12 detail about that than I would.
13    Q.    But from your understanding, the
14 health department and the medical examiner's
15 office define it differently?
16    A.    From my understanding, yeah.
17    Q.    You say, "Don't feel bad about this
18 one, every other week there is a different
19 number floating around the county."  What did
20 you mean by that?
21    A.    The medical examiner's office,
22 like, at that timeframe, this was done in 2016,
23 they were having -- and this is 2015, so they
24 were behind on their reporting and stuff.
25       So you get a different number,

Page 104

1 like, every week as they start catching up with
2 their reports.
3    Q.    You said, "It's more complicated
4 than it sounds."  What do you mean by that?
5    A.    I think that was just a sentence of
6 reassurance to a student.
7    Q.    EH3, the next comment down, states,
8 "Most deaths are considered drug overdoses,
9 because a lot of times, the person takes
10 multiple drugs and the actual drug that caused
11 the death is undetermined."  What did you mean
12 by that?
13       MS. KOUBA:  Object to form of the
14 question.
15    A.    That was my understanding of what
16 the medical examiner's office was telling me.
17    Q.    So most -- so most deaths -- strike
18 that.
19       The presence of multiple drugs in
20 the system can make it difficult to determine
21 the cause of death; is that fair?
22       MR. LEDLIE:  Objection.
23       MS. KOUBA:  Objection to the form
24 of the question.
25    A.    I'm sorry.  Could you repeat that.

Page 105

1    Q.    So reading this comment, is it fair
2 to say that, based on your understanding from a
3 medical examiner's office, most -- when there
4 are multiple drugs in a person's system, the
5 cause of death can be difficult to determine?
6       MS. KOUBA:  Object to the form.
7    A.    That's my understanding from what I
8 heard from the medical examiner's office, but,
9 again, they would be the experts on that, to be
10 able to tell what exactly goes on with that.
11    Q.    But you reviewed a lot of these
12 medical examiner records, right?
13    A.    Yes, I have.
14    Q.    At lot of our projects, as you
15 mentioned earlier, with students and as part of
16 your work involved analyzing and examining
17 medical examiner's records?
18    A.    Yes.
19    Q.    So when you say, "A lot of times a
20 person takes multiple drugs and the actual drug
21 that caused the death is undetermined," that's
22 based on your experience reading these medical
23 examiner records?
24    A.    Yes, it is.
25    Q.    And from that, from reviewing those

27 (Pages 102 - 105)

Page 106

1 medical examiner records -- actually, strike
2 that.
3        Let's turn to page 5, the section
4 titled Limitations.  What is the purpose of a
5 limitations section in a project like this?
6     A.   To reveal what the limitations of
7 the data are --
8     Q.   And why --
9     A.   -- and the research.
10     Q.   And why is it important to reveal
11 that?
12     A.   Because whoever would be reading
13 this has to know what the limitations are, if
14 they wanted to replicate it or if they wanted
15 to improve the research.
16     Q.   Do the limitations -- does a
17 limitations section inform the reader on what
18 conclusions can be drawn from the data?
19     A.   No, it doesn't.
20     Q.   But does it influence their ability
21 to understand what can be drawn from the data?
22     A.   Yes, it does.
23     Q.   And here it looks like the
24 individual who wrote this said, "The first
25 limitation is relevant to data collection

Page 107

1 analysis; the focus group questionnaire was
2 worded in a confusing manner and made it
3 difficult to determine what was implied by some
4 of the results."  What do you understand that
5 to mean?
6     A.   She is talking about the postcards
7 that were off the Deterra -- the Deterra bag,
8 and I believe at the time they -- it wasn't
9 specific enough, and so whoever was filling out
10 the survey could, like, interpret it different
11 ways.
12     Q.   So the information -- the data that
13 was collected wasn't specific, and so it could
14 be interpreted multiple ways?
15     A.   Yes.
16     Q.   And if you were going to improve
17 the ability to draw conclusions from the data,
18 would you -- would the next step be to try to
19 be more specific with what was written on the
20 postcards?
21        MS. KOUBA:  Object to the form of
22 the question.
23     A.   I'm sorry.  Could you repeat that.
24     Q.   I will just --
25        MR. MASTERS:  Can you repeat my

Page 108

1 question.
2        THE NOTARY:  Question:  "And if you
3 were going to improve the ability to draw
4 conclusions from the data, would you -- would
5 the next step be to try to be more specific
6 with what was written on the postcards?"
7     A.   Yes.
8     Q.   Can we take a break?
9     A.   Sure.
10        THE VIDEOGRAPHER:  Off the record
11 at 11:31.
12        (Recess taken.)
13        THE VIDEOGRAPHER:  On the record,
14 11:48.
15     Q.   Welcome back, Mr. Hutzell.
16     A.   Thank you.
17     Q.   I am showing you what is being
18 marked as Exhibit 5.  It is Bates stamped
19 Summit 001795395.
20            - - - - -
21        (Thereupon, Deposition Exhibit 5,
22        Opiate Task Force Data Dashboard,
23        Beginning with Bates Label SUMMIT
24        001795395, was marked for purposes
25        of identification.)

Page 109

1            - - - - -
2     Q.   Do you recognize this document?
3     A.   Yes I do.
4     Q.   What is it?
5     A.   This is the Opiate Task Force data
6 dashboard.
7     Q.   Did you prepare this document?
8     A.   Yes, I did.
9     Q.   Are these data dashboards something
10 that you regularly prepared as part of your
11 work at Summit ADM?
12     A.   Yes, they are.
13     Q.   Were data dashboards being prepared
14 prior to you joining Summit ADM?
15     A.   Yes, they were.
16     Q.   Who prepared this?
17     A.   I believe it was Tom Grande.
18     Q.   Before we get into this document,
19 you referenced that it is the data dashboard
20 for the Summit County Opiate Task Force, right?
21     A.   Yes -- or the Opiate Task Force
22 data dashboard.
23     Q.   And we talked earlier about now
24 important definitions are to understanding and
25 being able to draw conclusions from data; is

28 (Pages 106 - 109)

1  that right?
2      A.   Yes.
3      Q.   So the word opiate, how do you
4  understand that word to be defined?
5      A.   An opiate is a type of medication,
6  legal or illicit and stuff, that comes from the
7  opiate plant, from the poppy plant.  That's my
8  understanding of it, but I'm not a pharmacist,
9  so...
10     Q.   Have you ever heard the term
11  opioid?
12     A.   Yes, I have.
13     Q.   Do you understand if there a
14  difference between the term opiate and opioid?
15     A.   Yeah.  Opioid is synthetic.  Opiate
16  is natural.
17     Q.   What do you mean by synthetic
18  versus natural?
19     A.   Synthetic, like, is manmade.
20  Again, I'm not a pharmacist, so I don't know
21  exactly, like, the term or what goes into
22  making those two differences.
23     Q.   What kinds of substances are
24  opioids?
25     A.   What do you mean, like what?

1      Q.   What don't you understand about my
2  question?
3      A.   I don't understand if you are
4  asking, like, specific examples, or if you are
5  asking, like, definitions.
6      Q.   Specific examples.  What substances
7  are you aware of that would be defined as an
8  opioid?
9      A.   As an opioid and stuff, I believe,
10  you know, that heroin would be an opioid, and I
11  really can't say much, because I'm not the
12  substance use, like, expert and stuff.  So
13  without, like, looking at, like, definitions
14  and stuff like that, I wouldn't be able to tell
15  off the top of my head.
16     Q.   Do you know whether oxycodone is an
17  opiate or an opioid?
18     A.   No, I do not.
19     Q.   Do you know whether hydrocodone is
20  an opiate or an opioid?
21     A.   No, I do not.
22     Q.   In your experience, do you use the
23  word opiate to mean both opiate and opioid?
24     A.   In regards to the Opiate Task
25  Force, yes.

1      Q.   And generally speaking, did you
2  tend to lump the two together when you were
3  talking about, say, the opioid problem?
4      A.   In what context and stuff are you
5  referring to?
6      Q.   Generally speaking, if you are
7  referring to the opioid epidemic, do you
8  understand that to mean both opioids and
9  opiates?
10     A.   In what type of setting are you
11  referring to?
12     Q.   Are there setting in which you, you
13  specifically in your role at Summit ADM,
14  differentiate between the two?
15     A.   Yes.
16     Q.   What settings are those?
17     A.   Settings, you know, are different
18  stakeholder meetings and stuff.
19     Q.   So there are some stakeholder
20  meetings that are geared specifically toward
21  opiates as opposed to opioids, or vice versa?
22     A.   No.
23     Q.   You just said that the settings in
24  which you have differentiated between opiates
25  and opioids are stakeholder meetings.

1      A.   When you say, like, that, when I
2  differentiate, it means, like, I'm thinking
3  that I'm sitting in a room talking to people
4  and stuff and discussing an opiate versus an
5  opioid, but, you know, so as far as like, you
6  know, different types of meetings and stuff for
7  that, for each one of those, no, there is no
8  different meanings for those.
9      Q.   You use the terms interchangeably?
10     A.   Yes.
11     Q.   Okay.  Turning to page 2 of this
12  PowerPoint presentation, there is a list of the
13  Opiate Task Force key critical indicators, and
14  there are seven listed; is that right?
15     A.   Yes.
16     Q.   Who came up with these key
17  indicators?
18     A.   It was a meeting and stuff between
19  myself, Aimee Wade, Jerry Craig and Mary Alice.
20     Q.   And how did you settle on these
21  seven indicators?
22     A.   They were the easiest to report on
23  and collect the data from.
24     Q.   What do you mean by easiest to
25  report on?

29 (Pages 110 - 113)

Page 114

1    A.   We were able to get the data and
2  stuff easier and stuff, without much of a
3  hassle.
4    Q.   When -- why did you use the word
5  key critical indicators?
6    A.   That was a definition that was
7  determined by, I believe, Jerry Craig, so he
8  would have a better answer than I would on
9  that.
10    Q.   What did you understand it to mean?
11    A.   What did I understand it to mean
12  and stuff?  These were the seven items that
13  they wanted to be able to use to determine,
14  like, what type of, I guess, ecological results
15  were occurring within the county.
16    Q.   Are these seven indicators
17  considered key because they are revealing about
18  the opioid problem in Summit County?
19        MS. KOUBA:  Object to the form of
20  the question.
21    A.   What do you mean by revealing?
22    Q.   Do they -- do they help understand
23  the opioid problem in Summit County?
24    A.   Yes.
25    Q.   Do they help understand the opioid

Page 115

1  problem better than some other less key
2  critical indicators?
3    A.   What type of, like, less key
4  critical indicators would you be referring to?
5    Q.   Are these seven items considered
6  key because they are particularly revealing,
7  particularly helpful indicators?
8    A.   They are helpful indicators, yes.
9    Q.   So let's go through each one.
10  First is the drug overdoses per day, and it
11  says in parentheses, EPiCenter Data.  What is
12  EPiCenter day?
13    A.   When you say per day, which letter
14  are you looking at?
15    Q.   This is the key critical indicator
16  slide, there are seven listed, and the first
17  one says drug overdoses per day.
18    A.   So page two.  Page two is not per
19  day.  Page two is per month.
20    Q.   So I'm looking at the key critical
21  indicators, the seven indicators that were
22  chosen in the meeting you participated in with
23  Jerry Craig --
24    A.   Sorry.
25    Q.   -- and the first one says drug

Page 116

1  overdoses per day, and it says EPiCenter data?
2    A.   Yes.
3    Q.   What is EPiCenter data?
4    A.   EPiCenter data is a data source
5  that the health department has published on
6  their website.
7    Q.   They publish the data source?
8    A.   Yes.  They published the numbers.
9    Q.   Do they create the data source?
10    A.   I'm not sure.  You would have to
11  talk to the health department for that.
12    Q.   What do you understand the
13  EPiCenter data source to contain?
14    A.   It contains, like, different drug
15  overdoses, different metrics about drug
16  overdoses, and recently drug overdose deaths.
17    Q.   And how is this data collected?
18    A.   I'm not sure, because I'm not in
19  charge of that data.  So that's the health
20  department.
21    Q.   But you testified earlier that you
22  always investigate the reliability of data,
23  right?
24    A.   Yes.
25    Q.   And that entails understanding how

Page 117

1  it was collected, how it was sourced, where it
2  came from, what it means, right?
3    A.   Yes.
4    Q.   So did you not do that with the
5  EPiCenter data?
6    A.   Yes, I did do that with the
7  EPiCenter data.  The EPiCenter data comes from
8  the health department, the Summit County Public
9  Health Department.  Where they get that dataset
10  from, I believe, you know, is the Ohio
11  Department of Health and stuff, but again, I'm
12  not in charge of that, so I would assume that
13  the Summit County Public Health Department data
14  is reliable.
15    Q.   But you said earlier that you never
16  just assume the reliability of data, right?
17        MS. KOUBA:  Object to the form of
18  the question.
19    A.   Could you rephrase that.
20    Q.   Previously you testified that when
21  you get a data source, you determine the
22  reliability of that data source, right?
23    A.   Uh-huh.
24    Q.   And that entails understanding how
25  the data was collected, right?

30 (Pages 114 - 117)

Page 118

1     A.    Uh-huh.
2     Q.    And now you are telling me that the
3  EPiCenter data comes from the department of
4  health, but that you didn't investigate how it
5  was collected because it's not your job?
6         MS. KOUBA:  Objection to form.
7     A.    No, that's not what I'm saying at
8  all.
9     Q.    So what are you saying?  All I want
10 to know is what are you saying and how is this
11 data collected?
12    A.    The Summit County Public Health
13 Department, which is a reliable source of data,
14 collects this data and stuff, and they gather
15 it and put it on their data dashboards.
16    Q.    And that's --
17    A.    And that's -- yes, because Summit
18 County Public Health Department is a reliable
19 source of data.
20    Q.    And that's the extent that you have
21 looked into this data?
22    A.    Yes.
23    Q.    Okay.  Let's turn to page 3.  And
24 this is Drug Overdose Emergency Department
25 Visit Summary.  What do you understand this

Page 119

1  graph to be depicting?
2     A.    It's the monthly total of people
3  who had visited the emergency department for a
4  drug overdose.
5     Q.    So each of these numbers listed on
6  the chart is a monthly total?
7     A.    Yes.
8     Q.    And what is a drug overdose?
9     A.    A drug overdose is when somebody
10 had overdosed from a drug.
11    Q.    Any drug?
12    A.    Yes, it could be.
13    Q.    So this data references all drug
14 overdoses?
15    A.    Yes.
16    Q.    So if somebody overdosed from
17 cocaine, that would be included in this data?
18    A.    Yes.
19    Q.    If somebody overdosed from
20 methamphetamine, it would be included in this
21 overdose -- or in this data?
22    A.    I'm not sure if that's an accurate
23 statement and stuff, because I'm not sure if
24 people can overdose from methamphetamines or
25 not.  My understanding is you can get high, but

Page 120

1  you can't overdose from it, but I would have to
2  look that up to be able -- to be sure whether
3  that's true or not.
4     Q.    But assuming that one could, and
5  the person overdosed from methamphetamine, that
6  would be reflected in this data?
7         MS. KOUBA:  Objection to the form.
8     A.    I'm not going to say that assuming
9  somebody could overdose from methamphetamines,
10 because, again, I don't know, but this drug
11 overdose data is going to reflect every type of
12 different drugs that you can overdose from.
13    Q.    Okay.  It didn't differentiate
14 between opioids, for example, versus cocaine?
15    A.    Not to my knowledge.
16    Q.    And this chart reflects data from
17 three different years, correct?
18    A.    Yes, that is correct.
19    Q.    And the blue line is 2016?
20    A.    Yes.
21    Q.    And it appears there is a large
22 spike from June of 2016 to July of 2016?
23    A.    Yes, that is true.
24    Q.    Were you at Summit ADM at that
25 time?

Page 121

1     A.    Yes, I was.
2     Q.    Do you have -- what accounts for
3  that large spike, in your understanding?
4     A.    Fentanyl and carfentanil.
5     Q.    What are fentanyl and carfentanil?
6     A.    They are opioids.
7     Q.    They are opioids?
8     A.    Yes.
9     Q.    Are they prescription opioids?
10    A.    I don't know about carfentanil,
11 whether that is prescribed or not.  Fentanyl I
12 do know is prescribed.
13        THE NOTARY:  I'm sorry.  I didn't
14 hear that.
15    A.    Oh, sorry.  I said that I don't
16 know if carfentanil is prescribed or not, but I
17 do know that fentanyl can be prescribed.
18    Q.    Do you know what carfentanil, if
19 anything, is used for?
20    A.    The only thing I have heard is an
21 elephant tranquilizer, but that's my extent of
22 knowledge on that drug.
23    Q.    And this spike in overdoses that
24 you attribute to fentanyl and carfentanil, was
25 this a result of prescription fentanyl or

31 (Pages 118 - 121)

1  illicit fentanyl?

2      MS. KOUBA:  Object to the form.

3      A.  I don't know that.  I'm not an

4  expert on that.

5      Q.  So you don't have a view about

6  whether this reflects a spike in illicit versus

7  prescription?

8      A.  No, I don't know that question.

9      Q.  Do you know if the data indicates

10  whether this spike corresponds to overdoses

11  related to prescription fentanyl versus illicit

12  fentanyl?

13      MS. KOUBA:  Object to the form.

14      A.  No, I still don't know that.

15      Q.  But what you do know is that this

16  spike was related, in your view, to fentanyl

17  and carfentanil?

18      A.  Yes, that was what the reports

19  stated.

20      Q.  If we look the next page, this

21  slide is titled Drug Overdose Emergency

22  Department Visits Summary; is that right?

23      A.  Yes.

24      Q.  What is this graph depicting?

25      A.  The rounded average, averages of

1  emergency room overdoses per day.

2      Q.  And again we see a large spike.  Is

3  that the same spike that was shown on the

4  previous chart?

5      A.  To my knowledge, yes, but I didn't

6  do this graph.

7      Q.  Who did this graph?

8      A.  This was Jerry Craig.

9      Q.  So this is an example, perhaps, of

10  the 0.1 percent of data that didn't originate

11  from you?

12      A.  That's true.

13      Q.  So some data came from other

14  sources?

15      A.  Yes.

16      Q.  How often did Jerry Craig produce

17  data?

18      A.  Not too much.  I mean, he had,

19  like, this graph that he liked to do, and, I

20  believe, one other graph and stuff.

21      Q.  Why did he like to do this graph?

22      A.  I don't know.  I didn't ask him.

23  He just said he wanted that in the PowerPoint

24  slide, so I put it in there.

25      Q.  So he made this?

1      A.  Yes.

2      Q.  On what data did he base this?

3      A.  I'm not sure.  You're going to have

4  to ask him.

5      Q.  You didn't ask him?

6      A.  No.

7      Q.  You just -- he just sent you the

8  PowerPoint and you put it in the presentation?

9      A.  Yeah.  He said he wanted it.  This

10  was the drug overdose emergency department

11  visits summary, and he wanted it in the data

12  dashboard.

13      Q.  You mentioned that this spike that

14  occurred between June and July of 2016, you

15  understand that to be related to fentanyl and

16  carfentanil.  On what are you basing that

17  understanding?

18      A.  Well, first, are you -- because we

19  were on this page and stuff, and you are

20  looking at another page and stuff, are you

21  referring to that page now?

22      Q.  I'm referring generally to the

23  spike between June and July of 2016, which you

24  attributed to fentanyl and carfentanil, and I

25  am asking, on what are you basing your

1  understanding that that resulted from fentanyl

2  and carfentanil?

3      A.  The medical examiner records.

4      Q.  So not the EPiCenter data?

5      A.  No.

6      Q.  Do you know whether the EPiCenter

7  data indicates that the spike related to

8  fentanyl and carfentanil?

9      A.  No, I do not.

10      Q.  And when you say you are basing it

11  on the medical examiner records, what do you

12  mean by that?

13      MR. LEDLIE:  Object to the form of

14  the question.

15      Q.  You looked at the medical examiner

16  records and saw a lot of entries relating to

17  fentanyl and carfentanil?

18      A.  We did an analysis on it.

19      Q.  And what did your analysis -- what

20  did you find, in your analysis?

21      A.  That there are a lot of fentanyl

22  and carfentanil-related deaths.

23      Q.  During that time period?

24      A.  Yes.

25      Q.  And did your analysis of the

Page 126

1  medical examiner records indicate whether, one
2  way or another, whether the fentanyl-related
3  deaths were from prescription or illicit
4  fentanyl?
5      A.   No, not the ones that I saw.
6      Q.   Let's turn to page 7.  What is the
7  difference between a drug overdose and a drug
8  overdose death?
9      A.   Well, a drug overdose death is when
10  somebody dies from a drug overdose.  A drug
11  overdose, as stated in this particular slide,
12  is when somebody has overdosed from drugs but
13  has not died.
14      Q.   Okay.  And this slide here on page
15  7 refers to specifically drug overdose
16  deaths per month by year?
17      A.   Uh-huh.
18      Q.   And again, we see a very large
19  spike in 2015 and 2016, right?
20      A.   Yes.
21      Q.   Is it your understanding that that
22  spike in drug overdose deaths is also a result
23  of fentanyl and carfentanil?
24      A.   In 2015 and 2016?
25      Q.   Yes.

Page 127

1      A.   Yes, that's my understanding.
2      Q.   And again, that understanding is
3  not -- strike that.
4          Do you know whether the spike in
5  overdose deaths relating to fentanyl
6  corresponds to prescription fentanyl versus
7  illicit fentanyl?
8          MR. LEDLIE:  Object to the form of
9  the question.
10      A.   I don't have any way to
11  differentiate that and stuff.  It is just based
12  on the medical examiner's data.
13      Q.   Flipping to page 8, this slide is
14  titled OARRS report, right?
15      A.   Yes.
16      Q.   What is OARRS?
17      A.   OARRS is a reporting system that
18  Ohio set up for doctors and pharmacists, I
19  believe, and other agents -- other
20  professionals that are able to prescribe
21  opioids or opiates and stuff.
22      Q.   Did you put together this slide?
23      A.   Yes, I did.
24      Q.   How did you create this slide?
25      A.   How did I create this slide?  I

Page 128

1  took the numbers from the OARRS database and
2  put it into an Excel spreadsheet and then
3  created a line graph with that.
4      Q.   What is the nature of your access
5  to the OARRS database?
6      A.   Just public access and stuff.
7      Q.   So how do you access it?
8      A.   I go to the website, and there is a
9  part that has statistics and stuff, and then I
10  select which option that I want.
11      Q.   What kind of options are you
12  allowed to select on this database?
13      A.   I don't know.  There is like four
14  different ones.  I don't know all of them.  The
15  one I select is county statistics.
16      Q.   And specifically Summit County?
17      A.   Yes.
18      Q.   And what kind of statistics does it
19  generate?
20      A.   It generates, like, opiate
21  prescriptions, like, as far as how many has
22  been prescribed in the county.
23      Q.   Prescribed or dispensed?
24      A.   Dispensed.
25      Q.   And why is opiate -- why did you

Page 129

1  include opiate doses dispensed per capita in
2  this slide?
3      A.   Because it's easy to understand and
4  stuff.  When you are trying to explain
5  statistics to somebody, you want to make it as
6  easy as possible and stuff, so if you've got an
7  audience, you want to make sure that they
8  understand what is being said by the slide.
9      Q.   And what does opioid doses per
10  capita reflect?
11      A.   How many doses were dispensed per
12  individual.
13      Q.   And why is that a statistic that is
14  worthy of including in the Opiate Task Force
15  report?
16      A.   Because opioid and opiate
17  prescription medications have been attributed
18  to overdose deaths.
19      Q.   And so showing the trend is useful
20  for what reason?
21      A.   To see how much prescription
22  medications -- or to get an idea of how much
23  prescription medications are being dispensed by
24  professionals.
25      Q.   And why is it important to get an

33 (Pages 126 - 129)

Page 130

1  idea of that?
2      A.   I would say to better understand,
3  like, you know, how much of the, you know,
4  prescription medications are attributing to
5  deaths and drug overdoses.
6      Q.   Does this data help you understand
7  how prescription medications are attributed to
8  deaths and drug overdoses?
9      A.   Yes.
10     Q.   Just to be clear, we are talking
11  about opioid doses dispensed per capita?
12     A.   Yes.
13     Q.   How does opioid doses dispensed per
14  capita tell you whether prescription
15  medications are attributed to deaths and drug
16  overdoses?
17         MR. LEDLIE:  Object to the form of
18  the question.  Sorry.
19     A.   Could you rephrase that?
20     Q.   What didn't you understand about my
21  question?
22     A.   All of it.  Could you repeat that,
23  please?
24         MR. MASTERS:  Could you please
25  repeat the question for the witness.

Page 131

1          THE NOTARY:  Question:  "How does
2  opioid doses dispensed per capita tell you
3  whether prescription medications are attributed
4  to deaths and drug overdoses?"
5      A.   Because in various different
6  research articles, it's been attributed to
7  depression.  The number of opiates dispensed or
8  opioids dispensed in a population can be
9  attributed to depression, and so when you have
10  a high amount of depression in an area and
11  stuff, you have a lot of different substance
12  use issues and stuff, with that.
13          So you kind of look at that like as
14  an ecological factor and stuff.  You know, like
15  if there is a lot of opioids being dispensed in
16  an area and stuff, then you have to be looking
17  for those key indicators, as far as like
18  depression and deaths.
19     Q.   So what research articles are you
20  referring to?
21     A.   I can't name every article that
22  I've read and stuff.
23     Q.   Can you name any?
24     A.   No, not off the top of my head.
25     Q.   So this conclusion is based on

Page 132

1  research reports that you can't remember?
2          MS. KOUBA:  Objection to the form
3  of the question.
4      A.   That's not true and stuff.
5      Q.   Okay.
6      A.   I can remember things from my
7  research.  Just because I don't remember the
8  authors and the title of it and stuff --
9          MR. LEDLIE:  Can you please quit
10  interrupting him while he is answering your
11  question.
12          MR. MASTERS:  Will do.
13     Q.   You said that this relates to
14  depression, and you testified that in areas
15  with a high amount of depression have a lot of
16  different substance abuse issues.
17          What kinds of substance abuse
18  issues occur in areas with high degrees of
19  depression?
20     A.   There is a lot of varying substance
21  use issues and stuff and dependency that
22  occurs.  I don't have a specific one, if that's
23  what you're looking for.
24     Q.   I just want to know what you were
25  referring to when you said a lot of substance

Page 133

1  abuse issues occur in areas with high degrees
2  of depression?
3      A.   I mean, people getting -- having
4  substance use disorders, a high amount of
5  people having substance use disorders.
6      Q.   And so what does this opiate doses
7  dispensed per capita, what does this graph and
8  the data on this graph indicate about the
9  opioid problem in Summit County?
10     A.   This graph indicates how many
11  opioid doses are being dispensed per capita.
12     Q.   And does this graph indicate
13  anything about -- if you were to look at this
14  graph, does this tell you anything about the
15  number of opioid overdoses and deaths
16  attributed to prescription opioids in Summit
17  County?
18          MS. KOUBA:  Object to the form of
19  the question.
20     A.   I'm sorry.  Could you repeat that
21  again.
22     Q.   I'll read what I just asked.  "If
23  you were to look at this graph, does this tell
24  you anything about the number of opioid
25  overdoses and deaths attributed to prescription

34 (Pages 130 - 133)

Page 134

1 opioids in Summit County?
2          MR. LEDLIE:  Object to the form of
3 the question.
4      A.   I'm sorry.  I'm still not
5 understanding.
6      Q.    What don't you understand about my
7 question?
8      A.    The question itself.  Could you
9 rephrase it, please.
10     Q.    Does opioid doses dispensed per
11 capita provide information about the number of
12 prescription opioid-related overdoses and
13 deaths?
14     A.    It is a key critical indicator.
15     Q.    But from data about overdoses
16 dispensed per capita, can you draw a conclusion
17 about the number of prescription opioid-related
18 deaths?
19          MS. KOUBA:  Object to the form.
20          MR. LEDLIE:  Object to the form.
21     A.    What do you mean by conclusion?
22          MR. LEDLIE:  Is this a good time
23 for a break?
24          MS. FEINSTEIN:  There is a question
25 pending.

Page 135

1      Q.    There is a question pending.
2          MR. LEDLIE:  He has answered your
3 last question.
4          MS. FEINSTEIN:  No, he hasn't.
5      Q.    You testified that opioid doses
6 dispensed per capita can help you understand
7 how much the prescription medications are
8 attributing to deaths and drug overdoses.
9          My question was, what conclusions
10 can you draw about the number of prescription
11 opioid-related overdoses from this data?
12          MS. KOUBA:  Objection to the form
13 of the question.
14     A.    When you say conclusions, are you
15 referring to causations or correlations?
16     Q.    I'm referring to what you said this
17 data can be used to help you understand.
18     A.    If you are referring to causations,
19 from this data, you cannot determine a
20 causation, but you can determine a correlation.
21     Q.    And what is the nature of the
22 difference?
23     A.    A causation is pretty much in its
24 name, like you could say, you know, A equals B
25 and stuff, and that would be a causation,

Page 136

1 because you know for a fact in if A is there,
2 that you are going to get B.
3          You don't have that with this
4 dataset.  What you have is correlation, which
5 is that when A is present, there is a high
6 amount of B present.
7      Q.    There is a high amount or there is
8 some amount?
9          MS. KOUBA:  Object to the form.
10     A.    It could be either.
11     Q.    And do you know whether -- what is
12 the amount of correlation between opioid
13 dispensing per capita and prescription
14 opioid-related overdoses?
15          MS. KOUBA:  Objection to the form.
16     A.    As far as?
17     Q.    Is it a high correlation, is it a
18 low correlation, what is your basis for that?
19     A.    That, I don't have a statistical
20 analysis for that.
21     Q.    So you don't know --
22          MR. LEDLIE:  Let's take a break.
23          MR. MASTERS:  Okay.
24          THE VIDEOGRAPHER:  Off the record
25 at 12:24.

Page 137

1          (Recess taken.)
2          THE VIDEOGRAPHER:  On the record,
3 1:21.
4      Q.    Welcome back from lunch, Mr.
5 Hutzell.
6      A.    Thank you.
7      Q.    We left off talking about the OARRS
8 report slide, Exhibit 5.
9          Why is there a comparison or a
10 reflection of two different counties, Summit
11 and Montgomery?
12     A.    Because we wanted to see, like, how
13 our population is doing compared to a different
14 county.
15     Q.    Why was Montgomery chosen?
16     A.    Because they are similar size and
17 population.
18     Q.    And what does this chart reflect
19 about the comparison between Summit and
20 Montgomery?
21     A.    This chart reflects basically how
22 many opiate doses were dispensed per capita
23 over the time period of first quarter of 2016
24 to the fourth quarter of 2017.
25     Q.    And what specifically does it

35 (Pages 134 - 137)

1 reflect about the comparison between Summit and
2 Montgomery?
3     A.   What do you mean?
4     Q.   If you were to look at this chart,
5 what does it show?
6     A.   It just shows the number of opiate
7 doses dispensed per capita.
8     Q.   Is the number of opiate doses
9 dispensed per capita the same in Summit as in
10 Montgomery?
11     A.   No.  Those are different numbers.
12     Q.   So what does this chart show about
13 the difference between Summit and Montgomery?
14     A.   I'm sorry.  Could you rephrase
15 that.  I don't understand exactly.
16     Q.   This chart reflects the number of
17 opiate doses dispensed in both Summit and
18 Montgomery County from Q1 2016 to Q4 2017.
19     A.   Huh-uh.
20     Q.   And you said that Summit and
21 Montgomery doses per capita are not identical,
22 correct?
23     A.   I didn't say that exactly.  I did
24 say that it indicates the numbers and stuff.
25     Q.   And are they different?

1     A.   Yes.
2     Q.   And what does this chart show about
3 the difference between Summit and Montgomery
4 numbers?
5     A.   The amounts being dispensed.
6     Q.   Is there more that is being
7 dispensed in Montgomery than Summit?
8     A.   Yes.
9     Q.   You indicated that the OARRS report
10 was publicly available?
11     A.   Yes.
12     Q.   Do you get access to raw data when
13 you ran these public queries?
14     A.   No, I did not.
15     Q.   So what exactly did the OARRS
16 database spit back at you when you ran the
17 query?
18          MR. LEDLIE:  Object to the form of
19 the question.
20     A.   These numbers and stuff that are
21 present on the side.
22     Q.   Just opiate doses per capita?
23     A.   There is like three other different
24 queries, but I don't remember them off the top
25 of my head and stuff, so...

1     Q.   Did you run them?
2     A.   It runs all together.
3     Q.   And you don't remember what those
4 other queries were?
5     A.   No.
6     Q.   They weren't key indicators?
7     A.   No.  They weren't the ones that we
8 were using.
9     Q.   Is there a reason why you didn't
10 use those other ones?
11     A.   This was the one that Jerry had
12 recommended to use.
13     Q.   So this was Jerry's idea?
14     A.   Yeah.  And that's what we have
15 kept.
16     Q.   And this idea came about in that
17 meeting that you referenced earlier?
18     A.   Probably before the meeting.  I'm
19 not exactly sure when exactly it was
20 determined.  So you would probably have to ask
21 Jerry.
22     Q.   So it could have come before that
23 then?
24     A.   It could have.  I don't know.
25     Q.   The EPiCenter data that we talked

1 about earlier, did you get access to the raw
2 data for that?
3     A.   No, I did not.
4     Q.   So what form did this data take
5 that you received?
6     A.   It's a data dashboard that the
7 health department has on their website.
8     Q.   And what is contained in the data?
9     A.   Well, the data that I looked at was
10 the drug overdose visits by emergency room.
11     Q.   Is that the only data point in the
12 spreadsheet or the database?
13     A.   There is other, like other data
14 points and stuff that's on there.
15     Q.   How did you get this data?
16     A.   Just accessed it on the website and
17 chose the parameters that I wanted to have on
18 the report.
19          - - - - -
20          (Thereupon, Deposition Exhibit 6,
21          Email From Hutzell, with Quarterly
22          Stakeholders Meeting, March 14, 2018
23          Attached, Beginning with Bates Label
24          SUMMIT 0008711963, was marked for
25          purposes of identification.)

36 (Pages 138 - 141)

Page 142

1           - - - - -
2      Q.   I'm marking -- I'm showing you what
3  has been marked as Exhibit 6.  This is Bates
4  stamped Summit 00871963.
5           Do you recognize this document?
6      A.   I recognize it.
7      Q.   Is this an email to you?
8      A.   No, it's not.
9      Q.   Is it an email from you?
10     A.   Yes, it is.
11     Q.   And you are responding to an email
12  from Dr. Smith to you?
13     A.   Yes.
14     Q.   And you attached the Quarterly
15  Stakeholders meeting, September 14, 2016,
16  correct?
17     A.   Yes.
18     Q.   And what is that document?
19     A.   The Opiate Task Force data
20  dashboard.
21     Q.   So this is the same kind of
22  document, just an earlier time period?
23     A.   Yes.
24     Q.   And did you prepare this one?
25     A.   Yes.

Page 143

1      Q.   Let's focus on this PowerPoint
2  first.  If you flip to page 2, this PowerPoint
3  indicates the key critical indicators, and this
4  time there are 11?
5      A.   Uh-huh.
6      Q.   The previous PowerPoint had seven.
7  When did that change from 11 to seven?
8      A.   I'm not sure of the exact timeframe
9  and stuff.  I'm not sure if it was the
10  beginning or middle of 2017 or even at the end
11  of 2016.  So I'm not sure when exactly and
12  stuff that it happened.
13          MS. KOUBA:  Brad, there is
14  something I would like to clarify real quickly.
15  Is this a native format of the attachment that
16  corresponded to these Bates in this email?
17          MR. MASTERS:  Yes.
18          MS. KOUBA:  I just wanted to make
19  sure.
20          MR. MASTERS:  Yes.
21     Q.   Why were some of the key indicators
22  dropped off?
23     A.   Because the data was unreliable and
24  inconsistent.
25     Q.   Which data was unreliable and

Page 144

1  inconsistent?
2      A.   Numbers 4, 5 and 6.
3      Q.   Any others?
4      A.   No.
5      Q.   So let's take number 4, neonatal
6  abstinence syndrome incidence rate.  What was
7  unreliable and inconsistent about that data?
8      A.   Well, the unreliable part was the
9  inconsistencies and stuff.  We weren't able to
10  get a thorough number on that.  Some agencies
11  would report, others wouldn't and stuff.
12          The next time we did a quarterly
13  report, like say agency A and B reported, like,
14  the first time, well then the next time agency
15  C and D would report and stuff.  So it would be
16  constantly, you know, changing and not
17  providing an accurate picture of what was going
18  on.
19     Q.   And so then you dropped neonatal
20  abstinence syndrome as a key indicator for data
21  dashboards going forward?
22     A.   Yes.
23     Q.   Because the reliability of data is
24  important?
25     A.   Yes.

Page 145

1      Q.   Was that a result of you examining
2  the data?
3          MS. KOUBA:  Object to the form of
4  the question.
5      Q.   Let me rephrase it.
6          Were you the one that determined
7  that the data was unreliable?
8      A.   It was part of a meeting and stuff
9  that I talked about earlier with Jerry and
10  Aimee and Mary Alice, and that was one of the
11  conclusions that we came up with together.
12     Q.   So this was discussed as a group?
13     A.   Yes, it was.
14     Q.   Do you recall what was said in the
15  meeting by Jerry Craig about this data?
16     A.   No, I do not and stuff.  He
17  probably would be better to explain that.
18     Q.   But you don't recall?
19     A.   No, other than -- not exactly and
20  stuff what was said by him and stuff, other
21  than, you know, stating that we have -- you
22  know, we want to make sure that we are
23  consistent with all our metrics and stuff that
24  we are using.
25     Q.   Let's talk about overdose responses

37 (Pages 142 - 145)

Page 146

1  by Akron EMS.  What was unreliable about that
2  data?
3      A.   The only unreliable part about that
4  and stuff was just being able to get the data
5  and stuff before the timelines and stuff that
6  we were asking for.
7      Q.   Please finish.
8      A.   I was finished.
9      Q.   Okay.  What do you mean when you
10  say, being able to get the data and stuff?
11      A.   Getting it on time, on our
12  timeframe, you know.  I mean, they are
13  different agencies, so we have to, like, kind
14  of work with them on their timelines too and
15  take into consideration what they have and what
16  they are able to give to us.
17      Q.   Just so I understand, you indicated
18  that these were dropped off because they were
19  unreliable.  Was there anything about the
20  unreliability of the data with respect to the
21  overdose responses by Akron EMS?
22          MS. KOUBA:  Object to the form of
23  the question.
24      A.   When I said unreliable, I was
25  referring to inconsistent.

Page 147

1      Q.   And what inconsistencies presented
2  in the overdose response data from Akron EMS?
3      A.   Just being able to get it in a
4  timely manner at the time that we needed it.
5      Q.   And that is a reflection of data
6  being inconsistent?
7      A.   The timewise being inconsistent and
8  stuff, not the data itself.
9      Q.   Overdose reversals by Summit County
10  EMS and police departments, what was unreliable
11  about that data?
12      A.   That was, again, consistency and
13  stuff was meant by unreliable, not the data
14  itself.  Getting agencies to turn in the data
15  on the times that we needed it, or getting
16  every agency to turn it in, like --
17          Sorry, I'm just seeing if that was
18  your wife.
19      Q.   That was not.
20          MS. FEINSTEIN:  We all were.
21      A.   So anyways, you know, like I said,
22  agency A and B might turn it in at one time,
23  and then all of a sudden you have got G and X
24  turning it in at another time.  So that makes
25  it hard to report, because you can't have a

Page 148

1  comparison all the time and stuff.
2          So it's not that their data was
3  consistent, it was just the reporting was
4  inconsistent, which provides it to be
5  unreliable.
6      Q.   Looking at these key indicators, it
7  appears that there were, at this time in
8  September 2016, two opiate doses dispensed
9  indicators, one for Summit County versus Ohio
10  and one for Summit County versus Montgomery
11  County; is that right?
12      A.   Yes.
13      Q.   And the Summit County county versus
14  Ohio number was no longer included going
15  forward?
16      A.   Yeah.  At some point in time and
17  stuff, we decided to exclude that.
18      Q.   If you flip the page to the next
19  slide, this is titled Opiate Doses Dispensed
20  Per Capita to Ohio Patients By County and
21  Quarter.
22      A.   Uh-huh.
23      Q.   And at the bottom, it indicates
24  that this graph shows Ohio versus Summit; is
25  that fair?

Page 149

1      A.   Yes.
2      Q.   The blue or green line is Ohio and
3  the black line is Summit, right?
4      A.   Yes.
5      Q.   And from 2010 until the first
6  quarter of 2016, the doses per capita in Summit
7  is higher than the doses per capita statewide
8  in Ohio, right?
9      A.   Yes.
10      Q.   What happened to that number in
11  2016 quarter 1?
12          MS. KOUBA:  Objection to the form
13  of the question.
14      A.   What do you mean by what happened?
15      Q.   With respect to -- so in 2016
16  quarter 1, does this graph indicate that there
17  was a difference in opioid doses dispensed per
18  capita between Summit County and Ohio?
19      A.   Yes.
20      Q.   What is the difference?
21      A.   I don't know the exact numerical
22  difference and stuff, because the Ohio one is
23  not on here, but from the graph, it says it is
24  slightly higher.
25      Q.   It's slightly higher, but enough

38 (Pages 146 - 149)

Page 150

1 that the data point for the two jurisdictions
2 overlaps, when you look at the actual shape
3 itself?
4      MS. KOUBA:  Object to the form of
5 the question.
6      Q.   If you had to guess, by looking at
7 this graph, how many opiate doses -- opiate
8 doses dispensed per capita in Ohio in 2016
9 quarter 1?
10      MR. LEDLIE:  Object.
11      MS. KOUBA:  Object to the form.
12      A.   I couldn't guess, because I don't
13 know exactly.
14      Q.   If you had to estimate?
15      A.   It was -- in Ohio, it would be
16 lower than the one in Summit County.
17      Q.   Is it close to 14.3?
18      Let me ask it this way:  Were there
19 more than 14 doses per capita dispensed in Ohio
20 in 2016 Q1?
21      A.   Yes.
22      Q.   And there were 14.3 in Summit
23 County, correct?
24      A.   Yes.
25      Q.   So the number -- the delta between

Page 151

1 Summit and Ohio was somewhere between 0.3 and
2 0?
3      A.   No.
4      Q.   Can you explain why it is not?
5      A.   I would say that it would be 0 to
6 0.29.
7      Q.   Okay.  That's fair.  So the delta
8 is somewhere between 0 and 0.29?
9      A.   Yes.
10      Q.   And sometime after this, opioid
11 doses dispensed per capita in Summit County
12 versus Ohio was no longer included on data
13 dashboards?
14      A.   That's correct.
15      Q.   Is that because the number was no
16 longer -- the number of opioids dispensed in
17 Summit County versus Ohio was no longer a
18 meaningful indication of the opioid problem?
19      MS. KOUBA:  Object to the form of
20 the question.
21      A.   No, that's not the reason.
22      Q.   What is the reason?
23      A.   We wanted to focus on the
24 comparison with Montgomery County.
25      Q.   Okay.  If you turn to the neonatal

Page 152

1 abstinence syndrome slide, this
2 indicates -- the first line of this table
3 indicates the number of SC births, right?
4      A.   Yes.
5      Q.   Does SC refer to Summit County?
6      A.   Yes.
7      Q.   And the second line says NAS
8 incidence rates per 1,000?
9      A.   Yes.
10      Q.   What is neonatal abstinence
11 syndrome?
12      A.   That I don't know.  I don't have
13 expertise in that.
14      Q.   Let's refer to -- let's refer back
15 to the email that this power point was sent
16 along with, and we will probably go back to
17 that PowerPoint.
18      This helps to read this from the
19 bottom up.  The bottom is the email that was
20 sent by Doug Smith to you, correct?
21      A.   Yes.
22      Q.   And in this he mentions that -- he
23 mentioned the, quote, new data that you had
24 that show 200 opiate overdose deaths in 2015,
25 right?

Page 153

1      A.   Yes.
2      Q.   Why did he -- what do you
3 understand about why he included quotes around
4 the word "new"?
5      A.   What I understand is -- from that
6 is, looking at the medical examiner's data and
7 stuff and trying to figure that out and stuff,
8 you know, what exactly that meant.
9      Q.   And that was something that was
10 new?
11      A.   To my knowledge.
12      Q.   So prior to your coming to ADM,
13 you're not aware of an effort to examine
14 medical examiner records to understand what
15 they were saying?
16      MS. KOUBA:  Object to the form of
17 the question.
18      A.   Not to my knowledge.
19      Q.   He asked, in addition to that, "Are
20 you now certain that the data you were using, I
21 think you said from the ME's office, is
22 accurate and will be consistent moving
23 forward"; is that right?
24      A.   Yes.
25      Q.   Were you concerned that the data

39 (Pages 150 - 153)

Page 154

1  wasn't accurate and consistent?
2      MR. LEDLIE: Object to the form of
3  the question.
4      A.  No, I was not.
5      Q.  So what did you understand Dr.
6  Smith to be meaning when he said, "Are you now
7  certain that it will be accurate and consistent
8  moving forward"?
9      MS. KOUBA: Object to the form of
10  the question.
11      A.  At this time, I wasn't sure what
12  exactly I was looking at, because this is in
13  the beginning of the -- when I was first hired,
14  so I wanted to make sure I was certain what I
15  was looking at.
16      Q.  Did you raise concerns about the
17  accuracy of the -- the accuracy and consistency
18  of data?
19      A.  No.
20      Q.  So his inclusion of the word "now
21  certain" meant what exactly?
22      MR. LEDLIE: Object to the form.
23      MS. KOUBA: Object to the form.
24      A.  Could you rephrase that, please.
25      Q.  What do you understand he meant

Page 155

1  using the phrase "now certain"?
2      A.  When I explained this, my concerns
3  was it was more of my ability to interpret the
4  data at that time, because that was the first
5  time that I had looked at the data, so I wanted
6  to make sure that I was interpreting it
7  correctly.
8      Q.  Isn't his statement here though
9  reflecting the data and not your ability?
10      MS. KOUBA: Object to the form.
11      A.  No, that's not what was meant by
12  that.
13      Q.  So you read, "Are you now certain
14  that the data you are using is accurate and
15  will be consistent moving forward" to be a
16  question about whether you have the ability to
17  analyze data?
18      MR. LEDLIE: Object to the form.
19  Misstates.  That's an inaccurate recitation of
20  the email.
21      Q.  Okay.  You read the phrase, quote,
22  Are you now certain that the data that you are
23  using, I think you said from the ME's office,
24  is accurate and will be consistent moving
25  forward, end quote, to be a question about your

Page 156

1  ability to analyze data?
2      MS. KOUBA: Object to the form.
3      A.  No.  No.  The reason why it's
4  stated that way is because at the time, before
5  this, I had analyzed the data wrong, and I
6  realized that I analyzed it wrong, so I wanted
7  to double-check with him and the medical
8  examiner's office what was the correct way to
9  analyze the data.
10      Q.  How did you analyze the data wrong?
11      A.  I included everything as being,
12  like, being able to distinguish between
13  different drugs and stuff being used and stuff
14  as the cause of death, but that wasn't the
15  reason why.
16      What I was looking at was
17  toxicology reports, not cause of death, so
18  that's where I got confused and stuff.
19      Q.  Just so I understand, you -- where
20  you went wrong was analyzing toxicology reports
21  as opposed to cause of death?
22      A.  Yes.
23      Q.  Why is that an error?
24      A.  Because toxicology reports will
25  show more than one drug.

Page 157

1      Q.  And that's a problem because why?
2      A.  Because it, to my understanding, it
3  won't be -- one specific drug is not -- is not
4  the cause of death, would be the cause of
5  death.
6      Q.  So just because a drug is listed in
7  the toxicology report, doesn't mean that it was
8  actually the cause of death?
9      A.  That's my understanding.
10      Q.  And so prior to this point, you had
11  been analyzing these medical examiner reports
12  based on the toxicology report, but not the
13  cause of death?
14      A.  Yes.  And, yeah, when I first
15  started, yes.
16      Q.  If you flip over to your response,
17  you note, "If you refer to the PowerPoint and
18  go to slide 2013, you can see the different
19  drugs that were most commonly found in the
20  toxicology studies," right?
21      A.  Yes.
22      Q.  Let's refer to the PowerPoint.
23  It's slide -- so I'll represent that I don't
24  think what there is a slide 2013, but there is
25  a slide indicating -- or titled Comparison of

Page 158

1  Drugs Most Commonly Found As the Cause of Death
2  From 2015 to 2016, and there are two charts.
3  It's after -- I believe it is page 13.
4      MR. LEDLIE:  What's the title?
5      Q.   Comparison of Drugs Most Commonly
6  Found As the Cause of Death From 2015 to 2016.
7      Is this the slide that you were
8  referring to in that email?
9      A.   I can't remember.  It may have
10  been.
11      Q.   What is the first graph depicting,
12  on the left-hand side?
13      A.   That is the Summit County
14  examiner's -- medical examiner's report for
15  2015, and it depicts deaths directly related to
16  drug use, and then deaths not directly related
17  to drug use, but drugs were in the system.
18      Q.   And does this chart on the
19  left-hand side reflect what was in the
20  toxicology report?
21      A.   Yes.
22      Q.   So this slide would be -- or this
23  graph on the left-hand side is an example of
24  the error you mentioned earlier?
25      A.   Yes.

Page 159

1      Q.   You note shortly after that in the
2  email, "One of the limitations of this
3  toxicology study is that if a person has
4  multiple drugs in their system, the drugs and
5  not the people" -- sorry, "the drugs are
6  counted and not the people"; is that right?
7      A.   I also added, "At least that's my
8  understanding for now."
9      Q.   And is that still your
10  understanding?
11      A.   Yes.
12      Q.   You note two paragraphs down,
13  "Also, I requested death certificates from 2013
14  to August 2016 with toxicology results that
15  confirm opiate use.  Hopefully then, I can
16  analyze these datasets and determine whether
17  there are any patterns of drug use and see how
18  many opiates were involved in other types of
19  deaths."
20      Why did you request death
21  certificates?
22      A.   Because it's public data.  It was
23  easy to access.
24      Q.   What about death certificates was
25  important?

Page 160

1      A.   At this time, if you go one
2  paragraph before that, it talks about Dr.
3  Kohler and meeting her and stuff, and her
4  giving us a tour of the facilities and
5  explaining to me, you know, about the
6  operations, records and things like that.
7      I refer to death certificates and
8  stuff, but she had indicated me that that way I
9  can get the different reports from them, and
10  then also, like, the reports of investigation.
11      Q.   What is the difference between a
12  death certificate and report of investigation?
13      A.   That I'm not sure.
14      Q.   Did you request reports of
15  investigation?
16      A.   I did.
17      Q.   And what did those reports contain?
18      A.   Information on the -- whatever the
19  person's death was.
20      Q.   Was it just reports by the medical
21  examiner's office?
22      A.   These reports were created by the
23  medical examiner's office, yes.
24      Q.   Did they include reports from the
25  forensic examiner's office?

Page 161

1      A.   That I don't know.
2      Q.   You indicated that "This may result
3  in a better measurement of the impact of
4  opiates on the community."  What did you mean
5  by that?
6      A.   Well, before -- the sentence before
7  and stuff, it says, "I can analyze these
8  datasets and determine whether there are any
9  patterns of drug use and see how many opiates
10  were involved in other types of death,
11  suicides, homicides and et cetera."  And I did
12  believe that that would give a whole impact of
13  opiates of the effect on the community.
14      Q.   So studying whether opiates were
15  involved in other types of deaths, like
16  suicides and homicides, would help you better
17  measure the impact of opiates on the community?
18      A.   Yes.
19      Q.   Referring back to the PowerPoint
20  presentation, the data dashboard, several
21  slides later from the one that we were just
22  looking at is a slide titled Deterra Project.
23  What is Deterra?
24      A.   The Deterra Project is a project
25  that was initiated by Summit County Community

41 (Pages 158 - 161)

Page 162

1  Partnership.  What they did was they
2  distributed these Deterra bags out into the
3  community and stuff, to take prescription
4  opiates and other medications off of the
5  streets and stuff, and give people a safe way
6  of disposing of those.
7      Q.    Did you draft this slide?
8      A.    I believe this was worked with in
9  conjunction with Alice Jennings.
10     Q.    But you had a hand in drafting
11  this?
12     A.    Yeah.  We worked together.
13     Q.    The second bullet point says,
14  "Reducing the prescribing of large quantities
15  of opioid medications and disseminating clear
16  recommendations on safe storage and disposal of
17  opioid medications widely to the public and
18  prescribers may reduce risks"; is that right?
19     A.    Yes.
20     Q.    What is the basis of that
21  conclusion?
22     A.    That would be a question for Alice
23  Jennings and stuff.  She would know more about
24  that.
25     Q.    So you don't have a view about why

Page 163

1  reducing the prescribing of large quantities of
2  opioid medications may reduce risks?
3      A.    Yes, I do.
4          MS. KOUBA:  Object to the form.
5      Q.    And what is your view?
6      A.    My view is in align with exactly
7  what this says right here, reducing the
8  prescribing of large quantities of opioid
9  medication and disseminating, like, increases
10  public safety and reduces risks of them being
11  in the wrong hands.
12     Q.    And what is the basis for your
13  view?
14     A.    My work with Alice Jennings.
15     Q.    What do you mean by that?
16     A.    Working on this Deterra Project
17  with Alice Jennings.
18     Q.    What about your work with Alice
19  Jennings on the Deterra Project informed your
20  view that you agree with this statement?
21     A.    Different, like, information that
22  she gave out and stuff, you know, about the
23  harms of prescription opiates and opioids and
24  stuff, around medications getting into, like,
25  populations where they aren't meant to be.

Page 164

1      Q.    What information are you referring
2  to?
3      A.    Information that she looked up.
4  Like, she would be a better source of that and
5  stuff, you know.
6      Q.    But what kinds of things did the
7  information say?
8      A.    Like, it said, like, exactly that,
9  you know.  They tended to want to get opiate
10  medications off the streets and stuff.  That
11  was their whole line and stuff.  I mean, I
12  can't speak specifically, you know, because
13  that's -- Alice Jennings and stuff would be the
14  person for that.
15     Q.    So did you ever analyze data that
16  supports this conclusion?
17     A.    Yes.
18     Q.    What data did you analyze?
19     A.    When you said supports this
20  conclusion and stuff, what do you mean?
21     Q.    You just answered yes to a
22  question, so I'm asking you, what data did you
23  analyze that supports this?
24     A.    I want to make sure I give you, you
25  know, the best answer.

Page 165

1      Q.    So the conclusions that we are
2  talking about on this PowerPoint, did you ever
3  analyze data that supports this bullet point
4  that we are referencing here?
5      A.    Yes, to the fact that reducing the
6  prescription -- prescription medications off of
7  the streets, we did analyze that.
8      Q.    What data did you analyze?
9      A.    The survey data and stuff that we
10  had on the postcards and stuff that
11  specifically asked people, why did they use the
12  medication bags.
13     Q.    And what did -- what did that data
14  indicate?
15     A.    I don't have the results, off the
16  top of my head.
17     Q.    But generally speaking, what do you
18  recall that data indicating?
19     A.    That it reduced, like, the
20  prescription medication off the street.
21     Q.    That what reduced it?
22     A.    That's why people used them.
23  People used the bags to, like, dispose of
24  medications and stuff, and that was the whole
25  purpose of the Deterra Project.

42 (Pages 162 - 165)

Page 166

1      Q.   Did you ever look at data analyzing
2   whether reducing the prescribing of opioid
3   medications reduces the risks of injury?
4      A.   No, I haven't.
5           - - - - -
6          (Thereupon, Deposition Exhibit 7,
7          Email Conversation Between Hutzell,
8          Smalley and Smith, Beginning with
9          Bates Label SUMMIT 000885081, was
10         marked for purposes of
11         identification.)
12          - - - - -
13     Q.   I'm showing you what is being
14  marked as Exhibit 7.  Do you recognize this
15  document?  Sorry.  The Bates number is Summit
16  000885081.
17     A.   Yes, I recognize it.
18     Q.   What is this document?
19     A.   It's an email.
20     Q.   Is it an email you sent?
21     A.   The first one that's on the top,
22  yes.
23     Q.   So this is an email conversation
24  between you, Christine Smalley and Doug Smith,
25  right?

Page 167

1      A.   Yes.
2      Q.   Christine Smalley is wondering, "If
3   we can overlay the info we are getting
4   regarding zip codes of callers with a census
5   map with hotspots of zip codes of OD deaths and
6   ODs," right?
7      A.   Where are you seeing that?
8      Q.   Christine Smalley's email at
9   p.m. on February 7.
10     A.   Okay.
11         MR. LEDLIE:  Object to the form of
12  the question.  It's incomplete.
13     A.   Could you repeat the question
14  again.
15     Q.   So Christine Smalley wants to know,
16  "If we can overlay info we are getting
17  regarding zip codes of callers, then zip codes
18  of callers who complete appointments/callers
19  who don't complete, with a census map with
20  hotspots of zip codes of OD deaths and ODs,"
21  right?
22     A.   Yes, that's what she said on here.
23     Q.   And you indicated that you are
24  collecting reports of investigation from the
25  medical examiner's office for all drug

Page 168

1   overdoses deaths for 2016, right?
2      A.   Yes.
3      Q.   And then she responds, "That sounds
4   great" -- or "That sounds like a great start
5   point.  How frequently do you think we could
6   update it?  Because there were problems last
7   year" -- "because where there were problems
8   last year very well may be" -- sorry.  Forgive
9   me -- "because where there were problems last
10  year very well may not be where there are
11  problems right now," right?
12     A.   Yes.  That's what it says.
13     Q.   And your response was,
14  "Unfortunately, most areas that experience drug
15  overdoses are the same areas that have high,"
16  parentheses, "insert health problems here,"
17  closed parentheses.
18         What did you mean by that?
19     A.   In the next sentence after that, I
20  was talking about trends and stuff of the data.
21  If you look at -- what was meant by, if you
22  look at different maps of Summit County and
23  stuff, there is going to be similar maps.  If
24  you put, like, different health problems in
25  there, whether it's poverty, obesity, crime,

Page 169

1   you know, drug overdoses and stuff, usually,
2   not all the time, but it usually occurs in the
3   same zip codes and same areas of the county.
4      Q.   You spoke about correlation and
5   causation earlier.  Are you suggesting that
6   drug overdoses correlates with other public
7   health problems?
8          MR. LEDLIE:  Object to the form of
9   the question.
10     A.   No, I'm not.
11     Q.   Can you explain why you are not?
12     A.   Because it could be either/or.
13     Q.   Here you --
14     A.   -- vice versa.
15     Q.   Sorry.  I interrupted you.  Please
16  continue.
17     A.   Health problems, you know, whether
18  it's, you know, depression or other things,
19  could cause substance use.  In addition,
20  substance use can cause health problems.
21     Q.   Right.  That's correlation, right?
22  So my question is, are you suggesting to
23  Christine Smalley here that drug overdoses
24  correlate with areas that have high, insert
25  health problem here, meaning drug overdoses

43 (Pages 166 - 169)

Page 170

1 correlate with other health problems?
2　　　　MR. LEDLIE: Objection to the form.
3　　　　MS. KOUBA: Object to the form.
4　　A.　No, I'm not.
5　　Q.　So what are you saying here then?
6　　A.　I'm saying, like, geographically
7 they are in the same areas.
8　　Q.　Why did you say, "Insert health
9 problem here"?
10　　A.　Because as you stated before and
11 stuff, a lot of the times other health problems
12 are in the same areas within Summit County and
13 stuff as the drug overdoses.
14　　Q.　Right. So drug overdoses correlate
15 with health problems in other -- or with other
16 health problems?
17　　　　MS. KOUBA: Object to the form.
18　　A.　That's not what this email is
19 saying, no.
20　　Q.　But I'm asking, based on your
21 testimony just now, I'm asking you, drug
22 overdoses correlate with other health problems,
23 right?
24　　A.　Yes, there is possibilities.
25　　Q.　There is a possibility of that or

Page 171

1 that is the case?
2　　A.　There are possibilities. Every
3 case is, like, different. I can't answer your
4 question based on this email and stuff, for
5 what you are asking. You need to have more --
6 more data and everything and analysis to be
7 able to come up with a correlation and stuff.
8　　　　So if you are asking specifically
9 about Summit County and stuff, I don't have the
10 analysis or knowledge and stuff with that.
11　　Q.　So when you said, "Most areas that
12 experience drug overdoses are the same areas
13 that have high, insert health problem here,"
14 you are saying to me now that that does
15 not -- that does not indicate a representation
16 that drug overdoses correlate with public
17 health problems?
18　　　　MS. KOUBA: Object to the form.
19　　A.　Whenever I speak of, like,
20 correlation, or causation for that matter, I'm
21 speaking in statistical terms.
22　　　　What this is saying is that there
23 is a geographical overlay and stuff of other
24 health problems in the same area as drug
25 overdoses.

Page 172

1　　Q.　And is that overlay random?
2　　A.　No, it's not random.
3　　Q.　What do you mean by it's not
4 random?
5　　A.　It's precisely where the problems
6 are and stuff, so...
7　　Q.　But that's not by coincidence?
8　　　　MS. KOUBA: Object to the form.
9　　　　MR. LEDLIE: Object to the form.
10 Asked and answered quite a bit. This is
11 bordering on badgering at this point. You
12 literally asked the same question ten times.
13　　　　MR. MASTERS: I have not asked the
14 same question ten times. Please don't coach
15 the witness any further.
16　　　　MR. LEDLIE: I'm not coaching.
17 This is a conduct issue, and we will suspend
18 this deposition and we will get a ruling on
19 this.
20　　　　MR. MASTERS: All right.
21　　Q.　The next paragraph indicates, "The
22 medical examiner's office is about five months
23 behind in their data"; is that correct?
24　　A.　Yes.
25　　Q.　And the paragraph after that, "The

Page 173

1 drug overdose data from the health department
2 is more up to date," right?
3　　A.　And then I add in here, "But it
4 has its own limitations when trying to use it
5 for program implementation."
6　　Q.　So focusing on the firs part, the
7 health department is more up to date, that's
8 what you were referring to earlier when you
9 were talking about the difference between the
10 medical examiner data and the public health
11 department data; is that right?
12　　A.　Those are two different datasets
13 with two different things and stuff. That
14 paragraph is drug overdose data, not drug
15 overdose death data.
16　　　　So the health department does have
17 more up to date with the drug overdose data and
18 stuff, but the medical examiner's office does
19 not keep track of that. So that's two
20 different things.
21　　Q.　And what limitations present in the
22 health department data for trying to use it for
23 program implementation?
24　　A.　Is that it's not -- it comes up
25 with, like, how many are occurring, like,

44 (Pages 170 - 173)

Page 174

1  within zip codes and stuff.  So you are able to
2  find that, but you are not able to find out,
3  like, specifically what is going on and stuff
4  in there.
5       So you know there is drug overdose
6  occurring and stuff within the zip code area
7  and stuff, but you can't figure out, like,
8  specifically, like, what city and stuff, and
9  all the different things that are going on
10 within those zip codes.
11      Q.   Can you tell what kind of
12 substances are causing these overdoses from
13 this data?
14      A.   Not to my knowledge.
15           - - - - -
16      (Thereupon, Deposition Exhibit 8,
17      January 2018 Email Exchange,
18      Beginning with Bates Label SUMMIT
19      001790151, was marked for purposes
20      of identification.)
21           - - - - -
22      Q.   Showing you what has been marked as
23 Exhibit 8.  The Bates numbers for this exhibit
24 are Summit 001790151.  Do you recognize this
25 email exchange?

Page 175

1      A.   Yes, I do.
2      Q.   Who is Dennis Kirimi?
3      A.   He's the analyst at ASCA for the
4  ADM.
5      Q.   What is ASCA?
6      A.   I don't know.  Akron something
7  Community Association.  I'm not sure exactly
8  what the acronym stands for.
9      Q.   And what is their relationship to
10 the ADM Help Line?
11      A.   They run it.
12      Q.   And what is the ADM Help Line?
13      A.   It is a help line that people can
14 call in to to get connected to treatment for
15 substance abuse.
16      Q.   And from this email exchange, it
17 appears that ASCA, in running the ADM Help
18 Line, gathers data on these calls?
19      A.   Yes, they do.
20      Q.   So referring to your email on
21 January 5 at 4:02 p.m. to Aimee Budnik, she is
22 also at ASCA?
23      A.   Yeah.  She is the director.
24      Q.   And you had questions about what
25 kind of data they were collecting?

Page 176

1      A.   No.  Those are questions about the
2  difference statistics.
3      Q.   Okay.  Then let's refer to your
4  email on January 18 at 11:03 a.m.  In this
5  email you had questions about what data they
6  were collecting, right?
7      A.   11:03 a.m.  It is referring to
8  different definitions of the types of data that
9  they are collecting.
10      Q.   And you note that you have -- you
11 say, "I completely understand what you are
12 saying.  It does take some time to be able to
13 understand every data source that an agency
14 has.  I have been building databases for two
15 years, and I still learn something every day
16 about the data here," right?
17      A.   Yes.
18      Q.   What kind of databases were you
19 referring to there?
20      A.   As far as the databases that I have
21 been building --
22      Q.   Yes.
23      A.   -- and stuff, referring to datasets
24 that I had gotten from public records and stuff
25 and other outcomes records.

Page 177

1      Q.   Which databases?
2      A.   I'm sorry.  It sounds like the same
3  thing I just said.
4      Q.   Specifically, you said, "Databases
5  that I have been building, referring to
6  datasets that I had gotten from public records
7  and stuff and other outcomes records."
8       So what datasets -- what databases
9  were you referring to that are based on
10 datasets that you had gotten from public
11 records?
12      A.   That would be the medical
13 examiner's records and different police records
14 I would have gotten.
15      Q.   Anything else?
16      A.   As far as public data, that's the
17 majority of the data that I worked with.
18      Q.   What about nonpublic data?
19      A.   Nonpublic data, that would be the
20 outcomes reports.
21      Q.   Anything else?
22      A.   Maybe some government sites and
23 stuff, like county health reporting --
24      THE NOTARY:  I didn't hear you.
25      THE WITNESS:  I'm sorry.

45 (Pages 174 - 177)

Page 178

1     THE NOTARY:  That's okay.
2     A.   I said maybe some data from
3  CountyHealthRankings.Org.
4     Q.   What police records have you been
5  compiling for the purposes of building a
6  database?
7     A.   The CIT data, trying to put, like,
8  put that in more of electronic format, and also
9  using the Barberton Narcan usage data.
10    Q.   And for what purpose were you
11  collecting police records?
12    A.   We were collecting police records
13  to kind of like analyze the -- in cooperation
14  with Barberton Police Department, analyzing
15  what has been going on in Barberton and stuff,
16  as far as like things with the drug overdoses.
17    Q.   You ask if -- you say, "Are you
18  able to break down the categories by drug type
19  instead of clumping all opiates together as
20  one?"
21    A.   Yes.
22    Q.   Why were you interested in that?
23    A.   Because I wanted to know
24  specifically what type of opiate people are
25  using and stuff.  So just saying opiates is

Page 179

1  throwing a whole bunch of stuff together and
2  stuff, so I wanted to be more specific.  The
3  more specific you are, the more consistent you
4  can be.
5     Q.   And you say that.  You say, "The
6  more specific you can be the better," skipping
7  down a bit?
8     A.   Yes.
9     Q.   So how does specificity improve
10  your ability to draw conclusions from a
11  database?
12        MR. LEDLIE:  Object to the form of
13  the question.
14    Q.   Let me rephrase.
15        By clumping all opiates together
16  instead of breaking it down by categories, are
17  you able to tell which help line caller had a
18  substance use issue with which type of opiate?
19    A.   Yes.
20    Q.   You are able to?
21    A.   By what they report, yes.
22    Q.   But if they clumped everything
23  together, would you be able to tell?
24    A.   No.
25    Q.   Your next point is, "If there is

Page 180

1  more than one drug, are you able to add that
2  category together?  For example,
3  heroin/alcohol."
4     Why were you interested in
5  categorizing drugs together, if they presented
6  both drugs or more than one drug?
7        MS. KOUBA:  Object to form.
8     A.   I would say for -- I'm sorry.
9  Could you repeat the question.
10    Q.   Yeah.  Before I do, let me circle
11  back to number 1 again.
12    A.   Okay.
13    Q.   Clumping all these together, all
14  opiates would include prescription opioids,
15  right, and illicit opiates?
16    A.   Whatever the caller had identified.
17    Q.   So it could include Oxicodone and
18  it could include heroin?
19    A.   Yes.
20    Q.   And it could include illicit
21  fentanyl?
22    A.   Yes.
23    Q.   And why was it important to you to
24  have a category that accounts for individuals
25  who use more than one drug?

Page 181

1        MR. LEDLIE:  Object to the form of
2  the question?
3     A.   It was important because we wanted
4  to be able to give that data to the
5  clinicians -- or I wanted to be able to give
6  that data to the clinicians, to let them know
7  exactly what it was going on, so that it would
8  inform their decisionmaking.
9     Q.   Why would they need to know if
10  somebody was using both heroin and alcohol?
11        MS. KOUBA:  Object to the form.
12    A.   To see, like, whether -- you know,
13  what types of treatment that they may need.
14    Q.   So that would inform their clinical
15  decisions?
16    A.   Yes.
17    Q.   He responds on page 1 and says,
18  "Please see all the options as they appear,"
19  right, and then lists a number of options,
20  right?
21    A.   Yes.
22    Q.   And these options are the -- these
23  options reflect the data they collect about the
24  substances that the callers report, right?
25        MR. LEDLIE:  Object to the form.

46 (Pages 178 - 181)

Page 182

1    A.   Yes.
2    Q.   And this data includes categories
3  for multiple drug use, right?
4    A.   What do you mean by categories of
5  multiple drug use?
6    Q.   Well, for example, number 2,
7  alcohol, cannabis?
8    A.   Yeah, that would be two different
9  entries.
10    Q.   Alcohol, crack cocaine?
11    A.   Yes.
12    Q.   And this data also breaks it down
13  by various methods of using the drug, for
14  example, heroin inhalation?
15    A.   Yes, that's part of it.
16    Q.   And there is a category for other
17  opiates, parentheses, prescription?
18    A.   Yes.
19    Q.   So the help line then was asking
20  callers if they -- or not asking.  Let me
21  rephrase that.
22         The help line was collecting data
23  on individuals who reported prescription, as
24  opposed to just general opiates, right?
25         MS. KOUBA:  Object to the form.

Page 183

1    A.   No, that's not the case.
2    Q.   The ADM Help Line had a data
3  category for prescription opioids, right?
4    A.   Yes.
5    Q.   So if a reporter -- sorry.
6         If a caller reported that they had
7  a prescription opioid substance use issue, that
8  would be reflected in the ADM Help Line data?
9    A.   Yes.
10         MS. KOUBA:  Before we go over
11  another document, we have been going a little
12  over an hour.  Would this be a good time for a
13  break?
14         MR. MASTERS:  Sure.
15         THE VIDEOGRAPHER:  Off the record
16  at 2:25.
17         (Recess taken.)
18         THE VIDEOGRAPHER:  On the record,
19  2:41.
20    Q.   Let's go back to Exhibit 7 for a
21  moment.  In the email you sent, in that first
22  paragraph, the second sentence and the third
23  sentence say, "If you are looking for trends,
24  there needs to be at least three years of data
25  evaluated.  I prefer five though."

Page 184

1         Why does there need to be three
2  years of data to evaluate a trend?
3    A.   That's kind of like a statistical,
4  like, acceptable amount.
5    Q.   And why do you prefer five instead?
6    A.   Because the more data, the better,
7  so you can kind of see what's going on.
8    Q.   So the more data you have, the
9  better you are able to understand the
10  situations that you are analyzing?
11    A.   Yes.
12         - - - - -
13         (Thereupon, Deposition Exhibit 9,
14         February 6, 2018 Email Exchange,
15         Beginning with Bates Label SUMMIT
16         001065634, was marked for purposes
17         of identification.)
18         - - - - -
19    Q.   Showing you what has been marked as
20  Exhibit 9.  It is Bates stamped Summit
21  001065634.
22         Do you recognize this document?
23    A.   Yes.
24    Q.   This is an email conversation.
25  This is an -- the first email is an email from

Page 185

1  you to Mary Alice Sonnhalter and Jerry Craig,
2  right?
3    A.   Yes.
4    Q.   Who is Mary Alice Sonnhalter?
5    A.   She was the community relations
6  manager at that time.
7    Q.   Is she no longer there?
8    A.   No.
9    Q.   Who is now the community relations
10  manager?
11    A.   Chrissy Gashash.
12    Q.   And it looks like she forwarded you
13  and Jerry Craig an email from Amani Abraham,
14  right?
15    A.   Yes.
16    Q.   And Amani Abraham is a reporter?
17    A.   Yes.  I'm guessing, so yes.
18    Q.   And his question was whether Mary
19  Alice knew the heroin overdose numbers for
20  2017?
21    A.   Yes.
22    Q.   And then Amani indicates, "The data
23  dashboard shows" -- or, "The data dashboard
24  online shows overdoses, but does not specify
25  the drug"?

47 (Pages 182 - 185)

Page 186

1    A.    Yes.
2    Q.    Mary Alice forwarded this to you
3  and asks, "Do you have an estimate of OD
4  fatalities for this year," right?
5    A.    Yes.
6    Q.    And in your response, you indicated
7  that "The problem with this request is that it
8  will show a very small number of overdoses and
9  overdose deaths compared to the entire
10  opiate-related epidemic"; is that right?
11    A.    Yes.
12    Q.    The request being the heroin
13  overdose numbers for 2017?
14    A.    Yes.  That's the year he requested.
15    Q.    And why would that represent a very
16  small number of overdoses and overdose deaths
17  compared to the entire opiate-related epidemic?
18    A.    Because it is not representative of
19  the whole issue at hand.
20    Q.    What would his request need to seek
21  if he wanted to get a more comprehensive
22  understanding of the opiate-related epidemic?
23    A.    He would have to seek the opiate
24  overdose deaths.
25    Q.    Which include more than just

Page 187

1  heroin?
2    A.    Yes.
3    Q.    And heroin would be a small part of
4  the opiate-related epidemic?
5        MS. KOUBA:  Object to form.
6    A.    When you say like a small part,
7  what exactly do you mean?
8    Q.    So heroin overdoses would be --
9  would represent a very small number of
10  overdoses and overdose deaths compared to the
11  entire opiate-related epidemic?
12    A.    Yes, compared to the whole, yes.
13    Q.    You then indicate, "He is correct
14  in saying that the EPiCenter data show only
15  drug overdoses and not specific types of
16  drugs."
17    A.    Yes, that's what that sentence
18  says.
19    Q.    And the EPiCenter data is the data
20  we were talking about earlier that reflects
21  drug overdoses in emergency departments, right?
22    A.    Yes.
23    Q.    And then you say, "This is mainly
24  due to the ICD coding not being specific enough
25  to show certain types of drugs."  What is ICD

Page 188

1  coding?
2    A.    I don't know what the acronym for
3  ICD is, but we use the ICD 10, which is a
4  current version.  There is also ICD 9 entries
5  too, that are kind of like legacy entries, and
6  those kind of allow an agency to be able to
7  bill for specific types of substance use
8  disorders or treatments and stuff that they
9  have given.
10    Q.    So I understand you don't know the
11  acronym, but, like, what is ICD coding
12  reflecting; like what is ICD coding?
13    A.    To my knowledge and how I have used
14  ICD coding and stuff, it's just to -- it's part
15  of the diagnosis and stuff that's recorded when
16  agencies bill for a particular client or
17  patient.
18    Q.    So in this instance then, the
19  health department codes the overdoses, but that
20  coding is -- it does not reflect the drug that
21  caused the overdose, correct?
22    A.    Yeah, that's my understanding of
23  this email.
24    Q.    Is that your understanding of the
25  ICD coding relating to EPiCenter data?

Page 189

1    A.    I can't say for sure.
2    Q.    But at the time you wrote this,
3  that was your understanding?
4    A.    Yes.
5    Q.    And do you have any reason to think
6  it's -- think it was wrong?
7    A.    I'd have to look back into it to
8  double-check.
9    Q.    Sitting here today, you don't have
10  any reason to second guess what you wrote in
11  this email?
12        MS. KOUBA:  Object to form.
13    A.    I don't have any reason to second
14  guess, no.
15    Q.    Then you say, "The other reason why
16  everything shows as a drug overdose or drug
17  overdose related-death, is because normally a
18  person will have several drugs in their system
19  once their toxicology reports are finished"; is
20  that right?
21    A.    Yes, that's what that sentence
22  says.
23    Q.    And then you went on to say, "Thus,
24  it is hard to determine which drug was the
25  cause if there are multiple types of drugs

48 (Pages 186 - 189)

Page 190

1  found," right?
2      A.   Yes, that's what I wrote.
3      Q.    And as you indicated previously
4  with the ADM Help Line data, with more
5  specificity in coding, the better, because it
6  allows you to draw more specific and accurate
7  conclusions, right?
8          MS. KOUBA:  Object to form.
9          MR. LEDLIE:  Object to form.
10     A.   When you say specificity, what do
11  you mean?
12     Q.   Specificity about -- oh, sorry.
13          Specificity about the drug types
14  that are involved in overdoses data.
15     A.   From using that statistical jargon
16  and stuff, it doesn't determine specificity.
17     Q.   Sorry.  Could you explain that?
18     A.   Specificity is a type of test and
19  it's a statistical test.  So that has not been
20  done on anything.
21          If you are using the word
22  specificity as like a form of specific, then
23  that's a total different thing.
24     Q.   I'm using the term colloquially.
25          You say here, "This is mainly due

Page 191

1  to the ICD coding not being specific enough to
2  show certain types of drugs."
3      A.   Okay.
4      Q.   And I'm just trying to establish
5  that -- I'm trying to ask you whether -- well,
6  strike that.
7          - - - - -
8          (Thereupon, Deposition Exhibit 10,
9          November 17, 2017 Email Exchange,
10         Beginning with Bates Label SUMMIT
11         001095232, was marked for purposes
12         of identification.)
13         - - - - -
14     Q.   Showing you what has been marked as
15  Exhibit 10, Bates stamp Summit 001095232.  Do
16  you recognize this document?
17     A.   Yes, I do.
18     Q.   The first email above is an email
19  from you to Jerry Craig, right?
20     A.   Yes, it is.
21     Q.   And you are forwarding a
22  conversation, an email thread between you and
23  Nick Veauthier?
24     A.   Yes.
25     Q.   Did I pronounce that correctly?

Page 192

1      A.   I'm not sure.
2      Q.   Do you know who Nick Veauthier is?
3      A.   Yes, I do.
4      Q.   Who is he?
5      A.   He is the IT manager.
6      Q.   How long has he been with Summit
7  ADM?
8      A.   Maybe 15 years, maybe more.
9      Q.   What is his role as the IT manager?
10     A.   From my relationship with him, he's
11  the database manager.  And so that's what I
12  know of his role.  So I don't know what
13  involves everything about his role.
14     Q.   Which databases did he manage?
15     A.   The GOSH database and all the
16  claims databases.
17     Q.   What is the GOSH database?
18     A.   It's a database that includes all
19  of the claims information.
20     Q.   When you say claims information,
21  what are you referring to?
22     A.   The claims data, which is what,
23  like, agencies bill us and stuff, and they have
24  a record of all that.
25     Q.   Agencies meaning?

Page 193

1      A.   ADM funded agencies.
2      Q.   So, for example, Oriana House?
3      A.   Yes.
4      Q.   So Mr. Veauthier -- I'm butchering
5  his name, I'm sure.
6          Mr. Veauthier manages the GOSH
7  database?
8      A.   Yes.
9      Q.   Which contains claims information?
10     A.   Yes.
11     Q.   What other databases does he
12  manage?
13     A.   I'm not sure.
14     Q.   Have you heard of a database named
15  M-A-C-S-I-S?
16     A.   Yes.  MACSIS.
17     Q.   What is MACSIS?
18     A.   It was the older version of the
19  claims database and stuff, and then it updated
20  to GOSH.
21     Q.   When did it update to GOSH?
22     A.   I don't know the exact date and
23  stuff of when that was set in place.
24     Q.   So MACSIS was the way that
25  contracting agencies informed ADM of various

49 (Pages 190 - 193)

1  claims prior to the arrival of GOSH database?
2      A.    They are the same thing.
3      Q.    They are the same exact thing?
4      A.    Same thing, two different software.
5      Q.    Okay.  If you look at the first
6  email in this thread, this is an email from you
7  to Nick, and you asked, "Am I able to determine
8  what types of opiates, prescription versus
9  illegal street, were used in the claims data?
10  If so, how"; is that right?
11      A.    Yes.
12      Q.    What was his response?
13      A.    He said, "No, the opiate diagnosis
14  only consists of the following," and then he
15  lists the following codes.
16      Q.    Those codes include, for example,
17  opioid-related disorders; opioid abuse; opioid
18  abuse, uncomplicated; opioid abuse with
19  intoxication, correct?
20      A.    Yes.
21      Q.    These are various descriptions of
22  the opioid-related disorder that is presented
23  at these -- in the patients at these
24  contracting agencies?
25      A.    I'm sorry.  Could you repeat that.

1      Q.    So these are just various
2  descriptions of the kinds of opioid-related
3  disorders that present in patients who receive
4  services from the contracting agencies?
5      A.    No.
6      Q.    Okay.  Can you help me understand
7  it better.
8      A.    These are billing codes.
9      Q.    These are billing codes that
10  describe opioid-related disorders, correct?
11      A.    They describe a diagnosis and stuff
12  of what the person is being treated.
13      Q.    And that diagnosis of an
14  opioid-related disorder?
15      A.    If you are referring to the top
16  one, yes.
17      Q.    So the top one is F11,
18  opioid-related disorders, and then F11.1, is
19  that a subset of F11?
20          MR. LEDLIE:  Object to the form of
21  the question.
22      A.    That I don't know.
23      Q.    It appears that these categories
24  include different codes for opioid abuse,
25  F11.1; opioid dependence, F11.20; and below,

1  opioid use -- sorry, yeah, opioid use, 11.9 and
2  below; is that correct?
3          MR. LEDLIE:  Object to the form of
4  the question.
5      A.    Yes and no.
6      Q.    What's the no to that answer?
7      A.    Yes is the part, that's what's
8  written here and stuff, and no is the part that
9  these are two different -- coming from two
10  different things and stuff.
11          OCD -- sorry.  ICD9 and ICD10 and
12  stuff involve, like, all the different codes
13  and stuff.  OCD -- ICD10 refers to opiate use
14  disorders.  OC -- here I go again.  ICD9 refers
15  to opioid abuse and dependence.
16      Q.    Regardless, these categories that
17  Nick copied represent all of the opiate
18  diagnoses codes that can be entered into the
19  claims data?
20      A.    That I don't know.
21      Q.    Is that what Nick told you?
22      A.    No, that's not what Nick told me.
23      Q.    What did Nick tell you?
24      A.    Is that the opiate diagnosis only
25  consists of the following.

1      Q.    And what do you understand that to
2  mean?
3      A.    That the following is there, but I
4  don't know if that's, like, inclusive.  We
5  would have to ask Nick and stuff about that.
6      Q.    But it does not distinguish between
7  prescription versus illegal street opioids?
8      A.    No, it doesn't.  That was what was
9  part of his answer.
10      Q.    And you forwarded this on to Jerry
11  Craig and said, "Below is Nick's answer to the
12  question of identifying opiate drug use by
13  type," correct?
14      A.    Yes.
15      Q.    Was this a question that Mr. Craig
16  had asked you?
17      A.    I would say yes.  He must have
18  asked me not through email.
19      Q.    Do you recall --
20          THE NOTARY:  I didn't hear the end.
21      A.    Yeah.  He must have asked me and
22  not stated it through email.
23      Q.    Do you recall how he asked you, if
24  not through email?
25      A.    No, I don't recall.

50 (Pages 194 - 197)

Page 198

1     Q.   Do you recall the conversation you
2  had with him about it?
3     A.   No, I don't.
4        - - - - -
5        (Thereupon, Deposition Exhibit 11,
6        February 1, 2017 Email Exchange,
7        Beginning with Bates Label SUMMIT
8        000884505, was marked for purposes
9        of identification.)
10       - - - - -
11    Q.   I'm showing you what has been
12 marked as Exhibit 11, Summit 0884505.  Do you
13 recognize this document?
14    A.   Yes.  It's an email.
15    Q.   At the bottom of the first page, it
16 appears that you sent an email to Doug Smith at
17 10:09 a.m. on February 1, 2017; is that
18 correct?
19    A.   What page are you on?
20    Q.   The bottom of page 1, the very
21 first page.
22    A.   At what time?
23    Q.   10:09 a.m.
24    A.   No.  Oh, wait, I'm sorry.  Yes.
25 Yeah, I see that now.

Page 199

1     Q.   And you asked, or you said, "I have
2  a medical question for you:  Why would a woman
3  who is diagnosed with leukorrhea need to be
4  prescribed oxycodone and acetaminophen," right?
5     A.   Yes.
6     Q.   Why were you asking Dr. Smith this
7  question?
8     A.   Because he's a psychiatrist and a
9  medical doctor.
10    Q.   So you thought this kind of
11 question could be answered by a physician?
12    A.   Yes.
13    Q.   Why do you think this question
14 required the answer of a physician?
15    A.   Because he is an expert in his
16 field and stuff, so he would know about medical
17 stuff.
18    Q.   And what is Dr. Smith's specialty
19 as a medical doctor?
20    A.   He's a psychiatrist.
21    Q.   Do you know if he's ever treated a
22 woman -- or women who are diagnosed with
23 leukorrhea?
24       MS. KOUBA:  Object to form.
25    A.   You would have to ask him.

Page 200

1     Q.   But from your perspective, you
2  don't know?
3     A.   I don't know.  You would have to
4  ask him.
5     Q.   Do you know if Dr. Smith has ever
6  treated patients with symptoms of pain?
7        MS. KOUBA:  Object to form.
8     A.   I don't know about Dr. Smith's,
9  like, medical career.
10    Q.   So you were just asking him because
11 he's a physician generally?
12    A.   Yes.
13    Q.   And his response was, "It can be a
14 symptom of vaginitis, inflammation, which can
15 be painful.  However, an opiate does seem
16 excessive"; is that right?
17    A.   That's what that email does say,
18 yes.
19    Q.   Did you know at the time that
20 leukorrhea was a symptom of vaginitis?
21       MS. KOUBA:  Object to form.
22    A.   No, I did not.
23    Q.   Do you know that leukorrhea can be
24 painful?
25    A.   No, I do not.

Page 201

1     Q.   Do you know whether it is common to
2  prescribe opioids for women with leukorrhea?
3     A.   No, I do not.
4     Q.   In your response, you indicate,
5  "Thank you.  I am extracting data from Explorys
6  for the 443XX zip code and downloading patient
7  records.  It'll be a while before I can run a
8  diagnosis, but when I am finished, I will send
9  it to you."  What is Explorys?
10    A.   It's a database.
11    Q.   What kind of database?
12    A.   It's a database that holds, like,
13 hospital records.
14    Q.   Is this a publicly available
15 database?
16    A.   No, it's not.
17    Q.   How did you get access to this
18 database?
19    A.   The health department owned that.
20    Q.   And from this database, you were
21 able to download patient records?
22    A.   Yes.
23    Q.   And what did those patient records
24 reflect?
25    A.   Not much.

51 (Pages 198 - 201)

Page 202

1    Q.   Can you elaborate?
2    A.   They weren't very specific and
3  stuff, as far as, like, what they had and
4  stuff.
5    Q.   What did they have?
6    A.   It had information as far as, like,
7  what their diagnoses was and what they were
8  seen for and the dates.  And sometimes it
9  included treatments, other times it didn't.
10   Q.   Would it indicate, for example, if
11 a patient was prescribed any medication?
12   A.   That I don't know.
13   Q.   You don't recall?
14   A.   I don't recall, and it seems like
15 these are two different conversations and
16 stuff.  I mean, this says thank you for the
17 answer, then I go on about, like, downloading
18 patient records, but I don't see a connection
19 between the two.
20   Q.   Right.  Putting aside that there is
21 a connection, putting aside -- yeah, putting
22 aside that there is a connection, I'm asking
23 generally about this part of the email after
24 the thank you to understand what you are saying
25 here about Explorys, okay?

Page 203

1        So Explorys is a database that
2  contains hospital records, right?
3    A.   Yes.
4    Q.   Does it contain any other kind of
5  patient records?
6    A.   That I don't know.
7    Q.   But you downloaded data from this
8  database?
9    A.   Yes, I did.
10   Q.   And when you downloaded the data
11 from the database, did you see anything other
12 than hospital records?
13   A.   No.
14   Q.   And these hospital records include
15 patient records?
16        MS. KOUBA:  Object to the form.
17   A.   Yes.
18   Q.   Which you downloaded?
19   A.   Yes, but not exactly, because the
20 version of Explorys that we had was kind of
21 like a watered-down version.  So we really
22 didn't have access to an entire, like,
23 patient's record and stuff.  It was a -- there
24 was a lot of holes missing in it.
25   Q.   What did you have access to?

Page 204

1    A.   We had access to the zip code and,
2  I believe, like, you know, why they were being
3  seen at the hospital and stuff, but I can't
4  remember.
5    Q.   And how would that be indicated on
6  the record?
7    A.   In the column and stuff that it was
8  available in.
9    Q.   So there was a column that said
10 reason for treatment, or something like that?
11   A.   I can't remember stuff exactly.
12   Q.   Do you recall any other columns on
13 this database?
14   A.   There was a lot, but I didn't like
15 this database and stuff, because it didn't
16 give, like, very specific things, so I didn't
17 use it very much --
18   Q.   What specific --
19   A.   So I don't have --
20        MR. LEDLIE:  Sorry.  You were
21 cutting him off, and it wasn't on purpose, but
22 let's just be mindful.
23        MR. MASTERS:  Just one question, I
24 believe that --
25        MR. LEDLIE:  Under the deposition

Page 205

1  protocol, two lawyers can answer.  We can't
2  always anticipate each other, if that's your
3  question.
4        MR. MASTERS:  So are you
5  defending -- you are both defending this
6  deposition?
7        MR. LEDLIE:  Correct.
8        MR. MASTERS:  Okay.
9    Q.   I'm sorry.  I did not mean to cut
10 you off.  I thought you had finished.
11        What specific, what very specific
12 things did this database not have that caused
13 you to dislike it?
14        MS. KOUBA:  Object to form.
15   A.   It didn't have specific zip code
16 data and only included, like, the first three
17 digits of the zip code.
18   Q.   Anything else that was missing from
19 this database that you thought would have been
20 useful?
21   A.   Not to my knowledge.
22   Q.   Do you recall patient records
23 indicating whether a patient was prescribed
24 medication?
25   A.   I don't know that.

52 (Pages 202 - 205)

Page 206

1    Q.   When you say, "It'll be a while
2  before I can run a diagnosis," what were you
3  referring to?
4    A.   Probably the speed of the computer.
5    Q.   And specifically running a
6  diagnosis, what were you referring to by that?
7    A.   Referring to, like, running an
8  analysis.
9    Q.   Of what specifically?
10    A.   The Explorys data.
11    Q.   What were you looking for in the
12  Explorys data?
13    A.   I don't know from this email.
14       May I take a break, I have to use
15  the restroom really bad.
16    Q.   Yes.
17       THE VIDEOGRAPHER:  Off the record,
18  3:11.
19       (Recess taken.)
20       THE VIDEOGRAPHER:  On the record,
21  3:13.
22       - - - - -
23       (Thereupon, Deposition Exhibit 12,
24       Presentation, Opioid Epidemic: An
25       Overview in Summit County, Bates

Page 207

1       Label SUMMIT 001742658, was marked
2       for purposes of identification.)
3       - - - - -
4    Q.   I'm showing you what has been
5  marked as Exhibit 12, Bates stamp Summit
6  001742658.  Do you recognize this document?
7    A.   Yes, I do.
8    Q.   What is it?
9    A.   It is a presentation.
10    Q.   Is your name on this document?
11    A.   Yes, it is.
12    Q.   Did you help with it?
13    A.   I collaborated with it, yes.
14    Q.   And in what ways did you
15  collaborate?
16    A.   Providing data to the student and
17  helping her with her research outline.
18    Q.   Did you review the work that she
19  did?
20    A.   Yes.
21    Q.   Did you work on this
22  presentation -- did you work on actually
23  creating this presentation?
24    A.   No, I did not.
25    Q.   Did you edit the presentation?

Page 208

1    A.   No, I did not.
2    Q.   But you supervised it; is that
3  right?
4       MR. LEDLIE:  Object to the form of
5  the question.
6    A.   I collaborated.
7    Q.   And from your understanding, what
8  was her research objective?
9    A.   From my understanding, actually
10  it's analyzing different trends, like the
11  medical examiner's data and doing a GAS
12  analysis.
13    Q.   And prior to putting your name on
14  this presentation, did you review the work that
15  she did?
16    A.   No, I did not.
17    Q.   So how did your name get on this
18  presentation?
19       MS. KOUBA:  Object to form.
20    A.   Well, before this presentation was
21  created and sent out, I didn't, but I helped
22  with the data and stuff, like helping gather
23  data and providing her, like, different
24  connections.
25    Q.   What connections?

Page 209

1    A.   Connections to getting the data.
2    Q.   Which data?
3    A.   All of it.  All the medical
4  examiner's data, actually the drug overdose
5  data, and then she analyzed it on her own.
6    Q.   It appears from page 2 that she
7  obtained from the Summit Medical Examiner death
8  records as a result of drug overdose from 2014
9  to 2016; is that right?
10    A.   Yes, that's what it's dated.
11    Q.   And on page 3, there is a section
12  called Toxicology Report, and the second bullet
13  point indicates, "According to narratives
14  percentage of cases whom were prescribed
15  prescription opioid at time of death," and then
16  there is a table, right?
17    A.   Yes.
18    Q.   And that table is called Opioid
19  Prescription Data?
20    A.   Yes.
21    Q.   What does it mean -- actually,
22  strike that.
23       This table indicates that 11
24  percent of overdose -- of drug overdose
25  victims, drug overdose death victims, had a

1  prescription opioid at the time -- prescribed
2  at the time of death, correct?
3      MS. KOUBA:  Object to form.
4      Q.   I should correct that and say 11.26
5  percent.
6      A.   Yes.
7      Q.   And 12.23 percent did not, correct?
8      A.   That's what this table says, yes.
9      Q.   And there is no data for the
10  remaining 76.5 percent; is that correct?
11      A.   Yes.
12      Q.   So the medical examiner -- so 76.5
13  percent of the medical examiner records from
14  2014 to 2016 do not indicate whether or not an
15  opioid was prescribed at the time of death?
16      MS. KOUBA:  Object to form.
17      A.   I think that probably would be a
18  question better answered by the medical
19  examiner.
20      Q.   Did you ever present on this -- did
21  you present this presentation?
22      A.   No, I did not.
23      Q.   Did you ever attend a presentation
24  by the student who put this together?
25      A.   No, I did not.

1          - - - - -
2      (Thereupon, Deposition Exhibit 13,
3      Email Exchange with Report Attached,
4      Beginning with Bates Label SUMMIT
5      001405605, was marked for purposes
6      of identification.)
7          - - - - -
8      Q.   Showing you what has been marked
9  Exhibit 13, Summit 001405605.  Do you recognize
10  this document?
11      A.   Yes.  This is an email.
12      Q.   It's an email from you to Aimee at
13  the top, right?
14      A.   At the top, yes.
15      Q.   The email at the bottom is an email
16  from you to clinical services, right --
17  sorry -- at the bottom of the chain, so the
18  bottom of page 3?
19      A.   Yes.
20      Q.   What is clinical services?
21      A.   That's our department email.
22      Q.   And it says, "Here is a report I
23  was able to generate using the medical
24  examiner's data," correct?
25      A.   Yes.

1      Q.   At the top of page 2, so further up
2  the chain, you wrote, "Here is the revised
3  edition.  There were a few errors on the last
4  one," right?
5      A.   Yes.
6      Q.   And then Aimee emailed and asked,
7  "Were they major revisions?  I shared this
8  information with Montgomery County," right?
9      A.   Yes.
10      Q.   And you said, "The only major
11  revision was carfentanil was left out, but
12  nothing major there," correct?
13      A.   Yes.
14      Q.   So turning to the report, which is
15  the attachment to this email, do you recognize
16  this?
17      A.   Yes, I do.
18      Q.   Is this the report that you were
19  referencing when you said, "Here is the revised
20  version -- revised edition"?
21      A.   I don't know, because I don't have
22  a copy of the unrevised version to the revised
23  version to be able to figure out which one is
24  which.
25      Q.   This one has carfentanil on it,

1  correct?
2      A.   Yes, it does.
3      Q.   So do you have any reason to
4  believe that this is something other than the
5  revised edition?
6      A.   From my notes, no, I would say that
7  this is the revised edition.
8      Q.   Paragraph 3 states, "Fentanyl has
9  been found in 270 drug-related deaths during
10  this time period."
11      Just to be clear, fentanyl there,
12  did you intend -- using the word fentanyl
13  there, did you intend to draw a distinction
14  between illicit fentanyl and prescription
15  fentanyl?
16      A.   No.
17      Q.   So fentanyl lumps together illicit
18  fentanyl and any potential prescription
19  fentanyl?
20      MS. KOUBA:  Objection to form.
21      A.   Fentanyl is what is listed by the
22  medical examiner and stuff, so she would be the
23  one to be able to distinguish that.
24      Q.   So you just copied the medical
25  examiner's designation of fentanyl listed on

Page 214

1  the toxicology report?
2     A.   Yes.
3     Q.   You note that there was an increase
4  of fentanyl-related deaths by 5,250 percent,
5  correct?
6     A.   Yes, from 2010 to 2016.
7     Q.   Thank you for the clarification.
8        Looking at table I, what is table I
9  describing?
10    A.   Alcohol and other drugs and
11 drug-related deaths in Summit County from 2010
12 to 2016.
13    Q.   And what are the various rows in
14 the table?
15    A.   Those are the -- well, the first
16 one is the drug, and then you have each year
17 from 2010 to 2016, and then the totals.
18    Q.   Is this a reflection of cause of
19 death?
20    A.   No.
21    Q.   Is this what is presented in the
22 toxicology reports?
23    A.   Yes, what drugs were found in those
24 toxicology reports.
25    Q.   And so for fentanyl, in 2010, there

Page 215

1  were two overdoses, examined by the medical
2  examiner, that contained fentanyl, right?
3     A.   Yes.
4     Q.   In 2011 there were two; in 2012
5  there were 4; 2013, 5; 2014, 56; 2015, 94;
6  2016, 107, correct?
7     A.   Yes.
8     Q.   Looking down a little bit to
9  cocaine, 2010 there were 7; 2011 there were 13;
10 2012 there were 7; 2011 -- sorry, let me start
11 over.
12       2010, 7; 2011, 13; 2012, 7; 2013,
13 11; 2014, 19; 2015, 14; 2016, 56; is that
14 correct; is that what it says?
15    A.   Yes, that's what it says.
16    Q.   And you mentioned earlier that
17 there was a spike in drug overdoses between
18 2015 and 2016; is that right?
19    A.   Where do you see that?
20    Q.   This is from earlier this morning.
21    A.   Okay.  Could you repeat that.
22    Q.   You mentioned earlier this morning
23 that there was a spike, there was an increase
24 in drug overdoses in July of 2016, correct?
25       MS. KOUBA:  Object to form.

Page 216

1     A.   When you say drug overdoses, what
2  are you referring to?
3     Q.   I'm referring to the data dashboard
4  that we discussed earlier in Exhibit 4 that
5  showed a spike in the EPiCenter data, the
6  EPiCenter drug overdose data.
7     A.   Okay.  So the drug overdoses, drug
8  overdose visits to the emergency room; is that
9  what we are talking about?  Yeah.
10    Q.   And then we also looked at, on that
11 same data dashboard, a chart analyzing the drug
12 overdose deaths, showing a spike from 2015 to
13 2016, correct?
14    A.   Yes.
15    Q.   And you attributed that spike to
16 fentanyl and carfentanil, correct?
17       MS. KOUBA:  Object to form.
18    A.   Yes.
19    Q.   And looking at this data here, with
20 the number of fentanyl and carfentanil deaths
21 in 2016, as opposed to earlier years, is that
22 consistent with your conclusion?
23    A.   Could you repeat that.
24    Q.   Looking at -- let's switch courses.
25       Looking at this table I, which

Page 217

1  drugs would you, as a data analyst, when you
2  are looking at this, say there was a large
3  increase from 2010 to 2016 in the number of
4  drug overdose deaths?
5       MS. KOUBA:  Object to form.
6     A.   I'm sorry.  Did you say, like, as a
7  cause of death?
8     Q.   Yes.  Referring to table I --
9  sorry, sorry.  If I said as a cause of death, I
10 don't think that I meant to.
11       MR. LEDLIE:  Did you say number of
12 drug overdose deaths?
13    Q.   Yeah, which is reflected in the
14 toxicology report, right?  This is the
15 toxicology report.
16    A.   This table does not reflect the
17 cause of death.
18    Q.   Right.  This table --
19    A.   This table reflects the toxicology
20 report.
21    Q.   Correct.  And I'm saying, looking
22 at this, which drugs, based on this chart, seem
23 to account for the large increase in drug
24 overdose deaths on the -- as reflected on the
25 toxicology report?

55 (Pages 214 - 217)

1   MS. KOUBA:  Object to form.

2  A. You can't come up with that

3 assumption.

4  Q. Okay.  So what would we need in

5 order to draw a conclusion?

6  A. You would have to talk to the

7 medical examiner's office and stuff like that,

8 because they are the ones that are in charge of

9 death.  From this data right here and stuff,

10 you can't speculate that, but I believe that,

11 you know, the medical examiner would have a

12 better answer on that than I would.

13  Q. What would you need in order to

14 answer that question?

15  A. More knowledge about medical

16 examiner records.

17   - - - - -

18   (Thereupon, Deposition Exhibit 14,

19   Summit County Quick Response Team

20   Meeting Report, Beginning with Bates

21   Label SUMMIT 001793050, was marked

22   for purposes of identification.)

23   - - - - -

24  Q. I'm showing you what has been

25 marked as Exhibit 14, Summit 001793050.

1   MS. KOUBA:  Can I get a copy?

2   MR. MASTERS:  Sorry.

3   MS. KOUBA:  Thank you.

4  Q. Do you recognize this document?

5  A. Yes, I do.

6  Q. What is it?

7  A. It's a Summit County Response Team

8 meeting report.

9  Q. And have you seen it before?

10  A. Yes.

11  Q. Did you draft this document?

12  A. Yes, I did.

13  Q. What is the quick response team?

14  A. The quick response team is a team

15 that consists of a social worker, police

16 officer, and EMS personnel and stuff, and they

17 go out to somebody's house that have overdosed

18 from drugs and stuff, and try to get them into

19 treatment.

20  Q. So the purpose of the team is to

21 encourage the person who overdosed to seek

22 treatment?

23  A. Yes.

24  Q. How long have quick response teams

25 been around at Summit County?

1  A. Since January 2017.

2  Q. So you were around when

3 this -- when this concept was rolled out?

4  A. Yes.

5  Q. And is there one quick response

6 team or are there a number of quick response

7 teams?

8  A. There is a number of quick response

9 teams.

10  Q. Do they differ by jurisdiction?

11  A. Yes.

12  Q. So does the City of Akron have a

13 different quick response team than Summit

14 County?

15  A. Summit County doesn't have one.

16  Q. Summit County does not have one?

17  A. No.

18  Q. Is it a city -- so it is a city

19 municipality connected program?

20  A. Yes.  It is different

21 municipalities.

22  Q. And what is the nature of Summit

23 ADM's involvement in the quick response team

24 program?

25  A. They are the funders of the quick

1 response team.

2  Q. What do you mean by they are the

3 funders?

4  A. They fund the different agencies

5 and stuff that do the quick response team.

6  Q. Do you know whether these

7 agencies -- strike that.

8   Do you know whether these quick

9 response teams receive funding from anyone

10 other than Summit ADM?

11  A. No, I don't know that.

12  Q. Do you know how much money Summit

13 ADM provides for these quick response teams?

14  A. No, I don't.

15  Q. In the bottom right-hand corner,

16 there is a small table, right?

17  A. Yes.

18  Q. What does that table show?

19  A. That is the top five substances

20 reported from the ADM Help Line in 2017.

21  Q. And what are those top five

22 substances?

23  A. They are heroin, methamphetamine,

24 fentanyl, alcohol and cannabis.

25  Q. What is the percentage listed for

56 (Pages 218 - 221)

Page 222

1  heroin?
2      A.    43 percent.
3      Q.    And for meth?
4      A.    14 percent.
5      Q.    Fentanyl?
6      A.    13 percent.
7      Q.    Alcohol?
8      A.    7 percent.
9      Q.    Cannabis?
10     A.    5 percent.
11     Q.    And the ADM Help Line, in their
12  data collection, distinguishes between
13  prescription and illicit opioids, correct?
14         MS. KOUBA:  Object to form.
15     A.    Prescription and illicit, you said?
16     Q.    They have categories -- they have
17  categories that differentiate them, correct?
18     A.    Not complete, no.
19     Q.    If you recall, this is what we were
20  discussing with respect to Exhibit 8.  Perhaps
21  you can refer to Exhibit 8 again.  Does this
22  refresh your recollection?
23     A.    Yes.
24     Q.    So again, to ask the question that
25  I asked earlier, the ADM Help Line, in their

Page 223

1  data collection, tracks whether an individual
2  reports an issue with prescription opioids and
3  whether that person or other persons have an
4  issue with other illicit opioids, correct?
5         MS. KOUBA:  Object to the form.  I
6  think that misstates what Exhibit 8 says.
7      Q.    Does Exhibit 8 have a category to
8  track whether a caller reports an issue with
9  prescription opioids?
10     A.    Yes, they have a category for that.
11     Q.    And prescription opioids are not
12  listed as among the top five substances
13  reported from the ADM Help Line in 2017,
14  correct?
15     A.    The top five substances reported
16  from the ADM Help Line are how many mentioned
17  it is, and it would reflect an accurate picture
18  of whether the person had used or not used
19  prescription opioids.
20         If you look in here on Exhibit 8,
21  you see all the different heroins and stuff in
22  there.  So that's what that 43 percent
23  reflects.  It doesn't reflect how many times a
24  person was on something else.
25     Q.    I don't think you answered my

Page 224

1  question.
2         So prescription opioids are not
3  listed among the top five substances reported
4  from the ADM Help Line in 2017, correct?
5      A.    That's not listed here, no.
6         - - - - -
7         (Thereupon, Deposition Exhibit 15,
8         Email Exchange with Health Advisory
9         Attached, Beginning with Bates Label
10        SUMMIT 001407955, was marked for
11        purposes of identification.)
12        - - - - -
13     Q.    I'm showing you what has been
14  marked as Exhibit 15, Summit 001407955.  Do you
15  recognize this document?
16     A.    Yes.
17     Q.    What is it?
18     A.    It's an email.
19     Q.    From -- the first one is from you
20  to Aimee Wade?
21     A.    Yes.
22     Q.    And you are forwarding an email
23  from Jerry Craig?
24     A.    Yes.
25     Q.    Jerry Craig says, "Please see this

Page 225

1  important health advisory from the Ohio
2  Department of Health.  It confirms what we are
3  seeing locally"?
4      A.    Yes.
5      Q.    What does this health advisory from
6  Ohio Department of Health confirm?
7      A.    Without reading it in its entirety,
8  I don't know.
9      Q.    Please take a moment to review the
10  health advisory.
11         So what does this health advisory
12  confirm?  I think -- can I refer you to the
13  title.  What is the title of the health
14  advisory?
15     A.    The title of the health advisory is
16  Continuing Increase in Fentanyl-Related
17  Overdose Deaths Involving Non-Opioids Like
18  Cocaine, Methamphetamines and other
19  Psychostimulants.
20     Q.    And is that consistent with what
21  you were seeing locally when Jerry Craig sent
22  this email?
23     A.    Yes.
24     Q.    And this reflects that the number
25  of individuals who were overdosing and dying

57 (Pages 222 - 225)

Page 226

1  who took nonopioids, like cocaine and
2  methamphetamines, was increasing?
3       MR. LEDLIE:  Objection.
4       MS. KOUBA:  Object to form.
5       A.   And when you say this, what do you
6  mean?
7       Q.   This health advisory.
8       A.   This health advisory.  I'm sorry,
9  could you repeat what you asked.
10      MR. MASTERS:  Could you please read
11 the question for him.
12      THE NOTARY:  Question:  "And this
13 reflects that the number of individuals who
14 were overdosing and dying who took nonopioids,
15 like cocaine and methamphetamines, was
16 increasing?"
17      MS. KOUBA:  Same objection.
18      A.   No, it doesn't.
19      Q.   How does it not reflect that?
20      A.   Because it shows a continuing
21 increase in fentanyl-related drug overdose
22 deaths, and an increase in drug overdose deaths
23 involving both cocaine and fentanyl, as well as
24 methamphetamines and psychostimulants and
25 fentanyl.  It doesn't state that the other ones

Page 227

1  are the cause of death.
2       Q.   I'm struggling to see how my
3  question is not an accurate description of what
4  the document reflected.
5       So the title shows a
6  continuing -- states a Continuing Increase in
7  Fentanyl-Related Overdose Deaths Involving
8  Non-Opioids Like Cocaine, Methamphetamines and
9  Other Psychostimulants, correct?
10      A.   Correct.
11      Q.   Is it fair to say that this
12 document indicates that there is an increase in
13 overdose deaths involving nonopioids?
14      MS. KOUBA:  Object to the form.
15      A.   Involving, yes.
16      Q.   And that that is connected to the
17 use of fentanyl or fentanyl analogs?
18      MR. LEDLIE:  Object to the form of
19 the question.
20      A.   I don't see that stating that, no.
21      Q.   In your view, in your understanding
22 of the situation in Summit County, you
23 testified previously that the rise -- that the
24 increase in overdose deaths related to fentanyl
25 and carfentanil, correct?

Page 228

1       A.   Yes.
2       Q.   Did some of those overdose deaths
3  relating to fentanyl and carfentanil involve
4  nonopioids?
5       MS. KOUBA:  Object to the form.
6       A.   That I don't know without looking
7  at the data.
8       Q.   Why did you forward this email to
9  Aimee and say, "Cough, cough, cough," smiley
10 face?
11      A.   I don't recollect.
12      Q.   Is that because you agreed with
13 Jerry Craig's statement that it confirmed what
14 you were seeing locally?
15      MS. KOUBA:  Object to form.
16      A.   I honestly don't know.  I don't
17 remember.
18      Q.   And this document reflects that
19 "Most cases of fentanyl-related harm, overdose
20 and death, are linked to illegally manufactured
21 fentanyl," correct?
22      A.   Where do you see that?
23      Q.   This is in the -- this is in the
24 last paragraph above Recommendations.
25      A.   That's what that sentence says,

Page 229

1  yes.
2       Q.   Do you agree with that sentence?
3       A.   I don't have an opinion on that
4  sentence.
5       Q.   The next sentence says, "Fentanyl
6  is often mixed with heroin and/or cocaine as a
7  combination product, with or without the users
8  knowledge, to increase its euphoric effects";
9  is that correct?
10      A.   Yes, that is what it says.
11      Q.   Does your review of the medical
12 records reflect the fact that fentanyl was
13 often mixed with heroin and/or cocaine as a
14 combination product?
15      MS. KOUBA:  Object to the form.
16      A.   I don't think that -- no, the data
17 doesn't reflect that.
18      Q.   The data doesn't reflect that
19 fentanyl is often mixed with heroin or cocaine?
20      MS. KOUBA:  Object to form.
21      A.   Not the data that I have.
22      Q.   What data do you have that you are
23 referring to here?
24      MS. KOUBA:  Object to the form.
25      A.   What data am I referring to, is

58 (Pages 226 - 229)

Page 230

1  that what --
2      Q.  So I asked from your review of the
3  medical records, do you understand it to be
4  true that fentanyl is often mixed with heroin
5  and/or cocaine as a combination product?
6      A.  No, that data doesn't state that.
7      Q.  What does the data state?
8      A.  That with the toxicology reports,
9  it will just say, like, say, for instance, it
10  will say fentanyl, heroin, cocaine in the
11  toxicology reports, and I have no way of
12  telling whether that was mixed or whether it
13  was independently used.
14      Q.  So let me ask it this way:  Does
15  the data that you are -- does the medical
16  examiner data reflect that fentanyl is often
17  mixed or used at the same time or around the
18  same time as other substances, like heroin and
19  cocaine?
20      MS. KOUBA:  Object to form.
21      A.  That I don't know.
22      Q.  Does the medical examiner data from
23  the toxicology reports reflect that many
24  overdose victims present fentanyl and other
25  substances like heroin and cocaine?

Page 231

1      A.  I'm sorry.  Could you repeat that.
2      MR. MASTERS:  Could you please read
3  the question.
4      THE NOTARY:  Question:  "Does the
5  medical examiner data from the toxicology
6  reports reflect that many overdose victims
7  present fentanyl and other substances like
8  heroin and cocaine?"
9      A.  What do you mean by that?
10      Q.  You have reviewed medical examiner
11  records?
12      A.  Yes, I have.
13      Q.  And you have reviewed the
14  toxicology reports?
15      A.  Yes.
16      Q.  Are there instances in which
17  overdose victims have in their system fentanyl
18  and other substances, like heroin and cocaine?
19      A.  When you say overdose victims and
20  stuff, the medical examiner's office doesn't
21  evaluate overdose victims.  They evaluate
22  overdose deaths.
23      Q.  Okay.  Overdose deaths.  Are there
24  instances in which overdose deaths show that
25  the person who died had both fentanyl and

Page 232

1  cocaine in their system?
2      A.  Yes.
3      Q.  In your view, did such an instance
4  in which the overdose -- the person who
5  overdosed and died had both fentanyl and
6  cocaine in their system increase in 2017?
7      A.  That I don't know.
8      Q.  Do you have any reason to disagree
9  with this health advisory that was written?
10      MR. LEDLIE:  Object to the form of
11  the question.
12      A.  I don't have enough information to
13  determine whether I would disagree with this or
14  not.
15      Q.  So you don't have a view -- so you
16  don't question the accuracy of this health
17  advisory?
18      MS. KOUBA:  Object to the form.
19      A.  No, I don't question it.
20      - - - - -
21      (Thereupon, Deposition Exhibit 16,
22      November 23, 2016 Email, Subject
23      Drug Overdose Deaths and
24      Opiate-Related Deaths, Beginning
25      with Bates Label Summit 001056544,

Page 233

1      was marked for purposes of
2      identification.)
3      - - - - -
4      Q.  I show you what has been marked as
5  Exhibit 16, Summit 001056544.  Do you recognize
6  this document and the attachment?
7      A.  It is an email.
8      Q.  It is an email that you sent to
9  Jerry Craig on November 2016, correct?
10      A.  Yes.
11      Q.  You attached something.  Do you
12  recognize this attachment?
13      A.  Yes.
14      Q.  In the email, you indicate that you
15  were attaching the information that Jerry Craig
16  requested, correct?
17      A.  Yes.
18      Q.  And in the next paragraph, you say,
19  "I also added other slides that I thought you
20  might find interesting as far as the spike in
21  services for opiates and heroin users,"
22  correct?
23      A.  Yes.
24      Q.  "When you compare 2015 to 2016
25  data, you can see our system is serving more

59 (Pages 230 - 233)

Page 234

1  clients for opiates and heroin than anything
2  else," correct?
3      A.  Yes.
4      Q.  And from 2015 to 2016 is the same
5  period as you indicated earlier Summit County
6  experienced a spike in drug overdose deaths,
7  correct?
8          MS. KOUBA:  Object to form.
9      A.  Yes, that is the same period.
10     Q.  Referring to the attachment, the
11  second page, with the three slides on it, the
12  bottom two slides, what do they reflect -- or
13  sorry -- what do they describe?
14     A.  The one on the left is the Top
15  Three Drugs Contributing to ADM Board Services
16  in Summit County 2015.
17     Q.  And the one on the right?
18     A.  The one on the right is Top Three
19  Drugs Contributing to ADM Board Services in
20  2016.
21     Q.  And in 2015, what was the
22  percentage of ADM Board services for females
23  relating to opiates and heroin?
24     A.  20 percent.
25     Q.  So 20 percent of the females who

Page 235

1  receive services from ADM related to opiates
2  and heroin?
3      A.  Yes.
4      Q.  And 8 percent of the men?
5      A.  Yes, but this is only contributing
6  to ADM Board funded services.
7      Q.  Such as what?
8      A.  Services that we pay for.
9      Q.  Through the contracting agencies?
10     A.  Yes.
11     Q.  Like Oriana House?
12     A.  Yes.
13     Q.  In 2016, the percentage of females
14  receiving opiate and heroin-related services
15  was what?
16     A.  64 percent.
17     Q.  And for men?
18     A.  45 percent.
19     Q.  So this reflects that spike you
20  were talking about?
21          MS. KOUBA:  Object to form.
22     A.  Yes.
23     Q.  How was this information -- how did
24  you obtain that information?
25     A.  This is data straight from our

Page 236

1  claims data.  This is an analysis of our claims
2  data.
3      Q.  And that claims data doesn't
4  distinguish between prescription and illegal
5  street opiates, correct?
6      A.  It doesn't.
7          MS. KOUBA:  Object to the form.
8          MR. MASTERS:  Could we go off the
9  record really quick.
10         THE VIDEOGRAPHER:  Off the record
11  at 4:01.
12         (Discussion off the record.)
13         THE VIDEOGRAPHER:  On the record,
14  4:20.
15         - - - - -
16         (Thereupon, Deposition Exhibit 17,
17         May 25, 2018 Email Exchange Between
18         Patton and Hutzell, Beginning with
19         Bates Label SUMMIT 00097076, was
20         marked for purposes of
21         identification.)
22         - - - - -
23     Q.  All right.  I'm showing you what
24  has been marked as Exhibit 17, Summit
25  000970726.  Do you recognize this document?

Page 237

1      A.  Yes, I do.
2      Q.  And it is an email exchange between
3  you and Kimberly Patton; is that correct?
4      A.  Yes.
5      Q.  Who is Kimberly Patton?
6      A.  Kimberly Patton is the addiction
7  prevention and training coordinator at the ADM
8  Board.
9      Q.  What does that role entail?
10     A.  It entails, like, dealing with
11  different programs and stuff with addiction and
12  prevention and then setting up trainings.
13     Q.  What programs specifically does she
14  deal with?
15     A.  I don't know all the programs that
16  she deals with.
17     Q.  Do you know some of them?
18     A.  I know a couple.  I know that she
19  deals with the quick response team.
20     Q.  Any others that you know of?
21     A.  No, not off the top of my head.
22     Q.  And here she says she is wondering
23  if overdoses have declined or is it actually
24  deaths related to overdoses that have
25  decreased, correct?

Page 238

1    A.   Yes, that's what it says.
2    Q.   And how did you respond?
3    A.   I respond with, "Both have declined
4  this year when compared to the previous year."
5    Q.   And then you said, "It seems
6  cocaine, meth and other stimulant drugs are
7  being used more commonly," correct?
8    A.   Yes, based off of anecdotal
9  information that I got from police officers.
10   Q.   So you spoke with some police
11 officers about the drug use situation in Summit
12 County?
13   A.   Yes.
14   Q.   And this is what they indicated to
15 you?
16   A.   That's what they felt was
17 happening.
18   Q.   More commonly than what?
19   A.   They didn't -- than it was in
20 previous years.
21   Q.   And this accounted for the decline
22 in overdose related -- and this accounted for
23 the decline in overdoses?
24       MS. KOUBA:  Object to the form.
25   A.   That I don't know.

Page 239

1    Q.   Why did you include this sentence?
2    A.   Are you referring to -- what
3  sentence are you referring to?
4    Q.   So Kim Patton asked, "Wondering if
5  overdoses have declined or is it actual deaths
6  related to overdoses that have decreased?"
7        You respond, "Both have declined
8  this year when compared to the previous year."
9  And then you added, "It seems cocaine, meth,
10 and other stimulant drugs are being used more
11 commonly.  These typically have a lower
12 mortality and higher morbidity," correct?
13   A.   Yes.
14   Q.   Why did you -- what did you mean by
15 this second paragraph?
16   A.   Second paragraph, I meant that, you
17 know, that's what I was hearing and stuff that
18 was occurring on the streets.
19   Q.   And how does that second paragraph
20 relate to the question that Kim Patton asked?
21   A.   Because it's added information and
22 stuff, things that maybe she should be aware of
23 and stuff.
24   Q.   Does the second paragraph about the
25 use of cocaine, meth and other stimulant drugs

Page 240

1  being used more commonly have any relationship
2  to the decline in overdoses?
3        MS. KOUBA:  Object to the form.
4    A.   I don't know.
5    Q.   You are saying you just threw that
6  in there?
7        MS. KOUBA:  Object to the form.
8    A.   I don't believe that those two
9  paragraphs are related.
10   Q.   So -- strike that.
11       Was Kim Patton asking about the use
12 of cocaine, meth and other stimulant drugs?
13       MS. KOUBA:  Object to the form.
14   A.   No, she wasn't.
15   Q.   Was she asking whether these drugs
16 were used more commonly?
17       MS. KOUBA:  Object to the form.
18   A.   Not in this email.
19   Q.   Was she asking whether these drugs
20 typically have a lower mortality and higher
21 morbidity rate?
22       MS. KOUBA:  Object to the form.
23   A.   Not in this email.
24   Q.   So why did you -- why did you
25 include this information in response to a

Page 241

1  question about the number of overdose deaths?
2    A.   Because it was information that I
3  had that she should be made aware of.
4    Q.   But it has nothing to do with her
5  question?
6        MS. KOUBA:  Object to the form.
7    A.   It has nothing to do with the
8  question.
9    Q.   What is a lower mortality?
10   A.   It means a lower rate of death.
11   Q.   So wouldn't it be the case then
12 that if cocaine, meth and other stimulant drugs
13 are being used more commonly, and those drugs
14 have a lower mortality, that you would expect
15 the drug overdose number to decrease?
16       MS. KOUBA:  Object to the form.
17   A.   Based on this email, there is not
18 enough information to state that.
19   Q.   You wrote this email, correct?
20   A.   Yes.
21   Q.   And you don't recall, sitting here
22 today, what information would be necessary to
23 understand the relationship between cocaine,
24 meth and other stimulant drugs being used more
25 commonly and the overdose rate?

61 (Pages 238 - 241)

Page 242

1     MS. KOUBA:  Object to the form.
2     A.    Again, these two paragraphs are
3  separate and not related and stuff.  This is
4  referring to the rates of this year, of 2018
5  that is and stuff, and then the second one was
6  based on information that I had obtained from
7  police that I wanted Kim to know about.
8     Q.    What is your basis for concluding
9  that cocaine has a lower mortality?
10     MS. KOUBA:  Object to the form.
11     A.    Discussions with Dr. Doug Smith.
12     Q.    But independently you have no
13  knowledge of the mortality of cocaine?
14     A.    After discussions with Dr. Smith
15  and stuff, I did have, you know, an
16  understanding of that.
17     Q.    And other than those conversations,
18  have you done any research relating to the
19  mortality of cocaine?
20     A.    No.
21     Q.    What about the mortality of meth?
22     A.    No.
23     Q.    What is morbidity?
24     A.    Morbidity is a decrease in quality
25  of life.

Page 243

1     Q.    So in response to Kim Patton's
2  question of how the overdose has declined, you
3  said that the number had declined this year
4  when compared to the previous year.
5     Did you undertake an effort to
6  understand why there was a decline from the
7  previous year?
8     A.    No, I did not.
9     MR. LEDLIE:  Object to the form of
10  the question.
11     Q.    From your review of the medical
12  examiner data, do you have an impression about
13  what contributed to the decline in overdose
14  deaths?
15     MS. KOUBA:  Object to the form.
16     A.    No.
17     Q.    But you do know that there was a
18  decline?
19     A.    Yes, there was a decline.
20     MR. SALIMBENE:  This is Mike
21  Salimbene on the phone, and I'm just wondering
22  what is the basis for two lawyers making
23  objections during this deposition?
24     I looked at the depo protocol, and
25  it says certainly two questioners from any

Page 244

1  defendant group can ask questions, but I see
2  nothing about allowing two lawyers defending
3  the same party to both make objections
4  throughout the deposition.
5     MR. LEDLIE:  My understanding, and
6  I have read the protocol, and I don't have a
7  copy of it with me, if somebody wants to give
8  it to me, I'll be happy to go through it.
9     MR. MASTERS:  Does anyone here have
10  a copy?
11     MR. SALIMBENE:  Yeah, okay.  Well,
12  I'm looking at it, and it's just not in there.
13  It says, in fact, an objection by one plaintiff
14  shall be deemed to be made on behalf of all
15  other plaintiffs.  So I think if anything, the
16  protocol contemplates fewer objections --
17     MR. LEDLIE:  Talking about two
18  lawyers --
19     MR. SALIMBENE:  -- and this is not
20  consistent with any other case I've worked on,
21  with the federal rules.
22     But anyway, if you can point to
23  something, that's great, but I really don't
24  think you will be able to, and I don't think it
25  is entirely disruptive, but I think it is

Page 245

1  inappropriate, and I don't think everybody
2  would appreciate the defendants showing up at
3  the depositions just having multiple lawyers
4  sit and lodge objections the entire time.
5     - - - - -
6     (Thereupon, Deposition Exhibit 18,
7     Email Exchange, Subject Opioid Grand
8     Update and a Potential QRT Project
9     for This Summer, Beginning with
10     Bates Label SUMMIT 000969892, was
11     marked for purposes of
12     identification.)
13     - - - - -
14     Q.    Moving on, I am showing you what
15  has been marked as Exhibit 18, Summit
16  000969892.  Do you recognize this document?
17     A.    Yes.  It's an email.
18     Q.    And what is the subject of this
19  email?
20     A.    The subject reads, "A reply to the
21  opioid grant update and a potential QRT
22  customer project for the summer."
23     Q.    And I understand that that's what
24  the subject line is, but what is the subject
25  matter of the email?

62 (Pages 242 - 245)

1    A.   I'd have to read it all, to be able
2  to answer that question.
3    Q.   Let's look at the first email in
4  the chain, which was sent by Thomas P. Huber,
5  on April 11, 2018, at 8:23 p.m.; is that
6  correct?
7    A.   Yes, that is correct.
8    Q.   Thomas writes, "I have exciting
9  news, we got the opioid planning grant from
10 OSU," right?
11   A.   Yes, that is the subject.
12   Q.   What is OSU?
13   A.   Ohio State University.
14   Q.   He goes on to indicate that, "Below
15 we have a starting idea about a proposed
16 project.  Perhaps Lexi and I can come visit in
17 several weeks to talk further about the work,"
18 right?
19   A.   Where does it say that?
20   Q.   Third paragraph of the email, at
21 the very bottom of the page, "Below we have a
22 starting idea about a proposed project," right?
23   A.   Yes, that is correct.
24   Q.   And he wants to talk -- this is an
25 email -- sorry.  Strike that.

1    The project title is Evaluating
2  Barriers to Care and Best Practices of Quick
3  Response Training Team Members in Combatting
4  Opioid Use Disorder, correct?
5    A.   Yes, that's what the project title
6  is.
7    Q.   "The goal of this study is to
8  identify the primary barriers to treatment that
9  persons suffering from opioid use disorder
10 encounter, and to identify the best practices
11 of QRT teams in supporting clients and families
12 and connecting clients to treatment resources,"
13 correct?
14   A.   Yes.
15   Q.   One of the recipients of this email
16 is a man named David Garro, and he forwarded
17 this on to Jerry Craig, correct?
18   A.   Yes, Jerry Craig is in that email.
19   Q.   And then Jerry Craig responded with
20 some thoughts on this opioid-related,
21 QRT-related project, right?
22   A.   Yes.
23   Q.   And cc'd Kimberly Patton?
24   A.   Yes.
25   Q.   And presumably because she is in

1  charge of the QRT program?
2    A.   Yes.
3    Q.   And then Kimberly Patton forwarded
4  this on to you and said, "Let me know your
5  thoughts," right?
6    A.   Uh-huh.
7    Q.   So this is a -- this is a project
8  related to studying barriers treatment from
9  persons suffering with opioid use disorder and
10 the best practices of QRT teams in connecting
11 clients to resources, right?
12   A.   Yes.
13   Q.   And you responded that you think
14 this is a good project for an undergraduate
15 student?
16   A.   Yes.  That's the first sentence.
17   Q.   But that it needs some adjustments?
18   A.   Yes.
19   Q.   So you then say, "I'm not sure if
20 identifying systematic barriers is what we need
21 for QRT at this time.  If barriers is meant by
22 social or self-barriers, then it would be
23 fine."
24   Help me understand what you meant
25 by that, by those two sentences?

1    A.   If you read, like, the next
2  paragraph and stuff, it say, "Right now we
3  don't have the volume of drug overdoses that we
4  had the past three years.  A project finding
5  out how QRT can be used for other substance use
6  disorders may be beneficial," and that's my
7  reasoning for that.
8    Q.   What is your reasoning?
9    A.   My reasoning for that first
10 sentence and stuff, and why it may not be the
11 best thing that we needed at that time.
12   Q.   It is not the best thing we need
13 because the volume of drug overdoses is less
14 than the past three years and because it would
15 be more beneficial for a QRT project focused on
16 other substance use disorders?
17   MS. KOUBA:  Objection to form.
18   A.   I'm not sure what your question is.
19   Q.   Your reasoning for why -- I'm just
20 trying to repeat what you just said.
21   A.   Okay.
22   Q.   Are you saying that the reason why
23 you didn't think that this project, as
24 proposed, was what we need for QRT at this time
25 is because we don't have the volume of drug

1  overdoses as we did in the past three years,
2  and a project focused on how QRT can be used
3  for other substance use disorders may be more
4  beneficial?
5      A.   Yes, that's what I wrote.
6      Q.   That's what you wrote or that was
7  your reasoning for why you said that the
8  project was not what QRT needs at this time?
9           MS. KOUBA:  Object to the form.
10     A.   I'm sorry.  Could you repeat that.
11     Q.   Well, I asked a question, you said,
12 "Yes, that's what I wrote," but my question is,
13 your reason for why this project was not what
14 we need for QRT at this time was, A, we don't
15 have the volume of drug overdoses as we did in
16 the past three years, B, the project, finding
17 out how QRT can be used for other substance use
18 disorders, may be more beneficial, correct?
19          MR. LEDLIE:  Object to the form of
20 the question.
21     A.   That's what I wrote.
22          - - - - -
23          (Thereupon, Deposition Exhibit 19,
24          Email Exchange, Beginning with Bates
25          Label SUMMIT 001401097, was marked

1          for purposes of identification.)
2          - - - - -
3      Q.   I'm showing you what has been
4  marked as Exhibit 19, Summit 001401097.  Do you
5  recognize this email?
6      A.   Yes, I do.
7      Q.   This is an email to you from Aimee
8  Wade?
9      A.   Yes, it is.
10     Q.   Do you recall what this email was
11 about?
12     A.   Yes, I do.
13     Q.   What was it about?
14     A.   It was about a request to consider
15 funding information management system for the
16 medical examiner's office.
17     Q.   And why were you writing about this
18 subject?
19     A.   They were trying to gather funding
20 for digitizing their records from a paper
21 format and stuff, so I wrote about the benefit
22 of doing that.
23     Q.   And you understandably felt
24 strongly about digitized records over paper
25 records, right?

1      A.   Yes.
2      Q.   And why is that?
3      A.   Because with paper records, it
4  takes a lot of time to be able to digitize
5  that.  If it is already in a digitized format,
6  then you don't have to spend time with data
7  collection, or as much time with data
8  collection.
9      Q.   So it was impacting your work?
10     A.   The amount of time spent on the
11 work.
12     Q.   In paragraph 3, you indicate, "I
13 have not been able to monitor suicides because
14 of the amount of time that it takes to convert
15 these files from paper form to an electronic
16 file," right?
17     A.   Yes.
18     Q.   So this was an instance in which
19 the form of the medical examiner records
20 actually impacted your ability to analyze data
21 that you were interested in?
22     A.   Yes, that's true.
23     Q.   Was this funding request eventually
24 approved?
25     A.   Yes, it was.

1      Q.   So you are now able to -- are the
2  records now digitized?
3      A.   When I left the ADM Board, it
4  wasn't.  I'm not sure what the status is right
5  now.
6      Q.   You write, moving down the page,
7  "From utilizing the toxicology reports, we were
8  able to find out that 36 percent of the
9  drugs/medications mentioned in the 2015
10 toxicology reports were psychiatric
11 medications," correct?
12     A.   Yes.
13     Q.   And you write, "This is a large
14 number and is an important part of the
15 understanding who the opiate epidemic is
16 affecting"?
17     A.   Yes.
18     Q.   How is the large number of drugs
19 and medications mentioned in the toxicology
20 reports an important part of understanding who
21 the opioid epidemic is affecting?
22     A.   Because it raises other questions
23 on the percentage of people who were diagnosed
24 with psychiatric or mental health illnesses.
25     Q.   What questions did it raise?

64 (Pages 250 - 253)

Page 254

1    A.    As far as, like, how many of those
2  have been affected for drug overdose deaths --
3  or with drug overdose deaths.
4    Q.    I'm sorry.  I'm not sure I
5  understand your response.
6          What questions does the number of
7  drugs mentioned in the toxicology -- the number
8  of psychiatric medications mentioned in the
9  toxicology reports raise about the opioid
10 epidemic?
11   A.    It raises questions about, like,
12 co-occurring disorders.
13   Q.    What is a co-occurring disorder?
14   A.    That's when you have -- what I'm
15 talking about is a person who has a substance
16 use disorder and a mental health illness.
17   Q.    And is understanding co-occurring
18 disorders an important part of understanding
19 who the opioid epidemic is affecting?
20   A.    Yes.
21   Q.    Why is that an important part?
22   A.    Because you are able to identify
23 different populations that are affected, and
24 you are able to look into potential policy or
25 program changes to better serve that

Page 255

1  population.
2    Q.    So if you didn't acknowledge
3  that -- strike that.
4          If you didn't understand that there
5  were co-occurring disorders connected to opioid
6  use, you would be hindered in your ability to
7  develop policy or program changes that would
8  better serve the population?
9          MS. KOUBA:  Objection to form.
10   A.    I don't understand your question.
11   Q.    You testified a minute ago -- I
12 asked why is it an important part of
13 understanding the opioid epidemic to understand
14 co-occurring disorders, and you said, "Because
15 you are able to identify different populations
16 that are affected, and you are able to look
17 into potential policy or program changes to
18 better serve that population," right?
19   A.    Yes.
20   Q.    And I asked, "If you didn't
21 understand that there were co-occurring
22 disorders connected to opioid use, you would be
23 hindered in your ability to develop policy or
24 program changes that would better serve the
25 population?"

Page 256

1          MS. KOUBA:  Same objection.
2    A.    I don't know, based on the question
3  that you are asking, I don't know if that would
4  be a hindrance or not a hindrance.
5    Q.    But it's necessary to understand
6  co-occurring disorders in order to develop
7  policies and programs to serve the population,
8  correct?
9    A.    Yes.
10   Q.    And so without that understanding,
11 you wouldn't be able to develop policies and
12 programs that serve the population?
13         MR. LEDLIE:  Object to the form of
14 the question.
15   A.    I believe you would be better
16 informed.  Your decisions and policy making
17 would be better informed with that information.
18   Q.    You then go on to note that,
19 "Supporting the medical examiner's office to
20 get software to make their records electronic
21 will help us to understand what happened, why
22 it happened, and how to prepare and prevent the
23 next drug epidemic."
24         How do -- when you say that the
25 medical records will help us understand what

Page 257

1  happened, what are you referring to when you
2  say what happened?
3    A.    How did a person get from using
4  drugs to dying over -- a drug overdose death,
5  like, what was their journey that led them to
6  dying.
7    Q.    And how does the medical examiner
8  records reflect a person's journey from using
9  drugs to dying?
10   A.    It's a small piece of it, a small
11 piece of the pie.
12   Q.    Which piece of the pie is it?
13   A.    It's the piece that, like,
14 represents the drug overdose deaths.
15   Q.    So the very end?
16   A.    Yes.
17   Q.    Do the medical examiner records
18 indicate anything about how an individual first
19 began using a particular substance?
20   A.    By themselves, no.
21   Q.    Does it indicate whether a person
22 was addicted?
23         MS. KOUBA:  Object to the form.
24   A.    In the qualitative data, it is a
25 possibility.

65 (Pages 254 - 257)

Page 258

1    Q.   It is a possibility.  What would
2  that look like?
3      A.   I'm not sure, because you would
4  have to ask the medical examiner's office,
5  because they do their reports of investigation
6  and utilize that qualitative information, which
7  is why on a previus report that you went over,
8  we were able to, kind of, see what types of
9  medications and stuff and -- that people were
10  using.
11     Q.   But you would have to look beyond
12  the medical examiner reports that you were
13  examining?
14     A.   Yes.
15     Q.   So the medical examiner reports
16  that you had did not reflect information about
17  whether the individuals were addicted to any
18  particular substance?
19     A.   By themselves, no.
20     Q.   So to understand whether each
21  individual patient record reflected somebody
22  who was addicted to a substance, you would have
23  to have additional information, correct?
24     A.   Yes.  You would have to combine
25  different datasets.

Page 259

1    Q.   How do medical examiner records
2  help us understand why it happens, to quote
3  you?
4      A.   Well, I think, like, the big part
5  of this sentence is the word, "Help us to
6  understand."
7         And when you talk about helping, it
8  is meaning combining different datasets, you
9  know, from the beginning to the end and stuff,
10  and coming up with these, like, answers to
11  these questions.
12     Q.   And then you write, "And how to
13  prepare and prevent the next drug epidemic,"
14  correct?
15     A.   Yes, that's what I wrote.
16     Q.   Why did you -- do you expect there
17  will be another drug epidemic?
18         MS. KOUBA:  Object to the form.
19     A.   I think from past history and
20  stuff, we have looked at multiple drug
21  epidemics.
22     Q.   Is this something that -- strike
23  that.
24         So, historically, there have been
25  other drug epidemics?

Page 260

1      A.   Yes.
2      Q.   And are you suggesting here that
3  that trend might continue?
4          MS. KOUBA:  Object to form.
5      A.   There is a possibility.
6      Q.   What is your understanding about
7  historical drug epidemics based on?
8          MS. KOUBA:  Object to the form.
9      A.   To the events that occurred in
10  history, throughout history.
11     Q.   Did you study those prior drug
12  epidemics?
13     A.   Yes.
14     Q.   Where did you study them?
15     A.   On my own, self-study.
16     Q.   When did you study them?
17     A.   I'm not sure exactly when.
18     Q.   What did you do to study them?
19     A.   I read, read books.
20     Q.   What books did you read?
21     A.   One of the books that comes to mind
22  is called Opium.
23     Q.   Who was the author, do you recall?
24     A.   No, I don't.
25     Q.   What was that book about?

Page 261

1      A.   It was about the history of
2  opiates.
3      Q.   When did you read that book?
4      A.   I'm not sure.
5      Q.   Before or after you joined Summit
6  ADM?
7      A.   After.
8      Q.   Have you studied in history about
9  other nonopioid-related drug epidemics?
10     A.   No, I haven't studied about those.
11     Q.   So is your understanding of
12  historical drug epidemics limited to the
13  current opioid epidemic?
14         MS. KOUBA:  Object to the form.
15     A.   No.
16     Q.   So what else is included in your
17  understanding about historical drug epidemics?
18         What other drug epidemics have you
19  studied?
20         MS. KOUBA:  Object to the form.
21     A.   I've studied a little bit about the
22  Opium Wars that occurred in 1839 between China,
23  India and Great Brittain.
24     Q.   And what's your understanding of
25  those wars?

Page 262

1    A.    They had a lot of socioeconomic
2  impact on China and stuff, as far as, like, the
3  pushing of, like, opiates and stuff into
4  Chinese territory and stuff, and the Chinese
5  retaliated with that.
6    Q.    Have you studied any other drug
7  entities besides the Opium Wars of the 1830s
8  and the current opioid epidemic?
9    A.    No, I have not.
10    Q.    Have you read the complaint in this
11  lawsuit?
12    A.    No, I have not.
13    Q.    Do you know who the defendants are?
14    A.    Other than what you and your team
15  of lawyers here had said, no.
16    Q.    Do you know who the plaintiff is?
17    A.    I believe it is Summit County, but
18  I don't know everything that is involved with
19  that, like all the agencies.
20    Q.    Are you familiar with what a
21  pharmaceutical manufacturer is?
22    A.    Not exactly and stuff.  I mean, I
23  would say it is like a manufacturer who creates
24  different pharmaceuticals or drugs and stuff.
25  That would be my understanding of it.

Page 263

1    Q.    Do you know the names of any
2  specific opioid manufacturers?
3    A.    Yes, I do.
4    Q.    What names do you know?
5    A.    Janssen and Johnson & Johnson.
6    Q.    Any others?
7    A.    No.  I can't recall any at this
8  time.
9    Q.    Are you aware of what a wholesale
10  pharmaceutical distributor is?
11    A.    No, I'm not.
12    Q.    Have you heard the name of any
13  wholesale pharmaceutical distributors?
14    MR. LEDLIE:  Object to the form of
15  the question.
16    A.    Not to my knowledge.
17    Q.    Have you ever had any interaction
18  with anybody employed by Cardinal Health?
19    A.    No.
20    Q.    McKesson?
21    A.    No.
22    Q.    ABDC?
23    A.    No.
24    Q.    When did you first become aware
25  that there was an opioid abuse problem in

Page 264

1  Summit County?
2    MS. KOUBA:  Object to the form.
3    A.    When I started working for Summit
4  County ADM Board.
5    Q.    So prior to July of 2016, you were
6  not aware that there was an opioid abuse
7  problem in Summit County?
8    MS. KOUBA:  Object to the form.
9    A.    In Summit County, no.
10    Q.    You had not heard about it in your
11  connection -- in your work at Oriana House?
12    A.    No.
13    Q.    It was just not on your radar?
14    A.    Yes.
15    MS. KOUBA:  Object to the form.
16  Asked and answered.
17    MR. MASTERS:  I believe that's all
18  that I have.
19    Perhaps we can go off the record
20  for a minute.
21    THE VIDEOGRAPHER:  Off the record,
22  5:01.
23    (Recess taken.)
24    THE VIDEOGRAPHER:  On the record,
25  5:13.

Page 265

1    EXAMINATION OF ERIC HUTZELL
2  BY MS. FEINSTEIN:
3    Q.    Thank you.  Good afternoon, Mr.
4  Hutzell.
5    A.    Good afternoon.
6    Q.    My name is Wendy West Feinstein.  I
7  represent the Teva defendants in this
8  litigation.  We met briefly this morning,
9  before we went on the record.
10    I will do my best not to repeat
11  questions that my colleague asked you earlier
12  today, but I do have some follow-up questions
13  for you, and I may be a little scattered,
14  because I don't want to tread ground that we
15  have already covered, okay?
16    A.    Okay.
17    Q.    As with my colleague's questioning,
18  if you have -- if you don't understand a
19  question that I've asked, please ask me to
20  rephrase it, and I'll do my best to do so,
21  okay?
22    If you answer a question that I've
23  asked, I'll assume that you understood it as I
24  asked it, fair enough?
25    A.    Fair.

67 (Pages 262 - 265)

Page 266

1    Q.    And we will have to be careful not
2  to talk over one another, so that the court
3  reporter can take down everything, okay?
4    A.    Okay.
5    Q.    When did you first learn of this
6  lawsuit?
7    A.    Sometime in November.
8    Q.    November of 2018?
9    A.    Yes.
10    Q.    How did you first learn of it?
11    A.    The -- Jerry, my director at the
12  time, had told me that there was two lawyers
13  that wanted to talk with me.
14    Q.    You had not heard anything about
15  the litigation prior to the time your
16  deposition was requested?
17    A.    I heard that people were being
18  deposed, but other than that, I didn't know
19  what for or what it was about and stuff
20  specifically.
21    Q.    Had you ever seen any publicity
22  locally about the lawsuit?
23    A.    Yes.
24    Q.    What publicity did you see?
25    A.    I believe in the Akron Beacon

Page 267

1  Journal there was an article about it.
2    Q.    What is your understanding of the
3  allegations in the case?
4    A.    I don't have an understanding of
5  the allegations.
6    Q.    What do you remember about the --
7  strike that.
8          What do you remember about the
9  article that was in the Akron Beacon Journal?
10    A.    I read it very briefly.  It just
11  stated, like, that Summit County was involved
12  in a lawsuit and stuff involving the opiates,
13  related to opiates.
14    Q.    Do you remember whether that
15  article addressed anything about the
16  allegations that were made by Summit County in
17  the litigation?
18    A.    No, I don't.
19    Q.    At any point in time, have you
20  spoken to anyone, other than the lawyers for
21  Summit County, regarding the allegations in the
22  lawsuit?
23    A.    No.
24    Q.    Other than speaking with the
25  lawyers before your deposition, did you talk

Page 268

1  with anyone else about your deposition?
2    A.    Yes.
3    Q.    Who?
4    A.    I talked with Jerry and Aimee to
5  inform them that I was being deposed.
6    Q.    Did you talk to them at all about
7  the substance of the deposition?
8    A.    No, I didn't.
9    Q.    Did you talk with Dr. Smith about
10  the deposition?
11    A.    No, I didn't.
12    Q.    Do you know whether Jerry, Aimee or
13  Dr. Smith have been deposed in this litigation?
14    A.    I only know about Dr. Smith, that
15  he was deposed.  I know Jerry is, but I'm not
16  sure whether he did that or not.
17    Q.    How do you know that Dr. Smith was
18  deposed?
19    A.    He told me and several colleagues
20  and stuff that that's what happened.
21    Q.    Did he tell you about the substance
22  of his deposition?
23    A.    Not in detail, no.
24    Q.    What did he tell you?
25    A.    He said that he got asked a bunch

Page 269

1  of budget questions that he wasn't able to
2  answer.
3    Q.    Did he tell you anything else about
4  his deposition?
5    A.    No.
6    Q.    When you learned that you would be
7  giving a deposition, did you talk to Dr. Smith
8  about what it was like, what types of
9  questions, or anything like that?
10    A.    Not in that detail and stuff.  I
11  mean, I asked, like, you know, what's a
12  deposition and stuff and what are you expected
13  and stuff to do.
14    Q.    What did he tell you?
15    A.    He said that it was -- you know,
16  that you had to go in front of lawyers and just
17  kind of like explain, whatever your
18  expertise is and your involvement.
19    Q.    Did he talk to you at all about the
20  types of things that he covered in his
21  deposition besides the budget?
22        MS. KOUBA:  Object to form.
23    A.    No.
24    Q.    Did you talk with anyone else about
25  your deposition?

68 (Pages 266 - 269)

Page 270

1    A.    No.
2    Q.    When did you have that conversation
3  with Dr. Smith?
4    A.    Maybe sometime in December.
5    Q.    Did you look at any documents
6  before your deposition to prepare for your
7  deposition?
8    A.    No, I didn't.
9    Q.    And I believe you were asked this
10  earlier, but I apologize if I'm repeating, have
11  you ever seen the complaint that was filed by
12  Summit County in this case?
13    A.    No, I have not.
14    Q.    You mentioned earlier that you knew
15  that Janssen and Johnson & Johnson were
16  manufacturers of opioids; is that right?
17    A.    No, that's not what I was saying or
18  meant.
19    Q.    What were you saying about Janssen
20  and J&J?
21    A.    I was asked if I ever heard of any
22  pharmaceutical companies and stuff, and I said
23  Janssen and J&J and stuff, and from this
24  morning, knowing that one of the lawyers had
25  said that they represented this company and

Page 271

1  stuff, that's why I answered that.
2    Q.    In what context are you familiar
3  with the names Janssen and Johnson & Johnson,
4  as far as pharmaceutical manufacturing?
5    A.    I mostly work with -- or I have
6  worked with Janssen.
7    Q.    And in what context?
8    A.    I did a research project and stuff
9  with them.
10    Q.    What was the subject matter of the
11  research?
12    A.    Long-acting injectables and people
13  who have -- long-acting injectable use on
14  people who have schizoaffective or
15  schizophrenic disorders and their involvement
16  in the criminal justice system.
17    Q.    Have you worked with any
18  pharmaceutical manufacturer in any capacity
19  related to pain management?
20    A.    No, I have not.
21    Q.    Before today, did you have any
22  information about whether Janssen or Johnson &
23  Johnson manufacture opioids?
24    A.    Manufacture opioids?
25    Q.    Yes.

Page 272

1    A.    No, I did not.
2    Q.    Did you directly interact with any
3  representative of Janssen or Johnson & Johnson
4  with respect to that research project you
5  described?
6    A.    With the research project, yes.
7    Q.    And do you recall the name of the
8  person with whom you interacted or people?
9    A.    My main point of contact and
10  Antoine El-Khoury.  I'm probably chopping up
11  his name.
12    Q.    Do you recall his position with the
13  company?
14    A.    No, I don't.  I don't know his
15  exact title.
16    Q.    Was he a research scientist?
17    A.    I believe so.  I know he was in
18  charge of several different research projects,
19  but I'm not familiar with his title.
20    Q.    What was your role in that project?
21    A.    I was the project manager and stuff
22  for that project.
23    Q.    Can you describe for us -- you
24  mentioned that the product -- or that it was a
25  long acting -- that you were looking at

Page 273

1  long-acting schizophrenia treatment and its
2  relationship to the criminal justice system; is
3  that right?
4    A.    No, it's not right.
5    Q.    Okay.  Can you tell me again?
6    A.    Long-acting injectables.
7    Q.    Was there a specific product that
8  was involved in that research?
9    A.    By specific product, what do you
10  mean?
11    Q.    The long-acting injectable, was
12  there a specific long-acting injectable that
13  was being studied, or were there a number of
14  long-acting injectables?
15    A.    There is a number of long-acting
16  injectables.
17    Q.    In your interaction with the
18  representative of Janssen in that research
19  study, did you find the representative of
20  Janssen to be professional?
21    A.    Yes.
22    Q.    Were your interactions with that
23  representative of Janssen consistent with how
24  you would expect a researcher to interact with
25  you in that kind of setting?

69 (Pages 270 - 273)

Page 274

1     A.   Yes.
2     Q.   At any time has any representative
3  of Janssen or Johnson & Johnson misrepresented
4  any information to you?
5     A.   Not to my knowledge.
6     Q.   You mentioned that you were not
7  familiar with other manufacturers of opioids;
8  is that right?
9     A.   That's right.
10    Q.   Today I introduced myself as
11 counsel for the Teva defendants.  Have you ever
12 heard of Teva?
13    A.   No, I haven't.
14    Q.   Have you ever heard of Cephalon?
15    A.   No, I haven't.
16    Q.   Have you ever been heard of Purdue?
17    A.   Purdue, yes.
18    Q.   And what do you know about Purdue?
19    A.   Well, I don't know them from
20 pharmaceuticals.  I'm thinking of the chicken
21 manufacturer.
22    Q.   Have you ever heard of Endo
23 Pharmaceuticals?
24    A.   No.
25    Q.   Have you heard of Par?

Page 275

1     A.   No.
2     Q.   Have you heard of Noramco?
3     A.   No.
4     Q.   Have you heard of Allergan?
5     A.   No.
6     Q.   Have you heard of Watson
7  Laboratories?
8     A.   No.
9     Q.   Have you heard of Actavis?
10    A.   No.
11    Q.   Have you heard of Insys?
12    A.   No.
13    Q.   Have you heard of Mallinckrodt?
14    A.   It sounds familiar, but I don't
15 know, like, in what context I have heard that
16 name.
17    Q.   Have you heard of Spec TC?
18    A.   No.
19    Q.   Have you ever seen any advertising
20 for opioids, prescription opioids?
21    A.   Yes.
22    Q.   What advertising have you seen?
23    A.   Occasionally on television.
24    Q.   On what?
25    A.   On television and stuff.  Sometimes

Page 276

1  they have different prescription medications.
2     Q.   Have you seen advertising for
3  opioid medications on television?
4     A.   I can't recall.
5     Q.   Have you ever seen any print
6  advertisements for opioid medications?
7     A.   Not that I recall.
8     Q.   Have you ever reviewed any
9  prescribing information for prescription
10 opioids?
11    A.   No, I have not.
12    Q.   Are you aware that prescription
13 opioids are approved by the Food and Drug
14 Administration?
15    A.   Yes, I am.
16    Q.   Are you familiar at all with the
17 FDA approval process for pharmaceutical
18 products?
19    A.   Yes, I am.
20    Q.   And in what -- how are you familiar
21 with that process?
22    A.   In general and stuff, I know that
23 it's -- I know about the funding and stuff, as
24 far as like a lot of times the FDA requires the
25 pharmaceutical companies to upfront the funds

Page 277

1  to be able to approve different medications.
2     Q.   What do you mean by upfront the
3  funds for approval?
4     A.   Pay for it.
5     Q.   Pay for what?
6     A.   For the research and the approval
7  process.
8     Q.   Is it your understanding that
9  before a drug is approved by the FDA, it has to
10 under going a rigorous research and development
11 process?
12        MS. KOUBA:  Object to the form.
13    A.   That I don't know.
14    Q.   Have you ever participated in a
15 pharmaceutical study?
16    A.   The one that I talked about with
17 Janssen and stuff.
18    Q.   In that study, were you involved at
19 all in the study design?
20    A.   Yes, I was.
21    Q.   And what was your role in that
22 study design?
23    A.   Creating the outline and research
24 questions and what the objectives were.
25    Q.   Have you been involved in any other

70 (Pages 274 - 277)

Page 278

1  pharmaceutical research studies besides that
2  one?
3      A.  No, I have not.
4      Q.  Have you ever designed a research
5  study for a pain medication?
6      A.  No, I have not.
7      Q.  Have you ever read any publications
8  related to studies of pain medications?
9      A.  Yes, I have.
10      Q.  What studies have you read?
11      A.  I can't recall off the top of my
12  head and stuff.  I mean, I've read different
13  articles relating to opiates and their effect
14  on different populations, but I can't recall
15  exact studies.
16      Q.  Do you recall where those studies
17  were that you read; were they in journals,
18  online?
19          MS. KOUBA:  Object to the form.
20      A.  Journals.
21      Q.  What journals were they in?
22      A.  PubMed.  I'm sorry.  I apologize.
23  PubMed is not a journal.  It's a literature
24  review database.
25      Q.  For what purpose were you reviewing

Page 279

1  those articles?
2      A.  To get a better understanding of
3  the opiate epidemic.
4      Q.  At what point in time did you
5  review those articles?
6      A.  I would say between 2016 and the
7  end of 2018, during that timeframe.
8      Q.  Was it something that you did as a
9  part of your role at the ADM Board?
10      A.  Yes.
11      Q.  Did someone ask you to review those
12  articles?
13      A.  No.
14      Q.  How many articles did you review?
15      A.  I don't know exactly how many.
16      Q.  Do you recall that the substance of
17  any of those articles, what the research
18  endpoints were and what the findings and
19  conclusions were?
20      A.  Most of them had stated that the
21  opiate use had, like, an effect on the
22  population that they were studying and stuff,
23  whether that be, like, with quality of life or
24  drug overdose deaths or researching, like, how
25  it affects with the co-occurring disorders.

Page 280

1      Q.  Did you review any -- and you don't
2  recall -- strike that.
3          You don't recall the titles of any
4  of those articles?
5      A.  No, I don't.
6      Q.  Do you remember any of the lead
7  authors of any of the articles?
8      A.  No, I do not.
9      Q.  Is it your understanding that all
10  of the articles that you reviewed -- that you
11  read were peer-reviewed articles?
12      A.  Yes.
13      Q.  And you don't recall how many you
14  read?
15      A.  No, I don't recall.
16      Q.  Before you joined the ADM Board in
17  May of 2016, had you read any scientific
18  articles about opioids?
19      A.  I've read abstracts.
20      Q.  About opioids?
21      A.  Yes.
22      Q.  Do you recall what those abstracts
23  were that you read before you joined the ADM
24  Board?
25      A.  No, I don't.

Page 281

1      Q.  Do you recall reading any articles
2  about any opioids manufactured by the companies
3  that I just listed to you?
4      A.  No.
5      Q.  Did you review any articles, either
6  while you were at ADM board or before,
7  regarding prescription opioids and addiction?
8      A.  I'm sorry.  Can you say that again.
9      Q.  Either before you joined the ADM
10  Board, the abstracts that you reviewed, or
11  while you were employed by the ADM Board, the
12  peer-reviewed articles that you read, did any
13  of those relate to opioids and addiction?
14          MR. LEDLIE:  Object to the form of
15  the question.
16      A.  Yes.
17      Q.  And what do you recall about those
18  articles you read regarding opioids and
19  addiction?
20      A.  A lot of them are saying that
21  opioids were addictive substances.
22      Q.  When did you first learn that
23  opioids were addictive?
24      A.  I would say probably in grad
25  school.

71 (Pages 278 - 281)

Page 282

1    Q.    And what year about was that?
2    A.    2013, 2014, in that timeframe.
3    Q.    Are you aware that the FDA-approved
4  prescribing and patient information includes a
5  warning about the addictive properties of
6  opioids?
7         MS. KOUBA:  Object to the form.
8    A.    I wasn't aware.
9    Q.    Have you ever heard of a black box
10 warning with respect to FDA package inserts?
11   A.    No, I don't know about that.
12   Q.    Do you know whether -- strike that.
13        You understand that an individual
14 cannot obtain a prescription opioid without a
15 prescription from a physician, right?
16        MS. KOUBA:  Object to the form.
17   Q.    Lawfully?
18   A.    Could you repeat that?
19   Q.    Sure.  I'll ask it in a better way.
20 It was a poor question.
21        To legally obtain a prescription
22 opioid in the United States, you understand
23 that a person requires a prescription for that,
24 right?
25   A.    Yes.

Page 283

1    Q.    And it's your understanding that
2  for a pharmacy to dispense a prescription
3  opioid, that pharmacy has to receive a
4  prescription for that, right?
5    A.    Legally, yes.
6    Q.    Yes.  And you understand that the
7  prescriptions for opioids have to be written by
8  someone who is licensed by the state to write
9  prescriptions?
10   A.    Yes.
11   Q.    When my colleague earlier today was
12 asking you about the data that is available to
13 the ADM Board regarding opioids, it's my
14 understanding that most of the data does not
15 distinguish between illicit opioids and
16 prescription opioids; is that right?
17        MS. KOUBA:  Object to the form.
18   A.    There were several different
19 datasets discussed.  Which data are you
20 referring to?
21   Q.    Do any of the datasets that you
22 reviewed when you were at the ADM Board
23 distinguish between prescription opioids and
24 illicit opioids?
25   A.    Yes.

Page 284

1    Q.    Which ones?
2    A.    The ADM Help Line data.
3    Q.    The medical examiner data that you
4  evaluated as a part of your work at the ADM
5  Board, did that distinguish between
6  prescription and illicit opioids?
7         MS. KOUBA:  Object.
8         MR. LEDLIE:  Object to the form of
9  the question.
10   A.    Could you repeat that.
11   Q.    Sure.  The medical examiner data
12 that you evaluated as a part of your work at
13 the ADM Board, did it distinguish between
14 illicit opioids and prescription opioids?
15        MR. LEDLIE:  Same objection.
16   A.    Not the data that I analyzed.
17   Q.    Did you have access to the
18 underlying information for the data that you
19 analyzed from the medical examiner?
20   A.    What do you mean by that?
21   Q.    In what form was the data that you
22 received from the medical examiner?
23   A.    It was in an Excel spreadsheet.
24   Q.    Earlier we looked at an email
25 between Jerry Craig and Dr. Kohler that was

Page 285

1  forwarded to you that talked about putting
2  their records in electronic form, right?
3    A.    Yes.
4    Q.    Did you have access to those paper
5  records that were not in the Excel spreadsheet,
6  if you needed additional information?
7    A.    Yes.
8    Q.    What types of records did you have
9  access to at the ADM Board that supported the
10 spreadsheets that you got from the medical
11 examiner?
12   A.    What do you mean by supported?
13   Q.    What records did the medical
14 examiner have that were not electronic?
15   A.    The reports of the investigation.
16   Q.    Do you know what the reports of the
17 investigation include?
18   A.    Demographics, cause of death,
19 toxicology reports, and narratives, off the top
20 of my head, but that may not be conclusive.
21   Q.    Do you recall in the medical
22 examiner records, whether there was information
23 about whether the deceased was currently
24 prescribed any prescription opioid medication?
25        MS. KOUBA:  Object to the form.

72 (Pages 282 - 285)

1    A.   What do you mean by, like,
2  currently and stuff?
3    Q.   At the time of death --
4    A.   At the time of death.
5    Q.   -- was there anything in the
6  medical examiner's records that showed you, at
7  the time of death, or showed the medical
8  examiner, at the time of death, whether the
9  deceased had a prescription for a prescription
10  opioid at that time?
11    A.   That would be probably a better
12  question answered by the medical examiner.
13    Q.   You don't remember seeing anything
14  like that?
15    A.   They have different stuff that's
16  involved in the narratives, but I just -- it
17  doesn't come to the top of my head, as far as
18  that, so...
19    Q.   Do you recall any instance where
20  you asked to see the narrative documents, as
21  opposed to just the spreadsheet?
22    A.   Yes, I did.
23    Q.   And in what circumstance?
24    A.   To better understand, like, what
25  the records, like, and stuff.

1    Q.   For what purpose did you do that?
2    A.   Because I believe that by, like,
3  analyzing the quantitative information, that it
4  wasn't -- it wasn't capturing the full
5  information and stuff.  So I wanted to see
6  everything that the medical examiner had.
7    Q.   How frequently did you do that?
8    A.   For quite a while and stuff.
9  Probably, we probably pulled, like, maybe close
10  to 3,000 records.
11    Q.   Over the entire course of time at
12  the ADM Board, that you were with the ADM Board
13  rather?
14    A.   Probably most of it was done in
15  2017.
16    Q.   Did you do that for purposes of
17  preparing the data dashboard?
18    A.   No.
19    Q.   What was the purpose of doing that?
20    A.   The purpose was to be able to get a
21  better understanding of what was occurring in
22  the opioid epidemic.
23    Q.   Why did you want to have a better
24  understanding?
25    A.   Because just saying, like, the

1  different numbers or percentages of opiates
2  doesn't tell, like, the full story and stuff of
3  how that person got involved in opiates or
4  other drug use.
5    Q.   How did the underlying information
6  that you received from the medical examiner's
7  office help you build out that story?
8    A.   The reports of investigation and
9  stuff, the narratives, have a lot of, like,
10  detail, as far as, like, that person's life,
11  and then in different circumstances, police
12  records and stuff like that, they are very
13  thorough, and, like I said, the medical
14  examiner would be a better source to explain
15  exactly the thoroughness of those records, but
16  using those in combination with the claims data
17  and other public records and stuff, we were
18  able to, like, come up with a better picture of
19  what was going on.
20    Q.   Were you able to review claims data
21  for any particular person identified in a
22  medical examiner record?
23    A.   Yes.
24    Q.   How were you able to do that?
25    A.   Do you want me to explain the

1  coding?
2    Q.   Yeah.  I want to understand how you
3  were able to connect information from the
4  medical examiner with the claims data, yes.
5    A.   Okay.  You would be able to, in SQL
6  Server, which is the software that I use and
7  stuff, you would be able to create, like, say,
8  two different -- two different tables and
9  stuff.  One would be the medical examiner's
10  records, the other one would be the claims
11  database.
12    You can join those two databases --
13  or datasets together and be able to see, like,
14  which of those people and stuff that was in the
15  medical examiner's records were also involved
16  in the ADM Board services.
17    Q.   Did you -- how many times did you
18  do that, while you were at the ADM Board?
19    A.   Quite often.
20    Q.   Did you compile that in any type of
21  report?
22    A.   Yes.
23    Q.   Did the report have a name?
24    A.   Well, there are several different
25  reports that were part of the exhibits and

73 (Pages 286 - 289)

Page 290

1  stuff that were used that way and stuff, and
2  there was, you know, more too.  I mean, as far
3  as, like, you know, just conversation and
4  curiosity and stuff, seeing what direction you
5  need to, like, go to for further research.
6      Q.   Did you save those, I'll call them
7  reconciliations?  If that's not accurate,
8  please let me know, and I'll try to describe in
9  a more accurate way, but did you save on the
10  ADM Board's computer system that analysis with
11  the claims data and the medical examiner data?
12      A.   Yes, but not exactly, like, how you
13  worded it and stuff, because when you combine
14  the two, the two datasets, you create another
15  dataset.  And so after creating that other
16  dataset, that was put on the network drive.
17      Q.   Did you call it something; do you
18  remember what it was called?
19      A.   There is several different names
20  and stuff to that, depending on, like, what the
21  topic was and stuff, so...
22      Q.   Were they saved by -- were those
23  new datasets saved by you?
24      A.   Yes.
25      Q.   So if we or the ADM Board wanted to

Page 291

1  go into the ADM Board's computer system, we
2  could identify, based on -- or find those in
3  records that were created and saved by you?
4      A.   Yes.
5      Q.   In what computer system were those
6  saved?
7      A.   Those were in our network drive.
8      Q.   Did you use a specific program for
9  that purpose?
10      A.   A program for what purpose?
11      Q.   For comparing, or merging, I guess,
12  the claims data with the medical examiner data?
13      A.   Yes.
14      Q.   What program?
15      A.   SQL Server.
16      Q.   Do you know about how many separate
17  new datasets you saved?
18          MR. LEDLIE:  Object to the form of
19  the question.
20      A.   Not the number.
21      Q.   Did you do that throughout 2017 and
22  2018?
23      A.   Yes, mainly.
24      Q.   Did you do it at all in 2016?
25      A.   Not too much.  I was still figuring

Page 292

1  out things.
2      Q.   You mentioned earlier, and I don't
3  want to misstate your testimony, so please
4  correct me if I am, you mentioned earlier that
5  one of the reasons that you wanted to do that
6  was to better understand the opioid epidemic;
7  is that right?
8      A.   Yes.
9      Q.   What is your understanding of the
10  opioid epidemic in Summit County?
11      A.   In what regards?
12      Q.   What your understanding is, I just
13  want to know what your understanding is of the
14  epidemic?
15      A.   My understanding of the epidemic is
16  that it has impacted -- has had a strong
17  societal impact on county agencies and stuff
18  and their ability to be able to address the
19  issues and stuff at hand.
20      Q.   What did your data analysis show
21  with respect to the opioid epidemic?
22      A.   Which data analysis are you talking
23  about; in general?
24      Q.   In general.
25      A.   Okay.  I would say that it showed

Page 293

1  that opioid use has definitely had a
2  contribution to societal impact and stuff on
3  Summit County.
4      Q.   What types of impacts on Summit
5  County were you able to identify?
6      A.   Mostly on service utilization and
7  stuff and deaths.
8      Q.   At any point in time while you were
9  at the ADM Board, did you analyze any causes of
10  the opioid epidemic?
11      A.   Could you define causes for me?
12      Q.   At any point, did you look at
13  anything that caused or started the opioid
14  epidemic?
15      A.   I think that there is a, kind of
16  like, a jargon difference and stuff, as far as,
17  like, causation and stuff, and from speaking
18  earlier and stuff, when I say statistically
19  causation and stuff, that means we were doing
20  the statistical analysis and everything, but
21  causes, as far as like a contributing factor
22  and stuff, I would say that, yes, it definitely
23  was a contributing factor.
24      Q.   And what was a contributing factor?
25      A.   The opioids and stuff that people

74 (Pages 290 - 293)

Page 294

1  had used.
2      Q.    At any point, did you look at any
3  data to help identify what contributing factors
4  led to the opioid epidemic?
5      A.    That led to the beginning of the
6  opioid epidemic?
7      Q.    Huh-uh.
8      A.    No.  I came kind of in the middle.
9      Q.    At what point in time did the
10  opioid epidemic begin in Summit County?
11      MS. KOUBA:  Object to form.
12      A.    Could you say that again.
13      Q.    At what point in time did the
14  opioid epidemic begin in Summit County?
15      A.    That I don't know exactly.
16      Q.    When did you first learn of the
17  opioid epidemic in Summit County?
18      A.    When I started the job.
19      Q.    You hadn't heard of it before then?
20      A.    Not in Summit County, no.
21      Q.    Have you heard of it anywhere in
22  Ohio?
23      A.    No.
24      Q.    When you first started at the ADM
25  Board, did you do any sort of reading or

Page 295

1  research on your own to get up to speed on the
2  work of the ADM Board?
3      A.    Yes, I did.
4      Q.    What type of reading or research
5  did you do?
6      A.    Reading, as far as like reading
7  prior files, and also research, as in talking
8  to supervisors to understand, like, what has
9  been going on.
10      Q.    For what purpose did you review the
11  articles that you described earlier regarding
12  opioids?
13      A.    My own curiosity.
14      Q.    Did you attend any opioid task
15  force -- or Opiate Task Force meetings?
16      A.    Yes, I did.
17      Q.    How many?
18      A.    How many?  Let me think.  I would
19  say, I can't think off the top of my head, but
20  every Opiate Task Force meeting from June 2016
21  until December of 2018.
22      Q.    So while you were employed by the
23  ADM Board, you went to every Opiate Task Force
24  meeting?
25      A.    Yes.

Page 296

1      Q.    Did you present the data dashboard
2  PowerPoint at each meeting?
3      A.    No.
4      Q.    For what purpose did you create the
5  PowerPoint?  One is marked as Exhibit 5, if you
6  would like to pull it out.
7      For what purpose did you create
8  that PowerPoint?
9      A.    To be presented at the quarterly
10  meeting.
11      Q.    Quarterly meeting of what?
12      A.    The Opiate Task Force.
13      Q.    Exhibit 5 includes on the title
14  Quarterly Stakeholders Meeting, and feel free
15  to pull it out.  You have got the original in
16  your file -- or in your pile, rather.
17      Do you know who the stakeholders
18  are that are referred to in that title?
19      A.    I don't know them all, but it
20  includes the public and the different
21  subcommittees that belong to the Opiate Task
22  Force.
23      Q.    Did you prepare the data dashboard
24  PowerPoint on a quarterly basis?
25      A.    Yes.

Page 297

1      Q.    Did you present it to the Opiate
2  Task Force on a quarterly basis?
3      MR. LEDLIE:  Object to the form of
4  the question.
5      A.    I didn't always present it.
6      Q.    Would anyone else present it?
7      A.    Yes.
8      Q.    Who else?
9      A.    Jerry.
10      Q.    About how many attendees were at
11  each Opiate Task Force meeting that you
12  attended?
13      MS. KOUBA:  Object to the form.
14      A.    I don't know exactly what the head
15  count was.
16      Q.    At any point do you remember any
17  discussion at any Opiate Task Force meeting
18  about the causes of the opioid epidemic?
19      A.    I don't recall.
20      Q.    Do you know whether the ADM has
21  ever engaged in an analysis on contributing
22  factors to the opioid epidemic?
23      A.    I'm sorry.  Could you repeat that.
24      Q.    Do you know whether the ADM has
25  ever engaged in an analysis of contributing

Page 298

1    factors to the opioid epidemic?
2            MR. LEDLIE:  Object to the form of
3    the question.
4        A.    What do you mean by an analysis?
5        Q.    Any kind of analysis, data
6    analysis.
7        A.    Any kind of analysis?
8        Q.    Uh-huh.
9        A.    Yes.
10       Q.    What?
11       A.    The analysis that I've done, as far
12   as I know, about -- I'm not sure about the
13   other staff members.
14       Q.    What analysis have you done that is
15   of the contributing factors to the opioid
16   epidemic?
17       A.    I'm sorry.  Could you rephrase
18   that.
19       Q.    So my question related to
20   contributing factors to the opioid epidemic,
21   and you mentioned that you had done some
22   analysis at the ADM board on that.  What
23   analysis did you do on the contributing
24   factors?
25       A.    Like there is different reports and

Page 299

1    stuff that I've done and stuff that talk in
2    general and stuff about potential contributing
3    factors.
4        Q.    What potential contributing factors
5    have you identified?
6        A.    The involvement of different
7    opiates and stuff that people were using.
8        Q.    Do you recall the title of any of
9    the reports?
10       A.    No, I don't, not off the top of my
11   head.
12       Q.    Those reports would be in the ADM
13   records though?
14       A.    Yes, they are.
15       Q.    Do you recall about how many
16   reports you prepared?
17           MR. LEDLIE:  Object to the form of
18   the question.
19       A.    No, I don't know how many.
20       Q.    Did any of your analyses include
21   prescription opioids as a contributing factor
22   to the opioid epidemic?
23       A.    No, I don't believe so.
24       Q.    Do you know whether the ADM has
25   conducted an analysis of whether opioid deaths

Page 300

1    are attributable to prescription opioids?
2            MS. KOUBA:  Object to the form.
3        A.    Not to my knowledge.
4        Q.    Do you know whether the ADM has
5    ever done an analysis of any relationship
6    between prescription opioids and illicit opioid
7    use?
8        A.    Not to my knowledge, no.
9        Q.    Do you agree that not all users of
10   prescription opioids become addicted?
11       A.    What do you mean by addicted?
12       Q.    Addicted to opioids.
13       A.    Can you define addicted.
14       Q.    So we have talked about addiction
15   and that opioids have addictive qualities,
16   right?
17       A.    Uh-huh.
18       Q.    In that context, would you agree
19   that not all users of prescription opioids
20   become addicted?
21       A.    I'm not an expert in the field, so
22   I can't state.  I don't know.
23       Q.    You can't state one way or the
24   other?
25       A.    No.  I don't know.

Page 301

1        Q.    Would you agree that not all users
2    of illicit opioids at one point used a
3    prescription opioid?
4        A.    That I don't know either.
5        Q.    Are you aware of any overdose
6    deaths attributable to the use of a
7    prescription opioid as it was prescribed?
8        A.    Can you repeat that again.
9        Q.    Sure.  Are you aware of any
10   overdose deaths attributable to the use of a
11   prescription opioid as it was prescribed?
12       A.    No, I'm not aware of any.
13       Q.    Are there any substances other
14   than -- strike that.
15           Are there -- have you conducted any
16   analysis of what substances contributed to the
17   opioid epidemic?
18       A.    Yes.
19       Q.    What?
20       A.    What substances?
21       Q.    Huh-uh.
22       A.    The different types of opiates.
23       Q.    Such as heroin?
24       A.    Fentanyl, I believe, like, one of
25   the reports talks about carfentanil, fentanyl,

76 (Pages 298 - 301)

Page 302

1  OxyContin, stuff like that.
2      Q.    And when you say fentanyl, you are
3  not making any distinction between prescription
4  fentanyl and illicit fentanyl, right?
5      A.    No, I'm not, because I don't have
6  that information.
7      Q.    Do you know whether there has been
8  an increase in availability of illicit fentanyl
9  in Summit County?
10      MR. LEDLIE:  Object to the form of
11  the question.
12      A.    I'm not understanding the question.
13      Q.    Sure.  I'll ask a different
14  question.
15      Do you know whether there was an
16  increase in availability of illicit fentanyl in
17  Summit County in 2015 to 2016?
18      A.    Not based on my analysis.
19      Q.    The OARRS database would not
20  reflect illicit opioids, would it?
21      A.    No, it would not.
22      Q.    OARRS data is from prescription
23  dispensing, right?
24      A.    Yes.
25      Q.    Have you ever reviewed any data

Page 303

1  that tracks the amount of illicit opioids
2  available in Summit County?
3      A.    No, I have not.
4      Q.    Do you know whether anyone at the
5  ADM has after quantified or attempted to
6  quantify the availability of illicit opioids in
7  Summit County?
8      A.    Not to my knowledge.
9      Q.    For how long has the EPiCenter
10  database been in use?
11      A.    That I don't know.
12      Q.    Have you ever seen any misleading
13  statements regarding prescription opioids?
14      A.    Not that I'm aware of.
15      Q.    Just give me one second, I'm going
16  to flip through my notes, but I think I'm
17  almost done.
18      Would you agree, Mr. Hutzell, that
19  for some patients, prescription opioids can be
20  appropriate?
21      MS. KOUBA:  Object to the form.
22      A.    That's beyond my expertise.  I
23  don't know.
24      Q.    Would you defer to a medical doctor
25  for that conclusion?

Page 304

1      A.    Yes, I would.
2      MS. FEINSTEIN:  Thank you, Mr.
3  Hutzell.  I don't have anything further at this
4  time.  I appreciate your time.
5      THE WITNESS:  Thank you.
6      MS. FRANKLIN:  Off the record.
7      THE VIDEOGRAPHER:  Off the record
8  at 5:56.
9      (Recess taken.)
10      THE VIDEOGRAPHER:  On the record,
11  6:08.
12      EXAMINATION OF ERIC HUTZELL
13  BY MS. FRANKLIN:
14      Q.    Good afternoon, Mr. Hutzell.
15      A.    Good afternoon.
16      Q.    We are almost at the finish line.
17  We met briefly this morning, but again my name
18  is Shirlethia Franklin, and I represent
19  defendant Walmart, Inc. in this matter.
20      And the same house rules that we
21  discussed earlier, my co-defendants discussed
22  earlier, will still apply.  So I won't repeat
23  all of those for the sake of time, but I do
24  want to let you know, if you don't understand a
25  question that I asked, please ask me to

Page 305

1  rephrase it, I'm happy to do so.
2      And I will be fairly brief, but if
3  you need a break, happy to take a break as
4  well.
5      A.    Okay.
6      Q.    I have just a few follow-up
7  questions that I want to go over with you this
8  afternoon.
9      You testified earlier that you were
10  not aware of the opioid abuse problem in Summit
11  County prior to your arrival at the ADM Board;
12  is that correct?
13      MS. KOUBA:  Objection to form.
14      A.    Yes.
15      Q.    And that was in July of 2016,
16  right?
17      A.    Pardon me?
18      Q.    Your arrival to the ADM Board was
19  in July 2017 -- 2016?
20      A.    No.
21      Q.    When did you arrive?
22      A.    May 2016.
23      Q.    May 2016.  So you were not aware,
24  prior to your arrival in May of 2016, correct,
25  of the opioid problem in Summit County?

77 (Pages 302 - 305)

Page 306

1    A.   No.
2    Q.   Now, upon your arrival, as you were
3  originating the data from the -- for the ADM
4  Board, in the course of your work, did your
5  data analysis reveal any information to you
6  with respect to when the opioid epidemic began
7  in Summit County?
8         MR. LEDLIE:  Object to the form of
9  the question.
10    A.   No.
11    Q.   So no information from your
12  evaluation of the data revealed to you a
13  particular start point for the opioid epidemic?
14         MS. KOUBA:  Object to the form.
15    A.   No.
16    Q.   Okay.  You testified earlier that
17  you have not read the complaint in this matter.
18  So I'm assuming that you did not have a role in
19  deciding who would be the defendants in this
20  case?
21    A.   No, I didn't.
22    Q.   So there is a group of defendants
23  referred to as the national retail pharmacies.
24  Do you know who those defendants are?
25    A.   No, I do not.

Page 307

1    Q.   Have you heard of the national
2  retail pharmacies?
3    A.   No, I haven't.
4    Q.   Are you aware that Summit County
5  has sued Walmart in this matter?
6    A.   No, I haven't.
7    Q.   How about CVS?
8    A.   No.
9    Q.   Rite Aid?
10    A.   No.
11    Q.   Walgreens?
12    A.   No.
13    Q.   So I'm also assuming that you don't
14  know when these entities were added as
15  defendants in this case?
16    A.   No, I don't.
17    Q.   And you don't know why they are in
18  the case?
19    A.   No, I don't.
20    Q.   In your former role with the ADM
21  Board, have you ever had any professional
22  contact with Walmart in the course of your
23  work?
24    A.   No, I haven't.
25    Q.   What about CVS?

Page 308

1    A.   I don't know exactly.
2    Q.   Any professional contact or
3  interaction with Rite Aid?
4    A.   That I don't know either.
5    Q.   Or Walgreens?
6    A.   That I don't know either.
7    Q.   Now, we discussed at length
8  throughout the day various datasets related to
9  opioid overdoses and deaths in Summit County,
10  and I'm interested to know, in the various
11  datasets that you evaluated in the course of
12  your work, do you know how many drug overdoses
13  or deaths included situations in which people
14  misused prescription opioids?
15         MS. KOUBA:  Object to the form.
16    A.   Can you repeat that.
17    Q.   Sure.  In the course of your work
18  in evaluating the data for the ADM Board, do
19  you know how many overdose deaths or deaths
20  included situations in which people misuse
21  prescription opioids?
22         MS. KOUBA:  Same objection.
23    A.   No, I don't.
24    Q.   Okay.  How about how many overdose
25  deaths were caused by altering the medication

Page 309

1  in some way, such as crushing or tampering with
2  pills?
3         Do you know, in the course of your
4  data analysis, if there is a number of opioid
5  deaths ever caused by altering the medication
6  in any way?
7    A.   No, not from my analysis.
8    Q.   Do you know how many overdose
9  deaths were caused by people simply taking too
10  many of their prescription pills?
11         MR. LEDLIE:  Object to the form of
12  the question.
13    A.   No, I don't.  Not from my data
14  analysis.
15    Q.   Do you know how many opioid
16  overdose deaths were caused by a person taking
17  a medication that had been prescribed to
18  someone else?
19    A.   No, I don't know that.
20    Q.   Do you have any personal knowledge
21  of improper prescriptions for opioids being
22  written in Summit County?
23         MS. KOUBA:  Object to the form.
24    A.   Could you repeat that.
25    Q.   Do you have any personal knowledge

78 (Pages 306 - 309)

Page 310

1  of any improper prescriptions for opioids being
2  written in Summit County?
3      A.    What do you mean by personal
4  knowledge?
5      Q.    Any knowledge that you are aware of
6  yourself either -- well, first personally, and
7  then one in the course of your work.
8          So let's start with personal
9  knowledge that you just happened to know of?
10     A.    And what was the entire question?
11  Sorry.
12     Q.    Sure.  I'll repeat it.  Do you have
13  any personal knowledge of improper
14  prescriptions for opioids being written in
15  Summit County?
16     A.    What in Summit County?
17     Q.    Improper prescriptions for opioids.
18     A.    Did you say written?
19     Q.    Yes.
20     A.    Personal knowledge, yes.
21     Q.    Okay.  And can you tell me about
22  that knowledge?
23     A.    Just from newspaper articles.
24     Q.    And what articles, in particular,
25  are you referring to?

Page 311

1      A.    I don't know the name of the exact
2  article and stuff, but I know there has been
3  articles written about how the doctors have
4  prescribed medications out of their cars and,
5  you know, had been arrested for writing
6  prescriptions that they shouldn't have.
7      Q.    And do you know any details about
8  those doctors or any other details about the
9  contents of the articles?
10     A.    No, I don't.
11     Q.    And you specifically asked -- when
12  I said do you have personal knowledge, you
13  asked personal knowledge, so I'm going to ask
14  do you have any other knowledge, maybe
15  professional knowledge, of improper
16  prescriptions for opioids being written in
17  Summit County, any knowledge gained through the
18  course of your work with the ADM Board?
19     A.    As far as professional knowledge
20  and stuff, yes.
21     Q.    Can you repeat that?
22     A.    Yes, I do have, like, professional
23  knowledge.
24     Q.    Okay.  Can you tell me the basis of
25  that knowledge?

Page 312

1      A.    They were discussions in different
2  stakeholder meetings.
3      Q.    And what were those discussions?
4      A.    The discussions were with Dr. Doug
5  Smith and Kimberly Patton, as far as their take
6  on what -- what was being done with, like,
7  prescription medications.
8      Q.    And do you recall the substance of
9  that discussion?
10     A.    No, I don't know exactly.  I don't
11  recall exactly that.
12     Q.    Were there any details presented or
13  that you recall about how many improper
14  prescriptions were written in Summit County?
15     A.    No, I don't know.
16     Q.    What about who wrote those improper
17  prescriptions?
18     A.    No, I don't know that.
19     Q.    Any detail about the particular
20  substance or drug?
21     A.    No, I don't know that.
22     Q.    In the course of your data
23  evaluation, have you identified any overdose
24  deaths from prescription opioids where the
25  person was taking the medication consistent

Page 313

1  with their doctor's instruction?
2          MR. LEDLIE:  Object.
3          MS. KOUBA:  Object to the form.
4      A.    Could you repeat that.
5      Q.    Sure.  In the course of your data
6  evaluation, have you identified any overdose
7  deaths from prescription opioids where the
8  person was taking the medication consistent
9  with their doctor's instruction?
10     A.    From my data analysis and stuff,
11  no.
12     Q.    And you testified earlier that you
13  are not aware, other than the presence of the
14  lawyers sitting here, of the defendants in this
15  lawsuit, correct?
16     A.    Correct.
17     Q.    So you cannot, as you sit here
18  today, you cannot link any overdose deaths in
19  Summit County to any particular defendant in
20  this case; is that correct?
21         MS. KOUBA:  Objection to the form.
22         MR. LEDLIE:  Object to the form.
23     A.    Can you rephrase that, please.
24     Q.    Sure.  So is it -- you testified
25  earlier that you're not aware of the defendants

79 (Pages 310 - 313)

Page 314

1  in this case, and we have asked you about a
2  number of the defendants.
3       So is it fair to say that you
4  cannot link any of the overdose deaths in
5  Summit County directly to any particular
6  defendants in this case?
7       MR. LEDLIE:  Same objection.
8     A.  Not from my analysis.
9     Q.  And a similar question, you cannot
10  link any overdose deaths for prescriptions
11  filled in Summit County by any of the national
12  retail defendants?
13     A.  Not from my analysis.
14     Q.  You're not aware of any patient who
15  overdosed with prescription opioids from
16  Walmart, are you?
17     A.  No.
18     Q.  Okay.  And the same is true for any
19  other retail pharmacy defendants that we
20  mentioned earlier?
21     A.  None that somebody has said, no.
22     Q.  And you cannot identify any
23  individual in Summit County who died because of
24  prescription opioids that were properly
25  distributed by Walmart or any of the other

Page 315

1  defendants in this case; is that correct?
2       MS. KOUBA:  Object to the form.
3     A.  Not from my analysis.
4     Q.  And you can't identify any public
5  statements made by Walmart regarding
6  prescription opioids, can you?
7     A.  No, I can't.
8     Q.  Is the same true for the other
9  retail defendants in this case --
10     A.  Yes --
11     Q.  -- retail pharmacy defendants?
12     A.  -- that would be true, yes.
13     Q.  Okay.  And just for clarification
14  purposes, when I say the other retail pharmacy
15  defendants, I mean CVS, Rite Aid, and
16  Walgreens?
17     A.  That was my understanding too.
18     Q.  Great.  And you're not here today
19  to tell us or the jury that anything Walmart or
20  any of the other retail pharmacy defendants
21  said publicly about prescription opioids caused
22  the opioid crisis in Summit County, are you?
23     A.  I'm sorry.  Could you repeat that?
24     Q.  So you are not here today to
25  testify as to whether any public statements

Page 316

1  made by Walmart or retail pharmacy defendants
2  actually caused or contributed to the opioid
3  crisis in Summit County, correct?
4       MR. LEDLIE:  Object to the form of
5  the question.
6     A.  No.
7     Q.  Okay.  Now, earlier we talked a
8  little bit about budgeting, and you testified
9  that you didn't have any involvement in
10  budgeting matters in your role as research and
11  quality improvement coordinator for the ADM
12  Board; is that correct?
13     A.  No, that's not correct.
14     Q.  Okay.  I can read the testimony
15  back to you, if that's helpful.
16     A.  Well, when you say like budgeting
17  matters and stuff, like I stated earlier and
18  stuff, I did budgeting, but as far as the
19  Janssen research project.
20     Q.  Right.  So you testified that you
21  never looked at budgets, other than that
22  contract you had for the research project; is
23  that correct?
24     A.  Yes.  I never did analysis on
25  those.

Page 317

1     Q.  And that research project, just to
2  confirm, was not related to opioids, correct?
3     A.  No, it was not.
4     Q.  So is it fair to say that you have
5  not prepared any summaries of costs that Summit
6  County attributes to the opioid crisis?
7     A.  No, I have not.
8     Q.  And is it also fair to say that you
9  cannot identify any specific costs that you can
10  attribute to the actions of any particular
11  defendants in this case, correct?
12     A.  I apologize.  Could you restate
13  that question.
14     Q.  Sure.  Sure.  So is it also fair to
15  say that you cannot identify any specific costs
16  that can be attributed to the actions of any
17  particular defendant in this case?
18     A.  Are you saying cause or costs?
19     Q.  Costs, costs.  Forgive me, it's my
20  Mississippi accent.  Costs, C-O-S-T-S.
21     A.  Okay.  Yes, I don't have any
22  information about that.
23     Q.  Okay.  Thank you.  I think this is
24  probably the first time Mississippi appears in
25  one of these depositions.

80 (Pages 314 - 317)

Page 318

1     A.   Sorry.
2          MS. FRANKLIN:  Okay.  Well, thank
3  you so much for your time.  I don't have any
4  further questions.  Have a great evening.
5          THE WITNESS:  You too.
6          THE NOTARY:  On the phone, anybody
7  on the phone have questions?
8          A VOICE:  No.  Thank you, guys.
9          THE VIDEOGRAPHER:  Off the record,
10  6:22.
11     (Deposition concluded at 6:22 p.m.)
12          - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 319

1  Whereupon, counsel was requested to give
2  instruction regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5          SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9          TRANSCRIPT DELIVERY:
10  Counsel was requested to give instruction
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 320

1          REPORTER'S CERTIFICATE
2  The State of Ohio,  )
3              SS:
4  County of Cuyahoga.  )
5
6          I, Wendy L. Klauss, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, ERIC HUTZELL,
10  was by me first duly sworn to testify the
11  truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19          I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

Page 321

1          I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5          IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 11th day of
8  January, 2019.
9
10
11
12
13      _Wendy L. Klauss_
14      Wendy L. Klauss, Notary Public
15      within and for the State of Ohio
16
17  My commission expires July 13, 2019.
18
19
20
21
22
23
24
25

81 (Pages 318 - 321)

Page 322

1             Veritext Legal Solutions
                1100 Superior Ave
2                 Suite 1820
             Cleveland, Ohio 44114
3           Phone: 216-523-1313
4
    January 11, 2019
5
    To: Annie E. Kouba
6
    Case Name: In Re: National Prescription Opiate Litigation v.
7
    Veritext Reference Number: 3182076
8
    Witness:  Eric Hutzell    Deposition Date:  1/8/2019
9
10 Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 323

1       DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3182076
3 CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 1/8/2019
4 WITNESS' NAME: Eric Hutzell
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____
9 Date       Eric Hutzell
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11 the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13    They signed the foregoing Sworn
    Statement; and
14    Their execution of this Statement is of
    their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
18    _____
    Notary Public
19
    _____
    Commission Expiration Date
20
21
22
23
24
25

Page 324

1       DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3182076
3 CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 1/8/2019
4 WITNESS' NAME: Eric Hutzell
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s).
9    I request that these changes be entered
    as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
    that both be appended to the transcript of my
12 testimony and be incorporated therein.
13    _____
    Date       Eric Hutzell
14
    Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
    the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18    in the appended Errata Sheet;
    They signed the foregoing Sworn
19    Statement; and
    Their execution of this Statement is of
20    their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of_____, 20____.
23    _____
    Notary Public
24
    _____
25    Commission Expiration Date

Page 325

1       ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 1/8/2019
3 PAGE/LINE(S) /    CHANGE    /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20 Date       Eric Hutzell
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23
    _____
    Notary Public
24
    _____
25    Commission Expiration Date

82 (Pages 322 - 325)

| & |
|---|
| **&** 2:10 3:2,8,15 15:18 16:7,10 263:5 270:15 271:3,22 272:3 274:3 |

| 0 |
|---|
| **0** 151:2,5,8 |
| **0.1** 123:10 |
| **0.29** 151:8 |
| **0.29.** 151:6 |
| **0.3** 151:1 |
| **0008711963** 5:16 141:24 |
| **000884505** 6:1 198:8 |
| **000885081** 5:18 166:9,16 |
| **000969892** 6:19 245:10,16 |
| **000970726** 236:25 |
| **00097076** 6:16 236:19 |
| **001056544** 6:14 232:25 233:5 |
| **001065634** 5:22 184:16,21 |
| **001077027** 5:5 63:20,25 |
| **001095232** 5:24 191:11,15 |
| **001401097** 6:21 250:25 251:4 |
| **001405605** 6:6 211:5,9 |
| **001407955** 6:11 224:10,14 |
| **001742658** 6:4 207:1,6 |

**001774240** 5:3 24:1 52:19
**001776772** 5:10 97:21 98:2
**001788704** 5:8 66:12,17
**001790151** 5:20 174:19,24
**001793050** 6:8 218:21,25
**001795395** 5:12 108:19,24
**00871963** 142:4
**0884505** 198:12

| 1 |
|---|
| **1** 5:2,25 23:23 24:5 52:18 70:10 98:18,18 101:15 101:20 149:11,16 150:9 180:11 181:17 198:6,17 198:20 |
| **1,000** 152:8 |
| **1/8/2019** 322:8 323:3 324:3 325:2 |
| **10** 5:23 188:3 191:8,15 |
| **100** 8:18 34:13 50:10 |
| **104** 8:19,20,21,22 |
| **105** 8:23 |
| **107** 8:24 215:6 |
| **108** 5:11 |
| **10:09** 198:17,23 |
| **10:10** 52:12 |
| **10:21** 52:15 |
| **11** 5:25 143:4,7 198:5,12 209:23 215:13 246:5 322:4 |

**11.26** 210:4
**11.9** 196:1
**1100** 3:4 322:1
**114** 8:25
**117** 9:1
**118** 9:2
**11:03** 176:4,7
**11:31** 108:11
**11:48** 108:14
**11th** 321:7
**12** 6:2 206:23 207:5
**12.23** 210:7
**120** 9:3
**122** 9:4,5
**125** 9:6
**127** 9:7
**12:24** 136:25
**13** 6:5 67:15 158:3 211:2,9 215:9,12 222:6 321:17
**130** 9:8
**132** 9:9
**133** 9:10
**134** 9:11,12,13
**135** 9:14
**136** 9:15,16
**139** 9:17
**14** 5:14 6:7 141:22 142:15 150:19 215:13 218:18,25 222:4
**14.3** 150:17,22
**141** 5:13
**145** 9:18
**146** 9:19
**149** 9:20
**15** 6:9 192:8 224:7 224:14
**150** 9:21,22,23

**151** 9:24
**15219-6401** 2:17
**153** 9:25
**154** 10:1,2,3,4
**155** 10:5,6
**156** 10:7
**16** 4:4 6:12 232:21 233:5
**163** 10:8
**166** 5:17
**167** 10:9
**169** 10:10
**17** 1:8 5:23 6:15 191:9 236:16,24
**170** 10:11,12,13
**171** 10:14
**1717** 3:21
**172** 10:15,16
**174** 5:19
**179** 10:17
**18** 6:17 176:4 245:6,15
**180** 10:18
**181** 10:19,20,21
**182** 10:22
**1820** 322:2
**1830s** 262:7
**1839** 261:22
**184** 5:21
**187** 10:23
**189** 10:24
**19** 6:20 215:13 250:23 251:4
**190** 10:25 11:1
**191** 5:23
**19103** 3:21
**195** 11:2
**196** 11:3
**198** 5:25
**199** 11:4

**1:18**  1:15
**1:21**  137:3

**2**

**2**  4:2 5:4 24:21
37:25 59:16 60:19
63:3,18,24 113:11
143:2 182:6 209:6
212:1
**20**  7:3 234:24,25
323:16 324:22
325:22
**200**  11:5,6 98:25
152:24
**20001-2113**  2:22
**20001-3743**  3:16
**20005**  2:12
**2006**  54:17,18
**2008**  54:18
**2010**  92:7 149:5
214:6,11,17,25
215:9,12 217:3
**2011**  215:4,9,10,12
**2012**  215:4,10,12
**2013**  41:16 53:7
157:18,24 159:13
215:5,12 282:2
**2014**  41:17 209:8
210:14 215:5,13
282:2
**2015**  57:5 103:23
126:19,24 152:24
158:2,6,15 215:5
215:13,18 216:12
233:24 234:4,16
234:21 253:9
302:17
**2016**  5:9 6:12
24:17,21 38:11
41:15 90:24 97:20
103:22 120:19,22
120:22 124:14,23

126:19,24 137:23
138:18 142:15
143:11 148:8
149:6,11,15 150:8
150:20 158:2,6
159:14 168:1
209:9 210:14
214:6,12,17 215:6
215:13,18,24
216:13,21 217:3
232:22 233:9,24
234:4,20 235:13
264:5 279:6
280:17 291:24
295:20 302:17
305:15,19,22,23
305:24
**2017**  5:23,25
137:24 138:18
143:10 185:20
186:13 191:9
198:6,17 220:1
221:20 223:13
224:4 232:6
287:15 291:21
305:19
**2018**  5:14,19,21
6:15 141:22
174:17 184:14
236:17 242:4
246:5 266:8 279:7
291:22 295:21
**2019**  1:20 15:2
321:8,17 322:4
**202**  2:12,23 3:17
**203**  11:7
**205**  11:8
**206**  6:2
**208**  11:9,10
**210**  11:11,12

**211**  6:5
**213**  11:13
**215**  3:22 11:14
98:21,25
**216**  3:5 11:15
**216-523-1313**
322:3
**216-9000**  2:6
**217**  11:16
**218**  6:7 11:17
**22**  7:4
**222**  11:18
**2222**  321:13
**223**  11:19
**224**  6:9
**226**  11:20,21,22
**227**  11:23,24
**228**  11:25 12:1
**229**  12:2,3,4
**23**  5:2 6:12 7:5
232:22
**230**  12:5
**232**  6:12 12:6,7
**234**  12:8
**235**  12:9
**236**  6:15 12:10
**238**  12:11
**240**  12:12,13,14,15
12:16
**241**  12:17,18
**242**  12:19,20
**243**  12:21,22
**245**  6:17
**249**  12:23
**25**  6:15 236:17
**250**  6:20 12:24,25
**255**  13:1
**256**  13:2,3
**257**  13:4
**259**  13:5

**26**  94:17
**260**  13:6,7
**261**  13:8,9
**263**  13:10
**264**  13:11,12,13
**265**  4:5
**269**  13:14
**27**  7:6
**270**  213:9
**277**  13:15
**278**  13:16
**28**  2:5
**2804**  1:6
**281**  13:17
**282**  13:18,19
**283**  13:20
**284**  1:8 13:21,22
13:23
**285**  13:24
**29**  34:16
**291**  13:25
**294**  14:1
**29464**  2:6
**297**  14:2,3
**298**  14:4
**299**  14:5
**2:25**  183:16
**2:41**  183:19

**3**

**3**  5:6 66:9,16
118:23 209:11
211:18 213:8
252:12
**3,000**  287:10
**30**  101:19,20
**300**  14:6 37:25
**301**  2:17
**302**  14:7
**303**  14:8
**304**  4:5

**305** 14:9
**306** 14:10,11
**308** 14:12,13
**309** 14:14
**31** 7:7 59:9 101:15
**3100** 3:21
**313** 14:15,16,17,18
**314** 14:19
**315** 14:20
**316** 14:21
**3182076** 322:7
  323:2 324:2
**320** 4:6
**32nd** 2:16
**33** 7:8
**35** 7:9
**36** 253:8
**3:11** 206:18
**3:13** 206:21

**4**

**4** 5:9 97:18 98:1
  144:2,5 215:5
  216:4
**40** 7:10,11,12
**412** 2:18
**415** 3:10
**42** 34:5,10,12,23
  81:5
**43** 7:13 222:2
  223:22
**434-5000** 2:12
**44113** 3:5
**44114** 322:2
**44132** 85:25 86:12
  86:14
**44240** 17:10
**44312** 85:13 86:15
  87:4,11
**443xx** 201:6
**45** 7:14 235:18

**45090** 1:15
**46** 7:15
**471-3490** 2:18
**48** 7:16
**4:01** 236:11
**4:02** 175:21
**4:20** 236:14

**5**

**5** 4:3 5:11 106:3
  108:18,21 137:8
  144:2 175:21
  215:5 222:10
  296:5,13
**5,250** 214:4
**50** 1:22 7:17,18
  37:15
**51** 2:22 7:19
**54** 7:20
**56** 7:21 215:5,13
**591-6000** 3:10
**592-5000** 3:5
**5:01** 264:22
**5:13** 264:25
**5:56** 304:8

**6**

**6** 5:13,21 141:20
  142:3 144:2
  184:14
**60** 7:22
**601** 3:16
**61** 7:23
**63** 5:4
**64** 7:24 235:16
**65** 49:15
**66** 5:6
**68** 7:25
**6:08** 304:11
**6:22** 318:10,11

**7**

**7** 5:17 24:17 126:6
  126:15 166:6,14
  167:9 183:20
  215:9,10,12,12
  222:8
**70** 34:14 49:8,13
**71** 8:1
**725** 2:11
**74** 8:2
**7415** 17:9
**75** 37:18,19
**76** 8:3
**76.5** 210:10,12
**77** 8:4
**78** 8:5
**79** 8:6

**8**

**8** 1:20 5:19 15:2
  127:13 174:16,23
  222:20,21 223:6,7
  223:20 235:4
**80** 8:7
**82** 8:8
**83** 8:9,10
**843** 2:6
**85** 81:4,6,8 82:9
  83:14,17
**851-8100** 3:22
**86** 8:11
**879-3939** 2:23
**8:23** 246:5

**9**

**9** 5:21 184:13,20
  188:4
**91** 8:12
**93** 8:13
**94** 8:14 215:5
**94111-5356** 3:9

**942-5000** 3:17
**95** 8:15
**950** 3:4
**96** 8:16,17
**97** 5:9
**99.9** 67:21 68:17
  70:9,12,14
**9:09** 1:20 15:3
**9:11** 16:22
**9:23** 16:25

**a**

**a.m.** 1:20 15:3
  176:4,7 198:17,23
**abdc** 263:22
**ability** 87:21
  106:20 107:17
  108:3 155:3,9,16
  156:1 179:10
  252:20 255:6,23
  292:18
**able** 19:7 26:24
  34:25 38:8 48:4
  60:20 61:10 71:24
  76:8 83:12 85:3
  85:17,19,25 86:23
  88:4 96:3,22
  103:11 105:10
  109:25 111:14
  114:1,13 120:2
  127:20 144:9
  146:4,10,16 147:3
  156:12 171:7
  174:1,2 176:12
  178:18 179:17,20
  179:23 180:1
  181:4,5 184:9
  188:6 194:7
  201:21 211:23
  212:23 213:23
  244:24 246:1
  252:4,13 253:1,8

[able - affordable]

254:22,24 255:15
255:16 256:11
258:8 269:1 277:1
287:20 288:18,20
288:24 289:3,5,7
289:13 292:18
293:5
**abraham** 185:13
185:16
**abstinence** 144:6
144:20 152:1,10
**abstracts** 280:19
280:22 281:10
**abuse** 43:14 91:21
92:6 132:16,17
133:1 175:15
194:17,18,18
195:24 196:15
263:25 264:6
305:10
**accent** 317:20
**accept** 83:23
**acceptable** 184:4
**access** 128:4,6,7
139:12 141:1
159:23 201:17
203:22,25 204:1
284:17 285:4,9
**accessed** 141:16
**accommodate**
49:17
**account** 217:23
**accounted** 238:21
238:22
**accounts** 121:2
180:24
**accreditation**
36:17
**accuracy** 154:17
154:17 232:16

**accurate** 19:7
119:22 144:17
153:22 154:1,7
155:14,24 190:6
223:17 227:3
290:7,9
**acetaminophen**
199:4
**acknowledge**
255:2 323:11
324:16
**acronym** 175:8
188:2,11
**act** 28:7 323:14
324:20
**actavis** 275:9
**acting** 90:1 271:12
271:13 272:25
273:1,6,11,12,14
273:15
**action** 321:4
**actions** 317:10,16
**activities** 26:22
**actual** 98:24 99:2
104:10 105:20
150:2 239:5
**add** 97:4 173:3
180:1
**added** 43:18,23
159:7 233:19
239:9,21 307:14
**addicted** 28:4,10
28:17,20 29:2
257:22 258:17,22
300:10,11,12,13
300:20
**addiction** 237:6,11
281:7,13,19
300:14
**addictive** 281:21
281:23 282:5

300:15
**addition** 153:19
169:19
**additional** 36:24
258:23 285:6
**address** 17:8
292:18 322:15
**addressed** 267:15
**adjournment**
320:22
**adjustments**
248:17
**adm** 23:1,3,11
24:12,17 25:5,10
25:17 26:12 27:7
27:17 38:8 41:13
41:14,25 43:22
45:21 47:22,25
48:2 49:22 50:12
50:14,23 51:9,12
52:1 56:13 58:6
58:13 59:6,8 60:7
61:24 62:5,12,19
64:11 65:15,19
66:2 67:22 68:3,8
68:18 69:18 71:4
71:6 76:3 89:1
90:12,14 91:2,14
93:18 94:16 95:6
95:18 96:23
109:11,14 112:13
120:24 153:12
175:4,10,12,17
183:2,8 190:4
192:7 193:1,25
221:10,13,20
222:11,25 223:13
223:16 224:4
234:15,19,22
235:1,6 237:7
253:3 261:6 264:4

279:9 280:16,23
281:6,9,11 283:13
283:22 284:2,4,13
285:9 287:12,12
289:16,18 290:10
290:25 291:1
293:9 294:24
295:2,23 297:20
297:24 298:22
299:12,24 300:4
303:5 305:11,18
306:3 307:20
308:18 311:18
316:11
**adm's** 90:17
220:23
**administration**
276:14
**administrator**
63:16
**advance** 19:25
20:11
**advancement**
62:10,12
**advertisements**
276:6
**advertising** 275:19
275:22 276:2
**advisory** 6:10
224:8 225:1,5,10
225:11,14,15
226:7,8 232:9,17
**advocacy** 26:10,12
26:13,14,18 27:1,9
27:11
**advocating** 27:15
**affairs** 35:11
**affixed** 321:6
323:15 324:21
**affordable** 28:7

**aforesaid** 320:12
**afternoon** 265:3,5
  304:14,15 305:8
**age** 16:14
**agencies** 42:5
  48:18 72:4 144:10
  146:13 147:14
  188:16 192:23,25
  193:1,25 194:24
  195:4 221:4,7
  235:9 262:19
  292:17
**agency** 56:25
  62:15 72:6 80:1,3
  81:3,10 82:5
  144:13,14 147:16
  147:22 176:13
  188:6
**agents** 127:19
**ago** 255:11
**agree** 163:20
  229:2 300:9,18
  301:1 303:18
**agreed** 228:12
**aid** 307:9 308:3
  315:15
**aimee** 24:10
  113:19 145:10
  175:21 211:12
  212:6 224:20
  228:9 251:7 268:4
  268:12
**akouba** 2:7
**akron** 1:23 2:2
  15:20,23 16:1
  85:13,15,20,23
  86:10 87:4,7,12
  146:1,21 147:2
  175:6 220:12
  266:25 267:9

**al** 1:12,14
**alcohol** 180:3
  181:10 182:7,10
  214:10 221:24
  222:7
**alice** 113:19
  145:10 162:9,22
  163:14,17,18
  164:13 185:1,4,19
  186:2
**align** 163:6
**alive** 103:2,4
**allegations** 267:3
  267:5,16,21
**allergan** 275:4
**allow** 188:6
**allowed** 34:18
  128:12
**allowing** 244:2
**allows** 190:6
**altering** 308:25
  309:5
**amani** 185:13,16
  185:22
**amerisourceberg...**
  3:19 16:5
**amount** 131:10
  132:15 133:4
  136:6,7,8,12 184:4
  252:10,14 303:1
**amounts** 139:5
**analogs** 227:17
**analyses** 299:20
**analysis** 26:1 32:8
  32:9,14,17,20,22
  33:25 35:5 38:14
  39:17,19,20,21,22
  40:2,9,20,23 41:5
  43:25 44:2,4,5,9
  44:10 45:18,22
  52:22 53:1,16,21

  53:24 55:2,7,11,16
  56:2,7,11,16 58:8
  58:25 59:3,20
  60:1,10 68:15
  83:8,10,11 95:2
  96:17,19 107:1
  125:18,19,20,25
  136:20 171:6,10
  206:8 208:12
  236:1 290:10
  292:20,22 293:20
  297:21,25 298:4,5
  298:6,7,11,14,22
  298:23 299:25
  300:5 301:16
  302:18 306:5
  309:4,7,14 313:10
  314:8,13 315:3
  316:24
**analyst** 42:12
  44:17,19 45:4
  59:14,15,19,19
  68:7 78:8 83:22
  175:3 217:1
**analyst's** 77:21
**analyze** 41:7 42:13
  43:13 45:11 52:1
  60:16 69:2 95:5
  155:17 156:1,9,10
  159:16 161:7
  164:15,18,23
  165:3,7,8 178:13
  252:20 293:9
**analyzed** 42:14
  43:9 44:7 46:12
  46:17 60:5 156:5
  156:6 209:5
  284:16,19
**analyzing** 32:12
  41:1 60:3,13,14
  63:9 68:22 71:22

  105:16 156:20
  157:11 166:1
  178:14 184:10
  208:10 216:11
  287:3
**anecdotal** 238:8
**anne** 21:6,8
**annie** 2:4 15:19
  21:5 322:5
**answer** 18:18,19
  18:20 60:21 86:1
  86:12 88:13,16
  114:8 164:25
  171:3 196:6 197:9
  197:11 199:14
  202:17 205:1
  218:12,14 246:2
  265:22 269:2
**answered** 135:2
  164:21 172:10
  199:11 210:18
  223:25 264:16
  271:1 286:12
**answering** 88:18
  132:10
**answers** 259:10
**anticipate** 205:2
**antoine** 272:10
**anybody** 37:11
  68:19 263:18
  318:6
**anyway** 244:22
**anyways** 147:21
**aod** 90:14
**apadukone** 3:10
**apologize** 16:21
  53:6 270:10
  278:22 317:12
**appear** 181:18
  323:11 324:15

appearances 2:1
3:1 4:2
appears 24:23
30:24 42:2 64:8
98:20 120:21
148:7 175:17
195:23 198:16
209:6 317:24
appended 324:11
324:18
applicable 319:7
application 24:14
43:18
apply 25:14 37:10
304:22
applying 47:21
appointments
167:18
appreciate 245:2
304:4
approached 90:8
appropriate
303:20
approval 276:17
277:3,6
approve 49:1
277:1
approved 252:24
276:13 277:9
282:3
approximately
20:18
april 246:5
arch 3:21
area 34:2,4,20
44:17 131:10,16
171:24 174:6
areas 90:22
132:14,18 133:1
168:14,15 169:3
169:24 170:7,12

171:11,12
army 53:12,17,21
53:25 54:21 58:4
58:11 59:25
arnold 3:15 16:10
arnoldporter.com
3:17
arrested 311:5
arrival 194:1
305:11,18,24
306:2
arrive 305:21
article 131:21
267:1,9,15 311:2
articles 131:6,19
278:13 279:1,5,12
279:14,17 280:4,7
280:10,11,18
281:1,5,12,18
295:11 310:23,24
311:3,9
asca 175:3,5,17,22
aseem 3:8 16:6
aside 202:20,21,22
asked 22:9 38:2
64:15 74:17 88:14
133:22 153:19
165:11 172:10,12
172:13 194:7
197:16,18,21,23
199:1 212:6
222:25 226:9
230:2 239:4,20
250:11 255:12,20
264:16 265:11,19
265:23,24 268:25
269:11 270:9,21
286:20 304:25
311:11,13 314:1
asking 18:10,11
20:9 29:8 31:25

78:25 83:3 101:5
111:4,5 124:25
146:6 164:22
170:20,21 171:5,8
182:19,20 199:6
200:10 202:22
240:11,15,19
256:3 283:12
asks 86:8 186:3
aspects 90:17
assess 78:8 79:5,8
81:17
assessing 78:17
assigned 89:12
assignment 323:2
324:2 325:2
assistant 28:25
29:20 30:6
assisting 68:20
associate 24:11
associated 35:5
associates 36:21
55:5
association 175:7
assume 53:11
117:12,16 265:23
assuming 120:4,8
306:18 307:13
assumption 218:3
attached 5:2,15
6:5,10 23:24
141:23 142:14
211:3 224:9
233:11 324:7
attaching 233:15
attachment
143:15 212:15
233:6,12 234:10
attempted 303:5
attempting 32:3

attend 54:10,15
210:23 295:14
attended 54:18
297:12
attendees 297:10
attendings 15:7
attention 67:10
attorney 18:20
20:4 321:2
attorneys 15:6
18:15 20:3
attributable 300:1
301:6,10
attribute 121:24
317:10
attributed 124:24
129:17 130:7,15
131:3,6,9 133:16
133:25 216:15
317:16
attributes 317:6
attributing 130:4
135:8
audible 17:23
audience 129:7
august 159:14
author 260:23
authorize 324:11
authors 132:8
280:7
availability 302:8
302:16 303:6
available 82:4
139:10 201:14
204:8 283:12
303:2
ave 322:1
avenue 2:22 3:4,16
average 81:5,24
82:11 122:25

averages 122:25
aware 102:5 111:7
  153:13 239:22
  241:3 263:9,24
  264:6 276:12
  282:3,8 301:5,9,12
  303:14 305:10,23
  307:4 310:5
  313:13,25 314:14

**b**

b 135:24 136:2,6
  144:13 147:22
  250:16
bachelor 55:5
bachelor's 36:21
  39:14
back 27:24 42:24
  44:22 52:16 72:15
  108:15 137:4
  139:16 152:14,16
  161:19 180:11
  183:20 189:7
  316:15 322:15
bad 103:17 206:15
badge 66:6
badgering 172:11
bag 70:7 107:7
bags 162:2 165:12
  165:23
baked 31:17
barber 2:16
barberton 94:7
  178:9,14,15
barriers 247:2,8
  248:8,20,21,22
base 91:17 124:2
based 31:8,9,11,13
  31:14,18 53:20
  71:11 87:13,18,19
  105:2,22 127:11
  131:25 157:12

170:20 171:4
177:9 217:22
238:8 241:17
242:6 256:2 260:7
291:2 302:18
basically 59:18
  70:22 137:21
basing 124:16,25
  125:10
basis 20:3 136:18
  162:20 163:12
  242:8 243:22
  296:24 297:2
  311:24
bates 5:3,5,7,10,12
  5:15,18,20,22,24
  6:1,3,6,8,10,13,16
  6:19,21 23:25
  52:19 63:19,24
  66:11,16 97:21
  98:1 108:18,23
  141:23 142:3
  143:16 166:9,15
  174:18,23 184:15
  184:20 191:10,15
  198:7 206:25
  207:5 211:4
  218:20 224:9
  232:25 236:19
  245:10 250:24
beacon 266:25
  267:9
began 257:19
  306:6
beginning 5:3,4,7
  5:10,12,15,18,20
  5:22,24 6:1,5,8,10
  6:13,16,19,20
  23:25 53:7 63:19
  66:11 97:20
  108:23 141:23

143:10 154:13
166:8 174:18
184:15 191:10
198:7 211:4
218:20 224:9
232:24 236:18
245:9 250:24
259:9 294:5
behalf 2:2,9,14,20
  3:2,7,12,18 15:17
  15:23 16:7,10
  244:14
believe 19:12 21:3
  29:19 30:13,18
  40:7 55:3 57:5
  61:8 94:17 100:12
  107:8 109:17
  111:9 114:7
  117:10 123:20
  127:19 158:3
  161:12 162:8
  204:2,24 213:4
  218:10 240:8
  256:15 262:17
  264:17 266:25
  270:9 272:17
  287:2 299:23
  301:24
belong 296:21
beneficial 249:6
  249:15 250:4,18
benefit 251:21
benefits 28:6
best 26:25 60:5
  164:25 247:2,10
  248:10 249:11,12
  265:10,20
better 46:12 48:5
  48:11 51:6 52:2
  61:4,6,13 65:2
  71:12,20 72:17

73:16 96:3 102:20
114:8 115:1 130:2
145:17 161:3,16
164:4 179:6 184:6
184:9 190:5 195:7
210:18 218:12
254:25 255:8,18
255:24 256:15,17
279:2 282:19
286:11,24 287:21
287:23 288:14,18
292:6
beyond 88:9,21
  92:16 258:11
  303:22
big 51:1 78:7
  259:4
bigger 48:5 62:7
bill 188:7,16
  192:23
billing 195:8,9
biostatical 32:25
biostatisticians
  45:6
biostatistics 32:23
  33:12,13,23 34:24
  35:3,7,10 44:19
birmingham 5:7
  66:10,23
births 152:3
bit 28:5 34:9
  172:10 179:7
  215:8 261:21
  316:8
black 149:3 282:9
blue 120:19 149:2
blurs 44:16
bmasters 2:13
board 23:12 24:12
  25:5,11 38:9
  43:22 58:6,13

62:5 64:11 67:22
68:3,18 76:3
90:12 91:14 93:18
234:15,19,22
235:6 237:8 253:3
264:4 279:9
280:16,24 281:6
281:10,11 283:13
283:22 284:5,13
285:9 287:12,12
289:16,18 290:25
293:9 294:25
295:2,23 298:22
305:11,18 306:4
307:21 308:18
311:18 316:12
**board's** 290:10
291:1
**book** 260:25 261:3
**books** 54:7 93:3
260:19,20,21
**bordering** 172:11
**bottom** 64:7
148:23 152:19,19
198:15,20 211:15
211:17,18 221:15
234:12 246:21
**boulevard** 2:5
17:9
**box** 282:9
**brad** 2:11 15:9
17:3 143:13
**break** 34:25 51:14
51:21 52:10 108:8
134:23 136:22
178:18 183:13
206:14 305:3,3
**breaking** 179:16
**breaks** 182:12
**brenda** 3:4 15:16

**brenda.sweet** 3:6
**bridgeside** 2:5
**brief** 305:2
**briefly** 265:8
267:10 304:17
**brittain** 261:23
**budget** 89:23
269:1,21
**budgeting** 89:16
316:8,10,16,18
**budgets** 89:18
316:21
**budnik** 175:21
**build** 288:7
**building** 176:14
176:21 177:5
178:5
**bullet** 162:13
165:3 209:12
**bunch** 179:1
268:25
**burling** 3:8 16:7
**butchering** 193:4

**c**

**c** 144:15 193:15
317:20
**ca** 3:9 322:25
**calculating** 81:8
**calendar** 101:14
**call** 80:20 82:8
175:14 290:6,17
**called** 16:14
209:12,18 260:22
290:18
**caller** 179:17
180:16 183:6
223:8
**callers** 167:4,17,18
167:18 181:24
182:20

**calling** 81:21
**calls** 26:5 29:4
175:18
**cannabis** 182:7
221:24 222:9
**capacity** 59:23
71:6 271:18
**capita** 129:1,10
130:11,14 131:2
133:7,11 134:11
134:16 135:6
136:13 137:22
138:7,9,21 139:22
148:20 149:6,7,18
150:8,19 151:11
**caption** 15:3
320:21
**capturing** 287:4
**cardinal** 2:9 15:10
17:3 263:18
**care** 28:7 247:2
**career** 61:25 62:2
62:10,12 200:9
**careful** 266:1
**carfentanil** 121:4
121:5,10,16,18,24
122:17 124:16,24
125:2,8,17,22
126:23 212:11,25
216:16,20 227:25
228:3 301:25
**carry** 34:15,18
**carrying** 34:22
**cars** 311:4
**case** 1:8,15 15:3
19:11,16 22:14
171:1,3 183:1
241:11 244:20
267:3 270:12
306:20 307:15,18
313:20 314:1,6

315:1,9 317:11,17
322:6 323:3 324:3
**cases** 209:14
228:19
**catalog** 40:5
**catch** 18:4
**catching** 104:1
**categories** 63:10
178:18 179:16
182:2,4 195:23
196:16 222:16,17
**categorizing** 180:5
**category** 180:2,24
182:16 183:3
223:7,10
**causation** 135:20
135:23,25 169:5
171:20 293:17,19
**causations** 135:15
135:18
**cause** 35:17
104:21 105:5
156:14,17,21
157:4,4,8,13 158:1
158:6 169:19,20
189:25 214:18
217:7,9,17 227:1
285:18 317:18
320:12
**caused** 104:10
105:21 188:21
205:12 293:13
308:25 309:5,9,16
315:21 316:2
**causes** 293:9,11,21
297:18
**causing** 174:12
**cc'd** 247:23
**census** 167:4,19
**centre** 2:16

[cephalon - collecting]

cephalon 274:14

certain 70:13
153:20 154:7,14
154:21 155:1,13
155:22 187:25
191:2

certainly 18:3
243:25

certificate 4:6
36:16 160:12
320:1 324:11

certificates 159:13
159:21,24 160:7

certification 323:1
324:1

certified 16:17

certify 320:8,19
321:1

cetera 161:11

chain 211:17
212:2 246:4

chance 62:11

change 61:25 62:1
143:7 322:13,14
324:8 325:3

changes 254:25
255:7,17,24
322:12 323:7
324:7,9

changing 144:16

charge 116:19
117:12 218:8
248:1 272:18

chart 119:6
120:16 123:4
137:18,21 138:4
138:12,16 139:2
158:18 216:11
217:22

charts 158:2

check 156:7 189:8

chicken 274:20

china 261:22
262:2

chinese 262:4,4

choose 95:24

chopping 272:10

chose 141:17

chosen 115:22
137:15

chrissy 185:11

christine 166:24
167:2,8,15 169:23

circle 180:10

circumstance
286:23

circumstances
288:11

cit 25:18,20,21
26:6 27:17 41:19
76:2,6,14,23 178:7

cited 51:7

cities 85:11,14
87:5

city 2:2 15:20,23
16:1 34:2 85:12
85:15 87:3,7
88:17 174:8
220:12,18,18

civil 319:3,7 323:5
324:5

claims 192:16,19
192:20,22 193:9
193:19 194:1,9
196:19 236:1,1,3
288:16,20 289:4
289:10 290:11
291:12

clarification 18:7
214:7 315:13

clarify 87:19
143:14

class 33:5

classes 39:17,18
40:2

clear 31:19 68:24
86:18 99:24 101:3
130:10 162:15
213:11

clerk 42:14,16
43:10

cleveland 3:5
59:11,13 60:14
61:20 62:22 63:13
321:7 322:2

client 20:4 188:16

clients 234:1
247:11,12 248:11

clinic 59:11,13
60:14 61:20 62:22
63:13

clinical 24:11
181:14 211:16,20

clinicians 181:5,6

close 150:17 287:9

closed 168:17

clumped 179:22

clumping 178:19
179:15 180:13

coach 172:14

coaching 172:16

cocaine 119:17
120:14 182:10
215:9 225:18
226:1,15,23 227:8
229:6,13,19 230:5
230:10,19,25
231:8,18 232:1,6
238:6 239:9,25
240:12 241:12,23
242:9,13,19

code 85:13,25
86:11,19,20 87:4
87:11 88:6,15,19
174:6 201:6 204:1
205:15,17

codes 167:4,5,17
167:17,20 169:3
174:1,10 188:19
194:15,16 195:8,9
195:24 196:12,18

coding 47:9,17,18
48:8 187:24 188:1
188:11,12,14,20
188:25 190:5
191:1 289:1

cognitive 39:4,7
39:13

coincidence 172:7

coleman 56:20,22
56:23 57:3,7,15,22
58:5,12

collaborate 71:2
207:15

collaborated
207:13 208:6

collaboration 71:4

colleague 265:11
283:11

colleague's 265:17

colleagues 268:19

collect 22:20 29:6
113:23 181:23

collected 23:4,9
77:12 86:2 107:13
116:17 117:1,25
118:5,11

collecting 29:4
84:22 167:24
175:25 176:6,9
178:11,12 182:22

**collection** 84:12
106:25 222:12
223:1 252:7,8
**collects** 118:14
**colloquially**
190:24
**column** 204:7,9
**columns** 204:12
**combatting** 247:3
**combination**
59:18 229:7,14
230:5 288:16
**combine** 258:24
290:13
**combining** 259:8
**come** 22:20 27:24
48:4,10 57:13
70:11 76:10 81:11
83:12,16 90:24
140:22 171:7
218:2 246:16
286:17 288:18
**comes** 67:22 68:3
68:18 70:22 79:2
99:20 100:24
110:6 117:7 118:3
173:24 260:21
**coming** 42:24 96:9
153:12 196:9
259:10
**comment** 43:13
72:16 98:14,18
104:7 105:1
**commission**
321:17 323:19
324:25 325:25
**commissioned**
320:8
**common** 201:1
**commonly** 157:19
158:1,5 238:7,18

239:11 240:1,16
241:13,25
**communicate**
84:22
**community** 35:18
71:3 161:4,13,17
161:25 162:3
175:7 185:5,9
**companies** 3:14
270:22 276:25
281:2
**company** 62:7
270:25 272:13
**compare** 47:16
96:19 233:24
**compared** 137:13
186:9,17 187:10
187:12 238:4
239:8 243:4
**comparing** 85:4
291:11
**comparison** 61:16
137:9,19 138:1
148:1 151:24
157:25 158:5
**compile** 68:10
289:20
**compiling** 178:5
**complaint** 262:10
270:11 306:17
**complete** 49:9
167:18,19 222:18
**completed** 38:23
39:25 320:22
322:15
**completely** 176:11
**complicated** 104:3
**comprehensive**
186:21
**compromise** 84:20
84:25

**compromised**
77:24 78:1,2 85:7
**computer** 45:5,9
206:4 290:10
291:1,5
**conceal** 34:15
**concept** 220:3
**concern** 35:17
**concerned** 35:11
153:25
**concerns** 154:16
155:2
**concluded** 318:11
**concluding** 242:8
**conclusion** 83:13
83:17 85:8 131:25
134:16,21 162:21
164:16,20 216:22
218:5 303:25
**conclusions** 77:3,7
77:25 78:4,12
80:12 84:8 106:18
107:17 108:4
109:25 135:9,14
145:11 165:1
179:10 190:7
279:19
**conclusive** 285:20
**conduct** 172:17
**conducted** 299:25
301:15
**confirm** 159:15
225:6,12 317:2
**confirmed** 228:13
**confirms** 225:2
**confused** 86:25
156:18
**confusing** 107:2
**conjunction** 162:9
**connect** 289:3

**connected** 175:14
220:19 227:16
255:5,22
**connecting** 247:12
248:10
**connection** 55:5
202:18,21,22
264:11
**connections**
208:24,25 209:1
**connolly** 2:10
**consider** 40:11
41:2 52:21 65:14
65:23 251:14
**consideration**
146:15
**considerations**
46:21 75:9
**considered** 47:11
65:20 104:8
114:17 115:5
**consistency** 73:21
73:22,23 74:6,12
74:13,19,21,23,24
75:11 79:2 80:7
147:12 154:17
**consistent** 73:24
84:24 145:23
148:3 153:22
154:1,7 155:15,24
179:3 216:22
225:20 244:20
273:23 312:25
313:8
**consists** 194:14
196:25 219:15
**constantly** 144:16
**consulting** 56:10
**contact** 81:10
272:9 307:22
308:2

**contain** 116:13
160:17 203:4
**contained** 141:8
215:2
**contains** 116:14
193:9 203:2
**contemplates**
244:16
**contents** 311:9
**context** 112:4
271:2,7 275:15
300:18
**continue** 169:16
260:3
**continued** 3:1
**continuing** 225:16
226:20 227:6,6
**continuous** 25:4
**contract** 89:22,24
89:25 90:5 316:22
**contracted** 56:23
**contracting**
193:25 194:24
195:4 235:9
**contracts** 60:4
89:19,21
**contributed**
243:13 301:16
316:2
**contributing**
234:15,19 235:5
293:21,23,24
294:3 297:21,25
298:15,20,23
299:2,4,21
**contribution**
293:2
**conversation** 5:17
66:21 166:7,23
184:24 191:22
198:1 270:2 290:3

**conversations**
202:15 242:17
**convert** 252:14
**cooperation**
178:13
**coordinate** 89:9
**coordinator** 25:5
89:3,7 94:21
237:7 316:11
**copied** 196:17
213:24
**coping** 27:5
**copy** 30:24 31:1
212:22 219:1
244:7,10
**corner** 221:15
**corporation** 3:7
3:19 16:8
**correct** 30:25 46:6
46:7 78:6 89:4
96:10 99:21
100:25 120:17,18
138:22 142:16
150:23 151:14
152:20 156:8
172:23 187:13
188:21 194:19
195:10 196:2
197:13 198:18
205:7 210:2,4,7,10
211:24 212:12
213:1 214:5 215:6
215:14,24 216:13
216:16 217:21
222:13,17 223:4
223:14 224:4
227:9,10,25
228:21 229:9
233:9,16,22 234:2
234:7 236:5 237:3
237:25 238:7

239:12 241:19
246:6,7,23 247:4
247:13,17 250:18
253:11 256:8
258:23 259:14
292:4 305:12,24
313:15,16,20
315:1 316:3,12,13
316:23 317:2,11
320:17
**corrections** 322:12
324:17
**correctly** 87:10
155:7 191:25
**correlate** 169:24
170:1,14,22
171:16
**correlates** 169:6
**correlation** 135:20
136:4,12,17,18
169:4,21 171:7,20
**correlations**
135:15
**corresponded**
143:16
**corresponds**
122:10 127:6
**costs** 317:5,9,15
317:18,19,19,20
**cough** 228:9,9,9
**counsel** 2:9 274:11
319:1,10 321:2
**count** 297:15
**counted** 159:6
**counties** 137:10
**county** 1:12 2:3
6:3,7 15:19,24
16:2 17:11,12
23:1 24:12 62:5
90:12 91:13 93:11
98:25 99:9,10

100:10,16 102:9
103:19 109:20
114:15,18,23
117:8,13 118:12
118:18 128:15,16
128:22 133:9,17
134:1 137:14
138:18 147:9
148:9,10,11,13,13
148:20 149:18
150:16,23 151:11
151:17,24 152:5
158:13 161:25
168:22 169:3
170:12 171:9
177:23 206:25
212:8 214:11
218:19 219:7,25
220:14,15,16
227:22 234:5,16
238:12 262:17
264:1,4,7,9 267:11
267:16,21 270:12
292:10,17 293:3,5
294:10,14,17,20
302:9,17 303:2,7
305:11,25 306:7
307:4 308:9
309:22 310:2,15
310:16 311:17
312:14 313:19
314:5,11,23
315:22 316:3
317:6 320:4
323:10 324:15
**countyhealthran...**
178:3
**couple** 46:1 67:10
93:4,7 237:18
**course** 32:24 37:3
37:17 46:1 55:13

[course - data]　　　　　　　　　　　　　　　　　　　　　Page 12

66:1 287:11 306:4
307:22 308:11,17
309:3 310:7
311:18 312:22
313:5
**coursera** 37:1,2,21
55:20
**courses** 32:21,23
32:25 37:1,6,12,22
38:1,5,10,22 39:20
54:7 55:1,4,9,14
55:16,20,21
216:24
**coursework** 38:23
39:1,16 40:1 54:4
54:5 59:24
**court** 1:1 4:8
16:12 17:25 42:14
42:16 43:8 56:1
266:2 323:7
**courts** 43:2,4,9,11
**cov.com** 3:10
**cover** 24:9,23
26:19,20 33:1
**covered** 265:15
269:20
**covington** 3:8 16:7
**crack** 182:10
**craig** 19:20 64:10
64:20 113:19
114:7 115:23
123:8,16 145:15
185:1,13 191:19
197:11,15 224:23
224:25 225:21
233:9,15 247:17
247:18,19 284:25
**craig's** 228:13
**create** 46:10 71:12
71:20 72:16 116:9
127:24,25 289:7

290:14 296:4,7
**created** 92:7 128:3
160:22 208:21
291:3
**creates** 262:23
**creating** 57:11
61:7 207:23
277:23 290:15
**crime** 168:25
**criminal** 42:24
90:4 271:16 273:2
**crisis** 25:19 315:22
316:3 317:6
**critical** 113:13
114:5 115:2,4,15
115:20 134:14
143:3
**cross** 85:4
**crushing** 309:1
**curiosity** 290:4
295:13
**current** 17:7 188:4
261:13 262:8
**currently** 22:3
285:23 286:2
**custody** 4:7
**customer** 245:22
**cut** 101:19 205:9
**cutting** 204:21
**cuyahoga** 320:4
**cv** 30:25
**cvs** 307:7,25
315:15

**d**

**d** 144:15
**d.c.** 2:22 3:16
**dan** 1:9 64:9,13
65:6,9
**danielle** 2:5 15:25
**dashboard** 5:12
108:22 109:6,19

109:22 124:12
141:6 142:20
161:20 185:23,23
216:3,11 287:17
296:1,23
**dashboards** 109:9
109:13 118:15
144:21 151:13
**data** 5:11 29:5,6,7
29:8,21,23 30:15
30:16,19,21 31:11
32:12 41:2,7
42:12,13 43:25
44:2,4,5,6,9,17,19
44:21 45:4,11,22
46:11,13,19,22,23
46:23 47:3,7,11
48:6,11,13,15
51:10 52:1 59:19
60:12,17,20 61:4
61:12,16,16,21
63:10 64:21,24
66:4 67:21 68:2,7
68:11,15,18,20
69:2,6,9,12,13,15
69:17,18,20,21,22
69:25 70:1,3,10,22
71:11,12,19,19,22
71:25 72:2,5,8,11
72:16,18,22,25
73:1,6,7,25 74:7,9
75:2,6,18,20 76:13
76:22 77:1,3,11,12
77:14,20,24 78:3,8
78:9,11,14,18 79:2
79:3,17,24,25 80:5
80:8,21,22,24
81:17,20,24 82:3
82:24 83:4,7,16,22
83:23 84:12,13
86:1 87:11 88:8

88:12,16,21 91:24
95:12 96:5,7,17,18
96:21 106:7,18,21
106:25 107:12,17
108:4,22 109:5,9
109:13,19,22,25
113:23 114:1
115:11 116:1,3,4,4
116:7,9,13,17,19
116:22 117:5,7,7
117:13,16,21,22
117:25 118:3,11
118:13,14,15,19
118:21 119:13,17
119:21 120:6,11
120:16 122:9
123:10,13,17
124:2,11 125:4,7
127:12 130:6
133:8 134:15
135:11,17,19
139:12 140:25
141:2,4,6,8,9,11
141:13,15 142:19
143:23,25 144:7
144:20,23 145:2,7
145:15 146:2,4,10
146:20 147:2,5,8
147:11,13,14
148:2 150:1
151:12 152:23
153:6,20,25
154:18 155:4,5,9
155:14,17,22
156:1,5,9,10
159:22 161:20
164:15,18,22
165:3,8,9,13,18
166:1 168:20
171:6 172:23
173:1,10,11,14,15

**[data - decisionmakers]** Page 13

173:17,22 174:13
175:18,25 176:5,8
176:13,16 177:16
177:17,18,19
178:2,7,9 181:4,6
181:23 182:2,12
182:22 183:2,8,24
184:2,6,8 185:22
185:23 187:14,19
187:19 188:25
190:4,14 192:22
194:9 196:19
201:5 203:7,10
205:16 206:10,12
207:16 208:11,22
208:23 209:1,2,4,5
209:19 210:9
211:24 216:3,5,6
216:11,19 217:1
218:9 222:12
223:1 228:7
229:16,18,21,22
229:25 230:6,7,15
230:16,22 231:5
233:25 235:25
236:1,2,3 243:12
252:6,7,20 257:24
283:12,14,19
284:2,3,11,16,18
284:21 287:17
288:16,20 289:4
290:11,11 291:12
291:12 292:20,22
294:3 296:1,23
298:5 302:22,25
306:3,5,12 308:18
309:4,13 312:22
313:5,10
**data's** 96:2
**database** 44:1,3,6
45:19 46:5,8,9,19

47:3,6,12,14,15
48:8 49:19,24
51:5,11 74:24
75:1,7,10,13,23
76:9 78:20 79:8
80:10,12 84:1,9,23
128:1,5,12 139:16
141:12 178:6
179:11 192:11,15
192:17,18 193:7
193:14,19 194:1
201:10,11,12,15
201:18,20 203:1,8
203:11 204:13,15
205:12,19 278:24
289:11 302:19
303:10
**databases** 74:2,10
75:16 95:5,23
176:14,18,20
177:1,4,8 192:14
192:16 193:11
289:12
**dataset** 73:10,13
73:19 74:18 77:8
78:20 79:5,16
80:4,10 84:20
85:1,24 86:10,12
87:13,24 88:8,10
117:9 136:4
290:15,16
**datasets** 47:16
73:16 85:5 99:21
100:25 159:16
161:8 173:12
176:23 177:6,8,10
258:25 259:8
283:19,21 289:13
290:14,23 291:17
308:8,11

**date** 15:2 21:2
173:2,7,17 193:22
319:11 322:8
323:3,9,19 324:3
324:13,25 325:20
325:25
**dated** 24:16
209:10
**dates** 202:8
**david** 247:16
**day** 2:21 15:15
67:18 115:10,12
115:13,17,19
116:1 123:1
176:15 308:8
321:7 323:16
324:22 325:22
**days** 53:11 322:18
**dc** 2:12
**dead** 102:24
**deal** 25:22 237:14
**dealing** 26:22
33:10 237:10
**deals** 42:6 237:16
237:19
**dear** 322:10
**death** 102:2,6,8
103:1 104:11,21
105:5,21 126:8,9
156:14,17,21
157:4,5,8,13 158:1
158:6 159:13,20
159:24 160:7,12
160:19 161:10
173:15 189:17
209:7,15,25 210:2
210:15 214:19
217:7,9,17 218:9
227:1 228:20
241:10 257:4
285:18 286:3,4,7,8

**deaths** 6:12,13
102:4 104:8,17
116:16 125:22
126:3,16,22 127:5
129:18 130:5,8,15
131:4,18 133:15
133:25 134:13,18
135:8 152:24
158:15,16 159:19
161:15 167:5,20
168:1 186:9,16,24
187:10 213:9
214:4,11 216:12
216:20 217:4,12
217:24 225:17
226:22,22 227:7
227:13,24 228:2
231:22,23,24
232:23,24 234:6
237:24 239:5
241:1 243:14
254:2,3 257:14
279:24 293:7
299:25 301:6,10
308:9,13,19,19,25
309:5,9,16 312:24
313:7,18 314:4,10
**deceased** 285:23
286:9
**december** 21:18
59:9 67:15 101:15
270:4 295:21
**decent** 51:2
**decide** 39:6
**decided** 148:17
**deciding** 306:19
**decision** 72:19,23
73:8 77:2 96:20
**decisionmakers**
71:23

**decisionmaking**
71:13,21 72:17
181:8
**decisions** 71:24
77:13 181:15
256:16
**decline** 238:21,23
240:2 243:6,13,18
243:19
**declined** 237:23
238:3 239:5,7
243:2,3
**decrease** 241:15
242:24
**decreased** 237:25
239:6
**deed** 323:14
324:20
**deemed** 244:14
322:19
**defendant** 3:7
244:1 304:19
313:19 317:17
**defendants** 2:10
15:13 16:11 23:9
245:2 262:13
265:7 274:11
304:21 306:19,22
306:24 307:15
313:14,25 314:2,6
314:12,19 315:1,9
315:11,15,20
316:1 317:11
**defending** 205:5,5
244:2
**defer** 303:24
**define** 26:13
101:11,18 102:2
102:21 103:15
293:11 300:13

**defined** 27:20
40:24 74:21 84:11
85:7 102:9 110:4
111:7
**defines** 101:14
**defining** 102:4,6
**definitely** 37:15
50:8 70:19 81:9
293:1,22
**definition** 31:22
84:17,18,19 88:8
103:8 114:6
**definitional** 100:9
102:5
**definitions** 33:20
99:24 100:2,15,20
101:4,6,10,25
109:24 111:5,13
176:8
**definitive** 64:16
65:10,16,20 91:12
91:15 92:12
**degree** 36:21 39:2
39:3,4,11 54:23
55:6
**degrees** 132:18
133:1
**deleted** 22:13
**delivery** 319:9,11
**delta** 150:25 151:7
**demographics**
285:18
**dennis** 175:2
**density** 76:4
**department** 59:14
59:15 62:21,24,25
94:7 95:17 96:9
99:3,6,8,9,10,11
100:4,6,16 101:16
101:17 103:10,14
116:5,11,20 117:8

117:9,11,13 118:3
118:13,18,24
119:3 122:22
124:10 141:7
173:1,7,11,16,22
178:14 188:19
201:19 211:21
225:2,6 322:22
**departments**
147:10 187:21
**depend** 80:6
**dependability**
80:6
**dependence**
195:25 196:15
**dependency**
132:21
**depending** 75:19
290:20
**depends** 79:22
**depicting** 119:1
122:24 158:11
**depicts** 158:15
**depo** 243:24
**deposed** 16:17
17:16 19:11
266:18 268:5,13
268:15,18
**deposition** 1:18
19:22 23:23 32:2
56:1 63:18 66:9
97:18 108:21
141:20 166:6
172:18 174:16
184:13 191:8
198:5 204:25
205:6 206:23
211:2 218:18
224:7 232:21
236:16 243:23
244:4 245:6

250:23 266:16
267:25 268:1,7,10
268:22 269:4,7,12
269:21,25 270:6,7
318:11 320:20
322:8,11 323:1,3
324:1,3
**depositions** 245:3
317:25
**depression** 131:7
131:9,10,18
132:14,15,19
133:2 169:18
**deric** 30:7
**describe** 195:10
195:11 234:13
272:23 290:8
**described** 55:22
272:5 295:11
**describing** 35:11
214:9
**description** 5:1
227:3
**descriptions**
194:21 195:2
**design** 277:19,22
**designation**
213:25
**designed** 278:4
**desire** 26:8
**detail** 103:12
268:23 269:10
288:10 312:19
**detailed** 94:1
**details** 311:7,8
312:12
**determination**
84:2
**determine** 75:10
77:6 79:16 80:11
80:17,24 81:12

104:20 105:5
107:3 114:13
117:21 135:19,20
159:16 161:8
189:24 190:16
194:7 232:13
**determined** 114:7
140:20 145:6
**determining** 58:1
60:5 78:20
**deterra** 5:9 70:7
97:19 107:7,7
161:22,23,24
162:2 163:16,19
165:25
**develop** 47:24
48:3 51:6 53:3
255:7,23 256:6,11
**developed** 46:2
51:5 66:1
**developing** 68:20
68:21
**development**
277:10
**diagnosed** 199:3
199:22 253:23
**diagnoses** 196:18
202:7
**diagnosis** 188:15
194:13 195:11,13
196:24 201:8
206:2,6
**die** 103:6
**died** 126:13
231:25 232:5
314:23
**dies** 102:22 126:10
**differ** 220:10
**difference** 33:11
33:17,19,22 44:12
44:13 96:12,15

100:15 102:17
103:7 110:14
126:7 135:22
138:13 139:3
149:17,20,22
160:11 173:9
176:2 293:16
**differences** 100:10
102:6 110:22
**different** 26:5
28:12 31:10 32:11
33:7 36:4 39:10
40:25 41:1 44:10
45:10 47:7 52:3
54:7,7 57:13
58:22 72:5 79:18
85:5,14 87:5,17
93:2,3,9 94:22
95:20 99:4,21,22
99:23,24 100:1,25
101:1,2,3,6,12
103:18,25 107:10
112:17 113:6,8
116:14,15 120:12
120:17 128:14
131:5,11 132:16
137:10,13 138:11
138:25 139:23
146:13 156:13
157:18 160:9
163:21 168:22,24
171:3 173:12,13
173:20 174:9
176:8 177:13
182:8 190:23
194:4 195:24
196:9,10,12
202:15 208:10,23
220:13,20 221:4
223:21 237:11
254:23 255:15

258:25 259:8
262:24 272:18
276:1 277:1
278:12,14 283:18
286:15 288:1,11
289:8,8,24 290:19
296:20 298:25
299:6 301:22
302:13 312:1
**differentiate** 87:12
87:14 112:14
113:2 120:13
127:11 222:17
**differentiated**
112:24
**differently** 75:6
95:25 102:10
103:15
**difficult** 104:20
105:5 107:3
**dig** 81:17,20 96:20
**digging** 45:18
**digitize** 252:4
**digitized** 251:24
252:5 253:2
**digitizing** 251:20
**digits** 205:17
**direction** 39:10
290:4
**directly** 95:22
158:15,16 272:2
314:5
**director** 24:12
61:8 64:12 90:11
175:23 266:11
**directors** 61:10
**disagree** 232:8,13
**discuss** 43:13
70:25
**discussed** 145:12
216:4 283:19

304:21,21 308:7
**discussing** 113:4
222:20
**discussion** 236:12
297:17 312:9
**discussions** 242:11
242:14 312:1,3,4
**dislike** 205:13
**disorder** 28:6
90:17 194:22
195:14 247:4,9
248:9 254:13,16
**disorders** 30:14
69:24 133:4,5
188:8 194:17
195:3,10,18
196:14 249:6,16
250:3,18 254:12
254:18 255:5,14
255:22 256:6
271:15 279:25
**dispense** 283:2
**dispensed** 128:23
128:24 129:1,11
129:23 130:11,13
131:2,7,8,15 133:7
133:11 134:10,16
135:6 137:22
138:7,9,17 139:5,7
148:8,19 149:17
150:8,19 151:11
151:16
**dispensing** 136:13
302:23
**disposal** 5:9 97:20
162:16
**dispose** 165:23
**disposing** 162:6
**disruptive** 244:25
**disseminating**
162:15 163:9

**distance** 57:18,23
**distinction** 213:13
  302:3
**distinguish** 156:12
  197:6 213:23
  236:4 283:15,23
  284:5,13
**distinguishes**
  222:12
**distress** 25:23
**distributed** 162:2
  314:25
**distributor** 2:9 3:7
  3:18 263:10
**distributors**
  263:13
**district** 1:2
**divided** 90:13,15
**division** 1:3
**doctor** 199:9,19
  303:24
**doctor's** 313:1,9
**doctors** 127:18
  311:3,8
**document** 1:11
  24:6 64:1,8 66:18
  98:2 109:2,7,18
  142:5,18,22
  166:15,18 183:11
  184:22 191:16
  198:13 207:6,10
  211:10 219:4,11
  224:15 227:4,12
  228:18 233:6
  236:25 245:16
**documents** 22:10
  22:14,21,24 23:7
  270:5 286:20
**doing** 33:25 37:24
  47:12 57:8 76:4
  137:13 208:11

  251:22 287:19
  293:19
**doses** 129:1,9,11
  130:11,13 131:2
  133:6,11 134:10
  135:5 137:22
  138:7,8,17,21
  139:22 148:8,19
  149:6,7,17 150:7,8
  150:19 151:11
**double** 156:7
  189:8
**doug** 152:20
  166:24 198:16
  242:11 312:4
**download** 201:21
**downloaded** 203:7
  203:10,18
**downloading**
  201:6 202:17
**dr** 30:6,8 90:7,10
  90:11 142:12
  154:5 160:2 199:6
  199:18 200:5,8
  242:11,14 268:9
  268:13,14,17
  269:7 270:3
  284:25 312:4
**draft** 162:7 219:11
**drafting** 162:10
**draw** 67:9 77:3
  78:12 80:12 84:8
  107:17 108:3
  109:25 134:16
  135:10 179:10
  190:6 213:13
  218:5
**drawn** 77:7,14
  85:8 106:18,21
**drive** 290:16 291:7

**dropped** 143:22
  144:19 146:18
**drug** 3:19 5:9 6:12
  43:2,9 92:6 97:19
  102:7 103:1 104:8
  104:10 105:20
  115:10,17,25
  116:14,15,16
  118:24 119:4,8,9
  119:10,11,13
  120:10 121:22
  122:21 124:10
  126:7,7,9,10,10,15
  126:22 130:5,8,15
  131:4 135:8
  141:10 156:25
  157:3,6 158:16,17
  159:17 161:9
  167:25 168:14
  169:1,6,23,25
  170:13,14,21
  171:12,16,24
  173:1,14,14,17
  174:5 178:16,18
  180:1,6,25 182:3,5
  182:13 185:25
  187:15,21 188:20
  189:16,16,24
  190:13 197:12
  209:4,8,24,25
  213:9 214:11,16
  215:17,24 216:1,6
  216:7,7,11 217:4
  217:12,23 226:21
  226:22 232:23
  234:6 238:11
  241:15 249:3,13
  249:25 250:15
  254:2,3 256:23
  257:4,14 259:13
  259:17,20,25

  260:7,11 261:9,12
  261:17,18 262:6
  276:13 277:9
  279:24 288:4
  308:12 312:20
**drugs** 104:10,19
  105:4,20 120:12
  126:12 156:13
  157:19 158:1,5,17
  159:4,4,5 180:5,6
  187:16,25 189:18
  189:25 191:2
  214:10,23 217:1
  217:22 219:18
  234:15,19 238:6
  239:10,25 240:12
  240:15,19 241:12
  241:13,24 253:9
  253:18 254:7
  257:4,9 262:24
**dsalerno** 2:8
**due** 103:6 187:24
  190:25
**duly** 16:16 320:7
  320:10
**duplicate** 82:20,21
**duty** 34:17,17
**dying** 225:25
  226:14 257:4,6,9

    **e**

**e** 2:4 322:5
**earlier** 52:20
  55:23 87:1 91:10
  98:9 105:15
  109:23 116:21
  117:15 140:17
  141:1 142:22
  145:9 158:24
  169:5 173:8
  187:20 215:16,20
  215:22 216:4,21

222:25 234:5
265:11 270:10,14
283:11 284:24
292:2,4 293:18
295:11 304:21,22
305:9 306:16
313:12,25 314:20
316:7,17
**early** 57:5
**easier** 114:2
**easiest** 48:7
113:22,24
**eastern** 1:3
**easy** 127:3,6
159:23
**ecological** 114:14
131:14
**edit** 207:25
**edition** 212:3,20
213:5,7
**education** 36:10
38:3,13 58:12
91:5
**educational** 28:1
28:23 37:3 55:17
**effect** 161:13
278:13 279:21
**effectively** 38:8
54:2
**effects** 229:8
**effort** 153:13
243:5
**eh** 98:16
**eh1** 98:14
**eh2** 98:20,21
**eh3** 104:7
**either** 67:20
136:10 169:12
281:5,9 301:4
308:4,6 310:6
321:2

**el** 272:10
**elaborate** 202:1
**electronic** 46:16
178:8 252:15
256:20 285:2,14
**elephant** 121:21
**ellis** 3:3 15:17
**email** 5:2,4,6,13
5:17,19,21,23,25
6:5,9,12,15,17,20
23:16,17,24 63:19
64:4,5,9 65:4
66:10,20,20 67:13
71:16 141:21
142:7,9,11 143:16
152:15,19 155:20
158:8 159:2 166:7
166:19,20,23
167:8 170:18
171:4 174:17,25
175:16,20 176:4,5
183:21 184:14,24
184:25,25 185:13
188:23 189:11
191:9,18,18,22
194:6,6 197:18,22
197:24 198:6,14
198:16 200:17
202:23 206:13
211:3,11,12,15,15
211:21 212:15
224:8,18,22
225:22 228:8
232:22 233:7,8,14
236:17 237:2
240:18,23 241:17
241:19 245:7,17
245:19,25 246:3
246:20,25 247:15
247:18 250:24
251:5,7,10 284:24

322:17
**emailed** 212:6
**emergency** 118:24
119:3 122:21
123:1 124:10
141:10 187:21
216:8
**employed** 27:14
52:25 53:17 56:15
56:20 57:3 58:6
59:5 100:16
263:18 281:11
295:22
**employees** 23:3
**employment** 38:3
56:18 59:2
**ems** 63:4,7 102:23
146:1,21 147:2,10
219:16
**enabled** 96:6
**enclosed** 322:11
**encounter** 74:10
247:10
**encountered** 45:7
**encourage** 219:21
**endo** 3:12,13
16:10 274:22
**endpoints** 279:18
**engage** 72:10
**engaged** 297:21,25
**ensure** 84:7
**entail** 35:4 45:18
58:20 83:5 237:9
**entails** 58:21 63:4
116:25 117:24
237:10
**enter** 47:10
**entered** 30:16
73:15 78:15 79:5
80:22 196:18
324:9

**entering** 29:21
47:13 75:2,5,20
79:23 84:18
**entire** 93:17 186:9
186:17 187:11
203:22 245:4
287:11 310:10
323:5 324:5
**entirely** 244:25
**entirety** 225:7
**entities** 262:7
307:14
**entries** 125:16
182:9 188:4,5
**entry** 47:4,8,11
**epicenter** 115:11
115:12 116:1,3,4
116:13 117:5,7,7
118:3 125:4,6
140:25 187:14,19
188:25 216:5,6
303:9
**epidemic** 6:3
90:25 92:8,13,19
93:5,11,22,23
112:7 186:10,17
186:22 187:4,11
206:24 253:15,21
254:10,19 255:13
256:23 259:13,17
261:13 262:8
279:3 287:22
292:6,10,14,15,21
293:10,14 294:4,6
294:10,14,17
297:18,22 298:1
298:16,20 299:22
301:17 306:6,13
**epidemics** 259:21
259:25 260:7,12
261:9,12,17,18

**epidemiologist** 35:20,23 36:6,12 36:17

**epidemiology** 32:24 33:4,6,12,14 33:24 34:8 35:6 35:15

**equals** 135:24

**eric** 1:19 4:4 15:5 16:14,18 17:6 64:21,23 98:16 265:1 304:12 320:9 322:8 323:4 323:9 324:4,13 325:20

**errata** 322:13,18 324:7,10,18 325:1

**error** 156:23 158:24

**errors** 212:3

**esq** 2:4,4,5,11,15 2:16,21 3:4,8,15 3:20

**establish** 191:4

**estimate** 37:20 50:5,21 90:21 150:14 186:3

**estimates** 76:5

**et** 1:12,14 161:11

**euphoric** 229:8

**evaluate** 184:2 231:21,21

**evaluated** 183:25 284:4,12 308:11

**evaluating** 247:1 308:18

**evaluation** 5:9 97:19 306:12 312:23 313:6

**evening** 318:4

**event** 321:3

**events** 260:9

**eventually** 252:23

**everybody** 75:2,5 245:1

**everyday** 26:21

**evidence** 31:8,9,11 31:13,14,18

**exact** 21:2 37:14 37:24 143:8 149:21 193:22 194:3 272:15 278:15 311:1

**exactly** 20:6 29:12 30:22 32:5 43:6 50:11 54:19 57:17 71:14 76:9 81:11 85:18 94:18 96:19 97:5 99:24 101:3 105:10 110:21 138:15,23 139:15 140:19,19 143:11 145:19 150:13 153:8 154:12,21 163:6 164:8 175:7 181:7 187:7 203:19 204:11 260:17 262:22 279:15 288:15 290:12 294:15 297:14 308:1 312:10,11

**examination** 4:4 16:15,18 265:1 304:12

**examine** 153:13

**examined** 215:1

**examiner** 52:4 100:11,17 102:10 105:12,23 106:1 125:3,11,15 126:1

153:14 157:11 173:10 209:7 210:12,13,19 213:22 215:2 218:11,16 230:16 230:22 231:5,10 243:12 252:19 257:7,17 258:12 258:15 259:1 284:3,11,19,22 285:11,14,22 286:8,12 287:6 288:14,22 289:4 290:11 291:12

**examiner's** 70:6 94:6 99:5,13,15 100:4,6 101:13 102:15 103:11,14 103:21 104:16 105:3,8,17 127:12 153:6 156:8 158:14,14 160:21 160:23,25 167:25 172:22 173:18 177:13 208:11 209:4 211:24 213:25 218:7 231:20 251:16 256:19 258:4 286:6 288:6 289:9 289:15

**examining** 96:5 105:16 145:1 258:13

**example** 47:3 51:8 75:25 86:5,22 87:16,18 102:21 120:14 123:9 158:23 180:2 182:6,14 193:2 194:16 202:10

**examples** 33:19,21 49:3 85:6 111:4,6

**excel** 47:10 128:2 284:23 285:5

**excessive** 200:16

**exchange** 5:4,6,19 5:22,24 6:1,5,9,15 6:17,20 63:19 66:10 174:17,25 175:16 184:14 191:9 198:6 211:3 224:8 236:17 237:2 245:7 250:24

**exciting** 246:8

**exclude** 148:17

**executed** 324:10

**execution** 323:14 324:19

**executive** 61:7 64:12

**exhibit** 4:7 5:2,4,6 5:9,11,13,17,19,21 5:23,25 6:2,5,7,9 6:12,15,17,20 23:23 24:5 52:18 63:18,24 66:9,16 97:18 98:1 108:18 108:21 137:8 141:20 142:3 166:6,14 174:16 174:23,23 183:20 184:13,20 191:8 191:15 198:5,12 206:23 207:5 211:2,9 216:4 218:18,25 222:20 222:21 223:6,7,20 224:7,14 232:21 233:5 236:16,24 245:6,15 250:23

251:4 296:5,13
**exhibits**  4:3,8 5:1
  289:25
**exist**  88:21
**expect**  63:9 81:1
  241:14 259:16
  273:24
**expected**  39:23
  269:12
**expecting**  60:13
  60:16
**experience**  27:8
  28:2,24 31:24
  59:21 60:2,25
  105:22 111:22
  168:14 171:12
**experienced**  45:13
  45:15 234:6
**expert**  40:11,14,17
  40:21 41:3,4,9
  52:21 56:1,7,10
  65:24 95:2 102:4
  111:12 122:4
  199:15 300:21
**expertise**  152:13
  269:18 303:22
**experts**  105:9
**expiration**  323:19
  324:25 325:25
**expires**  321:17
**explain**  33:16
  129:4 145:17
  151:4 169:11
  190:17 269:17
  288:14,25
**explained**  155:2
**explaining**  160:5
**explanatory**  31:16
**explorys**  201:5,9
  202:25 203:1,20
  206:10,12

**extent**  20:1 43:7
  118:20 121:21
**externally**  89:10
**extracting**  201:5
**extracurricular**
  92:17,21
**extrapolating**
  47:14

**f**

**f**  2:20
**f11**  195:17,19
**f11.1**  195:18,25
**f11.20**  195:25
**face**  31:19 228:10
**facilities**  160:4
**fact**  136:1 165:5
  229:12 244:13
**factor**  131:14
  293:21,23,24
  299:21
**factors**  294:3
  297:22 298:1,15
  298:20,24 299:3,4
**fails**  103:6
**failure**  103:6
**fair**  35:15 45:17
  77:11,25 84:6
  104:21 105:1
  148:25 151:7
  227:11 265:24,25
  314:3 317:4,8,14
**fairly**  305:2
**familiar**  262:20
  271:2 272:19
  274:7 275:14
  276:16,20
**families**  247:11
**far**  33:8 38:20
  97:2 101:9 113:5
  128:21 131:17
  136:16 176:20

177:16 178:16
  202:3,6 233:20
  254:1 262:2 271:4
  276:24 286:17
  288:10 290:2
  293:16,21 295:6
  298:11 311:19
  312:5 316:18
**fatalities**  186:4
**fda**  276:17,24
  277:9 282:3,10
**february**  5:21,25
  167:9 184:14
  198:6,17
**federal**  244:21
**feel**  18:6,14 32:2
  103:17 296:14
**feinstein**  2:15 4:5
  15:11,12 51:17
  134:24 135:4
  147:20 265:2,6
  304:2
**felt**  238:16 251:23
**females**  234:22,25
  235:13
**fentanyl**  121:4,5
  121:11,17,24,25
  122:1,11,12,16
  124:15,24 125:1,8
  125:17,21 126:2,4
  126:23 127:5,6,7
  180:21 213:8,11
  213:12,14,15,17
  213:18,19,21,25
  214:4,25 215:2
  216:16,20 221:24
  222:5 225:16
  226:21,23,25
  227:7,17,17,24
  228:3,19,21 229:5
  229:12,19 230:4

230:10,16,24
  231:7,17,25 232:5
  301:24,25 302:2,4
  302:4,8,16
**fewer**  244:16
**field**  40:17,19 88:2
  199:16 300:21
**fields**  88:2
**figure**  59:17 81:10
  81:25 87:21 88:4
  153:7 174:7
  212:23
**figuring**  291:25
**file**  252:16 296:16
**filed**  270:11
**files**  252:15 295:7
**filled**  314:11
**filling**  107:9
**financial**  59:18,20
  60:1,9
**find**  102:24 125:20
  174:2,2 233:20
  253:8 273:19
  291:2 322:11
**finding**  34:2,3
  249:4 250:16
**findings**  279:18
**fine**  248:23
**finish**  18:11,11
  49:12 146:7
  304:16
**finished**  18:13
  146:8 189:19
  201:8 205:10
**firs**  173:6
**first**  16:16 17:22
  19:10 20:17 21:1
  21:14 54:18 71:16
  82:2 83:24 98:13
  106:24 115:10,16
  115:25 124:18

137:23 143:2
144:14 149:5
152:2 154:13
155:4 157:14
158:11 166:21
183:21 184:25
191:18 194:5
198:15,21 205:16
214:15 224:19
246:3 248:16
249:9 257:18
263:24 266:5,10
281:22 294:16,24
310:6 317:24
320:10
**five** 50:7,8 172:22
183:25 184:5
221:19,21 223:12
223:15 224:3
**fka** 3:14
**flip** 143:2 148:18
157:16 303:16
**flipping** 127:13
**floating** 103:19
**floor** 2:16
**focus** 49:7 107:1
143:1 151:23
**focused** 28:2 50:13
50:15 249:15
250:2
**focusing** 173:6
**follow** 265:12
305:6
**following** 194:14
194:15 196:25
197:3
**follows** 16:17
**food** 57:25 276:13
**force** 5:11 67:14
68:4,12 70:23
92:6 108:22 109:5

109:20,21 111:25
113:13 129:14
142:19 295:15,15
295:20,23 296:12
296:22 297:2,11
297:17
**foregoing** 320:16
320:21 323:13
324:18
**forensic** 160:25
**forgive** 168:8
317:19
**forgot** 21:7
**form** 22:16 23:18
27:10 31:20 33:18
35:13 40:3,13
43:15 44:7 45:14
46:12,23,24 48:24
50:17,24 51:13
54:12 56:3 60:15
61:5,22 64:25
68:23 71:7 74:3
76:16 77:9 78:22
79:10 80:14 82:25
83:1,6 86:3 91:7
93:24 94:23 95:7
96:13,24 100:18
104:13,23 105:6
107:21 114:19
117:17 118:6
120:7 122:2,13
125:13 127:8
130:17 132:2
133:18 134:2,19
134:20 135:12
136:9,15 139:18
141:4 145:3
146:22 149:12
150:4,11 151:19
153:16 154:2,9,22
154:23 155:10,18

156:2 163:4
167:11 169:8
170:2,3,17 171:18
172:8,9 179:12
180:7 181:1,11,25
182:25 187:5
189:12 190:8,9,22
195:20 196:3
199:24 200:7,21
203:16 205:14
208:4,19 210:3,16
213:20 215:25
216:17 217:5
218:1 222:14
223:5 226:4
227:14,18 228:5
228:15 229:15,20
229:24 230:20
232:10,18 234:8
235:21 236:7
238:24 240:3,7,13
240:17,22 241:6
241:16 242:1,10
243:9,15 249:17
250:9,19 252:15
252:19 255:9
256:13 257:23
259:18 260:4,8
261:14,20 263:14
264:2,8,15 269:22
277:12 278:19
281:14 282:7,16
283:17 284:8,21
285:2,25 291:18
294:11 297:3,13
298:2 299:17
300:2 302:10
303:21 305:13
306:8,14 308:15
309:11,23 313:3
313:21,22 315:2

316:4
**formal** 36:7,9,10
36:19 38:12
**formally** 36:11
**format** 46:16
48:14 143:15
178:8 251:21
252:5
**former** 25:2
307:20
**forth** 44:23
**forward** 144:21
148:15 153:23
154:8 155:15,25
228:8 322:15
**forwarded** 185:12
186:2 197:10
247:16 248:3
285:1
**forwarding**
191:21 224:22
**found** 34:7,10,14
34:19 157:19
158:1,6 190:1
213:9 214:23
**four** 20:14,14,15
38:22 53:2,6
55:14 79:12
128:13
**fourth** 20:24 22:6
137:24
**francisco** 3:9
**franklin** 2:21 4:5
15:14,14 304:6,13
304:18 318:2
**freak** 34:11
**free** 18:6,14 32:2
296:14 323:14
324:20
**frequent** 74:1

**frequently** 93:16 168:5 287:7
**front** 3:9 28:15 269:16
**full** 17:4 287:4 288:2
**fund** 221:4
**funded** 193:1 235:6
**funders** 220:25 221:3
**funding** 48:20 221:9 251:15,19 252:23 276:23
**funds** 276:25 277:3
**further** 88:10 172:15 212:1 246:17 290:5 304:3 318:4 320:19 321:1
**future** 39:1

**g**

**g** 147:23
**gained** 47:21 311:17
**garbage** 77:18,18
**garro** 247:16
**gas** 208:11
**gashash** 185:11
**gather** 118:14 208:22 251:19
**gathering** 69:15
**gathers** 175:18
**geared** 112:20
**general** 71:3 89:8 89:14 182:24 276:22 292:23,24 299:2
**generally** 77:6 112:1,6 124:22

165:17 200:11 202:23
**generate** 97:9,13 128:19 211:23
**generates** 128:20
**geographical** 57:10 171:23
**geographically** 170:6
**gerald** 17:6
**getting** 49:6 79:25 96:3 133:3 146:11 147:14,15 163:24 167:3,16 209:1
**gis** 28:8 57:8,9,12 57:15,20 58:16 59:1 88:3
**give** 49:3 60:20 75:9 85:10 101:12 146:16 161:12 162:5 164:24 181:4,5 204:16 244:7 303:15 319:1,10
**given** 19:4 35:12 82:6 188:9 320:13 320:18
**giving** 48:20 102:21 160:4 269:7
**go** 17:19 42:8 58:9 82:4 103:3 115:9 128:8 152:16 157:18 160:1 183:10,20 196:14 202:17 219:17 236:8 244:8 256:18 264:19 269:16 290:5 291:1 305:7

**goal** 49:14,16 61:3 247:7
**goes** 34:8 44:22 105:10 110:21 246:14
**going** 17:20,24 19:11 35:1,17 49:14,16 67:9 73:11 75:19 81:18 81:25 82:16 101:11 102:25 107:16 108:3 120:8,11 124:3 136:2 144:17,21 148:14 168:23 174:3,9 178:15 181:7 183:11 184:7 277:10 288:19 295:9 303:15 311:13
**good** 17:1 73:4 75:4,6 76:6,15,24 134:22 183:12 248:14 265:3,5 304:14,15
**gosh** 192:15,17 193:6,20,21 194:1
**gotten** 176:24 177:6,10,14
**government** 177:22
**grad** 29:11,13 281:24
**grand** 6:18 245:7
**grande** 25:2,3,6 41:21 94:13 95:1 109:17
**grant** 2:17 245:21 246:9
**graph** 119:1 122:24 123:6,7,19

123:20,21 128:3 133:7,8,10,12,14 133:23 148:24 149:16,23 150:7 158:11,23
**gray** 44:17
**great** 16:3 62:5 168:4,4 244:23 261:23 315:18 318:4
**green** 85:15,21 87:7,13 149:2
**greg** 16:9
**gregory** 3:15 64:9 64:13 65:6
**gregory's** 65:9
**gregory.schinner** 3:17
**grocery** 57:19,24 85:23,24 86:9,11 86:24 87:22 88:5 88:17
**ground** 17:19 265:14
**group** 107:1 145:12 244:1 306:22
**groups** 49:7
**growth** 62:4,6,8
**guess** 26:16 37:15 60:18 65:3 80:7 86:25 100:21 114:14 150:6,12 189:10,14 291:11
**guessing** 37:23 185:17
**gun** 34:22
**guns** 34:3,6,14
**guru** 64:21,24 66:4

**guys** 318:8

**h**

**haha** 67:21 70:15
**halfway** 42:7
**hand** 158:12,19,23
  162:10 186:19
  221:15 292:19
  321:6
**handing** 63:23
**handle** 61:14
**hands** 163:11
**happened** 71:5
  143:12 149:10,14
  256:21,22 257:1,2
  268:20 310:9
**happening** 33:9,14
  33:15,23,24
  238:17
**happens** 259:2
**happy** 70:25 244:8
  305:1,3
**hard** 147:25
  189:24
**harm** 228:19
**harms** 163:23
**hassle** 114:3
**hazards** 58:17
**head** 50:4 64:14
  101:9,23 111:15
  131:24 139:25
  165:16 237:21
  278:12 285:20
  286:17 295:19
  297:14 299:11
**health** 2:9 3:12 6:9
  15:10 17:3 25:13
  25:16,23 26:9,9,11
  26:18,23 27:3,4,9
  27:16 28:2,5,9
  29:16 31:3,6
  32:19 33:3 35:25

36:2,13 39:11
49:6,20 56:24
58:16 66:25 69:24
90:14 99:3,6,7,9
99:10,11 100:10
100:16 101:16,17
103:10,14 116:5
116:11,19 117:8,9
117:11,13 118:4
118:12,18 141:7
168:16,24 169:7
169:17,20,25
170:1,8,11,15,16
170:22 171:13,17
171:24 173:1,7,10
173:16,22 177:23
188:19 201:19
224:8 225:1,2,5,6
225:10,11,13,15
226:7,8 232:9,16
253:24 254:16
263:18
**hear** 16:3 17:15
  121:14 177:24
  197:20
**heard** 77:18 105:8
  110:10 121:20
  193:14 263:12
  264:10 266:14,17
  270:21 274:12,14
  274:16,22,25
  275:2,4,6,9,11,13
  275:15,17 282:9
  294:19,21 307:1
**hearing** 239:17
**help** 26:24 27:5
  61:13 68:14,16
  71:2,25 74:22,22
  114:22,25 130:6
  135:6,17 161:16
  175:10,12,13,17

179:17 182:19,22
183:2,8 190:4
195:6 207:12
221:20 222:11,25
223:13,16 224:4
248:24 256:21,25
259:2,5 284:2
288:7 294:3
**helped** 69:2 95:13
  208:21
**helpful** 33:21 35:2
  115:7,8 316:15
**helping** 26:8 49:5
  207:17 208:22
  259:7
**helps** 72:2 152:18
**hereinafter** 16:16
**hereunto** 321:5
**heroin** 64:18
  65:12,17,22 91:13
  111:10 180:3,18
  181:10 182:14
  185:19 186:12
  187:1,3,8 221:23
  222:1 229:6,13,19
  230:4,10,18,25
  231:8,18 233:21
  234:1,23 235:2,14
  301:23
**heroins** 223:21
**hey** 81:22
**hi** 16:6
**high** 119:25
  131:10 132:15,18
  133:1,4 136:5,7,17
  168:15 169:24
  171:13
**higher** 37:19
  81:23 82:10 149:7
  149:24,25 239:12
  240:20

**hindered** 255:6,23
**hindrance** 256:4,4
**hired** 24:17,18
  56:9 154:13
**historical** 260:7
  261:12,17
**historically**
  259:24
**history** 259:19
  260:10,10 261:1,8
**hoard** 70:4
**hoarder** 69:10,12
  69:21,25
**hoarding** 69:19,22
**hoards** 69:13
**hold** 16:20 40:16
  40:20 41:3,8
**holdings** 3:14
**holds** 201:12
**holes** 203:24
**home** 17:7 23:14
**homicides** 161:11
  161:16
**honest** 44:23
**honestly** 228:16
**hood** 35:4
**hoped** 60:24
**hopefully** 159:15
**hospital** 103:4,5
  201:13 203:2,12
  203:14 204:3
**hotspots** 167:5,20
**hour** 20:18 37:18
  183:12
**hours** 37:18,19,21
  37:25
**house** 42:3,4,5,7
  42:11,24 43:1,3,12
  193:2 219:17
  235:11 264:11
  304:20

**huber** 246:4
**huh** 63:8 74:20
   117:23 118:1
   126:17 138:19
   143:5 148:22
   248:6 294:7 298:8
   300:17 301:21
**hundred** 50:16,23
**hutzell** 1:19 4:4
   5:7,13,17 6:15
   15:5 16:14,18
   17:1,6 24:4,6
   28:14 52:16 64:21
   64:23 66:11 67:9
   98:16 108:15
   137:5 141:21
   166:7 236:18
   265:1,4 303:18
   304:3,12,14 320:9
   322:8 323:4,9
   324:4,13 325:20
**hydrocodone**
   111:19
**hypothetical** 86:6
   86:8

**i**

**icd** 187:24,25
   188:3,3,4,11,12,14
   188:25 191:1
**icd10** 196:11,13
**icd9** 196:11,14
**idea** 129:22 130:1
   140:13,16 246:15
   246:22
**identical** 138:21
**identification** 24:2
   63:21 66:13 97:23
   108:25 141:25
   166:11 174:20
   184:17 191:12
   198:9 207:2 211:6

218:22 224:11
   233:2 236:21
   245:12 251:1
**identified** 88:21
   180:16 288:21
   299:5 312:23
   313:6
**identify** 15:7
   247:8,10 254:22
   255:15 291:2
   293:5 294:3
   314:22 315:4
   317:9,15
**identifying** 197:12
   248:20
**illegal** 194:9 197:7
   236:4
**illegally** 34:22
   228:20
**illicit** 23:1 110:6
   122:1,6,11 126:3
   127:7 180:15,20
   213:14,17 222:13
   222:15 223:4
   283:15,24 284:6
   284:14 300:6
   301:2 302:4,8,16
   302:20 303:1,6
**illness** 26:23 27:4
   254:16
**illnesses** 26:9 27:3
   49:6 253:24
**impact** 73:7 77:13
   161:3,12,17 262:2
   292:17 293:2
**impacted** 252:20
   292:16
**impacting** 252:9
**impacts** 78:12
   293:4

**implementation**
   173:5,23
**implied** 107:3
**important** 39:22
   83:20 84:12,14
   106:10 109:24
   129:25 144:24
   159:25 180:23
   181:3 225:1
   253:14,20 254:18
   254:21 255:12
**impression** 243:12
**improper** 309:21
   310:1,13,17
   311:15 312:13,16
**improve** 49:19
   89:11 96:18,21
   106:15 107:16
   108:3 179:9
**improved** 96:16
**improvement** 25:5
   89:3,7,11 94:21
   316:11
**improving** 49:24
   97:3
**inaccurate** 155:19
**inappropriate**
   245:1
**incarnate** 54:9,11
   54:16,24 55:1,14
**incidence** 76:6,14
   76:24 144:6 152:8
**include** 31:8 43:9
   129:1 160:24
   180:14,17,18,20
   186:25 194:16
   195:24 203:14
   239:1 240:25
   285:17 299:20
**included** 119:17
   119:20 148:14

151:12 153:3
   156:11 202:9
   205:16 261:16
   308:13,20 322:13
**includes** 28:3,17
   182:2 192:18
   282:4 296:13,20
**including** 20:14
   129:14
**inclusion** 154:20
**inclusive** 197:4
**incomplete** 167:12
**inconsistencies**
   144:9 147:1
**inconsistency** 74:1
   74:9,11 75:4
**inconsistent**
   143:24 144:1,7
   146:25 147:6,7
   148:4
**incorporated**
   324:12
**increase** 34:6,24
   214:3 215:23
   217:3,23 225:16
   226:21,22 227:6
   227:12,24 229:8
   232:6 302:8,16
**increases** 163:9
**increasing** 226:2
   226:16
**independent** 37:5
**independently**
   230:13 242:12
**indepth** 34:9
   35:16
**index** 4:1,3 5:1 7:1
**india** 261:23
**indicate** 28:1
   60:23 69:5 71:10
   99:17 126:1 133:8

133:12 149:16
165:14 171:15
187:13 201:4
202:10 210:14
233:14 246:14
252:12 257:18,21
**indicated** 67:13,17
68:17 70:24 74:6
139:9 146:17
160:8 161:2
167:23 186:6
190:3 204:5 234:5
238:14
**indicates** 122:9
125:7 133:10
138:24 143:3
148:23 152:2,3
172:21 185:22
209:13,23 227:12
**indicating** 157:25
165:18 205:23
322:13
**indication** 151:18
**indicator** 115:15
134:14 144:20
**indicators** 113:13
113:17,21 114:5
114:16 115:2,4,7,8
115:21,21 131:17
140:6 143:3,21
148:6,9
**individual** 57:19
64:9 106:24
129:12 223:1
257:18 258:21
282:13 314:23
**individuals** 71:5
180:24 182:23
225:25 226:13
258:17

**industries** 2:14
**inflammation**
200:14
**influence** 72:18,22
106:20
**info** 167:3,16
**inform** 106:17
181:8,14 268:5
**informal** 36:8
**information** 57:10
88:4 95:12,17
107:12 134:11
160:18 163:21
164:1,3,7 192:19
192:20 193:9
202:6 212:8
232:12 233:15
235:23,24 238:9
239:21 240:25
241:2,18,22 242:6
251:15 256:17
258:6,16,23
271:22 274:4
276:9 282:4
284:18 285:6,22
287:3,5 288:5
289:3 302:6 306:5
306:11 317:22
**informative** 73:11
**informed** 163:19
193:25 256:16,17
**inhalation** 182:14
**initiated** 161:25
**initiative** 38:2,4,6
55:22
**injectable** 271:13
273:11,12
**injectables** 90:1
271:12 273:6,14
273:16

**injury** 166:3
**input** 46:18
**inputs** 77:6
**inputting** 46:22,22
**insecurity** 58:1
**insert** 168:16
169:24 170:8
171:13
**inserts** 282:10
**insights** 48:5,5,11
51:6 52:2 96:21
**instance** 42:22
76:12 85:11
188:18 230:9
232:3 252:18
286:19
**instances** 231:16
231:24
**institution** 55:17
**instruction** 313:1
313:9 319:2,10
**instructs** 18:20
**insys** 275:11
**integrity** 73:1,6
**intend** 213:12,13
**interact** 272:2
273:24
**interacted** 272:8
**interaction** 263:17
273:17 308:3
**interactions**
273:22
**interchangeably**
113:9
**interested** 178:22
180:4 252:21
308:10 321:3
**interesting** 39:8
233:20
**internally** 89:10

**internship** 25:10
41:19 42:3 76:1
**internships** 56:14
58:4,11
**interpret** 44:5
107:10 155:3
**interpretations**
76:11 96:4
**interpreted**
107:14
**interpreting** 96:10
155:6
**interrupted**
169:15
**interrupting**
132:10
**intervention** 25:19
**interviewing**
60:22
**intoxication**
194:19
**introduced** 17:2
274:10
**investigate** 116:22
118:4
**investigating**
83:24
**investigation**
160:10,12,15
167:24 258:5
285:15,17 288:8
**involve** 196:12
228:3
**involved** 105:16
159:18 161:10,15
190:14 262:18
267:11 273:8
277:18,25 286:16
288:3 289:15
**involvement** 29:3
89:15 90:3 220:23

269:18 271:15
299:6 316:9
**involves** 192:13
**involving** 94:5
225:17 226:23
227:7,13,15
267:12
**issue** 33:10 88:1
172:17 179:18
183:7 186:19
223:2,4,8
**issues** 43:13 58:2
131:12 132:16,18
132:21 133:1
292:19
**it'll** 201:7 206:1
**items** 114:12
115:5

**j**

**j** 3:20
**j&j** 270:20,23
**jackson** 1:22
**jail** 42:8
**james** 2:4 15:22
**janssen** 3:3 15:17
90:8 263:5 270:15
270:19,23 271:3,6
271:22 272:3
273:18,20,23
274:3 277:17
316:19
**january** 1:20 5:19
15:2 59:16 60:19
63:3 101:15
174:17 175:21
176:4 220:1 321:8
322:4
**jargon** 190:15
293:16
**jennings** 162:9,23
163:14,17,19

164:13
**jerry** 19:18,19
64:10,20 65:6
113:19 114:7
115:23 123:8,16
140:11,21 145:9
145:15 185:1,13
191:19 197:10
224:23,25 225:21
228:13 233:9,15
247:17,18,19
266:11 268:4,12
268:15 284:25
297:9
**jerry's** 140:13
**jledlie** 2:7
**job** 27:22,23 38:8
50:21 51:1,2
52:25 54:2 78:8
91:5,16 95:6
118:5 294:18
**joe** 3:24
**johnson** 3:2,2
15:18,18 263:5,5
270:15,15 271:3,3
271:22,23 272:3,3
274:3,3
**join** 289:12
**joined** 261:5
280:16,23 281:9
**joining** 25:17
26:12 27:7,17
41:14 45:21 65:19
91:2,14 94:16
109:14
**joke** 70:13,15
**jones** 2:21 15:15
**jonesday.com**
2:23
**journal** 267:1,9
278:23

**journals** 278:17
278:20,21
**journey** 257:5,8
**judge** 1:9
**julie** 63:14
**july** 101:19,20
120:22 124:14,23
215:24 264:5
305:15,19 321:17
**june** 101:19,20
120:22 124:14,23
295:20
**jurisdiction**
220:10
**jurisdictions**
150:1
**jury** 315:19
**justice** 42:25 90:4
271:16 273:2

**k**

**k** 2:16,20
**kearse** 21:8
**keep** 173:19
**kelly** 1:22
**kenne** 30:7,8
**kent** 17:9 29:14
30:9 36:22 55:4
55:14 58:16 67:4
67:7
**kept** 140:15
**kernel** 76:4
**key** 113:13,16
114:5,17 115:1,3,6
115:15,20 131:17
134:14 140:6
143:3,21 144:20
148:6
**khoury** 272:10
**kim** 239:4,20
240:11 242:7
243:1

**kimberly** 237:3,5
237:6 247:23
248:3 312:5
**kind** 25:16 29:1,6
31:13 35:4,22
42:6,13 44:16,22
60:1,12 61:12
62:8 72:11 93:10
128:11,18 131:13
142:21 146:13
174:11 175:25
176:18 178:13
184:3,7 188:5,6
199:10 201:11
203:4,20 258:8
269:17 273:25
293:15 294:8
298:5,7
**kinds** 29:8 30:16
32:1,16 45:12
48:23 49:18 60:23
69:22 70:3 72:8
77:2,2,12 80:23,23
96:21 110:23
132:17 164:6
195:2
**kirimi** 175:2
**klauss** 1:24 320:6
321:14
**knew** 38:7 67:6
185:19 270:14
**know** 18:10,24
21:2,9 24:13 25:9
26:21,22 27:5
28:13 33:6 34:5
34:11,13 39:23
42:7,21 43:6
44:21 46:15 48:21
49:14 50:3 64:13
67:1,3 75:25 76:3
76:4,5,23 79:23

80:7,22 81:1,6,7
81:11 82:11,12,13
82:16 85:20,22
87:18 90:23 91:24
93:3 97:1,2 99:23
101:2 102:3
106:13 110:20
111:10,16,19
112:17 113:5,6
117:10 118:10
120:10 121:10,12
121:16,17,18
122:3,8,9,14,15
123:22 125:6
127:4 128:13,14
130:3,3 131:14
132:24 135:24
136:1,11,21
140:24 144:16
145:21,22 146:12
147:21 149:21
150:13 152:12
153:8 160:5 161:1
162:23 163:22
164:5,9,12,25
167:15 169:1,17
169:18 174:5
175:6 178:23
181:6,9,12 188:2
188:10 192:2,12
192:12 193:22
195:22 196:20
197:4 199:16,21
200:2,3,5,8,19,23
201:1 202:12
203:6 204:2
205:25 206:13
212:21 218:11
221:6,8,11,12
225:8 228:6,16
230:21 232:7

237:15,17,18,18
237:20 238:25
239:17 240:4
242:7,15 243:17
248:4 256:2,3
259:9 262:13,16
262:18 263:1,4
266:18 268:12,14
268:15,17 269:11
269:15 272:14,17
274:18,19 275:15
276:22,23 277:13
279:15 282:11,12
285:16 290:2,3,8
291:16 292:13
294:15 296:17,19
297:14,20,24
298:12 299:19,24
300:4,22,25 301:4
302:7,15 303:4,11
303:23 304:24
306:24 307:14,17
308:1,4,6,10,12,19
309:3,8,15,19
310:9 311:1,2,5,7
312:10,15,18,21
**knowing**  270:24
**knowledge**  71:3
91:17 120:15
121:22 123:5
153:11,18 171:10
174:14 188:13
205:21 218:15
229:8 242:13
263:16 274:5
300:3,8 303:8
309:20,25 310:4,5
310:9,13,20,22
311:12,13,14,15
311:17,19,23,25

**kohler**  160:3
284:25
**kouba**  2:4 15:19
15:19 20:1 21:5
22:16 23:18 27:10
31:20 35:13 40:3
40:13 43:15 45:14
48:24 50:24 51:13
54:12 56:3 60:15
61:22 64:25 68:23
71:7 76:16 77:9
78:22 79:10 80:14
82:25 83:6 86:3
91:7 93:24 94:23
95:7 96:24 100:18
104:13,23 105:6
107:21 114:19
117:17 118:6
120:7 122:2,13
132:2 133:18
134:19 135:12
136:9,15 143:13
143:18 145:3
146:22 149:12
150:4,11 151:19
153:16 154:9,23
155:10 156:2
163:4 170:3,17
171:18 172:8
180:7 181:11
182:25 183:10
187:5 189:12
190:8 199:24
200:7,21 203:16
205:14 208:19
210:3,16 213:20
215:25 216:17
217:5 218:1 219:1
219:3 222:14
223:5 226:4,17
227:14 228:5,15

229:15,20,24
230:20 232:18
234:8 235:21
236:7 238:24
240:3,7,13,17,22
241:6,16 242:1,10
243:15 249:17
250:9 255:9 256:1
257:23 259:18
260:4,8 261:14,20
264:2,8,15 269:22
277:12 278:19
282:7,16 283:17
284:7 285:25
294:11 297:13
300:2 303:21
305:13 306:14
308:15,22 309:23
313:3,21 315:2
322:5

### l

**l**  1:24 3:15 320:6
321:14
**l.p.**  1:14
**lab**  58:17,19,22,25
**label**  5:3,5,7,10,12
5:15,18,20,22,24
6:1,3,6,8,10,13,16
6:19,21 23:25
63:20 66:12 97:21
108:23 141:23
166:9 174:18
184:15 191:10
198:7 207:1 211:4
218:21 224:9
232:25 236:19
245:10 250:25
**laboratories**  275:7
**lady**  19:4
**large**  120:21 121:3
123:2 126:18

162:14 163:1,8
217:2,23 253:13
253:18
**lauren** 66:23
71:16 72:10
**lawful** 16:14
**lawfully** 282:17
**lawsuit** 262:11
266:6,22 267:12
267:22 313:15
**lawyer** 21:6
**lawyers** 19:15,24
20:7,9,10 21:21
22:2 23:2 205:1
243:22 244:2,18
245:3 262:15
266:12 267:20,25
269:16 270:24
313:14
**lead** 280:6
**learn** 19:10,13
40:8 176:15 266:5
266:10 281:22
294:16
**learned** 91:16
269:6
**learning** 91:5
**leave** 59:8 61:24
**led** 257:5 294:4,5
**ledlie** 2:4 15:22,22
33:18 40:4 46:24
50:17 74:3 83:1
96:13 104:22
125:13 127:8
130:17 132:9
134:2,20,22 135:2
136:22 139:18
150:10 154:2,22
155:18 158:4
167:11 169:8
170:2 172:9,16

179:12 181:1,25
190:9 195:20
196:3 204:20,25
205:7 208:4
217:11 226:3
227:18 232:10
243:9 244:5,17
250:19 256:13
263:14 281:14
284:8,15 291:18
297:3 298:2
299:17 302:10
306:8 309:11
313:2,22 314:7
316:4
**left** 61:25 62:18
137:7 158:12,19
158:23 212:11
234:14 253:3
**legacy** 188:5
**legal** 110:6 322:1
325:1
**legally** 282:21
283:5
**length** 20:21,23,25
308:7
**letter** 24:9,23 25:1
26:19,20 28:15
115:13 322:19
**leukorrhea** 199:3
199:23 200:20,23
201:2
**lewis** 2:15 15:12
**lexi** 246:16
**liaison** 2:9
**licensed** 283:8
**life** 242:25 279:23
288:10
**liked** 123:19
**limit** 77:7,13

**limitation** 106:25
**limitations** 73:12
75:12,13,15,17
76:13,21 88:20
96:2,6 106:4,5,6
106:13,16,17
159:2 173:4,21
**limited** 261:12
**line** 120:19 128:3
149:2,3 152:2,7
164:11 175:10,12
175:13,18 179:17
182:19,22 183:2,8
190:4 221:20
222:11,25 223:13
223:16 224:4
245:24 284:2
304:16 322:13
324:7 325:3
**link** 313:18 314:4
314:10
**linked** 228:20
**list** 113:12
**listed** 45:22
113:14 115:16
119:5 157:6
213:21,25 221:25
223:12 224:3,5
281:3 324:7,17
**listing** 324:7
**lists** 181:19 194:15
**literally** 172:12
**literature** 278:23
**litigation** 1:7 15:4
22:11 23:10 265:8
266:15 267:17
268:13 322:6
323:3 324:3
**little** 28:5 34:9
183:11 215:8
261:21 265:13

316:8
**liver** 103:5,6
**llc** 2:3
**llp** 2:10,15 3:3,8
3:19 15:17
**locally** 225:3,21
228:14 266:22
**lodge** 245:4
**logan** 3:20
**long** 20:15,17,19
37:17 90:1 94:15
192:6 219:24
271:12,13 272:25
273:1,6,11,12,14
273:15 303:9
**longer** 148:14
151:12,16,17
185:7
**look** 35:4,16 64:7
78:19 79:8,15
81:24 83:15 87:24
87:25 88:3,6,9
89:18 98:13,20
120:2 122:20
131:13 133:13,23
138:4 150:2 166:1
168:21,22 189:7
194:5 223:20
246:3 254:24
255:16 258:2,11
270:5 293:12
294:2
**looked** 68:10
118:21 125:15
141:9 155:5 164:3
216:10 243:24
259:20 284:24
316:21
**looking** 42:15,17
42:22 52:18 57:25
61:21 62:9 72:15

75:9 76:22 78:17
79:3,4 89:25
111:13 115:14,20
124:20 131:16
132:23 148:6
150:6 153:6
154:12,15 156:16
161:22 183:23
206:11 214:8
215:8 216:19,24
216:25 217:2,21
228:6 244:12
272:25
**looks** 24:16 44:14
106:23 185:12
**lot** 43:1,3 44:21,24
45:5,8 50:6 69:15
91:3,5 94:5 99:1
99:18 104:9
105:11,14,19
125:16,21 131:11
131:15 132:15,20
132:25 170:11
203:24 204:14
252:4 262:1
276:24 281:20
288:9
**louisiana** 2:22
**low** 136:18
**lower** 150:16
239:11 240:20
241:9,10,14 242:9
**lump** 112:2
**lumps** 213:17
**lunch** 137:4

**m**

**m** 2:5 193:15
**macsis** 193:16,17
193:24
**madam** 322:10

**main** 1:22 3:4
272:9
**major** 43:24 212:7
212:10,12
**majority** 90:24
177:17
**making** 29:3
110:22 243:22
256:16 302:3
**mallinckrodt**
275:13
**man** 247:16
**manage** 192:14
193:12
**managed** 47:12
**management** 44:1
44:3,6 46:6,8,10
47:3,7 48:8 51:5
51:11 251:15
271:19
**manager** 58:19
185:6,10 192:5,9
192:11 272:21
**manages** 193:6
**managing** 44:6
**manmade** 110:19
**manner** 107:2
147:4
**manufacture**
271:23,24
**manufactured**
228:20 281:2
**manufacturer**
262:21,23 271:18
274:21
**manufacturers**
263:2 270:16
274:7
**manufacturing**
271:4

**map** 167:5,19
**mapping** 57:8,9,15
57:21 59:1 61:16
88:3
**maps** 57:11
168:22,23
**march** 5:14 24:16
141:22
**marked** 5:1 24:1,5
63:20,24 66:12
97:22 98:1 108:18
108:24 141:24
142:3 166:10,14
174:19,22 184:16
184:19 191:11,14
198:8,12 207:1,5
211:5,8 218:21,25
224:10,14 233:1,4
236:20,24 245:11
245:15 250:25
251:4 296:5
**marking** 66:16
142:2
**mart** 2:20
**marth** 63:14
**mary** 113:19
145:10 185:1,4,18
186:2
**massachusetts**
3:16
**master's** 35:24
36:1,12,21 39:14
55:10
**masters** 2:11 4:4
15:9,10 16:19
17:3 32:19 52:9
107:25 130:24
132:12 136:23
143:17,20 172:13
172:20 183:14
204:23 205:4,8

219:2 226:10
231:2 236:8 244:9
264:17
**math** 32:6 37:24
**matter** 86:20
93:19,21 171:20
245:25 271:10
304:19 306:17
307:5
**matters** 56:10
89:16 316:10,17
**maureen** 2:16
**maureen.barber**
2:19
**mckesson** 3:7 16:8
263:20
**mdl** 1:6,8
**me's** 153:21
155:23
**mean** 18:18 19:1
26:13 27:11,22
31:3 32:10 33:17
40:14,22 45:8
47:1,9,17 62:1
64:23 65:5 67:25
68:16,21,25 69:14
69:20 72:24 73:2
73:10,22,24 74:11
74:14,15 75:3,14
75:17 77:20 78:2
79:11 80:2,15
81:19 82:17,19,21
82:23 83:9 89:8
89:20 90:15 91:8
92:20 95:11,16
99:2 100:20
101:11 103:20
104:4,11 107:5
110:17,25 111:23
112:8 113:24
114:10,11,21

123:18 125:12
133:3 134:21
138:3 146:9,12
149:14 157:7
161:4 163:15
164:11,20 168:18
172:3 182:4 187:7
190:11 197:2
202:16 205:9
209:21 221:2
226:6 231:9
239:14 262:22
269:11 273:10
277:2 278:12
284:20 285:12
286:1 290:2 298:4
300:11 310:3
315:15
**meaning** 86:15
154:6 169:25
192:25 259:8
**meaningful**
151:18
**meanings** 113:8
**means** 18:24 19:4
31:14 53:9 73:14
74:25 78:15 79:4
113:2 117:2
241:10 293:19
**meant** 26:21 27:1
67:11 68:2 81:15
147:13 153:8
154:21,25 155:11
163:25 168:21
217:10 239:16
248:21,24 270:18
**measure** 161:17
**measurement**
161:3
**medical** 52:4 70:5
90:11 94:6 99:5

99:13,15 100:3,6
100:11,17 101:13
102:10,15 103:10
103:14,21 104:16
105:3,8,12,17,22
106:1 125:3,11,15
126:1 127:12
153:6,14 156:7
157:11 158:14
160:20,23 167:25
172:22 173:10,18
177:12 199:2,9,16
199:19 200:9
208:11 209:3,7
210:12,13,18
211:23 213:22,24
215:1 218:7,11,15
229:11 230:3,15
230:22 231:5,10
231:20 243:11
251:16 252:19
256:19,25 257:7
257:17 258:4,12
258:15 259:1
284:3,11,19,22
285:10,13,21
286:6,7,12 287:6
288:6,13,22 289:4
289:9,15 290:11
291:12 303:24
**medication** 110:5
163:9 165:12,20
202:11 205:24
278:5 285:24
308:25 309:5,17
312:25 313:8
**medications**
129:17,22,23
130:4,7,15 131:3
135:7 162:4,15,17
163:2,24 164:10

165:6,24 166:3
253:9,11,19 254:8
258:9 276:1,3,6
277:1 278:8 311:4
312:7
**meet** 19:24 20:7
21:4,19 22:1
**meeting** 5:14 6:7
19:25 20:8,11,17
20:20 21:1,14,17
21:17,20,24,25
22:7 67:15 113:18
115:22 140:17,18
141:22 142:15
145:8,15 160:3
218:20 219:8
295:20,24 296:2
296:10,11,14
297:11,17
**meetings** 20:16
21:12 112:18,20
112:25 113:6
295:15 312:2
**members** 247:3
298:13
**men** 235:4,17
**mental** 25:13,16
25:23 26:8,9,11,18
26:23 27:3,4,8,16
28:2,5,9 29:16
49:6,20 56:24
69:24 90:14
253:24 254:16
**mention** 61:12
**mentioned** 35:5
40:24 46:4 51:4
52:20 56:14 61:19
70:9 78:14 79:1,2
79:3,4,13 86:20
91:1 94:12 97:8
97:11 98:8 105:15

124:13 152:23
158:24 215:16,22
223:16 253:9,19
254:7,8 270:14
272:24 274:6
292:2,4 298:21
314:20
**mentions** 152:22
**mentor** 93:12
**mentoring** 93:16
**merging** 291:11
**met** 20:10 21:5
265:8 304:17
**meth** 222:3 238:6
239:9,25 240:12
241:12,24 242:21
**methamphetamine**
28:4 29:17,18,22
29:24 30:4,12,17
119:20 120:5
221:23
**methamphetami...**
119:24 120:9
225:18 226:2,15
226:24 227:8
**methodologies**
31:10 44:5
**methodology** 31:8
31:9,14,14,18
**methods** 32:11
33:7 40:25 41:1
44:15,18 182:13
**metrics** 48:25
116:15 145:23
**michael** 3:20 16:4
**middle** 71:17
143:10 294:8
**midwest** 322:17
325:1
**mike** 243:20

**mind** 260:21
**minded** 70:17
**mindful** 18:8
204:22
**minute** 255:11
264:20
**miscommunicati...**
99:1,18
**misleading** 303:12
**misrepresented**
274:3
**missing** 203:24
205:18
**mississippi** 317:20
317:24
**misstate** 292:3
**misstates** 155:19
223:6
**mistake** 81:13
**misuse** 308:20
**misused** 308:14
**mixed** 229:6,13,19
230:4,12,17
**moment** 183:21
225:9
**money** 60:3
221:12
**monitor** 252:13
**montgomery**
137:11,15,20
138:2,10,13,18,21
139:3,7 148:10
151:24 212:8
**month** 115:19
126:16
**monthly** 119:2,6
**months** 172:22
**morbidity** 239:12
240:21 242:23,24
**morgan** 2:15
15:12

**morganlewis.com**
2:18,19
**morning** 17:1 22:7
215:20,22 265:8
270:24 304:17
**mortality** 239:12
240:20 241:9,14
242:9,13,19,21
**motivated** 25:14
**motley** 2:3 15:21
15:23 16:1 21:6
22:2 23:3
**motleyrice.cm** 2:8
**motleyrice.com**
2:7,7
**move** 97:7
**moving** 153:22
154:8 155:15,24
245:14 253:6
**msalimbene** 3:22
**mt** 2:6
**multiple** 104:10
104:19 105:4,20
107:14 159:4
182:3,5 189:25
245:3 259:20
**municipalities**
220:21
**municipality**
220:19
**mute** 17:14

**n**

**n.d.** 1:15
**n.w.** 2:11,22 3:16
**name** 15:5,9 17:2
17:5,6 19:19 21:7
21:10 131:21,23
135:24 193:5
207:10 208:13,17
263:12 265:6
272:7,11 275:16

289:23 304:17
311:1 322:6 323:3
323:4,15 324:3,4
324:21
**named** 64:9
193:14 247:16
320:9
**names** 92:3 263:1
263:4 271:3
290:19
**narcan** 94:7 178:9
**narrative** 286:20
**narratives** 209:13
285:19 286:16
288:9
**nas** 152:7
**national** 1:6 15:4
81:5,23 82:11
306:23 307:1
314:11 322:6
323:3 324:3
**native** 143:15
**natural** 110:16,18
**nature** 25:24
28:21 29:17 30:21
41:13 42:10 57:6
128:4 135:21
220:22
**nearest** 57:24
**necessarily** 73:10
80:2
**necessary** 38:7
241:22 256:5
**need** 18:8 35:23
36:5 37:10 48:10
51:6 54:1 171:5
181:9,13 184:1
186:20 199:3
218:4,13 248:20
249:12,24 250:14
290:5 305:3

**needed** 48:4 52:8
95:14 147:4,15
249:11 285:6
**needs** 17:23 27:20
183:24 248:17
250:8
**neonatal** 144:5,19
151:25 152:10
**network** 290:16
291:7
**never** 27:8 117:15
316:21,24
**new** 31:23 32:5
69:18,20 152:23
153:4,10 290:23
291:17
**news** 246:9
**newspaper** 310:23
**nick** 191:23 192:2
194:7 196:17,21
196:22,23 197:5
**nick's** 197:11
**nods** 17:25
**non** 71:4 225:17
227:8
**nonlawyers** 21:11
21:13,22 22:4
**nonopioid** 261:9
**nonopioids** 226:1
226:14 227:13
228:4
**nonpublic** 177:18
177:19
**noramco** 275:2
**normally** 189:17
**northern** 1:2
**notarized** 322:14
**notary** 53:4 108:2
121:13 131:1
177:24 178:1
197:20 226:12

231:4 318:6 320:6
321:14 322:25
323:10,18 324:15
324:23 325:23
**note** 25:12 26:7
31:2,7 32:7 75:21
157:17 159:1,12
176:10 214:3
256:18 322:12
**notes** 213:6 303:16
**noticing** 82:9
**november** 5:23
6:12 19:12 21:3
191:9 232:22
233:9 266:7,8
**number** 5:1 34:6
34:13 81:22 85:24
98:18,21,24
103:19,25 131:7
133:15,24 134:11
134:17 135:10
138:6,8,16 144:5
144:10 148:14
149:10 150:25
151:15,16 152:3
166:15 180:11
181:19 182:6
186:8,16 187:9
216:20 217:3,11
220:6,8 225:24
226:13 241:1,15
243:3 253:14,18
254:6,7 273:13,15
291:20 309:4
314:2 322:7,13
**numbers** 81:12,23
99:2,5,6,11,16
100:8 101:12
116:8 119:5 128:1
138:11,24 139:4
139:20 144:2

174:23 185:19
186:13 288:1
324:7
**numerical** 149:21

**o**

**o** 317:20
**oarrs** 127:14,16,17
128:1,5 137:7
139:9,15 302:19
302:22
**oath** 18:22 19:2,3
**obesity** 168:25
**object** 7:2,3,4,5,6
7:7,8,9,10,12,13
7:14,15,16,17,18
7:19,20,21,22,23
7:24,25 8:1,2,3,4,5
8:6,7,8,9,10,11,12
8:13,14,15,16,17
8:18,19,23,24,25
9:1,4,5,6,7,8,10,11
9:12,13,15,17,18
9:19,21,22,23,24
9:25 10:1,2,3,4,5,6
10:7,8,9,10,12,13
10:14,15,16,17,18
10:19,20,21,22,23
10:24,25 11:1,2,3
11:4,5,6,7,8,9,10
11:11,12,14,15,16
11:17,18,19,21,23
11:24,25 12:1,2,3
12:4,5,6,7,8,9,10
12:11,12,13,14,15
12:16,17,18,19,20
12:21,22,24,25
13:3,4,5,6,7,8,9,10
13:11,12,13,14,15
13:16,17,18,19,20
13:21,22,24,25
14:1,2,3,4,5,6,7,8

14:10,11,12,14,15
14:16,18,20,21
20:1 22:16 23:18
27:10 31:20 33:18
35:13 40:3,13
43:15 45:14 46:24
48:24 50:17,24
51:13 54:12 56:3
60:15 61:22 64:25
68:23 71:7 74:3
76:16 77:9 78:22
79:10 80:14 82:25
83:1,6 86:3 91:7
93:24 94:23 95:7
96:13,24 100:18
104:13 105:6
107:21 114:19
117:17 122:2,13
125:13 127:8
130:17 133:18
134:2,19,20 136:9
139:18 145:3
146:22 150:4,10
150:11 151:19
153:16 154:2,9,22
154:23 155:10,18
156:2 163:4
167:11 169:8
170:3,17 171:18
172:8,9 179:12
180:7 181:1,11,25
182:25 187:5
189:12 190:8,9
195:20 196:3
199:24 200:7,21
203:16 205:14
208:4,19 210:3,16
215:25 216:17
217:5 218:1
222:14 223:5
226:4 227:14,18

228:5,15 229:15
229:20,24 230:20
232:10,18 234:8
235:21 236:7
238:24 240:3,7,13
240:17,22 241:6
241:16 242:1,10
243:9,15 250:9,19
256:13 257:23
259:18 260:4,8
261:14,20 263:14
264:2,8,15 269:22
277:12 278:19
281:14 282:7,16
283:17 284:7,8
285:25 291:18
294:11 297:3,13
298:2 299:17
300:2 302:10
303:21 306:8,14
308:15 309:11,23
313:2,3,22 315:2
316:4
**objection** 7:1,11
8:20,21,22 9:2,3,9
9:14,16,20 10:11
11:13,20,22 12:23
13:1,2,23 14:9,13
14:17,19 18:16,17
40:4 104:22,23
118:6 120:7 132:2
135:12 136:15
149:12 170:2
213:20 226:3,17
244:13 249:17
255:9 256:1
284:15 305:13
308:22 313:21
314:7
**objections** 243:23
244:3,16 245:4

[objective - opioid]

objective  208:8
objectives  277:24
obtain  53:23 96:22
  102:12 235:24
  282:14,21
obtained  32:13
  209:7 242:6
oc  196:14
occasionally
  275:23
occur  21:1,17
  132:18 133:1
occurred  124:14
  260:9 261:22
occurring  58:23
  114:15 173:25
  174:6 239:18
  254:12,13,17
  255:5,14,21 256:6
  279:25 287:21
occurs  132:22
  169:2
ocd  196:11,13
od  167:5,20 186:3
ods  167:6,20
offer  72:13
office  64:16 99:5
  99:14,15 101:13
  102:15 103:11,15
  103:21 104:16
  105:3,8 153:21
  155:23 156:8
  160:21,23,25
  167:25 172:22
  173:18 218:7
  231:20 251:16
  256:19 258:4
  288:7 321:6
officer  219:16
officers  25:22 34:3
  34:17,18 238:9,11

official  323:15
  324:21
oh  3:5 121:15
  190:12 198:24
ohio  1:2,12,15,23
  17:10 99:6,11
  101:17 117:10
  127:18 148:9,14
  148:20,24 149:2,8
  149:18,22 150:8
  150:15,19 151:1
  151:12,17 225:1,6
  246:13 294:22
  320:2,7 321:7,15
  322:2
ohio's  92:6
okay  17:23 18:7
  18:20 30:23 31:23
  41:11 47:20 52:9
  73:2 74:8 75:8
  83:9 88:7,20,25
  113:11 118:23
  120:13 126:14
  132:5 136:23
  146:9 151:7,25
  155:21 167:10
  176:3 178:1
  180:12 191:3
  194:5 195:6
  202:25 205:8
  215:21 216:7
  218:4 231:23
  244:11 249:21
  265:15,16,21
  266:3,4 273:5
  289:5 292:25
  305:5 306:16
  308:24 310:21
  311:24 314:18
  315:13 316:7,14
  317:21,23 318:2

older  193:18
once  18:13 34:25
  189:19
ones  126:5 128:14
  140:7,10 218:8
  226:25 284:1
online  54:7 185:24
  278:18
op  1:15
operations  89:12
  90:18 160:6
opiate  1:7 5:11
  6:13 15:4 28:10
  28:17,20 29:2
  67:14 68:4,11
  70:23 90:25
  108:22 109:5,20
  109:21 110:3,5,7
  110:14,15 111:17
  111:20,23,23,24
  113:4,13 128:20
  128:25 129:1,14
  129:16 133:6
  137:22 138:6,8,17
  139:22 142:19
  148:8,19 150:7,7
  152:24 159:15
  164:9 178:24
  179:18 186:10,17
  186:22,23 187:4
  187:11 194:13
  196:13,17,24
  197:12 200:15
  232:24 235:14
  253:15 279:3,21
  295:15,20,23
  296:12,21 297:1
  297:11,17 322:6
  323:3 324:3
opiates  102:25
  112:9,21,24

127:21 131:7
  159:18 161:4,9,13
  161:14,17 162:4
  163:23 178:19,25
  179:15 180:14,15
  182:17,24 194:8
  233:21 234:1,23
  235:1 236:5 261:2
  262:3 267:12,13
  278:13 288:1,3
  299:7 301:22
opinion  229:3
opioid  6:2,18 28:3
  43:14 61:21 64:17
  65:11,17,21 70:1,3
  91:13,20 92:8,13
  92:18 93:5,10,22
  93:23 110:11,14
  110:15 111:8,9,10
  111:17,20,23
  112:3,7 113:5
  114:18,23,25
  129:9,16 130:11
  130:13 131:2
  133:9,11,15,24
  134:10,12,17
  135:5,11 136:12
  136:14 149:17
  151:10,18 162:15
  162:17 163:2,8
  166:2 183:7
  194:17,17,17,18
  194:22 195:2,10
  195:14,18,24,25
  196:1,1,15 206:24
  209:15,18 210:1
  210:15 245:7,21
  246:9 247:4,9,20
  248:9 253:21
  254:9,19 255:5,13
  255:22 261:13

[opioid - p.m.]

262:8 263:2,25
264:6 276:3,6
282:14,22 283:3
285:24 286:10
287:22 292:6,10
292:21 293:1,10
293:13 294:4,6,10
294:14,17 295:14
297:18,22 298:1
298:15,20 299:22
299:25 300:6
301:3,7,11,17
305:10,25 306:6
306:13 308:9
309:4,15 315:22
316:2 317:6
**opioids** 22:25 23:8
23:17 61:17 91:4
91:9 94:4 110:24
112:8,21,25
120:14 121:6,7,9
127:21 131:8,15
133:16 134:1
151:16 163:23
180:14 183:3
197:7 201:2
222:13 223:2,4,9
223:11,19 224:2
225:17 227:8
270:16 271:23,24
274:7 275:20,20
276:10,13 280:18
280:20 281:2,7,13
281:18,21,23
282:6 283:7,13,15
283:16,23,24
284:6,14,14
293:25 295:12
299:21 300:1,6,10
300:12,15,19
301:2 302:20

303:1,6,13,19
308:14,21 309:21
310:1,14,17
311:16 312:24
313:7 314:15,24
315:6,21 317:2
**opium** 260:22
261:22 262:7
**opportunity** 62:4
**opposed** 112:21
156:21 182:24
216:21 286:21
**opposite** 74:12
**option** 128:10
**options** 128:11
181:18,19,22,23
**order** 35:23 36:5
52:2 79:5,8 218:5
218:13 256:6
**oriana** 42:3,4,5,11
42:23 43:1,3,12
193:2 235:11
264:11
**original** 80:8
296:15
**originate** 90:6
123:10
**originated** 80:2
90:7
**originates** 67:22
68:3,19 70:10
79:24
**originating** 306:3
**originators** 80:4
**osu** 246:10,12
**outcome** 48:21,21
49:7
**outcomes** 48:16,17
48:23 49:11,25
50:13,15,22 51:8,9
51:25 52:8 176:25

177:7,20
**outlier** 81:2
**outline** 207:17
277:23
**outside** 61:10
92:22,24
**overarching** 94:10
**overdose** 6:12
102:8 103:1
116:16 118:24
119:4,8,9,21,24
120:1,9,11,12
122:21 124:10
126:7,8,9,10,11,15
126:22 127:5
129:18 141:10
145:25 146:21
147:2,9 152:24
173:1,14,15,17
174:5 185:19
186:9,13,16,24
187:10 188:21
189:16,17 209:4,8
209:24,24,25
216:6,8,12 217:4
217:12,24 225:17
226:21,22 227:7
227:13,24 228:2
228:19 230:24
231:6,17,19,21,22
231:23,24 232:4
232:23 234:6
238:22 241:1,15
241:25 243:2,13
254:2,3 257:4,14
279:24 301:5,10
308:19,24 309:8
309:16 312:23
313:6,18 314:4,10
**overdosed** 119:10
119:16,19 120:5

126:12 219:17,21
232:5 314:15
**overdoses** 104:8
115:10,17 116:1
116:15,16 119:14
121:23 122:10
123:1 130:5,8,16
131:4 133:15,25
134:12,15 135:8
135:11 136:14
168:1,15 169:1,6
169:23,25 170:13
170:14,22 171:12
171:16,25 174:12
178:16 185:24
186:8,16 187:8,10
187:15,21 188:19
190:14 215:1,17
215:24 216:1,7
237:23,24 238:23
239:5,6 240:2
249:3,13 250:1,15
308:9,12
**overdosing** 225:25
226:14
**overlaps** 150:2
**overlay** 167:3,16
171:23 172:1
**oversight** 58:21
**overview** 6:3
206:25
**owned** 201:19
**oxford** 2:16
**oxicodone** 180:17
**oxycodone** 111:16
199:4
**oxycontin** 302:1

| p |
|---|

**p** 246:4
**p.m.** 167:9 175:21
246:5 318:11

**pa** 2:17 3:21
**package** 282:10
**padukone** 3:8 16:6
16:7
**page** 7:2 24:22
30:23 71:11,15
98:13 106:3
113:11 115:18,18
115:19 118:23
122:20 124:19,20
124:21 126:6,14
127:13 143:2
148:18 158:3
181:17 198:15,19
198:20,21 209:6
209:11 211:18
212:1 234:11
246:21 253:6
322:13,15 324:7
325:3
**pain** 200:6 271:19
278:5,8
**painful** 200:15,24
**paper** 46:15
251:20,24 252:3
252:15 285:4
**paperwork** 46:14
46:18
**par** 3:13,13,14
16:10 274:25
**paragraph** 28:16
69:6 71:16 160:2
172:21,25 173:14
183:22 213:8
228:24 233:18
239:15,16,19,24
246:20 249:2
252:12
**paragraphs**
159:12 240:9
242:2

**parameters**
141:17
**pardon** 305:17
**parentheses**
115:11 168:16,17
182:17
**parking** 63:4,6
**part** 22:10 28:23
38:2 39:16,22
47:24 51:1,2 55:9
58:11 66:21 78:7
95:5 102:3 105:15
109:10 128:9
144:8 145:8 146:3
173:6 182:15
187:3,6 188:14
196:7,8 197:9
202:23 253:14,20
254:18,21 255:12
259:4 279:9 284:4
284:12 289:25
324:9
**participated**
115:22 277:14
**particular** 39:2
49:9,23 88:17
126:11 188:16
257:19 258:18
288:21 306:13
310:24 312:19
313:19 314:5
317:10,17
**particularly** 115:6
115:7
**parties** 15:8
**partners** 26:3
**partnership** 162:1
**parts** 67:10
**party** 244:3 321:3
**passion** 25:12

**patient** 28:7
188:17 201:6,21
201:23 202:11,18
203:5,15 205:22
205:23 258:21
282:4 314:14
**patient's** 203:23
**patients** 148:20
194:23 195:3
200:6 303:19
**patterns** 26:2,4
57:13 76:7,15,24
159:17 161:9
**patton** 6:15
236:18 237:3,5,6
239:4,20 240:11
247:23 248:3
312:5
**patton's** 243:1
**pay** 235:8 277:4,5
**peer** 280:11
281:12
**pending** 51:18,20
134:25 135:1
**people** 17:13
25:22 26:8 34:15
34:16,16 42:6,18
49:5,9,12 68:10
69:1 80:20,21
88:1 90:2 102:14
113:3 119:2,24
133:3,5 159:5,6
162:5 165:11,22
165:23 175:13
178:24 253:23
258:9 266:17
271:12,14 272:8
289:14 293:25
299:7 308:13,20
309:9

**percent** 34:6,10,12
34:23 49:9,13,15
67:21 68:17 70:9
70:11,12,14 81:4,5
81:7,8 82:10
83:15,17 123:10
209:24 210:5,7,10
210:13 214:4
222:2,4,6,8,10
223:22 234:24,25
235:4,16,18 253:8
**percentage** 50:21
209:14 221:25
234:22 235:13
253:23
**percentages** 288:1
**period** 101:11
125:23 137:23
142:22 213:10
234:5,9
**person** 26:23 31:5
34:21 64:16 65:11
65:16,21 70:18
84:18 91:12,15
92:12 102:22
103:2 104:9
105:20 120:5
159:3 164:14
189:18 195:12
219:21 223:3,18
223:24 231:25
232:4 254:15
257:3,21 272:8
282:23 288:3,21
309:16 312:25
313:8
**person's** 86:13
105:4 160:19
257:8 288:10
**personal** 23:14,17
309:20,25 310:3,8

[personal - prepare]

310:13,20 311:12
311:13
**personally** 310:6
323:11 324:15
**personnel** 219:16
**persons** 223:3
247:9 248:9
**perspective** 71:11
77:21 200:1
**perspectives** 72:3
**ph.d.** 38:13,16,17
38:18 39:16,23
67:5
**pharma** 1:14
**pharmaceutical**
2:14 3:13,14,14
262:21 263:10,13
270:22 271:4,18
276:17,25 277:15
278:1
**pharmaceuticals**
3:3,13 90:9
262:24 274:20,23
**pharmacies**
306:23 307:2
**pharmacist** 110:8
110:20
**pharmacists**
127:18
**pharmacy** 283:2,3
314:19 315:11,14
315:20 316:1
**philadelphia** 3:21
**phone** 16:4 17:14
18:16 29:4 243:21
318:6,7 322:3
**phrase** 77:16,18
155:1,21
**physician** 199:11
199:14 200:11
282:15

**picking** 76:6,14,23
**picture** 144:17
223:17 288:18
**pie** 257:11,12
**piece** 257:10,11,12
257:13
**pile** 296:16
**pills** 309:2,10
**pinpoint** 85:19
**pittsburgh** 2:17
**place** 62:5 102:22
103:8 193:23
320:20
**plaintiff** 244:13
262:16
**plaintiffs** 244:15
**planning** 38:25
246:9
**plant** 110:7,7
**pleasant** 2:6
**please** 16:13 17:4
17:14,14 18:6,11
33:16 51:19,20,23
72:21 74:5 130:23
130:24 132:9
134:9 146:7
154:24 169:15
172:14 181:18
224:25 225:9
226:10 231:2
265:19 290:8
292:3 304:25
313:23 322:11,11
**pllc** 1:22
**point** 101:10
141:11 148:16
150:1 152:15
157:10 162:13
165:3 168:5
172:11 179:25
209:13 244:22

267:19 272:9
279:4 293:8,12
294:2,9,13 297:16
301:2 306:13
**pointing** 98:21
**points** 99:22 101:1
101:22 141:14
**police** 25:21 34:3
34:17 52:4 63:5,7
70:5 76:6,15,24
94:7 147:10
177:13 178:4,11
178:12,14 219:15
238:9,10 242:7
288:11
**policies** 27:15
256:7,11
**policing** 26:2,3,4
**policy** 28:2,9
29:16 254:24
255:7,17,23
256:16
**polster** 1:9
**poor** 282:20
**pop** 101:9,22
**poppy** 110:7
**population** 57:18
57:24 131:8
137:13,17 255:1,8
255:18,25 256:7
256:12 279:22
**populations**
163:25 254:23
255:15 278:14
**portage** 17:12
**porter** 3:15 16:10
**position** 25:7,14
27:22,23 56:16
58:7 60:23 63:15
83:22 89:2 272:12

**positions** 56:19
59:2 62:16
**possession** 22:24
23:2,14
**possibilities**
170:24 171:2
**possibility** 170:25
257:25 258:1
260:5
**possible** 129:6
**possibly** 37:19
69:16 84:20
**postcards** 107:6
107:20 108:6
165:10
**posting** 81:4
**potential** 6:18
213:18 245:8,21
254:24 255:17
299:2,4
**potentially** 71:2
**poverty** 168:25
**power** 152:15
**powerpoint**
113:12 123:23
124:8 143:1,2,6
152:17 157:17,22
161:19 165:2
296:2,5,8,24
**practical** 41:19
**practices** 247:2,10
248:10
**precisely** 172:5
**prefer** 183:25
184:5
**pregnant** 28:4,10
28:17,20 29:2
**preparation** 20:8
**prepare** 19:21
109:7 142:24
256:22 259:13

[prepare - program] Page 36

270:6 296:23
**prepared** 109:10
109:13,16 299:16
317:5
**preparing** 44:20
287:17
**prescribe** 127:20
201:2
**prescribed** 121:11
121:12,16,17
128:22,23 199:4
202:11 205:23
209:14 210:1,15
285:24 301:7,11
309:17 311:4
**prescribers**
162:18
**prescribing**
162:14 163:1,8
166:2 276:9 282:4
**prescription** 1:6
15:4 22:25 92:6
121:9,25 122:7,11
126:3 127:6
129:17,21,23
130:4,7,14 131:3
133:16,25 134:12
134:17 135:7,10
136:13 162:3
163:23 165:6,6,20
180:14 182:17,23
183:3,7 194:8
197:7 209:15,19
210:1 213:14,18
222:13,15 223:2,9
223:11,19 224:2
236:4 275:20
276:1,9,12 281:7
282:14,15,21,23
283:2,4,16,23
284:6,14 285:24

286:9,9 299:21
300:1,6,10,19
301:3,7,11 302:3
302:22 303:13,19
308:14,21 309:10
312:7,24 313:7
314:15,24 315:6
315:21 322:6
323:3 324:3
**prescriptions**
128:21 283:7,9
309:21 310:1,14
310:17 311:6,16
312:14,17 314:10
**presence** 104:19
313:13 320:15
**present** 3:24 15:6
21:11,13,22 22:3,4
38:11 136:5,6
139:21 173:21
195:3 210:20,21
230:24 231:7
296:1 297:1,5,6
**presentation** 6:2
113:12 124:8
161:20 206:24
207:9,22,23,25
208:14,18,20
210:21,23
**presented** 147:1
180:5 194:22
214:21 296:9
312:12
**presenting** 67:18
**preserve** 22:9
**presumably**
247:25
**pretty** 31:21 32:5
89:14 135:23
**prevent** 256:22
259:13

**prevention** 237:7
237:12
**previous** 58:4
78:16 123:4 143:6
238:4,20 239:8
243:4,7
**previously** 31:22
34:4 41:12 56:15
64:10 74:17 76:1
117:20 190:3
227:23
**previus** 258:7
**pride** 66:6
**primary** 68:5 80:5
80:8 247:8
**print** 276:5
**prior** 24:13 25:17
26:12 27:7,17
41:14 42:2 45:21
65:19 67:1 91:1
91:14 94:15
109:14 153:12
157:10 194:1
208:13 260:11
264:5 266:15
295:7 305:11,24
**privilege** 20:4
**probably** 82:2
93:17 102:20
140:18,20 145:17
152:16 206:4
210:17 272:10
281:24 286:11
287:9,9,14 317:24
**problem** 35:12
40:6 64:18 65:12
65:17,22 74:1
91:13,21 93:22
112:3 114:18,23
115:1 133:9
151:18 157:1

169:25 170:9
171:13 186:7
263:25 264:7
305:10,25
**problems** 32:12
41:2 168:6,7,9,11
168:16,24 169:7
169:17,20 170:1
170:11,15,16,22
171:17,24 172:5
**procedure** 319:7
323:5 324:5
**process** 47:2 80:9
83:5 84:12 276:17
276:21 277:7,11
**produce** 123:16
**produced** 23:9
**producing** 68:22
**product** 229:7,14
230:5 272:24
273:7,9
**production** 322:15
322:17,22
**products** 276:18
**professional** 27:8
27:15 58:7 273:20
307:21 308:2
311:15,19,22
**professionally**
52:25
**professionals**
56:21,22,24 57:4,7
57:16,22 58:5,12
127:20 129:24
**professor** 30:9
**professors** 93:9
**program** 5:9
25:21 38:20 39:14
48:19,22 49:4,5,10
49:13 67:5 72:19
72:23 73:3,8

97:19 101:18
173:5,23 220:19
220:24 248:1
254:25 255:7,17
255:24 291:8,10
291:14
**programs** 27:16
49:18,21,23 50:16
50:23 51:9,25
52:7 71:13,20
72:17 237:11,13
237:15 256:7,12
**project** 6:18 25:18
29:22 30:1,4
41:20 70:7 89:23
106:5 161:22,24
161:24 163:16,19
165:25 245:8,22
246:16,22 247:1,5
247:21 248:7,14
249:4,15,23 250:2
250:8,13,16 271:8
272:4,6,20,21,22
316:19,22 317:1
**projects** 58:22
60:24 70:25 93:4
93:6,8,20 94:2,4
94:11 97:11,13
105:14 272:18
**pronounce** 191:25
**properly** 314:24
**properties** 282:5
**proposed** 246:15
246:22 249:24
**protection** 28:7
**protective** 60:17
62:25 63:1
**protocol** 205:1
243:24 244:6,16
**prove** 49:2

**provide** 19:7
134:11
**provided** 16:15
**provides** 148:4
221:13
**providing** 144:17
207:16 208:23
**psychiatric** 253:10
253:24 254:8
**psychiatrist** 199:8
199:20
**psychology** 39:5,7
39:13
**psychostimulants**
225:19 226:24
227:9
**public** 31:2,5
32:19 33:2 35:24
36:1,12 39:11
52:3 100:10 117:8
117:13 118:12,18
128:6 139:13
159:22 162:17
163:10 169:6
171:16 173:10
176:24 177:6,10
177:16 288:17
296:20 315:4,25
320:6 321:14
323:10,18 324:15
324:23 325:23
**publications** 71:1
278:7
**publicity** 266:21
266:24
**publicly** 139:10
201:14 315:21
**publish** 116:7
**published** 97:15
97:16 98:11,12
116:5,8

**publishing** 68:22
**pubmed** 278:22,23
**pull** 296:6,15
**pulled** 287:9
**purdue** 1:14
274:16,17,18
**purpose** 57:20
106:4 165:25
178:10 204:21
219:20 278:25
287:1,19,20 291:9
291:10 295:10
296:4,7
**purposes** 24:1
63:21 66:13 97:22
108:24 141:25
166:10 174:19
178:5 184:16
191:11 198:8
207:2 211:5
218:22 224:11
233:1 236:20
245:11 251:1
287:16 315:14
**pursuant** 319:3,6
**pushing** 262:3
**put** 26:18,20 34:4
46:11 66:4 77:22
77:24 78:3 85:12
85:13 87:3,4
118:15 123:24
124:8 127:22
128:2 168:24
178:7,8 210:24
290:16
**putting** 202:20,21
202:21 208:13
285:1
**python** 45:15

**q**

**q1** 138:18 150:20
**q4** 138:18
**qrt** 6:18 245:8,21
247:11,21 248:1
248:10,21 249:5
249:15,24 250:2,8
250:14,17
**qualified** 320:8
**qualitative** 75:18
257:24 258:6
**qualities** 300:15
**quality** 25:4 72:18
72:18,22,23,24
73:3,7,7 89:3,7,11
94:21 96:17,18
242:24 279:23
316:11
**quantified** 303:5
**quantify** 33:9
303:6
**quantitative** 287:3
**quantities** 162:14
163:1,8
**quarter** 137:23,24
148:21 149:6,11
149:16 150:9
**quarterly** 5:14
141:21 142:14
144:12 296:9,11
296:14,24 297:2
**queries** 139:13,24
140:4
**query** 139:17
**question** 17:22
18:2,5,10,12,18,19
20:6 23:5 26:17
27:19 28:19 46:25
50:18,19 51:17,19
51:20,22 65:2
68:25 72:20 74:4

78:24 83:2 86:1,9
86:13 88:13,16
94:24 95:8 96:14
96:25 100:19
104:14,24 107:22
108:1,2 111:2
114:20 117:18
122:8 125:14
127:9 130:18,21
130:25 131:1
132:3,11 133:19
134:3,7,8,24 135:1
135:3,9,13 139:19
145:4 146:23
149:13 150:5
151:20 153:17
154:3,10 155:16
155:25 162:22
164:22 167:12,13
169:9,22 171:4
172:12,14 179:13
180:9 181:2
185:18 195:21
196:4 197:12,15
199:2,7,11,13
204:23 205:3
208:5 210:18
218:14 222:24
224:1 226:11,12
227:3,19 231:3,4
232:11,16,19
239:20 241:1,5,8
243:2,10 246:2
249:18 250:11,12
250:20 255:10
256:2,14 263:15
265:19,22 281:15
282:20 284:9
286:12 291:19
297:4 298:3,19
299:18 302:11,12

302:14 304:25
306:9 309:12
310:10 314:9
316:5 317:13
**questioners**
243:25
**questioning**
265:17
**questionnaire**
107:1
**questions** 29:9
32:1 175:24 176:1
176:5 244:1
253:22,25 254:6
254:11 259:11
265:11,12 269:1,9
277:24 305:7
318:4,7
**quick** 6:7 51:14
70:6 218:19
219:13,14,24
220:5,6,8,13,23,25
221:5,8,13 236:9
237:19 247:2
**quickly** 143:14
**quit** 132:9
**quite** 61:9 65:1
78:24 172:10
287:8 289:19
**quote** 152:23
155:21,25 259:2
**quotes** 153:3

**r**

**r** 45:15
**radar** 264:13
**raise** 154:16
253:25 254:9
**raises** 253:22
254:11
**ran** 139:13,16

**random** 172:1,2,4
**ranges** 37:18
**rate** 81:5 82:10
83:15,18 144:6
240:21 241:10,25
**rates** 152:8 242:4
**raw** 82:3 139:12
141:1
**reached** 91:16
**read** 91:19,20,23
92:4,5 93:2
131:22 133:22
152:18 155:13,21
226:10 231:2
244:6 246:1 249:1
260:19,19,20
261:3 262:10
267:10 278:7,10
278:12,17 280:11
280:14,17,19,23
281:12,18 306:17
316:14 323:5,6,12
324:5,6,17
**reader** 106:17
**reading** 92:11
105:1,22 106:12
225:7 281:1
294:25 295:4,6,6
322:19
**reads** 245:20
**real** 51:14 143:14
**realized** 156:6
**really** 50:11
111:11 203:21
206:15 236:9
244:23
**realm** 33:3,8 40:9
77:17
**reason** 19:6,9
27:19 34:11
129:20 140:9

151:21,22 156:3
156:15 189:5,10
189:13,15 204:10
213:3 232:8
249:22 250:13
322:14 324:8
325:3
**reasonable** 81:1
**reasoning** 249:7,8
249:9,19 250:7
**reasons** 62:18
292:5
**reassurance** 104:6
**recall** 30:15 93:19
100:1 102:16
145:14,18 165:18
197:19,23,25
198:1 202:13,14
204:12 205:22
222:19 241:21
251:10 260:23
263:7 272:7,12
276:4,7 278:11,14
278:16 279:16
280:2,3,13,15,22
281:1,17 285:21
286:19 297:19
299:8,15 312:8,11
312:13
**receipt** 322:18
**receive** 36:24
54:23 80:10 195:3
221:9 235:1 283:3
**received** 36:19
53:20 64:5 65:4
141:5 284:22
288:6
**receiving** 235:14
**recess** 16:23 52:13
108:12 137:1
183:17 206:19

264:23 304:9
**recidivism** 42:18
42:20,21 43:4
**recipients** 247:15
**recitation** 155:19
**recognize** 24:5
63:25 66:18 98:2
109:2 142:5,6
166:14,17 174:24
184:22 191:16
198:13 207:6
211:9 212:15
219:4 224:15
233:5,12 236:25
245:16 251:5
**recollect** 228:11
**recollection** 22:23
222:22
**recommendations**
162:16 228:24
**recommended**
140:12
**reconciliations**
290:7
**record** 15:2 16:22
16:24 17:2,5
52:11,14 108:10
108:13 136:24
137:2 183:15,18
192:24 203:23
204:6 206:17,20
236:9,10,12,13
258:21 264:19,21
264:24 265:9
288:22 304:6,7,10
318:9 324:9
**recorded** 17:24,24
188:15
**recording** 75:24
**records** 42:14,16
43:8,9,11 52:4,4,5

70:5,6 94:6
105:12,17,23
106:1 125:3,11,16
126:1 153:14
160:6 176:24,25
177:6,7,11,13,13
178:4,11,12 201:7
201:13,21,23
202:18 203:2,5,12
203:14,15 205:22
209:8 210:13
218:16 229:12
230:3 231:11
251:20,24,25
252:3,19 253:2
256:20,25 257:8
257:17 259:1
285:2,5,8,13,22
286:6,25 287:10
288:12,15,17
289:10,15 291:3
299:13
**reduce** 162:18
163:2
**reduced** 165:19,21
320:14
**reduces** 163:10
166:3
**reducing** 162:14
163:1,7 165:5
166:2
**reed** 3:19
**reedsmith.com**
3:22
**refer** 28:14 99:7
152:5,14,14
157:17,22 160:7
176:3 222:21
225:12
**reference** 322:7
323:2 324:2

**referenced** 109:19
140:17 320:13,18
323:11 324:15
**references** 119:13
**referencing** 165:4
212:19
**referred** 296:18
306:23
**referring** 26:4
48:15,16 91:10
98:8 99:8,19
100:22 101:7
112:5,7,11 115:4
124:21,22 131:20
132:25 135:15,16
135:18 146:25
158:8 161:19
164:1 173:8
175:20 176:7,19
176:23 177:5,9
192:21 195:15
206:3,6,7 216:2,3
217:8 229:23,25
234:10 239:2,3
242:4 257:1
283:20 310:25
**refers** 26:3 98:18
126:15 196:13,14
**reflect** 120:11
129:10 137:18
138:1 158:19
181:23 188:20
201:24 217:16
223:17,23 226:19
229:12,17,18
230:16,23 231:6
234:12 257:8
258:16 302:20
**reflected** 18:12
57:1 120:6 183:8
217:13,24 227:4

258:21
**reflecting** 155:9
188:12
**reflection** 137:10
147:5 214:18
**reflects** 120:16
122:6 137:21
138:16 187:20
217:19 223:23
225:24 226:13
228:18 235:19
**refresh** 222:22
**regarding** 167:4
167:17 267:21
281:7,18 283:13
295:11 303:13
315:5 319:2,11
**regardless** 196:16
**regards** 49:25
68:4 74:24 75:16
111:24 292:11
**regularly** 71:5
109:10
**relate** 22:25 69:23
102:25 239:20
281:13
**related** 6:13 22:14
26:6 32:17 53:21
55:2 61:21 88:2
91:9,19 93:5
122:11,16 124:15
125:7,22 126:2
134:12,17 135:11
136:14 158:15,16
186:10,17,22
187:4,11 189:17
194:17,22 195:2
195:10,14,18
213:9 214:4,11
225:16 226:21
227:7,24 228:19

232:24 235:1,14
237:24 238:22
239:6 240:9 242:3
247:20,21 248:8
261:9 267:13
271:19 278:8
298:19 308:8
317:2
**relates** 1:11
132:13
**relating** 23:8,16
27:16 28:10,20
29:2,18,23 30:4,16
38:14 43:14 50:15
50:22,23 55:6,10
56:7,10 58:24
59:3 61:17 63:10
68:11 91:4,12
92:13,18 94:4
125:16 127:5
188:25 228:3
234:23 242:18
278:13
**relations** 185:5,9
**relationship** 175:9
192:10 240:1
241:23 273:2
300:5
**relative** 321:2
**released** 42:19,23
**relevant** 31:7 32:7
32:14 45:22
106:25
**reliability** 78:9,11
78:17 80:24 84:3
84:13 116:22
117:16,22 144:23
**reliable** 73:19 74:7
74:16,18,22 75:10
78:4,5,21 79:6,9
79:16 80:18 83:23

84:8 117:14
118:13,18
**rely** 68:14 80:12
**relying** 84:3
**remaining** 210:10
**remember** 29:10
29:11 30:20 40:5
92:1,2,9 132:1,6,7
139:24 140:3
158:9 204:4,11
228:17 267:6,8,14
280:6 286:13
290:18 297:16
**remotely** 15:7
**repeat** 43:20 51:22
72:20 74:5 76:19
76:20 77:10 86:4
87:1 104:25
107:23,25 130:22
130:25 133:20
167:13 180:9
194:25 215:21
216:23 226:9
231:1 249:20
250:10 265:10
282:18 284:10
297:23 301:8
304:22 308:16
309:24 310:12
311:21 313:4
315:23
**repeating** 270:10
**rephrase** 23:5
27:13 30:2 43:2
50:19 51:24 54:13
56:4 57:21 68:6
78:23 97:4 117:19
130:19 134:9
138:14 145:5
154:24 179:14
182:21 265:20

298:17 305:1
313:23
**replicate** 82:5,7,14
82:17,23 83:4,7,8
83:10,11 106:14
**reply** 245:20
**report** 6:5,7 48:19
63:12 92:7 98:5
102:24 113:22,25
127:14 129:15
137:8 139:9
141:18 144:11,13
144:15 147:25
157:7,12 158:14
158:20 160:12
179:21 181:24
209:12 211:3,22
212:14,18 214:1
217:14,15,20,25
218:20 219:8
258:7 289:21,23
**reported** 144:13
182:23 183:6
221:20 223:13,15
224:3
**reporter** 4:8 16:13
17:25 183:5
185:16 266:3
323:7
**reporter's** 4:6
320:1
**reporting** 73:25
75:1,5 76:2
103:24 127:17
148:3 177:23
**reports** 48:16,17
48:21 61:7 91:20
91:23 92:3,11
95:14 97:8,10,13
98:7 104:2 122:18
132:1 156:17,20

156:24 157:11
160:9,10,14,17,20
160:22,24 167:24
177:20 189:19
214:22,24 223:2,8
230:8,11,23 231:6
231:14 253:7,10
253:20 254:9
258:5,12,15
285:15,16,19
288:8 289:25
298:25 299:9,12
299:16 301:25
**represent** 15:8,10
17:3 157:23
186:15 187:9
196:17 265:7
304:18
**representation**
171:15
**representative**
186:18 272:3
273:18,19,23
274:2
**representatives**
90:8
**represented**
270:25
**represents** 257:14
**reproduce** 82:18
82:19
**request** 65:9,10
159:20 160:14
186:7,12,20
251:14 252:23
324:9,11
**requested** 159:13
186:14 233:16
266:16 319:1,6,10
**required** 48:3 58:7
199:14 322:25

**requires** 52:25
56:16 276:24
282:23
**research** 25:13,16
25:18,25 28:3,3,10
28:17,20,22,25
29:1,16,18,20,22
30:1,6 31:12 89:3
89:7,9,23 91:22
92:18 93:2,4,6,7
94:11,21 106:9,15
131:6,19 132:1,7
207:17 208:8
242:18 271:8,11
272:4,6,16,18
273:8,18 277:6,10
277:23 278:1,4
279:17 290:5
295:1,4,7 316:10
316:19,22 317:1
**researcher** 273:24
**researching**
279:24
**residence** 102:23
**residency** 87:19
**residents** 98:25
**resources** 247:12
248:11
**respect** 51:11 70:1
146:20 149:15
222:20 272:4
282:10 292:21
306:6
**respond** 18:14
238:2,3 239:7
**responded** 26:5
64:20 247:19
248:13
**responding** 142:11
**responds** 168:3
181:17

**response** 6:7 17:23
65:9 70:7 147:2
157:16 168:13
186:6 194:12
200:13 201:4
218:19 219:7,13
219:14,24 220:5,6
220:8,13,23 221:1
221:5,9,13 237:19
240:25 243:1
247:3 254:5
**responses** 145:25
146:21
**responsibilities**
89:1,6 94:20
**restate** 317:12
**restroom** 51:15
206:15
**result** 97:13
121:25 126:22
145:1 161:2 209:8
**resulted** 125:1
**results** 107:4
114:14 159:14
165:15
**resume** 5:2 23:24
24:9 31:1 38:25
41:11 43:19,22,23
43:25 45:23 46:5
57:1
**resumed** 39:25
**retail** 306:23
307:2 314:12,19
315:9,11,14,20
316:1
**retained** 4:8
**retaliated** 262:5
**return** 71:9
**returned** 322:18
**reveal** 20:2 106:6
106:10 306:5

**revealed** 306:12
**revealing** 114:17
114:21 115:6
**reversals** 147:9
**review** 21:16
207:18 208:14
225:9 229:11
230:2 243:11
278:24 279:5,11
279:14 280:1
281:5 288:20
295:10 319:2,6
322:12 323:1
324:1
**reviewed** 105:11
231:10,13 276:8
280:10,11 281:10
281:12 283:22
302:25
**reviewing** 74:10
105:25 278:25
**revised** 212:2,19
212:20,22 213:5,7
**revision** 212:11
**revisions** 212:7
**reword** 18:4
**rice** 2:3 15:21,23
16:1 21:6 22:2
23:3
**right** 22:7 24:24
31:15 46:19 53:14
55:23 63:7 64:18
64:21 67:15,23
69:7 76:17 78:5
88:23 98:22
105:12 109:20
110:1 113:14
116:23 117:2,16
117:22,25 122:22
126:19 127:14
148:11 149:3,8

152:3,25 153:23
157:20 159:6
162:18 163:7
166:25 167:6,21
168:1,11,11
169:21,21 170:14
170:23 172:20
173:2,11 176:6,16
180:15 181:19,20
181:24 182:3,24
183:3 185:2,14
186:4,10 187:21
189:20 190:1,7
191:19 194:10
199:4 200:16
202:20 203:2
208:3 209:9,16
211:13,16 212:4,8
215:2,18 217:14
217:18 218:9
221:15,16 234:17
234:18 236:23
246:10,18,22
247:21 248:5,11
249:2 251:25
252:16 253:4
255:18 270:16
273:3,4 274:8,9
282:15,24 283:4
283:16 285:2
292:7 300:16
302:4,23 305:16
316:20
**rigorous** 277:10
**rise** 227:23
**risks** 162:18 163:2
163:10 166:3
**rite** 307:9 308:3
315:15
**roger** 53:8,9

**role** 28:24 29:19
43:6 94:22 112:13
192:9,12,13 237:9
272:20 277:21
279:9 306:18
307:20 316:10
**roles** 88:25
**rolled** 220:3
**room** 18:16 113:3
123:1 141:10
216:8
**rounded** 122:25
**rows** 214:13
**rpr** 1:24
**rules** 17:19 244:21
304:20 319:3,7
323:5 324:5
**ruling** 172:18
**run** 140:1 175:11
201:7 206:2
**running** 175:17
206:5,7
**runs** 140:2

**s**

**s** 193:15,15 317:20
317:20 322:15
324:8,8 325:3
**safe** 162:5,16
**safety** 163:10
**sake** 304:23
**salerno** 2:5 15:25
15:25
**salimbene** 3:20
16:3,4 243:20,21
244:11,19
**san** 3:9
**save** 290:6,9
**saved** 290:22,23
291:3,6,17
**saw** 125:16 126:5

**saying** 48:11 70:21
75:23 76:10 77:1
81:22 86:14 87:17
97:2,6 118:7,9,10
153:15 170:5,6,19
171:14,22 176:12
178:25 187:14
202:24 217:21
240:5 249:22
270:17,19 281:20
287:25 317:18
**says** 41:12 85:22
86:10 115:11,17
115:25 116:1
149:23 152:7
161:7 162:13
163:7 168:12
181:17 187:18
189:22 202:16
210:8 211:22
215:14,15 223:6
224:25 228:25
229:5,10 237:22
238:1 243:25
244:13
**sc** 2:6 152:3,5
**scattered** 265:13
**schinner** 3:15 16:9
16:9
**schizoaffective**
271:14
**schizophrenia**
90:2 273:1
**schizophrenic**
271:15
**school** 29:11,13
281:25
**schooling** 32:15,16
**science** 45:5,9 71:3
71:12,19

**scientific** 280:17
**scientist** 272:16
**seal** 321:6 323:15
324:21
**second** 16:21
20:19 21:16,17,20
24:22 28:16 46:4
71:15 152:7
162:13 183:22
189:10,13 209:12
234:11 239:15,16
239:19,24 242:5
303:15
**section** 106:3,5,17
209:11
**security** 34:17
63:5,7
**see** 42:22 57:17
62:11 71:13 77:5
80:25 82:3,5
83:16 123:2
126:18 129:21
137:12 157:18
159:17 161:9
181:12,18 184:7
198:25 202:18
203:11 215:19
223:21 224:25
227:2,20 228:22
233:25 244:1
258:8 266:24
286:20 287:5
289:13
**seeing** 147:17
167:7 225:3,21
228:14 286:13
290:4
**seek** 38:5 186:20
186:23 219:21
**seen** 18:1 60:19
202:8 204:3 219:9

266:21 270:11
275:19,22 276:2,5
303:12
**select** 128:10,12
128:15
**self** 31:16 32:15
248:22 260:15
**send** 201:8
**sending** 24:13
**sent** 43:17 64:9
80:20 124:7
152:15,20 166:20
183:21 198:16
208:21 225:21
233:8 246:4
**sentence** 104:5
161:6 168:19
183:22,23 187:17
189:21 228:25
229:2,4,5 239:1,3
248:16 249:10
259:5
**sentences** 248:25
**separate** 242:3
291:16
**september** 142:15
148:8
**serve** 254:25 255:8
255:18,24 256:7
256:12
**server** 289:6
291:15
**servers** 95:22
**service** 293:6
**services** 60:17
62:25 63:1,5
195:4 211:16,20
233:21 234:15,19
234:22 235:1,6,8
235:14 289:16

serving  233:25
set  75:18 127:18
  193:23 321:6
sets  52:3
setting  38:13
  112:10,12 237:12
  273:25
settings  112:16,17
  112:23
settle  113:20
seven  113:14,21
  114:12,16 115:5
  115:16,21 143:6,7
sfranklin  2:23
shape  150:2
shared  212:7
sharing  71:12,20
  71:25 72:2,11,16
sheet  322:13 324:7
  324:10,18 325:1
shirlethia  2:21
  15:14 304:18
shirt  66:5
shortly  159:1
show  138:5,12
  139:2 152:24
  156:25 186:8
  187:14,25 191:2
  221:18 231:24
  233:4 292:20
showed  216:5
  286:6,7 292:25
showing  24:4
  66:15 97:25
  108:17 129:19
  142:2 166:13
  174:22 184:19
  191:14 198:11
  207:4 211:8
  216:12 218:24
  224:13 236:23

245:2,14 251:3
shown  123:3
  322:16
shows  85:24
  102:23 138:6
  148:24 185:23,24
  189:16 226:20
  227:5
side  139:21 158:12
  158:19,23
sides  90:14
signature  319:5
  321:13 322:14
signed  323:13
  324:18
signing  322:19
similar  137:16
  168:23 314:9
simple  47:7
simply  26:15
  27:12 47:3 83:3
  101:5 309:9
sincerely  322:21
sir  24:25 53:15,18
  322:10
sit  245:4 313:17
sites  177:22
sitting  100:14
  113:3 189:9
  241:21 313:14
situation  227:22
  238:11
situations  184:10
  308:13,20
six  53:6
size  137:16
skill  32:7,14 45:23
  46:2 47:20,24
  48:3 51:5
skills  31:7

skipping  28:5
  179:6
slide  115:16
  122:21 123:24
  126:11,14 127:13
  127:22,24,25
  129:2,8 137:8
  148:19 152:1
  157:18,23,24,25
  158:7,22 161:22
  162:7
slides  161:21
  233:19 234:11,12
slightly  149:24,25
small  43:6 62:15
  186:8,16 187:3,6,9
  221:16 257:10,10
smalley  5:17 166:8
  166:24 167:2,15
  169:23
smalley's  167:8
smiley  228:9
smith  3:19 5:17
  90:7,10,11 142:12
  152:20 154:6
  166:8,24 198:16
  199:6 200:5
  242:11,14 268:9
  268:13,14,17
  269:7 270:3 312:5
smith's  199:18
  200:8
social  219:15
  248:22
societal  292:17
  293:2
socioeconomic
  262:1
software  45:10,12
  47:17 194:4
  256:20 289:6

solely  44:14
solid  60:20 71:24
solutions  3:12
  322:1 325:1
somebody  27:2,4
  69:13 85:22 86:8
  119:9,16,19 120:9
  126:10,12 129:5
  181:10 244:7
  258:21 314:21
somebody's  82:24
  219:17
sonnhalter  185:1
  185:4
sorry  20:5,16
  21:12 43:2,20
  50:25 51:19 53:4
  54:13 56:4 58:9
  68:5 78:23 80:19
  93:25 97:10
  104:25 107:23
  115:24 121:13,15
  130:18 133:20
  134:4 138:14
  147:17 159:5
  166:15 168:8
  169:15 177:2,25
  180:8 183:5
  190:12,17 194:25
  196:1,11 198:24
  204:20 205:9
  211:17 215:10
  217:6,9,9 219:2
  226:8 231:1
  234:13 246:25
  250:10 254:4
  278:22 281:8
  297:23 298:17
  310:11 315:23
  318:1

sort 294:25
sounds 104:4
   168:3,4 177:2
   275:14
source 79:17,25
   80:5,8 99:4 116:4
   116:7,9,13 117:21
   117:22 118:13,19
   164:4 176:13
   288:14
sourced 117:1
sources 123:14
south 1:22
spacial 26:1
speak 18:9 65:10
   164:12 171:19
speaking 96:8
   112:1,6 165:17
   171:21 267:24
   293:17
spec 275:17
specialist 31:3
specialize 30:11
specializes 30:13
   31:5
specialty 199:18
specific 39:19
   42:22 62:21 93:20
   107:9,13,19 108:5
   111:4,6 132:22
   157:3 179:2,3,6
   187:15,24 188:7
   190:6,22 191:1
   202:2 204:16,18
   205:11,11,15
   263:2 273:7,9,12
   291:8 317:9,15
specifically 32:17
   49:22 57:14 58:24
   61:13 93:23 94:3
   112:13,20 126:15

128:16 137:25
   164:12 165:11
   171:8 174:3,8
   177:4 178:24
   206:5,9 237:13
   266:20 311:11
specificity 179:9
   190:5,10,12,13,16
   190:18,22
specifics 92:3
specified 320:21
specify 185:24
speculate 218:10
speed 206:4 295:1
spend 37:21 90:20
   90:22 252:6
spent 60:4 90:25
   252:10
spike 120:22 121:3
   121:23 122:6,10
   122:16 123:2,3
   124:13,23 125:7
   126:19,22 127:4
   215:17,23 216:5
   216:12,15 233:20
   234:6 235:19
spit 139:16
spoke 20:3,9 169:4
   238:10
spoken 267:20
spreadsheet 47:10
   128:2 141:12
   284:23 285:5
   286:21
spreadsheets
   285:10
sql 45:16 48:8
   289:5 291:15
square 3:20
ss 320:3

staff 298:13
stakeholder
   112:18,19,25
   312:2
stakeholders 5:14
   61:11 71:23 82:15
   89:9 91:17 141:22
   142:15 296:14,17
stamp 191:15
   207:5
stamped 52:19
   63:25 66:16 98:1
   108:18 142:4
   184:20
stands 175:8
start 24:19,20
   61:20 104:1 168:4
   215:10 306:13
   310:8
started 24:21
   59:16 60:19
   157:15 264:3
   293:13 294:18,24
starting 246:15,22
state 17:4 25:1
   29:14 30:9 35:11
   36:22 49:16 55:4
   55:15 58:16 67:4
   67:7 92:5 226:25
   230:6,7 241:18
   246:13 283:8
   300:22,23 320:2,7
   321:15 323:10
   324:15
stated 87:16,18
   122:19 126:11
   156:4 170:10
   197:22 267:11
   279:20 316:17
statement 68:1
   119:23 155:8

163:20 228:13
   323:13,14 324:19
   324:19
statements 67:12
   303:13 315:5,25
states 1:1 104:7
   213:8 227:6
   282:22
statewide 149:7
stating 145:21
   227:20
statistic 129:13
statistical 31:25
   32:8,9,11,14,17,20
   32:22 33:7,25
   36:20,25 38:14
   39:17,19,20,21,22
   40:2,9,20,22,25
   41:1,4 44:4,10,14
   44:18 45:17 52:21
   53:1,16,21,24 55:2
   55:6,11,16 56:2,7
   56:11,16 58:8,25
   59:3 95:1 136:19
   171:21 184:3
   190:15,19 293:20
statistically
   293:18
statistician 40:12
   40:15 44:14,22,24
statistics 32:3 33:2
   40:17,18 41:6
   51:7 64:17 65:11
   65:16,21 70:12,17
   91:4,8,12 92:13
   101:18 128:9,15
   128:18 129:5
   176:2
status 253:4
statute 16:15

**stenotypy** 320:14
**step** 82:3 107:18
  108:5
**steps** 80:13,15,23
**stimulant** 238:6
  239:10,25 240:12
  241:12,24
**storage** 162:16
**store** 57:24 87:22
**stores** 2:20 57:19
  85:23,24 86:9,11
  86:24 88:5,17
**story** 82:13 288:2
  288:7
**straight** 235:25
**street** 1:22,22 2:11
  2:17 3:9,21
  165:20 194:9
  197:7 236:5
**streets** 162:5
  164:10 165:7
  239:18
**strengths** 73:13
  96:2
**strictly** 35:10
**strike** 30:2 50:13
  68:6 72:8 83:20
  88:14 97:10
  104:17 106:1
  127:3 191:6
  209:22 221:7
  240:10 246:25
  255:3 259:22
  267:7 280:2
  282:12 301:14
**strong** 292:16
**strongly** 251:24
**structured** 46:11
  46:23 61:5
**struggling** 227:2

**student** 32:3 38:16
  38:17,18 39:23
  67:4 98:5 104:6
  207:16 210:24
  248:15
**students** 93:8,13
  93:16 94:3 97:9
  97:12 105:15
**studied** 261:8,10
  261:19,21 262:6
  273:13
**studies** 157:20
  278:1,8,10,15,16
**study** 37:5 39:6,13
  92:18 159:3 247:7
  260:11,14,15,16
  260:18 273:19
  277:15,18,19,22
  278:5
**studying** 161:14
  248:8 279:22
**stuff** 26:22,24
  27:20 28:24,25
  29:20,20,21 31:22
  33:8,9 34:11,14,19
  34:23,24 37:15,16
  37:24 41:6 42:7
  42:18 44:15 45:5
  45:6,7 46:14 47:9
  47:10,11,13,14,15
  48:6,19,20 49:13
  49:15,17 50:10
  52:8 57:11 58:22
  60:4,16,20 61:6,9
  62:4,7 63:3 68:24
  70:13 71:22 72:4
  73:11,13 75:1
  76:2,7,10,11 79:23
  79:24 80:1,5 81:1
  81:2,7,12,19 82:4
  82:7,15 83:8,13

  85:12,15 86:23
  87:20 90:1 91:25
  93:3,4,10 94:1,25
  95:13 96:4 97:2,3
  97:5 99:22,25
  101:1,9,19,21
  102:2,3 103:9,24
  110:6 111:9,12,14
  112:4,18 113:4,6
  113:18 114:2,2,12
  117:11 118:14
  119:23 123:20
  124:19,20 127:11
  127:21 128:6,9
  129:4,6 131:11,12
  131:14,16,22
  132:4,8,21 135:25
  138:24 139:20,25
  141:14 143:9,12
  144:9,11,15 145:8
  145:16,20,20,23
  146:4,5,5,10 147:8
  147:13 148:1,17
  149:22 153:7,7
  156:13,13,18
  160:3,8 161:7
  162:3,5,23 163:22
  163:24 164:5,10
  164:11,13,20
  165:9,10,24
  168:20,23 169:1
  170:11,13 171:4,7
  171:9,10,23 172:6
  173:13,18 174:1,3
  174:6,7,8 176:23
  176:24 177:7,23
  178:15,25 179:1,2
  188:8,14,15
  190:16 192:23
  193:19,23 195:11
  196:8,10,12,13

  197:5 199:16,17
  202:3,4,16 203:23
  204:3,7,11,15
  208:22 213:22
  218:7,9 219:16,18
  221:5 223:21
  231:20 237:11
  239:17,22,23
  242:3,5,15 249:2
  249:10 251:21
  258:9 259:9,20
  262:2,3,4,22,24
  266:19 267:12
  268:20 269:10,12
  269:13 270:22,23
  271:1,8 272:21
  275:25 276:22,23
  277:17 278:12
  279:22 286:2,15
  286:25 287:5,8
  288:2,9,12,17
  289:7,9,14 290:1,1
  290:4,13,20,21
  292:17,19 293:2,7
  293:16,17,18,19
  293:22,25 299:1,1
  299:2,7 302:1
  311:2,20 313:10
  316:17,18
**subcommittees**
  296:21
**subject** 6:12,17
  29:15 93:19,21
  232:22 245:7,18
  245:20,24,24
  246:11 251:18
  271:10
**submitted** 43:21
**subscribed** 323:10
  324:14 325:21

**subset**  195:19

**substance**  28:6
30:14 49:20 69:24
90:17 111:12
131:11 132:16,17
132:20,25 133:4,5
169:19,20 175:15
179:18 183:7
188:7 249:5,16
250:3,17 254:15
257:19 258:18,22
268:7,21 279:16
312:8,20

**substances**  110:23
111:6 174:12
181:24 221:19,22
223:12,15 224:3
230:18,25 231:7
231:18 281:21
301:13,16,20

**succeed**  25:6

**succeeded**  94:12

**success**  81:4 82:10
82:13 83:15,18

**sudden**  103:5
147:23

**sued**  307:5

**suffering**  247:9
248:9

**suggest**  28:16

**suggesting**  169:5
169:22 260:2

**suicides**  161:11,16
252:13

**suite**  3:4,21 322:2

**summa**  66:25

**summaries**  317:5

**summary**  118:25
122:22 124:11

**summer**  6:19
245:9,22

**summit**  1:12 2:2
5:3,5,8,10,12,15
5:18,20,22,24 6:1
6:3,4,6,7,8,10,14
6:16,19,21 15:20
15:24 16:1 23:1,3
23:25 24:12,17
25:17 26:12 27:7
27:17 41:12,14,25
43:22 45:21 47:21
47:25 48:2 51:9
51:12 52:1,19
56:13 58:5,13
59:5,8 60:6 61:24
62:4,12,19 63:20
63:25 65:15,19
66:2,12,17 67:14
68:8 69:17 71:6
89:1 90:12,14
91:13,14 93:11
94:16 95:6,18
96:22 97:21 98:1
98:25 99:9,10
100:10,16 102:9
108:19,23 109:11
109:14,20 112:13
114:18,23 117:8
117:13 118:12,17
120:24 128:16
133:9,16 134:1
137:10,19 138:1,9
138:13,17,20
139:3,7 141:24
142:4 147:9 148:9
148:10,13,24
149:3,6,18 150:16
150:22 151:1,11
151:17 152:5
158:13 161:25
166:9,15 168:22
170:12 171:9

174:18,24 184:15
184:20 191:10,15
192:6 198:7,12
206:25 207:1,5
209:7 211:4,9
214:11 218:19,21
218:25 219:7,25
220:13,15,16,22
221:10,12 224:10
224:14 227:22
232:25 233:5
234:5,16 236:19
236:24 238:11
245:10,15 250:25
251:4 261:5
262:17 264:1,3,7,9
267:11,16,21
270:12 292:10
293:3,4 294:10,14
294:17,20 302:9
302:17 303:2,7
305:10,25 306:7
307:4 308:9
309:22 310:2,15
310:16 311:17
312:14 313:19
314:5,11,23
315:22 316:3
317:5

**superior**  322:1

**supervised**  208:2

**supervisor**  19:18
25:2 41:22 64:11

**supervisors**  295:8

**supported**  285:9
285:12

**supporting**  247:11
256:19

**supports**  164:16
164:19,23 165:3

**supposed**  49:5,8

**sure**  23:7 35:8
50:11 51:16 54:19
61:9 65:1 67:18
71:9 79:1 84:21
84:23 86:17 94:18
94:25 96:9 97:1,7
108:9 116:10,18
119:22,23 120:2
124:3 129:7
140:19 143:8,9,11
143:19 145:22
154:11,14 155:6
160:13 164:24
175:7 183:14
189:1 192:1 193:5
193:13 248:19
249:18 253:4
254:4 258:3
260:17 261:4
268:16 282:19
284:11 298:12
301:9 302:13
308:17 310:12
313:5,24 317:14
317:14

**surrounding**
64:17 65:11,21

**survey**  29:7,8
30:19,21 107:10
165:9

**suspend**  172:17

**swear**  16:13

**sweet**  3:4 15:16,16

**switch**  216:24

**sworn**  16:16
320:10 323:10,13
324:14,18 325:21

**symptom**  200:14
200:20

**symptoms**  200:6
**syndrome**  144:6
  144:20 152:1,11
**synthetic**  110:15
  110:17,19
**system**  5:9 42:25
  73:25 75:1,5
  82:15 90:4 97:20
  104:20 105:4
  127:17 158:17
  159:4 189:18
  231:17 232:1,6
  233:25 251:15
  271:16 273:2
  290:10 291:1,5
**systematic**  61:5
  248:20
**systems**  57:10

**t**

**t**  317:20
**table**  152:2 209:16
  209:18,23 210:8
  214:8,8,14 216:25
  217:8,16,18,19
  221:16,18
**tables**  289:8
**take**  32:21 37:9,11
  37:13 38:1,3,10
  39:17 40:6 44:8
  46:10 51:14,21
  52:9 55:2,6,10
  80:13,16,24 108:8
  136:22 141:4
  144:5 146:15
  162:3 176:12
  206:14 225:9
  266:3 305:3 312:5
**taken**  1:21 16:23
  40:1 52:13 55:15
  108:12 137:1
  183:17 206:19

  264:23 304:9
  320:20
**takes**  104:9 105:20
  252:4,14
**talk**  19:15 61:10
  65:7 80:21 101:24
  116:11 145:25
  218:6 246:17,24
  259:7 266:2,13
  267:25 268:6,9
  269:7,19,24 299:1
**talked**  74:25 76:1
  109:23 140:25
  145:9 268:4
  277:16 285:1
  300:14 316:7
**talking**  27:2 36:7
  41:16 86:21 87:20
  101:8 102:1,14
  107:6 112:3 113:3
  130:10 137:7
  165:2 168:20
  173:9 187:20
  216:9 235:20
  244:17 254:15
  292:22 295:7
**talks**  160:2 301:25
**tampering**  309:1
**task**  5:11 67:14
  68:4,11 70:23
  89:12 92:6 108:22
  109:5,20,21
  111:24 113:13
  129:14 142:19
  295:14,15,20,23
  296:12,21 297:2
  297:11,17
**tasked**  92:14,17,22
  92:24
**taught**  32:15

**tc**  275:17
**team**  6:7 69:1,3
  70:7 218:19 219:7
  219:13,14,14,20
  220:6,13,23 221:1
  221:5 237:19
  247:3 262:14
**teams**  219:24
  220:7,9 221:9,13
  247:11 248:10
**technology**  95:17
**television**  275:23
  275:25 276:3
**tell**  19:5 33:13,14
  61:2 76:14 86:23
  103:11 105:10
  111:14 130:14
  131:2 133:14,23
  174:11 179:17,23
  196:23 268:21,24
  269:3,14 273:5
  288:2 310:21
  311:24 315:19
**telling**  104:16
  118:2 230:12
**ten**  50:9 53:14
  86:11 172:12,14
**tend**  112:2
**tended**  164:9
**term**  26:18 31:4
  31:16,18,19 32:9
  84:11 85:7 110:10
  110:14,21 190:24
**terms**  27:13 31:23
  32:4 113:9 171:21
**territory**  262:4
**test**  190:18,19
**testified**  55:25
  56:6 116:21
  117:20 132:14
  135:5 227:23

  255:11 305:9
  306:16 313:12,24
  316:8,20
**testify**  315:25
  320:10
**testimony**  19:8
  78:16 91:11
  170:21 292:3
  316:14 320:13,17
  323:6,7 324:6,9,12
**teva**  2:14 15:12
  265:7 274:11,12
**thank**  17:15 35:2
  52:17 108:16
  137:6 201:5
  202:16,24 214:7
  219:3 265:3 304:2
  304:5 317:23
  318:2,8
**thing**  75:21 121:20
  177:3 190:23
  194:2,3,4 249:11
  249:12
**things**  28:12 33:17
  43:24 44:16 70:6
  79:13 80:23 87:17
  101:9,14 132:6
  160:6 164:6
  169:18 173:13,20
  174:9 178:16
  196:10 204:16
  205:12 239:22
  269:20 292:1
**think**  22:6 27:19
  32:2 43:24 61:15
  75:3 88:23 96:11
  96:16 101:25
  102:1 104:5
  153:21 155:23
  157:24 168:5
  189:5,6 199:13

210:17 217:10
223:6,25 225:12
229:16 244:15,24
244:24,25 245:1
248:13 249:23
259:4,19 293:15
295:18,19 303:16
317:23
**thinking**  84:17,19
113:2 274:20
**third**  20:22 21:24
21:25 183:22
246:20
**thirty**  322:18
**thomas**  25:2,3,6
41:21 94:13 246:4
246:8
**thorough**  144:10
288:13
**thoroughness**
288:15
**thought**  81:14
199:10 205:10,19
233:19
**thoughts**  247:20
248:5
**thread**  67:11
191:22 194:6
**three**  3:20 38:22
120:17 139:23
183:24 184:1
205:16 234:11,15
234:18 249:4,14
250:1,16
**threw**  240:5
**throw**  22:10
**throwing**  179:1
**thrown**  22:13
**time**  15:3,6 20:21
20:23,25 29:10
30:25 39:9 40:6

41:25 43:12,17,21
44:8 54:20 65:15
66:1,24 84:1
90:13,20,21,24
93:17 97:16 99:22
101:1,10 107:8
120:25 125:23
134:22 137:23
142:22 143:4
144:12,14,14
146:11 147:4,22
147:24 148:1,7,16
154:11 155:4,5
156:4 160:1 169:2
176:12 183:12
185:6 189:2
198:22 200:19
209:15 210:1,2,15
213:10 230:17,18
245:4 248:21
249:11,24 250:8
250:14 252:4,6,7
252:10,14 263:8
266:12,15 267:19
274:2 279:4 286:3
286:4,7,8,10
287:11 293:8
294:9,13 304:4,4
304:23 317:24
318:3 320:20
**timeframe**  41:17
103:22 143:8
146:12 279:7
282:2
**timelines**  146:5,14
**timely**  147:4
**times**  20:13,15
104:9 105:19
147:15 170:11
172:12,14 202:9
223:23 276:24

289:17
**timewise**  147:7
**title**  61:8 89:2
132:8 158:4
225:13,13,15
227:5 247:1,5
272:15,19 296:13
296:18 299:8
**titled**  106:4 122:21
127:14 148:19
157:25 161:22
**titles**  280:3
**today**  18:22 19:25
20:14 189:9
241:22 265:12
271:21 274:10
283:11 313:18
315:18,24
**today's**  19:21 20:8
20:11
**told**  19:14,17
196:21,22 266:12
268:19
**tom**  109:17
**tons**  69:5,6
**top**  50:3 64:14
67:13 111:15
131:24 139:24
165:16 166:21
195:15,17 211:13
211:14 212:1
221:19,21 223:12
223:15 224:3
234:14,18 237:21
278:11 285:19
286:17 295:19
299:10
**topic**  91:18 290:21
**topics**  94:10
**total**  119:2,6
190:23

**totals**  214:17
**tour**  160:4
**toxicology**  102:24
156:17,20,24
157:7,12,20
158:20 159:3,14
189:19 209:12
214:1,22,24
217:14,15,19,25
230:8,11,23 231:5
231:14 253:7,10
253:19 254:7,9
285:19
**track**  31:11 36:12
36:14 173:19
223:8
**tracks**  223:1 303:1
**trained**  45:13
**training**  25:19
35:22 36:4,20,25
38:12,13 53:19,20
53:24 54:3 237:7
247:3
**trainings**  237:12
**trains**  25:21
**tranquilizer**
121:21
**transcribed**
320:16 323:7
**transcript**  4:1
18:1,13 319:3,6,9
319:11 322:11,12
323:5,12 324:5,11
324:17
**transcription**
320:17
**transportation**
63:4,6
**transportational**
58:2

tread   265:14
treated   195:12
  199:21 200:6
treatment   175:14
  181:13 204:10
  219:19,22 247:8
  247:12 248:8
  273:1
treatments   188:8
  202:9
trend   129:19
  184:2 260:3
trends   168:20
  183:23 208:10
true   45:24 120:3
  120:23 123:12
  132:4 230:4
  252:22 314:18
  315:8,12 320:16
truly   81:14
truth   19:5 320:11
  320:11,12
truthful   19:7
try   81:17,25 83:4
  84:2 86:6 88:10
  107:18 108:5
  219:18 290:8
trying   33:8 40:5
  49:1 50:22 57:23
  59:17 102:21
  129:4 153:7 173:4
  173:22 178:7
  191:4,5 249:20
  251:19
tucker   3:3 15:17
tuckerellis.com
  3:6
turn   24:22 30:23
  88:25 106:3
  118:23 126:6
  147:14,16,22

151:25
turning   113:11
  147:24 212:14
twelfth   2:11
two   19:14 21:21
  28:12 32:23 33:17
  43:24 55:8,12
  85:14 87:5,17
  99:20 100:24
  101:9,22 110:22
  112:2,14 115:18
  115:18,19 137:10
  148:8 150:1 158:2
  159:12 173:12,13
  173:19 176:14
  182:8 194:4 196:9
  196:9 202:15,19
  205:1 215:1,4
  234:12 240:8
  242:2 243:22,25
  244:2,17 248:25
  266:12 289:8,8,12
  290:14,14
type   75:18 110:5
  112:10 114:14
  115:3 120:11
  178:18,24 179:18
  190:18 197:13
  289:20 295:4
types   37:5 45:10
  113:6 159:18
  161:10,15 176:8
  181:13 187:15,25
  188:7 189:25
  190:13 191:2
  194:8 258:8 269:8
  269:20 285:8
  293:4 301:22
typically   239:11
  240:20

typing   17:15

**u**

udemy   37:1,2,21
  55:20
uh   63:8 74:20
  117:23 118:1
  126:17 138:19
  143:5 148:22
  248:6 294:7 298:8
  300:17 301:21
unclear   18:3
uncomplicated
  194:18
undergraduate
  248:14
underlying   284:18
  288:5
understand   18:5
  18:21 20:5 26:17
  32:4,9 35:1,3 44:9
  50:22 57:23 65:4
  65:8 67:11 68:11
  70:18,20 73:12,14
  74:22 75:22 76:9
  76:21 84:4 85:18
  86:6 87:10 88:10
  96:6 97:5 106:21
  107:4 110:4,13
  111:1,3 112:8
  114:10,11,22,25
  116:12 118:25
  124:15 129:3,8
  130:2,6,20 134:6
  135:6,17 138:15
  146:17 153:3,5,14
  154:5,25 156:19
  176:11,13 184:9
  188:10 195:6
  197:1 202:24
  230:3 241:23
  243:6 245:23

248:24 254:5
  255:4,10,13,21
  256:5,21,25
  258:20 259:2,6
  265:18 282:13,22
  283:6 286:24
  289:2 292:6 295:8
  304:24
understandably
  251:23
understanding
  27:3,18 42:9 43:5
  44:20 45:4 50:15
  51:8 61:4 63:2
  78:24 87:10 91:3
  95:15 96:1 100:5
  100:7 101:15,21
  102:11,13 103:9
  103:13,16 104:15
  105:2,7 109:24
  110:8 116:25
  117:24 119:25
  121:3 124:17
  125:1 126:21
  127:1,2 134:5
  157:2,9 159:8,10
  186:22 188:22,24
  189:3 208:7,9
  227:21 242:16
  244:5 253:15,20
  254:17,18 255:13
  256:10 260:6
  261:11,17,24
  262:25 267:2,4
  277:8 279:2 280:9
  283:1,14 287:21
  287:24 292:9,12
  292:13,15 302:12
  315:17
understood
  265:23

undertake  243:5
underway  17:21
undetermined
  104:11 105:21
unfortunately
  168:14
uninitiated  74:23
united  1:1 282:22
universities  54:6,8
  93:9
university  29:14
  30:10 37:8 54:9
  54:10,15,24 55:16
  58:16 67:5 246:13
unreliabilities
  85:3
unreliability
  146:20
unreliable  143:23
  143:25 144:7,8
  145:7 146:1,3,19
  146:24 147:10,13
  148:5
unrevised  212:22
unstructured
  46:11,13,23 48:12
  48:13
update  6:18 168:6
  193:21 245:8,21
updated  193:19
upfront  276:25
  277:2
usable  48:14
usage  94:8 178:9
use  28:4,6 29:17
  29:18,22 30:5,12
  30:14,17 33:2
  43:14 45:12 49:1
  49:20 51:15 57:12
  57:14 58:7 61:6
  69:24 77:16 85:3

90:17 96:3 99:4,4
99:5,14 111:12,22
113:9 114:4,13
131:12 132:21
133:4,5 140:10,12
158:16,17 159:15
159:17 161:9
165:11 169:19,20
173:4,22 179:18
180:25 182:3,5
183:7 188:3,7
196:1,1,13 197:12
204:17 206:14
227:17 238:11
239:25 240:11
247:4,9 248:9
249:5,16 250:3,17
254:16 255:6,22
271:13 279:21
288:4 289:6 291:8
293:1 300:7 301:6
301:10 303:10
useful  129:19
  205:20
users  29:23 229:7
  233:21 300:9,19
  301:1
uses  32:19 44:18
  99:3,11
usually  81:16
  169:1,2
utilization  293:6
utilize  258:6
utilizing  44:21
  253:7

v

v  1:13 2:21 322:6
  323:3 324:3
vaginitis  200:14
  200:20

vandetta  3:24
varied  75:19
various  131:5
  182:13 193:25
  194:21 195:1
  214:13 308:8,10
varying  132:20
veauthier  191:23
  192:2 193:4,6
veritext  322:1,7
  325:1
veritext.com.
  322:17
versa  112:21
  169:14
version  188:4
  193:18 203:20,21
  212:20,22,23
versus  110:18
  113:4 120:14
  122:6,11 127:6
  148:9,10,13,24
  151:12,17 194:8
  197:7
vice  112:21 169:14
victims  209:25,25
  230:24 231:6,17
  231:19,21
video  7:1
videographer  3:24
  15:1 16:12,20,24
  17:13 52:11,14
  108:10,13 136:24
  137:2 183:15,18
  206:17,20 236:10
  236:13 264:21,24
  304:7,10 318:9
videotaped  1:18
view  122:5,16
  162:25 163:5,6,13
  163:20 227:21

232:3,15
visit  118:25
  246:16
visited  119:3
visits  122:22
  124:11 141:10
  216:8
vital  101:17
voice  318:8
volume  249:3,13
  249:25 250:15

w

w  2:4
wade  24:10 113:19
  224:20 251:8
wait  198:24
waived  322:19
wal  2:20
walgreens  307:11
  308:5 315:16
walk  47:2 80:9
  83:4
walmart  2:20
  15:15 304:19
  307:5,22 314:16
  314:25 315:5,19
  316:1
want  26:24 28:13
  33:19 54:17 61:13
  61:20 80:11,11
  81:6 82:12,13,22
  83:12 84:4,21
  85:22 86:17 118:9
  128:10 129:5,7
  132:24 145:22
  164:9,24 265:14
  287:23 288:25
  289:2 292:3,13
  304:24 305:7
wanted  19:15 61:3
  62:3,6 65:6 84:7

106:14,14 114:13
123:23 124:9,11
137:12 141:17
143:18 151:23
154:14 155:5
156:6 178:23
179:2 181:3,5
186:21 242:7
266:13 287:5
290:25 292:5
**wants** 167:15
244:7 246:24
**warning** 282:5,10
**wars** 261:22,25
262:7
**washington** 2:12
2:22 3:16
**watered** 203:21
**watson** 275:6
**way** 48:7 67:20
75:2 84:11 85:7
95:9 126:2 127:10
150:18 156:4,8
160:8 162:5
193:24 230:11,14
282:19 290:1,9
300:23 309:1,6
**ways** 107:11,14
207:14
**wc.com** 2:13
**weapon** 34:19
**weapons** 34:15
**wear** 66:5
**website** 116:6
128:8 141:7,16
**websites** 37:4
**weeds** 45:18
**week** 103:18 104:1
**weeks** 246:17
**welcome** 52:16
108:15 137:4

**wendy** 1:24 2:15
15:11 265:6 320:6
321:14
**wendy.feinstein**
2:18
**went** 29:13 36:11
62:7 93:10 156:20
189:23 258:7
265:9 295:23
**west** 2:15 15:11
265:6
**westlake** 17:9
**whereof** 321:5
**whiz** 32:6
**wholesale** 263:9
263:13
**widely** 162:17
**wife** 147:18
**williams** 2:10
**witness** 2:3 15:5
15:20,24 16:13
130:25 172:15
177:25 304:5
318:5 320:9,14,15
320:18 321:5
322:8,11 323:1,4
323:11 324:1,4,15
**witness's** 319:2
**witness'** 322:14
**woman** 199:2,22
**women** 28:4,11,18
28:21 29:2,4
199:22 201:2
**wondering** 167:2
237:22 239:4
243:21
**word** 54:9,11,16
54:24 55:1,14
75:14 110:3,4
111:23 114:4
153:4 154:20

190:21 213:12
259:5
**worded** 107:2
290:13
**words** 26:15 27:12
82:22 93:21
**work** 17:20 23:1
27:15 34:1 41:13
41:14,24 42:11
43:1,3 47:25 48:2
49:23 50:12,14
51:11 56:13 57:6
57:15 58:3,4,5,10
59:10,11 60:25
62:6 69:3 90:16
105:16 109:11
146:14 163:14,18
207:18,21,22
208:14 246:17
252:9,11 264:11
271:5 284:4,12
295:2 306:4
307:23 308:12,17
310:7 311:18
**worked** 41:12
48:13 66:25 89:22
93:20 94:2 97:9
162:8,12 177:17
244:20 271:6,17
**worker** 219:15
**working** 30:3 69:2
96:22 97:12
163:16 264:3
**world** 31:25 41:4
**worthy** 129:14
**write** 253:6,13
259:12 283:8
**writes** 246:8
**writing** 251:17
311:5

**written** 24:24
107:19 108:6
196:8 232:9 283:7
309:22 310:2,14
310:18 311:3,16
312:14
**wrong** 156:5,6,10
156:20 163:11
189:6
**wrote** 98:24
106:24 189:2,10
190:2 212:2
241:19 250:5,6,12
250:21 251:21
259:15 312:16

**x**

**x** 147:23

**y**

**yeah** 70:16,19
81:9 83:7 102:7
103:16 110:15
124:9 140:14
148:16 157:14
162:12 175:23
180:10 182:8
188:22 196:1
197:21 198:25
202:21 216:9
217:13 244:11
289:2
**year** 22:15 101:14
126:16 168:7,8,10
186:4,14 214:16
238:4,4 239:8,8
242:4 243:3,4,7
282:1
**years** 46:1 52:24
53:14 94:17,18
120:17 176:15
183:24 184:2

192:8 216:21
238:20 249:4,14
250:1,16
**yesterday**   21:25

**z**

**zip**   85:13,25 86:11
86:19,20 87:4,11
88:6,15,19 167:4,5
167:17,17,20
169:3 174:1,6,10
201:6 204:1
205:15,17

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.