Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION  |   MDL No. 2804
                                  |
 4   OPIATE LITIGATION            |   Case No. 17-MD-2804
                                  |
 5   This Document Relates to:    |   Hon. Dan A. Polster
                                  |
 6   APPLIES TO ALL CASES         |
                                  |
 7                                |
 8                   Monday, January 7, 2019
 9                        - - -
10         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                   CONFIDENTIALITY REVIEW
12                        - - -
13
14         Videotaped deposition of CATHERINE JACKSON,
        held at Foley & Lardner LLP, One Biscayne Tower, 2
15      Biscayne Boulevard, Suite 1900, Miami, Florida,
        commencing at 9:27 a.m., on the above date,
16      before Susan D. Wasilewski, Registered
        Professional Reporter, Certified Realtime
17      Reporter, Certified Realtime Captioner.
18
19
20
21
22
                              - - -
23
                 GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
25
```

## Page 2

```
1   APPEARANCES:
2   KELLER ROHRBACK, LLP
    BY: ALISON S. GAFFNEY, ESQUIRE
3   1201 Third Avenue, Suite 3200
    Seattle, Washington 98101-3052
    (206) 623-1900
4   agaffney@kellerrohrback.com
5   Representing the Plaintiffs
6
7   KELLER ROHRBACK, LLP
    BY: MARK SAMSON, ESQUIRE
    3101 North Central Avenue, Suite 1400
8   Phoenix, Arizona 85012-2643
    (602) 248-0088
9   msamson@kellerrohrback.com
    Representing the Plaintiffs
10
11  BRANSTETTER, STRANCH & JENNINGS, PLLC
    BY: JOE P. LENISKI, JR., ESQUIRE
12  223 Rosa L. Parks Avenue, Suite 200
    Nashville, Tennessee 37203
13  (615) 254-8801
    joeyl@bsjfirm.com
14  Representing the Tennessee Plaintiffs
15
16  ROPES & GRAY, LLP
    BY: WILLIAM DAVISON, ESQUIRE
    800 Boylston Street
17  Boston, Massachusetts 02199-3660
    (617) 951-7000
18  william.davison@ropesgray.com
    Representing Mallinckrodt LLC, SpecGX LLC
19  and the witness
20
21  ROPES & GRAY, LLP
    BY: FEIFEI (ANDREA) REN, ESQUIRE
    1211 Avenue of the Americas
22  New York, New York 10036-8704
    (212) 596-9000
23  andrea.ren@ropesgray.com
    Representing Mallinckrodt LLC, SpecGX LLC
24  and the witness
25
```

## Page 3

```
1   APPEARANCES:
2   JONES DAY
    BY: CHRISTOPHER LOMAX, ESQUIRE
3   600 Brickell Avenue, Suite 3300
    Miami, Florida 33131
4   (305) 714-9700
    clomax@jonesday.com
5   Representing Walmart Inc., f/k/a Wal-Mart Stores, Inc.
6
    McCARTER & ENGLISH
7   BY: AMY M. VANNI, ESQUIRE
    1600 Market Street, Suite 3900
8   Philadelphia, Pennsylvania 19103
    (215) 979-3848
9   avanni@mccarter.com
    Representing Endo Health Solutions Inc., Endo
10  Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
    Par Pharmaceutical Companies, Inc.,
11  (f/k/a Par Pharmaceutical Holdings, Inc.)
12
    DECHERT LLP
13  BY: MARA CUSKER GONZALEZ, ESQUIRE
    1095 Avenue of the Americas
14  New York, New York 10036-6797
    (212) 698-3500
15  maracusker.gonzalez@dechert.com
    Representing Purdue Pharma, L.P., Purdue Pharma, Inc.,
16  and The Purdue Frederick Company, Inc.
17
18  APPEARANCES VIA TELEPHONE AND STREAM:
19  JACKSON KELLY, PLLC
    BY: GRETCHEN CALLAS, ESQUIRE
20  500 Lee Street East, Suite 1600
    Charleston, West Virginia 25301-3202
21  (304) 340-1000
    gcallas@jacksonkelly.com
22  Representing AmerisourceBergen Corporation and
    AmerisourceBergen Drug Corporation
23
24
25
```

## Page 4

```
1   APPEARANCES VIA TELEPHONE AND STREAM:
2
    BAKER HOSTETLER
3   BY: MELISSA BERTKE, ESQUIRE
    Key Tower, 127 Public Square, Suite 2000
4   Cleveland, Ohio 44114-1214
    (216) 621-0200
5   mbertke@bakerlaw.com
    Representing Endo Health Solutions Inc., Endo
6   Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
    Par Pharmaceutical Companies, Inc.,
7   (f/k/a Par Pharmaceutical Holdings, Inc.)
8
9   COVINGTON & BURLING LLP
    BY: DEVON MOBLEY-RITTER, ESQUIRE
10  3000 El Camino Real
    5 Palo Alto Square, 10th Floor
11  Palo Alto, California 94306-2112
    (650) 632-4700
12  dmobleyritter@cov.com
    Representing McKesson Corporation
13
14  FOX ROTHSCHILD LLP
    BY: EILEEN OAKES MUSKETT, ESQUIRE
15  1301 Atlantic Avenue, Suite 400
    Atlantic City, New Jersey 08401-7212
16  (609) 348-4515
    emuskett@foxrothschild.com
17  Representing Validus
18
19  ALSO PRESENT:
20  JEFF FLEMING, Videographer
21
22
23
24
25
```

## Page 5

```
1   ---
2   I N D E X
3   ---
4   Testimony of: CATHERINE JACKSON      PAGE
5     DIRECT EXAMINATION BY MS. GAFFNEY.............  9
6     CROSS-EXAMINATION BY MR. LENISKI............. 182
7
8   E X H I B I T S
9     (Attached to transcript)
10  CATHY JACKSON DEPOSITION EXHIBITS      PAGE
    Mallinckrodt Plaintiff's Notice of Oral      11
11  - Jackson  Videotaped Deposition of Cathy
    Exhibit 1  Jackson and requests for Production
12             of Documents
13  Mallinckrodt E-mail - Subject:         18
    - Jackson  MNK-T1_0000880791 through 880793
14  Exhibit 2
15  Mallinckrodt E-mail - Subject: NIH Pathways to  50
    - Jackson   Prevention
16  Exhibit 3  MNK-T1_0000655211
17  Mallinckrodt E-mail - Subject: Summary of  57
    - Jackson  Centers of Excellence in Pain
18  Exhibit 4  Education Initiative and Maureen's
               comments
19         MNK-T1_0002373535 through 2373537
20  Mallinckrodt E-mail - Subject: For Review:  88
    - Jackson  Pending ADF Roxicodone FDA
21  Exhibit 5  Submission
               MNK-T1_0000938024 and 938025
22
    Mallinckrodt Transcript Excerpt - Deposition of  91
23  - Jackson  Steven A. Becker
    Exhibit 6  Page 260
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1        E X H I B I T S
 2      (Attached to transcript)
 3  CATHERINE JACKSON DEPOSITION EXHIBITS      PAGE
 4  Mallinckrodt  E-mail - Subject: For Review:    94
    - Jackson    Pending ADF Roxicodone FDA
 5  Exhibit 7    Submission
             MNK-T1_0000938034
 6
    Mallinckrodt  E-mail - Subject: (MNK)        96
 7  - Jackson    Anti-Diverson Programs Poster
    Exhibit 8    MNK-T1_0001139790
 8
    Mallinckrodt  E-mail - Subject: Poster        98
 9  - Jackson    MNK-T1_0002371099 and
    Exhibit 9    MNK-T1_0001139793
10
    Mallinckrodt  Administrative Memorandum of   120
11  - Jackson    Agreement
    Exhibit 10
12
    Mallinckrodt  Résumé of Catherine Jackson, RN,  122
13  - Jackson    BSN, MPH
    Exhibit 11
14
    Mallinckrodt  E-mail - Subject: SPPAC        127
15  - Jackson    ENDO00095641 through 95643
    Exhibit 12
16
    Exhibit 13    E-mail - Subject: States       135
17             PPLPC021000043786 through
                21000043789
18
    Mallinckrodt  E-mail - Subject: Ohio         139
19  - Jackson    PPLPC031000153876 and 31000153877
    Exhibit 14
20
    Exhibit 15    E-mail - Subject: Potential pain  142
21             management advocates
                PPLPC027000016922 and 27000016923
22
    Mallinckrodt  E-mail - Subject: Ohio         145
23  - Jackson    PPLPC018000000145 through
    Exhibit 16    18000000147
24
25
```

Page 7

```
 1        E X H I B I T S
 2      (Attached to transcript)
 3  CATHERINE JACKSON DEPOSITION EXHIBITS      PAGE
 4  Mallinckrodt  E-mail - Subject: Ohio Advocacy  155
    - Jackson    Strategic State Plan Meeting Notes
 5  Exhibit 17    PPLPC018000000680 and 18000000681
 6  Mallinckrodt  E-mail - Subject: Today's Daily  160
    - Jackson    Mail
 7  Exhibit 18    PPLPC021000049319 through
                21000049322
 8
    Mallinckrodt  E-mail - Subject: Revised       170
 9  - Jackson    presentation
    Exhibit 19    MNK-T1_0002371934 and 2371935
10
    Mallinckrodt  E-mail - Subject: TN proposal   220
11  - Jackson    ENDO-OPIOID_MDL-01964414 and
    Exhibit 20    1964415
12
    Mallinckrodt  E-mail - Subject: MSL Sales     233
13  - Jackson    Training Initiative
    Exhibit 21    ENDO-OPIOID_MDL-00580306 and
14             580307
15  Mallinckrodt  E-mail - Subject: OPANA ER      239
    - Jackson    Platform and Customer Strategy and
16  Exhibit 22    Implementation Team
             ENDO-OPIOID_MDL-01094008
17
18
    STEVEN BECKER DEPOSITION EXHIBITS        PAGE
19
    Mallinckrodt  E-mail - Subject: Oxycotin Article  85
20  - Becker    from St. Louis Post Dispatch
    Exhibit 11    MNK-T1_0004888161 and 4888162
21
22
    VICTOR BORELLI DEPOSITION EXHIBITS       PAGE
23
    Mallinckrodt  E-mail - Subject: Rx Drug Abuse  113
24  - Borelli    Epidemic
    Exhibit 25    MNK-T1_0000290150 and 290151
25
```

Page 8

```
 1                    - - -
 2       THE VIDEOGRAPHER:  We are now on the record.
 3  My name is Jeff Fleming.  I am a videographer for
 4  Golkow Litigation Services.  Today's date
 5  is January 7, 2019.  The time is 9:27 a.m.
 6       This video deposition is being held in
 7  Tampa, Florida, in the matter of National
 8  Prescription Opiate Litigation, MDL Number 2804,
 9  in the United States District Court for the
10  Northern District of Ohio, Eastern Division.
11       The deponent is Cathy Jackson.
12       Will counsel please introduce themselves for
13  the record.
14       MS. GAFFNEY:  Alison Gaffney for the
15  plaintiffs.
16       MR. SAMSON:  Mark Samson for the plaintiffs.
17       MR. LENISKI:  Joe Leniski for the Tennessee
18  plaintiffs.
19       MR. DAVISON:  William Davison on behalf of
20  Mallinckrodt LLC, SpecGx LLC, and the witness.
21       MS. REN:  Andrea FeiFei Ren for the same,
22  Mallinckrodt and SpecGx.
23       MR. LOMAX:  Christopher Lomax from Jones Day
24  on behalf of Walmart.
25       MS. VANNI:  Amy Vanni from McCarter &
```

Page 9

```
 1  English on behalf of Endo.
 2       MS. GONZALEZ:  Mara Cusker Gonzalez from
 3  Dechert on behalf of the Purdue defendants.
 4       THE COURT REPORTER:  Folks on the phone,
 5  I've already got your appearances.
 6       THE VIDEOGRAPHER:  Thank you.  The court
 7  reporter is Susan Wasilewski and will now swear
 8  in the witness.
 9       THE COURT REPORTER:  Ma'am, will you raise
10  your right hand?
11       Do you solemnly swear or affirm the
12  testimony you're about to give will be the truth,
13  the whole truth, and nothing but the truth?
14       THE WITNESS:  I do.
15       THE COURT REPORTER:  Thank you.
16       CATHERINE JACKSON, called as a witness by the
17  Plaintiffs, having been duly sworn, testified as
18  follows:
19            DIRECT EXAMINATION
20  BY MS. GAFFNEY:
21    Q.  Good morning, Ms. Jackson.  Could you please
22  state and spell your full name for the record?
23    A.  Sure.  It's Catherine Jackson,
24  C-a-t-h-e-r-i-n-e J-a-c-k-s-o-n, but I'm often
25  called Cathy.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    Q.   Thank you.  And you understand your under
2  oath --
3    A.   I do.
4    Q.   -- to tell the truth here today.  Are you
5  taking any medication or is there any other reason
6  that would interfere with your ability to answer
7  questions fully and truthfully today?
8    A.   No.
9    Q.   Have you ever been deposed before?
10   A.   No.
11   Q.   So there are a few basic ground rules that
12  are important for the sake of the court reporter and
13  to have a clear record.  First, is that we don't
14  speak at the same time, so wait for me to finish
15  asking a question before you answer, and I'll do the
16  same, wait for you to finish answering before I ask
17  another question.
18       And then second, when you answer a question,
19  you must answer it verbally with a yes or no rather
20  than nodding or shaking your head.  If I ask you a
21  question you don't understand, please let me know.
22  I'll try to rephrase the question.
23       Are you represented by counsel today?
24   A.   I am.
25   Q.   And who is your counsel?

Page 11

1    A.   It would be Will.
2    Q.   Okay.  Great.
3    A.   And Andrea.
4    Q.   And did you hire them or did they contact
5  you through your employer?
6    A.   Yes.
7    Q.   Okay.  And are you being compensated at all
8  for your time here today?
9    A.   No.  I'm a current employee of Mallinckrodt.
10       MS. GAFFNEY:  This is Exhibit 1.
11       (Mallinckrodt - Jackson Exhibit 1 was marked
12  for identification.)
13  BY MS. GAFFNEY:
14   Q.   Exhibit 1 is a copy of the deposition
15  notice.  Have you seen this document before?
16   A.   I have.
17   Q.   Okay.  When did you first see it?
18   A.   Friday.
19   Q.   Okay.  And if you look at the bottom of the
20  first page, it says:  "Additionally, please take
21  notice pursuant to applicable federal rules of civil
22  procedure, plaintiffs have requested, the individual
23  identified above, produce the documents identified
24  in Schedule A attached to this notice that is in
25  their possession, custody or control."

Page 12

1        And in schedule A there is a definition of
2  terms and then the requests are at the bottom,
3  starting at the bottom of page four and then going
4  on to page five.  So we have a copy of your résumé,
5  number two at the top of page five -- do you see it?
6    A.   (Nodding head.)
7    Q.   Okay.  "All documents including electronic
8  data and e-mail in your possession related in any
9  way to any defendants, manufacturer, marketing,
10  sale, distribution, suspicious order monitoring, and
11  lobbying efforts in connection with its opioid
12  business."
13       Did you search your documents for anything
14  responsive to this request?
15   A.   All of my documents were sent, when I moved
16  back to Florida, in 2015, all my documents were put
17  into storage, into archives.
18   Q.   Okay.
19   A.   Through, I want to say Iron Mountain, and I
20  may be incorrect on that, but I think that's the
21  company.
22   Q.   Okay.  So your documents that are in
23  storage, have they been searched?
24       MR. DAVISON:  When she says, "in storage", I
25  think she means for the company.  So I can

Page 13

1  represent that Mallinckrodt has undertaken a good
2  faith effort to produce documents responsive to
3  the request for production.
4    Q.   So that's for Mallinckrodt.  How about any
5  documents related to Purdue or Endo?
6    A.   Those documents have long been gone.  I
7  haven't been with those companies for many years.
8    Q.   Okay.  Do you use a phone for work, text
9  messaging on your phone, ever?
10   A.   I do.
11   Q.   Okay.  And have those text messages been
12  searched?
13   A.   I don't know.  My phone is -- I'm signed up
14  with a program -- actually, it's a bring your own
15  device but it's signed up so they can access it at
16  any time, so I don't know if they have or if they
17  haven't.
18   Q.   Okay.
19       MS. GAFFNEY:  Counsel, can you answer --
20  address whether you've searched text messages, I
21  know this has come up before.
22       MR. DAVISON:  We'll look into that and get
23  back to you on it.
24       MS. GAFFNEY:  Okay.
25   Q.   Ms. Jackson, what did you do to prepare for

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1   your deposition today?
2       A.  I had -- talked to Bill and Andrea.  I had
3   two days of practice but that's all.
4       Q.  Two days of preparation with the two
5   attorneys here?
6       A.  Yes.
7       Q.  Did you speak with any of the other
8   attorneys in this room?
9       A.  I did.  I spoke with the -- I'm so sorry on
10  names.  I'm blanking.
11      MS. GONZALEZ:  Mara.
12      A.  But they are with Purdue and also with Endo.
13      Q.  Okay.
14      A.  On Friday, but briefly, maybe less than 15
15  minutes each.
16      Q.  Okay.  And did you review any documents?
17      A.  I did.
18      Q.  Okay.  Did any of those documents refresh
19  your recollection?
20      A.  Some.
21      Q.  Okay.  And have all the documents that --
22      MS. GAFFNEY:  Counsel, have all the
23  documents that she reviewed been produced?
24      MR. DAVISON:  Yes.
25      MS. GAFFNEY:  Okay.

Page 15

1   BY MS. GAFFNEY:
2       Q.  Ms. Jackson, did you speak with any of your
3   coworkers or former coworkers about the topics that
4   we're going to discuss today?
5       A.  No, just to let my boss know I was going to
6   a deposition.
7       Q.  Okay.  When did you start working at
8   Mallinckrodt?
9       A.  I started at Mallinckrodt in April -- end of
10  April at 2014.
11      Q.  Okay.  And have you held the same position
12  there the entire time, or different positions?
13      A.  Different position.
14      Q.  Okay.  Can you walk me through those
15  positions?
16      A.  Sure.  I started as the manager of advocacy
17  for the global medical affairs function within
18  Mallinckrodt and then moved over to the government
19  affairs and advocacy team by January of 2015, and
20  then got promoted to director to -- director of
21  advocacy relations, to be honest, I can't remember,
22  I can't remember, it feels like I've been doing it
23  forever but I want to say within a year.  My current
24  position is director of advocacy of relations at
25  Mallinckrodt.

Page 16

1       Q.  What's the difference -- or how would you
2   describe the difference between global medical
3   affairs and government affairs and advocacy?
4       A.  Sure.  Two separate divisions within
5   Mallinckrodt and global medical affairs is medical
6   affairs, which is -- includes medical information,
7   medical science liaisons, the research, and then
8   government affairs and advocacy is more of a
9   corporate role and that is government affairs and
10  advocacy.
11      Q.  Okay.
12      A.  So State government affairs, federal
13  government affairs, policy, so that would be in that
14  wheelhouse.
15      Q.  Okay.  And then within medical affairs, you
16  were within medical advocacy but you listed a few
17  other divisions.  How was that structured, how did
18  you interact with, for example, with the research
19  arm of things, medical science?
20      MR. DAVISON:  Objection to form.
21      A.  So we would meet -- in my day-to-day work I
22  sat in the same floor with them in St. Louis and we
23  would have meetings together.
24      Q.  Okay.
25      A.  Cross functional meetings.

Page 17

1       Q.  Okay.  And when you were manager in medical
2   advocacy to whom did you report?
3       A.  So when I first started at Mallinckrodt I
4   reported to Lisa Saki for about two weeks and then
5   she left the company and then I reported to the
6   chief medical officer, which would have been Tom
7   Smith, and then after Tom Smith got laid off, it was
8   Anthony Lassiter, and then I went to government
9   affairs.
10      Q.  Okay.
11      A.  Under the medical directors.
12      Q.  And then within government affairs, to whom
13  did you report?
14      A.  So I had reported to Derek Naten who is a
15  senior director of government affairs and advocacy
16  since I started there, and continues to be my
17  manager.
18      Q.  In both of these positions, do you have
19  regular performance reviews?
20      A.  I do.
21      Q.  Okay.  Are there written evaluations for
22  those reviews?
23      A.  They are.
24      Q.  Okay.  Those were not produced as part of
25  the personnel file?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    MR. DAVISON:  And we produced the personnel
2  file consistent with the agreement that was
3  reached.  So if they are not in the personnel --
4  we did not withhold anything from the personnel
5  file that would have been responsive to the
6  request.
7    MS. GAFFNEY:  Okay.  Exhibit 2.
8    (Mallinckrodt - Jackson Exhibit 2 was marked
9  for identification.)
10  BY MS. GAFFNEY:
11    Q.   Okay.  You've been handed what's been marked
12  as Exhibit 2, which is an e-mail attaching a
13  presentation that you sent to Kevin Webb.  And with
14  those two departments we were just talking about,
15  medical affairs and government affairs, did Kevin
16  Webb work for one of those or does Kevin Webb work
17  for one of those too?
18    A.   Government affairs.
19    Q.   Government affairs.  Okay.  And the subject
20  of this e-mail was, today's call with CAD?  What
21  does CAD stand for?
22    A.   Can I please read it before we --
23    Q.   Oh, go ahead.
24    A.   So I know where I'm --  I'm ready.
25    Q.   Okay.  Great.  So just a question about the

Page 19

1  subject.  Today's call with CADs?  What does CAD
2  stand for?
3    A.   I was just trying to remember.  I honestly
4  can't remember but it's market access, the name
5  has changed.  It's the market access and if I think
6  long enough, I'll probably remember it but not at
7  this moment, so --
8    Q.   No problem.  Okay.  And then question about
9  your e-mail at the top of this page here.  You
10  mention meeting with Karen Harper in the diversion
11  group.
12    A.   Yes.
13    Q.   Is that something that you do regularly in
14  your -- so in 2014 this would have been in your
15  medical affairs position; is that correct?
16    A.   Yes.
17    Q.   Okay.  In the medical affairs position, is
18  that something you would do regularly, meet with the
19  diversion group?
20    MR. DAVISON:  Objection to form.
21    A.   The suspicious order monitoring team had a
22  monthly meeting that they set up and when I was able
23  to attend, I was part -- I would attend, if I was in
24  town and able to, and that is the group that I was
25  referring to.

Page 20

1    Q.   Got it.  Okay.  And then if you go down to
2  the bottom of the same page, Vanessa Harris is
3  asking Kevin Webb for the same slide deck that,
4  quote, Catherine Jackson did for Dina and I at our
5  first initial meeting.
6    So you've reviewed the slide deck, is it
7  your understanding or recollection, that you've used
8  this slide deck to give a presentation before?
9    A.   Not the entire deck.
10    Q.   Okay.
11    A.   So the deck that I would have been
12  responsible for would have been the Care Alliance
13  piece.
14    Q.   Got it.
15    A.   Which starts -- it's kind of toward the end
16  of it.
17    Q.   Okay.
18    A.   Unfortunately -- yeah, here it is.  It would
19  have been -- and when I -- Cathy Jackson right here
20  is on slide number -- it's after slide 9.  There is
21  no beginning slide, so I would say it's -- yeah,
22  slide 10.
23    Q.   Okay.
24    A.   And it was a managed care team presentation,
25  so it was to the managed care team.

Page 21

1    Q.   Okay.  And the slide deck that proceeds it,
2  is that something you're familiar with, the advocacy
3  overview?
4    A.   It is something Kevin Webb put together.
5    Q.   Okay.
6    A.   So I am briefly familiar with it.
7    Q.   Okay.  I have a question about the second
8  slide in that slide deck with the heading,
9  Mallinckrodt Advocacy Mission.
10    A.   Yes.
11    Q.   So here it says:  "The mission is to
12  position Mallinckrodt as a responsible company
13  developing and implementing innovative solutions to
14  address patient pain and supporting efforts to end
15  misuse and abuse."
16    What is your understanding of what it means
17  here by "responsible company?"
18    MR. DAVISON:  Objection to form.
19    A.   That if we are manufacturing drugs that are
20  being used out in the community, that we are
21  responsible for being a stakeholder in that
22  community.
23    Q.   Being a stakeholder in that community, what
24  does that mean?
25    A.   So we are, as things -- so their -- with

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  opioids there was appropriate use and disposal and
2  weaning and there is many issues related with
3  opioids, and so we were responsible to make sure
4  that we were doing our part to educate. Our role
5  was, in my opinion, down the chain and small, but
6  whatever we could do to give back to the community
7  was an important piece of what I felt was our
8  responsibility.
9      Q. And why would you describe your role as
10 "down the chain and small?"
11     A. Because we -- many people don't utilize --
12 manufacturers sources of their information, so even
13 though we can put out information, many -- many
14 groups won't even use it because it's got the name
15 of a company.
16     When you look at the fact that we were --
17 that we are a manufacturer, it takes so many more
18 steps to get to the patient, so I -- when I say
19 small, I mean it's -- unfortunately we don't have
20 the voice that -- that would allow us to make -- do
21 a lot of work in education and awareness and make a
22 huge impact. So what we do is we do -- we know that
23 there is multifaceted stakeholders involved in any
24 issue and we're one of them. So we do what we can
25 and I feel we should and then everybody else does it

Page 23

1  but we're not the sole source of information.
2      Q. Okay. And what are some of those things
3  that you said "you do what we can and what you feel
4  you should?"
5      A. Uh-huh, sure.
6      Q. What are some of those things?
7      MR. DAVISON: Objection to form.
8      A. Patient education, caregiver education,
9  healthcare provider education, and patient education
10 to make sure that they understand whatever disease
11 state, with the course of the disease state, where
12 treatments work in the disease state, how to discuss
13 to their physicians about options when they are
14 getting into trouble with their treatments, when
15 they are no longer working.
16     For caregivers, it's to help them with
17 resources to give them support, because that is --
18 for many patients, caregivers play a huge role.
19     For the healthcare provider, it's ensuring
20 that the products that we manufacture are used in an
21 appropriate way with the appropriate patient. They
22 are dosed appropriately, and then also at the end,
23 that when there is -- when everything -- when the
24 dose -- when the patient is no longer using those
25 medications, are they appropriately taken off, like

Page 24

1  they need to be weaned, different drugs require
2  different ways of stopping. Some you can just stop
3  but not -- especially not opioids.
4      And then also safe disposal, because we know
5  that there are -- that improper disposal, drugs can
6  lead to diversion.
7      Q. Okay. So flipping to the section of the
8  slide deck that's the Care Alliance presentation
9  that you would give, this here, as you pointed out,
10 it says managed care team presentation. So do I
11 understand that correctly that it's an internal
12 Mallinckrodt presentation to people who are working
13 on managed care accounts?
14     A. Yes.
15     Q. Okay.
16     A. Exactly.
17     Q. And what is the CARES Alliance?
18     A. So the CARES Alliance was a -- the
19 Mallinckrodt had started CARES Alliance in 2010 as
20 their efforts on risk evaluation and mitigation, and
21 so there was no official risk of the REMS program
22 prior to that, which are when Exalgo, which is one
23 of their drugs that was a long-acting pain
24 medication was made, and so the thought at the time
25 was that we really need to have a risk evaluation

Page 25

1  mitigation strategy that we share.
2      And so that was -- that's CARES Alliance.
3      Q. Okay. How does -- so is that particular to
4  Exalgo or what's the connection between CARES
5  Alliance and Exalgo?
6      MR. DAVISON: Objection to form.
7      A. Exalgo is a drug that was manufactured by
8  the Mallinckrodt section of Covidien, because that
9  was the thing, and so it worked -- it was in the
10 disease state of chronic pain and cancer pain, and
11 so it's really about disease state. The drugs that
12 we manufacture, lead us into the disease states that
13 we work in, if that makes sense, so whatever the FDA
14 approves for the disease state is the areas that we
15 will focus on for advocacy. We have to stay -- we
16 have to really stay in our lanes on disease state
17 because we -- we have -- I often worry that if we go
18 into a different area, that we may be considered --
19 even though we don't do anything with marketing,
20 marketing off-label. So we stay in the disease
21 state and at the time in 2010, it was in chronic
22 pain and cancer pain.
23     Q. Okay. And how does that bring about CARES
24 Alliance?
25     MR. DAVISON: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1   A.  So CARES Alliance was an -- was a -- the
2   idea -- and I can only give you what I was told when
3   I first started the company.  So I don't have a lot
4   of detail to that, but Art Morelli and Lisa Saki
5   started CARES Alliance and so it was -- the goal was
6   to be a coalition to collaborate and act responsibly
7   to ensure safety, exactly what it was.
8   Q.  Okay.  And what does acting responsibly mean
9   in the context of the CARES Alliance?
10      MR. DAVISON:  Objection to form.
11   A.  I think the same thing that we just
12   discussed, making sure that people are educated
13   about the side effects of drugs, about the -- about
14   proper use, proper disposal, proper management of
15   drugs.
16   Q.  Okay.  Flip and look at the next two slides
17   together.  So these two slides describe two
18   epidemics.  The epidemic of pain and the epidemic of
19   prescription drug abuse.
20      What's the definition of epidemic?
21      MR. DAVISON:  Objection to form.
22   A.  So epidemic is something that involves the
23   public health of a large group.  At this point, it's
24   the United States because this is a -- this was a
25   problem that was going across in different regions,

Page 27

1   a little more than others.
2   Q.  And which epidemic are you speaking about?
3   A.  Both, actually.  Yeah, they are both public
4   health issues that we -- unfortunately one affects
5   the other.
6   Q.  And which of these epidemics concerns you
7   more?
8      MR. DAVISON:  Objection to form.
9   A.  Oh, my goodness, as a nurse, the epidemic of
10   pain is devastating.  People who have -- I was a
11   pain management nurse for many years at Johns
12   Hopkins and saw people debilitated, unable to hold
13   their kids, unable to hold their jobs, just crushed
14   by chronic pain.
15      The epidemic of prescription drug abuse is
16   equally upsetting.  We have people who are dying and
17   who are turning to opioids for use other than pain.
18   It's -- both of them are equally disturbing,
19   haunting, and of concern to the medical community.
20   Q.  And personally, if you had a loved one swept
21   up in one of these epidemics, would you rather that
22   loved one experiencing chronic pain or
23   prescription drug abuse?
24      MR. DAVISON:  Objection to form.
25   A.  I can't answer that.

Page 28

1   Q.  Really?
2      MR. DAVISON:  Objection.
3   Q.  Truthfully?
4      MR. DAVISON:  Objection.
5   A.  Truthfully?  No, because have you ever had
6   pain?  Do you -- I don't know if you've had pain.
7   The kind of pain that's debilitating.  ████████
8   █ ████████████████████████████████████████████████
9   Luckily, we're blessed that nobody has pain, other
10   than, I think, one of my brothers has chronic back
11   pain, but I think both of them can be debilitating,
12   life ending.  People commit suicide due to pain, so
13   I'm not quite sure.  Maybe you can explain to me why
14   you seem to be leading me, I'm not quite sure where
15   that's coming from, because I've worked in pain
16   management for 13 years and that's -- you don't get
17   to work in pain without looking at prescription drug
18   abuse, so I've seen both issues in the course of my
19   treatment, I would not want -- I would not wish
20   either one of them on my worst enemy.
21   Q.  If you keep going through the slide, there's
22   a graph showing national rates of opioid overdose
23   deaths, treatment, admissions and sales from 1999 to
24   2010.  The graph shows all three steadily climbing
25   throughout that decade; is that correct?

Page 29

1   A.  Yes.
2   Q.  And if the graph were to continue to the
3   present year, we would see the line for opioid
4   overdose death rates continuing to climb; is that
5   correct?
6      MR. DAVISON:  Objection to form.
7   A.  You can't make that statement.  I don't know
8   what the data is.  I don't know if the data supports
9   your statement.
10   Q.  You personally are not familiar with the
11   overdose death rate annually?
12      MR. DAVISON:  Objection.
13   A.  Not any longer.  I haven't done pain
14   medicine, I haven't done advocacy and pain since
15   2015, so it's been three years since I've actually
16   worked in the area of pain medicine.  I'm in the
17   other therapeutic areas of our business.
18   Q.  Your current position at Mallinckrodt is in
19   government affairs and advocacy?
20   A.  It is.
21   Q.  And you would agree that there is a national
22   opioid epidemic currently?
23      MR. DAVISON:  Objection.
24   A.  I would agree that there is definitely a
25   problem with opioid.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1   Q.  You work for a company that manufactures
2  opioids?
3   A.  Uh-huh.
4   Q.  In the area of government affairs and
5  advocacy, but you're not aware of the opioid
6  overdose death rate?
7   A.  I am not.
8     MR. DAVISON:  Objection to form.
9   A.  No longer, I am not.
10   Q.  When is the last year for which you were
11  aware of it?
12     MR. DAVISON:  Objection to form.
13   A.  It would probably be about 2014, 2015, but I
14  don't remember what it was.  I might -- I am now in
15  10 other therapeutic areas other than pain, so my
16  areas of focus now are off of this and that's my
17  colleague Kevin Webb's area.  So we take this very
18  response -- very -- we haven't stepped away from it.
19  We have just changed with who would be focused on
20  it, and it's solely Kevin's area now for advocacy.
21   Q.  Do you ever read news articles about the
22  opioid epidemic?
23     MR. DAVISON:  Objection to form.
24   A.  I do but I can't quote rates.
25   Q.  So you think it may be that the death rate

Page 31

1  has plateaued since 2010?
2     MR. DAVISON:  Objection to form.
3   A.  I can't answer that.  I don't know what the
4  numbers are.  If you want to share with me another
5  graph, I'd be happy to speak to what is actually
6  happening, but I don't think that's -- I don't want
7  to speak, it could plateau, it could fall a little
8  bit, increase a little bit, it could be -- I don't
9  know.
10   Q.  I just want to make sure that testimony is
11  clear that in your position in Mallinckrodt, you
12  don't know what's happened to overdose death rates
13  since 2010, you think they may have fallen, they may
14  have plateaued, you don't know?
15     MR. DAVISON:  Objection.
16   A.  For the record, I do not know the actual
17  statistics.  I do know it's still a national problem
18  but I do not know the statistics, you're absolutely
19  right.  I don't know them.  I apologize, I don't
20  stay on top of every statistics having to do with
21  it.
22   Q.  Do you stay on top of trends?
23   A.  I -- if it's in my area of working.  I mean
24  I stay -- I'm still -- still connected to many
25  people in the pain management, and I would say that

Page 32

1  the trends are that there is increased opioid abuse.
2  I mean -- I'm sorry.  That there is continued opioid
3  abuse.  I'm not sure how much it's increased or
4  changed from these numbers but I can also tell you
5  that there is a huge trend in patients with pain
6  that are not getting treatment, none, people that
7  are going to the pharmacist with cancer, with other
8  sorts of pain who are unable to get their pain
9  treatment because of this hypervigilance on overdose
10  death.
11     I think both of them are equally important.
12  I think we absolutely need to do something about
13  both of them, but I do know that there is increased
14  problems on both parts.  So -- but I believe now
15  it's not as -- from what I'm reading and this is,
16  once again -- you know, I really, probably, should
17  not answer that because, it's really just my
18  thoughts, but heroin is now also a growing
19  addiction, growing and so this is a very bad
20  situation for this country and for people who are in
21  pain and for people who are addicted.
22   Q.  So you just described as equally important,
23  the undertreatment of pain and opioid overdose
24  deaths.  Is that correct?
25     MR. DAVISON:  Objection to form.

Page 33

1   A.  So these are two separate issues, but they
2  are both very concerning.  They are not -- one is
3  not meant to be put in front of the other.  One is
4  not meant to be pushed out and less important.  Both
5  of these affect our families, our coworkers, our
6  friends, so it's -- it's a -- I don't have the
7  answers.
8   Q.  Okay.  I'm just asking about your testimony.
9  You said, "I think both of them are equally
10  important."
11   A.  I do think they are both equally important.
12     MR. DAVISON:  Objection.
13   Q.  Okay.
14   A.  But they are separate.  One does not -- you
15  don't look at one and say, we need to focus on this
16  and ignore that one.  Unfortunate -- and we have
17  healthcare people looking at both of these issues.
18   Q.  And given that you are equating the two,
19  personally, would you rather have a loved one waking
20  up in pain every day or going to sleep and never
21  waking up?
22     MR. DAVISON:  Objection to form, asked and
23  answered.
24   A.  I think I've already answered that one for
25  you.  I don't want anyone to die, but I also don't

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 want someone committing suicide because they can't
2 get out of pain, and that has happened.
3    Q.   Are opioids the only solution for chronic
4 pain?
5        MR. DAVISON:  Objection.
6    A.   Oh, absolutely not.  Absolutely not.  They
7 are one of multi -- they are one of a multifactorial
8 equation in terms of treating pain.  They are just a
9 small piece of it, actually, a very small piece of
10 it.
11   Q.   Okay.  Going a couple slides ahead, the
12 heading CARES Alliance here it says "the CARES
13 Alliance aims to improve pain management outcomes
14 through education and awareness campaigns that are
15 innovative and science based? "
16   A.   Yes.
17   Q.   What does that mean, science based?
18   A.   So it's based in research.  So we did a
19 couple of programs that, with the -- one was with
20 the American Academy of Family Practice where they
21 actually took the -- took some of the forms that
22 were on CARES Alliance, some of the risk management
23 forms, and then they used them in clinics to
24 identify which patient would be at risk for
25 addiction, so that they could be appropriately

Page 35

1 managed with other therapies than opioids, or they
2 could be watched closer, or whatever it would be
3 that the physician would feel like was important.
4       So that is evidence -- what we call -- it's
5 actually that's a poor terminology.  It really is
6 evidence based --
7    Q.   Evidence based?
8    A.   --is the word that we used.  And that means
9 it's research done in a protocol, done strict -- you
10 know, with strict guidelines and it's not just
11 somebody's opinion.
12   Q.   Okay.  And who is the audience for the CARES
13 Alliance education and awareness campaigns?
14   A.   Patients, the public, caregivers, healthcare
15 providers, all stakeholders involved in pain.
16   Q.   The next bullet point on the slide says:
17 "Our goal is to help healthcare professionals and
18 people with pain work together to better assess the
19 risks and benefits of pain medications so more
20 people living in pain can find the relief they
21 need."
22       You mentioned having a background as an RN
23 in practice.  What -- given your experience as an
24 RN, what would you say you need to assess the risks
25 and benefits of medications?

Page 36

1        MR. DAVISON:  Objection to form.
2    A.   So for drugs like opioids, which can
3 cause -- can -- can be misused, you want to make
4 sure that people -- you have to -- there's all sorts
5 of science based guidelines.  You want to look at
6 people who have had a history of addiction, history
7 of misuse, tobacco use is a -- is one of those risk
8 factors, how -- family support, how you -- and I
9 apologize.  I don't remember all of them but those
10 are some of the ones that you would do, but opioids
11 are not for everyone.  Right?  That's the nuance of
12 pain management.  But they are used -- for some
13 people they can make the difference between going to
14 work, not going to work, taking care of their kids,
15 not participating.  And so we've gotten better
16 and -- in developing tools to help identify those
17 patients that may fall into risks with addiction.
18 It's not a perfect situation but I think we're -- I
19 think that the medical community is doing better and
20 better.
21   Q.   Okay.  And you just described the risk
22 information, in terms of balancing risks and
23 benefits.  What sort of information would you need
24 to -- on the benefits side, when you are evaluating
25 a medication?

Page 37

1        MR. DAVISON:  Objection to form.
2    A.   How does it -- does it -- does it actually
3 help you do something, you know.  When people would
4 come into our pain clinic and we would up their dose
5 of any drug, my question was what did you do to --
6 this -- since we've last met with you, and if they
7 would say, well, nothing, my pain is still 10 out of
8 10, I would say to them, well, then maybe these
9 drugs are not working for you.  You know, it's all
10 about when you are looking at benefit you want
11 reduction in pain, but you also want -- you want
12 someone to bring function back, right?  You want
13 people to be able to be participants in their lives.
14 They may not be able to return to work due to
15 injuries beyond -- because of the extent of their
16 injuries, but can they watch their kids, can they
17 get up, take care of the house.  Can you -- you
18 don't want people sitting on the couch all day no
19 matter what you are giving them because then you are
20 really not helping.
21   Q.   What about before a person starts to take
22 medication, you're talking about improvements in
23 function after taking a medication, but would you
24 also want to weigh the risks and benefits before
25 someone starts taking the medication at all?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1     MR. DAVISON: Objection to form.
2     A.  Well, that's what we do.  So that's what I'm
3  saying, these tools are used prior ever -- in the
4  nineties when I practiced, we didn't have these
5  tools, so, but now they have tools where you
6  would -- if you were to come in and say you were
7  having pain and a physician, or a nurse
8  practitioner, did a full exam on you, looked at all
9  the criteria for what you're -- all -- looked at
10  what possible causes could be related to your pain,
11  but decided that a drug such as an opioid was the
12  appropriate use, they would do a risk management --
13  risk evaluation beforehand.  So there is tools now
14  to use that.
15     So we would look, you know, are you somebody
16  who smokes, because that actually has an increased
17  risk, are you somebody who has had an addiction
18  problem before?  They may not preclude you from
19  using an opioid, but what we're going to do is
20  manage you much closer and I'm also going to let you
21  know the risks with these drugs, it's about
22  educating the patients about the risks.
23     Q.  What about assessing the benefits of a drug
24  before someone has taken it?
25     MR. DAVISON: Objection to form.

Page 39

1     A.  I'm not sure what you're asking.
2     Q.  Is there a way to do it?
3     MR. DAVISON: Objection.
4     A.  Just by research, when a drug gets approved
5  by the FDA, you read the research that they are
6  using to approve it.  Drugs are, you know, are not
7  the panacea.  Pain drugs are not the panacea.  They
8  only -- sometimes I only take care of -- in the
9  research studies you will see they only take care of
10  30 percent of pain but sometimes that can make the
11  difference between someone working or not.
12     And that's just for drugs, but there are
13  also other treatments, right, that we look at the
14  risk management, physical therapy, we look to see if
15  there is nonopioid medications that we could use,
16  psychological evaluations.  So pain should be
17  treated in a multifaceted way and if it's only being
18  treated with opioids, then that is not something we
19  would ever -- I as a nurse who has that background
20  or somebody involved with CARES Alliance would ever
21  be okay with.
22     And I'm talking chronic pain.  I apologize.
23     Q.  Got it.  Chronic pain.  In terms of opioid
24  treatment for chronic pain, are you aware of
25  research showing the benefits of opioid treatment

Page 40

1  for chronic pain?
2     MR. DAVISON: Objection to form.
3     A.  I -- gosh, I can't remember which studies
4  they were, but there were studies that were done
5  showing that some opioids -- that opioids can work
6  on some disease states and it would increase return
7  to work or -- but once again, not 100 percent, not a
8  panacea.  I know some areas of medicine -- disease
9  such as fibromyalgia, showed that opioids actually
10  didn't work very well.
11     So in our clinic, we try to steer those
12  patients to other drugs, but many times we would get
13  patients who had started on opioids prior to ever
14  coming into our clinic and so we would have to try
15  to wean them off and start them on other drugs that
16  we knew would actually work.  Actually, it's
17  exercise and tricyclic antidepressants for
18  fibromyalgia, but it's not a science because some
19  people can use opioids and it can work.  It's not
20  everyone that doesn't do well, but we definitely try
21  to -- I think medicine tries to be as much evidence
22  based as possible.
23     Q.  And the studies showing benefits of opioid
24  treatment for chronic pain, do you have any idea
25  generally how long those studies lasted?

Page 41

1     MR. DAVISON: Objection to form.
2     A.  Actually, I think that was -- it's one of
3  the complaints, when they did a -- in terms of how
4  long the studies are.  There is no huge long
5  epidemiological data.  I want to say they may have
6  been months, they may have been a few years, I think
7  now there is some work being done on longer studies.
8  So I think once again, science is not perfect and as
9  we learn more, we do better, and I think that's
10  what's happening in the medical community.
11     Q.  Just on the next page of this slide deck,
12  the heading is Objectives.  And the second bullet:
13  "To proactively address the need to ensure the
14  benefits of a drug outweigh their risks?"
15     A.  Absolutely.
16     Q.  Can you give me an example of how the CARES
17  Alliance carried out this objective?
18     MR. DAVISON: Object to the form.
19     A.  That would be -- sorry.  That would be
20  ensuring that people had risk -- risk evaluation
21  tools, that would be ensuring that they
22  understood -- and it's not just the clinician that
23  needs to identify risks.  It's the patient that
24  needs to understand the risks that they are going
25  through, right?  Hey, these drugs if you start to

Page 42

1  take them for reasons that are not pain related, you
2  need to let us know. So this is a conversation you
3  have with patients. We're definitely more nuances
4  with it than we used to be. In the nineties, you
5  know, we would give this drug, we would give our
6  prescriptions out to patients and that was my job to
7  educate them and I would say, you know, look, you
8  need to be careful that -- let me know when you have
9  any trouble, if you're starting to take these for
10  any other reason other than pain medicine. And so
11  these are the kinds of things that you have, and
12  that's -- you know, we need to address these risks,
13  not just to the healthcare providers, but also to
14  our patients and our caregivers and HIPAA came and
15  it became a lot tougher to do that because those are
16  the people that are going to see the changes.
17  Right? You're going to be on these drugs, you may
18  not see those personality changes that are happening
19  with you. You're in pain, you're trying to
20  figure -- you know, once again, it's rare that it
21  would take 100 percent of your chronic pain away.
22      So that's what -- that's what we would do.
23  We would work on making sure that all stakeholders
24  understand risks that were involved versus the
25  benefits, because risks are important, because as

Page 43

1  you had stated earlier, prescription drugs abuse is
2  not something we'd ever want to happen or advocate
3  or misuse of the drugs. It's something -- my whole
4  job was trying to fight that at Hopkins. Not fight
5  that -- fight that is probably a good word.
6      Q.  And on the benefits side, CARES Alliance
7  with its education and awareness campaigns, did
8  CARES Alliance ever do anything to educate providers
9  about the disease states for which opioids show
10  little to no benefit?
11      MR. DAVISON: Objection to form.
12      A.  We didn't educate on disease states. We
13  just talked about pain in general. Yeah. The thing
14  about pain is that it's ubiquitous, there is not a
15  disease state that -- probably very limited disease
16  states that -- that don't have a component of pain,
17  but that wasn't the goal of the -- we didn't -- we
18  didn't -- we worked in disease states but we didn't
19  educate people about the different cancers or
20  different things that might cause pain.
21      Q.  You mentioned fibromyalgia a moment ago as a
22  disease state for which opioids are not shown to be
23  effective.
24      A.  Well, I'm -- my studies -- I just wanted to
25  be very clear, that the research I'm doing was in

Page 44

1  the nineties. I worked with Dr. Raja who is one of
2  the premier guys in fibromyalgia. I don't know what
3  the research shows now, but at the time -- they
4  didn't show no benefit but they showed minimal
5  benefit to other drugs -- as compared to other
6  drugs.
7      Q.  In the nineties?
8      A.  In the nineties, late nineties. I left
9  Johns Hopkins in 2000, the end of 2000, so that --
10  so that was when I was deeply involved in patient
11  care and then I moved into the industry.
12      Q.  Got it. Okay.
13      MR. DAVISON: Counsel, do you mind if we
14  take a quick break.
15      MS. GAFFNEY: Sure, that's fine.
16      THE VIDEOGRAPHER: Off the record, 10:13
17  a.m.
18      (Recess from 10:13 a.m. until 10:25 a.m.)
19      THE VIDEOGRAPHER: On the record, 10:25 a.m.
20  BY MS. GAFFNEY:
21      Q.  Okay. Before the break we were talking
22  about studies you were aware of regarding opioid use
23  for fibromyalgia in the late '90s, and understanding
24  that you haven't kept up since then, since you left
25  clinical practice, if the evidence since then were

Page 45

1  to show that opioids were not effective for
2  fibromyalgia, would that be something that an opioid
3  manufacturer would have a responsibility to share
4  with the medical community and the patients?
5      MR. DAVISON: Objection to form.
6      A.  I can't answer that.
7      Q.  Earlier you spoke about a responsible
8  company educating the medical community patients,
9  caregivers, healthcare providers. Where does that
10  responsibility stop?
11      MR. DAVISON: Objection to form.
12      A.  So -- so the question is -- could you repeat
13  the question again and then I --
14      Q.  Sure. If the evidence were to show that
15  opioids were not effective for disease state, such
16  as fibromyalgia, would a manufacturer have a
17  responsibility to share that information with the
18  public?
19      MR. DAVISON: Objection to form.
20      A.  That's a pretty broad question. I would say
21  I don't know what the data is but we would share --
22  a manufacturer shares information on FDA -- what the
23  FDA has indicated -- the FDA approved indications,
24  and so we would never promote in an area that we
25  weren't -- at least our company would not promote in

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  an area that was not approved by the FDA, and each
2  physician has different treatment algorithms that
3  they use. And I can't answer that question, because
4  I need -- it's a little too broad.
5      Q. Okay. Earlier, when we were talking about
6  the advocacy mission of Mallinckrodt, positioning
7  Mallinckrodt to be a responsible company, one of the
8  things that you spoke about was patient education
9  and healthcare provider education, where treatment
10  works, in what disease states. Then you gave the
11  example of opioids not working for fibromyalgia
12  based on the studies as of the late '90s.
13      So wouldn't that fit into what you were
14  saying earlier, where treatment works for a disease
15  state or doesn't work in a disease state?
16      MR. DAVISON: Objection to form.
17      A. But I'm not quite sure what you mean by what
18  would we do. I'm not sure what a company would be
19  responsible for doing. That is a decision made by a
20  patient and by a clinician and patient relationship.
21  So that physician would -- I would think would not
22  utilize whatever -- I would think the physician
23  would decide what to use based on their knowledge of
24  the patient and their experience.
25      So the manufacturer really had no role there

Page 47

1  at all in that patient-physician relationship.
2      Q. Okay. So going back to what you said
3  earlier about a responsible pharmaceutical company
4  engaging in patient education and healthcare
5  provider education, including where treatment works
6  for which disease states, is that still your
7  testimony?
8      MR. DAVISON: Objection to form.
9      A. So we -- we -- I'm not sure -- I'm not
10  really sure what you're asking me. So if you are
11  asking me -- so maybe you can say it in a way that
12  I'm able to answer because I'm not quite sure what
13  you're wanting me to answer.
14      Q. I'm just trying to understand what you were
15  explaining about the manufacturer's responsibility
16  in terms of patient education and healthcare
17  provider education.
18      A. So we would -- once again --
19      MR. DAVISON: Objection.
20      A. As I said, we would not talk disease state.
21  We would talk about appropriate prescribing, use,
22  but that's not -- that would be our medical affairs
23  team would handle that. CARES Alliance was really
24  about looking at risks, appropriate disposal, making
25  sure people understood the knowledge base, but we

Page 48

1  never got into exact disease states.
2      Q. Okay. How about Mallinckrodt, not CARES
3  Alliance, but Mallinckrodt and other manufacturers.
4  Would they -- or do they engage in patient education
5  and healthcare provider education?
6      MR. DAVISON: Objection to form.
7      A. Yes.
8      Q. Including about where treatment works in
9  certain disease states or doesn't work in other
10  disease states?
11      MR. DAVISON: Objection to form.
12      A. They support patient education. They
13  support but it's usually done under independent
14  medical education, so we don't have any say into
15  what is being taught. There is many facets of a
16  company, so I'm not sure which one you're --
17      Q. Let me just go back to the words you had
18  earlier.
19      A. Sure.
20      Q. Okay. So earlier you were saying -- it's a
21  little hard to read from the transcript but it's
22  multifaceted and there are many shareholders, the
23  manufacturer is one of them, and one of the things
24  that a manufacturer, you said, can do and what you
25  feel should do, is: "Patient education, caregiver

Page 49

1  education, healthcare provider education and patient
2  education to make sure that they understand whatever
3  disease state with the course of the disease state,
4  where treatments work in the disease state, how to
5  discuss with their physicians when they are getting
6  trouble with their treatments, no longer working."
7      That's what I was asking about. This
8  educational piece about the disease state and where
9  treatments work and don't work with the disease
10  state. That was my understanding of what you said
11  earlier. Are you changing that now?
12      MR. DAVISON: Objection to form; asked and
13  answered.
14      A. No, I'm not changing that. I'm -- we do --
15  we do educate, but we do it -- we do it through
16  providing unrestricted educational grants, because
17  as I also said earlier, you know, we rely on our
18  physicians and the community and our research
19  community to help guide clinical practice. So we do
20  do all that but we don't do it ourselves, and that
21  would -- that's pretty much industry standard. So
22  we support all those.
23      Q. So you don't use the research in your
24  educational campaigns as a manufacturer?
25      MR. DAVISON: Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  A.  We did in CARES Alliance, for where it
2  related to CARES Alliance, that's all I can speak
3  to, because that's what I was involved with when I
4  was at Mallinckrodt, so what we studied we used or
5  shared.
6  MS. GAFFNEY:  Exhibit 3.
7  (Mallinckrodt - Jackson Exhibit 3 was marked
8  for identification.)
9  A.  Okay.
10  Q.  Okay.  So Exhibit 3 is an e-mail from
11  October 2014, so a few months after you had started
12  at Mallinckrodt, and it's an e-mail from you
13  describing attending a workshop in Washington, D.C.
14  with Maureen Corson.  Do you remember attending that
15  workshop?
16  A.  Yes.
17  Q.  Okay.
18  A.  Vaguely.
19  Q.  Vaguely.  Sure.  And who is Maureen Corson?
20  A.  I actually don't remember her.
21  Q.  Okay.  So you sent this e-mail to a number
22  of people at Mallinckrodt?
23  A.  Uh-huh.
24  Q.  Can you take a moment and run down the list
25  and state the name and then which department or

Page 51

1  division at Mallinckrodt each person worked in?
2  A.  Sure.
3  MR. DAVISON:  Objection to form.
4  A.  John Decker was medical; John Peppin was
5  medical; Melissa Falcone was marketing; Derek Naten
6  was government affairs; Kevin Webb, government
7  affairs; Tina Purcell, medical; Tim Missey,
8  marketing; Ginger Collier -- I'm sorry, I can't
9  recall Ginger, and Rhonda was communications and --
10  Q.  How about the CC line?
11  A.  Jan Anderson was medical, Maureen Corson
12  I -- I don't recall her.  I apologize.
13  Q.  That's fine.
14  A.  Being a PharmD, maybe medical, Anthony
15  Lassiter, medical, and Gena Holthaus was advocacy
16  and medical affairs, so medical.
17  Q.  So several departments in Mallinckrodt
18  represented.  Why were you sending all of them this
19  description of the workshop you attended?
20  MR. DAVISON:  Objection to form.
21  A.  That's part of my job.  I provided feedback
22  on the events that I attended.
23  Q.  Your e-mail says: "The goal of the meeting
24  was to present the evidence on the -- and then first
25  of all it is, long-term effectiveness of opioids for

Page 52

1  treating chronic pain."
2  You wrote: "The best way to summarize the
3  results of the meeting is to share, quote, from the
4  draft executive summary.  What was particularly
5  striking to the panel was the realization that there
6  is insufficient evidence for every clinical decision
7  that a provider needs to make regarding use of
8  opioids for chronic pain, leaving the provider to
9  rely on his or her own clinical experience?"
10  Did I read that correctly, that there is
11  insufficient evidence for every clinical decision
12  that a provider needs to make regarding use of
13  opioids for chronic pain?
14  MR. DAVISON:  Objection to form.
15  A.  You read the statement.
16  Q.  Okay.  How does this information about the
17  lack of sufficient evidence for opioid use for
18  chronic pain affect Mallinckrodt's messaging about
19  its products that treat chronic pain?
20  MR. DAVISON:  Objection to form.
21  A.  I was not responsible for the messages that
22  Mallinckrodt made on -- to -- all the messages, just
23  the ones that were related to the CARES Alliance.
24  So I think -- yeah.  So can you re -- can you
25  rephrase that question, please, just so I --

Page 53

1  Q.  Sure.  And just to clarify, in your time at
2  Mallinckrodt, you were only responsible for the
3  CARES Alliance?
4  A.  Yes.
5  Q.  In both positions?
6  A.  No.  No.  Since -- so I was -- so part of --
7  part of -- I was also responsible for the
8  relationships with advocacy groups in the
9  Mallinckrodt, and so care -- I moved away from
10  opioids in 2015, so just went to our other
11  therapeutic areas.
12  Q.  Okay.  You're reporting -- in this e-mail
13  you're reporting the summary from this panel you
14  attended.  Do you disagree with that panel, the
15  statement that you reported in your e-mail?
16  MR. DAVISON:  Objection to form.
17  A.  Do I disagree with it?  This wasn't -- I
18  didn't -- I wasn't making any -- I was just -- I
19  wasn't making any conclusions.  I just wanted to
20  share the summary because we often responded to
21  draft summaries, and that was the reason I wanted to
22  do that, to make sure that if we wanted to respond
23  as a company on this, we could.  There was an
24  option.  But I would not have made that decision.  I
25  think that the statement was just a statement.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  didn't make any conclusions off of this.
2     Q.  Based on your experience and your own
3  knowledge, do you believe that there is sufficient
4  evidence to support the use of opioids for chronic
5  pain?
6     MR. DAVISON:  Objection.
7     A.  I can't answer that.  I don't -- the data is
8  so different today, I don't -- it's much more robust
9  and I don't know where that would fall.
10    Q.  You said the data is so different today
11  compared to October 2014 or --
12    A.  Well, I'm not in this space.  So you're
13  asking me to answer a question I'm not in the
14  opioid -- I'm not in the pain space anymore.  You're
15  asking me to -- what you're -- you're asking me if I
16  agree with this statement.  That's not what the
17  purpose of this was.  The purpose of this was just
18  to summarize what was discussed at that meeting.
19  That was taken actually directly from the executive
20  summary.  That is not my statement.
21    Q.  At the time, in October 2014, did you
22  believe that there was sufficient evidence to
23  support the use of opioids for chronic pain?
24    A.  I wouldn't have --
25     MR. DAVISON:  Objection.

Page 55

1    A.  -- known all the evidence that was -- I --
2  you know, I'm one person working in a company.  This
3  meeting was to look at a longitude of data, and so I
4  don't have an opinion.  I was literally just taking
5  something to share with this team so that they
6  understood what the crux of that meeting was about
7  and that there was an opportunity for open convo.
8    Q.  Okay.  So as you said, you don't have all
9  that data, but you attended a meeting where the goal
10  of the meeting was to present that data on the
11  long-term effectiveness of opioids for treating
12  chronic pain.  Do you have any reason to doubt the
13  conclusion that you shared in your e-mail?
14     MR. DAVISON:  Objection to form.
15    A.  I don't have any reason to believe or doubt.
16  It was really about sharing the quote from the draft
17  summary so people understood what the crux of the
18  meeting was about, which is -- I'm going by that
19  because while I vaguely recall being there, I don't
20  recall all the data that was presented or all the
21  meeting notes.  I don't -- it's been so long.  It's
22  been over four years ago and so I apologize.  I
23  don't remember everything.
24    Q.  Okay.  So this conclusion from this panel
25  doesn't stand out as particularly striking or

Page 56

1  memorable?
2     MR. DAVISON:  Objection to form.
3    A.  No.
4    Q.  Something that you or others at Mallinckrodt
5  may have already been aware of?
6     MR. DAVISON:  Objection to form.
7    A.  I -- all I can tell you is I used that quote
8  to share the summary of the meeting.  That's not
9  something that would have been -- I would have never
10  seen that quote before the draft executive summary.
11    Q.  Sure, but not necessarily the quote, but the
12  content of it.  "What was particularly striking to
13  the panel, was the realization that there was
14  insufficient evidence for every clinical decision
15  that a provider needs to make regarding the use of
16  opioids for chronic pain."
17     Nothing about that stood out as striking to
18  you or memorable?
19     MR. DAVISON:  Objection to form.
20    A.  No.  It's actually a situation where
21  medicine as a whole.  There is not -- we don't
22  always have evidence-based medicine, unfortunately,
23  there is not enough research in any area of medicine
24  today.  We're building it.  So that's what I read
25  that to be, that we need to continue building the

Page 57

1  evidence.
2    Q.  But in the meantime, Mallinckrodt and other
3  manufacturers, promoted drugs for the treatment of
4  chronic pain, without evidence.  Is that what you're
5  saying?
6     MR. DAVISON:  Objection to form.
7    A.  No.  Not at all.
8    Q.  Okay.  You said, "sometimes we don't have
9  evidence-based medicine."
10    A.  Sometimes -- said --
11     MR. DAVISON:  Objection.
12    A.  There is insufficient evidence-based
13  medicine for all forms of medicine that is practiced
14  anywhere and everywhere because there are not enough
15  studies, enough study subjects, enough money to
16  support the research that has to be done.  It
17  continues to grow, we continue to build on that body
18  of knowledge.
19     MR. DAVISON:  Just to interrupt.
20     (Discussion off the record.)
21     MS. GAFFNEY:  Here's Exhibit 4.
22     (Mallinckrodt - Jackson Exhibit 4 was marked
23  for identification.)
24  BY MS. GAFFNEY:
25    Q.  I'll give you a moment to read it.  Okay?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  A.  Yeah.
2  Q.  So Exhibit 4 is an e-mail from Maureen
3  Corson to Sonya Martin and Jan Anderson and copying
4  you and it's around the same time as the prior
5  e-mail we were just looking at two days before, that
6  e-mail, and if you go to the beginning of the e-mail
7  thread, Sonya Martin is asking Maureen Corson to
8  send her her summary of the NIH meeting to her and
9  Jan Anderson.  The e-mail signature for Sonya shows
10  that she works for the medical affairs company.  Are
11  you familiar with the medical affairs company?
12  A.  I am.
13  Q.  Can you describe for me the role of that
14  company?
15  A.  They were a consultant firm that worked with
16  our global medical affairs, and helped out on
17  meeting planning and a lot of the strategy work, in
18  terms of research.
19  Q.  Okay.  And is it your understanding that
20  this e-mail summarizes the same NIH workshop that
21  the prior exhibit was about?
22  MR. DAVISON:  Objection to form.
23  A.  I'm actually not sure of it.  It could be.
24  I'm -- I'm not seeing the direct link but it could
25  certainly be.  It could certainly be.

Page 59

1  Q.  Okay.  Okay.  So Maureen's summary includes
2  14 points.
3  A.  Uh-huh.
4  Q.  We won't go through each of them but if you
5  can just go down to number seven.  It says: "There
6  are three major areas in which the use of opioids in
7  chronic pain can be eliminated and reduce the
8  burden.  The two most relevant are the management of
9  lower back pain and headaches.  Used long term, in
10  these two populations, has shown poor outcomes
11  because they trick the brain into feeling better
12  than it really is."
13  Following this panel and this information,
14  did Mallinckrodt communicate this information, in
15  its science-based education campaigns, that opioids
16  can be eliminated from the treatment of lower back
17  pain and headaches based on poor outcomes?
18  MR. DAVISON:  Objection to form.
19  A.  I don't know, but this was not -- this is
20  the findings that someone wrote up of a meeting that
21  they attended.  That's all this is.  This would not
22  have directed anybody to do anything.  This was more
23  about informing -- informing people about what
24  the -- what was presented at a meeting.  This would
25  have then resulted in additional meetings, perhaps a

Page 60

1  review of the actual report, but this itself, this
2  e-mail itself, is just a list of what was discussed.
3  This would not have done anything, this would not
4  have directed anyone, to my knowledge, but I did
5  not -- I don't know what they did with this
6  information.
7  Q.  You're on the e-mail.  What did you do with
8  the information?
9  MR. DAVISON:  Objection to form.
10  A.  I noted it.  I guess -- I don't know.  It's
11  been so long ago, I don't know.  I mean, this would
12  not have been an action item.  This was more about
13  an FYI of what was presented at a meeting, and then,
14  you know, this is an FYI.
15  Q.  So this e-mail is from October 1st, 2014,
16  and the request at the beginning is a summary of the
17  NIH meeting the past few days.  The prior exhibit we
18  looked at from, October 3rd, 2014, is an e-mail from
19  you where you said, "Maureen Corson, PharmD.  and I
20  attended the NIH Pathways to Prevention workshop on
21  the Role of Opioids in the Treatment of Chronic Pain
22  this week in Washington, D.C."
23  And then, this e-mail we're looking at now,
24  Exhibit 4, is Maureen Corson's summary of that
25  meeting that you attended with her.

Page 61

1  A.  Uh-huh.
2  MR. DAVISON:  Objection to form.
3  Q.  So you sent a -- your own summary on to many
4  other people at Mallinckrodt, we went through the
5  list of various departments.
6  A.  No, mine was not a summary.  This was just a
7  goal of the meeting and then a brief statement that
8  wrapped up what I felt was the summary.
9  Q.  Okay.
10  A.  And then it really was to let people know
11  about the public comment.
12  Q.  I understand.
13  A.  So that was the goal of that e-mail.  That
14  was not to summarize the meeting.  And this would
15  be -- this one that we're talking about that you
16  asked me about, are points of a meeting that were
17  shared with -- with just Sonya and then Jan Anderson
18  who was in our medical department.
19  Q.  Okay.  And what does NIH stand for?
20  A.  National Institute of Health.
21  Q.  So it's not just a meeting, but it's a
22  workshop held by the National Institute of Health to
23  present the evidence on the long-term use of opioids
24  for chronic pain?
25  MR. DAVISON:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    A.  It's a meeting at the NIH.  NIH pulled it
2    together, yeah.
3    Q.  Okay.  And would this sort of national
4    presentation of the evidence be important to
5    Mallinckrodt?
6        MR. DAVISON:  Objection to form.
7    A.  It would be -- it would warrant us to
8    attend, so I would say it would be important.  We
9    try to -- make good use of our time.
10    Q.  Sure.  And then after attending, what would
11    you do with this sort of information?
12        MR. DAVISON:  Objection to form.
13    A.  Bring back the -- educate the people in
14    our -- within our -- our colleagues to let them know
15    what we learned, and then that was the first
16    presentation of this, and once again, I vaguely
17    recall it.  I don't even recall the present -- or
18    who even presented at this meeting, so -- this
19    wasn't even complete because they were still waiting
20    for the draft -- it was in draft form, so we would
21    have never done anything with a draft in point.  So
22    these would have been discussed internally and every
23    group would have done -- I can't answer for that
24    because I was only in CARES Alliance, and once
25    again, we were very much in tune to making sure we

Page 63

1    were educating about the things that were
2    responsible with CARES and only CARES.
3    Q.  So once it's beyond the draft stage and it
4    is complete, and Mallinckrodt has had internal
5    discussions about this information, would
6    Mallinckrodt then disseminate it externally?
7        MR. DAVISON:  Objection to form.
8    A.  It's not ours to do that.  We would not --
9    this is an N -- to your point, it was NIH.  We --
10    that's not our purview to take something of someone
11    else's and distribute it.  That would require
12    approval from everybody involved.
13    Q.  What about the evidence that opioids are not
14    effective treatment for lower back pain and
15    headaches?
16        MR. DAVISON:  Objection to form.
17    Q.  Is that something that you would educate
18    healthcare providers and patients about?
19        MR. DAVISON:  Objection to form.
20    A.  That's -- I can't answer that.  That's not
21    in my purview at all.  That was not -- we did not do
22    disease state education as part of advocacy.
23    Q.  Who at Mallinckrodt could answer that?
24        MR. DAVISON:  Objection to form.
25    A.  I'm not -- I'm not sure.  I'm not sure.  I'm

Page 64

1    not sure, because your question is, did we take this
2    information and publicize it?  No, we did not
3    because this was draft form.  I don't know what they
4    did with the final.  I can't answer your question.
5    It -- yeah.
6    Q.  Earlier you spoke, for several minutes,
7    about a responsible company educating patients and
8    healthcare providers, including about disease
9    states --
10    A.  Right.
11    Q.  -- and treatments that work or don't work
12    for these disease states.  Here is a summary of
13    evidence that was presented, nationally, and that
14    has been relayed within Mallinckrodt that says
15    opioids can be eliminated for lower back pain
16    treatment and headaches and reduce the burden.
17    A.  We don't --
18        MR. DAVISON:  Objection to form.
19    A.  What is your question and then I --
20    Q.  Right.  I hadn't finished yet.
21    A.  I'm sorry.  I apologize.
22    Q.  No, no, that's fine.
23        Would Mallinckrodt take this information and
24    share that with healthcare providers and patients?
25        MR. DAVISON:  Objection to form.

Page 65

1    A.  I don't know if we did, I don't know -- I
2    don't believe we would -- we wouldn't withhold --
3    I'm having a hard time answering this because this
4    is a report done by the NIH that was open to
5    everybody.  It was available to everyone.  We do not
6    get involved in the patient-physician decisions.  We
7    do not do that.  Whatever a patient and -- whatever
8    a physician decides is the appropriate treatment for
9    that patient is -- that relationship is highly
10    respected and I can't answer how -- I can't
11    answer -- we wouldn't take every -- I can't answer
12    what information we would piece out of this because
13    this is a report and that would have been presented
14    to the public.  So it was available to anyone that
15    wanted to read it, that could read it or had an
16    interest in reading it.
17        MR. DAVISON:  Sorry.  My realtime is still
18    not working.  Could we just go off the record,
19    real quick, and try to get it fixed?
20        THE VIDEOGRAPHER:  Off the record, 10:57 a.m.
21    (Recess from 10:57 a.m. until 11:00 a.m.)
22        THE VIDEOGRAPHER:  On the record, 11:00 a.m.
23    BY MS. GAFFNEY:
24    Q.  Okay.  Would the medical affairs department
25    at Mallinckrodt -- or does the medical affairs

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  department at Mallinckrodt, provide information to
2  marketing and to sales regarding the medical
3  information about Mallinckrodt products?
4      MR. DAVISON: Objection to form.
5      A.  I'm not in either of those groups, but they
6  are the source of medical information for the
7  company, but I can't answer because I'm not in sales
8  or marketing.
9      Q.  But would medical affairs provide medical
10  information to those other departments within
11  Mallinckrodt?
12      MR. DAVISON: Objection to form.
13      A.  Yes, I just don't know the extent of what
14  they would do.
15      Q.  Okay.  Would they provide information about
16  what disease states Mallinckrodt products work or
17  don't work for?
18      MR. DAVISON: Objection to form.
19      A.  I don't know that.  I don't know that.  They
20  would talk about -- I don't know because once again
21  I'm not in those divisions but it would be whatever
22  the -- it was on label, that's what they would use
23  as their guide for education, what's on label from
24  the FDA.
25      Q.  So what sort of provider education and

Page 67

1  patient education would your department engage in?
2      A.  The advocacy?
3      MR. DAVISON: Objection.
4      Q.  Specifically, what sort of information would
5  you convey to healthcare providers and patients?
6  You've said nothing about disease states; is that
7  correct?
8      MR. DAVISON: Objection.
9      A.  We talk about pain management but not what
10  is the cause of the pain because every -- yeah,
11  because we don't get into that detail.
12      Q.  So earlier when we talked about evaluating
13  risks and benefits of a drug, you said, in terms of
14  the benefit of a drug, you would want to know
15  whether it would actually do something to bring
16  function back.
17      A.  Right.  Function is -- yes.
18      Q.  So would you want to know, whether the drug
19  you're going -- you're considering prescribing, is
20  effective for a state, such as low back pain or
21  headache, before you prescribe it?
22      MR. DAVISON: Objection to form.
23      A.  Well, it depends on what you're -- it's
24  being prescribed for.  In the instance of where I
25  was working in the area of pain medicine, it was

Page 68

1  pain.  It wasn't about injury to your low back or
2  your headache.  It was for pain, so it's not direct
3  to disease state, if that makes sense.
4      Q.  So tell me more about that, about pain as a
5  single entity.  I don't think that you're saying
6  that pain is a single entity.  There is different
7  kinds of pain, right?
8      MR. DAVISON: Objection to form.
9      A.  Pain is not an entity.  It is a result of
10  injury or a result of an outcome of neurological
11  problems.  There is a multitude of reasons for pain,
12  so I'm not quite sure.
13      Q.  So just to back up, to my understanding, the
14  source of the pain, such as whether it's chronic low
15  back pain or another type of musculoskeletal pain,
16  would be relevant to the treatment that would be
17  prescribed for that pain, but then you said, "Well,
18  this is about pain management, it's not about the
19  injury or the disease state."
20      MR. DAVISON: Objection.
21      A.  It's when a physician -- when an HCP
22  person -- I apologize.  I'm missing nurse
23  practitioners, a lot, NPs.
24      When a healthcare provider prescribed a drug
25  to a patient, they -- there is -- they do it based

Page 69

1  on -- for pain, they do it based on the cause of the
2  pain and what has been shown to be effective, what
3  is approved for that pain, and then they may
4  prescribe it and then wait to see what the effects
5  are.
6      If that doesn't work, they may go down
7  another alley and treat it.  They may treat it at
8  different pieces of where the -- at different
9  receptor sides within the body.  So is that help --
10  so it's not as simple -- it's really about that --
11  what that physician decides is appropriate.  I --
12  yeah.
13      Q.  But Mallinckrodt does communicate directly
14  with physicians?
15      MR. DAVISON: Objection to form.
16      Q.  Correct?
17      A.  Yes.  Our sales team calls on physicians,
18  but I don't have anything to do with sales.  It's a
19  huge separation.
20      Q.  Right.  Different department.  But the sales
21  team gets information about the medical science of
22  Mallinckrodt's products from the medical affairs
23  department, is that correct or is that not correct?
24      MR. DAVISON: Objection to form.
25      A.  They may get training from them or they

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  may -- I don't -- like to the extent, I'm not quite
2  sure what you're asking.  How much -- yeah.  They
3  are not getting one on one education from our
4  medical team.
5     Q.  Is there another source within Mallinckrodt
6  for medical information about Mallinckrodt products
7  other than the medical affairs department?
8     A.  No.
9        MR. DAVISON:  Objection.
10    Q.  So to the extent Mallinckrodt employees are
11 being trained on, say, how to speak to providers
12 about Exalgo, that information is coming from
13 medical affairs, is that correct?
14    A.  No.
15       MR. DAVISON:  Objection to form.
16    A.  Medical affairs would provide the clinical
17 data that, you know, what is pain, how is -- you
18 know, what's the different receptor sites, things
19 scientific, but the marketing team would teach --
20 the marketing team and the sales team would
21 separately on a whole different avenue decide --
22 make those kinds of decisions on how they are
23 representing -- how they are presenting the data and
24 what -- and it's all within guidelines of FDA.  Does
25 that make sense?

Page 71

1     Q.  That makes sense, but it's coming from the
2  medical affairs department whether --
3     A.  The scientific data is.
4     Q.  -- marketing and then to sales --
5     A.  The scientific data is coming --
6     Q.  That's what I'm asking about because that's
7  what I understand this meeting was presenting, was
8  the scientific data on the long-term use for opioids
9  for chronic pain, including that there are poor
10 outcomes for low back pain and headaches.  So --
11    A.  If a result of this meeting was -- I'm
12 sorry.  I didn't even wait for you to ask the
13 question.  Go ahead.
14    Q.  I would want -- as a patient, I would want
15 my healthcare provider to know whether a medication
16 was shown to be effective for the problem that I'm
17 presenting to the provider or not.  So here where
18 it's saying that opioids and chronic pain can be
19 eliminated for management of lower back pain and
20 headaches, would that be information that
21 Mallinckrodt would transmit to marketing and to its
22 sales team so that it could reach providers in
23 another way?
24       MR. DAVISON:  Objection to form.
25    A.  I can't answer that because I wasn't

Page 72

1  responsible for the sales education.
2     Q.  Would you think that that would be
3  information that the sales team should have when
4  speaking with providers?
5        MR. DAVISON:  Objection to form.
6     A.  I would want -- I think -- think about how I
7  would word this -- I would want them -- I would
8  think that clinicians -- I would think that there is
9  no set of data coming from any one meeting that
10 would -- that I think should inform -- I think you
11 have to look at a bigger picture, you have to wait
12 until the final results, you have to wait until the
13 FDA makes a decision and then that's a game changer
14 because then you would -- you would then have that
15 discussion.
16       I'm not sure how you could take a statement
17 from a meeting and make that gospel and ask -- this
18 was a first time at this meeting, if I recall, this
19 was a first time meeting, so that would be my
20 statement.  It's -- none of this is -- I don't even
21 see the evidence based behind it, so you would have
22 to actually go to the -- nothing we can do is not --
23 it can -- we heard at a meeting that this happened,
24 so --
25    Q.  The report is attached to this e-mail.  I

Page 73

1  didn't print it for today because it's 200 pages
2  long.
3     A.  Right.
4     Q.  You said you can't take it and make it
5  gospel, but would you ever present information to
6  the medical community to say it looks like the
7  evidence does not support the use for this drug
8  in -- for lower back pain or headaches without
9  having to say there is gospel?
10       MR. DAVISON:  Objection to form.
11    A.  I can't say that because I would not be
12 doing the education for -- I don't know what
13 criteria they used to make sure that -- to move that
14 from this document to the sales group.  I have no
15 clue of what that criteria would have been to go
16 from one piece to the other.
17    Q.  And in your clinical practice, would you
18 only want to hear about scientific evidence once it
19 was, quote, gospel?
20       MR. DAVISON:  Objection.
21    A.  Well, no.  But the truth is, in clinical
22 practice, you sometimes it's not as clean-cut, so
23 some people do actually benefit from these drugs
24 that have had back pain, and so that would be --
25 that's why you look at this, you look at the data --

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 that's why you do the best you can with the data,
2 but that doesn't necessarily mean that that is --
3 that -- that you would not try other things for a
4 patient who was not responding to what was out there
5 and was -- that's in clinical practice.
6 Q. And Mallinckrodt employees are
7 interacting -- the sales team is interacting with
8 doctors, with physicians, and nurses and PAs, and
9 there is nothing to prevent a Mallinckrodt
10 salesperson from saying, there doesn't appear to be
11 any evidence supporting the use of this drug for low
12 back pain, you, healthcare provider, can make your
13 decision based on your own practice but just so you
14 know, there is no evidence supporting the use of
15 this drug for that disease state, is there anything
16 to prevent a Mallinckrodt employee from sharing that
17 with a physician?
18 MR. DAVISON: Objection to form.
19 A. Yeah. I can't answer that because I don't
20 do the training but I can tell you that our reps are
21 very much regulated as to what they can and can't
22 say and they cannot read a document and go out and
23 say to the physician that this is not good for this
24 or this is good for this. It is highly regulated
25 and decided and -- so I can't answer that because I

Page 75

1 don't do it, but I do know that -- that there is
2 no -- we can't make a claim either way. I can't
3 even -- I don't even speak on that, so my answer
4 would be I can't -- but -- yeah.
5 Q. But manufacturers do present evidence when
6 it's favorable to them to the medical community, so
7 there isn't anything to prevent manufacturers from
8 also sharing with the medical community, evidence
9 that would be less favorable to the sales of their
10 products?
11 MR. DAVISON: Objection to form.
12 A. I -- yeah, I don't know what -- I don't know
13 what criteria -- that's not my area, so I don't know
14 presenting to physicians in an office setting, I
15 don't know what is allowed and what isn't allowed,
16 other than to know that it's highly regulated.
17 Q. Okay. If you go down to number 11 on this
18 document, it says: "During the panel discussions it
19 was quite evident that there isn't a single fix
20 needed for the issue of opioid prescribing and then
21 a multidisciplinary approach to management of pain,
22 is probably the best method of treating patients
23 with chronic pain."
24 The last sentence in that paragraph says:
25 "The major concern is that there isn't anything

Page 76

1 showing that opioids are effective long-term for
2 chronic pain with the exception of cancer-related
3 pain."
4 Is that your understanding of the state of
5 the evidence in 2014?
6 MR. DAVISON: Objection to form.
7 A. Well, I think the definition of long-term is
8 what was -- is questionable. So I think there is a
9 few year data. I don't think there is long-term --
10 I think at the time there wasn't long, long-term,
11 but I know the VA has some of the best data and the
12 sentence before that shows that because they have --
13 they've been under -- they have a electronic
14 monitoring program. So I would say that I don't
15 remember the data. It's 2014. I don't remember
16 what the data said.
17 Q. Okay. And at this point, this isn't
18 evidence review taking place in 2014, so looking
19 back to all the evidence assembled up to that point,
20 so to the extent that this conclusion is accurate,
21 that there is -- isn't anything showing that opioids
22 are effective long-term for chronic pain with the
23 exception of cancer-related pain that would cover,
24 not only 2014, but everything prior to that,
25 correct?

Page 77

1 MR. DAVISON: Objection to form.
2 A. I would -- yeah, I don't know what the
3 years -- I don't know the years that the data -- the
4 year of the studies that the data was looked at.
5 It's usually many years prior, but I don't know. I
6 can't answer that.
7 Q. So assuming that that is correct, that there
8 is nothing to show the effectiveness of opioids for
9 long-term treatment of chronic pain, why do you
10 think that opioids, over the past 20 years, have
11 been used long-term for the treatment of chronic
12 pain?
13 MR. DAVISON: Objection to form.
14 A. I believe that clinicians prescribe to their
15 patients based on their experience, based on how the
16 patient is doing, and so, I think, that they are
17 using their best clinical judgment. So I would say
18 it's based on clinical judgment that they continue
19 to use them.
20 Q. Why do you think that it became so common
21 over the past 20 years, not that they continued to
22 use them today?
23 MR. DAVISON: Objection to form.
24 A. Repeat the question.
25 Q. Over the past 20 years -- would you agree

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 that over the past 20 years, the use of opioids for
2 chronic pain became much more common than it was,
3 say, 30 years ago?
4     MR. DAVISON:  Objection to form.
5   A.  I would that say there was a lot more
6 available than chronic pain to treat for opioids.  I
7 would say that -- I think, that actual number is
8 probably decreasing now due to the heightened
9 awareness.  So I would say that there was -- that
10 opioids are used to treat chronic pain and --
11   Q.  How did that come about in the absence of
12 evidence?
13     MR. DAVISON:  Objection to form.
14   A.  I don't think it was an absence of evidence,
15 it was absence of long-term -- longitudinal
16 evidence.  There is lots of studies on opioids and
17 treatment.  I can't recall all of them but I
18 remember being part of -- I was at Hopkins, so I was
19 part of research.
20   Q.  Does that matter whether a study is short or
21 long when you are talking about a long-term
22 treatment?
23     MR. DAVISON:  Objection to form.
24   A.  Matter to whom?
25   Q.  A patient who is going to be taking the

Page 79

1 medication.
2     MR. DAVISON:  Objection.
3   Q.  A clinician who is prescribing it.
4     MR. DAVISON:  Objection.
5   A.  I would think that a patient wants to get
6 out of pain and, I think, that they would like to
7 minimize risks.  If I were a patient, I can only
8 speak if I'm a patient, and I'm in pain, I want to
9 get my pain relieved, I want to be able to return to
10 my function.  So that's all I can answer.  I -- I
11 don't read all the data.  I don't think most
12 patients do.  I think they just want to make sure
13 that risks are minimized and outcomes are there.
14   Q.  And what if the long-term outcomes are not
15 there?
16     MR. DAVISON:  Objection to form.
17   A.  I can't answer that.
18   Q.  Take a chance and take the drug?
19     MR. DAVISON:  Objection to form.
20   A.  That -- that question doesn't even make any
21 sense.  I'm not sure.  I'm being monitored by a
22 clinician while I take any medication.
23   Q.  You're being prescribed a drug for chronic
24 pain, not a short-term event.  Would you want to
25 know whether there is data showing long-term

Page 80

1 efficacy and safety?
2     MR. DAVISON:  Objection to form.
3   A.  At the time that I'm having pain, probably
4 not, but I'm going -- yeah.  The questions you're
5 asking are really hypothetical, so I'm kind of
6 having a hard time with them because it's not a real
7 life situation.
8   Q.  I think it's very much a real-life
9 situation.
10     MR. DAVISON:  Objection.  Let her answer
11   your questions.
12   A.  Because when you come into a pain clinic and
13 you are presented -- when you have to treat somebody
14 that's coming to you -- you can talk about risks but
15 I'm going to tell you their main goal is to get out
16 of pain.  We're not -- we're hoping that it's not
17 going to be a long-term -- no -- rarely does --
18 we're hoping that it's not going to be a chronic
19 condition, right, forever and ever.  We're hoping we
20 can get you out of pain as we're figuring out what
21 the causes are and treat the causes.
22     So it's much different than a diabetes or a
23 chronic, right?  People don't like to consider that
24 their chronic pain is chronic.  It's something they
25 are hoping it will go away one day and we're hoping

Page 81

1 we can figure out with science, better ways to treat
2 it and maybe even to eradicate its cause.
3   Q.  If you look at number 14 on this e-mail, it
4 says:  "The panel concluded there isn't any
5 consistency in prescribing chronic opioids and that
6 there isn't any data supporting their use long-term
7 in most disease states."
8     Is that information that a pharmaceutical
9 company has the responsibility to relay to
10 healthcare providers and patients?
11     MR. DAVISON:  Objection to form.
12   A.  My problem with this kind of information is
13 that there is a separate panel that may be going on
14 that talks about people who can't get pain relief
15 and may -- and all -- and they need every option
16 available to them.  This is one panel, albeit an NIH
17 panel.  I would never take one thing and make it --
18 take one statement out of any report that I'm
19 getting off of a meeting, I would need to do much
20 more research, look at the data that they looked at.
21 So I -- I hope that answers your question.  This is
22 one panel's discussion, not every clinician was on
23 that panel.  That is a subset of the clinical
24 community that's on that panel.
25     If these outcomes change what the FDA

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 decides how pain -- what can and cannot be used,
2 that's something much more directly influenced --
3 that influences manufacturers. This is the
4 recommendations of one panel. So all I can say is,
5 I do not feel that we would have a responsibility to
6 educate on this outcome based on one panel based on
7 this one e-mail.
8 Q. What would trigger that responsibility to
9 educate?
10 MR. DAVISON: Objection to form.
11 A. A change in the FDA guidelines, a change in
12 FDA approvals, a -- I, you know, I can't answer that
13 because I don't know what would -- you know, what
14 regulatory oversight would be needed to require
15 changes.
16 Q. Do you only make the changes when they are
17 required by regulation?
18 MR. DAVISON: Objection to form.
19 A. I can't answer that. I'm not in those
20 departments. I'm -- I'm -- make those changes in
21 what, I should ask?
22 Q. Mallinckrodt's messaging.
23 A. Yeah. I don't determine Mallinckrodt
24 messaging, I don't educate on Mallinckrodt
25 messaging. I can't answer these questions, where

Page 83

1 they make that decision and what evidence of data
2 they need. I'm not the right person for that.
3 Q. In your opinion, is the responsibility of a
4 pharmaceutical company to educate healthcare
5 providers and patients triggered only by FDA
6 regulations?
7 MR. DAVISON: Objection to form.
8 A. Unfortunately, I can't answer that one
9 either. I would say that we are -- we are
10 responsible for ensuring that we follow all FDA
11 guidance and regulatory oversight and that is
12 absolutely critical in what -- in determining what
13 we can and cannot say about products, about
14 statements, about claims. So I -- I would say that
15 they -- I -- I'm just not the right person to be
16 answering these questions. I don't make those
17 decisions for the company.
18 Q. One more point on this e-mail and then we
19 can let it rest.
20 A. That's all right.
21 Q. Number 8, if you could go back to the first
22 page.
23 A. I didn't even write this e-mail, so I'm
24 really just kind of -- go ahead.
25 Q. Number 8 reads: "The strategy to reduce

Page 84

1 abuse could involve the following items; tamper
2 proof products, aversion agent, antagonist delivery
3 system and formulation. When looking at the data
4 from the OxyContin reformulation, noticed a
5 significant decline in abuse after it was modified.
6 However, noticed a corresponding increase of
7 abuse of IR oxycodone."
8 And for the record, what is IR oxycodone?
9 A. Immediate release, so short-acting opiate.
10 Q. And do you remember what the time frame was
11 for when OxyContin was reformulated to be
12 abuse-deterrent?
13 A. I don't exactly remember it. I do know it
14 was after I worked there. Yeah, I don't remember
15 the year.
16 Q. Mallinckrodt manufacturers immediate-release
17 oxycodone, correct?
18 A. I believe so, yeah.
19 Q. Were you aware of any discussions among
20 Mallinckrodt employees about what's described here,
21 the increase in sales of IR oxycodone corresponding
22 to the decrease in OxyContin abuse after
23 reformulation?
24 A. No.
25 MR. DAVISON: Objection to form.

Page 85

1 MS. GAFFNEY: So this was Exhibit 11 in the
2 Becker deposition, so it's already --
3 THE COURT REPORTER: Okay.
4 (Becker Exhibit 11 was marked for
5 identification.)
6 BY MS. GAFFNEY:
7 Q. So this is an exhibit that was marked
8 Exhibit 11 in the deposition of Steven Becker, who
9 was the national account manager at Mallinckrodt. I
10 believe that his tenure at Mallinckrodt would have
11 only overlapped with your tenure by a few months.
12 Did you meet Steven Becker at Mallinckrodt?
13 A. That name is not familiar.
14 Q. And then the author of this e-mail is Bonny
15 New. Do you know who Bonny New is?
16 A. I don't.
17 Q. How about any of the recipients of this
18 e-mail?
19 A. Well, Ginger Collier was on the other e-mail
20 but I don't remember who she was.
21 Q. Okay.
22 A. No.
23 Q. So the e-mail, you can see she writes: I
24 think -- interesting read. I think it supports our
25 suspicions in the regard to the increased usage of

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  the oxy 30 milligram.
2      And then on the back is the short article,
3  and the second to last paragraph begins with:
4  Demand appears especially high for pure oxycodone
5  that come in 30 milligram pills.
6      This e-mail is from 2011. It's before you
7  started at Mallinckrodt, but since you have been
8  working at Mallinckrodt, has anyone at Mallinckrodt
9  ever talked to you about diversion and abuse related
10 to Mallinckrodt's generic oxycodone products,
11 particularly the oxy 30s?
12     MR. DAVISON: Objection to form.
13     A. Not -- not directly in terms -- I would
14 attend the suspicious order monitoring, but never
15 talked about -- no, I will just say no. Absolutely
16 no. Yeah, this is way before my time there and so
17 I -- yeah.
18     Q. Okay. And not about that article
19 specifically but about diversion and abuse of
20 generic oxycodone, is that something that people
21 have discussed with you at Mallinckrodt?
22     A. No.
23     MR. DAVISON: Objection.
24     Q. Not at the meetings with the suspicious
25 order monitoring group?

Page 87

1      MR. DAVISON: Objection.
2      A. No.
3      Q. Okay. And you now work in government
4  affairs and advocacy and no one at Mallinckrodt has
5  ever spoken to you about the diversion of
6  Mallinckrodt's generic oxycodone?
7      MR. DAVISON: Objection to form.
8      A. No one has spoken to me about the diversion
9  of any one particular drug. We speak about the
10 programs that are in place solely. I don't speak
11 about any one. I would not be the person that
12 anyone would talk to about it.
13     Q. Sure. You speak about the programs that are
14 in place without speaking about the products that
15 are being diverted; is that correct?
16     MR. DAVISON: Objection to form.
17     A. Yeah, I don't have that -- I was never given
18 that much detail because that was not my area of
19 expertise.
20     Q. Okay. Did it ever come up in discussion of
21 development of abuse-deterrent products?
22     MR. DAVISON: Objection to form.
23     A. I only knew that they were developing abuse
24 deter -- I didn't know any of the details.
25     Q. So would it surprise you to hear that IR

Page 88

1  oxycodone is the most abused opioid on the market?
2      MR. DAVISON: Objection to form.
3      A. Yes, because I used to think it was
4  hydrocodone, so --
5      Q. Would it surprise you to hear that IR
6  oxycodone is the most abused product in
7  Mallinckrodt's portfolio?
8      MR. DAVISON: Objection to form.
9      A. I don't have any -- I'm not surprised or not
10 surprised. I don't have any -- I don't have that
11 knowledge base, so --
12     MS. GAFFNEY: Here is Exhibit 5.
13     (Mallinckrodt - Jackson Exhibit 5 was marked
14 for identification.)
15 BY MS. GAFFNEY:
16     Q. I'll just give you a moment to look it over.
17     Okay. So this is an e-mail -- Exhibit 5 is
18 an e-mail from Kevin Webb, and you mentioned Kevin
19 Webb earlier when we were going through the people
20 you worked with at Mallinckrodt. So he's part of
21 government affairs and advocacy; is that correct?
22     A. He is now -- he is actually part of the
23 generics government affairs team now. I think
24 they've -- they're --
25     Q. Spin-off?

Page 89

1      A. Dotted line but separate.
2      Q. Okay. And you were copied on this e-mail as
3  well; is that correct?
4      A. I was.
5      Q. It's about the submission of an NDA for ADF
6  Roxicodone, and his e-mail states that oxycodone
7  immediate release (IR) is the most abused opioid on
8  the market and the most abused product in MNK's
9  portfolio; is that correct, that's what the e-mail
10 says?
11     A. That's what it says, yep.
12     Q. Do you have any reason to doubt that
13 statement?
14     MR. DAVISON: Objection to form.
15     A. No.
16     Q. And just to clarify for the record, since
17 this is about Roxicodone, Roxicodone is immediate
18 release oxycodone; is that correct?
19     A. Yes.
20     Q. On the second page of this e-mail, one of
21 the bullet points -- let's see. Under -- the
22 heading was on the first page, "Launch of
23 Re-formulated Roxi."
24     There is a bullet point: Requests FDA to
25 pull the NDA of the original non-ADF Roxi IR opioid

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 due to safety reasons.
2      What safety reasons are those?
3      MR. DAVISON:  Objection to form.
4   A.  I didn't -- I can't answer what he -- what
5 he was inferring.  That's a Kevin question.
6   Q.  Fair enough.  A Kevin question.
7      Do you have any understanding of what he
8 might have been referring to there?
9      MR. DAVISON:  Objection to form.
10   A.  It would just be -- it would just -- no.
11   Q.  Okay.  So you work -- this is October 2016.
12 Both you and Kevin Webb are working together in
13 government affairs and advocacy, but you don't have
14 any idea what he's referring to there with pulling
15 the NDA of one of Mallinckrodt's products for safety
16 reasons?
17      MR. DAVISON:  Objection to form; asked and
18 answered.
19   A.  I don't want to suppose what he was thinking
20 about when he wrote this.
21   Q.  But what's your understanding based on your
22 position in government affairs and advocacy for
23 Mallinckrodt?
24      MR. DAVISON:  Objection to form.
25   A.  I would not be involved in this at all.  I'm

Page 91

1 surprised he actually copied me on this.  I would --
2 at this time I was fully working in our other
3 therapeutic areas, none of which were pain
4 management, so I don't want to infer what he was
5 thinking.
6   Q.  So this e-mail is from October 2016, over
7 two years ago the bullet point of pulling the NDA
8 for non-ADF Roxi for safety reasons.  Has
9 Mallinckrodt done so?
10      MR. DAVISON:  Objection to form.
11   A.  I actually don't know if they -- what
12 actions they've taken.
13   Q.  Would it surprise you to hear that immediate
14 release oxycodone was not only the most abused
15 product in Mallinckrodt's portfolio, but also
16 Mallinckrodt's top-selling product?
17      MR. DAVISON:  Objection to form.
18   A.  The word surprise is -- is -- I did not know
19 that, so I didn't have any of that knowledge, so --
20 so am I surprised?  I guess that would be the word
21 you would use but --
22   Q.  I'm sure there is a better word.
23   A.  That's all right.  Yeah, it's --
24      MS. GAFFNEY:  This is Exhibit 6.
25      (Mallinckrodt - Jackson Exhibit 6 was marked

Page 92

1 for identification.)
2 BY MS. GAFFNEY:
3   Q.  So this is just an excerpt from the
4 deposition testimony of Steven Becker, I mentioned
5 earlier national account manager at Mallinckrodt.
6 The first page is a cover page, the second page is
7 the excerpt, and at the bottom of the second page
8 you can see that he testifies that oxycodone 30 is
9 "our top-selling product."
10   A.  Uh-huh.
11      MR. DAVISON:  Objection to this exhibit for
12 the excerpt.
13   Q.  Do you have any reason to disagree with his
14 testimony?
15      MR. DAVISON:  Objection.
16   A.  No, I don't have any reason.  I don't have
17 any of this knowledge, so I would -- I don't know if
18 it's correct or not.
19   Q.  Would that present a problem for
20 Mallinckrodt, that its top-selling product is also
21 its most abused product?
22      MR. DAVISON:  Objection to form.
23   A.  Define problem.  I'm not -- restate your
24 question, I'm sorry, because --
25   Q.  What is Mallinckrodt's responsibility if its

Page 93

1 top-selling product is also its most abused product?
2      MR. DAVISON:  Objection to form.
3   A.  So I would -- I would say that the
4 responsibility is to be engaged as a stakeholder and
5 to find out -- and I think we had been, you know.
6 That's where that suspicious monitoring program came
7 in, that's where the pills they were giving
8 pharmacies, and I don't recall all the things that
9 we were doing, but I know we were doing many things
10 to address this.
11      And so I do think as a stakeholder, we have
12 a responsibility, as all the other stakeholders in
13 this situation do, and I think that we did -- we --
14 as long as I've been with Mallinckrodt, I feel like
15 we have taken that very responsibly.  I since day
16 one was told about the suspicious ordering task
17 group, task force group that -- I apologize.  I may
18 be calling them the wrong name.  It's been many
19 years, but, you know, that was one thing I knew they
20 were working with the DEA on closely.
21      So I, you know, I don't think that that's
22 something that was ignored.  I have limited details,
23 limited information on that, but I know I was always
24 very impressed when I came to Mallinckrodt about all
25 the things they were doing as a company.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    Q.   And those efforts that you have seen since
2  you started in 2014, do you know when they started
3  at Mallinckrodt?
4        MR. DAVISON:  Objection to form.
5    A.   I don't -- I don't know.  I'm sorry.  Yeah,
6  no, they were going on when I started in April of
7  2014, because that I knew.
8    Q.   Okay.
9    A.   But I don't know when they started.
10        MS. GAFFNEY:  This is Exhibit 7.
11        (Mallinckrodt - Jackson Exhibit 7 was marked
12  for identification.)
13        THE WITNESS:  Thank you.
14  BY MS. GAFFNEY:
15    Q.   So Exhibit 7 is a subsequent e-mail to the
16  e-mail we were looking at previously, the e-mail
17  about abuse deterrent Roxicodone.
18        MR. DAVISON:  Just hold off until we get a
19    copy of that, please.
20        MS. GAFFNEY:  Oh, I'm sorry.
21        MR. DAVISON:  Thank you.  Okay.  Whenever
22    you're ready.  Thank you.
23  BY MS. GAFFNEY:
24    Q.   Ms. Jackson, could you read your reply
25  that's at the beginning of this e-mail into the

Page 95

1  record?
2    A.   Sure.  "Hi, this is great news but we will
3  need to get clear direction from Regulatory on
4  exactly what we can say.  We were not allowed to
5  say abuse deterrence with Xartemis.  That
6  designation comes after population based
7  postmarketing studies are published and with FDA
8  direction.  I was at Endo when they reformulated
9  Opana and they did allow us to say 'designed to be
10  abuse resistant' but when I suggested that with
11  Xartemis it was not approved."
12    Q.   Thank you.  Can you please explain what
13  "designed to be abuse resistant" means in the
14  context of Opana?
15        MR. DAVISON:  Objection to form.
16    A.   Sure.  So Opana had some ADF technology,
17  abuse deterrent technology, but because it was
18  not -- because we could never make that claim, it
19  has to be studied on population-based years of
20  study, we were -- we wanted to talk about the
21  reformulation and we wanted to do it in a
22  responsible manner, so we -- we were -- the idea
23  that it was designed to be abuse resistant is as
24  factual, I think, as you can be.  It is designed to
25  be abuse resistant.  Whether it is or not we don't

Page 96

1  know because that study -- the studies hadn't been
2  done.
3    Q.   And why did you suggest using that phrase
4  for Xartemis?
5        MR. DAVISON:  Objection.
6    A.   Because I think it's exactly what you've
7  done, you've designed it to be abuse resistant but
8  you can't make any claims about it.
9    Q.   Your e-mail says that that suggestion was
10  not approved.  Who at Mallinckrodt didn't approve
11  it?
12    A.   I can't remember.  I would have brought it
13  up to a team of people, so I don't remember if it
14  was -- I don't know.
15    Q.   Okay.  Do you know which department that
16  team would have been in?
17        MR. DAVISON:  Objection, and just if there
18    was any legal advice that was involved in it in
19    any way, I'm going to instruct you not to answer
20    that, but if it's not that, that's fine, or a yes
21    or no.
22    A.   I can't remember.
23    Q.   Okay.
24        MS. GAFFNEY:  Exhibit 8.
25        (Mallinckrodt - Jackson Exhibit 8 was marked

Page 97

1  for identification.)
2  BY MS. GAFFNEY:
3    Q.   Exhibit 8 is just a short e-mail.  Earlier
4  you had mentioned monthly meetings with the
5  compliance side or the suspicious order monitoring
6  side, and I wanted to ask about this -- this e-mail
7  says -- it's from Karen Harper:  "In advance of our
8  next CARES Alliance/Medical Advocacy/Legal
9  Department luncheon..."
10        Is this luncheon that Karen Harper is
11  referring to in your e-mail the same thing that you
12  had mentioned earlier, or it's different?
13        MR. DAVISON:  Objection.
14    A.   It's different.
15    Q.   Okay.  Could you explain what this luncheon
16  is?  Or it sounds like it's an event that took place
17  somewhat regularly.  Is that correct?
18        MR. DAVISON:  Objection.
19    A.   I actually don't remember it.
20    Q.   Okay.
21    A.   Sorry.
22    Q.   Okay.  That's no problem.  So the -- what
23  you were explaining earlier about monthly meetings,
24  tell me more about those.  Who would attend those
25  monthly meetings?  You said sometime you were able

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  to and sometimes you weren't.
2  A.  Yeah.
3  Q.  But who would be the broader group
4  attending?
5      MR. DAVISON:  Objection.
6  A.  Karen Harper, Don Loman.  I can't even
7  remember the exact title of it but it was -- they
8  would talk about the different programs that were in
9  place to do it, and I would share what I was working
10  on with CARES and the redesign of the website, which
11  was what my goal was.  So I was really just there as
12  an observer and just to talk about what the advocacy
13  end was doing, so I wasn't -- I'd do that, yeah.
14      Yeah, I don't believe this is the same
15  meeting.
16  Q.  Got it.  And you said the different programs
17  that were in place to do it.  Just to clarify for
18  the record, you're talking about anti-diversion
19  programs?
20  A.  Yes.  I'm sorry.  Yes.
21      (Mallinckrodt - Jackson Exhibit 9 was marked
22  for identification.)
23  BY MS. GAFFNEY:
24  Q.  Okay.  So this is Exhibit 9.  It's two
25  sheets.  I can explain.  Sorry, I didn't get them

Page 99

1  stapled, but the exhibit is an e-mail with an
2  attachment and the attachment is a poster, and when
3  it printed originally, you can see on the back of
4  that page it printed very small, so I printed a
5  different version of it, one that we might have some
6  chance of reading.
7      THE WITNESS:  Yeah.
8      MS. GAFFNEY:  It's still very small.  So
9  the --
10      MR. DAVISON:  Sorry.  Just to be clear on
11  this, so it does look like they have different
12  Bates numbers.
13      MS. GAFFNEY:  They do.
14      MR. DAVISON:  So it's not clear to me that
15  they are -- I mean, I obviously have not looked
16  that it's the same poster.  Are you representing
17  that it's the same exact poster?
18      MS. GAFFNEY:  You know, to be honest, this
19  one printed so small, there might have been a
20  word change.
21      MR. DAVISON:  Okay.
22      MS. GAFFNEY:  My understanding is that it's
23  the exact same poster.  There were several
24  e-mails sending it as an attachment for printing
25  purposes and it had to go to an outside printer

Page 100

1  because it was a large poster for an event.
2      MR. DAVISON:  So I'm just going to object to
3  the exhibit to the extent it's not the exact same
4  poster, but I don't think we need to look through
5  and check on that right now.
6      MS. GAFFNEY:  Sounds good.
7      THE VIDEOGRAPHER:  One second.
8      THE WITNESS:  Thank you.
9  BY MS. GAFFNEY:
10  Q.  Okay.  So this e-mail is from June 2014 --
11  well, it's two e-mails in this first page and your
12  e-mail is the bottom one asking for "the poster that
13  CARES Alliance supported on our diversion program."
14      What does it mean that CARES Alliance
15  supported this poster?
16      MR. DAVISON:  Objection to form.
17  A.  So I -- it was prior to my time there, but I
18  was told that this poster was paid for by CARES
19  Alliance, putting it together, writing it.  We
20  usually would get a vendor to help write these
21  posters.
22  Q.  Okay.  Okay.  So that was CARES Alliance
23  financially supporting the production of this
24  poster?
25  A.  Exactly.

Page 101

1  Q.  Okay.  And again, this is still hard to read
2  but I think we can see some of the headings on this
3  poster.  One of them is "Chargeback review."  Are
4  you familiar with Mallinckrodt's chargeback review
5  procedures?
6      MR. DAVISON:  Objection to form.
7  A.  Just -- just slightly.  I knew it's one of
8  the things that they did for suspicious -- for the
9  anti-diversion.  I don't really understand how that
10  all works.  It's kind of complicated.
11  Q.  Do you know what a chargeback is just as a
12  general matter?
13  A.  I really don't, so I'm sorry.  It's very
14  complicated and it's -- yeah.
15  Q.  That's fine.  To your knowledge is the use
16  of chargebacks common across the pharmaceutical
17  industry?
18      MR. DAVISON:  Objection to form.
19  A.  I don't know.  Yeah, I don't know.
20  Q.  In one of the larger print sections it says:
21  "Chargeback blocking prevents product distribution
22  to pharmacies at risk of diversion."
23      What is your understanding of what a
24  pharmacy at risk of diversion is?
25      MR. DAVISON:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1   A.  I would have no -- I would not know what
2  they were thinking about in --
3   Q.  Okay.
4   A.  -- in their definitions on this.  Yeah,
5  that's --
6   Q.  Okay.  This is text over here says the
7  anti-diversion working group -- sorry.  "The
8  Anti-Diversion Industry Working Group facilitates
9  collaboration with drug manufacturers
10  and distributors to prevent opioid diversion and
11  abuse."
12     Are you familiar with the Anti-Diversion
13  Industry Working Group?
14   A.  Only that we started it, Mallinckrodt
15  actually started it, and one of the things that we
16  had done -- this is the extent of my knowledge on
17  this -- was a video on pharmacists seeing aberrant
18  behavior of people coming into the pharmacy.  I
19  can't remember -- it was Red Flags, I think it was
20  called.
21   Q.  Okay.
22   A.  We were really proud -- the group that ran
23  this was really proud of all of these programs.
24   Q.  Okay.  And then the medical advocacy group
25  at Mallinckrodt worked on -- I don't know if you

Page 103

1  would call them anti-diversion measures, but
2  prescription drug takeback days, safe disposal
3  pouches; is that correct?
4   A.  Yes.  Okay.  So the safe disposal pouches
5  came from our government affairs and advocacy group.
6  So advocacy was actually done by two groups within
7  Mallinckrodt:  Medical advocacy, which is what I was
8  responsible for; and government affairs advocacy,
9  which was Kevin Webb was responsible for that
10  advocacy.
11     So the Medsaway pouches came from his --
12  that place, and we did the takeback programs, as
13  well as the sponsored disposal boxes in communities,
14  where people could bring back their drugs and
15  dispose of them.
16   Q.  Both the Medsaway pouches and the drug
17  takeback days are aimed at conduct that happens
18  after the drugs are sold.  Does medical affairs ever
19  work on any measures to actually reduce the number
20  of opioids prescribed?
21     MR. DAVISON:  Objection to form.
22   A.  So I can't answer that because I was only
23  there really at the very last part of it, before I
24  moved over to government affairs, and so I don't
25  know what all CARES Alliance did.  I didn't -- they

Page 104

1  had been going on since 2010 and I got there in
2  2014, so I don't know if they did that.
3   Q.  And I asked a question about this earlier
4  but I'm still a little bit confused about the
5  overlap between medical affairs and CARES Alliance.
6  My understanding is that medical affairs is broader
7  than CARES Alliance.
8   A.  Oh, yes.
9   Q.  Okay.  In some of the answers you're
10  speaking only to CARES Alliance but I'm asking about
11  medical affairs more broadly, so I just wanted to
12  clarify that.
13     What else was part of medical affairs
14  besides CARES Alliance when you were there?
15     MR. DAVISON:  Objection to form.
16   A.  CARES Alliance is a program of medical
17  affairs.  Medical affairs is -- was medical
18  information, product safety, research, research
19  publications, medical directors are part of medical
20  affairs, HEOR, Health Outcomes -- Health Economic
21  and Outcomes are part of H -- part are
22  of government --
23     Now, I think -- I think that -- I think I've
24  hit most of the areas.
25   Q.  Okay.  And medical affairs is the top of the

Page 105

1  umbrella under which there is -- is medical science
2  separate from medical affairs, or is it part of
3  medical affairs?
4     MR. DAVISON:  Objection to form.
5   A.  Yeah, I was just thinking about that as
6  we -- so there's -- so medical also includes our
7  regulatory side, but there -- but that is -- a piece
8  of that was a little bit separate from where we were
9  in govern -- in global -- when I was with them at
10  Mallinckrodt in global medical affairs, it was
11  regulatory, it was pipeline, research, things like
12  that.  So that was a -- that was kept separate but
13  they would have all been under your scientific
14  platform.
15   Q.  So going back to this poster and all the
16  programs that are listed there, why is all -- why
17  are all those programs necessary?
18     MR. DAVISON:  Objection to form.
19   A.  My answer would be that I don't know why
20  they felt all those, but I would say that, you know,
21  diversion is a multifaceted problem.  It happens
22  along the chain from a manufacturer to the actual
23  person -- group that we sell to, so I think you have
24  to address it in different -- in different places
25  along the chain.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.   Okay.  So according to your résumé, which we
2    will talk about, you've lived in a number of places
3    but you were based in Florida between 2005 and 2011?
4    A.   Uh-huh.
5    Q.   Okay.  Were you aware of a prescription
6    opioid abuse problem in Florida during that time?
7         MR. DAVISON:  Objection to form.
8    A.   I wasn't working directly with pain at that
9    time, but yes, I was.
10   Q.   How did you become aware of it?
11   A.   I was --
12        MR. DAVISON:  Objection.
13   A.   I was in the pain management field for many
14   years and so many of my friends were there, and
15   also, you can't hit a headline.  It was -- and I
16   used to -- I belonged to, when I was with Purdue and
17   when I would belong -- I belonged to a lot of the
18   local task forces, prescription drug abuse task
19   forces, and so I still got their e-mails, you know,
20   with updates; a variety of ways, actually.
21   Q.   And based on that variety of information,
22   was it your understanding that Florida had a
23   particularly strong problem with prescription drug
24   abuse relative to other places in the country?
25        MR. DAVISON:  Objection to form.

Page 107

1    A.   Yes, but I also understood it to be because
2    we had dispensing physicians, which was unique to
3    any state in the United States.
4    Q.   So what about that unique situation of
5    having dispensing physicians contributed to the
6    growth of prescription drug abuse in Florida?
7         MR. DAVISON:  Objection.
8    A.   Wow, that's a pretty broad question I can't
9    really answer, but I, you know, I think the
10   pharmacy/physician is a check and balance system,
11   and so -- hopefully, if it's used well, and so when
12   you lose that, I think there were some problems with
13   the checks and balances.
14        MR. DAVISON:  We've been going for about an
15   hour and a half.  Is now a good time to take a
16   lunch break?
17        MS. GAFFNEY:  Sure, we can do a lunch break
18   now.
19        MR. DAVISON:  Let's go off the record.
20        THE VIDEOGRAPHER:  Off the record, 11:58 a.m.
21   (Recess from 11:58 a.m. until 12:55 p.m.)
22        THE VIDEOGRAPHER:  On the record, 12:55 p.m.
23   BY MS. GAFFNEY:
24   Q.   Okay.  Before the break we were talking
25   about Florida and dispensing physicians as being

Page 108

1    kind of a unique factor in Florida's circumstance
2    related to prescription drug abuse.
3         What does that mean, dispensing physicians,
4    can you explain that?
5    A.   Physicians who are able to dispense the
6    actual prescription from their offices, so they
7    didn't have to -- the patient didn't have to go to a
8    pharmacy, they could get it filled right at their
9    office.
10   Q.   And to your knowledge, that's different than
11   the way it was in other states?
12        MR. DAVISON:  Objection.
13   A.   Yes.
14   Q.   And why would that have any influence, if it
15   did, on abuse and diversion?
16        MR. DAVISON:  Objection to form.
17   A.   Well, I think it had more to do with the
18   numbers of drugs being prescribed than abuse and
19   diversion, because there was just so many more
20   points of contact for patients to get the drugs, so
21   you wouldn't just have to go to a -- you wouldn't
22   go -- you wouldn't necessarily need to go back to
23   your home pharmacy, you could get them filled right
24   at your doctor's office, so -- so there was a lot
25   more drugs dis -- in -- in Florida, so that would --

Page 109

1    that may align with more ability to divert it.
2    Q.   And are you familiar with the term "pill
3    mill"?
4    A.   I am.
5         MR. DAVISON:  Objection.
6    Q.   What is a pill mill as you understand that
7    term?
8    A.   So a pill mill is a office practicing --
9    practicing as a pain clinic but only to distribute
10   pain medicines.
11   Q.   Okay.  Another term, have you ever heard the
12   term "Oxy Express"?
13        MR. DAVISON:  Objection.
14   A.   I've heard the YouTube video "OxyContin
15   Express," I believe it's called, and I -- yeah.
16   Q.   Okay.
17   A.   I -- that's how I know it, related to that.
18   Q.   Have you watched that video?  It's a short
19   documentary, correct?
20        MR. DAVISON:  Objection.
21   A.   I wouldn't call it documentary, I would call
22   it somebody with a camera, apparently.  I saw it
23   years ago.  I haven't seen it -- years ago when it
24   came out.
25   Q.   What's the -- what makes it not a

Highly Confidential – Subject to Further Confidentiality Review

Page 110

1  documentary, in your mind?
2      MR. DAVISON: Objection.
3      A.  It's short and it's not -- it reminds me
4  more of a -- somebody with a single camera walking
5  around just -- and their thoughts on it.  I just --
6  I just don't remember thinking of it as a
7  documentary at the time.  I just remember it -- I
8  never would have said -- I would have said it was a
9  video.  That's just my opinion.
10     Q.  Yeah, that's what I was asking about, your
11 opinion.  That's fine.  It won an award, is my
12 understanding.  Do you recall that?
13     MR. DAVISON: Objection.
14     A.  No, I do not.  I didn't know that.
15     Q.  A single person walking around with a camera
16 couldn't make a documentary?
17     MR. DAVISON: Objection.
18     A.  I didn't say that.
19     Q.  I'm just -- okay.  I'm trying to understand
20 what you are saying about why that wouldn't be a
21 documentary.
22     MR. DAVISON: Objection; asked and answered.
23     A.  I'm not an expert in what a documentary is.
24 It's not what I would have considered a documentary.
25 I would -- I would not.  I would have just -- I just

Page 111

1  would not have considered that a documentary at the
2  time, when I was watching it.
3      Q.  It documented the lives of some people
4  addicted to opioid painkillers and their families,
5  correct?
6      MR. DAVISON: Objection to form.
7      A.  I recall that there were some people in
8  there, but I don't remember all the stories that
9  were in there.  I mean, it's been years since I've
10 seen it, so I can't remember all the pieces of it.
11     Q.  So what does the "OxyContin Express" refer
12 to?
13     MR. DAVISON: Objection to form.
14     A.  So if -- it's been a while since I saw it
15 but I remember that people were flying from West
16 Virginia, I believe, to Fort Lauderdale, back and
17 forth, trying to get their pain medications.
18     Q.  You mentioned that you read articles about
19 the prescription drug epidemic in Florida while you
20 were living there.
21     MR. DAVISON: Objection.
22     A.  I would scan them, scan headlines, things
23 like that, but, yeah, I was not doing pain medicine
24 at the time that you're -- from 2005 to 2010 I was
25 not doing them, so that was not my area of focus.

Page 112

1      Q.  Okay.  You would scan the headlines.  And
2  were there a lot of headlines at that time?
3      A.  There were --
4      MR. DAVISON: Objection to form.
5      A.  I wouldn't -- I'm not sure I would say a
6  lot.  There were -- I remember some of them -- them
7  being there.  There were -- so I don't know how
8  many.  I don't -- I never counted them.
9      Q.  Were you aware through those headlines that
10 you scanned or other sources of information about
11 other ways that pills were leaving the state of
12 Florida and going to other states?
13     MR. DAVISON: Objection to form.
14     Q.  You'd -- sorry.  To clarify, you had
15 mentioned one example of the OxyContin Express
16 flights to Fort Lauderdale.
17     A.  Right.
18     Q.  But were you aware of other ways that pills
19 were being trafficked out of Florida?
20     A.  I think I had --
21     MR. DAVISON: Objection.
22     A.  I think I had learned that, like, people
23 were coming from Georgia over to Florida and getting
24 their pills filled, and vice versa, people in
25 Florida were going to Georgia to get their

Page 113

1  prescriptions filled, which was the purpose behind
2  advocating for prescription drug monitoring
3  programs, and other than individual people with
4  their medications, you know, making their own
5  decision to do -- to divert their own medications, I
6  can't recall any other areas of diversion, methods
7  of diversion.
8      MS. GAFFNEY: This was Exhibit 25 in the
9  deposition of Victor Borelli.
10     (Borelli Exhibit 25 was marked for
11 identification.)
12     THE WITNESS: Oh, I left my glasses in the
13 other room.
14     MR. DAVISON: Do you need them?
15     THE WITNESS: Yeah.  They might be in my
16 purse.  Feel free to go in there.  Sorry.
17 BY MS. GAFFNEY:
18     Q.  Should we wait a moment so you can --
19     A.  I can -- I'm reading.  No, it's just easier
20 to read with my glasses.  I just have to put it two
21 miles away, but I'll get there.
22     THE WITNESS: Thank you.
23     A.  Okay.
24     Q.  Okay.  This is an exhibit that was
25 Exhibit 25 in the deposition of Victor Borelli,

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 another national account manager at Mallinckrodt.
2 Do you know Victor Borelli?
3    A.  I do not.  I don't think he's there any
4 longer, or hasn't been there.
5    Q.  Right.  So at the bottom of the page you can
6 see it's a forward of a short article by Karen
7 Harper to other Mallinckrodt employees, and this
8 e-mail is from July 2009 with the headline
9 "Prescription Drug Abuse Epidemic" and it says
10 below:  "South Florida has become the largest
11 supplier of illegal prescription drugs in the
12 country."
13       Is this example similar to headlines that
14 you saw in that timeframe?
15    MR. DAVISON:  Objection to form.
16    A.  Yes.
17    Q.  And would you agree that this statement,
18 "South Florida has become the largest supplier of
19 illegal prescription drugs in the country," suggests
20 that Florida in particular is supplying the rest of
21 the country, not just that some individuals in
22 Florida are filling their prescriptions in Georgia
23 and some individuals in Georgia are filling their
24 prescriptions in Florida?
25    MR. DAVISON:  Objection to form.

Page 115

1    A.  Are you say -- can you restate what you're
2 asking?
3    Q.  That was long.  This statement, "South
4 Florida has become the largest supplier of illegal
5 prescription drugs in the country," would you agree
6 that this statement is saying that South Florida is
7 supplying the rest of the country and not just that
8 there are some people in Florida filling
9 prescriptions in Georgia and some people in Georgia
10 filling prescriptions in Florida?
11    MR. DAVISON:  Objection to form.
12    A.  I would say that that is what this statement
13 is saying, but -- I, mean that's -- you're just
14 reading the sentence, so I would agree with your
15 description of what the statement is.
16    Q.  Uh-huh.  And you read many articles or saw
17 many headlines while you were living in Florida at
18 this time of this nature?
19    MR. DAVISON:  Objection to form.
20    A.  Uh-huh.  Yes.  I'm sorry.
21    Q.  You said earlier -- strike that.
22       Would you agree that someone living in
23 Florida between 2005 and 2011 would likely have been
24 aware of a prescription drug abuse problem in the
25 state?

Page 116

1    MR. DAVISON:  Objection to form.
2    A.  I can't really answer that.  I mean, it
3 depends if people were interested in this or read
4 this or -- you know.  It's amazing to me what people
5 don't pay attention to, so I don't know.
6    Q.  Okay.
7    A.  Yeah.
8    Q.  But Mallinckrodt was paying attention to it,
9 correct?  Karen Harper forwarded this e-mail in
10 2009.
11    MR. DAVISON:  Objection to form.
12    A.  Well, Mallinckrodt noted this article.  I
13 don't know if I -- you know, paying attention or
14 just noted this article and shared it.
15    Q.  Since you started working at Mallinckrodt in
16 2014, have -- has anyone at Mallinckrodt talked to
17 you about Mallinckrodt's distribution of generic
18 oxycodone in Florida in this time frame?
19    MR. DAVISON:  Objection to form.
20    A.  No.  No, that did not happen, ung-ugh.
21    Q.  So in your work in government affairs and
22 advocacy, Mallinckrodt's distribution of oxy 30 and
23 15 into the state of Florida between 2008 and 2011
24 hasn't ever come up?
25    A.  No.

Page 117

1    MR. DAVISON:  Objection to form.
2    Q.  You're aware that Mallinckrodt signed a
3 settlement agreement with the DEA?
4    A.  I am.
5    Q.  Was that a surprise to you, when that
6 happened in 2017?
7    MR. DAVISON:  Objection to form.
8    A.  It was a surprise to me because we had
9 done -- because my experience was that we had done
10 so much to address the diversion issue, and so I was
11 coming at it from a different angle.  I thought we
12 had done -- I was really impressed with what our
13 programs were and the commitment of the company and
14 the people that worked there and to make sure that
15 we addressed this, so I was -- yeah, but that -- so
16 it's -- you know, it's -- but those are such
17 high-level decisions, it's not -- that I have
18 nothing to -- that I don't have any say in.
19    Q.  Government affairs and advocacy doesn't have
20 any say or anything to do with diversion-related
21 settlements with the DEA?
22    MR. DAVISON:  Objection to form.
23    A.  Not at my level, and that would have been
24 Mark Tyndall, our Vice President of Government
25 Affairs, and Derek Naten probably had knowledge of

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  it, but I wouldn't have.
2      Q.  But they didn't talk to you about what the
3  DEA's allegations were about?
4      MR. DAVISON:  Objection.
5      A.  That would not -- I don't remember any of
6  those conversations.
7      Q.  So since you started at Mallinckrodt in
8  2014, you explained you've been impressed by the
9  commitment to address the diversion issue, but no
10 one within the company has ever talked to you about
11 Mallinckrodt's conduct for which it was the subject
12 of a DEA investigation related to diversion?
13     MR. DAVISON:  Objection to form.
14     A.  No.  No.  I -- yeah, to my knowledge, I
15 don't -- yeah, we didn't have those kinds of
16 conversations.  Yeah, so I would not have been at
17 that level and --
18     Q.  But how do you address a problem without
19 really knowing what the problem was?
20     MR. DAVISON:  Objection to form.
21     A.  You're going to have to restate that.  I'm
22 not sure what you're inferring or --
23     Q.  Your job at CARES Alliance -- with CARES
24 Alliance and with global -- government affairs and
25 advocacy is to put out the messaging about how

Page 119

1  Mallinckrodt is being a good corporate citizen,
2  doing its job?
3      A.  Yes.
4      Q.  But you don't ever have internal
5  conversations about a time when Mallinckrodt was
6  alleged to not have done its job?
7      MR. DAVISON:  Objection to form.
8      A.  Well, I didn't ask those questions, no, and
9  I would not have been part of those conversations.
10 That happened way before I came.
11     By the time I got there, they had already
12 had all of the diversion programs in place that they
13 were working on.  I don't know exactly the dates
14 that they started, but I trusted that they were
15 based on -- that they started when they needed to
16 start, when the company felt that they needed to
17 start them, and I just -- when I heard about the
18 settlement, I was disappointed.  I felt like we had
19 done so much, and so I -- I still don't -- you know,
20 I know we are -- we follow strict guidelines from
21 the DEA and I know that we are heavily regulated,
22 and so I was disappointed because I really felt like
23 we had done a lot as a company, but I also
24 understand that there are factors beyond my
25 understanding that go into these decisions and I

Page 120

1  trust the leadership of my company.
2      MS. GAFFNEY:  This is Exhibit 10.
3      (Mallinckrodt - Jackson Exhibit 10 was
4  marked for identification.)
5  BY MS. GAFFNEY:
6      Q.  This is a copy of the settlement agreement
7  with the DEA.  It's a publicly available document.
8  Have you seen it before?
9      A.  I have not read it but I've seen it.  I know
10 it exists.
11     Q.  Okay.  It's a long document.  I just have a
12 question about text on the first page.
13     A.  Sure.
14     Q.  So I don't think you need to read the rest
15 of it, but take your time.
16     A.  Okay.
17     Q.  So just in the Background section, the
18 numbered headings, Number 2 says:  From January 1st,
19 2008, through September 30th, 2011, there was an
20 epidemic increase in diversion of the controlled
21 substance oxycodone, largely out of the state of
22 Florida.
23     Number 3:  The United States alleges that
24 Mallinckrodt, a manufacturer and distributor of
25 oxycodone, knew about the diversion and sold

Page 121

1  excessive amounts of the most highly abused forms of
2  oxycodone, 30 milligram and 50 milligrams tablets,
3  placing them into a stream of commerce that would
4  result in diversion.
5      So these are just the background
6  allegations, but this is a time period when you were
7  living in Florida, you were aware of the existence
8  of the epidemic in Florida, correct?
9      MR. DAVISON:  Objection to form.
10     A.  This is -- this is -- yes, I was living in
11 Florida and I was aware of the abuse and diversion
12 of medications.
13     Q.  Are you aware of the quantity of oxycodone
14 that Mallinckrodt shipped into Florida during that
15 time?
16     MR. DAVISON:  Objection to form.
17     A.  I am not.
18     Q.  Do you think that it would be important to
19 understand the extent of what happened in that time
20 frame to address the problem going forward?
21     MR. DAVISON:  Objection to form.
22     A.  Well, I am under the impression that the
23 suspicious ordering monitor and this chargeback that
24 I'm not completely clear on, and the industry
25 working group were all done as a result of the abuse

Page 122

1 and diversion problem, so I'm -- I'm under the
2 assumption that those were the -- that was a result
3 of this problem that was going on.
4    Q.   Okay.
5        MS. GAFFNEY:  Here is Exhibit 11.
6        (Mallinckrodt - Jackson Exhibit 11 was
7 marked for identification.)
8 BY MS. GAFFNEY:
9    Q.   This is a document you are familiar with.
10 It's your résumé.
11    A.   That, I know.  Okay.
12    Q.   I just have some -- oh, I'm sorry --
13 questions about -- so talking about that same time
14 period in Florida, you were with CMJ Consulting.  Is
15 that your company?
16    A.   That's me, uh-huh.
17    Q.   Okay.  The third bullet in bold, Pain
18 Program Accreditation Director, American Academy of
19 Pain Management, coordinated review and
20 revitalization of National Pain Clinic Accreditation
21 Program, can you explain that to me?
22    A.   So the American Academy of Pain Management,
23 which is now called the American Academy of
24 Integrated Pain Medicine, was a multidisciplinary
25 organization, and they had a accreditation for pain

Page 123

1 treatment facilities that they -- that they were
2 trying to reinvigorate, and so I was as a a -- I was a
3 consultant with them on this job, so I was helping
4 them redo their whole project.
5    Q.   Okay.  Did that have anything to do with the
6 issue of pain clinics sometimes being involved in
7 diversion as you mentioned earlier?
8    A.   No, actually, it was more about integrated
9 pain medicine.  So it was more to your answer that
10 pain -- that it wasn't just about --
11    Q.   Opioids?
12    A.   -- opioids or any kind of medications; was
13 it a -- was it a clinic that included psychological
14 and physical therapy.  So it was about -- was it
15 actually an integrated pain management.
16    Q.   Got it.  Okay.  And after that you worked
17 for Endo for a few years?
18    A.   I did.
19    Q.   Can you explain the work that you did at
20 Endo?
21        MR. DAVISON:  Objection to form.
22    A.   I was a medical science liaison there, so I
23 was responsible for engaging in the scientific
24 discussions with key opinion leaders and their --
25 and healthcare -- I was on the healthcare

Page 124

1 professionals side of that, so I worked within the
2 medical affairs.
3    Q.   Okay.  Could you explain a little bit more
4 about what that involved, the healthcare
5 professional side, the scientific discussions with
6 key opinion leaders?
7        MR. DAVISON:  Objection to form.
8    A.   Sure.  Just meeting with -- meeting with the
9 different thought leaders in the southeast in pain
10 medicine, discussing Endo and our areas of research,
11 finding out what their areas of research and if
12 there was any areas of synergy.
13        We also -- because we were also working on
14 investigator-initiated research, so finding out what
15 they were working on to see if there was any areas
16 of strategic alignment.
17        Then also we had -- this is when we were
18 reformulated, so we educated about the
19 reformulation.  We also worked -- we supported our
20 field team, our field sales team, by working with
21 the speakers to ensure that they had all the
22 information they needed so that they were providing
23 accurate information.
24        So it was really just being the face of Endo
25 to the key opinion leaders and also clinicians

Page 125

1 along -- there's practitioners, nurses, physicians,
2 anybody -- any healthcare provider to the pain
3 community, from Endo to the pain community.
4    Q.   Okay.  So what's involved in ensuring that
5 the speakers and the field sales team had all the
6 information they needed so that they were providing
7 accurate information?
8    A.   We didn't do anything with the field sales
9 team, but the -- we supported their -- the speakers,
10 because they -- the speakers -- they would choose
11 where the speakers spoke, if that makes -- they had
12 the -- they would arrange the -- with marketing,
13 with -- so just making sure that they had any
14 questions about the slides that were developed, that
15 they had any questions about any of the scientific
16 data that was on there, if they needed more
17 additional resources.
18        You know, so it's -- this is about the time
19 that speaker programs became much more regulated,
20 and it used to be they could ask questions, people
21 could ask all sorts of questions.  It started
22 getting more stricter, and we just wanted to make
23 sure that the speakers were comfortable with these
24 new regulations.
25    Q.   So the slides that the speakers would use

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  would come from the medical affairs department in
2  Endo?
3     A.  They would come from Endo.
4     Q.  Okay.
5     A.  Yeah.  I want to say it was -- I can't say
6  they were just -- they were -- they were all from --
7  they were informed by the scientific medical side,
8  but they were a marketing -- they were part of
9  marketing and sales.
10    Q.  But would contain some scientific
11 information?
12    MS. VANNI:  Object to the form.
13    A.  Lots of scientific information.  I mean,
14 yeah, it was based on science.  It was based on the
15 data and the PI.
16    Q.  And where did that science and data come
17 from?
18    MR. DAVISON:  Objection to form.
19    MS. VANNI:  Objection.
20    A.  The research that was being done and the
21 body of science that was out there.  I was not
22 responsible -- that was not my job to design the
23 speaker decks, so...
24    Q.  Okay.  But through the speaker decks, Endo
25 would communicate the body of science that was out

Page 127

1  there to the speakers, who would then go speak to
2  healthcare professionals?
3     MR. DAVISON:  Objection.
4     MS. VANNI:  Objection.
5     A.  Well, they would do it, but it all had to be
6  based on what -- on our prescribing information at
7  the FDA, so it was all -- it was very highly -- once
8  again, it's gotten very highly regulated, so there
9  was a point in time speakers used to be able to add
10 their own slides to a deck, and that practice
11 stopped, and so now it had to only be a
12 company-approved slide deck that went through the
13 appropriate regulatory review that a clinician now
14 can present on behalf of the company, to educate.
15    MS. GAFFNEY:  This is 12.
16    (Mallinckrodt - Jackson Exhibit 12 was
17 marked for identification.)
18    THE WITNESS:  Okay.
19 BY MS. GAFFNEY:
20    Q.  So this is an e-mail from 2012, the subject
21 SPPAC, the State Pain Policy Action Coalition, and I
22 see in the e-mail that you've written the coalition
23 was founded by -- there's a set of other acronyms,
24 but can you just explain what SPPAC is?
25    A.  Sure.  It is the policy group that was -- it

Page 128

1  was -- it was actually founded by three
2  organizations and eventually went in under the
3  American Academy of Integrated Pain Medicine, the
4  one that we just spoke about, but it was originally
5  a coalition of three organizations, and it was their
6  policy advocacy arm.
7     Q.  So as part of your work at Endo, did you
8  work with those three organizations as well as the
9  SPPAC?
10    A.  So I would -- yeah, I would attend the
11 meetings for -- so that's the American Academy of
12 Pain Management, that's the America Society of Pain
13 Management Nursing, and the American Pain
14 Foundation, and I would attend meetings, meet with
15 the leadership of those organizations, and then for
16 SPPAC I would -- I was on their mailing list and
17 just follow up with what they are doing.
18    Q.  Okay.  The attached document to your e-mail
19 is the Phase 1 Outcomes and Description of the
20 Restructured Model?
21    A.  Uh-huh.
22    Q.  Do you know what that refers to, Phase 1?
23    A.  I actually don't know what that refers to.
24 It's been a while.
25    Q.  Okay.  Yeah.  At the bottom, it says "during

Page 129

1  Phase 1," and there's a few bullet points, and one
2  of them is "coordinated actions in several states,
3  including in Ohio, alerts and written and direct
4  testimony that resulted in improvements in medical
5  board rules for pain clinics.  Local advocates are
6  now represented on a key committee."
7     Do you remember what any of that would have
8  been about, the medical board rules for pain
9  clinics?
10    MR. DAVISON:  Objection to form.
11    MS. VANNI:  Object to form.
12    A.  No.  These are just generalizations for
13 every state, so I don't know the exact rules they
14 were talking about.
15    Q.  And the next bullet point about Tennessee:
16 "Written and direct testimony and multiple other
17 communications related to medical board rules for
18 pain clinics."  In italics, "This resulted in
19 substantial revisions to the rules creating a less
20 stringent regulatory environment for pain management
21 clinics."
22    Why would that be a goal of the SPPAC?
23    MR. DAVISON:  Objection to form.
24    MS. VANNI:  Objection.
25    A.  Well, I can't speak to the legislation on

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 that. Some of the legislation that was getting
2 written was extremely restrictive for patients. One
3 of them, when they were trying to rewrite the
4 guidelines for Florida, literally talked about doing
5 urine testing in the office, and it would have
6 required the office to have to totally redesign
7 their bathrooms, instead of sending them to an
8 approved testing site or doing it.
9     So that's -- I don't -- I can't answer what
10 that was, but when you're looking at legislation,
11 they didn't do away with it. They just wanted to
12 make sure that it would not place undue burden on
13 patients and caregivers.
14    Q.  Do you see a requirement of an in-office
15 urinalysis as an undue burden?
16    A.  No, it's just you have to be careful about
17 what you're asking -- what you're putting in writing
18 to require, because then it becomes a process that
19 can be pretty burdensome to patients, and also
20 clinics. So it's just a -- it's a matter of
21 striking a balance to make sure that you're
22 addressing the concerns but also allowing patients
23 to be able to not feel like a criminal every time
24 they walk into their doctor's office.
25    Q.  Is a urinalysis for every patient one of

Page 131

1 the, quote, tools of CARES Alliance recommended for
2 safe opioid prescribing?
3     MR. DAVISON:  Objection to form.
4    A.  We would -- urinalysis is one tool used, but
5 it just depends on the patient. It's all
6 individualized. Urinalysis is absolutely a tool,
7 but you also have to know how to read it, because
8 many drugs, the -- or when they -- the testing comes
9 out, you just have to be very accurate in how you're
10 reading that, because it can be misleading.
11    Q.  But is that something that CARES Alliance
12 recommends that doctors do as part of what is
13 presented as safe opioid prescribing?
14     MR. DAVISON:  Objection to form.
15    A.  It's been a while since I read what we did,
16 but I want to say that's one of the tools we
17 educated about as something that could be used by
18 physicians' offices.
19    Q.  But you just gave that as an example of a
20 highly restrictive measure proposed in Florida.
21    A.  No, I didn't.
22     MR. DAVISON:  Objection.
23    A.  You're not -- that's not exactly what I
24 said.
25    Q.  Okay.

Page 132

1    A.  What I said was that was just one example of
2 where sometimes the legislation written is much --
3 is very stringent in the way they wrote it, and so
4 what they talk about is making it so that it's a
5 balance so that nothing becomes an undue burden on
6 any party.
7    Q.  Do you think having a less stringent
8 regulatory environment for pain management clinics
9 is a good idea?
10     MR. DAVISON:  Objection to form.
11     MS. VANNI:  Objection.
12    A.  I think that you need to strike a balance.
13 I keep telling you that, because I think you
14 can't -- I think you can have legislations so
15 restrictive that you end up defeating what you're
16 trying to accomplish, which is appropriate pain
17 management. At the end of the day, we're still
18 trying to accomplish pain management.
19    Q.  And what do you think of as appropriate pain
20 management?
21     MR. DAVISON:  Objection to form.
22    Q.  What does that mean?
23     MR. DAVISON:  Objection.
24    A.  It means pain -- pain management that
25 helps -- that manages the risks and the benefits,

Page 133

1 along with the benefits.
2    Q.  Would it be treatment that is effective for
3 a particular disease state?
4     MR. DAVISON:  Objection.
5    A.  Well, you'd also have to weigh it with the
6 risks. So it's balanced. It's looking at both
7 sides.
8    Q.  Is it possible to fully look at both sides
9 if there is no data on the benefits?
10     MR. DAVISON:  Objection to form.
11    A.  Well, I guess I would say to you if -- I'm
12 not sure how the FDA would approve drugs if there's
13 no benefit listed, so I would say to you that I
14 think the benefits -- that there's data on benefits
15 and there's data on risks, and I think the clinician
16 does the best they can to balance that, to make sure
17 that they're doing right by patients, but ultimately
18 it's a clinician's decision as to what they
19 prescribe, how they prescribe, and to whom they
20 prescribe.
21    Q.  In your work at the medical affairs
22 department at Endo, were you trying to influence
23 clinicians' decisions?
24     MS. VANNI:  Objection.
25    A.  No. We were trying to educate and inform.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1   My -- yeah.
2   Q. Going back to your résumé, you worked at
3 Purdue Pharma from 2003 to 2005, correct?
4   A. I did.
5   Q. Can you describe for me what you did there?
6   A. Sure. I was the regional manager of
7 advocacy and I worked in the government affairs and
8 advocacy department working on issues related to
9 pain medicine across the country.
10   Q. What were the sort of issues related to pain
11 medicine across the country that you were working on
12 at that time?
13     MR. DAVISON: Objection to form.
14   A. Well, that is when the -- that really
15 started to be a lot more information coming out on
16 abuse and diversion, but there was also, in efforts
17 to thwart that, there was also some mismanagement,
18 undermanagement of pain happening. So it's almost
19 the same problems that are happening today. We
20 still have patients in pain and we have abuse and
21 diversion, so trying to find the best ways to combat
22 both. You know, it's no less important today than
23 it was then in 2003.
24     MS. GAFFNEY: Can we go off the record for a
25 minute? I need to find another copy of this

Page 135

1 document.
2     THE VIDEOGRAPHER: Off the record, 1:34 p.m.
3     (Recess from 1:34 p.m. until 1:37 p.m.)
4     THE VIDEOGRAPHER: On the record, 1:37 p.m.
5     (Mallinckrodt - Jackson Exhibit 13 was
6 marked for identification.)
7     MS. GONZALEZ: I'm sorry, Counsel, what is
8 the plan for getting copies of this?
9     MS. GAFFNEY: We can print extra copies
10 or -- I was thinking we could just proceed with
11 the one copy, but we can take an off-the-record
12 break and get extra copies if you want.
13     MS. GONZALEZ: That would be great.
14     MS. GAFFNEY: Okay.
15     THE VIDEOGRAPHER: Off the record, 1:38 p.m.
16     (Recess from 1:38 p.m. until 1:41 p.m.)
17     THE VIDEOGRAPHER: On the record, 1:41 p.m.
18 BY MS. GAFFNEY:
19   Q. So this is an e-mail from 2003 from you to
20 Pamela Bennett?
21   A. She was my boss.
22   Q. Got it. So this is a list of PA needs state
23 by state, according to your e-mail. Can you explain
24 what that means?
25     No, wait. I'm sorry. I do not have a list

Page 136

1 of PA needs state by state. What is this list that
2 is attached? I'll just ask you that.
3   A. Gosh, it's been a really long time. It
4 looks like it was an -- well, I'm reading. It was a
5 state advocacy status for the northeast territory.
6 It looks like it was tiered based on states and some
7 states -- I don't even remember how we tiered them.
8   Q. Was the northeast territory your territory?
9   A. It -- well, we had divided it into different
10 territories, so I helped out across the country,
11 because it was just Pam and I at the time, just the
12 two of us, so this would have been the northeast
13 area.
14   Q. So just generally under most of the states
15 there's meetings with groups, pain initiatives, and
16 then also meetings with individual clinicians. So
17 what would those meetings with individual clinicians
18 entail, just generally?
19     MS. GONZALEZ: Objection.
20   A. So I was doing advocacy work at the time.
21 So it would have been, you know, talking about, you
22 know, pain management, access issues, you know, were
23 people having a hard time getting treatment, were
24 people -- you know, abuse -- what was going on with
25 diversion and abuse, and just -- I mean, I think any

Page 137

1 topic I can't answer, because I don't -- I didn't --
2 I wasn't -- I wasn't very specific on any of this,
3 but that is the kind of topics we would talk about.
4   We were dealing with a lot of, once again,
5 trying to make sure there was a balance, the
6 patients had access to pain treatment, but we were
7 also addressing abuse and diversion.
8   Q. What sort of things in 2003 were you doing
9 to address abuse and diversion?
10   A. Supporting educational programs, looking at
11 risk management. These cancer -- so the state --
12 there was a National Alliance for Cancer -- oh,
13 for -- it was these pain initiatives. I can't
14 remember the name, I apologize, but it was a cancer
15 pain alliance, I think that's what they're called,
16 that ended up being just a pain alliance.
17   And it was out of the University of
18 Wisconsin, and they would have state-based groups,
19 and they were ways for the states to come together
20 as a collaborative and talk about the issues that
21 were -- because each state is different -- and to
22 talk about what issues they wanted to work on. Was
23 it access. Sometimes it was access to pain
24 treatment or appropriate education. Other times it
25 might be abuse and diversion. At this point in time

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 it was people were just starting to get together and
2 start working together.
3 Q. Okay. And what does it mean when it says
4 "have mobilized on two issues or no issue
5 mobilization"? What is the --
6 A. So mobilization would have been educating
7 people on if there was legislation being done at the
8 State House, if Medicaid was hosting a hearing on
9 pain treatment, on letting -- it was really about
10 making people aware.
11 Q. Okay. As part of your advocacy work, did
12 Purdue Pharma ever retain agencies to assist with
13 that work? You said it was just you and Pamela
14 Bennett at the time?
15 A. Uh-huh.
16 MS. GONZALEZ: Objection.
17 Q. Did Purdue Pharma retain other agencies to
18 do this work with you?
19 A. Not to my knowledge, while I was there. It
20 wouldn't be unusual for them to do it, but I can't
21 recall -- at the time I can't recall that I worked
22 with anyone to do it.
23 Q. Do you remember an agency named Edward
24 Howard & Co.?
25 MR. DAVISON: Objection.

Page 139

1 A. I do not.
2 Q. How did your group select the KOLs that you
3 would work with at this time?
4 MS. GONZALEZ: Objection.
5 A. Which group are you talking about?
6 Q. What was the name of -- you said medical
7 advocacy, or you said government affairs at Purdue?
8 A. Oh --
9 Q. I'm getting the employer's names for the
10 advocacy groups mixed up.
11 MS. GONZALEZ: Objection.
12 A. So I was with the -- so -- advocacy -- I'm
13 sorry. Advocacy was within government affairs,
14 state government affairs at Purdue.
15 We don't select the KOLs. The KOLs are
16 decided by the community. They are people who are
17 researchers, speakers. So that's -- key opinion
18 leaders are people who are key opinion leaders who
19 have published. So that decision is not made by us.
20 Q. Okay.
21 MS. GAFFNEY: I have more copies of this
22 one. So here is --
23 (Mallinckrodt - Jackson Exhibit 14 was
24 marked for identification.)
25 BY MS. GAFFNEY:

Page 140

1 Q. All set?
2 A. Yeah.
3 Q. Okay. So in the middle of the page, your
4 e-mail from October 2003 states that you attended
5 the Ohio Compassionate Care Task Force last Friday.
6 What was your role with respect to the Ohio
7 Compassionate Care Task Force?
8 MS. GONZALEZ: Objection.
9 A. I would have been a participant.
10 Q. What did that involve?
11 A. Attending meetings, weighing in on issues,
12 but I -- I actually don't believe I was part of this
13 task force. I believe this was just a task force,
14 because it was a legislatively mandated group. All
15 meetings were open to the public. So I wasn't on
16 that task force. So to my -- to the best of my
17 recollection, I believe I was just a person in the
18 audience.
19 Q. Okay. What was your motivation for being a
20 person in the audience?
21 MS. GONZALEZ: Objection.
22 A. Because we were working on pain management
23 issues and this is a group that is looking at end of
24 life care and pain management in the state of Ohio.
25 Q. Did Purdue Pharma provide funding to the

Page 141

1 Ohio Compassionate Care Task force?
2 A. No, no. These are state-mandated task force
3 and there's no funding avenue, funding stream, for
4 that.
5 Q. Your e-mail continues to note that there
6 will be another meeting forum with Greg Jewel from
7 the Board of Workers' Comp. Did you ever interact
8 with Greg Jewel?
9 A. I don't recall. I may have attended
10 meetings with him, but I don't -- I don't recall.
11 Q. Okay. What sort of contact with the Ohio
12 Board of Workers' Comp did you have?
13 MS. GONZALEZ: Objection.
14 A. None. None. I attended two -- I attended
15 this Ohio task force, and then there was another
16 group that was actually in your last e-mail, the
17 Ohio Pain and Palliative Care Task Force. So there
18 was -- there was two groups within Ohio that I would
19 attend their meetings, but it was just more of a
20 passive sitting in the audience, listening to what
21 they were doing on pain management, how they were
22 addressing issues. There was nothing active.
23 Q. Okay. And did you ever interact with
24 Dr. Barbara Edwards from Medicaid mentioned in your
25 e-mail?

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    A.  I don't recall.  I just know that there
2  was -- I may have passed -- we may have passed --
3  crossed paths at these two difference meetings,
4  because they met monthly or quarterly.
5    Q.  Okay.  Did you do any work while you were at
6  Purdue Pharma related to state coverage or
7  reimbursement for opioids in Ohio?
8    A.  No.  No.
9    Q.  And did you do any work related to third
10  party payer reimbursements?
11    A.  No, that would not have been my area.
12    Q.  Okay.  So similar question then.  Would
13  you -- did you ever meet with any Ohio insurers
14  about coverage for formulary status?
15    A.  Oh.  That's managed care.
16    Q.  Managed care.
17      Okay, I think we're done with that one.
18      (Mallinckrodt - Jackson Exhibit 15 was
19  marked for identification.)
20      THE WITNESS:  Okay.
21  BY MS. GAFFNEY:
22    Q.  All set?  Okay.  So this is a 2003 e-mail to
23  you, and it mentions the company I asked about,
24  Edward Howard & Company.  Does this e-mail refresh
25  your recollection about that company?

Page 143

1    A.  Not at all.  I'm sorry.
2    Q.  Okay.  From the text in this e-mail, it
3  looks like Purdue has retained Edward Howard &
4  Company to identify and screen potential KOLs.  Is
5  that your understanding of this?
6      MS. GONZALEZ:  Objection.
7    A.  That's not something they would have hired a
8  firm to do.  To be honest, I really am -- this would
9  all be conjecture, because I don't have -- I don't
10  recall this issue, I don't recall this e-mail, but
11  you would -- it sounds like to me that this group
12  was identifying people.  They weren't creating
13  people.  They were identifying who was out there
14  already.
15    Q.  Sure.
16    A.  So it's a point of clarity, but I don't
17  recall this issue.
18      Yeah, so I'm sorry, I'm not going to be able
19  to answer that.
20    Q.  Okay.  Yeah, it says:  This individual is
21  recommended to us by Edward Howard & Company, the
22  agency retained in Ohio on behalf of Purdue Pharma.
23    A.  So he may have been a pain management person
24  in his community, well-respected, but wasn't getting
25  national attention.

Page 144

1    Q.  Okay.
2    A.  But I'm just, basically, reading from this.
3    Q.  Sure.  It looks from this e-mail that Purdue
4  Pharma retained this agency to help identify those
5  experts.
6      MS. GONZALEZ:  Objection.
7    A.  That doesn't -- that's not what I would have
8  gotten from this at all.
9    Q.  Okay.  Please tell me what you would have
10  gotten from it.  I mean, it's an e-mail to you in
11  your employment --
12    A.  Yeah.
13    Q.  -- in 2003, which I realize is a long time
14  ago, but I'm trying to understand it, so I would
15  appreciate hearing your understanding of it.
16      MS. GONZALEZ:  Objection.
17    A.  That they -- that they -- an -- they have an
18  agency retained in Ohio and they offered -- they
19  suggested a speaker.  So I don't know if that was
20  their main role, their only role, or it was just one
21  of the many things that they did.  That's what I'm
22  saying.  I don't -- they could have had a very wide
23  berth on responsibilities, or they could have been
24  very narrow.  I don't know.
25    Q.  Okay.  Do you know anything about the doctor

Page 145

1  whose name is listed below that paragraph, Eric
2  Chevlin?
3    A.  I do not.
4      (Mallinckrodt - Jackson Exhibit 16 was
5  marked for identification.)
6      THE WITNESS:  Okay.
7  BY MS. GAFFNEY:
8    Q.  Okay.  Starting in the middle of the first
9  page, it's an e-mail from you in February 2004 to --
10  Pamela Bennett, you mentioned, is your -- was your
11  boss at this time, correct?
12    A.  Uh-huh.  Yes.
13    Q.  Okay.  And Dr. Ruth Plant, who is she?
14    A.  I don't remember, but it looks like she was
15  the director of medical liaisons, according to the
16  e-mail above.
17    Q.  Oh, there we go.  Okay.  And the people on
18  the CC line, who are they?
19    A.  Joan Juper worked in advocacy.  She was like
20  an assistant.  Beverly King, gosh, I don't remember
21  who Beverly was.  And Dr. Deanna Finnell was the MSL
22  that was living in Ohio, or she may not be -- she
23  was my contact.  That was who I worked with.  I
24  can't remember where she was from.
25      Beverly King.  I believe Beverly King was on

Highly Confidential - Subject to Further Confidentiality Review

---

Page 146

1 the -- on the advocacy team too. We're going on 15
2 years. I'm lucky I can remember anything at this
3 point. But I think she was on the advocacy team
4 too. I know I'm blanking on her, but...
5 Q. Okay. And I know a lot of these questions
6 are reaching memory-wise, but your e-mail describes
7 a trip you and your colleague had in Ohio. Can you
8 generally -- explain what Purdue was doing generally
9 in terms of advocacy in Ohio in that time period?
10 MS. GONZALEZ: Objection.
11 A. Same thing we were doing in every state.
12 Meeting with people, trying to understand the
13 issues, what their concerns were. So...
14 Q. Okay. At the beginning of your e-mail:
15 Joan, these advocates have been vetted.
16 What does that mean?
17 A. Vetted means that I met with them and they
18 have expressed interest in being an -- in doing
19 advocacy outreach, education.
20 Q. Okay. And what does it mean for someone to
21 become an advocate the way it's used here?
22 MS. GONZALEZ: Objection.
23 A. Nothing. Just somebody who wants to --
24 wants to speak out, it could have been on any issues
25 related to pain management, but that is more than

Page 147

1 just wanting to be a clinician. They wanted to
2 maybe write an article, speak at a conference, which
3 is noted throughout here that people had different
4 interests. So advocacy means just speaking on
5 behalf of someone else.
6 Q. Right. Okay. You said: I'm forwarding the
7 complete addresses for IMT.
8 Do you remember what IMT is?
9 A. I don't, no.
10 Q. So your e-mail says: Yesterday we met with
11 clinicians in the Dayton area. While I was able to
12 talk about advocacy and present the advocacy tool
13 kit, Deanna was able to answer the clinical
14 questions that arose, as well as provide invaluable
15 resources for their professional practice, as well
16 as for their roles as educators.
17 And Deanna, you explained, was one of the
18 medical science liaisons?
19 A. Yes.
20 Q. So in what you've described, a manufacturer,
21 Purdue, is disseminating scientific information
22 within the clinical practice to a healthcare
23 provider; is that correct?
24 MS. GONZALEZ: Objection.
25 A. Yes.

Page 148

1 Q. What sort of things would be in the advocacy
2 tool kit that you presented?
3 A. Oh, my goodness. It's been a long time. It
4 was a thick, thick -- it was actually beautiful. It
5 was one of the things we were actually proud of. It
6 was about advocating on behalf of your pain, finding
7 out different resources for caregivers, resources
8 for patients. It was identifying some disease state
9 resources, like cancer pain and things like that.
10 It was a -- it was actually in a binder, and
11 then it was online, and I'm not sure if it's
12 available anymore. This has been -- yeah, it was --
13 but it was beautiful.
14 Q. Aimed towards patients?
15 A. Patients and caregivers.
16 Q. And what sort of clinical questions would a
17 medical science liaison be able to answer in a
18 meeting like this?
19 MS. GONZALEZ: Objection.
20 A. They can answer -- they have a lot more
21 latitude to answer questions from a physician
22 because of their science background, so anything --
23 I mean, really, it was really about scientific
24 discussions and could range from -- could be a broad
25 range of topics.

Page 149

1 Q. Would a medical science liaison be able to
2 inform a clinician that the evidence indicates that
3 opioids can be eliminated for the treatment of
4 chronic low back pain and headaches?
5 MS. GONZALEZ: Objection.
6 MR. DAVISON: Objection to form.
7 A. I -- they could, but I'm not sure they would
8 if they didn't have the data, the -- if they didn't
9 have all the resources. I mean, you know, I think
10 you have to be really careful about making any
11 statements unless you have the science to back them
12 up, and so -- because we're very evidence-based in
13 discussions and -- so I, you know, I think -- I
14 don't go into detail about that in this e-mail, so I
15 don't actually know what was discussed, but...
16 Q. But if a medical science liaison did have
17 all of the evidence to back up a statement like
18 that, the medical science liaison could inform
19 clinicians of the evidence?
20 MR. DAVISON: Objection.
21 MS. GONZALEZ: Objection.
22 A. Well, I think it would depend on the
23 conversation that they were having, and what was
24 appropriate, and what was being asked, and how the
25 information was delivered. But, you know, once

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 again, you have to be careful, because you don't
2 want to -- you know, just like we would not --
3 nobody -- when I was at MSL, I would never have
4 said, Oh, I heard this was good for this or this was
5 good for that in terms of just hearsay, or even if
6 it was panel discussion. You always have to wait
7 for this information to be vetted and then discuss
8 how it would be best presented.
9     So, you know, could they speak about it? I
10 don't think it -- I don't think they couldn't, but I
11 don't know if they would if it was not the topic, if
12 it didn't come up in conversation.
13     Q. Was there ever a time in your work in
14 advocacy for any of these companies when you would
15 share panel publications with clinicians?
16     MR. DAVISON: Objection to form.
17     A. No. We were always very careful, because
18 we -- I could certainly --
19     THE WITNESS: God bless you.
20     A. I could -- I would send links if they were
21 in the public domain, but I would be very careful
22 about what I was sending, because I didn't want
23 anyone as a -- as a spokesperson -- as somebody who
24 represents Endo or Purdue, and now Mallinckrodt, I
25 have to be careful about I don't want anyone to get

Page 151

1 the assumption that these are our materials or that
2 they're being misrepresented or I am trying to place
3 them in a different category of importance.
4     So I'm very careful about what I send out,
5 and I will educate people if something is out, but
6 it's usually just a link or, you know, and I don't
7 make claims or I don't pull pieces out of that,
8 because that would be inappropriate and
9 irresponsible.
10     Q. But you might share links to significant
11 panel guidelines or something like that?
12     MS. GONZALEZ: Objection.
13     A. Or if there was public testimony, things
14 like public testimony. I don't generally do
15 guidelines, because that would be some information
16 that should really be coming out of our medical,
17 because they should -- they need to review things
18 first. I mean, I do advocacy, so I always wait to
19 talk to our team to make sure it's aligned.
20     Q. So in this e-mail you describe a few
21 different clinicians and pharmacists. The first
22 one, Dr. Joshua Cox, is a pharmacist who runs a pain
23 management program at Good Samaritan. Do you
24 recall Dr. Joshua Cox?
25     A. I do not.

Page 152

1     Q. It says that you suggested him as a panel
2 member to Christina Thompson, coordinator for a CPI
3 national meeting.
4     Did you or others at Purdue correspond with
5 Dr. Cox after this e-mail and after recommending him
6 as a panel member to Christina Thompson?
7     MS. GONZALEZ: Objection.
8     A. I cannot recall -- I don't remember that,
9 but I can tell you it wouldn't -- I would have had
10 nothing -- no input into what he said or what he was
11 presenting. If I found people who I thought were
12 dynamic and good speakers and had a good background,
13 I would share them with my advocates across if they
14 were looking for speakers for different conferences,
15 but that would be the extent of it. I don't recall
16 ever talking to Dr. Cox again, or Cathy Tram, or
17 Dr. Thomas, any of those.
18     MR. DAVISON: So we've been going a little
19 over an hour and both my realtime screens are now
20 down, so --
21     MS. GAFFNEY: Yeah, mine just went down too.
22     MR. DAVISON: If we could just break.
23     THE WITNESS: Can we take a break? I do
24 need a break.
25     THE VIDEOGRAPHER: Off the record, 2:12 p.m.

Page 153

1     (Recess from 2:12 p.m. until 2:26 p.m.)
2     THE VIDEOGRAPHER: On the record, 2:26 p.m.
3 BY MS. GAFFNEY:
4     Q. Okay. We're still looking at this e-mail
5 description, the clinicians you met with in Ohio in
6 2004.
7     A. Okay.
8     Q. What do you recall about Cathy Tram?
9     A. Nothing.
10     Q. And how about Dr. Thomas?
11     A. The same.
12     Q. So your e-mail description of the meeting
13 with Dr. Thomas describes him as an addiction
14 specialist and family practitioner, the only
15 addictionologist in the area that speaks nationally
16 on the topic. He uses a phrase that we really
17 liked, quote, diversion of the well-intentioned
18 script, end quote, to describe the majority of
19 problems regarding abuse and diversion of
20 prescription opiates.
21     What did you like about that phrase?
22     MR. DAVISON: Objection to form.
23     A. I can't remember what I was thinking at the
24 time, but I think what it speaks to is that the
25 scrip was meant for a patient in pain, and to treat

Page 154

1  pain it was diverted.  So it was diverted from a
2  well-intentioned scrip.
3     Q.  It says that Deanna presented the animation
4  UTD slide set and addiction assessment.
5        Do you remember any of those materials?
6     A.  I don't.
7     Q.  Do you remember if they were given out
8  broadly at meetings with clinicians in Ohio and
9  elsewhere?
10       MS. GONZALEZ:  Objection.
11    A.  No.
12    Q.  Okay.  Do you remember if as part of your
13 advocacy in Ohio you did any work around the Ohio
14 Intractable Pain Care Act?
15       MS. GONZALEZ:  Objection.
16    A.  No, I do not remember.
17    Q.  Do you remember if Purdue's advocacy
18 included working toward the passage of Intractable
19 Pain Care Acts at the state level?
20       MS. GONZALEZ:  Objection.
21    A.  I don't recall.
22    Q.  And your team within advocacy was just on
23 state initiatives, right, not federal, just
24 state-wide initiatives?
25       MS. GONZALEZ:  Objection.

Page 155

1     A.  We worked on both.
2     Q.  Oh, you worked on both?
3     A.  But I was -- I was responsible for state.
4     Q.  Did Purdue play a role in the Ohio Pain
5  Initiative?
6        MS. GONZALEZ:  Objection.
7     A.  Define "role," because, I mean, we
8  participated in their meetings, but that would be
9  the extent.
10    Q.  Okay.  What did that participation in the
11 meetings involve?
12       MS. GONZALEZ:  Objection.
13    A.  Showing up.  But I was responsible for many,
14 many states, so it wouldn't have been every meeting.
15 It was when I could.
16    Q.  This is another document from -- this one is
17 from 2005.
18       (Mallinckrodt - Jackson Exhibit 17 was
19 marked for identification.)
20       THE WITNESS:  Okay.
21 BY MS. GAFFNEY:
22    Q.  Okay.  So this is an e-mail from March 2005
23 that you sent.  At meeting notes.  The subject is
24 Ohio Advocacy Strategic State Plan Meeting Notes.
25       And you list the people attending -- who

Page 156

1  were present at the meeting and those who were
2  absent.  Was this a group that met regularly, do you
3  recall?
4     A.  I don't recall.  I'm sorry.  I don't.
5     Q.  You can see it looks like one of the people
6  present at this meeting is from the agency Edward
7  Howard & Co.?
8     A.  Yeah, and I don't -- her name doesn't ring a
9  bell.  Her name -- yeah, it's been too long, I do
10 not remember her.
11    Q.  Okay.  Does this refresh your recollection
12 of what Edward Howard & Company was retained by
13 Purdue to do?
14       MS. GONZALEZ:  Objection.
15    A.  No.  No.  Yeah, I do know Purdue was -- we
16 were using state -- we had our government affairs
17 person, so he -- they may have been working with him
18 closely.  I honestly don't remember.  It's not
19 somebody I must have worked closely with, because I
20 don't remember.
21    Q.  What was the goal of the Ohio Advocacy
22 Strategic State Plan?
23       MR. DAVISON:  Objection.
24    A.  Well, considering I don't remember it, I'm
25 not quite sure what the goal was, but I think the

Page 157

1  goal of any group would be to assess the situation
2  going on in the state and -- and discuss tactics to
3  how -- if there was problems or questions or how to
4  work collaboratively.  But, once again, I don't --
5  my recall is totally off on this one.
6     Q.  Okay.  The bottom heading, Alliance
7  Development and Advocacy Update --
8     A.  Uh-huh.
9     Q.  -- there's multiple mentions of a survey?
10       MS. GONZALEZ:  Objection.
11    Q.  Do you recall working on a survey with these
12 organizations at that time?
13       MS. GONZALEZ:  Objection.
14    A.  I really don't.
15    Q.  So, again, on the back, Action Items, Number
16 3:  Maryland will continue to assist the OHPCO and
17 the OPI.
18       And those acronyms, just for the record,
19 appear to be the Ohio Hospice and Palliative Care
20 Organization and the Ohio Pain Initiative, correct?
21    A.  Yes.
22    Q.  Okay.  Will continue to assess them with the
23 development of the pain survey and develop a media
24 plan for publicizing the results.
25       And just going back, flipping back to this

Page 158

1 top of this e-mail, Marilyn was the person from the
2 agency Edward Howard & Company; is that correct?
3     MS. GONZALEZ: Objection.
4   A. That's what this says.
5   Q. Okay.
6   A. I don't know her.
7   Q. Okay. Do you have any recollection of
8 Purdue's role in assisting with this survey?
9     MS. GONZALEZ: Objection.
10   A. I do not.
11   Q. Bullet Point Number 4: Catherine and Deanna
12 will attend the OPI meeting and identify advocates
13 in key areas.
14    And then 5: Deanna and Catherine will work
15 at identifying advocates in Cleveland.
16    How would you go about identifying
17 advocates?
18   A. Finding out people who are speaking out on
19 issues, people who were involved with the Ohio Pain
20 Initiative or the Palliative Care, people who are
21 doing advocacy work, you know, any work additional
22 to what their clinical focus is.
23   Q. And what would you be looking for in
24 advocates?
25   A. People willing to work with Purdue, people

Page 159

1 who are balanced, who are -- have -- understand the
2 issues. It depends on what we were looking for. If
3 we wanted someone to speak at a patient conference,
4 were they good with patients, did they have an
5 interest in that. If they were speaking about
6 palliative care, do they have -- are they a
7 knowledge expert in that area. It just depended.
8   Q. So at the top there's a media update. Media
9 Focus in 2004. It appears from this that one role
10 that the agency Edward Howard & Company was to
11 analyze media stories and provide this update to
12 Purdue?
13     MS. GONZALEZ: Objection.
14   Q. Would that be fair to state, based on this
15 e-mail?
16     MS. GONZALEZ: Objection.
17   A. Yeah, they could have been a PR firm. They
18 could have been a lobbying. I honestly have no
19 idea. It's no -- yeah.
20   Q. Okay. Quite a lot of stories about
21 diversion and abuse in 2004. 813.
22     MS. GONZALEZ: Objection.
23   Q. Would you agree that it was -- the problem
24 of diversion and abuse was already widespread in
25 2004?

Page 160

1   A. Well, I would say that it's definitely an
2 issue that was discussed and I, you know, I think it
3 was something that we were hypervigilant about, so
4 we were going to catch every story.
5   Q. But at that point it was known and it was in
6 the news that addiction and abuse was a problem in
7 Ohio and elsewhere?
8   A. Yeah, it was a national.
9   Q. Is that another named -- do you recall the
10 name Gladstone McDowell?
11   A. No. I'm sorry, I do not.
12   Q. I know, it's a long time ago.
13   A. It was. I'm lucky if I remember last week,
14 so I am -- yeah, sorry.
15   Q. No problem. Just going back through. Okay.
16 Okay. That's good for that document.
17   A. Okay. Thank you.
18     (Mallinckrodt - Jackson Exhibit 18 was
19 marked for identification.)
20     MS. GAFFNEY: Here's another copy. One
21 more.
22     THE WITNESS: Okay.
23 BY MS. GAFFNEY:
24   Q. Okay. This is an e-mail and article that
25 you forwarded in 2004. It looks like a local news

Page 161

1 story from West Virginia in 2004. Is that --
2   A. I didn't forward it. It was forwarded to me
3 by --
4   Q. Oh, I'm sorry.
5   A. -- that's okay -- Brian Rosen, one of our
6 government affairs person.
7   Q. Okay. And your comment is: This article is
8 interesting, especially in light that many people
9 are claiming that methadone is a panacea for, quote,
10 addicted patients.
11    Why did you put the word "addicted" in
12 quotes there?
13     MR. DAVISON: Objection.
14   A. Oh, God, this is so long ago. I'm trying to
15 find that quote, actually, where he -- why would I
16 put it in quotes? I don't know what I was thinking
17 at the time. It was a long time.
18    Oh, because in some of his comments in the
19 beginning he talked about that he was going through
20 withdrawal, and so from opioids, so that's a
21 physical -- that's a physical, so I think I was --
22 just wanted to make sure that people -- people
23 under -- you know, were noting that addicted is
24 addicted.
25     MS. GONZALEZ: I'm sorry. Could we go off

Highly Confidential - Subject to Further Confidentiality Review

| Page 162 |
|---|
| 1 the record just to fix the realtime? Is there |
| 2 anything we can do to -- |
| 3     THE VIDEOGRAPHER: Off the record, 2:46 p.m. |
| 4     (Recess from 2:46 p.m. until 2:47 p.m.) |
| 5     THE VIDEOGRAPHER: On the record, 2:47 p.m.) |
| 6     THE WITNESS: I want to make a correction. |
| 7 I honestly don't know why I put that in |
| 8 quotations. It's been many years ago, so I'm not |
| 9 sure why I put the word "addicted" in quotations |
| 10 on this one. |
| 11 BY MS. GAFFNEY: |
| 12   Q. Okay. And you were explaining that |
| 13 experiencing withdrawal doesn't necessarily mean |
| 14 addiction, if I understood you correctly? |
| 15   A. Yes. |
| 16   Q. Can you explain the difference between |
| 17 dependence and addiction? |
| 18   A. Addiction is a psychological and |
| 19 physiological problem with medication, not just |
| 20 opioids, but other medication, and tolerance is -- |
| 21 well, physical dependence is when you're taking a |
| 22 medication or a drug, like caffeine, for a period of |
| 23 time and then you -- your body becomes used to it, |
| 24 and then if you stopped it suddenly, you could go |
| 25 through signs of what we call withdrawal. That's |

| Page 163 |
|---|
| 1 why people get jittery when they stop drinking |
| 2 coffee after a while. |
| 3     And then tolerance is a concept that you've |
| 4 been taking medication for a while at a certain dose |
| 5 and it's been effective and all the sudden it stops |
| 6 becoming effective. It may be that your body just |
| 7 requires just a little bit higher dose because it's |
| 8 become tolerant to that particular dose. |
| 9     So those are those three terms. |
| 10   Q. So just from reading about his withdrawal |
| 11 symptoms, you had some doubts about whether he would |
| 12 be considered addicted? |
| 13     MR. DAVISON: Objection. |
| 14     MS. GONZALEZ: Objection. |
| 15   A. When I read what I wrote, I have problems |
| 16 with this story, because in the second paragraph, "A |
| 17 naive Traviss Barker swallowed what he thought was a |
| 18 harmless prescription pill, just 20 milligrams of a |
| 19 popular pain killer. He was told that day about |
| 20 four years ago it would produce a satisfying |
| 21 euphoria and banish his worries," so, to me, he was |
| 22 not taking it for pain medicine, and that changes |
| 23 the story completely, because we were fighting to |
| 24 make sure that the products that we manufactured |
| 25 were used appropriately, and, to me, that is |

| Page 164 |
|---|
| 1 inappropriate use. |
| 2     And so that is what constituted my |
| 3 paragraph. I may have used not the best languages |
| 4 and the best things, but that was what my concern |
| 5 was when I said that this was a bit of a |
| 6 contradiction. |
| 7   Q. Okay. Did you ever hear or become aware of |
| 8 the perception that if a drug is prescribed by a |
| 9 doctor and approved by the FDA it is not as |
| 10 dangerous as one on the street -- |
| 11     MR. DAVISON: Objection. |
| 12   Q. -- such as heroin? |
| 13     MR. DAVISON: Objection. |
| 14   A. Did I -- can you repeat the question? |
| 15   Q. At any point did you become aware of the |
| 16 perception that people might hold that when a drug |
| 17 is prescribed by a doctor or approved by the FDA |
| 18 it's not as dangerous as a drug that is sold outside |
| 19 of that arena -- |
| 20     MR. DAVISON: Objection. |
| 21   Q. -- such as heroin? |
| 22     MR. DAVISON: Objection. |
| 23   A. I do believe that's a misconception that the |
| 24 public has. I've always felt that way, yeah. |
| 25   Q. Thinking that it -- it's safer just because |

| Page 165 |
|---|
| 1 it's sold within a legal medical sphere? |
| 2     MR. DAVISON: Objection. |
| 3   A. I think that many people do not understand |
| 4 how dangerous some drugs are and how important it is |
| 5 for a physician -- to have healthcare provider |
| 6 oversight when prescribing them. |
| 7   Q. Is it your understanding that if you were to |
| 8 equate the strengths, that heroin and pure oxycodone |
| 9 would be equally addictive? |
| 10     MR. DAVISON: Objection. |
| 11   A. I don't have that kind of knowledge. |
| 12   Q. Okay. Based on the clinical knowledge that |
| 13 you do have, do you have any reason to expect that |
| 14 they would be different -- |
| 15     MR. DAVISON: Objection. |
| 16   Q. -- with respect to addiction rates? |
| 17   A. Oh, with respect -- yes, I would -- I |
| 18 would -- heroin is Schedule I, totally illegal. |
| 19 Anyone who is taking it is absolutely abusing it. I |
| 20 would say the rates would -- I would think would be |
| 21 lower for an opioid because they're usually |
| 22 prescribed by a clinician, although I know there is |
| 23 diversion. |
| 24     But if you were -- you asked me to compare |
| 25 the two, that's how I feel. I feel that -- my |

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1 thoughts would be that it would be lower for opioids
2 because they are prescribed under the direction of a
3 physician, if they are used appropriately.
4    Q.  Heroin is an opioid, correct?
5    A.  Yes.  But it's a Schedule I, and it's not
6 prescribed.  So it's not -- you have to get it on
7 the streets, and it's -- I would think it's not as
8 readily available as things that are in pharmacies.
9 That would be my assumption.
10    I have never come across heroin in my entire
11 life, so I do not travel in those kinds of circles,
12 and maybe it's more readily available, but that
13 would be my answer.
14    Q.  So what does it being Schedule I versus
15 Schedule II have to do with the rate of -- the risk
16 of addiction, potential addiction?
17    MR. DAVISON:  Objection.
18    A.  Well, it's not about the risk of addiction.
19 You were asking me do I think that the rates of
20 addiction are higher in one than the other.  And I
21 say that I would think that something would -- it
22 would be higher rates of addiction of an illegal
23 substance than it would be of a legal substance,
24 because a --
25    Q.  Why?

Page 167

1    A.  -- because a legal substance should be
2 monitored by a physician if it's given
3 appropriately.  Now, if it's diverted, then it
4 all -- everything changes, and it becomes a little
5 bit less clear.  But if you're looking at heroin
6 versus OxyContin or oxycodone or any of the Schedule
7 II drugs, they -- the goal of those are for
8 medicinal purposes, which is why they were given
9 Schedule IIs.  And they are -- have oversight when
10 they're prescribed, if they're prescribed
11 appropriately and used appropriately, so --
12    Q.  But is there any difference in terms of the
13 molecular composition and binding to receptors in
14 the human brain for which you would expect heroin
15 and oxycodone or oxymorphone to have different
16 addiction rates?
17    A.  Yeah.
18    MR. DAVISON:  Objection.
19    A.  No.  I don't know the statistics for
20 everything on terms of how binding heroin versus how
21 binding a drug like hydrocodone was.  But, yeah,
22 that doesn't matter.  It's not about the bind --
23 it's not the binding.  I just say how much drug is
24 out in the -- available.  And if you're going to
25 take heroin, you are definitely taking it for a

Page 168

1 different reason than the majority of people who are
2 taking an opioid.
3    Q.  Right.  But heroin -- is it correct that a
4 heroin is a semisynthetic derivative of an opium
5 alkaloid just the same as oxycodone is a
6 semisynthetic derivative of an opioid alkaloid?
7    MR. DAVISON:  Objection.
8    A.  They both bind to same receptors, and they
9 both have -- can cause addiction.  There's no
10 question.
11    Q.  They both are derived from the same plant?
12    A.  Yes, the poppy plant.
13    Q.  Would you ever take heroin every day for low
14 back pain?
15    MR. DAVISON:  Objection.
16    A.  No.  I'm a law abiding citizen, so I
17 wouldn't take any illicit drugs.
18    Q.  But when heroin was a prescription drug, if
19 it had been prescribed to you for low pain, you
20 might have taken it then?
21    MR. DAVISON:  Objection.
22    A.  That's just conjecture.  I -- you know, if
23 it was an FDA-approved treatment for pain, and I
24 felt like that my physician and I together felt like
25 that was the best treatment for me, yes, I would

Page 169

1 have taken it.
2    MS. GAFFNEY:  Take, like, a five-, 10-minute
3 break?
4    THE WITNESS:  Sure.
5    THE VIDEOGRAPHER:  Off the record, 2:57 p.m.
6 (Recess from 2:57 p.m. until 3:10 p.m.)
7    THE VIDEOGRAPHER:  On the record, 3:10 p.m.
8 BY MS. GAFFNEY:
9    Q.  Okay.  Going back to earlier in the day, I
10 believe you said that Art Morelli was one of the
11 people who started CARES Alliance; is that correct?
12    A.  Yes.
13    Q.  And there was one other person working with
14 him that started it?
15    A.  Lisa Saki.
16    Q.  That's right.  Okay.  Did you overlap with
17 Art Morelli at all at Mallinckrodt?
18    A.  No.
19    Q.  Okay.  And does CARES Alliance still exist
20 at Mallinckrodt?
21    A.  No.
22    Q.  Okay.  Why does it no longer exist?
23    MR. DAVISON:  Objection to form.
24    A.  It was decided in 2015 -- actually,
25 really -- yeah, 2015, I would say, it was decided

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 that the resources -- we were working -- we had a
2 couple of different things going on.  And so we felt
3 like it was better that our resources be spent in
4 the Medsaway pouches which we thought were a great
5 solution for disposing of medications.
6 We also -- Kevin had been working with the
7 Alliance for Balanced Pain Management, and so it was
8 decided that the resources would be better spent in
9 that direction than CARES.
10 Q.  Okay.  And what was the Alliance for
11 Balanced Pain Management?
12 A.  So it was an alliance of organizations
13 coming together to talk about pain management and
14 other aspects of it, not just opioids --
15 Q.  Okay.
16 A.  -- to look at it across the pain continuums
17 and make sure that -- that there were other factors
18 being talked about, such as physical therapy, such
19 as psychological care, all the -- you know,
20 everything else, all the other components.
21 Q.  Okay.
22 (Discussion off the record.)
23 (Mallinckrodt - Jackson Exhibit 19 was
24 marked for identification.)
25 BY MS. GAFFNEY:

Page 171

1 A.  Okay.
2 Q.  Okay.  So this is an e-mail from 2014, in
3 September.  Gena Holthaus, is that --
4 A.  Uh-huh.
5 Q.  Okay -- has sent you a PowerPoint.  It says:
6 Let me know what you think.  The CARES Alliance
7 Redesign Overview.
8 So on the second slide:  Where have we been?
9 Market landscape in 2010.  Prescription drug abuse
10 on the rise, increasing societal burden, and also
11 the launch of Exalgo at the same time.
12 This is the time frame we were talking about
13 earlier in the day, when CARES Alliance was started
14 at Mallinckrodt, correct?
15 MR. DAVISON:  Objection.
16 A.  Exactly.
17 Q.  And then the next slide:  Where are we now
18 in 2014?  Prescription drug abuse at epidemic
19 levels.  Stigma with opioid prescribing and opioid
20 use.  Classified ER/LA REMS.
21 Then and under CARES Alliance:  Turnover in
22 staff and loss of internal support.
23 And this was in September, and you started
24 in April 2014?
25 A.  Yes.

Page 172

1 Q.  So can you explain what the turnover in
2 staff and loss of internal support was with respect
3 to CARES Alliance?
4 MR. DAVISON:  Objection to form.
5 A.  The turnover in staff meant from right
6 before Gena and I were hired, they -- four people
7 left, and they were all on the CARES Alliance, and
8 so that's the turnover in staff.
9 Q.  Okay.
10 A.  So my manager called me a week before I took
11 the job and told me she was leaving the company.  So
12 she was the last person with any historical
13 knowledge of CARES.  And so when I came in, that was
14 with the turnover of staff and loss of internal
15 support, so we didn't have a team.  It was just Gena
16 and myself.
17 Q.  Who were the four people who left the CARES
18 Alliance?
19 A.  So it was Lisa Saki, Leah -- I can't
20 remember Leah's last name, and there's two other
21 people that left the previous -- so I -- this
22 would -- I would have been -- that would have been
23 April -- March, April of 2014, and they left before.
24 Q.  Okay.
25 A.  But Lisa left when I was there, within two

Page 173

1 weeks.  Leah left at, like, Christmastime before I
2 got there, and then the other two people had left
3 before then.
4 Q.  Okay.  What department were they in?
5 A.  Medical affairs.
6 Q.  And how about the loss of internal support,
7 what does that refer to?
8 A.  That's just --
9 MR. DAVISON:  Objection.
10 A.  -- just means that we didn't have a team.
11 We also didn't have -- we were under the medical
12 director, but we really -- that wasn't really a
13 place for us because he was -- he had a lot of
14 groups that were under him.  So we didn't really
15 have anybody to throw out ideas with, and so it was
16 just internal stuff that we were working through as
17 a team.
18 Q.  Okay.  And then the bullet point,
19 conflicting messages from government affairs
20 advocacy, what were those conflicting messages?
21 A.  So that is --
22 MR. DAVISON:  Objection.
23 A.  That's really about internal -- the way that
24 they had situated.  So I got hired in medical
25 affairs; however, there was also an advocacy

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 component in our government affairs department. And
2 so that was -- we weren't really working in
3 alignment.
4     But this is when I first got there, and I
5 think there was -- it just wasn't as smooth as it
6 could be. And so we just wanted to make sure --
7 which is why I ended up moving over to -- Gena and I
8 both moved over to government affairs so that we
9 could be one voice, because it made more sense for
10 the company. So conflicting being who is the
11 primary contact for this organization, something to
12 that effect.
13     Q. Okay. So when you and Gena moved over to
14 government affairs advocacy, was there still a
15 medical advocacy group?
16     A. No.
17     Q. Okay. So going off of these slides, it
18 looks like the new vision for the CARES Alliance is
19 something called the Responsible Pain Care Campaign?
20     A. Uh-huh.
21     Q. Can you tell me about that?
22     A. It was just our idea of moving CARES to the
23 next level. One thing was, as a company, we were
24 moving into the acute pain area. And so we wanted
25 to make sure we were addressing issues related to

Page 175

1 acute pain, both in appropriate use prescribing and
2 risk factors with that, and also wanted to highlight
3 some of the acetaminophen advocacy in terms of
4 educating people about having too much -- taking too
5 much acetaminophen, because it's in so many
6 different products we have over the counter.
7     And so it was a -- it was a -- more of a
8 broader based campaign, but it was responsible pain
9 care, and it was responsible on the side of the
10 clinicians, patients, caregivers.
11     Q. You mentioned addressing areas related more
12 to acute pain, rather than chronic pain. Can you
13 explain the difference from the medical point of
14 view based on your medical knowledge and experience?
15     A. Sure.
16     MR. DAVISON: Objection.
17     A. And I wouldn't say it was instead of. It
18 was in addition to --
19     Q. Okay.
20     A. -- just to clarify. So with acute pain, you
21 have people on these medications for short periods
22 of time due to acute, usually temporary situations.
23 So it might be a broken leg, might be a cut, might
24 be a wisdom tooth taken out.
25     So there is -- you know, we want to make

Page 176

1 sure -- but the risk factors stay the same because
2 many people who have gotten into trouble with
3 addiction, many actually, have gotten through acute
4 pain, getting medicated through acute pain. And
5 nobody was monitoring them and watching them.
6     And so we wanted to make sure that people
7 understood that the risks are not just with chronic
8 pain, but also with acute pain.
9     In addition, because most times most
10 people -- the majority of people who take pain
11 medicines for acute pain conditions do not take all
12 their medications because it's taken PRN, as needed,
13 people often have medications in their household due
14 to acute pain.
15     So you might have, like, a prescription of
16 hydrocodone because you got your wisdom teeth taken
17 out. Well, these drugs sit in your house and could
18 be diverted in a number of ways. So we wanted to
19 make sure that people understood that these drugs
20 need to be disposed of appropriately and not held to
21 when you're having pain again, which happens.
22     And so we wanted to make sure the public
23 understood the importance of appropriate disposal of
24 medications and the risks associated with keeping
25 those medications around.

Page 177

1     Q. So some similar issues, but broadened to
2 acute pain specific --
3     A. Sure.
4     Q. -- situations?
5     MR. DAVISON: Objection.
6     Q. You stated that the risk factors stay the
7 same because many people who have gotten into
8 trouble with addiction, many have gotten from acute
9 pain.
10     A. Uh-huh.
11     Q. How did you know that -- do you know that,
12 or how did you become aware of that?
13     A. From the -- from what I've read and the
14 stories that I've read and especially with the
15 youth, because they don't have chronic pain. It's
16 usually due to a short-acting medication, so --
17     Q. What kind of stories that you've read?
18     MR. DAVISON: Objection.
19     A. Through the course of my career, in Florida,
20 when you were talking about Florida, headlines, kids
21 getting addicted. I did some work with the
22 Hillsborough Substance Abuse Coalition. I don't
23 remember any of the names of any of these
24 organizations, but -- and they would share these
25 stories oftentimes, that people were getting into

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 trouble after having acute pain.
2    Most chronic pain patients are followed by a
3 chronic pain clinician, and so it's a different --
4 acute pain is -- acute pain being ubiquitous,
5 everyone treats it, and anyone could treat it from
6 dentist to chiropractor to your daily practitioner.
7    Q.  Let's see.  When people have these
8 medications for acute pain, and maybe they have more
9 pills prescribed than they need, but we're still
10 talking about maybe 30 pills, maybe 60 pills?
11    A.  Uh-huh.
12       MR. DAVISON:  Objection.
13    A.  It depends on the prescription.
14    Q.  Sure.
15    A.  It's all over the place.
16    Q.  You said a lot of people are getting into
17 trouble with addiction from these acute pain
18 prescriptions.  So is it possible to get into
19 trouble with addiction from a prescription of 30
20 pills?
21       MR. DAVISON:  Objection.
22    A.  It's not that simple.  It's not about the
23 number of pills.  It's not even about the type of
24 pill.  It's really about the person, their risks,
25 their history, why they start taking pills, what

Page 179

1 they're doing with them.  Are they taking them
2 appropriately?  Are they stopped taking them for
3 pain and all the sudden taking them for the way they
4 make them feel?
5    So there's no simple answer.  It's not about
6 the numbers or even which type of drug.  It really
7 is so individualized, which is why addiction is so
8 hard to treat and has been with us since the
9 beginning of time, because it's just very hard to
10 pinpoint all the risk factors.
11    Q.  You had described earlier the difference
12 between dependence and addiction and a description
13 of a person's withdrawal symptoms in a news article
14 not necessarily indicating addiction to you.
15       MS. GONZALEZ:  Objection.
16       MR. DAVISON:  Objection.
17    Q.  Is that what you described earlier?
18       MR. DAVISON:  Objection.
19    A.  Yes, when that person said he was shaking
20 and --
21    Q.  Uh-huh.
22    A.  -- that -- it could possibly be clinically
23 physical -- a reaction to stopping the medications.
24    Q.  Okay.  And then in the context of acute pain
25 and these short-term prescriptions, I know you said

Page 180

1 a moment ago that it depends on the person.  But I'm
2 trying to understand how you know that someone has
3 gotten into trouble with addiction with a
4 short-term, 30 day or less prescription.
5    What would make something be addiction and
6 not dependence in that scenario, in your
7 understanding of it?
8       MR. DAVISON:  Objection.
9    A.  In acute pain?  It's rare that you would
10 have physical -- unless you were really taking it
11 around the clock, every day, same amount of pills,
12 same interval.  It's really individualized.
13    You can't -- I can't -- of everybody sitting
14 here in this room, I couldn't tell you who, if I
15 gave an opioid to, would get a -- have problems with
16 it and who wouldn't.  I would have to know your
17 background and your history and have you had
18 problems.
19    So addiction is -- and misuse is just really
20 individualized.  It's very hard to generalize it to
21 any -- any big group of people.  That's why it's so
22 difficult to treat.
23    Q.  Is it possible for someone who doesn't have
24 any of those risk factors to become addicted from
25 taking opioids as prescribed?

Page 181

1       MR. DAVISON:  Objection to form.
2    A.  I would say it's probably possible, yeah,
3 probably rare, but I would think it's possible.
4    Q.  But in terms of developing dependence, you
5 said that it's taking it around the clock that
6 really leads to dependence; is that correct?
7    A.  Yeah.
8       MR. DAVISON:  Objection.
9    A.  And not everyone has that, but if you're
10 taking a medicine continually, an opioid, and have
11 been consistent with it, and sometimes if you stop
12 it, you might feel jittery and shaky.  And you may
13 think you're addicted, but the truth is you just
14 need to slow down the taking of and then be fine.
15 You would have no problem at all.
16    Q.  In your understanding, it's easy to taper
17 off opioids?
18       MR. DAVISON:  Objection.
19    A.  It's all individualized.  Some people have a
20 very -- yes.  Some people have a very easy time, and
21 some people, it's much harder.
22    Q.  Okay.  But if you slow down the taking, you
23 have no problem at all?
24       MR. DAVISON:  Objection.
25    A.  I -- it's all individualized.  You're asking

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  me for generalizations, and I'm sorry, I can't give
2  them to you.
3      Q.  How much might you need to slow it down?
4      MR. DAVISON:  Objection.
5      A.  There's recommendations of 25 percent over
6  every three days, going down 20 percent.  Some
7  people will do 50 percent.  It's up to the clinician
8  and the patient, and it really is individualized.
9      MS. GAFFNEY:  Okay.  I don't have any more
10  questions.
11      THE WITNESS:  Oh, all right.
12      MS. GAFFNEY:  Thank you.
13      MR. DAVISON:  We're going to go off the
14  record.
15      THE VIDEOGRAPHER:  Off the record, 3:28 p.m.
16      (Recess from 3:28 p.m. until 3:31 p.m.)
17      THE VIDEOGRAPHER:  On the record, 3:31 p.m.
18          CROSS-EXAMINATION
19  BY MR. LENISKI:
20      Q.  Good afternoon, Ms. Jackson.
21      A.  Hi.
22      Q.  My name is Joe Leniski.  I represent
23  plaintiffs in Tennessee who are district attorneys
24  and babies who were born with NAS.  Do you know what
25  that is?

Page 183

1      A.  Neonatal abstinence syndrome.
2      Q.  Yes.
3      A.  Uh-huh.
4      MR. LENISKI:  And before we begin, I've got
5  to state on the record, we've got a standing
6  objection we're adopting here.  The Tennessee
7  plaintiffs were not privy to a lot of
8  correspondence with the parties.
9      Q.  By the way, this is for your lawyers'
10  benefit, not so much yours.
11      MR. LENISKI:  But we've got a standing
12  objection to the depositions, but, nonetheless,
13  in the spirit of cooperating with the MDL, we are
14  here, and we're ready to proceed.
15      MR. DAVISON:  We obviously disagree with
16  your objection, but the record is clear.
17      MR. LENISKI:  Understood.
18  BY MR. LENISKI:
19      Q.  So what is your understanding of what NAS
20  is?
21      A.  Neonatal abstinence syndrome are babies born
22  who have drug levels in their body that are -- and
23  they are born actually going through withdrawal
24  because they've been supplied, through their
25  bloodstream, a continuous amount of opioid, and then

Page 184

1  they come out, then they are not, obviously, and
2  then they go through withdrawal.
3      Q.  And that's because the mother was taking
4  opioids while pregnant; is that right?
5      MR. DAVISON:  Objection.
6      A.  Yes.
7      Q.  Okay.  Have you ever treated or been
8  involved in treating NAS?
9      A.  No.
10      Q.  And does it matter -- do you -- to your
11  knowledge, does it matter how much opioids the
12  mother is taking or administering to herself while
13  pregnant as it relates to whether the baby will
14  develop NAS?
15      MR. DAVISON:  Objection.
16      A.  I think that's individualized, and I -- so I
17  don't -- I think it's -- as I -- it's an
18  individualized effect in terms of mother and baby.
19      Q.  During your career, did you ever gain any
20  awareness about the relative NAS levels in
21  Appalachia?
22      A.  No.  NAS was not an -- did not really start
23  being an issue until -- I can't even give you the
24  year, but it was not when -- while I was in
25  practice.  It was, like, in the 2000s, mid-2000s when

Page 185

1  I started hearing the first cases.  And they were in
2  Florida, is where I first heard of it.
3      Q.  Okay.  And was there a correlation, to your
4  knowledge, between the rising opioid epidemic and
5  NAS cases nationwide?
6      A.  Yes.
7      Q.  In any of your positions at Purdue, Endo, or
8  Mallinckrodt, did you have occasion to address the
9  NAS issue as it relates to opioids?
10      MR. DAVISON:  Objection.
11      MS. GONZALEZ:  Objection.
12      MS. VANNI:  Objection.
13      A.  I didn't address them, but I was -- I was in
14  meetings where they were addressed --
15      Q.  Okay.
16      A.  -- if that makes sense.  So I didn't myself
17  speak on it or advocate on any issue.  I was
18  involved in meetings where that was the discussion
19  point.
20      Q.  And do you recall at which company those
21  meetings took place?
22      A.  It was probably more Endo, and it was
23  actually during my consulting time in the 2000s when
24  I -- when I would have heard most about it.
25      Q.  Okay.  So just to understand your answer,

Page 186

1  were -- the meetings that you were present at when
2  NAS was discussed, were you an Endo employee at that
3  point?
4      A.  Yeah, I probably was, because it was a
5  coalition meeting.  And I would attend as the person
6  from -- an -- as a stakeholder.  So it was a meeting
7  of multiple stakeholders on one of them.
8      Q.  So that would --
9      A.  Other industry sponsor -- other industry
10  personnel were there, other medical liaisons, other
11  advocacy people.  The public was there.  It was open
12  meetings.
13      Q.  So that would have been sometime during your
14  employment between 2011 and 2013?
15      A.  Yeah, I would --
16      Q.  Do you recall being at meetings where NAS
17  was addressed prior to joining Endo?
18      A.  I can't remember.  It could have been.  I
19  can't remember exactly when I -- I don't recall the
20  times when they were, but it was an issue in
21  Florida.
22      Q.  With respect to your time at Mallinckrodt,
23  do you recall any meetings where you discussed NAS?
24      A.  No, none.
25      Q.  And do you know why that was or --

Page 187

1      MR. DAVISON:  Objection.
2      Q.  -- do you have a theory as to why that was?
3      MR. DAVISON:  Objection.
4      A.  I think it -- no.  And they could have
5  happened while I was at Mallinckrodt in the very
6  beginning, too.  I mean, NAS became an issue just
7  like prescription -- like diversion.  It became an
8  issue in pain management that was discussed almost
9  at every meeting I attended to.  So I probably heard
10  it, too, when I was at Mallinckrodt going to local
11  meeting -- going to any kind of regional or national
12  meetings.  It was part of the agenda.
13      But I didn't pay particular close attention
14  to it at any point.  I knew it was an issue but it
15  wasn't -- I wasn't working in the area of maternal
16  health or, you know, maternal or fetal health.  And
17  so we would -- I didn't do anything directly
18  involved with it.
19      Q.  Okay.  I'm going to ask you some questions.
20  I'll try not to duplicate what got asked this
21  morning.  But the -- this morning you were asked
22  some questions about your time at Mallinckrodt.  So
23  we'll focus on that time period for now.
24      In your role as manager for advocacy for
25  global medical affairs, which I believe you said

Page 188

1  started in April of 2014; is that correct?
2      A.  Yes, sir.
3      Q.  At any point did you report to Kevin Webb?
4      A.  No.
5      Q.  Okay.  At any point in your career at
6  Mallinckrodt --
7      A.  No.
8      Q.  You never reported to Kevin Webb?
9      A.  No.
10      Q.  When asked questions -- well, do you recall
11  being asked questions about what your
12  responsibilities were in that role?
13      A.  Yes.
14      Q.  And do you recall giving an answer that at
15  least one aspect of that role had to do with
16  unrestricted educational grants?
17      A.  Yes.
18      Q.  Okay.  Describe that for me.
19      A.  So I worked --
20      MR. DAVISON:  Objection.
21      A.  I worked with the professional societies,
22  along with the patient societies, and if they wanted
23  to do a program on patient education, awareness, or
24  something to do on the advocacy realm -- it would
25  never be healthcare-provided education.  It would

Page 189

1  also be the -- the main audience in my area was
2  predominantly patients' caregivers, the public.
3      But it would be a grant where you would give
4  them money for a program.  They want to do a program
5  on -- I'm sorry, I'm -- I'm pretty -- blanking out
6  right now.
7      But let's say you wanted to do a program on
8  disposal of issues.  You would give that
9  organization a grant for whatever they asked for,
10  and -- well, based on the program.  And then they
11  would put on the program.  We had nothing to say
12  about speakers or content.  That would be an
13  unrestricted education grant.
14      CME is -- Certified Medical Education is
15  also unrestricted, but that is totally separate,
16  done with -- I'm not concerned about that at all.
17  So at that -- there is a distinction between that.
18  That's managed by our medical affairs team, and the
19  other one is more patient/caregiver education.
20      Q.  Okay.  So if I understand your answer, then,
21  CME is for healthcare professionals --
22      A.  Yeah.
23      Q.  -- who need them for accreditation or
24  certification to maintain credentialing.  That's
25  separate and apart what you were responsible for --

Page 190

1    A.   Absolutely.
2    Q.   -- at Mallinckrodt, correct?
3    A.   Yes, sir.
4    Q.   Okay.  Who were some of the entities that
5 you can recall giving unrestricted educational
6 grants to while at Mallinckrodt?
7    A.   So we gave it to the US Pain Foundation for
8 some of the programs they did.
9    Q.   And let me ask you a question.
10    A.   Okay.
11    Q.   When you say US Pain Foundation, is that the
12 same thing as American Pain Foundation?
13    A.   No.
14    Q.   That's different?
15    A.   Yeah, it's different.  American Pain
16 Foundation was out of business by the time -- had
17 folded up by the time I'd gotten to Mallinckrodt.
18    Q.   Okay.  Was the US Pain Foundation -- was
19 that something that was an offshoot of American
20 Pain --
21    A.   No.
22    Q.   -- Foundation at all?
23       MR. DAVISON:  Objection.
24    A.   They were totally separate.  The American
25 Chronic Pain Association did programs -- did

Page 191

1 educational programs for VA caregivers and people in
2 pain, sponsored that.  I'm trying to think of what
3 we did in -- when I was in medical affairs.  It's
4 been a while.  I'm trying to think of the
5 organizations.
6       (Discussion off the record.)
7    A.   So there's -- I can't recall them all.  I'm
8 sorry.
9    Q.   And how did you select the groups that would
10 receive such grants during your time at Mallinckrodt
11 in that position?
12    A.   Yeah.  So it was done under a charitable
13 grant -- charitable contribution committee.  And
14 that was decided by legal, regulatory.  Medical sat
15 on that.  And I would then present any -- if they
16 had a request from an organization that came in that
17 wanted to have a sponsorship from Mallinckrodt, I
18 would weigh in on the organization and what they're
19 working on and if we were -- if -- you know, if they
20 were -- what kind of programs that they did, and
21 then it was decided by that committee.
22    Q.   And were these groups that Mallinckrodt had
23 ongoing relationships with, to your knowledge?
24    A.   Yes.
25    Q.   Okay.  How much would Mallinckrodt spend on

Page 192

1 such a grant?
2       MR. DAVISON:  Objection.
3    A.   Not much, like $5,000, maybe $10,000.  It
4 just depended on -- it really depended on the
5 organization, the actual program, how many patients
6 were going to be or caregivers or, you know, what
7 the -- what the focus of the organization -- program
8 was going to be, how long was it going to be, things
9 like that.
10    Q.   Was there an upper limit on how much money
11 Mallinckrodt would spend on such a grant?
12    A.   We would -- it was not written that there
13 was an upper limit.
14    Q.   Were there any guidelines at all about the
15 grant -- the bestowing of these unrestricted grants?
16    A.   Oh, of course, yes.
17       MR. DAVISON:  Objection.
18    A.   We had -- we had -- we had guidelines.
19    Q.   Was there a budget for the grant?
20    A.   Yes.  But that would be based on what we got
21 in our budget than we --
22    Q.   Who's -- who set that budget?
23    A.   So the budget was set by medical affairs
24 when I was with advocacy and global medical affairs,
25 and then it's set by our government affairs and

Page 193

1 advocacy.  Our corporate group tells us.
2    Q.   Were you involved in asking for money in the
3 budget to be allocated for that purpose?
4    A.   Yes.  I would -- I would plan a budget based
5 on what we -- what kind of programs we might want to
6 do, how much -- you know, what we -- working with
7 the groups and what we would like to help support.
8    Q.   And was that true of the entire time that
9 you served as manager of advocacy for global medical
10 affairs?
11    A.   Uh-huh.
12    Q.   Did you continue to be involved with the
13 unrestricted educational grants when you
14 transitioned to government affairs?
15    A.   Just for clarity, we call them charitable
16 contributions, and I am involved still in that.
17 They're -- they are unrestricted grants, and they
18 sometimes support a program within an organization
19 or an educational program.
20       But they're considered under the title of
21 charitable contributions because we don't want to
22 mix them up with the medical education grants.
23    Q.   Okay.
24    A.   So we call them charitable contributions.
25    Q.   And I'm glad you clarified.  I was adopting

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  your --
2     A.  Yeah.  No, no.  We talked about unrestricted
3  education.  Medical does that through their CME
4  programs.  And then anytime that we sponsor a
5  program that's educating the public, it is
6  unrestricted in the terms of we don't have a say in
7  it.  We tell them -- we don't choose speakers.  We
8  don't choose content.  We just support the actual
9  program.
10    Q.  And just so the record is clear, from the
11 time you joined Mallinckrodt in April of 2014
12 through the present, you've had some
13 responsibilities with respect to charitable
14 contributions?
15    A.  I have.
16    Q.  Okay.  And again, we're talking about the
17 kind of charitable contributions that would go to
18 fund outside groups or --
19    A.  Yes.
20    Q.  -- societies that deal with, for example,
21 pain management?
22    A.  Yes.
23    Q.  And can you recall since 2014 -- well, do
24 you recall what the budget was for the charitable
25 contributions that you testified about in 2014?

Page 195

1     MR. DAVISON:  Objection.
2     A.  It depended on the different areas, and so
3  we -- Mallinckrodt ended up buying different
4  companies, and so we would get budgets from the --
5  you know, that were a continuation of these budgets.
6     For our pain -- when we -- when I was in the
7  pain space -- I want to say -- I don't remember.  I
8  actually don't remember.  It's been -- I haven't --
9  done pain advocacy and been in charge of that space
10 since 2015.
11    Q.  Are you able to approximate what
12 Mallinckrodt spent in 2014 on charitable
13 contributions in the pain space?
14    MR. DAVISON:  Objection.
15    A.  Maybe for patient advocacy -- oh, gosh.  I
16 really hate to do that because I honestly don't
17 remember.  I don't remember.  But it was --
18    Q.  Was it more than $100,000?
19    A.  Yes, for -- yes.
20    Q.  Was it more than a million?
21    A.  No.
22    Q.  So somewhere between 100,000 and a million?
23    A.  Yeah, somewhere in there.  I want to say it
24 was probably closer to 500, but that -- I'm
25 really -- I can't remember all the things that we

Page 196

1  sponsored and then -- yeah.
2     Q.  Okay.  And did that amount go up, or was it
3  more or less the same for 2015?
4     A.  So in 2015, I now moved over to government
5  affairs and advocacy.  And we were -- our budget was
6  actually across many -- a few different therapeutic
7  areas.  Now we have -- we're in the hospital space.
8  We're in -- we start to move into rare disease.  So
9  for the pain space, I would say for 2015 it probably
10 stayed the same, and then we started to decline in
11 2016.
12    Some of the stuff that we were doing in --
13 just because of organizations' requests -- it's
14 really based on what organizations request.  We
15 have -- we create a budget based on what we think is
16 going to be requested and what we would like to see
17 done for the year in advocacy in terms of helping to
18 support education, maybe corporate memberships,
19 things like that.
20    And then sometimes it all comes in, and
21 sometimes the requests get lesser.  But 2015 was
22 probably very similar to 2014.  And then 2016, I was
23 no longer doing it.  That was Kevin Webb's area.
24    Q.  Okay.  And who is doing the charitable
25 contributions before you arrived in April 2014?

Page 197

1     MR. DAVISON:  Objection.
2     A.  So it was always done by the charitable
3  contributions committee, the C -- I'm not sure if
4  that's -- I mean, I know the committee, but it was
5  run by Tammy -- I can't remember -- think of Tammy's
6  last name, Weber -- Tammy Webster or Tammy Weber.
7  But Tammy was working for Brian Elsburn out of --
8  Brian Elsburn was a lawyer, and it was out of
9  our legal department that that committee sat.  And
10 so they would have members of medical and -- but
11 never anybody in marketing or sales sat on that.  It
12 was always advocacy or -- it was always legal,
13 regulatory -- I'm sorry -- legal, compliance,
14 medical affairs, and advocacy.
15    Q.  Okay.  And I, on your résumé, noted that you
16 provided consulting to certain societies prior to
17 joining Mallinckrodt; is that correct?
18    A.  I did.
19    Q.  And did any of the societies that -- with
20 which you performed consulting receive grants from
21 Mallinckrodt, charitable contributions, after you
22 joined the company?
23    A.  They did.
24    MR. DAVISON:  Objection.
25    Q.  Which ones?

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    A.   It would be the American Society -- the
2 American Academy -- American Academy of Integrated
3 Pain Medicine, AAIPM.  They would have.  And then --
4 American Pain Foundation was gone by then.  But
5 that's the only organization that -- and that was
6 just to support the programs that they were doing.
7 So we were one of many -- or -- many pharmaceutical
8 companies that supported them.
9    Q.   Sure.  What was the budget, if you know, for
10 2013 for the charitable contributions?
11       MR. DAVISON:  Objection to form.
12    A.   That, I don't know.  I do not have that
13 history, but it wasn't -- their budget was never a
14 huge budget.  They -- CARES Alliance was the -- what
15 they did, and they would have -- they would support
16 some of the programming that some of the
17 organizations in the pain did.  And that was the
18 extent of what they -- how they participated, but
19 I would -- I would -- it wasn't -- I can't remember.
20 I'm sorry.  I just can't remember.
21       So when I came in 2014, it was very much in
22 line with where they had been in 2013.  I didn't
23 raise it or -- it was pretty much a flat budget for
24 the last few years.
25    Q.   Do you have any responsibilities with

Page 199

1 respect to giving any charitable contributions to
2 the US Federation of State and Medical Boards,
3 USFSMB?
4    A.   Gosh, no.
5       MR. DAVISON:  Objection.
6    Q.   Have you ever heard about that?
7    A.   I do know them, but they actually wrote
8 guidelines for pain management.  But they didn't --
9 I would never have given them money.
10    Q.   Why is that?
11    A.   Because they're not a patient or caregiver
12 organization.  They are a state medical board
13 organization, and so they're not a charitable
14 501(c)(3).  At least I don't think they are.  I
15 don't even know anything about their -- their
16 status.
17       So that would not be a group that would fall
18 on my radar, either.  They would be a more medical
19 affairs group.
20    Q.   Okay.  I understand.  You also testified
21 this morning about -- you were asked some questions
22 about your work with what was called the diversion
23 group or, alternatively, the suspicious order
24 monitoring team.
25    A.   Yeah.

Page 200

1    Q.   Do you recall that testimony?
2    A.   I do.
3    Q.   Were those -- when you testified this
4 morning about that, were you meaning those were the
5 same team, or are they two different teams that you
6 were testifying about?
7    A.   I was testifying that -- there is only one
8 team, one group that I knew of, and I don't exactly
9 remember their name.  I think they were the
10 suspicious order monitoring group, but that might be
11 just -- but I'm just -- I just remember that
12 program.  I don't remember if that was exactly the
13 name of the team -- of the group, but they met
14 regularly.
15    Q.   Okay.  And the e-mail we saw where you --
16 what was referred to as the diversion group.
17    A.   Right.
18    Q.   You don't think that was an official title;
19 you think that was sort of what -- they looked at
20 diversion issues?
21    A.   Exactly, yeah.  That's probably my --
22       MR. DAVISON:  Objection.
23    A.   -- my rendition, my shortening --
24    Q.   Okay.
25    A.   -- what they were, yes.

Page 201

1    Q.   Okay.  Thank you.  That's a helpful
2 clarification.
3       You testified this morning, do you recall,
4 that you would occasionally attend monthly meetings
5 of that group or that team?
6       MR. DAVISON:  Objection.
7    A.   Yes.
8    Q.   Okay.  And I think you testified also that
9 you would be there with -- Karen Harper would be at
10 those meetings?
11    A.   She would.
12    Q.   And Don Lohman?
13    A.   Yes.
14    Q.   And who else can you recall attended that
15 meeting on a regular basis?
16    A.   Kevin Webb.  And that's the only people I
17 actually remember.
18    Q.   Okay.  What was your role on that team, to
19 your knowledge?
20    A.   To bring information on the -- what we were
21 working on with the CARES Alliance, to learn about
22 what they were doing, really just a participatory
23 member.  I was just really there observing and also
24 sharing any information that I learned in the field.
25    Q.   Did you understand when you joined, in April

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 of 2014, Mallinckrodt, that you would be serving on
2 that team?
3    A. Well, it was part of what I was told, that
4 you would be invited to, so, yeah.
5    Q. Prior to 2014, had you had any experience
6 with suspicious order monitoring?
7    A. Never.
8    Q. Did you receive any training when you joined
9 Mallinckrodt on suspicious order monitoring?
10      MR. DAVISON: Objection.
11    A. We have a ComplianceWire training that talks
12 about safety along the manufacturing route and what
13 we do, what -- the importance of what is, but it's
14 not about the suspicious monitoring. So I had not
15 had any training prior to sitting in on these
16 meetings.
17    Q. Can you tell me what you mean by
18 ComplianceWire training that talks about safety
19 along the manufacturing route?
20    A. Yeah. I can't remember the name of it. I
21 just had it, too. So -- yeah. So they talk about
22 how we ensure safety from a -- from the manufacturer
23 site to when we deliver it to whenever it gets
24 delivered and all the pieces that go into that, and
25 that we are -- and the responsibility we feel and

Page 203

1 all the -- all the tactics that we ensure are
2 happening to ensure that our product gets from
3 point A to point B without diversion.
4     So that was it, but it's not -- that's not
5 the same as suspicious ordering. It's just two
6 separate programs, and so --
7    Q. And when you say safety, you're talking
8 about safety to the product?
9    A. Yes, to ensure that your product is not
10 tampered with or --
11    Q. Okay. Thank you. So with respect to the
12 suspicious order monitoring, what generally did that
13 team discuss along those lines?
14      MR. DAVISON: Objection to form.
15    A. It's been many years, and I don't recall all
16 of the agendas and topics --
17    Q. Sure.
18    A. -- but --
19    Q. And I'm asking general --
20    A. Yeah.
21    Q. -- recollection.
22    A. It was basically about the diversion
23 programs.
24      MR. DAVISON: Objection.
25    A. It was talking about what we're -- what

Page 204

1 we're doing, we're continuing to do, and some of the
2 programs that were coming up, like the red flags
3 videos that the industry working group was doing and
4 so --
5    Q. What information did that team review or
6 discuss?
7      MR. DAVISON: Objection.
8    A. It was really an update on the -- on where
9 the programs were. It wasn't about the detailed
10 reporting. So we didn't -- I wouldn't have known
11 what the suspicious monitoring program reports were.
12 It was just, hey, we are doing these, and we're
13 doing this. You know, we're continuing to work with
14 this industry, this industry group. And we're
15 working on all these different programs, what -- you
16 know, what are we doing in medical? How -- what is
17 CARES working on? What is government affairs
18 working on? To make sure we were always informed of
19 the program that's going on.
20    Q. So did that team review, for example, call
21 notes from sales reps?
22      MR. DAVISON: Objection.
23    A. No. We never got into that. That's what I
24 said. We never got into that detail. It was very
25 high level.

Page 205

1    Q. Okay. And you know what I'm talking
2 about --
3    A. Yeah.
4    Q. -- when I say call notes, right?
5    A. Yep.
6    Q. And what's your understanding of what call
7 notes are?
8    A. Call notes are notes on a call, notes that
9 depict the experiences of a rep calling on a
10 physician or an MSL calling on a physician or
11 healthcare provider.
12    Q. Okay. Did you review charge-back
13 information in those team meetings?
14    A. No.
15      MR. DAVISON: Objection.
16    Q. And I think we -- you had some questions
17 this morning about charge-back information. That
18 was one aspect of the anti-diversion programs at
19 Mallinckrodt while you were there, correct?
20    A. Yes.
21      MR. DAVISON: Objection.
22    Q. Okay. Did you have any role at all with
23 respect to reviewing charge-back data in --
24    A. No.
25    Q. -- in any facet of your job?

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    A.  None.
2    Q.  And this team also did not review orders
3  that had been flagged as suspicious?
4       MR. DAVISON:  Objection.
5    A.  I don't recall.  I don't recall.  They
6  could -- they -- they -- I don't remember if they
7  talked about -- they never talked about any location
8  or -- I don't recall any specifics to them.  I knew
9  they were putting out the reports, but that wasn't
10  discussed in the meeting.
11   Q.  When you say they were putting out reports,
12  what do you mean?
13   A.  The -- Don Lohman runs a group, runs --
14  through legal would be putting out all of this, and
15  we were just given high level information at this
16  meeting.
17   Q.  What was the purpose of that team?
18   A.  It was really to --
19      MR. DAVISON:  Objection.
20   A.  -- to ensure that everybody knew all the
21  things that we were working on.  They didn't need to
22  know the details.  They just needed to be aware of
23  the programs that were in place, and also, you know,
24  exchange of information, so that they could hear
25  what we were learning in advocacy.  And it was just

Page 207

1  that kind of a thing.
2    Q.  You were asked questions this morning about
3  whether this group worked with DEA.  Do you recall
4  that?
5       MR. DAVISON:  Objection.
6    A.  I don't recall that question, no.
7    Q.  Okay.  Well, did this group -- did this
8  team, rather, have communications with the DEA about
9  their anti-diversion programs?
10      MR. DAVISON:  Objection.
11   A.  I couldn't answer you.  I know individuals.
12  Stu Kim was one of them that worked with the DEA,
13  but I don't -- I don't know the extent of what he
14  did.  I just know he was one of our lawyers that was
15  working with --
16   Q.  So did you have any individual
17  responsibilities with respect to identifying or
18  flagging or the ultimate resolution of suspicious
19  orders?
20   A.  No.
21   Q.  Did this team review public information like
22  news reports or along those lines --
23   A.  I don't recall.
24   Q.  -- with respect to suspicious orders?
25      MR. DAVISON:  Objection.

Page 208

1    A.  I don't recall.
2    Q.  Okay.  Do you recall the State of Tennessee
3  or Appalachia in general ever coming up in this
4  suspicious order monitoring team?
5    A.  No.
6       MR. DAVISON:  Objection.
7    A.  No particular state.
8    Q.  And for what period of time did you -- or
9  were you assigned to attend those meetings?
10   A.  It would have been when I started in April
11  of 2014 until about mid-2015, when -- that's when I
12  changed focus.
13   Q.  Okay.  And during that time that you -- for
14  the meetings you did attend -- and your testimony is
15  you didn't attend every meeting; was that correct?
16      MR. DAVISON:  Objection.
17   A.  I didn't attend every meeting.
18   Q.  Okay.
19   A.  I traveled quite a bit.
20   Q.  About how many meetings do you recall
21  attending?
22   A.  I actually probably only -- I went to about
23  three of them --
24   Q.  Okay.
25   A.  -- in person.

Page 209

1    Q.  From a general standpoint, did that team
2  ever discuss particular populations or geographic
3  areas as particularly troublesome for suspicious
4  ordering or diversion?
5       MR. DAVISON:  Objection.
6    A.  I don't recall.
7    Q.  And do you have any recollection what that
8  team discussed a -- the distributors' roles or the
9  wholesalers' roles in flagging or monitoring
10  suspicious orders?
11      MR. DAVISON:  Objection.
12   A.  I don't recall.  Sorry.
13      MS. VANNI:  Objection.
14   Q.  Did that team, to your knowledge, review
15  what I'll call indirect customers?  And by that --
16  do you know what I'm talking about?
17      MR. DAVISON:  Objection.
18   A.  No.
19   Q.  Like pharmacies, did that team review
20  pharmacies prescribing or dispensing with respect to
21  suspicious orders?
22      MR. LOMAX:  Objection to form.
23   A.  I don't think so.  I don't recall.
24   Q.  Okay.  To your knowledge, was Mallinckrodt
25  obligated to fill an order that it deemed

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 suspicious?
2     MR. DAVISON: Objection.
3     A. I can't answer that. I don't have that kind
4 of knowledge.
5     Q. And did you ever gain awareness while you
6 worked at Mallinckrodt about any particular
7 prescribers or pharmacies in Tennessee that were
8 being problematic?
9     MR. LOMAX: Objection.
10     A. No.
11     Q. Okay. You were also asked this morning
12 about -- questions on a PowerPoint presentation. I
13 think it was Exhibit 2, but there were some slides
14 that used the term "epidemic."
15     A. Uh-huh.
16     Q. Do you recall those questions?
17     A. Uh-huh.
18     Q. And there were questions about the epidemic
19 of pain versus the epidemic of prescription drug
20 abuse. Do you recall those questions?
21     A. I do.
22     MR. DAVISON: Objection.
23     Q. So you were asked some questions about the
24 epidemic, and one of your answers, you mentioned a
25 phrase that -- well, you mentioned being aware of

Page 211

1 the phrase "hypervigilance on overdose death." Do
2 you recall using that phrase?
3     MR. DAVISON: Objection.
4     A. I don't.
5     Q. Okay. Well, in any event, at some point
6 during your career at Mallinckrodt, were you
7 aware -- were you aware of there being particular
8 sensitivity or particular awareness, heightened
9 awareness, as to preventing overdose -- overdose
10 death as a result of opioid use?
11     MR. DAVISON: Objection to form.
12     A. Can you -- I'm not quite sure I'm
13 understanding your line of questioning on that.
14     Q. Well, so was one of the concerns that
15 Mallinckrodt had, like any opioid manufacturer, that
16 its product is not being used in such a way or
17 abused in such a way that results in overdose death?
18     MR. DAVISON: Objection.
19     A. Well, we were -- of course, that's why we --
20 the diversion programs were put in place, because
21 there was concern that there was a -- our
22 responsibility to figure out ways that we could
23 address those concerns.
24     Q. And were you also aware at Mallinckrodt that
25 state and federal agencies and regulatory bodies

Page 212

1 were also concerned about preventing death from
2 overdose from opioid use?
3     A. Yes.
4     MR. DAVISON: Objection.
5     Q. And that there was enhanced awareness and
6 concern about that, about overdose from opioid use
7 that increased as the epidemic got worse?
8     A. Yes.
9     MR. DAVISON: Objection.
10     Q. Okay. And again, I'm only going back to
11 what I remember you saying. But you used the term
12 "hypervigilance." Do you recall using that term?
13     MR. DAVISON: Objection.
14     A. I don't, but I --
15     Q. Okay. But you agree there was -- as the
16 epidemic for opioids got worse, that the reaction by
17 state and federal regulatory bodies became more
18 severe or more drastic to try to address that?
19     A. Absolutely.
20     MR. DAVISON: Objection.
21     Q. Okay. And I think we looked at an
22 exhibit earlier. It was the SPPAC --
23     A. Yes.
24     Q. -- exhibit. Do you recall that? I think it
25 was Exhibit 12.

Page 213

1     A. I do.
2     Q. And you were asked some questions about the
3 work by SPPAC --
4     A. Uh-huh.
5     Q. -- trying to -- or efforts to revise rules,
6 and I think the quote was: Creating a less
7 stringent regulatory environment for pain management
8 clinics.
9     A. Uh-huh.
10     Q. Is that correct?
11     MR. DAVISON: Objection.
12     A. Uh-huh.
13     Q. Was -- was the purpose of removing, to your
14 knowledge, the regulatory burdens to result in more
15 opioids being prescribed?
16     MR. DAVISON: Objection.
17     A. No, no. That would never have been the
18 purpose.
19     Q. To the best of your knowledge, can you
20 recall a single instance where SPPAC lobbied for
21 more restrictions from a regulatory standpoint on
22 opioid distrubution?
23     A. I would --
24     MR. DAVISON: Objection.
25     A. To my recognition --

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    MR. DAVISON:  Recollection.
2    A. -- recollection.  Oh, my gosh.  To my -- or
3  for -- to my memory, I -- no.  There -- they -- this
4  group and many other advocates tried to make sure
5  that the -- legislation and well-meaning legislators
6  would often put very restrictive clauses in their
7  legislation.  So their goal was just to make it so
8  patients could still get pain treatment and while --
9  while also understanding that they needed to look at
10  these risks and considerations.  But they wanted --
11  they wanted to do it in a balanced way.  So they
12  wanted to do it in a way the patients could -- where
13  it was balanced with treatment for pain and making
14  sure that we're addressing risk and abusion [sic] --
15  risk of diversion and abuse.
16    Q.  So just -- so just to make sure the record
17  is clear, then, my question -- the answer to my
18  question, can you recall a single instance where
19  SPPAC lobbied for more regulatory restrictions on
20  opioid distribution, the answer would be "no"?
21    MR. DAVISON:  Objection.
22    A.  That's not the answer.  The answer is that
23  it's not whether it's more or less.  They just
24  wanted the legislation to make clinical sense, to
25  make -- to -- and also to be in line and not a

Page 215

1  burden to patients or clinicians.
2    So I can't say whether they did it more or
3  less.  It's not a number thing.  It's about how it's
4  written.  And that's the best I can answer that.
5    Q.  Well, can you recall an instance where SPPAC
6  lobbied for rules to be revised which created a more
7  stringent regulatory environment for pain management
8  clinics?
9    A.  I think you asked me the same question.
10    MR. DAVISON:  Objection.
11    A.  Well, I can --
12    Q.  A little different.
13    A.  I -- a little different.  So I -- no, I
14  can't tell you -- I can -- because I -- that wasn't
15  the goal of what they were doing.  They weren't
16  looking to increase or decrease the regulatory
17  environment.
18    They were looking to make sure that it
19  wasn't an undue burden to patients and caregivers.
20  That -- at the end of the day, they certainly -- Bob
21  Goldberg, who -- Bob Toolman, I'm sorry, Bob
22  Toolman, who runs that group, did his -- you know,
23  would say that if it was appropriate, he would have
24  advocated for it.
25    So it wasn't whether it was less or more

Page 216

1  stringent.  It was whether it was going to help them
2  accomplish what they were hoping to do.
3    Q.  Okay.  Well, take a look at Exhibit 12.
4    A.  Uh-huh, got it.
5    Q.  And let's look at the bullet under
6  Tennessee, which starts on the page ending 642, and
7  go over to summary of what SPPAC was doing in
8  Tennessee at that time.
9    A.  Uh-huh.
10    Q.  And it said:  "Written and direct testimony
11  and multiple other communications related to medical
12  board rules for pain clinics."
13    Correct?
14    A.  Yep.
15    Q.  Okay.  And this -- they summarize thusly:
16  "This resulted in substantial revisions to the
17  rules, creating a less stringent regulatory
18  environment from pain management clinics."
19    Did I read that correctly?
20    A.  Yep.  That's exactly what it says.
21    Q.  And my question to you is:  Can you recall
22  an instance where SPPAC had lobbied in the state of
23  Tennessee for revisions to medical board rules for
24  pain clinics that created a more stringent
25  regulatory environment for pain management clinics?

Page 217

1    A.  I do not know.
2    MR. DAVISON:  Objection.
3    MS. VANNI:  Objection.
4    Q.  Is the attempt by the state generally to
5  impose enhanced restrictions on -- that aim to curb
6  opioid abuse, is that inherently a bad thing?
7    MR. DAVISON:  Objection.
8    A.  No.  Well-meaning legislators create
9  legislation that they don't always understand what
10  kind of burden it places on patients and physicians.
11  I think their intent is always on behalf of their
12  constituents and to protect their group.  I don't
13  question that.
14    The problem -- but what they then do is put
15  it out, and we, as a clinical community, are able to
16  respond to that to help direct and help them
17  understand the burden they're putting on patients,
18  caregivers, and healthcare providers.  And so
19  that -- yeah.
20    Q.  So do you have an opinion, then, whether
21  government agencies should attempt to curb opioid
22  abuse by, for example, restricting the number or the
23  supply of prescription opioids that can be
24  distributed at any given time?
25    So, for example, taking it down from a

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  90-day supply to a 30-day supply, do you think
2  that's an undue burden that the State tries to
3  impose?
4        MR. DAVISON:  Objection.
5     A.  I can't answer about any one particular
6  facet.  Trying to curb prescription drug abuse and
7  diversion is a multifaceted problem.  It is very
8  complex.  I think anything we can do -- and, you
9  know, that we look at it across the entire spectrum,
10  looking at all the stakeholders, I think the best we
11  can do is try to get everyone to participate and do
12  what they can to do it.
13        I don't know if one particular -- if
14  reducing it to 30 -- for some patients on chronic
15  medication, maybe that's not the answer.  Maybe
16  it -- maybe -- and for others, it might be.  I can't
17  answer any one piece of legislation.
18        I can tell you that legislators are trying
19  to find ways, manufacturers are working on ways to
20  try to thwart this.  You know, we're -- doctors are
21  looking at risk factors.  Patients are being
22  educated.  As a community, we're all stakeholders in
23  this issue.  We all need to come to the table and
24  work together to create solutions.
25        I can't tell you whether one solution is

Page 219

1  going to be the panacea.  I don't know that.  No one
2  has been the panacea yet.
3     Q.  With respect to the -- a restriction that
4  requires that a healthcare provider cannot write
5  more than a 30-day supply --
6     A.  Uh-huh.
7     Q.  -- to a patient, the practical effect on the
8  patient will be that the patient has to go back and
9  see the provider to get the additional prescription
10  beyond the 30 days; is that correct?
11        MR. DAVISON:  Objection.
12     A.  Yes.
13     Q.  Okay.  And do you believe, by itself, that
14  restriction would be an undue burden?
15        MR. DAVISON:  Objection.
16     A.  But that's -- but that's already -- for
17  Schedule IIs, that is the -- that is the rule.  I
18  don't know if you know that.
19     Q.  How long has it been the rule?
20     A.  Since I've been in practice, that you can
21  only prescribe 30 days, and then they have --
22  then -- they can only have one prescription for 30
23  days.  It was Schedule IIIs that they could call
24  refills in.  And that's -- and hydrocodone was
25  rescheduled to Schedule II, which stopped that.  So

Page 220

1  I think all along the lines, we've -- we've tried to
2  address all these issues and -- and address them,
3  but --
4     Q.  At Endo Pharmaceuticals, were you ever
5  tasked with reviewing or looking at legislation in
6  the state of Tennessee that attempted to curb opioid
7  abuse?
8        MR. DAVISON:  Objection.
9     A.  I did not cover Tennessee while I was with
10  Endo.
11     Q.  So the answer is "no"?
12        MR. DAVISON:  There was an objection.
13  Sorry.
14     A.  So, no.  I'm sorry.
15        (Mallinckrodt - Jackson Exhibit 20 was
16  marked for identification.)
17        MR. LENISKI:  There's a cover page.  It's a
18  non-Bates stamped number page.  So I'm starting
19  the exhibit on the actual -- the other page, just
20  so you know, has got --
21        MR. DAVISON:  Oh.
22        MR. LENISKI:  -- the identifier on it.
23        MR. DAVISON:  I was just confused what that
24  was for.
25        MR. LENISKI:  Here.

Page 221

1  BY MR. LENISKI:
2     Q.  I've handed you what we've identified as
3  Exhibit 20.  My question is if you recognize the
4  document.
5     A.  Okay.
6     Q.  Do you recognize the document?
7     A.  I don't, but --
8     Q.  Okay.  Any reason to doubt you received it
9  while employed at Endo?
10     A.  No.  I think it's --
11     Q.  Go to the first e-mail in the chain, which
12  actually starts on the page ending Bates stamp 415.
13  Do you see the e-mail from Geoffrey Becker --
14     A.  Yeah.
15     Q.  -- and to yourself on January 7th, 2013?
16     A.  Yes.
17     Q.  Who is Geoffrey Becker?
18     A.  Geoffrey Becker was a government affairs
19  person for Florida -- for the southeast.
20     Q.  Okay.  He writes:  "Please see the following
21  proposal that is likely to be considered by the
22  Tennessee legislature in 2013."
23        He says:  "The first provision is
24  particularly heinous and one that we have seen in
25  other states."

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    Did I read that correctly?
2    A. I see that.
3    Q. And then if you go down to what he's
4 forwarding, under -- see where it starts "The
5 Addison Sharp Prescription Regulatory Act includes"?
6    A. Yep.
7    Q. So it says: "The Addison Sharp Prescription
8 Regulatory Act includes the following regulations
9 regarding pain clinics and the prescribing of
10 narcotics."
11    The provision -- the first provision says:
12 "No more 60 to 90-day prescriptions written. It
13 must be reduced to a 14 to 30-day limitation. Of
14 course, cancer patients and the terminally ill are
15 excluded. The only drugs that will be restricted
16 are opiates."
17    Did I read that correctly?
18    A. Uh-huh.
19    Q. Okay. Did you have awareness of this issue
20 that was happening while you were at Endo?
21    MS. VANNI: Object to form.
22    A. I did then, but I don't recall it now.
23    Q. Okay. And then you, later on the chain, are
24 sending this to Lynn Quaranta.
25    A. Uh-huh.

Page 223

1    Q. Did I say that correctly?
2    A. You did.
3    Q. Okay. And was she was -- was she the
4 district manager over the territory of --
5    A. She was the MSL that covered that.
6    Q. Oh, I'm sorry. That's right. She was the
7 medical science liaison for at least Tennessee,
8 right?
9    A. Yes. So I was the southeast medical science
10 liaison, and Lynn covered Tennessee.
11    Q. That's right. And you tell her: "Hi, Lynn.
12 Wanted to share this e-mail from Geoffrey Becker,
13 GAD, on Tennessee. I've copied Jeffrey to let him
14 know you are the MSL that is covering this state.
15 From the looks of the proposed legislation,
16 Tennessee is getting tough on pain medicine."
17    Did I read that correctly?
18    A. You did.
19    Q. Okay. Did you communicate with anyone
20 whether you agreed with Mr. Becker's assessment that
21 the provision -- the first provision under that
22 proposed legislation was heinous?
23    MS. VANNI: Object to form.
24    A. No.
25    Q. Do you agree with Mr. Becker?

Page 224

1    MS. VANNI: Objection.
2    A. Well, I think you need to finish my e-mail,
3 because I say: "Hopefully there are advocates there
4 to help ensure balance."
5    And once again, I go back to, balance was
6 the key to make sure patients got -- were able to
7 get access to treatment and also figure out what --
8 what are the -- how to deal with risk of abuse and
9 diversion appropriately. So I did not --
10    Q. Did you share Mr. Becker's opinion that that
11 provision I read from the proposed legislation in
12 Tennessee was heinous?
13    A. No.
14    MS. VANNI: Object to form.
15    A. I don't -- no, I don't -- I don't think it's
16 heinous, and I can't share -- I -- but --
17    Q. Are you aware of others in the company who
18 felt that way?
19    A. No.
20    MS. VANNI: Objection.
21    Q. You also testified earlier and were asked
22 some questions about opioid abuse in Florida.
23    A. Uh-huh.
24    Q. Do you recall that?
25    A. I do.

Page 225

1    Q. And you testified that there was an -- there
2 was an excessive number of opioids in Florida
3 relative to other states, and that was due largely
4 to the dispensing physician factor. Do you recall
5 that?
6    MR. DAVISON: Objection.
7    A. Uh-huh.
8    Q. You have to give a verbal answer. I'm
9 sorry.
10    A. Oh, I'm sorry. I said "yes." I'm sorry.
11 Yes.
12    Q. And that that may align that -- that factor
13 may align with the ability to divert it. Do you
14 recall that testimony?
15    MR. DAVISON: Objection.
16    A. I recall -- I recall talking about Florida
17 and dispensing of physicians, of -- in physicians'
18 offices.
19    Q. Okay. And you were asked some questions,
20 and I think you testified as to a general awareness
21 that opioid pills were leaving the State of Florida
22 and going to other states.
23    MR. DAVISON: Objection.
24    A. I --
25    Q. Do you recall that testimony?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    A.  I didn't say that.  That was shared with me,
2  and I said that -- and they asked me how were the
3  ways that it could happen, and I said one was
4  through this distribution chain from West Virginia,
5  and others were patients going over the border, both
6  back and forth.
7    Q.  Okay.  So maybe I'm not understanding.  Did
8  you have awareness, at the time that you had any
9  responsibilities with respect to the State of
10  Florida, of people coming from other states,
11  obtaining opioids and then leaving, going back to
12  their home states?
13    MR. DAVISON:  Objection.
14    A.  Well, nothing more than what was
15  happening -- that is the kind of thing that was
16  happening in all the states.  That was happening in
17  any -- any adjoining state, especially if the state
18  did not have a PDMP, people were going into those
19  states to get their prescriptions so they would not
20  be monitored.
21    Q.  And Florida is one of those states?
22    A.  Well, it has one now, has had one for --
23  since 2012 or something like that.  It's been a
24  while that it's had it, but --
25    Q.  And you were asked some questions about what

Page 227

1  the MDL lawyer called the Oxy Express.  Do you
2  recall that?
3    A.  Yes.
4    Q.  Okay.  And I think you testified that you
5  recall this being -- involving taking planes from
6  West Virginia to Fort Lauderdale?
7    A.  It was a video that showed up on YouTube,
8  and that was one of the premises, yes, on that
9  video.
10    Q.  Okay.  Have you ever heard of the I-75
11  pipeline?
12    A.  I have not.
13    MS. GONZALEZ:  Objection.
14    Q.  Do you know where I-75 is?
15    A.  I know I-75 well.  I live here.  I'm local.
16    Q.  And that's the interstate that goes from
17  basically Florida clear through Tennessee all the
18  way up into Michigan, right?
19    A.  Yes.
20    Q.  And did you ever have awareness of I-75
21  being used as a conduit taking opioids out of
22  Florida into states where I-75 runs?
23    MR. DAVISON:  Objection.
24    A.  I actually had not heard that, but being in
25  Tampa and St. Pete area, I know that's had a problem

Page 228

1  with some prescription pill mills and things that
2  were being discovered.  So I'm not surprised by it.
3    Q.  So at no time -- can you recall an instance
4  while you worked at -- or you were working at
5  Mallinckrodt where the I-75 pipeline of moving
6  opioids from Florida up through locations along I-75
7  was ever discussed?
8    MR. DAVISON:  Objection.
9    A.  No.  But I think that's really a result
10  of -- by the time I got to Mallinckrodt, it was
11  2014.  And much of that had already been discussed,
12  discovered, and then curtailed due to the changes --
13  the height -- the vigilance on the pain clinics and
14  the change in prescribing and the PDMP and all
15  things put into place.  So I'm not surprised we did
16  not discuss that at Mallinckrodt.  It was a
17  different time.
18    Q.  So you don't recall discussing, in that
19  suspicious order team or diversion team, the flow of
20  individuals coming from out of state down I-75 to
21  obtain opioids in Florida?
22    MR. DAVISON:  Objection.
23    A.  No.
24    Q.  Talk a little bit about your time at Endo.
25  Can you recall what you learned, if anything, about

Page 229

1  opioid abuse or diversion in the state of Tennessee
2  while at Endo?
3    MS. VANNI:  Object to form.
4    A.  I -- I don't recall any one particular
5  issue, other than when Opana was reformulated, there
6  were some instances -- incidences of a complication
7  with bleeding that occurred.  And we were looking at
8  that to see if it was related and how it was
9  related, because it was apparently aligned with
10  abuse of the redesigned -- the drug that was
11  designed to be -- but I never -- that would have
12  been -- I want to say that would have -- that was
13  late, and then we were let go in the end of
14  February.
15    So it was never resolved or I never went
16  down -- all I know, I remember offering to go talk
17  to people to find out if there is more information.
18  But our government affairs and medical team was
19  handling that aside from me.  So I didn't -- and so
20  that's the extent of what I remember, and I don't
21  know any more than that.
22    Q.  Okay.  You said incidences of a complication
23  with bleeding --
24    A.  Uh-huh.
25    Q.  -- that occurred.  And that was associated

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  with the reformulated?
2  A.  Well, that's what they were saying might
3  be -- it was all subjective, and it was just reports
4  that we got as a medical -- in the medical science
5  liaison.  But that's the most -- I can't tell you
6  any more because I don't -- it's been many years,
7  and I don't recall, and I don't even know what the
8  resolution was on that.
9  Q.  Okay.  Do you recall there being an entity
10  which I will call, at Endo, the risk management
11  team?
12  A.  I'm sure there was, but I don't recall them.
13  Q.  Do you recall ever being part of the risk
14  management team?
15  A.  If I was, it would have been on a
16  case-by-case basis, you know, due to where -- an
17  issue or -- but I wasn't -- I don't recall being a
18  regular on the risk management team.  But once
19  again, this is many years ago, and I honestly don't
20  recall much.
21  Q.  Well, you were -- you were medical science
22  liaison --
23  A.  I was.
24  Q.  -- at Endo.  And you said that you were all
25  let go in February of 2013?

Page 231

1  A.  We were as a whole team.
2  Q.  Were there any medical science liaisons that
3  stayed at Endo?
4  A.  Yes.  Our boss did, Vin Tormo.
5  Q.  Did -- was Vin your boss the entire time you
6  were at Endo?
7  A.  He was.
8  Q.  Do you recall having discussions with
9  Mr. Tormo about assisting with a Tennessee-specific
10  issue with what I'll call TTP?
11  A.  That's what I'm talking about.
12  Q.  Okay.
13  A.  Yes.  That's exactly the issue I'm talking
14  about.
15  Q.  Okay.  And TTP --
16  A.  I didn't -- I wasn't sure I was going to get
17  the initials right, so I didn't want to say it.
18  Q.  That's understandable.  And I'll try to
19  tease this out:  Thrombotic thrombocytopenic
20  purpura?
21  A.  Purpura, yeah.
22  Q.  Did I do that right?
23  A.  You did a good job.
24  Q.  I've said it enough times.
25  A.  And I have minimal knowledge of it.  Just

Page 232

1  like I said, I do recall that there were people --
2  that that was an issue on people who were abusing
3  the newly formed -- formulated --
4  Q.  And was it your recollection that it was due
5  to intravenous --
6  A.  Yes.
7  Q.  -- use of the new formulation?
8  A.  Yes.
9  Q.  What role, if any, did you have with respect
10  to addressing that issue?
11  A.  I did -- I --
12  MS. VANNI:  Object to form.
13  A.  At the time, I wouldn't -- I offered to go
14  down there if we needed to educate, if it -- it just
15  surfaced.  And I'm not even sure when it was, but I
16  know that it had surfaced.  I offered to go down to
17  help out in any way I could.  But it was being
18  managed by our risk -- our risk management team, our
19  medical affairs team, people much higher.
20  MS. VANNI:  Sorry, I just want to interject.
21  I objected.  It wasn't recorded.
22  Q.  To your knowledge, did -- was there any
23  medical science liaison that was assigned
24  specifically to deal with that issue or to manage
25  that issue in some way?

Page 233

1  A.  I --
2  MS. VANNI:  Object to form.
3  A.  -- don't know.  I didn't cover Tennessee.
4  I'm -- you know, I -- because my passion is
5  advocacy, I was -- I was willing to go and help
6  whenever I could.
7  MR. DAVISON:  Counsel, we've been going
8  about an hour now.  Time for a --
9  MR. LENISKI:  Yeah, let's take a break.
10  THE VIDEOGRAPHER:  Off the record, 4:25 p.m.
11  (Recess from 4:25 p.m. until 4:37 p.m.)
12  THE VIDEOGRAPHER:  On the record, 4:37 p.m.
13  (Mallinckrodt - Jackson Exhibit 21 was
14  marked for identification.)
15  BY MR. LENISKI:
16  Q.  Ms. Jackson, I've handed you a document
17  which we've identified as Exhibit 21 to your
18  deposition.  Do you have it in front of you?
19  A.  I do.
20  Q.  Would you take a look at the document and
21  see if you recognize it?
22  A.  I don't recognize it.
23  Q.  Okay.  Did you hold any special title at
24  Endo, to your knowledge, other than medical science
25  liaison?

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1　A.　I did not.
2　　　MS. VANNI:　Object to the form.
3　Q.　Were part of your responsibilities to be
4　the lead for public health abuse, misuse, and REMS?
5　　　MS. VANNI:　Object to the form.
6　A.　It could have been.　I don't -- I don't
7　recall.　We would often have certain areas we
8　focused on.　I just don't recall.
9　Q.　Okay.　So Exhibit 21, this is an e-mail from
10　Daniel Still.　Who is that?
11　A.　He was a colleague MSL.
12　Q.　And did he -- was he -- did he hold a
13　special title or role at Endo, to your knowledge?
14　A.　No.　He just --
15　　　MS. VANNI:　Objection.
16　A.　-- covered the Tennessee -- I mean, I'm
17　sorry, covered the Texas region.
18　Q.　Okay.　This e-mail, Mr. Still is writing to
19　all of the MSLs that you worked with at Endo,
20　correct?
21　A.　Yes.
22　Q.　And in the first paragraph, he writes:
23　"Team.　Thank you for your participation today
24　during our calls.　As promised, below is a summary
25　of our sales training project and some specific

Page 235

1　ideas for scientific educational topics for your use
2　in discussions with your RDs and DMs."
3　　　Did I read that correctly?
4　A.　Yeah, you read that correctly.
5　Q.　By RDs, you know, they mean regional
6　directors, and by DMs, district managers?
7　A.　I believe that was so.
8　Q.　Okay.　It goes on to say:　"Project
9　overview:　Our MSL team is working with sales
10　training in an effort to develop training modules in
11　several scientific topic areas that will help the
12　field sales team to improve their
13　proficiency/confidence level and to help them
14　achieve their business goals with their customers."
15　　　Did I read that correctly?
16　A.　Yes.
17　Q.　Okay.　And then he goes on in the e-mail, am
18　I correct, to suggest -- he states:　"A list of
19　potential education topics for the sales team."
20　　　Correct?
21　A.　Yes.
22　　　MS. VANNI:　Object to form.
23　Q.　Is that a "yes"?
24　A.　Yes.　I said "yes."
25　Q.　Look over at the second page.　There is a

Page 236

1　header, "Abuse and Diversion."
2　　　Do you see that?
3　A.　Yes.
4　Q.　And there is the topic, "urine drug
5　screens," correct?
6　A.　Yes.
7　Q.　I think you testified a little about that
8　earlier.　Was that something that Endo recommended
9　be used in order to suggest to healthcare providers
10　that -- as a -- as a tool for reducing abuse and
11　diversion?
12　A.　That was one of many --
13　　　MR. DAVISON:　Objection.
14　A.　-- tools that we would discuss and share as
15　being one -- we didn't recommend any -- any one
16　particular tool.　We just educated on the tools that
17　were available to do -- to do that.
18　Q.　And was the point of training the sales
19　team, as Mr. Still suggests, so that they could pass
20　along that knowledge to healthcare providers?
21　A.　Absolutely not.
22　　　MR. DAVISON:　Objection.
23　A.　It was purely to educate the sales, so they
24　could expand their scientific knowledge.　Everything
25　that they gave to their -- to their physicians that

Page 237

1　they called on had to be approved through a PRC, a
2　product -- I don't know -- I can't remember the
3　name.　But it would have gone through review.
4　　　So we would share scientific knowledge, but
5　they could only share what they were given
6　permission to share based on the approved documents
7　within Endo or within Mallinckrodt, anywhere.
8　Q.　Okay.　And do you know what Mr. Still meant
9　by "risk management tools and rating scales" in that
10　second line?
11　　　MS. VANNI:　Object to form.
12　A.　Yeah.　I would -- I don't know exactly which
13　ones he was thinking about, but I would think that
14　there is all sorts of risk management evaluations
15　you can do.　I can't think of any of the names right
16　now, but there is a variety of them.
17　　　And then rating scales are pain rating
18　scales or risk rating scales, so there's many
19　different kinds of rating scales.
20　Q.　Okay.　And then we see "risk evaluation and
21　mitigation strategy," correct?
22　A.　Yes.
23　Q.　And was the point of training the sales
24　team, from the MSL's perspective, so that -- at
25　least as it pertains to abuse and diversion topics

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1  here, to help the sales team to potentially identify
2  potential signs of abuse and diversion as it
3  pertains to their healthcare providers?
4      A.  That would not --
5          MS. VANNI:  Object to form.
6      A.  -- be their role.  That would not be what
7  their area of expertise would be, and that would be
8  not something we would do then.  But if we -- we
9  wanted them to be aware of what was being shared in
10 the -- what was happening in the pain management
11 arena, in the environment.
12         I can't remember if any of the information
13 we -- that they had to give out included any of
14 that.  But I think -- I didn't -- you know, the goal
15 would be to make sure that the -- that the sales
16 reps were -- were aware of trends and things that
17 were going on, especially in terms of these tools
18 that might be used, that they might see as they're
19 in a clinic.
20     Q.  When you said that would not be their role,
21 would not be what their area of expertise would be,
22 what do you mean by that?
23     A.  Well, they're not there to screen for abuse
24 and diversion and to -- that's -- their role is to
25 educate the clinician and -- with the approved

Page 239

1  materials.
2          And so I -- you know, unless that was a
3  material -- unless Endo developed the material for
4  the representatives to use in the field, and that
5  would have a separate training with it, this was,
6  from what I understand -- and once again, this is
7  limited knowledge because of memory.  This would
8  have been just general information for them to know
9  so that when they see things in the clinic, they
10 might understand where that tool was being used.
11     Q.  Okay.
12         (Mallinckrodt - Jackson Exhibit 22 was
13 marked for identification.)
14 BY MR. LENISKI:
15     Q.  Done with that one.  There's no staple on
16 this one.  Sorry about that.
17     A.  That's okay.
18     Q.  I've handed you a document we've identified
19 as Exhibit 22 to your deposition.  Take a moment to
20 review it.  I'm going to ask you some questions when
21 you're finished.
22     A.  Okay.
23     Q.  Okay.  Do you recognize the document?
24     A.  No.  I mean -- no.  My memory doesn't go
25 back that far.

Page 240

1      Q.  Okay.  This document makes reference to a
2  "Pain MSL/External Affairs Outreach Spreadsheet"
3  that was distributed in September of 2012.  Do you
4  see that at the top of the first page?
5      A.  Uh-huh.
6          MS. VANNI:  Object to the form.
7      Q.  If you look at the exhibit, does that
8  exhibit look familiar to you?
9      A.  Vaguely.
10     Q.  Okay.  Looking at this exhibit, this
11 spreadsheet, does it refresh your recollection as to
12 what it is or what information it contains?
13     A.  I was going to ask you if you had the legend
14 for the dots, because I don't know what the dots'
15 colors mean, but -- yeah.  It looks like it's a
16 listing of -- I don't recall what this is.  This
17 looks like it's a list of organizations.
18     Q.  Well, the title of the document is "Medical
19 Science Organizational Outreach - Pain."  And then
20 the first category -- first column, rather,
21 identifies whether the particular organization
22 that's discussed is a national or state
23 organization.
24         Do you see that?
25         MS. VANNI:  Object to the form.

Page 241

1      A.  I'm sorry?
2      Q.  Look at the very first --
3      A.  Yeah, yeah.
4      Q.  -- very first entry, first line.  It says
5  "national," and then it says "American Academy of
6  Pain Management."
7          Do you see that?
8      A.  I do.
9      Q.  And then your name is listed as the Endo
10 contact, along with Linda Kitlinski, for that --
11     A.  It is.
12     Q.  -- group; is that correct?
13     A.  It is.
14     Q.  Okay.  So what was your role with respect to
15 the -- as the Endo contact for the American Academy
16 of Pain Management?
17     A.  I would be the --
18         MS. VANNI:  Object to form.
19     A.  I would be the contact.  I would meet with
20 their leadership.  I would attend the meetings.  And
21 then that was it.
22     Q.  Had you worked previously with the American
23 Academy of Pain Management as a consultant prior to
24 joining Endo?
25     A.  I did.

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    Q.  How long had you worked with that entity?

2    A.  Approximately a year, I think it was about a

3  year that I actually worked with them. I never took

4  a salary from them. It was all on a volunteer

5  basis. I did not make that clear earlier, but I

6  wanted it to be clear. I never took a salary. I

7  did it all as a volunteer.

8    Q.  And what kind of work were you doing with

9  the American Academy of Pain Management?

10    A.  They were the group that had the

11  accreditation with pain clinics to make sure that

12  they were integrated, and so I did work with them to

13  look at their accreditation across --

14    Q.  And then next line down, you see AAPM and

15  then SPPAN?

16    A.  Right. So this was a group that we had a --

17  I had a -- there was a previous e-mail. It's a

18  state policy group that is now at this -- as -- is

19  actually a function out of AAPM, even though they

20  started as a coalition of three organizations.

21    Q.  Okay. You're listed as a contact for that

22  group, correct?

23    A.  I am.

24    Q.  And you had worked with them previous to

25  joining Endo?

Page 243

1    A.  Same organization, so I worked with them in

2  the same way, yeah.

3    Q.  Okay. And then two lines down, there is the

4  American Association of Pain Management Nursing?

5    A.  Yes.

6    Q.  You are listed as the contact?

7    A.  I am.

8    Q.  Is that a group you'd worked with prior to

9  joining Endo?

10    A.  Not --

11    MS. VANNI: Object to form.

12    A.  -- not a lot, but I'm a nurse, so that was a

13  natural fit for me.

14    Q.  Okay. Similar to Mallinckrodt, did Endo

15  provide unrestricted educational grants to pain

16  societies and other groups?

17    MS. VANNI: Object to form.

18    MR. DAVISON: Objection to form.

19    A.  We did, but I had nothing to do -- Endo had

20  nothing to do with it.

21    Q.  So, for example, these groups listed here,

22  the American Academy of Pain Management, the AAPM,

23  and the American Association of Pain Management

24  Nursing, you had no involvement in any grant moneys

25  going from Endo to those groups?

Page 244

1    A.  No.

2    MS. VANNI: Object to form.

3    Q.  Do you know, in fact, if Endo did give money

4  to those groups?

5    MS. VANNI: Object to form.

6    A.  Well, they would have supported their annual

7  meeting, so they would have done it through CME.

8  And then sometimes there was -- and then marketing

9  would have done it through a booth and that -- but

10  that's the extent. There were no special

11  projects with any of them.

12    Q.  And how do you know that?

13    A.  That I did. So I don't know if there was

14  anything, but to my knowledge there was nothing.

15  But that's the general support for any professional

16  organization.

17    Q.  Okay. All right. You were also listed on

18  the second page as a contact, along with Linda

19  Kitlinski, with the US Drug Enforcement

20  Administration, correct?

21    A.  I'm looking for that.

22    MS. VANNI: Counsel, can you say where

23  you're referring to?

24    MR. LENISKI: Second page, it's the one on

25  the back of the first page. Halfway down, it

Page 245

1  says US "Drug Enforcement Administration."

2    MS. VANNI: Thank you.

3    MR. LENISKI: Did you find it?

4    MS. VANNI: Yes.

5  BY MR. LENISKI:

6    Q.  Did you find that, Ms. Jackson?

7    A.  I did, yeah.

8    Q.  Okay. And you're listed as a contact for

9  Endo, correct?

10    A.  Yeah. But this was only on -- this was just

11  about being part of their take-back day, and I'm

12  not -- I don't even recall going to any meetings.

13  But I know I was working on Linda on take -- on one

14  of their take-back day projects, which was a --

15  where you bring your drugs to a central area, your

16  drugs that you've been storing at home, so they're

17  out of your house and -- anyway, that's the extent

18  of that.

19    Q.  What was Ms. Kitlinski's role?

20    A.  She was -- gosh, Linda was in charge of

21  our -- she worked with the REMS, you know, because

22  we did a lot of work on REMS. That's when it was

23  starting -- we developed REMS for Schedule -- for

24  chronic, long-acting opioids. And she was also -- I

25  think she was also education -- in charge of -- I'm

## Page 246

1  sorry, I don't recall all of her titles.  She had

2  been with the company for a long time.

3      Q.  Did you have any responsibilities with

4  respect to Endo's REMS program?

5      A.  None.

6        MR. LENISKI:  All right.  I don't have any

7  further questions at this time.

8        THE WITNESS:  Thank you.

9        MR. DAVISON:  Let's go off the record.

10       THE VIDEOGRAPHER:  Off the record, 4:51 p.m.

11       (Recess from 4:51 p m. until 4:56 p m.)

12       THE VIDEOGRAPHER:  On the record, 4:56 p m.

13       MR. DAVISON:  The defendants have no

14  redirect.  Thanks.

15       THE VIDEOGRAPHER:  Off the record, 4:56 p.m.

16       (Whereupon, the deposition concluded at

17  4:56 p m.)

18

19

20

21

22

23

24

25

## Page 247

1           C E R T I F I C A T E

2        I, SUSAN D. WASILEWSKI, Registered

3  Professional Reporter, Certified Realtime Reporter

4  and Certified Realtime Captioner, do hereby certify

5  that, pursuant to notice, the deposition of CATHY

6  JACKSON was duly taken on Monday, January 7, 2019,

7  at 9:27 a.m. before me.

8        The said CATHY JACKSON was duly sworn by me

9  according to law to tell the truth, the whole truth

10  and nothing but the truth and thereupon did testify

11  as set forth in the above transcript of testimony.

12  The testimony was taken down stenographically by me.

13  I do further certify that the above deposition is

14  full, complete, and a true record of all the

15  testimony given by the said witness, and that a

16  review of the transcript was requested.

17

18  _____

19  Susan D. Wasilewski, RPR, CRR, CCP

20  (The foregoing certification of this transcript does

21  not apply to any reproduction of the same by any

22  means, unless under the direct control and/or

23  supervision of the certifying reporter.)

24

25

## Page 248

1        INSTRUCTIONS TO WITNESS

2

3

4        Please read your deposition over carefully

5  and make any necessary corrections.  You should

6  state the reason in the appropriate space on the

7  errata sheet for any corrections that are made.

8

9        After doing so, please sign the errata sheet

10  and date it.  It will be attached to your

11  deposition.

12

13        It is imperative that you return the

14  original errata sheet to the deposing attorney

15  within thirty (30) days of receipt of the deposition

16  transcript by you.  If you fail to do so, the

17  deposition transcript may be deemed to be accurate

18  and may be used in court.

19

20

21

22

23

24

25

## Page 249

1           - - - - - -

2          E R R A T A

3           - - - - - -

4  PAGE  LINE  CHANGE

5  ____  ____  _____

6    REASON: _____

7  ____  ____  _____

8    REASON: _____

9  ____  ____  _____

10   REASON: _____

11  ____  ____  _____

12   REASON: _____

13  ____  ____  _____

14   REASON: _____

15  ____  ____  _____

16   REASON: _____

17  ____  ____  _____

18   REASON: _____

19  ____  ____  _____

20   REASON: _____

21  ____  ____  _____

22   REASON: _____

23  ____  ____  _____

24   REASON: _____

25

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1       ACKNOWLEDGMENT OF DEPONENT

2

3       I, _____, do hereby

4    acknowledge that I have read the foregoing pages, 1

5    through 250, and that the same is a correct

6    transcription of the answers given by me to the

7    questions therein propounded, except for the

8    corrections or changes in form or substance, if any,

9    noted in the attached Errata Sheet.

10

11

12   _____        _____

13   CATHERINE JACKSON                     DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   _____ day of _____, 20____.

20   My Commission expires: _____

21

22   _____
     Notary Public

23

24

25

Page 251

1       LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____  _____

4    _____  _____  _____

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25