Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3      **************************
      IN RE:  NATIONAL
 4    PRESCRIPTION OPIATE          Case No.
      LITIGATION                   1:17-MD-2804
 5

      APPLIES TO ALL CASES
 6                               Hon. Dan A. Polster
        **************************
 7

 8

 9              HIGHLY CONFIDENTIAL
10      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11

12

13            Videotaped Deposition of ANUPAM
14    B. JENA, M.D., Ph.D., held at the offices of
15    Morgan, Lewis & Bockius, LLP, One Federal
16    Street, Boston, Massachusetts, commencing at
17    11:09 a.m., on the 6th of June, 2019, before
18    Maureen O'Connor Pollard, Registered
19    Diplomate Reporter, Realtime Systems
20    Administrator, Certified Shorthand Reporter.
21

22

             GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

## Page 2

```
 1   APPEARANCES:
     FOR THE PLAINTIFFS:
 2
     BARON & BUDD, P.C.
 3   BY:  MARK PIFKO, ESQ.
          JAY LICHTER, ESQ. (Remotely)
 4        15910 Ventura Boulevard, Suite 1600
          Encino, California 91436
 5        818-839-2325
          mpifko@baronbudd.com
 6        jlichter@baronbudd.com
 7
 8   FOR PURDUE PHARMA:
 9   DECHERT LLP
     BY:  MELANIE MACKAY, ESQ. (Remotely)
10        35 West Wacker Drive
          Chicago, Illinois 60601
11        312-646-5800
          melanie.mackay@dechert.com
12
13
     FOR CARDINAL HEALTH, INC.:
14
     WILLIAMS & CONNOLLY LLP
15   BY:  MELINDA JOHNSON, ESQ. (Remotely)
          725 Twelfth Street, N.W.
16        Washington, DC 20005
          202-434-5452
17        mjohnson@wc.com
18
19   FOR AMERISOURCEBERGEN DRUG CORPORATION:
20   REED SMITH LLP
     BY:  NEIL HLAWATSCH, ESQ. (Remotely)
21        ANNE ROLLINS, ESQ. (Remotely)
          1717 Arch Street
22        Philadelphia, Pennsylvania 19103
          215-851-8100
23        nhlawatsch@reedsmith.com
          arollins@reedsmith.com
24
```

## Page 3

```
 1   APPEARANCES (Continued):
 2
     FOR DISCOUNT DRUG MART, INC.:
 3
     CAVITCH FAMILO & DURKIN, CO., LPA
 4   BY:  ROBERT WEST, ESQ. (Remotely)
          1300 E. 9th Street
 5        Cleveland, Ohio 44144
          216-621-7860
 6        rwest@cavitch.com
 7
 8   FOR WALGREENS:
 9   BARTLIT BECK LLP
     BY:  LESTER HOUTZ, ESQ. (Remotely)
10        1801 Wewatta Street
          Denver, Colorado 80202
11        303-592-3197
          lester.houtz@bartlitbeck.com
12
13
     FOR H.D. SMITH:
14
     BARNES & THORNBURG LLP
15   BY:  ALYSSA HUGHES, ESQ. (Remotely)
          11 South Meridian Street
16        Indianapolis, Indiana 46204
          317-261-7881
17        alyssa.hughes@btlaw.com
18
19   FOR WALMART:
20   JONES DAY
     BY:  STEVEN N. GEISE, ESQ.
21        4655 Executive Drive, Suite 1500
          San Diego, California 92121-3134
22        858-314-1170
          sngeise@jonesday.com
23
24
```

## Page 4

```
 1   APPEARANCES (Continued):
 2
     FOR JANSSEN and JOHNSON & JOHNSON DEFENDANTS:
 3
     O'MELVENY & MYERS LLP
 4   BY:  CAMERON BAGHAI, ESQ. (Remotely)
          610 Newport Center Drive
 5        Newport Beach, California 92660
          213-430-8117
 6        cbaghai@omm.com
 7
 8
     FOR HBC SERVICE, INC.:
 9
     MARCUS & SHAPIRA LLP
10   BY:  BENJAMIN KIFT, ESQ. (Remotely)
          One Oxford Centre, 35th Floor
11        301 Grant Street
          Pittsburgh, Pennsylvania 15219-6401
12        412-338-4690
          kift@marcus-shapira.com
13
14
     FOR RITE AID:
15
     MORGAN, LEWIS & BOCKIUS LLP
16   BY:  ELISA P. McENROE, ESQ.
          JOHN MALOY, ESQ.
17        JOHN P. LAVELLE, JR., ESQ. (Remotely)
          1701 Market Street
18        Philadelphia, Pennsylvania 19103-2921
          215-963-5000
19        elisa.mcenroe@morganlewis.com
          john.maloy@morganlewis.com
20
21
     VIDEOGRAPHER:  Robert Martignetti
22
23
24
```

## Page 5

```
 1             INDEX
 2   EXAMINATION                     PAGE
 3   ANUPAM B. JENA, M.D., Ph.D.
 4   BY MR. PIFKO                       9
 5   BY MS. MCENROE                   177
 6
 7
 8         E X H I B I T S
 9   NO.       DESCRIPTION            PAGE
10   1    Appendix B to expert report,
          List of Expert Testimony for Dr.
11        Jena.............................  65
12   2    Series of timesheets.............  80
13   3    Series of invoices from Analysis
          Group............................ 110
14
15   4    May 10, 2019 Expert Report of
          Dr. Anupam B. Jena, MD, PhD....... 131
16   5    Appendix E to expert report,
          falsification analysis of
17        Distribution of Opioids and
          Common Non-Controlled Drugs....... 140
18
19   6    Appendix D to expert report,
          Summary of Plaintiff Experts
20        Mentioning "Rite Aid"............. 144
21   7    Appendix C to expert report,
          Materials Considered.............. 154
22   8    Appendix A to expert report,
          Curriculum Vitae.................. 166
23
24   9    Analysis Group Affiliate Status
          Report............................ 167
```

Page 6

10    Plaintiffs' Notice of Oral
      Videotaped Expert Deposition......  171

Page 8

Bockius on behalf of Rite Aid of
Maryland, Inc. doing business as
Mid-Atlantic Customer Support Center,
and here as well defending the
witness.  I have my colleague John
Maloy with me as well.

MR. GEISE:  Steve Geise from
Jones Day on behalf of Walmart.

MR. PIFKO:  And then people on
the phone, if you can say your name,
your firm, and who you represent, I
would appreciate it.

MR. BAGHAI:  This is Cameron
Baghai from O'Melveny & Myers
representing the Johnson & Johnson and
Janssen defendants.

MR. HLAWATSCH:  This is Neil
Hlawatsch of Reed Smith for
AmerisourceBergen Drug Corporation.

MR. WEST:  This is Robert West
from Cavitch representing Discount
Drug Mart.

MS. HUGHES:  Alyssa Hughes from
Barnes & Thornburg on behalf of H.D.

Page 7

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now
on the record.  My name is Robert
Martignetti.  I'm a videographer for
Golkow Litigation Services.

Today's date is June 6th, 2019,
and the time is 11:09 a.m.

This video deposition is being
held in Boston, Massachusetts, In Re:
National Prescription Opiate
Litigation.

The deponent is Anupam Jena,
MD, PhD.

The court reporter is Maureen
Pollard.

Will counsel please identify
themselves.

MR. PIFKO:  Good morning.  Mark
Pifko from Baron & Budd Los Angeles on
behalf of plaintiffs and the executive
committee.

MS. MCENROE:  Good morning.
Elisa McEnroe from Morgan, Lewis &

Page 9

Smith.

MS. MACKAY:  Melanie MacKay
from Dechert on behalf of Purdue.

MS. JOHNSON:  Melinda Johnson
of Williams & Connolly on behalf of
Cardinal Health.

MR. KIFT:  Benjamin Kift of
Marcus & Shapira on behalf of HBC.

THE VIDEOGRAPHER:  The court
reporter will now swear in the
witness.

ANUPAM B. JENA, M.D., Ph.D.,
having been duly identified and sworn, was
examined and testified as follows:
EXAMINATION
BY MR. PIFKO:
Q.    Good morning.  My name is Mark
Pifko.  We just met for the first time off
the record a few minutes ago.  I'm going to
be asking you some questions today, okay?
A.    Perfect.
Q.    All right.  First thing, can
you state and spell your name for the record?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A.    Sure.  My name is Anupam Jena.
2    A-N-U-P-A-M, last name is Jena, J-E-N-A.
3        Q.    All right.  And you've just
4    been administered the oath, so you understand
5    that your testimony here is under penalty of
6    perjury?
7        A.    Yes, I do.
8        Q.    Okay.  And that means that if
9    you lie or are intentionally misleading or
10   dishonest, you could be subject to penalties
11   from the court.
12           Do you understand that?
13           MS. MCENROE:  Objection to
14   form.
15       A.    I understand that.
16   BY MR. PIFKO:
17       Q.    Okay.  Is there any reason why
18   you're not able to provide truthful and
19   accurate testimony today?
20       A.    No, there's no reason.
21       Q.    Are you taking any medications
22   or undergoing any treatment that would impair
23   your memory?
24       A.    No.

Page 11

1        Q.    Okay.  Is there any reason that
2    you can think of why your deposition should
3    not proceed today?
4        A.    No.
5        Q.    So I'm sure that counsel went
6    over the ground rules of the deposition
7    before with you so we don't have to waste a
8    lot of time doing that, but if you have a
9    question, you don't understand something I
10   say, please let me know.  If not, I'll assume
11   that you understand the question.  Okay?
12       A.    Perfect.  I'll do that.
13       Q.    And then just make sure you
14   give audible responses because the court
15   reporter can't take down shrugs of the
16   shoulders and nods of the heads.  And then
17   don't say uh-huh or uh-uh, because on the
18   written record, it looks the same.  Okay?
19       A.    Of course.  Thank you.
20       Q.    So have you been deposed
21   before?
22       A.    I have.
23       Q.    How many times?
24       A.    Three times.

Page 12

1        Q.    Three times.
2            When was the most recent time
3    that you were deposed?
4        A.    The most recent time I was
5    deposed was probably two to three months ago.
6        Q.    What was that in connection
7    with?
8        A.    That was a litigation matter
9    involving two pharmaceutical companies.
10       Q.    How about the time before that?
11       A.    The time before that, probably
12   four or five months before that.
13       Q.    So this is in the last -- that
14   both of these were in the last year?
15       A.    That's correct.
16       Q.    You have three matters listed
17   in your appendix.  So the first one is the
18   antitrust litigation.  Is that what -- when
19   was the most -- was that the most recent?
20           MS. MCENROE:  Counsel, are you
21   able to give the witness what you're
22   looking at so we can all be looking at
23   the same page?
24           MR. PIFKO:  We'll get there.

Page 13

1        A.    I mean, if you have a copy of
2    the report, I can walk through and make sure
3    I'm with you.
4    BY MR. PIFKO:
5        Q.    You listed three matters that
6    you provided prior testimony in --
7        A.    So the --
8        Q.    -- that's all I'm asking.
9        A.    -- the first one
10   chronologically is a Lamictal antitrust
11   matter.
12           The second one, I believe, or
13   the third one, is Momenta/Sandoz versus
14   Amphastar.
15           And the one in between I can't
16   recall without looking at the actual sheet.
17       Q.    And so which was the one that
18   you most recently testified in?
19       A.    The most recent one was the
20   Momenta/Sandoz/Amphastar, I believe, but it
21   would be --
22       Q.    Okay.
23       A.    -- helpful to look at the
24   actual.

Page 14

1    Q.    Okay.  And then six months or
2  so ago was -- which matter was that?
3    A.    I'd have to look at the
4  actual --
5    Q.    Okay.
6    A.    -- sheet.  I'm involved in many
7  different matters, and so it's hard to keep
8  track of what I've done what and when.
9    Q.    Okay.  And then you testified a
10  third time as well?
11    A.    I've been involved in two
12  depositions and one arbitration.  I'm not
13  making a distinguish -- I'm not --
14    Q.    Okay.
15    A.    -- distinguishing between those
16  two, but there may be a legal distinction
17  that I'm not aware of.
18    Q.    Okay.  So you testified twice
19  in a proceeding -- in connection with a
20  proceeding that was pending in a court?
21    A.    Correct.
22    Q.    And then once in connection
23  with a proceeding that was in an arbitration?
24    A.    Correct.

Page 15

1         And the arbitration one, I'm
2  now jogging my memory, was Ranbaxy
3  Pharmaceuticals, and that was a contract
4  dispute.
5    Q.    And when did you provide
6  testimony in connection with that matter?
7    A.    Sometime in 2018, I believe.
8    Q.    And you've never testified in
9  the history of your life before that?
10    A.    Just the three matters that you
11  see there.
12    Q.    Okay.  Have you served as a
13  testifying expert in any other matters
14  besides those three matters?
15         MS. MCENROE:  Objection to
16  form.
17    A.    The only three matters that
18  I've served as a testifying expert in are
19  those three that are listed there.
20  BY MR. PIFKO:
21    Q.    Okay.  Have you served as a
22  consulting expert in connection with any
23  litigation, whether it's pending in a court
24  or arbitration?

Page 16

1         MS. MCENROE:  Objection to
2  form.
3    A.    I have not served any -- as a
4  consulting expert in any other cases.
5  BY MR. PIFKO:
6    Q.    You understand that you've
7  provided a report in this matter for Rite
8  Aid, is that correct?
9    A.    That is correct.
10    Q.    Okay.  And you're -- are you
11  providing consulting work for them as well?
12         MS. MCENROE:  Objection to
13  form.
14    A.    I have been involved in some
15  consulting work prior to the production of my
16  report.
17  BY MR. PIFKO:
18    Q.    Okay.  And -- but that's in
19  connection with the opioid litigation?
20    A.    That is correct.
21    Q.    So in the opioid litigation,
22  you're serving as a testifying and a
23  consulting expert for Rite Aid, correct?
24         MS. MCENROE:  Objection to

Page 17

1  form.
2    A.    In the opioid litigation, I
3  serve as a test -- I'm serving as a
4  testifying expert.  All the work that's
5  embodied in my report was the work that I
6  did.
7         There's a separate consulting
8  work that Rite Aid has been doing with a
9  company called Analysis Group that supported
10  my report.  I have been peripherally involved
11  in that.  But the bulk of my involvement with
12  Rite Aid, the vast majority, in fact, has
13  been related to the report that you have in
14  front of you.
15  BY MR. PIFKO:
16    Q.    So other than those three
17  matters, there's no other testifying or
18  consulting work, setting aside the opioid
19  litigation, that you've ever done in your
20  career, is that correct?
21         MS. MCENROE:  Objection to
22  form.
23    A.    Can you clarify that question?
24  BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Q.    Just, I want to -- I think you
2 already answered, but I want to be crystal
3 clear, that for litigation, whether it be in
4 a court or arbitration, other than those
5 three matters and this matter, you've never
6 served as a consulting or testifying expert,
7 correct?
8         MS. MCENROE:  Objection to
9    form.
10    A.    That is correct.
11 BY MR. PIFKO:
12    Q.    Okay.  Have you provided
13 consulting services outside the context of a
14 litigation-type dispute?
15    A.    I have.
16    Q.    Okay.  When did you first start
17 doing consulting work?
18    A.    I would say probably 2005,
19 2006, sometime in that time frame.
20    Q.    I want to talk a little bit
21 about your work history.
22         So did you go straight through
23 like high school, college, graduate school?
24 Did you take any breaks?

Page 19

1    A.    I have not taken any breaks.
2    Q.    Okay.
3    A.    I finished college in, I
4 believe, 19 -- I started college in 1996,
5 went to MIT, finished in 2000, and have been
6 going straight since then.
7    Q.    Okay.  Let's just quickly go
8 through the degrees and the years that you
9 graduated, and the institutions.
10         So when did you graduate high
11 school?
12    A.    1996.
13    Q.    And where did you go to high
14 school?
15    A.    I went to a school called the
16 Governor's School for Government and
17 International Studies.  It's in Richmond,
18 Virginia.
19    Q.    Did you have any sort of
20 specialization there?
21    A.    No, just high school.
22    Q.    And then you graduated from
23 undergrad from where?
24    A.    MIT.

Page 20

1    Q.    Okay.  What year?
2    A.    2000.
3    Q.    What was your degree?
4    A.    I had two degrees, one in
5 biology and one in economics.
6    Q.    Did you attend anywhere
7 in-between high school and MIT, or you went
8 to MIT?
9    A.    I went straight to MIT.
10    Q.    After you finished MIT, where
11 did you go?
12    A.    After I finished MIT, I went to
13 University of Chicago.
14    Q.    Did you get a degree from
15 there?
16    A.    I got two degrees from there.
17 I got an MD, which is a medical doctorate,
18 and then a PhD in economics.
19    Q.    What year was that?
20    A.    I started in University of
21 Chicago in June of 2000, I believe, and I
22 left Chicago, University of Chicago, in June
23 of 2009.
24    Q.    Did you go to any other schools

Page 21

1 after that?
2    A.    No.  That was the end of my
3 formal education.
4    Q.    You didn't do any postgraduate
5 programs or anything like that?
6    A.    You mean like a post-doc, is
7 that what you're --
8    Q.    Right.
9    A.    -- referring to?
10         So between 2000 -- I'm just
11 going to walk you through the history because
12 it's a little bit complicated.
13         So I started in June of 2000, I
14 took anatomy.  In September of 2000, I
15 started in the economics department at the
16 University of Chicago.  I did the course work
17 for 2000 to 2002.  In that time, I also took
18 medical school courses as well.
19         From 2002 to 2004, I went back
20 to medical school full-time, so two years of
21 medical school, '02 to '04.  From '04 to '06,
22 I went back to my PhD in economics, and I
23 completed my dissertation during that period.
24 And I received a PhD from the econ department

Page 22

1  in June of 2006, I think.
2          From 2006 to 2007, I went to
3  UCLA in the RAND Corporation, where, on my
4  CV, it -- I'm not sure what it would be
5  listed at. I can take a look at it if you
6  have a copy for me. But it's a post-doc of
7  sorts, because I had just finished my PhD and
8  so I was doing some postdoctoral work at UCLA
9  in the RAND Corporation. And that was a
10  one-year engagement.
11          I returned back to University
12  of Chicago, I believe, in June of 2007 to
13  complete the final two years of medical
14  school, and I finished in 2009.
15          From 2009 to 2012, I was a
16  resident, an intern and resident at
17  Massachusetts General Hospital, which is one
18  of the Harvard teaching hospitals. It's very
19  close to here. During that time, I might
20  have been doing some postdoctoral work.
21          Again, I don't know what it
22  says on the CV, but I was probably doing
23  postdoctoral work ongoing with individuals
24  from the University of Chicago and from

Page 23

1  RAND/UCLA from my time there in the '06-'07
2  period.
3      Q.   Okay.
4      A.   I hope that clarifies for you.
5      Q.   No, that's helpful. Thank you.
6      A.   Perfect. Okay.
7      Q.   So you said you first served as
8  a consultant in 2005-2006?
9      A.   That would have been the first
10  time I did consulting work.
11      Q.   Okay. What I want to ask you
12  is, excluding like summer jobs, mowing lawns,
13  or something like -- I'm not sure you did
14  anything like that.
15      A.   I've done that.
16      Q.   Okay. Was that your first real
17  job basically?
18          MS. MCENROE: Objection. Form.
19      A.   That's a vague -- what do you
20  mean by "first job"?
21  BY MR. PIFKO:
22      Q.   Well, what I'm trying to get at
23  is like --
24      A.   For --

Page 24

1      Q.   -- where was the first time you
2  had a job that you felt like was like a real
3  career job that you had?
4          MS. MCENROE: Objection to
5  form.
6      A.   The first time I had a job, I'd
7  say, would be 2009 when --
8  BY MR. PIFKO:
9      Q.   Okay.
10      A.   -- I entered residency. I
11  mean, so I was a graduate student, I was a
12  medical student, and it's very common for
13  graduate students to do research assistant
14  work, and that's what I was doing, I was a
15  research assistant.
16          I'm calling it consulting
17  because the income was not coming from the
18  university, whereas a traditional research
19  assistant who is supporting a professor might
20  get paid from a grant that the university --
21  or that the professor has through the
22  university, so that's why I'm labeling it as
23  consulting. It wouldn't be a job in the way
24  that -- it wasn't a full-time job, let's put

Page 25

1  it that way.
2          My full-time work from an
3  employment perspective began in 2009 when I
4  finished res -- when I finished medical
5  school and began as an intern at Mass General
6  Hospital.
7      Q.   Okay. So the research
8  assistant consulting work that you did, was
9  that just a one-off thing, or were there
10  several projects that you worked on?
11          MS. MCENROE: Objection to
12  form.
13      A.   There was one project in,
14  again, I'm saying 2005-2006, I don't know the
15  exact date. There was some work that I did
16  then probably from 2000 -- let's call it 2006
17  until 2012, which is when I finished my
18  residency. I had probably several projects
19  that I worked on over that six to seven-year
20  period.
21  BY MR. PIFKO:
22      Q.   The first project you can
23  remember in 2005-2006, who funded that?
24      A.   The first project was funded by

Page 26

1 a company called Genentech.
2     Q.    What was the nature of that
3 work?
4     A.    The nature of that work was an
5 economic evaluation of the war on cancer.  I
6 actually can point it to you in my CV.  But
7 the basic idea behind the project was that
8 there had been very little investigation as
9 to the changes in survival over time of
10 patients who are affected with cancer in this
11 country, and what I wanted to do was
12 understand, well, how has survival changed
13 for people who have cancer, and what's the
14 economic value of those gains in cancer
15 survival.
16     Q.    And then the next consulting
17 job that you did, I'm talking about in this
18 period from 2006 to 2012 that you just
19 described where you're serving as a research
20 assistant type of work, what was the next job
21 after the Genentech work?
22         MS. MCENROE:  Objection to
23     form.
24     A.    It's hard for me to know.  I

Page 27

1 mean, a lot of the work that I did during
2 that period was related to thinking about the
3 economic value of medical innovations,
4 particularly with respect to cancer care.
5 BY MR. PIFKO:
6     Q.    Can you remember any of the
7 other companies who funded projects that you
8 worked on during that 2006 to 2012 time
9 period?
10         MS. MCENROE:  Objection to
11     form.
12     A.    Not specifically.  I mean, I
13 can tell you the companies that I've worked
14 with ever that, you know --
15 BY MR. PIFKO:
16     Q.    We'll get there.
17     A.    Yeah.
18     Q.    I just want to --
19     A.    Yeah.
20     Q.    -- narrow things.
21     A.    Yeah.  It's hard to pinpoint
22 the time periods exactly.
23     Q.    Okay.  So sitting here today,
24 there's no other -- you can't -- other than

Page 28

1 Genentech, you can't remember any other
2 specific company who funded research that you
3 were working on during 2006 to 2012?
4         MS. MCENROE:  Objection to
5     form.
6     A.    What I can say is that I
7 suspect that there were other companies that
8 I was working with during that period, I just
9 can't tell you exactly which ones.
10         The reason I remember the
11 Genentech one in particular was, A, because
12 it was my first time doing it, and B, because
13 the work was pretty impactful.  The White
14 House office of the report of the president
15 featured the work about the economic value of
16 the war on cancer, the Federal Reserve Bank
17 chair at that time, Ben Bernanke, described
18 the work.  So it's left an impression in my
19 memory.  Subsequent projects, I think it's
20 hard for me to remember who exactly was
21 involved, but there are probably other
22 companies that I've worked with during that
23 time.
24

Page 29

1 BY MR. PIFKO:
2     Q.    Okay.  And then from 2009 to
3 2012, you were a resident as well?
4     A.    That's correct.
5     Q.    Okay.  And you earned some
6 income associated with that?
7     A.    That's correct.

Page 30

Page 32

Page 31

Page 33



Page 34



8  BY MR. PIFKO:
9      Q.    Do you sit on any boards of any
10 companies?
11     A.    No, I do not.
12     Q.    Do you own any stock of any
13 pharmaceutical companies?
14     A.    I only own mutual funds.
15     Q.    Do you know if your -- you're
16 married, you said?
17     A.    Yes, sir.
18     Q.    Do you know if your wife owns
19 any stock in any pharmaceutical companies?
20     A.    No.  She only has the same
21 mutual funds that I do.
22     Q.    Is she in the medical field as
23 well?
24     A.    Yes.

Page 35

1      Q.    What does she do?
2      A.    She's a musculoskeletal
3  radiologist.
4      Q.    She just works in the clinical
5  setting?
6      A.    She actually works about
7  half/half, half clinical/half research.  Let
8  me be clear.  She works half clinical,
9  one-quarter research, one-quarter quality and
10 safety.
11     Q.    Where does she work?
12     A.    She works at Brigham & Women's
13 Hospital.
14     Q.    And so she just has different
15 roles within the hospital?
16     A.    That's correct.
17     Q.    That's in the Boston area?
18     A.    That's correct.
19     Q.    Let's talk about the consulting
20 work that you've done from 2012 to 2017,
21 okay?
22           So in 2012 you finished your
23 residency, correct?
24     A.    That's correct.

Page 36

1      Q.    And then you moved into an
2  academic position at Harvard?
3      A.    Yes.
4      Q.    When did you start the Harvard
5  position?
6      A.    I would say June or July, 2012.
7      Q.    And then you also maintained a
8  role doing clinical work at the hospital,
9  though --
10     A.    Yes.
11     Q.    -- the same hospital where you
12 did your residency?
13     A.    Exact same hospital, yes.
14     Q.    And then you started doing some
15 more detailed consulting work?
16           MS. MCENROE:  Objection to
17     form.
18     A.    I did the same type of
19 consulting work that I had done prior, and a
20 little -- again, a little bit during, during
21 residency, and I continued doing that kind of
22 work.
23 BY MR. PIFKO:
24     Q.    Okay.  But you devoted a little

Page 37

1  bit more time to that?
2      A.    I devoted a little bit more
3  time to that, that's correct.
4      Q.    Thinking back to 2012, what's
5  the first consulting job you can remember?
6      A.    I can't remember the specific
7  job.  I could -- if it's helpful to you, I
8  could talk about the types of projects I do.
9  But in terms of what consulting arrangement
10 or what consulting project I had done in 2012
11 versus 2013 versus 2014, it would be hard for
12 me to parse it out for you.
13     Q.    Okay.  Let's do this then.  Can
14 you identify any companies that have hired
15 you to do consulting from 2012 to 2017?
16     A.    Sure.
17           MS. MCENROE:  Objection to
18     form.
19     A.    That's easy to do.  I do most
20 of my consulting work through a company
21 called Precision Health Economics, I'll
22 abbreviate it as PHE.  And that's the same
23 group that I've been doing work with from
24 2005, 2006.  And through that company, I've

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 worked with companies like Amgen, Novartis,
2 Bristol-Myers Squibb, Sanofi, Bluebird,
3 Vertex Pharmaceuticals.  That's a range of
4 them.
5         A lot of this information that
6 you're actually requesting is publicly
7 available online.  Because I'm a physician,
8 there's something called the CMS Open
9 Payments Database, Sunshine Laws, and you can
10 see a lot of these things on there as well.
11    Q.    Is there any other companies
12 that you can think of who have paid for your
13 work?
14        MS. MCENROE:  Objection to
15 form.
16    A.    Can you clarify?  What do you
17 mean, paid for my work?
18 BY MR. PIFKO:
19    Q.    Well, what I'm clarifying is
20 I'm guessing you -- do you get a check from
21 Precision Health Economics?
22    A.    I do receive checks from
23 Precision Health Economics as a consultant.
24    Q.    Okay.  When these companies are

Page 39

1 hiring you, do they pay you directly?
2    A.    Sometimes they pay me directly.
3 Other times it would be through Precision
4 Health Economics.  And oftentimes the
5 consulting work that I do is not company --
6 is not company-specific.
7        So, for instance, I might work
8 with PHE to try and brainstorm research
9 ideas, and they may then talk to companies
10 about them, but I would never receive a
11 payment from them, from the company itself.
12    Q.    Okay.  All I'm trying to ask is
13 however the money comes, whether it's
14 directly to you or through Precision Health
15 Economics, you just listed a bunch of
16 companies, are there any other companies you
17 can think of who funded your work?
18        MS. MCENROE:  Objection to
19 form.
20    A.    There may be other companies,
21 not that I can think of.  But I would refer
22 you to a publicly available database where
23 you could sort out that information.  But
24 those are the companies that come to mind

Page 40

1 right now.
2 BY MR. PIFKO:
3    Q.    Okay.  So sitting here today,
4 you're not able to remember any other
5 companies?  That's what I'm asking you.
6        MS. MCENROE:  Objection to
7 form.
8    A.    Let me spend some more time
9 thinking if there's any other companies.
10        Years ago I did -- maybe five
11 or six years ago I did work for a company
12 called Hill-Rom.  I've done work probably
13 five or six years ago with a company called
14 TESARO, T-E-S-A-R-O.  And there may be other
15 companies beyond that.
16 BY MR. PIFKO:
17    Q.    Okay.  But you can't think of
18 any other ones?
19        MS. MCENROE:  Objection to
20 form.
21    A.    No.  I gave you a list of about
22 ten, I think.  That's about as much as I keep
23 in my mind at once.
24 BY MR. PIFKO:

Page 41

1    Q.    Okay.  Have you worked for any
2 other companies like Precision Health
3 Economics?
4        MS. MCENROE:  Objection.  Form.
5    A.    No.  Precision Health Economics
6 is the only company that I've done consulting
7 work with, what I call health economics
8 outcomes research consulting.
9 BY MR. PIFKO:
10    Q.    Okay.  On this matter, are you
11 retained through Analysis Group?
12    A.    Yes, that's correct.
13    Q.    Okay.  So Analysis Group writes
14 you the check?
15    A.    That's correct.
16    Q.    Have you done any work through
17 any other companies besides Analysis Group
18 and Precision Health Economics?
19        MS. MCENROE:  Objection to
20 form.
21    A.    No, not besides those.
22        As you alluded to earlier, you
23 asked earlier have I received any payments
24 directly from companies.  I have received

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 payments directly from some of those
2 companies that I described.
3       But in terms of either
4 economics consulting work, which is under
5 Precision Health Economics, or litigation
6 consulting work, which is what I've been
7 doing with Analysis Group, no other companies
8 besides those.
9 BY MR. PIFKO:
10      Q.    Your litigation work, has that
11 all been through the Analysis Group?
12      A.    Yes, that has been.
13      Q.    So as we discussed at the
14 beginning, you're doing some consulting for
15 Rite Aid in the opioid litigation. Setting
16 that aside, have you done any non-testifying
17 work with Analysis Group --
18      MS. MCENROE:  Objection.
19 BY MR. PIFKO:
20      Q.    -- besides the opioid cases?
21      A.    No. The only work I've done
22 with Analysis Group relates to litigation and
23 expert witness testimony.
24      Q.    Okay. So the only work that

Page 43

1 you've done for Analysis Group is the three
2 testifying matters that you listed in your
3 report and the one we're sitting here today
4 in, plus some consulting work for Rite Aid in
5 connection with the opioid litigation, is
6 that correct?
7       MS. MCENROE:  Objection.
8       A.    In addition to ongoing matters
9 that I have not -- I have not provided
10 testimony or filed a report in.
11 BY MR. PIFKO:
12      Q.    Okay. So there are some other
13 matters where you have been retained to
14 potentially be a testifying expert but you
15 haven't been designated?
16      MS. MCENROE:  Objection to
17 form.
18      A.    What do you mean by
19 "designated"?
20 BY MR. PIFKO:
21      Q.    Well, formally, when we get
22 your report, or sometimes someone submits a
23 pleading in the case saying here's my expert,
24 then it's known to everybody in the case that

Page 44

1 you're the expert.
2       A.    I see.
3       No. So I can't comment on the
4 legal term "designated." What I can say is
5 that I'm engaged in other litigation matters
6 that I have been retained as an expert in but
7 I have not filed a report in yet.
8       Q.    Okay. How many matters is
9 that?
10      A.    Say five or six.
11      Q.    When did you start work on
12 those?
13      A.    Some of the work would have
14 started in 2018. Others I've been retained
15 on in the last month, but I haven't actually
16 done any work for, I've just been retained.
17      So when I say five or six, I
18 mean cases I've been retained for, may not
19 have billed any hours to that -- to those
20 cases.
21      Q.    That's what I was going to get
22 at.
23      So of these five or six, how
24 many have you done more than just someone

Page 45

1 called you up and said, "hey, do you want to
2 work on this?" "Okay."
3       A.    I'd say three, three, four.
4 About half to two-thirds of them I've done
5 work, and the other, let's say, quarter I
6 have not done any work yet.
7       Q.    So of those ones that you have
8 done some work, that started in 2018?
9       A.    I think that started either
10 late 2017 or early 2018.
11      Q.    Are those all --
12      A.    Or just to clarify, my work
13 with Analysis Group started late 2017 or
14 early 2018. The matters that I've
15 been retained in that I haven't filed reports
16 in, I think that the onset of those matters
17 is probably late 2018, because, as I
18 mentioned, some of them I have not been --
19 done any work in yet. I've just been
20 retained.
21      Q.    Do you understand the clients
22 who hired you to be confidential?
23      A.    Can you clarify?
24      Q.    Those clients where you haven't

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 filed a report, do you understand -- are you
2 allowed to tell me who they are?
3          MS. MCENROE:  Objection to
4     form.
5     A.    I'm not aware if I'm allowed to
6 tell you or not.  I would suspect that I'm
7 not allowed to tell you.
8 BY MR. PIFKO:
9     Q.    Okay.  During the break,
10 whenever we take a break, I'd like you to
11 look into that and see if you're able to tell
12 me.  Okay?
13          MS. MCENROE:  And we'll talk
14     about it, and then we'll let you know,
15     Mark.
16 BY MR. PIFKO:
17     Q.    Let's talk about what we can --
18 whatever we can talk about about those.
19          Are those all in the
20 pharmaceutical area?
21     A.    They are mostly -- they're all
22 in the healthcare area.
23     Q.    When I say "all of them," I'm
24 talking about all five or six.

Page 47

1     A.    That's what I'm responding to.
2 Yes.
3     Q.    Okay.  So they're all in the
4 health care field?
5     A.    Yes.
6     Q.    Your clients in those, do you
7 know what field of classification they're in?
8          MS. MCENROE:  Objection to
9     form.
10     A.    Sure.  Yes.  So in one or
11 two -- maybe one or two cases, they're
12 biologic drugs to treat cancer.  One of the
13 cases is a blood thinner.  One of the cases
14 is a diagnostic test.  And the other case, I
15 think, involves a few drugs, an antibiotic,
16 possibly a proton pump inhibitor, it's like a
17 reflux medication.  None of them have to do
18 with opioids.
19 BY MR. PIFKO:
20     Q.    All these matters, you've been
21 retained by a company who is in the business
22 of producing the drug or the product?
23          MS. MCENROE:  Objection to
24     form.

Page 48

1     A.    Yes.
2 BY MR. PIFKO:



Page 49

1 BY MR. PIFKO:
2     Q.    Have you been paid at any time
3 to be a speaker at a conference or a
4 presentation of any kind?
5     A.    Can you clarify what you mean
6 by that?
7     Q.    Well, has any -- okay.  Just
8 have you ever been paid to give a lecture?
9     A.    I have been paid to give
10 lectures, but not been paid by pharmaceutical
11 companies to deliver lectures about their
12 products.
13          For instance, I gave a named
14 lecture at the American College of Radiology
15 called the Morton Lecture last year.  It's a
16 lecture that's given once a year by the ACR,
17 and they ask a, you know, a speaker to come
18 and give a talk.  It's a prestigious thing
19 with 800 to 1,000 people there.  So I would
20 have been paid to give that commentary.
21          I give grand rounds
22 presentations, so I gave a grand rounds
23 presentation at University of Texas
24 Southwestern.  And it's common for an

Page 50

1 institution to pay a professor to come to
2 give a talk, and it's called an honorarium,
3 and also to pay travel.
4         That's different than -- I have
5 not been paid to talk about the benefits of
6 one drug versus another by a drug company or
7 anything like that.
8     Q.    Okay.  But I think the thing --
9 the benefits of a drug or another, that's
10 like a speaker program.  Have you ever heard
11 that term before?
12     A.    Yes, I've heard that term.
13     Q.    So you've never served as a --
14 in a speaker program for any company?
15     A.    Correct.  I've never served,
16 and I've never actually been to a speaker
17 program event.
18     Q.    Okay.  And then you -- when you
19 were just talking about your academic income,
20 you mentioned giving lectures and things,
21 maybe not always at Harvard, maybe at other
22 universities for income.  And you said
23 something, I think, that that academic
24 institution pays you for that.  Was I -- did

Page 51

1 I hear you correctly?
2     A.    Yes, you did.
3     Q.    Okay.  So you were just talking
4 about giving some of the grand rounds and
5 some other types of lectures.  Was that in
6 the context of where you're getting an
7 academic payment?
8     A.    That's an academic, yeah.
9 That's pretty standard across all of
10 academics actually.  You know, if an English
11 professor goes to give -- he's at Harvard,
12 goes to give a talk at Brown, they may pay
13 him a $500 honorarium to come and give a
14 talk.
15     Q.    Okay.
16     A.    That's exactly what I'm
17 referring to.
18     Q.    So then, aside from like a
19 speaker program or these academic programs,
20 have you ever been paid to give, like, a
21 lecture or something anywhere at a conference
22 or like at a -- attend a corporate office and
23 give a speech or anything like that?
24         MS. MCENROE:  Objection to

Page 52

1 form.
2     A.    Not that I know of.  I mean, I
3 would go meet with -- as -- we talked about
4 me doing consulting work, so I've gone to
5 companies and talked about research, but not
6 in a -- not to, like, talk about a specific
7 drug or anything like that.
8 BY MR. PIFKO:
9     Q.    Well, or anything, you know,
10 like presidents get hired to come speak at
11 corporations.
12     A.    Oh, I see.  No, I have not been
13 hired in the way that Barrack Obama has been
14 hired, no.
15     Q.    Okay.
16     A.    Yeah.
17     Q.    Well, some experts have been
18 paid to come visit some corporation and give
19 a talk about something.
20     A.    Yeah.  No, no.  If you're
21 referring to experts, people getting paid
22 $20,000 to go give a talk at the retreat of a
23 major company, no, I've not done that before.
24     Q.    Okay.  How about -- so you

Page 53

1 all -- you do research as part of your work,
2 correct?
3     A.    That's almost all what I do,
4 yeah.
5     Q.    Okay.
6     A.    I'm a researcher.
7     Q.    So when you're doing -- and
8 you've written, I believe your CV says
9 somewhere around the neighborhood of --
10 you've had around 150 published articles or
11 so.  Does that sound right?
12     A.    That's correct, about 150
13 scientific articles, so peer-reviewed
14 articles.  Probably another 40 to 50 articles
15 that I've authored in the lay press.
16     Q.    So the distinguishment you just
17 made there is the 150 are, like, in academic
18 or medical-type journals?
19     A.    That's correct, or economics
20 journals.
21     Q.    Okay.
22     A.    But academic journals is a good
23 descriptor.
24     Q.    Okay.  And then the lay press

Page 54

1  is like if you write an opinion piece in a
2  newspaper, magazine, or something like that?
3      A.    Yeah, it could be -- so a lay
4  press is really meaning not peer-reviewed.
5          For instance, if I wrote a
6  piece in the Harvard Business Review, that
7  wouldn't be peer-reviewed by other scholars.
8  And so that's a -- I distinguish that kind of
9  piece from an article of mine in the New
10  England Journal of Medicine.  And I've
11  published in Harvard Business Review,
12  Washington Post, New York Times, Wall Street
13  Journal, places like that.
14      Q.    Do you receive an income from
15  writing those lay press articles?
16      A.    No, I don't receive any income
17  from that.  They sometimes -- to be clear,
18  the New York Times, for example, will -- if
19  you write an op ed in the New York Times, I
20  think that they will pay you a couple hundred
21  bucks if you request it.  I usually don't
22  because it's a lot of effort to go through
23  their accounts processing system or whatever
24  it's called, so I usually don't do that.  But

Page 55

1  that offer is there, and it varies across
2  outlets.  HBR, Harvard Business Review, for
3  example, doesn't pay.  I know that.
4      Q.    Okay.  So things like the New
5  York Times thing, it's just not worth the
6  complication of what you have to jump through
7  to get the money?
8          MS. MCENROE:  Objection to
9      form.
10      A.    Well, I don't know what -- not
11  worth it.  $200 is $200.  That's a -- it's --
12  I've tried to do the thing before, and it
13  doesn't work out.  And so aside from many
14  other things I've got to do, I end up not
15  getting paid.
16  BY MR. PIFKO:
17      Q.    Give me some leeway.  I don't
18  know if I use all the right terminology here.
19  But if I want to ask, like, so you have --
20  not every peer-reviewed article is about
21  original research.  I mean, maybe you do like
22  a -- you know, maybe you -- what -- I guess
23  what I'm -- I want to talk about data-driven
24  research where you're collecting the data

Page 56

1  versus -- what's the term where you review a
2  bunch of articles and then write a summary
3  about that?
4          MS. MCENROE:  Objection to
5      form.
6  BY MR. PIFKO:
7      Q.    So do you do research where you
8  are in a, you know, clinical trial or
9  something where you're collecting original
10  data?
11          MS. MCENROE:  Objection to
12      form.
13      A.    I do data-driven research, not
14  in a clinical trial setting.  I analyze data.
15  It's called observational data.  So I use
16  Medicare claims data, insurance claims data,
17  other publicly available databases, and I
18  answer questions based on that data.  I've
19  never conducted a randomized controlled
20  trial.
21  BY MR. PIFKO:
22      Q.    When you do the research
23  projects, are they funded by outside funding?
24          MS. MCENROE:  Objection.  Form.

Page 57

1      A.    The research that I do, some of
2  it is funded by NIH grants.  Others of it is
3  unfunded research, I just do it because, as
4  part of my faculty appointment at Harvard,
5  I'm -- you know, I'm paid to teach and do
6  research, and so I just do research through
7  my salary basically.
8  BY MR. PIFKO:
9      Q.    Okay.  And what I'm trying to
10  get at is any of those research projects, are
11  aspects of the research -- maybe you
12  personally don't get a check, but is parts of
13  the research funded by any private
14  corporations outside of the university?
15      A.    I see.
16          MS. MCENROE:  Objection to
17      form.
18      A.    So some of the -- some of the
19  papers on my CV and -- some of the papers on
20  my CV reflect projects where it would have
21  been a project that I did with Precision
22  Health Economics, and that would have been
23  often, but maybe not always, funded by an
24  industry sponsor.  And they are, you know,

Page 58

1  very clearly -- often there's even industry
2  authors that will -- it's a collaborative
3  effort, we work with industry authors, we
4  write a paper and disclose the funding as
5  well.  And some of the work in my CV reflects
6  that kind of research.
7  BY MR. PIFKO:
8     Q.    And the companies that have
9  made those type of payments, we talked about
10 those already?
11    A.    That's correct.
12    Q.    There's no other companies that
13 have provided that kind of funding that you
14 can think of sitting here today?
15       MS. MCENROE:  Objection to
16 form.
17    A.    There may be other companies,
18 but I think that that's probably a pretty
19 exhaustive list.  I would defer to you to
20 look through the papers and see if there's
21 any other sources, but I think that that's
22 pretty accurate.
23 BY MR. PIFKO:
24    Q.    Okay.  Well, I'm just asking,

Page 59

1  we're in the deposition setting, that's all
2  you can remember today?
3     A.    That's correct.
4     Q.    Do you intend to continue doing
5  litigation consulting?
6        MS. MCENROE:  Objection to
7  form.
8     A.    I plan to continue to do it,
9  but it depends on what other opportunities
10 come my way in terms of research and family
11 obligations and things like that.
12 BY MR. PIFKO:
13    Q.    Let's talk about how you came
14 to be retained in this matter, okay?
15    A.    Sure.
16    Q.    When did you first -- well,
17 actually, scratch that.
18       I want to ask you, how did you
19 first come to be involved with Analysis
20 Group?
21    A.    I started working with Analysis
22 Group, I believe, sometime in 2018.  I may
23 have been approached by them either late --
24 very late 2017 or early 2018, primarily

Page 60

1  because of my expertise.  I have a PhD in
2  economics, a medical degree, I see patients,
3  I write about economic issues in health care,
4  and so my background lends itself very well
5  to this kind of work.
6     Q.    So someone from Analysis Group
7  made a cold call to you and asked if you
8  wanted to be involved with them?
9     A.    Someone in Analysis Group
10 reached out to me through a mutual
11 acquaintance.
12    Q.    Okay.  Do you remember their
13 name?
14    A.    Yes.  Stephen Fink.
15    Q.    He works at Analysis Group?
16    A.    Yes.
17    Q.    Then I want to ask you, sorry,
18 Precision Health Economics, do you have an
19 official position there?
20    A.    What do you mean by "official
21 position"?
22    Q.    Do you have a title being
23 affiliated with --
24    A.    I think if you look at their

Page 61

1  website, they may say something like research
2  affiliate or something like that.  You know,
3  it's probably pretty standard, just like I
4  could be a fellow at some institution.  I'm
5  not like a VP of something or senior
6  director.  If that's what you mean by
7  "title," then no.  But there would be my name
8  on a website, I'm assuming, plus something
9  after it.
10    Q.    Okay.  Right.
11       So what I was trying to get at
12 is, do you view yourself as having any sort
13 of formal employment, ongoing employment with
14 Precision Health Economics?
15       MS. MCENROE:  Objection to
16 form.
17    A.    I view myself as being a
18 consultant to them.  So I can stop consulting
19 with them today or tomorrow without
20 any problem.  I don't get any health benefits
21 or anything like that from them, so they're
22 not an employer at all the same way that
23 Harvard or Mass General is an employer of
24 mine.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    Q.    Okay.  So Stephen Fink reached
2  out to you from Analysis Group?
3    A.    That's correct.
4    Q.    And he knew someone else that
5  you knew?
6    A.    That's correct.
7    Q.    Who was that person there?
8    A.    That's his wife.  I knew -- his
9  wife is a physician at Mass General.
10    Q.    What's her name?
11    A.    Sarah Turbett, T-U-R-B-E-T-T.
12    Q.    So Stephen Fink reached out to
13  you and said, hey, would you like to start
14  doing some litigation consulting through
15  Analysis Group?
16        MS. MCENROE:  Objection to
17    form.
18    A.    Stephen Fink reached out and
19  said, are you -- have you ever done any
20  litigation consulting work before, and I said
21  no, I had not done litigation work before,
22  I'd done other consulting.  And I was curious
23  about the types of work that happens in this
24  space, which is obviously old news to you but

Page 63

1  was news to me at that time, and I thought it
2  was an area where the set of skills that I've
3  developed and the expertise could actually be
4  very helpful.
5  BY MR. PIFKO:
6    Q.    And so did you meet with him in
7  person, or just talk on the phone at that
8  time?
9    A.    I think we probably met in
10  person.
11    Q.    Then did he ask you to start
12  work on a specific project right away at that
13  time?
14    A.    No.  It probably would have
15  been months, maybe six, seven months before I
16  actually did any work.
17    Q.    So you left that meeting
18  basically telling him, yeah, I'm interested
19  in doing this kind of work, if you have
20  something that -- where someone needs my
21  expertise, I'd be happy to be involved?
22        MS. MCENROE:  Objection to
23    form.
24    A.    Yeah, I left the meeting saying

Page 64

1  this is an interesting line of work, the
2  questions that are being asked are really
3  important.
4        And I spend a lot of my time,
5  for lack of better words, in data, in theory.
6  Being able to be part of litigation allows me
7  to take the stuff that I think about in a
8  room where I'm working with a computer and
9  writing papers and writing policy pieces to
10  be able to translate into real life.
11        And so when I left that
12  meeting, I thought this is quite interesting.
13  It's -- you know, I've never been involved in
14  this kind of work before.  I can see how the
15  way I think about the world, the questions
16  that I've asked, the answers that I've found
17  in my research could be impactful in shaping
18  how actual things happen in the real world.
19  BY MR. PIFKO:
20    Q.    And then six months or so later
21  he called you with a specific assignment?
22    A.    I think the first -- the first
23  assignment was what you see there, which was
24  the antitrust matter.  And my guess is that

Page 65

1  at the time Analysis Group was working with
2  another law firm on this matter, and they
3  were at the point of the work where they were
4  trying to identify experts.
5        And I had told Steve -- I was
6  like, Steve, I'm interested in this kind of
7  work, things that are health care-related,
8  things that rely on the economics of
9  innovation, things that rely on issues of
10  defining health care markets, things that
11  rely on issues of physician behavior and
12  prescribing and opioids.  I've done a lot of
13  work on opioids.  This had not started at
14  that point yet.  Things of that nature I'd be
15  interested in.
16        And so I suspect, although I
17  don't know the mechanics of what happened on
18  their end, is that they put my name forth as
19  an expert -- potential expert to the law
20  firm, and sometime after that I was retained
21  in that matter.
22        (Whereupon, Jena Exhibit Number
23      1 was marked for identification.)
24

Page 66

BY MR. PIFKO:

Q.   I'm handing you what's marked as Exhibit 1.

A.   Thank you.

Q.   Which is --

MS. MCENROE:  Thank you.

BY MR. PIFKO:

Q.   -- Appendix B to the expert report you provided in this case, which is the list of testimony.  Take a minute to look at that, and let me know when you're done.

A.   All set.

Q.   So is this a true and correct list of matters where you provided testimony?

A.   That's correct.

Q.   So the antitrust litigation, that was the first matter that you worked on?

A.   Yes.

Q.   Do you know who the law firm was for that?

A.   I think Kirkland & Ellis.

Q.   Do you remember the names of the lawyers that you worked with?

A.   No.  I remember the names of

Page 67

the lawyers in this room, but I couldn't tell you the names of all the different -- no disrespect to counsel -- I don't remember the name of all the lawyers.

Q.   Okay.  You don't remember any of their names?

A.   Let me just look at this list here.

Q.   Just on -- but just on that matter.

A.   For this one, if I give you first names, is that okay?

Q.   Yeah.

A.   Devora.

Q.   Whatever you remember.

A.   Devora, D-E-V-O-R-A.  Oh, yeah, no --

Q.   Okay.

A.   -- that's the extent of my recollection.

Q.   Do you know what office, in what city?

A.   New York, that I know.

Q.   How about lawyers on the other

Page 68

side, do you remember the name of the law firm on the other side, or any of the lawyers' names?

A.   No.

Q.   All right.  Let's go to the second matter, the Ranbaxy matter.  Do you remember the name of the law firm?

A.   That was -- those two are the same law firms.

Q.   Okay.  That was Kirkland & Ellis as well?

A.   Yes.

Q.   Do you remember any of the names on that one?

A.   And it would have been the same counsel on there.

Q.   How about on that arbitration matter, the Ranbaxy matter, do you remember the name of the lawyers on the other side?

A.   No, nor the firm.

Q.   Okay.  And then the Amphastar matter, do you know the name of the law firm that hired you?

A.   No, I do not know the name of

Page 69

the law firm.

Q.   How about any of the lawyers?

A.   No.

Q.   How about the law firm on the other side?

A.   Definitely not that.

Q.   Okay.  And so then looking at these, in the antitrust matter, you only provided a deposition, you didn't testify in trial?

A.   That's correct.

Q.   Do you know the outcome of that case?

A.   I believe it's still ongoing.

Q.   Do you know if any motions were filed to exclude you or --

A.   No motions have been filed in any of these matters to exclude me.

Q.   Okay.  The Ranbaxy matter, do you know the outcome of that matter?

A.   That was an arbitration.  I don't know the -- so I know that there was an outcome.  I just don't know what the outcome was.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    Q.   Okay.  You don't know if there
2  was a finding in favor or against your
3  client?
4    A.   I think there was a finding in
5  favor of my client, but I'm -- again, I don't
6  know exact details of what that would look
7  like.  But I do know that there was an
8  outcome because there was an arbitration,
9  there was some period of time after the
10 arbitration they were supposed to come up
11 with some ruling or some judgment.
12   Q.   Okay.  And then the Amphastar
13 matter, do you know the outcome of that
14 matter?
15   A.   This matter is still ongoing.
16   Q.   Do you know if there were any
17 motions to exclude you --
18   A.   No.
19   Q.   -- or challenge your testimony?
20   A.   No motions of that sort have
21 ever been filed against me.
22   Q.   And then so -- and the
23 Amphastar matter, you testified in
24 deposition, but that was it?

Page 71

1    A.   The trial has not occurred yet.
2    Q.   And then in the Ranbaxy matter,
3  you gave a deposition, and then you also
4  testified at the arbitration hearing?
5    A.   I think that those are one and
6  the same.  But again, I -- I believe that
7  they're one and the same.  I think what I did
8  is I filed a report and then gave a testimony
9  and was questioned in an arbitration.  I
10 don't think I did something else formal
11 before that.
12   Q.   Okay.
13        MS. MCENROE:  Mark, when we
14 reach a good chance to take a quick
15 break, I would appreciate it.
16        MR. PIFKO:  We can take a
17 break.
18        THE VIDEOGRAPHER:  The time is
19 12:07 p.m., and we're off the record.
20        (Whereupon, a recess was
21 taken.)
22        THE VIDEOGRAPHER:  The time is
23 12:22 p.m., and we're on the record.
24

Page 72

1  BY MR. PIFKO:
2    Q.   So off the record we were just
3  discussing the litigation consulting where
4  you have not filed a report.  And I
5  understand that you're -- you do not
6  understand yourself to be able to -- to
7  identify the clients, is that correct?
8    A.   That's correct.
9        MS. MCENROE:  Object to form.
10   A.   I apologize.
11        That's correct.
12        MS. MCENROE:  And I just want
13 to make sure it's clear, it's not that
14 he's not able to identify who they
15 are, it's that their identities are
16 confidential at this point.
17 BY MR. PIFKO:
18   Q.   Let's talk about how you came
19 to be retained in this particular matter,
20 okay?
21   A.   Sure.
22   Q.   So when were you first
23 contacted about providing work in the opioid
24 litigation?

Page 73

1    A.   I think sometime in 2018.
2    Q.   Who first contacted you?
3    A.   I believe I was first contacted
4  by Analysis Group.
5    Q.   Who at Analysis Group?
6    A.   I'm not sure who it would be,
7  but quite possibly Stephen Fink.
8    Q.   What did he tell you at that
9  time?
10        MS. MCENROE:  Objection to
11 form.
12   A.   At that time probably just
13 described the litigation.  I was aware that
14 litigation was ongoing, and he described to
15 me a potential client who may be interested
16 in hearing, you know, my thoughts on these
17 issues.  That would have been the nature of
18 the discussion.
19 BY MR. PIFKO:
20   Q.   You were aware that the opioid
21 litigation was going on?
22   A.   I think I was vaguely aware.  I
23 may -- and I don't know the timing of it, but
24 I think I was vaguely aware that something

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 was going on.
2     Q.    What did you understand about
3 the opioid litigation around this time --
4       MS. MCENROE: Objection to
5 form.
6 BY MR. PIFKO:
7     Q.   -- when you were first being
8 asked to work on this matter?
9     A.   At a very cursory level, that
10 organizations were being sued by local
11 jurisdictions.
12     Q.   Where was the basis of that
13 understanding?
14     A.   Just news media.
15     Q.   Had you developed a particular
16 interest in the litigation at that time
17 independent of being retained to work on it?
18       MS. MCENROE: Objection to
19 form.
20     A.   No particular interest in the
21 litigation. I work -- as you can see from my
22 CV, I work a lot on opioids and have done so
23 for years. So when Analysis Group approached
24 me about this potential matter, you know, I

Page 75

1 was a good fit for it because I've thought a
2 lot about these issues, I know about the
3 medicine, the economics, the health policy
4 issues that are involved, and I've written
5 about these issues as well.
6 BY MR. PIFKO:
7     Q.   And so Stephen Fink or somebody
8 from Analysis Group spoke to you, and you
9 said you wanted to be involved?
10     A.   When they spoke to me, I said
11 this is an interesting case, I'd like to
12 learn more.
13     Q.   Okay. And then who did you
14 talk to?
15     A.   At some point I would have
16 spoken to counsel from Morgan Lewis. And I
17 don't recall who was on the initial call.
18 Could be these individuals here. But I had a
19 call with Morgan Lewis. Analysis Group was
20 also on the phone call, and I -- then I heard
21 what some of the issues were.
22     Q.   We have your invoices, which
23 I'll go over with you in a little bit. But
24 would you have started to write down your

Page 76

1 time beginning with that first call?
2     A.   I think I probably would have
3 started writing down my time after I was
4 retained. So usually if I have a call with
5 someone, I don't write down the time because
6 I haven't been retained and there's no
7 expectation. But after I would have been
8 retained formally, then I would have started
9 writing down time.
10     Q.   Okay. So you -- do you have a
11 sense of when this first call might have
12 been?
13     A.   I don't. Sometime in 2018.
14 But the invoices will actually be very clear
15 on that, I think.
16     Q.   Well, that's what I was getting
17 at.
18       If we look at the invoices --
19 so it's your testimony that that invoice
20 likely would not reflect this first call
21 because you hadn't formally been retained
22 yet?
23     A.   The initial call? I suspect
24 not, but, again, I'd have to look at the

Page 77

1 invoice and see. I mean, I can just tell you
2 as a general matter on these matters, for
3 lack of better words, I usually don't charge
4 a bill for -- you know, bill for that first
5 call because I haven't been retained yet.
6 But it kind of depends on the context.
7       And I've also looked at
8 guidance from Analysis Group to say, well,
9 should I bill for this call or not. And that
10 -- so I don't know exactly in this matter
11 what I would have done, but that's my general
12 policy towards these things.
13     Q.   Okay. And then at some point
14 after that call you became formally retained?
15     A.   That's correct.
16     Q.   What did you understand the
17 scope of your assignment to be?
18     A.   When I was initially retained,
19 I was retained not with a specific assignment
20 at that time. I think my assignment became
21 more clear -- the scope of the assignment
22 became more clear later in either late 2018
23 or probably closer to early 2019, which is
24 when I really went in earnest in developing

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  my report.
2      Q.    When you did come to an
3  understanding about what the scope of work
4  was, what was your understanding of what the
5  scope of work was?
6          MS. MCENROE:  Objection to
7  form.
8      A.    So I can -- I could point you
9  to the specific part of my assignment, but
10  there's basically three broad categories.
11          First was to assess a
12  particular plaintiff's expert, Dr. McCann, in
13  the nature of a suspicious order flagging
14  methodology and just to assess it from an
15  academic perspective; is this a credible
16  methodology or not?  Would it pass muster
17  based on reliance on scientific evidence and
18  methods?  And my short answer to that is no.
19          The second was to assess the
20  quality of Rite Aid's anti-diversion
21  practices.
22          And the third was to assess the
23  harm, if any, that would have arisen from
24  Rite Aid's practices as it relates to

Page 79

1  diversion from harm.
2          Those are the three kind of
3  cornerstones of my assignment.
4      Q.    When you first became retained,
5  if you didn't have a clear scope of work,
6  what did you understand yourself -- what did
7  you understand you were supposed to be doing?
8          MS. MCENROE:  Objection to
9  form.
10      A.    When I was first -- from the
11  period when I was first retained until when I
12  started working in earnest on the report,
13  there's a series of consulting work that was
14  done by Rite Aid, which I was pretty
15  peripherally involved.  There may be some
16  topics here that I would chime in on, but I
17  really wasn't fully engaged until the last
18  several months where I started working on my
19  report.
20          MS. MCENROE:  Mark, I think
21      they should be chronologically
22      ordered.
23          MR. PIFKO:  Okay.  We'll find
24      out.

Page 80

1  BY MR. PIFKO:
2      Q.    I'm going to be handing you
3  some materials that were provided to me
4  yesterday by counsel for Rite Aid.
5          (Whereupon, Jena Exhibit Number
6      2 was marked for identification.)
7  BY MR. PIFKO:
8      Q.    The first thing I'm handing you
9  is what's marked as Exhibit 2.
10      A.    Thank you.
11          THE WITNESS:  I have five
12  copies.
13          MS. MCENROE:  Oh, yeah.
14          MR. PIFKO:  Let's go off the
15  record so we can collate these.
16          THE VIDEOGRAPHER:  The time is
17  12:31 p.m.  We're off the record.
18          (Whereupon, a recess was
19  taken.)
20          THE VIDEOGRAPHER:  The time is
21  12:36 p.m., and we're on the record.
22  BY MR. PIFKO:
23      Q.    Okay.  You have in front of you
24  what's marked as Exhibit 2, which are some

Page 81

1  materials that I received yesterday.  Take a
2  minute to review those, and let me know when
3  you're done.
4      A.    I've reviewed them.
5      Q.    For the record, Exhibit 2 is
6  six pages.  Can you tell me what Exhibit 2
7  is?
8      A.    So Exhibit 2 appears to be
9  timesheet that I e-mail to Analysis Group for
10  my work on --
11          PHONE PARTICIPANT:  Sorry to
12      interrupt, but we're having trouble,
13      at least on my end, hearing you guys
14      over the phone.
15          THE VIDEOGRAPHER:  The time is
16  12:37 p.m.  We're off the record.
17          (Off the record discussion.)
18          THE VIDEOGRAPHER:  The time is
19  12:39 p.m., and we're on the record.
20  BY MR. PIFKO:
21      Q.    Okay.  So looking at Exhibit 2,
22  you said that you e-mail your time to
23  Analysis Group?
24      A.    That's correct.

Page 82

1   Q.   Did you prepare Exhibit 2?
2        MS. MCENROE:  Objection to
3   form.
4   A.   This is -- these spreadsheets
5   are what I send them, or I have been sending
6   them since, it looks like, April of 2018.  I
7   didn't do any additional preparation of these
8   myself.
9   BY MR. PIFKO:
10  Q.   Okay.  So you -- this is a
11  form -- the same format that you use?  You
12  put it into like an Excel file and send it to
13  them?
14  A.   Yeah, it looks like actually
15  the exact -- exact format.
16  Q.   Okay.  So does this reflect all
17  the work that you performed on the case --
18       MS. MCENROE:  Objection to
19  form.
20  BY MR. PIFKO:
21  Q.   -- to date?
22  A.   This reflects the work as of
23  April 30, 2019.  So any work that would have
24  been done the month of May I have not

Page 83

1   submitted any timesheet on.
2   Q.   Okay.  So other than the month
3   of May, does that reflect all the work that
4   you've done?
5        MS. MCENROE:  Objection to
6   form.
7   A.   Yeah, month of May and month of
8   June, which is a few days.
9   BY MR. PIFKO:
10  Q.   So these are true and correct
11  copies of all the work you performed before
12  May, 2019 on this matter?
13       MS. MCENROE:  Objection to
14  form.
15  A.   Yes, before -- on or before
16  April 30, 2019, that's correct.
17  BY MR. PIFKO:
18  Q.   Looking at the first page of
19  Exhibit 2, does this refresh your
20  recollection about when you were retained in
21  this matter?
22  A.   What I can see here is that on
23  April 27, 2018, I billed half an hour for a
24  counsel call.  I don't recall whether or not

Page 84

1   that was the initial call per our earlier
2   conversation, or whether this is a follow-up
3   call that might have happened sometime later.
4   I would imagine that the proximity between
5   this date and when I was retained would have
6   been pretty close.
7   Q.   So you likely would have been
8   retained sometime in April, 2018?
9   A.   Yeah, sometime in March or
10  April, 2018.
11  Q.   And then you said you didn't
12  really get started on the report until
13  sometime later.  Looking at these time
14  entries, when would you say you started
15  working on the report?
16       MS. MCENROE:  Objection to
17  form.
18  A.   So looking at the time entries,
19  looks like March of 2019.
20  BY MR. PIFKO:
21  Q.   So the work that you did prior
22  to March, 2019 is not related to forming your
23  opinions that are in your report?
24       MS. MCENROE:  Objection to

Page 85

1   form.
2   A.   The opinions that are in my
3   report relate to a specific assignment that I
4   was asked to do.  The work that predates that
5   was consulting work that I was kind of
6   peripherally involved in.  It helped build
7   awareness of some of the issues.
8        So, for instance, there's data
9   sets that I rely on in my report, like the
10  ARCOS data, that I probably would have seen
11  prior to March of 2019, which is incredibly
12  helpful because you can't just analyze a data
13  set in one week and expect to know what it
14  entails.
15       So there's part of the
16  report -- parts of the billings before March
17  of 2019 that would have been relevant, but my
18  report relates to a specific assignment, and
19  that assignment was not handed down to me
20  until, you know, sometime probably in March,
21  I would guess.
22  BY MR. PIFKO:
23  Q.   Of 2019?
24  A.   Of 2019, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1　Q.　The last month -- prior to
2　March, 2019, the last time you worked on the
3　case was July 20, 2018, is that correct?
4　　　MS. MCENROE:　Objection to
5　form.
6　A.　That looks correct.
7　BY MR. PIFKO:
8　Q.　You didn't do anything on the
9　case between July 20, 2018 and March 18,
10　2019, correct?
11　A.　Not --
12　　　MS. MCENROE:　Objection to
13　form.
14　A.　Not that I'm aware of.
15　BY MR. PIFKO:
16　Q.　You finalized your report on
17　May 10th?
18　A.　That sounds right.　I'd have to
19　look at the report, but that sounds right.
20　Q.　The last entry on Exhibit 2 is
21　April 30, 2019.　Agree?
22　A.　I agree with that.
23　Q.　Okay.　Let's talk about the
24　work that you did after that up until

Page 87

1　finalizing your report, okay?
2　A.　Sure.
3　Q.　Do you know about how many
4　hours you spent, well, in May working on your
5　report?
6　A.　So between April 30th to
7　May 10th, if I had to guess, I would say
8　probably maybe 20 to 30 hours, if I had to
9　guess, somewhere in that ballpark.　10 to
10　30 hours.　It's a broad range, I realize, but
11　that's obviously a busy time.
12　Q.　So just for clarity, I don't
13　want you to guess in the deposition, and
14　maybe that's just a term that lawyers use,
15　but you are allowed to provide an estimate.
16　But a guess is just a shot in the dark like,
17　you know --
18　A.　I see.
19　Q.　-- I don't have -- if I just
20　would have guessed how much money you have in
21　your wallet, I have no idea, versus
22　estimating how much money I might have in my
23　wallet, I might not know the exact number but
24　I probably could have a good estimate.

Page 88

1　　　Do you understand the
2　difference?
3　A.　Understood.
4　Q.　Okay.　So when you say that you
5　worked 20 to 30 hours in May, that's an
6　estimate?
7　A.　I would estimate that between
8　the dates of April 30th to the filing of the
9　report on May 10th, my estimate is that I
10　worked 20 to 30 hours.
11　Q.　Okay.　And you have recorded
12　your time just like you did on Exhibit 2, but
13　you just haven't sent a bill for that yet?
14　A.　That is correct.
15　Q.　Have you sent that to Analysis
16　Group yet?
17　A.　No.
18　Q.　What's the protocol that you
19　use to send your time to Analysis Group?
20　　　MS. MCENROE:　Objection to
21　form.
22　A.　Sometimes I will e-mail a
23　document at the end of the month or in the
24　first week of the following month.　Other

Page 89

1　times, if there's a clear goal, benchmark or
2　goalpost, I'll wait until that.
3　　　So, for instance, if there's a
4　deposition on June 10th, I probably would not
5　have -- I probably would have waited until
6　after the deposition because I would not
7　expect any other subsequent work to be done
8　on that project.　So that just saves the
9　hassle of having to send two different
10　invoices.
11　BY MR. PIFKO:
12　Q.　Okay.　So what I'm hearing you
13　say basically is -- today is June 5th, is
14　that correct?
15　A.　That's correct.
16　　　MS. MCENROE:　Objection.
17　　　It's June 6th.
18　BY MR. PIFKO:
19　Q.　Okay.　June 6th.　All right.
20　　　So given that we're only a few
21　days into June, you're going to submit your
22　May time along with the work up until now not
23　long after, and then just have one invoice?
24　A.　So --

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1      MS. MCENROE:  Objection to
2  form.
3      A.    So I'll submit sometime after
4  today because I haven't submitted it yet, and
5  it depends on what else I have to do.
6          And sometimes Analysis Group
7  may reach out to me and say, oh, have you
8  sent us your, you know, billings for this
9  month, and I would say, oh, I completely
10  forgot because I've got other things I've got
11  to take care of.
12  BY MR. PIFKO:
13     Q.    Do you have a document where
14  you've been putting in your May time?
15     A.    Not yet, in part because I kind
16  of go back retrospectively and try to figure
17  out what I would have been doing on these
18  different dates.  I should probably have a
19  better bookkeeping method than I do.  But not
20  yet.
21     Q.    In preparing for this
22  deposition, did you look at anything to give
23  you a sense of how much time you spent in May
24  working on the report?

Page 91

1      A.    Not explicitly.
2      Q.    What was the nature of the work
3  that you did in May on your report on this
4  estimated 20 to 30 hours?
5          MS. MCENROE:  Objection to
6  form.
7      A.    From the period of May 30 until
8  I filed the report, it would have been
9  continuing to edit the manuscript or edit the
10  report, going through performing additional
11  analyses, reviewing materials that I relied
12  on on the report, that sort of stuff.
13  BY MR. PIFKO:
14     Q.    And did you work with others in
15  drafting the report?
16     A.    I did.
17     Q.    And those are people who work
18  at Analysis Group?
19     A.    That's correct.
20     Q.    Have you seen their invoices to
21  counsel or Rite Aid?
22     A.    I saw invoices yesterday, but
23  prior to that I'd never seen any invoices
24  from them.

Page 92

1      Q.    Okay.  So you saw invoices from
2  Analysis Group in preparing for this
3  deposition?
4      A.    I saw invoices yesterday.  My
5  understanding is that a court order was --
6  there's a court order to produce these
7  invoices, and so yesterday was the first time
8  I've ever seen any sort of invoice from
9  Analysis Group to Rite Aid, much less any
10  other client.
11     Q.    Did you work with anybody on
12  the report who didn't work at Analysis Group?
13     A.    No.
14     Q.    After May 10th, or whenever the
15  date that you finished your report, between
16  then and now, did you do any work for the
17  case?
18          MS. MCENROE:  Objection to
19  form.
20     A.    Yes.
21  BY MR. PIFKO:
22     Q.    What did you do?
23     A.    Primarily preparation for the
24  deposition.

Page 93

1      Q.    What did you do to prepare for
2  the deposition?
3      A.    I did a few things.  One is I
4  went through my report multiple times so I
5  could make sure that I could streamline the
6  process of our discussion with relationship
7  to the report.
8          Two is I re-reviewed and
9  re-reviewed again the materials that I rely
10  on.  I looked back at the analysis to make
11  sure that I could explain it very clearly and
12  succinctly if I'm asked about it.
13          And that's about it.  That's
14  been the nature of my preparation.
15     Q.    Did you meet with counsel to
16  prepare for the deposition?
17     A.    I did.
18     Q.    When was that?
19     A.    I met yesterday as well as last
20  week, I believe.  I met twice with them.
21     Q.    Yesterday, was that in person?
22     A.    Yes, that was in person.
23     Q.    Last week, was that in person?
24     A.    That was in person.

Page 94

1    Q.    Was that here in Boston last
2  week?
3    A.    That was here in Boston.
4    Q.    And was that -- those meetings
5  with counsel that's present here today?
6    A.    Yes.
7    Q.    Anyone else?
8    A.    Last week counsel named Kelly
9  Moore was here as well.
10   Q.    Okay.  Yesterday she wasn't
11 here?
12   A.    She was not here yesterday.
13   Q.    Did you speak with Kelly prior
14 to meeting with her last week?
15   A.    I have spoken to her on the
16 phone before.
17   Q.    Was there anyone else present
18 at the meeting last week besides Kelly and
19 counsel who is here today?
20   A.    Two members from Analysis Group
21 were also present.
22   Q.    Who was that?
23   A.    Stephen Fink, and a woman named
24 Erica VanSant, V-A-N-S-A-N-T.

Page 95

1    Q.    Were Stephen and Erica at
2  yesterday's meeting?
3    A.    They were at yesterday's
4  meeting as well.
5    Q.    Anyone else?
6    A.    No.
7    Q.    So let's just be clear.  So
8  yesterday's meeting was Stephen, Erica, John,
9  Elisa, and you?
10   A.    That's correct.
11   Q.    Okay.  And last week was
12 Stephen, Erica, Kelly.  Was Elisa there?
13   A.    Elisa was there, but John was
14 not there last week.
15   Q.    Okay.  Did you have any other
16 in-person meetings with counsel --
17   A.    No.
18   Q.    -- at any time on the case?
19   A.    Yes, we met once before.  That
20 was probably two months ago in Boston.
21   Q.    Who was present at that
22 meeting?
23   A.    At that meeting was Elisa
24 McEnroe and Kelly Moore.

Page 96

1    Q.    Was there anyone from Analysis
2  Group at that meeting?
3    A.    At that meeting, the same
4  individuals were present as I just described.
5    Q.    Stephen and Erica?
6    A.    Yes.
7    Q.    The materials you relied upon
8  in forming your opinions, so some of them are
9  publicly available materials, some might be
10 materials that you're aware of from your
11 academic experience, but other materials are
12 from the litigation, correct?
13   A.    That's correct.
14   Q.    Okay.  How did you obtain the
15 materials from the litigation?
16   A.    I formulated an outline of what
17 I wanted to address in the report, and asked
18 my colleagues that I supervise at Analysis
19 Group to identify documents -- they were all
20 available to them -- to identify documents
21 that could help elucidate each one of those
22 different points that I wanted to address.
23   Q.    So looking back to Exhibit 2,
24 the second-to-last page, which is March,

Page 97

1  2019, time, item 4 says there's work on an
2  outline.
3           Do you see that?
4    A.    I see that.
5    Q.    Okay.  Is that the outline that
6  you're talking about?
7    A.    That is the outline -- I
8  presume that's the outline that I'm talking
9  about.
10   Q.    So you put together -- at that
11 point you understood what the scope of your
12 assignment was going to be?
13        MS. MCENROE:  Objection to
14 form.
15   A.    I'm assuming that when I write
16 here work on the outline, I'm referring to
17 the first instance in which I'm working on
18 it.  It's possible that there may be other
19 times that I was working on it.  But let's --
20 I'm estimating that it was around March 22nd,
21 last week of March, and at that time I would
22 have had a good understanding what my
23 assignment would be.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1   Q.   Okay.  And you would have
2   understood that your scope of your assignment
3   was those three areas that we discussed
4   earlier; assessing Dr. McCann, looking at
5   Rite Aid's diversion control programs, and
6   the harm potentially caused by Rite Aid?
7   A.   That's correct.
8      MS. MCENROE:  Objection to
9   form.
10  BY MR. PIFKO:
11  Q.   And so then you would have
12  outlined the details of what you wanted to
13  say in your report, and then asked people at
14  Analysis Group to find you documents that are
15  relevant to those issues?
16     MS. MCENROE:  Objection to
17  form.
18  A.   I would have outlined
19  details -- I'll just use your words to be
20  specific.  I would have outlined details of
21  my report and asked Analysis Group to build
22  out that information with me using evidence
23  that's been produced in this litigation, my
24  own research, and outside documents that are

Page 99

1   publicly available.
2      But prior to that, as you can
3   see, I'd been doing some work in this space
4   and, you know, understood that these are
5   likely to be the issues even without a formal
6   assignment from counsel.
7      And so the Analysis Group team
8   has been familiarizing themselves through my
9   direction of a lot of the material, including
10  the data.  I mentioned earlier that the ARCOS
11  data is this huge dataset.  It takes effort
12  to understand, to debug, to analyze.  That
13  kind of analysis was already underway.
14     By the end of March is when I
15  had a firm direction of which way the report
16  would go, and so some of the preparatory work
17  that had already been done could now be
18  really done in earnest.  And so I asked the
19  Analysis Group team to look into items A, B,
20  C, and D and try to help me build out the
21  evidence base for these different points.
22  Q.   Who gave you the firm direction
23  about which way the report was going to go?
24     MS. MCENROE:  Objection to

Page 100

1   form.
2   A.   You mean specific on my
3   language?  The direction of the report was my
4   direction.  The assignment came from counsel.
5   BY MR. PIFKO:
6   Q.   When you say the assignment
7   versus the direction, what do you mean by
8   that?
9   A.   Well, the assignment is a set
10  of topics to answer.  The direction of the
11  report is up to me.  I can analyze it using
12  publicly available information.  I can
13  analyze it using ARCOS data.  I can analyze
14  these questions using documents that are
15  produced in litigation.  That's under my
16  direction.  Which is a different question
17  than what is the questions that I'd like --
18  counsel would like me to opine upon.
19  Q.   Okay.  So when we talk about
20  the three areas of assessing Dr. McCann, the
21  quality of Rite Aid's diversion control
22  programs, and the potential harm caused by
23  Rite Aid, those came from counsel?
24     MS. MCENROE:  Objection to

Page 101

1   form.
2   A.   That is correct.
3   BY MR. PIFKO:
4   Q.   Were there any other topics
5   they asked you to look at that you decided
6   not to use in your report?
7      MS. MCENROE:  Objection to
8   form.
9   A.   No.
10  BY MR. PIFKO:
11  Q.   Who did you work with at
12  Analysis Group?
13  A.   I worked with a team.  The team
14  is led by Stephen Fink and Erica VanSant.
15  There's a few other research assistants and
16  associates who have also been involved in the
17  work as well.
18  Q.   Let's discuss some of the
19  people at Analysis Group.  In order to do
20  that, I'm going to hand you the materials I
21  was provided yesterday from Analysis Group.
22     MS. MCENROE:  Mark, just to
23  speed things along, those are
24  organized in the same way the other

Page 102

1  documents had been.
2      MR. PIFKO:  Let's take a break
3  so that we can organize these.
4      THE VIDEOGRAPHER:  The time is
5  12:59 a.m., and we're off the record.
6      (Whereupon, a luncheon recess
7  was taken.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 103

1      AFTERNOON SESSION
2
3      THE VIDEOGRAPHER:  The time is
4  1:29 p.m., and we're on the record.
5  BY MR. PIFKO:
6      Q.    Real quick before we go back to
7  the invoices, I want to look at Exhibit 1
8  again, your list of testimony.
9      A.    Yes.
10     Q.    Are you there?
11     A.    Yes.
12     Q.    What were your opinions in the
13  antitrust case?
14     MS. MCENROE:  Objection to
15  form.
16     And I'm not familiar with that
17  litigation, so I don't know if there
18  are confidentiality provisions in
19  place or a protective order.  So I
20  just warn, if Dr. Jena believes it's
21  confidential, that he shouldn't
22  testify to that.  But otherwise I
23  don't have any basis to say otherwise.
24     A.    I can give you a high-level

Page 104

1  description.
2      So in many antitrust cases, one
3  of the key issues is defining the market, and
4  the reason supported to define the market is
5  to understand whether the firm has market
6  power in that market.  And it's actually not
7  a trivial exercise to figure out what are the
8  different products that comprise the market.
9      So, for instance, Levi jeans
10  and Lee jeans probably comprise the same
11  market, whereas some fancy company, some
12  fancier jeans may be in a different market.
13      In the pharmaceutical context,
14  the opinion that I provided in this
15  particular case was trying to use a clinical
16  perspective, clinical and economic
17  perspective, to define the market.
18      And I basically relied on
19  clinical guidelines to say what would
20  physicians who are faced with a patient who
21  has condition X, what are the treatments that
22  they would choose between, is it just one
23  treatment, two treatments, which would have a
24  narrow market, or is it seven or eight

Page 105

1  treatments, which would imply a broader
2  market.
3      And then I conducted data
4  analysis to look at real world patients and
5  to see in those contexts, what are the types
6  of drugs that patients choose between, do
7  they choose between one or two patients,
8  again, which would define the market to be
9  narrower, or do they choose between eight or
10  nine medications.
11      So that's the kind of basic
12  analysis that I performed there.
13  BY MR. PIFKO:
14      Q.    Okay.  And then ultimately your
15  conclusion was that your clients did not have
16  market power?
17      MS. MCENROE:  Objection to
18  form.
19      A.    In this particular case I
20  didn't actually come down on market power
21  versus not.  I was really defining the market
22  and looking at economic substitutability.
23      So the specific conclusion that
24  I had in this particular paper was looking at

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 whether or not the product at issue was an
2 economic or therapeutic substitute with other
3 products. And the way I did that is I said,
4 look at other treatment -- look at treatment
5 guidelines and see whether or not there are
6 other products or not. If there are, then
7 there would be substitutes towards that first
8 product.
9 And then the second issue is
10 looking at how patients' demand for the first
11 product at issue relates to the prices of
12 other products. If there's a cross-price
13 elasticity, meaning a sensitivity of demand
14 of the first product with respect to the
15 other ones, that would suggest that there
16 might be economic substitutes.
17 So that's what I was opining
18 on, is there economic or clinical
19 substitutability between an at-issue product
20 and the other ones.
21 Q. Okay. Did you find that there
22 was economic substitutability for your
23 clients' products?
24 MS. MCENROE: Objection to

Page 107

1 form.
2 A. In this case I found that
3 there's clinical and economic
4 substitutability between that product and
5 other products.
6 THE VIDEOGRAPHER: Can we go
7 off for one second? I don't know --
8 something got tripped with the power.
9 It seems -- now it's back. Sorry.
10 BY MR. PIFKO:
11 Q. Okay. Going to the Ranbaxy
12 case, what was the nature of your opinions in
13 that case?
14 MS. MCENROE: Objection to
15 form. Same objection I made
16 previously regarding potential
17 confidentiality concerns.
18 But, Dr. Jena, I leave that to
19 you in terms of whether you have a
20 protective order obligation or not.
21 A. I think I can provide a
22 high-level analysis. I wish I remembered
23 more of the details of the case.
24 But in this particular case

Page 108

1 here, it was a very similar issue of what are
2 the therapeutic substitutes to the product.
3 In this case it was a product to treat
4 metabolic disease. And the question was
5 whether or not there are other products that
6 are used to treat metabolic disease, or
7 simply one product.
8 BY MR. PIFKO:
9 Q. And did you find that your
10 clients' -- there was substitutability for
11 your clients' products in this -- in the
12 arbitration case as well?
13 MS. MCENROE: Objection to
14 form.
15 A. In that case I found that there
16 are other treatment options that are
17 supported by clinical guidelines for the
18 treatment of this particular condition.
19 BY MR. PIFKO:
20 Q. Okay. And then the Amphastar
21 case, what was the nature of your opinions?
22 MS. MCENROE: Objection to
23 form. Same objection I made
24 previously regarding confidentiality

Page 109

1 obligations or a protective order, but
2 I leave that up to the witness.
3 A. That was a similar sort of case
4 where I was approaching this question to
5 define the market from a clinical
6 perspective. This was a -- also a
7 cardiovascular medication that was at issue
8 here. And the question was whether or not
9 that medication is the only medication that
10 patients use for this particular condition,
11 or do clinical guidelines assert five or six
12 different medications.
13 And my finding there was that
14 there's multiple different medications that
15 physicians use.
16 BY MR. PIFKO:
17 Q. Okay. So similarly, there was
18 substitutability for those -- your clients'
19 product as well?
20 MS. MCENROE: Objection to
21 form.
22 A. That's correct. Another way to
23 say it is that the product is not unique in
24 any particular way.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

BY MR. PIFKO:

1 Q. Okay. Do you know -- in all
2 these cases, was your client a plaintiff or
3 defendant? Do you know the answer to that?
4 A. In these two cases, I was
5 representing the defendant.
6 Q. Okay. In all three, they were
7 defendants?
8 A. That's correct.
9 (Whereupon, Jena Exhibit Number
10 3 was marked for identification.)
11 BY MR. PIFKO:
12 Q. I'm handing you what's marked
13 as Exhibit 3.
14 A. Thank you.
15 Q. These are invoices from
16 Analysis Group that I received yesterday.
17 Take a moment to review them real quick, and
18 let me know when you're ready.
19 MR. PIFKO: For the record,
20 there are several pages within, but there's
21 one dated May 24, 2018, July 3, 2018,
22 July 27, 2018, August 20, 2018, September 28,
23 2018, October 22, 2018, December 21, 2018,

Page 111

1 January 25, 2019, February 19, 2019,
2 March 22, 2019, April 29, 2019, and May 21,
3 2019.
4 (Witness reviewing document.)
5 A. Okay. I've reviewed them.
6 BY MR. PIFKO:
7 Q. Okay. So the first time that
8 you saw these was yesterday?
9 A. The first time that I saw an
10 invoice was yesterday. I haven't reviewed
11 all -- you know, multiple of these invoices
12 here.
13 Q. So you don't have any knowledge
14 either way about whether these are true and
15 correct and accurate?
16 A. To the extent that they reflect
17 my own professional hours and those are
18 consistent with what's reported in the
19 spreadsheet, those are an accurate reflection
20 of my work in this matter. I don't -- I'm
21 not involved in the billing of Analysis Group
22 for its own work and services to clients,
23 including Rite Aid.
24 Q. Okay. So you don't know if --

Page 112

1 for example, looking at the top invoice from
2 May 24, 2018, the second page, it's got two
3 hours of time for Stephen Fink.
4 Do you see that?
5 A. Yes, I see that on the second
6 page.
7 Q. So you don't know if that's
8 accurate or not, correct?
9 A. I'm not an accountant, and also
10 I'm not filling this invoice, so I can't say
11 if it's accurate or not. I presume that it's
12 accurate, but it's an invoice that I wasn't
13 part of.
14 Q. Okay. But your time -- we can
15 cross-check your time with Exhibit 2 and see
16 that, if you look at the first page of
17 Exhibit 2, April 27, 2018, you billed
18 25 hours, we can see that that is correct,
19 yes?
20 A. Yes.
21 Q. Okay. And you don't have a
22 date -- there isn't a date on the Analysis
23 Group invoice, but it's for the period that
24 ends April 30th, so we can conclude that that

Page 113

1 .5 is the .5 referenced in your --
2 MS. MCENROE: Objection to
3 form.
4 BY MR. PIFKO:
5 Q. -- April 27, 2018 invoice,
6 correct?
7 A. I would think so.
8 Q. So other than verifying your
9 time like we just did for the April 30, 2018
10 period, you're not able to verify the
11 accuracy of any of these Analysis Group
12 invoices, correct?
13 MS. MCENROE: Objection to
14 form.
15 A. I can't comment on the accuracy
16 of any billing besides my own.
17 BY MR. PIFKO:
18 Q. Who would be the best person to
19 do that? Mr. Fink?
20 MS. MCENROE: Objection to
21 form.
22 A. I also don't know who the best
23 person at Analysis Group would be to do that.
24

Highly Confidential - Subject to Further Confidentiality Review

Page 114

BY MR. PIFKO:

1 Q. Okay. But we'd have to talk to
2 someone at Analysis Group?
3 MS. MCENROE: Objection to
4 form.
5 A. I presume so. It definitely
6 wouldn't be to talk to me.
7 BY MR. PIFKO:
8 Q. I do want to go through,
9 however, some of these, and ask you about the
10 individuals.
11 A. Sure.
12 Q. So then go to the July 3, 2018
13 invoice, and then you go to Page 3. Tell me
14 when you're there.
15 A. Okay. I am there.
16 MS. MCENROE: I see.
17 BY MR. PIFKO:
18 Q. All right. So it's got you for
19 nine hours. We can cross-check. That's
20 consistent with the amount of time you
21 billed, if you look back at Exhibit 2,
22 correct?
23 A. That looks like it's for the

Page 115

1 May period, in May, that looks correct, yes.
2 Q. Okay. The next person,
3 N. Kirsom, do you know who that is?
4 A. Yes.
5 Q. What's their full name?
6 A. Noam Kirson, N-O-A-M.
7 Q. And is that a man or a woman?
8 A. That's a man.
9 Q. I assumed, but you never know.
10 What does he do?
11 A. He is also a vice president at
12 Analysis Group.
13 Q. Do you know what his background
14 is?
15 A. He has a PhD in economics from
16 Harvard.
17 Q. He's employed by Analysis
18 Group?
19 A. I believe so, yes.
20 Q. Do you know if he has any other
21 degrees?
22 A. Besides the PhD? He might, but
23 I'm not sure. He does not have an MD.
24 Q. Did you work with him on this

Page 116

1 matter?
2 A. I did.
3 Q. What was the nature of your
4 work with him?
5 MS. MCENROE: Objection to
6 form.
7 A. This was a period, I believe,
8 when Mr. Fink was out, or soon to be, on some
9 abbreviated -- a paternity leave, he just had
10 twins around this time. And Mr. Kirson was
11 involved for some period of time, maybe a
12 month or two, in kind of starting the work on
13 this Rite Aid matter.
14 BY MR. PIFKO:
15 Q. Did you consult with him about
16 strategies to use in the case?
17 MS. MCENROE: Objection to
18 form.
19 A. I discussed with him what are
20 the datasets that are currently being
21 produced in the litigation.
22 A lot of the early work in this
23 matter that you're referencing in this time
24 period would have been data-oriented.

Page 117

1 BY MR. PIFKO:
2 Q. Okay. So the work with
3 Mr. Kirson was limited to just this early
4 period when Mr. Fink was on leave?
5 A. We can go through the
6 individual invoices just to verify, but we
7 can see in the next invoice of July 27,
8 Mr. Kirson's name is listed. August 20th,
9 his name is no longer listed. September 28th
10 invoice, his name is no longer listed.
11 Q. I can represent to you I went
12 through these. He's only billed time in
13 May -- the May 28, 2018, and the June, 2018.
14 A. That would be consistent with
15 my recollection and also the explanation I
16 just provided regarding the paternity leave
17 for Mr. Fink.
18 Q. Okay. We talked about Stephen
19 Fink.
20 Who is S. Kim?
21 A. I believe that's Soojin Kim.
22 Q. Mr. Fink, by the way, what --
23 do you know what type of degrees he has?
24 A. He has an MBA from Columbia

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 Business School, and an undergraduate from
2 Vassar College.
3     Q.    Soojin Kim, do you know the
4 academic background?
5     A.    I don't know her detailed
6 academic background.  I believe she studied
7 economics and is an undergraduate, may have
8 an MBA or a master's degree, but I'm not
9 entirely sure.
10     Q.    Did you work with Ms. Kim on
11 the matter?
12     A.    I worked with all these
13 individuals on the matter.  Each person has
14 different roles, and the roles vary over
15 time, but I worked with each one of these
16 individuals on the case.
17     Q.    What was Ms. Kim's role?
18     A.    It's hard to say as of this
19 period what her role was, but I can outline
20 for you the general roles that I oversaw.
21         So one big thing is data
22 cleaning, data preparation, data analysis.
23         The second big thing would be
24 analyzing existing documents that have been

Page 119

1 produced in the litigation, looking at
2 publicly available documents, looking at
3 publicly available data.
4         The third broad bucket would be
5 in terms of helping drafting particular
6 sections of the report under my direction.
7 For instance, I might say, you know, I've
8 written this paper on XYZ, could you please
9 put that into the report, cite this study,
10 and describe it in the following way.  And
11 they would pull the report, introduce it --
12 pull the study, introduce it into the record,
13 so forth.
14         So Ms. Kim, as well as
15 including Mr. Fink, Mr. Kirson, and others
16 that you'll see on subsequent invoices, would
17 probably have all shared roles of those
18 forms.
19     Q.    When you say "data cleaning,"
20 what does that mean?
21     A.    Data cleaning means the
22 following; if you get a large data set,
23 sometimes the data elements aren't as
24 structured as they should be.

Page 120

1         So, for instance, if you get a
2 data set that's transaction-based and it says
3 1/7/2012, you and I would probably both
4 interpret that to mean January 7, 2012.  The
5 next line might say 1-7-2012.  In order to
6 analyze data in a systematic way, we have to
7 tell the computer program that both of those
8 entries reflect January 7, 2012.  The process
9 of data cleaning is one in which an analyst
10 would go through and write a program to
11 create a data set that can be easily
12 analyzed.
13         That's an example of what data
14 cleaning, or data processing is the other
15 term you might hear.
16     Q.    What type of data analysis did
17 Ms. Kim do?
18         MS. MCENROE:  Objection to
19     form.
20     A.    So in this particular case, the
21 data analysis that were conducted -- and she
22 was probably a part of some of this, but it's
23 hard for me to know exactly what part.  This
24 is a report and a set of analysis that was

Page 121

1 conducted over many months over many person
2 hours.
3         The core parts of the empirical
4 analysis in my report reflect the ARCOS
5 database, which is a transaction database.  I
6 focused on opioid distribution, looking
7 particularly at Dr. McCann's report in which
8 he identified a methodology for flagging
9 potentially suspicious orders.
10         So I analyzed the database and
11 said, look, there's five methodologies that
12 Dr. McCann lays out, can we first replicate
13 that methodology.  That was the first task,
14 can we replicate what Dr. McCann has done.
15         And then, secondly, now let me
16 start and kind of unpack what is the validity
17 of each one of these methodologies.  And
18 doing that requires working with the ARCOS
19 data.  And that's, I'm sure, what Ms. Kim and
20 Mr. Fink and Mr. Kirson and Mr. Flignor and
21 others had a part in as well.
22     Q.    So I was going to ask you, the
23 ARCOS data that you examined, are you aware
24 that there's publicly available ARCOS data,

Page 122

1 then there's ARCOS data that was produced in
2 the case?
3          MS. MCENROE:  Objection to
4     form.
5     A.    I'm aware of that.
6 BY MR. PIFKO:
7     Q.    Okay.  Which ARCOS data did you
8 review?
9     A.    The ARCOS -- there's two types
10 of ARCOS data, actually, that I rely on in my
11 report.  The first is data that was produced
12 in the case, and that expanded over time.
13 Initially it was in these counties.  It's
14 actually national in nature.
15          The second is a form that was
16 processed by expert McCann, Dr. McCann.
17 There, he had already processed some of the
18 information.  And in order to be consistent
19 with his analysis and to ensure that his
20 analysis was valid, I used the process data
21 that Dr. McCann had used of the ARCOS data.
22     Q.    You said one of the steps in
23 the process that you used was replicating the
24 analysis that Dr. McCann did.  Was your team

Page 123

1 able to do that?
2     A.    I was able to replicate quite
3 closely his analysis.  There's actually some
4 issues in his analysis that I mention in the
5 report.
6          For example, in one of his
7 methodologies, which is a methodology for
8 comparing the current pharmacy distribution
9 to an average in the last several months, his
10 methodology states that he uses the averages
11 nationally.  In fact, there's a coding error
12 that I and my team uncovered.  He actually
13 only used the averages in the state -- the
14 counties at issue here, Cuyahoga and Summit.
15          So, for the most part, I would
16 say that I was able to replicate his
17 analysis.  That's not a -- that's not a
18 statement of whether I think his analysis is
19 valid.  It could be replicated somewhat.  But
20 it's a separate issue of whether I think that
21 analysis is correct.  And I go to great
22 lengths in the report to say that I don't
23 think it is.
24     Q.    Okay.  Mr. Flignor -- did I say

Page 124

1 that name right?
2     A.    I believe so.
3     Q.    Okay.  What's his full name?
4     A.    I believe it's Max Flignor, but
5 there's two Maxes, I think, that I've worked
6 with in this case, but...
7     Q.    Do you know what his background
8 is?
9     A.    I believe an undergraduate
10 degree, probably in economics or mathematics
11 or statistics.
12     Q.    Do you know from where?
13     A.    I don't know from where, no.
14     Q.    What was his role?
15     A.    He had -- he would have had a
16 similar role as Ms. Kim.  In general, as you
17 go through the invoices, the analysts and
18 senior analysts all have quite similar roles,
19 analyzing data, culling through documents,
20 synthesizing information, all under my
21 direction.
22     Q.    Let's go to -- a new name shows
23 up in the July 27, 2018 invoice.  Tell me
24 when you're there.  Page 3 of that invoice.

Page 125

1     A.    Yes.
2     Q.    Okay.  Again, we can
3 cross-check your time with Exhibit 2.  You
4 billed 11 hours in June.  Does that match up
5 with your time in June on your time from
6 Exhibit 2?
7     A.    That does match up, yes.
8     Q.    Okay.  So the last name is
9 Briesemeister?
10    A.    Briesemeister.
11    Q.    Briesemeister.
12    A.    Joe.
13    Q.    Joe.
14         What does Joe do?
15    A.    Joe has a very similar role to
16 both Soojin and Mr. Flignor as an analyst or
17 senior analyst, in this case he's an analyst,
18 same types of tasks I just outlined.
19    Q.    Do you know what his background
20 is?
21    A.    I believe also an undergraduate
22 degree.
23    Q.    You don't know in what?
24    A.    I think either economics or

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  statistics.  Most of the analysts and senior
2  analysts at Analysis Group and other similar
3  firms have an undergraduate degree in
4  economics or statistics.
5      Q.    If you go about halfway
6  through, the December 21, 2018 invoice --
7  tell me when you're there.
8      A.    I'm there.
9      Q.    Okay.  Then go to Page 2.
10      We see Erica VanSant's name?
11      A.    Yes.
12      Q.    You mentioned her earlier?
13      A.    Yes.
14      Q.    What was her role?
15      A.    She's an associate in Analysis
16  Group.  She has a PhD in economics from
17  Carnegie Mellon University.  She had a very
18  similar role as Stephen Fink, overseeing some
19  of the senior analysts and analysts that were
20  involved in those tasks that I outlined.
21      Q.    Okay.  So she was overseeing
22  some of the other analysts?
23      A.    That's correct, along with
24  Mr. Fink.

Page 127

1      Q.    She had more involvement in
2  your report than some of the other people?
3  You brought her with you to the meetings?
4          MS. MCENROE:  Objection to
5      form.
6      A.    She has had a role in my report
7  as a leadership role within Analysis Group,
8  along with Mr. Fink.
9  BY MR. PIFKO:
10      Q.    Did she draft some portions of
11  the report as well?
12          MS. MCENROE:  Objection to
13      form.
14      A.    The report as you see it is my
15  report.  I drafted a large part of it.  There
16  are certain portions which I thought were
17  fairly straightforward for someone who
18  doesn't need to have a PhD and MD to draft.
19  And so for those portions, Mr. Fink,
20  Ms. VanSant would probably have been doing
21  some of the drafting.  It's possible that
22  some of the other analysts would have also
23  been doing the drafting.
24          But at the end of the day, this

Page 128

1  is my report.  I edited it heavily.  The
2  language that you see there, that's my
3  language.
4  BY MR. PIFKO:
5      Q.    Go to the April 29, 2019
6  invoice.  Go to Page 3.  Tell me when you're
7  there.
8      A.    I'm there.
9      Q.    All right.  So then we see some
10  additional names show up here.
11          M. Lewis.  Is that Max Lewis?
12      A.    Mark Lewis.
13      Q.    Okay.  What does Mark Lewis do?
14      A.    Mark is a vice president at
15  Analysis Group.  He has a background in
16  economics.  He's been an economic litigation
17  consultant for many years.  He was involved
18  in helping Ms. Fink -- Mr. Fink and
19  Ms. VanSant.
20      Q.    For what specifically was he
21  doing helping them?
22      A.    Also similar project oversight.
23  This is a period -- as you can see,
24  March 31st, my own time now becomes more

Page 129

1  considerable.  This is the part of the
2  invoices where I'm starting to work in
3  earnest on the report.
4          And now you can see that the
5  team has increased in size to make sure that
6  all the different analyses that I'm
7  suggesting are getting done in a timely way,
8  can be ready to be prepared by the May 10th
9  filing.
10      Q.    Do you know if Mr. Lewis
11  drafted any portions of the report?
12          MS. MCENROE:  Objection to
13      form.
14      A.    Mr. Lewis, Mr. Fink, and
15  Ms. VanSant would have been involved under my
16  direction at portions of drafting.
17  BY MR. PIFKO:
18      Q.    We see another name,
19  D. Kellachan.
20      A.    Dylan.
21      Q.    Dylan?
22      A.    D-Y-L-A-N.
23      Q.    Is that a woman?
24      A.    That's a man.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    Q.    Okay.  What's his background?
2    A.    He also has a background in
3  economics, I believe a master's degree, and
4  also experienced in litigation economic work.
5    Q.    And what was his role?
6    A.    Same type of role as Erica
7  VanSant.
8    Q.    A management oversight role?
9    A.    Management, yeah.  I mean,
10  they -- I would describe it in the following;
11  senior analysts and analysts are doing much
12  more of the data analysis and data
13  processing.  Associates and vice-presidents
14  have a similar role.  There is management of
15  the analysts, but they're also involved in
16  double checking, and then in my case also
17  triple checking.
18        The idea here is this report
19  has got to be thorough, it's got to be done
20  in a way that meets the academic standards
21  that I have.  I'm signing my name to it, and
22  so I want to make sure each one of these
23  people is doing exactly what I tell them to
24  do -- ask them to do for the report.

Page 131

1        (Whereupon, Jena Exhibit Number
2        4 was marked for identification.)
3  BY MR. PIFKO:
4    Q.    I'm handing you what's marked
5  as Exhibit 4.
6    A.    Thank you.
7    Q.    Take a moment to review that.
8  Let me know when you're done.
9    A.    This is my report.
10    Q.    All right.  First question, can
11  you tell me what Exhibit 4 is?
12    A.    Exhibit 4 is my report.
13    Q.    Okay.  And to be clear, it's --
14  the appendices are not included as part of
15  Exhibit 4.
16        Other than the appendices, does
17  Exhibit 4 reflect all the work that you did
18  in forming your opinions in this case?
19        MS. MCENROE:  Objection to
20  form.
21    A.    Exhibit 4 reflects my opinions.
22  The materials that I considered in the report
23  are listed in the appendix.  That includes
24  documents produced in litigation, outside

Page 132

1  documents that are publicly available, and,
2  of course, my experience as a physician, as a
3  health policy researcher, as an economist,
4  those comprise the opinion.
5    Q.    Did you consider anything else
6  outside of what you just said and what's in
7  your report in forming your opinions?
8        MS. MCENROE:  Objection to
9        form.
10    A.    No.
11  BY MR. PIFKO:
12    Q.    Is Exhibit 4 a true and correct
13  copy of your report?
14        MS. MCENROE:  Objection to
15        form.
16        Do you want him to go through
17        page by page?
18    A.    Exhibit 4 appears to be a true
19  and accurate reflection of my report.
20  BY MR. PIFKO:
21    Q.    Okay.  Does Exhibit 4 reflect
22  all the opinions that you intend to provide
23  in this case?
24        MS. MCENROE:  Objection to

Page 133

1        form.
2    A.    Exhibit 4 reflects the opinions
3  that I provided to date.  I reserve the right
4  to provide additional opinions should
5  additional information surface, or if I'm
6  asked by counsel to opine on other issues.
7  BY MR. PIFKO:
8    Q.    Do you intend to perform
9  additional work after this deposition --
10        MS. MCENROE:  Objection to
11        form.
12  BY MR. PIFKO:
13    Q.    -- on this case?
14    A.    I have no plan or intention to
15  perform additional work on this case.  If I'm
16  asked to do so, I may choose to do so.  But
17  as of now, I have no firm intention of doing
18  that.
19    Q.    Has counsel asked you to do any
20  additional work on the case in connection
21  with your report?
22        MS. MCENROE:  Objection to
23        form.
24    A.    No further work has been

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 requested of me for this case.
2 BY MR. PIFKO:
3     Q.    Is there anything that's
4 missing or incomplete from your report that
5 you need to finish after -- as of this date?
6     A.    No.  This report is complete as
7 you have it.
8     Q.    Can you summarize your opinions
9 for me?
10    A.    Sure.
11        So let me point you to the
12 right page so you can see where I'm going to
13 be talking to you from.  So if you start at
14 Page 4, it outlines the beginning of the
15 Summary of Conclusions.
16        So basically there's four main
17 conclusions.
18        The first conclusion is that
19 Rite Aid, Mid-Atlantic as a distributor, in
20 my opinion, had in place effective
21 anti-diversion measures as a distributor.
22 That's the first opinion.
23        The second is, if you look at
24 Dr. McCann's methodology, my view is this is

Page 135

1 a methodology for identifying suspicious
2 orders, the methodology is flawed.  And I'm
3 happy to walk through why it is the case if
4 you'd like.
5        Third is from the perspective
6 of whether or not there's any harm caused by
7 diversion of opioids from Rite Aid
8 pharmacies.  I find no evidence of any harm
9 arising from diversion of opioids from Rite
10 Aid pharmacies.
11        And the fourth is that -- is an
12 important point, that the plaintiffs'
13 experts' reports don't characterize
14 Rite Aid's role as a distributor in the way
15 that I think that we should be characterizing
16 distributors and separating the role of
17 distributors from pharmacists, from
18 physicians.  And the interplay of the opioid
19 epidemic that we're in right now is a
20 complicated one, and it relies on many
21 different factors.
22        And the last part of my opinion
23 is that we cannot ignore the role of
24 prescribers in the epidemic.  And there's a

Page 136

1 section of my report that goes through that
2 in more detail.
3     Q.    Did Rite Aid's counsel draft
4 any portions of the report?
5        MS. MCENROE:  Objection to
6     form.
7        And I instruct you, in terms of
8     substantive discussions with counsel,
9     that is privileged, and you should not
10    respond.
11        In terms of mechanics of your
12    report, I'm not trying to stop you
13    from responding, but I recognize that
14    there's a fine line there, so I ask
15    you not to divulge privileged
16    information.
17    A.    This is my report.  I and my
18 team drafted it, not the counsel.
19 BY MR. PIFKO:
20    Q.    So they had no involvement in
21 drafting it?  Is that your testimony, just to
22 be clear?
23        MS. MCENROE:  Objection to
24     form.

Page 137

1    A.    Counsel has reviewed the report
2 but did not write sentences or tell me to say
3 one thing or the other.
4        Just to be very clear, the
5 opinions in this report, these are my
6 opinions.  The direction that the report
7 took, that was my direction.
8 BY MR. PIFKO:
9    Q.    You said that if you became
10 aware of additional information, you maybe
11 would revisit your opinions.  Did I hear you
12 correctly?
13        MS. MCENROE:  Objection to
14     form.
15    A.    If there's any information that
16 is brought to my attention that contradicts
17 portions of my report, I suppose that I'd be
18 willing to look at that and consider that.  I
19 have no intention at all of being involved in
20 this case any further beyond this.  If I'm
21 asked to do something, an assignment, I will
22 consider it at that time.  But right now,
23 what you have in front of you, this report,
24 is my plan.

Page 138

BY MR. PIFKO:

1   Q.   All my question was going to be
2   was, if you were aware of any information
3   that potentially contradicts your report that
4   you intend to look at?
5   A.   Oh, absolutely not.  I'm not
6   aware of any such information.
7   Q.   Do you intend to provide any --
8   do you intend to testify at trial if there's
9   a trial in this case?
10  A.   If I'm asked to testify at
11  trial, then I suspect I would be able and
12  willing to testify at trial.
13  Q.   Okay.  And Exhibit 4 reflects a
14  complete set of the opinions that you would
15  provide at trial, correct?
16      MS. MCENROE:  Objection to
17  form.
18  A.   This provides my opinions to
19  date.  If any new information is produced
20  from now until then, I would reserve the
21  right to analyze an opinion and give my
22  unbiased opinion.
23  BY MR. PIFKO:

Page 139

1   Q.   But other than new information
2   that doesn't exist as of today, Exhibit 4
3   represents the opinions that you would
4   provide at trial, correct?
5   A.   That is --
6      MS. MCENROE:  Objection to
7   form.
8   A.   I apologize.
9      That is correct.
10  BY MR. PIFKO:
11  Q.   Other than the people at
12  Analysis Group that we discussed, did you
13  talk to anyone else about your report?
14  A.   No.
15  Q.   Did you talk about your report
16  or your opinions with any other academic
17  colleagues?
18  A.   No.
19  Q.   If you testify at trial, do you
20  intend to provide any demonstrative exhibits?
21      MS. MCENROE:  Objection to
22  form.
23  A.   I would reserve the right to do
24  that.  Probably some of the exhibits, in my

Page 140

1   opinion, might be useful to illustrate the
2   opinions in my report.
3   BY MR. PIFKO:
4   Q.   Let's look at some of the
5   appendices that you provided.
6      (Whereupon, Jena Exhibit Number
7   5 was marked for identification.)
8   BY MR. PIFKO:
9   Q.   Handing you what's marked as
10  Exhibit 5.
11  A.   Thanks.
12  Q.   Take a minute to look at
13  Exhibit 5, and let me know when you're done.
14  A.   I'm done.
15  Q.   Okay.  Can you tell me what
16  Exhibit 5 is?
17  A.   Sure.  So Exhibit 5 reflects an
18  analysis that I conducted which is called a
19  falsification analysis.  The idea behind a
20  falsification analysis -- and I have a paper
21  published on this in the Journal of Medical
22  Research, which is MICV.
23      The basic idea behind the
24  falsification analysis is to see whether some

Page 141

1   of the patterns that Dr. McCann outlined as
2   being -- as flagging -- let me use the word
3   "potentially suspicious" because other
4   plaintiffs' experts used the report in that
5   way.
6      The question is whether or not
7   the methodology that he uses for flagging
8   orders is legitimate.  One sign that the
9   analysis would not be legitimate or valid
10  scientifically is, if you can generate the
11  same sorts of patterns using drugs that are
12  not addictive, that don't cause harm in the
13  way that opioids do, and that have no street
14  value.
15      So if you're able to generate
16  the same findings with non-opioid drugs, that
17  should raise a red flag as to whether or not
18  the primary methodology that you're using, in
19  this case Dr. McCann, is valid.  So Appendix
20  E presents 80 plots that are basically
21  store-by-store analyses of figures that are
22  in the report.
23      And in the report, what I
24  basically show is that the patterns that

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  Dr. McCann shows with opioids, that he and
2  then other plaintiffs' experts suggest is
3  illustrative of suspicious ordering,
4  suspicious distribution, those same patterns
5  occur when you look at drugs like
6  levothyroxine, that's a very common thyroid
7  medication, metoprolol succinate, that's a
8  beta blocker medication for heart disease,
9  statins, cholesterol medications, amlodipine,
10 which is a calcium channel blocker to treat
11 hypertension, you see the exact same patterns
12 with these other drugs as you see with
13 opioids.
14        So that to me is strong
15 evidence that whatever Dr. McCann is doing
16 when he's trying to, quote/unquote, flag
17 orders in opioids one could very easily
18 replicate with other very standard drugs.
19        And, by the way, these drugs
20 are very standard. I chose these drugs
21 because during this period, I think in 2006,
22 they are the top three or four selling drugs
23 in the market at the time. So these aren't
24 cherry-picked in any way. Appendix E

Page 143

1  basically takes the plots that are in the
2  report and does it store by store.
3        That's a long-winded way to
4  describe what Appendix E is.
5    Q.   Okay. And did someone at
6  Analysis Group actually prepare these charts?
7    A.   Someone at Analysis Group
8  prepared these charts under my direction.
9  And this was my idea, by the way. I publish
10 on falsification tests, and so I said to the
11 team, we've got to show this. In order to
12 say that this methodology is not robust,
13 meaning Dr. McCann's methodology, I want to
14 be able to take the best academic evidence
15 that there is and the best academic
16 approaches and look at it in this way. And
17 this is just a very transparent way -- it's a
18 lengthy way, but it's a transparent way to
19 show that.
20   Q.    Are there any -- did you say
21 falsification tests? Is that what they're
22 called?
23   A.    That's what they're called,
24 yes.

Page 144

1    Q.   Okay. Are there any
2  falsification tests that you performed on
3  other products that you didn't end up
4  including in your report?
5    A.   No. These were the products
6  that were analyzed. The reason I chose them
7  is because they were the top-selling drugs in
8  the period at issue.
9    Q.   Did you perform any other
10 analysis of data that you didn't include in
11 your report?
12        MS. MCENROE: Objection to
13        form.
14   A.    All the analysis of data that I
15 performed is in this report.
16        (Whereupon, Jena Exhibit Number
17        6 was marked for identification.)
18 BY MR. PIFKO:
19   Q.    Handing you what's marked as
20 Exhibit 6.
21   A.    Thank you.
22        MS. MCENROE: Thank you.
23 BY MR. PIFKO:
24   Q.    Take a minute to review that,

Page 145

1  and let me know when you're done.
2    A.   Okay. I'm done.
3    Q.   Can you tell me what Exhibit 6
4  is?
5    A.   Sure. Exhibit 6 reflects
6  Appendix D, which is an appendix in my report
7  which I just very briefly summarize
8  plaintiffs' experts' reports mentioning Rite
9  Aid.
10   Q.    And what does Exhibit 6 tell me
11 about other reports?
12        MS. MCENROE: Objection to
13        form.
14   A.    It does two things. First, it
15 just gives you a very high-level summary of
16 the expert assignment or opinion in each one
17 of the reports. That's the third column.
18 And then it identifies whether or not Rite
19 Aid was mentioned in the report, either
20 identified as a defendant, which is the
21 third-to-last column, or included in the
22 materials considered, which is the
23 second-to-last column.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    Q.    Did you prepare Exhibit 6?
2    A.    I asked the team to prepare
3  Exhibit 6 according to my guidelines.
4    Q.    Okay.  So someone at Analysis
5  Group prepared Exhibit 6?
6        MS. MCENROE:  Objection to
7    form.
8    A.    Someone at Analysis Group
9  prepared Exhibit 6 under my guidelines.  I
10  like -- this is my report, so I don't want to
11  say that someone else is -- I don't want to
12  give credit to someone else for what is my
13  report.  Someone assisted me in developing
14  Appendix B, which is Exhibit 6.
15  BY MR. PIFKO:
16    Q.    Do you know who specifically at
17  Analysis Group put the information into
18  Exhibit 6?
19    A.    So Mr. Fink, Ms. VanSant would
20  definitely have been involved, and one or two
21  of the other analysts.
22        The reason why is because there
23  are multiple different reports that are
24  culled through.

Page 147

1    Q.    All right.  So this has numbers
2  on the left for each expert, correct?
3    A.    That is correct.
4    Q.    Do you know if -- there's 21 of
5  them.  Do you agree?
6    A.    I agree.
7    Q.    Do you know if all these
8  experts provided a report?
9    A.    So from the exhibit it appears
10  that all the experts provided a report.  I'm
11  not sure if all those reports have ultimately
12  made it into the litigation.  I understand
13  that at various stages there were experts
14  whose reports did not make it into the
15  subsequent litigation.  I don't know the
16  legalese around it.  But these are the
17  reports that my team reviewed.
18    Q.    Okay.  Do you know if there are
19  any amendments to any of these reports?
20    A.    I am not aware of whether or
21  not amendments were filed to these reports.
22    Q.    If there were amendments, do
23  you know what version the team reviewed?
24        MS. MCENROE:  Objection to

Page 148

1    form.
2    A.    The -- I suspect that the
3  versions that are reported here are the
4  initial versions that were performed.  As you
5  can see here, the table is illustrating a few
6  things, not a lot.  What's the expert
7  assignment?  So to the extent that the
8  assignment would have changed in an
9  amendment, which I don't think it would have,
10  that's a non-issue.  The core opinion would
11  have changed?  I don't think it would have.
12  That would be a non-issue.  And whether Rite
13  Aid was mentioned, I'm not aware of any
14  changes in reports that now mention Rite Aid
15  that had not previously mentioned Rite Aid.
16  BY MR. PIFKO:
17    Q.    Okay.  But you don't know
18  either way whether the team reviewed any
19  amendments?
20        MS. MCENROE:  Objection to
21    form.
22    A.    I don't know whether or not the
23  team reviewed amendments.  But I -- if they
24  were available, I would suspect so, but I

Page 149

1  cannot tell you for sure.
2  BY MR. PIFKO:
3    Q.    Did you review all 21 of these
4  reports?
5    A.    I reviewed in detail several of
6  the reports, particularly ones that I had
7  drawn in my -- in my own report.  Some of the
8  reports are not -- are somewhat orthogonal to
9  what I'm talking about here, and so I didn't
10  review those in detail.
11        And I asked my team to go
12  through the reports and identify whether or
13  not there's any issues that I should be aware
14  of as they relate to my assignment and as
15  they relate to the core opinions that I
16  wanted to make here.
17    Q.    Okay.  So is your testimony
18  that you reviewed all the reports to some
19  degree?
20        MS. MCENROE:  Objection to
21    form.
22    A.    My testimony would be that I
23  reviewed all reports to some degree, but with
24  much greater degree to the reports that are

Page 150

1  germane to mine.
2      For example, McCann's report I
3  read page to page multiple times because I
4  spent half of my report talking about his own
5  report.
6  BY MR. PIFKO:
7      Q.  Okay.  And let's just go
8  through them.
9      David Courtwright's report, did
10  you read that cover to cover?
11     A.  No.  The only report that I
12  would have read cover to cover would be
13  Mr. McCann's report.
14     Q.  Okay.  So you didn't --
15     A.  And possibly Mr. -- Professor
16  Cutler's report as well, though that was a
17  little bit further back, and I only allude to
18  it very briefly in my own report.
19     Q.  You said possibly David
20  Cutler's report.  Did you -- do you know one
21  way or another if you reviewed it cover to
22  cover?
23     A.  I reviewed the majority of
24  Mr. Cutler's report, and I reviewed the

Page 151

1  entirety of Mr. McCann's report, and I
2  directed my team to review in detail each one
3  of these reports.
4      Q.  So we have this list of these
5  21 names.  Do you know any of these
6  individuals professionally or personally?
7      A.  Some of these individuals I
8  would know professionally.
9      Q.  Okay.  Which ones do you know
10  professionally?
11     A.  So Number 3, Professor Caleb
12  Alexander; 4, Professor Cutler; 6,
13  Professor Gruber; 11, Professor McGuire; 13,
14  Professor Rosenthal.  And I believe that's
15  it.
16     Q.  Okay.  Do you know any of these
17  people personally?
18     A.  What do you mean by
19  "personally"?
20     Q.  Well, like you know someone in
21  a professional capacity, maybe you interact
22  with them in a working manner, but maybe some
23  people you know them socially is what I'm
24  asking.

Page 152

1      A.  No.  So I can -- the
2  individuals -- several of these individuals
3  are at Harvard and MIT, so one of them is a
4  collaborator of mine on some work.
5      Q.  Who is that?
6      A.  That's Professor Gruber.  We've
7  collaborated on projects.  I wasn't aware
8  that he was involved in the opioid litigation
9  until an expert report was filed.
10     David Cutler is a professor at
11  Harvard.
12     Thomas McGuire is a professor
13  at Harvard.
14     And Meredith Rosenthal is a
15  professor at Harvard.
16     If I were to look back in my
17  social calendar in the last six months to a
18  year, I don't think I've had dinner with any
19  of these individuals.  That would be one
20  proxy for your question.
21     Q.  Caleb Alexander, you said you
22  know him professionally.  How do you know
23  him?
24     A.  I know him in a limited way.  I

Page 153

1  think we had some overlap at the University
2  of Chicago.  He's now at Johns Hopkins, and
3  he's been there many years.  I probably saw
4  him last maybe six years ago, five or six
5  years.
6      Q.  We talked about David Cutler.
7  You know him from Harvard?
8      A.  Yes.
9      Q.  Jonathan Gruber?
10     A.  From MIT.
11     Q.  You know him from when you were
12  an undergrad there?
13     A.  No.  I do not know him from
14  undergrad.  I don't know if he was there when
15  I was an undergrad.  He may not -- that was a
16  long time ago.
17     Q.  Yeah.  So that's what I was
18  just clarifying for the record.
19     So you know him because you --
20  because you're both in Boston, you interact
21  with him?
22     A.  Exactly.  These are all very
23  good health economists.
24     Q.  Thomas McGuire?

Page 154

1    A.    Also at Harvard.

2    Q.    And Meredith Rosenthal, same

3 thing?

4    A.    Yes, also Harvard.

5    (Whereupon, Jena Exhibit

6    Number 7 was marked for

7    identification.)

8 BY MR. PIFKO:

9    Q.    Handing you what's marked as

10 Exhibit 7.  Take a minute to look at

11 Exhibit 7.  Let me know when you're done.

12    A.    I'm done.

13    Q.    Okay.  Can you tell me what

14 Exhibit 7 is?

15    A.    Sure.  Exhibit 7 is Appendix C

16 in my report.  It reports Materials

17 Considered.

18    Q.    This is a true and correct copy

19 of all the materials considered?

20    A.    I believe so.

21    Q.    To your knowledge, there's

22 nothing that you considered that's not in

23 here?

24    A.    That's correct.

Page 155

1    Q.    To your knowledge, is there

2 anything that you didn't consider that's in

3 here?

4    A.    No.

5    Q.    Partway through we have -- if

6 you'd go to C-5.  So C-5 through C-11 makes

7 reference to documents in the litigation.

8    A.    Yes.

9    Q.    Let me know when you're there.

10    A.    I'm there.

11    Q.    Okay.  How did you come to

12 obtain these specific documents?

13    A.    My team had full access to the

14 documents that are produced in litigation,

15 again, as well as my other research and

16 publicly available documents.  And in forming

17 my outline and in devising a strategy to

18 thinking about the quality of anti-diversion

19 at Rite Aid, as well as other related issues,

20 I asked my team to search through documents

21 specifically within Rite Aid, but also other

22 places, to document exactly what are the

23 different processes and structures that the

24 organization, Mid-Atlantic distribution

Page 156

1 facility, as well as the headquarter, had in

2 place to prevent the diversion of opioids.

3    Q.    And that's how this list was

4 created?

5    A.    That is correct.

6    Q.    Do you know how the team

7 obtained access to the documents?

8    A.    They had access to all the

9 documents that have been produced in the

10 litigation.

11    Q.    Okay.  Do you know physically

12 how they had that access?

13    A.    "Physically," can you clarify

14 what you mean?

15    Q.    How did they gain access to all

16 the documents in the litigation?

17    A.    How -- do you mean by computer

18 or what --

19    Q.    Whatever --

20    A.    -- legal authority gave them

21 that?

22    Q.    Whatever method they used.

23    A.    Oh, I would assume that most of

24 it is electronic, and maybe through servers,

Page 157

1 maybe through disks.  I'm not sure in each

2 one of these cases how the specific document

3 was obtained.

4    Q.    Okay.  Did you personally

5 review any of these documents?

6    A.    Yes, I have reviewed some of

7 these documents.

8    Q.    Do you know which ones?

9    A.    If we went through my report,

10 the specific documents that I call on in the

11 report itself as opposed to in the materials

12 considered, each one of those documents I

13 would have -- I would have reviewed

14 personally, as well as other documents that

15 are in the materials considered that I may

16 not have cited in the actual report itself.

17    Q.    How did you come to access the

18 documents?

19    A.    I would access them through a

20 computer provided to me as a PDF file.

21    Q.    Okay.  So the team would send

22 you a PDF of certain documents?

23    A.    That's correct.

24    Q.    Via e-mail or something?

Page 158

1  A.    Not via e-mail.  Usually
2  through a secure mechanism.
3      Q.    Okay.  Like an FTP exchange?
4      A.    Something like that.
5      Q.    So from time to time the team
6  would upload some documents for your
7  attention?  Is that how it works?
8      A.    From time to time they would do
9  that.  And also in my report I have a zip
10  file, which is a compressed data file that's
11  probably more than 1 gigabyte, which links to
12  the exact documents that I rely on in my
13  report.
14          So, for instance, if I make a
15  comment and I want to refresh my memory, look
16  at what the underlying document is, I can
17  click on that link in my report, it takes me
18  to the underlying document and I can look at
19  the entire document so I can understand where
20  my particular statement in the report sits
21  and fits into the overall context of the
22  underlying document.
23      Q.    So you have an electronic
24  version that's hyperlinked, basically, is

Page 159

1  that what you're saying?
2      A.    To -- not to the entire
3  materials considered, but to the things that
4  are cited in the report.
5      Q.    Okay.  So if something is cited
6  in the report, you can click on it, and then
7  it pulls up the actual document, is that what
8  you're saying?
9      A.    That's correct.
10      Q.    How about deposition
11  transcripts, did you personally review any
12  deposition transcripts?
13      A.    I did.
14      Q.    Do you know which ones?
15      A.    I can look at them in the
16  report, but, in particular, Section 4
17  outlines a lot of deposition transcripts from
18  various Rite Aid employees, DEA employees,
19  Maryland State Board of Pharmacy documents.
20  So those are the places in the report where I
21  rely most heavily on deposition testimony.
22      Q.    Looking at Exhibit 7, the first
23  page, it's got depositions.  Can you tell me
24  which depositions that you personally

Page 160

1  reviewed?
2      A.    Sure.  I can estimate.  If we
3  want to do it in a thorough way, we'd have to
4  spend quite a bit of time with the report,
5  but Debra Chase, Keith Frost, Larry Ringgold,
6  Marian Wood, Janet Getzey Hart, Kyle Wright,
7  Thomas Prevoznik, Joseph Rannazzisi, Matthew
8  Perri.  These are the ones that are
9  immediately coming to mind -- to my mind.
10      Q.    Did you read those cover to
11  cover?
12      A.    I did not read each one of
13  these depositions cover to cover, but I read
14  the portions that are relevant to my opinion,
15  because these are broad -- many of these are
16  broad fact depositions, and I read the
17  portions that are critical to my opinion.
18      Q.    How did you determine which
19  portions were relevant to your opinion?
20      A.    I directed my team to read
21  through the reports, in this case the
22  depositions, and asked them to identify the
23  places in the report where arguments or facts
24  were being stated that were critical to my

Page 161

1  understanding of what are the structures and
2  processes that Rite Aid has in place to
3  prevent diversion of opioids.
4      Q.    Go to Page C-4.  Let me know
5  when you're there.
6      A.    I'm there.
7      Q.    Okay.  See the section "Other
8  Court Documents"?
9      A.    Yes.
10      Q.    It's got -- the first two items
11  are legal citations.  Do you know what those
12  are?
13      A.    I believe one of them refers to
14  the Controlled Substances Act.  I'd have to
15  flip through my report for the other one.
16          Unfortunately, I'm not a legal
17  scholar, so I don't even know what that
18  little squiggly sign means.
19      Q.    Did you read the first one in
20  its entirety?
21      A.    So I believe that that refers
22  to portions of the Controlled Substances Act.
23  I haven't read the document in its entirety,
24  but I did read the portions that are relevant

Page 162

1  to my report.
2      Q.    Okay.
3      A.    And I'm also not a legal
4  scholar, so my ability to interpret it in a
5  legal way would be, not just limited, it
6  would be zero.
7      Q.    Okay.  And then my question is
8  how do you -- how did you determine which
9  portions were relevant to your report?
10     A.    It's very clear, actually,
11  because I wanted to look at two things.  One
12  is what does the Act state with respect to
13  the level of effective control that a
14  distributor should have under the CSA; and
15  then, secondly, what should be the
16  expectations required to the monitoring and
17  evaluation of orders that might be of
18  potentially unusual size or frequency or
19  pattern.
20     Q.    Okay.  How specifically did you
21  determine which sections were relevant to
22  that?
23     A.    Those sections are pretty
24  straightforward.  This is a case -- or at

Page 163

1  least my assignment was to look at whether or
2  not Rite Aid as a distributor -- or one of
3  the portions of my assignment was to look at
4  whether Rite Aid as a distributor had an
5  effective program for anti-diversion, one
6  component of which would be a suspicious
7  ordering monitoring program.  The language in
8  the CSA simply states that that is something
9  that registrants should do.
10         So the portion of my report
11  that relies to it is only this point right
12  here, which is to say there's a regulatory
13  policy that organizations should be doing
14  this.
15         In my particular assignment, I
16  was asked to evaluate how was Rite Aid doing
17  it in this regard, along with other things in
18  the assignment.
19     Q.    Okay.  How about the second
20  document listed in Other Court Documents, do
21  you see that?
22     A.    I do.
23     Q.    Okay.  Do you know what that
24  is?

Page 164

1      A.    I don't know if that's a
2  portion of the CSA or not.  Again, I'm not a
3  legal scholar, so this documentation is a
4  little bit foreign to me.
5          I point you to Page 3 of my
6  report where I rely on this, and I say that
7  this -- this law was requiring that
8  distributors, quote/unquote, provide
9  effective controls and procedures to guard
10  against theft and diversion of controlled
11  substances.
12         My only point here is to say
13  that there appears to be -- I'm not a lawyer,
14  but there appears to be law about what
15  distributors should be doing in terms of
16  effective control and procedures to prevent
17  diversion, not just of opioids but of
18  controlled substances.
19     Q.    These other two documents, the
20  third one, do you know what that is?
21     A.    So this looks like -- I'm just
22  going to read it here, and then I'll describe
23  my understanding.  The Second Supplemental
24  Objectives (sic) and Answers to Plaintiffs'

Page 165

1  First Set of Interrogatories.  My -- again,
2  I'm not a legal scholar.  My understanding of
3  this document, the way I relied on it is it
4  provides a summary as well as answers by
5  counsel representing Rite Aid which includes
6  direct material from -- I'm going to use the
7  word fact experts, not knowing better words,
8  from Rite Aid to describe various things that
9  it had in place.
10         So, for instance, in my own
11  report, primarily in Section 4 of the report,
12  I refer to specific Rite Aid employees who
13  describe what are the processes that were in
14  place.  And a lot of that information is in
15  this Second Supplemental Objections and
16  Answers, for example, an auto-replenishment
17  system, thresholds for distributing opioids,
18  if you exceed it then you don't get the
19  opioids, the system of putting opioids and
20  other controlled substances in locked cages,
21  etcetera.
22     Q.    How about the last item, do you
23  know what that is?
24     A.    This one I don't recall.

Page 166

1    (Whereupon, Jena Exhibit
2    Number 8 was marked for
3    identification.)
4    BY MR. PIFKO:
5    Q.    Handing you what's marked as
6    Exhibit 8.
7    A.    Thanks.
8    Q.    Take a moment to review that,
9    and let me know when you're done.
10    A.    I reviewed it.
11    Q.    All right.  Do you know what
12    that is?
13    A.    This is my CV.
14    Q.    Is this complete and accurate?
15    A.    Yes, it is.
16    Q.    Is it accurate as of today's
17    date?
18    A.    Yes, it is.
19    Q.    Is there any other work that
20    you have that you're engaged in that you need
21    to add to it?
22    A.    No.
23    Q.    Okay.  We request that if you
24    do other updates to your CV, please provide

Page 167

1    to counsel an updated copy, okay?
2    MS. MCENROE:  Objection.  We
3    will take that request under
4    advisement and supplement our
5    disclosures as obligated under the
6    rules from time to time.
7    BY MR. PIFKO:
8    Q.    Do you have different versions
9    of your CV for different types of work?
10    A.    No.
11    Q.    Like some people have one --
12    maybe like if you were seeking another
13    academic position, maybe you'd have one
14    version, versus if you're doing consulting
15    work you have another version.
16    A.    No.  This is my only CV.
17    Q.    Okay.
18    (Whereupon, Jena Exhibit
19    Number 9 was marked for
20    identification.)
21    BY MR. PIFKO:
22    Q.    Handing you what's marked as
23    Exhibit 9.
24    A.    Thank you.

Page 168

1    Q.    Take a moment to review
2    Exhibit 9.  Let me know when you're done.
3    A.    I'm done.
4    Q.    Exhibit 9 is another document
5    that was provided to me yesterday.  Can you
6    tell me what Exhibit 9 is?
7    A.    Sure.  Exhibit 9, Page 1 says
8    "Dr. Anupam Bapu Jena Professional Fees"
9    received.
10    So these hours and amount paid
11    reflect what we went through earlier with
12    respect to the invoices.  This is the direct
13    payments that I received from Analysis Group
14    for the National Prescription Opioid
15    Litigation with Rite Aid for my professional
16    fees.
17    Q.    The second page, do you know
18    what that reflects?
19    A.    Yes.  The second page refers to
20    something called attribution, so this is all
21    of the billings from Analysis Group to -- for
22    Rite Aid work that's exclusive of my
23    professional billing, that's not included
24    here, that's separate billing.  So this is

Page 169

1    the work of the various names that you saw on
2    the invoices that we talked about earlier.
3    This is the billings to Rite Aid from
4    Analysis Group.
5    Q.    Do you know what all these
6    columns represent?
7    A.    Yes, I do.
8    Q.    Okay.  What does the "AG
9    Eligible Prof Fees" column represents?
10    A.    So I believe that stands for
11    Analysis Group eligible professional fees.
12    So these would be the fees representing the
13    hours worked and the hourly rate of all of
14    the people that you saw on those invoices,
15    excluding me.
16    Q.    Okay.  So that -- that was
17    going to be one of my questions.
18    So that doesn't include the
19    numbers that are on Page 1 of Exhibit 9?
20    A.    That's correct.  Those are
21    separate.
22    Q.    And then this only goes through
23    April, 2019, correct?
24    A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  Q.   So if we look back at
2  Exhibit 3, we can see that -- go to the last
3  bundle of Exhibit 3, which is dated May 21,
4  2019.  Let me know when you're there.
5  A.   Yes, I see that.

19 BY MR. PIFKO:
20 Q.   Do you know anything about the
21 number of hours or dollar amounts billed by
22 Analysis Group in May?
23 A.   I do not know what they billed
24 in May.

Page 171

1  Q.   How about in June leading up to
2  the deposition?
3  A.   In the last four days, no, I
4  don't know.
5      (Whereupon, Jena Exhibit
6      Number 10 was marked for
7      identification.)
8  BY MR. PIFKO:
9  Q.   Handing you what's marked as
10 Exhibit 10.  Take a minute to review that,
11 and let me know when you're done.
12     (Witness reviewing document.)
13 A.   Okay.  I reviewed it.
14 Q.   Okay.  Have you seen this
15 before?
16 A.   I saw this just before I came
17 into this room around 11:00 a.m.
18 Q.   Okay.  If you look to the last
19 page of Exhibit 10, there's some categories
20 of materials.
21     Do you see there?
22 A.   The last page, yes, I see three
23 bullet points.
24 Q.   Looking closely at those, have

Page 172

1  you provided all those materials to counsel?
2  A.   Yep.  Yes.  So all documents
3  that I've reviewed since the date of my
4  report, which is no other documents.
5      Itemization of hours spent,
6  compensation paid, including all invoices,
7  all of the invoices that I've submitted to
8  Analysis Group, which is how I submit my
9  invoices, have been submitted.
10 And the CV that you just
11 presented me is the most current CV, and it's
12 my only CV.

Page 173

17 Q.   Is there anything, to your
18 knowledge, inaccurate in your report?
19 A.   No.
20 Q.   We talked about testimony.
21 Have you ever -- aside from the -- like a
22 lawsuit, have you ever testified before a
23 government body?
24 A.   I have never testified before a



Page 174

1 government body, no.
2 Q. Have you ever testified before
3 a grand jury proceeding?
4 A. No.
5 Q. Have you ever provided
6 testimony to the FDA?
7 A. Not to the FDA, no.
8 Q. Maybe less formal than
9 testimony, any statements or anything like
10 that?
11 A. No, no written statements to
12 the FDA.
13 Q. How about oral?
14 A. No oral statements, no.
15 Q. Okay. Have you ever done any
16 advertising for your expert work?
17 A. Advertising, no.
18 Q. How about any advertising for
19 consulting work?
20 A. No.
21 Q. When you were interacting with
22 counsel on this matter, did they provide you
23 with any assumptions to consider in
24 connection with your opinion?

Page 175

1 A. No.
2 Q. Did they provide you with any
3 facts?
4 A. Can you clarify? What do you
5 mean by "facts"?
6 Q. Did they communicate anything
7 to you that they told you was a fact that you
8 should be aware of in connection with the
9 case?
10 A. The only facts that I rely on
11 in my report are the ones that my team
12 identified from the record in the matter.
13 Q. Okay. How about any data, did
14 counsel provide you with any data that you
15 used in forming your opinions?
16 A. No. The only -- the data that
17 we used is the ARCOS data.
18 Q. Were there any other databases
19 that your -- you or your team examined in
20 forming your report beside the ARCOS data?
21 A. No, just the ARCOS data. I
22 mean, I rely on publicly available documents
23 and studies, but those aren't databases,
24 those are studies.

Page 176

1 MR. PIFKO: We can go off the
2 record. I think I'm almost done here.
3 MS. MCENROE: Take a little
4 break.
5 THE VIDEOGRAPHER: The time is
6 2:44 p.m. We're off the record.
7 (Whereupon, a recess was
8 taken.)
9 THE VIDEOGRAPHER: The time is
10 2:49 p.m. We're on the record.
11 BY MR. PIFKO:
12 Q. Just one other question.
13 Do you understand yourself to
14 be only retained for the current bellwether
15 case track, or all opioid cases for Rite Aid?
16 MS. MCENROE: Objection to
17 form.
18 A. My understanding is I've been
19 retained for this particular case.
20 BY MR. PIFKO:
21 Q. Okay. Just the Cuyahoga and
22 Summit County cases?
23 A. Yes.
24 MR. PIFKO: Okay. So subject

Page 177

1 to any recross I may have based on
2 questions from other people, I don't
3 have any other further questions at
4 this time.
5 MS. MCENROE: I have just a
6 very few brief questions.
7 EXAMINATION
8 BY MS. MCENROE:
9 Q. Dr. Jena, nice to see you. As
10 you know, my name is Elisa McEnroe, counsel
11 for Rite Aid.
12 You testified just a minute ago
13 regarding the data that was considered in the
14 forming of your opinions.
15 Do you remember those lines of
16 questioning?
17 A. Yes.
18 Q. And you referred exclusively to
19 ARCOS data. Do you have any additions or
20 corrections to that response?
21 A. Yeah, I should be more clear.
22 I used the ARCOS data for the analysis of
23 Dr. McCann's methodology, suspicious order or
24 flag methodology, and I used Rite Aid

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  distribution data for the falsification test
2  that we spoke about earlier looking at
3  levothyroxine, metoprolol succinate, and the
4  other falsification drugs.
5      Q.    As is reflected in Appendix E
6  of your report that we were looking at
7  earlier?
8      A.    That is correct.
9      Q.    And a little bit earlier this
10  afternoon you were discussing certain of
11  plaintiffs' experts who you know
12  professionally.
13          Do you remember that?
14      A.    Yes.
15      Q.    And you referred to certain of
16  them and their being economists.
17          Do you remember that?
18      A.    Yes.
19      Q.    Are you adopting any of their
20  opinions in this case?
21      A.    No, I'm not.
22          MS. MCENROE:  I have no further
23  questions.
24          MR. PIFKO:  All right.  I don't

Page 179

1  have anything else.
2          MS. MCENROE:  Anybody else?
3          MR. GEISE:  No questions.
4          MS. MCENROE:  On the phone?
5          Great, then that concludes
6  Dr. Jena's deposition.  Thank you.
7          THE VIDEOGRAPHER:  The time is
8  2:51 p.m.  This deposition has
9  concluded, and we are off the record.
10          (Whereupon, the deposition was
11  concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 180

1  COMMONWEALTH OF MASSACHUSETTS )
2  SUFFOLK, SS.              )
3          I, MAUREEN O'CONNOR POLLARD, RDR,
4  RSA, and Notary Public in and for the
5  Commonwealth of Massachusetts, do certify
6  that on the 6th day of June, 2019, at 11:09
7  o'clock, the person above-named was duly
8  sworn to testify to the truth of their
9  knowledge, and examined, and such examination
10  reduced to typewriting under my direction,
11  and is a true record of the testimony given
12  by the witness.  I further certify that I am
13  neither attorney, related or employed by any
14  of the parties to this action, and that I am
15  not a relative or employee of any attorney
16  employed by the parties hereto, or
17  financially interested in the action.
18          In witness whereof, I have
19  hereunto set my hand this 6th day of June,
20  2019.
21  _____
22  MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
23  CSR #149108
24

Page 181

1          INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the errata
9  sheet and date it.  It will be attached to
10  your deposition.
11      It is imperative that you return the
12  original errata sheet to the deposing
13  attorney within thirty (30) days of receipt
14  of the deposition transcript by you.  If you
15  fail to do so, the deposition transcript may
16  be deemed to be accurate and may be used in
17  court.
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 182

```
1        - - - - - -
           E R R A T A
2        - - - - - -
3  PAGE LINE CHANGE
4  ____ ____ _____
5    REASON: _____
6  ____ ____ _____
7    REASON: _____
8  ____ ____ _____
9    REASON: _____
10 ____ ____ _____
11   REASON: _____
12 ____ ____ _____
13   REASON: _____
14 ____ ____ _____
15   REASON: _____
16 ____ ____ _____
17   REASON: _____
18 ____ ____ _____
19   REASON: _____
20 ____ ____ _____
21   REASON: _____
22 ____ ____ _____
23
24
```

Page 184

```
1     LAWYER'S NOTES
2  PAGE LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
```

Page 183

```
1
2      ACKNOWLEDGMENT OF DEPONENT
3
4    I,_____, do
     Hereby certify that I have read the foregoing
5    pages, and that the same is a correct
     transcription of the answers given by me to
6    the questions therein propounded, except for
     the corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.
8
9

10  _____
    WITNESS NAME          DATE
11
12
13
14
15
16
    Subscribed and sworn
17  To before me this
    _____ day of _____, 20____.
18
    My commission expires: _____
19
20  _____
    Notary Public
21
22
23
24
```