Page 1

1             UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF OHIO
3                 EASTERN DIVISION
4             ~~~~~~~~~~~~~~~~~~~~~
5
6   IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
    OPIATE LITIGATION
7                                   Case No.
                                    17-md-2804
8
                                    Judge Dan Aaron
9                                   Polster
10  This document relates to:
11  The County of Summit, Ohio, et al. v. Purdue
    Pharma L.P., et al., Case No. 18-OP-45090
12
13             ~~~~~~~~~~~~~~~~~~~~~
14
15
16             Videotaped Deposition of
17             GRETA JOHNSON, 30(b)(6)
18
                   January 15, 2019
19                   8:30 a.m.
20
                   Taken at:
21
             Sheraton Suites Akron
22        1989 Front Street - Portage Room
               Cuyahoga Falls, Ohio
23
24
25             Stephen J. DeBacco, RPR

Page 2

1  APPEARANCES:
2
          On behalf of the City of Akron, Summit
3     County, and the Witness:
4        Motley Rice LLC, by
            ANNE MCGINNESS KEARSE, ESQ.
5        JODI WESTBROOK FLOWERS, ESQ.
            ANNIE E. KOUBA, ESQ.
6        DANIELLE M. SALERNO, ESQ.
            28 Bridgeside Boulevard
7        Mt. Pleasant, South Carolina 29464
            (843) 216-9140
8        akearse@motleyrice.com
            (843) 216-9163
9        jflowers@motleyrice.com
            (843) 216-9225
10        akouba@motleyrice.com
            (843) 216-9461
11        dsalerno@motleyrice.com
12
          On behalf of Walmart, Inc.:
13
          Jones Day, by
14        CHRISTOPHER M. LOMAX, ESQ.
            Brickell World Plaza
15        600 Brickell Avenue, Suite 3300
            Miami, Florida 33131
16        (305) 714-9719
            clomax@jonesday.com
17
18     On behalf of Cardinal Health:
19        Williams & Connolly LLP, by
            WILL F. HAWKINS, ESQ.
20        725 Twelfth Street Northwest
            Washington, D.C. 20005
21        (202) 434-5172
            whawkins@wc.com
22
               ~ ~ ~ ~ ~
23
24
25

Page 3

1  APPEARANCES, Continued:
2
          On behalf of Johnson & Johnson and
3     Janssen Pharmaceuticals, Inc.:
4        Tucker Ellis, LLP, by
            ZACHARY J. ADAMS, ESQ.
5        950 North Main Avenue, Suite 1100
            Cleveland, Ohio 44113-7213
6        (216) 696-5474
            zachary.adams@tuckerellis.com
7
8     On behalf of Rite Aid:
9        Morgan, Lewis & Bockius LLP, by
            SCOTT T. SCHUTTE, ESQ.
10        77 West Wacker Drive
            Chicago, Illinois 60601-5094
11        (312) 324-1773
            scott.schutte@morganlewis.com
12
13     On behalf of Cephalon, Inc.; Teva
          Pharmaceuticals USA, Inc.; Actavis, LLC;
14     Actavis Pharma, Inc. f/k/a Watson Pharma,
          Inc.; and Watson Laboratories, Inc.:
15
          Morgan, Lewis & Bockius LLP, by
16        WENDY WEST FEINSTEIN, ESQ.
            One Oxford Centre, 32nd Floor
17        Pittsburgh, Pennsylvania 15219-6401
            (412) 560-7455
18        wendy.feinstein@morganlewis.com
19             ~ ~ ~ ~ ~
20
21
22
23
24
25

Page 4

1  APPEARANCES, Continued:
2
          On behalf of McKesson Corporation:
3
          Covington & Burling LLP, by
4        SONYA D. WINNER, ESQ.
            One Front Street
5        San Francisco, California 94111-5356
            (415) 591-7072
6        swinner@cov.com
          Covington & Burling LLP, by
7        STEPHEN F. RAIOLA, ESQ.
8        One CityCenter
            850 Tenth Street Northwest
9        Washington D.C., 20001-4956
            (202) 662-5786
10        sraiola@cov.com
11
          On behalf of Endo Health Solutions, Inc.,
12     and Endo Pharmaceuticals, Inc., via
          telephone:
13
          Baker Hostetler, by
14        CAROLE S. RENDON, ESQ.
            TERA N. COLEMAN, ESQ.
15        Key Tower
            127 Public Square, Suite 2000
16        Cleveland, Ohio 44114-1214
            (216) 861-7420
17        crendon@bakerlaw.com
            (216) 861-7582
18        tcoleman@bakerlaw.com
19
          On behalf of AmerisourceBergen Drug
20     Corporation, via telephone:
21        Jackson Kelly PLLC, by
            JAMES D. JOHNSON, ESQ.
22        221 Northwest Fifth Street
            Evansville, Indiana 47708
23        (812) 422-9444
            jdjohnson@jacksonkelly.com
24
               ~ ~ ~ ~ ~
25

Page 5

1  APPEARANCES, Continued:
2
3        On behalf of Cephalon, Inc.; Teva
          Pharmaceuticals USA, Inc.; Actavis, LLC;
          Actavis Pharma, Inc. f/k/a Watson Pharma,
4        Inc.; and Watson Laboratories, Inc., via
          telephone:
5
6        Morgan, Lewis & Bockius LLP, by
            LATIERA RAYFORD, ESQ.
          77 West Wacker Drive
7        Chicago, Illinois 60601-5094
            (312) 324-1481
8        latiera.rayford@morganlewis.com
9
10  ALSO PRESENT:
11        Randy Andrews, Legal Videographer
12             ~ ~ ~ ~ ~
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1        TRANSCRIPT INDEX

2

3  APPEARANCES............................. 2

4

5  INDEX OF EXHIBITS ...................... 7

6

7  EXAMINATION OF GRETA JOHNSON

8  By Ms. Winner........................... 17

9  By Ms. Feinstein........................ 266

10  By Mr. Schutte.......................... 398

11

12  REPORTER'S CERTIFICATE.................. 458

13

14  EXHIBIT CUSTODY

15  EXHIBITS RETAINED BY THE COURT REPORTER

16

17

18

19

20

21

22

23

24

25

Page 7

1       INDEX OF EXHIBITS
2  NUMBER    DESCRIPTION     MARKED
3  Exhibit 1  Second Amended Notice of ..... 22
      Videotaped 30(b)(6)
4      Deposition of the County of
      Summit
5  Exhibit 2  Document Titled, "Drug ....... 47
6      Thread Assessment, Summit
      County, Ohio,"
7      SUMMIT_000023567 to
      000023648
8
      Exhibit 3  Document Titled "Ohio Office . 61
9      of Criminal Justice Services
      2016 Semi-Annual Performance
10      Report," SUMMIT000020314 to
      000020323
11
      Exhibit 4  10/6/2014 E-Mail Chain Re: ... 67
12      2015 National Drug Threat
      Survey, with Attachments,
13      SUMMIT_000072535 to
      000072541
14
      Exhibit 5  1/25/2006 Media Release, ..... 88
15      "Heroin Users Face
      Potentially Fatal
16      Ingredient,"
      SUMMIT_000350711 to
17      000350712
18  Exhibit 6  Summit County and City of .... 118
      Akron, Ohio Plaintiff's
19      Supplemental Responses and
      Objections to Distributor
20      Defendants' Interrogatory
      Number 3 As Rewritten by
21      Special Master David Cohen
22  Exhibit 7  Summit County and City of .... 128
      Akron, Ohio Plaintiff's
23      First Amended Responses and
      Objections to Distributor
24      Defendants' Third Set of
      Interrogatories
25

Page 8

1  Exhibit 8  Summit County and City of .... 136
      Akron, Ohio Plaintiff First
2      Amended Responses and
      Objections to Distributor
3      Defendants' First Set of
      Interrogatories
4
      Exhibit 9  12/12/2018 Letter from Atty .. 182
5      Anne Kearse to Atty Sara
      Roitman
6
      Exhibit 10  Summit County and the City ... 263
7      of Akron, Ohio's Amended
      Responses and Objections to
8      the Manufacturer Defendants'
      First Set of Interrogatories
9      and the National Retail
      Pharmacy Defendants' First
10      Set of Interrogatories Re:
      30(b)(6) Topics
11
      Exhibit 11  Plaintiffs The City of ....... 264
12      Cleveland, County of
      Cuyahoga, County of Summit
13      and City of Akron's
      Supplemental Amended
14      Responses and
      Objections to the
15      Manufacturer Defendant's
      First Set of
16      Interrogatories, Submitted
      Pursuant to Discovery Ruling
17      No. 13
18  Exhibit 12  Spreadsheet Titled ........... 264
19      "Confidential Protected
      Health Information -
20      Produced Under a Protective
      Order - Attorneys' Eyes Only
21  Exhibit 13  Spreadsheet Titled ........... 265
22      "Confidential Protected
      Health Information -
23      Produced Under a Protective
      Order - Attorneys' Eyes Only
24
25

Page 9

1  Exhibit 14  1/8/2019 Letter from Atty .... 265
      Linda Singer to Special
2      Master David Cohen Re:
      Plaintiffs' Response to
3      Manufacturer Defendants'
      Renewed Motion to Compel
4      Immediate and Full
      Compliance with Discovery
5      Ruling Nos. 5 and 13
6  Exhibit 15  Spreadsheet Titled ........... 265
      "Confidential Protected
7      Health Information -
      Produced Under a Protective
8      Order - Attorneys' Eyes Only
9  Exhibit 16  Spreadsheet Titled ........... 266
      "Confidential Protected
10      Health Information"
11  Exhibit 17  Document Listing Names and ... 266
      Dates of Summit County
12      Overdose Deaths
13  Exhibit 18  10/1/2010 Document Titled .... 378
      "Ohio Prescription Drug
14      Abuse Task Force: Final
      Report Task Force
15      Recommendations
16  Exhibit 19  Document Titled "Joint ....... 385
      Commission on Accreditation
17      of Healthcare Organizations
      Pain Standards for 2001,"
18      PPLPC019001392359 to
      019001392374
19
20
21
22
23
24
25

Page 10

INDEX OF VIDEO OBJECTION

| OBJECT | PAGE |
|--------|------|
| objection | 36 |
| objection | 40 |
| object | 41 |
| object | 49 |
| object | 56 |
| object | 59 |
| object | 71 |
| object | 72 |
| object | 77 |
| object | 78 |
| object | 79 |
| object | 80 |
| object | 80 |
| object | 81 |
| object | 81 |
| object | 84 |
| object | 87 |
| object | 92 |
| object | 92 |
| object | 92 |
| object | 94 |
| object | 95 |
| object | 97 |
| object | 98 |
| object | 104 |
| object | 105 |
| object | 106 |
| object | 106 |
| object | 107 |
| object | 108 |
| object | 109 |
| object | 109 |
| object | 110 |
| object | 111 |
| object | 112 |
| object | 112 |
| object | 114 |
| object | 116 |
| object | 121 |
| object | 121 |
| object | 122 |
| object | 123 |
| object | 124 |
| object | 127 |
| objection | 133 |

Page 11

| object | 138 |
|--------|------|
| object | 139 |
| object | 141 |
| object | 143 |
| object | 145 |
| object | 155 |
| object | 157 |
| object | 158 |
| object | 160 |
| object | 171 |
| object | 173 |
| object | 174 |
| object | 175 |
| object | 176 |
| object | 178 |
| object | 180 |
| object | 184 |
| objection | 186 |
| object | 189 |
| Objection | 205 |
| objection | 205 |
| object | 206 |
| object | 208 |
| object | 210 |
| object | 224 |
| object | 225 |
| object | 235 |
| object | 236 |
| object | 242 |
| objection | 248 |
| object | 249 |
| object | 252 |
| object | 254 |
| object | 256 |
| object | 261 |
| object | 261 |
| object | 271 |
| objection | 274 |
| object | 276 |
| object | 279 |
| object | 279 |
| objection | 281 |
| objection | 281 |
| object | 282 |
| object | 285 |
| objection | 296 |
| object | 299 |
| object | 300 |
| objection | 300 |

Page 12

| objection | 301 |
|-----------|-----|
| objection | 302 |
| object | 303 |
| object | 304 |
| object | 304 |
| object | 304 |
| object | 305 |
| object | 306 |
| Objection | 307 |
| object | 309 |
| objection | 312 |
| object | 318 |
| object | 318 |
| object | 320 |
| object | 321 |
| object | 321 |
| objection | 325 |
| object | 325 |
| objection | 325 |
| object | 326 |
| objection | 327 |
| object | 328 |
| objection | 329 |
| objection | 330 |
| object | 332 |
| object | 337 |
| object | 340 |
| objection | 342 |
| objection | 343 |
| object | 351 |
| object | 357 |
| object | 358 |
| objection | 360 |
| object | 362 |
| object | 363 |
| object | 364 |
| object | 365 |
| object | 367 |
| object | 368 |
| object | 374 |
| object | 376 |
| object | 382 |
| object | 390 |
| object | 392 |
| object | 395 |
| objection | 396 |
| objection | 399 |
| object | 400 |
| object | 401 |

Page 13

| object | 402 |
|--------|------|
| object | 402 |
| object | 405 |
| object | 406 |
| objection | 419 |
| misstates her testimony | 420 |
| objection | 421 |
| objection | 425 |
| objection | 426 |
| objection | 426 |
| object | 429 |
| object | 429 |
| object | 430 |
| object | 432 |
| object | 435 |
| object | 439 |
| object | 440 |
| objection | 441 |
| object | 441 |
| object | 443 |
| object | 444 |
| object | 449 |
| object | 450 |
| object | 451 |
| object | 453 |

4 (Pages 10 - 13)

Page 14

1     THE VIDEOGRAPHER:  We're now on the
2  record.
3         Please note that the microphones
4  are sensitive and may pick up whispering and
5  private conversations.
6         Please turn off all cell phones or
7  place them away from microphones as they can
8  interfere with the deposition audio.
9         Recording will continue until all
10  parties agree to go off the record.
11        My name is Randy Andrews,
12  representing Veritext.
13        The date today is January 15, 2019.
14  The time is approximately 8:30 a.m.
15        This deposition is being held at
16  the Sheraton Suites located at 1989 Front
17  Street in Cuyahoga Falls, Ohio, and is being
18  taken by counsel for the Defendants.
19        The caption of this case is in re:
20  to the National Prescription Opiate Litigation.
21  This case is being held in the U.S. District
22  Court, Northern District of Ohio, Eastern
23  Division, Case No. 17-md-2804.
24        The name of the witness is Greta
25  Johnson.

Page 15

1         At this time, the attorneys present
2  in the room and everyone attending remotely
3  will identify themselves and the parties they
4  represent.
5         MS. KEARSE:  Anne Kearse with
6  Motley Rice on behalf of the County of Summit,
7  City of Akron, and Greta Johnson.
8         MS. FLOWERS:  Good morning.  It's
9  Jodi Flowers from Motley Rice on behalf of the
10  witness, the County of Summit, and the City of
11  Akron.
12        MS. KOUBA:  Annie Kouba from Motley
13  Rice on behalf of the County of Summit, City of
14  Akron, and the witness.
15        MS. SALERNO:  Danielle Salerno with
16  Motley Rice on behalf of City of Akron, Summit
17  County, and Greta Johnson.
18        MR. LOMAX:  Christopher Lomax with
19  Jones Day on behalf of Walmart.
20        MR. HAWKINS:  Will Hawkins of
21  Williams & Connolly on behalf of Cardinal
22  Health.
23        MR. ADAMS:  Zach Adams on behalf of
24  Tucker Ellis -- or here from Tucker Ellis -- on
25  behalf of J&J and Janssen Pharmaceutical.

Page 16

1         MR. SCHUTTE:  Scott Schutte from
2  Morgan Lewis on behalf of Rite Aid.
3         MS. FEINSTEIN:  Wendy West
4  Feinstein from Morgan Lewis on behalf of the
5  Teva Defendants.
6         MR. RAIOLA:  Stephen Raiola with
7  Covington & Burling on behalf of McKesson.
8         MS. WINNER:  Sonya Winner from
9  Covington & Burling on behalf of McKesson.
10        And on the phone?
11        MR. JOHNSON:  Jim Johnson --
12        MS. RENDON:  Good morning.
13        MR. JOHNSON:  I'm sorry.  Jim
14  Johnson on behalf of A -- ABDC.
15        MS. RENDON:  Good morning.  Carole
16  Rendon from Baker and Hostetler on behalf of
17  the Endo Defendants.
18        MS. WINNER:  Is there anyone else
19  on the phone?  Okay.
20        THE VIDEOGRAPHER:  Our court
21  reporter, Stephen DeBacco, representing
22  Veritext, will swear in the witness, and we can
23  proceed.
24        GRETA JOHNSON, of lawful age, called for
25  examination as provided by the Federal Rules of

Page 17

1  Civil Procedure, being by me first duly sworn,
2  as hereinafter certified, deposed and said as
3  follows:
4         EXAMINATION OF GRETA JOHNSON
5  BY MS. WINNER:
6     Q.   Good morning.
7     A.   Good morning.
8     Q.   Could you give us your name?  Your
9  full name and your address, please?
10    A.   Greta Johnson, 4488 Regal Drive,
11  Copley, Ohio 44321.
12    Q.   And where are you currently
13  employed?
14    A.   With the Summit County Executive's
15  Office.
16    Q.   And what is your position there?
17    A.   Assistant chief of staff and public
18  information officer.
19    Q.   Now, you're a lawyer; is that
20  right?
21    A.   Yes.
22    Q.   Have you ever had your deposition
23  taken before?
24    A.   I have not had my deposition taken.
25    Q.   Have you ever taken a deposition?

5 (Pages 14 - 17)

Page 18

1     A.   I have not.
2     Q.   Okay.  But you -- I understand -- I
3  assume you know the basic ground rules of --
4     A.   Yes.
5     Q.   -- what we're doing here today?
6     A.   Yes.
7     Q.   Okay.  I'm not going to go through
8  the whole song and dance, because I assume that
9  you know what's going on, but if you have a
10  question, feel free to speak up.
11     A.   I will.  Thank you.
12     Q.   The one thing I will say to you is
13  that I'm going to try to make my questions
14  understandable, but if I fail in that and
15  you -- you have a problem with one of my
16  questions, you think you don't understand it,
17  please speak up.
18     A.   Sure.
19     Q.   Because otherwise I'm going to
20  assume that you think -- at least you think you
21  know you understand the question and you're
22  trying to answer it.
23     A.   Okay.
24     Q.   And your lawyer may object at some
25  point to some of my questions.  If they object,

Page 19

1  you're still allowed to answer unless they
2  affirmatively instruct you not to.
3        Do you understand that?
4     A.   Yes.
5     Q.   Okay.  Have you ever testified at
6  all --
7     A.   Yes.
8     Q.   -- under oath?
9        In what situations have you
10  testified?
11     A.   I've testified in grand jury
12  proceedings, in criminal trial, in a civil
13  injunction hearing, and multiple times in the
14  state House and senate committees here in Ohio.
15     Q.   And you're a former legislator; is
16  that correct?
17     A.   It is.
18     Q.   How long were you in the
19  legislature?
20     A.   Just I served one full term and
21  then about four months of my second term.
22     Q.   And why did you leave the
23  legislature?
24     A.   The executive offered me a job, and
25  it was a good opportunity to transition from

Page 20

1  that life to where I am now.
2     Q.   Was there any other reason why you
3  made the switch?
4     A.   It's a term-limited position, so
5  spending eight years in the deepest minority
6  the state's ever seen didn't really have a lot
7  of job prospects at the end of it, so it was a
8  really good opportunity for me.
9     Q.   And I take it you're a Democrat?
10     A.   Yes.
11     Q.   Now, before you were a legislator,
12  you were a prosecutor; is that right?
13     A.   Yes.
14     Q.   And how many years were you a
15  prosecutor?
16     A.   I was in the Mahoning County
17  Prosecutor's Office about six months right out
18  of -- right just fresh from the bar exam.
19        I spent about seven and a half
20  years with the Summit County Prosecutor's
21  Office, and then about two and a half years
22  with the City of Akron Prosecutor's Office.  So
23  just over a decade as a prosecutor.
24     Q.   And what kinds of cases did you
25  prosecute?

Page 21

1     A.   Everything from a traffic violation
2  with the City of Akron to death penalty cases
3  with the Summit County Common Pleas, yes.
4     Q.   Did you prosecute any drug cases?
5     A.   Yes.
6     Q.   What kinds?
7     A.   All kinds.  Possession,
8  trafficking, deception to obtain dangerous
9  drugs, corruption of another with drugs.  I
10  think it's fair to say any of the drug offenses
11  in the Ohio Revised Code I have prosecuted.
12     Q.   Now, when you -- you said earlier
13  that you testified in grand jury proceedings.
14  Was that during the time when you were a
15  prosecutor?
16     A.   Yes.
17     Q.   And you said you've testified in a
18  civil injunction hearing.  What was the subject
19  matter of that?
20     A.   It was when I was in the
21  legislature.  It was a matter regarding the
22  Youngstown city public schools and sort of the
23  State takeover of -- of that school system.
24     Q.   Have you testified previously in
25  any case involving drugs?

6 (Pages 18 - 21)

Page 22

1    A.   No.
2         MS. WINNER:  I'd like to mark as
3  Exhibit 1 document entitled Second Amended
4  Notice of Videotaped Deposition.
5         - - - - -
6         (Thereupon, Deposition Exhibit 1,
7         Second Amended Notice of Videotaped
8         30(b)(6) Deposition of the County of
9         Summit, was marked for purposes of
10        identification.)
11        - - - - -
12        MS. WINNER:  Actually, it's Second
13  Amended Notice of Videotaped 30(B)(6)
14  Deposition of the County of Summit.
15    Q.   Have you seen this before?
16    A.   Yes, I believe I have.  I just want
17  to make sure.  I saw there were some
18  modifications to the ones I've seen.
19        Yes, this looks -- yes.
20    Q.   I think that this is probably
21  modified from the version you saw in terms of
22  the -- the date and location of the deposition.
23    A.   Sure.  Yes, yes.
24    Q.   Are you here today testifying in
25  response to this notice?

Page 23

1    A.   Yes.
2    Q.   And you understand that you have
3  been designated by the County of Summit to
4  testify on its behalf today?
5    A.   Yes.
6    Q.   What did you do to prepare for
7  today's deposition?
8         MS. KEARSE:  I'm just going to make
9  one note.  There is a letter that gave specific
10  topics that she was being designated for, so
11  it's not -- I think this still includes every
12  single topic, right?
13        MS. WINNER:  That's correct.
14        MS. KEARSE:  So it's the designated
15  cop- -- topics that we shared in our letter of
16  December 17, 2018.
17        MS. WINNER:  I think which was then
18  amended by an e-mail exchange when you added a
19  couple of others.
20        MS. KEARSE:  The -- the -- right.
21  The 4, 5, 6, 19.  Yeah.
22        MS. WINNER:  I'll -- I'll pull that
23  out and get it on the record later.
24        MS. KEARSE:  Okay.  Just so we're
25  clear, it's not the total notice.

Page 24

1         MS. WINNER:  Understood.
2         THE WITNESS:  I'm sorry.  What --
3  I'm sorry.  What was the question?
4    Q.   The question was, what did you do
5  to prepare for the deposition?
6    A.   Sure.  So I met with the team of
7  attorneys from Motley Rice seven or eight
8  times.
9         I read, I believe, where I was up
10  to about 14 transcripts that have previously
11  been taken regarding this case.  I've reviewed
12  documents.
13        I've spoken to multiple people who
14  are involved in gathering information regarding
15  the case.
16        Sat down and met with our budget
17  and finance director.
18        I've met with Patrick Leonard, a
19  detective for the Akron Police Department.
20        Spoken with Lori Baker-Stella, who
21  is a detective for the Summit County Sheriff's
22  Office.
23        Met extensively with our public
24  safety director, Lori Pesci.
25        Met with Donna Skoda, the Summit

Page 25

1  County Public Health director.
2         Just read a lot of documents.
3         And frankly, I've been a public
4  servant in Summit County for over the last 13
5  years, so I feel like my own personal
6  experience really has prepared me in the best
7  way to put that all into context.
8    Q.   Now, you said you read -- I'm
9  sorry.  Did you finish your answer?
10    A.   I think -- I think so, yes.
11    Q.   Okay.  If I ever --
12    A.   Sure.
13    Q.   -- inadvertently interrupt you,
14  please speak up.
15    A.   Sure.
16    Q.   You said you read 14 --
17    A.   Uh-huh.
18    Q.   -- about 14 transcripts?
19    A.   I think so.
20    Q.   Were these all deposition
21  transcripts?
22    A.   Yes, ma'am.
23    Q.   Do you know whose depositions they
24  were?
25    A.   Yes.  I read Matt Paolino's, Shane

7 (Pages 22 - 25)

1  Barker's, Hylton Baker's.  I read Julie Barnes,
2  Donna Skoda, Tonya Block, Jackie Pollard,
3  Dr. Lisa Kohler, Dr. George Sterbenz, Steve
4  Perch.  I read most of Gary Guenther's from the
5  medical examiner's office.  Gertrude Wilms,
6  Brad Gessner.
7       I feel like there's one more, but
8  that's -- those are the ones I remember.
9       Q.   Were all the depositions you read
10  of people employed by either Summit or Akron?
11       A.   No.  Chad Garner, from the pharmacy
12  board, was not.
13            I think -- well, Hylton Baker is no
14  longer employed by the Summit County Sheriff's
15  Office, but he was previously.
16            Donna Skoda and Jackie Pollard and
17  Tonya Block aren't technically employees of
18  Summit County because they are sort of a hybrid
19  with -- with public health and ADM.  We do
20  their payroll, but they have different sort of
21  entities.
22       Q.   Uh-huh.
23       A.   We're -- we're all Summit County,
24  but they don't report to the executive.  And
25  likewise, all of these folks work in the county

1  system or the city system.  Yes.
2       Q.   Did you -- have you read any of the
3  depositions of employees of Cleveland or
4  Cuyahoga County?
5       A.   I have not.  I have also read Brian
6  Nelson's, the finance director.
7       Q.   And when you said you met with the
8  budget and finance director, was that who you
9  were referring to?
10       A.   Yes.
11       Q.   Are there any other people you've
12  met with other than the ones you've named
13  previously?
14       A.   I've had internal communications
15  with the Summit County executive, with her
16  chief of staff, with some of the lawyers, our
17  in-house lawyers.
18       Q.   Could you give me the name?
19       A.   Sure.  I -- sure.  Sorry.  Bob
20  Higham is a Summit County attorney.  Deborah
21  Matz is our law director.  Jason Dodson is the
22  chief of staff.  Ilene Shapiro is the county
23  executive.  And I think I said before, Lori
24  Pesci is the Summit County public safety
25  director.  She's also an attorney for the

1  County.
2       Q.   Anyone else?
3       A.   In the last six weeks, not
4  specifically this deposition, but -- that I
5  can think of right now.  But again, my service
6  in the community, the conversations that I've
7  had, the cases I have prosecuted, my experience
8  in the state House, all of that I feel I've
9  relied on in preparation for this deposition.
10       Q.   And then you say you've also
11  reviewed a number of documents.
12       A.   Yes.
13       Q.   Can you estimate about how many?
14  Just in rough terms.
15       A.   Well, not inclusive of pleadings, I
16  don't know.  Probably 100 documents.  I -- I --
17  just looking at things, I've looked at what --
18  oh, gosh, sorry -- what the attorneys have
19  shown me.  I've looked at articles that I
20  remember reading as, sort of, this crisis was
21  ongoing in our community.  I looked at things
22  that I remember speaking to me, articles and ADM
23  statistics.  So I would say close to 100, but
24  that's -- I -- it's not my best asset is
25  guessing numbers on things like that.

1       Q.   Did you take notes of any of the
2  conversations you had?
3       A.   Yes.
4       Q.   Do you have those notes with you?
5       A.   No, I do not.
6            MS. WINNER:  I would like to ask to
7  have those notes produced, please.  We will
8  follow up.
9            MS. KEARSE:  I'm not going to -- I
10  assume you'll follow up on that, yeah.
11       Q.   Did you take notes on any of the
12  documents you read?
13       A.   I highlighted portions or, you
14  know, question marks.  And I'm a big sticky
15  note believer, so I would tab something to
16  remind myself to follow up or to look something
17  up.  Tend to read a lot on the treadmill, and
18  so it's not conducive to Google when you're on
19  the treadmill.
20       Q.   Apart from reading documents, did
21  you do any research like Googling things or
22  anything like that?
23       A.   A few times, yes.
24       Q.   What did you research that way?
25       A.   I remember reading Donna Skoda's

8 (Pages 26 - 29)

Page 30

1 transcript, and I did not know at that time
2 that we were using fentanyl strips.  I didn't
3 really know what they were, and Donna explained
4 that pretty well.  But I was very interested in
5 sort of where that idea came from, so I did a
6 little bit of research on that.  I remember
7 that specifically.
8         I looked up some different
9 terminology that I was not familiar with.  MEE
10 [sic], I did not know what that meant, the
11 morphine equivalency.  More just trying to look
12 up words I -- I didn't know or acronyms I was
13 unfamiliar with.
14         I did Google a couple of articles
15 that I remember being impactful to me and
16 wanting to go back and refresh why it mattered.
17 Things like that.
18     Q.   Is there anything else you did to
19 prepare for today other than what you've
20 already described?
21     A.   No.  Again, I really feel strongly
22 that the best preparation I've done for this is
23 living in this community for the last 20-plus
24 years and being in public service, sort of as
25 the recipient of the knowledge and wishes of my

Page 31

1 community.
2     Q.   Have you read the complaint in this
3 case?
4     A.   I have.
5     Q.   When did you first read it?
6     A.   I first read -- I believe I saw a
7 draft of it before it was filed.  Shortly
8 before it was filed.  And then I read it after
9 it was filed.  And then throughout preparation,
10 I've been reading parts of it thoroughly again
11 sort of, you know, bringing everything in full
12 context.
13     Q.   Have you reviewed the interrogatory
14 responses that Summit has provided in this
15 case?
16     A.   Many of them.  I don't know that
17 I've reviewed all of them, but I have reviewed
18 many.
19     Q.   When did you do all this work that
20 we've just been talking about, apart from
21 living in the community?
22     A.   Sure.
23     Q.   Obviously you've been doing that
24 for a while, but --
25     A.   Sure.  So the -- the reading of

Page 32

1 depositions and the meeting with the attorneys.
2 We met during the workday.  We met on the
3 weekends.
4         Sometimes I was able to block off
5 blocks of hours during the workday to devote to
6 door shut, don't come in unless it's an
7 emergency, so that I could really focus on the
8 reading.
9         And frankly, I'm a 5:00 a.m. reader
10 and a 10:00 p.m., so try and get about an hour
11 in, like I said, on the treadmill in the
12 morning and then a couple of hours in the
13 evening.
14     Q.   So has this been over the last few
15 weeks or the --
16     A.   Probably --
17     Q.   -- the last several months?
18     A.   Yeah.  Probably six -- at least six
19 weeks.  I believe we really started -- I really
20 started reading depositions and that sort of
21 thing at the very beginning of December, but I
22 had reviewed documents.  I had certainly read
23 the complaint and was aware of many of those
24 beforehand, but -- but that sort of intensive
25 preparation for about six weeks.

Page 33

1     Q.   Well, turning back to -- to
2 Exhibit 1, you understand that Summit County
3 has designated you to testify on its behalf on
4 certain topics in this notice, correct?
5     A.   Yes, ma'am.
6     Q.   And do you understand that this
7 means that the testimony you're giving today
8 represents the testimony of Summit County, not
9 just your personal recollection or your
10 personal opinions?
11     A.   Yes, ma'am.
12     Q.   Are you aware of which topics you
13 have been asked to address?
14     A.   Yes.
15     Q.   Did the preparation that you've
16 described cover all of those topics?
17     A.   Yes.
18     Q.   As you sit here now, do you feel
19 qualified to testify as the representative of
20 Summit County on all of the topics on which
21 you've been designated?
22     A.   Absolutely.
23     Q.   Are there any exceptions?
24     A.   No.
25     Q.   Leaving aside your -- your

9 (Pages 30 - 33)

Page 34

1 professional experiences and your work, have
2 there been any experiences in your personal
3 life that have affected your views about
4 prescription opioids?
5    A.   My -- I don't know that I
6 understand what you're asking.
7    Q.   Have you ever been affected
8 personally, for example, positively or
9 negatively, by prescription opioids?
10    A.   I see. I have lost a friend who
11 overdosed in 2016. I won't give a revisionist
12 history that we were extremely close at the
13 time that he passed, but certainly we were in
14 college. So, yes, I feel like that's a
15 personal -- a personal story that I -- that I
16 have.
17    Q.   Well, you say you lost a friend.
18 Was this friend lost to prescription opioids?
19    A.   He was lost to opioid addiction.
20    Q.   And what -- what -- he overdosed?
21    A.   Yes.
22    Q.   And what did he overdose on?
23    A.   Heroin.
24    Q.   Had he -- okay. So he -- he was
25 taking heroin at the time that he passed away;

Page 35

1 is that correct?
2    A.   Yes.
3    Q.   Are you aware of the history of --
4 of his addiction?
5    A.   Yes.
6    Q.   And what's the -- your basis for
7 that knowledge?
8    A.   He began using opioids in college
9 for injuries that he sustained playing sports
10 in college.
11    Q.   And how do you know that?
12    A.   We were all very close, and the
13 news of his death passed through our group of
14 friends rather quickly. And there was a lot of
15 discussion about when it had started and things
16 about, wish we -- you know, wish we had known.
17    Q.   So this is something that somebody
18 told you?
19    A.   Yes.
20    Q.   And who told you that?
21    A.   Teammates, friends, the -- the sort
22 of college-kid community that we had created at
23 that time.
24    Q.   So this wasn't something that he
25 himself told you?

Page 36

1    A.   No.
2    Q.   Have you ever taken prescription
3 opioids yourself?
4    A.   Yes.
5       MS. KEARSE:  Objection.
6    Q.   For what?
7    A.   Post surg- ---
8       MS. KEARSE:  I'm just going to
9 instruct the answer -- you're free to answer
10 that question if you want, but you also have
11 your own personal privacy rights as well, so --
12       THE WITNESS:  Okay.
13       MS. KEARSE:  -- you can answer if
14 you want.
15    A.   Post-surgery.
16    Q.   And what did you take -- take it
17 for? I mean -- excuse me -- what did you take?
18    A.   I took OxyContin. I don't -- I
19 believe I took Percocet once, but it made me
20 very sick.
21    Q.   Did the OxyContin help you or
22 whatever it was you took?
23    A.   I only took it, like, two -- I
24 think I took two doses post-surgery. Yeah. I
25 was still pretty groggy from the anesthesia.

Page 37

1    Q.   I take it you did not become
2 addicted?
3    A.   No.
4    Q.   Did you take it as directed by your
5 doctor?
6    A.   Yes.
7    Q.   I want to talk just a second about
8 terminology just to make sure we're all on the
9 same page.
10       What do you understand an opioid to
11 be?
12    A.   A synthetic derivative of an
13 opiate, so a synthetic derivative of morphine
14 or heroin. Sort of those naturally occurring
15 opiates.
16    Q.   And what's an opiate?
17    A.   It's essentially a drug that
18 directly attaches to receptors in our brains to
19 either relieve pain or produce a high.
20    Q.   What is the difference between an
21 opiate and an opioid, in your understanding?
22    A.   So they're really used
23 interchangeably in our community.
24    Q.   That's what I thought, yeah.
25    A.   But, you know, I believe the

Page 38

1  definition to be opiates, a-t-e, is those sort
2  of origins, the opium, heroin, morphine.  And
3  then opioids are sort of the synthetic
4  versions, Percocet, OxyContin, oxycodone, those
5  types of things.  But they are used very
6  interchangeably.
7      Q.   So for today can we agree that
8  we're not going to worry --
9      A.   Sure.
10     Q.   -- about that distinction?
11     A.   Absolutely.  Of course.
12     Q.   What drugs are considered to be
13  opioids or opiates?
14     A.   Sure.  So those ones that we've
15  just named, OxyContin, oxycodone, Percocet,
16  Opana, then opium, heroin, morphine.  That's
17  the -- that's the laundry list I can come up
18  with.
19     Q.   How about fentanyl?
20     A.   Yes.  Absolutely, yes.  Thank --
21     Q.   How about carfentanil?
22     A.   Yes.
23     Q.   Is cocaine an opioid?
24     A.   No.
25     Q.   How about methamphetamine?

Page 39

1      A.   No.  Not -- those two are not in
2  and of themselves, only when mixed, yes.
3      Q.   But they are sometimes mixed?
4      A.   Yes.
5      Q.   And that's sometimes a problem?
6      A.   Yes.
7      Q.   What about Xanax?
8      A.   No.
9      Q.   How about marijuana?
10     A.   No.
11     Q.   Do prescription -- does the term
12  "prescription opioid" have a meaning to you?
13     A.   Yes.
14     Q.   And what would be included in
15  prescription opioids?
16     A.   OxyContin, oxycodone, Percocet,
17  Vicodin, Opana, Dilaudid.
18     Q.   So those are the opioids that are
19  prescribed to people?
20     A.   Yes.
21     Q.   Do prescription opioids have
22  beneficial and lawful uses?
23     A.   Yes.
24     Q.   And they're tested and reviewed by
25  the FDA to make sure their benefits out- --

Page 40

1  outweigh their risks, correct?
2      A.   I know they're tested by the FDA
3  and are -- go through some sort of approval
4  process.  I'm definitely not incredibly well
5  versed on the FDA process.
6      Q.   But they're regulated by the FDA
7  and the DEA?
8      A.   Yes.
9      Q.   And prescription opioids are
10  prescribed by doctors to treat medical
11  conditions, correct?
12     A.   They can be.
13     Q.   Well, they're -- okay.  And they
14  are, in fact?
15         MS. KEARSE:  Objection.  Form.
16     Q.   They are, in fact, prescribed by
17  doctors for medical purposes.
18     A.   They can be, yes.
19     Q.   Well, I'm just -- I just want to
20  make sure we're not quibbling here.
21         Yes, some of it could be something
22  that can be but never happens.  It, in fact,
23  happens that doctors do prescribe opioids for
24  medical conditions, correct?
25     A.   Yes.

Page 41

1      Q.   But opioids like heroin are illegal
2  to produce, distribute, and possess, correct?
3         MS. KEARSE:  Object to form.
4      A.   I'm sorry.  Could you say that
5  again?
6      Q.   Heroin is illegal to produce, to
7  distribute, and to possess, correct?
8      A.   Correct, yes.
9      Q.   By the way, do you know who the
10  Defendants in this case are?
11     A.   I do.
12     Q.   Okay.  And none of those Defendants
13  produces, distributes, or dispenses heroin,
14  correct?
15     A.   No, but they do produce, distribute
16  opioids.
17     Q.   I understand that, but they don't
18  produce or distribute heroin, correct?
19     A.   Correct.
20     Q.   Now, I've seen in the complaint --
21  I'm sure you have too -- references to things
22  like an "opioid epidemic" and an "opioid
23  crisis."
24     A.   Uh-huh.
25     Q.   Are those terms that are familiar

11 (Pages 38 - 41)

Page 42

1 to you?
2     A.   Yes.
3     Q.   And what does Summit County mean by
4 those terms in its complaint?
5     A.   I think any time there is an
6 individual suffering from addiction, that is a
7 crisis in that person's family, and that
8 becomes a crisis in their community.  And when
9 you add all of those crises up, you have an
10 epidemic.
11          You know, the -- the root of the
12 term really comes down to this -- this illness
13 or plague occurring in a much more rapid or
14 increased fashion than should be in a
15 population.  So all of those crises add up to
16 the epidemic that our county is facing.
17     Q.   What drugs are involved in the
18 opioid epidemic, as you used that term?
19     A.   Right.  So all of the drugs that
20 we've talked about, Vicodin, Percocet,
21 OxyContin, oxycodone, and the naturally
22 occurring ones, heroin, morphine, and the
23 introduction of fentanyl and carfentanil into
24 our community.
25     Q.   Is cocaine part of the opioid

Page 43

1 epidemic?
2     A.   It has become sort of this
3 stepsister to the epidemic because of the
4 shifts in the way people are using opioids.
5 Cocaine has been used more recently in
6 conjunction with opioids.
7     Q.   Is -- in your understanding, is the
8 opioid epidemic what this lawsuit is about?
9     A.   This lawsuit is -- is about the
10 aggregate harm that's been caused by the
11 manufacture and distribution of opioids into
12 our community.
13     Q.   When did the opioid epidemic begin?
14     A.   Opioids have always been in our
15 community, but I believe we really saw an
16 uptick in the presence of diverted pills and
17 use really started to come along in the late
18 2000s.
19          And certainly we noticed that in
20 the prosecutor's office where folks were being
21 arrested and having one or two pills in their
22 pocket, folks were being arrested for deception
23 to obtain a dangerous drug or forging drug
24 documents.  We started to see that uptick in
25 the late -- in the late 2000s.

Page 44

1          And then as the legislature and
2 regulations sort of began to ratchet down
3 and -- and monitor more closely, OARRS became
4 more accessible and more usable for a wider
5 variety of folks in the county, that's when we
6 started to see the shift from people who could
7 no longer get the opioids that they had become
8 so addicted to.  They couldn't get a $40, 40
9 milligram pill anymore, but they could easily
10 get a $10 bag of heroin, and so this -- this
11 opioid addiction created space and created the
12 market for the always illegal heroin, morphine,
13 those types of things.
14          So we really started to see the
15 increase from the late 2000s into the early
16 teens.  And we began to take notice of how many
17 folks were seeking recovery treatment through
18 ADM and the public health department in the
19 early teens.
20          We started to see an increase of
21 NAS in our babies being born.  We started to
22 see an increased need for funding to low level
23 felony defense.  We started to see an increase
24 in our jail population.  And that started to
25 really bloom, for lack of a better word, into

Page 45

1 '14, '15, '16, '17, where we literally had
2 bodies stacking up at the county medical
3 examiner's office due to overdose.
4     Q.   Okay.  Is there a specific time, a
5 date, where you see a demarcation between when
6 there was -- wasn't an epidemic, opioid
7 epidemic, to when there was?
8     A.   Well, I -- I think there are many
9 factors that exacerbate -- exacerbated it.  The
10 onset of the fifth vital sign becoming -- you
11 know, pain becoming the fifth vital sign
12 certainly created space for this flood of pills
13 that came into our community.
14          It's hard to pick one specific day
15 because there's this level of legality that
16 surrounds prescription pills that does not
17 surround the trip -- the typical drug cases
18 that we encountered in Summit County.
19          So this flood of pills came into
20 our community in -- in sort of record fashion,
21 so I -- I couldn't say one particular day in
22 time.  It is a wave that is growing and growing
23 and continues to grow.
24     Q.   When was the -- when did you first
25 become -- personally become aware that there

12 (Pages 42 - 45)

Page 46

1  was a problem?
2      A.   Personally?  I first became aware
3  that there was a real difference in some of the
4  cases I was seeing.  I was seeing, instead of
5  detectives who were bringing in crack cases or
6  things like that, we started to see a lot of
7  pill cases; a lot of defendants without a prior
8  record, being arrested for possession of
9  oxycodone, OxyContin, Percocets.  And we
10  started to see, in the late 2000s, this
11  increase in cases of deception to obtain and
12  forging drug documents.
13          These folks had become so addicted
14  that they were resorting to, you know, trying
15  to write false prescriptions, trying to obtain
16  these pills in a different manner.
17      Q.   And when was it that you started
18  seeing this?
19      A.   In the late 2000s is really --
20      Q.   2007?  2008?  Somewhere in there?
21      A.   I -- I remember it steadily
22  growing.  I can recall being -- in 2009, I was
23  the grand jury prosecutor, and I recall seeing
24  many of those cases in sort of a way that I had
25  not previously.

Page 47

1      Q.   Do you think, at the time that you
2  personally perceived that there was a problem,
3  do you think that generally there was an
4  understanding in Summit County at that time
5  that there was a problem?
6      A.   Calling it a problem, I think at
7  that time, as a prosecutor, I was aware that
8  this was a change that we were perceiving.  I
9  think at that time the ADM Board and Summit
10  County Public Health started to perceive that
11  the people seeking treatment were coming in for
12  opioid addiction in greater numbers than they
13  had previously seen.  I think our hospitals saw
14  that there were more babies being born with NAS
15  than they had previously seen.
16          And at that point, I think, you
17  know, there were some -- some concerns, but not
18  a true identification of the root cause yet.
19          MS. WINNER:  I'd like to ask the
20  reporter to mark as Exhibit 2 a document
21  entitled "Drug Threat Assessment, Summit
22  County, Ohio."  It appears to be a 2005
23  document.
24              - - - - -
25          (Thereupon, Deposition Exhibit 2,

Page 48

1          Document Titled, "Drug Thread
2          Assessment, Summit County, Ohio,"
3          SUMMIT_000023567 to 000023648, was
4          marked for purposes of
5          identification.)
6              - - - - -
7      Q.   Have you seen this before?
8      A.   I have.
9      Q.   Is this one of the documents you
10  reviewed?
11      A.   It is.
12      Q.   Are you familiar with Captain
13  Baker?
14      A.   I am.
15      Q.   What was Captain Baker's position?
16      A.   He was the captain -- I think that
17  was his highest rank.  He was the captain
18  assigned to the Summit County Drug Unit with
19  the Summit County Sheriff's Office.
20      Q.   And in that position, was he
21  familiar with the drug enforcement situation in
22  Summit County?
23      A.   Yes.
24      Q.   If you turn to page 62 of this
25  document -- oh, first of all, this -- this

Page 49

1  document appears on its face to -- to -- dated
2  to approximately 2005.  It says it's an
3  addendum to a 2005 Justice Assistance Grant
4  application.
5      A.   Okay.
6      Q.   Do you see that at the top?
7      A.   I do.
8      Q.   And would you agree with me that
9  this -- this document dates to 2005?
10      A.   I'm sure it was in 2005 or 2006.
11  Typically, when we apply for grants, sometimes
12  the addendums are filed the year after.
13      Q.   Have you ever discussed this
14  document with Captain Baker?
15      A.   I have not.  Not, you know,
16  personally discussed it with him, no.
17      Q.   Was he one of the people you talked
18  to, or did you just reread his deposition
19  transcript?
20      A.   I --
21          MS. KEARSE:  Object to form.
22      A.   I did not speak with Captain Baker.
23  I haven't seen him in -- in years, frankly.  I
24  read his deposition.
25      Q.   Did you work with him when you were

13 (Pages 46 - 49)

Page 50

1  a prosecutor?
2      A.   I did, yes.
3      Q.   If you would turn to page 62 --
4      A.   Uh-huh.
5      Q.   -- of this document, there's a
6  section on pharmaceuticals.  Do you see that?
7      A.   I do.
8      Q.   And the first thing that is said
9  here is that the level of threat is very high.
10     A.   Yes.
11     Q.   And do you agree that that was a
12  true statement?
13     A.   I -- I don't know -- I'd have to
14  look at this a little bit more thoroughly.  I
15  don't know what the scale is.  I -- I wouldn't
16  speak to -- to know what Captain Baker saw as
17  very high or extremely high or -- I don't know
18  that.
19     Q.   Do you have any reason to think
20  that this characterization of the level of
21  threat of pharmaceuticals in 2005 or 2006,
22  whenever he wrote this, was very high?
23     A.   Well, certainly he turned out to be
24  right, so, no.
25     Q.   The first sentence under "Level of

Page 51

1  threat" says, "The diversion of narcotics and
2  pain analgesics in Summit County continues to
3  increase."
4      A.   Uh-huh.
5      Q.   Do you see that?
6      A.   Yes, I do.
7      Q.   And was that a correct statement in
8  2005?
9      A.   I'm sure that it was.
10     Q.   And then it then goes on to refer
11  to some of the -- the drugs --
12     A.   Yes.
13     Q.   -- correct?
14          And then under "Availability," he
15  goes on to say, quote, "While there are no
16  conclusive estimates as to the total amount of
17  diverted prescription narcotics, depressants,
18  and stimulants available in the drug markets of
19  Summit County, it is known that legitimate
20  commercial disbursal of prescription
21  pharmaceuticals distributed to pharmacies,
22  hospitals, and practitioners has increased
23  sharply over the past four years, thereby
24  making more of the drugs available to criminal
25  diversion and abuse."

Page 52

1          Is that a correct statement, as far
2  as you were aware?
3      A.   I just want to read it again.  It's
4  a long sentence.
5      Q.   Sure.
6      A.   Yes, I would agree with that.
7      Q.   So again, this is -- this is
8  information that was known to Summit County in
9  2005, correct?
10     A.   Yes.  We were starting to become
11  very aware that pills were beginning to flood
12  our community.
13     Q.   And the next sentence goes on to
14  say, quote, "In a sampling of data from the
15  Akron Police Department's narcotics unit
16  diversion division during the first quarter of
17  2004, the unit investigated 60 new diversion
18  cases, or one case every day and a half," end
19  quote.
20          Is that an accurate statement, as
21  far as you were aware?
22     A.   I assume that the Akron Police
23  narcotics unit can provide the data that would
24  back that up.  I can't imagine there would be
25  any reason that Captain Baker would have

Page 53

1  grabbed that number out of thin air.
2      Q.   If you then go on to the whole next
3  section, "Associated Crimes and Violence."  Do
4  you see that later in the page?
5      A.   I do.
6      Q.   And it says, quote, "Criminal
7  actions associated with pharmaceutical
8  diversion in Summit County include burglaries
9  and robberies of drugstores.  Several pharmacy
10  robberies have occurred in Summit County.  Most
11  notable was a man seeking OxyContin," end
12  quote.
13          Is that a truthful statement, to
14  your knowledge?
15     A.   Yes, but certainly additional
16  crimes began to happen as well.  We prosecuted
17  robberies not just of pharmacies, but
18  individuals were robbed because someone in the
19  community found out that they had opioids in
20  their home for -- or were prescribed opioids.
21  And there were particular cases where, you
22  know, folks were robbed at gunpoint for these
23  because of their street value at that time and
24  because of the overwhelming demand for these
25  pills.

14 (Pages 50 - 53)

Page 54

1    Q.    And this was -- again, this was
2  back in 2005 when he wrote this report?
3      A.   He wrote this report in 2005, yes.
4         But these cases that he's talking
5  about, those continued to increase.  Where it
6  may have been a pharmacy or two in 2005, by the
7  late 2000s opioids were so in demand and were
8  becoming so much less available through the
9  normal courses, folks were resorting to really
10 desperate measures to get these pills.
11     Q.    The -- when you say that -- that
12 people resorting to -- to desperate measures to
13 obtain the pills as they were becoming less
14 available, are you aware of any statistical
15 studies that were done in Summit County to
16 confirm that that was the reason for the
17 change?
18     A.   I don't need a statistical study.
19 I saw it.  I -- I had these cases in front of
20 me.  We had these victims who had been
21 prescribed, who would come in and talk about
22 how they'd had guns pointed in their face.
23        But the most important thing to
24 them was not the measure of justice that the
25 criminal justice system could provide, but

Page 55

1  getting a note from the prosecutor saying, you
2  know, "It's okay to prescribe him more pills.
3  They really were stolen."  The animalistic need
4  for these opioids overwhelmed the victim's
5  desire to seek justice.
6      Q.    So you say there were -- there were
7  occasions that you saw when that was the case,
8  correct?
9      A.   Absolutely.
10     Q.    But my -- my question is -- is if
11 one tries to extrapolate that to the community,
12 are you aware of any statistical studies or
13 research studies that were done to confirm that
14 these weren't just some selected cases that you
15 saw, but more generic?
16     A.   I don't know if the Summit
17 County -- I'd -- I'd have to refer back to the
18 Summit County Sheriff's Office, their annual
19 report, to see if there were statistics done.
20 I don't know of any.
21     Q.    Now, just to clarify.  When you
22 talk about the late 2000s, are you talking
23 about -- when you say the 2000s, are you
24 talking about the decade of 2001 to 2009?
25     A.   Yes, yes.  And then sort of

Page 56

1  2010 sort of starts what I call the early
2  teens.
3      Q.    Now, did you see Captain Baker's
4  testimony in his deposition that he has been
5  investigating crimes relating to unlawful
6  trafficking in prescription opioids for
7  decades?
8      A.   Yes.
9      Q.    And do you have any reason to doubt
10 that that's correct?
11     A.   No.
12     Q.    The pharmaceutical -- the -- is
13 the -- the prevalence of prescription opioid
14 crime is, in fact, less today than it was in
15 the late 2000s, is it not?
16        MS. KEARSE:  Object to form.
17     A.   The prevalence of crime?
18     Q.    Crime relating specifically to
19 prescription opioids --
20     A.   Are you --
21     Q.    -- is less today?
22     A.   Are you talking about violent
23 crime?  Or are you talking about the criminal
24 act of obtaining --
25     Q.    The criminal -- the criminal acts

Page 57

1  relating to obtaining and using prescription
2  opioids illegally.
3      A.   Is down from when?
4      Q.    The late 2000s.  The period you
5  were talking about.
6      A.   I -- I don't know the answer to
7  that.  I -- I would -- I would guess that there
8  is because you're -- you're using the term
9  "prescription opioids."  Certainly we've seen a
10 dramatic increase in opioids, including heroin
11 and -- and fentanyl and -- and those types of
12 other non-prescribed opioids.
13        So I -- I guess to parse that out,
14 there are probably less deceptions to obtain a
15 dangerous drug, but there are certainly more
16 possessions of opioids, including heroin,
17 Percocet, Vicodin, all of those.
18     Q.    But I'm asking specifically about
19 prescription opioids.  Is the amount of -- and
20 am I correct that you're saying you don't know
21 one way or the other whether the incidents --
22     A.   I'm sure you're right.  I'm sure
23 you are right, because of tools like OARRS and
24 more public awareness now, certainly, than
25 there was then, and, quite frankly, the

15 (Pages 54 - 57)

Page 58

1 overwhelming community knowledge that these
2 are, in fact, dangerous drugs, that these are,
3 in fact, addictive, which was information we
4 really didn't have in the late 2000s.
5     Q.   And when -- when did that public
6 awareness come into being?
7     A.   I think we really did start to see
8 ADM -- and I'm sorry.  Alcohol is -- okay
9 as ADM to use?  Okay.
10        The ADM Board, Summit County Public
11 Health started to reach out to physicians.  We
12 had law enforcement officers who were meeting
13 with physicians to try and educate them about
14 what drug-seeking behavior looked like.  We
15 wanted to educate our physicians about how
16 incredibly addictive these were and what the
17 results would be, which would be that these
18 folks end up with needles in their arms.
19     Q.   When did that happen?
20     A.   That started to happen -- I want to
21 say that -- that the first, like, continuing
22 medical education piece was, I want to say, the
23 early teens.  Perhaps '13 or '14 I can recall
24 Dr. Doug Smith, Dr. Kohler really starting to
25 talk to the medical community.

Page 59

1        But even leading up to that, I know
2 that Detective Leonard and some of his
3 colleagues were meeting with emergency room
4 physicians trying to educate them about, you
5 know, sort of what was happening in the street
6 so that -- that those physicians could be
7 aware.
8     Q.   So you were seeing -- am I correct
9 of just putting two pieces together, that you
10 were seeing significant criminal activity and
11 other problems relating to abuse of
12 prescription opioids by the late 2000s, but
13 that the public education efforts relating to
14 that did not start until several years later?
15        MS. KEARSE:  Object to form.
16     A.   I don't think that's true because I
17 know -- I know -- I guess I was thinking
18 specifically about educating physicians.
19        I know that at the time we were
20 already doing some education in schools through
21 public health and through the ADM Board, and
22 the -- the task force did not begin until 2014.
23 So I would say we were seeing an uptick in
24 criminal activity.  But again, we still had not
25 really identified the head of the monster.  We

Page 60

1 had not -- we were sort of looking at these as
2 individual -- individual in our lane, doing our
3 thing:  prosecutors prosecuting the cases, ADM
4 treating folks, public health offering
5 services.
6        We did not really identify the one
7 common theme in all of this, which was the
8 flood of prescription opioids into Summit
9 County, until the early teens.
10     Q.   The -- when did you do the
11 education in schools through public health and
12 the ADM Board?
13     A.   That began -- they -- they have
14 always been in the schools --
15     Q.   Uh-huh.
16     A.   -- talking about addiction and
17 prevention and -- and other healthy --
18     Q.   But when did they --
19     A.   -- lifestyle choices.
20     Q.   When did they talk about
21 prescription opioids?
22     A.   I believe I saw something as early
23 as 2011.  I'd -- I'd have to double-check that
24 to be sure.
25        MS. WINNER:  I'd like to ask the

Page 61

1 reporter to mark as Exhibit 4 a document
2 entitled "Ohio Office of Criminal Justice
3 Services 2016 Semiannual Performance Report."
4 Exhibit 3.  Just to correct that, it's
5 Exhibit 3.
6            - - - - -
7        (Thereupon, Deposition Exhibit 3,
8        Document Titled "Ohio Office of
9        Criminal Justice Services 2016
10       Semi-Annual Performance Report,"
11       SUMMIT000020314 to 000020323, was
12       marked for purposes of
13       identification.)
14           - - - - -
15     Q.   Have you ever seen this before?
16     A.   I don't --
17        MS. FLOWERS:  Do you have any extra
18 copies, Counselor?
19        MS. WINNER:  I don't know if we
20 have any other copies.
21        MS. FLOWERS:  Just the one?  Okay.
22     A.   I don't know that I have seen this
23 before.  I don't think I have.
24     Q.   The -- the name that appears on the
25 cover page of this is Captain Matt Paolino.

16 (Pages 58 - 61)

Page 62

1    A.    Sure.
2    Q.    Do you know who he is?
3    A.    I do.
4    Q.    And who is he?
5    A.    He is the captain in charge of the
6 Summit County Drug Unit currently.
7    Q.    And you see that this is -- at the
8 bottom of the first page, it says this is for
9 the reporting period of July 1st to December
10 31st, 2016?
11    A.    I see that.
12    Q.    And then if you turn to the second
13 page of the exhibit --
14    A.    Uh-huh.  Yes.
15    Q.    -- under Question 3, there's a -- a
16 question for the number of persons indicted for
17 each type of drug.
18    A.    Okay.
19    Q.    Do you see that?
20    A.    I do.
21    Q.    And the instructions say that it's
22 not to include pharmaceuticals.  That's a
23 separate question.  So would --
24    A.    Okay.
25    Q.    -- this is just the

Page 63

1 non-pharmaceutical drugs.
2    A.    Okay.
3    Q.    And then he reports figures for
4 indictments for a variety of drugs, including
5 cocaine, heroin, marijuana, methamphetamine.
6    A.    Yes.  I see that.
7    Q.    Do you have any reason to question
8 the accuracy of these figures?
9    A.    I don't have any reason to question
10 the accuracy.  I would wonder -- this is
11 certainly not all cases indicted in Summit
12 County.  This might be the lead detective was a
13 Summit County Drug Unit detective, but this
14 would not be reflective of all of the
15 trafficking in marijuana or possession of
16 marijuana cases in Summit County for that time
17 period.
18    Q.    Well, this is -- does not include
19 misdemeanors.
20    A.    Sure.  And -- and -- so there are
21 31 communities that make up Summit County, and
22 many of them have their own police department,
23 and so, you know, whether Hudson or Stow police
24 department arrested someone for trafficking in
25 marijuana, I assume those are not reflected in

Page 64

1 this.
2    Q.    I see what you mean.  Okay.
3    A.    So -- so this would be the Summit
4 County Drug Unit specifically, because these
5 seem rather low.  They would not be inclusive
6 of the outside agencies' arrests or
7 indictments.
8    Q.    Okay.  If you then turn to a couple
9 more pages into question, there's a section on
10 pharmaceutical diversion.  I think it's the --
11 one, two -- sixth page into the exhibit.
12    A.    I see.  Fifth, sure.
13    Q.    And then Question 5 asks for the
14 number of people indicted for pharmaceutical
15 crimes.
16        Do you see that?
17    A.    I do.
18    Q.    And then, on that page, and then on
19 the following pages, there's figures provided
20 for those as well.
21    A.    Uh-huh.  I see that.
22    Q.    And the numbers of people indicted
23 for pharmaceutical crime is considerably
24 less --
25    A.    Sure.

Page 65

1    Q.    -- correct?
2    A.    Sure.  But, again, I don't know --
3 I'm sorry.  I don't know that I've seen this
4 particular report.
5        So the -- the Summit County Drug
6 Unit task force are not the only Summit County
7 officers who make these arrests or provide
8 testimony for these indictments.  You know,
9 there -- there is an entire patrol division who
10 have arrest power and who routinely arrest for
11 these types of crimes as well.
12        That's -- these don't include,
13 certainly, the more than 400 police officers
14 for the City of Akron and -- and the over a
15 thousand police officers we have countywide.
16 So, again, I'm not exactly sure what this
17 report is produced for, but.
18    Q.    Well, let me ask you this.  Is
19 there any reason to think that in those other
20 jurisdictions the relative ratio of indictments
21 for these other drugs as compared to
22 prescription pharmaceuticals is any different?
23    A.    Is there any reason to think the
24 ratio is different?  Perhaps, because of the
25 number of pharmacies that exist in the city of

17 (Pages 62 - 65)

Page 66

1  Akron.  It's our most populate, and it's the
2  county seat.  It has nearly half the population
3  making up Summit County.
4        So, you know, whereas in some of
5  these smaller jurisdictions there might be one
6  pharmacy, in Akron there are hundreds.  So I --
7  you know, if some of these are -- I see, like,
8  pharmacy technicians, pharmacists, things like
9  that listed, certainly there are -- there are
10  far more pharmacies in Akron and then Barberton
11  and Cuyahoga Falls than there are in, say, for
12  example, Mogadore or Lakemore.
13     Q.   Do you think that the amount of
14  felony indictments for crime relating to
15  prescription pharmaceuticals is significantly
16  greater in places that have more pharmacies?
17     A.   I -- I -- again, I'm -- I'm not --
18  I would need a minute to -- to read this report
19  to see what it's looking at.
20        I'm looking at words that are
21  listed on here that says pharmacists, pharmacy
22  techs, and I'm seeing zero.  So I'm not sure
23  exactly what this report is or why it was
24  produced, so I would -- because I need to
25  clarify.

Page 67

1     Q.   So you're not familiar with this
2  document?
3     A.   I -- I'm sorry.  I don't believe
4  I've ever seen it.
5        MS. KEARSE:  Is this a good time
6  for a break?
7        MS. WINNER:  Sure.
8        THE VIDEOGRAPHER:  Off the record
9  at 9:28.
10        (A recess was taken.)
11        THE VIDEOGRAPHER:  On the record at
12  9:42.
13        MS. WINNER:  I'd like to ask the
14  reporter to mark as Exhibit 4 an e-mail from
15  Matthew Paolino with attachments.  The first
16  production number is SUMMIT_000072535.
17
18        (Thereupon, Deposition Exhibit 4,
19         10/6/2014 E-Mail Chain Re: 2015
20         National Drug Threat Survey, with
21         Attachments, SUMMIT_000072535 to
22         000072541, was marked for purposes
23         of identification.)
24        - - - - -
25     Q.   And my questions actually relate to

Page 68

1  an attachment to this e-mail.  If you can turn
2  a few pages in, at the top it says "National
3  Drug Threat Survey, 2015."
4     A.   Okay.
5     Q.   Have you seen this before?
6     A.   I don't believe I've seen this
7  e-mail.
8     Q.   How about the attachment?  The
9  National Drug Threat Survey, 2015?
10     A.   No, I don't believe I've seen this.
11     Q.   And again, the name that is listed
12  here is Matthew Paolino, correct?
13     A.   Correct.
14     Q.   Do you know what the National Drug
15  Threat Survey is?
16     A.   It appears to be -- well, no, not
17  without reading this.  I don't know.
18     Q.   Okay.  If you would turn to the
19  second page of the survey, to -- the answer to
20  Question 1a.
21     A.   Okay.
22     Q.   And the first question, it says,
23  "Over the past year, has your agency
24  experienced a significant change in a drug
25  trafficking attribute (availability, demand,

Page 69

1  distribution, production, transportation) for
2  any of the drugs listed?"
3        Do you see that?
4     A.   I do.
5     Q.   And then on -- then there are a
6  number of drugs listed, and for each of these
7  categories he had to fill out whether it was
8  increasing, decreasing, the same, or N/A.
9        Do you see that?
10     A.   I see -- I see that.
11     Q.   And so, for example, for heroin, he
12  put down, "Availability is increasing, demand
13  is increasing, distribution is increasing,
14  transportation is the same."
15     A.   I see that.
16     Q.   And then a few lines down, for
17  controlled prescription drugs, he's got,
18  "Availability as decreasing, demand is the
19  same, distribution is decreasing, and
20  transportation is the same."
21        Do you see that?
22     A.   I do.
23     Q.   Do you have any reason to doubt
24  whether he was correct about this?
25     A.   No, because we know that the peak

18 (Pages 66 - 69)

Page 70

1 of availability of opioid pills in Summit
2 County, I believe, reached its peak in 2012, so
3 certainly there would have been less in 2015.
4    Q.   And then, under "Drug availability"
5 in Question 2, do you see that?  The level --
6    A.   Yes, I see.
7    Q.   -- of availability, he -- he marks
8 for controlled prescription drugs was low.
9    A.   Wait.  Did you move to Question 2?
10    Q.   Question 2.
11    A.   Okay.  I see.  And I'm sorry.
12 The -- say that last part.
13    Q.   The availability for controlled
14 prescription drugs, the availability he
15 indicated was low.
16        Do you see that?
17    A.   I do see that.
18    Q.   And was that correct in 2015, as
19 far as you're aware?
20    A.   It was certainly lower than it had
21 been.
22    Q.   But do you disagree that it was
23 low?
24    A.   I will just certainly say it was
25 lower than it had been.  And I think when we

Page 71

1 look at how readily they were available prior
2 to 2015, it was a marked difference because of
3 the availability of OARRS for use by physicians
4 and pharmacists and law enforcement.
5        So I -- I won't disagree with
6 Paolino, but it was -- I would -- I would
7 certainly believe that that is one of the
8 factors that went into his marking this as low,
9 was because of how much lower it had become.
10    Q.   Did you discuss that with him?
11    A.   I did not.
12    Q.   So you don't know what was in his
13 mind when he marked it as low?
14    A.   I don't know what was in his mind
15 when he marked any of the things we've just
16 talked about.
17    Q.   Was he qualified to fill out this
18 questionnaire?
19    A.   Absolutely.
20    Q.   Now, the problem with opioids in
21 Summit County in the last several years has
22 included drugs other than prescription opioids,
23 correct?
24        MS. KEARSE:  Object to form.
25    A.   The problem in the last several

Page 72

1 years has included --
2    Q.   Drugs other than prescription
3 opioids, correct?
4    A.   Yes.
5    Q.   It's included heroin, for example?
6    A.   Yes.
7    Q.   And it's also included fentanyl and
8 carfentanil?
9    A.   It has, but those really have --
10 their prevalence has increased because of the
11 space created by the prescription opioids.
12    Q.   But that's -- I mean, that's -- I
13 understand that that's your position.
14        My question is, are, in fact,
15 fentanyl and carfentanil a significant part of
16 the problem?
17        MS. KEARSE:  Object to form.
18    A.   Significant, I don't -- I don't
19 know how you use the word "significant."
20        To me, carfentanil and fentanyl
21 don't come into Summit County unless the space
22 has been created by 39 million pills in 2012
23 and in 2010.
24    Q.   And what's your basis for that?
25    A.   Everything I've seen in the last 13

Page 73

1 years of public service, everything that I've
2 read in preparation for this deposition today.
3    Q.   So that's --
4    A.   There's --
5    Q.   -- that's -- that's an opinion you
6 would have formed based on the things you've
7 read?
8    A.   That is an opinion of the County.
9 That is an opinion shared by public health, by
10 ADM, by the executive's office, by everyone who
11 has been impacted by this plague.
12        It is -- it is -- we know that 80
13 percent of our heroin users start with
14 prescription opioids.
15    Q.   How do you know that?
16    A.   There's research to back it up.
17 The articles that I've read that talk about
18 when folks self-report, in talking with Donna
19 Skoda, in being at Opiate Task Force meetings
20 where the dashboard data is put up on slides
21 that are 10 feet wide to see that when folks
22 are coming in, that's how they've started.
23    Q.   Where does the 80 percent number
24 come from?
25    A.   The article that I read, it was

19 (Pages 70 - 73)

Page 74

1  produced -- it was provided to me by Summit
2  County Public Health, Rich Marountas.  I can't
3  recall the title of it.
4       But also there have been
5  presentations done by Dr. Doug Smith, who's
6  deposition I also read -- I remembered that
7  over the break -- from ADM, where he talks
8  about how the receptors in the brain are set up
9  to receive these opioids.
10      And we know that when pills became
11 less available -- less readily available and
12 much more expensive, it created the space for
13 heroin, which created the space for fentanyl
14 and carfentanil.
15      Q.   Let me go back.  I want to go back
16 to the 80 percent.  You said the 80 percent --
17 you got the 80 percent from an article.  Was
18 this an -- what -- do you know the name of the
19 article?
20      A.   No.  I -- I can't -- I can see it
21 in a binder.  I can't recall the name of it.
22 But that's not the first time I've heard it.
23 In fact, that was something that I
24 specifically -- you had asked had I Googled
25 things or anything like that.

Page 75

1       It was a -- it was a very specific
2  discussion I'd had with Donna Skoda and with
3  counsel, frankly, because it was such a -- it
4  was something that I felt so inherently I knew
5  that I wanted to make sure that I had the right
6  statistics and the right research to back that
7  up.  Because it's something that certainly we
8  know, and it's one of those things, how do you
9  know you know?  But there is research to back
10 that up.
11      Q.   Well --
12      A.   And certainly Doug Smith, Donna
13 Skoda, who are experts in the community, agree.
14      Q.   Well, does the article -- you don't
15 remember specifically what the article was.  Is
16 that article just about -- is it about Summit
17 County specifically?
18      A.   No, not specifically.  However,
19 Doug and Donna's research backs that up as
20 well.
21      Q.   They have -- what is -- what is the
22 nature of their research?
23      A.   They treat people.  They --
24      Q.   But how did they develop this 80
25 percent statistic?  Have they actually done a

Page 76

1  study that says 80 percent of the people
2  started on prescription opioids?
3       A.   The data dashboard that's readily
4  available on Summit County's Public Health
5  reflects that.
6       Q.   It specifically reflects 80 percent
7  of the people.  They know how 80 percent of the
8  people started.
9       A.   That -- as I sit here today,
10 that's -- yes.  That's what I believe, yes.
11      Q.   And what is the source of
12 information?  How do they know that that's how
13 they started?
14      A.   Because folks report it.  Not every
15 person who comes in for treatment wants to talk
16 about how they started, and, quite frankly,
17 when we're treating people and trying to save
18 lives, we're going to treat them right then.
19 So I know that when Donna was deposed, that
20 that discussion was also had.
21      Q.   So there are some people that you
22 know did not start with prescription opioids,
23 correct?
24      A.   I don't know anyone who started
25 with heroin.

Page 77

1       Q.   Well, 80 percent is less than 100
2  percent, correct?
3       A.   Correct.  Those are people who
4  report.  So that 80 percent could just be the
5  20 percent we don't know.  Perhaps they did.
6  Perhaps they started with something else.  But
7  we can't definitively say what they started
8  with.
9       Q.   So -- all right.  But it -- you
10 accept that at least it's possible that at
11 least 20 percent of people did not start with
12 prescription opioids?
13      MS. KEARSE:  Object to form.
14      A.   I know that addiction is a
15 progressive disease, and that it would be
16 incredibly uncommon for someone who had not
17 already become addicted to an opium derivative
18 to go straight to the street and shoot heroin.
19      Q.   How many -- how long has there --
20 has heroin addiction existed in Summit County?
21      A.   I'm sure heroin addiction in some
22 form has existed for decades, but certainly not
23 to the level we saw explode in '14, '15 and
24 '16.
25      Q.   Okay.  But those people who were

20 (Pages 74 - 77)

1 addicted to heroin in 1980, did they start with
2 prescription opioids?
3     A.   I -- I don't know if they did.  If
4 you're talking about, you know, folks who were
5 using heroin as a result of coming back from
6 Vietnam, that sort of thing, I mean, those are
7 certainly very different.  It's a very
8 different environment.
9     Q.   Is the -- what about people who
10 were addicted to heroin in 1992?  Did they
11 start with prescription opioids?
12     A.   I don't know.
13     Q.   How about people who were addicted
14 to heroin in 2000?  Were they -- did they start
15 with prescription opioids?
16     A.   I'm sure a large portion did,
17 because that is after prescription opioids were
18 being directly marketed to physicians and
19 consumers.
20     Q.   Do you have any other reason for
21 believing that -- giving me a different answer
22 as to 199- -- for -- a different answer for
23 1992 than you did for 2000?
24     MS. KEARSE:  Object to form.
25     A.   Can -- I don't think I understand

1 what you're asking.
2     Q.   Well, I asked you how the -- I
3 asked you about people in 1992, and you said
4 you didn't know.  And I asked you about people
5 in 2000, did they start with prescription
6 opioids, and you said you were sure a large
7 portion did because -- because of the marketing
8 that had occurred.
9        Is there any other reason that you
10 have for -- for giving me a different answer as
11 to 2000 than for 1992?
12     MS. KEARSE:  Object to form.
13     A.   I don't -- I don't know.  I don't
14 know how to answer that question.
15     Q.   Okay.  Now, of the people who
16 started with prescription opioids, what
17 percentage of those started with opioids that
18 they were prescribed by a doctor themselves?
19     A.   How many -- how many people started
20 with an opioid that a doctor prescribed them?
21 Is that what you're asking?
22     Q.   To them.
23     A.   To them.
24     Q.   To them.
25     A.   I don't know that that deep of a

1 dive is taken as far as, did you get it from
2 your doctor or did you get it through
3 diversion?  I mean, certainly the argument can
4 be made that anybody who did get it from a
5 doctor, whether they got good information about
6 how addictive it was, whether they could, you
7 know, form a habit from it, I -- I don't know.
8     Q.   Okay.  Just to be clear, because
9 you sort of wandered around a little bit with
10 that answer, you do not know what percentage of
11 the people who become addicted to prescription
12 opioids started with a prescription they got
13 from their doctor?
14     MS. KEARSE:  Object to form.
15     A.   I do not know.
16     Q.   What percentage of overdoses over
17 the past five years in Summit County have been
18 of people overdosing on prescription opioids?
19     A.   On prescription opioids?
20     Q.   Yes.
21     A.   I don't know the exact percentage.
22     Q.   It's pretty small, is it not?
23     MS. KEARSE:  Object to form.
24     A.   Pretty small I don't think is a
25 fair estimate.  If it was your family member,

1 it would certainly be far too much.
2     Q.   Well, any -- I'm sure we'll agree
3 any is too many.
4     A.   Agreed.
5     Q.   But is the -- the vast majority of
6 overdoses have been on heroin, fentanyl, and
7 carfentanil, correct?
8     A.   And I would classify those as
9 overdoses on opioids.
10     Q.   Okay.  But the opioids on which
11 people have overdosed have been heroin,
12 fentanyl, and carfentanil, correct?
13     MS. KEARSE:  Object to form.
14     A.   Not all of them.  But there --
15 there was a huge influx of fentanyl and
16 carfentanil that killed hundreds of Summit
17 County residents.
18     Q.   Do you -- but you do not know
19 what -- what the percentage of the total is of
20 heroin, fentanyl, and carfentanil?
21     A.   I do not know the percentage.
22     Q.   But it's well over half, correct?
23     MS. KEARSE:  Object to form.
24     A.   I've said I don't know the
25 percentage.

21 (Pages 78 - 81)

1    I know that Dr. Kohler and
2 Dr. Sterbenz talked in their depositions about
3 the increases and -- and the percentages, but
4 as I sit here today, I can't tell you the
5 number.
6    Q.   Now, when you read Commander
7 Paolino's deposition, did you see his testimony
8 that the greatest drug threats to Summit County
9 today are heroin, fentanyl, crystal meth, and
10 cocaine?
11    A.   I did read that.
12    Q.   And is -- was that testimony
13 correct?
14    A.   I think from a law enforcement
15 perspective, yes. But I think holistically
16 prescription opioids still pose an incredibly
17 dangerous threat to the Summit County
18 community, because there is still this inherent
19 trust that if it comes from the doctor, it
20 can't hurt me. And -- and that -- from a law
21 enforcement perspective, I believe Captain
22 Paolino certainly is qualified and certainly
23 sees day to day what his troops see out there.
24 But I think that is a law enforcement
25 perspective that is looking at what's in front

1 of them right now.
2    As we take a step back with ADM,
3 with Summit County Public Health, there is
4 still a grave risk of addiction that exists
5 every time an opioid is prescribed for
6 something that's outside of -- of cancer
7 patients and -- and those folks that we know
8 with acute pain after surgery, something like
9 that.
10    Q.   What percentage of people in Summit
11 County pursuing addiction treatment are
12 using -- are not -- strike that.
13    What percentage of the people
14 seeking substance abuse treatment for opioids
15 are using heroin?
16    A.   I -- the last slide that I saw, it
17 was -- it was very close. It was 48 or 52
18 percent were using opioids. I can't remember
19 which way. But it -- approximately half are
20 using opioids.
21    Q.   So that is of the total, and so the
22 rest would be, like, cocaine or other, meth?
23    A.   That would be the assumption.
24 Alcohol certainly still continues to be --
25    Q.   Of that 40-something, 48 or 52 or

1 whatever it is that's opioids, what percentage
2 of those are people who, at the time they're
3 seeking addiction treatment, are using heroin?
4    A.   I don't know the answer to that. I
5 sort of, as we discussed before, classify all
6 the opioids together.
7    Q.   Do you view prescription opioids as
8 a cause of the problem with methamphetamine?
9    MS. KEARSE: I'll object to form.
10    A.   It would be unfair to say that
11 Summit County didn't have methamphetamine
12 before opioids became the crisis that they are,
13 but the resurgence we have seen of
14 methamphetamines recently is certainly related
15 to the opioid crisis.
16    Folks who are suffering with
17 addiction become streetwise, and they know that
18 their friends are dying of fentanyl,
19 carfentanil, opioid overdose, and so they try
20 to seek different routes. They are still
21 interested in getting high. They still don't
22 want to go into withdrawal. They don't want to
23 be the sickest they've ever felt, and so they
24 choose different drugs, and oftentimes we're
25 seeing now methamphetamines, cocaine, even

1 marijuana laced with "fill in the blank,"
2 fentanyl, carfentanil, heroin, morphine.
3    Q.   And, in fact, sometimes it happens
4 the other direction, that there's sometime
5 people who are addicted to methamphetamine who
6 will switch to heroin, correct?
7    A.   Yes, I think that's fair.
8    Q.   And sometimes there are people who
9 are addicted to cocaine who will switch to
10 heroin, correct?
11    A.   I -- I have not heard that just
12 sort of anecdotally, because they're such
13 different drugs that produce such different
14 results. It would surprise me to find people
15 who switch in that -- in that way.
16    Q.   Do you know that that hasn't
17 happened?
18    A.   I don't. It would just surprise
19 me.
20    Q.   The -- now, you referred earlier to
21 sort of the mixing of drugs. There are --
22 there -- there are situations where dealers or
23 their suppliers will mix fentanyl or even
24 carfentanil in with other drugs that are
25 supplied to people, correct?

22 (Pages 82 - 85)

Page 86

1    A.    Yes.
2    Q.    And often the people who buy the
3 drugs do not know that that has happened,
4 correct?
5    A.    That's correct.  That's why we
6 started providing fentanyl strips at our Summit
7 County Public Health department.
8    Q.    And so sometimes somebody, you
9 know, might buy some heroin from their dealer
10 and not know that that heroin is -- is laced
11 with fentanyl, and that leads to an overdose,
12 correct?
13   A.    That can happen, yes.
14   Q.    And it's happened a fair amount,
15 has it not?
16   A.    I'm sure.
17   Q.    There are also times people buy --
18 have bought cocaine from their dealer that has
19 been laced with fentanyl that they have not
20 been aware of, correct?
21   A.    Correct.  It's an unregulated
22 industry.
23   Q.    So sometimes people who end up
24 overdosing on an opioid may not even realize
25 that they purchased an opioid, correct?

Page 87

1        MS. KEARSE:  Object to form.
2    A.    Yeah, I -- I suppose that's fair.
3 They may not have known.  Yes, that's fair.
4    Q.    Has there ever been an effort, to
5 your knowledge, undertaken to quantify how much
6 Summit County has spent addressing criminal
7 activity involving drugs that are not opioids?
8    A.    I don't know that -- that that has
9 been parsed out.  Certainly before we reached
10 an epidemic crisis, you could look at what we
11 were spending on indigent defense and
12 treatment, but I -- I don't know that that's
13 been quantified.
14       MS. KEARSE:  And, Counsel, I
15 just -- I know we're not talking topic to
16 topic, but I think the damages and the costs
17 associated with the epidemic is with Brian
18 Nelson as a 30(b).
19       MS. WINNER:  That's my
20 understanding.
21       MS. KEARSE:  Yeah.  So I just want
22 to make sure that it's -- I'm not going to say
23 what topic you're on, but I think that's --
24 going much more into that is really off topic.
25       MS. WINNER:  I'm floating around a

Page 88

1 bit, but -- but there's a little bit of overlap
2 in some of these.  So --
3        MS. KEARSE:  Yeah.  But if it's --
4 if it's -- just for the record, if it's -- if
5 there's dollars, costs, anything with that,
6 that's Brian Nelson who's been designated, and
7 not Ms. Johnson.
8        MS. WINNER:  I'd like to ask the
9 reporter to mark as Exhibit 5 a document titled
10 "Media Release," January 25, 2006.
11       - - - - -
12       (Thereupon, Deposition Exhibit 5,
13       1/25/2006 Media Release, "Heroin
14       Users Face Potentially Fatal
15       Ingredient," SUMMIT_000350711 to
16       000350712, was marked for purposes
17       of identification.)
18       - - - - -
19   Q.    Have you seen this before?
20   A.    I have.
21   Q.    And Drew Alexander was the sheriff
22 of Summit County at the time; is that correct?
23   A.    Yes, he was.
24   Q.    And do you see here that there is a
25 warn- -- there's issuing a warning about heroin

Page 89

1 mixed with fentanyl?
2    A.    Yes.
3    Q.    So this is a problem that was seen
4 in the mid-2000s, correct?
5    A.    Well, I don't know that that's a
6 fair characterization because this -- this
7 specifically talks about Northeast Ohio.  Our
8 Summit County Drug Unit certainly corresponds
9 and interacts with task force officers all over
10 the state, so to say that it was a problem in
11 Summit County I think mischaracterizes this, or
12 could, because it certainly doesn't say that
13 anyone died or that they found fentanyl in
14 Summit County, but just in Northeastern Ohio.
15       So I -- I don't know what incident
16 brought this about, but I -- I don't believe
17 that it's fair to characterize that it was a
18 problem in Summit County in 2006.
19   Q.    Do you know whether it -- it was or
20 wasn't?
21   A.    I -- I was a prosecutor in 2006,
22 and I never had a fentanyl case in 2006.  I
23 don't ever recall hearing of a fentanyl case in
24 2006.
25   Q.    Do you know that there were none?

23 (Pages 86 - 89)

Page 90

1    A.   I don't, but I would be confident
2  that if there were any fentanyl cases, it was
3  less than a handful.
4    Q.   Was Summit -- is Summit County
5  considered to be part of Northeastern Ohio?
6    A.   It is.
7    Q.   Just want to make sure I was right
8  on my geography.
9    A.   Sure.
10   Q.   Now, here there's discussion here
11 about fentanyl being used as a prescription
12 pharmaceutical.
13   A.   Yes.
14   Q.   Now, the fentanyl that has been
15 seen in more recent years has been imported
16 from Mexico and China, correct?
17   A.   Some of it has.  Some of it was --
18 we were seeing fentanyl patches being cut open
19 and abused.  But I -- yes, it is fair to say
20 that there's been an influx of fentanyl,
21 primarily from China, in Summit County.
22   Q.   And that -- the fentanyl that's
23 mixed with heroin or with cocaine has been that
24 imported fentanyl, correct?
25   A.   I -- I would say by and large.  I

Page 91

1  couldn't say in every instance, but by and
2  large it's been imported.
3    Q.   Do you know of any instance in
4  which diverted prescription fentanyl has been
5  mixed with heroin or cocaine or other drugs?
6    A.   Has -- I know that -- I can recall
7  it being used in conjunction with, like
8  somebody cutting open a patch, and they will
9  eat it and take other pills with it.  But as
10 far as like, you know, mixing the compound, I'm
11 not aware of any.
12   Q.   And is the carfentanil that has
13 been seen and -- and caused problems in Summit
14 County in recent years, has that been illicit,
15 imported carfentanil?
16   A.   Yes.  I -- frankly, I don't know
17 that any of us had heard of carfentanil until
18 about 2016.
19   Q.   So that's -- that's not something
20 that you have seen diverted pharmaceutical
21 carfentanil for?
22   A.   No.  It's -- it's used for large
23 animals.  Our zoo in Akron doesn't have animals
24 large enough to keep carfentanil.
25   Q.   Now, the -- there's been an

Page 92

1  increase in the supply of heroin in Summit
2  County in recent years, correct?
3        MS. KEARSE:  Object to form.
4    A.   There's been an increase in supply?
5  Yes, there's also been an increase in demand.
6    Q.   But the increase in supply has
7  included changes in the distribution methods
8  used by Mexican drug cartels in Northeastern
9  Ohio, correct?
10       MS. KEARSE:  Object to form.
11   A.   I mean, the cartels have always
12 used some of the same hierarchy, whether it was
13 cocaine or heroin now.
14       I'm not sure what specifically
15 you're asking, but, you know, I'm aware that --
16 that some of our drugs have come through the
17 southern border, yes.
18   Q.   Well, and the -- the -- the -- the
19 drug traffic organizations have improved their
20 distribution strategies, have they not?
21 They've gotten more efficient just like other
22 businesses.
23       MS. KEARSE:  Object to form.
24   A.   I don't know.  I thought they were
25 pretty good at it before.  I mean, it seemed

Page 93

1  like I was pretty busy with drug cases.  I
2  think they have been in the game long enough
3  that they evolve and adapt like any business
4  does.
5        The desire was not for cocaine.
6  The desire was for an opium high, and that was
7  the market demand, and they adjusted their
8  business strategy to meet that.
9    Q.   Is cocaine still a problem in
10 Summit County?
11   A.   I think any time cocaine is around
12 it's a problem.
13   Q.   Has it -- is it less of a problem
14 than it was?
15   A.   I think -- it was different.  Opium
16 derivatives and heroin are so different than
17 the cocaine problems we saw in the '90s and
18 2000s, because people are literally dropping
19 dead immediately.  And is it -- is it more or
20 less of a problem?  I don't know, because all
21 of our attention became 100 percent
22 laser-focused on opioids.
23   Q.   So there's no focus anymore on
24 trying to interdict cocaine?
25   A.   No.  There's always -- there's

Page 94

1  always officers whose primary responsibilities
2  are to work with the interdiction world, but
3  it's just a different focus.
4      It became so prevalent -- it cannot
5  be overstated how prevalent the opioid crisis
6  discussion was in '14 and '15 and '16. It was
7  the dominant topic in every conversation,
8  whether public or private here.
9      Q.   And that was largely because there
10  were a lot of overdoses that were occurring
11  during that time, correct?
12      A.   Absolutely.
13      Q.   And -- and that was in large part
14  because of the problem with fentanyl being
15  mixed in with the heroin and carfentanil?
16      MS. KEARSE:  Object to form.
17      A.   I would suggest that those were
18  opioid overdoses.  That that space, again, was
19  created by the 39 million pills per year that
20  were coming into our community.
21      Fentanyl doesn't find its way here
22  unless the demand is here, and that demand was
23  created by an addicted population brought about
24  by opioid prescriptions.
25      Q.   I'm not asking you to trace

Page 95

1  everything back in history.  I'm asking you
2  what was it that was causing people to perk up
3  and pay attention, in -- in the period 2014,
4  '15, '16, and that was because people were
5  overdosing, correct?
6      MS. KEARSE:  Object to form.
7      A.   People were sitting up and paying
8  attention because we all started to see things
9  in our lane.  Prosecutors were seeing their
10  lane.  ADM was seeing their lane.  Hospital was
11  seeing their lane.  ER visits were up.  And we
12  all started to come together to say, you know,
13  how is this going on and how -- how do we treat
14  this community issue?
15      Not the least of which was that we
16  had thousands -- we lost thousands of people in
17  that time period.
18      Q.   And those were the people who were
19  overdosing on heroin and fentanyl, correct?
20      A.   Those were the people who were
21  overdosing on opioids.
22      Q.   But the opioids they were
23  overdosing on were heroin and fentanyl, were
24  they not?
25      A.   Those were two of the drugs.  I

Page 96

1  have not reviewed every autopsy of the people
2  we lost, but I would -- I would assume that
3  some of them also had prescription opioids in
4  their system as well.
5      Q.   But you don't know what percentage
6  were?
7      A.   I don't.
8      Q.   Are you familiar with the term
9  "diversion" as it relates to prescription
10  pharmaceuticals?
11      A.   I am.
12      Q.   And what does diversion mean?
13      A.   Diversion means the -- obtaining or
14  using prescription medications outside of the
15  sort of medically recommended or legal uses.
16      Q.   Is --
17      A.   It's the -- it's the way that pills
18  get into our community, sort of outside of the
19  original intended use.
20      Q.   Is diversion a crime?
21      A.   It -- yes.
22      Q.   Are there any situations when it's
23  not a crime?
24      A.   No.
25      Q.   Is it common for pills that have

Page 97

1  been diverted to pass through multiple hands
2  before they reach the user?
3      A.   Multiple hands?
4      Q.   Multiple people.
5      MS. KEARSE:  Object to form.
6      A.   Like doctor, pharmacist, patient?
7      Q.   Well, diversion -- after -- after
8  the diversion first occurs until the user who
9  consumes it, are there often --
10      A.   I see what you're saying.
11      Q.   -- multiple steps in there?
12      A.   So diversion can occur with the
13  original patient.  I mean, certainly diversion
14  can occur if I'm someone who is addicted and my
15  doctor will no longer prescribe to me and I go
16  to another doctor, that's diversion as well.
17  So -- so in that case, no.
18      In other cases, I don't know the
19  answer to that.  It's not something I've
20  considered before.
21      Q.   All right.  Well, I'd like to talk
22  about some of the ways that diversion does
23  occur.
24      A.   Uh-huh.
25      Q.   And I think we've already talked

25 (Pages 94 - 97)

Page 98

1 about some of them. One of them you talked
2 about just now. I think it's referred to as
3 doctor shopping, correct?
4     MS. KEARSE: Object to form.
5     A. I've heard it called that, yes.
6 Yeah. Or hopping.
7     Q. What is doctor shopping or doctor
8 hopping?
9     A. It's when an individual typically
10 has a prescription from their doctor, and
11 typically for opioid, and at some point either
12 becomes so addicted that their prescribed
13 dos- -- dosage no longer keeps them from
14 becoming pill sick, or their doctor has said,
15 you know, there's no reason -- this was
16 post-surgical, or something like that, or they
17 don't have a primary care physician, and so
18 they seek to get more opioids from another
19 doctor than the one they originated with.
20     Q. Is doctor -- did doctor shopping or
21 doctor hopping occur for other drugs, like
22 Xanax or...
23     A. I'm sure that it did. I -- I don't
24 recall -- I don't recall any specific instances
25 where I would say I'd seen that, but I'm -- I'm

Page 99

1 sure that it did.
2     Q. Well, talking about doctor
3 shopping, let's limit it to opioids for right
4 now. Who has the power to prevent it from
5 happening?
6     A. Well, certainly the person who
7 writes the prescription, if they are accessing
8 OARRS, so the -- the physician.
9     Pharmacists who have access to
10 OARRS.
11     But, again, having dealt with an
12 addicted population to crack, to
13 methamphetamine, cocaine -- if you believe or
14 not, people can be addicted to marijuana --
15 opioid addicts are far more clever and are far
16 more committed than any other addicted
17 population I've seen.
18     So prevention, there are -- there
19 are guardrails that should be in place, but
20 these folks are very committed. And frankly,
21 you know, I think the other people that could
22 have intervened are certainly the manufacturers
23 and distributors. There were --
24     Q. Well, how is a distributor going to
25 prevent doctor shopping?

Page 100

1     A. Well, I think with better
2 education. It might not prevent them on that
3 particular day, but perhaps if accurate
4 information had been provided by the
5 manufacturers to distributors and doctors,
6 perhaps that first initial prescription
7 wouldn't have been written. So, you know --
8     Q. So anything else that -- that a --
9 well, I've asked you specifically not about the
10 manufacturer, but about a distributor. What --
11 what can a dis- -- what can a distributor do to
12 stop doctor shopping?
13     A. Well, I -- I think when they see
14 that -- because doctor shopping isn't just
15 limited to somebody who's looking for two
16 different doctors. You can be looking for that
17 one special doc who everybody knows --
18     Q. Uh-huh.
19     A. -- will fill the script. And I
20 think distributors have and do have the
21 responsibility of identifying when, you know,
22 there are certain doctors who are writing
23 hundreds of scripts. Like we -- we did have a
24 couple of those in Summit County.
25     Q. Do distributors interact directly

Page 101

1 with doctors?
2     A. Their reps do.
3     Q. Distributors, or pharmaceutical --
4 or manufacturers?
5     A. I guess I hadn't thought about it
6 that way. I suppose it's manufacturers. I --
7 I -- I guess I hadn't really thought of it in
8 that terms.
9     Q. Well, let's -- another kind of
10 diversion occurs when people still -- still --
11 steal pills, correct?
12     A. Yes.
13     Q. And sometimes they will -- may rob
14 a pharmacy or a hospital.
15     A. Yes.
16     Q. Who has the power to prevent that
17 from happening?
18     A. I mean, crime prevention in
19 general? I don't -- I don't know who -- I
20 don't know who has the power to prevent a
21 robbery from occurring.
22     Q. There's also a theft just from
23 individuals from friends or from family
24 members?
25     A. Correct.

26 (Pages 98 - 101)

1    Q.    And would your answer be the same
2  as -- if I asked you who has the power to
3  prevent that from happening?
4    A.    No, it wouldn't be.
5    Q.    Okay.
6    A.    Because there was so much
7  overprescribing based on bad information, that,
8  you know, an incident that probably could have
9  been handled with a three- or five-day supply,
10  there was a 30-day supply.  And --
11    Q.    So if doctors --
12    A.    -- you know, I -- I --
13    Q.    I'm sorry.  No, go ahead.
14    A.    You had asked earlier.  I have
15  taken an opioid post-surgery, but I've never
16  taken the whole bottle.  And I think that
17  that's reflective of so many folks in our
18  community who take a couple, feel better, and
19  then they stay in the medicine cabinet, and --
20  and that is -- that is certainly a way that
21  pills in Summit County were diverted.
22        So perhaps if there had been better
23  information about habit forming and addiction
24  levels, perhaps those -- those prescriptions
25  for 30 days would not have occurred when three

1  or five would have sufficed.
2    Q.    So -- so doc- -- so doctors -- if
3  doctors could pre- -- prescribed less, there
4  would be less theft?
5    A.    I think if doctors had the accurate
6  information, that they would have acted in that
7  fashion.
8    Q.    Will doctors have the accurate
9  information today?
10    A.    I hope so.  I think that's what
11  we're trying to make sure of.
12    Q.    What happened to the rest of your
13  pills?
14    A.    We disposed of them.  I -- we
15  have -- I worked in the courthouse, and the
16  police off- -- officer has a dump box right in
17  the -- right when you walk in the door at the
18  Akron Police Department.
19    Q.    There is also a diversion just from
20  people giving pills to friends, like kids get
21  together and give pills to each other, correct?
22    A.    That's correct.
23    Q.    And -- and who has the power to
24  prevent that from happening?
25    A.    Well, again, if we could have

1  prevented the readily available supply.  I
2  mean, again, I -- it's such a big number to me.
3  39 million pills.  72 pills for every man,
4  woman, and child in Summit County.  So they
5  were just there.  They were so available.
6    Q.    But sometimes pills were taken from
7  people who had legitimate prescriptions for the
8  full amount for which they were prescribed,
9  correct?
10    A.    That's correct.
11    Q.    So it's not always the fault of the
12  doctor or anybody else for giving the person
13  too many pills --
14        MS. KEARSE:  Object to form.
15    Q.    -- is it?
16    A.    I've not encountered a situation
17  where someone stole pills from a sick relative
18  when they hadn't already had pills before.
19    Q.    Okay.  But the -- when they steal
20  pills from a sick relative, that sick relative
21  may have the pills perfectly legitimately.
22    A.    They may, yes.
23    Q.    And so the doctor may have done
24  exactly the right thing in giving them the
25  pills, correct?

1    A.    Correct.
2    Q.    And the pharmacy may have done
3  exactly the right thing in filling that
4  prescription, correct?
5    A.    Correct.
6    Q.    And the distributor may have done
7  exactly the right thing in -- in supplying the
8  pills to the pharmacy, correct?
9    A.    There are residents in Summit
10  County who legitimately need and are prescribed
11  these pills, yes.
12    Q.    And -- and the manufacturer that
13  manufactured the pills that were given to that
14  sick relative didn't do anything wrong in
15  giving -- in manufacturing those pills that
16  went to that sick relative?
17    A.    For that particular person --
18        MS. KEARSE:  Object to form.
19    A.    -- I -- I -- you know, for that
20  particular person, if that's what was
21  prescribed appropriately, then, yes.
22    Q.    And then, when they're stolen but
23  they -- when they're stolen, they're then
24  diverted, and the person who's at fault is
25  whoever stole them, correct?

27 (Pages 102 - 105)

1     MS. KEARSE:  Object to form.
2     A.   I -- you know, I -- the person who
3 is at fault for what?
4     Q.   All right.  Let me just ask.  Do
5 you think that the person who steals pills from
6 somebody else is at fault?
7     MS. KEARSE:  Object to form.
8     A.   Yeah.  I'm not -- I'm not -- no.
9 I'm not going to sort of fall into that
10 victim-blaming trap.  No.  Because these -- I
11 have not seen an instance where someone stole
12 pills from a sick relative who was not already
13 addicted to opioids.
14     Q.   Has anybody stolen pills from --
15 from somebody else, another individual, whether
16 they're a sick relative or not, who's been
17 prosecuted?
18     A.   Has -- say that again, please.
19     Q.   Has a person who's stolen pills
20 from another person been prosecuted in Summit
21 County?
22     A.   Stolen pills from another person.
23 I mean, we've had robberies, certainly.
24     Q.   And those people are prosecuted,
25 right?

1     A.   Yes.
2     Q.   And they're convicted?
3     MS. KEARSE:  Object to form.
4     A.   Yes.
5     Q.   And are some of the people who --
6 well, strike that.
7     Another type of diversion that
8 occurs is the forgery of prescriptions,
9 correct?
10     A.   That's correct.
11     Q.   Is that something you saw in the
12 prosecutor's office?
13     A.   It is.
14     Q.   And so were you, as a prosecutor,
15 and the police you worked with, the main people
16 who have the power to address that issue?
17     A.   I -- I think that there was some
18 education that could have occurred with the
19 pharmacists from, you know, their board.  I
20 think with the advent of OARRS and sort of the
21 understanding that these pills were highly
22 addictive started to become more prevalent in
23 our community.  Physicians, pharmacists, and
24 law enforcement began to work together.
25     Q.   Now, another cause of diversion is

1 just flat out improper prescrib- --
2 prescribing.  Doctors prescribing pills that
3 they know the person doesn't need, correct?
4     MS. KEARSE:  Object to form.
5     A.   Yes, there were -- there were
6 doctors who were improperly prescribing in
7 Summit County.
8     Q.   And they were -- these were doctors
9 who knew they were improperly prescribing?
10     A.   I think that's fair.
11     Q.   And some of them were prosecuted,
12 correct?
13     A.   Yes.
14     Q.   Have you ever heard the term "pill
15 mill"?
16     A.   I have.
17     Q.   Were there pill mills in Summit
18 County?
19     A.   I think that we had a couple
20 that -- depending on what your definition is,
21 that were referred to as -- as pill mills, yes.
22     Q.   Are there pill mills in Summit
23 County today?
24     A.   Not that I'm aware of.
25     Q.   Who were -- who were the ones

1 that -- that you were aware of?
2     A.   Yeah.  Dr. Bressi, Dr. Heim,
3 Dr. Harper stood out as -- you know, they
4 were -- they were headline news at the time.
5     Q.   And these were people who wrote
6 prescriptions for large numbers of patients who
7 didn't need opioids, but they gave them
8 prescriptions for opioids anyway, correct?
9     MS. KEARSE:  Object to form.
10     A.   These were doctors who -- will you
11 say that part again?  I feel like there was a
12 couple different questions in that.
13     Q.   All right.  Well, these were
14 people -- these were doctors who wrote
15 prescriptions for opioids for patients knowing
16 that they didn't need them, correct?
17     A.   I --
18     MS. KEARSE:  Object to form.
19     A.   I don't think that "need" -- I
20 think that term "need" is tough for me, because
21 from the patient's perspective, they needed
22 them.  They were deeply addicted.  And --
23     Q.   Okay.  Let me ask it a different
24 way, then.
25     A.   Okay.  Okay.

28 (Pages 106 - 109)

Page 110

1     Q.   So they -- they wrote --
2          MS. KEARSE:  Counsel, I'm just --
3  she was answering your question.
4          MS. WINNER:  Okay.
5          MS. KEARSE:  I believe you just cut
6  her off.  So --
7     Q.   I'm sorry.  I didn't mean to cut
8  you off.  I just -- I think maybe you
9  misunderstood my question.  I wanted to
10 rephrase it.
11         The -- my -- my question is they
12 wrote -- they wrote -- let -- let me put it a
13 different way.
14         These were people that were
15 prosecuted for writing prescriptions to
16 patients for which -- for whom the --
17 prescriptions were improper?
18         MS. KEARSE:  Object to form.
19    A.   I think im- -- yeah, "improper"
20 is -- is fair.  I -- I think that we prosecuted
21 doctors who were not following their oath, who
22 were -- were writing prescriptions to, albeit
23 sick individuals, but should have intervened in
24 a different way.
25    Q.   In fact, it wasn't just wrong what

Page 111

1  they were doing, it was criminal what they were
2  doing, correct?
3     A.   There's no question.  But, you
4  know, at the same time, these doctors were
5  still being called upon by reps.  I mean, we
6  certainly have seen that through the discovery
7  process the number of times -- you know, it's
8  not to excuse the -- the behavior of these
9  docs, certainly, but they definitely had a
10 partner in that crime.
11    Q.   But they knew that what they were
12 doing was -- was illegal, correct?
13         MS. KEARSE:  Object to form.
14    A.   I -- I think that they did, yes.
15    Q.   All right.  Is any of the -- are
16 any of the diverted prescription opioids sold
17 in Summit County smuggled in from Canada?
18    A.   I don't know the answer to that.  I
19 don't think we really had a need.  We had
20 almost 40 million pills a year, so I -- it's
21 not something I ever encountered.
22    Q.   But you don't know how many pills a
23 year came in from Canada?
24    A.   Not into Summit County, I do not.
25 Certainly not illegally.

Page 112

1     Q.   So people who are engaged in
2  diversion include medical professionals,
3  correct?
4          MS. KEARSE:  Object to the form.
5     A.   You mean the doctors who were
6  prescribing?
7     Q.   Well, sometimes it's maybe doctors
8  who were prescribing.  Sometimes it may be
9  doctors or nursing -- nurses or others who are
10 stealing --
11    A.   I see.
12    Q.   -- drugs, correct?
13    A.   I see.  We did have instances, yes,
14 of that.
15    Q.   Dentists have also been involved in
16 diversion?
17         MS. KEARSE:  Object to form.
18    A.   I -- I'm not aware of -- well, are
19 you asking are there, you know, like, bad
20 dentists in Summit County?
21    Q.   Yes.
22    A.   I -- I don't know that -- I don't
23 know of -- of a dentist we've prosecuted.  I'm
24 sure that there has been diversion in a dentist
25 office through someone seeking opioids, but

Page 113

1  I -- I don't -- I'm not familiar if we had a
2  dentist.
3     Q.   Has every medical professional
4  who's been suspected of diversion been
5  prosecuted?
6     A.   Suspected?  I'm sure not.
7     Q.   Why not?
8     A.   At the time?  Are -- I guess I
9  should ask you to -- to be specific.  Are you
10 asking if every doc who we thought was, you
11 know, acting outside of their oath was -- are
12 you asking if every doc who was duped by
13 somebody seeking a pill that they should not
14 have been seeking?
15    Q.   I'm asking you if -- if -- if every
16 doctor that you suspected might be knowingly
17 writing improper prescriptions was prosecuted?
18    A.   I don't think so.
19    Q.   Why?
20    A.   Because the access to OARRS at the
21 time was so incredibly limited.  The way that
22 doctors were originally prosecuted was really
23 an officer or detective driving from pharmacy
24 to pharmacy to pharmacy and trying to interview
25 patients.  And quite frankly, nobody wants to

29 (Pages 110 - 113)

Page 114

1 rat out their doc, especially when they're
2 deeply addicted to opioids.
3        So to suspect a doctor is one
4 thing. To be able to put that case together,
5 really almost impossible because the lack of
6 cooperation that you need from the patients,
7 because there was such limited access to OARRS
8 at the time. I'm sure that there were some
9 that we missed.
10       Q.   Are there situations where it's not
11 a bright line as to whether a prescription was
12 written improperly or not?
13       MS. KEARSE:  Object to form.
14       A.   I know that there were doctors who
15 were given information that said these are
16 folks -- you know, these are the right kind of
17 patients who aren't going to get addicted.  And
18 I think that's bad information for the docs to
19 act on.
20       So the bright line, was it an
21 improper prescription?  Perhaps.  However, the
22 doc was acting in good faith.
23       Q.   Well, leaving aside whether the
24 doctor had good -- let's assume it's today when
25 a doctor -- and a doctor has good information.

Page 115

1 Is law enforcement always able to fully
2 evaluate whether the doctor has properly --
3       A.   No. We're --
4       Q.   -- made a prescription?
5       A.   Law enforcement is not trying to
6 put itself, and neither is the County, in the
7 shoes of a physician.  I mean, we still want to
8 allow doctors to treat their patients.
9       Q.   And whether to prescribe opioids or
10 not to a particular patient is often a judgment
11 call, is it not?
12       A.   Yes, because pain is self-reported.
13       Q.   And different doctors have -- may
14 have different judgments about the appropriate
15 way to treat pain for a particular patient,
16 correct?
17       A.   Absolutely.
18       Q.   Do you know how many nurses have
19 been prosecuted for diversion?
20       A.   The exact number, no, but I recall
21 reading in Brad Gessner's deposition, like,
22 half a dozen in one particular year or one
23 particular span of time that he talked about.
24       Q.   Does Summit County ever work with
25 the board of nursing or the medical board or

Page 116

1 the board of pharmacy to try to get licenses
2 lifted for people who are involved in
3 diversion?
4       A.   That did occur.
5       Q.   When did it occur?
6       A.   I recall it occurring in the late
7 2000s.  Certainly when I was a prosecutor I
8 recall there being some nursing licenses that
9 were in question.
10       Q.   And who -- how did that work?
11 Did -- did somebody reach out to the -- to the
12 board?
13       A.   Typically the board already knew,
14 because, frankly, the nurses tended to
15 self-report.  As soon as the diversion occurred
16 and they were -- they first encountered law
17 enforcement, they -- there was, by and large,
18 self-reporting.
19       Q.   In your view, did the medical
20 board -- just focusing just on the medical
21 board -- did the medical board do enough to
22 regulate doctors who were involved in this?
23       MS. KEARSE:  Object to form.
24       A.   I don't feel like I can make that
25 judgment.  I'm -- I'm not familiar with what

Page 117

1 the medical board did at that time.
2       Q.   Do you have a view about whether
3 the nursing board did enough?  The board of
4 nursing did enough?
5       A.   Again, I -- what they were doing to
6 regulate their folks, I mean, I think looking
7 back, we criminalized addiction at that time,
8 and we still do today.  And if -- if I could go
9 back, I would go back with a different mindset
10 of rather than creating a felon out of this
11 situation, trying to figure out what caused it
12 and -- and trying to put that person in a
13 better position to be in recovery rather than
14 taking away their means to provide treatment.
15 You know, their means to put food on their own
16 table.
17       Q.   My question was, did you have a
18 view about whether the board of nursing did
19 enough to combat diversion?
20       A.   I don't know what the board of
21 nursing did at that time.
22       MS. WINNER:  I'd like to ask the
23 reporter to mark as Exhibit 6 a document titled
24 "Summit County and the City of Akron, Ohio,
25 Plaintiff's Supplemental Responses and

30 (Pages 114 - 117)

1 Objections to Distributor Defendants'
2 Interrogatory No. 3, as Rewritten by Special
3 Master David Cohen."
4       - - - - -
5           (Thereupon, Deposition Exhibit 6,
6           Summit County and City of Akron,
7           Ohio Plaintiff's Supplemental
8           Responses and Objections to
9           Distributor Defendants'
10          Interrogatory Number 3 As Rewritten
11          by Special Master David Cohen, was
12          marked for purposes of
13          identification.)
14      - - - - -
15     Q.    Have you seen this before?
16     A.    I have.
17     Q.    Was this one of the documents you
18 reviewed in preparing for this deposition?
19     A.    It is -- look through it -- yes.  I
20 recognize that.
21     Q.    Okay.  If you would turn to page
22 5 --
23     A.    Uh-huh.
24     Q.    -- we'll skip over the objections
25 for now -- it asks to identify those pharmacies

1 within your geographical boundaries that you
2 investigated for or learned were being
3 investigated for or learned were engaged in
4 possible diversion or wrongful prescription of
5 prescription opioids during the time frame.
6 And then if you go down below, there's a list
7 of two pharmacies.
8     A.    Yes.
9     Q.    Are you familiar with these two
10 pharmacies?
11     A.    I mean, I've seen this document.
12 I'm not familiar with -- I've never been to
13 either one of these pharmacies.
14     Q.    Okay.  Do you know what -- the
15 first of these, what -- what the wrongdoing was
16 that was investigated entailed?
17     A.    I believe this was -- no.  I don't
18 want to guess.  I -- I don't know.  I mean, I
19 could read through this again more closely if
20 it's detailed in here.
21     Q.    It's not.
22     A.    Okay.  Okay.
23     Q.    At least not that I -- not that I'm
24 aware of.
25     A.    No.  Okay.

1     Q.    My question is, do you know
2 anything -- do you know anything about these
3 two pharmacies or their involvement in
4 diversion beyond what is in this interrogatory
5 response?
6     A.    About -- no, I do not.
7     Q.    All right.  If you would then turn
8 a few more pages in to page 8.  At the top of
9 that page, it says, "Based upon data made
10 available to Summit County and the City of
11 Akron through the Court's order concerning
12 ARCOS data, Plaintiff has identified the
13 following pharmacies as having placed
14 suspicious orders during the relevant time
15 frame."
16         Do you see that?
17     A.    I do, uh-huh.
18     Q.    Do you know whether any of the
19 pharmacies that are then listed on this list
20 have been investigated for diversion?
21     A.    Oh, I don't know.  Like a detective
22 went and -- is that what you're asking?
23     Q.    Whether anything was done to -- to
24 look into anything involving any of these
25 pharmacies?

1     A.    Well, no.  I don't think we had
2 that data until the Judge released it.
3     Q.    But apart from -- apart from that
4 data, do you know whether any of these
5 pharmacies have ever been investigated for
6 involvement in diversion?
7         MS. KEARSE:  Object to form.
8     A.    I -- I mean, I'm -- I'm confident
9 some of these pharmacies were part of criminal
10 investigations when somebody was, you know,
11 seeking to pass a forged script or something
12 like that.  I mean, there's -- but I -- I don't
13 know specifically that anybody has investigated
14 these pharmacies, from law enforcement
15 perspective.
16     Q.    Do you know whether, apart from
17 whatever analysis was done of the ARCOS data,
18 Summit County has any reason to believe that
19 any of these pharmacies dispensed
20 pharmaceuticals improperly?
21         MS. KEARSE:  Object to form.
22     A.    Well, certainly as they were listed
23 in the response, I'm confident that our counsel
24 and the experts have determined, based on the
25 ARCOS data, that there was some involvement,

31 (Pages 118 - 121)

1 whether it was a fail to report or stop a
2 suspicious order.
3    Q.   I'm talking about the pharmacies.
4 Is there anything any of these pharmacies is
5 believed to have done wrong with prescription
6 opioids that they ordered?
7    A.   The pharmacies that are listed are
8 our representation of pharmacies we believe
9 have placed suspicious orders.
10    Q.   But you would agree, as a former
11 prosecutor, that there's a difference between a
12 suspicion of wrongdoing and actual wrongdoing,
13 correct?
14       MS. KEARSE:  Object to form.
15    A.   I mean, sure.  There's also
16 different burdens of proof, and, you know, the
17 criterion that we looked at for -- or were
18 asked to provide, I think, informed some of our
19 decisions about what we looked at.
20    Q.   But my question is, do you -- apart
21 from whatever analysis that was done with the
22 ARCOS data to come up with this list --
23    A.   Oh, okay.
24    Q.   -- do you know of any- -- anything
25 else that Summit County is aware of indicating

1 that any of these pharmacies did anything wrong
2 with the prescription opioids that they
3 ordered?
4    A.   Apart from the ARCOS data, I am not
5 aware of anything, no.
6    Q.   Do you know how it was determined,
7 based on the ARCOS data, that these pharmacies
8 placed suspicious orders?
9    A.   That was done by counsel and the
10 experts who analyzed that data.
11    Q.   So is the answer, no, you don't
12 know?
13       MS. KEARSE:  Object to form.
14    A.   I know that that's how this list
15 was created.  How they did that, I do not know.
16    Q.   If you would then go on to page 10
17 of the exhibit -- and we're still on
18 Exhibit 6 --
19    A.   Uh-huh.
20    Q.   -- then there's a list here of
21 pharmacies that had the largest shipments of
22 opioids.
23    A.   Uh-huh.
24    Q.   Does the fact that a pharmacy had a
25 larger shipment of opioids than another

1 pharmacy necessarily mean that there was
2 anything wrong going on?
3       MS. KEARSE:  Object to form.
4    A.   Outside of -- of the guardrails of
5 reporting, I know that we've learned, through
6 the discovery process, that there were -- there
7 was at least a pharmacy that always kept on
8 hand a greater number of opioids due to its
9 proximity to one of our sort of nefarious docs.
10 So the reporting requirements of the
11 pharmacies, I think, are in question.
12 That's -- that's the way I understand it.
13    Q.   What's the pharmacy you were just
14 referring to?
15    A.   I believe there was a Rite Aid.  I
16 don't -- yeah.  I would guess it's this one on
17 Waterloo Road.
18    Q.   You would guess or you know?
19    A.   I don't know.  You know what?  I'm
20 not going to say.  I know -- I know that it was
21 a Rite Aid in proximity to one of the docs.
22    Q.   But there might also -- there might
23 also be a pharmacy that's in proximity to a
24 hospice prescriber, correct?  Than --
25    A.   Sorry.  I got distracted by the

1 pounding.
2       MS. WINNER:  Let's go off the
3 record.
4       THE VIDEOGRAPHER:  Off the record
5 at 10:51.
6       (A recess was taken.)
7       THE VIDEOGRAPHER:  On the record.
8 This is the beginning of Disk No. 2 of
9 deposition of Greta Johnson.  The time is
10 11:09.
11       MS. KEARSE:  I just want to, has
12 any- -- everyone on the phone made an
13 appearance?
14       MS. RAYFORD:  I have not.  This is
15 Latiera Rayford of Morgan Lewis on behalf of
16 the Teva Defendants.
17       MS. WINNER:  Anyone else?
18       (No response.)
19       MS. WINNER:  Okay.  We'll go ahead,
20 then.
21 BY MS. WINNER:
22    Q.   We were on Exhibit 6 and on page
23 10, the list of pharmacies that were identified
24 as having the largest shipments of opioids.
25       Do you see that?

32 (Pages 122 - 125)

Page 126

1    A.   I do.
2    Q.   And the question I was trying to
3  ask you was whether you would agree that a
4  pharmacy may have a large shipment of opioids
5  simply because it has a lot of legitimate
6  prescriptions to fill.
7    A.   Yes.  I think these were identified
8  because there was an increase in -- from, you
9  know, one shipment to the next.  So I -- I
10  believe that some of the pharmacies were
11  identified because of the increase.
12    Q.   Is that for the list on page 10 or
13  the list on page 8?
14    A.   I want to make sure they're the
15  same.
16         Well, some -- it appears that some
17  of them are the same.  So these are identified
18  as having just the largest overall set.
19    Q.   Yes.
20    A.   Okay.  Okay.
21    Q.   So my question was, would you agree
22  that a pharmacy may have a large shipment of
23  opioids simply because it has a lot of
24  legitimate prescriptions to fill?
25    A.   Yes.

Page 127

1    Q.   So the mere fact that -- that a
2  shipment is large does not in and of itself
3  indicate wrongdoing.
4    A.   No, but I think it does require
5  that there is -- I don't want to say
6  investigation, but there is sort of a look at
7  why that size.
8    Q.   Do you know whether Summit has --
9  has looked into the reasons why these are
10  large?
11         MS. KEARSE:  Object to form.
12    A.   Whether -- you mean our counsel?
13    Q.   Whether Summit -- anyone from
14  Summit has looked into the reasons why these
15  particular pharmacies have had large shipments?
16    A.   I don't know that we had this data
17  until fairly recently.  This is, I believe,
18  part of the ARCOS data.
19    Q.   My question was, do you know --
20    A.   Oh, okay.  Sorry.
21    Q.   -- whether anyone from Summit has
22  looked into the reasons why these particular
23  pharmacies had large orders?
24    A.   I don't know.
25    Q.   Do you know whether anyone from

Page 128

1  Summit has investigated any of these pharmacies
2  for wrongdoing?
3    A.   I don't know.
4         MS. WINNER:  I'd like to ask the
5  reporter to mark as Exhibit 7 a document
6  entitled "Summit County and City of Akron,
7  Ohio, Plaintiff's First Amended Responses and
8  Objections to Distributor Defendants' Third Set
9  of Interrogatories."
10         - - - - -
11         (Thereupon, Deposition Exhibit 7,
12         Summit County and City of Akron,
13         Ohio Plaintiff's First Amended
14         Responses and Objections to
15         Distributor Defendants' Third Set of
16         Interrogatories, was marked for
17         purposes of identification.)
18         - - - - -
19    Q.   Is this another one of the
20  interrogatory documents that you reviewed in
21  preparing for this deposition?
22    A.   Yes, or at least some form of this.
23    Q.   Okay.  Well, why don't you turn to
24  page 11.
25    A.   Okay.  Okay.

Page 129

1    Q.   And then, on about two-thirds of
2  the way down the page, it says, "Subject to and
3  waiving all objections, Plaintiff states that
4  it believes on information and belief that the
5  following individuals prescribed controlled
6  substances that may be part of a suspicious
7  order in its geographic area."
8         Do you see that?
9    A.   I do.
10    Q.   And then there are five people who
11  are identified below that, correct?
12    A.   I see that.
13    Q.   Do these names look familiar to
14  you?
15    A.   Other than I -- I believe I've seen
16  this document or a version of this document,
17  no, I do not know these doctors.
18    Q.   Do you know why these doctors are
19  believed to have prescribed controlled
20  substances that may be part of a suspicious
21  order?
22    A.   It's my understanding that based on
23  the data we received from ARCOS that they were
24  identified.
25    Q.   Oh, you believe these -- these

33 (Pages 126 - 129)

Page 130

1 doctors were identified from ARCOS data?
2     A.   So my understanding is that these
3 doctors are identified as potentially being
4 part of a suspicious order in a geographical
5 area, not necessarily that their prescribing
6 was not appropriate, but that they wrote
7 prescriptions that were part of a suspicious
8 order in a geographical area.
9     Q.   And what's the basis for that?
10     A.   That's based on the ARCOS data, the
11 expert analysis of it.
12         But I know that -- I know that when
13 we're talking about the prescriptions -- you
14 know, our -- our contention is that it isn't
15 just like any one prescription or any one
16 doctor.  It's -- it's in the aggregate.  And
17 when sort of forced or ordered to come up with
18 certain prescriptions, our team looked at the
19 three criterion of not a cancer patient, 120
20 morphine-equivalent grams or -- "and," I should
21 say -- not "or, "and" -- someone being
22 prescribed who was identified as having drug
23 dependency.
24         So I -- I don't know if that's what
25 you're asking, but that was the criterion

Page 131

1 for --
2     Q.   Well, we're going to be coming --
3 we'll be coming back to -- to those questions
4 later.
5     A.   Okay.
6     Q.   That's a separate set of -- of
7 discovery requests.
8     A.   Okay.
9     Q.   My question is, how did these --
10 these -- you come up with these specific five
11 doctors?
12     A.   I --
13     Q.   Are they the ones who wrote the
14 prescriptions that you responded to in the
15 other discovery requests?
16     A.   I don't -- I don't know the answer
17 to that. I'm afraid that I'm -- I'm probably
18 trying to answer a question I don't understand.
19 So I --
20     Q.   Okay.
21     A.   -- I'll -- I'll ask you --
22     Q.   Well, let me --
23     A.   -- to start over.
24     Q.   -- let me try the question again.
25     A.   Sure.

Page 132

1     Q.   Why were these five doctors
2 identified in this discovery response?  What
3 is -- what are the criteria that were used to
4 identify them?
5     A.   I don't know how to answer that
6 question.
7     Q.   Okay.  Do you know whether any of
8 these doctors are believed to have done
9 anything wrong?
10     A.   I don't know that that's the
11 assertion.  I know that they were identified as
12 having written prescriptions that were
13 contained in a part of a suspicious order.
14     Q.   How do you -- how do you determine
15 whether prescriptions a particular doctor
16 writes are part of a suspicious order?
17     A.   My understanding is in the way
18 that -- I don't know if it was the special
19 magistrate or the judge -- sort of the
20 flowchart he did, when a suspicious order comes
21 in, my understanding is that it's all of those
22 prescriptions that were written that were
23 filled by that particular order.  So I --
24     Q.   Well, but an order goes -- a
25 suspicious order -- a suspicious order is an

Page 133

1 order placed by a pharmacy, correct?
2     A.   That's -- that's my understanding,
3 yes.
4     Q.   Okay.  And the ARCOS data has
5 information on pharmacy orders.  It doesn't
6 have information about prescriptions or doctors
7 who write prescriptions, correct?
8         MS. FLOWERS:  Objection.  Lack of
9 foundation.
10     Q.   Or does it?
11     A.   Could you say that again, please?
12     Q.   Does the ARCOS data include
13 information about prescriptions, individual
14 prescriptions?
15     A.   I believe that what we did was used
16 a -- a different -- I don't know what to call
17 it -- data warehouse to get some of that
18 information.
19     Q.   So how do you know -- how do you
20 know whether Dr. Mark Davis wrote a
21 prescription that was part of a suspicious
22 order?
23     A.   It's my understanding the
24 information that's been gathered by the
25 attorneys identifies that.

34 (Pages 130 - 133)

Page 134

1    Q.    So this is something the attorneys
2  came up with?
3    A.    Well, I don't think that they
4  created it out of thin air.  I -- I -- my
5  understanding is that the ARCOS data is one
6  piece of it, and that the second piece is --
7  gosh, what's the name of it -- Rawlings is a
8  data mine of sorts.
9    Q.    Uh-huh.
10    A.    That's what I've come to -- to
11  know, that we contracted with to get the
12  information about, sort of, start to finish
13  where the pills came from.
14    Q.    So do you know where the pills that
15  Dr. Mark Davis came from prescribed?
16        When Dr. Mark Davis prescribed
17  pills, somebody had to go to a pharmacy and
18  fill that prescription, right?
19    A.    Yes.
20    Q.    Or maybe they maybe went to 20 or
21  30 or 80 different pharmacies to fill those
22  prescriptions, correct?
23    A.    Sure.
24    Q.    How do we know -- how do we find
25  which suspicious order he's being tied to here?

Page 135

1    A.    Again, it's my understanding that
2  the ARCOS data, coupled with the data that we
3  contracted with to get from Rawlings, put this
4  piece together.
5    Q.    And that's all you know about it?
6    A.    That is, yes.
7    Q.    Do you know whether any of the
8  prescriptions written by Dr. Mark Davis were
9  improper?
10    A.    Improper in what way?
11    Q.    They weren't meant for medically
12  necessary purposes.
13    A.    I -- I don't want to put my place
14  in -- I don't want to put myself in the place
15  of a medical doctor.  I don't -- I don't know.
16    Q.    Do you know whether any of the
17  prescriptions written by the other doctors
18  listed here were improper in the sense of not
19  being medically necessary?
20    A.    I -- same answer.  I don't
21  recognize these names.  However, I know we did
22  prosecute more doctors than the ones I named
23  originally.  I -- I don't have all of their
24  names committed to memory.  So if they were
25  someone that was prosecuted, certainly.  But

Page 136

1  beyond that, I don't know.
2        MS. WINNER:  Okay.  I'd like to
3  mark as Exhibit 8 a document entitled "Summit
4  County and City of Akron, Ohio, Plaintiff's
5  First Amended Responses and Objections to
6  Distributor Defendants' First Set of
7  Interrogatories."
8        - - - - -
9        (Thereupon, Deposition Exhibit 8,
10        Summit County and City of Akron,
11        Ohio Plaintiff First Amended
12        Responses and Objections to
13        Distributor Defendants' First Set of
14        Interrogatories, was marked for
15        purposes of identification.)
16        - - - - -
17    Q.    My question on this one relate to
18  page 36.
19    A.    Have I seen this one?
20    Q.    You were just asking yourself under
21  your breath whether you've seen this one.
22    A.    Yes.
23    Q.    What's the answer to that question?
24    A.    I -- I think I -- I try and look at
25  the dates because you all amend the responses.

Page 137

1  I believe I have seen this, and I --
2    Q.    Okay.
3    A.    Yeah, I recognize this paragraph.
4    Q.    Okay.
5    A.    Yes.
6    Q.    Good.  Well that's the paragraph I
7  wanted to ask you about.
8    A.    Sure.
9    Q.    It refers to four prescribers in
10  Summit County who were convicted of crimes
11  involving drug diversion?
12    A.    Yes.
13    Q.    And it says "since 2014."  Were
14  there any prescribers convicted of crimes
15  involving drug diversion before 2014?
16    A.    I don't know the answer to that.
17  I -- I would have -- if you would have asked me
18  when it started, I would have said early teens,
19  but I don't know the exact -- the exact years.
20    Q.    Well, what did Dr. Harper and his
21  employees do?
22    A.    They were sort of one of the most
23  prominently known offices for folks who were
24  seeking prescriptions.  The investigation into
25  Dr. Harper was lengthy, as I recall.  And they

35 (Pages 134 - 137)

Page 138

1 were prescribing just incredibly large numbers
2 of opioids at the time.
3     Q.    Now, he prescribed -- some of the
4 people he prescribed to, I assume, were
5 probably addicts; is that correct?
6         MS. KEARSE:  Object to form.
7     A.    I mean, I think that a lot of
8 people who went into Dr. Harper's office were
9 definitely suffering from addiction, yes.
10    Q.    And some of his patients were not
11 addicts when they went in, but may have been
12 addicts after they were his patients?
13    A.    They became addicts after -- after
14 taking opioids, yes, certainly.
15    Q.    And those were opioids that he
16 prescribed?
17    A.    Yes.
18    Q.    Do you know how many patients were
19 in that category?
20    A.    In the category of?
21    Q.    The people who went -- who weren't
22 addicts when they went --
23    A.    Oh.
24    Q.    -- to him but became addicts after
25 having seen him and gotten prescriptions from

Page 139

1 him.
2         MS. KEARSE:  Object to form.
3     A.    I -- I don't know the numbers.
4     Q.    Do you know how -- what the numbers
5 were overall of how many patients he prescribed
6 to?
7     A.    No, but I know that it was
8 hundreds.  I mean, I -- I can remember reading
9 that in the paper.  It was hundreds of people,
10 yes.
11    Q.    And what -- what was the
12 involvement of his three employees?
13    A.    I recall that they were taking cash
14 for, you know, filling, essentially, some
15 prescriptions, or tak- -- or not -- they were
16 taking cash for the doctor visits and there was
17 a lack of recording and reporting of the
18 dollars coming through the doors.  Beyond that,
19 I can't recall what the employees' involvement
20 was.
21    Q.    Where were -- where were his
22 prescriptions filled?
23    A.    I'm sure that they were filled all
24 over Summit County.
25    Q.    Were any pharmacies investigated or

Page 140

1 prosecuted for filling his prescriptions?
2     A.    Prosecuted?  Like criminally
3 prosecuted?
4     Q.    Well, let's start with just
5 invest- -- criminally investigated.
6     A.    Well, I'm certain that, you know,
7 you'll -- you'll be able to talk to Detective
8 Leonard about that more specifically, but I
9 know that Detective Leonard visited pharmacies
10 and inquired of and, you know, asked multiple
11 questions.  And at that point when it began the
12 investigation, as I stated before, OARRS was
13 not what it is today.  It was much more
14 difficult to put these types of cases together
15 because it relied heavily on patients
16 responding to law enforcement, and that was a
17 really difficult thing to get people to do.
18    Q.    When did OARRS become what it is
19 today?
20    A.    Well, it continues to evolve.  I
21 mean, 2013 and 2014 there really became an
22 enhanced promotion to use it.  There was
23 legislation, I think it was in '13 and maybe
24 went into effect in '14, right around that
25 time, giving access for different uses of law

Page 141

1 enforcement, pharmacists and doctors, and
2 that's really, again, when this public
3 awareness campaign began about making sure
4 people understood the risks and the addictive
5 nature.
6     Q.    Well, but I'm -- again, I'm
7 focusing on when did things change with OARRS?
8     A.    So it's changed multiple times.
9     Q.    Well, when did OARRS -- let me ask
10 you another question.  When did OARRS start --
11 when -- when did OARRS first have a significant
12 impact on diversion?
13        MS. KEARSE:  Object to form.
14    A.    From the County's perspective,
15 OARRS had a significant impact on diversion
16 around '13 and '14, and -- and I would say that
17 because of the grand scale at that time.
18        It certainly had an impact, and
19 significant impact, when our law enforcement
20 officers were using it in the late 2000s and --
21 and early teens as well.  It was a new tool.
22 But certainly, you know, it wasn't admissible
23 in court.  It was -- I called it, like, it was
24 sort of like a dull butter knife.  It -- it
25 helped, but it -- it wasn't very precise and --

36 (Pages 138 - 141)

Page 142

1 and could not be used for the ultimate question
2 that would be called into court in a criminal
3 case.
4     Q.   And that was because it wasn't
5 admissible?
6     A.   Correct.
7     Q.   And when did that change?
8     A.   I don't know that it has.  I -- I
9 don't know that --
10     Q.   Okay.
11     A.   -- it's admissible even today.
12     Q.   Well, when -- when -- what changed
13 that made it have an impact that it hadn't had
14 before?
15     A.   Legislatively there were more folks
16 who were able --
17         Before, you -- I recall prosecutors
18 weren't able to access it.  I don't believe
19 when I started as a prosecutor any of us had
20 access to it.
21         It just became a tool -- I think
22 there was some changes in 2009, and then in '13
23 and '14 there was some pressure, publicly, from
24 law enforcement and public health and ADM, not
25 just in Summit County, but across the state,

Page 143

1 that this was a tool that more people needed to
2 be using:  that doctors needed to use it, the
3 pharmacists needed to use it, and it needed to
4 be more widely known to be used in
5 investigatory purposes.
6     Q.   When were doctors first required to
7 use it?
8     A.   First required?  I don't think they
9 were required until that '13-'14 time.  I --
10 I --
11     Q.   Are you sure about that?
12     A.   I don't know for sure, though.
13 That's when it stands out to me as being very
14 prominently discussed.
15     Q.   Have doctors ever been disciplined
16 for not using it?
17     A.   I don't know the answer to that.
18     Q.   Have they ever been prosecuted for
19 not using it?
20     A.   I don't know if that's a part of
21 the prosecutions that -- that happened.
22     Q.   I take it having access to OARRS
23 would not have changed Dr. Harper's behavior?
24         MS. KEARSE:  Object to form.
25     A.   I can't speak to what would have

Page 144

1 changed Dr. Harper's.
2     Q.   All right.  Let me ask you, then,
3 about the other doctor who's identified in this
4 response.  Brian Heim?
5     A.   Yes.
6     Q.   Am I pronouncing that right?
7     A.   That's the way I say it, yes.
8     Q.   What did he do?
9     A.   The same.  He was writing
10 prescriptions that wouldn't comport with the --
11 with his oath; that I -- I believe he was
12 another one who was known in the community as
13 someone you could get an opioid prescription
14 from.
15     Q.   Well, it's not a crime to not
16 comply with your doctor's oath, is it?
17     A.   I suppose it depends on how far you
18 stray, but no, not in and of itself.
19     Q.   What he was convicted of was
20 something different, correct?
21     A.   Correct.
22     Q.   How many patients did -- did he
23 have; do you know?
24     A.   I don't know the answer to that.
25     Q.   Were there any other doctors

Page 145

1 that -- who are not listed in this response
2 that you're aware of?
3     A.   Dr. Bressi.  There are a number of
4 doctors.  I can't -- I -- I can't come up with
5 the names, but there are at least a handful I'm
6 sure that I've read about and have seen and am
7 aware of.
8     Q.   How do you spell Bressi?
9     A.   B-r-e-s-s-i, I believe.
10     Q.   What did Dr. Bressi do?
11     A.   He was -- a lot of the same thing.
12 But I believe he was the one who switched from
13 being a gynecologist to being a pain management
14 specialist.
15     Q.   More lucrative.
16         MS. KEARSE:  Object to form.
17         MS. WINNER:  I withdraw it.
18         Was Dr. Bressi convicted?
19     A.   Yes.
20     Q.   When?
21     A.   I don't know the answer to that.
22 Within the last five years.
23     Q.   Where was he operating?
24     A.   In Summit County.  I don't recall
25 where he was.

37 (Pages 142 - 145)

Page 146

1    Q.    Was Dr. Harper's operation what you
2  would consider to be a pill mill?
3    A.    Yes.
4    Q.    How about Dr. Heim?
5    A.    Yes.
6    Q.    How about Dr. Bressi?
7    A.    Yes.
8    Q.    Are there any statistics on how
9  much diversion has occurred in Summit County
10  each year?
11    A.    I mean, we know how many pills were
12  prescribed.  But I -- again, with diversion
13  being -- taking so many forms, I -- I don't
14  know that we have the -- the percentages.
15    Q.    How do you know how many pills were
16  prescribed?
17    A.    We have that data from OARRS.  And
18  I've seen it through the public health
19  department as well as the ADM Board.
20    Q.    Where did they get it?
21    A.    From -- from the OARRS data.
22    Q.    So the ultimate -- the ultimate
23  source is the OARRS data?
24    A.    Correct.
25    Q.    Are you aware of any diversion

Page 147

1  occurring outside Summit County that has had an
2  impact within Summit County?
3    A.    I -- certainly there were instances
4  where folks who could not -- who went across
5  state lines or county lines to obtain different
6  prescriptions, yes, certainly that happened.
7    Q.    How often?
8    A.    I don't know.
9    Q.    Do you know what percentage of the
10  diversion that's affected Summit County comes
11  from outside Summit County?
12    A.    I don't.
13    Q.    Has any of that diversion from
14  outside Summit County involved, you know, drug
15  trafficking organizations as opposed to just
16  individuals?  Do you know?
17    A.    I suspect it could.  Certainly
18  there are cases where cocaine, heroin, things
19  like that are trafficked in, in addition to 300
20  pills or something like that.  Certainly
21  that -- those instances have happened.
22    Q.    Do you know how often?
23    A.    I don't know how often.
24    Q.    Do you know how many prescription
25  drug diversion investigations Summit County

Page 148

1  conducted last year?
2    A.    I -- I don't know the exact number.
3  Like the Summit County Drug Unit or all across
4  Summit County?
5    Q.    Either one.
6    A.    No, but the -- yeah.  No, I don't.
7    Q.    Okay.
8    A.    No to both.
9    Q.    Do you know the answer to that
10  question for any year?
11    A.    I believe I read something that you
12  just put in front of me from 2016 for the
13  Summit County Drug Unit.  There -- there was a
14  number in there.
15    Q.    It was a very small number of
16  indictments?
17    A.    Yeah.  But I -- that was like a
18  six -- it was a six-month period, so if you can
19  assume that it doubles, sure.
20    Q.    Do you know of any other source of
21  statistics on that subject?
22    A.    The sheriff's annual report, I
23  reviewed those, and I know that in those there
24  was graphs -- or charts, really, that talk
25  about the different drugs and -- and what's

Page 149

1  been investigated.
2    Q.    Any other sources of information
3  for that?
4    A.    Just my discussions with the
5  detectives.  You know, Detective Leonard and
6  Detective Baker-Stella.  Just those
7  conversations.
8    Q.    Who does Detective Baker-Stella
9  work for?
10    A.    She works for the Summit County
11  Sheriff's Office, but she is assigned as the
12  task force officer for the DEA for the
13  department.
14    Q.    And what did you discuss with her?
15    A.    I talked to her a little bit about
16  just finding out when she made the transition
17  to being the task force officer and what her
18  duties are now and some of the work that she's
19  done in Summit County.
20    I asked her specifically about
21  ARCOS, because it was completely unfamiliar to
22  me until this lawsuit, and if she had had any
23  interaction with it.
24    And we talked about how while she's
25  designated to be the task force officer in

38 (Pages 146 - 149)

Page 150

1 tactical diver- -- or no.  There's two
2 different diversions.  One is tactical, and one
3 is not.  I don't remember which.  But in
4 diversion, that -- all of the sworn officers
5 for the sheriff's department and all the police
6 departments have the arresting authority and
7 have some training on identifying and
8 investigating these cases.
9     Q.   What did she tell you about the
10 work she's done?
11     A.   She indicated that she works not
12 just in Summit County, but she works all, sort
13 of, over Northeast Ohio now, and that she has
14 gone undercover into some doctors' offices, and
15 has, you know, participated in the
16 investigation of both prescribers and -- and
17 users.
18     Q.   Is there anything else she's
19 told -- she told you about the work she's done?
20     A.   She talked about how she uses OARRS
21 a lot, that that is a primary tool for her.
22 And that she assists other officers who are not
23 as familiar, who do not have access to it, if
24 they have an investigation or suspect, you
25 know, criminal activity.

Page 151

1         I think -- I think that's about it.
2     Q.   Anything else she told you about
3 the work she does?
4     A.   I think that's it.  Yeah.
5     Q.   What did she tell you about ARCOS?
6     A.   That she'd been trained briefly on
7 it when she went to Quantico, but that she did
8 not regularly use that.  That there were
9 analysts who work with the DEA who have --
10 probably my words, not hers -- more in-depth
11 understanding or training on -- on that
12 particular database.
13     Q.   Does anybody in Summit County use
14 ARCOS for anything, apart from your lawyers in
15 this litigation?
16     A.   No.  And I've asked.  You know,
17 Detective Leonard did not have access to it.
18 And while, again, all of our officers can
19 arrest for these offenses, those were the
20 places I'd start.  They tend to be the go-to
21 folks when you have questions about these types
22 of cases.  So, no, no one had had that access.
23     Q.   Has he asked for access?
24     A.   I don't know the answer to that.
25     Q.   Do you know whether anybody else

Page 152

1 in -- in either Akron or Summit County has
2 asked for access to ARCOS?
3     A.   It's my understanding that it --
4 this was not something where access was
5 granted, that -- that there was no local access
6 available.  In fact, it's my understanding that
7 none of these numbers or none of these sort of
8 statistics became available until the Judge in
9 this case ordered them released.
10     Q.   But do you know whether they asked?
11     A.   I don't know.  I don't know that
12 they knew they existed.
13     Q.   Well, okay.  Let me just ask you
14 that straight out.  Do you know whether anybody
15 other than Detective Baker-Stella knew about
16 ARCOS?
17     A.   I don't.
18     Q.   What did Detective Leonard -- is it
19 Detective Leonard?
20     A.   It is.
21     Q.   What did Detective Leonard tell you
22 about his work?
23     A.   Well, I've known Detective Leonard
24 since my first days as a prosecutor, so we've
25 worked together multiple occasions.  So I knew

Page 153

1 him from having cases with him.
2         And then when we met to discuss in
3 preparation for this deposition, he indicated
4 that he had not had access to ARCOS.  And I
5 can't recall if he knew that it existed.  I
6 don't know the answer to that.
7         But we talked about some of the
8 investigations into the doctors, and he
9 reminded me of how incredibly difficult those
10 cases were early on without OARRS access and
11 without mandatory reporting to OARRS and --
12 and -- yeah.  I -- we just talked about sort of
13 the way we went through some cases.
14     Q.   Were there any investigations you
15 talked about other than investigations into
16 doctors?
17     A.   Not specifically.  We talked more
18 generally about how this seemed to create a new
19 population of people suffering from addiction
20 and a new class of felons.  Again, a lot of the
21 folks we were seeing didn't have a prior
22 criminal record.
23         And we talked about how it really
24 changed our perception on treatment and how,
25 for better or for worse -- really, for worse --

39 (Pages 150 - 153)

Page 154

1 we had spent a couple of decades trying to
2 arrest our way out of addiction.
3        And that hopefully this epidemic,
4 if there is any silver lining, that it will
5 serve to be really the -- the spotlight will be
6 shown that -- that addiction is an illness, and
7 we have been criminalizing illness for a long
8 time. Because he -- you know, Detective
9 Leonard talks about soccer moms and the nurses
10 and having levels of empathy for them.
11        And again, we didn't do a good job,
12 probably, in the '80s and '90s when we were
13 trying to have this war on drugs because we
14 were just -- thought we could arrest and
15 incarcerate our -- our way out of it.
16        So our shifts -- and I'm off the
17 question, but our shift really -- when
18 Detective Leonard and I were talking, we talked
19 about how important drug courts became. We
20 talked about how there was this new influx.
21        And we've seen in Summit County
22 opioid addiction has flooded our communities in
23 such a way that we've had to increase our
24 capacity in drug courts, and we had a pretty
25 robust drug court to begin with.

Page 155

1        And really intentional about
2 messaging on this. That while they may be in
3 the criminal justice system, criminal justice
4 system recognizes that addiction is an illness
5 and how do we rehabilitate that better than
6 just incarcering?
7    Q.   I was asking you about what he told
8 you about his investigations.
9    A.   Yeah.
10        MS. KEARSE: I'm going to object.
11 Counsel, you asked her what did you talk about.
12 You left it more open.
13    Q.   Well -- well, whatever.
14        What else did he tell you about his
15 investigations, if anything?
16    A.   He talked to me about driving from
17 place to place in trying to get the cooperation
18 of the patients. And he talked about -- I
19 can't recall anything else about the
20 investigations.
21    Q.   Well, let me ask you this. Did he
22 identify anybody other than doctors that he was
23 investigating?
24    A.   Oh, he certainly investigated
25 individuals who were forging drug documents and

Page 156

1 who were engaged in deceptions to obtain
2 dangerous drugs, yes.
3    Q.   So -- so he was also investigating,
4 we'll call them, patients or users, however you
5 want to refer to them.
6        Was there anybody else who -- any
7 other category he was investigating?
8    A.   I don't believe so.
9    Q.   Now, OARRS made a significant
10 difference in the ability to investigate
11 diversion; is that correct?
12    A.   Yes.
13    Q.   And you said there were changes in
14 around 2013, 2014?
15    A.   Yes.
16    Q.   Why -- why weren't those changes
17 instituted earlier?
18    A.   Well, it was a legislative change
19 allowing more access, I guess is the best way
20 to put it.
21        And, you know, at that time, and
22 still currently, it -- it's not uncommon to
23 find legislators who believe that addiction is
24 a moral issue rather than a medical, and so
25 it's -- that's a big boulder to push up the

Page 157

1 hill.
2        And the administration tended to
3 be, for a time period, more concerned about the
4 criminal penalties: making sure that we were
5 prosecuting doctors; and making sure that we
6 were looking at folks who were using and who
7 were addicted; looking at changing the bulk
8 amounts, and things like that. Looking,
9 really, at the criminal side of things and --
10 and how to use those penalties, I guess, in a
11 way, rather than looking at ways to combat it,
12 prevent it, stop it before it starts. Things
13 like that.
14    Q.   So you think it was a mistake for
15 broader access to OARRS not being made
16 available earlier?
17        MS. KEARSE: Object to form.
18    A.   I think when you know better, you
19 do better. So, I -- you know. I don't ever
20 like to assume nefarious intent. I certainly
21 don't think legislators wanted people to get
22 hooked on opioids and end up shooting heroin in
23 a gas station bathroom, no.
24        So I think also that change came
25 about when there was a real sort of -- the

40 (Pages 154 - 157)

Page 158

1 awakening was beginning that these pills that
2 were once promoted as being non-addictive were
3 certainly the very opposite of that.
4      Q.   Now, OAR- -- access to OARRS is
5 still limited, correct?  Not every person can
6 get access?
7      A.   Correct.  And even those who have
8 access, you can't just jump on and noodle
9 around.  It's got to be for a specific patient
10 or a specific purpose.
11      Q.   And none of the Defendants have
12 access to OARRS, do they?
13          MS. KEARSE:  Object to form.
14      A.   I don't know the answer to that.
15      Q.   When Summit County comes across a
16 situation involving diverted opioid --
17 prescription opioids, what effort is made to
18 trace the source and origin of those opioids?
19      A.   I suppose it depends on how they
20 come into contact with those diverted opioids.
21 If it's a law enforcement contact, certainly
22 many of the officers and detectives will simply
23 ask, "Where did you get it?"  And by and large,
24 there are two different answers.  It's, "I
25 don't know.  Not mine.  Not my purse.  Not my

Page 159

1 pants.  Not my car."  Or, you know, there's no
2 response.  They don't want to talk about it.
3      Occasionally folks are willing to
4 share their story, and typically it's
5 first-time arrestees, unsophisticated in the
6 ways of law enforcement.  But then that process
7 typically goes into one of our drug courts or
8 are treatment in lieu of conviction now, so
9 they have contact with a caseworker and a
10 probation officer.
11      If we come into contact with those
12 diverted pills now, occasionally it's through
13 some of our programming.  We've got an
14 emergency room program where folks can walk in,
15 and it is treated as a medical emergency if
16 they've -- and if they have drugs on them, on
17 their person, there's typically some leniency
18 from law enforcement that if they're seeking
19 help that -- that they're not going to be
20 arrested for being in possession.
21      But there's always an effort made
22 to try and find out, but it -- it's -- folks
23 are pretty reluctant to talk about where they
24 got them.
25      Q.   So would you say most of the time

Page 160

1 you're not able to find out where they came
2 from?
3          MS. KEARSE:  Object to form.
4      A.   I would -- I -- I don't know that I
5 can answer that.  I -- I don't know that I'm
6 comfortable answering that one.
7      I would say that -- that primarily
8 when they come into contact with law
9 enforcement, if they're -- if they're a
10 first-time offender, meaning it's their first
11 interaction with law enforcement, they
12 typically are willing to talk, because our law
13 enforcement community has been trained to get
14 folks to talk to them and let them know that,
15 you know, now in Summit County with these
16 felony 5s, you're not going to jail tonight.
17 You're going to get a summons.  We're going to
18 ask you to come in on a certain day, and what
19 can we do to try and get you some help to get
20 that started.
21      Q.   Well, but more generally, not just
22 focusing just on the first-time offenders --
23      A.   Uh-huh.
24      Q.   -- more generally, can you estimate
25 what percentage of the time you're able to find

Page 161

1 out --
2      A.   I couldn't --
3      Q.   -- where the pills came from?
4      A.   I couldn't estimate that.
5      Q.   When Summit County responds to an
6 overdose incident that involves heroin or
7 fentanyl, do you try to find out if that person
8 has been prescribed opioids previously?
9      A.   Yes.  Our -- our detectives who
10 investigate those, I believe, have OARRS
11 access.  And certainly if it's, unfortunately,
12 a -- a death -- an overdose death, our medical
13 examiner has that access as well.
14      Q.   Do you know what percentage of the
15 time the person has previously had an opioid
16 prescription?
17      A.   I don't know that percentage.
18      Q.   Does Summit County know how many
19 prescription opioids were consumed in Summit
20 County in any given year?
21      A.   Consumed?
22      Q.   Consumed.
23      A.   No.  Prescribed?  Yes.
24      Q.   And prescribed, that's from OARRS?
25      A.   Yes.

41 (Pages 158 - 161)

Page 162

1    Q.   And who puts the information into
2  OARRS that -- from which that statistic is
3  derived?
4    A.   I believe there's a requirement
5  that doctors use it, as well as pharmacists.
6    Q.   How long has that been in place?
7    A.   Again, I feel like that big change
8  came in -- in '13-'14.
9    Q.   Okay.  So do you -- would you know
10  how many prescriptions -- or would you have the
11  ability to find out how many prescriptions were
12  pres- -- how many opioids were prescribed in
13  Summit County in, say, 2011?
14    A.   Well, I think it's a best guess,
15  because I don't think it was mandatory
16  reporting.  I think a lot -- a lot was being
17  reported, but I don't believe it was mandatory
18  at that time.  So it would -- I guess for lack
19  of a better term, it would be underreported,
20  the numbers that we have.
21    Q.   Has Summit County ever sought the
22  assistance of the board of pharmacy in using
23  data that the board has from OARRS or otherwise
24  to help combat diversion?
25    A.   I know that our public health

Page 163

1  department and our ADM Board interface with the
2  pharmacy board in an effort to make sure that
3  we have good data.
4        I don't know the specifics of it
5  other than I know that, you know, Dr. Smith
6  from ADM has OARRS data access.  And obviously
7  there's a public dashboard for OARRS that I
8  know gets used.  I would -- I'm sure it's daily
9  with some -- some of the public health staff.
10    Q.   Anybody else -- any- -- anything
11  else that's done to interface with the board of
12  pharmacy?
13    A.   I -- I mean, in the prosecutor's
14  office, I don't recall a pharmacist being
15  prosecuted.  I don't recall that ever
16  happening.  So I -- I don't think so.  I don't
17  recall the County touching the board of
18  pharmacy in any other fashion.
19    Q.   Does anyone other than -- okay.
20  Just to make sure I've -- I've -- we've touched
21  on OARRS before, I don't want to repeat what
22  we've already covered, but you talked about how
23  Detective Baker-Stella uses OARRS --
24    A.   Uh-huh.
25    Q.   -- and Detective Leonard uses

Page 164

1  OARRS, and I think you said that Dr. Smith --
2    A.   Yes.
3    Q.   -- uses OARRS.
4        Does anybody else in the County use
5  OARRS for anything?
6    A.   Probation officers have access to
7  OARRS.  And it's my understanding, you know,
8  if -- as part of your probation, you are
9  required to give urine screens.  You know, if
10  you come up positive for an opioid, certainly
11  they would be looking to see if, in fact, you
12  had a valid prescription.
13        And I believe the drug court
14  judges, through the probation officers, use
15  some OARRS data.
16        The medical examiner, in very
17  limited situations.
18        And, obviously, we don't employ
19  physicians outside of our medical examiner's
20  office, but physicians in Summit County and
21  pharmacists in Summit County have access.
22    Q.   But they have access -- okay.
23  Strike that.
24        Does Summit County have any
25  policies that require anyone to -- employed by

Page 165

1  the County to use OARRS for anything?
2    A.   I don't know that it's a written
3  policy with the sheriff's department that
4  requires them to use OARRS.  But certainly it
5  would be one of the best investigata-  --
6  investi- --
7    Q.   Investigative.
8    A.   -- thank you -- tools; that there
9  would be an expectation that it would be used
10  in these.  I -- I don't know if it's a -- if
11  it's a written policy from the Sheriff.
12    Q.   And that would be Detective
13  Leonard?
14    A.   It would be any of them.  Detective
15  Leonard's employed by the Akron Police
16  Department --
17    Q.   I'm sorry.
18    A.   -- but -- but he really -- his
19  reputation is the guy who knows this stuff.
20  And while everyone who works for the Akron
21  Police Department in a uniformed capacity in --
22  in the detective bureau --
23    Q.   Uh-huh.
24    A.   -- they make those arrests and they
25  do those investigations as well, but certainly

Page 166

1 he's somebody they could call. And Detective
2 Baker-Stella for the sheriff's office, the
3 same.
4        I think the investigations occur,
5 you know, on the street level, but if there's
6 questions or, you know, a deeper dive needs to
7 occur, I think those are the two folks who
8 typically get contacted with questions.
9    Q.   Does anybody other than those two
10 have direct access to OARRS within law
11 enforcement?
12    A.   I know in Summit County, Carmen
13 Ingram, who works for the Summit County
14 sheriff's office, and she works with the drug
15 task force -- or the Summit County Drug Unit,
16 she has access, and then Captain Paolino also
17 has access.
18    Q.   Anyone else?
19    A.   I don't think so.
20    Q.   Does anyone have access in any of
21 the other, you know, townships throughout
22 Summit County?
23    A.   I -- yes, I'm sure that there are
24 officers. I've personally worked with officers
25 who have used OARRS data or OARRS reports.

Page 167

1    Q.   Going back to back when you were a
2 prosecutor?
3    A.   Yes.
4    Q.   So law enforcement did have --
5    A.   Some access.
6    Q.   -- some access?
7    A.   Some access.
8    Q.   What's the difference between the
9 access they had before and what they have now?
10    A.   I feel like there's more
11 information. I haven't seen an OARRS report
12 post-'14 because I was no longer a prosecutor.
13        But I -- as -- in my discussions
14 with Detective Leonard and -- and the things
15 that I've read about the sort of evolution of
16 OARRS, I believe there's more information. And
17 with the mandatory reporting part of it, I
18 think is really what changed things.
19    Q.   So there's more information because
20 more is going in?
21    A.   I think so. I think so. And I --
22 I think there's a better understanding of how
23 to use it now.
24        I think when it was first
25 available, it was kind of like, "Hmm, good

Page 168

1 luck." There wasn't a lot of intensive
2 training for law enforcement, and I think our
3 officers now have more specific training.
4    Q.   Does Summit County receive any
5 access to any suspicious order reports about
6 pharmaceutical orders placed by pharmacies?
7    A.   I -- you mean like this -- do our
8 detectives receive that information? I
9 don't --
10    Q.   Anybody in the County, apart from
11 the lawyers representing you in this
12 litigation.
13    A.   Yeah. I don't --
14    Q.   We're always excluding them.
15    A.   Sure.
16        MS. KEARSE: Gee, thanks. You want
17 us to leave?
18        MS. WINNER: Sure. Go ahead.
19    A.   I don't -- I don't know. I don't
20 know if they receive that information.
21    Q.   All right. Well, we talked
22 about -- we've talked about OARRS. We've
23 talked a little bit about ARCOS.
24        Are there any other database
25 resources that Summit County has access to to

Page 169

1 detect or combat diversion?
2    A.   I -- I don't think there are any,
3 like, government-function databases. As I
4 stated, there's a data dashboard that the
5 public health department and ADM work hand in
6 glove on making sure those are accurate numbers
7 that the public can access and can be used by
8 law enforcement if -- if that's what they're
9 looking for.
10    Q.   Are there any other database
11 resources that the County has to detect or
12 combat diversion?
13    A.   I don't believe so. None that -- I
14 should say none that I'm aware of.
15    Q.   Are there any other government
16 agencies that the County reaches out to for
17 assistance in detecting or combatting
18 diversion?
19    A.   Certainly the DEA, with Detective
20 Baker-Stella being a task force member.
21 Detective Leonard is also a task force
22 member -- task force officer with the DEA.
23        And there are FBI task force
24 officers who work in the same proximity as our
25 Summit County Drug Unit, the Akron narcotics

43 (Pages 166 - 169)

Page 170

1  division, so I know that the FBI is also called
2  upon to assist in investigations.  Whether
3  they're specifically targeted at diversion, I
4  couldn't say, but they all work in the same
5  building together on many cases.
6      Q.   Well, there is a -- a HIDTA task
7  force that Summit County participates in,
8  correct?
9      A.   Correct.
10     Q.   And HIDTA is H-I-D-T-A, High
11 Intensity Drug Trafficking --
12     A.   Area.
13     Q.   -- Area?
14     A.   Correct.
15     Q.   Does that task force get involved
16 in -- in investigating diversion?
17     A.   I think as -- as necessary, yes.
18     Q.   What percentage of its efforts
19 relate to diversion?
20     A.   I don't know.
21     Q.   Has Summit County ever reached out
22 to any of the Defendants for assistance in
23 combatting diversion?
24     A.   I know that we have sought and been
25 granted a grant from Cardinal with sort of the

Page 171

1  long-term goal being less opioids in Summit
2  County, yes.
3      Q.   Anything else?
4      A.   Not that I'm aware of.
5      Q.   Has Summit County reached out to
6  any of the manufacturing -- Manufacturer
7  Defendants for assistance in connection with
8  the opioid problem?
9          MS. KEARSE:  Object to form.
10     A.   I -- I mean, reached out.
11 Formally?
12     Q.   In any way.  And I don't -- other
13 than filing this lawsuit.  We'll not count
14 that.
15     A.   I've forgotten about them already.
16     Q.   Okay.
17     A.   I don't know.  Perhaps there are
18 other grants that were funded --
19     Q.   Uh-huh.
20     A.   -- in some way, shape or form by
21 manufacturers or distributors.  I know that we
22 have worked with -- they're -- they're --
23 they're not named as a defendant, but some of
24 the pharmacies, I think, that are listed in
25 some of the interrogatories carry the Deterra

Page 172

1  bags for the Summit County Public Health
2  Department.
3          But I'm not aware of any specific
4  formal request to any of the Defendants, other
5  than the public health grant with Cardinal that
6  we've made.
7      Q.   What's a Deterra bag?
8      A.   It's -- essentially it looks like a
9  foil, probably 5 inches by 8 or 10 inches, that
10 you can use at home.  It has a carbon --
11 "science magic" in it.
12     Q.   Uh-huh.
13     A.   Dump the pills in, put a little bit
14 of water in it, seal it up, and the pills
15 essentially disintegrate, and it's safe to
16 dispose of.  So it's a safe way to dispose of
17 your unused medications at home.
18     Q.   Do you know whether Summit County
19 has ever reached out to any of the Defendants,
20 either formally or informally, for assistance
21 in dealing with any other aspect of the opioid
22 problem, such as a pharmacy that -- or a
23 problem doctor, anything like that?
24     A.   I'm not aware of any direct
25 contact.

Page 173

1      Q.   Are you aware of any indirect
2  contact?
3      A.   No.  No, I should -- no.
4      Q.   In your -- do you believe that the
5  State has done as much as it should to help
6  combat the opioid problem?
7      A.   Well, the State didn't create the
8  opioid problem.  So my opinion on their
9  response to it, I think, could have been
10 swifter or more robust, but they didn't create
11 this problem.
12     Q.   But you have, in fact, been highly
13 critical of the State's response, have you not?
14         MS. KEARSE:  Object to form.
15     A.   I think some people think I
16 probably wasn't critical enough, but I
17 certainly was vocal about the need in my
18 community for a response and for the dollars
19 that were needed to respond to this crisis.
20     Q.   Did you sponsor a resolution on the
21 subject in the state legislature?
22     A.   I believe I did, yes.  Oh, yes, I
23 did.  Absolutely.  Yes, I did.
24     Q.   And what happened to that
25 resolution?

44 (Pages 170 - 173)

Page 174

1    A.   Oh, it went absolutely nowhere.
2  Yes.
3    Q.   And why was that?
4    A.   Well, it was sponsored by myself
5  and two other Democrats, and we were -- it's an
6  essential super minority in the state House.
7  So outnumbered three to one without a
8  Republican sponsor, I don't believe we even got
9  a first hearing on it.
10    Q.   Were the -- was the Republican
11  majority hostile to the idea?
12        MS. KEARSE:  Object to form.
13    A.   I mean, hostility can take many
14  forms, and silence is one of them.  So to me,
15  as the representative serving Summit County,
16  there was a lack of response that was being
17  felt by the people in this community.  They
18  felt that this epidemic should have been the
19  number one priority at that time, and there was
20  a --
21        The State was doing things.  The
22  State was working on it.  But you have to
23  understand, in 2016, when I sponsored that
24  resolution, people's kids were dying, and dying
25  in my district specifically.  I represented the

Page 175

1  number one ZIP code for overdose in Summit
2  County, and I literally couldn't go anywhere
3  without somebody telling me about their kid.
4        And so hostility?  I would have
5  been grateful to have a conversation about it.
6  Because the State didn't create this problem,
7  but I do believe that they had an obligation to
8  respond to the needs of the citizens, and I
9  felt like more response was warranted.  But I
10  don't lay the blame for people dying at the
11  State's feet.
12    Q.   If the State had done more, would
13  it have helped the situation?
14        MS. KEARSE:  Object to form.
15    A.   The opioid crisis had a decade head
16  start on us.  People were so deeply addicted
17  and were so deeply affected by this epidemic
18  that, yeah, I wanted the governor to dump
19  millions of dollars into Summit County.  We
20  still would have had people dying.  We still
21  did have people dying.  I mean, we still do
22  have people dying every -- every day.  Not
23  nearly at the rate they were dying, luckily, in
24  2016.  But, you know, we needed more treatment
25  beds.  We needed more caseworkers.  We needed

Page 176

1  more money in our medical examiner's office.
2        We had to bring up the mobile
3  morgue five times in 2016, and that costs
4  money.  We had to send out all these samples
5  from the medical examiner's office to be tested
6  because we didn't have the right equipment,
7  this $300 -- $300,000 machine to test this.
8        So I wanted more attention paid to
9  my constituents.  I had a platform, and -- and,
10  yes, I wish there had been more time and money
11  and talent and treasure spent on it, but it
12  wasn't the State's fault.
13    Q.   If the State had done more, would
14  it have helped the situation?
15        MS. KEARSE:  Object to form.
16    A.   It may have mitigated some part,
17  but we were already in a crisis.  I mean,
18  again, there was this decade-long head start
19  where these people were so deeply addicted,
20  throwing a million dollars at their feet may
21  not have saved them.  My --
22    Q.   So you're saying that it wouldn't
23  have made any difference?  If the State had --
24    A.   I don't know.
25    Q.   -- helped more, it wouldn't have

Page 177

1  made any difference?
2    A.   I don't know.
3        I know that when I was saying those
4  things and sponsoring that, that that was the
5  amplification of the voices of my community.
6        It's -- you know, it's not a
7  secret, as I sit here, as I've told you,
8  that -- that resolution wasn't going to go
9  anywhere, and I knew that.  I didn't introduce
10  it to -- with the expectation it would pass.  I
11  introduced it with the expectation that the
12  people in Summit County would feel that someone
13  in the state House was hearing them and
14  responding to them, because --
15        I don't know where you're from, but
16  in Summit County it was the most desperate time
17  I have ever seen, and I have lived here for
18  over 20 years.  Every day of my adult life I
19  have lived in Summit County.  People were so
20  desperate for anything.  It was that time to
21  throw everything at the wall to see what
22  sticks, because that's how critical the
23  casualties were coming.
24    Q.   Are there any laws, policies, or
25  procedures that restrict the discretion of law

45 (Pages 174 - 177)

1 enforcement officers or prosecutors to
2 investigate or pursue individuals for
3 opioid-related misconduct?
4    A.   Boy, that was a long one.
5    Q.   Yep.
6        MS. KEARSE:  I'll object to the
7 form.
8    A.   Okay.
9    Q.   I -- I think that's fair.  Let
10 me --
11    A.   Okay.
12    Q.   Let me try it again.
13    A.   Okay.
14        MS. KEARSE:  I was going to ask to
15 break for lunch soon.
16    Q.   Are there any laws, policies, or
17 procedures --
18    A.   Okay.
19    Q.   -- that restrict the discretion --
20 let's just start with law enforcement -- to
21 investigate or arrest individuals for
22 opioid-related misconduct?
23    A.   I mean, HIPAA is in place.  I mean,
24 you can't, you know, ask someone to divulge
25 their medical history.

1        I -- I guess I'm not -- is that
2 what you're asking?  I don't -- I don't --
3    Q.   I'm asking if there's anything --
4    A.   I don't know --
5    Q.   -- that gets in the way.
6    A.   Well, certainly.  I mean --
7    Q.   In terms of laws, policies, or
8 procedures.
9    A.   -- every investigation into a
10 diversion case starts with this blanket of
11 legality, and additionally, this inherent
12 community trust of the pharmaceutical industry.
13        As a community, Summit County
14 trusted that what was being manufactured,
15 distributed, and prescribed to them and to
16 their family members was safe.
17        So what stood in the way originally
18 was we didn't know.  And --
19    Q.   Go ahead.
20    A.   -- when -- when you add in that
21 layer of sort of this inherent respect of
22 doctors and -- and you've got police officers
23 who are used to investigating drug dealers who
24 stand on street corners and peddle crack,
25 there's a different -- there's a different

1 strategy to that, that requires probably
2 more --
3        It requires a different strategy to
4 investigate a doctor who you suspect of -- of
5 prescribing outside of -- of what they should
6 be doing versus somebody who is inherently
7 doing illegal activity.  There's no
8 protections.  They are not licensed to
9 distribute, and all of the drugs they're
10 distributing are classified as illegal to begin
11 with.
12    Q.   So what you're saying is that when
13 you refer to the blanket of legality, is that
14 doctors are legally authorized to prescribe
15 opioids to people?
16    A.   Right.
17        MS. KEARSE:  Object to form.
18    A.   And their -- that's part of their
19 job, essentially, is what a community believes.
20 And that, I think, stretches to the
21 distributors and manufacturers of the
22 medications that are being prescribed, this
23 inherent trust that when I go to the doctor,
24 the doctor is smart and has all the good
25 information and is going to give me something

1 that's going to help me and -- and won't cause
2 me harm in the future.
3    Q.   Well, but I -- I -- I'm not talking
4 about anything that gets in the way.  I'm just
5 talking specifically about laws or policies.
6    A.   I feel like you said hurdles, and
7 so that was where I went to.
8    Q.   No.  Laws or policies that are
9 hurdles to restricting the discretion of law
10 enforcement to investigate diversion.
11        You mentioned HIPAA.  Is there
12 anything else?
13    A.   Yeah.  I mean, I think early on,
14 the -- the lack of access to good OARRS
15 information, which changed, so I guess that was
16 a law that was tweaked to give them better.
17 So, prior to, wasn't as good as.
18        Beyond that, I -- I -- I don't know
19 how to answer the question beyond that.
20        MS. KEARSE:  Is this a good time to
21 break for lunch?
22        MS. WINNER:  Sure.
23        THE VIDEOGRAPHER:  Off the record
24 at 12:21.
25        (A recess was taken.)

46 (Pages 178 - 181)

Page 182

```
1              - - - - -
2         (Thereupon, Deposition Exhibit 9,
3    12/12/2018 Letter from Atty Anne
4    Kearse to Atty Sara Roitman, was
5    marked for purposes of
6    identification.)
7              - - - - -
8         THE VIDEOGRAPHER:  On the record at
9    1:10.
10        MS. WINNER:  Is there anybody on
11   the phone who has not yet entered an
12   appearance?
13            (No response.)
14        MS. WINNER:  Hearing nothing, we
15   will go forward.
16        I have asked the reporter to mark
17   as Exhibit 9 a letter from Anne Kearse to Sara
18   Roitman dated December 12, 2018.  And I'm
19   mostly just marking this for the record.
20        And, Ms. Kearse, I'm asking you if
21   you will confirm that this letter accurately
22   lists the topics on which this witness has been
23   designated, with the exception of 4, 5, 6, and
24   19, which need to be added to the list?
25        MS. KEARSE:  Yeah, to the extent
```

Page 183

```
1    I'm not being deposed today, but I believe this
2    is accurate.
3         MS. WINNER:  Okay.  Well --
4         MS. KEARSE:  With the -- no,
5    this -- this should be -- I -- I didn't look at
6    what else -- I wasn't looking at Wendy and -- I
7    was just looking at the notice today for Greta
8    Johnson.
9         MS. WINNER:  Yeah, that's the only
10   one I'm focusing on.
11        MS. KEARSE:  Yeah.  So that is my
12   understanding, that's accurate except for the
13   written -- the 4, 5, 6, 19.  Yep.
14        MS. WINNER:  Those -- those would
15   need to be added to the ones that are listed
16   here for Greta Johnson, correct?
17        MS. KEARSE:  Yes.  Because I
18   suggested we do those in written form, and --
19   and you did not want to take me up on that
20   offer, so.
21        MS. WINNER:  Thank you.  Just
22   wanted to make sure our record was clear on
23   which topics she's here on.
24   BY MS. WINNER:
25        Q.   Ms. Johnson --
```

Page 184

```
1         A.   Yes.
2         Q.   -- prescription opioids are
3    controlled substances, correct?
4         A.   Yes.
5         Q.   And because they're controlled
6    substances, a patient cannot legally get an
7    opioid without a prescription; is that correct?
8         A.   That's correct.
9         Q.   And only certain licensed medical
10   professionals, like doctors and dentists and
11   nurse practitioners, are allowed to write
12   prescriptions, correct?
13        A.   Correct.
14        Q.   And in order to write a
15   prescription for a controlled substance, a
16   practitioner has to have a license from the
17   State from -- and from the DEA, correct?
18        A.   That's my understanding.
19        Q.   Now, individuals who are addicted
20   to opioids often have mental health disorders,
21   correct?
22        MS. KEARSE:  Object to form.
23        A.   I think there's a prevalence of
24   dual diagnosis, certainly, of addiction and
25   mental health.  They can go hand in hand,
```

Page 185

```
1    certainly.
2         Q.   Is it common for individuals who
3    are addicted to opioids to be addicted to more
4    than one substance?
5         A.   I don't know a percentage, but I
6    don't think that's an unfair statement.  I
7    think that different substances can certainly
8    play a role.  We talked about people using
9    different ones before.  Yes.
10        Q.   Do people sometimes use alcohol and
11   opioids?
12        A.   Yes.
13        Q.   And do people -- are there some
14   people who are addicted to alcohol before they
15   become addicted to opioids?
16        A.   I'm sure there are.
17        Q.   All right.  I want to turn now to a
18   different subject.  Some of our different
19   topics.
20        A.   Okay.
21        Q.   And you've been designated to
22   testify about the harms that the Plaintiffs
23   have suffered and their efforts to mitigate
24   them.  And I just want to start off, you -- you
25   personally have been quoted in the press as
```

47 (Pages 182 - 185)

Page 186

1 saying that Summit County has spent nearly
2 $200 million during the past decade trying to
3 keep up with the cost of addiction.  Do you
4 remember giving that statement?
5     A.   I remember that statement occurring
6 a couple of different times from myself and
7 from the executive.  And it has spanned -- I
8 think we talked about $66 million within the
9 last four or five years.  We've talked about
10 $150 million dollars up to a quarter billion
11 dollars.  Different numbers have been used sort
12 of as we really take a deeper dive into what it
13 truly has cost, financially, the County.
14     Q.   Well, where does that -- how is
15 that 200 -- how did you come up with that $200
16 million figure?
17     A.   So --
18         MS. KEARSE:  I'm going to let you
19 answer the question.
20         I'm going to -- I'm going to put an
21 objection down.  She's going to be able to
22 testify about things that have been put out
23 there in the public, but if it's going into a
24 damages or more in-depth, Brian Nelson is the
25 30(b) representative for --

Page 187

1         MS. WINNER:  Understand that.
2 Thank you.
3     A.   So the -- the reason I've had those
4 numbers and have put those out there is as the
5 chief information officer, I deal with the
6 press and I write a lot of the speeches for the
7 executive.  I always get the numbers directly
8 from Brian Nelson.  I rarely, if ever, know
9 where to start without talking to him first.
10         And I know that when we first
11 started trying to take a look at that, we
12 looked really in-house what we were spending on
13 medical examiner costs, what we were spending
14 on indigent defense, monies that we were trying
15 to seek for drug court.  So I consider those
16 in-house as far as the executive's office.
17         And then we really began to look
18 outside of our own house at, countywide, the
19 amount of money ADM was spending, the amount of
20 money the health department was spending, and
21 the number of dollars being used up at
22 Children's Services.  And that's not to speak
23 of, you know, the -- the costs of the treatment
24 being provided and that sort of thing.
25         So those numbers started out --

Page 188

1 again, like I said, my recollection is, what
2 are we looking at here on -- I call it on the
3 eighth floor versus countywide.
4     Q.   Well, the -- am I correct in --
5 from what you just said that -- that you do
6 not, yourself, know how the $200 million figure
7 was calculated?
8     A.   I know that those -- those things I
9 just talked about, some of those things are
10 what was looked at.  Brian and I have discussed
11 that we've -- you know, that was sort of our
12 original thought, like what should we start
13 looking at.
14         I'm not sure when it morphed from
15 66- to 150- to 200-, to 250-, because it, quite
16 frankly, I think if we looked even today, we'd
17 find even more dollars being spent.
18     Q.   Do you know what specifically is
19 and is not included in the 200 million figure?
20     A.   I don't.
21     Q.   All right.  If you look at the note
22 that -- the notice, which was Exhibit 1 today,
23 and look at Topic 10.
24         Topic 10 is "The harms that
25 Plaintiff has incurred from the promotion,

Page 189

1 marketing, distribution, dispensing and/or
2 diversion of prescription opioids."
3         Do you see that?
4     A.   I do.
5     Q.   And I'm going to take you in a
6 minute and we're going to go into some of the
7 specifics, but my first question for you is, is
8 the list of harms that you would come up with
9 different for any of the individual activities
10 that are listed here, promotion, marketing,
11 distribution, dispensing and/or diversion?
12         MS. KEARSE:  Object to form.
13     A.   No.  This looks at the aggregate
14 harm caused in this instance, and that's --
15 that's what I feel most comfortable talking
16 about in the aggregate.
17     Q.   Okay.  Have you made -- and again,
18 we're going to get into the specifics --
19     A.   Sure.
20     Q.   -- in a minute, but have you made
21 any effort to consider whether the list would
22 be different for any of the individual
23 activities that are listed --
24     A.   I have not.
25     Q.   -- here?

48 (Pages 186 - 189)

1      Have you thought about it?
2      A.  No.  Again, to me, it is an
3  aggregate harm to the community.
4      Q.  All right.  I'd like you to pull
5  back out --
6          MS. WINNER:  Oh, no, we didn't.  I
7  thought we already marked this.  Did we mark
8  this already?  I thought we did mark this.
9          Could I just see the --
10         THE WITNESS:  Sure.
11         MS. WINNER:  -- exhibits quickly?
12  My apologies.
13         THE WITNESS:  I'm sorry.  They're
14  not in order.
15         MS. WINNER:  That's all right.
16  You're not required to keep them in order.
17         MS. KEARSE:  You're working hard
18  enough.
19         MS. WINNER:  Oh, here it is,
20  Exhibit 7.  I think this is Exhibit 7.
21     Q.  If you pull out Exhibit 7.
22     A.  Sure.
23     Q.  And look at page 14.
24     A.  Okay.
25     Q.  And you see at the bottom there's

1  Interrogatory 18 --
2      A.  I do.
3      Q.  -- which asks for categories of
4  injury.
5      A.  Uh-huh.
6      Q.  And then for some other
7  information.  But then -- if you then go to the
8  response, and there's a bullet point list of
9  categories of injury.
10         Do you see that?
11     A.  I do.
12     Q.  Do you -- is this one of the
13  interrogatory answers that you reviewed?
14     A.  It is.
15     Q.  Does this list look familiar to
16  you?
17     A.  Yes.  Sorry.
18         MS. WINNER:  Are you okay?  Do you
19  need a break?
20         THE WITNESS:  No, I'm okay.
21     Q.  As you understand it, does -- is
22  this a -- does this -- is everything on this
23  list -- let me strike that.
24         Is this a -- an accurate list of
25  the injuries that Summit County has -- claims

1  to have suffered in this case?
2      A.  Okay.  Let me take a look.
3      Q.  Sure.  Go ahead.
4      A.  I've reviewed it.  Could you
5  restate the question?
6      Q.  Sure.  Is this an accurate list of
7  the injuries that Summit County claims to have
8  suffered in this case?
9      A.  I -- I feel that it's missing some
10  of the major losses that we've incurred.
11     Q.  Okay.  What's missing?  I want to
12  go back through the list, but before we do
13  that, why don't you tell me what's missing from
14  the list.
15     A.  The loss of human capital.  And
16  certainly there's not a dollar figure you can
17  put on the thousands of lives we've lost.
18     Q.  Is that an injury for which Summit
19  County is seeking damages in this case?
20     A.  It is, because we're seeking
21  damages due to the total harm caused by this
22  epidemic.  The loss of life that really
23  exploded in 2016 created another loss, and that
24  was a loss of a sense of community.  And when
25  you talk about the aggregate harm, that is a

1  harm that we will be trying to recover from for
2  decades.
3          To declare a state of emergency in
4  Summit County was not something that was easily
5  reached, because it sends an alarm bell to
6  businesses and to people seeking to relocate
7  that we have a problem.  And we're no different
8  than anyone else, but we were the grownups in
9  the room enough to acknowledge what the problem
10  was and use the platform of the executive's
11  office to bring attention to it.
12         So the losses that are monetized
13  certainly here, I know that Brian can speak to
14  those directly and that Ms. Miller-Dawson can
15  as well.
16         But the aggregate loss is -- is not
17  limited to what you can put on a paper.  The
18  overwhelming sense of hopelessness that took
19  over this community in 2016, you can't monetize
20  that.  Every single day the newspaper was
21  reporting on the overdose death rates.  You
22  could not go into a community setting where
23  there were not weeping mothers talking about
24  their children.
25         So you asked me before if I had

49 (Pages 190 - 193)

Page 194

1 personal contact with it, and I'm lucky.  I'm
2 lucky in that my family has not.  But it is
3 personal to me when parents and community
4 members come to their government looking for
5 answers, looking for help, those can't be
6 monetized.  Those can't be bullet-pointed,
7 because that loss of human capital and the loss
8 of trust in the community, in doctors, in
9 patient care, because they know now how their
10 kids started.  They know what caused this,
11 and -- and that is a harm that this community
12 will be trying to rebuild for decades.
13     Q.   Okay.  Ms. Johnson, what I'm asking
14 you right now is whether there are any injuries
15 for which Summit County is seeking damages in
16 this case that are not listed in the response
17 that appears on pages 15 to 17 of this exhibit.
18     A.   The medical --
19         (Telephonic interruption.)
20         MS. WINNER:  If you're on the
21 phone, if you would please put yourself on
22 mute.
23     A.   Are the increased costs to the
24 medical examiner's office listed here?
25     Q.   I'm sure it is.  If not, we'll come

Page 195

1 back to it.
2     A.   The other costs that I think should
3 be reflected -- and again, probably tough to
4 monetize -- is the compassion fatigue that our
5 first responders and treatment providers are
6 incurring, and sort of the resources that we're
7 trying to put toward that effort of making sure
8 that those folks are supported, that they don't
9 become overwhelmed by hopelessness, and that
10 they don't become overwhelmed by the sheer
11 volume and turn cold to it.
12         So there have been efforts to try
13 and address that, both through the medical
14 community and through the first responder
15 community and all of those things.  Any time
16 there's an investment of time, there's an
17 investment of treasure, and I think that that
18 is something that's missing.
19     Q.   Anything else?
20     A.   I think that there's also -- the
21 portion that talks about the loss of tax
22 revenue due to the decreased efficiency and
23 size of the working population, I read that as
24 we had a lot of people die, so our population
25 decreased.

Page 196

1         The other part of that, opioid
2 epidemic that impacts that, is that we have
3 created a new class of felons who cannot seek
4 certain employment and might not be able to
5 seek the employment they had prior to falling
6 victim to addiction.
7         So I think there's -- there is a
8 loss that's beyond just the physical presence
9 of people we've lost, but also the ability of
10 people to work in certain fields because of the
11 felonization of -- of this epidemic.
12     Q.   Anything else that's not on the
13 list?  An injury for which Summit County seeks
14 damages in this case?
15     A.   I think it could be argued that --
16 the very last bullet point is cost for child
17 services and foster care for opioid-dependent
18 babies and foster children, so that's just a
19 really small portion of it.
20         Our -- our Children's Service Board
21 had to seek an increase in their levy this
22 year.  And levy campaigns cost money.  And the
23 driving factor behind the request for increase
24 is the opioid epidemic.  And so the costs of
25 that campaign really to try and support this

Page 197

1 fundamental service I feel like could be
2 included with the Children's Services portion.
3     Q.   Anything else?  I'm not asking you
4 to explain anything that's here.  I'm going to
5 go --
6     A.   Sure.
7     Q.   -- through each item that's on the
8 list.  I just wanted to know if there's
9 anything else that's not on the list.
10     A.   I don't see anything that's
11 standing out right now.
12     Q.   Okay.  Well, let's go back to the
13 top of the list, then.
14     A.   Okay.
15     Q.   The first item is, "Losses caused
16 by the decrease in funding available for
17 Plaintiff's public services for which funding
18 was lost because it was diverted to other
19 public services designed to address the opioid
20 epidemic."
21         What public services -- for what
22 public services was funding lost because it was
23 diverted to other public service?
24     A.   Well, specifically in Summit County
25 we have deferred capital improvements.  We've

50 (Pages 194 - 197)

Page 198

1  deferred, you know, what I would call
2  enhancement projects, things meant to enhance
3  our community because our resources were
4  laser-focused on the opioid epidemic.
5       So where public health, for
6  instance, really would like to spend their time
7  promoting this T21 initiative that they have,
8  eliminating the ability for our youth to buy
9  tobacco products.  A lot of science behind how
10  tobacco can change your brain makeup and how
11  it's important to not do that at an early age.
12  I know that that is an initiative they take
13  really seriously and wanted to promote, but it
14  really takes a back seat to the opioid
15  strategies and -- and programs.
16       Additionally, in Summit County
17  we've got health issues like anyone else.  I
18  didn't know that diabetes was such a huge
19  health issue in Summit County.  It is.  It's
20  our number one health issue, outside of
21  addiction, that -- that public health was
22  targeting.  And -- and all of those things get
23  pushed to the side.  Those important community
24  initiatives get pushed to the side, because
25  when people are dying immediately, you know,

Page 199

1  it's -- it's all hands on deck for that.
2       Q.   So --
3       A.   Obvious- --
4       Q.   Go ahead.
5       A.   With law enforcement, we have
6  detectives who are, you know, responding to
7  overdose cases frequently.  And those, as we've
8  discussed, are incredibly difficult to
9  investigate for a myriad of reasons, and their
10  time is, therefore, tied up in those cases
11  rather than, you know, folks who have had their
12  home burglarized or their car stolen.
13       And we also have a lot of our
14  resources being put into things like our Quick
15  Response Teams that we never had to do before,
16  but we know that Quick Response Teams are
17  effective, and so we put money toward them.  So
18  the number of other things that don't get the
19  attention or the money that they typically
20  would or should get because we're busy trying
21  to save people's lives with -- with these
22  efforts.
23       I know that in the medical
24  examiner's office we have lost a stream of
25  revenue.  Our medical examiner's office used to

Page 200

1  perform several autopsies for outside agencies
2  for cost, and that was a stream of revenue that
3  we were able to help fund some of -- of the
4  operations there.  Can no longer do that
5  because we don't have the capacity to do it,
6  and our -- and the funds there have to go to
7  what's happening in front of them.
8       I know that we have used grant
9  dollars to help support the expansion of our
10  drug courts, that perhaps those dollars could
11  have been used in a prevention setting or could
12  have been used for some other law enforcement
13  purpose, but because of the need for increased
14  capacity in drug courts, we -- we have
15  designated grant dollars for that as well.
16       And -- and likewise, those judges,
17  their time that would normally have been spent
18  on a variety of different cases is focused
19  on -- on drug cases, and certainly a huge
20  percentage of which are opioids.
21       I'm trying to go around the county
22  in my mind.
23       I -- that's -- that's -- I think
24  that's where I'm at on that.
25       Q.   Well, you said -- let me take you

Page 201

1  through some of these.  This was -- has money
2  been taken away -- that was already allocated
3  to T21 taken away from it?
4       A.   I don't know that money was taken
5  away, but certainly focus.
6       Q.   How about money that was dedicated
7  to diabetes, whatever was going to be done
8  about diabetes, has anything been taken away
9  from that?
10       A.   I -- again, I think where you've
11  got time invested, you know, from people,
12  that's money.  So when you take people off of,
13  you know, particular initiatives and refocus
14  them on something else, that is a diversion
15  of -- probably not the right word -- that's a
16  shift in dollars.
17       Q.   Were specific people taken off
18  diabetes?
19       A.   I don't know that for sure.  I just
20  know that that's not something that they are
21  focused on.  I shouldn't say that.  That's
22  unfair.
23       I know that what is coming out of
24  public health frequently, and investments of
25  new dollars are going into are ways to mitigate

51 (Pages 198 - 201)

Page 202

1  harm, harm -- harm reduction for the opioid
2  crisis.
3      Q.   Okay.  What -- but this bullet
4  point talks funding being diverted to other
5  public services --
6      A.   Right.
7      Q.   -- so my question is, what was
8  their -- what was the specific funding or -- or
9  resources, whether it was particular people,
10 that -- that was supposed to be -- you know,
11 was allocated out for diabetes and got diverted
12 elsewhere?
13     A.   I don't -- I don't know how to
14 specifically answer what was allocated for
15 diabetes, but I know we spent $10,000 on
16 fentanyl strips.  $10,000 that could have been
17 spent on diabetes prevention.  $10,000 that
18 could have been spent on T21.  But because harm
19 reduction is so critical in our community,
20 $10,000 was spent on fentanyl strips.
21         The increase in dollars that are
22 being spent on the needle exchange.  Certainly
23 those are dollars that weren't previously being
24 spent on needle exchange, but because the
25 demand is so high and the harm reduction

Page 203

1  benefit of that is so great, that those dollars
2  are not being spent on those other things.
3      Q.   What -- in a -- in a law
4  enforcement category, you say that there are
5  people who are investigating over- --
6  overdoses.  Were those people who were
7  previously assigned to do something else
8  specifically, and if so, what?
9      A.   Well, there are two detectives in
10 the Summit County Sheriff's Office who are
11 general division detectives, but they respond
12 to any fatal overdose scene.  So that means
13 they leave their desk and whatever rape,
14 robbery or homicide they're working on and
15 their attention has to be focused on -- on this
16 overdose.
17         I know the City of Akron had two
18 detectives who were working in, you know,
19 the -- the drug unit who were earmarked
20 specifically to investigate overdose deaths
21 because there were so many.
22         That's to say nothing of all of the
23 other police officers throughout the county who
24 would be proactively policing and are spending
25 lots of time on calls for service regarding

Page 204

1  overdoses.
2      Q.   Are there any -- is -- is the -- is
3  Summit County seeking damages in this case for
4  injuries suffered by the City of Akron?
5          THE WITNESS:  Thank you.
6      A.   Well, I mean, we don't -- we are
7  separate entities, certainly.  Akron's in
8  Summit County, and what happens in Akron does
9  affect Summit County.  So an arrest that's made
10 in the City of Akron by Detective Leonard, that
11 becomes a Summit County case.  It's a felony.
12         So the City of Akron arrest goes
13 through Akron Municipal Court, comes to Summit
14 County Common Pleas court, goes through our
15 prosecutor's office, goes through our Common
16 Pleas court system, our drug court.  Our ADM
17 provides services.  Our health department
18 provides services.
19         So we're certainly separate
20 entities, but what happens with nearly half of
21 our population impacts what goes on in Summit
22 County.
23     Q.   Is Summit County seeking damages in
24 this case for injuries suffered by the City of
25 Akron?

Page 205

1          MS. FLOWERS:  Objection.  Asked and
2  answered.
3      A.   We're -- we're both independently
4  seeking our own damages, is the way I
5  understand the -- the case.
6      Q.   So if the -- if the City of Akron
7  police department suffers an injury, that's not
8  part of the injury for which Summit County is
9  seeking damages, correct?
10         MS. KEARSE:  Objection.
11     A.   Again, it's tough because you get
12 arrested in the city of Akron, you're coming to
13 the Summit County Jail.  So I -- I know that
14 they're -- that we're seeking -- we're two
15 separate plaintiffs, certainly, but the
16 aggregate harm, to me, is what I always come
17 back to.
18         You know, I will leave to the
19 lawyers to make the determination of -- of
20 where that line separates, but to me it's
21 difficult for me to separate out what happens
22 in Akron from what happens in Summit County
23 because they're the same thing.  Everything in
24 Akron is in Summit County.
25     Q.   Is the --

52 (Pages 202 - 205)

1     MS. KEARSE:  And, Counselor, just
2 again for the record, we've got 30(b)(6)
3 representatives who are going to go
4 specifically to the dollar figures for the City
5 of Akron and for the County of Summit, so I
6 think those questions are probably more
7 appropriate for the 30(b)(6) representatives
8 who will deal specifically with the costs and
9 dollars associated with the recovery.
10     Q.   Are there any statistics maintained
11 or -- by Summit County concerning any changes
12 in law enforcement activities in areas other
13 than drug enforcement that you attribute to the
14 opioid problem?
15     A.   I'm sorry.  Could you say that
16 again, please?
17     Q.   Sure.  Are there any statistics
18 maintained by Summit County concerning any
19 changes in law enforcement activity in areas
20 other than drug enforcement that you attribute
21 to the opioid problem?
22     MS. KEARSE:  Object to form.
23     A.   I -- I feel like I'm -- I'm sorry.
24 I feel like I'm still missing it.  Changes
25 in --

1     Q.   Well, you say that -- you say that
2 these people who were investigating drug
3 overdoses are not investigating something else.
4 Was there -- are there any statistics that are
5 maintained on what other crime is out there
6 and -- and whether it's being addressed at a
7 different level than it was before?
8     A.   I see what you're saying.
9         Certainly the -- the sheriff's
10 department has its annual report, as does the
11 Akron Police Department.
12        But again, it's hard to measure the
13 crime we don't catch.  We're so focused on
14 opioids and the havoc that they have caused
15 that it would be difficult to graph the crime
16 that they're not catching because of the -- the
17 attention being paid to opioids.
18     Q.   Do you know whether clearance rates
19 have changed?
20     A.   I don't know that.  I -- I don't --
21 I don't know that.
22     Q.   Now, you said that the medical
23 examiner's office is no longer able to earn
24 income for doing autopsies for other people,
25 for other counties.  Was that, like, other

1 counties?
2     A.   Yes.
3     Q.   Okay.  So this is just -- this is
4 just a money-making proposition for the County
5 that you're not able to do anymore; is that
6 right?
7     MS. KEARSE:  Object to form.
8     A.   Yeah, it wasn't just about making
9 money.  We have highly skilled physicians who
10 have different certifications in our medical
11 examiner's office.  I believer Dr. Kohler is
12 one of only -- it's either 150 or 200 in the
13 country with certain qualifications.  So often
14 her expertise was helpful in difficult cases.
15     Q.   Well, and the -- the Quick Response
16 Teams, were the- -- are these people who were
17 diverted from other activities, and if so,
18 what?
19     A.   Well, any time a police officer is
20 responding to an overdose, they're not
21 proactively policing.  They're not being
22 present in the community.  They're taken out of
23 the community for a specific purpose.  So
24 again, it's one of those it's hard to quantify
25 because it's the stuff you don't catch.

1        But any time a police officer is
2 dispatched as a part of a QRT, that's a police
3 officer who's not enforcing traffic laws.
4 That's a police officer who's not able to
5 respond to a domestic violence call.  It's --
6 it's more officers who have to respond solo and
7 without, you know, a second officer present to
8 those types of cases.
9     Q.   And -- and again, am I correct that
10 you're not aware of any statistics, hard
11 statistics, about the activities that those
12 officers did not do because they were involved
13 in the Quick Response Teams?
14     A.   No.  It's hard to quantify what you
15 didn't do, I guess.
16     Q.   All right.  Then you say there that
17 you used grant dollars for drug court
18 expansion.
19     A.   Uh-huh.
20     Q.   So this was grant -- grant dollars
21 received from a third party?
22     A.   From the federal government.
23     Q.   From the federal government.  Okay.
24 So this is not -- this is not Summit County tax
25 money you're talking about?

53 (Pages 206 - 209)

1    A.   No, but they're dollars that might
2 have otherwise been used for other
3 opportunities in the County.
4    Q.   Were -- was that in the grant
5 documents?  Is that money tailored for other --
6 excuse me -- targeted for other uses?
7    A.   That was a DOJ grant that was -- I
8 don't -- it was not specifically for drug
9 courts, but it was fashioned by Summit County
10 employees in an effort to make our needs meet
11 the requirements of the grant, as I recall.
12    Like, it was a pretty broad one.
13 You could apply for many different reasons.
14 But as I recall, it was -- we tailored it to --
15 to expand drug court.
16    Q.   Well, and you don't -- I take it
17 you don't know -- you don't know you would
18 have -- you would have received the grant for a
19 different use for those same funds?
20    MS. KEARSE:  Object to form.
21    A.   I mean, I can't predict the federal
22 government.  I don't think anybody can these
23 days.  So, no, I couldn't say that we would
24 have gotten it or not.
25    Q.   All right.  I think we've covered

1 the first -- first bullet --
2    A.   Okay.
3    Q.   -- pretty thoroughly.
4    Is there anything we have- -- we've
5 failed to cover on the first bullet?
6    I -- so maybe we can move to the
7 second one.  "Costs for providing health care
8 and medical care for patients suffering from
9 opioid-related addiction or disease, including
10 overdoses and deaths."
11    A.   I'm sorry.  If I could go back to
12 the first one.
13    Q.   Sure.
14    A.   So because of the prevalence of the
15 opioid epidemic --
16    Q.   Uh-huh.
17    A.   -- lots of tasks -- task forces,
18 boards, commissions, things like that have
19 sprung up in an effort to educate and -- and
20 promote and -- and treat and combat the whole
21 thing, and a lot of person hours are being
22 devoted to those.  So myself, our public safety
23 director, the executive, my staff, the public
24 safety staff have spent countless hours on
25 these boards and commissions trying to

1 coordinate efforts and leverage funds, and
2 those are, you know -- personally those are
3 hours that were not spent doing things that
4 could have enhanced our community.  Those
5 are -- those are hours that were spent
6 specifically doing things that we would not
7 have been doing had this epidemic not taken
8 place in Summit County.
9    So public services is -- I guess I
10 sort of was just thinking police, but certainly
11 all of the public servants who work for the
12 County, in addition to public health and ADM,
13 have diverted our personal resources to this
14 issue.
15    Q.   Have you tracked the -- the
16 hours --
17    A.   No.
18    Q.   -- that you spent on this?
19    A.   I have not.
20    Q.   Do you know if anybody else in the
21 County has done that?
22    A.   I don't.  But certainly I can
23 personally tell you I have spent what I am
24 confident are hundreds of hours at boards and
25 commission meetings on behalf of the County for

1 this specific purpose.
2    Q.   You were not hired specifically by
3 the County for that purpose, correct?
4    A.   I was not hired by the County?
5    Q.   To -- to deal with opioid issues.
6 Or were you?
7    A.   That wasn't the only reason.  I --
8 I think my knowledge of the criminal justice
9 system and my advocacy platform certainly lent
10 itself to the position that the executive hired
11 me at.
12    Q.   Did the position that you -- that
13 you were hired for exist before you were hired
14 for it?
15    A.   It did the way I was hired.  I was
16 hired in as a deputy director of law, and that
17 was a position that existed.
18    January 1st of last year, the new
19 position of assistant chief of staff was
20 created.
21    Q.   And then -- and you're also the
22 public spokes- --
23    A.   Correct.  Public information
24 officer.
25    Q.   Public information officer.

1    A.    Yes.

2    Q.    And that's, I assume, a

3 long-standing position?

4    A.    It is, but it was -- it was held by

5 our public safety division, and so it was

6 really more of a job that was kicked into gear

7 if there was an emergency or a public safety

8 issue.

9    Q.    Has there been any policy or

10 practice within the County for people who are

11 working on opioid-related issues to track their

12 time working on those issues?

13    A.    No, not that I'm aware of.

14    Q.    Are we now ready to move --

15    A.    Yes.

16    Q.    -- to the second bullet?  Okay.

17    A.    Yes.

18    Q.    "Costs for providing health care

19 and medical care for patients suffering from

20 opioid-related addiction or disease, including

21 overdoses and deaths."

22        Who in the -- what entity within

23 the County structure has incurred those costs?

24 Or entities?

25    A.    Well, the ADM Board has certainly

1 incurred a huge cost and has expended their own

2 rainy day reserve funds to address it.

3        The public health department

4 obviously has spent a lot of money doing that.

5        You know, our court system, when

6 there are babies born addicted, there are

7 caseworkers assigned to CSB, things like that,

8 so there are costs associated with that.

9        So health care to me is -- is not

10 just about, like, what's in the doctor's

11 office.  Is that fair to go down that road?

12 Because the County has very much participated

13 in transitional housing for folks recovering

14 from opioid addiction.

15    Q.    Are only people who have opioid

16 addiction eligible for transitional housing?

17    A.    We specifically worked with

18 opioid -- there's a specific transitional

19 housing program that the County worked with.

20 It was the largest transitional housing program

21 that centered on men recovering from opioid

22 addiction.  It was in danger of closing because

23 their landlord had put the building up for

24 auction --

25    Q.    Uh-huh.

1    A.    -- and so we used County resources

2 to sort of leverage the transfer of a former DD

3 home.  All of the DD homes in Ohio have been

4 shut down.  And so the Summit County DD board

5 had this facility that was transferred to the

6 Land Bank.  I can't recall the dollar amount

7 that the Land Bank paid for it.  And then we

8 invested general fund dollars to rehabilitate

9 it so that the folks who were living in this --

10 this sober-living transitional housing

11 environment would not be left to fend for

12 themselves.

13        So, you know, general fund is sort

14 of the fund of last resort.  Those are dollars

15 that we use only when we really feel we have

16 to, and we certainly felt that that was

17 important to provide that care for those --

18 those patients, for lack of a better term.

19    Q.    Well, I'm focusing on the second

20 bullet point.

21    A.    Yeah.

22    Q.    It says, "The costs for providing

23 health care and medical" --

24    A.    Right.

25    Q.    -- "care for patients suffering

1 from opioid-related addiction or disease."

2    A.    I consider treatment health care.

3    Q.    Okay.

4    A.    And -- and treatment was being

5 provided at the transitional housing facility.

6    Q.    Okay.  So who -- who -- you say the

7 ADM Board does some of this.

8    A.    Yes.

9    Q.    The public health department --

10    A.    Yes.

11    Q.    -- does some of this.

12        Does -- is there any other entity

13 within Summit County that incurs costs for

14 providing health care and medical care for

15 patients suffering --

16    A.    Right.

17    Q.    -- from opioid-related addiction or

18 disease?

19    A.    So I consider treatment health

20 care, and the County contracts with places like

21 the Oriana House, the Interval Brotherhood

22 Home, the Community Health Center.  And if you

23 are a person who comes into contact with our

24 court system and treatment is part of your

25 criminal justice process, we pay for that.

55 (Pages 214 - 217)

1    Q.   Does that go through a particular
2 department?
3    A.   So we have -- the county of Summit
4 has a direct contract with Oriana House, has --
5 has some direct --
6    Q.   Uh-huh.
7    A.   -- contracts with some of these
8 care providers.  And additionally, we also have
9 contracts with ADM, who then contract with
10 Summit Psychological, where health care is
11 provided in the jail and in our residential
12 facilities.
13        So any time you have a Summit
14 County inmate who's receiving health care in
15 the jail, certainly we are paying for that as
16 well.
17    Q.   But not all medical care that
18 people receive in jail is for opioid addiction?
19    A.   No.
20    Q.   Do you know what percentage of it
21 is?
22    A.   I don't.  I recall Captain -- or --
23 yeah, Captain Barker's testimony that there had
24 been an increase.  I don't recall if there were
25 percentages in there.

1    Q.   Are -- is -- are the contracts with
2 Oriana House and the others you listed limited
3 to opioid treatment?
4    A.   No.
5    Q.   So do they also cover treatment for
6 people who are addicted to other substances?
7    A.   Correct.  They do.
8    Q.   Does that include alcohol?
9    A.   Yes.
10    Q.   Do you know what percentage of it
11 is for opioid addiction?
12    A.   No, but I know there are some
13 specific programs, because opioid addiction is
14 very different than alcoholism and cocaine
15 addiction, for example.
16    Q.   Are the contracts for those
17 program -- are those programs subject to
18 separate contracts?
19    A.   Some of them are, and that would be
20 probably a better question for Brian.
21        I know that there are line items
22 that are affiliated with specific programs, but
23 I'm not -- I'm not in the weeds on that as much
24 as he is.
25    Q.   Do you know what the programs are

1 that are specific to opioids?
2    A.   I -- I -- there are -- there's a
3 recovery coaching program that's specific to
4 it, and I know that there are certain
5 requirements for the recovery coaches to be
6 certified and Medicaid reimbursed that
7 essentially require that they're somebody who
8 has lived through recovery, and that is focused
9 on opioid treatment.  I -- I feel like the
10 recovery coaches are specific to opioids.
11    Q.   Anything else?
12    A.   Again, I -- I'd tell you that Brian
13 would be more able to answer that in- -- into
14 those line items.
15    Q.   Going back just for a second,
16 something I forgot to ask you about, No. 1, the
17 first -- not No. 1 -- the first bullet point --
18    A.   Sure.
19    Q.   -- on page 15 of this exhibit --
20    A.   Uh-huh.
21    Q.   -- the loss caused by the decrease
22 in funding because of diversion of funding.
23        What -- what time period -- during
24 what time period were these losses incurred?
25    A.   Well, I think we, again, started to

1 see the uptick in criminal cases that opioids
2 were the root of.  Right?  The possessions,
3 deception to obtain, we started to see that
4 uptick in -- you know, prosecutors handling
5 those cases, probation officers monitoring
6 those cases, treatment being sought because of
7 that -- in the late 2000s and early teens.
8        And I think it -- it really sort of
9 exploded '15 to '16 when we really were -- were
10 faced with, we have to do everything we can to
11 try to stop the bleeding.  And that's -- that's
12 when we saw our medical examiner's office,
13 those types of things, really being impacted.
14 And -- and bottom line is -- I don't know that
15 that's the right word, but certainly their
16 budget changed dramatically in '15 and '16.
17    Q.   The medical examiner office?
18    A.   Yes, ma'am.  Yeah.
19    Q.   And the -- the diversion of
20 resources for law enforcement that you referred
21 to, is that -- did that occur in the same era?
22    A.   Yes, I would say so.  Again, saw
23 that uptick -- whether it was patrol, arrests,
24 or diversion detectives -- toward the end of
25 the 2000s, beginning of the teens.  But really

56 (Pages 218 - 221)

Page 222

1 that explosion of and really demand from the
2 public that law enforcement, you know, present
3 them with some response as well.
4     Q.    Oh, when did the Quick Response
5 Teams start?
6     A.    Those started, I believe, in '15.
7 I believe that there was discussion about them
8 perhaps at the end of '14, right when the
9 Opiate Task Force was forming, but I -- around
10 '15.
11    Q.    And the task forces were formed in
12 the 2014-2015 --
13    A.    So the Opiate Task Force that sort
14 of everyone talks about, the one that ADM sort
15 of hosts, that started in 2014.
16    Q.    And the diversion of resources that
17 you think could have been spent on T21 and
18 diabetes, was that at the same time?
19    A.    The same time and growing.  I know
20 that the fentanyl strips were just purchased
21 for the first time last year, so certainly not
22 a cost we had incurred prior to that.
23    Q.    Okay.  Going back to the second
24 bullet point, then.
25    A.    Okay.

Page 223

1     Q.    The costs for providing health care
2 and medical care for patients suffering from
3 opioid-related addiction or disease.
4     A.    Uh-huh.
5     Q.    For whom does the ADM Board -- oh,
6 first of all, starting with -- starting -- let
7 me start again.
8     A.    Okay.
9     Q.    The ADM Board, -- has the funding
10 for the ADM Board increased?
11    A.    No, it has not.  Well, so they're
12 levy-funded mostly, so local dollars mostly
13 fund the ADM Board.  Their last levy was six
14 years ago.  They are in a levy year this year.
15 So in 2013 they did not seek a renewal at that
16 time, so they've had a flat budget.
17    I know that their funding from the
18 State has increased over the last eight years.
19 But their local dollars, I mean, you know, with
20 the rise and fall of -- of tax receipts.  But
21 pretty flat.
22    Q.    Why was no renewal sought in 2013?
23    A.    No, it was a renewal.  It was not
24 an increase.
25    Q.    Oh, it was not an increase.

Page 224

1     A.    Correct.
2     Q.    Oh.  So they didn't think an
3 increase was needed in 2013?
4          MS. KEARSE:  Object to form.
5     A.    I -- I did not have a discussion
6 with the director about that.  I think at that
7 time in 2013 we knew we had a problem.  We knew
8 families were incurring crisis.  I don't think
9 we knew yet that we had an epidemic.
10    Q.    Now, you say the funding for the
11 State has decreased for the ADM Board.
12    A.    Yes.
13    Q.    What's the reason for that?
14    A.    Priorities.  The administration and
15 the legislature, throughout the last eight
16 years, have had different priorities, and a lot
17 of the -- what was previously in place is what
18 I would call permanent funding, so funding
19 streams, a lot of those dollars have been
20 turned into grants, so non-permanent.
21    The response to requests for more
22 funding has commonly been, "Seek a grant.
23 Here's a grant that might fill that gap for
24 you."
25    So it's a priority.  It was not the

Page 225

1 number one priority of the administration and
2 the legislature, and perhaps they think that
3 investing in other ways is more beneficial.
4     Q.    So the -- when you say the
5 administration, you're talking about the
6 governor and --
7     A.    Yes.
8     Q.    -- the State administration?
9     A.    Correct.
10    Q.    And -- but they have elected to
11 decrease the funding that went to the ADM
12 Board.  When did that --
13          MS. KEARSE:  Object to form.
14    Q.    When did that decrease occur?
15    A.    I think it's been decreasing.
16 There's a biennium budget every two years, and
17 I don't -- I think they were flat budgeted this
18 cycle, but prior to that had faced at least a
19 small decrease every cycle.
20          MS. KEARSE:  And I'm also going to
21 say, this line of questioning, there's a 30(b)
22 on budgets as well, and Brian Nelson will be
23 testifying about that as well.  So I think
24 budget issues, there's a specific 30(b) witness
25 for budget and costs associated with that, too.

Page 226

1     Q.    For whom has the ADM Board paid --
2          MS. KEARSE:  And -- and I -- I
3  don't mean -- by budget, I'm just going to say,
4  I mean, to the extent there's anything
5  conflicting, I think you'll have the
6  opportunity to talk to Brian Nelson about the
7  specific budgets.  I do not want Ms. Johnson
8  having to be the 30(b) representative on budget
9  issues.
10         MS. WINNER:  I understand if it has
11  a -- if it's a number with a dollar sign in
12  front of it, that's for one of your other
13  witnesses.
14         MS. KEARSE:  Well, and the whole
15  budget line.  What's on the budget decreases,
16  increases.  All --
17         MS. WINNER:  Okay.
18         MS. KEARSE:  Anything budget on
19  that is Brian Nelson.
20     Q.    The ADM Board, who -- whose health
21  care and medical care costs does the ADM Board
22  pay?
23     A.    Well, they provide treatment to
24  individuals who seek it either on their own or
25  at the direction of a judge.

Page 227

1     Q.    And is that independent of the
2  treatment that's provided through contracts
3  with the likes of Oriana House?
4     A.    It can be.  The -- ADM is a funder,
5  so they fund the Oriana House.  They fund IBH,
6  the Interval Brotherhood Home.  They fund the
7  Community Health Center.  So they're not a
8  direct treatment provider, so, you know, the
9  dollars they spend aren't on, you know,
10  person-to-person care.  They're spent --
11     Q.    For programs.
12     A.    Yes.
13     Q.    Who determines the eligibility for
14  those programs?
15     A.    The caseworkers, primarily.
16  Probation officers.  At times judges.  You
17  know, if you go to a detox center, you'll be
18  interviewed.  If you get arrested, you'll be
19  interviewed.  And the folks who work in our
20  probation department and with our drug courts
21  have specialized training to make some of those
22  referrals and those decisions.
23     Q.    Are there any financial-need tests
24  for any of the programs?
25     A.    I don't know what you mean by that.

Page 228

1     Q.    You have to be below the poverty
2  line or something like that?
3     A.    Oh, I don't know that we do any
4  TANF funding for that.  I -- I know that there
5  is a real intentional and concentrated effort
6  to make sure folks are enrolled in Medicaid, if
7  they aren't already, so that reimbursement can
8  be sought and so that they are able to get the
9  best care they can.
10         But I don't -- I don't know that
11  there's any -- we don't turn people away if
12  they can't pay.  And certainly if they have
13  private pay, those are accepted by a lot of our
14  treatment providers as well.
15     Q.    So when you say costs, are there
16  costs for providing health care and medical
17  care for patients suffering from opioid-related
18  addiction or disease, as in this second bullet
19  point, that are not reimbursed by Medicaid or
20  other health insurance?
21     A.    Oh, yeah.  A lot of people aren't
22  insured still.  I mean, a whole lot.  You know,
23  there are also lots of children who, if they
24  are -- if they're -- we call it Rule 6.  If
25  they are removed from the home, they certainly

Page 229

1  have to have a health care screening, and not
2  all of those children are enrolled in Medicaid
3  and -- and/or have insurance, and so a lot
4  of -- a lot of times -- there are plenty of
5  folks who don't have insurance and are not
6  being reimbursed for.
7          And certainly we've got some
8  facilities like IBH, which exceeds the Medicaid
9  bed limit for reimbursement, and so we can't
10  get any reimbursement at IBH, which is our
11  largest inpatient facility.
12         MS. KEARSE:  And, Counsel, I'll
13  just -- I mean I know you're asking questions,
14  but even Topic 11, that Brian Nelson will -- it
15  talks about the source of funds, so I think
16  Ms. Johnson could talk, certainly, about the --
17  the harm that's been done to the community
18  there, but when you're talking about the
19  sources of funds and the dollar signs, I think
20  it is more appropriate -- it is more
21  appropriate for Mr. Nelson, who has been
22  designated as a 30(b) for damages and budgets
23  and line items that -- that go to the specific
24  costs of things as well.
25     Q.    You said that the public health

58 (Pages 226 - 229)

Page 230

1 department also incurs some of the costs that
2 are covered -- that are addressed in this
3 second bullet point. For whom does the public
4 health department pay for health care and
5 medical care?
6     A. Well, they -- they are direct
7 treatment providers, so they do some direct --
8 I call it person to person. They are care
9 providers, some of their programming.
10     Q. And do they have any programs that
11 are limited to opioid addiction?
12     A. Well, their needle exchange
13 certainly is and their fentanyl strip program,
14 I would say, are opioid -- you know, those are
15 certainly opioid-driven programs.
16     Q. Well, needle exchange can -- can
17 apply to addicts using other drugs also, can't
18 it?
19     A. Well, sure, but I've not heard of
20 people using intravenous cocaine. I mean,
21 opioids seem to be the ones that go with
22 needles.
23     Q. Any other programs that are
24 specific to opioids in the public health
25 department?

Page 231

1     A. Public health department
2 participates in the Centering program. That's
3 at Summa Health System's Barberton campus.
4 They provide some wraparound services there,
5 and that is an opioid-specific treatment
6 program for pregnant moms and moms of babies
7 that -- that the public health department
8 participates in.
9     Q. When you say "participates," what
10 do you mean by that?
11     A. They offer person-to-person and
12 direct-group counseling services.
13     Q. Is there anybody else that the
14 public health department pays health care or
15 medical care for involving opioid-related
16 addiction or disease?
17     A. I can't -- I can't think of any
18 others right now.
19     Q. All right. Let's go to the next
20 item, which is "Costs of training emergency
21 and/or first responders in the proper treatment
22 of drug overdoses."
23     A. Uh-huh.
24     Q. What kind of -- what -- can you
25 describe what kind of training that refers to?

Page 232

1     A. When our residents first -- I
2 shouldn't say first. When it started to become
3 more prevalent that folks were overdosing in
4 homes outside of hospitals, there was not a lot
5 of attention paid to the scene. Medical
6 emergency first and foremost, and -- and that's
7 the way it was treated.
8     And then there came a shift of,
9 this needs to be treated like a crime scene,
10 because it is. If someone overdosed then, you
11 know, died with the needle in their arm, the
12 response was typically two-part. It was from
13 EMT to make sure all efforts to resuscitate had
14 been completed, and then the scene was then
15 treated a crime scene, which had not been
16 previously done before. And as we talked about
17 before, detectives were assigned to respond to
18 those as quickly as possible so that evidence
19 could be preserved and the scene could be
20 evaluated.
21     So there was definitely training
22 that went into some of our officers
23 understanding what to look for, what to be
24 careful of, because, quite frankly, as this
25 epidemic has evolved, the danger to our

Page 233

1 officers has increased.
2     Q. And the danger to the officers is
3 primarily from exposure to fentanyl?
4     A. And carfentanil and needles. You
5 know, needle sticks are still troubling, to say
6 the least, and require medical treatment and
7 attention.
8     Q. Well, the training that -- that's
9 described in Bullet Point 3, I mean, who
10 receives this training? Police officers?
11     A. Police officers, the QRT response
12 teams, the recovery coaches, any folks who
13 might respond to an immediate scene of
14 overdose.
15     Q. And how many people have received
16 that kind of training?
17     A. Gosh, I don't know the answer to
18 that.
19     Q. What kind of training -- I mean,
20 what scope of training? Are we talking about
21 somebody having to go off to a course for a
22 month? Are we talking about a course of a
23 couple hours in an afternoon? Can you sort of
24 give us a sense of --
25     A. I know that some of --

59 (Pages 230 - 233)

Page 234

1    Q.   -- the extent of the training
2  that's required here?
3    A.   I know some of our law enforcement
4  officers have received more training than, you
5  know, an hour update.  I know that there are
6  some law enforcement officers who not only have
7  received it but now give it.  They -- they
8  teach other officers how to do it.
9        As far as our recovery coaches,
10  there's a certification process, because
11  recovery coaches are dispatched with the QRT
12  teams, and so they certainly have been trained
13  on it.  And it's -- it's not an insignificant
14  training process and certification process for
15  those folks.  But the number?  Not enough.  We
16  could use more recovery coaches.
17    Q.   Well, what's the average amount of
18  time that a police officer has -- the average
19  amount of time that a police officer has in
20  training for this?
21    A.   I couldn't speak to the average
22  number.
23    Q.   Are all police officers given this
24  training?
25    A.   All police officers are trained in

Page 235

1  evidence collection and investigative tools,
2  things like that.  Specifically to overdose and
3  more specifically overdose death, I -- I don't
4  want to guess.
5    Q.   Have we pretty much covered the
6  third bullet point now?
7    A.   We talked only about police
8  officers.  We didn't really talk about the
9  EMTs.
10    Q.   Okay.
11    A.   So --
12    Q.   So is there also training for
13  the --
14    A.   Sure.
15    Q.   I mean, I assume EMTs have to be
16  trained to deal with overdoses no matter what,
17  right?
18    A.   Sure, but --
19        MS. KEARSE:  Object to form.
20    A.   -- they also -- they also need to
21  be trained on how to interact with law
22  enforcement in that capacity as well, because
23  it's an emergency situation, but it's also a
24  crime scene.  And the other part that we did
25  not talk about with police officers was

Page 236

1  training them on how to use naloxone.
2    Q.   Yeah, let's come back to the
3  naloxone in a minute.
4    A.   Yeah.
5    Q.   But -- but my question is, I mean,
6  I would -- I -- maybe I'm wrong, but I would
7  assume that an EMT, among the basic skill set
8  for an EMT would be dealing with an overdose --
9    A.   Sure.
10    Q.   -- handling an overdose situation,
11  and that's nothing particularly special now, is
12  it?
13        MS. KEARSE:  Object to form.
14    A.   I don't know that I disagree with
15  that.  I think the -- the cumulative nature of
16  some of our EMTs responding has required some
17  additional attention paid to their -- to their
18  mental wellness, because when you've got EMTs
19  who respond to the same house five times, it
20  can certainly impact and create some care
21  fatigue.  So I -- I know that there has been
22  some intentionality about addressing that with
23  first responders as well.
24        MS. WINNER:  Why don't we take a
25  break.

Page 237

1        THE WITNESS:  Sure.
2        THE VIDEOGRAPHER:  Off the record
3  at 2:17.
4        (A recess was taken.)
5        THE VIDEOGRAPHER:  On the record.
6  This is the beginning of Disk No. 3.  The time
7  is 2:42.
8  BY MS. WINNER:
9    Q.   Okay.  We're back on the record.
10        Do you still have Exhibit 7 in
11  front of you?
12    A.   Yes.
13    Q.   And we've been talking about some
14  of the bullet points under Response 18?
15    A.   Yes.
16    Q.   And I'm not going to probably skip
17  over some of them, because I -- I think most of
18  them are ones that your counsel would direct
19  all of my questions to one of your colleagues.
20    A.   Okay.
21    Q.   But there are a few that I'd like
22  to ask you a few more questions about.
23    A.   Sure.
24    Q.   If you would look at the last
25  bullet point on page 15, first of all, "Costs

60 (Pages 234 - 237)

Page 238

1 for providing mental health services,
2 treatment, counseling, rehabilitation service,
3 and social service to victim of the opioid
4 epidemic and their families."
5        Now, I think a lot of these
6 categories overlap.
7     A.   Yeah.
8     Q.   So I think a lot of this one we've
9 already talked about.
10       Is there anything that fits in this
11 category that you haven't already described for
12 me?
13    A.   I don't know that we've talked a
14 lot about Children's Services and the costs
15 associated with the increased treatment and
16 placement.
17    Q.   We have a whole separate bullet
18 point --
19    A.   Oh, that's right.  Sure.  Okay.
20    Q.   -- for that one later.  So let's --
21    MS. KEARSE:  And I'm -- I'm sorry.
22 Which bullet point are you on?
23       MS. WINNER:  We're on the last one
24 on page 15.
25       MS. KEARSE:  Okay.  All right.

Page 239

1     A.   So directly from the County,
2 because of the increased demand for inpatient
3 treatment, as well as other forms of services
4 and counseling centers, the County donated
5 land.  There are two separate 501(c)(3) groups
6 in Summit County who were working together and
7 are working together.  One called Hope United,
8 which is seeking to create a community center
9 specifically for folks recovering from opioid
10 addiction.
11       The other is called -- I've lost
12 it.  Dan Gregory's group.  It will come to me
13 as I talk about it.  They are looking to build
14 an inpatient facility.  And they approached the
15 County multiple times looking for land or a
16 building that would make sense.
17       Because we could not find the right
18 fit for something they could purchase, we
19 donated over 20 acres of land to these two
20 501(c)(3)s in an effort to co-locate them and
21 provide, really, a campus for treatment.  This
22 was done essentially because we saw the need
23 and --
24       MR. JOHNSON:  They didn't turn the
25 telephone back on.

Page 240

1       MS. WINNER:  Oops.  Okay.
2       MR. JOHNSON:  Oh, now they did.
3       MS. WINNER:  Now we're back on.
4       MR. JOHNSON:  Thank you.
5     A.   So this was done in response to a
6 need for not only more treatment beds, but also
7 a variety of treatment options for folks.  It
8 really -- it's a large tract of land that the
9 County owns and had for sale that we certainly
10 didn't sell to anyone else because we felt it
11 was so imperative to create this availability
12 of space for -- for these treatment providers.
13    Q.   Where is this land located?
14    A.   It's located in Lakemore, which is
15 interesting because it's a landlocked community
16 inside of Springfield, which is just east of
17 Akron.
18    Q.   You said you had it for sale.  How
19 long had it been for sale?
20    A.   I don't know when the last -- when
21 it -- the last tenants.  So it -- I don't know
22 how long it had been for sale.
23    Q.   The -- are these, Hope United and
24 Dan Gregory's group, whatever its name is,
25 limited to opioid addiction treatment?

Page 241

1     A.   I don't think that they are limited
2 to, but they came to us because of.  Both of
3 their families are personally affected by the
4 opioid epidemic.
5        Hope United was founded by Travis
6 and Shelly Bornstein, and they lost their son
7 to an overdose.  And he was a college athlete
8 who became addicted to opioids, and when no --
9 he could no longer get those, he turned to
10 heroin.  And he overdosed, and his body was
11 dumped in a field.  And so they very quickly
12 mobilized their community to support this
13 effort of having a place of hope for people to
14 go to.
15        And Dan's organization, he also has
16 a family member who has been directly impacted
17 by opioid addiction that started with
18 medication and now has turned to heroin.
19    Q.   And what is the source of your
20 information about how his addiction started?
21    A.   I talked with him.
22    Q.   With him?  He told you that?
23    A.   I talked with Dan, and I talked
24 with Shelly and Travis Bornstein.  They lost
25 their son.

61 (Pages 238 - 241)

1    Q.   Okay.  But my point is, did you --
2  do you have any information, other than what
3  these family members told you about that?
4    A.   No.  He's dead.  I mean, this is
5  what happened to him.
6    Q.   Well, but, I -- again, you're --
7  you're a former prosecutor.  You know the
8  difference between hearsay and direct -- direct
9  evidence.
10        Do you have any personal knowledge
11  on that point or is it you just know what they
12  told you?
13        MS. KEARSE:  Object to form.
14    A.   I believe that the parents knew
15  what their child was doing when he was taking
16  prescription medication prescribed to him by
17  his physician after an injury.  And they know
18  that he then started seeking heroin.  And they
19  know this because he died with a needle in his
20  arm.
21    Q.   And that's what they've told you;
22  is that correct?
23    A.   That's also what a police report
24  indicates in the way that he died.
25    Q.   And does the police report include

1  any independent information about the source of
2  his opioid use?
3    A.   I don't recall exactly what the
4  police report says.
5    Q.   Okay.  On this, have we now covered
6  either in our conversation just now or in our
7  conversation before the break, everything
8  that -- that's covered within -- of the last
9  bullet point on page 15?
10    A.   That's the best of my ability at
11  this point, yes.
12    Q.   Okay.  Why don't we skip over the
13  next bullet point and talk about the second
14  bullet point on page 16.
15    A.   Uh-huh.
16    Q.   Which is costs associated with
17  various public safety and health initiatives
18  related to the opioid epidemic.  And again, I
19  don't want us to be repeating ourselves.
20    A.   Sure.
21    Q.   So is there anything in that
22  category beyond what we've already talked about
23  here today?
24    A.   The number of dump sites for
25  medication has increased.  I know that most

1  police departments in Summit County now have a
2  drop-off box, and --
3    Q.   Is that what a dump site is --
4    A.   Yeah.
5    Q.   -- a drop-off box?
6    A.   Yes, yes.  And there have been
7  several initiatives, drug take-back days, where
8  there's specified locations for folks to turn
9  in unused medications.
10    Q.   Who runs that?
11    A.   It depends.  Obviously, all of the
12  different police departments monitor their own
13  drop boxes.  The DEA certainly has, I think,
14  either one or two specified days per year, but
15  local law enforcement groups have done their
16  own, and it has gone to a point where we've had
17  local high school groups organize some of these
18  sort of take-back or turn-in days.
19    Q.   All right.  Well, what is --
20  what -- just focusing in on the county again.
21    A.   Uh-huh.
22    Q.   What -- what has Summit County done
23  in this category?
24    A.   Well, the health department
25  participates in those, as well as ADM.  Those

1  are -- a lot of those initiatives are driven
2  out of the Opiate Task Force meetings.  So the
3  health department and -- and the ADM are
4  involved in all of those efforts for those
5  initiatives.
6    Q.   Well, other than the -- is there
7  anything else other than the dump sites and the
8  drug take-back days that fits in this category,
9  beyond the things that we've already talked
10  about.  I realize some of them would probably
11  fit --
12    A.   Yeah.
13    Q.   -- into this category also.
14    A.   Did we talk about the fentanyl
15  strips and needles with this?
16    Q.   You have.
17    A.   Okay.
18    Q.   Anything else?
19    A.   The -- Dr. Smith and Dr. Kohler
20  presenting at continuing medical education
21  programs.  As far as initiatives, that's --
22  that's what I can come up with at this point.
23    Q.   Now, the -- the dump sites for
24  medication and the drug take-back days, those
25  are not limited to opioids, are they?

1    A.   No.

2    Q.   All right.  The costs associated
3  with the increased burden on Plaintiff's drug
4  courts, are there specific initiatives
5  associated with opioids that have been
6  undertaken by the drug courts?

7    A.   They've had to increase capacity.
8  As far as initiatives, I guess I don't know
9  exactly how to frame that other than to say
10  there's been an increase in who becomes
11  eligible for drug court, or I -- we call it
12  "Hope Court" in municipal court.  It's "Turning
13  Point" in common pleas court.  But I guess it's
14  commonly referred to as "drug court."

15         But it used to be, 10 and 15 years
16  ago even, the only courses that went to drug
17  court was drug cases, possession cases, and
18  there's been a shift in policy and in thought
19  that it should be expanded to cover theft cases
20  or other things that were committed as a result
21  of addiction and drug-seeking behavior.

22         So the expansion of and sort of the
23  change in philosophy has certainly required
24  additional probation officers, additional
25  caseworkers.  Common pleas court now has two

1  judges.  It expanded from one of our three
2  municipal courts to there's now a second drug
3  court.  And Barberton Municipal Court and the
4  Stow Municipal Court has an agreement with
5  Akron so that some of their defendants can use
6  the services in Akron.

7    Q.   Okay.  But I want to focus again on
8  Summit, what Summit County --

9    A.   Right, and we --

10    Q.   -- has incurred here.

11    A.   -- we -- so the court system is 100
12  percent Summit County, the common pleas court
13  system.

14    Q.   Okay.  I see.

15    A.   Yes.  So that's general fund money
16  for the most part.  Some of the grant funds
17  that we talked about previously helped support
18  drug court, but that -- that is a Summit County
19  cost.

20    Q.   To the extent Summit County --
21  okay, Summit County versus another
22  jurisdiction.  But some of that money may be
23  paid with grant funds?

24    A.   Yes.

25    Q.   Now, this policy change that you

1  talk about to incur -- to expand the
2  eligibility, that isn't limited to people with
3  opioid problems, is it?

4    A.   No.  But I really think it was the
5  opioid epidemic that awakened this sort of
6  sensibility about rather than criminalizing
7  this behavior, looking at the root of why this
8  person committed theft or why this person
9  committed forgery of this check, rather than
10  just, you know, the punishment for writing a
11  bad check on, you know, either a closed account
12  or someone else's account.  And -- and seeing
13  that the reason they did it was they were
14  trying to get money to buy opioids.

15         So I think that that created an
16  entire shift in -- in sort of the ideology in
17  our community that -- looking at what we call
18  crime as part of addiction.

19    Q.   Well, let me ask you this.  If --
20  if opioids were to disappear tomorrow so that
21  all you had --

22    A.   Please.

23    Q.   Yeah.  I think we all agree with
24  that.  At least illegal opioids.

25         MS. KEARSE:  Objection.

1    Q.   And if the -- if opioids were to --
2  the opioid problem was to disappear tomorrow
3  and all you had left were cocaine addicts, meth
4  addicts, people addicted to other substances, I
5  assume you would still -- you know, Summit
6  County would still want to have a drug court
7  for those people?

8    A.   Yes.  We had a drug court before
9  the opioid epidemic.

10    Q.   And this policy change is something
11  you would probably still keep in place?

12    A.   I would certainly hope so.

13    Q.   Okay.  Costs associated with
14  cleanup of public parks, spaces, and facilities
15  of needles and other debris and waste of opioid
16  addiction.  Is this something that's actually
17  tracked somehow in the county?

18         MS. KEARSE:  Object to form.

19    A.   I would suggest that that be
20  referred to Mr. Nelson, that the -- Summit
21  County Metroparks is a separate entity.  They
22  are funded by a levy.  So I don't know what
23  their tracking on that part is.

24    Q.   Do you know anything about this
25  cost category?

Page 250

```
 1      A.   I do not.
 2      Q.   Loss of tax revenue due to
 3  decreased efficiency and size of the working
 4  population in Plaintiff's communities, and due
 5  to other impacts on property values and other
 6  tax generators for Plaintiff.
 7           Has there been any kind of study
 8  done to evaluate this category of loss?
 9      A.   Not by Summit County.  We do have a
10  division of workforce development, and we also
11  have an economic and community development
12  division within the executive's office.  And
13  part of what we do in that division is make
14  house calls, essentially, to the businesses in
15  Summit County.
16           And the number one complaint or the
17  number one need of employers in Summit County
18  is workforce.  And by and large these are
19  manufacturing jobs.  And going one step
20  further, the number one issue is having folks
21  who can pass a drug test, and there's a lot of
22  concern from our business community that they
23  can't expand because the workforce is not
24  healthy enough to do so.
25           And, again, as I previously said,
```

Page 251

```
 1  there are a lot of industries that are
 2  regulated, either by statute or ordinance, that
 3  disallow felons.  And with this epidemic
 4  creating a new class of not only sick people,
 5  it created a new class of sometimes
 6  unemployable people in certain fields because
 7  of their felony classification.
 8           And again, it's also an issue of
 9  how can we measure what we didn't know?  When
10  you couldn't look at a newspaper in 2016
11  without seeing a headline about death and
12  opioid affliction in the community, it's hard
13  to say what we missed when it comes to economic
14  development or tax generators, because, A, we
15  were busy trying to address the issue, and, B,
16  if you were a site selector at that time, I
17  can't imagine that Summit County would have
18  been a desirable location if you were looking
19  to relocate a new manufacturing plant or a
20  headquarters of some type of economic
21  development industry.
22      Q.   What's the unemployment rate in
23  Summit County right now?
24      A.   I think it's right around 4
25  percent.
```

Page 252

```
 1      Q.   And that is generally considered at
 2  the level of full employment, correct?
 3      A.   I don't know -- I don't know how to
 4  respond to that.
 5      Q.   Do you -- but 4 percent is a pretty
 6  low unemployment rate, is it not?
 7           MS. KEARSE:  Object to form.
 8      A.   I think it depends on if you're one
 9  of the people who's employed and if you're one
10  of the people who is looking for a workforce.
11      Q.   Well, let me ask you this way.  If
12  you are somebody who is looking for a
13  workforce, you typically will have a much more
14  difficult time filling positions at 4 percent
15  unemployment rate than, say, at 7 or 8 or 10
16  percent unemployment rate, correct?
17      A.   I think it depends on the industry.
18  And the unemployment rate doesn't look at our
19  underemployment, where we've got folks who
20  perhaps were nurses or other professionals that
21  are regulated by the State, who now, with a
22  felony conviction, can no longer practice in
23  the field they were previously, you know,
24  paying income tax and owned a home and now work
25  at minimum wage jobs or a lower paying wage job
```

Page 253

```
 1  than previously.
 2      Q.   How many people are in that
 3  category?
 4      A.   I don't know.
 5      Q.   Are you aware of any specific
 6  business investments that businesses have
 7  considered making in Summit County but have not
 8  made as a result of the opioid crisis?
 9      A.   No.  As I said, trying to capture
10  what you never knew was happening is -- is
11  incredibly difficult, at least for us.
12      Q.   And Northeast Ohio has had -- been
13  struggling with attracting investment for a
14  number of years now, hasn't it?
15      A.   I -- I don't really want to speak
16  for Northeast Ohio.  I feel like Summit County
17  has weathered the financial crisis in some
18  better ways than most, but it's because we've
19  been -- we operate with a thousand less
20  employees than we did 10 years ago, so I
21  couldn't say what Northeast Ohio has -- has or
22  has not you attracted.
23      Q.   Well, as the -- was the -- did the
24  financial crisis hit Summit County hard?
25      A.   Yes, it did.
```

64 (Pages 250 - 253)

Page 254

1    Q.   Is there -- are there any specific
2  tax revenue streams that you can identify for
3  which you believe there is a quantifiable
4  impact?
5    A.   I would have to defer to -- to
6  Mr. Nelson that, on the tax revenue streams. I
7  mean, we're a sales-tax-based fund, our -- I
8  would defer to Mr. Nelson that one.
9    Q.   So is the answer you don't know?
10      MS. KEARSE:  Object to form.
11    A.   As I sit here today, I -- I can't
12  answer that question.
13    Q.   When it talk -- when you -- when
14  this response talks about tax revenue, is it
15  talking about sales tax revenue?
16    A.   I think it includes sales tax --
17  sales tax revenue, but also income tax revenue.
18  When you're not working, you're not paying
19  income tax, and -- and that can impact the
20  County as well.  While we don't collect income
21  tax, what affects Akron affects Summit County,
22  and when their numbers are down, we have to
23  find ways to help support our 31 communities.
24      And so when, quote-unquote,
25  business is good for the 31 communities,

Page 255

1  business is also good for Summit County.  And
2  likewise, when it's not, the strain and the
3  leveraging of dollars has to become much more
4  creative.
5    Q.   So am I correct that Akron charges
6  income tax, but Summit County does not?
7    A.   Well, that -- that's our primary --
8  the way our general fund is -- is set up is
9  that we operate -- all counties in Ohio operate
10  on sales tax revenue.
11    Q.   Are there any other tax revenues
12  that the County receives that are affected, you
13  believe, by the opioid crisis?
14    A.   Sitting here today, I don't -- I
15  don't know that I can come up with any.
16      MS. KEARSE:  And for the record, I
17  think she already deferred to Mr. Nelson as
18  well, so if there's anything she's missing,
19  Mr. Nelson can fill that in for you.
20      MS. WINNER:  I'm sure Mr. Nelson
21  will be a fount of information.
22      MS. KEARSE:  Save some time.
23      MS. WINNER:  We will.
24    Q.   Okay.  Let me then ask -- go down a
25  couple more, toward the next to last bullet on

Page 256

1  the page, talks about cost associated with
2  impact of opioid epidemic on Plaintiff's
3  vehicle fleets.
4      What does that relate to?
5      MS. KEARSE:  Object to form.
6      MS. WINNER:  Oh, you meant -- you
7  were objecting to my tone of voice.
8      MS. KEARSE:  Well, I didn't want to
9  say it that way, but, yeah.
10      MS. WINNER:  Yeah, okay.  Fair
11  enough.
12      MS. KEARSE:  I guess you were
13  responding to how I said "object to form."
14      (Laughter.)
15      MS. KEARSE:  We got to have some
16  fun at this.
17    A.   So there are multiple fleets of
18  vehicles in the County.  Surprising number of
19  vehicles.  And as I sit here, the -- the thing
20  that really stands out to me is that, you know,
21  buying new vehicles for our sheriff's
22  department, for the investigators and the
23  prosecutor's office, all the way down to the
24  surveyors for the fiscal office, certainly when
25  the bottom line is impacted, the timeliness of,

Page 257

1  you know, replacement -- I certainly hope it's
2  not repair -- but replacement of these vehicles
3  isn't a priority when we're using our funds
4  elsewhere.  Beyond that, I can't speak to that
5  one.
6    Q.   Okay.  Then go on, the next one is
7  costs for Plaintiff to properly and adequately
8  abate the nuisance created by the opioid
9  epidemic.
10      And, again, excluding everything
11  you've already described, is there anything
12  else that falls into this category?
13    A.   This one's hard for me, because
14  there's so much that I cannot, as -- as an
15  attorney and as whatever my hats are, I'm not
16  an economist.  These kids who have gone into
17  our Children's Services system, the babies born
18  addicted, the people who this -- this entire
19  population who is now living with addiction.
20      Luckily, we've gotten better at
21  harm reduction, but what that means is that now
22  we have this population of people who are
23  living with addiction who are going to our
24  community health center for methadone every
25  single day.  The costs for that, to me, are

65 (Pages 254 - 257)

Page 258

1 endless.
2        So, I mean, we've -- as I said,
3 there's always a dead horse that needs to be
4 beaten somewhere, but we have gone over so many
5 of these things, but we haven't talked about
6 the future.  These costs we've been talking
7 about in the past tense.  These are costs that
8 are being incurred today.  They are costs --
9 these same costs are going to be incurred
10 tomorrow.  There are still kids coming into CSB
11 at higher rates than before.
12        And so it's like looking at these
13 numbers from the past and putting them out into
14 when?  I don't know, because the generational
15 addiction that's been created by this epidemic
16 is something that we've never seen before, and
17 so it's hard for me, as an attorney and not an
18 economist, to project what we might need for
19 these kids and for these families.
20     Q.   Is that your full answer?
21     A.   That is.
22     Q.   All right.  Then the last bullet is
23 costs for child services and foster care for
24 opioid-dependent babies and foster children.
25        And you talked a little bit about

Page 259

1 this earlier.  I guess my first question is, to
2 what extent are the -- the -- are child
3 services and foster care services tracked in
4 terms of the extent to which they relate
5 explicitly to opioid addiction?
6     A.   I believe in -- in 2016, our
7 Children's Services Bureau began tracking,
8 like, a specific -- I don't know what they
9 would call it, but I would call it, like, the
10 entrance point, what brought this kid into our
11 system.  And I believe it was in 2016, maybe
12 later in the year, they began specifically
13 identifying those.  And I believe Director
14 Barnes talked about that, that they had seen an
15 increase to the point that it became imperative
16 that they focus on it so that they could
17 quantify and understand how to budget for it.
18        The costs for foster care and
19 placement have grown additionally, because with
20 the prior forms of addiction that we'd seen in
21 Summit County -- crack, methamphetamine,
22 cocaine -- familial placement was always
23 priority.  Can a -- can this child be placed
24 with a family member?
25        And what has been incredibly

Page 260

1 alarming is that that isn't the case with
2 opioids, because it's a familial addiction.
3 Mom is addicted.  Brother is addicted.
4 Grandparent is addicted.  And so the ability to
5 place a child with a family member has
6 decreased.  And when the child has to be placed
7 with a non-family member, the costs of that
8 placement are higher than they are with a
9 family member.
10     Q.   Well, I'm -- one thing that just
11 struck me as you were talking just now is you
12 talked about familial addiction.  When a --
13 when you see, you know, mom, dad, grandma, all
14 addicted to opioids, did all of them start with
15 prescription opioids from a doctor, or does it
16 start with one particular family member and
17 then it spreads to others?
18     A.   My experience has shown me that
19 when one person comes home with a bottle full
20 of 60 or 90 pills and that person either uses
21 or doesn't use them all, the readily available
22 supply in the home is what leads to this
23 familial addiction.  Everybody has access to
24 this oversupply, and it's right there in front
25 of them because there are so many pills.

Page 261

1     Q.   If somebody were able to make -- to
2 wave a magic wand and make heroin and fentanyl
3 disappear, would the opioid epidemic in Summit
4 County look different than it does now?
5        MS. KEARSE:  Object to form.  Calls
6 for speculation.
7     A.   I mean, if I had a magic wand, I'd
8 go back much farther than that and make sure
9 that the doctors and our community was educated
10 about the addiction rates and levels and let
11 people know, if you get addicted to this, you
12 are very likely going to be out in the street
13 looking for heroin.
14     Q.   Okay.  But that wasn't my question.
15 My question was if heroin wasn't available
16 anymore, fentanyl wasn't available anymore,
17 what impact, if any, would that have on the
18 opioid situation in Summit County?
19     A.   If it --
20        MS. KEARSE:  Object to form.
21     A.   If it wasn't available in Summit
22 County and people were addicted to opioids,
23 they'd go someplace else to get it.  That's
24 how -- that's how this addiction is
25 functioning.  The -- it's not like they're

66 (Pages 258 - 261)

Page 262

1 not -- they're going to stay in bed and be
2 like, "Meh, it's not out there, so I'm good."
3 The pill sickness that people get is what
4 drives them out to find that heroin, because
5 the pills were too expensive or harder to get.
6        So, I mean, that magic wand --
7 heroin's been around.  It's not like this is
8 the first time heroin has been in Summit
9 County.  But it was not so incredibly prevalent
10 until the space created by the opioid industry
11 brought it upon us.
12        So, yeah, it would change if there
13 wasn't any heroin available or fentanyl
14 available, but I still have this huge addicted
15 population who are going to be sick, who are
16 going to be seeking pills or seeking opium in
17 some fashion.
18    Q.   Would you expect overdoses to
19 decline in that situation?
20    A.   Well, certainly the overdoses from
21 fentanyl, if it wasn't available, would go
22 away.  But I don't -- I don't know that I
23 can -- can speculate to that.
24    Q.   Okay.  That's fair enough.  Let me
25 ask you, actually, a different question that I

Page 263

1 intended to ask you earlier, and I forgot.
2        Has Summit County seen an issue
3 with drug dealers selling counterfeit
4 prescription opioids?
5    A.   As far as -- I know that there have
6 been some that were like fentanyl that were
7 being told as -- yes, I'm -- I am aware of
8 that.
9    Q.   Has that been a significant
10 problem?
11    A.   I mean, any time fentanyl is in the
12 community, if it's less than a milligram, it's
13 a significant problem, because we know how
14 potent it is.
15        MS. WINNER:  I think I'm going to
16 turn it over to one of my colleagues, so why
17 don't we go off the record so we can switch
18 places and move our boxes around.
19        THE WITNESS:  Sure, okay.
20        THE VIDEOGRAPHER:  Off the record
21 at 3:15.
22        (A recess was taken.)
23        - - - - -
24        (Thereupon, Deposition Exhibit 10,
25        Summit County and the City of Akron,

Page 264

1 Ohio's Amended Responses and
2 Objections to the Manufacturer
3 Defendants' First Set of
4 Interrogatories and the National
5 Retail Pharmacy Defendants' First
6 Set of Interrogatories Re: 30(b)(6)
7 Topics, was marked for purposes of
8 identification.)
9        - - - - -
10 (Thereupon, Deposition Exhibit 11,
11 Plaintiffs The City of Cleveland,
12 County of Cuyahoga, County of Summit
13 and City of Akron's Supplemental
14 Amended Responses and
15 Objections to the Manufacturer
16 Defendant's First Set of
17 Interrogatories, Submitted Pursuant
18 to Discovery Ruling No. 13, was
19 marked for purposes of
20 identification.)
21        - - - - -
22 (Thereupon, Deposition Exhibit 12,
23 Spreadsheet Titled "Confidential
24 Protected Health Information -
25 Produced Under a Protective Order -

Page 265

1 Attorneys' Eyes Only, was marked for
2 purposes of identification.)
3        - - - - -
4 (Thereupon, Deposition Exhibit 13,
5 Spreadsheet Titled "Confidential
6 Protected Health Information -
7 Produced Under a Protective Order -
8 Attorneys' Eyes Only, was marked for
9 purposes of identification.)
10        - - - - -
11 (Thereupon, Deposition Exhibit 14,
12 1/8/2019 Letter from Atty Linda
13 Singer to Special Master David Cohen
14 Re: Plaintiffs' Response to
15 Manufacturer Defendants' Renewed
16 Motion to Compel Immediate and Full
17 Compliance with Discovery Ruling
18 Nos. 5 and 13, was marked for
19 purposes of identification.)
20        - - - - -
21 (Thereupon, Deposition Exhibit 15,
22 Spreadsheet Titled "Confidential
23 Protected Health Information -
24 Produced Under a Protective Order -
25 Attorneys' Eyes Only, was marked for

67 (Pages 262 - 265)

Page 266

1       purposes of identification.)
2           - - - - -
3       (Thereupon, Deposition Exhibit 16,
4       Spreadsheet Titled "Confidential
5       Protected Health Information", was
6       marked for purposes of
7       identification.)
8           - - - - -
9       (Thereupon, Deposition Exhibit 17,
10      Document Listing Names and Dates of
11      Summit County Overdose Deaths, was
12      marked for purposes of
13      identification.)
14          - - - - -
15      THE VIDEOGRAPHER:  On the record at
16  3:38.
17      EXAMINATION OF GRETA JOHNSON
18  BY MS. FEINSTEIN:
19      Q.   Good afternoon, Ms. Johnson.
20      A.   Good afternoon.
21      Q.   My name is Wendy West Feinstein.
22  We met briefly this morning before we went on
23  the record.  I represent the Teva Defendants.
24      I'm going to take over the
25  examination now, and a few of my colleagues may

Page 267

1  have some additional questions after I'm done,
2  okay?
3      A.   Sure.
4      Q.   You were designated on a number of
5  topics, and my colleague, Ms. Winner, went
6  through some of those topics with you about
7  your designations.  Four of the topics that
8  were not the in the letter, but that were
9  confirmed by e-mail, were Topics 4, 5, 6, and
10  19.
11      A.   Yes.  I'm familiar with that.
12      Q.   Are you prepared to testify on
13  those topics today?
14      A.   I am.
15      MS. FLOWERS:  To be clear, though,
16  it's not 4, 5, 6 and 19.  It's 4, 5, 6, and 19
17  as rewritten by Special Master Cohen.
18      MS. FEINSTEIN:  Exactly.  Yes.
19  Thank you, Counsel.  And we can read that into
20  the record now.
21      Special Master Cohen, after some
22  back and forth among counsel, revised those
23  topics and directed that with respect to Topics
24  4, 5, 6, and 19, Plaintiffs must designate a
25  person to testify on the criteria that

Page 268

1  Plaintiffs used to identify the information
2  required by the interrogatories at issue in
3  Discovery Ruling No. 5.
4      Q.   Do you understand that ruling?
5      A.   Yes, I do.
6      Q.   Have you had an opportunity to
7  review the Plaintiff's responses pursuant to
8  Special Master Cohen's order?
9      A.   Yes.
10      Q.   And did you do that in preparation
11  for your deposition today?
12      A.   I -- I didn't do it for week -- the
13  weekend.
14      Q.   You didn't do it for fun.
15      A.   Yes, yes.  I absolutely did, yes.
16      Q.   Did you speak with anyone, aside
17  from counsel, to prepare to testify on these
18  topics?
19      A.   No, I -- not specifically about
20  those interrogatories.
21      Q.   Did you talk with anyone at
22  Rawlings about these topics?
23      A.   No.
24      Q.   Did you review any documents
25  specifically to respond to these top- -- or to

Page 269

1  be prepared to testify about these topics?
2      A.   Other than the interrogatories and
3  the responses?  Outside of that, just
4  discussion with counsel.
5      Q.   Did you review Special Master
6  Cohen's order?
7      A.   I've seen it, yes.
8      Q.   And it's attached to Exhibit 1,
9  right?
10      A.   Yes, yes.
11      Q.   Okay, good.  During the break, your
12  counsel and everyone here was very patient as I
13  handed you a series of documents, and I'd like
14  to go through those right now.
15      The -- the first document that we
16  marked as an exhibit and that I put in front of
17  you should be Exhibit 10, which is Summit
18  County and the City of Akron, Ohio's Amended
19  Responses and Objections to the Manufacturer
20  Defendants' First Set of Interrogatories and
21  the National Retail Pharmacy Defendants' First
22  Set of Interrogatories.
23      Do you have that in front of you as
24  Exhibit 10?
25      A.   I do have that in front of me, yes.

68 (Pages 266 - 269)

Page 270

1    Q.   And it is dated, if you flip to --
2  the pages are not numbered, but it's page 8,
3  the second to last page.  This is a double
4  sided copy.
5    A.   Yes.
6    Q.   November 2, 2018?
7    A.   Yes.
8    Q.   Excellent.
9         The next document that I've handed
10 to you and that we have marked as Exhibit 11 is
11 the Plaintiff -- Plaintiffs -- the City of
12 Cleveland, County of Cuyahoga, County of
13 Summit, and City of Akron's Supplemental
14 Amended Responses and Objections to the
15 Manufacturer Defendants' First Set of
16 Interrogatories Submitted Pursuant to Discovery
17 Ruling 13.
18       Do you have that in front of you as
19 Exhibit 11?
20   A.   I do.
21   Q.   And that document, if you turn
22 to -- the third to the last page is dated
23 December -- it's actually page 15.  We've got
24 page numbers on this copy.  It's dated December
25 31, 2018.

Page 271

1    A.   Yes.
2    Q.   Is that what you have in front of
3  you?
4    A.   Yes.
5    Q.   Excellent.
6         Is it your understanding that
7  pursuant to Exhibit 11, so the responses
8  provided -- oh, I'm sorry -- pursuant to the
9  responses provided in Exhibit 10, that
10 spreadsheets were provided to counsel for the
11 Defendants?
12       MS. FLOWERS:  Object to the form.
13   A.   I know that counsel was requested
14 to provide, I believe it was 500 different
15 instances, so I assumed they would be in a --
16 in a spreadsheet.
17   Q.   Have you seen the spreadsheets
18 before today?
19   A.   I have not.
20   Q.   Okay.  At no point in your
21 preparation did you review the spreadsheets,
22 whether electronically or in print form?
23   A.   I did not review this -- the actual
24 spreadsheets.
25   Q.   Do you have an understanding of

Page 272

1  what information is to be contained in those
2  spreadsheets?
3    A.   Well, I understand that the request
4  was made to try to identify individuals, and I
5  know that the County's contention has always
6  been that this is not about any individual
7  prescription or any individual person or case
8  of overdose, that it -- it is truly an
9  aggregate of all of the harms.
10       So I guess as an attorney, I was
11 intrigued by this -- by this process, but I
12 know that we provided, through Rawlings GS,
13 some of this information in conjunction with
14 the information that counsel received from
15 ARCOS.
16   Q.   Okay.  And it's -- it's your
17 understanding that the ARCOS data was used to
18 respond to these interrogatories, or Rawlings
19 data?
20   A.   Well, Rawlings, yes.
21   Q.   Okay.  Let's look next at
22 Exhibit 11, which is the Plaintiff's response
23 to -- revised response to Interrogatory No. 6.
24       If I could direct your attention to
25 the bottom of the first page of Exhibit 11, it

Page 273

1  repeats the interrogatory there and requests
2  the Plaintiffs to identify and describe 500
3  prescriptions of opioids that were written in
4  Summit County in reliance on any alleged
5  misrepresentations, omissions, or any alleged
6  wrongdoing by any Defendant, correct?
7    A.   Correct.
8    Q.   To identify those 500
9  prescriptions, Summit County provided to us the
10 spreadsheets that we have marked as Exhibit 12
11 and Exhibit 13.  Do you have those in front of
12 you?
13   A.   I do.
14   Q.   Okay.  And, again, just to
15 reiterate, you have not seen Exhibit 12 or 13
16 earlier?
17   A.   No.
18   Q.   Before today?
19   A.   Correct.  I think I've -- I think
20 I've seen them, that my counsel's had them.  I
21 have not reviewed them.
22   Q.   Okay.  But you've reviewed the
23 written responses that we see in Exhibit 11,
24 right?
25   A.   Yes, yes.

Page 274

1    Q.   If I could direct your attention,
2  please, to page 14 of the written responses?
3    A.   In -- in Exhibit 11?
4    Q.   Yes.
5    A.   Yes, okay.
6    Q.   Directing your attention to the
7  last paragraph on page 14 about, it looks like
8  maybe one sentence in, it says, "Bellwether
9  Plaintiffs."  Do you see where I am?
10   A.   I do.
11   Q.   "Bellwether Plaintiffs contend that
12 each prescription in the previously provided
13 Exhibit A was as a result of Manufacturer
14 Defendants' deceptive marketing."
15      Did I read that correctly?
16   A.   You did.
17   Q.   Is that your understanding of what
18 is represented in Exhibits 12 and 13?
19      MS. FLOWERS:  Objection.  I think
20 this goes beyond the redefinition by the
21 Special Master, and -- that she testify on the
22 criteria used to answer these interrogatories.
23      MS. FEINSTEIN:  Thank you, Counsel.
24 I'm just setting a foundation and identifying
25 the exhibit so that we have some basis to -- to

Page 275

1  ask about the criteria --
2      MS. FLOWERS:  Okay.
3      MS. FEINSTEIN:  -- in those
4  exhibits, okay?
5    A.   I -- having not reviewed 12 and 13,
6  and seeing that they are double sided and what
7  appears to be a couple hundred pages, I don't
8  know what's in these.
9    Q.   Okay.
10   A.   So I -- they look like what would
11 go with a request like that.  I see
12 "manufacturer," "provider name," "patient key
13 name," so I see identifying factors.  Makes
14 sense, but I couldn't -- I couldn't swear to
15 that.
16   Q.   What is your understanding of where
17 the Plaintiffs obtained that information to
18 provide it to the Defendants in response to
19 this interrogatory?
20   A.   The criterion we used or the --
21   Q.   First the source.  From where did
22 you -- did the Plaintiffs obtain that
23 information to provide it to the Defendants?
24   A.   My understanding is that some of
25 the information started with our original

Page 276

1  discovery process, and then the contract with
2  Rawlings to get the additional information as
3  requested by counsel.
4    Q.   Is it your understanding that
5  Rawlings obtained that information from
6  CareSource and Medical Mutual of Ohio?
7    A.   I know that they have access to
8  insurance forms and to pharmacy claims that I
9  didn't know anybody had that source.  So, yes,
10 I -- I became aware of that through preparation
11 for this.
12   Q.   And am I correct in identifying
13 those two entities as the entities from which
14 Rawlings got information to provide to the
15 Plaintiffs to provide to the Defendants in this
16 case?
17   A.   I don't -- I don't know that.  I
18 can't confirm that.  I don't have any
19 independent knowledge of that.
20   Q.   You didn't review that information
21 to prepare to testify on these topics for
22 today?
23   A.   I did not review --
24      MS. FLOWERS:  Object to form.
25   A.   I did not review the Rawlings,

Page 277

1  their cri- -- their -- how they went about
2  doing their job.
3    Q.   Are you aware that the Plaintiffs
4  subpoenaed Rawlings to obtain information to
5  respond to these interrogatories?
6    A.   Yes.
7    Q.   What is your understanding of why
8  the Plaintiffs subpoenaed Rawlings to get that
9  information for the Plain- -- for the
10 Defendants?
11   A.   My understanding -- and, again, I
12 know that -- that there was a reluctance or --
13 we didn't want this to come down to
14 individuals.  So my understanding is that
15 Rawlings was contacted because they have the
16 ability to mine that data, that would take -- I
17 can't even imagine if an individual could do
18 that on their own, if they had that access.
19 But apparently Rawlings has the access to those
20 records to provide what's contained in these
21 spreadsheets to defense counsel.
22   Q.   And Plaintiffs did not have that
23 information themselves, right?
24   A.   No.  Oh, no.  No, no.
25   Q.   Do you know what CareSource is?

70 (Pages 274 - 277)

Page 278

1     A.   It's an insurance carrier of some
2  sort.  I think they do -- Caremark -- I don't
3  know if Caremark and CareSource are the same
4  thing, but typically prescription coverage.
5     Q.   Does CareSource provide coverage to
6  Summit County?
7     A.   I believe -- I don't know if I
8  filled a prescription for myself, so that's a
9  healthy year.
10        I believe they are.  That sounds
11 familiar.  I -- yeah, I believe they are.
12    Q.   Do you know what Medical Mutual of
13 Ohio is?
14    A.   Yes.  That's an insurance provider.
15    Q.   And does Medical Mutual of Ohio
16 provide insurance to Summit County?
17    A.   I know that one.  Yes.
18    Q.   I'll represent to you that it's my
19 understanding, based on the information that we
20 received from counsel, that the exhibits that I
21 placed in front of you as -- marked as Exhibits
22 12 and 13 were identified by Plaintiffs'
23 counsel collectively, for all of the Track One
24 Plaintiffs, as the Exhibit A response for
25 Interrogatory No. 6.

Page 279

1     A.   Okay.
2     Q.   Is it your understanding, sitting
3  here today to testify about the criteria used
4  to identify prescriptions, that Plaintiffs
5  identified a number of prescriptions in an --
6  in an Exhibit A that was provided to defense
7  counsel?
8     A.   I understand that I -- I lost you
9  for a minute there.  I understand that we --
10 that criterion was established to obtain a
11 certain type or kind of record.
12    Q.   Do you have an understanding that
13 Defendants received an initial Exhibit A with
14 500 prescriptions on it, using certain
15 criteria, and then just recently, on Friday,
16 received a second Exhibit A with different
17 criteria?
18        MS. KEARSE:  Object to form.
19        MS. FLOWERS:  Object to form.
20    A.   I -- I am not aware of that.
21    Q.   So you're not aware of an updated
22 spreadsheet that we received from Plaintiffs on
23 Friday of last week?
24        MS. FLOWERS:  The same objection.
25    A.   I -- I don't recall having that

Page 280

1  specific conversation with counsel.
2     Q.   If I could direct your attention to
3  one of the letters that I sent to you, or that
4  I marked for you, Exhibit 14, please.
5        Do you have Exhibit 14 in front of
6  you?
7     A.   I do.
8        MS. KEARSE:  What was 14?
9        THE WITNESS:  It's a letter --
10        MS. FEINSTEIN:  Should be the
11 letter from Linda Singer.
12        MS. KEARSE:  Did I already eat it?
13        MS. FEINSTEIN:  Sorry, guys, I
14 tried to make this organized.
15    Q.   Do you have that in front of you?
16    A.   I do.
17    Q.   Have you seen Exhibit 14 before
18 today?
19    A.   I believe I have seen -- oh, yes,
20 I've seen this list.
21    Q.   And what page are you referring to?
22    A.   I'm sorry.  Page 2 stands out as --
23 I recognize that page.
24    Q.   Okay.
25    A.   That -- the -- all the rest.

Page 281

1     Q.   This letter is dated January 8,
2  2019.  It's addressed to Special Master David
3  Cohen.
4        Do you know who Special Master
5  David Cohen is?
6     A.   I know that he is -- I'm going to
7  use the term probably incorrectly, but a
8  magistrate or some -- some sort of official
9  within this case.  I've -- I've seen his name
10 and heard him referred to multiple times.
11    Q.   Did you review this letter in
12 preparation for your testimony today?
13    A.   I believe we discussed this just
14 last week.
15    Q.   Is it your understanding that this
16 letter was sent to Special Master Cohen, but
17 then copied to all defense counsel in the case?
18        MS. FLOWERS:  Objection.
19    A.   I don't know how to answer that.
20    Q.   Do you understand this letter to be
21 providing additional information related to the
22 interrogatory responses that the Plaintiffs
23 provided to the Defendants, specifically
24 Interrogatories No. 6, 7, and 10?
25        MS. FLOWERS:  Objection.  Beyond

71 (Pages 278 - 281)

Page 282

1 the scope.
2     A.    Could you ask that question again,
3 please?
4     A.    Sure.
5     A.    Sorry.  I'm just trying to
6 familiarize myself with the document.
7     Q.    Sure.  Do you understand this
8 letter to be a -- further information from the
9 Plaintiffs to the Defendants in response to
10 Interrogatories Nos. 6, 7, and 10, which are
11 the topics that you've been designated on,
12 Deposition Topics 4, 5, 6, and 19, as modified
13 by Special Master Cohen?
14     A.    That's -- yeah, that's -- yes,
15 that's what the -- I -- I hesitate to answer
16 that, because I still don't think I understand
17 what -- what you're asking me, what it does,
18 and I --
19     Q.    Did you -- do you understand this
20 letter to be providing additional information
21 in response to those interrogatories?
22     A.    Yes.
23        MS. FLOWERS:  Object to form.
24     Q.    Okay.  If I could direct your
25 attention to page 4 of Exhibit 14, Section 2.

Page 283

1     A.    Okay.
2     Q.    Section 2 on page 4 is about
3 halfway down the page, is titled, "Plaintiffs
4 have completely responded to Interrogatories
5 Nos. 6, 7, and 10."
6        Do you see that?
7     A.    I do.
8     Q.    About halfway down that page, right
9 after the parenthetical reference, there's a
10 sentence that begins with "Exhibit A."  Do you
11 see that?
12     A.    I do.
13     Q.    It reads, "Exhibit A is a
14 spreadsheet that identifies 500 patients by
15 name in the relevant jurisdictions who have not
16 been treated for cancer, who have been
17 diagnosed with opioid use disorder, and who
18 were provided daily doses of opioids of 150 MME
19 or higher."
20        Did I read that correctly?
21     A.    You did.
22     Q.    Is it your understanding that the
23 exhibits, the spreadsheets that I provided you,
24 12 and 13, understanding that you haven't seen
25 the printed versions or electronic versions

Page 284

1 before, is it your understanding that those are
2 lists of the exhibits that Plaintiff -- the
3 prescriptions that Plaintiffs identified as
4 described in Ms. Singer's letter?
5     A.    So you're saying this was Exhibit A
6 to --
7     Q.    Those two documents, yes.
8     A.    Again, from looking at just the
9 front page, that's what it appears to be.  But
10 having not reviewed Exhibits 12 and 13 before,
11 I couldn't definitively say.  But I have no
12 reason to doubt that.
13     Q.    The criteria that we just read in
14 Exhibit 14 in Ms. Singer's letter, do you have
15 any understanding of whether those were the
16 criteria used to identify the 500 prescriptions
17 in response to the interrogatories?
18     A.    I do.  The -- the criterion we
19 discussed was folks who were not diagnosed with
20 cancer, folks who were receiving over 120 MME
21 prescriptions, and folks who had been diagnosed
22 with a -- a chemical dependency previously, or
23 an -- so the -- that touches on two of them in
24 a little bit of a different vein.
25     Q.    Do you know whether there was an

Page 285

1 initial -- strike that.
2        So if you continue down in Exhibit
3 14, the sentence we just read identified a
4 threshold dosing of 150 MME --
5     A.    Right.
6     Q.    -- right?
7     A.    Correct.
8     Q.    Did -- are you aware of the
9 Plaintiffs identifying an initial list --
10     A.    Yes.
11     Q.    -- of prescriptions, of 500
12 prescriptions with a threshold of 150 MME?
13     A.    So the original list was produced
14 at 150, and then the supplemental list was 120?
15     Q.    Right.
16     A.    Is that what you're asking me?
17     Q.    I'm -- I'm asking -- well, I was
18 asking first whether you understood where there
19 was an initial list of 500 prescriptions --
20     A.    That's what it says, yes.
21     Q.    -- is that, as the corporate
22 designee for Summit County on this topic, is
23 that your understanding of what the original
24 500 prescriptions, the threshold dosing was?
25        MS. KEARSE:  Object to form.

72 (Pages 282 - 285)

Page 286

1    A.   I'm just going to rely on my
2  preparation in that my understanding was that
3  we had set the criterion to be non-cancer
4  patients, 120 ME -- MME, and folks who suffered
5  already from addiction diagnoses.
6        The -- the 150 is something that I
7  am not familiar with.
8    Q.   Okay.  So as a part of your
9  preparation, you weren't making
10  any distinguish -- you didn't make any
11  distinction between the initial produced list
12  of 500 prescriptions versus the later produced
13  list of 730 prescriptions at 120 MME; is that
14  right?
15    A.   No.  My -- my preparation has been
16  focused on the aggregate.  My preparation has
17  never been about any individual prescription
18  and what it was for, to whom it was prescribed,
19  or even, frankly, who prescribed it.  So I
20  prepared to respond to the request of defense
21  counsel by understanding the criterion and how
22  we went about getting that information from
23  Rawlings.
24        I feel like I have seen this
25  document, because this list looks familiar to

Page 287

1  me, but I have not -- I would not say I have
2  memorized it or --
3    Q.   Sure.  Under- --
4    A.   -- done a deep dive.
5    Q.   Understood.  Well, let me direct
6  you to the -- still on page 4, the last
7  paragraph on that page, and see if that helps
8  refresh your recollection of -- of what
9  transpired.  So we just read, in the first full
10  paragraph under Section 2, in which Ms. Singer
11  writes, "Plaintiffs have completely responded
12  to Interrogatories Nos. 6, 7, and 10," and
13  then -- and I'll paraphrase, because we've
14  already read it into the record -- and
15  provided, in an Exhibit A, 500 prescriptions
16  with the criteria of they have not been treated
17  for cancer, have been diagnosed with opioid use
18  disorder, and who were prescribed daily doses
19  of 150 MME or higher, right?
20    A.   Sure, yes.
21    Q.   That's what this says?
22    A.   Absolutely.
23    Q.   Okay.  Continuing down --
24    A.   Yes.
25    Q.   -- the last paragraph of

Page 288

1  Ms. Singer's January 8, 2019 letter, in the
2  last paragraph on page 4 of Exhibit 14, reads,
3  "Nonetheless, in an effort to compromise and to
4  meet Defendants' concerns, Plaintiffs will
5  produce, this week, a revised spreadsheet
6  identifying approximately 730 additional
7  patients who were prescribed daily doses of
8  opioids of 120 MME or higher."
9        Do you see that?
10    A.   I do.
11    Q.   Does that -- reading those -- those
12  two sentences together --
13    A.   Yes.
14    Q.   -- does that help refresh your
15  recollection --
16    A.   Yes.
17    Q.   -- or does it inform you --
18    A.   Yes.
19    Q.   -- of the course of events?
20    A.   I understand where we are now.
21    Q.   Okay.  And sorry for the confusion.
22    A.   No, that's fine.
23    Q.   This is a bit of a slog --
24    A.   Right, right.
25    Q.   -- so why don't we kind of rewind a

Page 289

1  bit --
2    A.   Sure.
3    Q.   -- and just so we've got kind of a
4  clean record of -- of what Summit County's
5  testimony is on this point.
6    A.   Absolutely.
7    Q.   Okay.  So is it Summit County's
8  position that the initial Exhibit A that was
9  produced in response to the Defendant --
10  Manufacturer Defendants' interrogatories
11  identified 500 prescriptions using criteria
12  that the Plaintiffs had not -- the patients,
13  rather, had not been treated for cancer, have
14  been diagnosed with opioid use disorder, and
15  were prescribed daily doses of opioids of 150
16  MME or higher?
17    A.   Correct.
18    Q.   More recently --
19    A.   Yes.
20    Q.   -- the Plaintiffs identified an
21  additional 730 prescriptions using criter- --
22  strike that.
23        Using at least -- a new dosing
24  criteria?
25    A.   Yes.

73 (Pages 286 - 289)

Page 290

1    Q.    A lower dosing --
2    A.    A lower --
3    Q.    -- criteria --
4    A.    Yes.
5    Q.    -- of 120 MME?
6    A.    Correct.  And I believe that lower
7  dosing criteria was in accordance with the
8  CDC's warning that use at that level and
9  anything over 90 MME had a greater chance for
10  addiction and misuse.
11    Q.    So that dosing criteria of 120 MME
12  came from the CDC?
13    A.    Yes.  I believe the CDC's
14  statements on it are anything over 90 is sort
15  of what I would call a danger zone, certainly.
16    Q.    And just to kind of close the loop
17  on these documents that I've placed in front of
18  you, if you could please take a look at
19  Exhibits 15 and 16 --
20    A.    Yeah.
21    Q.    -- which are the other -- the
22  additional spreadsheets.
23    A.    Sure.
24    Q.    Have you seen either Exhibits 15 or
25  16 before today?

Page 291

1    A.    I have not.
2    Q.    And I'll represent to you for the
3  record that these are the prescriptions that we
4  received on Friday, January 19 -- or January
5  11, 2019, for the revised Exhibit A response --
6    A.    Okay.
7    Q.    -- at 120 MME.
8    A.    Okay.
9    Q.    Okay.  The source of the data, it's
10  my understanding, continue to be Rawlings?
11    A.    Yes.
12    Q.    And also was CareSource and Medical
13  Mutual of Ohio data.  Is that your
14  understanding as well?
15    A.    That's my understanding.
16    Q.    We can set those spreadsheets
17  aside, but I -- if you need to refer to them at
18  any point --
19    A.    Okay.
20    Q.    -- please feel free.
21    A.    Okay.
22    Q.    So what -- the -- the letter from
23  Ms. Singer that we just looked at, Exhibit 14,
24  that had the three sort of parameters for the
25  identification of the prescriptions, from where

Page 292

1  did the Plaintiffs get those parameters?
2    A.    Well, again, I think our contention
3  has always been and will continue to be that it
4  is not about any one individual prescription or
5  any two or any 500, but really the aggregate
6  effect.
7        After consultation with the
8  attorneys, I've learned that this was the what the
9  experts suggested to properly respond to the
10  order, these were the appropriate criterion to
11  do.
12    Q.    Is it your understanding that for
13  the prescriptions identified in the
14  spreadsheets that were Exhibits A to the
15  interrogatories, and that we've marked as
16  separate deposition exhibits here today, that
17  all three of those criteria had to have been
18  met for the prescription to be included in the
19  list?
20    A.    That was my understanding.
21    Q.    Are there any prescriptions listed
22  in the Exhibit A that do not meet the -- those
23  criteria?
24    A.    I have not reviewed Exhibit A, so I
25  could not speak to that.

Page 293

1    Q.    Did you receive any information, as
2  a part of your preparation to testify on the
3  criteria today, that when the analysis was
4  done, that some of the prescriptions that were
5  provided to the Defendants did not meet all
6  three of those criteria?
7    A.    I don't have that -- I have not
8  received any of that type of information.
9    Q.    So it's your understanding, and
10  just to make sure that we're all on the same
11  page, that all of the prescriptions identified
12  in Plaintiff's Exhibit A to the Manufacturer
13  Defendants' interrogatories, meet the three
14  criteria of no cancer diagnosis, 120 MME for
15  the most recent list, and diagnosis of opioid
16  use disorder; is that right?
17    A.    Again, I -- I just hesitate to
18  confirm what's in here without having reviewed
19  it, but if that's what was requested by
20  Rawlings and this is the report given by them,
21  I would assume that it -- that that is
22  accurate.
23    Q.    You're designated today to talk
24  about the criteria that were used by
25  Plaintiffs, right?

74 (Pages 290 - 293)

Page 294

1    A.    Uh-huh, correct.
2    Q.    Are you aware of any prescriptions
3  that have been identified by the Plaintiffs to
4  the Defendants in this case that utilize any
5  other criteria?
6    A.    Not that I'm aware of.
7    Q.    Are you aware of any prescriptions
8  that have been identified that do not meet
9  those three criteria that we've just listed?
10    A.    In these documents that you've
11  marked, 12, 13, 15, and 16, I am not aware that
12  any of those would exist in there.
13    Q.    Do you know why the initial
14  identification of 500 exhibit used a threshold
15  dosing of 150 MME?
16    A.    Well, I know that the CDC, again,
17  has said over 90, so I -- I can assume that we
18  would be looking at above 90 to start with.  I
19  don't have direct knowledge of why it was
20  lowered to 120, other than to better comport
21  with the directives of the Special Master on
22  that.
23    Q.    Do you know why it was started at
24  150?
25    A.    I don't.

Page 295

1    Q.    Do you know who at Summit County
2  who might have that information?
3    A.    Perhaps Dr. Doug Smith would be the
4  person to speak to about the risks that are
5  posed by opioids with an MME that high.
6  Frankly, I thought they stopped at 120.  I did
7  not realize it could go up to 150.  So I -- I'm
8  not sure, other than I know, again, the
9  preparation was looking at what the CDC had
10  discussed.
11    Q.    Did you talk with Dr. Smith at all
12  in preparation --
13    A.    I read his --
14    Q.    -- to testify on those topics?
15    A.    I did not.  I read his deposition.
16    Q.    Okay.  But for purposes of your
17  testimony on Topics 4, 5, 6, and 19 of the
18  30(b)(6) notice, you did not have any
19  discussions with Dr. Smith?
20    A.    I did not.
21    Q.    And other than what you've just
22  told me about your understanding of the CDC
23  guidelines, you don't have any information
24  about how Plaintiffs identified the criteria,
25  first for a 150 MME threshold, and then later

Page 296

1  lowered it to 120?
2    A.    I do not.
3    Q.    And you don't know who within
4  Summit County, other than potentially
5  Dr. Smith, who would have that information?
6    MS. FLOWERS:  Objection.  Asked and
7  answered.
8    A.    I -- Dr. Smith is the medical
9  doctor who I think would be in the best
10  position to answer that.  Perhaps Donna Skoda,
11  her -- as the director of Summit County Public
12  Health, would have some insight into the
13  difference between why 150 and 120 would be so
14  important.
15    Q.    Did -- did you see in your
16  preparation any documents from the Plaintiffs
17  to Rawlings identifying the criteria that the
18  Plaintiffs wanted to apply to the collection of
19  data from Rawlings?
20    A.    No.  We -- we talked about the
21  subpoena for it, and -- and because I -- I did
22  not know what Rawlings was and I had lots of
23  question about how that happened, and we -- we
24  talked about the subpoena being served than --
25  than -- I think that it had contained the

Page 297

1  criterion, but I do not believe I have reviewed
2  the actual document.
3    Q.    Did you review the subpoena?
4    A.    No, I don't believe I reviewed the
5  subpoena.
6    Q.    Did you see any documents that
7  related to the criteria utilized by the
8  Plaintiffs to identify the prescriptions?
9    A.    There was an internally created
10  document where I -- we talked about what was --
11  what the criterion was.  It was all during
12  preparation with counsel, so it would -- it was
13  a document that was created by -- by counsel
14  for me to review.
15    Q.    A document created for purposes of
16  preparing you to testify as the corporate
17  designee on this topic?
18    A.    Yes.
19    Q.    Do you have that document with you
20  today?
21    A.    I -- I don't have the document with
22  me.
23    MS. KEARSE:  And, Counsel, it was
24  in consultation for her testimony in this case,
25  which would be privileged information.  We've

75 (Pages 294 - 297)

Page 298

1 provided coun- -- we've provided you with a
2 witness, a 30(b) witness to talk about the
3 criteria. Our work product and anything we've
4 shared is our work product, and it's privileged
5 information.
6        MS. FEINSTEIN: Yeah. And,
7 Counsel, we can visit --
8        MS. KEARSE: That's fine.
9        MS. FEINSTEIN: -- on this topic at
10 a later date, but I disagree that if it was
11 something that -- that the 30(b)(6) witness
12 reviewed and relied upon for purposes of her
13 corporate designee testimony, I think that we
14 are entitled to see it. But we can discuss
15 that some other time.
16        MS. KEARSE: And, Counsel, I
17 believe, as her -- as her attorney, we're
18 allowed to have conversations and have work
19 product information that would be privileged
20 information for -- in consultation for her
21 preparation today.
22        MS. FEINSTEIN: Yeah, and -- we'll
23 discuss at another time, but, thank you. Your
24 objection is noted. I appreciate that.
25 BY MS. FEINSTEIN:

Page 299

1        Q.   Did you review any other documents,
2 other than the -- the document that your
3 counsel has asserted a work product privilege
4 about, to develop an understanding of the
5 criteria used by Plaintiffs to identify the
6 prescriptions?
7        MS. FLOWERS: Object to the form.
8 Lack of foundation.
9        A.   I -- there were some -- and I don't
10 know if they were objections or
11 interrogatories, but there was a pleading that
12 I reviewed that I feel like that's where I --
13 there was a pleading that I reviewed. I -- I
14 can't recall which one it was, but I remember
15 attaching my notes to the front of it to -- to
16 keep it front of mind.
17        Q.   Was it either Exhibit 10 or 11?
18 It's right there, I think, flipped over.
19        A.   I think that's right, because I
20 remember seeing the doctors' names at the
21 bottom of the page. So 10 would have been
22 included. Yes, I believe 10 and 11 were in
23 that packet, as well as the -- as this letter
24 from Attorney Singer, were things that sort of
25 had grouped together.

Page 300

1        Q.   So in preparation regarding the
2 criteria utilized by Plaintiffs, you reviewed
3 Exhibit 10, Exhibit 11, and Exhibit 14?
4        MS. FLOWERS: Object to the form.
5 Lack of foundation.
6        A.   I reviewed 10 and 11. I feel like
7 I -- I don't know how you differentiate between
8 looked at and reviewed. I -- this -- Exhibit
9 14 is familiar to me because I recognize seeing
10 this list. I -- I would not say that I
11 reviewed it in depth.
12        Q.   And the explanations that we just
13 reviewed on page 4 of Exhibit 14, you had not
14 seen those before today?
15        MS. FLOWERS: Objection.
16        A.   I believe I've seen this document.
17 I don't -- I couldn't say that I read them with
18 any explicit detail, but it is familiar to me.
19        Q.   Let's talk about the -- the
20 criteria a bit more. The prescriptions that
21 are listed by the Plaintiffs in the Exhibit A
22 include the criteria "not treated for cancer,"
23 right?
24        A.   So you're back -- you're referring
25 back to 12 and 13?

Page 301

1        Q.   The prescriptions that were
2 identified, so I don't want to get bogged down
3 on -- on the documents if you haven't -- if
4 you're not comfortable with the documents. But
5 you're here to testify about the criteria --
6        A.   Yes.
7        Q.   -- used by the Plaintiffs --
8        A.   Yes.
9        Q.   -- to identify prescriptions,
10 right?
11        A.   Correct.
12        Q.   So one of those criteria is whether
13 the patients had -- did not have -- were not
14 treated for cancer; is that right?
15        A.   That's correct.
16        Q.   What criteria did Plaintiffs use to
17 determine whether a patient had been treated
18 with cancer -- or had not been treated for
19 cancer?
20        MS. FLOWERS: Objection. Calls for
21 speculation.
22        A.   That's information that I am of the
23 understanding that Rawlings had the access to.
24 I'm not sure how else that would have been
25 obtained other than through this third-party

Page 302

1 data mine.
2    Q.    Did Plaintiffs provide to Rawlings
3 any information for it to make the
4 determination that the prescriptions provided
5 identified patients who had not been treated
6 for cancer?
7        MS. FLOWERS: Objection.
8    A.    Did -- could you say that again?
9    Q.    Did Plaintiffs provide to Rawlings
10 any information for it, Rawlings, to make the
11 determination that the prescriptions provided
12 identified patients who had not been treated
13 for cancer?
14    A.    That was one of the criterion we
15 asked Rawlings to use. I don't -- I feel like
16 I'm still not understanding what you're asking
17 me.
18    Q.    What sources of information were
19 used to confirm that the patients had not been
20 treated for cancer?
21    A.    By Rawlings? I -- I don't know
22 what Rawlings' methodology was.
23    Q.    What did Plaintiffs tell Rawlings
24 that Plaintiffs needed?
25    A.    My understanding --

Page 303

1        MS. FLOWERS: Object to the form.
2    A.    My understanding is that we
3 requested prescriptions for those three things
4 we've discussed: folks who did not have
5 cancer, folks with a dependency, and over 120
6 MME.
7    Q.    And you don't have any information
8 about how Rawlings then determined whether or
9 not the patients or the prescriptions
10 identified had no cancer treatment?
11    A.    I -- I do not know how Rawlings'
12 data mine works internally.
13    Q.    And you don't know what sources of
14 information Rawlings used to confirm that the
15 prescriptions had no treatment for cancer?
16    A.    Other than what we've referred to
17 between Medical Mutual and CareSource, which I
18 assume there are claims and documentation
19 available through those two entities.
20    Q.    Do you know whether Rawlings had
21 access to underlying information to confirm
22 that the -- the prescriptions were not for the
23 treatment of cancer?
24    A.    I do not know what information
25 Rawlings had.

Page 304

1    Q.    Does Summit contend that all of --
2 all opioid prescriptions for patients who are
3 not treated for cancer are unauthorized,
4 medically unnecessary, ineffective, or harmful?
5        MS. FLOWERS: Object to the form.
6    A.    I'm sorry. My brain is going a
7 little slow today. Could you repeat that?
8    Q.    Sure. Does Summit County contend
9 that all opioid prescriptions for patients who
10 are not treated for cancer are unauthorized,
11 medically unnecessary, ineffective, or harmful?
12    A.    No.
13        MS. FLOWERS: Object to the form.
14    A.    Not all.
15    Q.    Is --
16    A.    You don't -- I guess, if I can say
17 it this way. We don't contend that every
18 person who doesn't have cancer who gets an
19 opioid prescription, it's -- that it's
20 improper, for lack of a better term.
21    Q.    Fair enough. Does Summit County
22 contend that any opioid prescription for
23 conditions other than cancer were written as a
24 result of any wrongdoing by the Defendants?
25        MS. FLOWERS: Object to the form.

Page 305

1    A.    Well, certainly doctors who wrote
2 prescriptions for opioids for chronic pain who
3 did not have the accurate and appropriate
4 information about levels of addiction and
5 potential for diversion, potential for misuse,
6 while the person in front of them certainly may
7 have had pain, Summit County contends that --
8 that those doctors did not have the right
9 information. And so had they had the right
10 information, there could have been another
11 result for that patient.
12    Q.    Does Summit County contend that the
13 prescriptions it identified in the Exhibit A to
14 the interrogatory were unauthorized, medically
15 unnecessary, ineffective, or harmful?
16        MS. FLOWERS: Object to the form.
17    A.    These documents were produced in
18 response to the directives of the Special
19 Master to comply with individual prescriptions,
20 which, again, has never been the contention of
21 the County. The contention of the County has
22 always been that the aggregate harm caused by
23 these, and others, created a supply in our
24 community that resulted in this epidemic.
25        So --

77 (Pages 302 - 305)

Page 306

1     Q.   In identifying those criteria, did
2 the Special Ma- -- is it your understanding
3 that the Special Master required the Plaintiffs
4 to apply the criteria that the patients had not
5 been treated for cancer?
6          MS. FLOWERS:  Object to the form.
7     A.   I don't know the answer to that
8 one.
9     Q.   Do you have any understanding of
10 why Plaintiffs applied that criteria to this
11 list?
12     A.   Because that's what opioids were
13 originally used for.  They were for cancer
14 treatment.  They were for acute pain from
15 surgical procedures.
16          It wasn't until this change in
17 methodology and until pain becoming the fifth
18 vital sign and this sort of messaging from
19 manufacturers that -- that opioids were an
20 effective and safe way to treat chronic pain,
21 that this really became a problem.
22          So identifying patients who did not
23 have cancer seemed like a reasonable place to
24 start, since that was the original use of -- of
25 these medications.

Page 307

1     Q.   The criteria of 120 MME that's
2 applied to the later list, you testified
3 earlier that the Plaintiffs identified that
4 number after consulting the CDC guidelines,
5 right?
6     A.   Correct.
7     Q.   And it's your understanding that
8 the CDC guidelines are 90 per day?
9     A.   Well, the CDC guidelines indicated
10 that doses of over 90 are, I think I called it
11 the danger zone.  That's what it reads to me,
12 in that that is where there exist a much higher
13 likelihood for addiction and misuse is over 90.
14     Q.   How did Plaintiffs land on 120,
15 then, as the threshold dosing amount to
16 identify the prescriptions?
17     A.   Well, it's my understanding that --
18 and just what I've seen, they come in 30, 60,
19 90, 120.  So over 90, the next natural dosing
20 would be 120.
21     Q.   And you don't have any
22 understanding of why initially 150 was chosen
23 and later 120 was applied?
24     A.   I do not.
25          MS. FLOWERS:  Objection.

Page 308

1     Q.   Is it Summit's contention that any
2 opioid prescription with a daily dose of 120
3 MME or higher was inappropriate?
4     A.   Of any prescription?
5     Q.   Yes, any opioid prescription with a
6 daily dose of 120 MME or higher was
7 inappropriate?
8     A.   No.  Certainly there are
9 end-of-life care and cancer care or even, I'm
10 sure, under hospital supervision, folks who've
11 just come out of procedures that that would be
12 appropriate.
13     Q.   Does Summit contend that the
14 prescriptions identified in the Exhibit A as
15 being prescriptions of 120 MME per day or
16 higher were written as a result of manufacturer
17 marketing?
18     A.   They were written -- I certainly
19 think it played a role or could have played a
20 role in any number of the prescriptions.
21     Q.   What sources of information did the
22 Plaintiff use to identify whether any of the
23 prescriptions identified in exhibit -- in the
24 Exhibit A that were provided to Defendants were
25 the result of manufacturer marketing?

Page 309

1          MS. FLOWERS:  Object to the form.
2     A.   Did we -- I don't -- could you ask
3 that again, please?
4     Q.   Sure.  So I asked you whether it
5 was Summit's contention that manufacturer
6 marketing could play a role --
7     A.   Yes.
8     Q.   -- in prescriptions above 120 MME
9 per day, right?
10     A.   Sure, uh-huh.
11     Q.   And you said that it could for
12 some?
13     A.   Sure.
14     Q.   And my question, then, is with
15 respect to the prescriptions that have been
16 identified for the Plaintiffs for purposes of
17 responding to the interrogatories, did
18 Plaintiffs use any source of information to
19 determine whether the prescriptions they've
20 listed were, in fact, the result of
21 manufacturer marketing?
22     A.   Well, I'm certain that they could
23 in some instances.  I know that we are aware of
24 calls being made to doctors by representatives
25 in the community, and certainly even after

78 (Pages 306 - 309)

Page 310

1 there was suspected improper prescriptions
2 going on, calls were still being made by
3 manufacturers to some of the doctors in the
4 area, so, again I -- I have not looked at these
5 individuals, but I'm -- I'm certain that
6 information could be extrapolated in some way.
7     Q.   Did Summit reach out to any of the
8 prescribers identified for these prescriptions
9 to ask the doctors whether or not manufacturer
10 marketing played a role in their decision to
11 prescribe?
12     A.   I know that, through counsel,
13 there's been discussions with doctors about
14 prescribing practices and industry norms at the
15 time, but as -- as a county entity, we did not
16 reach out and ask about these patients.
17         The County engaged in ways to try
18 and educate doctors, certainly the doctors
19 who -- I mean, I see -- I see Harper on here,
20 on the first page, so certainly the County,
21 through law enforcement, intervened in that
22 practice.
23     Q.   Is it -- strike that.
24         Is it your understanding that the
25 prescriptions identified in response to the

Page 311

1 interrogatory include prescriptions that were
2 written as a result of manufacturer marketing?
3     A.   I -- is that -- is that different
4 than what you asked me before?  I'm sorry.
5     Q.   So you're here to talk to us about
6 the criteria used to identify, and I'm trying
7 to understand what criteria --
8     A.   Yeah, I'm sorry.  I'm trying really
9 hard to follow your questions.  I really am.
10         MS. KEARSE:  Maybe -- maybe we can
11 take a break, too, at some point.  I know it's
12 just getting late in the afternoon.
13         MS. FEINSTEIN:  Sure, sure, yeah.
14     Q.   Let me just try to -- I'll try to
15 rephrase it, okay?  And see if we can get on
16 the same page.
17         So we've talked about the not
18 treated for cancer --
19     A.   Right.
20     Q.   -- criteria being used, right?
21         And we've talked about the daily
22 dosing of 120 MME --
23     A.   Correct.
24     Q.   -- right?
25         And so I was asking, and I'm trying

Page 312

1 to understand from you, whether those two
2 criteria, either together or either one, it's
3 Plaintiff's position that the prescriptions
4 meeting those criteria were written as a result
5 of manufacturer marketing?
6     A.   I'm with you now.
7         Summit County contends that it
8 certainly played a role, that the marketing and
9 the inaccurate information that was provided
10 certainly let doctors and their patients
11 believe that these types of dosing for
12 non-cancer treatment was safe when, you know,
13 certainly it was not at the time.
14     Q.   Is Summit County able to identify
15 any specific prescriptions of those it obtained
16 from Rawlings that were the result of
17 manufacturer marketing?
18         MS. FLOWERS:  Objection.
19     A.   Specifically, no, I can't point to
20 one of these and say this person received it
21 because of marketing.  But certainly, again, it
22 can be extrapolated that some calls were being
23 made by reps from certain manufacturers to some
24 of the doctors on this list.
25         MS. FEINSTEIN:  All right.  Why

Page 313

1 don't we take a break here.
2         THE WITNESS:  Okay.
3         THE VIDEOGRAPHER:  Off the record
4 at 4:29.
5         (A recess was taken.)
6         THE VIDEOGRAPHER:  On the record at
7 5:05.
8 BY MS. FEINSTEIN:
9     Q.   Thank you.  Ms. Johnson, before the
10 break we were going through the criteria used
11 to identify the prescriptions in response to
12 the Manufacturer Defendants' interrogatories,
13 and -- and I'd like to return to that topic --
14     A.   Great.
15     Q.   -- to continue that discussion.
16         The -- Summit County is not
17 contending that anything above 120 MME is
18 improper as a matter of that dosing level,
19 right?
20     A.   Not in every circumstance.
21     Q.   Exactly.
22     A.   Correct.
23     Q.   So there could be some
24 circumstances --
25     A.   Absolutely.

79 (Pages 310 - 313)

Page 314

1    Q.   -- where it would be appropriate;
2  is that right?
3    A.   Of course.
4    Q.   But there are other circumstances
5  in which Summit County maintains that it may
6  not be appropriate; is that correct?
7    A.   That's correct.
8    Q.   Does Summit County contend that
9  anything above 150 MME is improper?
10   A.   Not in and of itself, as a
11 stand-alone.
12   Q.   Combined with other criteria, it
13 potentially could be; is that right?
14   A.   Correct.
15   Q.   If I could please direct your
16 attention to Exhibit 11.  We were looking at
17 Exhibit 11 a little bit before the break.
18   A.   Uh-huh.
19   Q.   This is the -- the document that
20 includes the Plaintiffs' responses to
21 Interrogatory No. 6, correct?
22   A.   Yes.
23   Q.   If I could direct your attention,
24 please, to page 15 of Exhibit 11.
25   A.   Okay.

Page 316

1    Q.   Do you have any information about
2  what criteria were used to identify those
3  prescriptions of reformulated products listed
4  in Exhibit 11?
5    A.   The same criterion that we
6  submitted, the 120, the opioid -- or the
7  dependency and non-cancer patient.
8    Q.   Was an additional criteria applied
9  to those reformulated products in that
10 Plaintiffs maintain that they were not
11 abuse-deterrent?
12   A.   The three criterion remained the
13 same.  It's my understanding that all of these
14 were produced in response to those three
15 crit- -- three criterion that we have talked
16 about at length.
17   Q.   There were no additional criteria
18 applied for these reformulated products?
19   A.   Not that I'm aware of.
20   Q.   And in nothing that you reviewed in
21 preparation for your testimony on these topics
22 led you to believe there were different
23 criteria used for those products?
24   A.   Nothing.
25   Q.   Directing your attention now to the

Page 315

1    Q.   The first full paragraph on page 15
2  indicates that the list of prescriptions
3  provided by the Plaintiffs includes individuals
4  who are prescribed reformulated OxyContin,
5  Hysingla ER, Opana ER, Exalgo, and Xartemis
6  XR -- and I probably mangled the
7  pronunciations -- as abuse-deterrent
8  formulations of Defendants' opioids.
9         Do you see that?
10   A.   I do see that.
11   Q.   Is it your understanding that the
12 list of prescriptions included those --
13 prescriptions for those products?
14   A.   The list of prescriptions -- say
15 that last part again.
16   Q.   Is it your understanding that the
17 list of prescriptions identified by the
18 Plaintiffs in response to the interrogatories
19 included prescription of those reformulated
20 products that are listed in Exhibit 11?
21   A.   That's what the letter states, that
22 it in-- that this list includes those.
23   Q.   Do you have any reason to believe
24 otherwise?
25   A.   No.

Page 317

1  next paragraph now on page 15 of Exhibit 11.
2  The letter reads that "The prescriptions for
3  Actiq, Fentora, and Subsys included in the list
4  of prescriptions, Exhibit A, were prescribed to
5  individuals who did not have a recent diagnosis
6  for cancer."
7         Do you see that?
8    A.   I do.
9    Q.   Did I read that correctly?
10   A.   Yes.
11   Q.   What criteria did Plaintiffs use to
12 determine whether a patient had a recent
13 diagnosis of cancer?
14   A.   I don't know what Rawlings used as
15 their criterion.  I know that the criterion we
16 gave to them were the three that we continue to
17 talk about.
18   Q.   And so for the criteria for the --
19 the Actiq, Fentora, and Subsys prescriptions
20 identified in the list, Plaintiffs told
21 Rawlings to pull those prescriptions or include
22 those prescriptions for which the prescription
23 did not -- the recipient of the prescription
24 did not have a recent diagnosis of cancer; is
25 that right?

80 (Pages 314 - 317)

Page 318

1    A.   I --
2        MS. FLOWERS:  Object to the form.
3    A.   Yeah, I'm not going to use the word
4  "recent."  I -- I -- the criterion that we gave
5  to Rawlings did not have the word "recent" that
6  I am aware of.
7    Q.   The letter, Exhibit 11, includes
8  that word, right?
9    A.   The letter does include that word.
10   Q.   So do you know whether the criteria
11  provided to Rawlings included any time
12  parameters for the -- the not-for-cancer
13  prescription?
14   A.   That would have been a decision by
15  counsel and the experts.  I don't have that
16  information.
17   Q.   And as the designee on the
18  criteria, you don't have any information about
19  whether there was some time window within which
20  a patient had to have been free of a -- a
21  diagnosis of cancer --
22       MS. FLOWERS:  Object to the form.
23   Q.   Is that right?
24   A.   That's right.
25   Q.   Do you know whether Rawlings had

Page 319

1  available to it any source information, patient
2  files or anything such as that, to confirm that
3  there was no recent diagnosis of cancer?
4    A.   I do not know what Rawlings used to
5  produce these reports other than their
6  contracts with the insurance agencies we've
7  discussed.
8    Q.   And it's your understanding that
9  the Plaintiffs, through counsel, provided the
10  three criteria to Rawlings to apply?
11   A.   Yes.
12   Q.   To generate the list of
13  prescriptions?
14   A.   Yes.
15   Q.   No other criteria were applied?
16   A.   None that I'm aware of.
17   Q.   Did you, in reviewing your
18  information to prepare to testify on those
19  criteria -- today is my day to ask you about
20  that and today is the day for Defendants to
21  understand what criteria were applied to
22  generate these lists --
23   A.   Uh-huh.
24   Q.   -- did anything in the materials
25  that you reviewed include any other criteria to

Page 320

1  identify the prescriptions on this list?
2    A.   No.  The three criteria were based
3  on the public health consensus that these were
4  a combination of factors that would result in
5  improper use of prescription.
6    Q.   Did Summit consider any other
7  criteria in providing its list to the -- to the
8  Defendants?
9        MS. FLOWERS:  Object to the form.
10   A.   I do not know the conversation
11  between the attorneys and Rawlings.
12   Q.   Did Summit evaluate whether the
13  prescriptions were dis -- where the
14  prescriptions were dispensed?  Was that a
15  factor that was considered?
16   A.   Say that again.  Did Summit --
17   Q.   Did Summit consider where the
18  prescriptions were dispensed as a criteria?
19  For example, whether they were dispensed in an
20  inpatient facility --
21   A.   Oh, I see --
22   Q.   -- or at a -- or at a pharmacy?
23   A.   I see what you're saying.
24       I don't know.  I don't know the
25  answer to that question.

Page 321

1    Q.   Do you know whether -- strike that.
2        Did Summit consider whether -- in
3  evaluating the dosing parameters, whether the
4  dosing was a stable dosing or whether it was a
5  tapered dosing?
6        MS. FLOWERS:  Objection.  Asked and
7  answered.  Calls for speculation.
8    A.   We looked at the CDC statement on
9  90 milligrams being sort of the threshold where
10  folks move into more likelihood for dependence
11  and addiction.
12   Q.   So Summit didn't look at the
13  prescription, for example, of 120 and compare
14  it to any earlier prescription to determine
15  whether that patient was being held stable at
16  that or whether they were coming down from 150;
17  is that right?
18       MS. FLOWERS:  Object to the form.
19   A.   We didn't look at any one person.
20  We looked at the fact that we had 39 million
21  pills in 2012 and said, "This is a crisis."
22       There wasn't any one person or
23  prescription that we identified as, "This is
24  the reason for the case."  It's every single
25  person in the 500 and in the 720, plus the

81 (Pages 318 - 321)

Page 322

1 thousands of people who died that brought us to
2 the conclusion that this needed to happen.
3        It was the request of defense
4 counsel, is my understanding, that data be
5 produced.  The criterion was determined,
6 general health consensus, and beyond that,
7 those decisions were made by counsel and the
8 experts they've employed.
9    Q.    And -- and today you are here to
10 testify about those criteria, and what I'm
11 trying to understand is how those criteria were
12 applied by Plaintiffs in identifying the
13 prescriptions?
14        MS. KEARSE:  And, Counsel, I'll say
15 she -- the witness has given you the criteria.
16 So you -- you keep asking her about the
17 criteria, and Ms. Johnson has testified about
18 the criteria used.  So if you want to ask -- I
19 mean, at some point you're going to be asking
20 the same question for another hour, but -- and
21 I don't know if that's appropriate or not, but
22 we'll see how it goes.
23        MS. FEINSTEIN:  Thank you, Counsel.
24    Q.    What I'm trying to understand is
25 how those criteria, then, are applied.  And my

Page 323

1 question was --
2        MS. KEARSE:  But -- but the witness
3 is here to testify about the criteria, and
4 she's given you the criteria, and I think that
5 is the scope of her testimony on that.
6    Q.    My question was, in applying those
7 criteria, did Summit County look at whether the
8 dosing number was a stable dosing number for
9 any individual identified in the list?
10    A.    I -- I do not know the answer to
11 that.
12    Q.    Did Rawlings providing -- strike
13 that.
14        Did the Plaintiffs provide to the
15 Defendants all of the information that Rawlings
16 provided to it with respect to the
17 prescriptions identified?
18        MS. KEARSE:  Counsel, I think we're
19 going beyond the scope when we read -- it's the
20 criteria that Plaintiffs used to identify the
21 information that we provided in the
22 interrogatories.  So we're talking about the
23 information that was provided.
24        MS. FEINSTEIN:  And my question is,
25 did Rawlings provide any other information.

Page 324

1 The witness testified that Plaintiffs provided
2 certain criteria to generate a list of
3 prescriptions.  Is the list of prescriptions
4 that was provided to the Defendants everything
5 that Rawlings provided in response to those
6 criteria?
7        MS. KEARSE:  But, Counsel, I'm
8 saying that is outside the scope that -- she's
9 testified on what was provided to Defendants
10 from the answers to the interrogatories, not
11 what else is -- I don't even know if there's
12 anything else out there, but I'm just saying
13 that's not -- I don't think -- I think that's
14 beyond the scope of what she is to testify
15 about as to what was provided.
16        MS. FEINSTEIN:  Counsel, your scope
17 objection is noted, and I'd like an answer to
18 my question from the witness, please.
19    A.    I don't know if Rawlings provided
20 anything else.  My assumption is that --
21        MS. KEARSE:  I think -- I'm going
22 to advise, counsel not to assume anything.  If
23 you -- we're not guessing.
24    Q.    The source of information from
25 Rawlings were in insurance companies,

Page 325

1 CareSource and Medical Mutual of Ohio, right?
2    A.    That's my understanding.
3    Q.    Do you know whether the
4 prescriptions identified in the materials
5 provided by Plaintiffs were reimbursed?
6        MS. KEARSE:  Objection.  Outside
7 the scope.
8    Q.    Were they covered by insurance?
9    A.    Oh, I don't know the answer to
10 that.
11    Q.    Do you know whether Medical Mutual
12 of Ohio or CareSource rejected payment for any
13 of the prescriptions identified in the exhibit?
14        MS. KEARSE:  Objection.  Outside of
15 the scope.
16    A.    I -- is that information included
17 in here?  Can it be gleaned from here?  I mean,
18 I can look, but I don't know, as I sit here
19 today, if that information was a part of that.
20    Q.    Do you know whether, in applying
21 the criteria, whether Rawlings utilized any
22 information provided by Plaintiffs, or did
23 Rawlings use its own data?
24        MS. KEARSE:  Objection.  Outside
25 the scope.

82 (Pages 322 - 325)

Page 326

1    A.   I do not know Rawlings'
2  methodology.  All I know is the criterion were
3  provided to Rawlings to create these
4  spreadsheets at the order of the Court.
5    Q.   Did Rawlings have any input in
6  determining the criteria?
7         MS. KEARSE:  Object.  Outside the
8  scope.
9    A.   No, that -- those decisions were
10  made because it -- that's the public health
11  consensus, and with counsel and the experts
12  from the case made that determination.
13    Q.   Turning back to Exhibit 11, which
14  is the Plaintiffs' response to Interrogatory
15  No. 6, if you could please turn to page 5.
16        The second full paragraph, it
17  reads, "Subject to and without waiving the
18  foregoing objections and limitations,
19  Bellwether Plaintiffs contend that all
20  prescriptions of opioids for chronic pain in
21  the bellwether jurisdictions were written in
22  reliance on misrepresentations, omissions, and
23  wrongdoing alleged in their Complaint."
24        Did I read that correctly?
25    A.   You did.

Page 327

1    Q.   In identifying the prescriptions
2  that were provided to the Defendants in
3  response to these interrogatories, is it
4  Plaintiff's contention that those prescriptions
5  were for chronic pain?
6    A.   That all of these prescriptions
7  were for chronic pain --
8    Q.   Yes.
9    A.   -- in these exhibits?
10        I -- I don't know, again, what they
11  were for.  I know they were not for cancer
12  treatment.
13    Q.   What does the "not for cancer
14  treatment" criteria mean?
15    A.   Exactly what it states, that these
16  were not people who were diagnosed with cancer.
17    Q.   So this list of prescriptions could
18  have appropriate prescriptions included that
19  are for other reasons, not cancer, but because
20  it didn't meet the cancer criteria, it's
21  included on that list; is that correct?
22        MS. KEARSE:  Object to form.
23  Outside the scope, as well.
24    A.   I -- I don't know that I could
25  answer that, other than to say, without having

Page 328

1  reviewed these documents very specifically, I
2  don't know if there is any diagnosis included.
3  I can't imagine that there would be.
4         So these are folks who have not
5  been diagnosed with cancer.  Beyond that, I
6  mean, quite frankly, even to a layperson,
7  someone who has been diagnosed with opioid
8  dependency perhaps should not continue to be
9  prescribed certainly at a level of 120 MME or
10  higher.  So, you know --
11    Q.   Is it Summit's contention that
12  every prescription included in the list of --
13  that meets the criteria no cancer diagnosis,
14  120 MME, and opioid use disorder, that all of
15  those are improper prescriptions?
16        MS. KEARSE:  Object to form.
17    A.   Summit County contends that these
18  are identified in response to the request of
19  defense counsel and that certainly if we take
20  away two out of the three and we just say these
21  people have opiate abuse disorder, Summit
22  County's position would be that alone would red
23  flag them to us that they should have been
24  looked at.
25    Q.   Do you know whether Rawlings used

Page 329

1  any source information, patient files or
2  anything, such as that to confirm that the list
3  includes those with opioid use disorder?
4         MS. KEARSE:  Objection.  Asked and
5  answered.
6    A.   I don't know what methodology
7  Rawlings used.
8    Q.   Still within Exhibit 11, I'd like
9  to direct your attention back to page 14,
10  please.
11        The very last part of that page,
12  it's the last partial paragraph that bleeds
13  over into the next page, there is, near the
14  end -- near the end of that partial paragraph,
15  about three lines down, over to the right, do
16  you see, "Based upon a review"?
17    A.   I do.
18    Q.   Do you see where I am?
19    A.   I do.
20    Q.   It reads, "Based upon a review of
21  relative call notes, Bellwether Plaintiffs
22  contend that Manufacturer Defendants
23  systematically omitted or misrepresented the
24  risk of addiction, failed to accurately
25  disclose the risk of addiction, provided false

83 (Pages 326 - 329)

Page 330

1 assurance that addiction is rare among patients
2 taking opioids for pain," and it continues,
3 "and/or can be identified or managed, and
4 failed to disclose the risk of addiction
5 increase with longer duration of opioid use or
6 higher doses," and then it continues.
7     Did I read that correctly?
8     A.  Yes.
9     Q.  Did the Plaintiffs, did Summit
10 County review call notes in determining the
11 criteria applied to the list of prescriptions?
12     MS. KEARSE:  Objection.  Outside
13 the scope.
14     A.  I know that call notes have been
15 produced as a part of discovery.  The decision
16 for setting the criterion was left to the
17 attorneys and the experts.
18     Q.  So you don't know whether any
19 specific call notes were reviewed to set those
20 criteria for this list?
21     A.  I do not know that.
22     Q.  Turning your attention now to what
23 we have marked as Exhibit 10.  Exhibit 10 is
24 one of the documents that you took a look at in
25 preparation for today's deposition, right?

Page 331

1     A.  I need to look again.
2     Q.  Yes, please, feel free.
3     MS. KEARSE:  Take your time.
4     A.  Yes.
5     Q.  This document includes the
6 Plaintiffs's responses to Manufacturer
7 Interrogatory No. 7 and No. 10, right?
8     A.  Yes.
9     Q.  Directing your attention to the --
10 the fourth page.  The pages are not numbered --
11     A.  Sure.
12     Q.  -- but you see Manufacturer
13 Interrogatory No. 7 at the top?
14     A.  I do.
15     Q.  In the answer, the second sentence
16 in the response reads, "Each individual has a
17 diagnosis of opioid use disorder and therefore
18 has suffered and/or continues to suffer
19 significant harm."
20     Do you see that?
21     A.  I do.
22     Q.  Did I read that correctly?
23     A.  Yes.
24     Q.  Do you know what criteria were used
25 to determine that a patient had opioid use

Page 332

1 disorder?
2     A.  By Rawlings?
3     Q.  Yes.
4     A.  I do not know Rawlings'
5 methodology.
6     Q.  And similarly, then, you don't know
7 what source documents they may have looked at
8 to confirm that?
9     A.  I do not.
10     Q.  Does Summit County contend that
11 each of the individuals who had an opioid use
12 disorder and received a prescription for a
13 prescription opioid, that that prescription was
14 improper?
15     MS. FLOWERS:  Object to the form.
16     MS. KEARSE:  Objection.  Outside of
17 the scope, as well.
18     A.  I don't know that that is the legal
19 contention being made, but certainly as we sit
20 here, as I sit here today on behalf of the
21 County, it would seem to me that every person
22 with a diagnosed opioid disorder still
23 receiving over 120 morphine equivalent
24 milligrams, that was a problem.  Certainly was
25 a problem.

Page 333

1     Q.  Does Summit County contend that
2 those individuals identified in the list of
3 prescriptions with an opioid use disorder
4 developed that disorder as a result of some
5 wrongdoing by the Defendants?
6     A.  The marketing was so pervasive, and
7 the availability was so readily procured that
8 it absolutely had an impact on this.  The --
9 the false narrative that this was a safe way to
10 treat things like chronic pain or injury from
11 sports or injury from a work accident, that was
12 pervasive in this community, and it was
13 inaccurate.  So it absolutely impacted it.
14     Q.  Did Summit County do anything to
15 rule out other possible causes for the opioid
16 use disorder, aside from Defendants' conduct?
17     A.  I'm sorry.  Did we -- did Ra- -- I
18 don't understand your question.
19     MS. KEARSE:  I think we changed
20 gears, right?
21     Q.  Did Summit County do anything to
22 rule out any other cause for the opioid use
23 disorder, aside from the alleged wrongdoing of
24 the Defendants?
25     A.  As far as getting these lists?

84 (Pages 330 - 333)

Page 334

1     Q.    As far as the -- the wrongdoing
2  that you just testified about that led to
3  opioid use disorder, did Summit County do
4  anything to rule out any other causes of that
5  opioid use disorder?
6     A.    There are no other causes to opioid
7  use disorder, other than the pervasive
8  availability of opioids in our community.  I
9  don't know if you're asking specifically about
10 these folks, but there is one root cause for
11 why we are here today, and it is 40 million
12 pills in my community in one year.
13    Q.    So it's your testimony that anyone
14 with opioid use disorder developed that
15 disorder because of some wrongdoing by the
16 Defendants; is that right?
17    A.    I think when the Defendants
18 knowingly misrepresented what these pills were
19 going to cause and what this would lead to,
20 that even an appropriately prescribed person,
21 meaning a doctor relying on that information
22 wants to treat the person in front of him, I --
23 I absolutely believe that the wrongdoing of the
24 Defendants is part of every piece of the
25 addiction process.

Page 335

1     Q.    Directing your attention back to
2  Exhibit 10, that same paragraph that we were
3  just in.
4     A.    Okay.
5     Q.    The next sentence reads, "In
6  addition, Exhibit B identifies certain
7  individuals in the bellwether jurisdictions who
8  died from overdoses as a result of the use of
9  prescription opioids."
10    A.    I think I'm on the wrong page.  I'm
11 sorry.
12    Q.    Sure, yeah.  Yeah, let's get --
13 it's -- we're in Exhibit 10.
14    A.    Yes.  Page 4?
15    Q.    Page 4.  They aren't numbered.
16    A.    Yes, okay.
17    Q.    So at the top it says
18 Manufacturer --
19    A.    Interrogatory, yes.
20    Q.    -- Interrogatory No. 7.  Then I'm
21 in the "Answer" section.
22    A.    Okay.  Exhibit B identifies.
23    Q.    Yeah.
24    A.    Got it.
25    Q.    The first full paragraph under

Page 336

1  "Answer."
2     A.    Got it.
3     Q.    Are you there?
4     A.    Yes.
5     Q.    And feel free to read that
6  sentence.  I won't --
7     A.    Okay.
8     Q.    -- read it into the record.
9     A.    The second sentence of the
10 paragraph?
11    Q.    Yeah.  The -- actually, the very
12 last sentence of the paragraph.
13    A.    Okay.  Oh, okay.  I see it, yes.
14    Q.    If I could now direct your
15 attention to what we've marked as Exhibit 17.
16    A.    Yes.
17    Q.    Do you understand Exhibit 17 to be
18 the Exhibit B that's referenced in Exhibit 10?
19    A.    I do.
20    Q.    Do you know what criteria Summit
21 County used to identify the individuals listed
22 in Exhibit B?
23    A.    I know that these came from our
24 medical examiner's office, and something either
25 in the toxicology report for the decedent or

Page 337

1  something else within the autopsy would have
2  led Dr. Kohler to create this list.
3     Q.    Do you know what criteria
4  Dr. Kohler, or whoever participated in the
5  preparation of Exhibit B, applied to determine
6  whether the individuals purportedly died of an
7  overdose of prescription opioids?
8     A.    I -- I believe that, again, it
9  was -- it was reflected in the toxicology
10 screen or something in the history included in
11 the autopsy, that these -- this list is
12 reflective of prescription opioids.
13    Q.    Do you know whether that list is
14 overdoses of prescription opioids?
15    A.    It's listed as overdose deaths,
16 yes.
17    Q.    Do you know whether the medical
18 examiner and anyone who assisted in the
19 preparation of Exhibit B is able to identify
20 which prescription opioids are associated with
21 the overdose deaths listed?
22         MS. KEARSE:  Object to form.
23    A.    I mean, unless there was a pill
24 bottle next to the person, and certainly
25 however long the person had been deceased

85 (Pages 334 - 337)

Page 338

1  before blood and urine samples were taken, that
2  can -- that can impact the levels that are
3  returned in the toxicology screen, and -- and
4  many of these prescription pills they tend to
5  metabolize.  You end up with morphine
6  equivalent.
7          And so I would think that the only
8  way to do that was if there was a known
9  history, a prescription pill bottle at the
10  scene, something like that.  But certainly the
11  toxicologist who was deposed spoke to that sort
12  of, you know, more fluently than I can.
13      Q.   Do you know whether Exhibit 17,
14  which is Exhibit B to Interrogatory No. 7 -- a
15  lot of exhibit references -- do you know
16  whether that listing includes only prescription
17  overdose deaths of prescription opioids
18  manufactured by Defendants in this case, as
19  opposed to other manufacturers of prescription
20  opioids?
21      A.   I do not know the answer to that.
22          THE VIDEOGRAPHER:  Excuse me,
23  Ms. Johnson.
24          THE WITNESS:  Yes.
25          THE VIDEOGRAPHER:  Could you slide

Page 339

1  your microphone up for me?
2          THE WITNESS:  Oh, gosh, yes, sorry.
3          MS. FEINSTEIN:  You okay?
4          THE WITNESS:  Yeah, I think I keep
5  stepping on.
6      Q.   Staying within Exhibit 10, I'd like
7  to direct your attention now to page 5 or the
8  response to Manufacturer Interrogatory No. 10.
9          Have you reviewed this response to
10  Manufacturer Interrogatory No. 10 before?
11      A.   Yes, I've read this.
12      Q.   The individuals identified in the
13  answer, is it your understanding that those are
14  physicians who prescribed prescription opioids?
15      A.   Yes.
16      Q.   The individuals listed are
17  identified in the response as those prosecuted
18  or disciplined doctors, to the Plaintiff's
19  knowledge; is that right?
20      A.   Yes, correct.
21      Q.   So it's your understanding that
22  each of these individuals listed here was
23  prosecuted or otherwise disciplined; is that
24  right?
25      A.   That's right.

Page 340

1      Q.   Do you know whether the physicians
2  listed in response to Interrogatory No. 10 are
3  the prescribers of the prescriptions that were
4  identified by the Plaintiffs in response to the
5  interrogatories?
6      A.   I can see some of their names on
7  the front page, so I -- I know that they are
8  included in these, in these Exhibits 12
9  through -- 12, 13, 15 and 16.  I can see a few
10  of the names at least.
11      Q.   Do you know whether a prescription
12  being written by one of these prescribers was
13  an additional criteria applied by Rawlings to
14  generate the list of prescriptions?
15      A.   It's my understanding that these
16  lists were created based on the three criterion
17  given to them by our counsel.
18      Q.   So it -- it is just coincidental
19  that some of these prescribers are included in
20  that list?
21          MS. FLOWERS:  Object to form.
22      A.   Well, I mean, these are -- I don't
23  know that coincidental is really the word.
24  These doctors were clearly either convicted of
25  crimes or held responsible for improper

Page 341

1  prescribing, so it certainly is no surprise
2  that they would be in these lists.
3      Q.   Do you have any information about
4  whether any of the prescriptions written by
5  these physicians who were prosecuted or
6  disciplined were prescribed based on any action
7  of any of the Defendants in this case?
8      A.   Well, we know that calls were still
9  being made to these doctors even after
10  suspected improper prescriptions were being
11  written, so certainly the manufacturers were
12  sending folks out to call upon these doctors,
13  even in some instances when these -- the reps
14  had indicated that there may have been a
15  problem, so --
16      Q.   And do you -- sorry.
17      A.   -- so the manufacturers were still
18  certainly contacting and the prescriptions were
19  obviously still being filled.
20      Q.   Do you know whether any of the
21  prescriptions written by any of the individuals
22  listed in the answer to Interrogatory No. 10
23  were written as a result of information
24  provided by any manufacturer to those
25  physicians?

86 (Pages 338 - 341)

Page 342

1      MS. KEARSE:  Objection.  Outside
2 the scope.
3      A.   Any information provided to them?
4      Q.   Uh-huh.  Yeah, you just mentioned
5 that you know, from information that you've
6 reviewed --
7      A.   Yeah.
8      Q.   -- that some of these physicians
9 continued to be visited --
10     A.   Right.
11     Q.   -- by representatives of the
12 manufacturers.  Were any of their prescriptions
13 written in reliance on information provided to
14 them by those representatives?
15          MS. KEARSE:  And I'll let you
16 answer, but I think we're way out of the scope
17 of what -- if we're still on the criteria, this
18 is way out of the scope of what Ms. Johnson is
19 here to testify about, the criteria that was
20 used to generate the exhibits in front of her.
21     A.   I -- I can't -- I -- I don't know
22 how to answer that question on -- on what
23 information the doctors relied, but I'm -- what
24 I will say is that many of the patients who
25 were going to these doctors certainly started

Page 343

1 out taking opioids based on their reliance on
2 information from the manufacturers that these
3 would not habit forming and that they would
4 not become addicted.
5      Q.   Did the Plaintiffs' criteria in
6 identifying these doctors in response to
7 Interrogatory No. 10, did it include speaking
8 with any of these physicians?
9          MS. KEARSE:  Objection.  Asked and
10 answered.  I think the witness has testified
11 it's a criteria used for Topics 4, 5, 6, and
12 19, and you're going out of the scope and
13 asking additional questions that just have no
14 bearing on her testimony today as a 30(b)
15 representative.
16     A.   I -- I do not know if -- I know
17 that they spoke to some doctors.  I do not know
18 if the list included the doctors who have been
19 convicted.
20     Q.   Do you know whether any of the
21 listed prescriptions that were provided to the
22 Defendants were responsive to only one of the
23 interrogatories, as opposed to all three of the
24 interrogatories?  Strike that.
25     A.   I don't follow that.

Page 344

1      Q.   Let me re-ask it.
2      A.   Okay.
3      Q.   That was an awkward question.
4          Is it your understanding that the
5 prescriptions that were identified by the
6 Plaintiffs are responsive to all three of the
7 interrogatories that we just discussed, so
8 Interrogatory No. 6, Interrogatory No. 7, and
9 Interrogatory No. 10?
10     A.   That's my understanding.
11     Q.   Do you have any understanding of
12 whether there are any prescriptions in those
13 identified that do not apply to all three and
14 that only apply to either one, two, or three of
15 those interrogatories?
16     A.   If I could review the
17 interrogatories so that I could be clear on
18 that.  I --
19     Q.   And you have the interrogatories in
20 front of you.
21     A.   Okay.
22     Q.   So Exhibit 10 and Exhibit 11 --
23     A.   Eleven.
24     Q.   -- have the interrogatories.
25     A.   Oh, there it is.  Okay.  So your

Page 345

1 question is, are these responsive to all three
2 at the same time?
3      Q.   Yeah -- yes.  So is that list, does
4 that -- does the list of prescriptions provided
5 by the Plaintiffs respond to Interrogatory
6 No. 6, Interrogatory No. 7, and Interrogatory
7 No. 10?
8      A.   Okay.
9          MS. KEARSE:  And again, Counsel, I
10 think she's -- Ms. Johnson has testified to the
11 criteria used in Exhibits A and B, Exhibits 12
12 through 16 already.  This is getting to be to
13 the point of way outside the scope.
14          MS. FEINSTEIN:  You'll be glad to
15 know it's my last question.  I just want to
16 understand --
17          MS. KEARSE:  Okay.  And then we
18 keep going.
19          MS. FEINSTEIN:  -- if that list
20 applies to all these.  On this.  Not my last
21 question all day.
22          THE WITNESS:  So this is six.
23     A.   Based on reviewing the
24 interrogatories again, Exhibits 12 through 16
25 respond to all three individually and as a

87 (Pages 342 - 345)

Page 346

1 whole.
2    Q.   Thank you.  You're also designated,
3 thankfully, on some other topics, right?
4    A.   I mean...
5    Q.   We can continue talking about those
6 lists, if you'd like, but --
7    A.   Thankfully is your word.
8    Q.   -- I'm ready to move on.
9    A.   Okay.  Let's do this.  Yes.
10    Q.   Feel free to move those out of your
11 way if you'd like.
12    A.   Yeah.
13    Q.   You were also designated on Topic 3
14 in the 30(b)(6) notice; is that right?
15    A.   Correct.
16    Q.   And that topic is Plaintiffs'
17 knowledge of concerns or complaints made to the
18 Plaintiffs or by the Plaintiffs of any
19 promotion, marketing, educational activities
20 with respect to prescription opioids, within or
21 relating to the Plaintiffs' geographic area and
22 actions taken by the Plaintiff or others in
23 response to those concerns or complaints.
24       Are you prepared to testify on that
25 topic?

Page 347

1    A.   I am.
2    Q.   What did you do to prepare --
3       MS. KEARSE:  Counsel, I just want
4 to make sure that's reading number three.  I
5 thought three was changed.
6       MS. FEINSTEIN:  Oh, sure.  If it
7 was, yeah, feel free.  I thought I was reading
8 Special Master Cohen --
9       MS. KEARSE:  Are you reading
10 Exhibit 3?  Okay.
11       MS. FEINSTEIN:  I wasn't reading
12 from it.  I was reading what should have been
13 typed from it.
14       MS. KEARSE:  Okay.
15       MS. FEINSTEIN:  But, yeah, I
16 think -- so I don't want to --
17       MS. KEARSE:  Okay.  So I just
18 wanted to make sure you were reading --
19       MS. FEINSTEIN:  Yeah.
20       MS. KEARSE:  -- off of Exhibit B.
21       MS. FEINSTEIN:  Yes.
22    Q.   And feel free, Ms. Johnson, if
23 you'd like to look at Exhibit 1 --
24    A.   Yep.
25    Q.   -- it is the second to last page, I

Page 348

1 know.  Mine's double sided.  I don't know if
2 that --
3       MS. KEARSE:  And I wasn't
4 suggesting you were -- I just wanted to -- I
5 wanted to make sure we were reading off the
6 same one.
7       MS. FEINSTEIN:  Absolutely.  And I
8 want to make sure that the witness is
9 comfortable responding to the questions.
10       THE WITNESS:  Could I ask someone
11 to get more water --
12       MS. KEARSE:  Yeah.
13       THE WITNESS:  -- if there's any
14 more over there.
15       MS. KEARSE:  I don't know.
16    Q.   Are you okay to continue?
17    A.   Yeah, I just --
18    Q.   Okay.  You just need some more --
19    A.   I -- apparently I'll stop breathing
20 if I stop drinking water today.
21    Q.   Thanks.  If you need to take a
22 break --
23    A.   Sure.  No, I --
24    Q.   -- let me know.
25       But if you could please, then,

Page 349

1 referring to Exhibit 1, take a look at Topic
2 No. 3 --
3    A.   Yes, ma'am.
4    Q.   -- and let me know whether you are
5 prepared to testify on behalf of Summit County
6 as to that topic as modified by Special Master
7 Cohen and hopefully as read correctly by me in
8 the record a moment ago.
9    A.   Yes, I am.
10    Q.   Did you talk to the anybody to --
11 besides counsel to prepare for your testimony
12 in response to that topic?
13    A.   I -- I talked with, you know, the
14 individuals that I listed before about a
15 variety of different topics, but frankly the
16 people I've talked to about this particular
17 interrogatory have come throughout the last 15
18 years of being in the community and in the jobs
19 that I've served.
20       So I spoke with Detective Leonard
21 about it a little bit, and obviously with
22 counsel.  But certainly the conversations that
23 I've had outside of the preparation or outside
24 specific preparation for today, inform my
25 answers on this as well.

88 (Pages 346 - 349)

Page 350

1    Q.    Just to make sure I'm
2 understanding, too, so for purposes of your
3 testimony on behalf of Summit County as its
4 designee on this topic, did you speak with
5 anyone else within Summit County just for
6 preparation for this topic specifically?
7    A.    I did.  I spoke with the executive
8 about it and asked for her input as well, and I
9 spoke with the public safety director, Lori
10 Pesci, about that.
11    Q.    When did Summit County first have
12 concerns or complaints about the promotion of
13 prescription opioids?
14    A.    I would say that Summit County
15 first became aware of the pharmaceutical
16 industry's role in our growing epidemic toward
17 the end of 2014 and into 2015 when the Opiate
18 Task Force came together, and started to put
19 the numbers in front of all of us about just
20 how many pills per capita were being
21 distributed in our community.
22    Q.    My question is a little bit
23 different than that.
24    A.    Okay.
25    Q.    So my question is, when did Summit

Page 351

1 County first have concerns or complaints about
2 the promotion of prescription opioids?
3    A.    So same -- same answer.
4         MS. KEARSE:  I'm going object.
5 Asked and an- -- I was going to say asked and
6 answered, yes.
7    A.    Same answer.  Because that -- it
8 was in those Opiate Task Force meetings where
9 the conversation first started with, we all
10 have one thing in common here, and it's the
11 pharmaceutical industry.  So -- so it was
12 really in those early 2015, throughout 2015
13 where, I mean, quite frankly we started looking
14 at who was to blame.
15    Q.    So it's your testimony that Summit
16 County had no concerns about opioid
17 manufacturers' promotion of prescription
18 opioids at any point in time prior to 2014 or
19 2015; is that right?
20    A.    No concern?
21    Q.    Uh-huh.
22    A.    There was not an alarming concern
23 at that time.  I think Summit County, its
24 residents, its officials were still operating
25 under this dangerous belief that the

Page 352

1 pharmaceutical industry was being honest, was
2 not going to put pills into our community at
3 this rate that could harm the people who live
4 here.
5    Q.    Is there any specific promotion
6 that you learned of that -- strike that.
7         Is there any specific promotion
8 that Summit County learned of in 2014-2015 that
9 caused it concern at that time?
10    A.    The conversations in those task
11 force meetings centered around, quite frankly,
12 the pleas from parents who witnessed it
13 firsthand, that their child had become addicted
14 after being told that this was a safe and
15 effective way to treat pain.
16         And I've said it several times
17 because it's true:  The people who pointed us
18 in the direction of the pharmaceutical
19 manufacturing and distributing industry were
20 the family members of people who are suffering
21 from addiction.
22    Q.    And my question is about promotion.
23    A.    Right.
24    Q.    So what -- is there any specific
25 promotion that Summit County learned of in 2014

Page 353

1 or 2015 that it viewed as improper?
2    A.    There's no specific promotion, but
3 the pervasive nature of the messaging coming
4 from the manufacturers blanketed the community.
5    Q.    You've reviewed the complaint filed
6 on behalf of Summit County and the City of
7 Akron in this litigation, right?
8    A.    I have.
9    Q.    You're aware that that complaint
10 includes allegations regarding activities
11 engaged in by the Manufacturing Defendants
12 related to the promotion of prescription
13 opioids dating back into the 2000s; is that
14 right?
15    A.    Correct, yes.
16    Q.    Was Summit County aware of that
17 promotion of prescription opioids in 2007-2008
18 time period?
19    A.    I'm sure we were aware of it.  We
20 did not know the harmful effects it would have
21 at that point.  I don't know that -- those
22 promotional materials were available in, I
23 believe you said 2007.  I don't know that
24 Summit County -- in fact I know that Summit
25 County didn't know how harmful and the danger

89 (Pages 350 - 353)

Page 354

1 that we would incur as a result of those at
2 that time.
3      Q.   Do you know whether the State of
4 Ohio had identified any concerns with
5 pharmaceutical manufacturers' promotion of
6 prescription opioids in 2010?
7      A.   I -- I know now that there was a
8 governor's task force that convened and issued
9 a report in October of 2010, but that didn't
10 reach Summit County.  The people I've spoken to
11 in Summit County had not seen that.
12          And there are a number of reasons
13 why, not the least of which is that was a very
14 brief period of time when the governor and
15 house of representatives were both Democratic,
16 and about 35 days after that report was issued,
17 there was a dramatic shift in Ohio politics and
18 a Republican governor was elected and the
19 Republican contingency took over control of the
20 Statehouse, and there was a dramatic shift in
21 ideology and priorities at that time.
22          So the 2010 report became obsolete,
23 in effect, about 35 days after it was issued.
24      Q.   So it's -- it's your testimony that
25 Summit County had no concerns or complaints

Page 355

1 about any manufacturer promotion or marketing
2 or educational activities related to
3 prescription opioids prior to 2014; is that
4 right?
5      A.   I think that's fair.
6      Q.   And it was the information that
7 Summit County learned through the opioid task
8 force that it formed in 2014 that allowed it to
9 make that connection between its allegations
10 related to promotional activities of the
11 pharmaceutical manufacturers to the opioid
12 issues within Summit County; is that right?
13      A.   Absolutely.  There were specific
14 meetings where you could feel the ripple effect
15 of realization in the room.
16      Q.   And it's further your testimony
17 that Summit County had no knowledge of the
18 governor's task force report that identified
19 several criteria --
20      A.   Sure.
21      Q.   -- including, among them, promotion
22 of prescription opioids as a potential factor
23 in opioid misuse?
24      A.   I was a prosecutor when that came
25 out.  I did not -- I was not familiar with

Page 356

1 that.  I know that Prosecutor Gessner, who was
2 deposed, was not familiar with that.  I've
3 asked -- I asked Detective Leonard if he was
4 familiar with it.  I asked -- I don't -- I
5 can't recall if Donna Skoda was familiar with
6 it.
7      Q.   Did you talk with Dr. Smith about
8 it?
9      A.   I did not.  I did not have a
10 conversation with Dr. Smith to prepare.
11      Q.   Do you know if Dr. Smith or others
12 who are active at the ADM Board and with --
13 within the Summit County Opiate Task Force,
14 whether or not they had information regarding
15 that report prior to 2014-2015?
16      A.   I don't know if they did or not.
17      Q.   You reviewed Dr. Smith's
18 transcript, right?
19      A.   I did.
20      Q.   Do you recall seeing any testimony
21 from Dr. Smith that he was aware of at least
22 concerns with pharmaceutical manufacturers'
23 promotion of opioids prior to the formation of
24 the Opiate Task Force?
25      A.   Yes.  I recall that we had

Page 357

1 concerns.  I believe his testimony also talked
2 about the direct marketing to patients, in
3 addition to the marketing materials provided to
4 doctors.  So I believe that there was an
5 acknowledgement that they were aware that --
6 that there was an issue.
7      Q.   Do you recall his testimony that he
8 could not remember any direct-to-consumer or
9 direct-to-patient marketing regarding
10 prescription opioids?
11      A.   I -- I remember him talking about
12 it.  I thought it was the opposite.  I could be
13 mistaken.
14      Q.   Have you seen any direct-to-
15 consumer marketing related to opioids?
16      A.   I can't say that recently I can
17 recall anything like that.
18      Q.   Do you have any information about
19 any specific promotion of opioids within Summit
20 County that caused Summit County any concerns,
21 whether you learned of it in 2014 or otherwise?
22          MS. KEARSE:  Object to form.
23      A.   Could you say that again?
24      Q.   Sure.  Yeah, it was a little
25 confusing.

Page 358

1    Do you have any information about
2 any promotion of prescription opioids that
3 occurred within Summit County that raised a red
4 flag for Summit County and caused Summit County
5 concern?
6    MS. KEARSE: Object to form.
7    A.   Just what we've talked about
8 when -- when we came together and looked at
9 the -- the number of pills being prescribed in
10 our community, those don't get prescribed by
11 accident. They don't get prescribed without
12 active promotion and marketing to consumers and
13 to the physicians in our area. 40 million
14 pills don't happen by accident of the industry.
15    Q.   Where is the 40 million pills
16 number from?
17    A.   So in 2010, there were 71.6 pills
18 per every man, woman, and child in Summit
19 County.
20    In 2012, it was 72.8, I believe.
21    And when you multiply that by the
22 over 451,000 -- 541,000 residents in Summit
23 County, you get upwards of 40 million pills.
24    Q.   And from where do you get the data
25 71.6 and 72.8?

Page 359

1    A.   Sure. That's the OARRS data that's
2 compiled by the Summit County Public Health.
3 That's on their data dashboard.
4    Q.   You understand that prescription
5 opioids are regulated by the Food and Drug
6 Administration, right?
7    A.   Yes.
8    Q.   You also understand that
9 prescription opioids are -- are approved by the
10 FDA to be available for prescription in the
11 United States, right?
12    A.   I do understand there's a process
13 to that, yes.
14    Q.   Do you have any understanding
15 regarding the FDA's role with respect to
16 marketing or promotion of pharmaceutical
17 products that are approved by it?
18    A.   Do I have an understanding of how
19 they're involved with marketing?
20    Q.   Do you have any understanding of
21 whether they're involved at all?
22    A.   I don't, actually.
23    MS. KEARSE: Counsel, I think there
24 was a separate 30(b) specific to FDA that we
25 submitted in writing, so it may be outside of

Page 360

1 her scope.
2    Q.   And I'm asking about marketing.
3 You don't have any information about whether
4 the marketing or promotion of prescription
5 opioids is regulated at all by the FDA?
6    MS. KEARSE: The same objection.
7    A.   I don't know if the FDA regulates
8 those.
9    Q.   Is it Summit's position that it --
10 strike that.
11    When did Summit County first learn
12 of educational activities engaged in by
13 manufacturers of prescription opioids that
14 caused it concern?
15    A.   I don't think I follow your
16 question. Educational activities that the
17 manufacturers were putting on?
18    Q.   Yes.
19    A.   Oh, for doctors?
20    Q.   Regarding prescription opioids,
21 uh-huh.
22    A.   I don't know the answer to that
23 question.
24    Q.   Do you draw a distinction between
25 the term promotion and marketing?

Page 361

1    A.   Marketing is -- the distinction I
2 draw between promotion and marketing is
3 marketing is the -- the tangibles, whether it's
4 paper or advertisements. Sort of the
5 in-passive parts.
6    Promotion, to me, is reps going
7 out, meeting with docs, promoting the effects
8 and the efficacy of the medications.
9    Q.   My questions earlier about when
10 Summit County first became concerned, I used
11 the term "promotion," so now I'll ask the
12 same --
13    A.   Oh, okay.
14    Q.   -- question regarding marketing --
15    A.   Sure.
16    Q.   -- to see if there's any different
17 response. So the topic includes both terms, so
18 I want to ask about both.
19    When did Summit County first become
20 concerned or receive complaints about the
21 marketing of prescription opioids within Summit
22 County?
23    A.   The same answer. When we really --
24 I understand that Dr. Smith and some others
25 discussed some early warning signs, perhaps,

91 (Pages 358 - 361)

Page 362

1 but it was not until the Opiate Task Force
2 convening in '14 and '15 that -- that that
3 really became a topic of conversation that
4 dominated the -- those meetings.
5     Q.   Did Summit County contact the --
6 the pharmaceutical manufacturers and complain
7 about their promotional or marketing activities
8 at that point?
9         MS. KEARSE:  Object to form.
10    A.   I think we were too busy trying to
11 treat people.  I think we were too busy trying
12 to find new avenues and bed space for the
13 addiction crisis that we were facing.  It was
14 not until, again, we -- we sort of put all of
15 the ducks in a row and came to the conclusion
16 that there was one common factor in all of
17 these stories, and that's when our -- our
18 attention was directed.
19    Q.   Did Summit County report any
20 promotional activities to the FDA?
21    A.   Not that I'm aware of.
22    Q.   You've mentioned a few times
23 reference to the task force that began in the
24 2014 time period.  And by that, are you
25 referring to the Summit County Opiate Task

Page 363

1 Force.
2    A.   I am, yes.
3    Q.   Are you aware of any other task
4 forces that were formed at an earlier time in
5 other counties or within the state of Ohio?
6    A.   Well, we've discussed the
7 governor's report that was issued in 2010.
8 Before 2014, we had drug task force within the
9 county but beyond the law enforcement
10 perspective, I'm not aware of any community.
11    Q.   Did -- I asked you if Summit County
12 reached out to the pharmaceutical manufacturers
13 or reached out to the FDA.
14         Did Summit County do any kind of
15 internal -- strike that.
16         Did Summit County institute any
17 sort of investigation into the promotional
18 activities of the pharmaceutical manufacturers
19 to determine whether it was wrongful activity?
20         MS. KEARSE:  Object to form.
21    A.   I mean, quite frankly, that's why
22 we engaged with counsel.
23    Q.   So this lawsuit is the action that
24 Summit County decided to take when it made that
25 connection; is that right?

Page 364

1    A.   I think that's fair.
2    Q.   Did Summit County contact any
3 federal authorities to evaluate whether or not
4 the activities engaged in by the manufacturers
5 of prescription opioids may have violated
6 any -- any federal laws or regulations?
7         MS. KEARSE:  Object to form.
8    A.   We did not reach out to the FDA.  I
9 mean, certainly our DEA agents were
10 investigating diversion, but as far as -- as
11 reporting the marketing or promotion, no, this
12 lawsuit is the way we've addressed that.
13    Q.   Did Summit County enact any
14 ordinances or any sort of restrictions on the
15 ability of pharmaceutical manufacturers to
16 either visit physicians within its borders or
17 otherwise engage in promotion or marketing of
18 prescription opioids?
19    A.   We don't have the authority to do
20 that.  That's a federally regulated practice,
21 and the only other regulations are at the state
22 level.  As a county council and the county
23 executive, and certainly in the city of Akron,
24 they don't -- none of us have the authority to
25 do that.

Page 365

1    Q.   And did Summit County reach out to the
2 to any of those entities that would have
3 authority to do so and request limitations
4 within the borders of Summit County on the
5 activity that caused concern to Summit County?
6    A.   I don't know that we specifically
7 talked about marketing promotions with our
8 federal representatives.  I know that we talked
9 about the -- the need for treatment facilities,
10 the need for, you know, the continuation of
11 Medicaid expansion, the lifting of the bed
12 limit for Medicaid reimbursement.  Our focus,
13 up and to the point that we filed this lawsuit,
14 has been on treating the victims of this
15 epidemic.
16    Q.   Did Summit County reach out to the
17 FDA, recognizing Summit County's concern with
18 promotional activities of the pharmaceutical
19 companies, did Summit County reach out to the
20 FDA to request that it somehow limit the
21 ability of manufacturers to promote and market
22 prescription opioids?
23         MS. KEARSE:  Object to form.
24    A.   We did not reach out to the FDA.
25         MS. FEINSTEIN:  Why don't we take a

92 (Pages 362 - 365)

Page 366

1 break here.
2          THE VIDEOGRAPHER: Off the record
3 at 6:04.
4          (A recess was taken.)
5          THE VIDEOGRAPHER: On the record at
6 6:24.
7 BY MS. FEINSTEIN:
8     Q.   Thank you. Before the break, we
9 were talking about Summit County's knowledge of
10 concerns related to pharmaceutical promotion
11 and marketing. Do you recall that?
12    A.   I do.
13    Q.   If you could take a look, if you'd
14 like, at Exhibit 1, which is the notice of
15 deposition that identifies the topics, just
16 because I may bounce around a little bit, I
17 just want to confirm on the record, the other
18 topics that I'm going to address with you and
19 for which you have been designated by Summit
20 County to testify about are Topics 9 and 34, as
21 modified by Special Master Cohen's order, which
22 is the second to last page of Exhibit 1.
23          Do you see that?
24    A.   I do.
25    Q.   If you could please review those

Page 367

1 topics and let me know whether you're prepared
2 to testify on behalf of Summit County as to
3 Topics 9 and 34 as well.
4     A.   Yes. I've reviewed them, and I
5 feel prepared to testify on behalf of Summit
6 County.
7     Q.   Other than what you've described
8 already regarding your preparation for today's
9 deposition, did you do anything in addition to
10 prepare specifically for your testimony with
11 respect to Topics 9 or 34?
12    A.   Not in addition to what we've
13 already discussed.
14    Q.   You mentioned that Summit County
15 did not have knowledge or con- -- strike that.
16          You mentioned earlier that Summit
17 County did not have concerns about
18 pharmaceutical promotion or marketing until
19 2014; is that right?
20          MS. KEARSE: Object to form.
21    A.   I -- I would say '14 -- I believe
22 the Opiate Task force first met at, I want to
23 say, December of '14. So it was very late '14
24 and into '15 when those sort of realizations
25 started to come to the forefront.

Page 368

1     Q.   At any time point prior to --
2 strike that.
3          Was it a specific discussion at a
4 task force that flipped the switch for the
5 County, that caused it to have concern about
6 pharmaceutical promotion or marketing?
7          MS. KEARSE: Object to form.
8     A.   There were specific slides. I
9 remember very vividly being shown slides about
10 the number of pills in our community. And as I
11 said before, there was a collective -- it was
12 almost like you could feel the light bulb.
13          And that was when I recall
14 specifically a parent of a child standing up
15 and using the words "big pharma." I remember
16 it very vividly. And that was truly one of the
17 first times a real discussion was had in the
18 county about what all of these stories we were
19 discussing in these task force meetings had in
20 common, and that was the opioid industry.
21    Q.   That meeting, there was no
22 discussion specifically about any particular
23 promotion or marketing; is that right?
24    A.   There was. There was a parent
25 there who talked about doctors telling his

Page 369

1 child, and being a part of that conversation,
2 that these were safe and effective. And
3 certainly, that information funneled down from
4 the manufacturer through the doctor.
5     Q.   How does Summit County know that
6 that information funneled down from a source
7 other than the physician's own medical opinion?
8     A.   It was pervasive. I mean, I -- as
9 a prosecutor, I had had interactions with
10 individuals who had been robbed of their opioid
11 pills, who talked about, "This is my long-term
12 chronic pain maintenance." And there was an
13 overwhelming presence of the idea that the
14 manufacturers said this was okay, and this
15 inherent trust of our community in the medical
16 field, which includes the pharmaceutical field.
17    Q.   Do you know whether the
18 prescription opioids that are available for
19 prescription in the United States have
20 prescribing information that comes with them
21 that is FDA approved?
22    A.   Like the warnings that come --
23    Q.   Yes --
24    A.   -- in the -- I'm sure that they do.
25    Q.   Have you ever read those?

93 (Pages 366 - 369)

1    A.   I'm sure I've read the ones that I
2 was prescribed.
3    Q.   Do you know whether the information
4 that is provided with prescription opioids in
5 the United States includes a warning regarding
6 addiction?
7    A.   I believe that it does.
8        MS. KEARSE:  And, Counsel, I think
9 we established there's a specific 30(b)
10 specific to the FDA, which we responded to in
11 writing, and I'd say it's outside the scope of
12 Ms. Johnson's testimony.
13    Q.   Is it your --
14        MR. SCHUTTE:  Hold on.  I don't
15 know if we're going to do anything about this,
16 but the people on the phone, they've -- the
17 realtime feed has dropped again.
18        MS. FEINSTEIN:  Oh, it has.  Okay.
19 Do we need to go off the record to fix that?
20        THE VIDEOGRAPHER:  Off the record
21 at 6:30.
22        (A recess was taken.)
23        THE VIDEOGRAPHER:  On the record at
24 6:40.
25 BY MS. FEINSTEIN:

1    Q.   Thank you.  We had a few technical
2 issues, but hopefully we're -- we're back on
3 track.
4        MS. FEINSTEIN:  If you could please
5 read the last question, because I've lost track
6 of where we were.
7        (Record read.)
8        MS. FEINSTEIN:  Thank you.  And
9 there was an objection.  The witness answered.
10 I just wanted to confirm where we were.
11        MS. KEARSE:  Okay.  All right.
12 There was no pending -- there wasn't a pending
13 question.
14        MS. FEINSTEIN:  Right, there was no
15 pending question.
16        MS. KEARSE:  Right, right.
17        MS. FEINSTEIN:  I mean, we lost
18 our --
19        MS. KEARSE:  Okay.
20        MS. FEINSTEIN:  -- our connection.
21    Q.   Other than that anecdotal
22 information that you reported from the task
23 force meeting, was there any specific
24 discussion about pharmaceutical marketing at
25 the Opioid Task -- the Summit County Opioid

1 Task Force meeting in the 2014-2015 time frame
2 that addressed pharmaceutical marketing?
3    A.   Other than the discussions we've
4 talked about at those meetings?
5    Q.   You've discussed a parent reporting
6 a conversation with a physician.
7    A.   Uh-huh.
8    Q.   Was there anything specific
9 discussed about pharmaceutical marketing within
10 the context of that discussion?
11    A.   I don't recall anything beyond the
12 slides and the parent and hearing those words
13 for the first time.
14    Q.   Whose slides -- what slide deck are
15 you referring to?
16    A.   I believe it was used as an exhibit
17 in Prosecutor Wilms' deposition.  There were
18 some statistics put up about how many pills per
19 quarter were being put into Summit County, and
20 I remember being struck by the number and then
21 having the conversation with prosecutor Wilms,
22 who reminded me to multiply it by 4.
23    Q.   Was -- it was -- strike that.
24        Who was presenting the slide deck?
25    A.   It was Jerry Craig from the ADM.  I

1 can't recall if anybody was doing it in
2 conjunction, but the slides were from ADM.  I
3 remember Jerry being at the front of the room.
4    Q.   You testified earlier about numbers
5 of pills being available in 2010.
6    A.   Uh-huh.
7    Q.   In that time frame, right?
8    A.   Uh-huh.
9    Q.   Is that a yes?
10    A.   Yes.  I'm sorry, yes.
11    Q.   Thanks.  And you also testified
12 about the number of pills that Summit County
13 was aware of in 2012, right?
14    A.   Correct.
15    Q.   Does Summit County have any data
16 regarding the availability of prescription
17 opioids in Summit County prior to 2010?
18    A.   I believe so.  I believe that was
19 included in -- in some of the graphs that I
20 reviewed.  I remember thinking that it had
21 peaked in 2010 and then reviewing another
22 document that I remember seeing the numbers
23 were even higher in 2012.
24    Q.   What was the subject matter of
25 Mr. Craig's presentation, if you recall?

Page 374

1    A.    It was really sort of telling the
2  community, you want to know where these
3  problems are coming from, look at these
4  statistics to help us understand what's
5  happening here in our community.
6    Q.    Aside from pharmaceutical
7  marketing, what factors does Summit County
8  contended affected prescribing of prescription
9  opioids in Summit County?
10    MS. KEARSE:  Object to form.
11    A.    There weren't any.  I mean, the
12  prescribing came from the ind- -- the
13  prescribing practices were really informed by
14  the industry.
15    Q.    Earlier, you testified about the
16  pain as the fifth vital sign.
17    A.    Uh-huh, yes.
18    Q.    What did you mean by that?
19    A.    Well it -- prior to that, there
20  were only four.  And it's my understanding that
21  when pain became the fifth vital sign, it
22  became a real driver in patient satisfaction,
23  and that many of the manufacturers participated
24  in patient satisfaction surveys, and that some
25  of the questions involved in these patient

Page 375

1  satisfaction surveys are related to, did this
2  medication treat your pain?  Are you better now
3  than you were then?
4    Q.    Is it your understanding that the
5  manufacturers were behind pain as a fifth vital
6  sign?
7    A.    I -- I don't know specifically that
8  I've read that, but everything that I've read
9  leads me to believe that the pharmaceutical
10  industry participated in the process of this
11  sort of shift in thinking about pain as the
12  fifth vital sign.
13    Q.    What have you read that led you to
14  believe that the pharmaceutical manufacturers
15  were behind the -- the shift to pain as a fifth
16  vital sign?
17    A.    As I said, I can't point to
18  anything specific other than the opinions I've
19  formed as a result of my time in this community
20  and preparing specifically for this deposition.
21    Q.    And you just said, though, that
22  based on things that you read.  So I want to
23  know what things did you read that led you to
24  that conclusion?
25    A.    It's hard not to.  This has become

Page 376

1  such -- I wasn't a conspiracy theorist before I
2  started to understand the money that drives
3  this industry.  And when I look at the human
4  capital that has been lost in my community as a
5  result of the improper actions of the
6  Defendants in this case, I can't point you to
7  an article other than I believe that they
8  participated in it.
9    I -- they've participated in so
10  many other changes in the medical field that I
11  think it would be naive of me to think that
12  they did not.  I feel very naive that I was not
13  more focused on them before 2014-2015.
14    Q.    So it's -- it's just your belief
15  that there's a connection; you didn't actually
16  read something that led you to have that
17  connection?
18    MS. KEARSE:  Object to form.
19    A.    On behalf of Summit County, I
20  believe that to be true, yes.
21    Q.    But you can't think of anything
22  specific that you read that connects the
23  pharmaceutical industry with pain as the fifth
24  vital sign?
25    A.    No.

Page 377

1    Q.    Have you ever heard of the Joint
2  Commission on Accreditation of Health
3  Organizations?
4    A.    I don't believe I have.
5    Q.    Did you ever hear -- strike that.
6    Do you recall reading in
7  Dr. Smith's deposition about the Joint
8  Commission prescribing guidelines?
9    A.    I -- I'd have to -- you'd have to
10  show it to me in his transcript.  I don't
11  recall that specifically.
12    Q.    Do you ever remember any
13  presentation done by the Summit County Opioid
14  Task Force that identified the Joint Commission
15  prescribing guidelines as a contributing factor
16  to the opioid epidemic?
17    A.    I -- I don't recall that part
18  specifically.  No, I do not.
19    Q.    Did you ever read the governor's
20  report that we referenced earlier -- or that
21  you referenced earlier in your testimony, from
22  2010?
23    A.    I didn't read it page for page.  I
24  definitely looked at it and looked at some of
25  the findings and recommendations and sort of

95 (Pages 374 - 377)

Page 378

1 focused on who was on it and what roles they
2 played.
3     Q.   And I believe you testified
4 earlier, and please correct me if I am
5 misremembering, and I don't have the live feed
6 to double check it.  But I believe you
7 testified that because there was a shift in the
8 administration, that the report really was kind
9 of obsolete?
10     A.   Yes.
11         - - - - -
12         (Thereupon, Deposition Exhibit 18,
13         10/1/2010 Document Titled "Ohio
14         Prescription Drug Abuse Task Force:
15         Final Report Task Force
16         Recommendations, was marked for
17         purposes of identification.)
18         - - - - -
19     Q.   I'm going to hand you what we've
20 marked as Exhibit 18 for identification
21 purposes.  Do you recognize Exhibit 18 to be
22 the report, the 2010 report from the Ohio
23 Prescription Drug Abuse Task Force?
24     A.   Yes.
25     Q.   Is this the report you were

Page 379

1 referring to earlier in your testimony?
2     A.   I think so.  It looks a little
3 different.  I don't -- I think this was the
4 front page that I had, this sort of yellow.
5     Q.   Okay.  So the second page of
6 Exhibit 18, at least the copy that we've
7 marked, you recognize that?
8     A.   Yes, I do.
9         MS. KEARSE:  And, Counsel, I just
10 want to make sure, I mean, this was all in
11 preparation for testimony, so any discussions
12 that we have had, that would be privileged.
13     Q.   Before preparing for your
14 deposition, had you seen this document before?
15     A.   No.
16     Q.   Was this document discussed at any
17 of the opiate task -- the Summit County Opioid
18 Task Force meetings that you attended?
19     A.   I don't recall.
20     Q.   Directing your attention, please,
21 to page 21 of Exhibit 18.  Are you there?
22     A.   I am.
23     Q.   Page 21 of Exhibit 18 has some text
24 in the middle of the page, and the bottom part
25 of the page is a graphic that has a circle or

Page 380

1 oval, I guess, in the middle, and it says,
2 "Epidemic," and then the graphic includes six
3 boxes with arrows pointing in toward the oval
4 that says "Epidemic," right?
5     A.   Yes.
6     Q.   Above that, the narrative, the
7 title of the narrative section is, "How did
8 this become an epidemic?"
9         Do you see that?
10     A.   I do.
11     Q.   Had you read this information
12 before today?
13     A.   I've looked at this in preparation
14 for the deposition.
15     Q.   Is it your understanding -- or
16 strike that.
17         Earlier you said because of the --
18 the change in the administration, folks didn't
19 really give much weight to this report because
20 the administration changed hands; is that
21 right?
22     A.   I wouldn't say folks didn't give it
23 much weight.  I -- I don't think it reached a
24 broad audience.  You know, I sort of prided
25 myself on being a very informed prosecutor, and

Page 381

1 we were led by a prosecutor who was very
2 connected to -- to the state capitol.  And so
3 these were typically things -- I was surprised
4 that I had not seen it, because of her
5 connection.
6         But then when I looked at sort of
7 the timing of when it was released and the, you
8 know, change of guard, it did not surprise me
9 that it had not reached a broader audience.
10     Q.   And do you know for a fact that it
11 did not reach a broader audience just because
12 you personally did not know of it?
13     A.   Well, as I stated before, I asked
14 multiple people in preparation for this if they
15 had ever seen it, and they had not.
16     Q.   Who did you ask who said that they
17 had never seen it?
18     A.   Patrick Leonard, Gertrude Wilms,
19 and I believe Brad Gessner testified that he
20 had never seen it.
21     Q.   Did you talk with any clinicians
22 like Dr. Smith or any of the other clinicians
23 that -- that you've spoken to, about this?
24     A.   No.  As I previously stated, I read
25 Dr. Smith's testimony, but I did not have a

96 (Pages 378 - 381)

Page 382

1  discussion with him.
2      Q.   Is it your understanding that -- or
3  strike that.
4          This document that is dated October
5  1, 2010, do you understand this to be publicly
6  available?
7      MS. KEARSE:  Object to form.
8      A.   Well, it -- it's a public record.
9  You'd have to know what you were looking for or
10  asking for to get it.  I don't know how it was
11  disseminated or to whom it was sent, but it --
12  it's absolutely a public record.
13     Q.   This public record from 2010
14  includes a discussion of how prescription
15  opioids became an epidemic, right?
16     A.   I see that, uh-huh.
17     Q.   And it includes a discussion of a
18  number of factors, right?
19     A.   Yes.
20     Q.   Among those factors, they're listed
21  in the graphic, and then also there's a
22  narrative that follows in Exhibit 18 about most
23  of those factors.
24         Among those factors is "changes in
25  clinical pain management."  Do you see that?

Page 383

1      A.   I do.
2      Q.   Do you have any understanding of --
3  of what that factor in the contributions to the
4  opioid epidemic is?
5      A.   I'm sorry.  Could you rephrase
6  that?
7      Q.   Sure, sure.  Do you have any
8  understanding of what is meant by changes in
9  clinical pain management in this graphic
10  depicting contributing factors to the opioid
11  epidemic?
12     A.   I -- if you're asking if changes in
13  pain management are the cause of this problem,
14  I -- I would tend to disagree that they are the
15  cause.  They may have exacerbated the problem,
16  but they are not necessarily the root cause.
17     Q.   No, my question was, do you
18  understand that to be one of the contributing
19  factors?  I'm not asking for a determination --
20     A.   I understand but that that's what
21  this report says.
22     Q.   Do you disagree that changes in
23  clinical pain management are a contributing
24  factor to the opioid epidemic?
25     A.   I don't want to use the term

Page 384

1  "contributing factor," because that has weight.
2  It has value.
3          The cause of this epidemic in
4  Summit County is the opioid industry.  The
5  changes in clinical pain management, the
6  aggressive marketing, those -- these other
7  things, those all exacerbate this problem of
8  the readily available supply in my community.
9          So I -- you know, I didn't write
10  this.  I -- I don't like -- I won't use the
11  term "contributing factor."
12     Q.   What are the contributing factors
13  to the cause of the opioid epidemic?
14     A.   I -- I don't subscribe anything to
15  a contributing factor.  There is one cause, and
16  there are things, other elements that have
17  spread this fire, but the match was lit by the
18  industry.
19     Q.   On what do you -- strike that.
20         First, what is the one cause?  What
21  do you mean by the opioid industry?  What does
22  that include?
23     A.   The manufacturers, distributors,
24  and pharmacies who dispensed these pills into
25  the community.

Page 385

1      Q.   And it's your testimony, on behalf
2  of Summit County, on the topic of contributing
3  factors to the opioid epidemic, that there are
4  no other contributing factors; is that right?
5      A.   No, there are no other -- that is
6  the factor.  That is the cause.
7          These other things that are in
8  these, you know, fancy colored boxes or -- or
9  things outside of the industry certainly spread
10  that fire, but, again, that match was lit with
11  one -- with one entity, and that's the
12  industry.
13     Q.   I think you've testified that you
14  are not familiar with the Joint Commission on
15  the Accreditation of Health Care Organizations,
16  right?
17     A.   I -- I don't believe so.  I -- if
18  you had a document I could look at, but I don't
19  believe so.
20         - - - - -
21         (Thereupon, Deposition Exhibit 19,
22         Document Titled "Joint Commission on
23         Accreditation of Healthcare
24         Organizations Pain Standards for
25         2001," PPLPC019001392359 to

97 (Pages 382 - 385)

Page 386

1    019001392374, was marked for
2    purposes of identification.)
3        - - - - -
4    Q.   Hand you what we've marked as --
5    A.   Okay.
6    Q.   -- Exhibit 19 for identification
7    purposes.
8        Have you ever seen that document
9    before?
10   A.   I do not recognize this one.
11   Q.   This is publicly available
12   information dated from 2001 on the Joint
13   Commission on Accreditation of Health Care
14   Organization Pain Standards for 2001.
15       Do you see that at the top of the
16   page?
17   A.   I do.
18   Q.   And you don't have any
19   understanding of the Joint Commission's
20   relationship with health care entities?
21   A.   I do not.
22   Q.   And you don't recall any testimony
23   in Dr. Smith's deposition regarding the Joint
24   Commission guidelines?
25   A.   Not specifically, I don't.

Page 387

1    Q.   I'd like to direct your attention
2    to the second page of Exhibit 19.  Near the top
3    of the page, you'll see three bullets, and
4    immediately underneath that, it says,
5    "Effective pain management is appropriate for
6    all patients, not just for dying patients," and
7    then paren "See standards RI.1.2.8."
8    A.   I see that.
9    Q.   Do you see that?
10   A.   I do.
11   Q.   Have you ever heard of any medical
12   accrediting agency indicating that pain
13   management is appropriate for all patients?
14   A.   I've not heard that, and I
15   certainly wouldn't contend that pain management
16   isn't appropriate for people who are in pain.
17   Q.   Continuing on in this document,
18   near the back, you will see examples of --
19   strike that.
20       Let me try to find a page number
21   for you.  At the bottom, there is a page number
22   RI-14.  The bottom left.
23   A.   Okay.
24   Q.   In the middle of the page, there is
25   a -- a section that's titled, "Examples Of

Page 388

1    Implementation for RI-1" -- or "RI.1.2.8."
2        Do you see that?
3    A.   I see that, yes.
4    Q.   The first entry underneath that is
5    number one, and it reads, "Pain is considered a
6    fifth vital sign in the hospital's care of
7    patients."
8        Did I read that correctly?
9    A.   Yes.
10   Q.   Do you know whether the
11   pharmaceutical industry has any relationship to
12   the Joint Commission?
13   A.   I -- I don't know.  I'm not
14   familiar with the Joint Commission, as I -- as
15   I stated.
16   Q.   And do you know whether the Joint
17   Commission made a recommendation, in 2001, to
18   health care providers to consider pain in
19   evaluating patients?
20   A.   Did the -- I'm sorry.  Could you
21   say that one more time.
22   Q.   Reading this document --
23       MS. FLOWERS:  I'm sorry.  What page
24   is it?
25       MS. FEINSTEIN:  It is RI-14.

Page 389

1        THE WITNESS:  It's in that corner.
2        MS. FEINSTEIN:  Yeah, sorry.
3    There -- there's also a Bates number that is
4    Bates ending 2370.
5        MS. FLOWERS:  Thank you.
6        MS. FEINSTEIN:  You're welcome.
7    Q.   Before reading this today, had you
8    ever heard of the Joint Commission issuing a
9    recommendation that pain be considered a fifth
10   vital sign?
11   A.   No.  I -- again, to -- to be
12   honest, I don't know that I've -- if I've heard
13   the term or read the term "Joint Commission on
14   Accreditation of Health Care Organizations,"
15   it's not something that is common or familiar
16   to me.
17   Q.   Do you know whether the prescribing
18   guidelines provided by the Joint Commission to
19   health care facilities had any impact on
20   prescribing practices of physicians?
21   A.   I don't know.
22   Q.   The other factors that are
23   identified in Exhibit 18 on page 21 that we
24   were looking at, that graphic, have you ever
25   seen a similar graphic to this that's been

98 (Pages 386 - 389)

Page 390

1 presented by the Opioid Task Force?
2     A.   I have.
3     Q.   Did you discount all of those other
4 factors as contributing to the opioid epidemic?
5     A.   I don't discount them as playing a
6 role in exacerbating the epidemic that we had
7 in Summit County.  I don't use the term
8 "contributing cause," because I understand the
9 weight that that carries.
10     Q.   You understand, as -- as a former
11 prosecutor, that it's important to have
12 evidence to support claims, right?
13     A.   Yes.
14     Q.   What evidence, specific evidence
15 regarding the marketing of pharmaceuticals does
16 Summit County have that -- that the marketing
17 of pharmaceuticals caused the opioid epidemic.
18 What evidence do you point to?
19         MS. KEARSE:  Object to form.
20     A.   I guess -- I'm sorry.  I -- what
21 evidence do I point to that suggests that the
22 marketing of opioids caused the harm?
23     Q.   Yes.
24     A.   Is that a question?  Okay.
25         Throughout the discovery process

Page 391

1 I've learned that the -- some of the marketing
2 materials were inaccurate, and --
3     Q.   And how did that cause the harm?
4     A.   -- misleading.
5         Doctors relied on those materials,
6 and patients relied on their doctors.  And as a
7 person who trusts doctors and trusts
8 physicians, in a community like that, where --
9 where there is that inherent trust, that --
10 that created this epidemic in -- in people that
11 would not have come into contact with opioids
12 but for taking them at the direction of their
13 doctor, who was operating under inaccurate
14 information directly from the marketing
15 materials.
16         There are doctors who certainly,
17 had they known the real outcomes that this
18 false narrative that these were not going to
19 become habit forming and these were not going
20 to become harmful, would have suggested other
21 ways to treat the pain.
22     Q.   Is it your testimony that
23 physicians were not aware that opioids had a
24 risk of addiction?
25     A.   I think physicians learn, and --

Page 392

1 and the testimony I remember reading from the
2 physicians who have testified, they've all
3 learned about the addictive nature of opioids.
4 But these were being marketed in a different
5 way, that they were slow release, that they
6 were non-habit forming, that two 12-hour pills
7 a day could be long-term relief for pain.  And
8 that people wouldn't build up a tolerance, that
9 the pain would somehow offset this addiction,
10 which just simply wasn't true.
11         People were no longer taking them
12 for pain.  They were taking them so that they
13 would not become sick.
14     Q.   Is it -- does Summit County
15 acknowledge that the opioid crisis is complex?
16         MS. KEARSE:  Object to form.
17     A.   It could be characterized as
18 complex.  It could absolutely be characterized
19 as quite simple:  that the marketplace for
20 these pills was created by an industry that
21 preyed upon people who didn't know any better.
22     Q.   Is it your testimony, on behalf of
23 Summit County, that there are no other
24 contributing factors to the opioid crisis?
25     A.   I am not going to use the word

Page 393

1 "contributing factors."  There are other issues
2 in our community that have added gasoline to
3 the fire, that have exacerbated the problem.
4     Q.   What are some of those factors?
5     A.   Most of them occur after the point
6 that addiction has already taken hold.
7     Q.   I'm not asking when.  I'm asking
8 what are those contributing factors?
9     A.   But it's important to note the
10 timing of them, because, again, not a
11 contributing factor, but when you have people
12 who go to their doctor and have had an accident
13 at work or have had an injury at work, and they
14 want to go back to work, they are in a job that
15 if they don't work, they don't get paid.  They
16 don't have paid time off, or they have had a
17 fight with BWC that they're not going to win.
18 And they have to put food on the table.  So
19 they do whatever they need to do to feel a
20 certain way so that they can go to work.
21         So economic driver certainly is a
22 part of that.  But, again, they aren't getting
23 those pills unless there's a doctor who's
24 relying on the manufacturer's information
25 prescribing those.

99 (Pages 390 - 393)

Page 394

1    Q.    Do illicit opioids play any role in
2 the opioid crisis?
3    A.    Illicit meaning through diversion?
4    Q.    Illicit meaning through diversion,
5 illicit opiates, do those play any role in the
6 opioid crisis?
7    A.    I mean, diversion certainly plays a
8 role, no question.  And illicit, if you mean
9 what we would call street drugs, heroin and
10 fentanyl, certainly.
11    But, again, people aren't using
12 heroin out of the gate.  This influx of 40
13 million pills per year created an avenue that
14 heroin was able to drive right through, because
15 people couldn't get the pills.  And we weren't
16 identifying those folks, because they were
17 still going to work.  They were still trying to
18 maintain a regular lifestyle.  And when those
19 pills were no longer available, the cheaper and
20 easier way to not get pill sick was to buy
21 heroin.
22    Q.    And it's your testimony that Summit
23 County could not make any connection between
24 the alleged role of the opioid industry, as
25 you've described it, which includes

Page 395

1 manufacturers, distributors, and pharmacies,
2 until 2014, despite the fact that you've
3 testified that Summit County had information
4 about a heightened risk of fentanyl in the
5 2000s, that the number of opioid pills
6 available was known to be rather high in 2010
7 and in 2012, and the governor's report that
8 identified -- the governor's opioid task force
9 report that identified pharmaceutical
10 marketing, among other potential factors,
11 contributing to an opioid epidemic that was
12 identified in 2010?  It's your testimony that
13 with all that information, Summit County was
14 not aware of any connection between the opioid
15 industry and the opioid problem until 2014; is
16 that right?
17    MS. KEARSE:  Object -- object to
18 form.  Mischaracterizes Ms. Johnson's
19 testimony.
20    A.    Victim blaming, however carefully
21 crafted or explained, is repugnant to me, and
22 when we identified the root of the crisis in
23 our community, we took action, and we took
24 action in the form of a lawsuit.
25    We did not reach out to the FDA.

Page 396

1 We did not do those things that you asked
2 about.  We went, as a community, inward and did
3 everything we could to save people's lives.
4    So I reject the notion that we were
5 sitting around waiting for this to get bad.
6 Everyone in their lane was doing everything
7 they could to address the issue.  And when we,
8 the collective we, came to this conclusion, we
9 acted.
10    Q.    So it's your testimony that prior
11 to that epiphany at the Opioid Task Force
12 meeting in 2014-2015, Summit County had no
13 information available to it to make a
14 connection between its view that the opioid
15 industry created this opioid issue?
16    MS. KEARSE:  Objection to form, and
17 misstates her testimony.
18    A.    I stated before, there were red
19 flags.  There were upticks in cases.  There
20 were new people seeking treatment.  There was
21 an increased request for treatment.  But it was
22 not until these times when the collective
23 community came together that we identified the
24 root of all of these problems people were
25 facing in their lanes.

Page 397

1    MS. FEINSTEIN:  All right.  Why
2 don't we take a short break here, and I'll flip
3 through my notes, and I think I'm almost done.
4    THE VIDEOGRAPHER:  Off the record
5 at 7:10.
6    (A recess was taken.)
7    THE VIDEOGRAPHER:  On the record,
8 7:35.
9 BY MS. FEINSTEIN:
10    Q.    Thank you.  Ms. Johnson, I just
11 have a few more questions for you, and then I'm
12 going to pass the mic to one of my colleagues.
13    I was asking you some questions
14 that related to Deposition Topics No. 9 and
15 No. 34 as modified by Special Master Cohen, as
16 listed in what we've marked as Exhibit 1.  Both
17 of those topics request information from Summit
18 County as a non-expert related to the topics.
19    Do you see that?
20    A.    I do.
21    Q.    And was the testimony that you were
22 providing to me during the questions that I
23 asked you earlier today, in your capacity as a
24 corporate designee for Summit County as
25 non-expert on those items?

100 (Pages 394 - 397)

Page 398

1    A.   Yes, I've not been qualified as an
2 expert in these fields.
3        MS. FEINSTEIN: Thank you for your
4 time. I have nothing further.
5        THE WITNESS: Okay. Thank you.
6        EXAMINATION OF GRETA JOHNSON
7 BY MR SCHUTTE:
8    Q.   Well, I have to say good evening --
9    A.   Good evening.
10    Q.   -- Ms. Johnson. My name is Scott
11 Schutte. I represented Rite Aid, and I have
12 some questions to ask you now on behalf of my
13 client.
14        First of all, let me start with
15 something that you testified about early in the
16 day, which was that you said you were
17 personally affected by the opioid crisis
18 because you lost a friend to overdose?
19    A.   Yes.
20    Q.   What was his name?
21    A.   Alan.
22    Q.   What was his last name?
23    A.   Eller.
24    Q.   How do you spell that?
25    A.   E-l-l-e-r.

Page 399

1    Q.   And you said that you knew him
2 from -- from college and knew him well?
3    A.   I knew him well in college, yes.
4    Q.   And at the time of his passing, you
5 had not had contact with him in recent times?
6    A.   Correct.
7    Q.   And the information you testified
8 to about his -- the fact that he had been using
9 prescription opioids while in college and had
10 become eventually a heroin user was information
11 that you heard from other folks that you knew
12 at college?
13    A.   Yes.
14    Q.   Where -- where did he live when he
15 passed, if you know?
16    A.   It was not in Summit County.
17    Q.   Okay. How much time did you
18 prepare -- spend preparing for your deposition
19 today?
20        MS. KEARSE: Objection. Asked and
21 answered.
22    A.   As I looked at what I had done to
23 prepare, it's somewhere between 30 and 35 hours
24 that I've spent with the attorneys on the case.
25 And then I would estimate specifically

Page 400

1 preparing, so intentionally preparing, in
2 addition to my work in this community, I -- 60
3 to 70 hours, probably, between reading the
4 transcripts and -- and reviewing the documents
5 that -- and that's a low estimate, I would
6 guess, but, yeah, I don't...
7    Q.   Okay. One of the transcripts you
8 said you reviewed in preparation for the
9 deposition today was Julie Barnes?
10    A.   Yes, I did.
11    Q.   And can you tell us what Julie
12 Barnes' title is?
13    A.   She's the director of the
14 Children's Services Bureau in Summit County.
15    Q.   Okay. Do you recall her testimony,
16 Ms. Johnson, that between 25 percent and 33
17 percent of the people that she comes into
18 contact through, through her work are addicted
19 to some drug or other?
20        MS. KEARSE: Object to form.
21    A.   I recall -- I recall 30 percent is
22 what sticks in my mind. I recall that there --
23 that addiction rates were -- were at around 30
24 percent in some way, shape, or form.
25    Q.   But did you understand her

Page 401

1 testimony to be that there is a certain segment
2 of the population with which she interacts that
3 was going to be addicted to some drug at any
4 given time, and it moved depending on available
5 and perception of safety between
6 methamphetamines, cocaine, heroin, alcohol,
7 marijuana?
8        MS. KEARSE: I'm going -- I'm going
9 to object to the form, and if you want show her
10 the testimony, you're free to show her the
11 testimony.
12    A.   I -- the first part of your
13 question was does she come into contact with
14 folks who are abusing and -- and are those the
15 drugs?
16    Q.   Let me start over.
17        Do you recall the portion of her
18 testimony where she testified that -- that the
19 population she's in contact with, she estimated
20 that any given time, 25 percent to 33 percent
21 are addicted to some drug or another,
22 irrespective of what drug is -- let me -- let
23 me strike that and start over.
24        She testified that 25 to 33 percent
25 of the people she comes into contact with are

101 (Pages 398 - 401)

Page 402

1 addicts of one drug or another, and the type of
2 drug rotates among things like marijuana,
3 alcohol, meth, cocaine and opioids; do you
4 recall that?
5        MS. KEARSE:  I'm going to object to
6 the form of the question, and direct, if you
7 want to show her testimony, you're free to do
8 that.
9    A.    I -- I --
10        MS. KEARSE:  Mischaracterizes it.
11    A.    Yeah, I don't recall in -- I guess
12 in my mind I recall there being 30 percent
13 being a percentage that I felt like was
14 attributable to the increase in placement due
15 to opioids.  I'd ask to see that.  I can
16 certainly comment on it.  If you have it, I'd
17 be glad to look at it.
18    Q.    Do you believe that Julie Barnes
19 has expertise in -- in dealing with a
20 population that is addicted to opioids?
21        MS. KEARSE:  Object to form.
22    A.    She's an expert in Children's
23 Services, and as a result of the opioid crisis
24 has had to educate herself and her staff on
25 interacting with people who are addicted and

Page 403

1 the cadre of issues that come along with that.
2        I don't think Julie Barnes set out
3 to be an opioid addiction expert.  She -- as
4 the director of Children's Services, she's been
5 forced into a role of having to become far more
6 knowledgeable than she originally was.
7    Q.    You testified, just before the last
8 break -- and I didn't have a live feed so I
9 hope I have this correct -- that, quote,
10 "People are not using heroin out of the gate,"
11 close quote.
12        Is that correct?
13    A.    That's correct.
14    Q.    Is it -- so it is your testimony,
15 as a corporate representative for Summit
16 County, that not a single person in Summit
17 County becomes addicted to heroin without first
18 using a prescription opioid?
19    A.    No, not without first using a
20 prescription opioid.  Certainly there are, I'm
21 sure, some addicts who transitioned from other
22 drugs.  But by and large, the heroin epidemic
23 that came sort of as the -- the tail of the
24 fireball of the opioid epidemic, the numbers
25 consistently show that 80 percent of those

Page 404

1 individuals start with opioids.
2    Q.    I'll come back to that in a second,
3 but I want to stick with your testimony that
4 people are not using heroin out the gate.
5    A.    Yeah, addiction is a progressive
6 disease, and there's still a real -- even
7 addicts, there is a level that people feel like
8 once you put a needle in your arm, everything
9 changes, so that -- that's still a pervasive
10 thought in the community, even in the addiction
11 community and the population affected by
12 addiction.
13        So with addiction being such a
14 progressive illness, it would be incredibly
15 uncommon -- and this is something that I talked
16 with Donna Abbot about -- or, I'm sorry, Donna
17 Skoda about -- about the ways in which people
18 transition through different drugs.
19    Q.    Okay.  Let me -- let me try this
20 again.  My question is not about people
21 transitioning through drugs.  My question is
22 about your testimony that people are not using
23 heroin out of the gate.
24        And what I'm trying to understand
25 and trying to have you testify to the ladies

Page 405

1 and gentlemen of the jury about is whether
2 there's a single person in Summit County since,
3 let's say, 2006, who started using drugs by
4 using heroin and had not used a prescription
5 opioid before that?
6    A.    I don't know the answer to that.
7    Q.    There could be -- there could be
8 one person, certainly, right?
9    A.    Perhaps.
10    Q.    There could be thousands of those
11 people?
12        MS. KEARSE:  Object to form.
13    A.    I wouldn't agree to that.
14    Q.    How do you know?
15    A.    Because I've been in this community
16 for the last 20 years and I've been at the
17 Opiate Task Force meetings where we have people
18 come in who are not only in active recovery,
19 but who provide the treatment.  And
20 overwhelmingly -- 80 percent to me seems low,
21 because overwhelmingly these folks started with
22 prescription pain pills.
23        The 20 percent that gets us to the
24 hundred, those are just unknowns or unreported,
25 people who either didn't want to tell or

102 (Pages 402 - 405)

Page 406

1 perhaps they did start with something else.
2 But at least 80 percent started with opioid
3 pain pills.
4     Q.   Okay.  So we can agree, can't we,
5 that possibly as many as 20 percent of folks
6 who are using heroin started with heroin and
7 did not start with prescription opioids?
8         MS. KEARSE:  Object to form.
9 Misstates her char- -- her testimony.
10     A.   We could agree to that, but we
11 could also get to 100 percent, because I
12 believe that 20 percent to be unknown.
13     Q.   We can't get to 100 percent,
14 because you already told me you'll agree that
15 not every -- there's at least one person who
16 started with heroin, not prescription opioids?
17     A.   I said there could be, not that
18 there was.  I'm not aware of anyone who I've
19 come into contact with who started with heroin.
20     Q.   Okay.  But I'm not asking about
21 your personal knowledge, ma'am.  I'm talking
22 about you as a corporate representative of
23 Summit County, okay?
24     A.   Yes.  And when I discussed this
25 with the public health director, she agreed

Page 407

1 that this is not an illness where people use
2 heroin, using my terms, out of the gate.  That
3 this is something that progresses to people
4 finding themselves so desperate to not become
5 ill, that they will -- they will find heroin on
6 the street.
7     Q.   And the public health director is
8 Donna Skoda?
9     A.   Yes.
10     Q.   Do you believe she's good at her
11 job?
12     A.   I do.
13     Q.   Do you believe she's knowledgeable?
14     A.   I do.
15     Q.   Do you believe she has expertise?
16     A.   I do.
17     Q.   This 80 percent number, as I
18 understood your testimony, it comes from a
19 study that you reviewed?
20     A.   Yes, from the American Medical
21 Journal, I believe was what it was from.
22     Q.   All right.  When was it published?
23     A.   2013, and then, as I previously
24 stated as well, that number is discussed by the
25 public health officials in Summit County, by

Page 408

1 the law enforcement officials, by the ADM Board
2 officials.  That is general knowledge in Summit
3 County that 80 percent of these folks are
4 starting with opioid pills.
5     Q.   You were a prosecutor for how many
6 years?
7     A.   Approximately 10.  Just over 10.
8     Q.   You tried cases in front of juries?
9     A.   I did.
10     Q.   You understand that -- I -- well,
11 let's strike that.
12         I assume that when you were a
13 prosecutor, if the defense was tendering an
14 argument that it's generally understood in the
15 community I didn't commit a crime, that that
16 probably wouldn't be evidence that you would
17 allow in without objection, correct?
18         MS. KEARSE:  Object to form.
19     A.   I would also say that there were
20 plenty of times that evidence was "Everybody in
21 the neighborhood knew," and we relied on that
22 all the time.
23     Q.   Could you give me an example?
24     A.   Sure.  "Everybody in the
25 neighborhood knew that the after-party was at

Page 409

1 490 Allen Street."  "Everybody knew that even
2 though the bar was supposed to close at
3 a.m., it stayed open until 4:00."
4     Q.   But you -- you'd establish that
5 through testimony?
6     A.   Correct.
7     Q.   People who -- people who actually
8 testified and had firsthand knowledge that the
9 bar was open after 2:00?
10     A.   Sure.
11     Q.   Or people who testified, based on
12 personal knowledge, that -- what was the thing?
13 490?  What was the reference?
14     A.   That -- that an after-party was
15 always at this particular house.
16     Q.   Okay.  For the ladies and gentlemen
17 of the jury, I understand now that you pointed
18 to an article that you said was published in
19 2013 --
20     A.   I believe.
21     Q.   -- in the Amer- -- in the AMA
22 Journal, and I understand we can -- we can dig
23 that up and look at that.
24         But with respect to all those other
25 folks that you said you heard this 80 percent

103 (Pages 406 - 409)

Page 410

1  number from, do any of them have personal
2  knowledge about the percentage of people who
3  started as a prescription opiate -- opioid user
4  and then became a heroin addict?
5      A.   Yes.  That information is presented
6  at the Opiate Task Force meetings and has been
7  presented at the Opiate Task Force meetings
8  from treatment providers, and also from law
9  enforcement officials who come into contact
10  with folks every day who, you know, are
11  arrested.
12         The -- the number of individuals
13  who go through our drug courts, I've heard our
14  drug court judges talk about the overwhelming
15  majority of individuals who are using heroin
16  started with opioids.
17         So I don't -- there are -- the data
18  dashboards are out there for the ADM and the
19  public health.  But I -- I have lived among
20  these people, and I have heard their, not sworn
21  testimony in front of a jury, but this is what
22  they do.  It is the lane in which they live
23  every day.  The drug court judges, the director
24  of ADM, the public health commissioner, these
25  are folks who do this work every day, and they

Page 411

1  all agree on this number as well.
2      Q.   They all say 80 percent?
3      A.   Yes.  Absolutely.
4      Q.   Do any of them say 75 percent?
5      A.   I've heard 85 percent.  I've heard
6  it higher.  But 80 percent is -- is where it
7  almost always lands, is that 80.
8      Q.   And that's anecdotal, though?
9         MS. KEARSE:  Object to form.
10      Q.   It's not based -- it's not based on
11  any kind of scientific study or any survey;
12  it's based on what these folks you claim have
13  heard out on the street or seen out on the
14  street?
15         MS. KEARSE:  Object to form.
16      A.   Well, it's not what I'm claiming.
17  It's what I've heard them say.  It's also my
18  own experiences, being the representative, of
19  what people say in these meetings, of what
20  these folks who are in the throes of addiction
21  are saying.  It's what the family members of
22  the people who are on the list that Dr. Kohler
23  provided, it's what their families say.
24         And we can get into, "Well, but you
25  weren't there and you didn't see them."

Page 412

1         You know, you've said I'm an
2  attorney.  Everybody's pointing out that I'm an
3  attorney.  I'm a mother.  And when a mother
4  looks at you and tells you what killed her
5  child, that has weight also.
6      Q.   Ma'am, can we -- we have limited
7  time, and I understand that you feel
8  passionately about this, but I'm not talking
9  about that.  I'm talking about this number,
10  this 8 out of 10 or 80 percent number that
11  you've talked about all day long.  Let me make
12  sure I understand it.
13         That's based on one study that
14  you've seen, and it's based on talking to folks
15  who estimate that in their experience, that
16  that's what they've seen, that 80 percent of
17  folks who are addicted to heroin started using
18  prescription opioids?
19         MS. KEARSE:  Object to form, and
20  argumentative.
21      A.   I stand by 80 percent.
22      Q.   Okay.  But my question is, do I
23  have the bases for that testimony correct?
24  It's one article plus folks you've talked to?
25         MS. KEARSE:  Object to form.  That

Page 413

1  misstates her char- --- her testimony.
2      A.   Folks I've talked to?  I know it's
3  late, and I'm trying not to be argumentative as
4  well.  But it's insulting to say "folks I've
5  talked to" like I'm just -- this is so
6  pervasive.  And -- and you can be irritated
7  that it's your time, but this is so pervasive
8  and it is so clear that opioids are the driving
9  factor in the crisis that we are in, that it's
10  not -- I'm not saying this off the cuff or
11  being flippant about what I have heard and what
12  I've experienced.
13         So you can characterize it as folks
14  I've talked to.  I will characterize it as the
15  work I've done in this community for the better
16  part of 15 years, my experience as a
17  prosecutor, as a legislator, and now as a
18  representative of the County, that I stand
19  beside the 80 percent.
20      Q.   Okay.  And, ma'am, I'm -- again,
21  I'm trying to get an answer to my question.
22  I'm not trying to irritate you.  You're using a
23  very specific number.  I want to make sure that
24  we understand -- we understand, going forward,
25  because I'm not going to get a chance to talk

104 (Pages 410 - 413)

Page 414

1 to you again before you perhaps testify in
2 front of a jury.
3        The question I'm asking, it's a yes
4 or no, which is -- are -- other than this one
5 study, the name of which you don't recall, and
6 people that you've talked about -- actually
7 three sources:  the study, the people that
8 you've talked to, and your own experience,
9 those are the bases of your testimony that 80
10 percent of heroin users started as prescription
11 opioid users?
12        MS. KEARSE:  All right.  Again, I'm
13 going to object to the repetitive questioning.
14 She's asked and answered this.  She's also
15 asked these questions earlier this morning
16 during her testimony as well.  Asked and
17 answered.
18    A.  The American Medical Association
19 Journal that I've talked about, I believe has
20 been produced as part of the discovery process,
21 or certainly presented to me.
22        The people I've talked to, as you
23 characterize it, are professionals in our
24 community who do have resources where they are
25 in-taking clients and asking clients how they

Page 415

1 became addicted.  So there is some basis for
2 the representations they're making.
3        So the people I've spoken to, my
4 personal experience with these folks, and the
5 article I've read, that is what has informed my
6 answer.
7    Q.  Okay.  Can I ask you to take a look
8 at Exhibit 1.  And specifically that last
9 Exhibit B, which is the modification of certain
10 topics by the Judge.
11    A.  Yes.
12    Q.  I want to ask you about Topic 34.
13 I know Ms. Feinstein has asked you some
14 questions about that.
15        You testified as a non-expert
16 that --
17        MR. SCHUTTE:  Excuse me?
18        MS. KEARSE:  Which -- what topic
19 are you talking about?
20        MR. SCHUTTE:  34.
21        MS. KEARSE:  34.
22    Q.  You testified, as a non-expert,
23 that the only cause of the opioid crisis in
24 Summit County was the marketing of
25 pharmaceuticals by, quote, "the pharma

Page 416

1 industry," close quote; is that right?
2    A.  No.  I believe I said the
3 marketing, the promotion, the distribution, and
4 the filling of those prescriptions.  That --
5 that the industry was the cause.  It wasn't
6 just marketing.
7    Q.  Okay.  You understand that I
8 represent Rite Aid, correct?  I've represented
9 that to you?
10    A.  You said that, yes.
11    Q.  Yes.  And you understand that Rite
12 Aid, Walmart, Walgreens, and CVS have all been
13 sued, and we refer to them among the group as
14 the Retail Pharmacy Defendants?
15    A.  Yes, I'm aware of that.
16    Q.  Okay.  What is your understanding
17 as to what the complaint alleges that the
18 Retail Pharmacy Defendants did wrong?
19    A.  They were an arm of the industry,
20 and when these increased orders were being
21 filled, these suspicious orders, there -- there
22 was a duty to investigate these and whether or
23 not they should have been filled, and that duty
24 was breached.
25    Q.  What suspicious orders are you

Page 417

1 referring to?
2    A.  The orders that have been
3 identified as being higher -- I don't know how
4 to really scientifically explain it or other
5 than the order that comes in is -- is higher at
6 a certain level than the last order from the
7 pharmacy, and that I don't know if it was the
8 special magistrate or the Judge that did the
9 little graph in the order about suspicious
10 order and was -- was it looked into or
11 investigated and -- and what should have
12 happened from then.
13        And it's my understanding that
14 those -- those things were not occurring, and
15 that's why the retail pharmacy chains were
16 include in the Defendants.
17    Q.  What is the basis of your
18 understanding?
19    A.  I'm sorry.  I don't understand what
20 you're asking.
21    Q.  You just testified that it was your
22 understanding that the Retail Pharmacy
23 Defendants were not properly reviewing the size
24 of shipments.  And I'm paraphrasing.
25    A.  Yes.

105 (Pages 414 - 417)

Page 418

1     Q.    What's the basis of that
2  understanding?
3        A.    My conversation --
4        MS. KEARSE:  Object to form.
5        A.    My conversations with my counsel.
6        Q.    Anything else besides your
7  conversation with counsel?
8        A.    Well, looking at the complaint.
9        Q.    Besides looking at the complaint
10  and conversations with counsel, any other
11  factual basis for that -- for that assertion?
12        A.    No.  I -- I don't think I can
13  answer that any better.
14        Q.    Okay.  Okay.  You -- Ms. Feinstein
15  asked you some questions about contributing
16  factors, and that was a term that you were not
17  comfortable with.  Am I correct in hearing the
18  testimony that way?
19        A.    That's correct.
20        Q.    All right.  Topic 34 asked you
21  to -- about the identification of entities and
22  individuals other than Defendants who you, as a
23  non-expert, believe caused -- and we've covered
24  that.  And now I wanted to focus on "and/or
25  contributed to the opioid crisis."

Page 419

1        Okay.  What -- can you please
2  identify for us, as a corporate representative
3  of Summit County, the entities and individuals,
4  other than Defendants, who contributed to the
5  opioid crisis?
6        MS. KEARSE:  Object to form.
7        A.    Again, I'm -- I'm going to give the
8  same answer I gave your co-counsel.  I'm not
9  going to use the words "contributed" or --
10  those words have legal value.
11        The cause of this problem is the
12  opioid industry.  There have been exacerbating
13  factors that have come along that have
14  increased, certainly, the carnage.  But the
15  cause of this continues to be the industry.
16        Q.    So you will not comply with the
17  Judge's order that you, as the corporate
18  representative for Summit County as to Topic
19  34, will not identify entities and individuals,
20  other than the Defendants, who contributed to
21  the opioid crisis?
22        MS. KEARSE:  And, Counsel, I'm
23  going to set an objection.  Topic 34 asks that
24  as a non-expert believe caused and/or
25  contributed to the opioid crisis.  So she's --

Page 420

1  Ms. Johnson is answering the question as she
2  sees fit as the corporate representative for
3  Summit County.
4        Q.    You're not answering the question
5  at all, are you?  You're telling me that you're
6  not comfortable using the term "contributed"
7  because it has legal meaning, and therefore, as
8  the corporate representative of Summit County,
9  you are not answering that portion of the
10  question?
11        MS. KEARSE:  Misstates her
12  testimony.
13        A.    It does misstate my testimony,
14  because I'm not saying that there isn't a
15  cause.  There is a cause.  It is also a valid
16  answer to say there aren't any other causes,
17  that the -- the primary and only cause that I
18  believe put us in this position was the
19  industry.
20        As I've stated, there certainly are
21  other issues and other factors that have,
22  again, put gasoline on this fire.  But I will
23  not -- I will not use the word "contributed" or
24  I can't remember the word Ms. Feinstein used,
25  but -- because I understand --

Page 421

1        Q.    I don't -- I don't want to talk
2  about gasoline or fires.  What I want to talk
3  about is the Judge's order that modified Topic
4  34 --
5        A.    Uh-huh.
6        Q.    -- a topic that you're here to
7  testify about today --
8        A.    Yes.
9        Q.    -- and the Judge said we are
10  allowed to have a corporate representative who
11  test- -- who was to testify as to the
12  identification of entities and individuals,
13  other than the Defendants, whom you, as a
14  non-expert believe -- let's strike "cause,"
15  because we've already dealt with cause --
16        A.    Sure.
17        Q.    -- believe contributed to the
18  opioid crisis.  Are you going to answer that
19  question or not?
20        MS. FLOWERS:  Objection.
21  Argumentative.
22        MS. KEARSE:  Yeah, it's very
23  argumentative.  And -- and the specific No. 34,
24  "believe caused and/or contributed to the
25  opioid crisis."  And she's doing everything she

106 (Pages 418 - 421)

Page 422

1  can in the last eight hours to answer all
2  questions that counsel have asked her, and
3  she's been asked these specific questions
4  already and covered this ground.  But if you
5  want to keep asking her and beat a dead horse,
6  go ahead.
7      Q.   I want an answer to my question.
8           Are you going to provide us with
9  the corporate representative testimony that a
10  Judge said we were entitled to, which is the
11  identification of entities and individuals,
12  other than Defendants, who you, as a
13  non-expert, believed contributed to the opioid
14  crisis?
15      A.   I believe I have done that.
16      Q.   You have -- and -- and you've done
17  that by saying that there's not any entity that
18  you can identify that contributed to the opioid
19  crisis?
20           MS. FLOWERS:  Misstates her
21  testimony.
22      A.   I -- I was speaking with your
23  co-counsel about that inherent desire for
24  people to be able to get back to work,
25  certainly drove more folks back to doctors'

Page 423

1  offices.
2      Q.   So that contributed?
3      A.   I'm not going to use the word
4  "contributed."  I'm going to say that that
5  exacerbated the problem.  People wouldn't have
6  gone back to the doctor if the doctor hadn't
7  already given them a prescription that was --
8  relied upon bad information, was relied upon by
9  the Defendants saying that you could taper
10  opioids, that they were not going to be
11  addictive.
12           So that original prescription is
13  already tainted, is already a part of a bad
14  chain.
15      Q.   Okay.  Can we -- can we take this
16  one piece at a time, because I'd really like
17  to -- we've got -- I've got some stuff to
18  cover, and I know you want to get out of here,
19  as we do as well.  Let's just take --
20      A.   I've got all the time in the world.
21      Q.   Let me take it one piece at a time.
22           The Judge rewrote one of our topics
23  and the Judge said that we were allowed to get
24  testimony from a corporate representative of
25  Summit County -- that's you, correct?

Page 424

1      A.   Yes.
2      Q.   -- on Topic 34.  And that topic is
3  identification of entities and individuals,
4  other than Defendants, whom you, as a
5  non-expert, believed caused and/or contributed
6  to the opioid crisis.  We've covered "caused."
7           Is your -- is your position, ma'am,
8  as you sit here today that you will not testify
9  about any entity or individual who contributed
10  to the opioid crisis?
11           MS. KEARSE:  I'm going to --
12  Counsel, I think you're misstating her
13  testimony.  She is doing everything that she
14  can to answer the questions that are posed to
15  her.  With that, you're being very
16  argumentative to her.  Ms. Johnson has
17  testified to various what she calls factors
18  that have been involved and is using other
19  terminology.
20           But it's "caused and/or
21  contributed" on there, too.  She's answering
22  the question as she deems appropriate as the
23  corporate rep for Summit County.
24      Q.   The Judge used the term
25  "contributed."

Page 425

1           Are there any fact- -- are there
2  any entities and individuals, other than
3  Defendants, who contributed to the opioid
4  crisis, yes or no?
5           MS. FLOWERS:  Objection.
6      A.   It's not that -- it's not that I am
7  refusing to answer.  It's that you don't like
8  the answer I'm giving, which is "none."
9      Q.   So the answer is that no other
10  entity other than, or individual other than
11  Defendants, contributed to the opioid crisis?
12      A.   Because of the legal value of the
13  "contributed," it's none.
14      Q.   What's the legal value of the word
15  "contributed"?
16      A.   Contributing causes, intervening
17  factors, things like that have value in this
18  process.  And a non-expert wouldn't know that.
19           Certainly somebody who came in here
20  and testified who was not a lawyer, perhaps
21  would talk about some of the factors that I
22  have discussed as contributing.  But I
23  understand the value of that word, and so I'm
24  choosing other words.
25      Q.   You think the Judge understands the

Page 426

1  value of that word?
2      MS. FLOWERS:  Objection.
3      A.  I'm sure the Judge understands the
4  value of the word.  I'm also unsure of whether
5  the Judge knew there would be an attorney
6  sitting in the seat as the designated 30(b)(6).
7      Q.  The Judge understood the value of
8  the word "contributed," he specifically
9  approved of having a corporate representative
10 on that topic, and you're refusing to testify
11 using the word "contributed"?
12      MS. KEARSE:  You --
13      MS. FLOWERS:  Objection.  That is
14 not what she's doing.  It's time to move on,
15 Counsel.  That's quite enough.
16      MR. SCHUTTE:  One lawyer.  Either
17 one.  Pick your shot.  One at a time.
18      MS. FLOWERS:  You know what,
19 listen.
20      MR. SCHUTTE:  Well, let's go --
21      MS. FLOWERS:  You are beating up on
22 this witness.  It's time to move on.
23      Q.  You can go ahead and answer the
24 question.
25      A.  And I'll say it again.  I'm not

Page 427

1  refusing to answer the question.  You just
2  don't like my answer.  The answer is none.
3      Q.  The answer is no one contributed?
4      A.  Correct.
5      Q.  Okay.  We have Exhibit 2 in front
6  of us, if you could put that in front of you.
7  Let's see.  You talked about this earlier
8  today.  This is Captain Baker's drug threat
9  assessment from Exhibit -- excuse me, from
10 2005.
11      A.  Yes.
12      Q.  If I could ask you to turn to
13 page 60- --
14      MS. KEARSE:  Can you -- can -- let
15 me -- what -- what exhibit number?
16      MR. SCHUTTE:  Two.
17      MS. KEARSE:  Okay, just they're
18 buried in the exhibits, so.
19      Do you have Exhibit 2?
20      I'm sorry, Counsel.  What page?
21      MR. SCHUTTE:  It's 64.
22      Q.  In that -- 64, Captain Baker is --
23 and this is a document that you looked at in
24 preparation for your deposition today, correct?
25      A.  I bel- -- yes, I believe I've

Page 428

1  reviewed this.
2      Q.  And in this section of Exhibit 2,
3  Captain Baker is writing about pharmaceuticals.
4  That's back on page 62.  We looked at that this
5  morning with Ms. Winner.
6      A.  Yes, we did.
7      Q.  And he said, back in 2005, that the
8  level of threat from pharmaceuticals was,
9  quote, very high.
10      A.  Correct.
11      Q.  Over on page 64, he talked about --
12 he has a section called "Distribution," and he
13 wrote that, "Distribution of diverted
14 pharmaceuticals in Summit County is primarily
15 through the individuals involved in the
16 diversion or theft of the drugs.
17 Pharmaceuticals are diverted in several ways,"
18 and then he goes on to list one, two, three,
19 four of those.
20      One of them is unscrupulous
21 physicians.  Do you see that?
22      A.  Yes, I do.
23      Q.  Are unscrupulous physicians
24 individuals who contributed to the opioid
25 crisis?

Page 429

1      MS. KEARSE:  Object to form.
2      A.  Unscrupulous physicians played a
3  role in this certainly.
4      Q.  Did they contribute to the opioid
5  crisis?
6      MS. KEARSE:  Object to form.
7      A.  They played a role.  They played a
8  significant role in this.
9      Q.  Did people who imported illegal
10 heroin into Summit County play -- excuse me,
11 contribute to the opiate crisis?
12      A.  They played a role.
13      Q.  Did they contribute?
14      A.  I'm not going to characterize it
15 using the word "contribute."
16      Q.  You're not going to use the word
17 that the Judge put in the topic that he
18 rewrote?
19      A.  No.
20      MS. KEARSE:  Counsel, you're
21 badgering the witness.  She's answering your
22 questions.  There's nothing in the rule --
23      Q.  Were people who --
24      MS. KEARSE:  -- that says she has
25 to use that word, okay?  She's answering your

108 (Pages 426 - 429)

Page 430

1 questions the best she can, okay?  So move on,
2 please.
3          MR. SCHUTTE:  Ma'am, let me -- let
4 me engage you on that point for just a second.
5 Are you seriously taking the position that when
6 the Judge rewrote the topic and the Judge not
7 only approved but used the word "contributed,"
8 you're saying that I am somehow
9 mischaracterizing this?
10          MS. KEARSE:  What I'm saying is if
11 Ms. Johnson wants to say it was -- it -- her
12 testimony was it was a -- played a role, she
13 does not have to use the word "contribute" in
14 her answers.  She's answering your questions.
15     Q.   Did pill mills, Ms. Johnson,
16 contribute to the opioid crisis in Summit
17 County?
18          MS. KEARSE:  Object to form.
19     A.   Pill mills played a role in the
20 opioid crisis.
21     Q.   Ms. Feinstein -- you testified
22 earlier that a key point with respect to
23 the opioid crisis is when pain management was
24 identified as a fifth vital sign.
25     A.   Yes.

Page 431

1     Q.   Okay.  When was pain management
2 identified as a fifth vital sign?
3     A.   It was in the -- I believe in the
4 late '90s.  I think it was originally
5 introduced, and then I think the pain manage --
6 or the Pain Association pressed for this, which
7 Ms. Feinstein's client is on the board of that.
8 So I believe it was in the late '90s.  I
9 believe we reviewed -- it's in the complaint.
10 I believe I reviewed that part in the
11 complaint, that it was the American Pain
12 Association pushed for that.
13     Q.   And your understanding was that was
14 late 1990s?
15     A.   I -- that's -- yes, that's my
16 recollection.
17     Q.   You testified several times today
18 about -- and this was in connection with -- I
19 won't ask you about the criteria -- about
20 the -- the interrogatory responses, and you
21 said that Summit County was not seeking to
22 recover based on individual incidents, but
23 rather on the aggregate of the harm.
24          Can you explain what you meant when
25 you used that term several times today?

Page 432

1     A.   That this isn't a personal injury
2 case.  This is not one individual coming
3 forward and trying to address their grievances
4 with the industry.
5          This is the collective pain.  This
6 is the collective harm that all of these
7 individuals make up has impacted our
8 community, both financially, emotionally, in
9 every way.  The tax of the resources, the loss
10 of human capital.  All of these things
11 aggregate into this sort of enormous harm
12 that -- and that's how -- that's how I have
13 prepared.
14          I have not looked at these
15 individuals, although I know them and I know
16 their stories.  But it is all of these people
17 in these spreadsheets who make up a part of the
18 aggregate harm that I'm here to talk about.
19     Q.   Is ag- -- excuse me.  Is aggregate
20 harm your term, or did someone else come up
21 with that?
22          MS. KEARSE:  Object to form.
23     A.   "Aggregate" is a word I use a lot,
24 I feel like.  That -- I -- that wasn't put to
25 me, that -- that's a word that I would use,

Page 433

1 yes.
2     Q.   Aggregate harm was -- was the --
3 the use of -- your use of the term aggregate
4 harm was something that you came up with, and
5 that's how you personally view the theory of
6 Summit County?
7     A.   Yes.  I have said aggregate harm,
8 and I believe the community impact, those are
9 words that I have used in the past.
10     Q.   Can I ask you to take -- you still
11 have Exhibit 1 in front of you, or maybe I
12 could put it in front of you.  And, again, I
13 would ask you to turn to Exhibit B, which is
14 the rewrite of the topics that was approved by
15 the Judge.  And specifically, No. 30.
16          Number 30, you're here as a
17 corporate representative, are you not,
18 Ms. Johnson, to talk about, quote, "What
19 efforts, if any, Plaintiffs made to influence
20 the DEA's quota setting process and what
21 actions, if any, Plaintiffs took in response to
22 the DEA's setting of quotas."
23          You are here to testify about that
24 topic?
25     A.   I am.

109 (Pages 430 - 433)

Page 434

1    Q.   Okay.  Let's start with the efforts
2  that Summit County made to influence the DEA's
3  quota setting process.
4         Did Summit County make any such
5  efforts?
6    A.   No.
7    Q.   Okay.  What actions did Summit
8  County take in response to the DEA's setting of
9  quotas?
10   A.   I don't know that there were any
11 actions.  I certainly had conversations with
12 the detectives who are in the diversion units
13 as DEA task force officers, and I asked them
14 these same questions, to make sure I understood
15 if they had had any impact, and -- and their
16 answer was, no, that there was no influence
17 that was tried to be exerted on the setting of
18 quotas on Summit County's behalf.
19   Q.   Okay.  And these conversations took
20 place in the course of preparing for your
21 deposition?
22   A.   Correct.
23   Q.   In these conversations, did you ask
24 whether Plaintiffs took any actions in response
25 to the -- excuse me.  In your conversations,

Page 435

1  did you ask whether Summit County took any
2  actions in response to the DEA's setting of
3  quotas?
4    A.   I don't know that we talked about
5  the -- the response.  We talked about
6  influence, and -- and it was agreed that there
7  was really -- there was not -- that there was
8  no influence trying to be exerted over that.
9  In response to it, as far as, you know,
10 certainly there were investigations, but there
11 was nothing related to the setting of quotas.
12   Q.   Okay.  I want to ask you a few more
13 questions about this meeting of the task force
14 that took place in December of 2014, the one
15 where you said that slides were presented and
16 the family member said, "It's big pharma."
17        Do you remember that testimony from
18 earlier today?
19        MS. KEARSE:  Object to form.
20   A.   I -- I do.  And I have to be
21 honest, I don't recall if it was the December
22 meeting or if it was in one of the early
23 meetings in 2015.  I know that the first
24 meetings were at the end of '14, and I feel
25 like it was maybe not at the -- at that first

Page 436

1  one, but it was right in that, you know, three-
2  to five-month time frame, yes.  But I remember,
3  yes, the person standing up and saying that,
4  yes.
5    Q.   Well -- well, let me see if I can
6  tighten that up a bit, because earlier today
7  you talked about December of 2014.
8         How often did that task force meet?
9    A.   They meet quarterly now.  I -- I
10 believe that I reviewed documents, and I think
11 I participated even in a couple of subcommittee
12 meetings.  So the subcommittees meet more
13 frequently.  The task force overall I believe
14 has always met just quarterly, but I know that
15 there were different subcommittee meetings that
16 happen at various times.
17   Q.   Right.  So let me ask you, to the
18 best of your ability, to put in your mind's eye
19 that meeting where --
20   A.   Uh-huh.
21   Q.   -- the family member said "big
22 pharma" --
23   A.   Yes.
24   Q.   -- and the -- sort of the
25 collective light went off, "Hey that's --

Page 437

1    A.   Yes.
2    Q.   -- the cause."
3    Q.   Do you have any -- as -- are you
4  able to pinpoint whether that was December of
5  '14 or sometime in 2015?
6    A.   I know there's a document that if I
7  looked at, it would say -- exhibit.  That word.
8    Q.   It's late.
9    A.   It was an exhibit to Prosecutor
10 Wilms' testimony, and I remember because I was
11 sitting next to Prosecutor Wilms during that
12 meeting.  And I talked with Attorney Feinstein
13 about, I looked at the number, and she said,
14 "Multiply that by 4."
15        So I know that -- that there was an
16 interaction between myself and the prosecutor,
17 about our alarm at that.  I think it was
18 December, but I -- I couldn't say.
19   Q.   But if we find that document --
20   A.   Yes.
21   Q.   -- and it's dated, that will tell
22 us --
23   A.   Yes, absolutely.
24   Q.   Okay.
25   A.   Yes, absolutely.

110 (Pages 434 - 437)

Page 438

1    Q.   Thank you.  What was your job in
2  December of 2014?  Was that when you were a
3  legislator?
4    A.   I was not a legislator yet.  I was
5  still a prosecutor.  I was an assistant
6  prosecutor working for the chief prosecutor,
7  Wilms, at the time.
8    Q.   Okay.  And were you prosecuting any
9  type of cases in particular at that time?
10    A.   It was -- so I was advising -- I
11  was the police legal advisor, so I was advising
12  police departments whose jurisdictions was
13  within the Akron Municipal Court on charging,
14  on search warrants, things like that.
15         The actual handling of cases, I
16  handled felonies in arraignment court, so
17  setting bonds, attorneys becoming appointed,
18  initial appearances.  And then I handled
19  misdemeanors in the courtrooms.
20    Q.   The -- the -- part of the
21  information that was presented at that meeting
22  was on a -- for one quarter -- I think I
23  understood your testimony, for one quarter, it
24  was number of pills in Summit County, correct?
25    A.   Correct.

Page 439

1    Q.   And you said that was that
2  testimony about, "Well, you have to multiply
3  that by 4" --
4    A.   Correct.
5    Q.   -- correct?
6         You've also testified about this
7  count of 71 point I believe 4, or 72.8 pills
8  per person in Summit County that -- where did
9  that data come from?
10    A.   The 71.6 in 2010 was data that the
11  health department pulled from OARRS.
12    Q.   Okay.  When did the health
13  department pull that data from OARRS?
14    A.   I don't know.  I remember seeing
15  numbers like that, but I saw, in preparation
16  for my deposition, I reviewed a chart that was
17  produced by -- gosh, what's his name -- Rich
18  Marountas, who does a lot of the statistics at
19  public health.
20    Q.   The data that shows that number of
21  pills per person in Summit County from 2010 was
22  available in 2010, correct?
23         MS. KEARSE:  Object to form.
24    A.   You know, I -- I don't know the
25  answer to that.  I know that there was

Page 440

1  significant changes to OARRS in 2014-ish, so I
2  don't know what was available.  I -- I don't
3  believe -- there certainly wasn't the public
4  dashboard on OARRS that there is now.  And I
5  think a lot of that information came from the
6  public dashboard, because Rich does not have
7  specific access like Dr. Smith would or a
8  physician would or law enforcement would.
9    Q.   Well, let me break that into
10  pieces.  If in -- if by December of 2014 or
11  early 2015, whenever that meeting took place,
12  someone was able to go into the OARRS database
13  and pull out and analyze and sort out that the
14  number from 2010 was, I believe you said, 71.6?
15    A.   Yes.
16    Q.   That -- that data, whether it was
17  accessible or not to the statistician, that
18  data resided in the OARRS database as of 2010,
19  correct?
20         MS. KEARSE:  Object to form.
21    A.   I -- I don't -- I don't know.
22  Because I don't know -- the access to OARRS was
23  really limited to just one individual at a
24  time, so this sort of 30,000-foot view of
25  everything in the county, I don't know if that

Page 441

1  was being done.
2    Q.   Right, but let me draw a
3  distinction, ma'am.  The -- draw a distinction
4  between access and the data.
5    A.   Oh, okay.  Sure.
6    Q.   The data -- the data was in OARRS,
7  whether somebody could access it or not,
8  correct?
9         MS. KEARSE:  Objection.
10  Speculation.
11    A.   I -- I honestly don't know.  I
12  don't know what was being kept in 2010.  My --
13  my interaction with OARRS was limited on a
14  case-by-case basis.
15    Q.   But if the 2010 data in -- if
16  you're able, in 2014, to pull data from 2010
17  out of OARRS, wouldn't you agree with me that
18  that data must have been in there in 2010;
19  somebody didn't put it in later?
20         MS. KEARSE:  Object to form.
21    A.   No, I disagree.  I mean, certainly
22  I -- we implemented a new system in Summit
23  County for our prosecutor's office that, you
24  know, we're -- we're inputting data and, you
25  know, reorganizing how data is aggregated and

111 (Pages 438 - 441)

1 mined to sort of be able to run reports more
2 effectively than -- than we could with prior.
3         So, I mean, someplace, somewhere
4 that data existed.  Whether it was in OARRS, I
5 don't know, or if in 2014 they had to go back
6 and pull from different buckets to create
7 this -- this information.  I don't know.
8     Q.   In 2010, who controlled who had
9 access to OARRS?
10     A.   Well, it's statutory.
11     Q.   So it was controlled by the
12 legislature?
13     A.   Yes.
14     Q.   Okay.  Changing subjects, and I'm
15 going to probably do that a bit now as we move
16 toward the conclusion.
17     A.   Okay.
18     Q.   You testified about this report
19 from October 1st of 2010, and we've marked as
20 an exhibit that.  And then I understood your
21 testimony, some 35 days later Republicans were
22 elected, and you -- I think you used the term
23 that the report became obsolete?
24     A.   Yeah.  And, you know, I -- I'm not
25 suggesting that the report was buried.  I

1 certainly don't want that to be the impression.
2         What I can only surmise happened,
3 because it didn't reach people like myself,
4 like Prosecutor Gessner, like Jerry Craig, is
5 that it didn't have a champion anymore, that
6 the folks who really were invested in -- in the
7 mission that drove that report were no longer
8 in power.  So it -- it wasn't that it got
9 buried or anything.  It just didn't have a
10 champion.
11     Q.   Okay.  And I wasn't suggesting that
12 it got buried.
13     A.   Yeah.
14     Q.   I was trying to get at, when you
15 said obsolete, you're not intending to suggest
16 to the Judge or the jury that the data in the
17 report --
18     A.   Oh, yes.
19     Q.   -- somehow turned out to be wrong
20 35 days later?
21     A.   No, absolutely not.
22     Q.   Okay.  The report was accurate 35
23 days later?
24         MS. KEARSE:  Object to form.
25     Q.   Let me put it this way.  The report

1 was as accurate 35 days later as the day it was
2 issued, correct?
3     A.   That's fair.
4     Q.   Okay.  It's that the utility of the
5 report, because of the changes in the
6 administration, the utility was lower because
7 it didn't have an advocate?
8     A.   I don't know if it's utility or
9 reach.  I don't know who -- you know, who it
10 was disseminated to or who sort of, you know,
11 was carrying the torch at the time.
12         My assumption would be that it was
13 the governor.  And then he wasn't the governor
14 anymore, and so at that point, I don't know how
15 far reaching that report would have been
16 carried.
17     Q.   But the report still existed on the
18 government website, did it not?
19         MS. KEARSE:  Object to form.
20     A.   I don't know if it was on the
21 website.  I know it's a public record, but,
22 again, if you don't know it's there can, you
23 don't know what to ask for kind of thing.
24     Q.   Topic 23, I believe on that one we
25 can look, actually, to Attachment A.

1     A.   Okay.
2     Q.   And Ms. Feinstein touched on this,
3 so I don't want to deal with it for a long
4 time.  But the topic is any task force program,
5 working group, committee, or other organization
6 designed to address opioid prescribing,
7 promotion, marketing, distribution, diversion,
8 use, and/or misuse.
9     A.   Uh-huh.
10     Q.   When is -- when was the very first
11 time there was a task force or a program or
12 working group or committee or other
13 organization in Summit County to address these
14 topics relating to opioids?
15     A.   Well, there -- there has been a
16 drug task force for decades.  They were not
17 specifically targeting opioids only.  They --
18 you know, whatever drug.  So they weren't just
19 for opioids, but they've always -- there's
20 always been a drug task force within our law
21 enforcement agencies.
22         The first one that I am aware of is
23 the Opiate Task Force that we've talked about,
24 that ADM hosts.  In early 2017 -- sorry --
25     Q.   '14?

1    A.  No.  That was in 2014.

2         At the end of 2017, the United Way
3  of Summit County made invitations to community
4  leaders to convene an opioid leadership council
5  made up of elected officials, business leaders,
6  clergy, and the local philanthropic
7  organizations to come together to have
8  conversation about it from sort of a more
9  executive level.

10        At that point the Opiate Task Force
11 had approximately 400 members, and so it was
12 really robust, and everyone from consumers of
13 treatment to the county executive could be in
14 the room at the same time.

15        So that task force was brought
16 together, and the executive declared the state
17 of emergency in October of 2017, and with that
18 state of emergency, mobilized the Incident
19 Management Assistance Team to formulate a plan
20 in response to the opioid epidemic.

21        As part of the IMAT plan moving
22 forward, there was a grant.  I believe it was
23 grant money that was used to bring in some
24 experts on what we call intercept mapping, and
25 identifying, really, what do we have in Summit

1  County as far as our resources.  And by
2  resources I mean what treatment of -- what
3  treatment is out there, what education programs
4  are out there, what interdiction.  Just really
5  taking a global perspective on everything that
6  was touching the crisis.  And they created some
7  priorities from that, and the IMAT team is
8  implementing those priorities through this
9  structure with United Way.

10        The other organizations or working
11 groups are ongoing ones.  We have a criminal
12 justice advisory board where there is
13 discussion about opioids.  There is a jail
14 capacity monthly meeting where we talk about
15 exactly what it is, jail capacity:  who's in
16 the jail, what are our pressure points there.

17        There has been a task force
18 assembled of elected officials and community
19 leaders regarding the jail operations, and part
20 of their research focused on treatment in the
21 jail, specifically for opioids, and what
22 opportunities are available for treatment
23 there.  And that was done in 2018.

24        There are other -- make sure I'm
25 reading this correctly -- you know, working

1  groups or organizations.  There have certainly
2  been community meetings in every one of the 31
3  communities within Summit County, trying to get
4  information from law enforcement, trying to get
5  information from public health.  So I wouldn't
6  call it a task force, but there have certainly
7  been different community groups coming together
8  for these discussions.

9    Q.  Ms. Johnson, the task force that
10 you said had been in place for decades, that
11 was called the "Drug Task Force"?

12   A.  The Summit County Drug Unit.

13   Q.  And was that a -- was that a group
14 that was solely within law enforcement?

15   A.  Yes.

16   Q.  Okay.  The group that met in
17 December of 2014 or early 2015, what was that
18 task force called?

19   A.  That was the Summit County
20 Opioid Task For- -- or Opiate Task Force, I
21 think.

22   Q.  And was the meeting in December of
23 2014 or early in 2015 the first meeting with
24 the Summit County Opiate Task Force?

25   A.  Yes.

1    Q.  Okay.  In general terms, who was
2  involved in that?  What categories of people?
3  Law enforcement, et cetera?

4    A.  Sure, there was law enforcement,
5  judges, treatment providers, health care
6  professionals.  And I know treatment providers
7  are health care professionals, but I think of,
8  you know, addiction treatment providers.
9  Hospital representatives, consumers of
10 treatment, family members there to support,
11 elected officials, public health was always
12 represented, ADM was always represented.
13 Interested community members, members of the
14 clergy.  It was a -- it was a wide variety of
15 individuals.

16   Q.  And, again, at that meeting, the
17 bulb goes off.  Big pharma is disc- -- or the
18 pharma industry is the, I think, what you said
19 was -- was the word that was used.  And you
20 testified in response to one of Ms. Feinstein's
21 question that the action that Summit County
22 chose to take was to file this lawsuit.

23        MS. KEARSE:  Object to form.

24   Q.  Correct?

25   A.  We --

Page 450

1     Q.    Not to report to the DEA or the
2  FDA; it was to pursue claims against
3  manufacturers and distributors of prescription
4  opioids?
5          MS. KEARSE:  Object to form.
6     A.    That is how we chose to address
7  getting at the industry, yes, that's correct.
8     Q.    Was a lawsuit discussed at that
9  meeting, the one in December of '14 or early
10  '15?
11    A.    No.
12    Q.    Okay.  When was the first time a
13  lawsuit was discussed, to your knowledge?
14    A.    I can't speak for some of the
15  smaller communities.  But, you know, if there
16  were discussions on, you know, Mogadore council
17  I don't know.
18          But as the County as a whole, those
19  discussions began in 2000 -- early 2017, yes.
20  Perhaps even late 2016, but probably more
21  realistically, like, talking about it
22  legitimately in 2017.
23    Q.    Okay.  If the light went off, at
24  least in your head, in December of '14 or early
25  2015, why did there not be -- well, why was

Page 451

1  there not any consideration of a lawsuit until
2  late 2016, early 2017?
3          MS. KEARSE:  Object to form.
4     A.    We were still just trying to save
5  lives.  And -- and I am not saying that in a
6  cliche way.  The focus was not on getting at
7  the head of the monster.  The focus was on
8  saving people in our community.  Our collective
9  resources and efforts were very specifically
10  directed at treatment, at how to increase the
11  bed capacity, how to find ways to leverage
12  funds, how to make sure we could staff these
13  places, because the real concern, I recall, at
14  some of those early meetings was, even if we
15  increase capacity, do we have educated
16  professionals to treat these folks?  If -- if
17  we built a thousand-bed facility, who would run
18  it?
19          So there -- there was a real focus
20  on saving lives that was really overwhelming
21  the conversation in '15 and '16.
22    Q.    What changed in late 2016 or early
23  2017 when there was a discussion of -- of the
24  lawsuit?
25    A.    We finally got better at harm

Page 452

1  reduction.  People stopped dying five and six a
2  day.  I mean, we were literally having five and
3  six people die every day.  And when we flooded
4  our streets with Narcan and with information
5  and perhaps the Good Samaritan bill played a
6  role; I don't know.  I think that that whole
7  idea of understanding you can't dump people in
8  fields.  We got better at harm reduction.
9          And because we spent a lot of money
10  and a lot of effort at it, we were to be able
11  to take that collective breath and say, "Okay,
12  we have put the tourniquet on, we have triaged
13  this.  Now what is the surgical step to help us
14  in our process of getting better?"
15    Q.    You testified earlier that one of
16  the transcripts that you reviewed in preparing
17  for your deposition was Dr. Doug Smith?
18    A.    Yes.
19    Q.    Okay.  What -- for the record, what
20  is his position?
21    A.    He is the medical director for the
22  ADM Board.
23    Q.    Do you believe he's knowledgeable?
24    A.    Oh, sure.
25    Q.    Knowledgeable about opioid issues?

Page 453

1     A.    Yeah, of course.
2     Q.    Do you believe he has expertise?
3     A.    Yes.
4     Q.    Do you respect his opinion?
5          MS. KEARSE:  Object to form.
6     A.    He and I have had disagreements on
7  certain things.
8     Q.    We can disagree but still respect
9  each other, correct?
10    A.    You and I can talk after this.
11          But I -- I believe that Dr. Smith
12  is -- is certainly well versed in -- in
13  opioids, yes.
14    Q.    Well, I'll state for the record I
15  respect you.
16    A.    Appreciate that.
17    Q.    Captain Baker, who wrote this drug
18  threat assessment back in 2005, was he at the
19  Summit County Opiate Task Force meeting in
20  December of '14 or early '15?
21    A.    I don't know that he was.  I think
22  he had retired at that point.
23    Q.    Okay.  I'm going to --
24    A.    It was right around that time.
25    Q.    What about Detective Paolino?

114 (Pages 450 - 453)

Page 454

1    A.   Paolino? I'm sure -- I'm sure he
2  was -- I'm sure one of them was or someone on
3  their task -- on the Summit County Drug Unit
4  was.  I -- I recall seeing detectives there
5  very frequently, sure.
6    Q.   During that meeting did he
7  contribute that he thought that by October of
8  2014, the availability of controlled
9  prescription drugs was increasing?
10    A.   He who, please.
11    Q.   Oh, sorry.  Detective Paolino.
12    A.   Paolino? Did he --
13    Q.   At that meeting, as this discussion
14  was taking place about opiates, did he raise
15  his hand and say, "Well, from my perspective,
16  the availability of controlled prescription
17  drugs is decreasing"?
18    A.   I don't remember him saying that,
19  no.
20    Q.   Did he say anything about that the
21  distribution at that time of controlled
22  prescription drugs was decreasing?
23    A.   I don't recall if Detective Paolino
24  was at that particular meeting.  I know I have
25  seen him at them, but I -- I don't recall

Page 455

1  whether he was even at that particular one.
2    MR. SCHUTTE:  What I would suggest,
3  Ms. Kearse, is that we take five or 10 minutes.
4  I'm pretty close to being finished, but let me
5  just circle up with my colleague and see if we
6  can close this out.
7    MS. KEARSE:  Okay.
8    MR. SCHUTTE:  All right.
9    THE VIDEOGRAPHER:  Off the record
10  at 8:34.
11    (A recess was taken.)
12    THE VIDEOGRAPHER:  On the record at
13  8:56.
14    MR. SCHUTTE:  Ms. Johnson, I have
15  no further questions.
16    Does anybody on the phone have any
17  questions?
18    Hearing none --
19    MR. JOHNSON:  No.
20    MR. SCHUTTE:  Plaintiff's counsel?
21    MS. KEARSE:  Okay.  Give us one
22  second.
23    Ms. Johnson, thank you for being
24  here today and answering the questions of
25  counsel.  I think this deposition is now

Page 456

1  concluded.
2    THE WITNESS:  Thank you.
3    MR. SCHUTTE:  Thank you for your
4  time and your patience.
5    THE WITNESS:  Thank you.
6    THE VIDEOGRAPHER:  This concludes
7  the deposition.  The time is 8:56 p.m.
8    (Deposition concluded at 8:56 p.m.)
9    ~ ~ ~ ~ ~
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 457

1  Whereupon, counsel was requested to give
2  instructions regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5    SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9    TRANSCRIPT DELIVERY:
10  Counsel was requested to give instructions
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

115 (Pages 454 - 457)

Page 458

```
1        REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3                SS:
4  County of Cuyahoga.  )
5
6        I, Stephen J. DeBacco, a Notary
7  Public within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, GRETA JOHNSON,
10 was by me first duly sworn to testify the
11 truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19        I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25
```

Page 459

```
1        I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5        IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 18th day of
8  January, 2019.
9
10
11
12
13
14 Stephen J. DeBacco, Notary Public
15 within and for the State of Ohio
16
17 My commission expires September 30, 2022.
18
19
20
21
22
23
24
25
```

Page 460

```
1           Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
             Cleveland, Ohio 44114
3             Phone: 216-523-1313
4
   January 18, 2019
5
   To: Ms. Kearse
6
   Case Name: In Re: National Prescription Opiate Litigation v.
7
   Veritext Reference Number: 3190232
8
   Witness: Greta Johnson , 30(B)(6)   Deposition Date: 1/15/2019
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA
```

Page 461

```
1           DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3190232
3  CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 1/15/2019
4  WITNESS' NAME: Greta Johnson , 30(B)(6)
5  In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7  I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9  Date          Greta Johnson , 30(B)(6)
10   Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13 They signed the foregoing Sworn
        Statement; and
14 Their execution of this Statement is of
        their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
   _____
18 Notary Public
19 _____
   Commission Expiration Date
20
21
22
23
24
25
```

116 (Pages 458 - 461)

Page 462

```
1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 3190232
3      CASE NAME: In Re: National Prescription Opiate Litigation v.
       DATE OF DEPOSITION: 1/15/2019
4      WITNESS' NAME: Greta Johnson , 30(B)(6)
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
       as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
       that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date          Greta Johnson , 30(B)(6)
14
       Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
       the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18         in the appended Errata Sheet;
       They signed the foregoing Sworn
19         Statement; and
       Their execution of this Statement is of
20         their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of _____, 20____.
23 _____
       Notary Public
24
25 _____
       Commission Expiration Date
```

Page 463

```
1      ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 1/15/2019
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____    _____
20 Date          Greta Johnson , 30(B)(6)
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
       Notary Public
24
25 _____
       Commission Expiration Date
```

117 (Pages 462 - 463)

**[& - 15]**

| & | |
|---|---|
| **&** 2:19 3:2,9,15 4:3,7 5:5 15:21 16:7,9 | |

| 0 | |
|---|---|
| **000020323** 7:10 61:11 | |
| **000023567** 7:7 48:3 | |
| **000023648** 7:7 48:3 | |
| **000072535** 7:13 67:16,21 | |
| **000072541** 7:13 67:22 | |
| **000350711** 7:16 88:15 | |
| **000350712** 7:17 88:16 | |
| **019001392374** 9:18 386:1 | |

| 1 | |
|---|---|
| **1** 7:3 22:3,6 33:2 188:22 220:16,17 269:8 347:23 349:1 366:14,22 382:5 388:1 397:16 415:8 433:11 | |
| **1/15/2019** 460:8 461:3 462:3 463:2 | |
| **1/25/2006** 7:14 88:13 | |
| **1/8/2019** 9:1 265:12 | |
| **10** 8:6 44:10 73:21 123:12 125:23 126:12 172:9 188:23,24 246:15 252:15 253:20 | |

263:24 269:17,24
271:9 281:24
282:10 283:5
287:12 299:17,21
299:22 300:3,6
330:23,23 331:7
335:2,13 336:18
339:6,8,10 340:2
341:22 343:7
344:9,22 345:7
408:7,7 412:10
455:3
**10,000** 202:15,16
202:17,20
**10/1/2010** 9:13
378:13
**10/6/2014** 7:11
67:19
**100** 28:16,23 77:1
93:21 247:11
406:11,13
**104** 10:15
**105** 10:15
**106** 10:16,16
**107** 10:17
**108** 10:17
**109** 10:18,18
**10:00** 32:10
**10:51** 125:5
**11** 8:11 128:24
229:14 264:10
270:10,19 271:7
272:22,25 273:23
274:3 291:5
299:17,22 300:3,6
314:16,17,24
315:20 316:4
317:1 318:7
326:13 329:8
344:22

**110** 10:19
**1100** 3:5 460:1
**111** 10:19
**112** 10:20,20
**114** 10:21
**11472** 459:13
**116** 10:21
**118** 7:18
**11:09** 125:10
**12** 8:18 182:18
264:22 273:10,15
274:18 275:5
278:22 283:24
284:10 294:11
300:25 340:8,9
345:11,24 392:6
**12/12/2018** 8:4
182:3
**120** 130:19 284:20
285:14 286:4,13
288:8 290:5,11
291:7 293:14
294:20 295:6
296:1,13 303:5
307:1,14,19,20,23
308:2,6,15 309:8
311:22 313:17
316:6 321:13
328:9,14 332:23
**121** 10:22,22
**122** 10:23
**123** 10:23
**124** 10:24
**127** 4:15 10:24
**128** 7:22
**12:21** 181:24
**13** 8:17,21 9:5
25:4 58:23 72:25
140:23 141:16
142:22 143:9
162:8 264:18

**110** 265:4,18 270:17
273:11,15 274:18
275:5 278:22
283:24 284:10
294:11 300:25
340:9
**133** 10:25
**136** 8:1
**138** 11:1
**139** 11:1
**14** 9:1 24:10 25:16
25:18 45:1 58:23
77:23 94:6 140:24
141:16 142:23
143:9 162:8
167:12 190:23
222:8 265:11
274:2,7 280:4,5,8
280:17 282:25
284:14 285:3
288:2 291:23
300:3,9,13 329:9
362:2 367:21,23
367:23 387:22
388:25 435:24
437:5 445:25
450:9,24 453:20
**141** 11:2
**143** 11:2
**145** 11:3
**15** 1:18 9:6 14:13
45:1 77:23 94:6
95:4 194:17
220:19 221:9,16
222:6,10 237:25
238:24 243:9
246:15 265:21
270:23 290:19,24
294:11 314:24
315:1 317:1 340:9
349:17 362:2

367:24 413:16
450:10 451:21
453:20
**150** 186:10 188:15
208:12 283:18
285:4,12,14 286:6
287:19 289:15
294:15,24 295:7
295:25 296:13
307:22 314:9
321:16
**15219-6401** 3:17
**155** 11:3
**157** 11:4
**158** 11:4
**16** 9:9 45:1 77:24
94:6 95:4 221:9
221:16 243:14
266:3 290:19,25
294:11 340:9
345:12,24 451:21
**160** 11:5
**17** 1:7 6:8 9:11
14:23 23:16 45:1
194:17 266:9
336:15,17 338:13
**171** 11:5
**173** 11:6
**174** 11:6
**175** 11:7
**176** 11:7
**178** 11:8
**18** 1:11 9:13 191:1
237:14 378:12,20
378:21 379:6,21
379:23 382:22
389:23 460:4
**180** 11:8
**182** 8:4
**1820** 460:2

**184** 11:9
**186** 11:9
**189** 11:10
**18th** 459:7
**19** 9:16 23:21
182:24 183:13
267:10,16,16,24
282:12 291:4
295:17 343:12
385:21 386:6
387:2
**1980** 78:1
**1989** 1:22 14:16
**199** 78:22
**1990s** 431:14
**1992** 78:10,23 79:3
79:11
**1:10** 182:9
**1a** 68:20
**1st** 62:9 213:18
442:19

**2**

**2** 6:3 7:5 47:20,25
70:5,9,10 125:8
270:6 280:22
282:25 283:2
287:10 427:5,19
428:2
**20** 30:23 77:5,11
134:20 177:18
239:19 405:16,23
406:5,12 461:16
462:22 463:22
**200** 186:2,15,15
188:6,15,19
208:12
**2000** 4:15 78:14,23
79:5,11 450:19
**20001-4956** 4:9
**20005** 2:20

**2000s** 43:18,25
44:15 46:10,19
54:7 55:22,23
56:15 57:4 58:4
59:12 89:4 93:18
116:7 141:20
221:7,25 353:13
395:5
**2001** 9:17 55:24
385:25 386:12,14
388:17
**2004** 52:17
**2005** 47:22 49:2,3
49:9,10 50:21
51:8 52:9 54:2,3,6
427:10 428:7
453:18
**2006** 49:10 50:21
88:10 89:18,21,22
89:24 405:3
**2007** 46:20 353:23
**2007-2008** 353:17
**2008** 46:20
**2009** 46:22 55:24
142:22
**2010** 56:1 72:23
354:6,9,22 358:17
363:7 373:5,17,21
377:22 378:22
382:5,13 395:6,12
439:10,21,22
440:14,18 441:12
441:15,16,18
442:8,19
**2011** 60:23 162:13
**2012** 70:2 72:22
321:21 358:20
373:13,23 395:7
**2013** 140:21
156:14 223:15,22
224:3,7 407:23

409:19
**2014** 59:22 95:3
137:13,15 140:21
156:14 222:15
350:17 351:18
352:25 355:3,8
357:21 362:24
363:8 367:19
395:2,15 435:14
436:7 438:2 440:1
440:10 441:16
442:5 446:1
448:17,23 454:8
**2014-2015** 222:12
352:8 356:15
372:1 376:13
396:12
**2015** 7:12 67:19
68:3,9 70:3,18
71:2 350:17
351:12,12,19
353:1 435:23
437:5 440:11
448:17,23 450:25
**2016** 7:9 34:11
61:3,9 62:10
91:18 148:12
174:23 175:24
176:3 192:23
193:19 251:10
259:6,11 450:20
451:2,22
**2017** 445:24 446:2
446:17 450:19,22
451:2,23
**2018** 23:16 182:18
270:6,25 447:23
**2019** 1:18 14:13
281:2 288:1 291:5
459:8 460:4

**202** 2:21 4:9

**2022** 459:17

**205** 11:10,11

**206** 11:11

**208** 11:12

**21** 379:21,23 389:23

**210** 11:12

**216** 3:6 4:16,17

**216-523-1313** 460:3

**216-9140** 2:7

**216-9163** 2:8

**216-9225** 2:9

**216-9461** 2:10

**22** 7:3

**221** 4:22

**224** 11:13

**225** 11:13

**23** 444:24

**235** 11:14

**236** 11:14

**2370** 389:4

**242** 11:15

**248** 11:15

**249** 11:16

**25** 88:10 400:16 401:20,24

**250** 188:15

**252** 11:16

**254** 11:17

**256** 11:17

**261** 11:18,18

**263** 8:6

**264** 8:11,18

**265** 8:21 9:1,6

**266** 6:9 9:9,11

**271** 11:19

**274** 11:19

**276** 11:20

**279** 11:20,21

**28** 2:6

**2804** 1:6,7 14:23

**281** 11:21,22

**282** 11:22

**285** 11:23

**29464** 2:7

**296** 11:23

**299** 11:24

**2:00** 409:9

**2:17** 237:3

**2:42** 237:7

**3**

**3** 7:8,20 61:4,5,7 62:15 118:2,10 233:9 237:6 239:5 239:20 346:13 347:10 349:2

**30** 1:17 7:3 8:10 22:8,13 87:18 102:10,25 134:21 186:25 206:2,7 225:21,24 226:8 229:22 264:6 295:18 298:2,11 307:18 343:14 346:14 359:24 370:9 399:23 400:21,23 402:12 426:6 433:15,16 459:17 460:8 461:4,9 462:4,13 463:20

**30,000** 440:24

**300** 11:24,25 147:19 176:7

**300,000** 176:7

**301** 12:1

**302** 12:1

**303** 12:2

**304** 12:2,3,3

**305** 2:16 12:4

**306** 12:4

**307** 12:5

**309** 12:5

**31** 63:21 254:23,25 270:25 448:2

**312** 3:11 5:7 12:6

**318** 12:6,7

**3190232** 460:7 461:2 462:2

**31st** 62:10

**320** 12:7

**321** 12:8,8

**324-1481** 5:7

**324-1773** 3:11

**325** 12:9,9,10

**326** 12:10

**327** 12:11

**328** 12:11

**329** 12:12

**32nd** 3:16

**33** 400:16 401:20 401:24

**330** 12:12

**3300** 2:15

**33131** 2:15

**332** 12:13

**337** 12:13

**34** 366:20 367:3,11 397:15 415:12,20 415:21 418:20 419:19,23 421:4 421:23 424:2

**340** 12:14

**342** 12:14

**343** 12:15

**35** 354:16,23 399:23 442:21 443:20,22 444:1

**351** 12:15

**357** 12:16

**358** 12:16

**36** 10:3 136:18

**360** 12:17

**362** 12:17

**363** 12:18

**364** 12:18

**365** 12:19

**367** 12:19

**368** 12:20

**374** 12:20

**376** 12:21

**378** 9:13

**382** 12:21

**385** 9:16

**39** 72:22 94:19 104:3 321:20

**390** 12:22

**392** 12:22

**395** 12:23

**396** 12:23

**398** 6:10

**399** 12:24

**3:15** 263:21

**3:38** 266:16

**4**

**4** 7:11 23:21 61:1 67:14,18 182:23 183:13 251:24 252:5,14 267:9,16 267:16,24 282:12 282:25 283:2 287:6 288:2 295:17 300:13 335:14,15 343:11 372:22 437:14 439:3,7

**40** 10:3 44:8,8 83:25 111:20 334:11 358:13,15

**[40 - 861-7582]**                                              Page 4

358:23 394:12
**400**   12:24 65:13
   446:11
**401**   12:25
**402**   13:1,1
**405**   13:2
**406**   13:2
**41**   10:4
**412**   3:17
**415**   4:5
**419**   13:3
**420**   13:3
**421**   13:4
**422-9444**   4:23
**425**   13:4
**426**   13:5,5
**429**   13:6,6
**430**   13:7
**432**   13:7
**434-5172**   2:21
**435**   13:8
**439**   13:8
**440**   13:9
**441**   13:9,10
**44113-7213**   3:5
**44114**   460:2
**44114-1214**   4:16
**443**   13:10
**44321**   17:11
**444**   13:11
**4488**   17:10
**449**   13:11
**450**   13:12
**45090**   1:11
**451**   13:12
**451,000**   358:22
**453**   13:13
**458**   6:12
**47**   7:5
**47708**   4:22

**48**   83:17,25
**49**   10:4
**490**   409:1,13
**4:00**   409:3
**4:29**   313:4

**5**

**5**   7:14 9:5 23:21
   64:13 88:9,12
   118:22 172:9
   182:23 183:13
   265:18 267:9,16
   267:16,24 268:3
   282:12 295:17
   326:15 339:7
   343:11
**500**   271:14 273:2,8
   279:14 283:14
   284:16 285:11,19
   285:24 286:12
   287:15 289:11
   292:5 294:14
   321:25
**501**   239:5,20
**52**   83:17,25
**541,000**   358:22
**56**   10:5
**560-7455**   3:17
**59**   10:5
**591-7072**   4:5
**5:00**   32:9
**5:05**   313:7
**5s**   160:16

**6**

**6**   1:17 7:3,18 8:10
   22:8,13 23:21
   117:23 118:5
   123:18 125:22
   182:23 183:13
   206:2,7 228:24
   264:6 267:9,16,16

267:24 272:23
278:25 281:24
282:10,12 283:5
287:12 295:17,18
298:11 314:21
326:15 343:11
344:8 345:6
346:14 426:6
460:8 461:4,9
462:4,13 463:20
**60**   52:17 260:20
307:18 400:2
427:13
**600**   2:15
**60601-5094**   3:10
   5:7
**61**   7:8
**62**   48:24 50:3
428:4
**64**   427:21,22
428:11
**66**   186:8 188:15
**662-5786**   4:9
**67**   7:11
**696-5474**   3:6
**6:04**   366:3
**6:24**   366:6
**6:30**   370:21
**6:40**   370:24

**7**

**7**   6:5 7:22 128:5
128:11 190:20,20
190:21 237:10
252:15 281:24
282:10 283:5
287:12 331:7,13
335:20 338:14
344:8 345:6
**70**   400:3
**71**   10:6 439:7

**71.6**   358:17,25
439:10 440:14
**714-9719**   2:16
**72**   10:6 104:3
**72.8**   358:20,25
439:7
**720**   321:25
**725**   2:20
**730**   286:13 288:6
289:21
**75**   411:4
**77**   3:10 5:6 10:7
**78**   10:7
**79**   10:8
**7:10**   397:5
**7:35**   397:8

**8**

**8**   8:1 120:8 126:13
136:3,9 172:9
252:15 270:2
281:1 288:1
412:10
**80**   10:8,9 73:12,23
74:16,16,17 75:24
76:1,6,7 77:1,4
134:21 403:25
405:20 406:2
407:17 408:3
409:25 411:2,6,7
412:10,16,21
413:19 414:9
**80s**   154:12
**81**   10:9,10
**812**   4:23
**84**   10:10
**843**   2:7,8,9,10
**85**   411:5
**850**   4:8
**861-7420**   4:16
**861-7582**   4:17

**87** 10:11
**88** 7:14
**8:30** 1:19 14:14
**8:34** 455:10
**8:56** 455:13 456:7
  456:8

**9**

**9** 8:4 182:2,17
  366:20 367:3,11
  397:14
**90** 260:20 290:9,14
  294:17,18 307:8
  307:10,13,19,19
  321:9
**90s** 93:17 154:12
  431:4,8
**92** 10:11,12,12
**94** 10:13
**94111-5356** 4:5
**95** 10:13
**950** 3:5
**97** 10:14
**98** 10:14
**9:28** 67:9
**9:42** 67:12

**a**

**a.m.** 1:19 14:14
  32:9 409:3
**aaron** 1:8
**abate** 257:8
**abbot** 404:16
**abdc** 16:14
**ability** 156:10
  162:11 196:9
  198:8 243:10
  260:4 277:16
  364:15 365:21
  436:18
**able** 32:4 114:4
  115:1 140:7

142:16,18 160:1
160:25 186:21
196:4 200:3
207:23 208:5
209:4 220:13
228:8 261:1
312:14 337:19
394:14 422:24
437:4 440:12
441:16 442:1
452:10
**absolutely** 33:22
38:11,20 55:9
71:19 94:12
115:17 173:23
174:1 268:15
287:22 289:6
313:25 333:8,13
334:23 348:7
355:13 382:12
392:18 411:3
437:23,25 443:21
**abuse** 9:14 51:25
59:11 83:14 315:7
316:11 328:21
378:14,23
**abused** 90:19
**abusing** 401:14
**accept** 77:10
**accepted** 228:13
**access** 99:9 113:20
114:7 140:25
142:18,20 143:22
150:23 151:17,22
151:23 152:2,4,5
153:4,10 156:19
157:15 158:4,6,8
158:12 161:11,13
163:6 164:6,21,22
166:10,16,17,20
167:5,6,7,9 168:5

168:25 169:7
181:14 260:23
276:7 277:18,19
301:23 303:21
440:7,22 441:4,7
442:9
**accessible** 44:4
440:17
**accessing** 99:7
**accident** 333:11
358:11,14 393:12
**account** 248:11,12
**accreditation** 9:16
377:2 385:15,23
386:13 389:14
**accrediting** 387:12
**accuracy** 63:8,10
**accurate** 52:20
100:3 103:5,8
169:6 183:2,12
191:24 192:6
293:22 305:3
443:22 444:1
**accurately** 182:21
329:24
**acknowledge**
193:9 392:15
461:11 462:16
**acknowledgement**
357:5
**acres** 239:19
**acronyms** 30:12
**act** 56:24 114:19
461:14 462:20
**actavis** 3:13,14 5:3
5:3
**acted** 103:6 396:9
**acting** 113:11
114:22
**action** 341:6
363:23 395:23,24

449:21 459:4
**actions** 53:7
346:22 376:5
433:21 434:7,11
434:24 435:2
**actiq** 317:3,19
**active** 356:12
358:12 405:18
**activities** 189:9,23
206:12 208:17
209:11 346:19
353:10 355:2,10
360:12,16 362:7
362:20 363:18
364:4 365:18
**activity** 59:10,24
87:7 150:25 180:7
206:19 363:19
365:5
**acts** 56:25
**actual** 122:12
271:23 297:2
438:15
**acute** 83:8 306:14
**adams** 3:4 15:23
15:23
**adapt** 93:3
**add** 42:9,15
179:20
**added** 23:18
182:24 183:15
393:2
**addendum** 49:3
**addendums** 49:12
**addict** 410:4
**addicted** 37:2 44:8
46:13 77:17 78:1
78:10,13 80:11
85:5,9 94:23
97:14 98:12 99:12
99:14,16 106:13

109:22 114:2,17
157:7 175:16
176:19 184:19
185:3,3,14,15
215:6 219:6 241:8
249:4 257:18
260:3,3,4,14
261:11,22 262:14
343:4 352:13
400:18 401:3,21
402:20,25 403:17
412:17 415:1
**addiction** 34:19
35:4 42:6 44:11
47:12 60:16 77:14
77:20,21 83:4,11
84:3,17 102:23
117:7 138:9
153:19 154:2,6,22
155:4 156:23
184:24 186:3
196:6 198:21
211:9 214:20
215:14,16,22
217:1,17 218:18
219:11,13,15
223:3 228:18
230:11 231:16
239:10 240:25
241:17,20 246:21
248:18 249:16
257:19,23 258:15
259:5,20 260:2,12
260:23 261:10,24
286:5 290:10
305:4 307:13
321:11 329:24,25
330:1,4 334:25
352:21 362:13
370:6 391:24
392:9 393:6

400:23 403:3
404:5,10,12,13
411:20 449:8
**addictive** 58:3,16
80:6 107:22 141:4
158:2 392:3
423:11
**addicts** 99:15
138:5,11,12,13,22
138:24 230:17
249:3,4 402:1
403:21 404:7
**addition** 147:19
212:12 335:6
357:3 367:9,12
400:2
**additional** 53:15
236:17 246:24,24
267:1 276:2
281:21 282:20
288:6 289:21
290:22 316:8,17
340:13 343:13
**additionally**
179:11 198:16
218:8 259:19
**address** 17:9
33:13 107:16
195:13 197:19
215:2 251:15
366:18 396:7
432:3 445:6,13
450:6 460:15
**addressed** 207:6
230:2 281:2
364:12 372:2
**addressing** 87:6
236:22
**adequately** 257:7
**adjournment**
458:22

**adjusted** 93:7
**adm** 26:19 28:22
44:18 47:9 58:8,9
58:10 59:21 60:3
60:12 73:10 74:7
83:2 95:10 142:24
146:19 163:1,6
169:5 187:19
204:16 212:12
214:25 217:7
218:9 222:14
223:5,9,10,13
224:11 225:11
226:1,20,21 227:4
244:25 245:3
356:12 372:25
373:2 408:1
410:18,24 445:24
449:12 452:22
**administration**
157:2 224:14
225:1,5,8 359:6
378:8 380:18,20
444:6
**admissible** 141:22
142:5,11
**adult** 177:18
**advent** 107:20
**advertisements**
361:4
**advise** 324:22
**advising** 438:10
438:11
**advisor** 438:11
**advisory** 447:12
**advocacy** 213:9
**advocate** 444:7
**affect** 204:9
**affiliated** 219:22
**affirmatively** 19:2

**affixed** 459:6
461:15 462:21
**affliction** 251:12
**aforesaid** 458:12
**afraid** 131:17
**afternoon** 233:23
266:19,20 311:12
**ag** 432:19
**age** 16:24 198:11
**agencies** 64:6
169:16 200:1
319:6 445:21
**agency** 68:23
387:12
**agents** 364:9
**aggregate** 43:10
130:16 189:13,16
190:3 192:25
193:16 205:16
272:9 286:16
292:5 305:22
431:23 432:11,18
432:19,23 433:2,3
433:7
**aggregated** 441:25
**aggressive** 384:6
**ago** 223:14 246:16
253:20 349:8
**agree** 14:10 38:7
49:8 50:11 52:6
75:13 81:2 122:10
126:3,21 248:23
405:13 406:4,10
406:14 411:1
441:17
**agreed** 81:4
406:25 435:6
**agreement** 247:4
**ahead** 102:13
125:19 168:18
179:19 192:3

199:4 422:6
426:23
**aid** 3:8 16:2
124:15,21 398:11
416:8,12
**air** 53:1 134:4
**akearse** 2:8
**akouba** 2:10
**akron** 1:21 2:2
7:18,22 8:1,7 15:7
15:11,14,16 20:22
21:2 24:19 26:10
52:15,22 65:14
66:1,6,10 91:23
103:18 117:24
118:6 120:11
128:6,12 136:4,10
152:1 165:15,20
169:25 203:17
204:4,8,10,12,13
204:25 205:6,12
205:22,24 206:5
207:11 240:17
247:5,6 254:21
255:5 263:25
269:18 353:7
364:23 438:13
**akron's** 8:13 204:7
264:13 270:13
**al** 1:11,11
**alan** 398:21
**alarm** 193:5
437:17
**alarming** 260:1
351:22
**albeit** 110:22
**alcohol** 58:8 83:24
185:10,14 219:8
401:6 402:3
**alcoholism** 219:14

**alexander** 88:21
**allegations** 353:10
355:9
**alleged** 273:4,5
326:23 333:23
394:24
**alleges** 416:17
**allen** 409:1
**allocated** 201:2
202:11,14
**allow** 115:8
408:17
**allowed** 19:1
184:11 298:18
355:8 421:10
423:23
**allowing** 156:19
**ama** 409:21
**amend** 136:25
**amended** 7:3,23
8:2,7,13 22:3,7,13
23:18 128:7,13
136:5,11 264:1,14
269:18 270:14
**amer** 409:21
**american** 407:20
414:18 431:11
**amerisourceberg...**
4:19
**amount** 51:16
57:19 66:13 86:14
104:8 187:19,19
216:6 234:17,19
307:15
**amounts** 157:8
**amplification**
177:5
**analgesics** 51:2
**analysis** 121:17
122:21 130:11
293:3

**analysts** 151:9
**analyze** 440:13
**analyzed** 123:10
**andrews** 5:11
14:11
**anecdotal** 371:21
411:8
**anecdotally** 85:12
**anesthesia** 36:25
**animalistic** 55:3
**animals** 91:23,23
**anne** 2:4 8:5 15:5
182:3,17
**annie** 2:5 15:12
**annual** 7:9 55:18
61:10 148:22
207:10
**answer** 18:22 19:1
25:9 36:9,9,13
57:6 68:19 78:21
78:22 79:10,14
80:10 84:4 97:19
102:1 111:18
123:11 131:16,18
132:5 135:20
136:23 137:16
143:17 144:24
145:21 148:9
151:24 153:6
158:14 160:5
181:19 186:19
202:14 220:13
233:17 254:9,12
258:20 274:22
281:19 282:15
296:10 306:7
320:25 323:10
324:17 325:9
327:25 331:15
335:21 336:1
338:21 339:13

341:22 342:16,22
351:3,7 360:22
361:23 405:6
413:21 415:6
418:13 419:8
420:16 421:18
422:1,7 424:14
425:7,8,9 426:23
427:1,2,2,3 434:16
439:25
**answered** 205:2
296:7 321:7 329:5
343:10 351:6
371:9 399:21
414:14,17
**answering** 110:3
160:6 420:1,4,9
424:21 429:21,25
430:14 455:24
**answers** 158:24
191:13 194:5
324:10 349:25
430:14
**anybody** 80:4
104:12 106:14
121:13 151:13,25
152:14 155:22
156:6 163:10
164:4 166:9
168:10 182:10
210:22 212:20
231:13 276:9
349:10 373:1
455:16
**anymore** 44:9
93:23 208:5
261:16,16 443:5
444:14
**anyway** 109:8
**apart** 29:20 31:20
121:3,3,16 122:20

123:4 151:14
168:10
**apologies**  190:12
**apparently**  277:19
348:19
**appear**  461:11
462:15
**appearance**
125:13 182:12
**appearances**  2:1
3:1 4:1 5:1 6:3
438:18
**appears**  47:22
49:1 61:24 68:16
126:16 194:17
275:7 284:9
**appended**  462:11
462:18
**applicable**  457:7
**application**  49:4
**applied**  306:10
307:2,23 316:8,18
319:15,21 322:12
322:25 330:11
337:5 340:13
**applies**  345:20
**apply**  49:11
210:13 230:17
296:18 306:4
319:10 344:13,14
**applying**  323:6
325:20
**appointed**  438:17
**appreciate**  298:24
453:16
**approached**
239:14
**appropriate**
115:14 130:6
206:7 229:20,21
292:10 305:3

308:12 314:1,6
322:21 327:18
387:5,13,16
424:22
**appropriately**
105:21 334:20
**approval**  40:3
**approved**  359:9
359:17 369:21
426:9 430:7
433:14
**approximately**
14:14 49:2 83:19
288:6 408:7
446:11
**arcos**  120:12
121:17,25 122:22
123:4,7 127:18
129:23 130:1,10
133:4,12 134:5
135:2 149:21
151:5,14 152:2,16
153:4 168:23
272:15,17
**area**  129:7 130:5,8
170:12,13 310:4
346:21 358:13
**areas**  206:12,19
**argued**  196:15
**argument**  80:3
408:14
**argumentative**
412:20 413:3
421:21,23 424:16
**arm**  232:11
242:20 404:8
416:19
**arms**  58:18
**arraignment**
438:16

**arrest**  65:10,10
151:19 154:2,14
178:21 204:9,12
**arrested**  43:21,22
46:8 63:24 159:20
205:12 227:18
410:11
**arrestees**  159:5
**arresting**  150:6
**arrests**  64:6 65:7
165:24 221:23
**arrows**  380:3
**article**  73:25 74:17
74:19 75:14,15,16
376:7 409:18
412:24 415:5
**articles**  28:19,22
30:14 73:17
**aside**  33:25 114:23
268:16 291:17
333:16,23 374:6
**asked**  33:13 74:24
79:2,3,4 100:9
102:2,14 122:18
137:17 140:10
149:20 151:16,23
152:2,10 155:11
182:16 193:25
205:1 296:6
302:15 309:4
311:4 321:6 329:4
343:9 350:8 351:5
351:5 356:3,3,4
363:11 381:13
396:1 397:23
399:20 414:14,15
414:16 415:13
418:15,20 422:2,3
434:13
**asking**  34:6 57:18
79:1,21 92:15

94:25 95:1 112:19
113:10,12,15
120:22 130:25
136:20 155:7
179:2,3 182:20
194:13 197:3
229:13 282:17
285:16,17,18
302:16 311:25
322:16,19 334:9
343:13 360:2
382:10 383:12,19
393:7,7 397:13
406:20 414:3,25
417:20 422:5
**asks**  64:13 118:25
191:3 419:23
**aspect**  172:21
**assembled**  447:18
**asserted**  299:3
**assertion**  132:11
418:11
**assessment**  7:6
47:21 48:2 427:9
453:18
**asset**  28:24
**assigned**  48:18
149:11 203:7
215:7 232:17
**assignment**  461:2
462:2 463:2
**assist**  170:2
**assistance**  49:3
162:22 169:17
170:22 171:7
172:20 446:19
**assistant**  17:17
213:19 438:5
**assisted**  337:18
**assists**  150:22

**associated** 53:3,7 87:17 206:9 215:8 225:25 238:15 243:16 246:2,5 249:13 256:1 337:20

**association** 414:18 431:6,12

**assume** 18:3,8,20 29:10 52:22 63:25 96:2 114:24 138:4 148:19 157:20 214:2 235:15 236:7 249:5 293:21 294:17 303:18 324:22 408:12

**assumed** 271:15

**assumption** 83:23 324:20 444:12

**assurance** 330:1

**athlete** 241:7

**attached** 269:8 462:7

**attaches** 37:18

**attaching** 299:15

**attachment** 68:1,8 444:25

**attachments** 7:12 67:15,21

**attended** 379:18

**attending** 15:2

**attention** 93:21 95:3,8 176:8 193:11 199:19 203:15 207:17 232:5 233:7 236:17 272:24 274:1,6 280:2 282:25 314:16,23 316:25 329:9

330:22 331:9 335:1 336:15 339:7 362:18 379:20 387:1

**attorney** 27:20,25 257:15 258:17 272:10 298:17 299:24 412:2,3 426:5 437:12 459:2

**attorneys** 8:20,23 9:8 15:1 24:7 28:18 32:1 133:25 134:1 265:1,8,25 292:8 320:11 330:17 399:24 438:17

**attracted** 253:22

**attracting** 253:13

**attributable** 402:14

**attribute** 68:25 206:13,20

**atty** 8:4,5 9:1 182:3,4 265:12

**auction** 215:24

**audience** 380:24 381:9,11

**audio** 14:8

**authorities** 364:3

**authority** 150:6 364:19,24 365:3

**authorize** 462:11

**authorized** 180:14

**autopsies** 200:1 207:24

**autopsy** 96:1 337:1,11

**availability** 51:14 68:25 69:12,18 70:1,4,7,13,14

71:3 240:11 333:7 334:8 373:16 454:8,16

**available** 51:18,24 54:8,14 71:1 74:11,11 76:4 104:1,5 120:10 152:6,8 157:16 167:25 197:16 260:21 261:15,16 261:21 262:13,14 262:21 303:19 319:1 353:22 359:10 369:18 373:5 382:6 384:8 386:11 394:19 395:6 396:13 401:4 439:22 440:2 447:22

**ave** 460:1

**avenue** 2:15 3:5 394:13

**avenues** 362:12

**average** 234:17,18 234:21

**awakened** 248:5

**awakening** 158:1

**aware** 32:23 33:12 35:3 45:25 46:2 47:7 52:2,11,21 54:14 55:12 59:7 70:19 86:20 91:11 92:15 108:24 109:1 112:18 119:24 122:25 123:5 145:2,7 146:25 169:14 171:4 172:3,24 173:1 209:10 214:13 253:5 263:7 276:10

277:3 279:20,21 285:8 294:2,6,7,11 309:23 316:19 318:6 319:16 350:15 353:9,16 353:19 356:21 357:5 362:21 363:3,10 373:13 391:23 395:14 406:18 416:15 445:22

**awareness** 57:24 58:6 141:3

**awkward** 344:3

**b**

**b** 1:17 7:3 8:10 22:8,13 87:18 145:9 186:25 206:2,7 225:21,24 226:8 229:22 251:15 264:6 295:18 298:2,11 335:6,22 336:18 336:22 337:5,19 338:14 343:14 345:11 346:14 347:20 359:24 370:9 415:9 426:6 433:13 460:8 461:4,9 462:4,13 463:20

**babies** 44:21 47:14 196:18 215:6 231:6 257:17 258:24

**back** 30:16 33:1 52:24 54:2 55:17 73:16 74:15,15 75:6,9 78:5 83:2 95:1 117:7,9,9 131:3 167:1,1

**[back - beneficial]**

190:5 192:12
195:1 197:12
198:14 205:17
211:11 220:15
222:23 236:2
237:9 239:25
240:3 244:7,18
245:8,24 261:8
267:22 300:24,25
326:13 329:9
335:1 353:13
371:2 387:18
393:14 404:2
422:24,25 423:6
428:4,7 442:5
453:18 460:15
**backs** 75:19
**bad** 102:7 112:19
114:18 248:11
396:5 423:8,13
**badgering** 429:21
**bag** 44:10 172:7
**bags** 172:1
**baker** 4:13 16:16
24:20 26:13 48:13
49:14,22 50:16
52:25 149:6,8
152:15 163:23
166:2 169:20
427:22 428:3
453:17
**baker's** 26:1 48:15
56:3 427:8
**bakerlaw.com**
4:17,18
**bank** 216:6,7
**bar** 20:18 409:2,9
**barberton** 66:10
231:3 247:3
**barker's** 26:1
218:23

**barnes** 26:1
259:14 400:9,12
402:18 403:2
**based** 73:6 102:7
120:9 121:24
123:7 129:22
130:10 254:7
278:19 320:2
329:16,20 340:16
341:6 343:1
345:23 375:22
409:11 411:10,10
411:12 412:13,14
431:22
**bases** 412:23
414:9
**basic** 18:3 236:7
**basis** 35:6 72:24
130:9 274:25
415:1 417:17
418:1,11 441:14
**bates** 389:3,4
**bathroom** 157:23
**bearing** 343:14
**beat** 422:5
**beaten** 258:4
**beating** 426:21
**becoming** 45:10
45:11 54:8,13
98:14 306:17
438:17
**bed** 229:9 262:1
362:12 365:11
451:11,17
**beds** 175:25 240:6
**began** 35:8 44:2
44:16 53:16 60:13
107:24 140:11
141:3 187:17
259:7,12 362:23
450:19

**beginning** 32:21
52:11 125:8 158:1
221:25 237:6
**begins** 283:10
**behalf** 2:2,12,18
3:2,8,13 4:2,11,19
5:2 15:6,9,13,16
15:19,21,23,25
16:2,4,7,9,14,16
23:4 33:3 125:15
212:25 332:20
349:5 350:3 353:6
367:2,5 376:19
385:1 392:22
398:12 434:18
**behavior** 58:14
111:8 143:23
246:21 248:7
**bel** 427:25
**belief** 129:4
351:25 376:14
**believe** 22:16 24:9
31:6 32:19 36:19
37:25 43:15 60:22
67:3 68:6,10 70:2
71:7 76:10 82:21
89:16 99:13 110:5
119:17 121:18
122:8 124:15
126:10 127:17
129:15,25 133:15
137:1 142:18
144:11 145:9,12
148:11 156:8,23
161:10 162:4,17
164:13 167:16
169:13 173:4,22
174:8 175:7 183:1
222:6,7 242:14
254:3 255:13
259:6,11,13

271:14 278:7,10
278:11 280:19
281:13 290:6,13
297:1,4 298:17
299:22 300:16
312:11 315:23
316:22 334:23
337:8 353:23
357:1,4 358:20
367:21 370:7
372:16 373:18,18
375:9,14 376:7,20
377:4 378:3,6
381:19 385:17,19
402:18 406:12
407:10,13,15,21
409:20 414:19
416:2 418:23
419:24 420:18
421:14,17,24
422:15 427:25
431:3,8,9,10 433:8
436:10,13 439:7
440:3,14 444:24
446:22 452:23
453:2,11
**believed** 122:5
129:19 132:8
422:13 424:5
**believer** 29:15
208:11
**believes** 129:4
180:19
**believing** 78:21
**bell** 193:5
**bellwether** 274:8
274:11 326:19,21
329:21 335:7
**beneficial** 39:22
225:3

**benefit** 203:1
**benefits** 39:25
**best** 25:6 28:24
  30:22 156:19
  162:14 165:5
  228:9 243:10
  296:9 430:1
  436:18
**better** 44:25 100:1
  102:18,22 117:13
  153:25 155:5
  157:18,19 162:19
  167:22 181:16
  216:18 219:20
  253:18 257:20
  294:20 304:20
  375:2 392:21
  413:15 418:13
  451:25 452:8,14
**beyond** 120:4
  136:1 139:18
  181:18,19 196:8
  243:22 245:9
  257:4 274:20
  281:25 322:6
  323:19 324:14
  328:5 363:9
  372:11
**biennium** 225:16
**big** 29:14 104:2
  156:25 162:7
  368:15 435:16
  436:21 449:17
**bill** 452:5
**billion** 186:10
**binder** 74:21
**bit** 30:6 50:14 80:9
  88:1,1 149:15
  168:23 172:13
  258:25 284:24
  288:23 289:1

300:20 314:17
  349:21 350:22
  366:16 436:6
  442:15
**blame** 175:10
  351:14
**blaming** 106:10
  395:20
**blank** 85:1
**blanket** 179:10
  180:13
**blanketed** 353:4
**bleeding** 221:11
**bleeds** 329:12
**block** 26:2,17 32:4
**blocks** 32:5
**blood** 338:1
**bloom** 44:25
**board** 26:12 47:9
  58:10 59:21 60:12
  107:19 115:25,25
  116:1,12,13,20,21
  116:21 117:1,3,3
  117:18,20 146:19
  162:22,23 163:1,2
  163:11,17 196:20
  214:25 216:4
  217:7 223:5,9,10
  223:13 224:11
  225:12 226:1,20
  226:21 356:12
  408:1 431:7
  447:12 452:22
**boards** 211:18,25
  212:24
**bob** 27:19
**bockius** 3:9,15 5:5
**bodies** 45:2
**body** 241:10
**bogged** 301:2

**bonds** 438:17
**border** 92:17
**borders** 364:16
  365:4
**born** 44:21 47:14
  215:6 257:17
**bornstein** 241:6
  241:24
**bottle** 102:16
  260:19 337:24
  338:9
**bottom** 62:8
  190:25 221:14
  256:25 272:25
  299:21 379:24
  387:21,22
**bought** 86:18
**boulder** 156:25
**boulevard** 2:6
**bounce** 366:16
**boundaries** 119:1
**box** 103:16 244:2
  244:5
**boxes** 244:13
  263:18 380:3
  385:8
**boy** 178:4
**brad** 26:6 115:21
  381:19
**brain** 74:8 198:10
  304:6
**brains** 37:18
**breached** 416:24
**break** 67:6 74:7
  178:15 181:21
  191:19 236:25
  243:7 269:11
  311:11 313:1,10
  314:17 348:22
  366:1,8 397:2
  403:8 440:9

**breath** 136:21
  452:11
**breathing** 348:19
**bressi** 109:2 145:3
  145:8,10,18 146:6
**brian** 27:5 87:17
  88:6 144:4 186:24
  187:8 188:10
  193:13 219:20
  220:12 225:22
  226:6,19 229:14
**brickell** 2:14,15
**bridgeside** 2:6
**brief** 354:14
**briefly** 151:6
  266:22
**bright** 114:11,20
**bring** 176:2
  193:11 446:23
**bringing** 31:11
  46:5
**broad** 210:12
  380:24
**broader** 157:15
  381:9,11
**brother** 260:3
**brotherhood**
  217:21 227:6
**brought** 89:16
  94:23 259:10
  262:11 322:1
  446:15
**buckets** 442:6
**budget** 24:16 27:8
  221:16 223:16
  225:16,24,25
  226:3,8,15,15,18
  259:17
**budgeted** 225:17
**budgets** 225:22
  226:7 229:22

**build** 239:13 392:8
**building** 170:5
  215:23 239:16
**built** 451:17
**bulb** 368:12
  449:17
**bulk** 157:7
**bullet** 191:8 194:6
  196:16 202:3
  211:1,5 214:16
  216:20 220:17
  222:24 228:18
  230:3 233:9 235:6
  237:14,25 238:17
  238:22 243:9,13
  243:14 255:25
  258:22
**bullets** 387:3
**burden** 246:3
**burdens** 122:16
**bureau** 165:22
  259:7 400:14
**burglaries** 53:8
**burglarized**
  199:12
**buried** 427:18
  442:25 443:9,12
**burling** 4:3,7 16:7
  16:9
**business** 93:3,8
  250:22 253:6
  254:25 255:1
  446:5
**businesses** 92:22
  193:6 250:14
  253:6
**busy** 93:1 199:20
  251:15 362:10,11
**butter** 141:24
**buy** 86:2,9,17
  198:8 248:14

  394:20
**buying** 256:21
**bwc** 393:17

**c**

**c** 239:5,20
**ca** 460:25
**cabinet** 102:19
**cadre** 403:1
**calculated** 188:7
**california** 4:5
**call** 56:1 115:11
  133:16 156:4
  166:1 188:2 198:1
  209:5 224:18
  228:24 230:8
  246:11 248:17
  259:9,9 290:15
  329:21 330:10,14
  330:19 341:12
  394:9 446:24
  448:6
**called** 16:24 98:5
  111:5 141:23
  142:2 170:1 239:7
  239:11 307:10
  428:12 448:11,18
**calling** 47:6
**calls** 203:25
  250:14 261:5
  301:20 309:24
  310:2 312:22
  321:7 341:8
  424:17
**campaign** 141:3
  196:25
**campaigns** 196:22
**campus** 231:3
  239:21
**canada** 111:17,23
**cancer** 83:6
  130:19 283:16

284:20 286:3
287:17 289:13
293:14 300:22
301:14,18,19
302:6,13,20 303:5
303:10,15,23
304:3,10,18,23
306:5,13,23 308:9
311:18 312:12
316:7 317:6,13,24
318:12,21 319:3
327:11,13,16,19
327:20 328:5,13
**capacity** 154:24
  165:21 200:5,14
  235:22 246:7
  397:23 447:14,15
  451:11,15
**capita** 350:20
**capital** 192:15
  194:7 197:25
  376:4 432:10
**capitol** 381:2
**captain** 48:12,15
  48:16,17 49:14,22
  50:16 52:25 56:3
  61:25 62:5 82:21
  166:16 218:22,23
  427:8,22 428:3
  453:17
**caption** 14:19
  458:21
**capture** 253:9
**car** 159:1 199:12
**carbon** 172:10
**cardinal** 2:18
  15:21 170:25
  172:5
**care** 98:17 194:9
  196:17 211:7,8
  214:18,19 215:9

216:17,23,25
217:2,14,14,20
218:8,10,14,17
223:1,2 226:21,21
227:10 228:9,16
228:17 229:1
230:4,5,8 231:14
231:15 236:20
258:23 259:3,18
308:9,9 385:15
386:13,20 388:6
388:18 389:14,19
449:5,7
**careful** 232:24
**carefully** 395:20
**caremark** 278:2,3
**caresource** 276:6
  277:25 278:3,5
  291:12 303:17
  325:1,12
**carfentanil** 38:21
  42:23 72:8,15,20
  74:14 81:7,12,16
  81:20 84:19 85:2
  85:24 91:12,15,17
  91:21,24 94:15
  233:4
**carmen** 166:12
**carnage** 419:14
**carole** 4:14 16:15
**carolina** 2:7
**carried** 444:16
**carrier** 278:1
**carries** 390:9
**carry** 171:25
**carrying** 444:11
**cartels** 92:8,11
**case** 1:7,11 14:19
  14:21,23 21:25
  24:11,15 31:3,15
  41:10 52:18 55:7

89:22,23 97:17
114:4 142:3 152:9
179:10 192:1,8,19
194:16 196:14
204:3,11,24 205:5
260:1 272:7
276:16 281:9,17
294:4 297:24
321:24 326:12
338:18 341:7
376:6 399:24
432:2 441:14,14
460:6 461:3 462:3
**cases** 20:24 21:2,4
28:7 45:17 46:4,5
46:7,11,24 52:18
53:21 54:4,19
55:14 60:3 63:11
63:16 90:2 93:1
97:18 140:14
147:18 150:8
151:22 153:1,10
153:13 170:5
199:7,10 200:18
200:19 208:14
209:8 221:1,5,6
246:17,17,19
396:19 408:8
438:9,15
**caseworker** 159:9
**caseworkers**
175:25 215:7
227:15 246:25
**cash** 139:13,16
**casualties** 177:23
**catch** 207:13
208:25
**catching** 207:16
**categories** 69:7
191:3,9 238:6
449:2

**category** 138:19
138:20 156:7
203:4 238:11
243:22 244:23
245:8,13 249:25
250:8 253:3
257:12
**cause** 47:18 84:8
107:25 181:1
333:22 334:10,19
383:13,15,16
384:3,13,15,20
385:6 390:8 391:3
415:23 416:5
419:11,15 420:15
420:15,17 421:14
421:15 437:2
458:12
**caused** 43:10
91:13 117:11
189:14 192:21
194:10 197:15
207:14 220:21
305:22 352:9
357:20 358:4
360:14 365:5
368:5 390:17,22
418:23 419:24
421:24 424:5,6,20
**causes** 333:15
334:4,6 420:16
425:16
**causing** 95:2
**cdc** 290:12 294:16
295:9,22 307:4,8,9
321:8
**cdc's** 290:8,13
**cell** 14:6
**center** 217:22
227:7,17 239:8
257:24

**centered** 215:21
352:11
**centering** 231:2
**centers** 239:4
**centre** 3:16
**cephalon** 3:13 5:2
**certain** 33:4
100:22 130:18
140:6 160:18
184:9 196:4,10
208:13 220:4
251:6 279:11,14
309:22 310:5
312:23 324:2
335:6 393:20
401:1 415:9 417:6
453:7
**certainly** 32:22
34:13 43:19 45:12
50:23 53:15 57:9
57:15,24 63:11
65:13 66:9 70:3
70:20,24 71:7
75:7,12 77:22
78:7 80:3 81:1
82:22,22 83:24
84:14 87:9 89:8
89:12 97:13 99:6
99:22 102:20
106:23 111:6,9,25
116:7 121:22
135:25 138:14
141:18,22 147:3,6
147:17,20 155:24
157:20 158:3,21
161:11 164:10
165:4,25 169:19
173:17 179:6
184:24 185:1,7
192:16 193:13
200:19 201:5

202:22 204:7,19
205:15 207:9
212:10,22 213:9
214:25 216:16
218:15 221:15
222:21 228:12,25
229:7,16 230:13
230:15 234:12
236:20 240:9
244:13 246:23
249:12 256:24
257:1 262:20
290:15 305:1,6
308:8,18 309:25
310:18,20 312:8
312:10,13,21
328:9,19 332:19
332:24 337:24
338:10 341:1,11
341:18 342:25
349:22 364:9,23
369:3 385:9
387:15 391:16
393:21 394:7,10
402:16 403:20
405:8 414:21
419:14 420:20
422:25 425:19
429:3 434:11
435:10 440:3
441:21 443:1
448:1,6 453:12
**certificate** 6:12
458:1 462:11
**certification**
234:10,14 461:1
462:1
**certifications**
208:10
**certified** 17:2
220:6

certify 458:8,19
459:1
cetera 449:3
chad 26:11
chain 7:11 67:19
423:14
chains 417:15
champion 443:5
443:10
chance 290:9
413:25
change 47:8 54:17
68:24 141:7 142:7
156:18 157:24
162:7 198:10
246:23 247:25
249:10 262:12
306:16 380:18
381:8 460:13,14
462:8 463:3
changed 141:8
142:12 143:23
144:1 153:24
167:18 181:15
207:19 221:16
333:19 347:5
380:20 451:22
changes 92:7
142:22 156:13,16
206:11,19,24
376:10 382:24
383:8,12,22 384:5
404:9 440:1 444:5
460:12 461:7
462:7,9
changing 157:7
442:14
char 406:9 413:1
characterization
50:20 89:6

characterize 89:17
413:13,14 414:23
429:14
characterized
392:17,18
charge 62:5
charges 255:5
charging 438:13
chart 439:16
charts 148:24
cheaper 394:19
check 60:23 248:9
248:11 378:6
chemical 284:22
chicago 3:10 5:7
chief 17:17 27:16
27:22 187:5
213:19 438:6
child 104:4 196:16
242:15 258:23
259:2,23 260:5,6
352:13 358:18
368:14 369:1
412:5
children 193:24
196:18 228:23
229:2 258:24
children's 187:22
196:20 197:2
238:14 257:17
259:7 400:14
402:22 403:4
china 90:16,21
choices 60:19
choose 84:24
choosing 425:24
chose 449:22
450:6
chosen 307:22
christopher 2:14
15:18

chronic 305:2
306:20 326:20
327:5,7 333:10
369:12
circle 379:25
455:5
circumstance
313:20
circumstances
313:24 314:4
citizens 175:8
city 2:2 7:18,22
8:1,6,11,13 15:7
15:10,13,16 20:22
21:2,22 27:1
65:14,25 117:24
118:6 120:10
128:6,12 136:4,10
203:17 204:4,10
204:12,24 205:6
205:12 206:4
263:25 264:11,13
269:18 270:11,13
353:6 364:23
citycenter 4:8
civil 17:1 19:12
21:18 457:3,7
461:5 462:5
claim 411:12
claiming 411:16
claims 191:25
192:7 276:8
303:18 390:12
450:2
clarify 55:21
66:25
class 153:20 196:3
251:4,5
classification
251:7

classified 180:10
classify 81:8 84:5
clean 289:4
cleanup 249:14
clear 23:25 80:8
183:22 267:15
344:17 413:8
clearance 207:18
clearly 340:24
clergy 446:6
449:14
cleveland 3:5 4:16
8:12 27:3 264:11
270:12 459:7
460:2
clever 99:15
cliche 451:6
client 398:13
431:7
clients 414:25,25
clinical 382:25
383:9,23 384:5
clinicians 381:21
381:22
clomax 2:16
close 28:23 34:12
35:12 83:17
290:16 403:11
409:2 416:1 455:4
455:6
closed 248:11
closely 44:3
119:19
closing 215:22
coaches 220:5,10
233:12 234:9,11
234:16
coaching 220:3
cocaine 38:23
42:25 43:5 63:5
82:10 83:22 84:25

85:9 86:18 90:23
91:5 92:13 93:5,9
93:11,17,24 99:13
147:18 219:14
230:20 249:3
259:22 401:6
402:3
**code** 21:11 175:1
**cohen** 7:21 9:2
118:3,11 265:13
267:17,21 281:3,5
281:16 282:13
347:8 349:7
397:15
**cohen's** 268:8
269:6 366:21
**coincidental**
340:18,23
**cold** 195:11
**coleman** 4:14
**colleague** 267:5
455:5
**colleagues** 59:3
237:19 263:16
266:25 397:12
**collect** 254:20
**collection** 235:1
296:18
**collective** 368:11
396:8,22 432:5,6
436:25 451:8
452:11
**collectively** 278:23
**college** 34:14 35:8
35:10,22 241:7
399:2,3,9,12
**colored** 385:8
**combat** 117:19
157:11 162:24
169:1,12 173:6
211:20

**combatting**
169:17 170:23
**combination**
320:4
**combined** 314:12
**come** 32:6 38:17
43:17 54:21 58:6
72:21 73:24 92:16
95:12 122:22
130:17 131:10
134:10 145:4
158:20 159:11
160:8,18 164:10
186:15 189:8
194:4,25 205:16
236:2 239:12
245:22 255:15
277:13 307:18
308:11 349:17
367:25 369:22
391:11 401:13
403:1 404:2
405:18 406:19
410:9 419:13
432:20 439:9
446:7
**comes** 42:12 76:15
82:19 132:20
147:10 158:15
204:13 217:23
251:13 260:19
369:20 400:17
401:25 407:18
417:5
**comfortable** 160:6
189:15 301:4
348:9 418:17
420:6
**coming** 47:11
73:22 78:5 94:20
131:2,3 139:18

177:23 201:23
205:12 258:10
321:16 353:3
374:3 432:2 448:7
**commander** 82:6
**comment** 402:16
**commercial** 51:20
**commission** 9:16
212:25 377:2,8,14
385:14,22 386:13
386:24 388:12,14
388:17 389:8,13
389:18 459:17
461:19 462:25
463:25
**commission's**
386:19
**commissioned**
458:8
**commissioner**
410:24
**commissions**
211:18,25
**commit** 408:15
**committed** 99:16
99:20 135:24
246:20 248:8,9
**committee** 445:5
445:12
**committees** 19:14
**common** 21:3 60:7
96:25 185:2
204:14,15 246:13
246:25 247:12
351:10 362:16
368:20 389:15
**commonly** 224:22
246:14
**communications**
27:14

**communities**
63:21 154:22
250:4 254:23,25
448:3 450:15
**community** 28:6
28:21 30:23 31:1
31:21 35:22 37:23
42:8,24 43:12,15
45:13,20 52:12
53:19 55:11 58:1
58:25 75:13 82:18
94:20 95:14 96:18
102:18 107:23
144:12 160:13
173:18 174:17
177:5 179:12,13
180:19 190:3
192:24 193:19,22
194:3,8,11 195:14
195:15 198:3,23
202:19 208:22,23
212:4 217:22
227:7 229:17
239:8 240:15
241:12 248:17
250:11,22 251:12
257:24 261:9
263:12 305:24
309:25 333:12
334:8,12 349:18
350:21 352:2
353:4 358:10
363:10 368:10
369:15 374:2,5
375:19 376:4
384:8,25 391:8
393:2 395:23
396:2,23 400:2
404:10,11 405:15
408:15 413:15
414:24 432:8

433:8 446:3
447:18 448:2,7
449:13 451:8
**companies** 324:25
365:19
**compare** 321:13
**compared** 65:21
**compassion** 195:4
**compel** 9:3 265:16
**compiled** 359:2
**complain** 362:6
**complaint** 31:2
32:23 41:20 42:4
250:16 326:23
353:5,9 416:17
418:8,9 431:9,11
**complaints** 346:17
346:23 350:12
351:1 354:25
361:20
**completed** 232:14
458:22 460:15
**completely** 149:21
283:4 287:11
**complex** 392:15
392:18
**compliance** 9:4
265:17
**comply** 144:16
305:19 419:16
**comport** 144:10
294:20
**compound** 91:10
**compromise** 288:3
**con** 367:15
**concentrated**
228:5
**concern** 250:22
351:20,22 352:9
358:5 360:14
365:5,17 368:5

451:13
**concerned** 157:3
361:10,20
**concerning** 120:11
206:11,18
**concerns** 47:17
288:4 346:17,23
350:12 351:1,16
354:4,25 356:22
357:1,20 366:10
367:17
**concluded** 456:1,8
**concludes** 456:6
**conclusion** 322:2
362:15 375:24
396:8 442:16
**conclusive** 51:16
**conditions** 40:11
40:24 304:23
**conducive** 29:18
**conduct** 333:16
**conducted** 148:1
**confident** 90:1
121:8,23 212:24
**confidential** 8:18
8:21 9:6,9 264:23
265:5,22 266:4
**confirm** 54:16
55:13 182:21
276:18 293:18
302:19 303:14,21
319:2 329:2 332:8
366:17 371:10
**confirmed** 267:9
**conflicting** 226:5
**confusing** 357:25
**confusion** 288:21
**conjunction** 43:6
91:7 272:13 373:2
**connected** 381:2

**connection** 171:7
355:9 363:25
371:20 376:15,17
381:5 394:23
395:14 396:14
431:18
**connects** 376:22
**connolly** 2:19
15:21
**consensus** 320:3
322:6 326:11
**consider** 146:2
187:15 189:21
217:2,19 320:6,17
321:2 388:18
**considerably**
64:23
**consideration**
451:1
**considered** 38:12
90:5 97:20 252:1
253:7 320:15
388:5 389:9
**consistently**
403:25
**conspiracy** 376:1
**constituents** 176:9
**consultation** 292:7
297:24 298:20
**consulting** 307:4
**consumed** 161:19
161:21,22
**consumer** 357:8
357:15
**consumers** 78:19
358:12 446:12
449:9
**consumes** 97:9
**contact** 158:20,21
159:9,11 160:8
172:25 173:2

194:1 217:23
362:5 364:2
391:11 399:5
400:18 401:13,19
401:25 406:19
410:9
**contacted** 166:8
277:15
**contacting** 341:18
**contained** 132:13
272:1 277:20
296:25
**contend** 274:11
304:1,8,17,22
305:12 308:13
314:8 326:19
329:22 332:10
333:1 387:15
**contended** 374:8
**contending** 313:17
**contends** 305:7
312:7 328:17
**contention** 130:14
272:5 292:2
305:20,21 308:1
309:5 327:4
328:11 332:19
**context** 25:7 31:12
372:10
**contingency**
354:19
**continuation**
365:10
**continue** 14:9
285:2 291:10
292:3 313:15
317:16 328:8
346:5 348:16
**continued** 3:1 4:1
5:1 54:5 342:9

continues  45:23
51:2 83:24 140:20
330:2,6 331:18
419:15
continuing  58:21
245:20 287:23
387:17
contract  218:4,9
276:1
contracted  134:11
135:3
contracts  217:20
218:7,9 219:1,16
219:18 227:2
319:6
contribute  429:4
429:11,13,15
430:13,16 454:7
contributed
418:25 419:4,9,20
419:25 420:6,23
421:17,24 422:13
422:18 423:2,4
424:5,9,21,25
425:3,11,13,15
426:8,11 427:3
428:24 430:7
contributing
377:15 383:10,18
383:23 384:1,11
384:12,15 385:2,4
390:4,8 392:24
393:1,8,11 395:11
418:15 425:16,22
contributions
383:3
control  354:19
controlled  69:17
70:8,13 129:5,19
184:3,5,15 442:8
442:11 454:8,16

454:21
convene  446:4
convened  354:8
convening  362:2
conversation  94:7
175:5 243:6,7
280:1 320:10
351:9 356:10
362:3 369:1 372:6
372:21 418:3,7
446:8 451:21
conversations
14:5 28:6 29:2
149:7 298:18
349:22 352:10
418:5,10 434:11
434:19,23,25
convicted  107:2
137:10,14 144:19
145:18 340:24
343:19
conviction  159:8
252:22
cooperation  114:6
155:17
coordinate  212:1
cop  23:15
copied  281:17
copies  61:18,20
copley  17:11
copy  270:4,24
379:6
corner  389:1
corners  179:24
corporate  285:21
297:16 298:13
397:24 403:15
406:22 419:2,17
420:2,8 421:10
422:9 423:24
424:23 426:9

433:17
corporation  4:2
4:20
correct  19:16
23:13 33:4 35:1
40:1,11,24 41:2,7
41:8,14,18,19 51:7
51:13 52:1,9 55:8
56:10 57:20 59:8
61:4 65:1 68:12
68:13 69:24 70:18
71:23 72:3 76:23
77:2,3 81:7,12,22
82:13 85:6,10,25
86:4,5,12,20,21,25
88:22 89:4 90:16
90:24 92:2,9
94:11 95:5,19
98:3 101:11,25
103:21,22 104:9
104:10,25 105:1,4
105:5,8,25 107:9
107:10 108:3,12
109:8,16 111:2,12
112:3,12 115:16
122:13 124:24
129:11 133:1,7
134:22 138:5
142:6 144:20,21
146:24 156:11
158:5,7 170:8,9,14
183:16 184:3,7,8
184:12,13,17,21
188:4 205:9 209:9
213:3,23 219:7
224:1 225:9
242:22 252:2,16
255:5 273:6,7,19
276:12 285:7
289:17 290:6
294:1 301:11,15

307:6 311:23
313:22 314:6,7,14
314:21 327:21
339:20 346:15
353:15 373:14
378:4 399:6 403:9
403:12,13 408:17
409:6 412:23
416:8 418:17,19
423:25 427:4,24
428:10 434:22
438:24,25 439:4,5
439:22 440:19
441:8 444:2
449:24 450:7
453:9 458:17
corrections  460:12
462:17
correctly  274:15
283:20 317:9
326:24 330:7
331:22 349:7
388:8 447:25
corresponds  89:8
corruption  21:9
cost  186:3,13
196:16,22 200:2
215:1 222:22
247:19 249:25
256:1
costs  87:16 88:5
176:3 187:13,23
194:23 195:2
196:24 206:8
211:7 214:18,23
215:8 216:22
217:13 223:1
225:25 226:21
228:15,16 229:24
230:1 231:20
237:25 238:14

243:16 246:2
249:13 257:7,25
258:6,7,8,9,23
259:18 260:7
**coun** 298:1
**council** 364:22
446:4 450:16
**counsel** 14:18 75:3
87:14 110:2
121:23 123:9
127:12 155:11
229:12 237:18
267:19,22 268:17
269:4,12 271:10
271:13 272:14
274:23 276:3
277:21 278:20,23
279:7 280:1
281:17 286:21
297:12,13,23
298:7,16 299:3
310:12 318:15
319:9 322:4,7,14
322:23 323:18
324:7,16,22
326:11 328:19
340:17 345:9
347:3 349:11,22
359:23 363:22
370:8 379:9 418:5
418:7,10 419:8,22
422:2,23 424:12
426:15 427:20
429:20 455:20,25
457:1,10 459:2
**counsel's** 273:20
**counseling** 231:12
238:2 239:4
**counselor** 61:18
206:1

**count** 171:13
439:7
**counterfeit** 263:3
**counties** 207:25
208:1 255:9 363:5
**countless** 211:24
**country** 208:13
**county** 1:11 2:3
7:4,6,18,22 8:1,6
8:12,12 9:11 15:6
15:10,13,17 17:14
20:16,20 21:3
22:8,14 23:3
24:21 25:1,4
26:14,18,23,25
27:4,15,20,22,24
28:1 33:2,8,20
42:3,16 44:5 45:2
45:18 47:4,10,22
48:2,18,19,22 51:2
51:19 52:8 53:8
53:10 54:15 55:17
55:18 58:10 60:9
62:6 63:12,13,16
63:21 64:4 65:5,6
66:2,3 70:2 71:21
72:21 73:8 74:2
75:17 77:20 80:17
81:17 82:8,17
83:3,11 84:11
86:7 87:6 88:22
89:8,11,14,18 90:4
90:21 91:14 92:2
93:10 100:24
102:21 104:4
105:10 106:21
108:7,18,23
111:17,24 112:20
115:6,24 117:24
118:6 120:10
121:18 122:25

128:6,12 136:4,10
137:10 139:24
142:25 145:24
146:9 147:1,2,5,10
147:11,14,25
148:3,4,13 149:10
149:19 150:12
151:13 152:1
154:21 158:15
160:15 161:5,18
161:20 162:13,21
163:17 164:4,20
164:21,24 165:1
166:12,13,15,22
168:4,10,25
169:11,16,25
170:7,21 171:2,5
172:1,18 174:15
175:2,19 177:12
177:16,19 179:13
186:1,13 191:25
192:7,19 193:4
194:15 196:13
197:24 198:16,19
200:21 203:10,23
204:3,8,9,11,14,22
204:23 205:8,13
205:22,24 206:5
206:11,18 208:4
209:24 210:3,9
212:8,12,21,25
213:3,4 214:10,23
215:12,19 216:1,4
217:13,20 218:3
218:14 239:1,4,6
239:15 240:9
244:1,20,22 247:8
247:12,18,20,21
249:6,17,21 250:9
250:15,17 251:17
251:23 253:7,16

253:24 254:20,21
255:1,6,12 256:18
259:21 261:4,18
261:22 262:9
263:2,25 264:12
264:12 266:11
269:18 270:12,12
273:4,9 278:6,16
285:22 295:1
296:4,11 304:8,21
305:7,12,21,21
310:15,17,20
312:7,14 313:16
314:5,8 323:7
328:17 330:10
332:10,21 333:1
333:14,21 334:3
336:21 349:5
350:3,5,11,14
351:1,16,23 352:8
352:25 353:6,16
353:24,25 354:10
354:11,25 355:7
355:12,17 356:13
357:20,20 358:3,4
358:4,19,23 359:2
360:11 361:10,19
361:22 362:5,19
362:25 363:9,11
363:14,16,24
364:2,13,22,22
365:1,4,5,16,19
366:20 367:2,6,14
367:17 368:5,18
369:5 371:25
372:19 373:12,15
373:17 374:7,9
376:19 377:13
379:17 384:4
385:2 390:7,16
392:14,23 394:23

395:3,13 396:12
397:18,24 399:16
400:14 403:16,17
405:2 406:23
407:25 408:3
413:18 415:24
419:3,18 420:3,8
423:25 424:23
428:14 429:10
430:17 431:21
433:6 434:2,4,8
435:1 438:24
439:8,21 440:25
441:23 445:13
446:3,13 447:1
448:3,12,19,24
449:21 450:18
453:19 454:3
458:4 461:10
462:15
**county's** 76:4
141:14 272:5
289:4,7 328:22
365:17 366:9
434:18
**countywide** 65:15
187:18 188:3
**couple** 23:19
30:14 32:12 64:8
100:24 102:18
108:19 109:12
154:1 186:6
233:23 255:25
275:7 436:11
**coupled** 135:2
**course** 38:11
233:21,22 288:19
314:3 434:20
453:1
**courses** 54:9
246:16

**court** 1:1 6:15
14:22 16:20
141:23 142:2
154:25 164:13
187:15 204:13,14
204:16,16 209:17
210:15 215:5
217:24 246:11,12
246:12,13,14,17
246:25 247:3,3,4
247:11,12,18
249:6,8 326:4
410:14,23 438:13
438:16 461:7
**court's** 120:11
**courthouse** 103:15
**courtrooms**
438:19
**courts** 154:19,24
159:7 200:10,14
210:9 227:20
246:4,6 247:2
410:13
**cov.com** 4:6,10
**cover** 33:16 61:25
211:5 219:5
246:19 423:18
**coverage** 278:4,5
**covered** 163:22
210:25 230:2
235:5 243:5,8
325:8 418:23
422:4 424:6
**covington** 4:3,7
16:7,9
**crack** 46:5 99:12
179:24 259:21
**crafted** 395:21
**craig** 372:25 443:4
**craig's** 373:25

**create** 153:18
173:7,10 175:6
236:20 239:8
240:11 326:3
337:2 442:6
**created** 35:22
44:11,11 45:12
72:11,22 74:12,13
94:19,23 123:15
134:4 192:23
196:3 213:20
248:15 251:5
257:8 258:15
262:10 297:9,13
297:15 305:23
340:16 391:10
392:20 394:13
396:15 447:6
**creating** 117:10
251:4
**creative** 255:4
**crendon** 4:17
**cri** 277:1
**crime** 56:14,17,18
56:23 64:23 66:14
96:20,23 101:18
111:10 144:15
207:5,13,15 232:9
232:15 235:24
248:18 408:15
**crimes** 53:3,16
56:5 64:15 65:11
137:10,14 340:25
**criminal** 7:9 19:12
51:24 53:6 54:25
56:23,25,25 59:10
59:24 61:2,9 87:6
111:1 121:9 142:2
150:25 153:22
155:3,3 157:4,9
213:8 217:25

221:1 447:11
**criminalized**
117:7
**criminalizing**
154:7 248:6
**criminally** 140:2,5
**crises** 42:9,15
**crisis** 28:20 41:23
42:7,8 84:12,15
87:10 94:5 173:19
175:15 176:17
202:2 224:8 253:8
253:17,24 255:13
321:21 362:13
392:15,24 394:2,6
395:22 398:17
402:23 413:9
415:23 418:25
419:5,21,25
421:18,25 422:14
422:19 424:6,10
425:4,11 428:25
429:5,11 430:16
430:20,23 447:6
**crit** 316:15
**criter** 289:21
**criteria** 132:3
267:25 274:22
275:1 279:3,15,17
284:13,16 287:16
289:11,24 290:3,7
290:11 292:17,23
293:3,6,14,24
294:5,9 295:24
296:17 297:7
298:3 299:5 300:2
300:20,22 301:5
301:12,16 306:1,4
306:10 307:1
311:6,7,20 312:2,4
313:10 314:12

316:2,8,17,23
317:11,18 318:10
318:18 319:10,15
319:19,21,25
320:2,7,18 322:10
322:11,15,17,18
322:25 323:3,4,7
323:20 324:2,6
325:21 326:6
327:14,20 328:13
330:11,20 331:24
336:20 337:3
340:13 342:17,19
343:5,11 345:11
355:19 431:19
**criterion** 122:17
130:19,25 275:20
279:10 284:18
286:3,21 292:10
297:1,11 302:14
316:5,12,15
317:15,15 318:4
322:5 326:2
330:16 340:16
**critical** 173:13,16
177:22 202:19
**crystal** 82:9
**csb** 215:7 258:10
**cuff** 413:10
**cumulative** 236:15
**currently** 17:12
62:6 156:22
**custody** 6:14
**cut** 90:18 110:5,7
**cutting** 91:8
**cuyahoga** 1:22
8:12 14:17 27:4
66:11 264:12
270:12 458:4
**cvs** 416:12

**cycle** 225:18,19

**d**

**d** 4:4,21 170:10
**d.c.** 2:20 4:9
**dad** 260:13
**daily** 163:8 283:18
287:18 288:7
289:15 308:2,6
311:21
**damages** 87:16
186:24 192:19,21
194:15 196:14
204:3,23 205:4,9
229:22
**dan** 1:8 239:12
240:24 241:23
**dan's** 241:15
**dance** 18:8
**danger** 215:22
232:25 233:2
290:15 307:11
353:25
**dangerous** 21:8
43:23 57:15 58:2
82:17 156:2
351:25
**danielle** 2:6 15:15
**dashboard** 73:20
76:3 163:7 169:4
359:3 440:4,6
**dashboards**
410:18
**data** 52:14,23
73:20 76:3 120:9
120:12 121:2,4,17
121:25 122:22
123:4,7,10 127:16
127:18 129:23
130:1,10 133:4,12
133:17 134:5,8
135:2,2 146:17,21

146:23 162:23
163:3,6 164:15
166:25 169:4
272:17,19 277:16
291:9,13 296:19
302:1 303:12
322:4 325:23
358:24 359:1,3
373:15 410:17
439:9,10,13,20
440:16,18 441:4,6
441:6,15,16,18,24
441:25 442:4
443:16
**database** 151:12
168:24 169:10
440:12,18
**databases** 169:3
**date** 14:13 22:22
45:5 298:10
457:11 460:8
461:3,9,19 462:3
462:13,25 463:20
463:25
**dated** 49:1 182:18
270:1,22,24 281:1
382:4 386:12
437:21
**dates** 9:11 49:9
136:25 266:10
**dating** 353:13
**david** 7:21 9:2
118:3,11 265:13
281:2,5
**davis** 133:20
134:15,16 135:8
**dawson** 193:14
**day** 2:13 15:19
45:14,21 52:18
82:23,23 100:3
102:9,10 160:18

175:22 177:18
193:20 215:2
257:25 307:8
308:15 309:9
319:19,20 345:21
392:7 398:16
410:10,23,25
412:11 444:1
452:2,3 459:7
461:16 462:22
463:22
**days** 102:25
152:24 210:23
244:7,14,18 245:8
245:24 354:16,23
442:21 443:20,23
444:1 460:18
**dd** 216:2,3,4
**dea** 40:7 149:12
151:9 169:19,22
184:17 244:13
364:9 434:13
450:1
**dea's** 433:20,22
434:2,8 435:2
**dead** 93:19 242:4
258:3 422:5
**deal** 187:5 206:8
213:5 235:16
445:3
**dealer** 86:9,18
**dealers** 85:22
179:23 263:3
**dealing** 172:21
236:8 402:19
**dealt** 99:11 421:15
**dear** 460:10
**death** 21:2 35:13
161:12,12 193:21
235:3 251:11

**deaths** 9:12
203:20 211:10
214:21 266:11
337:15,21 338:17
**debacco** 1:25
16:21 458:6
459:14
**deborah** 27:20
**debris** 249:15
**decade** 20:23
55:24 175:15
176:18 186:2
**decades** 56:7
77:22 154:1 193:2
194:12 445:16
448:10
**deceased** 337:25
**decedent** 336:25
**december** 23:16
32:21 62:9 182:18
270:23,24 367:23
435:14,21 436:7
437:4,18 438:2
440:10 448:17,22
450:9,24 453:20
**deception** 21:8
43:22 46:11 221:3
**deceptions** 57:14
156:1
**deceptive** 274:14
**decided** 363:24
**decision** 310:10
318:14 330:15
**decisions** 122:19
227:22 322:7
326:9
**deck** 199:1 372:14
372:24
**declare** 193:3
**declared** 446:16

**decline** 262:19
**decrease** 197:16
220:21 225:11,14
225:19
**decreased** 195:22
195:25 224:11
250:3 260:6
**decreases** 226:15
**decreasing** 69:8
69:18,19 225:15
454:17,22
**dedicated** 201:6
**deed** 461:14
462:20
**deemed** 460:19
**deems** 424:22
**deep** 79:25 287:4
**deeper** 166:6
186:12
**deepest** 20:5
**deeply** 109:22
114:2 175:16,17
176:19
**defendant** 171:23
273:6 289:9
**defendant's** 8:15
264:16
**defendants** 7:20
7:24 8:3,8,9 9:3
14:18 16:5,17
41:10,12 46:7
118:1,9 125:16
128:8,15 136:6,13
158:11 170:22
171:7 172:4,19
247:5 264:3,5
265:15 266:23
269:20,21 270:15
271:11 274:14
275:18,23 276:15
277:10 279:13

281:23 282:9
288:4 289:10
293:5,13 294:4
304:24 308:24
313:12 315:8
319:20 320:8
323:15 324:4,9
327:2 329:22
333:5,16,24
334:16,17,24
338:18 341:7
343:22 353:11
376:6 416:14,18
417:16,23 418:22
419:4,20 421:13
422:12 423:9
424:4 425:3,11
**defense** 44:23
87:11 187:14
277:21 279:6
281:17 286:20
322:3 328:19
408:13
**defer** 254:5,8
**deferred** 197:25
198:1 255:17
**definitely** 40:4
111:9 138:9
232:21 377:24
**definition** 38:1
108:20
**definitively** 77:7
284:11
**delivery** 457:9,11
**demand** 53:24
54:7 68:25 69:12
69:18 92:5 93:7
94:22,22 202:25
222:1 239:2
**demarcation** 45:5

**democrat** 20:9
**democratic** 354:15
**democrats** 174:5
**dentist** 112:23,24
113:2
**dentists** 112:15,20
184:10
**department** 24:19
44:18 63:22,24
86:7 103:18
146:19 149:13
150:5 163:1 165:3
165:16,21 169:5
172:2 187:20
204:17 205:7
207:10,11 215:3
217:9 218:2
227:20 230:1,4,25
231:1,7,14 244:24
245:3 256:22
439:11,13 460:22
**department's**
52:15
**departments**
150:6 244:1,12
438:12
**dependence**
321:10
**dependency**
130:23 284:22
303:5 316:7 328:8
**dependent** 196:17
258:24
**depending** 108:20
401:4
**depends** 144:17
158:19 244:11
252:8,17
**depicting** 383:10
**deposed** 17:2
76:19 183:1

[deposed - different]

338:11 356:2
**deposition** 1:16
7:4 14:8,15 17:22
17:24,25 22:4,6,8
22:14,22 23:7
24:5 25:20 28:4,9
47:25 49:18,24
56:4 61:7 67:18
73:2 74:6 82:7
88:12 115:21
118:5,18 125:9
128:11,21 136:9
153:3 182:2
263:24 264:10,22
265:4,11,21 266:3
266:9 268:11
282:12 292:16
295:15 330:25
366:15 367:9
372:17 375:20
377:7 378:12
379:14 380:14
385:21 386:23
397:14 399:18
400:9 427:24
434:21 439:16
452:17 455:25
456:7,8 458:20
460:8,11 461:1,3
462:1,3
**depositions** 25:23
26:9 27:3 32:1,20
82:2
**depressants** 51:17
**depth** 151:10
186:24 300:11
**deputy** 213:16
**derivative** 37:12
37:13 77:17
**derivatives** 93:16

**derived** 162:3
**describe** 231:25
273:2
**described** 30:20
33:16 233:9
238:11 257:11
284:4 367:7
394:25
**description** 7:2
**designate** 267:24
**designated** 23:3
23:10,14 33:3,21
88:6 149:25
182:23 185:21
200:15 229:22
267:4 282:11
293:23 346:2,13
366:19 426:6
**designations** 267:7
**designed** 197:19
445:6
**designee** 285:22
297:17 298:13
318:17 350:4
397:24
**desirable** 251:18
**desire** 55:5 93:5,6
422:23
**desk** 203:13
**desperate** 54:10
54:12 177:16,20
407:4
**despite** 395:2
**detail** 300:18
**detailed** 119:20
**detect** 169:1,11
**detecting** 169:17
**detective** 24:19,21
59:2 63:12,13
113:23 120:21
140:7,9 149:5,6,8

151:17 152:15,18
152:19,21,23
154:8,18 163:23
163:25 165:12,14
165:22 166:1
167:14 169:19,21
204:10 349:20
356:3 453:25
454:11,23
**detectives** 46:5
149:5 158:22
161:9 168:8 199:6
203:9,11,18
221:24 232:17
434:12 454:4
**determination**
205:19 302:4,11
326:12 383:19
**determine** 132:14
301:17 309:19
317:12 321:14
331:25 337:5
363:19
**determined**
121:24 123:6
303:8 322:5
**determines** 227:13
**determining** 326:6
330:10
**deterra** 171:25
172:7
**deterrent** 315:7
316:11
**detox** 227:17
**develop** 75:24
299:4
**developed** 333:4
334:14
**development**
250:10,11 251:14
251:21

**devote** 32:5
**devoted** 211:22
**diabetes** 198:18
201:7,8,18 202:11
202:15,17 222:18
**diagnosed** 283:17
284:19,21 287:17
289:14 327:16
328:5,7 332:22
**diagnoses** 286:5
**diagnosis** 184:24
293:14,15 317:5
317:13,24 318:21
319:3 328:2,13
331:17
**die** 195:24 452:3
**died** 89:13 232:11
242:19,24 322:1
335:8 337:6
**difference** 37:20
46:3 71:2 122:11
156:10 167:8
176:23 177:1
242:8 296:13
**different** 26:20
30:8 46:16 65:22
65:24 78:7,8,21,22
79:10 84:20,24
85:13,13 93:15,16
94:3 100:16
109:12,23 110:13
110:24 115:13,14
117:9 122:16
133:16 134:21
140:25 144:20
147:5 148:25
150:2 158:24
179:25,25 180:3
185:7,9,18,18
186:6,11 189:9,22
193:7 200:18

207:7 208:10
210:13,19 219:14
224:16 244:12
261:4 262:25
271:14 279:16
284:24 311:3
316:22 349:15
350:23 361:16
379:3 392:4
404:18 436:15
442:6 448:7
**differentiate** 300:7
**difficult** 140:14,17
153:9 199:8
205:21 207:15
208:14 252:14
253:11
**dig** 409:22
**dilaudid** 39:17
**direct** 166:10
172:24 218:4,5
227:8 230:6,7
231:12 237:18
242:8,8 272:24
274:1 280:2
282:24 287:5
294:19 314:15,23
329:9 336:14
339:7 357:2,8,9,14
387:1 402:6
**directed** 37:4
267:23 362:18
451:10
**directing** 274:6
316:25 331:9
335:1 379:20
**direction** 85:4
226:25 352:18
391:12
**directives** 294:21
305:18

**directly** 37:18
78:18 100:25
187:7 193:14
239:1 241:16
391:14
**director** 24:17,24
25:1 27:6,8,21,25
211:23 213:16
224:6 259:13
296:11 350:9
400:13 403:4
406:25 407:7
410:23 452:21
**dis** 100:11 320:13
**disagree** 70:22
71:5 236:14
298:10 383:14,22
441:21 453:8
**disagreements**
453:6
**disallow** 251:3
**disappear** 248:20
249:2 261:3
**disbursal** 51:20
**disc** 449:17
**disciplined** 143:15
339:18,23 341:6
**disclose** 329:25
330:4
**discount** 390:3,5
**discovery** 8:16 9:4
111:6 124:6 131:7
131:15 132:2
264:18 265:17
268:3 270:16
276:1 330:15
390:25 414:20
**discretion** 177:25
178:19 181:9
**discuss** 71:10
149:14 153:2

298:14,23
**discussed** 49:13,16
84:5 143:14
188:10 199:8
281:13 284:19
295:10 303:4
319:7 344:7
361:25 363:6
367:13 372:5,9
379:16 406:24
407:24 425:22
450:8,13
**discussing** 368:19
**discussion** 35:15
75:2 76:20 90:10
94:6 222:7 224:5
269:4 313:15
368:3,17,22
371:24 372:10
382:1,14,17
447:13 451:23
454:13
**discussions** 149:4
167:13 295:19
310:13 372:3
379:11 448:8
450:16,19
**disease** 77:15
211:9 214:20
217:1,18 223:3
228:18 231:16
404:6
**disintegrate**
172:15
**disk** 125:8 237:6
**disorder** 283:17
287:18 289:14
293:16 328:14,21
329:3 331:17
332:1,12,22 333:3
333:4,16,23 334:3

334:5,7,14,15
**disorders** 184:20
**dispatched** 209:2
234:11
**dispensed** 121:19
320:14,18,19
384:24
**dispenses** 41:13
**dispensing** 189:1
189:11
**dispose** 172:16,16
**disposed** 103:14
**disseminated**
382:11 444:10
**distinction** 38:10
286:11 360:24
361:1 441:3,3
**distinguish** 286:10
**distracted** 124:25
**distribute** 41:2,7
41:15,18 180:9
**distributed** 51:21
179:15 350:21
**distributes** 41:13
**distributing**
180:10 352:19
**distribution** 43:11
69:1,13,19 92:7,20
189:1,11 416:3
428:12,13 445:7
454:21
**distributor** 7:19
7:23 8:2 99:24
100:10,11 105:6
118:1,9 128:8,15
136:6,13
**distributors** 99:23
100:5,20,25 101:3
171:21 180:21
384:23 395:1
450:3

**district** 1:1,2
14:21,22 174:25
**dive** 80:1 166:6
186:12 287:4
**diver** 150:1
**diversion** 51:1,25
52:16,17 53:8
64:10 80:3 96:9
96:12,13,20 97:7,8
97:12,13,16,22
101:10 103:19
107:7,25 112:2,16
112:24 113:4
115:19 116:3,15
117:19 119:4
120:4,20 121:6
137:11,15 141:12
141:15 146:9,12
146:25 147:10,13
147:25 150:4
156:11 162:24
169:1,12,18 170:3
170:16,19,23
179:10 181:10
189:2,11 201:14
220:22 221:19,24
222:16 305:5
364:10 394:3,4,7
428:16 434:12
445:7
**diversions** 150:2
**diverted** 43:16
51:17 91:4,20
97:1 102:21
105:24 111:16
158:16,20 159:12
197:18,23 202:4
202:11 208:17
212:13 428:13,17
**division** 1:3 14:23
52:16 65:9 170:1

203:11 214:5
250:10,12,13
**divulge** 178:24
**doc** 100:17 103:2
113:10,12 114:1
114:22
**docs** 111:9 114:18
124:9,21 361:7
**doctor** 37:5 79:18
79:20 80:2,5,13
82:19 97:6,15,16
98:3,7,7,10,14,19
98:20,20,21 99:2
99:25 100:12,14
104:12,23 113:16
114:3,24,25,25
115:2 130:16
132:15 135:15
139:16 144:3
172:23 180:4,23
180:24 260:15
296:9 334:21
369:4 391:13
393:12,23 423:6,6
**doctor's** 144:16
215:10
**doctors** 40:10,17
40:23 100:5,16,22
101:1 102:11
103:2,3,5,8 108:2
108:6,8 109:10,14
110:21 111:4
112:5,7,9 113:22
114:14 115:8,13
116:22 129:17,18
130:1,3 131:11
132:1,8 133:6
135:17,22 141:1
143:2,6,15 144:25
145:4 150:14
153:8,16 155:22

157:5 162:5
179:22 180:14
184:10 194:8
261:9 299:20
305:1,8 309:24
310:3,9,13,18,18
312:10,24 339:18
340:24 341:9,12
342:23,25 343:6
343:17,18 357:4
360:19 368:25
391:5,6,7,16
422:25
**document** 1:10 7:5
7:8 9:11,13,16
22:3 47:20,23
48:1,25 49:1,9,14
50:5 61:1,8 67:2
88:9 117:23
119:11 128:5
129:16,16 136:3
266:10 269:15
270:9,21 282:6
286:25 297:2,10
297:13,15,19,21
299:2 300:16
314:19 331:5
373:22 378:13
379:14,16 382:4
385:18,22 386:8
387:17 388:22
427:23 437:6,19
**documentation**
303:18
**documents** 24:12
25:2 28:11,16
29:12,20 32:22
43:24 46:12 48:9
118:17 128:20
155:25 210:5
268:24 269:13

284:7 290:17
294:10 296:16
297:6 299:1 301:3
301:4 305:17
328:1 330:24
332:7 400:4
436:10
**dodson** 27:21
**doing** 18:5 31:23
59:20 60:2 111:1
111:2,12 117:5
174:21 180:6,7
207:24 212:3,6,7
215:4 242:15
277:2 373:1 396:6
421:25 424:13
426:14
**doj** 210:7
**dollar** 192:16
206:4 216:6
226:11 229:19
**dollars** 88:5
139:18 173:18
175:19 176:20
186:10,11 187:21
188:17 200:9,10
200:15 201:16,25
202:21,23 203:1
206:9 209:17,20
210:1 216:8,14
223:12,19 224:19
227:9 255:3
**domestic** 209:5
**dominant** 94:7
**dominated** 362:4
**donated** 239:4,19
**donna** 24:25 26:2
26:16 29:25 30:3
73:18 75:2,12
76:19 296:10
356:5 404:16,16

407:8
**donna's** 75:19
**door** 32:6 103:17
**doors** 139:18
**dos** 98:13
**dosage** 98:13
**dose** 308:2,6
**doses** 36:24
283:18 287:18
288:7 289:15
307:10 330:6
**dosing** 285:4,24
289:23 290:1,7,11
294:15 307:15,19
311:22 312:11
313:18 321:3,4,4,5
323:8,8
**double** 60:23
270:3 275:6 348:1
378:6
**doubles** 148:19
**doubt** 56:9 69:23
284:12
**doug** 58:24 74:5
75:12,19 295:3
452:17
**dozen** 115:22
**dr** 26:3,3 58:24,24
74:5 82:1,2 109:2
109:2,3 133:20
134:15,16 135:8
137:20,25 138:8
143:23 144:1
145:3,10,18 146:1
146:4,6 163:5
164:1 208:11
245:19,19 295:3
295:11,19 296:5,8
337:2,4 356:7,10
356:11,17,21
361:24 377:7

381:22,25 386:23
411:22 440:7
452:17 453:11
**draft** 31:7
**dramatic** 57:10
354:17,20
**dramatically**
221:16
**draw** 360:24 361:2
441:2,3
**drew** 88:21
**drinking** 348:20
**drive** 3:10 5:6
17:10 394:14
**driven** 230:15
245:1
**driver** 374:22
393:21
**drives** 262:4 376:2
**driving** 113:23
155:16 196:23
413:8
**drop** 244:2,5,13
**dropped** 370:17
**dropping** 93:18
**drove** 422:25
443:7
**drug** 4:19 7:5,12
9:13 21:4,10
37:17 43:23,23
45:17 46:12 47:21
48:1,18,21 51:18
57:15 58:14 62:6
62:17 63:13 64:4
65:5 67:20 68:3,9
68:14,24 70:4
82:8 89:8 92:8,19
93:1 130:22
137:11,15 147:14
147:25 148:3,13
154:19,24,25

155:25 159:7
164:13 166:14,15
169:25 170:11
179:23 187:15
200:10,14,19
203:19 204:16
206:13,20 207:2
209:17 210:8,15
227:20 231:22
244:7 245:8,24
246:3,6,11,14,16
246:17,21 247:2
247:18 249:6,8
250:21 263:3
359:5 363:8
378:14,23 400:19
401:3,21,22 402:1
402:2 410:13,14
410:23 427:8
445:16,18,20
448:11,12 453:17
454:3
**drugs** 21:9,9,25
38:12 42:17,19
51:11,24 58:2
63:1,4 65:21 69:2
69:6,17 70:8,14
71:22 72:2 84:24
85:13,21,24 86:3
87:7 91:5 92:16
95:25 98:21
112:12 148:25
154:13 156:2
159:16 180:9
230:17 394:9
401:15 403:22
404:18,21 405:3
428:16 454:9,17
454:22
**drugstores** 53:9

**dsalerno** 2:11
**dual** 184:24
**ducks** 362:15
**due** 45:3 124:8
192:21 195:22
250:2,4 402:14
**dull** 141:24
**duly** 17:1 458:7,10
**dump** 103:16
172:13 175:18
243:24 244:3
245:7,23 452:7
**dumped** 241:11
**duped** 113:12
**duration** 330:5
**duties** 149:18
**duty** 416:22,23
**dying** 84:18
174:24,24 175:10
175:20,21,22,23
198:25 387:6
452:1

| e |
|---|

**e** 2:5 7:11 23:18
38:1 67:14,19
68:1,7 145:9
267:9 398:25,25
**earlier** 21:12
85:20 102:14
156:17 157:16
259:1 263:1
273:16 307:3
321:14 361:9
363:4 367:16
373:4 374:15
377:20,21 378:4
379:1 380:17
397:23 414:15
427:7 430:22
435:18 436:6
452:15

**early** 44:15,19
56:1 58:23 60:9
60:22 137:18
141:21 153:10
181:13 198:11
221:7 351:12
361:25 398:15
435:22 440:11
445:24 448:17,23
450:9,19,24 451:2
451:14,22 453:20
**earmarked** 203:19
**earn** 207:23
**easier** 394:20
**easily** 44:9 193:4
**east** 240:16
**eastern** 1:3 14:22
**eat** 91:9 280:12
**economic** 250:11
251:13,20 393:21
**economist** 257:16
258:18
**educate** 58:13,15
59:4 211:19
310:18 402:24
**educated** 261:9
451:15
**educating** 59:18
**education** 58:22
59:13,20 60:11
100:2 107:18
245:20 447:3
**educational**
346:19 355:2
360:12,16
**effect** 140:24
292:6 354:23
355:14
**effective** 199:17
306:20 352:15
369:2 387:5

**effectively** 442:2
**effects** 353:20
361:7
**efficacy** 361:8
**efficiency** 195:22
250:3
**efficient** 92:21
**effort** 87:4 158:17
159:21 163:2
189:21 195:7
210:10 211:19
228:5 239:20
241:13 288:3
452:10
**efforts** 59:13
170:18 185:23
195:12 199:22
212:1 232:13
245:4 433:19
434:1,5 451:9
**eight** 20:5 24:7
223:18 224:15
422:1
**eighth** 188:3
**either** 26:10 37:19
98:11 119:13
148:5 152:1
172:20 208:12
226:24 243:6
244:14 248:11
251:2 260:20
290:24 299:17
312:2,2 336:24
340:24 344:14
364:16 405:25
426:16 459:2
**elected** 225:10
354:18 442:22
446:5 447:18
449:11

**electronic** 283:25
**electronically**
271:22
**elements** 384:16
**eleven** 344:23
**eligibility** 227:13
248:2
**eligible** 215:16
246:11
**eliminating** 198:8
**eller** 398:23
**ellis** 3:4 15:24,24
**else's** 248:12
**email** 460:17
**emergency** 32:7
59:3 159:14,15
193:3 214:7
231:20 232:6
235:23 446:17,18
**emotionally** 432:8
**empathy** 154:10
**employ** 164:18
**employed** 17:13
26:10,14 164:25
165:15 252:9
322:8
**employees** 26:17
27:3 137:21
139:12,19 210:10
253:20
**employers** 250:17
**employment** 196:4
196:5 252:2
**emt** 232:13 236:7
236:8
**emts** 235:9,15
236:16,18
**enact** 364:13
**enclosed** 460:11
**encountered** 45:18
104:16 111:21

116:16
**endless** 258:1
**endo** 4:11,12
16:17
**enforcement**
48:21 58:12 71:4
82:14,21,24
107:24 115:1,5
116:17 121:14
140:16 141:1,19
142:24 158:21
159:6,18 160:9,11
160:13 166:11
167:4 168:2 169:8
178:1,20 181:10
199:5 200:12
203:4 206:12,13
206:19,20 221:20
222:2 234:3,6
235:22 244:15
310:21 363:9
408:1 410:9 440:8
445:21 448:4,14
449:3,4
**enforcing** 209:3
**engage** 364:17
430:4
**engaged** 112:1
119:3 156:1
310:17 353:11
360:12 363:22
364:4
**enhance** 198:2
**enhanced** 140:22
212:4
**enhancement**
198:2
**enormous** 432:11
**enrolled** 228:6
229:2

entailed 119:16
entered 182:11
  462:9
entire 65:9 248:16
  257:18 461:5
  462:5
entities 26:21
  204:7,20 214:24
  276:13,13 303:19
  365:2 386:20
  418:21 419:3,19
  421:12 422:11
  424:3 425:2
entitled 22:3 47:21
  61:2 128:6 136:3
  298:14 422:10
entity 214:22
  217:12 249:21
  310:15 385:11
  422:17 424:9
  425:10
entrance 259:10
entry 388:4
environment 78:8
  216:11
epidemic 41:22
  42:10,16,18 43:1,3
  43:8,13 45:6,7
  87:10,17 154:3
  174:18 175:17
  192:22 196:2,11
  196:24 197:20
  198:4 211:15
  212:7 224:9
  232:25 238:4
  241:4 243:18
  248:5 249:9 251:3
  256:2 257:9
  258:15 261:3
  305:24 350:16
  365:15 377:16

380:2,4,8 382:15
  383:4,11,24 384:3
  384:13 385:3
  390:4,6,17 391:10
  395:11 403:22,24
  446:20
epiphany 396:11
equipment 176:6
equivalency 30:11
equivalent 130:20
  332:23 338:6
er 95:11 315:5,5
era 221:21
errata 460:13,18
  462:7,10,18 463:1
especially 114:1
esq 2:4,5,5,6,14,19
  3:4,9,16 4:4,7,14
  4:14,21 5:6
essential 174:6
essentially 37:17
  139:14 172:8,15
  180:19 220:7
  239:22 250:14
establish 409:4
established 279:10
  370:9
estimate 28:13
  80:25 160:24
  161:4 399:25
  400:5 412:15
estimated 401:19
estimates 51:16
et 1:11,11 449:3
evaluate 115:2
  250:8 320:12
  364:3
evaluated 232:20
evaluating 321:3
  388:19

evansville 4:22
evening 32:13
  398:8,9
event 459:3
events 288:19
eventually 399:10
everybody 100:17
  260:23 408:20,24
  409:1
everybody's 412:2
evidence 232:18
  235:1 242:9
  390:12,14,14,18
  390:21 408:16,20
evolution 167:15
evolve 93:3 140:20
evolved 232:25
exacerbate 45:9
  384:7
exacerbated 45:9
  383:15 393:3
  423:5
exacerbating
  390:6 419:12
exact 80:21 115:20
  137:19,19 148:2
exactly 65:16
  66:23 104:24
  105:3,7 243:3
  246:9 267:18
  313:21 327:15
  447:15
exalgo 315:5
exam 20:18
examination 6:7
  16:25 17:4 266:17
  266:25 398:6
examiner 161:13
  164:16 187:13
  221:17 337:18

examiner's 26:5
  45:3 164:19 176:1
  176:5 194:24
  199:24,25 207:23
  208:11 221:12
  336:24
example 34:8
  66:12 69:11 72:5
  219:15 320:19
  321:13 408:23
examples 387:18
  387:25
exceeds 229:8
excellent 270:8
  271:5
exception 182:23
exceptions 33:23
exchange 23:18
  202:22,24 230:12
  230:16
excluding 168:14
  257:10
excuse 36:17
  111:8 210:6
  338:22 415:17
  427:9 429:10
  432:19 434:25
executed 462:10
execution 461:14
  462:19
executive 19:24
  26:24 27:15,23
  186:7 187:7
  211:23 213:10
  350:7 364:23
  446:9,13,16
executive's 17:14
  73:10 187:16
  193:10 250:12
exerted 434:17
  435:8

**exhibit** 6:14 7:3,5
7:8,11,14,18,22
8:1,4,6,11,18,21
9:1,6,9,11,13,16
22:3,6 33:2 47:20
47:25 61:1,4,5,7
62:13 64:11 67:14
67:18 88:9,12
117:23 118:5
123:17,18 125:22
128:5,11 136:3,9
182:2,17 188:22
190:20,20,21
194:17 220:19
237:10 263:24
264:10,22 265:4
265:11,21 266:3,9
269:8,16,17,24
270:10,19 271:7,9
272:22,25 273:10
273:11,15,23
274:3,13,25
278:24 279:6,13
279:16 280:4,5,17
282:25 283:10,13
284:5,14 285:2
287:15 288:2
289:8 291:5,23
292:22,24 293:12
294:14 299:17
300:3,3,3,8,13,21
305:13 308:14,23
308:24 314:16,17
314:24 315:20
316:4 317:1,4
318:7 325:13
326:13 329:8
330:23,23 335:2,6
335:13,22 336:15
336:17,18,18,22
337:5,19 338:13

338:14,15 339:6
344:22,22 347:10
347:20,23 349:1
366:14,22 372:16
378:12,20,21
379:6,21,23
382:22 385:21
386:6 387:2
389:23 397:16
415:8,9 427:5,9,15
427:19 428:2
433:11,13 437:7,9
442:20
**exhibits** 6:5,15 7:1
190:11 274:18
275:4 278:20,21
283:23 284:2,10
290:19,24 292:14
292:16 327:9
340:8 342:20
345:11,11,24
427:18
**exist** 65:25 213:13
294:12 307:12
**existed** 77:20,22
152:12 153:5
213:17 442:4
444:17
**exists** 83:4
**expand** 210:15
248:1 250:23
**expanded** 246:19
247:1
**expansion** 200:9
209:18 246:22
365:11
**expect** 262:18
**expectation** 165:9
177:10,11
**expended** 215:1

**expensive** 74:12
262:5
**experience** 25:6
28:7 260:18
412:15 413:16
414:8 415:4
**experienced** 68:24
413:12
**experiences** 34:1,2
411:18
**expert** 130:11
397:18,25 398:2
402:22 403:3
415:15,22 418:23
419:24 421:14
422:13 424:5
425:18
**expertise** 208:14
402:19 407:15
453:2
**experts** 75:13
121:24 123:10
292:9 318:15
322:8 326:11
330:17 446:24
**expiration** 461:19
462:25 463:25
**expires** 459:17
**explain** 197:4
417:4 431:24
**explained** 30:3
395:21
**explanations**
300:12
**explicit** 300:18
**explicitly** 259:5
**explode** 77:23
**exploded** 192:23
221:9
**explosion** 222:1

**exposure** 233:3
**extensively** 24:23
**extent** 182:25
226:4 234:1
247:20 259:2,4
**extra** 61:17
**extrapolate** 55:11
**extrapolated**
310:6 312:22
**extremely** 34:12
50:17
**eye** 436:18
**eyes** 8:20,23 9:8
265:1,8,25

**f**

**f** 2:19 3:14 4:7 5:3
**face** 7:15 49:1
54:22 88:14
**faced** 221:10
225:18
**facilities** 218:12
229:8 249:14
365:9 389:19
**facility** 216:5
217:5 229:11
239:14 320:20
451:17
**facing** 42:16
362:13 396:25
**fact** 40:14,16,22
56:14 58:2,3
72:14 74:23 85:3
110:25 123:24
127:1 152:6
164:11 173:12
309:20 321:20
353:24 381:10
395:2 399:8 425:1
**factor** 196:23
320:15 355:22
362:16 377:15

383:3,24 384:1,11
384:15 385:6
393:11 413:9
**factors**  45:9 71:8
275:13 320:4
374:7 382:18,20
382:23,24 383:10
383:19 384:12
385:3,4 389:22
390:4 392:24
393:1,4,8 395:10
418:16 419:13
420:21 424:17
425:17,21
**factual**  418:11
**fail**  18:14 122:1
**failed**  211:5
329:24 330:4
**fair**  21:10 80:25
85:7 86:14 87:2,3
89:6,17 90:19
108:10 110:20
178:9 215:11
256:10 262:24
304:21 355:5
364:1 444:3
**fairly**  127:17
**faith**  114:22
**fall**  106:9 223:20
**falling**  196:5
**falls**  1:22 14:17
66:11 257:12
**false**  46:15 329:25
333:9 391:18
**familial**  259:22
260:2,12,23
**familiar**  30:9
41:25 48:12,21
67:1 96:8 113:1
116:25 119:9,12
129:13 150:23

191:15 267:11
278:11 286:7,25
300:9,18 355:25
356:2,4,5 385:14
388:14 389:15
**familiarize**  282:6
**families**  224:8
238:4 241:3
258:19 411:23
**family**  42:7 80:25
101:23 179:16
194:2 241:16
242:3 259:24
260:5,7,9,16
352:20 411:21
435:16 436:21
449:10
**fancy**  385:8
**far**  52:1,21 66:10
70:19 80:1 81:1
91:10 99:15,15
144:17 187:16
234:9 245:21
246:8 263:5
333:25 334:1
364:10 403:5
435:9 444:15
447:1
**farther**  261:8
**fashion**  42:14
45:20 103:7
163:18 262:17
**fashioned**  210:9
**fatal**  7:15 88:14
203:12
**fatigue**  195:4
236:21
**fault**  104:11
105:24 106:3,6
176:12

**fbi**  169:23 170:1
**fda**  39:25 40:2,5,6
359:10,24 360:5,7
362:20 363:13
364:8 365:17,20
365:24 369:21
370:10 395:25
450:2
**fda's**  359:15
**federal**  16:25
209:22,23 210:21
364:3,6 365:8
**federally**  364:20
**feed**  370:17 378:5
403:8
**feel**  18:10 25:5
26:7 28:8 30:21
33:18 34:14
102:18 109:11
116:24 162:7
167:10 177:12
181:6 189:15
192:9 197:1
206:23,24 216:15
220:9 253:16
286:24 291:20
299:12 300:6
302:15 331:2
336:5 346:10
347:7,22 355:14
367:5 368:12
376:12 393:19
404:7 412:7
432:24 435:24
**feet**  73:21 175:11
176:20
**feinstein**  3:16 6:9
16:3,4 266:18,21
267:18 274:23
275:3 280:10,13
298:6,9,22,25

311:13 312:25
313:8 322:23
323:24 324:16
339:3 345:14,19
347:6,11,15,19,21
348:7 365:25
366:7 370:18,25
371:4,8,14,17,20
388:25 389:2,6
397:1,9 398:3
415:13 418:14
420:24 430:21
437:12 445:2
**feinstein's**  431:7
449:20
**felon**  117:10
**felonies**  438:16
**felonization**
196:11
**felons**  153:20
196:3 251:3
**felony**  44:23 66:14
160:16 204:11
251:7 252:22
**felt**  75:4 84:23
174:17,18 175:9
216:16 240:10
402:13
**fend**  216:11
**fentanyl**  30:2
38:19 42:23 57:11
72:7,15,20 74:13
81:6,12,15,20 82:9
84:18 85:2,23
86:6,11,19 89:1,13
89:22,23 90:2,11
90:14,18,20,22,24
91:4 94:14,21
95:19,23 161:7
202:16,20 222:20
230:13 233:3

[fentanyl - focused]

245:14 261:2,16
262:13,21 263:6
263:11 394:10
395:4
**fentora** 317:3,19
**field** 241:11
252:23 369:16,16
376:10
**fields** 196:10
251:6 398:2 452:8
**fifth** 4:22 45:10,11
64:12 306:17
374:16,21 375:5
375:12,15 376:23
388:6 389:9
430:24 431:2
**fight** 393:17
**figure** 117:11
186:16 188:6,19
192:16
**figures** 63:3,8
64:19 206:4
**file** 449:22
**filed** 31:7,8,9
49:12 353:5
365:13
**files** 319:2 329:1
**filing** 171:13
**fill** 69:7 71:17 85:1
100:19 126:6,24
134:18,21 224:23
255:19
**filled** 132:23
139:22,23 278:8
341:19 416:21,23
**filling** 105:3
139:14 140:1
252:14 416:4
**final** 9:14 378:15
**finally** 451:25

**finance** 24:17 27:6
27:8
**financial** 227:23
253:17,24
**financially** 186:13
432:8
**find** 85:14 94:21
134:24 156:23
159:22 160:1,25
161:7 162:11
188:17 239:17
254:23 262:4
362:12 387:20
407:5 437:19
451:11 460:11
**finding** 149:16
407:4
**findings** 377:25
**fine** 288:22 298:8
**finish** 25:9 134:12
**finished** 455:4
**fire** 384:17 385:10
393:3 420:22
**fireball** 403:24
**fires** 421:2
**first** 7:23 8:1,3,8,9
8:15 17:1 31:5,6
45:24 46:2 48:25
50:8,25 52:16
58:21 62:8 67:15
68:22 74:22 97:8
100:6 116:16
119:15 128:7,13
136:5,6,11,13
141:11 143:6,8
152:24 159:5
160:10,10,22
167:24 174:9
187:9,10 189:7
195:5,14 197:15
211:1,1,5,12

220:17,17 222:21
223:6 231:21
232:1,2,6 236:23
237:25 259:1
262:8 264:3,5,16
269:15,20,21
270:15 272:25
275:21 285:18
287:9 295:25
310:20 315:1
335:25 350:11,15
351:1,9 360:11
361:10,19 367:22
368:17 372:13
384:20 388:4
398:14 401:12
403:17,19 435:23
435:25 445:10,22
448:23 450:12
458:10
**firsthand** 352:13
409:8
**fiscal** 256:24
**fit** 239:18 245:11
420:2
**fits** 238:10 245:8
**five** 80:17 102:9
103:1 129:10
131:10 132:1
145:22 176:3
186:9 236:19
436:2 452:1,2
455:3
**fix** 370:19
**flag** 328:23 358:4
**flags** 396:19
**flat** 108:1 223:16
223:21 225:17
**fleets** 256:3,17
**flip** 270:1 397:2

**flippant** 413:11
**flipped** 299:18
368:4
**floating** 87:25
**flood** 45:12,19
52:11 60:8
**flooded** 154:22
452:3
**floor** 3:16 188:3
**florida** 2:15
**flowchart** 132:20
**flowers** 2:5 15:8,9
61:17,21 133:8
205:1 267:15
271:12 274:19
275:2 276:24
279:19,24 281:18
281:25 282:23
296:6 299:7 300:4
300:15 301:20
302:7 303:1 304:5
304:13,25 305:16
306:6 307:25
309:1 312:18
318:2,22 320:9
321:6,18 332:15
340:21 388:23
389:5 421:20
422:20 425:5
426:2,13,18,21
**fluently** 338:12
**focus** 32:7 93:23
94:3 201:5 247:7
259:16 365:12
418:24 451:6,7,19
**focused** 93:22
198:4 200:18
201:21 203:15
207:13 220:8
286:16 376:13
378:1 447:20

**focusing** 116:20
141:7 160:22
183:10 216:19
244:20
**foil** 172:9
**folks** 26:25 43:20
43:22 44:5,17
46:13 53:22 54:9
58:18 60:4 73:18
73:21 76:14 78:4
83:7 84:16 99:20
102:17 114:16
117:6 137:23
142:15 147:4
151:21 153:21
157:6 159:3,14,22
160:14 166:7
195:8 199:11
215:13 216:9
227:19 228:6
229:5 232:3
233:12 234:15
239:9 240:7 244:8
250:20 252:19
284:19,20,21
286:4 303:4,5
308:10 321:10
328:4 334:10
341:12 380:18,22
394:16 399:11
401:14 405:21
406:5 408:3
409:25 410:10,25
411:12,20 412:14
412:17,24 413:2,4
413:13 415:4
422:25 443:6
451:16
**follow** 29:8,10,16
311:9 343:25
360:15

**following** 64:19
110:21 120:13
129:5
**follows** 17:3
382:22
**food** 117:15 359:5
393:18
**foot** 440:24
**force** 9:14,14
59:22 65:6 73:19
89:9 149:12,17,25
166:15 169:20,21
169:22,23 170:7
170:15 222:9,13
245:2 350:18
351:8 352:11
354:8 355:8,18
356:13,24 362:1
362:23 363:1,8
367:22 368:4,19
371:23 372:1
377:14 378:14,15
378:23 379:18
390:1 395:8
396:11 405:17
410:6,7 434:13
435:13 436:8,13
445:4,11,16,20,23
446:10,15 447:17
448:6,9,11,18,20
448:24 453:19
**forced** 130:17
403:5
**forces** 211:17
222:11 363:4
**forefront** 367:25
**foregoing** 326:18
458:16,21 461:13
462:18
**foremost** 232:6

**forged** 121:11
**forgery** 107:8
248:9
**forging** 43:23
46:12 155:25
**forgot** 220:16
263:1
**forgotten** 171:15
**form** 40:15 41:3
49:21 56:16 59:15
71:24 72:17 77:13
77:22 78:24 79:12
80:7,14,23 81:13
81:23 84:9 87:1
92:3,10,23 94:16
95:6 97:5 98:4
104:14 105:18
106:1,7 107:3
108:4 109:9,18
110:18 111:13
112:4,17 114:13
116:23 121:7,21
122:14 123:13
124:3 127:11
128:22 138:6
139:2 141:13
143:24 145:16
157:17 158:13
160:3 171:9,20
173:14 174:12
175:14 176:15
178:7 180:17
183:18 184:22
189:12 206:22
208:7 210:20
224:4 225:13
235:19 236:13
242:13 249:18
252:7 254:10
256:5,13 261:5,20
271:12,22 276:24

279:18,19 282:23
285:25 299:7
300:4 303:1 304:5
304:13,25 305:16
306:6 309:1 318:2
318:22 320:9
321:18 327:22
328:16 332:15
337:22 340:21
357:22 358:6
362:9 363:20
364:7 365:23
367:20 368:7
374:10 376:18
382:7 390:19
392:16 395:18,24
396:16 400:20,24
401:9 402:6,21
405:12 406:8
408:18 411:9,15
412:19,25 418:4
419:6 429:1,6
430:18 432:22
435:19 439:23
440:20 441:20
443:24 444:19
449:23 450:5
451:3 453:5
**formal** 172:4
**formally** 171:11
172:20
**formation** 356:23
**formed** 73:6
222:11 355:8
363:4 375:19
**former** 19:15
122:10 216:2
242:7 390:10
**forming** 102:23
222:9 343:3
391:19 392:6

**forms**  146:13
  174:14 239:3
  259:20 276:8
**formulate**  446:19
**formulations**
  315:8
**forth**  267:22
**forward**  182:15
  413:24 432:3
  446:22 460:15
**foster**  196:17,18
  258:23,24 259:3
  259:18
**found**  53:19 89:13
**foundation**  133:9
  274:24 299:8
  300:5
**founded**  241:5
**fount**  255:21
**four**  19:21 51:23
  137:9 186:9 267:7
  374:20 428:19
**fourth**  331:10
**frame**  119:5
  120:15 246:9
  372:1 373:7 436:2
**francisco**  4:5
**frankly**  25:3 32:9
  49:23 57:25 75:3
  76:16 91:16 99:20
  113:25 116:14
  188:16 232:24
  286:19 295:6
  328:6 349:15
  351:13 352:11
  363:21
**free**  18:10 36:9
  291:20 318:20
  331:2 336:5
  346:10 347:7,22
  401:10 402:7

461:14 462:20
**frequently**  199:7
  201:24 436:13
  454:5
**fresh**  20:18
**friday**  279:15,23
  291:4
**friend**  34:10,17,18
  398:18
**friends**  35:14,21
  84:18 101:23
  103:20
**front**  1:22 4:4
  14:16 54:19 82:25
  148:12 200:7
  226:12 237:11
  260:24 269:16,23
  269:25 270:18
  271:2 273:11
  278:21 280:5,15
  284:9 290:17
  299:15,16 305:6
  334:22 340:7
  342:20 344:20
  350:19 373:3
  379:4 408:8
  410:21 414:2
  427:5,6 433:11,12
**full**  9:4 17:9 19:20
  31:11 104:8 252:2
  258:20 260:19
  265:16 287:9
  315:1 326:16
  335:25
**fully**  115:1
**fun**  256:16 268:14
**function**  169:3
**functioning**
  261:25
**fund**  200:3 216:8
  216:13,14 223:13

227:5,5,6 247:15
  254:7 255:8
**fundamental**
  197:1
**funded**  171:18
  223:12 249:22
**funder**  227:4
**funding**  44:22
  197:16,17,22
  202:4,8 220:22,22
  223:9,17 224:10
  224:18,18,22
  225:11 228:4
**funds**  200:6
  210:19 212:1
  215:2 229:15,19
  247:16,23 257:3
  451:12
**funneled**  369:3,6
**further**  250:20
  282:8 355:16
  398:4 455:15
  458:19 459:1
**future**  181:2 258:6

**g**

**game**  93:2
**gap**  224:23
**garner**  26:11
**gary**  26:4
**gas**  157:23
**gasoline**  393:2
  420:22 421:2
**gate**  394:12
  403:10 404:4,23
  407:2
**gathered**  133:24
**gathering**  24:14
**gear**  214:6
**gears**  333:20
**gee**  168:16

**general**  101:19
  203:11 216:8,13
  247:15 255:8
  322:6 408:2 449:1
**generally**  47:3
  153:18 160:21,24
  252:1 408:14
**generate**  319:12
  319:22 324:2
  340:14 342:20
**generational**
  258:14
**generators**  250:6
  251:14
**generic**  55:15
**gentlemen**  405:1
  409:16
**geographic**  129:7
  346:21
**geographical**
  119:1 130:4,8
**geography**  90:8
**george**  26:3
**gertrude**  26:5
  381:18
**gessner**  26:6 356:1
  381:19 443:4
**gessner's**  115:21
**getting**  55:1 84:21
  286:22 311:12
  333:25 345:12
  393:22 450:7
  451:6 452:14
**give**  17:8 27:18
  34:11 103:21
  164:9 180:25
  181:16 233:24
  234:7 380:19,22
  408:23 419:7
  455:21 457:1,10

**[given - groggy]**

**given** 105:13
114:15 161:20
234:23 293:20
322:15 323:4
340:17 401:4,20
423:7 458:13,18
**giving** 33:7 78:21
79:10 103:20
104:12,24 105:15
140:25 186:4
425:8
**glad** 345:14
402:17
**gleaned** 325:17
**global** 447:5
**glove** 169:6
**go** 14:10 18:7
30:16 40:3 53:2
74:15,15 77:18
84:22 97:15
102:13 117:8,9
119:6 123:16
125:2,19 134:17
151:20 168:18
175:2 177:8
179:19 180:23
182:15 184:25
189:6 191:7 192:3
192:12 193:22
197:5,12 199:4
200:6,21 206:3
211:11 215:11
218:1 227:17
229:23 230:21
231:19 233:21
241:14 255:24
257:6 261:8,23
262:21 263:17
269:14 275:11
295:7 370:19
393:12,14,20

410:13 422:6
426:20,23 440:12
442:5
**goal** 171:1
**goes** 51:10,15
52:13 132:24
159:7 204:12,14
204:15,21 274:20
322:22 428:18
449:17
**going** 18:7,9,13,19
23:8 29:9 36:8
38:8 76:18 87:22
87:24 95:13 99:24
106:9 114:17
124:2,20 131:2
155:10 159:19
160:16,17,17
167:1,20 177:8
178:14 180:25
181:1 186:18,20
186:20,21,23
189:5,6,18 197:4
201:7,25 206:3
220:15 222:23
225:20 226:3
237:16 250:19
257:23 258:9
261:12 262:1,15
262:16 263:15
266:24 281:6
286:1 304:6 310:2
313:10 318:3
322:19 323:19
324:21 334:19
342:25 343:12
345:18 351:4,5
352:2 361:6
366:18 370:15
378:19 391:18,19
392:25 393:17

394:17 397:12
401:3,8,8 402:5
413:24,25 414:13
419:7,9,23 421:18
422:8 423:3,4,10
424:11 429:14,16
442:15 453:23
**good** 15:8 16:12
16:15 17:6,7
19:25 20:8 67:5
80:5 92:25 114:22
114:24,25 137:6
154:11 163:3
167:25 180:24
181:14,17,20
254:25 255:1
262:2 266:19,20
269:11 398:8,9
407:10 452:5
**google** 29:18 30:14
**googled** 74:24
**googling** 29:21
**gosh** 28:18 134:7
233:17 339:2
439:17
**gotten** 92:21
138:25 210:24
257:20
**government** 169:3
169:15 194:4
209:22,23 210:22
444:18
**governor** 175:18
225:6 354:14,18
444:13,13
**governor's** 354:8
355:18 363:7
377:19 395:7,8
**grabbed** 53:1
**grams** 130:20

**grand** 19:11 21:13
46:23 141:17
**grandma** 260:13
**grandparent**
260:4
**grant** 49:3 170:25
172:5 200:8,15
209:17,20,20
210:4,7,11,18
224:22,23 247:16
247:23 446:22,23
**granted** 152:5
170:25
**grants** 49:11
171:18 224:20
**graph** 207:15
417:9
**graphic** 379:25
380:2 382:21
383:9 389:24,25
**graphs** 148:24
373:19
**grateful** 175:5
**grave** 83:4
**great** 203:1 313:14
**greater** 47:12
66:16 124:8 290:9
**greatest** 82:8
**gregory's** 239:12
240:24
**greta** 1:17 6:7
14:24 15:7,17
16:24 17:4,10
125:9 183:7,16
266:17 398:6
458:9 460:8 461:4
461:9 462:4,13
463:20
**grievances** 432:3
**groggy** 36:25

**ground** 18:3 422:4
**group** 35:13
  231:12 239:12
  240:24 416:13
  445:5,12 448:13
  448:16
**grouped** 299:25
**groups** 239:5
  244:15,17 447:11
  448:1,7
**grow** 45:23
**growing** 45:22,22
  46:22 222:19
  350:16
**grown** 259:19
**grownups** 193:8
**gs** 272:12
**guard** 381:8
**guardrails** 99:19
  124:4
**guenther's** 26:4
**guess** 57:7,13
  59:17 101:5,7
  113:8 119:18
  124:16,18 156:19
  157:10 162:14,18
  179:1 181:15
  209:15 212:9
  235:4 246:8,13
  256:12 259:1
  272:10 304:16
  380:1 390:20
  400:6 402:11
**guessing** 28:25
  324:23
**guidelines** 295:23
  307:4,8,9 377:8,15
  386:24 389:18
**gunpoint** 53:22
**guns** 54:22

**guy** 165:19
**guys** 280:13
**gynecologist**
  145:13

**h**

**h** 170:10
**habit** 80:7 102:23
  343:3 391:19
  392:6
**half** 20:19,21
  52:18 66:2 81:22
  83:19 115:22
  204:20
**halfway** 283:3,8
**hand** 124:8 169:5
  184:25,25 378:19
  386:4 454:15
  459:6
**handed** 269:13
  270:9
**handful** 90:3
  145:5
**handled** 102:9
  438:16,18
**handling** 221:4
  236:10 438:15
**hands** 97:1,3
  199:1 380:20
**happen** 53:16
  58:19,20 86:13
  322:2 358:14
  436:16
**happened** 85:17
  86:3,14 103:12
  143:21 147:6,21
  173:24 242:5
  296:23 417:12
  443:2
**happening** 59:5
  99:5 101:17 102:3
  103:24 163:16

  200:7 253:10
  374:5
**happens** 40:22,23
  85:3 204:8,20
  205:21,22
**hard** 45:14 190:17
  207:12 208:24
  209:10,14 251:12
  253:24 257:13
  258:17 311:9
  375:25
**harder** 262:5
**harm** 43:10 181:2
  189:14 190:3
  192:21,25 193:1
  194:11 202:1,1,1
  202:18,25 205:16
  229:17 257:21
  305:22 331:19
  352:3 390:22
  391:3 431:23
  432:6,11,18,20
  433:2,4,7 451:25
  452:8
**harmful** 304:4,11
  305:15 353:20,25
  391:20
**harms** 185:22
  188:24 189:8
  272:9
**harper** 109:3
  137:20,25 310:19
**harper's** 138:8
  143:23 144:1
  146:1
**hats** 257:15
**havoc** 207:14
**hawkins** 2:19
  15:20,20
**head** 59:25 175:15
  176:18 450:24

  451:7
**headline** 109:4
  251:11
**headquarters**
  251:20
**health** 2:18 4:11
  8:19,22 9:7,10
  15:22 25:1 26:19
  44:18 47:10 58:11
  59:21 60:4,11
  73:9 74:2 76:4
  83:3 86:7 142:24
  146:18 162:25
  163:9 169:5 172:1
  172:5 184:20,25
  187:20 198:5,17
  198:19,20,21
  201:24 204:17
  211:7 212:12
  214:18 215:3,9
  216:23 217:2,9,14
  217:19,22 218:10
  218:14 223:1
  226:20 227:7
  228:16,20 229:1
  229:25 230:4,4,24
  231:1,3,7,14,14
  238:1 243:17
  244:24 245:3
  257:24 264:24
  265:6,23 266:5
  296:12 320:3
  322:6 326:10
  359:2 377:2
  385:15 386:13,20
  388:18 389:14,19
  406:25 407:7,25
  410:19,24 439:11
  439:12,19 448:5
  449:5,7,11

**healthcare** 9:17 385:23
**healthy** 60:17 250:24 278:9
**hear** 377:5
**heard** 74:22 85:11 91:17 98:5 108:14 230:19 281:10 377:1 387:11,14 389:8,12 399:11 409:25 410:13,20 411:5,5,13,17 413:11
**hearing** 19:13 21:18 89:23 174:9 177:13 182:14 372:12 418:17 455:18
**hearsay** 242:8
**heavily** 140:15
**heightened** 395:4
**heim** 109:2 144:4 146:4
**held** 14:15,21 214:4 321:15 340:25
**help** 36:21 159:19 160:19 162:24 173:5 181:1 194:5 200:3,9 254:23 288:14 374:4 452:13
**helped** 141:25 175:13 176:14,25 247:17
**helpful** 208:14
**helps** 287:7
**hereinafter** 17:2
**hereunto** 459:5
**heroin** 7:15 34:23 34:25 37:14 38:2

38:16 41:1,6,13,18 42:22 44:10,12 57:10,16 63:5 69:11 72:5 73:13 74:13 76:25 77:18 77:20,21 78:1,5,10 78:14 81:6,11,20 82:9 83:15 84:3 85:2,6,10 86:9,10 88:13,25 90:23 91:5 92:1,13 93:16 94:15 95:19 95:23 147:18 157:22 161:6 241:10,18 242:18 261:2,13,15 262:4 262:8,13 394:9,12 394:14,21 399:10 401:6 403:10,17 403:22 404:4,23 405:4 406:6,6,16 406:19 407:2,5 410:4,15 412:17 414:10 429:10
**heroin's** 262:7
**hesitate** 282:15 293:17
**hey** 436:25
**hidta** 170:6,10
**hierarchy** 92:12
**high** 37:19 50:9,17 50:17,22 84:21 93:6 170:10 202:25 244:17 295:5 395:6 428:9
**higham** 27:20
**higher** 258:11 260:8 283:19 287:19 288:8 289:16 307:12 308:3,6,16 328:10

330:6 373:23 411:6 417:3,5
**highest** 48:17
**highlighted** 29:13
**highly** 107:21 173:12 208:9
**hill** 157:1
**hipaa** 178:23 181:11
**hired** 213:2,4,10 213:13,13,15,16
**history** 34:12 35:3 95:1 178:25 337:10 338:9
**hit** 253:24
**hmm** 167:25
**hold** 370:14 393:6
**holistically** 82:15
**home** 53:20 172:10,17 199:12 216:3 217:22 227:6 228:25 252:24 260:19,22
**homes** 216:3 232:4
**homicide** 203:14
**honest** 352:1 389:12 435:21
**honestly** 441:11
**hooked** 157:22
**hope** 103:10 239:7 240:23 241:5,13 246:12 249:12 257:1 403:9
**hopefully** 154:3 349:7 371:2
**hopelessness** 193:18 195:9
**hopping** 98:6,8,21
**horse** 258:3 422:5
**hospice** 124:24

**hospital** 95:10 101:14 308:10 449:9
**hospital's** 388:6
**hospitals** 47:13 51:22 232:4
**hostetler** 4:13 16:16
**hostile** 174:11
**hostility** 174:13 175:4
**hosts** 222:15 445:24
**hour** 32:10 234:5 322:20 392:6
**hours** 32:5,12 211:21,24 212:3,5 212:16,24 233:23 399:23 400:3 422:1
**house** 19:14 27:17 28:8 174:6 177:13 187:12,16,18 217:21 218:4 219:2 227:3,5 236:19 250:14 354:15 409:15
**housing** 215:13,16 215:19,20 216:10 217:5
**hudson** 63:23
**huge** 81:15 198:18 200:19 215:1 262:14
**huh** 25:17 26:22 41:24 50:4 51:4 60:15 62:14 64:21 97:24 100:18 118:23 120:17 123:19,23 134:9 160:23 163:24

165:23 171:19
172:12 191:5
209:19 211:16
215:25 218:6
220:20 223:4
231:23 243:15
244:21 294:1
309:10 314:18
319:23 342:4
351:21 360:21
372:7 373:6,8
374:17 382:16
421:5 436:20
445:9
**human** 192:15
194:7 376:3
432:10
**hundred** 275:7
405:24
**hundreds** 66:6
81:16 100:23
139:8,9 212:24
**hurdles** 181:6,9
**hurt** 82:20
**hybrid** 26:18
**hylton** 26:1,13
**hysingla** 315:5

**i**

**ibh** 227:5 229:8,10
**idea** 30:5 174:11
369:13 452:7
**identification**
22:10 47:18 48:5
61:13 67:23 88:17
118:13 128:17
136:15 182:6
264:8,20 265:2,9
265:19 266:1,7,13
291:25 294:14
378:17,20 386:2,6
418:21 421:12

422:11 424:3
**identified** 59:25
120:12 125:23
126:7,11,17
129:11,24 130:1,3
130:22 132:2,11
144:3 278:22
279:5 284:3 285:3
289:11,20 292:13
293:11 294:3,8
295:24 301:2
302:5,12 303:10
305:13 307:3
308:14,23 309:16
310:8,25 315:17
317:20 321:23
323:9,17 325:4,13
328:18 330:3
333:2 339:12,17
340:4 344:5,13
354:4 355:18
377:14 389:23
395:8,9,12,22
396:23 417:3
430:24 431:2
**identifies** 133:25
283:14 335:6,22
366:15
**identify** 15:3 60:6
118:25 132:4
155:22 254:2
268:1 272:4 273:2
273:8 279:4
284:16 297:8
299:5 301:9
307:16 308:22
311:6 312:14
313:11 316:2
320:1 323:20
336:21 337:19
419:2,19 422:18

**identifying** 100:21
150:7 259:13
274:24 275:13
276:12 285:9
288:6 296:17
306:1,22 322:12
327:1 343:6
394:16 446:25
**ideology** 248:16
354:21
**ilene** 27:22
**illegal** 41:1,6
44:12 111:12
180:7,10 248:24
429:9
**illegally** 57:2
111:25
**illicit** 91:14 394:1
394:3,4,5,8
**illinois** 3:10 5:7
**illness** 42:12 154:6
154:7 155:4
404:14 407:1
**imagine** 52:24
251:17 277:17
328:3
**imat** 446:21 447:7
**immediate** 9:4
233:13 265:16
**immediately** 93:19
198:25 387:4
**impact** 141:12,15
141:18,19 142:13
147:2 236:20
254:4,19 256:2
261:17 333:8
338:2 389:19
433:8 434:15
**impacted** 73:11
221:13 241:16
256:25 333:13

432:7
**impactful** 30:15
**impacts** 196:2
204:21 250:5
**imperative** 240:11
259:15
**implementation**
388:1
**implemented**
441:22
**implementing**
447:8
**important** 54:23
154:19 198:11,23
216:17 296:14
390:11 393:9
**imported** 90:15,24
91:2,15 429:9
**impossible** 114:5
**impression** 443:1
**improper** 108:1
110:17,19 113:17
114:21 135:9,10
135:18 304:20
310:1 313:18
314:9 320:5
328:15 332:14
340:25 341:10
353:1 376:5
**improperly** 108:6
108:9 114:12
121:20
**improved** 92:19
**improvements**
197:25
**inaccurate** 312:9
333:13 391:2,13
**inadvertently**
25:13
**inappropriate**
308:3,7

incarcerate
154:15
incarcerating
155:6
inches 172:9,9
incident 89:15
102:8 161:6
446:18
incidents 57:21
431:22
include 53:8 62:22
63:18 65:12 112:2
133:12 219:8
242:25 300:22
311:1 317:21
318:9 319:25
343:7 384:22
417:16
included 39:14
71:22 72:1,5,7
92:7 188:19 197:2
292:18 299:22
315:12,19 317:3
318:11 325:16
327:18,21 328:2
328:12 337:10
340:8,19 343:18
373:19 460:13
includes 23:11
254:16 314:20
315:3,22 318:7
329:3 331:5
338:16 353:10
361:17 369:16
370:5 380:2
382:14,17 394:25
including 57:10,16
63:4 211:9 214:20
355:21
inclusive 28:15
64:5

income 207:24
252:24 254:17,19
254:20 255:6
incorporated
462:12
incorrectly 281:7
increase 44:15,20
44:23 46:11 51:3
54:5 57:10 92:1,4
92:5,6 126:8,11
154:23 196:21,23
202:21 218:24
223:24,25 224:3
246:7,10 259:15
330:5 402:14
451:10,15
increased 42:14
44:22 51:22 72:10
194:23 200:13
223:10,18 233:1
238:15 239:2
243:25 246:3
396:21 416:20
419:14
increases 82:3
226:16
increasing 69:8,12
69:13,13 454:9
incredibly 40:4
58:16 77:16 82:16
113:21 138:1
153:9 199:8
253:11 259:25
262:9 404:14
incur 248:1 354:1
incurred 188:25
192:10 214:23
215:1 220:24
222:22 247:10
258:8,9

incurring 195:6
224:8
incurs 217:13
230:1
ind 374:12
independent 227:1
243:1 276:19
independently
205:3
index 6:1,5 7:1
10:1
indiana 4:22
indicate 127:3
indicated 70:15
150:11 153:3
307:9 341:14
indicates 242:24
315:2
indicating 122:25
387:12 460:13
indicted 62:16
63:11 64:14,22
indictments 63:4
64:7 65:8,20
66:14 148:16
indigent 87:11
187:14
indirect 173:1
individual 42:6
60:2,2 98:9
106:15 133:13
189:9,22 272:6,7
277:17 286:17
292:4 305:19
323:9 331:16
424:9 425:10
431:22 432:2
440:23
individually
345:25

individuals 53:18
101:23 110:23
129:5 147:16
155:25 178:2,21
184:19 185:2
226:24 272:4
277:14 310:5
315:3 317:5
332:11 333:2
335:7 336:21
337:6 339:12,16
339:22 341:21
349:14 369:10
404:1 410:12,15
418:22 419:3,19
421:12 422:11
424:3 425:2
428:15,24 432:7
432:15 449:15
industries 251:1
industry 86:22
179:12 251:21
252:17 262:10
310:14 351:11
352:1,19 358:14
368:20 374:14
375:10 376:3,23
384:4,18,21 385:9
385:12 388:11
392:20 394:24
395:15 396:15
416:1,5,19 419:12
419:15 420:19
432:4 449:18
450:7
industry's 350:16
ineffective 304:4
304:11 305:15
influence 433:19
434:2,16 435:6,8

**influx**  81:15 90:20
  154:20 394:12
**inform**  288:17
  349:24
**informally**  172:20
**information**  8:19
  8:22 9:7,10 17:18
  24:14 52:8 58:3
  76:12 80:5 100:4
  102:7,23 103:6,9
  114:15,18,25
  129:4 133:5,6,13
  133:18,24 134:12
  149:2 162:1
  167:11,16,19
  168:8,20 180:25
  181:15 187:5
  191:7 213:23,25
  241:20 242:2
  243:1 255:21
  264:24 265:6,23
  266:5 268:1 272:1
  272:13,14 275:17
  275:23,25 276:2,5
  276:14,20 277:4,9
  277:23 278:19
  281:21 282:8,20
  286:22 293:1,8
  295:2,23 296:5
  297:25 298:5,19
  298:20 301:22
  302:3,10,18 303:7
  303:14,21,24
  305:4,9,10 308:21
  309:18 310:6
  312:9 316:1
  318:16,18 319:1
  319:18 323:15,21
  323:23,25 324:24
  325:16,19,22
  329:1 334:21

341:3,23 342:3,5
  342:13,23 343:2
  355:6 356:14
  357:18 358:1
  360:3 369:3,6,20
  370:3 371:22
  380:11 386:12
  391:14 393:24
  395:3,13 396:13
  397:17 399:7,10
  410:5 423:8
  438:21 440:5
  442:7 448:4,5
  452:4
**informed**  122:18
  374:13 380:25
  415:5
**ingram**  166:13
**ingredient**  7:16
  88:15
**inherent**  82:18
  179:11,21 180:23
  369:15 391:9
  422:23
**inherently**  75:4
  180:6
**initial**  100:6
  279:13 285:1,9,19
  286:11 289:8
  294:13 438:18
**initially**  307:22
**initiative**  198:7,12
**initiatives**  198:24
  201:13 243:17
  244:7 245:1,5,21
  246:4,8
**injunction**  19:13
  21:18
**injuries**  35:9
  191:25 192:7
  194:14 204:4,24

**injury**  191:4,9
  192:18 196:13
  205:7,8 242:17
  333:10,11 393:13
  432:1
**inmate**  218:14
**inpatient**  229:11
  239:2,14 320:20
**input**  326:5 350:8
**inputting**  441:24
**inquired**  140:10
**inside**  240:16
**insight**  296:12
**insignificant**
  234:13
**instance**  91:1,3
  106:11 189:14
  198:6
**instances**  98:24
  112:13 147:3,21
  271:15 309:23
  341:13
**institute**  363:16
**instituted**  156:17
**instruct**  19:2 36:9
**instructions**  62:21
  457:2,10
**insulting**  413:4
**insurance**  228:20
  229:3,5 276:8
  278:1,14,16 319:6
  324:25 325:8
**insured**  228:22
**intended**  96:19
  263:1
**intending**  443:15
**intensity**  170:11
**intensive**  32:24
  168:1
**intent**  157:20

**intentional**  155:1
  228:5
**intentionality**
  236:22
**intentionally**
  400:1
**interact**  100:25
  235:21
**interacting**  402:25
**interaction**  149:23
  160:11 437:16
  441:13
**interactions**  369:9
**interacts**  89:9
  401:2
**intercept**  446:24
**interchangeably**
  37:23 38:6
**interdict**  93:24
**interdiction**  94:2
  447:4
**interested**  30:4
  84:21 449:13
  459:3
**interesting**  240:15
**interface**  163:1,11
**interfere**  14:8
**internal**  27:14
  363:15
**internally**  297:9
  303:12
**interrogatories**
  7:24 8:3,8,10,16
  128:9,16 136:7,14
  171:25 264:4,6,17
  268:2,20 269:2,20
  269:22 270:16
  272:18 274:22
  277:5 281:24
  282:10,21 283:4
  284:17 287:12

289:10 292:15
293:13 299:11
309:17 313:12
315:18 323:22
324:10 327:3
340:5 343:23,24
344:7,15,17,19,24
345:24
**interrogatory**
7:20 31:13 118:2
118:10 120:4
128:20 191:1,13
272:23 273:1
275:19 278:25
281:22 305:14
311:1 314:21
326:14 331:7,13
335:19,20 338:14
339:8,10 340:2
341:22 343:7
344:8,8,9 345:5,6
345:6 349:17
431:20
**interrupt** 25:13
**interruption**
194:19
**interval** 217:21
227:6
**intervened** 99:22
110:23 310:21
**intervening**
425:16
**interview** 113:24
**interviewed**
227:18,19
**intravenous**
230:20
**intrigued** 272:11
**introduce** 177:9
**introduced** 177:11
431:5

**introduction**
42:23
**invest** 140:5
**invested** 201:11
216:8 443:6
**investi** 165:6
**investigata** 165:5
**investigate** 156:10
161:10 178:2,21
180:4 181:10
199:9 203:20
416:22
**investigated** 52:17
119:2,3,16 120:20
121:5,13 128:1
139:25 140:5
149:1 155:24
417:11
**investigating** 56:5
150:8 155:23
156:3,7 170:16
179:23 203:5
207:2,3 364:10
**investigation**
127:6 137:24
140:12 150:16,24
179:9 363:17
**investigations**
121:10 147:25
153:8,14,15 155:8
155:15,20 165:25
166:4 170:2
435:10
**investigative**
165:7 235:1
**investigators**
256:22
**investigatory**
143:5
**investing** 225:3

**investment** 195:16
195:17 253:13
**investments**
201:24 253:6
**invitations** 446:3
**involved** 24:14
42:17 112:15
116:2,22 147:14
170:15 209:12
245:4 359:19,21
374:25 424:18
428:15 449:2
**involvement** 120:3
121:6,25 139:12
139:19
**involves** 161:6
**involving** 21:25
87:7 120:24
137:11,15 158:16
231:15
**inward** 396:2
**irrespective**
401:22
**irritate** 413:22
**irritated** 413:6
**ish** 440:1
**issue** 95:14 107:16
156:24 198:19,20
212:14 214:8
250:20 251:8,15
263:2 268:2 357:6
396:7,15
**issued** 354:8,16,23
363:7 444:2
**issues** 198:17
213:5 214:11,12
225:24 226:9
355:12 371:2
393:1 403:1
420:21 452:25

**issuing** 88:25
389:8
**item** 197:7,15
231:20
**items** 219:21
220:14 229:23
397:25

**j**

**j** 1:25 3:4 458:6
459:14
**j&j** 15:25
**jackie** 26:2,16
**jackson** 4:21
**jacksonkelly.com**
4:23
**jail** 44:24 160:16
205:13 218:11,15
218:18 447:13,15
447:16,19,21
**james** 4:21
**janssen** 3:3 15:25
**january** 1:18
14:13 88:10
213:18 281:1
288:1 291:4,4
459:8 460:4
**jason** 27:21
**jdjohnson** 4:23
**jerry** 372:25 373:3
443:4
**jflowers** 2:9
**jim** 16:11,13
**job** 19:24 20:7
154:11 180:19
214:6 252:25
277:2 393:14
407:11 438:1
**jobs** 250:19
252:25 349:18
**jodi** 2:5 15:9

**johnson** 1:17 3:2,2
4:21 6:7 14:25
15:7,17 16:11,11
16:13,14,24 17:4
17:10 88:7 125:9
183:8,16,25
194:13 226:7
229:16 239:24
240:2,4 266:17,19
313:9 322:17
338:23 342:18
345:10 347:22
397:10 398:6,10
400:16 420:1
424:16 430:11,15
433:18 448:9
455:14,19,23
458:9 460:8 461:4
461:9 462:4,13
463:20
**johnson's** 370:12
395:18
**joint** 9:16 377:1,7
377:14 385:14,22
386:12,19,23
388:12,14,16
389:8,13,18
**jones** 2:13 15:19
**jonesday.com**
2:16
**journal** 407:21
409:22 414:19
**judge** 1:8 121:2
132:19 152:8
226:25 415:10
417:8 421:9
422:10 423:22,23
424:24 425:25
426:3,5,7 429:17
430:6,6 433:15
443:16

**judge's** 419:17
421:3
**judges** 164:14
200:16 227:16
247:1 410:14,23
449:5
**judgment** 115:10
116:25
**judgments** 115:14
**julie** 26:1 400:9,11
402:18 403:2
**july** 62:9
**jump** 158:8
**juries** 408:8
**jurisdiction**
247:22
**jurisdictions**
65:20 66:5 283:15
326:21 335:7
438:12
**jury** 19:11 21:13
46:23 405:1
409:17 410:21
414:2 443:16
**justice** 7:9 49:3
54:24,25 55:5
61:2,9 155:3,3
213:8 217:25
447:12

**k**

**k** 3:14 5:3
**kearse** 2:4 8:5
15:5,5 23:8,14,20
23:24 29:9 36:5,8
36:13 40:15 41:3
49:21 56:16 59:15
67:5 71:24 72:17
77:13 78:24 79:12
80:14,23 81:13,23
84:9 87:1,14,21
88:3 92:3,10,23

94:16 95:6 97:5
98:4 104:14
105:18 106:1,7
107:3 108:4 109:9
109:18 110:2,5,18
111:13 112:4,17
114:13 116:23
121:7,21 122:14
123:13 124:3
125:11 127:11
138:6 139:2
141:13 143:24
145:16 155:10
157:17 158:13
160:3 168:16
171:9 173:14
174:12 175:14
176:15 178:6,14
180:17 181:20
182:4,17,20,25
183:4,11,17
184:22 186:18
189:12 190:17
205:10 206:1,22
208:7 210:20
224:4 225:13,20
226:2,14,18
229:12 235:19
236:13 238:21,25
242:13 248:25
249:18 252:7
254:10 255:16,22
256:5,8,12,15
261:5,20 279:18
280:8,12 285:25
297:23 298:8,16
311:10 322:14
323:2,18 324:7,21
325:6,14,24 326:7
327:22 328:16
329:4 330:12

331:3 332:16
333:19 337:22
342:1,15 343:9
345:9,17 347:3,9
347:14,17,20
348:3,12,15 351:4
357:22 358:6
359:23 360:6
362:9 363:20
364:7 365:23
367:20 368:7
370:8 371:11,16
371:19 374:10
376:18 379:9
382:7 390:19
392:16 395:17
396:16 399:20
400:20 401:8
402:5,10,21
405:12 406:8
408:18 411:9,15
412:19,25 414:12
415:18,21 418:4
419:6,22 420:11
421:22 424:11
426:12 427:14,17
429:1,6,20,24
430:10,18 432:22
435:19 439:23
440:20 441:9,20
443:24 444:19
449:23 450:5
451:3 453:5 455:3
455:7,21 460:5
**keep** 91:24 186:3
190:16 249:11
299:16 322:16
339:4 345:18
422:5
**keeps** 98:13

| | | | |
|---|---|---|---|
| **kelly** 4:21 | 68:17 69:25 71:12 | 138:18 139:3,4,7 | 219:10,12,21,25 |
| **kept** 124:7 441:12 | 71:14 72:19 73:12 | 139:14 140:6,9,10 | 220:4 221:4,14 |
| **key** 4:15 275:12 | 73:15 74:10,18 | 141:22 142:8,9 | 222:2,19 223:17 |
| 430:22 | 75:8,9,9 76:7,12 | 143:12,17,20 | 223:19 227:8,9,17 |
| **kicked** 214:6 | 76:19,22,24 77:5 | 144:23,24 145:21 | 227:25 228:3,4,10 |
| **kid** 35:22 175:3 | 77:14 78:3,4,12 | 146:11,14,15 | 228:22 229:13 |
| 259:10 | 79:4,13,14,25 80:7 | 147:8,9,14,16,22 | 230:14 232:11 |
| **kids** 103:20 | 80:7,10,15,21 | 147:23,24 148:2,9 | 233:5,17,25 234:3 |
| 174:24 194:10 | 81:18,21,24 82:1 | 148:20,23 149:5 | 234:5,5 236:14,21 |
| 257:16 258:10,19 | 83:7 84:4,17 | 150:15,25 151:16 | 238:13 240:20,21 |
| **killed** 81:16 412:4 | 85:16 86:3,9,10 | 151:24,25 152:10 | 242:7,11,17,19 |
| **kind** 101:9 114:16 | 87:8,12,15 89:5,15 | 152:11,11,14 | 243:25 246:8 |
| 167:25 231:24,25 | 89:19,25 91:3,6,10 | 153:6 154:8 | 248:10,11 249:5 |
| 233:16,19 250:7 | 91:16 92:15,24 | 156:21 157:18,19 | 249:22,24 251:9 |
| 279:11 288:25 | 93:20 95:12 96:5 | 158:14,25 159:1 | 252:3,3,23 253:4 |
| 289:3 290:16 | 97:18 98:15 99:21 | 160:4,5,14,15 | 254:9 255:15 |
| 363:14 378:8 | 100:7,21 101:19 | 161:14,17,18 | 256:20 257:1 |
| 411:11 444:23 | 101:20 102:8,12 | 162:9,25 163:4,5,5 | 258:14 259:8 |
| **kinds** 20:24 21:6,7 | 105:19 106:2 | 163:8 164:7,9 | 260:13 261:11 |
| **knew** 75:4 108:9 | 107:19 108:3 | 165:2,10 166:5,6 | 262:22 263:5,13 |
| 111:11 116:13 | 109:3 111:4,7,18 | 166:12,21 168:19 | 271:13 272:5,12 |
| 152:12,15,25 | 111:22 112:19,22 | 168:20 170:1,20 | 275:8 276:7,9,17 |
| 153:5 177:9 224:7 | 112:23 113:11 | 170:24 171:17,21 | 277:12,25 278:3,7 |
| 224:7,9 242:14 | 114:14,16 115:18 | 172:18 175:24 | 278:12,17 281:4,6 |
| 253:10 399:1,2,3 | 117:15,20 119:14 | 176:24 177:2,3,6 | 281:19 284:25 |
| 399:11 408:21,25 | 119:18 120:1,2,18 | 177:15 178:24 | 294:13,16,23 |
| 409:1 426:5 | 120:21 121:4,10 | 179:4,18 181:18 | 295:1,8 296:3,22 |
| **knife** 141:24 | 121:13,16 122:16 | 185:5 187:8,10,23 | 299:10 300:7 |
| **know** 18:3,9,21 | 122:24 123:6,12 | 188:6,8,11,18 | 302:21 303:11,13 |
| 25:23 28:16 29:14 | 123:14,15 124:5 | 193:13 194:9,10 | 303:20,24 306:7 |
| 30:1,3,10,12 31:11 | 124:18,19,19,20 | 197:8 198:1,12,18 | 309:23 310:12 |
| 31:16 34:5 35:11 | 124:20 126:9 | 198:25 199:6,11 | 311:11 312:12 |
| 35:16 37:25 40:2 | 127:8,16,19,24,25 | 199:16,23 200:8 | 317:14,15 318:10 |
| 41:9 42:11 45:11 | 128:3 129:17,18 | 201:4,11,13,19,20 | 318:25 319:4 |
| 46:14 47:17 49:15 | 130:12,12,14,24 | 201:23 202:10,13 | 320:10,24,24 |
| 50:13,15,16,17 | 131:16 132:5,7,10 | 202:15 203:17,18 | 321:1 322:21 |
| 53:22 55:2,16,20 | 132:11,18 133:16 | 205:13,18 207:18 | 323:10 324:11,19 |
| 57:6,20 59:1,5,17 | 133:19,20 134:11 | 207:20,21 209:7 | 325:3,9,11,18,20 |
| 59:17,19 61:19,22 | 134:14,24 135:5,7 | 210:17,17 212:2 | 326:1,2 327:10,11 |
| 62:2 63:23 65:2,3 | 135:15,16,21 | 212:20 215:5 | 327:24 328:2,10 |
| 65:8 66:4,7 68:14 | 136:1 137:16,19 | 216:13 218:20 | 328:25 329:6 |

330:14,18,21
331:24 332:4,6,18
334:9 336:20,23
337:3,13,17
338:12,13,15,21
340:1,7,11,23
341:8,20 342:5,21
343:16,16,17,20
345:15 348:1,1,15
348:24 349:4,13
353:20,21,23,24
353:25 354:3,7
356:1,11,16 360:7
360:22 365:6,8,10
367:1 369:5,17
370:3,15 374:2
375:7,23 380:24
381:8,10,12 382:9
382:10 384:9
385:8 388:10,13
388:16 389:12,17
389:21 392:21
399:15 405:6,14
410:10 412:1
413:2 415:13
417:3,7 423:18
425:18 426:18
432:15,15 434:10
435:4,9,23 436:1
436:14 437:6,15
439:14,24,24,25
440:2,21,22,25
441:11,12,24,25
442:5,7,24 444:8,9
444:9,10,14,20,21
444:22,23 445:18
447:25 449:6,8
450:15,16,17
452:6 453:21
454:24

**knowing**  109:15
**knowingly**  113:16
    334:18
**knowledge**  30:25
    35:7 53:14 58:1
    87:5 213:8 242:10
    276:19 294:19
    339:19 346:17
    355:17 366:9
    367:15 406:21
    408:2 409:8,12
    410:2 450:13
**knowledgeable**
    403:6 407:13
    452:23,25
**known**  35:16
    51:19 52:8 87:3
    137:23 143:4
    144:12 152:23
    338:8 391:17
    395:6
**knows**  100:17
    165:19
**kohler**  26:3 58:24
    82:1 208:11
    245:19 337:2,4
    411:22
**kouba**  2:5 15:12
    15:12

**l**

**l**  398:25,25
**l.p.**  1:11
**laboratories**  3:14
    5:4
**laced**  85:1 86:10
    86:19
**lack**  44:25 114:5
    133:8 139:17
    162:18 174:16
    181:14 216:18
    299:8 300:5

304:20
**ladies**  404:25
    409:16
**lakemore**  66:12
    240:14
**land**  216:6,7 239:5
    239:15,19 240:8
    240:13 307:14
**landlocked**  240:15
**landlord**  215:23
**lands**  411:7
**lane**  60:2 95:9,10
    95:10,11 396:6
    410:22
**lanes**  396:25
**large**  78:16 79:6
    90:25 91:2,22,24
    94:13 109:6
    116:17 126:4,22
    127:2,10,15,23
    138:1 158:23
    240:8 250:18
    403:22
**largely**  94:9
**larger**  123:25
**largest**  123:21
    125:24 126:18
    215:20 229:11
**laser**  93:22 198:4
**late**  43:17,25,25
    44:15 46:10,19
    54:7 55:22 56:15
    57:4 58:4 59:12
    116:6 141:20
    221:7 311:12
    367:23 413:3
    431:4,8,14 437:8
    450:20 451:2,22
**latiera**  5:6 125:15
**latiera.rayford**
    5:8

**laughter**  256:14
**laundry**  38:17
**law**  27:21 58:12
    71:4 82:14,20,24
    107:24 115:1,5
    116:16 121:14
    140:16,25 141:19
    142:24 158:21
    159:6,18 160:8,11
    160:12 166:10
    167:4 168:2 169:8
    177:25 178:20
    181:9,16 199:5
    200:12 203:3
    206:12,19 213:16
    221:20 222:2
    234:3,6 235:21
    244:15 310:21
    363:9 408:1 410:8
    440:8 445:20
    448:4,14 449:3,4
**lawful**  16:24 39:22
**laws**  177:24
    178:16 179:7
    181:5,8 209:3
    364:6
**lawsuit**  43:8,9
    149:22 171:13
    363:23 364:12
    365:13 395:24
    449:22 450:8,13
    451:1,24
**lawyer**  17:19
    18:24 425:20
    426:16
**lawyers**  27:16,17
    151:14 168:11
    205:19
**lay**  175:10
**layer**  179:21

layperson 328:6
lead 63:12 334:19
leaders 446:4,5
447:19
leadership 446:4
leading 59:1
leads 86:11 260:22
375:9
learn 360:11
391:25
learned 119:2,3
124:5 292:8 352:6
352:8,25 355:7
357:21 391:1
392:3
leave 19:22 168:17
203:13 205:18
leaving 33:25
114:23
led 316:22 334:2
337:2 375:13,23
376:16 381:1
left 155:12 216:11
249:3 330:16
387:22
legal 5:11 96:15
332:18 419:10
420:7 425:12,14
438:11 460:1
463:1
legality 45:15
179:11 180:13
legally 180:14
184:6
legislation 140:23
legislative 156:18
legislatively
142:15
legislator 19:15
20:11 413:17
438:3,4

legislators 156:23
157:21
legislature 19:19
19:23 21:21 44:1
173:21 224:15
225:2 442:12
legitimate 51:19
104:7 126:5,24
legitimately
104:21 105:10
450:22
length 316:16
lengthy 137:25
leniency 159:17
lent 213:9
leonard 24:18
59:2 140:8,9
149:5 151:17
152:18,19,21,23
154:9,18 163:25
165:13 167:14
169:21 204:10
349:20 356:3
381:18
leonard's 165:15
letter 8:4 9:1 23:9
23:15 182:3,17,21
265:12 267:8
280:9,11 281:1,11
281:16,20 282:8
282:20 284:4,14
288:1 291:22
299:23 315:21
317:2 318:7,9
460:19
letters 280:3
level 44:22 45:15
50:9,20,25 70:5
77:23 166:5 207:7
252:2 290:8
313:18 328:9

364:22 404:7
417:6 428:8 446:9
levels 102:24
154:10 261:10
305:4 338:2
leverage 212:1
216:2 451:11
leveraging 255:3
levy 196:21,22
223:12,13,14
249:22
lewis 3:9,15 5:5
16:2,4 125:15
license 184:16
licensed 180:8
184:9
licenses 116:1,8
lieu 159:8
life 20:1 34:3
177:18 192:22
308:9
lifestyle 60:19
394:18
lifted 116:2
lifting 365:11
light 368:12
436:25 450:23
likelihood 307:13
321:10
likes 227:3
likewise 26:25
200:16 255:2
limit 99:3 229:9
365:12,20
limitations 326:18
365:3
limited 20:4
100:15 113:21
114:7 158:5
164:17 193:17
219:2 230:11

240:25 241:1
245:25 248:2
412:6 440:23
441:13
linda 9:1 265:12
280:11
line 114:11,20
205:20 219:21
220:14 221:14
225:21 226:15
228:2 229:23
256:25 460:13
462:7 463:3
lines 69:16 147:5,5
329:15
lining 154:4
lisa 26:3
list 38:17 119:6
120:19 122:22
123:14,20 125:23
126:12,13 182:24
189:8,21 191:8,15
191:23,24 192:6
192:12,14 196:13
197:8,9,13 280:20
285:9,13,14,19
286:11,13,25
292:19 293:15
300:10 306:11
307:2 312:24
315:2,12,14,17,22
317:3,20 319:12
320:1,7 323:9
324:2,3 327:17,21
328:12 329:2
330:11,20 333:2
337:2,11,13
340:14,20 343:18
345:3,4,19 411:22
428:18

**listed**  66:9,21
68:11 69:2,6
120:19 121:22
122:7 135:18
145:1 171:24
183:15 189:10,23
194:16,24 219:2
292:21 294:9
300:21 309:20
315:20 316:3
336:21 337:15,21
339:16,22 340:2
341:22 343:21
349:14 382:20
397:16 462:7,17
**listen**  426:19
**listing**  9:11 266:10
338:16 462:7
**lists**  182:22 284:2
319:22 333:25
340:16 341:2
346:6
**lit**  384:17 385:10
**literally**  45:1
93:18 175:2 452:2
**litigation**  1:6
14:20 151:15
168:12 353:7
460:6 461:3 462:3
**little**  30:6 50:14
80:9 88:1 149:15
168:23 172:13
258:25 284:24
304:7 314:17
349:21 350:22
357:24 366:16
379:2 417:9
**live**  352:3 378:5
399:14 403:8
410:22

**lived**  177:17,19
220:8 410:19
**lives**  76:18 192:17
199:21 396:3
451:5,20
**living**  30:23 31:21
216:9,10 257:19
257:23
**llc**  2:4 3:13 5:3
**llp**  2:19 3:4,9,15
4:3,7 5:5
**local**  152:5 223:12
223:19 244:15,17
446:6
**locate**  239:20
**located**  14:16
240:13,14
**location**  22:22
251:18
**locations**  244:8
**lomax**  2:14 15:18
15:18
**long**  19:18 52:4
77:19 93:2 154:7
162:6 171:1
176:18 178:4
214:3 240:19,22
337:25 369:11
392:7 412:11
445:3
**longer**  26:14 44:7
97:15 98:13
167:12 200:4
207:23 241:9
252:22 330:5
392:11 394:19
443:7
**look**  29:16 30:11
50:14 71:1 87:10
118:19 120:24
127:6 129:13

136:24 183:5
187:11,17 188:21
188:23 190:23
191:15 192:2
232:23 237:24
251:10 252:18
261:4 272:21
275:10 290:18
321:12,19 323:7
325:18 330:24
331:1 347:23
349:1 366:13
374:3 376:3
385:18 402:17
409:23 415:7
444:25
**looked**  28:17,19
28:21 30:8 58:14
122:17,19 127:9
127:14,22 130:18
187:12 188:10,16
291:23 300:8
310:4 321:8,20
328:24 332:7
358:8 377:24,24
380:13 381:6
399:22 417:10
427:23 428:4
432:14 437:7,13
**looking**  28:17 60:1
66:19,20 82:25
100:15,16 117:6
157:6,7,8,11
164:11 169:9
183:6,7 188:2,13
194:4,5 239:13,15
248:7,17 251:18
252:10,12 258:12
261:13 284:8
294:18 295:9
314:16 351:13

382:9 389:24
418:8,9
**looks**  22:19 172:8
189:13 274:7
286:25 379:2
412:4
**loop**  290:16
**lori**  24:20,24 27:23
350:9
**loss**  192:15,22,23
192:24 193:16
194:7,7 195:21
196:8 220:21
250:2,8 432:9
**losses**  192:10
193:12 197:15
220:24
**lost**  34:10,17,18,19
95:16 96:2 192:17
196:9 197:18,22
199:24 239:11
241:6,24 279:8
371:5,17 376:4
398:18
**lot**  20:6 25:2 29:17
35:14 46:6,7
94:10 126:5,23
138:7 145:11
150:21 153:20
162:16,16 168:1
187:6 195:24
198:9 199:13
211:21 215:4
224:16,19 228:13
228:21,22 229:3,4
232:4 238:5,8,14
245:1 250:21
251:1 338:15
432:23 439:18
440:5 452:9,10

**lots**  203:25 211:17 228:23 296:22

**low**  44:22 64:5 70:8,15,23 71:8,13 252:6 400:5 405:20

**lower**  70:20,25 71:9 252:25 290:1 290:2,6 444:6

**lowered**  294:20 296:1

**luck**  168:1

**luckily**  175:23 257:20

**lucky**  194:1,2

**lucrative**  145:15

**lunch**  178:15 181:21

**m**

**m**  2:6,14

**ma**  306:2

**ma'am**  25:22 33:5 33:11 221:18 349:3 406:21 412:6 413:20 424:7 430:3 441:3

**machine**  176:7

**madam**  460:10

**magic**  172:11 261:2,7 262:6

**magistrate**  132:19 281:8 417:8

**mahoning**  20:16

**mail**  7:11 23:18 67:14,19 68:1,7 267:9

**main**  3:5 107:15

**maintain**  316:10 394:18

**maintained**  206:10,18 207:5

**maintains**  314:5

**maintenance**  369:12

**major**  192:10

**majority**  81:5 174:11 410:15

**makeup**  198:10

**making**  51:24 66:3 141:3 157:4,5 169:6 195:7 208:4 208:8 253:7 286:9 415:2

**man**  53:11 104:3 358:18

**manage**  431:5

**managed**  330:3

**management** 145:13 382:25 383:9,13,23 384:5 387:5,13,15 430:23 431:1 446:19

**mandatory**  153:11 162:15,17 167:17

**mangled**  315:6

**manner**  46:16

**manufacture** 43:11

**manufactured** 105:13 179:14 338:18

**manufacturer**  8:8 8:15 9:3 100:10 105:12 171:6 264:2,15 265:15 269:19 270:15 274:13 275:12 289:10 293:12 308:16,25 309:5 309:21 310:9 311:2 312:5,17

313:12 329:22 331:6,12 335:18 339:8,10 341:24 355:1 369:4

**manufacturer's** 393:24

**manufacturers** 99:22 100:5 101:4 101:6 171:21 180:21 306:19 310:3 312:23 338:19 341:11,17 342:12 343:2 351:17 353:4 354:5 355:11 356:22 360:13,17 362:6 363:12,18 364:4,15 365:21 369:14 374:23 375:5,14 384:23 395:1 450:3

**manufacturing** 105:15 171:6 250:19 251:19 352:19 353:11

**mapping**  446:24

**marijuana**  39:9 63:5,15,16,25 85:1 99:14 401:7 402:2

**mark**  22:2 47:20 61:1 67:14 88:9 117:23 128:5 133:20 134:15,16 135:8 136:3 182:16 190:7,8

**marked**  7:2 22:9 48:4 61:12 67:22 71:2,13,15 88:16 118:12 128:16 136:14 182:5 190:7 264:7,19

265:1,8,18,25 266:6,12 269:16 270:10 273:10 278:21 280:4 292:15 294:11 330:23 336:15 378:16,20 379:7 386:1,4 397:16 442:19

**market**  44:12 93:7 365:21

**marketed**  78:18 392:4

**marketing**  79:7 189:1,10 274:14 308:17,25 309:6 309:21 310:10 311:2 312:5,8,17 312:21 333:6 346:19 355:1 357:2,3,9,15 358:12 359:16,19 360:2,4,25 361:1,2 361:3,14,21 362:7 364:11,17 365:7 366:11 367:18 368:6,23 371:24 372:2,9 374:7 384:6 390:15,16 390:22 391:1,14 395:10 415:24 416:3,6 445:7

**marketplace** 392:19

**markets**  51:18

**marking**  71:8 182:19

**marks**  29:14 70:7

**marountas**  74:2 439:18

**master** 7:21 9:2
118:3,11 265:13
267:17,21 268:8
269:5 274:21
281:2,4,16 282:13
294:21 305:19
306:3 347:8 349:6
366:21 397:15
**match** 384:17
385:10
**materials** 319:24
325:4 353:22
357:3 391:2,5,15
**matt** 25:25 61:25
**matter** 21:19,21
235:16 313:18
373:24
**mattered** 30:16
**matthew** 67:15
68:12
**matz** 27:21
**mcginness** 2:4
**mckesson** 4:2 16:7
16:9
**md** 1:7 14:23
**mdl** 1:6
**mean** 36:17 42:3
64:2 72:12 78:6
80:3 92:11,25
96:12 97:13
101:18 104:2
106:23 110:7
111:5 112:5 115:7
117:6 119:11,18
121:8,12 122:15
124:1 127:12
138:7 139:8
140:21 146:11
163:13 168:7
171:10 174:13
175:21 176:17

178:23,23 179:6
181:13 204:6
210:21 223:19
226:3,4 227:25
228:22 229:13
230:20 231:10
233:9,19 235:15
236:5 242:4 254:7
258:2 261:7 262:6
263:11 310:19
322:19 325:17
327:14 328:6
337:23 340:22
346:4 351:13
363:21 364:9
369:8 371:17
374:11,18 379:10
384:21 394:7,8
441:21 442:3
447:2 452:2
**meaning** 39:12
160:10 334:21
394:3,4 420:7
**means** 33:7 96:13
117:14,15 203:12
257:21
**meant** 30:10
135:11 198:2
256:6 383:8
431:24
**measure** 54:24
207:12 251:9
**measures** 54:10,12
**media** 7:14 88:10
88:13
**medicaid** 220:6
228:6,19 229:2,8
365:11,12
**medical** 26:5
40:10,17,24 45:2
58:22,25 112:2

113:3 115:25
116:19,20,21
117:1 135:15
156:24 159:15
161:12 164:16,19
176:1,5 178:25
184:9 187:13
194:18,24 195:13
199:23,25 207:22
208:10 211:8
214:19 216:23
217:14 218:17
221:12,17 223:2
226:21 228:16
230:5 231:15
232:5 233:6
245:20 276:6
278:12,15 291:12
296:8 303:17
325:1,11 336:24
337:17 369:7,15
376:10 387:11
407:20 414:18
452:21
**medically** 96:15
135:11,19 304:4
304:11 305:14
**medication** 241:18
242:16 243:25
245:24 375:2
**medications** 96:14
172:17 180:22
244:9 306:25
361:8
**medicine** 102:19
**mee** 30:9
**meet** 93:8 210:10
288:4 292:22
293:5,13 294:8
327:20 436:8,9,12

**meeting** 32:1
58:12 59:3 312:4
361:7 368:21
371:23 372:1
396:12 435:13,22
436:19 437:12
438:21 440:11
447:14 448:22,23
449:16 450:9
453:19 454:6,13
454:24
**meetings** 73:19
212:25 245:2
351:8 352:11
355:14 362:4
368:19 372:4
379:18 405:17
410:6,7 411:19
435:23,24 436:12
436:15 448:2
451:14
**meets** 328:13
**meh** 262:2
**member** 80:25
169:20,22 241:16
259:24 260:5,7,9
260:16 435:16
436:21
**members** 101:24
179:16 194:4
242:3 352:20
411:21 446:11
449:10,13,13
**memorized** 287:2
**memory** 135:24
**men** 215:21
**mental** 184:20,25
236:18 238:1
**mentioned** 181:11
342:4 362:22
367:14,16

| | | | |
|---|---|---|---|
| **mere** 127:1 | **milligrams** 321:9 | **misrepresentatio...** | 328:9,14 |
| **messaging** 155:2 | 332:24 | 273:5 326:22 | **mobile** 176:2 |
| 306:18 353:3 | **million** 72:22 | **misrepresented** | **mobilized** 241:12 |
| **met** 24:6,16,18,23 | 94:19 104:3 | 329:23 334:18 | 446:18 |
| 24:25 27:7,12 | 111:20 176:20 | **missed** 114:9 | **modification** |
| 32:2,2 153:2 | 186:2,8,10,16 | 251:13 | 415:9 |
| 266:22 292:18 | 188:6,19 321:20 | **missing** 192:9,11 | **modifications** |
| 367:22 436:14 | 334:11 358:13,15 | 192:13 195:18 | 22:18 |
| 448:16 | 358:23 394:13 | 206:24 255:18 | **modified** 22:21 |
| **metabolize** 338:5 | **millions** 175:19 | **mission** 443:7 | 282:12 349:6 |
| **meth** 82:9 83:22 | **mills** 108:17,21,22 | **misstate** 420:13 | 366:21 397:15 |
| 249:3 402:3 | 430:15,19 | **misstates** 13:3 | 421:3 |
| **methadone** 257:24 | **mind** 71:13,14 | 396:17 406:9 | **mogadore** 66:12 |
| **methamphetamine** | 200:22 299:16 | 413:1 420:11 | 450:16 |
| 38:25 63:5 84:8 | 400:22 402:12 | 422:20 | **mom** 260:3,13 |
| 84:11 85:5 99:13 | **mind's** 436:18 | **misstating** 424:12 | **moment** 349:8 |
| 259:21 | **mindset** 117:9 | **mistake** 157:14 | **moms** 154:9 231:6 |
| **methamphetami...** | **mine** 134:8 158:25 | **mistaken** 357:13 | 231:6 |
| 84:14,25 401:6 | 277:16 302:1 | **misunderstood** | **monetize** 193:19 |
| **methodology** | 303:12 | 110:9 | 195:4 |
| 302:22 306:17 | **mine's** 348:1 | **misuse** 290:10 | **monetized** 193:12 |
| 326:2 329:6 332:5 | **mined** 442:1 | 305:5 307:13 | 194:6 |
| **methods** 92:7 | **minimum** 252:25 | 355:23 445:8 | **money** 176:1,4,10 |
| **metroparks** | **minority** 20:5 | **mitigate** 185:23 | 187:19,20 196:22 |
| 249:21 | 174:6 | 201:25 | 199:17,19 201:1,4 |
| **mexican** 92:8 | **minute** 66:18 | **mitigated** 176:16 | 201:6,12 208:4,9 |
| **mexico** 90:16 | 189:6,20 236:3 | **mix** 85:23 | 209:25 210:5 |
| **miami** 2:15 | 279:9 | **mixed** 39:2,3 89:1 | 215:4 247:15,22 |
| **mic** 397:12 | **minutes** 455:3 | 90:23 91:5 94:15 | 248:14 376:2 |
| **microphone** 339:1 | **mischaracterizes** | **mixing** 85:21 | 446:23 452:9 |
| **microphones** 14:3 | 89:11 395:18 | 91:10 | **monies** 187:14 |
| 14:7 | 402:10 | **mme** 283:18 | **monitor** 44:3 |
| **mid** 89:4 | **mischaracterizing** | 284:20 285:4,12 | 244:12 |
| **middle** 379:24 | 430:9 | 286:4,13 287:19 | **monitoring** 221:5 |
| 380:1 387:24 | **misconduct** 178:3 | 288:8 289:16 | **monster** 59:25 |
| **midwest** 460:17 | 178:22 | 290:5,9,11 291:7 | 451:7 |
| 463:1 | **misdemeanors** | 293:14 294:15 | **month** 148:18 |
| **mill** 108:15 146:2 | 63:19 438:19 | 295:5,25 303:6 | 233:22 436:2 |
| **miller** 193:14 | **misleading** 391:4 | 307:1 308:3,6,15 | **monthly** 447:14 |
| **milligram** 44:9 | **misremembering** | 309:8 311:22 | **months** 19:21 |
| 263:12 | 378:5 | 313:17 314:9 | 20:17 32:17 |

**moral** 156:24
**morgan** 3:9,15 5:5
   16:2,4 125:15
**morganlewis.com**
   3:11,18 5:8
**morgue** 176:3
**morning** 15:8
   16:12,15 17:6,7
   32:12 266:22
   414:15 428:5
**morphed** 188:14
**morphine** 30:11
   37:13 38:2,16
   42:22 44:12 85:2
   130:20 332:23
   338:5
**mother** 412:3,3
**mothers** 193:23
**motion** 9:3 265:16
**motley** 2:4 15:6,9
   15:12,16 24:7
**motleyrice.com**
   2:8,9,10,11
**move** 70:9 211:6
   214:14 263:18
   321:10 346:8,10
   426:14,22 430:1
   442:15
**moved** 401:4
**moving** 446:21
**mt** 2:7
**multiple** 19:13
   24:13 97:1,3,4,11
   140:10 141:8
   152:25 239:15
   256:17 281:10
   381:14
**multiply** 358:21
   372:22 437:14
   439:2

**municipal** 204:13
   246:12 247:2,3,4
   438:13
**mute** 194:22
**mutual** 276:6
   278:12,15 291:13
   303:17 325:1,11
**myriad** 199:9

**n**

**n** 4:14 69:8
**naive** 376:11,12
**naloxone** 236:1,3
**name** 14:11,24
   17:8,9 27:18
   61:24 68:11 74:18
   74:21 134:7
   240:24 266:21
   275:12,13 281:9
   283:15 398:10,20
   398:22 414:5
   439:17 460:6
   461:3,4,15 462:3,4
   462:21
**named** 27:12
   38:15 135:22
   171:23 458:9
**names** 9:11 129:13
   135:21,24 145:5
   266:10 299:20
   340:6,10
**narcan** 452:4
**narcotics** 51:1,17
   52:15,23 169:25
**narrative** 333:9
   380:6,7 382:22
   391:18
**nas** 44:21 47:14
**national** 1:6 7:12
   8:9 14:20 67:20
   68:2,9,14 264:4
   269:21 460:6

461:3 462:3
**natural** 307:19
**naturally** 37:14
   42:21
**nature** 75:22
   141:5 236:15
   353:3 392:3
**near** 329:13,14
   387:2,18
**nearly** 66:2 175:23
   186:1 204:20
**necessarily** 124:1
   130:5 383:16
**necessary** 135:12
   135:19 170:17
**need** 44:22 54:18
   55:3 66:18,24
   105:10 108:3
   109:7,16,19,20
   111:19 114:6
   173:17 182:24
   183:15 191:19
   200:13 227:23
   235:20 239:22
   240:6 250:17
   258:18 291:17
   331:1 348:18,21
   365:9,10 370:19
   393:19
**needed** 109:21
   143:1,2,3,3 173:19
   175:24,25,25
   224:3 302:24
   322:2
**needle** 202:22,24
   230:12,16 232:11
   233:5 242:19
   404:8
**needles** 58:18
   230:22 233:4
   245:15 249:15

**needs** 166:6 175:8
   210:10 232:9
   258:3
**nefarious** 124:9
   157:20
**negatively** 34:9
**neighborhood**
   408:21,25
**neither** 115:6
**nelson** 87:18 88:6
   186:24 187:8
   225:22 226:6,19
   229:14,21 249:20
   254:6,8 255:17,19
   255:20
**nelson's** 27:6
**never** 40:22 89:22
   102:15 119:12
   199:15 253:10
   258:16 286:17
   305:20 381:17,20
**new** 52:17 141:21
   153:18,20 154:20
   196:3 201:25
   213:18 251:4,5,19
   256:21 289:23
   362:12 396:20
   441:22
**news** 35:13 109:4
**newspaper** 193:20
   251:10
**non** 57:12 63:1
   158:2 224:20
   260:7 286:3
   312:12 316:7
   392:6 397:18,25
   415:15,22 418:23
   419:24 421:14
   422:13 424:5
   425:18

noodle  158:8
normal  54:9
normally  200:17
norms  310:14
north  3:5
northeast  89:7
  150:13 253:12,16
  253:21
northeastern
  89:14 90:5 92:8
northern  1:2
  14:22
northwest  2:20
  4:8,22
nos  9:5 265:18
  282:10 283:5
  287:12
notable  53:11
notarized  460:14
notary  458:6
  459:14 460:25
  461:10,18 462:15
  462:23 463:23
note  14:3 23:9
  29:15 55:1 188:21
  393:9 460:12
noted  298:24
  324:17
notes  29:1,4,7,11
  299:15 329:21
  330:10,14,19
  397:3
notice  7:3 22:4,7
  22:13,25 23:25
  33:4 44:16 183:7
  188:22 295:18
  346:14 366:14
noticed  43:19
notion  396:4
november  270:6

nuisance  257:8
number  7:2,20
  28:11 53:1 62:16
  64:14 65:25 67:16
  69:6 73:23 82:5
  104:2 111:7
  115:20 118:10
  124:8 145:3 148:2
  148:14,15 174:19
  175:1 187:21
  198:20 199:18
  225:1 226:11
  234:15,22 243:24
  250:16,17,20
  253:14 256:18
  267:4 279:5 307:4
  308:20 323:8,8
  347:4 354:12
  358:9,16 368:10
  372:20 373:12
  382:18 387:20,21
  388:5 389:3 395:5
  407:17,24 410:1
  410:12 411:1
  412:9,10 413:23
  427:15 433:16
  437:13 438:24
  439:20 440:14
  460:7,13
numbered  270:2
  331:10 335:15
numbers  28:25
  47:12 64:22 109:6
  138:1 139:3,4
  152:7 162:20
  169:6 186:11
  187:4,7,25 254:22
  258:13 270:24
  350:19 373:4,22
  403:24 439:15
  462:7

nurse  184:11
nurses  112:9
  115:18 116:14
  154:9 252:20
nursing  112:9
  115:25 116:8
  117:3,4,18,21

**o**

oar  158:4
oarrs  44:3 57:23
  71:3 99:8,10
  107:20 113:20
  114:7 140:12,18
  141:7,9,10,11,15
  143:22 146:17,21
  146:23 150:20
  153:10,11 156:9
  157:15 158:4,12
  161:10,24 162:2
  162:23 163:6,7,21
  163:23 164:1,3,5,7
  164:15 165:1,4
  166:10,25,25
  167:11,16 168:22
  181:14 359:1
  439:11,13 440:1,4
  440:12,18,22
  441:6,13,17 442:4
  442:9
oath  19:8 110:21
  113:11 144:11,16
object  10:2,4,4,5,5
  10:6,6,7,7,8,8,9,9
  10:10,10,11,11,12
  10:12,13,13,14,14
  10:15,15,16,16,17
  10:17,18,18,19,19
  10:20,20,21,21,22
  10:22,23,23,24,24
  11:1,1,2,2,3,3,4,4
  11:5,5,6,6,7,7,8,8

11:9,10,11,12,12
11:13,13,14,14,15
11:16,16,17,17,18
11:18,19,20,20,22
11:23,24,24 12:2,2
12:3,3,4,4,5,6,7,7
12:8,10,11,11,13
12:13,14,15,16,16
12:17,18,18,19,19
12:20,20,21,21,22
12:22,23,24,25
13:1,1,2,2,6,6,7,7
13:8,8,9,10,10,11
13:11,12,12,13
18:24,25 41:3
49:21 56:16 59:15
71:24 72:17 77:13
78:24 79:12 80:14
80:23 81:13,23
84:9 87:1 92:3,10
92:23 94:16 95:6
97:5 98:4 104:14
105:18 106:1,7
107:3 108:4 109:9
109:18 110:18
111:13 112:4,17
114:13 116:23
121:7,21 122:14
123:13 124:3
127:11 138:6
139:2 141:13
143:24 145:16
155:10 157:17
158:13 160:3
171:9 173:14
174:12 175:14
176:15 178:6
180:17 184:22
189:12 206:22
208:7 210:20
224:4 225:13

235:19 236:13
242:13 249:18
252:7 254:10
256:5,13 261:5,20
271:12 276:24
279:18,19 282:23
285:25 299:7
300:4 303:1 304:5
304:13,25 305:16
306:6 309:1 318:2
318:22 320:9
321:18 326:7
327:22 328:16
332:15 337:22
340:21 351:4
357:22 358:6
362:9 363:20
364:7 365:23
367:20 368:7
374:10 376:18
382:7 390:19
392:16 395:17,17
400:20 401:9
402:5,21 405:12
406:8 408:18
411:9,15 412:19
412:25 414:13
418:4 419:6 429:1
429:6 430:18
432:22 435:19
439:23 440:20
441:20 443:24
444:19 449:23
450:5 451:3 453:5
**objecting** 256:7
**objection** 10:1,3,3
10:25 11:9,10,11
11:15,19,21,21,22
11:23,25 12:1,1,5
12:6,8,9,9,10,12
12:12,14,15,17,23

12:24 13:3,4,4,5,5
13:9 36:5 40:15
133:8 186:21
205:1,10 248:25
274:19 279:24
281:18,25 296:6
298:24 300:15
301:20 302:7
307:25 312:18
321:6 324:17
325:6,14,24 329:4
330:12 332:16
342:1 343:9 360:6
371:9 396:16
399:20 408:17
419:23 421:20
425:5 426:2,13
441:9
**objections** 7:19,23
8:2,7,14 118:1,8
118:24 128:8,14
129:3 136:5,12
264:2,15 269:19
270:14 299:10
326:18
**obligation** 175:7
**obsolete** 354:22
378:9 442:23
443:15
**obtain** 21:8 43:23
46:11,15 54:13
57:14 147:5 156:1
221:3 275:22
277:4 279:10
**obtained** 275:17
276:5 301:25
312:15
**obtaining** 56:24
57:1 96:13
**obvious** 199:3

**obviously** 31:23
163:6 164:18
215:4 244:11
341:19 349:21
**occasionally** 159:3
159:12
**occasions** 55:7
152:25
**occur** 97:12,14,23
98:21 116:4,5
166:4,7 221:21
225:14 393:5
**occurred** 53:10
79:8 102:25
107:18 116:15
146:9 358:3
**occurring** 37:14
42:13,22 94:10
101:21 116:6
147:1 186:5
417:14
**occurs** 97:8
101:10 107:8
**october** 354:9
382:4 442:19
446:17 454:7
**offender** 160:10
**offenders** 160:22
**offenses** 21:10
151:19
**offer** 183:20
231:11
**offered** 19:24
**offering** 60:4
**office** 7:8 17:15
20:17,21,22 24:22
26:5,15 43:20
45:3 48:19 55:18
61:2,8 73:10
107:12 112:25
138:8 149:11

163:14 164:20
166:2,14 176:1,5
187:16 193:11
194:24 199:24,25
203:10 204:15
207:23 208:11
215:11 221:12,17
250:12 256:23,24
336:24 441:23
459:6
**officer** 17:18
103:16 113:23
149:12,17,25
159:10 169:22
187:5 208:19
209:1,3,4,7 213:24
213:25 234:18,19
**officers** 58:12 65:7
65:13,15 89:9
94:1 141:20 150:4
150:22 151:18
158:22 164:6,14
166:24,24 168:3
169:24 178:1
179:22 203:23
209:6,12 221:5
227:16 232:22
233:1,2,10,11
234:4,6,8,23,25
235:8,25 246:24
434:13
**offices** 137:23
150:14 423:1
**official** 281:8
461:15 462:21
**officials** 351:24
407:25 408:1,2
410:9 446:5
447:18 449:11
**offset** 392:9

**oftentimes**  84:24
**oh**  28:18 48:25
  120:21 122:23
  127:20 129:25
  138:23 155:24
  173:22 174:1
  190:6,19 222:4
  223:5,25 224:2
  228:3,21 238:19
  240:2 256:6 271:8
  277:24 280:19
  320:21 325:9
  336:13 339:2
  344:25 347:6
  360:19 361:13
  370:18 441:5
  443:18 452:24
  454:11
**ohio**  1:2,11,22 3:5
  4:16 7:6,8,18,22
  8:1 9:13 14:17,22
  17:11 19:14 21:11
  47:22 48:2 61:2,8
  89:7,14 90:5 92:9
  117:24 118:7
  128:7,13 136:4,11
  150:13 216:3
  253:12,16,21
  255:9 276:6
  278:13,15 291:13
  325:1,12 354:4,17
  363:5 378:13,22
  458:2,7 459:7,15
  460:2
**ohio's**  8:7 264:1
  269:18
**okay**  16:19 18:2,7
  18:23 19:5 23:24
  25:11 34:24 36:12
  40:13 41:12 45:4
  49:5 55:2 58:8,9

  61:21 62:18,24
  63:2 64:2,8 68:4
  68:18,21 70:11
  77:25 79:15 80:8
  81:10 102:5
  104:19 109:23,25
  109:25 110:4
  118:21 119:14,22
  119:22,25 122:23
  125:19 126:20,20
  127:20 128:23,25
  128:25 131:5,8,20
  132:7 133:4 136:2
  137:2,4 142:10
  148:7 152:13
  162:9 163:19
  164:22 171:16
  178:8,11,13,18
  183:3 185:20
  189:17 190:24
  191:18,20 192:2
  192:11 194:13
  197:12,14 202:3
  208:3 209:23
  211:2 214:16
  217:3,6 222:23,25
  223:8 226:17
  235:10 237:9,20
  238:19,25 240:1
  242:1 243:5,12
  245:17 247:7,14
  247:21 249:13
  255:24 256:10
  257:6 261:14
  262:24 263:19
  267:2 269:11
  271:20 272:16,21
  273:14,22 274:5
  275:2,4,9 279:1
  280:24 282:24
  283:1 286:8

  287:23 288:21
  289:7 291:6,8,9,19
  291:21 295:16
  311:15 313:2
  314:25 335:4,16
  335:22 336:7,13
  336:13 339:3
  344:2,21,25 345:8
  345:17 346:9
  347:10,14,17
  348:16,18 350:24
  361:13 369:14
  370:18 371:11,19
  379:5 386:5
  387:23 390:24
  398:5 399:17
  400:7,15 404:19
  406:4,20,23
  409:16 412:22
  413:20 415:7
  416:7,16 418:14
  418:14 419:1
  423:15 427:5,17
  429:25 430:1
  431:1 434:1,7,19
  435:12 437:24
  438:8 439:12
  441:5 442:14,17
  443:11,22 444:4
  445:1 448:16
  449:1 450:12,23
  452:11,19 453:23
  455:7,21
**omissions**  273:5
  326:22
**omitted**  329:23
**once**  36:19 158:2
  404:8
**one's**  257:13
**ones**  22:18 26:8
  27:12 38:14 42:22

  108:25 131:13
  135:22 183:15
  185:9 230:21
  237:18 370:1
  447:11
**ongoing**  28:21
  447:11
**onset**  45:10
**oops**  240:1
**op**  1:11
**opana**  38:16 39:17
  315:5
**open**  90:18 91:8
  155:12 409:3,9
**operate**  253:19
  255:9,9
**operating**  145:23
  351:24 391:13
**operation**  146:1
**operations**  200:4
  447:19
**opiate**  1:6 14:20
  37:13,16,21 73:19
  222:9,13 245:2
  328:21 350:17
  351:8 356:13,24
  362:1,25 367:22
  379:17 405:17
  410:3,6,7 429:11
  445:23 446:10
  448:20,24 453:19
  460:6 461:3 462:3
**opiates**  37:15 38:1
  38:13 394:5
  454:14
**opinion**  73:5,8,9
  173:8 369:7 453:4
**opinions**  33:10
  375:18
**opioid**  34:19 37:10
  37:21 38:23 39:12

| | | | |
|---|---|---|---|
| 41:22,22 42:18,25 | 368:20 369:10 | 106:13 109:7,8,15 | 406:7,16 410:16 |
| 43:8,13 44:11 | 371:25,25 377:13 | 111:16 112:25 | 412:18 413:8 |
| 45:6 47:12 56:13 | 377:16 379:17 | 114:2 115:9 119:5 | 423:10 445:14,17 |
| 70:1 79:20 83:5 | 383:4,10,24 384:4 | 122:6 123:2,22,25 | 445:19 447:13,21 |
| 84:15,19 86:24,25 | 384:13,21 385:3 | 124:8 125:24 | 450:4 453:13 |
| 94:5,18,24 98:11 | 390:1,4,17 392:15 | 126:4,23 138:2,14 | **opium** 38:2,16 |
| 99:15 102:15 | 392:24 394:2,6,24 | 138:15 157:22 | 77:17 93:6,15 |
| 144:13 154:22 | 395:5,8,11,14,15 | 158:17,18,20 | 262:16 |
| 158:16 161:15 | 396:11,14,15 | 161:8,19 162:12 | **opportunities** |
| 164:10 171:8 | 398:17 402:23 | 171:1 180:15 | 210:3 447:22 |
| 172:21 173:6,8 | 403:3,18,20,24 | 184:2,20 185:3,11 | **opportunity** 19:25 |
| 175:15 178:3,22 | 405:5 406:2 408:4 | 185:15 189:2 | 20:8 226:6 268:6 |
| 184:7 196:1,17,24 | 410:3 414:11 | 200:20 207:14,17 | **opposed** 147:15 |
| 197:19 198:4,14 | 415:23 418:25 | 220:1,10 221:1 | 338:19 343:23 |
| 202:1 206:14,21 | 419:5,12,21,25 | 230:21,24 241:8 | **opposite** 158:3 |
| 211:9,15 213:5 | 421:18,25 422:13 | 245:25 246:5 | 357:12 |
| 214:11,20 215:14 | 422:18 424:6,10 | 248:14,20,24 | **options** 240:7 |
| 215:15,18,21 | 425:3,11 428:24 | 249:1 260:2,14,15 | **order** 8:20,23 9:8 |
| 217:1,17 218:18 | 429:4 430:16,20 | 261:22 263:4 | 120:11 122:2 |
| 219:3,11,13 220:9 | 430:23 445:6 | 273:3 283:18 | 129:7,21 130:4,8 |
| 223:3 228:17 | 446:4,20 448:20 | 288:8 289:15 | 132:13,16,20,23 |
| 230:11,14,15 | 452:25 | 295:5 305:2 | 132:24,25,25 |
| 231:5,15 238:3 | **opioids** 34:4,9,18 | 306:12,19 315:8 | 133:1,22 134:25 |
| 239:9 240:25 | 35:8 36:3 38:3,13 | 326:20 330:2 | 168:5 184:14 |
| 241:4,17 243:2,18 | 39:15,18,21 40:9 | 334:8 335:9 337:7 | 190:14,16 264:25 |
| 248:3,5 249:2,9,15 | 40:23 41:1,16 | 337:12,14,20 | 265:7,24 268:8 |
| 251:12 253:8 | 43:4,6,11,14 44:7 | 338:17,20 339:14 | 269:6 292:10 |
| 255:13 256:2 | 53:19,20 54:7 | 343:1 346:20 | 326:4 366:21 |
| 257:8 258:24 | 55:4 56:6,19 57:2 | 350:13 351:2,18 | 417:5,6,9,10 |
| 259:5 261:3,18 | 57:9,10,12,16,19 | 353:13,17 354:6 | 419:17 421:3 |
| 262:10 283:17 | 59:12 60:8,21 | 355:3,22 356:23 | **ordered** 122:6 |
| 287:17 289:14 | 71:20,22 72:3,11 | 357:10,15,19 | 123:3 130:17 |
| 293:15 304:2,9,19 | 73:14 74:9 76:2 | 358:2 359:5,9 | 152:9 |
| 304:22 308:2,5 | 76:22 77:12 78:2 | 360:5,13,20 | **orders** 120:14 |
| 316:6 328:7,14 | 78:11,15,17 79:6 | 361:21 364:5,18 | 122:9 123:8 |
| 329:3 330:5 | 79:16,17 80:12,18 | 365:22 369:18 | 127:23 133:5 |
| 331:17,25 332:11 | 80:19 81:9,10 | 370:4 373:17 | 168:6 416:20,21 |
| 332:13,22 333:3 | 82:16 83:14,18,20 | 374:9 382:15 | 416:25 417:2 |
| 333:15,22 334:3,5 | 84:1,6,7,12 87:7 | 390:22 391:11,23 | **ordinance** 251:2 |
| 334:6,14 351:16 | 93:22 95:21,22 | 392:3 394:1 399:9 | **ordinances** 364:14 |
| 355:7,11,23 | 96:3 98:18 99:3 | 402:3,15,20 404:1 | |

organization
241:15 386:14
445:5,13
organizations  9:17
92:19 147:15
377:3 385:15,24
389:14 446:7
447:10 448:1
organize  244:17
organized  280:14
oriana  217:21
218:4 219:2 227:3
227:5
origin  158:18
original  96:19
97:13 188:12
275:25 285:13,23
306:24 423:12
originally  113:22
135:23 179:17
306:13 403:6
431:4
originated  98:19
origins  38:2
outcomes  391:17
outnumbered
174:7
outside  64:6 83:6
96:14,18 113:11
124:4 147:1,11,14
164:19 180:5
187:18 198:20
200:1 232:4 269:3
324:8 325:6,14,24
326:7 327:23
330:12 332:16
342:1 345:13
349:23,23 359:25
370:11 385:9
outweigh  40:1

oval  380:1,3
overall  126:18
139:5 436:13
overdose  9:12
34:22 45:3 84:19
86:11 161:6,12
175:1 193:21
199:7 203:12,16
203:20 208:20
233:14 235:2,3
236:8,10 241:7
266:11 272:8
337:7,15,21
338:17 398:18
overdosed  34:11
34:20 81:11
232:10 241:10
overdoses  80:16
81:6,9 94:10,18
203:6 204:1 207:3
211:10 214:21
231:22 235:16
262:18,20 335:8
337:14
overdosing  80:18
86:24 95:5,19,21
95:23 232:3
overlap  88:1 238:6
overprescribing
102:7
overstated  94:5
oversupply  260:24
overwhelmed  55:4
195:9,10
overwhelming
53:24 58:1 193:18
369:13 410:14
451:20
overwhelmingly
405:20,21

owned  252:24
owns  240:9
oxford  3:16
oxycodone  38:4,15
39:16 42:21 46:9
oxycontin  36:18
36:21 38:4,15
39:16 42:21 46:9
53:11 315:4

**p**

p.m.  32:10 456:7,8
packet  299:23
page  10:2 37:9
48:24 50:3 53:4
61:25 62:8,13
64:11,18 68:19
118:21 120:8,9
123:16 125:22
126:12,13 128:24
129:2 136:18
190:23 220:19
237:25 238:24
243:9,14 256:1
270:2,3,22,23,24
272:25 274:2,7
280:21,22,23
282:25 283:2,3,8
284:9 287:6,7
288:2 293:11
299:21 300:13
310:20 311:16
314:24 315:1
317:1 326:15
329:9,11,13
331:10 335:10,14
335:15 339:7
340:7 347:25
366:22 377:23,23
379:4,5,21,23,24
379:25 386:16
387:2,3,20,21,24

388:23 389:23
427:13,20 428:4
428:11 460:13,15
462:7 463:3
pages  64:9,19 68:2
120:8 194:17
270:2 275:7
331:10
paid  176:8 207:17
216:7 226:1 232:5
236:17 247:23
393:15,16
pain  9:17 37:19
45:11 51:2 83:8
115:12,15 145:13
305:2,7 306:14,17
306:20 326:20
327:5,7 330:2
333:10 352:15
369:12 374:16,21
375:2,5,11,15
376:23 382:25
383:9,13,23 384:5
385:24 386:14
387:5,12,15,16
388:5,18 389:9
391:21 392:7,9,12
405:22 406:3
430:23 431:1,5,6
431:11 432:5
pants  159:1
paolino  61:25
67:15 68:12 71:6
82:22 166:16
453:25 454:1,11
454:12,23
paolino's  25:25
82:7
paper  139:9
193:17 361:4

**paragraph** 137:3
137:6 274:7 287:7
287:10,25 288:2
315:1 317:1
326:16 329:12,14
335:2,25 336:10
336:12
**parameters**
291:24 292:1
318:12 321:3
**paraphrase**
287:13
**paraphrasing**
417:24
**paren** 387:7
**parent** 368:14,24
372:5,12
**parenthetical**
283:9
**parents** 194:3
242:14 352:12
**parks** 249:14
**parse** 57:13
**parsed** 87:9
**part** 42:25 70:12
72:15 90:5 94:13
109:11 121:9
127:18 129:6,20
130:4,7 132:13,16
133:21 143:20
164:8 167:17
176:16 180:18
196:1 205:8 209:2
217:24 232:12
235:24 247:16
248:18 249:23
250:13 286:8
293:2 315:15
325:19 329:11
330:15 334:24
369:1 377:17

379:24 393:22
401:12 413:16
414:20 423:13
431:10 432:17
438:20 446:21
447:19 462:9
**partial** 329:12,14
**participated**
150:15 215:12
337:4 374:23
375:10 376:8,9
436:11
**participates** 170:7
231:2,8,9 244:25
**particular** 45:21
53:21 65:4 100:3
105:17,20 115:10
115:15,22,23
127:15,22 132:15
132:23 151:12
201:13 202:9
218:1 260:16
349:16 368:22
409:15 438:9
454:24 455:1
**particularly**
236:11
**parties** 14:10 15:3
**partner** 111:10
**parts** 31:10 361:5
**party** 209:21
301:25 408:25
409:14 459:3
**pass** 97:1 121:11
177:10 250:21
397:12
**passed** 34:13,25
35:13 399:15
**passing** 399:4
**passionately** 412:8

**passive** 361:5
**patch** 91:8
**patches** 90:18
**patience** 456:4
**patient** 97:6,13
115:10,15 130:19
158:9 184:6 194:9
269:12 275:12
301:17 305:11
316:7 317:12
318:20 319:1
321:15 329:1
331:25 357:9
374:22,24,25
**patient's** 109:21
**patients** 83:7
109:6,15 110:16
113:25 114:6,17
115:8 138:10,12
138:18 139:5
140:15 144:22
155:18 156:4
211:8 214:19
216:18,25 217:15
223:2 228:17
283:14 286:4
288:7 289:12
301:13 302:5,12
302:19 303:9
304:2,9 306:4,22
310:16 312:10
330:1 342:24
357:2 387:6,6,13
388:7,19 391:6
**patrick** 24:18
381:18
**patrol** 65:9 221:23
**pay** 95:3 217:25
226:22 228:12,13
230:4

**paying** 95:7
218:15 252:24,25
254:18
**payment** 325:12
**payroll** 26:20
**pays** 231:14
**peak** 69:25 70:2
**peaked** 373:21
**peddle** 179:24
**penalties** 157:4,10
**penalty** 21:2
**pending** 371:12,12
371:15
**pennsylvania** 3:17
**people** 24:13
26:10 27:11 39:19
43:4 44:6 47:11
49:17 54:12 64:14
64:22 75:23 76:1
76:7,8,17,21 77:3
77:11,25 78:9,13
79:3,4,15,19 80:11
80:18 81:11 83:10
83:13 84:2 85:5,8
85:14,25 86:2,17
86:23 93:18 95:2
95:4,7,16,18,20
96:1 97:4 99:14
99:21 101:10
103:20 104:7
106:24 107:5,15
109:5,14 110:14
112:1 116:2
129:10 138:4,8,21
139:9 140:17
141:4 143:1
153:19 157:21
173:15 174:17
175:10,16,20,21
175:22 176:19
177:12,19 180:15

185:8,10,13,14
193:6 195:24
196:9,10 198:25
201:11,12,17
202:9 203:5,6
207:2,24 208:16
214:10 215:15
218:18 219:6
228:11,21 230:20
233:15 241:13
248:2 249:4,7
251:4,6 252:9,10
253:2 257:18,22
261:11,22 262:3
322:1 327:16
328:21 349:16
352:3,17,20
354:10 362:11
370:16 381:14
387:16 391:10
392:8,11,21
393:11 394:11,15
396:20,24 400:17
401:25 402:25
403:10 404:4,7,17
404:20,22 405:11
405:17,25 407:1,3
409:7,7,11 410:2
410:20 411:19,22
414:6,7,22 415:3
422:24 423:5
429:9,23 432:16
443:3 449:2 451:8
452:1,3,7
**people's** 174:24
199:21 396:3
**perceive** 47:10
**perceived** 47:2
**perceiving** 47:8
**percent** 73:13,23
74:16,16,17 75:25

76:1,6,7 77:1,2,4,5
77:11 83:18 93:21
247:12 251:25
252:5,14,16
400:16,17,21,24
401:20,20,24
402:12 403:25
405:20,23 406:2,5
406:11,12,13
407:17 408:3
409:25 411:2,4,5,6
412:10,16,21
413:19 414:10
**percentage** 79:17
80:10,16,21 81:19
81:21,25 83:10,13
84:1 96:5 147:9
160:25 161:14,17
170:18 185:5
200:20 218:20
219:10 402:13
410:2
**percentages** 82:3
146:14 218:25
**perception** 153:24
401:5
**perch** 26:4
**percocet** 36:19
38:4,15 39:16
42:20 57:17
**percocets** 46:9
**perfectly** 104:21
**perform** 200:1
**performance** 7:9
61:3,10
**period** 57:4 62:9
63:17 95:3,17
148:18 157:3
220:23,24 353:18
354:14 362:24

**perk** 95:2
**permanent** 224:18
224:20
**person** 76:15 99:6
104:12 105:17,20
105:24 106:2,5,19
106:20,22 108:3
117:12 158:5
159:17 161:7,15
211:21 217:23
227:10,10 230:8,8
231:11,11 248:8,8
260:19,20 267:25
272:7 295:4
304:18 305:6
312:20 321:19,22
321:25 332:21
334:20,22 337:24
337:25 391:7
403:16 405:2,8
406:15 436:3
439:8,21
**person's** 42:7
**personal** 25:5 33:9
33:10 34:2,15,15
36:11 194:1,3
212:13 242:10
406:21 409:12
410:1 415:4 432:1
**personally** 34:8
45:25 46:2 47:2
49:16 166:24
185:25 212:2,23
241:3 381:12
398:17 433:5
461:11 462:15
**persons** 62:16
**perspective** 82:15
82:21,25 109:21
121:15 141:14
363:10 447:5

454:15
**pervasive** 333:6
333:12 334:7
353:3 369:8 404:9
413:6,7
**pesci** 24:24 27:24
350:10
**pharma** 1:11 3:14
3:14 5:3,3 368:15
415:25 435:16
436:22 449:17,18
**pharmaceutical**
15:25 53:7 56:12
63:1 64:10,14,23
90:12 91:20 101:3
168:6 179:12
350:15 351:11
352:1,18 354:5
355:11 356:22
359:16 362:6
363:12,18 364:15
365:18 366:10
367:18 368:6
369:16 371:24
372:2,9 374:6
375:9,14 376:23
388:11 395:9
**pharmaceuticals**
3:3,13 4:12 5:3
50:6,21 51:21
62:22 65:22 66:15
96:10 121:20
390:15,17 415:25
428:3,8,14,17
**pharmacies** 51:21
53:17 65:25 66:10
66:16 118:25
119:7,10,13 120:3
120:13,19,25
121:5,9,14,19
122:3,4,7,8 123:1

[pharmacies - plaintiffs]                                                                Page 56

123:7,21 124:11
125:23 126:10
127:15,23 128:1
134:21 139:25
140:9 168:6
171:24 384:24
395:1
**pharmacist**  97:6
163:14
**pharmacists**  66:8
66:21 71:4 99:9
107:19,23 141:1
143:3 162:5
164:21
**pharmacy**  8:9
26:11 53:9 54:6
66:6,8,21 101:14
105:2,8 113:23,24
113:24 116:1
123:24 124:1,7,13
124:23 126:4,22
133:1,5 134:17
162:22 163:2,12
163:18 172:22
264:5 269:21
276:8 320:22
416:14,18 417:7
417:15,22
**philanthropic**
446:6
**philosophy**  246:23
**phone**  16:10,19
125:12 182:11
194:21 370:16
455:16 460:3
**phones**  14:6
**physical**  196:8
**physician**  98:17
99:8 115:7 242:17
372:6 440:8

**physician's**  369:7
**physicians**  58:11
58:13,15 59:4,6,18
71:3 78:18 107:23
164:19,20 208:9
339:14 340:1
341:5,25 342:8
343:8 358:13
364:16 389:20
391:8,23,25 392:2
428:21,23 429:2
**pick**  14:4 45:14
426:17
**piece**  58:22 134:6
134:6 135:4
334:24 423:16,21
**pieces**  59:9 440:10
**pill**  44:9 46:7
98:14 108:14,17
108:21,22 113:13
146:2 262:3
337:23 338:9
394:20 430:15,19
**pills**  43:16,21
45:12,16,19 46:16
52:11 53:25 54:10
54:13 55:2 70:1
72:22 74:10 91:9
94:19 96:17,25
101:11 102:21
103:13,20,21
104:3,3,6,13,17,18
104:20,21,25
105:8,11,13,15
106:5,12,14,19,22
107:21 108:2
111:20,22 134:13
134:14,17 146:11
146:15 147:20
158:1 159:12
161:3 172:13,14

260:20,25 262:5
262:16 321:21
334:12,18 338:4
350:20 352:2
358:9,14,15,17,23
368:10 369:11
372:18 373:5,12
384:24 392:6,20
393:23 394:13,15
394:19 395:5
405:22 406:3
408:4 438:24
439:7,21
**pinpoint**  437:4
**pittsburgh**  3:17
**place**  14:7 99:19
135:13,14 155:17
155:17 162:6
178:23 212:8
224:17 241:13
249:11 260:5
306:23 434:20
435:14 440:11
448:10 454:14
458:20
**placed**  120:13
122:9 123:8 133:1
168:6 259:23
260:6 278:21
290:17
**placement**  238:16
259:19,22 260:8
402:14
**places**  66:16
151:20 217:20
263:18 451:13
**plague**  42:13
73:11
**plain**  277:9
**plaintiff**  8:1
120:12 129:3

136:11 188:25
250:6 257:7
270:11 284:2
308:22 346:22
**plaintiff's**  7:18,22
117:25 118:7
128:7,13 136:4
197:17 246:3
250:4 256:2 268:7
272:22 293:12
312:3 327:4
339:18 455:20
**plaintiffs**  8:11 9:2
185:22 205:15
264:11 265:14
267:24 268:1
270:11 273:2
274:9,11 275:17
275:22 276:15
277:3,8,22 278:22
278:24 279:4,22
281:22 282:9
283:3 284:3 285:9
287:11 288:4
289:12,20 292:1
293:25 294:3
295:24 296:16,18
297:8 299:5 300:2
300:21 301:7,16
302:2,9,23,24
306:3,10 307:3,14
309:16,18 314:20
315:3,18 316:10
317:11,20 319:9
322:12 323:14,20
324:1 325:5,22
326:14,19 329:21
330:9 340:4 343:5
344:6 345:5
346:16,18,18,21
433:19,21 434:24

plaintiffs's 331:6
plan 446:19,21
plant 251:19
platform 176:9
  193:10 213:9
play 185:8 309:6
  394:1,5 429:10
played 308:19,19
  310:10 312:8
  378:2 429:2,7,7,12
  430:12,19 452:5
playing 35:9 390:5
plays 394:7
plaza 2:14
pleading 299:11
  299:13
pleadings 28:15
pleas 21:3 204:14
  204:16 246:13,25
  247:12 352:12
pleasant 2:7
please 14:3,6 17:9
  18:17 25:14 29:7
  106:18 133:11
  194:21 206:16
  248:22 274:2
  280:4 282:3
  290:18 291:20
  309:3 314:15,24
  324:18 326:15
  329:10 331:2
  348:25 366:25
  371:4 378:4
  379:20 419:1
  430:2 454:10
  460:11,11
plenty 229:4
  408:20
pllc 4:21
plus 30:23 321:25
  412:24

pocket 43:22
point 18:25 47:16
  98:11 140:11
  191:8 196:16
  202:4 216:20
  220:17 222:24
  228:19 230:3
  233:9 235:6
  237:25 238:18,22
  242:1,11 243:9,11
  243:13,14 244:16
  245:22 246:13
  259:10,15 271:20
  289:5 291:18
  311:11 312:19
  322:19 345:13
  351:18 353:21
  362:8 365:13
  368:1 375:17
  376:6 390:18,21
  393:5 430:4,22
  439:7 444:14
  446:10 453:22
pointed 54:22
  194:6 352:17
  409:17
pointing 380:3
  412:2
points 237:14
  447:16
police 24:19 52:15
  52:22 63:22,23
  65:13,15 103:16
  103:18 107:15
  150:5 165:15,21
  179:22 203:23
  205:7 207:11
  208:19 209:1,2,4
  212:10 233:10,11
  234:18,19,23,25
  235:7,25 242:23

242:25 243:4
  244:1,12 438:11
  438:12
policies 164:25
  177:24 178:16
  179:7 181:5,8
policing 203:24
  208:21
policy 165:3,11
  214:9 246:18
  247:25 249:10
politics 354:17
pollard 26:2,16
polster 1:9
populate 66:1
population 42:15
  44:24 66:2 94:23
  99:12,17 153:19
  195:23,24 204:21
  250:4 257:19,22
  262:15 401:2,19
  402:20 404:11
portage 1:22
portion 78:16 79:7
  195:21 196:19
  197:2 401:17
  420:9
portions 29:13
pose 82:16
posed 295:5
  424:14
position 17:16
  20:4 48:15,20
  72:13 117:13
  213:10,12,17,19
  214:3 289:8
  296:10 312:3
  328:22 360:9
  420:18 424:7
  430:5 452:20

positions 252:14
positive 164:10
positively 34:8
possess 41:2,7
possession 21:7
  46:8 63:15 159:20
  246:17
possessions 57:16
  221:2
possible 77:10
  119:4 232:18
  333:15
possibly 406:5
post 36:7,15,24
  98:16 102:15
  167:12
potent 263:14
potential 305:5,5
  355:22 395:10
potentially 7:15
  88:14 130:3 296:4
  314:13
pounding 125:1
poverty 228:1
power 65:10 99:4
  101:16,20 102:2
  103:23 107:16
  443:8
pplpc01900139...
  9:18 385:25
practice 214:10
  252:22 310:22
  364:20
practices 310:14
  374:13 389:20
practitioner
  184:16
practitioners
  51:22 184:11
pre 103:3

**precise** 141:25
**predict** 210:21
**pregnant** 231:6
**preparation** 28:9
  30:22 31:9 32:25
  33:15 73:2 153:3
  268:10 271:21
  276:10 281:12
  286:2,9,15,16
  293:2 295:9,12
  296:16 297:12
  298:21 300:1
  316:21 330:25
  337:5,19 349:23
  349:24 350:6
  367:8 379:11
  380:13 381:14
  400:8 427:24
  439:15
**prepare** 23:6 24:5
  30:19 268:17
  276:21 319:18
  347:2 349:11
  356:10 367:10
  399:18,23
**prepared** 25:6
  267:12 269:1
  286:20 346:24
  349:5 367:1,5
  432:13
**preparing** 118:18
  128:21 297:16
  375:20 379:13
  399:18 400:1,1
  434:20 452:16
**pres** 162:12
**prescrib** 108:1
**prescribe** 40:23
  55:2 97:15 115:9
  180:14 310:11

**prescribed** 39:19
  40:10,16 53:20
  54:21 57:12 79:18
  79:20 83:5 98:12
  103:3 104:8
  105:10,21 129:5
  129:19 130:22
  134:15,16 138:3,4
  138:16 139:5
  146:12,16 161:8
  161:23,24 162:12
  179:15 180:22
  242:16 286:18,19
  287:18 288:7
  289:15 315:4
  317:4 328:9
  334:20 339:14
  341:6 358:9,10,11
  370:2
**prescriber** 124:24
**prescribers** 137:9
  137:14 150:16
  310:8 340:3,12,19
**prescribing** 108:2
  108:2,6,9 112:6,8
  130:5 138:1 180:5
  310:14 341:1
  369:20 374:8,12
  374:13 377:8,15
  389:17,20 393:25
  445:6
**prescription** 1:6
  9:13 14:20 34:4,9
  34:18 36:2 39:11
  39:12,15,21 40:9
  45:16 51:17,20
  56:6,13,19 57:1,9
  57:19 59:12 60:8
  60:21 65:22 66:15
  69:17 70:8,14
  71:22 72:2,11

73:14 76:2,22
77:12 78:2,11,15
78:17 79:5,16
80:11,12,18,19
82:16 84:7 90:11
91:4 96:3,9,14
98:10 99:7 100:6
105:4 111:16
114:11,21 115:4
119:4,5 122:5
123:2 130:15
133:21 134:18
144:13 147:24
158:17 161:16,19
164:12 184:2,7,15
189:2 242:16
260:15 263:4
272:7 274:12
278:4,8 286:17
292:4,18 304:19
304:22 308:2,4,5
315:19 317:22,23
318:13 320:5
321:13,14,23
328:12 332:12,13
332:13 335:9
337:7,12,14,20
338:4,9,16,17,19
339:14 340:11
346:20 350:13
351:2,17 353:12
353:17 354:6
355:3,22 357:10
358:2 359:4,9,10
360:4,13,20
361:21 364:5,18
365:22 369:18,19
370:4 373:16
374:8 378:14,23
382:14 399:9
403:18,20 405:4

405:22 406:7,16
410:3 412:18
414:10 423:7,12
450:3 454:9,16,22
460:6 461:3 462:3
**prescriptions**
46:15 94:24
102:24 104:7
107:8 109:6,8,15
110:15,17,22
113:17 126:6,24
130:7,13,18
131:14 132:12,15
132:22 133:6,7,13
133:14 134:22
135:8,17 137:24
138:25 139:15,22
140:1 144:10
147:6 162:10,11
184:12 273:3,9
279:4,5,14 284:3
284:16,21 285:11
285:12,19,24
286:12,13 287:15
289:11,21 291:3
291:25 292:13,21
293:4,11 294:2,7
297:8 299:6
300:20 301:1,9
302:4,11 303:3,9
303:15,22 304:2,9
305:2,13,19
307:16 308:14,15
308:20,23 309:8
309:15,19 310:1,8
310:25 311:1
312:3,15 313:11
315:2,12,13,14,17
316:3 317:2,4,19
317:21,22 319:13
320:1,13,14,18

322:13 323:17
324:3,3 325:4,13
326:20 327:1,4,6
327:17,18 328:15
330:11 333:3
340:3,14 341:4,10
341:18,21 342:12
343:21 344:5,12
345:4 416:4
**presence** 43:16
196:8 369:13
458:15
**present** 5:10 15:1
208:12 209:7
222:2
**presentation**
373:25 377:13
**presentations** 74:5
**presented** 390:1
410:5,7 414:21
435:15 438:21
**presenting** 245:20
372:24
**preserved** 232:19
**press** 185:25 187:6
**pressed** 431:6
**pressure** 142:23
447:16
**pretty** 30:4 36:25
80:22,24 92:25
93:1 154:24
159:23 210:12
211:3 223:21
235:5 252:5 455:4
**prevalence** 56:13
56:17 72:10
184:23 211:14
**prevalent** 94:4,5
107:22 232:3
262:9

**prevent** 99:4,25
100:2 101:16,20
102:3 103:24
157:12
**prevented** 104:1
**prevention** 60:17
99:18 101:18
200:11 202:17
**previously** 21:24
24:10 26:15 27:13
46:25 47:13,15
161:8,15 202:23
203:7 224:17
232:16 247:17
250:25 252:23
253:1 274:12
284:22 381:24
407:23
**preyed** 392:21
**prided** 380:24
**primarily** 90:21
160:7 227:15
233:3 428:14
**primary** 94:1
98:17 150:21
255:7 420:17
**print** 271:22
**printed** 283:25
**prior** 46:7 71:1
153:21 181:17
196:5 222:22
225:18 259:20
351:18 355:3
356:15,23 368:1
373:17 374:19
396:10 442:2
**priorities** 224:14
224:16 354:21
447:7,8
**priority** 174:19
224:25 225:1

257:3 259:23
**privacy** 36:11
**private** 14:5 94:8
228:13
**privilege** 299:3
**privileged** 297:25
298:4,19 379:12
**proactively**
203:24 208:21
**probably** 22:20
28:16 32:16,18
57:14 102:8
131:17 138:5
151:10 154:12
172:9 173:16
180:1 195:3
201:15 206:6
219:20 237:16
245:10 249:11
281:7 315:6 400:3
408:16 442:15
450:20
**probation** 159:10
164:6,8,14 221:5
227:16,20 246:24
**problem** 18:15
39:5 46:1 47:2,5,6
71:20,25 72:16
84:8 89:3,10,18
93:9,12,13,20
94:14 171:8
172:22,23 173:6,8
173:11 175:6
193:7,9 206:14,21
224:7 249:2
263:10,13 306:21
332:24,25 341:15
383:13,15 384:7
393:3 395:15
419:11 423:5

**problems** 59:11
91:13 93:17 248:3
374:3 396:24
**procedure** 17:1
457:7 461:5 462:5
**procedures** 177:25
178:17 179:8
306:15 308:11
**proceed** 16:23
**proceedings** 19:12
21:13
**process** 40:4,5
111:7 124:6 159:6
217:25 234:10,14
234:14 272:11
276:1 334:25
359:12 375:10
390:25 414:20
425:18 433:20
434:3 452:14
**procured** 333:7
**produce** 37:19
41:2,6,15,18 85:13
288:5 319:5
**produced** 8:19,22
9:7 29:7 65:17
66:24 74:1 264:25
265:7,24 285:13
286:11,12 289:9
305:17 316:14
322:5 330:15
414:20 439:17
**produces** 41:13
**product** 298:3,4
298:19 299:3
**production** 67:16
69:1 460:15,17,22
**products** 198:9
315:13,20 316:3,9
316:18,23 359:17

**professional** 34:1
  113:3
**professionals**
  112:2 184:10
  252:20 414:23
  449:6,7 451:16
**program** 159:14
  215:19,20 219:17
  220:3 230:13
  231:2,6 445:4,11
**programming**
  159:13 230:9
**programs** 198:15
  219:13,17,22,25
  227:11,14,24
  230:10,15,23
  245:21 447:3
**progresses** 407:3
**progressive** 77:15
  404:5,14
**project** 258:18
**projects** 198:2
**prominently**
  137:23 143:14
**promote** 198:13
  211:20 365:21
**promoted** 158:2
**promoting** 198:7
  361:7
**promotion** 140:22
  188:25 189:10
  346:19 350:12
  351:2,17 352:5,7
  352:22,25 353:2
  353:12,17 354:5
  355:1,21 356:23
  357:19 358:2,12
  359:16 360:4,25
  361:2,6,11 364:11
  364:17 366:10
  367:18 368:6,23

  416:3 445:7
**promotional**
  353:22 355:10
  362:7,20 363:17
  365:18
**promotions** 365:7
**pronouncing**
  144:6
**pronunciations**
  315:7
**proof** 122:16
**proper** 231:21
**properly** 115:2
  257:7 292:9
  417:23
**property** 250:5
**proposition** 208:4
**prosecute** 20:25
  21:4 135:22
**prosecuted** 21:11
  28:7 53:16 106:17
  106:20,24 108:11
  110:15,20 112:23
  113:5,17,22
  115:19 135:25
  140:1,2,3 143:18
  163:15 339:17,23
  341:5
**prosecuting** 60:3
  157:5 438:8
**prosecutions**
  143:21
**prosecutor** 20:12
  20:15,23 21:15
  46:23 47:7 50:1
  55:1 89:21 107:14
  116:7 122:11
  142:19 152:24
  167:2,12 242:7
  355:24 356:1
  369:9 372:17,21

  380:25 381:1
  390:11 408:5,13
  413:17 437:9,11
  437:16 438:5,6,6
  443:4
**prosecutor's** 20:17
  20:20,22 43:20
  107:12 163:13
  204:15 256:23
  441:23
**prosecutors** 60:3
  95:9 142:17 178:1
  221:4
**prospects** 20:7
**protected** 8:18,21
  9:6,9 264:24
  265:6,23 266:5
**protections** 180:8
**protective** 8:19,22
  9:7 264:25 265:7
  265:24
**provide** 52:23
  54:25 65:7 117:14
  122:18 216:17
  226:23 231:4
  239:21 271:14
  275:18,23 276:14
  276:15 277:20
  278:5,16 302:2,9
  323:14,25 405:19
  422:8
**provided** 16:25
  31:14 64:19 74:1
  100:4 187:24
  217:5 218:11
  227:2 271:8,9,10
  272:12 273:9
  274:12 279:6
  281:23 283:18,23
  287:15 293:5
  298:1,1 302:4,11

  308:24 312:9
  315:3 318:11
  319:9 323:16,21
  323:23 324:1,4,5,9
  324:15,19 325:5
  325:22 326:3
  327:2 329:25
  341:24 342:3,13
  343:21 345:4
  357:3 370:4
  389:18 411:23
**provider** 227:8
  275:12 278:14
**providers** 195:5
  218:8 228:14
  230:7,9 240:12
  388:18 410:8
  449:5,6,8
**provides** 204:17
  204:18
**providing** 86:6
  211:7 214:18
  216:22 217:14
  223:1 228:16
  238:1 281:21
  282:20 320:7
  323:12 397:22
**proximity** 124:9
  124:21,23 169:24
**psychological**
  218:10
**public** 4:15 17:17
  21:22 24:23 25:1
  25:3 26:19 27:24
  30:24 44:18 47:10
  57:24 58:5,10
  59:13,21 60:4,11
  73:1,9 74:2 76:4
  83:3 86:7 94:8
  141:2 142:24
  146:18 162:25

[public - quick]

163:7,9 169:5,7
172:1,5 186:23
197:17,19,21,22
197:23 198:5,21
201:24 202:5
211:22,23 212:9
212:11,12 213:22
213:23,25 214:5,7
215:3 217:9 222:2
229:25 230:3,24
231:1,7,14 243:17
249:14 296:11
320:3 326:10
350:9 359:2 382:8
382:12,13 406:25
407:7,25 410:19
410:24 439:19
440:3,6 444:21
448:5 449:11
458:7 459:14
461:10,18 462:15
462:23 463:23
**publicly** 142:23
382:5 386:11
**published** 407:22
409:18
**pull** 23:22 190:4
190:21 317:21
439:13 440:13
441:16 442:6
**pulled** 439:11
**punishment**
248:10
**purchase** 239:18
**purchased** 86:25
222:20
**purdue** 1:11
**purportedly** 337:6
**purpose** 158:10
200:13 208:23
213:1,3

**purposes** 22:9
40:17 48:4 61:12
67:22 88:16
118:12 128:17
135:12 136:15
143:5 182:5 264:7
264:19 265:2,9,19
266:1,6,12 295:16
297:15 298:12
309:16 350:2
378:17,21 386:2,7
**purse** 158:25
**pursuant** 8:16
264:17 268:7
270:16 271:7,8
457:3,6
**pursue** 178:2
450:2
**pursuing** 83:11
**push** 156:25
**pushed** 198:23,24
431:12
**put** 25:7 69:12
73:20 110:12
114:4 115:6
117:12,15 135:3
135:13,14 140:14
148:12 156:20
172:13 186:20,22
187:4 192:17
193:17 194:21
195:7 199:14,17
215:23 269:16
350:18 352:2
362:14 372:18,19
393:18 404:8
420:18,22 427:6
429:17 432:24
433:12 436:18
441:19 443:25
452:12

**puts** 162:1
**putting** 59:9
258:13 360:17

**q**

**qrt** 209:2 233:11
234:11
**qualifications**
208:13
**qualified** 33:19
71:17 82:22 398:1
458:8
**quantico** 151:7
**quantifiable** 254:3
**quantified** 87:13
**quantify** 87:5
208:24 209:14
259:17
**quarter** 52:16
186:10 372:19
438:22,23
**quarterly** 436:9
436:14
**question** 18:10,21
24:3,4 29:14
36:10 55:10 62:15
62:16,23 63:7,9
64:9,13 68:20,22
70:5,9,10 72:14
79:14 110:3,9,11
111:3 116:9
117:17 120:1
122:20 124:11
126:2,21 127:19
131:9,18,24 132:6
136:17,23 141:10
142:1 148:10
154:17 181:19
186:19 189:7
192:5 202:7
219:20 236:5
254:12 259:1

261:14,15 262:25
282:2 296:23
309:14 320:25
322:20 323:1,6,24
324:18 333:18
342:22 344:3
345:1,15,21
350:22,25 352:22
360:16,23 361:14
371:5,13,15
383:17 390:24
394:8 401:13
402:6 404:20,21
412:22 413:21
414:3 420:1,4,10
421:19 422:7
424:22 426:24
427:1 449:21
**questioning**
225:21 414:13
**questionnaire**
71:18
**questions** 18:13,16
18:25 67:25
109:12 131:3
140:11 151:21
166:6,8 206:6
229:13 237:19,22
267:1 311:9
343:13 348:9
361:9 374:25
397:11,13,22
398:12 414:15
415:14 418:15
422:2,3 424:14
429:22 430:1,14
434:14 435:13
455:15,17,24
**quibbling** 40:20
**quick** 199:14,16
208:15 209:13

**[quick - really]**

222:4
**quickly** 35:14
190:11 232:18
241:11
**quite** 57:25 76:16
113:25 188:15
232:24 328:6
351:13 352:11
363:21 392:19
426:15
**quota** 433:20
434:3
**quotas** 433:22
434:9,18 435:3,11
**quote** 51:15 52:14
52:19 53:6,12
254:24 403:9,11
415:25 416:1
428:9 433:18
**quoted** 185:25

**r**

**r** 145:9 398:25
**ra** 333:17
**rainy** 215:2
**raiola** 4:7 16:6,6
**raise** 454:14
**raised** 358:3
**randy** 5:11 14:11
**rank** 48:17
**rape** 203:13
**rapid** 42:13
**rare** 330:1
**rarely** 187:8
**rat** 114:1
**ratchet** 44:2
**rate** 175:23 251:22
252:6,15,16,18
352:3
**rates** 193:21
207:18 258:11
261:10 400:23

**ratio** 65:20,24
**rawlings** 134:7
135:3 268:22
272:12,18,20
276:2,5,14,25
277:4,8,15,19
286:23 291:10
293:20 296:17,19
296:22 301:23
302:2,9,10,15,21
302:22,23 303:8
303:11,14,20,25
312:16 317:14,21
318:5,11,25 319:4
319:10 320:11
323:12,15,25
324:5,19,25
325:21,23 326:1,3
326:5 328:25
329:7 332:2,4
340:13
**rayford** 5:6
125:14,15
**reach** 58:11 97:2
116:11 310:7,16
354:10 364:8
365:1,16,19,24
381:11 395:25
443:3 444:9
**reached** 70:2 87:9
170:21 171:5,10
172:19 193:5
363:12,13 380:23
381:9
**reaches** 169:16
**reaching** 444:15
**read** 24:9 25:2,8
25:16,25 26:1,4,9
27:2,5 29:12,17
31:2,5,6,8 32:22
49:24 52:3 66:18

73:2,7,17,25 74:6
82:6,11 119:19
145:6 148:11
167:15 195:23
267:19 274:15
283:20 284:13
285:3 287:9,14
295:13,15 300:17
317:9 323:19
326:24 330:7
331:22 336:5,8
339:11 349:7
369:25 370:1
371:5,7 375:8,8,13
375:22,23 376:16
376:22 377:19,23
380:11 381:24
388:8 389:13
415:5 461:5,6,12
462:5,6,17
**reader** 32:9
**readily** 71:1 74:11
76:3 104:1 260:21
333:7 384:8
**reading** 28:20
29:20,25 31:10,25
32:8,20 68:17
115:21 139:8
288:11 347:4,7,9
347:11,12,18
348:5 377:6
388:22 389:7
392:1 400:3
447:25 460:19
**reads** 283:13
288:2 307:11
317:2 326:17
329:20 331:16
335:5 388:5
**ready** 214:14
346:8

**real** 46:3 157:25
228:5 368:17
374:22 391:17
404:6 451:13,19
**realistically**
450:21
**realization** 355:15
**realizations**
367:24
**realize** 86:24
245:10 295:7
**really** 20:6,8 25:6
30:3,21 32:7,19,19
37:22 42:12 43:15
43:17 44:14,25
46:19 54:9 55:3
58:4,7,24 59:25
60:6 72:9 87:24
101:7 111:19
113:22 114:5
140:17,21 141:2
148:24 153:23,25
154:5,17 155:1
157:9 165:18
167:18 186:12
187:12,17 192:22
196:19,25 198:6
198:13,14 214:6
216:15 221:8,9,13
221:25 222:1
235:8 239:21
240:8 248:4
253:15 256:20
292:5 306:21
311:8,9 340:23
351:12 361:23
362:3 374:1,13
378:8 380:19
417:4 423:16
435:7 440:23
443:6 446:12,25

[really - regarding]

447:4 451:20
**realtime** 370:17
**reason** 20:2 50:19
52:25 54:16 56:9
63:7,9 65:19,23
69:23 78:20 79:9
98:15 121:18
187:3 213:7
224:13 248:13
284:12 315:23
321:24 460:14
462:8 463:3
**reasonable** 306:23
**reasons** 127:9,14
127:22 199:9
210:13 327:19
354:12
**rebuild** 194:12
**recall** 46:22,23
58:23 74:3,21
89:23 91:6 98:24
98:24 115:20
116:6,8 137:25
139:13,19 142:17
145:24 153:5
155:19 163:14,15
163:17 210:11,14
216:6 218:22,24
243:3 279:25
299:14 356:5,20
356:25 357:7,17
366:11 368:13
372:11 373:1,25
377:6,11,17
379:19 386:22
400:15,21,21,22
401:17 402:4,11
402:12 414:5
435:21 451:13
454:4,23,25

**receipt** 460:18
**receipts** 223:20
**receive** 74:9 168:4
168:8,20 218:18
293:1 361:20
**received** 129:23
209:21 210:18
233:15 234:4,7
272:14 278:20
279:13,16,22
291:4 293:8
312:20 332:12
**receives** 233:10
255:12
**receiving** 218:14
284:20 332:23
**receptors** 37:18
74:8
**recess** 67:10 125:6
181:25 237:4
263:22 313:5
366:4 370:22
397:6 455:11
**recipient** 30:25
317:23
**recognize** 118:20
135:21 137:3
280:23 300:9
378:21 379:7
386:10
**recognizes** 155:4
**recognizing**
365:17
**recollection** 33:9
188:1 287:8
288:15 431:16
**recommendation**
388:17 389:9
**recommendations**
9:15 377:25
378:16

**recommended**
96:15
**record** 14:2,10
23:23 45:20 46:8
67:8,11 88:4
125:3,4,7 153:22
181:23 182:8,19
183:22 206:2
237:2,5,9 255:16
263:17,20 266:15
266:23 267:20
279:11 287:14
289:4 291:3 313:3
313:6 336:8 349:8
366:2,5,17 370:19
370:20,23 371:7
382:8,12,13 397:4
397:7 444:21
452:19 453:14
455:9,12 462:9
**recording** 14:9
139:17
**records** 277:20
**recover** 193:1
431:22
**recovering** 215:13
215:21 239:9
**recovery** 44:17
117:13 206:9
220:3,5,8,10
233:12 234:9,11
234:16 405:18
**red** 328:22 358:3
396:18
**redefinition**
274:20
**reduced** 458:14
**reduction** 202:1
202:19,25 257:21
452:1,8

**refer** 51:10 55:17
156:5 180:13
291:17 416:13
**reference** 283:9
362:23 409:13
460:7 461:2 462:2
**referenced** 336:18
377:20,21 458:13
458:18 461:11
462:15
**references** 41:21
338:15
**referrals** 227:22
**referred** 85:20
98:2 108:21
221:20 246:14
249:20 281:10
303:16
**referring** 27:9
124:14 280:21
300:24 349:1
362:25 372:15
379:1 417:1
**refers** 137:9
231:25
**reflected** 63:25
195:3 337:9
**reflective** 63:14
102:17 337:12
**reflects** 76:5,6
**refocus** 201:13
**reformulated**
315:4,19 316:3,9
316:18
**refresh** 30:16
287:8 288:14
**refusing** 425:7
426:10 427:1
**regal** 17:10
**regarding** 21:21
24:11,14 203:25

300:1 353:10
356:14 357:9
359:15 360:20
361:14 367:8
370:5 373:16
386:23 390:15
447:19 457:2,11
**regular** 394:18
**regularly** 151:8
**regulate** 116:22
117:6
**regulated** 40:6
251:2 252:21
359:5 360:5
364:20
**regulates** 360:7
**regulations** 44:2
364:6,21
**rehabilitate** 155:5
216:8
**rehabilitation**
238:2
**reimbursed** 220:6
228:19 229:6
325:5
**reimbursement**
228:7 229:9,10
365:12
**reiterate** 273:15
**reject** 396:4
**rejected** 325:12
**relate** 67:25
136:17 170:19
256:4 259:4
**related** 84:14
178:3,22 211:9
214:11,20 217:1
217:17 223:3
228:17 231:15
243:18 281:21
297:7 353:12

355:2,10 357:15
366:10 375:1
397:14,18 435:11
**relates** 1:10 96:9
**relating** 56:5,18
57:1 59:11,13
66:14 346:21
445:14
**relationship**
386:20 388:11
**relative** 65:20
104:17,20,20
105:14,16 106:12
106:16 329:21
459:2
**release** 7:14 88:10
88:13 392:5
**released** 121:2
152:9 381:7
**relevant** 120:14
283:15
**reliance** 273:4
326:22 342:13
343:1
**relied** 28:9 140:15
298:12 342:23
391:5,6 408:21
423:8,8
**relief** 392:7
**relieve** 37:19
**relocate** 193:6
251:19
**reluctance** 277:12
**reluctant** 159:23
**rely** 286:1
**relying** 334:21
393:24
**remained** 316:12
**remember** 26:8
28:20,22 29:25
30:6,15 46:21

75:15 83:18 139:8
150:3 186:4,5
299:14,20 357:8
357:11 368:9,15
372:20 373:3,20
373:22 377:12
392:1 420:24
435:17 436:2
437:10 439:14
454:18
**remembered** 74:6
**remind** 29:16
**reminded** 153:9
372:22
**remotely** 15:2
**removed** 228:25
**rendon** 4:14 16:12
16:15,16
**renewal** 223:15,22
223:23
**renewed** 9:3
265:15
**reorganizing**
441:25
**rep** 424:23
**repair** 257:2
**repeat** 163:21
304:7
**repeating** 243:19
**repeats** 273:1
**repetitive** 414:13
**rephrase** 110:10
311:15 383:5
**replacement** 257:1
257:2
**report** 7:10 9:14
26:24 54:2,3
55:19 61:3,10
65:4,17 66:18,23
73:18 76:14 77:4
116:15 122:1

148:22 167:11
207:10 242:23,25
243:4 293:20
336:25 354:9,16
354:22 355:18
356:15 362:19
363:7 377:20
378:8,15,22,22,25
380:19 383:21
395:7,9 442:18,23
442:25 443:7,17
443:22,25 444:5
444:15,17 450:1
**reported** 115:12
162:17 371:22
**reporter** 6:15
16:21 47:20 61:1
67:14 88:9 117:23
128:5 182:16
461:7
**reporter's** 6:12
458:1
**reporting** 62:9
116:18 124:5,10
139:17 153:11
162:16 167:17
193:21 364:11
372:5
**reports** 63:3
166:25 168:5
319:5 442:1
**represent** 15:4
266:23 278:18
291:2 416:8
**representation**
122:8
**representations**
415:2
**representative**
33:19 174:15
186:25 226:8

343:15 403:15
406:22 411:18
413:18 419:2,18
420:2,8 421:10
422:9 423:24
426:9 433:17
**representatives**
206:3,7 309:24
342:11,14 354:15
365:8 449:9
**represented**
174:25 274:18
398:11 416:8
449:12,12
**representing**
14:12 16:21
168:11
**represents** 33:8
**reps** 101:2 111:5
312:23 341:13
361:6
**republican** 174:8
174:10 354:18,19
**republicans**
442:21
**repugnant** 395:21
**reputation** 165:19
**request** 172:4
196:23 272:3
275:11 286:20
322:3 328:18
365:3,20 396:21
397:17 462:9,11
**requested** 271:13
276:3 293:19
303:3 457:1,6,10
**requests** 131:7,15
224:21 273:1
**require** 127:4
164:25 220:7
233:6

**required** 143:6,8,9
164:9 190:16
234:2 236:16
246:23 268:2
306:3 460:25
**requirement**
162:4
**requirements**
124:10 210:11
220:5
**requires** 165:4
180:1,3
**reread** 49:18
**research** 29:21,24
30:6 55:13 73:16
75:6,9,19,22
447:20
**reserve** 215:2
**resided** 440:18
**residential** 218:11
**residents** 81:17
105:9 232:1
351:24 358:22
**resolution** 173:20
173:25 174:24
177:8
**resort** 216:14
**resorting** 46:14
54:9,12
**resources** 168:25
169:11 195:6
198:3 199:14
202:9 212:13
216:1 221:20
222:16 414:24
432:9 447:1,2
451:9
**respect** 179:21
267:23 309:15
323:16 346:20
359:15 367:11

409:24 430:22
453:4,8,15
**respond** 173:19
175:8 203:11
209:5,6 232:17
233:13 236:19
252:4 268:25
272:18 277:5
286:20 292:9
345:5,25
**responded** 131:4
283:4 287:11
370:10
**responder** 195:14
**responders** 195:5
231:21 236:23
**responding** 140:16
177:14 199:6
208:20 236:16
256:13 309:17
348:9
**responds** 161:5
**response** 9:2 22:25
120:5 121:23
125:18 132:2
144:4 145:1 159:2
173:9,13,18
174:16 175:9
182:13 191:8
194:16 199:15,16
208:15 209:13
222:3,4 224:21
232:12 233:11
237:14 240:5
254:14 265:14
272:22,23 275:18
278:24 282:9,21
284:17 289:9
291:5 305:18
310:25 313:11
315:18 316:14

324:5 326:14
327:3 328:18
331:16 339:8,9,17
340:2,4 343:6
346:23 349:12
361:17 433:21
434:8,24 435:2,5,9
446:20 449:20
**responses** 7:19,23
8:2,7,14 31:14
117:25 118:8
128:7,14 136:5,12
136:25 264:1,14
268:7 269:3,19
270:14 271:7,9
273:23 274:2
281:22 314:20
331:6 431:20
**responsibilities**
94:1
**responsibility**
100:21
**responsible**
340:25
**responsive** 343:22
344:6 345:1
**rest** 83:22 103:12
280:25
**restate** 192:5
**restrict** 177:25
178:19
**restricting** 181:9
**restrictions**
364:14
**result** 78:5 246:20
253:8 274:13
304:24 305:12
308:16,25 309:20
311:2 312:4,16
320:4 333:4 335:8
341:23 354:1

375:19 376:5
402:23
**resulted** 305:24
**results** 58:17
85:14
**resurgence** 84:13
**resuscitate** 232:13
**retail** 8:9 264:5
269:21 416:14,18
417:15,22
**retained** 6:15
**retired** 453:22
**return** 313:13
**returned** 338:3
460:18
**revenue** 195:22
199:25 200:2
250:2 254:2,6,14
254:15,17,17
255:10
**revenues** 255:11
**review** 268:7,24
269:5 271:21,23
276:20,23,25
281:11 297:3,14
299:1 329:16,20
330:10 344:16
366:25 457:2,6
460:12 461:1
462:1
**reviewed** 24:11
28:11 31:13,17,17
32:22 39:24 48:10
96:1 118:18
128:20 148:23
191:13 192:4
273:21,22 275:5
284:10 292:24
293:18 297:1,4
298:12 299:12,13
300:2,6,8,11,13

316:20 319:25
328:1 330:19
339:9 342:6 353:5
356:17 367:4
373:20 400:8
407:19 428:1
431:9,10 436:10
439:16 452:16
**reviewing** 319:17
345:23 373:21
400:4 417:23
**revised** 21:11
267:22 272:23
288:5 291:5
**revisionist** 34:11
**rewind** 288:25
**rewrite** 433:14
**rewritten** 7:20
118:2,10 267:17
**rewrote** 423:22
429:18 430:6
**ri** 387:22 388:1,25
**ri.1.2.8.** 387:7
388:1
**rice** 2:4 15:6,9,13
15:16 24:7
**rich** 74:2 439:17
440:6
**right** 17:20 20:12
20:17,18 23:12,20
28:5 42:19 50:24
57:22,23 75:5,6
76:18 77:9 83:1
90:7 97:21 99:3
103:16,17 104:24
105:3,7 106:4,25
109:13 111:15
114:16 120:7
134:18 140:24
144:2,6 168:21
176:6 180:16

185:17 188:21
190:4,15 194:14
197:11 201:15
202:6 208:6
209:16 210:25
216:24 217:16
221:2,15 222:8
231:18,19 235:17
238:19,25 239:17
244:19 246:2
247:9 251:23,24
258:22 260:24
269:9,14 273:24
277:23 283:8
285:5,6,15 286:14
287:19 288:24,24
293:16,25 299:18
299:19 300:23
301:10,14 305:8,9
307:5 309:9
311:19,20,24
312:25 313:19
314:2,13 317:25
318:8,23,24
321:17 325:1
329:15 330:25
331:7 333:20
334:16 339:19,24
339:25 342:10
346:3,14 351:19
352:23 353:7,14
355:4,12 356:18
359:6,11 363:25
367:19 368:23
371:11,14,16,16
373:7,13 380:4,21
382:15,18 385:4
385:16 390:12
394:14 395:16
397:1 405:8
407:22 414:12

416:1 418:20
436:1,17 441:2
453:24 455:8
**rights** 36:11
**ripple** 355:14
**rise** 223:20
**risk** 83:4 329:24
329:25 330:4
391:24 395:4
**risks** 40:1 141:4
295:4
**rite** 3:8 16:2
124:15,21 398:11
416:8,11
**road** 124:17
215:11
**rob** 101:13
**robbed** 53:18,22
369:10
**robberies** 53:9,10
53:17 106:23
**robbery** 101:21
203:14
**robust** 154:25
173:10 446:12
**roitman** 8:5 182:4
182:18
**role** 185:8 308:19
308:20 309:6
310:10 312:8
350:16 359:15
390:6 394:1,5,8,24
403:5 429:3,7,8,12
430:12,19 452:6
**roles** 378:1
**room** 1:22 15:2
59:3 159:14 193:9
355:15 373:3
446:14
**root** 42:11 47:18
221:2 248:7

**[root - see]** Page 67

334:10 383:16
395:22 396:24
**rotates**  402:2
**rough**  28:14
**routes**  84:20
**routinely**  65:10
**row**  362:15
**rpr**  1:25
**rule**  228:24 333:15
333:22 334:4
429:22
**rules**  16:25 18:3
457:3,7 461:5
462:5
**ruling**  8:16 9:5
264:18 265:17
268:3,4 270:17
**run**  442:1 451:17
**runs**  244:10

**s**

**s**  4:14 145:9,9
239:20 460:15
462:8,8 463:3
**safe**  172:15,16
179:16 306:20
312:12 333:9
352:14 369:2
**safety**  24:24 27:24
211:22,24 214:5,7
243:17 350:9
401:5
**sale**  240:9,18,19
240:22
**salerno**  2:6 15:15
15:15
**sales**  254:7,15,16
254:17 255:10
**samaritan**  452:5
**samples**  176:4
338:1

**sampling**  52:14
**san**  4:5
**sara**  8:5 182:4,17
**sat**  24:16
**satisfaction**
374:22,24 375:1
**save**  76:17 199:21
255:22 396:3
451:4
**saved**  176:21
**saving**  451:8,20
**saw**  22:17,21 31:6
43:15 47:13 50:16
54:19 55:7,15
60:22 77:23 83:16
93:17 107:11
221:12,22 239:22
439:15
**saying**  55:1 57:20
97:10 176:22
177:3 180:12
186:1 207:8 284:5
320:23 324:8,12
411:21 413:10
420:14 422:17
423:9 430:8,10
436:3 451:5
454:18
**says**  49:2 51:1
53:6 62:8 66:21
68:2,22 76:1
120:9 129:2
137:13 216:22
243:4 274:8
285:20 287:21
335:17 380:1,4
383:21 387:4
429:24
**scale**  50:15 141:17
**scene**  203:12
232:5,9,14,15,19

233:13 235:24
338:10
**school**  21:23
244:17
**schools**  21:22
59:19 60:11,14
**schutte**  3:9 6:10
16:1,1 370:14
398:7,11 415:17
415:20 426:16,20
427:16,21 430:3
455:2,8,14,20
456:3
**science**  172:11
198:9
**scientific**  411:11
**scientifically**
417:4
**scope**  233:20
282:1 323:5,19
324:8,14,16 325:7
325:15,25 326:8
327:23 330:13
332:17 342:2,16
342:18 343:12
345:13 360:1
370:11
**scott**  3:9 16:1
398:10
**scott.schutte**  3:11
**screen**  337:10
338:3
**screening**  229:1
**screens**  164:9
**script**  100:19
121:11
**scripts**  100:23
**seal**  172:14 459:6
461:15 462:21
**search**  438:14

**seat**  66:2 198:14
426:6
**second**  7:3 19:21
22:3,7,12 37:7
62:12 68:19 134:6
209:7 211:7
214:16 216:19
220:15 222:23
228:18 230:3
243:13 247:2
270:3 279:16
326:16 331:15
336:9 347:25
366:22 379:5
387:2 404:2 430:4
455:22
**secret**  177:7
**section**  50:6 53:3
64:9 282:25 283:2
287:10 335:21
380:7 387:25
428:2,12
**see**  34:10 43:24
44:6,14,20,22,23
45:5 46:6,10 49:6
50:6 51:5 53:4
55:19 56:3 58:7
62:7,11,19 63:6
64:2,12,16,21 66:7
66:19 69:3,9,10,10
69:15,21 70:5,6,11
70:16,17 73:21
74:20 82:7,23
88:24 95:8 97:10
100:13 112:11,13
120:16 125:25
129:8,12 164:11
177:21 189:3
190:9,25 191:10
197:10 207:8
221:1,3 247:14

**[see - sheriff]**

260:13 273:23
274:9 275:11,13
283:6,11 287:7
288:9 296:15
297:6 298:14
310:19,19 311:15
315:9,10 317:7
320:21,23 322:22
329:16,18 331:12
331:20 336:13
340:6,9 361:16
366:23 380:9
382:16,25 386:15
387:3,7,8,9,18
388:2,3 397:19
402:15 411:25
427:7 428:21
436:5 455:5
**seeing** 46:4,4,18
46:23 59:8,10,23
66:22 84:25 90:18
95:9,10,11 153:21
248:12 251:11
275:6 299:20
300:9 356:20
373:22 439:14
454:4
**seek** 55:5 84:20
98:18 187:15
196:3,5,21 223:15
224:22 226:24
**seeking** 44:17
47:11 53:11 58:14
83:14 84:3 112:25
113:13,14 121:11
137:24 159:18
192:19,20 193:6
194:15 204:3,23
205:4,9,14 239:8
242:18 246:21
262:16,16 396:20

431:21
**seeks** 196:13
**seen** 20:6 22:15,18
41:20 47:13,15
48:7 49:23 57:9
61:15,22 65:3
67:4 68:5,6,10
72:25 84:13 88:19
89:3 90:15 91:13
91:20 98:25 99:17
106:11 111:6
118:15 119:11
129:15 136:19,21
137:1 138:25
145:6 146:18
154:21 167:11
177:17 258:16
259:14,20 263:2
269:7 271:17
273:15,20 280:17
280:19,20 281:9
283:24 286:24
290:24 300:14,16
307:18 354:11
357:14 379:14
381:4,15,17,20
386:8 389:25
411:13 412:14,16
454:25
**sees** 82:23 420:2
**segment** 401:1
**selected** 55:14
**selector** 251:16
**self** 73:18 115:12
116:15,18
**sell** 240:10
**selling** 263:3
**semi** 7:9 61:10
**semiannual** 61:3
**senate** 19:14

**send** 176:4
**sending** 341:12
**sends** 193:5
**sense** 135:18
192:24 193:18
233:24 239:16
275:14
**sensibility** 248:6
**sensitive** 14:4
**sent** 280:3 281:16
382:11
**sentence** 50:25
52:4,13 274:8
283:10 285:3
331:15 335:5
336:6,9,12
**sentences** 288:12
**separate** 62:23
131:6 204:7,19
205:15,21 219:18
238:17 239:5
249:21 292:16
359:24
**separates** 205:20
**september** 459:17
**series** 269:13
**seriously** 198:13
430:5
**servant** 25:4
**servants** 212:11
**serve** 154:5
**served** 19:20
296:24 349:19
**service** 28:5 30:24
73:1 196:20 197:1
197:23 203:25
238:2,3
**services** 7:9 60:5
61:3,9 187:22
196:17 197:2,17
197:19,21,22

202:5 204:17,18
212:9 231:4,12
238:1,14 239:3
247:6 257:17
258:23 259:3,3,7
400:14 402:23
403:4
**serving** 174:15
**set** 7:24 8:3,8,10
8:15 74:8 126:18
128:8,15 131:6
136:6,13 236:7
255:8 264:3,6,16
269:20,22 270:15
286:3 291:16
330:19 403:2
419:23 459:6
**setting** 193:22
200:11 274:24
330:16 433:20,22
434:3,8,17 435:2
435:11 438:17
**seven** 20:19 24:7
**shane** 25:25
**shape** 171:20
400:24
**shapiro** 27:22
**share** 159:4
**shared** 23:15 73:9
298:4
**sharply** 51:23
**she'd** 151:6
**sheer** 195:10
**sheet** 460:13 462:7
462:10,18 463:1
**shelly** 241:6,24
**sheraton** 1:21
14:16
**sheriff** 88:21
165:11

**sheriff's** 24:21 26:14 48:19 55:18 148:22 149:11 150:5 165:3 166:2 166:14 203:10 207:9 256:21

**shift** 44:6 154:17 201:16 232:8 246:18 248:16 354:17,20 375:11 375:15 378:7

**shifts** 43:4 154:16

**shipment** 123:25 126:4,9,22 127:2

**shipments** 123:21 125:24 127:15 417:24

**shoes** 115:7

**shoot** 77:18

**shooting** 157:22

**shopping** 98:3,7 98:20 99:3,25 100:12,14

**short** 397:2

**shortly** 31:7

**shot** 426:17

**show** 377:10 401:9 401:10 402:7 403:25

**shown** 28:19 154:6 260:18 368:9 460:16

**shows** 439:20

**shut** 32:6 216:4

**sic** 30:10

**sick** 36:20 98:14 104:17,20,20 105:14,16 106:12 106:16 110:23 251:4 262:15 392:13 394:20

**sickest** 84:23

**sickness** 262:3

**side** 157:9 198:23 198:24

**sided** 270:4 275:6 348:1

**sign** 45:10,11 226:11 306:18 374:16,21 375:6 375:12,16 376:24 388:6 389:10 430:24 431:2

**signature** 457:5 459:13 460:14

**signed** 461:13 462:18

**significant** 59:10 68:24 72:15,18,19 141:11,15,19 156:9 263:9,13 331:19 429:8 440:1

**significantly** 66:15

**signing** 460:19

**signs** 229:19 361:25

**silence** 174:14

**silver** 154:4

**similar** 389:25

**similarly** 332:6

**simple** 392:19

**simply** 126:5,23 158:22 392:10

**sincerely** 460:21

**singer** 9:1 265:13 280:11 287:10 291:23 299:24

**singer's** 284:4,14 288:1

**single** 23:12 193:20 257:25

321:24 403:16 405:2

**sir** 460:10

**sit** 33:18 76:9 82:4 177:7 254:11 256:19 325:18 332:19,20 424:8

**site** 244:3 251:16

**sites** 243:24 245:7 245:23

**sitting** 95:7 255:14 279:2 396:5 426:6 437:11

**situation** 48:21 104:16 117:11 158:16 175:13 176:14 235:23 236:10 261:18 262:19

**situations** 19:9 85:22 96:22 114:10 164:17

**six** 20:17 28:3 32:18,18,25 148:18,18 223:13 345:22 380:2 452:1,3

**sixth** 64:11

**size** 127:7 195:23 250:3 417:23

**skill** 236:7

**skilled** 208:9

**skip** 118:24 237:16 243:12

**skoda** 24:25 26:2 26:16 73:19 75:2 75:13 296:10 356:5 404:17 407:8

**skoda's** 29:25

**slide** 83:16 338:25 372:14,24

**slides** 73:20 368:8 368:9 372:12,14 373:2 435:15

**slog** 288:23

**slow** 304:7 392:5

**small** 80:22,24 148:15 196:19 225:19

**smaller** 66:5 450:15

**smart** 180:24

**smith** 58:24 74:5 75:12 163:5 164:1 245:19 295:3,11 295:19 296:5,8 356:7,10,11,21 361:24 381:22 440:7 452:17 453:11

**smith's** 356:17 377:7 381:25 386:23

**smuggled** 111:17

**sober** 216:10

**soccer** 154:9

**social** 238:3

**sold** 111:16

**solely** 448:14

**solo** 209:6

**solutions** 4:11 460:1 463:1

**somebody** 35:17 86:8 91:8 100:15 106:6,15 113:13 116:11 121:10 134:17 166:1 175:3 180:6 220:7 233:21 252:12 261:1 425:19

441:7,19
**someplace** 261:23
442:3
**son** 241:6,25
**song** 18:8
**sonya** 4:4 16:8
**soon** 116:15
178:15
**sorry** 16:13 24:2,3
25:9 27:19 28:18
41:4 58:8 65:3
67:3 70:11 102:13
110:7 124:25
127:20 165:17
190:13 191:17
206:15,23 211:11
238:21 271:8
280:13,22 282:5
288:21 304:6
311:4,8 333:17
335:11 339:2
341:16 373:10
383:5 388:20,23
389:2 390:20
404:16 417:19
427:20 445:24
454:11
**sort** 21:22 26:18
26:20 28:20 30:5
30:24 31:11 32:20
32:24 35:21 37:14
38:1,3 40:3 43:2
44:2 45:20 46:24
55:25 56:1 59:5
60:1 78:6 80:9
84:5 85:12,21
96:15,18 106:9
107:20 124:9
127:6 130:17
132:19 134:12
137:22 141:24

150:12 152:7
153:12 157:25
167:15 170:25
179:21 186:11
187:24 188:11
195:6 212:10
216:2,13 221:8
222:13,14 233:23
244:18 246:22
248:5,16 278:2
281:8 290:14
291:24 299:24
306:18 321:9
338:11 361:4
362:14 363:17
364:14 367:24
374:1 375:11
377:25 379:4
380:24 381:6
403:23 432:11
436:24 440:13,24
442:1 444:10
446:8
**sorts** 134:8
**sought** 162:21
170:24 221:6
223:22 228:8
**sounds** 278:10
**source** 76:11
146:23 148:20
158:18 229:15
241:19 243:1
275:21 276:9
291:9 309:18
319:1 324:24
329:1 332:7 369:6
**sources** 149:2
229:19 302:18
303:13 308:21
414:7

**south** 2:7
**southern** 92:17
**space** 44:11 45:12
72:11,21 74:12,13
94:18 240:12
262:10 362:12
**spaces** 249:14
**span** 115:23
**spanned** 186:7
**speak** 18:10,17
25:14 49:22 50:16
143:25 187:22
193:13 234:21
253:15 257:4
268:16 292:25
295:4 350:4
450:14
**speaking** 28:22
343:7 422:22
**special** 7:21 9:1
100:17 118:2,11
132:18 236:11
265:13 267:17,21
268:8 269:5
274:21 281:2,4,16
282:13 294:21
305:18 306:2,3
347:8 349:6
366:21 397:15
417:8
**specialist** 145:14
**specialized** 227:21
**specific** 23:9 45:4
45:14 75:1 98:24
113:9 131:10
158:9,10 168:3
172:3 201:17
202:8 208:23
213:1 215:18
219:13,22 220:1,3
220:10 225:24

226:7 229:23
230:24 231:5
246:4 253:5 254:1
259:8 280:1
312:15 330:19
349:24 352:5,7,24
353:2 355:13
357:19 359:24
368:3,8 370:9,10
371:23 372:8
375:18 376:22
390:14 413:23
421:23 422:3
440:7
**specifically** 28:4
30:7 56:18 57:18
59:18 64:4 74:24
75:15,17,18 76:6
89:7 92:14 100:9
121:13 140:8
149:20 153:17
170:3 174:25
181:5 188:18
197:24 202:14
203:8,20 206:4,8
210:8 212:6 213:2
215:17 235:2,3
239:9 259:12
268:19,25 281:23
312:19 328:1
334:9 350:6 365:6
367:10 368:14,22
375:7,20 377:11
377:18 386:25
399:25 415:8
426:8 433:15
445:17 447:21
451:9
**specifics** 163:4
189:7,18

[specified - statutory]                                                     Page 71

specified  244:8,14
  458:21
speculate  262:23
speculation  261:6
  301:21 321:7
  441:10
speeches  187:6
spell  145:8 398:24
spend  198:6 227:9
  399:18
spending  20:5
  87:11 187:12,13
  187:19,20 203:24
spent  20:19 87:6
  154:1 176:11
  186:1 188:17
  200:17 202:15,17
  202:18,20,22,24
  203:2 211:24
  212:3,5,18,23
  215:4 222:17
  227:10 399:24
  452:9
spoke  338:11
  343:17 349:20
  350:7,9
spoken  24:13,20
  354:10 381:23
  415:3
spokes  213:22
sponsor  173:20
  174:8
sponsored  174:4
  174:23
sponsoring  177:4
sports  35:9 333:11
spotlight  154:5
spread  384:17
  385:9
spreads  260:17

spreadsheet  8:18
  8:21 9:6,9 264:23
  265:5,22 266:4
  271:16 279:22
  283:14 288:5
spreadsheets
  271:10,17,21,24
  272:2 273:10
  277:21 283:23
  290:22 291:16
  292:14 326:4
  432:17
springfield  240:16
sprung  211:19
square  4:15
sraiola  4:10
ss  458:3
stable  321:4,15
  323:8
stacking  45:2
staff  17:17 27:16
  27:22 163:9
  211:23,24 213:19
  402:24 451:12
stand  179:24
  314:11 412:21
  413:18
standards  9:17
  385:24 386:14
  387:7
standing  197:11
  214:3 368:14
  436:3
stands  143:13
  256:20 280:22
start  58:7 59:14
  73:13 76:22 77:11
  78:1,11,14 79:5
  131:23 134:12
  140:4 141:10
  151:20 175:16

176:18 178:20
  185:24 187:9
  188:12 222:5
  223:7 260:14,16
  294:18 306:24
  398:14 401:16,23
  404:1 406:1,7
  434:1
started  32:19,20
  35:15 43:17,24
  44:6,14,20,21,23
  44:24 46:6,10,17
  47:10 58:11,20
  73:22 76:2,8,13,16
  76:24 77:6,7
  79:16,17,19 80:12
  86:6 95:8,12
  107:22 137:18
  142:19 160:20
  187:11,25 194:10
  220:25 221:3
  222:6,15 232:2
  241:17,20 242:18
  275:25 294:23
  342:25 350:18
  351:9,13 367:25
  376:2 405:3,21
  406:2,6,16,19
  410:3,16 412:17
  414:10
starting  52:10
  58:24 223:6,6
  408:4
starts  56:1 157:12
  179:10
state  19:14 21:23
  28:8 89:10 142:25
  147:5 173:5,7,21
  174:6,21,22 175:6
  175:12 176:13,23
  177:13 184:17

193:3 223:18
  224:11 225:8
  252:21 354:3
  363:5 364:21
  381:2 446:16,18
  453:14 458:2,7
  459:15 461:10
  462:15
state's  20:6 173:13
  175:11 176:12
stated  140:12
  169:4 381:13,24
  388:15 396:18
  407:24 420:20
statehouse  354:20
statement  50:12
  51:7 52:1,20
  53:13 185:6 186:4
  186:5 321:8
  461:13,14 462:19
  462:19
statements  290:14
states  1:1 129:3
  315:21 327:15
  359:11 369:19
  370:5
station  157:23
statistic  75:25
  162:2
statistical  54:14
  54:18 55:12
statistician  440:17
statistics  28:23
  55:19 75:6 146:8
  148:21 152:8
statistics  28:23
  55:19 75:6 146:8
  148:21 152:8
statistics  206:10,17 207:4
  209:10,11 372:18
  374:4 439:18
statute  251:2
statutory  442:10

**[stay - summit]**

stay  102:19 262:1
stayed  409:3
staying  339:6
steadily  46:21
steal  101:11
  104:19
stealing  112:10
steals  106:5
stella  24:20 149:6
  149:8 152:15
  163:23 166:2
  169:20
stenotypy  458:14
step  83:2 250:19
  452:13
stephen  1:25 4:7
  16:6,21 458:6
  459:14
stepping  339:5
steps  97:11
stepsister  43:3
sterbenz  26:3 82:2
steve  26:3
stick  404:3
sticks  177:22
  233:5 400:22
sticky  29:14
stimulants  51:18
stole  104:17
  105:25 106:11
stolen  55:3 105:22
  105:23 106:14,19
  106:22 199:12
stood  109:3
  179:17
stop  100:12 122:1
  157:12 221:11
  348:19,20
stopped  295:6
  452:1

stories  362:17
  368:18 432:16
story  34:15 159:4
stow  63:23 247:4
straight  77:18
  152:14
strain  255:2
strategies  92:20
  198:15
strategy  93:8
  180:1,3
stray  144:18
stream  199:24
  200:2
streams  224:19
  254:2,6
street  1:22 2:20
  4:4,8,22 14:17
  53:23 59:5 77:18
  166:5 179:24
  261:12 394:9
  407:6 409:1
  411:13,14
streets  452:4
streetwise  84:17
stretches  180:20
strike  83:12 107:6
  164:23 191:23
  285:1 289:22
  310:23 321:1
  323:12 343:24
  352:6 360:10
  363:15 367:15
  368:2 372:23
  377:5 380:16
  382:3 384:19
  387:19 401:23
  408:11 421:14
strip  230:13
strips  30:2 86:6
  202:16,20 222:20

245:15
strongly  30:21
struck  260:11
  372:20
structure  214:23
  447:9
struggling  253:13
studies  54:15
  55:12,13
study  54:18 76:1
  250:7 407:19
  411:11 412:13
  414:5,7
stuff  165:19
  208:25 423:17
subcommittee
  436:11,15
subcommittees
  436:12
subject  21:18
  129:2 148:21
  173:21 185:18
  219:17 326:17
  373:24
subjects  442:14
submitted  8:16
  264:17 270:16
  316:6 359:25
subpoena  296:21
  296:24 297:3,5
subpoenaed  277:4
  277:8
subscribe  384:14
subscribed  461:10
  462:14 463:21
substance  83:14
  184:15 185:4
substances  129:6
  129:20 184:3,6
  185:7 219:6 249:4

subsys  317:3,19
sued  416:13
suffer  331:18
suffered  185:23
  192:1,8 204:4,24
  286:4 331:18
suffering  42:6
  84:16 138:9
  153:19 211:8
  214:19 216:25
  217:15 223:2
  228:17 352:20
suffers  205:7
sufficed  103:1
suggest  94:17
  249:19 443:15
  455:2
suggested  183:18
  292:9 391:20
suggesting  348:4
  442:25 443:11
suggests  390:21
suite  2:15 3:5 4:15
  460:2
suites  1:21 14:16
summa  231:3
summit  1:11 2:2
  7:4,6,7,13,16,18
  7:22 8:1,6,12 9:11
  15:6,10,13,16
  17:14 20:20 21:3
  22:9,14 23:3
  24:21,25 25:4
  26:10,14,18,23
  27:15,20,24 31:14
  33:2,8,20 42:3
  45:18 47:4,9,21
  48:2,3,18,19,22
  51:2,19 52:8 53:8
  53:10 54:15 55:16
  55:18 58:10 60:8

    

| | | | |
|---|---|---|---|
| 62:6 63:11,13,16 | 197:24 198:16,19 | 360:11 361:10,19 | **supplemental** 7:19 |
| 63:21 64:3 65:5,6 | 203:10 204:3,8,9 | 361:21 362:5,19 | 8:13 117:25 118:7 |
| 66:3 67:16,21 | 204:11,13,21,23 | 362:25 363:11,14 | 264:13 270:13 |
| 70:1 71:21 72:21 | 205:8,13,22,24 | 363:16,24 364:2 | 285:14 |
| 74:1 75:16 76:4 | 206:5,11,18 | 364:13 365:1,4,5 | **supplied** 85:25 |
| 77:20 80:17 81:16 | 209:24 210:9 | 365:16,17,19 | **suppliers** 85:23 |
| 82:8,17 83:3,10 | 212:8 216:4 | 366:9,19 367:2,5 | **supply** 92:1,4,6 |
| 84:11 86:6 87:6 | 217:13 218:3,10 | 367:14,16 369:5 | 102:9,10 104:1 |
| 88:15,22 89:8,11 | 218:13 239:6 | 371:25 372:19 | 260:22 305:23 |
| 89:14,18 90:4,4,21 | 244:1,22 247:8,8 | 373:12,15,17 | 384:8 |
| 91:13 92:1 93:10 | 247:12,18,20,21 | 374:7,9 376:19 | **supplying** 105:7 |
| 100:24 102:21 | 249:5,20 250:9,15 | 377:13 379:17 | **support** 196:25 |
| 104:4 105:9 | 250:17 251:17,23 | 384:4 385:2 390:7 | 200:9 241:12 |
| 106:20 108:7,17 | 253:7,16,24 | 390:16 392:14,23 | 247:17 254:23 |
| 108:22 111:17,24 | 254:21 255:1,6 | 394:22 395:3,13 | 390:12 449:10 |
| 112:20 115:24 | 259:21 261:3,18 | 396:12 397:17,24 | **supported** 195:8 |
| 117:24 118:6 | 261:21 262:8 | 399:16 400:14 | **suppose** 87:2 |
| 120:10 121:18 | 263:2,25 264:12 | 403:15,16 405:2 | 101:6 144:17 |
| 122:25 127:8,13 | 266:11 269:17 | 406:23 407:25 | 158:19 |
| 127:14,21 128:1,6 | 270:13 273:4,9 | 408:2 415:24 | **supposed** 202:10 |
| 128:12 136:3,10 | 278:6,16 285:22 | 419:3,18 420:3,8 | 409:2 |
| 137:10 139:24 | 289:4,7 295:1 | 423:25 424:23 | **sure** 18:18 22:17 |
| 142:25 145:24 | 296:4,11 304:1,8 | 428:14 429:10 | 22:23 24:6 25:12 |
| 146:9 147:1,2,10 | 304:21 305:7,12 | 430:16 431:21 | 25:15 27:19,19 |
| 147:11,14,25 | 308:13 310:7 | 433:6 434:2,4,7,18 | 31:22,25 37:8 |
| 148:3,4,13 149:10 | 312:7,14 313:16 | 435:1 438:24 | 38:9,14 39:25 |
| 149:19 150:12 | 314:5,8 320:6,12 | 439:8,21 441:22 | 40:20 41:21 49:10 |
| 151:13 152:1 | 320:16,17 321:2 | 445:13 446:3,25 | 51:9 52:5 57:22 |
| 154:21 158:15 | 321:12 323:7 | 448:3,12,19,24 | 57:22 60:24 62:1 |
| 160:15 161:5,18 | 328:17,21 330:9 | 449:21 453:19 | 63:20 64:12,25 |
| 161:19 162:13,21 | 332:10 333:1,14 | 454:3 | 65:2,16 66:22 |
| 164:20,21,24 | 333:21 334:3 | **summit's** 308:1 | 67:7 75:5 77:21 |
| 166:12,13,15,22 | 336:20 349:5 | 309:5 328:11 | 78:16 79:6 81:2 |
| 168:4,25 169:25 | 350:3,5,11,14,25 | 360:9 | 86:16 87:22 90:7 |
| 170:7,21 171:1,5 | 351:15,23 352:8 | **summit0000203...** | 90:9 92:14 98:23 |
| 172:1,18 174:15 | 352:25 353:6,16 | 7:10 61:11 | 99:1 103:11 |
| 175:1,19 177:12 | 353:24,24 354:10 | **summons** 160:17 | 112:24 113:6 |
| 177:16,19 179:13 | 354:11,25 355:7 | **super** 174:6 | 114:8 122:15 |
| 186:1 191:25 | 355:12,17 356:13 | **superior** 460:1 | 126:14 131:25 |
| 192:7,18 193:4 | 357:19,20 358:3,4 | **supervision** | 134:23 137:8 |
| 194:15 196:13 | 358:4,18,22 359:2 | 308:10 | 139:23 141:3 |

143:11,12 145:6
148:19 157:4,5
163:2,8,20 166:23
168:15,18 169:6
181:22 183:22
185:16 188:14
189:19 190:10,22
192:3,6 194:25
195:7 197:6
201:19 206:17
211:13 220:18
228:6 230:19
232:13 235:14,18
236:9 237:1,23
238:19 243:20
255:20 261:8
263:19 267:3
282:4,7 287:3,20
289:2 290:23
293:10 295:8
301:24 304:8
308:10 309:4,10
309:13 311:13,13
331:11 335:12
347:4,6,18 348:5,8
348:23 350:1
353:19 355:20
357:24 359:1
361:15 369:24
370:1 379:10
383:7,7 403:21
408:24 409:10
412:12 413:23
421:16 426:3
434:14 441:5
447:24 449:4
451:12 452:24
454:1,1,2,5
**surg**  36:7
**surgery**  36:15,24
83:8 102:15

**surgical**  98:16
306:15 452:13
**surmise**  443:2
**surprise**  85:14,18
341:1 381:8
**surprised**  381:3
**surprising**  256:18
**surround**  45:17
**surrounds**  45:16
**survey**  7:12 67:20
68:3,9,15,19
411:11
**surveyors**  256:24
**surveys**  374:24
375:1
**suspect**  114:3
147:17 150:24
180:4
**suspected**  113:4,6
113:16 310:1
341:10
**suspicion**  122:12
**suspicious**  120:14
122:2,9 123:8
129:6,20 130:4,7
132:13,16,20,25
132:25 133:21
134:25 168:5
416:21,25 417:9
**sustained**  35:9
**swear**  16:22
275:14
**swifter**  173:10
**swinner**  4:6
**switch**  20:3 85:6,9
85:15 263:17
368:4
**switched**  145:12
**sworn**  17:1 150:4
410:20 458:10
461:10,13 462:14

462:18 463:21
**synthetic**  37:12,13
38:3
**system**  21:23 27:1
27:1 54:25 96:4
155:3,4 204:16
213:9 215:5
217:24 247:11,13
257:17 259:11
441:22
**system's**  231:3
**systematically**
329:23

**t**

**t**  3:9 38:1 170:10
**t21**  198:7 201:3
202:18 222:17
**tab**  29:15
**table**  117:16
393:18
**tactical**  150:1,2
**tail**  403:23
**tailored**  210:5,14
**tainted**  423:13
**tak**  139:15
**take**  20:9 29:1,11
36:16,16,17 37:1,4
44:16 83:2 91:9
102:18 143:22
174:13 183:19
186:12 187:11
189:5 192:2
198:12 200:25
201:12 210:16
236:24 244:7,18
245:8,24 266:24
277:16 290:18
311:11 313:1
328:19 331:3
348:21 349:1
363:24 365:25

366:13 397:2
415:7 423:15,19
423:21 433:10
434:8 449:22
452:11 455:3
**taken**  1:20 14:18
17:23,24,25 24:11
36:2 67:10 80:1
102:15,16 104:6
125:6 181:25
201:2,3,4,8,17
208:22 212:7
237:4 263:22
313:5 338:1
346:22 366:4
370:22 393:6
397:6 455:11
458:20
**takeover**  21:23
**takes**  198:14
**talent**  176:11
**talk**  37:7 54:21
55:22 58:25 60:20
73:17 76:15 97:21
140:7 148:24
155:11 159:2,23
160:12,14 192:25
226:6 229:16
235:8,25 239:13
243:13 245:14
248:1 254:13
268:21 293:23
295:11 298:2
300:19 311:5
317:17 349:10
356:7 381:21
410:14 413:25
421:1,2 425:21
432:18 433:18
447:14 453:10

**talked** 42:20 49:17
71:16 82:2 97:25
98:1 115:23
149:15,24 150:20
153:7,12,15,17,23
154:18,20 155:16
155:18 163:22
168:21,22,23
185:8 186:8,9
188:9 232:16
235:7 238:9,13
241:21,23,23
243:22 245:9
247:17 258:5,25
259:14 260:12
296:20,24 297:10
311:17,21 316:15
349:13,16 357:1
358:7 365:7,8
368:25 369:11
372:4 404:15
412:11,24 413:2,5
413:14 414:6,8,19
414:22 427:7
428:11 435:4,5
436:7 437:12
445:23

**talking** 31:20 54:4
55:22,24 56:22,23
57:5 60:16 73:18
78:4 87:15 99:2
122:3 130:13
154:18 181:3,5
187:9 189:15
193:23 209:25
225:5 229:18
233:20,22 237:13
254:15 258:6
260:11 323:22
346:5 357:11
366:9 406:21

412:8,9,14 415:19
450:21
**talks** 74:7 89:7
154:9 195:21
202:4 222:14
229:15 254:14
256:1
**tanf** 228:4
**tangibles** 361:3
**taper** 423:9
**tapered** 321:5
**targeted** 170:3
210:6
**targeting** 198:22
445:17
**task** 9:14,14 59:22
65:6 73:19 89:9
149:12,17,25
166:15 169:20,21
169:22,23 170:6
170:15 211:17
222:9,11,13 245:2
350:18 351:8
352:10 354:8
355:7,18 356:13
356:24 362:1,23
362:25 363:3,8
367:22 368:4,19
371:22,25 372:1
377:14 378:14,15
378:23 379:17,18
390:1 395:8
396:11 405:17
410:6,7 434:13
435:13 436:8,13
445:4,11,16,20,23
446:10,15 447:17
448:6,9,11,18,20
448:20,24 453:19
454:3

**tasks** 211:17
**tax** 195:21 209:24
223:20 250:2,6
251:14 252:24
254:2,6,7,14,15,16
254:17,17,19,21
255:6,10,11 432:9
**tcoleman** 4:18
**teach** 234:8
**team** 24:6 130:18
446:19 447:7
**teammates** 35:21
**teams** 199:15,16
208:16 209:13
222:5 233:12
234:12
**technical** 371:1
**technically** 26:17
**technicians** 66:8
**techs** 66:22
**teens** 44:16,19
56:2 58:23 60:9
137:18 141:21
221:7,25
**telephone** 4:12,20
5:4 239:25
**telephonic** 194:19
**tell** 82:4 150:9
151:5 152:21
155:14 192:13
212:23 220:12
302:23 400:11
405:25 437:21
**telling** 175:3
368:25 374:1
420:5
**tells** 412:4
**tenants** 240:21
**tend** 29:17 151:20
338:4 383:14

**tended** 116:14
157:2
**tendering** 408:13
**tense** 258:7
**tenth** 4:8
**tera** 4:14
**term** 19:20,21
20:4 39:11 42:12
42:18 57:8 96:8
108:14 109:20
162:19 171:1
216:18 281:7
304:20 360:25
361:11 369:11
383:25 384:11
389:13,13 390:7
392:7 418:16
420:6 424:24
431:25 432:20
433:3 442:22
**terminology** 30:9
37:8 424:19
**terms** 22:21 28:14
41:25 42:4 101:8
179:7 259:4
361:17 407:2
449:1
**test** 176:7 250:21
421:11
**tested** 39:24 40:2
176:5
**testified** 19:5,10
19:11 21:13,17,24
307:2 322:17
324:1,9 334:2
343:10 345:10
373:4,11 374:15
378:3,7 381:19
385:13 392:2
395:3 398:15
399:7 401:18,24

| | | | |
|---|---|---|---|
| 403:7 409:8,11 | 396:17 397:21 | 78:6 104:24 105:3 | 70:25 78:25 80:24 |
| 415:15,22 417:21 | 400:15 401:1,10 | 105:7 114:4 | 82:14,15,24 85:7 |
| 424:17 425:20 | 401:11,18 402:7 | 140:17 145:11 | 87:16,23 89:11 |
| 430:21 431:17 | 403:14 404:3,22 | 187:24 205:23 | 93:2,11,15 97:25 |
| 439:6 442:18 | 406:9 407:18 | 211:21 256:19 | 98:2 99:21 100:1 |
| 449:20 452:15 | 409:5 410:21 | 260:10 278:4 | 100:13,20 102:16 |
| **testify** 23:4 33:3 | 412:23 413:1 | 351:10 409:12 | 103:5,10 106:5 |
| 33:19 185:22 | 414:9,16 418:18 | 444:23 | 107:17,20 108:10 |
| 186:22 267:12,25 | 420:12,13 422:9 | **things** 28:17,21,25 | 108:19 109:19,20 |
| 268:17 269:1 | 422:21 423:24 | 29:21 30:17 35:15 | 110:8,19,20 |
| 274:21 276:21 | 424:13 430:12 | 38:5 41:21 44:13 | 111:14,19 113:18 |
| 279:3 293:2 | 435:17 437:10 | 46:6 66:8 71:15 | 114:18 117:6 |
| 295:14 297:16 | 438:23 439:2 | 73:6 74:25 75:8 | 121:1 122:18 |
| 301:5 319:18 | 442:21 458:13,17 | 95:8 141:7 147:18 | 124:11 126:7 |
| 322:10 323:3 | 461:6,7 462:6,9,12 | 157:8,9,12 167:14 | 127:4 134:3 |
| 324:14 342:19 | **tests** 227:23 | 167:18 174:21 | 136:24 138:7 |
| 346:24 349:5 | **teva** 3:13 5:2 16:5 | 177:4 186:22 | 140:23 142:21 |
| 366:20 367:2,5 | 125:16 266:23 | 188:8,9 195:15 | 143:8 151:1,1,4 |
| 404:25 414:1 | **text** 379:23 | 198:2,22 199:14 | 157:14,18,21,24 |
| 421:7,11 424:8 | **thank** 18:11 38:20 | 199:18 203:2 | 162:14,15,16 |
| 426:10 433:23 | 165:8 183:21 | 211:18 212:3,6 | 163:16 164:1 |
| 458:10 | 187:2 204:5 240:4 | 215:7 221:13 | 166:4,7,19 167:18 |
| **testifying** 22:24 | 267:19 274:23 | 229:24 235:2 | 167:21,21,22,24 |
| 225:23 | 298:23 313:9 | 245:9 246:20 | 168:2 169:2 |
| **testimony** 13:3 | 322:23 346:2 | 258:5 299:24 | 170:17 171:24 |
| 33:7,8 56:4 65:8 | 366:8 371:1,8 | 303:3 333:10 | 173:9,15,15 178:9 |
| 82:7,12 218:23 | 389:5 397:10 | 375:22,23 381:3 | 180:20 181:13 |
| 281:12 289:5 | 398:3,5 438:1 | 384:7,16 385:7,9 | 184:23 185:6,7 |
| 295:17 297:24 | 455:23 456:2,3,5 | 396:1 402:2 | 186:8 188:16 |
| 298:13 316:21 | **thankfully** 346:3,7 | 417:14 425:17 | 190:20 195:2,17 |
| 323:5 334:13 | **thanks** 168:16 | 432:10 438:14 | 195:20 196:7,15 |
| 343:14 349:11 | 348:21 373:11 | 453:7 | 200:23 201:10 |
| 350:3 351:15 | **theft** 101:22 103:4 | **think** 18:16,20,20 | 206:6 210:22,25 |
| 354:24 355:16 | 246:19 248:8 | 21:10 22:20 23:11 | 213:8 220:25 |
| 356:20 357:1,7 | 428:16 | 23:17 25:10,10,19 | 221:8 222:17 |
| 367:10 370:12 | **theme** 60:7 | 26:13 27:23 28:5 | 224:2,6,8 225:2,15 |
| 377:21 379:1,11 | **theorist** 376:1 | 36:24 42:5 45:8 | 225:17,23 226:5 |
| 381:25 385:1 | **theory** 433:5 | 47:1,3,6,9,13,16 | 229:15,19 231:17 |
| 386:22 391:22 | **thin** 53:1 134:4 | 48:16 50:19 58:7 | 236:15 237:17 |
| 392:1,22 394:22 | **thing** 18:12 32:21 | 59:16 61:23 64:10 | 238:5,8 241:1 |
| 395:12,19 396:10 | 50:8 54:23 60:3 | 65:19,23 66:13 | 244:13 248:4,15 |

248:23 251:24
252:8,17 254:16
255:17 263:15
273:19,19 274:19
278:2 282:16
292:2 296:9,25
298:13 299:18,19
307:10 308:19
323:4,18 324:13
324:13,21 333:19
334:17 335:10
338:7 339:4
342:16 343:10
345:10 347:16
351:23 355:5
359:23 360:15
362:10,11 364:1
370:8 376:11,11
376:21 379:2,3
380:23 385:13
391:25 397:3
403:2 418:12
424:12 425:25
431:4,5 436:10
437:17 438:22
440:5 442:22
448:21 449:7,18
452:6 453:21
455:25
**thinking** 59:17
212:10 373:20
375:11
**third** 7:24 128:8
128:15 209:21
235:6 270:22
301:25
**thirds** 129:1
**thirty** 460:18
**thoroughly** 31:10
50:14 211:3

**thought** 37:24
92:24 101:5,7
113:10 154:14
188:12 190:1,7,8
246:18 295:6
347:5,7 357:12
404:10 454:7
**thousand** 65:15
253:19 451:17
**thousands** 95:16
95:16 192:17
322:1 405:10
**thread** 7:6 48:1
**threat** 7:12 47:21
50:9,21 51:1
67:20 68:3,9,15
82:17 427:8 428:8
453:18
**threats** 82:8
**three** 102:9,25
130:19 139:12
174:7 247:1
291:24 292:17
293:6,13 294:9
303:3 316:12,14
316:15 317:16
319:10 320:2
328:20 329:15
340:16 343:23
344:6,13,14 345:1
345:25 347:4,5
387:3 414:7
428:18 436:1
**threshold** 285:4
285:12,24 294:14
295:25 307:15
321:9
**throes** 411:20
**throw** 177:21
**throwing** 176:20

**tied** 134:25 199:10
**tighten** 436:6
**time** 14:14 15:1
21:14 30:1 34:13
34:25 35:23 42:5
45:4,22 47:1,4,7,9
53:23 59:19 63:16
67:5 74:22 83:5
84:2 88:22 93:11
94:11 95:17 109:4
111:4 113:8,21
114:8 115:23
117:1,7,21 119:5
120:14 125:9
138:2 140:25
141:17 143:9
154:8 156:21
157:3 159:5,25
160:10,22,25
161:15 162:18
174:19 176:10
177:16,20 181:20
195:15,16 198:6
199:10 200:17
201:11 203:25
208:19 209:1
214:12 218:13
220:23,24 222:18
222:19,21 223:16
224:7 234:18,19
237:6 251:16
252:14 255:22
262:8 263:11
298:15,23 310:15
312:13 318:11,19
331:3 345:2
351:18,23 352:9
353:18 354:2,14
354:21 362:24
363:4 368:1 372:1
372:13 373:7

375:19 388:21
393:16 398:4
399:4,17 401:4,20
408:22 412:7
413:7 423:16,20
423:21 426:14,17
426:22 436:2
438:7,9 440:24
444:11 445:4,11
446:14 450:12
453:24 454:21
456:4,7 458:20
**timeliness** 256:25
**times** 19:13 24:8
29:23 86:17 111:7
141:8 176:3 186:6
227:16 229:4
236:19 239:15
281:10 352:16
362:22 368:17
396:22 399:5
408:20 431:17,25
436:16
**timing** 381:7
393:10
**title** 74:3 380:7
400:12
**titled** 7:5,8 8:18,21
9:6,9,13,16 48:1
61:8 88:9 117:23
264:23 265:5,22
266:4 283:3
378:13 385:22
387:25
**tobacco** 198:9,10
**today** 14:13 18:5
22:24 23:4 30:19
33:7 38:7 56:14
56:21 73:2 76:9
82:4,9 103:9
108:23 114:24

117:8 140:13,19
142:11 183:1,7
188:16,22 243:23
254:11 255:14
258:8 267:13
268:11 271:18
273:18 276:22
279:3 280:18
281:12 290:25
292:16 293:3,23
297:20 298:21
300:14 304:7
319:19,20 322:9
325:19 332:20
334:11 343:14
348:20 349:24
380:12 389:7
397:23 399:19
400:9 421:7 424:8
427:8,24 430:22
431:17,25 435:18
436:6 455:24
**today's** 23:7
330:25 367:8
**told** 35:18,20,25
150:19,19 151:2
155:7 177:7
241:22 242:3,12
242:21 263:7
295:22 317:20
352:14 406:14
**tolerance** 392:8
**tomorrow** 248:20
249:2 258:10
**tone** 256:7
**tonight** 160:16
**tonya** 26:2,17
**tool** 141:21 142:21
143:1 150:21
**tools** 57:23 165:8
235:1

**top** 49:6 68:2
120:8 197:13
268:25 331:13
335:17 386:15
387:2
**topic** 23:12 87:15
87:16,23,24 94:7
188:23,24 229:14
285:22 297:17
298:9 313:13
346:13,16,25
349:1,6,12 350:4,6
361:17 362:3
385:2 415:12,18
418:20 419:18,23
421:3,6 424:2,2
426:10 429:17
430:6 433:24
444:24 445:4
**topics** 8:10 23:10
23:15 33:4,12,16
33:20 182:22
183:23 185:19
264:7 267:5,6,7,9
267:13,23,23
268:18,22 269:1
276:21 282:11,12
295:14,17 316:21
343:11 346:3
349:15 366:15,18
366:20 367:1,3,11
397:14,17,18
415:10 423:22
433:14 445:14
**torch** 444:11
**total** 23:25 51:16
81:19 83:21
192:21
**touched** 163:20
445:2

**touches** 284:23
**touching** 163:17
447:6
**tough** 109:20
195:3 205:11
**tourniquet** 452:12
**tower** 4:15
**townships** 166:21
**toxicologist**
338:11
**toxicology** 336:25
337:9 338:3
**trace** 94:25 158:18
**track** 214:11
278:23 371:3,5
**tracked** 212:15
249:17 259:3
**tracking** 249:23
259:7
**tract** 240:8
**traffic** 21:1 92:19
209:3
**trafficked** 147:19
**trafficking** 21:8
56:6 63:15,24
68:25 147:15
170:11
**trained** 151:6
160:13 234:12,25
235:16,21
**training** 150:7
151:11 168:2,3
227:21 231:20,25
232:21 233:8,10
233:16,19,20
234:1,4,14,20,24
235:12 236:1
**transcribed**
458:16 461:7
**transcript** 6:1
30:1 49:19 356:18

377:10 457:3,6,9
457:11 460:11,12
461:5,12 462:5,11
462:17
**transcription**
458:17
**transcripts** 24:10
25:18,21 400:4,7
452:16
**transfer** 216:2
**transferred** 216:5
**transition** 19:25
149:16 404:18
**transitional**
215:13,16,18,20
216:10 217:5
**transitioned**
403:21
**transitioning**
404:21
**transpired** 287:9
**transportation**
69:1,14,20
**trap** 106:10
**travis** 241:5,24
**treadmill** 29:17,19
32:11
**treasure** 176:11
195:17
**treat** 40:10 75:23
76:18 95:13 115:8
115:15 211:20
306:20 333:10
334:22 352:15
362:11 375:2
391:21 451:16
**treated** 159:15
232:7,9,15 283:16
287:16 289:13
300:22 301:14,17
301:18 302:5,12

302:20 304:3,10
306:5 311:18
**treating**  60:4
76:17 365:14
**treatment**  44:17
47:11 76:15 83:11
83:14 84:3 87:12
117:14 153:24
159:8 175:24
187:23 195:5
217:2,4,19,24
219:3,5 220:9
221:6 226:23
227:2,8 228:14
230:7 231:5,21
233:6 238:2,15
239:3,21 240:6,7
240:12,25 303:10
303:15,23 306:14
312:12 327:12,14
365:9 396:20,21
405:19 410:8
446:13 447:2,3,20
447:22 449:5,6,8
449:10 451:10
**triaged**  452:12
**trial**  19:12
**tried**  280:14 408:8
434:17
**tries**  55:11
**trip**  45:17
**troops**  82:23
**troubling**  233:5
**true**  47:18 50:12
59:16 352:17
376:20 392:10
458:16
**truly**  186:13 272:8
368:16
**trust**  82:19 179:12
180:23 194:8

369:15 391:9
**trusted**  179:14
**trusts**  391:7,7
**truth**  458:11,11,12
**truthful**  53:13
**try**  18:13 32:10
58:13 84:19 116:1
131:24 136:24
159:22 160:19
161:7 178:12
195:12 196:25
221:11 272:4
310:17 311:14,14
387:20 404:19
**trying**  18:22 30:11
46:14,15 59:4
76:17 93:24
103:11 113:24
115:5 117:11,12
126:2 131:18
154:1,13 155:17
186:2 187:11,14
193:1 194:12
195:7 199:20
200:21 211:25
248:14 251:15
253:9 282:5 311:6
311:8,25 322:11
322:24 362:10,11
394:17 404:24,25
413:3,21,22 432:3
435:8 443:14
448:3,4 451:4
**tucker**  3:4 15:24
15:24
**tuckerellis.com**
3:6
**turn**  14:6 48:24
50:3 62:12 64:8
68:1,18 118:21
120:7 128:23

185:17 195:11
228:11 239:24
244:8,18 263:16
270:21 326:15
427:12 433:13
**turned**  50:23
224:20 241:9,18
443:19
**turning**  33:1
246:12 326:13
330:22
**tweaked**  181:16
**twelfth**  2:20
**two**  20:21 36:23
36:24 39:1 43:21
54:6 59:9 64:11
95:25 100:15
119:7,9 120:3
129:1 150:1
158:24 166:7,9
174:5 203:9,17
205:14 225:16
232:12 239:5,19
244:14 246:25
276:13 284:7,23
288:12 292:5
303:19 312:1
328:20 344:14
392:6 427:16
428:18
**type**  62:17 107:7
251:20 279:11
293:8 402:1 438:9
**typed**  347:13
**types**  38:5 44:13
57:11 65:11
140:14 151:21
209:8 221:13
312:11
**typical**  45:17

**typically**  49:11
98:9,11 116:13
159:4,7,17 160:12
166:8 199:19
232:12 252:13
278:4 381:3

|  u  |

**u.s.**  14:21
**uh**  25:17 26:22
41:24 50:4 51:4
60:15 62:14 64:21
97:24 100:18
118:23 120:17
123:19,23 134:9
160:23 163:24
165:23 171:19
172:12 191:5
209:19 211:16
215:25 218:6
220:20 223:4
231:23 243:15
244:21 294:1
309:10 314:18
319:23 342:4
351:21 360:21
372:7 373:6,8
374:17 382:16
421:5 436:20
445:9
**ultimate**  142:1
146:22,22
**unauthorized**
304:3,10 305:14
**uncommon**  77:16
156:22 404:15
**undercover**
150:14
**underemployment**
252:19
**underlying**  303:21

underneath 387:4
388:4
underreported
162:19
understand 18:2
18:16,21 19:3
23:2 33:2,6 34:6
37:10 41:17 72:13
78:25 124:12
131:18 174:23
187:1 191:21
205:5 226:10
259:17 268:4
272:3 279:8,9
281:20 282:7,16
282:19 288:20
311:7 312:1
319:21 322:11,24
333:18 336:17
345:16 359:4,8,12
361:24 374:4
376:2 382:5
383:18,20 390:8
390:10 400:25
404:24 408:10
409:17,22 412:7
412:12 413:24,24
416:7,11 417:19
420:25 425:23
understandable
18:14
understanding
37:21 43:7 47:4
87:20 107:21
129:22 130:2
132:17,21 133:2
133:23 134:5
135:1 151:11
152:3,6 164:7
167:22 183:12
184:18 232:23

271:6,25 272:17
274:17 275:16,24
276:4 277:7,11,14
278:19 279:2,12
281:15 283:22,24
284:1,15 285:23
286:2,21 291:10
291:14,15 292:12
292:20 293:9
295:22 299:4
301:23 302:16,25
303:2 306:2,9
307:7,17,22
310:24 315:11,16
316:13 319:8
322:4 325:2
339:13,21 340:15
344:4,10,11 350:2
359:14,18,20
374:20 375:4
380:15 382:2
383:2,8 386:19
416:16 417:13,18
417:22 418:2
431:13 452:7
understands
425:25 426:3
understood 24:1
141:4 285:18
287:5 407:18
408:14 426:7
434:14 438:23
442:20
undertaken 87:5
246:6
unemployable
251:6
unemployment
251:22 252:6,15
252:16,18

unfair 84:10 185:6
201:22
unfamiliar 30:13
149:21
unfortunately
161:11
uniformed 165:21
unit 48:18 52:15
52:17,23 62:6
63:13 64:4 65:6
89:8 148:3,13
166:15 169:25
203:19 448:12
454:3
united 1:1 239:7
240:23 241:5
359:11 369:19
370:5 446:2 447:9
units 434:12
unknown 406:12
unknowns 405:24
unlawful 56:5
unnecessary 304:4
304:11 305:15
unquote 254:24
unregulated 86:21
unreported
405:24
unscrupulous
428:20,23 429:2
unsophisticated
159:5
unsure 426:4
unused 172:17
244:9
update 234:5
updated 279:21
uptick 43:16,24
59:23 221:1,4,23
upticks 396:19

upwards 358:23
urine 164:9 338:1
usa 3:13 5:3
usable 44:4
use 43:17 58:9
71:3 72:19 96:19
140:22 143:2,3,7
151:8,13 157:10
162:5 164:4,14
165:1,4 167:23
172:10 185:10
193:10 210:19
216:15 234:16
236:1 243:2 247:5
260:21 281:7
283:17 287:17
289:14 290:8
293:16 301:16
302:15 306:24
308:22 309:18
317:11 318:3
320:5 325:23
328:14 329:3
330:5 331:17,25
332:11 333:3,16
333:22 334:3,5,7
334:14 335:8
383:25 384:10
390:7 392:25
407:1 419:9
420:23 423:3
429:16,25 430:13
432:23,25 433:3,3
445:8
user 97:2,8 399:10
410:3
users 7:15 73:13
88:14 150:17
156:4 414:10,11
uses 39:22 96:15
140:25 150:20

[uses - way]

Page 81

163:23,25 164:3
210:6 260:20
**utility** 444:4,6,8
**utilize** 294:4
**utilized** 297:7
300:2 325:21

**v**

**v** 1:11 460:6 461:3
462:3
**valid** 164:12
420:15
**value** 53:23 384:2
419:10 425:12,14
425:17,23 426:1,4
426:7
**values** 250:5
**variety** 44:5 63:4
200:18 240:7
349:15 449:14
**various** 243:17
424:17 436:16
**vast** 81:5
**vehicle** 256:3
**vehicles** 256:18,19
256:21 257:2
**vein** 284:24
**veritext** 14:12
16:22 460:1,7
463:1
**veritext.com.**
460:17
**versed** 40:5
453:12
**version** 22:21
129:16
**versions** 38:4
283:25,25
**versus** 180:6 188:3
247:21 286:12
**vicodin** 39:17
42:20 57:17

**victim** 106:10
196:6 238:3
395:20
**victim's** 55:4
**victims** 54:20
365:14
**video** 10:1
**videographer** 5:11
14:1 16:20 67:8
67:11 125:4,7
181:23 182:8
237:2,5 263:20
266:15 313:3,6
338:22,25 366:2,5
370:20,23 397:4,7
455:9,12 456:6
**videotaped** 1:16
7:3 22:4,7,13
**vietnam** 78:6
**view** 84:7 116:19
117:2,18 396:14
433:5 440:24
**viewed** 353:1
**views** 34:3
**violated** 364:5
**violation** 21:1
**violence** 53:3
209:5
**violent** 56:22
**visit** 298:7 364:16
**visited** 140:9
342:9
**visits** 95:11 139:16
**vital** 45:10,11
306:18 374:16,21
375:5,12,16
376:24 388:6
389:10 430:24
431:2
**vividly** 368:9,16

**vocal** 173:17
**voice** 256:7
**voices** 177:5
**volume** 195:11

**w**

**wacker** 3:10 5:6
**wage** 252:25,25
**wait** 70:9
**waiting** 396:5
**waived** 460:19
**waiving** 129:3
326:17
**walgreens** 416:12
**walk** 103:17
159:14
**wall** 177:21
**walmart** 2:12
15:19 416:12
**wand** 261:2,7
262:6
**wandered** 80:9
**want** 22:16 36:10
36:14 37:7 40:19
52:3 58:20,22
74:15 84:22,22
87:21 90:7 115:7
119:18 125:11
126:14 127:5
135:13,14 156:5
159:2 163:21
168:16 183:19
185:17,24 192:11
226:7 235:4
243:19 247:7
249:6 253:15
256:8 277:13
301:2 322:18
345:15 347:3,16
348:8 361:18
366:17 367:22
374:2 375:22

379:10 383:25
393:14 401:9
402:7 404:3
405:25 413:23
415:12 421:1,2
422:5,7 423:18
435:12 443:1
445:3
**wanted** 58:15 75:5
110:9 137:7
157:21 175:18
176:8 183:22
197:8 198:13
296:18 347:18
348:4,5 371:10
418:24
**wanting** 30:16
**wants** 76:15
113:25 334:22
430:11
**war** 154:13
**warehouse** 133:17
**warn** 88:25
**warning** 88:25
290:8 361:25
370:5
**warnings** 369:22
**warranted** 175:9
**warrants** 438:14
**washington** 2:20
4:9
**waste** 249:15
**water** 172:14
348:11,20
**waterloo** 124:17
**watson** 3:14,14
5:3,4
**wave** 45:22 261:2
**way** 25:7 29:24
41:9 43:4 46:24
57:21 83:19 85:15

94:21 96:17 101:6
102:20 109:24
110:13,24 113:21
115:15 124:12
129:2 132:17
135:10 144:7
153:13 154:2,15
154:23 156:19
157:11 171:12,20
172:16 179:5,17
181:4 205:4
213:15 232:7
242:24 252:11
255:8 256:9,23
304:17 306:20
310:6 333:9 338:8
342:16,18 345:13
346:11 352:15
364:12 392:5
393:20 394:20
400:24 418:18
432:9 443:25
446:2 447:9 451:6
**ways** 97:22 157:11
159:6 201:25
225:3 253:18
254:23 310:17
391:21 404:17
428:17 451:11
**wc.com** 2:21
**we've** 31:20 38:14
42:20 57:9 71:15
97:25 106:23
112:23 124:5
152:24 154:21,23
159:13 163:20,22
168:22,22 172:6
186:9 188:11
192:10,17 196:9
197:25 198:17
199:7 206:2

210:25 211:4
229:7 237:13
238:8,13 243:22
244:16 245:9
252:19 253:18
257:20 258:2,6,16
270:23 287:13
289:3 292:15
294:9 297:25
298:1,3 303:4,16
311:17,21 319:6
336:15 358:7
363:6 364:12
367:12 372:3
378:19 379:6
386:4 397:16
418:23 421:15
423:17 424:6
442:19 445:23
**weathered** 253:17
**website** 444:18,21
**weeds** 219:23
**week** 268:12
279:23 281:14
288:5
**weekend** 268:13
**weekends** 32:3
**weeks** 28:3 32:15
32:19,25
**weeping** 193:23
**weight** 380:19,23
384:1 390:9 412:5
**welcome** 389:6
**wellness** 236:18
**wendy** 3:16 16:3
183:6 266:21
**wendy.feinstein**
3:18
**went** 71:8 105:16
120:22 134:20
138:8,11,21,22

140:24 147:4
151:7 153:13
174:1 181:7
225:11 232:22
246:16 266:22
267:5 277:1
286:22 396:2
436:25 450:23
**west** 3:10,16 5:6
16:3 266:21
**westbrook** 2:5
**whawkins** 2:21
**whereof** 459:5
**whispering** 14:4
**who've** 308:10
**wide** 73:21 449:14
**widely** 143:4
**wider** 44:4
**williams** 2:19
15:21
**willing** 159:3
160:12
**wilms** 26:5 372:17
372:21 381:18
437:10,11 438:7
**win** 393:17
**window** 318:19
**winner** 4:4 6:8
16:8,8,18 17:5
22:2,12 23:13,17
23:22 24:1 29:6
47:19 60:25 61:19
67:7,13 87:19,25
88:8 110:4 117:22
125:2,17,19,21
128:4 136:2
145:17 168:18
181:22 182:10,14
183:3,9,14,21,24
187:1 190:6,11,15
190:19 191:18

194:20 226:10,17
236:24 237:8
238:23 240:1,3
255:20,23 256:6
256:10 263:15
267:5 428:5
**wish** 35:16,16
176:10
**wishes** 30:25
**withdraw** 145:17
**withdrawal** 84:22
**witness** 2:3 14:24
15:10,14 16:22
24:2 36:12 182:22
190:10,13 191:20
204:5 225:24
237:1 263:19
280:9 298:2,2,11
313:2 322:15
323:2 324:1,18
338:24 339:2,4
343:10 345:22
348:8,10,13 371:9
389:1 398:5
426:22 429:21
456:2,5 458:9,14
458:15,18 459:5
460:8,11 461:1,4
461:11 462:1,4,15
**witness's** 457:2
**witnessed** 352:12
**witnesses** 226:13
**witness'** 460:14
**woman** 104:4
358:18
**wonder** 63:10
**word** 44:25 72:19
201:15 221:15
318:3,5,8,9 340:23
346:7 392:25
420:23,24 423:3

425:14,23 426:1,4
426:8,11 429:15
429:16,25 430:7
430:13 432:23,25
437:7 449:19
**words** 30:12 66:20
151:10 368:15
372:12 419:9,10
425:24 433:9
**work** 26:25 31:19
34:1 49:25 94:2
107:24 115:24
116:10 149:9,18
150:10,19 151:3,9
152:22 169:5,24
170:4 196:10
212:11 227:19
252:24 298:3,4,18
299:3 333:11
393:13,13,14,15
393:20 394:17
400:2,18 410:25
413:15 422:24
**workday** 32:2,5
**worked** 103:15
107:15 152:25
166:24 171:22
215:17,19
**workforce** 250:10
250:18,23 252:10
252:13
**working** 174:22
190:17 195:23
203:14,18 214:11
214:12 239:6,7
250:3 254:18
438:6 445:5,12
447:10,25
**works** 149:10
150:11,12 165:20
166:13,14 303:12

**world** 2:14 94:2
423:20
**worry** 38:8
**worse** 153:25,25
**wraparound**
231:4
**write** 46:15 133:7
184:11,14 187:6
384:9
**writes** 99:7 132:16
287:11
**writing** 100:22
110:15,22 113:17
144:9 248:10
359:25 370:11
428:3
**written** 100:7
114:12 132:12,22
135:8,17 165:2,11
183:13,18 273:3
273:23 274:2
304:23 308:16,18
311:2 312:4
326:21 340:12
341:4,11,21,23
342:13
**wrong** 105:14
110:25 122:5
123:1 124:2 132:9
236:6 335:10
416:18 443:19
**wrongdoing**
119:15 122:12,12
127:3 128:2 273:6
304:24 326:23
333:5,23 334:1,15
334:23
**wrongful** 119:4
363:19
**wrote** 50:22 54:2,3
109:5,14 110:1,12

110:12 130:6
131:13 133:20
305:1 428:13
453:17

| x |
| --- |

**xanax** 39:7 98:22
**xartemis** 315:5
**xr** 315:6

| y |
| --- |

**yeah** 23:21 29:10
32:18 36:24 37:24
87:2,21 88:3 98:6
106:8 109:2
110:19 124:16
137:3 148:6,17
151:4 153:12
155:9 168:13
175:18 181:13
182:25 183:9,11
208:8 216:21
218:23 221:18
228:21 236:2,4
238:7 244:4
245:12 248:23
256:9,10 262:12
278:11 282:14
290:20 298:6,22
311:8,13 318:3
335:12,12,23
336:11 339:4
342:4,7 345:3
346:12 347:7,15
347:19 348:12,17
357:24 389:2
400:6 402:11
404:5 421:22
442:24 443:13
453:1
**year** 49:12 68:23
94:19 111:20,23

115:22 146:10
148:1,10 161:20
196:22 213:18
222:21 223:14,14
244:14 259:12
278:9 334:12
394:13
**years** 20:5,14,20
20:21 25:5 30:24
49:23 51:23 59:14
71:21 72:1 73:1
80:17 90:15 91:14
92:2 137:19
145:22 177:18
186:9 223:14,18
224:16 225:16
246:15 253:14,20
349:18 405:16
408:6 413:16
**yellow** 379:4
**yep** 178:5 183:13
347:24
**youngstown** 21:22
**youth** 198:8

| z |
| --- |

**zach** 15:23
**zachary** 3:4
**zachary.adams**
3:6
**zero** 66:22
**zip** 175:1
**zone** 290:15
307:11
**zoo** 91:23

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.