UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL )
PRESCRIPTION ) MDL No. 2804
OPIATE LITIGATION )
_____ ) Case No.
) 1:17-MD-2804
)
THIS DOCUMENT RELATES ) Hon. Dan A.
TO ALL CASES ) Polster

FRIDAY, OCTOBER 26, 2018

HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW
– – –

Videotaped deposition of Stephan
Kaufhold, held at the offices of LIEFF
CABRASER HEIMANN & BERNSTEIN, LLP, 250 Hudson
Street, 8th Floor, New York, New York,
commencing at 12:03 p.m., on the above date,
before Carrie A. Campbell, Registered
Diplomate Reporter and Certified Realtime
Reporter.

– – –

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

1
2     A P P E A R A N C E S :
3     ROBBINS GELLER RUDMAN & DOWD LLP
      BY: MATTHEW S. MELAMED, ESQUIRE
4        mmelamed@rgrdlaw.com
         DORY P. ANTULLIS, ESQUIRE
5        dantullis@rgrdlaw.com
      1 Montgomery Street, Suite 1800
6     San Francisco, California 94104
      (415) 393-1500
7     Counsel for Plaintiffs
8
9     WILLIAMS & CONNOLLY LLP
      BY: ANDREW C. MCBRIDE, ESQUIRE
10       amcbride@wc.com
         725 Twelfth Street, N.W.
11    Washington, DC 20005
      (202) 434-5331
12    Counsel for Cardinal Health, Inc
13
14    REED SMITH LLP
      BY: SAMANTHA L. ROCCHINO, ESQUIRE
15       srocchino@reedsmith.com
      Three Logan Square
16    1717 Arch Street, Suite 3100
      Philadelphia, Pennsylvania 19103
17    (215) 851-8100
      Counsel for AmerisourceBergen
18
19
20    JONES DAY
      BY: EDWARD M. CARTER, ESQUIRE
21       emcarter@jonesday.com
      325 John H. McConnell Boulevard
22    Suite 600
      Columbus, Ohio 43215-2673
23    (614) 469-3939
      Counsel for Walmart
24
25

1     PELINI, CAMPBELL & WILLIAMS LLC
      BY: PAUL B. RICARD, ESQUIRE
2        pbricard@pelini-law.com
      8040 Cleveland Avenue NW, Suite 400
3     North Canton, Ohio 44720
      (330) 305-6400
4     Counsel for Prescription Supply,
      Inc
5
6
7     ROPES & GRAY, LLP
      BY: MAX R. MAEROWITZ, ESQUIRE
8        Max.Maerowitz@ropesgray.com
         (VIA TELECONFERENCE)
      800 Boylston Street
9     Boston, Massachusetts 02199-3600
      (617) 951-7000
10    Counsel for Mallinckrodt
11
12    MARCUS & SHAPIRA LLP
      BY: DARLENE M. NOWAK, ESQUIRE
13       nowak@marcus-shapira.com
         (VIA TELECONFERENCE)
14    One Oxford Centre, 35th Floor
      Pittsburgh, Pennsylvania 15219-6401
15    (412) 338-4690
      Counsel for HBC
16
17
18    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY: JOANNA PERSIO, ESQUIRE
19       joanna.persio@arnoldporter.com
      601 Massachusetts Avenue, NW
20    Washington, DC 20001-3743
      (202) 942-5000
21    Counsel for Endo Pharmaceuticals
      Inc., and Endo Health Solutions Inc
22
23
24
25

1     MORGAN, LEWIS & BOCKIUS LLP
      BY: EVAN K. JACOBS, ESQUIRE
2        evan.jacobs@morganlewis.com
      1701 Market Street
3     Philadelphia, Pennsylvania 19103
      (215) 963-5000
4     Counsel for Teva Pharmaceuticals
      USA, Inc., Cephalon, Inc., Watson
5     Laboratories, Inc., Actavis LLC,
      Actavis Pharma, Inc., f/k/a Watson
6     Pharma, Inc
7
8     KIRKLAND & ELLIS, LLP
      BY: JENNIFER LEVY, ESQUIRE
9     655 15th Street, NW, Suite 1200
      Washington, DC 20005
10    (202) 879-5000
11    and
12    BY: MICHAEL LEFEVOUR, ESQUIRE
         michael.lefevour@kirkland.com
13    300 North LaSalle
      Chicago, Illinois 60654
14    (312) 862-2000
      Counsel for Allergan Finance, LLC
15
16
17    COVINGTON & BURLING LLP
      BY: GABRIEL FULMER, ESQUIRE
18       (VIA TELECONFERENCE)
      850 Tenth Street, NW
19    Washington, DC 20001-4956
      (202) 662-6000
20    Counsel for McKesson Corporation
21
22    VIDEOGRAPHER:
         HENRY MARTE,
23       Golkow Litigation Services

24       – – –
25

INDEX

PAGE

APPEARANCES.................................. 2

EXAMINATIONS
BY MR. MELAMED............................ 10
BY MS. LEVY................................ 159

EXHIBITS
No.     Description                Page

Allergan     Second Amended Notice of     14
Kaufhold 1    Deposition Pursuant to Rule
30(b)(6) and Document
Request Pursuant to Rule
30(b)(6) and Rule 34 to
Defendants Allergan PLC
f/k/a Actavis PLC; Allergan
Finance LLC, f/k/a Actavis,
Inc., f/k/a Watson
Pharmaceuticals, Inc.;
Watson Laboratories, Inc.;
Actavis LLC; Actavis Pharma,
Inc. F/k/a Watson
Laboratories, Inc.; Actavis
LLC; Actavis Pharma, Inc.
F/k/a Watson Pharma, Inc ;
Allergan Pharmaceuticals,
Inc.; and Allergan Health
Solutions, Inc.

Allergan     October 5, 2018 Robbins      16
Kaufhold 2    Geller letter to Special
Master Cohen

Allergan     Documents brought by the      20
Kaufhold 3    witness to the deposition

Allergan     Exhibit 10.66 Execution       27
Kaufhold 4    Version, Settlement
Agreement and Mutual
Releases

Allergan     SEC Form 10-K for Watson      36
Kaufhold 5    Pharmaceuticals, Inc , for
the fiscal year ended
December 31, 2001

Allergan     SEC Form 10-K for the fiscal   45
Kaufhold 6    year ended December 31,
2005, for Watson
Pharmaceuticals, Inc

Allergan     SEC Form 10-K for Actavis,     54
Kaufhold 7    Inc , for the fiscal year
ended December 31, 2012

Allergan     Organizational/merger chart    57
Kaufhold 8    of Actavis Group, et cetera

Allergan     Letter from the Department     58
Kaufhold 9    of Health and Human Services
dated February 6, 2004, to
Amide Pharmaceutical

Allergan     Allergan PLC and its          60
Kaufhold 10   subsidiaries at August 2,
2016 "Legacy Watson, Warner
Chilcott US, Durata,"
ALLERGAN_MDL_03674502 -
ALLERGAN_MDL_03674506

Allergan     Form 10-K for Actavis PLC      74
Kaufhold 11   for the year ended 2013

Allergan     Fiscal year 2014 Form 10-K     88
Kaufhold 12   for Actavis PLC

Allergan     2015 Form 10-K for Allergan    92
Kaufhold 13   PLC

Allergan     Form 10-K for the fiscal      105
Kaufhold 14   year ended 2017 for Allergan
PLC

Allergan     Article from Fortune          111
Kaufhold 15   magazine dated May 21, 2013,
titled "Actavis, the latest
Fortune 500 Company to
'leave' the US for tax
reasons"

Allergan     Website printout of the       117
Kaufhold 16   current executive leadership
of Allergan PLC

Allergan     E-mail(s),                    144
Kaufhold 17   ALLERGAN_MDL_01335569 -
ALLERGAN_MDL_01335570

Allergan     E-mail(s),                    146
Kaufhold 18   ALLERGAN_MDL_01334578 -
ALLERGAN_MDL_01334579

Allergan     E-mail(s),                    148
Kaufhold 19   ALLERGAN_MDL_01334588 -
ALLERGAN_MDL_01334589

Allergan     E-mail(s),                    150
Kaufhold 20   ALLERGAN_MDL_01489486 -
ALLERGAN_MDL_01489488

Allergan     E-mail(s),                    153
Kaufhold 21   ALLERGAN_MDL_02024980 -
ALLERGAN_MDL_02024982

(Exhibits attached to the deposition.)

```
 1          VIDEOGRAPHER:  We are now on
 2    the record.
 3          My name is Henry Marte.  I'm a
 4    videographer with Golkow Litigation
 5    Services.
 6          Today's date is October 26,
 7    2018, and the time is 12:03 p.m.
 8          This videotaped deposition is
 9    being held at 250 Hudson Street,
10    New York, New York, in the matter of
11    prescription opiate litigation.
12          The deponent today is Stephan
13    Kaufhold.
14          Everybody please introduce
15    themselves for the record.
16          MR. MELAMED:  Matthew Melamed,
17    Robbins Geller Rudman & Dowd, for the
18    plaintiffs.
19          MS. ANTULLIS:  Dory Antullis,
20    Robbins Geller Rudman & Dowd, for the
21    plaintiffs.
22          MR. CARTER:  Ed Carter, Jones
23    Day, for Walmart.
24          MS. PERSIO:  Joanna Persio,
25    Arnold & Porter, for the Endo
```

1 defendants and the Par defendants.
2     MR. RICARD: Paul Ricard,
3 Prescription Supply, Inc.
4     MR. MCBRIDE: Andrew McBride,
5 Williams & Connolly, for Cardinal.
6     MR. JACOBS: Evan Jacobs,
7 Morgan Lewis, for Teva
8 Pharmaceuticals, USA, Cephalon, Inc.,
9 Actavis Pharma, Inc., Actavis, LLC,
10 and Watson Laboratories, Inc.
11     MR. LEFEVOUR: Michael LeFevour
12 from Kirkland & Ellis on behalf of the
13 Allergan.
14     MS. LEVY: Jennifer Levy from
15 Kirkland and Ellis on behalf of the
16 Allergan defendants.
17     THE WITNESS: Steve Kaufhold
18 with Allergan.
19     VIDEOGRAPHER: Okay. And the
20 people on the phone, please?
21     MR. PALMER: Andrew Palmer on
22 behalf of McKesson.
23     MR. MAEROWITZ: Max Maerowitz
24 on behalf of Mallinckrodt, LLC.
25     MS. NOWAK: Darlene Nowak on

1 behalf of HBC Services.
2     MS. ROCCHINO: Samantha
3 Rocchino on behalf of
4 AmerisourceBergen Drug Corporation.
5     VIDEOGRAPHER: Okay. Will the
6 court reporter please administer the
7 oath to the witness?
8
9     STEPHAN KAUFHOLD,
10 of lawful age, having been first duly sworn
11 to tell the truth, the whole truth and
12 nothing but the truth, deposes and says on
13 behalf of the Plaintiffs, as follows:
14
15     DIRECT EXAMINATION
16 QUESTIONS BY MR. MELAMED:
17     Q. Good afternoon.
18     A. Good afternoon.
19     Q. My name is Matt Melamed. I'm
20 from Robbins Geller, and I represent the
21 plaintiffs in this matter.
22     Can you state your full name,
23 your home address and your work address for
24 the record, please?
25     A. Absolutely.

1     My name's Stephan Kaufhold.
2 I'm senior vice president, treasurer of
3 Allergan.
4
5
6
7
8     Q. My job today is to ask clear
9 questions. If the question I ask is unclear,
10 please let me know.
11     A. Sure.
12     Q. Please answer audibly, as you
13 are doing. Please avoid shaking your head or
14 nodding for a no or yes respectively.
15     Okay?
16     A. Understood.
17     Q. And similarly, please answer
18 with easily transcribable words such as yes
19 or no and not uh-huh or huh-uh.
20     Okay?
21     A. Yes.
22     Q. Have you been deposed before?
23     A. I have.
24     Q. So you're generally familiar
25 with the process?

1     A. I am.
2     Q. You understand that you've been
3 designated by a corporation to speak on
4 behalf of that corporation in your testimony
5 today, correct?
6     A. That is correct.
7     Q. What is the name of the entity
8 that designated you to testify on its behalf?
9     A. It would be Allergan PLC.
10     Q. And you are currently an
11 employee of Allergan PLC; is that correct?
12     A. That is not correct.
13     Q. Who are you currently employed
14 by?
15     A. I'm employed by Allergan Sales,
16 LLC.
17     Q. What is Allergan Sales, LLC's,
18 relationship to Allergan PLC?
19     A. It is an indirect subsidiary.
20     Q. Can you please tell me your
21 educational and employment history from --
22 starting from college and going through to
23 present?
24     A. Absolutely.
25     Undergraduate degree from

1    Loyola College, which is now Loyola
2    University, in Baltimore, Maryland; business
3    administration, BA, concentration economics,
4    finance.
5        I also have a BS in accounting
6    from St. Peters College.
7        Graduate degree, MBA, in
8    corporate finance from Fairleigh Dickinson,
9    and I've done some postgraduate work at
10   Columbia University.
11       From an employment perspective,
12   since graduating college, if you want to go
13   that far back, first job was with Security
14   Pacific Finance Corp., which was consumer
15   lending.
16       I then worked for Chase
17   Manhattan Leasing as a credit analyst. That
18   was then -- that operation was bought by AT&T
19   Credit Corporation financing telephone sets.
20       We were then sold to Nomura
21   Securities PLC, followed by a sale to
22   Newcourt Credit.
23       We were then bought by CIT.
24       CIT was sold to Tyco; we went
25   public again.

1        I left in 2004 to be the
2    treasurer of Virgin Mobile USA, which was a
3    prepaid wireless carrier. I was there for
4    five and a half years.
5        Left in March of 2010 and
6    joined Watson Pharmaceuticals in April of
7    2010.
8        Q.   Watson Pharmaceuticals, Inc.?
9        A.   Watson Pharmaceuticals. I'm
10   not sure exactly who my employer was of which
11   of the subsidiaries, but it was Watson
12   Pharmaceuticals, a US generic company.
13       And I've been the treasurer
14   through the -- the transition of the business
15   to where it is today.
16       (Allergan-Kaufhold Exhibit 1
17   marked for identification.)
18   QUESTIONS BY MR. MELAMED:
19       Q.   I'm going to hand you what's
20   been marked Exhibit Number 1.
21       Exhibit Number 1 is titled "The
22   Second Amended Notice of Deposition Pursuant
23   to Rule 30(b)(6) and Document Request
24   Pursuant to Rule 30 B(2) and Rule 34 to
25   Defendants Allergan PLC, formerly known as

1    Actavis PLC; Allergan Finance, LLC, formerly
2    known as Actavis, Incorporated, formerly
3    known as Watson Pharmaceuticals,
4    Incorporated; Watson Laboratories,
5    Incorporated; Actavis LLC; Actavis Pharma,
6    Inc., formerly known as Watson Pharma, Inc.;
7    Allergan Pharmaceuticals, Inc.; and Allergan
8    Health Solutions, Inc."
9        Have you seen this document
10   before?
11       A.   I have seen this document.
12       Q.   Okay. And you recognize that
13   on page 1 of the document you have been
14   designated to testify on Topic 43 of the
15   30(b)(6) topics, correct?
16       A.   That is correct.
17       Q.   And if you turn to page 16 in
18   the document, you see that Topic 43 states,
19   "To the extent not encompassed within the
20   other topics, your marketing, promotion,
21   sales, distribution, diversion and suspicious
22   order monitoring compliance,
23   pharmacovigilance concerning your generic
24   opioid products."
25       A.   I see that, yes.

1        Q.   Are you prepared to testify on
2    those topics today?
3        MS. LEVY:  Objection. As you
4        well know, he is prepared to testify
5        on three specific subtopics of that
6        topic that we subsequently negotiated
7        after the fact.
8    QUESTIONS BY MR. MELAMED:
9        Q.   Are you prepared to testify
10   about the topics in number 43 today?
11       A.   I am not.
12       (Allergan-Kaufhold Exhibit 2
13   marked for identification.)
14   QUESTIONS BY MR. MELAMED:
15       Q.   I'm going to hand you what's
16   been marked Exhibit Number 2.
17       Exhibit Number 2 is an
18   October 5th letter from Aelish Baig to
19   Special Master Cohen.
20       And if you -- I would like you
21   to just turn to page 3 of this letter.
22       Do you see the three bullet
23   points and the paragraph preceding those
24   three bullet points?
25       A.   Yes.

1    Q.    Those three bullet points
2    define a scope of the -- what's referred to
3    as the first Allergan 30(b)(6) deposition.
4          Do you see that?
5    A.    Yes.
6    Q.    Are you prepared to testify
7    about those subjects today?
8    A.    I am.
9    Q.    You can put that aside.
10   A.    Okay.
11   Q.    What did you do to prepare to
12   testify on those topics today?
13   A.    Sure.
14         Working with counsel and at my
15   direction we went through corporation files.
16   I also went through what I had in regard to
17   corporate structures and also have had
18   conversations with folks internally,
19   specifically within the tax group, who
20   manages the corporate structure.
21   Q.    Did you review any documents in
22   preparation for today?
23   A.    I have, yes.
24   Q.    Approximately how many?
25   A.    I would say probably about --

1    in the neighborhood of 25 or so.
2    Q.    Did those documents refresh
3    your recollection as to the items you're --
4    the subject of your testimony today?
5    A.    Yes.
6    Q.    Are those the documents that
7    you brought with you, that your counsel
8    handed me before the deposition started
9    today?
10   A.    That is correct.
11   Q.    And is that the sum total of
12   the documents that you reviewed in
13   preparation for today's deposition?
14   A.    I've also reviewed other
15   documents such as -- which was public
16   information, such as 10-Ks, 10-Qs and the
17   master purchase agreement that Teva and
18   Allergan PLC signed on the sale of the
19   generic business.
20   Q.    Any documents that were not
21   publicly available, other than those --
22   A.    No.
23   Q.    -- that you brought with you
24   today?
25         Who prepared the documents that

1    you brought with you today?
2    A.    It's counsel at my direction.
3    I've also provided them some of the documents
4    as well, too.
5          MR. MELAMED:  I'll represent to
6    counsel that I haven't taken anything
7    out or put anything into this folder.
8    QUESTIONS BY MR. MELAMED:
9    Q.    But this -- the folder that I'm
10   holding right now appears to be the
11   documents.
12   A.    That is correct.
13   Q.    Not -- I'll let you flip
14   through that, if you want, before you answer.
15         MS. LEVY:  We can stipulate
16   that it's the right set.
17         MR. MELAMED:  Okay.
18         So I'll just mention for the
19   record it appears to be more than 25
20   pages.
21   QUESTIONS BY MR. MELAMED:
22   Q.    I don't know if you mentioned
23   25 documents or 25 pages earlier.
24   A.    The question, I believe, how
25   many documents, not pages.

1    Q.    Fair enough.
2          So approximately 25 documents?
3    A.    Documents.
4    Q.    Reflecting about how many
5    pages, would you estimate?
6    A.    It would -- I would think it
7    would have to be somewhere between 6 and 750
8    pages, considering the purchase agreement is
9    fairly numerous.  When you look at our 10-Ks,
10   our 10-Ks are probably about 200 pages.
11   Q.    I'm just talking about the
12   doc -- I'm sorry.  To be clear, I'm just
13   talking about the documents that are in the
14   folder that was handed to me before the
15   deposition started.
16         MS. LEVY:  You're asking him to
17   guess how many pages --
18         MR. MELAMED:  Just an estimate.
19         THE WITNESS:  It looks like it
20   could be somewhere between 200 and
21   250.
22         (Allergan-Kaufhold Exhibit 3
23   marked for identification.)
24   QUESTIONS BY MR. MELAMED:
25   Q.    Okay.  I'm going to mark these

1 as Exhibit 3. It's just the folder. I'm
2 going to have all of these collectively put
3 in as an exhibit. During a break I'll have
4 them copied so I can have a copy of them.
5     MS. LEVY: We have copies, if
6 you need copies.
7     MR. MELAMED: Fantastic. I
8 would like a copy, please.
9 QUESTIONS BY MR. MELAMED:
10    Q.    As I expressed in letters to
11 Ms. Levy prior to the deposition, it's
12 unclear to me why this information couldn't
13 have been provided before, particularly given
14 the limitations on time established by the
15 special master for 30(b)(6) testimony in this
16 action.
17        I am not going to have -- I'm
18 going to tell you right now that there's not
19 a chance that I'm going to have the time to
20 review these documents, understand what's in
21 them. We may touch on certain of the subject
22 matters, but I'm not going to be able to do
23 that today during the deposition.
24        And as a result, I'm going to
25 reserve our right to call you back after I've

1 had a chance to look through those and ask
2 Special Master Cohen and, if necessary, Judge
3 Polster for the right to do so because of
4 these late-produced documents.
5        Did you talk to anybody at
6 Allergan or any Allergan-related entity in
7 preparation for your testimony today?
8    A.    I have spoken to some people
9 within the company, yes.
10    Q.    Who have you spoken to?
11    A.    Members of our tax group.
12    Q.    Which members of your tax
13 group?
14    A.    Marty Shindler, Carina
15 Sinclair.
16    Q.    Why did you speak to members of
17 the tax group?
18    A.    Carina is the one who tracks
19 and maintains the corporate structure slides
20 that we've provided, and in regard to the
21 ANDAs and the transfers of IP, I spoke to
22 Marty Shindler as well.
23    Q.    Is Marty Shindler also in the
24 tax group?
25    A.    Yes, he is.

1    Q.    And what tax -- what entity's
2 tax group do these people work for?
3        What is the name of the
4 corporation they work for?
5    A.    They work for Allergan Sales,
6 LLC.
7    Q.    Does Allergan PLC maintain its
8 own tax group separate and distinct from
9 Allergan Sales, LLC?
10    A.    Does not.
11    Q.    And you mentioned you spoke to
12 outside counsel in preparation for today's
13 deposition, correct?
14    A.    That's correct.
15    Q.    About how many times did you
16 speak with outside -- let -- let me withdraw
17 that.
18        About how many hours total did
19 you speak with outside counsel in preparation
20 for the deposition?
21    A.    Probably somewhere between 15
22 and 20 hours.
23    Q.    Over what period of time did
24 those 15 to 20 hours occur? For example, was
25 that during the last week? Was it over the

1 last month?
2    A.    It was over the last -- I would
3 say over the last week.
4    Q.    Did you speak with anybody
5 aside from colleagues at Allergan entities
6 and outside counsel in preparation for
7 today's deposition?
8    A.    I have not.
9    Q.    Did you speak to anybody at
10 Teva Pharmaceuticals in preparation for
11 today's deposition?
12    A.    I have not.
13    Q.    You're aware that some of the
14 subject matter covered by today's deposition
15 concerns generic opioids that were sold by
16 Allergan PLC to Teva, correct?
17    A.    Could you rephrase that,
18 please?
19    Q.    One of the subjects we're going
20 to talk about today is generic opioids,
21 correct?
22    A.    That is correct.
23    Q.    And the generic opioids were
24 sold by Allergan PLC, correct?
25    A.    Allergan PLC was the party to

1  the sale agreement.
2      Q.    And the party to which the
3  generic opioids were transferred under that
4  sale agreement was a Teva-related entity,
5  correct?
6      A.    It was sold to a Teva-related
7  entity, yes.
8      Q.    And that was completed in 2016,
9  right?
10     A.    It closed in August of 2016.
11     Q.    And Teva and Allergan PLC
12 executed an agreement earlier this year
13 concerning defense of claims asserted in this
14 and similar cases, correct?
15     A.    That is not correct.
16     Q.    Okay.  What -- are you aware of
17 an agreement executed this year between Teva
18 and Allergan PLC concerning the cases in the
19 MDL and other like -- similar cases?
20     A.    That is not -- that is not
21 correct.
22     Q.    Are you aware of any agreements
23 signed this year between Teva and --
24     A.    I am.
25     Q.    Okay.  What was the subject

1  matter of that?
2      A.    In January of 2018, as -- what
3  is typical for any type of M&A, especially of
4  this size, there is a true-up in regard to
5  the accounts and a working capital adjustment
6  is made.  Either the buyer has to make a
7  payment to the seller or the seller has to
8  make a payment to the buyer -- or to --
9  seller to the buyer or the buyer to the
10 seller after we go through the accounts and
11 true-up all the accounts.
12           So there was an agreement, and
13 then there was also consideration paid,
14 approximately $700 million, to settle the
15 working capital.
16     Q.    Was there an indemnification
17 agreement signed between Teva and Allergan
18 PLC?
19     A.    There were indemnification
20 provisions within the purchase agreement.
21     Q.    Are you aware of an
22 indemnification agreement signed in 2018
23 between Teva and Allergan?
24     A.    Not separate from what the --
25 of the agreement that I described, other than

1  that agreement restated those indemnification
2  provisions that were part of the August
3  close.
4           (Allergan-Kaufhold Exhibit 4
5      marked for identification.)
6  QUESTIONS BY MR. MELAMED:
7      Q.    Okay.  I'm going to hand you
8  what's been marked as Exhibit 4.
9      A.    Uh-huh.
10     Q.    Exhibit 4 is titled
11 "Exhibit 10.66 Execution Version, Settlement
12 Agreement and Mutual Releases."
13           Do you see that?
14     A.    Yes.
15     Q.    And you see that this is an
16 agreement executed January 31, 2018, or has
17 an effective date of January 31, 2018.  It's
18 between Teva Pharmaceutical Industries,
19 Limited, and Allergan PLC, correct?
20     A.    That is fair.
21     Q.    If you turn to page 3.  And you
22 see that page 3 contains Item Number 4, which
23 is agreed liabilities and indemnification,
24 third-party claim indemnification procedures?
25     A.    Yes.

1      Q.    Are you aware that this case
2  concerns one of the -- a scenario that would
3  trigger these indemnification procedures?
4      MS. LEVY:  Objection.  Calls
5      for a legal conclusion.
6  QUESTIONS BY MR. MELAMED:
7      Q.    Do you know?
8      A.    I don't.
9      Q.    Okay.  If you look -- it's very
10 small type, and I apologize for that.
11     A.    No.
12     Q.    If you look approximately
13 two-thirds of the way down, there is a little
14 Roman Numeral II on the left column.
15           Do you see that?
16     A.    Yes.
17     Q.    Okay.  If you go back a little,
18 it says that -- the sentence starts prior to
19 that:  "In the case of third-party claims
20 that involve both, one, branded opioid drugs
21 of the retained business that are not
22 products and, two, generic opioid drugs that
23 are products, the parties shall, X, each be
24 responsible for the defense of such
25 third-party claim in accordance with the

1    immediate prior sentence and, Y, cooperate
2    with each other to enable the proper and
3    adequate defense of such third-party claim."
4         Do you see that?
5         A.    Yes, I do.
6         Q.    And your testimony is that you
7    did not cooperate with, nor did Teva
8    cooperate, with you in preparing for this
9    deposition today; is that correct?
10        A.    I did not have a conversation
11   with them, no.
12        Q.    Do you have any reason why?
13        A.    Reason why I --
14        Q.    Yeah.  Why didn't you talk to
15   Teva before?
16        A.    I haven't spoken to them
17   because my understanding is the liabilities
18   transferred to Teva.  Teva owns the entities
19   in question, Actavis, and the records have
20   been transferred to the company.  So I don't
21   have access to those files.
22        Q.    You're aware that Allergan PLC
23   was named as a defendant in a case brought in
24   the Northern District of Illinois that was
25   subsequently transferred to the MDL, correct?

1         A.    I am not.
2         Q.    Okay.  I represent to you that
3    it has been.
4         A.    Okay.  Understood.
5         Q.    Actually, it was filed in 2014.
6         Are you aware that in 2015, the
7    court in that case held that Allergan PLC --
8    that it had jurisdiction to hear the claims
9    over Allergan PLC.
10        Are you aware of that?
11        A.    I am not.
12        Q.    Okay.  Do you know if
13   Allergan PLC instituted a litigation hold in
14   response to the filing of that case or in
15   response to the opinion in 2015 upholding it
16   as a defendant?
17        A.    I am not.
18        Q.    Can you list each opioid from
19   1995 to present that any Allergan entities,
20   parents -- I'm sorry.  And by "Allergan
21   entities" I just want to be clear, Allergan
22   Finance, LLC, Allergan PLC, any and all
23   subsidiaries, parents, predecessors,
24   successors and/or associated entities
25   resulting -- resulting from any and all

1    mergers over the years since 1995.
2         Can you list each opioid that
3    any of those entities have licensed,
4    manufactured, marketed, sold, distributed or
5    had any other involvement with?
6         A.    Yes.
7         Q.    Okay.  What are they?
8         A.    Okay.  What I could do is refer
9    to the documents that we gave you today.
10        Q.    Uh-huh.
11        A.    Underneath 43.1, towards the
12   bottom of the first page, we have involvement
13   with opioids.  And what we've done here, just
14   to make it easy for everyone, we've kind of
15   broken this down to the opioids associated to
16   the transferred entities as well as what are
17   the branded that have been retained by
18   Allergan.
19        So first item -- or the first
20   entity on the bottom that you see here is
21   Watson Laboratories, comma, Inc., and then
22   you see underneath that the ANDA or the NDAs,
23   if it is applicable, for each of the opioid
24   product.
25        Number 2 is Actavis

1    Laboratories Florida, f/k/a, formerly known
2    as, Watson Laboratories, Inc., those related
3    products.
4         Page 3 you'll see Actavis
5    Totowa, LLC; Actavis Elizabeth, LLC; Actavis,
6    Midatlantic, LLC; Actavis Laboratories Utah,
7    Inc., formerly known as Watson Laboratories,
8    Inc., Salt Lake City.  And on top of page 4,
9    Item 7, is Actavis South Atlantic, LLC.
10        Remaining Allergan entities.
11   So these are the products that are retained
12   by Allergan today, is Kadian -- and we've
13   out-listed here the history of that product
14   and the transfer of that product.  When
15   Actavis legacy was the contract manufacturer
16   for Alpharma, bought the product in 2008,
17   being manufactured at Actavis Elizabeth's
18   manufacturing facility, where it is still
19   manufactured today.
20        And then on page 5, we go into
21   Norco, which was the Watson-related product.
22        Q.    So in your response and in the
23   chart you prepared, for each of the drugs
24   under involvement with opioids, you have
25   listed which entity was listed as the ANDA or

1  NDA holder, correct?
2      A.  That is correct.
3      Q.   Have you listed which entities
4  had other involvement with the drugs that --
5  with those drugs?  Any other involvement?
6      A.   These are all the companies and
7  products.
8      Q.   Have -- so to take an example,
9  on page 3 there's Actavis Totowa --
10          Is that the correct --
11     A.  That is correct.
12     Q.   -- pronunciation?
13          -- LLC is number 3, and the
14  first drug is listed oxycodone acetaminophen.
15     A.   That's correct.
16     Q.   And you provide the ANDA
17  numbers.
18          Did any other entity other than
19  Actavis Totowa book any revenues from sales
20  of that drug?
21     A.   Just to be clear on sales,
22  Actavis Totowa, LLC, is the ANDA holder of
23  that product.  That does not necessarily mean
24  they're the manufacturer, and they're
25  certainly not the sales entity.

1      Q.   Okay.  That was why I was
2  asking the prior question, which is -- and
3  I'll ask it again.
4      A.   Sure.
5      Q.   Did any corporations, other
6  than those listed here, have anything to do
7  with the drugs listed below those
8  corporations?
9      A.   Yes.  And what I would like to
10  submit as part of the folder is kind of a
11  chronological order broken down between who
12  holds the IP, who is the manufacturer and who
13  is the entity that sold the products.  It's a
14  one-pager.
15     Q.   Is the -- the page up on the
16  screen --
17     A.   That is correct.
18     Q.   -- reflect part of the
19  one-pager?
20     A.   That is correct.
21     Q.   Okay.  And you've done that for
22  Norco and Kadian?
23     A.   That is correct.
24     Q.   What about for each of the
25  other drugs listed in 43.1, the exhibit

1  you -- that was -- either you created or was
2  created for you that you brought today?
3      A.   Sure.
4          So in regard to the time when
5  Watson acquired Actavis legacy, okay, the
6  sales entity that we would have used, all our
7  sales went through Watson Pharma, Inc., which
8  is currently known as Allergan USA, Inc.,
9  today.
10     Q.   And when the sales went through
11  Watson Pharma, Inc. --
12     A.   Yes.
13     Q.   -- what entity booked revenue
14  from those sales?
15     A.   Would have been Watson Pharma,
16  Inc.
17     Q.   Not Watson Pharmaceuticals?
18     A.   No.
19     Q.   What entity would have spent
20  money on research, development, marketing,
21  cost of sales for those drugs?
22     A.   I don't know the specific
23  entities.
24     Q.   I forgot to mention this
25  before.  If you want to take a break, as long

1  as it's not in the middle of any line of
2  questioning, I'll be happy to give you that.
3      A.   I appreciate that.
4          (Allergan-Kaufhold Exhibit 5
5      marked for identification.)
6  QUESTIONS BY MR. MELAMED:
7      Q.   I'm handing you what's been
8  marked as Exhibit 5, and don't worry, I'm not
9  going to ask you to go through the entire
10  document.
11     A.   I appreciate that.
12     Q.   Exhibit 5 is the SEC Form 10-K
13  for Watson Pharmaceuticals, Inc., for the
14  fiscal year ended December 31, 2001.
15     A.   I see it.
16     Q.   If you turn to page 6, please.
17  And the page numbers are -- I'm referring to
18  the small pagination in the center of the
19  bottom of the page.
20     A.   (Witness complies.)
21     Q.   And do you see the list of
22  Watson-branded products near the top of
23  page 6?
24     A.   Yes.
25     Q.   And you see that there are two

1 opioid-related products there?
2     A.   Yes.
3     Q.   Maxidone and Norco?
4     A.   I do.
5     Q.   Okay. Do you see that the --
6 the sentence prior to that says, "We
7 currently market a total of 20 branded
8 product lines that we classify as general and
9 pain management products, including the
10 following"?
11     A.   Yes.
12     Q.   Who is "we" in that sentence?
13     A.   It refers to Watson
14 Pharmaceutical, comma, Inc., and its indirect
15 and direct subsidiaries.
16     Q.   So Watson Pharmaceuticals,
17 comma, Inc., is reporting to the SEC and to
18 its investors that it, Watson
19 Pharmaceuticals, comma, Inc., and some of its
20 subsidiaries market Maxidone and Norco as of
21 the fiscal -- end of fiscal year 2001?
22     MS. LEVY: Objection.
23     You can answer.
24     THE WITNESS: Okay. This is a
25 consolidated financial, so it is a

1 collection of companies reporting up
2 into the consolidated entity of Watson
3 Pharmaceuticals, comma, Inc.
4 QUESTIONS BY MR. MELAMED:
5     Q.   And that consolidated entity in
6 its financial statements records revenues
7 generated from the sales of those two drugs,
8 correct?
9     A.   "That entity," could you
10 clarify that, please?
11     Q.   Yes.
12     Watson Pharmaceuticals, Inc.,
13 the reporting entity here, reports in its
14 financials sales from -- of Norco and
15 Maxidone as of fiscal year 2001?
16     A.   On a consolidated basis.
17     Q.   And it also reports cost of
18 sales for those two drugs, among others?
19     A.   On a consolidated basis.
20     Q.   Turn to page 7. You'll see
21 that there is a similar list of off-patent
22 pharmaceutical products.
23     Do you see the list of drugs?
24     A.   Small 7 of 87?
25     Q.   Yes. No, I'm sorry, not small

1 7 of 87. It's small 8 of 87. It's page
2 number 7 in the center.
3     A.   Thanks for the clarification.
4     Yes.
5     Q.   Okay. And do you see that it
6 lists several opioids, including hydrocodone
7 bitartrate acetaminophen, two versions of
8 that, and oxycodone acetaminophen?
9     A.   I do.
10     Q.   And you see in the full
11 paragraph above that starts with "we are,"
12 the Watson Pharmaceuticals, Inc., in this
13 10-K is reporting that it develops,
14 manufactures and sales off-patent
15 pharmaceutical products?
16     A.   I do.
17     Q.   And you see that the products I
18 just identified are amongst those off-patent
19 pharmaceutical products that Watson
20 Pharmaceutical, Inc., states -- Watson
21 Pharmaceutical, Inc., states it develops,
22 manufactures and sales?
23     A.   I do.
24     Q.   And I apologize, that should
25 have been sells, not sales.

1     Turn back to page 3. Again,
2 this is the 3 in the center of the bottom of
3 the page in the overview.
4     Do you see that the first
5 paragraph states that this is Watson
6 Pharmaceutical, Inc., Watson, is primarily
7 engaged in the development, manufacture,
8 marketing and distribution of patent and
9 off-patent generic pharmaceutical products?
10     A.   I see that.
11     Q.   And you see that "we" is the
12 first word in the next sentence?
13     A.   Yes.
14     Q.   Who is that "we" referring to
15 in this sentence?
16     A.   It is referring to Watson
17 Pharmaceuticals and its indirect and direct
18 subsidiaries.
19     Q.   Where does it say that?
20     A.   It doesn't.
21     Q.   Okay. If you were to read this
22 as somebody reading plain English, who would
23 the "we" refer to?
24     MS. LEVY: Objection to that
25 question.

1    You can answer it.
2    THE WITNESS:  Again, with this
3  document taking its context as being a
4  consolidated financial, again, from a
5  layman's perspective it's reporting on
6  a group of entities.
7  QUESTIONS BY MR. MELAMED:
8    Q.    Where does it define that group
9  of entities in this document?
10    MS. LEVY:  Objection.  You're
11  going to have to let the witness read
12  the document if you want him to answer
13  about its contents.
14  QUESTIONS BY MR. MELAMED:
15    Q.   Do you know as you -- you -- before
16  you -- before flipping through it, and I'm
17  not -- this isn't a gotcha.
18    A.    Sure.
19    Q.    If you come back and find it
20  later, that's cool.
21    Do you know as you sit here
22  right now if this document defines the
23  related entities, the consolidated entities
24  that --
25    A.    I don't know that.

1    Q.    Okay.  If you identify it at a
2  later point, I'm happy to -- you know, please
3  clarify your testimony.
4    A.    Sure.
5    Q.    I'm not going to hold you to
6  the guess if you're able to identify them.
7    Which of the Allergan-related
8  entities -- and when I use that today, I'm
9  trying -- please ask me if I'm not being
10  clear --
11    A.    Sure.
12    Q.    -- but I'm trying to refer to
13  all of the predecessors, successors,
14  subsidiaries, 1995 on, all the companies that
15  have been rolled up --
16    A.    Understood.
17    Q.    -- and potentially later sold.
18    Which made contributions on its
19  behalf or its parent's behalf or a
20  subsidiary's behalf to federal politicians to
21  lobby?
22    A.    I don't know.
23    Q.    Which actually engaged in
24  hiring lobbyists?
25    A.    I don't have that information.

1    MS. LEVY:  Objection.  This is
2  beyond the scope of the topics he's
3  being designated on.
4  QUESTIONS BY MR. MELAMED:
5    Q.    Which participated directly in
6  lobbying?
7    MS. LEVY:  Same objection.
8    THE WITNESS:  I don't know.
9    MS. LEVY:  Beyond the scope of
10  what he is -- let me finish my
11  objection.
12    Beyond the scope of what this
13  witness is being designated on.
14  QUESTIONS BY MR. MELAMED:
15    Q.    Do you know which made payments
16  of any type?
17    And by "any type" I'm meaning
18  membership payments, sponsorship payments,
19  donation payments, to the American Pain
20  Foundation.
21    MS. LEVY:  Same objection.
22  This is -- you're welcome to spend as
23  much time as you want on this, but
24  this is beyond the scope of the three
25  topics that he is designated for.

1    MR. MELAMED:  Fair enough.  You
2  can object and then --
3    MS. LEVY:  Go ahead.
4    THE WITNESS:  I don't know.
5  QUESTIONS BY MR. MELAMED:
6    Q.    Okay.  What about American
7  Academy of Pain Medicine?
8    MS. LEVY:  Same objection.
9    THE WITNESS:  I don't know.
10  QUESTIONS BY MR. MELAMED:
11    Q.    American Pain Society?
12    MS. LEVY:  Same objection.
13    THE WITNESS:  I don't know.
14  QUESTIONS BY MR. MELAMED:
15    Q.    Federation of State Medical
16  Boards?
17    MS. LEVY:  Same objection.
18    THE WITNESS:  I don't know.
19  QUESTIONS BY MR. MELAMED:
20    Q.    Alliance for Patient Access?
21    MS. LEVY:  Objection.  Beyond
22  the scope.
23    You may answer.
24    THE WITNESS:  I don't know.
25

1    QUESTIONS BY MR. MELAMED:
2        Q.    US Pain Foundation?
3            MS. LEVY:  Same objection.
4            THE WITNESS:  I don't know.
5    QUESTIONS BY MR. MELAMED:
6        Q.    US Geriatrics Society?
7            MS. LEVY:  Same objection.
8            THE WITNESS:  I don't know.
9            (Allergan-Kaufhold Exhibit 6
10    marked for identification.)
11    QUESTIONS BY MR. MELAMED:
12        Q.    I'm handing you what's been
13    marked as Exhibit 6.
14            Exhibit 6 is a -- an SEC Form
15    10-K for the fiscal year ended December 31,
16    2005, for Watson Pharmaceuticals, Inc.
17            Turn to page -- let's see how
18    it's paginated.  Unfortunately, the
19    pagination on this one is in the middle of
20    the page.
21        A.    I see that.
22        Q.    Okay.  So it's going to be the
23    second page but is actually on the paginated
24    page 3.  So we're looking at the -- under the
25    table of contents, part 1.

1            Do you see the business
2    overview?
3        A.    I do.
4        Q.    Okay.  And you see that Watson
5    Pharmaceuticals, Inc., here is defined --
6    "we" and "us" and "our" is defined as Watson
7    Pharmaceuticals, Inc., for purposes of this
8    document, correct?
9        A.    That is correct.
10        Q.    If you just turn the page one
11    page, you see a listing of some, but not all,
12    of Watson's generic products, correct?
13        A.    Correct.
14        Q.    And amongst those there are
15    several opioids, correct?
16        A.    Correct.
17        Q.    And I see hydrocodone
18    bitartrate acetaminophen, which is comparable
19    to brand name Lorcet; hydrocodone bitartrate
20    acetaminophen, comparable to Vicodin, and
21    then the same comparable to Lortab, and then
22    the same comparable to Norco; and then
23    oxycodone acetaminophen, comparable to
24    Percocet; oxycodone HCL, comparable to
25    OxyContin, correct?

1        A.    Correct.
2        Q.    And you see that it refers --
3    above that it refers to those generic drugs
4    and others as "our portfolio of generic
5    pharmaceutical products," correct?
6        A.    Correct.
7        Q.    If you -- let's go back a page
8    under business description.
9            You see it says there,
10    "Prescription pharmaceutical products in the
11    US generally are marketed as either generic
12    or brand pharmaceuticals."  Describes what
13    generic and brand pharmaceuticals refer to,
14    and then it says, "As a result of the
15    differences between these two types of
16    products, we operate and manage our business
17    as two segments:  Generic and brand,"
18    correct?
19        A.    Correct.
20        Q.    So when we were just talking
21    about the drugs on the next page, we were
22    talking about the Watson Pharmaceuticals,
23    Incorporated, brand -- I'm sorry, generic
24    segment, correct?
25        A.    That's what it -- yes, generic

1    products, generic segment, yes.
2        Q.    If you find the bottom -- if
3    you find what's marked, paginated, with
4    page 5 in the middle of the page and then you
5    look directly below that, do you see a list
6    of Watson brand products?
7        A.    Yes.
8        Q.    Okay.  And you see that Norco
9    is listed as a Watson brand product?
10        A.    I do.
11        Q.    And you see that preceding the
12    10-K says "our," meaning Watson
13    Pharmaceuticals, Incorporated, "portfolio of
14    brand pharmaceutical products includes," and
15    then amongst the drugs it includes is Norco,
16    correct?
17        A.    Correct.
18            MS. LEVY:  Objection to the
19    form.
20            Wait for me to object before
21    you answer.
22            You can answer.
23            THE WITNESS:  Yes.
24    QUESTIONS BY MR. MELAMED:
25        Q.    And if you look at the prior

1    paragraph, it says, "Our sales and marketing
2    groups have targeted selected therapeutic
3    areas," correct?
4         A.    Yes.
5         Q.    And it is -- those selected
6    therapeutic areas are reflected in some of
7    the drugs, including Norco listed below,
8    correct?
9         A.    Yes.
10        Q.    I'm sorry to go out of order.
11   Let's go back to page 3 for a second.
12        Above the generics table, do
13   you see the header "generic pharmaceutical
14   products"?
15        A.    Yes.
16        Q.    Do you see that it's -- the
17   10-K states, "Watson is a leader in the
18   development, manufacture and sale of generic
19   pharmaceutical products," correct?
20        A.    Yes.
21        Q.    So costs associated with the
22   development, manufacture and sale of Watson
23   Pharmaceuticals, Incorporated, generic
24   opioids would be reflected on Watson
25   Pharmaceutical, Incorporated's financial

1    statements, correct?
2         A.    On a consolidated basis.
3         Q.    Similarly, revenues would be --
4    for branded opioid sales such as Norco,
5    referenced in this document, would be
6    recorded on Watson Pharmaceutical,
7    Incorporated's financial statements, correct?
8         A.    On a consolidated basis.
9         Q.    This is the fiscal year 2005
10   10-K.
11        Can you tell me which entity
12   owned the NDA for Norco at that time?  And
13   feel free to refer back to the chart.
14        A.    Sure.  I'd have to refer back
15   to the chart.
16        So in -- I'll call your
17   attention to page 5 of the --
18        Q.    Uh-huh.
19        A.    -- grid chart.  The holders of
20   the Norco ANDAs 2005 was Watson Laboratories,
21   comma, Inc.
22        Q.    Which is the entity that is the
23   reporting entity in Exhibit 6 that we've been
24   speaking about, correct?
25        A.    No.

1         Q.    What is the difference between
2    the reporting entity in Exhibit 6 and the
3    holder in 2005?
4         A.    Sure.
5         The holder of the ANDA was a
6    company called Watson Laboratories, comma,
7    Inc., which is an indirect subsidiary of the
8    top parent company of Watson Pharmaceuticals,
9    comma, Inc., whose only assets is the net
10   investment in the subsidiaries below it.
11        Q.    Understood.
12        Who were the executive officers
13   of Watson Laboratories, comma, Inc., in
14   fiscal year 2005?
15        A.    Watson Pharmaceuticals, comma,
16   Inc. --
17        Q.    Uh-huh.
18        A.    -- you're referring to?
19        We've listed those on page 10.
20   We've actually provided years when -- who
21   were the officers and who were the directors.
22        Q.    Okay.  And that's for Watson
23   Pharmaceuticals, comma, Inc.?
24        A.    Comma, Inc., that is correct.
25        Q.    What about Watson Laboratories,

1    comma, Inc.?
2         A.    Watson.
3         Bottom of page 8, top of
4    page 9, we provided here who the director,
5    officers, were as of 2012 and 2013.
6         Q.    Okay.  But not the directors as
7    of 2005; is that correct?
8         A.    That is correct.
9         Q.    And I see Watson Laboratories,
10   Inc., the list -- the name is all the way at
11   the bottom of page 8, but the actual list
12   appears complete on page 9, correct?
13        A.    That's correct.
14        Q.    Okay.  The officers -- the
15   director is singular.  It's Paul Bisaro.
16        Was he also the director of --
17   just want to make sure I get the name
18   right -- of Watson Pharmaceuticals, Inc., at
19   that time?  Or "a" director of Watson
20   Pharmaceutical, Inc.?
21        A.    I'd have to refer back to the
22   10-K since this was before my time.
23        Q.    Do you know -- I'm happy to let
24   you do that.
25        Do you know whether the

1     officers of Watson Laboratories, Inc., were
2     coextensive with the officers of Watson
3     Pharmaceuticals, Inc., at that time?
4        A.   Could you repeat that, please?
5        Q.   Do you know if the directors of
6     the two entities we're talking about were the
7     same?
8        A.   Between Watson Pharmaceutical,
9     comma, Inc., and --
10       Q.   And Watson Laboratories, Inc.
11       A.   No, they would not be the same.
12     And actually, just to clarify
13     here in regard to Paul Bisaro, who I listed
14     in 2012, he's not listed in '05.  I believe
15     he joined the company sometime in the '07,
16     '08 time frame.
17       Q.   Okay.  In 2012, do you know,
18     without looking at the -- at a K -- and if we
19     have to, we'll get there -- but do you know
20     whether Paul Bisaro was an officer of Watson
21     Pharmaceuticals, Inc.?
22       A.   He would be -- at 2012 he would
23     be the CEO, president, of Watson
24     Pharmaceutical, comma, Inc.
25       Q.   So as of 2012, he was both a

1     director of Watson Pharmaceuticals, Inc., and
2     Watson Laboratories, Inc., correct?
3       A.   That is correct.
4       Q.   Same in 2013?
5       A.   That would be -- that would be
6     correct.
7       Q.   What about the other -- just
8     sticking with these listed officers on page 9
9     of the exhibit you prepared, are each of
10     these officers of Watson Laboratories, Inc.,
11     as of these dates in -- on July 24, 2012,
12     also officers of Watson Pharmaceuticals,
13     Inc., as of that date?
14       A.   I don't have that information.
15       Q.   You don't know; is this
16     correct?
17       A.   I don't know.
18       (Allergan-Kaufhold Exhibit 7
19     marked for identification.)
20     QUESTIONS BY MR. MELAMED:
21       Q.   I'm handing you what's been
22     marked as Exhibit 7.
23       Exhibit 7 is SEC Form 10-K for
24     Actavis, Inc., for the fiscal year ended
25     December 31, 2012?

1       A.   Actavis, comma, Inc., yes.
2       Q.   Actavis, comma, Inc.
3     And you see that the address
4     for the principal executive offices is in the
5     Morris Corporate Center in Parsippany, New
6     Jersey?
7       A.   Yes.
8       Q.   If you'd turn to page 3, and
9     here the pagination does align with the
10     pages, which is helpful.
11     In the business overview, it
12     reflects that Watson Pharmaceuticals, Inc.,
13     completed the acquisition of Actavis Group in
14     2012, correct?
15       A.   That is correct.
16       Q.   What are the entities in
17     Actavis Group?
18       A.   I think probably the easiest
19     way to refer to that since it's numerous is
20     in one of the pictorials that we've provided.
21     And I'm referring to Allergan PLC and
22     subsidiaries as of August 2, 2016.
23     I also, just as a reference,
24     given the, you know, the transformation of
25     the business, you know, really since November

1     of 2012, there is a bigger chart in there
2     that steps through the history and the
3     evolution of the Actavis Group from the time
4     Watson Pharmaceutical, Inc., acquired it and
5     the other subsequent transformational
6     transactions as well, too.
7       Q.   Okay.  So just to be clear for
8     the record, the August 2, 2016 chart you were
9     referring to has a Bates number which is
10     ALLERGAN_MDL_03674501, correct?
11       A.   That is correct.
12       Q.   Okay.  And -- all right.  And
13     just so the record's clear, I'm going to mark
14     the larger chart that you gave me as a
15     separate document.  So when I -- when I --
16     this exhibit will appear in two places.  It
17     will be in the collection of materials you
18     gave me earlier, but it will also be a
19     standalone, single-page document.
20       A.   Understood.
21       Q.   Do you want to trade so you can
22     have the marked exhibit, as long as you
23     haven't written on it?
24       A.   No.  Good.
25       Q.   And I've marked that as

1    Exhibit 8.
2         (Allergan-Kaufhold Exhibit 8
3    marked for identification.)
4    QUESTIONS BY MR. MELAMED:
5         Q.    So I just want to very briefly
6    talk through this.  I think it's pretty
7    self-explanatory.
8         A.    Sure.
9         Q.    There are a lot of people on
10   the phone, and I want to make sure the
11   record's clear.
12        So the Actavis Group acquires a
13   company called Amide or Amide
14   Pharmaceuticals; is that correct?
15        A.    That is -- it -- it buys the
16   manufacturing facility Purepac --
17        Q.    Okay.
18        A.    -- from Alpharma generic.
19        Q.    Okay.  And is Amide that
20   manufacturing facility, or is that something
21   different?
22        A.    That's something different.
23   Purepac was the manufacturer.
24        MS. LEVY:  I think it's Amide.
25   I'm not sure.  Maybe I'm southern, but

1         that's the way I say it.
2         MR. MELAMED:  I will refer to
3    it as Amide.
4    QUESTIONS BY MR. MELAMED:
5         Q.    And Amide had an ANDA for
6    oxycodone hydrochloride tablets, is that
7    correct, at the time it was acquired?
8         A.    I believe I listed -- they
9    became -- it would have been the Kadian
10   product.
11        Q.    Keep that chart out.  I'm going
12   to hand you another exhibit to look at
13   briefly.
14        (Allergan-Kaufhold Exhibit 9
15   marked for identification.)
16   QUESTIONS BY MR. MELAMED:
17        Q.    This is marked as Exhibit 9.
18        Exhibit 9 is a letter from the
19   Department of Health and Human Services dated
20   February 6, 2004, to Amide Pharmaceutical
21   concluding that its ANDA for oxycodone
22   hydrochloride tablets is safe and effective
23   for use as recommended in the submitted
24   labeling.
25        Do you see that?

1         A.    I do.
2         Q.    When -- now, if you return to
3    the chart, when the Actavis Group acquired
4    Amide Pharmaceuticals, it also acquired the
5    ANDA for oxycodone hydrochloride tablets,
6    correct?
7         A.    I see that on a list on the
8    grid.
9         Q.    Okay.  What is in the Actavis
10   Group as reflected on the chart you've
11   prepared?  What entities?
12        A.    Sure.  What I'll refer to is
13   the other chart that I provided, and this is
14   the one that's the Allergan PLC and
15   subsidiaries at August 2, 2006.  We refer
16   that to MDL_03674504.
17        And if I refer to page 4 of
18   6 --
19        Q.    It's dated August 2nd --
20        A.    2nd.
21        Q.    2016?
22        A.    2016, that is correct.
23        Q.    Okay.
24        A.    Okay.  I'm just going to mark
25   this as an exhibit.  If you wouldn't mind

1    trading again so everybody can be clear what
2    we're talking about.
3         (Allergan-Kaufhold Exhibit 10
4    marked for identification.)
5    QUESTIONS BY MR. MELAMED:
6         Q.    Okay.  So page 4 of 6 has the
7    Bate stamp at the bottom,
8    ALLERGAN_MDL_03674504; is that correct?
9         A.    That is correct.
10        Q.    And this is dated 2016,
11   correct?
12        A.    That is correct.
13        Q.    So I just want to be clear.
14   What I was asking about, if you look at the
15   chart you created --
16        A.    Yes.
17        Q.    -- Actavis Group is labeled in
18   the upper left, and the first date associated
19   with that is 2005 on the chart you created,
20   correct?
21        A.    That is correct, yes.
22        Q.    It actually preexisted that
23   date, right?  That was the date it entered
24   the opioids market.  So Actavis Group existed
25   as an entity prior to 2005?

1      A.    That is correct.
2      Q.    What entities were in the
3   Actavis Group when it entered the opioid
4   market?
5      A.    I don't have that information
6   here.
7      Q.    Okay.  So returning to the
8   chart you created, when did the Actavis Group
9   become Actavis, Inc., to which -- the one
10  that has the dotted line with the Kadian
11  investment in it?
12     A.    So the Actavis Group was
13  acquired by Watson Pharmaceutical, comma,
14  Inc., in October of 2012, okay?  At that
15  point in time, the combined entity, the name
16  was changed from Watson Pharmaceutical,
17  comma, Inc., to Actavis, comma, Inc.
18     Q.    Okay.  Do you see how there are
19  two Actavis, comma, Inc.s, on the chart that
20  you created?
21           There is the one that was
22  created in October 2013, and then there is
23  one above it --
24     A.    Right.
25     Q.    -- to which Kadian appears to

1   be divested in December 2008, correct?
2      A.    The -- so the Kadian divested
3   was King Pharma -- King Alpharma divesting
4   the Kadian product.  So King was acquiring
5   Alpharma.  Kadian was divested.  Actavis,
6   Inc., prior to the acquisition of that
7   company by Watson Pharmaceutical, comma,
8   Inc., since that happened in 2008, that
9   product became part of legacy Actavis, as we
10  refer it to.
11           Then Watson Pharmaceutical,
12  comma, Inc., acquired that company in October
13  of 2012.  We rebranded the company to
14  Actavis, comma, Inc.
15           And then subsequent to that, in
16  October of 2013, Actavis, Inc., acquired a
17  company by the name of Warner Chilcott PLC.
18     Q.    Understood.
19           I just want to make clear, the
20  thing I'm not -- I'm clear on the
21  October 2013 --
22     A.    Okay.
23     Q.    -- renaming of Actavis, Inc.
24           Watson acquires Actavis,
25  something, and decides to rename it Actavis,

1   Inc.
2           Is that essentially correct?
3      A.    Renamed it Actavis, comma, Inc.
4      Q.    Actavis, comma, Inc.
5           What is the entity that Watson
6   Pharmaceuticals, Inc., acquired called?
7      A.    I believe it was the Actavis
8   Group.
9      Q.    What are the entities in the
10  Actavis Group?
11     A.    I don't have that information.
12     Q.    Okay.  Warner Chilcott was an
13  Irish company, correct?
14     A.    Excuse me.
15     Q.    Warner Chilcott was an Irish
16  company?
17     A.    Was, yes.
18     Q.    And after Actavis, Inc.,
19  acquired Warner -- let me withdraw that.
20  I'll get to that a little later.
21     A.    Sure.
22     Q.    So this chart, you -- did you
23  create this chart?
24     A.    At my direction, the attorneys
25  created this.

1      Q.    Okay.  So your outside counsel
2   created this at your direction?
3      A.    That is correct.
4      Q.    Okay.  And this reflects the
5   corporate entities, the Allergan-related
6   corporate entities, that had involvement in
7   the US opioid market through time; is that
8   correct?
9      A.    That would be correct.
10     Q.    Before we were looking at the
11  10-K for fiscal year 2012.  Can you remind me
12  what exhibit that was?  I'm sorry that I
13  don't have it.
14     A.    It was Exhibit 7.
15     Q.    Okay.  If you turn to part 1,
16  page 3, you'll see the business overview.
17  The first paragraph pertains to the -- one of
18  the transactions you were just talking about,
19  correct?
20     A.    Yes.
21     Q.    And that transaction being
22  Watson Pharmaceuticals, Inc., acquired
23  Actavis Group in October of 2012, correct?
24     A.    Correct.
25     Q.    Watson then subsequently

1  changed its name to Actavis, Inc., in early
2  2013, right?
3      A.   Changed the name to Actavis,
4  comma, Inc., yes.
5      Q.   Actavis, comma, Inc.
6           Is there an entity called
7  Actavis Inc. without a comma?
8      A.   There is.
9      Q.   Can you explain where they fit
10  into this corporate structure?
11      A.   I'll just have to refer to the
12  chart.
13           On this chart, Actavis Inc., I
14  believe, is -- on this chart is known as
15  Actavis, LLC.  So Actavis Inc. was the old
16  Actavis US business that was acquired.
17           So the legacy business name was
18  Actavis Inc.  The top parent company, Watson
19  Pharmaceutical, comma, Inc., changed its name
20  to Actavis, comma, Inc.  So the difference
21  between the two companies is the comma.
22      Q.   And the difference is that the
23  non-comma -- what you're testifying is that
24  the non-comma company, Actavis Inc., was a
25  subsidiary of Watson Pharmaceuticals, Inc.?

1      A.   It was an indirect subsidiary
2  of Watson Pharmaceutical, comma, Inc.
3      Q.   Indirect subsidiary, you're
4  talking about for tax purposes?
5      A.   From an ownership perspective.
6  It's not a direct, hundred-percent owned
7  subsidiary of Watson Pharmaceutical, comma,
8  Inc.
9      Q.   Okay.  We can turn back to
10  Exhibit 7, which is the 10-K from fiscal year
11  2012 of Actavis, Inc.  And we were just going
12  over the business overview, and we'd
13  established that Watson Pharmaceuticals,
14  Inc., had completed the acquisition of
15  Actavis Group.
16           And am I correct then that when
17  this 10-K says Watson Pharmaceuticals, Inc.,
18  completed the acquisition of Actavis Group,
19  it acquired a company that is also known as
20  Actavis, no comma, Inc.?
21      A.   Watson Pharmaceutical, comma,
22  Inc., completed the acquisition of the
23  Actavis Group.
24      Q.   And is the Actavis Group
25  Actavis, no comma, Inc., or no?  Am I

1  misunderstanding?
2      A.   Actavis Inc. -- I'm just
3  thinking on the international side since
4  Actavis Group would have had international
5  operations as well.  Actavis Inc. might just
6  refer to the US part of that entity.
7      Q.   At this point you're not sure?
8      A.   No.
9      Q.   Okay.  If you -- if at a break
10  or whenever you figure this out --
11      A.   Sure.
12      Q.   -- please let me know.
13      A.   I will.
14      Q.   So returning to the business
15  overview in the -- in Exhibit 7, you see that
16  Watson Pharmaceuticals, Inc., changes
17  its ticker symbol from WPI to ACT in January
18  2013, correct?
19      A.   Correct.
20      Q.   And then the document names
21  Actavis, Inc. -- it defines Actavis, Inc. as
22  Actavis, the company, we, us, our, for
23  purposes of the 10-K, correct?
24      A.   Actavis, comma, Inc., yes, is
25  defined as that.

1      Q.   Thanks for clarifying that.
2           And you see that Actavis,
3  comma, Inc., describes itself as a global
4  specialty pharmaceutical company engaged in
5  the development, manufacturing, marketing,
6  sale and distribution of generic-branded,
7  generic -- I'm sorry, let me state that more
8  clearly -- of generic, comma, branded
9  generic, comma, brand biosimilar and
10  over-the-counter pharmaceutical products?
11      A.   Yes.
12      Q.   And those include opioids, both
13  branded and generic, correct?
14      A.   Correct.
15      Q.   If you turn to page 4, near the
16  top you'll see that the acquisition of
17  Actavis Group resulted in the company
18  becoming the third largest global generics
19  pharmaceutical company, correct?
20           It's the first sentence of the
21  first full paragraph.
22      A.   I see that, yes.
23      Q.   Okay.  If you turn to page 8,
24  you see another list of generic products, and
25  the drugs named in this list, according to

1    the preceding paragraph, reflected
2    approximately 50 -- I'm sorry, 57 percent of
3    the Actavis pharma segment product revenues
4    in 2012, correct?
5       A.    Correct.
6       Q.    And those included opioids --
7    the opioids fentanyl transdermal system,
8    hydrocodone bitartrate acetaminophen,
9    morphine sulfate, oxycodone hydrochloride and
10   acetaminophen, correct?
11      A.    Correct.
12      Q.    And again, the sentence at the
13   beginning -- just preceding the list of drugs
14   refers to "our" US portfolio, correct?
15      A.    Correct.
16      Q.    And "our" has been previously
17   defined as Actavis, Inc., correct?
18      A.    Has been defined as Actavis,
19   comma, Inc.
20      Q.    Thank you for the
21   clarification.  We might need to go over that
22   a few times.
23      A.    Yes.  Yes.
24      Q.    If you turn to page 12, do you
25   see the section titled "Anda distribution

1    segment"?
2       A.    Yes.
3      Q.    And again, it refers to "our
4    Anda distribution business."
5       Do you see that?
6      A.    I do.
7      Q.    And "our" means Actavis, comma,
8    Inc., correct?
9      A.    Could you rephrase that or
10   repeat that, please?
11      Q.    Sure.  It's just the definition
12   of "our" again.
13        "Our" there refers to Actavis,
14   comma, Inc., in this context, correct?
15      A.    "Our" -- that's what "our"
16   refers to.
17      Q.    And the Anda distribution
18   business distributed prescription opioids,
19   correct?
20      A.    The legal entity of Anda did,
21   yes.
22      Q.    I'm just asking about the Anda
23   distribution business as -- as named here.
24      A.    Yes.
25      Q.    Okay.  And it had -- if you

1    look a couple paragraphs down toward the end
2    of that section on Anda, it reflects that as
3    of 2012, fiscal year 2012, the Anda
4    distribution business distributed products
5    from facilities in Florida, Ohio,
6    Mississippi, and then a small volume from
7    Puerto Rico, correct?
8       A.    Correct.
9      Q.    If you turn to page F 48 in the
10   financials, you see that this page reports
11   the segment revenues, operating expenses, et
12   cetera?
13      A.    Yes.
14      Q.    Okay.  And so the Actavis
15   Pharma segment contains revenues and
16   operating expenses reflecting Actavis, comma,
17   Incorporated's, generic opioids, correct?
18      A.    Correct.
19      Q.    And its specialty brand segment
20   includes revenues and operating expenses from
21   Actavis, comma, Inc.'s, branded opioids,
22   correct?
23      A.    Yes.
24      Q.    And Anda distribution segments
25   revenues and operating expenses reflect

1    revenues and expenses from the distribution
2    of both -- of Actavis, comma, Inc.'s, generic
3    and branded opioids, correct?
4       A.    It might -- no, it would not be
5    all the sales of the products.  There was
6    other distribution centers.
7      Q.    Let me rephrase the question.
8      A.    Yeah.
9      Q.    Some of Anda distribution
10   segments, revenues and expenses reflect
11   revenues and expenses derived from the sale
12   of Actavis, comma, Inc.'s, generic and
13   branded opioids; is that correct?
14       MS. LEVY:  Object to the form.
15       THE WITNESS:  It reflects the
16    sales of the indirect subsidiary of
17    Actavis, comma, Inc., that booked the
18    sales.  These are consolidated
19    financial statements, so this is on --
20    reporting on the group.
21   QUESTIONS BY MR. MELAMED:
22      Q.    Uh-huh.  And this is described
23   in the 10-K as a reporting segment, correct?
24      A.    This is a reporting segment,
25   yes.

1    Q.   And Anda, also at this point in
2  time, distributed opioid -- prescription
3  opioids manufactured by other companies aside
4  from Actavis, comma, Inc.; is that correct?
5    A.   I don't have direct knowledge
6  of that.
7    Q.   There's no reason to say that
8  you believe that's not so; you just don't
9  know?
10   A.   I don't know.
11        MR. MELAMED:  Let's go off the
12   record.
13        VIDEOGRAPHER:  The time is
14   1:25 p.m.  Going off the record.
15        (Off the record at 1:25 p.m.)
16        VIDEOGRAPHER:  Okay.  We are
17   back on the record.  The time is
18   1:39 p.m.
19  QUESTIONS BY MR. MELAMED:
20   Q.   All right.  I want you to pull
21  back out the Actavis, comma, Inc., Form 10-K
22  for the year ended December 31, 2012, which I
23  believe is --
24   A.   7.
25   Q.   Thank you.  Exhibit 7.

1        And turn to page 77.
2    Q.   Do you see it lists the
3  executive officers of the registrant?
4    A.   Yes.
5    Q.   And it lists Paul Bisaro,
6  Sigurder Olfasson, G. Frederick Wilkinson,
7  Robert Stewart, R. Todd Joyce, David Buchen,
8  Charles Mayr and Patrick Eagan?
9    A.   Correct.
10        (Allergan-Kaufhold Exhibit 11
11   marked for identification.)
12  QUESTIONS BY MR. MELAMED:
13   Q.   Okay.  I'm going to hand you
14  what's been marked as Exhibit 11.
15        Exhibit 11 is -- is the Form
16  10-K for Actavis PLC for the year ended 2013?
17   A.   Yes.
18   Q.   If you'd turn to page 98.
19   A.   I'm on 98.
20   Q.   And you see the executive
21  officers of the registrant listed?
22   A.   I do.
23   Q.   And you see that each of the
24  executive officers, with the exception of
25  one, was an executive officer of Actavis,

1  comma, Inc., the year before, correct?
2    A.   That is correct.
3    Q.   The only difference being James
4  D'Arecca or D'Arecca --
5    A.   D'Arecca.
6    Q.   D'Arecca, thank you.
7        -- was added as an executive in
8  2013 of Allergan PLC, correct?
9    A.   That is correct.
10   Q.   If you turn back to page 3 now
11  of Exhibit 11, you'll see that in the third
12  paragraph Allergan PLC's principal executive
13  offices are located -- sorry.  Sorry.
14  Withdraw that.
15        Page 4.  It says that while the
16  principal executive offices are now located
17  in Dublin, the administrative offices are
18  located at the Morris Corporate Center in
19  Parsippany, New Jersey, correct?
20   A.   That is correct.
21   Q.   And that's the same address
22  where Allergan, comma, Inc.'s, executive
23  offices were located -- I'm sorry, principal
24  headquarters were located at the end of
25  fiscal year 2012, correct?

1    A.   That was the principal office
2  of Actavis, comma, Inc., yes.
3    Q.   Okay.  And where did -- the
4  individuals on page 98, the executive
5  officers of the registrant, where did they
6  keep their offices?
7    A.   They worked from the
8  administrative headquarters.
9    Q.   In Parsippany, New Jersey?
10   A.   In Parsippany.
11   Q.   So the activities of Actavis
12  PLC, in fiscal year 2013, were directed,
13  controlled and coordinated by executives
14  located in Parsippany, New Jersey, correct?
15        MS. LEVY:  Objection to form.
16        THE WITNESS:  Can you rephrase
17   that about activities?
18  QUESTIONS BY MR. MELAMED:
19   Q.   Sure.
20        Actavis PLC as a company --
21   A.   Yes.
22   Q.   -- was run by executives
23  located in Parsippany, New Jersey, in 2013;
24  is that correct?
25   A.   Actavis PLC, in the matter and

1    course of its business -- and again, when I
2    look at that, it is from the board of
3    directors and board meetings -- board
4    meetings are in Dublin, Ireland.
5        Q.   Where were -- you said the
6    executives were in New Jersey, correct?
7        A.   The ones that we described on
8    98 were working out of the administrative
9    offices.
10        Q.   Is it your understanding that
11    board -- board members direct the day-to-day
12    operations of the company?
13        A.   The board members give
14    oversight to the company.
15        Q.   Who directs the day-to-day
16    operations of the company?
17        A.   Would be the -- the day-to-day
18    operations of a company is usually the
19    leadership, the executive leadership, team.
20        Q.   And that executive leadership
21    conducted that day-to-day leadership of
22    Actavis PLC as of fiscal year 2013 from New
23    Jersey, correct?
24        A.   Part of the business was based
25    in New Jersey.

1        Q.   All of the executives were
2    based in New Jersey, correct?
3        A.   They were based in Jersey.
4        Q.   And they traveled to Ireland
5    for board meetings?
6        A.   They participated in the board
7    meetings, and all our board meetings,
8    stockholder meetings, are based in Dublin.
9        Q.   How many of those were there a
10    year?
11        A.   At least four, probably more,
12    considering any type of material,
13    transactions, acquisitions.  Those decisions
14    were made in Dublin as well.
15        Q.   Board decisions were made in
16    Dublin?
17        A.   Board decisions, company
18    decisions, material acquisitions and so
19    forth.
20        Q.   Mr. Bisaro, among others,
21    participated in quarterly conference calls
22    with investors, correct?
23        A.   That is correct.
24        Q.   Do you know where he prepared
25    for those?

1        A.   I do not.
2        Q.   So go back to page 3, which
3    recounts the company history.  And it states
4    that "Actavis PLC, which was formerly known
5    as Actavis Limited, was incorporated in
6    Ireland in 2013, first as a limited company,
7    subsequently as a public limited company, for
8    the purpose of facilitating the business
9    connection between Actavis, Inc., and Warner
10    Chilcott PLC," correct?
11        A.   Correct.
12        Q.   So neither Actavis Limited nor
13    Actavis PLC had any existence before they
14    were created to effectuate that merger?
15        A.   That is -- that is correct.
16        Q.   As part of the merger, each
17    share of Actavis, comma, Inc., stock
18    converted -- I'm sorry, let me withdraw that.
19    State it a different way.
20        A.   Uh-huh.
21        Q.   As part of the merger, all
22    shares of Actavis, comma, Inc., stock were
23    converted into Actavis PLC common ordinary
24    shares; is that correct?
25        A.   That is correct.  That became

1    the public company.
2        Q.   And that was a one-to-one basis
3    as well, correct?
4        A.   I don't have the ratio.
5        Q.   If you look at the last
6    sentence of the first paragraph of the
7    company history --
8        A.   Okay.
9        Q.   -- does that refresh your
10    recollection?
11        A.   Where are you seeing that?
12        Q.   It says, "Each" -- I'm on
13    page 3.
14        A.   Page 3.
15        Q.   Last sentence, first paragraph,
16    "Each of Actavis, comma, Inc.'s, common
17    shares was converted into one company
18    ordinary share."
19        Do you see that?
20        A.   Yes.
21        Q.   And do you see the paragraph on
22    page 3 just preceding the business overview
23    that defines "we," "our," "us," "the company"
24    and "Actavis" throughout this document?
25        A.   I do.

1    Q.    And you see that they refer to
2  the financial information and transactions of
3  Watson Pharmaceuticals, Inc., before 2000 --
4  January 23, 2013?
5    A.    That is correct.
6    Q.    And then they refer to Actavis,
7  the financial information and transactions of
8  Actavis, comma, Inc., from January 23, 2013,
9  until October 1, 2013?
10   A.    Yes.
11   Q.    And then subsequently to
12 Actavis PLC?
13   A.    Correct.
14   Q.    And then in the business
15 overview, Actavis is described as a
16 pharmaceutical company engaged in the
17 development, manufacturing, marketing, sale
18 and distribution of generic, branded generic,
19 brand name, brand or branded, biosimilar and
20 over-the-counter, OTC, pharmaceutical
21 products, right?
22   A.    Correct.
23   Q.    Those -- some of the generic
24 pharmaceutical products include generic
25 pharmaceutical opioids, correct?

1    A.    Correct.
2    Q.    And some of the branded
3  pharmaceutical products include branded
4  opioids such as Kadian and Norco, correct?
5    A.    Correct.
6    Q.    If you turn to page 10, you see
7  a list of key generic pharmaceutical
8  products, correct?
9    A.    That is correct.
10   Q.    And there -- this -- under the
11 title of "Actavis Pharma Product Portfolio."
12      Do you see that?
13   A.    Yes.
14   Q.    You see among the generic
15 products listed are the opioids fentanyl
16 transdermal system, hydrocodone bitartrate
17 acetaminophen and morphine sulfate?
18   A.    Yes.
19   Q.    And you see the next paragraph,
20 second sentence, where it says "we," meaning
21 Allergan PLC, "sell our generic prescription
22 opioids primarily under Watson Laboratories,
23 Watson Pharma and Actavis Pharma labels"?
24   A.    Yes.
25   Q.    On page 12, you see a list of

1  key brand pharmaceutical product families,
2  correct?
3    A.    Correct.
4    Q.    And that includes the opioid
5  Kadian, correct?
6    A.    Correct.
7    Q.    And then on page 14, the 10-K
8  refers to another of the business segments,
9  the Anda distribution segment, correct?
10   A.    Yes.
11   Q.    And that is a distributor of
12 generic and brand pharmaceutical products,
13 vaccines, injectables, OTC medicines,
14 correct?
15   A.    That is their business.
16   Q.    Yes.
17      If you turn to page 65, you see
18 the year-end financial highlights?
19      Do you see that?  Are you at
20 that page?
21   A.    Yes.
22   Q.    Okay.  And you see the year
23 ended December 31, 2013, compared to 2012
24 section?
25   A.    I do.

1    Q.    And you see that the results
2  below reflect the segment net revenues,
3  operating expenses and contributions for the
4  Actavis Pharma, Actavis Specialty Brands and
5  Actavis -- I'm sorry, Anda distribution
6  segments?
7    A.    I do.
8    Q.    And the revenues and operating
9  expenses for the Actavis Pharma business
10 segment included revenues derived from and
11 expenses on generic opioids, correct?
12   A.    Of the Actavis Pharma reporting
13 segment, yes.
14   Q.    Okay.  And for the Actavis
15 Specialty Brand segment, that reflects
16 revenues, some revenues, derived from and
17 some expenses expended on the brand opioid
18 Kadian, correct?
19   A.    Yes.
20   Q.    And do you have any reason --
21 you do not know as you sit here right now
22 whether the Anda distribution business
23 segment distributed opioids, whether from
24 Actavis PLC or any other company; is that
25 correct?

1    A.   That's correct.
2    Q.   Do you know how -- if you turn
3 the page to 66, it starts breaking down by
4 business segment financials.
5        This is the Actavis Pharma
6 segment?
7    A.   Uh-huh.
8    Q.   Do you know how much of the
9 revenue for the Actavis Pharma segment was
10 derived from sales of generic opioids in
11 fiscal year 2013?
12    MS. LEVY:  Objection.  Beyond
13    the scope of this witness' testimony.
14    THE WITNESS:  I do not know.
15 QUESTIONS BY MR. MELAMED:
16    Q.   Where would you find out that
17 information or from whom?
18    A.   I would have to ask Teva of the
19 generic opioids, since the business was sold
20 to Teva.  The books and records were
21 transferred.
22    Q.   Is it your understanding that
23 Actavis PLC, which became Allergan PLC, no
24 longer has the books and records reflecting
25 that period of time?

1    A.   That is correct.
2    Q.   And you mentioned before you
3 don't remember -- I just want to make sure
4 I'm clear on this.  You don't remember
5 receiving a litigation hold letter or similar
6 document concerning those records at any
7 point, do you?
8    MS. LEVY:  Objection to form.
9    You can answer.
10    THE WITNESS:  Sure.  I mean, we
11    do as it relates to other type of
12    cases.  This specific question, I
13    don't remember.
14 QUESTIONS BY MR. MELAMED:
15    Q.   The specific question you're
16 referring to being?
17    A.   This case, the opioid.
18    Q.   You don't remember receiving a
19 litigation hold letter --
20    A.   That's correct.
21    Q.   -- or something like it
22 concerning the generic opioid business
23 transferred to Teva in 2016?
24    A.   I don't remember.  It doesn't
25 mean that I haven't.

1    Q.   Fair enough.
2    I assume if I ask you the same
3 questions about the percentage of revenues or
4 the percentage of costs -- well, let me
5 withdraw that.
6    For the Actavis Specialty Brand
7 segment, which includes Kadian and Norco,
8 correct?
9    A.   That is correct.
10    Q.   Do you know the percentage of
11 revenues derived from sales of Norco and
12 Kadian together in fiscal year 2013?
13    MS. LEVY:  Objection.  That is
14    beyond the scope of the topics for
15    which this witness is being
16    designated.
17    You may answer the question.
18    THE WITNESS:  Sure.  I do not
19    know the figures.
20 QUESTIONS BY MR. MELAMED:
21    Q.   Okay.  Same thing with costs
22 associated with those drugs?
23    A.   That's correct, I do not.
24    Q.   Okay.  And same thing with
25 revenues or expenses derived from the

1 distribution through the Anda business
2 segment of any generics?
3    MS. LEVY:  Objection.  Beyond
4    the scope of what this witness is
5    designated for, and, also, that
6    information has already been provided
7    to counsel through written discovery.
8    THE WITNESS:  I do not know.
9    (Allergan-Kaufhold Exhibit 12
10    marked for identification.)
11 QUESTIONS BY MR. MELAMED:
12    Q.   I'm going to hand you what has
13 been marked Exhibit 12.
14    Exhibit 12 is the fiscal year
15 2014 Form 10-K for Actavis PLC.
16    A.   Correct.
17    Q.   If you turn to page 2, do you
18 see that the administrative headquarters --
19 this is in the last paragraph -- of Actavis
20 PLC remain at the Morris Corporate Center in
21 Parsippany?  Correct?
22    A.   Bottom of page --
23    Q.   Bottom of page 2 -- top of the
24 last paragraph on page 2.
25    A.   Principal, Dublin,

1    administrative headquarters located in Morris
2    Corporate Center III, yes.
3       Q.    And that's the same location
4    where they were located for Actavis, comma,
5    Inc., correct?
6       A.    Actavis, comma, Inc., that is
7    correct.
8       Q.    And I believe the same at least
9    for some time for Watson Pharmaceuticals; is
10   that correct?  Watson Pharmaceuticals, comma,
11   Inc.?
12      A.    2012.  That -- I don't
13   recollect the date that we moved to that
14   facility.
15      Q.    But you do recall as an
16   employee of Watson Pharmaceuticals, Inc.,
17   moving to that facility; is that correct?
18      A.    I was not an employee of Watson
19   Pharmaceutical, comma, Inc.
20      Q.    What were you?
21      A.    I don't have the specific
22   entity, but it was not the top parent
23   company.
24      Q.    What was your role at Watson
25   Pharmaceuticals?  At the sub -- whatever

1    entity you were in?
2      A.    I don't know.
3      Q.    What did you -- without
4    defining it with a name, what did you do at
5    Watson Pharmaceuticals, Inc., towards the end
6    of your time at Watson Pharmaceuticals, Inc.?
7      A.    For Watson Pharmaceuticals,
8    comma, Inc., I was the treasurer of the
9    company.
10      Q.    Okay.  But you weren't employed
11   at Watson Pharmaceuticals, comma, Inc.; is
12   that correct?
13      A.    That is correct.
14      Q.    But you were the treasurer for
15   the entity -- your responsibility as a
16   treasurer included being a treasurer for the
17   entity known as Watson Pharmaceuticals,
18   comma, Inc., correct?
19      A.    I provided that service, yes.
20      Q.    Watson -- another way of
21   putting that is Watson Pharmaceuticals,
22   comma, Inc., did not have its own treasurer
23   employed as an employee of Watson
24   Pharmaceuticals, comma, Inc., correct?
25      A.    That is correct.

1      Q.    Turn to page 1 of the fiscal
2    year 2014 10-K.
3         Do you see in the bottom
4    paragraph it references a definitive
5    agreement between Actavis PLC and Allergan,
6    Incorporated, under which Actavis PLC will
7    acquire Allergan --
8      A.    Yes.
9      Q.    You see that, correct?
10      A.    I do.
11      Q.    And it's subsequent to that
12   acquisition that the name Actavis PLC became
13   Allergan PLC, correct?
14      A.    That is correct.
15      Q.    Allergan PLC is the successor
16   in interest to Actavis PLC; is that correct?
17      A.    Correct.
18      Q.    Just -- and Actavis PLC is the
19   successor in interest to Actavis, comma,
20   Inc., correct?
21      A.    That -- again, the legal
22   terminology.  Actavis PLC was -- again, there
23   was the share-for-share exchange of Actavis,
24   comma, Inc., and Warner Chilcott PLC into
25   shares of Actavis PLC.

1      Q.    Okay.  And no other entity
2    aside of Actavis PLC had any ownership
3    interest in or ability to direct the actions
4    of the company Actavis, comma, Inc.,
5    subsequent to the merger?
6      A.    Not sure what you mean by
7    "direct."
8      Q.    All of the shares from Actavis,
9    comma, Inc., converted to shares of --
10      A.    That is --
11      Q.    -- Actavis PLC, correct?
12      A.    That is correct.
13         (Allergan-Kaufhold Exhibit 13
14   marked for identification.)
15  QUESTIONS BY MR. MELAMED:
16      Q.    Okay.  You can put that aside.
17         I'm handing you what's been
18   marked Exhibit 13, which is the 2015 Form
19   10-K for Allergan PLC.  And if you turn to
20   page 3.
21         So in the bottom paragraph
22   describes the master purchase agreement
23   entered into on July 26, 2015, by Allergan
24   PLC and Teva Pharmaceutical Industries
25   Limited, correct?

1    A.   Yes.
2    Q.   What was Allergan PLC selling
3  to Teva?
4    A.   It was its generic business.
5    Q.   Generic opioids business or
6  generic all -- let me ask that as a single
7  question.
8         What kind of generic
9  pharmaceuticals were included in that
10  transaction?
11    A.   What was sold was all of the
12  generic business.
13    Q.   Inclusive of, but not limited
14  to, generic opioids, correct?
15    A.   That is correct.
16    Q.   This master purchase agreement
17  did not include the sale of the Anda
18  distribution segment; is that correct?
19    A.   The Anda business was sold --
20  it might have been in a separate agreement.
21    Q.   You're just not sure either
22  way?
23    A.   What I'm sure of is we do not
24  own the business.  Teva owns the business.
25    Q.   And page 3 says that "We" --

1  and here "we" is the "financial information
2  and transactions of Watson Pharmaceuticals,
3  Inc., prior to January 2013, Actavis, Inc.,
4  from January 2013 to October 2013, and
5  Allergan PLC and Warner Chilcott Limited,
6  subsequent to October 2013.
7         You see that, correct,
8  regarding "we"?
9    A.   Actavis, comma, Inc., from
10  January 23, 2013, to October 1, 2013.
11    Q.   Okay.  And the rest of what I
12  said was correct?
13    A.   Yes.
14    Q.   Okay.  That "we" will receive
15  $33.75 billion in cash and 100.3 million Teva
16  ordinary shares or American depositary
17  shares, correct?
18    A.   Yes.
19    Q.   Is that what Allergan PLC
20  received for the sale of its generics
21  business to Teva?
22    A.   At the -- this was, again,
23  2015.  This had a certain value of the 100
24  million shares.  On the day it closed, the
25  100 million shares would have been valued

1  something different than what is in this
2  agreement.
3    Q.   So you did -- Allergan PLC did
4  receive approximately $33.75 billion in cash?
5    A.   That is correct.
6    Q.   And then it received --
7    A.   Shares.
8    Q.   -- some -- some body of
9  approximately 100 million shares, give or
10  take, depending on the current value of the
11  shares?
12    A.   Exactly.
13    Q.   Where did that money get -- on
14  whose financial statements were the
15  $33.75 billion in cash recorded?
16    A.   Would have been recorded --
17  again, I don't have that direct knowledge.
18    Q.   You were the treasurer --
19  currently your job is as treasurer, correct?
20    A.   Yes.
21    Q.   And you're treasurer of --
22  what's the name of the company?  It's
23  Allergan...
24    A.   I'm treasurer of several legal
25  entities in the Allergan group of companies.

1    Q.   I'm sorry, who's your -- who
2  are you employed by?
3    A.   I'm employed by Allergan Sales,
4  LLC.
5    Q.   And as treasurer of Allergan
6  Sales, LLC, one of the companies that you
7  provide services to, that you are treasurer
8  for, is Allergan PLC, correct?
9    A.   That is correct.
10    Q.   Do you know whether the
11  $33.75 billion went on to Allergan PLC's
12  financial statements?
13    A.   It went on its consolidated
14  financial statements.
15    Q.   Do you know what happened to
16  that money --
17    A.   Yes.
18    Q.   -- how it derived through --
19  how it made its way through the organization,
20  if it did?
21    A.   Yes.
22    Q.   What happened to the
23  $33.75 billion?
24    A.   When we received the company,
25  some of it, approximately $6.2 billion, went

1    to -- would have been called Actavis Capital
2    S.a.r.l., okay, where we had debt
3    outstanding.  We paid off approximately
4    6.2 billion of term loans, so the proceeds
5    went there.
6          A portion of the proceeds also
7    went to, I believe it would have been, the
8    Holdco, which was the owner, who had its net
9    investment in the group that we sold to Teva.
10    Q.    What was the owner of the
11    hold -- what was the Holdco that sold the
12    generics entities?
13    A.    In regard to the August 2,
14    2016, org chart, page 2 of 6 -- and again,
15    this is MDL03674502.  If you go to page 2,
16    you see the top box that's in yellow, Actavis
17    Holdco US, that was sold to Teva.
18          It's direct parent was Allergan
19    Holdco US, comma, Inc.  So a portion, a
20    majority of the funds, went to that entity.
21    Q.    At that point in time did
22    Allergan Holdco US, comma, Inc., have any
23    employees?
24    A.    No, it did not.
25    Q.    Did Actavis Holdco US, comma,

1    Inc., that was sold have any -- itself have
2    any employees?
3    A.    Actavis Holdco US, comma, Inc.,
4    no.
5    Q.    Did -- and if you look up the
6    chart, there's an entity called Actavis
7    Capital S.a.r.l., S-a-r-l?
8    A.    Yes.
9    Q.    Is that the entity to which you
10    said approximately $6 billion --
11    A.    That is correct.
12    Q.    Did Actavis Capital S.a.r.l.
13    have any employees at that point in time?
14    A.    It did not.
15    Q.    If you want to go to the front
16    page just -- of the same exhibit, which is
17    ALLERGAN_MDL_03674501.
18    A.    Yes.
19    Q.    As of August 2, 2016, do you
20    know how many, approximately how many,
21    employees Allergan PLC had in its Irish
22    office?
23    A.    Allergan PLC has no employees.
24    Q.    Today does Allergan PLC have no
25    employees?

1    A.    No employees.
2    Q.    Has Allergan PLC ever had
3    employees?
4    A.    That is possible.
5    Q.    Possible but you're not sure?
6    A.    I'm not sure.
7    Q.    What about Warner Chilcott PLC,
8    the entity that reported -- according to this
9    organizational chart, the entity that
10    reported directly up to Allergan PLC, did it
11    have any employees?  Sorry, just --
12    A.    I don't know.
13    Q.    Does it currently have any
14    employees?
15    A.    It does not.
16    Q.    What about Warner Chilcott
17    Limited, Bermuda?
18    A.    No employees.
19    Q.    Never?
20    A.    Never.
21    Q.    What about Warner Chilcott
22    Holdings Company II, Limited?
23    A.    No.
24    Q.    What about Warner Chilcott
25    Holdings Company III, Limited?

1    A.    No.
2    Q.    What about Actavis Ireland
3    Holding, Limited, over to the left?
4    A.    No.
5    Q.    Zero employees?
6    A.    Zero employees.
7    Q.    What about Actavis Capital
8    S.a r.l.?  I believe we just covered that on
9    the other sheet.
10    A.    Yes.
11    Q.    Zero employees?
12    A.    Zero employees.
13    Q.    What about Actavis WC Holding,
14    Incorporated?
15    A.    I do not know.
16    Q.    Okay.  Does it exist currently,
17    as of today?
18    A.    Actavis WC?  Actavis WC
19    Holdings today -- do you have -- I would need
20    the chart.
21          MS. LEVY:  Just -- you can say
22    if you know and what you would need to
23    know.
24          THE WITNESS:  I don't know.
25

1    QUESTIONS BY MR. MELAMED:
2        Q.    As of 2016 you don't know, and
3    as of 2018, without looking at another
4    document, you don't know?
5        A.    That's correct.
6        Q.    What about Allergan Finance,
7    LLC, formerly known as Actavis, no comma,
8    Inc.?
9        A.    Actavis --
10       Q.    We're still on the page ending
11   501.
12       A.    Okay.
13       Q.    And it's a dark blue box.
14       A.    Yeah.
15       Q.    As of 2016, did Allergan
16   Finance, LLC, formerly known as Actavis, no
17   comma, Inc., have any employees?
18       A.    I do not know.
19       Q.    Who would I ask to figure that
20   out?
21       A.    I wouldn't know the person.
22       Q.    Did Allergan, comma, Inc.,
23   direct -- directly below the entity we were
24   just talking about have any employees in
25   2016?

1        A.    I don't have that information.
2        Q.    Do you know whether they have
3    employees today?
4        A.    I don't have that information.
5        Q.    Go back to the FY 15 -- fiscal
6    year 15 Allergan PLC 10-K and turn to page 4.
7             Under business overview, do you
8    see that?
9        A.    I do.
10       Q.    Do you see that Allergan PLC
11   describes itself as a global specialty
12   pharmaceutical company engaged in the
13   development, manufacturing, marketing and
14   distribution of brand name pharmaceutical
15   products, brand, branded or specialty brand,
16   medical aesthetics, biosimilar and
17   over-the-counter pharmaceutical products?
18       A.    Yes.
19       Q.    Did that engagement include the
20   development, manufacturing, marketing or
21   distribution of any brand name opioids?
22       A.    Yes.
23       Q.    And at this point in time prior
24   to the closing of the deal with Teva, did
25   that development, manufacturing and

1    marketing -- I'm sorry, development,
2    manufacturing, marketing and distribution
3    include generic opioid products?
4        A.    Prior to the close of the
5    generic sale, it would have included.
6        Q.    If you look at the bottom
7    paragraph on page 4, it states that "Allergan
8    PLC's principal executive offices are located
9    in Dublin, Ireland, and our administrative
10   headquarters are located at the Morris
11   Corporate Center III in Parsippany, New
12   Jersey," correct?
13       A.    Yes.
14       Q.    Where did Allergan PLC's
15   executives have their office?
16       A.    Allergan PLC had no employees.
17       Q.    Allergan PLC did not have any
18   executives, executive officers?
19       A.    It had executive -- people who
20   served in a role of executive officers.
21       Q.    And they're listed in the K,
22   correct?
23       A.    They are listed in the K.
24       Q.    Where did those individuals
25   maintain their offices?

1        A.    I just need to take a look at
2    the list to see who changed.
3             Do you know what page that is?
4        Q.    See if I can help you out in a
5    second.
6             You can look at the signature
7    page on page 106. It lists -- we can just
8    talk about the four officers listed there.
9        A.    Page...
10       Q.    Actually, let me make sure
11   that's the correct page.
12             MS. LEVY:  Is this the PDF?
13             MR. MELAMED:  It's page 106.
14   In the middle of the bottom of the
15   page is 106.
16             THE WITNESS:  Got it.  Okay.
17   QUESTIONS BY MR. MELAMED:
18       Q.    And it lists the executives.
19   It list four executives on this page:  Paul
20   Bisaro, Brenton Saunders, Maria Teresa Hilado
21   and James -- I'm sorry --
22       A.    James D'Arecca.
23       Q.    D'Arecca.  Thank you.
24       A.    These four officers worked from
25   the administrative offices.

1    Q.   In Parsippany?

2    A.   In Parsippany.

3    Q.   As in past years, certain of

4  the revenues reported by Allergan PLC in this

5  fiscal year 10-K would reflect sales of brand

6  opioids, correct?

7    A.   It would reflect the

8  consolidated revenues from the brand opioids.

9    Q.   And certain of the revenues for

10  the global generics business would reflect --

11  prior to the sale of the generic opioid

12  business to Teva --

13    A.   It would include the

14  consolidated revenues, yes.

15    Q.   Okay. And similarly, expenses

16  for generic opioids would be reflected in the

17  financial statements for the global generics

18  business, correct?

19    A.   The consolidated expenses, yes.

20    Q.   And the brand expenses would

21  reflect -- the consolidated expenses would

22  reflect expenses on brand name Kadian,

23  correct?

24    A.   That's correct.

25       (Allergan-Kaufhold Exhibit 14

1  marked for identification.)

2  QUESTIONS BY MR. MELAMED:

3    Q.   I'm going to hand you what I'm

4  marking as Exhibit 14, which is the Form 10-K

5  for the fiscal year ended 2017 for Allergan

6  PLC.

7       If you turn to page 3, you'll

8  see under the company history we have the

9  same accounting of the company history as has

10  been told in prior 10-Ks, correct?

11    A.   Correct.

12    Q.   The one change being that

13  Actavis, comma, Inc., is now known as

14  Allergan Finance, LLC, correct?

15       It's in the first paragraph

16  under company history. Oh, you're checking

17  to see if there was a change.

18    A.   Yeah, I just wanted to see the

19  name change. That is correct.

20    Q.   Okay. So the name change

21  from --

22    A.   From Actavis, Inc., to Allergan

23  Finance, comma, LLC.

24    Q.   That's from Actavis, comma,

25  Inc., correct?

1    A.   That is correct.

2    Q.   Okay. So that occurred during

3  the fiscal year -- sometime in the fiscal

4  year of 2017?

5    A.   That would be correct. '17 --

6  this is the financials as of '17. That would

7  be correct, yes.

8    Q.   So just to be clear, Allergan

9  Finance, comma, LLC, is what was formerly

10  known as Actavis, Inc. -- comma, Inc.,

11  correct?

12    A.   That is correct.

13    Q.   If you turn to page 4, the top

14  paragraph addresses the sale of the Anda

15  distribution business at Teva which we

16  alluded to before --

17    A.   Yes.

18    Q.   -- but you see that it sold for

19  $500 million, correct?

20    A.   Correct.

21    Q.   Where did that $500 million go?

22    A.   I don't -- off the top of my

23  head, I'm not sure where that went, but it

24  did not go to Allergan PLC.

25    Q.   Why are you sure that it did

1  not go to Allergan PLC?

2    A.   Because Allergan PLC -- there's

3  no large cash balances being maintained at

4  Allergan PLC, just sufficient cash to pay the

5  expenses of maintaining that entity.

6    Q.   When Actavis, comma, Inc., and

7  Warner Chilcott merged and became Actavis

8  PLC, Actavis, comma, Inc., was the larger

9  company, correct?

10    A.   That is correct.

11    Q.   And Actavis, comma, Inc., at

12  that point was incorporated in the United

13  States, correct?

14    A.   Actavis, comma, Inc., was

15  incorporated in the US, yes.

16    Q.   Why did the company formed to

17  effectuate that merger, Actavis PLC,

18  incorporate in Ireland?

19    A.   We were acquiring a PLC company

20  which was based in Ireland, and a decision

21  was made to be an Irish company.

22    Q.   What was -- what were the

23  considerations that drove that decision, the

24  primary considerations that drove that

25  decision?

```
 1      A.    I, again, was not part of those
 2   discussions.
 3      Q.    Have you seen anything reported
 4   publicly on those discussions?
 5      A.    Well, there was being reported
 6   at the time or afterwards, again, with
 7   inversions --
 8      Q.    What --
 9      A.    -- companies redomiciling for
10   tax reasons.
11      Q.    So the tax liability for
12   incorporating in Ireland would be less than
13   it would have been had the company
14   incorporated in the United States?
15      A.    It would be a lower effective
16   tax rate.
17      Q.    And is that what you understand
18   to be the primary reason that the merge --
19   the company created to effectuate that merger
20   was incorporated in Ireland?
21      A.    I don't know if that was the
22   primary reason.  It was probably one of the
23   reasons.
24           Warner Chilcott had extensive
25   manufacturing facilities in Ireland employing
```

```
 1   people, so that would probably also have been
 2   part of the decision as well.
 3      Q.    Did Actavis, comma, Inc., have
 4   manufacturing facilities in the United States
 5   at the time of the merger?
 6      A.    They had some of their
 7   manufacturing in the US.
 8      Q.    And did those manufacturing
 9   facilities employ a lot of people?
10      A.    They -- well, I don't know what
11   you mean by "a lot."
12      Q.    I'm just using the language you
13   used when you talked about the Irish
14   manufacturing facilities.
15      A.    Okay.
16      Q.    You said it employed a lot of
17   people.  I think --
18      A.    I said there were significant
19   manufacturing since some of the larger
20   products of Warner Chilcott were being
21   manufactured out of Ireland.
22      Q.    Do you know as you sit here
23   today whether there were more employees of
24   Aller -- I'm sorry, Actavis, comma, Inc.'s,
25   American manufacturing facilities or more
```

```
 1   employees of Warner Chilcott PLC's Irish
 2   manufacturing facilities?
 3      A.    Rephrase the part about
 4   Actavis' manufacturing facilities.
 5      Q.    I just want to know if, as you
 6   sit here today, do you know whether there
 7   were more employees of manufacturing
 8   facilities in the US or in Irish -- in
 9   Irish -- in Ireland of the combined two
10   companies.
11      A.    I don't have those numbers.
12      Q.    Do you have reason to think one
13   or the other, as you sit here today, without
14   being exact?
15      A.    Without being exact, I would
16   think when you look at the global
17   manufacturing facilities of Actavis, if you
18   look at the US portion, probably they were
19   greater than Warner Chilcott Ireland's
20   facility.
21      Q.    You can put that 10-K aside.
22      A.    Sure.
23           (Allergan-Kaufhold Exhibit 15
24           marked for identification.)
25
```

```
 1   QUESTIONS BY MR. MELAMED:
 2      Q.    Handing you what's been marked
 3   as Exhibit 15, which is an article from
 4   Fortune magazine dated May 21, 2013, titled
 5   "Actavis, the latest Fortune 500 Company to
 6   quote, leave, unquote, the US for tax
 7   reasons."
 8           MS. LEVY:  Can you give him a
 9      minute to review the document?
10           MR. MELAMED:  Sure.
11           MS. LEVY:  You can ask your
12      questions then.
13           MR. MELAMED:  Yeah, I'll direct
14      him if I have specific questions, but
15      I'm happy to give him...
16           THE WITNESS:  Okay.
17   QUESTIONS BY MR. MELAMED:
18      Q.    This article, or at least the
19   title of the article, reflects what you were
20   talking about before, that it was at least --
21   the tax reasons played at least some part in
22   the decision to -- to undergo a corporate
23   inversion, correct?
24      A.    That's what I said.
25      Q.    Is it correct that the title
```

1  reflects that reason?
2      MS. LEVY:  Object to the form.
3      THE WITNESS:  Again, I didn't
4  write this article.  I don't know
5  what's in the author's head.
6  QUESTIONS BY MR. MELAMED:
7     Q.   Just asking you to read -- as a
8  treasurer of a -- who has treasury
9  experience, responsibility for the successor
10  of the company being spoken about.
11      MS. LEVY:  What's the question?
12  QUESTIONS BY MR. MELAMED:
13     Q.   Does the title reflect what you
14  were saying before, that one of the reasons
15  that Actavis chose to incorporate the merged
16  company in Ireland instead of the US was for
17  tax reasons?
18     A.   As part of our -- yes, as part
19  of our fiduciary responsibility.
20     Q.   Okay.  So the title is -- of
21  this article, by use of the quotes around
22  leave, is suggesting that -- do you
23  understand the title of this article --
24     A.   Yes.
25     Q.   -- by using the quote -- the

1  quotes around the word "leave," to imply that
2  the company did not actually leave the US?
3      MS. LEVY:  I'm going to object
4  to the question to the extent that
5  you're calling for him to speculate
6  about this article.
7  QUESTIONS BY MR. MELAMED:
8     Q.   You can answer based on being a
9  reader and a treasurer of the company.
10     A.   Can you rephrase that question
11  then?  Or restate -- or repeat it, please?
12     Q.   So as the treasurer that
13  provides services to the company being
14  discussed -- you do provide treasurer
15  services to the company being discussed; is
16  that correct?
17     A.   Correct.
18     Q.   Okay.  And in that role, with
19  your body of experience as you read the
20  title, do you understand the title to imply
21  that the company -- that the author is saying
22  the company was not leaving the US?
23      MS. LEVY:  Object to form.
24  That's an improper question, and it's
25  been asked and answered.

1     You can answer again.
2      THE WITNESS:  Again, I don't
3  know what is meant by -- what the
4  quotes or what it means.  Leaves.
5  QUESTIONS BY MR. MELAMED:
6     Q.   Okay.  You don't have an
7  understanding of what you think he means to
8  intend by those quotes?
9     A.   Exactly.
10      MS. LEVY:  Same objection.
11  QUESTIONS BY MR. MELAMED:
12     Q.   And you see at the end of the
13  first paragraph of the article and then the
14  one-sentence -- second paragraph -- statement
15  from the author:  "This despite the fact that
16  the company's top executives, including CEO
17  Paul Bisaro, will continue to live and work
18  in New Jersey."
19     And then the article purports
20  to quote Bisaro, who says, "'Everybody loves
21  New Jersey too much, and nobody is willing to
22  go,' he said on a conference call yesterday."
23     Do you see that?
24     A.   I see that.
25     Q.   And that's consistent with your

1  testimony before, that the execu -- the top
2  executives of Actavis PLC remained in New
3  Jersey, correct?
4     A.   They work in the administrative
5  offices in New Jersey.  That part I agree
6  with.
7     Q.   You don't agree that everybody
8  loves New Jersey too much?
9     A.   No.  What it says is, "CEO Paul
10  Bisaro will continue to live and work in New
11  Jersey."  He worked in the administrative
12  headquarters of Actavis in Parsippany.
13     Q.   And Mr. Saunders is currently
14  the CEO of the sub -- the successor in
15  interest Allergan PLC, correct?
16     A.   He is the CEO, president, of
17  Allergan PLC.
18     Q.   And he also continues to work
19  in New Jersey, correct?
20     A.   He works in the administrative
21  offices, yes.
22     Q.   And you -- the company has
23  moved its administrative offices to Madison,
24  New Jersey; is that correct?
25     A.   That is correct.

1    Q.    And it is in the process of
2 consolidating offices from other locations in
3 New Jersey; is that correct?
4    A.    It has consolidated Parsippany,
5 Rockaway, Jersey City, since the facility in
6 Parsippany went to Teva.
7        (Allergan-Kaufhold Exhibit 16
8        marked for identification.)
9 QUESTIONS BY MR. MELAMED:
10   Q.    I'm going to hand you what I'm
11 marking as Exhibit 16.  Exhibit 16 is a
12 printout of the current executive leadership
13 of Allergan PLC taken from the company's
14 website.
15       So we just discussed,
16 Mr. Saunders, Brenton Saunders, works in New
17 Jersey, correct?
18   A.    He works from New Jersey, yes.
19   Q.    You turn the page, William
20 Meury -- I'm not sure if I'm saying his last
21 name --
22   A.    Meury.
23   Q.    Meury.
24   A.    Yes.
25   Q.    Where does William Meury live

1 and work?
2    A.    Again, to where he lives, I
3 think he lives in Connecticut.
4        Work, I believe he has -- he
5 has an office in the administrative
6 headquarters.
7    Q.    Do you know if that's where he
8 primarily works, or you don't know either
9 way?
10   A.    I don't know.
11   Q.    The next individual is the
12 chief financial -- chief financial officer,
13 Matt Welsh?
14   A.    Uh-huh.
15   Q.    Do you know where Mr. Welsh
16 works primarily -- where his primary office
17 is?
18   A.    Administrative offices.
19   Q.    In New Jersey?
20   A.    In New Jersey.
21   Q.    Is it currently Madison?  We
22 just --
23   A.    Madison, yes.
24   Q.    Do you know where he lives?
25   A.    I do.

1    Q.    In what state?
2    A.    New Jersey.
3    Q.    Do you know where chief legal
4 officer and corporate secretary, A. Robert D.
5 Bailey, works, where his primary office is?
6    A.    He has an office at the
7 administrative offices.
8    Q.    Is that his primary office?
9    A.    That is his primary office.
10   Q.    Okay.  And that's the
11 administrative offices in New Jersey,
12 correct?
13   A.    Correct.
14   Q.    Chief human resources officer
15 Karen Ling, do you know where she maintains
16 her primary office?
17   A.    The administrative offices.
18   Q.    In New Jersey?
19   A.    In New Jersey.
20   Q.    The chief research and
21 development officer, C. David Nicholson, do
22 you know where he maintains his principal
23 office?
24   A.    Administrative offices, New
25 Jersey.

1    Q.    Chief communications officer,
2 Alex Kelly, do you know where he maintains
3 his principal office?
4    A.    Administrative offices in New
5 Jersey.
6    Q.    Executive vice president for
7 global operations, Wayne Swanton, do you know
8 where he maintains his principal office?
9    A.    Administrative offices in New
10 Jersey.
11   Q.    You can put that aside.
12       Where do you maintain your
13 principal office?
14   A.    New Jersey.
15   Q.    Same -- same office building --
16   A.    Yes.
17   Q.    -- as these individuals?
18   A.    Yes.
19   Q.    Are you on the same floor as
20 the CEO?  Mr. Saunders?
21   A.    I am on the fourth floor.
22   Q.    Is that the executive floor,
23 where all the executive offices are?
24   A.    There are other offices in the
25 building.  I mean, it's 450,000 square feet,

1  five, six stories, so...
2      Q.   I'm not trying to be tricky
3  with the question.  I understand you're
4  trying to be precise, and I appreciate that.
5      A.   Yeah, I sit within -- I do not
6  sit in the executive suite.
7      Q.   Okay.  So there's an executive
8  suite where the -- all of the individuals we
9  just went through sit or most of them sit?
10     A.   They have offices next to each
11 other, yes.
12     Q.   And are you on the same floor?
13     A.   I am on the fourth floor, yes.
14     Q.   Okay.  How many --
15 approximately how many individuals are on the
16 fourth floor?
17     A.   I don't have that number.
18     Q.   Is it, like, fewer than a
19 hundred?  Just trying to get an idea.
20     A.   It's -- again, it's a
21 five-story building.  You have a cafeteria.
22 I mean, it's probably -- probably somewhere
23 about 200 to 300 employees.
24     Q.   In all five floors?
25     A.   Five floors.

1          In total, it's 1,300 people,
2  approximately, in that location.
3      Q.   At that location --
4      A.   Five floors.
5      Q.   There are approximately 1,300
6  people in the five floors in Madison, New
7  Jersey?
8      A.   Correct.
9      Q.   How many employees of Allergan
10 PLC are in Ireland?
11         MS. LEVY:  Object to the form.
12         THE WITNESS:  Allergan PLC has
13 no employees.
14 QUESTIONS BY MR. MELAMED:
15     Q.   Who is -- who is Mr. Saunders
16 employed by?
17     A.   I don't have that information.
18     Q.   Do you know who pays his
19 checks, what corporate entity pays his
20 checks?
21     A.   I would -- it would be ADP.
22     Q.   Who -- does ADP draw -- who
23 provides the funding for ADP to provide
24 Mr. Saunders his checks; do you know?
25     A.   A subsidiary of Allergan.

1      Q.   What is that subsidiary called?
2      A.   I don't have that name.
3      Q.   Do you believe -- withdraw
4  that.
5          Do you know whether you
6  receive -- whether your check's funding comes
7  from the same subsidiary?
8      A.   Yes.
9      Q.   It does come from the same
10 subsidiary?
11     A.   Yes.
12         MR. MELAMED:  Let's go off the
13 record, please.
14         THE WITNESS:  Sure.
15         VIDEOGRAPHER:  All right.  The
16 time is 2:46 p.m.  Off the record.
17     (Off the record at 2:46 p.m.)
18         VIDEOGRAPHER:  We are now on
19 the record.  The time 3:02 p.m.
20         THE WITNESS:  Excuse me just
21 for a second, Matt.
22         Just in regard to this one
23 exhibit, which is the chart that we
24 provided, just -- there was a typo on
25 here where it says, "Allergan Finance,

1  comma, LLC," in parentheses it says
2  "f/k/a Actavis Inc."  It should say
3  "Actavis, comma, Inc."
4  QUESTIONS BY MR. MELAMED:
5      Q.   Okay.  And is that the --
6      A.   That's correct, that's the dark
7  blue box in the middle.  You'll see Allergan
8  Finance, LLC.  You'll see f/k/a Actavis Inc.
9  It should say Actavis, comma, Inc.
10     Q.   Okay.  And that's
11 ALLERGAN_MDL_03674501.
12     A.   That's correct.
13     Q.   All right.
14     A.   And then also during the break
15 I did go back.  We did look at some of the
16 org charts that have been provided, and I'll
17 just call your attention to MDL_03367301,
18 which shows the -- it will show where Actavis
19 Group is and Actavis Inc., no comma.
20     Q.   Okay.  I just want to look for
21 that for a sec.
22         You said 33601?
23     A.   67301, correct.
24         MS. LEVY:  It's not in that
25 stack, Matt.  It's a previously

1    produced org chart.  I have a copy in
2  my bag if you want to see it.
3        You had asked about Actavis
4  Group --
5        MR. MELAMED:  Correct.
6        MS. LEVY:  -- and he's telling
7  you where the answer to --
8        MR. MELAMED:  Okay.  I was just
9  looking -- thank you.  I was
10  looking -- can I look at that at the
11  next break?
12        MS. LEVY:  Sure.
13        MR. MELAMED:  Thank you.
14  QUESTIONS BY MR. MELAMED:
15        Q.    Where is Allergan Finance, LLC,
16  located?  In the world, not in the org chart.
17        A.    In the world is -- that is a US
18  company.
19        Q.    Where is -- where -- does it
20  have -- you said before it has no employees,
21  correct?
22        A.    It has no employees, no
23  operations.
24        Q.    What is its purpose?
25        A.    Is a holding company.  It holds

1    the investment of the subsidiary that is
2  right below that.
3        Q.    What is the subsidiary that is
4  right below it?
5        A.    Is Allergan, comma, Inc.
6        Q.    In the -- I believe it's the
7  fiscal year '18 10-K, one of the 10-Ks we
8  looked at before, it said "Allergan Finance,
9  LLC, was formerly known as Allergan, comma,
10  Inc.'"?
11        I'm sorry, let me withdraw
12  that.
13        In one of the Ks we looked at
14  before -- and I will look through and find
15  it.  But if you remember, I won't have to.
16        A.    Sure.
17        Q.    -- the K stated that Allergan
18  Finance, LLC, was formerly known as Actavis,
19  comma, Inc.?
20        A.    That is correct.
21        Q.    Okay.  Is also -- let me just
22  make sure I understand.
23        It is also -- Allergan Finance,
24  LLC, is also the holding company of Actavis,
25  comma, Inc.?

1        A.    No.
2        Q.    I'm sorry.  Can you repeat what
3  it is the holding company of?
4        A.    Sure.  Allergan Finance, LLC,
5  owns 100 percent of the Allergan, comma, Inc.
6        Q.    Allergan, comma, Inc.  Thank
7  you.
8        Where is Allergan, comma, Inc.,
9  located in the world?
10        A.    US.
11        Q.    How many employees does
12  Allergan, comma, Inc., have?
13        A.    I don't have that number.
14        Q.    Does it have employees?
15        A.    I do not know.
16        Q.    Do you know the purpose of
17  Allergan, comma, Inc.?
18        A.    Allergan, comma, Inc., is
19  his -- it's the historical Allergan company
20  that was acquired in 2015.
21        Q.    So the previously existing
22  entity that was acquired by Actavis?
23        A.    Acquired by Actavis PLC.
24        Q.    Okay.  So the company that
25  manufactures Botox and other pharmaceutical

1    products?
2        A.    Botox and products that they
3  were manufacturing at that time, yes.
4        Q.    None of which are opioids,
5  correct?
6        A.    That is correct.
7        Q.    So I just want to state what we
8  just went through a little more concisely.
9        A.    Sure.
10        Q.    Please correct me if I get it
11  wrong.
12        A.    Absolutely.
13        Q.    Allergan Finance, LLC, is a
14  holding company that holds 100 percent of the
15  Allergan, comma, Inc., which is the legacy
16  Allergan entity, correct?
17        A.    Correct.
18        Q.    And the legacy Allergan entity
19  has at no point that you are aware of been
20  involved in -- in the marketing, production,
21  sale or any other -- in any other way of
22  prescription opioids, correct?
23        A.    That is correct.
24        And thinking about it, Allergan
25  Finance, comma, LLC, may have some operating

1 assets, but I -- I don't have that
2 information.
3     Q.    Assets.  But you're -- it may
4 have assets, but you are sure that it does
5 not have employees?
6     A.    That is correct.
7     Q.    How are you -- is there
8 something about the org chart that shows you
9 it does not have employees?
10     A.    No, it does not.
11     Q.    Okay.
12     A.    Doesn't show on the chart.
13     Q.    It's just something you know
14 independently?
15     A.    Yes.
16     Q.    Are you the treasurer of
17 Allergan Finance, LLC?
18     A.    I am the treasurer, yes.
19     Q.    But you do not work for
20 Allergan Finance, LLC, correct?
21     A.    That is correct.
22     Q.    You have a similar relationship
23 vis-à-vis your job as treasurer with Allergan
24 Finance, LLC, as you do with Allergan PLC,
25 correct?

1     A.    Same type of relationship --
2 providing treasury functions?
3     Q.    That you are the treasurer for
4 both companies, but you are not employed by
5 either, correct?
6     A.    Correct.
7     Q.    What other companies are you
8 treasurer for?
9     A.    There are numerous US
10 companies.  I don't have the list of names.
11     Q.    Who are the officers of
12 Allergan Finance, LLC?
13     A.    We have it listed on the grid
14 that we provided on page 12.  We list the
15 Allergan Finance, comma, LLC, officers.
16     Q.    Is that what's reflected
17 currently on the screen?
18     A.    That is correct.
19     Q.    Is this at a particular point
20 in time?  Is this -- let me withdraw that.
21          Is this the current list of
22 officers?
23     A.    Yes, it is.
24     Q.    Is this list of officers also
25 the list of officers of Allergan, comma,

1 Inc.?
2     A.    I don't have that information.
3     Q.    Okay.  You, however, are an
4 officer of Allergan Finance, LLC, correct?
5     A.    Correct.
6     Q.    Because Allergan Finance, LLC,
7 is a holding company, it has no -- let me
8 withdraw that.
9          Allergan Finance, LLC, you
10 testified, is a holding company, correct?
11     A.    I said it was a holding company
12 owning 100 percent.  Then I corrected by
13 saying it may have some operating assets.
14     Q.    Do you know if any of the
15 operating assets have anything to do with
16 opioids?
17     A.    Sub -- could you repeat that
18 question, please?
19     Q.    Do any of Allergan Finance --
20 does Allergan Finance, LLC, have any
21 involvement with opioid products?
22     A.    Through an indirect
23 relationship of subsidiaries.
24     Q.    What is -- can you walk me
25 through that indirect relationship of

1 subsidiaries?
2     A.    Sure.  And I'll just bring back
3 out this sheet here, which is the branded
4 opioids.
5     Q.    The Norco and Kadian?
6     A.    Norco and Kadian.
7          So when you look at, for
8 example -- you look at sales, currently
9 they're being sold by Allergan USA, comma,
10 Inc., which is a subsidiary of Allergan,
11 comma, Inc., which is a subsidiary of
12 Allergan Finance, comma, LLC.
13     Q.    Okay.  I thought before you
14 testified that Allergan, comma, Inc., was the
15 legacy Allergan business.
16     A.    Say it again, please.
17     Q.    I thought -- I just want you to
18 help me clarify.
19     A.    Sure.
20     Q.    My understanding of what you
21 testified to before is that Allergan, comma,
22 Inc., was the legacy Allergan business and,
23 as such, had nothing to do with opioids.
24     A.    Allergan, comma, Inc., per the
25 chart on 6 -- and again, I stand corrected on

1  that -- do some corporate reorganization.
2  Allergan Sales, comma, LLC, is the entity
3  that is currently selling the Norco product
4  and is also the entity that is selling the
5  Kadian product, the brand product.
6      Q.   On 6 you're referring to --
7      A.   Page 6.
8      Q.   -- the Bates number that ends
9  506?
10     A.   506.
11     Q.   Okay.
12     A.   If you look towards the top,
13  you see Allergan PLC, Allergan, comma, Inc.
14      If you go to your left, you
15  will -- you'll see -- okay. Hold on for one
16  second. Okay. There's two entities, okay?
17  And let's be specific here.
18      Allergan Sales, comma, LLC,
19  which is the entity that you see at the far
20  right -- okay?
21     Q.   Far right up here?
22     A.   Yes.
23     Q.   Okay.
24     A.   Okay? That holds the IP, okay,
25  the ANDA in Kadian, okay?

1      And then if -- on this chart
2  here -- where is Allergan Sales USA? If you
3  now come back a little and -- you'll see a
4  company right next to Allergan Sales, comma,
5  LLC, Allergan Specialty Therapeutics, comma,
6  Inc.
7      Q.   Uh-huh.
8      A.   Right below that is an entity
9  called Allergan USA, comma, Inc.
10     Q.   Uh-huh.
11     A.   That is where the sales, the
12  revenue, is booked for Norco as well as for
13  Kadian.
14     Q.   And does Allergan USA, comma,
15  Inc., have any employees?
16     A.   I believe not, no.
17     Q.   And then that revenue that's
18  booked at Allergan USA, comma, Inc., for the
19  sale of Kadian and Norco rolls up into the
20  consolidated financial statements of Allergan
21  PLC?
22     A.   That would be correct, yes.
23     Q.   Which also has no employees?
24     A.   That is correct.
25     Q.   In what division do people who

1  actually sell Kadian and Norco work?
2      A.   What division?
3      Q.   What entity, on this sheet or
4  any other sheet, do the individuals who sell
5  Kadian or Norco work?
6      MS. LEVY: Object to the form.
7      THE WITNESS: I don't know who
8      they're employed by.
9  QUESTIONS BY MR. MELAMED:
10     Q.   Do you know what -- prior to
11  the sale of the generic opioid products, do
12  you know what entity at Allergan employed the
13  individuals who marketed those generic drugs
14  to distributors and pharmacies?
15      MS. LEVY: Object to the form.
16      THE WITNESS: I do not.
17  QUESTIONS BY MR. MELAMED:
18     Q.   Do you know if there was
19  anybody employed anywhere within Allergan PLC
20  who fulfilled that role?
21     A.   Within PLC, the answer is no.
22     Q.   At any subsidiary to PLC?
23     A.   They would be in some
24  subsidiary.
25     Q.   You're just unaware of which

1  one?
2      A.   Which one, yes.
3      Q.   At some point Kadian was
4  marketed and detailed to physicians and other
5  health care professionals, are you aware of
6  that?
7      MS. LEVY: Objection. This is
8      beyond the scope of what this witness
9      has been proffered on.
10      But you may answer.
11      THE WITNESS: I would assume.
12  I have no direct knowledge.
13  QUESTIONS BY MR. MELAMED:
14     Q.   Okay. So you have been offered
15  to talk about the corporate structure
16  relating to opioids generally, correctly --
17  correct?
18     A.   Correct.
19     Q.   Okay. I'm going to represent
20  to you, and you can just object again, that
21  at some point in the past Kadian was marketed
22  and detailed to physicians and other health
23  care providers. With that -- let me withdraw
24  that last phrase.
25      Do you know which entity within

1   the org chart is an entity where anyone who
2   marketed Kadian or detailed Kadian to
3   physicians worked?
4      A.   I do not.
5      Q.   What about Norco?
6      A.   I do not.
7      Q.   What about generic opioids
8   prior to the sale of -- to Teva?
9      A.   I do not.
10      Q.   Do you know what entity in this
11  org chart or any other org chart employed the
12  individuals who worked on regulatory issues
13  concerning opioids?
14      A.   I do not.
15      Q.   Do you know which entity, if
16  any, within this org chart, or any other
17  employed individuals who worked in the
18  suspicious -- the monitoring of suspicious
19  sales of opioids?
20      MS. LEVY:  Objection, again, to
21     this line of questioning.  Beyond the
22     scope of what this witness is offered
23     for, and we have other corporate reps
24     who have been offered to testify about
25     these subjects.

1      MR. MELAMED:  I just want to
2   clarify.  I think you are -- is it
3   true that he was offered to talk about
4   corporation -- the organization of the
5   corporation and -- vis-à-vis opioids?
6      MS. LEVY:  This witness is
7   offered on the three topics that we've
8   offered him on.  You know what they
9   are.
10      MR. MELAMED:  Okay.  So I'll
11  reask the question.  You can object,
12  and then I'd like you to answer.
13  QUESTIONS BY MR. MELAMED:
14      Q.   What Allergan PLC entity works
15  on issues related to suspicious monitoring of
16  the sales of Allergan's opioids?
17      MS. LEVY:  Objection.  Beyond
18   the scope of what this witness has
19   been offered to testify about.
20     As you know, Counsel, we have
21   other corporate representatives who
22   have been designated to testify about
23   that topic.
24      THE WITNESS:  I do not know.
25

1  QUESTIONS BY MR. MELAMED:
2      Q.   You previously testified that
3  there are approximately 1,300 people who work
4  in the Madison, New Jersey, administrative
5  headquarters of Allergan PLC?
6      A.   Approximately.
7      Q.   Who employs those individuals?
8      A.   I do not know.
9      Q.   You said you're employed by
10  Allergan Sales, LLC, correct?
11      A.   That is correct.
12      Q.   Do you know who employs the
13  executives of Allergan PLC?
14      A.   I do not know.
15      Q.   Do you know who employs anybody
16  else in the building?
17      Without naming anybody, do you
18  know who employs anybody else in the building
19  at Madison -- in Madison?
20      A.   Well, certain groups, yes.
21      Q.   What groups?
22      A.   Well, for example, people who
23  report to me as part of the treasury
24  function, they would also be employees of
25  Allergan Sales, LLC.  Same with the other

1  finance functions as well, too.
2      Q.   What other finance -- are all
3  the finance functions for the entirety of
4  Allergan PLC within the Allergan Sales, LLC,
5  entity?
6      A.   Rephrase that, please?
7      Q.   You said -- I -- it was an
8  inartfully phrased question.  I'm trying to
9  follow up on what your testimony was.
10      A.   Sure.
11      Q.   You testified you would also
12  know about the entity that employs the
13  Allergan Finance group; is that true?
14      A.   To clarify, the Allergan
15  Finance group that works in the US at
16  Madison, New Jersey.
17      Q.   Okay.  Who employs them?
18      A.   Allergan Sales, LLC.
19      Q.   Okay.  Do you know any other
20  entities who employ individuals who work at
21  the Madison, New Jersey, location?
22      A.   I do not.
23      Q.   Approximately how many
24  employees does Allergan Sales, LLC, have?
25      A.   I do not know.

1    Q.    About how many employees are in
2  the treasury function of Allergan Sales, LLC?
3    A.    Including myself and my admin,
4  it's eight people in treasury.
5    Q.    About how many people are
6  employed in the finance group in Madison of
7  Allergan Sales, LLC?
8    A.    Well, not -- the finance
9  function -- who are hired by Allergan Sales,
10  LLC, is probably somewhere 200 to 200 -- I
11  would say about 200 people.
12    Q.    And you said they were hired by
13  Allergan Sales, LLC.
14        Can you clarify what you mean,
15  why you said "hired"?
16    A.    Well, they are on the payroll
17  of Allergan Sales, LLC, so when I get my
18  check, when I get my W-2 at the end of the
19  year, it says "Allergan Sales, LLC."
20    Q.    You testified before that you
21  weren't sure whose funds were used when ADP
22  processed your paycheck.
23        Do you remember that?
24        MS. LEVY:  Objection to
25    mischaracterization.

1  QUESTIONS BY MR. MELAMED:
2    Q.    Feel free to clarify.
3    A.    Right.  The question was, which
4  entity paid that.
5        I don't recollect or have that
6  information readily, which entity that is,
7  considering the number of legal entities that
8  we have.
9    Q.    Do you know which entity signs
10  that paycheck?
11    A.    I -- again, it's mostly all
12  direct deposits.  I don't even know if
13  there's a signature on the check.
14    Q.    But when you get your W-2, it's
15  from Allergan Sales, LLC?
16    A.    That is correct.
17    Q.    Do you know if that is true of
18  the executive officers, that their W-2s would
19  reflect salaries earned from Allergan Sales,
20  LLC?
21    A.    I don't know that.
22    Q.    Do you have any reason to
23  believe it's any different?
24    A.    It would only be an assumption
25  on my part.

1    Q.    You have no idea either way.
2  You just --
3    A.    I have no idea.
4    Q.    I asked you before about a
5  litigation hold pertaining to the City of
6  Chicago case.  Do you remember that?
7    A.    Yes.
8    Q.    And you said you didn't
9  remember a litigation hold for that case,
10  correct?
11    A.    That's correct.
12    Q.    It may have been issued, it may
13  not, you just don't have a --
14    A.    Exactly.
15    Q.    Do you have a memory of a
16  litigation hold being issued pertaining to
17  any case in the MDL?
18    A.    I -- not specifically.
19    Q.    Do you know that one has been
20  issued?
21    A.    Not specifically.  It doesn't
22  mean it has been.
23    Q.    Okay.  Understood.  I'm just
24  trying to understand.
25    A.    Yeah.

1    Q.    Has anybody told you to retain
2  all documents related to some category of
3  information concerning the MDL litigation?
4    A.    We get document, you know, hold
5  requests coming in from legal, and we
6  certainly abide by those requests, but I
7  can't list out for you here the -- here are
8  all the requests that we received in the last
9  couple of years.
10    Q.    So you just aren't sure either
11  way whether you received one pertaining to
12  any of the cases in the MDL?
13    A.    That's what I said.
14        (Allergan-Kaufhold Exhibit 17
15    marked for identification.)
16  QUESTIONS BY MR. MELAMED:
17    Q.    I'm going to hand you what I've
18  marked as Exhibit 17.  It's an e-mail chain,
19  the most recent in time from Joel Trugman to
20  Tara Brolly, cc'ing others.  The Bates number
21  is ALLERGAN_MDL_01335569.
22        First, I want to draw your
23  attention to the signature block of Mr. --
24  Dr. Trugman on the last in time e-mail, which
25  is on top of the first page.

1    Do you see that?
2    A.   Yes.
3    Q.   Do you see where he represents
4  he is -- what company represents -- employs
5  him? I'm sorry, let me withdraw that.
6    Do you see what company he
7  represents employs him?
8    A.   I see it in the signature.
9    Q.   And it's Allergan PLC, correct?
10   A.   That's what he has.
11   Q.   Okay. And you -- so your
12 testimony is that Allergan PLC has no
13 employees; is that correct?
14   A.   That's correct.
15   Q.   Okay. Do you know which
16 Allergan entity employs Dr. Trugman?
17   A.   I do not.
18   Q.   And you see that generally --
19 and I'm happy to give you a minute to review
20 it.
21   A.   Sure.
22   Q.   But the e-mail written on
23 June 29, 2015, from Dr. Trugman to Tara
24 Brolly concerns opioid REMS assessments.
25   A.   I see it here, yes.

1    Q.   Are you familiar with what a
2  REMS assessment is?
3    A.   This is outside my area of
4  expertise. I don't know the subject or these
5  individuals.
6    Q.   Okay. You don't know any of
7  these individuals --
8    A.   I do not.
9    Q.   -- is that correct?
10   A.   No.
11   Q.   Okay. You can put that aside.
12   (Allergan-Kaufhold Exhibit 18
13 marked for identification.)
14 QUESTIONS BY MR. MELAMED:
15   Q.   I'm handing you what's been
16 marked as Exhibit 18. Exhibit 18 is an
17 e-mail and attachments.
18   The e-mail is from Wendy
19 Despain to Julienne Balcon, or Balcon, dated
20 August 4, 2015. The Bates number is
21 ALLERGAN_MDL_01334578.
22   Attachment starts at
23 ALLERGAN_MDL_01334579 and ends -- that is
24 all -- all those pages are actually a single
25 document. It's a spreadsheet that's been

1  pointed out.
2    A.   Understood.
3    Q.   Printed out.
4    Do you see the signature block
5  in Ms. Balcon's e-mail from August 4th --
6    A.   Yes.
7    Q.   -- at 1:03.
8    Do you see where she writes she
9  is employed?
10   A.   Yes.
11   Q.   And you see that's Allergan
12 PLC?
13   A.   No. It was Allergan, comma,
14 PLC, period.
15   Q.   Is Allergan, comma, PLC,
16 period, a different entity within the
17 Allergan PLC family?
18   A.   I've never heard of this
19 entity.
20   Q.   Is it your -- do you have any
21 reason to believe this is anything but a typo
22 and that she meant to write Allergan PLC?
23   MS. LEVY: Objection.
24   THE WITNESS: I don't know.
25

1  QUESTIONS BY MR. MELAMED:
2    Q.   You don't know either way.
3    As treasurer of -- let me
4  withdraw that.
5    You can put that aside.
6    (Allergan-Kaufhold Exhibit 19
7  marked for identification.)
8  QUESTIONS BY MR. MELAMED:
9    Q.   I'm going to hand you what's
10 been marked as Exhibit 19. It's an e-mail
11 string starting at ALLERGAN_MDL_01334588,
12 continuing to 589, the most recent in time
13 being an e-mail from Wendy Despain to Anna
14 Haripersaud on August 18, 2015.
15   Do you see Ms. Haripersaud's
16 e-mail signature in the middle of the first
17 page?
18   A.   I do.
19   Q.   Do you see that she represents
20 she works -- in her signature, she represents
21 she works at Allergan PLC?
22   A.   That's what it shows.
23   Q.   And if you go to the e-mail
24 first in time and then follow up, you -- the
25 second page, so those first two e-mails,

1    reflect an annual report on Kadian.
2         Do you see that?
3         A.   I do.
4         Q.   Okay.  And then if you turn
5    back to the first page, Wendy Despain asks
6    for information about patient exposure --
7    exposure data for morphine sulfate XR
8    capsules, generic product?
9         A.   I see that.
10        Q.   And do you see that -- do you
11   understand that those capsules are generic
12   opioids?
13        A.   Other than referencing it to
14   the list here, yes.
15        Q.   You're aware?
16        A.   Yes.
17        Q.   Okay.  And I just want to -- if
18   you pull back Exhibit 18 for a second and
19   hold it next to 19, and you look at the
20   signature files of Anna Haripersaud and
21   Julienne Balcon side by side, do you see they
22   work at the same address?
23        A.   They work at the same 185
24   Hudson Street.
25        Q.   Both in Plaza 5, correct?

1         A.   Plaza 5, yes.
2         Q.   Both look like they work on the
3    19th floor, correct?
4              One says "19th floor"; one says
5    "Suite 1900"?
6         A.   It appears that.
7         Q.   Okay.  Do you see that -- does
8    that provide any reason for you to change
9    your assessment about whether Allergan,
10   comma, PLC, period, is a typo?
11        A.   I mean, it's confusing to me
12   because in their e-mail addresses and the
13   website references it says "actavis.com."
14             (Allergan-Kaufhold Exhibit 20
15   marked for identification.)
16   QUESTIONS BY MR. MELAMED:
17        Q.   Handing you what's been marked
18   as Exhibit 20.
19        A.   Thank you.
20        Q.   Exhibit 20 is an e-mail string
21   starting at ALLERGAN_MDL_01489486, continuing
22   through 9488.  It is -- it says, "From daily
23   inventory report," dated December 11, 2015.
24             Do you see that?
25        A.   I see that.

1         Q.   Okay.  Do you see that the
2    signature on the second page from Ebenezer
3    Ankrah is from Allergan PLC?
4         A.   I see that.
5         Q.   Do you see just above the
6    signature that it concerns at least -- that
7    this daily inventory report calls out
8    information as to at least one opioid
9    product, oxycodone HCL CR?
10        A.   I see that.
11        Q.   If you look at the "to" list,
12   there -- and I'll -- on the first page, all
13   the addressees, they appear to be
14   alphabetical by last name.
15             Do you see Paul Bisaro on the
16   fourth line?
17        A.   I do.
18        Q.   He was the CEO of Allergan PLC
19   at that time, correct?
20        A.   CEO of -- December 15.  He
21   was -- what did -- rephrase that, please?
22   What was the question?
23        Q.   Was he the CEO of Allergan PLC
24   at that time?
25        A.   No.

1         Q.   What was he -- what was his
2    role?
3         A.   He possibly could have been
4    director.
5         Q.   Okay.  So he was no longer the
6    CEO, but he was, I believe, actually
7    executive director of Allergan PLC.
8              Does that sound --
9         A.   That's correct.
10        Q.   Okay.  And that would be
11   reflected in the 10-K, correct?
12        A.   Correct.
13        Q.   And then if you look down about
14   four-fifths of the way down the addressee
15   list, do you see Robert A. Stewart?
16        A.   Yes.
17        Q.   At that time, was Mr. Stewart
18   an executive officer of Allergan PLC?
19        A.   He was an executive off -- at
20   2015, yes.
21        Q.   He was the chief operating
22   officer, correct?
23        A.   Correct.
24             And just back on the signature,
25   since it did get cut off, if we look at the

1 top of the next page, again, it's the use of
2 an actavis.com e-mail address.
3    Q.   Is it possible that the use of
4 the actavis.com e-mail addresses that you've
5 been referencing while simultaneously
6 referencing employment at Allergan PLC is
7 because the name had changed around this
8 time?
9    A.   I'm not sure when the name
10 change took place.  I would have thought the
11 name change would have been a little bit
12 earlier in the year when we acquired
13 Allergan.
14       (Allergan-Kaufhold Exhibit 21
15       marked for identification.)
16 QUESTIONS BY MR. MELAMED:
17    Q.   I'm going to hand you what's
18 been marked Exhibit 21.  It's an e-mail chain
19 starting at ALLERGAN_MDL_0 -- I'm sorry,
20 ALLERGAN_MDL_02024980, continuing
21 through 4982, the most recent in time being
22 from Lynne Bolduc to Michael Kuderka on
23 September 30, 2016.
24       I want you to turn to the
25 first-in-time e-mail, which starts on page 2.

1    A.   (Witness complies.)
2    Q.   It's an e-mail from -- do you
3 see it's an e-mail from Jon Kamp to -- at The
4 Wall Street Journal from -- to Mark Marmur
5 and Frances DeSena?
6    A.   Yes.
7    Q.   And Jon Kamp writes with a
8 series of questions or statements that he
9 wants -- wants information about from
10 Allergan.
11       Do you see that?
12    A.   I need to read through it,
13 but --
14    Q.   Sure.
15    A.   Okay.  It seems like four
16 questions.
17    Q.   Okay.  And if you go up to the
18 bottom e-mail at the page -- at the -- I'm
19 sorry, the e-mail at the bottom of page 1,
20 which is next in time, you'll see that it's
21 Mark Marmur sending something on to Michael
22 Kuderka, who was not on the initial e-mail
23 from The Wall Street Journal reporter,
24 saying, "See below for responses.  Let me
25 know if you have any comments or Norco

1 specific," and then some other information.
2       Do you see that?
3    A.   Yes.
4    Q.   So if you go back to the first
5 e-mail in time from Jon Kamp's e-mail?
6    A.   Uh-huh.
7    Q.   It appears that Mr. Marmur's
8 responses are below each of the bullet
9 points.
10    A.   Yes.
11    Q.   Correct?
12    A.   Yes.
13    Q.   Do you see where Mark Marmur's
14 signature file identifies his place of
15 employment?  What he says is his place of
16 employment?
17    A.   Yes.
18    Q.   And that's Allergan PLC,
19 correct?
20    A.   It says "Allergan PLC."
21    Q.   And he was the director of
22 corporate affairs, right?
23    A.   By his title.
24    Q.   Do you know Mr. Marmur?
25    A.   I do know him.

1    Q.   What is his role at the
2 company?
3    A.   He's still part of corporate
4 affairs.  No longer works in Madison but is
5 overseas.
6    Q.   At this time, do you know what
7 his -- was he the director of corporate
8 affairs?  Is that an accurate description of
9 what you understood his role to be?
10    A.   Yes.
11    Q.   Who employed him?  What -- what
12 organizational entity within the Allergan
13 family employed Mr. Marmur?
14    A.   I don't know that.
15    Q.   And just to bring your
16 attention to more e-mail address confusion,
17 you see in the second-to-last e-mail, near
18 the top the first page, September 30, 2016,
19 at 6:23, it says, "Kuderka_Michael," and then
20 it gives his e-mail address as an
21 allergan.com e-mail address, wrote -- he
22 writes something, and then his signature
23 says -- provides his e-mail address as
24 actavis.com.
25       Do you see that?

1    A.    I see that.
2        But he also has Allergan, which
3  I'm not sure which entity that is.
4    Q.    What is Allergan PLC's, excuse
5  me, website?
6    A.    Would be allergan.com.
7        MR. MELAMED:  Let's off the
8  record.
9        THE WITNESS:  Sure.
10        VIDEOGRAPHER:  Standby, please.
11  Remove your microphones.
12        The time is 3:41 p.m.  Going
13  off the record.
14    (Off the record at 3:41 p.m.)
15        VIDEOGRAPHER:  All right.  We
16  are back on the record.  The time is
17    3:56 p.m.
18  QUESTIONS BY MR. MELAMED:
19    Q.    Are you aware of an entity --
20  an Allergan entity named Allergan
21  Pharmaceuticals, Inc.?
22    A.    I am not.
23    Q.    Are you aware of an entity
24  named Allergan Health Solutions, Inc.?
25    A.    I am not.

1        MR. MELAMED:  So I want to
2  state for the record that counsel for
3  Allergan offered -- you know,
4  encouraged us to take the time to
5  review the documents that were
6  provided this morning -- or at noon
7  when we started the deposition and ask
8  questions on them today in order to
9  avoid fights later.  I appreciate the
10  offer.
11        I want to state that I'm not
12  able to review and develop questions
13  for those right now, and so we will
14  reserve our right to call you back in
15  the event that on review we want to
16  ask further questions about.
17        And I also want to state that
18  though the three topics agreed on
19  included testimony about all Allergan
20  entities' roles in connection with any
21  opioids from 1995 to present and all
22  management of those opioids, that
23  Mr. Kaufhold was unable to answer a
24  number of those questions.  And we
25  will reserve our right to seek

1  additional time for deposition of
2  another 30(b)(6) witness or
3  Mr. Kaufhold at another time to answer
4  those questions.
5        And I have no further
6  questions.
7        MS. LEVY:  Could the court
8  reporter state the time for the record
9  and the time used in this deposition?
10        VIDEOGRAPHER:  So we've used up
11  3 hours and 9 minutes.
12        MS. LEVY:  Okay.  I have a
13  question for you, Mr. Kaufhold.
14        CROSS-EXAMINATION
15  QUESTIONS BY MS. LEVY:
16    Q.    To the best of your knowledge,
17  does Allergan PLC have any documents related
18  to the manufacture, sale, marketing,
19  promotion of opioids?
20    A.    It does not.
21        MS. LEVY:  And in response to
22  counsel's comments both at the
23  beginning of the deposition and now,
24  let me make the following
25  representations so that our record is

1  clear.
2        Today when we arrived at the
3  deposition, we came and provided
4  counsel with a folder that is
5  Exhibit 3 in the deposition.  That
6  folder contains five documents, all
7  previously -- three of the documents
8  previously produced in the case --
9  sorry, let me correct myself -- two
10  documents previously produced in the
11  case.
12        The first are the schedules to
13  the Teva MPA, which have been
14  previously produced.  The second is an
15  org chart which has been previously
16  produced to counsel.
17        Both documents Mr. Kaufhold
18  anticipated that he may need to rely
19  on for his deposition and, therefore,
20  brought them with him in case he was
21  asked questions that required him to
22  consult on those two documents.
23        The other three documents that
24  were provided in Exhibit 3 reflect
25  notes that Mr. Kaufhold, along with

1  counsel, in preparation for the
2  deposition, prepared in order to
3  assist him in testimony that we
4  anticipated that you might ask, and in
5  preparing and finding the answers to
6  the subtopics that we agreed would be
7  the subject of this deposition.
8       Mr. Kaufhold took notes, himself
9  compiled things, found himself unable
10  to remember all of the corporate
11  structure over the period of time that
12  you had asked.
13       We don't believe that we have
14  any obligation to provide these to
15  you. But, however, every deposition
16  I've ever been in when a witness comes
17  with notes and deposition aids,
18  opposing counsel has asked me to see a
19  copy. So as a courtesy, we copied
20  them and provided them to you in order
21  to assist you in having what he had to
22  give testimony in the case.
23       So the other three documents
24  are a flow chart which Mr. Kaufhold
25  prepared, with assistance of his

1  counsel, in order to more efficiently
2  illustrate the history of the
3  corporate acquisitions and which a
4  great deal of testimony has been given
5  about today.
6       The two documents remaining in
7  Exhibit 3 are his notes compiled
8  with -- reflecting his research and
9  all documents consulted in preparation
10  of his responses to those documents,
11  and both have been provided.
12       We renew our -- so again, you
13  know, in hopes of just avoiding
14  unnecessary fights down the road, no
15  documents were provided, unlike what
16  some of the plaintiffs have done in
17  this case, like dumping new documents
18  during the deposition. This is not
19  that.
20       The two documents you haven't
21  seen before are -- reflect the notes
22  of what he used as notes for himself.
23  We have provided them to avoid a fight
24  on that.
25       And certainly if you'd like to

1  take time and read them further and
2  ask questions about it, given the
3  early hour today, we are more than
4  happy to take a break and allow you to
5  do that.
6       It's no secret to you or
7  anybody in the room that if you choose
8  not to do that, we will object to
9  taking more time with Mr. Kaufhold
10  because we don't agree that you even
11  really have the right to these and
12  that we've -- you know, we have bent
13  over backwards to make things easy and
14  efficient for you by providing them in
15  the first place.
16       MR. MELAMED: We can agree to
17  disagree on that, with the one note
18  that I asked repeatedly via e-mail
19  over the last week for the provision
20  of any materials that you had
21  referenced he would be bringing.
22       MS. LEVY: Sure.
23       And as you know, we were
24  working with Mr. Kaufhold in preparing
25  his summary right up through the end

1  of the day yesterday and, you know --
2  so it is what it is. The record is
3  clear on what this Exhibit 3 is.
4       And I don't have anything
5  further.
6       MR. MELAMED: Does anybody in
7  this room have any further questions?
8       Does anybody, if anybody is
9  left on the phone, have any further
10  questions?
11       We'll go off the record.
12       VIDEOGRAPHER: This marks the
13  end of today's deposition. The time
14  is 4:04 p.m. Going off the record.
15  (Deposition concluded at 4:04 p.m.)
16       MR. JACOBS: Would we be able
17  to get a rough and the like the same
18  as Allergan?
19       -------
20
21
22
23
24
25

```
 1          CERTIFICATE
 2
 3      I, CARRIE A CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
 4  Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
 5  of the examination, Stephan Kaufhold was duly
    sworn by me to testify to the truth, the
 6  whole truth and nothing but the truth
 7      I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability
10
        I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action
14
15
16
             _____
17  CARRIE A CAMPBELL,
    NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
    Notary Public
19

20

21

22
23  Dated: October 29, 2018
24
25
```

```
 1      INSTRUCTIONS TO WITNESS
 2
 3      Please read your deposition over
 4  carefully and make any necessary corrections.
 5  You should state the reason in the
 6  appropriate space on the errata sheet for any
 7  corrections that are made.
 8      After doing so, please sign the
 9  errata sheet and date it. You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13      It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you. If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25
```

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4      I,_____, do
 5  hereby certify that I have read the foregoing
    pages and that the same is a correct
 6  transcription of the answers given by me to
    the questions therein propounded, except for
 7  the corrections or changes in form or
    substance, if any, noted in the attached
 8  Errata Sheet.
 9
10
11
12  _____
    Stephan Kaufhold          DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
25
```

```
 1          - - - - - - -
            ERRATA
 2          - - - - - - -
 3  PAGE  LINE  CHANGE/REASON
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```

```
 1              - - - - - - -
                LAWYER'S NOTES
 2              - - - - - - -
 3    PAGE  LINE
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25
```