Page 1

1              IN THE UNITED STATES COURT

2              NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4              ~~~~~~~~~~~~~~~~~~~~~

5    IN RE:  NATIONAL PRESCRIPTION

6    OPIATE LITIGATION              MDL No. 2804

7                                   Case No. 17-md-2804

8                                   Judge Dan Polster

9    This document relates to:

10   The County of Summit, Ohio, et al., v.

11   Purdue Pharma L.P., et al.,

12   Case No. 1:18-OP-45090 (N.D. Ohio)

13

14

15

16            VIDEOTAPED DEPOSITION OF

17          MARGARET ("MAGGIE") KEENAN

18        December 12, 2018, at 9:00 a.m.

19                Cleveland, Ohio

20

21

22

23   Reported by:

24   Anne E. Vosburgh, CSR-6804, RPR, CRR

25   Job No. 3153090

Page 2

```
1              -oOo-
2
3       On December 12, 2018, commencing at
4  approximately 9:00 a.m., the deposition of
5  MARGARET ("MAGGIE") KEENAN, taken by Counsel
6  for the Defendants, was held at the offices
7  of Climaco Wilcox Peca Tarantino & Garofoli
8  LPA, located 55 Public Square, Suite 1950,
9  Cleveland, Ohio 44113-197255, before and
10 stenographically reported by
11 Anne E. Vosburgh, Certified Shorthand
12 Reporter No. 6804, Registered Professional
13 Reporter, Certified Realtime Reporter, and
14 Notary Public.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1  (Appearances, continued.)
2
3  On behalf of Cardinal Health:
4      WILLIAMS & CONNOLLY
5      725 Twelfth Street, N.W.
6      Washington, D.C. 20005
7      202.434.5421
8      By: Paul E. Boehm, Esq.
9         pboehm@wc.com
10
11 On behalf of Janssen Pharmaceutica Inc., Janssen
12 Pharmaceuticals, Inc., Johnson & Johnson, and
13 Ortho-McNeil-Janssen Pharmaceuticals, Inc.;
14     TUCKER ELLIS LLP
15     950 Main Avenue
16     Suite 1100
17     Cleveland, Ohio 44113
18     By: Tariq M. Naeem, Esq.
19        tariq.naeem@tuckerellis.com
20
21
22
23
24
25
```

Page 3

```
1  APPEARANCES:
2
3  On behalf of Cuyahoga County and the
4  Witness:
5      NAPOLI SHKOLNIK PLLC
6      400 Broadhollow Road, Suite 305
7      Melville, NY 11747
8      631.224.1133
9      By: Salvatore C. Badala, Esq.
10        sbadala@napolilaw.com
11     By: Joseph L. Ciaccio, Esq.
12        jciaccio@napolilaw.com
13 and
14     SMITH LAW OFFICE
15     5003 Horizons Drive
16     Suite 200
17     Columbus, Ohio 43220
18     614.846.1700
19     By: Scott Elliott Smith, Esq.
20        ses@sestriallaw.com
21
22
23
24
25
```

Page 5

```
1  (Appearances, continued.)
2
3  On behalf of Distributor Defendant
4  McKesson Corporation, Co-Liaison Counsel
5  for the Distributor Defendants:
6      COVINGTON & BURLING LLP
7      One City Center
8      850 Tenth Street, NW
9      Washington, D.C. 20001-4956
10     202.662.6000
11     By: David W. Haller, Esq.
12        dhaller@cov.com
13
14 On behalf of Walmart Inc. F/K/A Wal-Mart
15 Stores, Inc.:
16     JONES DAY
17     51 Louisiana Avenue, N.W.
18     Washington, D.C. 20001-2113
19     202.879.3939
20     By: Sarah G. Conway, Esq.
21        sgconway@jonesday.com
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1 (Appearances, continued.)
2
3 On behalf of Endo Health Solutions, Inc.,
4 Endo Pharmaceuticals Inc., Par Pharmaceutical,
5 Inc., and Par Pharmaceutical Companies, Inc.,
6 (FKA Par Pharmaceutical Holdings, Inc.)
7     ARNOLD & PORTER
8     601 Massachusetts Ave., NW
9     Washington, D.C. 20001-3743
10     202.942.5404
11     By:  Adam M. Pergament
12       (via Veritext Virtual)
13       adam.pergament@arnoldporter.com
14
15 On behalf of AmerisourceBergen Drug Corporation:
16     REED SMITH LLP
17     1301 K Street, N.W.
18     Suite 1000, East Tower
19     Washington, D.C.  20005
20     202.414.9200
21     By:  Anne E. Collins, Esq.
22       (via Veritext Virtual)
23       acollins@reedsmith.com
24
25 Also present:  Kurt Henschel, Legal Videographer

Page 7

1         I N D E X
2
3 WITNESS:  MARGARET "Maggie" KEENAN
4
5     ---------- EXAMINATIONS ----------
6
7 Examination by Mr. Boehm                12
8 Examination by Mr. Badala               455
9 Re-Examination by Mr. Boehm             462
10
11
12
13
14     ---------- OCCURRENCES ----------
15 Phone call to Special Master       Page 48 to 65
16 Instruction to not answer       Page 274, Line 14
17
18
19
20
21
22
23
24
25

Page 8

1      ---------- EXHIBITS ----------
2 NUMBER        DESCRIPTION            PAGE
3 Exhibit 1    Maggie Keenan, Curriculum      45
4            Vitae, CUYAH_003301608 to
5            CUYAH_003301609
6 Exhibit 2    Cuyahoga County,          136
7            Organizational Chart - no
8            Bates
9 Exhibit 3    2018-2019 Biennial Budget,    160
10           County of Cuyahoga County,
11           Ohio, Bates CUYAH_000010910
12           through CUYAH_000011080
13 Exhibit 4    Email chain, Bates        322
14           CUYAH_005324032 through
15           CUYAH_005324034
16 Exhibit 5    Email chain, Bates        332
17           CUYAH_001764533 through
18           CUYAH_001764535
19 Exhibit 6    Email, Bates CUYAH_001763476  341
20           through CUYAH_001763483
21 Exhibit 7    Email, Bates CUYAH_001757582  360
22 Exhibit 8    Email chain, Bates        372
23           CUYAH_001764847 through
24           CUYAH_001764848
25

Page 9

1 (Exhibits, continued.)
2 Exhibit 9    Email, Bates CUYAH_001739956  378
3 Exhibit 10   Email, March 1, 2018, Bates   390
4           CUYAH_001738714
5 Exhibit 11   Email chain, Bates        393
6           CUYAH_001764146 through
7           CUYAH_001764148
8 Exhibit 12   Email chain, Bates        401
9           CUYAH_001742324 through
10           CUYAH_001742325
11 Exhibit 13   Email, Bates CUYAH_001749074  406
12 Exhibit 14   Email, CUYAH_001715624      412
13 Exhibit 15   Email chain, Bates        415
14           CUYAH_001753465 through
15           CUYAH_001753466
16 Exhibit 16   Email, "Actuals," Bates     420
17           CUYAH_001732895
18 Exhibit 17   *Clawed Back* Email, "Re:    424
19           Opiates," Bates
20           CUYAH_001753000
21
22
23
24
25

3 (Pages 6 - 9)

Page 10

1 (Exhibits, continued.)
2 Exhibit 18    Plaintiffs County of          430
3            Cuyahoga, Ohio, and the State
4            of Ohio, Prosecuting Attorney
5            of Cuyahoga County,
6            O'Malley's Second
7            Supplemental Responses and
8            Objections to Interrogatory 18
9
10 Exhibit 19    Email chain, "Re: Deaths     436
11           under 18," Bates
12           CUYAH_001641531,
13           CUYAH_001729677, and
14           CUYAH_001729694
15
16        (EXHIBIT 17 CLAWED BACK,
17        ALL OTHER EXHIBITS ATTACHED.)
18
19
20
21
22
23
24
25

Page 11

1            Cleveland, Ohio
2         December 12, 2018, 9:00 a.m.
3         ---------------
4              PROCEEDINGS
5         ---------------
6         THE VIDEOGRAPHER:  We're on the
7    record at 9:09.
8         Today's date is December 12th,
9    2018.  We are here in the matter of
10   National Prescription Opiate
11   Litigation.  This deposition is taking
12   place in Cleveland, Ohio.
13        Will counsel please identify
14   themselves for the record.
15        MR. BADALA:  Salvatore Badala for
16   the plaintiff, Cuyahoga County.
17        MR. CIACCIO:  Joseph Ciaccio for
18   Cuyahoga County.
19        MR. SMITH:  Scott Smith for
20   Cuyahoga County.
21        MR. BOEHM:  Good morning,
22   everybody.  My name is Paul Boehm.  I'm
23   at Williams & Connolly.  I'm here for
24   Cardinal Health.
25        MS. CONWAY:  Sarah Conway from

Page 12

1    Jones Day for Walmart.
2         MR. NAEEM:  Tariq Naeem, Tucker &
3    Ellis, for Janssen and J & J.
4         MR. HALLER:  Dave Haller,
5    Covington & Burling, for McKesson.
6         MR. BOEHM:  And by telephone?
7         MR. PERGAMENT:  Adam Pergament
8    from Arnold & Porter, for the Endo and
9    Par Pharmaceutical defendants.
10        MR. BOEHM:  Is anybody else on
11   the phone?
12        MS. COLLINS:  Hi.  This is
13   Anne Collins from Reed Smith for
14   AmerisourceBergen Drug Corporation.
15 MAGGIE KEENAN,
16   having been called as a witness, was
17   duly sworn to testify to the truth by
18   an authorized notary public and
19   testified as follows.
20            ---
21            EXAMINATION
22 BY MR. BOEHM:
23   Q.  Good morning, Ms. Keenan.
24   A.  Good morning.
25   Q.  Thank you for being here.  You

Page 13

1 and I introduced ourselves before we went on
2 the record.  I'll do that again for the
3 record.
4         My name is Paul Boehm, and I
5 represent one of the defendants in this
6 case.  And I'll be asking you some questions
7 here today.
8    A.  Okay.
9    Q.  Now, I understand that you are
10 the director of the Cuyahoga County Office of
11 Budget Management; is that correct?
12   A.  That's correct.
13   Q.  And can you just spell your name
14 so that we have it for the record?
15   A.  It's K-e-e-n-a-n.
16   Q.  And your first name as well,
17 please?
18   A.  Oh, sorry.  M-a-r-g-a-r-e-t.
19   Q.  Do you have an understanding
20 about why you have been identified as a
21 witness in this case?
22        MR. BADALA:  Objection to form.
23 BY MR. BOEHM:
24   Q.  You can go ahead and answer.
25   A.  Yes.  As the director of the

4 (Pages 10 - 13)

Page 14

1  Office of Budget Management, I have knowledge
2  relative to all financial matters that affect
3  the county.
4      Q.  Now, do you have knowledge about
5  financial matters that date back prior to
6  your time as the director of the Office of
7  Budget Management?
8      A.  I do.  I was first hired in the
9  Office of Budget Management in 2006.
10     Q.  And have you undertaken, as part
11 of your responsibilities as the current
12 director of that office, to try and
13 understand the historical budgeting process
14 and the historical budgets for the county?
15         MR. BADALA:  Objection to form.
16         THE WITNESS:  Absolutely.
17 BY MR. BOEHM:
18     Q.  When did you first learn about
19 the existence of this lawsuit?
20         MR. BADALA:  I'm just going to
21     instruct you that to the extent a
22     communication came from the law
23     department or an attorney, not to
24     disclose that communication.  So you can
25     answer without disclosing that

Page 15

1      communication.
2          THE WITNESS:  I cannot.
3          MR. BOEHM:  No, no, no.  I think
4      the direction might have been confusing.
5          MR. BADALA:  Yeah.  He's asking
6      when, not asking what the conversation
7      was about.  Do you know a date?
8          I'm assuming you're asking a
9      date.
10         MR. BOEHM:  Correct.
11 BY MR. BOEHM:
12     Q.  I'm not asking about the
13 substantive conversations or you to tell me
14 what Sal said to you or what you said to
15 Sal --
16     A.  Okay.
17     Q.  -- or Sal's friends.
18         I'm asking you, just as a
19 factual matter, when did you first learn
20 about the existence of this lawsuit.
21     A.  I can't recall a date.
22     Q.  Can you recall generally when
23 that would have been?
24     A.  I cannot.
25     Q.  Would it have been in 2018?

Page 16

1      A.  I don't want to guess.  I don't
2  know.
3      Q.  Do you recall how you learned
4  about the existence of a lawsuit?
5      A.  Yes.
6      Q.  And how is that?
7      A.  That was communicated by the
8  county's law director.
9      Q.  When you reference the county's
10 law director, you're referring to an employee
11 of Cuyahoga County?
12     A.  I am.
13     Q.  Who works in the law department?
14     A.  Yes.
15     Q.  And who is that?
16     A.  Robert Triozzi.
17     Q.  Do you have views or opinions
18 about the merits of this lawsuit?
19         MR. BADALA:  Objection to form.
20         THE WITNESS:  No.
21 BY MR. BOEHM:
22     Q.  Have you read the complaint?
23     A.  I have not.
24     Q.  Has anybody ever asked you to
25 review the complaint?

Page 17

1      A.  No.
2      Q.  Do you have any opinions about
3  what factors have caused or contributed to
4  the misuse or the abuse of opiates --
5          MR. BADALA:  Objection to form.
6  BY MR. BOEHM:
7      Q.  -- in Cuyahoga County?
8          MR. BADALA:  Objection to form.
9          THE WITNESS:  I'm sorry.  Could
10     you repeat the question?
11         MR. BOEHM:  Sure.  Perhaps the
12     court reporter can read it back for you.
13     (The reporter read back where
14         requested.)
15         THE WITNESS:  So based on
16     articles I've read, journals I've read,
17     I do believe that there is -- that the
18     abuse is related to prescription
19     opiates.
20 BY MR. BOEHM:
21     Q.  And when you say that you believe
22 the abuse is related to prescription opiates,
23 can you say more about what you mean by that?
24     A.  I'm unclear really what you're
25 asking.  That's my belief based on what I've

5 (Pages 14 - 17)

Page 18

1 read and what I've heard.
2 Q. Right. And I'm just trying to
3 understand what you mean when you say it's
4 your understanding that prescription opiates
5 have caused or contributed to the misuse or
6 abuse of opiates.
7 A. So you're asking my opinion?
8 Q. Uh-huh.
9 A. And based on what I've read and
10 what I've heard, I do believe that the cause
11 of our current epidemic is related to
12 prescription opiates.
13 Q. Right. And I'm -- can you
14 explain why that is your understanding?
15 A. Like I said, it's based on
16 articles I've read, journals I've read,
17 conversations I've had.
18 Q. What articles are you referring
19 to?
20 A. I can't recall specific articles
21 I've read. I read articles every day.
22 Q. Newspaper articles or articles
23 from other sources?
24 MR. BADALA: Objection to form.
25 THE WITNESS: Newspaper articles,

Page 19

1 magazine articles, journals.
2 BY MR. BOEHM:
3 Q. Can you remember any one
4 particular article that you've read that has
5 informed your understanding on the question
6 of what has caused or contributed to the
7 misuse or the abuse of opiates in Cuyahoga
8 County?
9 A. I'm sorry, I can't.
10 Q. You also indicated that you might
11 have had some conversations about that
12 subject --
13 A. Yes.
14 Q. -- that have informed your
15 understanding?
16 A. Yes.
17 Q. With whom have you had such
18 conversations?
19 A. I can't recall specific
20 individuals. I have conversations with
21 people every day.
22 Q. Do you have conversations every
23 day with people about the misuse and abuse of
24 opiates?
25 A. I have conversations about that

Page 20

1 quite frequently. It's dramatically
2 affecting the county's budget, which is my
3 area of expertise.
4 Q. Who do you have those
5 conversations with?
6 MR. BADALA: Objection to form.
7 THE WITNESS: So within the
8 county system specifically, Dr. Thomas
9 Gilson, our medical examiner; Walter
10 Parfejewiec, our director of Health and
11 Human Services; Hugh Shannon, the
12 administrator for the medical examiner's
13 office.
14 BY MR. BOEHM:
15 Q. Anybody else?
16 A. No.
17 Q. How regularly do you speak with
18 Mr. Gilson, Mr. Shannon, or -- I'm going to
19 not say this name correctly -- Par --
20 A. Parfejewiec.
21 Q. -- Parfejewiec on the subject of
22 opiate misuse or abuse?
23 MR. BADALA: Objection to form.
24 THE WITNESS: Quite frequently.
25

Page 21

1 BY MR. BOEHM:
2 Q. Can you say what you mean by
3 that?
4 A. I routinely have conversations
5 with those individuals and anyone else in the
6 county because it impacts the county budget.
7 Q. You mean once a week, once a
8 month? How often?
9 MR. BADALA: Objection to form.
10 THE WITNESS: I can't guess.
11 BY MR. BOEHM:
12 Q. When is the last time you've had
13 a conversation with any of the three
14 individuals you've identified as having
15 conversations about the subject of opiate
16 abuse in Cuyahoga County?
17 A. I can't recall a specific date.
18 I don't keep notes.
19 Q. Was it within the last month?
20 A. I don't want to guess.
21 Q. Was it in the last six months?
22 MR. BADALA: Objection to form.
23 THE WITNESS: Yes.
24 BY MR. BOEHM:
25 Q. And do you recall what you

6 (Pages 18 - 21)

Page 22

1    discussed?
2           MR. BADALA:  Objection to form.
3           THE WITNESS:  Not specifically,
4       no.
5    BY MR. BOEHM:
6       Q.  Do you recall generally what you
7    discussed?
8       A.  Prescription opiates.
9       Q.  What did you discuss -- well, let
10   me back up.
11          Who was that conversation with?
12      A.  I have had conversations with
13   those three individuals within the last six
14   months.  I don't recall specific dates.  I
15   don't recall the specific nature of any one
16   of those conversations.
17      Q.  What was the general nature of
18   those conversations?
19          MR. BADALA:  Objection to form.
20          THE WITNESS:  Prescription
21      opiates and the impact on the county
22      budget.
23   BY MR. BOEHM:
24      Q.  Did they provide you information
25   about their views on prescription opiates and

Page 23

1    the impact on Cuyahoga County's budget?
2           MR. BADALA:  Objection to form.
3           THE WITNESS:  I don't recall the
4       specific nature of any of those
5       conversations.
6    BY MR. BOEHM:
7       Q.  So you don't know if they gave
8    you information that informed your
9    understanding about the impact of
10   prescription opioids on Cuyahoga County's
11   budget?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I'm saying I don't
14      recall the specific nature of the
15      conversations that I've had within the
16      last six months.
17   BY MR. BOEHM:
18      Q.  Do you recall conversations with
19   any of those individuals where they provided
20   to you information --
21          MR. BADALA:  Objection to form.
22          MR. BOEHM:  I'm sorry.  I'm not
23      done yet, Sal.
24   BY MR. BOEHM:
25      Q.  -- about the specific impact of

Page 24

1    prescription opiates on Cuyahoga County's
2    budget?
3           MR. BADALA:  Objection to form.
4           THE WITNESS:  Conversations, no.
5       But I have received data from all those
6       sources.
7    BY MR. BOEHM:
8       Q.  When you talk about receiving
9    data, what data have you received from them?
10      A.  As part of my job, I track
11   certain key indicators in county operations
12   so that I can make judgments relative to
13   current year spending, future year spending.
14   Part of what OBM does is we provide forecasts
15   not only for the current year, but also for
16   five years out.  We're required to do that by
17   law.
18          So I do track, for example, the
19   number of children in out-of-home placement
20   in our Department of Children and Family
21   Services.  I track the number of people that
22   are in our jail.  I track the number of
23   autopsies performed.  I have received data
24   on the number of toxicology tests that we're
25   performing in the Medical Examiner's office.

Page 25

1           All of that has an impact on the
2    budget, and all of that is used to determine
3    what we are going to spend in the future.
4       Q.  You indicated that you'd had
5    conversations with them about data related to
6    prescription opioids, right?
7       A.  Correct.
8       Q.  You understand there's a
9    difference between a prescription opioid
10   medication approved by the Food and Drug
11   Administration and an illegal opiate, right?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I am aware that
14      there is a difference, but I don't
15      believe that there's -- I do believe
16      that both have had an impact on the
17      county budget.
18   BY MR. BOEHM:
19      Q.  And your understanding comes from
20   reading newspaper articles?
21      A.  Yes.
22      Q.  Is it informed by other
23   information?
24      A.  Like I said, newspaper articles,
25   journal articles, conversations.

7 (Pages 22 - 25)

1        Q.   In terms of the difference
2    between prescription and illegal opiates,
3    what conversations have you had and with whom
4    about the relative impact of prescription
5    versus illegal opiates?
6            MR. BADALA:  Objection to form.
7            THE WITNESS:  I can't recall
8        every conversation I've ever had.
9    BY MR. BOEHM:
10       Q.   Have you ever had any
11   conversation about that difference?
12       A.   Yes, but I do not recall when or
13   with whom.
14       Q.   What was the nature of the
15   conversation you had -- with whoever it was
16   you had it and whenever it was you had it --
17   about the difference between the impact of
18   prescription opioid medications and illegal
19   opiates?
20       A.   I don't recall.
21       Q.   You said that there were
22   conversations that informed your present
23   understanding --
24       A.   That's correct.
25       Q.   -- about that distinction, right?

1        A.   That's correct.
2        Q.   But you don't recall what those
3    conversations were about?
4        A.   Not specifically, no.
5        Q.   What about generally?
6        A.   Generally, they're about the
7    difference between prescribed opiates and
8    illegal.
9        Q.   How did those conversations
10   inform your understanding about the relative
11   impact on Cuyahoga County in terms of
12   prescription opioid medications versus
13   illegal opiates?
14       A.   When I talk about the impact on
15   Cuyahoga County, I am talking specifically
16   about the impact of opiates.  When I refer to
17   opiates in just -- I use opiates, not
18   opioids, just generally.  So that's what I
19   mean when I say "opiates."  I mean
20   prescription opiates, Fentanyl, carfentanil,
21   heroin.  That all is encompassed in my
22   definition, just so we're clear.
23            But so, against, based on things
24   that I've read, I can make generalizations
25   about the impact on the county's budget.

1    That's part of my job.
2        Q.   But what I'm trying to tease out
3    here, Ms. Keenan, is the distinction between
4    prescription opioid medications and illegal
5    opiates and your view about the relative
6    impact of each category on Cuyahoga County
7    and its budget.  And I'm wondering if you
8    have any opinions about that or if you're
9    just lumping all opiates together.
10           MR. BADALA:  Objection to form.
11           THE WITNESS:  I have an opinion
12       that opiate abuse stems from
13       prescription opiates.  That's my
14       opinion.
15   BY MR. BOEHM:
16       Q.   And your opinion is based on
17   what?
18       A.   As I've said, articles I've read.
19       Q.   Do you consider yourself an
20   expert in public health?
21       A.   I do not.
22       Q.   In epidemiology?
23       A.   I do not.
24       Q.   Are you a medical doctor?
25       A.   I am not.

1        Q.   So you're not holding yourself
2    out as having any specialized expertise or
3    understanding about public health issues,
4    correct?
5        A.   No, absolutely not.
6        Q.   So when you talk about holding
7    that opinion, you hold that opinion just as a
8    layperson who has read some newspaper
9    articles, right?
10           MR. BADALA:  Objection to form.
11           THE WITNESS:  That's correct.
12   BY MR. BOEHM:
13       Q.   When were you first approached by
14   the plaintiffs' lawyers about the possibility
15   of you providing sworn testimony in this
16   litigation?
17       A.   I can't recall the date.
18       Q.   Have you ever testified under
19   oath before?
20       A.   I have.
21       Q.   When was that?
22       A.   I testified once in a court in
23   1999, maybe.  I don't -- and then I have
24   testified before a grand jury.
25       Q.   What was the nature of your

8 (Pages 26 - 29)

1  testimony in court in 1999?
2      A.  It was a domestic violence case.
3      Q.  And then you testified in the
4  grand jury proceeding as well?
5      A.  Yes.
6      Q.  Was that also related to a
7  domestic violence issue?
8          MR. BADALA:  I'm going to object
9      and just -- to the extent that you've
10      been informed not to discuss anything
11      about a grand jury, I'm going to suggest
12      you follow that instruction.
13          THE WITNESS:  I have been advised
14      not to talk about that.
15  BY MR. BOEHM:
16      Q.  You have been advised by counsel
17  not to answer questions related to testimony
18  you've given to a grand jury?
19      A.  Yes.
20      Q.  When was the grand jury
21  testimony?
22          MR. BADALA:  Again, if you've
23      been advised not to discuss anything
24      about the grand jury, I would advise you
25      to stay with that instruction.

1  BY MR. BOEHM:
2      Q.  Just because I'm not asking about
3  the substance -- this question is not asking
4  about what you said to a grand jury or the
5  nature of the testimony, but rather when this
6  happened.
7      A.  I understand, but I've been
8  advised not to talk about it.
9          MR. BOEHM:  And what's the basis
10      of the -- are you instructing the
11      witness not to answer it?
12          MR. BADALA:  Well, why don't you
13      ask her.
14  BY MR. BOEHM:
15      Q.  Who has instructed you not to
16  give testimony about your -- testimony today
17  about testimony you previously have given
18  before a grand jury?
19      A.  The prosecutor.
20      Q.  A prosecutor for Cuyahoga County?
21      A.  Yes.
22      Q.  What's the name of the prosecutor
23  for Cuyahoga County who instructed you not to
24  testify today about your grand jury
25  experience?

1          MR. BADALA:  I don't know if
2      you're allowed to give that information.
3      I don't know if we can do this off the
4      record, but she's telling you that the
5      prosecutor told her that.  We can maybe
6      do it off the record.
7          MR. BOEHM:  That's not an
8      appropriate instruction not to answer.
9          THE WITNESS:  I'm not comfortable
10      answering that question unless I were to
11      talk to the prosecutor.
12  BY MR. BOEHM:
13      Q.  Right now I want to know who the
14  prosecutor is who told you that.
15      A.  I understand that, but I'm not
16  comfortable answering that question until I
17  talk to the prosecutor.
18          MR. BOEHM:  Okay.  Let's go off
19      the record.
20          THE VIDEOGRAPHER:  Off the
21      record, 9:28 a.m.
22          (Recess taken from 9:28 a.m. to
23          9:36 a.m.)
24          THE VIDEOGRAPHER:  On the record,
25      9:36.

1          MR. BADALA:  And just for the
2      record, we went off the record.  Counsel
3      spoke about this -- about the grand
4      jury.  The witness was able to speak to
5      the prosecutor's office.  Again, she was
6      instructed not to give any detail.  But
7      my understanding is she can at least
8      identify the prosecutor's name for the
9      defendants.
10  BY MR. BOEHM:
11      Q.  Yes, Ms. Keenan.  One of the
12  questions I had for you is which prosecutor
13  for Cuyahoga County instructed you not to
14  provide any information about the grand jury
15  investigation and testimony that you provided
16  in the past?
17      A.  Assistant County Prosecutor Matt
18  Meyer.
19      Q.  And when did Mr. Meyer instruct
20  you not to provide any testimony today about
21  that investigation?
22      A.  I can't answer that question.
23      Q.  You can't tell me whether that
24  was recent or ten years ago?
25      A.  I've been instructed not to say

Page 34

1    anything except the name of the prosecutor.
2        Q.   Does this grand jury
3    investigation that you are referring to --
4    well, let me strike that and start over.
5        Is the grand jury investigation
6    that you're referring to ongoing?
7        MR. BADALA:  Objection.
8        Again, if you've been instructed
9    not to give details, I would instruct
10   you to follow that instruction.
11       MR. BOEHM:  All right.  So now I
12   understand you, Sal, to be instructing
13   the witness to follow the instructions
14   of the county prosecutor.
15       Now it's the position of the
16   county that she cannot provide
17   responses to these questions, correct?
18       MR. BADALA:  She can answer above
19   my objection.  You can ask her if she
20   can.
21       MR. BOEHM:  But I am saying
22   something different.  You are
23   instructing her to follow the advice of
24   Mr. Meyer; is that right?
25       MR. BADALA:  I'm saying if she

Page 35

1    has been told, then I would instruct her
2    to follow that.  If she doesn't want to
3    follow it, she can.  It's her choice.
4    You can ask her.
5        MR. BOEHM:  But you're
6    instructing her to follow it.
7        MR. BADALA:  I said if she has
8    been told that, that she should follow
9    that.  I'm instructing her.  It's a
10   simple objection.  If she can answer
11   that without that, then let her answer.
12   BY MR. BOEHM:
13       Q.   What's the reason why you cannot
14   provide information about that?
15       A.   I have been instructed by the
16   county prosecutor not to say anything.
17       Q.   I understand, but my question is
18   why can't you provide information about this?
19       A.   I don't mean to be difficult, but
20   I have been instructed by the county
21   prosecutor not to say anything.
22       Q.   You can't tell me why?
23       A.   I can't guess as to what his
24   motives or objectives or rationale is.  I can
25   only tell you what I was told.

Page 36

1        Q.   What is the -- you've gone to law
2    school, right?
3        A.   I am in law school.
4        Q.   You are in law school.
5        What is your graduation date?
6        A.   I have no idea.  Hopefully 2021.
7        Q.   Okay.
8        What's the basis of the
9    instruction for you not to provide any
10   information about this?
11       A.   I can only tell you what I was
12   told.  I did not ask for rationale, and I'm
13   not going to guess at what his rationale was.
14       MR. BOEHM:  Sal, do you know the
15   basis?  Can you help us with that?
16       MR. BADALA:  I don't know.
17       MR. BOEHM:  Not even the basis?
18       MR. BADALA:  I don't know.
19   BY MR. BOEHM:
20       Q.   Do you know Mr. Frank Russo?
21       A.   Not personally.  I know of him.
22       Q.   You never met Mr. Russo?
23       A.   No, I did not.
24       Q.   What about Mr. Jimmy Dimora?
25       A.   I, again, know of him.  I was in

Page 37

1    one meeting with Jimmy Dimora, but I don't
2    believe that we were even introduced.
3        Q.   You recall that right around
4    2009/2010, there was a criminal investigation
5    of public figures in Cuyahoga County related
6    to corruption, correct?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  Absolutely.
9    BY MR. BOEHM:
10       Q.   Did you have any knowledge or
11   information about the nature of the
12   allegations that were giving rise to that
13   criminal investigation?
14       MR. BADALA:  Objection to form.
15       THE WITNESS:  No, I did not.
16   BY MR. BOEHM:
17       Q.   Were you ever interviewed in
18   connection with that investigation?
19       A.   With the county's corruption
20   investigation?  No.
21       Q.   Okay.
22       You indicated that you've given
23   courtroom testimony related to a domestic
24   violence issue, and then that you testified
25   before a grand jury, and you won't tell us

10 (Pages 34 - 37)

Page 38

1   anything about that, unfortunately.
2        Is there anything else?  Have
3   there ever been any other occasions when you
4   have given sworn testimony?
5        A.  No.
6        Q.  And you understand that you're
7   under oath today, right?
8        A.  I do.
9        Q.  Is there any reason why you may
10  not be able to testify truthfully,
11  accurately, and completely in answering the
12  questions that we ask you here today?
13       A.  There is no reason why I could
14  not answer truthfully and accurately.  I
15  can't answer completely based on the advice
16  of the county prosecutor.
17       Q.  Are there any other subjects that
18  anybody has told you you can't talk about
19  here today if you're asked questions?
20       MR. BADALA:  Objection to form.
21       Any communications with counsel,
22       obviously, if we get into that.  Are you
23       talking about other matters?
24  BY MR. BOEHM:
25       Q.  Well, have you been instructed by

Page 39

1   anybody to not provide information that you
2   know about in response to questions that are
3   asked of you today?
4        MR. BADALA:  Objection to form.
5        THE WITNESS:  No, I have not.
6   BY MR. BOEHM:
7        Q.  Other than this grand jury.
8        A.  That's correct.
9        Q.  Will you please let me know if
10  you don't understand any of my questions here
11  today?
12       A.  Yes.
13       Q.  And we've been doing a pretty
14  good job of this so far, and let's see if we
15  can keep it up.  But one of us, and only one
16  of us, should be speaking at a time.  And
17  that's because, as you've noticed, we have a
18  court reporter here who is typing everything
19  up.  And if we're both speaking at the same
20  time, it becomes very difficult.
21       Does that make sense?
22       A.  Yes.
23       Q.  What did you do to prepare for
24  your deposition today?
25       A.  I met with my attorneys, the

Page 40

1   county's attorneys.  That was it.
2        Q.  Who specifically did you meet
3   with?
4        A.  I have had more than one meeting.
5   So I've met primarily with Sal.  I have met
6   with Joe.  I have met with Sam.  And I had
7   one meeting some time ago with Frank
8   Gallucci.
9        Q.  Anybody else?
10       A.  Not that I can recall.
11       Q.  And you indicated that you've had
12  more than one meeting.
13       A.  That's correct.
14       Q.  How many meetings have you had?
15       A.  I can't say.
16       Q.  Can you tell me roughly how many
17  meetings you've had with the lawyers?
18       MR. BADALA:  Objection to form.
19       THE WITNESS:  I don't want to
20       guess.  I don't keep a list.
21  BY MR. BOEHM:
22       Q.  Have you had so many meetings
23  with the lawyers that you can't keep track?
24       MR. BADALA:  Objection to form.
25       THE WITNESS:  I'm not sure how to

Page 41

1   answer that question.  I have had more
2   than one meeting.  I have had multiple
3   meetings.  But I don't want to guess at
4   how many.
5   BY MR. BOEHM:
6        Q.  Have you had five?
7        A.  I don't want to guess.
8        Q.  Is it possible you've had five
9   meetings with the lawyers?
10       MR. BADALA:  Objection to form.
11       THE WITNESS:  I don't want to
12       guess.  I don't recall how many meetings
13       I've had.
14  BY MR. BOEHM:
15       Q.  But it's possible you've had
16  five?
17       MR. BADALA:  Objection to form.
18       THE WITNESS:  Anything is
19       possible.
20  BY MR. BOEHM:
21       Q.  Is it possible you've had more
22  than five meetings with the lawyers to
23  prepare for your deposition?
24       MR. BADALA:  Objection to form.
25       THE WITNESS:  I don't want to

11 (Pages 38 - 41)

Page 42

1    guess.
2  BY MR. BOEHM:
3        Q.  I'm not asking you to guess.  I'm
4  asking you a question.  The question is:  Is
5  it possible that you've had more than five
6  meetings with the lawyers to prepare for your
7  deposition?
8        MR. BADALA:  Objection to form.
9        THE WITNESS:  I don't recall how
10    many meetings I've had.
11  BY MR. BOEHM:
12        Q.  How long have your meetings gone?
13        A.  Well, varying lengths.  Some of
14  them were -- I mean, some of them were
15  probably an hour, and then I had one meeting
16  that lasted five hours.
17        Q.  When was the five-hour meeting?
18        A.  Yesterday.
19        Q.  Did you meet with the lawyers on
20  Monday?
21        A.  No.
22        Q.  Did you review any documents in
23  preparation for your testimony here today?
24        A.  I didn't review documents.  I
25  have been asked to provide documents to the

Page 43

1  attorneys.  So -- I mean, in preparing them,
2  either I, you know, had to prepare them,
3  which requires some amount of review.  But I
4  didn't, like, study up on documents, if
5  that's what you mean.
6        Q.  When you say you had to collect
7  documents to give to the lawyers, tell me
8  more about that.  What are you referring to?
9        A.  I provided budget documents for
10  the county going back several years.  I
11  provided our comprehensive annual financial
12  report, which is referred to as the CAFR,
13  going back many years.
14        I have provided spreadsheets
15  that detail, you know, expenditures by
16  departments.
17        Q.  When did you provide those
18  materials to the lawyers?
19        A.  Different dates.  I don't recall
20  the specific dates, but at different times.
21  It wasn't all at once.
22        Q.  Have you read the transcripts of
23  any depositions of other individuals who have
24  testified in this litigation?
25        A.  No, I have not.

Page 44

1        Q.  Have you had conversations with
2  anybody outside of your lawyers in connection
3  with your deposition testimony?
4        MR. BADALA:  Objection.  I would
5        also include the county law department
6        when you say "your lawyers."
7  BY MR. BOEHM:
8        Q.  Go ahead and answer.
9        A.  I have -- I communicated to my
10  supervisor, Dennis Kennedy, and my staff,
11  that I was going to be in a deposition to
12  explain why I wasn't going to be at work
13  today.
14        Q.  Have you ever spoken with
15  Mr. Kennedy about the budget impact of opiate
16  use or misuse in Cuyahoga County?
17        MR. BADALA:  Objection to form.
18        THE WITNESS:  I have -- you know,
19        I can't say whether I've specifically
20        had that conversation with Dennis
21        Kennedy.
22  BY MR. BOEHM:
23        Q.  You don't recall ever having had
24  a conversation with Mr. Dennis Kennedy about
25  the budget impact of opiate use or misuse on

Page 45

1  Cuyahoga County; is that fair?
2        A.  Yes.
3        Q.  You indicated that you also told
4  your staff that you would be absent today
5  because you were giving a deposition?
6        A.  That's correct.
7        Q.  Have you spoken with any of your
8  work colleagues or anybody within county
9  government about the nature of your
10  deposition testimony today?
11        A.  No, I have not.
12        Q.  Have you spoken with friends or
13  family?
14        A.  About this?  No.
15        (Maggie Keenan, Curriculum
16        Vitae, CUYAH_003301608 to
17        CUYAH_003301609, marked as
18        Deposition Exhibit 1.)
19  BY MR. BOEHM:
20        Q.  Ms. Keenan, I'm handing you a
21  document that's been marked Exhibit 1 for
22  purposes of your deposition.  And I'll
23  represent to you that this was produced to us
24  in the context of the litigation by counsel
25  for the county.

12 (Pages 42 - 45)

Page 46

1      And it appears to be your
2  resume.  Does that look right to you?
3      A.   It does.
4      (Interruption in proceedings.)
5      MR. BOEHM:  Off the record.
6      THE VIDEOGRAPHER:  Off the
7  record.
8      (Recess taken, 9:50 a.m. to
9      10:11 a.m.; whereupon a phone
10     call was made to
11     Special Master Cohen.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 47

1      *********
2      Transcript of phone call,
3  December 12, 2018 at 9:52 a.m.
4      *********
5      SPECIAL MASTER COHEN:  Can
6  somebody tell me -- I think I read that
7  this deponent's name is Maggie -- what
8  her position is?
9      MR. BOEHM:  Sure.  It's
10  Maggie Keenan.
11     Maggie is the director of the
12  Office of Budget Management for
13  Cuyahoga County.  Today she's being
14  deposed in her personal capacity.
15     We understand that the County
16  has designated her for 30(b)(6)
17  testimony that will be taking place at
18  a later date.
19     SPECIAL MASTER COHEN:  Okay.
20     MR. BOEHM:  So the issue right
21  now, David, is that -- and this is
22  Paul Boehm speaking.
23     Thank you for taking a minute,
24  especially while you're traveling in an
25  airport.

Page 48

1      The issue is that Ms. Keenan has
2  been instructed by somebody in the
3  prosecutor's office for
4  Cuyahoga County, Mr. Matt Meyer, to not
5  provide any information about testimony
6  that she has given in connection with a
7  grand jury proceeding, including when
8  that testimony took place, when she was
9  instructed not to provide information
10  to us about it, the basis of the
11  instruction not to provide any
12  information.
13     So we're really just left not
14  knowing anything about why we're not
15  allowed to ask questions about it.
16     It may be that there's a very
17  good reason why; we just don't know
18  what that is.
19     And it sounds like, from Sal
20  here, that they also don't know why
21  Ms. Keenan was told not to answer
22  questions about this, including when
23  she was instructed or --
24     SPECIAL MASTER COHEN:  May I
25  interrupt you?

Page 49

1      MR. BOEHM:  Yes.  Go ahead.
2      SPECIAL MASTER COHEN:  So I'm
3  losing about 10 percent of what you're
4  saying because you're cutting out.  I
5  don't know if there's a window you could
6  move closer to or -- I'm not sure why
7  that's happening.
8      MR. BOEHM:  I'm sorry.  I moved
9  the phone a little bit closer.  We're at
10  a big conference room table.  Hopefully
11  this helps a little bit.
12     SPECIAL MASTER COHEN:  Okay.
13     So I understand the issue, and I
14  think I understand where we are on it.
15     And the -- my understanding is
16  that the attorney for the City of
17  Cleveland in their prosecutor's office
18  who instructed the witness not to
19  answer questions is not currently
20  available?
21     MR. BOEHM:  The person is
22  available and spoke apparently -- is
23  that right, Sal?
24     MR. BADALA:  Well, she spoke to
25  the prosecutor's office.  I don't know

13 (Pages 46 - 49)

Page 50

1  if she specifically spoke to that
2  prosecutor.
3       But the prosecutor's office -- a
4  prosecutor there said, "Like we told
5  you, do not disclose any details about
6  this.  We're instructing you not to.
7  If we need to go to court on it, we
8  can.  But do not instruct anything
9  about it -- do not give any details
10  about it."
11       MR. BOEHM:  And that person -- I
12  don't know who she had that conversation
13  with; maybe Sal does.
14       Was it Mr. Meyer?
15       MR. BADALA:  No.  I don't think
16  he was available.  She might have spoken
17  to him.  I know she called the
18  prosecutor's office.  So she might have
19  spoken to the head prosecutor,
20  Mike O'Malley.
21       MR. BOEHM:  So we don't know who
22  she has spoken with.
23       SPECIAL MASTER COHEN:  Is she in
24  the room?
25       MR. BADALA:  She's not in the

Page 51

1  room.  We can pull her in here if you'd
2  like.
3       SPECIAL MASTER COHEN:  Why don't
4  you do that.
5       (Pause in proceedings.)
6       MR. BOEHM:  David?  Maggie has
7  come in.  She can hear you now.
8       SPECIAL MASTER COHEN:  Hello,
9  Maggie.  My name is David Cohen.  I'm
10  the Special Master in the opioid
11  litigation.
12       How are you?
13       THE WITNESS:  I'm good.
14       SPECIAL MASTER COHEN:  If you
15  could do me the favor of getting as
16  close to the phone as possible, because
17  it breaks up if you're not right on top
18  of it.
19       THE WITNESS:  Okay.
20       SPECIAL MASTER COHEN:  So my
21  understanding is that you work for the
22  office of -- is it OMB or OBM for the
23  City of Cleveland?
24       THE WITNESS:  That's right.  OBM,
25  but I'm with the county.

Page 52

1       SPECIAL MASTER COHEN:  And you're
2  not an attorney; is that correct?
3       THE WITNESS:  No.
4       SPECIAL MASTER COHEN:  And you
5  apparently gave some testimony to a
6  grand jury at some point; is that
7  correct?
8       THE WITNESS:  That's correct.
9       SPECIAL MASTER COHEN:  And my
10  understanding is also that you were
11  instructed by an attorney who works for
12  the City of Cleveland, apparently
13  somebody in the prosecutor's office,
14  that you should not discuss any of the
15  testimony that you gave in front of the
16  grand jury.
17       Do I still have everything
18  right?
19       THE WITNESS:  Except that I was
20  instructed by only the county
21  prosecutor's office, not City of
22  Cleveland attorneys.
23       SPECIAL MASTER COHEN:  Okay.  So
24  let me just explain something very
25  briefly to you.

Page 53

1       There are reasons that you are
2  allowed not to answer questions under
3  oath.  One of them is any conversations
4  that you have had with an attorney for
5  the purpose of obtaining or receiving
6  legal advice, you are not required --
7  you are allowed to say, "I am not going
8  to tell you what my attorney and I
9  spoke about."  Okay?
10       THE WITNESS:  Okay.
11       SPECIAL MASTER COHEN:  There are
12  others.
13       For example, the grand jury
14  proceedings are secret, and so what
15  happens within those grand jury
16  proceedings, for example, what you were
17  asked and how you responded to certain
18  questions is also, as a general matter,
19  secret, and you're allowed to say, "I'm
20  not going to answer that question."
21       THE WITNESS:  Okay.
22       SPECIAL MASTER COHEN:  But there
23  are certain questions that counsel is
24  allowed to ask you to essentially test
25  the privilege.

14 (Pages 50 - 53)

Page 54

1     So, for example, if I have a
2  conversation with my attorney, and they
3  say, "Well, what did you and your
4  attorney talk about?"  I'm allowed to
5  say, "I ain't gonna tell you that
6  because it's between my attorney and me
7  and it was for the purpose of receiving
8  legal advice, so that is privileged."
9     But they're allowed to ask me
10  questions like, "Well, who is your
11  attorney?  When did you have that
12  conversation?"  In other words,
13  information that doesn't go to the
14  substance of what I talked about with
15  my attorney, that just kind of goes
16  around the circumference of it to
17  understand what generally we were
18  talking -- when I say "what generally
19  we were talking about," it could be "I
20  was receiving advice for taxes," okay,
21  something as simple as that, "and we
22  had a conversation on January 31st
23  about it."  That, they're allowed to
24  ask.
25     So those very basic questions --

Page 55

1  and I can tell you that this is what
2  the prosecutor that you spoke with
3  should have told you -- they are
4  allowed to ask you, and you should
5  answer.
6     Now, I understand that you're
7  trying to follow the instructions of an
8  attorney that you spoke with.
9     So the first question I will ask
10  you, and I will tell you that this is
11  something that counsel is allowed to
12  ask and that you're allowed to say is,
13  what's the name of the person that you
14  spoke with who directed you not to
15  answer questions because we may have to
16  get that person on the phone.
17     THE WITNESS:  Okay.
18     MR. BADALA:  You can tell him.
19     THE WITNESS:  Oh, I'm sorry.
20  Matt Meyer.
21     SPECIAL MASTER COHEN:  Is he with
22  the prosecutor's office?
23     THE WITNESS:  He is.  And Michael
24  O'Malley, who is the county prosecutor.
25     SPECIAL MASTER COHEN:  And can

Page 56

1  you tell me just when it was that you
2  testified in front of the grand jury?
3     MR. BADALA:  Special Master
4  Cohen, that's part of the issue.  She
5  asked the prosecutor if she can answer
6  that question and the prosecutor told
7  her that she is not allowed to.
8     So if we can get the prosecutor
9  on the phone, maybe that will help.
10     SPECIAL MASTER COHEN:  I think it
11  will.
12     Before we do that, let me just
13  ask a question.
14     So, Paul, it's you who is asking
15  these questions of Maggie, correct?
16     MR. BOEHM:  Yes, that's correct,
17  David.
18     SPECIAL MASTER COHEN:  I just
19  want to make sure I understand the
20  relevance.
21     Can you give me just some
22  background as to how we got to where we
23  are?
24     MR. BOEHM:  Well, how we got to
25  where we are is I was asking about any

Page 57

1  experience she has had testifying under
2  oath before.  I didn't have any
3  indication that she had testified before
4  a grand jury, so it wasn't like I
5  planned to ask questions about it.
6     I just asked a couple of
7  follow-ups like you're asking, "When
8  did you testify?  When did you receive
9  this instruction?"
10     It's -- like you say, it's very
11  possible it's not relevant.  It's just
12  impossible for me right now to discern
13  that.
14     SPECIAL MASTER COHEN:  Knowing
15  what I know about Cuyahoga County and
16  what's been reported in the paper, my
17  very strong suspicions is that the
18  reasons that Maggie was talking to the
19  grand jury have nothing to do with the
20  opioid case.
21     I get why you would want to
22  know.  "Have you testified before?  Do
23  you understand what testifying under
24  oath means?"  But I think that there's
25  a greater than 90 percent chance that

15 (Pages 54 - 57)

Page 58

1     what it was that she was testifying
2     about has nothing to do with opioids.
3            And, in fact, maybe that's a
4     question she can answer, because by
5     answering that question is how to get
6     past this, and it doesn't suggest in
7     any way what it was she was talking
8     about.
9            MR. BOEHM:  Yeah.  I think you
10    may be right.  I don't know what the
11    percentage of likelihood is that this is
12    irrelevant.
13           I certainly believe it's
14    possible that it's not relevant.  I
15    just can't really make that
16    determination based on the zero
17    information I've gotten so far.
18           And then I would just note that
19    she's -- her testimony, David, because
20    she's the director of the Office of
21    Budget Management, is a little bit
22    different in nature than maybe some of
23    the witnesses who we've been examining,
24    because she really has broad oversight
25    for all finance and budget-related

Page 59

1     information.  And that, of course, goes
2     to the damages part of the case.
3            And so it's -- I don't know,
4     again, if that has any relevance or
5     bearing on this issue with the grand
6     jury, but it's possible it does.
7            MR. BADALA:  And Special Master
8     Cohen, this is Sal Badala again.
9            I think what -- if you agree
10    with this, I think maybe if you can
11    speak with the prosecutor himself and
12    ask if it's relevant to opioids, that
13    may help, and then you can tell us what
14    his response is.
15           I don't know how we can do this
16    without -- I don't want Maggie to do
17    something that the prosecutor
18    instructed her not to do already.
19           SPECIAL MASTER COHEN:  Maggie,
20    there's two ways we can do this.
21           One is we can try and get the
22    attorneys you spoke with on the phone.
23    The other is that I can instruct the
24    attorneys to leave the room and you and
25    I can have the conversation.

Page 60

1            As the Special Master, I'm
2     essentially the Court.  I don't mean to
3     overstate it, but I'm appointed by the
4     Court and I'm neutral and I don't work
5     for either side.
6            So the reason that they're
7     calling me is to get a neutral
8     evaluation.  And anything you tell me
9     about what we would have a brief
10    conversation about would never be known
11    by anybody.
12           So is that something that you
13    feel comfortable doing?
14           MR. BADALA:  It's up to you,
15    Maggie.  Do you want to do that?  You
16    tell me.
17           THE WITNESS:  That's fine.
18           MR. BADALA:  So we're going to go
19    off the record and everyone is going to
20    leave the room, and just you and Maggie
21    will stay here.
22           We're going to mute the phone.
23    Actually, if we could hang up and you
24    can dial back in, in about five
25    minutes.  We'll dial back in, okay?

Page 61

1            MR. BADALA:  Special Master
2     Cohen, we're going to put you in a
3     separate room with Maggie.
4            (Pause in phone call.)
5            SPECIAL MASTER COHEN:  So I had a
6     conversation with Maggie, during which
7     time she explained to me -- she was kind
8     enough to slightly ignore the
9     instructions she received from her
10    counsel from the prosecutor's office --
11    sufficient to understand what it was
12    that she was testifying about, as a
13    general matter, in front of the grand
14    jury.
15           And as I strongly suspected, it
16    has absolutely nothing to do with the
17    opioid case.  It's entirely irrelevant
18    to the opioid case.
19           And so if the only point that
20    questioning counsel, Mr. Boehm, had was
21    to understand the extent to which she's
22    testified before and understands what
23    an oath means, then I think you got
24    what you need and should move past
25    this.  It really is just holding you up

16 (Pages 58 - 61)

Page 62

1    for no good reason, and there's better
2    things you should be doing with your
3    time.
4         MR. BOEHM:  Understood.  We thank
5    you for your time.
6         I guess, just for the record,
7    we'd say that to the extent this might
8    have relevance to financial
9    irregularities or budgeting impacts,
10   then potentially there would be
11   relevance.
12        For example, if somebody is
13   stealing millions of dollars from the
14   coffers of Cuyahoga County -- of
15   course, I'm not suggesting that is the
16   issue; I have no idea what it is --
17   then that potentially could have some
18   relevance in terms of calculations of
19   resources available to the county and
20   so on.
21        If it's the determination that
22   it even has not even that level of
23   relevance or bearing on the
24   allegations, then we'll proceed.
25        MR. BADALA:  And Special Master

Page 63

1    Cohen, this is Sal Badala.  We'll follow
2    your ruling.
3         I just think, you know, it was
4    really unprofessional -- we've been
5    professionals this whole time -- for
6    now Mr. Boehm to go on the record and
7    say something like accusations about
8    stealing millions of dollars.  I
9    mean --
10        MR. BOEHM:  I specifically wasn't
11   saying that, David.  I think you know I
12   was just throwing it out as an example.
13        SPECIAL MASTER COHEN:  He was
14   just putting a marker down, saying that
15   this could become relevant, and I
16   understand why he did it.
17        I'm telling you that the
18   connection is so tenuous that I think
19   you don't need to worry about it.
20        If it comes back around, then
21   it'll come back around, but I'm not
22   seeing even the most remote likelihood
23   of that at this point.
24        So I really think we need to
25   move on to things that are more

Page 64

1    relevant and directly related to what
2    this lawsuit is about.
3         MR. BOEHM:  Thank you very much,
4    David.  I appreciate your time.
5         MR. BADALA:  Thank you.
6         **********
7    PHONE CALL TERMINATED, 10:11 A.M.
8         **********

Page 65

1         THE VIDEOGRAPHER:  On the record,
2    10:11.
3         MR. BADALA:  And, I guess, just
4    for the video portion, we did have some
5    discussions with Special Master Cohen on
6    the record, but they weren't on the
7    video.
8         MR. BOEHM:  Correct.  We did not,
9    as Master Cohen indicated, and as makes
10   sense.  It does not count against the
11   time that we have available to us today.
12   BY MR. BOEHM:
13        Q.   Okay.
14        Ms. Keenan, we're back to
15   looking at Exhibit 1 that was marked before
16   we took a break.  And you have that in front
17   of you, correct?
18        A.   Yes.
19        Q.   And this is a copy of a resume
20   that belongs to you, right?
21        A.   Yes.
22        Q.   It looks like it's probably not
23   up to date, fair?
24        A.   That's correct.
25        Q.   Can you give us an idea of --

17 (Pages 62 - 65)

Page 66

1  from what time period this resume is from?
2      A.  I can't tell you when it was
3  prepared, but it would have been after
4  October of 2013, because I have an end date.
5      Q.  That's the latest date that shows
6  up on your resume, is October 2013?
7      A.  That's correct.
8      Q.  All right.  Let's look at the
9  second page of this and look first at your
10  education history.
11      Do you see you have a section
12  called "Education"?
13      A.  Yes.
14      Q.  You went to Cleveland State
15  University?
16      A.  I did.
17      Q.  Are you from Cleveland?
18      A.  I am.
19      Q.  Born and raised?
20      A.  Yes.
21      Q.  And you received it looks like
22  three undergraduate degrees -- am I reading
23  that right? -- political science, psychology,
24  and urban studies?
25      A.  It's two undergraduate degrees.

Page 67

1  One of them was a double major.
2      Q.  Political science and psychology
3  was a double major?
4      A.  That's correct.
5      Q.  A single degree but a double
6  major?
7      A.  It's two degrees, but one of them
8  has a double major, yes.
9      Q.  Okay.
10      And your second degree is in
11  urban studies, right?
12      A.  My second bachelor's, yes.
13      Q.  Your second bachelor's degree.
14      How did you go about deciding to
15  major in those particular subjects?  Or I
16  should say, why did you choose to focus on
17  any of those majors?
18      A.  Originally I had intended to go
19  to law school, and my father told me to take
20  political science if I wanted to go to law
21  school, so I started that; ended up taking
22  some urban studies courses to satisfy other
23  requirements and really fell in love with
24  that discipline.  I saw that as being more
25  proactive, and the law being more reactive.

Page 68

1      So I intended to do the double
2  major -- or the two degrees from the
3  separate colleges.  And psychology I ended
4  up tacking on.  I have a sister who has a
5  master's in psychology who asked me to take
6  courses that she found interesting.  And by
7  the time I took all the classes she told me
8  to take, I only needed a handful more to get
9  the degree.
10      Q.  Okay.
11      So you didn't go to law school
12  immediately after your completion of
13  bachelor's studies?
14      A.  I did not.
15      Q.  But you did enroll later in life,
16  right?
17      A.  I did.
18      Q.  In fact, your resume says that
19  you had enrolled, whenever this resume was
20  created, at the Cleveland-Marshall College of
21  Law, correct?
22      A.  That's correct.
23      Q.  Are you currently enrolled?
24      A.  Yes.  I am currently enrolled.
25      Q.  You kind of paused a little bit.

Page 69

1  Why?
2      A.  Only because I forgot for a
3  second that I haven't taken my finals yet, so
4  I couldn't remember if I was between
5  semesters.  I haven't enrolled for spring
6  yet.
7      Q.  This resume says that your
8  anticipated completion of your juris
9  doctorate degree would be 2018.
10      A.  That's correct.  I got
11  sidetracked by a family health issue.
12      Q.  How far along are you in that
13  program?
14      A.  I'm about two years in.
15      Q.  But I thought I heard you earlier
16  say that your new estimated or anticipation
17  graduation date -- did you say 2020?
18      A.  You're given seven years from the
19  date you enroll to finish.  I have an ongoing
20  family health issue, so I anticipate taking
21  the very slow road.
22      Q.  Why did you choose to enroll in
23  law school?
24      A.  It was something that I had
25  always wanted to do.  That was my initial

18 (Pages 66 - 69)

Page 70

1    plan.  And at the time, the time was right
2    for me to do it.
3         Q.  Do you expect to practice law?
4         A.  No, I don't.
5         Q.  Do you expect to apply your juris
6    doctorate degree to your professional life?
7         A.  I do.  I think there's some
8    overlap.  The county is an arm of the state.
9    We are bound -- almost everything we do is
10   dictated by the Ohio Revised Code and now the
11   county code.
12        I don't think you all are local,
13   but you know we have a different charter
14   form of government in Cuyahoga County, and
15   very much of this budget ties back to the
16   Ohio Revised Code.
17        I had no idea when I took the
18   job how often I would be reading the Ohio
19   Revised Code.
20        Q.  So your expectation is you'll
21   continue along the same professional path
22   you're on now, with the advantage of legal
23   training, but you're not expecting to have a
24   shift in the trajectory of your career.
25        Is that a fair summary?

Page 71

1         A.  That's correct.
2         Q.  You started out of college, it
3    looks like, at an organization called the
4    Second Growth Institute?
5         A.  That's correct.
6         Q.  Was that your first job after
7    graduation?
8         A.  My first professional job.  I did
9    a lot of waiting tables.
10        Q.  Yes.  I did some of that myself.
11        What is the Second Growth
12   Institute?
13        A.  Second Growth was a non-profit
14   organization that operated in the Collingwood
15   neighborhood, which is a neighborhood in the
16   city of Cleveland on the eastern border,
17   toward the city of Euclid, and we were
18   engaged in Brownfield Redevelopment.
19        Q.  What is Brownfield Redevelopment?
20        A.  So taking old Brownfield
21   properties that had been laying dormant in
22   these neighborhoods -- Collinwood
23   specifically has a very rich history in
24   manufacturing going back decades.  But when
25   the industries left, they did not take their

Page 72

1    buildings and pollution with them.  And
2    people are reluctant to take on these
3    properties because they don't want the
4    liability associated with whatever may be
5    underground.
6         So as a non-profit, we were able
7    to secure grants and loans from mostly
8    government sources to redevelop properties.
9         Q.  Do you have a degree in finance?
10        A.  I do not.
11        Q.  Do you have a degree in
12   accounting?
13        A.  I do not.
14        Q.  It looks like you also
15   volunteered at the Free Medical Clinic of
16   Greater Cleveland --
17        A.  I did.
18        Q.  -- during that time; is that
19   right?
20        A.  That's correct.
21        Q.  It says that you developed and
22   implemented a patient assistance program.
23        A.  That's correct.
24        Q.  What is that?
25        A.  So at this time, back in 2000 --

Page 73

1    well, the Free Clinic, as the name suggests,
2    provides free medical care.  It's no longer
3    operating in the same way, but they provide
4    free medical care, mental healthcare, to
5    individuals who are uninsured or
6    underinsured.
7         The majority of the patients in
8    the mental health department, which is where
9    I worked, were on prescription medications.
10   They can't afford their prescription
11   medications.  We relied on donations.
12        Back then it was a little easier
13   to get donations.  The volunteer doctors
14   would bring in stuff from their practice.
15   We got donations from pharmaceutical
16   companies.
17        And back then, most of the
18   pharmaceutical companies had patient
19   assistance programs, but they're difficult
20   for our patients to stay on top of and
21   manage.  So we had developed a program at
22   the Free Clinic.
23        We had a dedicated volunteer,
24   that was eventually a grant-funded position,
25   to help the patients stay on top of the

19 (Pages 70 - 73)

Page 74

1  patient assistance program so that they
2  weren't remembering two months after their
3  medication ran out that they needed to
4  re-up.
5        There's a lot of paperwork
6  associated with those pharmaceutical
7  programs and, you know, we're dealing with a
8  population that had special needs.
9        Q.  Did the clinic have healthcare
10 providers who were authorized to prescribe
11 medications to patients?
12       A.  The free clinic?
13       Q.  Yes.
14       A.  Yes, they did.
15       Q.  And you indicated that some
16 healthcare providers would bring things from
17 their own practice into the clinic.
18       Did you mean prescription
19 medications?
20       A.  So the -- some of the doctors
21 received samples -- it's always samples.  So
22 the doctors, some from the clinic, University
23 Hospitals, the largest systems would get
24 samples and bring them to our patients.
25       Q.  Do you know if the healthcare

Page 75

1  providers at the Free Medical Clinic of
2  Greater Cleveland prescribed opioid
3  medications to patients?
4        A.  I don't know.  I was only in
5  mental health.
6        Q.  All right.  Flipping back to the
7  first page -- we're kind of working our way
8  chronologically up your resume -- there's a
9  reference to the Neighborhood Centers
10 Association?
11       A.  Yes.
12       Q.  Did you have financial oversight
13 for the Neighborhood Centers Association?
14       A.  I did.
15       Q.  You indicated you don't have any
16 degrees in finance or accounting, right?
17       A.  That's correct.
18       Q.  Do you have any specialized
19 training in either of those subjects, finance
20 or accounting?
21       MR. BADALA:  Objection to form.
22       THE WITNESS:  I have more than a
23 decade of experience working in finance
24 and budget.
25

Page 76

1  BY MR. BOEHM:
2        Q.  On-the-job training?
3        A.  That's correct.
4        Q.  But I'm asking if you have
5  received any specialized training
6  certification programs, academic training in
7  those areas?
8        A.  No, I have not.
9        Q.  So what you know about finance
10 and accounting really comes from the
11 experience you've gained on the job; is that
12 fair?
13       A.  The majority of it, yes.
14       Q.  But when you say "the majority of
15 it," it seems that you're carving out a
16 caveat.  So tell us about that.
17       A.  Well, I go to conferences.  I
18 stay current with best practices.  The County
19 is members of associations where -- I'm a
20 member of the Government Finance Officers
21 Association, so I don't restrict my knowledge
22 to what I'm being told every day at work.
23       Q.  What conferences do you attend in
24 your professional capacity?
25       A.  I can't name all the conferences

Page 77

1  I've attended, but I know I do attend
2  Government Finance Officers Association's
3  trainings.
4        Q.  Are there other kinds of
5  conferences that stand out as the ones you
6  most commonly attend?
7        A.  No.
8        Q.  At some point you went back to
9  school to get a master's of public
10 administration; is that right?
11       A.  That's correct.
12       Q.  And you received that degree also
13 at Cleveland State University?
14       A.  That's correct.
15       Q.  Did you study for that degree
16 while you were continuing to work or did you
17 go back to school full time?
18       A.  No.  I did both.
19       Q.  And was that while you were at
20 the Neighborhood Centers Association?  Or had
21 you gone to work for Cuyahoga County?
22       A.  I believe I was at -- yes.  I was
23 taking classes while I was at the
24 Neighborhood Centers Association.
25       Q.  It looks like you got your MPA in

20 (Pages 74 - 77)

Page 78

1  2007, right?
2     A.  That's correct.
3     Q.  And you started at the county in
4  2006?
5     A.  That's correct.
6     Q.  So do I understand it correctly
7  in terms of the timeline that you started
8  your MPA program while you were at the
9  Neighborhood Centers Association and you
10  finished and completed that degree after you
11  had already joined Cuyahoga County?
12     A.  That's correct.
13     Q.  It looks like the first position
14  you took with Cuyahoga County was as a Health
15  and Human Services budget management analyst,
16  right?
17     A.  Yes.
18     Q.  Can you describe for us what that
19  is?
20     A.  That's a position within the
21  Office of Budget Management.  At the time we
22  had six agents.  We currently have seven.
23  Analysts are assigned agencies, so all the
24  county agencies and departments are
25  distributed among the analysts.

Page 79

1     Analysts are responsible for
2  preparing annual budgets, preparing
3  forecasts, doing ad hoc and as-needed
4  financial analyses, making recommendations
5  when the agencies request additional
6  funding, making recommendations on if we
7  have to do budget cuts, whether it's a
8  viable cut.
9     Analysts also are expected to
10  have, you know, a working understanding of
11  the operations and programs and services
12  that are offered by the agencies, staying up
13  to date with best practices, benchmarking.
14     We do -- the Office of Budget
15  Management tracks performance, so the
16  analyst will also track performance
17  measures.
18     Q.  The Health and Human Services
19  budget management analyst position is
20  something that still exists within the Office
21  of Budget Management?
22     A.  It's not.  At the time the office
23  was split into three sectors.  We had Health
24  and Human Services, general government, and
25  then Legal and Judicial.  And all the

Page 80

1  agencies fell in one of those three.
2     I have since shuffled a bit.  So
3  all of the analysts had agencies from all of
4  those different sectors.
5     I don't think it's in our best
6  interests to have somebody who only knows
7  Health and Human Services, for example.  I
8  want people who have a working knowledge of
9  all facets of government.
10     Q.  Back in those days, when you were
11  more siloed in the Health and Human Services
12  area, what divisions, departments, and
13  programs fell into that particular bucket?
14     MR. BADALA:  Objection to form.
15     THE WITNESS:  So this will not be
16  an exhaustive list, because that was
17  many years ago.  But at the time, the
18  Department of Health and Human Services
19  was broken up.
20     So the Department of -- it was
21  called Employment and Family Services
22  back then.  It's now Job and Family
23  Services; the Department of
24  Children and Family Services -- again,
25  at the time it was called the Child

Page 81

1  Support Enforcement Agency.  It's now
2  The Office of Child Support Services;
3  the Fatherhood Program; the ADAMHS
4  Board, which -- again, sorry, but at
5  the time it was the Mental Health Board
6  and the Drug -- the Alcohol and Drug
7  Addiction Services Board; the Family
8  and Children First Council; Office of
9  Early Childhood; Office of Homeless
10  Services; Office of Reentry -- I may be
11  forgetting some, but those are the --
12  senior adult services, Office of
13  Senior -- Department of Senior and
14  Adult Services.
15     Those are the big ones.
16  BY MR. BOEHM:
17     Q.  Great.  And then in 2018, you
18  took on a new role, correct?
19     A.  I did.
20     Q.  Your resume says that you became
21  a senior budget management analyst.
22     A.  That's correct.
23     Q.  Was that also within the Health
24  and Human Services area or did you move to a
25  different group?

21 (Pages 78 - 81)

Page 82

1    A.  I moved.  So I moved to the
2    Legal/Judicial.
3         Q.  What are the divisions,
4    departments, and programs under the Legal and
5    Judicial area?
6         A.  So, again, not an exhaustive
7    list, but it's the county's four courts:
8    Common Pleas Court, Juvenile Court, Probate
9    Court, Domestic Relations Court.
10        Cuyahoga County -- the Eighth
11   District State Court of Appeals has single
12   jurisdiction in Cuyahoga County, so we have
13   the state appellate court, the prosecutor's
14   office, public defender's office,
15   Medical Examiner's office, the sheriff --
16   which in Cuyahoga County, that includes the
17   jail -- municipal courts, so the county does
18   have to pay a portion of expenses in the
19   municipal courts, the law library.
20        And I may be forgetting one,
21   but, again, those are the big ones.
22        Q.  When you became a senior budget
23   management analyst in the Legal and Judicial
24   Group, did you then have people who were
25   reporting up to you?

Page 83

1         A.  I had two analysts that reported
2    to me.
3         Q.  Did you stay in the Legal and
4    Judicial position until 2013?
5         A.  Yes.
6         Q.  And then in 2013, did you take a
7    new position?
8         A.  I did not take a new employment
9    position in 2013, but I was participating in
10   a fellowship.
11        Q.  Okay.  All right.  Well, we'll
12   turn to your fellowship in just a minute.
13        Your resume, in describing your
14   role as a senior budget management analyst,
15   indicates that you provided decision support
16   to the county executive.
17        A.  Uh-huh.
18        Q.  Do you see that?
19        A.  Yes.
20        Q.  When you say "decision support to
21   the county executive," what do you mean by
22   that?
23        A.  So when we refer to decision
24   support, what we mean is providing the
25   information necessary for the elected

Page 84

1    officials to make informed decisions.
2         The Office of Budget
3    Management -- we do make some decisions, but
4    by and large, we're making recommendations.
5    Usually our recommendations are accepted.
6    Not always, of course.  But we provide
7    financial analyses.  We provide policy
8    analysis.  We provide legislative analysis.
9         So also part of what we do is we
10   monitor activity, predominantly in the state
11   house, but also at the federal level, and
12   then do analyses on how that's going to
13   impact the county budget and/or county
14   operations.
15        So we really try to make sure
16   that these elected officials -- they're not
17   making decisions based on lack of
18   information.
19        Q.  You're trying to inform the
20   county executive, who has the ultimate
21   authority to make the decisions at issue; is
22   that right?
23        MR. BADALA:  Objection to form.
24        THE WITNESS:  Yes.  But I will
25   just point out that under the charter

Page 85

1    form of government, it's the county--
2    the county executive does have
3    management authority, but it is the
4    county council that has budget
5    authority.
6    BY MR. BOEHM:
7         Q.  Okay.
8         A.  And legislative authority.
9         Q.  So for a time it would have been
10   the county executive.  Now, because the
11   charter, the form of the Cuyahoga County
12   government changed after the corruption
13   scandal, there's a new form and it goes
14   through the county council; is that right?
15        MR. BADALA:  Objection to form.
16        THE WITNESS:  No.
17   BY MR. BOEHM:
18        Q.  Help me out.
19        A.  I'm sorry.  So pre-charter we had
20   three commissioners.  86 counties in Ohio of
21   the 88 have three-commissioner form of
22   government.  That's what we had as well.
23   Post charter, we have an executive and a
24   council.
25        Q.  Understood.  And is the Office of

22 (Pages 82 - 85)

Page 86

1  Budget Management providing decision support
2  to both the county executive and the county
3  council?
4      A.  Yes.
5      Q.  And is that because the county
6  executive and the county council are the
7  individuals and groups who actually have the
8  ultimate authority in terms of budgeting?
9      A.  That's correct.
10     Q.  And it is the county executive
11 and the county council who set the financial
12 and budgeting priorities for the county;
13 fair?
14         MR. BADALA:  Objection to form.
15 BY MR. BOEHM:
16     Q.  Go ahead.
17     A.  I would just say the county
18 council has the ultimate authority over the
19 budget, but the county executive does make
20 recommendations.
21     Q.  Right.  My question had to do
22 with setting priorities.
23         Is it correct that the county
24 executive and the county council are the
25 individuals and groups who have the

Page 87

1  authority to set financial priorities that
2  then the budgeting process attempts to
3  follow?  Is that correct?
4          MR. BADALA:  Objection to form.
5          THE WITNESS:  It is, and I
6  don't -- but I don't mean to split
7  hairs, but the county executive will set
8  priorities.  Whether he is given the
9  authority to implement those priorities
10 really does ultimately fall on the
11 council.
12         Because if his priority, for
13 example, is a million dollars for
14 whatever and the council says no, we're
15 not giving it, then obviously his
16 priorities may change.  But for the
17 most part, they do work in concert with
18 one another.
19 BY MR. BOEHM:
20     Q.  You indicate in the fourth bullet
21 down under your senior budget management
22 analyst section that you assisted in the
23 development of the county's financial
24 policies and procedures.
25         Do you see that?

Page 88

1      A.  I do.
2      Q.  What are you referring to there?
3      A.  So the county has policies and
4  procedures -- excuse me -- that dictate --
5  they range from how the budget processes is
6  set up, accounting principles, how we make
7  determinations if agencies will ask for
8  funding, all of that, our debt, that's all
9  financial policies.
10     Q.  To what extent are you, as the
11 director of the Office of Budget Management,
12 able to apply and implement your own policy
13 preferences in terms of the budgeting
14 decision-making process?
15         MR. BADALA:  Objection to form.
16         THE WITNESS:  Do you mean in
17 terms of what gets funded ultimately or
18 the process itself?
19 BY MR. BOEHM:
20     Q.  Any part of the process.
21         MR. BADALA:  Same objection.
22         THE WITNESS:  That really varies.
23 As the director, I have unlimited
24 authority to make recommendations on the
25 process and what gets funded, but,

Page 89

1  again, my recommendations are not always
2  adhered to.
3          Generally, on process, my
4  recommendations are adhered to, because
5  that's less political.  That's less --
6  you know, that's more form over
7  substance.
8  BY MR. BOEHM:
9      Q.  Do you apply your own policy
10 preferences in making recommendations to the
11 county council, the county executive, and
12 others, as it concerns the budgeting process?
13         MR. BADALA:  Objection to form.
14         THE WITNESS:  I apply data.  So
15 to the -- I mean, to the extent that
16 those line up with my personal policy
17 choices, that's great.  But I have -- I
18 have made recommendations in the past to
19 cut funding to programs that I want to
20 believe in from a social and policy
21 standpoint, but if the data shows that
22 they are not effective, what can I do?
23         We also, as I said before, the
24 county is -- so much of what we do is
25 mandated by the state and the federal

23 (Pages 86 - 89)

Page 90

1    government.  And so we have limited
2    resources.  We don't print money in the
3    basement, unfortunately.  And very
4    often you have to prioritize your
5    mandates.
6        I mean, I believe in all of our
7    mandates.  That's why I work here.  But
8    there are any number of discretionary
9    programs that I wish we could fund,
10   that I would love to recommend that we
11   fund, that I think would be effective,
12   but if we don't have the money, we
13   don't have the money.  And I have to
14   make decisions, keeping in mind the
15   ability to carry out those decisions.
16   BY MR. BOEHM:
17       Q.  When you talk about so much of
18   what you do being mandated by state and
19   federal governments, are you talking about
20   the expenditures that the county makes are
21   mandated by the state and federal government?
22       A.  Some of them are, yes.  Well,
23   yes, directly and indirectly.  So the
24   state -- we do have areas of the government
25   where we are required to contribute specific

Page 91

1    dollar amounts.
2        For example, in the Department
3    of Health and Human Services, the county
4    receives an allocation from Temporary
5    Assistance to Needy Families, TANF, if
6    anyone is familiar with that.  The county
7    has to commit what's called a mandated
8    share, and that's $7.4 million a year.  So
9    we are mandated, if we want to draw down
10   those TANF dollars, which could be over $40
11   million, we are going to commit that
12   7.4 million.
13       And then indirectly in terms of
14   the state and/or federal government will
15   dictate what we have to do and how we have
16   to do it.  So, for example, we get a call
17   about a suspected abuse of a child, we must
18   go out and investigate.  If the claim is
19   substantiated, we must either provide
20   services to that family in the home, or in
21   the most extreme, take the child home.
22       Everything we do, unfortunately,
23   it affects the budget.
24       Q.  How much of Cuyahoga County's
25   expenditures are mandated expenditures as

Page 92

1    opposed to the discretionary type of
2    expenditure that you referred to?
3        A.  I can't give you a percentage off
4    the top of my head, but the majority.  So
5    definitely more than 50 percent are mandated.
6        Q.  And when we talk about mandated,
7    for those people who may not be super
8    familiar with the financials of local
9    government, can you describe what it means to
10   say that an expenditure is mandated?
11       A.  Absolutely.
12       So assigned counsel -- public
13   defender's office is a good example.
14   Everyone has the right to counsel if they
15   come through the criminal courts.  And the
16   county -- the public defender in Ohio is
17   locally administered.  So we have a county
18   public defender's office.  They cost about
19   $12 million a year.
20       In Cuayahoga Common Pleas Court,
21   you get a public defender or an assigned
22   private attorney.  The private attorneys
23   actually take the majority of the cases,
24   about 70 percent, but they cost almost
25   $7 million a year.  Those are mandated

Page 93

1    expenses.
2        And the -- I'm looking at the
3    Justice Center.  That in there is a mandated
4    expense, everything.  That's the Court of
5    Common Pleas, the prosecutor's office, the
6    jail.
7        We are bound by the law to --
8    despite what you're reading in the papers --
9    perform certain services in those jails.
10   Those inmates are entitled to medical care.
11   They are entitled to three meals a day.
12   That costs money.  That's a mandated
13   expense.  Their meals cost $1.7 million a
14   year.  Their medical care is more than
15   $10 million a year.
16       Q.  To sum it up, when you talk about
17   mandated expenditures, those are funds that
18   have to be spent for a particular purpose.
19   The county cannot take the money and choose
20   to spend it in some other way.  Is that a
21   fair summary?
22       A.  There are mandated expenses and
23   then there are restricted funds, and I don't
24   want to get into the weeds with restricted
25   funds.  And so, yes, the -- not appointed

24 (Pages 90 - 93)

Page 94

1 then, but the prosecutor's office is largely
2 supported by the County's General Revenue
3 Fund.
4         Had we unlimited resources, that
5 fund the county is permitted to spend in any
6 way it wants, as long as it's legal, of
7 course.  But if they wanted to build a new
8 football stadium, General Revenue Fund --
9 hope they don't, but they could.
10        Restricted funds are restricted
11 by law.  So that's why I'm saying, I never
12 knew how much I would be reading the Ohio
13 Revised Code, but I have got 50 funds in my
14 budget, probably more, that have a specific
15 section of the Ohio Revised Code that says,
16 "You will collect this money for this
17 purpose and only this purpose."
18    Q.   And when you say "collect it for
19 the purpose," meaning here's the money, and
20 here's how you have to spend it?
21    A.   That's correct.
22    Q.   And you indicated that --
23 something about despite what we read in the
24 paper, you have to spend money in the
25 Department of Corrections.  What did you mean

Page 95

1 by that?  What's in the paper that you had in
2 mind?
3    A.   The jail has recently received
4 a -- not a good report from the US Marshal's
5 Service -- office, whatever they're called.
6    Q.   And does that have anything to do
7 with spending and budgeting decisions here in
8 Cuyahoga County?
9    A.   I believe that's going to have a
10 big impact on our budget, yes.
11    Q.   And how so?
12    A.   We have to make a number of
13 changes in the jail in response to that
14 report.
15    Q.   For those of us who have not
16 fully read that report, what's the main
17 point?
18        MR. BADALA:  Objection to form.
19 BY MR. BOEHM:
20    Q.   And how is that going to impact
21 spending here in the county?
22        MR. BADALA:  Objection to form.
23        THE WITNESS:  Everything impacts
24 spending in the county.
25        There are allegations in the

Page 96

1 report that inmates weren't being seen
2 by the doctors within a certain period
3 of time.  So they are supposed to
4 receive an assessment -- I don't
5 remember offhand, within a certain
6 number of days.  Well, they get an
7 immediate assessment when they come in,
8 but after that they're supposed to have
9 a follow-up.
10        There's an allegation in the
11 report that people weren't getting
12 their followups immediately.  That is
13 likely going to result in the county
14 hiring additional medical personnel,
15 perhaps additional corrections
16 officers, so that we can make sure
17 these inmates get seen.
18        When you move people in the jail
19 out of their cells, two corrections
20 officers are usually going with them,
21 even if it's one guy.  That costs
22 money.  I mean, every movement costs
23 money.
24        And I think the county -- I hope
25 the county is going to respond to those

Page 97

1 allegations.  And that's going to cost
2 money.
3 BY MR. BOEHM:
4    Q.   Okay.
5        You indicated that sometime
6 around 2013 or 2014, you went to this
7 program -- I think it was a visiting
8 professionals program?
9    A.   That's correct.
10    Q.   And was that at the international
11 criminal court?
12    A.   It was.
13    Q.   And what did you do there?
14    A.   I was in their budget office.  I
15 didn't do a lot there.  It wasn't as exciting
16 as I thought it would be.  I wasn't really
17 assigned any tasks, so I did a lot of reading
18 and checking my email.
19    Q.   How long were you there?
20    A.   I was there for -- I was at the
21 court for about a month -- for a month.
22    Q.   Oh, just for one month?
23    A.   For one month.  I was in Europe
24 for two months.
25    Q.   And when was that?  Was that in

25 (Pages 94 - 97)

Page 98

1    2013?
2        A.   That was in -- I left in
3    September of 2013.
4        Q.   Okay.
5            And you spent a month or two
6    over in Europe.  And then what did you do
7    after you got back?
8        A.   I enrolled in law school.  I came
9    home.  I was looking for a job.  I enrolled
10   in law school and got a job with the Shaker
11   Heights Public Library.
12       Q.   What did you do with the Shaker
13   Heights Public Library?
14       A.   I was the fiscal officer and
15   business manager.
16       Q.   How long were you in that
17   position?
18       A.   A little less than a year.
19       Q.   So that takes us into 2014?
20       A.   That takes us into 2015, when I
21   came back to the county.
22       Q.   You came back to the county in
23   2015 in what capacity?
24       A.   As the director of the Office of
25   Budget Management.

Page 99

1        Q.   Did you apply for the position?
2        A.   I did.
3        Q.   Had anybody reached out to you
4    and asked you to apply or did you just see
5    the opening and apply on your own?
6        A.   I saw the opening.  I had talked
7    to a few people that I had worked with before
8    just to see, you know, if the office had
9    changed at all, and we had a new -- when I
10   left, it was Ed Fitzgerald who was the county
11   administrator.  And when I came back, it was
12   Armond Budish, so I tried to scope him out a
13   bit.
14       Q.   You decided you want to apply?
15       A.   I did.
16       Q.   And did you interview for the
17   position?
18       A.   I did.
19       Q.   Who did you interview with?
20       A.   Dennis Kennedy.
21       Q.   Did you already know Mr. Kennedy?
22       A.   I did not.
23       Q.   You probably know that
24   Christopher Murray had been the acting or
25   interim director of the Office of Budget

Page 100

1    Management, correct?
2        A.   That's correct.
3        Q.   Do you know Mr. Murray?
4        A.   He was my first supervisor when I
5    was hired.
6        Q.   Do you have an updated CV or
7    resume?
8        A.   I have one that's more updated
9    than this.  I don't know that it's current,
10   but I believe it is.
11       Q.   Is it fair to say that you take
12   your responsibilities as the director of the
13   Office of Budget Management seriously?
14       A.   Yes, it is.
15       Q.   Do you agree that you have a duty
16   to the people of the county?
17       A.   Yes.
18       Q.   And what do you believe that duty
19   is?
20           MR. BADALA:  Objection to form.
21           THE WITNESS:  To ensure that the
22   county dollars are spent appropriately,
23   efficiently, effectively, to make sure
24   that we're getting -- that we're
25   satisfying our mandates, that we're

Page 101

1    doing what we can to help people.
2            The county -- the county's
3    clientele, with the exception perhaps
4    of the board of elections, are all
5    having a bad day.  They're coming in to
6    pay taxes, which means we're separating
7    them from their money.  We've taken
8    their children from them.  We're
9    performing autopsies on their family
10   members.  They're in our jail.
11           People don't want to interact
12   with the county.  And I do believe it's
13   part of my responsibility to ensure
14   that, A, that interaction is humane,
15   morally correct, and that we are not
16   abusing our discretion on how we
17   allocate the dollars that these people
18   give us.
19           I am paid for by tax dollars
20   that could have been spent on any
21   number of other things.  I am worth two
22   social workers, maybe three, in the
23   Department of Children and Family
24   Services.  Each one manages a caseload
25   of at least 20 families.  And our

26 (Pages 98 - 101)

Page 102

1 number of kids in care has skyrocketed.
2         I know that we could be spending
3 my dollars for my own salary on
4 something extremely important.
5 BY MR. BOEHM:
6         Q.  Do you agree that it is one of
7 your responsibilities and duties to ensure
8 that funds are carefully accounted for?
9         A.  Yes, I do.
10        Q.  I'm sorry.  Go ahead.  I didn't
11 know you were still going.
12        A.  No.  I'm sorry.  I will just --
13 the fiscal office has a separate financial
14 reporting.  So, you know, accounting is not
15 my direct responsibility, but as part of
16 our -- "our," meaning OBM -- job is to
17 monitor spending and, yes, to the greatest
18 extent possible, make sure that it's being
19 appropriately accounted for.
20        Q.  Are you aware of any instances
21 where, in your view, public funds here in
22 Cuyahoga County have not been carefully or
23 appropriately accounted for?
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  Am I allowed to ask

Page 103

1 you a question?
2         MR. BADALA:  No.  You have to --
3         MR. BOEHM:  No.  There's a
4 question pending to you.
5         MR. BADALA:  The only thing I'll
6 tell you, a conversation with an
7 attorney or something like that you
8 would not be able to disclose.
9 BY MR. BOEHM:
10        Q.  I'm not asking about any
11 conversations with any lawyers.
12        I'm asking you, Ms. Keenan,
13 director of the Office of Budget Management,
14 if you are aware of any instances where
15 public funds in Cuyahoga County have not
16 been carefully or appropriately accounted
17 for.
18        MR. BADALA:  And my objection to
19 form.
20        THE WITNESS:  I am aware of
21 instances where the expenditure of funds
22 is being questioned.
23 BY MR. BOEHM:
24        Q.  And what are those instances?
25        A.  Spending on contracts in the

Page 104

1 Department of Information and Technology.
2         Q.  Okay.
3         And what funds the Department of
4 Information and Technology?  In other words,
5 what are the sources of revenue for that
6 department?
7         A.  They have multiple sources of
8 revenue.  They are about 17 million from the
9 General Fund.  They receive some funding from
10 the health -- we have two voted levies for
11 Health and Human Services.  And that's for
12 the IT staff that work directly in the
13 Department of Health and Human Services.  And
14 they also receive funds from our Real Estate
15 Assessment Fund, which is property taxes.
16        Q.  And what is the nature of the
17 questions that are being raised about
18 expenditures in that Division of Information
19 Technology?
20        MR. BADALA:  Objection to form.
21        THE WITNESS:  There are questions
22 that the expenditure did not go through
23 the proper approval path.
24 BY MR. BOEHM:
25        Q.  What do you mean by that?

Page 105

1         A.  So when you -- we procure
2 anything in the county, there is, of course,
3 a quite laborious process.  You need to get
4 certain approvals.  OBM is one of those
5 approvals.  Law is an approval.  They have to
6 hit each cue.  And there are some contracts
7 that did not hit all cues.
8         Q.  Which cues didn't they hit?
9         A.  One didn't hit any cue.  And
10 there's at least one that did not hit budget.
11        Q.  When you say "did not hit
12 budget," you mean didn't go through the
13 Office of Budget Management?
14        A.  That's correct.
15        Q.  And when you say it didn't hit
16 any cues, you mean there was some kind of
17 direct payment out of Cuyahoga County dollars
18 that went to a contractor without any review?
19        MR. BADALA:  Objection to form.
20        THE WITNESS:  That's being
21 questioned.
22 BY MR. BOEHM:
23        Q.  Who is being questioned?
24        A.  Two administrators in the
25 Department of Information and Technology.

27 (Pages 102 - 105)

Page 106

1      Q.   And did you indicate that one
2    source of funds for the Department of
3    Information and Technology is the HHS levy
4    fund?
5      A.   That's correct.
6      Q.   Are there any other instances
7    that you're aware of, as the director of the
8    Office of Budget Management, where public
9    dollars have not been appropriately accounted
10   for?
11         MR. BADALA:  Objection to form.
12         THE WITNESS:  No.
13   BY MR. BOEHM:
14     Q.   Is it fair to say that your job
15   requires that you understand the details of
16   the budgets that are reviewed by your office
17   and then ultimately approved by the county
18   council?
19     A.   I'm not expected to know all of
20   the details.  I do know a lot of them for
21   most agencies, but I have seven extremely
22   bright analysts that work with me that know
23   most of the details.
24     Q.   Fair to say that, as the
25   director, it's important for you to have a

Page 107

1    mastery of the information relevant to the
2    budget-making process?
3      A.   That's correct.
4      Q.   And it's important for you, as
5    the director of the office, to understand the
6    details of the budgets, fair?
7      A.   Like I said, I don't know the
8    details of every budget in our
9    $2 billion budget, but I have broad
10   understanding of every agency and department,
11   and I do have more detailed knowledge of some
12   of our agencies.
13     Q.   Ms. Keenan, I've reviewed the
14   budgets that have been provided to us for
15   Cuyahoga County by counsel that go back to
16   2006.  And one thing that I've noticed there
17   is that the budgets --
18         Let me start by saying, have you
19   reviewed budgets that go back at least to
20   2006 as part of your kind of making sure you
21   understand the history of the department?
22     A.   I had a hand in preparing all of
23   them from 2006.
24     Q.   Okay.  So that's a yes?
25     A.   Yes.

Page 108

1          MR. BADALA:  We've been going
2    about two hours.  I don't know if this
3    is a good time to take a break?
4          MR. BOEHM:  Sure.  Let me just --
5    I just have a few more, maybe, and
6    then -- unless you need to go now.  It
7    doesn't matter to me, but I'm about to
8    wrap up in a second.
9          MR. BADALA:  It's up to you.  Do
10   you want to take a break now or do you
11   want to wait?
12         THE WITNESS:  I wouldn't mind
13   taking a break now.
14         MR. BOEHM:  Yeah.  Let's take a
15   break.
16         THE VIDEOGRAPHER:  Off the
17   record, 10:54.
18         (Recess taken, 10:54 a.m. to
19   11:07 a.m.)
20         THE VIDEOGRAPHER:  On the record,
21   11:07.
22   BY MR. BOEHM:
23     Q.   Ms. Keenan, welcome back from a
24   short break.
25         We were talking about the

Page 109

1    budgets that have been produced to us from
2    the county that go back to 2006.  I think
3    Joe was suggesting that maybe there were
4    some that go back further than that, but not
5    to my knowledge.
6          Joe, did you want to clarify
7    that?
8          MR. CIACCIO:  I don't have the
9    specifics in front of me yet, but I know
10   that with our production 51, we
11   collected and produced budget books
12   before 2006.
13         MR. BOEHM:  Was that the annual
14   budget or do you mean something else by
15   "budget books"?
16         MR. CIACCIO:  The annual --
17   whatever they were called before 2006;
18   not the executive recommended budget,
19   but whatever the recommended budget
20   books were for those years.
21         MR. BOEHM:  Thanks.
22   BY MR. BOEHM:
23     Q.   In any event, you started there
24   in 2006.  And one thing that we noticed, as I
25   was starting to say, Ms. Keenan, is that the

28 (Pages 106 - 109)

1  budgets have a section that describe the
2  economic conditions generally in the county.
3      Do you recall that part of the
4  budgets?
5      A.  Not specifically, no.
6      Q.  There's a section in the budget
7  that talks about economic conditions in terms
8  of stressors that might be happening in the
9  county at that particular period of time or
10  other good or bad things --
11      A.  Okay.
12      Q.  -- that generally describe kind
13  of the state of financial affairs.
14      A.  Okay.
15      Q.  Is that a section of the budget
16  that you recall seeing?
17      MR. BADALA:  Objection to form.
18      THE WITNESS:  I can't say that I
19  specifically recall it, but I
20  wouldn't -- I mean, the budget books do
21  try to paint a picture of the county not
22  only as an entity but a region.
23  BY MR. BOEHM:
24      Q.  And the budgets try to
25  communicate with the public to some extent.

1  That's at least one purpose, right?
2      A.  That's correct.
3      Q.  And they describe for the public
4  some of the economic stressors that are most
5  relevant to whatever is happening in the
6  financial world of the county, fair?
7      MR. BADALA:  Objection to form.
8      THE WITNESS:  That's correct.
9  BY MR. BOEHM:
10      Q.  Why do the budgets describe the
11  most important economic and financial
12  stressors to whoever is reading it?  What's
13  the purpose of that?
14      A.  Well, I can't speak -- I didn't
15  write the ones that would have been created
16  before, so I can only speak to the books that
17  were written post 2015.  But we would want to
18  include that to give an indication of the
19  county's financial status, our ability to
20  pay, our ability to respond to stressors.
21      This county has been asked
22  repeatedly for -- since 2015, we get
23  requests from these agencies -- not all of
24  our agencies, but many, for additional
25  funding, some specific to the opiate

1  epidemic in the county.
2      So it's important for the
3  community to understand that the county can
4  only fund with the resources that it has
5  available to us.  And those resources are
6  insufficient to meet demand.
7      (Discussion held.)
8  BY MR. BOEHM:
9      Q.  Do you agree that it's important
10  for you, as the director of the Office of
11  Budget Management, to understand the economic
12  conditions in the county, including the
13  stressors on the economy that impact
14  budgeting?
15      MR. BADALA:  Objection to form.
16      THE WITNESS:  Yes.
17  BY MR. BOEHM:
18      Q.  And is it important to
19  communicate that to the public?
20      A.  Yes.
21      Q.  And it's fair to say that's what
22  the county has tried to do in releasing its
23  budgets, to communicate to the community what
24  the economic conditions are, generally
25  speaking, and including the most important

1  economic stressors that the county is facing
2  at any particular period of time, fair?
3      MR. BADALA:  Objection to form.
4      THE WITNESS:  I can't say that
5  because I don't recall specifically what
6  has been included in previous budget
7  documents.  The primary purpose of them
8  is to communicate what's happening in
9  the agencies and departments.
10      Sometimes there's a reference to
11  economic conditions; sometimes there
12  isn't.  But the primary -- I'm sorry --
13  the primary purpose is to communicate
14  agency-specific information.
15  BY MR. BOEHM:
16      Q.  What are the years in which the
17  budget has not included a section describing
18  the economic conditions, including the
19  economic stressors in the county?
20      A.  I can't answer that.
21      Q.  But you said in your answer,
22  sometimes you did and sometimes you didn't.
23      MR. BADALA:  Objection to form.
24  BY MR. BOEHM:
25      Q.  And I'm wondering if you actually

29 (Pages 110 - 113)

Page 114

1    know of any instances where you didn't.
2         MR. BADALA:  Objection to form.
3         THE WITNESS:  I can't answer
4    that.
5    BY MR. BOEHM:
6         Q.   So you're not aware of any
7    instances where the budget didn't include a
8    section that described the general economic
9    conditions in the county, including economic
10   stressors?
11        MR. BADALA:  Objection to form.
12        THE WITNESS:  No.
13   BY MR. BOEHM:
14        Q.   Now, have you ever personally
15   filed for bankruptcy?
16        A.   Yes, I have.
17        Q.   When was that?
18        A.   I don't -- 2010.
19        Q.   What were the circumstances?
20        MR. BADALA:  Objection to form.
21   You can answer.
22        THE WITNESS:  Financial distress.
23   The county had --
24   BY MR. BOEHM:
25        Q.   I'm sorry.  Just start over,

Page 115

1    because I think there was a --
2         A.   So just financial distress.  The
3    county had been participating in layoffs --
4    or, I'm sorry, furloughs for several years.
5    We weren't given raises for several years.  I
6    had a mortgage that I could no longer afford.
7    I'm a single mother.
8         Q.   What's the current disposition of
9    that matter?
10        A.   That's all done.
11        Q.   And you said that was around
12   2010?
13        A.   I believe so.
14        Q.   That was -- that period of time
15   was the time of financial difficulty for many
16   people.
17        Do you recall that?
18        MR. BADALA:  Objection to form.
19        THE WITNESS:  Yes.
20   BY MR. BOEHM:
21        Q.   There was the 2008, 2009, into
22   2010, right?
23        A.   Yes.
24        Q.   There was a housing crisis?
25        A.   Yes.

Page 116

1         Q.   And some people refer to that now
2    as The Great Recession?
3         MR. BADALA:  Objection to form.
4         THE WITNESS:  Yes.
5    BY MR. BOEHM:
6         Q.   And it was right around that time
7    that you were having your personal financial
8    difficulty, correct?
9         A.   That's correct.
10        Q.   Did The Great Recession -- well,
11   let me back up.
12        Is it fair to say the economic
13   difficulty from that period of time that is
14   sometimes now referred to as The Great
15   Recession had an impact on Cuyahoga County
16   and its ability to budget and spend funds,
17   right?
18        MR. BADALA:  Objection to form.
19        THE WITNESS:  For a period of
20   years, yes, the county -- the budget --
21   to produce the budget required agencies
22   to take cuts.  We had an impact
23   particularly on our sales tax revenue
24   and property tax revenue.
25

Page 117

1    BY MR. BOEHM:
2         Q.   Why did The Great Recession have
3    an impact on Cuyahoga County budgeting?
4         A.   The county's largest revenue
5    source in the General Fund is sales tax.  And
6    sales tax is usually an indicator of the
7    economy around you.
8         And in -- I don't remember what
9    year it would have been, but there was a
10   reappraisal done maybe in 2000 -- well, in
11   one of those 2008, 2009, 2010 years, and
12   property tax went -- property values went
13   down, which means our tax revenue went down.
14        Q.   And the property tax value went
15   down as a result of this housing crisis that
16   started in around 2008, right?
17        A.   That's correct.
18        Q.   And that has an impact on the
19   health of the Cuyahoga County budget, fair?
20        A.   It did.
21        Q.   For what years, in your view, did
22   The Great Recession, the economic crisis that
23   impacted the entire country, including
24   Cuyahoga County, impact the Cuyahoga County
25   budgeting process, up to and including the

1  present day?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  In 2008, we did
4      cuts.  2009, we did cuts.
5          I don't recall specifically
6      about 2010.
7          In 2011, we did not.  That was
8      the first year of the new government.
9  BY MR. BOEHM:
10     Q.  In 2011 you did not do cuts?
11     A.  I don't believe so.
12     Q.  Did you add money to the budget
13  or did you just not further cut it back?
14         MR. BADALA:  Objection to form.
15         THE WITNESS:  I don't recall in
16     2011.
17  BY MR. BOEHM:
18     Q.  Do you have a view of for how
19  long the economic crisis that started in 2008
20  impacted the amount of money that
21  Cuyahoga County has had available to it for
22  purposes of its expenditures?
23         MR. BADALA:  Objection to form.
24         THE WITNESS:  So sales tax, which
25     is my primary indicator, has been

1      increasing every year since at least
2      2012, year over year.  I don't know of
3      the years prior to that because I wasn't
4      responsible for those projections.
5  BY MR. BOEHM:
6      Q.  How about for property tax?
7      A.  There was a reappraisal in 2012,
8  and values decreased in 2012, which would
9  only impact largely the county's
10  General Fund.
11         Our two voted levies are
12  protected by House Bill 920, which means
13  that we manipulate the effective rate of the
14  millage to generate the amount of money that
15  we said we would.
16     Q.  But the 2008 economic crisis --
17     A.  Uh-huh.
18     Q.  -- which was a housing crisis,
19  did that have an impact on property values in
20  Cuyahoga County?
21     A.  Property values decreased in the
22  2012 appraisal.  I'm not an economist.  All I
23  can tell you is that they decreased in 2012.
24     Q.  What about in 2008?
25     A.  I don't know.

1      Q.  What about 2009?
2      A.  I don't know.  I wasn't tracking.
3  That wasn't my area.
4      Q.  You don't know as you sit here
5  today, as the director of the Office of
6  Budget Management, whether or not the housing
7  crisis of 2008 had an impact on property
8  values in Cuyahoga County?
9          MR. BADALA:  Objection to form.
10         THE WITNESS:  I'm telling you
11     that property values decreased in 2012.
12  BY MR. BOEHM:
13     Q.  Right.  But I asked --
14     A.  The results of the reappraisal in
15  years prior to that, I don't know.
16     Q.  This 2012 appraisal, you said
17  that the values decreased.  Relative to what?
18     A.  We do appraisals every three
19  years.
20     Q.  So between 2009 and 2012, real
21  estate property values decreased?
22     A.  That's correct.
23     Q.  How much did they decrease?
24     A.  I don't know.
25     Q.  And is it fair to say that you

1  attribute the decrease in property value
2  between 2009 to 2012 to what was, in fact, a
3  nationwide housing crisis?
4          MR. BADALA:  Objection to form.
5          THE WITNESS:  I can only say what
6      happened to the values.  I don't know
7      what -- I am not an expert in this.
8  BY MR. BOEHM:
9      Q.  Do you have an opinion as to why
10  property values in Cuyahoga County decreased?
11         MR. BADALA:  Objection to form.
12         THE WITNESS:  No.
13  BY MR. BOEHM:
14     Q.  Have you undertaken to try and
15  understand that?
16     A.  For 2009?  No.
17     Q.  For any period of time.
18     A.  I track housing values now.  But
19  I do not analyze housing values from ten
20  years ago.
21     Q.  As the director of the Office of
22  Budget Management, have you ever undertaken
23  to try and understand what has accounted for
24  decreases in property values in
25  Cuyahoga County?

31 (Pages 118 - 121)

1          MR. BADALA: Objection to form.
2          THE WITNESS: Not in any detail,
3     no. We have directors that are
4     responsible for that, and I trust the
5     directors to keep on top of that.
6     BY MR. BOEHM:
7          Q. Who are the directors that we
8     would need to talk to to understand those
9     questions better?
10          A. Department of Development,
11     Ted Carter.
12          Q. Anybody else?
13          A. No.
14          Q. How have property values in
15     Cuyahoga County done since 2012?
16          A. The most recent appraisal was
17     just completed, and property values on a
18     whole are increasing by 11 percent.
19          Q. And is that for the last three
20     years?
21          A. That's correct.
22          Q. So in the last three years here
23     in Cuyahoga County, property values have gone
24     up 11 percent?
25          A. That's correct.

1          Q. That's pretty good, wouldn't you
2     say?
3          MR. BADALA: Objection to form.
4          THE WITNESS: Yes. That's good
5     for the county. That's good for the
6     county.
7     BY MR. BOEHM:
8          Q. And that's a pretty big increase,
9     is what I mean. Yes?
10          MR. BADALA: Objection to form.
11          THE WITNESS: The county is not
12     the largest beneficiary of property tax
13     dollars in Ohio, so we are not going to
14     see a big increase. The voted levies,
15     we will not see any increase.
16          So the fact that property values
17     have gone up does not in any way affect
18     our ability to pay for our services,
19     including responding to the opiate
20     epidemic.
21     BY MR. BOEHM:
22          Q. Okay.
23          A. Property values will increase
24     General Fund revenue slightly.
25          Q. So is it fair to say, then,

1     fluctuations in either direction, up or down,
2     of property values don't materially impact
3     the county's ability to pay for expenditures,
4     including with respect to any opiate-related
5     expenditures?
6          MR. BADALA: Objection to form.
7          THE WITNESS: The General Fund
8     will see an increase or decrease. And I
9     don't agree that a 3 to
10     $6 million increase is not material.
11     BY MR. BOEHM:
12          Q. So are you saying that the
13     11 percent rise in property values would
14     translate to somewhere between 3 and
15     $6 million in terms of funds available to the
16     county?
17          A. That's correct.
18          Q. Is that the limit of it, or is
19     there more money that would be available
20     based on changes in property value?
21          MR. BADALA: Objection to form.
22          THE WITNESS: Changes in property
23     value will always impact it. New
24     construction two weeks from now will
25     impact the amount of revenue that comes

1     in.
2     BY MR. BOEHM:
3          Q. I just want to make sure we have
4     this very clear.
5          So I think you were saying that
6     increases in property value don't materially
7     impact the county's ability to pay for
8     expenditures, but I might have misunderstood
9     that. So explain to me if I got that wrong.
10          A. I said the exact opposite.
11          Q. Okay. Say it again.
12          A. The increase in property values
13     will increase General Fund revenue from
14     anywhere to 3 to $6 million. And the
15     difference is right now I'm waiting on the
16     board -- you can go through the Board of
17     Revision. So I'm seeing what happens with
18     the appeal process. People are going to
19     appeal. But 3 to $6 million is material.
20          Q. How do you translate the
21     11 percent increase in property values here
22     in Cuyahoga County over the last three years
23     to somewhere between 3 and $6 million
24     additional funds being available to the
25     county?

32 (Pages 122 - 125)

Page 126

1    A.   The county is entitled to a
2  certain percentage of inside millage.  We get
3  property tax dollars.
4    Q.   You indicated that mostly,
5  though, decreases or increases in property
6  value don't impact the county, they impact --
7  do they impact other entities?
8      MR. BADALA:  Objection to form.
9      THE WITNESS:  They do impact the
10  county's General Fund.
11  BY MR. BOEHM:
12    Q.   The 3 to $6 million, right?
13    A.   That's correct.
14    Q.   Right.  But you indicated in one
15  of your earlier responses that actually
16  changes in property value have a bigger
17  impact outside the county than they do inside
18  the county in terms of available money.
19    A.   The largest recipient of property
20  tax revenue are schools and libraries.
21    Q.   That doesn't go directly to the
22  county?
23    A.   It does go directly to the county
24  and the county redistributes it.
25    Q.   So if I understand it correctly,

Page 127

1  the largest recipient of funds from property
2  taxes are schools and libraries?
3    A.   Correct.
4    Q.   What else?
5    A.   We have metro parks, a park
6  district that receives property tax dollars.
7  There are voted levies in various
8  municipalities for property tax dollars.  So
9  any new levies will get the benefit of
10  increase in property taxes.
11    Q.   Do fluctuations in property
12  values have any impact on the county's
13  ability to pay for opiate -- specifically
14  opiate-related expenditures?
15    A.   Absolutely.
16      The county gets General Fund
17  dollars from property tax, and we are using
18  the General Fund dollars to pay for record
19  number of autopsies in the
20  Medical Examiner's office; record number of
21  toxicology testing in the Medical Examiner's
22  office; two years of steady increases in
23  case filings in Common Pleas Court, which
24  affects the prosecutor, public defender.
25      And we have seen an exponential

Page 128

1  increase in the number of inmates in our
2  facility who come in addicted to
3  prescription opiates, and we have to take
4  care of their medical needs.
5      That's all General Fund.
6    Q.   That's all from the General Fund?
7    A.   That's correct.
8    Q.   What percentage of property taxes
9  here in Cuyahoga County go to
10  General Fund?
11    A.   About 10.  A little less than
12  10 percent.
13    Q.   Do you know why property values
14  here in Cuyahoga County have gone up about
15  11 percent in the last three years?
16    A.   I can't say that, just like I
17  can't specifically say why they went down.
18  But Cuyahoga County, the city of Cleveland,
19  has been on the rebound for the last, really,
20  decade, but the last five years
21      Sales tax, as I mentioned, has
22  been going up.  That's really my bellwether
23  for what's happening in the community.  And
24  we've seen pretty good-sized percentage
25  increases year over year in sales tax.

Page 129

1      We did have the Cleveland
2  Cavaliers for a while there as a winning
3  basketball team.  The Indians were doing
4  well.  We have a lot of new construction.
5  Things are going well in Cuyahoga County.
6    Q.   You said that the county is on
7  the rebound and has been on the rebound for
8  the last ten years.  And when you say it's
9  "on the rebound," tell me what you mean by
10  that.
11    A.   The county as an entity I'm not
12  talking about.  I'm talking about the region.
13  So, you know, Cuyahoga County as a region has
14  seen some new businesses.  Like I said, we
15  had two winning sports teams for a while.
16      And our sales tax is up.  Sales
17  tax is a good indication that your economy
18  is doing -- you know, if you go up, you're
19  doing at least a little bit better than you
20  were last year, and our sales tax has been
21  going up for several years.
22    Q.   For how long has the sales tax
23  been going up?
24    A.   Sales tax has been going up year
25  over year at least since 2012.

33 (Pages 126 - 129)

Page 130

1    Q.  Do you know how property taxes
2  changed between 2012 and 2015?
3    A.  I do not, no.
4    Q.  You don't know if it went up or
5  down?
6    A.  I do not know.
7    Q.  Who would we have to ask to find
8  out?
9    A.  I can get that information.
10    Q.  Who would you ask?
11    A.  Probably Chris Murray, the county
12  treasurer.
13    Q.  The county treasurer.
14       When you say that sales tax
15  going up is a good indicator of economic
16  health --
17    A.  Uh-huh.
18    Q.  -- why is that true?  What does
19  that mean?
20    A.  If sales tax is increasing, that
21  suggests that people are spending more, or at
22  least not spending less, or they're buying
23  more expensive items.  And if people have
24  money to spend, that's a good thing for the
25  economy.

Page 131

1    Q.  So you would say, overall, for
2  the last ten years, Cuyahoga County has been
3  doing well economically?
4       MR. BADALA:  Objection to form.
5       THE WITNESS:  I would not say
6    that.  I would say that our sales tax
7    has been performing well.
8    Cuyahoga County, in terms of its budget,
9    has been hit extraordinarily hard by the
10    opiate epidemic for years.
11       And in 2017, we lost 30 million
12    of our annual sales tax revenue due to
13    a decision at the federal level.
14       So this is the first year where
15    we're going to be 30 million down in
16    sales tax.  That's a really large hit.
17  BY MR. BOEHM:
18    Q.  That 30 million doesn't have
19  anything to do with opiates, does it?
20    A.  It absolutely does.  The county
21  supports all of these costs through its
22  General Fund.  And sales tax is our largest
23  revenue source to the General Fund.
24    Q.  The decision to take away the
25  $30 million was not a decision made in

Page 132

1  connection with opiate use or abuse, fair?
2       MR. BADALA:  Objection to form.
3       THE WITNESS:  I don't believe so.
4  BY MR. BOEHM:
5    Q.  Who made the decision to change
6  the sales tax such that Cuyahoga County will
7  have $30 million less?
8    A.  A federal agency.  I'm not sure
9  which one.
10    Q.  Do you know why they made that
11  decision?
12    A.  Previously, sales tax had been
13  assessed on the premiums paid by Medicaid
14  Managed Care Organizations.
15       And the federal government has
16  been saying for years, "You either tax
17  everybody, so your healthcare too, or you
18  tax nobody."  And the State of Ohio said,
19  "We will tax nobody."
20       But that Medicaid Managed Care
21  tax was $30 million for us.  And that
22  absolutely affects our ability to respond to
23  the opiate epidemic.
24    Q.  I understand that it affects the
25  amount of money you have available to spend.

Page 133

1    A.  That's correct.
2    Q.  I get that.  But the $30 million
3  that you might be -- you might not have
4  because of the changes in the Medicaid
5  Managed Care Act, that's a legislative
6  decision, right?
7       MR. BADALA:  Objection to form.
8       THE WITNESS:  I believe it was a
9    decision by one of the federal agencies,
10    so executive.
11  BY MR. BOEHM:
12    Q.  Where has money from the Medicaid
13  Managed Care Act in past years gone?  Into
14  which funds does it go?
15    A.  The General Fund.
16    Q.  Does all of it go into the
17  General Fund?
18    A.  It does.
19    Q.  But you're not blaming the
20  defendants in this case for the fact that a
21  federal agency has made a decision to apply
22  the Medicaid Managed Care Act in the way that
23  they have, are you?
24       MR. BADALA:  Objection to form.
25       THE WITNESS:  I'm not blaming

34 (Pages 130 - 133)

Page 134

1    anyone, including the federal agency.
2    BY MR. BOEHM:
3        Q.  You're just making a note that
4    you may have an additional financial
5    stressor.
6        MR. BADALA:  Objection to form.
7    BY MR. BOEHM:
8        Q.  Right?
9        A.  It's a considerable financial
10   stressor.
11       Q.  But it doesn't have anything to
12   do with the conduct that's being alleged
13   about the defendants in this case, fair?
14       MR. BADALA:  Objection to form.
15       THE WITNESS:  I think that there
16   is a connection.  The demand for our
17   expenditure of funds to provide certain
18   services in response to this crisis is
19   increasing.  It's not only not staying
20   the same and we're losing 30 million,
21   but it's increasing and we're losing
22   30 million.
23       The number of children in foster
24   care has been increasing every week --
25   every week this year, and we're at

Page 135

1    record highs going back to 2011.  Not
2    having $30 million makes our job very
3    difficult.
4    BY MR. BOEHM:
5        Q.  I got the talking points, but
6    it's not the answer to my question.  I'll
7    move to strike.
8        I'm going to give you plenty of
9    opportunities today to talk about what you
10   think the specific damages are.  Trust me,
11   I'll get to that.  But that's not my
12   question.
13       A.  I believe I answered your
14   question in saying I think there is a
15   connection, yes.
16       Q.  My question to you, Ms. Keenan,
17   was whether or not you believe that the
18   decision-makers at the federal agency,
19   vis-a-vis this Medicaid Managed Care Act,
20   made their decision that impacts the county
21   because of something having to do
22   specifically with opiates?
23       MR. BADALA:  Objection to form.
24   And just note my objection.  That was
25   not Mr. Boehm's previous question.

Page 136

1        THE WITNESS:  Yeah.  I don't
2    believe that was the question.
3    BY MR. BOEHM:
4        Q.  But what's the answer?
5        A.  The answer to this new question
6    is, no, I don't believe that decision was
7    made for that reason.
8        Q.  It has nothing to do with
9    opiates, right?
10       MR. BADALA:  Objection to form.
11       THE WITNESS:  I don't believe so.
12       (Cuyahoga County, Organizational
13       Chart - no Bates, marked as
14       Deposition Exhibit 2.)
15   BY MR. BOEHM:
16       Q.  Ms. Keenan, I've marked this
17   document in front of you as Exhibit 2 for
18   purposes of your deposition.
19       It's an organizational chart of
20   Cuyahoga County government.
21       A.  Uh-huh.
22       Q.  Have you seen this before?
23       A.  Something like it, at least, yes.
24       Q.  And your name is right there,
25   almost smack-dab in the middle.

Page 137

1        Do you see that?
2        A.  I do.
3        Q.  It says "Office of Budget
4    Management Director Maggie Keenan."  Right?
5        A.  Yes.
6        Q.  And that's you?
7        A.  That's me.
8        Q.  You report directly to Mr. Dennis
9    Kennedy?
10       A.  That's correct.
11       Q.  He's the chief financial officer?
12       A.  That's correct.
13       Q.  What does it mean that he's the
14   chief financial officer?
15       A.  Under the charter, the fiscal
16   officer performs the statutory functions of
17   the county auditor and the county recorder.
18   And the statutory functions as it relates to
19   title, like vehicle and boat title, that used
20   to fall under the elected Clerk of Courts.
21       Q.  Does he have oversight over your
22   office?
23       A.  Yes.
24       Q.  Mr. Kennedy has oversight over
25   the Office of Budget Management, right?

35 (Pages 134 - 137)

Page 138

1     A.   We are part of the fiscal office.
2     Q.   Is that a yes?
3     A.   Yes.
4     Q.   Do you report to anybody other
5   than Mr. Kennedy?
6     A.   No.
7     Q.   There are several other people
8   who are listed under your name on this
9   organizational chart, including Mr. Murray.
10         Do you see that?
11    A.   Yes.
12    Q.   Do any of those individuals
13  report to you?
14    A.   No.
15    Q.   Would there be a different
16  organizational chart for the Office of Budget
17  Management that would show how your office
18  breaks down?
19    A.   Yes.
20    Q.   Do you have a chart like that for
21  the OBM?
22    A.   I do.
23    Q.   Is that one of the items that you
24  made available to the lawyers when you said
25  you had collected documents for the case?

Page 139

1     A.   I don't recall.
2     Q.   Is that something you could
3   easily get?
4         MR. BADALA:  Objection to form.
5         THE WITNESS:  Yes.
6   BY MR. BOEHM:
7     Q.   You could just pull up your
8   computer and find it?
9     A.   Yeah.
10    Q.   Mr. Kennedy reports directly to
11  the county executive, Mr. Armond Budish,
12  right?
13    A.   That's correct.
14    Q.   Mr. Budish is the head of county
15  government?
16    A.   He is the head of the executive
17  branch of county government.
18    Q.   He's the county executive?
19    A.   That's correct.
20    Q.   Do you know him?
21    A.   I do.
22    Q.   Do you meet with him?
23    A.   I do.
24    Q.   How often do you meet with
25  Mr. Budish?

Page 140

1         MR. BADALA:  Objection to form.
2         THE WITNESS:  It varies depending
3   on time of year, what's happening around
4   the county.  But I meet with him quite
5   frequently.
6   BY MR. BOEHM:
7     Q.   What does "quite frequently"
8   mean, on average?
9     A.   On average, I would say that I
10  communicate with him once or twice a week.
11    Q.   Do you usually do that by email,
12  in person, on the phone?  How do you do that?
13        MR. BADALA:  Objection to form.
14        THE WITNESS:  All of the above.
15  BY MR. BOEHM:
16    Q.   Do you ever communicate with
17  Mr. Budish about the impact in Cuyahoga
18  County from the use or misuse or abuse of
19  opiates?
20        MR. BADALA:  Objection to form.
21        THE WITNESS:  I have had
22    conversations with him on -- yes, on the
23    impact of prescription opiates and
24    heroin on individual agencies, yes.
25

Page 141

1   BY MR. BOEHM:
2     Q.   What have you discussed with him
3   about that?
4     A.   So I, obviously, can't recall
5   every conversation, but as an example, I do
6   communicate on a weekly basis the number of
7   children that we have in foster care.  I will
8   communicate --
9         I'm sorry.  May I have a tissue?
10        MR. BADALA:  Yes.
11        THE WITNESS:  Thank you.  Sorry.
12        If we're getting requests from
13    agencies for additional funding to
14    support the demand for whatever
15    services it is that they provide, I'll
16    have to communicate that to Armond,
17    Mr. Budish.
18  BY MR. BOEHM:
19    Q.   Okay.
20        Has he ever expressed any
21  opinions to you about the impacts of opiate
22  use or abuse on Cuyahoga County and its
23  financial state?
24        MR. BADALA:  Object to the form.
25        THE WITNESS:  Yes.

36 (Pages 138 - 141)

Page 142

1  BY MR. BOEHM:
2      Q.  What has he said to you about
3  that?
4      A.  He believes that this is having a
5  devastating effect on our finances.
6      Q.  What specifically has he said to
7  you about that?
8      MR. BADALA:  Objection to form.
9      THE WITNESS:  I can't recall
10     specific conversations that I've had,
11     but Armond has made several speeches
12     about this and has communicated -- since
13     Armond took office in January of 2015,
14     we have had to cut tens of millions of
15     dollars each year from the budget,
16     partly in response to the increase in
17     our costs.  And so when we communicate
18     at any particular agency, it comes up.
19  BY MR. BOEHM:
20     Q.  Did I hear you right that since
21  Mr. Budish has become the county executive,
22  Cuyahoga County has cut tens of millions of
23  dollars from its annual budget?
24     A.  That's correct.
25     Q.  And you said that one of the

Page 143

1  reasons was what?
2      A.  I'm sorry?
3      Q.  What were the reasons that
4  Cuyahoga County has had to cut tens of
5  millions of dollars from its budget?
6      A.  The demand for our services and
7  our costs are skyrocketing.
8      Q.  That's not a reason to cut,
9  though.  That's a stressor, but it's not a
10  reason to cut.  I'm asking you --
11     A.  It is a reason --
12     Q.  -- why has the county had to cut
13  the amount of money it spends on services?
14     MR. BADALA:  Objection to form.
15     THE WITNESS:  We don't have
16     enough money.  We don't have enough
17     money to cover our expenses.
18  BY MR. BOEHM:
19     Q.  What has caused the county --
20     MR. BADALA:  Are you done?
21  BY MR. BOEHM:
22     Q.  I'm sorry.  I thought you were
23  done.  Go ahead.
24     A.  No.  Sorry.
25     We also have -- so the county

Page 144

1  budget General Fund levies is 650-or-so
2  million dollars.  We don't spend the same
3  money on the same programs every year,
4  right?  So we have to make priorities.  We
5  have to make policy decisions.
6      When we see that we're having to
7  perform our autopsies -- hire a new
8  pathologist to respond to that in the
9  Medical Examiner's office, I have to find
10  that money from some other agency and cut
11  it.
12     So we are making cuts.  Even if,
13  in total, we are spending the same amount of
14  money, for the agency who just lost their
15  funding, they will tell you that that is
16  absolutely a cut.
17     Everything that we give is
18  because we're taking from somebody else.
19     Q.  So when you say that you've had
20  to make cuts of tens of millions of dollars
21  to the budget, you're talking about
22  reshuffling funds?
23     A.  No.  I'm talking about both.  We
24  have cut tens of millions of dollars from the
25  budget.

Page 145

1      Q.  Well --
2      A.  And in addition to that, we have
3  had to reallocate funds to respond to
4  demands.
5      Q.  Okay.
6      But let's talk about those one
7  at a time.  Because they are different,
8  right?
9      A.  Uh-huh.
10     Q.  Those are different things,
11  right?
12     A.  They are.
13     Q.  So let's talk about them one at a
14  time so we don't get confused.
15     A.  Okay.
16     Q.  With respect to the cutting tens
17  of millions of dollars, what are the reasons
18  why Cuyahoga County has had to cut tens of
19  millions of dollars from its budgets?
20     MR. BADALA:  Objection to form.
21     THE WITNESS:  The primary reason
22     is the loss of the Medicaid Managed
23     Care.  So we actually -- when we passed
24     our budgets, we tried to be proactive
25     and eliminate some things in advance of

1  actually losing the money so that we
2  weren't turning off services that day.
3      And transitioning our clients to
4  other resources takes time and takes
5  money.  We have seen a decrease in some
6  of our other revenue sources.  A lot of
7  our revenue comes from state and
8  federal sources.
9      For example, the Ohio Public
10  Defender reimburses a percentage of our
11  indigent care costs.  And when their
12  money gets tight, they don't cut; they
13  take it out on the locals.  So they'll
14  reduce the reimbursement rate.  And
15  they did reduce the reimbursement rate
16  at some point, and so we have to
17  respond to that and we have to cover
18  it, because we don't have the option to
19  not provide indigent defense.
20  BY MR. BOEHM:
21      Q.  I think I heard you say two
22  reasons why you've had to cut the total
23  amount of spending.  One was the Medicaid
24  Managed Care changes.  And two, you said that
25  there were reductions in some of your other

1  revenue sources, and you specifically
2  mentioned state funds and federal funds.
3      A.  That's correct.
4      Q.  Are there any other reasons why
5  Cuyahoga County has had to cut its budget?
6      A.  Yes.
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  I'm sorry.
9      The cost of our operations
10  increases every year.  Cuyahoga County,
11  with the exception of like our Road and
12  Bridge division, our sanitary divisions
13  where you have large construction
14  costs, we are very heavily personnel.
15  We are also very heavily union.  So we
16  have bargaining agreements that
17  guarantee certain percentage increases
18  for salaries every year.  The executive
19  has made a commitment to try and
20  implement cost-of-living increases to
21  the non-bargainings every year.
22      So when I say we're cutting,
23  we're also cutting from -- you know, if
24  our costs this year are 18 million and
25  we think they're going to go up to

1  21 million next year to cover
2  hospitalizations, COLAs, you have to
3  cut to stay within the 18 million that
4  you have available to you.
5      The cost of our employee
6  healthcare has been increasing.  I
7  mean, that's not unique to
8  Cuyahoga County, but it's an
9  extraordinarily large expense.
10  BY MR. BOEHM:
11      Q.  Okay.
12      But, again, we kind of slipped
13  into a discussion about increasing costs.
14  And I want to be very clear, I'm not right
15  now asking you about increasing costs.  I'm
16  asking you about decreasing the budget, in
17  other words, decreasing revenue that you
18  have available to cover the costs.
19      And you indicated that Medicare
20  Managed Care changes was one reason.  And
21  you also indicated that losses from state
22  and federal funding was another reason.
23      And I'm asking you now, are
24  there any other reasons?
25      A.  So perhaps to put this in

1  context, if I can just provide some
2  background on how the budget process
3  operates, because that might make it more
4  clear.
5      We adopt a budget.  We don't do
6  biannual budgets in Cuyahoga County, but we
7  analyze them annually.  Throughout the year
8  we will do forecasts.  We go three years
9  out.
10      If our forecasts show that our
11  personnel costs are going to increase, just
12  as an example, $5 million a year every year,
13  we have to cut something else to pay for our
14  staff.
15      So when I say "cut," it's
16  cutting based off of those forecasts.  We
17  have to eliminate contracts.  We have to
18  eliminate something if we're going to keep
19  the staff that we have who actually perform
20  the services.
21      Q.  Right.  So you have to -- that's
22  the reshuffling of funds, right?  You might
23  have to take from Peter to pay Paul?
24      A.  No.  We actually have to cut
25  because the costs keep rising.  When you have

38 (Pages 146 - 149)

Page 150

1    rising costs, you eventually have to cut.
2    Revenue doesn't increase with expenses.
3        Q.  You have to cut services?
4        A.  We have to cut something.
5        Q.  I'm talking about the total
6    amount of money that you have available to
7    spend.  That's my question to you, right?
8    And I thought you had said that the county
9    has had reductions in the total amount of
10   money that it has available to spend.
11       And you identified a couple of
12   reasons why:  The Medicaid Managed Care
13   changes and losses from state and federal
14   sources, okay?
15       Are there other actual reasons
16   why you have lost money in terms of the
17   total amount you have available to spend,
18   however you spend it?
19       A.  We lose revenue all the time.  We
20   get a significant number of revenue from fees
21   for services, charges for services, filings
22   in the Court of Common Pleas.  85 percent of
23   our defendants in the Court of Common Pleas
24   for the criminal cases are indigent.  They
25   don't pay, but the cost to provide that trial

Page 151

1    stays the same or goes up because we have
2    county staff who get increases in personnel
3    every year.
4        Those costs have gone down as
5    case filings are going through the roof over
6    there, and the defendants aren't paying.
7    We're losing revenue in our charges.
8        Q.  Has the amount of money that the
9    county has collected from the Court of Common
10   Pleas' fees gone down in recent years?
11       A.  Absolutely.  It has from all the
12   courts except for juvenile.
13       Q.  For how long have court fee
14   revenues been going down in Cuyahoga County?
15       A.  I can't answer that without
16   seeing a budget.
17       Q.  Can you just describe it for me
18   generally?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  I don't want to
21   guess.
22   BY MR. BOEHM:
23       Q.  Has it been going down for years?
24       A.  I'd need to see a budget.
25       Q.  You're not even sure if it's gone

Page 152

1    down for years?
2        A.  I'm sure it's gone down.  I'm not
3    going to guess at how long.
4        Q.  Okay.
5        So now we've got a third, the
6    loss of fees from the Court of Common Pleas.
7        Are there other losses of total
8    revenue that the county has available to
9    spend that we've not already talked about?
10       A.  Of course.  I mean, the county
11   has hundreds of revenue sources.  So, yes,
12   there are losses in several of them.
13       Q.  What else?
14       A.  Reimbursements that we get.  We
15   used to receive more revenue from commissary;
16   that's gone down.  Our fees was a big one;
17   that's gone down.
18       I would have to see a budget to
19   see -- to know every single one that's gone
20   down.
21       Q.  When you say losses in revenue
22   from commissary, does that have to do with
23   commissary in the jail?
24       A.  It does.
25       Q.  And that amount has been going

Page 153

1    down?
2        A.  That's correct.
3        Q.  What are the revenues generated
4    from commissary used to fund for the county?
5        A.  Services for the inmates.  So we
6    have -- this is really a question for Cliff
7    Pinkney, who is our county sheriff, but they
8    have GED classes, other services in the jail.
9        And you are permitted to use
10   commissary funds for expenses that create a
11   safe -- I forget the language -- something
12   environment for the inmates.  We use it to
13   pay for the employees that actually work in
14   commissary, but they don't -- we don't
15   anymore, because that used to be a million
16   dollars and commissary doesn't have it.
17       Q.  For how long has commissary
18   revenue been going down here in
19   Cuyahoga County?
20       A.  We haven't received any revenue
21   from commissary in 2018 and 2017.
22       Q.  Zero funds?
23       A.  Zero.
24       Q.  Explain how that's possible.
25       A.  We're collecting --

39 (Pages 150 - 153)

Page 154

1      Q.  Is commissary generating any
2   revenue?
3      A.  It is, but the costs are going
4   up.
5      Q.  I see.  So the revenue is being
6   generated, but it's being spent directly at
7   the jail?
8      A.  That's correct.
9      Q.  And that raises another question
10  I have.  When you were describing the issues
11  at the Office of Information and Technology,
12  you -- I'm curious how it's possible that
13  county dollars can be spent, actually
14  provided to a contractor, without there being
15  any level of review, approval, sign-off.
16      How is that even, as a
17  logistical matter, feasible?
18      MR. BADALA:  Objection to form.
19      THE WITNESS:  All I know is that
20   that's being investigated.  I don't know
21   that it actually took place.  And I
22   wouldn't know how you can spend county
23   dollars without going through the
24   process.
25

Page 155

1   BY MR. BOEHM:
2      Q.  All right.  Other than commissary
3   fees, loss in reimbursements in state and
4   federal funds, and Medicaid Managed Care
5   changes, are there any other losses to the
6   total net revenue that the county has
7   available to spend?
8      MR. BADALA:  Objection to form.
9      THE WITNESS:  So there are
10   additional losses -- excuse me -- in
11   some of our special revenue funds.  So
12   the special revenue funds collect
13   revenue that is restricted for a certain
14   purpose.
15      And we have -- the General Fund
16   is a $450 million budget, and we're at
17   $2 billion with all our special
18   revenues and grants entities.  So we
19   have a number of restricted funds.
20      If the restricted funds aren't
21   earning enough revenue to cover the
22   costs of whatever we were charging to
23   them, the General Fund will have to
24   pick that up.
25      So though it doesn't directly

Page 156

1   affect General Fund revenue, it will
2   affect the General Fund budget if our
3   special revenue funds are running dry.
4   And our special revenue funds, a lot of
5   them, are running dry.
6   BY MR. BOEHM:
7      Q.  What are the reasons why the
8   special revenue funds are losing revenue?  In
9   other words, what are the sources of revenue
10  that are now reduced?
11      A.  So any number of sources.  Some
12  are fees, some are assessments on property
13  taxes, reimbursements from other sources.  I
14  mean, they could come from anywhere.  But we
15  have -- you know, titles is a big one.  We
16  get 5 or so million from that.
17      But we have been drawing down
18  cash balances on our special revenue funds
19  for years to prop up the General Fund
20  budget.  So to the extent allowable by
21  law -- which some of our special revenue
22  funds, you can declare a surplus and then
23  you can use those dollars into the
24  General Fund.
25      We have done that, but that's a

Page 157

1   one-time activity, you know.  When you draw
2   down a cash balance, you can only do that
3   one time and then it will take you another
4   five years or whatever to build it back up.
5      Q.  So some of the special revenue
6   funds, you can -- let me start over.
7      Did I understand you correctly
8   to say that it is permissible for the county
9   to remove funds from a special revenue fund
10  that's designated for a mandated purpose and
11  transfer it to the General Operating Fund?
12      A.  If there's a specific permission
13  in the Ohio Revised Code, the Certificate of
14  Title Fund, which is -- well, not you, but
15  when people pay for their automobile titles,
16  you are permitted to declare a surplus in
17  that fund.
18      Q.  Any other funds where you're
19  permitted to declare a surplus and then
20  transfer it out of the special revenue fund?
21      A.  Off the top of my head, I can't
22  think of any, but there are other funds that
23  the county, for whatever reason, will
24  designate a special revenue instead of
25  General Fund.

40 (Pages 154 - 157)

Page 158

1     Sometimes it's as simple as
2  because it's ease of reporting.  It's much
3  quicker to be able to pull up a special
4  revenue fund than dig through all the
5  General Fund revenue.
6     But the Treasurer's Office, for
7  example, has several special revenue funds,
8  but that money is allowed to be used to
9  support the cost of operating the
10  Treasurer's Office.
11     And they're a General Fund
12  entity.  So we could take that money and put
13  it in the General Fund to offset the cost of
14  operating the Treasurer's Office.
15     Q.  I would like to know which
16  special revenue funds are available for
17  transfers of funds out of that special
18  revenue fund and into the General Operating
19  Fund.
20     Can you identify which special
21  revenue funds the county can do that with?
22     MR. BADALA:  Objection to form.
23     THE WITNESS:  So this would not
24  be an exhaustive list, but we can do
25  that with the Certificate of Title Fund.

Page 159

1  We can do that with the Tax Assessment
2  Fund -- Tax Assessment Collection Fund.
3     There's another one in the
4  Treasurer's Office that I'm blanking on
5  the name right now.  Those are the ones
6  that are jumping to mind.
7  BY MR. BOEHM:
8     Q.  Okay.
9     You indicated that perhaps
10  there's been a loss in revenue related to
11  certification of titles.  Did I understand
12  that?
13     A.  No.  That revenue is quite
14  strong.
15     Q.  That revenue is strong.  Okay.
16     And then you also indicated
17  property taxes might represent an overall
18  loss for the county.  But I thought you had
19  said that the property values have actually
20  increased 11 percent here in Cuyahoga County
21  in the last three years?
22     A.  I don't believe I said that
23  property taxes have gone down.
24     Q.  Okay.
25     So property taxes also does not

Page 160

1  represent an overall loss in revenue for the
2  county?
3     A.  No.  Property tax collections for
4  the General Fund have been flat for the last
5  two years.  And I expect to see an increase
6  when we start tax collection in January.
7     Q.  Because of this reevaluation?
8     A.  That's correct.
9     Q.  What about more than two years
10  ago?  Has it been flat?  Has it gone up?  Has
11  it gone down?
12     MR. BADALA:  Objection to form.
13     THE WITNESS:  I would have to
14  look at a budget, though.
15  BY MR. BOEHM:
16     Q.  Is that something that would be
17  reflected in a budget?
18     A.  It would.
19     (2018-2019 Biennial Budget,
20     County of Cuyahoga County, Ohio,
21     Bates CUYAH_000010910 through
22     CUYAH_000011080, marked as
23     Deposition Exhibit 3.)
24  BY MR. BOEHM:
25     Q.  I'm going to hand you a document

Page 161

1  marked as Exhibit 3.  And that is the
2  2018/2019 biennial budget for
3  Cuyahoga County.
4     Do you see that?
5     A.  Yes.
6     Q.  In fact, your name is on the
7  front page, right?
8     A.  It is.
9     Q.  You reviewed this?
10     A.  I did.
11     Q.  You helped generate it?
12     A.  I did.
13     Q.  Where would we look in this
14  budget to see how property values or taxes
15  have changed over time?
16     A.  So there would be two places.
17  One, if you see the table of contents here,
18  where it says the budget schedules?  The
19  schedules are in the back.  They're the
20  actual numbers, not the narrative.
21     Q.  That starts on page 154, right?
22     A.  So -- yeah.  My pages aren't
23  numbered -- but, yes.
24     So the first page of the
25  schedules -- are you following along or do

41 (Pages 158 - 161)

Page 162

1    you just --
2        Q.   Yes.  Let's just give the Bates
3    numbers just for the record.  I think they're
4    in the bottom right-hand corner?
5        A.   11064.
6        Q.   Thank you.  11064, which is
7    identified -- just further for the record --
8    as Schedule 1, right?
9        A.   That's correct.
10       Q.   What were you going to show us
11   there?
12       A.   Schedule 1 is a report that
13   summarizes financial data by fund.  And what
14   we're looking at here is the General
15   Operating Fund.
16           If you look at the first line
17   under "operating revenue" is property taxes.
18       Q.   The General Government Fund?  Is
19   that what you were pointing me to?
20       A.   No, I'm sorry.  Look up.  Revenue
21   is at the top.
22       Q.   "Operating revenue" at the very
23   top, and then just under that, it says
24   "property taxes"?
25       A.   Correct.  In 2016 the

Page 163

1    General Fund collected $12 million.  Now,
2    this book, keep in mind, was written in 2017,
3    so we didn't have actuals yet.
4        Q.   You didn't have the estimate --
5    you didn't have the reevaluation yet, right?
6        A.   No.  And it wouldn't have
7    impacted these numbers anyway.  But I'm just
8    pointing this out to say why that's why we
9    don't have the '17 actual yet.
10           But in 2017, the projection was
11   12.5 million.  I believe the actuals
12   actually came in slightly less than that.
13   And the 12.5 is what we used to base the
14   budget on.
15           And property tax revenues for
16   2018 did come in less than that.  It came in
17   about 12.2 or 12.3 million.  So a little bit
18   up from '16, flat in '17.
19       Q.   So when you look at this under
20   "operating revenue," you see various
21   categories, including the property taxes, but
22   there are several others, right?
23       A.   Uh-huh.
24       Q.   And you had indicated that the
25   county's revenue overall is losing tens of

Page 164

1    millions of dollars, right?
2        A.   I didn't say that the county
3    revenue was losing tens of millions of
4    dollars.
5            I said that when we prepared the
6    budget, we had to cut tens of millions of
7    dollars so that it would balance.  And
8    budgets are based off of projections.
9        Q.   Is the total budget for 2018 and
10   '19 larger or smaller than the one for 2016
11   and '17?
12           MR. BADALA:  Objection to form.
13           THE WITNESS:  I would want to see
14   '16 and '17 before I comment on that.  I
15   didn't create that budget.
16   BY MR. BOEHM:
17       Q.   You were in the office by 2016,
18   right?
19       A.   I was.  But the budget process --
20   the budget had actually already been
21   submitted by the time I got there.
22       Q.   Right.
23       A.   During the year -- during the
24   year, the projections are really what
25   matters.

Page 165

1        Q.   I'm really just trying to
2    understand what you meant when you said that
3    the revenue available to the county has been
4    cut by tens of millions of dollars, and
5    whether or not that's reflected in the actual
6    budgeting materials that we have available to
7    us.
8        A.   Well, I didn't say that revenue
9    has been cut by tens of millions of dollars.
10   What I said was that we had to cut tens of
11   millions of dollars to balance the budget
12   based on projections.
13           So back in 2017 -- though you
14   see, the third column from the right there,
15   where it says "2018 final budget"?  So our
16   final budget in the General Operating Fund
17   was 375 million, if you can see where it
18   says "total expenditures."  That's the total
19   budget.
20           In 2017, our projections for the
21   General Fund were substantially larger than
22   that.  But this county has to make
23   decisions, and we did.  We added new fees.
24   We increased the fees that the statutes
25   allow us to increase, and we cut.  We cut

42 (Pages 162 - 165)

Page 166

1  from what we thought we would have been able
2  to do to make sure that we had a budget that
3  was balanced.  And you can see, we're
4  balanced by only a million dollars.
5      Q.  Okay.
6          And you say you're balanced by a
7  million dollars, meaning you have a million
8  dollars' surplus in the budget?
9      A.  Well, at the time the budget was
10  adopted, yes.  That has not held true for
11  2018.
12      Q.  Because you have had to make
13  adjustments?
14      A.  We have made adjustments.
15      Q.  How many people report to you
16  now?
17      A.  Ten.
18      Q.  How many people directly report
19  to you?  All ten?
20      A.  No.  Three.
21      Q.  So there are ten people, analysts
22  in your department, three of which are direct
23  reports?
24      A.  They're not all analysts.  We
25  have two senior analysts, seven analysts, and

Page 167

1  one fiscal officer.
2      Q.  I notice here that the county
3  council is not shown on this.  I presume
4  that's because this is a reflection of the
5  executive branch of county government?
6          I'm looking back now at
7  Exhibit 2.
8      A.  That's correct.  These are only
9  the executive.
10      Q.  What is the relationship between
11  the Office of Budget Management and the
12  Cuyahoga County Council?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  I have no direct
15  reporting to county council.
16  Technically, we are an executive agency.
17  But OBM is required by county code to
18  provide a slew of reports and
19  communications to county council.  I
20  have to give them a monthly update on
21  the status of anything that's happening
22  in the county.  We give them quarterly
23  books that aren't quite this big, but
24  close to it.
25          And county council members and

Page 168

1  staff are constantly asking me for
2  recommendations and analyses.  They
3  treat us like we're their staff too.  I
4  have a very good relationship with
5  county council.
6  BY MR. BOEHM:
7      Q.  They treat you like you work for
8  the county?
9      A.  Yes.  I don't mean that in a bad
10  way.  I mean that no decisions get made that
11  don't get run by me.
12      Q.  What do you mean?
13      A.  Ultimately, when council will
14  approve something, I'd know about it in
15  advance, and I've usually been asked to give
16  my recommendation on it.
17      Q.  And I think you've clarified a
18  couple of times today that it's actually the
19  county council that has the final say as to
20  whether or not a budget for the county will
21  be approved?
22      A.  Per the charter, that's correct.
23      Q.  And they do that by vote?
24      A.  They do.
25      Q.  And do you consult with you, as

Page 169

1  the director of the Office of Budget
2  Management, as part of their deliberative
3  process?
4      A.  They do.
5      Q.  Describe for us, if you can, the
6  nature of that interaction with the council.
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  So to be clear, not
9  all members of council.  We have 11.
10  Some are more engaged than others.
11          So I meet with them at their
12  request.  If they ask me for -- you
13  know, they'll email me and ask me to
14  prepare financial analyses,
15  benchmarking, looking at performance
16  data and trends, specifics.
17          They'll ask me, you know, "This
18  agency asked for additional money.
19  What do you think?"
20          They tend to rely on us slightly
21  more for the non-executive agencies, so
22  the courts, the independent boards and
23  commissions.  And we hear about all of
24  it.
25

43 (Pages 166 - 169)

Page 170

1 BY MR. BOEHM:
2     Q.   What do you mean, you hear about
3 all of it?
4     A.   Well, anything that happens with
5 this budget goes through my office.
6     Q.   You indicated that some council
7 members are more engaged than others. Who
8 are the ones that are most engaged --
9         MR. BADALA: Objection to form.
10 BY MR. BOEHM:
11    Q.   -- on budgeting issues?
12        MR. BADALA: Objection to form.
13        THE WITNESS: Dale Miller is the
14    chair of the Finance and Budget
15    Committee, so I would say he's the most
16    engaged.
17        But councilman Dan Brady, who is
18    our president of council, is actively
19    engaged. Councilwoman Sunny Simon.
20    Councilwoman Yvonne Conwell.
21    Councilwoman Nan Baker -- she's
22    relatively new. Councilman Michael
23    Gallagher.
24        I'm trying to picture them in
25    their chairs. Those are the ones that

Page 171

1    I interact with most frequently.
2 BY MR. BOEHM:
3    Q.   You would say those are the
4 council members who are most engaged on
5 issues having to do with budget?
6    A.   At least as it relates to their
7 communication with me. They might be
8 incredibly engaged in -- you know.
9    Q.   Are there any of these council
10 members or other council members who are
11 particularly engaged on questions related to
12 budgeting and the impact of opiates in
13 Cuyahoga County?
14        MR. BADALA: Objection to form.
15        THE WITNESS: Yes. Yvonne
16    Conwell. Councilwoman Yvonne Conwell is
17    the chair of the Health and Human
18    Services committee.
19        Councilman Michael Gallagher is
20    the chair of the Public Safety and
21    Justice committee, so the court's
22    medical ^team^ falls under that.
23        Dale Miller and Dan Brady; those
24    two are interested in everything.
25        And Councilwoman Sunny Simon.

Page 172

1 BY MR. BOEHM:
2     Q.   I just circled every name you
3 gave me other than Nan Baker.
4     A.   Okay.
5     Q.   So they're all interested in and
6 active --
7     A.   Absolutely.
8     Q.   -- on questions of budgeting and
9 the impact of opiates?
10    A.   Yes.
11    Q.   All the ones you mentioned?
12    A.   That's correct.
13    Q.   Any others?
14    A.   Not that I can -- not that I
15 would say offhand.
16    Q.   Let's start with Ms. Conwell.
17 You indicated she's the chair of the HHS
18 committee?
19    A.   She is.
20    Q.   Is it in that capacity that she
21 has expressed a particular interest in
22 budgeting and the impact of opiates in
23 Cuyahoga County?
24    A.   I don't know what you mean by "in
25 that capacity."

Page 173

1    Q.   Let me make it more general. In
2 what form has Ms. Conwell's interest in
3 opiates and its impact on budgeting on
4 Cuyahoga County, what form has it taken? How
5 have you seen that?
6        MR. BADALA: Objection to form.
7        THE WITNESS: Questions that they
8    ask in committee meetings, statements
9    they make -- questions or statements
10    they make in committee meetings,
11    questions or statements they make in
12    council meetings -- those are all
13    public -- and questions she's asked of
14    me.
15 BY MR. BOEHM:
16    Q.   What questions has she asked of
17 you?
18    A.   She's asked for financial data
19 relative to departments that are affected.
20    Q.   What specific data has she asked
21 you for?
22    A.   I can't recall offhand exactly
23 what she's asked me for. I've been working
24 with her for three years.
25    Q.   Can you describe generally?

44 (Pages 170 - 173)

1      A.  She has asked me for data,
2  financial data, and statistical data.
3      Q.  For which divisions, departments,
4  or programs?
5      A.  Children and Family Services, the
6  one that would come immediate to mind.  I
7  can't recall if there were others.
8      Q.  You don't recall any others right
9  now?
10      A.  That's correct.
11      Q.  Have you privately met with
12  Ms. Conwell about this subject?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  I can't recall
15      that.
16  BY MR. BOEHM:
17      Q.  Have you emailed with Ms. Conwell
18  about the subject of opiates and its impact
19  on county budgeting?
20      A.  I can't recall in what form
21  specific conversations took place.
22      Q.  You indicated she requested
23  certain data.  Did she do that by email?  Did
24  she pick up the phone and call you?
25      A.  I can't recall what specific form

1  those specific communications took place.  I
2  talked to these council members on a host of
3  issues.
4      Q.  Did you send her the data she
5  asked for?
6      A.  Of course.
7      Q.  When was that?
8      A.  I can't recall.
9      Q.  Was it this year?
10      A.  I can't recall.
11      Q.  You cannot recall whether it was
12  during 2018?
13      A.  No, I can't.
14      Q.  So it wasn't within the last six
15  months?
16          MR. BADALA:  Objection to form.
17          THE WITNESS:  I said I can't
18      recall.
19  BY MR. BOEHM:
20      Q.  So if Ms. Conwell had asked you
21  for specific data having to do with budgeting
22  and opiates that particularly concerns the
23  Department of Children and Family Services
24  within the last six months, you wouldn't be
25  able to discern that from a request from

1  2016?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  No.  I get a number
4      of requests every day.  Like I say, I
5      don't recall the specific conversations,
6      so I'm not going to guess at whether it
7      took place six months ago or three years
8      ago.
9  BY MR. BOEHM:
10      Q.  Do you recall what you said back
11  to Ms. Conwell in response to her inquiry?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I don't.
14  BY MR. BOEHM:
15      Q.  Do you recall specifically what
16  the data showed that you sent back to
17  Ms. Conwell?
18      A.  I don't recall what specific data
19  I sent her.
20      Q.  Has Ms. Conwell's interest in
21  opiates and budgeting manifest in any other
22  ways that we haven't already discussed?
23          MR. BADALA:  Objection to form.
24          THE WITNESS:  Not with me.
25

1  BY MR. BOEHM:
2      Q.  Let's go to Mr. Gallagher.  You
3  said that Mr. Gallagher is the chair of the
4  Public Safety and Justice Committee, right?
5      A.  Uh-huh.
6      Q.  And how has his interest in
7  opiates and its impact on expenditures and
8  budgets in the county manifest?
9      A.  Similar as Councilwoman Conwell,
10  statements that he makes in committee and
11  council meetings, questions that he asks in
12  committee and council meetings.  They've had
13  a number of presentations from agencies that
14  are affected, including the juvenile court
15  and the Medical Examiner's office.
16      Q.  Has he specifically asked you to
17  perform any computations or calculations
18  about how the opiate issues in the county
19  have impacted expenditures?
20          MR. BADALA:  Objection to form.
21          THE WITNESS:  I don't believe
22      that he has.
23  BY MR. BOEHM:
24      Q.  Has Ms. Conwell ever asked you to
25  perform any computations or calculations

45 (Pages 174 - 177)

Page 178

1  about how opiate abuse or misuse has impacted
2  specific expenditures by the county?
3      MR. BADALA:  Objection to form.
4      THE WITNESS:  I don't believe
5  that she has.
6  BY MR. BOEHM:
7      Q.  Has anyone from the county
8  council ever asked you to perform any
9  computations or calculations designed to
10 determine what specific impacts opiate abuse
11 and misuse have had on actual expenditures in
12 the county?
13     MR. BADALA:  Objection to form.
14     THE WITNESS:  So I did provide
15 them, and I don't know who asked for it,
16 but in one of my monthly updates, I know
17 I was asked to provide data on the
18 Medical Examiner's office.
19     So I provided them statistics on
20 toxicology tests, autopsies, and
21 overdose deaths.
22 BY MR. BOEHM:
23     Q.  Where did you get the data that
24 you provided to them?
25     A.  The statistical data I received

Page 179

1  from the Medical Examiner's office.
2  Financial data I have.
3      Q.  How did you go about making the
4  computation in terms of the financial
5  figures?
6      MR. BADALA:  Objection to form.
7      THE WITNESS:  I didn't make a
8  computation.  I submitted what the
9  actual financial costs were for that
10 office.
11 BY MR. BOEHM:
12     Q.  I see.  Okay.
13     So you were not trying to
14 specifically differentiate between the
15 office's overall costs for toxicology,
16 autopsies, and overdose deaths from those
17 that are specifically related to opiates?
18     MR. BADALA:  Objection to form.
19     THE WITNESS:  Not in that update,
20 no.
21 BY MR. BOEHM:
22     Q.  Any other requests that you can
23 think of from the county council to computate
24 or calculate opiate-specific related
25 expenditures to the county?

Page 180

1      MR. BADALA:  Objection to form.
2      THE WITNESS:  I don't believe so.
3  BY MR. BOEHM:
4      Q.  Has the county executive ever
5  asked you to do that?
6      MR. BADALA:  Objection to form.
7      THE WITNESS:  I don't recall.
8  BY MR. BOEHM:
9      Q.  You don't recall the county
10 executive ever asking you to perform a
11 computation or a calculation of the total
12 opiate-specific expenditures to
13 Cuyahoga County?
14     MR. BADALA:  Objection to form.
15 BY MR. BOEHM:
16     Q.  Correct?
17     A.  That's correct.
18     What I would provide is -- for
19 example, historical data on a particular
20 agency, this is what they spent in the last
21 ten years, give that same -- you know, for
22 the same period, statistical data, and I
23 don't take it any further than that.
24     Q.  You don't try and analyze or
25 calculate the data that you have to try and

Page 181

1  tease out why expenditures might go up or
2  down --
3      MR. BADALA:  Objection to form.
4  BY MR. BOEHM:
5      Q.  -- with respect to any
6  differences you would see; is that fair?
7      MR. BADALA:  Objection to form.
8      THE WITNESS:  No, I do.  I
9  absolutely use data to try to understand
10 why expenditures go up or down.
11     What I have not done is look
12 specifically at -- for example, abuse
13 dependency neglect filings in juvenile
14 court have increased substantially.  I
15 know that they have increased by a
16 certain percentage.  I know the cost of
17 those filings.  I know the cost of the
18 guardian ad litems that get assigned to
19 all those children.
20     I don't know how many of those
21 filings -- I don't know the underlying
22 costs of those filings.
23 BY MR. BOEHM:
24     Q.  Okay.
25     A.  That would be data that the court

46 (Pages 178 - 181)

Page 182

1  has, or the agencies themselves have.
2          MR. BADALA:  So we've been going
3      for another hour.  Do you want to take a
4      break for lunch now, 30 minutes?
5          MR. BOEHM:  Fine with me.
6          THE VIDEOGRAPHER:  Off the
7      record, 12:19.
8          (Recess taken, 12:19 p.m. to
9          1:04 p.m.)
10      ----------------------
11      AFTERNOON SESSION
12      ----------------------
13          THE VIDEOGRAPHER:  We're on the
14      record.  1:04.
15  BY MR. BOEHM:
16      Q.  Welcome back, Ms. Keenan, after
17  lunch.  I hope you had a nice lunch.
18          We were talking about these
19  budget plans earlier today and about how one
20  purpose of the budget plans is to
21  communicate with the community about what's
22  happening in terms of the financial
23  condition of the county; is that correct?
24      A.  That's correct.
25      Q.  Is it fair to say that you try to

Page 183

1  be as accurate as possible when you
2  communicate with the citizens of the county
3  through the budget plans?
4          MR. BADALA:  Objection to form.
5          THE WITNESS:  That's correct.
6  BY MR. BOEHM:
7      Q.  Do you know of any errors or
8  mistakes or misstatements or critical
9  omissions from the budgets during the years
10  that you've been at the Office of Budget
11  Management?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I am not aware of
14      any mistakes, no.
15  BY MR. BOEHM:
16      Q.  As part of the process for
17  developing a budget, do heads of departments,
18  divisions, and programs make requests to the
19  Office of Budget Management for funding?
20      A.  They can.
21      Q.  They can, but are they not
22  required to do that?
23      A.  They're not required to do that.
24      Q.  Okay.
25      A.  The last several years we weren't

Page 184

1  entertaining requests for new funding except
2  from a handful of agencies.
3      Q.  From which agencies -- well, let
4  me start by asking you for which years you're
5  referring to where you were not entertaining
6  budgeting requests.
7      A.  With few exceptions, we did not
8  entertain requests for new money for the
9  current biennial budget.
10      Q.  For the 2018/19 budget?
11      A.  That's correct.
12      Q.  That's the one that's been marked
13  Exhibit 3 to your deposition?
14      A.  That's correct.
15      Q.  For which divisions, departments,
16  or programs were you accepting budgeting
17  requests?
18      A.  So we had requested cuts from
19  most agencies, but not all that received
20  funding from either the General Fund or the
21  Health and Human Services Levy Fund.
22          Juvenile court was asked to take
23  a substantial, multi-million-dollar cut, and
24  they came back and requested the money back,
25  in large part, because they have seen a

Page 185

1  dramatic increase in the number of abuse,
2  dependency, neglect filings driven by the
3  opiate epidemic.  Our guardian ad litem
4  expenses have been going up.  So the court
5  said they were completely incapable of
6  operating with fewer dollars.
7          The jail -- so the sheriff's
8  office, the jail, did not take a cut.  We
9  had originally proposed one, but they also
10  said they couldn't operate with fewer
11  dollars.  We've had -- it's not the highest
12  ADP we've ever had, average daily
13  population, but it's substantially over what
14  it should be, and we have more inmates in
15  this facility that are coming in addicted
16  than we've had, according to the sheriff's
17  office, in the last several years, which
18  creates a financial liability for the
19  county.
20          The Department of Health and
21  Human Services did take a cut, but they
22  asked in a sense for us to set aside a
23  reserve for them totaling $7 million because
24  they collectively anticipated that their
25  costs were going to continue to rise.  The

47 (Pages 182 - 185)

1   largest driver of that would be the
2   Department of Children and Family Services.
3         To date, they have drawn down
4   all but 900,000 of that $7 million reserve.
5   So they did receive substantial increase in
6   funding because the number of children in
7   care has gone up, due in part to the opiate
8   epidemic.
9         Q.   Were there any other departments,
10  divisions, or programs that were permitted to
11  request budgeting expenditures increases or
12  no cuts?
13        A.   The Department of Information
14  Technology received an increase in its
15  budget.  I forget exactly how much, but they
16  did receive an increase.
17        And I believe the Department of
18  Development received an increase in its
19  budget for economic development.  That is a
20  charter mandate for the county economic
21  development.
22        Q.   How much was the Department of
23  Information Technology's budget increase?
24        A.   If you can give me a minute -- I
25  don't know offhand.  I can go through the

1   documents.
2         Q.   We'll be going through this, so
3   we can get to it.
4         A.   Okay.
5         Q.   Do you know why the Department of
6   Information Technology was permitted to have
7   a budget increase, whereas some departments
8   weren't?
9         A.   They had presented just a need
10  for increased -- as you can imagine, more and
11  more of our costs are on the IT side, and
12  it's maintenance contracts for our systems.
13  I don't recall specifically what they were
14  asking for the additional funding for, but --
15        Q.   How about the Department of
16  Development?  Why was the Department of
17  Development permitted to have increased
18  funds?
19        A.   Because of the charter mandate to
20  invest in economic development.
21        And they did not receive a
22  substantial increase.  I can't remember
23  offhand what it was, but I know they got
24  additional funding for a position to work in
25  our Brownfield Redevelopment program, so the

1   county offers loans and grants for
2   Brownfield Redevelopment.  I don't remember
3   what else they got.
4         Q.   When a division or a department
5   or a program makes a request for funding
6   through the budgeting process, in what form
7   is that submission made?
8         MR. BADALA:  Objection to form.
9         THE WITNESS:  It could be any
10  number of ways.  They, meaning the
11  agencies, could email a request.  They
12  could submit a formal, you know, like
13  memo, write-up request.  Sometimes it's
14  conversations that we have in meetings,
15  hallways, to come meet with their
16  assigned analyst or me.  So multiple
17  avenues to get requests in.
18  BY MR. BOEHM:
19        Q.   So a department or division
20  program head can make a request for
21  additional funding in the hallway?
22        A.   Absolutely.  I mean, ultimately
23  the analysts and my office will likely ask
24  for additional justification that could come
25  in any form, depending on what the request

1   is, and then our analysts are the ones who
2   actually key it into the system.
3         Q.   Into what system are requests
4   keyed into?
5         A.   Into the county's budget and
6   reporting system, which is referred by the
7   acronym BRASS, B-R-A-S-S.
8         Q.   Are all budgeting requests from
9   divisions, departments, and programs input
10  into the BRASS system?
11        A.   No.  If the request is not
12  funded, it might not be entered into BRASS,
13  if it's just a non-starter from the
14  beginning.
15        MR. BOEHM:  Let's go off the
16  record.
17        THE VIDEOGRAPHER:  Off the
18  record. 1:13.
19        (Recess taken, 1:13 p.m. to
20  1:14 p.m.)
21        THE VIDEOGRAPHER:  On the record,
22  1:14.
23  BY MR. BOEHM:
24        Q.   Why would a budgeting request be
25  entered into BRASS, versus circumstances when

48 (Pages 186 - 189)

Page 190

1     it wouldn't be entered into BRASS?
2           MR. BADALA: Objection to form.
3           THE WITNESS: BRASS is a system
4     that we use to create the budget. So if
5     we know that the request is not going to
6     be approved or it already has not been
7     approved by the executive, we don't put
8     it in the system always.
9     BY MR. BOEHM:
10       Q. What if somebody sends you an
11     email and says, "Hey, Maggie, I need more
12     money and here's how much I need and here's
13     what it's for"? Does that get entered into
14     some sort of system so that we can track
15     requests that come in?
16           MR. BADALA: Objection to form.
17           THE WITNESS: No.
18     BY MR. BOEHM:
19       Q. Why not?
20           MR. BADALA: Objection to form.
21           THE WITNESS: I don't know.
22     BY MR. BOEHM:
23       Q. What about memos that are
24     submitted requesting additional funds? Is
25     there any system that the Office of Budget

Page 191

1     Management has in place to track those kinds
2     of requests for funds?
3           MR. BADALA: Objection to form.
4           THE WITNESS: We have, I mean,
5     files on the computer that we will store
6     documents.
7     BY MR. BOEHM:
8       Q. Do those get stored in kind of a
9     folder that's dedicated to funding requests?
10       A. They could be stored either in a
11     folder that's dedicated to funding requests
12     or a folder that's dedicated to the agency.
13     The analysts maintain their own files.
14       Q. Okay.
15       So if we wanted to know what all
16     the requests have been for budgets from the
17     division, department, and program heads in
18     Cuyahoga County, how would we go about
19     collecting that set of materials?
20           MR. BADALA: Objection to form.
21           THE WITNESS: Well, as I told
22     you, it doesn't always exist.
23     BY MR. BOEHM:
24       Q. Does the Office of Budget
25     Management have some kind of approved form

Page 192

1     for the submission of budget requests?
2           MR. BADALA: Objection to form.
3           THE WITNESS: For some years a
4     form was sent out to the agencies asking
5     them to use that to submit any requests
6     for additional funding or request for --
7     not request for cuts, but if we asked
8     for cuts. Some years there were those
9     forms; some years there were not.
10     BY MR. BOEHM:
11       Q. What's the practice and procedure
12     of the Office of Budget Management under your
13     direction in terms of whether or not budget
14     request forms are used for submitting
15     requests?
16       A. Budget request forms were used
17     for the biennial budget.
18       Q. For the 2018 and 2019 biennial
19     budget?
20       A. That's correct.
21       Q. So is it fair to say that any
22     budget requests that came in to the Office of
23     Budget Management in connection with the 2018
24     and '19 budget would have been submitted
25     through budget request forms?

Page 193

1       A. No, that's not fair. Not all
2     agencies comply with my requests, so --
3       Q. So you don't -- I'm sorry. Go
4     ahead.
5       A. I mean, I can't control what they
6     do.
7       Q. Well, you could. You could say,
8     "We don't accept requests out of the ordinary
9     course."
10           MR. BADALA: Objection to form.
11     BY MR. BOEHM:
12       Q. Do you do that?
13       A. Sometimes I do; sometimes I
14     don't. I have a $2 billion budget to
15     supervise. I have 12 elected officials that
16     I have to wrangle, and I have 10 staff.
17       So sometimes it's not as
18     important for me to stand on principle to
19     make sure they're using the right piece of
20     paper as it is to make sure that I get the
21     right data to support any request that comes
22     in.
23       Q. Where do the budget request forms
24     that you do receive get stored?
25       A. Like I said, the analyst will

49 (Pages 190 - 193)

Page 194

1　store them.  And they're either in folders
2　that are specific to agencies or folders that
3　are specific to the budget.  I don't dictate
4　how my staff maintains their files.
5　　　Q.  Have you received, as the
6　director of the Office of Budget Management,
7　any funding requests from a Cuyahoga
8　department, division, or program, that is
9　specific to addressing issues of opiate use
10　or abuse?
11　　　MR. BADALA:  Objection to form.
12　　　THE WITNESS:  I have.  I received
13　a request from the Medical Examiner's
14　office.
15　　　That came -- I don't recall
16　specifically if it was to me with a
17　copy to the analyst or vice versa, but
18　I copy it for an additional
19　pathologist.
20　　　The medical examiner had
21　submitted a separate request for
22　additional funding, not personnel
23　related, but just to cover, I believe,
24　testing supplies and other expenses
25　associated with running the office.

Page 195

1　　　The juvenile court has submitted
2　a request for funding due, in large
3　part, to the increase in caseloads.
4　And the only caseloads that rose in the
5　juvenile court -- excuse me -- with any
6　significant amount was abuse,
7　dependency, and neglect.
8　　　The sheriff's office has been
9　provided additional funding to cover
10　medical expenses associated with the
11　inmates in the county jail who are
12　opiate-addicted.  Previously, the
13　inmates who were receiving
14　medically-assisted treatment had to be
15　taken off site to a hospital for that
16　treatment.
17　　　And when we remove an inmate
18　from the facility, he or she has to be
19　accompanied by two law enforcement
20　deputies, not corrections officers.
21　And so our overtime costs in the deputy
22　division, we had to provide additional
23　funding to cover those costs.
24　　　The ADAMHS Board, which is the
25　Alcohol Drug Addiction and Mental

Page 196

1　Health Services Board of Cuyahoga
2　County, they are, you know, the now
3　combined Mental Health and Drug.  They
4　requested additional funding in 2017
5　for 2018.
6　　　I believe the request -- the
7　initial request was $20 million.  I
8　think that is ultimately taken down
9　because the county would have initially
10　been very clear that we simply didn't
11　have $20 million.  And that was
12　specific to the opiate crisis.
13　　　For right now, that's all I can
14　think of.
15　BY MR. BOEHM:
16　　　Q.  Thank you.  I appreciate that.
17　　　Now, for each of those
18　categories that you just listed, are you
19　saying that those are all divisions,
20　departments, or programs that came to the
21　Office of Budget Management and made a
22　request for additional funding specifically
23　related to issues of opiate abuse or misuse?
24　　　MR. BADALA:  Objection to form.
25　　　THE WITNESS:  That is correct,

Page 197

1　　with the exception of the ADAMHS Board,
2　　which notified me of their request, but
3　　did not formally make it to me.
4　BY MR. BOEHM:
5　　　Q.  Who did they make it to?
6　　　A.  I'm actually unclear whether they
7　went to Armond -- the executive first or
8　council, but I know both of them.  We all saw
9　the request.
10　　　Q.  Are you familiar with Ohio Public
11　Record laws in terms of the maintaining of
12　public records?
13　　　A.  I am.
14　　　Q.  Do you endeavor to follow those
15　in your role as director of the Office of
16　Budget Management for Cuyahoga County?
17　　　A.  I do.
18　　　Q.  What do you understand your
19　obligation to be vis-a-vis those laws in
20　connection with budgeting requests?
21　　　MR. BADALA:  Objection to form.
22　　　THE WITNESS:  The Office of
23　　Budget Management will maintain
24　　documents related to the budget process.
25　　I can't specifically say how far we go

50 (Pages 194 - 197)

Page 198

1      back.  I know we go far back, several
2      years, that we maintain electronic files
3      that are copies of our -- you know, the
4      draft budgets, some of our work papers
5      that go into the budget process, and
6      requests that come from the agencies.
7   BY MR. BOEHM:
8      Q.   Do you understand your process
9   for maintaining or not maintaining budget
10  requests put to the Office of Budget
11  Management for Cuyahoga County to be in
12  compliance with Ohio Public Record laws?
13         MR. BADALA:  Objection to form.
14         THE WITNESS:  To my knowledge, we
15      are compliant.
16  BY MR. BOEHM:
17     Q.   Now, you've just identified some
18  entities that made requests, you believe, in
19  connection with opiate abuse or misuse issues
20  most recently.
21         My question now to you is
22  whether or not prior to this most recent
23  round of budgeting, the request process, and
24  the completion of the budget that we've been
25  looking at now that's attached to this

Page 199

1   transcript as Exhibit 3, do you recall any
2   other instances where divisions,
3   departments, or programs made specific
4   requests of the Office of Budget Management
5   for funding related specifically to the
6   issue of opiate use or abuse?
7          MR. BADALA:  Objection to form.
8          THE WITNESS:  Well, I couldn't
9       tell you what year, but I can tell you
10      that it was prior to 2013.  So I know
11      that the ADAMHS Board has requested
12      funding specific to opiate treatment.
13      And then I would have to look at the
14      documents for the 2016/2017 budget
15      because, as I said, I came when it had
16      already been submitted, so I don't know
17      what was specifically requested or what
18      was just in the base budget.
19  BY MR. BOEHM:
20     Q.   Sitting here today, you cannot
21  recall any instances of a department,
22  division, program coming to the Office of
23  Budget Management and making an
24  opiate-specific request for funding other
25  than the ones you identified for this most

Page 200

1   recent round and then the one instance
2   pre-2013 where you recall the ADAMHS Board
3   had a particular request; is that correct?
4          MR. BADALA:  Objection to form.
5          THE WITNESS:  That's correct.
6   BY MR. BOEHM:
7      Q.   Were any of the requests that
8   you've identified from these various
9   departments for opiate-related funds denied
10  by county government?
11         MR. BADALA:  Objection to form.
12         THE WITNESS:  No.  Well, the
13      ADAMHS Board request was denied.
14  BY MR. BOEHM:
15     Q.   Which ADAMHS Board request are
16  you referring to?  The $20 million request
17  most recently?
18     A.   That's correct.
19     Q.   And you said it was scaled
20  downward, right?
21     A.   I believe it was scaled down to
22  5 million.
23     Q.   So you believe 5 million was the
24  amount that was granted?
25     A.   No, no.  They were denied.  They

Page 201

1   did not receive any increase in funding.
2      Q.   Oh, I see.  So what is the
3   $5 million figure that you just referred to?
4      A.   I believe their initial request
5   for funding was 20.  I believe when we told
6   them absolutely not, they said, "Can we have
7   five?"  And we said, "We don't have it."
8      Q.   So you said no even to the
9   5 million?
10     A.   We did.  We had to cut in the
11  Levy Fund and the budget that we finally
12  settled on was still out of balance by
13  $6 million.
14     Q.   Have any Cuyahoga County Council
15  members ever made a request of the Office of
16  Budget Management to increase funding to any
17  division, department, or program,
18  specifically related to issues of opiate use
19  or abuse?
20     A.   Council doesn't make requests of
21  OBM.  Council just does.
22     Q.   Do you know of any instance where
23  the county council has directed that
24  additional funds be sent to divisions,
25  departments, or programs of Cuyahoga County

51 (Pages 198 - 201)

Page 202

1  specific to the issue of opiate use or abuse?
2       MR. BADALA:  Objection to form.
3       THE WITNESS:  In 2018, Children
4   and Family Services did receive an
5   additional 1.6 million.  That was agreed
6   on by both the executive and council.
7   And that was attributed to the rising
8   caseloads, which has been attributed by
9   their director, Cindy Weiskittel, to the
10   opiate crisis.
11       I can't recall any other time
12   when council has directed us to amend
13   the budget.
14  BY MR. BOEHM:
15       Q.   What about from the county
16  executive?
17       A.   Well, any request that is made to
18  council comes from the county executive.  The
19  county executive did authorize at least the
20  recommendation of funds for the
21  Medical Examiner's office, additional funding
22  for the jail, and no cut to juvenile court.
23       Q.   Just to be clear, though, I'm not
24  asking you about whether or not they agreed
25  to the request that was made by the division,

Page 203

1   the department, or the program.
2        I'm asking if you're aware of an
3   instance where the county executive has
4   directed that funds be sent to a department,
5   division, or program, specific to addressing
6   issues having to do with opiate use or
7   abuse.
8        A.   Do you mean without the agency
9   asking for it?
10       Q.   Correct.
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  No.  I cannot
13   recall.
14  BY MR. BOEHM:
15       Q.   With respect to the medical
16  examiner request, I think you said that the
17  request was to pay for testing supplies and
18  other office administration expenses?
19       A.   Testing supplies.  They also had
20  a larger request to hire an additional
21  pathologist.
22       Q.   How much were they asking for?
23  How much was the medical examiner's office
24  requesting?
25       A.   I don't recall specifically.

Page 204

1        Q.   Where would we go to find that
2   information out?
3        A.   I would have to look in my files.
4        Q.   Was there a formal budget request
5   that was made from the Cuyahoga County Office
6   of the medical examiner?
7        A.   There was.
8        Q.   Would that be in BRASS?
9        A.   The medical examiner doesn't have
10  access to BRASS.  He submitted a request to
11  us in memo form, requesting additional
12  funding, and that included supporting
13  documentation for the request.
14       Q.   Would staff at the Office of
15  Budget Management take the request from the
16  Cuyahoga County Office of the Medical
17  Examiner and enter that information into the
18  BRASS system?
19       A.   No.  That request was made
20  mid-year, which means that we would have made
21  the adjustment in what's referred to as
22  FAMIS, F-A-M-I-S, which is the county's
23  financial system.
24       Q.   Does FAMIS contain information
25  about budget requests?

Page 205

1        A.   It does not.  What would have
2   been typed into FAMIS was the approved
3   edition.
4        Q.   You don't know how much the
5   medical examiner's request for additional
6   funds was?
7        A.   No.
8        Q.   You mentioned the juvenile court.
9        Do you know how much the
10  juvenile court was asking for?
11       A.   I don't recall.  I know it was
12  more than a million.
13       Q.   How much more than a million?
14       A.   I don't recall.
15       Q.   Can you give me a range?
16       A.   No.
17       Q.   It could have been a hundred
18  million?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  It was not a
21   hundred million.
22  BY MR. BOEHM:
23       Q.   Can you narrow it down even a
24  little bit for me?
25       A.   Under ten million.

52 (Pages 202 - 205)

Page 206

1    Q.   Between one and ten million?
2    A.   Yes.
3    Q.   How much was approved for the
4  juvenile court?
5    A.   Whatever they asked for, they
6  got.
7    Q.   With respect to the medical
8  examiner request, you weren't sure how much
9  they requested.  How much was approved?
10    A.   Whatever they asked for.
11    Q.   You indicated that the sheriff's
12  department made a request for additional
13  funding related to inmate medical expenses,
14  right?
15    A.   That's correct.
16    Q.   How much did the sheriff's
17  department ask for?
18    A.   I don't recall.
19    Q.   Can you give me a range?
20    A.   I can't.
21    Q.   How much was given in response to
22  that request?
23    A.   Whatever they asked for, because
24  the sheriff, their funding was specific to --
25  it was based on the projections.  So they

Page 207

1  weren't asking to do something new, per se,
2  but they were just saying, "Hey, our overtime
3  is up.  Our runs are up.  Medical costs are
4  up.  We need to cover payroll.  We need to
5  cover all of the contract costs."
6    Q.   Okay.
7    We're going to come back to some
8  of those categories in a moment.
9    Let's turn back for now to the
10  document -- you already have it in front of
11  you, the 2018/2019 biennial budget.
12    We already mentioned that your
13  name is on the bottom on the third page?
14    A.   That's correct.
15    Q.   At the top there are the names of
16  county executive and Dan Brady, the president
17  of the Cuyahoga County Council.
18    Do you see that?
19    A.   I do.
20    Q.   Why are their names at the top of
21  this document?
22    MR. BADALA:  Objection to form.
23    THE WITNESS:  Because they
24    represent the county's leadership.
25

Page 208

1  BY MR. BOEHM:
2    Q.   They're the ones who have final
3  authority in terms of the recommendations and
4  finalization of the budget, fair?
5    MR. BADALA:  Objection to form.
6    THE WITNESS:  Dan Brady does not
7    have final authority.  We put him on
8    there as a representative of county
9    council and as a show of respect because
10    he was voted president, but he has no
11    more authority than any other council
12    member.
13  BY MR. BOEHM:
14    Q.   He's a representative of county
15  council who does have the authority to pass a
16  resolution, putting the budget into effect,
17  right?
18    MR. BADALA:  Objection to form.
19    THE WITNESS:  That's correct.
20  BY MR. BOEHM:
21    Q.   And I see that Dennis Kennedy's
22  name is also on the cover page of the budget,
23  right?
24    A.   That's correct.
25    Q.   Why is his name on here?

Page 209

1    A.   Because Dennis is my boss.
2    Q.   Does he participate in the
3  preparation of the budget?
4    A.   He does not.
5    Q.   He doesn't have any oversight
6  responsibility for it?
7    MR. BADALA:  Objection to form.
8    THE WITNESS:  He does not
9    participate in the preparation of the
10    budget.
11  BY MR. BOEHM:
12    Q.   Does he have oversight
13  responsibility for it?
14    A.   Dennis supervises me, so yes.
15    Q.   What is the nature of
16  Mr. Kennedy's oversight of budgeting and
17  expenditures for the county?
18    MR. BADALA:  Objection to form.
19    THE WITNESS:  Dennis Kennedy is
20    the chief financial officer as the
21    fiscal officer.  As I mentioned, he
22    serves as our county auditor and county
23    recorder.
24    He supervises the Office of
25    Budget Management, but I generally have

53 (Pages 206 - 209)

Page 210

1  full authority over this office.  He
2  does not participate in the budget
3  process, and I am free to make
4  recommendations directly to Armond as I
5  see fit.
6  BY MR. BOEHM:
7      Q.  This budget has some background
8  information that I thought was helpful and I
9  thought we could look at it together.
10         If you could turn with me to the
11  page that has been numbered at the bottom
12  11008.  It's about halfway through -- a
13  little more than halfway through.  It says
14  "fund budgets."
15      A.  Okay.
16      Q.  And on the next page here in this
17  section, it says that the county maintains a
18  fund accounting system.
19         Do you see that?
20      A.  Yes.
21      Q.  What does that mean?
22      A.  It means that our activity is
23  captured in distinct funds.
24      Q.  What is a fund in this context?
25      A.  A fund is an independent,

Page 211

1  segregated ledger that records revenue and
2  expenses.
3      Q.  Okay.
4         And then if you go down to the
5  bottom of this paragraph, it identifies what
6  are referred to here as "major fund types."
7         Do you see that?
8      A.  Yes.
9      Q.  It has general, special revenue,
10  debt service, enterprise, and internal
11  service, right?
12      A.  That's correct.
13      Q.  Are there any fund types that are
14  not listed here in this paragraph?
15      A.  No.
16      Q.  So when it says, "Major fund
17  types include," and then it has a list, that
18  is not meant to suggest that there are funds
19  that are not identified here?
20      A.  That's correct.  Fund types, not
21  funds.  That's a difference.
22      Q.  Right.  I'm talking about the
23  word "include."  This is a --
24      A.  I understand, but you said
25  "include different funds," and these are fund

Page 212

1  types.
2      Q.  Right.  But there are no major
3  fund types not included on this list,
4  correct?
5      A.  That's correct.
6      Q.  If you look down toward the
7  bottom of the page, I think we have a
8  reflection of the overall Cuyahoga County
9  budget divided up by fund type; is that
10  right?
11      A.  This is the county's operating
12  budget.  So that's partially correct.  But
13  this does not include grants, which would be
14  considered special revenue funds, and capital
15  projects, which would also be considered
16  special revenue funds.
17      Q.  Well, special revenue funds is
18  reflected in the pie chart, right?
19      A.  That does not reflect grants and
20  capital projects.
21      Q.  So the 50 percent special revenue
22  fund that's reflected in the pie chart at the
23  bottom of page 11009 does not account for
24  grants that the county has received?
25      A.  It does not account for all

Page 213

1  grants.  No, it does not.
2      Q.  So it says "Special revenue
3  funds, 50 percent."  What does that mean?
4      A.  It means that special revenue
5  funds make up 50 percent of the county's
6  all-funds operating budget.
7      Q.  And that does not include grants?
8      A.  It does not include all grants
9  and capital projects.
10      Q.  Is there anything else that it
11  does not include?
12      A.  No.
13      Q.  Do grants go in the special
14  revenue funds category?
15      A.  Yes.
16      Q.  What about capital revenue
17  projects?  Where would that -- did I get it
18  right?  You looked at me funny.
19      A.  Capital projects.
20      Q.  Capital projects?
21      A.  Yes.
22      Q.  Where do capital projects fit?
23      A.  Those are special revenue funds.
24      Q.  Okay.
25         So if you were to add the grants

54 (Pages 210 - 213)

Page 214

1   and the capital projects to this pie chart,
2   the special revenues funds section that
3   right now is reflected at 50 percent would
4   get even bigger?
5       A.  That's correct.
6       Q.  How much bigger would it get?
7       A.  I can't say.
8       Q.  Can you give me an approximation?
9           MR. BADALA:  Objection to form.
10          THE WITNESS:  I can't.
11  BY MR. BOEHM:
12      Q.  You cannot?
13      A.  No.
14      Q.  Not even an approximation?
15      A.  Not even an approximation.
16      Q.  Well, do grants and special
17  projects make up a significant amount of
18  revenue for the county?
19          MR. BADALA:  Objection to form.
20          THE WITNESS:  I think all revenue
21  to the county is significant.  They make
22  up a good portion of activity, yes.
23  BY MR. BOEHM:
24      Q.  Well, when I say "significant" --
25  because I'm trying not be cute here.  When I

Page 215

1   say "significant," I'm talking about relative
2   to the overall piece of the pie.
3           So my question to you is you not
4   whether dollars matter, but whether or not
5   grants and special projects make up a
6   significant proportion of the total revenue
7   available to Cuyahoga County.
8           MR. BADALA:  Objection to form.
9           THE WITNESS:  What do you mean by
10          "significant"?
11  BY MR. BOEHM:
12      Q.  A material amount.
13      A.  What do you mean by "material"?
14      Q.  Well, you're the director of the
15  Office of Budget Management, so I'll let you
16  define that how you think it is appropriate.
17      A.  As I said, I cannot approximate
18  the percentage that this would increase if we
19  added grants and capital projects.
20      Q.  Do you consider it to be a
21  significant amount?
22          MR. BADALA:  Objection to form.
23          THE WITNESS:  I consider
24          everything significant.
25

Page 216

1   BY MR. BOEHM:
2       Q.  If you go to the next page, it
3   says "General Fund" right at the top, right?
4       A.  Yes.
5       Q.  And it says, "39 percent of the
6   2018/2019 all-funds budget."
7       A.  Correct.
8       Q.  But if you look back at the pie
9   chart, it says 30 percent for the
10  General Fund HHS levy.
11          I'm trying to make sense of
12  30 percent in the pie chart and 39 percent
13  in the text on the following page.  Can you
14  help me understand that?
15      A.  No.  I would have to look at the
16  spreadsheets behind it.
17      Q.  Is that a typo?
18      A.  I would have to look at the
19  spreadsheets behind it.
20      Q.  You can't explain it?
21      A.  Not without looking at the
22  spreadsheets behind it.
23      Q.  What spreadsheets do you have in
24  mind when you say "looking at the
25  spreadsheets behind it"?

Page 217

1       A.  The spreadsheets that would tell
2   me exactly what kind of dollars we're talking
3   about.
4       Q.  I'm asking you what spreadsheets.
5           MR. BADALA:  Objection to form.
6   BY MR. BOEHM:
7       Q.  What spreadsheets are those?
8   Because I don't know.  You have to help me.
9       A.  I would pull up the budget
10  amounts from the resolutions, type them into
11  a spreadsheet, and then calculate the
12  percentage so that I could determine whether
13  it's 30 percent or 39 percent.
14      Q.  Is that information that's
15  reflected somewhere in this budget or is that
16  somewhere else?
17      A.  The revenue is in the schedules.
18      Q.  In the back of the budget?
19      A.  That's correct.
20      Q.  So is there a schedule you can
21  look at to tell me why the pie chart says
22  30 percent and the text for the General Fund
23  says 39 percent?
24      A.  I don't do percentages in my
25  head, but I can tell you that this is where

55 (Pages 214 - 217)

Page 218

1  the revenue is.
2      Q.  Where?
3      A.  In the schedules.
4      Q.  Tell me where.
5      A.  11064, 11065, 11067.
6      Q.  Okay.  Where on 11064 are you
7  looking?
8      A.  Under the expenditures, total
9  expenditures.
10      Q.  "Total operating expenditures"?
11  Is that --
12      A.  No.
13      Q.  -- the line you're looking at?
14      A.  Total expenditures.
15      Q.  So about three-quarters of the
16  way down the page, there's a line that says
17  "total expenditures"?
18      A.  That's correct.
19      Q.  Does that help us in some way
20  figure out how much of the total all-fund
21  budget is from the General Fund and HHS levy
22  fund?
23      A.  It does, if you want to do the
24  math.  I'm not going to do percentages in my
25  head.

Page 219

1          But the total General Fund
2  expenditures is 432.9 million; HHS levy
3  expenditures, 238.2 million; all-funds,
4  1.5 billion.
5      Q.  Okay.
6          The bottom line is, just by
7  looking here at the pie chart and then the
8  parenthetical at the top of the next page,
9  you're not able to explain why the
10  percentages provided are 9 percent off?
11          MR. BADALA:  Objection to form.
12          THE WITNESS:  No.
13  BY MR. BOEHM:
14      Q.  And you're not sure whether
15  that's a typo or not?
16      A.  I am not sure.
17      Q.  The next sentence there on 11010
18  says, "The General Fund is the primary
19  operating fund of the county," and it says
20  it's comprised of four separate sub-funds.
21          Do you see that?
22      A.  Yes.
23      Q.  The general operating,
24  0.25 percent, and then two HHS levies, right?
25      A.  That's correct.

Page 220

1      Q.  And then it says at the bottom of
2  that paragraph that the General Fund is the
3  only discretionary fund included in the
4  county's all-funds budget.
5          Do you see that?
6      A.  Yes.
7      Q.  What does that mean?
8      A.  Every other fund that would be
9  included in the budget is restricted in some
10  way by something.  So usually it's the Ohio
11  Revised Code.  Sometimes it's the county
12  code.  It means those funds were designated
13  for a specific purpose.
14          The General Fund, there is
15  discretion there.  So you can make a policy
16  decision whether you want to spend money on
17  X or Y.
18      Q.  As I understand it, money from
19  the General Fund can be transferred to
20  special revenue funds; is that right?
21      A.  And it is.  That's correct.
22      Q.  That does happen?
23      A.  Yes.
24      Q.  And it is within the discretion
25  of county leadership to decide how much of

Page 221

1  the General Fund dollars get transferred to
2  the special revenue funds, correct?
3      A.  That's correct.
4          MR. BADALA:  Objection to form.
5          Just give me a second.
6          THE WITNESS:  I'm sorry.
7          MR. BADALA:  That's okay.
8          THE WITNESS:  That's correct.
9  BY MR. BOEHM:
10      Q.  How would we go about tracking
11  how much money from the General Fund goes to
12  the various special revenue funds, to the
13  extent that such transfers exist?
14      A.  So if you look in the back,
15  beginning on page 11070, we have three
16  reports in a row that detail -- we call them
17  subsidies, the money that went from the
18  General Fund into other funds.
19      Q.  Okay.
20          Do these pages that you've just
21  identified for us provide a comprehensive
22  summary of General Fund dollars that have
23  been transferred to special revenue funds,
24  or are there other places in the budget we
25  would have to go to understand that?

56 (Pages 218 - 221)

Page 222

1    MR. BADALA:  Objection to form.
2    THE WITNESS:  This is a
3 comprehensive list of all of our
4 subsidies.
5 BY MR. BOEHM:
6    Q.  Okay.
7       About a third of the way down
8 this page, going back to 11010, where you
9 were?
10    A.  Uh-huh.
11    Q.  Ms. Keenan, I'm back at 11010.
12    A.  Oh, I'm sorry.
13    Q.  That's kind of where we left off.
14 11010.
15    MR. BADALA:  Yeah.  I don't think
16 you're on the same page.
17    THE WITNESS:  Oh, I'm sorry.  I'm
18 sorry.  Okay.
19 BY MR. BOEHM:
20    Q.  This is the page of the budget
21 that describes the General Fund, right?
22    A.  It's a page in the budget that
23 describes the General Fund.
24    Q.  And -- well, to me, it looks like
25 it's the section of the budget that is

Page 223

1 designed to explain what the different funds
2 are and what they do, right?
3    MR. BADALA:  Objection to form.
4    THE WITNESS:  That's correct, but
5 the General Fund is discussed throughout
6 the document.
7 BY MR. BOEHM:
8    Q.  Sure.  It has application
9 throughout.
10       But this is -- I'm simply making
11 the point that this is the section designed
12 to describe for the reader what this fund
13 is, right?
14    MR. BADALA:  Objection to form.
15    THE WITNESS:  I suppose, but we
16 have a revenue section that discusses
17 all of the revenue in the General Fund.
18 There's expenditure sections.  It's
19 throughout the document.
20 BY MR. BOEHM:
21    Q.  This is going to get real tough.
22 Okay.
23       The General Fund is described
24 further about a third of the way down the
25 page, where it says:

Page 224

1    "The county's General Fund
2 includes two sub-funds."
3    Do you see that?
4    A.  Uh-huh.
5    Q.  And then it says that those two
6 are the General Operating Fund and the
7 0.25 percent fund.
8    Do you see that?
9    A.  That's correct.
10    Q.  So I was a little confused in
11 reading this page, because in the first
12 paragraph it says the General Fund has four
13 sub-funds, and then here it says the
14 General Fund has two sub-funds.  And I read
15 this document as carefully as I could, and
16 didn't see any explanation for that apparent
17 discrepancy.
18       Could you please explain that
19 for those of us who might not understand
20 that?
21    A.  The first paragraph is referring
22 to the fund type, and the fund type General
23 Fund has the four sub-funds.
24       General Fund is referred to as a
25 fund, so there's -- in the hierarchy, we

Page 225

1 have fund type, then we have fund, then we
2 have sub-fund.  The top is the fund type.
3       This then discussion is about
4 the General Fund, which has two sub-funds.
5    Q.  Thank you.  Very helpful.
6       So the discussion here about the
7 General Operating Fund, how does that, if at
8 all, relate to the HHS levies that are
9 discussed in the same section?
10    A.  It doesn't.  The discussion that
11 begins the third paragraph with the bolded
12 "General Fund," that's -- I'm sorry.
13    Q.  Just for the record, are you
14 looking at the very last paragraph on
15 page 11010?
16    A.  I'm starting here.  This is
17 talking about the General Fund, which would
18 be separate from the two levies.  Those are a
19 different fund.
20    Q.  Subsidies make up about one-third
21 of the total General Fund expenditures in
22 2018 and '19; is that correct?
23    A.  That's correct.
24    Q.  And "subsidies," when we use it
25 in this context, refers to money that is sent

57 (Pages 222 - 225)

Page 226

1    to the special revenue funds?
2         A.  That's correct.
3         Q.  Okay.
4              Speaking now specifically about
5    the General Operating Fund, what are the
6    revenue sources of the General Operating
7    Fund?
8         A.  So if you go back to the
9    schedules on page 11064, this is a fund
10   report for the General Operating Fund, and
11   the larger revenue sources are summarized:
12   Property taxes, sales tax, licenses and
13   permits, fines and forfeitures, charges, fees
14   for services, the local government fund,
15   which comes from the State of Ohio, other
16   intergovernmental, which largely refers to
17   the state public defender's office, other
18   taxes, investment earnings, and then
19   miscellaneous income.
20        Q.  Got it.  Thank you very much.
21             Now, the Local Government Fund,
22   you have indicated, goes to the General
23   Operating Fund?  Did I understand that
24   correctly?
25        A.  That's correct.

Page 227

1         Q.  And I think you indicated that
2    the Local Government Fund comes from the
3    State of Ohio?
4         A.  That's correct.  It's a fund
5    within the state's budget that's made up of
6    1.66 percent of all state tax revenue.
7         Q.  Then you made reference to "the
8    other intergovernmental fund."
9         A.  Right.  It's just --
10        Q.  What's that?
11        A.  In general, that will refer to
12   revenue that comes to the county from other
13   governmental sources.  For the General
14   Operating Fund specifically, that is almost
15   exclusively the reimbursement from the state
16   public defender's office.
17        Q.  Now, do sales taxes come directly
18   to Cuyahoga County or is that also through
19   the state?
20        A.  Sales taxes flow from
21   Cuyahoga County to the state, and then they
22   actually flow to a trustee before they come
23   to the county.  The county has a number of
24   outstanding debt issues.  So our sales tax
25   gets routed through a trustee first.

Page 228

1         Q.  What formula does the State use
2    to determine how to apportion the sales tax
3    to the various counties within the state?
4              MR. BADALA:  Objection to form.
5              THE WITNESS:  It's based on the
6         sales tax that's charged in that county.
7         So it's not distributed by formula.  If
8         you buy here, we're going to get the
9         sales tax eventually.
10   BY MR. BOEHM:
11        Q.  Is it your understanding that
12   it's that simple, whatever Cuyahoga County
13   generates in sales tax comes back to
14   Cuyahoga County?
15             MR. BADALA:  Objection to form.
16             THE WITNESS:  I'm sure it's not
17        that simple, but that is essentially how
18        it works.
19   BY MR. BOEHM:
20        Q.  Who would we need to talk to to
21   make sure we understood exactly how it works?
22        A.  You could call the State.
23        Q.  Then you stated that it goes
24   through a trustee?
25        A.  That's correct.

Page 229

1         Q.  And explain what that is about.
2         A.  When public entities issue debt
3    that's backed by sales tax, we are required
4    to pay debt service first.  So our sales tax
5    gets routed to a trustee, who takes out the
6    amount due for debt service, and then gives
7    us the balance.
8         Q.  The county also has its own debt
9    service fund, doesn't it?
10        A.  That's correct.
11        Q.  And is that separate and apart
12   from the amount it has to pay in debt service
13   through the sales tax process?
14        A.  The debt service funds will
15   capture that amount.
16        Q.  It's probably because I'm slow on
17   the take, but I don't quite yet understand
18   the relationship, if there is one, between
19   the debt service fund that Cuyahoga County
20   has and maintains and the process by which
21   the trustee takes money --
22        A.  Uh-huh.
23        Q.  -- out of what would be
24   Cuyahoga County's share of sales tax.
25             Can you explain that for us?

58 (Pages 226 - 229)

Page 230

1      A.   So the county has a number of
2  debt-service funds.  We have several bond
3  issues.  The sales tax ones are in this
4  lockbox structure, which means we have to
5  route through the trustee.
6           The trustee retains -- just
7  throwing out numbers --$10 million for a
8  debt service, and then I get the balance of
9  what's owed to the county, we spend it on
10 whatever.
11          We make manual adjustments in
12 our system to note that the county did
13 receive $10 million, though it doesn't
14 physically come to us, and that we paid $10
15 million in debt service, though we didn't
16 actually pay the money, the trustee did; but
17 we make journal entries so we can accurately
18 reflect to the citizens, we did have these
19 debt service payments.  Otherwise, they
20 would not be reflected in our financials.
21      Q.   Thank you.
22          If you flip over to page 11012.
23          MR. BOEHM:  And I'm just reading,
24 for the record, the final numbers in the
25 Bates stamp that's at the bottom

Page 231

1  right-hand corner of the page of the
2  exhibit.
3  BY MR. BOEHM:
4      Q.   In this page at the top, there's
5  a reference to the budgets for the
6  General Fund for 2018 and 2019.
7          Do you see that?
8      A.   Yes.
9      Q.   And, again, the number we're
10 looking at there does not reflect HHS levy
11 funds, right?  That's just the General
12 Operating Fund?
13     A.   That's correct.
14     Q.   And it says that personnel costs
15 represent 55 percent of the total General
16 Fund's spending.
17          Did I read that correctly?
18     A.   Yes.
19     Q.   What does that mean?
20     A.   It means that 55 percent of total
21 expenses are attributed to salaries,
22 benefits, for employees.
23     Q.   Where does the rest go?
24     A.   Any number of expenses.  It goes
25 to medical in the jail.  It goes to drug

Page 232

1  treatment in the jail for our addicted
2  inmates.
3          It goes to assigned counsel in
4  the Court of Common Pleas, assigned counsel
5  in the juvenile court.  It goes to
6  prosecutor's office, pays for expert
7  witnesses.  Court of Common Pleas, pays for
8  expert witnesses.
9          We have a lot of other expenses.
10 Contracts.  Information technology.  A lot
11 of that is contracts, maintenance contracts
12 on our systems.
13          Most of the general
14 government -- you know, elections, you know,
15 Board of Elections costs.  We pay for
16 ballots, we pay for poll workers, which
17 actually don't count as personnel because
18 they're temporary workers.
19     Q.   Just below this, there's another
20 depiction -- I'm not even sure what kind of
21 graph to call this.
22     A.   Uh-huh.
23     Q.   You might know.  There is a graph
24 here that I believe reflects which divisions
25 and departments of Cuyahoga County government

Page 233

1  this General Fund, Operating Fund, goes to.
2          Do I understand that right?
3      A.   The circle graph?
4      Q.   Yeah, the circle graph.  Let's
5  call it that.
6      A.   That details spending by what we
7  call "program."  So programs are functional
8  areas of government.
9      Q.   And when you say "spending," you
10 mean spending from this General Operating
11 Fund?
12     A.   That's correct.
13     Q.   It looks like 62 percent of it,
14 according to this circle graph, goes to the
15 Justice and Public Safety Division.
16     A.   That is correct.  Jail is our
17 largest single spend in the General Fund.
18     Q.   Do you know how much of that is
19 jail?
20     A.   In the budget, not specifically.
21 But the jail is approximately $70 million a
22 year and rising.
23     Q.   The next-largest segment here
24 refers to general government at 18 percent.
25          What's covered there?

59 (Pages 230 - 233)

Page 234

1     A.   General government includes, not
2  limited to, county executive, county council,
3  human resources, information technology,
4  Board of Elections.
5          Oh, we have an inspector
6  general, Department of Internal Audit, the
7  fiscal office, the law department, Personnel
8  Review Commission.
9     Q.   I was hoping you could help me
10  make sense of one other thing that appears to
11  a layperson to be a discrepancy, but probably
12  has an explanation.
13          In subsidies, it says 14 percent
14  on the circle graph on 11012.
15          Do you see that?
16     A.   Uh-huh.
17     Q.   But we had read earlier on
18  page 11010, that about a third of the total
19  General Fund expenditures go to subsidies.
20          Obviously, 14 percent is less
21  than a third.  And I was trying to
22  understand how that fits together.  Can you
23  help us?
24     A.   So I'm not going to do math in my
25  head, but subsidies in the 2018 budget total

Page 235

1  12.1 million.  Total expenditures,
2  375 million.  One of those is a typo.
3     Q.   So when we see the 62 percent
4  Justice and Public Safety figure in the
5  circle graph on 11012, is it possible that
6  any of that calculation is from subsidies to
7  special revenue funds in the Justice and
8  Public Safety space?
9     A.   No.
10     Q.   All right.  So one of those is a
11  typo, and you don't know which one?
12     A.   Not without doing the
13  calculation.
14     Q.   Underneath the circle graph, it
15  says that the General Fund expenditures have
16  remained relatively constant over the past
17  several years with increases in 2015 and '16
18  due to spending on capital projects.
19          Do you see that?
20     A.   Yes.
21     Q.   Do you know how far back in time
22  it's true that General Fund expenditures have
23  remained relatively constant?
24     A.   Not without looking at a report.
25     Q.   Do you know when the last time

Page 236

1  the General Fund expenditures were reduced
2  from one year to the other?
3     A.   What do you mean by "from one
4  year to another"?  Comparing what?
5     Q.   Comparing one budget to the next.
6  Here the statement is, as I understand it --
7  I'll just read it:
8          "General Fund expenditures have
9          remained relatively constant over the
10          past several years."
11     A.   Right.  There's a difference
12  between budget and expenditures.  So when we
13  say "expenditures," we're talking about
14  actuals for the year.
15          I would have to look at a budget
16  to see the relationship between budgets year
17  over year.
18     Q.   What does it mean that General
19  Fund expenditures have remained relatively
20  constant over the past several years?
21     A.   It means that the shifts have
22  been relatively nominal, so the darker bars
23  on these graphs are total expenses in 2000 --
24  I'm sorry, the lighter one.  In 2015 and '16,
25  we saw a spike, but then '17, '18, '19, looks

Page 237

1  about the same as '14.
2     Q.   And do you know how far back
3  before 2014 the same could be said that the
4  General Fund expenditures have remained
5  relatively constant?
6     A.   I would have to look at a report.
7     Q.   Are you aware of any significant
8  spikes or drops in the years prior to 2014?
9          MR. BADALA:  Objection to form.
10          THE WITNESS:  I would really have
11     to look at a report.
12  BY MR. BOEHM:
13     Q.   You just don't know?
14     A.   Not off the top of my head.
15     Q.   And nothing stands out to you as
16  you sit here today; is that fair?
17          MR. BADALA:  Objection to form.
18          THE WITNESS:  I would have to
19     look at a report.  I really can't say.
20  BY MR. BOEHM:
21     Q.   That's a yes, nothing stands out
22  to you?
23          MR. BADALA:  Objection to form.
24          THE WITNESS:  That's correct.
25

60 (Pages 234 - 237)

Page 238

1  BY MR. BOEHM:
2      Q.  Now, just kind of going back for
3  a moment to the testimony you gave about
4  requests that were made from the
5  medical examiner's office, the juvenile
6  court, sheriff's department, and ADAMHS, you
7  said three of the four of those requests were
8  funded, right?
9      A.  That's correct.
10      Q.  And one was not, and that's the
11  ADAMHS request, right?
12      A.  That's correct.
13      Q.  Were the requests from the
14  medical examiner's office, the juvenile
15  court, and the sheriff's department that the
16  county did choose to fund come out of the
17  General Operating Fund?
18      A.  The medical examiner did.
19  Juvenile court received funding -- and by
20  that, I mean they did not have to take their
21  cut from the General Fund and the Levy Fund.
22          And, I'm sorry, who was the
23  third one?
24      Q.  The sheriff's department.
25      A.  The sheriff's department is

Page 239

1  General Fund.
2      Q.  And just General Fund?
3      A.  No, not just General Fund.  The
4  sheriff's department also receives some
5  funding from the --
6      Q.  I'm sorry.  I may have confused
7  you.
8      A.  Oh.
9      Q.  My question is with respect to
10  this request for additional funds that the
11  county decided to agree to, did that come
12  from the General Fund or from some other
13  source?
14      A.  For the sheriff, just the
15  General Fund.
16      Q.  And for the juvenile court?
17      A.  Both.  General Fund and Levy.
18      Q.  And for the medical examiner's
19  office?
20      A.  General Fund.
21      MR. BOEHM:  Let's go off the
22  record just for a minute.
23      MR. BADALA:  You want to take a
24  break?  Is that what you're saying?
25      THE VIDEOGRAPHER:  Off the

Page 240

1  record, 2:08.
2          (Recess taken, 2:08 p.m. to
3      2:18 p.m.)
4      THE VIDEOGRAPHER:  On the record,
5      2:18.
6  BY MR. BOEHM:
7      Q.  All right.  We've made a couple
8  of references to the HHS levy funds.
9          Do you recall that, Ms. Keenan?
10      A.  Yes.
11      Q.  What do the HHS levy funds go
12  toward?
13      MR. BADALA:  Objection to form.
14      THE WITNESS:  The Health and
15  Human Services levy funds support a
16  number of county agencies and
17  departments, and therefore host
18  different activities, including
19  addiction treatment, mental health
20  treatment, mental healthcare in the
21  jail, child welfare, medical care by way
22  of MetroHealth, entitlement programs,
23  like traditionally referred to as
24  welfare programs, child support
25  programs, juvenile services in juvenile

Page 241

1      court for the kids participating in
2      their programs.
3          That's not an exhaustive list.
4  BY MR. BOEHM:
5      Q.  It's a lot of different things?
6      A.  It's a lot of different things.
7  The levies bring in 240 million a year.
8      Q.  Has that amount been steady or
9  has that gone up or down over the last
10  several years?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  Over the last
13  several years, it's been relatively
14  steady.  The levies are protected to a
15  certain extent from fluctuations in home
16  values.  Home values would have to, you
17  know, change dramatically for us to take
18  a hit on the levies.
19  BY MR. BOEHM:
20      Q.  I think you made reference to
21  this earlier in the day, and I'm glad you
22  mentioned it because I wanted to follow up.
23          When you talk about protection
24  against the changes in real estate property
25  values, what does that mean?  How is it that

61 (Pages 238 - 241)

Page 242

1    these levy amounts are protected from
2    fluctuations in the market?
3         A.   I don't know offhand the statute,
4    but it originated with House Bill 920 in the
5    Ohio General Assembly.
6             What it means effectively is if
7    you vote for a levy when your house is
8    valued at $100,000, then based on your
9    $100,000 home, you're going to contribute $5
10   a year to the levy.  If your home value
11   increases, the amount that you contribute
12   doesn't increase.  We change what's called
13   the effective rate.  It will decrease it so
14   that your -- the rate of the levy actually
15   goes down so that we still only get $5 from
16   you.  It protects the homeowners from an
17   increase in taxes if their property values
18   go up.
19        Q.   It kind of sets a ceiling on how
20   much will be collected, according to that
21   levy, regardless if home values rise; is that
22   fair?
23        A.   That's correct.  We will see no
24   more money in the levies as a result of the
25   reappraisal.

Page 243

1         Q.   But you also indicated it
2    protects against you seeing less money.  So
3    how does that work?
4         A.   To a certain extent it will.  So
5    if values -- for example, we have a 3.8 mill
6    levy.  Millage is based on your home values.
7    If we're able to bring in that $5 because
8    your property increased so much, we actually
9    reduce that effective rate to 3.5, say, so we
10   get your $5.  If your home value tanks, we
11   can raise that back up to 3.9, because you
12   voted to no more than 3.9.
13            Where we would run into trouble
14   and then be unable to support our services
15   is if the values decreased so much so and we
16   hit that cap of where you voted your rate.
17        Q.   I think you made references
18   earlier in the day also to something called
19   "reimbursement."  For those of us who are not
20   in the world of local government finance,
21   what does that term mean in the context of
22   Cuyahoga County budgeting and spending?
23        A.   What does a reimbursement mean?
24        Q.   A reimbursement, yeah.  What is a
25   reimbursement?

Page 244

1         A.   A reimbursement means that some
2    other entity is paying us back for a cost
3    that we've incurred.
4         Q.   How does that get reflected in
5    the budget?
6             Say, for example, you have an
7    expenditure of funds and you use Cayahoga
8    County dollars to pay for it and then you
9    get reimbursed by, let's say, the federal
10   government.  How does that get accounted for
11   in your budgeting system?
12        A.   It depends what fund we're
13   talking about.  But largely, reimbursements
14   are reflected as miscellaneous revenue.  So
15   whatever fund incurred the expense, the
16   revenue will be credited to that fund as a
17   miscellaneous revenue.
18        Q.   Let's take, for example, the HHS
19   levy fund.
20            Is Cuyahoga County sometimes
21   reimbursed by state or federal governments
22   in connection with spending out of the HHS
23   levy fund?
24        A.   We're not reimbursed specifically
25   for spending out of the levy funds, but we

Page 245

1    are reimbursed for spending in the funds that
2    capture the activity of the agencies.
3             The only expenses in the levy
4    funds are transfers out, if that makes
5    sense.
6         Q.   Okay.
7             It says here that the levy is
8    budgeted for 231.8 million in 2018 and 2019.
9             So if the county were receiving
10   reimbursements for some of the expenditures
11   that it makes further on down the line, does
12   that get accounted for in this overall
13   HHS levy budget number that's reported here
14   in the biennial budget?
15        A.   It does not.  It gets reflected
16   in the all-funds number.  So if I can give
17   you an example, based on the budget for 2018,
18   the county anticipated transferring --
19        Q.   I'm sorry.  I don't want to stop
20   you; just tell us where you are, what page?
21        A.   I'm sorry.  11072.
22        Q.   Thank you.
23        A.   So based on this, if you look at
24   the third and fourth lines down, Children and
25   Family Services and Children Services Fund,

62 (Pages 242 - 245)

Page 246

1  those two funds capture the activity of the
2  Department of Children and Family Services.
3  The budget anticipated that from the levies
4  that department would receive $64 million,
5  right?  The 27 million and the 37 million.
6        But if you look at the all-funds
7  report two pages later on 11074 -- I think
8  it's two pages later -- HHS Children Family
9  Services is about halfway down, and their
10  total budget is 141 million.
11        So all those reimbursements are
12  captured in the funds in addition to the
13  levy revenue.
14        Q.  Okay.
15        So is the difference between the
16  60-some million and the 100- --
17        A.  41.
18        Q.  -- 141 or so million all made up
19  for with reimbursements?
20        MR. BADALA:  Objection to form.
21        THE WITNESS:  I can't say that
22        it's all reimbursements.  Some of it
23        might be dollars that we can request as
24        an advance, but it's all from other
25        sources, federal and state sources.

Page 247

1  BY MR. BOEHM:
2        Q.  So it's not from Cuyahoga County
3  dollars; it's from state and federal dollars.
4        MR. BADALA:  Objection to form.
5        THE WITNESS:  State and federal
6        dollars are Cuyahoga County dollars.
7  BY MR. BOEHM:
8        Q.  You mean you get to spend it, but
9  you didn't generate it, right?  Is that what
10  you're saying?
11        A.  No.  I disagree with that
12  statement.
13        The money that flows to county
14  government from federal and state sources is
15  generated by us.  It's generated by the
16  number of addicts we have in treatment.
17  It's generated by the number of children we
18  have in foster care.  It's generated by the
19  poverty rate of the kids who come to
20  juvenile court.
21        Those dollars come to
22  Cuyahoga County with discretion on how
23  they're spent.  Those are county dollars.
24        Q.  I think we're confusing terms.
25        When the federal government

Page 248

1  sends money as a reimbursement to Cuyahoga
2  County to spend, are you saying that the
3  money sent by the federal government comes
4  from the county?
5        MR. BADALA:  Objection to form.
6        THE WITNESS:  I'm not saying
7        that.
8  BY MR. BOEHM:
9        Q.  Okay.  I didn't think so.
10        It comes from the federal
11  government, right?
12        A.  To the county, which makes it
13  county dollars.
14        Q.  Understood.  But not generated in
15  the county?
16        MR. BADALA:  Objection to form.
17        THE WITNESS:  I would disagree
18        with that because it's our demographics,
19        our needs, that are driving the way we
20        generate those dollars.  Dollars are
21        generated by poverty rates, rates of
22        addiction, rates of children in foster
23        care.  That's how those dollars are
24        generated.
25

Page 249

1  BY MR. BOEHM:
2        Q.  Dollars aren't generated through
3  poverty levels.
4        A.  I disagree.
5        Q.  That might be the formula by
6  which you receive funds.  I want to make
7  sure -- are you suggesting that there's
8  something about the poverty level in Cuyahoga
9  County that raises funds for you to spend?
10        MR. BADALA:  Objection to form.
11        THE WITNESS:  The poverty rates
12        in Cuyahoga County do entitle us to
13        certain revenue sources that we would
14        not be entitled to if the poverty rates
15        weren't what they were.
16  BY MR. BOEHM:
17        Q.  Right.  But entitlements are not
18  the same thing as generating funds, right?
19        MR. BADALA:  Objection to form.
20  BY MR. BOEHM:
21        Q.  I don't want to get into an
22  academic exercise.  It seems pretty obvious
23  to me.  But if you want to fight about it, we
24  can.
25        MR. BADALA:  Objection to form.

63 (Pages 246 - 249)

Page 250

1       THE WITNESS:  I don't want to
2   fight about it, but I don't think it
3   seems obvious to me.  I would argue that
4   those dollars are generated in Cuyahoga
5   County.
6   BY MR. BOEHM:
7       Q.  Can you explain your theory?
8       MR. BADALA:  Objection to form.
9   BY MR. BOEHM:
10      Q.  How they're generated?
11      A.  Because they are generated based
12  on statistics.
13      Q.  You wouldn't say that poverty
14  levels are a money-making venture for the
15  county, would you?
16      MR. BADALA:  Objection to form.
17      THE WITNESS:  I say that our
18   poverty levels entitle us to certain
19   revenue sources.
20  BY MR. BOEHM:
21      Q.  And that's all you're saying.
22  You're not saying that the money is raised
23  here in the county, goes up to the federal
24  government, and then comes back, right?
25      A.  Well, a good portion of the

Page 251

1   federal government's revenue is raised here
2   through taxes.  Our residents pay taxes.
3       Q.  Federal taxes, right?
4       A.  That's correct.
5       Q.  Not county taxes?
6       A.  That's correct.
7       Q.  Not state taxes?
8       A.  That's correct.
9       Q.  And does the county sometimes
10  also receive grants?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  Yes.
13  BY MR. BOEHM:
14      Q.  Where does the county receive
15  grants from?
16      A.  The county receives grants from
17  any number of federal agencies, state
18  agencies, philanthropic sources.
19      Q.  When you say "philanthropic," you
20  mean private grants that are provided to the
21  county?
22      A.  Yes.
23      Q.  And those funds also -- private
24  donations made to the county in the form of
25  grants are not monies that are generated by

Page 252

1   the county government, fair?
2       MR. BADALA:  Objection to form.
3       THE WITNESS:  Most likely, that's
4   correct.
5   BY MR. BOEHM:
6       Q.  Okay.
7       I wanted to go back to the
8   special revenue funds, because that's the
9   next category we haven't discussed yet.  And
10  if you look in the budget at 11014, there's
11  a description of special revenue funds.
12      Do you see that?
13      A.  Yes.
14      Q.  We talked a little bit about
15  these earlier in the day.
16      Do you remember that?
17      A.  Yes.
18      Q.  And it says here that these are
19  funds that are established and maintained to
20  account for resources designated for specific
21  purposes, right?
22      A.  That's correct.
23      Q.  And then it says this fund type
24  includes grant, state, and federal
25  allocations.

Page 253

1       Do you see that?
2       A.  Yes.
3       Q.  What does that refer to?
4       A.  It says that included in this
5   fund type are grants, state, and federal
6   allocations.
7       Q.  Right.  But what does that mean?
8       A.  What does what mean?
9       Q.  That these fund types include
10  grants, state, and federal allocations?
11      A.  It means the revenue that's
12  captured in special revenue funds is grant
13  revenue, state revenue, and special revenue.
14      Q.  When we talk about state revenue,
15  what's that?
16      A.  Revenue that flows through the
17  state, either flows through or originates
18  with the state.
19      Q.  And what about federal revenue?
20  What do we mean by that?
21      A.  Revenue that comes from the
22  federal government.
23      Q.  And then it also says:
24       "These fund types include taxes
25       and fees collected for a designated

64 (Pages 250 - 253)

Page 254

1    activity."
2        Do you see that?
3    A.  That's correct.
4    Q.  And it goes on to say:
5        "The county's financial policies
6    dictate that expenditures from these
7    funds are limited to the mandates or
8    direction of the funding source."
9        Do you see that?
10   A.  Yes.
11   Q.  That means that if the state
12   gives you money, it comes earmarked to be
13   spent in a particular fashion, right?
14       MR. BADALA: Objection to form.
15       THE WITNESS:  That's not always
16   the case, no.  The county has discretion
17   often on how it spends its money.
18   BY MR. BOEHM:
19   Q.  What does it mean here that the
20   funds are limited to the mandates or the
21   direction of the funding source?
22   A.  The direction of the funding
23   source could say spend the money on child
24   welfare, but that could mean any number of
25   things.  We could spend that money on

Page 255

1    subsidies to foster parents.  We could spend
2    that money on treatment services for babies
3    that are born addicted.
4    Q.  I see.  So the funding that you
5    receive from these other sources may come
6    with tight restrictions or looser
7    restrictions in terms of how the money can be
8    spent?
9    A.  That's correct.
10   Q.  The sentence goes on to say:
11       "These funds cannot be used to
12   subsidize other funds except as
13   required or permitted by program
14   regulations or legal directive."
15       Do you see that?
16   A.  I do.
17   Q.  Is this what we were talking
18   about earlier where you said that at least
19   with respect to some of these funds, there
20   can be transfers out of the special revenue
21   fund to the General Operating Fund?
22   A.  That's correct.
23   Q.  I wonder if you could say again
24   what the list of special revenue funds are
25   that fit within the caveat where program

Page 256

1    regulations or legal directives permit the
2    transfer of funds?
3    A.  I can't give a list of that off
4    the top of my head.
5    Q.  Well, the special revenue funds
6    are actually identified here in the budget
7    over the next few pages:  HHS Job and Family
8    Services, Children and Family Services,
9    Children Services Fund, Road and Bridge,
10   Child Support Services, juvenile court, HHS.
11       Are any of those funds available
12   for transfer into the General Operating
13   Fund?
14   A.  Road and Bridge dollars could be
15   transferred into the General Fund if there
16   was an allowable expense incurred in the
17   General Fund.
18       And any of the Health and Human
19   Services funds, or the Juvenile Court Fund,
20   levy revenue can be transferred back to the
21   Levy Fund if other income comes in in excess
22   of what we expected, which means we would
23   have subsidized too much.  I am permitted to
24   transfer that money back.
25   Q.  Okay.  Anything else?

Page 257

1    A.  This is not a list of all of our
2    special revenue funds.  We have hundreds.
3    So, no, I can't tell you off the top of my
4    head.
5    Q.  Okay.
6        You indicated that there may be,
7    in the context of the Road and Bridge Fund,
8    an allowable expense --
9    A.  That is correct.
10   Q.  -- that could then go back to the
11   General Operating Fund?
12   A.  If the expense was incurred in
13   the General Operating Fund.
14   Q.  What does that mean?
15   A.  If we have an expense in the
16   General Fund that could have been covered by
17   the Road and Bridge Fund, we can take Road
18   and Bridge cash and put it into the
19   General Fund to reimburse the General Fund.
20   Q.  Does that sometimes happen?
21   A.  That has happened.
22   Q.  Are you aware of any transfers
23   out of the special revenue funds designed to
24   address funding specific to opiate use or
25   abuse in Cuyahoga County?

65 (Pages 254 - 257)

Page 258

1      MR. BADALA:  Objection to form.
2      THE WITNESS:  Transfers out of
3    the special revenue funds?
4  BY MR. BOEHM:
5      Q.   Correct.
6      A.   Into the General Fund or into any
7  other fund?
8      Q.   Let's start broadly.  Into any
9  other fund.special revenue fund
10      A.   Off the top of my head, I can't
11  recall money coming from a special revenue
12  fund into another fund.
13      Q.   For purposes of addressing the
14  opiates?
15      A.   For that purpose, yes.  Money has
16  come from the Levy Fund and the General Fund
17  for the purpose of addressing opiates.
18      Q.   You anticipated where I was going
19  to go next.
20      A.   Okay.
21      Q.   So my question to you is whether
22  or not you're aware of any instances where
23  money from the General Operating Fund has
24  been transferred out of that fund to a
25  special revenue fund, earmarked with a

Page 259

1  specific purpose of addressing opiate-related
2  expenditures?
3      MR. BADALA:  Objection to form.
4      THE WITNESS:  Yes.  So the
5    General Fund has transferred money to
6    the medical examiner's office, has a
7    special revenue fund specific to the
8    regional crime lab.  And the crime lab
9    is where most of -- that's where most of
10    the toxicology expenses are captured.
11      And the General Fund has given a
12    subsidy -- we call it a subsidy -- to
13    the crime lab, and that has increased.
14    It increased in 2017 specific to
15    opiates.
16  BY MR. BOEHM:
17      Q.   How much was that transfer?
18      A.   In 2017 -- well, I don't have the
19  actuals in front of me.  For 2017 and 2016,
20  it was 4.2 million.
21      Q.   Okay.
22      I want to make sure I understood
23  that.  For 2016 and '17?
24      A.   I don't have the actuals in front
25  of me for '17.

Page 260

1      Q.   For what year, 2016?
2      A.   4.2 million.
3      Q.   So if I understand you correctly,
4  you're saying that in 2016, $4.2 million was
5  transferred from the General Fund into the
6  medical examiner office's special revenue
7  fund for purposes of the regional crime
8  laboratory; is that right?
9      A.   That's correct.  But that is
10  specific to opiate.
11      Q.   And when you say it's specific to
12  opiates --
13      A.   Uh-huh.
14      Q.   -- tell me what you mean by that.
15  Are you sure that all $4.2 million goes
16  directly to opiate-related work?
17      A.   No.  But I am sure that a portion
18  of this money was related to opiates, because
19  the medical examiner has provided data to
20  show that overdoses from prescription
21  opiates, carfentanil, Fentanyl, and heroin
22  are on the rise, and the tests associated
23  with performing those functions have
24  dramatically increased.  And they're -- so I
25  know that a portion of it is.  I can't say

Page 261

1  how much of the 4.2.
2      Q.   How would you go about trying to
3  determine what portion of the 4.2 is going
4  directly to opiate-related work?
5      A.   I'm not performing those
6  calculations.
7      Q.   Do you have information available
8  to you that would allow you to do that kind
9  of computation?
10      MR. BADALA:  Objection to form.
11      THE WITNESS:  No.
12  BY MR. BOEHM:
13      Q.   Do you know of anybody who has
14  information available to them that would
15  allow them to do a computation to determine
16  how much of that $4.2 million is going
17  specifically to opiate-related work?
18      A.   I'm sure somebody does, but I
19  don't know who.
20      Q.   You don't know who?
21      A.   No.
22      Q.   Would it be somebody in the
23  Office of Budget Management?
24      A.   That's where I work, and I said I
25  don't have it, no.

66 (Pages 258 - 261)

Page 262

1    Q.   Would it be somebody in the
2 medical examiner's office?
3    A.   The Medical Examiner's office
4 would have data relative to the types of
5 testing they're performing, why the people
6 died that they're autopsying.  I'm sure that
7 is a portion of it, but I am not performing
8 those calculations.
9    Q.   So you're not sure whether or not
10 the Medical Examiner's office would have
11 information available to it to determine how
12 much of the $4.2 million from the
13 General Fund to the special revenue fund for
14 the crime laboratory went to work that is
15 specific to opiates?
16    MR. BADALA:  Objection to form.
17    THE WITNESS:  I believe I said
18    that the Medical Examiner's office does
19    have data relative to why they're
20    performing tests, why they're performing
21    autopsies, who is dying in this county
22    and why they're dying, and why the
23    number of people dying from prescription
24    opiates has been increasing over the
25    last years.

Page 263

1    Whether the Medical Examiner's
2 office is capable of performing the
3 calculation to say how much of that 4.2
4 specifically was related?  I don't know
5 what would go into that.
6 BY MR. BOEHM:
7    Q.   Okay.
8    And you said in 2016, the
9 special revenue fund received $4.2 million.
10 Where could we go to see how
11 much was designated to that special revenue
12 fund for 2017?
13    A.   How much was designated in the
14 budget?
15    Q.   Yeah.  How much was sent from the
16 General Fund to the special revenue fund for
17 the regional crime laboratory of the
18 Medical Examiner's office in 2017?
19    A.   You would have to look at our
20 results of operations report for 2017.  That
21 has actuals.
22    Q.   Do you know how much was budgeted
23 in 2017 for that purpose?
24    A.   Not off the top of my head, no.
25    Q.   Where would we go to see that?

Page 264

1    A.   To see the original budget, that
2 would be in the 2017 budget book.
3    Q.   So that would be in the budget
4 itself?
5    A.   That's correct.
6    Q.   When you say the "budget book" --
7 when you use the term "budget book," is
8 Exhibit 3 to your deposition the budget book
9 for 2018/2019 Cuyahoga County biennial
10 budget?
11    A.   That's correct.
12    Q.   So if we wanted to see the 2017
13 amount out of the General Fund to the special
14 revenue fund for the regional crime lab, we
15 could look in the 2017 budget?
16    A.   If you want to see the amount
17 that was budgeted, yes.
18    Q.   Because you're drawing a
19 distinction between the amount that was
20 budgeted and the amount that was actually
21 spent?
22    A.   That's correct.
23    Q.   And you said to see how much was
24 actually spent, we would have to go and look
25 at the results of operations report?

Page 265

1    A.   That's correct.
2    Q.   And where is that?
3    A.   On OBM's website.
4    Q.   Is it available to the public?
5    A.   Absolutely.
6    Q.   So I could go on -- if I had my
7 internet connection all fired up and ready to
8 go, I could Google Cuyahoga County, Office of
9 Budget Management, it might have a photograph
10 of you there on the home page, and then I
11 could find my way to a Results of Operation
12 Report?
13    A.   You could.
14    Q.   For how many years is the Results
15 of Operation Report available on the website?
16    A.   That specific report only goes
17 back to 2015, when I started writing them.
18    Q.   How about prior to 2015?  How
19 would I figure it out before then?
20    A.   Looking at our -- so you could --
21 any number of options.
22    One, you can look at financial
23 reports from our financial system, FAMIS, or
24 I can create spreadsheets from our budget
25 and reporting system, which captures actuals

67 (Pages 262 - 265)

Page 266

1   going back to 2003.
2        Q.  Do you know if the amount
3   budgeted out of the General Fund to the
4   special revenue fund for the
5   medical examiner's regional crime laboratory
6   went up in 2017, went down in 2017, or said
7   the same at $4.2 million?
8        A.  I'm sorry.  Are you -- the budget
9   or the actual transfer?
10       Q.  I'm talking about the budget
11  right now.
12       A.  I would have to look at --
13  because I don't know what was budgeted in
14  '16.
15       Q.  We know it was $4.2 million,
16  right?
17       A.  That's the actual.
18       Q.  That's the actual.  I'm sorry.  I
19  keep confusing that.  So the actual was 4.2.
20  You don't know how much was budgeted from the
21  General Fund to the special revenue fund?
22       A.  Not off the top of my head.
23       Q.  Under what circumstances could
24  the Medical Examiner's office spend more than
25  was budgeted for a particular purpose?  Would

Page 267

1   they have to go back to the Office of Budget
2   Management to request permission or could
3   they just ask for forgiveness?
4        MR. BADALA:  Objection to form.
5        THE WITNESS:  So I want to draw a
6   distinction between budgets for
7   subsidies and the budget that you're
8   referring to, which is the
9   Medical Examiner's ability to spend.
10       At the beginning of the year,
11  the two should be equal.  The
12  medical examiner, in order to get the
13  authority to spend, has to come to me.
14  They cannot ask forgiveness later, and
15  say, "We need additional
16  appropriation."  Appropriation is the
17  authority to spend.
18       If they get that, then their
19  subsidy is likely to increase, right?
20  They have some other revenue sources,
21  the crime lab, it's miniscule, but some
22  other entities pay for the services of
23  our crime lab.  If we budgeted, say, a
24  thousand dollars for that revenue to
25  come in and it didn't, they decided not

Page 268

1   to charge anyone, their subsidy is
2   going to go up, even though their
3   authority to spend did not change.  For
4   that, they don't have to come and ask
5   permission.  I usually catch it and
6   chastise them, but their appropriation
7   levels are what they are.  And it's my
8   job to then bring it to counsel's
9   attention and say you might want to
10  decrease their authority to spend.
11       But that's a judgment call
12  because sometimes based on the amount
13  of work they're doing, they couldn't.
14  In the last few years, I would never
15  recommend a decrease to the crime lab
16  because they're overwhelmed by the
17  deaths from the prescription opiates.
18  BY MR. BOEHM:
19       Q.  In terms of actual
20  expenditures --
21       A.  Uh-huh.
22       Q.  -- in the Medical Examiner's
23  regional crime lab, how has that actual
24  amount changed since 2006 to the present day?
25       A.  I would have to look at a report.

Page 269

1   I would have to look at a report.
2        Q.  Have you ever been asked to look
3   at that and try and figure out what the
4   actual changes have been, if any?
5        A.  I look at all of this.  I don't
6   necessarily memorize all of it.  But the
7   Medical Examiner's office crime lab has
8   increased.  I don't know by how much.
9        MR. BOEHM:  Let's go off the
10  record.
11       THE VIDEOGRAPHER:  Off the
12  record.
13       (Recess taken from 2:50 p.m. to
14  2:52 p.m.)
15       THE VIDEOGRAPHER:  On the record,
16  2:52.
17  BY MR. BOEHM:
18       Q.  Ms. Keenan, before we went off
19  the record you thought the actual
20  expenditures by the Medical Examiner's
21  regional crime laboratory had gone up, but
22  you weren't sure by how much.  Did I
23  understand you correctly?
24       A.  That's correct.
25       Q.  Over what time did you think

68 (Pages 266 - 269)

Page 270

1 there was an increase?  Over what time were
2 there increases, as you understand it?
3 A.  Spending in the
4 Medical Examiner's office in total, I
5 believe, has gone up every year for the last
6 couple of years.  But I can't break that down
7 between the funds without looking at a
8 report.
9 Q.  Just for purposes of clarity,
10 it's important we stay kind of focused
11 because I do want to expand it to other
12 medical examiner areas.
13 But let's stay focused if we can
14 right now on the spends for the regional
15 crime laboratory.  Because I think you had
16 said that actual expenditures had gone up,
17 but you didn't know by how much?
18 A.  That's correct.
19 Q.  By how much do you believe they
20 went up?
21 A.  I'm not going to guess.  I don't
22 know.
23 Q.  What are the reasons they went
24 up?
25 A.  Demand for services.  The number

Page 271

1 of overdose deaths has risen significantly in
2 Cuyahoga County.
3 Q.  And that, as you understand it,
4 has raised the actual expenditures of the
5 regional crime laboratory?
6 A.  Absolutely.
7 Q.  But you don't know by how much?
8 A.  No.
9 Q.  And you don't know when?
10 A.  I would have to look at my
11 reports.
12 Q.  What reports are you talking
13 about, the Results of Operation reports?
14 A.  Sure.
15 Q.  And it would be there?
16 A.  It would be.
17 Q.  Would that go back in time?
18 A.  It would go back at least a year
19 or two and then I can -- in our budget
20 system, I can go back to 2003.
21 Q.  What budget system are you
22 talking about?
23 A.  BRASS.
24 Q.  So you could go into BRASS if you
25 wanted and you could look to see how much

Page 272

1 actual revenue was being spent by the
2 regional crime laboratory for the
3 Medical Examiner's office back from 2003
4 until the present day?
5 A.  We didn't have a regional crime
6 lab in 2003, but I could go back to when it
7 started, yes.
8 Q.  When did it start?
9 A.  Pre-charter.  That's all I
10 remember.
11 Q.  Before 2010?
12 A.  I can't recall.  I can't recall
13 the specific year.
14 Q.  And just to be clear, you don't
15 know how much of whatever reach expenditure
16 was for a particular year was directed
17 specifically to opiate-related work, fair?
18 MR. BADALA:  Objection to form.
19 THE WITNESS:  That's correct.
20 BY MR. BOEHM:
21 Q.  And then if you could -- if you
22 did know that information, you wouldn't be
23 able to differentiate between expenses that
24 were directed toward prescription opiates
25 versus elicit is it opiates, correct?

Page 273

1 MR. BADALA:  Objection to form.
2 THE WITNESS:  The
3 medical examiner can distinguish between
4 prescription opiates and heroin, if
5 that's what you mean by elicit street
6 drugs.
7 BY MR. BOEHM:
8 Q.  Well, heroin and others, right?
9 It's not the only is it opiate?
10 MR. BADALA:  Objection to form.
11 BY MR. BOEHM:
12 Q.  Right?
13 MR. BADALA:  Same objection.
14 THE WITNESS:  I don't know.
15 BY MR. BOEHM:
16 Q.  You're not sure?
17 A.  No.
18 Q.  But regardless of whatever the
19 medical examiner can or can't do with the
20 date they have available there, you yourself
21 don't know what the actual expenditures are
22 out of the Medical Examiner's office that are
23 directly tied to opiates, true?
24 A.  That's correct.
25 Q.  And you've never undertaken to

69 (Pages 270 - 273)

Page 274

1    try to understand that?
2        A.  I have not.  All I've been trying
3    to do for the last several years is find
4    money from somewhere to deal with the crisis.
5    At this point it doesn't concern me to know
6    the details on everything, but I know that
7    this is a crisis that was driven in part by
8    prescription opiates, Fentanyl, carfentanil,
9    and heroin.  And my sole job for this county
10   is to find as much money as I can to respond
11   to the crisis.  That's what I've been budgets
12   doing for the last several years.
13       Q.  Do you know the difference
14   between prescription opioid medications and
15   elicit opiates that one gets on the street,
16   like heroin and Fentanyl?
17           MR. BADALA:  Objection to form.
18           THE WITNESS:  I am not a doctor
19    or a drug dealer, no.
20   BY MR. BOEHM:
21       Q.  Have you ever, yourself, been
22   prescribed opioid medication?
23           MR. BADALA:  I'm going to direct
24    you not to answer that question.
25           (Instruction given.)

Page 275

1    BY MR. BOEHM:
2        Q.  Are you going to follow that?
3        A.  I'm not going to answer the
4    question.
5            MR. BADALA:  Her medical history
6     is not in dispute.  I told Defendants in
7     multiple depositions, if you want to
8     stipulate that all your witnesses are
9     going to answer that question too, then
10    we'll go into it, but --
11           MR. NAEEM:  I just wanted you to
12    explain the basis, the legal basis for
13    your objection.
14           MR. BADALA:  It was her medical
15    history.
16           MR. BOEHM:  So it's a relevance
17    objection?  It sounds like a relevance
18    objection.
19           MR. BADALA:  Relevance, and then
20    it goes into medical history.  There's
21    HIPAA issues too.
22           MR. NAEEM:  I'm not sure either
23    one of those are bases under the federal
24    law to instruct the witness not to
25    answer.

Page 276

1            But all I wanted to know was the
2     basis.  So if we got the basis, sorry
3      for interrupting.
4            MR. BOEHM:  No problem.
5    BY MR. BOEHM:
6        Q.  Other than money from the HHS
7    levies that gets sent to the special revenue
8    funds, are there any other -- is there any
9    other revenue generated in the county through
10   taxes or fees that get directed toward
11   special revenue funds?
12       A.  Absolutely.
13       Q.  And what are those?
14       A.  This will not be an exhaustive
15   list --
16       Q.  You can just give me some
17   examples.
18       A.  -- but the county assesses a fee
19   on delinquent taxes.  So if you don't pay
20   your property taxes, there is a fee assessed
21   for that.  That by statute goes into special
22   revenue funds, two of them, one designated to
23   the county prosecutor, one designated to the
24   county treasurer.
25           All of our courts charge filing

Page 277

1    fees, as I'm sure you people are aware of.
2    Many of those fees go into special revenue
3    funds.  So the Common Pleas Court will
4    charge $20 for computer costs in the court.
5    Probate court charges a fee on marriage
6    licenses that goes into a fund to assist
7    with domestic violence.
8            Probate court also charges a fee
9    for alternative dispute resolution.
10   Juvenile court has that fee as well.
11   Juvenile court charges fees for psychiatric
12   evaluations.  That's all special revenue.
13       Q.  Is there a place in the budget
14   that I could go for each special revenue fund
15   to understand where the money is coming from
16   that goes into that fund?
17       A.  Not really, no.
18       Q.  How would I figure that out?
19       A.  Call me.
20       Q.  Is that an offer?  I mean, I feel
21   like it's been going quite well today, but --
22       A.  So the very back of our
23   schedules, beginning on 11076, which are the
24   last few documents in the book that's in
25   front of you, this details most of our

70 (Pages 274 - 277)

Page 278

1  special revenue funds.  Some grants are not
2  included here, so it's not exhaustive, but
3  all of these pages are special revenue funds.
4      Some of them are discussed in
5  the narrative.  We do try to highlight the
6  larger funds to give our reader a sense of
7  what is happening, but it would be nearly
8  impossible to reduce a book that is
9  reader-friendly that includes the level of
10  detail you are asking.
11      Q.  Is there a system that you keep
12  at the Office of Budget Management that would
13  have that level of detail?  So, for example,
14  if I wanted to pick one of the many special
15  revenue funds that you have listed here and
16  understand what the sources of revenue were
17  for that particular fund, I could do it?
18      MR. BADALA:  Objection to form.
19      THE WITNESS:  There is no system
20  that does that.  Our system could
21  produce a more detailed report that
22  identifies revenue by category so you
23  could at least see whether it was a fee,
24  a tax, some other source.
25      But really, for that, I would

Page 279

1  direct you to contact one of our
2  analysts who are experts in all the
3  funds, and it's just their job to
4  provide the information that the
5  community wants.
6  BY MR. BOEHM:
7      Q.  And where would I go to see
8  actual expenditures for each of these funds
9  instead of just a budgeted amount?
10      A.  For this particular report, the
11  only report that we prepare would be the
12  results of operation.
13      Q.  And that only goes back to 2015?
14      A.  That's correct.
15      Q.  So if I wanted to have something
16  from before 2015, would I use BRASS?
17      A.  You could -- I could use BRASS or
18  I could use FAMIS.
19      Q.  Either one?
20      A.  That's correct.
21      Q.  Now, you mentioned the
22  Medical Examiner, Regional Crime Lab special
23  revenue fund that gets almost all of its
24  money from the subsidy out of the
25  General Fund --

Page 280

1      A.  That's correct.
2      Q.  -- that you understand to be at
3  least partly tied into opiate-related
4  expenditures.
5      Are there other specific special
6  revenue funds that you as the director of
7  the Office of Budget Management understand
8  to involve expenditures that are specific to
9  opiate use or abuse?
10      So I'm looking now at the pages
11  you directed me to.  11076 is the first.
12      MR. BADALA:  Objection to form.
13      THE WITNESS:  So the answer is
14  yes.  The General Fund has a number of
15  expenses incurred that are specific to
16  opiates.
17  BY MR. BOEHM:
18      Q.  I'm directing you now to the
19  special revenue funds.
20      A.  Oh, I'm sorry.
21      Q.  You mentioned the one example is
22  the Regional Crime Laboratory for the
23  Medical Examiner.
24      A.  That's correct.
25      The TASC Medicaid fund.  TASC

Page 281

1  stands for treatment alternative to street
2  crimes.  That's an assessment program for
3  people who are coming into the Court of
4  Common Pleas who have addictions needs.
5  Some of them -- not all, but some of them,
6  of course, will be opiate-addicted.
7      Q.  I'm just going to ask you to
8  pause for each one you identify for me.
9      A.  Okay.
10      Q.  So let's start with that one.
11      A.  Okay.
12      Q.  You're referring to the TASC
13  Medicaid funds?
14      A.  That's correct.
15      Q.  That is coded as 20A099?
16      A.  That's correct.
17      Q.  And you mentioned that that has
18  to do with treatment of incoming jail
19  inmates?  Did I understand that right?
20      A.  Most of them are in jail.
21  They're not all in jail.  But this is people
22  who have cases in the Court of Common Pleas.
23      Q.  So what is this fund used for?
24      A.  This fund is used for assessment
25  and treatment services.

71 (Pages 278 - 281)

Page 282

1      Q.  Does that involve addiction to
2   any kind of substance?
3      A.  It does.
4      Q.  So it could be alcoholism?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  It could be.
7   BY MR. BOEHM:
8      Q.  It could be cocaine?
9      A.  It could be.
10      Q.  It could be marijuana?
11      A.  I don't know if they let people
12   in with marijuana, but I'm not going to say
13   yes or no.
14      Q.  Okay.
15          Do you know how much of funds
16   expended out of the TASC Medicaid special
17   revenue fund is directed specifically to
18   opiates?
19      A.  I don't.  That would be a
20   question for the Court of Common Pleas.
21      Q.  And you've never undertaken to
22   try to understand that?
23      A.  I have not.
24      Q.  Is there any coding that's done
25   in terms of the intake process designed to

Page 283

1   determine whether or not whatever case you're
2   looking at is related to one substance or
3   another?
4      A.  I'm sure there is for them, but
5   we don't code it as such in our financial
6   system.
7      Q.  And do you do anything at the
8   Office of Budget Management to try and track
9   data coming from the TASC Medicaid fund?
10      A.  No.
11      Q.  What is the source of revenue for
12   the TASC Medicaid special revenue fund?
13      A.  For this fund in particular,
14   these are Medicaid reimbursements for
15   expenses that were incurred by the HHS
16   levy fund.
17      Q.  And Medicaid is funded by the
18   federal government, right?
19      A.  That's correct.
20      Q.  So as I understand it, then, this
21   is one of those occasions where
22   Cuyahoga County government will use money out
23   of the HHS levy fund, and then those
24   expenditures are reimbursed by the federal
25   government?

Page 284

1          MR. BADALA:  Objection to form.
2          THE WITNESS:  That's correct.
3      There's more than one fund for TASC.
4      This just happens to be the one that
5      captures Medicaid.
6   BY MR. BOEHM:
7      Q.  Okay.  Thank you.  Let's go on.
8          I was asking you to identify
9   special revenue funds that you understand to
10   have involved specific expenditures related
11   to opiate abuse.
12      A.  Okay.  The community-based
13   correctional facility, which is the next one
14   down, this is a state-funded, county-owned,
15   community-based correctional facility.  They
16   do have individuals who have been previously
17   addicted.  I have no data on the type of
18   addiction, but I would speculate that at
19   least some of their residents were
20   opiate-addicted.
21      Q.  So you say state-funded,
22   county-owned?
23      A.  That's correct.
24      Q.  What do you mean by that?
25      A.  So the state gives the county

Page 285

1   money to operate this facility.
2      Q.  Does the county send any of its
3   own funds to operate this facility or does it
4   all come from the state?
5          MR. BADALA:  Objection to form.
6          THE WITNESS:  This all comes from
7      the state.
8   BY MR. BOEHM:
9      Q.  And then you indicated that --
10          MR. BADALA:  Hold on.  Were you
11      done?
12          THE WITNESS:  I'm sorry.  It's
13      fine.  Go ahead.
14   BY MR. BOEHM:
15      Q.  You indicated that this
16   corrections facility has people who at least
17   at some point were addicted to substances?
18      A.  That's correct.
19      Q.  But you don't know which?
20      A.  No.
21      Q.  So you wouldn't be able to say
22   what expenditures, if any, out of this
23   special revenue fund went to opiates?
24      A.  No.
25      Q.  Okay.  Go ahead.  What's next on

72 (Pages 282 - 285)

Page 286

1  the list?
2      A.  The next one is Treatment
3  Alternatives to Street Crime.  So this is
4  another fund that's for the TASC program.
5  These are levy dollars.
6      Q.  When you say "levy dollars," you
7  mean HHS levy dollars?
8      A.  Yes.
9      Q.  And how does this, if at all,
10  relate to opiate use and abuse?
11      MR. BADALA:  Objection to form.
12      THE WITNESS:  These individuals,
13  like I mentioned, are presenting to the
14  Court of Common Pleas with drug-related
15  cases.
16  BY MR. BOEHM:
17      Q.  Okay.
18      A.  Some of them are opiate.  I can't
19  say how many.
20      Q.  So you don't know what
21  expenditures, if any, out of this particular
22  special revenue fund are specifically related
23  to opiate issues?
24      A.  I know that some of these
25  expenditures are specific to opiate issues,

Page 287

1  but I cannot say how much.
2      Q.  Who would we ask to try and
3  figure out -- is there even a way to try and
4  figure out what specific expenditures out of
5  this special revenue fund are directed to
6  opiate abuse?
7      MR. BADALA:  Objection to form.
8      THE WITNESS:  There's always a
9  way.  So you have to get the data from
10  TASC.
11  BY MR. BOEHM:
12      Q.  From TASC.
13      A.  Uh-huh.
14      Q.  And who --
15      A.  Treatment Alternatives to Street
16  Crime.
17      Q.  Is that a Cuyahoga County
18  government department?
19      A.  Court of Common Pleas.
20      Q.  It's under the Court of Common
21  Pleas?
22      A.  It's a program in the Court of
23  Common Pleas.
24      Q.  Is this related to the Drug
25  Court?

Page 288

1      A.  Yes.  Not all of these
2  individuals are participating in the Drug
3  Court, because there's a strict criteria,
4  but, yes, some of them are.
5      Q.  Does all of the money in the
6  special revenue fund for Treatment
7  Alternatives to Street Crime come from the
8  HHS levy, or are there other sources of
9  revenue for this special revenue fund?
10      A.  For this fund, this is all levy
11  dollars.
12      Q.  And do you know if the data
13  that's collected in connection with this
14  program codes instances or cases to try and
15  identify any particular substance that might
16  be involved for a particular individual?
17      MR. BADALA:  Objection to form.
18      THE WITNESS:  I don't know that.
19  That's a question for the Court.
20  BY MR. BOEHM:
21      Q.  We would have to ask somebody
22  from the Court of Common Pleas?
23      A.  Uh-huh.
24      Q.  Do you know who heads TASC?
25      A.  I believe it's Maria Nemec.

Page 289

1      Q.  Can you spell Nemec?
2      A.  N-e-m-e-c.
3      Q.  All right.  Let's keep going.
4      A.  Okay.
5      The Children Services Fund,
6  20A303.  That fund is one of three operating
7  funds that captures the activity of the
8  Department of Children and Family Services.
9      The expenses in this fund are
10  largely residential board and care, which is
11  the cost of placing children in residential
12  treatment facilities because they're not
13  appropriate to be in their own homes or in
14  foster homes, and then also the cost
15  associated with adoption services and some
16  foster care services.
17      Children and Family Services has
18  seen an exponential increase in the number
19  of children that are in out-of-home
20  placement that is directly attributed to
21  opiates.
22      Q.  Are you able to -- have you ever
23  performed a computation or calculation to
24  determine exactly what expenditures in the
25  division of Children and Family Services are

73 (Pages 286 - 289)

Page 290

1  related to opiates?
2      MR. BADALA:  Objection to form.
3      THE WITNESS:  No.  I am trying to
4  keep my head above water with the crisis
5  that we're dealing with, with the
6  budget.
7      This has affected all of our
8  agencies.  So as I said, as much as I
9  love digging into data, the last three
10  years I have just been finding out who
11  I can raid in order to fund increases.
12 BY MR. BOEHM:
13      Q.  How would you go about, as a
14  process matter, trying to determine which
15  expenditures in the Department of
16  Children and Family Services are specifically
17  tied to the opiate crisis?
18      MR. BADALA:  Objection to form.
19      THE WITNESS:  I would rely on an
20  expert for that.  That's not my area of
21  expertise.
22 BY MR. BOEHM:
23      Q.  That sounds like something Sal
24  would say if we asked him.
25      MR. BADALA:  Let's just keep the

Page 291

1  comments out.  Come on.  Let's go.
2  BY MR. BOEHM:
3      Q.  You would rely on an expert?
4  What do you mean by that?
5      A.  I mean there's somebody probably
6  better than me who can perform that
7  computation.  My business is creating
8  budgets, monitoring budgets, reporting to
9  elected officials, and finding out how to
10  fund our mandates.
11      Q.  But I'm not asking you that.  I
12  get it.  You have a lot to do.  And I know
13  you haven't done it.  But my question is, if
14  you wanted to, if somebody asked you to,
15  could you, using the information you have
16  available to you as the director of the
17  Office of Budget Management, perform a
18  computation or a calculation to determine
19  what specific expenditures within the
20  Department of Children and Family Services
21  are actually tied to opiate abuse.
22      MR. BADALA:  Objection to form.
23      Asked and answered.
24  BY MR. BOEHM:
25      Q.  Go ahead.

Page 292

1      A.  I wouldn't do it.  I would get an
2  expert to do it.
3      Q.  Could you do it?
4      MR. BADALA:  Objection to form.
5      Asked and answered.
6      THE WITNESS:  I wouldn't even
7  try.
8  BY MR. BOEHM:
9      Q.  That's not my question.  I'm not
10  asking whether you're willing to, whether you
11  want to, whether you have time to do it,
12  whether you're inclined.  That's not my
13  question.
14      A.  I don't know if I could because I
15  wouldn't even try.
16      Q.  Based on the information you have
17  available to you as the director of the
18  Office of Budget Management, could you, using
19  that information, perform a calculation to
20  determine what expenditures from the
21  Department of Children and Family Services
22  are actually tied to opiate abuse or misuse?
23      MR. BADALA:  Objection, form.
24      Asked and answered, the sixth time
25  asking the same question.

Page 293

1      THE WITNESS:  I don't know if I
2  could.
3  BY MR. BOEHM:
4      Q.  And nobody has asked you to do
5  that?
6      A.  No.  I have been asked to find
7  funds to address the crisis that permeates
8  every agency and department.  That's all I've
9  had time to do for the last several years.
10      Q.  So you don't know which
11  expenditures out of the Children Services
12  Fund, which is a special revenue fund,
13  directly go to addressing issues tied to
14  opiates, right?
15      MR. BADALA:  Objection to form.
16      THE WITNESS:  No.
17  BY MR. BOEHM:
18      Q.  So when you say "no" --
19      A.  I'm sorry.  That's correct.  I
20  don't know which dollars are specifically
21  related to opiates.
22      Q.  And is the same thing true with
23  respect to the other two operating funds for
24  the division of Children and Family Services?
25      MR. BADALA:  Objection to form.

74 (Pages 290 - 293)

Page 294

1  THE WITNESS:  What do you mean by
2  "is the same thing true"?
3  BY MR. BOEHM:
4  Q.  Well, you said this is one of
5  three operating funds for DCFS, right?
6  A.  That's correct.
7  Q.  And then you said, with respect
8  to this fund, "I don't know which
9  expenditures are tied to opiates or not,"
10  right?
11  A.  That's correct.
12  MR. BADALA:  Objection to form.
13  BY MR. BOEHM:
14  Q.  And then now I'm asking you that
15  same question with respect to the other two
16  funds that go to the operating of the DCFS.
17  MR. BADALA:  Objection to form.
18  BY MR. BOEHM:
19  Q.  Is it also true that you don't
20  know which expenditures out of those other
21  funds for DCFS are tied to opiates?
22  MR. BADALA:  Objection to form.
23  THE WITNESS:  I have not done
24  that computation, no.
25

Page 295

1  BY MR. BOEHM:
2  Q.  Could you do that computation if
3  you wanted to?
4  MR. BADALA:  Objection to form.
5  THE WITNESS:  I believe I've
6  answered that.  I don't know if I could.
7  BY MR. BOEHM:
8  Q.  All right.  Let's keep going down
9  the list.
10  A.  The Coroner's Lab Fund, 28312.
11  This is separate from the Regional Crime Lab
12  Fund.
13  So they actually have two funds
14  called "the lab fund."  This, again, would
15  have some expenses related to opiates.  This
16  fund generates revenue.
17  Our county performs autopsies
18  for adjacent and smaller counties that don't
19  have the resources that we have available to
20  us.  And the majority of the revenue in this
21  fund comes from those fees.
22  Q.  Fees from other counties?
23  A.  That's correct.
24  Q.  What other special revenue
25  sources does this special revenue fund have?

Page 296

1  A.  If there are others -- I would
2  have to look them up, but they're -- most of
3  it is from the autopsy fees.
4  Q.  It sounds like you're saying the
5  overwhelming majority is from autopsy fees
6  from other counties?
7  A.  That's correct.
8  This fund -- the expenditures in
9  this fund are largely staff.  So I believe
10  we charge a portion -- at least a portion of
11  a couple of pathologists, as well as
12  some support staff in the Medical Examiner's
13  office, the scientists -- I don't know their
14  exact titles -- and then some equipment
15  costs and office expenditure costs.
16  So, again, because the
17  Medical Examiner's office, a portion of
18  their workload is certainly attributed to
19  the opiates, prescription opiates, a portion
20  of these expenses would be similarly
21  attributable.
22  Q.  But you don't know how much?
23  A.  That's correct.
24  The Probation Supervision Fee
25  Fund, which is a little bit down, 20A377,

Page 297

1  this is revenue that is charged by the
2  Common Pleas Court.  It is statutory.  They
3  access a fee for individuals who are placed
4  on probation.  It's a monthly fee.  If
5  they're indigent, they don't have to pay,
6  but they try to get whatever money they can.
7  And then those funds are then
8  used for services for the individuals on
9  probation.  Some of these individuals would
10  have been opiate-addicted.  And included in
11  the expenditures are some treatment
12  services.
13  Q.  Okay.
14  Do you know how much of the
15  expenditures go to addiction treatment
16  services?
17  A.  I do not off the top of my head,
18  no.
19  Q.  So I take it, then, you wouldn't
20  also be able to tell us how much of whatever
21  that amount is to addiction services is
22  directed toward opiate?
23  MR. BADALA:  Objection to form.
24  THE WITNESS:  I'm still not able
25  to tell you that.

75 (Pages 294 - 297)

Page 298

BY MR. BOEHM:
1
2      Q.   Okay.
3      A.   Flipping to the next page, the
4  first fund, the Cuayahoga Support Enforcement
5  Agency, this is the fund that is associated
6  with what is now called the Office of Child
7  Support Services.
8           Child Support Services has been
9  affected by the opiate epidemic.  I would
10  leave it to Debra -- or Walter Parfejewiec,
11  who is now the director of HHS, of how
12  exactly that has affected that particular
13  agency.
14           But a portion of their total
15  budget comes from the HHS levy fund.  So
16  they're one of the subsidies.
17      Q.   How does that tie to opiates?
18      MR. BADALA:  Objection to form.
19      THE WITNESS:  These are -- I'm
20      sorry.  These families are affected by
21      the opiate epidemic.  There is a large
22      overlap between the families that are
23      engaged in the Office of Child Support
24      Services and the families that are
25      engaged in Children and Family Services.

Page 299

1  BY MR. BOEHM:
2      Q.   Just for the sake of time, why
3  don't we just do this.  Why don't you just --
4  because some of these I may be able to deal
5  with kind of more collectively --
6      A.   Okay.
7      Q.   -- if your answers are going to
8  be the same, which I suspect they might be,
9  given what you've said so far.
10           Just identify for me the ones
11  you want to underline for us as kind of
12  having to do with expenditures related to
13  opiates.
14           So just keep going down the
15  list.  We just won't pause as much on each
16  one.
17      A.   Okay.  Title IV-E, juvenile
18  court.
19      Q.   Now, is that special revenue fund
20  the only operating special revenue fund for
21  the juvenile court?
22      A.   No.  They have several.
23      Q.   What does this particular special
24  revenue fund do?
25      A.   It captures the reimbursements

Page 300

1  from the federal Title IV-E program, which is
2  Title IV-E of the Social Security Act.  This
3  reimburses for costs associated with
4  out-of-home care.
5      Q.   These are reimbursements from the
6  federal government?
7      A.   From the federal government
8  through the state government.  Costs are
9  incurred in another special revenue fund by
10  the HHS levy, but by Ohio Revised Code and an
11  agreement with the Court and ODJFS, which is
12  the Ohio Department of Job and Family
13  Services, the Court is entitled to all
14  revenue reimbursements.  So the HHS levy pays
15  for it and the Court gets the reimbursement.
16      Q.   Does the federal government
17  reimburse 100 percent?
18      A.   No, it does not.
19      Q.   What percentage does it
20  reimburse?
21      A.   That's a calculation that will
22  vary based on penetration rates, poverty
23  rates.  It's the demographics of the children
24  involved in these systems.  Generally
25  speaking, it's about 35 percent.

Page 301

1      Q.   Okay.  What else?
2      A.   Public defender -- skipping a
3  little bit down.  Public defender has two
4  special revenue funds and then they also have
5  a General Fund budget, so Public Defender
6  Cleveland Municipal, Public Defender HHS.
7      Q.   How are those two funds funded?
8      A.   The municipal is funded by a
9  contract with the city of Cleveland.  HHS is
10  from the Health and Human Services levies.
11      Q.   100 percent from HHS?
12      A.   That's correct.
13           Juvenile court detention and
14  probation services, 28A11, that fund largely
15  includes the cost of board and care for
16  juveniles who we can't send to the Ohio
17  Department of Youth Services, which is the
18  prison system for the juveniles, but, you
19  know, should not be, you know, unrestricted
20  in the community.  So we send them to
21  restricted placements.
22           That fund also captures the cost
23  of our guardian ad litems.  The guardian
24  ad litems are assigned to every child who is
25  in court for an abuse, dependency, or

76 (Pages 298 - 301)

Page 302

1    neglect case.  Those costs are all covered
2    by the levies.
3        Q.  The HHS levies?
4        A.  That's correct.  And they have
5    increased substantially over the last couple
6    of years.
7        Q.  Has Cuyahoga County directed more
8    of the HHS levy to the special revenue funds
9    in recent years?
10       A.  I would have to look at -- I
11   don't know if -- I'd have to see how much
12   they each got, but it could have been a
13   combination of more funds and also the Court
14   having to cut something else to accommodate
15   an increase elsewhere.
16       Just because an agency sees an
17   increase in cost X doesn't mean that we
18   respond with additional funding because we
19   have limited funds.  So it's always an
20   opportunity cost there that you pay for
21   this, so now we don't pay for this anymore.
22       Mental health services, HHS,
23   about two-thirds down, 20A30, that is
24   associated with the cost of providing mental
25   healthcare in the jail.

Page 303

1        That is solely HHS levy dollars.
2    And the majority of the inmates in our
3    facility that have mental illnesses are
4    dually diagnosed.
5        Q.  Double diagnosed with some
6    addiction?
7        A.  That's correct.
8        Q.  But you don't know how many are
9    diagnosed with opiate addiction?
10       A.  I do not know that, but I do know
11   that the number of opiate-addicted inmates
12   have been increasing over the last couple
13   years.
14       Q.  Do you know whether the level of
15   inmates who are addicted to other substances
16   has been increasing, decreasing, or staying
17   the same?
18       MR. BADALA:  Objection to form.
19       THE WITNESS:  My understanding is
20   that the number of inmates that are
21   opiate-addicted is increasing at a
22   greater rate.  Now, whether that means
23   the other ones are increasing just a
24   little or staying the same, I don't
25   know.

Page 304

1    BY MR. BOEHM:
2        Q.  Or maybe even going down?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  I don't know.
5    BY MR. BOEHM:
6        Q.  You don't know?
7        A.  I don't know.
8        The second from the bottom,
9    Children and Family Services --
10       Q.  I'm sorry.  Before we -- I guess
11   that Mental Health Services HHS is from the
12   HHS levy fund?
13       A.  Yes.  Sorry.  I thought I said
14   that.
15       Q.  100 percent?
16       A.  Yes.
17       Second from the bottom, Children
18   and Family Services, this is another one of
19   the special revenue funds that supports the
20   Department of Children and Family Services.
21   All of the department's personnel costs are
22   included in this fund.
23       Q.  Personnel costs?
24       A.  So all of our social workers.  It
25   includes some foster care expenses,

Page 305

1    supportive services.
2        So DCFS -- it's important to
3    note with this fund, when we receive an
4    allegation of abuse or neglect, there are
5    several options.  One is you go in, you take
6    the child.  One, you just say it's not
7    substantiated and you close the case.  And
8    then one is you provide services in the home
9    while the child stays in the home in an
10   attempt not to remove the child.
11       Moving a child from a home is
12   extremely traumatic.
13       Q.  How is this -- I'm sorry.
14       A.  I'm telling you this is relevant
15   because these costs have increased.  We've
16   had to increase staffing levels because the
17   number of families that we're dealing with
18   who have opiate addiction issues, they don't
19   warrant the level where we're actually taking
20   the children, but the number of families who
21   we're serving in the home has increased
22   substantially.
23       Q.  Has the division of Children and
24   Family Services increased its number of
25   social service workers?

77 (Pages 302 - 305)

Page 306

1      A.   They have increased, at least in
2   2018, overtime.  I don't know head count.  I
3   go by FTEs.  And I know that their overtime
4   is through the roof.  Every pay period in
5   2018, overtime hours are higher than the same
6   pay period last year.
7      Q.   Do you know how the expenditures
8   out of the Children and Family Services
9   special revenue fund, as reflected here,
10  compare to expenditures in past years?
11         MR. BADALA:  Objection to form.
12         THE WITNESS:  In 2018, the
13     expenses are much higher.  The
14     department has had to receive additional
15     funding this year.  They got several
16     infusions of additional funding in 2018.
17     I would have to look at a report to see
18     prior years.
19  BY MR. BOEHM:
20     Q.   Anything else?
21     A.   Oh, yes.  Flipping the page,
22  24A435, Tapestry System of Care, this is the
23  third fund that supports Children and Family
24  Services.  I can't say how much, but some of
25  these expenses would be opiate-related.

Page 307

1      Q.   Why do you say that?
2      A.   Because a great portion of
3   Children and Family Services' expenses in
4   general are opiate-related.  That's the
5   report coming back.
6      Q.   What specific expenditures out of
7   the revenue fund are you aware of having to
8   do with opiate abuse or misuse?
9      A.   I haven't answered that question
10  for any of the funds because I don't know the
11  exact dollar amount, but I can tell you that
12  something in this fund is attributed to the
13  opiate abuse.
14     Q.   What?  Even if you don't know of
15  particular line item expenditures, what are
16  the specific types of expenditures that you
17  know to be directly related to opiate use or
18  abuse out of this special revenue fund, if
19  any?
20         MR. BADALA:  Objection to form.
21         THE WITNESS:  These are expenses
22     that are paid -- supportive expenses,
23     what we call wraparound expenses, which
24     are meant to -- they're provided to the
25     children and families after the children

Page 308

1   have been sent back to their homes.
2   These services are meant to avoid
3   disruptions and a repeat of coming back
4   into the system.
5   BY MR. BOEHM:
6      Q.   What are the revenue sources for
7   this special revenue fund?
8      A.   The Health and Human Services
9   Levy Fund.
10     Q.   100 percent?
11     A.   100 percent.
12         The next fund down, 24A510, Job
13  and Family Services, this is our --
14  essentially the welfare department for
15  Cuyahoga County.  This is where we --
16  included in here would be the Medicaid
17  expenses, the costs associated with Medicaid
18  eligibility, and all of our entitlement
19  programs.
20         So this would include, as I
21  said, Medicaid, which is related -- people
22  that are on opiates are supported by
23  Medicaid.  Additionally, most -- not most,
24  but a lot of the children that have been
25  removed from their homes the last couple

Page 309

1   years have been placed with families.  It's
2   called a kinship placement.  It's better
3   outcomes for the child, and it's also less
4   expensive to the county because most of the
5   kinship placements are not paid.
6          You would be paid foster parent.
7   If you take your nephew, generally speaking,
8   you are not paid.  That is one way that we
9   have been able to contain costs in this
10  department in particular, despite the
11  skyrocketing of the number of kids in
12  placement.
13     Q.   Have you actually been able to
14  reduce costs?
15     A.   I don't believe that our costs
16  have been reduced.  But if we did not have
17  the ability to do the kinship placements, I
18  would be crying right now.  I mean, the
19  number of children in custody has increased
20  from 1,600 when I started; now we're at 2,550
21  this week.  And they're expensive.
22         I don't mean to sound cold about
23  that, but it's expensive to provide care out
24  of home.  And then these children,
25  unfortunately, tend to stay with us forever.

78 (Pages 306 - 309)

Page 310

```
1       Q.   What are the sources of funds for
2    this special revenue fund?
3           MR. BADALA:  Are you done?
4           THE WITNESS:  Well, I just wanted
5       to point out that a lot of the children
6       who are placed in their kinship
7       placements, they get benefits through
8       Job and Family Services.  So they're not
9       getting direct stipends from families,
10      but they are entitled to different kinds
11      of welfare benefits.
12          This fund receives levy dollars
13      and it then it also receives federal
14      and state reimbursements.
15   BY MR. BOEHM:
16      Q.   What are the proportions of HHS
17   levy dollars versus state and federal
18   dollars?
19      A.   For 510, they receive about --
20   it's mostly federal and state.  So they
21   receive about 8 million a year from the HHS
22   levy fund, and their total revenue, at least
23   according to this, was budgeted at
24   73 million.
25      Q.   So --
```

Page 311

```
1       A.   So 8 of 73.
2       Q.   Comes from HHS, the rest comes
3    from state and federal?
4       A.   That's correct.
5       Q.   Okay.
6       A.   But I do want to point out that
7    the state and federal dollars that we get,
8    those are either entitlement programs or
9    formula driven.  And the county does have a
10   great deal of discretion in how those dollars
11   are allocated.  So if we spend them all here,
12   because these costs are going up, that means
13   we're not spending them in children and
14   family.  We're not spending them in child
15   support.
16          Let's see.
17          So the only other one that I
18   would point out that's not in the special
19   revenue funds on our list would be the
20   ADAMHS Board.  The ADAMHS board does receive
21   money from the county, $39 million a year,
22   but their total budget is not reflected in
23   our financials.
24      Q.   Okay.  That's a good transition.
25   Is that it?  Any others that you want to
```

Page 312

```
1    identify there in the special revenue funds?
2       A.   No others jump out at me.  I'm
3    not saying that it's not possible, but --
4    BY MR. BOEHM:
5       Q.   I want you to look and I want you
6    to tell me if your --
7       A.   I did look and those are the ones
8    that jump out at me.
9       Q.   If you need to look again, I'm
10   happy to wait for you to do that, because I
11   do believe I'm entitled to your testimony
12   about your understanding.  So if there are
13   others that you want to talk about, please
14   let us know now.
15      A.   There aren't.
16          MR. BADALA:  We've been going
17      about an hour and a half.  Maybe if
18      you're at a transition, we can take a
19      five-minute break?
20          MR. BOEHM:  Sure.
21          THE VIDEOGRAPHER:  Off the
22      record, 3:35.
23          (Recess taken, 3:35 p.m. to
24      3:48 p.m.)
25          THE VIDEOGRAPHER:  We're on the
```

Page 313

```
1    record, 3:48.
2    BY MR. BOEHM:
3       Q.   All right, Ms. Keenan.  We are
4    back after a short break.  And I'm going to
5    ask you to turn now to page 10960 of
6    Exhibit 3.
7           This is the part of the budget
8    plan, as I understand it, that describes the
9    departmental budgets and performances.
10          Do you see that?
11      A.   That's correct.
12      Q.   And this one has to do with
13   Health and Human Services.
14      A.   That's correct.
15      Q.   And if you turn to the next page,
16   the first category in the Health and Human
17   Services group is the ADAMHS Board.  That's
18   the Alcohol, Drug Addiction, and Mental
19   Health Services board.
20          Do you see that?
21      A.   Yes.
22      Q.   And I think you indicated that
23   there was a time when the ADAMHS Board was
24   actually two different boards, and then there
25   was a merger into a single entity which we
```

79 (Pages 310 - 313)

Page 314

1  now refer to as the ADAMHS Board, right?
2      A.  Yes.
3      Q.  When did that merger happen?
4      A.  Discussions began in 2008.  I
5  don't remember if it finished in '08 or 2009.
6      Q.  Do you recall why the two boards
7  merged?
8      A.  I would like to say it's because
9  that's what I wrote my master's thesis on and
10  I gave it to the county.
11      Q.  You wrote your master's thesis on
12  what?
13      A.  Merging the two boards.
14      Q.  What was your thesis?
15      A.  To merge the two boards.
16      Q.  Why?
17      A.  Overlap in -- I'm being a little
18  facetious, but overlap in service provision.
19  A lot of these patients are dually diagnosed.
20  It doesn't make sense to send them to two
21  separate, completely distinct entities for
22  treatment.  Treatment should be coordinated.
23      Part of the problem with the
24  system in general is that we are siloed in
25  how we treat a lot of these individuals, and

Page 315

1  they're starting out a little bit behind the
2  starting line from the beginning because
3  they are mentally ill.  They have drug
4  treatment problems.
5      Both of these boards are
6  expensive.  They had administrative costs
7  associated with both of them.  The thought
8  process was that there would be either a
9  reduction in expenses, or same expenses, but
10  a greater proportion spent on direct service
11  provision.
12      Q.  Based on your understanding as
13  the director of the Office of Budget
14  Management, has that turned out to be true?
15      MR. BADALA:  Objection to form.
16  BY MR. BOEHM:
17      Q.  Well, that's a good point.  You
18  said a lot, and then my question didn't
19  specify what part of it was true.
20      Based on your understanding as
21  the director of the Office of Budget
22  Management, do you believe it's true that
23  the merger has saved money for the county?
24      MR. BADALA:  Objection to form.
25      THE WITNESS:  I don't know that

Page 316

1  the merger has saved money for the
2  county.  The county's funding to the
3  system -- previously, the two systems --
4  is discretionary.  We're under no
5  obligation to provide funding to the
6  board, but of course we do because it's
7  seen as a moral mandate.  I don't have
8  ready access to the financials for the
9  ADAMHS Board.  They are not part of the
10  county's all-funds budget.
11  BY MR. BOEHM:
12      Q.  Why do they show up in the budget
13  at all?
14      A.  Because we provide them
15  $39 million a year.
16      Q.  How much of their total budget
17  does the $39 million out of the HHS levy fund
18  represent?  Do you know?
19      A.  Not off the top of my head.
20      Q.  Does Cuyahoga County have a rainy
21  day fund?
22      A.  We do not.
23      Q.  Has Cuyahoga County ever had a
24  rainy day fund?
25      MR. BADALA:  Objection to form.

Page 317

1      THE WITNESS:  Not at least going
2  back to 2006.
3  BY MR. BOEHM:
4      Q.  Does Cuyahoga County have any
5  process by which it reserves funds in case of
6  emergency or unexpected issues that it has to
7  spend money on?
8      MR. BADALA:  Objection to form.
9      THE WITNESS:  The county is bound
10  by two separate provisions in the county
11  code, which require, one, that we
12  maintain a 25 percent cash balance in
13  the General Fund for reserves, and a
14  10 percent cash balance in the Health
15  and Human Services Levy Fund.
16  BY MR. BOEHM:
17      Q.  What's the purpose of that
18  requirement?
19      A.  To protect the county against
20  catastrophic events.  We are not in the
21  position to close our doors.
22      Q.  Has the county ever had to dip
23  into those reserves since you've been
24  involved at the Office of Budget Management?
25      A.  Absolutely.

80 (Pages 314 - 317)

Page 318

1    Q.  When?
2    A.  The county spent down reserves in
3  2015, 2016 -- not spent down in full, but we
4  tapped reserves in 2015, 2016, 2017, 2018.
5    Q.  How much of those reserves did
6  the county tap in those years?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  In 2015, at least
9    35 million.  This year, it's about
10   30 million.  The other two years, I
11   can't remember off the top of my head.
12  BY MR. BOEHM:
13   Q.  In 2015, where did the
14  $35 million that you tapped into go?
15   A.  Capital projects.
16   Q.  Anything else?
17   A.  No.
18   Q.  And then you said in this year,
19  it's 30 million?  And where is the
20  $30 million that you tapped into the reserves
21  for this year go?
22   A.  It's -- that's General Fund
23  reserves that I'm talking about, the
24  30 million.  And that is going to every
25  county agency and department supported by the

Page 319

1  General Fund.  Revenue is coming in slightly
2  under budget, so you're always going to tap
3  reserves.  And our appropriation levels have
4  increased since the start of the year.  So
5  when you increase your appropriation, you're
6  going to have to tap into your reserves.
7        We also have some capital
8  projects that we're undertaking this year
9  that are being paid for by reserves.  On the
10  Health and Human Services levy side, we had
11  a reserve of $6 million set aside for the
12  Department of Health and Human Services.
13  The Department of Children and Family
14  Services has exhausted 6 million of the
15  $7 million reserve.
16   Q.  Do you know where that $6 million
17  went to, what specific expenditures it
18  covered?
19   A.  I do.  It covered personnel.  The
20  majority of it was in personnel.  We're
21  trying to hire additional social workers to
22  keep up with the increase in the number of
23  families that we're serving in their home and
24  children that we're serving outside of their
25  natural homes.

Page 320

1        And they have increased funding
2  in their contractual budget line to add a
3  new -- what we call a neighborhood
4  collaborative, which is funding to a
5  neighborhood center to support families in
6  the communities in which they reside.
7    Q.  Is any of that $6 million
8  directed specifically to issues related to
9  opiate abuse?
10        MR. BADALA:  Objection to form.
11        THE WITNESS:  Yes, it is.
12  BY MR. BOEHM:
13   Q.  How so and how much?
14   A.  The increase in the number of
15  children in out-of-home placement is driven
16  in part by the opiate epidemic.
17        As I said before, I cannot say a
18  specific dollar amount.
19   Q.  We're going to talk about that in
20  a minute and test that proposition that,
21  indeed, expenditures have risen.  But before
22  we do that, I just want to make sure I have
23  it clear.
24        Is your testimony here today
25  that Cuyahoga County has actually increased

Page 321

1  its expenditures for purposes of foster care
2  in the county due to the opiate epidemic?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  I believe I said
5    the exact opposite of that.
6  BY MR. BOEHM:
7    Q.  Okay.
8    A.  What I said was the increase of
9  children in out-of-home care has increased.
10  The number of families that we're serving has
11  increased.  But our expenses, with the
12  exception of 2018 where there was a $6
13  million subsidy increase, have remained
14  relatively flat because we're using kinship
15  placements.
16   Q.  Do you consider kinship
17  placements to be superior than other forms of
18  foster care?
19        MR. BADALA:  Objection to form.
20        THE WITNESS:  I'm not a social
21  worker.
22  BY MR. BOEHM:
23   Q.  So you don't have an opinion
24  about that?
25   A.  No.

81 (Pages 318 - 321)

Page 322

1         (Email chain, Bates
2         CUYAH_005324032 through
3         CUYAH_005324034, marked as
4         Deposition Exhibit 4.)
5    BY MR. BOEHM:
6         Q.  All right.  I want to direct your
7    attention to this document that's been marked
8    as Exhibit 4 for purposes of your deposition.
9    And this is an email chain.  So that means if
10   you want to start at the beginning, you have
11   to go to the back.
12        This email chain begins on
13   January 27th, 2010.  It's an email from you
14   to Joanna Henz.  And you ask whether she can
15   give you a paragraph on the MH liaison in
16   the municipal jails program.
17        Do you see that?
18        A.  Yes.
19        Q.  Who is Joanna Henz?
20        A.  My sister.
21        Q.  And does she work for Cuyahoga
22   County?
23        A.  At the time, she worked for the
24   ADAMHS Board.
25        Q.  What did she do for the ADAMHS

Page 323

1    Board?
2         A.  She was a quality improvement
3    specialist.
4         Q.  And you were asking her for a
5    paragraph on the MH liaison in the municipal
6    jails program.
7         Do you see that?
8         A.  I do.
9         Q.  What is the MH liaison in the
10   municipal jails program?
11        A.  MH would stand for mental health.
12   A liaison in the municipal jails program -- I
13   don't remember.  This was eight years ago.
14        Q.  Okay.
15        Does your sister Joanna continue
16   to work for the county?
17        A.  No, she does not.
18        Q.  Where is she now?
19        A.  She's on disability, recovering
20   from a double lung transplant.
21        Q.  I'm sorry to hear that.
22        She writes you back and provides
23   you with what she hopes will be an answer to
24   your request.  And then you write back --
25   this is all the same day -- to say, "This

Page 324

1    stops just short.  What are you going to
2    fund?  A body to sit in the jail and
3    identify referral sources?"  And then you go
4    on a little bit.
5         Do you see that?
6         A.  I do.
7         Q.  What did you mean by that?  What
8    are you saying to her in this email?
9         MR. BADALA:  Objection to form.
10        THE WITNESS:  Based on the
11   description that she provided me, I did
12   not know exactly how the $100,000 would
13   be spent.
14   BY MR. BOEHM:
15        Q.  You were seeking clarification
16   about that, right?
17        A.  That's correct.
18        Q.  But it seemed to you, based on
19   your follow-up email, that it was for a body
20   to sit in the jail to identify referral
21   sources, or at least you were asking if
22   that's what this was, right?
23        MR. BADALA:  Objection to form.
24        THE WITNESS:  I was asking if
25   that's what it was.

Page 325

1    BY MR. BOEHM:
2         Q.  And she says:
3         "No.  It's to provide money to an
4    agency that will actually do
5    assessment and either take the client
6    themselves or refer them to another
7    agency, and the money is to pay for
8    the staff."
9         Do you see that?
10        A.  Yes.
11        Q.  And you write:
12        "Sounds fake.  So basically it's
13   a back-door way to give an agency
14   more money."
15        Do you see that?
16        A.  Yes.
17        Q.  What did you mean when you said
18   that sounded fake?
19        MR. BADALA:  Objection to form.
20        THE WITNESS:  I would ask you to
21   remember that I'm emailing my sister.
22   So our emails are not going to stay as
23   professional as they would if I were
24   emailing somebody who wasn't related to
25   me.

82 (Pages 322 - 325)

Page 326

1    BY MR. BOEHM:
2        Q.  You're a little more blunt?
3        A.  Pardon me?
4        Q.  You're a little more blunt than
5    you might otherwise be?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  No.  Actually, I
8    don't think they're more blunt than I
9    would otherwise be.  I don't have a
10   problem being blunt.  But sometimes I'm
11   joking.  So when I say "Sounds fake,"
12   I'm joking.
13   BY MR. BOEHM:
14       Q.  Oh, you were joking here?
15       A.  I was joking there, but --
16       Q.  Then you say:
17           "It's basically a back-door way
18       to give an agency more money?"
19           Were you joking there too?
20       MR. BADALA:  Objection to form.
21       THE WITNESS:  I would have to
22   read the whole thing if you want me to
23   answer that.
24   BY MR. BOEHM:
25       Q.  Sure.  Sure.

Page 327

1        MR. PERGAMENT:  Paul, would you
2    mind reading the Bates Number in while
3    she's reading?
4        MR. BOEHM:  Yes.  Of course.
5    It's a Cuyahoga production, 5324032.
6        THE WITNESS:  So my concern
7    was -- or my question, perhaps a better
8    word, is it sounds like this was a
9    referral service.  And I'm wondering why
10   the staff in the jails couldn't provide
11   the inmates with a list of the agencies
12   that provide these services as opposed
13   to paying one of their staff members to
14   sit in the jail and say, "Come to us
15   when you get out."
16   BY MR. BOEHM:
17       Q.  Right.  You were questioning
18   whether or not this request for additional
19   funding was justifiable.  Is that fair?
20       MR. BADALA:  Objection to form.
21       THE WITNESS:  I question
22   everything.
23   BY MR. BOEHM:
24       Q.  And so when you said it sounds
25   fake, did you mean that or were you just

Page 328

1    joking?
2        MR. BADALA:  Objection to form.
3        THE WITNESS:  That specific is a
4    joke.
5    BY MR. BOEHM:
6        Q.  Okay.
7        She writes -- she didn't seem to
8    think you were joking, because she actually
9    writes back and says, "It's not fake."
10       MR. BADALA:  Objection to form.
11       THE WITNESS:  I disagree with
12   that statement.  My sister knows what I
13   meant.
14   BY MR. BOEHM:
15       Q.  Okay.
16       She responds and explains to you
17   a little bit more about what she's
18   suggesting, right?
19       A.  That's correct.
20       Q.  And then you say, "What's to stop
21   Marty Lentz from calling Mobile Crisis on a
22   person?  That's still getting the assessment.
23   You can bring a horse to water, my friend.
24   I'm into it, but not when we're cutting other
25   things to get to it.  We're cutting treatment

Page 329

1    to fund referrals.  That's so messed up."
2        Did I read that correctly?
3        A.  Yes.
4        Q.  So when you say, "You can bring a
5    horse to water, my friend," what did you mean
6    by that?
7        A.  Referrals don't necessarily
8    provide treatment.  The mental health and the
9    AOD population need treatment.  Based on my
10   opinion of what I know of the system, we have
11   enough opportunities for referrals out there.
12   We don't have enough treatment beds.
13       I can call anyone in the county
14   and get a referral to a dozen places that
15   provide treatment for my prescription opiate
16   addiction.  When I call those places, I'm
17   going to get put on a wait list.
18       Personal opinion, I want to see
19   more money going to treatment.
20       Q.  This goes back to a question that
21   I asked you, I think, earlier in the day,
22   which was to what extent do your own personal
23   policy preferences inform your official
24   activities in the Office of Budget
25   Management.

83 (Pages 326 - 329)

Page 330

1    A.  Uh-huh.
2        Q.  Is this one of those instances
3   where your own personal views impact the way
4   you perceive, interpret, and relate to
5   requests?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  It absolutely is
8        not.  Because what you don't see in this
9        email chain is what my recommendation
10       was on this particular project.
11           I can complain about a project
12       all I want, particularly to my sister,
13       but it doesn't mean that I am going to
14       not recommend it based on my own
15       opinion.  I also recognize I'm not the
16       expert when it comes to addiction
17       services.
18   BY MR. BOEHM:
19       Q.  Is your sister an expert in
20   addiction services?
21       MR. BADALA:  Objection to form.
22       THE WITNESS:  I would not qualify
23       her as an expert, no.
24   BY MR. BOEHM:
25       Q.  Does she have a public health

Page 331

1   background?
2        A.  She has a master's in psychology.
3        Q.  She writes back to you and says,
4   "We're not cutting treatment.  We're
5   increasing access to it."
6           Do you see that?
7        A.  I do.
8        Q.  So this is just a continuation of
9   your conversation.
10          And in response to you having
11  said that this sounds fake, she writes at
12  the end:  "That's like telling me" -- I
13  think she meant to say, "That's like me --
14      Let me start this over.
15          There's a little typo in what
16  she says, but I think it says:
17      "That's like me telling you your
18      budget is fake.  There is a use for
19      it, for real."
20          Do you see that?
21       A.  I do.
22       Q.  And then you write back:  "The
23  budget IS fake."  And "is" is in all caps.
24          Do you see that?
25       A.  I do.

Page 332

1        Q.  What were you trying to convey
2   with that?
3        A.  That's a joke.
4        Q.  That's a joke?  What's the funny
5   part of that joke?
6        MR. BADALA:  Objection to form.
7        THE WITNESS:  My sister thought
8        it was funny.  Ask her.
9        MR. BOEHM:  Okay.  We're going to
10       go to Exhibit 5.
11          (Email chain, Bates
12          CUYAH_001764533 through
13          CUYAH_001764535, marked as
14          Deposition Exhibit 5.)
15       MR. BOEHM:  And here's a copy for
16       you, Ms. Keenan.  And here's a copy for
17       you, Mr. Badala, and Joe and Scott.
18   BY MR. BOEHM:
19       Q.  Here's another email exchange.
20   And this one has to do with the ADAMHS Board,
21   which is what we were just talking about in
22   the budget.
23          There's an email, if you look at
24   the bottom of the page there, from
25   September 5th, 2017, from Mr. Gregory Beyer.

Page 333

1           Do you see that?
2        A.  Yes.
3        Q.  And it's to Frank Brickner, who
4   appears, based on the email address, to work
5   for the ADAMHS board, right?
6        A.  That's correct.
7        Q.  Who is Greg Beyer?
8        A.  He's an analyst at OBM.
9        Q.  He works under you?
10       A.  He works under a supervisor who
11  works under me.
12       Q.  And he writes to Frank,
13  Mr. Brickner, that it's his understanding
14  that the ADAMHS Board will be receiving
15  $39,363,659 in 2018 and 2019.
16          See that?
17       A.  I do.
18       Q.  It looks like their budget got
19  cut by $2 if you look in the budget plan.
20  But that's basically the number that they
21  ended up getting in the budget, right?  Yes?
22       A.  I believe so.
23       Q.  And Greg asks Frank whether the
24  number is going to be sufficient for 2018 and
25  2019 or if the ADAMHS Board is going to ask

Page 334

1    for an increase, right?
2           MR. BADALA:  Objection to form.
3           THE WITNESS:  That's correct.
4    BY MR. BOEHM:
5        Q.  And Mr. Brickner writes back,
6    saying that they're "still determining their
7    budget need.  Part of the ADAMHS Board
8    challenge this past two years is that our
9    expenses have exceeded revenues due to the
10   opiate epidemic."
11          Did I read that correctly?
12       A.  Yes.
13       Q.  "We have depleted our reserves."
14          Do you see that?
15       A.  Yes.
16       Q.  Do you know what reserves
17   Mr. Brickner is referring to?
18       A.  I don't.  ADAMHS doesn't fall
19   under us.  So I don't have access to their
20   financial data.
21       Q.  Do you know the specific nature
22   in which ADAMHS expenses had exceeded
23   revenues due to the opiate epidemic?
24          MR. BADALA:  Objection to form.
25          THE WITNESS:  The ADAMHS Board

Page 336

1        Q.  I'm sorry.  Where does it say
2    that in the email?
3        A.  "Expenses exceeding revenue"
4    means you're operating at a deficit.
5        Q.  Do you know if that -- but they
6    had some reserves, right?
7        A.  Based on the fact that they're
8    saying they depleted their reserves, I will
9    assume that they had reserves to begin with.
10       Q.  But do you know if they used up
11   all their reserves?
12       A.  I can only go by the email from
13   their financial manager, which says they
14   depleted their reserves.  And "depleted" I
15   take to mean they used them all.
16       Q.  But it could mean that it was
17   just lesser, right?
18          MR. BADALA:  Objection to form.
19   BY MR. BOEHM:
20       Q.  Why is it that you are -- I mean,
21   did you talk to Mr. Brickner about this?
22          MR. BADALA:  Objection to form.
23          THE WITNESS:  Generally
24   "depleted" means gone.
25

Page 335

1    had increased funding.  I don't know for
2    how many years, but they were
3    essentially deficit spending to try to
4    respond to the demand, the need, for
5    treatment services for individuals that
6    were addicted to prescription opiates,
7    Fentanyl, carfentanil, and heroin.
8           And in trying to respond to
9    that, there was an outlay of funding,
10   but the revenue never caught up.  So
11   based on the email, it sounds like they
12   spent all of their reserves, which
13   means they would have to make a
14   decision in the future years of -- get
15   money from somewhere else, wherever
16   they can get it, or cut their expenses.
17   BY MR. BOEHM:
18       Q.  And you indicated that the ADAMHS
19   Board had been operating, I think you said,
20   in deficit spending.
21       A.  Yes.
22       Q.  Did you mean that literally?  Do
23   you know that the ADAMHS board was operating
24   at a loss over a period of time?
25       A.  That's what the email says.

Page 337

1    BY MR. BOEHM:
2        Q.  Okay.  I don't think so, but if
3    that's your sworn testimony today.
4           Let me just put it to you this
5    way:  Do you know that they actually used up
6    all their reserves or do you not know?
7        A.  I said I am basing this on the
8    email.  I do not track ADAMHS's financial
9    activity.
10       Q.  So you don't know how many
11   reserves they had and how much of those
12   reserves they used; fair?
13          MR. BADALA:  Objection to form.
14          THE WITNESS:  That's correct.
15   BY MR. BOEHM:
16       Q.  And you don't know if they used
17   them all up or not?
18       A.  That's correct.
19       Q.  And then you jump in here at the
20   top of this email exchange and say, "If they
21   want to request more money, they need to do
22   that ASAP."
23          And I think you testified
24   earlier that the ADAMHS Board did, in fact,
25   come and request more money, right?

85 (Pages 334 - 337)

Page 338

1     A.  Yes.
2     Q.  And you even said, "If they want
3   to go straight to council, they have time."
4        Did you mean the county council?
5     A.  Yes.
6     Q.  And that means don't stop here at
7   OBM; you can go right to the council to ask?
8     A.  No.  They always have to stop at
9   OBM.  What that means is they don't have to
10  stop with the county executive.  Nothing gets
11  into a budget that doesn't go through my
12  office.
13    Q.  So what did you mean when you
14  said, "If they want to go straight to
15  council, they have time"?
16    A.  Agencies and departments can
17  request funding in one of two ways.  They can
18  request it from the county executive, who
19  will then say "yes" or "no."  If he says yes,
20  it's included in the executive's recommended
21  budget to council.  Or the agency can go
22  directly to council.
23    Q.  Okay.
24       And here you were saying, "If
25  they want to go right to the council, they

Page 339

1   can do that"?
2     A.  As an independent board, they
3   have the opportunity to do that.
4     Q.  Can other divisions, departments,
5   and programs that are not independent from
6   Cuyahoga County government skip that step and
7   go right to the county council?
8     A.  Agencies and departments,
9   there's -- there is no Cuyahoga County
10  government.  We have the Cuyahoga County
11  executive, Cuayahoga County Council,
12  separately elected judges.  The agencies that
13  are under the authority of the executive do
14  not have the authority to go to council
15  without going through their elected official.
16    Q.  Were you surprised that the
17  county executive did not choose to increase
18  funding in the recommended budget to ADAMHS
19  board?
20       MR. BADALA:  Objection to form.
21       THE WITNESS:  I was not
22  surprised.  This county has been
23  operating at a deficit in the levy
24  funds.  We don't have the money to
25  support what needs to be supported.

Page 340

1   So, no, I was not surprised.  We
2   were cutting budgets to balance that.
3   BY MR. BOEHM:
4     Q.  Were you surprised that the
5   ADAMHS Board's request for additional funding
6   was not honored?
7       MR. BADALA:  Objection to form.
8       THE WITNESS:  Is that not what
9   you just asked me?
10  BY MR. BOEHM:
11    Q.  No.  I think that is different,
12  if I understand the process correctly.  What
13  I first asked you was about the county
14  executive and the recommended budget, right?
15    A.  Okay.
16    Q.  And you know that's separate from
17  the actual final approved budget that gets
18  passed through a County Council resolution?
19    A.  That's correct.  I was not
20  surprised that the council did not honor
21  their request.
22    Q.  Notwithstanding the work that the
23  ADAMHS Board was doing with respect to
24  opiates?
25       MR. BADALA:  Objection to form.

Page 341

1       THE WITNESS:  Absolutely.  The
2   decision not to fund is very rarely
3   based on the merits of the program, or
4   to that matter, the necessity of the
5   program.  Armond Budish acknowledges the
6   opiate epidemic probably three to four
7   times a week.
8       If we had money, we would be
9   funding ADAMHS.  But we don't have
10  money.  And going back to my earlier
11  statements about mandates, regardless
12  of what we want to do policywise, we
13  have to fund our mandates first.
14      (Email, Bates CUYAH_001763476
15      through CUYAH_001763483, marked
16      as Deposition Exhibit 6.)
17      MR. BOEHM:  I think we're at
18  Exhibit Number 6, which I'm going to
19  hand to you now.
20      And for those of you on the
21  phone, this document has Exhibit
22  Number -- it's the CUAYAHOGA and then
23  1763476, and it has an attachment,
24  -477.
25      I'm sorry.  Actually, I don't

86 (Pages 338 - 341)

Page 342

1  know if there's a stapler in here.
2      Let's go off the record for a
3  second.  I need to just reorder this.
4  It's messed up.
5      THE VIDEOGRAPHER:  Off the
6  record, 4:17.
7      (Recess taken, 4:17 p.m. to
8      4:25 p.m.)
9      THE VIDEOGRAPHER:  We're on the
10  record, 4:25.
11  BY MR. BOEHM:
12      Q.  Welcome back, Ms. Keenan, from
13  our short break.  You have now in front of
14  you the document marked Exhibit 6.  For
15  purposes of this deposition, for those of you
16  on the phone, it's CUYAHOGA production
17  1763476 through 482.
18      And the first page of this
19  exhibit is an email from May 25, 2018, from
20  Wendy Feinn to you.  The subject is "Emails
21  regarding opiates."
22      Do you see that?
23      A.  I don't know if it matters, but I
24  go to 483.
25      Q.  You're right.  I'm sorry.  It

Page 343

1  goes to 483.  My apologies.  Thank you for
2  the clarification.
3      A.  Okay.
4      Q.  Am I right otherwise in my
5  description?
6      A.  I'm sorry.  Can you repeat the
7  question again?
8      Q.  I'm just noting that the first
9  page is an email from Wendy Feinn to you,
10  from May 25th, 2018, subject line, "Emails
11  Re: opiates."
12      A.  That is correct.
13      Q.  And she says:
14      "Here are the emails that I have
15  regarding opiates."
16      Do you see that?
17      A.  I do.
18      Q.  What is the purpose of this email
19  from Wendy to you?
20      MR. BADALA:  Objection to form.
21  And to the extent this was done at the
22  advice of counsel, I would just tell you
23  not to disclose that communication.
24      THE WITNESS:  I'm sorry.  I'm
25  answering, correct?

Page 344

1  BY MR. BOEHM:
2      Q.  You're answering.
3      MR. BADALA:  I said unless there
4  was a communication between counsel,
5  yes.
6      THE WITNESS:  I had asked Wendy
7  to look through her emails for documents
8  related to opiates.
9  BY MR. BOEHM:
10      Q.  And why had you asked Wendy to
11  review her emails for documents -- for emails
12  related to opiates?
13      MR. BADALA:  And, again,
14  objection.  To the extent this was a
15  communication with an attorney -- due to
16  a conversation with an attorney, I would
17  urge you not to disclose that
18  conversation.
19      THE WITNESS:  I can't answer that
20  question.
21  BY MR. BOEHM:
22      Q.  You can't answer my question?
23      MR. BADALA:  Based on the
24  objection?
25      THE WITNESS:  Yes.

Page 345

1      MR. BOEHM:  Well, are you
2  instructing her not to answer that
3  question, Sal?
4      MR. BADALA:  I'm instructing her
5  not to disclose the communication if it
6  was with an attorney.  If you want to
7  ask your question again -- I forgot what
8  your question was.
9  BY MR. BOEHM:
10      Q.  Well, my question was, why had
11  you -- I'll ask it again.
12      Ms. Keenan, why did you ask
13  Wendy Feinn to collect emails regarding
14  opiates?
15      MR. BADALA:  Objection.  To be
16  clear, you can answer why.  But to that
17  extent, I'd tell you not to disclose a
18  communication with an attorney if it was
19  a communication, just so we're clear.
20      THE WITNESS:  At the request of
21  the attorneys.
22  BY MR. BOEHM:
23      Q.  Okay.  And that was in May 2018.
24      Which attorney requested that
25  you collect emails regarding opiates?

87 (Pages 342 - 345)

Page 346

1      A.  I can't remember.
2      Q.  Was it a -- was it one of the
3  attorneys who you've been preparing for your
4  deposition with, or was it somebody who works
5  for the county?
6      A.  It was not somebody who works for
7  the county.
8      Q.  And then she says to you:
9         "I figured I should share with
10        you before I send them outside the
11        county."
12        Do you see that?
13      A.  I do.
14      Q.  So she was going to send these
15  emails to people outside of Cuyahoga County?
16        MR. BADALA:  Objection to form.
17        THE WITNESS:  She was going to
18      send the emails to the county's counsel.
19  BY MR. BOEHM:
20      Q.  She identifies three things:  An
21  email with the medical examiner with stats
22  from Dr. Gilson.
23        Do you see that?
24      A.  I do.
25      Q.  That's Number 1.

Page 347

1         Number 2 is an October monthly
2  report, at the bottom -- that has an excerpt
3  quoted from the bottom of that document,
4  right?
5      A.  That's correct.
6      Q.  And then the third thing is an
7  email that she says has your edits to the
8  community solutions draft report.
9         Do you see that?
10      A.  Yes.
11      Q.  Did Ms. Feinn identify any other
12  emails related to opiates besides the three
13  that are referenced here?
14        MR. BADALA:  Objection to form.
15        THE WITNESS:  So I want to be
16      clear that Wendy, Ms. Feinn, was only
17      looking in her own emails, not
18      officewide.  And based on this email,
19      these are the three she found.  I cannot
20      recall if there was a subsequent email
21      she sent.
22  BY MR. BOEHM:
23      Q.  Did you, yourself, endeavor to
24  collect any emails that you had related to
25  opiates?

Page 348

1        MR. BADALA:  Objection to form.
2        And I would just like to state
3      for the record, both Ms. Feinn and
4      Ms. Keenan's custodial files have been
5      produced in this litigation.
6        THE WITNESS:  I honestly can't
7      recall if I looked through my own emails
8      and produced them or if the attorneys
9      got them.
10  BY MR. BOEHM:
11      Q.  I want to direct your attention
12  to one of the items that Ms. Feinn apparently
13  sent to you, this October monthly report.
14  And that starts at Bates Numbers 3478.  This
15  is from October 23rd, 2017.
16        Do you see that?
17      A.  Yes.
18      Q.  And this is from you, as director
19  of the Office of Budget Management, to
20  members of the Cuyahoga County Council,
21  right?
22      A.  That's correct.
23      Q.  And you copy the county
24  executive, Mr. Budish, right?
25      A.  And Dennis Kennedy, the fiscal

Page 349

1  officer.
2      Q.  Right.
3        Do you know why Ms. Feinn
4  attached this October report in response to
5  your request that she collect email
6  regarding opiates?
7        MR. BADALA:  Objection to form.
8        THE WITNESS:  On page 3479, the
9      last bullet that's the bold is
10      "Miscellaneous obligations."  There was
11      an allocation included in the budget for
12      contingencies.  So instead of drawing on
13      reserves, there was actually kind of a
14      to-be-determined line in the operating
15      budget.  And this notes that we had to
16      draw on that contingency allocation to
17      cover shortfalls in the
18      medical examiner's office, rising
19      caseloads associated with the opiate
20      epidemic.
21  BY MR. BOEHM:
22      Q.  Right.  Thank you.
23        Specifically, what it says here
24  is that, "There was underutilization of the
25  $2 million allocation in the budget for

88 (Pages 346 - 349)

Page 350

1  contingencies."
2        Do you see that?
3        A.  That's correct.
4        Q.  What does it mean that there was
5  underutilization of that allocation?
6        A.  It means that the 2 million at
7  the time was not spent in full.  So we had
8  made a transfer for the medical examiner's
9  office, and we made a transfer for the
10  Department of Communications.
11        Q.  Was the $2 million that was
12  allocated for contingencies for the
13  year 2017?
14        A.  Yes.
15        Q.  It turns out that -- well, let me
16  back up for just a moment.
17        For what purpose or purposes was
18  this $2 million allocated?  Was it for
19  shortfalls in the Medical Examiner's office?
20        MR. BADALA:  Objection to form.
21        THE WITNESS:  It was for
22  shortfalls, period, in the General Fund.
23  BY MR. BOEHM:
24        Q.  Well, the two things that are
25  identified here that actually resulted in

Page 351

1  real expenditures were shortfalls in the
2  medical examiner's office due to rising
3  caseloads, and two, additional staff in the
4  Department of Communications, right?
5        A.  That's correct.
6        Q.  That amounted to a total of only
7  $500,000, right?
8        A.  That's correct.
9        Q.  Why is it that it turned out that
10  the full $2 million was not necessary?
11        MR. BADALA:  Objection to form.
12        THE WITNESS:  Without looking at
13  the budget documents, I'm not confident
14  agreeing with you that a $2 million
15  reserve wasn't necessary.  The policy
16  was meant to have been that if you --
17  "you," meaning an analyst, was going to
18  increase the General Fund in one agency,
19  you would decrease that contingency.
20        I can't sit here and tell you
21  without a doubt that the analysts all
22  did that.  So we may have had increases
23  without that corresponding decrease.
24  Similarly, this is only --
25

Page 352

1  BY MR. BOEHM:
2        Q.  You don't know one way or the
3  other, right?
4        MR. BADALA:  Were you done
5  answering?
6        THE WITNESS:  I'm not done
7  answering.
8  BY MR. BOEHM:
9        Q.  I'm sorry.  Go ahead.
10        A.  This is only in the General Fund.
11  So we did not have a contingency in any of
12  the other funds.
13        Q.  You don't know one way or another
14  whether the scenario was that your analysts
15  didn't adjust properly or not?
16        MR. BADALA:  Objection to form.
17        THE WITNESS:  Not without looking
18  at our -- the requests that go to
19  council.
20  BY MR. BOEHM:
21        Q.  It certainly doesn't indicate
22  that here in this report from you to the
23  county council, right?
24        A.  It doesn't indicate --
25        Q.  It doesn't indicate that this was

Page 353

1  just some kind of -- it doesn't explain why
2  only 500,000 of the $2 million was actually
3  used.
4        A.  That's correct.
5        Q.  And you don't know why?
6        A.  Like I'm saying, I cannot
7  definitively answer that question because I
8  can't confirm that we always did the
9  decrease.  There may have been increases and
10  we actually didn't do the decrease.  And this
11  is only in one of the county's funds.
12        Q.  The General Fund, right?
13        A.  That's correct.
14        I say that to point out that if
15  the assumption is that the county had an
16  extra $1.5 million last year, we did not.
17        Q.  What happened to that
18  $1.5 million?
19        A.  A budget isn't dollars.  A budget
20  is appropriation.  Last --
21        Q.  Well, there was $2 million
22  allocated, right, to the contingencies,
23  right?
24        A.  If I can finish, yes.
25        Q.  But only $500,000 was spent,

Page 354

1 right?
2          MR. BADALA:  You're talking over
3    each other.
4          THE WITNESS:  Can I finish,
5    please?
6 BY MR. BOEHM:
7      Q.   Sure, but you have a question
8 pending.
9      A.   I understand that.  I'm trying to
10 answer your question.
11          There needs to be an
12 understanding of the difference between
13 appropriation and cash.  So if you see that
14 there's $1.5 million in appropriation that
15 remains unspent, those aren't dollars,
16 unfortunately, that you can clawback and
17 spend somewhere else.
18          If you look at our documents,
19 last year's expenditures exceeded revenue,
20 which means there is no extra money.
21 Appropriation is the authority to spend,
22 which is from a financial standpoint less
23 significant than it sounds.  There was no
24 money left over.
25      Q.   If you turn over a couple of

Page 355

1 pages to 3482, you'll see maybe two-thirds of
2 the way down the page a section called
3 "Expenditures."
4          Do you see that?
5      A.   Yes.
6      Q.   And under that, it refers to
7 expenditures in the General Fund.  That's the
8 first sub bullet point.
9          Do you see that?
10     A.   That's correct.
11     Q.   It says, "$10 million dollars
12 under budget, driven by surpluses in nearly
13 every agency/department budget supported by
14 the General Fund, most notably in
15 miscellaneous programs, information
16 technology, and the fiscal office."
17          Do you see that?
18     A.   Yes, but that is not an
19 indication that agencies weren't spending
20 more.  Again, a budget is simply a budget.
21          If the Medical Examiner's office
22 needed an extra $150,000 -- I'm just making
23 that number up, and they ended up spending
24 145, they have a surplus.  But it doesn't
25 mean that they didn't need more money, get

Page 356

1 more money, and spend more money.
2          Budget surpluses are largely
3 irrelevant to people working in finance in
4 the public sector.  What's most important is
5 your revenue, which would be the equivalent
6 of your salary, and our expenses.
7          Just because someone says
8 they're going to spend a million dollars a
9 year, if your salary is only 100,000, it's
10 completely irrelevant what you think you're
11 going to spend.  We can only spend the cash
12 that's available to us.
13     Q.   In any event, it's true that in
14 the General Fund, there was a surplus in
15 nearly every agency and department supported
16 by the General Fund; is that true?
17          MR. BADALA:  Objection to form.
18          THE WITNESS:  The General Fund
19    had an operating deficit and a budget
20    surplus.
21 BY MR. BOEHM:
22     Q.   Several of these categories
23 reflect that the amount of money that was
24 actually spent was less than the amount of
25 money that had been budgeted for that

Page 357

1 division or department, right?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  That's correct.
4    When we set budgets, increase budgets,
5    it's all based on projections.  And in
6    the case of many of these departments,
7    Children and Family and juvenile court
8    specifically, under the same bullet that
9    you're referencing, I am never, ever
10   going to put either of those entities in
11   a position where they don't have the
12   authority to spend.  Because when we get
13   a kid, we move that kid immediately.
14        So we will overestimate always.
15   If you look back in our budget
16   documents going back 20 years, Children
17   and Family Services always has a budget
18   surplus.  But they do spend more every
19   year, but I am never going to leave
20   these two departments in a position
21   where they're going to come begging for
22   council to pay the cost associated with
23   the placement of a child.
24 BY MR. BOEHM:
25     Q.   So you overbudget?  You budget

90 (Pages 354 - 357)

Page 358

1   more than they're actually going to spend?
2       A.   For these two agencies, we tend
3   to ensure that there is at least sufficient
4   funding to ensure that they are never caught
5   in a position where they can't respond to the
6   needs of the community.
7       Q.   What this says is that there are
8   surpluses in nearly every agency and
9   department that is funded by the
10  General Fund, not in just two, right?
11      A.   That does not mean that some of
12  these agencies didn't get additional funding
13  throughout the year, and they did.  So
14  they're ending -- remember, this is written
15  in October.  And they're ending the year now
16  under budget.
17          To be clear, every agency has to
18  end the year with a surplus or I would be
19  breaking the law if I allow them to spend
20  money without appropriation.  So you will
21  never find a report that says that these
22  agencies didn't end with a surplus.
23      Q.   Their actual expenditures will
24  either be the same as what was budgeted or
25  less than what was budgeted; is that what

Page 359

1   you're saying?
2       A.   That's correct.  They will never
3   be the same.  They will never be exactly the
4   same.
5       Q.   So then they will always be
6   under?
7       A.   That is correct.  We have to
8   ensure that our expenses are covered.
9       Q.   So the amount of actual
10  expenditures by any department, division, or
11  program within Cuyahoga County will always be
12  less than the amount that's actually budgeted
13  for that department, division, or program; is
14  that correct?
15      A.   That's correct, unless there's
16  some payment that we're making that's like
17  contractual and we know it's only going to be
18  a hundred thousand.  But for departments,
19  this is always based on projections.
20      Q.   Do you recall a time when -- let
21  me back up and ask first if you know who Bill
22  Denihan is.
23      A.   Bill Denihan was the former CEO
24  of the Mental Health Board and then the
25  ADAMHS Board.

Page 360

1       Q.   Okay.  And do you know him?
2       A.   I've seen him in meetings.  I
3   don't think he would know me.  I know who he
4   is.  My sister worked for him.
5           (Email, Bates CUYAH_001757582,
6           marked as Deposition Exhibit 7.)
7   BY MR. BOEHM:
8       Q.   I've marked this document as
9   Exhibit 7.  It's 1757582, and it's an email
10  from December 15th, 2016, again, from
11  Ms. Wendy Feinn to you, subject: "Opioid
12  state of emergency."
13          Do you see that?
14      A.   I do.
15      Q.   It indicates that Mr. Brickner --
16  who I think you said is the budget officer
17  for ADAMHS; is that right?
18      A.   That's correct.
19      Q.   He had said that "Bill Denihan's
20  goal in declaring the states of emergency is
21  to become eligible for more state and federal
22  funds to combat it."
23          Do you see that?
24      A.   I do.
25      Q.   In other words, Mr. Denihan was

Page 361

1   hoping that by declaring a public health
2   emergency in connection with opioid abuse,
3   that would generate more funding from the
4   state and federal government, right?
5           MR. BADALA:  Objection to form.
6   BY MR. BOEHM:
7       Q.   Is that how you understand this?
8           MR. BADALA:  Same objection.
9           THE WITNESS:  I can only read
10      what's written.  I can't speak to what
11      his motivation or intent was.
12  BY MR. BOEHM:
13      Q.   I'm not asking you about his
14  motivation and intent.  I'm asking how you
15  understand the words on the page.
16          MR. BADALA:  Objection.  That
17      wasn't the question.
18  BY MR. BOEHM:
19      Q.   Do you want me to start over?
20      A.   Okay.
21      Q.   Isn't it true that, as you
22  interpret this email, that Mr. Denihan was
23  declaring a public health emergency in
24  connection with opiate abuse in hopes that it
25  would make the county eligible for more state

91 (Pages 358 - 361)

Page 362

1    and federal funds?
2         MR. BADALA:  Objection to form.
3         THE WITNESS:  That is what's
4    written, yes.  It would make the county
5    eligible.
6    BY MR. BOEHM:
7         Q.  Is this time frame, this is
8    December 2016, is this when Cuyahoga County
9    first started experiencing the noticeable
10   impact of opioid abuse in the county?
11        MR. BADALA:  Objection to form.
12   Are you asking her personal?  You said
13   the county.  She's not here as a
14   30(b)(6) today.
15        MR. BOEHM:  I said "in the
16   county."
17        MR. BADALA:  Is when the county,
18   not in the county.  Is when the county
19   first --
20        MR. BOEHM:  Yeah.  I'm asking her
21   her understanding of that.
22        MR. BADALA:  Not as a 30(b)(6) --
23   obviously, she's not a 30(b)(6).
24        MR. BOEHM:  Obviously, yeah.
25   Right.

Page 363

1         MR. BADALA:  You were just saying
2    --
3         MR. BOEHM:  Let me ask the
4    question.  If you want to object to
5    form, go for it.
6    BY MR. BOEHM:
7         Q.  This email was written in
8    December 2016, right?
9         A.  That's correct.
10        Q.  Is December 2016 when Cuyahoga
11   County first started experiencing a
12   noticeable impact of opioid abuse in the
13   county?
14        MR. BADALA:  Same objection.
15   Seeking 30(b)(6) testimony.
16   BY MR. BOEHM:
17        Q.  Go ahead.
18        A.  No.
19        Q.  When, in your view, did opioid
20   abuse first become a public health crisis in
21   Cuyahoga County?
22        MR. BADALA:  Objection to form.
23        THE WITNESS:  I'm not qualified
24   to answer that, when it's a public
25   health crisis.

Page 364

1    BY MR. BOEHM:
2         Q.  When, in your view, did Cuyahoga
3    County first begin to experience a financial
4    impact related to opiate abuse and misuse?
5         MR. BADALA:  Objection to form.
6         THE WITNESS:  I can't recall a
7    specific time.
8    BY MR. BOEHM:
9         Q.  Okay.
10        Well, you're the director of the
11   Office of Budget Management, right?
12        A.  I am.
13        Q.  And you indicated first thing
14   this morning that one of the things that you
15   thought was important to do in order to be
16   able to do your job well was to look back and
17   try and understand the financial and economic
18   stressors and conditions that the county has
19   faced and how that has impacted county
20   finances.
21        Do you remember giving that
22   testimony earlier today?
23        A.  I do.
24        MR. BADALA:  Objection to form.
25   Misstates testimony.

Page 365

1    BY MR. BOEHM:
2         Q.  And my question is, based on your
3    effort to try and understand the financial
4    stressors and financial impact on the county
5    as the director of the Office of Budget
6    Management, what is your understanding about
7    when opioid abuse and misuse began to have a
8    financial impact on Cuyahoga County?
9         MR. BADALA:  Objection to form.
10        THE WITNESS:  I cannot answer
11   that.
12   BY MR. BOEHM:
13        Q.  Why not?
14        A.  Because I can't identify a
15   specific date.  And I'm not going to guess.
16        Q.  Well, generally speaking.
17        MR. BADALA:  Objection to form.
18        THE WITNESS:  I'm not going to
19   guess.
20   BY MR. BOEHM:
21        Q.  Was it after 2012?
22        MR. BADALA:  Objection to form.
23   BY MR. BOEHM:
24        Q.  -- or before 2012?
25        MR. BADALA:  Same objection.

92 (Pages 362 - 365)

Page 366

1    THE WITNESS: I'm not going to
2  guess.
3  BY MR. BOEHM:
4    Q.  I'm not asking you to guess.
5    MR. BADALA:  You are.
6  BY MR. BOEHM:
7    Q.  You are the director of the
8  Office of Budget Management.  You've been
9  designated -- you're not here today in a
10  30(b)(6) capacity, but you have been
11  designated as a person who will speak for the
12  county on issues of damages.
13    Right now, today, I'm asking
14  you, in your personal capacity as the
15  director of the office for Cuyahoga County
16  responsible for budgeting and responsible
17  for understanding the financial impacts, the
18  stressors, and all the things we've been
19  talking about today, when it is that you
20  believe the county first began to experience
21  a financial impact related to opioid abuse
22  and misuse?
23    MR. BADALA:  Objection to form.
24  Asked and answered.  Vague.  Mr. Boehm's
25  testimony --

Page 367

1    THE WITNESS:  I cannot answer
2  that question.
3  BY MR. BOEHM:
4    Q.  Why can you not answer that
5  question?
6    MR. BADALA:  Objection.  Asked
7  and answered.
8    THE WITNESS:  As I've stated, I
9  cannot pinpoint a specific date and I am
10  not going to guess.
11  BY MR. BOEHM:
12    Q.  Can you pinpoint a year?
13    A.  I am not going to guess, and I'm
14  not going to --
15    Q.  Nobody here is asking you to
16  guess.
17    A.  You're asking me to approximate,
18  which I will not do.
19    Q.  Can you pinpoint a year?
20    MR. BADALA:  Objection to form.
21    THE WITNESS:  No.
22  BY MR. BOEHM:
23    Q.  Can you pinpoint a decade?
24    MR. BADALA:  Objection to form.
25    THE WITNESS:  No.

Page 368

1  BY MR. BOEHM:
2    Q.  So just to make sure we've got
3  this perfectly clear, you, director of the
4  Cuyahoga County Office of Budget Management,
5  cannot, do not, or will not pinpoint even a
6  year when you believe the county first began
7  to experience a financial impact due to
8  opiate abuse or misuse in the county.
9    Do I have that right?
10    MR. BADALA:  Objection to form.
11    THE WITNESS:  You have that
12  right.
13  BY MR. BOEHM:
14    Q.  Did the county experience any
15  financial impact related to the use or abuse
16  of opiates in the year 2006?
17    MR. BADALA:  Objection to form.
18    THE WITNESS:  I can't answer that
19  question.
20  BY MR. BOEHM:
21    Q.  Why not?
22    A.  Because I'm not going to identify
23  a date when the opiate epidemic was reflected
24  in the financials.
25    Q.  Is it because you don't know if

Page 369

1  there was a financial impact in 2006?
2    MR. BADALA:  Objection to form.
3    THE WITNESS:  I'm not prepared to
4  answer that question.
5  BY MR. BOEHM:
6    Q.  Is it because you don't know, or
7  is there some other reason why you're not
8  prepared to answer that question?
9    A.  I don't know.
10    Q.  Did the county experience any
11  impact related to the use or abuse of opiates
12  in 2007?
13    MR. BADALA:  Objection to form.
14    THE WITNESS:  I don't know.
15  BY MR. BOEHM:
16    Q.  2008?
17    MR. BADALA:  Objection to form.
18    THE WITNESS:  I don't know.
19  BY MR. BOEHM:
20    Q.  2009?
21    MR. BADALA:  Objection to form.
22    THE WITNESS:  I don't know.
23  BY MR. BOEHM:
24    Q.  2010?
25    MR. BADALA:  Objection to form.

93 (Pages 366 - 369)

Page 370

1           THE WITNESS:  I don't know.
2    BY MR. BOEHM:
3       Q.  2011?
4           MR. BADALA:  Objection to form.
5           THE WITNESS:  I don't know.
6    BY MR. BOEHM:
7       Q.  2012?
8           MR. BADALA:  Objection to form.
9           THE WITNESS:  I don't know.
10   BY MR. BOEHM:
11      Q.  2013?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I don't know.
14   BY MR. BOEHM:
15      Q.  2014?
16      A.  I don't know.
17      Q.  2015?
18          MR. BADALA:  Objection to form.
19          THE WITNESS:  Yes.
20   BY MR. BOEHM:
21      Q.  So 2015 is the first year when
22   you're comfortable saying that Cuyahoga
23   County experienced specific financial impacts
24   related to the use and abuse of opiates.
25   Fair?

Page 371

1           MR. BADALA:  Objection to form.
2           THE WITNESS:  That's correct.
3    BY MR. BOEHM:
4       Q.  With respect to the impact that
5    you say existed in 2015, can you identify
6    what specifically that impact was on the
7    county in 2015?
8           MR. BADALA:  Objection to form.
9           THE WITNESS:  In 2015, the ADAMHS
10   board was asking for additional funding
11   in its budget.  We gave 39 million.
12   They wanted more.
13          In 2015, Children and Family
14   Services, the number of children in
15   placement was increasing.
16          In 2015, the number of abuse,
17   dependency, and neglect cases in
18   juvenile court was increasing.
19          In 2015 -- in 2015 or 2016, we
20   were seeing an increase in filings in
21   Common Pleas Court; increase in
22   autopsies at the Medical Examiner's
23   office.
24          That's all I'm going to think of
25   right now off the top of my head.

Page 372

1    That's all I can recall, but I'm
2    certain that's not an exhaustive list.
3           (Email chain, Bates
4           CUYAH_001764847 through
5           CUYAH_001764848, marked as
6           Deposition Exhibit 8.)
7    BY MR. BOEHM:
8       Q.  Okay.
9           I've now put in front of you a
10   document marked as Exhibit 8 for purposes of
11   your deposition.  It's an email exchange
12   that goes back to August 2017, and this is
13   further to the discussion about the ADAMHS
14   Board.
15          We've already established that
16   Frank Brickner works for the ADAMHS board,
17   right?
18      A.  He did at the time, yes.
19      Q.  Does he no longer work there?
20      A.  He does not.
21      Q.  Who it is the new financial
22   officer for the ADAMHS Board?
23      A.  I don't know that.
24      Q.  And there's some discussion here
25   about the cost of beds related to the ADAMHS

Page 373

1    Board.
2           Do you see that?
3       A.  Yes.
4       Q.  It has detoxification,
5    residential treatment, recovery/sober beds,
6    and it appears that there was a request for
7    the ADAMHS Board to provide information about
8    how much it costs per bed per day.
9           Do I understand that correctly?
10      A.  The request was for services
11   offered for the opiate crisis.  What is the
12   average daily cost for a bed and treatment at
13   one of the facilities.
14      Q.  If you go up to the email on
15   August 18th at 2:43 p.m. from Gregory Beyer,
16   he says he crunched some numbers and added
17   those below in red.
18          Unfortunately, this was produced
19   to us in black and white, so we have to kind
20   of surmise what he's added.  Are you able to
21   help us out with that?  Has he added the
22   calculations about -- after the equal signs,
23   or do you know?
24      A.  I don't know.
25      Q.  And then you write back and you

94 (Pages 370 - 373)

Page 374

1  say:
2       "I know our systems were
3  outdated.  And I think upgrading
4  could improve transparency.  I just
5  wonder if we should have settled for
6  a Kia so we could pay some medical
7  bills."
8       What did you mean by that?
9  A.  I don't recall.
10  Q.  Well, you say in the next
11  sentence, "Not knocking the Kias."
12       Do you see that?
13  A.  I do.
14  Q.  So you seem to be suggesting that
15  the county settled for something -- some kind
16  of inferior product, all respect to Kias, in
17  order to pay some medical bills.
18       Is that how you understand it?
19       MR. BADALA:  Objection to form.
20       THE WITNESS:  As I said, I don't
21  recall what I meant by this.
22  BY MR. BOEHM:
23  Q.  And seeing it here in context
24  doesn't help you interpret it?
25  A.  No.

Page 375

1  Q.  Mr. Beyer has this reference to
2  $25 million, right?
3       Do you see that?
4  A.  Yes.
5  Q.  Do you know where he's coming up
6  with that $25 million figure?
7  A.  I do not.  He doesn't include it
8  in here.
9  Q.  How much does Cuyahoga County pay
10  in debt service each year?
11  A.  That fluctuates because a lot of
12  our debt is paid for by other sources.  The
13  county's obligation toward debt service is
14  about a little less than a hundred million a
15  year, but not all of that comes from the
16  county.
17       From the county's all-funds
18  budget specifically, it would be somewhere
19  around 70 million.  60, 70.
20  Q.  What does "debt service" mean,
21  for people who may not be familiar with why
22  you'd have a debt service fund?
23  A.  Debt service is repayment on
24  bonds issued, bonds or loans.  So debt
25  service is akin to your mortgage payment, car

Page 376

1  payment.
2  Q.  You have to pay back the interest
3  on that too, right?
4  A.  You do indeed.
5  Q.  Is Cuyahoga County presently in a
6  condition where it could issue public debt if
7  it wanted to?
8       MR. BADALA:  Objection to form.
9       THE WITNESS:  Absolutely.
10  BY MR. BOEHM:
11  Q.  Notwithstanding the tens of
12  millions of dollars it pays in debt service
13  each year?
14  A.  You're asking "could."  We could
15  issue debt.  That would obviously require
16  cutting something to make room in the budget
17  for the annual debt service, but we have the
18  legal capacity to issue debt.
19  Q.  Is the county presently upgrading
20  its IT systems?
21  A.  We are.
22  Q.  How much is that costing?
23  A.  That project, most recent
24  estimates were that that's going to cost
25  about 23, $24 million.

Page 377

1  Q.  Is that going to come out of the
2  2018 budget?
3  A.  No.  We started paying for that
4  in, I believe, late 2015.  It should be paid
5  in full by 2019 for the -- I'm sorry -- for
6  the implementation costs.  There will be
7  ongoing maintenance forever.
8  Q.  Do you have a view as to whether
9  or not the upgrading of IT systems is an
10  appropriate use of county funds at this time?
11       MR. BADALA:  Objection to form.
12       THE WITNESS:  I do believe it's
13  an appropriate use of county funds.  Our
14  current systems are siloed.  Some of
15  them interface with each other; some do
16  not.
17       The FAMIS system is a DOS system
18  that you can't even use a mouse.  It's
19  the old florescent green.  BRASS is
20  from probably 2000, if not 1999.
21       And all of the systems have
22  limitations in terms of reporting,
23  retrieving data, storing data, and
24  particularly my system, BRASS, it's not
25  maintained anymore, so it is slowly

95 (Pages 374 - 377)

Page 378

1    dying.
2  BY MR. BOEHM:
3      Q.  So you think it's an appropriate
4  and good use of funds?
5      A.  Yes, I do.
6         (Email, Bates CUYAH_001739956,
7         marked as Deposition Exhibit 9.)
8  BY MR. BOEHM:
9      Q.  I've just put in front of you a
10  document we've marked as Exhibit 9 for
11  purposes of your deposition.  This is an
12  email from you to Mr. Dennis Kennedy from May
13  2018.
14      Do you see that?
15      A.  That's correct.
16      Q.  And Mr. Kennedy is your boss.  We
17  established that earlier, right?
18      A.  He is.
19      Q.  And it has a link to the news
20  report from, it looks like, the local FOX
21  News channel, right?
22      A.  Yes.
23      Q.  And the link suggests that it has
24  something to do with giving out Fentanyl test
25  strips to users, right?

Page 379

1      A.  That's correct.
2      Q.  And you just have two sentences
3  below the link.  You write, "We fund ADAMHS,"
4  right?
5      A.  Yes.
6      Q.  And we talked about that earlier,
7  about $39 million, right?
8      A.  That's correct.
9      Q.  And then you write:
10      "So we're paying to make sure
11  people get good, clean heroin?"
12      Do you see that?
13      A.  I do.
14      Q.  And I read it correctly?
15      A.  Yes.
16      Q.  What were you trying to
17  communicate to your boss, Mr. Kennedy, when
18  you wrote this email?
19      MR. BADALA:  Objection to form.
20      THE WITNESS:  My priority
21  personally is treatment services for
22  people who are addicted to prescription
23  opiates, Fentanyl, carfentanil, and
24  heroin.  I would rather see funding go
25  toward treatment than the test strips.

Page 380

1  BY MR. BOEHM:
2      Q.  What is your understanding about
3  what these test strips do?
4      A.  I would have to look at the
5  article again.  This was several months ago.
6      Q.  It's testing for Fentanyl, right?
7      MR. BADALA:  Objection to form.
8      THE WITNESS:  I would have to
9  look at the article again.
10  BY MR. BOEHM:
11      Q.  "Clinic giving out Fentanyl test
12  strips to users."
13      Do you see that?
14      A.  I do, but I will not assume that
15  that's testing for Fentanyl.
16      Q.  Okay.  What's your understanding?
17      MR. BADALA:  Objection to form.
18      THE WITNESS:  I said, I would
19  have to look at the article again.  I
20  have no understanding of what this is.
21  BY MR. BOEHM:
22      Q.  But you know what somebody else
23  meant when they said "depleted," right?
24      A.  That's correct.
25      Q.  And you said that "You're paying

Page 381

1  to make sure people get good, clean heroin."
2  Right?
3      A.  That's correct.
4      Q.  And you objected to that?
5      MR. BADALA:  Objection to form.
6      THE WITNESS:  I did not object to
7  it.  Like I said, I like to see money go
8  to treatment.  But I made no
9  recommendation on ADAMHS's budget other
10  than to say that they need additional
11  funding.
12  BY MR. BOEHM:
13      Q.  Well, you say:
14      "We fund ADAMHS.  So we're paying
15  to make sure people get good, clean
16  heroin?"
17      That's sarcastic, right?
18      MR. BADALA:  Objection to form.
19  Argumentative.
20      THE WITNESS:  I don't know.  I
21  don't remember reading this article.  I
22  assume it is sarcastic, yes.
23  BY MR. BOEHM:
24      Q.  You don't think it was a good use
25  of funds by ADAMHS, some of which comes from

96 (Pages 378 - 381)

Page 382

1    the HHS levy, to pay for addicts to opiates
2    who want to test their product to make sure
3    it doesn't have Fentanyl, right?
4         MR. BADALA:  Objection to form.
5         THE WITNESS:  I don't know that
6    this is testing to make sure that there
7    is no Fentanyl.
8    BY MR. BOEHM:
9         Q.   Okay.
10        Do you know what Fentanyl is?
11        A.   I do not know the chemical makeup
12   of Fentanyl.
13        Q.   Do you know if the Fentanyl that
14   gets used and gets cut into opiates is
15   Fentanyl that's prescribed by a doctor or
16   Fentanyl that comes through illegal channels?
17        MR. BADALA:  Objection to form.
18        THE WITNESS:  I don't know.  I'm
19   not a doctor.
20   BY MR. BOEHM:
21        Q.   Do you know to what extent the
22   increase in overdose deaths in Cuyahoga
23   County are related to Fentanyl specifically?
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  That's a question

Page 383

1    for the medical examiner.  I don't know.
2    BY MR. BOEHM:
3         Q.   Whether it's a question for
4    somebody else, we'll all sort out.  I'm
5    asking you if you know.
6         A.   And I said that I don't.
7         Q.   You do not know.
8         Have you ever asked anybody what
9    accounts for the uptick in overdose deaths
10   related to opiates here in Cuyahoga County?
11        MR. BADALA:  Objection to form.
12        THE WITNESS:  I have asked.
13   BY MR. BOEHM:
14        Q.   Has anybody ever said, "Actually,
15   it's Fentanyl"?
16        A.   I can't recall.  I don't know the
17   answer to that.
18        Q.   What have people said to you when
19   you've asked the question?
20        A.   I can't recall.
21        Q.   Who have you asked?
22        A.   I cannot recall every person that
23   I've talked to about opiates or opiate
24   deaths.
25        Q.   Can you recall anybody?  You said

Page 384

1    you have asked that question, you have asked
2    what accounts for the uptick in overdose
3    deaths.  And I'm asking you, who did you ask?
4         A.   I have asked the
5    Medical Examiner's office.  And I do not
6    recall the answer that came back.
7         Q.   Did you ask the
8    Medical Examiner's office to what extent
9    their request for additional funding was
10   related specifically to Fentanyl?
11        MR. BADALA:  Objection to form.
12        THE WITNESS:  I would have no
13   reason to ask that.
14   BY MR. BOEHM:
15        Q.   Why not?
16        A.   Because this county is suffering
17   from an opiate epidemic that includes
18   prescription opiates, Fentanyl, carfentanil,
19   and heroin.
20        Q.   And you don't see any reason at
21   all to try and understand the differences
22   between those different opiates, how they're
23   used, how they're obtained, and why they're
24   dangerous?
25        MR. BADALA:  Objection to form.

Page 385

1         THE WITNESS:  In my capacity as
2    the director of the Office of Budget
3    Management, I'm solely focused on
4    funding the agencies to ensure that they
5    comply with their legal and moral
6    mandates.
7         I'm sure I would love to know
8    the answers to all of your questions,
9    but we're in a crisis.  We've been in a
10   crisis.  I have 60 agencies calling me
11   daily saying they're in a crisis due
12   specifically to the opiate epidemic,
13   prescription opiates, Fentanyl,
14   carfentanil, and heroin.
15        I appreciate everything that's
16   happening here, but in my capacity as
17   the director, I don't care which is
18   which.  My only concern is making sure
19   that the bodies that are in the
20   medical examiner get autopsied and
21   returned to their loved ones; that the
22   children we take from Children and
23   Family Services are safe in the foster
24   homes.  I don't care about the
25   distinction.

97 (Pages 382 - 385)

Page 386

1    BY MR. BOEHM:
2        Q.   Okay.
3            And you've not undertaken in any
4    way to try to understand how those
5    distinctions might have impacted the
6    specific expenditures that Cuyahoga County
7    has made; is that true?
8            MR. BADALA:  Objection to form.
9            THE WITNESS:  As it relates to my
10       job, that distinction is not important.
11       I work 60 hours a week just trying to
12       stay ahead of all these agencies' needs.
13       Had I the time to focus more on this,
14       that would be wonderful, but I don't
15       have the time.
16   BY MR. BOEHM:
17       Q.   I think you said a minute ago
18   that you have 60 agencies who call you daily.
19   I assume you are exaggerating, but I'm going
20   to give you an opportunity to clarify whether
21   that's, in fact, what you meant when you said
22   that?
23           MR. BADALA:  Objection to form.
24           THE WITNESS:  I am exaggerating,
25       but we have agencies that call either me

Page 387

1    or my analysts daily.
2    BY MR. BOEHM:
3        Q.   And you're not suggesting that
4    you have agencies who call you every day to
5    ask you questions specifically related to
6    opiates, are you?
7            MR. BADALA:  Objection to form.
8            THE WITNESS:  I did not say that.
9    BY MR. BOEHM:
10       Q.   Your point, really, is you have a
11   big job.  It's a lot of agencies, departments
12   and divisions and programs you have got to
13   keep your eye on, right?  You don't have time
14   maybe to know all the details; is that your
15   point?
16           MR. BADALA:  Objection to form.
17       Misstates her testimony.
18   BY MR. BOEHM:
19       Q.   That's why I'm asking.  Was that
20   your point?
21       A.   My point was that I have a big
22   job.  I am trying to manage these agencies so
23   that we can perform our legal and moral
24   mandates, and we are in the midst of a crisis
25   in this county, the likes of which I've never

Page 388

1    seen as long as I've been here.  I am trying
2    to stay on top of that.
3            MR. BOEHM:  Okay.  Let's go off
4        the record.
5            THE VIDEOGRAPHER:  Off the
6        record, 5:09.
7            (Recess taken from 5:09 p.m. to
8        5:21 p.m.)
9            THE VIDEOGRAPHER:  On the record
10       at 5:21.
11   BY MR. BOEHM:
12       Q.   Ms. Keenan, do you know what
13   Narcan is?
14       A.   No.
15       Q.   You hesitated.
16       A.   I believe it's medication given
17   to combat an overdose.
18       Q.   Do you have an opinion about
19   whether or not Narcan should be provided to
20   people with an opiate substance abuse
21   disorder?
22           MR. BADALA:  Objection to form.
23           THE WITNESS:  I'm not qualified
24       to make an opinion on that.
25

Page 389

1    BY MR. BOEHM:
2        Q.   Do you know whether
3    Cuyahoga County has experienced increased
4    costs of foster care due to the opiate
5    epidemic?
6            MR. BADALA:  Objection to form.
7            THE WITNESS:  I don't believe
8        that our foster care costs have
9        increased, largely because we're relying
10       on kinship placements.
11           But the number of children in
12       out-of-home placement has increased
13       quite dramatically that if we weren't
14       dealing with the opiate issue, we would
15       have money that we could spend on
16       something else.
17   BY MR. BOEHM:
18       Q.   Okay.
19           But the cost of foster care in
20   Cuyahoga County has not increased due to the
21   opiate epidemic; is that true?
22           MR. BADALA:  Objection to form.
23           THE WITNESS:  The cost,
24       specifically, of foster care has
25       remained relatively flat.  That's

98 (Pages 386 - 389)

Page 390

1    correct.
2  BY MR. BOEHM:
3      Q.  I've marked a document as
4  Exhibit 10 that reflects that.  I'll just
5  keep it on the record and we'll keep going.
6          This is, for the record,
7  1738714.
8          (Email, March 1, 2018, Bates
9          CUYAH_001738714, marked as
10         Deposition Exhibit 10.)
11 BY MR. BOEHM:
12     Q.  Actually, I do have one question
13 for you.  In this email change on March 1,
14 2018, you answer this question by saying,
15 "No, we haven't seen an increase."
16         And, by that, you meant an
17 increase of costs of foster care due to the
18 opiate epidemic, right?
19         MR. BADALA:  Objection to form.
20         THE WITNESS:  That's correct.
21 BY MR. BOEHM:
22     Q.   And then you say, in the next
23 sentence, "Based on drug test results, it's
24 not necessarily attributed to opiates," in
25 reference to out-of-home placements?

Page 391

1      A.  That is correct.  That was based
2  on information that was told to me, which was
3  later refuted by the director of DCFS.
4      Q.  Who told you that?
5      A.  Walter Parfejewiec.
6      Q.  Who later refuted it?
7      A.  Cindy Weiskittle.
8      Q.  Is that reflected in an email?
9      A.  I can't say.  I don't know.
10     Q.  Did Ms. Weiskittle email you when
11 she refuted that --
12         MR. BADALA:  Objection to form.
13 BY MR. BOEHM:
14     Q.  -- or did she talk to you in a
15 hallway?
16     A.  I can't say.
17     Q.  Did you ever go back to
18 Mr. Parfejewiec to say, "Hey, Ms. Weiskittle
19 said you were wrong"?
20     A.  I did.  I talk to Mr. Parfejewiec
21 quite frequently.
22     Q.  What had Mr. Parfejewiec said to
23 you that you are reporting in this March 1,
24 2018, email, based on the drug test results?
25     A.  So I believe, based on subsequent

Page 392

1  conversations, that there was a
2  miscommunication between Mr. Parfejewiec and
3  me.
4          Mr. Parfejewiec is now the
5  director of Health and Human Services.  At
6  the time that he told me about the drug
7  tests, he was newly interim director, but
8  his job is in Job and Family Services.  And
9  I believe he may have been talking about
10 drug test results of our clients in Job and
11 Family Services.
12         That's the only thing I can
13 think of because, as I said, Cindy
14 Weiskittle later said, "No, no, this is not
15 true."  And she is the expert, as it relates
16 to Children and Family Services.
17     Q.  Well, I guess it's convenient
18 because you, on that same day, forwarded your
19 email to Mr. Parfejewiec, right?
20     A.  Parfejewiec, but, yes.
21     Q.  Parfejewiec, I'm so sorry.
22     A.  That's okay.
23     Q.  Parfejewiec.  Boy, I never would
24 have guessed that pronunciation in a million
25 years.

Page 393

1      A.  Nobody would.
2      Q.  You forwarded your email to
3  Mr. Parfejewiec and wrote, "FYI," right?
4      A.  Yes. I always will notify an
5  agency if I'm communicating something that
6  has to do with them.
7      Q.  And he never wrote back?
8      A.  I can't say that.
9      Q.  Do you recall him writing back?
10     A.  No.
11     Q.  Did he write you back and say,
12 "No.  Sorry, Ms. Keenan, you have
13 misunderstood what I said to you"?
14     A.  I can't recall.
15         MR. BADALA:  I'm going to mark
16 the next document as Exhibit 11.
17         (Email chain, Bates
18         CUYAH_001764146 through
19         CUYAH_001764148, marked as
20         Deposition Exhibit 11.)
21 BY MR. BOEHM:
22     Q.  And this is an April 2018 email
23 exchange between you and the now well-known
24 Mr. Par -- say it again?
25     A.  Parfejewiec.

99 (Pages 390 - 393)

Page 394

1    Q.  Parfejewiec.
2        MR. BADALA:  Call him Walter P.
3        THE VIDEOGRAPHER:  We all call
4    him Walter P.
5    BY MR. BOEHM:
6        Q.  Walter P, okay.
7        It says here at the beginning of
8    this exchange, or I guess at the end, this
9    is an email you write on April 11, 2018.
10       And you say:
11       "My immediate concern, aside from
12    first quarter, is that Armond is
13    going to say something in his speech
14    about the numbers going up because of
15    opiates, and I don't think that's
16    what the data show.  Are you going to
17    talk about this?"
18       Do you see that?
19   A.  I do.
20       Q.  What exactly were you concerned
21   about?
22       MR. BADALA:  Objection to form.
23       THE WITNESS:  So if -- I need to
24   read the entire string, if you give me a
25   minute.

Page 395

1        (Reviewing document.)
2        So as I mentioned before, Walter
3    is the one who had initially told me in
4    a conversation that the drug tests --
5    many of them are coming out negative.
6        I interpreted that -- we were
7    having a conversation about DCFS at the
8    time, so I thought that's what he was
9    referring to.
10       So as I mentioned here -- my
11   concern always is I don't want the
12   county executive saying something that
13   if, when pressed for additional
14   details, or if somebody were to call
15   the agency directly and say, "Hey, this
16   is what he said," I don't ever want the
17   county in a position where it's giving
18   out conflicting information.
19       So I asked Walter if he was
20   going to clarify it, because he's the
21   one who told me originally that the
22   tests were coming out negative.
23   BY MR. BOEHM:
24       Q.  Were you worried that
25   Armond Budish was going to say in a speech

Page 396

1    that numbers related to the Department of
2    Children and Family Services were going up,
3    and you didn't think that was true?
4        MR. BADALA:  Objection to form.
5        THE WITNESS:  I was worried that
6    what Armond was going to communicate was
7    different from what Walter had
8    communicated to me.
9    BY MR. BOEHM:
10       Q.  What numbers are you referring to
11   here when you say that he's going to say in
12   his speech that the numbers are going up
13   because of opiates?  Numbers of what?
14       A.  That's the number of children in
15   out-of-home care.
16       But I think that Walter -- I
17   mean, with all due respect to him, like I
18   said, he was in JFS his -- almost his entire
19   career.  He was relatively new to DCFS.
20       So I am in no way criticizing
21   him, but if you look down through the email
22   thread, Walter says that the HHS budget was
23   reduced by 7 million.  They reduced
24   overtime.  There's nothing to report.
25       To which I reply back, their

Page 397

1    overtime earnings were up every pay period
2    of the year over last pay period.  I
3    consider that something material to report.
4        I don't think he was as familiar
5    with DCFS's financial activity as perhaps he
6    is now.
7        Q.  Okay.
8        But that's really speculation on
9    your part, right?
10       You've been pretty unwilling to
11   speculate on certain things, and in this
12   case --
13       A.  I'm not speculating.  In the
14   email exchange, he's clearly incorrect.  He's
15   saying overtime is down.  And I have the
16   data; overtime was up.
17       Q.  If you look down in the email
18   exchange a little bit, you have an email from
19   Mr. Parfejewiec from April 11, where he says:
20       "The DCFS increase you reference
21   is due to the recent fatality."
22       Do you know what he's talking
23   about there?
24       A.  I do, and I disagree with it.
25       Q.  What is he talking about?

100 (Pages 394 - 397)

Page 398

1      A.  We had a child die in custody.
2   When that happens, sometimes the workers are
3   more cautious about either sending children
4   home or bringing children in, depending on
5   where the child died.
6      Q.  But it was his view that the DCFS
7   increase was due to the recent fatality?
8      A.  He would be incorrect though.
9   The numbers had been increasing steadily
10  every year for years, and the fatality was in
11  2018.
12     Q.  I understand you may disagree
13  with Mr. Parfejewiec, but that's what he was
14  saying, right?
15     MR. BADALA:  Objection to form.
16     THE WITNESS:  That is what he is
17   saying.
18  BY MR. BOEHM:
19     Q.  And you never in this email
20  exchange say that you disagree with him,
21  right?
22     A.  I do.
23      So if you switch to the next
24  page, I'm saying, "Placement numbers
25  increased 30 percent.  Overtime is way up.

Page 399

1   How are we covering this shortfall?"
2        When he reports this, it's quite
3   frankly so off that, you see, I respond with
4   "I'll call you."  There is a point at which
5   I am not going to go back and forth with
6   emails any longer.
7      Q.  The email that you reference
8   first, actually, you wrote before he said
9   anything about the recent fatality.
10     A.  Right.
11     Q.  Right.  Now after.
12     A.  I'm pointing this out that I
13  disagree with him.  I don't have an issue
14  doing that.
15     Q.  But the email you just referred
16  to is written before --
17     A.  If I could finish.
18     Q.  -- his reference to the recent
19  fatality.
20     A.  I know.
21     Q.  Right?
22     A.  Yes.
23      On April 11th, he is saying
24  things that are so inaccurate that I called
25  him to clarify.

Page 400

1      Q.  Right.  And then you wrote -- the
2   one thing you did write in this email
3   exchange is that you were worried that Armand
4   was going to say something in his speech
5   about the numbers going up because of
6   opiates, and you didn't think that's what the
7   data show, right?
8      MR. BADALA:  Objection to form.
9      THE WITNESS:  Based on what he
10   told me.
11  BY MR. BOEHM:
12     Q.  What was his position at this
13  time, Mr. Parfejewiec?
14     A.  At this time, I believe he was
15  the interim director of Health and Human
16  Services.
17     Q.  Is it fair to say that for
18  purposes of the 2018 and 2019 Cuyahoga County
19  budget, no agency other than the
20  medical examiner received additional funding
21  that you considered to be specifically in
22  response to opiates?
23     MR. BADALA:  Objection to form.
24     THE WITNESS:  No, that's not fair
25   to say that.

Page 401

1      DCFS has received additional
2   funding in 2018.  The sheriff's office
3   received additional funding through
4   their base budget.
5        It wasn't a request, but we just
6   increased the base because there was --
7   we saw that the expenses were going up.
8      (Email chain, Bates
9      CUYAH_001742324 through
10      CUYAH_001742325, marked as
11      Deposition Exhibit 12.)
12  BY MR. BOEHM:
13     Q.  I'm showing you a document that
14  I've now marked as Exhibit 12 for purposes of
15  your deposition.  It's an email that you
16  wrote to Ms. Karen Kearney.
17      Do you know who Ms. Kearney is?
18     A.  Based on her email address, she
19  works for the Mental Health Advocacy
20  Coalition.
21     Q.  Okay.  And you thank her for
22  reading the budget book.
23      And you say:
24      "You're correct that the 2018
25   budgets for Children and Family

101 (Pages 398 - 401)

1  Services and most agencies is an
2  increase over the 2017 estimate, but
3  in most cases the increase reflects
4  an assumed 2 percent increase in
5  salaries, COLA, merit, or a
6  combination of the two; and an
7  increase in the employer's share of
8  employee health care expenses."
9      Do you see that?
10     A.  I do.
11     Q.  Okay.
12         Do you stand by that, as you sit
13 here today?
14     A.  I do.
15     Q.  Okay.
16         And then you write:
17         "So, yes, several agencies are
18 getting an increase, but no agency
19 other than the medical examiner has
20 received additional funding
21 specifically in response to opiates."
22         Do you see that?
23     A.  At the time of writing, that was
24 true.
25     Q.  So you don't think that's true

1  anymore?
2      A.  I know it's not true anymore.
3      Q.  What are the specific additional
4  funding that other agencies have received in
5  response to opiates?
6      A.  Children and Family Services has
7  received an additional $7 million this year.
8          I cannot tell you, as I said
9  before, what actual dollar amount is
10 specific to opiates, but based on the
11 director and their data, some of it would be
12 absolutely attributed to opiates.
13     Q.  For what purposes?  You said it
14 doesn't apply to foster care, right?
15     A.  Pardon me?
16     Q.  It doesn't apply to foster care,
17 right?  There's no increase in terms of
18 foster care costs --
19         MR. BADALA:  Objection to form.
20 BY MR. BOEHM:
21     Q.  -- in connection with opiates,
22 right?
23         MR. BADALA:  Objection to form.
24         THE WITNESS:  So far that has
25     been true.

1  BY MR. BOEHM:
2      Q.  Okay.
3          So what are the expenses -- the
4  specific expenditures that you understood to
5  have been made within DCFS that are specific
6  to opiates?
7      A.  The additional funding that they
8  have received was for personnel costs, which
9  are the social workers who do all of the
10 work.  As I mentioned several times, their
11 overtime is up, so that's expensive time and
12 a half.
13         And they also received funding
14 this year for neighborhood-based services,
15 which are, simply put, like support groups
16 for families that have foster care children
17 or are, you know, taking custody of family
18 members to give them access to supportive
19 services in their own communities.
20     Q.  Do you know who Judge Sweeney is?
21     A.  Which Judge Sweeney?
22     Q.  Do you know more than one Judge
23 Sweeney?
24     A.  It's possible we have more than
25 one.  They're all Irish in Cuyahoga County.

1      Q.  But I'm asking if you know more
2  than one Judge Sweeney.
3      A.  Not off the top of my head.
4      Q.  Do you know a Judge Sweeney?
5      A.  I know Kristen from Juvenile
6  Court.
7      Q.  Okay.  Have you ever had any
8  conversations with Judge Sweeney about
9  whether opiates and costs related to opiates
10 have gone up in connection with juvenile
11 detention?
12     A.  I don't know that I had a
13 conversation with her about that, no.
14     Q.  Have you ever had any kind of
15 communication with her about that?
16     A.  I don't know that I've had that
17 communication with Judge Sweeney
18 specifically, no.
19     Q.  Do you remember ever learning
20 Judge Sweeney's views on whether or not the
21 opiate crisis was impacting costs for
22 Cuyahoga County in connection with juvenile
23 detention?
24     A.  I don't recall having any
25 conversations.

Page 406

1      Q.  Do you have a view as to whether
2  or not the opiate public health issues in
3  Cuyahoga County have impacted costs vis-a-vis
4  juvenile detention?
5           MR. BADALA:  Objection to form.
6           THE WITNESS:  I need to ask what
7      you mean when you say "juvenile
8      detention."
9  BY MR. BOEHM:
10      Q.  Do you know what juvenile
11  detention refers to?
12      A.  Well, we have a fund that's
13  labeled "Juvenile Detention" that includes
14  costs that aren't exclusive to juvenile
15  detention, and then there is a juvenile
16  detention center.  So I don't know what
17  you're referring to.
18      Q.  Okay.  I'm showing you an email
19  now.
20      A.  Okay.
21      Q.  It's been marked Exhibit 13.
22          (Email, Bates CUYAH_001749074,
23          marked as Deposition
24          Exhibit 13.)
25

Page 407

1  BY MR. BOEHM:
2      Q.  It was sent from Sybil Haney to
3  you, among others.  And it says, subject line
4  "FYI."
5           Do you see that?
6      A.  I see that.
7      Q.  The email reads:
8          "According to Judge Sweeney, the
9      opioid crisis is not, however,
10      impacting juvenile detention."
11          Did I read that correctly?
12      A.  Yes.
13      Q.  Do you disagree with that?
14      A.  With how you read it?
15      Q.  Do you disagree with the
16  substance of that statement?
17      A.  I have no data to agree or
18  disagree with that statement.
19      Q.  So you don't know whether or not
20  the opiate crisis has impacted costs related
21  to juvenile detention?
22      A.  Not off the top of my head.
23      Q.  Where would you go to figure that
24  out?
25      A.  I would have to look at their

Page 408

1  financial activity for the last several
2  years, and I would have to talk to the court.
3      Q.  Okay.  Well, you said that you
4  have people calling you all the time.
5      A.  Including the court.
6      Q.  Including the court.
7           Has anybody from the Court ever
8  called you up and said, "Hey, the opiate
9  crisis is impacting our costs relative to
10  juvenile detention"?
11           MR. BADALA:  Objection to form.
12           THE WITNESS:  The court has said,
13      "Hey, the opiate crisis is impacting our
14      costs relative to guardian ad litem
15      expenses and the cost associated with
16      processing cases."
17  BY MR. BOEHM:
18      Q.  I'm sure Sal can ask you the
19  questions to get out testimony about other
20  subjects --
21           MR. BADALA:  Wait.  What?
22           MR. BOEHM:  -- if he wants to.
23      But I'm asking you my question and so
24      that's the one I need you to answer.
25           MR. BADALA:  Listen, I'm going to

Page 409

1  object.  I mean, she's answering the
2  question that you're asking.  You don't
3  like the answer, you then say that it's
4  a question from Sal -- or Sal -- I don't
5  know what you're saying.
6           If you don't like --
7           MR. BOEHM:  If you want to ask
8      follow-up questions, then do it.
9  BY MR. BOEHM:
10      Q.  My question to you -- my question
11  to you, Ms. Keenan --
12           MR. BADALA:  I can't teach you
13      how to ask a question.
14  BY MR. BOEHM:
15      Q.  My question to you, Ms. Keenan --
16           MR. BOEHM:  Just knock it off.
17           MR. BADALA:  You're the one --
18           MR. BOEHM:  Knock it off.
19           MR. BADALA:  -- that's talking
20      about my --
21           MR. BOEHM:  Knock it off.  Knock
22      it off.
23           MR. BADALA:  All right.  She
24      answered your question.
25

103 (Pages 406 - 409)

Page 410

1  BY MR. BOEHM:
2      Q.  Ms. Keenan, has anybody from the
3  juvenile court called you up -- because you
4  said you get a lot of calls, right?
5      A.  We've established that.
6      Q.  You get a lot of calls about
7  budgets and needs from different departments,
8  divisions, and programs in the county?
9      A.  Yes.
10     Q.  Has anybody from the juvenile
11 court called you up and said, "Hey, the
12 opioid crisis is affecting our costs in
13 relation to juvenile detention"?
14         MR. BADALA:  Objection to form.
15 Asked and answered.
16         THE WITNESS:  No.
17 BY MR. BOEHM:
18     Q.  This email goes on to say, "Crack
19 did though."  Crack.
20         Do you see that?
21     A.  Yes, I can see that.
22     Q.  Do you have any basis to disagree
23 with anything that is written in this email
24 that was sent to you on May 15th, 2017?
25         MR. BADALA:  Objection to form.

Page 411

1          THE WITNESS:  I've already
2  answered that I have no data that would
3  support my agreeing or disagreeing with
4  anything on this paper.
5          MR. BOEHM:  Okay.
6          THE VIDEOGRAPHER:  I'm sorry.
7  Can we go off the record for one second?
8          MR. BADALA:  Sure.
9          MR. BOEHM:  Yeah.
10         THE VIDEOGRAPHER:  Off the
11 record.
12         (Recess taken from 5:41 p.m. to
13         5:57 p.m.)
14         THE VIDEOGRAPHER:  On the record,
15 5:57.
16 BY MR. BOEHM:
17     Q.  Ms. Keenan, welcome back.
18         Have you ever made an effort to
19 calculate the total amount of expenditures
20 that Cuyahoga County has made in connection
21 with addressing the opiate public health
22 issues in the county?
23         MR. BADALA:  Objection to form.
24         THE WITNESS:  I don't believe so,
25     no.

Page 412

1  BY MR. BOEHM:
2      Q.  Has anybody ever shown you
3  calculations about expenditures made by the
4  county in connection with opiate use or abuse
5  and asked you to review them?
6          MR. BADALA:  Objection to form.
7          THE WITNESS:  I can't recall.
8          (Email, CUYAH_001715624, marked
9  as Deposition Exhibit 14.)
10         MR. BOEHM:  I want to mark the
11 next exhibit, which is Number 14 to your
12 deposition.  It's a May 2018 email.  And
13 it's from Ms. Cheryl Subler.
14         She says that she's touching
15 base to see if you are able to share
16 data on opioid costs on the county, as
17 you are going to check because of the
18 lawsuit.
19         Do you see that?
20     A.  I see that.
21     Q.  What data was Ms. Subler asking
22 you about?
23     A.  Data on the cost of the opiate
24 epidemic to the county.
25     Q.  Did you ever generate such data?

Page 413

1      A.  I did not.
2      Q.  Do you know if anybody in the
3  Office of Budget and Management has ever
4  generated such data?
5      A.  I don't believe so.
6      Q.  Do you know of anybody in
7  Cuyahoga County government who has undertaken
8  to perform such a calculation?
9          MR. BADALA:  Objection to form.
10         THE WITNESS:  I wouldn't know.
11 BY MR. BOEHM:
12     Q.  You're not aware of any such
13 calculation having been performed?
14     A.  No.
15     Q.  And nobody has asked you to do
16 that?
17     A.  Not that I can recall.
18     Q.  And nobody has asked you to
19 review any figures or calculations along
20 those lines?
21         MR. BADALA:  Objection to form.
22         THE WITNESS:  Not that I can
23     recall.
24 BY MR. BOEHM:
25     Q.  When you say "not that I can

104 (Pages 410 - 413)

Page 414

1  recall," do you have any sense that somebody
2  in the past has asked you to do that?
3          MR. BADALA:  Objection to form.
4          THE WITNESS:  I can't recall.
5  BY MR. BOEHM:
6      Q.  Does that seem like something
7  that you would remember, if somebody had come
8  to you and said, "Here's what we think is the
9  total amount of expenditures made by
10  Cuyahoga County in connection with the opiate
11  crisis"?
12          MR. BADALA:  Objection to form.
13          THE WITNESS:  I don't -- I won't
14      confirm that that's something that I
15      would automatically remember.
16          People come to me almost every
17      day saying, Will you review these
18      numbers?  Will you analyze this?  Will
19      you review this?  I don't recall all
20      the requests that come to me.
21  BY MR. BOEHM:
22      Q.  And you don't recall any request
23  of that nature coming to you, right?
24      A.  Request of what nature?
25      Q.  Trying to calculate the total

Page 415

1  amount of expenditures by Cuyahoga County in
2  connection with opiate use and abuse.
3          MR. BADALA:  Objection to form.
4          THE WITNESS:  As I stated, I
5      can't recall that.
6          MR. BOEHM:  This is Exhibit 15 to
7      your deposition.
8          (Email chain, Bates
9          CUYAH_001753465 through
10          CUYAH_001753466, marked as
11          Deposition Exhibit 15.)
12  BY MR. BOEHM:
13      Q.  It's an email from April 2016.
14      And here we see Ms. Subler
15  again.  And she asks you and others if
16  you've quantified the cost of the opioid
17  crisis on your county.
18          Do you see that?
19      A.  Yes.
20      Q.  And you write back on April 26th
21  to say:  "We can.  When do you need it?"
22          Do you see that?
23      A.  I see that.
24      Q.  Did you ever actually perform
25  that analysis?

Page 416

1      A.  I did not.
2      Q.  Why not?
3      A.  Because the county is engaged in
4  litigation.
5      Q.  Did somebody tell you not to
6  conduct that analysis?
7          MR. BADALA:  Objection to form.
8      To the extent you were told by an
9      attorney, I will tell you not to
10      disclose that information.
11          THE WITNESS:  I can't answer that
12      question.
13  BY MR. BOEHM:
14      Q.  Did somebody instruct you not to
15  perform this analysis?
16      A.  I didn't ask anyone to perform
17  this analysis.  We're engaged in litigation.
18  I didn't feel that it would be prudent to
19  produce documents for an advocacy
20  organization.
21      Q.  Well, actually, you write back to
22  her to say,  "We can.  When do you need it?"
23  Right?
24      A.  That is correct.
25      Q.  So did you then have second

Page 417

1  thoughts?
2      A.  That is correct.
3      Q.  Why did you have second thoughts?
4      A.  Because the County is engaged in
5  litigation.
6      Q.  Did somebody tell you not to
7  perform this analysis because the County is
8  engaged in litigation?
9          MR. BADALA:  Objection to form.
10          THE WITNESS:  They did not.  I
11      didn't ask anyone if I should be
12      performing this.
13  BY MR. BOEHM:
14      Q.  Why does the fact that the county
15  has filed a lawsuit inform your -- inform
16  whether or not you would conduct an analysis
17  to try and quantify the cost of the opioid
18  crisis on Cuyahoga County?
19          MR. BADALA:  Objection to form.
20          THE WITNESS:  I don't want to do
21      anything in addition to what might take
22      place within the -- this lawsuit.
23          If those calculations are going
24      to be completed, they're going to be
25      completed by experts, somebody else,

105 (Pages 414 - 417)

1    and I'm not going to do competing
2    analyses.  Somebody else is handling
3    that.  I'm busy.  CCAO is not my
4    priority.
5    BY MR. BOEHM:
6        Q.  You were afraid that any
7    calculation you might perform would be
8    contradictory or different from the
9    litigation-related calculations?
10        MR. BADALA:  Objection to form.
11    BY MR. BOEHM:
12        Q.  Is that what you're saying?
13        A.  That is not what I said.
14        Q.  I thought you had said that
15    somebody -- explain to me what you mean by
16    that.
17        A.  I'm not going to spend my time
18    engaging in preparing calculations that
19    somebody else is completing on behalf of this
20    county.
21        Q.  In any event, you said -- in
22    fact, the first thing you said is we can do
23    it, right?
24        A.  Yes.
25        Q.  And do you stand by that today,

1    that you could, if you wanted to, quantify
2    the cost of opioids on your county?  Right?
3        MR. BADALA:  Objection to form.
4        THE WITNESS:  I believe I've
5    answered that.
6        I don't know that I can do that.
7    To say "we can," that's usually my
8    go-to response.  I try to be helpful.
9        But it's not something I've
10    undertaken.  It's not something I've
11    considered undertaking and, therefore,
12    I have not considered whether I am
13    capable of performing that analysis.
14    BY MR. BOEHM:
15        Q.  So when you said "we can," you
16    didn't really mean it?
17        MR. BADALA:  Objection to form.
18        THE WITNESS:  I am capable of
19    providing them data relative to our
20    total expenditures, which is what I know
21    the other counties have provided.
22        But if you want to say that I
23    didn't really mean it, I'm not going to
24    object to that.
25

1        MR. BOEHM:  Okay.  I'm going to
2    mark this next document as Exhibit 16.
3        (Email, "Actuals," Bates
4        CUYAH_001732895, marked as
5        Deposition Exhibit 16.)
6    BY MR. BOEHM:
7        Q.  This is a document that is from
8    you to James Phillips.
9        Who is James Phillips?
10        A.  He's a fiscal officer in the
11    Office of Budget and Management.
12        Q.  And it says:
13        "Attached are actuals by year,
14        going back to 2006."
15        Do you see that?
16        A.  I see that.
17        Q.  Why back to 2006?
18        A.  I have no idea.  I don't know
19    what this email is about.  There's no detail
20    in the subject.  I don't know what I was
21    requesting here.
22        Q.  This doesn't ring a bell for you
23    at all?
24        A.  It does not.
25        Q.  It's from May 2018, right?

1        A.  That's correct.
2        Q.  You say:
3        "Can you please add subtotals for
4        each department and then a total at
5        the bottom."
6        Do you see that?
7        A.  I see that.
8        Q.  Okay.
9        MR. BADALA:  Was there an
10    attachment?  I don't think we got one.
11        MR. BOEHM:  There was.  It was
12    produced in native.
13        MR. BADALA:  Okay.  I just wanted
14    to let you know we didn't have it as the
15    exhibit.
16        MR. BOEHM:  It's produced in
17    native.  It's a major spreadsheet.
18        MR. BADALA:  I'm just letting you
19    know, it's not in that exhibit she has
20    in front of her.
21        MR. BOEHM:  No.  I didn't mark it
22    just because --
23        MR. BADALA:  Just for the record,
24    the attachment is not part of the
25    exhibit.

106 (Pages 418 - 421)

Page 422

1      MR. BOEHM:  Correct.
2      MR. BADALA:  Just so we're clear
3  about that.
4      MR. BOEHM:  Correct.
5      We can reference it, I think, by
6  Bates number if you'd like.
7      MR. BADALA:  Yeah.  I just wanted
8  to let you know because I didn't know
9  if --
10      MR. BOEHM:  Yeah.
11      For the record, it's a
12  natively-produced spreadsheet that does
13  have financial information.
14  BY MR. BOEHM:
15      Q.  I was hoping that this would
16  refresh your recollection, but I think you're
17  testifying that it doesn't.
18      A.  I don't know what "natively
19  produced" means.
20      Q.  It means we got it as a -- as an
21  Excel file, so I would have to open it up in
22  Excel and look at it in Excel, as opposed to
23  these documents that, you know, we can print
24  out, they come with a Bates stamp and so on.
25      A.  Based on what's written in this

Page 423

1  email, I can't say that.
2      I send an email like this
3  probably once a week to everybody that works
4  for me.  I don't know which departments were
5  included in the request.
6      I don't know if it includes all
7  expenses, only some expenses, all funds,
8  restricted funds.  I ask for this kind of
9  data all the time.
10      Q.  Have you ever asked your team at
11  the Office of Budget and Management to put
12  together totals of opiate-related
13  expenditures by Cuyahoga County?
14      MR. BADALA:  Objection to form.
15      THE WITNESS:  I can't recall
16      doing that.
17  BY MR. BOEHM:
18      Q.  Do you ever remember Mr. Budish
19  instructing you not to perform a calculation,
20  computation, or analysis of the expenditures
21  by Cuyahoga County related to opiates?
22      MR. BADALA:  Objection to form.
23      THE WITNESS:  I don't recall
24      that, no.
25

Page 424

1  BY MR. BOEHM:
2      Q.  Does that seem like something
3  that would stand out in your memory?
4      MR. BADALA:  Objection to form.
5      THE WITNESS:  That does not seem
6  like something that would stand out in
7  my memory, no.
8      MR. BOEHM:  I'm marking this
9  document as Exhibit 17.
10      (*Clawed back* Email, "Re:
11      Opiates," Bates CUYAH_001753000,
12      marked as Deposition
13      Exhibit 17.)
14  BY MR. BOEHM:
15      Q.  It's an email from April 2018.
16      And you write to Mr. Budish, the
17  county executive, and inform him that you've
18  been asked if you can quantify the impact of
19  opiates on budgets.
20      Do you see that?
21      A.  I see that.
22      Q.  And you write to him:
23      "We can directly attribute costs
24  in the Medical Examiner's office and
25  the sheriff's office to the rise in

Page 425

1  opiate cases in the county.
2      "DCFS costs are more difficult to
3  directly attribute, but I can take
4  the increase in the number of parents
5  testing positive for opiates in cases
6  where the child was removed because
7  of drugs, and multiple that by the
8  average placement cost and length of
9  stay."
10      Do you see that?
11      A.  I see that.
12      Q.  Is that something you, in fact,
13  could do?
14      MR. BADALA:  Objection to form.
15      THE WITNESS:  If that data is
16  available.
17      MR. BADALA:  If I could just put
18  a standing objection to this document.
19      I think this document made it
20  into our claw back privileged log, so
21  -- I don't know if that's true, but I'm
22  going to put that standing objection in
23  there.
24      MR. BOEHM:  I'm not aware that
25  it's been clawed back.

Page 426

1       MR. BADALA:  I believe it has,
2   I'd have to double-check.  I don't have
3   my computer right now, but you can put
4   my standing objection on the record.
5  BY MR. BOEHM:
6    Q.  It does go on to say here --
7  well, Mr. Budish writes back, right?
8    A.  That's correct.
9    Q.  He says:
10     "I checked with Bob, but our
11    lawyers in the litigation will be
12    putting this together and they'll be
13    working with others around the
14    country so we don't miss categories
15    of damages.  So I think we should not
16    send anything to CCAO which could be
17    used against us in the lawsuit."
18    Do you see that?
19    A.  I see that.
20    Q.  Do you remember receiving this?
21    A.  I don't.
22    Q.  Is this the reason why you didn't
23  perform any computation?
24    A.  No.  This is the reason I did not
25  provide data to CCAO, presumably, but this is

Page 427

1  not the reason why I haven't performed any
2  computations.
3       MR. BADALA:  And I'm sorry, just
4   further to my standing objection, on
5   October 26th, defendants confirmed that
6   specifically this document, that they
7   complied with its obligations under
8   CMO 2, specific to this document.
9       MR. BOEHM:  Oh, so this was
10   clawed back?
11       MR. BADALA:  Yes.
12       MR. BOEHM:  Okay.  My apologies.
13   If this was clawed back, I will cease my
14   questioning on that.
15       MR. BADALA:  So just so you have
16   my standing objection for that document.
17       MR. BOEHM:  Do you want me to
18   strike that part of the --
19       MR. BADALA:  Yeah, that would be
20   great.
21       MR. BOEHM:  Okay.  I didn't mean
22   to -- I apologize.  I didn't know that
23   had been clawed back.  Thank you for
24   letting me know.
25       MR. BADALA:  I didn't think you

Page 428

1  were doing it purposefully, that's why I
2  was --
3       MR. BOEHM:  Okay.
4       MR. HALLER:  Just for the record,
5   that exhibit, the copies never made it
6   down to this end of the table, so --
7       MR. BADALA:  So you're saying you
8   don't have to destroy it?  Is that what
9   you're saying?
10       MR. HALLER:  We never got it.
11  BY MR. BOEHM:
12    Q.  Did you know, Ms. Keenan, that
13  the lawyers in this case have provided to us
14  an estimate of what they believe
15  Cuyahoga County's expenditures related to
16  opiate use and abuse to be?
17       MR. BADALA:  Objection to form.
18       THE WITNESS:  I don't know what
19   the estimate -- the actual estimate for
20   our damages are.
21  BY MR. BOEHM:
22    Q.  That wasn't quite my question.
23    My question is were you aware
24  that the lawyers had prepared an estimate of
25  the damages?

Page 429

1       MR. BADALA:  Objection to form.
2       THE WITNESS:  I'm not aware that
3   the lawyers have prepared an estimate
4   that has been communicated.
5  BY MR. BOEHM:
6    Q.  Are you aware that they've you've
7  prepared an estimate, notwithstanding whether
8  it's been communicated?
9    A.  No.  I know that estimates are
10  being prepared, but I don't know that
11  estimates are final and being communicated.
12    Q.  Have you been consulted -- have
13  you been asked to provide your own input, as
14  the director of the Office of Budget and
15  Management --
16    A.  Input?
17    Q.  -- in terms of estimates of
18  damages to Cuyahoga County?
19       MR. BADALA:  Objection to form;
20   and to the extent you've had
21   communications with lawyers, I'll tell
22   you not to disclose the actual
23   communication.
24    He's asking whether you've had
25   communications, not what the

108 (Pages 426 - 429)

Page 430

1    communications are.
2         THE WITNESS:  I have had
3    communication about the impact of
4    opioids on the county's budget.
5    BY MR. BOEHM:
6         Q.  I'm talking about specific
7    estimates of total damages.
8         Have you had communications with
9    individuals in the county about that?
10        MR. BADALA:  Same objection and
11   same instruction.
12        THE WITNESS:  I have not had
13   communication with individuals in the
14   county related to damages.
15   BY MR. BOEHM:
16        Q.  Have you seen specific damage
17   estimates?
18        A.  No, I have not.
19        Q.  So you wouldn't know how any
20   damage estimates were computed?
21        A.  No.
22        MR. BOEHM:  And we'll mark this
23   document as Exhibit 18.
24        (Plaintiffs County of Cuyahoga,
25        Ohio, and the State of Ohio,

Page 431

1         Prosecuting Attorney of Cuyahoga
2         County, O'Malley's Second
3         Supplemental Responses and
4         Objections to Interrogatory 18,
5         marked as Deposition
6         Exhibit 18.)
7    MR. BOEHM:  Mr. Badala will
8    recognize it.
9         It's the County's responses to
10   Distributor Defendants
11   Interrogatory 18, and it's actually
12   the -- I don't know, is this the third
13   response?
14        MR. BADALA:  Yeah, the second
15   supplemental, right?  Okay.
16        MR. BOEHM:  Second supplemental,
17   so I think that makes it the third
18   response.
19   BY MR. BOEHM:
20        Q.  If you turn to the next to last
21   page, there's a spreadsheet that attempts to
22   estimate damages based on various categories.
23        Have you ever seen this before?
24        A.  No, I have not.
25        Q.  Are you able to determine how

Page 432

1    this is computed?
2         A.  This document doesn't even detail
3    what these numbers are?
4         Q.  What do you mean?
5         A.  I don't know what's being
6    reported here.
7         Is this total expenses?  Is this
8    revenue?  Is this expenses related to
9    opiates?  There's no real detailing on the
10   spreadsheet.
11        Q.  If you -- I can give you a little
12   bit of context.  But the plaintiffs -- I'll
13   direct you to a page here.
14        We've got a bunch of lawyer talk
15   pages of it.  And then they finally say, at
16   the bottom of page 7:
17        "Plaintiffs computation, based on
18   Plaintiffs' preliminary review of its
19   records and is an estimate of --
20   sorry -- as of Plaintiffs' damages,
21   as of the date of this response, is
22   provided in Exhibit 2."
23        Do you see that?
24        MR. BADALA:  I think the
25   paragraph before is still relevant too.

Page 433

1    BY MR. BOEHM:
2         Q.  Yeah.  You're welcome to look at
3    that too.
4         And Exhibit 2 is what I --
5         A.  I'm sorry.  I'm just reading
6    this --
7         Q.  Yeah.
8         A.  I don't want to --
9         (Reviewing document.)
10        Okay.
11        Q.  And I directed you to the
12   spreadsheet because, Ms. Keenan, that is
13   Exhibit 2.
14        A.  Okay.
15        Q.  Ms. Keenan, are you able to
16   determine how these numbers were computed?
17        MR. BADALA:  Objection to form.
18        THE WITNESS:  I am not able to
19   determine that, no.
20   BY MR. BOEHM:
21        Q.  Would you have any ability, based
22   on the spreadsheet, to go and fact check
23   this?
24        MR. BADALA:  Objection to form.
25        THE WITNESS:  No.

109 (Pages 430 - 433)

Page 434

BY MR. BOEHM:
 Q.  What information would you need in order to do that?
 A.  I would need to know how the costs were calculated and what costs this would include.
     Children and Family Services, for example, in 2017 probably spent somewhere around $140 million.  I don't know which of those 140 million is this 23.
 Q.  You're looking at 2013 right now?
 A.  I'm sorry.
 Q.  What year?
 A.  2017.
 Q.  So that says '14, right?
 A.  For Children and Family Services -- am I looking at the right page?
     MR. BADALA:  I think you might be looking at the wrong page.
     MR. BOEHM:  Oh, I might be looking at the wrong number.
     MR. BADALA:  Yeah.
     MR. BOEHM:  I'm sorry.  I've got the columns backwards.

Page 435

BY MR. BOEHM:
 Q.  You're looking at 2017 for Children and Family Services where it says 23, right?
 A.  That's correct.
 Q.  And you don't know how they got that number?
 A.  I don't know how they got that number.
 Q.  And you said the total Children and Family Services budget for 2017 would have been what?
     MR. BADALA:  Objection to form.
     THE WITNESS:  I wouldn't know what the budget was.  Actual spending would have been in about the area of about 140 million.
BY MR. BOEHM:
 Q.  But you can't tell based on this how somebody got to the idea that there was $23 million in expenditures specific to opiates in 2017 out of the Children and Family Services department?
     MR. BADALA:  Objection to form.
     THE WITNESS:  I can't tell

Page 436

anything from this spreadsheet.  These are just numbers.
BY MR. BOEHM:
 Q.  Do you know, Ms. Keenan, whether or not in 2016 there were any overdose deaths of individuals under the age of 18 attributable to opiates?
     MR. BADALA:  Objection to form.
     THE WITNESS:  Not off the top of my head, no.
BY MR. BOEHM:
 Q.  Do you recall ever having had conversations with anybody in the county on that subject?
 A.  I know that data is tracked separately, overdose deaths by age category, adult/juvenile.
     I do recall having a conversation about it because that specifically rings a bell, but I could not tell you who I was talking to or when it was.
     MR. BOEHM:  I'm marking this document as Exhibit -- I'm sorry -- 19.
     (Email chain, "Re: Deaths under

Page 437

18," Bates CUYAH_001641531, CUYAH_001729677, and CUYAH_001729694, marked as Deposition Exhibit 19.)
BY MR. BOEHM:
 Q.  And I've actually put three emails together, they're all part of the same thread.
     They concern the question of whether or not there had been opiate-related overdose deaths in individuals under 18 during the year 2016.
     Do you see that?
 A.  Yes.
 Q.  And the answer was there were zero, right?
 A.  At the time of writing, yes.
 Q.  And that was mid-November, so near the end of the year, right?
 A.  That's correct.
 Q.  And in one of the emails there, you write -- it's the document that ends -- I'm sorry, the page that ends 1729677.  You write: "Really?  Well, that's good."
     Do you see that?

110 (Pages 434 - 437)

Page 438

1      A.  I see that.
2      Q.  Were you surprised?
3      A.  I don't know if I was surprised.
4      Q.  What did you mean when you wrote
5  "Really?"
6      A.  I honestly don't know because
7  sometimes I write that when I'm surprised,
8  and sometimes I write that when I want the
9  person to review what they've told me one
10  more time to make sure it's accurate.
11      Q.  In this case Mr. Miller says:
12  "Well, that's a surprise."  Right?
13      A.  That is correct.
14      Q.  And then you write:
15      "That's what I said.  But the
16  best kind of surprise."
17      Do you remember saying that?
18      A.  I don't remember saying it, but I
19  see I typed it.
20      Q.  Do you know who has been named as
21  defendants in this lawsuit by
22  Cuyahoga County?
23      A.  I don't know that, no.
24      Q.  Are you -- do you know what a
25  wholesale drug distributor is?

Page 439

1      A.  I don't know that.
2      Q.  Have you ever heard of
3  Cardinal Health?
4      A.  I've heard of Cardinal Health,
5  yes.
6      Q.  What do you know about
7  Cardinal Health and its business?
8      A.  Very little.  I know that they're
9  a vendor of the county, or at least they used
10  to be.
11      Q.  When you say "vendor of the
12  county," what do you mean?  They provide
13  services to the county?
14      A.  They do.
15      Q.  Do you know what services?
16      A.  Something in the jail.
17      Q.  Do you know what?
18      A.  I don't.
19      Q.  Do you know who AmerisourceBergen
20  is?
21      A.  No, I don't.
22      Q.  What about McKesson?
23      A.  No, I don't.
24      Q.  Do you know what, if any,
25  allegations have been made in the County's

Page 440

1  lawsuit against Walmart, Walgreens, CVS, and
2  Rite-Aid?
3      MR. BADALA:  Objection to form.
4      THE WITNESS:  No, I don't.
5  BY MR. BOEHM:
6      Q.  You mentioned earlier on that you
7  received and had tracked data from the
8  Medical Examiner's office.  I believe you
9  specifically mentioned toxicology, overdose
10  deaths, and autopsies.
11      Do you remember that?
12      A.  I do remember that.
13      Q.  What did you mean when you said
14  you tracked the data?
15      A.  I mean that we request it from
16  the agency periodically, and then we will
17  track it, only to say whether the numbers are
18  going up, down, staying the same.
19      Q.  Do you track it to see whether
20  the numbers are related to one particular
21  substance or another?
22      A.  That data is not tracked
23  routinely.  I have requested it in the past,
24  periodically.  I know I asked for it when the
25  medical examiner was requesting additional

Page 441

1  funding.  And I've asked for it at least a
2  second time because I know I communicated in
3  some fashion to county council about the
4  toxicology tests that we were doing.
5      But that's not something that I
6  routinely -- I don't check in on those every
7  month or quarter.
8      Q.  Okay.
9      When you track the data, how do
10  you -- how do you go about tracking it, and
11  what do you mean by tracking it?
12      A.  So by tracking it, I only mean
13  that we will take note if the numbers are
14  rising in a material amount.  One, two, maybe
15  not; but if they're going down, if they're
16  staying the same.  That kind of data has an
17  impact, obviously, on the budget.
18      If the number of autopsies
19  performed is increasing, that might warrant
20  the need for additional pathologists.  We're
21  accredited in our medical examiner's office,
22  and so there are regulations on how many
23  autopsies they can inform.
24      Same for Children and Family
25  Services.  If that number is going up, it

111 (Pages 438 - 441)

Page 442

1 informs our projections.
2     Q.  You said you haven't always
3 tracked the data, you just sometimes track
4 the data.  I'm a little confused by that
5 because typically when people talk about
6 tracking data, there's a regularized kind of
7 routine to it.
8         Do you mean when you say "track
9 the data," that you have a regular
10 routinized method for keeping track of data
11 out of the Medical Examiner's office?  Or is
12 it more kind of ad hoc requests every now
13 and then?
14     A.  I believe I answered that for the
15 Medical Examiner's office, that is not
16 routine.
17     Q.  So how often have you -- is it
18 just based on your ad hoc requests?
19     A.  Data will be requested by the
20 analyst quarterly, usually.  Not always.  But
21 we -- I ask them to do it quarterly.
22         We report certainly every year
23 the number of autopsies performed, and then
24 I have personally made requests on an ad hoc
25 basis.

Page 443

1     Q.  How far back have you tried to
2 keep tabs on those data?
3     MR. BADALA:  Objection to form.
4     THE WITNESS:  I have physical
5     access to the number of autopsies we
6     performed going back to 2006 in the
7     budget books.
8 BY MR. BOEHM:
9     Q.  Is the information in the budget
10 books coded to try and differentiate as
11 between opiate-related information versus
12 autopsies, toxicology, or overdose related to
13 other substances?
14     A.  In the budget books, it's not
15 coded.  Limited space, so we just track the
16 key indicators that we feel might best
17 communicate, like volume of activity.
18     Q.  Fair to say it's not really your
19 concern, based on your job at the county, to
20 try and differentiate as between expenditures
21 that are related to opiates versus other
22 expenditures that, let's say, the
23 Medical Examiner's office or the Department
24 of Children and Family Services, or the
25 sheriff's office might have, because you're

Page 444

1 thinking more in terms of the total amount of
2 money that they need?
3     MR. BADALA:  Objection to form.
4     THE WITNESS:  I don't wholly
5     agree with that statement.
6         I am concerned to a certain
7     extent with what is driving an increase
8     in activity, volume, demands for
9     services.  Because the county has -- it
10     does have some obligation, however
11     slight, to try to remediate the causes
12     of what's driving this increase.
13         So to the best of our ability,
14     if we're seeing an increase in children
15     in placement, autopsies, guardian
16     ad litems, inmates in the jail who are
17     opium addicted, we will try to divert
18     money that we can to treatment.
19         That's why the ADAMHS Board has
20     never been cut.  Other agencies have
21     been cut.  I mean, I appreciate that
22     they asked for more money.  It's
23     unfortunate that we couldn't give it.
24         But I feel it is important for
25     the county.  And I do feel that, even

Page 445

1     for myself, yes, I would like to know
2     at some level what is driving these
3     numbers.
4 BY MR. BOEHM:
5     Q.  But every time I ask you if you
6 do know and if you've looked into it, you
7 just say "I'm just trying to keep my head
8 above water.  I don't know."  Right?
9     MR. BADALA:  Objection to form.
10     THE WITNESS:  I don't believe
11     that's what I said.  I said I have --
12 BY MR. BOEHM:
13     Q.  All right.  Let's go through it.
14     MR. BADALA:  Do you want to
15     finish?
16 BY MR. BOEHM:
17     Q.  Go ahead.
18     MR. BADALA:  Were you done?
19     THE WITNESS:  I said I have
20     routinely asked for some data and on a
21     non-routine basis I have asked for other
22     data.
23         What I have not dug into is what
24     can be attributed to specific opiates,
25     Fentanyl, carfentanil, heroine.  I

112 (Pages 442 - 445)

Page 446

1  don't care.  From my perspective, it
2  all goes back to prescription opiates,
3  so I don't track that data.
4  BY MR. BOEHM:
5      Q.  But you -- I've asked you even to
6  differentiate between opiates and other
7  substances.  And you said you couldn't do
8  that either, right?
9          MR. BADALA:  Objection to form.
10         THE WITNESS:  The
11     Medical Examiner's office can do that,
12     and I have received that data.
13  BY MR. BOEHM:
14     Q.  Okay.  Great.  Let's do this
15  again.
16         Ms. Keenan, what specific
17  expenditures from the Medical Examiner's
18  office for Cuyahoga County can you attribute
19  directly to opiates?
20         MR. BADALA:  Objection, form.
21     Asked and answered.
22  BY MR. BOEHM:
23     Q.  Can you do that?  Because
24  earlier, you said, I think, that you
25  couldn't.

Page 447

1          MR. BADALA:  Objection to form.
2          THE WITNESS:  The answer to the
3      question hasn't changed.  I cannot do
4      that.  I get data.
5  BY MR. BOEHM:
6      Q.  Does the data that has provided
7  to you -- does that allow you to do that?
8          MR. BADALA:  Objection to form.
9          THE WITNESS:  I can't answer that
10     question.  I don't know.
11  BY MR. BOEHM:
12     Q.  Why not?
13     A.  Because as I've said before, I
14  don't know how to do that computation, and I
15  haven't dug into trying to figure it out yet.
16     Q.  Have you tried to do that with
17  respect to expenditures in the Department of
18  Children and Family Services?
19     A.  I haven't done it for any agency.
20         MR. BOEHM:  How are we doing?
21         THE VIDEOGRAPHER:  Approximately
22     ten minutes.
23         MR. BADALA:  I have eight, just
24     to be accurate.
25         MR. BOEHM:  No, no, sorry.  We're

Page 448

1  going with this guy.
2          MR. BADALA:  We're going to go
3      with what it says at the (inaudible.)
4  BY MR. BOEHM:
5      Q.  Do you track data out of the
6  division of Children and Family Services?
7      A.  Every week.
8      Q.  What data have you tracked?
9      A.  I track the number of children in
10  out-of-home placement, and I track the number
11  of children in the county's permanent
12  custody, which means they are never going
13  home.
14     Q.  But you don't track to try and
15  determine what expenditures by the county in
16  the Department of Children and Family
17  Services are attributable to opiates?
18     A.  No, I have not.
19     Q.  Could you do that if you wanted
20  to?
21     A.  I believe I've answered that
22  question.  I don't know if I could do that.
23  I have not endeavored to try.
24     Q.  What would you have to do to try
25  and figure out whether you could or couldn't

Page 449

1  do that?
2          MR. BADALA:  Objection to form.
3          THE WITNESS:  I don't know.
4  BY MR. BOEHM:
5      Q.  Well, how would you go about it?
6      If Armond Budish called you up
7  and asked you to do that, what steps would
8  you take?
9          MR. BADALA:  Objection to form.
10         THE WITNESS:  I don't know.
11  BY MR. BOEHM:
12     Q.  If Armond Budish called you up on
13  the phone tomorrow and said, "Ms. Keenan,
14  here's my task:  I want you to try and figure
15  out what specific expenditures from the
16  Department of Children and Family Services
17  are attributable to opiates.  Can you do
18  that?"  What would your response be?
19         MR. BADALA:  Objection to form.
20         THE WITNESS:  My response would
21     be my response to you, I don't know if I
22     can do that.
23  BY MR. BOEHM:
24     Q.  And if he said, "Well, I want you
25  to try and find out.  Take whatever steps you

113 (Pages 446 - 449)

1  need to try and figure out whether you can,
2  and then report back to me." What would you
3  do?
4       MR. BADALA: Objection to form.
5       THE WITNESS: I don't know.
6  BY MR. BOEHM:
7       Q.  Is your mom in the medical field?
8       MR. BADALA: Objection to form.
9       THE WITNESS: She's a nurse.
10  BY MR. BOEHM:
11      Q.  Have you ever had a request from
12  somebody in County government to assist in
13  addressing any particular individual with an
14  opiate substance abuse problem?
15      MR. BADALA: Objection to form.
16      THE WITNESS: I don't know if
17  I've had a request to deal with an
18  opiate-specific problem, but I have had
19  several requests for an assist to secure
20  treatment for drug abuse.
21  BY MR. BOEHM:
22      Q.  Individuals in the County have
23  come to you and requested your assistance in
24  securing treatment for drug abuse?
25      MR. BADALA: Objection to form.

1  BY MR. BOEHM:
2       Q.  Did I understand that right?
3       A.  That's correct.
4       Q.  Who has done that?
5       MR. BADALA: I'm only going to
6  instruct you not to disclose someone's
7  personal health information, that's what
8  my instruction is going to be.
9       If you can answer that
10  question --
11      MR. BOEHM: Even by saying that,
12  Sal, even the mere suggestion that she
13  should not answer that question is
14  improper.
15      There's nothing improper about
16  the question. There's no basis for her
17  not to answer it. And you even saying
18  that is improper because it does, I
19  think -- is very much intended to
20  suggest to her that she shouldn't
21  respond. There's no basis for that.
22      MR. BADALA: If I can finish?
23  You jumped right in. Let me finish.
24      What I'm telling you is that if
25  this requires -- if answering this

1  question requires you to disclose this
2  person's name --
3       MR. BOEHM: I didn't ask about
4  any names.
5       MR. BADALA: You asked her who.
6  Didn't you ask that?
7       MR. BOEHM: I asked who came to
8  you with requests about --
9  BY MR. BOEHM:
10      Q.  Were you suggesting that -- let
11  me ask you this question.
12      MR. BOEHM: Maybe you heard a
13  different --
14      MR. BADALA: Maybe you asked it
15  wrong.
16      MR. BOEHM: Well, maybe you
17  understood it. We'll see.
18  BY MR. BOEHM:
19      Q.  Have individuals from the County
20  come to you requesting assistance for their
21  own substance abuse treatment?
22      A.  No.
23      Q.  Okay.
24      MR. BADALA: There you go.
25

1  BY MR. BOEHM:
2       Q.  So have individuals come to you
3  requesting assistance for substance use
4  treatment for members of their family?
5       A.  Yes.
6       Q.  And who has done that?
7       A.  It wasn't his family member, but
8  Dennis Kennedy, my boss, asked me. It was a
9  friend of his son's.
10      Q.  Did you talk to your mother about
11  that?
12      A.  I believe I did.
13      Q.  What did you discuss with your
14  mother about that?
15      A.  At the time, my mother worked for
16  the Cleveland Clinic, and treatment beds are
17  hard to come by in the city of Cleveland,
18  Cuyahoga County. So I was asking her where
19  should this person go; what's their first
20  step.
21      Q.  And were you trying to provide
22  assistance to this friend of Mr. Kennedy so
23  that the person could get treatment for
24  substance use?
25      MR. BADALA: Objection to form.

Page 454

1      THE WITNESS:  I was trying to
2   give them some information on how they
3   go about securing treatment.
4   BY MR. BOEHM:
5      Q.  Okay.
6      Do you know if that person got
7   any preferential treatment, in terms of
8   securing treatment for substance use
9   disorder?
10      MR. BADALA:  Objection to form.
11      THE WITNESS:  I wouldn't know
12   that, but I didn't even disclose his
13   name to my mother, so it wouldn't have
14   come from my family.
15      MR. BOEHM:  All right.  Let's go
16   off the record.
17      THE VIDEOGRAPHER:  Off the
18   record, 6:37.
19      (Recess taken from 6:37 p.m. to
20   6:43 p.m.)
21      THE VIDEOGRAPHER:  On the record,
22   6:43.
23      MR. BOEHM:  Ms. Keenan, thank you
24   very much for your time here today.  I
25   know it's been a long day.  It's much

Page 455

1   appreciated.  We did it, and thanks for
2   your time.
3      I don't know if Mr. Badala is
4   going to have questions of you or not.
5   If he does, I'll have some follow-ups.
6   If he doesn't, then I think you'll be
7   done for the day.
8      THE WITNESS:  Okay.
9      MR. BADALA:  Any questions?
10   Okay.
11      So, just for the record,
12   defendants have said they have no
13   further questions at this time.
14      ---
15      EXAMINATION
16   BY MR. BADALA:
17      Q.  Ms. Keenan, I have a few
18   questions for you.
19      Do you recall testifying earlier
20   that you, yourself, do not separate
21   prescription opioids, heroine, carfentanil,
22   and Fentanyl?
23      A.  Yes.
24      Q.  Why don't you separate
25   prescription opioids, heroine, carfentanil,

Page 456

1   and Fentanyl?
2      A.  Because I associate them all with
3   prescription opiates.
4      Q.  What do you mean by that?
5      A.  Based on what I've read, my
6   understanding is the increase in the use of
7   heroin is directly attributable to the
8   increase in the use of prescription opiates.
9      Q.  And is that the same for
10   Fentanyl?
11      A.  That's correct.
12      Q.  Ms. Keenan, you mentioned earlier
13   about a report about the Cuyahoga County
14   jail.  Do you recall that?
15      A.  Yes.
16      Q.  And to your knowledge, does that
17   have -- does that report have any connection
18   to the impact of the opioid epidemic?
19      A.  It does.
20      One of the allegations in the
21   report was that inmates weren't being
22   treated medically on a timely basis, and
23   they weren't receiving proper medical care.
24      And part of the county's problem
25   is that the increase in the number of

Page 457

1   inmates that are coming in opiate-addicted,
2   the county has not been able to fully
3   respond to that.
4      Q.  Do you believe County
5   Executive Budish has any necessary
6   information that you do not have regarding
7   the budget process within Cuyahoga County?
8      MR. BOEHM:  Objection.  Lack of
9   foundation.
10   BY MR. BADALA:
11      Q.  Let's go back a little bit here.
12      Do you recall testifying about
13   your communications with County
14   Executive Budish earlier here today?
15      A.  Yes.
16      Q.  And do you recall Mr. Boehm
17   asking you questions about the county
18   executive's authority to recommend a budget
19   to the county council?
20      A.  I do.
21      Q.  And do you believe County
22   Executive Budish has any necessary
23   information that you do not have regarding
24   the budget process within Cuyahoga County?
25      MR. BOEHM:  Objection, calls for

115 (Pages 454 - 457)

Page 458

1    speculation and lacks foundation.
2    BY MR. BADALA:
3        Q.  You can answer.
4        A.  No, he does not.
5        Q.  Now, earlier you heard about
6    county council members.
7        Do you recall that?
8        A.  Yes.
9        Q.  Do you believe any of the county
10   council members have any necessary
11   information that you do not have regarding
12   the budget process within Cuyahoga County?
13       MR. BOEHM:  Lacks foundation and
14   utterly calls for speculation.
15       MR. BADALA:  You can only object
16   to form.  Can you just make your
17   objection to form?
18       MR. BOEHM:  It's made.
19       MR. BADALA:  Okay.  No speaking
20   objections.
21       MR. BOEHM:  It's a form
22   objection.  Go ahead.
23       THE WITNESS:  No, I don't believe
24   they do.  The budget process is dictated
25   by the Office of Budget and Management.

Page 459

1    BY MR. BADALA:
2        Q.  Do you believe County
3    Executive Budish has any necessary
4    information that you do not have regarding
5    the impact of opioids on Cuyahoga County?
6        MR. BOEHM:  Lacks foundation,
7    calls for speculation.
8        MR. BADALA:  Please only state
9    "objection to form."  That's what the
10   rules are in this case.
11       If you want to keep making
12   speaking objections, we'll note it for
13   the record.
14       MR. BOEHM:  It would be nice if
15   you'd followed your own rule today.
16       MR. BADALA:  I stated "Objection
17   to form."  Are you telling me right
18   now --
19       MR. BOEHM:  Sometimes you didn't.
20       MR. BADALA:  Make your objection
21   to form.
22       MR. BOEHM:  Sometimes you did and
23   sometimes you didn't, Sal.
24       MR. BADALA:  Make your objection
25   to form

Page 460

1    BY MR. BADALA:
2        Q.  You can answer the question.  Or
3    do you need it repeated?
4        MR. BOEHM:  The record speaks for
5    itself.  You know you didn't always.
6    BY MR. BADALA:
7        Q.  Do you need it repeated?
8        A.  I don't need it repeated.
9        I do not believe he has any
10   knowledge that I'm also not aware of.
11       Q.  Well, let me ask that again,
12   because I think that was a different answer.
13       A.  Relative to the opiate epidemic.
14       Q.  I'll ask again.
15       Do you believe County
16   Executive Budish has any necessary
17   information that you do not have regarding
18   the impact of opioids on Cuyahoga County?
19       MR. BOEHM:  Speculation.
20   Foundation.
21       THE WITNESS:  No, I don't believe
22   he does.
23   BY MR. BADALA:
24       Q.  Do you believe the county council
25   members have any necessary information that

Page 461

1    you do not have regarding the impact of
2    opioids on Cuyahoga County?
3        MR. BOEHM:  Same objections.
4        THE WITNESS:  Absolutely not.
5    They do not.
6    BY MR. BADALA:
7        Q.  Do you believe Dennis Kennedy,
8    the CFO, has any necessary information that
9    you do not have regarding the budget process
10   within Cuyahoga County?
11       MR. BOEHM:  Same objections.
12       THE WITNESS:  Absolutely not.
13   BY MR. BADALA:
14       Q.  Do you believe the CFO,
15   Dennis Kennedy, has any necessary information
16   that you do not have regarding the impact of
17   opioids on Cuyahoga County?
18       MR. BOEHM:  Same objections.
19       THE WITNESS:  No, he does not.
20       MR. BADALA:  Okay.  I have no
21   further questions.
22       MR. BOEHM:  Great.  I do have
23   some follow-ups.
24       MR. NAEEM:  Let's go off the
25   record.

116 (Pages 458 - 461)

Page 462

1    THE VIDEOGRAPHER:  Off the
2  record, 6:49.
3    (Recess taken from 6:49 p.m. to
4  6:58 p.m.)
5    THE VIDEOGRAPHER:  On the record,
6  6:58.
7    ---
8    RE-EXAMINATION
9  BY MR. BOEHM:
10    Q.  Hi, Ms. Keenan.  I have just a
11  few follow-up questions based on some of the
12  things that your lawyer over here asked you.
13    Do you recall that some heroin
14  users have never used a prescription opioid
15  medication?
16    MR. BADALA:  Objection to form.
17    THE WITNESS:  I'm sure there are
18  some heroin users.
19  BY MR. BOEHM:
20    Q.  And you're not an expert in the
21  statistics of how opiate substance abuse
22  sufferers first become addicted to opiates,
23  correct?
24    MR. BADALA:  Objection to form.
25    THE WITNESS:  I am not an expert

Page 463

1  in that area.
2  BY MR. BOEHM:
3    Q.  You're not an expert in
4  epidemiology or biostatistics?
5    MR. BADALA:  Objection to form.
6    THE WITNESS:  I am not an expert
7  in either of those areas.
8  BY MR. BOEHM:
9    Q.  And you're not an expert in
10  addiction medication, correct?
11    MR. BADALA:  Objection to form.
12  I'm going to use a Mr. Boehm objection:
13  Asked and answered.
14    THE WITNESS:  I am not an expert
15  in addiction.
16  BY MR. BOEHM:
17    Q.  And, in fact, earlier today when
18  I asked you some questions about Fentanyl,
19  you said you weren't even sure what Fentanyl
20  is, right?
21    MR. BADALA:  Objection to form.
22    THE WITNESS:  No.  I do not know
23  the chemical makeup of Fentanyl.
24  BY MR. BOEHM:
25    Q.  And you didn't know whether it's

Page 464

1  a prescription, or whether it's an elicit
2  product as it's being used in
3  Cuyahoga County, right?
4    MR. BADALA:  Objection to form.
5    THE WITNESS:  Okay.  I don't
6  remember saying that.  That was many
7  hours ago.
8  BY MR. BOEHM:
9    Q.  Is that true?  You don't know?
10    A.  I don't know.
11    Q.  You mentioned, or your lawyer
12  mentioned this report about a jail and
13  inmates not being treated on a timely basis.
14    Do you remember the questions
15  about that?
16    A.  I do.
17    Q.  Do you know specifically what the
18  numbers of opiate-addicted inmates is at the
19  Cuyahoga County Jail?
20    A.  That number will change daily.  I
21  don't know what it is off the top of my head.
22    Q.  Do you keep track of the trends
23  in terms of opiate-addicted inmates?
24    A.  I do not.
25    Q.  Have you ever?

Page 465

1    A.  I have requested that data
2  periodically, but I do not track it on a
3  routine basis.
4    Q.  So you don't really have any
5  basis to say whether or not the delays in the
6  number of -- or the delays in treatment is
7  specifically related to opiate-addicted
8  patients, correct?
9    MR. BADALA:  Objection to form.
10    THE WITNESS:  I do have a basis
11  for saying that because I communicate
12  with everybody that works in the jail.
13  And that's what's reported back, that
14  they're being --
15  BY MR. BOEHM:
16    Q.  Have you -- I'm sorry.
17    A.  I'm sorry -- being overwhelmed by
18  the increase in the number of inmates that
19  are coming in addicted to opiates.
20    Q.  That's just based on your
21  conversations, right?
22    A.  That's correct.
23    Q.  You don't know the numbers?
24    MR. BADALA:  Objection, form.
25    THE WITNESS:  Not off the top of

117 (Pages 462 - 465)

Page 466

1      my head.
2      BY MR. BOEHM:
3          Q.  Well, top of your head or not,
4      it's not something you regularly track,
5      right?
6              MR. BADALA:  Objection to form.
7          Asked and answered.  Misstates
8          testimony.
9              THE WITNESS:  As I said, I have
10         requested that data, so I've seen it
11         before.  But I do not track it on a
12         routine basis.
13     BY MR. BOEHM:
14         Q.  Have you read this report about
15     the jail?
16         A.  Yes, I have.
17         Q.  Did you read the whole thing?
18         A.  Yes, I did.
19         Q.  Did you read about the vermin
20     infestations?
21         A.  Yes, I did.
22         Q.  Was that related to opiates?
23         A.  I wouldn't know.
24         Q.  Did you read about children being
25     housed with adults?

Page 467

1          A.  Yes, I did.
2          Q.  Was that related to opiates?
3          A.  I wouldn't know.
4          Q.  You wouldn't know?  You don't
5      know one way or another?
6          A.  I don't know one way or --
7          Q.  You don't know whether the vermin
8      infestation is related to opiates or not?
9              MR. BADALA:  Objection to form.
10         Asked and answered.
11             THE WITNESS:  I don't know why we
12         have vermin in the county jail.
13     BY MR. BOEHM:
14         Q.  But you do know what
15     Armond Budish thinks, and you know everything
16     he thinks and knows, right?
17             MR. BADALA:  Objection to form.
18         Misstates the testimony.
19             THE WITNESS:  That wasn't the
20         question that was asked of me, and that
21         wasn't my answer to the question that
22         was asked of me.
23             I do know that Armond Budish
24         knows nothing about the budget process
25         that I don't know, and I know that

Page 468

1          Armond Budish knows nothing about this
2      county budget that I don't know.
3      BY MR. BOEHM:
4          Q.  Do you sit in on every meeting
5      that the county executive has?
6          A.  I do not.
7          Q.  Do you know if Mr. Budish has
8      ever had conversations with department,
9      division, or program heads related to the
10     opiate crisis that you have not been a part
11     of?
12             MR. BADALA:  Objection to form.
13             THE WITNESS:  I don't know.
14     BY MR. BOEHM:
15         Q.  And you don't listen in on his
16     conversations?
17             MR. BADALA:  Objection, form.
18             THE WITNESS:  I do not, but I
19         communicate with Armond, so I am well
20         aware of what he knows and what he does
21         not know.
22     BY MR. BOEHM:
23         Q.  Do you have access to his email
24     account?
25         A.  I routinely communicate with him.

Page 469

1          No, I don't have access to his
2      email.
3          Q.  So you don't know whether or not
4      he's had email communications with
5      department, division, or program leads within
6      Cuyahoga County government about opiates,
7      right?
8              MR. BADALA:  Objection to form.
9              THE WITNESS:  I don't but, like I
10         stated, I have had these conversations
11         with Armond for several years.  I know
12         what he knows, and it's no more than I
13         know.
14     BY MR. BOEHM:
15         Q.  You've had conversations with
16     him, but you've not been a party to all of
17     his conversations, fair?
18         A.  During the course of our
19     conversations, he has communicated to me what
20     he knows.
21         Q.  Has he told you, "Hey, Maggie, I
22     have told you about every conversation and
23     every thought I've had as it relates to
24     opiates"?  Has he ever said that to you?
25             MR. BADALA:  Objection to form.

118 (Pages 466 - 469)

Page 470

1    THE WITNESS:  No.
2  BY MR. BOEHM:
3    Q.  Has he ever said anything like
4  that to you?
5    A.  He has told me what he knows
6  about the opiate epidemic.  He has told me
7  what he knows about the impact of the opioid
8  impact on the county budget.  And he has told
9  me what he knows about the county budget and
10  the county budget process.
11    And I can assure you, none of
12  that was unknown to me.
13    Q.  He's the one who sets the
14  policies, right?
15    MR. BADALA:  Objection to form.
16    Are we past that six minutes?
17  BY MR. BOEHM:
18    Q.  For the county government?
19    A.  Not solely, no.
20    Q.  And the county council is the
21  ones who approves the budget, right?
22    A.  Ultimately, yes.
23    Q.  Do you know if members of the
24  county council have had communications that
25  you've not been privy to with department,

Page 471

1  division, or program heads related to
2  opiates?
3    MR. BADALA:  Objection to form.
4    THE WITNESS:  If I wasn't privy
5    to the conversation, I can't confirm or
6    deny that it happened.
7  BY MR. BOEHM:
8    Q.  Right.  So you don't know, right?
9    MR. BADALA:  Objection to form.
10    THE WITNESS:  That's correct.
11  BY MR. BOEHM:
12    Q.  And you don't know what they've
13  said about their views on opiates to those
14  individuals, and you don't know what,
15  division, department, and program leads have
16  said to the county council, to the extent you
17  have not, yourself, been a part of that
18  conversation, correct?
19    MR. BADALA:  Objection to form.
20    THE WITNESS:  I do know to a
21    certain extent what the county council
22    members know, because they communicate
23    that publicly in committee meetings and
24    council meetings.
25    And the majority of the

Page 472

1  interactions that the directors have
2  with the council members are in public
3  meetings.
4    We're prohibited from having
5  individual meetings with all the county
6  council members separately about the
7  same topic.  We have to do that
8  publicly.
9  BY MR. BOEHM:
10    Q.  A division head can call a member
11  of the county council and have a conversation
12  on the telephone or by email, right?
13    MR. BADALA:  Objection to form.
14    THE WITNESS:  I didn't say they
15  couldn't.
16  BY MR. BOEHM:
17    Q.  And they could talk about their
18  views on opiates, right?
19    MR. BADALA:  Objection to form.
20    THE WITNESS:  That's correct.
21  BY MR. BOEHM:
22    Q.  And you wouldn't know anything
23  about that?
24    MR. BADALA:  Objection to form.
25    THE WITNESS:  I believe I've

Page 473

1  answered that.  Yes.
2  BY MR. BOEHM:
3    Q.  You would not know anything about
4  that, right?
5    A.  That's correct.
6    MR. BOEHM:  Thank you.
7    MR. BADALA:  Any other questions?
8    How about on the phone?  No one
9  on the phone?  Okay.
10    I have no further questions.
11    MS. COLLINS:  Thanks.
12    MR. BOEHM:  Thanks.
13    THE VIDEOGRAPHER:  Off the
14  record, 7:04.
15    (Time noted: 7:04 p.m.)
16
17
18
19
20
21
22
23
24
25

119 (Pages 470 - 473)

Page 474

1
2      I, ANNE E. VOSBURGH, Certified Shorthand
3  Reporter, Registered Professional Reporter,
4  Certified Realtime Reporter, and Notary
5  Public, hereby certify:
6      That MARGARET "MAGGIE" KEENAN was duly sworn by me,
7  an authorized Notary Public, and that this
8  deposition is a true and correct record of
9  the testimony given by such witness to the
10  best of my knowledge and ability.
11      I further certify that I am not related
12  to any of the parties to this action and that
13  I am in no way interested in the outcome of
14  this matter.
15      In witness whereof, I have hereunto set
16  my hand this day, December 17, 2018.
17
18      _Anne E Vosburgh_
19  Anne E. Vosburgh, CSR-6804, RPR, CRR
20
21
22
23
24
25

Page 475

1          Veritext Legal Solutions
           1100 Superior Ave
2             Suite 1820
          Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
    December 18, 2018
5
    To: Salvatore Badala, Esq.
6
    Case Name: In Re: National Prescription Opiate Litigation
7
    Veritext Reference Number: 3153090
8
    Witness:  Margaret Keenan      Deposition Date:  12/12/2018
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 476

1          DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3153090
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 12/12/2018
4   WITNESS' NAME: Margaret Keenan
5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____
9   Date            Margaret Keenan
10     Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
16      I have affixed my name and official seal
17  this _____ day of _____, 20____.
18      _____
        Notary Public
19
        _____
        Commission Expiration Date
20
21
22
23
24
25

Page 477

1          DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3153090
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 12/12/2018
4   WITNESS' NAME: Margaret Keenan
5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9      I request that these changes be entered
    as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date           Margaret Keenan
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18      in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20      their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of _____, 20____.
23      _____
        Notary Public
24
        _____
25      Commission Expiration Date

120 (Pages 474 - 477)

Page 478

1     ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 12/12/2018
3  PAGE/LINE(S) /      CHANGE      /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19

   _____    _____
20 Date          Margaret Keenan
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
      Notary Public
24

      _____
25    Commission Expiration Date

**&**

**&** 2:7 4:4,12 5:6
6:7 11:23 12:2,3,5
12:8

**0**

**0.25** 219:24 224:7
**000010910** 8:11
160:21
**000011080** 8:12
160:22
**001641531** 10:12
437:1
**001715624** 9:12
412:8
**001729677** 10:13
437:2
**001729694** 10:14
437:3
**001732895** 9:17
420:4
**001738714** 9:4
390:9
**001739956** 9:2
378:6
**001742324** 9:9
401:9
**001742325** 9:10
401:10
**001749074** 9:11
406:22
**001753000** 9:20
424:11
**001753465** 9:14
415:9
**001753466** 9:15
415:10
**001757582** 8:21
360:5
**001763476** 8:19
341:14

**001763483** 8:20
341:15
**001764146** 9:6
393:18
**001764148** 9:7
393:19
**001764533** 8:17
332:12
**001764535** 8:18
332:13
**001764847** 8:23
372:4
**001764848** 8:24
372:5
**003301608** 8:4
45:16
**003301609** 8:5
45:17
**005324032** 8:14
322:2
**005324034** 8:15
322:3
**08** 314:5

**1**

**1** 8:3 9:3 45:18,21
65:15 162:8,12
346:25 390:8,13
391:23
**1,600** 309:20
**1.5** 219:4 353:16
353:18 354:14
**1.6** 202:5
**1.66** 227:6
**1.7** 93:13
**10** 9:3 49:3 93:15
128:11,12 193:16
230:7,13,14
317:14 355:11
390:4,10
**100** 246:16 300:17
301:11 304:15

**308:**10,11
**100,000** 242:8,9
324:12 356:9
**1000** 6:18
**10960** 313:5
**10:11** 46:9 64:7
65:2
**10:54** 108:17,18
**11** 9:5 122:18,24
124:13 125:21
128:15 159:20
169:9 393:16,20
394:9 397:19
**1100** 4:16 475:1
**11008** 210:12
**11009** 212:23
**11010** 219:17
222:8,11,14
225:15 234:18
**11012** 230:22
234:14 235:5
**11014** 252:10
**11064** 162:5,6
218:5,6 226:9
**11065** 218:5
**11067** 218:5
**11070** 221:15
**11072** 245:21
**11074** 246:7
**11076** 277:23
280:11
**11747** 3:7
**11:07** 108:19,21
**11th** 399:23
**12** 1:18 2:3 7:7 9:8
11:2 47:3 92:19
163:1 193:15
401:11,14
**12.1** 235:1
**12.2** 163:17

**12.3** 163:17
**12.5** 163:11,13
**12/12/2018** 475:8
476:3 477:3 478:2
**12:19** 182:7,8
**12th** 11:8
**13** 9:11 406:21,24
**1301** 6:17
**13334** 474:18
**136** 8:6
**14** 7:16 9:12
234:13,20 237:1
412:9,11 434:15
**140** 434:9,10
435:17
**141** 246:10,18
**145** 355:24
**15** 9:13 415:6,11
**150,000** 355:22
**154** 161:21
**15th** 360:10
410:24
**16** 9:16 163:18
164:14 235:17
236:24 266:14
420:2,5
**160** 8:9
**17** 1:7 9:18 10:16
104:8 163:9,18
164:11,14 236:25
259:23,25 424:9
424:13 474:16
**1729677** 437:23
**1738714** 390:7
**1757582** 360:9
**1763476** 341:23
342:17
**18** 10:2,8,11
147:24 148:3
233:24 236:25
430:23 431:4,6,11

436:6 437:1,11
475:4
**1820**  475:2
**18th**  373:15
**19**  10:10 164:10
192:24 225:22
236:25 436:24
437:4
**1950**  2:8
**1999**  29:23 30:1
377:20
**1:04**  182:9,14
**1:13**  189:18,19
**1:14**  189:20,22
**1:18**  1:12

**2**

**2**  8:6 107:9 136:14
136:17 155:17
167:7 193:14
333:19 347:1
349:25 350:6,11
350:18 351:10,14
353:2,21 402:4
427:8 432:22
433:4,13
**2,550**  309:20
**20**  101:25 196:7,11
200:16 201:5
277:4 357:16
476:16 477:22
478:22
**200**  3:16
**2000**  72:25 117:10
236:23 377:20
**20001-2113**  5:18
**20001-3743**  6:9
**20001-4956**  5:9
**20005**  4:6 6:19
**2003**  266:1 271:20
272:3,6

**2006**  14:9 78:4
107:16,20,23
109:2,12,17,24
268:24 317:2
368:16 369:1
420:14,17 443:6
**2007**  78:1 369:12
**2008**  115:21
117:11,16 118:3
118:19 119:16,24
120:7 314:4
369:16
**2009**  115:21
117:11 118:4
120:1,20 121:2,16
314:5 369:20
**2009/2010**  37:4
**2010**  114:18
115:12,22 117:11
118:6 272:11
322:13 369:24
**2011**  118:7,10,16
135:1 370:3
**2012**  119:2,7,8,22
119:23 120:11,16
120:20 121:2
122:15 129:25
130:2 365:21,24
370:7
**2013**  66:4,6 83:4,6
83:9 97:6 98:1,3
199:10 200:2
370:11 434:11
**2014**  97:6 98:19
237:3,8 370:15
**2015**  98:20,23
111:17,22 130:2
142:13 235:17
236:24 265:17,18
279:13,16 318:3,4
318:8,13 370:17

370:21 371:5,7,9
371:13,16,19,19
377:4
**2016**  162:25
164:10,17 176:1
259:19,23 260:1,4
263:8 318:3,4
360:10 362:8
363:8,10 371:19
415:13 436:5
437:12
**2016/2017**  199:14
**2017**  131:11
153:21 163:2,10
165:13,20 196:4
259:14,18,19
263:12,18,20,23
264:2,12,15 266:6
266:6 318:4
332:25 348:15
350:13 372:12
402:2 410:24
434:8,14 435:2,11
435:22
**2018**  1:18 2:3 9:3
11:2,9 15:25 47:3
69:9 81:17 153:21
163:16 164:9
165:15 166:11
175:12 192:18,23
196:5 202:3
225:22 231:6
234:25 245:8,17
306:2,5,12,16
318:4 321:12
333:15,24 342:19
343:10 345:23
377:2 378:13
390:8,14 391:24
393:22 394:9
398:11 400:18

401:2,24 412:12
420:25 424:15
474:16 475:4
**2018-2019**  8:9
160:19
**2018/19**  184:10
**2018/2019**  161:2
207:11 216:6
264:9
**2019**  192:18 231:6
245:8 333:15,25
377:5 400:18
**202.414.9200**  6:20
**202.434.5421**  4:7
**202.662.6000**  5:10
**202.879.3939**  5:19
**202.942.5404**  6:10
**2020**  69:17
**2021**  36:6
**20a099**  281:15
**20a30**  302:23
**20a303**  289:6
**20a377**  296:25
**21**  148:1
**216-523-1313**
475:3
**23**  376:25 434:10
435:4,21
**231.8**  245:8
**238.2**  219:3
**23rd**  348:15
**24**  376:25
**240**  241:7
**24a435**  306:22
**24a510**  308:12
**25**  317:12 342:19
375:2,6
**25th**  343:10
**26th**  415:20 427:5
**27**  246:5

[274 - 900,000]

**274** 7:16
**27th** 322:13
**2804** 1:6,7
**28312** 295:10
**28a11** 301:14
**2:08** 240:1,2
**2:18** 240:3,5
**2:43** 373:15
**2:50** 269:13
**2:52** 269:14,16

**3**

**3** 8:9 124:9,14
125:14,19,23
126:12 160:23
161:1 184:13
199:1 264:8 313:6
**3.5** 243:9
**3.8** 243:5
**3.9** 243:11
**3.9.** 243:12
**30** 47:16 131:11,15
131:18,25 132:7
132:21 133:2
134:20,22 135:2
182:4 216:9,12
217:13,22 318:10
318:19,20,24
362:14,22,23
363:15 366:10
398:25
**305** 3:6
**3153090** 1:25
475:7 476:2 477:2
**31st** 54:22
**322** 8:13
**332** 8:16
**341** 8:19
**3478** 348:14
**3479** 349:8
**3482** 355:1

**35** 300:25 318:9,14
**360** 8:21
**37** 246:5
**372** 8:22
**375** 165:17 235:2
**378** 9:2
**39** 216:5,12 217:13
217:23 311:21
316:15,17 371:11
379:7
**39,363,659** 333:15
**390** 9:3
**393** 9:5
**3:35** 312:22,23
**3:48** 312:24 313:1

**4**

**4** 8:13 322:4,8
**4.2** 259:20 260:2,4
260:15 261:3,16
262:12 263:3,9
266:7,15
**4.2.** 261:1 266:19
**40** 91:10
**400** 3:6
**401** 9:8
**406** 9:11
**41** 246:17
**412** 9:12
**415** 9:13
**420** 9:16
**424** 9:18
**430** 10:2
**432.9** 219:2
**43220** 3:17
**436** 10:10
**44113** 4:17
**44113-197255** 2:9
**44114** 475:2
**45** 8:3
**450** 155:16

**45090** 1:12
**455** 7:8
**462** 7:9
**477** 341:24
**48** 7:15
**482** 342:17
**483** 342:24 343:1
**4:17** 342:6,7
**4:25** 342:8,10

**5**

**5** 8:16 149:12
156:16 200:22,23
201:3,9 242:9,15
243:7,10 332:10
332:14
**50** 92:5 94:13
212:21 213:3,5
214:3
**500,000** 351:7
353:2,25
**5003** 3:15
**51** 5:17 109:10
**510** 310:19
**5324032** 327:5
**55** 2:8 231:15,20
**5:09** 388:6,7
**5:21** 388:8,10
**5:41** 411:12
**5:57** 411:13,15
**5th** 332:25

**6**

**6** 8:19 47:16
124:10,15 125:14
125:19,23 126:12
201:13 319:11,14
319:16 320:7
321:12 341:16,18
342:14 362:14,22
362:23 363:15
366:10

**60** 246:16 375:19
385:10 386:11,18
**601** 6:8
**614.846.1700** 3:18
**62** 233:13 235:3
**631.224.1133** 3:8
**64** 246:4
**65** 7:15
**650** 144:1
**6804** 1:24 2:12
474:19
**6:37** 454:18,19
**6:43** 454:20,22
**6:49** 462:2,3
**6:58** 462:4,6

**7**

**7** 8:21 92:25
185:23 186:4
319:15 360:6,9
396:23 403:7
432:16
**7.4** 91:8,12
**70** 92:24 233:21
375:19,19
**725** 4:5
**73** 310:24 311:1
**7:04** 473:14,15

**8**

**8** 8:22 310:21
311:1 372:6,10
**85** 150:22
**850** 5:8
**86** 85:20
**88** 85:21

**9**

**9** 9:2 219:10 378:7
378:10
**90** 57:25
**900,000** 186:4

**920** 119:12 242:4
**950** 4:15
**9:00** 1:18 2:4 11:2
**9:09** 11:7
**9:28** 32:21,22
**9:36** 32:23,25
**9:50** 46:8
**9:52** 47:3

**a**

**a.m.** 1:18 2:4 11:2
32:21,22,23 46:8,9
47:3 64:7 108:18
108:19
**ability** 90:15
111:19,20 116:16
123:18 124:3
125:7 127:13
132:22 267:9
309:17 433:21
444:13 474:10
**able** 33:4 38:10
72:6 88:12 103:8
158:3 166:1
175:25 219:9
243:7 272:23
285:21 289:22
297:20,24 299:4
309:9,13 364:16
373:20 412:15
431:25 433:15,18
457:2
**absent** 45:4
**absolutely** 14:16
29:5 37:8 61:16
92:11 127:15
131:20 132:22
144:16 151:11
172:7 181:9
188:22 201:6
265:5 271:6
276:12 317:25

330:7 341:1 376:9
403:12 461:4,12
**abuse** 17:4,18,22
18:6 19:7,23
20:22 21:16 28:12
91:17 132:1
140:18 141:22
178:1,10 181:12
185:1 194:10
195:6 196:23
198:19 199:6
201:19 202:1
203:7 257:25
280:9 284:11
286:10 287:6
291:21 292:22
301:25 305:4
307:8,13,18 320:9
361:2,24 362:10
363:12,20 364:4
365:7 366:21
368:8,15 369:11
370:24 371:16
388:20 412:4
415:2 428:16
450:14,20,24
452:21 462:21
**abusing** 101:16
**academic** 76:6
249:22
**accept** 193:8
**accepted** 84:5
**accepting** 184:16
**access** 204:10
297:3 316:8 331:5
334:19 404:18
443:5 468:23
469:1
**accommodate**
302:14

**accompanied**
195:19
**account** 212:23,25
252:20 468:24
**accounted** 102:8
102:19,23 103:16
106:9 121:23
244:10 245:12
**accounting** 72:12
75:16,20 76:10
88:6 102:14
210:18
**accounts** 383:9
384:2
**accredited** 441:21
**accurate** 183:1
438:10 447:24
**accurately** 38:11
38:14 230:17
**accusations** 63:7
**acknowledge**
476:11 477:16
**acknowledges**
341:5
**acollins** 6:23
**acronym** 189:7
**act** 133:5,13,22
135:19 300:2
476:14 477:20
**acting** 99:24
**action** 474:12
**active** 172:6
**actively** 170:18
**activities** 240:18
329:24
**activity** 84:10
157:1 210:22
214:22 245:2
246:1 254:1 289:7
337:9 397:5 408:1
443:17 444:8

**actual** 150:15
161:20 163:9
165:5 178:11
179:9 266:9,17,18
266:19 268:19,23
269:4,19 270:16
271:4 272:1
273:21 279:8
340:17 358:23
359:9 403:9
428:19 429:22
435:15
**actuals** 9:16 163:3
163:11 236:14
259:19,24 263:21
265:25 420:3,13
**ad** 79:3 181:18
185:3 301:23,24
408:14 442:12,18
442:24 444:16
**adam** 6:11 12:7
**adam.pergament**
6:13
**adamhs** 81:3
195:24 197:1
199:11 200:2,13
200:15 238:6,11
311:20,20 313:17
313:23 314:1
316:9 322:24,25
332:20 333:5,14
333:25 334:7,18
334:22,25 335:18
335:23 337:24
339:18 340:5,23
341:9 359:25
360:17 371:9
372:13,16,22,25
373:7 379:3
381:14,25 444:19

adamhs's 337:8
381:9
add 118:12 213:25
320:2 421:3
added 165:23
215:19 373:16,20
373:21
addicted 128:2
185:15 195:12
232:1 255:3 281:6
284:17,20 285:17
297:10 303:11,15
303:21 335:6
379:22 444:17
457:1 462:22
464:18,23 465:7
465:19
addiction 81:7
195:25 240:19
248:22 282:1
284:18 297:15,21
303:6,9 305:18
313:18 329:16
330:16,20 463:10
463:15
addictions 281:4
addicts 247:16
382:1
addition 145:2
246:12 417:21
additional 79:5
96:14,15 111:24
125:24 134:4
141:13 155:10
169:18 187:14,24
188:21,24 190:24
192:6 194:18,22
195:9,22 196:4,22
201:24 202:5,21
203:20 204:11
205:5 206:12

239:10 267:15
302:18 306:14,16
319:21 327:18
340:5 351:3
358:12 371:10
381:10 384:9
395:13 400:20
401:1,3 402:20
403:3,7 404:7
440:25 441:20
additionally
308:23
address 257:24
293:7 333:4
401:18 475:15
addressing 194:9
203:5 258:13,17
259:1 293:13
411:21 450:13
adhered 89:2,4
adjacent 295:18
adjust 352:15
adjustment
204:21
adjustments
166:13,14 230:11
administered
92:17
administration
25:11 77:10
203:18
administrative
315:6
administrator
20:12 99:11
administrators
105:24
adopt 149:5
adopted 166:10
adoption 289:15

adp 185:12
adult 81:12,14
436:17
adults 466:25
advance 145:25
168:15 246:24
advantage 70:22
advice 34:23 38:15
53:6 54:8,20
343:22
advise 30:24
advised 30:13,16
30:23 31:8
advocacy 401:19
416:19
affairs 110:13
affect 14:2 123:17
156:1,2
affixed 476:15
477:21
afford 73:10 115:6
afraid 418:6
afternoon 182:11
age 436:6,16
agencies 78:23,24
79:5,12 80:1,3
88:7 106:21
107:12 111:23,24
113:9 116:21
133:9 140:24
141:13 169:21
177:13 182:1
184:2,3,19 188:11
192:4 193:2 194:2
198:6 240:16
245:2 251:17,18
290:8 327:11
338:16 339:8,12
355:19 358:2,12
358:22 385:4,10
386:12,18,25

387:4,11,22 402:1
402:17 403:4
444:20
agency 81:1
107:10 113:14
132:8 133:21
134:1 135:18
142:18 144:10,14
167:16 169:18
180:20 191:12
203:8 293:8 298:5
298:13 302:16
318:25 325:4,7,13
326:18 338:21
351:18 355:13
356:15 358:8,17
393:5 395:15
400:19 402:18
440:16 447:19
agents 78:22
ago 33:24 40:7
80:17 121:20
160:10 176:7,8
323:13 380:5
386:17 464:7
agree 59:9 100:15
102:6 112:9 124:9
239:11 407:17
444:5
agreed 202:5,24
agreeing 351:14
411:3
agreement 300:11
agreements
147:16
ahead 13:24 44:8
49:1 86:16 102:10
143:23 193:4
285:13,25 291:25
352:9 363:17
386:12 445:17

458:22

aid 440:2

ain't 54:5

airport 47:25

akin 375:25

al 1:10,11

alcohol 81:6
195:25 313:18

alcoholism 282:4

allegation 96:10
305:4

allegations 37:12
62:24 95:25 97:1
439:25 456:20

alleged 134:12

allocate 101:17

allocated 311:11
350:12,18 353:22

allocation 91:4
349:11,16,25
350:5

allocations 252:25
253:6,10

allow 165:25
261:8,15 358:19
447:7

allowable 156:20
256:16 257:8

allowed 32:2
48:15 53:2,7,19,24
54:4,9,23 55:4,11
55:12 56:7 102:25
158:8

alternative 277:9
281:1

alternatives 286:3
287:15 288:7

amend 202:12

amerisourceberg...
6:15 12:14 439:19

amount 43:3
118:20 119:14
124:25 132:25
143:13 144:13
146:23 150:6,9,17
151:8 152:25
195:6 200:24
214:17 215:12,21
229:6,12,15 241:8
242:11 264:13,16
264:19,20 266:2
268:12,24 279:9
297:21 307:11
320:18 356:23,24
359:9,12 403:9
411:19 414:9
415:1 441:14
444:1

amounted 351:6

amounts 91:1
217:10 242:1

analyses 79:4 84:7
84:12 168:2
169:14 418:2

analysis 84:8,8
415:25 416:6,15
416:17 417:7,16
419:13 423:20

analyst 78:15
79:16,19 81:21
82:23 83:14 87:22
188:16 193:25
194:17 333:8
351:17 442:20

analysts 78:23,25
79:1,9 80:3 83:1
106:22 166:21,24
166:25,25 188:23
189:1 191:13
279:2 351:21
352:14 387:1

analyze 121:19
149:7 180:24
414:18

anne 1:24 2:11
6:21 12:13 474:2
474:19

annual 43:11 79:2
109:13,16 131:12
142:23 376:17

annually 149:7

answer 7:16 13:24
14:25 30:17 31:11
32:8 33:22 34:18
35:10,11 38:14,15
41:1 44:8 48:21
49:19 53:2,20
55:5,15 56:5 58:4
113:20,21 114:3
114:21 135:6
136:4,5 151:15
274:24 275:3,9,25
280:13 323:23
326:23 344:19,22
345:2,16 353:7
354:10 363:24
365:10 367:1,4
368:18 369:4,8
383:17 384:6
390:14 408:24
409:3 416:11
437:15 447:2,9
451:9,13,17 458:3
460:2,12 467:21

answered 135:13
291:23 292:5,24
295:6 307:9
366:24 367:7
409:24 410:15
411:2 419:5
442:14 446:21
448:21 463:13

analyze 121:19

466:7 467:10
473:1

answering 32:10
32:16 38:11 58:5
343:25 344:2
352:5,7 409:1
451:25

answers 299:7
385:8

anticipate 69:20

anticipated 69:8
185:24 245:18
246:3 258:18

anticipation 69:16

anybody 12:10
16:24 20:15 38:18
39:1 40:9 44:2
45:8 60:11 99:3
122:12 138:4
261:13 383:8,14
383:25 408:7
410:2,10 412:2
413:2,6 436:13

anymore 153:15
302:21 377:25
403:1,2

anyway 163:7

aod 329:9

apart 229:11

apologies 343:1
427:12

apologize 427:22

apparent 224:16

apparently 49:22
52:5,12 348:12

appeal 125:18,19

appeals 82:11

appear 476:11
477:15

appearances 3:1
4:1 5:1 6:1

appears 46:1
234:10 333:4
373:6
appellate 82:13
appended 477:11
477:18
application 223:8
apply 70:5 88:12
89:9,14 99:1,4,5
99:14 133:21
403:14,16
appointed 60:3
93:25
apportion 228:2
appraisal 119:22
120:16 122:16
appraisals 120:18
appreciate 64:4
196:16 385:15
444:21
appreciated 455:1
approached 29:13
appropriate 32:8
215:16 289:13
377:10,13 378:3
appropriately
100:22 102:19,23
103:16 106:9
appropriation
267:16,16 268:6
319:3,5 353:20
354:13,14,21
358:20
approval 104:23
105:5 154:15
approvals 105:4,5
approve 168:14
approved 25:10
106:17 168:21
190:6,7 191:25
205:2 206:3,9

340:17
approves 470:21
approximate
215:17 367:17
approximately 2:4
233:21 447:21
approximation
214:8,14,15
april 393:22 394:9
397:19 399:23
415:13,20 424:15
area 20:3 80:12
81:24 82:5 120:3
290:20 435:16
463:1
areas 76:7 90:24
233:8 270:12
463:7
argue 250:3
argumentative
381:19
arm 70:8
armand 400:3
armond 99:12
139:11 141:16
142:11,13 197:7
210:4 341:5
394:12 395:25
396:6 449:6,12
467:15,23 468:1
468:19 469:11
arnold 6:7 12:8
arnoldporter.com
6:13
article 19:4 380:5
380:9,19 381:21
articles 17:16
18:16,18,20,21,22
18:22,25 19:1
25:20,24,25 28:18
29:9

asap 337:22
aside 185:22
319:11 394:11
asked 16:24 38:19
39:3 42:25 53:17
56:5 57:6 68:5
99:4 111:21
120:13 168:15
169:18 173:13,16
173:18,20,23
174:1 175:5,20
177:16,24 178:8
178:15,17 180:5
184:22 185:22
192:7 206:5,10,23
269:2 290:24
291:14,23 292:5
292:24 293:4,6
329:21 340:9,13
344:6,10 366:24
367:6 383:8,12,19
383:21 384:1,1,4
395:19 410:15
412:5 413:15,18
414:2 423:10
424:18 429:13
440:24 441:1
444:22 445:20,21
446:5,21 449:7
452:5,7,14 453:8
462:12 463:13,18
466:7 467:10,20
467:22
asking 13:6 15:5,6
15:8,12,18 17:25
18:7 31:2,3 42:3,4
56:14,25 57:7
76:4 103:10,12
143:10 148:15,16
148:23 168:1
180:10 184:4

187:14 192:4
202:24 203:2,9,22
205:10 207:1
217:4 278:10
284:8 291:11
292:10,25 294:14
323:4 324:21,24
361:13,14 362:12
362:20 366:4,13
367:15,17 371:10
376:14 383:5
384:3 387:19
405:1 408:23
409:2 412:21
429:24 453:18
457:17
asks 177:11
333:23 415:15
assembly 242:5
assessed 132:13
276:20
assesses 276:18
assessment 96:4,7
104:15 159:1,2
281:2,24 325:5
328:22
assessments
156:12
assigned 78:23
92:12,21 97:17
181:18 188:16
232:3,4 301:24
assignment 476:2
477:2 478:2
assist 277:6
450:12,19
assistance 72:22
73:19 74:1 91:5
450:23 452:20
453:3,22

**assistant** 33:17
**assisted** 87:22
  195:14
**associate** 456:2
**associated** 72:4
  74:6 194:25
  195:10 260:22
  289:15 298:5
  300:3 302:24
  308:17 315:7
  349:19 357:22
  408:15
**association** 75:10
  75:13 76:21 77:20
  77:24 78:9
**association's** 77:2
**associations** 76:19
**assume** 336:9
  380:14 381:22
  386:19
**assumed** 402:4
**assuming** 15:8
**assumption**
  353:15
**assure** 470:11
**attached** 10:17
  198:25 349:4
  420:13 477:7
**attachment**
  341:23 421:10,24
**attempt** 305:10
**attempts** 87:2
  431:21
**attend** 76:23 77:1
  77:6
**attended** 77:1
**attention** 268:9
  322:7 348:11
**attorney** 10:4
  14:23 49:16 52:2
  52:11 53:4,8 54:2

54:4,6,11,15 55:8
  92:22 103:7
  344:15,16 345:6
  345:18,24 416:9
  431:1
**attorneys** 39:25
  40:1 43:1 52:22
  59:22,24 92:22
  345:21 346:3
  348:8
**attributable**
  296:21 436:7
  448:17 449:17
  456:7
**attribute** 121:1
  424:23 425:3
  446:18
**attributed** 202:7,8
  231:21 289:20
  296:18 307:12
  390:24 403:12
  445:24
**audit** 234:6
**auditor** 137:17
  209:22
**august** 372:12
  373:15
**authority** 84:21
  85:3,5,8 86:8,18
  87:1,9 88:24
  208:3,7,11,15
  210:1 267:13,17
  268:3,10 339:13
  339:14 354:21
  357:12 457:18
**authorize** 202:19
  477:11
**authorized** 12:18
  74:10 474:7
**automatically**
  414:15

**automobile** 157:15
**autopsied** 385:20
**autopsies** 24:23
  101:9 127:19
  144:7 178:20
  179:16 262:21
  295:17 371:22
  440:10 441:18,23
  442:23 443:5,12
  444:15
**autopsy** 296:3,5
**autopsying** 262:6
**available** 49:20,22
  50:16 62:19 65:11
  112:5 118:21
  124:15,19 125:24
  126:18 132:25
  138:24 148:4,18
  150:6,10,17 152:8
  155:7 158:16
  165:3,6 215:7
  256:11 261:7,14
  262:11 265:4,15
  273:20 291:16
  292:17 295:19
  356:12 425:16
**ave** 6:8 475:1
**avenue** 4:15 5:17
**avenues** 188:17
**average** 140:8,9
  185:12 373:12
  425:8
**avoid** 308:2
**aware** 25:13
  102:20 103:14,20
  106:7 114:6
  183:13 203:2
  237:7 257:22
  258:22 277:1
  307:7 413:12
  425:24 428:23

429:2,6 460:10
  468:20

**b**

**b** 47:16 189:7
  362:14,22,23
  363:15 366:10
**babies** 255:2
**bachelor's** 67:12
  67:13 68:13
**back** 9:18 10:16
  14:5 17:12,13
  22:10 43:10,13
  60:24,25 63:20,21
  65:14 70:15 71:24
  72:25 73:12,17
  75:6 77:8,17
  80:10,22 98:7,21
  98:22 99:11
  107:15,19 108:23
  109:2,4 116:11
  118:13 135:1
  157:4 161:19
  165:13 167:6
  176:10,16 182:16
  184:24,24 198:1,1
  207:7,9 216:8
  217:18 221:14
  222:8,11 226:8
  228:13 235:21
  237:2 238:2
  243:11 244:2
  250:24 252:7
  256:20,24 257:10
  265:17 266:1
  267:1 271:17,18
  271:20 272:3,6
  277:22 279:13
  307:5 308:1,3
  313:4 317:2
  322:11 323:22,24
  325:13 326:17

328:9 329:20
331:3,22 334:5
341:10 342:12
350:16 357:15,16
359:21 364:16
372:12 373:25
376:2 384:6
391:17 393:7,9,11
396:25 399:5
411:17 415:20
416:21 420:14,17
424:10 425:20,25
426:7 427:10,13
427:23 443:1,6
446:2 450:2
457:11 465:13
475:15
**backed** 229:3
**background** 56:22
149:2 210:7 331:1
**backwards** 434:24
**bad** 101:5 110:10
168:9
**badala** 3:9 7:8
11:15,15 13:22
14:15,20 15:5
16:19 17:5,8
18:24 20:6,23
21:9,22 22:2,19
23:2,12,21 24:3
25:12 26:6 28:10
29:10 30:8,22
31:12 32:1 33:1
34:7,18,25 35:7
36:16,18 37:7,14
38:20 39:4 40:18
40:24 41:10,17,24
42:8 44:4,17
49:24 50:15,25
55:18 56:3 59:7,8
60:14,18 61:1

62:25 63:1 64:5
65:3 75:21 80:14
84:23 85:15 86:14
87:4 88:15,21
89:13 95:18,22
100:20 102:24
103:2,5,18 104:20
105:19 106:11
108:1,9 110:17
111:7 112:15
113:3,23 114:2,11
114:20 115:18
116:3,18 118:2,14
118:23 120:9
121:4,11 122:1
123:3,10 124:6,21
126:8 131:4 132:2
133:7,24 134:6,14
135:23 136:10
139:4 140:1,13,20
141:10,24 142:8
143:14,20 145:20
147:7 151:19
154:18 155:8
158:22 160:12
164:12 167:13
169:7 170:9,12
171:14 173:6
174:13 175:16
176:2,12,23
177:20 178:3,13
179:6,18 180:1,6
180:14 181:3,7
182:2 183:4,12
188:8 190:2,16,20
191:3,20 192:2
193:10 194:11
196:24 197:21
198:13 199:7
200:4,11 202:2
203:11 205:19

207:22 208:5,18
209:7,18 214:9,19
215:8,22 217:5
219:11 221:4,7
222:1,15 223:3,14
228:4,15 237:9,17
237:23 239:23
240:13 241:11
246:20 247:4
248:5,16 249:10
249:19,25 250:8
250:16 251:11
252:2 254:14
258:1 259:3
261:10 262:16
267:4 272:18
273:1,10,13
274:17,23 275:5
275:14,19 278:18
280:12 282:5
284:1 285:5,10
286:11 287:7
288:17 290:2,18
290:25 291:22
292:4,23 293:15
293:25 294:12,17
294:22 295:4
297:23 298:18
303:18 304:3
306:11 307:20
310:3 312:16
315:15,24 316:25
317:8 318:7
320:10 321:3,19
324:9,23 325:19
326:6,20 327:20
328:2,10 330:6,21
332:6,17 334:2,24
336:18,22 337:13
339:20 340:7,25
343:20 344:3,13

344:23 345:4,15
346:16 347:14
348:1 349:7
350:20 351:11
352:4,16 354:2
356:17 357:2
361:5,8,16 362:2
362:11,17,22
363:1,14,22 364:5
364:24 365:9,17
365:22,25 366:5
366:23 367:6,20
367:24 368:10,17
369:2,13,17,21,25
370:4,8,12,18
371:1,8 374:19
376:8 377:11
379:19 380:7,17
381:5,18 382:4,17
382:24 383:11
384:11,25 386:8
386:23 387:7,16
388:22 389:6,22
390:19 391:12
393:15 394:2,22
396:4 398:15
400:8,23 403:19
403:23 406:5
408:11,21,25
409:12,17,19,23
410:14,25 411:8
411:23 412:6
413:9,21 414:3,12
415:3 416:7 417:9
417:19 418:10
419:3,17 421:9,13
421:18,23 422:2,7
423:14,22 424:4
425:14,17 426:1
427:3,11,15,19,25
428:7,17 429:1,19

430:10 431:7,14
432:24 433:17,24
434:18,22 435:13
435:24 436:8
440:3 443:3 444:3
445:9,14,18 446:9
446:20 447:1,8,23
448:2 449:2,9,19
450:4,8,15,25
451:5,22 452:5,14
452:24 453:25
454:10 455:3,9,16
457:10 458:2,15
458:19 459:1,8,16
459:20,24 460:1,6
460:23 461:6,13
461:20 462:16,24
463:5,11,21 464:4
465:9,24 466:6
467:9,17 468:12
468:17 469:8,25
470:15 471:3,9,19
472:13,19,24
473:7 475:5
**baker**  170:21
  172:3
**balance**  157:2
  164:7 165:11
  201:12 229:7
  230:8 317:12,14
  340:2
**balanced**  166:3,4
  166:6
**balances**  156:18
**ballots**  232:16
**bankruptcy**
  114:15
**bargaining**  147:16
**bargainings**
  147:21

**bars**  236:22
**base**  163:13
  199:18 401:4,6
  412:15
**based**  17:15,25
  18:9,15 27:23
  28:16 38:15 58:16
  84:17 124:20
  149:16 164:8
  165:12 206:25
  228:5 242:8 243:6
  245:17,23 250:11
  268:12 284:12,15
  292:16 300:22
  315:12,20 324:10
  324:18 329:9
  330:14 333:4
  335:11 336:7
  341:3 344:23
  347:18 357:5
  359:19 365:2
  390:23 391:1,24
  391:25 400:9
  401:18 403:10
  404:14 422:25
  431:22 432:17
  433:21 435:19
  442:18 443:19
  456:5 462:11
  465:20
**basement**  90:3
**bases**  275:23
**basic**  54:25
**basically**  325:12
  326:17 333:20
**basing**  337:7
**basis**  31:9 36:8,15
  36:17 48:10 141:6
  275:12,12 276:2,2
  410:22 442:25
  445:21 451:16,21

456:22 464:13
  465:3,5,10 466:12
**basketball**  129:3
**bates**  8:8,11,13,16
  8:19,21,22 9:2,3,5
  9:8,11,13,16,19
  10:11 136:13
  160:21 162:2
  230:25 322:1
  327:2 332:11
  341:14 348:14
  360:5 372:3 378:6
  390:8 393:17
  401:8 406:22
  415:8 420:3 422:6
  422:24 424:11
  437:1
**bearing**  59:5
  62:23
**bed**  373:8,12
**beds**  329:12
  372:25 373:5
  453:16
**began**  314:4 365:7
  366:20 368:6
**begging**  357:21
**beginning**  189:14
  221:15 267:10
  277:23 315:2
  322:10 394:7
**begins**  225:11
  322:12
**behalf**  3:3 4:3,11
  5:3,14 6:3,15
  418:19
**belief**  17:25
**believe**  17:17,21
  18:10 25:15,15
  37:2 58:13 77:22
  89:20 90:6 95:9
  100:10,18 101:12

115:13 118:11
132:3 133:8
135:13,17 136:2,6
136:11 159:22
163:11 177:21
178:4 180:2
186:17 194:23
196:6 198:18
200:21,23 201:4,5
232:24 262:17
270:5,19 288:25
295:5 296:9
309:15 312:11
315:22 321:4
333:22 366:20
368:6 377:4,12
388:16 389:7
391:25 392:9
400:14 411:24
413:5 419:4 426:1
428:14 440:8
442:14 445:10
448:21 453:12
457:4,21 458:9,23
459:2 460:9,15,21
460:24 461:7,14
472:25
**believes**  142:4
**bell**  420:22 436:20
**bellwether**  128:22
**belongs**  65:20
**benchmarking**
  79:13 169:15
**beneficiary**
  123:12
**benefit**  127:9
**benefits**  231:22
  310:7,11
**best**  76:18 79:13
  80:5 438:16
  443:16 444:13

474:10
**better** 62:1 122:9
129:19 291:6
309:2 327:7
**beyer** 332:25
333:7 373:15
375:1
**biannual** 149:6
**biennial** 8:9
160:19 161:2
184:9 192:17,18
207:11 245:14
264:9
**big** 49:10 81:15
82:21 95:10 123:8
123:14 152:16
156:15 167:23
387:11,21
**bigger** 126:16
214:4,6
**bill** 119:12 242:4
359:21,23 360:19
**billion** 107:9
155:17 193:14
219:4
**bills** 374:7,17
**biostatistics** 463:4
**bit** 49:9,11 58:21
68:25 80:2 99:13
129:19 163:17
205:24 252:14
296:25 301:3
315:1 324:4
328:17 397:18
432:12 457:11
**black** 373:19
**blaming** 133:19,25
**blanking** 159:4
**blunt** 326:2,4,8,10
**board** 81:4,5,7
101:4 125:16,16

195:24 196:1
197:1 199:11
200:2,13,15
232:15 234:4
289:10 301:15
311:20,23 313:17
313:19,23 314:1
316:6,9 322:24
323:1 332:20
333:5,14,25 334:7
334:25 335:19,23
337:24 339:2,19
340:23 359:24,25
371:10 372:14,16
372:22 373:1,7
444:19
**board's** 340:5
**boards** 169:22
313:24 314:6,13
314:15 315:5
**boat** 137:19
**bob** 426:10
**bodies** 385:19
**body** 324:2,19
**boehm** 4:8 7:7,9
11:21,22 12:6,10
12:22 13:4,23
14:17 15:3,10,11
16:21 17:6,11,20
19:2 20:14 21:1
21:11,24 22:5,23
23:6,17,22,24 24:7
25:18 26:9 28:15
29:12 30:15 31:1
31:9,14 32:7,12,18
33:10 34:11,21
35:5,12 36:14,17
36:19 37:9,16
38:24 39:6 40:21
41:5,14,20 42:2,11
44:7,22 45:19

46:5 47:9,20,22
49:1,8,21 50:11,21
51:6 56:16,24
58:9 61:20 62:4
63:6,10 64:3 65:8
65:12 76:1 81:16
85:6,17 86:15
87:19 88:19 89:8
90:16 95:19 97:3
102:5 103:3,9,23
104:24 105:22
106:13 108:4,14
108:22 109:13,21
109:22 110:23
111:9 112:8,17
113:15,24 114:5
114:13,24 115:20
116:5 117:1 118:9
118:17 119:5
120:12 121:8,13
122:6 123:7,21
124:11 125:2
126:11 131:17
132:4 133:11
134:2,7 135:4
136:3,15 139:6
140:6,15 141:1,18
142:1,19 143:18
143:21 146:20
148:10 151:22
155:1 156:6 159:7
160:15,24 164:16
168:6 170:1,10
171:2 172:1
173:15 174:16
175:19 176:9,14
177:1,23 178:6,22
179:11,21 180:3,8
180:15 181:4,23
182:5,15 183:6,15
188:18 189:15,23

190:9,18,22 191:7
191:23 192:10
193:11 196:15
197:4 198:7,16
199:19 200:6,14
202:14 203:14
205:22 208:1,13
208:20 209:11
210:6 214:11,23
215:11 216:1
217:6 219:13
221:9 222:5,19
223:7,20 228:10
228:19 230:23
231:3 237:12,20
238:1 239:21
240:6 241:4,19
247:1,7 248:8
249:1,16,20 250:6
250:9,20 251:13
252:5 254:18
258:4 259:16
261:12 263:6
268:18 269:9,17
272:20 273:7,11
273:15 274:20
275:1,16 276:4,5
279:6 280:17
282:7 284:6 285:8
285:14 286:16
287:11 288:20
290:12,22 291:2
291:24 292:8
293:3,17 294:3,13
294:18 295:1,7
298:1 299:1 304:1
304:5 306:19
308:5 310:15
312:4,20 313:2
315:16 316:11
317:3,16 318:12

320:12 321:6,22
322:5 324:14
325:1 326:1,13,24
327:4,16,23 328:5
328:14 330:18,24
332:9,15,18 334:4
335:17 336:19
337:1,15 340:3,10
341:17 342:11
344:1,9,21 345:1,9
345:22 346:19
347:22 348:10
349:21 350:23
352:1,8,20 354:6
356:21 357:24
360:7 361:6,12,18
362:6,15,20,24
363:3,6,16 364:1,8
365:1,12,20,23
366:3,6 367:3,11
367:22 368:1,13
368:20 369:5,15
369:19,23 370:2,6
370:10,14,20
371:3 372:7
374:22 376:10
378:2,8 380:1,10
380:21 381:12,23
382:8,20 383:2,13
384:14 386:1,16
387:2,9,18 388:3
388:11 389:1,17
390:2,11,21
391:13 393:21
394:5 395:23
396:9 398:18
400:11 401:12
403:20 404:1
406:9 407:1
408:17,22 409:7,9
409:14,16,18,21

410:1,17 411:5,9
411:16 412:1,10
413:11,24 414:5
414:21 415:6,12
416:13 417:13
418:5,11 419:14
420:1,6 421:11,16
421:21 422:1,4,10
422:14 423:17
424:1,8,14 425:24
426:5 427:9,12,17
427:21 428:3,11
428:21 429:5
430:5,15,22 431:7
431:16,19 433:1
433:20 434:1,20
434:23 435:1,18
436:3,11,23 437:5
440:5 443:8 445:4
445:12,16 446:4
446:13,22 447:5
447:11,20,25
448:4 449:4,11,23
450:6,10,21 451:1
451:11 452:3,7,9
452:12,16,18
453:1 454:4,15,23
457:8,16,25
458:13,18,21
459:6,14,19,22
460:4,19 461:3,11
461:18,22 462:9
462:19 463:2,8,12
463:16,24 464:8
465:15 466:2,13
467:13 468:3,14
468:22 469:14
470:2,17 471:7,11
472:9,16,21 473:2
473:6,12

**boehm's** 135:25
366:24
**bold** 349:9
**bolded** 225:11
**bond** 230:2
**bonds** 375:24,24
**book** 163:2 264:2
264:6,7,8 277:24
278:8 401:22
**books** 109:11,15
109:20 110:20
111:16 167:23
443:7,10,14
**border** 71:16
**born** 66:19 255:3
**boss** 209:1 378:16
379:17 453:8
**bottom** 162:4
207:13 210:11
211:5 212:7,23
219:6 220:1
230:25 304:8,17
332:24 347:2,3
421:5 432:16
**bound** 70:9 93:7
317:9
**boy** 392:23
**brady** 170:17
171:23 207:16
208:6
**branch** 139:17
167:5
**brass** 189:7,10,12
189:25 190:1,3
204:8,10,18
271:23,24 279:16
279:17 377:19,24
**break** 65:16 108:3
108:10,13,15,24
182:4 239:24
270:6 312:19

313:4 342:13
**breaking** 358:19
**breaks** 51:17
138:18
**brickner** 333:3,13
334:5,17 336:21
360:15 372:16
**bridge** 147:12
256:9,14 257:7,17
257:18
**brief** 60:9
**briefly** 52:25
**bright** 106:22
**bring** 73:14 74:16
74:24 241:7 243:7
268:8 328:23
329:4
**bringing** 398:4
**broad** 58:24 107:9
**broadhollow** 3:6
**broadly** 258:8
**broken** 80:19
**brownfield** 71:18
71:19,20 187:25
188:2
**bucket** 80:13
**budget** 8:9 13:11
14:1,7,9 20:2 21:6
22:22 23:1,11
24:2 25:2,17
27:25 28:7 43:9
44:15,25 47:12
58:21,25 70:15
75:24 78:15,21
79:7,14,19,21
81:21 82:22 83:14
84:2,13 85:4 86:1
86:19 87:21 88:5
88:11 91:23 94:14
95:10 97:14 98:25
99:25 100:13

**[budget - calculations]** Page 13

| | | | |
|---|---|---|---|
| 103:13 105:10,12 | 209:25 210:2,7 | 420:11 423:11 | **budish** 99:12 |
| 105:13 106:8 | 212:9,12 213:6 | 429:14 430:4 | 139:11,14,25 |
| 107:2,8,9 109:11 | 215:15 216:6 | 435:11,15 441:17 | 140:17 141:17 |
| 109:14,15,18,19 | 217:9,15,18 | 443:7,9,14 457:7 | 142:21 341:5 |
| 110:6,15,20 | 218:21 220:4,9 | 457:18,24 458:12 | 348:24 395:25 |
| 112:11 113:6,17 | 221:24 222:20,22 | 458:24,25 461:9 | 423:18 424:16 |
| 114:7 116:16,20 | 222:25 227:5 | 467:24 468:2 | 426:7 449:6,12 |
| 116:21 117:19 | 233:20 234:25 | 470:8,9,10,21 | 457:5,14,22 459:3 |
| 118:12 120:6 | 236:5,12,15 244:5 | **budgeted** 245:8 | 460:16 467:15,23 |
| 121:22 131:8 | 245:13,14,17 | 263:22 264:17,20 | 468:1,7 |
| 137:3,25 138:16 | 246:3,10 252:10 | 266:3,13,20,25 | **build** 94:7 157:4 |
| 142:15,23 143:5 | 256:6 261:23 | 267:23 279:9 | **buildings** 72:1 |
| 144:1,21,25 147:5 | 263:14 264:1,2,3,6 | 310:23 356:25 | **bullet** 87:20 349:9 |
| 148:16 149:2,5 | 264:7,8,10,15 | 358:24,25 359:12 | 355:8 357:8 |
| 151:16,24 152:18 | 265:9,24 266:8,10 | **budgeting** 14:13 | **bunch** 432:14 |
| 155:16 156:2,20 | 267:1,7 271:19,21 | 62:9 86:8,12 87:2 | **burling** 5:6 12:5 |
| 160:14,17,19 | 277:13 278:12 | 88:13 89:12 95:7 | **business** 98:15 |
| 161:2,14,18 | 280:7 283:8 290:6 | 112:14 117:3,25 | 291:7 439:7 |
| 163:14 164:6,9,15 | 291:17 292:18 | 165:6 170:11 | **businesses** 129:14 |
| 164:19,20 165:11 | 298:15 301:5 | 171:12 172:8,22 | **busy** 418:3 |
| 165:15,16,19 | 311:22 313:7 | 173:3 174:19 | **buy** 228:8 |
| 166:2,8,9 167:11 | 315:13,21 316:10 | 175:21 176:21 | **buying** 130:22 |
| 168:20 169:1 | 316:12,16 317:24 | 184:6,16 186:11 | |
| 170:5,14 171:5 | 319:2 320:2 | 188:6 189:8,24 | **c** |
| 182:19,20 183:3 | 329:24 331:18,23 | 197:20 198:23 | **c** 3:9 289:2 |
| 183:10,17,19 | 332:22 333:18,19 | 209:16 243:22 | **ca** 475:25 |
| 184:9,10 186:15 | 333:21 334:7 | 244:11 366:16 | **cafr** 43:12 |
| 186:19,23 187:7 | 338:11,21 339:18 | **budgets** 14:14 | **calculate** 179:24 |
| 189:5 190:4,25 | 340:14,17 348:19 | 79:2 106:16 107:6 | 180:25 217:11 |
| 191:24 192:1,12 | 349:11,15,25 | 107:14,17,19 | 411:19 414:25 |
| 192:13,16,17,19 | 351:13 353:19,19 | 109:1 110:1,4,24 | **calculated** 434:5 |
| 192:22,23,24,25 | 355:12,13,20,20 | 111:10 112:23 | **calculation** 180:11 |
| 193:14,23 194:3,6 | 356:2,19 357:15 | 145:19,24 149:6 | 235:6,13 263:3 |
| 196:21 197:16,23 | 357:17,25 358:16 | 164:8 177:8 183:9 | 289:23 291:18 |
| 197:24 198:5,9,10 | 360:16 364:11 | 191:16 198:4 | 292:19 300:21 |
| 198:24 199:4,14 | 365:5 366:8 368:4 | 210:14 231:5 | 413:8,13 418:7 |
| 199:18,23 201:11 | 371:11 375:18 | 236:16 267:6 | 423:19 |
| 201:16 202:13 | 376:16 377:2 | 274:11 291:8,8 | **calculations** 62:18 |
| 204:4,15,25 | 381:9 385:2 | 313:9 340:2 357:4 | 177:17,25 178:9 |
| 207:11 208:4,16 | 396:22 400:19 | 357:4 401:25 | 261:6 262:8 |
| 208:22 209:3,10 | 401:4,22 413:3 | 410:7 424:19 | 373:22 412:3 |
| | | | 413:19 417:23 |

[calculations - chain] Page 14

418:9,18
call 7:15 46:10
47:2 61:4 64:7
91:16 174:24
221:16 228:22
232:21 233:5,7
259:12 268:11
277:19 307:23
320:3 329:13,16
386:18,25 387:4
394:2,3 395:14
399:4 472:10
called 12:16 50:17
66:12 71:3 80:21
80:25 91:7 95:5
109:17 242:12
243:18 295:14
298:6 309:2 355:2
399:24 408:8
410:3,11 449:6,12
calling 60:7
328:21 385:10
408:4
calls 410:4,6
457:25 458:14
459:7
cap 243:16
capable 263:2
419:13,18
capacity 47:14
76:24 98:23
172:20,25 366:10
366:14 376:18
385:1,16
capital 212:14,20
213:9,16,19,20,22
214:1 215:19
235:18 318:15
319:7
caps 331:23

capture 229:15
245:2 246:1
captured 210:23
246:12 253:12
259:10
captures 265:25
284:5 289:7
299:25 301:22
car 375:25
cardinal 4:3 11:24
439:3,4,7
care 73:2,4 93:10
93:14 102:1 128:4
132:14,20 133:5
133:13,22 134:24
135:19 141:7
145:23 146:11,24
148:20 150:12
155:4 186:7
240:21 247:18
248:23 289:10,16
300:4 301:15
304:25 306:22
309:23 321:1,9,18
385:17,24 389:4,8
389:19,24 390:17
396:15 402:8
403:14,16,18
404:16 446:1
456:23
career 70:24
396:19
carefully 102:8,22
103:16 224:15
carfentanil 27:20
260:21 274:8
335:7 379:23
384:18 385:14
445:25 455:21,25
carry 90:15

carter 122:11
carving 76:15
case 1:7,12 13:6
13:21 30:2 57:20
59:2 61:17,18
127:23 133:20
134:13 138:25
151:5 254:16
283:1 302:1 305:7
317:5 357:6
397:12 428:13
438:11 459:10
475:6 476:3 477:3
caseload 101:24
caseloads 195:3,4
202:8 349:19
351:3
cases 92:23 150:24
281:22 286:15
288:14 371:17
402:3 408:16
425:1,5
cash 156:18 157:2
257:18 317:12,14
354:13 356:11
catastrophic
317:20
catch 268:5
categories 163:21
196:18 207:8
356:22 426:14
431:22
category 28:6
213:14 252:9
278:22 313:16
436:16
caught 335:10
358:4
cause 18:10
caused 17:3 18:5
19:6 143:19

causes 444:11
cautious 398:3
cavaliers 129:2
caveat 76:16
255:25
cayahoga 244:7
ccao 418:3 426:16
426:25
cease 427:13
ceiling 242:19
cells 96:19
center 5:7 93:3
320:5 406:16
centers 75:9,13
77:20,24 78:9
ceo 359:23
certain 24:11
53:17,23 93:9
96:2,5 105:4
126:2 134:17
147:17 155:13
174:23 181:16
241:15 243:4
249:13 250:18
372:2 397:11
444:6 471:21
certainly 58:13
296:18 352:21
442:22
certificate 157:13
158:25 477:11
certification 76:6
159:11 476:1
477:1
certified 2:11,13
474:2,4
certify 474:5,11
cfo 461:8,14
chain 8:13,16,22
9:5,8,13 10:10
322:1,9,12 330:9

332:11 372:3
393:17 401:8
415:8 436:25
**chair**  170:14
171:17,20 172:17
177:3
**chairs**  170:25
**challenge**  334:8
**chance**  57:25
**change**  87:16
132:5 241:17
242:12 268:3
390:13 464:20
475:13,14 477:8
478:3
**changed**  85:12
99:9 130:2 161:15
268:24 447:3
**changes**  95:13
124:20,22 126:16
133:4 146:24
148:20 150:13
155:5 241:24
269:4 475:12
476:7 477:7,9
**channel**  378:21
**channels**  382:16
**charge**  268:1
276:25 277:4
296:10
**charged**  228:6
297:1
**charges**  150:21
151:7 226:13
277:5,8,11
**charging**  155:22
**chart**  8:7 136:13
136:19 138:9,16
138:20 212:18,22
214:1 216:9,12
217:21 219:7

**charter**  70:13
84:25 85:11,19,23
137:15 168:22
186:20 187:19
272:9
**chastise**  268:6
**check**  412:17
426:2 433:22
441:6
**checked**  426:10
**checking**  97:18
**chemical**  382:11
463:23
**cheryl**  412:13
**chief**  137:11,14
209:20
**child**  80:25 81:2
91:17,21 240:21
240:24 254:23
256:10 298:6,8,23
301:24 305:6,9,10
305:11 309:3
311:14 357:23
398:1,5 425:6
**childhood**  81:9
**children**  24:19,20
80:24 81:8 101:8
101:23 134:23
141:7 174:5
175:23 181:19
186:2,6 202:3
245:24,25 246:2,8
247:17 248:22
256:8,9 289:5,8,11
289:17,19,25
290:16 291:20
292:21 293:11,21
298:25 300:23
304:9,17,20
305:20,23 306:8
306:23 307:3,25

307:25 308:24
309:19,24 310:5
311:13 319:13,24
320:15 321:9
357:7,16 371:13
371:14 385:22,22
389:11 392:16
396:2,14 398:3,4
401:25 403:6
404:16 434:7,16
435:3,11,22
441:24 443:24
444:14 447:18
448:6,9,11,16
449:16 466:24
**choice**  35:3
**choices**  89:17
**choose**  67:16
69:22 93:19
238:16 339:17
**chris**  130:11
**christopher**  99:24
**chronologically**
75:8
**ciaccio**  3:11 11:17
11:17 109:8,16
**cindy**  202:9 391:7
392:13
**circle**  233:3,4,14
234:14 235:5,14
**circled**  172:2
**circumference**
54:16
**circumstances**
114:19 189:25
266:23
**citizens**  183:2
230:18
**city**  5:7 49:16
51:23 52:12,21
71:16,17 128:18

301:9 453:17
**civil**  476:5 477:5
**claim**  91:18
**clarification**
324:15 343:2
**clarified**  168:17
**clarify**  109:6
386:10 395:20
399:25
**clarity**  270:9
**classes**  68:7 77:23
153:8
**claw**  425:20
**clawback**  354:16
**clawed**  9:18 10:16
424:10 425:25
427:10,13,23
**clean**  379:11 381:1
381:15
**clear**  27:22 125:4
148:14 149:4
169:8 196:10
202:23 272:14
320:23 345:16,19
347:16 358:17
368:3 422:2
**clearly**  397:14
**clerk**  137:20
**cleveland**  1:19 2:9
4:17 11:1,12
49:17 51:23 52:12
52:22 66:14,17
68:20 71:16 72:16
75:2 77:13 128:18
129:1 301:6,9
453:16,17 475:2
**client**  325:5
**clientele**  101:3
**clients**  146:3
392:10

cliff 153:6
climaco 2:7
clinic 72:15 73:1
73:22 74:9,12,17
74:22 75:1 380:11
453:16
close 51:16 167:24
305:7 317:21
closer 49:6,9
cmo 427:8
coalition 401:20
cocaine 282:8
code 70:10,11,16
70:19 94:13,15
157:13 167:17
220:11,12 283:5
300:10 317:11
coded 281:15
443:10,15
codes 288:14
coding 282:24
coffers 62:14
cohen 46:11 47:5
47:19 48:24 49:2
49:12 50:23 51:3
51:8,9,14,20 52:1
52:4,9,23 53:11,22
55:21,25 56:4,10
56:18 57:14 59:8
59:19 61:2,5 63:1
63:13 65:5,9
cola 402:5
colas 148:2
cold 309:22
collaborative
320:4
colleagues 45:8
collect 43:6 94:16
94:18 155:12
345:13,25 347:24
349:5

collected 109:11
138:25 151:9
163:1 242:20
253:25 288:13
collecting 153:25
191:19
collection 159:2
160:6
collections 160:3
collectively 185:24
299:5
college 68:20 71:2
colleges 68:3
collingwood 71:14
collins 6:21 12:12
12:13 473:11
collinwood 71:22
columbus 3:17
column 165:14
columns 434:24
combat 360:22
388:17
combination
302:13 402:6
combined 196:3
come 51:7 63:21
92:15 96:7 128:2
156:14 163:16
174:6 188:15,24
190:15 198:6
207:7 227:17,22
230:14 238:16
239:11 247:19,21
255:5 258:16
267:13,25 268:4
285:4 288:7 291:1
327:14 337:25
357:21 377:1
414:7,16,20
422:24 450:23
452:20 453:2,17

454:14
comes 25:19 63:20
76:10 124:25
142:18 146:7
193:21 202:18
226:15 227:2,12
228:13 248:3,10
250:24 253:21
254:12 256:21
285:6 295:21
298:15 311:2,2
330:16 375:15
381:25 382:16
comfortable 32:9
32:16 60:13
370:22
coming 101:5
185:15 199:22
258:11 277:15
281:3 283:9 307:5
308:3 319:1 375:5
395:5,22 414:23
457:1 465:19
commencing 2:3
comment 164:14
comments 291:1
commissary
152:15,22,23
153:4,10,14,16,17
153:21 154:1
155:2
commission 234:8
476:19 477:25
478:25
commissioner
85:21
commissioners
85:20
commissions
169:23

commit 91:7,11
commitment
147:19
committee 170:15
171:18,21 172:18
173:8,10 177:4,10
177:12 471:23
common 82:8
92:20 93:5 127:23
150:22,23 151:9
152:6 232:4,7
277:3 281:4,22
282:20 286:14
287:19,20,23
288:22 297:2
371:21
commonly 77:6
communicate
110:25 112:19,23
113:8,13 140:10
140:16 141:6,8,16
142:17 182:21
183:2 379:17
396:6 443:17
465:11 468:19,25
471:22
communicated
16:7 44:9 142:12
396:8 429:4,8,11
441:2 469:19
communicating
393:5
communication
14:22,24 15:1
171:7 343:23
344:4,15 345:5,18
345:19 405:15,17
429:23 430:3,13
communications
38:21 167:19
175:1 350:10

351:4 429:21,25
430:1,8 457:13
469:4 470:24
**communities**
320:6 404:19
**community** 112:3
112:23 128:23
182:21 279:5
284:12,15 301:20
347:8 358:6
**companies** 6:5
73:16,18
**compare** 306:10
**comparing** 236:4
236:5
**competing** 418:1
**complain** 330:11
**complaint** 16:22
16:25
**completed** 78:10
122:17 417:24,25
475:15
**completely** 38:11
38:15 185:5
314:21 356:10
**completing** 418:19
**completion** 68:12
69:8 198:24
**compliance**
198:12
**compliant** 198:15
**complied** 427:7
**comply** 193:2
385:5
**comprehensive**
43:11 221:21
222:3
**comprised** 219:20
**computate** 179:23
**computation**
179:4,8 180:11

261:9,15 289:23
291:7,18 294:24
295:2 423:20
426:23 432:17
447:14
**computations**
177:17,25 178:9
427:2
**computed** 430:20
432:1 433:16
**computer** 139:8
191:5 277:4 426:3
**concern** 274:5
327:6 385:18
394:11 395:11
437:9 443:19
**concerned** 394:20
444:6
**concerns** 89:12
175:22
**concert** 87:17
**condition** 182:23
376:6
**conditions** 110:2,7
112:12,24 113:11
113:18 114:9
364:18
**conduct** 134:12
416:6 417:16
**conference** 49:10
**conferences** 76:17
76:23,25 77:5
**confident** 351:13
**confirm** 353:8
414:14 471:5
**confirmed** 427:5
**conflicting** 395:18
**confused** 145:14
224:10 239:6
442:4

**confusing** 15:4
247:24 266:19
**connection** 37:18
44:2 48:6 63:18
132:1 134:16
135:15 192:23
197:20 198:19
244:22 265:7
288:13 361:2,24
403:21 405:10,22
411:20 412:4
414:10 415:2
456:17
**connolly** 4:4 11:23
**consider** 28:19
215:20,23 321:16
397:3
**considerable**
134:9
**considered** 212:14
212:15 400:21
419:11,12
**constant** 235:16
235:23 236:9,20
237:5
**constantly** 168:1
**construction**
124:24 129:4
147:13
**consult** 168:25
**consulted** 429:12
**contact** 279:1
**contain** 204:24
309:9
**contents** 161:17
**context** 45:24
149:1 210:24
225:25 243:21
257:7 374:23
432:12

**contingencies**
349:12 350:1,12
353:22
**contingency**
349:16 351:19
352:11
**continuation**
331:8
**continue** 70:21
185:25 323:15
**continued** 4:1 5:1
6:1 9:1 10:1
**continuing** 77:16
**contract** 207:5
301:9
**contractor** 105:18
154:14
**contracts** 103:25
105:6 149:17
187:12 232:10,11
232:11
**contractual** 320:2
359:17
**contradictory**
418:8
**contribute** 90:25
242:9,11
**contributed** 17:3
18:5 19:6
**control** 193:5
**convenient** 392:17
**conversation** 15:6
21:13 22:11 26:8
26:11,15 44:20,24
50:12 54:2,12,22
59:25 60:10 61:6
103:6 141:5 331:9
344:16,18 395:4,7
405:13 436:19
469:22 471:5,18
472:11

**conversations**
15:13 18:17 19:11
19:18,20,22,25
20:5 21:4,15
22:12,16,18 23:5
23:15,18 24:4
25:5,25 26:3,22
27:3,9 44:1 53:3
103:11 140:22
142:10 174:21
176:5 188:14
392:1 405:8,25
436:13 465:21
468:8,16 469:10
469:15,17,19
**convey** 332:1
**conway** 5:20 11:25
11:25
**conwell** 170:20
171:16,16 172:16
174:12,17 175:20
176:11,17 177:9
177:24
**conwell's** 173:2
176:20
**coordinated**
314:22
**copies** 198:3 428:5
**copy** 65:19 194:17
194:18 332:15,16
348:23
**corner** 162:4
231:1
**coroner's** 295:10
**corporation** 5:4
6:15 12:14
**correct** 13:11,12
15:10 25:7 26:24
27:1 29:4,11
34:17 37:6 39:8
40:13 45:6 52:2,7

52:8 56:15,16
65:8,17,24 66:7
67:4 68:21,22
69:10 71:1,5
72:20,23 75:17
76:3 77:11,14
78:2,5,12 81:18,22
86:9,23 87:3
94:21 97:9 100:1
100:2 101:15
105:14 106:5
107:3 111:2,8
116:8,9 117:17
120:22 122:21,25
124:17 126:13
127:3 128:7 133:1
137:10,12 139:13
139:19 142:24
147:3 153:2 154:8
160:8 162:9,25
167:8 168:22
172:12 174:10
180:16,17 182:23
182:24 183:5
184:11,14 192:20
196:25 200:3,5,18
203:10 206:15
207:14 208:19,24
211:12,20 212:4,5
212:12 214:5
216:7 217:19
218:18 219:25
220:21 221:2,3,8
223:4 224:9
225:22,23 226:2
226:25 227:4
228:25 229:10
231:13 233:12,16
237:24 238:9,12
242:23 251:4,6,8
252:4,22 254:3

255:9,22 257:9
258:5 260:9 264:5
264:11,22 265:1
269:24 270:18
272:19,25 273:24
279:14,20 280:1
280:24 281:14,16
283:19 284:2,23
285:18 293:19
294:6,11 295:23
296:7,23 301:12
302:4 303:7 311:4
313:11,14 324:17
328:19 333:6
334:3 337:14,18
340:19 343:12,25
347:5 348:22
350:3 351:5,8
353:4,13 355:10
357:3 359:2,7,14
359:15 360:18
363:9 371:2
378:15 379:1,8
380:24 381:3
390:1,20 391:1
401:24 416:24
417:2 421:1 422:1
422:4 426:8 435:5
437:20 438:13
451:3 456:11
462:23 463:10
465:8,22 471:10
471:18 472:20
473:5 474:8
**correctional**
284:13,15
**corrections** 94:25
96:15,19 195:20
285:16 475:12
477:17

**correctly** 20:19
78:6 126:25 157:7
226:24 231:17
260:3 269:23
329:2 334:11
340:12 373:9
379:14 407:11
**corresponding**
351:23
**corruption** 37:6
37:19 85:12
**cost** 92:18,24
93:13 97:1 147:9
147:20 148:5
150:25 158:9,13
181:16,17 244:2
289:11,14 301:15
301:22 302:17,20
302:24 357:22
372:25 373:12
376:24 389:19,23
408:15 412:23
415:16 417:17
419:2 425:8
**costing** 376:22
**costs** 93:12 96:21
96:22 131:21
142:17 143:7
146:11 147:14,24
148:13,15,18
149:11,25 150:1
151:4 154:3
155:22 179:9,15
181:22 185:25
187:11 195:21,23
207:3,5 231:14
232:15 277:4
296:15,15 300:3,8
302:1 304:21,23
305:15 308:17
309:9,14,15

311:12 315:6
373:8 377:6 389:4
389:8 390:17
403:18 404:8
405:9,21 406:3,14
407:20 408:9,14
410:12 412:16
424:23 425:2
434:5,5
**council** 81:8 85:4
85:14,24 86:3,6,11
86:18,24 87:11,14
89:11 106:18
167:3,12,15,19,25
168:5,13,19 169:6
169:9 170:6,18
171:4,9,10 173:12
175:2 177:11,12
178:8 179:23
197:8 201:14,20
201:21,23 202:6
202:12,18 207:17
208:9,11,15 234:2
338:3,4,7,15,21,22
338:25 339:7,11
339:14 340:18,20
348:20 352:19,23
357:22 441:3
457:19 458:6,10
460:24 470:20,24
471:16,21,24
472:2,6,11
**councilman**
170:17,22 171:19
**councilwoman**
170:19,20,21
171:16,25 177:9
**counsel** 2:5 5:4
11:13 30:16 33:2
38:21 45:24 53:23
55:11 61:10,20

92:12,14 107:15
232:3,4 343:22
344:4 346:18
**counsel's** 268:8
**count** 65:10
232:17 306:2
**counties** 85:20
228:3 295:18,22
296:6 419:21
**country** 117:23
426:14
**county** 1:10 3:3
8:6,10,10 10:2,5
11:16,18,20 13:10
14:3,14 16:11
17:7 19:8 20:8
21:6,6,16 22:21
24:11 25:17 27:11
27:15 28:6 31:20
31:23 33:13,17
34:14,16 35:16,20
37:5 38:16 43:10
44:5,16 45:1,8,25
47:13,15 48:4
51:25 52:20 55:24
57:15 62:14,19
70:8,11,14 76:18
77:21 78:3,11,14
78:24 82:10,12,16
82:17 83:16,21
84:13,13,20 85:1,2
85:4,10,11,14 86:2
86:2,5,6,10,11,12
86:17,19,23,24
87:7 88:3 89:11
89:11,24 90:20
91:3,6 92:16,17
93:19 94:5 95:8
95:21,24 96:13,24
96:25 98:21,22
99:10 100:16,22

101:2,12 102:22
103:15 105:2,17
106:17 107:15
109:2 110:2,9,21
111:6,21 112:1,3
112:12,22 113:1
113:19 114:9,23
115:3 116:15,20
117:3,19,24,24
118:21 119:20
120:8 121:10,25
122:15,23 123:5,6
123:11 124:16
125:22,25 126:1,6
126:17,18,22,23
126:24 127:16
128:9,14,18 129:5
129:6,11,13
130:11,13 131:2,8
131:20 132:6
135:20 136:12,20
137:17,17 139:11
139:14,17,18
140:4,18 141:22
142:21,22 143:4
143:12,19,25
145:18 147:5,10
148:8 149:6 150:8
151:2,9,14 152:8
152:10 153:4,7,19
154:13,22 155:6
157:8,23 158:21
159:18,20 160:2
160:20,20 161:3
164:2 165:3,22
167:2,5,12,15,17
167:19,22,25
168:5,8,19,20
171:13 172:23
173:4 174:19
177:8,18 178:2,7

178:12 179:23,25
180:4,9,13 182:23
183:2 185:19
186:20 188:1
191:18 195:11
196:2,9 197:16
198:11 200:10
201:14,23,25
202:15,18,19
203:3 204:5,16
207:16,17 208:8
208:14 209:17,22
209:22 210:17
212:8,24 214:18
214:21 215:7
219:19 220:11,25
227:12,18,21,23
227:23 228:6,12
228:14 229:8,19
230:1,9,12 232:25
234:2,2 238:16
239:11 240:16
243:22 244:8,20
245:9,18 247:2,6
247:13,22,23
248:2,4,12,13,15
249:9,12 250:5,15
250:23 251:5,9,14
251:16,21,24
252:1 254:16
257:25 262:21
264:9 265:8 271:2
274:9 276:9,18,23
276:24 283:22
284:14,22,25
285:2 287:17
295:17 302:7
308:15 309:4
311:9,21 314:10
315:23 316:2,20
316:23 317:4,9,10

| | | | |
|---|---|---|---|
| 317:19,22 318:2,6 | 453:18 456:13 | **courses** 67:22 68:6 | **covered** 233:25 |
| 318:25 320:25 | 457:2,4,7,13,17,19 | **court** 1:1 17:12 | 257:16 302:1 |
| 321:2 322:22 | 457:21,24 458:6,9 | 29:22 30:1 39:18 | 319:18,19 359:8 |
| 323:16 329:13 | 458:12 459:2,5 | 50:7 60:2,4 82:8,8 | **covering** 399:1 |
| 338:4,10,18 339:6 | 460:15,18,24 | 82:9,9,11,13 92:20 | **covington** 5:6 12:5 |
| 339:7,9,10,11,17 | 461:2,10,17 464:3 | 93:4 97:11,21 | **crack** 410:18,19 |
| 339:22 340:13,18 | 464:19 467:12 | 127:23 150:22,23 | **create** 153:10 |
| 346:5,7,11,15 | 468:2,5 469:6 | 151:9,13 152:6 | 164:15 190:4 |
| 348:20,23 352:23 | 470:8,9,10,18,20 | 177:14 181:14,25 | 265:24 |
| 353:15 359:11 | 470:24 471:16,21 | 184:22 185:4 | **created** 68:20 |
| 361:25 362:4,8,10 | 472:5,11 476:10 | 195:1,5 202:22 | 111:15 |
| 362:13,16,17,18 | 477:15 | 205:8,10 206:4 | **creates** 185:18 |
| 362:18 363:11,13 | **county's** 16:8,9 | 232:4,5,7 238:6,15 | **creating** 291:7 |
| 363:21 364:3,18 | 20:2 23:1,10 24:1 | 238:19 239:16 | **credited** 244:16 |
| 364:19 365:4,8 | 27:25 37:19 40:1 | 241:1 247:20 | **crime** 259:8,8,13 |
| 366:12,15,20 | 82:7 87:23 91:24 | 256:10,19 277:3,4 | 260:7 262:14 |
| 368:4,6,8,14 | 94:2 101:2 111:19 | 277:5,8,10,11 | 263:17 264:14 |
| 369:10 370:23 | 117:4 119:9 124:3 | 281:3,22 282:20 | 266:5 267:21,23 |
| 371:7 374:15 | 125:7 126:10 | 286:14 287:19,20 | 268:15,23 269:7 |
| 375:9,16 376:5,19 | 127:12 163:25 | 287:22,25 288:3 | 269:21 270:15 |
| 377:10,13 382:23 | 189:5 204:22 | 288:19,22 297:2 | 271:5 272:2,5 |
| 383:10 384:16 | 207:24 212:11 | 299:18,21 300:11 | 279:22 280:22 |
| 386:6 387:25 | 213:5 220:4 224:1 | 300:13,15 301:13 | 286:3 287:16 |
| 389:3,20 395:12 | 229:24 254:5 | 301:25 302:13 | 288:7 295:11 |
| 395:17 400:18 | 316:2,10 346:18 | 357:7 371:18,21 | **crimes** 281:2 |
| 404:25 405:22 | 353:11 375:13,17 | 405:6 408:2,5,6,7 | **criminal** 37:4,13 |
| 406:3 410:8 | 428:15 430:4 | 408:12 410:3,11 | 92:15 97:11 |
| 411:20,22 412:4 | 431:9 439:25 | 476:7 | 150:24 |
| 412:16,24 413:7 | 448:11 456:24 | **court's** 171:21 | **crisis** 115:24 |
| 414:10 415:1,17 | **couple** 57:6 | **courtroom** 37:23 | 117:15,22 118:19 |
| 416:3 417:4,7,14 | 150:11 168:18 | **courts** 82:7,17,19 | 119:16,18 120:7 |
| 417:18 418:20 | 240:7 270:6 | 92:15 137:20 | 121:3 134:18 |
| 419:2 423:13,21 | 296:11 302:5 | 151:12 169:22 | 196:12 202:10 |
| 424:17 425:1 | 303:12 308:25 | 276:25 | 274:4,7,11 290:4 |
| 429:18 430:9,14 | 354:25 | **cov.com** 5:12 | 290:17 293:7 |
| 430:24 431:2 | **course** 59:1 62:15 | **cover** 143:17 | 328:21 363:20,25 |
| 436:13 438:22 | 84:6 94:7 105:2 | 146:17 148:1,18 | 373:11 385:9,10 |
| 439:9,12,13 441:3 | 152:10 175:6 | 155:21 194:23 | 385:11 387:24 |
| 443:19 444:9,25 | 193:9 281:6 316:6 | 195:9,23 207:4,5 | 405:21 407:9,20 |
| 446:18 448:15 | 327:4 469:18 | 208:22 349:17 | 408:9,13 410:12 |
| 450:12,22 452:19 | | | 414:11 415:17 |

417:18 468:10
**criteria** 288:3
**critical** 183:8
**criticizing** 396:20
**crr** 1:24 474:19
**crunched** 373:16
**crying** 309:18
**csr** 1:24 474:19
**cuayahoga** 92:20
298:4 339:11
341:22
**cue** 105:6,9
**cues** 105:7,8,16
**curious** 154:12
**current** 14:11
18:11 24:13,15
76:18 100:9 115:8
184:9 377:14
**currently** 49:19
68:23,24 78:22
**curriculum** 8:3
45:15
**custodial** 348:4
**custody** 309:19
398:1 404:17
448:12
**cut** 79:8 89:19
118:13 142:14,22
143:4,8,10,12
144:10,16,24
145:18 146:12,22
147:5 148:3
149:13,15,24
150:1,3,4 164:6
165:4,9,10,25,25
184:23 185:8,21
201:10 202:22
238:21 302:14
333:19 335:16
382:14 444:20,21

**cute** 214:25
**cuts** 79:7 116:22
118:4,4,10 144:12
144:20 184:18
186:12 192:7,8
**cutting** 49:4
145:16 147:22,23
149:16 328:24,25
331:4 340:2
376:16
**cuyah** 8:4,5,11,12
8:14,15,17,18,19
8:20,21,23,24 9:2
9:4,6,7,9,10,11,12
9:14,15,17,20
10:12,13,14 45:16
45:17 160:21,22
322:2,3 332:12,13
341:14,15 360:5
372:4,5 378:6
390:9 393:18,19
401:9,10 406:22
412:8 415:9,10
420:4 424:11
437:1,2,3
**cuyahoga** 3:3 8:6
8:10 10:3,5 11:16
11:18,20 13:10
16:11 17:7 19:7
21:16 23:1,10
24:1 27:11,15
28:6 31:20,23
33:13 37:5 44:16
45:1 47:13 48:4
57:15 62:14 70:14
77:21 78:11,14
82:10,12,16 85:11
91:24 95:8 102:22
103:15 105:17
107:15 116:15
117:3,19,24,24

118:21 119:20
120:8 121:10,25
122:15,23 125:22
128:9,14,18 129:5
129:13 131:2,8
132:6 136:12,20
140:17 141:22
142:22 143:4
145:18 147:5,10
148:8 149:6
151:14 153:19
159:20 160:20
161:3 167:12
171:13 172:23
173:4 180:13
191:18 194:7
196:1 197:16
198:11 201:14,25
204:5,16 207:17
212:8 215:7
227:18,21 228:12
228:14 229:19,24
232:25 243:22
244:20 247:2,6,22
248:1 249:8,12
250:4 257:25
264:9 265:8 271:2
283:22 287:17
302:7 308:15
316:20,23 317:4
320:25 322:21
327:5 339:6,9,10
342:16 346:15
348:20 359:11
362:8 363:10,21
364:2 365:8
366:15 368:4
370:22 375:9
376:5 382:22
383:10 386:6
389:3,20 400:18

404:25 405:22
406:3 411:20
413:7 414:10
415:1 417:18
423:13,21 428:15
429:18 430:24
431:1 438:22
446:18 453:18
456:13 457:7,24
458:12 459:5
460:18 461:2,10
461:17 464:3,19
469:6
**cv** 100:6
**cvs** 440:1

| **d** |
| --- |

**d** 7:1
**d.c.** 4:6 5:9,18 6:9
6:19
**dab** 136:25
**daily** 185:12
373:12 385:11
386:18 387:1
464:20
**dale** 170:13
171:23
**damage** 430:16,20
**damages** 59:2
135:10 366:12
426:15 428:20,25
429:18 430:7,14
431:22 432:20
**dan** 1:8 170:17
171:23 207:16
208:6
**dangerous** 384:24
**darker** 236:22
**data** 24:5,9,9,23
25:5 89:14,21
162:13 169:16
173:18,20 174:1,2

174:2,23 175:4,21
176:16,18 178:17
178:23,25 179:2
180:19,22,25
181:9,25 193:21
260:19 262:4,19
283:9 284:17
287:9 288:12
290:9 334:20
377:23,23 394:16
397:16 400:7
403:11 407:17
411:2 412:16,21
412:23,25 413:4
419:19 423:9
425:15 426:25
436:15 440:7,14
440:22 441:9,16
442:3,4,6,9,10,19
443:2 445:20,22
446:3,12 447:4,6
448:5,8 465:1
466:10
**date** 11:8 14:5
15:7,9,21 21:17
29:17 36:5 47:18
65:23 66:4,5
69:17,19 79:13
186:3 273:20
365:15 367:9
368:23 432:21
475:8 476:3,9,19
477:3,13,25
478:20,25
**dates** 22:14 43:19
43:20
**dave** 12:4
**david** 5:11 47:21
51:6,9 56:17
58:19 63:11 64:4

**day** 5:16 12:1
18:21 19:21,23
76:22 93:11 101:5
118:1 146:2 176:4
241:21 243:18
252:15 268:24
272:4 316:21,24
323:25 329:21
373:8 387:4
392:18 414:17
454:25 455:7
474:16 476:16
477:22 478:22
**days** 80:10 96:6
475:18
**dcfs** 294:5,16,21
305:2 391:3 395:7
396:19 397:20
398:6 401:1 404:5
425:2
**dcfs's** 397:5
**deal** 274:4 299:4
311:10 450:17
**dealer** 274:19
**dealing** 74:7 290:5
305:17 389:14
**dear** 475:10
**deaths** 10:10
178:21 179:16
268:17 271:1
382:22 383:9,24
384:3 436:5,16,25
437:11 440:10
**debra** 298:10
**debt** 88:8 211:10
227:24 229:2,4,6,8
229:12,14,19
230:2,8,15,19
375:10,12,13,20
375:22,23,24
376:6,12,15,17,18

**decade** 75:23
128:20 367:23
**decades** 71:24
**december** 1:18 2:3
11:2,8 47:3
360:10 362:8
363:8,10 474:16
475:4
**decide** 220:25
**decided** 99:14
239:11 267:25
**deciding** 67:14
**decision** 83:15,20
83:23 86:1 88:14
131:13,24,25
132:5,11 133:6,9
133:21 135:18,20
136:6 220:16
335:14 341:2
**decisions** 84:1,3
84:17,21 90:14,15
95:7 144:5 165:23
168:10
**declare** 156:22
157:16,19
**declaring** 360:20
361:1,23
**decrease** 120:23
121:1 124:8 146:5
242:13 268:10,15
351:19,23 353:9
353:10
**decreased** 119:8
119:21,23 120:11
120:17,21 121:10
243:15
**decreases** 121:24
126:5
**decreasing** 148:16
148:17 303:16

**dedicated** 73:23
191:9,11,12
**deed** 476:14
477:20
**deemed** 475:19
**defendant** 5:3
**defendants** 2:6 5:5
12:9 13:5 33:9
133:20 134:13
150:23 151:6
275:6 427:5
431:10 438:21
455:12
**defender** 92:16,21
127:24 146:10
301:2,3,5,6
**defender's** 82:14
92:13,18 226:17
227:16
**defense** 146:19
**deficit** 335:3,20
336:4 339:23
356:19
**define** 215:16
**definitely** 92:5
**definition** 27:22
**definitively** 353:7
**degree** 67:5,10,13
68:9 69:9 70:6
72:9,11 77:12,15
78:10
**degrees** 66:22,25
67:7 68:2 75:16
**delays** 465:5,6
**deliberative** 169:2
**delinquent** 276:19
**demand** 112:6
134:16 141:14
143:6 270:25
335:4

demands 145:4
444:8
demographics
248:18 300:23
denied 200:9,13
200:25
denihan 359:22,23
360:25 361:22
denihan's 360:19
dennis 44:10,20,24
99:20 137:8
208:21 209:1,14
209:19 348:25
378:12 453:8
461:7,15
deny 471:6
department 14:23
16:13 24:20 44:5
73:8 80:18,20,23
81:13 91:2 94:25
101:23 104:1,3,6
104:13 105:25
106:2 107:10,21
122:10 166:22
175:23 185:20
186:2,13,17,22
187:5,15,16 188:4
188:19 191:17
194:8 199:21
201:17 203:1,4
206:12,17 234:6,7
238:6,15,24,25
239:4 246:2,4
287:18 289:8
290:15 291:20
292:21 293:8
300:12 301:17
304:20 306:14
308:14 309:10
318:25 319:12,13
350:10 351:4

355:13 356:15
357:1 358:9
359:10,13 396:1
421:4 435:23
443:23 447:17
448:16 449:16
468:8 469:5
470:25 471:15
475:22
department's
304:21
departmental
313:9
departments
43:16 78:24 80:12
82:4 113:9 173:19
174:3 183:17
184:15 186:9
187:7 189:9
196:20 199:3
200:9 201:25
232:25 240:17
338:16 339:4,8
357:6,20 359:18
387:11 410:7
423:4
dependency
181:13 185:2
195:7 301:25
371:17
depending 140:2
188:25 398:4
depends 244:12
depiction 232:20
depleted 334:13
336:8,14,14,24
380:23
deponent's 47:7
deposed 47:14
deposition 1:16
2:4 11:11 39:24

41:23 42:7 44:3
44:11 45:5,10,18
45:22 136:14,18
160:23 184:13
264:8 322:4,8
332:14 341:16
342:15 346:4
360:6 372:6,11
378:7,11 390:10
393:20 401:11,15
406:23 412:9,12
415:7,11 420:5
424:12 431:5
437:4 474:8 475:8
475:11 476:1,3
477:1,3
depositions 43:23
275:7
deputies 195:20
deputy 195:21
describe 78:18
92:9 110:1,12
111:3,10 151:17
169:5 173:25
223:12
described 114:8
223:23
describes 222:21
222:23 313:8
describing 83:13
113:17 154:10
description 8:2
252:11 324:11
343:5
designate 157:24
designated 47:16
157:10 220:12
252:20 253:25
263:11,13 276:22
276:23 366:9,11

designed 178:9
223:1,11 257:23
282:25
despite 93:8 94:23
309:10
destroy 428:8
detail 33:6 43:15
122:2 221:16
278:10,13 420:19
432:2
detailed 107:11
278:21
detailing 432:9
details 34:9 50:5,9
106:15,20,23
107:6,8 233:6
274:6 277:25
387:14 395:14
detention 301:13
405:11,23 406:4,8
406:11,13,15,16
407:10,21 408:10
410:13
determination
58:16 62:21
determinations
88:7
determine 25:2
178:10 217:12
228:2 261:3,15
262:11 283:1
289:24 290:14
291:18 292:20
431:25 433:16,19
448:15
determined
349:14
determining 334:6
detoxification
373:4

devastating 142:5
developed 72:21
73:21
developing 183:17
development
87:23 122:10
186:18,19,21
187:16,17,20
dhaller 5:12
diagnosed 303:4,5
303:9 314:19
dial 60:24,25
dictate 88:4 91:15
194:3 254:6
dictated 70:10
458:24
die 398:1
died 262:6 398:5
difference 25:9,14
26:1,11,17 27:7
125:15 211:21
236:11 246:15
274:13 354:12
differences 181:6
384:21
different 34:22
43:19,20 58:22
70:13 80:4 81:25
138:15 145:7,10
211:25 223:1
225:19 240:18
241:5,6 310:10
313:24 340:11
384:22 396:7
410:7 418:8
452:13 460:12
differentiate
179:14 272:23
443:10,20 446:6
difficult 35:19
39:20 73:19 135:3

425:2
difficulty 115:15
116:8,13
dig 158:4
digging 290:9
dimora 36:24 37:1
dip 317:22
direct 102:15
105:17 166:22
167:14 274:23
279:1 310:9
315:10 322:6
348:11 432:13
directed 55:14
201:23 202:12
203:4 272:16,24
276:10 280:11
282:17 287:5
297:22 302:7
320:8 433:11
directing 280:18
direction 15:4
124:1 192:13
254:8,21,22
directive 255:14
directives 256:1
directly 64:1
90:23 104:12
126:21,23 137:8
139:10 154:6
155:25 166:18
210:4 227:17
260:16 261:4
273:23 289:20
293:13 307:17
338:22 395:15
424:23 425:3
446:19 456:7
director 13:10,25
14:6,12 16:8,10
20:10 47:11 58:20

88:11,23 98:24
99:25 100:12
103:13 106:7,25
107:5 112:10
120:5 121:21
137:4 169:1 194:6
197:15 202:9
215:14 280:6
291:16 292:17
298:11 315:13,21
348:18 364:10
365:5 366:7,15
368:3 385:2,17
391:3 392:5,7
400:15 403:11
429:14
directors 122:3,5
122:7 472:1
disability 323:19
disagree 247:11
248:17 249:4
328:11 397:24
398:12,20 399:13
407:13,15,18
410:22
disagreeing 411:3
discern 57:12
175:25
discipline 67:24
disclose 14:24
50:5 103:8 343:23
344:17 345:5,17
416:10 429:22
451:6 452:1
454:12
disclosing 14:25
discrepancy
224:17 234:11
discretion 101:16
220:15,24 247:22
254:16 311:10

discretionary 90:8
92:1 220:3 316:4
discuss 22:9 30:10
30:23 52:14
453:13
discussed 22:1,7
141:2 176:22
223:5 225:9 252:9
278:4
discusses 223:16
discussion 112:7
148:13 225:3,6,10
372:13,24
discussions 65:5
314:4
disorder 388:21
454:9
disposition 115:8
dispute 275:6
277:9
disruptions 308:3
distinct 210:23
314:21
distinction 26:25
28:3 264:19 267:6
385:25 386:10
distinctions 386:5
distinguish 273:3
distress 114:22
115:2
distributed 78:25
228:7
distributor 5:3,5
431:10 438:25
district 1:2 82:11
127:6
divert 444:17
divided 212:9
division 1:3
104:18 147:12
188:4,19 191:17

194:8 195:22
199:22 201:17
202:25 203:5
233:15 289:25
293:24 305:23
357:1 359:10,13
448:6 468:9 469:5
471:1,15 472:10
**divisions** 80:12
82:3 147:12 174:3
183:18 184:15
186:10 189:9
196:19 199:2
201:24 232:24
339:4 387:12
410:8
**doctor** 28:24
274:18 382:15,19
**doctorate** 69:9
70:6
**doctors** 73:13
74:20,22 96:2
**document** 1:9
45:21 136:17
160:25 207:10,21
223:6,19 224:15
322:7 341:21
342:14 347:3
360:8 372:10
378:10 390:3
393:16 395:1
401:13 420:2,7
424:9 425:18,19
427:6,8,16 430:23
432:2 433:9
436:24 437:22
**documentation**
204:13
**documents** 42:22
42:24,25 43:4,7,9
113:7 138:25

187:1 191:6
197:24 199:14
277:24 344:7,11
351:13 354:18
357:16 416:19
422:23
**doing** 39:13 60:13
62:2 79:3 101:1
129:3,18,19 131:3
235:12 268:13
274:12 340:23
399:14 423:16
428:1 441:4
447:20
**dollar** 91:1 184:23
307:11 320:18
403:9
**dollars** 62:13 63:8
87:13 91:10
100:22 101:17,19
102:3 105:17
106:9 123:13
126:3 127:6,8,17
127:18 142:15,23
143:5 144:2,20,24
145:17,19 153:16
154:13,23 156:23
164:1,4,7 165:4,9
165:11 166:4,7,8
185:6,11 215:4
217:2 221:1,22
244:8 246:23
247:3,3,6,6,21,23
248:13,20,20,23
249:2 250:4
256:14 267:24
286:5,6,7 288:11
293:20 303:1
310:12,17,18
311:7,10 353:19
354:15 355:11

356:8 376:12
**domestic** 30:2,7
37:23 82:9 277:7
**donations** 73:11
73:13,15 251:24
**door** 325:13
326:17
**doors** 317:21
**dormant** 71:21
**dos** 377:17
**double** 67:1,3,5,8
68:1 303:5 323:20
426:2
**doubt** 351:21
**downward** 200:20
**dozen** 329:14
**dr** 20:8 346:22
**draft** 198:4 347:8
**dramatic** 185:1
**dramatically** 20:1
241:17 260:24
389:13
**draw** 91:9 157:1
267:5 349:16
**drawing** 156:17
264:18 349:12
**drawn** 186:3
**drive** 3:15
**driven** 185:2
274:7 311:9
320:15 355:12
**driver** 186:1
**driving** 248:19
444:7,12 445:2
**drops** 237:8
**drug** 6:15 12:14
25:10 81:6,6
195:25 196:3
231:25 274:19
286:14 287:24
288:2 313:18

315:3 390:23
391:24 392:6,10
395:4 438:25
450:20,24
**drugs** 273:6 425:7
**dry** 156:3,5
**dually** 303:4
314:19
**due** 131:12 186:7
195:2 229:6
235:18 321:2
334:9,23 344:15
351:2 368:7
385:11 389:4,20
390:17 396:17
397:21 398:7
**dug** 445:23 447:15
**duly** 12:17 474:6
**duties** 102:7
**duty** 100:15,18
**dying** 262:21,22
262:23 378:1

| e |
|---|

**e** 1:24 2:11 4:8
6:21 7:1 13:15,15
13:18 289:2,2
299:17 300:1,2
474:2,19
**earlier** 69:15
126:15 182:19
234:17 241:21
243:18 252:15
255:18 329:21
337:24 341:10
364:22 378:17
379:6 440:6
446:24 455:19
456:12 457:14
458:5 463:17
**early** 81:9

**earmarked** 254:12 258:25

**earning** 155:21

**earnings** 226:18 397:1

**ease** 158:2

**easier** 73:12

**easily** 139:3

**east** 6:18

**eastern** 1:3 71:16

**economic** 110:2,7 111:4,11 112:11 112:24 113:1,11 113:18,19 114:8,9 116:12 117:22 118:19 119:16 130:15 186:19,20 187:20 364:17

**economically** 131:3

**economist** 119:22

**economy** 112:13 117:7 129:17 130:25

**ed** 99:10

**edition** 205:3

**edits** 347:7

**education** 66:10 66:12

**effect** 142:5 208:16

**effective** 89:22 90:11 119:13 242:13 243:9

**effectively** 100:23 242:6

**efficiently** 100:23

**effort** 365:3 411:18

**eight** 323:13 447:23

**eighth** 82:10

**either** 43:2 60:5 75:19 91:19 124:1 132:16 184:20 191:10 194:1 253:17 275:22 279:19 311:8 315:8 325:5 357:10 358:24 386:25 398:3 446:8 463:7

**elected** 83:25 84:16 137:20 193:15 291:9 339:12,15

**elections** 101:4 232:14,15 234:4

**electronic** 198:2

**elicit** 272:25 273:5 274:15 464:1

**eligibility** 308:18

**eligible** 360:21 361:25 362:5

**eliminate** 145:25 149:17,18

**elliott** 3:19

**ellis** 4:14 12:3

**email** 8:13,16,19 8:21,22 9:2,3,5,8 9:11,12,13,16,18 10:10 97:18 140:11 169:13 174:23 188:11 190:11 322:1,9,12 322:13 324:8,19 330:9 332:11,19 332:23 333:4 335:11,25 336:2 336:12 337:8,20 341:14 342:19 343:9,18 346:21

347:7,18,20 349:5 360:5,9 361:22 363:7 372:3,11 373:14 378:6,12 379:18 390:8,13 391:8,10,24 392:19 393:2,17 393:22 394:9 396:21 397:14,21 397:18 398:19 399:7,15 400:2 401:8,15,18 406:18,22 407:7 410:18,23 412:8 412:12 415:8,13 420:3,19 423:1,2 424:10,15 436:25 468:23 469:2,4 472:12 475:17

**emailed** 174:17

**emailing** 325:21 325:24

**emails** 325:22 342:20 343:10,14 344:7,11,11 345:13,25 346:15 346:18 347:12,17 347:24 348:7 399:6 437:7,21

**emergency** 317:6 360:12,20 361:2 361:23

**employee** 16:10 148:5 402:8

**employees** 153:13 231:22

**employer's** 402:7

**employment** 80:21 83:8

**enclosed** 475:11

**encompassed** 27:21

**endeavor** 197:14 347:23

**endeavored** 448:23

**ended** 67:21 68:3 333:21 355:23

**endo** 6:3,4 12:8

**ends** 437:22,23

**enforcement** 81:1 195:19 298:4

**engaged** 71:18 169:10 170:7,8,16 170:19 171:4,8,11 298:23,25 416:3 416:17 417:4,8

**engaging** 418:18

**enroll** 68:15 69:19 69:22

**enrolled** 68:19,23 68:24 69:5 98:8,9

**ensure** 100:21 101:13 102:7 358:3,4 359:8 385:4

**enter** 204:17

**entered** 189:12,25 190:1,13 477:9

**enterprise** 211:10

**entertain** 184:8

**entertaining** 184:1 184:5

**entire** 117:23 394:24 396:18 476:5 477:5

**entirely** 61:17

**entities** 126:7 155:18 198:18 229:2 267:22 314:21 357:10

entitle 249:12
250:18
entitled 93:10,11
126:1 249:14
300:13 310:10
312:11
entitlement
240:22 308:18
311:8
entitlements
249:17
entity 110:22
129:11 158:12
244:2 313:25
entries 230:17
environment
153:12
epidemic 18:11
112:1 123:20
131:10 132:23
185:3 186:8 298:9
298:21 320:16
321:2 334:10,23
341:6 349:20
368:23 384:17
385:12 389:5,21
390:18 412:24
456:18 460:13
470:6
epidemiology
28:22 463:4
equal 267:11
373:22
equipment 296:14
equivalent 356:5
errata 475:13,18
477:7,10,18 478:1
errors 183:7
especially 47:24
esq 3:9,11,19 4:8
4:18 5:11,20 6:21

475:5
essentially 53:24
60:2 228:17
308:14 335:3
established 252:19
372:15 378:17
410:5
estate 104:14
120:21 241:24
estimate 163:4
402:2 428:14,19
428:19,24 429:3,7
431:22 432:19
estimated 69:16
estimates 376:24
429:9,11,17 430:7
430:17,20
et 1:10,11
euclid 71:17
europe 97:23 98:6
evaluation 60:8
evaluations
277:12
event 109:23
356:13 418:21
events 317:20
eventually 73:24
150:1 228:9
everybody 11:22
132:17 423:3
465:12
exact 125:10
296:14 307:11
321:5
exactly 173:22
186:15 217:2
228:21 289:24
298:12 324:12
359:3 394:20
exaggerating
386:19,24

examination 7:7,8
7:9 12:21 455:15
462:8
examinations 7:5
examiner 20:9
194:20 203:16
204:6,9,17 206:8
238:18 260:6,19
267:12 270:12
273:3,19 279:22
280:23 346:21
383:1 385:20
400:20 402:19
440:25
examiner's 20:12
24:25 82:15
127:20,21 144:9
177:15 178:18
179:1 194:13
202:21 203:23
205:5 238:5,14
239:18 259:6
262:2,3,10,18
263:1,18 266:5,24
267:9 268:22
269:7,20 270:4
272:3 273:22
296:12,17 349:18
350:8,19 351:2
355:21 371:22
384:5,8 424:24
440:8 441:21
442:11,15 443:23
446:11,17
examining 58:23
example 24:18
53:13,16 54:1
62:12 63:12 80:7
87:13 91:2,16
92:13 141:5 146:9
149:12 158:7

180:19 181:12
243:5 244:6,18
245:17 278:13
280:21 434:8
examples 276:17
exceeded 334:9,22
354:19
exceeding 336:3
excel 422:21,22,22
exception 101:3
147:11 197:1
321:12
exceptions 184:7
excerpt 347:2
excess 256:21
exchange 332:19
337:20 372:11
393:23 394:8
397:14,18 398:20
400:3
exciting 97:15
exclusive 406:14
exclusively 227:15
excuse 88:4
155:10 195:5
executed 477:10
execution 476:14
477:19
executive 83:16,21
84:20 85:2,10,23
86:2,6,10,19,24
87:7 89:11 109:18
133:10 139:11,16
139:18 142:21
147:18 167:5,9,16
169:21 180:4,10
190:7 197:7 202:6
202:16,18,19
203:3 207:16
234:2 338:10,18
339:11,13,17

340:14 348:24
395:12 424:17
457:5,14,22 459:3
460:16 468:5
**executive's**  338:20
457:18
**exercise**  249:22
**exhausted**  319:14
**exhaustive**  80:16
82:6 158:24 241:3
276:14 278:2
372:2
**exhibit**  8:3,6,9,13
8:16,19,21,22 9:2
9:3,5,8,11,12,13
9:16,18 10:2,10,16
45:18,21 65:15
136:14,17 160:23
161:1 167:7
184:13 199:1
231:2 264:8 313:6
322:4,8 332:10,14
341:16,18,21
342:14,19 360:6,9
372:6,10 378:7,10
390:4,10 393:16
393:20 401:11,14
406:21,24 412:9
412:11 415:6,11
420:2,5 421:15,19
421:25 424:9,13
428:5 430:23
431:6 432:22
433:4,13 436:24
437:4
**exhibits**  8:1 9:1
10:1,17
**exist**  191:22
221:13
**existed**  371:5

**existence**  14:19
15:20 16:4
**exists**  79:20
**expand**  270:11
**expect**  70:3,5
160:5
**expectation**  70:20
**expected**  79:9
106:19 256:22
**expecting**  70:23
**expended**  282:16
**expenditure**  92:2
92:10 103:21
104:22 134:17
223:18 244:7
272:15 296:15
**expenditures**
43:15 90:20 91:25
91:25 93:17
104:18 118:22
124:3,5 125:8
127:14 165:18
177:7,19 178:2,11
179:25 180:12
181:1,10 186:11
209:17 218:8,9,10
218:14,17 219:2,3
225:21 234:19
235:1,15,22 236:1
236:8,12,13,19
237:4 245:10
254:6 259:2
268:20 269:20
270:16 271:4
273:21 279:8
280:4,8 283:24
284:10 285:22
286:21,25 287:4
289:24 290:15
291:19 292:20
293:11 294:9,20

296:8 297:11,15
299:12 306:7,10
307:6,15,16
319:17 320:21
321:1 351:1
354:19 355:3,7
358:23 359:10
386:6 404:4
411:19 412:3
414:9 415:1
419:20 423:13,20
428:15 435:21
443:20,22 446:17
447:17 448:15
449:15
**expense**  93:4,13
148:9 244:15
256:16 257:8,12
257:15
**expenses**  82:18
93:1,22 143:17
150:2 153:10
185:4 194:24
195:10 203:18
206:13 211:2
231:21,24 232:9
236:23 245:3
259:10 272:23
280:15 283:15
289:9 295:15
296:20 304:25
306:13,25 307:3
307:21,22,23
308:17 315:9,9
321:11 334:9,22
335:16 336:3
356:6 359:8 401:7
402:8 404:3
408:15 423:7,7
432:7,8

**expensive**  130:23
309:4,21,23 315:6
404:11
**experience**  31:25
57:1 75:23 76:11
364:3 366:20
368:7,14 369:10
**experienced**
370:23 389:3
**experiencing**
362:9 363:11
**expert**  28:20 121:7
232:6,8 290:20
291:3 292:2
330:16,19,23
392:15 462:20,25
463:3,6,9,14
**expertise**  20:3
29:2 290:21
**experts**  279:2
417:25
**expiration**  476:19
477:25 478:25
**explain**  18:14
44:12 52:24 125:9
153:24 216:20
219:9 223:1
224:18 229:1,25
250:7 275:12
353:1 418:15
**explained**  61:7
**explains**  328:16
**explanation**
224:16 234:12
**exponential**
127:25 289:18
**expressed**  141:20
172:21
**extent**  14:21 30:9
61:21 62:7 88:10
89:15 102:18

110:25 156:20
221:13 241:15
243:4 329:22
343:21 344:14
345:17 382:21
384:8 416:8
429:20 444:7
471:16,21
**extra** 353:16
354:20 355:22
**extraordinarily**
131:9 148:9
**extreme** 91:21
**extremely** 102:4
106:21 305:12
**eye** 387:13

**f**

**f** 5:14 204:22
**faced** 364:19
**facetious** 314:18
**facets** 80:9
**facilities** 289:12
373:13
**facility** 128:2
185:15 195:18
284:13,15 285:1,3
285:16 303:3
**facing** 113:1
**fact** 58:3 68:18
121:2 123:16
133:20 161:6
336:7 337:24
386:21 417:14
418:22 425:12
433:22 463:17
**factors** 17:3
**factual** 15:19
**fair** 45:1 65:23
70:25 76:12 86:13
93:21 100:11
106:14,24 107:6

111:6 112:21
113:2 116:12
117:19 120:25
123:25 132:1
134:13 181:6
182:25 192:21
193:1 208:4
237:16 242:22
252:1 272:17
327:19 337:12
370:25 400:17,24
443:18 469:17
**fake** 325:12,18
326:11 327:25
328:9 331:11,18
331:23
**fall** 87:10 137:20
334:18
**falls** 171:22
**familiar** 91:6 92:8
197:10 375:21
397:4
**families** 91:5
101:25 298:20,22
298:24 305:17,20
307:25 309:1
310:9 319:23
320:5 321:10
404:16
**family** 24:20 45:13
69:11,20 80:21,22
80:24 81:7 91:20
101:9,23 174:5
175:23 186:2
202:4 245:25
246:2,8 256:7,8
289:8,17,25
290:16 291:20
292:21 293:24
298:25 300:12
304:9,18,20

305:24 306:8,23
307:3 308:13
310:8 311:14
319:13 357:7,17
371:13 385:23
392:8,11,16 396:2
401:25 403:6
404:17 434:7,16
435:3,11,23
441:24 443:24
447:18 448:6,16
449:16 453:4,7
454:14
**famis** 204:22,24
205:2 265:23
279:18 377:17
**far** 39:14 58:17
69:12 197:25
198:1 235:21
237:2 299:9
403:24 443:1
**fashion** 254:13
441:3
**fatality** 397:21
398:7,10 399:9,19
**father** 67:19
**fatherhood** 81:3
**favor** 51:15
**feasible** 154:17
**federal** 84:11
89:25 90:19,21
91:14 131:13
132:8,15 133:9,21
134:1 135:18
146:8 147:2
148:22 150:13
155:4 244:9,21
246:25 247:3,5,14
247:25 248:3,10
250:23 251:1,3,17
252:24 253:5,10

253:19,22 275:23
283:18,24 300:1,6
300:7,16 310:13
310:17,20 311:3,7
360:21 361:4
362:1
**fee** 151:13 276:18
276:20 277:5,8,10
278:23 296:24
297:3,4
**feel** 60:13 277:20
416:18 443:16
444:24,25
**fees** 150:20 151:10
152:6,16 155:3
156:12 165:23,24
226:13 253:25
276:10 277:1,2,11
295:21,22 296:3,5
**feinn** 342:20 343:9
345:13 347:11,16
348:3,12 349:3
360:11
**fell** 67:23 80:1,13
**fellowship** 83:10
83:12
**fentanyl** 27:20
260:21 274:8,16
335:7 378:24
379:23 380:6,11
380:15 382:3,7,10
382:12,13,15,16
382:23 383:15
384:10,18 385:13
445:25 455:22
456:1,10 463:18
463:19,23
**fewer** 185:6,10
**field** 450:7
**fight** 249:23 250:2

[figure - form]                                                                    Page 30

**figure** 201:3
218:20 235:4
265:19 269:3
277:18 287:3,4
375:6 407:23
447:15 448:25
449:14 450:1
**figured** 346:9
**figures** 37:5 179:5
413:19
**file** 422:21
**filed** 114:15
417:15
**files** 191:5,13
194:4 198:2 204:3
348:4
**filing** 276:25
**filings** 127:23
150:21 151:5
181:13,17,21,22
185:2 371:20
**final** 165:15,16
168:19 208:2,7
230:24 340:17
429:11
**finalization** 208:4
**finally** 201:11
432:15
**finals** 69:3
**finance** 58:25 72:9
75:16,19,23 76:9
76:20 77:2 170:14
243:20 356:3
**finances** 142:5
364:20
**financial** 14:2,5
43:11 62:8 75:12
79:4 84:7 86:11
87:1,23 88:9
102:13 110:13
111:6,11,19

114:22 115:2,15
116:7 134:4,9
137:11,14 141:23
162:13 169:14
173:18 174:2
179:2,4,9 182:22
185:18 204:23
209:24 254:5
265:22,23 283:5
334:20 336:13
337:8 354:22
364:3,17 365:3,4,8
366:17,21 368:7
368:15 369:1
370:23 372:21
397:5 408:1
422:13
**financials** 92:8
230:20 311:23
316:8 368:24
**find** 130:7 139:8
144:9 204:1
265:11 274:3,10
293:6 358:21
449:25 475:11
**finding** 290:10
291:9
**fine** 60:17 182:5
285:13
**fines** 226:13
**finish** 69:19
353:24 354:4
399:17 445:15
451:22,23
**finished** 78:10
314:5
**fired** 265:7
**first** 13:16 14:8,18
15:19 29:13 55:9
66:9 71:6,8 75:7
78:13 81:8 100:4

118:8 131:14
161:24 162:16
197:7 224:11,21
227:25 229:4
280:11 298:4
313:16 340:13
341:13 342:18
343:8 355:8
359:21 362:9,19
363:11,20 364:3
364:13 366:20
368:6 370:21
394:12 399:8
418:22 453:19
462:22
**fiscal** 98:14 102:13
137:15 138:1
167:1 209:21
234:7 348:25
355:16 420:10
**fit** 210:5 213:22
255:25
**fits** 234:22
**fitzgerald** 99:10
**five** 24:16 41:6,8
41:16,22 42:5,16
42:17 60:24
128:20 157:4
201:7 312:19
**fka** 6:6
**flat** 160:4,10
163:18 321:14
389:25
**flip** 230:22
**flipping** 75:6
298:3 306:21
**florescent** 377:19
**flow** 227:20,22
**flows** 247:13
253:16,17

118:8 131:14

**fluctuates** 375:11
**fluctuations** 124:1
127:11 241:15
242:2
**focus** 67:16 386:13
**focused** 270:10,13
385:3
**folder** 191:9,11,12
**folders** 194:1,2
**follow** 30:12 34:10
34:13,23 35:2,3,6
35:8 55:7 57:7
63:1 87:3 96:9
197:14 241:22
275:2 324:19
409:8 455:5
461:23 462:11
**followed** 459:15
**following** 161:25
216:13
**follows** 12:19
**followups** 96:12
**food** 25:10
**football** 94:8
**forecasts** 24:14
79:3 149:8,10,16
**foregoing** 476:13
477:18
**forever** 309:25
377:7
**forfeitures** 226:13
**forget** 153:11
186:15
**forgetting** 81:11
82:20
**forgiveness** 267:3
267:14
**forgot** 69:2 345:7
**form** 13:22 14:15
16:19 17:5,8
18:24 20:6,23

**[form - fourth]**

21:9,22 22:2,19
23:2,12,21 24:3
25:12 26:6 28:10
29:10 37:7,14
38:20 39:4 40:18
40:24 41:10,17,24
42:8 44:17 70:14
75:21 80:14 84:23
85:1,11,13,15,21
86:14 87:4 88:15
89:6,13 95:18,22
100:20 102:24
103:19 104:20
105:19 106:11
110:17 111:7
112:15 113:3,23
114:2,11,20
115:18 116:3,18
118:2,14,23 120:9
121:4,11 122:1
123:3,10 124:6,21
126:8 131:4 132:2
133:7,24 134:6,14
135:23 136:10
139:4 140:1,13,20
141:24 142:8
143:14 145:20
147:7 151:19
154:18 155:8
158:22 160:12
164:12 167:13
169:7 170:9,12
171:14 173:2,4,6
174:13,20,25
175:16 176:2,12
176:23 177:20
178:3,13 179:6,18
180:1,6,14 181:3,7
183:4,12 188:6,8
188:25 190:2,16
190:20 191:3,20

191:25 192:2,4
193:10 194:11
196:24 197:21
198:13 199:7
200:4,11 202:2
203:11 204:11
205:19 207:22
208:5,18 209:7,18
214:9,19 215:8,22
217:5 219:11
221:4 222:1 223:3
223:14 228:4,15
237:9,17,23
240:13 241:11
246:20 247:4
248:5,16 249:10
249:19,25 250:8
250:16 251:11,24
252:2 254:14
258:1 259:3
261:10 262:16
267:4 272:18
273:1,10 274:17
278:18 280:12
282:5 284:1 285:5
286:11 287:7
288:17 290:2,18
291:22 292:4,23
293:15,25 294:12
294:17,22 295:4
297:23 298:18
303:18 304:3
306:11 307:20
315:15,24 316:25
317:8 318:7
320:10 321:3,19
324:9,23 325:19
326:6,20 327:20
328:2,10 330:6,21
332:6 334:2,24
336:18,22 337:13

339:20 340:7,25
343:20 346:16
347:14 348:1
349:7 350:20
351:11 352:16
356:17 357:2
361:5 362:2,11
363:5,22 364:5,24
365:9,17,22
366:23 367:20,24
368:10,17 369:2
369:13,17,21,25
370:4,8,12,18
371:1,8 374:19
376:8 377:11
379:19 380:7,17
381:5,18 382:4,17
382:24 383:11
384:11,25 386:8
386:23 387:7,16
388:22 389:6,22
390:19 391:12
394:22 396:4
398:15 400:8,23
403:19,23 406:5
408:11 410:14,25
411:23 412:6
413:9,21 414:3,12
415:3 416:7 417:19
417:19 418:10
419:3,17 423:14
423:22 424:4
425:14 428:17
429:1,19 433:17
433:24 435:13,24
436:8 440:3 443:3
444:3 445:9 446:9
446:20 447:1,8
449:2,9,19 450:4,8
450:15,25 453:25
454:10 458:16,17

458:21 459:9,17
459:21,25 462:16
462:24 463:5,11
463:21 464:4
465:9,24 466:6
467:9,17 468:12
468:17 469:8,25
470:15 471:3,9,19
472:13,19,24
**formal**  188:12
204:4
**formally**  197:3
**former**  359:23
**forms**  192:9,14,16
192:25 193:23
321:17
**formula**  228:1,7
249:5 311:9
**forth**  399:5
**forward**  475:15
**forwarded**  392:18
393:2
**foster**  134:23
141:7 247:18
248:22 255:1
289:14,16 304:25
309:6 321:1,18
385:23 389:4,8,19
389:24 390:17
403:14,16,18
404:16
**found**  68:6 347:19
**foundation**  457:9
458:1,13 459:6
460:20
**four**  82:7 219:20
224:12,23 238:7
341:6
**fourth**  87:20
245:24

**[fox - funds]**

| | | | |
|---|---|---|---|
| **fox** 378:20 | 144:1 153:4 | 258:9,12,12,16,16 | 238:8 283:17 |
| **frame** 362:7 | 155:15,23 156:1,2 | 258:23,24,25 | 284:14,21 301:7,8 |
| **frank** 36:20 40:7 | 156:19,24 157:9 | 259:5,7,11 260:5,7 | 358:9 |
| 333:3,12,23 | 157:11,14,17,20 | 262:13,13 263:9 | **funding** 79:6 88:8 |
| 372:16 | 157:25 158:4,5,11 | 263:12,16,16 | 89:19 104:9 |
| **frankly** 399:3 | 158:13,18,19,25 | 264:13,14 266:3,4 | 111:25 141:13 |
| **free** 72:15 73:1,2,4 | 159:2,2 160:4 | 266:21,21 277:6 | 144:15 148:22 |
| 73:22 74:12 75:1 | 162:13,15,18 | 277:14,16 278:17 | 183:19 184:1,20 |
| 210:3 476:14 | 163:1 165:16,21 | 279:23,25 280:14 | 186:6 187:14,24 |
| 477:20 | 184:20,21 201:11 | 280:25 281:23,24 | 188:5,21 191:9,11 |
| **frequently** 20:1,24 | 210:14,18,24,25 | 282:17 283:9,12 | 192:6 194:7,22 |
| 140:5,7 171:1 | 211:6,13,16,20,25 | 283:13,16,23 | 195:2,9,23 196:4 |
| 391:21 | 212:3,9,22 216:3 | 284:3 285:23 | 196:22 199:5,12 |
| **friend** 328:23 | 216:10 217:22 | 286:4,22 287:5 | 199:24 201:1,5,16 |
| 329:5 453:9,22 | 218:20,21,22 | 288:6,9,10 289:5,6 | 202:21 204:12 |
| **friendly** 278:9 | 219:1,18,19 220:2 | 289:9 290:11 | 206:13,24 238:19 |
| **friends** 15:17 | 220:3,8,14,19 | 291:10 293:12,12 | 239:5 254:8,21,22 |
| 45:12 | 221:1,11,18,22 | 294:8 295:10,12 | 255:4 257:24 |
| **front** 52:15 56:2 | 222:21,23 223:5 | 295:14,16,21,25 | 302:18 306:15,16 |
| 61:13 65:16 109:9 | 223:12,17,23 | 296:8,9,25 298:4,5 | 316:2,5 320:1,4 |
| 136:17 161:7 | 224:1,6,7,12,14,22 | 298:15 299:19,20 | 327:19 335:1,9 |
| 207:10 259:19,24 | 224:22,23,24,25 | 299:24 300:9 | 338:17 339:18 |
| 277:25 342:13 | 225:1,1,2,2,4,7,12 | 301:5,14,22 | 340:5 341:9 358:4 |
| 372:9 378:9 | 225:17,19,21 | 304:12,22 305:3 | 358:12 361:3 |
| 421:20 | 226:5,7,9,10,14,21 | 306:9,23 307:7,12 | 371:10 379:24 |
| **ftes** 306:3 | 226:23 227:2,4,8 | 307:18 308:7,9,12 | 381:11 384:9 |
| **full** 77:17 210:1 | 227:14 229:9,19 | 310:2,12,22 | 385:4 400:20 |
| 318:3 350:7 | 231:6,12 233:1,1 | 316:17,21,24 | 401:2,3 402:20 |
| 351:10 377:5 | 233:11,17 234:19 | 317:13,15 318:22 | 403:4 404:7,13 |
| **fully** 95:16 457:2 | 235:15,22 236:1,8 | 319:1 324:2 329:1 | 441:1 |
| **functional** 233:7 | 236:19 237:4 | 341:2,13 350:22 | **funds** 93:17,23,25 |
| **functions** 137:16 | 238:16,17,21,21 | 351:18 352:10 | 94:10,13 102:8,21 |
| 137:18 260:23 | 239:1,2,3,12,15,17 | 353:12 355:7,14 | 103:15,21 104:3 |
| **fund** 90:9,11 94:3 | 239:20 244:12,15 | 356:14,16,18 | 104:14 106:2 |
| 94:5,8 104:9,15 | 244:16,19,23 | 358:10 375:22 | 116:16 124:15 |
| 106:4 112:4 117:5 | 245:25 252:23 | 379:3 381:14 | 125:24 127:1 |
| 119:10 123:24 | 253:5,9,24 255:21 | 406:12 | 133:14 134:17 |
| 124:7 125:13 | 255:21 256:9,13 | **fund's** 231:16 | 144:22 145:3 |
| 126:10 127:16,18 | 256:15,17,19,21 | **fund.special** 258:9 | 147:2,2 149:22 |
| 128:5,6,10 131:22 | 257:7,11,13,16,17 | **funded** 73:24 | 153:10,22 155:4 |
| 131:23 133:15,17 | 257:19,19 258:6,7 | 88:17,25 189:12 | 155:11,12,19,20 |

156:3,4,8,18,22
157:6,9,18,22
158:7,16,17,21
187:18 190:24
191:2 200:9
201:24 202:20
203:4 205:6
210:23 211:18,21
211:25 212:14,16
212:17 213:3,5,6
213:14,23 214:2
216:6 219:3,20
220:4,12,20 221:2
221:12,18,23
223:1 224:2,13,14
224:23 225:4
226:1 229:14
230:2 231:11
235:7 239:10
240:8,11,15 244:7
244:25 245:1,4,16
246:1,6,12 249:6,9
249:18 251:23
252:8,11,19
253:12 254:7,20
255:11,12,19,24
256:2,5,11,19
257:2,23 258:3
270:7 276:8,11,22
277:3 278:1,3,6,15
279:3,8 280:6,19
281:13 282:15
284:9 285:3 289:7
293:7,23 294:5,16
294:21 295:13
297:7 301:4,7
302:8,13,19
304:19 307:10
310:1 311:19
312:1 316:10
317:5 339:24

352:12 353:11
360:22 362:1
375:17 377:10,13
378:4 381:25
423:7,8
**funny** 213:18
332:4,8
**furloughs** 115:4
**further** 109:4
118:13 162:7
180:23 223:24
245:11 372:13
427:4 455:13
461:21 473:10
474:11
**future** 24:13 25:3
335:14
**fyi** 393:3 407:4

**g**

**g** 5:20 13:18
**gained** 76:11
**gallagher** 170:23
171:19 177:2,3
**gallucci** 40:8
**garofoli** 2:7
**ged** 153:8
**general** 22:17
53:18 61:13 79:24
94:2,8 104:9
114:8 117:5
119:10 123:24
124:7 125:13
126:10 127:16,18
128:5,6,10 131:22
131:23 133:15,17
144:1 155:15,23
156:1,2,19,24
157:11,25 158:5
158:11,13,18
160:4 162:14,18
163:1 165:16,21

173:1 184:20
211:9 216:3,10
217:22 218:21
219:1,18,23 220:2
220:14,19 221:1
221:11,18,22
222:21,23 223:5
223:17,23 224:1,6
224:12,14,22,24
225:4,7,12,17,21
226:5,6,10,22
227:11,13 231:6
231:11,15 232:13
233:1,10,17,24
234:1,6,19 235:15
235:22 236:1,8,18
237:4 238:17,21
239:1,2,3,12,15,17
239:20 242:5
255:21 256:12,15
256:17 257:11,13
257:16,19,19
258:6,16,23 259:5
259:11 260:5
262:13 263:16
264:13 266:3,21
279:25 280:14
301:5 307:4
314:24 317:13
318:22 319:1
350:22 351:18
352:10 353:12
355:7,14 356:14
356:16,18 358:10
**generalizations**
27:24
**generally** 15:22
22:6 27:5,6,18
54:17,18 89:3
110:2,12 112:24
151:18 173:25

209:25 300:24
309:7 336:23
365:16
**generate** 119:14
161:11 247:9
248:20 361:3
412:25
**generated** 153:3
154:6 247:15,15
247:17,18 248:14
248:21,24 249:2
250:4,10,11
251:25 276:9
413:4
**generates** 228:13
295:16
**generating** 154:1
249:18
**getting** 51:15
96:11 100:24
141:12 310:9
328:22 333:21
402:18
**gilson** 20:9,18
346:22
**give** 31:16 32:2
33:6 34:9 43:7
50:9 56:21 65:25
92:3 101:18
111:18 135:8
144:17 162:2
167:20,22 168:15
180:21 186:24
205:15 206:19
214:8 221:5
245:16 256:3
276:16 278:6
322:15 325:13
326:18 386:20
394:24 404:18
432:11 444:23

454:2
**given** 30:18 31:17
37:22 38:4 48:6
69:18 87:8 115:5
206:21 259:11
274:25 299:9
388:16 474:9
**gives** 229:6 254:12
284:25
**giving** 37:12 45:5
87:15 364:21
378:24 380:11
395:17
**glad** 241:21
**go** 13:24 32:18
44:8 49:1 50:7
54:13 60:18 63:6
67:14,18,20 68:11
76:17 77:17 86:16
91:18 102:10
104:22 105:12
107:15,19 108:6
109:2,4 125:16
126:21,23 128:9
129:18 133:14,16
143:23 147:25
149:8 177:2 179:3
181:1,10 186:25
189:15 191:18
193:3 197:25
198:1,5 204:1
211:4 213:13
216:2 221:10,25
226:8 231:23
234:19 239:21
240:11 242:18
252:7 257:10
258:19 261:2
263:5,10,25
264:24 265:6,8
267:1 268:2 269:9

271:17,18,20,24
272:6 275:10
277:2,14 279:7
284:7 285:13,25
290:13 291:1,25
293:13 294:16
297:15 305:5
306:3 318:14,21
322:11 324:3
332:10 336:12
338:3,7,11,14,21
338:25 339:7,14
342:2,24 352:9,18
363:5,17 373:14
379:24 381:7
388:3 391:17
399:5 407:23
411:7 419:8 426:6
433:22 441:10
445:13,17 448:2
449:5 452:24
453:19 454:3,15
457:11 458:22
461:24
**goal** 360:20
**goes** 54:15 59:1
85:13 151:1 170:5
221:11 226:22
228:23 231:24,25
232:3,5 233:1,14
242:15 250:23
254:4 255:10
260:15 265:16
275:20 276:21
277:6,16 279:13
329:20 343:1
372:12 410:18
446:2
**going** 14:20 20:18
25:3 30:8,11
36:13 43:10,13

44:11,12 53:7,20
60:18,19,22 61:2
71:24 84:12 91:11
95:9,20 96:13,20
96:25 97:1 102:11
108:1 123:13
125:18 128:22
129:5,21,23,24
130:15 131:15
135:1,8 147:25
149:11,18 151:5
151:14,23 152:3
152:25 153:18
154:3,23 160:25
162:10 176:6
182:2 185:4,25
187:2 190:5 207:7
218:24 222:8
223:21 228:8
234:24 238:2
242:9 258:18
261:3,16 266:1
268:2 270:21
274:23 275:2,3,9
277:21 281:7
282:12 289:3
295:8 299:7,14
304:2 311:12
312:16 313:4
317:1 318:24
319:2,6 320:19
324:1 325:22
329:17,19 330:13
332:9 333:24,25
339:15 341:10,18
346:14,17 351:17
356:8,11 357:10
357:16,19,21
358:1 359:17
365:15,18 366:1
367:10,13,14

368:22 371:24
376:24 377:1
386:19 390:5
393:15 394:13,14
394:16 395:20,25
396:2,6,11,12
399:5 400:4,5
401:7 408:25
412:17 417:23,24
418:1,17 419:23
420:1,14 425:22
440:18 441:15,25
443:6 448:1,2,12
451:5,8 455:4
463:12
**gonna** 54:5
**good** 11:21 12:23
12:24 39:14 48:17
51:13 62:1 92:13
95:4 108:3 110:10
123:1,4,5 128:24
129:17 130:15,24
168:4 214:22
250:25 311:24
315:17 378:4
379:11 381:1,15
381:24 437:24
**google** 265:8
**gotten** 58:17
**government** 45:9
70:14 72:8 76:20
77:2 79:24 80:9
85:1,12,22 90:1,21
90:24 91:14 92:9
118:8 132:15
136:20 139:15,17
162:18 167:5
200:10 226:14,21
227:2 232:14,25
233:8,24 234:1
243:20 244:10

247:14,25 248:3
248:11 250:24
252:1 253:22
283:18,22,25
287:18 300:6,7,8
300:16 339:6,10
361:4 413:7
450:12 469:6
470:18
**government's**
251:1
**governmental**
227:13
**governments**
90:19 244:21
**graduation** 36:5
69:17 71:7
**grand** 29:24 30:4
30:11,18,20,24
31:4,18,24 33:3,14
34:2,5 37:25 39:7
48:7 52:6,16
53:13,15 56:2
57:4,19 59:5
61:13
**grant** 73:24
252:24 253:12
**granted** 200:24
**grants** 72:7 155:18
188:1 212:13,19
212:24 213:1,7,8
213:13,25 214:16
215:5,19 251:10
251:15,16,20,25
253:5,10 278:1
**graph** 232:21,23
233:3,4,14 234:14
235:5,14
**graphs** 236:23
**great** 81:17 89:17
116:2,10,14 117:2

117:22 307:2
311:10 427:20
446:14 461:22
**greater** 57:25
72:16 75:2 303:22
315:10
**greatest** 102:17
**green** 377:19
**greg** 333:7,23
**gregory** 332:25
373:15
**group** 81:25 82:24
313:17
**groups** 86:7,25
404:15
**growth** 71:4,11,13
**guarantee** 147:17
**guardian** 181:18
185:3 301:23,23
408:14 444:15
**guess** 16:1 21:10
21:20 35:23 36:13
40:20 41:3,7,12
42:1,3 62:6 65:3
151:21 152:3
176:6 270:21
304:10 365:15,19
366:2,4 367:10,13
367:16 392:17
394:8
**guessed** 392:24
**guy** 96:21 448:1

**h**

**hairs** 87:7
**half** 312:17 404:12
**halfway** 210:12,13
246:9
**haller** 5:11 12:4,4
428:4,10
**hallway** 188:21
391:15

**hallways** 188:15
**hand** 107:22
160:25 162:4
231:1 341:19
474:16
**handful** 68:8
184:2
**handing** 45:20
**handling** 418:2
**haney** 407:2
**hang** 60:23
**happen** 220:22
257:20 314:3
**happened** 31:6
121:6 257:21
353:17 471:6
**happening** 49:7
110:8 111:5 113:8
128:23 140:3
167:21 182:22
278:7 385:16
**happens** 53:15
125:17 170:4
284:4 398:2
**happy** 312:10
**hard** 131:9 453:17
**head** 50:19 92:4
139:14,16 157:21
188:20 217:25
218:25 234:25
237:14 256:4
257:4 258:10
263:24 266:22
290:4 297:17
306:2 316:19
318:11 371:25
405:3 407:22
436:10 445:7
464:21 466:1,3
472:10

**heads** 183:17
191:17 288:24
468:9 471:1
**health** 4:3 6:3
11:24 20:10 28:20
29:3 69:11,20
73:8 75:5 78:14
79:18,23 80:7,11
80:18 81:5,23
91:3 104:10,11,13
117:19 130:16
171:17 184:21
185:20 196:1,3
240:14,19 256:18
301:10 302:22
304:11 308:8
313:13,16,19
317:14 319:10,12
323:11 329:8
330:25 359:24
361:1,23 363:20
363:25 392:5
400:15 401:19
402:8 406:2
411:21 439:3,4,7
451:7
**healthcare** 73:4
74:9,16,25 132:17
148:6 240:20
302:25
**hear** 51:7 142:20
169:23 170:2
323:21
**heard** 18:1,10
69:15 146:21
439:2,4 452:12
458:5
**heavily** 147:14,15
**heights** 98:11,13
**held** 2:6 112:7
166:10

hello 51:8
help 36:15 56:9
59:13 73:25 85:18
101:1 216:14
217:8 218:19
234:9,23 373:21
374:24
helped 161:11
helpful 210:8
225:5 419:8
helps 49:11
henschel 6:25
henz 322:14,19
hereunto 474:15
heroin 27:21
140:24 260:21
273:4,8 274:9,16
335:7 379:11,24
381:1,16 384:19
385:14 456:7
462:13,18
heroine 445:25
455:21,25
hesitated 388:15
hey 190:11 207:2
391:18 395:15
408:8,13 410:11
469:21
hhs 106:3 172:17
216:10 218:21
219:2,24 225:8
231:10 240:8,11
244:18,22 245:13
246:8 256:7,10
276:6 283:15,23
286:7 288:8
298:11,15 300:10
300:14 301:6,9,11
302:3,8,22 303:1
304:11,12 310:16
310:21 311:2

316:17 382:1
396:22
hi 12:12 462:10
hierarchy 224:25
higher 306:5,13
highest 185:11
highlight 278:5
highs 135:1
hipaa 275:21
hire 144:7 203:20
319:21
hired 14:8 100:5
hiring 96:14
historical 14:13,14
180:19
history 66:10
71:23 107:21
275:5,15,20
hit 105:6,7,8,9,10
105:11,15 131:9
131:16 241:18
243:16
hoc 79:3 442:12,18
442:24
hold 29:7 285:10
holding 29:1,6
61:25
holdings 6:6
home 24:19 91:20
91:21 98:9 241:15
241:16 242:9,10
242:21 243:6,10
265:10 289:19
300:4 305:8,9,11
305:21 309:24
319:23 320:15
321:9 389:12
390:25 396:15
398:4 448:10,13
homeless 81:9

homeowners
242:16
homes 289:13,14
308:1,25 319:25
385:24
honestly 348:6
438:6
honor 340:20
honored 340:6
hope 94:9 96:24
182:17
hopefully 36:6
49:10
hopes 323:23
361:24
hoping 234:9
361:1 422:15
horizons 3:15
horse 328:23
329:5
hospital 195:15
hospitalizations
148:2
hospitals 74:23
host 175:2 240:17
hour 42:15,17
182:3 312:17
hours 42:16 108:2
306:5 386:11
464:7
house 84:11
119:12 242:4,7
housed 466:25
housing 115:24
117:15 119:18
120:6 121:3,18,19
hugh 20:11
huh 18:8 83:17
119:17 130:17
136:21 145:9
163:23 177:5

222:10 224:4
229:22 232:22
234:16 260:13
268:21 287:13
288:23 330:1
human 20:11
78:15 79:18,24
80:7,11,18 81:24
91:3 104:11,13
171:17 184:21
185:21 234:3
240:15 256:18
301:10 308:8
313:13,16 317:15
319:10,12 392:5
400:15
humane 101:14
hundred 205:17
205:21 359:18
375:14
hundreds 152:11
257:2

**i**

idea 36:6 62:16
65:25 70:17
420:18 435:20
identified 13:20
21:14 150:11
162:7 198:17
199:25 200:8
211:19 221:21
256:6 350:25
identifies 211:5
278:22 346:20
identify 11:13
33:8 158:20 281:8
284:8 288:15
299:10 312:1
324:3,20 347:11
365:14 368:22
371:5

**ignore** 61:8
**illegal** 25:11 26:2
  26:5,18 27:8,13
  28:4 382:16
**illnesses** 303:3
**imagine** 187:10
**immediate** 96:7
  174:6 394:11
**immediately** 68:12
  96:12 357:13
**impact** 22:21 23:1
  23:9,25 25:1,16
  26:4,17 27:11,14
  27:16,25 28:6
  44:15,25 84:13
  95:10,20 112:13
  116:15,22 117:3
  117:18,24 119:9
  119:19 120:7
  124:2,23,25 125:7
  126:6,6,7,9,17
  127:12 140:17,23
  171:12 172:9,22
  173:3 174:18
  177:7 330:3
  362:10 363:12
  364:4 365:4,8
  366:21 368:7,15
  369:1,11 371:4,6
  424:18 430:3
  441:17 456:18
  459:5 460:18
  461:1,16 470:7,8
**impacted** 117:23
  118:20 163:7
  177:19 178:1
  364:19 386:5
  406:3 407:20
**impacting** 405:21
  407:10 408:9,13

**impacts** 21:6 62:9
  95:23 135:20
  141:21 178:10
  366:17 370:23
**implement** 87:9
  88:12 147:20
**implementation**
  377:6
**implemented**
  72:22
**important** 102:4
  106:25 107:4
  111:11 112:2,9,18
  112:25 193:18
  270:10 305:2
  356:4 364:15
  386:10 444:24
**impossible** 57:12
  278:8
**improper** 451:14
  451:15,18
**improve** 374:4
**improvement**
  323:2
**inaccurate** 399:24
**inaudible** 448:3
**incapable** 185:5
**inclined** 292:12
**include** 44:5
  111:18 114:7
  211:17,23,25
  212:13 213:7,8,11
  253:9,24 308:20
  375:7 434:6
**included** 113:6,17
  204:12 212:3
  220:3,9 253:4
  278:2 297:10
  304:22 308:16
  338:20 349:11
  423:5 475:13

**includes** 82:16
  224:2 234:1
  252:24 278:9
  301:15 304:25
  384:17 406:13
  423:6
**including** 48:7,22
  112:12,25 113:18
  114:9 117:23,25
  123:19 124:4
  134:1 138:9
  163:21 177:14
  240:18 408:5,6
**income** 226:19
  256:21
**incoming** 281:18
**incorporated**
  477:12
**incorrect** 397:14
  398:8
**increase** 123:8,14
  123:15,23 124:8
  124:10 125:12,13
  125:21 127:10
  128:1 142:16
  149:11 150:2
  160:5 165:25
  185:1 186:5,14,16
  186:18,23 187:7
  187:22 195:3
  201:1,16 215:18
  242:12,17 267:19
  270:1 289:18
  302:15,17 305:16
  319:5,22 320:14
  321:8,13 334:1
  339:17 351:18
  357:4 371:20,21
  382:22 390:15,17
  397:20 398:7
  402:2,3,4,7,18

  403:17 425:4
  444:7,12,14 456:6
  456:8,25 465:18
**increased** 159:20
  165:24 181:14,15
  187:10,17 243:8
  259:13,14 260:24
  269:8 302:5
  305:15,21,24
  306:1 309:19
  319:4 320:1,25
  321:9,11 335:1
  389:3,9,12,20
  398:25 401:6
**increases** 125:6
  126:5 127:22
  128:25 147:10,17
  147:20 151:2
  186:11 235:17
  242:11 270:2
  290:11 351:22
  353:9
**increasing** 119:1
  122:18 130:20
  134:19,21,24
  148:6,13,15
  262:24 303:12,16
  303:21,23 331:5
  371:15,18 398:9
  441:19
**incredibly** 171:8
**incurred** 244:3,15
  256:16 257:12
  280:15 283:15
  300:9
**independent**
  169:22 210:25
  339:2,5
**indians** 129:3
**indicate** 87:20
  106:1 352:21,24

352:25
**indicated**  19:10
  25:4 37:22 40:11
  45:3 65:9 74:15
  75:15 94:22 97:5
  126:4,14 148:19
  148:21 159:9,16
  163:24 170:6
  172:17 174:22
  206:11 226:22
  227:1 243:1 257:6
  285:9,15 313:22
  335:18 364:13
**indicates**  83:15
  360:15
**indicating**  475:13
**indication**  57:3
  111:18 129:17
  355:19
**indicator**  117:6
  118:25 130:15
**indicators**  24:11
  443:16
**indigent**  146:11,19
  150:24 297:5
**indirectly**  90:23
  91:13
**individual**  140:24
  288:16 450:13
  472:5
**individuals**  19:20
  21:5,14 22:13
  23:19 43:23 73:5
  86:7,25 138:12
  284:16 286:12
  288:2 297:3,8,9
  314:25 335:5
  430:9,13 436:6
  437:11 450:22
  452:19 453:2
  471:14

**industries**  71:25
**inferior**  374:16
**infestation**  467:8
**infestations**
  466:20
**inform**  27:10
  84:19 329:23
  417:15,15 424:17
  441:23
**information**  22:24
  23:8,20 25:23
  32:2 33:14 35:14
  35:18 36:10 37:11
  39:1 48:5,9,12
  54:13 58:17 59:1
  83:25 84:18 104:1
  104:4,18 105:25
  106:3 107:1
  113:14 130:9
  154:11 186:13,23
  187:6 204:2,17,24
  210:8 217:14
  232:10 234:3
  261:7,14 262:11
  272:22 279:4
  291:15 292:16,19
  355:15 373:7
  391:2 395:18
  416:10 422:13
  434:2 443:9,11
  451:7 454:2 457:6
  457:23 458:11
  459:4 460:17,25
  461:8,15
**informed**  19:5,14
  23:8 25:22 26:22
  30:10 84:1
**informs**  442:1
**infusions**  306:16
**initial**  69:25 196:7
  201:4

**initially**  196:9
  395:3
**inmate**  195:17
  206:13
**inmates**  93:10
  96:1,17 128:1
  153:5,12 185:14
  195:11,13 232:2
  281:19 303:2,11
  303:15,20 327:11
  444:16 456:21
  457:1 464:13,18
  464:23 465:18
**input**  189:9
  429:13,16
**inquiry**  176:11
**inside**  126:2,17
**inspector**  234:5
**instance**  200:1
  201:22 203:3
**instances**  102:20
  103:14,21,24
  106:6 114:1,7
  199:2,21 258:22
  288:14 330:2
**institute**  71:4,12
**instruct**  14:21
  33:19 34:9 35:1
  50:8 59:23 275:24
  416:14 451:6
**instructed**  31:15
  31:23 33:6,13,25
  34:8 35:15,20
  38:25 48:2,9,23
  49:18 52:11,20
  59:18
**instructing**  31:10
  34:12,23 35:6,9
  50:6 345:2,4
  423:19

**instruction**  7:16
  30:12,25 32:8
  34:10 36:9 48:11
  57:9 274:25
  430:11 451:8
**instructions**  34:13
  55:7 61:9
**insufficient**  112:6
**intake**  282:25
**intended**  67:18
  68:1 451:19
**intent**  361:11,14
**interact**  101:11
  171:1
**interaction**  101:14
  169:6
**interactions**  472:1
**interest**  172:21
  173:2 176:20
  177:6 376:2
**interested**  171:24
  172:5 474:13
**interesting**  68:6
**interests**  80:6
**interface**  377:15
**intergovernmental**
  226:16 227:8
**interim**  99:25
  392:7 400:15
**internal**  211:10
  234:6
**international**
  97:10
**internet**  265:7
**interpret**  330:4
  361:22 374:24
**interpreted**  395:6
**interrogatory**
  10:8 431:4,11
**interrupt**  48:25

interrupting  276:3
interruption  46:4
interview  99:16,19
interviewed  37:17
introduced  13:1
  37:2
invest  187:20
investigate  91:18
investigated
  154:20
investigation
  33:15,21 34:3,5
  37:4,13,18,20
investment  226:18
involve  280:8
  282:1
involved  284:10
  288:16 300:24
  317:24
irish  404:25
irregularities  62:9
irrelevant  58:12
  61:17 356:3,10
issue  30:7 37:24
  47:20 48:1 49:13
  56:4 59:5 62:16
  69:11,20 84:21
  199:6 202:1 229:2
  376:6,15,18
  389:14 399:13
issued  375:24
issues  29:3 154:10
  170:11 171:5
  175:3 177:18
  194:9 196:23
  198:19 201:18
  203:6 227:24
  230:3 275:21
  286:23,25 293:13
  305:18 317:6
  320:8 366:12

406:2 411:22
it'll  63:21
item  307:15
items  130:23
  138:23 348:12
iv  299:17 300:1,2

**j**

j  12:3,3
jail  24:22 82:17
  93:6 95:3,13
  96:18 101:10
  152:23 153:8
  154:7 185:7,8
  195:11 202:22
  231:25 232:1
  233:16,19,21
  240:21 281:18,20
  281:21 302:25
  324:2,20 327:14
  439:16 444:16
  456:14 464:12,19
  465:12 466:15
  467:12
jails  93:9 322:16
  323:6,10,12
  327:10
james  420:8,9
janssen  4:11,11,13
  12:3
january  54:22
  142:13 160:6
  322:13
jciaccio  3:12
jfs  396:18
jimmy  36:24 37:1
joanna  322:14,19
  323:15
job  1:25 24:10
  28:1 39:14 70:18
  71:6,8 76:2,11
  80:22 98:9,10

102:16 106:14
  135:2 256:7 268:8
  274:9 279:3
  300:12 308:12
  310:8 364:16
  386:10 387:11,22
  392:8,8,10 443:19
joe  40:6 109:3,6
  332:17
johnson  4:12,12
joined  78:11
joke  328:4 332:3,4
  332:5
joking  326:11,12
  326:14,15,19
  328:1,8
jones  5:16 12:1
jonesday.com
  5:21
joseph  3:11 11:17
journal  25:25
  230:17
journals  17:16
  18:16 19:1
judge  1:8 404:20
  404:21,22 405:2,4
  405:8,17,20 407:8
judges  339:12
judgment  268:11
judgments  24:12
judicial  79:25 82:2
  82:5,23 83:4
jump  312:2,8
  337:19
jumped  451:23
jumping  159:6
juris  69:8 70:5
jurisdiction  82:12
jury  29:24 30:4,11
  30:18,20,24 31:4
  31:18,24 33:4,14

34:2,5 37:25 39:7
  48:7 52:6,16
  53:13,15 56:2
  57:4,19 59:6
  61:14
justice  93:3
  171:21 177:4
  233:15 235:4,7
justifiable  327:19
justification
  188:24
juvenile  82:8
  151:12 177:14
  181:13 184:22
  195:1,5 202:22
  205:8,10 206:4
  232:5 238:5,14,19
  239:16 240:25,25
  247:20 256:10,19
  277:10,11 299:17
  299:21 301:13
  357:7 371:18
  405:5,10,22 406:4
  406:7,10,13,14,15
  407:10,21 408:10
  410:3,10,13
  436:17
juveniles  301:16
  301:18

**k**

k  5:14 6:17 13:15
karen  401:16
kearney  401:16,17
keenan  1:17 2:5
  7:3 8:3 12:15,23
  28:3 33:11 45:15
  45:20 47:10 48:1
  48:21 65:14
  103:12 107:13
  108:23 109:25
  135:16 136:16

137:4 182:16
222:11 240:9
269:18 313:3
332:16 342:12
345:12 388:12
393:12 409:11,15
410:2 411:17
428:12 433:12,15
436:4 446:16
449:13 454:23
455:17 456:12
462:10 474:6
475:8 476:4,9
477:4,13 478:20
**keenan's** 348:4
**keep** 21:18 39:15
40:20,23 122:5
149:18,25 163:2
266:19 278:11
289:3 290:4,25
295:8 299:14
319:22 387:13
390:5,5 443:2
445:7 459:11
464:22
**keeping** 90:14
442:10
**kennedy** 44:10,15
44:21,24 99:20,21
137:9,24 138:5
139:10 209:19
348:25 378:12,16
379:17 453:8,22
461:7,15
**kennedy's** 208:21
209:16
**key** 24:11 189:2
443:16
**keyed** 189:4
**kia** 374:6

**kias** 374:11,16
**kid** 357:13,13
**kids** 102:1 241:1
247:19 309:11
**kind** 54:15 61:7
68:25 75:7 105:16
107:20 110:12
148:12 191:8,25
217:2 222:13
232:20 238:2
242:19 261:8
270:10 282:2
299:5,11 349:13
353:1 373:19
374:15 405:14
423:8 438:16
441:16 442:6,12
**kinds** 77:4 191:1
310:10
**kinship** 309:2,5,17
310:6 321:14,16
389:10
**knew** 94:12
**knock** 409:16,18
409:21,21
**knocking** 374:11
**know** 15:7 16:2
23:7 32:1,3,13
36:14,16,18,20,21
36:25 39:2,9 43:2
43:15 44:18 48:17
48:20 49:5,25
50:12,17,21 57:15
57:22 58:10 59:3
59:15 63:3,11
70:13 74:7,25
75:4 76:9 77:1
79:10 89:6 99:8
99:21,23 100:3,9
102:2,11,14
106:19,20,22

107:7 108:2 109:9
114:1 119:2,25
120:2,4,15,24
121:6 128:13
129:13,18 130:1,4
130:6 132:10
139:20 147:23
152:19 154:19,20
154:22 156:15
157:1 158:15
168:14 169:13,17
171:8 172:24
178:15,16 180:21
181:15,16,17,20
181:21 183:7
186:25 187:5,23
188:12 190:5,21
191:15 196:2
197:8 198:1,3
199:10,16 201:22
205:4,9,11 217:8
232:14,14,23
233:18 235:11,21
235:25 237:2,13
241:17 242:3
260:25 261:13,19
261:20 263:4,22
266:2,13,15,20
269:8 270:17,22
271:7,9 272:15,22
273:14,21 274:5,6
274:13 276:1
282:11,15 285:19
286:20,24 288:12
288:18,24 291:12
292:14 293:1,10
293:20 294:8,20
295:6 296:13,22
297:14 301:19,19
302:11 303:8,10
303:10,14,25

304:4,6,7 306:2,3
306:7 307:10,14
307:17 312:14
315:25 316:18
319:16 324:12
329:10 334:16,21
335:1,23 336:5,10
337:5,6,10,16
340:16 342:1,23
349:3 352:2,13
353:5 359:17,21
360:1,3,3 368:25
369:6,9,14,18,22
370:1,5,9,13,16
372:23 373:23,24
374:2 375:5
380:22 381:20
382:5,10,11,13,18
382:21 383:1,5,7
383:16 385:7
387:14 388:12
389:2 391:9
397:22 399:20
401:17 403:2
404:17,20,22
405:1,4,5,12,16
406:10,16 407:19
409:5 413:2,6,10
419:6,20 420:18
420:20 421:14,19
422:8,8,18,23
423:4,6 425:21
427:22,24 428:12
428:18 429:9,10
430:19 431:12
432:5 434:4,9
435:6,8,14 436:4
436:15 438:3,6,20
438:23,24 439:1,6
439:8,15,17,19,24
440:24 441:2

445:1,6,8 447:10
447:14 448:22
449:3,10,21 450:5
450:16 454:6,11
454:25 455:3
460:5 463:22,25
464:9,10,17,21
465:23 466:23
467:3,4,5,6,7,11
467:14,15,23,25
467:25 468:2,7,13
468:21 469:3,11
469:13 470:23
471:8,12,14,20,22
472:22 473:3
**knowing** 48:14
57:14
**knowledge** 14:1,4
37:10 76:21 80:8
107:11 109:5
198:14 456:16
460:10 474:10
**known** 60:10
393:23
**knows** 80:6 328:12
467:16,24 468:1
468:20 469:12,20
470:5,7,9
**kristen** 405:5
**kurt** 6:25

**l**

**l** 3:11
**l.p.** 1:11
**lab** 259:8,8,13
264:14 267:21,23
268:15,23 269:7
272:6 279:22
295:10,11,14
**labeled** 406:13
**laboratory** 260:8
262:14 263:17

266:5 269:21
270:15 271:5
272:2 280:22
**laborious** 105:3
**lack** 84:17 457:8
**lacks** 458:1,13
459:6
**language** 153:11
**large** 84:4 131:16
147:13 148:9
184:25 195:2
298:21
**largely** 94:1 119:9
226:16 244:13
289:10 296:9
301:14 356:2
389:9
**larger** 164:10
165:21 203:20
226:11 278:6
**largest** 74:23
117:4 123:12
126:19 127:1
131:22 186:1
233:17,23
**lasted** 42:16
**late** 377:4
**latest** 66:5
**law** 3:14 14:22
16:8,10,13 24:17
36:1,3,4 44:5
67:19,20,25 68:11
68:21 69:23 70:3
82:19 93:7 94:11
98:8,10 105:5
156:21 195:19
234:7 275:24
358:19
**laws** 197:11,19
198:12

**lawsuit** 14:19
15:20 16:4,18
64:2 412:18
417:15,22 426:17
438:21 440:1
**lawyer** 432:14
462:12 464:11
**lawyers** 29:14
40:17,23 41:9,22
42:6,19 43:7,18
44:2,6 103:11
138:24 426:11
428:13,24 429:3
429:21
**laying** 71:21
**layoffs** 115:3
**layperson** 29:8
234:11
**leadership** 207:24
220:25
**leads** 469:5 471:15
**learn** 14:18 15:19
**learned** 16:3
**learning** 405:19
**leave** 59:24 60:20
298:10 357:19
**ledger** 211:1
**left** 48:13 71:25
98:2 99:10 222:13
354:24
**legal** 6:25 53:6
54:8 70:22 79:25
82:2,4,23 83:3
94:6 255:14 256:1
275:12 376:18
385:5 387:23
475:1 478:1
**legislative** 84:8
85:8 133:5
**length** 425:8

**lengths** 42:13
**lentz** 328:21
**lesser** 336:17
**letter** 475:19
**letting** 421:18
427:24
**level** 62:22 84:11
131:13 154:15
249:8 278:9,13
303:14 305:19
445:2
**levels** 249:3
250:14,18 268:7
305:16 319:3
**levies** 104:10
119:11 123:14
127:7,9 144:1
219:24 225:8,18
241:7,14,18
242:24 246:3
276:7 301:10
302:2,3
**levy** 106:3 184:21
201:11 216:10
218:21 219:2
231:10 238:21
239:17 240:8,11
240:15 242:1,7,10
242:14,21 243:6
244:19,23,25
245:3,7,13 246:13
256:20,21 258:16
283:16,23 286:5,6
286:7 288:8,10
298:15 300:10,14
302:8 303:1
304:12 308:9
310:12,17,22
316:17 317:15
319:10 339:23
382:1

**liability** 72:4
185:18
**liaison** 5:4 322:15
323:5,9,12
**libraries** 126:20
127:2
**library** 82:19
98:11,13
**licenses** 226:12
277:6
**life** 68:15 70:6
**lighter** 236:24
**likelihood** 58:11
63:22
**likes** 387:25
**limit** 124:18
**limitations** 377:22
**limited** 90:1 234:2
254:7,20 302:19
443:15
**line** 7:16 89:16
162:16 218:13,16
219:6 245:11
307:15 315:2
320:2 343:10
349:14 407:3
475:13 477:7
478:3
**lines** 245:24
413:20
**link** 378:19,23
379:3
**list** 40:20 80:16
82:7 158:24
211:17 212:3
222:3 241:3
255:24 256:3
257:1 276:15
286:1 295:9
299:15 311:19
327:11 329:17

372:2
**listed** 138:8
196:18 211:14
278:15 477:7,17
**listen** 408:25
468:15
**listing** 477:7
**litem** 185:3 408:14
**litems** 181:18
301:23,24 444:16
**literally** 335:22
**litigation** 1:6
11:11 29:16 43:24
45:24 51:11 348:5
416:4,17 417:5,8
418:9 426:11
475:6 476:3 477:3
**little** 49:9,11 58:21
68:25 73:12 98:18
128:11 129:19
163:17 205:24
210:13 224:10
252:14 296:25
301:3 303:24
314:17 315:1
324:4 326:2,4
328:17 331:15
375:14 397:18
432:11 439:8
442:4 457:11
**living** 147:20
**llp** 4:14 5:6 6:16
**loans** 72:7 188:1
375:24
**local** 70:12 92:8
226:14,21 227:2
243:20 378:20
**locally** 92:17
**locals** 146:13
**located** 2:8

**lockbox** 230:4
**log** 425:20
**logistical** 154:17
**long** 42:12 94:6
97:19 98:16
118:19 129:22
151:13 152:3
153:17 388:1
454:25
**longer** 73:2 115:6
372:19 399:6
**look** 46:2 66:8,9
160:14 161:13
162:16,20 163:19
181:11 199:13
204:3 210:9 212:6
216:8,15,18
217:21 221:14
236:15 237:6,11
237:19 245:23
246:6 252:10
263:19 264:15,24
265:22 266:12
268:25 269:1,2,5
271:10,25 296:2
302:10 306:17
312:5,7,9 332:23
333:19 344:7
354:18 357:15
364:16 380:4,9,19
396:21 397:17
407:25 422:22
433:2
**looked** 213:18
348:7 445:6
**looking** 65:15 93:2
98:9 162:14 167:6
169:15 198:25
216:21,24 218:7
218:13 219:7
225:14 231:10

235:24 265:20
270:7 280:10
283:2 347:17
351:12 352:17
434:11,17,19,21
435:2
**looks** 65:22 66:21
71:3 72:14 77:25
78:13 222:24
233:13 236:25
333:18 378:20
**looser** 255:6
**lose** 150:19
**losing** 49:3 134:20
134:21 146:1
151:7 156:8
163:25 164:3
**loss** 145:22 152:6
155:3 159:10,18
160:1 335:24
**losses** 148:21
150:13 152:7,12
152:21 155:5,10
**lost** 131:11 144:14
150:16
**lot** 71:9 74:5 97:15
97:17 106:20
129:4 146:6 156:4
232:9,10 241:5,6
291:12 308:24
310:5 314:19,25
315:18 375:11
387:11 410:4,6
**louisiana** 5:17
**love** 67:23 90:10
290:9 385:7
**loved** 385:21
**lpa** 2:8
**lumping** 28:9
**lunch** 182:4,17,17

lung 323:20

**m**

**m** 4:18 6:11 13:18
 204:22 289:2
**madam** 475:10
**magazine** 19:1
**maggie** 1:17 2:5
 7:3 8:3 12:15
 45:15 47:7,10,11
 51:6,9 56:15
 57:18 59:16,19
 60:15,20 61:3,6
 137:4 190:11
 469:21 474:6
**main** 4:15 95:16
**maintain** 191:13
 197:23 198:2
 317:12
**maintained**
 252:19 377:25
**maintaining**
 197:11 198:9,9
**maintains** 194:4
 210:17 229:20
**maintenance**
 187:12 232:11
 377:7
**major** 67:1,3,6,8
 67:15 68:2 211:6
 211:16 212:2
 421:17
**majority** 73:7
 76:13,14 92:4,23
 295:20 296:5
 303:2 319:20
 471:25
**majors** 67:17
**makers** 135:18
**makeup** 382:11
 463:23

**making** 79:4,6
 84:4,17 88:14
 89:10 107:2,20
 134:3 144:12
 179:3 199:23
 223:10 250:14
 355:22 359:16
 385:18 459:11
**manage** 73:21
 387:22
**managed** 132:14
 132:20 133:5,13
 133:22 135:19
 145:22 146:24
 148:20 150:12
 155:4
**management**
 13:11 14:1,7,9
 47:12 58:21 78:15
 78:21 79:15,19,21
 81:21 82:23 83:14
 84:3 85:3 86:1
 87:21 88:11 98:25
 100:1,13 103:13
 105:13 106:8
 112:11 120:6
 121:22 137:4,25
 138:17 167:11
 169:2 183:11,19
 191:1,25 192:12
 192:23 194:6
 196:21 197:16,23
 198:11 199:4,23
 201:16 204:15
 209:25 215:15
 261:23 265:9
 267:2 278:12
 280:7 283:8
 291:17 292:18
 315:14,22 317:24
 329:25 348:19

 364:11 365:6
 366:8 368:4 385:3
 413:3 420:11
 423:11 429:15
 458:25
**manager** 98:15
 336:13
**manages** 101:24
**mandate** 186:20
 187:19 316:7
**mandated** 89:25
 90:18,21 91:7,9,25
 92:5,6,10,25 93:3
 93:12,17,22
 157:10
**mandates** 90:5,7
 100:25 254:7,20
 291:10 341:11,13
 385:6 387:24
**manifest** 176:21
 177:8
**manipulate**
 119:13
**manual** 230:11
**manufacturing**
 71:24
**march** 9:3 390:8
 390:13 391:23
**margaret** 1:17 2:5
 7:3 474:6 475:8
 476:4,9 477:4,13
 478:20
**maria** 288:25
**marijuana** 282:10
 282:12
**mark** 393:15
 412:10 420:2
 421:21 430:22
**marked** 45:17,21
 65:15 136:13,16
 160:22 161:1

 184:12 322:3,7
 332:13 341:15
 342:14 360:6,8
 372:5,10 378:7,10
 390:3,9 393:19
 401:10,14 406:21
 406:23 412:8
 415:10 420:4
 424:12 431:5
 437:3
**marker** 63:14
**market** 242:2
**marking** 424:8
 436:23
**marriage** 277:5
**marshal's** 95:4
**marshall** 68:20
**mart** 5:14
**marty** 328:21
**massachusetts** 6:8
**master** 7:15 46:11
 47:5,19 48:24
 49:2,12 50:23
 51:3,8,10,14,20
 52:1,4,9,23 53:11
 53:22 55:21,25
 56:3,10,18 57:14
 59:7,19 60:1 61:1
 61:5 62:25 63:13
 65:5,9
**master's** 68:5 77:9
 314:9,11 331:2
**mastery** 107:1
**material** 124:10
 125:19 215:12,13
 397:3 441:14
**materially** 124:2
 125:6
**materials** 43:18
 165:6 191:19

**math** 218:24
234:24
**matt** 33:17 48:4
55:20
**matter** 11:9 15:19
53:18 61:13 108:7
115:9 154:17
215:4 290:14
341:4 474:14
**matters** 14:2,5
38:23 164:25
342:23
**mckesson** 5:4 12:5
439:22
**mcneil** 4:13
**md** 1:7
**mdl** 1:6
**meals** 93:11,13
**mean** 17:23 18:3
21:2,7 27:19,19
35:19 42:14 43:1
43:5 60:2 63:9
74:18 83:21,24
87:6 88:16 89:15
90:6 94:25 96:22
104:25 105:12,16
109:14 110:20
123:9 129:9
130:19 137:13
140:8 148:7
152:10 156:14
168:9,10,12 170:2
172:24 188:22
191:4 193:5 203:8
210:21 213:3
215:9,13 220:7
231:19 233:10
236:3,18 238:20
241:25 243:21,23
247:8 251:20
253:7,8,20 254:19

254:24 257:14
260:14 273:5
277:20 284:24
286:7 291:4,5
294:1 302:17
309:18,22 324:7
325:17 327:25
329:5 330:13
335:22 336:15,16
336:20 338:4,13
350:4 355:25
358:11 374:8
375:20 396:17
406:7 409:1
418:15 419:16,23
427:21 432:4
438:4 439:12
440:13,15 441:11
441:12 442:8
444:21 456:4
**meaning** 94:19
102:16 166:7
188:10 351:17
**means** 57:24 61:23
92:9 101:6 117:13
119:12 204:20
210:22 213:4
220:12 230:4
231:20 236:21
242:6 244:1
253:11 254:11
256:22 303:22
311:12 322:9
335:13 336:4,24
338:6,9 350:6
354:20 422:19,20
448:12
**meant** 165:2
211:18 307:24
308:2 328:13
331:13 351:16

374:21 380:23
386:21 390:16
**measures** 79:17
**medicaid** 132:13
132:20 133:4,12
133:22 135:19
145:22 146:23
150:12 155:4
280:25 281:13
282:16 283:9,12
283:14,17 284:5
308:16,17,21,23
**medical** 20:9,12
24:25 28:24 72:15
73:2,4 75:1 82:15
93:10,14 96:14
127:20,21 128:4
144:9 171:22
177:15 178:18
179:1 194:13,20
195:10 202:21
203:15,23 204:6,9
204:16 205:5
206:7,13 207:3
231:25 238:5,14
238:18 239:18
240:21 259:6
260:6,19 262:2,3
262:10,18 263:1
263:18 266:5,24
267:9,12 268:22
269:7,20 270:4,12
272:3 273:3,19,22
275:5,14,20
279:22 280:23
296:12,17 346:21
349:18 350:8,19
351:2 355:21
371:22 374:6,17
383:1 384:5,8
385:20 400:20

402:19 424:24
440:8,25 441:21
442:11,15 443:23
446:11,17 450:7
456:23
**medically** 195:14
456:22
**medicare** 148:19
**medication** 25:10
74:3 274:22
388:16 462:15
463:10
**medications** 26:18
27:12 28:4 73:9
73:11 74:11,19
75:3 274:14
**meet** 40:2 42:19
112:6 139:22,24
140:4 169:11
188:15
**meeting** 37:1 40:4
40:7,12 41:2
42:15,17 468:4
**meetings** 40:14,17
40:22 41:3,9,12,22
42:6,10,12 173:8
173:10,12 177:11
177:12 188:14
360:2 471:23,24
472:3,5
**melville** 3:7
**member** 76:20
208:12 453:7
472:10
**members** 76:19
101:10 167:25
169:9 170:7 171:4
171:10,10 175:2
201:15 327:13
348:20 404:18
453:4 458:6,10

460:25 470:23
471:22 472:2,6
**memo** 188:13
204:11
**memorize** 269:6
**memory** 424:3,7
**memos** 190:23
**mental** 73:4,8 75:5
81:5 195:25 196:3
240:19,20 302:22
302:24 303:3
304:11 313:18
323:11 329:8
359:24 401:19
**mentally** 315:3
**mentioned** 128:21
147:2 172:11
205:8 207:12
209:21 241:22
279:21 280:21
281:17 286:13
395:2,10 404:10
440:6,9 456:12
464:11,12
**mere** 451:12
**merge** 314:15
**merged** 314:7
**merger** 313:25
314:3 315:23
316:1
**merging** 314:13
**merit** 402:5
**merits** 16:18 341:3
**messed** 329:1
342:4
**met** 36:22 39:25
40:5,5,6 174:11
**method** 442:10
**metro** 127:5
**metrohealth**
240:22

**meyer** 33:18,19
34:24 48:4 50:14
55:20
**mh** 322:15 323:5,9
323:11
**michael** 55:23
170:22 171:19
**mid** 204:20 437:18
**middle** 136:25
**midst** 387:24
**midwest** 475:17
478:1
**mike** 50:20
**mill** 243:5
**millage** 119:14
126:2 243:6
**miller** 170:13
171:23 438:11
**million** 87:13 91:8
91:11,12 92:19,25
93:13,15 104:8
124:10,15 125:14
125:19,23 126:12
131:11,15,18,25
132:7,21 133:2
134:20,22 135:2
144:2 147:24
148:1,3 149:12
153:15 155:16
156:16 163:1,11
163:17 165:17
166:4,7,7 184:23
185:23 186:4
196:7,11 200:16
200:22,23 201:3,9
201:13 202:5
205:12,13,18,21
205:25 206:1
219:2,3 230:7,13
230:15 233:21
235:1,2 241:7

245:8 246:4,5,5,10
246:16,18 259:20
260:2,4,15 261:16
262:12 263:9
266:7,15 310:21
310:24 311:21
316:15,17 318:9
318:10,14,19,20
318:24 319:11,14
319:15,16 320:7
321:13 349:25
350:6,11,18
351:10,14 353:2
353:16,18,21
354:14 355:11
356:8 371:11
375:2,6,14,19
376:25 379:7
392:24 396:23
403:7 434:9,10
435:17,21
**millions** 62:13
63:8 142:14,22
143:5 144:20,24
145:17,19 164:1,3
164:6 165:4,9,11
376:12
**mind** 90:14 95:2
108:12 159:6
163:2 174:6
216:24 327:2
**miniscule** 267:21
**minute** 47:23
83:12 186:24
239:22 312:19
320:20 386:17
394:25
**minutes** 60:25
182:4 447:22
470:16

**miscellaneous**
226:19 244:14,17
349:10 355:15
**miscommunicati...**
392:2
**misstatements**
183:8
**misstates** 364:25
387:17 466:7
467:18
**mistakes** 183:8,14
**misunderstood**
125:8 393:13
**misuse** 17:4 18:5
19:7,23 20:22
44:16,25 140:18
178:1,11 196:23
198:19 292:22
307:8 364:4 365:7
366:22 368:8
**mobile** 328:21
**mom** 450:7
**moment** 207:8
238:3 350:16
**monday** 42:20
**money** 90:2,12,13
93:12,19 94:16,19
94:24 96:22,23
97:2 101:7 118:12
118:20 119:14
124:19 126:18
130:24 132:25
133:12 143:13,16
143:17 144:3,10
144:14 146:1,5,12
150:6,10,16 151:8
158:8,12 169:18
184:8,24 190:12
220:16,18 221:11
221:17 225:25
229:21 230:16

242:24 243:2
247:13 248:1,3
250:14,22 254:12
254:17,23,25
255:2,7 256:24
258:11,15,23
259:5 260:18
274:4,10 276:6
277:15 279:24
283:22 285:1
288:5 297:6
311:21 315:23
316:1 317:7 325:3
325:7,14 326:18
329:19 335:15
337:21,25 339:24
341:8,10 354:20
354:24 355:25
356:1,1,23,25
358:20 381:7
389:15 444:2,18
444:22
**monies** 251:25
**monitor** 84:10
102:17
**monitoring** 291:8
**month** 21:8,19
97:21,21,22,23
98:5 441:7
**monthly** 167:20
178:16 297:4
347:1 348:13
**months** 21:21
22:14 23:16 74:2
97:24 175:15,24
176:7 380:5
**moral** 316:7 385:5
387:23
**morally** 101:15
**morning** 11:21
12:23,24 364:14

**mortgage** 115:6
375:25
**mother** 115:7
453:10,14,15
454:13
**motivation** 361:11
361:14
**motives** 35:24
**mouse** 377:18
**move** 49:6 61:24
63:25 81:24 96:18
135:7 357:13
**moved** 49:8 82:1,1
**movement** 96:22
**moving** 305:11
**mpa** 77:25 78:8
**multi** 184:23
**multiple** 41:2
104:7 188:16
275:7 425:7
**municipal** 82:17
82:19 301:6,8
322:16 323:5,10
323:12
**municipalities**
127:8
**murray** 99:24
100:3 130:11
138:9
**mute** 60:22

**n**

**n** 7:1 13:15,15
289:2
**n.d.** 1:12
**n.w.** 4:5 5:17 6:17
**naeem** 4:18 12:2,2
275:11,22 461:24
**name** 11:22 13:4
13:13,16 20:19
31:22 33:8 34:1
47:7 51:9 55:13

73:1 76:25 136:24
138:8 159:5 161:6
172:2 207:13
208:22,25 452:2
454:13 475:6
476:3,4,15 477:3,4
477:21
**named** 438:20
**names** 207:15,20
452:4
**nan** 170:21 172:3
**napoli** 3:5
**napolilaw.com**
3:10,12
**narcan** 388:13,19
**narrative** 161:20
278:5
**narrow** 205:23
**national** 1:5 11:10
475:6 476:3 477:3
**nationwide** 121:3
**native** 421:12,17
**natively** 422:12,18
**natural** 319:25
**nature** 22:15,17
23:4,14 26:14
29:25 31:5 37:11
45:9 58:22 104:16
169:6 209:15
334:21 414:23,24
**near** 437:19
**nearly** 278:7
355:12 356:15
358:8
**necessarily** 269:6
329:7 390:24
**necessary** 83:25
351:10,15 457:5
457:22 458:10
459:3 460:16,25
461:8,15

**necessity** 341:4
**need** 50:7 61:24
63:19,24 105:3
108:6 122:8
151:24 187:9
190:11,12 207:4,4
228:20 267:15
312:9 329:9 334:7
335:4 337:21
342:3 355:25
381:10 394:23
406:6 408:24
415:21 416:22
434:2,4 441:20
444:2 450:1 460:3
460:7,8
**needed** 68:8 74:3
79:3 355:22
**needs** 74:8 128:4
248:19 281:4
339:25 354:11
358:6 386:12
410:7
**needy** 91:5
**negative** 395:5,22
**neglect** 181:13
185:2 195:7 302:1
305:4 371:17
**neighborhood**
71:15,15 75:9,13
77:20,24 78:9
320:3,5 404:14
**neighborhoods**
71:22
**nemec** 288:25
289:1
**nephew** 309:7
**net** 155:6
**neutral** 60:4,7
**never** 36:22 60:10
94:11 268:14

273:25 282:21
335:10 357:9,19
358:4,21 359:2,3
387:25 392:23
393:7 398:19
428:5,10 444:20
448:12 462:14
new 69:16 81:18
83:7,8 85:13 94:7
99:9 118:8 124:23
127:9 129:4,14
136:5 144:7
165:23 170:22
184:1,8 207:1
320:3 372:21
396:19
newly 392:7
news 378:19,21
newspaper 18:22
18:25 25:20,24
29:8
nice 182:17 459:14
nominal 236:22
non 71:13 72:6
147:21 169:21
189:13 445:21
northern 1:2
notably 355:14
notarized 475:14
notary 2:14 12:18
474:4,7 475:25
476:10,18 477:15
477:23 478:23
note 58:18 134:3
135:24 230:12
305:3 441:13
459:12 475:12
noted 473:15
notes 21:18 349:15
notice 167:2

noticeable 362:9
363:12
noticed 39:17
107:16 109:24
notified 197:2
notify 393:4
noting 343:8
notwithstanding
340:22 376:11
429:7
november 437:18
number 8:2 24:19
24:21,22,24 90:8
95:12 96:6 101:21
102:1 127:19,20
128:1 134:23
141:6 150:20
155:19 156:11
176:3 177:13
185:1 186:6
188:10 227:23
230:1 231:9,24
240:16 245:13,16
247:16,17 251:17
254:24 262:23
265:21 270:25
280:14 289:18
303:11,20 305:17
305:20,24 309:11
309:19 319:22
320:14 321:10
327:2 333:20,24
341:18,22 346:25
347:1 355:23
371:14,16 389:11
396:14 412:11
422:6 425:4
434:21 435:7,9
441:18,25 442:23
443:5 448:9,10
456:25 464:20

465:6,18 475:7,13
numbered 161:23
210:11
numbers 161:20
162:3 163:7 230:7
230:24 348:14
373:16 394:14
396:1,10,12,13
398:9,24 400:5
414:18 432:3
433:16 436:2
440:17,20 441:13
445:3 464:18
465:23 477:7
nurse 450:9
nw 5:8 6:8
ny 3:7

**o**

o'malley 50:20
55:24
o'malley's 10:6
431:2
oath 29:19 38:7
53:3 57:2,24
61:23
object 30:8 141:24
363:4 381:6 409:1
419:24 458:15
objected 381:4
objection 13:22
14:15 16:19 17:5
17:8 18:24 20:6
20:23 21:9,22
22:2,19 23:2,12,21
24:3 25:12 26:6
28:10 29:10 34:7
34:19 35:10 37:7
37:14 38:20 39:4
40:18,24 41:10,17
41:24 42:8 44:4
44:17 75:21 80:14

84:23 85:15 86:14
87:4 88:15,21
89:13 95:18,22
100:20 102:24
103:18 104:20
105:19 106:11
110:17 111:7
112:15 113:3,23
114:2,11,20
115:18 116:3,18
118:2,14,23 120:9
121:4,11 122:1
123:3,10 124:6,21
126:8 131:4 132:2
133:7,24 134:6,14
135:23,24 136:10
139:4 140:1,13,20
142:8 143:14
145:20 147:7
151:19 154:18
155:8 158:22
160:12 164:12
167:13 169:7
170:9,12 171:14
173:6 174:13
175:16 176:2,12
176:23 177:20
178:3,13 179:6,18
180:1,6,14 181:3,7
183:4,12 188:8
190:2,16,20 191:3
191:20 192:2
193:10 194:11
196:24 197:21
198:13 199:7
200:4,11 202:2
203:11 205:19
207:22 208:5,18
209:7,18 214:9,19
215:8,22 217:5
219:11 221:4

**[objection - office]**

| | | | |
|---|---|---|---|
| 222:1 223:3,14 | 364:5,24 365:9,17 | 467:9,17 468:12 | **offhand** 96:5 |
| 228:4,15 237:9,17 | 365:22,25 366:23 | 468:17 469:8,25 | 172:15 173:22 |
| 237:23 240:13 | 367:6,20,24 | 470:15 471:3,9,19 | 186:25 187:23 |
| 241:11 246:20 | 368:10,17 369:2 | 472:13,19,24 | 242:3 |
| 247:4 248:5,16 | 369:13,17,21,25 | **objections** 10:8 | **office** 3:14 13:10 |
| 249:10,19,25 | 370:4,8,12,18 | 431:4 458:20 | 14:1,6,9,12 20:13 |
| 250:8,16 251:11 | 371:1,8 374:19 | 459:12 461:3,11 | 24:25 33:5 47:12 |
| 252:2 254:14 | 376:8 377:11 | 461:18 | 48:3 49:17,25 |
| 258:1 259:3 | 379:19 380:7,17 | **objectives** 35:24 | 50:3,18 51:22 |
| 261:10 262:16 | 381:5,18 382:4,17 | **obligation** 197:19 | 52:13,21 55:22 |
| 267:4 272:18 | 382:24 383:11 | 316:5 375:13 | 58:20 61:10 78:21 |
| 273:1,10,13 | 384:11,25 386:8 | 444:10 | 79:14,20,22 81:2,8 |
| 274:17 275:13,17 | 386:23 387:7,16 | **obligations** 349:10 | 81:9,10,12 82:14 |
| 275:18 278:18 | 388:22 389:6,22 | 427:7 | 82:14,15 84:2 |
| 280:12 282:5 | 390:19 391:12 | **obm** 24:14 51:22 | 85:25 88:11 92:13 |
| 284:1 285:5 | 394:22 396:4 | 51:24 102:16 | 92:18 93:5 94:1 |
| 286:11 287:7 | 398:15 400:8,23 | 105:4 138:21 | 95:5 97:14 98:24 |
| 288:17 290:2,18 | 403:19,23 406:5 | 167:17 201:21 | 99:8,25 100:13 |
| 291:22 292:4,23 | 408:11 410:14,25 | 333:8 338:7,9 | 102:13 103:13 |
| 293:15,25 294:12 | 411:23 412:6 | **obm's** 265:3 | 105:13 106:8,16 |
| 294:17,22 295:4 | 413:9,21 414:3,12 | **obtained** 384:23 | 107:5 112:10 |
| 297:23 298:18 | 415:3 416:7 417:9 | **obtaining** 53:5 | 120:5 121:21 |
| 303:18 304:3 | 417:19 418:10 | **obvious** 249:22 | 127:20,22 137:3 |
| 306:11 307:20 | 419:3,17 423:14 | 250:3 | 137:22,25 138:1 |
| 315:15,24 316:25 | 423:22 424:4 | **obviously** 38:22 | 138:16,17 142:13 |
| 317:8 318:7 | 425:14,18,22 | 87:15 141:4 | 144:9 154:11 |
| 320:10 321:3,19 | 426:4 427:4,16 | 234:20 362:23,24 | 158:6,10,14 159:4 |
| 324:9,23 325:19 | 428:17 429:1,19 | 376:15 441:17 | 164:17 167:11 |
| 326:6,20 327:20 | 430:10 433:17,24 | **occasions** 38:3 | 169:1 170:5 |
| 328:2,10 330:6,21 | 435:13,24 436:8 | 283:21 | 177:15 178:18 |
| 332:6 334:2,24 | 440:3 443:3 444:3 | **occurrences** 7:14 | 179:1,10 183:10 |
| 336:18,22 337:13 | 445:9 446:9,20 | **october** 66:4,6 | 183:19 185:8,17 |
| 339:20 340:7,25 | 447:1,8 449:2,9,19 | 347:1 348:13,15 | 188:23 190:25 |
| 343:20 344:14,24 | 450:4,8,15,25 | 349:4 358:15 | 191:24 192:12,22 |
| 345:15 346:16 | 453:25 454:10 | 427:5 | 194:6,14,25 195:8 |
| 347:14 348:1 | 457:8,25 458:17 | **odjfs** 300:11 | 196:21 197:15,22 |
| 349:7 350:20 | 458:22 459:9,16 | **offer** 277:20 | 198:10 199:4,22 |
| 351:11 352:16 | 459:20,24 462:16 | **offered** 79:12 | 201:15 202:21 |
| 356:17 357:2 | 462:24 463:5,11 | 373:11 | 203:18,23 204:5 |
| 361:5,8,16 362:2 | 463:12,21 464:4 | **offers** 188:1 | 204:14,16 209:24 |
| 362:11 363:14,22 | 465:9,24 466:6 | | 210:1 215:15 |

226:17 227:16
232:6 234:7 238:5
238:14 239:19
259:6 261:23
262:2,3,10,18
263:2,18 265:8
266:24 267:1
269:7 270:4 272:3
273:22 278:12
280:7 283:8
291:17 292:18
296:13,15,17
298:6,23 315:13
315:21 317:24
329:24 338:12
348:19 349:18
350:9,19 351:2
355:16,21 364:11
365:5 366:8,15
368:4 371:23
384:5,8 385:2
401:2 413:3
420:11 423:11
424:24,25 429:14
440:8 441:21
442:11,15 443:23
443:25 446:11,18
458:25
office's 179:15
260:6
officer 98:14
137:11,14,16
167:1 209:20,21
349:1 360:16
372:22 420:10
officers 76:20 77:2
96:16,20 195:20
offices 2:6
officewide 347:18
official 329:23
339:15 476:15

477:21
officials 84:1,16
193:15 291:9
offset 158:13
oh 13:18 55:19
97:22 201:2
222:12,17 234:5
239:8 280:20
306:21 326:14
427:9 434:20
ohio 1:2,10,12,19
2:9 3:17 4:17 8:11
10:3,4 11:1,12
70:10,16,18 85:20
92:16 94:12,15
123:13 132:18
146:9 157:13
160:20 197:10
198:12 220:10
226:15 227:3
242:5 300:10,12
301:16 430:25,25
475:2
okay 13:8 15:16
32:18 36:7 37:21
47:19 49:12 51:19
52:23 53:9,10,21
54:20 55:17 60:25
65:13 67:9 68:10
83:11 85:7 97:4
98:4 104:2 107:24
110:11,14 123:22
125:11 141:19
145:5,15 148:11
150:14 152:4
159:8,15,24 166:5
172:4 179:12
181:24 183:24
187:4 191:14
207:6 210:15
211:3 213:24

218:6 219:5 221:7
221:19 222:6,18
223:22 226:3
245:6 246:14
248:9 252:6
256:25 257:5
258:20 259:21
263:7 281:9,11
282:14 284:7,12
285:25 286:17
289:4 297:13
298:2 299:6,17
301:1 311:5,24
321:7 323:14
328:6,15 332:9
337:2 338:23
340:15 343:3
345:23 360:1
361:20 364:9
372:8 380:16
382:9 386:2 388:3
389:18 392:22
394:6 397:7
401:21 402:11,15
404:2 405:7
406:18,20 408:3
411:5 420:1 421:8
421:13 427:12,21
428:3 431:15
433:10,14 441:8
446:14 452:23
454:5 455:8,10
458:19 461:20
464:5 473:9
old 71:20 377:19
omb 51:22
omissions 183:9
once 21:7,7 29:22
43:21 140:10
423:3

ones 77:5 81:15
82:21 111:15
159:5 170:8,25
172:11 189:1
199:25 208:2
230:3 299:10
303:23 312:7
385:21 470:21
ongoing 34:6
69:19 377:7
ooo 2:1
op 1:12
open 422:21
opening 99:5,6
operate 185:10
285:1,3
operated 71:14
operates 149:3
operating 73:3
157:11 158:9,14
158:18 162:15,17
162:22 163:20
165:16 185:6
212:11 213:6
218:10 219:19,23
224:6 225:7 226:5
226:6,10,23
227:14 231:12
233:1,10 238:17
255:21 256:12
257:11,13 258:23
289:6 293:23
294:5,16 299:20
335:19,23 336:4
339:23 349:14
356:19
operation 265:11
265:15 271:13
279:12
operations 24:11
79:11 84:14 147:9

263:20 264:25
**opiate** 1:6 11:10
20:22 21:15 25:11
28:12 44:15,25
111:25 123:19
124:4 127:13,14
131:10 132:1,23
141:21 177:18
178:1,10 179:24
180:12 185:3
186:7 194:9
195:12 196:12,23
198:19 199:6,12
199:24 200:9
201:18 202:1,10
203:6 257:24
259:1 260:10,16
261:4,17 272:17
273:9 280:3,9
281:6 284:11,20
286:10,18,23,25
287:6 290:17
291:21 292:22
297:10,22 298:9
298:21 303:9,11
303:21 305:18
306:25 307:4,8,13
307:17 320:9,16
321:2 329:15
334:10,23 341:6
349:19 361:24
364:4 368:8,23
373:11 383:23
384:17 385:12
388:20 389:4,14
389:21 390:18
405:21 406:2
407:20 408:8,13
411:21 412:4,23
414:10 415:2
423:12 425:1

428:16 437:10
443:11 450:14,18
457:1 460:13
462:21 464:18,23
465:7 468:10
470:6 475:6 476:3
477:3
**opiates** 9:19 17:4
17:19,22 18:4,6,12
19:7,24 22:8,21,25
24:1 26:2,5,19
27:7,13,16,17,17
27:19,20 28:5,9,13
128:3 131:19
135:22 136:9
140:19,23 171:12
172:9,22 173:3
174:18 175:22
176:21 177:7
179:17 258:14,17
259:15 260:12,18
260:21 262:15,24
268:17 272:24,25
273:4,23 274:8,15
280:16 282:18
285:23 289:21
290:1 293:14,21
294:9,21 295:15
296:19,19 298:17
299:13 308:22
335:6 340:24
342:21 343:11,15
344:8,12 345:14
345:25 347:12,25
349:6 368:16
369:11 370:24
379:23 382:1,14
383:10,23 384:18
384:22 385:13
387:6 390:24
394:15 396:13

400:6,22 402:21
403:5,10,12,21
404:6 405:9,9
423:21 424:11,19
425:5 432:9
435:22 436:7
443:21 445:24
446:2,6,19 448:17
449:17 456:3,8
462:22 465:19
466:22 467:2,8
469:6,24 471:2,13
472:18
**opinion** 18:7 28:11
28:14,16 29:7,7
121:9 321:23
329:10,18 330:15
388:18,24
**opinions** 16:17
17:2 28:8 141:21
**opioid** 25:9 26:18
27:12 28:4 51:10
57:20 61:17,18
75:2 274:14,22
360:11 361:2
362:10 363:12,19
365:7 366:21
407:9 410:12
412:16 415:16
417:17 456:18
462:14 470:7
**opioids** 23:10 25:6
27:18 58:2 59:12
419:2 430:4
455:21,25 459:5
460:18 461:2,17
**opium** 444:17
**opportunities**
135:9 329:11
**opportunity**
302:20 339:3

386:20
**opposed** 92:1
327:12 422:22
**opposite** 125:10
321:5
**option** 146:18
**options** 265:21
305:5
**order** 267:12
290:11 364:15
374:17 434:3
**ordinary** 193:8
**organization** 71:3
71:14 416:20
**organizational** 8:7
136:12,19 138:9
138:16
**organizations**
132:14
**original** 264:1
**originally** 67:18
185:9 395:21
**originated** 242:4
**originates** 253:17
**ortho** 4:13
**outcome** 474:13
**outcomes** 309:3
**outdated** 374:3
**outlay** 335:9
**outside** 44:2
126:17 319:24
346:10,15
**outstanding**
227:24
**overall** 131:1
159:17 160:1
163:25 179:15
212:8 215:2
245:12
**overbudget**
357:25

overdose 178:21
179:16 271:1
382:22 383:9
384:2 388:17
436:5,16 437:11
440:9 443:12
overdoses 260:20
overestimate
357:14
overlap 70:8
298:22 314:17,18
oversight 58:24
75:12 137:21,24
209:5,12,16
overstate 60:3
overtime 195:21
207:2 306:2,3,5
396:24 397:1,15
397:16 398:25
404:11
overwhelmed
268:16 465:17
overwhelming
296:5
owed 230:9
owned 284:14,22

**p**

p 394:2,4,6
p.m. 182:8,9
189:19,20 240:2,3
269:13,14 312:23
312:24 342:7,8
373:15 388:7,8
411:12,13 454:19
454:20 462:3,4
473:15
page 7:15,16 8:2
66:9 75:7 161:7
161:21,24 207:13
208:22 210:11,16
212:7,23 216:2,13

218:16 219:8
221:15 222:8,16
222:20,22 223:25
224:11 225:15
226:9 230:22
231:1,4 234:18
245:20 265:10
298:3 306:21
313:5,15 332:24
342:18 343:9
349:8 355:2
361:15 398:24
431:21 432:13,16
434:17,19 437:23
475:13,15 477:7
478:3
pages 161:22
221:20 246:7,8
256:7 278:3
280:10 355:1
432:15
paid 101:19
132:13 230:14
307:22 309:5,6,8
319:9 375:12
377:4
paint 110:21
paper 57:16 94:24
95:1 193:20 411:4
papers 93:8 198:4
paperwork 74:5
par 6:4,5,6 12:9
20:19 393:24
paragraph 211:5
211:14 220:2
224:12,21 225:11
225:14 322:15
323:5 432:25
pardon 326:3
403:15

parent 309:6
parenthetical
219:8
parents 255:1
425:4
parfejewiec 20:10
20:20,21 298:10
391:5,18,20,22
392:2,4,19,20,21
392:23 393:3,25
394:1 397:19
398:13 400:13
park 127:5
parks 127:5
part 14:10 24:10
24:14 28:1 56:4
59:2 84:9 87:17
88:20 101:13
102:15 107:20
110:3 138:1 169:2
183:16 184:25
186:7 195:3 274:7
313:7 314:23
315:19 316:9
320:16 332:5
334:7 397:9
421:24 427:18
437:7 456:24
468:10 471:17
477:9
partially 212:12
participate 209:2
209:9 210:2
participating 83:9
115:3 241:1 288:2
particular 19:4
67:15 80:13 93:18
110:9 113:2
142:18 172:21
180:19 200:3
254:13 266:25

272:16 278:17
279:10 283:13
286:21 288:15,16
298:12 299:23
307:15 309:10
330:10 440:20
450:13
particularly
116:23 171:11
175:22 330:12
377:24
parties 474:12
partly 142:16
280:3
party 469:16
pass 208:15
passed 145:23
340:18
path 70:21 104:23
pathologist 144:8
194:19 203:21
pathologists
296:11 441:20
patient 72:22
73:18 74:1
patients 73:7,20
73:25 74:11,24
75:3 314:19 465:8
paul 4:8 11:22
13:4 47:22 56:14
149:23 327:1
pause 51:5 61:4
281:8 299:15
paused 68:25
pay 82:18 101:6
111:20 123:18
124:3 125:7
127:13,18 149:13
149:23 150:25
153:13 157:15
203:17 229:4,12

[pay - pick] Page 52

230:16 232:15,16
244:8 251:2
267:22 276:19
297:5 302:20,21
306:4,6 325:7
357:22 374:6,17
375:9 376:2 382:1
397:1,2
**paying** 151:6
244:2 327:13
377:3 379:10
380:25 381:14
**payment** 105:17
359:16 375:25
376:1
**payments** 230:19
**payroll** 207:4
**pays** 232:6,7
300:14 376:12
**pboehm** 4:9
**peca** 2:7
**pending** 103:4
354:8
**penetration**
300:22
**people** 19:21,23
24:21 72:2 80:8
82:24 92:7 96:11
96:18 99:7 100:16
101:1,11,17
115:16 116:1
125:18 130:21,23
138:7 157:15
166:15,18,21
262:5,23 277:1
281:3,21 282:11
285:16 308:21
346:15 356:3
375:21 379:11,22
381:1,15 383:18
388:20 408:4

414:16 442:5
**perceive** 330:4
**percent** 49:3 57:25
92:5,24 122:18,24
124:13 125:21
128:12,15 150:22
159:20 212:21
213:3,5 214:3
216:5,9,12,12
217:13,13,22,23
219:10,24 224:7
227:6 231:15,20
233:13,24 234:13
234:20 235:3
300:17,25 301:11
304:15 308:10,11
317:12,14 398:25
402:4
**percentage** 58:11
92:3 126:2 128:8
128:24 146:10
147:17 181:16
215:18 217:12
300:19
**percentages**
217:24 218:24
219:10
**perfectly** 368:3
**perform** 93:9
144:7 149:19
177:17,25 178:8
180:10 291:6,17
292:19 387:23
413:8 415:24
416:15,16 417:7
418:7 423:19
426:23
**performance**
79:15,16 169:15
**performances**
313:9

**performed** 24:23
289:23 413:13
427:1 441:19
442:23 443:6
**performing** 24:25
101:9 131:7
260:23 261:5
262:5,7,20,20
263:2 417:12
419:13
**performs** 137:16
295:17
**pergament** 6:11
12:7,7 327:1
**period** 66:1 96:2
110:9 113:2
115:14 116:13,19
121:17 180:22
306:4,6 335:24
350:22 397:1,2
**periodically**
440:16,24 465:2
**permanent** 448:11
**permeates** 293:7
**permissible** 157:8
**permission** 157:12
267:2 268:5
**permit** 256:1
**permits** 226:13
**permitted** 94:5
153:9 157:16,19
186:10 187:6,17
255:13 256:23
**person** 49:21
50:11 55:13,16
140:12 328:22
366:11 383:22
438:9 453:19,23
454:6
**person's** 452:2

**personal** 47:14
89:16 116:7
329:18,22 330:3
362:12 366:14
451:7
**personally** 36:21
114:14 379:21
442:24 476:11
477:15
**personnel** 96:14
147:14 149:11
151:2 194:22
231:14 232:17
234:7 304:21,23
319:19,20 404:8
**perspective** 446:1
**peter** 149:23
**pharma** 1:11
**pharmaceutica**
4:11
**pharmaceutical**
6:4,5,6 12:9 73:15
73:18 74:6
**pharmaceuticals**
4:12,13 6:4
**philanthropic**
251:18,19
**phillips** 420:8,9
**phone** 7:15 12:11
46:9 47:2 49:9
51:16 55:16 56:9
59:22 60:22 61:4
64:7 140:12
174:24 341:21
342:16 449:13
473:8,9 475:3
**photograph** 265:9
**physical** 443:4
**physically** 230:14
**pick** 155:24
174:24 278:14

[picture - present]                                                                Page 53

picture 110:21
  170:24
pie 212:18,22
  214:1 215:2 216:8
  216:12 217:21
  219:7
piece 193:19 215:2
pinkney 153:7
pinpoint 367:9,12
  367:19,23 368:5
place 11:12 47:17
  48:8 154:21
  174:21 175:1
  176:7 191:1
  277:13 417:22
placed 297:3
  309:1 310:6
placement 24:19
  289:20 309:2,12
  320:15 357:23
  371:15 389:12
  398:24 425:8
  444:15 448:10
placements 301:21
  309:5,17 310:7
  321:15,17 389:10
  390:25
places 161:16
  221:24 329:14,16
placing 289:11
plaintiff 11:16
plaintiffs 10:2
  29:14 430:24
  432:12,17,18,20
plan 70:1 313:8
  333:19
planned 57:5
plans 182:19,20
  183:3
pleas 82:8 92:20
  93:5 127:23

150:22,23 151:10
152:6 232:4,7
277:3 281:4,22
282:20 286:14
287:19,21,23
288:22 297:2
371:21
please 11:13 13:17
  39:9 224:18
  312:13 354:5
  421:3 459:8
  475:11,11
plenty 135:8
pllc 3:5
point 52:6 61:19
  63:23 77:8 84:25
  95:17 146:16
  223:11 274:5
  285:17 310:5
  311:6,18 315:17
  353:14 355:8
  387:10,15,20,21
  399:4
pointing 162:19
  163:8 399:12
points 135:5
policies 87:24 88:3
  88:9 254:5 470:14
policy 84:7 88:12
  89:9,16,20 144:5
  220:15 329:23
  351:15
policywise 341:12
political 66:23
  67:2,20 89:5
poll 232:16
pollution 72:1
polster 1:8
population 74:8
  185:13 329:9

porter 6:7 12:8
portion 65:4 82:18
  214:22 250:25
  260:17,25 261:3
  262:7 296:10,10
  296:17,19 298:14
  307:2
position 34:15
  47:8 73:24 78:13
  78:20 79:19 83:4
  83:7,9 98:17 99:1
  99:17 187:24
  317:21 357:11,20
  358:5 395:17
  400:12
positive 425:5
possibility 29:14
possible 41:8,15
  41:19,21 42:5
  51:16 57:11 58:14
  59:6 102:18
  153:24 154:12
  183:1 235:5 312:3
  404:24
post 85:23 111:17
potentially 62:10
  62:17
poverty 247:19
  248:21 249:3,8,11
  249:14 250:13,18
  300:22
practice 70:3
  73:14 74:17
  192:11
practices 76:18
  79:13
pre 85:19 200:2
  272:9
predominantly
  84:10

preferences 88:13
  89:10 329:23
preferential 454:7
preliminary
  432:18
premiums 132:13
preparation 42:23
  209:3,9
prepare 39:23
  41:23 42:6 43:2
  169:14 279:11
prepared 66:3
  164:5 369:3,8
  428:24 429:3,7,10
preparing 43:1
  79:2,2 107:22
  346:3 418:18
prescribe 74:10
prescribed 27:7
  75:2 274:22
  382:15
prescription 1:5
  11:10 17:18,22
  18:4,12 22:8,20,25
  23:10 24:1 25:6,9
  26:2,4,18 27:12,20
  28:4,13 73:9,10
  74:18 128:3
  140:23 260:20
  262:23 268:17
  272:24 273:4
  274:8,14 296:19
  329:15 335:6
  379:22 384:18
  385:13 446:2
  455:21,25 456:3,8
  462:14 464:1
  475:6 476:3 477:3
present 6:25 26:22
  118:1 268:24
  272:4

presentations
177:13
presented 187:9
presenting 286:13
presently 376:5,19
president 170:18
207:16 208:10
pressed 395:13
presumably
426:25
presume 167:3
pretty 39:13 123:1
123:8 128:24
249:22 397:10
previous 113:6
135:25
previously 31:17
132:12 195:12
284:16 316:3
primarily 40:5
primary 113:7,12
113:13 118:25
145:21 219:18
principle 193:18
principles 88:6
print 90:2 422:23
prior 14:5 119:3
120:15 198:22
199:10 237:8
265:18 306:18
priorities 86:12,22
87:1,8,9,16 144:4
prioritize 90:4
priority 87:12
379:20 418:4
prison 301:18
private 92:22,22
251:20,23
privately 174:11
privilege 53:25

privileged 54:8
425:20
privy 470:25
471:4
proactive 67:25
145:24
probably 42:15
65:22 94:14 99:23
130:11 229:16
234:11 291:5
341:6 377:20
423:3 434:8
probate 82:8
277:5,8
probation 296:24
297:4,9 301:14
problem 276:4
314:23 326:10
450:14,18 456:24
problems 315:4
procedure 192:11
476:5 477:5
procedures 87:24
88:4
proceed 62:24
proceeding 30:4
48:7
proceedings 11:4
46:4 51:5 53:14
53:16
process 14:13 87:2
88:14,18,20,25
89:3,12 105:3
107:2 117:25
125:18 149:2
154:24 164:19
169:3 183:16
188:6 197:24
198:5,8,23 210:3
229:13,20 282:25
290:14 315:8

317:5 340:12
457:7,24 458:12
458:24 461:9
467:24 470:10
processes 88:5
processing 408:16
procure 105:1
produce 116:21
278:21 416:19
produced 45:23
109:1,11 348:5,8
373:18 421:12,16
422:12,19
product 374:16
382:2 464:2
production 109:10
327:5 342:16
475:15,17,22
professional 2:12
70:6,21 71:8
76:24 325:23
474:3
professionals 63:5
97:8
profit 71:13 72:6
program 69:13
72:22 73:21 74:1
78:8 81:3 97:7,8
187:25 188:5,20
191:17 194:8
199:22 201:17
203:1,5 233:7
255:13,25 281:2
286:4 287:22
288:14 300:1
322:16 323:6,10
323:12 341:3,5
359:11,13 468:9
469:5 471:1,15
programs 73:19
74:7 76:6 79:11

80:13 82:4 89:19
90:9 144:3 174:4
183:18 184:16
186:10 189:9
196:20 199:3
201:25 233:7
240:22,24,25
241:2 308:19
311:8 339:5
355:15 387:12
410:8
prohibited 472:4
project 330:10,11
376:23
projection 163:10
projections 119:4
164:8,24 165:12
165:20 206:25
357:5 359:19
442:1
projects 212:15,20
213:9,17,19,20,22
214:1,17 215:5,19
235:18 318:15
319:8
pronunciation
392:24
prop 156:19
proper 104:23
456:23
properly 352:15
properties 71:21
72:3,8
property 104:15
116:24 117:12,12
117:14 119:6,19
119:21 120:7,11
120:21 121:1,10
121:24 122:14,17
122:23 123:12,16
123:23 124:2,13

[property - question]

124:20,22 125:6
125:12,21 126:3,5
126:16,19 127:1,6
127:8,10,11,17
128:8,13 130:1
156:12 159:17,19
159:23,25 160:3
161:14 162:17,24
163:15,21 226:12
241:24 242:17
243:8 276:20
**proportion**  215:6
315:10
**proportions**
310:16
**proposed**  185:9
**proposition**
320:20
**prosecuting**  10:4
431:1
**prosecutor**  31:19
31:20,22 32:5,11
32:14,17 33:12,17
34:1,14 35:16,21
38:16 50:2,4,19
55:2,24 56:5,6,8
59:11,17 127:24
276:23
**prosecutor's**  33:5
33:8 48:3 49:17
49:25 50:3,18
52:13,21 55:22
61:10 82:13 93:5
94:1 232:6
**protect**  317:19
**protected**  119:12
241:14 242:1
**protection**  241:23
**protects**  242:16
243:2

**provide**  22:24
24:14 33:14,20
34:16 35:14,18
36:9 39:1 42:25
43:17 48:5,9,11
73:3 84:6,7,8
91:19 134:17
141:15 146:19
149:1 150:25
167:18 178:14,17
180:18 195:22
221:21 279:4
305:8 309:23
316:5,14 325:3
327:10,12 329:8
329:15 373:7
426:25 429:13
439:12 453:21
**provided**  23:19
33:15 43:9,11,14
83:15 107:14
154:14 178:19,24
195:9 219:10
251:20 260:19
307:24 324:11
388:19 419:21
428:13 432:22
447:6
**providers**  74:10
74:16 75:1
**provides**  73:2
323:22
**providing**  29:15
83:24 86:1 302:24
419:19
**provision**  314:18
315:11
**provisions**  317:10
**prudent**  416:18
**psychiatric**  277:11

**psychology**  66:23
67:2 68:3,5 331:2
**public**  2:8,14
12:18 28:20 29:3
37:5 77:9 82:14
92:12,16,18,21
98:11,13 102:21
103:15 106:8
110:25 111:3
112:19 127:24
146:9 171:20
173:13 177:4
197:10,12 198:12
226:17 227:16
229:2 233:15
235:4,8 265:4
301:2,3,5,6 330:25
356:4 361:1,23
363:20,24 376:6
406:2 411:21
472:2 474:5,7
476:10,18 477:15
477:23 478:23
**publicly**  471:23
472:8
**pull**  51:1 139:7
158:3 217:9
**purdue**  1:11
**purpose**  53:5 54:7
93:18 94:17,17,19
111:1,13 113:7,13
155:14 157:10
182:20 220:13
258:15,17 259:1
263:23 266:25
317:17 343:18
350:17
**purposefully**
428:1
**purposes**  45:22
118:22 136:18

252:21 258:13
260:7 270:9 321:1
322:8 342:15
350:17 372:10
378:11 400:18
401:14 403:13
**put**  61:2 148:25
158:12 190:7
198:10 208:7
257:18 329:17
337:4 357:10
372:9 378:9
404:15 423:11
425:17,22 426:3
437:6
**putting**  63:14
208:16 426:12

| q |
| --- |

**qualified**  363:23
388:23
**qualify**  330:22
**quality**  323:2
**quantified**  415:16
**quantify**  417:17
419:1 424:18
**quarter**  394:12
441:7
**quarterly**  167:22
442:20,21
**quarters**  218:15
**question**  17:10
19:5 31:3 32:10
32:16 33:22 35:17
41:1 42:4,4 53:20
55:9 56:6,13 58:4
58:5 86:21 103:1
103:4 135:6,12,14
135:16,25 136:2,5
150:7 153:6 154:9
198:21 215:3
239:9 258:21

274:24 275:4,9
282:20 288:19
291:13 292:9,13
292:25 294:15
307:9 315:18
327:7,21 329:20
343:7 344:20,22
345:3,7,8,10 353:7
354:7,10 361:17
363:4 365:2 367:2
367:5 368:19
369:4,8 382:25
383:3,19 384:1
390:12,14 408:23
409:2,4,10,10,13
409:15,24 416:12
428:22,23 437:9
447:3,10 448:22
451:10,13,16
452:1,11 460:2
467:20,21
**questioned** 103:22
105:21,23
**questioning** 61:20
327:17 427:14
**questions** 13:6
30:17 33:12 34:17
38:12,19 39:2,10
48:15,22 49:19
53:2,18,23 54:10
54:25 55:15 56:15
57:5 104:17,21
122:9 171:11
172:8 173:7,9,11
173:13,16 177:11
385:8 387:5
408:19 409:8
455:4,9,13,18
457:17 461:21
462:11 463:18
464:14 473:7,10

**quicker** 158:3
**quite** 20:1,24
105:3 140:4,7
159:13 167:23
229:17 277:21
389:13 391:21
399:2 428:22
**quoted** 347:3

**r**

**r** 13:18,18 189:7
**raid** 290:11
**rainy** 316:20,24
**raise** 243:11
**raised** 66:19
104:17 250:22
251:1 271:4
**raises** 115:5 154:9
249:9
**ran** 74:3
**range** 88:5 205:15
206:19
**rarely** 341:2
**rate** 119:13 146:14
146:15 242:13,14
243:9,16 247:19
303:22
**rates** 248:21,21,22
249:11,14 300:22
300:23
**rationale** 35:24
36:12,13
**reach** 272:15
**reached** 99:3
**reactive** 67:25
**read** 16:22 17:12
17:13,16,16 18:1,9
18:16,16,21,21
19:4 27:24 28:18
29:8 43:22 47:6
94:23 95:16
224:14 231:17

234:17 236:7
326:22 329:2
334:11 361:9
379:14 394:24
407:11,14 456:5
466:14,17,19,24
476:5,6,12 477:5,6
477:17
**reader** 223:12
278:6,9
**reading** 25:20
66:22 70:18 93:8
94:12 97:17
111:12 224:11
230:23 327:2,3
381:21 401:22
433:5 475:19
**reads** 407:7
**ready** 265:7 316:8
**real** 104:14 120:20
223:21 241:24
331:19 351:1
432:9
**reallocate** 145:3
**really** 17:24 48:13
58:15,24 61:25
63:4,24 67:23
76:10 84:15 87:10
88:22 97:16
128:19,22 131:16
153:6 164:24
165:1 237:10,19
277:17 278:25
387:10 397:8
419:16,23 437:24
438:5 443:18
465:4
**realtime** 2:13
474:4
**reappraisal**
117:10 119:7

120:14 242:25
**reason** 35:13 38:9
38:13 48:17 60:6
62:1 136:7 143:8
143:10,11 145:21
148:20,22 157:23
369:7 384:13,20
426:22,24 427:1
475:14 477:8
478:3
**reasons** 53:1 57:18
143:1,3 145:17
146:22 147:4
148:24 150:12,15
156:7 270:23
**rebound** 128:19
129:7,7,9
**recall** 15:21,22
16:3 18:20 19:19
21:17,25 22:6,14
22:15 23:3,14,18
26:7,12,20 27:2
29:17 37:3 40:10
41:12 42:9 43:19
44:23 110:3,16,19
113:5 115:17
118:5,15 139:1
141:4 142:9
173:22 174:7,8,14
174:20,25 175:8
175:10,11,18
176:5,10,15,18
180:7,9 187:13
194:15 199:1,21
200:2 202:11
203:13,25 205:11
205:14 206:18
240:9 258:11
272:12,12 314:6
347:20 348:7
359:20 364:6

372:1 374:9,21
383:16,20,22,25
384:6 393:9,14
405:24 412:7
413:17,23 414:1,4
414:19,22 415:5
423:15,23 436:12
436:18 455:19
456:14 457:12,16
458:7 462:13
**receipt** 475:18
**receive** 57:8 96:4
104:9,14 152:15
186:5,16 187:21
193:24 201:1
202:4 230:13
246:4 249:6
251:10,14 255:5
305:3 306:14
310:19,21 311:20
**received** 24:5,9,23
61:9 66:21 74:21
76:5 77:12 95:3
153:20 178:25
184:19 186:14,18
194:5,12 212:24
238:19 263:9
400:20 401:1,3
402:20 403:4,7
404:8,13 440:7
446:12
**receives** 91:4
127:6 239:4
251:16 310:12,13
**receiving** 24:8
53:5 54:7,20
195:13 245:9
333:14 426:20
456:23
**recess** 32:22 46:8
108:18 182:8

189:19 240:2
269:13 312:23
342:7 388:7
411:12 454:19
462:3
**recession** 116:2,10
116:15 117:2,22
**recipient** 126:19
127:1
**recognize** 330:15
431:8
**recollection**
422:16
**recommend** 90:10
268:15 330:14
457:18
**recommendation**
168:16 202:20
330:9 381:9
**recommendations**
79:4,6 84:4,5
86:20 88:24 89:1
89:4,10,18 168:2
208:3 210:4
**recommended**
109:18,19 338:20
339:18 340:14
**record** 11:7,14
13:2,3,14 32:4,6
32:19,21,24 33:2,2
46:5,7 60:19 62:6
63:6 65:1,6
108:17,20 127:18
127:20 135:1
162:3,7 182:7,14
189:16,18,21
197:11 198:12
225:13 230:24
239:22 240:1,4
269:10,12,15,19
312:22 313:1

342:2,6,10 348:3
388:4,6,9 390:5,6
411:7,11,14
421:23 422:11
426:4 428:4
454:16,18,21
455:11 459:13
460:4 461:25
462:2,5 473:14
474:8 477:9
**recorder** 137:17
209:23
**records** 197:12
211:1 432:19
**recovering** 323:19
**recovery** 373:5
**red** 373:17
**redevelop** 72:8
**redevelopment**
71:18,19 187:25
188:2
**redistributes**
126:24
**reduce** 146:14,15
243:9 278:8
309:14
**reduced** 156:10
236:1 309:16
396:23,23
**reduction** 315:9
**reductions** 146:25
150:9
**reed** 6:16 12:13
**reedsmith.com**
6:23
**reentry** 81:10
**reevaluation**
160:7 163:5
**refer** 27:16 83:23
116:1 227:11
253:3 314:1 325:6

**reference** 16:9
75:9 113:10 227:7
231:5 241:20
375:1 390:25
397:20 399:7,18
422:5 475:7 476:2
477:2
**referenced** 347:13
476:11 477:15
**references** 240:8
243:17
**referencing** 357:9
**referral** 324:3,20
327:9 329:14
**referrals** 329:1,7
329:11
**referred** 43:12
92:2 116:14 189:6
201:3 204:21
211:6 224:24
240:23 399:15
**referring** 16:10
18:18 34:3,6 43:8
88:2 184:5 200:16
224:21 267:8
281:12 334:17
395:9 396:10
406:17
**refers** 225:25
226:16 233:24
355:6 406:11
**reflect** 212:19
230:18 231:10
356:23
**reflected** 160:17
165:5 212:18,22
214:3 217:15
230:20 244:4,14
245:15 306:9
311:22 368:23
391:8

reflection 167:4
212:8
reflects 232:24
390:4 402:3
refresh 422:16
refuted 391:3,6,11
regarding 342:21
343:15 345:13,25
349:6 457:6,23
458:11 459:4
460:17 461:1,9,16
regardless 242:21
273:18 341:11
region 110:22
129:12,13
regional 259:8
260:7 263:17
264:14 266:5
268:23 269:21
270:14 271:5
272:2,5 279:22
280:22 295:11
registered 2:12
474:3
regular 442:9
regularized 442:6
regularly 20:17
466:4
regulations 255:14
256:1 441:22
reimburse 257:19
300:17,20
reimbursed 244:9
244:21,24 245:1
283:24
reimbursement
146:14,15 227:15
243:19,23,24,25
244:1 248:1
300:15

reimbursements
152:14 155:3
156:13 244:13
245:10 246:11,19
246:22 283:14
299:25 300:5,14
310:14
reimburses 146:10
300:3
relate 225:8
286:10 330:4
related 17:18,22
18:11 25:5 30:6
30:17 37:5,23
58:25 64:1 124:4
127:14 159:10
171:11 179:17,24
194:23 196:23
197:24 199:5
200:9 201:18
206:13 259:1
260:16,18 261:4
261:17 263:4
272:17 280:3
283:2 284:10
286:14,22 287:24
290:1 293:21
295:15 299:12
306:25 307:4,17
308:21 320:8
325:24 344:8,12
347:12,24 364:4
366:21 368:15
369:11 370:24
372:25 382:23
383:10 384:10
387:5 396:1 405:9
407:20 418:9
423:12,21 428:15
430:14 432:8
437:10 440:20

443:11,12,21
465:7 466:22
467:2,8 468:9
471:1 474:11
relates 1:9 137:18
171:6 386:9
392:15 469:23
relation 410:13
relations 82:9
relationship
167:10 168:4
229:18 236:16
relative 14:2 24:12
26:4 27:10 28:5
120:17 173:19
215:1 262:4,19
408:9,14 419:19
460:13
relatively 170:22
235:16,23 236:9
236:19,22 237:5
241:13 321:14
389:25 396:19
releasing 112:22
relevance 56:20
59:4 62:8,11,18,23
275:16,17,19
relevant 57:11
58:14 59:12 63:15
64:1 107:1 111:5
305:14 432:25
relied 73:11
reluctant 72:2
rely 169:20 290:19
291:3
relying 389:9
remained 235:16
235:23 236:9,19
237:4 321:13
389:25

remains 354:15
remediate 444:11
remember 19:3
69:4 96:5 117:8
187:22 188:2
252:16 272:10
314:5 318:11
323:13 325:21
346:1 358:14
364:21 381:21
405:19 414:7,15
423:18 426:20
438:17,18 440:11
440:12 464:6,14
remembering 74:2
remote 63:22
remove 157:9
195:17 305:10
removed 308:25
425:6
reorder 342:3
repayment 375:23
repeat 17:10 308:3
343:6
repeated 460:3,7,8
repeatedly 111:22
reply 396:25
report 43:12 95:4
95:14,16 96:1,11
137:8 138:4,13
162:12 166:15,18
226:10 235:24
237:6,11,19 246:7
263:20 264:25
265:12,15,16
268:25 269:1
270:8 278:21
279:10,11 306:17
307:5 347:2,8
348:13 349:4
352:22 358:21

[report - restricted]

378:20 396:24
397:3 442:22
450:2 456:13,17
456:21 464:12
466:14
**reported** 1:23 2:10
57:16 83:1 245:13
432:6 465:13
**reporter** 2:12,13
2:13 17:12,13
39:18 474:3,3,4
476:7
**reporting** 82:25
102:14 158:2
167:15 189:6
265:25 291:8
377:22 391:23
**reports** 139:10
166:23 167:18
221:16 265:23
271:11,12,13
399:2
**represent** 13:5
45:23 159:17
160:1 207:24
231:15 316:18
**representative**
208:8,14
**request** 79:5
169:12 175:25
186:11 188:5,11
188:13,20,25
189:11,24 190:5
192:6,7,14,16,25
193:21,23 194:13
194:21 195:2
196:6,7,22 197:2,9
198:23 199:24
200:3,13,15,16
201:4,15 202:17
202:25 203:16,17

203:20 204:4,10
204:13,15,19
205:5 206:8,12,22
238:11 239:10
246:23 267:2
323:24 327:18
337:21,25 338:17
338:18 340:5,21
345:20 349:5
373:6,10 384:9
401:5 414:22,24
423:5 440:15
450:11,17 477:9
477:11
**requested** 17:14
174:22 184:18,24
196:4 199:11,17
206:9 345:24
440:23 442:19
450:23 465:1
466:10
**requesting** 190:24
203:24 204:11
420:21 440:25
452:20 453:3
**requests** 111:23
141:12 176:4
179:22 183:18
184:1,6,8,17
188:17 189:3,8
190:15 191:2,9,11
191:16 192:1,5,15
192:22 193:2,8
194:7 197:20
198:6,10,18 199:4
200:7 201:20
204:25 238:4,7,13
330:5 352:18
414:20 442:12,18
442:24 450:19
452:8

**require** 317:11
376:15
**required** 24:16
53:6 90:25 116:21
167:17 183:22,23
229:3 255:13
475:25
**requirement**
317:18
**requirements**
67:23
**requires** 43:3
106:15 451:25
452:1
**reserve** 185:23
186:4 319:11,15
351:15
**reserves** 317:5,13
317:23 318:2,4,5
318:20,23 319:3,6
319:9 334:13,16
335:12 336:6,8,9
336:11,14 337:6
337:11,12 349:13
**reshuffling** 144:22
149:22
**reside** 320:6
**residential** 289:10
289:11 373:5
**residents** 251:2
284:19
**resolution** 208:16
277:9 340:18
**resolutions** 217:10
**resources** 62:19
90:2 94:4 112:4,5
146:4 234:3
252:20 295:19
**respect** 124:4
145:16 181:5
203:15 206:7

208:9 239:9
255:19 293:23
294:7,15 340:23
371:4 374:16
396:17 447:17
**respond** 96:25
111:20 132:22
144:8 145:3
146:17 274:10
302:18 335:4,8
358:5 399:3
451:21 457:3
**responded** 53:17
**responding** 123:19
**responds** 328:16
**response** 39:2
59:14 95:13
134:18 142:16
176:11 206:21
331:10 349:4
400:22 402:21
403:5 419:8
431:13,18 432:21
449:18,20,21
**responses** 10:7
34:17 126:15
431:3,9
**responsibilities**
14:11 100:12
102:7
**responsibility**
101:13 102:15
209:6,13
**responsible** 79:1
119:4 122:4
366:16,16
**rest** 231:23 311:2
**restrict** 76:21
**restricted** 93:23
93:24 94:10,10
155:13,19,20

[restricted - right]

220:9 301:21
423:8
**restrictions** 255:6
255:7
**result** 96:13
117:15 242:24
**resulted** 350:25
**results** 120:14
263:20 264:25
265:11,14 271:13
279:12 390:23
391:24 392:10
**resume** 46:2 65:19
66:1,6 68:18,19
69:7 75:8 81:20
83:13 100:7
**retains** 230:6
**retrieving** 377:23
**returned** 385:21
475:18
**revenue** 94:2,8
104:5,8 116:23,24
117:4,13 123:24
124:25 125:13
126:20 131:12,23
146:6,7 147:1
148:17 150:2,19
150:20 151:7
152:8,11,15,21
153:18,20 154:2,5
155:6,11,12,13,21
156:1,3,4,8,8,9,18
156:21 157:5,9,20
157:24 158:4,5,7
158:16,18,21
159:10,13,15
160:1 162:17,20
162:22 163:20,25
164:3 165:3,8
211:1,9 212:14,16
212:17,21 213:2,4

213:14,16,23
214:18,20 215:6
217:17 218:1
220:20 221:2,12
221:23 223:16,17
226:1,6,11 227:6
227:12 235:7
244:14,16,17
246:13 249:13
250:19 251:1
252:8,11 253:11
253:12,13,13,13
253:14,16,19,21
255:20,24 256:5
256:20 257:2,23
258:3,9,11,25
259:7 260:6
262:13 263:9,11
263:16 264:14
266:4,21 267:20
267:24 272:1
276:7,9,11,22
277:2,12,14 278:1
278:3,15,16,22
279:23 280:6,19
282:17 283:11,12
284:9 285:23
286:22 287:5
288:6,9,9 293:12
295:16,20,24,25
297:1 299:19,20
299:24 300:9,14
301:4 302:8
304:19 306:9
307:7,18 308:6,7
310:2,22 311:19
312:1 319:1
335:10 336:3
354:19 356:5
432:8

**revenues** 151:14
153:3 155:18
163:15 214:2
334:9,23
**review** 16:25
42:22,24 43:3
105:18 154:15
234:8 344:11
412:5 413:19
414:17,19 432:18
438:9 475:12
476:1 477:1
**reviewed** 106:16
107:13,19 161:9
**reviewing** 395:1
433:9
**revised** 70:10,16
70:19 94:13,15
157:13 220:11
300:10
**revision** 125:17
**rich** 71:23
**right** 18:2,13 25:6
25:11 26:25 29:9
32:13 34:11,24
36:2 37:3 38:7
46:2 47:20 49:23
51:17,24 52:18
57:12 58:10 65:20
66:8,23 67:11
68:16 70:1 72:19
75:6,16 77:10
78:1,16 83:11
84:22 85:14 86:21
92:14 111:1
115:22 116:6,17
117:16 120:13
125:15 126:12,14
133:6 134:8 136:9
136:24 137:4,25
139:12 142:20

144:4 145:8,11
148:14 149:21,22
150:7 155:2 159:5
161:7,21 162:4,8
163:5,22 164:1,18
164:22 165:14
174:8 177:4
193:19,21 196:13
200:20 206:14
208:17,23 211:11
211:22 212:2,10
212:18 213:18
214:3 216:3,3
219:24 220:20
222:21 223:2,13
227:9 231:1,11
233:2 235:10
236:11 238:8,11
240:7 246:5 247:9
248:11 249:17,18
250:24 251:3
252:21 253:7
254:13 260:8
266:11,16 267:19
270:14 273:8,12
281:19 283:18
289:3 293:14
294:5,10 295:8
309:18 313:3
314:1 322:6
324:16,22 327:17
328:18 333:5,21
334:1 336:6,17
337:25 338:7,25
339:7 340:14
342:25 343:4
347:4 348:21,24
349:2,22 351:4,7
352:3,23 353:12
353:22,23 354:1
357:1 358:10

**[right - says]**

360:17 361:4
362:25 363:8
364:11 366:13
368:9,12 371:25
372:17 375:2
376:3 378:17,21
378:25 379:4,7
380:6,23 381:2,17
382:3 387:13
390:18 392:19
393:3 397:9
398:14,21 399:10
399:11,21 400:1,7
403:14,17,22
409:23 410:4
414:23 416:23
418:23 419:2
420:25 426:3,7
431:15 434:11,15
434:17 435:4
437:16,19 438:12
445:8,13 446:8
451:2,23 454:15
459:17 463:20
464:3 465:21
466:5 467:16
469:7 470:14,21
471:8,8 472:12,18
473:4
**ring** 420:22
**rings** 436:20
**rise** 37:12 124:13
185:25 242:21
260:22 424:25
**risen** 271:1 320:21
**rising** 149:25
150:1 202:7
233:22 349:18
351:2 441:14
**rite** 440:2

**road** 3:6 69:21
147:11 256:9,14
257:7,17,17
**robert** 16:16
**role** 81:18 83:14
197:15
**roof** 151:5 306:4
**room** 49:10 50:24
51:1 59:24 60:20
61:3 376:16
**rose** 195:4
**roughly** 40:16
**round** 198:23
200:1
**route** 230:5
**routed** 227:25
229:5
**routine** 442:7,16
445:21 465:3
466:12
**routinely** 21:4
440:23 441:6
445:20 468:25
**routinized** 442:10
**row** 221:16
**rpr** 1:24 474:19
**rule** 459:15
**rules** 459:10 476:5
477:5
**ruling** 63:2
**run** 168:11 243:13
**running** 156:3,5
194:25
**runs** 207:3
**russo** 36:20,22

**s**

**s** 189:7,7 204:22
475:15 477:8,8
478:3
**safe** 153:11 385:23

**safety** 171:20
177:4 233:15
235:4,8
**sake** 299:2
**sal** 15:14,15 23:23
34:12 36:14 40:5
48:19 49:23 50:13
59:8 63:1 290:23
345:3 408:18
409:4,4 451:12
459:23
**sal's** 15:17
**salaries** 147:18
231:21 402:5
**salary** 102:3 356:6
356:9
**sales** 116:23 117:5
117:6 118:24
128:21,25 129:16
129:16,20,22,24
130:14,20 131:6
131:12,16,22
132:6,12 226:12
227:17,20,24
228:2,6,9,13 229:3
229:4,13,24 230:3
**salvatore** 3:9
11:15 475:5
**sam** 40:6
**samples** 74:21,21
74:24
**sanitary** 147:12
**sarah** 5:20 11:25
**sarcastic** 381:17
381:22
**satisfy** 67:22
**satisfying** 100:25
**saved** 315:23
316:1
**saw** 67:24 99:6
197:8 236:25

401:7
**saying** 23:13 34:21
34:25 49:4 63:11
63:14 94:11
107:18 124:12
125:5 132:16
135:14 196:19
207:2 239:24
247:10 248:2,6
250:21,22 260:4
296:4 312:3 324:8
334:6 336:8
338:24 353:6
359:1 363:1
370:22 385:11
390:14 395:12
397:15 398:14,17
398:24 399:23
409:5 414:17
418:12 428:7,9
438:17,18 451:11
451:17 464:6
465:11
**says** 68:18 69:7
72:21 81:20 87:14
94:15 137:3
161:18 162:23
165:15,18 190:11
210:13,17 211:16
213:2 216:3,5,9
217:21,23 218:16
219:18,19 220:1
223:25 224:5,12
224:13 231:14
234:13 235:15
245:7 252:18,23
253:4,23 325:2
328:9 331:3,16,16
335:25 336:13
338:19 343:13
346:8 347:7

349:23 355:11
356:7 358:7,21
373:16 394:7
396:22 397:19
407:3 412:14
420:12 426:9
434:15 435:3
438:11 448:3
**sbadala** 3:10
**scaled** 200:19,21
**scandal** 85:13
**scenario** 352:14
**schedule** 162:8,12
217:20
**schedules** 161:18
161:19,25 217:17
218:3 226:9
277:23
**school** 36:2,3,4
67:19,21 68:11
69:23 77:9,17
98:8,10
**schools** 126:20
127:2
**science** 66:23 67:2
67:20
**scientists** 296:13
**scope** 99:12
**scott** 3:19 11:19
332:17
**se** 207:1
**seal** 476:15 477:21
**second** 10:6 66:9
67:10,12,13 69:3
71:4,11,13 108:8
221:5 304:8,17
342:3 411:7
416:25 417:3
431:2,14,16 441:2
**secret** 53:14,19

**section** 66:11
87:22 94:15 110:1
110:6,15 113:17
114:8 210:17
214:2 222:25
223:11,16 225:9
355:2
**sections** 223:18
**sector** 356:4
**sectors** 79:23 80:4
**secure** 72:7 450:19
**securing** 450:24
454:3,8
**security** 300:2
**see** 39:14 66:11
83:18 87:25 99:4
99:8 123:14,15
124:8 137:1
138:10 144:6
151:24 152:18,19
154:5 160:5 161:4
161:14,17 163:20
164:13 165:14,17
166:3 179:12
181:6 201:2
207:18 208:21
210:5,19 211:7
219:21 220:5
224:3,8,16 231:7
234:15 235:3,19
236:16 242:23
252:12 253:1
254:2,9 255:4,15
263:10,25 264:1
264:12,16,23
271:25 278:23
279:7 302:11
306:17 311:16
313:10,20 322:17
323:7 324:5 325:9
325:15 329:18

330:8 331:6,20,24
333:1,16 334:14
342:22 343:16
346:12,23 347:9
348:16 350:2
354:13 355:1,4,9
355:17 360:13,23
373:2 374:12
375:3 378:14
379:12,24 380:13
381:7 384:20
394:18 399:3
402:9,22 407:5,6
410:20,21 412:15
412:19,20 415:14
415:18,22,23
420:15,16 421:6,7
424:20,21 425:10
425:11 426:18,19
432:23 437:13,25
438:1,19 440:19
452:17
**seeing** 63:22
110:16 125:17
151:16 243:2
371:20 374:23
444:14
**seeking** 324:15
363:15
**seen** 96:1,17
127:25 128:24
129:14 136:22
146:5 173:5
184:25 289:18
316:7 360:2 388:1
390:15 430:16
431:23 466:10
**sees** 302:16
**segment** 233:23
**segregated** 211:1

**semesters** 69:5
**send** 175:4 285:2
301:16,20 314:20
346:10,14,18
423:2 426:16
**sending** 398:3
**sends** 190:10
248:1
**senior** 81:12,13,13
81:21 82:22 83:14
87:21 166:25
**sense** 39:21 65:10
185:22 216:11
234:10 245:5
278:6 314:20
414:1
**sent** 176:16,19
192:4 201:24
203:4 225:25
248:3 263:15
276:7 308:1
347:21 348:13
407:2 410:24
**sentence** 219:17
255:10 374:11
390:23
**sentences** 379:2
**separate** 61:3 68:3
102:13 194:21
219:20 225:18
229:11 295:11
314:21 317:10
340:16 455:20,24
**separately** 339:12
436:16 472:6
**separating** 101:6
**september** 98:3
332:25
**seriously** 100:13
**serves** 209:22

**service** 95:5
211:10,11 229:4,6
229:9,12,14,19
230:2,8,15,19
305:25 314:18
315:10 327:9
375:10,13,20,22
375:23,25 376:12
376:17
**services** 20:11
24:21 78:15 79:11
79:18,24 80:7,11
80:18,21,23,24
81:2,7,10,12,14,24
91:3,20 93:9
101:24 104:11,13
123:18 134:18
141:15 143:6,13
146:2 149:20
150:3,21,21 153:5
153:8 171:18
174:5 175:23
184:21 185:21
186:2 196:1 202:4
226:14 240:15,25
243:14 245:25,25
246:2,9 255:2
256:8,8,9,10,19
267:22 270:25
281:25 289:5,8,15
289:16,17,25
290:16 291:20
292:21 293:11,24
297:8,12,16,21
298:7,8,24,25
300:13 301:10,14
301:17 302:22
304:9,11,18,20
305:1,8,24 306:8
306:24 307:3
308:2,8,13 310:8

313:13,17,19
317:15 319:10,12
319:14 327:12
330:17,20 335:5
357:17 371:14
373:10 379:21
385:23 392:5,8,11
392:16 396:2
400:16 402:1
403:6 404:14,19
434:7,17 435:3,11
435:23 439:13,15
441:25 443:24
444:9 447:18
448:6,17 449:16
**serving** 305:21
319:23,24 321:10
**ses** 3:20
**session** 182:11
**sestriallaw.com**
3:20
**set** 86:11 87:1,7
88:6 185:22
191:19 319:11
357:4 474:15
**sets** 242:19 470:13
**setting** 86:22
**settled** 201:12
374:5,15
**seven** 69:18 78:22
106:21 166:25
**sgconway** 5:21
**shaker** 98:10,12
**shannon** 20:11,18
**share** 91:8 229:24
346:9 402:7
412:15
**sheet** 475:13 477:7
477:10,18 478:1
**sheriff** 82:15
153:7 206:24

239:14
**sheriff's** 185:7,16
195:8 206:11,16
238:6,15,24,25
239:4 401:2
424:25 443:25
**shift** 70:24
**shifts** 236:21
**shkolnik** 3:5
**short** 108:24 313:4
324:1 342:13
**shortfall** 399:1
**shortfalls** 349:17
350:19,22 351:1
**shorthand** 2:11
474:2
**show** 138:17
149:10 162:10
208:9 260:20
316:12 394:16
400:7
**showed** 176:16
**showing** 401:13
406:18
**shown** 167:3 412:2
475:16
**shows** 66:5 89:21
**shuffled** 80:2
**side** 60:5 187:11
319:10
**sidetracked** 69:11
**sign** 154:15
**signature** 474:18
475:14
**signed** 476:13
477:18
**significant** 150:20
195:6 214:17,21
214:24 215:1,6,10
215:21,24 237:7
354:23

**significantly** 271:1
**signing** 475:19
**signs** 373:22
**siloed** 80:11
314:24 377:14
**similar** 177:9
**similarly** 296:20
351:24
**simon** 170:19
171:25
**simple** 35:10
54:21 158:1
228:12,17
**simply** 196:10
223:10 355:20
404:15
**sincerely** 475:21
**single** 67:5 82:11
115:7 152:19
233:17 313:25
**sir** 475:10
**sister** 68:4 322:20
323:15 325:21
328:12 330:12,19
332:7 360:4
**sit** 120:4 237:16
324:2,20 327:14
351:20 402:12
468:4
**site** 195:15
**sitting** 199:20
**six** 21:21 22:13
23:16 78:22
175:14,24 176:7
470:16
**sixth** 292:24
**sized** 128:24
**skip** 339:6
**skipping** 301:2
**skyrocketed** 102:1

| | | | |
|---|---|---|---|
| **skyrocketing** 143:7 309:11 | **sorry** 13:18 17:9 19:9 23:22 49:8 | 146:6,8 147:1 150:14 152:11 | 221:23 226:1 235:7 252:8,11 |
| **slew** 167:18 | 55:19 81:4 85:19 | 156:9,11,13 226:6 | 253:12,13 255:20 |
| **slight** 444:11 | 102:10,12 113:12 | 226:11 227:13 | 255:24 256:5 |
| **slightly** 61:8 | 114:25 115:4 | 246:25,25 247:14 | 257:2,23 258:3,11 |
| 123:24 163:12 | 141:9,11 143:2,22 | 249:13 250:19 | 258:25 259:7 |
| 169:20 319:1 | 143:24 147:8 | 251:18 255:5 | 260:6 262:13 |
| **slipped** 148:12 | 162:20 193:3 | 267:20 278:16 | 263:9,11,16 |
| **slow** 69:21 229:16 | 221:6 222:12,17 | 288:8 295:25 | 264:13 266:4,21 |
| **slowly** 377:25 | 222:18 225:12 | 308:6 310:1 324:3 | 276:7,11,21 277:2 |
| **smack** 136:25 | 236:24 238:22 | 324:21 375:12 | 277:12,14 278:1,3 |
| **smaller** 164:10 | 239:6 245:19,21 | **space** 235:8 | 278:14 279:22 |
| 295:18 | 266:8,18 276:2 | 443:15 | 280:5,19 282:16 |
| **smith** 3:14,19 6:16 | 280:20 285:12 | **speak** 20:17 33:4 | 283:12 284:9 |
| 11:19,19 12:13 | 293:19 298:20 | 59:11 111:14,16 | 285:23 286:22 |
| **sober** 373:5 | 304:10,13 305:13 | 361:10 366:11 | 287:5 288:6,9 |
| **social** 89:20 | 323:21 336:1 | **speaking** 39:16,19 | 293:12 295:24,25 |
| 101:22 300:2 | 341:25 342:25 | 47:22 112:25 | 299:19,20,23 |
| 304:24 305:25 | 343:6,24 352:9 | 226:4 300:25 | 300:9 301:4 302:8 |
| 319:21 321:20 | 377:5 392:21 | 309:7 365:16 | 304:19 306:9 |
| 404:9 | 393:12 411:6 | 458:19 459:12 | 307:18 308:7 |
| **sole** 274:9 | 427:3 432:20 | **speaks** 460:4 | 310:2 311:18 |
| **solely** 303:1 385:3 | 433:5 434:12,23 | **special** 7:15 46:11 | 312:1 |
| 470:19 | 436:24 437:23 | 47:5,19 48:24 | **specialist** 323:3 |
| **solutions** 6:3 | 447:25 465:16,17 | 49:2,12 50:23 | **specialized** 29:2 |
| 347:8 475:1 478:1 | **sort** 190:14 383:4 | 51:3,8,10,14,20 | 75:18 76:5 |
| **somebody** 47:6 | **sound** 309:22 | 52:1,4,9,23 53:11 | **specific** 18:20 |
| 48:2 52:13 62:12 | **sounded** 325:18 | 53:22 55:21,25 | 19:19 21:17 22:14 |
| 80:6 144:18 | **sounds** 48:19 | 56:3,10,18 57:14 | 22:15 23:4,14,25 |
| 190:10 261:18,22 | 275:17 290:23 | 59:7,19 60:1 61:1 | 43:20 90:25 94:14 |
| 262:1 288:21 | 296:4 325:12 | 61:5 62:25 63:13 | 111:25 113:14 |
| 291:5,14 325:24 | 326:11 327:8,24 | 65:5 74:8 155:11 | 135:10 142:10 |
| 346:4,6 380:22 | 331:11 335:11 | 155:12,17 156:3,4 | 157:12 173:20 |
| 383:4 395:14 | 354:23 | 156:8,18,21 157:5 | 174:21,25 175:1 |
| 414:1,7 416:5,14 | **source** 106:2 | 157:9,20,24 158:3 | 175:21 176:5,18 |
| 417:6,25 418:2,15 | 117:5 131:23 | 158:7,16,17,20 | 178:2,10 179:24 |
| 418:19 435:20 | 239:13 254:8,21 | 211:9 212:14,16 | 180:12 194:2,3,9 |
| 450:12 | 254:23 278:24 | 212:17,21 213:2,4 | 196:12 199:3,12 |
| **someone's** 451:6 | 283:11 | 213:13,23 214:2 | 199:24 202:1 |
| **son's** 453:9 | **sources** 18:23 24:6 | 214:16 215:5 | 203:5 206:24 |
| | 72:8 104:5,7 | 220:20 221:2,12 | 220:13 252:20 |

257:24 259:1,7,14
260:10,11 262:15
265:16 272:13
280:5,8,15 284:10
286:25 287:4
291:19 307:6,16
319:17 320:18
328:3 334:21
364:7 365:15
367:9 370:23
386:6 403:3,10
404:4,5 427:8
430:6,16 435:21
445:24 446:16
449:15 450:18
**specifically** 20:8
22:3 27:4,15 40:2
44:19 50:1 63:10
71:23 110:5,19
113:5 118:5
127:13 128:17
135:22 142:6
147:1 176:15
177:16 179:14,17
181:12 187:13
194:16 196:22
197:25 199:5,17
201:18 203:25
226:4 227:14
233:20 244:24
261:17 263:4
272:17 282:17
286:22 290:16
293:20 320:8
349:23 357:8
371:6 375:18
382:23 384:10
385:12 387:5
389:24 400:21
402:21 405:18
427:6 436:20

440:9 464:17
465:7
**specifics** 109:9
169:16
**specify** 315:19
**speculate** 284:18
397:11
**speculating**
397:13
**speculation** 397:8
458:1,14 459:7
460:19
**speech** 394:13
395:25 396:12
400:4
**speeches** 142:11
**spell** 13:13 289:1
**spend** 25:3 93:20
94:5,20,24 116:16
130:24 132:25
144:2 150:7,10,17
150:18 152:9
154:22 155:7
220:16 230:9
233:17 247:8
248:2 249:9
254:23,25 255:1
266:24 267:9,13
267:17 268:3,10
311:11 317:7
354:17,21 356:1,8
356:11,11 357:12
357:18 358:1,19
389:15 418:17
**spending** 24:13,13
95:7,21,24 102:2
102:17 103:25
130:21,22 144:13
146:23 231:16
233:6,9,10 235:18
243:22 244:22,25

245:1 270:3
311:13,14 335:3
335:20 355:19,23
435:15
**spends** 143:13
254:17 270:14
**spent** 93:18 98:5
100:22 101:20
154:6,13 180:20
247:23 254:13
255:8 264:21,24
272:1 315:10
318:2,3 324:13
335:12 350:7
353:25 356:24
434:8
**spike** 236:25
**spikes** 237:8
**split** 79:23 87:6
**spoke** 33:3 49:22
49:24 50:1 53:9
55:2,8,14 59:22
**spoken** 44:14 45:7
45:12 50:16,19,22
**sports** 129:15
**spreadsheet**
217:11 421:17
422:12 431:21
432:10 433:12,22
436:1
**spreadsheets**
43:14 216:16,19
216:22,23,25
217:1,4,7 265:24
**spring** 69:5
**square** 2:8
**stadium** 94:8
**staff** 44:10 45:4
104:12 149:14,19
151:2 168:1,3
193:16 194:4

204:14 296:9,12
325:8 327:10,13
351:3
**staffing** 305:16
**stamp** 230:25
422:24
**stand** 77:5 193:18
323:11 402:12
418:25 424:3,6
**standing** 425:18
425:22 426:4
427:4,16
**standpoint** 89:21
354:22
**stands** 237:15,21
281:1
**stapler** 342:1
**start** 34:4 107:18
114:25 157:6
160:6 172:16
184:4 258:8 272:8
281:10 319:4
322:10 331:14
361:19
**started** 67:21 71:2
78:3,7 109:23
117:16 118:19
265:17 272:7
309:20 362:9
363:11 377:3
**starter** 189:13
**starting** 109:25
225:16 315:1,2
**starts** 161:21
348:14
**state** 10:3 66:14
70:8 77:13 82:11
82:13 84:10 89:25
90:18,21,24 91:14
110:13 132:18
141:23 146:7

147:2 148:21
150:13 155:3
226:15,17 227:3,6
227:15,19,21
228:1,3,22 244:21
246:25 247:3,5,14
251:7,17 252:24
253:5,10,13,14,17
253:18 254:11
284:14,21,25
285:4,7 300:8
310:14,17,20
311:3,7 348:2
360:12,21 361:4
361:25 430:25
459:8 476:10
477:15
**state's**  227:5
**stated**  228:23
367:8 415:4
459:16 469:10
**statement**  236:6
247:12 328:12
407:16,18 444:5
476:13,14 477:19
477:19
**statements**  173:8
173:9,11 177:10
341:11
**states**  1:1 360:20
**statistical**  174:2
178:25 180:22
**statistics**  178:19
250:12 462:21
**stats**  346:21
**status**  111:19
167:21
**statute**  242:3
276:21
**statutes**  165:24

**statutory**  137:16
137:18 297:2
**stay**  30:25 60:21
73:20,25 76:18
83:3 148:3 270:10
270:13 309:25
325:22 386:12
388:2 425:9
**staying**  79:12
134:19 303:16,24
440:18 441:16
**stays**  151:1 305:9
**steadily**  398:9
**steady**  127:22
241:8,14
**stealing**  62:13
63:8
**stems**  28:12
**stenographically**
2:10
**step**  339:6 453:20
**steps**  449:7,25
**stipends**  310:9
**stipulate**  275:8
**stop**  245:19
328:20 338:6,8,10
**stops**  324:1
**store**  191:5 194:1
**stored**  191:8,10
193:24
**stores**  5:15
**storing**  377:23
**straight**  338:3,14
**street**  4:5 5:8 6:17
273:5 274:15
281:1 286:3
287:15 288:7
**stressor**  134:5,10
143:9
**stressors**  110:8
111:4,12,20

112:13 113:1,19
114:10 364:18
365:4 366:18
**strict**  288:3
**strike**  34:4 135:7
427:18
**string**  394:24
**strips**  378:25
379:25 380:3,12
**strong**  57:17
159:14,15
**strongly**  61:15
**structure**  230:4
**studies**  66:24
67:11,22 68:13
**study**  43:4 77:15
**stuff**  73:14
**sub**  219:20 224:2
224:13,14,23
225:2,4 355:8
**subject**  19:12
20:21 21:15
174:12,18 342:20
343:10 360:11
407:3 420:20
436:14
**subjects**  38:17
67:15 75:19
408:20
**subler**  412:13,21
415:14
**submission**  188:7
192:1
**submit**  188:12
192:5
**submitted**  164:21
179:8 190:24
192:24 194:21
195:1 199:16
204:10

**submitting**  192:14
**subscribed**  476:10
477:14 478:21
**subsequent**  347:20
391:25
**subsidies**  221:17
222:4 225:20,24
234:13,19,25
235:6 255:1 267:7
298:16
**subsidize**  255:12
**subsidized**  256:23
**subsidy**  259:12,12
267:19 268:1
279:24 321:13
**substance**  31:3
54:14 89:7 282:2
283:2 288:15
388:20 407:16
440:21 450:14
452:21 453:3,24
454:8 462:21
**substances**  285:17
303:15 443:13
446:7
**substantial**  184:23
186:5 187:22
**substantially**
165:21 181:14
185:13 302:5
305:22
**substantiated**
91:19 305:7
**substantive**  15:13
**subtotals**  421:3
**sufferers**  462:22
**suffering**  384:16
**sufficient**  61:11
333:24 358:3
**suggest**  30:11 58:6
211:18 451:20

**suggesting** 62:15
109:3 249:7
328:18 374:14
387:3 452:10
**suggestion** 451:12
**suggests** 73:1
130:21 378:23
**suite** 2:8 3:6,16
4:16 6:18 475:2
**sum** 93:16
**summarized**
226:11
**summarizes**
162:13
**summary** 70:25
93:21 221:22
**summit** 1:10
**sunny** 170:19
171:25
**super** 92:7
**superior** 321:17
475:1
**supervise** 193:15
**supervises** 209:14
209:24
**supervision**
296:24
**supervisor** 44:10
100:4 333:10
**supplemental** 10:7
431:3,15,16
**supplies** 194:24
203:17,19
**support** 81:1,2
83:15,20,24 86:1
141:14 158:9
193:21 240:15,24
243:14 256:10
296:12 298:4,7,8
298:23 311:15
320:5 339:25

404:15 411:3
**supported** 94:2
308:22 318:25
339:25 355:13
356:15
**supporting** 204:12
**supportive** 305:1
307:22 404:18
**supports** 131:21
304:19 306:23
**suppose** 223:15
**supposed** 96:3,8
**sure** 17:11 40:25
47:9 49:6 56:19
84:15 96:16
100:23 102:18
107:20 108:4
125:3 132:8
151:25 152:2
166:2 193:19,20
206:8 219:14,16
223:8 228:16,21
232:20 249:7
259:22 260:15,17
261:18 262:6,9
269:22 271:14
273:16 275:22
277:1 283:4
312:20 320:22
326:25,25 354:7
368:2 379:10
381:1,15 382:2,6
385:7,18 408:18
411:8 438:10
462:17 463:19
**surmise** 373:20
**surplus** 156:22
157:16,19 166:8
355:24 356:14,20
357:18 358:18,22

**surpluses** 355:12
356:2 358:8
**surprise** 438:12,16
**surprised** 339:16
339:22 340:1,4,20
438:2,3,7
**suspect** 299:8
**suspected** 61:15
91:17
**suspicions** 57:17
**sweeney** 404:20,21
404:23 405:2,4,8
405:17 407:8
**sweeney's** 405:20
**switch** 398:23
**sworn** 12:17 29:15
38:4 337:3 474:6
476:10,13 477:14
477:18 478:21
**sybil** 407:2
**system** 20:8 189:2
189:3,6,10 190:3,8
190:14,25 204:18
204:23 210:18
230:12 244:11
265:23,25 271:20
271:21 278:11,19
278:20 283:6
301:18 306:22
308:4 314:24
316:3 329:10
377:17,17,24
**systems** 74:23
187:12 232:12
300:24 316:3
374:2 376:20
377:9,14,21

---

**t**

**t** 13:18
**table** 49:10 161:17
428:6

**tables** 71:9
**tabs** 443:2
**tacking** 68:4
**take** 67:19 68:5,8
71:25 72:2 83:6,8
91:21 92:23 93:19
100:11 108:3,10
108:14 116:22
128:3 131:24
146:13 149:23
157:3 158:12
180:23 182:3
184:22 185:8,21
204:15 229:17
238:20 239:23
241:17 244:18
257:17 297:19
305:5 309:7
312:18 325:5
336:15 385:22
417:21 425:3
441:13 449:8,25
**taken** 2:5 32:22
46:8 69:3 101:7
108:18 173:4
182:8 189:19
195:15 196:8
240:2 269:13
312:23 342:7
388:7 411:12
454:19 462:3
**takes** 98:19,20
146:4,4 229:5,21
**talk** 24:8 27:14
29:6 30:14 31:8
32:11,17 38:18
54:4 90:17 92:6
93:16 122:8 135:9
145:6,13 228:20
241:23 253:14
312:13 320:19

[talk - testimony] Page 68

336:21 391:14,20
394:17 408:2
432:14 442:5
453:10 472:17
**talked** 54:14 99:6
152:9 175:2
252:14 379:6
383:23
**talking** 27:15
38:23 54:18,19
57:18 58:7 90:19
108:25 129:12,12
135:5 144:21,23
150:5 182:18
211:22 215:1
217:2 225:17
236:13 244:13
255:17 266:10
271:12,22 318:23
332:21 354:2
366:19 392:9
397:22,25 409:19
430:6 436:21
**talks** 110:7
**tanf** 91:5,10
**tanks** 243:10
**tap** 318:6 319:2,6
**tapestry** 306:22
**tapped** 318:4,14
318:20
**tarantino** 2:7
**tariq** 4:18 12:2
**tariq.naeem** 4:19
**tasc** 280:25,25
281:12 282:16
283:9,12 284:3
286:4 287:10,12
288:24
**task** 449:14
**tasks** 97:17

**tax** 101:19 116:23
116:24 117:5,6,12
117:13,14 118:24
119:6 123:12
126:3,20 127:6,8
127:17 128:21,25
129:16,17,20,22
129:24 130:14,20
131:6,12,16,22
132:6,12,16,18,19
132:21 159:1,2
160:3,6 163:15
226:12 227:6,24
228:2,6,9,13 229:3
229:4,13,24 230:3
278:24
**taxes** 54:20 101:6
104:15 127:2,10
128:8 130:1
156:13 159:17,23
159:25 161:14
162:17,24 163:21
226:12,18 227:17
227:20 242:17
251:2,2,3,5,7
253:24 276:10,19
276:20
**teach** 409:12
**team** 129:3 171:22
423:10
**teams** 129:15
**tease** 28:2 181:1
**technically** 167:16
**technology** 104:1
104:4,19 105:25
106:3 154:11
186:14 187:6
232:10 234:3
355:16
**technology's**
186:23

**ted** 122:11
**telephone** 12:6
472:12
**tell** 15:13 33:23
35:22,25 36:11
37:25 40:16 43:7
47:6 53:8 54:5
55:1,10,18 56:1
59:13 60:8,16
66:2 76:16 103:6
119:23 129:9
144:15 199:9,9
217:1,21,25 218:4
245:20 257:3
260:14 297:20,25
307:11 312:6
343:22 345:17
351:20 403:8
416:5,9 417:6
429:21 435:19,25
436:21
**telling** 32:4 63:17
120:10 305:14
331:12,17 451:24
459:17
**temporary** 91:4
232:18
**ten** 33:24 121:19
129:8 131:2
166:17,19,21
180:21 205:25
206:1 447:22
**tend** 169:20
309:25 358:2
**tens** 142:14,22
143:4 144:20,24
145:16,18 163:25
164:3,6 165:4,9,10
376:11
**tenth** 5:8

**tenuous** 63:18
**term** 243:21 264:7
**terminated** 64:7
**terms** 26:1 27:11
62:18 78:7 86:8
88:13,17 91:13
110:7 124:15
126:18 131:8
150:16 179:4
182:22 192:13
197:11 208:3
247:24 255:7
268:19 282:25
377:22 403:17
429:17 444:1
454:7 464:23
**test** 53:24 320:20
378:24 379:25
380:3,11 382:2
390:23 391:24
392:10
**testified** 12:19
29:18,22,24 30:3
37:24 43:24 56:2
57:3,22 61:22
337:23
**testify** 12:17 31:24
38:10 57:8
**testifying** 57:1,23
58:1 61:12 422:17
455:19 457:12
**testimony** 29:15
30:1,17,21 31:5,16
31:16,17 33:15,20
37:23 38:4 42:23
44:3 45:10 47:17
48:5,8 52:5,15
58:19 238:3
312:11 320:24
337:3 363:15
364:22,25 366:25

**[testimony - time]**

387:17 408:19
466:8 467:18
474:9 476:6,7
477:6,9,12
**testing** 127:21
194:24 203:17,19
262:5 380:6,15
382:6 425:5
**tests** 24:24 178:20
260:22 262:20
392:7 395:4,22
441:4
**text** 216:13 217:22
**thank** 12:25 47:23
62:4 64:3,5
141:11 162:6
196:16 225:5
226:20 230:21
245:22 284:7
343:1 349:22
401:21 427:23
454:23 473:6
**thanks** 109:21
455:1 473:11,12
**theory** 250:7
**thesis** 314:9,11,14
**thing** 103:5 107:16
109:24 130:24
234:10 249:18
293:22 294:2
326:22 347:6
364:13 392:12
400:2 418:22
466:17
**things** 27:23 62:2
63:25 74:16
101:21 110:10
129:5 145:10,25
241:5,6 254:25
328:25 346:20
350:24 364:14

366:18 397:11
399:24 462:12
**think** 15:3 47:6
49:14 50:15 56:10
57:24 58:9 59:9
59:10 61:23 63:3
63:11,18,24 70:7
70:12 80:5 90:11
96:24 97:7 109:2
115:1 125:5
134:15 135:10,14
146:21 147:25
157:22 162:3
168:17 169:19
179:23 196:8,14
203:16 212:7
214:20 215:16
222:15 227:1
241:20 243:17
246:7 247:24
248:9 250:2
269:25 270:15
313:22 326:8
328:8 329:21
331:13,16 335:19
337:2,23 340:11
341:17 356:10
360:3,16 371:24
374:3 378:3
381:24 386:17
392:13 394:15
396:3,16 397:4
400:6 402:25
414:8 421:10
422:5,16 425:19
426:15 427:25
431:17 432:24
434:18 446:24
451:19 455:6
460:12

**thinking** 444:1
**thinks** 467:15,16
**third** 152:5 165:14
207:13 222:7
223:24 225:11,20
234:18,21 238:23
245:24 306:23
347:6 431:12,17
**thirds** 302:23
355:1
**thirty** 475:18
**thomas** 20:8
**thought** 69:15
97:16 143:22
150:8 159:18
166:1 210:8,9
269:19 304:13
315:7 332:7
364:15 395:8
418:14 469:23
**thoughts** 417:1,3
**thousand** 267:24
359:18
**thread** 396:22
437:8
**three** 21:13 22:13
66:22 79:23 80:1
85:20,21 93:11
101:22 120:18
122:19,22 125:22
128:15 149:8
159:21 166:20,22
173:24 176:7
218:15 221:15
238:7 289:6 290:9
294:5 341:6
346:20 347:12,19
437:6
**throwing** 63:12
230:7

**tie** 298:17
**tied** 273:23 280:3
290:17 291:21
292:22 293:13
294:9,21
**ties** 70:15
**tight** 146:12 255:6
**time** 14:6 21:12
39:16,20 40:7
61:7 62:3,5 63:5
64:4 65:11 66:1
68:7 70:1,1 72:18
72:25 77:17 78:21
79:22 80:17,25
81:5 85:9 96:3
108:3 110:9 113:2
115:14,15 116:6
116:13 121:17
140:3 145:7,14
146:4 150:19
157:1,3 161:15
164:21 166:9
202:11 235:21,25
269:25 270:1
271:17 292:11,24
293:9 299:2
313:23 322:23
335:24 338:3,15
350:7 359:20
362:7 364:7
372:18 377:10
386:13,15 387:13
392:6 395:8
400:13,14 402:23
404:11 408:4
418:17 423:9
437:17 438:10
441:2 445:5
453:15 454:24
455:2,13 473:15

timeline 78:7
timely 456:22
 464:13
times 43:20
 168:18 341:7
 404:10
tissue 141:9
title 137:19,19
 157:14 158:25
 299:17 300:1,2
titles 156:15
 157:15 159:11
 296:14
today 13:7 31:16
 31:24 33:20 38:7
 38:12,19 39:3,11
 39:24 42:23 44:13
 45:4,10 47:13
 65:11 120:5 135:9
 168:18 182:19
 199:20 237:16
 277:21 320:24
 337:3 362:14
 364:22 366:9,13
 366:19 402:13
 418:25 454:24
 457:14 459:15
 463:17
today's 11:8
told 32:5,14 35:1,8
 35:25 36:12 38:18
 45:3 48:21 50:4
 55:3 56:6 67:19
 68:7 76:22 191:21
 201:5 275:6 391:2
 391:4 392:6 395:3
 395:21 400:10
 416:8 438:9
 469:21,22 470:5,6
 470:8

tomorrow 449:13
top 51:17 73:20,25
 92:4 122:5 157:21
 162:21,23 207:15
 207:20 216:3
 219:8 225:2 231:4
 237:14 256:4
 257:3 258:10
 263:24 266:22
 297:17 316:19
 318:11 337:20
 371:25 388:2
 405:3 407:22
 436:9 464:21
 465:25 466:3
topic 472:7
total 144:13
 146:22 150:5,9,17
 152:7 155:6 164:9
 165:18,18 180:11
 215:6 218:8,10,14
 218:17,20 219:1
 225:21 231:15,20
 234:18,25 235:1
 236:23 246:10
 270:4 298:14
 310:22 311:22
 316:16 351:6
 411:19 414:9,25
 419:20 421:4
 430:7 432:7
 435:10 444:1
totaling 185:23
totals 423:12
touching 412:14
tough 223:21
tower 6:18
toxicology 24:24
 127:21 178:20
 179:15 259:10
 440:9 441:4

443:12
track 24:10,18,21
 24:22 40:23 79:16
 121:18 190:14
 191:1 283:8 337:8
 440:17,19 441:9
 442:3,8,10 443:15
 446:3 448:5,9,10
 448:14 464:22
 465:2 466:4,11
tracked 436:15
 440:7,14,22 442:3
 448:8
tracking 120:2
 221:10 441:10,11
 441:12 442:6
tracks 79:15
traditionally
 240:23
training 70:23
 75:19 76:2,5,6
trainings 77:3
trajectory 70:24
transcribed 476:7
transcript 47:2
 199:1 475:11,12
 476:5,12 477:5,11
 477:17
transcripts 43:22
transfer 157:11,20
 256:2,12,24
 259:17 266:9
 350:8,9
transferred
 220:19 221:1,23
 256:15,20 258:24
 259:5 260:5
transferring
 245:18
transfers 158:17
 221:13 245:4

255:20 257:22
 258:2
transition 311:24
 312:18
transitioning
 146:3
translate 124:14
 125:20
transparency
 374:4
transplant 323:20
traumatic 305:12
traveling 47:24
treasurer 130:12
 130:13 276:24
treasurer's 158:6
 158:10,14 159:4
treat 168:3,7
 314:25
treated 456:22
 464:13
treatment 195:14
 195:16 199:12
 232:1 240:19,20
 247:16 255:2
 281:1,18,25 286:2
 287:15 288:6
 289:12 297:11,15
 314:22,22 315:4
 328:25 329:8,9,12
 329:15,19 331:4
 335:5 373:5,12
 379:21,25 381:8
 444:18 450:20,24
 452:21 453:4,16
 453:23 454:3,7,8
 465:6
trends 169:16
 464:22
trial 150:25

**tried** 99:12 112:22
145:24 443:1
447:16
**triozzi** 16:16
**trouble** 243:13
**true** 130:18
166:10 235:22
273:23 293:22
294:2,19 315:14
315:19,22 356:13
356:16 361:21
386:7 389:21
392:15 396:3
402:24,25 403:2
403:25 425:21
464:9 474:8
**trust** 122:4 135:10
**trustee** 227:22,25
228:24 229:5,21
230:5,6,16
**truth** 12:17
**truthfully** 38:10
38:14
**try** 14:12 59:21
84:15 110:21,24
121:14,23 147:19
180:24,25 181:9
182:25 269:3
274:1 278:5
282:22 283:8
287:2,3 288:14
292:7,15 297:6
335:3 364:17
365:3 384:21
386:4 417:17
419:8 443:10,20
444:11,17 448:14
448:23,24 449:14
449:25 450:1
**trying** 18:2 28:2
55:7 84:19 165:1

170:24 179:13
214:25 216:11
234:21 261:2
274:2 290:3,14
319:21 332:1
335:8 354:9
379:16 386:11
387:22 388:1
414:25 445:7
447:15 453:21
454:1
**tucker** 4:14 12:2
**tuckerellis.com**
4:19
**turn** 83:12 207:9
210:10 313:5,15
354:25 431:20
**turned** 315:14
351:9
**turning** 146:2
**turns** 350:15
**twelfth** 4:5
**twice** 140:10
**two** 59:20 66:25
67:7 68:2 69:14
74:2 83:1 96:19
97:24 98:5 101:21
104:10 105:24
108:2 119:11
124:24 127:22
129:15 146:21,24
160:5,9 161:16
166:25 171:24
195:19 219:24
224:2,5,14 225:4
225:18 246:1,7,8
267:11 271:19
276:22 293:23
294:15 295:13
301:3,7 302:23
313:24 314:6,13

314:15,20 316:3
317:10 318:10
334:8 338:17
350:24 351:3
355:1 357:20
358:2,10 379:2
402:6 441:14
**type** 92:1 212:9
217:10 224:22,22
225:1,2 252:23
253:5 284:17
**typed** 205:2
438:19
**types** 211:6,13,17
211:20 212:1,3
253:9,24 262:4
307:16
**typically** 442:5
**typing** 39:18
**typo** 216:17
219:15 235:2,11
331:15

## u

**uh** 18:8 83:17
119:17 130:17
136:21 145:9
163:23 177:5
222:10 224:4
229:22 232:22
234:16 260:13
268:21 287:13
288:23 330:1
**ultimate** 84:20
86:8,18
**ultimately** 87:10
88:17 106:17
168:13 188:22
196:8 470:22
**unable** 243:14
**unclear** 17:24
197:6

**undergraduate**
66:22,25
**underground** 72:5
**underinsured** 73:6
**underline** 299:11
**underlying** 181:21
**underneath**
235:14
**understand** 13:9
14:13 18:3 25:8
31:7 32:15 34:12
35:17 38:6 39:10
47:15 49:13,14
54:17 55:6 56:19
57:23 61:11,21
63:16 78:6 106:15
107:5,21 112:3,11
121:15,23 122:8
126:25 132:24
157:7 159:11
165:2 181:9
197:18 198:8
211:24 216:14
220:18 221:25
224:19 226:23
229:17 233:2
234:22 236:6
260:3 269:23
270:2 271:3 274:1
277:15 278:16
280:2,7 281:19
282:22 283:20
284:9 313:8
340:12 354:9
361:7,15 364:17
365:3 373:9
374:18 384:21
386:4 398:12
451:2
**understanding**
13:19 18:4,14

19:5,15 23:9
25:19 26:23 27:10
29:3 33:7 49:15
51:21 52:10 79:10
107:10 228:11
303:19 312:12
315:12,20 333:13
354:12 362:21
365:6 366:17
380:2,16,20 456:6
**understands** 61:22
**understood** 62:4
85:25 228:21
248:14 259:22
404:4 452:17
**undertaken** 14:10
121:14,22 273:25
282:21 386:3
413:7 419:10
**undertaking** 319:8
419:11
**underutilization**
349:24 350:5
**unexpected** 317:6
**unfortunate**
444:23
**unfortunately**
38:1 90:3 91:22
309:25 354:16
373:18
**uninsured** 73:5
**union** 147:15
**unique** 148:7
**united** 1:1
**university** 66:15
74:22 77:13
**unknown** 470:12
**unlimited** 88:23
94:4
**unprofessional**
63:4

**unrestricted**
301:19
**unspent** 354:15
**unwilling** 397:10
**update** 167:20
179:19
**updated** 100:6,8
**updates** 178:16
**upgrading** 374:3
376:19 377:9
**ups** 57:7 455:5
461:23
**uptick** 383:9 384:2
**urban** 66:24 67:11
67:22
**urge** 344:17
**use** 27:17 44:16,25
132:1 140:18
141:22 153:9,12
156:23 181:9
190:4 192:5 194:9
199:6 201:18
202:1 203:6
225:24 228:1
244:7 257:24
264:7 279:16,17
279:18 280:9
283:22 286:10
307:17 331:18
368:15 369:11
370:24 377:10,13
377:18 378:4
381:24 412:4
415:2 428:16
453:3,24 454:8
456:6,8 463:12
**users** 378:25
380:12 462:14,18
**usually** 84:5 96:20
117:6 140:11
168:15 220:10

268:5 419:7
442:20
**utterly** 458:14

**v**

**v** 1:10
**vague** 366:24
**value** 117:14
121:1 124:20,23
125:6 126:6,16
242:10 243:10
**valued** 242:8
**values** 117:12
119:8,19,21 120:8
120:11,17,21
121:6,10,18,19,24
122:14,17,23
123:16,23 124:2
124:13 125:12,21
127:12 128:13
159:19 161:14
241:16,16,25
242:17,21 243:5,6
243:15
**varies** 88:22 140:2
**various** 127:7
163:20 200:8
221:12 228:3
431:22
**vary** 300:22
**varying** 42:13
**vehicle** 137:19
**vendor** 439:9,11
**venture** 250:14
**veritext** 6:12,22
475:1,7 478:1
**veritext.com.**
475:17
**vermin** 466:19
467:7,12
**versa** 194:17

**versus** 26:5 27:12
189:25 272:25
310:17 443:11,21
**viable** 79:8
**vice** 194:17
**video** 65:4,7
**videographer** 6:25
11:6 32:20,24
46:6 65:1 108:16
108:20 182:6,13
189:17,21 239:25
240:4 269:11,15
312:21,25 342:5,9
388:5,9 394:3
411:6,10,14
447:21 454:17,21
462:1,5 473:13
**videotaped** 1:16
**view** 28:5 102:21
117:21 118:18
363:19 364:2
377:8 398:6 406:1
**views** 16:17 22:25
330:3 405:20
471:13 472:18
**violence** 30:2,7
37:24 277:7
**virtual** 6:12,22
**vis** 135:19,19
197:19,19 406:3,3
**visiting** 97:7
**vitae** 8:4 45:16
**volume** 443:17
444:8
**volunteer** 73:13
73:23
**volunteered** 72:15
**vosburgh** 1:24
2:11 474:2,19
**vote** 168:23 242:7

**voted** 104:10
119:11 123:14
127:7 208:10
243:12,16

**w**

**w** 5:11
**wait** 108:11
312:10 329:17
408:21
**waiting** 71:9
125:15
**waived** 475:19
**wal** 5:14
**walgreens** 440:1
**walmart** 5:14 12:1
440:1
**walter** 20:9 298:10
391:5 394:2,4,6
395:2,19 396:7,16
396:22
**want** 16:1 21:20
32:13 35:2 40:19
41:3,7,11,25 56:19
57:21 59:16 60:15
72:3 80:8 89:19
91:9 93:24 99:14
101:11 108:10,11
109:6 111:17
125:3 148:14
151:20 164:13
182:3 218:23
220:16 239:23
245:19 249:6,21
249:23 250:1
259:22 264:16
267:5 268:9
270:11 275:7
292:11 299:11
311:6,25 312:5,5
312:13 320:22
322:6,10 326:22

329:18 330:12
337:21 338:2,14
338:25 341:12
345:6 347:15
348:11 361:19
363:4 382:2
395:11,16 409:7
412:10 417:20
419:22 427:17
433:8 438:8
445:14 449:14,24
459:11
**wanted** 67:20
69:25 94:7 191:15
241:22 252:7
264:12 271:25
275:11 276:1
278:14 279:15
291:14 295:3
310:4 371:12
376:7 419:1
421:13 422:7
448:19
**wants** 94:6 279:5
408:22
**warrant** 305:19
441:19
**washington** 4:6
5:9,18 6:9,19
**water** 290:4
328:23 329:5
445:8
**way** 58:7 73:3
75:7 93:20 94:6
123:17 133:22
168:10 218:16,19
220:10 222:7
223:24 240:21
248:19 265:11
287:3,9 309:8
325:13 326:17

330:3 337:5 352:2
352:13 355:2
386:4 396:20
398:25 467:5,6
474:13
**ways** 59:20 176:22
188:10 338:17
**wc.com** 4:9
**we've** 39:13 58:23
63:4 101:7 108:1
128:24 152:5,9
182:2 185:11,12
185:16 198:24
240:7 244:3
305:15 312:16
366:18 368:2
372:15 378:10
385:9 410:5
432:14
**website** 265:3,15
**weeds** 93:24
**week** 21:7 134:24
134:25 140:10
309:21 341:7
386:11 423:3
448:7
**weekly** 141:6
**weeks** 124:24
**weiskittel** 202:9
**weiskittle** 391:7
391:10,18 392:14
**welcome** 108:23
182:16 342:12
411:17 433:2
**welfare** 240:21,24
254:24 308:14
310:11
**wendy** 342:20
343:9,19 344:6,10
345:13 347:16
360:11

**went** 13:1 33:2
66:14 77:8 97:6
105:18 117:12,12
117:13,14 128:17
130:4 197:7
221:17 262:14
266:6,6 269:18
270:20,23 285:23
319:17
**whereof** 474:15
**white** 373:19
**wholesale** 438:25
**wholly** 444:4
**wilcox** 2:7
**williams** 4:4 11:23
**willing** 292:10
**window** 49:5
**winning** 129:2,15
**wish** 90:9
**witness** 3:4 7:3
12:16 13:21 14:16
15:2 16:20 17:9
17:15 18:25 20:7
20:24 21:10,23
22:3,20 23:3,13
24:4 25:13 26:7
28:11 29:11 30:13
31:11 32:9 33:4
34:13 37:8,15
39:5 40:19,25
41:11,18,25 42:9
44:18 49:18 51:13
51:19,24 52:3,8,19
53:10,21 55:17,19
55:23 60:17 75:22
80:15 84:24 85:16
87:5 88:16,22
89:14 95:23
100:21 102:25
103:20 104:21
105:20 106:12

**[witness - works]**

| | | | |
|---|---|---|---|
| 108:12 110:18 | 250:1,17 251:12 | 379:20 380:8,18 | **wonder** 255:23 |
| 111:8 112:16 | 252:3 254:15 | 381:6,20 382:5,18 | 374:5 |
| 113:4 114:3,12,22 | 258:2 259:4 | 382:25 383:12 | **wonderful** 386:14 |
| 115:19 116:4,19 | 261:11 262:17 | 384:12 385:1 | **wondering** 28:7 |
| 118:3,15,24 | 267:5 272:19 | 386:9,24 387:8 | 113:25 327:9 |
| 120:10 121:5,12 | 273:2,14 274:18 | 388:23 389:7,23 | **word** 211:23 327:8 |
| 122:2 123:4,11 | 275:24 278:19 | 390:20 394:23 | **words** 54:12 104:4 |
| 124:7,22 126:9 | 280:13 282:6 | 396:5 398:16 | 148:17 156:9 |
| 131:5 132:3 133:8 | 284:2 285:6,12 | 400:9,24 403:24 | 360:25 361:15 |
| 133:25 134:15 | 286:12 287:8 | 406:6 408:12 | **work** 44:12 45:8 |
| 136:1,11 139:5 | 288:18 290:3,19 | 410:16 411:1,24 | 51:21 60:4 76:22 |
| 140:2,14,21 | 292:6 293:1,16 | 412:7 413:10,22 | 77:16,21 87:17 |
| 141:11,25 142:9 | 294:1,23 295:5 | 414:4,13 415:4 | 90:7 104:12 |
| 143:15 145:21 | 297:24 298:19 | 416:11 417:10,20 | 106:22 153:13 |
| 147:8 151:20 | 303:19 304:4 | 419:4,18 423:15 | 168:7 187:24 |
| 154:19 155:9 | 306:12 307:21 | 423:23 424:5 | 198:4 243:3 |
| 158:23 160:13 | 310:4 315:25 | 425:15 428:18 | 260:16 261:4,17 |
| 164:13 167:14 | 317:1,9 318:8 | 429:2 430:2,12 | 261:24 262:14 |
| 169:8 170:13 | 320:11 321:4,20 | 433:18,25 435:14 | 268:13 272:17 |
| 171:15 173:7 | 324:10,24 325:20 | 435:25 436:9 | 322:21 323:16 |
| 174:14 175:17 | 326:7,21 327:6,21 | 440:4 443:4 444:4 | 333:4 340:22 |
| 176:3,13,24 | 328:3,11 330:7,22 | 445:10,19 446:10 | 372:19 386:11 |
| 177:21 178:4,14 | 332:7 334:3,25 | 447:2,9 449:3,10 | 404:10 |
| 179:7,19 180:2,7 | 336:23 337:14 | 449:20 450:5,9,16 | **worked** 73:9 99:7 |
| 181:8 183:5,13 | 339:21 340:8 | 454:1,11 455:8 | 322:23 360:4 |
| 188:9 190:3,17,21 | 341:1 343:24 | 458:23 460:21 | 453:15 |
| 191:4,21 192:3 | 344:6,19,25 | 461:4,12,19 | **worker** 321:21 |
| 194:12 196:25 | 345:20 346:17 | 462:17,25 463:6 | **workers** 101:22 |
| 197:22 198:14 | 347:15 348:6 | 463:14,22 464:5 | 232:16,18 304:24 |
| 199:8 200:5,12 | 349:8 350:21 | 465:10,25 466:9 | 305:25 319:21 |
| 202:3 203:12 | 351:12 352:6,17 | 467:11,19 468:13 | 398:2 404:9 |
| 205:20 207:23 | 354:4 356:18 | 468:18 469:9 | **working** 75:7,23 |
| 208:6,19 209:8,19 | 357:3 361:9 362:3 | 470:1 471:4,10,20 | 79:10 80:8 173:23 |
| 214:10,20 215:9 | 363:23 364:6 | 472:14,20,25 | 356:3 426:13 |
| 215:23 219:12 | 365:10,18 366:1 | 474:9,15 475:8,11 | **workload** 296:18 |
| 221:6,8 222:2,17 | 367:1,8,21,25 | 476:1,4,11 477:1,4 | **works** 16:13 52:11 |
| 223:4,15 228:5,16 | 368:11,18 369:3 | 477:15 | 228:18,21 333:9 |
| 237:10,18,24 | 369:14,18,22 | **witnesses** 58:23 | 333:10,11 346:4,6 |
| 240:14 241:12 | 370:1,5,9,13,19 | 232:7,8 275:8 | 372:16 401:19 |
| 246:21 247:5 | 371:2,9 374:20 | **witness'** 475:14 | 423:3 465:12 |
| 248:6,17 249:11 | 376:9 377:12 | | |

**[world - zero]**

| world | x | 375:10,15 376:13 | z |
|---|---|---|---|
| **world** 111:6 | **x** | 397:2 398:10 | **z** |
| 243:20 | **x** 7:1 220:17 | 403:7 404:14 | **zero** 58:16 153:22 |
| **worried** 395:24 | 302:17 | 420:13 434:13 | 153:23 437:16 |

**world** 111:6
243:20
**worried** 395:24
396:5 400:3
**worry** 63:19
**worth** 101:21
**wrangle** 193:16
**wrap** 108:8
**wraparound**
307:23
**write** 111:15
188:13 323:24
325:11 331:22
373:25 379:3,9
393:11 394:9
400:2 402:16
415:20 416:21
424:16,22 437:22
437:24 438:7,8,14
**writes** 323:22
328:7,9 331:3,11
333:12 334:5
426:7
**writing** 265:17
393:9 402:23
437:17
**written** 111:17
163:2 358:14
361:10 362:4
363:7 399:16
410:23 422:25
**wrong** 125:9
391:19 434:19,21
452:15
**wrote** 314:9,11
379:18 393:3,7
399:8 400:1
401:16 438:4

**x**

**x** 7:1 220:17
302:17

**y**

**y** 220:17
**yeah** 15:5 58:9
108:14 136:1
139:9 161:22
222:15 233:4
243:24 263:15
362:20,24 411:9
422:7,10 427:19
431:14 433:2,7
434:22
**year** 24:13,13,15
91:8 92:19,25
93:14,15 98:18
117:9 118:8 119:1
119:2,2 128:25,25
129:20,24,25
131:14 134:25
140:3 142:15
144:3 147:10,18
147:21,24 148:1
149:7,12,12 151:3
164:23,24 175:9
199:9 204:20
233:22 236:2,4,14
236:16,17 241:7
242:10 260:1
267:10 270:5
271:18 272:13,16
306:6,15 310:21
311:21 316:15
318:9,18,21 319:4
319:8 350:13
353:16 356:9
357:19 358:13,15
358:18 367:12,19
368:6,16 370:21

375:10,15 376:13
397:2 398:10
403:7 404:14
420:13 434:13
437:12,19 442:22
**year's** 354:19
**years** 24:16 33:24
43:10,13 69:14,18
80:17 109:20
113:16 115:4,5
116:20 117:11,21
119:3 120:15,19
121:20 122:20,22
125:22 127:22
128:15,20 129:8
129:21 131:2,10
132:16 133:13
149:8 151:10,23
152:1 156:19
157:4 159:21
160:5,9 173:24
176:7 180:21
183:9,25 184:4
185:17 192:3,8,9
198:2 235:17
236:10,20 237:8
241:10,13 262:25
265:14 268:14
270:6 274:3,12
290:10 293:9
302:6,9 303:13
306:10,18 309:1
318:6,10 323:13
334:8 335:2,14
357:16 392:25
398:10 408:2
469:11
**yesterday** 42:18
**youth** 301:17
**yvonne** 170:20
171:15,16

**z**

**zero** 58:16 153:22
153:23 437:16

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.